# EIGHTIETH DAY

---

### FRIDAY, MAY 27, 2005

---

### PROCEEDINGS

---

The Senate met at 12:00 noon pursuant to adjournment and was called to order by Senator Armbrister.

The roll was called and the following Senators were present:  Armbrister, Averitt, Barrientos, Brimer, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hinojosa, Jackson, Janek, Lindsay, Lucio, Madla, Nelson, Ogden, Seliger, Shapiro, Shapleigh, Staples, Van de Putte, Wentworth, Whitmire, Williams, Zaffirini.

Absent-excused:  Carona, West.

The Presiding Officer announced that a quorum of the Senate was present.

The Reverend Ron Smith, Saint David's Episcopal Church, Austin, offered the invocation as follows:

> May God's wisdom and grace be given to the Members of this body so that they may, through their deliberations and actions, promote the welfare of all the people of Texas.  May the Senators of our state enjoy the respect and affection of their colleagues and the gratitude of their fellow citizens, and, finally, when they return to their homes after the session is ended, may they do so with a sense that they have done their best, faithful service. Amen.

Senator Whitmire moved that the reading of the Journal of the proceedings of yesterday be dispensed with and the Journal be approved as printed.

The motion prevailed without objection.

### LEAVES OF ABSENCE

On motion of Senator Whitmire, Senator Carona was granted leave of absence for today on account of important business.

On motion of Senator Whitmire, Senator West was granted leave of absence for today on account of important business.

## MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
May 27, 2005

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS PASSED THE FOLLOWING MEASURES:

**HCR 189,** In memory of J. E. "Gene" Buster of Paris.

**HCR 190,** In memory of Floyd Weger of Paris.

**HCR 194,** Designating July 2005 as Lawn Mower Safety Awareness Month.

**HCR 205,** In memory of Stanley and Jake Avery of Sulphur Springs.

**HCR 214,** Recognizing the 2005 and 2006 appointments of State Poet Laureate, State Musician, and State Visual Artists.

**HCR 225,** Recalling H.B. 872 from the Secretary of the Senate.

**HCR 226,** In memory of Billy T. Burney of Sulphur Springs.

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

## GUEST PRESENTED

Senator Lucio was recognized and introduced to the Senate Commissioner Arturo Q. "Tury" Duran of the United States Section of the International Boundary and Water Commission.

The Senate welcomed its guest.

## PHYSICIAN OF THE DAY

Senator Shapiro was recognized and presented Dr. Christopher Crow of Plano as the Physician of the Day.

The Senate welcomed Dr. Crow and thanked him for his participation in the Physician of the Day program sponsored by the Texas Academy of Family Physicians.

## HOUSE CONCURRENT RESOLUTION 214

The Presiding Officer laid before the Senate the following resolution:

WHEREAS, The Texas Commission on the Arts has announced the 2005 and 2006 appointments for the positions of State Poet Laureate, State Musician, State Two-Dimensional Artist, and State Three-Dimensional Artist; and

WHEREAS, Honorees are chosen for the exceptional quality of their work and for their outstanding commitment to the arts in Texas; the 2005 appointees are Texas Poet Laureate Alan Birkelbach of Plano, Texas State Musician Johnny Gimble of Tyler, Texas State Two-Dimensional Artist Kathy Vargas of San Antonio, and Texas State Three-Dimensional Artist Sharon Kopriva of Houston; and

WHEREAS, The 2006 appointees include Texas Poet Laureate Red Steagall of Fort Worth, Texas State Musician Billy Joe Shaver of Waco, Texas State Two-Dimensional Artist George Boutwell of Bosque, and Texas State Three-Dimensional Artist James Surls of Athens; and

WHEREAS, Nominees for these prestigious positions must either be native Texans or have resided in the state for at least five years; in addition, they must have received critical reviews in state, regional, or national publications, and they must have achieved recognition for high levels of excellence and success in their respective disciplines; and

WHEREAS, To be considered for the position of State Poet Laureate, nominees must have compiled a substantial body of work, including at least one publication that is not a self-published or vanity-press release; State Musician nominees must have produced a substantial body of work, including at least two nationally available records, or taught music for at least 20 years in a formal classroom, or they must receive the majority of their income from musical endeavors; State Visual Artist nominees must work in two- or three-dimensional art mediums, must have been represented in at least one one-person show, and must have an extensive history of exhibiting in recognized museums and galleries; and

WHEREAS, Nominations are made by Texas citizens and reviewed by the Texas Commission on the Arts, which develops a list of finalists; the Texas Poet Laureate, State Musician, and State Artist Committee, composed of members appointed by the governor, lieutenant governor, and speaker of the house of representatives, makes the final selections; and

WHEREAS, The men and women who have been selected to hold these distinguished posts for the next two years have contributed magnificently to the vibrant cultural life of the Lone Star State, and it is indeed a pleasure to recognize them at this time; now, therefore, be it

RESOLVED, That the 79th Legislature of the State of Texas hereby honor the 2005 and 2006 appointees to the positions of State Poet Laureate, State Musician, State Two-Dimensional Artist, and State Three-Dimensional Artist and extend to them sincere best wishes for continued success.

SHAPIRO

**HCR 214** was read.

On motion of Senator Shapiro and by unanimous consent, the resolution was considered immediately and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of the resolution except as follows:

Absent-excused: Carona, West.

## GUESTS PRESENTED

Senator Shapiro was recognized and introduced to the Senate Kathy Vargas of San Antonio, 2005 Texas State Two-Dimensional Artist; Sharon Kopriva of Houston, 2005 Texas State Three-Dimensional Artist; Alan Birkelbach of Plano, 2005 Texas Poet Laureate; and Red Steagall of Fort Worth, 2006 Texas Poet Laureate.

The Senate welcomed its guests.

## SENATE RESOLUTION 971

Senator Ellis offered the following resolution:

WHEREAS, The Senate of the State of Texas is pleased to recognize the Houston Fire Museum, which is now making plans for the construction of the Houston Fire Museum Education Center; and

WHEREAS, Dedicated to preserving and displaying artifacts and antiques of the fire service, the Houston Fire Museum educates the citizens of Houston and the surrounding communities about the history and evolution of fire service and the importance of fire safety; and

WHEREAS, Houston is widely recognized as a leader in firefighting techniques and technology and emergency medical services, and the Houston Fire Museum plays an important role in that success through its easy access to comprehensive safety education and information; and

WHEREAS, With the new education center, the museum will expand programming and unify citizens, firefighters, educators, and community leaders; vital lifesaving techniques will be demonstrated, information will be shared, and children will be shown the practical application of math, science, chemistry, and physics in firefighting and fire prevention; and

WHEREAS, The Fire Museum Education Center will include a memorial park incorporating pieces of steel from the World Trade Center into the design to pay tribute to the lives lost in the tragedy on September 11, 2001; now, therefore, be it

RESOLVED, That the Senate of the State of Texas, 79th Legislature, hereby commend the Houston Fire Museum for its outstanding work in educating Texans about the history and importance of fire safety and its ongoing commitment to the future; and, be it further

RESOLVED, That a copy of this Resolution be prepared for the Houston Fire Museum as an expression of esteem from the Texas Senate.

ELLIS
GALLEGOS

**SR 971** was again read.

The resolution was previously adopted on Friday, May 20, 2005.

## GUESTS PRESENTED

Senator Ellis, joined by Senator Gallegos, was recognized and introduced to the Senate representatives of the Houston Fire Museum: Emily Ponte, Executive Director, and Mary Lou Henry, President of the Board of Trustees.

The Senate welcomed its guests.

### CONFERENCE COMMITTEE ON HOUSE BILL 2510

Senator Jackson called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2510** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer, Senator Armbrister in Chair, asked if there were any motions to instruct the conference committee on **HB 2510** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Jackson, Chair; Estes, Fraser, Armbrister, and Madla.

### CONFERENCE COMMITTEE ON HOUSE BILL 3526

Senator Ellis called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 3526** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 3526** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Ellis, Chair; Madla, Whitmire, Wentworth, and Lindsay.

### CONFERENCE COMMITTEE ON HOUSE BILL 2604

Senator Van de Putte called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2604** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2604** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Van de Putte, Chair; Seliger, Fraser, Shapleigh, and Estes.

### CONFERENCE COMMITTEE ON HOUSE BILL 2421

Senator Zaffirini called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2421** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2421** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Zaffirini, Chair; Carona, Fraser, Shapiro, and West.

### CONFERENCE COMMITTEE ON HOUSE BILL 1855

Senator Ellis called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 1855** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 1855** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Ellis, Chair; Fraser, Van de Putte, Hinojosa, and Harris.

### CONFERENCE COMMITTEE ON HOUSE BILL 1830

Senator Ellis called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 1830** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 1830** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Ellis, Chair; Madla, Whitmire, Lindsay, and Wentworth.

### CONFERENCE COMMITTEE ON HOUSE BILL 1690

Senator Staples, on behalf of Senator West, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 1690** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 1690** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators West, Chair; Duncan, Harris, Ellis, and Carona.

### SENATE BILL 444 WITH HOUSE AMENDMENT

Senator Staples called **SB 444** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 444** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to registration fee credits for the owners of certain dry cleaning facilities that do not participate in the dry cleaning facility release fund.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subsection (b), Section 374.104, Health and Safety Code, is amended to read as follows:

(b)  An option not to participate must be filed on or before February 28, 2006 [January 1, 2004].  An owner may not file an option not to participate after September 1, 2005, unless the owner was:

(1)  the owner of the dry cleaning facility or drop station on January 1, 2004; and

(2)  eligible to file the option on or before January 1, 2004, and inadvertently failed to file before that date.

SECTION 2. An owner of a dry cleaning facility who files an option not to participate in the dry cleaning facility release fund on or before February 28, 2006, and whose facility is designated as nonparticipating by the Texas Commission on Environmental Quality under Section 374.104, Health and Safety Code, as amended by this Act, is entitled to a credit against future registration fees under Section 374.102, Health and Safety Code, to the extent that a registration fee paid in 2004 or 2005 exceeded the amount due for a nonparticipating dry cleaning facility.

SECTION 3. Not later than February 28, 2006, the Texas Commission on Environmental Quality shall adopt rules governing applications to register a dry cleaning facility as nonparticipating in the dry cleaning facility release fund under Section 374.104, Health and Safety Code, as amended by this Act.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Staples moved that the Senate do not concur in the House amendment, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 444** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Staples, Chair; Jackson, Eltife, Deuell, and Armbrister.

### CONFERENCE COMMITTEE ON HOUSE BILL 836

Senator Williams, on behalf of Senator Ogden, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 836** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 836** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators Ogden, Chair; Deuell, Nelson, Gallegos, and Armbrister.

### SENATE BILL 567 WITH HOUSE AMENDMENTS

Senator Deuell called **SB 567** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 1**

Amend **SB 567** on page 1, line 11, by striking "18-point" and substituting "24-point [18-point]".

**Floor Amendment No. 2**

Amend **SB 567** as follows:

(1)  In SECTION 1 of the bill, strike the prefatory language (committee printing, page 1, line 7 and 8), and substitute the following:

SECTION 1.  Subsections (b) and (c), Section 26.06, Tax Code, are amended to read as follows:

(2)  In SECTION 1 of the bill, immediately following amended Subsection (b), Section 26.06, Tax Code (committee printing, page 3, between lines 23 and 24), insert the following:

(c)  The notice must [may] be delivered by mail to each property owner in the unit and  [, or it may be] published in a newspaper.  The [If the] notice [is] published in a newspaper [, it] may not be in the part of the paper in which legal notices and classified advertisements appear.

(3)  In SECTION 2 of the bill, strike the prefatory language (committee printing, page 3, lines 24 and 25), and substitute the following:

SECTION 2.  Subsections (b) and (c), Section 44.004, Education Code, are amended to read as follows:

(b)  The president shall provide for the mailing of notice of the budget and proposed tax rate meeting to each property owner in the school district and for the publication of notice of the budget and proposed tax rate meeting in a daily, weekly, or biweekly newspaper published in the district.  If no daily, weekly, or biweekly newspaper is published in the district, the president shall provide for the publication of notice in at least one newspaper of general circulation in the county in which the district's central administrative office is located.  Notice under this subsection shall be published not earlier than the 30th day or later than the 10th day before the date of the hearing.  The notice mailed to property owners must contain all the information required by Subsection (c).

(4)  In SECTION 2 of the bill, amended Subsection (c), Section 44.004, Education Code (committee printing, page 3, line 26), between "The" and "notice", insert "published".

**Floor Amendment No. 3**

Amend **SB 567** on page 4, on line 25 between ";" and "and" by adding a new Subsections (C) and (D) to read as follows and renumbering subsequent subsections:

"(C)  the growth or decrease in the total value of property;

"(D)  the growth or decrease in the total estimated population;

"(E)  the growth or decrease in the estimated number of households living with a household income under 125% of the federal poverty guidelines;

"(F)  the growth or decrease in the estimated number of children enrolled in the school district who qualify for free breakfasts and/or free lunches;

"(G)  the growth or decrease in the estimated number of children with special needs;

"(H)  the growth or decrease in the number of miles required to transport students to and from school;

"(I)  the growth or decrease in the number and cost of new textbooks and technological hardware;"

**Floor Amendment No. 4**

Amend **SB 567** as follows:

(1)  On page 2, line 6, between "(A)" and "the", insert "a section entitled "Comparison of Proposed Budget with Last Year's Budget, which must show".

(2)  On page 2, line 13, between "(B)" and "the", insert "a section entitled "Total Appraised Value and Total Taxable Value, which must show".

**Floor Amendment No. 1 on Third Reading**

Amend **SB 567** on third reading as follows by striking Subsection (c), Section 26.06, Tax Code, as amended by second reading Floor Amendment No. 2 by Riddle (page 1, lines 11-15 of the second reading amendment), and substitute the following:

(c)  Except as provided by this subsection, the [The] notice may be delivered by mail to each property owner in the unit, or it may be published in a newspaper. If the notice is published in a newspaper, it may not be in the part of the paper in which legal notices and classified advertisements appear. In a county with a population of

three million or more, the notice must be delivered by mail to each property owner in the unit and published in a newspaper, and the notice published in a newspaper may not be in the part of the paper in which legal notices and classified advertisements appear.

**Floor Amendment No. 2 on Third Reading**

Amend **SB 567** on third reading by striking adopted Floor Amendment No. 2 to the bill, by Riddle.

**Floor Amendment No. 3 on Third Reading**

Amend **SB 567** on third reading as follows:

(1)  In Section 1 of the bill, amended Section 26.06(b)(2), Tax Code, immediately following added Paragraph (B), add the following paragraph and redesignate subsequent paragraphs accordingly:

(C)  the total amount of the outstanding and unpaid bonded indebtedness of the taxing unit;

(2)  In Section 2 of the bill, amended Section 44.004(c), Education Code, immediately following added Subdivision (3), add the following subdivision and renumber subsequent subdivisions accordingly:

(4)  contain a statement of the total amount of the outstanding and unpaid bonded indebtedness of the school district;

The amendments were read.

Senator Deuell moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 567** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators Deuell, Chair; Seliger, Janek, Staples, and Madla.

### SENATE BILL 1188 WITH HOUSE AMENDMENTS

Senator Nelson called **SB 1188** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 1188** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the medical assistance program and the provision of related services.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  COMMUNITY COLLABORATION.  Subchapter A, Chapter 531, Government Code, is amended by adding Section 531.020 to read as follows:

Sec. 531.020.  OFFICE OF COMMUNITY COLLABORATION. The executive commissioner shall establish within the commission an office of community collaboration. The office is responsible for:

(1)  collaborating with community, state, and federal stakeholders to improve the elements of the health care system that are involved in the delivery of Medicaid services; and

(2)  sharing with Medicaid providers, including hospitals, any best practices, resources, or other information regarding improvements to the health care system.

SECTION 2. MEDICAID FINANCING. (a) Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.02113 to read as follows:

Sec. 531.02113.  OPTIMIZATION OF MEDICAID FINANCING. The commission shall ensure that the Medicaid finance system is optimized to:

(1)  maximize the state's receipt of federal funds;

(2)  create incentives for providers to use preventive care;

(3)  increase and retain providers in the system to maintain an adequate provider network;

(4)  more accurately reflect the costs borne by providers; and

(5)  encourage the improvement of the quality of care.

(b)  Section 32.042, Human Resources Code, is amended by amending Subsections (a), (b), (d), and (e) and adding Subsection (b-1) to read as follows:

(a)  An insurer shall maintain a file system that contains:

(1)  the name, address, including claim submission address, group policy number, employer's mailing address, social security number, and date of birth of each enrollee, beneficiary, subscriber, or policyholder covered by the insurer; and

(2)  the name, address, including claim submission address, and date of birth of each dependent of each enrollee, beneficiary, subscriber, or policyholder covered by the insurer.

(b)  The state's Medicaid third-party recovery division shall identify state medical assistance recipients who have third-party health coverage or insurance as provided by this subsection. The department may:

(1)  [shall] provide to an insurer Medicaid data tapes that identify medical assistance recipients and request that the insurer identify each enrollee, beneficiary, subscriber, or policyholder of the insurer whose name also appears on the Medicaid data tape; or

(2)  request that an insurer provide to the department identifying information for each enrollee, beneficiary, subscriber, or policyholder of the insurer.

(b-1)  An insurer from which the department requests information under Subsection (b) shall provide that information, except that the [An insurer shall comply with a request under this subsection not later than the 60th day after the date the request was made.  An] insurer is only required [under this subsection] to provide the department with the information maintained under Subsection (a) by the insurer or made available to the insurer from the plan. A plan administrator is subject to Subsection (b) and shall provide information under that [this] subsection to the extent the information [described in this subsection] is made available to the plan administrator from the insurer or plan.

(d) An insurer shall provide the information required under Subsection (b)(1) [this section] only if the department certifies that the identified individuals are applicants for or recipients of services under Medicaid or are legally responsible for an applicant for or recipient of Medicaid services.

(e) The department shall enter into an agreement to reimburse an insurer or plan administrator for necessary and reasonable costs incurred in providing information requested under Subsection (b)(1), not to exceed $5,000 for each data match made under that subdivision. If the department makes a data match using information provided under Subsection (b)(2), the department shall reimburse the insurer or plan administrator for reasonable administrative expenses incurred in providing the information. The reimbursement for information under Subsection (b)(2) may not exceed $5,000 for initially producing information with respect to a person, or $200 for each subsequent production of information with respect to the person [this section]. The department may enter into an agreement with an insurer or plan administrator [insurers] that provides procedures for requesting and providing information under this section. An agreement under this subsection may not be inconsistent with any law relating to the confidentiality or privacy of personal information or medical records. The procedures agreed to under this subsection must state the time and manner the procedures take effect.

(c) Subchapter B, Chapter 32, Human Resources Code, is amended by adding Section 32.0424 to read as follows:

Sec. 32.0424. CLAIMS FOR REIMBURSEMENT TO MEDICAL ASSISTANCE PROGRAM. (a) In this section, "insurer" and "plan administrator" have the meanings assigned by Section 32.042.

(b) An insurer or plan administrator may not apply a point of sale, timely filing, or out-of-network limitation, restriction, or provision, or any other plan limitation, restriction, or provision, that results in the rejection or denial of a claim by the medical assistance program for reimbursement as authorized by federal or state law for a health care benefit paid by the program.

(c) An insurer or plan administrator that may have primary liability with respect to a health care benefit provided under the medical assistance program to a person may not impose on the department or a designee of the department any kind of fee, charge, or expense to process a claim by the program for reimbursement for the benefit.

(d) The Health and Human Services Commission shall:

(1) examine the possibility of using existing state funds, including existing state funds for the county indigent health care program and the area health education centers in this state, on health-related programs to maximize receipt of additional federal Medicaid funds;

(2) subject to availability of funds, increase Medicaid reimbursement rates for hospitals and physicians to better align those rates with Medicare and private-pay reimbursement rates;

(3) examine the possibility of a program under which intergovernmental transfers are used to support graduate medical education in support of the Medicaid program and, if cost-effective, implement that program;

(4) examine the possibility of a program that includes comprehensive outpatient rehabilitation facilities in the prospective payment systems methodology and, if cost-effective, implement that program;

(5) examine the possibility of developing Medicaid waivers for intergovernmental transfers from local entities similar to those used in the demonstration projects under Chapter 534, Government Code;

(6) examine the possibility of developing a Medicaid waiver program to allow local governmental entities as well as private employers to buy into the Medicaid or children's health insurance programs and, if cost-effective, implement that program;

(7) examine the possibility of using employer contributions and donations to expand eligibility and funding for the Medicaid and children's health insurance programs and, if cost-effective, implement that option; and

(8) examine the possibility of providing a tax incentive in the form of an ad valorem, franchise, or sales tax credit for employers to enable those employers to pay the state's portion of the premiums for Medicaid or children's health insurance for employees whose family income does not exceed 200 percent of the federal poverty limit and, if cost-effective, implement that option.

(e) If the Health and Human Services Commission chooses to increase reimbursement rates for any providers under Subsection (d)(2) of this section, the commission shall give priority to providers serving medically underserved areas, those who treat a high volume of Medicaid patients, and those who provide care that is an alternative to care in an emergency department.

SECTION 3. COLLECTION AND ANALYSIS OF INFORMATION. (a) Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.02141 to read as follows:

Sec. 531.02141. MEDICAID INFORMATION COLLECTION AND ANALYSIS. (a) The commission shall make every effort to improve data analysis and integrate available information associated with the Medicaid program. The commission shall use the decision support system in the commission's center for strategic decision support for this purpose and shall modify or redesign the system to allow for the data collected by the Medicaid program to be used more systematically and effectively for Medicaid program evaluation and policy development. The commission shall develop or redesign the system as necessary to ensure that the system:

(1) incorporates program enrollment, utilization, and provider data that are currently collected;

(2) allows data manipulation and quick analysis to address a large variety of questions concerning enrollment and utilization patterns and trends within the program;

(3) is able to obtain consistent and accurate answers to questions;

(4) allows for analysis of multiple issues within the program to determine whether any programmatic or policy issues overlap or are in conflict;

(5) includes predefined data reports on utilization of high-cost services that allow program management to analyze and determine the reasons for an increase or decrease in utilization and immediately proceed with policy changes, if appropriate; and

(6) includes any encounter data with respect to recipients that a managed care organization that contracts with the commission under Chapter 533 receives from a health care provider under the organization's provider network.

(b) The commission shall ensure that all Medicaid data sets created or identified by the decision support system are made available on the Internet to the extent not prohibited by federal or state laws regarding medical privacy or security. If privacy concerns exist or arise with respect to making the data sets available on the Internet, the system and the commission shall make every effort to make the data available through that means either by removing information by which particular individuals may be identified or by aggregating the data in a manner so that individual records cannot be associated with particular individuals.

(b) The Health and Human Services Commission shall allow for sufficient opportunities for stakeholder input in the modification or redesign of the decision support system in the commission's center for strategic decision support as required by Section 531.02141, Government Code, as added by this section. The commission may provide these opportunities through:

(1) existing mechanisms, such as regional advisory committees or public forums; and

(2) meetings involving state and local agencies and other entities involved in the planning, management, or delivery of health and human services in this state.

SECTION 4. ADMINISTRATIVE PROCESSES AND AUDIT REQUIREMENTS. (a) Subchapter B, Chapter 531, Government Code, is amended by adding Sections 531.02411 and 531.02412 to read as follows:

Sec. 531.02411. STREAMLINING ADMINISTRATIVE PROCESSES. The commission shall make every effort using the commission's existing resources to reduce the paperwork and other administrative burdens placed on Medicaid recipients and providers and other participants in the Medicaid program and shall use technology and efficient business practices to decrease those burdens. In addition, the commission shall make every effort to improve the business practices associated with the administration of the Medicaid program by any method the commission determines is cost-effective, including:

(1) expanding the utilization of the electronic claims payment system;

(2) developing an Internet portal system for prior authorization requests;

(3) encouraging Medicaid providers to submit their program participation applications electronically;

(4) ensuring that the Medicaid provider application is easy to locate on the Internet so that providers may conveniently apply to the program;

(5) working with federal partners to take advantage of every opportunity to maximize additional federal funding for technology in the Medicaid program; and

(6) encouraging the increased use of medical technology by providers, including increasing their use of:

    (A)  electronic communications between patients and their physicians or other health care providers;

    (B)  electronic prescribing tools that provide up-to-date payer formulary information at the time a physician or other health care practitioner writes a prescription and that support the electronic transmission of a prescription;

    (C)  ambulatory computerized order entry systems that facilitate physician and other health care practitioner orders at the point of care for medications and laboratory and radiological tests;

    (D)  inpatient computerized order entry systems to reduce errors, improve health care quality, and lower costs in a hospital setting;

    (E)  regional data-sharing to coordinate patient care across a community for patients who are treated by multiple providers; and

    (F)  electronic intensive care unit technology to allow physicians to fully monitor hospital patients remotely.

    Sec. 531.02412.  SERVICE DELIVERY AUDIT MECHANISMS. (a)  The commission shall make every effort to ensure the integrity of the Medicaid program. To ensure that integrity, the commission shall:

    (1)  perform risk assessments of every element of the Medicaid program and audit those elements of the program that are determined to present the greatest risks;

    (2)  ensure that sufficient oversight is in place for the Medicaid medical transportation program;

    (3)  ensure that a quality review assessment of the Medicaid medical transportation program occurs; and

    (4)  evaluate the Medicaid program with respect to use of the metrics developed through the Texas Health Steps performance improvement plan to guide changes and improvements to the program.

    (b)  This section does not affect the duty of the Texas Department of Transportation to manage the delivery of transportation services, including the delivery of transportation services for clients of health and human services programs.

    (b)  To further encourage the use of medical technology by providers under the Medicaid program, the Health and Human Services Commission may enter into a written agreement with a manufacturer, as defined by Section 531.070, Government Code, to accept as a program benefit in lieu of supplemental rebates, as defined by Section 531.070, Government Code, the manufacturer's operation of a pilot program under which the manufacturer supplies those providers with a graphical electronic medical record system and evaluates the benefits and cost-effectiveness of the system. The program must be operated in a manner that is acceptable to the commission and must be designed to test the benefits and cost-effectiveness on a sufficiently large scale. The manufacturer shall report the results of the program, including an analysis of the program's benefits and cost-effectiveness, to the commission. The commission shall report those results to the 80th Legislature not later than January 15, 2007.

    (c)  The Health and Human Services Commission shall examine options for standardizing and simplifying the interaction between the Medicaid system and providers regardless of the service delivery system through which a provider provides services and, using existing resources, implement any options that are anticipated to increase the quality of care and contain costs.

SECTION 5. LONG-TERM CARE SERVICES. (a)  Subchapter B, Chapter 531, Government Code, is amended by adding Sections 531.083 and 531.084 to read as follows:

Sec. 531.083.  MEDICAID LONG-TERM CARE SYSTEM. The commission shall ensure that the Medicaid long-term care system provides the broadest array of choices possible for recipients while ensuring that the services are delivered in a manner that is cost-effective and makes the best use of available funds. The commission shall also make every effort to improve the quality of care for recipients of Medicaid long-term care services by:

(1) evaluating the need for expanding the provider base for consumer-directed services and, if the commission identifies a demand for that expansion, encouraging area agencies on aging, independent living centers, and other potential long-term care providers to become providers through contracts with the Department of Aging and Disability Services;

(2) ensuring that all recipients who reside in a nursing facility are provided information about end-of-life care options and the importance of planning for end-of-life care; and

(3) developing policies to encourage a recipient who resides in a nursing facility to receive treatment at that facility whenever possible, while ensuring that the recipient receives an appropriate continuum of care.

Sec. 531.084.  MEDICAID LONG-TERM CARE COST CONTAINMENT STRATEGIES. (a)  The commission shall make every effort to achieve cost efficiencies within the Medicaid long-term care program. To achieve those efficiencies, the commission shall:

(1) establish a fee schedule for reimbursable incurred medical expenses for dental services controlled in long-term care facilities;

(2) implement a fee schedule for reimbursable incurred medical expenses for durable medical equipment in nursing facilities and ICF-MR facilities;

(3) implement a durable medical equipment fee schedule action plan;

(4) establish a system for private contractors to secure and coordinate the collection of Medicare funds for recipients who are dually eligible for Medicare and Medicaid;

(5) create additional partnerships with pharmaceutical companies to obtain discounted prescription drugs for Medicaid recipients; and

(6) develop and implement a system for auditing the Medicaid hospice care system that provides services in long-term care facilities to ensure correct billing for pharmaceuticals.

(b) The executive commissioner and the commissioner of aging and disability services shall jointly appoint persons to serve on a work group to assist the commission in developing the fee schedule required by Subsection (a)(1). The work group must consist of providers of long-term care services, including dentists and long-term care advocates.

(c) In developing the fee schedule required by Subsection (a)(1), the commission shall consider:

(1) the need to ensure access to dental services for residents of long-term care facilities who are unable to travel to a dental office to obtain care;

(2) the most recent Comprehensive Fee Report published by the National Dental Advisory Service;

(3) the difficulty of providing dental services in long-term care facilities;

(4) the complexity of treating medically compromised patients; and

(5) time-related and travel-related costs incurred by dentists providing dental services in long-term care facilities.

(d) The commission shall annually update the fee schedule required by Subsection (a)(1).

(b) The Health and Human Services Commission shall examine:

(1) the possibility of implementing a program to expand Medicaid home health benefits to include speech pathology services, intravenous therapy, and chemotherapy treatments and, if cost-effective, implement that program;

(2) the possibility of implementing a program to provide respite and other support services to individuals providing daily assistance to persons with Alzheimer's disease or dementia to reduce caregiver burnout and, if cost-effective, implement that program;

(3) the possibility of implementing a program to offer services through state schools to recipients who are living in the community and a program to use funding for community-based services to pay for the services from the state schools and, if cost-effective, implement those programs;

(4) in conjunction with the Department of Aging and Disability Services, the possibility of implementing a program to simplify the administrative procedures for regulating nursing facilities and, if cost-effective, implement that program; and

(5) the possibility of using fee schedules, prior approval processes, and alternative service delivery options to ensure appropriate utilization and payment for Medicaid services and, if cost-effective, implement those schedules, processes, and options.

(c) The Health and Human Services Commission shall study and determine whether polypharmacy reviews for Medicaid recipients receiving long-term care services could identify inappropriate pharmaceutical usage patterns and lead to controlled costs.

(d) Prior to developing and adopting the fee schedule required by Subdivision (1), Subsection (a), Section 531.084, Government Code, as added by this section, the Health and Human Services Commission shall make every effort to expedite the approval of dental treatment plans and the approval and payment of reimbursable incurred medical expenses for dental services provided to residents of long-term care facilities.

SECTION 6. MEDICAID MANAGED CARE. (a) Section 533.005, Government Code, is amended by amending Subsection (a) and adding Subsection (c) to read as follows:

(a) A contract between a managed care organization and the commission for the organization to provide health care services to recipients must contain:

(1) procedures to ensure accountability to the state for the provision of health care services, including procedures for financial reporting, quality assurance, utilization review, and assurance of contract and subcontract compliance;

(2) capitation [and provider payment] rates that ensure the cost-effective provision of quality health care;

(3) a requirement that the managed care organization provide ready access to a person who assists recipients in resolving issues relating to enrollment, plan administration, education and training, access to services, and grievance procedures;

(4) a requirement that the managed care organization provide ready access to a person who assists providers in resolving issues relating to payment, plan administration, education and training, and grievance procedures;

(5) a requirement that the managed care organization provide information and referral about the availability of educational, social, and other community services that could benefit a recipient;

(6) procedures for recipient outreach and education;

(7) a requirement that the managed care organization make payment to a physician or provider for health care services rendered to a recipient under a managed care plan not later than the 45th day after the date a claim for payment is received with documentation reasonably necessary for the managed care organization to process the claim, or within a period, not to exceed 60 days, specified by a written agreement between the physician or provider and the managed care organization;

(8) a requirement that the commission, on the date of a recipient's enrollment in a managed care plan issued by the managed care organization, inform the organization of the recipient's Medicaid certification date;

(9) a requirement that the managed care organization comply with Section 533.006 as a condition of contract retention and renewal;

(10) a requirement that the managed care organization provide the information required by Section 533.012 and otherwise comply and cooperate with the commission's office of inspector general [investigations and enforcement];

(11) a requirement that the managed care organization's usages of out-of-network providers or groups of out-of-network providers may not exceed limits for those usages relating to total inpatient admissions, total outpatient services, and emergency room admissions determined by the commission; [and]

(12) if the commission finds that a managed care organization has violated Subdivision (11), a requirement that the managed care organization reimburse an out-of-network provider for health care services at a rate that is equal to the allowable rate for those services, as determined under Sections 32.028 and 32.0281, Human Resources Code;

(13) a requirement that the organization use advanced practice nurses in addition to physicians as primary care providers to increase the availability of primary care providers in the organization's provider network; and

(14) a requirement that the managed care organization reimburse a federally qualified health center or rural health clinic for health care services provided to a recipient outside of regular business hours, including on a weekend day or holiday, at a rate that is equal to the allowable rate for those services as determined under Section 32.028, Human Resources Code, if the recipient does not have a referral from the recipient's primary care physician.

(c) The executive commissioner shall adopt rules regarding the days, times of days, and holidays that are considered to be outside of regular business hours for purposes of Subsection (a)(14).

(b) Subchapter A, Chapter 533, Government Code, is amended by adding Sections 533.0071 and 533.0072 to read as follows:

Sec. 533.0071.  ADMINISTRATION OF CONTRACTS. The commission shall make every effort to improve the administration of contracts with managed care organizations. To improve the administration of these contracts, the commission shall:

(1) ensure that the commission has appropriate expertise and qualified staff to effectively manage contracts with managed care organizations under the Medicaid managed care program;

(2) evaluate options for Medicaid payment recovery from managed care organizations if the enrollee dies or is incarcerated or if an enrollee is enrolled in more than one state program;

(3) maximize Medicaid payment recovery options by contracting with private vendors to assist in the recovery of capitation payments and other payments made to managed care organizations with respect to enrollees who leave the managed care program; and

(4) decrease the administrative burdens of managed care for the state, the managed care organizations, and the providers under managed care networks to the extent that those changes are compatible with state law and existing Medicaid managed care contracts, including decreasing those burdens by:

(A) where possible, decreasing the duplication of administrative reporting requirements for the managed care organizations, such as requirements for the submission of encounter data, quality reports, historically underutilized business reports, and claims payment summary reports;

(B) allowing managed care organizations to provide updated address information directly to the commission for correction in the state system;

(C) requiring consistency and uniformity among managed care organization policies, including policies relating to the preauthorization process, lengths of hospital stays, filing deadlines, levels of care, and case management services; and

(D) reviewing the appropriateness of primary care case management requirements in the admission and clinical criteria process, such as requirements relating to including a separate cover sheet for all communications, submitting handwritten communications instead of electronic or typed review processes, and admitting patients listed on separate notifications.

Sec. 533.0072.  INTERNET POSTING OF SANCTIONS IMPOSED FOR CONTRACTUAL VIOLATIONS.  (a) The commission shall prepare and maintain a record of each enforcement action initiated by the commission that results in a sanction, including a penalty, being imposed against a managed care organization for failure to comply with the terms of a contract to provide health care services to recipients through a managed care plan issued by the organization.

(b) The record must include:

(1) the name and address of the organization;

(2) a description of the contractual obligation the organization failed to meet;

(3)  the date of determination of noncompliance;

(4)  the date the sanction was imposed;

(5)  the maximum sanction that may be imposed under the contract for the violation; and

(6)  the actual sanction imposed against the organization.

(c)  The commission shall post and maintain the records required by this section on the commission's Internet website in English and Spanish.  The records must be posted in a format that is readily accessible to and understandable by a member of the public.  The commission shall update the list of records on the website at least quarterly.

(d)  The commission may not post information under this section that relates to a sanction while the sanction is the subject of an administrative appeal or judicial review.

(e)  A record prepared under this section may not include information that is excepted from disclosure under Chapter 552.

(f)  The executive commissioner shall adopt rules as necessary to implement this section.

(c)  The Health and Human Services Commission shall reevaluate the case management fee used in the primary care case management program and shall make recommendations to the Legislative Budget Board if the commission finds that a different rate is appropriate.

(d)  The Health and Human Services Commission shall examine:

(1)  the feasibility and cost-effectiveness of establishing a sliding-scale case management fee for the primary care case management program based on primary care provider performance;

(2)  the operational efficiency, health outcomes, case management, and cost-effectiveness of the primary care case management program and adopt any necessary changes to maximize health outcomes and cost-effectiveness; and

(3)  the mechanism used to encourage hospital participation in the primary care case management program and adopt alternative policies if current policies are determined to be ineffective.

(e)  The Health and Human Services Commission shall make every effort to improve the delivery of health care services to recipients enrolled in the Medicaid managed care program by evaluating the following actions for a determination of cost-effectiveness and pursuing those actions if they are determined to be cost-effective:

(1)  adding a Medicaid managed care contract requirement that requires each managed care plan to work with the commission and health care providers to improve the immunization rate of Medicaid clients and the reporting of immunization information for inclusion in ImmTrac;

(2)  to the extent permitted by federal law, allowing managed care organizations access to the previous claims history of a new enrollee that is maintained by a claims administrator if the new managed care organization enrollee was formerly a recipient under the Medicaid fee for service or primary care case management system;

      (3) encouraging managed care organizations to operate nurse triage telephone lines and to more effectively notify enrollees that the lines exist and inform enrollees regarding how to access those lines;

      (4) creating more rigorous contract standards for managed care organizations to ensure that children have clinically appropriate alternatives to emergency room services outside of regular office hours;

      (5) developing more effective mechanisms to identify and control the utilization of program services by enrollees who are found to have abused the services; and

      (6) studying the impact on the program of enrollees who have a history of high or abusive use of program services and incorporating the most effective methods of curtailing that activity while assuring that those enrollees receive adequate health services.

    (f) Section 533.005, Government Code, as amended by this section, applies only to a contract between the Health and Human Services Commission and a managed care organization under Chapter 533, Government Code, that is entered into or renewed on or after the effective date of this section. A contract between the commission and an organization that is entered into or renewed before the effective date of this section is governed by the law in effect on the date the contract was entered into or renewed, and the former law is continued in effect for that purpose.

    (g) Section 533.0072, Government Code, as added by this section, applies only to a sanction imposed on or after the effective date of this section.

    SECTION 7. SELECTION OF MEDICAL ASSISTANCE PROVIDERS. Subsection (f), Section 32.027, Human Resources Code, is amended to read as follows:

    (f) The executive commissioner of the Health and Human Services Commission [department] by rule may [shall] develop a system of selective contracting with health care providers for the provision of nonemergency inpatient hospital services to a recipient of medical assistance under this chapter. In implementing this subsection, the executive commissioner [department] shall:

      (1) seek input from consumer representatives and from representatives of hospitals licensed under Chapter 241, Health and Safety Code, and from organizations representing those hospitals; and

      (2) ensure that providers selected under the system meet the needs of a recipient of medical assistance under this chapter.

    SECTION 8. OPTIMIZATION OF CASE MANAGEMENT SYSTEMS. (a) Subchapter B, Chapter 32, Human Resources Code, is amended by adding Section 32.0551 to read as follows:

    Sec. 32.0551. OPTIMIZATION OF CASE MANAGEMENT SYSTEMS. The Health and Human Services Commission shall:

      (1) create and coordinate staffing and other administrative efficiencies for case management initiatives across the commission and health and human services agencies, as defined by Section 531.001, Government Code; and

      (2) optimize federal funding revenue sources and maximize the use of state funding resources for case management initiatives across the commission and health and human services agencies.

(b) The Health and Human Services Commission shall evaluate the cost-effectiveness of developing intensive case management and targeted interventions for all Medicaid recipients who are aged, blind, or disabled.

(c) The Health and Human Services Commission shall identify Medicaid programs or protocols in existence on the effective date of this section that are not resulting in their anticipated cost savings or quality outcomes. The commission shall enhance or replace these programs or protocols with targeted strategies that have demonstrated success in improving coordination of care and cost savings within similar Medicaid recipient populations.

(d) The Health and Human Services Commission shall evaluate the cost-effectiveness of including within Medicaid disease management programs in existence on the effective date of this section additional diseases, such as chronic kidney disease or end-stage renal disease, additional chronic medical conditions, such as severe pain that requires management, and other strategies, such as home health services for children with chronic conditions that are not included in the existing disease management programs and the use of schools and school nurses to manage chronic medical conditions of children. In evaluating the cost-effectiveness of including other diseases, conditions, and strategies, the commission may review existing data from the provider of disease management services under Section 32.059, Human Resources Code, as added by Chapter 208, Acts of the 78th Legislature, Regular Session, 2003. The commission may also research the experiences of other states, insurance companies, and managed care organizations and review other sources of data the commission determines is appropriate. The commission shall expand Medicaid disease management programs and related programs to include the diseases, conditions, and strategies that the commission determines under this subsection will be cost-effective.

(e) The Health and Human Services Commission shall conduct a study to determine the feasibility of combining the utilization management, case management, care coordination, high-cost targeting, provider incentives, and other quality and cost-control measures implemented with respect to the Medicaid program under a single federal waiver, which may be a waiver under Section 1915(c) of the federal Social Security Act (42 U.S.C. Section 1396n(c)) or a waiver under Section 1115(a) of that Act (42 U.S.C. Section 1315(a)). If the commission determines that the combination is feasible, the commission shall develop the combined program and seek the appropriate approval from the Centers for Medicare and Medicaid Services.

SECTION 9. EDUCATION CAMPAIGN. (a) Subchapter B, Chapter 32, Human Resources Code, is amended by adding Section 32.071 to read as follows:

Sec. 32.071. RECIPIENT AND PROVIDER EDUCATION. (a) The department shall develop and implement a comprehensive medical assistance education campaign for recipients and providers to ensure that care is provided in such a way as to improve patient outcomes and maximize cost-effectiveness. The department shall ensure that educational information developed under this section is demographically relevant and appropriate for each recipient or provider to whom the information is provided.

(b)  The comprehensive medical assistance education campaign must include elements designed to encourage recipients to obtain, maintain, and use a medical home and to reduce their use of high-cost emergency department services for conditions that can be treated through primary care or nonemergency physicians or other providers. The campaign must include the dissemination of educational information through newsletters and emergency department staff members and at local health fairs, unless the department determines that these methods of dissemination are not effective in increasing recipients' appropriate use of the health care system.

(c)  The department shall evaluate whether certain risk groups may disproportionately increase their appropriate use of the health care system as a result of targeted elements of an education campaign. If the department determines that certain risk groups will respond with more appropriate use of the system, the department shall develop and implement the appropriate targeted educational elements.

(d)  The department shall develop a system for reviewing recipient prescription drug use and educating providers with respect to that drug use in a manner that emphasizes reducing inappropriate prescription drug use and the possibility of adverse drug interactions.

(e)  The department shall coordinate the medical assistance education campaign with area health education centers, federally qualified health centers, as defined by 42 U.S.C. Section 1396d(l)(2)(B), and other stakeholders who use public funds to educate recipients and providers about the health care system in this state. The department shall make every effort to maximize state funds by working through these partners to maximize receipt of additional federal funding for administrative and other costs.

(f)  The department shall coordinate with other state and local agencies to ensure that community-based health workers, health educators, state eligibility determination employees who work in hospitals and other provider locations, and promoters are used in the medical assistance education campaign, as appropriate.

(g)  The department shall ensure that all state agencies that work with recipients, all administrative persons who provide eligibility determination and enrollment services, and all service providers use the same curriculum for recipient and provider education, as appropriate.

(b)  In developing the comprehensive medical assistance education campaign under Section 32.071, Human Resources Code, as added by this section, the Health and Human Services Commission shall ensure that private entities participating in the Medicaid program, including vendors providing claims administration, eligibility determination, enrollment services, and managed care services, are involved to the extent those entities' participation is useful.

(c)  The Health and Human Services Commission shall identify all funds being spent on the effective date of this section on education for Medicaid recipients. The commission shall integrate these funds into the comprehensive medical assistance education campaign under Section 32.071, Human Resources Code, as added by this section.

SECTION 10. MAXIMIZATION OF FEDERAL RESOURCES. The Health and Human Services Commission shall make every effort to maximize the receipt and use of federal health and human services resources for the office of community collaboration established under Section 531.020, Government Code, as added by this Act, and the decision support system in the commission's center for strategic decision support.

SECTION 11. IMPLEMENTATION; WAIVER. (a)  The Health and Human Services Commission shall make every effort to take each action and implement each reform required by this Act as soon as possible. Except as otherwise provided by this subsection and Subsection (d) of this section, the commission shall take each action and implement each reform required by this Act not later than September 1, 2007. Any action of the commission taken to justify implementing or ignoring the reforms required by this Act must be defensible, but need not be exhaustive.

(b)  Not later than December 1, 2005, the Health and Human Services Commission shall submit a report to the governor and to the presiding officers of the standing committees of the senate and house of representatives having primary jurisdiction over health and human services that specifies the strategies the commission or an appropriate health and human services agency, as defined by Section 531.001, Government Code, will use to examine, study, evaluate, or otherwise make a determination relating to a reform or take another action required by this Act.

(c)  Except as provided by Subsection (b) of this section, for each provision of this Act that requires the Health and Human Services Commission or a health and human services agency, as defined by Section 531.001, Government Code, to examine the possibility of making changes to the Medicaid program, to study an aspect of the Medicaid program, to evaluate the cost-effectiveness of a proposed reform, or to otherwise make a determination before implementing a reform, the Health and Human Services Commission shall submit a report to the governor and to the presiding officers of the standing committees of the senate and house of representatives having primary jurisdiction over health and human services that includes the criteria used and the results obtained by the commission or health and human services agency in taking the required action. The report must be delivered not later than September 1, 2007.

(d)  If before implementing any provision of this Act a state agency determines that a waiver or authorization from a federal agency is necessary for implementation of that provision, the agency affected by the provision shall request the waiver or authorization and may delay implementing that provision until the waiver or authorization is granted.

SECTION 12.  EFFECTIVE DATE. This Act takes effect September 1, 2005.

**Floor Amendment No. 1**

Amend **CSSB 1188** by adding the following appropriately numbered Sections to the bill and renumbering subsequent Sections of the bill accordingly:

SECTION ___. Section 531.102, Government Code, is amended by adding Subsections (j) and (k) to read as follows:

(j) The office shall prepare a final report on each audit or investigation conducted under this section. The final report must include:

(1)  a summary of the activities performed by the office in conducting the audit or investigation;

(2)  a statement regarding whether the audit or investigation resulted in a finding of any wrongdoing; and

(3)  a description of any findings of wrongdoing.

(k)  A final report on an audit or investigation is subject to required disclosure under Chapter 552. All information and materials compiled during the audit or investigation remain confidential and not subject to required disclosure in accordance with Section 531.1021(g).

SECTION ___.  Section 531.1021, Government Code, is amended by amending Subsection (g) and adding Subsection (h) to read as follows:

(g)  All information and materials subpoenaed or compiled by the office in connection with an audit or investigation are confidential and not subject to disclosure under Chapter 552, and not subject to disclosure, discovery, subpoena, or other means of legal compulsion for their release to anyone other than the office or its employees or agents involved in the audit or investigation conducted by the office, except that this information may be disclosed to the office of the attorney general, the state auditor's office, and law enforcement agencies.

(h)  A person who receives information under Subsection (g) may disclose the information only in accordance with Subsection (g) and in a manner that is consistent with the authorized purpose for which the person first received the information.

**Floor Amendment No. 2**

Amend **CSSB 1188** (House committee printing) as follows:

(1)  Add the following appropriately numbered SECTION to the bill and renumber subsequent SECTIONS of the bill accordingly:

SECTION ____.  MEDICAL INFORMATION TELEPHONE HOTLINE.  (a) Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.02131 to read as follows:

Sec. 531.02131.  MEDICAID MEDICAL INFORMATION TELEPHONE HOTLINE PILOT PROGRAM. (a)  In this section, "net cost-savings" means the total projected cost of Medicaid benefits for an area served under the pilot program minus the actual cost of Medicaid benefits for the area.

(b)  The commission shall evaluate the cost-effectiveness, in regard to preventing unnecessary emergency room visits and ensuring that Medicaid recipients seek medical treatment in the most medically appropriate and cost-effective setting, of developing a Medicaid medical information telephone hotline pilot program under which physicians are available by telephone to answer medical questions and provide medical information for recipients.  If the commission determines that the pilot program is likely to result in net cost-savings, the commission shall develop the pilot program.

(c)  The commission shall select the area in which to implement the pilot program.  The selected area must include:

(1)  at least two counties; and

(2)  not more than 100,000 Medicaid recipients, with approximately 50 percent of the recipients enrolled in a managed care program in which the recipients receive services from a health maintenance organization.

(d) The commission shall request proposals from private vendors for the operation of a telephone hotline under the pilot program. The commission may not award a contract to a vendor unless the vendor agrees to contractual terms:

    (1) requiring the vendor to answer medical questions and provide medical information by telephone to recipients using only physicians;

    (2) providing that the value of the contract is contingent on achievement of net cost-savings in the area served by the vendor; and

    (3) permitting the commission to terminate the contract after a reasonable period if the vendor's services do not result in net cost-savings in the area served by the vendor.

(e) The commission shall periodically determine whether the pilot program is resulting in net cost-savings. The commission shall discontinue the pilot program if the commission determines that the pilot program is not resulting in net cost-savings after a reasonable period.

(f) Notwithstanding any other provision of this section, including Subsection (b), the commission is not required to develop the pilot program if suitable private vendors are not available to operate the telephone hotline.

(g) The executive commissioner shall adopt rules necessary for implementation of this section.

(b) Not later than December 1, 2005, the Health and Human Services Commission shall determine whether the pilot program described by Section 531.02131, Government Code, as added by this section, is likely to result in net cost-savings. If the determination indicates that net cost-savings are likely, the commission shall take the action required by Subsections (c), (d), and (e) of this section.

(c) Not later than January 1, 2006, the Health and Human Services Commission shall select the counties in which the pilot program will be implemented.

(d) Not later than February 1, 2006, the Health and Human Services Commission shall request proposals from private vendors for the operation of a medical information telephone hotline. The commission shall evaluate the proposals and choose one or more vendors as soon as possible after the receipt of the proposals.

(e) Not later than January 1, 2007, the Health and Human Services Commission shall report to the governor, the lieutenant governor, and the speaker of the house of representatives regarding the pilot program. The report must include:

    (1) a description of the status of the pilot program, including whether the commission was unable to contract with a suitable vendor;

    (2) if the pilot program has been implemented:

      (A) an evaluation of the effects of the pilot program on emergency room visits by program participants; and

      (B) a description of cost savings in the area included in the pilot program; and

    (3) recommendations regarding expanding or revising the pilot program.

(2) In SECTION 11(a) of the bill (page 28, lines 18 through 19), strike "Except as otherwise provided by this subsection and Subsection (d) of this section," and substitute "Except as otherwise provided by this Act,".

**Floor Amendment No. 3**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTIONS to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION ____. OFFICE OF MEDICAL TECHNOLOGY.   Subchapter A, Chapter 531, Government Code, is amended by adding Section 531.0081 to read as follows:

Sec. 531.0081. OFFICE OF MEDICAL TECHNOLOGY. (a) In this section, "office" means the office of medical technology.

(b) The commission shall establish the office of medical technology within the commission. The office shall explore and evaluate new developments in medical technology and propose implementing the technology in the medical assistance program under Chapter 32, Human Resources Code, if appropriate and cost-effective.

(c) Office staff must have skills and experience in research regarding health care technology.

SECTION ____. MEDICAID REIMBURSEMENT RATES.   (a)   Section 531.021, Government Code, is amended by adding Subsections (f) and (g) to read as follows:

(f) In adopting rates for medical assistance payments under Subsection (b)(2), the executive commissioner may adopt reimbursement rates for appropriate nursing services provided to recipients with certain health conditions if those services are determined to provide a cost-effective alternative to hospitalization. A physician must certify that the nursing services are medically appropriate for the recipient for those services to qualify for reimbursement under this subsection.

(g) In adopting rates for medical assistance payments under Subsection (b)(2), the executive commissioner may adopt cost-effective reimbursement rates for group appointments with medical assistance providers for certain diseases and medical conditions specified by rules of the executive commissioner.

(b) Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.02175 to read as follows:

Sec. 531.02175. REIMBURSEMENT FOR ONLINE MEDICAL CONSULTATIONS.   (a)   In this section, "physician" means a person licensed to practice medicine in this state under Subtitle B, Title 3, Occupations Code.

(b) Subject to the requirements of this subsection, the executive commissioner by rule may require the commission and each health and human services agency that administers a part of the Medicaid program to provide Medicaid reimbursement for a medical consultation that is provided by a physician or other health care professional using the Internet as a cost-effective alternative to an in-person consultation. The executive commissioner may require the commission or a health and human services agency to provide the reimbursement described by this subsection only if the Centers for Medicare and Medicaid Services develop an appropriate Current Procedural Terminology code for medical services provided using the Internet.

(c) The executive commissioner may develop and implement a pilot program in one or more sites chosen by the executive commissioner under which Medicaid reimbursements are paid for medical consultations provided by physicians or other health care professionals using the Internet. The pilot program must be designed to

test whether an Internet medical consultation is a cost-effective alternative to an in-person consultation under the Medicaid program. The executive commissioner may modify the pilot program as necessary throughout its implementation to maximize the potential cost-effectiveness of Internet medical consultations. If the executive commissioner determines from the pilot program that Internet medical consultations are cost-effective, the executive commissioner may expand the pilot program to additional sites or may implement Medicaid reimbursements for Internet medical consultations statewide.

(d)  The executive commissioner is not required to implement the pilot program authorized under Subsection (c) as a prerequisite to providing Medicaid reimbursement authorized by Subsection (b) on a statewide basis.

SECTION ____.  HOSPITAL EMERGENCY ROOM USE REDUCTION.  (a) Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.085 to read as follows:

Sec. 531.085.  HOSPITAL EMERGENCY ROOM USE REDUCTION INITIATIVES.  The commission shall develop and implement a comprehensive plan to reduce the use of hospital emergency room services by recipients under the medical assistance program. The plan may include:

(1)  a pilot program designed to facilitate program participants in accessing an appropriate level of health care, which may include as components:

(A)  providing program participants access to bilingual health services providers; and

(B)  giving program participants information on how to access primary care physicians, advanced practice nurses, and local health clinics;

(2)  a pilot program under which health care providers, other than hospitals, are given financial incentives for treating recipients outside of normal business hours to divert those recipients from hospital emergency rooms;

(3)  payment of a nominal referral fee to hospital emergency rooms that perform an initial medical evaluation of a recipient and subsequently refer the recipient, if medically stable, to an appropriate level of health care, such as care provided by a primary care physician, advanced practice nurse, or local clinic;

(4)  a program under which the commission or a managed care organization that enters into a contract with the commission under Chapter 533 contacts, by telephone or mail, a recipient who accesses a hospital emergency room three times during a six-month period and provides the recipient with information on ways the recipient may secure a medical home to avoid unnecessary treatment at hospital emergency rooms;

(5)  a health care literacy program under which the commission develops partnerships with other state agencies and private entities to:

(A)  assist the commission in developing materials that:

(i)  contain basic health care information for parents of young children who are recipients under the medical assistance program and who are participating in public or private child-care or prekindergarten programs, including federal Head Start programs; and

(ii)  are written in a language understandable to those parents and specifically tailored to be applicable to the needs of those parents;

          (B) distribute the materials developed under Paragraph (A) to those parents; and

          (C) otherwise teach those parents about the health care needs of their children and ways to address those needs; and

       (6) other initiatives developed and implemented in other states that have shown success in reducing the incidence of unnecessary treatment in hospital emergency rooms.

    (b) The Health and Human Services Commission may develop the health care literacy component of the comprehensive plan to reduce the use of hospital emergency room services required by Section 531.085(5), Government Code, as added by this section, so that the health care literacy component operates in a manner similar to the manner in which the Johnson & Johnson/UCLA Health Care Institute operates its health care training program that is designed to teach parents to better address the health care needs of their children.

    SECTION ____. PERFORMANCE BONUS PILOT PROGRAM. Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.086 to read as follows:

    Sec. 531.086. PERFORMANCE BONUS PILOT PROGRAM. (a) The commission shall develop a proposal for providing higher reimbursement rates to primary care case management providers under the Medicaid program who treat program recipients with chronic health conditions in accordance with evidence-based, nationally accepted best practices and standards of care.

    (b) The commission shall define the parameters of the proposed program, including:

       (1) the types of chronic health conditions the program would target;

       (2) the best practices and standards of care that must be followed for a provider to obtain a higher reimbursement rate under the proposed program; and

       (3) the types of providers to whom the higher reimbursement rate would be offered under the proposed program.

    (c) Not later than December 1, 2006, the Health and Human Services Commission shall report to the standing committees of the senate and the house of representatives having primary jurisdiction over welfare programs regarding the proposed program under this section. The report must include:

       (1) the anticipated effect of the higher reimbursement rates to be offered under the program on the quality of care provided and the health outcomes for program recipients;

       (2) a determination of whether the program would be cost-effective; and

       (3) a recommendation regarding implementation of the program.

    (d) This section expires September 1, 2007.

    SECTION ____. RETURN OF UNUSED DRUGS. Section 562.1085, Occupations Code, is amended by amending Subsection (a) and adding Subsection (f) to read as follows:

    (a) A pharmacist who practices in or serves as a consultant for a health care facility in this state may return to a pharmacy certain unused drugs, other than a controlled substance as defined by Chapter 481, Health and Safety Code, purchased from the pharmacy as provided by board rule. The unused drugs must:

     (1)  be approved by the federal Food and Drug Administration and be:

        (A)  sealed in [the manufacturer's original] unopened tamper-evident packaging and either individually packaged or packaged in unit-dose packaging;

        (B)  oral or parenteral medication in sealed single-dose containers approved by the federal Food and Drug Administration;

        (C)  topical or inhalant drugs in sealed units-of-use containers approved by the federal Food and Drug Administration; or

        (D)  parenteral medications in sealed multiple-dose containers approved by the federal Food and Drug Administration from which doses have not been withdrawn; and

     (2)  not be the subject of a mandatory recall by a state or federal agency or a voluntary recall by a drug seller or manufacturer.

    (f)  The tamper-evident packaging required under Subsection (a)(1) for the return of unused drugs is not required to be the manufacturer's original packaging unless that packaging is required by federal law.

    SECTION ____.  MEDICAID COVERAGE FOR HEALTH INSURANCE PREMIUMS AND LONG-TERM CARE NEEDS. (a) The Health and Human Services Commission shall explore the commission's authority under federal law to offer, and the cost and feasibility of offering:

     (1)  a stipend paid by the Medicaid program to a person to cover the cost of a private health insurance plan as an alternative to providing traditional Medicaid services for the person;

     (2)  premium payment assistance through the Medicaid program for long-term care insurance for a person with a health condition that increases the likelihood that the person will need long-term care in the future; and

     (3)  a long-term care partnership between the Medicaid program and a person under which the person pays the premiums for long-term care insurance and the Medicaid program provides continued coverage after benefits under that insurance are exhausted.

    (b)  In exploring the feasibility of the options described by Subsection (a) of this section, the Health and Human Services Commission shall consider whether other state incentives that could encourage persons to purchase health insurance plans or long-term care insurance are feasible. The incentives may include offering tax credits to businesses to increase the availability of affordable insurance.

    (c)  If the Health and Human Services Commission determines that any of the options described by Subsection (a) of this section are feasible and cost-effective, the commission shall make efforts to implement those options to the extent they are authorized by federal law.  The commission shall request any necessary waivers from the Centers for Medicare and Medicaid Services as soon as possible after determining that an option is feasible and cost-effective. If the commission determines that legislative changes are necessary to implement an option, the commission shall report to the 80th Legislature and specify the changes that are needed.

**Floor Amendment No. 4**

    Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION and renumbering subsequent SECTIONS of the bill accordingly:

SECTION \_\_\_. MEDICAID DISEASE MANAGEMENT PROGRAMS. (a) Section 533.009, Government Code, is amended by adding Subsection (f) to read as follows:

(f) The executive commissioner, by rule, shall prescribe the minimum requirements that a managed care organization, in providing a disease management program, must meet to be eligible to receive a contract under this section. The managed care organization must, at a minimum, be required to:

(1) provide disease management services that have performance measures for particular diseases that are comparable to the relevant performance measures applicable to a provider of disease management services under Section 32.059, Human Resources Code, as added by Chapter 208, Acts of the 78th Legislature, Regular Session, 2003; and

(2) show evidence of managing complex diseases in the Medicaid population.

(b) Section 32.059, Human Resources Code, as added by Chapter 208, Acts of the 78th Legislature, Regular Session, 2003, is amended by amending Subsection (c) and adding Subsection (c-1) to read as follows:

(c) The executive commissioner of the Health and Human Services Commission [department], by rule, shall prescribe the minimum requirements a provider of a disease management program must meet to be eligible to receive a contract under this section. The provider must, at a minimum, be required to:

(1) use disease management approaches that are based on evidence-supported models, [minimum] standards of care in the medical community, and clinical outcomes; and

(2) ensure that a recipient's primary care physician and other appropriate specialty physicians, or registered nurses, advanced practice nurses, or physician assistants specified and directed or supervised in accordance with applicable law by the recipient's primary care physician or other appropriate specialty physicians, become directly involved in the disease management program through which the recipient receives services.

(c-1) A managed care health plan that develops and implements a disease management program under Section 533.009, Government Code, and a provider of a disease management program under this section shall coordinate during a transition period beneficiary care for patients that move from one disease management program to another program.

(c) The executive commissioner of the Health and Human Services Commission may use a provider of a disease management program under Section 32.059, Human Resources Code, as added by Chapter 208, Acts of the 78th Legislature, Regular Session, 2003, as amended by this section, to provide disease management services if the executive commissioner determines that the use of that provider will be more cost-effective to the Medicaid program than using a provider of a disease management program under Section 533.009, Government Code, as amended by this section. A Medicaid recipient currently in a disease management program provided under Section 32.059, Human Resources Code, as added by Chapter 208, Acts of the 78th Legislature, Regular Session, 2003, in a service area that is subject to a Medicaid

managed care expansion may remain enrolled in the recipient's current disease management program if the executive commissioner determines that allowing those recipients to remain is cost-effective.

**Floor Amendment No. 7**

Amend **CSSB 1188** as follows:

(1)  Strike added Section 531.502, Government Code, (page 2, lines 2-9) and substitute the following:

Sec. 531.502.  MAXIMUM PRICE.  The executive commissioner shall determine by rule the price of a prescription drug charged to an eligible person under the state pharmacy assistance program.  The price may not exceed the sum of:

(1)  the discounted acquisition price under the program; and

(2)  a reasonable dispensing fee.

(2)  Strike added Section 531.504(d), Government Code, (page 4, lines 13-23) and substitute the following:

(d)  The executive commissioner by rule shall specify inventory and recordkeeping requirements for participating pharmacies.

(3)  In added Section 531.505(a), Government Code (page 5, line 12-13) strike "an entity designated by the executive commissioner" and substitute "a physician who meets the requirements under Section 563.053, Occupations Code,".

(4)  In added Section 531.505(b), Government Code (page 5, lines 16-17) strike "pharmacies or other".

**Floor Amendment No. 8**

Amend **CSSB 1188** in SECTION 2 of the bill, in Subsection (d)(2) of that SECTION (House committee printing, page 5, line 10), between "rates" and ";", insert "and increase dispensing fees for pharmacies under the Medicaid program to better align those fees with actual dispensing costs".

**Floor Amendment No. 9**

Amend **CSSB 1188** (House committee printing), page 7 by adding a new number 7 as follows:

(7)  links Medicaid and non-Medicaid data sets, including but not limited to data sets related to Medicaid, TANF, WIC, vital statistics, and other public health programs.

**Floor Amendment No. 10**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __.  ABOLITION OF LONG-TERM CARE LEGISLATIVE OVERSIGHT COMMITTEE;  INTERIM REPORT ON LONG-TERM CARE.  (a) On the effective date of this Act, Subchapter O, Chapter 242, Health and Safety Code, is repealed, and the long-term care legislative oversight committee established under that subchapter is abolished.

(b)  All records in the custody of the long-term care legislative oversight committee that are related to a duty, function, or activity of the committee shall be transferred on the effective date of this Act to the standing committees of the senate and house of representatives having primary jurisdiction over long-term care services.

### Floor Amendment No. 11

Amend **CSSB 1188** (House committee printing) in SECTION 6 of the bill, in amended Section 533.005(a), Government Code (page 17, lines 14-17), by striking Subdivision (13) and substituting the following:

(13)  a requirement that the organization consider the use of advanced practice nurses as one type of primary care provider in the organization's provider network; and

### Floor Amendment No. 12

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION and renumbering subsequent SECTIONS of the bill accordingly:

SECTION ___. ABOLITION OF HEALTH AND HUMAN SERVICES TRANSITION LEGISLATIVE OVERSIGHT COMMITTEE. The Health and Human Services Transition Legislative Oversight Committee established under Section 1.22, Chapter 198, Acts of the 78th Legislature, Regular Session, 2003, is abolished on the effective date of this Act.

### Floor Amendment No. 13

Amend **CSSB 1188**, SECTION 5(a), as follows:

(1)  On page 17, line 17, by striking the word "and"

(2)  On page 17, line 25, by inserting the following between the word "network" and the period:

; and (15) a requirement that the managed care organization develop, implement and maintain a system for tracking and resolving all provider appeals related to claims payment, including a process that will require:

(A)  a tracking mechanism to document the status and final disposition of each provider's claims payment appeal;

(B)  the contracting with physicians who are not network providers and who are of the same or related specialty as the appealing physician to resolve claims disputes related to denial on the basis of medical necessity that remain unresolved subsequent to a provider appeal; and

(C)  the determination of the physician resolving the dispute to be binding on the managed care organization and provider.

(3)  On page 18, line 20, by striking the word "and"

(4)  On page 19, line 17, by inserting the following between the word "notifications" and the period:

; and (5)  reserve the right to amend the managed care organization's process for resolving provider appeals of denials based on medical necessity to include an independent review process established by commission for final determination of these disputes

### Floor Amendment No. 15

Amend **CSSB 1188** (House committee printing) in SECTION 8 of the bill in Subsection (e) (page 25, line 22) following the last sentence, by inserting the following:

In conducting the study, the commission shall solicit stakeholder input and consider information from any other optimization-related projects currently being operated, including the Consolidated Waiver Project authorized by 531.0219, Government Code, former projects including the Mental Retardation Local Authority program, and related information from projects in other states.

### Floor Amendment No. 16

Amend **CSSB 1188** by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. PHARMACEUTICAL AND THERAPEUTICS COMMITTEE. Section 531.074, Government Code, is amended by adding Subsection (m) to read as follows:

(m)  The commission or the commission's agent shall publicly disclose each specific drug recommended for preferred drug list status for each drug class included in the preferred drug list for the Medicaid vendor drug program.  The disclosure must be made in writing after the conclusion of committee deliberations that result in recommendations made to the executive commissioner regarding the placement of drugs on the preferred drug list.

### Floor Amendment No. 17

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. ABOLITION OF INTERAGENCY COUNCIL ON PHARMACEUTICALS BULK PURCHASING.  (a)  The Interagency Council on Pharmaceuticals Bulk Purchasing is abolished.

(b)  Chapter 111, Health and Safety Code, and Sections 431.116(e) and 431.208(d), Health and Safety Code, are repealed.

### Floor Amendment No. 18

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. PRESCRIPTION DRUGS.  Section 531.070(l), Government Code, is amended to read as follows:

(l)  Each year the commission shall provide a written report to the legislature and the governor.  The report shall cover:

(1)  the cost of administering the preferred drug lists adopted under Section 531.072;

(2)  an analysis of the utilization trends for medical services provided by the state and any correlation to the preferred drug lists;

     (3)  an analysis of the effect on health outcomes and results for recipients;
[and]

     (4)  statistical information related to the number of approvals granted or denied; and

     (5)  an analysis of the effect during the preceding year of the implementation of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173) on the preferred drug list adopted under Section 531.072 and the prior authorization requirements under Section 531.073 applicable under the Medicaid vendor drug program.

**Floor Amendment No. 19**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __.  PRESCRIPTION DRUGS.  (a)  Section 531.070, Government Code, is amended by adding Subsection (n) to read as follows:

(n)  Before entering into a supplemental rebate agreement with a manufacturer, the commission shall disclose to the manufacturer any clinical edits or clinical protocols that the commission knows might be imposed during the term of the agreement on a particular class of drugs on the preferred drug list adopted under Section 531.072 that applies under the Medicaid vendor drug program.  If the commission does not disclose a clinical edit or clinical protocol as required by this subsection that would otherwise apply to a drug that is manufactured by the manufacturer and that will be provided under the Medicaid vendor drug program, the clinical edit or clinical protocol may not be imposed on the drug during the term of the agreement.

(b)  Section 531.070(n), Government Code, as added by this section, applies only to a supplemental rebate agreement that is entered into or renewed on or after the effective date of this Act.  A supplemental rebate agreement that is entered into or renewed before the effective date of this Act is governed by the law in effect on the date the agreement was entered into or renewed, and the former law is continued in effect for that purpose.

**Floor Amendment No. 20**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION and renumbering subsequent SECTIONS accordingly:

SECTION __.  FRAUD AND ABUSE INVESTIGATIONS.  Section 531.1021, Government Code, is amended by amending Subsection (g) and adding Subsections (h) and (i) to read as follows:

(g)  Except as provided by Subsection (h), all [All] information and materials subpoenaed or compiled by the office in connection with an open fraud and abuse investigation are confidential and not subject to disclosure under Chapter 552, and not subject to disclosure, discovery, subpoena, or other means of legal compulsion for their release to anyone other than the office or its employees or agents involved in the investigation conducted by the office, except that this information may be disclosed to the office of the attorney general and other law enforcement agencies.

(h)  This section may not be interpreted to prohibit the disclosure of information contained in a closed fraud and abuse investigative case file or information contained in a fraud and abuse investigative case file relating to a case that has been resolved by settlement, unless disclosure is otherwise prohibited by law.

(i)  For purposes of this section, a fraud and abuse investigation is any formal inquiry of the office of inspector general that:

(1)  is based upon a suspicion of fraud, as defined by Section 531.1011, in the provision of health and human services; or

(2)  supports a claim by the state or a health and human services agency of fraud in the provision of health and human services.

**Floor Amendment No. 21**

Amend **CSSB 1188** by adding the following appropriately numbered section to the bill and renumbering existing sections accordingly:

SECTION __.  (a)  Sections 481.074(o) and (p), Health and Safety Code, are amended to read as follows:

(o)  A pharmacist may dispense a Schedule II controlled substance pursuant to a facsimile copy of an official prescription completed in the manner required by Section 481.075 and transmitted by the practitioner or the practitioner's agent to the pharmacy if:

(1)  the prescription is written for:

(A)  a Schedule II narcotic or nonnarcotic substance for a patient in a long-term care facility (LTCF), and the practitioner notes on the prescription "LTCF patient";

(B)  a Schedule II narcotic product to be compounded for the direct administration to a patient by parenteral, intravenous, intramuscular, subcutaneous, or intraspinal infusion; or

(C)  a Schedule II narcotic substance for a patient with a medical diagnosis documenting a terminal illness or a patient enrolled in a hospice care program certified or paid for by Medicare under Title XVIII, Social Security Act (42 U.S.C. Section 1395 et seq.), as amended, by Medicaid, or by a hospice program that is licensed under Chapter 142, and the practitioner or the practitioner's agent notes on the prescription "terminally ill" or "hospice patient"; and

(2)  after transmitting the prescription, the prescribing practitioner or the practitioner's agent:

(A)  writes across the face of the official prescription "VOID–sent by fax to (name and telephone number of receiving pharmacy)"; and

(B)  files the official prescription in the patient's medical records instead of delivering it to the patient [promptly complies with Subsection (p)].

(p)  [Not later than the seventh day after the date a prescribing practitioner transmits the facsimile copy of the official prescription to the pharmacy, the prescribing practitioner shall deliver in person or mail the official written prescription to the dispensing pharmacist at the pharmacy where the prescription was dispensed. The envelope of a prescription delivered by mail must be postmarked not later than the seventh day after the date the official prescription was written.] On receipt of the

prescription, the dispensing pharmacy shall file the facsimile copy of the prescription [with the official prescription] and shall send information to the director as required by Section 481.075.

(b)  This section takes effect immediately if this Act receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this section takes effect September 1, 2005.

**Floor Amendment No. 22**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __.  PROVISION OF CERTAIN PRESCRIPTION DRUGS PROHIBITED.  Section 32.024, Human Resources Code, is amended by adding Subsection (bb) to read as follows:

(bb)  The department may not provide an erectile dysfunction medication under the Medicaid vendor drug program to a person required to register as a sex offender under Chapter 62, Code of Criminal Procedure, to the maximum extent federal law allows the department to deny that medication.

**Floor Amendment No. 23**

Amend **CSSB 1188** by adding the following appropriately numbered SECTIONS and renumbering subsequent SECTIONS accordingly:

SECTION __.  Section 32.027, Human Resources Code, is amended by adding Subsection (1) to read as follows:

(1)  Subject to appropriations, the department shall assure that a recipient of medical assistance under this chapter may select a licensed psychologist, a licensed marriage and family therapist, as defined by Section 502.002, Occupations Code, a licensed professional counselor, as defined by Section 503.002, Occupations Code, or a licensed master social worker, as defined by Section 505.002, Occupations Code, to perform any health care service or procedure covered under the medical assistance program if the selected person is authorized by law to perform the service or procedure.

SECTION 2.  Section 32.027(e), Human Resources Code, as amended by Chapter 1251, Acts of the 78th Legislature, Regular Session, 2003, is repealed.

**Floor Amendment No. 24**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __.  ADMINISTRATIVE AND JUDICIAL REVIEW OF MEDICAID DECISIONS.  (a)  Subchapter A, Chapter 531, Government Code, is amended by adding Section 531.019 to read as follows:

Sec. 531.019.  ADMINISTRATIVE AND JUDICIAL REVIEW OF CERTAIN DECISIONS.  (a)  In this section, "medical assistance benefits" means benefits provided under the medical assistance program under Chapter 32, Human Resources Code.

(b)  The proceedings of a hearing related to a decision regarding medical assistance benefits contested by an applicant for or recipient of the benefits that is conducted by the commission or a health and human services agency to which the commission delegates a function related to the benefits must be recorded electronically. Notwithstanding Section 2001.177, the cost of preparing the record and transcript required to be sent to a reviewing court may not be charged to the applicant for or recipient of the benefits.

(c)  Before an applicant for or recipient of medical assistance benefits may appeal a decision of a hearing officer for the commission or a health and human services agency related to those benefits, the applicant or recipient must request an administrative review by an appropriate attorney of the commission or a health and human services agency, as applicable, in accordance with rules of the executive commissioner. Not later than the 15th business day after the date the attorney receives the request for administrative review, the attorney shall complete an administrative review of the decision and notify the applicant or recipient in writing of the results of that review.

(d)  Except as provided by this section, Subchapters G and H, Chapter 2001, govern an appeal of a decision made by a hearing officer for the commission or a health and human services agency related to medical assistance benefits brought by an applicant for or recipient of the benefits.

(e)  For purposes of Section 2001.171, an applicant for or recipient of medical assistance benefits has exhausted all available administrative remedies and a decision, including a decision under Section 32.035, Human Resources Code, is final and appealable on the date that, after a hearing:

(1)  the hearing officer for the commission or a health and human services agency reaches a final decision related to the benefits; and

(2)  the appropriate attorney completes an administrative review of the decision and notifies the applicant or recipient in writing of the results of that review.

(f)  For purposes of Section 2001.171, an applicant for or recipient of medical assistance benefits is not required to file a motion for rehearing with the commission or a health and human services agency, as applicable.

(g)  Judicial review of a decision made by a hearing officer for the commission or a health and human services agency related to medical assistance benefits is under the substantial evidence rule and is instituted by filing a petition with a district court in Travis County, as provided by Subchapter G, Chapter 2001.

(h)  An appeal described by Subsection (d) takes precedence over all civil cases except workers' compensation and unemployment compensation cases.

(i)  The appellee is the commission.

(b)  Section 2001.223, Government Code, is amended to read as follows:

Sec. 2001.223.  EXCEPTIONS FROM DECLARATORY JUDGMENT, COURT ENFORCEMENT, AND CONTESTED CASE PROVISIONS.   Section 2001.038 and Subchapters C through H do not apply to:

(1)  except as provided by Section 531.019, the granting, payment, denial, or withdrawal of financial or medical assistance or benefits under service programs that were operated by the former [of the] Texas Department of Human Services before

September 1, 2003, and are operated on and after that date by the Health and Human Services Commission or a health and human services agency, as defined by Section 531.001;

(2)  action by the Banking Commissioner or the Finance Commission of Texas regarding the issuance of a state bank or state trust company charter for a bank or trust company to assume the assets and liabilities of a financial institution that the commissioner considers to be in hazardous condition as defined by Section 31.002(a) or 181.002(a), Finance Code, as applicable;

(3)  a hearing or interview conducted by the Board of Pardons and Paroles or the pardons and paroles division of the Texas Department of Criminal Justice relating to the grant, rescission, or revocation of parole or other form of administrative release; or

(4)  the suspension, revocation, or termination of the certification of a breath analysis operator or technical supervisor under the rules of the Department of Public Safety.

(c)  The changes in law made by this section apply only to an appeal of a final decision by the Health and Human Services Commission or a health and human services agency to which the commission delegates a function related to medical assistance benefits under Chapter 32, Human Resources Code, that is rendered on or after the effective date of this Act. A final decision rendered by the commission or a health and human services agency before the effective date of this Act is governed by the law in effect on the date the decision was rendered, and the former law is continued in effect for that purpose.

## Floor Amendment No. 27

Amend **CSSB 1188** as follows:

On page 18, line 15 add or is covered by another liable third party insurer. after the word program.

On page 18, line 18 between the words "payments" and "and" insert , payments from other liable third parties,

## Floor Amendment No. 28

Amend **CSSB 1188** (House committee printing) in SECTION 5(a) of the bill by striking added Section 531.083, Government Code (page 11, line 23, through page 12, line 15), and substituting the following:

Sec. 531.083.  MEDICAID LONG-TERM CARE SYSTEM. The commission shall ensure that the Medicaid long-term care system provides the broadest array of choices possible for recipients while ensuring that the services are delivered in a manner that is cost-effective and makes the best use of available funds. The commission shall also make every effort to improve the quality of care for recipients of Medicaid long-term care services by:

(1)  evaluating the need for expanding the provider base for consumer-directed services and, if the commission identifies a demand for that expansion, encouraging area agencies on aging, independent living centers, and other potential long-term care providers to become providers through contracts with the Department of Aging and Disability Services;

(2) ensuring that each recipient who resides in a nursing facility and the person responsible for making health care decisions for the recipient are provided information about end-of-life care options and the importance of planning for end-of-life care, including the need for an advanced directive, as defined by Section 166.002, Health and Safety Code;

(3) developing policies to encourage a recipient who resides in a nursing facility to receive treatment at that facility whenever possible, while ensuring that the recipient receives an appropriate continuum of care; and

(4) ensuring that each recipient who resides in a nursing facility receives Medicaid long-term care coverage for the cost of a transfer to a willing provider and continued available life-sustaining treatment until the transfer is completed and, notwithstanding Sections 166.045 and 166.046, Health and Safety Code, is provided available life-sustaining treatment, if:

(A) the recipient's attending physician or nursing facility decides to deny the treatment under Section 166.045 or 166.046, Health and Safety Code;

(B) the recipient, the recipient's advanced directive, as defined by Section 166.002, Health and Safety Code, or the person responsible for making health care decisions for the recipient directs that the treatment be provided; and

(C) denial of the treatment, in reasonable medical judgment, would likely result in the recipient's death.

### Floor Amendment No. 29

Amend **CSSB 1188** by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. (a) Section 32.024(w), Human Resources Code, is amended to read as follows:

(w) The department shall set a personal needs allowance of not less than $45 a month and, subject to availability of funds, shall set the personal needs allowance in an amount not less than $60 a month for a resident of a convalescent or nursing home or related institution licensed under Chapter 242, Health and Safety Code, personal care facility, ICF-MR facility, or other similar long-term care facility who receives medical assistance. The department may send the personal needs allowance directly to a resident who receives Supplemental Security Income (SSI) (42 U.S.C. Section 1381 et seq.). This subsection does not apply to a resident who is participating in a medical assistance waiver program administered by the department.

(b) This section applies only to a personal needs allowance paid on or after the effective date of this Act.

### Floor Amendment No. 30

Amend the Thompson Floor Amendment No. 29 to **CSSB 1188** by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. (a) Section 32.024(w), Human Resources Code, is amended to read as follows:

(w) The department shall set a personal needs allowance of not less than $45 a month and, shall set the personal needs allowance in an amount not less than $60 a month for a resident of a convalescent or nursing home or related institution licensed

under Chapter 242, Health and Safety Code, personal care facility, ICF-MR facility, or other similar long-term care facility who receives medical assistance. The department may send the personal needs allowance directly to a resident who receives Supplemental Security Income (SSI) (42 U.S.C. Section 1381 et seq.).   This subsection does not apply to a resident who is participating in a medical assistance waiver program administered by the department.

(b)   This section applies only to a personal needs allowance paid on or after the effective date of this Act.

## Floor Amendment No. 31

Amend **CSSB 1188** by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __.   CONTINUOUS ELIGIBILITY.   Section 32.0261, Human Resources Code, is amended to read as follows:

Sec. 32.0261.  CONTINUOUS ELIGIBILITY.  The department shall adopt rules in accordance with 42 U.S.C. Section 1396a(e)(12), as amended, to provide for a period of continuous eligibility for a child under 19 years of age who is determined to be eligible for medical assistance under this chapter. The rules shall provide that the child remains eligible for medical assistance, without additional review by the department and regardless of changes in the child's resources or income, until the earlier of:

(1)   the end of the six-month period following [first anniversary of] the date on which the child's eligibility was determined; or

(2)   the child's 19th birthday.

## Amendment No. 32

Amend **CSSB 1188** by adding the following appropriately numbered section:

Section __.   The speaker and lieutenant governor shall create a joint interim committee to study and make recommendations to the legislature relating to how Medicaid and other supportive medical care services can be more effectively delivered through regional planning involving all relevant stakeholders in rural, border, and urban counties and the surrounding rural or suburban communities. Specifically, the study should: (1)  identify incentives and resources necessary to promote personal responsibility and accountability, encourage preventive care, and expand use of available primary care services; (2) identify cost-effective technological innovations to improve health care access and coordination, such as telemedicine or automated medical records; (3)  improve access and availability to primary care services; (4) improve access to secondary and tertiary care in rural communities; (5)  identify how health care services can be improved through collaboration across funding streams, such as the Children's Health Insurance Program, Medicaid, and private insurance; (6) make recommendations to improve the capacity of public health entities in Texas to comply with the Centers for Disease Control National Public Health Performance Standards; (7)  identify successful strategies and recommend incentives to develop multicounty public health entities authorized to collaborate to ensure that the essential public health services as authorized in Section 121.002, Health and Safety Code, are available to all Texans; (8)  evaluate the role of existing regional public health entities and make recommendations to optimize their capacity to assume responsibility for the

foregoing purposes or create additional regional entities as needed; and (9) recommend appropriate funding levels needed to implement the committee's recommendations.

## Floor Amendment No. 33

Amend **CSSB 1188** by adding the following appropriately numbered sections and renumbering the sections of the bill accordingly:

SECTION ___. Subchapter B, Chapter 32, Human Resources Code, is amended by adding Section 32.0248 to read as follows:

Sec. 32.0248. DEMONSTRATION PROJECT FOR WOMEN'S HEALTH CARE SERVICES. (a) The department shall establish a five-year demonstration project through the medical assistance program to expand access to preventive health and family planning services for women. A woman eligible under Subsection (b) to participate in the demonstration project may receive appropriate preventive health and family planning services, including:

(1)  medical history recording and evaluation;

(2)  physical examinations;

(3)  health screenings, including screening for:

(A)  diabetes;

(B)  cervical cancer;

(C)  breast cancer;

(D)  sexually transmitted diseases;

(E)  hypertension;

(F)  cholesterol; and

(G)  tuberculosis;

(4)  counseling and education on contraceptive methods, except for counseling and education regarding emergency contraception;

(5)  provision of contraceptives, except for the provision of emergency contraception;

(6)  risk assessment; and

(7)  referral of medical problems to appropriate providers that are entities or organizations that do not perform or promote elective abortions or contract or affiliate with entities that perform or promote elective abortions.

(b)  A woman is eligible to participate in the demonstration project if the woman is at least 18 years of age and:

(1)  has a net family income that is at or below 185 percent of the federal poverty level;

(2)  participates in or receives benefits under any of the following:

(A)  the medical assistance program;

(B)  the financial assistance program under Chapter 31;

(C)  the nutritional assistance program under Chapter 33;

(D)  the Supplemental Food Program for Women, Infants and Children;

or

(E)  another program administered by the state that:

(i)  requires documentation of income; and

(ii)  restricts eligibility to persons with income equal to or less than the income eligibility guidelines applicable to the medical assistance program;

(3) is presumed eligible for one of the programs listed in Subdivision (2) pending completion of that program's eligibility process; or

(4) is a member of a family that contains at least one person who participates in or receives benefits under one of the programs listed in Subdivision (2).

(c) The department shall ensure that the standards of care provided to a woman participating in the demonstration project are consistent with the requirements of law and current best practices for provision of public health services.

(d) The department shall develop procedures for determining and certifying eligibility for services under the demonstration project at the point of service delivery using integrated procedures that minimize duplication of effort by providers, the department, and other state agencies. The department may not use a procedure that would require a cost in excess of 10 percent of the total costs of actual preventive health and family planning services provided under the demonstration project. The eligibility procedure may provide for expedited determination and certification using a simplified form requiring only family income and family size.

(e) The department shall compile a list of potential funding sources a woman participating in the demonstration project may be able to use to help pay for treatment for health problems:

(1) identified using services provided under the demonstration project; and

(2) for which the woman is not eligible to receive treatment under the medical assistance program or the demonstration project.

(f) Providers of services under the demonstration project shall comply with requests made by the department for information necessary for the department to:

(1) make efficient use of money spent for the operation and administration of the demonstration project;

(2) report and provide information required by federal law; and

(3) compile the report required by Subsection (g).

(g) Not later than December 1 of each even-numbered year, the department shall submit a report to the legislature regarding the department's progress in establishing and operating the demonstration project.

(h) The department shall ensure the money spent under the demonstration project, regardless of the funding source, is not used to perform or promote elective abortions. The department, for the purpose of the demonstration project, may not contract with entities that perform or promote elective abortions or are affiliates of entities that perform or promote elective abortions.

(i) This section expires September 1, 2011.

SECTION ____. If before implementing any provision of Section 32.048, Human Resources Code, as added by this Act, a state agency determines that a waiver or authorization from a federal agency is necessary for implementation of that provision, the agency affected by the provision shall request the waiver or authorization and may delay implementing that provision until the waiver or authorization is granted.

SECTION ___. Not later than September 1, 2006, the state agency responsible for implementing the demonstration project required by Section 32.0248, Human Resources Code, as added by this Act, shall implement the demonstration project.

**Floor Amendment No. 35**

Amend **CSSB 1188** (House committee printing) by adding the following appropriately numbered Section to the bill and renumbering subsequent Sections of the bill as appropriate:

SECTION __.  Chapter 159, Occupations Code, is amended by adding Section 159.010 to read as follows:

Sec. 159.010.  NOTICE OF BENEFITS UNDER STATE CHILD HEALTH PLAN.  A physician who provides Medicaid health care services to a pregnant woman shall inform the woman of the health benefits for which the woman or the woman's child may be eligible under the state child health plan under Chapter 62, Health and Safety Code.

**Floor Amendment No. 36**

Amend **CSSB 1188** as follows:

Page 12, strike lines 1 and 2 and substitute the following:

(b)  Subchapter A, Chapter 533, Government Code, is amended by adding Sections 533.0071, 533.0072 and 533.0073 to read as follows:

Page 14, following line 18, add a new Section 533.0073 to read as follows:

Sec. 533.0073. PRESERVATION OF UPPER LIMIT PROVISIONS OF THE MEDICAID PROGRAM.  The Health and Human Services Commission shall not implement a form of Medicaid Managed Care in a service area which results in the reduction or elimination of allowable federal Medicaid payments under the upper payment limit provisions of the Medicaid program to public hospitals or other safety net hospitals which serve the Medicaid population.

**Floor Amendment No. 1 on Third Reading**

Amend **CSSB 1188** on third reading as follows:

(1)  Strike the recital to SECTION 6(b) of the bill, as amended by Floor Amendment No. 36 by Truitt on second reading, and substitute "Subchapter A, Chapter 533, Government Code, is amended by adding Sections 533.0071 and 533.0072 to read as follows:".

(2)  Strike Section 533.0073, Government Code, as added by Floor Amendment No. 36 by Truitt on second reading.

(3)  Add the following appropriately numbered SECTION to the bill and renumber subsequent SECTIONS of the bill accordingly:

SECTION __. MEDICAID UPPER PAYMENT LIMIT. Subchapter A, Chapter 533, Government Code, is amended by adding Section 533.00251 as follows:

Sec. 533.00251.  PRESERVATION OF UPPER PAYMENT LIMIT PROVISIONS OF MEDICAID PROGRAM.  (a)  The commission may not expand any Medicaid managed care capitated model or arrangement if the expansion would eliminate federal matching payments made to public hospitals under the federal upper payment limit regulations of the Medicaid program.

(b)  This section expires September 1, 2007.

**Floor Amendment No. 2 on Third Reading**

Amend **CSSB 1188** on third reading by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS accordingly:

SECTION __. (a) Chapter 533, Government Code, is amended by adding Subchapter D to read as follows:

SUBCHAPTER D. INTEGRATED CARE MANAGEMENT MODEL

Sec. 533.061. INTEGRATED CARE MANAGEMENT MODEL. (a) The executive commissioner, by rule, shall develop an integrated care management model of Medicaid managed care. The "integrated care management model" is a noncapitated primary care case management model of Medicaid managed care with enhanced components to:

(1) improve patient health and social outcomes;

(2) improve access to care;

(3) constrain health care costs; and

(4) integrate the spectrum of acute care and long-term care services and supports.

(b) In developing the integrated care management model, the executive commissioner shall ensure that the integrated care management model utilizes managed care principles and strategies to assure proper utilization of acute care and long-term care services and supports. The components of the model must include:

(1) the assignment of recipients to a medical home;

(2) utilization management to assure appropriate access and utilization of services, including prescription drugs;

(3) health risk or functional needs assessment;

(4) a method for reporting to medical homes and other appropriate health care providers on the utilization by recipients of health care services and the associated cost of utilization of those services;

(5) mechanisms to reduce inappropriate emergency department utilization by recipients, including the provision of after-hours primary care;

(6) mechanisms that ensure a robust system of care coordination for assessing, planning, coordinating, and monitoring recipients with complex, chronic, or high-cost health care or social support needs, including attendant care and other services needed to remain in the community;

(7) implementation of a comprehensive, community-based initiative to educate recipients about effective use of the health care delivery system;

(8) strategies to prevent or delay institutionalization of recipients through the effective utilization of home and community-based support services; and

(9) any other components the executive commissioner determines will improve a recipient's health outcome and are cost-effective.

(c) For purposes of this chapter, the integrated care management model is a managed care plan.

Sec. 533.062. CONTRACTING FOR INTEGRATED CARE MANAGEMENT. (a) The commission may contract with one or more administrative services organizations to perform the coordination of care and other services and functions of the integrated care management model developed under Section 533.061.

(b)  The commission may require that each administrative services organization contracting with the commission under this section assume responsibility for exceeding administrative costs and not meeting performance standards in connection with the provision of acute care and long-term care services and supports under the terms of the contract.

(c)  The commission may include in a contract awarded under this section a written guarantee of state savings on Medicaid expenditures for recipients receiving services provided under the integrated care management model developed under Section 533.061.

(d)  The commission may require that each administrative services organization contracting with the commission under this section establish pay-for-performance incentives for providers to improve patient outcomes.

(e)  In this section, "administrative services organization" means an entity that performs administrative and management functions, such as the development of a physician and provider network, care coordination, service coordination, utilization review and management, quality management, and patient and provider education, for a noncapitated system of health care services, medical services, or long-term care services and supports.

Sec. 533.063.  STATEWIDE INTEGRATED CARE MANAGEMENT ADVISORY COMMITTEE. (a)  The executive commissioner may appoint an advisory committee to assist the executive commissioner in the development and implementation of the integrated care management model.

(b)  The advisory committee is subject to Chapter 551.

(b)  The Health and Human Services Commission shall require each administrative services organization contracting with the commission to perform services under Section 533.062, Government Code, as added by this section, to coordinate with, use, and otherwise interface with the fee-for-service claims payment contractor operating in this state on August 31, 2005, until the date the claims payment contract expires, subject to renewal of the contract.

(c)  The commission may require each administrative services organization contracting with the commission to perform services under Section 533.062, Government Code, as added by this section, to incorporate disease management into the integrated care management model established under Section 533.061, Government Code, as added by this section, utilizing the Medicaid disease management contractor operating in this state on November 1, 2004, until the date the disease management contract expires, subject to renewal of the contract.

(d)  If any provision of this section conflicts with a statute enacted by the 79th Legislature, Regular Session, 2005, the provision of this section controls.

**Floor Amendment No. 3 on Third Reading**

Amend **CSSB 1188** on third reading by striking Section 533.0071(4)(C), Government Code, as added by the bill, and substituting the following:

(C) promoting consistency and uniformity among managed care organization policies, including policies relating to the pressurization process, lengths of hospital stays, filing deadlines, levels of care, and case management services; and

**Floor Amendment No. 4 on Third Reading**

Amend **CSSB 1188** on third reading by striking the changes made by items (1) - (4) of Floor Amendment No. 7 by Miller on second reading.

The amendments were read.

Senator Nelson moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 1188** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Nelson, Chair; Janek, Carona, Seliger, and Lucio.

## SENATE BILL 52 WITH HOUSE AMENDMENT

Senator Nelson called **SB 52** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 52** by inserting the following appropriately numbered sections to the bill and renumbering the subsequent sections of the bill accordingly:

SECTION __. Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.085 to read as follows:

Sec. 531.085. PILOT PROGRAM FOR FUNDING COMMUNITY-BASED SERVICES. (a) In this section, "ICF-MR" has the meaning assigned by Section 531.002, Health and Safety Code.

(b) The commission shall direct the Department of Aging and Disability Services to develop and implement a pilot program to:

(1) quantify the amount of money appropriated by the legislature that would have been spent during the remainder of a state fiscal biennium to care for a person who lives in an ICF-MR facility administered by an ICF-MR provider selected to participate in the pilot program under this section, but who is leaving that facility before the end of the biennium to live in the community with the assistance of community-based services provided through a medical assistance waiver program; and

(2) notwithstanding any other state law and to the maximum extent allowed by federal law, transfer within the department's budget or among the commission and the health and human services agencies at the time the person leaves the facility the amount necessary to pay the cost of the community-based services provided to the person as necessary to comply with this section.

(c)  The amount transferred under this section must be redirected by the commission or a health and human services agency to one or more community-based programs to provide community-based services to the person through a medical assistance waiver program after the person leaves the ICF-MR facility.

(d)  The commission and the Department of Aging and Disability Services shall jointly determine criteria for selecting providers of ICF-MR services to participate in the pilot program under this section and shall jointly select at least one provider, but not more than five providers, for participation.  The criteria for selecting a provider may relate to any factor the commission and department consider relevant, including:

(1)  the size and number of ICF-MR facilities the provider administers;

(2)  the history of the provider's quality of care;

(3)  the specific geographic area in which the provider provides services; or

(4)  whether the provider is willing to convert the services provided from institutional services to community-based medical assistance waiver program services.

(e)  The executive commissioner may adopt rules under which the commission may decertify an appropriate Medicaid bed for each person who leaves an ICF-MR facility and for whom money is transferred under Subsection (b)(2).

(f)  Not later than December 1, 2006, the commission and the Department of Aging and Disability Services shall submit a joint report concerning the effectiveness of the pilot program to the governor and the committees of each house of the legislature that have primary oversight jurisdiction over health and human services agencies.  The report must include a recommendation regarding the feasibility of expanding the pilot program statewide, and analysis of provider and consumer experiences under the program, provider information related to the feasibility of expanding the program, and stakeholder recommendations relating to the program.  In preparing the report and recommendations, the commission and department must:

(1)  consider consumer satisfaction with the services provided under the program;

(2)  compare like provider elements, including the following elements with respect to each provider:

(A)  size;

(B)  the number of persons served;

(C)  financial viability, including rates;

(D)  service transition costs;

(E)  geographic location; and

(F)  type and physical condition of facilities; and

(3)  consider other aspects necessary to provide a comprehensive analysis of the program.

SECTION __.  Not later than December 1, 2005, the Department of Aging and Disability Services shall implement the pilot program under Section 531.085, Government Code, as added by this Act.

The amendment was read.

Senator Nelson moved that the Senate do not concur in the House amendment, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 52** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Nelson, Chair; Janek, Armbrister, Carona, and Hinojosa.

### CONFERENCE COMMITTEE ON HOUSE BILL 664

Senator Averitt, on behalf of Senator Duncan, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 664** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 664** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Duncan, Chair; Madla, Brimer, Seliger, and Armbrister.

### SENATE BILL 825 WITH HOUSE AMENDMENTS

Senator Shapleigh called **SB 825** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment No. 2**

Amend **SB 825** by striking Section 1 and adding the following appropriately numbered Section:

SECTION __. Subchapter I, Chapter 2054, Government Code, is amended by adding Section 2054.272 to read as follows:

Sec. 2054.272. USE OF REVENUE FOR PORTALS.  The authority may not use any more of the States share of revenue generated by TexasOnline than is necessary to cover the cost of operations related to the development of internet portals that provide access to information regarding:

(1) education;
(2) business; and
(3) state employees.

**Floor Amendment No. 3**

Amend the Solomons Amendment No. 2 to **SB 825** as follows:

(1) In Section 1 of the bill, in added Section 2054.272, Government Code, between "PORTALS." and "The", insert "(a)".

(3) In Section 1 of the bill, after added Section 2054.272, Government Code, insert a new Subsection (b) as follows:

(b) Subtitle D, Title 10, applies to any purchase made to develop an Internet portal described by Subsection (a).

## Floor Amendment No. 1 on Third Reading

Amend **SB 825** on third reading, in added Section 2054.272(a), Government Code, by striking "The authority may not use any more of the States share of revenue generated by Texas Online than is necessary to cover the cost of operations" and substituting:

"The authority may use revenue generated by Texas Online, other than the state's share of revenue, to cover the cost of operations".

## Floor Amendment No. 2 on Third Reading

Amend **SB 825** on third reading by adding the following appropriately numbered section and renumbering the remaining sections of the bill accordingly:

SECTION __. Section 2054.252(e), Government Code, is amended to read as follows:

(e) The authority shall charge fees to licensing entities as provided by this subchapter in amounts sufficient to cover the cost of implementing this section with respect to licensing entities. The authority shall charge a subscription fee to be paid by each licensing entity. The authority may not charge the subscription fee until the service for which the fee is charged is available on the Internet. If the authority determines that the transaction costs exceed the maximum increase in occupational license issuance or renewal fees allowed under Subsection (g), the authority may also charge a reasonable convenience fee to be recovered from a license holder who uses the project for online issuance or renewal of a license.

## Floor Amendment No. 4 on Third Reading

Amend **SB 825** on third reading by adding the following appropriately numbered section and renumbering the remaining sections of the bill accordingly:

SECTION __. Subchapter I, Chapter 2054, Government Code, is amended by adding SECTION 2054.273 to read as follows:

Sec. 2054.273. INDEPENDENT ANNUAL AUDIT. (a) Not later than August 1 of each year, any private vendor chosen to implement or manage the project shall have an audit of the vendor's finances associated with the management and operation of the project performed by an independent certified public accountant selected by the state. The vendor shall pay for the audit and shall have a copy of the audit provided to the authority.

(b) Not later than August 15 of each year, the authority shall provide a copy of the audit report to:

(1) the presiding officer of each house of the legislature; and

(2) the chair of each committee in the legislature that has primary jurisdiction over the department.

(c) The authority shall keep a copy of the audit report and make the audit report available for inspection by any interested person during regular business hours.

The amendments were read.

Senator Shapleigh moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 825** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Shapleigh, Chair; Ellis, Gallegos, Eltife, and Barrientos.

### SENATE BILL 1887 WITH HOUSE AMENDMENT

Senator Williams, on behalf of Senator Ogden, called **SB 1887** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1887** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to the creation of the Williamson County Municipal Utility District No. 22; providing authority to impose a tax and issue bonds; granting the power of eminent domain.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subtitle F, Title 6, Special District Local Laws Code, is amended by adding Chapter 8135 to read as follows:

#### CHAPTER 8135. WILLIAMSON COUNTY MUNICIPAL
#### UTILITY DISTRICT NO. 22
#### SUBCHAPTER A. GENERAL PROVISIONS

Sec. 8135.001. DEFINITIONS. In this chapter:

(1) "Board" means the board of directors of the district.

(2) "Director" means a member of the board.

(3) "District" means the Williamson County Municipal Utility District No. 22.

Sec. 8135.002. NATURE OF DISTRICT. The district is a municipal utility district in Williamson County created under and essential to accomplish the purposes of Sections 52 and 52-a, Article III, Texas Constitution, and Section 59, Article XVI, Texas Constitution.

Sec. 8135.003. CONFIRMATION ELECTION REQUIRED. If the creation of the district is not confirmed at a confirmation election held under Section 8135.022 before September 1, 2007:

(1) the district is dissolved September 1, 2007, except that:

(A) any debts incurred shall be paid;

(B) any assets that remain after the payment of debts shall be transferred to Williamson County; and

(C) the organization of the district shall be maintained until all debts are paid and remaining assets are transferred; and

(2) this chapter expires September 1, 2010.

Sec. 8135.004. INITIAL DISTRICT TERRITORY. (a) The district is initially composed of the territory described by Section 2 of the Act creating this chapter.

(b) The boundaries and field notes contained in Section 2 of the Act creating this chapter form a closure. A mistake made in the field notes or in copying the field notes in the legislative process does not affect:

(1) the organization, existence, or validity of the district;

(2) the right of the district to impose taxes; or

(3) the legality or operation of the district or the board.

[Sections 8135.005-8135.020 reserved for expansion]

SUBCHAPTER A-1. TEMPORARY PROVISIONS

Sec. 8135.021. TEMPORARY DIRECTORS. (a) The temporary board consists of:

(1) Doug Snyder;

(2) Kyle Spears;

(3) Samantha Brown;

(4) Kenny Mire; and

(5) Gary Fischer.

(b) Temporary directors of the district are not required to own land in or be residents of the district.

(c) If a temporary director fails to qualify for office, the temporary directors who have qualified shall appoint a person to fill the vacancy. If at any time there are fewer than three qualified temporary directors, the Texas Commission on Environmental Quality shall appoint the necessary number of persons to fill all vacancies on the board.

(d) Temporary directors serve until the earlier of:

(1) the date directors are elected under Section 8135.022; or

(2) the date this chapter expires under Section 8135.003.

Sec. 8135.022. CONFIRMATION AND INITIAL DIRECTORS' ELECTION. (a) The temporary directors shall hold an election to confirm the creation of the district and to elect five initial directors as provided by Section 49.102, Water Code.

(b) At the confirmation and initial directors' election the board may submit to the voters a proposition to authorize:

(1) an issuance of bonds;

(2) a maintenance tax; or

(3) a tax to fund payments required under a contract.

(c) Section 41.001(a), Election Code, does not apply to a confirmation and initial directors' election held under this section.

Sec. 8135.023. INITIAL ELECTED DIRECTORS; TERMS. The directors elected under Section 8135.022 shall draw lots to determine which two shall serve until the first regularly scheduled election of directors under Section 8135.052 and which three shall serve until the second regularly scheduled election of directors.

Sec. 8135.024. EXPIRATION OF SUBCHAPTER. This subchapter expires September 1, 2010.

[Sections 8135.025-8135.050 reserved for expansion]
## SUBCHAPTER B. BOARD OF DIRECTORS

Sec. 8135.051. DIRECTORS; TERMS. (a) The district is governed by a board of five directors.

(b) Directors serve staggered four-year terms.

Sec. 8135.052. ELECTION OF DIRECTORS. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

[Sections 8135.053-8135.100 reserved for expansion]
## SUBCHAPTER C. POWERS AND DUTIES

Sec. 8135.101. MUNICIPAL UTILITY DISTRICT POWERS AND DUTIES. The district has the powers and duties provided by the general law of this state, including Chapters 30, 49, and 54, Water Code, applicable to municipal utility districts created under Section 59, Article XVI, Texas Constitution.

Sec. 8135.102. ROAD PROJECTS. (a) To the extent authorized by Section 52, Article III, Texas Constitution, the district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

(b) A road project must meet or exceed all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each municipality in whose corporate limits or extraterritorial jurisdiction the district is located. If the district is located outside the extraterritorial jurisdiction of a municipality, a road project must meet all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each county in which the district is located.

(c) The district may not undertake a road project unless each municipality in whose corporate limits or extraterritorial jurisdiction the district is located consents by ordinance or resolution. If the district is located outside the extraterritorial jurisdiction of a municipality, the district may not undertake a road project unless each county in which the district is located consents by ordinance or resolution.

Sec. 8135.103. LIMITATION ON USE OF EMINENT DOMAIN. The district may exercise the power of eminent domain outside the district only to acquire an easement necessary for a pipeline that serves the district.

Sec. 8135.104. COMPLIANCE WITH MUNICIPAL ORDINANCES. The district is subject to the requirements of municipal ordinances of the City of Hutto that apply to areas within the extraterritorial jurisdiction of the City of Hutto, unless the municipality's governing body waives compliance.

[Sections 8135.105-8135.150 reserved for expansion]
## SUBCHAPTER D. DIVISION OF DISTRICT INTO MULTIPLE DISTRICTS

Sec. 8135.151. DIVISION OF DISTRICT; REQUIREMENTS. (a) Subject to the approval of the City of Hutto, at any time before the district issues indebtedness secured by taxes or net revenues, the district, including any annexed territory, may be divided into two or more new districts.

(b) A new district created by division of the district must be at least 100 acres.

(c) The board by resolution may declare an intent to divide the district. The resolution must:

(1)  set the terms of the division, including a plan for the payment or performance of any outstanding district obligations; and

(2)  contain a metes and bounds description for each new district.

Sec. 8135.152.  DISTRICT DIVISION BY ELECTION. (a) The board shall hold an election in the district to determine whether the district should be divided as proposed under Section 8135.151.

(b)  The board shall give notice of the election not later than the 20th day before the date of the election.  The notice must state:

(1)  the date and location of the election; and

(2)  the proposition to be voted on.

(c)  If a majority of the votes are cast in favor of the division, the district is divided.

(d)  If less than a majority of the votes are cast in favor of the division, the district may not be divided.

(e)  The resulting new districts are separate districts and shall be governed as separate districts.

Sec. 8135.153.  NOTICE OF DIVISION. Not later than the 30th day after the date of a division under this subchapter, the district shall provide written notice of the plan for division to:

(1)  the Texas Commission on Environmental Quality;

(2)  the attorney general;

(3)  the commissioners court of each county in which a new district is located; and

(4)  each municipality having extraterritorial jurisdiction over territory in a new district.

Sec. 8135.154.  DISTRICT NAMES FOLLOWING DIVISION. The resulting new districts are assigned consecutive letters to be appended to the name of the original district.

Sec. 8135.155.  ELECTION OF DIRECTORS OF NEW DISTRICTS. (a) Not later than the 90th day after the date of an election in favor of the division of the district, the board shall:

(1)  appoint itself as the board of one of the new districts; and

(2)  appoint five directors for each of the other new districts.

(b)  A director appointed under Subsection (a)(1) serves the term to which that director was elected in the original district. A director appointed under Subsection (a)(2):

(1)  serves until the election for directors under Subsection (c); and

(2)  is not required to own land in or reside in the district for which the director is appointed.

(c)  On the uniform election date in May of the first even-numbered year after the year in which the directors are appointed, an election shall be held to elect five directors in each district for which directors were appointed under Subsection (a)(2). Of the five directors elected in each district, the three directors receiving the greatest number of votes shall serve until the second regularly scheduled election of directors under Subsection (d), and the remaining two directors shall serve until the first regularly scheduled election of directors.

(d) Except as provided by Subsection (c), directors serve staggered four-year terms. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

Sec. 8135.156. CONTINUING POWERS AND OBLIGATIONS OF NEW DISTRICTS. (a) Each new district may incur and pay debts and has all powers of the original district created by this chapter.

(b) If the district is divided as provided by this subchapter, the current obligations and any bond authorizations of the district are not impaired. Debts shall be paid by revenues or by taxes or assessments imposed on real property in the district as if the district had not been divided or by contributions from each new district as stated in the terms set by the board in the plan for division.

(c) Any other district obligation shall be divided pro rata among the new districts on an acreage basis or on other terms that are satisfactory to the new districts.

Sec. 8135.157. CONTRACT AUTHORITY OF NEW DISTRICTS. The new districts may contract with each other for:

(1) water and wastewater services; or

(2) any other matter the boards of the new districts consider appropriate.

Sec. 8135.158. BOND ISSUANCE BY NEW DISTRICT. A new district may issue bonds payable wholly or partially from ad valorem taxes on the approval of a majority of the residents voting in an election called and held for that purpose.

Sec. 8135.159. MAINTENANCE TAX APPROVAL FOR NEW DISTRICT. A new district may impose a maintenance tax on the approval of a majority of the residents voting in an election called and held for that purpose.

SECTION 2. The Williamson County Municipal Utility District No. 22 initially includes the territory contained within the following area:

The boundaries of the district consist of approximately 424.3675 acres of land, more or less, being approximately 490.72 acres of land, more or less as described in Exhibit A attached hereto and incorporated herein by reference for all intents and purposes save and except approximately 66.3525 acres of land, more or less, in three tracts of land described in Exhibit B attached hereto and incorporated herein by reference for all intents and purposes.

"EXHIBIT A"

TRACT I:

First Tract:

BEGINNING AT A ST.MD. IN THE S. LINE OF THE MCNUTT LEAGUE BEING THE S.W. CORNER OF A TRACT OF 250 ACRES OF LAND DEEDED TO H.M. MCNUTT BY MARY MCNUTT;

THENCE EAST 915 VRS. TO THE S.W. CORNER OF THE A.S. WALKER TRACT;

THENCE NORTH WITH WEST LINE OF SAID A.S. WALKER TRACT TO THE S. EDGE OF THE TIMBER;

THENCE WEST WITH THE MEANDERS OF SAID TIMBER TO THE EAST LINE OF A TRACT OF LAND SOLD BY H.M. NCNUTT TO BEN SNYDER;

THENCE NORTH WITH THE SAID E. LINE OF THE SNYDER TRACT 339 VRS. A. STONE MD.;

THENCE WEST 290 BRS. TO A SMALL SPANISH OAK FOR A CORNER;

THENCE WITH THE MEANDERS OF A BANK OR BLUFF TO A STAKE IN THE WEST LINE OF THE AFORESAID 250 ACRE TRACT, FROM WHICH A SPANISH OAK BRS. S.50 W 5 VRS.

THENCE SOUTH 800 VRS. TO THE PLACE OF BEGINNING.

Second Tract:

BEGINNING AT THE S.W. CORNER OF THE WALKER TRACT;

THENCE NORTH 373 VRS.;

THENCE EAST 29 1/2 VRS.;

THENCE SOUTH 373 VRS;

THENCE WEST 29 1/2 VRS. TO THE BEGINNING.

Third Tract:

BEGINNING IN THE CENTER OF BRUSHY CREEK, ON THE A.S. WALKER WEST LINE;

THENCE SOUTH WITH SAID WALKER'S LINE 300 VRS;

THENCE NORTH 45 W 143 VRS;

THENCE NORTH 3 EAST 260 VRS. TO THE CENTER OF SAID BRUSHY CREEK;

THENCE DOWN SAID CREEK WITH ITS MEANDERS TO THE PLACE OF BEGINNING.

AS TO TRACT I, THE THREE TRACTS CONTAIN 75-ACRES, MORE OR LESS, AND BEING THE SAME LAND CONVEYED BY W.R. RAY AND WIFE, NANNIE BELLE RAY TO BEN BURSON ON DECEMBER 26, 1907, BY DEED RECORDED IN VOL. 127, PAGE 372, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS.

TRACT II:

BEGINNING AT THE S.E. CORNER OF THE TRACT OWNED BY BURSON FOR S.W. CORNER HEREOF;

THENCE EAST WITH THE SOUTH LINE OF R. MCNUTT SURVEY 108.7 VRS., A POST FOR S.E. CORNER HEREOF;

THENCE NORTH 3 EAST 894.3 VRS. TO A STONE IN THE GROUND FOR THE N.E. CORNER HEREOF, AND ON THE SOUTH MARGIN OF A PUBLIC ROAD;

THENCE NORTH 71-1/4 WEST 191-1/2 VRS. TO THE N.E. CORNER OF SAID BURSON TRACT;

THENCE WITH SAID BURSON EAST LINE ABOUT DUE SOUTH 565-1/5 VRS. TO A POST;

THENCE SOUTH 60-3/4 EAST 34-1/5 VRS. A POST FOR CORNER;

THENCE SOUTH 368-3/4 VRS. TO THE PLACE OF BEGINNING AND CONTAINING 24-1/10 ACRES OF LAND, AND BEING THE SAME LAND CONVEYED BY H. TIMMERMAN TO BEN BURSON ON NOVEMBER 27, 1912, BY DEED RECORDED IN VOL. 155, PAGE 159, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS.

TRACT III:

BEING A PORTION OF THE ROBERT MCNUTT LEAGUE AND OFF OF AND ENTIRELY ACROSS THE EAST SIDE OF A TRACT OF LAND 94.89 ACRES, CONVEYED TO JOE D. CRAWFORD BY H. TIMMERMANN BY DEED DATED JANUARY 1, 1910, AND RECORDED IN VOL. 138, PAGE 287, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, AND MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE S.E. CORNER OF SAID 94.89 ACRE TRACT, SAME BEING THE S.E. CORNER OF THIS TRACT;

THENCE NORTH WITH FENCE FOR EAST LINE 722 VRS. TO THE N.E. CORNER OF SAID 94.89 ACRE TRACT, ALSO THE N.E. CORNER OF THIS TRACT;

THENCE WEST WITH FENCE 120 VRS. TO AN IRON ROD IN GROUND FOR N.W. CORNER OF THIS TRACT;

THENCE SOUTH PARALLEL WITH THE EAST LINE OF SAID 94.89 ACRE TRACT FOR S.W. CORNER OF THIS TRACT;

THENCE EAST 120 VRS. WITH FENCE TO THE PLACE OF BEGINNING AND CONTAINING 15.34 ACRES OF LAND, AND BEING THE SAME TRACT CONVEYED BY J.D. CRAWFORD AND WIFE JULIA CRAWFORD, TO BEN BURSON BY DEED DATED NOVEMBER 7, 1912, RECORDED IN VOL. 155, PAGE 156, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS.

TRACT IV:

First Tract:

ABOUT 4 ACRES OF LAND OFF OF THE SOUTH END OF A TRACT OF 99-1/4 ACRES OUT OF THE ROBERT MCNUTT LEAGUE, DESCRIBED AS SIXTH TRACT IN DEED FROM B.L. RAY AND WIFE, TO ED M. DOWNING, DATED THE 23RD DAY OF OCTOBER, 1929, AND RECORDED IN VOL. 244, PAGE 520, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, DESCRIBED AS FOLLOWS:

BEGINNING AT THE S.W. CORNER OF SAID 99-1/4 ACRE TRACT FOR THE S.W. CORNER HEREOF;

THENCE NORTH 3 EAST ABOUT 300 VRS. TO POINT IN SOUTH LINE OF PUBLIC ROAD, FOR N.W. CORNER HEREOF;

THENCE IN AN EASTERLY DIRECTION WITH THE SOUTH LINE OF SAID ROAD TO POINT WHERE THE SAID SOUTHLINE CROSSES THE EASTLINE OF THE 99-1/4 ACRE TRACT FOR N.E. CORNER HEREOF;

THENCE SOUTH WITH THE EAST LINE OF SAID 99-1/4 ACRE TRACT TO THE S.E. CORNER OF SAME IN CENTER OF CHANNEL OF BRUSHY CREEK;

THENCE UP SAID CREEK WITH ITS MEANDERS TO THE PLACE OF BEGINNING, AND CONTAINING 4 ACRES OF LAND, MORE OR LESS.

Second Tract:

BEING DESCRIBED AS SEVENTH TRACT IN THE DEED NEXT ABOVE MENTIONED, AND DESCRIBED AS FOLLOWS: A TRACT OF TIMBERED LAND ON THE SOUTH SIDE OF BRUSHY CREEK;

BEGINNING AT THE S.W. CORNER OF SHERMAN'S WOODLAND TRACT, RUNNING SOUTH 245 VRS. TO ST.MD ON WEST RUBLE'S LINE;

THENCE EAST WITH SAID LANE TO THE EAST LINE OF SURVEY SOLD BY JAMES WILLIAMS TO H.M. MCNUTT;

THENCE NORTH WITH SAID LINE TO BRUSHY CREEK ON SHERMAN'S LINE;

THENCE WEST TO THE PLACE OF BEGINNING, SUPPOSED TO CONTAIN 3 ACRES OF LAND, BEING THE SAME LAND DESCRIBED IN DEED FROM ED M. DOWNING TO BEN BURSON, DATED JANUARY 23, 1931, RECORDED IN VOL. 255, PAGE 558, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS

THE FIRST AND SECOND TRACT OF TRACT IV BEING THE SEPARATE PROPERTY OF ALMA MARSHALL, AND SET ASIDE TO HER IN A PARTITION DEED DATED FEBRUARY 4, 1943, AND RECORDED IN VOL. 315, PAGE 399, DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, AND REFERENCE IS MADE TO SAID DEED FOR A FULL DESCRIPTION OF THE SAME.

TRACTS I, II, III AND IV ABOVE DESCRIBED BEING THE SAME LANDS DESCRIBED IN A DEED DATED MAY 9, 1955, FROM OSCAR MARSHALL AND WIFE, ALMA MARSHALL, TO R.R. KAY, AND RECORDED IN VOL. 405, PAGE 235 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, TO WHICH REFERENCE IS HERE MADE FOR ALL PURPOSES.

TRACT V:

BEGINNING AT THE S.E. CORNER OF BURSON'S TRACT OF LAND, A POST ON THE R. MCNUTT SOUTH LINE, AND NORTH LINE OF THE JAMES H. NEILY SURVEY;

THENCE EAST 108.7 VRS. A CEDAR POST FOR CORNER;

THENCE SOUTH 3 WEST 367-1/2 VRS. A CEDAR POST FOR CORNER;

THENCE SOUTH 50-25 WEST 340.7 VRS. A CEDAR POST FOR CORNER;

THENCE SOUTH 80-1/3 WEST 764.7 VRS. A CEDAR POST ON WEST LINE AND FLUGER'S EAST LINE;

THENCE NORTH 704-1/5 VRS. TO A POST FOR N.W. CORNER HEREOF;

THENCE 927-1/5 VRS. TO THE PLACE OF BEGINNING, AND CONTAINING 108.58 ACRES OF LAND OUT OF THE JAMES H. NEILY SURVEY, PATENT NO. 644, VOL. 2.

TRACT VI:

BEGINNING AT THE NORTHWEST CORNER OF THE ABOVE DESCRIBED TRACT V;

THENCE NORTH 75 VRS. A POST FOR NORTHWEST CORNER THEREOF;

THENCE EAST 226 VRS. TO POST FOR NORTHWEST CORNER;

THENCE SOUTH 75 VRS. A STONE ON NORTH LINE OF SAID TRACT V;

THENCE WEST 226 VRS TO THE PLACE OF BEGINNING, AND CONTAINING 3 ACRES OF LAND OUT OF THE R. MCNUTT SURVEY, AND BEING THE SAME LAND CONVEYED TO OSCAR MARSHALL BY H. TIMMERMANN, BY DEED DATED NOVEMBER 27, 1912, RECORDED IN BOOK 179, PAGE 549 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS.

TRACTS V AND VI ABOVE DESCRIBED BEING THE SAME LANDS DESCRIBED IN THAT CERTAIN DEED DATED MAY 9, 1955, FROM OSCAR MARSHALL AND WIFE ALMA MARSHALL, TO R.R. KAY AND RECORDED IN VOL. 405, PAGE 239 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, TO WHICH REFERENCE IS HERE MADE FOR ALL PURPOSES.

TRACT VII:

THE FOLLOWING PROPERTY OUT OF THE ROBERT MCNUTT SURVEY IN WILLIAMSON COUNTY, TEXAS, AS DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE WEST FENCE LINE OF A TRACT OF 65 ACRES OF LAND IN SAID ROBERT MCNUTT SURVEY HERETOFORE CONVEYED TO G.W. BOHLS ET AL AS "FIRST TRACT" IN A DEED RECORDED IN VOL. 243, PAGE 315 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, WHICH SAID POINT OF BEGINNING IS IN THE EAST LINE OF LAND NOW OWNED BY R.R. KAY AND 14 FEET FROM THE S.E. CORNER OF KAY AND THE S.W. CORNER OF SAID 65 ACRE

TRACT, WHICH SAID CORNERS ARE IN THE SOUTH LINE OF SAID ROBERT MCNUTT SURVEY, AN IRON PIPE SET FOR THE S.W. CORNER HEREOF;

THENCE NORTH 3 DEG. 20 MIN. EAST 887.04 VRS. (2464 FT.) WITH THE FENCE ALONG SAID COMMON LINES, CROSSING BRUSHY CREEK AT 2075 FT. TO AN IRON PIPE AT OR NEAR THE N.E. CORNER OF SAID 65 ACRE-TRACT IN THE SOUTH LINE OF AN OLD ROAD NOT USED FOR SOME YEARS, FOR THE N.W. CORNER HEREOF;

THENCE SOUTH 77 DEG. 45 MIN. EAST, 201.6 VRS. (560 FT.) TO A BEND IN THE ROAD LINE;

THENCE SOUTH 87 DEG. EAST, 252.0 VRS. (700 FT.) TO AN IRON STAKE SET IN THE ROAD LINE FOR THE N.E. CORNER HEREOF, SAME BEING THE N.E. CORNER OF SAID 65 ACRE TRACT, ON OR NEAR THE EAST LINE OF SAID ROBERT MCNUTT SURVEY;

THENCE SOUTH 10 DEG. WEST, 731.53 VRS. (2032 FT.) TO AN IRON PIPE FOR THE S.E. CORNER HEREOF (AT 310 FT.) CROSSED CENTER OF BRUSHY CREEK, AT 415 FT. SPRING BRANCH, LEAVE SPRING BRANCH AT 555 FT., CROSS SPRING BRANCH AT 1848 FT. AND AT 2032 FT. IN ALL THE S.E. CORNER HEREOF);

THENCE NORTH 88 DEG. 40 MIN. WEST, AT 126.5 FT. PASSED THROUGH A 9" ELM, AT 193 FT. CROSSED THE CENTER OF SPRING BRANCH, AND AT 220.5 FT. IN ALL (79.38 VRS.) TO A 5" ASH TREE MARKED "V" IN THE S.W. SIDE, 6' FROM THE GROUND;

THENCE SOUTH 69 DEG. 20 MIN. WEST, 314.1 VRS. (872.5 FT.) TO THE PLACE OF BEGINNING, AND CONTAINING 56.48 ACRES OF LAND, AS SURVEYED BY W.F. FOREST, REGISTERED PUBLIC SURVEYOR, #101, ON APRIL 6, 1957;

AND BEING THE SAME PROPERTY DESCRIBED IN THAT CERTAIN DEED DATED APRIL 29, 1957, FROM THEO TIMMERMANN, ET AL, TO R.R. KAY, RECORDED IN VOL. 485, PAGE 215 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS TO WHICH REFERENCE IS HERE MADE FOR ALL PURPOSES.

TRACTS VIII AND IX HEREIN DESCRIBED BEING A PART OF THE M.D. WALDING SURVEY, ABSTRACT 675, IN WILLIAMSON COUNTY, TEXAS, AND BEING OFF THE NORTH END OF A TRACT OF 301.6 ACRES OF LAND DESCRIBED IN DEED TO WM. KLATTENHOFF, RECORDED IN VOL. 23, PAGE 591 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, AND DESCRIBED AS FOLLOWS:

TRACT VIII:

BEGINNING AT THE N.W. CORNER OF THE TRACT 301.6 ACRES DESCRIBED IN DEED TO W.M. KLATTENHOFF RECORDED IN VOL. 23, PAGE 591 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, AND THE N.W. CORNER OF THE WALDING SURVEY, IN THE EAST LINE OF THE MCNUTT SURVEY AND OF R.R. KAY'S LAND, IN THE CENTER OF BRUSHY CREEK;

THENCE DOWN THE CENTER OF BRUSHY CREEK WITH ITS MEANDERS AS FOLLOWS:

NORTH 71 EAST, 72.0 VRS.;

NORTH 50 DEG. 10 MIN. EAST, 140.4 VRS.;

NORTH 66 DEG. 10 MIN EAST, 151.2 VRS.;

NORTH 71 EAST, 180.0 VRS.;

NORTH 81 DEG. 30 MIN. EAST, 266.4 VRS; AND

SOUTH 86 DEG. 10 MIN. EAST, 196.92 VRS. TO THE N.E. CORNER OF SAID 301.6 ACRE TRACT;

THENCE SOUTH 10 WEST, AT 15.84 VRS. SET AN IRON PIPE ON THE BANK AND CONTINUING 104.4 VRS. IN ALL, SET AN IRON STAKE IN THE CENTER OF AN OLD ABANDONED ROAD AT A CORNER OF THE SAID 301.6 ACRE TRACT AND OF A TRACT

DESCRIBED IN A DEED TO WM. R. BRIGHT, RECORDED IN VOL. 338, PAGE 480 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS;

THENCE SOUTH 80 WEST, WITH THE CENTER OF SAID OLD ROAD, 181.08 VRS. TO AN IRON PIPE SET AT A BEND IN THE ROAD, ANOTHER CORNER OF THE BRIGHT AND KLATTENHOFF TRACTS;

THENCE SOUTH 10 DEG. 20 MIN. WEST, WITH THE CENTER OF THE OLD ROAD (46 FEET WIDE), 812.16 VRS. TO A POINT IN THE WEST RIGHT-OF-WAY LINE OF PRESENT FARM ROAD #685;

THENCE SOUTH 27 DEG. 30 MIN. WEST WITH SAID WEST RIGHT-OF-WAY, AT 600.12 VRS. PASS A CONCRETE ROW MARKER, AND CONTINUING 841.97 VRS. IN ALL TO AN IRON PIPE SET 3.8 FEET PAST A POINT IN LINE WITH THE CENTER OF A SMALL BOX CULVERT, FOR THE S.E. CORNER HEREOF;

THENCE WEST 379.98 VRS. TO AN IRON PIPE SET IN A FENCE;

THENCE NORTH 9 DEG. 40 MIN. EAST, WITH THE FENCE, 108 VRS. TO AN IRON PIPE SET IN THE GROUND;

THENCE WEST 83.77 VRS. TO AN IRON STAKE SET AT A FENCE CORNER, THE S.E. OF 35 ACRE TRACT OWNED BY TIMMERMAN & BOHLS, THE N.E. CORNER OF A TRACT OF 200 ACRES OWNED BY KLATTENHOFF;

THENCE NORTH 10 DEG. EAST, WITH A FENCE ALONG THE WEST LINE OF SAID 301.6 ACRE TRACT ABOVE DESCRIBED, AND WITH THE WEST LINE OF SAID WALDING SURVEY, AT ABOUT 600 VRS. PASS THE N.E. CORNER OF THE JAMES N. NEILLY SURVEY AND THE S.E. CORNER OF THE R. MCNUTT SURVEY, AT 715.88 VRS. PASS THE S.E. CORNER OF THE R.R. KAY TRACT, AND CONTAINING IN ALL 1334.52 VRS TO THE PLACE OF BEGINNING AND CONTAINING 189.92 ACRES OF LAND.

TRACT IX:

BEGINNING AT A FENCE CORNER IN THE EAST RIGHT-OF-WAY LINE OF FARM ROAD #685; THE S.E. CORNER OF TRACT VIII ABOVE, BEARS NORTH 75 DEG. 05 MIN. WEST; 36.86 VRS AND SOUTH 27 DEG. 30 MIN. WEST, 55.73 VRS., AN IRON PIPE SET FOR THE S.W. CORNER OF THIS TRACT;

THENCE NORTH 27 DEG. 30 MIN. EAST, WITH THE RIGHT-OF-WAY LINE, 574.74 VRS. TO A ROW MARKER FOR CORNER;

THENCE SOUTH 59 DEG. 30 MIN. EAST, AT 20.12 VRS. PASS A ROW MARKER IN THE WEST LINE OF AN OLD ABANDONED ROAD, AND CONTINUING IN ALL, 28.62 VRS. TO THE CENTER OF SAID ROAD; THENCE SOUTH 10 WEST WITH THE CENTER OF THE OLD ROAD 555.12 VRS.;

THENCE NORTH 75 DEG. 05 MIN. WEST, AT 8 VRS. PASS A FENCE CORNER IN THE WEST LINE OF SAID OLD ROAD (THE ROW MARKER IN THE WEST LINE OF SAID OLD ROAD MENTIONED ABOVE BEARS NORTH

10 EAST 557.28 VRS.) WITH AN OLD FENCE, AND CONTINUING IN ALL
201.6 VRS. TO THE PLACE OF BEGINNING AND CONTAINING 11.30 ACRES
OF LAND, OF WHICH 0.8 ACRES IS IN THE OLD ROAD.

"EXHIBIT B"

DESCRIPTION FOR PARCEL 118

DESCRIPTION OF A 2,841,401 SQUARE FOOT, 65.230 ACRE, TRACT
OF LAND OUT OF THE N.D. WALLING SURVEY NO. 19, ABSTRACT
NO. 675 AND THE ROBERT MCNUTT SURVEY, ABSTRACT NO. 422,
WILLIAMSON COUNTY, TEXAS, BEING PART OF A 189.92 ACRE
TRACT (TRACT VIII), AND A PART OF A 56.48 ACRE TRACT
(TRACT VII) BOTH DESCRIBED IN GENERAL WARRANTY DEEDS
DATED JUNE 1, 2000, TO KAY RANCH LIMITED PARTNERSHIP
RECORDED IN DOCUMENT NOS. 2000036589, 2000036590,
2000036591, 2000036592, AND 2000036593, OFFICIAL PUBLIC
RECORDS OF WILLIAMSON COUNTY, TEXAS; SAID 2,841, 401
SQUARE FOOT, 65.230 ACRE TRACT AS SHOWN ON THE
ACCOMPANYING PARCEL PLAT, BEING MORE PARTICULARLY
DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING for reference at a found 1/2-inch iron rod at the
southernmost southwest corner of said 189.92 acre tract, and an interior ell
corner of a 48.8642 acre tract described in a Warranty Deed, dated April 4,
2003, to Tack Development, LTD., recorded in Document No. 2003031850,
Official Public Records of Williamson County, Texas;

THENCE, N 87°36' 42" E, with the common line between said 189.92 acre
tract and said 48.8642 acre tract, a distance of 546.75 feet to a set 1/2-inch
iron rod with TxDOT aluminum cap, on the proposed west right-of-way line
of S.H. 130, 327.77 feet right of proposed S.H. 130 baseline station
794+49.45, for the southwest corner and the POINT OF BEGINNING of
this tract;

THENCE, across said 189.92 acre tract with the proposed west right-of-way
line of S.H. 130, the following four (4) courses:

1) N 01° 52 '37" W, a distance of 1249.76 feet to a set 1/2-inch iron rod
with TxDOT aluminum cap (to be replaced with a TxDOT Type II
monument after right-of-way acquisition is complete), at an angle point of
this tract;

2) N 03° 09' 00" W, a distance of 1353.15 feet to a set 1/2-inch iron rod
with TxDOT aluminum cap (to be replaced with a TxDOT Type II
monument after right-of-way acquisition is complete), at an angle point of
this tract;

3) S 86° 50' 57" W, a distance of 145.00 feet to set 1/2-inch iron rod with
TxDOT aluminum cap (to be replaced with a TxDOT Type II monument
after right-of-way acquisition is complete), at an angle point of this tract;

4) N 03° 31' 10" W, at a distance of 1,500.00 feet pass a set 1/2-inch
iron rod with TxDOT aluminum cap (to be replaced with a TxDOT
Type II monument after right-of-way acquisition is complete) on the

proposed west right-of-way line of S.H.130, in all a total distance of 1691.73 feet to a set 1/2-inch iron rod with TxDOT aluminum cap, 455.91 feet right of proposed S.H. 130 baseline station 751+55.15, on the north line of said 56.48 acre tract and the south line of a 155 acre tract referenced in a Final Divorce Decree dated June 26, 1989, to Bobby J. Shepherd recorded in Document No. 2000045213, Official Public Records of Williamson County, Texas, for the northwest corner of this tract;

5) THENCE, S 89° 00' 08" E, with the common line between said 56.48 acre tract and said 155 acre tract, a distance of 165.07 feet to a found 1/2-inch iron rod, at the northeast corner of said 56.48 acre tract, a southeast corner of said 155 acre tract and on the west line of a 201.37 acre tract referenced in said Divorce Decree to Linda K. Shepherd, of said Document No. 2000045213, and described in said Trustee's Deed of said Volume 1399, Page 172;

6) THENCE, S 07° 40' 07" W, with the common line between said 56.48 acre tract and said 201.37 acre tract, a distance of 337.66 feet to a calculated point at the northwest corner of said 189.92 acre tract and the approximate centerline of Brushy Creek;

THENCE, with the north line of said 189.92 acre tract and the approximate centerline of Brushy Creek the following three (3) courses:

7) N 68° 40' 13" E, a distance of 200.05 feet to a calculated point at an angle point of this tract;

8) N 47° 50' 13" E, a distance of 390.00 feet to a calculated point at an angle point of this tract;

9) N 63° 50' 13" E, a distance of 192.16 feet to a calculated point, on the proposed east right-of-way line of S.H.130, 315.31 feet left of proposed S.H.130 baseline station 751+15.70, for the northeast corner of this tract;

DESCRIPTION FOR PARCEL 119

DESCRIPTION OF A 4,201 SQUARE FOOT, 0.096 ACRE TRACT OF LAND OUT OF THE N.D. WALLING SURVEY NO. 19, ABSTRACT NO. 675, BEING A PART OF AN 11.30 ACRE TRACT DESCRIBED AS TRACT IX IN A GENERAL WARRANTY DEED DATED MAY 8, 2000, TO KAY RANCH LIMITED PARTNERSHIP, RECORDED IN DOCUMENT NO. 2000036593, OFFICIAL PUBLIC RECORDS OF WILLIAMSON, COUNTY, TEXAS; SAID 4,201 SQUARE FOOT, 0.096 ACRE TRACT AS SHOWN ON THE ACCOMPANYING PARCEL PLAT, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING for reference at a found 1/2-inch iron rod at the southeast corner of said 11.30 acre tract on the centerline of an old abandoned road;

THENCE, N 77° 48' 52" W, across said road with the south line of said 11.30 acre tract, at a distance of 22.22 feet pass the west line of said road, at northeast corner of a 51.06 acre tract of land described in a General Warranty Deed dated August 7, 1987, to Carolyn Pfeiffer,

recorded in Volume 1571, Page 383, Official Records of Williamson County, Texas, continuing with the common line between said 11.30 acre tract and said 51.06 acre tract in all a total distance of 523.25 feet to a set 1/2-inch iron rod with TxDOT aluminum cap 391.90 feet left of proposed S.H. 130 baseline station 793+58.40, on the proposed cast right-of way line of S.H.130, for the southeast corner and the POINT OF BEGINNING of this tract;

1) THENCE, N 77° 48' 52" W, continuing with the common line between said 51.06 acre tract and said 11.30 acre tract, at a distance of 36.99 feet pass a found 1/2-inch iron pipe, in all a total distance of 37.85 feet to a calculated point on the existing east right-of-way line F.M. 685, a 100-foot right-of-way, for the southwest corner of this tract;

2) THENCE, N 25° 04' 25" E, with the common line between said 11.30 acre tract and said F.M. 685, distance of 339.07 feet to a set 1/2-inch iron rod with TxDOT aluminum cap (to be replaced with a TxDOT Type II monument after right-of-way acquisition is complete), 515.76 feet left of proposed S.H.130 baseline station 790+49.63, on a curve of the proposed east right-of-way line of said S.H.130, for the north corner of this tract;

3) THENCE, along said curve to the left, having a radius of 1500.00 feet, a central angle of 12° 44' 02", a chord which bears S 18° 42' 25" W, 332.69 feet, and an arc distance of 333.37 feet to the POINT OF BEGINNING, containing 4,201 square feet, 0.096 acres of land, more or less.

FIELD NOTE DESCRIPTION OF A TRACT OR PARCEL OF LAND CONTAINING 1.0265 ACRES SITUATED IN THE JAMES H. NEILEY SURVEY, ABSTRACT NUMBER 485, WILLIAMSON COUNTY, TEXAS; BEING A PORTION OF A 108.58 ACRE TRACT DESCRIBED AS "TRACT V", IN A DEED TO JOHN H. HUGGINS, SR. RECORDED IN VOLUME 2338, PAGE 516 OF THE DEED RECORDS OF WILLIAMSON COUNTY, TEXAS, AND IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT 1" IRON PIPE FOUND FOR THE NORTHEAST CORNER OF A 8.52 ACRE TRACT DESCRIBED AS THE "FIRST TRACT" AND CONVEYED TO BRUSHY CREEK LTD. BY A DEED RECORDED IN DOCUMENT NO. 9731656 OF THE "OFFICIAL PUBLIC RECORDS" OF WILLIAMSON COUNTY, TEXAS, AND IS THE SOUTHEAST CORNER OF A 56.48 ACRE TRACT DESCRIBED AS "TRACT VII" AND CONVEYED TO JOHN H. HUGGINS, SR. IN THE DEED MENTIONED ABOVE RECORDED IN VOLUME 2338, PAGE 516 OF THE SAID WILLIAMSON COUNTY DEED RECORDS; THENCE, S88°10'33"W, WITH THE COMMON LINE BETWEEN THE 8.52 ACRE TRACT AND THE 56.48 ACRE TRACT, 221.32 FEET TO A 10" WILLOW TREE (WITH EMBEDDED BARB WIRE FENCING);

THENCE, S68°02'17"W, CONTINUING WITH THE ABOVE SAID COMMON LINE, 853.02 FEET TO A 1/2" IRON ROD FOUND WITH A PLASTIC CAP (STAMPED "CAPITAL SURVEYING CO. INC.") FOR THE COMMON WESTERN CORNER OF THE 8.52 ACRE TRACT AND THE 56.48 ACRE TRACT, A NORTHERLY COMMON CORNER OF A 35.00 ACRE TRACT DESCRIBED AS THE "SECOND TRACT" AND CONVEYED TO BRUSHY CREEK LTD. BY THE DEED RECORDED IN DOCUMENT NO. 9131656 MENTIONED ABOVE, AND THE 108.58 ACRE HUGGINS TRACT; AND IS THE SOUTHEAST CORNER OF A 24.1 ACRE TRACT DESCRIBED AS "TRACT II" IN THE DEED TO JOHN HUGGINS, SR., AND RECORDED IN VOLUME 2338, PAGE 516 OF THE SAID DEED RECORDS;

THENCE, S00°45'28"W, WITH THE COMMON LINE BETWEEN THE 35 ACRE TRACT AND THE 108.58 ACRE TRACT, 83.38 FEET TO A 1/2" IRON ROD SET WITH A PLASTIC CAP (STAMPED "CAPITAL SURVEYING CO.INC."), FOR THE POINT OF BEGINNING OF THE HEREIN DESCRIBED 1.0265 ACRE TRACT;

THENCE, S00°45'28"W, CONTINUING WITH THE COMMON LINE BETWEEN THE 108.58 ACRE TRACT AND THE 35 ACRE TRACT, 214.84 FEET TO A 1/2" IRON ROD SET WITH A PLASTIC CAP (STAMPED "CAPITAL SURVEYING CO. INC,"), SAID IRON ROD BEARS N00°45'28"e, 759.90 FEET FROM A FENCE CORNER POST FOUND FOR AN ANGLE POINT IN THIS COMMON LINE;

THENCE, S83°50'26"W, LEAVING THE SAID COMMON LINE AND CROSSING INTO THE 108.58 ACRE TRACT, 184.66 FEET TO A 1/2" IRON ROD SET WITH A PLASTIC CAP (STAMPED "CAPITAL SURVEYING CO. INC."), FOR THE POINT OF CURVATURE OF A CURVE TO THE RIGHT;

THENCE, CONTINUING ACROSS THE 108.58 ACRE TRACT WITH THE SAID CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 164°18'02", A RADIUS OF 75.00 FEET, A LONG CHORD OF 148.59 FEET (CHORD BEARS N14°15'39"W), FOR AN ARC DISTANCE OF 215.07 FEET TO A 1/2" IRON ROD SET WITH A PLASTIC CAP (STAMPED "CAPITAL SURVEYING CO. INC.);

THENCE, N67°53'21"E, 240.74 FEET TO THE POINT OF BEGINNING, CONTAINING WITH THESE METES AND BOUND 1.0265 ACRES OF LAND AREA.

SECTION 3. (a) The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b)  The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c)  The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d)  All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 4.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Williams, on behalf of Senator Ogden, moved to concur in the House amendment to **SB 1887**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1836 WITH HOUSE AMENDMENT

Senator Van de Putte, on behalf of Senator Barrientos, called **SB 1836** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

#### Amendment

Amend **SB 1836** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the creation of the Pflugerville Municipal Management District No. 1; providing authority to impose a tax and issue bonds.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle C, Title 4, Special District Local Laws Code, is amended by adding Chapter 3852 to read as follows:

CHAPTER 3852.  PFLUGERVILLE MUNICIPAL

MANAGEMENT DISTRICT NO. 1

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 3852.001.  DEFINITIONS.  In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "District" means the Pflugerville Municipal Management District No. 1.

Sec. 3852.002.  PFLUGERVILLE MUNICIPAL MANAGEMENT DISTRICT NO. 1. The Pflugerville Municipal Management District No. 1 is a special district created under Section 59, Article XVI, Texas Constitution.

Sec. 3852.003.  PURPOSE; DECLARATION OF INTENT. (a)  The creation of the district is essential to accomplish the purposes of Sections 52 and 52-a, Article III, and Section 59, Article XVI, Texas Constitution, and other public purposes stated in this chapter. By creating the district and in authorizing Travis County, the City of Pflugerville, and other political subdivisions to contract with the district, the legislature has established a program to accomplish the public purposes set out in Section 52-a, Article III, Texas Constitution.

(b)  The creation of the district is necessary to promote, develop, encourage, and maintain employment, commerce, transportation, housing, tourism, recreation, the arts, entertainment, economic development, safety, and the public welfare in the district.

(c)  This chapter and the creation of the district may not be interpreted to relieve Travis County or the City of Pflugerville from providing the level of services provided as of September 1, 2005, to the area in the district or to release the county or the city from the obligations of each entity to provide services to that area. The district is created to supplement and not to supplant the county or city services provided in the area in the district.

Sec. 3852.004.  FINDINGS OF BENEFIT AND PUBLIC PURPOSE. (a)  The district is created to serve a public use and benefit.

(b)  All land and other property included in the district will benefit from the improvements and services to be provided by the district under powers conferred by Sections 52 and 52-a, Article III, and Section 59, Article XVI, Texas Constitution, and other powers granted under this chapter.

(c)  The creation of the district is in the public interest and is essential to:

(1)  further the public purposes of developing and diversifying the economy of the state;

(2)  eliminate unemployment and underemployment; and

(3)  develop or expand transportation and commerce.

(d)  The district will:

(1)  promote the health, safety, and general welfare of residents, employers, employees, visitors, and consumers in the district and of the public;

(2)  provide needed funding to preserve, maintain, and enhance the economic health and vitality of the area as a community and business center; and

(3)  promote the health, safety, welfare, and enjoyment of the public by providing pedestrian ways and by landscaping and developing certain areas in the district, which are necessary for the restoration, preservation, and enhancement of scenic and aesthetic beauty.

(e)  Hike and bike trails, pedestrian ways along or across a street, whether at grade or above or below the surface, and street lighting, street landscaping, and street art objects are parts of and necessary components of a street and are considered to be a street or road improvement in accordance with Section 52, Article III, Texas Constitution.

(f)  The district may not act as the agent or instrumentality of any private interest even though the district will benefit many private interests as well as the public.

Sec. 3852.005.  DISTRICT TERRITORY. (a)  The district is composed of the territory described by Section 2 of the Act enacting this chapter, as that territory may have been modified under:

(1)  Section 3852.110;

(2)  Subchapter J, Chapter 49, Water Code; or

(3)  other law.

(b)  The boundaries and field notes of the district contained in Section 2 of the Act enacting this chapter form a closure. A mistake in the field notes or in copying the field notes in the legislative process does not affect the district's:

        (1) organization, existence, or validity;

        (2) right to issue any type of bond for a purpose for which the district is created or to pay the principal of and interest on the bond;

        (3) right to impose or collect an assessment or tax; or

        (4) legality or operation.

    Sec. 3852.006. ELIGIBILITY FOR INCLUSION IN SPECIAL ZONES. All or any part of the area of the district is eligible to be included in:

        (1) a tax increment reinvestment zone created by the City of Pflugerville under Chapter 311, Tax Code;

        (2) a tax abatement reinvestment zone created by the City of Pflugerville under Chapter 312, Tax Code; or

        (3) an enterprise zone created by the City of Pflugerville under Chapter 2303, Government Code.

    Sec. 3852.007. APPLICABILITY OF MUNICIPAL MANAGEMENT DISTRICTS LAW. Except as otherwise provided by this chapter, Chapter 375, Local Government Code, applies to the district.

    Sec. 3852.008. LIBERAL CONSTRUCTION OF CHAPTER. This chapter shall be liberally construed in conformity with the findings and purposes stated in this chapter.

       [Sections 3852.009-3852.050 reserved for expansion]

       SUBCHAPTER B. BOARD OF DIRECTORS

    Sec. 3852.051. GOVERNING BODY; TERMS. The district is governed by a board of five directors who serve staggered terms of four years.

    Sec. 3852.052. COMPENSATION. A director is entitled to compensation as provided by Section 49.060, Water Code.

    Sec. 3852.053. ADDITIONAL QUALIFICATIONS. (a) A person is eligible for appointment to the board if:

        (1) the person:

           (A) owns land in the City of Pflugerville subject to taxation; or

           (B) is registered to vote in the City of Pflugerville; and

        (2) the appointment of the person under this section does not result in more than two directors who were eligible solely under this section and not Section 375.063, Local Government Code.

    (b) Section 375.063, Local Government Code, does not apply to a director appointed under Subsection (a).

    Sec. 3852.054. APPOINTMENT OF DIRECTORS. (a) The mayor and members of the governing body of the City of Pflugerville shall appoint directors from persons recommended by the board. A person is appointed if a majority of the members and the mayor vote to appoint the person.

    (b) A person may not be appointed to the board if the appointment of that person would result in fewer than two-thirds of the directors residing in the City of Pflugerville.

    Sec. 3852.055. NONVOTING DIRECTORS. (a) The following persons serve as nonvoting directors:

        (1) the directors of the parks and recreation, planning and development, and public works departments of the City of Pflugerville;

(2)  the chief of police of the City of Pflugerville;

(3)  the executive director of any development corporation in the City of Pflugerville;

(4)  the president of each institution of higher learning located in the district; and

(5)  the fire chief of any emergency services district in the City of Pflugerville.

(b)  If a city department described by Subsection (a) is consolidated, renamed, or changed, the board may appoint a director of the consolidated, renamed, or changed department as a nonvoting director. If a city department described by Subsection (a) is abolished, the board may appoint a representative of another department of the City of Pflugerville that performs duties comparable to those performed by the abolished department.

Sec. 3852.056.  CONFLICTS OF INTEREST.  (a)  Except as provided by this section:

(1)  a director may participate in all board votes and decisions; and

(2)  Chapter 171, Local Government Code, governs conflicts of interest of directors.

(b)  Section 171.004, Local Government Code, does not apply to the district. A director who has a substantial interest in a business or charitable entity that will receive a pecuniary benefit from a board action shall file an affidavit with the board secretary declaring the interest. Another affidavit is not required if the director's interest changes.

(c)  After the affidavit is filed, the director may participate in a discussion or vote on that action if:

(1)  a majority of the directors have a similar interest in the same entity; or

(2)  all other similar business or charitable entities in the district will receive a similar pecuniary benefit.

(d)  A director who is also an officer or employee of a political subdivision may not participate in a discussion of or vote on a matter regarding a contract with that same political subdivision.

(e)  For purposes of this section, a director has a substantial interest in a charitable entity in the same manner that a person would have a substantial interest in a business entity under Section 171.002, Local Government Code.

Sec. 3852.057.  INITIAL VOTING DIRECTORS.  (a)  The initial board consists of the following voting directors:

| Pos. No. | Name of Director |
|----------|------------------|
| 1 | Tim Timmerman |
| 2 | David Seeker |
| 3 | Elaine Hebert |
| 4 | John Franklin |
| 5 | Beverly Burk |

(b)  Of the initial directors, the terms of directors appointed for positions 1 through 3 expire June 1, 2009, and the terms of directors appointed for positions 4 and 5 expire June 1, 2007.

(c)  Section 3852.054 does not apply to this section.

(d)  This section expires September 1, 2009.

[Sections 3852.058-3852.100 reserved for expansion]

SUBCHAPTER C. POWERS AND DUTIES

Sec. 3852.101.  ADDITIONAL DISTRICT POWERS.  The district may exercise the powers given to a corporation created under Section 4A or 4B, Development Corporation Act of 1979 (Article 5190.6, Vernon's Texas Civil Statutes).

Sec. 3852.102.  EXERCISE OF POWERS OUTSIDE DISTRICT.  The district may exercise its powers in an area outside the district if the board determines that exercising those powers benefits the district.

Sec. 3852.103.  NONPROFIT CORPORATION. (a) The board by resolution may authorize the creation of a nonprofit corporation to assist and act for the district in implementing a project or providing a service authorized by this chapter.

(b)  The nonprofit corporation:

(1)  has each power of and is considered for purposes of this chapter to be a local government corporation created under Chapter 431, Transportation Code; and

(2)  may implement any project and provide any service authorized by this chapter.

(c)  The board shall appoint the board of directors of the nonprofit corporation.

(d)  The board of directors of the nonprofit corporation shall serve in the same manner as the board of directors of a local government corporation created under Chapter 431, Transportation Code.

Sec. 3852.104.  RECLAMATION PROJECT.  The district may own, operate, or maintain a reclamation project.

Sec. 3852.105.  AGREEMENTS; GRANTS; DONATIONS.  (a)  The district may enter into an agreement with or accept a donation, grant, or loan from any person.

(b)  A municipality, county, or other political subdivision of this state, or a nonprofit corporation, without further authorization, may contract with the district for:

(1)  the acquisition, construction, improvement, implementation, maintenance, and operation of a district project; or

(2)  the provision of a service authorized under this chapter.

(c)  A contract under Subsection (b) may:

(1)  be for a period and include terms on which the parties agree;

(2)  be payable from taxes or any other source of revenue that may be available for that purpose; and

(3)  provide terms under which taxes or other revenues collected at a district project or from a person using or purchasing a commodity or service at a district project may be paid or rebated to the district.

(d)  The implementation of a project is a governmental function or service for the purposes of Chapter 791, Government Code.

(e)  To the extent of any conflict between this section and any other law, including a charter of a home-rule municipality, this section controls.

(f)  The district, the City of Pflugerville, Travis County, or another political subdivision may use another law to the extent convenient or necessary to carry out any power or authority, express or implied, granted by this section.

(g)  This section is wholly sufficient authority for the execution of a contract, the imposition and pledging of taxes and revenues to the contract, and the performance of other acts and procedures authorized by this section, or by the district, the City of Pflugerville, Travis County, and any other political subdivision without reference to any other provision of law or any restriction or limitation contained in those provisions, except as specifically provided by this section.

Sec. 3852.106.  ECONOMIC DEVELOPMENT PROGRAMS AND OTHER POWERS RELATED TO PLANNING AND DEVELOPMENT.  (a) The district may establish and provide for the administration of one or more programs to promote state or local economic development and to stimulate business and commercial activity in the district, including programs to:

(1)  make loans and grants of public money; and

(2)  provide district personnel and services.

(b)  The district has all of the powers of a municipality under Chapter 380, Local Government Code.

Sec. 3852.107.  AUTHORITY TO CONTRACT FOR LAW ENFORCEMENT. To protect the public interest, the district may contract with Travis County or the City of Pflugerville for the county or city to provide law enforcement services in the district for a fee.

Sec. 3852.108.  COMPETITIVE BIDDING.  Section 375.221, Local Government Code, does not apply to a district contract for $25,000 or less.

Sec. 3852.109.  APPROVAL BY CITY OF PFLUGERVILLE.  (a)  Except as provided by Subsection (b), the district must obtain approval from the City of Pflugerville's governing body:

(1)  for the issuance of a bond other than a refunding bond;

(2)  of the plans and specifications of a project to be financed by the bond; and

(3)  of the plans and specifications of any district project related to the use of land owned by the City of Pflugerville, an easement granted by the City of Pflugerville, or a right-of-way of a street, road, or highway.

(b)  If the district obtains approval from the City of Pflugerville's governing body of a capital improvements budget for a period not to exceed five years, the district may finance the projects and issue bonds specified in the budget without further approval from the City of Pflugerville.

Sec. 3852.110.  ANNEXATION.  In addition to the authority to annex territory under Subchapter J, Chapter 49, Water Code, the district may annex territory located in a reinvestment zone created by the City of Pflugerville under Chapter 311, Tax Code, if the city's governing body consents to the annexation.

[Sections 3852.111-3852.150 reserved for expansion]

SUBCHAPTER D. FINANCIAL PROVISIONS

Sec. 3852.151.  PETITION REQUIRED FOR FINANCING SERVICES AND IMPROVEMENTS.  (a)  The board may not finance a service or an improvement project with assessments under this chapter unless a written petition requesting that service or improvement is filed with the board.

(b) The petition must be signed by the owners of a majority of the assessed value of real property in the area of the district that will be subject to the assessment according to the most recent certified tax appraisal roll for Travis County.

Sec. 3852.152. DISBURSEMENTS AND TRANSFERS OF MONEY. The board by resolution shall establish the number of directors' signatures and the procedure required for a disbursement or transfer of the district's money.

Sec. 3852.153. MAINTENANCE TAX. (a) The district may impose an annual ad valorem tax on taxable property in the district to maintain and operate the district and the improvements and projects constructed or acquired by the district or to provide a service only if:

(1) two-thirds of the directors vote in favor of imposing the tax; and

(2) the tax is authorized at an election held in accordance with Section 3852.156.

(b) The board shall determine the tax rate.

Sec. 3852.154. ASSESSMENTS; LIENS FOR ASSESSMENTS. (a) The board by resolution may impose and collect an assessment for any purpose authorized by this chapter only if two-thirds of the directors vote in favor of imposing the assessment.

(b) The board may adjust an annual assessment for a service in accordance with an annual budget adopted by the board to provide those services. The annual adjustment may not be more than the original assessment unless the board provides notice and hearing.

(c) An assessment, a reassessment, or an assessment resulting from an addition to, deletion from, or correction of the assessment roll by the district, penalties and interest on an assessment or reassessment, an expense of collection, and reasonable attorney's fees incurred by the district:

(1) are a first and prior lien against the property assessed;

(2) are superior to any other lien or claim other than a lien or claim for county, school district, or municipal ad valorem taxes; and

(3) are the personal liability of and a charge against the owners of the property even if the owners are not named in the assessment proceeding.

(d) The lien is effective from the date of the board's resolution imposing the assessment until the date the assessment is paid. The board may enforce the lien in the same manner that the board may enforce an ad valorem tax lien against real property.

Sec. 3852.155. UTILITY PROPERTY EXEMPT FROM IMPACT FEES AND ASSESSMENTS. The district may not impose an impact fee or assessment on the property of a person who provides to the public gas, electric, telephone, sewage, or water service.

Sec. 3852.156. ELECTIONS REGARDING TAXES OR TAX BONDS. (a) In addition to the elections required under Subchapter L, Chapter 375, Local Government Code, the district must hold an election in the manner provided by that subchapter to obtain voter approval before the district may:

(1) impose a maintenance tax;

(2) issue a bond payable from ad valorem taxes; or

(3) secure an agreement wholly or partly from a pledge of ad valorem taxes.

(b) The board may submit multiple purposes in a single proposition at an election.

(c) Section 375.243, Local Government Code, does not apply to the district.

Sec. 3852.157. BONDS AND OTHER OBLIGATIONS. (a) The district may issue bonds or other obligations payable wholly or partly from taxes, assessments, impact fees, revenue, grants, contracts, or other money of the district, or any combination of those sources of money, to pay for any authorized purpose of the district.

(b) The district may issue a bond or other obligation in the form of a bond, note, certificate of participation or other instrument evidencing a proportionate interest in payments to be made by the district, or other type of obligation.

(c) The district may issue a bond to refinance a public security issued by the City of Pflugerville or to finance a district project located outside the boundaries of the district if the board finds that the refinancing or project wholly or partly furthers the purposes of and benefits the district.

(d) Sections 375.208 and 375.243, Local Government Code, do not apply to bonds or other obligations issued under this section solely to pay for a project constructed by the City of Pflugerville and payable wholly or partly from payments made by the City of Pflugerville under an agreement authorized under Section 3852.105.

(e) The district may issue bonds in accordance with terms and provisions as determined by the board, including the sale of bonds in a manner and with terms as determined by the board. As provided by Section 3852.007, Sections 375.202, 375.203, 375.205, and 375.206, Local Government Code, apply to bonds issued under this section.

(f) A bond issued under this section may be refunded or otherwise refinanced by the issuance of refunding bonds under terms or conditions determined by board order or resolution. A refunding bond may be issued in an amount necessary to pay the principal and any interest and redemption premium of bonds to be refunded, at maturity or on any redemption date, and issued to provide for the payment of costs incurred in connection with the refunding. A refunding bond may be issued in any manner provided by law.

Sec. 3852.158. ECONOMIC DEVELOPMENT BONDS. The district may issue bonds for economic development projects in accordance with Section 52-a, Article III, Texas Constitution.

Sec. 3852.159. MUNICIPALITY NOT OBLIGATED TO PAY DISTRICT OBLIGATIONS. Except as provided by Sections 3852.105 and 3852.157 of this code and Section 375.263, Local Government Code, a municipality is not obligated to pay a bond, note, or other obligation of the district.

[Sections 3852.160-3852.200 reserved for expansion]

SUBCHAPTER E. DISSOLUTION

Sec. 3852.201. DISSOLUTION OF DISTRICT WITH OUTSTANDING DEBT. (a) The board may dissolve the district regardless of whether the district has debt. Section 375.264, Local Government Code, does not apply to the district.

(b) If the district has debt when it is dissolved, the district shall remain in existence solely for the purpose of discharging its debts. The dissolution is effective when all debts have been discharged.

SECTION 2. As of the effective date of this Act, the Pflugerville Municipal Management District No. 1 includes all the territory contained within the following described area:

TRACT 1:397.2 ACRES - METES AND BOUNDS DESCRIPTION

The herein description is based on a combination of field survey data and record information of various tracts of land located in the John Davis Survey No. 13, the Sefrin Eiselin Survey No. 4, Abstract No. 265, the Taylor S. Barnes Survey No. 46, Abstract No. 67 and the William Caldwell Survey No. 66, Abstract No. 162 in Travis County, Texas and being more particularly described by metes and bounds as follows:

BEGINNING at a found iron rod with an aluminum cap stamped "Texas Department of Transportation" found in the south line of a 62.474 acre remainder of a record 236.03 acre tract of land described in a deed to Timmerman & Hagn, Ltd. recorded in Doc. No. 2004025617, Official Public Records of Travis County, Texas (O.P.R.T.C.T.); and situated in the Sefrin Eiselin Survey No. 4, Abstract No. 265 and lying on the north line of a +/-133 acre remainder of a 296.72 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Volume 8394, Page 544, D.R.T.C.T. and lying on the west line of State Highway 130 and located 321.79 feet right of Engineers Station 1078+62.12, of the State Highway 130 baseline as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans;

THENCE with the west line of S.H. 130 and northeasterly line of the said 133 acre tract, the following three courses:

1) south 12°41'25" east, 242.72 feet to an angle point;

2) south 14°09'23" east, 508.30 feet to an angle point;

3) south 17°59'46" east, 54.80 feet to a found iron rod with an aluminum cap stamped "Texas Department of Transportation" found in the east line of the said 133 acre tract and lying on the west line of a 77.29 acre remainder of the said 236.03 acre tract and located 324.33 feet right of Engineers Station 1086+67.74, of the State Highway 130 baseline as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans;

THENCE with the west line of S.H. 130 and northeasterly line of the said 77.29 acre tract, the following five courses:

1) south 17°59'55" east, 363.08 feet to an angle point;

2) south 14°09'23" east, 314.17 feet to an angle point;

3) south 10°39'58" east, 657.05 feet to an angle point;

4) south 10°42'32" east, 415.75 feet to an angle point;

5) south 12°47'49" east, 187.97 feet to a found iron rod with an aluminum cap stamped "Texas Department of Transportation" found in the east line of the said 77.29 acre tract and being the northwest corner of a 23.732 acre remainder of a 97.5 acre tract described in a deed to Theodore R. Timmerman recorded in Volume 2470, Page 572, D.R.T.C.T.; and located 369.46 feet right of Engineers Station 1106+02.92, of the State Highway 130 baseline as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans;

THENCE with the west line of S.H. 130 and northeasterly line of the said 23.732 acre tract, the following three courses:

1) south 12°47'56" east, 297.16 feet to an angle point;

2) south 15°09'32" east, 600.09 feet to an angle point;

3) south 14°09'23" east, 316.46 feet to a found iron rod with an aluminum cap stamped "Texas Department of Transportation" found in the east line of the said 23.732 acre tract and lying on the west line of a 8.72 acre tract being a remainder of a record 96.90 acre tract of land described in a deed to Connie Lorraine Sladek recorded in Volume 10530, Page 676, D.R.T.C.T. and located 366.00 feet right of Engineers Station 1118+16.46, of the State Highway 130 baseline as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans;

THENCE departing the S.H. 130 right-of-way with the common line between the said 77.29 and 23.732 acre tracts, south 27°37'50" west, 955.17 feet to the southeast corner of the said 77.29 acre tract and lying on the original north right-of-way line of pecan street, a 60 foot wide public right-of-way;

THENCE north 65°02'11" west, 793.74 feet, with the south line of the said 77.29 acre tract and the north line of pecan street to the southwest corner of the said 77.29 acre tract and southeast corner of the said 133 acre tract;

THENCE along the common line between the said 23.732 acre and 77.29 acre tracts, north 27°02'59" east, 1458.23 feet to an angle point lying on the west line of the current Pflugerville city limit established by Ordinance 768-04-12-28;

THENCE through the said 77.29 acre tract along the said west city limit line, north 14°12'03" west, 968.56 feet to the intersection of the said west city limit with the approximate centerline of Wilbarger Creek;

THENCE with the approximate centerline meanders of Wilbarger Creek through the said 77.29 acre tract and through the 129 acre remainder of a 133 acre tract conveyed to Timmerman & Hagn, Ltd. in a deed recorded in Volume 8394, Page 544, D.R.T.C.T. and through a 71.5 acre remainder of a 74.46 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Volume 12720, Page 2014, O.P.R.T.C.T. and through a 62.474 acre remainder of the said 236.03 acre tract and through a 153.8 acre remainder of a 300.03 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Doc. No. 2004025616, O.P.R.T.C.T., the following fifty-four courses:

1) north 42°04'22" west, 195.44 feet;

2) north 26°50'28" west, 448.97 feet;

3) north 02°18'41" east, 239.75 feet;

4) north 60°14'18" west, 134.55 feet;

5) south 61°28'25" west, 139.32 feet;

6) south 36°46'43" west, 167.86 feet;

7) south 88°35'32" west, 76.74 feet;

8) north 58°26'43" west, 243.00 feet;

9) south 66°24'16" west, 112.25 feet;

10) south 62°38'58" west, 97.70 feet;

11) north 51°04'22" west, 62.35 feet;

12) north 34°09'28" west, 200.91 feet;

13) north 23°56'34" east, 127.94 feet;

14) north 03°47'52" west, 205.55 feet;

15) north 01°03'54" west, 121.08 feet;
16) north 15°44'01" east, 127.41 feet;
17) north 31°01'44" west, 54.90 feet;
18) north 66°16'01" west, 77.02 feet;
19) north 39°29'44" west, 116.77 feet;
20) north 05°12'36" west, 94.70 feet;
21) north 25°37'00" east, 240.36 feet;
22) north 03°14'50" east, 81.81 feet;
23) north 57°01'50" west, 131.00 feet;
24) north 27°10'09" west, 123.52 feet;
25) north 07°21'30" west, 88.08 feet;
26) north 44°06'28" east, 165.15 feet;
27) north 30°06'29" west, 122.32 feet;
28) north 36°55'28" east, 192.68 feet;
29) south 67°10'46" east, 78.63 feet;
30) south 16°21'01" east, 141.85 feet;
31) north 62°14'07" east, 94.03 feet;
32) north 16°11'32" east, 263.03 feet;
33) north 23°15'16" west, 280.65 feet;
34) south 62°45'24" west, 403.17 feet;
35) north 60°21'14" west, 256.35 feet;
36) north 31°24'57" west, 154.04 feet;
37) north 08°27'41" east, 164.44 feet;
38) north 66°41'07" east, 362.25 feet;
39) north 14°23'36" east, 423.77 feet;
40) north 47°18'45" west, 258.08 feet;
41) south 64°50'25" west, 96.86 feet;
42) south 35°00'08" west, 192.60 feet;
43) north 85°22'27" west, 247.67 feet;
44) north 13°06'02" west, 204.90 feet;
45) north 31°21'21" east, 283.69 feet;
46) north 58°02'32" east, 167.84 feet;
47) south 82°44'37" east, 272.01 feet;
48) north 20°24'18" east, 286.65 feet;
49) north 09°13'34" west, 228.08 feet;
50) north 55°17'10" west, 162.25 feet;
51) north 31°47'06" west, 184.17 feet;
52) north 45°38'56" east, 208.89 feet;
53) north 33°16'06" east, 182.55 feet;
54) north 60°51'34" east, 130.55 feet to the intersection of the centerline of Wilbarger Creek with the curving said west city limit;
THENCE with the west city limit line through the said 153.8 acre tract, and through a portion of a 57 acre tract being a remainder of a 535 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Volume 8394, Page 544, D.R.T.C.T., with the curve to the right having a radius of 12109.16 feet, a central angle of 03°10'33", a

chord bearing and distance of north 06°06'47" west, 671.12 feet and an arc length of 671.21 feet to an angle point lying on the west line of the current Pflugerville city limit established by Ordinance 544-99-05-11;

THENCE continuing through the said 57 acre and 153.8 acres, with the said Pflugerville city limit line, south 24°45'43" west a distance of 1560.60 feet to the beginning of a curve;

THENCE continuing through the said 153.8 acre tract and through the remainder of a 158.22 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Volume 8394, Page 544, D.R.T.C.T., with the curve to the right having a radius of 8419.58 feet, a central angle of 02°44'00", a chord bearing and distance of south 26°07'43" west, 401.62 feet and an arc length of 401.66 feet to a Point of Tangency;

THENCE continuing through the said 158.22 acre tract along the said city limit line, south 27°29'43" west a distance of 1167.07 feet to a point on the south line of the said 158.22 acre tract;

THENCE continuing with the south line of the said 158.22 acre tract, north 65°55'11" west, 1264.53 feet to the southeast corner of a 4.0 acre tract described in a deed to the City of Pflugerville recorded in Document No. 2003187793. O.P.R.T.C.T.;

THENCE with the common line between the said 157.22 acre and 4.0 acre tracts, the following five courses:
1) north 24°02'01" east, 340.95 feet;
2) north 65°57'17" west, 259.81 feet;
3) south 83°32'13" west, 260.21 feet;
4) south 63°24'26" west, 149.64 feet;
5) north 88°56'57" west, 187.19 feet to a point on the east line of a 29,667 square foot right-of-way dedication for Old Austin-Hutto Road described in a deed to the City of Pflugerville recorded in Volume 12618, Page 128, D.R.T.C.T.;

THENCE with the common line between the said 158.22 acre and the current east line of Old Austin-Hutto Road, the following three courses:
1) north 17°04'04" east, 145.97 feet;
2) north 17°12'49" west, 418.53 feet;
3) north 59°49'12" west, 290.90 feet to a point on the east line of Texas Farm to Market Road 685 (F.M. 685);

THENCE with the west line of the said 158.22 acre tract and the east line of F.M. 685, north 26°31'09" east, 964.80 feet to the northwest corner of the said 157.22 acre tract and being the southwest corner of a 153.8 acre remainder of a 300.03 acre tract;

THENCE with the west line of the said 153.8 acre tract and the east line of F.M. 685, north 24°48'39" east, 1850.00 feet to the northwest corner of the said 153.8 acre tract and being the southwest corner of the said Timmerman & Hagn, Ltd. 57 acre tract;

THENCE with the west line of the said 153.8 acre tract and the east line of F.M. 685, north 24°42'36" east, 1105.70 feet to the northwest corner of the said 57 acre tract and being the intersection of the east line of F.M. 685 with the south line of Pfluger Lane;

THENCE with the north line of the said 57 acre tract and the south line of Pfluger Lane, south 60°37'16" east, 513.90 feet to the northwest corner of a 3.32 acre tract of land described in a deed to Texas Utilities Electric Company recorded in Volume 12440, Page 1318, D.R.T.C.T.;

THENCE with the west line of the said 3.32 acre tract, south 00°47'53" west, 341.86 feet to the southwest corner of the said 3.32 acre tract and being the northwest corner of a 6.50 acre tract of land described in a deed to TXU Electric recorded in Document No. 2001051986, O.P.R.T.C.T.;

THENCE with the common lines between the said 57 acre tract and the 6.50 acre tract, the following four courses:

1) south 01°04'09" east, 343.33 feet;

2) south 30°27'56" east, 12.22 feet;

3) south 60°16'46" east, 528.20 feet;

4) north 29°21'16" east, 605.32 feet to the northeast corner of the said 6.50 acre tract and lying on the south line of Pfluger Lane;

THENCE with the north line of the said 57 acre tract and the original south line of Pfluger Lane, south 61°06'52" east, 485.19 feet to an angle point;

THENCE with an east line of the said 57 acre tract, south 23°38'07" west, 16.68 feet to an angle point in the current south line of Pfluger Lane;

THENCE with the north line of the said 57 acre tract and the current south line of Pfluger Lane, south 59°22'18" east, 398.75 feet to an angle point lying in the west line of State Highway 130;

THENCE with the east line of the said 57 acre tract and the west line of S.H. 130 the following two courses:

1) south 28°01'06" east, 299.31 feet;

2) south 02°03'15" east, 329.42 feet to the beginning of a curve;

THENCE with the curve to the left having a radius of 7701.11 feet, a central angle of 05°19'15", a chord bearing and distance of south 03°38'34" east, 714.91 feet and an arc length of 715.17 feet with the west line of S.H. 130 to a point of compound curvature lying on the south line of the said 57 acre tract and north line of the said 153.8 acre tract;

THENCE along the east line of the said 153.8 acre and with the west line of S.H. 130, the following seven courses:

1) with a curve to the left having a radius of 7701.11 feet, a central angle of 02°38'40", a chord bearing and distance of south 07°37'31" east, 355.40 feet and an arc length of 355.44 feet to an angle point;

2) south 82°30'53" west, 245.91 feet;

3) south 07°29'07" east, 100.00 feet;

4) north 82°30'53" east, 249.11 feet to a point lying on a curve;

5) with a curve to the left having a radius of 7701.11 feet, a central angle of 04°30'45", a chord bearing and distance of south 11°56'53" east, 606.37 feet and an arc length of 606.52 feet to a Point of Tangency;

6) south 14°09'24" east, 716.33 feet;

7) south 14°09'23" east, 602.04 feet to a found iron rod with an aluminum cap stamped "Texas Department of Transportation" found in the south line of 153.8 acre tract and lying on the north line of the said 62.474 acre tract and located

300.00 feet right of Engineers Station 1063+36.11 of the State Highway 130 baseline as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans;

THENCE continuing with the west line of S.H. 130 and east line of the said 62.474 acre tract, the following three courses:

1) south 14°09'23" east, 810.50 feet to an angle point;

2) south 12°09'04" east, 369.79 feet to an angle point;

3) south 12°41'28" east, 346.06 feet to the POINT OF BEGINNING and containing 397.2 acres, more or less.

BASIS OF BEARINGS:

Bearings shown hereon are referenced to grid north for the Texas State Plane Coordinate System, Central Zone NAD 83 per Texas Turnpike Authority right-of-way plans for State Highway 130.

TRACT 2:146.3 ACRES - METES AND BOUNDS DESCRIPTION

The herein description is based on a combination of field survey data and record information of various tracts of land located in the John Davis Survey No. 13, the George M. Martin Survey No. 9, the E. Kirkland Survey No. 7, Abstract No. 458, the Sefrin Eiselin Survey No. 4, Abstract No. 265, and the J.P. Sherwood Survey in Travis County, Texas and being more particularly described by metes and bounds as follows:

BEGINNING at a found iron rod with an aluminum cap stamped "Texas Department of Transportation" located 350.00 feet left of Engineers Station 1045+12.69 of the State Highway 130 baseline and lying on the curving east line of the said State Highway 130 right-of-way as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans and being the northwest corner of a 111.07 remainder of a 300.03 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Doc. No. 2004025616, Official Public Records of Travis County, Texas (O.P.R.T.C.T.); and being the westerly southwest corner of a calculated 146 acre remainder of a 535 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Volume 8394, Page 544, D.R.T.C.T., said point also lying on the east line of the current Pflugerville city limit established by Ordinance 768-04-12-28;

THENCE with the east right-of-way of State Highway 130 along the west and north lines of the said 146 acre tract, the following five courses:

1) with a curve to the right having a radius of 11109.16 feet, a central angle of 03°36'05", a chord bearing and distance of north 06°14'55" west, 698.17 feet and an arc length of 698.28 feet to an angle point;

2) north 04°05'35" east, 466.69 feet;

3) north 46°20'42" east, 43.29 feet;

4) south 61°16'45" east, 557.45 feet to a point in the said city limit line;

5) THENCE on the said east city limit line, north 27°23'31" east, 12.89 feet to an angle point on the original south right of way of Pfluger Lane, a 60 foot wide public right-of way annexed by the City of Pflugerville by Ordinance 730-03-12-16;

THENCE with the original south right-of-way of Pfluger Lane and said city limit, with the north line of the said 146 acre tract, south 60°35'24" east, 4117.77 feet to the beginning of a curve;

THENCE continuing with the north line of the 146 acre tract and with the original south line of Pfluger Lane and said city limit, with the curve to the right having a radius of 471.08 feet, a central angle of 23°47'15", a chord bearing and distance of south 48°41'13" east, 194.18 feet and an arc length of 195.58 feet to a Point of Reverse Curvature;

THENCE continuing with the north line of the said 146 acre tract with the original south line of Pfluger Lane and said city limit line with a curve to the left having a radius of 501.50 feet, a central angle of 03°41'31", a chord bearing and distance of south 38°38'21" east, 32.31 feet, and an arc length of 32.32 feet to a point in the west line of the current Pflugerville city limit established by Ordinance 744-04-03-23;

THENCE along the said west city limit line and the east line of the said 146 acre tract, south 26°33'46" west, 31.44 feet to northwest corner of a 34.618 acre remainder of a 58.08 acre tract described in a deed to Robert Nicholas and Sally Nicholas recorded in Volume 11418, Page 1139, D.R.T.C.T., point lying on the current south right-of-way line of Pfluger Lane;

THENCE departing Pfluger Lane with the common line between the said 146 and 34.618 acre tracts, south 27°04'11" west, 416.82 feet with the west line of a tract annexed by the City of Pflugerville by Ordinance 768-04-12-28; to an angle point;

THENCE through the said 146 acre tract on a course generally parallel and 500 foot south of the current south line of Pfluger Lane, north 60°35'24" west, 2377.73 feet to an angle point in the east line of a 0.781 acre tract described in a deed to Mark William Hodgson recorded in Volume 12398, Page 0400, D.R.T.C.T.;

THENCE with the common lines between the said 146 acre and 0.781 acre tracts, the following three courses:

1) north 29°24'50" east, 54.87 feet;
2) north 60°35'10" west, 170.00 feet;
3) south 29°24'50" west, 54.88 feet to an angle point;

THENCE continuing through the said 146 acre tract, on a course parallel and 500 foot south of the current south line of Pfluger Lane, north 60°35'24" west, 1190.60 feet to an angle point;

THENCE with a line parallel to and 600 foot east of the east line of the State Highway 130 right-of-way, through the said 146 acre tract and through the said 111.07 acre remainder of a 300.03 acre tract and through a 47.131 acre remainder of a 236.03 acre tract described in a deed to Timmerman & Hagn, Ltd. recorded in Doc. No. 20425617, O.P.R.T.C.T.; and through a 53.728 acre remainder of a 97.5 acre tract of land described in a deed to Theodore R. Timmerman recorded in Volume 2470, Page 572, D.R.T.C.T. the following five courses:

1) south 27°23'31" west, 335.01 feet;
2) south 08°43'50" east, 962.07 feet;
3) south 14°09'23" east, 1613.54 feet;
4) south 18°43'49" east, 501.37 feet

5) south 14°12'03" east, 2477.04 feet to a point on the east line of the said 53.728 acre tract and lying on the west line of a 54.94 acre remainder of a 96.90 acre tract of land described in a deed to Connie Lorraine Sladek recorded in Volume 10530, Page 676, D.R.T.C.T.;

THENCE with the common line between the said 53.728 and 54.94 acre tracts, south 27°37'30" west, 899.73 feet to an iron rod with an aluminum cap stamped "Texas Department of Transportation" and located 342.43 feet left of Engineers Station 1110+23.76 of the said State Highway 130 baseline for the south corner of the said 53.728 acre tract and lying on the east line of State Highway 130; said point also lying on the east line of the current Pflugerville city limit established by Ordinance 768-04-12-28;

THENCE with common line between the said 53.728 and 47.131 acre tracts, with the east line of State Highway 130, the following three courses:

1) north 14°12'03" west, 3123.77 feet to an angle point;

2) north 18°43'49" west, 501.60 feet to an iron rod with an aluminum cap stamped "Texas Department of Transportation" and located 300.00 feet left of Engineers Station 1074+00.00 of the said State Highway 130 baseline;

3) north 14°09'23" west, 521.55 feet to an iron rod with an aluminum cap stamped "Texas Department of Transportation" and located 300.00 feet left of Engineers Station 1068+78.45 of the said State Highway 130 baseline for the southwest corner of the said 111.07 acre tract and being the northwest corner of the said 47.131 acre tract;

THENCE continuing with the east line the State Highway 130 and with the west line of the said 111.07 and 146 acre tracts the following three courses:

1) north 14°09'23" west, 1144.38 feet;

2) north 08°43'50" west, 1055.19 feet to an iron rod with an aluminum cap stamped "Texas Department of Transportation" and located 350.00 feet left of Engineers Station 1046+48.90 of the said State Highway 130 baseline;

3) with the curve to the right having a radius of 11109.16 feet, a central angle of 0°40'52", a chord bearing and distance of north 08°23'24" west, 132.05 feet and an arc length of 132.05 feet to the POINT OF BEGINNING and containing 146.3 acres, more or less.

BASIS OF BEARINGS:

Bearings shown hereon are referenced to grid north for the Texas State Plane Coordinate System, Central Zone NAD 83 per Texas Turnpike Authority right-of-way plans for State Highway 130.

TRACT 3: 29.8 ACRES - METES AND BOUNDS DESCRIPTION

The herein description is based on a combination of field survey data and record information of various tracts of land located in the John Davis Survey No. 13 in Travis County, Texas and being more particularly described by metes and bounds as follows:

BEGINNING for reference at an iron rod with an aluminum cap stamped "Texas Department of Transportation" found in the south line of a 149.599 acre tract of land (save and except 2.751 acres) described in a deed to Terrabrook Falcon Ridge, L.P. recorded in Doc. No. 2000105424, Official Public Records of Travis County, Texas (O.P.R.T.C.T.), said 149.599 acre tract annexed into the City of Pflugerville by

Ordinance No. 607 00 11-28 and lying in the north line of Pfluger Lane, a 60 foot wide public right-of-way annexed into the City of Pflugerville by Ordinance No. 730-03-12-16 and located 958.16 feet left of Engineers Station 1035+21.45, of the State Highway 130 baseline as shown on the Texas Turnpike Authority Project No. HP 1196 (1) right-of-way plans. THENCE with the south line of the said 149.599 acre tract with the north line of said Pfluger Lane, south 60°36'00" east, a distance of 882.40 feet to the southeast corner of the said 149.599 acre tract and being the southwest corner of the said 197.89 acre tract and being the same tract called 197.27 acres described in a deed to Timmerman & Hagn, Ltd. recorded in Volume 3310, Page 1434, Deed Records of Travis County Texas (D.R.T.C.T.) and being the POINT OF BEGINNING;

THENCE, departing the north line of Pfluger Line along the common line between the said 149.599 acre and 197.89 acre tracts with the current Pflugerville city limit, north 27°35'36" east, a distance of 500.26 feet to a point for a corner;

THENCE through the said 197.89 acre tract on a line parallel to and 500 foot north of the current north right-of-way of Pfluger Lane, south 60°34'24" east, a distance of 2593.00 feet to a point on the east line of the said 197.89 acre tract and on the west line of a 50.00 acre tract described in a deed to the Preismeyer Family, L.P. recorded in Volume 13091, Page 0010, D.R.T.C.T. and lying on the west line of the current Pflugerville city limit established by Ordinance 768-04-12-28;

THENCE with the common line between the said 197.89 and 50.00 acre tracts with the west line of the said Pflugerville city limit, south 27°35'36" west, 500.26 feet to the southeast corner of the 197.89 acre tract and lying on the current north line of Pfluger Lane and the north line of the current Pflugerville city limit established by Ordinance 730-03-12-16;

THENCE with the south line of the said 197.89 acre tract and the north line of the said Pflugerville city limit and the current north line of Pfluger Lane, north 60°34'24" west, distance of 2593.00 feet to the POINT OF BEGINNING and containing 29.8 acres, more or less.

BASIS OF BEARINGS:

Bearings shown hereon are referenced to grid north for the Texas State Plane Coordinate System, Central Zone NAD 83 per Texas Turnpike Authority right-of-way plans for State Highway 130.

SECTION 3. The Pflugerville Municipal Management District No. 1 may hold the first election under Section 3852.156, Special District Local Laws Code, as added by this Act, on a date other than a uniform election date.

SECTION 4. The legislature finds that:

(1) proper and legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished by the constitution and laws of this state, including the governor, who has submitted the notice and Act to the Texas Commission on Environmental Quality;

(2) the Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, lieutenant governor, and speaker of the house of representatives within the required time;

(3) the general law relating to consent by political subdivisions to the creation of districts with conservation, reclamation, and road powers and the inclusion of land in those districts has been complied with; and

(4) all requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act have been fulfilled and accomplished.

SECTION 5. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Van de Putte, on behalf of Senator Barrientos, moved to concur in the House amendment to **SB 1836**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
May 27, 2005

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS CONCURRED IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES:

**HB 164** (136 Yeas, 0 Nays, 2 Present, not voting)

**HB 412** (139 Yeas, 1 Nays, 2 Present, not voting)

**HB 541** (132 Yeas, 3 Nays, 2 Present, not voting)

**HB 916** (135 Yeas, 0 Nays, 2 Present, not voting)

**HB 1606** (140 Yeas, 0 Nays, 2 Present, not voting)

**HB 2266** (non-record vote)

THE HOUSE HAS REFUSED TO CONCUR IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES AND REQUESTS THE APPOINTMENT OF A CONFERENCE COMMITTEE TO ADJUST THE DIFFERENCES BETWEEN THE TWO HOUSES:

**HB 1006** (102 Yeas, 28 Nays, 2 Present, not voting)
House Conferees: Isett - Chair/Baxter/Hopson/Nixon/Otto

**HB 1634** (non-record vote)
House Conferees: Allen, Ray - Chair/Hodge/Keel/Talton/Uresti

**HB 1068** (non-record vote)
House Conferees:  Driver - Chair/Bailey/Corte/McCall/Madden

**HB 2217** (non-record vote)
House Conferees:  McCall - Chair/Hamric/Eiland/Ritter/Woolley

**HB 3485** (non-record vote)
House Conferees:  Oliveira - Chair/Brown, Fred/Escobar/Herrero/Solis

**HB 3539** (non-record vote)
House Conferees:  Hupp - Chair/Bonnen/Callegari/Martinez/Miller

**HJR 80** (non-record vote)

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

### SENATE BILL 166 WITH HOUSE AMENDMENTS

Senator Ellis called **SB 166** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 1**

Amend **SB 166** (House committee printing) by adding the following appropriately numbered SECTIONS to the bill and renumbering existing SECTIONS of the bill accordingly:

SECTION __.  Article 55.01, Code of Criminal Procedure, is amended by adding Subsection (a-1) to read as follows:

(a-1)  Regardless of whether the person is convicted of or receives deferred disposition for the misdemeanor offense, a person not otherwise entitled to expunction under Subsection (a) is entitled to have all records and files relating to the arrest of the person for the commission of a Class C misdemeanor expunged if the person:

(1)  committed the Class C misdemeanor not less than two years before filing a petition for expunction with respect to the offense;

(2)  after the date on which the Class C misdemeanor was committed, has not been convicted of or placed on deferred adjudication community supervision for any other offense higher than the grade of misdemeanor punishable by fine only; and

(3)  is not subject to pending charges for any other offense at the time of filing the petition.

SECTION __.  Section 2(a), Article 55.02, Code of Criminal Procedure, as amended by Section 2, Chapter 339, and Section 2, Chapter 1236, Acts of the 78th Legislature, Regular Session, 2003, is reenacted and amended to read as follows:

(a)  A person who is entitled to expunction of records and files under Article 55.01(a) or (a-1) or a person who is eligible for expunction of records and files under Article 55.01(b) may file an ex parte petition for expunction in a district court for the county in which:

(1)  the petitioner was arrested; or

(2)  the offense was alleged to have occurred.

SECTION __. The change in law made by this Act in amending Article 55.01 and amending Section 2(a), Article 55.02, Code of Criminal Procedure, applies to a defendant seeking expunction of records relating to an arrest regardless of whether the arrest occurred before, on, or after the effective date of this Act.

## Floor Amendment No. 1 on Third Reading

Amend **SB 166** on third reading by striking the language added by the Truitt amendment on second reading that adds Subsection (a-1), Article 55.01, Code of Criminal Procedure, amends Section 2(a), Article 55.02, Code of Criminal Procedure, and adds nonamendatory transition language relating to the addition and amendment.

The amendments were read.

Senator Ellis moved to concur in the House amendments to **SB 166**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1149 WITH HOUSE AMENDMENTS

Senator Harris called **SB 1149** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House amendments before the Senate.

## Floor Amendment No. 1

Amend **SB 1149** (House committee printing) in SECTION 1 of the bill as follows:

(1) In added Section 1274.001, Insurance Code (page 1, between lines 13 and 14), add the following new Subdivision (2) and renumber subdivisions appropriately:

(2) "Health benefit plan" means a group, blanket, or franchise insurance policy, a certificate issued under a group policy, a group hospital service contract, or a group subscriber contract or evidence of coverage issued by a health maintenance organization that provides benefits for health care services. The term does not include:

(A) accident-only or disability income insurance coverage or a combination of accident-only and disability income insurance coverage;

(B) credit-only insurance coverage;

(C) disability insurance coverage;

(D) coverage only for a specified disease or illness;

(E) Medicare services under a federal contract;

(F) Medicare supplement and Medicare Select policies regulated in accordance with federal law;

(G) long-term care coverage or benefits, nursing home care coverage or benefits, home health care coverage or benefits, community-based care coverage or benefits, or any combination of those coverages or benefits;

(H) coverage that provides limited-scope dental or vision benefits;

(I) coverage provided by a single service health maintenance organization;

(J) coverage issued as a supplement to liability insurance;

(K)  workers' compensation insurance coverage or similar insurance coverage;

(L)  automobile medical payment insurance coverage;

(M)  a jointly managed trust authorized under 29 U.S.C. Section 141 et seq. that contains a plan of benefits for employees that is negotiated in a collective bargaining agreement governing wages, hours, and working conditions of the employees that is authorized under 29 U.S.C. Section 157;

(N)  hospital indemnity or other fixed indemnity insurance coverage;

(O)  reinsurance contracts issued on a stop-loss, quota-share, or similar basis;

(P)  liability insurance coverage, including general liability insurance and automobile liability insurance coverage; or

(Q)  coverage that provides other limited benefits specified by federal regulations.

(2)  In added Section 1274.002, Insurance Code (page 3, line 11), between "STATUS." and "Each", insert "(a)".

(3)  In added Section 1274.002, Insurance Code (page 4, between lines 9 and 10), insert Subsection (b) to read as follows:

(b)  Information required to be made available under this section may be made available only to a participating provider who is authorized under state and federal law to receive personally identifiable information on an enrollee or dependent.

## Floor Amendment No. 2

Amend **SB 1149** (House committee printing) in SECTION 1 of the bill as follows:

(1)  In added Chapter 1274, Insurance Code (page 3, between lines 9 and 10), insert the following new section:

Sec. 1274.0015.  EXEMPTION. This chapter does not apply to a single-service health maintenance organization that provides coverage only for dental or vision benefits.

(2)  In added Section 1274.002, Insurance Code (page 3, lines 14-16), strike "and sufficient for the provider to determine at the time of an enrollee's visit information".

## Floor Amendment No. 1 on Third Reading

Amend **SB 1149** on third reading, as amended on second reading, in SECTION 1 of the bill as follows:

(1)  On page 3, line 14, after "in the ordinary course of business" add "and sufficient for the provider to determine at the time of the enrollee's visit information".

(2)  On page 3, line 11, between "shall" and "make" insert ", upon the participating provider's submission of the patient's name, relationship to the primary enrollee, and birth date,".

The amendments were read.

Senator Harris moved to concur in the House amendments to **SB 1149**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 23 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 23** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Amendment No. 1

Amend **SB 23** in SECTION 1 of the bill, in added Section 29.1561(c), Education Code (engrossed version, page 1, line 8), by striking "award grants" and substituting "provide incentives".

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 23**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 40 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 40** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Floor Amendment No. 1

Amend **SB 40** (House committee printing) in SECTION 2 of the bill, in added Section 531.1532, Government Code (page 3, line 9), by striking "An institution in which a child resides" and substituting "An entity that provides information to a child's parent or guardian relating to permanency planning".

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 40**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 369 WITH HOUSE AMENDMENT

Senator Barrientos called **SB 369** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Amendment

Amend **SB 369** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the prohibition of signs on Farm-to-Market Road 3238.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 391.252(a), Transportation Code, is amended to read as follows:

(a) A [Subsequent to the effective date of this subchapter, a] person may not erect an off-premise sign that is adjacent to and visible from:

(1)  U.S. Highway 290 between the western city limits of the city of Austin and the eastern city limits of the city of Fredericksburg;

(2)  State Highway 317 between the northern city limits of the city of Belton to the southern city limits of the city of Valley Mills;

(3)  State Highway 16 between the northern city limits of the city of Kerrville and Interstate Highway 20;

(4)  U.S. Highway 77 between State Highway 186 and State Highway 44;

(5)  U.S. Highway 281 between State Highway 186 and Interstate Highway 37;

(6)  State Highway 17 between State Highway 118 and U.S. Highway 90;

(7)  State Highway 67 between U.S. Highway 90 and Farm-to-Market Road 170;

(8)  Farm-to-Market Road 170 between State Highway 67 and State Highway 118;

(9)  State Highway 118 between Farm-to-Market Road 170 and State Highway 17;

(10)  State Highway 105 between the western city limits of the city of Sour Lake to the eastern city limits of the city of Cleveland;

(11)  State Highway 73 between the eastern city limits of the city of Winnie to the western city limits of the city of Port Arthur;

(12)  State Highway 21 between the southern city limits of the city of College Station and U.S. Highway 290; [or]

(13)  a highway located in:

(A)  the Sabine National Forest;

(B)  the Davy Crockett National Forest; or

(C)  the Sam Houston National Forest; or

(14)  Farm-to-Market Road 3238 beginning at State Highway 71 and any extension of that road through Hays and Blanco Counties.

SECTION 2.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Barrientos moved to concur in the House amendment to **SB 369**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 269 WITH HOUSE AMENDMENT

Senator Madla called **SB 269** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 269** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to certain administrative fees and taxes collected by the Texas Alcoholic Beverage Commission.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 107.07, Alcoholic Beverage Code, is amended by adding Subsection (g) to read as follows:

(g) In computing the total amount of taxes and administrative fees to be collected on alcoholic beverages imported by a person into the state for personal use, the commission may round the amount up to the nearest quarter of a dollar.

SECTION 2. Subsection (b), Section 154.024, Tax Code, is amended to read as follows:

(b) Employees of the Texas Alcoholic Beverage Commission who collect taxes on alcoholic beverages at ports of entry shall collect at the ports of entry the tax imposed by this chapter on cigarettes imported into this state. In computing the amount of taxes to be collected, the commission may round the total amount up to the nearest quarter of a dollar.

SECTION 3. This Act applies to fees or taxes collected on or after the effective date of this Act, without regard to whether the fees or taxes were due before, on, or after that date.

SECTION 4. This Act takes effect September 1, 2005.

The amendment was read.

Senator Madla moved to concur in the House amendment to **SB 269**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 890 WITH HOUSE AMENDMENT

Senator Williams called **SB 890** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 890** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the amount of recovery in a civil action.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 33.012(b), Civil Practice and Remedies Code, is amended to read as follows:

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements [a percentage equal to each settling person's percentage of responsibility].

SECTION 2. (a) This Act applies to all actions:

(1) commenced on or after the effective date of this Act; or

(2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date.

(b) For an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on the effective date is governed by the law applicable to the trial, new trial, or retrial immediately before that date, and that law is continued in effect for that purpose.

SECTION 3. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Williams moved to concur in the House amendment to **SB 890**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 630 WITH HOUSE AMENDMENT

Senator Van de Putte called **SB 630** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 630** in SECTION 1 of the bill, in proposed Subdivision (13), Subsection (c), Section 32.070, Human Resources Code (page 3, line 19), by striking "peer".

The amendment was read.

Senator Van de Putte moved to concur in the House amendment to **SB 630**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 51 WITH HOUSE AMENDMENT

Senator Nelson called **SB 51** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 51** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
#### AN ACT

relating to administration of certain health benefit plans.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subchapter A, Chapter 1301, Insurance Code, is amended by adding Section 1301.0061 to read as follows:

Sec. 1301.0061.  TERMS OF ENROLLEE ELIGIBILITY.  A contract between an insurer and a group policyholder under a preferred provider benefit plan must provide that:

(1)  in addition to any other premiums for which the group policyholder is liable, the group policyholder is liable for an individual insured's premiums from the time the individual is no longer part of the group eligible for coverage under the policy until the end of the month in which the policyholder notifies the insurer that the individual is no longer part of the group eligible for coverage under the policy; and

(2)  the individual remains covered under the policy until the end of that period.

SECTION 2.  Subchapter F, Chapter 843, Insurance Code, is amended by adding Section 843.210 to read as follows:

Sec. 843.210.  TERMS OF ENROLLEE ELIGIBILITY.  A contract between a health maintenance organization and a group contract holder must provide that:

(1)  in addition to any other premiums for which the group contract holder is liable, the group contract holder is liable for an enrollee's premiums from the time the enrollee is no longer part of the group eligible for coverage under the contract until the end of the month in which the contract holder notifies the health maintenance organization that the enrollee is no longer part of the group eligible for coverage by the contract; and

(2)  the enrollee remains covered by the contract until the end of that period.

SECTION 3.  Section 843.347, Insurance Code, is amended by adding Subsections (h) and (i) to read as follows:

(h)  A health maintenance organization providing routine vision services as a single health care service plan or providing dental health care services as a single health care service plan is not required to comply with Subsection (c) with respect to those services. For purposes of this subsection, "routine vision services" means a routine annual or biennial eye examination to determine ocular health and refractive conditions that may include provision of glasses or contact lenses.

(i)  A health maintenance organization described by Subsection (h) shall:

(1)  have appropriate personnel reasonably available at a toll-free telephone number to provide a verification under this section between 8 a.m. and 5 p.m. central time Monday through Friday on each day that is not a legal holiday;

(2)  have a telephone system capable of accepting or recording incoming phone calls for verifications after 5 p.m. Monday through Friday and all day on Saturday, Sunday, and legal holidays; and

(3)  respond to calls accepted or recorded on the telephone system described by Subdivision (2) not later than the next business day after the date the call is received.

SECTION 4.  Section 843.348, Insurance Code, is amended by adding Subsections (i) and (j) to read as follows:

(i)  A health maintenance organization providing routine vision services as a single health care service plan or providing dental health care services as a single health care service plan is not required to comply with Subsection (f) with respect to

those services. For purposes of this subsection, "routine vision services" means a routine annual or biennial eye examination to determine ocular health and refractive conditions that may include provision of glasses or contact lenses.

(j)  A health maintenance organization described by Subsection (i) shall:

(1)  have appropriate personnel reasonably available at a toll-free telephone number to respond to requests for preauthorization under this section between 8 a.m. and 5 p.m. central time Monday through Friday on each day that is not a legal holiday;

(2)  have a telephone system capable of accepting or recording incoming phone calls for preauthorizations after 5 p.m. Monday through Friday and all day on Saturday, Sunday, and legal holidays; and

(3)  respond to calls accepted or recorded on the telephone system described by Subdivision (2) not later than the next business day after the date the call is received.

SECTION 5. Sections 843.210 and 1301.0061, Insurance Code, as added by this Act, apply only to a contract between an insurer or health maintenance organization and a group policy or contract holder that is entered into or renewed on or after January 1, 2006. A contract entered into or renewed before January 1, 2006, is governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose.

SECTION 6. (a)  With respect to a contract entered into between an insurer or health maintenance organization and a physician or health care provider, and payment for medical care or health care services under the contract, Sections 843.347(h) and (i) and 843.348(i) and (j), Insurance Code, as added by this Act, apply only to a contract entered into or renewed on or after the 60th day after the effective date of this Act and payment for services under the contract. Such a contract entered into before the 60th day after the effective date of this Act and not renewed or that was last renewed before the 60th day after the effective date of this Act, and payment for medical care or health care services under the contract, are governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose.

(b) With respect to the payment for medical care or health care services provided, but not provided under a contract to which Subsection (a) of this section applies, Sections 843.347(h) and (i) and 843.348(i) and (j), Insurance Code, as added by this Act, apply only to the payment for those services provided on or after the 60th day after the effective date of this Act. Payment for those services provided before the 60th day after the effective date of this Act is governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose.

SECTION 7.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Nelson moved to concur in the House amendment to **SB 51**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 623 WITH HOUSE AMENDMENT

Senator Hinojosa called **SB 623** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Floor Amendment No. 1

Amend **SB 623** (House committee printing), in Section 1 of the bill as follows:

(1) In Section 552.263(e) (page 1, line 8), strike "E" and insert "F".

(2) In Section 552.263(f) (page 1, line 16), strike "(c)" and insert "(a)".

The amendment was read.

Senator Hinojosa moved to concur in the House amendment to **SB 623**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 921 WITH HOUSE AMENDMENT

Senator Duncan called **SB 921** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Amendment

Amend **SB 921** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the designation of a portion of Interstate Highway 27 between Lubbock and Amarillo as the Marshall Formby Memorial Highway.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subchapter B, Chapter 225, Transportation Code, is amended by adding Section 225.059 to read as follows:

Sec. 225.059. MARSHALL FORMBY MEMORIAL HIGHWAY. (a) Interstate Highway 27 between its intersection with United States Highway 84 in Lubbock and its intersection with Interstate Highway 40 in Amarillo is designated as the Marshall Formby Memorial Highway.

(b) The department shall design and construct memorial markers indicating the highway number, the designation as the Marshall Formby Memorial Highway, and any other appropriate information.

(c) The department shall erect a marker at each end of the highway and at appropriate intermediate sites along the highway.

(d) Notwithstanding Subsections (b) and (c), the department is required to design, construct, and erect the markers only to the extent that money is available for this purpose from a grant or donation of private funds.

(e) Funds collected by the department under Section 225.021 for the purpose of implementing this section shall be deposited to the credit of the state highway fund.

SECTION 2. This Act takes effect September 1, 2005.

The amendment was read.

Senator Duncan moved to concur in the House amendment to **SB 921**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1112 WITH HOUSE AMENDMENT

Senator Eltife called **SB 1112** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1112** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to debt management services; providing a penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Chapter 394, Finance Code, is amended by adding Subchapter C to read as follows:

SUBCHAPTER C. CONSUMER DEBT MANAGEMENT SERVICES

Sec. 394.201.  PURPOSE; CONSTRUCTION.  (a)  The purpose of this subchapter is to protect consumers who contract for services with debt management services providers.

(b)  This subchapter shall be liberally construed to accomplish its purpose.

Sec. 394.202.  DEFINITIONS.  In this subchapter:

(1)  "Advertising" means information about a provider or about the provider's debt management services, communicated in writing or orally to an individual consumer or the public by telephone, television, Internet, radio, or other electronic medium, or by written material sent by mail, posted publicly, or posted at the provider's business location.

(2)  "Certified counselor" means an individual who:

(A)  is certified as a debt management counselor by an independent accreditation organization; or

(B)  if the individual has been employed for less than 12 months, is in the process of being certified as a debt management counselor by an independent accreditation organization.

(3)  "Commissioner" means the consumer credit commissioner.

(4)  "Consumer" means an individual who resides in this state and seeks a debt management service or enters a debt management service agreement.

(5)  "Creditor" means a person to whom a person owes money.

(6)  "Debt management service" means:

(A)  the receiving of money from a consumer for the purpose of distributing that money to or among one or more of the creditors of the consumer in full or partial payment of the consumer's obligations;

(B)  arranging or assisting a consumer to arrange for the distribution of one or more payments to or among one or more creditors of the consumer in full or partial payment of the consumer's obligations; or

(C) exercising control, directly or indirectly, or arranging for the exercise of control over funds of a consumer for the purpose of distributing payments to or among one or more creditors of the consumer in full or partial payment of the consumer's obligations.

(7) "Debt management service agreement" means a written agreement between a provider and a consumer for the performance of a debt management service.

(8) "Finance commission" means the Finance Commission of Texas.

(9) "Person" means an individual, partnership, corporation, limited liability company, association, or organization.

(10) "Provider" means a person that provides or offers to provide to a consumer in this state a debt management service.

(11) "Secured debt" means a debt for which a creditor has a mortgage, lien, or security interest in collateral.

(12) "Trust account" means an account that is:

(A) established in a federally insured financial institution;

(B) separate from any account of the debt management service provider;

(C) designated as a "trust account" or other appropriate designation indicating that the money in the account is not money of the provider or its officers, employees, or agents;

(D) unavailable to creditors of the provider; and

(E) used exclusively to hold money paid by consumers to the provider for disbursement to creditors of the consumers and to the provider for the disbursement of fees and contributions earned and agreed to in advance.

(13) "Unsecured debt" means a debt for which a creditor does not have collateral.

Sec. 394.203. APPLICABILITY. (a) Except as otherwise provided by this subchapter, this subchapter applies to a provider regardless of whether the provider charges a fee or receives consideration for a service.

(b) The business of providing debt management services is conducted in this state if the debt management services provider solicits or contracts with consumers located in this state.

(c) This subchapter does not apply to:

(1) an attorney licensed to practice in this state, unless the attorney holds the attorney's self out to the public as a provider or is employed, affiliated with, or otherwise working on behalf of a provider;

(2) a title insurance or abstract company employee or agent, or other person legally authorized to engage in escrow business in the state, only while engaged in the escrow business;

(3) a judicial officer or person acting under a court order;

(4) a person who has legal authority under federal or state law to act as a representative payee for a consumer, only to the extent the person is paying bills or other debts on behalf of that consumer;

(5)  a person who pays bills or other debts owed by a consumer and on behalf of a consumer, if the money used to make the payments belongs exclusively to the consumer and the person does not initiate any contact with individual creditors of the consumer to compromise a debt, arrange a new payment schedule, or otherwise change the terms of the debt; or

(6)  a financial institution, as defined by Section 201.101.

(d)  The following are not debt management services for purposes of this subchapter:

(1)  an extension of credit, including consolidation or refinance of a loan; and

(2)  bankruptcy services provided by an attorney licensed to practice in this state.

(e)  This subchapter applies to a person who seeks to evade its applicability by any device, subterfuge, or pretense.

Sec. 394.204.  REGISTRATION.  (a)  A person, regardless of whether located in this state, may not provide a debt management service to a consumer in this state unless the person is registered with the commissioner.

(b)  Registration expires on December 31 of the year in which the registration occurs and must be renewed annually.

(c)  An application for an initial registration must be in a form prescribed by the commissioner and accompanied by:

(1)  the appropriate fees set by the finance commission in an amount necessary to recover the costs of administering this subchapter;

(2)  the surety bond or insurance required by Section 394.206;

(3)  a detailed description of the ownership interest of each officer, director, agent, or employee of the applicant, and any member of the immediate family of an officer, director, agent, or employee of the applicant, in a for-profit affiliate or subsidiary of the applicant or in any other for-profit business entity that provides services to the applicant or to a consumer in relation to the applicant's debt management business; and

(4)  any other information that the commissioner requires.

(d)  An officer or employee of a person registered under this subchapter is not required to be separately registered.

(e)  Unless the commissioner notifies an applicant that a longer period is necessary, the commissioner shall approve or deny an initial registration not later than the 60th day after the date on which the completed application, including all required documents and payments, is filed.  The commissioner shall inform the applicant in writing of the reason for denial.

(f)  A person may renew a registration by paying the appropriate fee and completing all required documents.

(g)  The finance commission by rule may establish procedures to facilitate the registration and collection of fees under this section, including rules staggering throughout the year the dates on which fees are due.

(h)  The commissioner may refuse an initial application if the application contains errors or incomplete information. An application is incomplete if it does not include all of the information required by this section and Section 394.205.

(i)  The commissioner may deny an initial application if:

(1)  the applicant or any principal of the applicant has been convicted of a crime or found civilly liable for an offense involving moral turpitude, including forgery, embezzlement, obtaining money under false pretenses, larceny, extortion, conspiracy to defraud, or any other similar offense or violation;

(2)  the registration of the applicant or any principal of the applicant has been revoked or suspended in this state or another state, unless the applicant provides information that the commissioner finds sufficient to show that the grounds for the previous revocation or suspension no longer exist and any problem cited in the previous revocation has been corrected; or

(3)  the commissioner, based on specific evidence, finds that the applicant does not warrant the belief that the business will be operated lawfully and fairly and within the provisions and purposes of this subchapter.

(j)  On written request, the applicant is entitled to a hearing, pursuant to Chapter 2001, Government Code, on the question of the applicant's qualifications for initial registration if the commissioner has notified the applicant in writing that the initial application has been denied.  A request for a hearing may not be made after the 30th day after the date the commissioner mails a notice to the applicant stating that the application has been denied and stating the reasons for the denial.

(k)  In addition to the power to refuse an initial application as specified in this section, the commissioner may suspend or revoke a provider's registration after notice and hearing if the commissioner finds that any of the following conditions are met:

(1)  a fact or condition exists that if it had existed when the provider applied for registration, would have been grounds for denying registration;

(2)  a fact or condition exists that the commissioner was not aware of when the provider applied for registration and would have been grounds for denying registration;

(3)  the provider violates this subchapter or rule or order of the commissioner under this subchapter;

(4)  the provider is insolvent;

(5)  the provider refuses to permit the commissioner to make an examination authorized by this subchapter;

(6)  the provider fails to respond within a reasonable time and in an appropriate manner to communications from the commissioner;

(7)  the provider has failed to disburse money to creditors on behalf of consumers within a reasonable time, normally 30 days;

(8)  the commissioner determines that the provider's trust account is not materially in balance with and reconciled to the consumer's account; or

(9)  the provider fails to warrant the belief that the business will be operated lawfully and fairly and within the provisions and purposes of this subchapter.

(l)  The commissioner's order revoking a registration must include appropriate provisions to transfer existing clients of the provider to one or more registered providers to ensure the continued servicing of the clients' accounts.

(m)  The commissioner shall maintain a list of registered providers and make the list available to interested persons and to the public.

Sec. 394.205.  RECORDS.  (a)  A provider shall keep and use books, accounts, and other records that will enable the commissioner to determine if the provider is complying with this subchapter and maintain any other records as required by the commissioner.  The commissioner may examine the records at any reasonable time. The records must be kept for at least three years after the date of the last service on a consumer's debt management plan.

(b)  Each provider shall file a report with the commissioner at each renewal of the provider's registration.  The report must at a minimum disclose in detail and under appropriate headings:

(1)  the assets and liabilities of the provider at the beginning and end of the period;

(2)  the total number of debt management plans the provider has initiated during that year; and

(3)  records of total and average fees charged to consumers, including all voluntary contributions received from consumers.

(c)  The reports must be verified by the oath or affirmation of the owner, manager, president, chief executive officer, or chairman of the board of directors of the provider.

(d)  A provider shall file a blank copy of the agreement described in Section 394.209 and blank copies of the written information required in Section 394.208(a) with the commissioner accompanying the initial registration and each renewal of registration.

(e)  The commissioner shall make the information provided under this section available to interested parties and to the public.

Sec. 394.206.  BOND; INSURANCE.  (a)  A provider shall, at the time the provider files an initial or renewal registration application with the commissioner, file:

(1)  a surety bond; or

(2)  evidence that the provider maintains an insurance policy in a form approved by the commissioner.

(b)  The bond or insurance must:

(1)  run concurrently with the period of registration;

(2)  be available to pay damages and penalties to consumers directly harmed by a violation of this subchapter;

(3)  be in favor of this state for the use of this state and the use of a person who has a cause of action under this subchapter against the provider;

(4)  be in an amount equal to the average daily balance of the provider's trust account serving Texas consumers over the six-month period preceding the issuance of the bond, or in the case of an initial application, in an amount determined by the commissioner, but not less than $25,000 or more than $100,000;

(5)  if an insurance policy:

(A)  provide coverage for professional liability, employee dishonesty, depositor's forgery, and computer fraud in an amount not less than $100,000;

(B)  be issued by a company rated at least "A-" or its equivalent by a nationally recognized rating organization; and

(C)  provide for 30 days advance written notice of termination of the policy to be provided to the commissioner;

(6)  be issued by a bonding, surety, or insurance company that is authorized to do business in the state; and

(7)  be conditioned on the provider and its agents complying with all state and federal laws, including regulations, governing the business of debt management services.

(c)  In lieu of a bond or insurance, the finance commission by rule may establish alternative financial requirements to provide substantially equivalent protection to pay damages and penalties to consumers directly harmed by a violation under this subchapter.

(d)  The commissioner may adjust the amount of the provider's bond or insurance only when the provider applies for renewal of registration and requests a review of the bond or insurance amount.

Sec. 394.207.  ADVERTISING.   A provider may not engage in false or deceptive advertising.

Sec. 394.208.  REQUIRED ACTIONS BY PROVIDER.  (a)  A provider may not enroll a consumer in a debt management plan unless:

(1)  the provider is a nonprofit organization exempt from taxation under Section 501(c)(3), Internal Revenue Code of 1986; and

(2)  through the services of a counselor certified by an independent accreditation organization, the provider has:

(A)  provided the consumer individualized counseling and educational information that at a minimum addresses the topics of managing household finances, managing credit and debt, and budgeting;

(B)  prepared an individualized financial analysis and an initial debt management plan for the consumer's debts with specific recommendations regarding actions the consumer should take;

(C)  determined that the consumer has a reasonable ability to make payments under the proposed debt management plan based on the information provided by the consumer;

(D)  a reasonable expectation, provided that the consumer has provided accurate information to the provider, that each creditor of the consumer listed as a participating creditor in the plan will accept payment of the consumer's debts as provided in the initial plan;

(E)  prepared, for all creditors identified by the consumer or identified through additional investigation by the provider, a list, which must be provided to the consumer in a form the consumer may keep, of the creditors that the provider reasonably expects to participate in the plan; and

(F)  provided a written document to the consumer in a form the consumer may keep that clearly and conspicuously contains the following statements:

(i)  that debt management services are not suitable for all consumers and that consumers may request information about other ways, including bankruptcy, to deal with indebtedness;

(ii)  that the nonprofit or tax-exempt organization cannot require donations or contributions; and

(iii) that some of the provider's funding comes from contributions from creditors who participate in debt management plans, except that a provider may substitute for "some" the actual percentage of creditor contributions it received during the most recent reporting period.

(b) If the provider discusses its services with a consumer primarily in a language other than English, the provider must provide the debt management agreement in that language.

(c) A consumer must give at least 10 days' notice to the provider to cancel a debt management services agreement. The provider must cancel a debt management services agreement within 10 days after the date the provider receives the notice from the consumer. The provider must continue making disbursements to the consumer's creditors if money has been paid to the provider under the agreement until the expiration of the 10-day period, unless otherwise agreed in writing by the consumer and the provider.

(d) A provider may provide the information required by Subsections (a)(2)(B), (E), and (F) through its Internet website if the provider:

(1) has complied with the federal Electronic Signatures in Global and National Commerce Act (15 U.S.C. Section 7001 et seq.);

(2) informs the consumer that, on electronic, telephonic, or written request the provider will make available to the consumer a paper copy or copies; and

(3) discloses on its Internet website:

(A) the provider's name and each name under which it does business;

(B) the provider's principal business address and telephone number; and

(C) the names of the provider's principal officers.

(e) A provider, including a provider that does business only or principally through the Internet, shall maintain a telephone system staffed at a level that reasonably permits a consumer to access a counselor during ordinary business hours.

(f) A provider shall provide each consumer for whom it provides debt management services a written report accounting for:

(1) the amount of money received from the consumer since the last report;

(2) the amount and date of each disbursement made on the consumer's behalf to each creditor listed in the agreement since the last report;

(3) any amount deducted from amounts received from the consumer; and

(4) any amount held in reserve.

(g) The provider shall provide the report under Subsection (f):

(1) at least once each calendar quarter; and

(2) not later than the 10th business day after the date of a request by a consumer.

Sec. 394.209. WRITTEN DEBT MANAGEMENT SERVICES AGREEMENT. (a) A debt management services provider may not prepare a debt management services agreement before the provider has fully complied with Sections 394.208(a) and (b).

(b) Each debt management services agreement must:

(1) be dated and signed by the consumer;

(2) include the name and address of the consumer and the name, address, and telephone number of the provider;

(3) describe the services to be provided;

(4) state all fees, individually itemized, to be paid by the consumer;

(5) list in the agreement or accompanying document, to the extent the information is available to the provider at the time the agreement is executed, each participating creditor of the consumer to which payments will be made, and based on information provided by the consumer the amount owed to each creditor and the schedule of payments the consumer will be required to make to the creditor, including the amount and date on which each payment will be due;

(6) state the existence of a surety bond or insurance for consumer claims;

(7) state that establishment of a debt management plan may impact the consumer's credit rating and credit score either favorably or unfavorably, depending on creditor policies and the consumer's payment history before and during participation in the debt management plan; and

(8) state that either party may cancel the agreement without penalty at any time on 10 days' notice and that a consumer who cancels an agreement is entitled to a refund of all money that the consumer has paid to the provider that has not been disbursed.

(c) A debt management services agreement may contain a voluntary consumer arbitration provision or a voluntary mediation provision.

(d) A provider may deliver the debt management services agreement through the Internet if the provider:

(1) has complied with the federal Electronic Signatures in Global and National Commerce Act (15 U.S.C. Section 7001 et seq.);

(2) sends the consumer a paper copy of the agreement not later than the seventh day after the date of a request by a consumer to do so; and

(3) discloses on a prominent page of its Internet website:

(A) the provider's name and each name under which it does business;

(B) the provider's principal business address and telephone number; and

(C) the names of the provider's principal officers.

(e) If the provider discusses its services or negotiates with a consumer primarily in a language other than English, the provider may not begin performance of a debt management plan until the provider and consumer sign a copy of the written agreement, provided by the debt management services provider, in that language and a copy is made available to the consumer.

Sec. 394.210. PERMITTED FEES. (a) With respect to the provision of a debt management plan service, a provider may not impose a fee or other charge on a consumer, or receive payment from a consumer or other person on behalf of a consumer except as allowed under this section.

(b) For the purposes of this section, fees or charges include both voluntary contributions and any other fees charged to or collected from a consumer or on behalf of the consumer.

(c)  Any fee charged by a provider must be fair and reasonable given the value of the products and services provided to the consumer, including consideration of the amount subject to debt management and the number of anticipated payments.  A fee or a portion of a fee that is specifically related to a debt management plan may not be charged until the provider has complied with Sections 394.208(a) and (b) and 394.209.

(d)  A provider may charge a monthly maintenance fee if the fee is fair and reasonable.

(e)  A fee charged for a service other than a debt management service must be fair and reasonable.

Sec. 394.211.  TRUST ACCOUNT.  (a)  A provider must use a trust account for the management of all money paid by or on behalf of a consumer for disbursement to the consumer's creditor. A provider may not commingle the money in a trust account established for the benefit of consumers with any operating funds of the provider. A provider shall exercise due care to appropriately manage the funds in the trust account.

(b)  The trust account must at all times be materially in balance with and reconciled to the consumers' accounts.  Failure to maintain that balance is cause for a summary suspension of registration under Section 394.204.

(c)  If a trust account does not contain sufficient money to cover the aggregate consumer balances, and the provider has not corrected the deficiency within 48 hours of discovery, the provider shall notify the commissioner by telephone, facsimile, electronic mail, or other method approved by the commissioner, and provide written notice including a description of the remedial action taken.

Sec. 394.212.  PROHIBITED ACTS AND PRACTICES.  (a)  A provider may not:

(1)  purchase a debt or obligation of a consumer;

(2)  receive or charge a fee in the form of a promissory note or other negotiable instrument other than a check or a draft;

(3)  lend money or provide credit to the consumer;

(4)  obtain a mortgage or other security interest in property owned by a consumer;

(5)  engage in business with an entity described by Section 394.204(c)(3) without prior consent of the commissioner, except that unless denied, consent is considered granted 30 days after the date the provider notifies the commissioner of the intent to engage in business with an organization described by Section 394.204(c)(3);

(6)  offer, pay, or give a gift, bonus, premium, reward, or other compensation to a person for entering into a debt management services agreement;

(7)  represent that the provider is authorized or competent to furnish legal advice or perform legal services unless supervised by an attorney as required by State Bar of Texas rules;

(8)  use an unconscionable means to obtain a contract with a consumer;

(9)  engage in an unfair, deceptive, or unconscionable act or practice in connection with a service provided to a consumer; or

(10)  require or attempt to require payment of an amount that the provider states, discloses, or advertises to be a voluntary contribution from the consumer.

(b)  A provider does not have a claim:

(1)  for breach of contract against a consumer who cancels an agreement pursuant to this subchapter; or

(2)  in restitution with respect to an agreement that is void under this subchapter.

(c)  A provider may not include any of the following provisions in a disclosure related to debt management services or in a debt management services agreement:

(1)  a confession of judgment clause;

(2)  a waiver of the right to a jury trial, if applicable, in an action brought by or against a consumer;

(3)  an assignment of or order for payment of wages or other compensation for services; or

(4)  a waiver of a provision of this subchapter.

Sec. 394.213.  DUTIES OF PROPER MANAGEMENT.  A provider has a duty to a consumer who receives debt management services from the provider to ensure that client money is managed properly at all times.

Sec. 394.214.  ADDITIONAL ENFORCEMENT POWERS.  (a)  The finance commission may adopt rules to carry out this subchapter.

(b)  The commissioner may:

(1)  investigate the activities of a person subject to this subchapter to determine compliance with this subchapter, including examination of the books, accounts, and records of a provider; and

(2)  require or permit a person to file a statement under oath and otherwise subject to the penalties of perjury, as to all the facts and circumstances of the matter to be investigated.

(c)  Failure to comply with an investigation under Subsection (b) is grounds for issuance of a cease and desist order.

(d)  The commissioner may receive and act on complaints, take action to obtain voluntary compliance with this subchapter, and refer cases to the attorney general for prosecution.

(e)  The commissioner may enforce this subchapter and rules adopted under this subchapter by:

(1)  ordering the violator to cease and desist from the violation and any similar violations;

(2)  ordering the violator to take affirmative action to correct the violation, including the restitution of money or property to a person aggrieved by the violation;

(3)  imposing an administrative penalty not to exceed $1,000 for each violation as provided by Subchapter F, Chapter 14; or

(4)  rejecting an initial application or revoking or suspending a registration as provided by Section 394.204.

(f)  In determining the amount of an administrative penalty to be imposed under this section, the commissioner shall consider the seriousness of the violation, the good faith of the violator, the violator's history of previous violations, the deleterious effect of the violation on the public, the assets of the violator, and any other factors the commissioner considers relevant.

(g)  The commissioner, on relation of the attorney general at the request of the commissioner, may bring an action in district court to enjoin a person from engaging in an act or continuing a course of action that violates this chapter.  The court may order a preliminary or final injunction.

Sec. 394.215.  PRIVATE REMEDIES.  (a)  An agreement for debt management services between a consumer and a person that is not registered under this subchapter is void.

(b)  A consumer is entitled to recover all fees paid by the consumer under a void agreement, costs, and reasonable attorney's fees.

(c)  In addition to any other remedies provided by this subchapter, a consumer who is aggrieved by a violation of this subchapter, a rule adopted by the finance commission under this subchapter, or by any unfair, unconscionable, or deceptive act or practice may recover:

(1)  actual damages;

(2)  punitive damages for acts or practices under a void agreement; and

(3)  the costs of the action, including reasonable attorney's fees based on the amount of time involved.

(d)  An aggrieved consumer may sue for injunctive and other appropriate equitable relief to stop a person from violating this subchapter.

(e)  The remedies provided in this section are not intended to be the exclusive remedies available to a consumer nor must the consumer exhaust any administrative remedies provided under this subchapter or any other applicable law.

SECTION 2.  Subchapter B, Chapter 394, Finance Code, is repealed.

SECTION 3.  A person is not required to be registered under Section 394.204, Finance Code, as added by this Act, before January 1, 2006.

SECTION 4.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Eltife moved to concur in the House amendment to **SB 1112**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1340 WITH HOUSE AMENDMENT

Senator Madla called **SB 1340** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1340** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to the regulation and reimbursement of health care services provided through telehealth or telemedicine under the state Medicaid program.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subsection (b), Section 531.0216, Government Code, is amended to read as follows:

(b)  In developing the system, the <u>executive commissioner</u> [commission] by rule shall:

(1)  review programs and pilot projects in other states to determine the most effective method for reimbursement;

(2)  establish billing codes and a fee schedule for services;

(3)  provide for an approval process before a provider can receive reimbursement for services;

(4)  consult with the [Texas] Department of <u>State</u> Health <u>Services</u> and the telemedicine advisory committee to establish procedures to:

(A)  identify clinical evidence supporting delivery of health care services using a telecommunications system [by January 1, 2001];

(B)  establish pilot studies for telemedicine medical service delivery; and

(C)  annually review health care services, considering new clinical findings, to determine whether reimbursement for particular services should be denied or authorized;

(5)  establish pilot programs in designated areas of this state under which the commission, in administering government-funded health programs, may reimburse a health professional participating in the pilot program for telehealth services authorized under the licensing law applicable to the health professional; [and]

(6)  establish a separate provider identifier for telemedicine medical services providers<u>; and</u>

<u>(7)  establish a separate modifier for telemedicine medical services eligible for reimbursement.</u>

SECTION 2.  Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.02163 to read as follows:

<u>Sec. 531.02163.  TELEPRESENTERS.  (a)  In this section, "health professional" means an individual who:</u>

<u>(1)  is licensed or certified in this state to perform health care services; and</u>

<u>(2)  is not a physician, registered nurse, advanced practice nurse, or physician assistant.</u>

<u>(b)  The executive commissioner by rule shall establish and adopt minimum standards to permit the use of trained health professionals in presenting patients who are Medicaid recipients for telemedicine medical services consultations to be conducted by physicians at distant sites.</u>

<u>(c)  Notwithstanding Section 531.0217, the commission may provide reimbursement under the state Medicaid program for a telemedicine medical service initiated by a trained health professional who complies with the minimum standards adopted under this section.</u>

<u>(d)  The commission shall provide reimbursement under the state Medicaid program to a physician for overseeing a telemedicine consultation at a telemedicine hub site if the telepresenter at the remote site is another physician or is an advanced practice nurse, registered nurse, or physician assistant acting under physician delegation and supervision throughout the consultation.</u>

SECTION 3.  Section 531.0217, Government Code, is amended by amending Subsection (i) and adding Subsection (i-1) to read as follows:

(i) The Texas State Board of Medical Examiners, in consultation with the commission, as appropriate, may adopt rules as necessary to:

(1) ensure that appropriate care, including quality of care, is provided to patients who receive telemedicine medical services;

(2) prevent abuse and fraud through the use of telemedicine medical services, including rules relating to filing of claims and records required to be maintained in connection with telemedicine; and

(3) [establish supervisory requirements for a service delegated to and performed by an individual who is not a physician; and

[(4)] define those situations when a face-to-face consultation with a physician is required after a telemedicine medical service.

(i-1) The Texas State Board of Medical Examiners, in consultation with the commission and the Department of State Health Services, as appropriate, shall adopt rules to establish supervisory requirements for a physician delegating a service to be performed by an individual who is not a physician, registered nurse, advanced practice nurse, or physician assistant, including a health professional who is authorized to be a telepresenter under Section 531.02163.  This section may not be construed as authorizing the Texas State Board of Medical Examiners to regulate another licensed or certified health care provider.

SECTION 4.  Subsection (a), Section 531.02172, Government Code, is amended to read as follows:

(a) The commissioner shall establish an advisory committee to assist the commission in:

(1) evaluating policies for telemedical consultations under Sections 531.02163 and [Section] 531.0217;

(2) evaluating policies for telemedicine medical services or telehealth services pilot programs established under Section 531.02171;

(3) ensuring the efficient and consistent development and use of telecommunication technology for telemedical consultations and telemedicine medical services or telehealth services reimbursed under government-funded health programs;

(4) monitoring the type of programs receiving reimbursement under Sections 531.0217 and 531.02171; and

(5) coordinating the activities of state agencies concerned with the use of telemedical consultations and telemedicine medical services or telehealth services.

SECTION 5. Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.02175 to read as follows:

Sec. 531.02175.  PILOT PROGRAM FOR TELEHEALTH OR TELEMEDICINE CONSULTATIONS FOR CERTAIN MEDICAID RECIPIENTS. (a)  In this section, "qualified mental health professional" means an individual who:

(1) is credentialed to provide qualified mental health professional community services; and

(2) holds a bachelor's or more advanced degree from an accredited college or university with a minimum number of hours that is equivalent to a major in psychology, social work, medicine, nursing, rehabilitation, counseling, sociology, human growth and development, physician assistant, gerontology, special education, educational psychology, early childhood education, or early childhood intervention.

(b)  The executive commissioner by rule shall develop and the Department of State Health Services shall implement a pilot program under which Medicaid recipients in need of mental health services are provided those services through telehealth or telemedicine.

(c)  The executive commissioner shall design the pilot program in a manner that:

(1)  enhances the delivery of mental health services to recipients;

(2)  ensures adequate supervision of social workers, psychologists, and other licensed professionals who are not psychiatrists and who provide services through the use of telehealth or telemedicine; and

(3)  enables the state to determine whether extension of the use of telehealth or telemedicine would improve the delivery of mental health services.

(d)  The executive commissioner may not require mental health services to be provided through telehealth or telemedicine under the pilot program if an in-person consultation with a psychiatrist or other licensed mental health professional qualified to provide those services is reasonably available where the recipient resides or works.

(e)  The executive commissioner by rule shall establish and adopt minimum standards to permit the use of trained qualified mental health professionals in presenting Medicaid recipients participating in the pilot program for telehealth or telemedicine consultations to be conducted by psychiatrists at distant sites.

(f)  The commission may reimburse a provider participating in the pilot program for services provided through telehealth or telemedicine.  Notwithstanding Section 531.0217, the commission may provide reimbursement under the state Medicaid program for a telehealth or telemedicine consultation initiated by a trained qualified mental health professional who complies with the minimum standards adopted under Subsection (e).

(g)  The Texas State Board of Medical Examiners, in consultation with the commission and the Department of State Health Services, as appropriate, shall adopt rules to establish supervisory requirements for a physician delegating a service to be performed by a qualified mental health professional who is authorized to be a telepresenter under this section.  This section may not be construed as authorizing the Texas State Board of Medical Examiners to regulate another licensed or certified health care provider.

(h)  The commission may apply for and receive a grant to fund the pilot program under the federal New Freedom Initiative on Mental Health plan or from the Office of the National Coordinator for Health Information Technology. The commission shall seek the assistance of the Office of State-Federal Relations in identifying and applying for federal grants for the pilot program.

(i)  Not later than December 1, 2006, the commission shall submit a report to the legislature regarding the results of the pilot program. The report must include recommendations regarding elimination, continuation, or expansion of the pilot program.

(j)  This section expires September 1, 2007.

SECTION 6.  (a) The Health and Human Services Commission shall conduct a study to:

(1) identify any program or policy changes necessary to facilitate the development of a network of providers of telemedicine medical services under the state Medicaid program, including:

(A) the establishment of new billing codes;

(B) the establishment of new provider identifiers; and

(C) a description of telemedicine medical services eligible for reimbursement;

(2) investigate the current use of digital medical imaging in the provision of telemedicine medical services to Medicaid recipients;

(3) investigate the feasibility, including the fiscal impact, of expanding the use of digital medical imaging in the provision of telemedicine medical services to Medicaid recipients;

(4) investigate the feasibility of reimbursing health care providers under the state Medicaid program for telemedicine medical services appropriately performed using digital medical imaging; and

(5) investigate the feasibility of developing a system to reimburse physicians for services performed through telemedicine by health care providers acting under physician delegation and supervision, regardless of whether the health care service was initiated by the physician.

(b) Not later than January 1, 2006, the Health and Human Services Commission shall submit a report regarding the results of the study to the presiding officer of each house and senate standing committee having jurisdiction over the state Medicaid program. The report must:

(1) identify any significant barriers, in addition to cost, to expanding the use of digital medical imaging in the provision of telemedicine medical services to Medicaid recipients; and

(2) include the fiscal impact to this state of each of the proposed initiatives.

(c) This section expires September 1, 2007.

SECTION 7. As soon as practicable after the effective date of this Act:

(1) the Texas State Board of Medical Examiners shall adopt rules as required by Subsection (i-1), Section 531.0217, and Subsection (g), Section 531.02175, Government Code, as added by this Act; and

(2) the executive commissioner of the Health and Human Services Commission shall adopt rules as required by Section 531.02163 and Subsection (e), Section 531.02175, Government Code, as added by this Act.

SECTION 8. If before implementing any provision of this Act a state agency determines that a waiver or other authorization from a federal agency is necessary for implementation, the agency affected by the provision shall request the waiver or authorization and may delay implementing that provision until the waiver or authorization is granted.

SECTION 9. This Act takes effect September 1, 2005.

The amendment was read.

Senator Madla moved to concur in the House amendment to **SB 1340**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 826 WITH HOUSE AMENDMENT

Senator Van de Putte called **SB 826** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 826** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to a study examining the feasibility of providing health services for women with postpartum depression.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  (a) In this section, "postpartum depression" means a disorder with postpartum onset that is categorized as a mood disorder by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders, fourth edition, or a subsequent edition of that manual that the executive commissioner of the Health and Human Services Commission by rule adopts to take the place of the fourth edition.

(b) The Health and Human Services Commission shall conduct a study examining the feasibility and effects of providing 12 months of health services under the Medicaid program to women who are:

(1) diagnosed with postpartum depression; and

(2) eligible for medical assistance under Chapter 32, Human Resources Code, at the time of diagnosis.

(c) Not later than September 1, 2006, the Health and Human Services Commission shall provide a report to the governor, lieutenant governor, speaker of the house of representatives, and legislature that explains the conclusions of the study.

SECTION 2.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Van de Putte moved to concur in the House amendment to **SB 826**.

The motion prevailed by the following vote:  Yeas 27, Nays 2.

Yeas:  Armbrister, Averitt, Barrientos, Brimer, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hinojosa, Jackson, Janek, Lindsay, Lucio, Madla, Nelson, Ogden, Seliger, Shapiro, Shapleigh, Van de Putte, Wentworth, Whitmire, Zaffirini.

Nays:  Staples, Williams.

Absent-excused:  Carona, West.

## SENATE BILL 781 WITH HOUSE AMENDMENT

Senator Fraser called **SB 781** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 781** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
#### AN ACT

relating to the prosecution of certain acts that constitute the unauthorized business of insurance.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 101.106(a), Insurance Code, is amended to read as follows:

(a) A person, including an insurer, who intentionally, knowingly, or recklessly violates Section 101.102 commits an offense.

SECTION 2. (a) The change in law made by this Act applies only to the punishment for an offense committed on or after the effective date of this Act. For purposes of this section, an offense is committed before the effective date of this Act if any element of the offense occurs before the effective date.

(b) An offense committed before the effective date of this Act is governed by the law in effect on the date that the offense was committed, and the former law is continued in effect for this purpose.

SECTION 3. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Fraser moved to concur in the House amendment to **SB 781**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 1772 WITH HOUSE AMENDMENT

Senator Deuell called **SB 1772** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Committee Amendment No. 1**

Amend **SB 1772** by striking SECTION 6 of the bill (Senate engrossment, page 15, lines 9-10) and substituting the following:

SECTION 6. NO ADDITIONAL POWERS OR DUTIES; RETAIL WATER UTILITY SERVICE. (a) This Act does not grant any additional powers or duties to the district.

(b) The district may not provide additional retail water utility service in the corporate boundaries of the City of Mesquite other than the service provided on the effective date of this Act without obtaining the city's consent.

The amendment was read.

Senator Deuell moved to concur in the House amendment to **SB 1772**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 327 WITH HOUSE AMENDMENTS

Senator Zaffirini called **SB 327** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 327** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the installation, copying, or use of computer software for unauthorized purposes; providing a penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Title 4, Business & Commerce Code, is amended by adding Chapter 48 to read as follows:

### CHAPTER 48. CONSUMER PROTECTION AGAINST
### COMPUTER SPYWARE ACT
### SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 48.001.  SHORT  TITLE. This  chapter  may  be  cited  as  the  Consumer Protection Against Computer Spyware Act.

Sec. 48.002.  DEFINITIONS. In this chapter:

(1)  "Advertisement" means a communication that includes the promotion of a commercial product or service, including communication on an Internet website operated for a commercial purpose.

(2)  "Computer software" means a sequence of instructions written in a programming language that is executed on a computer.  The term does not include:

(A)  a web page; or

(B)  a data component of a web page that cannot be executed independently of that page.

(3)  "Damage," with respect to a computer, means significant impairment to the integrity or availability of data, computer software, a system, or information.

(4)  "Execute," with respect to computer software, means to perform a function or carry out instructions.

(5)  "Keystroke-logging function" means a function of a computer software program that records all keystrokes made by a person using a computer and transfers that information from the computer to another person.

(6)  "Owner or operator of a computer" means the owner or lessee of a computer or an individual using a computer with the authorization of the owner or lessee of the computer. If a computer was sold at retail, the phrase "owner of a computer" does not include the person who owned the computer before the date on which the computer was sold.

(7)  "Person" means any individual, partnership, corporation, limited liability company, or other organization, or a combination of those organizations.

(8)  "Personally identifiable information," with respect to an individual who is the owner or operator of a computer, means:

(A)  first name or first initial in combination with last name;

(B)  a home or other physical address, including street name;

(C)  an electronic mail address;

(D)  a credit or debit card number;

(E)  a bank account number;

(F)  a password or access code associated with a credit or debit card or bank account;

(G)  a social security number, tax identification number, driver's license number, passport number, or other government-issued identification number; or

(H)  any of the following information if the information alone or in combination with other information personally identifies the individual:

(i)  account balances;

(ii)  overdraft history; or

(iii)  payment history.

Sec. 48.003.  APPLICABILITY OF CHAPTER. (a)  This chapter does not apply to the transmission of computer software to the computer of another by a person providing:

(1)  the Internet connection, telephone connection, or other means of transmission capability such as a compact disc or digital video disc through which the software was made available;

(2)  the storage or hosting of the software program or an Internet web page through which the software was made available; or

(3)  an information location tool, such as a directory, index, reference pointer, or hypertext link, through which the user of the computer located the software, unless the person receives a direct economic benefit from the execution of the software on the computer.

(b)  Section 48.052, other than Subdivision (1) of that section, and Sections 48.053(4) and 48.055 do not apply to a telecommunications carrier, cable operator, computer hardware or software provider, or provider of information service or interactive computer service that monitors or has interaction with a subscriber's Internet or other network connection or service or a protected computer for:

(1)  network or computer security purposes;

(2)  diagnostics, technical support, or repair purposes;

(3)  authorized updates of computer software or system firmware;

(4)  authorized remote system management; or

(5)  detection or prevention of unauthorized use of or fraudulent or other illegal activities in connection with a network, service, or computer software, including scanning for and removing software proscribed under this chapter.

[Sections 48.004-48.050 reserved for expansion]

SUBCHAPTER B.  PROHIBITED CONDUCT OR ACTIVITIES

Sec. 48.051.  UNAUTHORIZED  COLLECTION  OR  TRANSMISSION  OF PERSONALLY IDENTIFIABLE INFORMATION. If a person is not the owner or operator of the computer, the person may not knowingly transmit computer software to a computer in this state and use the software to:

(1)  collect, through intentionally deceptive means:

(A)  personally  identifiable  information  by  using  a  keystroke-logging function; or

(B)  personally identifiable information in a manner that correlates that information with information regarding all or substantially all of the websites visited by the owner or operator of the computer, other than websites operated by the person collecting the information; or

(2)  cull,  through  intentionally  deceptive  means,  the  following  kinds  of personally identifiable information from the consumer's computer hard drive for a purpose wholly unrelated to any of the purposes of the software or service described to an owner or operator of the computer:

(A)  a credit or debit card number;

(B)  a bank account number;

(C)  a password or access code associated with a credit or debit card number or a bank account;

(D)  a social security number;

(E)  account balances; or

(F)  overdraft history.

Sec. 48.052.  UNAUTHORIZED  TRANSMISSIONS  OR  MODIFICATIONS OF COMPUTER SETTINGS; COMPUTER DAMAGE. If a person is not the owner or operator of the computer, the person may not knowingly transmit computer software to a computer in this state and use the software to:

(1)  modify, through intentionally deceptive means, a setting that controls:

(A)  the  page  that  appears  when  an  Internet  browser  or  a  similar software program is launched to access and navigate the Internet;

(B)  the default provider or web proxy used to access or search the Internet; or

(C)  a list of bookmarks used to access web pages;

(2)  take control of the computer by:

(A)  accessing or using the computer's modem or Internet service to:

(i)  cause damage to the computer;

(ii)  cause the owner or operator of the computer to incur financial charges for a service not previously authorized by the owner or operator; or

(iii)  cause a third party affected by the conduct to incur financial charges for a service not previously authorized by the third party; or

(B)  opening,  without  the  consent  of  the  owner  or  operator  of  the computer, an advertisement that:

(i)  is  in  the  owner's  or  operator's  Internet  browser  in  a  multiple, sequential, or stand-alone form; and

(ii) cannot be closed by an ordinarily reasonable person using the computer without closing the browser or shutting down the computer;

(3) modify settings on the computer that relate to access to or use of the Internet and protection of information for purposes of stealing personally identifiable information of the owner or operator of the computer; or

(4) modify security settings on the computer relating to access to or use of the Internet for purposes of causing damage to one or more computers.

Sec. 48.053. UNAUTHORIZED INTERFERENCE WITH INSTALLATION OR DISABLING OF COMPUTER SOFTWARE. If a person is not the owner or operator of the computer, the person may not knowingly transmit computer software to a computer in this state and use the software to:

(1) prevent, through intentionally deceptive means, reasonable efforts of the owner or operator of the computer to block the installation or execution of or to disable computer software by causing computer software that the owner or operator has properly removed or disabled to automatically reinstall or reactivate on the computer;

(2) intentionally misrepresent to another that computer software will be uninstalled or disabled by the actions of the owner or operator of the computer;

(3) remove, disable, or render inoperative, through intentionally deceptive means, security, antispyware, or antivirus computer software installed on the computer; or

(4) prevent the owner's or operator's reasonable efforts to block the installation of or to disable computer software by:

(A) presenting the owner or operator with an option to decline the installation of software knowing that, when the option is selected, the installation process will continue to proceed; or

(B) misrepresenting that software has been disabled.

Sec. 48.054. KNOWING VIOLATION. A person knowingly violates Section 48.051, 48.052, or 48.053 if the person:

(1) acts with actual knowledge of the facts that constitute the violation; or

(2) consciously avoids information that would establish actual knowledge of those facts.

Sec. 48.055. OTHER PROHIBITED CONDUCT. If a person is not the owner or operator of the computer, the person may not:

(1) induce the owner or operator of a computer in this state to install a computer software component to the computer by intentionally misrepresenting the extent to which the installation is necessary for security or privacy reasons, to open or view text, or to play a particular type of musical or other content; or

(2) copy and execute or provide for the copying and execution of a computer software component to a computer in this state in a deceptive manner with the intent of causing the owner or operator of the computer to use the component in a manner that violates this chapter.

Sec. 48.056. DECEPTIVE ACT OR OMISSION. For purposes of this chapter, a person is considered to have acted through intentionally deceptive means if the person, with the intent to deceive an owner or operator of a computer:

(1) intentionally makes a materially false or fraudulent statement;

(2) intentionally makes a statement or uses a description that omits or misrepresents material information; or

(3) intentionally and materially fails to provide to the owner or operator any notice regarding the installation or execution of computer software.

Sec. 48.057.  TRANSMISSION OF COMPUTER SOFTWARE. For purposes of this chapter, a person is considered to have transmitted computer software to a computer if the person transfers, sends, or makes available computer software, or a component of the software, through:

(1)  the Internet;

(2)  a local area network of computers;

(3)  other non-wire transmission;

(4)  a disc or other data storage device; or

(5)  any other medium.

[Sections 48.058-48.100 reserved for expansion]

SUBCHAPTER C.  CIVIL REMEDIES

Sec. 48.101.  CIVIL RELIEF. (a) The following persons may bring a civil action against a person who violates this chapter:

(1)  a provider of computer software who is adversely affected by the violation;

(2)  an owner of a web page or trademark who is adversely affected by the violation; or

(3)  a telecommunications carrier or Internet service provider who is adversely affected by the violation.

(b)  In addition to any other remedy provided by law and except as provided by Subsection (g), a person bringing an action under this section may:

(1)  seek injunctive relief to restrain the violator from continuing the violation;

(2)  recover damages in an amount equal to the greater of:

(A)  actual damages arising from the violation; or

(B)  $100,000 for each violation of the same nature; or

(3)  both seek injunctive relief and recover damages as provided by this subsection.

(c)  The court may increase an award of actual damages in an action brought under Subsection (b) to an amount not to exceed three times the actual damages sustained if the court finds that the violations have occurred with a frequency as to constitute a pattern or practice.

(d)  A plaintiff who prevails in an action filed under Subsection (b) is entitled to recover reasonable attorney's fees and court costs.

(e)  Each separate violation of this chapter is an actionable violation.

(f)  For purposes of Subsection (b), violations are of the same nature if the violations consist of the same course of conduct or action, regardless of the number of times the conduct or act occurred.

(g)  In the case of a violation of Section 48.052 that causes a telecommunications carrier to incur costs for the origination, transport, or termination of a call triggered using the modem of a customer of the carrier as a result of the violation and in addition to any other remedy provided by law, a telecommunications carrier bringing an action under this section may:

(1)  apply to a court for an order to enjoin the violation;

(2)  recover the charges the carrier is obligated to pay to another carrier or an information service provider as a result of the violation, including charges for the origination, transport, or termination of the call;

(3)  recover the costs of handling customer inquiries or complaints with respect to amounts billed for calls as a result of the violation;

(4)  recover other costs, including court costs, and reasonable attorney's fees; or

(5)  both apply for injunctive relief and recover charges and other costs as provided by this subsection.

Sec. 48.102.  CIVIL PENALTY; INJUNCTION. (a) A person who violates this chapter is liable to the state for a civil penalty in an amount not to exceed $100,000 for each violation. The attorney general may bring suit to recover the civil penalty imposed by this subsection.

(b)  If it appears to the attorney general that a person is engaging in, has engaged in, or is about to engage in conduct that violates this chapter, the attorney general may bring an action in the name of this state against the person to restrain the violation by a temporary restraining order or a permanent or temporary injunction.

(c)  The attorney general is entitled to recover reasonable expenses incurred in obtaining injunctive relief, civil penalties, or both, under this section, including reasonable attorney's fees and court costs.

SECTION 2.  This Act takes effect September 1, 2005.

**Floor Amendment No. 1**

Amend **CSSB 327** (House committee printing) as follows:

(1)  In SECTION 1 of the bill, in added Section 48.002, Business & Commerce Code (page 1, between lines 15 and 16), add a new Subdivision (2) to read as follows and renumber subsequent subdivisions accordingly:

(2)  "Cause computer software to be copied" means to distribute or transfer computer software or a component of computer software. The term does not include:

(A)  the transmission or routing of computer software or a component of the software;

(B)  the provision of intermediate temporary storage or caching of software;

(C)  the provision of a storage medium such as a compact disk;

(D)  a website;

(E)  the distribution of computer software by a third party through a computer server; or

(F)  the provision of an information location tool, such as a directory, index, reference, pointer, or hypertext link, through which the user of a computer is able to locate computer software.

(2) In SECTION 1 of the bill, strike added Section 48.003(a), Business & Commerce Code (page 3, lines 10-23).

(3) In SECTION 1 of the bill, in added Section 48.003, Business & Commerce Code (page 3, line 24), strike "(b)".

(4) In SECTION 1 of the bill, in the heading to added Section 48.051, Business & Commerce Code (page 4, line 16), strike "TRANSMISSION" and substitute "CULLING".

(5) In SECTION 1 of the bill, in added Section 48.051, Business & Commerce Code (page 4, lines 18 and 19), strike "transmit computer software" and substitute "cause computer software to be copied".

(6) In SECTION 1 of the bill, in the heading to added Section 48.052, Business & Commerce Code (page 5, line 14), strike "TRANSMISSIONS" and substitute "ACCESS TO".

(7) In SECTION 1 of the bill, in added Section 48.052, Business & Commerce Code (page 5, lines 16 and 17), strike "transmit computer software" and substitute "cause computer software to be copied".

(8) In SECTION 1 of the bill, in added Section 48.053, Business & Commerce Code (page 6, lines 26 and 27), strike "transmit computer software" and substitute "cause computer software to be copied".

(9) In SECTION 1 of the bill, in Subdivision (3) of added Section 48.053, Business & Commerce Code (page 7, line 13), strike "; or" and substitute ";".

(10) In SECTION 1 of the bill, in Subdivision (4)(B) of added Section 48.053, Business & Commerce Code (page 7, line 22), strike "." and substitute ";".

(11) In SECTION 1 of the bill, immediately following Subdivision (4) of added Section 48.053, Business & Commerce Code (page 7, between lines 22 and 23), insert the following:

(5) change the name, location, or other designation of computer software to prevent the owner from locating and removing the software; or

(6) create randomized or intentionally deceptive file names or random or intentionally deceptive directory folders, formats, or registry entries to avoid detection and prevent the owner from removing computer software.

(12) In SECTION 1 of the bill, in added Section 48.055(2), Business & Commerce Code (page 8, line 9), strike "provide for" and substitute "cause".

(13) In SECTION 1 of the bill, strike added Section 48.057, Business & Commerce Code (page 8, line 25, through page 9, line 7).

**Floor Amendment No. 2**

Amend **CSSB 327** (House committee printing) as follows:

(1) In SECTION 1 of the bill, at the end of added Section 48.003, Business & Commerce Code (page 4, between lines 13 and 14), insert the following:

(c) This chapter does not apply to:

(1) the use of a navigation device, any interaction with a navigation device, or the installation or use of computer software on a navigation device by a multichannel video programming distributor or video programmer in connection with the provision of multichannel video programming or other services offered over a multichannel video programming system if the provision of the programming or other service is subject to 47 U.S.C. Section 338(i) or 551; or

(2) the collection or disclosure of subscriber information by a multichannel video programming distributor or video programmer in connection with the provision of multichannel video programming or other services offered over a multichannel video programming system if the collection or disclosure of the information is subject to 47 U.S.C. Section 338(i) or 551.

(d) In this section, "multichannel video programming distributor" has the meaning assigned by 47 U.S.C. Section 522(13).

(2) In SECTION 1 of the bill, strike added Section 48.101(a), Business & Commerce Code (page 9, lines 10-17), and substitute the following:

(a) The following persons, if adversely affected by the violation, may bring a civil action against a person who violates this chapter:

(1) a provider of computer software;

(2) an owner of a web page or trademark;

(3) a telecommunications carrier;

(4) a cable operator; or

(5) an Internet service provider.

(3) In SECTION 1 of the bill, strike added Section 48.101(g), Business & Commerce Code (page 10, line 17, through page 11, line 8), and substitute the following:

(g) In the case of a violation of Section 48.052 that causes a telecommunications carrier or cable operator to incur costs for the origination, transport, or termination of a call triggered using the modem of a customer of the telecommunications carrier or cable operator as a result of the violation and in addition to any other remedy provided by law, a telecommunications carrier or cable operator bringing an action under this section may:

(1) apply to a court for an order to enjoin the violation;

(2) recover the charges the telecommunications carrier or cable operator is obligated to pay to a telecommunications carrier, cable operator, other provider of transmission capability, or an information service provider as a result of the violation, including charges for the origination, transport, or termination of the call;

(3) recover the costs of handling customer inquiries or complaints with respect to amounts billed for calls as a result of the violation;

(4) recover other costs, including court costs, and reasonable attorney's fees; or

(5) both apply for injunctive relief and recover charges and other costs as provided by this subsection.

The amendments were read.

Senator Zaffirini moved to concur in the House amendments to **SB 327**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 837 WITH HOUSE AMENDMENTS

Senator Wentworth called **SB 837** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House amendments before the Senate.

## Committee Amendment No. 1

Amend **SB 837** (Senate engrossed version) as follows:

(1)  In SECTION 2 of the bill, in added Subsection (b), Article 46C.051, Code of Criminal Procedure (page 2, line 19), strike "10" and substitute "20".

(2)  In SECTION 2 of the bill, in added Subsection (b), Article 46C.051, Code of Criminal Procedure (page 2, line 20), strike "Subsections (c) and (d)" and substitute "Subsection (c)".

(3)  In SECTION 2 of the bill, in added Subsection (c), Article 46C.051, Code of Criminal Procedure (page 2, line 21), strike "10-day" and substitute "20-day".

(4)  In SECTION 2 of the bill, in added Article 46C.051, Code of Criminal Procedure (page 2, lines 23-26), strike Subsection (d).

## Floor Amendment No. 2

Amend **SB 837** (House committee printing) as follows:

(1)  In SECTION 2 of the bill, immediately following added Subsection (b), Article 46C.258, Code of Criminal Procedure (page 19, between lines 7 and 8), insert the following:

(c)  Not later than the 60th day before the date of expiration of the order, the head of the facility shall transmit to the committing court a psychological evaluation of the acquitted person, a certificate of medical examination of the person, and any recommendation for further treatment of the person.  The committing court shall make the documents available to the attorneys representing the state and the acquitted person.

(2)  In SECTION 2 of the bill, in added Subsection (d), Article 46C.263, Code of Criminal Procedure (page 24, line 11), between "by" and "the", insert "the appropriate community supervision and corrections department or".

The amendments were read.

Senator Wentworth moved to concur in the House amendments to **SB 837**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 1525 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 1525** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

## Amendment

Amend **SB 1525** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to safe patient handling and movement practices of nurses in hospitals and nursing homes.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle B, Title 4, Health and Safety Code, is amended by adding Chapter 256 to read as follows:

CHAPTER 256.  SAFE PATIENT HANDLING AND
MOVEMENT PRACTICES

Sec. 256.001.  DEFINITIONS.  In this chapter:

(1)  "Hospital" means a general or special hospital, as defined by Section 241.003, a private mental hospital licensed under Chapter 577, or another hospital that is maintained or operated by the state.

(2)  "Nursing home" means an institution licensed under Chapter 242.

Sec. 256.002.  REQUIRED SAFE PATIENT HANDLING AND MOVEMENT POLICY.  (a)  The governing body of a hospital or the quality assurance committee of a nursing home shall adopt and ensure implementation of a policy to identify, assess, and develop strategies to control risk of injury to patients and nurses associated with the lifting, transferring, repositioning, or movement of a patient.

(b)  The policy shall establish a process that, at a minimum, includes:

(1)  analysis of the risk of injury to both patients and nurses posed by the patient handling needs of the patient populations served by the hospital or nursing home and the physical environment in which patient handling and movement occurs;

(2)  education of nurses in the identification, assessment, and control of risks of injury to patients and nurses during patient handling;

(3)  evaluation of alternative ways to reduce risks associated with patient handling, including evaluation of equipment and the environment;

(4)  restriction, to the extent feasible with existing equipment and aids, of manual patient handling or movement of all or most of a patient's weight to emergency, life-threatening, or otherwise exceptional circumstances;

(5)  collaboration with and annual report to the nurse staffing committee;

(6)  procedures for nurses to refuse to perform or be involved in patient handling or movement that the nurse believes in good faith will expose a patient or a nurse to an unacceptable risk of injury;

(7)  submission of an annual report to the governing body or the quality assurance committee on activities related to the identification, assessment, and development of strategies to control risk of injury to patients and nurses associated with the lifting, transferring, repositioning, or movement of a patient; and

(8)  in developing architectural plans for constructing or remodeling a hospital or nursing home or a unit of a hospital or nursing home in which patient handling and movement occurs, consideration of the feasibility of incorporating patient handling equipment or the physical space and construction design needed to incorporate that equipment at a later date.

SECTION 2.  This Act takes effect January 1, 2006.

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 1525**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1823 WITH HOUSE AMENDMENT

Senator Wentworth called **SB 1823** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1823** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the creation of the Schertz Municipal Utility District No. 1; providing authority to impose a tax and issue bonds; granting the power of eminent domain.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle F, Title 6, Special District Local Laws Code, is amended by adding Chapter 8128 to read as follows:

CHAPTER 8128.  SCHERTZ MUNICIPAL UTILITY DISTRICT NO. 1
SUBCHAPTER A. GENERAL PROVISIONS

Sec. 8128.001.  DEFINITIONS. In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "Director" means a member of the board.

(3)  "District" means the Schertz Municipal Utility District No. 1.

Sec. 8128.002. NATURE OF DISTRICT. The district is a municipal utility district in Bexar County created under and essential to accomplish the purposes of Section 59, Article XVI, Texas Constitution.

Sec. 8128.003. CONFIRMATION ELECTION REQUIRED. If the creation of the district is not confirmed at a confirmation election held under Section 8128.022 before September 1, 2007:

(1)  the district is dissolved September 1, 2007, except that:

(A)  any debts incurred shall be paid;

(B)  any assets that remain after the payment of debts shall be transferred to the City of Schertz; and

(C)  the organization of the district shall be maintained until all debts are paid and remaining assets are transferred; and

(2)  this chapter expires September 1, 2010.

Sec. 8128.004.  INITIAL DISTRICT TERRITORY. (a) The district is initially composed of the territory described by Section 2 of the Act creating this chapter.

(b)  The boundaries and field notes contained in Section 2 of the Act creating this chapter form a closure. A mistake made in the field notes or in copying the field notes in the legislative process does not affect:

(1)  the organization, existence, or validity of the district;

(2)  the right of the district to impose taxes; or

(3)  the legality or operation of the board.

Sec. 8128.005.  APPLICABILITY  OF  OTHER  LAW. Except  as  otherwise provided by this chapter, Chapters 30, 49, and 54, Water Code, apply to the district.

[Sections 8128.006-8128.020 reserved for expansion]

SUBCHAPTER A-1. TEMPORARY PROVISIONS

Sec. 8128.021. TEMPORARY DIRECTORS. (a) The temporary board consists of:

(1) Bill K. Benton;

(2) Gina L. Fann;

(3) Christopher K. Price;

(4) Barbara Boyer Simpson; and

(5) Suzette M. Smith.

(b) Temporary directors of the district are not required to own land in or be residents of the district.

(c) If a temporary director fails to qualify for office, the temporary directors who have qualified shall appoint a person to fill the vacancy. If at any time there are fewer than three qualified temporary directors, the Texas Commission on Environmental Quality shall appoint the necessary number of persons to fill all vacancies on the board.

(d) Temporary directors serve until the earlier of:

(1) the date directors are elected under Section 8128.022; or

(2) the date this chapter expires under Section 8128.003.

Sec. 8128.022. CONFIRMATION AND INITIAL DIRECTORS' ELECTION. (a) The temporary directors shall hold an election to confirm the creation of the district and to elect five initial directors as provided by Section 49.102, Water Code.

(b) At the confirmation and initial directors' election the board may submit to the voters a proposition to authorize:

(1) an issuance of bonds;

(2) a maintenance tax; or

(3) a tax to fund payments required under a contract.

(c) Section 41.001(a), Election Code, does not apply to a confirmation and initial directors' election held under this section.

Sec. 8128.023. INITIAL ELECTED DIRECTORS; TERMS. The directors elected under Section 8128.022 shall draw lots to determine which two shall serve until the first regularly scheduled election of directors under Section 8128.052 and which three shall serve until the second regularly scheduled election of directors.

Sec. 8128.024. EXPIRATION OF SUBCHAPTER. This subchapter expires September 1, 2010.

[Sections 8128.025-8128.050 reserved for expansion]

SUBCHAPTER B. BOARD OF DIRECTORS

Sec. 8128.051. DIRECTORS; TERMS. (a) The district is governed by a board of five directors.

(b) Directors serve staggered four-year terms.

Sec. 8128.052. ELECTION OF DIRECTORS. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

[Sections 8128.053-8128.100 reserved for expansion]

SUBCHAPTER C. DIVISION OF DISTRICT TO MULTIPLE DISTRICTS

Sec. 8128.101.  DIVISION OF DISTRICT; REQUIREMENTS. (a) At any time before the district issues indebtedness secured by taxes or net revenues, the district, including any annexed territory, may be divided into two or more new districts.

(b)  A new district created by division of the district must be at least 100 acres.

(c)  The board by resolution may declare an intent to divide the district. The resolution must:

(1)  set the terms of the division, including a plan for the payment or performance of any outstanding district obligations; and

(2)  contain a metes and bounds description for each new district.

Sec. 8128.102. DISTRICT DIVISION BY ELECTION. (a) The board shall hold an election in the district to determine whether the district should be divided as proposed under Section 8128.101.

(b)  The board shall give notice of the election not later than the 35th day before the date of the election.  The notice must state:

(1)  the date and location of the election; and

(2)  the proposition to be voted on.

(c)  If a majority of the votes are cast in favor of the division, the district is divided.

(d)  If less than a majority of the votes are cast in favor of the division, the district may not be divided.

(e)  The resulting new districts are separate districts and shall be governed as separate districts.

Sec. 8128.103.  NOTICE OF DIVISION. Not later than the 30th day after the date of a division under this subchapter, the district shall provide written notice of the plan for division to:

(1)  the Texas Commission on Environmental Quality;

(2)  the attorney general;

(3)  the commissioners court of each county in which a new district is located; and

(4)  each municipality having extraterritorial jurisdiction over territory in a new district.

Sec. 8128.104.  DISTRICT NAMES FOLLOWING DIVISION. The resulting new districts are assigned consecutive letters to be appended to the name of the original district.

Sec. 8128.105. ELECTION OF DIRECTORS OF NEW DISTRICTS. (a) Not later than the 90th day after the date of an election in favor of the division of the district, the board shall:

(1)  appoint itself as the board of one of the new districts; and

(2)  appoint five directors for each of the other new districts.

(b)  A director appointed under Subsection (a)(1) serves the term to which that director was elected in the original district. A director appointed under Subsection (a)(2):

(1)  serves until the election for directors under Subsection (c); and

(2)  is not required to own land in or reside in the district for which the director is appointed.

(c)  On the uniform election date in May of the first even-numbered year after the year in which the directors are appointed, an election shall be held to elect five directors in each district for which directors were appointed under Subsection (a)(2). Of the five directors elected in each district, the three directors receiving the greatest number of votes shall serve until the second regularly scheduled election of directors under Subsection (d), and the remaining two directors shall serve until the first regularly scheduled election of directors.

(d)  Except as provided by Subsection (c), directors serve staggered four-year terms. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

Sec. 8128.106.  CONTINUING POWERS AND OBLIGATIONS OF NEW DISTRICTS. (a) Each new district may incur and pay debts and has all powers of the original district created by this chapter.

(b)  If the district is divided as provided by this subchapter, the current obligations and any bond authorizations of the district are not impaired. Debts shall be paid by revenues or by taxes or assessments imposed on real property in the district as if the district had not been divided or by contributions from each new district as stated in the terms set by the board in the plan for division.

(c)  Any other district obligation shall be divided pro rata among the new districts on an acreage basis or on other terms that are satisfactory to the new districts.

Sec. 8128.107.  CONTRACT AUTHORITY OF NEW DISTRICTS. The new districts may contract with each other for:

(1)  water and wastewater services; or

(2)  any other matter the boards of the new districts consider appropriate.

Sec. 8128.108.  BOND ISSUANCE BY NEW DISTRICT. A new district may issue bonds payable wholly or partially from ad valorem taxes on the approval of a majority of the residents voting in an election called and held for that purpose.

Sec. 8128.109.  MAINTENANCE TAX APPROVAL FOR NEW DISTRICT. A new district may impose a maintenance tax on the approval of a majority of the residents voting in an election called and held for that purpose.

SECTION 2. The Schertz Municipal Utility District No. 1 initially includes the territory contained within the following area:

BEING 101.223 acres of land more or less situated in the Julian Diaz Survey No. 66, Abstract No. 187, County Block 5059, Bexar County, Texas, consisting of 78.951 acres of land more or less out of a called 145.776 acre tract as described in Volume 6300, Page 439 Official Public Records, Bexar County, Texas, and 22.272 acres of land more or less out of a called 52.539 acre tract as described in Volume 5491, Page 740 Official Public Records, Bexar County, Texas, and being more particularly described as follows:

BEGINNING at a point for the North corner of said 145.776 acre tract and the North corner of this tract herein described, situated at the point of intersection of the southeast right-of-way of Lower Sequin Road with the southwest right-of-way of Trainer Hale Road (abandoned);

Thence with the southwest right-of-way of Trainer Hale Road S30°16'00"E, 1214.52 feet to a point marking the intersection of the southwest right-of-way of Trainer Hale Road with the southwest right-of-way of F.M. Road 1518;

THENCE with the southwest right-of-way of F.M. 1518, S30°16'000"E, 2715.35 feet to a point for the west corner of this tract and the east corner of said 145.776 acre tract;

THENCE S59°54'31"W, 900.86 feet crossing the east corner of said 52.593 acre tract at 300.00 feet, to a point for a corner of this tract herein described on the southeast line of the above mentioned 52.593 acre tract;

THENCE leaving the southeast line of said 52.593 acre tract and into said 52.593 acre tract N71°13'42"W, 350.07 feet to a point for a corner of this tract herein described;

Thence N30°16'00"W, 3663.16 feet to a point on the southeast right-of-way of Lower Sequin Road;

THENCE N59°45'15"E, 1130.14 feet to the Point of Beginning and containing 101.223 acres of land more or less.

SECTION 3. (a) The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b) The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c) The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d) All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 4. This Act takes effect September 1, 2005.

The amendment was read.

Senator Wentworth moved to concur in the House amendment to **SB 1823**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 1871 WITH HOUSE AMENDMENT

Senator Jackson called **SB 1871** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1871** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the creation of the Brazoria County Municipal Utility District No. 44; providing authority to impose a tax and issue bonds; granting the power of eminent domain.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle F, Title 6, Special District Local Laws Code, is amended by adding Chapter 8153 to read as follows:

CHAPTER 8153. BRAZORIA COUNTY MUNICIPAL
UTILITY DISTRICT NO. 44
SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 8153.001.  DEFINITIONS. In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "Director" means a member of the board.

(3)  "District" means the Brazoria County Municipal Utility District No. 44.

Sec. 8153.002. NATURE OF DISTRICT. The district is a municipal utility district in Brazoria County created under and essential to accomplish the purposes of Section 59, Article XVI, Texas Constitution.

Sec. 8153.003. CONFIRMATION ELECTION REQUIRED. If the creation of the district is not confirmed at a confirmation election held under Section 8153.024 before September 1, 2007:

(1)  the district is dissolved September 1, 2007, except that:

(A)  any debts incurred shall be paid;

(B)  any assets that remain after the payment of debts shall be transferred to Brazoria County; and

(C)  the organization of the district shall be maintained until all debts are paid and remaining assets are transferred; and

(2)  this chapter expires September 1, 2010.

Sec. 8153.004.  INITIAL DISTRICT TERRITORY. (a) The district is initially composed of the territory described by Section 2 of the Act creating this chapter.

(b)  The boundaries and field notes contained in Section 2 of the Act creating this chapter form a closure. A mistake made in the field notes or in copying the field notes in the legislative process does not affect:

(1)  the organization, existence, or validity of the district;

(2)  the right of the district to impose taxes; or

(3)  the legality or operation of the board.

[Sections 8153.005-8153.020 reserved for expansion]
SUBCHAPTER A1. TEMPORARY PROVISIONS

Sec. 8153.021.  TEMPORARY  DIRECTORS. (a) On or after September 1, 2005, a person who owns land in the district may submit a petition to the Texas Commission on Environmental Quality to appoint as temporary directors the five persons named in the petition.

(b)  The commission shall appoint as temporary directors the five persons named in the first petition received by the commission under Subsection (a).

(c)  If a temporary director fails to qualify for office, the commission shall appoint a person to fill the vacancy.

    (d)  Temporary directors serve until the earlier of:

        (1)  the date directors are elected under Section 8153.024; or

        (2)  the date this chapter expires under Section 8153.003.

    Sec. 8153.022.  ORGANIZATIONAL MEETING OF TEMPORARY DIRECTORS. As soon as practicable after all the temporary directors have qualified under Section 49.055, Water Code, the temporary directors shall meet at a location in the district agreeable to a majority of the directors. If a location cannot be agreed upon, the meeting shall be at the Brazoria County Courthouse. At the meeting, the temporary directors shall elect officers from among the temporary directors and conduct any other district business.

    Sec. 8153.023.  CONSENT OF MUNICIPALITY OR COUNTY REQUIRED. (a)  The temporary directors may not hold an election under Section 8153.024 until each municipality in whose corporate limits or extraterritorial jurisdiction the district is located has adopted a resolution consenting to the creation of the district.

    (b) If the district is located outside the extraterritorial jurisdiction of a municipality, the temporary directors may not hold the election until each county in which the district is located has adopted a resolution consenting to the creation of the district.

    (c) A municipality or county may not adopt a resolution under this section before the effective date of the Act creating this chapter.

    Sec. 8153.024.  CONFIRMATION AND INITIAL DIRECTORS' ELECTION. If each municipality or county has consented to the creation of the district under Section 8153.023, the temporary directors shall hold an election to confirm the creation of the district and to elect five directors as provided by Section 49.102, Water Code.

    Sec. 8153.025.  INITIAL ELECTED DIRECTORS; TERMS.   The directors elected under Section 8153.024 shall draw lots to determine which two shall serve until the first regularly scheduled election of directors under Section 8153.052 and which three shall serve until the second regularly scheduled election of directors.

    Sec. 8153.026.  EXPIRATION OF SUBCHAPTER. This subchapter expires September 1, 2010.

        [Sections 8153.027-8153.050 reserved for expansion]

        SUBCHAPTER B. BOARD OF DIRECTORS

    Sec. 8153.051.  DIRECTORS; TERMS. (a)  The district is governed by a board of five directors.

    (b)  Directors serve staggered four-year terms.

    Sec. 8153.052.  ELECTION OF DIRECTORS. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

        [Sections 8153.053-8153.100 reserved for expansion]

        SUBCHAPTER C.  POWERS AND DUTIES

    Sec. 8153.101.  MUNICIPAL UTILITY DISTRICT POWERS AND DUTIES. The district has the powers and duties provided by the general law of this state, including Chapters 49 and 54, Water Code, applicable to municipal utility districts created under Section 59, Article XVI, Texas Constitution.

Sec. 8153.102. ROAD PROJECTS. (a) To the extent authorized under Section 52, Article III, Texas Constitution, the district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

(b) A road project must meet or exceed all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each municipality in whose corporate limits or extraterritorial jurisdiction the district is located. If the district is located outside the extraterritorial jurisdiction of a municipality, a road project must meet or exceed all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each county in which the district is located.

(c) The district may not undertake a road project unless each municipality in whose corporate limits or extraterritorial jurisdiction the district is located consents by ordinance or resolution. If the district is located outside the extraterritorial jurisdiction of a municipality, the district may not undertake a road project unless each county in which the district is located consents by ordinance or resolution.

Sec. 8153.103. COMPLIANCE WITH MUNICIPAL ORDINANCES OR RESOLUTIONS. Subject to the limitations of Section 54.016, Water Code, the district shall comply with all applicable requirements of any ordinance or resolution adopted by the city council of the City of Bonney.

Sec. 8153.104. LIMITATION ON USE OF EMINENT DOMAIN. The district may exercise the power of eminent domain outside the district only to acquire an easement necessary for a pipeline that serves the district.

[Sections 8153.105-8153.150 reserved for expansion]

SUBCHAPTER D. GENERAL FINANCIAL PROVISIONS

Sec. 8153.151. TAX TO REPAY BONDS. The district may impose a tax to pay the principal of or interest on bonds issued under Section 8153.201.

[Sections 8153.152-8153.200 reserved for expansion]

SUBCHAPTER E. BONDS

Sec. 8153.201. AUTHORITY TO ISSUE BONDS AND OTHER OBLIGATIONS. (a) The district may issue bonds or other obligations as provided by Chapters 49 and 54, Water Code, to finance the construction, maintenance, or operation of projects under Sections 8153.101 and 8153.102.

(b) The district may not issue bonds to finance projects authorized by Section 8153.102 unless the issuance is approved by a vote of a two-thirds majority of the voters of the district voting at an election called for that purpose.

(c) Bonds or other obligations issued or incurred to finance projects authorized by Section 8153.102 may not exceed one-fourth of the assessed value of the real property in the district.

(d) Sections 49.181 and 49.182, Water Code, do not apply to a project undertaken by the district under Section 8153.102 or to bonds issued by the district to finance the project.

SECTION 2. The Brazoria County Municipal Utility District No. 44 initially includes all the territory contained in the following area:

BEGINNING at a concrete monument at the intersection with the East line of County Road 48, Airline road, and the South line of County Road 51; said concrete monument making the Northwest corner of Tract 25 of the Bogart & Taylor Subdivision;

THENCE South 03 deg. 01 min. 46 sec. East 2,577.15 feet to a concrete monument at the intersection with the East line of County Road 48 and the North line of County Road 35;

THENCE North 86 deg. 58 min. 14 sec. East 4,305.70 feet along the North line of County Road 35 to a concrete monument in the Westerly right-of-way line of the proposed State Highway 288 Freeway;

THENCE in a Northerly direction following the said Westerly right-of-way line of proposed State Highway 288 Freeway with the following calls: North 42 deg. 01 min. 15 sec. East, 70.69 feet to an iron rod for corner;

THENCE North 02 deg, 59 min. 46 sec. West, 1,273.85 feet to an iron rod for corner;

THENCE around a curve to the left whose radius is 1,091.35 feet, an arc distance of 961.91 feet to an iron rod for corner;

THENCE North 53 deg. 29 min. 46 sec. West, 44.89 feet to an iron rod for corner;

THENCE around a curve to the right whose radius is 446.46 feet, an arc distance of 293.51 feet to an iron rod for corner;

THENCE North 45 deg. 34 min. 29 sec. West, 134.72 feet to an iron rod for corner;

THENCE South 87 deg. 00 min. 14 sec. West, 270.00 feet to an iron rod for corner;

THENCE North 02 deg. 59 min. 46 sec. West, 31.24 feet to a concrete monument in the South line of County Road 51;

THENCE South 86 deg. 58 min. 14 sec. West, 3,405.20 feet along the South line of County Road 51 to the PLACE OF BEGINNING

Said tract therein containing 249.972 acres of land.

SAVE AND EXCEPT 4.066 acres, more or less, out of Lots Twenty Two (22) and Twenty Three (23) being more fully described in that certain conveyance of drainage facilities to the State Hwy Commission as filed under Volume 1180, Page 790 of the Deed Records of Brazoria County, Texas.

SAVE AND EXCEPT the Southerly thirty (30) feet of Lot Twenty Four (24) as conveyed to the County of Brazoria as described in deed filed under Volume 50, Page 102, in the Deed Records of Brazoria County, Texas.

SECTION 3. (a) The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b) The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c) The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d) All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 4.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson moved to concur in the House amendment to **SB 1871**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1264 WITH HOUSE AMENDMENT

Senator Hinojosa, on behalf of Senator Whitmire, called **SB 1264** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1264** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to fees collected for services provided by the Commission on Jail Standards.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 511.0091, Government Code, is amended by adding Subsection (c-1) and amending Subsection (d) to read as follows:

(c-1)  In addition to the other fees authorized by this section, the commission may set and collect a reasonable fee to cover the cost of performing any reinspection of a municipal or county jail described by Subsection (a) that is conducted by the commission:

(1)  following a determination by the commission that the jail is not in compliance with minimum standards; and

(2)  in response to a request by the operator of the jail for an inspection.

(d)  All money paid to the commission under this chapter:

(1)  is subject to Subchapter F, Chapter 404; and

(2)  shall be deposited to the credit of a special account in the general revenue fund to be appropriated only to pay costs incurred by the commission in performing services under this section.

SECTION 2.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Hinojosa, on behalf of Senator Whitmire, moved to concur in the House amendment to **SB 1264**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1130 WITH HOUSE AMENDMENT

Senator Hinojosa called **SB 1130** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1130** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to a requirement that a common carrier or pipeline owner or operator report contamination.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter C, Chapter 81, Natural Resources Code, is amended by adding Section 81.056 to read as follows:

Sec. 81.056.  CONTAMINATION REPORT. (a)  In this section:

(1)  "Common carrier" has the meaning assigned by Section 111.002.

(2)  "Owner of the land" or "landowner" means the first person who is shown on the appraisal roll of the appraisal district established for the county in which a tract of land is located as owning an interest in the surface estate of the land at the time a contamination report is required to be made under this section.

(b)  If in the process of placing, repairing, replacing, or maintaining a pipeline a common carrier or an owner or operator of a pipeline observes or detects any petroleum-based contamination of soil or water in proximity to the pipeline, the common carrier or pipeline owner or operator shall report the contamination to the commission and the owner of the land on which the pipeline is located. Petroleum-based contamination of soil or water that is observed or detected is required to be reported under this subsection if:

(1)  hydrocarbons are present on the surface of the water;

(2)  at least five linear yards of soil have been affected by hydrocarbons; or

(3)  soil affected by hydrocarbons extends beyond the face of the excavation in which the contamination is observed or detected.

(c)  The contamination report:

(1)  must be made not later than 24 hours after the common carrier or pipeline owner or operator observes or detects the contamination;

(2)  must include the global positioning satellite coordinates of the location of the contamination; and

(3)  may be made by telephone, facsimile, or electronic mail.

(d)  Not later than the third business day after the date the commission receives the contamination report, a person authorized by the commission shall withdraw a soil sample from the contaminated land.  The person is entitled to enter the land for the purpose of withdrawing the sample.

(e)  A common carrier or pipeline owner or operator that makes a contamination report under this section is released from all liability for the contamination or the cleanup of the contamination covered by the report, except for any contamination caused by the common carrier or pipeline owner or operator.

(f)  The commission shall adopt rules to implement this section.

(g)  The commission may not use money in the oil-field cleanup fund to implement this section.

SECTION 2.  Section 81.056(e), Natural Resources Code, as added by this Act, is an exercise of authority under Section 66(c), Article III, Texas Constitution, and takes effect only if this Act receives a vote of three-fifths of all the members elected to each house, as provided by Subsection (e) of that section.

SECTION 3.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Hinojosa moved to concur in the House amendment to **SB 1130**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1707 WITH HOUSE AMENDMENT

Senator Staples called **SB 1707** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1707** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the regulation of poultry facilities.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 26.0286(a), Water Code, is amended by adding Subdivision (3) to read as follows:

(3)  "Liquid waste handling system" means a system in which fresh water or wastewater is used for transporting and land applying waste.

SECTION 2.  Section 26.0286, Water Code, is amended by adding Subsection (d) to read as follows:

(d)  This section does not apply to a poultry operation that does not use a liquid waste handling system.

SECTION 3.  Section 26.301, Water Code, is amended by adding Subdivision (5) to read as follows:

(5)  "Liquid waste handling system" has the meaning assigned by Section 26.0286.

SECTION 4.  Section 26.302, Water Code, is amended by adding Subsections (b-1) and (d) to read as follows:

(b-1)  The State Soil and Water Conservation Board may certify a water quality management plan for a poultry facility that:

(1)  does not use a liquid waste handling system; and

(2)  is required to obtain a permit or other authorization from the commission.

(d)  This section does not affect the authority of the commission to investigate or take enforcement action against an unauthorized discharge under Section 26.121.

SECTION 5.  Section 201.026(e), Agriculture Code, as added by Section 1, Chapter 1189, Acts of the 77th Legislature, Regular Session, 2001, is amended to read as follows:

(e)  At the request of the landowner, the state board may develop and certify a water quality management plan for any agricultural or silvicultural land in the state. Section 26.302(b-1), Water Code, applies to a water quality management plan developed or certified for use by a poultry facility under this section.

SECTION 6. This Act takes effect September 1, 2005.

The amendment was read.

Senator Staples moved to concur in the House amendment to **SB 1707**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1740 WITH HOUSE AMENDMENTS

Senator Staples called **SB 1740** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

#### Floor Amendment No. 1

Amend **SB 1740** (House committee printing) by inserting the following appropriately numbered new SECTION and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. Section 382.05195, Health and Safety Code, is amended by adding Subsection (j) to read as follows:

(j)  If a standard permit for a facility requires a distance, setback, or buffer from other property or structures as a condition of the permit, the determination of whether the distance, setback, or buffer is satisfied shall be made on the basis of conditions existing at the earlier of:

(1)  the date construction begins on the facility; or

(2)  the date any application or notice of intent is first filed with the commission to obtain approval for the construction or operation of the facility.

#### Floor Amendment No. 1 on Third Reading

Amend **SB 1740** (House committee printing) on third reading by inserting the following appropriately numbered new SECTION and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. Section 382.05195, Health and Safety Code, is amended by adding subsection (j) to read as follows:

(j)  If a standard permit for a facility requires a distance, setback or buffer from other property or structures as a condition of the permit, the determination of whether the distance, setback or buffer is satisfied shall be made on the basis of conditions existing at the earlier of:

(1)  the date of new construction, expansion or modification of a facility begins; or

(2)  the date any application or notice of intent is first filed with the commission to obtain approval for the construction or operation of the facility.

The amendments were read.

Senator Staples moved to concur in the House amendments to **SB 1740**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 1579 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 1579** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Amendment

Amend **SB 1579** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the prohibition of signs on certain roads.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 391.252(a), Transportation Code, is amended to read as follows:

(a)  A [Subsequent to the effective date of this subchapter, a] person may not erect an off-premise sign that is adjacent to and visible from:

(1)  U.S. Highway 290 between the western city limits of the city of Austin and the eastern city limits of the city of Fredericksburg;

(2)  State Highway 317 between the northern city limits of the city of Belton to the southern city limits of the city of Valley Mills;

(3)  State Highway 16 between the northern city limits of the city of Kerrville and Interstate Highway 20;

(4)  U.S. Highway 77 between State Highway 186 and State Highway 44;

(5)  U.S. Highway 281 between State Highway 186 and Interstate Highway 37, exclusive of the segment of U.S. Highway 281 located in the city limits of Three Rivers;

(6)  State Highway 17 between State Highway 118 and U.S. Highway 90;

(7)  State Highway 67 between U.S. Highway 90 and Farm-to-Market Road 170;

(8)  Farm-to-Market Road 170 between State Highway 67 and State Highway 118;

(9)  State Highway 118 between Farm-to-Market Road 170 and State Highway 17;

(10)  State Highway 105 between the western city limits of the city of Sour Lake to the eastern city limits of the city of Cleveland;

(11)  State Highway 73 between the eastern city limits of the city of Winnie to the western city limits of the city of Port Arthur;

(12)  State Highway 21 between the southern city limits of the city of College Station and U.S. Highway 290; or

(13)  a highway located in:

(A)  the Sabine National Forest;

(B)  the Davy Crockett National Forest; or

(C)  the Sam Houston National Forest.

SECTION 2.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 1579**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 1704 WITH HOUSE AMENDMENT

Senator Ellis called **SB 1704** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 1704** (House committee printing) as follows:

(1) In SECTION 2 of the bill, in added Subsection (c), Section 61.0015, Government Code, (page 2, line 2), strike "judicial fund" and substitute "jury service fund".

(2) In SECTION 5 of the bill, in added Subsection (b), Article 102.0045, Code of Criminal Procedure (page 4, line 11), strike "judicial fund" and substitute "jury service fund".

(3) In SECTION 5 of the bill, immediately following added Subsection (b), Article 102.0045, Code of Criminal Procedure (page 4, between lines 11-12), insert the following:

(c) The jury service fund is created in the state treasury. If, at any time, the unexpended balance of the jury service fund exceeds $10 million, the comptroller shall transfer the amount in excess of $10 million to the fair defense account.

(d) Fees deposited in the jury service fund under this section are exempt from the application of Section 403.095, Government Code.

The amendment was read.

Senator Ellis moved to concur in the House amendment to **SB 1704**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 872 WITH HOUSE AMENDMENTS

Senator Seliger, on behalf of Senator Nelson, called **SB 872** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 2**

Amend **SB 872** (House committee printing) as follows:

(1) On page 5, line 3, strike "and".

(2) On page 5, line 6, strike the period and substitute "; and".

(3) On page 5, between lines 6 and 7, insert the following:

(7) the number of deaths by infections each niche hospital has in a year".

**Floor Amendment No. 3**

Amend Floor Amendment No. 2 by Davis to **SB 872** on page 1, line 6, between "each" and "niche" by inserting "hospital including a".

**Floor Amendment No. 3 on Third Reading**

Amend **SB 872** on third reading by adding appropriately numbered sections to the bill to read as follows and renumbering the other sections of the bill accordingly:

SECTION __. Subtitle D, Title 2, Health and Safety Code, is amended by adding Chapter 96 to read as follows:

CHAPTER 96. HEALTH CARE ASSOCIATED INFECTION RATE
AND PROCESS MEASURE REPORTING
SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 96.001.  DEFINITIONS.  (a)  In this chapter:

(1)  "Advisory panel" means the Advisory Panel on Health Care Associated Infections.

(2)  "Commissioner" means the commissioner of state health services.

(3)  "Department" means the Department of State Health Services.

(4)  "Health care associated infection" means a localized or symptomatic condition resulting from an adverse reaction to an infectious agent or its toxins to which a patient is exposed in the course of health care delivery.

(5)  "Health care facility" means a hospital licensed under Chapter 241 or an ambulatory surgical center licensed under Chapter 243.

(6)  "Infection rate" means the number of health care associated infections at a health care facility divided by a numerical measure over time of the population at risk for contracting the infection.

(7)  "Process measure" means a measure of a health care facility's compliance with recommended infection control practices.

(b)  The advisory panel may modify or define the term "infection rate" as necessary to accomplish the purposes of this chapter.

Sec. 96.002.  APPLICABILITY OF OTHER LAW.  Chapter 2110, Government Code, does not apply to the advisory panel created under Subchapter B.

Sec. 96.003.  EXPIRATION.  This chapter expires January 1, 2007.

[Sections 96.004-96.050 reserved for expansion]
SUBCHAPTER B.  ADVISORY PANEL ON
HEALTH CARE ASSOCIATED INFECTIONS

Sec. 96.051.  ESTABLISHMENT.   The commissioner shall establish the Advisory Panel on Health Care Associated Infections within the regulatory licensing unit of the health care quality section of the department.

Sec. 96.052.  MEMBERSHIP.  The advisory panel is composed of 14 members as follows:

(1)  two infection control practitioner members who:

(A)  are certified by the Certification Board of Infection Control and Epidemiology; and

(B)  are practicing in hospitals in this state, at least one of which must be a rural hospital;

(2)  two infection control practitioner members who:

(A)  are certified by the Certification Board of Infection Control and Epidemiology; and

(B)  are nurses licensed to engage in professional nursing under Chapter 301, Occupations Code;

(3)  three board-certified or board-eligible physician members who:
          (A)  are licensed to practice medicine in this state under Chapter 155,
Occupations Code, at least two of whom have active medical staff privileges at a
hospital in this state;
          (B)  are active members of the Society for Healthcare Epidemiology of
America; and
          (C)  have demonstrated expertise in infection control in health care
facilities;
      (4)  one member who is a chief executive officer of a hospital licensed under
Chapter 241;
      (5)  one member who is a chief executive officer of an ambulatory surgical
center licensed under Chapter 243;
      (6)  three members who:
          (A)  are department employees representing the department in
epidemiology and the licensing of hospitals or ambulatory surgical centers; and
          (B)  serve as nonvoting members of the advisory panel; and
      (7)  two members who represent the public as consumers.
   Sec. 96.053.  MEMBER ELIGIBILITY.  A person may not be a member of the
advisory panel if the person is required to register as a lobbyist under Chapter 305,
Government Code, because of the person's activities for compensation on behalf of a
profession related to health care.
   Sec. 96.054.  OFFICERS.   The members of the advisory panel shall elect a
presiding officer and an assistant presiding officer from among the members.
   Sec. 96.055.  COMPENSATION; EXPENSES.   (a)   Except as provided by
Subsection (b), a member of the advisory panel is not entitled to compensation for
service on the advisory panel and is not entitled to reimbursement for travel expenses.
   (b)  A member who is a representative of a state agency shall be reimbursed for
travel expenses incurred while conducting the business of the advisory panel from the
funds of the agency the person represents in accordance with the General
Appropriations Act.
   Sec. 96.056.  VACANCY.  A vacancy on the advisory panel shall be filled by the
commissioner.
   Sec. 96.057.  ABOLISHED.   The Advisory Panel on Health Care Associated
Infections is abolished January 1, 2007.
               [Sections 96.058-96.100 reserved for expansion]
      SUBCHAPTER C.  POWERS AND DUTIES OF ADVISORY PANEL
   Sec. 96.101.  GENERAL POWERS AND DUTIES.   (a)   The advisory panel,
using nationally accepted measures, shall study and recommend definitions and
methodologies for collecting and reporting evidence-based data on:
      (1)  infection rates;
      (2)  process measures; or
      (3)  both infection rates and process measures.
   (b)  In developing the recommendations described in Subsection (a), the advisory
panel shall consider:
      (1)  adjusting the reported infection rates to account for the differences in
patient populations and for factors outside the control of the health care facility;

(2)  standardizing data collection methodology and reporting;

(3)  reviewing data collection and reporting systems of other entities related to infection rates, such as the National Nosocomial Infections Surveillance System of the federal Centers for Disease Control and Prevention;

(4)  reviewing data collection and reporting systems of other entities related to process measures, such as the Joint Commission on Accreditation of Healthcare Organizations or the Centers for Medicare and Medicaid Services;

(5)  maximizing the efficient use of the resources required for health care facilities to conduct required surveillance and reporting;

(6)  recognizing the potential unintended consequences of public reporting that is poorly designed or executed and that may diminish the overall quality of this state's health care or mislead or fail to protect health care consumers who use the data; and

(7)  providing additional benefits to health care consumers.

Sec. 96.102.  REPORT TO LEGISLATURE.  (a)  Not later than November 1, 2006, the commissioner shall file a report with the presiding officer of each house of the legislature on the advisory panel's recommendations for legislation regarding the collection and reporting of infection rates, process measures, or both.

(b)  The report shall include a recommendation that the legislation set September 1, 2007, as the date for hospitals and ambulatory surgical centers to comply with the legislation.

(c)  Nothing shall preclude the immediate reporting of the number of deaths from infection by hospitals and niche hospitals as included in this legislation.

SECTION __.  As soon as practicable after the effective date of this Act, the commissioner of the Department of State Health Services shall appoint members to the Advisory Panel on Health Care Associated Infections as required by Chapter 96, Health and Safety Code, as added by this Act.

**Floor Amendment No. 4 on Third Reading**

Amend **SB 872** on third reading by adding the following appropriately numbered SECTIONS and renumbering subsequent SECTIONS accordingly:

SECTION __.  Section 311.033(a), Health and Safety Code, is amended to read as follows:

(a)  A hospital shall submit to the department financial and utilization data for that hospital, including data relating to the hospital's:

(1)  total gross revenue, including:

(A)  Medicare gross revenue;

(B)  Medicaid gross revenue;

(C)  other revenue from state programs;

(D)  revenue from local government programs;

(E)  local tax support;

(F)  charitable contributions;

(G)  other third party payments;

(H)  gross inpatient revenue; and

(I)  gross outpatient revenue;

(2)  total deductions from gross revenue, including:

(A)  contractual allowance; and

       (B)  any other deducations;

    (3)  charity care;

    (4)  bad debt expense;

    (5)  total admissions, including:

       (A)  Medicare admissions;

       (B)  Medicaid admissions;

       (C)  admissions under a local government program;

       (D)  charity care admissions; and

       (E)  any other type of admission;

    (6)  total discharges;

    (7)  total patient days

    (8)  average length of stay;

    (9)  total outpatient visits

    (10)  total assets;

    (11)  total liabilities;

    (12)  estimates of unreimbursed costs of subsidized health services reported separately in the following categories:

       (A)  emergency care and trauma care;

       (B)  neonatal intensive care;

       (C)  free-standing community clinics;

       (D)  collaborative efforts with local government or private agencies in preventative medicine, such as immunization programs; and

       (E)  other services that satisfy the definition of "subsidized health services" contained in Section 311.031 [311.031(13)];

    (13)  donations;

    (14)  total cost of reimbursed and unreimbursed research;

    (15)  total cost of reimbursed and unreimbursed education separated into the following categories:

       (A)  education of physicians, nurses, technicians, and other medical professionals and health care providers;

       (B)  scholarships and funding to medical schools, colleges, and universities for health professions education;

       (C)  education of patients concerning diseases and home care in response to community needs;

       (D)  community health education through information programs, publications, and outreach activities in response to community needs; and

       (E)  other educational services that satisfy the definition of "education-related costs" under Section 311.031(6); and

    (16)  total emergency department visits, including the percentage of patients examined or treated in the hospital's emergency room who are insured and the percentage who are uninsured.

The amendments were read.

Senator Seliger, on behalf of Senator Nelson, moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 872** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Nelson, Chair; Deuell, Zaffirini, Carona, and Hinojosa.

### SENATE BILL 1227 WITH HOUSE AMENDMENTS

Senator Shapiro called **SB 1227** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 1227** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to enrollment in public and private postsecondary educational institutions, to payment of the costs of attending those educational institutions, and to financial aid and other measures to assist students to pay those costs.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subsection (e), Section 52.17, Education Code, is amended to read as follows:

(e)  Amounts paid to the board by the federal Lender's Special Allowance program may:

    (1)  be deposited in:

        (A)  the Texas college interest and sinking fund; or

        (B)  [,] a board interest and sinking fund;[,] or

    (2)  be used by the board for the administration of student loan and grant programs [and the Teacher Loan Program and Future Teacher Loan Program authorized under House Bill 72, 68th Legislature, 2nd Called Session, 1984, or other programs] administered by the board, including the making of grants under Subchapter M, Chapter 56 [as specified by the legislature in the General Appropriations Act].

SECTION 2.  Section 52.31, Education Code, is amended to read as follows:

Sec. 52.31.  PARTICIPATING INSTITUTIONS.  In this subchapter, "participating [A participating] higher educational institution" means a public or private nonprofit [is any] institution of higher education, [public or private nonprofit,] including a junior college, [which is recognized or] accredited by a recognized accrediting agency as defined by Section 61.003, or a regional education service center or other entity that offers an alternative educator certification program approved by the State Board for Educator Certification, that:

    (1)  is located in this state; and

(2) [the Texas Education Agency or the Coordinating Board, Texas College and University System, or its successors, and which] complies with the provisions of this chapter and the rules [and regulations] of the board promulgated in accordance with this chapter.

SECTION 3. Section 52.32, Education Code, is amended by amending Subsections (a) and (b) and adding Subsection (a-1) to read as follows:

(a) The board may authorize loans from the Texas Opportunity Plan Fund to a qualified [students if the] applicant who:

(1) is a resident of this state [Texas] as defined by the board in accordance with Subchapter B, Chapter 54 [of this code];

(2) has been accepted for enrollment at a participating higher educational institution, provided that if the institution is a public or private [any] postsecondary educational institution, the institution must be [within the State of Texas, public or private, which has been] approved by an agency of the United States government for the purpose of guaranteeing the maker of such loans against loss due to the death, disability, or default of the borrower[. If the postsecondary institution that the student has been accepted to attend was not a participating institution as defined in Section 52.31 of this code on May 1, 1985, the applicant must provide evidence that he is unable to obtain a guaranteed student loan from a commercial lender except as provided by Subsection (b) of this section];

(3) has established that the student [he] has insufficient resources to finance the student's [his] college education;

(4) has been recommended by reputable persons in the student's [his] home community; and

(5) has complied with other requirements established by the rules [and regulations] adopted by the board in conformity with this chapter.

(a-1) Except as provided by Subsection (b), if the institution to which the applicant has been accepted for enrollment was not a participating institution, as defined by Section 52.31, on May 1, 1985, the applicant must provide evidence that the applicant is unable to obtain a guaranteed student loan from a commercial lender.

(b) If a loan applicant is enrolled at a career school or college in a degree program that is approved by the board or at a regional education service center or other entity in an alternative educator certification program that is approved by the State Board for Educator Certification, the applicant is not required to provide evidence that the applicant is unable to obtain a guaranteed student loan from a commercial lender under Subsection (a-1) [(a)(2) of this section].

SECTION 4. Subsection (c), Section 52.91, Education Code, is amended to read as follows:

(c) The board shall repay bonds issued by the board to fund the Texas B-On-time student loan program using legislative appropriations and money collected by the board as repayment for Texas B-On-time student loans awarded by the board. The board may use tuition set aside under Section 56.465 to repay bonds issued by the board for the Texas B-On-time student loan program. The board may not use money collected by the board as repayment for student loans awarded by the board under Subchapter C to repay bonds issued by the board for the Texas B-On-time student loan program under Section 56.464(b).

SECTION 5. Section 54.007, Education Code, is amended by adding Subsection (f) to read as follows:

(f) A student may elect to pay the tuition and fees of an institution of higher education by installment under this section regardless of whether the student intends to apply a financial aid award administered by the institution toward the tuition and fees, except that a student whose financial aid award or awards are available to cover the total amount of tuition and fees may not pay by installment under this section. On receipt of notice of a student's election to pay tuition and fees by installment, the governing board of the institution shall apply any financial aid award administered for the student toward the amount of tuition and fees due for that semester or summer session until the tuition and fees are paid in full and shall immediately release any remaining amount of the award to the student, except that the institution is not required to apply the award or awards toward the total amount of tuition and fees in exigent circumstances as determined by the institution.

SECTION 6. Subchapter A, Chapter 54, Education Code, is amended by adding Section 54.0071 to read as follows:

Sec. 54.0071. AUTHORITY OF INSTITUTION TO PROVIDE PAYMENT OPTIONS FOR STUDENT WITH DELAYED FINANCIAL AID. (a) The governing board of an institution of higher education may postpone the due date for the payment of all or part of the tuition and fees for a student for a semester or summer session in which the student will receive one or more delayed financial aid awards if:

(1) the student has not received the awards by the regular due date for payment of the tuition and fees; and

(2) the student agrees to assign to the institution a portion of the awards equal to the amount of tuition and fees for which the due date is postponed.

(b) A postponed due date under Subsection (a) applies only to the portion of tuition and fees to be covered by the student's delayed financial aid awards. When the financial aid awards become available, a governing board that postpones a due date under this section shall apply the awards toward the amount of tuition and fees due and immediately release any remaining amount of the awards to the student.

(c) If after the due date for a student's tuition and fees is postponed under this section the student becomes ineligible to receive one or more of the delayed financial aid awards, or the amount awarded is less than the amount of tuition and fees due, the governing board shall provide the student a reasonable period, not to exceed 30 days, to pay the unpaid amount of tuition and fees. The board may deny a student credit for work done in the semester or summer session if the student fails to pay the tuition and fees by the end of that period.

(d) The Texas Higher Education Coordinating Board shall prescribe procedures for the administration of this section.

(e) If a student with delayed financial aid awards has elected to pay tuition and fees by installment as permitted by Section 54.007 and if the governing board elects to postpone the due date for the student's tuition and fees as authorized by this section, the governing board in the manner provided by this section shall postpone the due date for each installment payment that becomes due before the student receives the awards.

SECTION 7. Subchapter B, Chapter 54, Education Code, is amended by adding Section 54.0516 to read as follows:

Sec. 54.0516. SPECIAL SUMMER TUITION RATES AT TEXAS A&M UNIVERSITY: PILOT PROGRAM. (a) This section applies only to a resident undergraduate student enrolled for a summer term or session at Texas A&M University.

(b) Tuition, other than tuition under Section 54.0513, charged to a student to whom this section applies is three-fourths of the amount otherwise provided by this subchapter.

(c) The amount that the board of regents may charge as tuition under Section 54.0513 to a student to whom this section applies may not exceed the amount of other tuition the board is authorized to charge to the student under Subsection (b).

(d) This section applies only if the legislature specifically appropriates money to Texas A&M University for the state fiscal biennium ending August 31, 2007, to cover the tuition revenue lost to the institution by the application of this section.

(e) This section applies only to a summer term or session in 2006 or 2007. This section expires January 1, 2008.

SECTION 8. Subsection (c), Section 54.214, Education Code, is amended to read as follows:

(c) To be eligible for an exemption under this section, a person must:

(1) be a resident of this state;

(2) be a school employee serving in any capacity;

(3) for the initial term or semester for which the person receives an exemption under this section, have [who] worked as an educational aide for at least one school year during the five years preceding that [the] term or semester [for which the person receives the exemption];

(4) [(3)] establish financial need as determined by coordinating board rule;

(5) [(4)] be enrolled in courses required for teacher certification at the institution of higher education granting the exemption;

(6) [(5)] maintain an acceptable grade point average as determined by coordinating board rule; and

(7) [(6)] comply with any other requirements adopted by the coordinating board under this section.

SECTION 9. Section 54.2155, Education Code, is amended to read as follows:

Sec. 54.2155. PAYMENT OF TUITION ASSISTANCE FOR MEMBERS OF STATE MILITARY FORCES. (a) For [In the manner established by the Texas Higher Education Coordinating Board, for] each semester, the adjutant general of the state military forces [coordinating board] shall certify to institutions of higher education as described by Section 431.090, Government Code, information identifying the persons to whom the adjutant general [of the state military forces] has awarded tuition assistance under that section [Section 431.090, Government Code, if the coordinating board has determined that sufficient money is available to reimburse institutions for tuition exemptions granted under this section and to make tuition assistance grants under Subsection (e)].

(b) An institution of higher education shall exempt a person certified by the adjutant general as described by Subsection (a) [coordinating board under this section] from the payment of tuition for the semester credit hours for which the person enrolls, not to exceed 12 semester credit hours. If the person is not charged tuition at the rate provided for other Texas residents, the amount of the exemption may not exceed the amount of tuition the person would be charged as a Texas resident for the number of semester credit hours for which the person enrolls, not to exceed 12 semester credit hours.

[(b) From money appropriated for purposes of this section, the coordinating board shall reimburse an institution of higher education in an amount equal to the amount of the tuition exemption the institution grants to a person under Subsection (a).

[(c) From money appropriated for purposes of this section, the coordinating board shall make a grant to a person attending a private or independent institution of higher education, as defined by Section 61.003, to whom the adjutant general has awarded tuition assistance for the semester under Section 431.090, Government Code. The amount of a grant under this section is an amount equal to the average amount of reimbursement the coordinating board estimates will be paid per student for the same semester under Subsection (b).]

SECTION 10. Subsection (b), Section 54.5021, Education Code, is amended to read as follows:

(b) The student deposit fund of an institution of higher education shall be used, at the discretion of the institution's governing board, for making scholarship awards to needy and deserving students of the institution and making grants under Subchapter C, Chapter 56, to resident students of the institution. The governing board shall administer the scholarship awards for the institution, including the selection of recipients and the amounts and conditions of the awards. The recipients of the scholarships must be residents of the state as defined for tuition purposes.

SECTION 11. Section 56.033, Education Code, is amended by adding Subsection (e) to read as follows:

(e) To supplement money set aside under Subsection (a), the governing board of an institution of higher education may use money received by the institution from the fee for issuance of collegiate license plates under Section 504.615, Transportation Code, for awarding Texas Public Educational Grants. The board may use the money to award grants to both resident and nonresident students, except that the board shall give priority to grants for resident students. Notwithstanding Subsection (b), the board may not use the money for emergency loans under Subchapter D.

SECTION 12. Section 56.051, Education Code, is amended to read as follows:

Sec. 56.051. EMERGENCY LOANS. Each institution of higher education may establish an emergency loan program under which students are loaned money to pay tuition, [and] fees, and the costs of textbooks.

SECTION 13. Section 56.052, Education Code, is amended to read as follows:

Sec. 56.052. ELIGIBILITY. (a) The governing board of each institution shall adopt rules establishing eligibility criteria. The rules must allow eligible students to obtain loans on the basis of the order of receipt of applications, except as provided by Subsection (b).

(b)  The governing board may adopt rules that allow the institution to select loan recipients from the eligible applicants according to financial need, regardless of when their applications are received, if money available for the program is insufficient to provide loans to each eligible applicant.

SECTION 14.  Section 56.076, Education Code, is amended to read as follows:

Sec. 56.076.  ELIGIBLE EMPLOYER.  An eligible institution may enter into agreements with employers that participate in the work-study program. To be eligible to participate in the work-study program, an employer must:

(1)  provide part-time employment to an eligible student in nonpartisan and nonsectarian activities;

(2)  provide, insofar as is practicable, employment to an eligible student that is related to the student's academic interests;

(3)  use Texas college work-study program positions only to supplement and not to supplant positions normally filled by persons not eligible to participate in the work-study program;

(4)  provide from sources other than federal college work-study program funds a percentage [not less than 30 percent] of an employed student's wages that is equal to the percentage of a student's wages that the employer would be required to provide to the student in that academic year under the [and 100 percent of other employee benefits for the employed student from sources other than] federal college work-study program [funds, if the employer is a nonprofit entity]; and

(5)  provide from sources other than federal college work-study funds [not less than 50 percent of an employed student's wages and] 100 percent of other employee benefits for the employed student[, if the employer is a profit-making entity].

SECTION 15.  Subchapter K, Chapter 56, Education Code, is amended by adding Section 56.2011 to read as follows:

Sec. 56.2011.  DEFINITION. In this subchapter, "coordinating board" means the Texas Higher Education Coordinating Board.

SECTION 16.  Section 56.202, Education Code, is amended to read as follows:

Sec. 56.202.  PURPOSE. (a)  The Early High School Graduation Scholarship program is created to increase efficiency in the Foundation School Program and to provide assistance for tuition or tuition and mandatory fees, as provided by Section 56.204, to an eligible person to enable that person to attend a [Texas] public or private institution of higher education in this state.

(b)  A portion of the savings to the Foundation School Program that occur as a result of the program is dedicated to state credits for tuition or tuition and mandatory fees, as applicable, provided to an eligible person under the program.

SECTION 17.  Section 56.203, Education Code, as amended by Chapters 365 and 1317, Acts of the 78th Legislature, Regular Session, 2003, is reenacted and amended to read as follows:

Sec. 56.203.  ELIGIBLE PERSON. (a)  To be eligible for an award through the Early High School Graduation Scholarship program, a person must:

(1)  [have the written approval of at least one of the person's parents or a person standing in parental relation to the person, if the person graduated from high school in not more than 41 consecutive months;

[(2)] have [successfully completed the recommended or advanced high school program established under Section 28.025 and] graduated from [a Texas public] high school:

(A) in not more than 41 consecutive months and successfully completed the recommended or advanced high school program established under Section 28.025, if the person graduated on or after September 1, 2005;

(B) in not more than 45 consecutive months, [or, if the person graduated] with at least 30 hours of college credit, and successfully completed the recommended or advanced high school program established under Section 28.025, if the person graduated on or after September 1, 2005 [in not more than 45 consecutive months]; or

(C) in not more than 36 consecutive months after successfully completing the requirements for a high school diploma, if the person graduated before September 1, 2005, regardless of whether the person successfully completed the recommended or advanced high school program established under Section 28.025;

(2) [(3)] have attended high school exclusively in one or more public high schools in this state [only]; and

(3) [(4)] be a Texas resident as defined by coordinating board [Texas Higher Education Coordinating Board] rule.

(b) The [A person's] eligibility for the Early High School Graduation Scholarship program of a person described by Subsection (a)(1)(A) or (B) ends on the sixth anniversary of the date that the person first becomes eligible to participate in the program, unless the person is provided additional time to participate in the program under Subsection (c).

(c) The coordinating board shall adopt rules to provide a person described by Subsection (a)(1)(A) or (B) who is otherwise eligible to participate in the Early High School Graduation Scholarship program additional time to use a state credit for tuition and mandatory fees under the program. The rules must require a person seeking an extension under this subsection to show hardship or other good cause that prevents the person from enrolling in or continuing enrollment in an eligible institution during the period provided by Subsection (b). For purposes of this subsection, hardship or other good cause includes a severe illness or other debilitating condition, [or] responsibility for the care of a sick, injured, or needy person, or active duty or other service in the United States armed forces.

(d) A person who does not satisfy the curriculum requirements for the recommended or advanced high school program as required to establish eligibility under Subsection (a)(1)(A) or (B) [of Subsection (a)(2)] is considered to have satisfied those requirements if the high school from which the person graduated indicates on the person's transcript that the person was unable to complete the appropriate curriculum within the time prescribed by that subsection solely because of a reason beyond the person's control, such as [necessary courses were unavailable to the person at the appropriate times in the person's high school career as a result of course scheduling,] lack of enrollment capacity[,] or a shortage of qualified teachers [another cause not within the person's control].

SECTION 18. The heading to Section 56.204, Education Code, is amended to read as follows:

Sec. 56.204. ENTITLEMENT[; MATCHING CREDIT].

SECTION 19. Section 56.204(a), Education Code, is amended to read as follows:

(a) An eligible person under the Early High School Graduation Scholarship program is entitled to a state credit to apply toward tuition or [pay] tuition and mandatory fees, as applicable, at a public or private institution of higher education in this state in the following amounts:

(1) $2,000 to apply toward tuition and mandatory fees if the person successfully completed the recommended or advanced high school program established under Section 28.025 and graduated from high school on or after September 1, 2005, in 36 consecutive months or less and an additional $1,000 to apply toward tuition and mandatory fees if the person graduated with at least 15 hours of college credit;

(2) $500 to apply toward tuition and mandatory fees if the person successfully completed the recommended or advanced high school program established under Section 28.025 and graduated from high school on or after September 1, 2005, in more than 36 consecutive months but not more than 41 consecutive months and an additional $1,000 to apply toward tuition and mandatory fees if the person graduated with at least 30 hours of college credit; [or]

(3) $1,000 to apply toward tuition and mandatory fees if the person successfully completed the recommended or advanced high school program established under Section 28.025 and graduated from high school on or after September 1, 2005, in more than 41 consecutive months but not more than 45 consecutive months with at least 30 hours of college credit; or

(4) $1,000 to apply only toward tuition if the person graduated before September 1, 2005, after successfully completing the requirements for a high school diploma in not more than 36 consecutive months.

SECTION 20. Section 56.205, Education Code, is amended to read as follows:

Sec. 56.205. ISSUANCE OF CERTIFICATE. As soon as practicable after the coordinating board confirms with the high school from which a person graduated that the person is eligible for an award through the Early High School Graduation Scholarship program, the [The] coordinating board shall provide a certificate for state credits for tuition or tuition and mandatory fees, as applicable, to the [an] eligible person.

SECTION 21. Sections 56.206(a), (c), and (d), Education Code, are amended to read as follows:

(a) On enrollment of an eligible person in an eligible institution of higher education, the institution shall apply to the person's charges for tuition or tuition and mandatory fees, as applicable, for the enrollment period an amount equal to the lesser of:

(1) the amount of the state credit available to the person; or

(2) the person's actual tuition or tuition and mandatory fees, as applicable.

(c) For each student using a state credit for tuition or tuition and mandatory fees under this subchapter, the institution of higher education shall report to the coordinating board the following information:

(1) the student's name;

(2) the school district from which the student graduated from high school; [and]

(3) the amount of the state credit applied; and

(4) whether the state credit was applied toward tuition or tuition and mandatory fees.

(d) Subject to Section 56.203(b), an eligible person may use the state credit for enrollment in an eligible institution of higher education during any semester or summer session, except the [person's] initial use of the credit by a person who qualifies for an award under Section 56.203(a)(1)(A) or (B) may not be for enrollment during any term of a summer session immediately following the person's graduation from high school.

SECTION 22. Section 56.207(b), Education Code, is amended to read as follows:

(b) On receipt of a report from the coordinating board under Subsection (a), the commissioner of education shall transfer to the coordinating board, from funds appropriated for the Foundation School Program, an amount sufficient to pay each eligible institution of higher education the amount of state credit for tuition or tuition and mandatory fees, as applicable, that is applied by the institution during the period covered by the report.

SECTION 23. Section 56.2075(b), Education Code, is amended to read as follows:

(b) The commissioner of education shall distribute money from the foundation school fund in an amount sufficient to pay each school district under Subsection (a).

SECTION 24. Subchapter K, Chapter 56, Education Code, is amended by adding Section 56.210 to read as follows:

Sec. 56.210. NOTIFICATION BY HIGH SCHOOLS REGARDING PROGRAM REQUIREMENTS. (a) When the student initially enrolls in the school, each public high school in this state shall provide information regarding the requirements of the Early High School Graduation Scholarship program:

(1) to each freshman student enrolled when the school year begins and to a parent, conservator, or guardian of the student; and

(2) to each student who:

(A) enrolls in the school before the student's senior year; and

(B) did not receive the information under Subdivision (1).

(b) The information provided under Subsection (a) must include:

(1) the number and type of high school course credits necessary to satisfy the eligibility requirements for the Early High School Graduation Scholarship program; and

(2) the appropriate order in which those high school course credits must be earned to satisfy the eligibility requirements, including course credits related to the curriculum for the recommended or advanced high school program.

(c) The Texas Education Agency shall prepare a publication that includes the information required to be provided under this section and shall post that publication on the agency's website in a form that enables a public high school to reproduce the information for distribution to students, parents, and other persons as required by this section.

SECTION 25. Section 56.304, Education Code, is amended by amending Subsection (e) and adding Subsections (e-1) and (e-2) to read as follows:

(e)  If a person is initially awarded a TEXAS grant for an academic period before the 2005 fall semester, the [A] person's eligibility for a TEXAS grant ends on the sixth anniversary of the initial award of a TEXAS grant to the person and the person's enrollment in an eligible institution, unless the person is provided additional time during which the person may receive a TEXAS grant under Subsection (e-2) [this subsection].

(e-1)  If a person is initially awarded a TEXAS grant for the 2005 fall semester or a later academic period, unless the person is provided additional time during which the person may receive a TEXAS grant under Subsection (e-2), the person's eligibility for a TEXAS grant ends on:

(1)  the fifth anniversary of the initial award of a TEXAS grant to the person, if the person is enrolled in a degree or certificate program of four years or less; or

(2)  the sixth anniversary of the initial award of a TEXAS grant to the person, if the person is enrolled in a degree program of more than four years.

(e-2)  The coordinating board shall adopt rules to provide a person who is otherwise eligible to receive a TEXAS grant additional time during which the person may receive a TEXAS grant in the event of a hardship or other good cause shown that prevents the person from continuing the person's enrollment during the period the person would otherwise have been eligible to receive a TEXAS grant, including a showing of a severe illness or other debilitating condition or that the person is or was responsible for the care of a sick, injured, or needy person.

SECTION 26. Section 56.305, Education Code, is amended by amending Subsections (e) and (g) and adding Subsection (e-1) to read as follows:

(e)  For the purpose of this section, a person who is initially awarded a TEXAS grant for an academic period before the 2005 fall semester makes satisfactory academic progress toward an undergraduate degree or certificate only if:

(1)  in the person's first academic year the person meets the satisfactory academic progress requirements of the institution at which the person is enrolled; and

(2)  in a subsequent academic year, the person:

(A)  completes at least 75 percent of the semester credit hours attempted in the student's most recent academic year; and

(B)  earns an overall grade point average of at least 2.5 on a four-point scale or the equivalent on coursework previously attempted at institutions of higher education.

(e-1)  For purposes of this section, a person who is initially awarded a TEXAS grant for the 2005 fall semester or a later academic period makes satisfactory academic progress toward an undergraduate degree or certificate only if:

(1)  in the person's first academic year the person meets the satisfactory academic progress requirements of the institution at which the person is enrolled; and

(2)  in a subsequent academic year, the person:

(A)  completed at least 24 semester credit hours in the student's most recent academic year; and

(B) has earned an overall grade point average of at least 2.5 on a four-point scale or the equivalent on coursework previously attempted at institutions of higher education.

(g) The coordinating board shall adopt rules to allow a person who is otherwise eligible to receive a TEXAS grant, in the event of a hardship or for other good cause shown, including a showing of a severe illness or other debilitating condition that may affect the person's academic performance or that the person is responsible for the care of a sick, injured, or needy person and that the person's provision of care may affect the person's academic performance, to receive a TEXAS grant:

(1) while enrolled in a number of semester credit hours that is less than the number of semester credit hours required under Subsection (a)(3); or

(2) if the student's grade point average or the student's completion rate or number of semester credit hours completed, as applicable, falls below the satisfactory academic progress requirements of Subsection (e) or (e-1).

SECTION 27. Section 56.307, Education Code, is amended by amending Subsections (b), (c), (d), (i), and (j) and adding Subsections (d-1), (i-1), and (l) to read as follows:

(b) The amount of a TEXAS grant for a semester or term for a student enrolled full-time at a private or independent institution of higher education is the amount determined by the coordinating board as the average statewide amount of tuition and required fees that a resident student enrolled full-time in a baccalaureate degree program would be charged for that semester or term at general academic teaching institutions.

(c) The amount of a TEXAS grant for a semester or term for a student enrolled full-time at a public technical institute is the amount determined by the coordinating board as the average statewide amount of tuition and required fees that a resident student enrolled full-time in an associate degree or certificate program would be charged for that semester or term at public technical institutes.

(d) The amount of a TEXAS grant for a semester or term for a student enrolled full-time at a public junior college is the amount determined by the coordinating board as the average statewide amount of tuition and required fees that a student who is a resident of the junior college district and is enrolled full-time in an associate degree or certificate program would be charged for that semester or term at public junior colleges.

(d-1) The coordinating board shall determine the average statewide tuition and fee amounts for a semester or term of the next academic year for purposes of this section by using the amounts of tuition and required fees that will be charged by the applicable eligible institutions for that semester or term in that academic year. The board may estimate the amount of the charges for a semester or term in the next academic year by an institution if the relevant information is not yet available to the board.

(i) A public institution of higher education may not:

(1) unless the institution complies with Subsection (j), charge a person attending the institution who also receives a TEXAS grant an amount of tuition and required fees in excess of the amount of the TEXAS grant received by the person; or

(2) deny admission to or enrollment in the institution based on a person's eligibility to receive a TEXAS grant or a person's receipt of a TEXAS grant.

(i-1) A public institution of higher education may elect to award a TEXAS grant to any student in an amount that is less than the applicable amount established under Subsection (a), (c), (d), or (e).

(j) A public [An] institution of higher education shall [may] use other available sources of financial aid, other than a loan, to cover any difference in the amount of a TEXAS grant awarded to the student and the actual amount of tuition and required fees at the institution if the difference results from:

(1) a reduction in the amount of a TEXAS grant under Subsection (i-1); or

(2) a deficiency in the amount of the grant as established under Subsection (a), (c), (d), or (e), as applicable, to cover the full amount of tuition and required fees charged to the student by the institution.

(l) The coordinating board shall provide information regarding the Texas B-On-time loan program established under Subchapter Q to each eligible applicant who receives less than the full amount of a TEXAS grant.

SECTION 28. Subchapter M, Chapter 56, Education Code, is amended by adding Section 56.3071 to read as follows:

Sec. 56.3071. EFFECT OF ELIGIBILITY FOR TUITION EQUALIZATION GRANT. (a) Notwithstanding Section 56.307, the total amount of financial aid that a student enrolled in a private or independent institution of higher education is eligible to receive in a state fiscal year from TEXAS grants awarded under this subchapter may not exceed the maximum amount the student may receive in tuition equalization grants in that fiscal year as determined under Subchapter F, Chapter 61.

(b) Notwithstanding any other law, a student enrolled in a private or independent institution of higher education may not receive a TEXAS grant under this subchapter and a tuition equalization grant under Subchapter F, Chapter 61, for the same semester or other term, regardless of whether the student is otherwise eligible for both grants during that semester or term. A student who but for this subsection would be awarded both a TEXAS grant and a tuition equalization grant for the same semester or other term is entitled to receive only the grant of the greater amount.

SECTION 29. Subsection (a), Section 56.3075, Education Code, is amended to read as follows:

(a) If the money available for TEXAS grants in a period for which grants are awarded is sufficient to provide grants to all eligible applicants in amounts specified by Section 56.307, the [The] coordinating board may use any excess money available for TEXAS grants to award a grant in an amount not more than three times the amount that may be awarded under Section 56.307 to a student who:

(1) is enrolled in a program that fulfills the educational requirements for licensure or certification by the state in a health care profession that the coordinating board, in consultation with the Texas Workforce Commission and the statewide health coordinating council, has identified as having a critical shortage in the number of license holders needed in this state;

(2) has completed at least one-half of the work toward a degree or certificate that fulfills the educational requirement for licensure or certification; and

(3) meets all the requirements to receive a grant award under Section 56.307.

SECTION 30. The heading to Subchapter P, Chapter 56, Education Code, is amended to read as follows:

SUBCHAPTER P.  TEXAS EDUCATIONAL OPPORTUNITY [~~TOWARD EXCELLENCE, ACCESS, & SUCCESS (TEXAS)~~] GRANT [~~II~~] PROGRAM

SECTION 31. Subsection (a), Section 56.402, Education Code, is amended to read as follows:

(a) The student financial assistance program authorized by this subchapter is known as the Texas Educational Opportunity Grant Program [~~Toward EXcellence, Access, & Success (TEXAS) grant II program, and an individual grant awarded under this subchapter is known as a TEXAS grant II~~].

SECTION 32. Section 56.403, Education Code, is amended to read as follows:

Sec. 56.403.  ADMINISTRATION OF PROGRAM. (a)  The coordinating board shall administer the [~~TEXAS~~] grant [~~II~~] program and shall adopt any rules necessary to implement the [~~TEXAS~~] grant [~~II~~] program or this subchapter. The coordinating board shall consult with the student financial aid officers of eligible institutions in developing the rules.

(b) The coordinating board shall adopt rules to provide a [~~TEXAS~~] grant under this subchapter [~~II~~] to an eligible student enrolled in an eligible institution in a manner consistent with the administration of federal student financial aid programs.

(c) The total amount of grants awarded under the [~~TEXAS~~] grant [~~II~~] program may not exceed the amount available for the program from appropriations, gifts, grants, or other funds.

(d) In determining who should receive a [~~TEXAS~~] grant under this subchapter [~~II~~], the coordinating board and the eligible institutions shall give highest priority to awarding [~~TEXAS~~] grants [~~II~~] to students who demonstrate the greatest financial need.

SECTION 33. Section 56.404, Education Code, is amended to read as follows:

Sec. 56.404.  INITIAL ELIGIBILITY FOR GRANT. (a)  To be eligible initially for a grant under the [~~TEXAS~~] grant [~~II~~] program, a person must:

(1) be a resident of this state as determined by coordinating board rules;

(2) meet financial need requirements as defined by the coordinating board;

(3) be enrolled in an associate degree or certificate program at an eligible institution;

(4) be enrolled as an entering student for at least one-half of a full course load for an entering student in the associate degree or certificate program, as determined by the coordinating board;

(5) have applied for any available financial aid or assistance; and

(6) comply with any additional nonacademic requirement adopted by the coordinating board under this subchapter.

(b) A person is not eligible to receive a [~~TEXAS~~] grant under this subchapter [~~II~~] if the person has been convicted of a felony or an offense under Chapter 481, Health and Safety Code (Texas Controlled Substances Act), or under the law of

another jurisdiction involving a controlled substance as defined by Chapter 481, Health and Safety Code, unless the person has met the other applicable eligibility requirements under this subchapter and has:

     (1)  received a certificate of discharge by the Texas Department of Criminal Justice or a correctional facility or completed a period of probation ordered by a court and at least two years have elapsed from the date of the receipt or completion; or

     (2)  been pardoned, had the record of the offense expunged from the person's record, or otherwise been released from the resulting ineligibility to receive a grant under this subchapter.

    (c)  A person is not eligible to receive a [TEXAS] grant under this subchapter [H] if the person has been granted an associate or baccalaureate degree.

    (d)  A person may not receive a [TEXAS] grant under this subchapter [H] for more than 75 semester credit hours or the equivalent.

    (e)  A person may not receive a [TEXAS] grant under this subchapter [H] if the person is eligible for a TEXAS grant.

    (f)  A person's eligibility for a [TEXAS] grant under this subchapter [H] ends on the fourth anniversary of the initial award of a [TEXAS] grant under this subchapter [H] to the person and the person's enrollment in an eligible institution.

    SECTION 34.  Section 56.405, Education Code, is amended to read as follows:

    Sec. 56.405.  CONTINUING ELIGIBILITY AND ACADEMIC PERFORMANCE REQUIREMENTS.  (a)  After initially qualifying for a [TEXAS] grant under this subchapter [H], a person may continue to receive a [TEXAS] grant under this subchapter [H] during each semester or term in which the person is enrolled at an eligible institution only if the person:

     (1)  meets financial need requirements as defined by the coordinating board;

     (2)  is enrolled in an associate degree or certificate program at an eligible institution;

     (3)  is enrolled for at least one-half of a full course load for a student in an associate degree or certificate program, as determined by the coordinating board;

     (4)  makes satisfactory academic progress toward an associate degree or certificate; and

     (5)  complies with any additional nonacademic requirement adopted by the coordinating board.

    (b)  A person is not eligible to continue to receive a [TEXAS] grant [H] under this section if the person has been convicted of a felony or an offense under Chapter 481, Health and Safety Code (Texas Controlled Substances Act), or under the law of another jurisdiction involving a controlled substance as defined by Chapter 481, Health and Safety Code, unless the person has met the other applicable eligibility requirements under this subchapter and has:

     (1)  received a certificate of discharge by the Texas Department of Criminal Justice or a correctional facility or completed a period of probation ordered by a court and at least two years have elapsed from the date of the receipt or completion; or

     (2)  been pardoned, had the record of the offense expunged from the person's record, or otherwise been released from the resulting ineligibility to receive a grant under this subchapter.

(c) If a person fails to meet any of the requirements of Subsection (a) after the completion of any semester or term, the person may not receive a [TEXAS] grant under this subchapter [H] during the next semester or term in which the person enrolls. A person may become eligible to receive a [TEXAS] grant under this subchapter [H] in a subsequent semester or term if the person:

(1) completes a semester or term during which the student is not eligible for a scholarship; and

(2) meets all the requirements of Subsection (a).

(d) For the purpose of this section, a person makes satisfactory academic progress toward an associate degree or certificate only if:

(1) in the person's first academic year the person meets the satisfactory academic progress requirements of the institution at which the person is enrolled; and

(2) in a subsequent academic year, the person:

(A) [(1)] completes at least 75 percent of the semester credit hours attempted in the student's most recent academic year; and

(B) has earned [(2) earns] an overall grade point average of at least 2.5 on a four-point scale or the equivalent on course work previously attempted at institutions of higher education.

(e) A person who is eligible to receive a [TEXAS] grant under this subchapter [H] continues to remain eligible to receive the [TEXAS] grant [H] if the person enrolls in or transfers to another eligible institution.

(f) The coordinating board shall adopt rules to allow a person who is otherwise eligible to receive a grant under this subchapter, in the event of a hardship or for other good cause shown, including a showing of a severe illness or other debilitating condition that may affect the person's academic performance or that the person is responsible for the care of a sick, injured, or needy person and that the person's provision of care may affect the person's academic performance, to receive a grant under this subchapter:

(1) while enrolled in a number of semester credit hours that is less than the number of semester credit hours required under Subsection (a)(3); or

(2) if the student's grade point average or completion rate falls below the satisfactory academic progress requirements of Subsection (d).

SECTION 35. Section 56.406, Education Code, is amended to read as follows:

Sec. 56.406. GRANT USE. A person receiving a [TEXAS] grant under this subchapter [H] may use the money to pay any usual and customary cost of attendance at an eligible institution incurred by the student. The institution may disburse all or part of the proceeds of a [TEXAS] grant under this subchapter [H] to an eligible person only if the tuition and required fees incurred by the person at the institution have been paid.

SECTION 36. Subsections (a), (b), (c), (f), and (g), Section 56.407, Education Code, are amended to read as follows:

(a) The amount of a [TEXAS] grant under this subchapter [H] for a student enrolled full-time at an eligible institution is the amount determined by the coordinating board as the average statewide amount of tuition and required fees that a resident student enrolled full-time in an associate degree or certificate program would be charged for that semester or term at eligible institutions.

(b)  The coordinating board may adopt rules that allow the coordinating board to increase or decrease, in proportion to the number of semester credit hours in which a student is enrolled, the amount of a [TEXAS] grant [H] award under this section to a student who is enrolled in a number of semester credit hours in excess of or below the number of semester credit hours described in Section 56.404(a)(4) or 56.405(a)(3).

(c)  The amount of a [TEXAS] grant under this subchapter [H] may not be reduced by any gift aid for which the person receiving the grant is eligible, unless the total amount of a person's grant plus any gift aid received exceeds the total cost of attendance at an eligible institution.

(f)  An eligible institution may not:

(1)  charge a person attending the institution who also receives a [TEXAS] grant under this subchapter [H] an amount of tuition and required fees in excess of the amount of the [TEXAS] grant under this subchapter [H] received by the person; or

(2)  deny admission to or enrollment in the institution based on a person's eligibility to receive a [TEXAS] grant under this subchapter [H] or a person's receipt of a [TEXAS] grant under this subchapter [H].

(g)  An institution may use other available sources of financial aid, other than a loan or a Pell grant, to cover any difference in the amount of a [TEXAS] grant under this subchapter [H] and the actual amount of tuition and required fees at the institution.

SECTION 37.  Subsection (b), Section 56.463, Education Code, is amended to read as follows:

(b)  Money in the Texas B-On-time student loan account may be used only to pay any costs of the coordinating board related to the operation of the Texas B-On-time loan program and as otherwise provided by this subchapter.

SECTION 38.  Subsection (b), Section 56.465, Education Code, is amended to read as follows:

(b)  The amount of tuition set aside under Subsection (a) shall be deposited to the credit of the Texas B-On-time student loan account established under Section 56.463 or to the interest and sinking fund established by the coordinating board under Section 52.91(b) in accordance with the resolution of the board establishing such fund.

SECTION 39.  Section 61.066, Education Code, is amended by adding Subsection (c) to read as follows:

(c)  The board shall conduct a biennial study to determine the total cost of attending each institution of higher education and the resources used by students to cover that cost, including the amounts of money received by students at each institution from the major sources of public and private financial aid, including grants, loans, scholarships, gifts, and work-study programs. In conducting the study, the board shall solicit information and comments from the financial aid office at each institution of higher education. Not later than November 1 of each even-numbered year, the board shall report the findings of the study to each legislative standing committee and subcommittee with primary jurisdiction over higher education.

SECTION 40.  Section 61.0776, Education Code, is amended by adding Subsection (f) to read as follows:

(f)  The board, in cooperation with the entities specified by Subsection (a) and the advisory committee established by Subsection (b), shall develop a comprehensive financial aid training program for public school counselors, employees of student financial aid offices of public and private or independent institutions of higher education, members of appropriate community-based organizations, and other appropriate persons. The board may adopt rules as necessary to administer the training program. The board shall design the training program to:

(1)  use the information required by Subsection (e) and any other information necessary to carry out this subdivision:

(A)  to inform persons receiving the training concerning:

(i)  the opportunities available to students for obtaining financial aid, including eligibility requirements; and

(ii)  the procedures for obtaining financial aid; and

(B)  to provide sufficient and accessible detail to enable the persons receiving the training to provide timely and consistent answers to the questions of students and their parents, conservators, or guardians concerning the opportunities and procedures;

(2)  teach methods to enable the persons receiving the training to effectively communicate financial aid information to students and their parents, conservators, or guardians;

(3)  support and promote the dissemination of financial aid information to students and their parents, conservators, or guardians throughout local areas; and

(4)  publicize the training and make the training easily available to public school counselors and other appropriate persons throughout this state.

SECTION 41.  Subchapter C, Chapter 61, Education Code, is amended by adding Section 61.088 to read as follows:

Sec. 61.088.  HIGHER EDUCATION ENROLLMENT ASSISTANCE PROGRAM.  (a)  To the extent that funds are available for the purpose, the board shall administer the Higher Education Enrollment Assistance Program.  Under the program, the board shall:

(1)  provide information related to enrollment in public or private or independent institutions of higher education, including admissions and financial aid information, to prospective students in three areas of this state identified by the board as having a significant number of students who graduate from high school and do not attend an institution of higher education; and

(2)  assist those prospective students in completing applications related to enrollment in those institutions, including admissions and financial aid applications.

(b)  To the extent that funds are available for the purpose, the board shall expand the program to include additional areas identified by the board as meeting the criteria specified by Subsection (a).

(c)  The board shall provide the information and assistance required by this section at least twice each year at one or more appropriate locations in each area served by the program.

(d)  The board may coordinate with an institution of higher education or other entity to provide the information and assistance required by this section in each area served by the program.

(e) Not later than August 31 of each year, the board shall submit to the legislature a report on the scope and effectiveness of the program.

(f)  The board shall adopt rules as necessary to implement this section.

SECTION 42.  Section 61.225, Education Code, is amended to read as follows:

Sec. 61.225.  ELIGIBILITY [QUALIFICATIONS] FOR GRANT; PERSONS AWARDED GRANTS BEFORE 2005-2006 ACADEMIC YEAR.  (a) This section applies only to a person who initially received a tuition equalization grant for an academic period before the 2005-2006 academic year.

(b)  To be eligible for a tuition equalization grant, a person must:

(1)  be a Texas resident as defined by the coordinating board and meet, at a minimum, the resident requirements defined by law for Texas resident tuition in fully state-supported institutions of higher education;

(2)  be enrolled for at least one-half of a full course load conforming to an individual degree plan in an approved college or university;

(3)  be required to pay more tuition than is required at a public college or university and be charged no less than the regular tuition required of all students enrolled at the institution;

(4)  establish financial need in accordance with procedures and regulations of the coordinating board;

(5)  not be a recipient of any form of athletic scholarship; and

(6)  have complied with other requirements adopted by the coordinating board under this subchapter.

(c)  A grant to a part-time student under this section shall be made on a pro rata basis of a full-time equivalent.

SECTION 43.  Subchapter F, Chapter 61, Education Code, is amended by adding Section 61.2251 to read as follows:

Sec. 61.2251.  ELIGIBILITY FOR GRANT; PERSONS INITIALLY AWARDED GRANTS DURING OR AFTER 2005-2006 ACADEMIC YEAR. (a) This section does not apply to a person who initially received a tuition equalization grant for an academic period before the 2005-2006 academic year.

(b)  To be eligible for a tuition equalization grant in the first academic year in which the person receives the grant, a person must:

(1)  be a Texas resident as defined by the coordinating board and meet, at a minimum, the resident requirements defined by law for Texas resident tuition in fully state-supported institutions of higher education;

(2)  be enrolled for a full course load conforming to an individual degree plan in an approved college or university;

(3)  be required to pay more tuition than is required at a public college or university and be charged no less than the regular tuition required of all students enrolled at the institution;

(4)  establish financial need in accordance with procedures and regulations of the coordinating board;

(5)  not be a recipient of any form of athletic scholarship; and

(6)  have complied with other requirements adopted by the coordinating board under this subchapter.

  (c) After qualifying for a tuition equalization grant under Subsection (b), a person may receive a tuition equalization grant in a subsequent academic year in which the person is enrolled at an approved institution only if the person:

    (1) meets the requirements of Subsection (b);

    (2) completed at least:

      (A) 24 semester credit hours in the person's most recent academic year, if the person is enrolled in an undergraduate degree or certificate program; or

      (B) 18 semester credit hours in the person's most recent academic year, if the person is enrolled in a graduate or professional degree program; and

    (3) has earned an overall grade point average of at least 2.5 on a four-point scale or the equivalent on coursework previously attempted at public or private institutions of higher education.

  (d) Notwithstanding Subsections (b) and (c), a person's eligibility for a tuition equalization grant ends on:

    (1) the fifth anniversary of the initial award of a tuition equalization grant to the person, if the person is enrolled in an undergraduate degree or certificate program of four years or less; or

    (2) the sixth anniversary of the initial award of a tuition equalization grant to the person, if the person is enrolled in an undergraduate degree program of more than four years.

  (e) The coordinating board shall adopt rules to allow a person who is otherwise eligible to receive a tuition equalization grant, in the event of a hardship or for other good cause shown, to receive a tuition equalization grant if the person does not:

    (1) complete the semester credit hours required by Subsection (c)(2);

    (2) maintain the grade point average required by Subsection (c)(3); or

    (3) complete the person's certificate or degree program within the period prescribed by Subsection (d).

  SECTION 44. Section 61.227, Education Code, is amended by adding Subsection (d) to read as follows:

  (d) Notwithstanding any other law, a student enrolled in a private or independent institution of higher education may not receive a tuition equalization grant under this subchapter and a TEXAS grant under Subchapter M, Chapter 56, for the same semester or other term, regardless of whether the student is otherwise eligible for both grants during that semester or term. A student who but for this subsection would be awarded both a tuition equalization grant and a TEXAS grant for the same semester or other term is entitled to receive only the grant of the greater amount.

  SECTION 45. Section 431.090, Government Code, is amended by amending Subsection (g) and adding Subsections (h) and (i) to read as follows:

  (g) Before each semester at a time determined by the adjutant general [Texas Higher Education Coordinating Board], the adjutant general shall certify to the appropriate public and private institutions of higher education [the coordinating board] a list of the persons to whom the adjutant general has awarded tuition assistance under this section for that semester. The amount of tuition assistance awarded by the adjutant general under this section may not exceed the amount of [After receipt of the list, the coordinating board shall determine whether sufficient] money [is] available to fund the tuition assistance awards [under Section 54.2155,

Education Code.  If the coordinating board determines that sufficient money is not available, the board shall notify the adjutant general, who shall reduce the number of awards according to the amount of money available and certify to the coordinating board a revised list of the persons to whom the adjutant general has awarded tuition assistance].

(h)  From money appropriated for purposes of this section, the adjutant general shall authorize the comptroller to reimburse an institution of higher education in an amount equal to the amount of the tuition exemption the institution grants to a person under Section 54.2155, Education Code.

(i)  From money appropriated for purposes of this section, the adjutant general shall authorize the comptroller to make a grant to a person attending a private or independent institution of higher education to whom the adjutant general has awarded tuition assistance for the semester under this section. The amount of a grant under this subsection is an amount equal to the average amount of reimbursement the adjutant general estimates will be paid per student for the same semester under Subsection (h).

SECTION 46. Subsection (b), Section 504.615, Transportation Code, is amended to read as follows:

(b)  After deduction of the department's administrative costs, the remainder of the fee for issuance of the license plates shall be deposited to the credit of the general revenue fund. The money may be used only for:

(1)  scholarships to students who demonstrate a need for financial assistance under Texas Higher Education Coordinating Board rule; or

(2)  Texas Public Educational Grants awarded under Subchapter C, Chapter 56, Education Code, if the fee is for the issuance of a license plate for a college described by Subsection (e)(1).

SECTION 47.  Subsection (h), Section 56.307, Education Code, is repealed.

SECTION 48.  The Texas Higher Education Coordinating Board shall, as necessary, adopt rules consistent with Sections 52.91, 56.463, and 56.465, Education Code, as amended by this Act, as soon as practicable after this Act takes effect. For that purpose, the coordinating board may adopt the rules in the manner provided by law for emergency rules.

SECTION 49. (a) The Texas Higher Education Coordinating Board shall conduct a study of the tuition exemptions and waivers authorized under Chapter 54, Education Code. The study must include an evaluation of the extent to which the tuition exemptions and waivers:

(1)  are a cost-effective and efficient method of providing financial assistance to students when compared to other types of available financial aid;

(2)  are consistent with one another in regard to eligibility requirements and application procedures;

(3)  are capable of being efficiently or properly administered by public institutions of higher education or other applicable entities;

(4)  effectively target students having substantial financial need or effectively accomplish the other purposes of those exemptions or waivers; and

(5)  distribute tuition assistance fairly among similarly situated students.

(b)  Not later than November 1, 2006, the Texas Higher Education Coordinating Board shall report the results of the study, including the board's recommendations for administrative or statutory changes to address the board's findings, to the governing board of each public institution of higher education and to the presiding officer of each legislative standing committee and subcommittee with primary jurisdiction over higher education.

(c)  This section expires January 1, 2007.

SECTION 50.  Subsection (f), Section 54.007, and Section 54.0071, Education Code, as added by this Act, apply beginning with the 2006 spring semester.

SECTION 51.  (a)  The change in law made by this Act to Section 54.214, Education Code, applies to eligibility for an exemption from payment of tuition and fees for an academic period beginning with the 2005 fall semester and applies regardless of whether a person would have been exempt from payment of tuition and fees under Subsection (c), Section 54.214, Education Code, as that subsection existed before the amendment made by this Act. Eligibility for an exemption from payment of tuition and fees for an academic period before the 2005 fall semester is covered by the applicable law in effect before the effective date of this Act, and the former law is continued in effect for that purpose.

(b)  The Texas Higher Education Coordinating Board shall, as necessary, adopt rules consistent with Subsection (c), Section 54.214, Education Code, as amended by this Act, as soon as practicable after this Act takes effect. For that purpose, the coordinating board may adopt the rules in the manner provided by law for emergency rules.  This subsection expires May 1, 2006.

SECTION 52.  The changes in law made by this Act to Section 54.2155, Education Code, and Section 431.090, Government Code, apply beginning with tuition assistance awards for the 2006-2007 academic year.  Tuition assistance awards for an academic year before the 2006-2007 academic year are covered by the law in effect immediately preceding the effective date of this Act, and the former law is continued in effect for that purpose.

SECTION 53.  Sections 56.051 and 56.052, Education Code, as amended by this Act, apply beginning with the 2006 spring semester.  The law governing emergency student loans in effect immediately before the effective date of this Act applies to those loans for a semester or term before the 2006 spring semester, and the former law is continued in effect for that purpose.

SECTION 54.  The changes in law made by this Act to Section 56.076, Education Code, apply only to an agreement entered into by an institution of higher education and an employer under that section on or after the effective date of this Act.

SECTION 55.  As soon as practicable after this Act takes effect, the Texas Higher Education Coordinating Board shall revise rules adopted under Section 56.209(a), Education Code, as necessary to conform to changes made by this Act to Subchapter K, Chapter 56, Education Code. For that purpose, the coordinating board may adopt the revisions to those rules in the manner provided by law for emergency rules. This section expires September 1, 2006.

SECTION 56.  The change in law made by this Act to Subchapter M, Chapter 56, Education Code, applies beginning with the 2005-2006 academic year, but does not affect the amount of or entitlement to any grant awarded before the effective date of this Act.

SECTION 57.  The change in law made by this Act relating to the eligibility of a person to receive a Texas Educational Opportunity Grant applies to each Texas Educational Opportunity Grant awarded on or after the effective date of this Act.

SECTION 58.  The Texas Higher Education Coordinating Board shall make the initial report required by Subsection (c), Section 61.066, Education Code, as added by this Act, not later than November 1, 2006.

SECTION 59.  The Texas Higher Education Coordinating Board shall implement the comprehensive financial aid training program under Subsection (f), Section 61.0776, Education Code, as added by this Act, not later than January 1, 2006.

SECTION 60.  The changes in law made by this Act by amending Sections 61.225 and 61.227, Education Code, and by adding Section 61.2251, Education Code, apply beginning with tuition equalization grants for the 2005-2006 academic year, but only for tuition equalization grants awarded on or after the effective date of this Act. A tuition equalization grant awarded before the effective date of this Act is governed by the law in effect immediately before the effective date, and the former law is continued in effect for that purpose.

SECTION 61.  This Act takes effect September 1, 2005.

### Floor Amendment No. 1

Amend **CSSB 1227** (House committee printing) as follows:

(1) In SECTION 3 of the bill, in amended Subdivision (3), Subsection (a), Section 52.32, Education Code (page 3, line 11), between "education" and the semicolon, insert "or alternative educator certification program".

(2) In SECTION 3 of the bill, strike amended Subdivision (4), Subsection (a), Section 52.32, Education Code (page 3, lines 12-13), and substitute the following:

(4) has submitted to the board at least two references, including the names of the persons giving those references and appropriate contact information for those persons [been recommended by reputable persons in his home community]; and

(3) Add the following appropriately numbered SECTIONS to the bill and renumber existing SECTIONS of the bill accordingly:

SECTION ____.  Section 52.33, Education Code, is amended to read as follows:

Sec. 52.33.  AMOUNT OF LOAN. The amount of the loan to any qualified applicant shall be limited to the difference between the financial resources available to the applicant [him], including but not limited to the applicant's [his] income from parents and other sources, scholarships, gifts, grants, other financial aid, and the amount the applicant [he] can reasonably be expected to earn, and the amount necessary to pay the applicant's [his] reasonable expenses as a student at the participating institution of higher education where the applicant [he] has been accepted for enrollment, under the rules and regulations adopted by the board. The total loan to any individual student may never be more than the amount the student

[he] can reasonably be expected to repay in the [a] maximum loan period provided by board rule [of 10 years after he is last enrolled in a participating institution], except as otherwise provided for in this chapter.

SECTION ____.  Section 52.35, Education Code, is amended to read as follows:

Sec. 52.35.  TERM OF LOANS. The term of all authorized loans must be for the shortest possible period consistent with general practice by issuers of student loans, as determined by the board. [However, no loan may be made to any student for a period longer than 10 years from the date he is last enrolled in a participating institution.]

## Floor Amendment No. 3

Amend **CSSB 1227** (House committee printing) by adding the following appropriately numbered SECTIONS to the bill and renumbering existing SECTIONS of the bill accordingly:

SECTION __. (a)   Section 51.801, Education Code, is amended to read as follows:

Sec. 51.801.  DEFINITIONS. In this subchapter, "general academic teaching institution," "governing board," "medical and dental unit," "public junior college," "public technical institute," and "university system" have the meanings assigned by Section 61.003.

(b)  Subchapter U, Chapter 51, Education Code, is amended by adding Section 51.8065 to read as follows:

Sec. 51.8065.  AUTOMATIC ADMISSION: UNDERGRADUATE TRANSFER STUDENTS HOLDING ASSOCIATE DEGREES OR CERTIFICATES. (a) In this section, "public upper-level institution of higher education" means an institution of higher education that offers only junior-level and senior-level courses or only junior-level, senior-level, and graduate-level courses.

(b)  Except as provided by Subsection (g), each general academic teaching institution shall admit an applicant for admission to the institution as an undergraduate transfer student if in the year preceding the academic year for which the applicant is applying for admission under this section the applicant:

(1)  received a degree or certificate from a public junior college or public technical institute in a program requiring at least 42 semester credit hours in the core curriculum, as defined by Section 61.821; and

(2)  completed the degree or certificate program with a cumulative grade point average of at least a 3.0 on a four-point scale or the equivalent.

(c)  To qualify for admission under this section, an applicant must submit an application before the expiration of any application filing deadline established by the institution.

(d)  After admitting an applicant under this section, the institution may review the applicant's record and any other factor the institution considers appropriate to determine whether the applicant may require additional preparation for college-level work or would benefit from inclusion in a retention program. The institution may require a student so identified to enroll during the summer immediately after the student is admitted under this section to participate in appropriate enrichment courses and orientation programs. This section does not prohibit a student who is not

determined to need additional preparation for college-level work from enrolling, if the student chooses, during the summer immediately after the student is admitted under this section.

(e) Admission to a specific general academic teaching institution is contingent on the availability of space within the institution for the admission of additional students.

(f) Admissions to a particular program or school within a general academic teaching institution are based solely on the requirements of the institution.

(g) This section does not apply to admission to:

(1) a public upper-level institution of higher education; or

(2) any other general academic teaching institution if, with respect to the academic year for which an undergraduate transfer student has applied for admission, the institution has filled through automatic admission as required by the other provisions of this subchapter at least 50 percent of the spaces available for entering undergraduate students at the institution.

(c) The Texas Higher Education Coordinating Board and the governing board of each general academic teaching institution shall adopt rules or policies relating to the admission of students under Section 51.8065, Education Code, as added by this section, not later than February 1, 2006.

(d) Section 51.8065, Education Code, as added by this section, applies beginning with admissions for the 2006 fall semester.

**Floor Amendment No. 5**

Amend **CSSB 1227** (House committee printing) as follows:

(1) In SECTION 26 of the bill, in Subsection (e)(2)(B), Section 56.305, Education Code (page 20, line 24), strike "2.5" and substitute "2.0 [2.5]".

(2) In SECTION 26 of the bill, in added Subsection (e-1)(2)(B), Section 56.305, Education Code (page 21, line 10), strike "2.5" and substitute "2.0".

(3) In SECTION 34 of the bill, in Subsection (d)(2)(B), Section 56.405, Education Code (page 30, line 15), strike "2.5" and substitute "2.0 [2.5]".

(4) In SECTION 43 of the bill, in added Subsection (c)(3), Section 61.2251, Education Code (page 38, line 24), strike "2.5" and substitute "2.0".

**Floor Amendment No. 6**

Amend **CSSB 1227** (House committee printing) as follows:

(1) In Section 43 of the bill, in added Subdivision (2), Subsection (b), Section 61.2251, Education Code (page 37, line 26), between "(2)" and "be enrolled", insert "if the person is enrolled in an undergraduate degree or certificate program,".

(2) In Section 43 of the bill, strike added Subdivisions (1) - (3), Subsection (c), Section 61.2251, Education Code (page 38, lines 15-26), and substitute the following:

(1) meets the requirements of Subsection (b); and

(2) if the person is enrolled in an undergraduate degree or certificate program:

(A) completed at least 24 semester credit hours in the person's most recent academic year; and

(B)   has earned an overall grade point average of at least 2.5 on a four-point scale or the equivalent on coursework previously attempted at public or private institutions of higher education.

**Floor Amendment No. 7**

Amend **CSSB 1227** by adding the following SECTIONS to the bill and renumbering subsequent SECTIONS of the bill appropriately:

SECTION ____. Section 51.351(1), Education Code, is amended to read as follows:

(1)   "General academic teaching institution," "governing board," "institution of higher education," "medical and dental unit," "public junior college," and "university system" have the meanings assigned by Section 61.003 [of this code].

SECTION ____. Subchapter G, Chapter 51, Education Code, is amended by adding Sections 51.355 and 51.356 to read as follows:

Sec. 51.355. NONVOTING STUDENT REGENT; UNIVERSITY SYSTEM BOARD OF REGENTS.   (a) In this section, "student government" means the representative student organization directly elected by the student body of a general academic teaching institution or medical and dental unit.

(b)   The chancellor of each university system shall develop a uniform application form to be used by each general academic teaching institution and medical and dental unit in the university system to solicit applicants for the position of student regent.

(c)   Except as provided by Subsection (f), not later than September 1 of each year, the student government of each general academic teaching institution and medical and dental unit in a university system shall solicit applicants for the position of student regent. Not later than November 1, from among the applications received by the student government, the student government shall select five applicants as the student government's recommendations for the position of student regent and send the applications of those applicants, with the name of each applicant and the name of the institution or unit in which the applicant is enrolled removed, to the chancellor of the university system. From among those applicants, the chancellor shall select two or more applicants as the university system's recommendations for the position of student regent and shall send the applications of those applicants to the governor not later than December 1. The governor may request to review all applications for the position of student regent received by the student governments and may request to review information required to be removed from an application by a student government under this subsection. On February 1, or as soon thereafter as practicable, the governor shall appoint one of the applicants to serve as the student regent for the system for a one-year term expiring on the next February 1. The governor is not required to appoint an applicant recommended by the chancellor.

(d)   A student regent must be enrolled as an undergraduate or graduate student in a general academic teaching institution or medical and dental unit in the university system at the time of appointment and throughout the student regent's term. For purposes of this subsection, a person is considered to be enrolled in an institution or unit for a summer term if the person was enrolled in the institution or unit for the preceding semester and:

(1)   is registered or preregistered at the institution or unit for the following fall semester;

(2) if the person has not completed the person's degree program, is eligible to continue the degree program at the institution or unit in the following fall semester; or

(3) if the person completed a degree program in the preceding semester, is admitted to another degree program at the institution or unit for the following fall semester.

(e) A student regent is not a member of the board of regents of the system for which the student regent is appointed. A student regent has the same powers and duties as the members of the board of regents of the system, including the right to attend and participate in meetings of the board of regents, except that the student regent:

(1) may not vote on any matter before the board or make or second any motion before the board; and

(2) is not counted in determining whether a quorum exists for a meeting of the board or in determining the outcome of any vote of the board.

(f) The student government of the general academic teaching institution or medical and dental unit at which a current student regent was enrolled at the time of the student regent's appointment may not solicit applicants for the position of student regent for the next regular term of the position.

(g) A vacancy in the position of student regent for a university system shall be filled for the unexpired term by appointment by the governor in consultation with the chancellor of the system.

Sec. 51.356. NONVOTING STUDENT REGENT; INSTITUTION BOARD OF REGENTS. (a) This section applies only to a general academic teaching institution that is not a part of a university system.

(b) In this section, "student government" means the representative student organization directly elected by the student body of a general academic teaching institution.

(c) The president of a general academic teaching institution shall develop a uniform application form to be used to solicit applicants for the position of student regent.

(d) Not later than September 1 of each year, the student government of the general academic teaching institution shall solicit applicants for the position of student regent. Not later than November 1, from among the applications received by the student government, the student government shall select five applicants as the student government's recommendations for the position of student regent and send the applications of those applicants, with the name of each applicant removed, to the president of the institution. From among those applicants, the president shall select two or more applicants as the institution's recommendations for the position of student regent and shall send the applications of those applicants to the governor not later than December 1. The governor may request to review all applications for the position of student regent received by the student government and may request to review information required to be removed from an application by the student government under this subsection. On February 1, or as soon thereafter as practicable,

the governor shall appoint one of the applicants to serve as the student regent for the institution for a one-year term expiring on the next February 1. The governor is not required to appoint an applicant recommended by the president.

(e) A student regent must be enrolled as an undergraduate or graduate student in the general academic teaching institution at the time of appointment and throughout the student regent's term. For purposes of this subsection, a person is considered to be enrolled in an institution for a summer term if the person was enrolled in the institution for the preceding semester and:

(1) is registered or preregistered at the institution for the following fall semester;

(2) if the person has not completed the person's degree program, is eligible to continue the degree program at the institution in the following fall semester; or

(3) if the person completed a degree program in the preceding semester, is admitted to another degree program at the institution for the following fall semester.

(f) A student regent is not a member of the board of regents of the institution for which the student regent is appointed. A student regent has the same powers and duties as the members of the board of regents of the institution, including the right to attend and participate in meetings of the board of regents, except that the student regent:

(1) may not vote on any matter before the board or make or second any motion before the board; and

(2) is not counted in determining whether a quorum exists for a meeting of the board or in determining the outcome of any vote of the board.

(g) A vacancy in the position of student regent for an institution shall be filled for the unexpired term by appointment by the governor in consultation with the president of the institution.

SECTION ____. The initial term of a student regent appointed for a state university system under Section 51.355, Education Code, as added by this Act, or for a state university under Section 51.356, Education Code, as added by this Act, expires February 1, 2007. The appropriate student governments, the chancellor of each state university system, the president of each state university that is not a part of a university system, and the governor shall take the actions required by Sections 51.355 and 51.356, Education Code, as added by this Act, as soon as practicable after this Act takes effect to select a student regent for each state university or state university system for that initial term.

**Floor Amendment No. 8**

Amend **CSSB 1227** by adding the following new SECTIONS, appropriately numbered, and renumbering subsequent SECTIONS of the bill accordingly:

SECTION ____. Subchapter M, Chapter 56, Education Code, is amended by adding Section 56.3012 to read as follows:

Sec. 56.3012. PILOT PROJECT TO PROVIDE INCENTIVES FOR ATTENDANCE AT UNDERUTILIZED PUBLIC INSTITUTIONS. (a) The coordinating board shall establish a TEXAS grant pilot project as provided by this section to encourage students to attend eligible public institutions of higher education that offer extensive baccalaureate degree program options and that have sufficient

facilities, administrative infrastructure, and faculty to serve additional students in order to reduce the need for this state to construct additional facilities or hire additional faculty at other institutions of higher education.

(b)  From money available under Section 56.310 for purposes of this subchapter and money available under Section 56.464 for purposes of Subchapter Q, the coordinating board shall set aside sufficient money to provide TEXAS grants for the 2005-2006 and 2006-2007 academic years to students who are initially eligible for a grant under Section 56.304 or 56.3041 in either of those years as follows:

(1)  for not more than 400 additional students in excess of the total of fall 2004 TEXAS Grant awards at Angelo State University; and

(2)  for not more than 200 additional students in excess of the total of fall 2004 TEXAS Grant awards at Sul Ross State University.

(c)  To the extent money set aside under Subsection (b) is available for the purpose, a person awarded a grant as provided by Subsection (b) who continues to be eligible for a grant under Section 56.305 may receive a grant from the money set aside.  If money set aside under Subsection (b) is not available to pay for a grant for a person awarded a grant as provided by Subsection (b) who continues to be eligible for a grant under Section 56.305, the person may receive a grant from the money available under Section 56.310 on the same basis as other TEXAS grant applicants.

(d)  The coordinating board shall reallocate for grants under this subchapter or for loans under Subchapter Q, as applicable, any money set aside for purposes of the TEXAS grant pilot project that is not used in the academic year for which the money is set aside.  Money reallocated under this subsection may be used at any eligible institution under this subchapter or Subchapter Q.

(e)  Except as otherwise specifically provided by this section, this subchapter applies to a TEXAS grant awarded under this section.

(f)  The coordinating board shall develop criteria for evaluating the TEXAS grant pilot project and, based on that evaluation, not later than January 1, 2007, shall report to the 80th Legislature the coordinating board's recommendations concerning whether to continue, expand to other underutilized eligible public institutions of higher education, or discontinue the TEXAS grant pilot project.

SECTION __.  The Texas Higher Education Coordinating Board shall adopt rules to administer Section 56.3012, Education Code, as added by this Act, as soon as practicable after the date this Act takes effect. For that purpose, the board may adopt the initial rules in the manner provided by law for adoption of emergency rules.

**Floor Amendment No. 10**

Amend **CSSB 1227** by adding the following appropriately numbered Sections to the bill and renumbering the remaining Sections of the bill appropriately:

SECTION __.  Section 54.203, Education Code, is amended by amending Subsections (a), (e), and (g) and adding Subsections (h) and (i) to read as follows:

(a)  The governing board of each institution of higher education shall exempt the following persons from the payment of all dues, fees, and charges, including fees for correspondence courses but excluding property deposit fees, student services fees, and any fees or charges for lodging, board, or clothing, provided the persons seeking the

exemptions were citizens of Texas at the time they entered the services indicated and have resided in Texas for at least the period of 12 months before the date of registration:

(1)  all nurses and honorably discharged members of the armed forces of the United States who served during the Spanish-American War or during World War I;

(2)  all nurses, members of the Women's Army Auxiliary Corps, members of the Women's Auxiliary Volunteer Emergency Service, and all honorably discharged members of the armed forces of the United States who served during World War II except those who were discharged from service because they were over the age of 38 or because of a personal request on the part of the person that the person [he] be discharged from service;

(3)  all honorably discharged men and women of the armed forces of the United States who served during the national emergency which began on June 27, 1950, and which is referred to as the Korean War; and

(4)  all persons who were honorably discharged from the armed forces of the United States after serving on active military duty, excluding training, for more than 180 days and who served a portion of their active duty during:

(A)  the Cold War which began on the date of the termination of the national emergency cited in Subdivision (3) and ended on December 26, 1991 [of this subsection];

(B)  the Vietnam era which began on December 21, 1961, and ended on May 7, 1975;

(C)  the Grenada and Lebanon era which began on August 24, 1982, and ended on July 31, 1984;

(D)  the Panama era which began on December 20, 1989, and ended on January 21, 1990;

(E)  the Persian Gulf War which began on August 2, 1990, and ends on the date thereafter prescribed by Presidential proclamation or September 1, 1997, whichever occurs first; or

(F)  any future national emergency declared in accordance with federal law.

(e)  An [The] exemption from fees provided for in Subsection (a) or (h) [of this section] does not apply to a person if at the time of the person's [his] registration the person [he] is eligible for educational benefits under federal legislation in effect at the time of [his] registration if the value of those benefits is equal to or exceeds the value of the exemption, except that the person must first utilize the federal benefit for which the person [he] is eligible and the combined amount of the federal benefit plus the amount of this waiver shall not exceed the maximum value of the waiver. A person is covered by the exemptions if the person's [his] right to benefits under federal legislation is extinguished at the time of [his] registration, except that a person is not eligible for an exemption from fees under this section if the person's right to benefits under federal legislation is extinguished because the person is in default of repayment of a loan made to the person under a federal program to provide or guarantee loans for educational purposes. A person is not eligible for the exemption if the person is in default on a loan made or guaranteed for educational purposes by the State of Texas.

(g)  The governing board of a junior college district may provide that the exemptions provided by Subsections (a), [and] (b), and (h) do not apply to a course fee or training fee charged a student by the junior college district to cover the flight time costs associated with a course in aircraft flight training, to the extent those costs are incurred by a student:

(1)  who does not have a private pilot rating; or

(2)  who has a private pilot rating but is not actively seeking to fulfill the requirements of the Federal Aviation Administration for an additional certification or rating.

(h)  The Texas Higher Education Coordinating Board by rule shall prescribe procedures to allow a person who becomes eligible for an exemption provided by Subsection (a) before September 1, 2015, to waive the person's right to any unused portion of the maximum number of cumulative credit hours for which the person could receive the exemption and assign the exemption for the unused portion of those credit hours to one of the person's children. The procedures shall provide:

(1)  the manner in which a person may waive the exemption and designate a child to receive the exemption;

(2)  a procedure permitting the person to designate a different child to receive the exemption if the child previously designated to receive the exemption has never received an exemption under this section; and

(3)  a method of documentation to enable institutions of higher education to determine the eligibility of the designated person to receive the exemption.

(i)  To be eligible to receive an exemption under Subsection (h), a person must:

(1)  be an undergraduate student who is classified as a resident under Subchapter B when the person enrolls in an institution of higher education;

(2)  make satisfactory academic progress toward a degree or certificate as determined by the institution at which the person is enrolled, except that the institution may not require the person to enroll in a minimum course load;

(3)  in each academic year in which the person receives an exemption for any of the credit hours assigned to the person under Subsection (h), perform a number of hours of community service equal to one-third of the total number of credit hours assigned to the person under Subsection (h) for each of the following:

(A)  a veterans organization; and

(B)  the institution in which the person is enrolled; and

(4)  be less than 28 years old, except that the coordinating board by rule shall prescribe procedures by which a person who suffered from a severe illness or other debilitating condition that affected the person's ability to use the exemption before reaching that age may be granted additional time to use the exemption corresponding to the time the person was unable to use the exemption because of the illness or condition.

SECTION __.  (a)  The change in law made by this Act to Section 54.203(a)(4), Education Code, applies only to a person who is honorably discharged from the armed forces of the United States on or after the effective date of this Act.

(b) Section 54.203, Education Code, as amended by this Act, applies beginning with tuition and other fees charged for the 2005 fall semester. Tuition and other fees charged for an academic period before the 2005 fall semester are covered by the law in effect immediately before the effective date of this Act, and the former law is continued in effect for that purpose.

(c) The Texas Higher Education Coordinating Board shall prescribe the procedures required by Sections 54.203(h) and (i), Education Code, as added by this Act, as soon as practicable after the effective date of this Act.  For that purpose, the coordinating board may adopt the initial rules prescribing those procedures in the manner provided by law for emergency rules.

## Amendment No. 11

Amend **CSSB 1227** by adding the following appropriately numbered section:

SECTION ___.  Notwithstanding other law, a provision of this Act that requires a tuition or fee exemption that did not exist on January 1, 2005, is effective only to the extent that funds are expressly appropriated for that purpose.

## Floor Amendment No. 13

Amend **CSSB 1227** by adding the following appropriately numbered SECTIONS to the bill and renumbering existing SECTIONS of the bill accordingly:

SECTION __.  Section 56.304(a), Education Code, is amended to read as follows:

(a)  To be eligible initially for a TEXAS grant, a person must:

(1)  be a resident of this state as determined by coordinating board rules;

(2)  meet either of the following academic requirements:

(A)  be a graduate of a public or [accredited] private high school, including a home school, in this state who graduated not earlier than the 1998-1999 school year and who completed the recommended or advanced high school curriculum established under Section 28.002 or 28.025 or its equivalent; or

(B)  have received an associate degree from an eligible institution not earlier than May 1, 2001;

(3)  meet financial need requirements as defined by the coordinating board;

(4)  be enrolled in an undergraduate degree or certificate program at an eligible institution;

(5)  be enrolled as:

(A)  an entering undergraduate student for at least three-fourths of a full course load for an entering undergraduate student, as determined by the coordinating board, not later than the 16th month after the date of the person's graduation from high school; or

(B)  an entering student for at least three-fourths of a full course load for an undergraduate student as determined by the coordinating board, not later than the 12th month after the month the person receives an associate degree from an eligible institution;

(6)  have applied for any available financial aid or assistance; and

(7)  comply with any additional nonacademic requirement adopted by the coordinating board under this subchapter.

SECTION __.  Section 56.455, Education Code, is amended to read as follows:

Sec. 56.455.  INITIAL ELIGIBILITY FOR LOAN. To be eligible initially for a Texas B-On-time loan, a person must:

(1)  be a resident of this state for purposes of Subchapter B, Chapter 54;

(2)  meet one of the following academic requirements:

(A)  be a graduate of a public or [accredited] private high school, including a home school, in this state who graduated not earlier than the 2002-2003 school year under the recommended or advanced high school program established under Section 28.025(a); or

(B)  have received an associate degree from an eligible institution not earlier than May 1, 2005;

(3)  be enrolled for a full course load for an undergraduate student, as determined by the coordinating board, in an undergraduate degree or certificate program at an eligible institution;

(4)  be eligible for federal financial aid, except that a person is not required to meet any financial need requirement applicable to a particular federal financial aid program; and

(5)  comply with any additional nonacademic requirement adopted by the coordinating board under this subchapter.

SECTION __.  The change in law made by this Act in amending Sections 56.304(a) and 56.455, Education Code, applies beginning with student financial aid awarded for the 2006-2007 academic year.  The change in law does not affect student financial aid awarded for an academic period before that academic year, and the former law is continued in effect for that purpose.

**Floor Amendment No. 1 on Third Reading**

Amend **CSSB 1227** (House committee printing) on third reading by adding the following numbered section to the bill and renumber the remaining sections appropriately:

(1)  "SECTION __.  Section 56.203, Education Code, as amended by Chapter 365, Acts of the 78th Legislature, Regular Session, 2003 is repealed."

**Floor Amendment No. 2 on Third Reading**

Amend **CSSB 1227** on third reading by adding the following appropriately numbered SECTION to the bill and by renumbering existing SECTIONS of the bill accordingly:

SECTION __.  Subchapter G, Chapter 504, Transportation Code, is amended by adding Section 504.657 to read as follows:

Sec. 504.657.  HIGHER EDUCATION COORDINATING BOARD LICENSE PLATES.  (a)  The department shall issue specialty license plates for the Texas Higher Education Coordinating Board.  The department shall design the license plates in consultation with the coordinating board.

(b)  After deduction of the department's administrative costs, the remainder of the fee shall be deposited to the credit of the "College For Texans" campaign account in the general revenue fund for use only by the Texas Higher Education Coordinating Board for purposes of the campaign.

**Floor Amendment No. 5 on Third Reading**

Amend **CSSB 1227** on third reading by adding a new Sections __, __, and __ to read as follows and renumbering the subsequent sections accordingly:

SECTION __.  Section 56.310, Education Code, is amended by amending Subsection (a) and adding Subsection (c) to read as follows:

(a)  The coordinating board may solicit and accept gifts, [and] grants, and donations from any public or private source for the purposes of this subchapter.

(c)  In performing its duties under Subsection (a), the coordinating board may develop and implement an appropriate process for the naming and sponsoring of the program created under this subchapter, an individual grant awarded under this subchapter, or any item received by the coordinating board under Subsection (a).

SECTION __.  Subsection (a), Section 56.302, Education Code, is amended to read as follows:

(a)  Except as provided under Section 56.310(c), the [The] student financial assistance program authorized by this subchapter is known as the Toward EXcellence, Access, & Success (TEXAS) grant program, and an individual grant awarded under this subchapter is known as a TEXAS grant.

SECTION __.  The Texas Higher Education Coordinating Board shall:

(1)  study alternative methods of funding the Toward EXcellence, Access, & Success (TEXAS) grant program created under Subchapter M, Chapter 56, Education Code; and

(2)  not later than September 1, 2006, report to the Legislative Oversight Committee on the TEXAS grant program and Teach for Texas grant program concerning the results of the study.

**Floor Amendment No. 6 on Third Reading**

Amend **CSSB 1227** on third reading by adding the following appropriately numbered SECTIONS to the bill and by renumbering existing SECTIONS of the bill accordingly:

SECTION __.  Section 51.009(c), Education Code, is amended to read as follows:

(c)  Each of the following shall be accounted for as educational and general funds:

(1)  net tuition, special course fees charged under Sections 54.051(e) and (l), [Education Code,] lab fees, student teaching fees, [hospital and clinic fees,] organized activity fees, proceeds from the sale of educational and general equipment, and indirect cost recovery fees; and

(2)  hospital and clinic fees received by a state-owned clinical care facility that is operated using general revenue fund appropriations for patient care.

SECTION __.  Section 51.009, Education Code, as amended by this Act, applies to fees collected on or after the effective date of this Act. A fee collected before that date is governed by the law in effect when the fee is collected, and that law is continued in effect for that purpose.

**Floor Amendment No. 7 on Third Reading**

Amend **CSSB 1227** on third reading as follows:

(1) Add the following appropriately numbered SECTIONS to the bill:

SECTION __.  Section 56.301, Education Code, is amended to read as follows:

Sec. 56.301. DEFINITIONS. In this subchapter:

(1) "Coordinating board" means the Texas Higher Education Coordinating Board.

(2) "Eligible institution" means[:

[(A)] an institution of higher education that offers one or more undergradutate degree or certification programs[; or

[(B) a private or independent institution of higher education].

(3) "Public junior college" ["Private or independent institution of higher education," "public junior college,"] and "public technical institute" have the meanings assigned by Section 61.003.

SECTION ___. Subsection (b), Section 56.302, Education Code, is amended to read as follows:

(b) The purpose of this subchapter is to provide a grant of money to enable eligible students to attend public [and private] institutions of higher education in this state.

SECTION __. Subchapter M, Chapter 56, Education Code, is amended by adding Section 56.3021 to read as follows:

Sec. 56.3021. STUDENTS ENROLLED IN PRIVATE OR INDEPENDENT INSTITUTIONS: LIMITED ELIGIBILITY FOR GRANT. (a) Notwithstanding any other provision of this subchapter, a student who was initially awarded a TEXAS grant under this subchapter to pay the costs of enrollment in a private or independent institution of higher education for the 2005 fall semester or an earlier academic period may continue to receive grants under this subchapter while enrolled in a private or independent institution of higher education if the student is otherwise eligible to receive a grant under this subchapter.

(b) For purposes of determining the eligibility of a student to continue to receive a grant under this section, a reference in this subchapter to an eligible institution includes a private or independent institution of higher education.

(c) The amount of a TEXAS grant under this section for a student enrolled full-time at a private or independent institution of higher education is the amount determined by the coordinating board as the average statewide amount of tuition and required fees that a resident student enrolled full-time in a baccalaureate degree program would be charged for that semester or term at general academic teaching institutions.

(d) Notwithstanding Subsection (c) or other law, the total amount of financial aid that a student enrolled in a private or independent institution of higher education is eligible to receive in a state fiscal year from TEXAS grants awarded under this section may not exceed the maximum amount the student may receive in tuition equalization grants in that fiscal year as determined under Subchapter F, Chapter 61.

(e) Notwithstanding Subsection (c) or other law, a student enrolled in a private or independent institution of higher education may not receive a TEXAS grant under this section and a tuition equalization grant under Subchapter F, Chapter 61, for the same semester or other term, regardless of whether the student is otherwise eligible for both grants during that semester or term. A student who but for this subsection would be awarded both a TEXAS grant and a tuition equalization grant for the same semester or other term is entitled to receive only the grant of the greater amount.

(f) This section expires September 1, 2015.

(2) In the SECTION of the bill that amends Section 56.304, Education Code, strike amended Subsection (a), Section 56.304, Education Code, and substitute the following:

(a) To be eligible initially for a TEXAS grant, a person must:

(1) be a resident of this state as determined by coordinating board rules;

(2) meet either of the following academic requirements:

(A) be a graduate of a public or [accredited] private high school, including a home school, in this state who graduated not earlier than the 1998-1999 school year and who completed the recommended or advanced high school curriculum established under Section 28.002 or 28.025 or its equivalent; or

(B) have received an associate degree from a public or private [an eligible] institution of higher education not earlier than May 1, 2001;

(3) meet financial need requirements as defined by the coordinating board;

(4) be enrolled in an undergraduate degree or certificate program at an eligible institution;

(5) be enrolled as:

(A) an entering undergraduate student for at least three-fourths of a full course load for an entering undergraduate student, as determined by the coordinating board, not later than the 16th month after the date of the person's graduation from high school; or

(B) an entering student for at least three-fourths of a full course load for an undergraduate student as determined by the coordinating board, not later than the 12th month after the month the person receives an associate degree from a public or private [an eligible] institution of higher education;

(6) have applied for any available financial aid or assistance; and

(7) comply with any additional nonacademic requirement adopted by the coordinating board under this subchapter.

(3) In the SECTION of the bill that amends Section 56.305, Education Code, in Paragraph (B), Subdivision (2), of amended Subsection (e), Section 56.305, Education Code, between "attempted at" and "institutions", insert "public or private".

(4) In the SECTION of the bill that amends Section 56.305, Education Code, in proposed Paragraph (B), Subdivision (2), Subsection (e-1), Section 56.305, Education Code, between "attempted at" and "institutions", insert "public or private".

(5) In the recital to the SECTION of the bill that amends Section 56.307, Education Code, strike "Subsections (b)" and substitute "Subsections (a)".

(6) In SECTION of the bill that amends Section 56.307, Education Code, strike amended Subsection (b), Section 56.307, Education Code, and substitute the following:

(a) The amount of a TEXAS grant for a semester or term for a person enrolled full-time at an eligible institution other than an institution covered by Subsection [(b),] (c)[,] or (d) is the amount determined by the coordinating board as the average statewide amount of tuition and required fees that a resident student enrolled full-time in a baccalaureate degree program would be charged for that semester or term at general academic teaching institutions.

(7) Strike the SECTION of the bill that adds Section 56.3071, Education Code.

(8) In the SECTION of the bill that adds Section 61.2251, Education Code, following proposed Subsection (e), Section 61.2251, Education Code, insert the following:

(f)  If a person fails to meet any of the requirements of Subsection (c) after the completion of any semester or term, the person may not receive a tuition equalization grant during the next semester or term in which the person enrolls. A person may become eligible to receive a tuition equalization grant in a subsequent semester or term if the person:

(1)  completes a semester or term during which the student is not eligible for a tuition equalization grant; and

(2)  meets all the requirements of Subsection (c).

(9) In the SECTION of the bill that adds Subsection (d), Section 61.227, Education Code, strike proposed Subsection (d), Section 61.227, Education Code, and substitute the following:

(d)  Notwithstanding any restrictions provided by Subsection (c) on the amount of a grant, a tuition equalization grant for an academic period for a student who establishes exceptional financial need in accordance with the procedures and rules of the coordinating board may be certified by the coordinating board in an amount not to exceed 150 percent of the amount of the grant that the student would otherwise have been awarded for that period under the other provisions of this section.

(10) Add the following appropriately numbered SECTION to the bill:

SECTION __. Subsection (b), Section 56.307, Education Code, is repealed.

(11) Renumber other SECTIONS of the bill accordingly.

### Floor Amendment No. 8 on Third Reading

Amend **CSSB 1227** on third reading as follows:

(1)  In the SECTION of the bill adding Section 56.3071, Education Code, strike added Subsection (b), Section 56.3071, and substitute the following:

(b)  Notwithstanding any other law, a student enrolled in a private or independent institution of higher education may not receive a TEXAS grant under this subchapter and a tuition equalization grant under Subchapter F, Chapter 61, for the same semester or other term, regardless of whether the student is otherwise eligible for both grants during that semester or term.  A student who but for this subsection would be awarded both a TEXAS grant and a tuition equalization grant for the same semester or other term is entitled to receive only the grant of the greater amount. This subsection does not apply to a grant recipient who is enrolled in an eligible institution at which 40 percent or more of the total number of the institution's students are members of ethnic or racial groups that are underrepresented among undergraduate students at public or private institutions of higher education in this state.

(1)  In the SECTION of the bill adding Section 61.227, Education Code, strike added Subsection (d), Section 61.227, and substitute the following:

(d)  Notwithstanding any other law, a student enrolled in a private or independent institution of higher education may not receive a tuition equalization grant under this subchapter and a TEXAS grant under Subchapter M, Chapter 56, for the same semester or other term, regardless of whether the student is otherwise eligible for both grants during that semester or term. A student who but for this subsection would be awarded both a tuition equalization grant and a TEXAS grant for the same semester or

other term is entitled to receive only the grant of the greater amount. This subsection does not apply to a grant recipient who is enrolled in an approved institution at which 40 percent or more of the total number of the institution's students are members of ethnic or racial groups that are underrepresented among undergraduate students at public or private institutions of higher education in this state.

The amendments were read.

Senator Shapiro moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 1227** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Shapiro, Chair; Janek, Duncan, Ogden, and Zaffirini.

### CONFERENCE COMMITTEE ON HOUSE BILL 2048

Senator Ellis called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2048** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer, Senator Armbrister in Chair, asked if there were any motions to instruct the conference committee on **HB 2048** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Ellis, Chair; Nelson, Eltife, Williams, and Barrientos.

### SENATE BILL 573 WITH HOUSE AMENDMENT

Senator Brimer called **SB 573** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 573** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS as appropriate:

SECTION __. Section 222.053, Transportation Code, is amended by adding Subsections (f), (g), and (h) to read as follows:

(f) The commission shall certify a county as an economically disadvantaged county on an annual basis as soon as possible after the comptroller reports on the economic indicators listed under Subsection (a). A county certified under this section is eligible for an adjustment under Subsection (c)(2).

(g)　The commission shall determine whether to make an adjustment under Subsection (c)(2) at the time a political subdivision that consists of all or a portion of an economically disadvantaged county submits a proposal to construct, maintain, or extend a highway or for another type of highway project.

(h)　The commission may delegate any of its duties or powers under this section to the director or the director's designee.

The amendment was read.

Senator Brimer moved to concur in the House amendment to **SB 573**.

The motion prevailed by the following vote:　Yeas 29, Nays 0.

Absent-excused:　Carona, West.

### SENATE BILL 1255 WITH HOUSE AMENDMENTS

Senator Brimer called **SB 1255** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 1255** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to the number of certain alcoholic beverage permits and licenses that may be issued for a single location.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.　Chapter 12, Alcoholic Beverage Code, is amended by adding Section 12.06 to read as follows:

Sec. 12.06.　USE OF FACILITIES. (a) An entity or successor to an entity that on May 1, 2005, held a brewer's or nonresident brewer's permit or whose brand was legally sold in this state may contract with the holder of a brewer's permit for the use of the permit holder's brewing facilities or to provide brewing services.

(b)　An entity or successor to an entity that on May 1, 2005, held a brewer's or nonresident brewer's permit or whose brand was legally sold in this state is not required to own its brewing facilities.

(c)　More than one brewer's permit may be issued for a single premises if the permit holder for the premises has contracted with an entity or successor to an entity that on May 1, 2005, held a brewer's or nonresident brewer's permit or whose brand was legally sold in this state for the use of the permit holder's brewing facilities or to provide brewing services.

(d)　This section does not authorize a person acting as an agent for a brewery located outside of this state to contract with the holder of a brewer's permit to brew ale or malt liquor on the person's behalf. A contract described by this subsection may only be entered into by the holder of a brewer's permit and another person holding a permit under this code.

SECTION 2.　Chapter 13, Alcoholic Beverage Code, is amended by adding Section 13.04 to read as follows:

Sec. 13.04.  USE OF FACILITIES.  (a) An entity or successor to an entity that on May 1, 2005, held a brewer's or nonresident brewer's permit or whose brand was legally sold in this state may contract with the holder of a nonresident brewer's permit for the use of the permit holder's brewing facilities or to provide brewing services.

(b)  An entity or successor to an entity that on May 1, 2005, held a brewer's or nonresident brewer's permit or whose brand was legally sold in this state is not required to own its brewing facilities.

(c)  More than one nonresident brewer's permit may be issued for a single premises if the permit holder for the premises has contracted with an entity or successor to an entity that on May 1, 2005, held a brewer's or nonresident brewer's permit or whose brand was legally sold in this state for the use of the permit holder's brewing facilities or to provide brewing services.

(d)  This section does not authorize a person acting as an agent for a brewery located outside of this state to contract with the holder of a nonresident brewer's permit to brew ale or malt liquor on the person's behalf. A contract described by this subsection may only be entered into by the holder of a nonresident brewer's permit and another person holding a permit under this code.

SECTION 3.  Section 61.41, Alcoholic Beverage Code, is amended to read as follows:

Sec. 61.41.  SECOND LICENSE AT SAME LOCATION; EFFECT ON EXISTING LICENSE. (a)  Except as provided by Subsection (d), no [No] license may be issued for a premises, location, or place of business for which a license is in effect unless the holder of the existing license has shown to the satisfaction of the commission that the license holder [he] will no longer exercise any privilege granted by the existing license at that location.

(b)  If the holder of the existing license desires to transfer the license to another location, the license holder [he] may apply for a transfer of location in accordance with this code.

(c)  If the holder of the existing license has made a declaration required by the commission that the license holder [he] will no longer use the license, the license holder [he] may not manufacture or sell beer or possess it for the purpose of sale until the license has been reinstated. The holder may apply to the county judge for the reinstatement of the [his] license in the same manner and according to the same procedure as in the case of an original license application. The county judge or the commission or administrator may deny reinstatement of the license for any cause for which an original license application may be denied.

(d)  Notwithstanding Subsection (a) and Sections 11.49 and 109.53, more than one manufacturer's or nonresident manufacturer's license may be issued for a single premises if the license holder for the premises has contracted with an entity or successor to an entity that on May 1, 2005, held a manufacturer's or nonresident manufacturer's license or whose brand was legally sold in this state for the use of the license holder's premises for manufacturing purposes or to provide manufacturing services.

SECTION 4.  Section 62.03(a), Alcoholic Beverage Code, is amended to read as follows:

(a) Except as provided by Section 62.14, each [Each] applicant for a manufacturer's license shall file with an [his] application a sworn statement that the applicant [he] will be engaged in the business of brewing and packaging beer in this state [Texas] in quantities sufficient to make the applicant's [of his] operation [that of] a bona fide brewing manufacturer within three years of the issuance of the [his] original license. If the applicant is a corporation, the statement must be signed by one of its principal officers. The county judge may [shall] not approve an application unless it is accompanied by the required sworn statement.

SECTION 5. Chapter 62, Alcoholic Beverage Code, is amended by adding Section 62.14 to read as follows:

Sec. 62.14. USE OF FACILITIES. (a)  An entity or successor to an entity that on May 1, 2005, held a manufacturer's or nonresident manufacturer's license or whose brand was legally sold in this state may contract with the holder of a manufacturer's license for the use of the license holder's manufacturing facilities or to provide manufacturing services.

(b) An entity or successor to an entity that on May 1, 2005, held a manufacturer's or nonresident manufacturer's license or whose brand was legally sold in this state is not required to own its manufacturing facilities.

(c) This section does not authorize a person acting as an agent for a manufacturer located outside of this state to contract with the holder of a manufacturer's license to manufacture beer on the person's behalf. A contract described by this subsection may only be entered into by the holder of a manufacturer's license and another person holding a license under this code.

SECTION 6. Chapter 63, Alcoholic Beverage Code, is amended by adding Section 63.05 to read as follows:

Sec. 63.05. USE OF FACILITIES. (a)  An entity or successor to an entity that on May 1, 2005, held a manufacturer's or nonresident manufacturer's license or whose brand was legally sold in this state may contract with the holder of a nonresident manufacturer's license for the use of the license holder's manufacturing facilities or to provide manufacturing services.

(b) An entity or successor to an entity that on May 1, 2005, held a manufacturer's or nonresident manufacturer's license or whose brand was legally sold in this state is not required to own its manufacturing facilities.

(c) This section does not authorize a person acting as an agent for a manufacturer located outside of this state to contract with the holder of a nonresident manufacturer's license to manufacture beer on the person's behalf. A contract described by this subsection may only be entered into by the holder of a nonresident manufacturer's license and another person holding a license under this code.

SECTION 7.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

## Amendment No. 1

Amend **CSSB 1255** by adding the following:

Section 1.04, Alcoholic Beverage Code, is amended by amending Subdivision (18) to read as follows:

(18) "Original package," as applied to beer, means a container holding [one barrel, one half barrel, one quarter barrel, or one eighth barrel of] beer in bulk, or any box, crate, carton, or other device used in packing beer that is contained in bottles or other containers.

Section 101.44, Alcoholic Beverage Code is repealed.

**Amendment No. 2**

Amend **CSSB 1255** by adding the following:

Section 103.07, Alcoholic Beverage Code, is amended to read as follows:

Sec. 103.07. BEVERAGE OF ILLICIT MANUFACTURE OR UNFIT FOR CONSUMPTION. (a) The commission may not sell [but may destroy] alcoholic beverages seized by a peace officer, as provided in Section 103.03, that are unfit for public consumption or are of illicit manufacture.

(b) Alcoholic beverages are unfit for public consumption if:

(1) the manufacturer or wholesaler of the beverages determines that the beverages are inappropriate for sale to a consumer;

(2) the beverages are damaged; or

(3) the code date affixed by the manufacturer to the beverages has expired.

(c) If the commission determines that seized alcoholic beverages are unfit for public consumption or are of illicit manufacture, the commission shall destroy the alcoholic beverages.

SECTION 26. Section 103.22, Alcoholic Beverage Code, is amended to read as follows:

Sec. 103.22. COSTS OF FORFEITURE SUITS. The commission is entitled to recover from the proceeds of a forfeiture sale [shall pay] all costs of a forfeiture suit brought under this chapter, including:

(1) all usual court costs, including the cost of serving process;

(2) expenses of the forfeiture sale; and

(3) reasonable attorney's fees [suits out of the confiscated liquor fund or any other fund available to the commission for that purpose].

The amendments were read.

Senator Brimer moved to concur in the House amendments to **SB 1255**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 995 WITH HOUSE AMENDMENT

Senator Averitt called **SB 995** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 995** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to donees of anatomical gifts.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 692.005, Health and Safety Code, is amended to read as follows:

Sec. 692.005. PERSONS WHO MAY BECOME DONEES. (a) The following persons may be donees of gifts of bodies or parts of bodies:

(1) a qualified organ procurement organization, for distribution to another person who may be a donee under this section, to be used for transplantation;

(2) a hospital or physician, to be used only for therapy or transplantation;

(3) a bank or storage facility, to be used only for therapy or transplantation;

(4) a person specified by a physician, to be used only for therapy or transplantation needed by the person;

(5) an eye bank the medical activities of which are directed by a physician;

(6) a forensic science program at:

(A) a general academic teaching institution, as defined by Section 61.003(3), Education Code; or

(B) a private or independent institution of higher education, as defined by Section 61.003(15), Education Code; or

(7) [(6)] the Anatomical Board of the State of Texas.

(b) Except for donations to a forensic science program under Subsection (a)(6), the [The] Anatomical Board of the State of Texas shall be the donee of gifts of bodies or parts of bodies made for education or research, which are subject to distribution by that board under Chapter 691.

(c) A forensic science program that receives a donation under Subsection (a)(6) must submit a report to the Anatomical Board of the State of Texas on a quarterly basis that lists:

(1) the number of bodies or parts of bodies the forensic science program received; and

(2) the method in which the forensic science program used the bodies or parts of bodies for education or research.

SECTION 2. This Act takes effect September 1, 2005.

The amendment was read.

Senator Averitt moved to concur in the House amendment to **SB 995**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 1821 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Fraser, called **SB 1821** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Floor Amendment No. 1

Amend **SB 1821** (House committee report) in SECTION 1 of the bill, by striking added Section 3818.007, Special District Local Laws Code (page 4, lines 6 through 20) and inserting the following:

Sec. 3818.007.  CONTRACT WITH DISTRICT.  The district and a municipality in whose extraterritorial jurisdiction the district is located may enter into development agreements under Subchapter G, Chapter 212, Local Government Code, concerning development of the property within the district and annexation of all or a portion of the district by the municipality.

The amendment was read.

Senator Jackson, on behalf of Senator Fraser, moved to concur in the House amendment to **SB 1821**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 747 WITH HOUSE AMENDMENT

Senator Nelson, on behalf of Senator Carona, called **SB 747** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 747** (House committee report) in SECTION 1 of the bill, in proposed Section 32.0248(a)(4), Human Resources Code (page 4, line 1), between "methods" and ", except" by inserting "emphasizing the health benefits of abstinence from sexual activity to recipients who are not married".

The amendment was read.

Senator Nelson, on behalf of Senator Carona, moved to concur in the House amendment to **SB 747**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1283 WITH HOUSE AMENDMENTS

Senator Nelson, on behalf of Senator Armbrister, called **SB 1283** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 1283** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the application of certain laws to certain commercially domiciled insurers and insurers that are part of an insurance company holding system.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 823.015, Insurance Code, is amended to read as follows:

Sec. 823.015.  EXEMPTION FROM CHAPTER AND CERTAIN OTHER LAW.  (a)  [This chapter does not apply to an insurance holding company system if each affiliate in the system is privately owned by not more than five security holders,

~~each of whom is an individual. For purposes of this subsection, a person is a security~~
~~holder of another if the person owns any security of the other person, including~~
~~common stock, preferred stock, a debt obligation, and any other security convertible~~
~~into or evidencing the right to acquire stock or a debt obligation.~~

[(b)] The commissioner may exempt from the application of this chapter a commercially domiciled insurer that the commissioner determines has assets physically located in this state or an asset-to-liability ratio sufficient to justify the conclusion that there is no reasonable danger that the operations or conduct of the business of the insurer could present a danger of loss to the policyholders of this state.

(b)  The commissioner may exempt from the application of Articles 5.01-1 and 5.03-1 an insurer that is part of an insurance company holding system or a commercially domiciled insurer described by Section 823.004 if the commissioner finds that:

(1)  the insurer has demonstrated that the exemption:

(A)  is consistent with sound actuarial and underwriting practices used by the insurer in this state; and

(B)  would encourage and improve competition in the line or lines of business to which the exemption applies; and

(2)  the exemption will not adversely affect the operations or conduct of the insurer's business in this state in a manner that presents a danger of loss the insurer's policyholders in this state.

SECTION 2.  An insurance holding system that becomes subject to Chapter 823, Insurance Code, as a result of the repeal of Section 823.015(a), Insurance Code, by Section 1 of this Act is not required to comply with Chapter 823, Insurance Code, until January 1, 2006.

SECTION 3.  This Act takes effect September 1, 2005.

**Floor Amendment No. 1**

Amend **CSSB 1283** by striking Sec. 823.015 Subsection (b), on page 1 line 24 through page 2, lines 1 through 12.

The amendments were read.

Senator Nelson, on behalf of Senator Armbrister, moved to concur in the House amendments to **SB 1283**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 522 WITH HOUSE AMENDMENT

Senator Nelson, on behalf of Senator Armbrister, called **SB 522** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 522** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to the Texas Emergency Services Retirement System; providing an administrative penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Title 8, Government Code, is amended by adding Subtitle H to read as follows:

SUBTITLE H.  TEXAS EMERGENCY SERVICES RETIREMENT SYSTEM
CHAPTER 861.  GENERAL PROVISIONS

Sec. 861.001.  DEFINITIONS. In this subtitle:

(1) "Actuarially sound pension system" means a system in which the amount of contributions is sufficient to cover the normal cost and amortize the unfunded accrued actuarial liability in a period that does not exceed 30 years.

(2) "Auxiliary employee" means a person who receives compensation at a rate that does not exceed the federal minimum wage by more than $2 an hour, as established under the Fair Labor Standards Act of 1938 (29 U.S.C. Section 201 et seq.), for performing emergency services and is certified by a political subdivision of this state as being regularly engaged in the performance of duties for a participating department in an appointive office or position that normally requires services from the person for fewer than 1,000 hours a year, but excludes a person who is eligible to receive credit for the same service in either the Texas County and District Retirement System or the Texas Municipal Retirement System.

(3) "Commissioner" means the firefighters' pension commissioner appointed under Section 21, Texas Local Fire Fighters Retirement Act (Article 6243e, Vernon's Texas Civil Statutes).

(4) "Dependent" means an unmarried child, natural or adopted, who:

(A) is less than 18 years of age;

(B) is less than 19 years of age and a full-time student at an elementary or secondary school; or

(C) became disabled before the child's 22nd birthday and remains disabled.

(5) "Emergency services" means only those services relating to fire, rescue, and emergency medical services, including support services for those duties, performed by a volunteer or auxiliary employee of a participating department.

(6) "Fund" means the Texas emergency services retirement fund.

(7) "Local board" means a local board of trustees established under Section 865.012.

(8) "Member" means a volunteer or auxiliary employee who participates in the pension system.

(9) "Pension system" means the Texas Emergency Services Retirement System.

(10) "Qualified service" means service:

(A) for a participating department that is recognized as an emergency services department by its governing body and that conducts at least 48 hours of training in a calendar year; and

(B)  that is performed by a member in good standing in the department who attends at least 20 hours of annual training and at least 25 percent of the department's emergencies in a calendar year or who does not attend because the member is absent because of military duty.

(11)  "State board" means the state board of trustees established under Section 865.001.

(12)  "Volunteer" means a person who performs emergency services for civic, charitable, or humanitarian reasons, receives no monetary compensation from a participating department, and is not subject to the compensation requirements provided for employees by the Fair Labor Standards Act of 1938 (29 U.S.C. Section 201 et seq.).

Sec. 861.002.  PENSION SYSTEM. The pension system is a public entity. The Texas Emergency Services Retirement System is the name by which all its business shall be transacted, all its funds invested, and all its cash, securities, and other property held.

Sec. 861.003.  POWERS AND PRIVILEGES. The pension system has the powers, privileges, and immunities of a corporation as well as the powers, privileges, and immunities conferred by this subtitle.

Sec. 861.004.  EXEMPTION FROM EXECUTION. All benefit payments, contributions, money in the pension system fund, and rights accrued or accruing under this subtitle to any person are exempt from garnishment, attachment, state and local taxation, levies, and any other process and are unassignable.

Sec. 861.005.  NO DIVERSION OF ASSETS. The fund must be maintained for the exclusive benefit of members, retirees, and their beneficiaries. At no time before the termination of the fund and the satisfaction of all liabilities with respect to members, retirees, and their beneficiaries may any part of the principal of or interest from fund assets be used for or diverted to a purpose other than the exclusive benefit of the members, retirees, and their beneficiaries.

Sec. 861.006.  PLAN QUALIFICATION AND DISTRIBUTIONS. (a) The legislature intends that this subtitle be construed and administered in a manner so that the pension system's benefit plan will be considered a qualified plan under Section 401(a) of the Internal Revenue Code of 1986 (26 U.S.C. Section 401). The state board may adopt rules that modify the plan as necessary to meet those qualification requirements.

(b)  Notwithstanding any other provision of this subtitle, all distributions under this subtitle must be made in accordance with applicable provisions of the Internal Revenue Code of 1986 and regulations adopted under that code.

(c)  The state board by rule may authorize an eligible rollover distribution to be made in the form of a direct trustee-to-trustee transfer.

Sec. 861.007.  FORFEITURE NOT TO INCREASE BENEFITS. A forfeiture that occurs under this subtitle may not be used to increase the benefits that any member would otherwise receive under this subtitle.

CHAPTER 862. MEMBERSHIP

Sec. 862.001.  PARTICIPATION BY DEPARTMENT. (a) The governing body of a department that performs emergency services may, in the manner provided for taking official action by the body, elect to participate in the pension system. A

governing body shall notify the commissioner as soon as practicable of an election made under this subsection. Except as provided by Subsection (b), an election to participate under this subsection is irrevocable.

(b) The governing body of a department that makes an election under Subsection (a) may terminate participation in the pension system not later than the fifth anniversary of the date of the election to participate, except that a department that begins participation after September 1, 2005, may not terminate that participation.

Sec. 862.002. MEMBERSHIP BY INDIVIDUAL. (a) Except as otherwise provided by this section, each person who performs service as a volunteer or auxiliary employee of a participating department is a member of the pension system.

(b) A person is not a member of the pension system if the person:

(1) is less than 18 years of age;

(2) is in a probationary period of service before becoming a regular member of a participating department for which the department is not making contributions for the service;

(3) does not receive a certification of physical fitness or assignment to support duties under Section 862.003; or

(4) is retired under this subtitle, regardless of whether the person continues to participate in emergency service-related functions for a department from which the person retired.

Sec. 862.003. CERTIFICATION OF PHYSICAL FITNESS. (a) A prospective member shall present to the local board a certification of physical fitness by a qualified physician. The person becomes a member of the pension system if the local board accepts the certification or if the local board assigns the person to support duties.

(b) A local board shall assign a person to support duties if the person does not present an acceptable certification and the person is at least 18 years of age, is not retired from the pension system, and is not serving a probationary period before becoming a regular member of a participating department.

Sec. 862.004. DEPARTMENTAL ELECTIONS AND MERGERS. The state board may adopt rules for governing body elections under Section 862.001 or for the merger of existing pension plans into the pension system.

CHAPTER 863. CREDITABLE SERVICE

Sec. 863.001. CREDIT FOR CURRENT SERVICE. A member is entitled to receive credit in the pension system for each month of qualified service for which the system receives the contributions required by this subtitle.

Sec. 863.002. CREDIT FOR MILITARY SERVICE. The pension system shall grant credit for qualified service for military duty in accordance with Section 414(u) of the Internal Revenue Code of 1986 (26 U.S.C. Section 414(u)) and other applicable federal law.

Sec. 863.003. TRANSFER OF SERVICE CREDIT. A member who terminates service, except by retirement, and later resumes service with the same participating department or begins service with another participating department may transfer all previously accrued service credit to the new department.

Sec. 863.004.  PRIOR SERVICE OF MEMBER BEFORE DEPARTMENTAL PARTICIPATION. The state board by rule may authorize the granting of credit for service with a participating department that was performed before the date the department began participation in the pension system.  The costs of granting prior service credit under this section must be determined on a basis that maintains the pension system as actuarially sound.

CHAPTER 864.  BENEFITS

Sec. 864.001.  ELIGIBILITY  FOR  SERVICE  RETIREMENT  ANNUITY.  (a) The state board by rule shall determine the period of qualified service and, if appropriate, the age required for a member to receive a service retirement annuity with full benefits after the member terminates service with a participating department.  The state board by rule may provide for partial vesting of benefits after a particular period.

(b)  The state board may change the benefit formula for any person who is not an annuitant of the pension system.

Sec. 864.002.  SERVICE RETIREMENT ANNUITY.  (a)  A service retirement annuity is payable in monthly installments based on:

(1)  the governing body's average monthly contribution during the member's term of qualified service under this subtitle, not including a contribution to reduce the unfunded accrued actuarial liability of the pension system; and

(2)  a formula adopted by the state board by rule that allows the pension system, assuming maximum state contributions are provided under Section 865.015, to be maintained as actuarially sound.

(b)  The state board by rule may provide, for each year of qualified service in excess of the period provided under Section 864.001 for full benefits, an additional amount that is a percentage of the person's monthly pension, compounded annually. A person may receive a proportional credit for months of qualified service that make up less than a year.

Sec. 864.003.  SERVICE  RETIREMENT  BENEFITS  FROM  MORE  THAN ONE DEPARTMENT. A member who performs qualified service for more than one participating department may become eligible to receive a service retirement annuity for service from each department but, if the person dies while a member, the member's beneficiary must choose between an on-duty and off-duty death benefit, if applicable.

Sec. 864.004.  DISABILITY RETIREMENT ANNUITY. (a) A member must, at the time of disability, elect between a service or disability retirement annuity, if eligible for both.

(b)  A member who is disabled during the performance of emergency service duties is automatically vested 100 percent as of the date of disability if the disability occurs before the member has completed the period provided under Section 864.001 for full service retirement benefits.

(c)  A member whose disability results from performing emergency service duties is guaranteed a disability retirement annuity of $300 a month or a greater amount that the state board by rule adopts based on monthly contributions of a participating department for its members.

(d)  A person who is determined to be temporarily disabled must apply to the Social Security Administration and be certified, not later than the second anniversary of the date the person was determined to be temporarily disabled, as permanently disabled by that agency or by any alternative procedure the state board provides by rule.

Sec. 864.005.  CERTIFICATION AND CONTINUANCE OF DISABILITY. (a) A local board shall require a member who is receiving temporary disability benefits to file a disability rating report every three months from a physician chosen by the local board. If a report indicates a significant change of condition, the local board, after notice and a hearing, may adopt an order to terminate payments or place the member on permanent disability. The local board shall send a copy of each order adopted under this subsection to the commissioner.

(b)  Disability benefits cease if the recipient becomes capable of performing the duties of the person's most recent position with a participating department or the duties of another occupation for which the person is reasonably suited by education, training, and experience. Rejection of a suitable offer of employment is conclusive evidence for purposes of this subtitle that the person is no longer eligible to receive disability retirement benefits, if the employment would provide the person with a salary equal to or greater than the salary the person was earning at the time the disability occurred.

(c)  The state board or a local board may require financial information from a person as a condition to the continued receipt of disability retirement benefits, including federal income tax returns and wage earning forms. Failure to provide requested information is a ground for terminating benefits.

Sec. 864.006.  MEMBER SERVICE DEATH BENEFITS. (a) The surviving spouse and dependents of a member who dies as a result of performing emergency service duties are entitled to receive in equal shares a death benefit annuity equal to two-thirds of the service retirement annuity that the decedent would have been entitled to receive if the decedent had been able to retire, vested at 100 percent, on the date of the decedent's death. As long as both the spouse and one or more dependents survive, an additional one-third of that annuity is payable to the dependents in equal shares.

(b)  The beneficiary of a member who dies as a result of performing emergency service duties is entitled to a lump-sum benefit of $5,000 or a greater amount that the state board provides by rule.

Sec. 864.007.  MEMBER NONSERVICE DEATH BENEFIT. The state board by rule may provide the beneficiary of a deceased member whose death did not result from the performance of emergency service duties a lump-sum benefit that is the greater of:

(1)  the amount contributed to the fund on the decedent's behalf; or

(2)  the sum that would have been contributed on the decedent's behalf from whatever source at the end of the period provided under Section 864.001 for full service retirement benefits.

Sec. 864.008. VESTED MEMBER DEATH BENEFIT ANNUITY. (a) The surviving spouse of a deceased member who dies before retirement but after meeting the minimum age and service requirements for service retirement is entitled to two-thirds of the monthly annuity that the decedent would have received if the decedent had retired on the date of death.

(b) The surviving spouse of a deceased member who dies after terminating service with all participating departments and meeting a vesting requirement under Section 864.001 but before attaining the age of 55 is entitled to a death benefit annuity, beginning on the date that the decedent would have attained that age, equal to two-thirds of the monthly annuity to which the decedent would have been entitled on that date.

Sec. 864.009. RETIREE DEATH BENEFIT ANNUITY. The surviving spouse of a person who dies after retirement is entitled to two-thirds of the monthly annuity the decedent was receiving at the time of death.

Sec. 864.010. BENEFITS FOR MEMBERS AND RETIREES OF DEPARTMENT THAT WITHDRAWS FROM PARTICIPATION OR CEASES TO EXIST. (a) The commissioner shall continue to administer benefits of the pension system for members and retirees who perform service for a formerly participating department that has withdrawn from participation in the pension system or has ceased to exist.

(b) The governing body of a political subdivision in which a department described by Subsection (a) is or was located shall perform the duties required of a local board for the members and retirees who served for the formerly participating department.

Sec. 864.011. FIRST PAYMENT OF RETIREMENT OR DEATH BENEFIT ANNUITY. The cashing or depositing of the first payment of a service, disability, or death benefit annuity by a person entitled to it is considered acceptance of the amount of the annuity and, if the annuity is based on the payee's service, is conclusive evidence for purposes of this subtitle that the payee is retired.

Sec. 864.012. CERTAIN BENEFICIARIES. (a) If a member names more than one beneficiary for a lump-sum death benefit, the pension system shall divide the benefit equally among the named beneficiaries or, if the member has designated a proportional division, each beneficiary is entitled to the proportion designated.

(b) Except as provided by Subsection (a), lump-sum death benefits are subject to the laws of descent and distribution if the decedent has not provided for testamentary disposition.

Sec. 864.013. COST-OF-LIVING INCREASE. The state board by rule may provide a cost-of-living increase for any benefit provided by the pension system. If benefits are increased, the state board shall require an increase in governing body contributions if necessary to maintain an actuarially sound pension system.

Sec. 864.014. STATE BOARD AUTHORITY FOR LUMP-SUM PAYMENTS. In lieu of any annuity otherwise payable under this subtitle, the state board by rule may provide for a lump-sum payment if the board determines that a lump-sum payment is cost-efficient or is necessary for the pension system to remain actuarially sound.

Sec. 864.015. CURRENT PLAN DESIGN. Notwithstanding any other provision of this chapter, the state board by rule may maintain the benefit structure in effect on August 31, 2005, regardless of whether the pension system is actuarially sound.

Sec. 864.016. CLAIM AND APPEAL PROCEDURE. (a) A claim for benefits must be filed with the local board. On receiving a claim, the local board shall hold a hearing to decide the claim. The local board shall send a written copy of its decision to the claimant and the commissioner.

(b) A person aggrieved by a decision of a local board relating to eligibility for or the amount of benefits under this subtitle may appeal the decision to the commissioner.

(c) An appeal under this section is begun by delivering a notice of appeal to the presiding officer or secretary of the local board that made the decision. The notice must be delivered not later than the 20th day after the date of the decision and contain a brief description of the reasons for the appeal. The aggrieved person must file a copy of the notice with the commissioner.

(d) An appeal under this section is held in Austin and is a contested case under Chapter 2001, conducted as a de novo hearing by the State Office of Administrative Hearings.

(e) After a hearing under Subsection (d), the commissioner shall decide each appeal from a local board decision, issue a written opinion, and notify the local board and the claimant if the commissioner overrules the local board's decision.

(f) A person aggrieved by a decision of the commissioner under this section may appeal the decision to the state board. The state board shall decide each appeal based on the hearing record.

(g) A decision of the state board may not be appealed to a court or be subject to any other legal process.

CHAPTER 865. ADMINISTRATION

Sec. 865.001. COMPOSITION OF STATE BOARD. (a) The state board of the pension system is composed of nine members appointed by the governor for staggered terms of six years, with the terms of three trustees expiring on September 1 of each odd-numbered year.

(b) Six trustees must be active members of the pension system, one of whom must represent emergency medical services personnel.

(c) In appointing the six trustees under Subsection (b), the governor shall select from a list of three to five nominees submitted by the State Firemen's and Fire Marshals' Association of Texas for each vacancy. The governor may reject a list submitted under this subsection and request a new list containing different nominees.

(d) Three trustees must be persons who have experience in the fields of finance, securities investment, or pension administration.

(e) Appointments to the state board shall be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointee.

Sec. 865.002. INELIGIBILITY OF CERTAIN EMPLOYEES FOR STATE BOARD. (a) A person is not eligible for appointment to the state board if the person or the person's spouse is employed by or participates in the management of a business entity or other organization regulated by or receiving funds from the state board or the fund.

(b)  A person may not serve as a trustee of the state board or act as the general counsel to the state board if the person is required to register as a lobbyist under Chapter 305 because of the person's activities for compensation on behalf of a business or an association related to the operation of the state board.

Sec. 865.003. COMPENSATION; EXPENSES. Trustees of the state board serve without compensation but may be reimbursed for actual and necessary expenses incurred in performing state board functions.

Sec. 865.004. VOTING. (a)  Each trustee of the state board is entitled to one vote. Except as provided by Subsection (b), at any meeting of the state board, a vote by a majority of the trustees present is necessary for a decision by the trustees.

(b)  The concurrence of a majority of the members of the state board is required for a vote regarding:

(1)  eligibility for service retirement described by Section 864.001;

(2)  the computation of a service retirement annuity described by Section 864.002;

(3)  a cost-of-living increase described by Section 864.013; or

(4)  a lump-sum payment adopted under Section 864.014.

Sec. 865.005. GROUNDS FOR REMOVAL OF TRUSTEES. (a) It is a ground for removal from the state board that a trustee:

(1)  does not have at the time of appointment the qualifications required by Section 865.001;

(2)  does not maintain during service on the state board the qualifications required by Section 865.001;

(3)  violates a prohibition established by Section 865.002;

(4)  cannot discharge the person's duties for a substantial part of the term for which the person is appointed because of illness or disability; or

(5)  is absent from more than half of the regularly scheduled state board meetings that the trustee is eligible to attend during a calendar year unless the absence is excused by a majority vote of the state board.

(b)  The validity of an action of the state board is not affected by the fact that it is taken when a ground for removal of a trustee exists.

(c)  If the commissioner has knowledge that a potential ground for removal exists, the commissioner shall notify the presiding officer of the state board of the ground. The presiding officer shall then notify the governor that a potential ground for removal exists.

Sec. 865.006. GENERAL DUTIES OF STATE BOARD. (a) The state board shall employ a certified public accountant, an actuary, and an investment consultant for the fund and may acquire computer, custodial, or investment management services for the fund. The costs of accounting, actuarial, investment consulting, computer, custodial, or investment management services and other administrative expenses may

be paid from income earned by investment of the fund. No portion of the corpus or income of the fund may be used for purposes other than the benefit of members, retired emergency services personnel, and their beneficiaries.

(b)  The state board shall adopt rules necessary for the administration of the fund. The state board shall adopt rules to provide a proration of the requirements for qualified service for a member who performs service for only a portion of a calendar year and may provide by rule for the manner in which member attendance or training hours are to be computed.

Sec. 865.007.  ADMINISTERING SYSTEM ASSETS. (a) The state board shall administer all assets of the pension system. The state board is the trustee of the pension system's assets.

(b)  The state board may acquire, hold, manage, purchase, sell, assign, trade, transfer, and dispose of any security, evidence of debt, or other investment in which the pension system's assets may be invested.

(c)  The state board or the commissioner may accept on behalf of the pension system gifts of money or other property from any public or private source.

Sec. 865.008.  INVESTMENT OF ASSETS. (a) If a surplus exists in the fund over the amount necessary to pay benefits due for a reasonable period of time, the state board shall invest the surplus.

(b)  The assets of the pension system shall be invested and reinvested in accordance with Section 67, Article XVI, Texas Constitution. A determination of whether the state board has exercised prudence with respect to an investment decision must be made, taking into consideration the investment of all assets of the trust over which the state board has management and control rather than considering the prudence of a single investment.

Sec. 865.009.  TRUST FUND. The Texas emergency services retirement fund is a trust fund established with the comptroller.

Sec. 865.010.  COMMISSIONER'S DUTIES. (a) The commissioner shall oversee the distribution of all benefits.

(b)  The commissioner shall collect the revenues for the fund from the governing bodies of participating departments.

(c)  The commissioner may request and administer, in an emergency, state funds in addition to those required by this subtitle and appropriated by the legislature.

(d)  The commissioner is responsible for recovering any fraudulently acquired benefits. If it appears that fraud has occurred, the commissioner shall notify the appropriate local board and the claimant and hold a hearing. If after the hearing the commissioner determines that benefits have been or are being fraudulently acquired, the commissioner shall seek action in a court.

Sec. 865.011.  RECORDS AND REPORTS. (a) The commissioner may at any reasonable time examine the records and accounts of local boards.

(b)  The commissioner shall require in a timely manner periodic reports from the local boards and shall prepare necessary forms for use by local boards.

(c)  The commissioner shall prepare an annual report on the activity and status of the fund and submit the report to the governor, the lieutenant governor, and the speaker of the house of representatives.

Sec. 865.012.  LOCAL BOARD. (a)  A local board is composed of:

(1)  one trustee selected by the governing body of the political subdivision of which a participating department is a part;

(2)  three trustees who are active members representing a participating department chosen by a majority of the emergency services personnel in the department who are eligible to participate in the pension system; and

(3)  two trustees who are representatives of the political subdivision who are chosen by the other members of the local board.

(b)  Trustees of a local board serve staggered two-year terms. At the first meeting of a local board, the trustees shall draw lots to determine the length of the term to be served, with the terms of two trustees to be two years and the terms of two trustees to be one year. The first appointments of trustees appointed by other members of the local board are to be one trustee for a two-year term and one trustee for a one-year term.

(c)  A local board shall hold not fewer than four meetings a year under Chapter 551.

(d)  A vacancy on a local board is filled for the remainder of the unexpired term by the procedure by which the position was originally filled.

(e)  A local board shall elect a presiding officer from the trustees at its first meeting.

(f)  At any meeting of a local board, a vote by a majority of the trustees present is necessary for a decision by the trustees.

(g)  A trustee of a local board may not receive compensation for service as a trustee but may be reimbursed by the governing body of a participating department for actual and necessary expenses incurred in performing local board functions.

Sec. 865.013.  MONITORING OF CONTRIBUTION SUBMISSION. A local board shall monitor the timely submission of required contributions to the commissioner.

Sec. 865.014.  LOCAL CONTRIBUTIONS. (a)  Each governing body of a political subdivision of which a participating department is a part shall contribute for each member for each month of service beginning on the date that the member enters the pension system at a rate determined in accordance with Subsection (b) and may make additional contributions as determined by the political subdivision. If the participating department is located in more than one political subdivision, the governing bodies of the political subdivisions shall contribute equally for each member for each month of service.

(b)  The state board by rule shall determine the minimum, and may determine a maximum, contribution for each member of a participating department for each month of qualified service at a rate the state board determines necessary, after consultation with the actuary, to make the pension system actuarially sound.

(c)  Contributions required as provided by this section shall be paid at the times and in the manner that the state board prescribes by rule. Contributions required by this section shall be submitted by electronic funds transfer unless the commissioner grants an exception based on the difficulty of a participating department's use of that payment method. Contributions that are not paid within the time required by the state board accrue interest at the most recent assumed actuarial rate of return on investments of the fund.

(d)  The state board may by rule require a monthly contribution from political subdivisions that do not participate in the pension system but whose employees or former employees are members or retirees of the pension system in an amount necessary to pay the expenses of administering benefits for those persons.

(e)  The attorney general may file suit to collect unpaid accrued interest. Interest recovered shall be deposited in the fund.

Sec. 865.015.  STATE CONTRIBUTIONS. The state shall contribute the amount necessary to make the pension system actuarially sound each year, except that the state's contribution may not exceed one-third of the total of all contributions by governing bodies in a particular year.

Sec. 865.016.  ADMINISTRATIVE PENALTY. (a) The state board may impose an administrative penalty on a local board that fails to file a required report in a timely manner.

(b)  The amount of the penalty may not exceed $5,000. The amount shall be based on:

(1)  the seriousness of the violation, including the nature, circumstances, extent, and gravity of the violation;

(2)  the history of previous violations;

(3)  the amount necessary to deter a future violation;

(4)  efforts to correct the violation; and

(5)  any other matter that justice may require.

(c)  The state board may adopt rules for determining the amount of a penalty.

(d)  The enforcement of the penalty may be stayed during the time the order is under judicial review if the person pays the penalty to the clerk of the court or files a supersedeas bond with the court in the amount of the penalty. A person who cannot afford to pay the penalty or file the bond may stay the enforcement by filing an affidavit in the manner required by the Texas Rules of Civil Procedure for a party who cannot afford to file security for costs, subject to the right of the state board to contest the affidavit as provided by those rules.

(e)  The attorney general may file suit to collect the penalty. Penalties recovered will be deposited in the fund.

(f)  A proceeding to impose the penalty is considered to be a contested case under Chapter 2001.

Sec. 865.017.  INTERRUPTION OF PAYMENTS. (a) The pension system shall withhold payment of a monthly retirement annuity if a participating department attempts to provide information to the commissioner relating to continued eligibility to receive the payments and the recipient fails to cooperate or provide the requested information. The state board may adopt rules to enforce this subsection.

(b)  The pension system may not begin service or disability retirement annuity or death benefit payments based on the service of a person whose local board is not current in its filing of a required periodic report.

Sec. 865.018.  CERTIFICATION OF FUND. (a) In this section, "qualified actuary" means a fellow of the Society of Actuaries or a member of the American Academy of Actuaries who has at least five years of experience with public retirement systems.

(b)  The commissioner and the state board shall certify the actuarial and financial soundness of the fund every two years with the assistance of a qualified actuary.

Sec. 865.019.  CONFIDENTIALITY OF INFORMATION ABOUT MEMBERS, ANNUITANTS, AND BENEFICIARIES. (a) Information contained in records that are in the custody of the pension system concerning an individual member, annuitant, or beneficiary is confidential under Section 552.101 and may not be disclosed in a form identifiable with a specific individual unless:

(1)  the information is disclosed to:

(A)  the individual or the individual's attorney, guardian, executor, administrator, conservator, or other person who the commissioner determines is acting in the interest of the individual or the individual's estate;

(B)  a spouse or former spouse of the individual after the commissioner determines that the information is relevant to the spouse's or former spouse's interest in member accounts, benefits, or other amounts payable by the pension system;

(C)  a governmental official or employee after the commissioner determines that disclosure of the information requested is reasonably necessary to the performance of the duties of the official or employee; or

(D)  a person authorized by the individual in writing to receive the information; or

(2)  the information is disclosed under a subpoena and the commissioner determines that the individual will have a reasonable opportunity to contest the subpoena.

(b)  This section does not prevent the disclosure of the status or identity of an individual as a member, former member, retiree, deceased member or retiree, or beneficiary of the pension system.

(c)  The commissioner may designate other employees of the pension system to make the necessary determinations under Subsection (a).

(d)  A determination and disclosure under Subsection (a) may be made without notice to the individual member, annuitant, or beneficiary.

SECTION 2.  The Texas Statewide Emergency Services Retirement Act (Article 6243e.3, Vernon's Texas Civil Statutes) is repealed.

SECTION 3.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Nelson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 522**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### HOUSE CONCURRENT RESOLUTION 225

The Presiding Officer, Senator Armbrister in Chair, laid before the Senate the following resolution:

WHEREAS, The House of Representatives of the State of Texas has passed **HB 872** and returned it to the Senate of the State of Texas; and

WHEREAS, Further consideration of the bill by the house is necessary; now, therefore, be it

RESOLVED by the House of Representatives of the State of Texas, the Senate of the State of Texas concurring, That the house hereby respectfully requests that the Secretary of the Senate be authorized to return House Bill No. 872 to the house for further consideration.

WEST

**HCR 225** was read.

On motion of Senator Nelson, on behalf of Senator West, and by unanimous consent, the resolution was considered immediately and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of the resolution except as follows:

Absent-excused: Carona, West.

### SENATE BILL 1691 WITH HOUSE AMENDMENTS

Senator Duncan called **SB 1691** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 3**

Amend **SB 1691** (House committee printing) by inserting the following new SECTION to the bill, numbered appropriately, and renumbering subsequent SECTIONS of the bill accordingly:

SECTION ___. Section 825.110, Government Code, is amended to read as follows:

Sec. 825.110. DETERMINATION OF ANNUAL COMPENSATION. The board of trustees shall [may] adopt rules to exclude from annual compensation all or part of salary and wages in the final years of a member's employment that reasonably can be presumed to have been derived from a conversion of fringe benefits, maintenance, or other payments not includable in annual compensation to salary and wages. The board of trustees shall [may] adopt rules that include a percentage limitation on the amount of increases in annual compensation that may be subject to credit and deposit during a member's final years of employment.

**Floor Amendment No. 4**

Amend **SB 1691,** Section 21, by adding "Except as provided herein," before the word "Chapter" on page 20, line 24, and inserting the following language at the between the end of page 21, line 4, and the beginning of page 21, line 5: "The retirement system shall be subject to the relevant requirements of Chapter 412, Texas Labor Code, only for the specific program(s) or service(s) the board elects to obtain from or through the State Office of Risk Management."

**Floor Amendment No. 5**

Amend Floor Amendment No. 4 by Giddings to **SB 1691**, in the beginning of the full sentence added by the amendment, by striking "The retirement system", and substituting "In accordance with terms mutually agreed upon by both parties, the retirement system".

**Floor Amendment No. 6**

Amend **SB 1691** (House committee printing), in SECTION 29 of the bill, by striking added Subsection (e), Section 825.4092, Government Code (page 30, lines 5-8), and substituting:

(e) The amounts required to be paid under Subsections (b) and (c) are not required to be paid by a reporting employer for a retiree who was reported under the retirement system rules in effect for the report month of January 2005 by:

(1) that reporting employer; or

(2) another employer, if both employers are school districts that consolidated into a consolidated school district on or before September 1, 2005.

The amendments were read.

Senator Duncan moved to concur in the House amendments to **SB 1691**.

The motion prevailed by the following vote: Yeas 24, Nays 5.

Yeas: Armbrister, Averitt, Brimer, Deuell, Duncan, Estes, Fraser, Gallegos, Harris, Jackson, Janek, Lindsay, Lucio, Madla, Nelson, Ogden, Seliger, Shapiro, Staples, Van de Putte, Wentworth, Whitmire, Williams, Zaffirini.

Nays: Barrientos, Ellis, Eltife, Hinojosa, Shapleigh.

Absent-excused: Carona, West.

### RECESS

On motion of Senator Whitmire, the Senate at 2:26 p.m. recessed until 4:30 p.m. today.

### AFTER RECESS

The Senate met at 5:17 p.m. and was called to order by Senator Armbrister.

### SENATE BILL 265 WITH HOUSE AMENDMENTS

Senator Williams called **SB 265** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 1**

Amend **SB 265**, House committee printing, in SECTION 1 of the bill, on page 1, after line 24, by inserting a new Subsection (d) in added Section 4004.0535, Insurance Code, to read as follows:

(d) An agent who seeks continuing education credit under this section shall provide to the department in the manner prescribed by the commissioner a sworn affirmation that the agent is an active member of a state or national insurance association described by Subsection (a) and, for the number of continuing education hours claimed, has:

(1)  reviewed educational materials provided by that association; or

(2)  attended educational presentations sponsored by that association.

**Floor Amendment No. 2**

Amend **SB 265** (committee printing) as follows:

(1)  On page 2, line 1, add the following new sections and renumber appropriately:

SECTION 2.  Subchapter B, Chapter 4004, Insurance Code, as effective April 1, 2005, is amended by adding Section 4004.0536 as follows:

Sec. 4004.0536.  CONTENT OF CONTINUING EDUCATION PROGRAM. A continuing education program for individuals who hold a general life accident and health license, a life and health insurance counselors license or a limited life accident and health license may include information related to the Health Insurance Portability and Accountability Act, Texas Insurance Code Chapter 1501, including provisions related to participation and contribution requirements and renewability of coverage.

SECTION 3. Section 1501.108, Insurance Code, is amended by adding Subsection (d) to read as follows:

(d)  A small or large employer health benefit plan issuer may modify a particular small or large employer health benefit plan at the time of coverage renewal if the modification applies uniformly to all small or large employers whose employees are covered by that health benefit plan.

SECTION 4. Section 1501.153(a), Insurance Code, is amended to read as follows:

(a) This chapter does not require a small employer to make an employer contribution to the premium paid to a small employer health benefit plan issuer, but the issuer may require an employer contribution in accordance with the issuer's usual and customary practices applicable to each of the issuer's small employer group health benefit plans in this state. The issuer shall apply the employer contribution level uniformly to each small employer offered or issued coverage under a small employer health benefit plan by the issuer in this state.

SECTION 5. Sections 1501.155(a) and (b), Insurance Code, are amended to read as follows:

(a) A small employer health benefit plan issuer may offer a small employer health benefit plan to a small employer with a participation level of less than 75 percent of the employer's eligible employees if the issuer permits the same qualifying participation level for each of the small employer health benefit plans [plan] offered by the issuer in this state.

(b) A small employer health benefit plan issuer may offer a small employer health benefit plan to a small employer even if the employer's participation level is less than the issuer's qualifying participation level for a small employer health benefit plan established in accordance with Subsection (a) if:

(1)  the employer obtains a written waiver from each eligible employee who declines coverage under a health benefit plan offered to the employer stating that the employee was not induced or pressured to decline coverage because of the employee's risk characteristics; and

(2)  the issuer accepts or rejects the entire group of eligible employees who choose to participate and excludes only those employees who have declined coverage.

SECTION 6. Sections 1501.605(a) and (d), Insurance Code, are amended to read as follows:

(a) A large employer health benefit plan issuer may require a large employer to meet a minimum contribution or participation requirement as a condition of issuance or renewal in accordance with the issuer's usual and customary practices for each of [all] the issuer's large employer health benefit plans in this state.

(d) A participation requirement must be stated in the health benefit plan contract and must be applied uniformly to each large employer offered or issued coverage under a large employer health benefit plan by a large employer health benefit plan issuer in this state.

**Floor Amendment No. 3**

Amend **SB 265** (committee printing) as follows:

(1) On page 2, line 1, add the following new sections and renumber appropriately:

SECTION 2. Subchapter B, Chapter 4004, Insurance Code, as effective April 1, 2005, is amended by adding Section 4004.0536 as follows:

Sec. 4004.0536. CONTENT OF CONTINUING EDUCATION PROGRAM. A continuing education program for individuals who hold a general life accident and health license, a life and health insurance counselors license or a limited life accident and health license may include information related to the Texas Health Insurance Risk Pool.

SECTION 3. Subsection (b), Section 1506.002, Insurance Code, is amended to read as follows:

(b) In this chapter, "health benefit plan" does not include:

(1) accident insurance;

(2) a plan providing coverage only for dental or vision care;

(3) fixed indemnity insurance, including hospital indemnity insurance;

(4) [(2)] credit insurance;

(5) [(3)] long-term care insurance;

(6) [(4)] disability income insurance;

(7) other limited benefit coverage, including specified disease coverage;

(8) [(5)] coverage issued as a supplement to liability insurance;

(9) [(6)] insurance arising out of a workers' compensation law or similar law;

(10) [(7)] automobile medical payment insurance; or

(11) [(8)] insurance coverage under which benefits are payable with or without regard to fault and that is statutorily required to be contained in a liability insurance policy or equivalent self-insurance.

SECTION 4. Subsection (a), Section 1506.109, Insurance Code, is amended to read as follows:

(a) The pool shall [may] provide for and use cost containment measures and requirements to make the coverage offered by the pool more cost-effective. To the extent the board determines it is cost-effective, the cost containment measures must include individual case management and disease management. The cost containment measures may include[, including] preadmission screening, the requirement of a

second surgical opinion, <u>and</u> concurrent utilization review subject to Article 21.58[~~, and individual case management, to make the coverage offered by the pool more cost-effective~~].

SECTION 5.  Subsection (a), Section 1506.152, Insurance Code, is amended to read as follows:

(a)  An individual who is a legally domiciled resident of this state is eligible for coverage from the pool if the individual:

(1)  provides to the pool evidence that the individual maintained health benefit plan coverage for the preceding 18 months with no gap in coverage longer than 63 days and with the most recent coverage being provided through an employer-sponsored plan, church plan, or government plan;

(2)  provides to the pool evidence that the individual maintained health benefit plan coverage under another state's qualified Health Insurance Portability and Accountability Act health program that was terminated because the individual did not reside in that state and submits an application for pool coverage not later than the 63rd day after the date the coverage described by this subdivision was terminated;

(3)  has been a legally domiciled resident of this state for the preceding 30 days, is a citizen of the United States or has been a permanent resident of the United States for at least three continuous years, and provides to the pool:

(A)  a notice of rejection of, or refusal to issue, substantially similar individual health benefit plan coverage from a health benefit plan issuer, other than an insurer that offers only stop-loss, excess loss, or reinsurance coverage, if the rejection or refusal was for health reasons;

(B)  certification from an agent or salaried representative of a health benefit plan issuer that states that the agent or salaried representative cannot obtain substantially similar individual coverage for the individual from any health benefit plan issuer that the agent or salaried representative represents because, under the underwriting guidelines of the health benefit plan issuer, the individual will be denied coverage as a result of a medical condition of the individual;

(C)  an offer to issue substantially similar individual coverage only with conditional riders; or

(D)  [~~a notice of refusal by a health benefit plan issuer to issue substantially similar individual coverage except at a rate exceeding the pool rate; or~~

[~~(E)~~] a diagnosis of the individual with one of the medical or health conditions on the list adopted under Section 1506.154; or

(4)  provides to the pool evidence that, on the date of application to the pool, the individual is certified as eligible for trade adjustment assistance or for pension benefit guaranty corporation assistance, as provided by the Trade Adjustment Assistance Reform Act of 2002 (Pub. L. No. 107-210).

SECTION 6.  Subsection (a), Section 1506.155, Insurance Code, is amended to read as follows:

(a)  Except as provided by this section and Section 1506.056, pool coverage excludes charges or expenses incurred before the first anniversary of the effective date of coverage with regard to any condition for which:

(1)  the existence of symptoms would cause an ordinarily prudent person to seek diagnosis, care, or treatment within the six-month period preceding the effective date of coverage; or

(2)  medical advice, care, or treatment was recommended or received during the six-month period preceding the effective date of coverage.

SECTION 7. Subchapter F, Chapter 1506, Insurance Code, is amended by adding Section 1506.2522 to read as follows:

Sec. 1506.2522.  ANNUAL REPORT TO BOARD: ENROLLED INDIVIDUALS. (a) Each health benefit plan issuer shall report to the board the number of residents of this state enrolled, as of December 31 of the previous year, in the issuer's health benefit plans providing coverage for residents in this state, as:

(1)  an employee or retired employee under a group health benefit plan; or

(2)  an individual policyholder or subscriber.

(b)  In determining the number of individuals to report under Subsection (a)(1), the health benefit plan issuer shall include each employee or retired employee for whom a premium is paid and coverage is provided under an excess loss, stop-loss, or reinsurance policy issued by the issuer to an employer or group health benefit plan providing coverage for employees or retired employees in this state. A health benefit plan issuer providing excess loss insurance, stop-loss insurance, or reinsurance, as described by this subsection, for a primary health benefit plan issuer may not report individuals reported by the primary health benefit plan issuer.

(c)  Ten employees or retired employees covered by a health plan issuer under a policy of excess loss insurance, stop-loss insurance, or reinsurance count as one employee or retired employee for purposes of determining that health plan issuer's assessment.

(d)  In determining the number of individuals to report under this section, the health benefit plan issuer shall exclude:

(1)  the dependents of the employee or retired employee or an individual policyholder or subscriber; and

(2)  individuals who are covered by the health benefit plan issuer under a Medicare supplement benefit plan subject to Chapter 1652.

(e)  This section expires September 1, 2007.

SECTION 8. Section 1506.253, Insurance Code, is amended to read as follows:

Sec. 1506.253. ASSESSMENTS TO COVER NET LOSSES. (a) The board shall recover any net loss of the pool by assessing each health benefit plan issuer an amount determined annually by the board based on information in annual statements, the health benefit plan issuer's annual report to the board under Sections [Section] 1506.2521 and 1506.2522, and any other reports required by and filed with the board.

(b)  The amount of a health benefit plan issuer's assessment is computed by multiplying the total amount required to be assessed against all health benefit plan issuers by a number computed by dividing:

[(1)  the gross premiums collected by the issuer for health benefit plans in this state during the preceding calendar year; by

(2)  the gross premiums collected by all issuers for health benefit plans in this state during the preceding calendar year.

(b-1)  Notwithstanding Subsection (b), to compute the amount of a health benefit plan issuer's assessment, if any, the board shall:

(1)  divide the total amount to be assessed by the total number of enrolled individuals reported by all health benefit plan issuers under Section 1506.2522 as of the preceding December 31 to determine the per capita amount; and

(2)  multiply the number of enrolled individuals reported by the health benefit plan issuer under Section 1506.2522 as of the preceding December 31 by the per capita amount to determine the amount assessed to that health benefit plan issuer.

(b-2)  Subsection (b-1) and this subsection expire September 1, 2007.

(c)  A [For purposes of the assessment under this subchapter, gross health benefit plan premiums do not include premiums collected for:

[(1)  coverage under a Medicare supplement benefit plan subject to Chapter 1652;

[(2)  coverage under a] small employer health benefit plan subject to Subchapters A-H, Chapter 1501, is not subject to an assessment under this subchapter[; or

[(3)  coverage or insurance listed in Section 1506.002(b)].

SECTION 9.  Chapter 1506, Insurance Code, is amended by adding Subchapter G to read as follows:

SUBCHAPTER G. SUBROGATION RIGHTS OF POOL

Sec. 1506.301.  SUBROGATION TO RIGHTS AGAINST THIRD PARTY. The pool:

(1)  is subrogated to the rights of an individual covered by the pool to recover against a third party costs for an injury or illness for which the third party is liable under contract, tort law, or other law that have been paid by the pool on behalf of the covered individual; and

(2)  may enforce that liability on behalf of the individual.

Sec. 1506.302.  BENEFITS NOT PAYABLE; ADVANCE OF BENEFITS AUTHORIZED. (a) Under coverage provided by the pool, benefits are not payable for an injury or illness for which a third party may be liable under contract, tort law, or other law.

(b)  Notwithstanding Subsection (a), the pool may advance to a covered individual the benefits provided under the pool coverage for medical expenses resulting from the injury or illness, subject to the pool's right to subrogation and reimbursement under this subchapter.

Sec. 1506.303.  REIMBURSEMENT OF POOL REQUIRED. (a) Subject to Section 1506.305, the amount recovered by a covered individual in an action against a third party who is liable for the injury or illness must be used to reimburse the pool for benefits for medical expenses that have been advanced under Section 1506.302.

(b)  The amount of reimbursement required by this section is not reduced by the application of the doctrine established at common law relating to adequate compensation of insureds and commonly referred to as the "made whole" doctrine.

(c)  Subject to Section 1506.305, the pool shall treat any amount recovered by a covered individual in an action against a third party who is liable for the injury or illness that exceeds the amount of the reimbursement required under this section as an advance against future medical benefits for the injury or illness that the individual would otherwise be entitled to receive under pool coverage.

Sec. 1506.304.  RESUMPTION OF PAYMENT OF BENEFITS. If the amount treated as an advance under Section 1506.303(c) is adequate to cover all future medical costs for the covered individual's injury or illness, the pool is not required to resume the payment of benefits. If the advance is insufficient, the pool shall resume the payment of benefits when the advance is exhausted.

Sec. 1506.305.  ATTORNEY'S FEE FOR REPRESENTATION OF POOL'S INTEREST. (a) For purposes of this section, the pool's recovery includes:

(1)  the amount recovered by the pool in the action; and

(2)  the amount of the covered individual's total recovery that must be used to reimburse the pool or that is treated as an advance for future medical costs under Section 1506.303(c).

(b)  If the pool's interest is not actively represented by an attorney in a third-party action under this subchapter, the pool shall pay a fee to an attorney representing the claimant in the amount agreed on between the attorney and the pool. In the absence of an agreement, the court shall award to the attorney payable out of the pool's recovery:

(1)  a reasonable fee for recovery of the pool's interest that may not exceed one-third of the pool's recovery; and

(2)  a proportionate share of the reasonable expenses incurred.

(c)  An attorney who represents a covered individual and is also to represent the interests of the pool under this subchapter must make a full written disclosure to the covered individual before employment as an attorney by the pool. The covered individual must acknowledge the disclosure and consent to the representation. A signed copy of the disclosure shall be provided to the covered individual and the pool. A copy of the disclosure with the covered individual's consent must be filed with the pleading before a judgment is entered and approved by the court. The attorney may not receive a fee under this section to which the attorney is otherwise entitled under an agreement with the pool unless the attorney complies with the requirements of this subsection.

(d)  If an attorney actively representing the pool's interest actively participates in obtaining a recovery, the court shall award and apportion between the covered individual's and the pool's attorneys a fee payable out of the pool's subrogation recovery. In apportioning the award, the court shall consider the benefit accruing to the pool as a result of each attorney's service. The total attorney's fees may not exceed one-third of the pool's recovery.

SECTION 10.  (a) The legislature shall establish a joint interim committee to study the deficit resulting from the net losses of the Texas Health Insurance Risk Pool and to recommend a method or formula for recouping any deficit that apportions the cost of those losses among the largest possible number of users of the health care system.

(b)  Not later than September 1, 2006, the committee shall report its findings and recommendations to the governor, lieutenant governor, and speaker of the house of representatives.

(c)  The lieutenant governor and speaker shall determine the composition of the committee.

(d)  This section expires September 1, 2007.

SECTION 11.  (a) This Act applies only to an application for initial or renewal coverage through the Texas Health Insurance Risk Pool under Chapter 1506, Insurance Code, as amended by this Act, that is filed with that pool on or after the effective date of this Act. An application filed before the effective date of this Act is governed by the law in effect on the date on which the application was filed, and the former law is continued in effect for that purpose.

(b)  Section 1506.155, Insurance Code, as amended by this Act, and Subchapter G, Chapter 1506, Insurance Code, as added by this Act, apply only to pool coverage that is delivered, issued for delivery, or renewed on or after the effective date of this Act. Pool coverage that is delivered, issued for delivery, or renewed before the effective date of this Act is governed by the law as it existed immediately before that date, and that law is continued in effect for that purpose.

(c)  The change in law made by this Act to Section 1506.002(b), Insurance Code, applies to an assessment under Subchapter F, Chapter 1506, Insurance Code, for a calendar year beginning on or after the effective date of this Act. An assessment for a net loss for a calendar year before the effective date of this Act is governed by the law in effect during the calendar year for which the assessment is made, and the former law is continued in effect for that purpose.

(d)  The board of directors of the Texas Health Insurance Risk Pool shall refund an assessment amount paid for a period after September 30, 2005, that is attributable to those coverages that are exempt from the assessment because of the change in law made by this Act to Section 1506.002(b), Insurance Code, at the time the final net loss for the period for which the assessment is made is determined.

(e)  Section 1506.253, Insurance Code, as amended by this Act, applies to an assessment under Subchapter F, Chapter 1506, Insurance Code, for a calendar year beginning on or after January 1, 2006. An assessment for a calendar year before January 1, 2006, is governed by the law in effect during the period for which the assessment is made, and the former law is continued in effect for that purpose.

(f)  Notwithstanding Subsection (a) of this section and Section 1506.158, Insurance Code, an individual who is covered by the Texas Health Insurance Risk Pool on the effective date of this Act and who, because of the change in law made by this Act to Subsection (a), Section 1506.152, Insurance Code, would no longer be eligible for coverage, continues to be eligible for coverage from the pool until the individual's coverage is terminated for a reason other than that change in law.

SECTION 12.  (a) In accordance with Subsection (c), Section 311.031, Government Code, which gives effect to a substantive amendment enacted by the same legislature that codifies the amended statute, the text of Subsection (b), Section 1506.002, Insurance Code, as set out in Section 1 of this Act, Subsection (a), Section 1506.152, Insurance Code, as set out in Section 3 of this Act, and Subsections (a) and

(c), Section 1506.253, Insurance Code, as set out in Section 6 of this Act, gives effect to changes made by Sections 1, 6, and 11, Chapter 840, Acts of the 78th Legislature, Regular Session, 2003.

(b) To the extent of any conflict, Subsection (b), Section 1506.002, Insurance Code; Subsection (a), Section 1506.109, Insurance Code; Subsection (a), Section 1506.152, Insurance Code; Subsection (a), Section 1506.155, Insurance Code; Section 1506.253, Insurance Code; Chapter 1506, Insurance Code prevails over another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes.

SECTION 13. Subsection (b), Section 1506.002, Insurance Code; Subsection (a), Section 1506.109, Insurance Code; Subsection (a), Section 1506.152, Insurance Code; Subsection (a), Section 1506.155, Insurance Code; Section 1506.253, Insurance Code; Chapter 1506, Insurance Code takes effect January 1, 2006.

The amendments were read.

Senator Williams moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 265** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Williams, Chair; Averitt, Eltife, Lucio, and Van de Putte.

### SENATE BILL 568 WITH HOUSE AMENDMENTS

Senator Deuell called **SB 568** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

### Floor Amendment No. 1

Amend **SB 568** (House committee report) as follows:

(1) In SECTION 2 of the bill, in Subdivision (5) of added Section 781.001, Health and Safety Code (page 2, line 24), strike "security services contractor" and substitute "personal emergency response system provider".

(2) In SECTION 2 of the bill, in added Section 781.101, Health and Safety Code (page 3, line 21), strike "SECURITY SERVICES CONTRACTOR" and substitute "PERSONAL EMERGENCY RESPONSE SYSTEM PROVIDER".

(3) In SECTION 2 of the bill, in added Section 781.101, Health and Safety Code (page 3, lines 22-24), strike "as a security services contractor, a person may not act as or offer to perform the services of an alarm systems company" and substitute "issued under this chapter, a person may not act as or perform the services of a personal emergency response system provider".

(4)  In SECTION 2 of the bill, in added Section 781.102, Health and Safety Code (page 3, lines 25-26), strike "ALARM SYSTEMS COMPANY. A person acts as an alarm systems company" and substitute "PERSONAL EMERGENCY RESPONSE SYSTEM PROVIDER. A person acts as a personal emergency response system provider".

(5)  In SECTION 2 of the bill, strike Subdivision (5) of added Section 781.103, Health and Safety Code (page 4, lines 15-19), and renumber subsequent subdivisions of added Section 781.103, Health and Safety Code, appropriately.

(6)  In SECTION 2 of the bill, in Subsection (a) of added Section 781.201, Health and Safety Code (page 11, line 26, through page 12, line 2), strike "Federal Bureau of Investigation, in the manner provided by Subchapter F, Chapter 411, Government Code, on each applicant for a license or registration" and substitute "Department of Public Safety, that relates to each applicant for registration".

(7)  In SECTION 2 of the bill, in Subsection (a) of added Section 781.201, Health and Safety Code (page 12, lines 5-7), strike "Each applicant must include in the application two complete sets of fingerprints on forms prescribed by the commissioner accompanied by the fee set by the commissioner."

(8)  In SECTION 2 of the bill, in the first sentence of Subsection (a) of added Section 781.258, Health and Safety Code (page 16, line 27), strike "shall" and substitute "may".

**Floor Amendment No. 2**

Amend **SB 568** (House committee printing) by adding the following appropriately numbered SECTIONS to the bill and renumbering the subsequent SECTIONS of the bill accordingly:

SECTION ___.  Section 214.194, Local Government Code, is amended to read as follows:

Sec. 214.194.  [FEE FOR] MUNICIPAL PERMIT FEE GENERALLY. (a) If a municipality adopts an ordinance that requires a person to pay an annual fee to obtain a permit from the municipality before the person may use an alarm system in the municipality, the fee shall be used for the general administration of this subchapter, including the provision of responses generally required to implement this subchapter other than specific responses to false alarms.

(b)  A municipal permit fee imposed under this section may not exceed the rate of $50 a year for a residential location.

SECTION ___.  The heading to Section 214.195, Local Government Code, is amended to read as follows:

Sec. 214.195.  NONRENEWAL OR REVOCATION OF PERMIT AND TERMINATION OF MUNICIPAL RESPONSE; [AND] DISCRIMINATION PROHIBITED.

SECTION ___.  Sections 214.195(a) and (d), Local Government Code, are amended to read as follows:

(a)  Except as provided in Subsection (d) [of this section], a municipality may not terminate its law enforcement response to a residential permit holder because of excess false alarms if the false alarm fees are paid in full.

(d) A municipality may <u>revoke or</u> [~~set standards for systems to be permitted and may~~] refuse to <u>renew the permit of an alarm system that has had eight or more false alarms during the preceding 12-month period</u> [~~permit particular systems which in its discretion have a history of unreliability~~].

SECTION ___. Subchapter F, Chapter 214, Local Government Code, is amended by adding Section 214.1955 to read as follows:

<u>Sec. 214.1955.  MULTIUNIT HOUSING FACILITIES. (a) A municipality may not refuse to issue an alarm system permit for a residential location solely because the residential location is an individual residential unit located in a multiunit housing facility.</u>

<u>(b) In issuing an alarm system permit for an alarm installed in an individual residential unit of a multiunit housing facility, the municipality shall issue the permit to the person occupying the individual residential unit.</u>

<u>(c) A municipality may impose a penalty under Section 214.197 for the signaling of a false alarm on the premises of a multiunit housing facility for a facility other than an individual residential unit only if the permit holder is notified of:</u>

<u>(1) the date of the signaling of the false alarm;</u>

<u>(2) the address of the multiunit housing facility where the signaling of the false alarm occurred; and</u>

<u>(3) the identification of the individual facility, if applicable, located on the multiunit housing facility premises where the signaling of the false alarm occurred.</u>

SECTION ___. Section 214.197, Local Government Code, is amended to read as follows:

Sec. 214.197.  <u>PENALTIES FOR FALSE ALARMS</u> [~~PENALTY LIMITATIONS~~].  [~~(a)~~] A municipality may [~~not~~] impose a penalty [~~or fee~~] for the signaling of a false alarm by a burglar alarm system <u>if</u> [~~unless~~] at least <u>three</u> [~~five~~] other false alarms have occurred during the preceding 12-month period. <u>The amount of the penalty for the signaling of a false alarm as described by Section 214.196 may not exceed:</u>

<u>(1) $50, if the location has had more than three but fewer than six other false alarms in the preceding 12-month period;</u>

<u>(2) $75, if the location has had more than five but fewer than eight other false alarms in the preceding 12-month period; or</u>

<u>(3) $100, if the location has had eight or more other false alarms in the preceding 12-month period.</u>

[~~(b) A penalty or fee imposed for a false alarm must be established by ordinance based on the type and level of emergency response provided. This fee may not exceed $50 in the case of the category of burglar alarms. The penalty or fee for a false alarm may not exceed the actual expenses incurred for the response.~~]

SECTION ___. Subchapter F, Chapter 214, Local Government Code, is amended by adding Sections 214.198-214.200 to read as follows:

<u>Sec. 214.198.  VERIFICATION. A municipality may require an alarm systems monitor to attempt to contact the occupant of the alarm system location twice before the municipality responds to the alarm signal.</u>

Sec. 214.199. EXCEPTION OF MUNICIPALITY FROM ALARM SYSTEM RESPONSE. (a) The governing body of a municipality may not adopt an ordinance providing that law enforcement personnel of the municipality will not respond to any alarm signal indicated by an alarm system in the municipality unless, before adopting the ordinance, the governing body of the municipality:

      (1)  makes reasonable efforts to notify permit holders of its intention to adopt the ordinance; and

      (2)  conducts a public hearing at which persons interested in the response of the municipality to alarm systems are given the opportunity to be heard.

(b)  A municipality that adopts an ordinance under this section may not impose or collect any fine, fee, or penalty otherwise authorized by this subchapter.

Sec. 214.200. PRIORITY OR LEVEL OF RESPONSE NOT AFFECTED; LIABILITY OF MUNICIPALITY FOR NONRESPONSE. (a) Nothing in this subchapter:

      (1)  affects the priority or level of response provided by a municipality to a permitted location; or

      (2)  waives the governmental immunity provided by law for a municipality.

(b)  A municipality that does not respond to an alarm signal is not liable for damages that may occur relating to the cause of the alarm signal.

SECTION \_\_\_. Subchapter L, Chapter 1702, Occupations Code, is amended by adding Sections 1702.286, 1702.287, and 1702.288 to read as follows:

Sec. 1702.286. DUTIES OF ALARM SYSTEMS COMPANY. (a) On the installation or activation of an alarm system, an alarm systems company shall distribute to the occupant of the alarm system location information summarizing:

      (1)  the applicable law relating to false alarms, including the potential for penalties and revocation or suspension of a permit;

      (2)  how to prevent false alarms; and

      (3)  how to operate the alarm system.

(b)  An alarm systems company shall notify the municipality in which the alarm system is located of an installation or activation of an alarm system not later than the 30th day after the date of the installation or activation. The alarm systems company shall provide to the municipality:

      (1)  the alarm systems company name;

      (2)  the alarm systems company license number;

      (3)  the name of the occupant of the alarm system location;

      (4)  the address of the alarm system location; and

      (5)  the date of installation or activation.

(c)  Information provided to a governmental body under this section is confidential and subject to disclosure only as provided under Section 1702.284.

(d)  An alarm systems company commits an offense if the company violates Subsection (a) or (b). An offense under this subsection is a Class C misdemeanor.

(e)  The duties imposed by this section on an alarm systems company do not apply to the installation or activation of a personal emergency response system, as defined under Section 1702.331.

Sec. 1702.287. DETECTION DEVICE CONTROL PANELS; MINIMUM STANDARDS. An alarm systems company may not install any alarm system on or after January 1, 2007, that includes a detection device control panel unless the control panel meets or exceeds the standards of the American National Standards Institute for false alarm reduction.

Sec. 1702.288. NOTICE OF CERTAIN INFORMATION TO RECIPIENT OF ALARM SYSTEM SERVICES. (a) The board shall adopt rules in accordance with this section that require a license holder acting as an alarm systems company under this chapter to inform each of the license holder's clients that the client is entitled to receive a written contract for alarm system services that contains the client's fee arrangement and other relevant information about services to be rendered.

(b)　The rules shall require that a written contract for alarm system services shall be furnished to a client in accordance with Subsection (a) not later than the seventh day after the date the client requests the written contract.

(c)　The rules shall require that the written contract for services shall be dated and signed by the owner or manager of an alarm systems company or a person expressly authorized by the owner or manager to sign written contracts on behalf of the company.

(d)　The rules shall require that, not later than the seventh day after the date of entering into a contract for services regulated by the board with another alarm systems company or alarm systems monitor, an alarm systems company shall:

(1)　notify the recipient of those services of the name, address, and telephone number, and individual to contact at the company that purchased the contract;

(2)　notify the recipient of services at the time the contract is negotiated that another licensed company may provide any of the services requested by subcontracting or outsourcing those services; and

(3)　if any of the services are subcontracted or outsourced to a licensed third party, notify the recipient of services, by mail, of the name, address, phone number, and license number of the company providing those services.

(e)　The rules shall require that notice provided to a recipient of services under Subsection (d) shall:

(1)　be mailed to the recipient in a written form that emphasizes the required information; and

(2)　include stickers or other materials to be affixed to an alarm system indicating the alarm systems company's or alarm systems monitor's new telephone number.

SECTION ___. Section 1702.286, Occupations Code, as added by this Act, applies only to an alarm system installed or activated on or after January 1, 2006.

The amendments were read.

Senator Deuell moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 568** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Deuell, Chair; Armbrister, Lindsay, Nelson, and Zaffirini.

### SENATE BILL 882 WITH HOUSE AMENDMENT

Senator Lucio called **SB 882** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1 on Third Reading**

Amend **SB 882** on third reading by adding the following appropriately numbered SECTIONS to the bill and renumbering the subsequent SECTIONS of the bill accordingly:

SECTION __. Section 29.005, Education Code, is amended by adding Subsection (e) to read as follows:

(e) The commissioner by rule may require a school district to include in the individualized education program of a student with autism or another pervasive developmental disorder any information or requirement authorized under the Individuals with Disabilities Education Act (20 U.S.C. Section 1400 et seq.).

SECTION __. Subchapter A, Chapter 29, Education Code, is amended by adding Section 29.0051 to read as follows:

Sec. 29.0051. STUDY OF RULE CONCERNING CONTENT OF INDIVIDUALIZED EDUCATION PROGRAM FOR STUDENT WITH PERVASIVE DEVELOPMENTAL DISORDER. (a) The agency shall establish a committee composed of parents of students with autism or other pervasive developmental disorders, teachers, school administrators, and other interested persons to study the rule concerning the content of an individualized education program for a student with autism or another pervasive developmental disorder (19 T.A.C. Section 89.1055(e)). School district employees or educational consultants or contractors who receive or are employed by entities that receive compensation from a school district may not constitute more than 50 percent of the committee.

(b) In studying the rule, the committee shall consider whether any other considerations, such as applied behavior analysis, communication training, or the use of inclusive settings, should be included in the rule.

(c) Not later than July 1, 2006, the committee shall recommend to the commissioner any necessary changes to the rule.

(d) This section expires August 1, 2006.

The amendment was read.

Senator Lucio moved that the Senate do not concur in the House amendment, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 882** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lucio, Chair; Nelson, West, Shapleigh, and Shapiro.

### CONFERENCE COMMITTEE ON HOUSE BILL 265

Senator Eltife called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 265** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 265** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Eltife, Chair; Madla, Brimer, Fraser, and Gallegos.

### CONFERENCE COMMITTEE ON HOUSE BILL 3485

Senator Lucio called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 3485** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 3485** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lucio, Chair; Wentworth, Carona, Harris, and Shapleigh.

### CONFERENCE COMMITTEE ON HOUSE BILL 873

Senator Lucio called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 873** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 873** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lucio, Chair; Ellis, Madla, Jackson, and Harris.

### SENATE BILL 39 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 39** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 39** (House committee printing) in SECTION 1 of the bill by striking added Section 156.057, Occupations Code, and substituting the following:

Sec. 156.057. CONTINUING EDUCATION IN FORENSIC EVIDENCE COLLECTION. (a) A physician licensed under this subtitle who submits an application for renewal of a license to practice medicine and whose practice includes treating patients in an emergency room setting may complete two hours of continuing medical education relating to forensic evidence.

(b) The board may adopt rules to identify the physicians who are qualified to complete continuing medical education under Subsection (a) and to establish the content of that continuing medical education. The board may adopt other rules to implement this section.

The amendment was read.

Senator Zaffirini moved that the Senate do not concur in the House amendment, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 39** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Zaffirini, Chair; Janek, Averitt, Ellis, and Lucio.

### CONFERENCE COMMITTEE ON HOUSE BILL 1634

Senator Gallegos called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 1634** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 1634** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Gallegos, Chair; Whitmire, Ellis, Duncan, and Hinojosa.

### SENATE BILL 111 WITH HOUSE AMENDMENTS

Senator Shapleigh called **SB 111** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 1**

Amend **SB 111** (House committee printing) as follows:

(1) In SECTION 1 of the bill, strike added Subdivision (1), Subsection (a), Section 51.968, Education Code (page 1, lines 11-12), and substitute the following:

(1)    "Advanced Placement examination"   means an examination administered through the Advanced Placement Program.

(2) In SECTION 1 of the bill, in added Subdivision (2), Subsection (a), Section 51.968, Education Code (page 1, line 14), strike "college-level examination program" and substitute "College-Level Examination Program".

(3) In SECTION 1 of the bill, in added Subdivision (5), Subsection (a), Section 51.968, Education Code (page 1, lines 20-22), strike "(5)  "International baccalaureate diploma program" means the curriculum and examinations leading to an international baccalaureate diploma" and substitute "(5)   "International Baccalaureate Diploma Program" means the curriculum and examinations leading to an International Baccalaureate diploma".

(4)   In SECTION 1 of the bill, in added Subsection (b), Section 51.968, Education Code (page 2, lines 3-6), strike "international baccalaureate diploma program, who have achieved required scores on one or more examinations in the advanced placement program or the college-level examination program" and substitute "International Baccalaureate Diploma Program, who have achieved required scores on one or more examinations in the Advanced Placement Program or the College-Level Examination Program".

(5) In SECTION 1 of the bill, in added Subdivision (1), Subsection (c), Section 51.968, Education Code (page 2, lines 12-14), strike "advanced placement examinations, and examinations for courses constituting the international baccalaureate diploma program" and substitute "Advanced Placement examinations, and examinations for courses constituting the International Baccalaureate Diploma Program".

(6)   In SECTION 1 of the bill, in added Subdivision (2), Subsection (c), Section 51.968, Education Code (page 2, line 22), strike "advanced placement" and substitute "Advanced Placement".

(7)   In SECTION 1 of the bill, in added Subdivision (1), Subsection (f), Section 51.968, Education Code (page 3, lines 15-17), strike "international baccalaureate diploma program, the advanced placement program, and the college-level examination program" and substitute "International Baccalaureate Diploma Program, the Advanced Placement Program, and the College-Level Examination Program".

(8)   In SECTION 1 of the bill, in added Subsection (g), Section 51.968, Education Code (page 3, line 24), strike "international baccalaureate diploma program" and substitute "International Baccalaureate Diploma Program".

**Floor Amendment No. 3**

Amend **SB 111** by adding the following appropriately numbered section and renumbering the subsequent sections of the bill accordingly:

SECTION __. Subchapter B, Chapter 28, Education Code, is amended by adding Section 28.0252 to read as follows:

Sec. 28.0252.   COMPUTATION OF HIGH SCHOOL GRADE POINT AVERAGE. (a)  The commissioner may develop a standard method of computing a student's high school grade point average that provides for additional weight to be

given to each honors course, advanced placement course, international baccalaureate course, or dual credit course described by Section 28.025(e)(2)(B) completed by a student.

(b)  If the commissioner develops a standard method under this section, a school district shall use the standard method to compute a student's high school grade point average, and the student's grade point average computed in that manner shall be used in determining the student's eligibility for automatic college admission under Section 51.803.

(b-1)  Subsection (b) applies only to students entering grade nine during or after the 2007-2008 school year. This subsection expires September 1, 2010.

(c)  The commissioner may adopt rules necessary to implement this section.

The amendments were read.

Senator Shapleigh moved to concur in the House amendments to **SB 111**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1433 WITH HOUSE AMENDMENTS

Senator Madla called **SB 1433** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 1433** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to the conditions of employment for firefighters employed by certain districts and entities; providing penalties.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle C, Title 5, Local Government Code, is amended by adding Chapter 179 to read as follows:

CHAPTER 179. CONDITIONS OF EMPLOYMENT FOR FIREFIGHTERS OF
CERTAIN DISTRICTS AND ENTITIES

Sec. 179.001.  APPLICABILITY. (a) This chapter applies to a fire department of and firefighters employed by:

(1)  an emergency services district created under Chapter 775, Health and Safety Code, with a population of 30,000 or more; and

(2)  an entity created by an interlocal agreement between two or more political subdivisions of this state.

(b)  This chapter does not apply to a volunteer fire department or the members or employees of a volunteer fire department that is operating under a contract with an emergency services district.

(c) For purposes of this section, a reference to a municipality or a municipal official in a provision of law made applicable by this chapter to a district or entity described by Subsection (a) is considered to be a reference to the district or entity or the official of the district or entity responsible for the performance of the duty to which the provision applies.

(d) If this chapter applies to the fire department of and firefighters employed by an emergency services district and the population of the district decreases to less than 30,000, the applicability of this chapter in relation to the district is not affected.

Sec. 179.002.  DEFINITIONS. In this chapter:

(1) "Emergency services employer" means an emergency services district created under Chapter 775, Health and Safety Code, or an entity created by an interlocal agreement between two or more political subdivisions of this state.

(2) "Firefighter" means a person defined as fire protection personnel under Section 419.021, Government Code.

Sec. 179.003.  PAYROLL DEDUCTIONS; LONGEVITY PAY; CLASSIFICATION PAY; PENALTY. (a) Sections 141.008, 141.032, 141.033, and 141.034 apply to a firefighter employed by an emergency services employer.

(b) The penalty under Section 141.035 applies to a person who is in charge of the fire department of an emergency services employer or who is responsible for setting the compensation for firefighters employed by an emergency services employer in accordance with this section.

Sec. 179.004.  ASSISTANCE; BENEFITS; WORKING CONDITIONS; PENALTY. Sections 142.001, 142.0013, 142.0015, 142.0016, 142.004, 142.005, 142.006, 142.008, and 142.009 apply to a firefighter employed by an emergency services employer.

Sec. 179.005.  EXCLUSIVE APPEAL PROCEDURE.  This chapter provides the exclusive procedure for the administration and appeal of a disciplinary action against a firefighter covered by this chapter.

Sec. 179.006.  DISCIPLINARY SUSPENSION OR DISMISSAL. (a)  The head of a fire department for just cause may suspend or dismiss from employment a firefighter for violating a rule of the fire department or of the emergency services employer.  A rule described by this subsection must have been adopted by the governing body of the emergency services employer.

(b) A firefighter may be suspended for a reasonable period not to exceed 15 days or may be dismissed from employment with the fire department.

(c) If a department head suspends or dismisses a firefighter, the department head shall, within 120 hours after the hour of suspension or dismissal:

(1) file a written statement of the reasons for the suspension or dismissal with the governing body of the emergency services employer; and

(2) deliver in person to the firefighter a copy of the statement described by Subdivision (1) and a written statement that if the firefighter wishes to appeal the suspension or dismissal, the firefighter must file a written notice of appeal with the governing body not later than the 10th day after the date the firefighter receives the copy of the statement described by Subdivision (1) and the statement described by this subdivision.

(d)  The written statement filed by the department head with the governing body under Subsection (c)(1) must list each fire department or emergency services employer rule allegedly violated by the firefighter and specifically describe the actions of the firefighter that allegedly violate the rule.

(e)  A department head may not amend a written statement of the reasons for a firefighter's suspension or dismissal from employment submitted under Subsection (c).

Sec. 179.007.  APPEAL OF DISCIPLINARY SUSPENSION OR DISMISSAL. (a)  If a firefighter files a notice of appeal of the firefighter's suspension or dismissal from employment with the governing body of the emergency services employer, the governing body shall hold a hearing on the appeal and render a written decision not later than the 30th day after the date the governing body receives the notice of appeal from the firefighter. The firefighter and the governing body may agree to postpone the hearing for a definite period.

(b)  In a hearing conducted under this section, the department head may only allege actions and rule violations included in the department head's original written statement submitted to the governing body of the emergency services employer under Section 179.006(c)(1).

(c)  The governing body of the emergency services employer may deliberate in closed session after a hearing conducted under this section. In reaching its decision after the hearing, the governing body may not consider evidence that was not presented at the hearing.  The governing body must vote on the decision regarding an appeal under this section in open session.

(d)  In its decision, the governing body of an emergency services employer shall state whether the firefighter is:

(1)  permanently dismissed from employment with the fire department;

(2)  temporarily suspended from employment with the fire department; or

(3)  reinstated to the firefighter's former position or status in the fire department.

(e)  If in a decision rendered under this section the governing body of the emergency services employer finds that the period of disciplinary suspension should be reduced, the governing body may order a reduction in the period of suspension.

(f)  A firefighter who is reinstated to the position or class of service from which the firefighter was suspended or dismissed is entitled to:

(1)  full compensation for the actual time lost as a result of the suspension or dismissal at the rate of pay provided for the position held or class of service assigned; and

(2)  restoration of or credit for any other benefits lost as a result of the suspension or dismissal, including sick leave, vacation leave, and service credit in a retirement system.

(g)  The emergency services employer shall:

(1)  make any standard payroll deductions for retirement and other benefits restored as provided by Subsection (f)(2) from any compensation paid under Subsection (f)(1); and

(2)  make any of the employer's standard corresponding contributions to the retirement system or other applicable benefit system.

(h) A firefighter may be suspended or dismissed from employment only for a violation of the rules adopted by the governing body of the emergency services employer and only after a finding by the governing body of the truth of the specific charges made against the firefighter.

Sec. 179.008. APPEAL PROCEDURE. (a) A notice of appeal filed under Section 179.007 must:

(1) include the basis for the appeal and a request for a hearing; and

(2) contain a statement denying the truth of the charge as made, a statement taking exception to the legal sufficiency of the charge, a statement alleging that the recommended action does not fit the offense or alleged offense, or a combination of these statements.

(b) In each hearing, appeal, or review of any kind in which the governing body of the emergency services employer performs an adjudicatory function, the firefighter who is the subject of the hearing, appeal, or review is entitled to be represented by counsel or any other person the firefighter chooses. The hearing must be held in public.

(c) The governing body of the emergency services employer may issue subpoenas and subpoenas duces tecum for the attendance of witnesses and for the production of documentary material.

(d) The firefighter may request the governing body of the emergency services employer to subpoena any books, records, documents, papers, accounts, or witnesses that the firefighter considers pertinent to the case. The firefighter must make the request before the 10th day before the date the appeal hearing will be held. If the governing body does not subpoena the material, the governing body shall, before the third day before the date the hearing will be held, make a written report to the firefighter stating the reason the governing body will not subpoena the requested material. The report must be read into the public record of the hearing.

(e) Witnesses may be placed under the rule at a hearing conducted by the governing body of the emergency services employer.

(f) Only the evidence submitted at the hearing may be considered by the governing body of the emergency services employer.

(g) A public record of each proceeding shall be made, with copies available at cost.

(h) The governing body of the emergency services employer may designate three persons who are qualified voters within the employer's jurisdiction to serve as an appeal panel to hear and decide the appeal in lieu of the governing body. The appeal panel has the same powers and duties related to the appeal as the governing body, including the power to issue subpoenas.

Sec. 179.009. HEARING EXAMINER. (a) A firefighter may choose to appeal to a hearing examiner instead of the governing body of the emergency services employer. The appealing firefighter must submit to the governing body a written request as part of the original notice of appeal required under this chapter stating the person's decision to appeal to an independent third party hearing examiner.

(b) The hearing examiner's decision is final and binding on all parties. If the firefighter decides to appeal to an independent third party hearing examiner, the person automatically waives all rights to appeal to a district court except as provided by Section 179.010(e).

(c) If the appealing firefighter chooses to appeal to a hearing examiner, the firefighter and the department head, or their designees, shall first attempt to agree on the selection of an impartial hearing examiner. If the parties do not agree on the selection of a hearing examiner within 10 days after the date the appeal is filed, the parties shall immediately request a list of seven qualified neutral arbitrators from the American Arbitration Association or the Federal Mediation and Conciliation Service, or their successors in function. The firefighter and the department head, or their designees, may agree on one of the seven neutral arbitrators on the list. If the parties do not agree within five working days after the date they receive the list, each party or the party's designee shall alternate striking a name from the list, and the name remaining is the hearing examiner. The parties or their designees shall agree on a date for the hearing.

(d) The appeal hearing shall begin as soon as the hearing examiner can be scheduled. If the firefighter receives notice that the hearing examiner cannot begin the hearing within 45 days after the date of selection, the firefighter, within two days after receiving the notice, may call for the selection of a new hearing examiner using the procedure prescribed by Subsection (c).

(e) In a hearing conducted under this section, the hearing examiner has the same duties and powers as the governing body of the emergency services employer, including the power to issue subpoenas.

(f) In a hearing conducted under this section, the appealing firefighter shall pay the hearing examiner's fees and expenses. The party who calls a witness shall pay the costs of the witness.

Sec. 179.010. DISTRICT COURT PETITION. (a) A firefighter who is dissatisfied with the decision of the governing body of the emergency services employer may file a petition in a district court asking that the decision be set aside. The petition must be filed not later than the 10th day after the date the governing body's final decision is:

(1) sent to the firefighter by certified mail; or

(2) personally received by the firefighter or by the firefighter's designee.

(b) An appeal under this section is by trial de novo. The district court may grant the appropriate legal or equitable relief necessary to carry out the purposes of this chapter. The relief may include reinstatement with back pay if an order of suspension or dismissal is set aside.

(c) The court may award reasonable attorney's fees to the prevailing party and assess court costs against the nonprevailing party.

(d) If the court finds in favor of the firefighter, the court shall order the emergency services employer to pay lost wages to the firefighter.

(e) A district court may hear an appeal of a hearing examiner's award only on the grounds that the hearing examiner was without jurisdiction or exceeded the examiner's jurisdiction or that the order was procured by fraud, collusion, or other unlawful means.

(f) An appeal under this section must be brought in a district court having jurisdiction in the emergency services district or in a political subdivision in which the fire department is located, as applicable.

SECTION 2. This Act takes effect September 1, 2005.

## Floor Amendment No. 1

Amend **CSSB 1433** by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. Section 143.005, Local Government Code, is amended to read as follows:

Sec. 143.005. STATUS OF EMPLOYEES IF CHAPTER ADOPTED.

(a) Each fire fighter or police officer serving in a municipality that adopts this chapter and who has been in the service of the municipality for more than six months at the time this chapter is adopted and who is entitled to civil service classification has the status of a civil service employee and is not required to take a competitive examination to remain in the position the person occupies at the time of the adoption.

(b) Emergency medical services personnel who work in the fire department or another municipal department of a municipality that has adopted this chapter, and whose primary duties are to provide emergency medical services, are considered to be members of the fire department performing fire medical emergency technology who are fire fighters entitled to civil service protection. Such emergency medical services personnel shall not be considered members of the fire fighters' bargaining unit in a municipality that has adopted Chapter 174. Such personnel who have been in the service of the municipality for six months on the later of the date this chapter is adopted, or this subsection is added by amendment, have the status of civil service employees and are not required to take a competitive examination to remain in the positions they occupy on that date.

(c) "Emergency medical services personnel" as used in this Section has the meaning assigned by Health and Safety Code Section 773.003. The term applies only to individuals certified under Chapter 773, Health and Safety Code.

(d) If emergency medical services personnel covered by this Chapter work in a municipal department other than the fire department, the department head of such other municipal department will be appointed in accordance with Section 143.013, and will have all duties assigned to the department head by this Chapter.

## Floor Amendment No. 1 on Third Reading

Amend **CSSB 1433** on third reading by striking the text added by second reading Floor Amendment No. 1 by Martinez.

The amendments were read.

Senator Madla moved to concur in the House amendments to **SB 1433**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 1570 WITH HOUSE AMENDMENT

Senator Williams called **SB 1570** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 1570** (House committee report) by striking SECTION 1 of the bill (page 1, line 4, through page 2, line 15) and substituting a new SECTION 1 to read as follows:

SECTION 1. Section 111.064, Tax Code, is amended by amending Subsections (a), (c), and (f) and adding Subsection (c-1) to read as follows:

(a) Except as underline{otherwise} provided by <u>this section, for a refund under this chapter</u> [Subsections (b) and (c), in a comptroller's final decision on a claim for refund or in an audit], interest is at the rate <u>that is the lesser of the annual rate of interest earned on deposits in the state treasury during December of the previous calendar year, as determined by the comptroller, or the rate set in Section 111.060, and accrues</u> on the amount found to be erroneously paid for a period:

(1) beginning on the later of 60 days after the date of payment or the due date of the tax report; and

(2) ending on, as determined by the comptroller, either the date of allowance of credit on account of the comptroller's final decision or audit or a date not more than 10 days before the date of the refund warrant.

(c) For a refund underline{claimed before September 1, 2005, and granted for a report period due on or after January 1, 2000, the rate of interest is the rate set in Section 111.060} [granted for a report period due on or after January 1, 2000, the rate of interest is the rate set in Section 111.060].

underline{(c-1) A refund, without regard to the date claimed, for a report period due before January 1, 2000, does not accrue interest.}

(f) A local revenue fund is not subject to Subsections underline{(a)-(c-1)} [(a)-(c)]. In this subsection, "local revenue fund" includes a court cost, a fee, a fine, or a similar charge collected by a municipality, a county, or a court of this state and remitted to the comptroller.

The amendment was read.

Senator Williams moved to concur in the House amendment to **SB 1570**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 356 WITH HOUSE AMENDMENT

Senator Gallegos, on behalf of Senator Ellis, called **SB 356** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 356** in SECTION 1 of the bill, following added Subsection (c), Section 379D.010, Local Government Code (engrossed version, page 8, between lines 24 and 25), by inserting the following:

<u>(d) Notwithstanding Subsection (c), housing developed under this chapter may consist of one to eight residential units, all of which may be rental units, if:</u>

(1)  each tenant household meets the income eligibility requirements of a low income household;

(2)  the housing is located in an area that:

(A)  is adjacent to the central business district of the municipality; and

(B)  has a number of owner-occupied households that does not exceed 25 percent of the total number of households in the area; and

(3)  the median income of households for the area described by Subdivision (2) is less than 50 percent of the median income of households for the municipality.

The amendment was read.

Senator Gallegos, on behalf of Senator Ellis, moved to concur in the House amendment to **SB 356**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 14 WITH HOUSE AMENDMENTS

Senator Jackson called **SB 14** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 14** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to rates for certain property and casualty insurance.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Article 5.144, Insurance Code, is amended by amending Subsection (b) and adding Subsections (b-1) and (b-2) to read as follows:

(b)  Except as provided by Subsection (d) of this article, if the commissioner determines that an insurer has charged a rate for personal automobile insurance or residential property insurance that is excessive or unfairly discriminatory, as described by Article 5.13-2 [or 5.101] of this code, the commissioner may order the insurer to:

(1)  issue a refund of the excessive or unfairly discriminatory portion of the premium, plus interest on that amount, directly to each affected policyholder if the amount of that portion of the premium is at least 7.5 percent of the total premium charged for the coverage; or

(2)  if the amount of that portion of the premium is less than 7.5 percent:

(A)  provide each affected policyholder who renews the policy a future premium discount in the amount of the excessive or unfairly discriminatory portion of the premium, plus interest on that amount; and

(B)  provide each affected policyholder who does not renew or whose coverage is otherwise terminated a refund in the amount described by Subdivision (1) of this subsection.

(b-1)  The rate for interest assessed under Subsection (b) of this article is the lesser of 18 percent or the sum of six percent and the prime rate for the calendar year in which the commissioner's order finding that the rate is excessive or unfairly

discriminatory is issued. For purposes of this subsection, the prime rate is the prime rate as published in The Wall Street Journal for the first day of the calendar year that is not a Saturday, Sunday, or legal holiday, and the interest accrues beginning on the date on which the commissioner enters the order and continues to accrue until the refund is paid. An insurer may not be required to pay any interest penalty if the insurer prevails in an appeal of the commissioner's order under Subchapter D, Chapter 36, of this code.

(b-2) An insurer may not claim a premium tax credit to which the insurer is otherwise entitled unless the insurer complies with Subsection (b) of this article.

SECTION 2. This Act takes effect September 1, 2005.

**Floor Amendment No. 1 on Third Reading**

Amend **CSSB 14** (House committee printing) on third reading as follows:

(1) In SECTION 1 of the bill, in added Subsection (b-1), Article 5.144, Insurance Code (page 2, lines 10-12), strike "holiday, and the interest accrues beginning on the date on which the commissioner enters the order and continues" and substitute "holiday. The period for the refund and interest begins on the date on which the commissioner enters the order, and interest continues".

(2) Add the following appropriately numbered SECTIONS to the bill and renumber subsequent SECTIONS of the bill accordingly:

SECTION __. Article 5.171, Insurance Code, is amended to read as follows:

Art. 5.171. RATING TERRITORIES. Notwithstanding any other provision of this code, an insurer, in writing residential property or personal automobile insurance, may not use rating territories that subdivide a county unless:

(1) the county is subdivided; and

(2) the rate for any subdivisions within that county is not greater than 15 percent higher than the rate used in any other subdivisions in the county by that insurer, except that the commissioner may by rule allow a greater rate difference [for residential property insurance or personal automobile insurance].

SECTION __. Article 5.171, Insurance Code, as amended by this Act applies only to the rates applicable to insurance policies that are delivered, issued for delivery, or renewed on or after January 1, 2006. Rates applicable to policies that are delivered, issued for delivery, or renewed before January 1, 2006, are governed by the law as it existed immediately before the effective date of this Act, and that law is continued in effect for this purpose.

SECTION __. Section 202.052(a), Insurance Code, is amended to read as follows:

(a) The commissioner by rule [department] shall adopt [impose] and the comptroller shall collect fees for the use of the state from each authorized insurer writing a class of insurance that may be written by an insurer operating under Chapter 841. The commissioner may adopt different valuation fees for valuation of individual life insurance policies and group life insurance policies. The amount of the fees adopted may not exceed:

(1) for valuing life insurance policies, and for each $1 million of insurance or fraction thereof . . . $10; and

(2) for filing the annual statement . . . $500.

SECTION __. The change in law made by this Act in amending Section 202.052(a), Insurance Code, applies only to a fee, payment of which is originally due on or after January 1, 2006. A fee, payment of which is originally due before January 1, 2006, is governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose.

SECTION ___. Title 5, Insurance Code, is amended by adding Subtitle G to read as follows:

### SUBTITLE G.  REGULATION OF INSURER MARKET CONDUCT
### CHAPTER 751.  MARKET CONDUCT SURVEILLANCE
### SUBCHAPTER A. GENERAL PROVISIONS

Sec. 751.001.  SHORT TITLE. This chapter may be cited as the Insurance Market Conduct Surveillance Act.

Sec. 751.002.  PURPOSE AND SCOPE. (a)  The purpose of this chapter is to establish a framework for department market conduct actions, including:

(1)  processes and systems for identifying, assessing, and prioritizing market conduct problems that have a substantial adverse impact on consumers, policyholders, and claimants;

(2)  development of appropriate market conduct actions by the commissioner as required to:

(A)  substantiate market conduct problems; and

(B)  remedy significant market conduct problems; and

(3)  procedures to communicate and coordinate market conduct actions with other states to foster the most efficient and effective use of resources.

(b)  Notwithstanding any other law of this state, the department or commissioner, as applicable, may undertake market analysis or market conduct action only as provided by this chapter.

Sec. 751.003.  DEFINITIONS. (a)  In this chapter:

(1)  "Complaint" means a written or documented oral communication, the primary intent of which is to express a grievance or an expression of dissatisfaction.

(2)  "Desk examination" means a targeted examination conducted by an examiner at a location other than an insurer's premises. The term includes an examination performed at the department's offices during which the insurer provides requested documents for department review by hard copy or by microfiche, disk, or other electronic media.

(3)  "Market analysis" means a process under which market conduct surveillance personnel collect and analyze information from filed schedules, surveys, required reports, and other sources as necessary to:

(A)  develop a baseline understanding of the marketplace; and

(B)  identify insurer patterns or practices that:

(i)  deviate significantly from the norm; or

(ii)  pose a potential risk to the insurance consumer.

(4)  "Market analysis handbook" means the outline of the elements and objectives of market analysis as developed and adopted by the National Association of Insurance Commissioners, and used to establish a uniform process by which states may establish and implement market analysis programs.

(5) "Market conduct action" means any activity that the commissioner may initiate to assess and address insurer market practices before conducting a targeted examination. The term does not include a commissioner action taken to resolve:

(A) an individual consumer complaint; or

(B) another report relating to a specific instance of insurer misconduct.

(6) "Market conduct examination" means a review of one or more lines of business of an insurer domiciled in this state that is not conducted for cause. The term includes a review of rating, tier classification, underwriting, policyholder service, claims, marketing and sales, producer licensing, complaint handling practices, or compliance procedures and policies.

(7) "Market conduct examiner's handbook" means the set of guidelines, developed and adopted by the National Association of Insurance Commissioners, that document established practices to be used by market conduct surveillance personnel in developing and executing an examination under this chapter.

(8) "Market conduct surveillance personnel" means those individuals employed by or under contract with the department who collect, analyze, review, or act on information regarding insurer patterns or practices.

(9) "Market conduct uniform examination procedures" means the set of guidelines developed and adopted by the National Association of Insurance Commissioners designed to be used by market conduct surveillance personnel in conducting an examination under this chapter.

(10) "On-site examination" means a targeted examination that is conducted at:

(A) the insurer's home office; or

(B) another location at which the records under review are stored.

(11) "Qualified contract examiner" means a person qualified by education, experience, and any applicable professional designations who is under contract with the commissioner to perform market conduct actions.

(12) "Standard data request" means the set of field names and descriptions developed and adopted by the National Association of Insurance Commissioners for use by market conduct surveillance personnel in an examination.

(13) "Targeted examination" means a limited review and analysis, conducted through a desk examination or an on-site examination and in accordance with the market conduct uniform examination procedures, of specific insurer conduct, practices, or risks identified through market analysis that have not been remedied by the insurer, including:

(A) underwriting and rating;

(B) marketing and sales;

(C) complaint handling operations and management;

(D) advertising materials;

(E) licensing;

(F) policyholder services;

(G) claims handling;

(H) policy forms and filings; or

(I) tier classification.

(14)  "Third-party model or product" means a model or product provided by an entity that is separate from and not under direct or indirect corporate control of the insurer using the model or product.

(b)  In this chapter, "affiliate" and "subsidiary" have the meanings described by Section 823.003.

Sec. 751.004.  IMMUNITY. (a) A cause of action does not arise, and liability may not be imposed, for any statements made or conduct performed in good faith while implementing this chapter, against:

(1)  the commissioner;

(2)  an authorized representative of the commissioner; or

(3)  an examiner appointed by the commissioner.

(b)  A cause of action does not arise, and liability may not be imposed, against any person for the act of communicating or delivering information or data to the commissioner or the commissioner's authorized representative or examiner under an examination made under this chapter, if the act of communication or delivery was performed in good faith and without fraudulent intent or the intent to deceive.

(c)  A person identified in Subsection (a) is entitled to attorney's fees and costs if the person is the prevailing party in a civil cause of action for libel, slander, or any other relevant tort arising out of activities conducted in implementing this chapter, and the party bringing the action was not substantially justified in doing so. For purposes of this subsection, an action is "substantially justified" if the action had a reasonable basis in law or fact at the time that it was initiated.

(d)  This section does not abrogate or modify any common law or statutory privilege or immunity.

[Sections 751.005-751.050 reserved for expansion]

SUBCHAPTER B. GENERAL POWERS AND DUTIES OF COMMISSIONER

Sec. 751.051.  PARTICIPATION IN NATIONAL MARKET CONDUCT DATABASES. (a) The commissioner shall collect and report market data to the National Association of Insurance Commissioner's market information systems, including the complaint database system, the examination tracking system, the regulatory information retrieval system, or other successor systems of that association, as determined by the commissioner.

(b)  Information collected and maintained by the department shall be compiled in a manner that meets the requirements of the National Association of Insurance Commissioners.

Sec. 751.052.  COORDINATION WITH OTHER STATES.  The commissioner shall coordinate the department's market analysis and examination efforts with other states through the National Association of Insurance Commissioners.

Sec. 751.053.  INFORMATION FROM COMMISSIONER. (a) At least once annually or more frequently if determined necessary by the commissioner, the commissioner shall provide in an appropriate manner to insurers and other entities subject to this code information regarding new laws and rules, enforcement actions, and other information the commissioner considers relevant to ensure compliance with market conduct requirements.

(b)  The commissioner may provide the notice required under Subsection (a) in an electronic format that is designed to give insurers and other entities adequate notice.

(c)  Failure by the commissioner to provide the information described by Subsection (a) does not constitute a defense for an insurer who fails to comply with an insurance law of this state.

Sec. 751.054.  REPORT OF VIOLATIONS. (a)  The commissioner shall designate an individual within the department whose responsibilities shall include the receipt of information from employees of insurers and other entities regulated by the department regarding violations of laws or rules by their employers. The commissioner's designee shall be properly trained in the handling of that information.

(b)  Information received under this section is a confidential communication and is not public information.

Sec. 751.055.  EXERCISE OF SUBPOENA AUTHORITY. The commissioner has the subpoena power authorized by Subchapter C, Chapter 36, for the production of documents under this chapter and enforcement of this subtitle.

[Sections 751.056-751.100 reserved for expansion]

SUBCHAPTER C. RELATIONS WITH OTHER STATES

Sec. 751.101.  COMMISSIONER AUTHORITY; INTERACTIONS WITH OTHER INSURANCE COMMISSIONERS OF OTHER STATES. (a)  The commissioner has responsibility for conducting market conduct examinations on domestic insurers. The commissioner may delegate that responsibility to the insurance commissioner of another state, if that insurance commissioner agrees to accept the delegated responsibility. If the commissioner elects to delegate responsibility for examining an insurer, the commissioner shall accept a report of the examination prepared by the insurance commissioner to whom the responsibility has been delegated.

(b)  If the insurer to be examined is part of an insurance holding company system, the commissioner may also seek to simultaneously examine any affiliate of the insurer that is authorized to write the same types of insurance in this state as the insurer if the insurance commissioner of the state in which the affiliate is organized consents and delegates responsibility for that examination.

(c)  In lieu of conducting a targeted examination of an insurer that holds a certificate of authority in this state but is not a domestic insurer, the commissioner shall accept a report of a market conduct examination regarding that insurer prepared by the insurance commissioner of the state in which the insurer is organized or by another state if:

(1)  the laws of the examining state that are applicable to the subject of the examination are substantially similar to those of this state; and

(2)  the examining state has a market conduct surveillance system that the commissioner deems comparable to the market conduct surveillance system required under this chapter.

(d)  The commissioner's determination under Subsection (c)(2) is discretionary with the commissioner and is not subject to appeal.

(e) If a market conduct examination conducted by another state results in a finding that an insurer should modify a specific practice or procedure, the commissioner shall accept documentation that the insurer has made a similar modification in this state in lieu of initiating a market conduct action or examination related to that practice or procedure. The commissioner may require other or additional practice or procedure modifications.

[Sections 751.102-751.150 reserved for expansion]

SUBCHAPTER D. MARKET ANALYSIS PROCEDURES

Sec. 751.151.  COLLECTION  OF  INFORMATION;  COMMISSIONER ANALYSIS. (a)  Subject to Subsection (d), the commissioner shall gather insurance market information from:

(1)  data available to the department, including survey results and information required to be reported to the department;

(2)  information collected by the National Association of Insurance Commissioners and other public and private sources; and

(3)  information from within and outside the insurance industry.

(b)  The commissioner shall analyze the information compiled under Subsection (a) as necessary to:

(1)  develop a baseline understanding of the insurance marketplace; and

(2)  identify for further review insurers or insurance practices that deviate significantly from the norm or that pose a potential risk to the insurance consumer.

(c)  The commissioner shall use the market analysis handbook as a resource in performing the analysis required under this section.

(d)  Except as otherwise specifically provided, the department or the commissioner, as applicable, may not require an insurer to report information in a manner that is inconsistent with the records the insurer maintains in the ordinary course of business or can create at a reasonable expense or effort.

Sec. 751.152.  ADDITIONAL ANALYSIS OF MARKET ACTIONS. (a) If, as a result of the market analysis, the commissioner determines that further inquiry into a particular insurer or insurance practice is needed, the commissioner shall consider taking one or more of the market conduct actions described by Subsection (b) before conducting a targeted examination. If a market conduct action selected by the commissioner requires the participation of or a response by the affected insurer, the commissioner shall notify the insurer of the action selected in writing.

(b)  Market conduct actions described by Subsection (a) may include:

(1)  correspondence with the insurer;

(2)  insurer interviews;

(3)  information gathering;

(4)  policy and procedure reviews;

(5)  interrogatories; and

(6)  review of insurer self-evaluation and compliance programs, including insurer membership in a best-practice organization.

(c)  The commissioner shall select market conduct actions that are efficient and cost-effective for the department and the insurer while protecting the interests of the insurance consumer.

(d)  The commissioner shall take steps reasonably necessary to:

(1) eliminate requests for information that duplicates or conflicts with information provided as part of an insurer's annual financial statement, the annual market conduct statement of the National Association of Insurance Commissioners, or other required schedules, surveys, or reports that are regularly submitted to the commissioner, or with data requests made by other states if that information is available to the commissioner, unless the information is state specific; and

(2) coordinate the market conduct actions and findings of this state with those of other states.

Sec. 751.153. PROTOCOLS FOR MARKET CONDUCT ACTIONS. (a) Each market conduct action taken as a result of a market analysis:

(1) must focus on the general business practices and compliance activities of insurers, rather than identifying infrequent or unintentional random errors that do not cause significant consumer harm; and

(2) may not result in a market conduct examination, unless the head of the insurance regulatory agency in the insurer's state of domicile determines that a market conduct examination is needed.

(b) The commissioner may determine the frequency and timing of the market conduct actions. The timing of an action depends on the specific market conduct action to be initiated unless extraordinary circumstances indicating a risk to consumers require immediate action.

(c) If the commissioner has information that more than one insurer is engaged in practices that may violate statutes or rules, the commissioner may schedule and coordinate multiple examinations simultaneously.

(d) The commissioner shall provide an insurer with an opportunity to resolve to the satisfaction of the commissioner any matter that arises as a result of a market analysis before any additional market conduct actions are taken against the insurer. If the insurer has modified a practice or procedure as a result of a market conduct action taken or examination conducted by the insurance commissioner of another state, and the commissioner deems that state's market conduct surveillance system comparable to the system required under this chapter, the commissioner may accept the modified practice or procedure and may require other or additional practice or procedure modifications.

(e) For an application by the department of a handbook, guideline, or other product referenced in this chapter that is the work product of the National Association of Insurance Commissioners that changes the way in which market conduct actions are conducted, the commissioner shall give notice and provide interested parties with an opportunity for a public hearing as provided by Chapter 2001, Government Code, if the change:

(1) necessitates a change in a statute or rule; or

(2) deviates from the applicable handbook, guideline, or other product most recently adopted by the National Association of Insurance Commissioners.

(f) Except as otherwise provided by law, each insurer or person from whom information is sought, and each officer, director, or agent of that insurer or person, shall provide the commissioner with convenient and free access to all books, records, accounts, papers, documents and any computer or other recordings relating to the property, assets, business and affairs of the insurer or person.

(g)  Each officer, director, employee, insurance producer, and agent of an insurer or person described by Subsection (f) shall, to the extent of that individual's ability, facilitate and aid in a department market conduct action.

[Sections 751.154-751.200 reserved for expansion]

SUBCHAPTER E. EXAMINATIONS

Sec. 751.201.  EXAMINATION. (a)  If the commissioner determines that a market conduct action described by Section 751.152(b) is not appropriate, the commissioner may conduct a targeted examination in accordance with the market conduct uniform examination procedures and the market conduct examiners handbook.

(b)  A targeted examination may be conducted through a desk examination or an on-site examination. To the extent feasible, the department shall conduct a market conduct examination through desk examinations and data requests before conducting an on-site examination.

(c)  The department shall conduct an examination in accordance with the market conduct examiners handbook and the market conduct uniform examinations procedures.

(d)  The department shall use the standard data request or a successor product that is substantially similar to the standard data request as adopted by the commissioner by rule.

(e)  If the insurer to be examined is not a domestic insurer, the commissioner shall coordinate the examination with the insurance commissioner of the state in which the insurer is organized.

Sec. 751.202.  WORK PLAN. Before beginning an examination, market conduct surveillance personnel shall prepare a work plan that includes:

(1)  the name and address of the insurer to be examined;

(2)  the name and contact information of the examiner-in-charge;

(3)  a statement of the reasons for the examination;

(4)  a description of the scope of the examination;

(5)  the date the examination is scheduled to begin;

(6)  notice to any non-insurance department personnel who will assist in the examination;

(7)  a time estimate for the examination; and

(8)  if the cost of the examination is billed to the affected insurer:

(A)  a budget for the examination; and

(B)  an identification of factors that will be included in the billing.

Sec. 751.203.  NOTICE OF EXAMINATION. (a)  Unless the examination is conducted in response to extraordinary circumstances as described by Section 751.153(b), the department shall notify an affected insurer of an examination not later than the 60th day before the scheduled date of the beginning of the examination. The notice must include the examination work plan and a request that the insurer name an examination coordinator for the insurer.

(b)  In addition to the notice required under Subsection (a), the commissioner shall post notice that a market conduct examination has been scheduled on the National Association of Insurance Commissioners examination tracking system.

(c)  If a targeted examination is expanded beyond the reasons provided to the insurer in the notice of the examination required under Subsection (a), the commissioner shall provide written notice to the insurer, explaining the extent of the expansion and the reasons for the expansion. The department shall provide a revised work plan to the insurer before the beginning of any significantly expanded examination.

Sec. 751.204.  PRE-EXAMINATION CONFERENCE.  Not later than the 30th day before the scheduled date of the examination, the commissioner shall conduct a pre-examination conference with the insurer's examination coordinator and key personnel to clarify expectations.

Sec. 751.205.  EXIT CONFERENCE. Before the conclusion of an examination, the member of the market conduct surveillance personnel who is designated as the examiner-in-charge shall schedule an exit conference with the insurer.

Sec. 751.206.  EXAMINATION REPORT. (a)  Unless the commissioner and the insurer agree to a different schedule, the commissioner shall follow the time line established under this section.

(b) The commissioner shall deliver the draft examination report to the insurer not later than the 60th day after the date the examination is completed. For purposes of this section, the date the examination is completed is the date on which the exit conference is conducted.

(c)  Not later than the 30th day after the date on which the insurer receives the draft examination report, the insurer shall provide any written comments regarding the report to the department.

(d)  The department shall make a good faith effort to resolve issues with the insurer informally and shall prepare a final examination report not later than the 30th day after the date of receipt of the insurer's written comments on the draft report unless a mutual agreement is reached to extend the deadline.

(e)  The department shall include the insurer's responses in the final examination report. The responses may be included as an appendix or in the text of the examination report. An insurer is not obligated to submit a response. An individual involved in the examination may not be named in either the report or the insurer response except to acknowledge the individual's involvement.

(f)  The commissioner may make corrections and other changes to the final examination report as appropriate, and shall issue the report to the insurer. Not later than the 30th day after receipt of the final examination report under this subsection, the insurer shall accept the report, accept the findings of the report, or request a hearing. The commissioner and the insurer by mutual agreement may extend the period for an additional 30 days. A request for a hearing must be made in writing and must follow the requirements of Chapter 2001, Government Code.

Sec. 751.207.  CONFIDENTIALITY OF EXAMINATION REPORT INFORMATION. (a) A final or preliminary market conduct examination report, and any information obtained during the course of an examination, is confidential and is not subject to disclosure under Chapter 552, Government Code. This section may not be construed to limit the commissioner's authority to use any final or preliminary market conduct examination report, any examiner or company work papers or other

documents, or any other information discovered or developed during the course of an examination in the furtherance of any legal or regulatory action that the commissioner, in the commissioner's sole discretion, may deem appropriate.

(b)  This chapter does not prevent the commissioner from disclosing at any time the contents of a final market conduct examination report to the department, the insurance department of any other state, or an agency of the federal government, if the department or agency receiving the report agrees in writing to maintain the information as confidential and in a manner consistent with this chapter.

(c)  The commissioner shall provide to an insurer subject to a final market conduct examination a written agreement described by Subsection (b) not later than the fifth day after the date the final market conduct examination is released under Subsection (b).

Sec. 751.208.  ASSESSMENT OF COSTS OF EXAMINATION. (a) Subject to Subsection (d), if the reasonable and necessary cost of a market conduct examination is to be assessed against the affected insurer, fees for that cost must be consistent with those otherwise authorized by law. The fees must be itemized and bills for the fees must be provided to the insurer on a monthly basis for review prior to submission for payment.

(b)  The commissioner shall actively manage and oversee examination costs, including costs associated with the use of department examiners and with retaining qualified contract examiners necessary to perform an on-site examination. To the extent the commissioner retains outside assistance, the commissioner shall adopt by rule written protocols that:

(1)  clearly identify the types of functions to be subject to outsourcing;

(2)  provide specific time lines for completion of the outsourced review;

(3)  require disclosure of recommendations made by contract examiners;

(4)  establish and use a dispute resolution or arbitration mechanism to resolve conflicts with insurers regarding examination fees; and

(5)  require disclosure of the terms of contracts entered into with outside consultants, and specifically terms regarding the fees or hourly rates that may be charged by those consultants.

(c)  The commissioner must review and affirmatively endorse detailed billings made by a qualified contract examiner before the detailed billings are sent to the insurer.

(d)  An insurer may not be required to provide reimbursement for examiner fees under Subsection (a), whether those fees are incurred by market conduct surveillance personnel or qualified contract examiners, to the extent that those fees exceed the fees prescribed in the market conduct examiner's handbook and any successor documents to that handbook, unless the commissioner demonstrates that the fees prescribed in the handbook are inadequate under the circumstances of the examination.

Sec. 751.209.  LIMIT ON CERTAIN EXAMINATIONS. The commissioner may not conduct a market conduct examination more frequently than once every three years. The commissioner may defer conducting a market conduct examination for longer than once every three years.

[Sections 751.210-751.250 reserved for expansion]

SUBCHAPTER F. CONFIDENTIALITY REQUIREMENTS

Sec. 751.251. NO WAIVER. (a) The disclosure to the commissioner under this subchapter of a document, material, or information does not constitute the waiver of any applicable privilege or claim of confidentiality regarding the document, material, or information.

(b) Notwithstanding Subsection (a), an insurer may not be compelled to disclose a self-audit document or waive any statutory or common law privilege. An insurer may, however, voluntarily disclose a document described by this subsection to the commissioner in response to any market conduct action or examination.

(c) For the purposes of Subsection (b), "self-audit document" means a document that is prepared as a result of or in connection with an insurance compliance audit.

Sec. 751.252. AUTHORITY OF COMMISSIONER. (a) The commissioner may share documents, materials, or other information obtained by or disclosed to the commissioner under this chapter with other state, federal and international regulatory agencies and law enforcement authorities if the recipient agrees to and has the legal authority to maintain the confidentiality and privileged status of the document, material, or other information.

(b) The commissioner may receive documents, materials, or information, including otherwise confidential and privileged documents, materials, or information, from the National Association of Insurance Commissioners and that association's affiliates or subsidiaries, and from regulatory and law enforcement officials of other foreign or domestic jurisdictions. The commissioner shall maintain as confidential or privileged any document, material, or information received with notice or the understanding that the document, material, or information is confidential or privileged under the laws of the jurisdiction that is the source of the document, material, or information.

(c) Consistent with this section, the commissioner may enter into agreements governing the sharing and use of information.

[Sections 751.253-751.300 reserved for expansion]

SUBCHAPTER G. MARKET CONDUCT SURVEILLANCE PERSONNEL

Sec. 751.301. PERSONNEL; QUALIFICATIONS. (a) To conduct market conduct surveillance under this chapter, the commissioner may designate department staff to perform duties under this chapter, and may supplement that staff with qualified outside professional assistance if the commissioner determines that that assistance is necessary.

(b) Market conduct surveillance personnel must be qualified by education and experience and, if applicable, must hold appropriate professional designations.

Sec. 751.302. CONFLICT OF INTEREST. (a) An individual who is a member of the market conduct surveillance personnel has a conflict of interest, either directly or indirectly, if the individual is affiliated with the management of, has been employed by, or owns a pecuniary interest in, an insurer subject to an examination conducted under this chapter.

(b) This section may not be construed to automatically preclude the individual from being:

(1) a policyholder or claimant under an insurance policy;

(2) a grantee of a mortgage or similar instrument on the individual's residence from a regulated entity if done under customary terms and in the ordinary course of business;

(3) an investment owner in shares of regulated diversified investment companies; or

(4) a settlor or beneficiary of a blind trust into which any otherwise permissible holdings have been placed.

Sec. 751.303.  ACCESS TO INFORMATION. (a)  Except as otherwise provided by law, market conduct surveillance personnel shall, as practicable, have free and full access to all books and records, and all employees, officers, and directors, of the insurer during regular business hours.

(b)  On the request of market conduct surveillance personnel, an insurer that uses a third-party model or product for any of the activities under examination shall make the details of those models or products available to that personnel.

Sec. 751.304.  AUTHORITY OF MARKET CONDUCT SURVEILLANCE PERSONNEL.  Market conduct surveillance personnel may examine insurance company personnel under oath if that action is ordered by the commissioner under Subchapter C, Chapter 36.

[Sections 751.305-751.350 reserved for expansion]

SUBCHAPTER H. SANCTIONS

Sec. 751.351.  SANCTIONS. (a)  The commissioner may impose sanctions under Chapter 82 against an insurer determined, as a result of a market conduct action or other action under this chapter, to have violated this code, a rule adopted under this code, or another insurance law of this state.

(b)  In determining an appropriate sanction under Subsection (a) the commissioner shall consider:

(1)  any actions taken by the insurer to maintain membership in, and comply with the standards of, best-practice organizations that promote high ethical standards of conduct in the insurance marketplace; and

(2)  the extent to which the insurer maintains regulatory compliance programs to self-assess, self-report, and remediate problems detected by the insurer.

SECTION __.  Article 5.43, Insurance Code, is amended by adding Subsections (a-1) and (f) to read as follows:

(a-1)  A residential property insurance claim under this article does not include a claim:

(1)  resulting from a loss caused by natural causes;

(2)  that is filed but is not paid or payable under the policy; or

(3)  that an insurer is prohibited from using under Section 3, Article 5.35-4, of this code.

(f)  Any change in the amount of a discount provided under this article must comply with the requirements of Section 551.107 of this code.

SECTION __.  Section 551.107, Insurance Code, is amended by amending Subsections (b), (c), (e), and (f) and adding Subsection (g) to read as follows:

(b)  A claim under this section does not include a claim:

(1)  resulting from a loss caused by natural causes; [or]

(2)  that is filed but is not paid or payable under the policy; or

(3)  that an insurer is prohibited from using under Section 3, Article 5.35-4.

(c)  An insurer may assess a premium surcharge at the time an insurance policy is renewed if the insured has filed one [two] or more claims in the preceding three policy years [year]. [The insurer may assess an additional premium surcharge if an additional claim is made in the following policy year. The department shall set the amount of any surcharge that may be assessed under this subsection.]  The amount of the surcharge must be based on sound actuarial principles [may not exceed 10 percent of the total premium, including any premium surcharge, actually paid by the insured in the preceding policy year].

(e)  An insurer may notify an insured who has filed two claims in a period of less than three years that the insurer may refuse to renew the policy if the insured files a third claim during the three-year period. If the insurer does not notify the insured in accordance with this subsection, the insurer may not refuse to renew the policy because of claims [losses]. The notice form must:

(1)  list the policyholder's claims; and

(2)  contain the sentence: "The filing by you of another claim, except for a claim resulting from a loss caused by natural causes, a claim filed but not paid or payable under the policy under which it was filed, or an appliance-related claim that we are prohibited from using under Section 3, Article 5.35-4, Texas Insurance Code, [Another non-weather related loss] could cause us to refuse to renew your policy."

(f)  In this section, "premium surcharge" means an additional amount that is added to the base rate.  The term does not include a reduction or elimination of a discount previously received by an insured, reassignment of an insured from one rating tier to another, re-rating an insured, or re-underwriting an insured by using multiple affiliates [An insurer that renews the insurance policy of an insured who has filed three or more claims under the policy in a three-year period may assess a premium surcharge in an amount set by the department].

(g)  The commissioner shall adopt rules as necessary to implement this section.

SECTION __.  The changes in law made by this Act in amending Article 5.43 and Section 551.107, Insurance Code, apply only to an insurance policy that is delivered, issued for delivery, or renewed on or after January 1, 2006. An insurance policy that is delivered, issued for delivery, or renewed before January 1, 2006, is covered by the law in effect at the time the policy was delivered, issued for delivery, or renewed, and that law is continued in effect for that purpose.

**Floor Amendment No. 2 on Third Reading**

Amend third reading Floor Amendment No. 1 by Eiland to **SB 14** on third reading as follows:

(1)  In item (1) of the amendment (page 1, lines 6-7), strike "begins on the date on which the commissioner enters the order" and substitute "begins on the date the department first provides the insurer with formal written notice that the insurer's filed rate is excessive or unfairly discriminatory".

(2)  Strike the SECTION of the amendment that amends Section 202.052(a), Insurance Code, and the SECTION following that SECTION (page 2, lines 2-19).

(3)  In added Subsection (e), Section 751.101, Insurance Code (page 9, line 15), strike "If" and substitute "Subject to a determination under Subsection (c), if".

(4)  Strike added Subsection (f), Article 5.43, Insurance Code (page 21, line 30, through page 22, line 1), and amend the recital to the SECTION amending Article 5.43, Insurance Code, appropriately.

The amendments were read.

Senator Jackson moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 14** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Jackson, Chair; Fraser, Brimer, Lucio, and Van de Putte.

### CONFERENCE COMMITTEE REPORT ON
### HOUSE BILL 747 ADOPTED

Senator Staples called from the President's table the Conference Committee Report on **HB 747**.  The Conference Committee Report was filed with the Senate on Wednesday, May 25, 2005.

On motion of Senator Staples, the Conference Committee Report was adopted by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1074 WITH HOUSE AMENDMENT

Senator Staples called **SB 1074** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 1074** by adding the following appropriately numbered section to the bill and renumbering existing sections accordingly:

SECTION ____.  Subsection (a), Section 644.002, Transportation Code, is amended to read as follows:

(a)  A federal motor carrier safety regulation prevails over a conflicting provision of this title applicable to a commercial vehicle operated in interstate commerce. A [chapter or a] rule adopted by the director under this chapter prevails over a conflicting provision of a federal motor carrier safety regulation applicable to a commercial vehicle operated in intrastate commerce.

The amendment was read.

Senator Staples moved to concur in the House amendment to **SB 1074**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 343 WITH HOUSE AMENDMENTS

Senator Brimer called **SB 343** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

#### Amendment

Amend **SB 343** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the regulation of the placement of water wells and the installation and maintenance of well pumps and equipment; providing a penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Chapter 240, Local Government Code, is amended by adding Subchapter C to read as follows:

### SUBCHAPTER C. REGULATION OF WATER WELLS IN
### CERTAIN COUNTIES

Sec. 240.041. DEFINITION. In this subchapter, "on-site sewage disposal system" has the meaning assigned by Section 366.002, Health and Safety Code.

Sec. 240.042. AUTHORITY TO REGULATE PLACEMENT OF WATER WELLS. (a)  The commissioners court of a county with a population of 1.4 million or more by order may regulate the placement of private water wells in the unincorporated area of the county to prevent:

(1) the contamination of a well from an on-site sewage disposal system;

(2) rendering an on-site sewage disposal system that was in place before the well was drilled out of compliance with applicable law because of the placement of the well; and

(3) drilling into a contaminated groundwater plume or aquifer.

(b) A commissioners court that decides to regulate the placement of private water wells under this subchapter by order shall adopt rules governing the placement of a water well in relation to an existing on-site sewage disposal system or drilling into a contaminated groundwater plume or aquifer and enforcement of those rules. The rules must require:

(1) a person desiring to drill a private water well, or the owner of the land on which the well is to be located, to:

(A) notify the county health officer or an official designated by the commissioners court of the intent to drill the well; and

(B) include with the notice a diagram showing the proposed location of the well and its distance from any on-site sewage disposal system that is located within 100 feet of the well; and

(2) the county health officer or an official designated by the commissioners court to:

(A) review the notice and diagram;

(B) not later than the 10th business day after the date the notice is received:

(i)  approve the drilling of the well if the well will not be drilled into or through an aquifer or groundwater plume that has been confirmed as contaminated by the Texas Commission on Environmental Quality or the United States Environmental Protection Agency and placement of the well will not violate the rules adopted by the Texas Commission of Licensing and Regulation under Chapters 1901 and 1902, Occupations Code; or

(ii)  disapprove the drilling of the well; and

(C)  provide a written acknowledgment to the person desiring to drill the well and to the owner of the land on which the well is to be located that states:

(i)  that the requirements of the rules adopted under Subdivision (1) have been satisfied; and

(ii)  whether the drilling of the well has been approved or disapproved.

Sec. 240.043.  NOTICE. (a)  Before rules adopted under Section 240.042 may take effect, the commissioners court of the county must publish notice of the adoption of the rules in a newspaper of general circulation in the county.

(b)  The notice must:

(1)  include:

(A)  a brief summary of the rules; and

(B)  a statement that the full text of the rules is on file in the office of the county clerk; and

(2)  be published on two separate dates.

(c)  The rules may not take effect until after the 14th day after the date of the second publication as provided by Subsection (b)(2).

Sec. 240.044.  FEE. The county may impose a placement review fee in the amount of not more than $50 to be paid by the person drilling the well. Fees collected under this section shall be deposited to the county's general fund to be used only for the administration and enforcement of this subchapter.

Sec. 240.045.  INSPECTION. A county health officer or an official designated by the commissioners court may inspect a proposed private water well site to ensure that it complies with the requirements of this subchapter and county rules adopted under this subchapter.

Sec. 240.046.  COMPLIANCE REQUIRED. A person may not drill a private water well in a county that has chosen to regulate the placement of private water wells under this subchapter unless the placement of the well complies with this subchapter and applicable rules and has been approved by the county health officer or an official designated by the commissioners court.

Sec. 240.047.  OFFENSE; PENALTY. (a)  A person who drills a private water well without possessing a written acknowledgment, or a copy of a written acknowledgment, under Section 240.042 by the county health officer or an official designated by the commissioners court approving the drilling of the well commits an offense.  An offense under this section is a Class C misdemeanor.

(b)  The county health officer or an official designated by the commissioners court shall report a citation issued under this section to the Texas Department of Licensing and Regulation.

Sec. 240.048.  EXCEPTIONS. This subchapter does not apply to:

    (1)  a private water well drilled:

      (A)  on a parcel of land that:

        (i)  is 10 acres or more in size; or

        (ii)  is qualified open-space land, as defined by Section 23.51, Tax Code;

      (B)  within the boundaries of a groundwater conservation district;

      (C)  within the boundaries of a subsidence district other than the Harris-Galveston Coastal Subsidence District; or

      (D)  incident to the exploration, development, or production of oil, gas, or other minerals; or

    (2)  a public water system that has been permitted under rules adopted by the Texas Commission on Environmental Quality.

SECTION 2.  Section 1305.003(a), Occupations Code, is amended to read as follows:

(a)  This chapter does not apply to:

    (1)  the installation of electrical equipment in a ship, watercraft other than a floating building, railway rolling stock, aircraft, or a motor vehicle other than a mobile home or recreational vehicle;

    (2)  the installation of electrical equipment underground in a mine and in self-propelled mobile surface mining machinery and its attendant electrical trailing cable;

    (3)  the installation of electrical equipment for generation, transformation, transmission, or distribution of power used exclusively to operate railway rolling stock or exclusively for signaling and communications purposes;

    (4)  the installation, maintenance, alteration, or repair of communications equipment provided by a telecommunications provider;

    (5)  the installation, maintenance, alteration, or repair of electrical equipment under the exclusive control of an electric utility, electric cooperative, or municipally owned utility and used for communications or metering, or for the generation, control, transformation, transmission, and distribution of electrical energy, and located:

      (A)  in a building used exclusively by a utility for those purposes;

      (B)  outdoors on property owned or leased by the utility;

      (C)  on public highways, streets, roads, or other public rights-of-way; or

      (D)  outdoors by established rights in vaults or on private property;

    (6)  work not specifically regulated by a municipal ordinance that is performed in or on a dwelling by a person who owns and resides in the dwelling;

    (7)  work involved in the manufacture of electrical equipment;

    (8)  electrical maintenance work if:

      (A)  the work is performed by a person regularly employed as a maintenance person at the building or premises;

      (B)  the work is performed in conjunction with the business in which the person is employed; and

      (C)  the person does not engage in electrical work for the public;

(9) the installation, maintenance, alteration, or repair of electrical equipment or associated wiring under the exclusive control of a gas utility and used for communications or metering or for the control, transmission, or distribution of natural gas;

(10) thoroughfare lighting, traffic signals, intelligent transportation systems, and telecommunications controlled by a governmental entity;

(11) electrical connections supplying heating, ventilation, and cooling and refrigeration equipment, including any required disconnect exclusively for the equipment, if the service is performed by a licensed air conditioning and refrigeration contractor under Chapter 1302;

(12) the design, installation, erection, repair, or alteration of Class 1, Class 2, or Class 3 remote control, signaling, or power-limited circuits, fire alarm circuits, optical fiber cables, or communications circuits, including raceways, as defined by the National Electrical Code;

(13) landscape irrigation installers, as necessary to perform the installation and maintenance of irrigation control systems, and landscapers, as necessary to perform the installation and maintenance of low-voltage exterior lighting and holiday lighting excluding any required power source;

(14) a person who is employed by and performs electrical work solely for a private industrial business, including a business that operates a chemical plant, petrochemical plant, refinery, natural gas plant, natural gas treating plant, pipeline, or oil and gas exploration and production operation;

(15) the installation, maintenance, alteration, or repair of elevators, escalators, or related equipment, excluding any required power source, regulated under Chapter 754, Health and Safety Code;

(16) the installation, maintenance, alteration, or repair of equipment or network facilities provided or utilized by a cable operator, as that term is defined by 47 U.S.C. Section 522, as amended; [and]

(17) the location, design, construction, extension, maintenance, and installation of on-site sewage disposal systems in accordance with Chapter 366, Health and Safety Code; and

(18) the installation, maintenance, alteration, or repair of well pumps and equipment in accordance with Chapter 1902.

SECTION 3. This Act takes effect September 1, 2005.

**Floor Amendment No. 1**

Amend **CSSB 343** (House committee printing) as follows:

(1) On page 1, line 22, after the word "drilling" and before the word "into" insert "of a domestic well".

(2) On page 8, line 10, after the word "Code;" strike the word "and"

(3) On page 8, strike lines 11-12 and substitute the following:

(18) the installation, maintenance, alteration, or repair of well pumps and equipment in accordance with Chapter 1902; and

(19) electrical work performed on a building, structure, or equipment in agricultural use as defined by Section 11.002, Water Code, other than the processing of an agricultural commodity.

The amendments were read.

Senator Brimer moved to concur in the House amendments to **SB 343**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 44 WITH HOUSE AMENDMENT

Senator Nelson called **SB 44** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 44** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the Indigent Health Care Advisory Committee.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter A, Chapter 61, Health and Safety Code, is amended by adding Section 61.012 to read as follows:

Sec. 61.012.  INDIGENT  HEALTH  CARE  ADVISORY  COMMITTEE. (a)  The executive commissioner of the Health and Human Services Commission shall establish an advisory committee to advise the commission on rules and policies concerning indigent health care services.

(b)  The advisory committee shall consist of 11 members, including four consumers or persons representing consumers and seven other representatives, appointed by the executive commissioner of the Health and Human Services Commission.

(c)  The advisory committee shall:

(1)  conduct a feasibility study and develop recommendations regarding the implementation of a pilot program for the regionalization of county indigent health care services and assistance and hospital district services and assistance;

(2)  review and propose recommendations for legislation updating indigent health care and treatment under this chapter, including:

(A)  the health care services provided under Subchapter B;

(B)  the differences in eligibility requirements for and health care services provided by:

(i)  a county under Subchapter B;

(ii)  a public hospital under Subchapter C; and

(iii)  a hospital district under Subchapter C;

(C)  the allocation method used for distributing state assistance funds; and

(D)  county reporting requirements and enforcement by the department; and

(3)  identify other areas or subjects related to indigent health care that the advisory committee could review or study.

(d)  Chapter 2110, Government Code, does not apply to the size or composition of the advisory committee.

(e)  Not later than November 1 of each even-numbered year, the Health and Human Services Commission shall submit a report regarding the advisory committee's recommendations to the governor, lieutenant governor, the speaker of the house of representatives, and the legislature.

(f)  This section expires September 1, 2007.

SECTION 2.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Nelson moved to concur in the House amendment to **SB 44**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1246 WITH HOUSE AMENDMENTS

Senator Brimer called **SB 1246** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

#### Floor Amendment No. 1

Amend **SB 1246** as follows:

(1)  On page 1, line 11, between "county" and "adjacent" insert "with a population in excess of 300,000".

(2)  On page 1, line 19, following Subsection (b), insert the following new subsection (c):

(c)  If the issue fails to pass in a municipality located within a county described in Subsection (a), the election shall have no effect on the status of the municipality.

#### Floor Amendment No. 2

Amend **SB 1246** as follows:

(1) On page 1, line 10, strike "and".

(2) On page 1, line 12, strike the period and substitute "; and".

(3) On page 1, between lines 12 and 13, insert the following:

(3)  a municipality with a population of at least 50,000 located in a county with a population of at least 250,000 that is located on the Gulf of Mexico and along the Texas-Louisiana border.

#### Floor Amendment No. 1 on Third Reading

Amend **SB 1246** on third reading in SECTION 1 of the bill in added Section 251.011, Alcoholic Beverage Code, by inserting Subsection (d) to read as follows:

(d)  An election held under this section does not authorize a sexually oriented business to obtain a license or permit to sell mixed beverages or any alcoholic beverage of any type.

The amendments were read.

Senator Brimer moved to concur in the House amendments to **SB 1246**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1652 WITH HOUSE AMENDMENT

Senator Staples called **SB 1652** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

#### Committee Amendment No. 1

Amend **SB 1652**, by adding the following Sections to read as follows:

SECTION __.  Section 21.02, Tax Code, is amended by adding Subsection (d) to read as follows:

(d)  A motor vehicle does not have taxable situs in a taxing unit under Subsection (a)(1) if, on January 1, the vehicle:

(1)  has been located for less than 60 days at a place of business of a person who holds a wholesale motor vehicle auction general distinguishing number issued by the Texas Department of Transportation under Chapter 503, Transportation Code, for that place of business; and

(2)  is offered for resale.

SECTION __.  Section 22.04, Tax Code, is amended by adding Subsection (d) to read as follows:

(d)  This section does not apply to a motor vehicle that on January 1 is located at a place of business of a person who holds a wholesale motor vehicle auction general distinguishing number issued by the Texas Department of Transportation under Chapter 503, Transportation Code, for that place of business, and that:

(1)  has not acquired taxable situs under Section 21.02(a)(1) in a taxing unit that participates in the appraisal district because the vehicle is described by Section 21.02(d);

(2)  is offered for sale by a dealer who holds a dealer's general distinguishing number issued by the Texas Department of Transportation under Chapter 503, Transportation Code, and whose inventory of motor vehicles is subject to taxation in the manner provided by Sections 23.121 and 23.122; or

(3)  is collateral possessed by a lienholder and offered for sale in foreclosure of a security interest.

The amendment was read.

Senator Staples moved to concur in the House amendment to **SB 1652**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 610 WITH HOUSE AMENDMENT

Senator Nelson called **SB 610** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 610** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the regulation of the practice of dentistry.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subsection (a), Section 251.004, Occupations Code, is amended to read as follows:

(a)  A person does not practice dentistry as provided by Section 251.003 if the person is:

(1)  a faculty member of a reputable dental or dental hygiene school in which the member performs services for the sole benefit of the school;

(2)  a student of a reputable dental school who performs the student's operations without pay, except for actual cost of materials, in the presence of and under the direct personal supervision of a demonstrator or teacher who is a faculty member of a reputable dental school;

(3)  a person:

(A)  who performs laboratory work only on inert matter; and

(B)  who does not solicit or obtain work by any means from a person who is not a licensed dentist engaged in the practice of dentistry and does not act as the agent or solicitor of, and does not have any interest in, a dental office or practice or the receipts of a dental office or practice;

(4)  a physician licensed in this state who does not represent that the person is practicing dentistry, including a physician who extracts teeth or applies pain relief in the regular practice of the physician's profession;

(5)  a dental hygienist:

(A)  who is authorized to practice dental hygiene in this state; and

(B)  who practices dental hygiene in strict conformity with the state law regulating the practice of dental hygiene;

(6)  a person who is a member of an established church and practices healing by prayer only;

(7)  an employee of a licensed dentist in this state who makes dental x-rays in the dental office under the supervision of the dentist;

(8)  a Dental Health Service Corporation chartered under Section A(1), Article 2.01, Texas Non-Profit Corporation Act (Article 1396-2.01, Vernon's Texas Civil Statutes);

(9)  a dental intern or dental resident as defined and regulated by board rules;

(10)  a student:

(A)  who is in a dental hygiene program accredited by the Commission on Dental Accreditation of the American Dental Association and operated at an accredited institution of higher education;

(B)  who practices dental hygiene without pay under the general supervision of a dentist and under the supervision of a demonstrator or teacher who is a faculty member of the program:

(i)  in a clinic operated for the sole benefit of the program's institution of higher education; or

(ii)  in a clinic operated by a government or nonprofit organization that serves underserved populations as determined by board rule; and

(C)  who practices in strict conformity with state law regulating the practice of dental hygiene;

(11)  a dental assistant who performs duties permitted under Chapter 265, in strict conformity with state law;

(12)  a dentist or dental hygienist licensed by another state or a foreign country who performs a clinical procedure only as a demonstration for professional and technical education purposes, if the dentist or dental hygienist first obtains from the board a temporary license for that purpose;

(13)  a dental hygienist who is a faculty member of a dental or dental hygiene school while practicing dental hygiene:

(A)  under the supervision of a dentist licensed in this state or of a teacher or demonstrator who is a dentist faculty member of the school; and

(B)  in strict conformity with state law regulating the practice of dental hygiene;

(14)  a dentist who is in a remedial training program sponsored by the Commission on Dental Accreditation of the American Dental Association at an accredited dental or dental hygiene school;

(15)  a dental hygienist who is in a remedial training program sponsored by the Commission on Dental Accreditation of the American Dental Association at an accredited dental or dental hygiene school and who acts in strict conformity with state law regulating the practice of dental hygiene, except that supervision may be provided by a demonstrator or teacher who is a dentist member of the program;

(16)  a dentist who is not licensed in this state and who is taking the dental clinical examination offered [by the Western Regional Examining Board] in this state by an examining body designated by the board;

(17)  a dental hygienist who is not licensed in this state and who is taking the dental hygiene clinical examination offered [by the Western Regional Examining Board] in this state by an examining body designated by the board if participation is in strict conformity with state law regulating the practice of dental hygiene, except that supervision may be provided by a dentist whose services are secured by the examining body [Western Regional Examining Board];

(18)  a dentist whose license is in retired status or who is licensed in another state and is attending a continuing education clinical program offered at a dental or dental hygiene school accredited by the Commission on Dental Accreditation of the American Dental Association; or

(19)  a dental hygienist whose dental hygienist license is in retired status or who is licensed in another state and is attending a continuing education clinical program offered at a dental or dental hygiene school accredited by the Commission on Dental Accreditation of the American Dental Association if tasks are performed in strict conformity with state law regulating the practice of dental hygiene, except that supervision may be provided by a dentist member of the program.

SECTION 2.  Subsection (d), Section 255.006, Occupations Code, is amended to read as follows:

(d)  The board shall adopt rules concerning the investigation of a complaint filed with the board. The rules adopted under this subsection must:

(1)  distinguish between categories of complaints;

(2)  ensure that a complaint is not dismissed without appropriate consideration;

(3)  require that the board be advised of a complaint that is dismissed and that a letter be sent to the person who filed the complaint explaining the action taken on the dismissed complaint;

(4)  ensure that the person who filed the complaint has an opportunity to explain the allegations made in the complaint;

(5)  require that investigators used by the board be state employees; and

(6)  establish procedures by which a board employee may dismiss a complaint if the investigation does not reveal a violation[; and

[(7)  establish procedures by which a board employee may expunge from the records of the board a complaint dismissed under Subdivision (6) if the employee determines the complaint to have been groundless].

SECTION 3.  Section 256.102, Occupations Code, is amended by amending Subsection (c) and adding Subsection (f) to read as follows:

(c)  A license holder on retired status:

(1)  is not required to pay license renewal fees; and

(2)  except as provided by Subsection (f), may not perform any activity regulated under this subtitle.

(f)  A dentist on retired status may perform an activity regulated under this subtitle if the dentist's practice consists only of voluntary charity care, as defined by board rule. The board's rules under this subsection must prescribe the scope of practice permitted for the retired dentist, the retired dentist's authority to prescribe and administer drugs, and any continuing education requirements applicable to the retired dentist.

SECTION 4.  Section 256.103, Occupations Code, is amended by adding Subsection (c) to read as follows:

(c)  A person may practice without displaying the person's current registration certificate as required by Subsection (a) for not more than 30 days after the date the person receives from the board written confirmation that the person's original license was issued.

SECTION 5.  Section 258.054, Occupations Code, is amended by adding Subsection (c) to read as follows:

(c)  A dentist may not authorize a dental assistant to make a dental x-ray unless the dental assistant holds an x-ray certificate issued under Section 265.005.

SECTION 6.  Subsections (b) and (c), Section 263.004, Occupations Code, are amended to read as follows:

(b)  The board may not temporarily suspend a license or permit under this section without notice or hearing unless [if] at the time of the temporary suspension the board or the executive committee requests the State Office of Administrative Hearings to set a date for a hearing on the temporary suspension.

(c)  The State Office of Administrative Hearings shall hold a hearing not later than the 30th [14th] day after the date the license or permit is suspended unless the license or permit holder requests a continuance. The State Office of Administrative Hearings shall hold a second hearing on the suspension and on any other action to be taken against the license or permit holder not later than the 60th day after:

(1)  the date the license or permit is temporarily suspended; or

(2)  the date specified in the continuance requested by the license or permit holder.

SECTION 7.  Subsections (a) and (b), Section 263.006, Occupations Code, are amended to read as follows:

(a)  The board shall suspend a license holder's license issued under this subtitle on proof [if it is determined at an administrative hearing] that the person has been:

(1)  initially convicted of:

(A)  a felony;

(B)  a misdemeanor under Chapter 22, Penal Code, other than a misdemeanor punishable by fine only;

(C)  a misdemeanor on conviction of which a defendant is required to register as a sex offender under Chapter 62, Code of Criminal Procedure;

(D)  a misdemeanor under Section 25.07, Penal Code; or

(E)  a misdemeanor under Section 25.071, Penal Code; or

(2)  subject to an initial finding by the trier of fact of guilt of a felony under:

(A)  Chapter 481 or 483, Health and Safety Code;

(B)  Section 485.033, Health and Safety Code; or

(C)  the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.) [convicted of a felony under Chapter 481 or 483, Health and Safety Code, or Section 485.033, Health and Safety Code].

(b)  On final conviction for an offense described by Subsection (a), the [The] board shall revoke the person's license [on the person's final conviction].

SECTION 8.  Subsection (b), Section 265.004, Occupations Code, is amended to read as follows:

(b)  To qualify for a certificate, an applicant must:

(1)  have at least two years' experience as a dental assistant; and

(2)  have successfully completed a minimum of 16 hours of clinical and didactic education in pit and fissure sealants taken through an accredited dental hygiene program or a dental assisting program accredited by the Commission on Dental Accreditation of the American Dental Association and approved by the board.

SECTION 9.  Section 265.005, Occupations Code, is amended to read as follows:

Sec. 265.005.  X-RAY CERTIFICATE. (a) A dental assistant may not make dental x-rays unless the dental assistant holds a certificate of registration issued by the board under this section.

(b)  To qualify for a certificate of registration, a dental assistant must pay a fee in an amount determined by the board and:

(1)  pass an examination administered under this section on completion of a course [by the board] covering:

(A)  the procedure for making dental x-rays;

(B)  jurisprudence; and

(C)  infection control; or

(2)  <u>complete a course and</u> pass an examination [<s>administered by the board</s>] covering the subject described by Subdivision (1)(B) and be certified as a dental assistant by the Dental Assisting National Board if the board determines that the requirements for certification by that board are sufficient to protect the public.

(c)  [<s>The board shall set the registration fee for a dental assistant who qualifies under Subsection (b)(1) in an amount greater than the amount of the registration fee for a dental assistant who qualifies under Subsection (b)(2).</s>

[<s>(d)</s>]  The <u>course and</u> [<s>portion of the</s>] examination described by Subsection <u>(b)(1)</u> [<s>(b)(1)(B)</s>] must be tailored to a dental assistant's responsibilities and role in a dental office.

<u>(d)  A course and examination described by Subsection (b) may be offered through self-study, interactive computer courses, or lecture courses and may be offered through the Internet. The course and examination must comply with rules adopted under Subsection (f) and be approved by the board.</u>

(e)  [<s>The board shall develop the examination or contract with another person the board determines has the expertise and resources to develop the examination.</s>]  The board <u>shall</u> [<s>may</s>] create an advisory committee consisting of <u>dentists, dental assistants, and</u> dental <u>assistant</u> [<s>industry professionals and</s>] educators to advise the board in <u>adopting rules under Subsection (f)</u>.

<u>(f)  The board by rule shall set:</u>

<u>(1)  objectives for</u> [<s>developing</s>] the examination <u>and course under Subsection (b)(1); and</u>

<u>(2)  procedures to ensure the examination's integrity.</u>

<u>(g)</u> [<s>(f)</s>]  The <u>course and</u> examination <u>under Subsection (b)(1)</u> shall <u>comply with board rules. Any school or program accredited by the Commission on Dental Accreditation of the American Dental Association or any dental industry professional organization may offer a course and examination that complies with board rules.</u>

<u>(h)  The board, in consultation with the advisory committee, shall develop a program to ensure that courses and examinations developed or administered under this section comply with board rules</u> [<s>be administered by the board or by a testing service under an agreement with the board</s>].

<u>(i)</u> [<s>(g)</s>]  A certificate of registration issued under this section must be renewed annually. <u>Except as otherwise provided by this subsection, the board may not require a person who has successfully completed the course and examination required under Subsection (b) to complete an additional course or examination to renew the registration. The board may require a person to complete a new course and examination if the person fails to renew the person's certificate of registration before the second anniversary of the date the certificate expired.</u>

<u>(j)</u> [<s>(h)</s>]  The board by rule shall develop a mandatory continuing education program for holders of certificates of registration. The board may not require a person to complete more than 12 hours of continuing education annually. The curriculum must cover <u>dental assistant duties</u> [<s>standards of care, procedures for infectious disease control, and the requirements of this subtitle</s>].

(k) A person may not renew a certificate of registration unless the person complies with the continuing education requirements. The person may fulfill continuing education requirements through board-approved self-study, interactive computer courses, or lecture courses.

(l) A dental assistant who is hired as a dental assistant for the first time and who has not previously been issued a certificate under this section may make dental x-rays without complying with this section until the first anniversary of the date on which the dental assistant is hired.

SECTION 10. Subsection (d-2), Section 255.006, Occupations Code, is repealed.

SECTION 11. (a) Section 256.103, Occupations Code, as amended by this Act, applies only to a person licensed on or after the effective date of this Act. A person licensed before that date is governed by the law in effect immediately before the effective date of this Act, and the former law is continued in effect for that purpose.

(b) Section 263.006, Occupations Code, as amended by this Act, applies only to a person who is initially convicted of an offense on or after the effective date of this Act. A person initially convicted of an offense before that date is governed by the law in effect on the date the conviction occurred, and the former law is continued in effect for that purpose.

(c) Section 263.004, Occupations Code, as amended by this Act, applies only to a license or permit suspended on or after the effective date of this Act. A license or permit suspended before that date is governed by the law in effect on the date the license or permit was suspended, and the former law is continued in effect for that purpose.

SECTION 12. Not later than March 1, 2006, the State Board of Dental Examiners shall adopt the rules required by Subsection (f), Section 256.102, Occupations Code, as added by this Act.

SECTION 13. Not later than July 1, 2006, the State Board of Dental Examiners shall adopt the rules required by Subsection (f), Section 265.005, Occupations Code, as amended by this Act.

SECTION 14. Compliance with Section 265.005, Occupations Code, as amended by this Act, is required only for a certificate of registration issued or renewed on or after September 1, 2006, except as provided by this section and Section 15 of this Act. If the State Board of Dental Examiners determines that additional time is necessary to implement the new course and examination system under Section 265.005, Occupations Code, as amended by this Act, the board may extend the time required for compliance under this section to January 1, 2007.

SECTION 15. (a) This section applies only to a dental assistant who qualified for registration with the State Board of Dental Examiners under former 22 T.A.C. Section 115.10 before September 1, 2004, by successfully completing the examination described by Subsection (e)(3) of that section.

(b) Section 258.054, Occupations Code, as amended by this Act, does not apply to a dental assistant until on and after September 1, 2007.

(c) A dental assistant is not required to obtain a certificate of registration under Section 265.005, Occupations Code, as amended by this Act, before September 1, 2007. Before September 1, 2007, a dental assistant shall comply with:

(1) the former law, and the former law is continued in effect for that purpose; or

(2) Section 265.005, Occupations Code, as amended by this Act.

SECTION 16. This Act takes effect September 1, 2005.

The amendment was read.

Senator Nelson moved to concur in the House amendment to **SB 610**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 1195 WITH HOUSE AMENDMENTS

Senator Hinojosa called **SB 1195** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 1195** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the authority of peace officers to conduct certain searches.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Article 1.06, Code of Criminal Procedure, is amended to read as follows:

Art. 1.06. SEARCHES AND SEIZURES. (a) The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches. No warrant to search any place or to seize any person or thing shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation.

(b) A peace officer who stops a motor vehicle for any alleged violation of a law or ordinance regulating traffic may not search the vehicle unless the peace officer:

(1) has probable cause or another legal basis for the search;

(2) obtains the written consent of the operator of the vehicle on a form that complies with Section 411.0207(b), Government Code; or

(3) obtains the oral consent of the operator of the vehicle and ensures that the oral consent is evidenced by an audio and video recording that complies with Section 411.0207(c), Government Code.

SECTION 2. Subchapter A, Chapter 411, Government Code, is amended by adding Section 411.0207 to read as follows:

Sec. 411.0207. RULES FOR CERTAIN EVIDENCE OF CONSENT TO VEHICLE SEARCH. (a) The director by rule shall establish requirements for:

(1) a form used to obtain the written consent of the operator of a motor vehicle under Article 1.06, Code of Criminal Procedure; and

(2) an audio and video recording used as evidence of the oral consent of the operator of a motor vehicle under Article 1.06, Code of Criminal Procedure.

(b) At a minimum, the rules adopted under Subsection (a)(1) must require the form to contain:

      (1)  a statement that the operator of the motor vehicle fully understands that the operator may refuse to give the peace officer consent to search the motor vehicle;

      (2)  a statement that the operator of the motor vehicle is freely and voluntarily giving the peace officer consent to search the motor vehicle;

      (3)  the time and date of the stop giving rise to the search;

      (4)  a description of the motor vehicle to be searched; and

      (5)  the name of each peace officer conducting the stop or search.

  (c)  At a minimum, the rules adopted under Subsection (a)(2) must require the audio and video recording to reflect an affirmative statement made by the operator that:

      (1)  the operator of the motor vehicle fully understands that the operator may refuse to give the peace officer consent to search the motor vehicle; and

      (2)  the operator of the motor vehicle is freely and voluntarily giving the peace officer consent to search the motor vehicle.

  SECTION 3.  The director of the Department of Public Safety of the State of Texas shall adopt the rules required by Section 411.0207, Government Code, as added by this Act, not later than December 1, 2005.

  SECTION 4.  (a)  Except as provided by Subsection (b) of this section, this Act takes effect September 1, 2005.

  (b)  Article 1.06, Code of Criminal Procedure, as amended by this Act, takes effect January 1, 2006.

**Floor Amendment No. 1**

  Amend **CSSB 1195** (House committee report) in SECTION 1 of the bill, in proposed Subsection (b), Article 1.06, Code of Criminal Procedure (page 1, between lines 17 and 18), by inserting the following new Subdivision (2) and renumbering the subsequent subdivisions of that section accordingly:

      (2)  conducts a search for weapons based on a reasonable fear for the officer's safety or the safety of others;

**Floor Amendment No. 1 on Third Reading**

  Amend **CSSB 1195** on third reading, as amended by Floor Amendment No. 1 by Dutton, in added Subdivision (2), Subsection (b), Article 1.06, Code of Criminal Procedure, between "based on" and "a reasonable fear", by inserting "an articulation of".

**Floor Amendment No. 2 on Third Reading**

  Amend **CSSB 1195** on third reading as follows:

  (1)  In Section 2 of the bill in added Subdivision (1), Subsection (c), Section 411.0207, Government Code, strike "fully".

  (2)  In Section 2 of the bill in added Subdivision (2), Subsection (c), Section 411.0207, Government Code, strike "freely and".

  The amendments were read.

  Senator Hinojosa moved to concur in the House amendments to **SB 1195**.

  The motion prevailed by the following vote:  Yeas 28, Nays 1.

  Nays:  Estes.

  Absent-excused:  Carona, West.

### SENATE BILL 805 WITH HOUSE AMENDMENT

Senator Fraser, on behalf of Senator Averitt, called **SB 805** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 805** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to certain small and large employer health cooperatives.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter B, Chapter 1501, Insurance Code, as amended by the Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes (the general code update bill), is amended by adding Section 1501.0575 to read as follows:

Sec. 1501.0575.  VOLUNTARY PARTICIPATION BY ISSUER IN COOPERATIVE.  A health benefit plan issuer may elect not to participate in a health group cooperative.  The health benefit plan issuer may elect to participate in one or more health group cooperatives and may select the cooperatives in which the issuer will participate.

SECTION 2.  Section 1501.0581, Insurance Code, as added by the Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes (the general code update bill), is amended by amending Subsections (a), (b), and (c) and adding Subsections (o) and (p) to read as follows:

(a)  The membership of a health group cooperative may consist only of small employers or may consist only of large employers, but may not[, at the option of the health group cooperative,] consist of both small and large employers. To participate as a member of a health group cooperative, an employer must be a small or large employer as described by this chapter.

(b)  Subject to the requirements imposed on small employer health benefit plan issuers under Section 1501.101, a health group cooperative:

(1)  shall allow a small employer to join a [the] health group cooperative consisting only of small employers and enroll in health benefit plan coverage, subject to Subsection (o); and

(2)  may allow a large employer to join a [the] health group cooperative consisting only of large employers and enroll in health benefit plan coverage.

(c)  Subject to Subsection (o), a [A] health group cooperative consisting only of small employers shall allow any small employer to join the health group cooperative and enroll in the cooperative's health benefit plan coverage during the initial enrollment and annual open enrollment periods.

(o)  A health group cooperative consisting only of small employers is not required to allow a small employer to join the health group cooperative under Subsection (c) if:

(1) the cooperative has elected to restrict membership in the cooperative in accordance with this subsection and Subsection (p); and

(2) after the small employer has joined the cooperative, the total number of eligible employees employed on business days during the preceding calendar year by all small employers participating in the cooperative would exceed 50.

(p) A health group cooperative must make the election described by Subsection (o) at the time the cooperative is initially formed. Evidence of the election must be filed in writing with the commissioner in the form and at the time prescribed by the commissioner by rule.

SECTION 3. Section 1501.063, Insurance Code, as amended by the Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes (the general code update bill), is amended by amending Subsection (b) and adding Subsections (b-1), (b-2), and (b-3) to read as follows:

(b) A health group cooperative [that is composed only of small employers] is considered a single employer under this code.

(b-1) A health group cooperative that is composed only of small employers and that has made the election described by Section 1501.0581(o)(1) in accordance with Subsection (p) of that section [and] shall be treated in the same manner as a small employer for the purposes of this chapter, including for the purposes of any provision relating to premium rates and issuance and renewal of coverage.

(b-2) A health group cooperative that is composed only of small [and large] employers and that has not made the election described by Section 1501.0581(o)(1) in accordance with Subsection (p) of that section:

(1) shall be treated in the same manner as a single small employer under this code for the purposes of any provision relating to premium rates; and

(2) shall be treated as a single large employer for all other purposes, including for purposes of any provision relating to issuance and renewal of coverage.

(b-3) [is considered a single employer under this code and, in relation to the small employers that are members of the cooperative, shall be treated in the same manner as a small employer. A health group cooperative that is composed of small and large employers may elect to extend the protections of this chapter that are applicable to small employer groups to the large employer groups that participate in the cooperative.] A health group cooperative shall have sole authority to make benefit elections and perform other administrative functions under this code for the cooperative's participating employers.

SECTION 4. Section 1501.324, Insurance Code, is amended to read as follows:

Sec. 1501.324. LIMIT ON TOTAL ASSESSMENTS. The maximum assessment amount payable for a calendar year may not exceed 10 [five] percent of the total premiums earned in the preceding calendar year from small employer health benefit plans delivered or issued for delivery by reinsured health benefit plan issuers in this state.

SECTION 5. Subsections (d) and (e), Section 1501.325, Insurance Code, are amended to read as follows:

(d) A reinsured health benefit plan issuer may not cede additional eligible lives to the system [write small employer health benefit plans on a guaranteed issue basis] during a calendar year if the assessment amount payable for the preceding calendar

year is at least 10 [five] percent of the total premiums earned in that calendar year from small employer health benefit plans delivered or issued for delivery by reinsured health benefit plan issuers in this state.

(e) A reinsured health benefit plan issuer may not cede additional eligible lives to the system [write small employer health benefit plans on a guaranteed issue basis] after the board determines that the expected loss from the reinsurance system for a year will exceed the total amount of assessments payable at a rate of 10 [five] percent of the total premiums earned for the preceding calendar year. A reinsured health benefit plan issuer may not resume ceding additional eligible lives to the system [writing small employer health benefit plans on a guaranteed issue basis] until the board determines that the expected loss will be less than the maximum established by this subsection.

SECTION 6. Notwithstanding Subsection (p), Section 1501.0581, Insurance Code, as added by this Act, a health group cooperative in existence on the effective date of this Act may make the election described by Subsection (o), Section 1501.0581, Insurance Code, as added by this Act, not later than December 31, 2005.

SECTION 7. The provisions of this Act amending Section 1501.324, Insurance Code, by increasing the maximum total assessment amount payable for a calendar year from five percent to 10 percent of total premiums earned in the preceding calendar year from small employer health benefit plans delivered or issued for delivery by reinsured health benefit plan issuers in this state, expire September 1, 2007. The provisions of this Act amending Subsections (d) and (e), Section 1501.325, Insurance Code, by increasing from five percent to 10 percent the ratio between the assessment amount payable for the preceding calendar year and the total applicable premiums earned in the preceding calendar year, at or above which limitations are imposed on reinsured small employer health benefit plan issuers, expire September 1, 2007.

SECTION 8. Not later than January 1, 2006, the commissioner of insurance shall adopt rules under Section 1501.010, Insurance Code, as necessary to implement the change in law made by this Act.

SECTION 9. This Act takes effect only if S.B. No. 979 or H.B. No. 2018 or another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes becomes law. If S.B. No. 979 or H.B. No. 2018 or another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes does not become law, this Act has no effect.

SECTION 10. To the extent of any conflict, this Act prevails over another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes.

SECTION 11. This Act takes effect September 1, 2005.

The amendment was read.

Senator Fraser, on behalf of Senator Averitt, moved that the Senate do not concur in the House amendment, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 805** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators Averitt, Chair; Williams, Eltife, Estes, and Duncan.

### SENATE BILL 809 WITH HOUSE AMENDMENTS

Senator Fraser, on behalf of Senator Averitt, called **SB 809** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 809** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the Texas Health Insurance Risk Pool.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subsection (b), Section 1506.002, Insurance Code, is amended to read as follows:

(b)  In this chapter, "health benefit plan" does not include:

(1)  accident insurance;

(2)  a plan providing coverage only for dental or vision care;

(3)  fixed indemnity insurance, including hospital indemnity insurance;

(4) [(2)]  credit insurance;

(5) [(3)]  long-term care insurance;

(6) [(4)]  disability income insurance;

(7)  other limited benefit coverage, including specified disease coverage;

(8) [(5)]  coverage issued as a supplement to liability insurance;

(9) [(6)]  insurance arising out of a workers' compensation law or similar law;

(10) [(7)]  automobile medical payment insurance; or

(11) [(8)]  insurance coverage under which benefits are payable with or without regard to fault and that is statutorily required to be contained in a liability insurance policy or equivalent self-insurance.

SECTION 2.  Subsection (a), Section 1506.109, Insurance Code, is amended to read as follows:

(a)  The pool shall [may] provide for and use cost containment measures and requirements to make the coverage offered by the pool more cost-effective.  To the extent the board determines it is cost-effective, the cost containment measures must include individual case management and disease management.  The cost containment measures may include[, including] preadmission screening, the requirement of a second surgical opinion, and concurrent utilization review subject to Article 21.58A[, and individual case management, to make the coverage offered by the pool more cost-effective].

SECTION 3.  Subsection (a), Section 1506.152, Insurance Code, is amended to read as follows:

(a)  An individual who is a legally domiciled resident of this state is eligible for coverage from the pool if the individual:

(1)  provides to the pool evidence that the individual maintained health benefit plan coverage for the preceding 18 months with no gap in coverage longer than 63 days and with the most recent coverage being provided through an employer-sponsored plan, church plan, or government plan;

(2)  provides to the pool evidence that the individual maintained health benefit plan coverage under another state's qualified Health Insurance Portability and Accountability Act health program that was terminated because the individual did not reside in that state and submits an application for pool coverage not later than the 63rd day after the date the coverage described by this subdivision was terminated;

(3)  has been a legally domiciled resident of this state for the preceding 30 days, is a citizen of the United States or has been a permanent resident of the United States for at least three continuous years, and provides to the pool:

(A)  a notice of rejection of, or refusal to issue, substantially similar individual health benefit plan coverage from a health benefit plan issuer, other than an insurer that offers only stop-loss, excess loss, or reinsurance coverage, if the rejection or refusal was for health reasons;

(B)  certification from an agent or salaried representative of a health benefit plan issuer that states that the agent or salaried representative cannot obtain substantially similar individual coverage for the individual from any health benefit plan issuer that the agent or salaried representative represents because, under the underwriting guidelines of the health benefit plan issuer, the individual will be denied coverage as a result of a medical condition of the individual;

(C)  an offer to issue substantially similar individual coverage only with conditional riders; or

(D)  [a notice of refusal by a health benefit plan issuer to issue substantially similar individual coverage except at a rate exceeding the pool rate; or

[(E)] a diagnosis of the individual with one of the medical or health conditions on the list adopted under Section 1506.154; or

(4)  provides to the pool evidence that, on the date of application to the pool, the individual is certified as eligible for trade adjustment assistance or for pension benefit guaranty corporation assistance, as provided by the Trade Adjustment Assistance Reform Act of 2002 (Pub. L. No. 107-210).

SECTION 4.  Subsection (a), Section 1506.155, Insurance Code, is amended to read as follows:

(a)  Except as provided by this section and Section 1506.056, pool coverage excludes charges or expenses incurred before the first anniversary of the effective date of coverage with regard to any condition for which:

(1)  the existence of symptoms would cause an ordinarily prudent person to seek diagnosis, care, or treatment within the six-month period preceding the effective date of coverage; or

(2)  medical advice, care, or treatment was recommended or received during the six-month period preceding the effective date of coverage.

SECTION 5. Subchapter F, Chapter 1506, Insurance Code, is amended by adding Section 1506.2522 to read as follows:

Sec. 1506.2522. ANNUAL REPORT TO BOARD:  ENROLLED INDIVIDUALS.  (a) Each health benefit plan issuer shall report to the board the number of residents of this state enrolled, as of December 31 of the previous year, in the issuer's health benefit plans providing coverage for residents in this state, as:

(1)  an employee or retired employee under a group health benefit plan; or

(2)  an individual policyholder or subscriber.

(b)  In determining the number of individuals to report under Subsection (a)(1), the health benefit plan issuer shall include each employee or retired employee for whom a premium is paid and coverage is provided under an excess loss, stop-loss, or reinsurance policy issued by the issuer to an employer or group health benefit plan providing coverage for employees or retired employees in this state. A health benefit plan issuer providing excess loss insurance, stop-loss insurance, or reinsurance, as described by this subsection, for a primary health benefit plan issuer may not report individuals reported by the primary health benefit plan issuer.

(c)  Ten employees or retired employees covered by a health plan issuer under a policy of excess loss insurance, stop-loss insurance, or reinsurance count as one employee or retired employee for purposes of determining that health plan issuer's assessment.

(d)  In determining the number of individuals to report under this section, the health benefit plan issuer shall exclude:

(1)  the dependents of the employee or retired employee or an individual policyholder or subscriber; and

(2)  individuals who are covered by the health benefit plan issuer under a Medicare supplement benefit plan subject to Chapter 1652.

SECTION 6.  Section 1506.253, Insurance Code, is amended to read as follows:

Sec. 1506.253. ASSESSMENTS TO COVER NET LOSSES.  (a) The board shall recover any net loss of the pool by assessing each health benefit plan issuer an amount determined annually by the board based on information in annual statements, the health benefit plan issuer's annual report to the board under Sections [Section] 1506.2521 and 1506.2522, and any other reports required by and filed with the board.

(b)  To compute the [The] amount of a health benefit plan issuer's assessment, if any, the board shall:

(1)  divide the total amount to be assessed by the total number of enrolled individuals reported by all health benefit plan issuers under Section 1506.2522 as of the preceding December 31 to determine the per capita amount; and

(2)  multiply the number of enrolled individuals reported by the health benefit plan issuer under Section 1506.2522 as of the preceding December 31 by the per capita amount to determine the amount assessed to that health benefit plan issuer [is computed by multiplying the total amount required to be assessed against all health benefit plan issuers by a number computed by dividing:

[(1)  the gross premiums collected by the issuer for health benefit plans in this state during the preceding calendar year; by

[(2)  the gross premiums collected by all issuers for health benefit plans in this state during the preceding calendar year].

(c)  A [~~For purposes of the assessment under this subchapter, gross health benefit plan premiums do not include premiums collected for:~~

[~~(1) coverage under a Medicare supplement benefit plan subject to Chapter 1652;~~

[~~(2) coverage under a~~] small employer health benefit plan subject to Subchapters A-H, Chapter 1501, is not subject to an assessment under this subchapter[~~; or~~

[~~(3) coverage or insurance listed in Section 1506.002(b)~~].

SECTION 7.  Chapter 1506, Insurance Code, is amended by adding Subchapter G to read as follows:

SUBCHAPTER G.  SUBROGATION RIGHTS OF POOL

Sec. 1506.301.  SUBROGATION TO RIGHTS AGAINST THIRD PARTY.  The pool:

(1)  is subrogated to the rights of an individual covered by the pool to recover against a third party costs for an injury or illness for which the third party is liable under contract, tort law, or other law that have been paid by the pool on behalf of the covered individual; and

(2)  may enforce that liability on behalf of the individual.

Sec. 1506.302.  BENEFITS NOT PAYABLE; ADVANCE OF BENEFITS AUTHORIZED.  (a)  Under coverage provided by the pool, benefits are not payable for an injury or illness for which a third party may be liable under contract, tort law, or other law.

(b)  Notwithstanding Subsection (a), the pool may advance to a covered individual the benefits provided under the pool coverage for medical expenses resulting from the injury or illness, subject to the pool's right to subrogation and reimbursement under this subchapter.

Sec. 1506.303.  REIMBURSEMENT OF POOL REQUIRED.  (a)  Subject to Section 1506.305, the amount recovered by a covered individual in an action against a third party who is liable for the injury or illness must be used to reimburse the pool for benefits for medical expenses that have been advanced under Section 1506.302.

(b)  The amount of reimbursement required by this section is not reduced by the application of the doctrine established at common law relating to adequate compensation of insureds and commonly referred to as the "made whole" doctrine.

(c)  Subject to Section 1506.305, the pool shall treat any amount recovered by a covered individual in an action against a third party who is liable for the injury or illness that exceeds the amount of the reimbursement required under this section as an advance against future medical benefits for the injury or illness that the individual would otherwise be entitled to receive under pool coverage.

Sec. 1506.304.  RESUMPTION OF PAYMENT OF BENEFITS.  If the amount treated as an advance under Section 1506.303(c) is adequate to cover all future medical costs for the covered individual's injury or illness, the pool is not required to resume the payment of benefits.  If the advance is insufficient, the pool shall resume the payment of benefits when the advance is exhausted.

Sec. 1506.305.  ATTORNEY'S FEE FOR REPRESENTATION OF POOL'S INTEREST.  (a)  For purposes of this section, the pool's recovery includes:

(1)  the amount recovered by the pool in the action; and

(2)  the amount of the covered individual's total recovery that must be used to reimburse the pool or that is treated as an advance for future medical costs under Section 1506.303(c).

(b)  If the pool's interest is not actively represented by an attorney in a third-party action under this subchapter, the pool shall pay a fee to an attorney representing the claimant in the amount agreed on between the attorney and the pool. In the absence of an agreement, the court shall award to the attorney payable out of the pool's recovery:

(1)  a reasonable fee for recovery of the pool's interest that may not exceed one-third of the pool's recovery; and

(2)  a proportionate share of the reasonable expenses incurred.

(c)  An attorney who represents a covered individual and is also to represent the interests of the pool under this subchapter must make a full written disclosure to the covered individual before employment as an attorney by the pool. The covered individual must acknowledge the disclosure and consent to the representation. A signed copy of the disclosure shall be provided to the covered individual and the pool. A copy of the disclosure with the covered individual's consent must be filed with the pleading before a judgment is entered and approved by the court. The attorney may not receive a fee under this section to which the attorney is otherwise entitled under an agreement with the pool unless the attorney complies with the requirements of this subsection.

(d)  If an attorney actively representing the pool's interest actively participates in obtaining a recovery, the court shall award and apportion between the covered individual's and the pool's attorneys a fee payable out of the pool's subrogation recovery. In apportioning the award, the court shall consider the benefit accruing to the pool as a result of each attorney's service. The total attorney's fees may not exceed one-third of the pool's recovery.

SECTION 8.  (a)  This Act applies only to an application for initial or renewal coverage through the Texas Health Insurance Risk Pool under Chapter 1506, Insurance Code, as amended by this Act, that is filed with that pool on or after the effective date of this Act.  An application filed before the effective date of this Act is governed by the law in effect on the date on which the application was filed, and the former law is continued in effect for that purpose.

(b)  Section 1506.155, Insurance Code, as amended by this Act, and Subchapter G, Chapter 1506, Insurance Code, as added by this Act, apply only to pool coverage that is delivered, issued for delivery, or renewed on or after the effective date of this Act.  Pool coverage that is delivered, issued for delivery, or renewed before the effective date of this Act is governed by the law as it existed immediately before that date, and that law is continued in effect for that purpose.

(c)  The change in law made by this Act to Section 1506.002(b), Insurance Code, applies to an assessment under Subchapter F, Chapter 1506, Insurance Code, for a calendar year beginning on or after the effective date of this Act. An assessment for a net loss for a calendar year before the effective date of this Act is governed by the law in effect during the calendar year for which the assessment is made, and the former law is continued in effect for that purpose.

(d) The board of directors of the Texas Health Insurance Risk Pool shall refund an assessment amount paid for a period after September 30, 2005, that is attributable to those coverages that are exempt from the assessment because of the change in law made by this Act to Section 1506.002(b), Insurance Code, at the time the final net loss for the period for which the assessment is made is determined.

(e) Section 1506.253, Insurance Code, as amended by this Act, applies to an assessment under Subchapter F, Chapter 1506, Insurance Code, for a calendar year beginning on or after January 1, 2006. An assessment for a calendar year before January 1, 2006, is governed by the law in effect during the period for which the assessment is made, and the former law is continued in effect for that purpose.

(f) Notwithstanding Subsection (a) of this section and Section 1506.158, Insurance Code, an individual who is covered by the Texas Health Insurance Risk Pool on the effective date of this Act and who, because of the change in law made by this Act to Subsection (a), Section 1506.152, Insurance Code, would no longer be eligible for coverage, continues to be eligible for coverage from the pool until the individual's coverage is terminated for a reason other than that change in law.

SECTION 9. (a) In accordance with Subsection (c), Section 311.031, Government Code, which gives effect to a substantive amendment enacted by the same legislature that codifies the amended statute, the text of Subsection (b), Section 1506.002, Insurance Code, as set out in Section 1 of this Act, Subsection (a), Section 1506.152, Insurance Code, as set out in Section 3 of this Act, and Subsections (a) and (c), Section 1506.253, Insurance Code, as set out in Section 6 of this Act, gives effect to changes made by Sections 1, 6, and 11, Chapter 840, Acts of the 78th Legislature, Regular Session, 2003.

(b) To the extent of any conflict, this Act prevails over another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes.

SECTION 10. This Act takes effect January 1, 2006.

**Floor Amendment No. 2**

Amend **CSSB 809** (House committee printing) as follows:

(1) In SECTION 5 of the bill, in added Section 1506.2522, Insurance Code, strike the phrases "or retired employee" and "or retired employees" each place the phrases appear (page 4, line 26, and page 5, lines 4, 7-8, 13, 15, and 19).

(2) In SECTION 5 of the bill, in added Section 1506.2522, Insurance Code, following Subsection (d) (page 5, between lines 23 and 24), insert:

(e) In determining the number of enrolled individuals to report under this section, the health benefit plan issuer shall exclude individuals who are retired employees who are 65 years of age or older.

**Floor Amendment No. 3**

Amend **CSSB 809** (House committee printing) as follows:

(1) In SECTION 5 of the bill, in added Section 1506.2522, Insurance Code (page 5, between lines 23 and 24), insert the following new subsection:

(e) This section expires September 1, 2007.

(2) In SECTION 6 of the bill, strike amended Subsection (b), Section 1506.253, Insurance Code (page 6, lines 6-24), and substitute the following:

(b)  The amount of a health benefit plan issuer's assessment is computed by multiplying the total amount required to be assessed against all health benefit plan issuers by a number computed by dividing:

(1)  the gross premiums collected by the issuer for health benefit plans in this state during the preceding calendar year; by

(2)  the gross premiums collected by all issuers for health benefit plans in this state during the preceding calendar year.

(b-1)  Notwithstanding Subsection (b), to compute the amount of a health benefit plan issuer's assessment, if any, the board shall:

(1)  divide the total amount to be assessed by the total number of enrolled individuals reported by all health benefit plan issuers under Section 1506.2522 as of the preceding December 31 to determine the per capita amount; and

(2)  multiply the number of enrolled individuals reported by the health benefit plan issuer under Section 1506.2522 as of the preceding December 31 by the per capita amount to determine the amount assessed to that health benefit plan issuer.

(b-2)  Subsection (b-1) and this subsection expire September 1, 2007.

(3)  Insert the following new SECTION, numbered appropriately:

SECTION ___.  (a) The legislature shall establish a joint interim committee to study the deficit resulting from the net losses of the Texas Health Insurance Risk Pool and to recommend a method or formula for recouping any deficit that apportions the cost of those losses among the largest possible number of users of the health care system.

(b)  Not later than September 1, 2006, the committee shall report its findings and recommendations to the governor, lieutenant governor, and speaker of the house of representatives.

(c)  The lieutenant governor and speaker shall determine the composition of the committee.

(d)  This section expires September 1, 2007.

(4)  Renumber SECTIONS of the bill accordingly.

**Floor Amendment No. 4**

Amend **CSSB 809** as follows:

(1)  On page 3, line 27, strike "or"

(2)  Between page 3, line 27 and page 4, line 28 insert the following:

(E)  evidence that the individual is covered by substantially similar individual coverage that excludes one or more conditions by rider; or

(3)  Insert the following appropriately numbered section and renumber the remaining sections accordingly:

SECTION ___.  Section 1506.153, Insurance Code, is amended to read as follows:

Sec. 1506.153.  INELIGIBILITY FOR COVERAGE.  Notwithstanding Sections 1506.152(a)-(d), an individual is not eligible for coverage from the pool if:

(1)  on the date pool coverage is to take effect, the individual has health benefit plan coverage from a health benefit plan issuer or health benefit arrangement in effect, except as provided by Section 1506.152(a)(3)(E);

(2)  at the time the individual applies to the pool, the individual is eligible for other health care benefits, including benefits from the continuation of coverage under Title X, Consolidated Omnibus Budget Reconciliation Act of 1985 (29 U.S.C. Section 1161 et seq.), as amended (COBRA), other than:

(A)  coverage, including COBRA or other continuation coverage or conversion coverage, maintained for any preexisting condition waiting period under a pool policy;

(B)  employer group coverage conditioned by a limitation of the kind described by Section 1506.152(a)(3)(A) or (C); or

(C)  individual coverage conditioned by a limitation described by Section 1506.152(a)(3)(C), [or] (D), or (E);

(3)  within 12 months before the date the individual applies to the pool, the individual terminated coverage in the pool, unless the individual demonstrates a good faith reason for the termination;

(4)  the individual is confined in a county jail or imprisoned in a state or federal prison;

(5)  any of the individual's premiums are paid for or reimbursed under a government-sponsored program or by a government agency or health care provider, other than as an otherwise qualifying full-time employee of a government agency or health care provider or as a dependent of such an employee;

(6)  the individual's prior coverage with the pool was terminated:

(A)  during the 12-month period preceding the date of application for nonpayment of premiums; or

(B)  for fraud; or

(7)  the individual is eligible for health benefit plan coverage provided in connection with a policy, plan, or program paid for or sponsored by an employer, even though the employer coverage is declined.

SECTION ___. Section 1506.156, Insurance Code, is amended to read as follows:

Sec. 1506.156.  BENEFIT REDUCTION; CERTAIN COVERAGES SECONDARY.  (a) The pool shall reduce benefits otherwise payable under pool coverage by:

(1)  the total amount paid or payable through any other health benefit plan or health benefit arrangement; and

(2)  the total amount of hospital or medical expense benefits paid or payable under:

(A)  workers' compensation coverage;

(B)  automobile insurance, regardless of whether provided on the basis of fault or no fault; or

(C)  a state or federal law or program.

(b)  Pool coverage provided under Section 1506.152(a)(3)(E) is secondary to the individual coverage described by that paragraph for any period during which that individual coverage is in effect.

The amendments were read.

Senator Fraser, on behalf of Senator Averitt, moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **SB 809** before appointment.

There were no motions offered.

The Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators Averitt, Chair; Duncan, Williams, Armbrister, and Madla.

### SENATE BILL 1881 WITH HOUSE AMENDMENT

Senator Deuell called **SB 1881** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1881** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the validation, annexation, powers, and duties of the Parker Creek Municipal Utility District of Rockwall County; providing authority to impose a tax and issue bonds; granting the power of eminent domain.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle F, Title 6, Special District Local Laws Code, is amended by adding Chapter 8123 to read as follows:

CHAPTER 8123. PARKER CREEK MUNICIPAL UTILITY DISTRICT
OF ROCKWALL COUNTY
SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 8123.001.  DEFINITIONS. In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "District" means the Parker Creek Municipal Utility District of Rockwall County.

Sec. 8123.002.  NATURE OF DISTRICT. The district is a municipal utility district in Rockwall County created under and essential to accomplish the purposes of Section 52, Article III, and Section 59, Article XVI, Texas Constitution.

Sec. 8123.003.  MUNICIPAL UTILITY DISTRICT POWERS AND DUTIES. The district has the powers and duties provided by the general law of this state, including Chapters 49 and 54, Water Code, applicable to municipal utility districts created under Section 59, Article XVI, Texas Constitution.

[Sections 8123.004-8123.050 reserved for expansion]
SUBCHAPTER B. ANNEXATION BY MUNICIPALITY

Sec. 8123.051.  REQUEST FOR ANNEXATION.  (a) The board may adopt a resolution requesting that a municipality in whose extraterritorial jurisdiction the district is wholly or partly located annex all or part of the territory of the district.

(b)  The resolution adopted must describe the territory requested for annexation by metes and bounds.

(c)  If the board adopts a resolution as provided by Subsection (a), the municipality may by ordinance annex the territory described in the resolution without complying with other procedural requirements.

(d)  If the board adopts a resolution requesting annexation by a municipality under this section, the terms of the resolution control the annexation.  If the board does not adopt a resolution requesting annexation, the terms regarding annexation of any agreement between the municipality and the district or a property owner in the district control the annexation.

Sec. 8123.052.  CONTINUANCE OF DISTRICT; DISTRICT POWERS. Annexation by a municipality of all or part of the territory of the district under this subchapter does not affect any district power or duty that the district had before the annexation.

[Sections 8123.053-8123.100 reserved for expansion]
SUBCHAPTER C. POWERS AND DUTIES CONTINGENT ON
ANNEXATION BY MUNICIPALITY

Sec. 8123.101.  APPLICABILITY OF SUBCHAPTER. This subchapter applies to the district only if the district is wholly or partly annexed by a municipality under Subchapter B.

Sec. 8123.102.  ROAD PROJECTS.  (a)  In the part of the district annexed by the municipality, the district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes or improvements in aid of those roads or turnpikes.

(b)  A project authorized by this section must meet or exceed all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of the municipality.  The district may not undertake a road project under this section unless the municipality consents by ordinance or resolution.

(c)  The district may contract for a road project in the manner provided by Subchapter I, Chapter 49, Water Code.

(d)  Section 49.182, Water Code, does not apply to a project under this section.

Sec. 8123.103.  FINANCING OF ROAD PROJECTS. (a)  Except as provided by Subsections (b) and (c), the district may issue bonds or other obligations as provided by Chapters 49 and 54, Water Code, to finance a project under Section 8123.102 in the part of the district annexed by a municipality.

(b)  The district may not issue bonds or other obligations secured wholly or partly by ad valorem taxes to finance a project under Section 8123.102 unless the issuance is approved by a vote of a two-thirds majority of the voters of the district voting at an election called for that purpose.

(c)  Bonds or other obligations issued to finance projects under Section 8123.102 may not exceed one-fourth of the assessed value of the real property in the district.

(d)  Section 49.181, Water Code, does not apply to bonds issued under this section.

[Sections 8123.104-8123.150 reserved for expansion]

SUBCHAPTER D.  GENERAL FINANCIAL POWERS

Sec. 8123.151.  AUTHORITY  TO  ISSUE  BONDS  AND  OTHER OBLIGATIONS.  (a)  The district may issue bonds in accordance with Chapters 49 and 54, Water Code.

(b)  District bonds or other obligations are payable wholly or partly from ad valorem taxes, impact fees, revenue, grants, other district money, or any combination of those sources of money.

Sec. 8123.152.  TAX TO REPAY BONDS.  The district may impose a tax to pay the principal of and interest on bonds issued under Section 8123.103 or 8123.151.

Sec. 8123.153.  OPERATION AND MAINTENANCE TAX.  (a)  The district may impose a tax for any district operation and maintenance purpose in the manner provided by Section 49.107, Water Code.

(b)  Section 49.107(f), Water Code, does not apply to reimbursement for a project constructed or acquired under Section 8123.102.

SECTION 2.  (a)  The following are validated and confirmed in all respects:

(1)  the creation of the Parker Creek Municipal Utility District of Rockwall County and all proceedings related to the creation of the district, effective as of the date on which the creation or related proceedings occurred; and

(2)  any act or proceeding of the Parker Creek Municipal Utility District of Rockwall County, including an election, not excepted by this section and taken not more than two years before the effective date of this Act, effective as of the date on which the act or proceeding occurred.

(b)  This section does not apply to:

(1)  an act, proceeding, director, other official, bond, or other obligation the validity of which or of whom is the subject of litigation that is pending on the effective date of this Act; or

(2)  an act or proceeding that, under a statute of this state or the United States, was a misdemeanor or felony at the time the act or proceeding occurred.

SECTION 3.  The Parker Creek Municipal Utility District of Rockwall County retains all the rights, powers, privileges, authority, duties, and functions that it had before the effective date of this Act.

SECTION 4.  Except as provided by Sections 8123.051 and 8123.052, Special District Local Laws Code, as added by this Act, to the extent of any conflict between this Act and the terms and provisions of any agreement executed before the effective date of this Act between a municipality and the Parker Creek Municipal Utility District of Rockwall County or a property owner in that district, the agreement prevails.

SECTION 5.  (a)  The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b)  The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c) The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d) All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 6. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Deuell moved to concur in the House amendment to **SB 1881**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 296 WITH HOUSE AMENDMENT

Senator Madla called **SB 296** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Floor Amendment No. 1

Amend **SB 296** as follows:

On page 1, after line 20 add a new subsection as follows;

(e)  Notwithstanding any other law, Texas A&M University–San Antonio is not eligible to receive the small institution supplement under the Texas Higher Education Coordinating Board's General Academic Instruction and Operations Formula during the state fiscal biennium beginning September 1, 2005.  This subsection expires September 1, 2007.

Strike language on page 1, line 21 through page 2, line 10.

Renumber bill sections accordingly.

The amendment was read.

Senator Madla moved to concur in the House amendment to **SB 296**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 532 WITH HOUSE AMENDMENT

Senator Shapiro called **SB 532** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Amendment

Amend **SB 532** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to tuition and other charges and fees imposed by the governing board of a junior college district.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 130.003(b), Education Code, is amended to read as follows:

(b)  To be eligible for and to receive a proportionate share of the appropriation, a public junior college must:

(1)  be certified as a public junior college as prescribed in Section 61.063 [of this code];

(2)  offer a minimum of 24 semester hours of vocational and/or terminal courses;

(3)  have complied with all existing laws, rules, and regulations governing the establishment and maintenance of public junior colleges;

(4)  collect, from each full-time and part-time student enrolled, matriculation and other session fees in the amounts required by law or in the amounts set by the governing board of the junior college district as authorized by this title;

(5)  grant, when properly applied for, the scholarships and tuition exemptions provided for in this code; and

(6)  for a public junior college established on or after September 1, 1986, levy and collect ad valorem taxes as provided by law for the operation and maintenance of the public junior college.

SECTION 2. Section 130.084, Education Code, is amended to read as follows:

Sec. 130.084.  POWERS AND DUTIES. (a) The governing board [of trustees] of a junior college district [districts] shall be governed in the establishment, management, and control of a public [the] junior college in the district by the general law governing the establishment, management, and control of independent school districts insofar as the general law is applicable.

(b)  The governing board of a junior college district may set and collect with respect to a public junior college in the district any amount of tuition, rentals, rates, charges, or fees the board considers necessary for the efficient operation of the college, except that a tuition rate set under this subsection must satisfy the requirements of Section 54.051(n). The governing board may set a different tuition rate for each program, course, or course level offered by the college, including a program, course, or course level to which a provision of Section 54.051 applies, as the governing board considers appropriate to reflect course costs or to promote efficiency or another rational purpose.

SECTION 3. Sections 130.003(b) and 130.084, Education Code, as amended by this Act, apply beginning with tuition charged for the 2005 fall semester. Tuition charged for an academic period before the 2005 fall semester is covered by the law in effect immediately before the effective date of this Act, and the former law is continued in effect for that purpose.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Shapiro moved to concur in the House amendment to **SB 532**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1146 WITH HOUSE AMENDMENT

Senator Shapiro called **SB 1146** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 1146** (House committee report) in SECTION 1 of the bill, in amended Subsection (d), Section 29.908, Education Code (page 3, line 13), between "program." and "The P-16 Council" by inserting "The Texas Higher Education Coordinating Board may adopt rules as necessary to exercise its powers and duties under this section.".

The amendment was read.

Senator Shapiro moved to concur in the House amendment to **SB 1146**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1807 WITH HOUSE AMENDMENT

Senator Jackson called **SB 1807** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1807** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to the power and duties of the Galveston County Municipal Utility District No. 52.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle F, Title 6, Special District Local Laws Code, is amended by adding Chapter 8148 to read as follows:

CHAPTER 8148. GALVESTON COUNTY MUNICIPAL
UTILITY DISTRICT NO. 52
SUBCHAPTER A. GENERAL PROVISIONS
Sec. 8148.001.  DEFINITIONS. In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "Director" means a member of the board.

(3)  "District" means the Galveston County Municipal Utility District No. 52.

Sec. 8148.002.  FINDINGS OF BENEFIT AND PUBLIC PURPOSE. (a)  All land and other property included in the district will benefit from the works and projects to be provided by the district under powers conferred by Section 59, Article XVI, Texas Constitution.

(b)  The district exists to accomplish:

(1)  the same purposes as a municipal utility district as provided by Section 54.012, Water Code;

(2)  the same purposes as a navigation district created under Section 59, Article XVI, Texas Constitution, and operating under Chapters 60 and 62, Water Code; and

(3)  to the extent authorized by Section 52, Article III, Texas Constitution, the construction, acquisition, improvement, maintenance, or operation of macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

[Sections 8148.003-8148.050 reserved for expansion]

SUBCHAPTER B. POWERS AND DUTIES

Sec. 8148.051.  MUNICIPAL UTILITY DISTRICT POWERS AND DUTIES.  The district has the powers and duties provided by the general law of this state, including Chapters 49 and 54, Water Code, applicable to municipal utility districts created under Section 59, Article XVI, Texas Constitution.

Sec. 8148.052.  NAVIGATION POWERS. The district may purchase, construct, acquire, own, operate, maintain, improve, or extend, inside and outside the district, canals, waterways, bulkheads, docks, and any other improvements or facilities necessary or convenient to accomplish the navigation purposes of the district authorized by Section 59, Article XVI, Texas Constitution.

Sec. 8148.053. ROAD PROJECTS. (a)  The district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

(b)  A road project must meet all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of the municipality or county in whose jurisdiction the district is located.

(c)  The district may not undertake a road project unless each municipality or county in whose jurisdiction the district is located consents by ordinance or resolution.

Sec. 8148.054.  COMPLIANCE WITH MUNICIPAL CONSENT ORDINANCES OR RESOLUTIONS. Subject to the limitations of Section 54.016, Water Code, the district shall comply with all applicable requirements of any ordinance or resolution adopted by the city council of the City of Texas City that consents to the creation of the district or to the inclusion of lands within the district.

Sec. 8148.055. LIMITATION ON USE OF EMINENT DOMAIN. The district may exercise the power of eminent domain outside the district only to acquire an easement necessary for underground water, sewage, or drainage facilities that serve the district.

[Sections 8148.056-8148.100 reserved for expansion]

SUBCHAPTER C. BONDS

Sec. 8148.101.  AUTHORITY TO ISSUE BONDS AND OTHER OBLIGATIONS. (a) The district may issue bonds or other obligations as provided by Chapters 49 and 54, Water Code, to finance the construction, maintenance, or operation of projects under Section 8148.053.

(b)  The district may not issue bonds to finance projects authorized by Section 8148.053 unless the issuance is approved by a vote of a two-thirds majority of the voters of the district voting at an election called for that purpose.

(c)  Bonds or other obligations issued or incurred to finance projects authorized by Section 8148.053 may not exceed one-fourth of the assessed value of the real property in the district.

(d)  Sections 49.181 and 49.182, Water Code, do not apply to a project undertaken by the district under Section 8148.053 or to bonds issued by the district to finance the project.

SECTION 2.  (a) The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b)  The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c)  The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d)  All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 3.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson moved to concur in the House amendment to **SB 1807**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 155 WITH HOUSE AMENDMENTS

Senator Shapiro called **SB 155** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 1**

Amend **SB 155** (House committee printing) in SECTION 1 of the bill by striking Subsection (c) of added Section 847.005, Insurance Code (page 5, lines 22-27), and substituting the following:

(c)  If the department determines that a health benefit plan issuer is in compliance with a state statutory or regulatory requirement, the commission may presume that a Medicaid or state child health plan program managed care plan offered by a health benefit plan issuer under contract with the commission is in compliance with any contractual Medicaid or state child health plan program managed care plan requirement that is the same as, substantially similar to, or more stringent than the state statutory or regulatory requirement, as determined by the commission.

**Floor Amendment No. 2**

Amend **SB 155** on page 8, line 20, by inserting the following sections renumbering accordingly:

SECTION ___.  Subtitle F, Title 8, Insurance Code, is amended by adding Chapter 1457 to read as follows:

CHAPTER 1457 PROVISIONAL CREDENTIALING STATUS

Sec. 1457.001 DEFINITIONS. In this chapter:

(1)  "Enrollee" means an individual who is eligible to receive health care services through a health benefit plan.

(2)  "Physician"  means an individual licensed to practice medicine in this state under the authority of Title 3, Subtitle B, Occupations Code.

(3)  "Provider network" means a health benefit plan under which health care services are provided to enrollees through contracts with physicians and that requires those enrollees to use physicians participating in the plan and procedures covered by the plan. The term includes a network operated by:

(A) a health maintenance organization;

(B)  a preferred provider organization; or

(C)  another entity that issues a health benefit plan, including an insurance company.

Sec. 1457.002.  APPLICABILITY OF CHAPTER.  This chapter applies to any health benefit plan covered by Section 1456.002, Insurance Code.

Sec. 1457.003. PROVISIONAL CREDENTIALING STATUS.

(a)  A health benefit plan shall have a process for provisional credentialing status in compliance with the requirements of the National Committee for Quality Assurance.

(b)  A health benefit plan shall grant provisional credentialing status to a physician:

(1)  submits a completed standard credentialing application to the health benefit plan;

(2)  meets the health plan's requirements for provisional credentialing; and

(3)  joins as a partner, shareholder or employee of another physician who is contracted with a health benefit plan to provide medical or healthcare services to enrollees.

    (c)  A health benefit plan must complete the credentialing process within sixty (60) calendar days of the date a physician is granted provisional status.  In the event the physician does not meet the health plan's credentialing standards, the physician must be provided the same appeal process as any other physician applying for participation with the health benefit plan.

## Floor Amendment No. 1 on Third Reading

    Amend **SB 155** on third reading as follows:

    (1)  In Chapter 1457, Insurance Code, as added by second reading Floor Amendment No. 2 (page 1, lines 22-24, of floor amendment), strike Section 1457.002, Insurance Code, and renumber Chapter 1457 accordingly.

    (2)  In Subsection (b), Section 1457.003, Insurance Code, as added by second reading Floor Amendment No. 2 (page 1, line 29, of floor amendment), strike "shall grant" and substitute "may grant".

    The amendments were read.

    Senator Shapiro moved to concur in the House amendments to **SB 155**.

    The motion prevailed by the following vote:  Yeas 29, Nays 0.

    Absent-excused:  Carona, West.

### SENATE BILL 1751 WITH HOUSE AMENDMENT

    Senator Duncan called **SB 1751** from the President's table for consideration of the House amendment to the bill.

    The Presiding Officer laid the bill and the House amendment before the Senate.

## Amendment

    Amend **SB 1751** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the powers and board of directors of the Lubbock Reese Redevelopment Authority; authorizing a bond or similar obligation.

    BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

    SECTION 1.  Section 3501.051, Special District Local Laws Code, is amended to read as follows:

    Sec. 3501.051.  COMPOSITION OF BOARD. (a)  The board is composed of:

        (1)  five [seven] directors appointed by the governing body of the City of Lubbock from a list of persons recommended by the board under this section;

        (2)  one director appointed by the commissioners court of Lubbock County from a list of persons recommended by the board under this section; and

        (3)  one director appointed by the South Plains Association of Governments.

    (b) Before the term of a director appointed under Subsection (a)(1) or (a)(2) expires, the board, in consultation with the City of Lubbock or Lubbock County, as applicable, shall recommend to the governing body of the City of Lubbock or the commissioners court of Lubbock County, as applicable, a list of persons to serve on the succeeding board.  After reviewing the list of recommendations, the governing

body of the City of Lubbock or the commissioners court of Lubbock County, as applicable, shall appoint the appropriate number of directors from the recommended persons, or request that the board provide additional recommendations.

(c)  The governing body of the City of Lubbock, the commissioners court of Lubbock County, or the board, as appropriate, shall make recommendations and appointments to the board so that places on the board are occupied by persons with experience in:

(1)  real estate;
(2)  finance;
(3)  manufacturing;
(4)  agriculture; and
(5)  general business.

SECTION 2.  Subchapter C, Chapter 3501, Special District Local Laws Code, is amended by adding Sections 3501.105 and 3501.106 to read as follows:

Sec. 3501.105.  ADVISORY BOARDS. The board may appoint advisory boards to assist the board in administering this chapter.

Sec. 3501.106.  REVENUE BONDS. The authority may issue for any authority purpose bonds or other obligations payable from any source of authority revenue. The authority may issue a bond or other obligation in the form of a bond, note, certificate of participation or other instrument evidencing a proportionate interest in payments to be made by the authority, or other type of obligation.

SECTION 3. (a)  As used in this section, "director" means a member of the board of directors of the Lubbock Reese Redevelopment Authority.

(b)  The changes in law made by this Act applying to directors do not affect the entitlement of a director serving on the board of directors immediately before the effective date of this Act to continue to serve and function as a director until September 30, 2005. Those changes in law apply only to a director appointed under Section 3501.051, Special District Local Laws Code, as amended by this Act.

(c)  On September 30, 2005, all Lubbock Reese Redevelopment Authority board members' terms expire.

(d)  Not later than September 30, 2005:

(1)  the governing body of the City of Lubbock shall appoint five directors under Section 3501.051, Special District Local Laws Code, as amended by this Act, to serve terms beginning October 1, 2005, with two directors' terms expiring September 30, 2007, and three directors' terms expiring September 30, 2009;

(2)  the commissioners court of Lubbock County shall appoint one director under Section 3501.051, Special District Local Laws Code, as amended by this Act, to serve a term beginning October 1, 2005, and expiring September 30, 2007; and

(3)  the South Plains Association of Governments shall appoint one director under Section 3501.051, Special District Local Laws Code, as amended by this Act, to serve a term beginning October 1, 2005, and expiring September 30, 2009.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Duncan moved to concur in the House amendment to **SB 1751**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 30 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 30** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

#### Floor Amendment No. 1

Amend **SB 30** as follows:

(1)  On page 2, line 17, strike "declare a major" and substitute "select a degree program".

(2)  On page 2, line 27, strike "contract at the times required by the contract" and substitute "degree program selected as specified in Subsection (c)".

(3)  On page 3, lines 14 and 15, strike "at the appropriate time as specified by the institution in the contract" and substitute "in the sequence required by the degree program selected as specified in Subsection (c)".

(4)  On page 3, line 23, between "student's" and "tuition", insert "designated".

(5)  On page 3, lines 24 and 25, strike "at the time the student is first able to enroll in the course".

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 30**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
May 27, 2005

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS CONCURRED IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES:

**HB 34** (non-record vote)

**HB 51** (non-record vote)

**HB 148** (non-record vote)

**HB 178** (non-record vote)

**HB 602** (139 Yeas, 0 Nays, 2 Present, not voting)

**HB 616** (non-record vote)

**HB 677** (non-record vote)

**HB 731** (141 Yeas, 0 Nays, 2 Present, not voting)

**HB 765** (non-record vote)

**HB 790** (non-record vote)

**HB 809** (non-record vote)

**HB 823** (non-record vote)

**HB 831** (non-record vote)

**HB 840** (non-record vote)

**HB 853** (non-record vote)

**HB 908** (non-record vote)

**HB 934** (non-record vote)

**HB 975** (non-record vote)

**HB 1012** (141 Yeas, 0 Nays, 2 Present, not voting)

**HB 1092** (non-record vote)

**HB 1114** (141 Yeas, 0 Nays, 2 Present, not voting)

**HB 1238** (non-record vote)

**HB 1294** (111 Yeas, 30 Nays, 1 Present, not voting)

**HB 1353** (non-record vote)

**HB 1366** (non-record vote)

**HB 1399** (non-record vote)

**HB 1575** (139 Yeas, 2 Nays, 2 Present, not voting)

**HB 1582** (141 Yeas, 0 Nays, 2 Present, not voting)

**HB 1672** (142 Yeas, 0 Nays, 2 Present, not voting)

**HB 1718** (non-record vote)

**HB 1737** (138 Yeas, 0 Nays, 2 Present, not voting)

**HB 1740** (141 Yeas, 0 Nays, 2 Present, not voting)

**HB 1767** (non-record vote)

**HB 1959** (non-record vote)

**HB 1986** (non-record vote)

**HB 2180** (non-record vote)

**HB 2257** (non-record vote)

**HB 2267** (143 Yeas, 0 Nays, 2 Present, not voting)

**HB 2339** (non-record vote)

**HB 2344** (non-record vote)

**HB 2376** (non-record vote)

**HB 2381** (non-record vote)

**HB 2430** (143 Yeas, 0 Nays, 2 Present, not voting)

**HB 2463** (137 Yeas, 3 Nays, 2 Present, not voting)

**HB 2593** (140 Yeas, 0 Nays, 2 Present, not voting)

**HB 2630** (non-record vote)

**HB 2694** (non-record vote)

**HB 2759** (non-record vote)

**HB 2772** (140 Yeas, 0 Nays, 2 Present, not voting)

**HB 2808** (non-record vote)

**HB 2819** (non-record vote)

**HB 3093** (non-record vote)

**HB 3112** (non-record vote)

**HB 3426** (non-record vote)

**HB 3469** (142 Yeas, 0 Nays, 2 Present, not voting)

**HB 3528** (143 Yeas, 0 Nays, 2 Present, not voting)

THE HOUSE HAS REFUSED TO CONCUR IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES AND REQUESTS THE APPOINTMENT OF A CONFERENCE COMMITTEE TO ADJUST THE DIFFERENCES BETWEEN THE TWO HOUSES:

**HB 266** (non-record vote)
House Conferees:  Smith, Wayne - Chair/Blake/Harper-Brown/Mowery/Naishtat

**HB 580** (non-record vote)
House Conferees:  Smith, Wayne - Chair/Allen, Ray/Bonnen/Howard/King, Tracy

**HB 698** (non-record vote)
House Conferees:  McCall - Chair/Eiland/Giddings/Keel/Paxton

**HB 955** (non-record vote)
House Conferees:  Solomons - Chair/Elkins/Guillen/Homer/Orr

**HB 1207** (non-record vote)
House Conferees:  Haggerty - Chair/Bonnen/Callegari/Hardcastle/Puente

**HB 1610** (non-record vote)
House Conferees:  Chisum - Chair/Allen, Ray/Farabee/Olivo/Smith, Wayne

**HB 1773** (non-record vote)
House Conferees:  Miller - Chair/Hamilton/Hill/Quintanilla/Uresti

**HB 1800** (non-record vote)
House Conferees:  Denny - Chair/Hughes/Jones, Jesse/Keel/Madden

**HB 1890** (non-record vote)
House Conferees:  Smithee - Chair/Eiland/Escobar/Keffer, Bill/Taylor

**HB 2120** (non-record vote)
House Conferees:  Allen, Ray - Chair/Hamric/Nixon/Rose/Truitt

**HB 2309** (non-record vote)
House Conferees:  Denny - Chair/Anderson/Bohac/Nixon/Straus

**HB 2335** (non-record vote)
House Conferees:  Corte - Chair/Chavez/Delisi/Noriega, Melissa/Seaman

**HB 2491** (non-record vote)
House Conferees:  Puente - Chair/Crabb/Otto/Paxton/Rodriguez

**HB 2525** (non-record vote)
House Conferees:  Callegari - Chair/Anderson/Frost/Rodriguez/Smith, Wayne

**HB 2639** (non-record vote)
House Conferees:  Geren - Chair/Cook, Robby/Hardcastle/Puente/Solis

**HB 2668** (non-record vote)
House Conferees:  Dutton - Chair/Goodman/Nixon/Paxton/Strama

**HB 2928**
House Conferees:  Kolkhorst - Chair/Cook, Byron/Chisum/McReynolds/Ritter

**HB 3482** (non-record vote)
House Conferees:  Hegar - Chair/Callegari/Howard/Olivo/Puente

**HB 3518** (non-record vote)
House Conferees:  Coleman - Chair/Allen, Ray/Olivo/Smith, Wayne/Talton

**HB 3563** (non-record vote)
House Conferees:  King, Phil - Chair/Bailey/Luna/Straus/Swinford

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

## SENATE BILL 732 WITH HOUSE AMENDMENT

Senator Williams called **SB 732** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 732** by substituting in lieu thereof the following:

## A BILL TO BE ENTITLED
## AN ACT

relating to the administration of polygraph examinations to certain applicants for positions in the Department of Public Safety.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 411.007(c), Government Code, is amended to read as follows:

(c) An applicant for a position in the department must be a United States citizen. An applicant may not be questioned regarding the applicant's political affiliation or religious faith or beliefs. The department may not prohibit an officer or employee of the department, while off duty and out of uniform, from placing a bumper sticker endorsing political activities or a candidate for political office on a personal vehicle, placing a campaign sign in the person's private yard, making a political contribution, or wearing a badge endorsing political activities or a candidate. An officer commissioned by the department may not be suspended, terminated, or subjected to any form of discrimination by the department because of the refusal of the officer to take a polygraph examination. Section 411.0074 does not authorize the department to require an officer commissioned by the department to take a polygraph examination.

SECTION 2. Subchapter A, Chapter 411, Government Code, is amended by adding Section 411.0074 to read as follows:

Sec. 411.0074. POLYGRAPH EXAMINATIONS FOR CERTAIN APPLICANTS. (a) This section does not apply to:

(1) an applicant who is currently a peace officer of the department commissioned by the department; or

(2) an applicant for a police communications operator position who is currently employed by the department in another police communications operator position.

(b) Before commissioning an applicant as a peace officer or employing an applicant for a police communications operator position, the department shall require the applicant to submit to the administration of a polygraph examination in accordance with rules adopted under Subsection (e).

(c) The polygraph examination required by this section may only be administered by a polygraph examiner licensed under Chapter 1703, Occupations Code, who:

(1) is a peace officer commissioned by the department; or

(2) has a minimum of two years of experience conducting preemployment polygraph examinations for a law enforcement agency.

(d) The department and the polygraph examiner shall maintain the confidentiality of the results of a polygraph examination administered under this section, except that:

(1) the department and the polygraph examiner may disclose the results in accordance with Section 1703.306, Occupations Code; and

(2) notwithstanding Section 1703.306, Occupations Code, the department may disclose any admission of criminal conduct made during the course of an examination to another appropriate governmental entity.

(e)  The department shall adopt reasonable rules to specify the point in the hiring process at which the department shall require a polygraph examination to be administered under this section and the manner in which the examination shall be administered. Rules relating to the administration of a polygraph examination shall be adopted in accordance with the guidelines published by the American Polygraph Association or the American Association of Police Polygraphists.

(f)  The department shall use the results of a polygraph examination under this section as a factor in determining whether to commission a peace officer or employ an applicant for the position of police communications operator.

SECTION 3.  Section 411.0074, Government Code, as added by this Act, applies only to an applicant who submits an application for a position in the Department of Public Safety of the State of Texas on or after the effective date of this Act.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Williams moved to concur in the House amendment to **SB 732**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 151 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 151** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 151** by adding the following appropriately numbered SECTIONs to the bill and renumbering subsequent SECTIONs of the bill accordingly:

SECTION ____.  Subchapter F, Chapter 87, Education Code, is amended by adding Section 87.505 to read as follows:

Sec. 87.505.  TEXAS ACADEMY OF INTERNATIONAL STUDIES.  (a)  In this section:

(1)  "Academy" means the Texas Academy of International Studies.

(2)  "Board" means the board of regents of The Texas A&M University System.

(3)  "University" means Texas A&M International University.

(b)  The Texas Academy of International Studies is a division of Texas A&M International University and is under the management and control of the board. The academy serves the following purposes:

(1)  to provide academically gifted and highly motivated junior and senior high school students with a challenging university-level curriculum that:

(A)  allows students to complete high school graduation requirements, including requirements adopted under Section 28.025 for the advanced high school program, while attending for academic credit a public institution of higher education;

(B)  fosters students' knowledge of real-world international issues and problems and teaches students to apply critical thinking and problem-solving skills to those issues and problems;

(C)  includes the study of English, foreign languages, social studies, anthropology, and sociology;

(D)  is presented through an interdisciplinary approach that introduces and develops issues, especially issues related to international concerns, throughout the curriculum; and

(E)  offers students learning opportunities related to international issues through in-depth research and field-based studies;

(2)  to provide students with an awareness of international career and professional development opportunities through seminars, workshops, collaboration with postsecondary students from other countries, summer academic international studies internships in foreign countries, and similar methods; and

(3)  to provide students with social development activities that enrich the academic curriculum and student life, including, as determined appropriate by the academy, University Interscholastic League activities and other extracurricular activities generally offered by public high schools.

(c)  The academy is a residential, coeducational institution for selected Texas high school students with an interest and the potential to excel in international studies. The academy shall admit only high school juniors and seniors, except that the academy may admit a student with exceptional abilities who is not yet a high school junior. The board shall set aside adequate space on the university campus in Laredo to operate the academy and implement the purposes of this section. The academy must operate on the same fall and spring semester basis as the university.  Full-time students of the academy must enroll for both the fall and spring semesters. Faculty members of the university shall teach all academic classes at the academy. A student of the academy may attend a college course offered by the university and receive college credit for that course.

(d)  Except as otherwise provided by this subsection, the university administration has the same powers and duties with respect to the academy that the administration has with respect to the university. The board shall consult with the dean of the College of Education and other members of the administration as the board considers necessary concerning the academy's administrative design and support, personnel and student issues, and faculty development. The board shall consult with the dean of the College of Arts and Sciences and other members of the administration as the board considers necessary concerning the academy's curriculum development, program design, and general faculty issues. The board, in consultation with university administration, shall:

(1)  establish an internal management system for the academy and appoint an academy principal who serves at the will of the board and reports to the university provost;

(2)  provide for one or more academy counselors;

(3)  establish for the academy a site-based decision-making process similar to the process required by Subchapter F, Chapter 11, that provides for the participation of academy faculty, parents of academy students, and other members of the community; and

(4)  establish an admissions process for the academy.

(e)  The student-teacher ratio in all regular academic classes at the academy may not exceed 30 students for each classroom teacher, except that the student-teacher ratio may exceed that limit:

(1)  in a program provided for the purposes prescribed by Subsection (b)(2) or another special enrichment course or in a physical education course; or

(2)  if the board determines that a class with a higher student-teacher ratio would contribute to the educational development of the students in the class.

(f)  The academy shall provide the university-level curriculum in a manner that is appropriate for the social, psychological, emotional, and physical development of high school juniors and seniors. The administrative and counseling personnel of the academy shall provide continuous support to and supervision of students.

(g)  For each student enrolled in the academy, the academy is entitled to allotments from the foundation school fund under Chapter 42 as if the academy were a school district without a tier one local share for purposes of Section 42.253.  If in any academic year the amount of the allotments under this subsection exceeds the amount of state funds paid to the academy in the first fiscal year of the academy's operation, the commissioner of education shall set aside from the total amount of funds to which school districts are entitled under Section 42.253(c) an amount equal to the excess amount and shall distribute that amount to the academy. After deducting the amount set aside and paid to the academy by the commissioner of education under this subsection, the commissioner of education shall reduce the amount to which each district is entitled under Section 42.253(c) in the manner described by Section 42.253(h). A determination of the commissioner of education under this subsection is final and may not be appealed.

(h)  The board may use any available money, enter into contracts, and accept grants, including matching grants, federal grants, and grants from a corporation or other private contributor, in establishing and operating the academy. Money spent by the academy must further the purposes of the academy prescribed by Subsection (b).

(i)  The liability of the state under Chapters 101 and 104, Civil Practice and Remedies Code, is limited for the academy and employees assigned to the academy and acting on behalf of the academy to the same extent that the liability of a school district and an employee of the school district is limited under Sections 22.0511, 22.0512, and 22.052 of this code and Section 101.051, Civil Practice and Remedies Code. An employee assigned to the academy is entitled to representation by the attorney general in a civil suit based on an action or omission of the employee in the course of the employee's employment, limits on liability, and indemnity under Chapters 104 and 108, Civil Practice and Remedies Code.

(j)  Except as otherwise provided by this section, the academy is not subject to the provisions of this code, or to the rules of the Texas Education Agency, regulating public schools.

(k) A student may not begin attending the academy before the 2007 fall semester. This subsection expires August 31, 2008.

SECTION ____. Subsection (a), Section 25.086, Education Code, is amended to read as follows:

(a) A child is exempt from the requirements of compulsory school attendance if the child:

(1) attends a private or parochial school that includes in its course a study of good citizenship;

(2) is eligible to participate in a school district's special education program under Section 29.003 and cannot be appropriately served by the resident district;

(3) has a physical or mental condition of a temporary and remediable nature that makes the child's attendance infeasible and holds a certificate from a qualified physician specifying the temporary condition, indicating the treatment prescribed to remedy the temporary condition, and covering the anticipated period of the child's absence from school for the purpose of receiving and recuperating from that remedial treatment;

(4) is expelled in accordance with the requirements of law in a school district that does not participate in a mandatory juvenile justice alternative education program under Section 37.011;

(5) is at least 17 years of age and:

(A) is attending a course of instruction to prepare for the high school equivalency examination, and:

(i) has the permission of the child's parent or guardian to attend the course;

(ii) is required by court order to attend the course;

(iii) has established a residence separate and apart from the child's parent, guardian, or other person having lawful control of the child; or

(iv) is homeless as defined by 42 U.S.C. Section 11302; or

(B) has received a high school diploma or high school equivalency certificate;

(6) is at least 16 years of age and is attending a course of instruction to prepare for the high school equivalency examination, if:

(A) the child is recommended to take the course of instruction by a public agency that has supervision or custody of the child under a court order; or

(B) the child is enrolled in a Job Corps training program under [the Job Training Partnership Act (]29 U.S.C. Section 2881 [1501] et seq.[), and its subsequent amendments];

(7) is enrolled in the Texas Academy of Mathematics and Science;

(8) is enrolled in the Texas Academy of Leadership in the Humanities; [or]

(9) is enrolled in the Texas Academy of International Studies; or

(10) is specifically exempted under another law.

SECTION ____. Section 28.024, Education Code, is amended to read as follows:

Sec. 28.024. CREDIT FOR ENROLLMENT IN CERTAIN ACADEMIES. A school district shall grant to a student credit toward the academic course requirements for high school graduation, up to a maximum of two years of credit, for courses the student successfully completes at:

(1) the Texas Academy of Leadership in the Humanities under <u>Section 96.707</u> [Subchapter E, Chapter 108]; [or]

(2) the Texas Academy of Mathematics and Science under Subchapter <u>G</u> [H], Chapter 105<u>; or</u>

<u>(3) the Texas Academy of International Studies under Section 87.505</u>.

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 151**.

The motion prevailed by the following vote: Yeas 28, Nays 1.

Nays: Estes.

Absent-excused: Carona, West.

### SENATE BILL 851 WITH HOUSE AMENDMENTS

Senator Shapleigh called **SB 851** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Floor Amendment No. 1**

Amend **SB 851** on page 2, line 11 by striking "<u>five</u>" and substituting "<u>twenty-five</u>".

**Floor Amendment No. 3**

Amend **SB 851** on page 2, line 6, between "<u>:</u>" and "<u>and</u>" by inserting a new subsection (c)(9) to read as follows and renumbering subsequent subsections:

"<u>(9) balancing a check book</u>".

The amendments were read.

Senator Shapleigh moved to concur in the House amendments to **SB 851**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 658 WITH HOUSE AMENDMENT

Senator Madla called **SB 658** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 658** by substituting in lieu thereof the following:

## A BILL TO BE ENTITLED
### AN ACT

relating to the scheduling of certain University Interscholastic League competitions.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter D, Chapter 33, Education Code, is amended by adding Section 33.0812 to read as follows:

Sec. 33.0812.  SCHEDULING EXTRACURRICULAR ACTIVITIES PROHIBITED IN CERTAIN CIRCUMSTANCES. (a) The State Board of Education by rule shall prohibit participation in a University Interscholastic League area, regional, or state competition:

(1)  on Monday through Thursday of the school week in which the primary administration of assessment instruments under Section 39.023(a), (c), or (l) occurs; or

(2)  if the primary administration of the assessment instruments is completed before Thursday of the school week, beginning on Monday and ending on the last school day on which the assessment instruments are administered.

(b)  The commissioner shall determine the school week during the school year in which the primary administration of assessment instruments occurs for purposes of Subsection (a).

(c)  The commissioner shall adopt rules to provide the University Interscholastic League with a periodic calendar of dates reserved for testing for planning purposes under this section. The periodic calendar must be provided at least every three years on or before May 1 of the year preceding the three-year cycle of reserved testing dates.

(d)  In adopting rules under this section, the commissioner shall:

(1)  include a procedure for changing, in exceptional circumstances, testing dates reserved under the periodic calendar;

(2)  define circumstances that constitute exceptional circumstances under Subdivision (1) as unforeseen events, including a natural disaster, severe weather, fire, explosion, or similar circumstances beyond the control of school districts or the agency; and

(3)  establish criteria for determining whether a University Interscholastic League area, regional, or state competition must be canceled if that event conflicts with a changed testing date.

(e)  This section does not apply to testing dates on which assessment instruments are administered only to students retaking assessment instruments.

SECTION 2.  Section 7.056(e), Education Code, is amended to read as follows:

(e)  Except as provided by Subsection (f), a school campus or district may not receive an exemption or waiver under this section from:

(1)  a prohibition on conduct that constitutes a criminal offense;

(2)  a requirement imposed by federal law or rule, including a requirement for special education or bilingual education programs; or

(3)  a requirement, restriction, or prohibition relating to:

(A)  essential knowledge or skills under Section 28.002 or minimum graduation requirements under Section 28.025;

       (B)  public school accountability as provided by Subchapters B, C, D, and G, Chapter 39;

       (C)  extracurricular activities under Section 33.081 <u>or participation in a University Interscholastic League area, regional, or state competition under Section 33.0812</u>;

       (D)  health and safety under Chapter 38;

       (E)  purchasing under Subchapter B, Chapter 44;

       (F)  elementary school class size limits, except as provided by Section 25.112;

       (G)  removal of a disruptive student from the classroom under Subchapter A, Chapter 37;

       (H)  at-risk programs under Subchapter C, Chapter 29;

       (I)  prekindergarten programs under Subchapter E, Chapter 29;

       (J)  educator rights and benefits under Subchapters A, C, D, E, F, G, and I, Chapter 21, or under Subchapter A, Chapter 22;

       (K)  special education programs under Subchapter A, Chapter 29; or

       (L)  bilingual education programs under Subchapter B, Chapter 29.

SECTION 3.  A rule adopted under Section 33.0812(a), Education Code, as added by this Act, does not apply to student participation in a University Interscholastic League area, regional, or state competition for which a contract for the provision of facilities in which the competition will be conducted was entered into before the effective date of this Act.

SECTION 4.  This Act applies beginning with the 2006-2007 school year.

SECTION 5.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Madla moved to concur in the House amendment to **SB 658**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 331 WITH HOUSE AMENDMENT

Senator Lindsay called **SB 331** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 331** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the powers and duties of the North Harris County Regional Water Authority.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 2.02(c), Chapter 1029, Acts of the 76th Legislature, Regular Session, 1999, is amended to read as follows:

(c) In the manner described by Section 49.103(d), Water Code, the board shall redraw the single-member voting districts [as required by law] as soon as practicable after[:

[(1)] each federal decennial census[;] and as otherwise required by law

[(2) any change in the boundaries of the authority which increases the total area of the authority by more than 20 percent].

SECTION 2. Section 4.10, Chapter 1029, Acts of the 76th Legislature, Regular Session, 1999, is amended by adding Subsections (e) through (k) to read as follows:

(e) The authority may expedite the financing and construction of a surface water delivery system, or other projects of the authority to accomplish a conversion from reliance on groundwater to reliance on surface water not later than the earlier of:

(1) the date required by the subsidence district; or

(2) the date determined by the board to be in the interest of the authority or one or more districts inside or outside the authority.

(f)(1) In this section, "surface water delivery system" includes a facility that is to be constructed and that will be:

(A) used to transport groundwater between utility districts;

(B) used temporarily to transport groundwater between utility districts if there is a reasonable probability that the facility will be used for that purpose on a permanent basis in the future; or

(C) necessary to accomplish an authority purpose, including management of water, water conservation, or water reuse.

(2) For purposes of subsections (e)-(k), "surface water delivery system" does not include the use of the bed and banks to transport water or waste water.

(g) It is the intent of the legislature that the commission cooperate with and assist the authority in developing a surface water delivery system or other authority project in an expedited manner as provided by Subsection (e). The commission may grant conditional approval of a construction project or waive a requirement of any law or commission rule with respect to a construction project, if the conditional approval or waiver does not compromise public health or safety.

(h) If the commission grants conditional approval of or a waiver for a construction project, the authority shall make any subsequent changes in the construction project necessary to protect the public health or safety that the commission requires.

(i) The commission may not require as a condition for approving an authority construction project that the authority enter into a contract with another person. The authority may meet its obligations under commission rules that require that certain issues be addressed by contract by adopting rules that address those issues and that allocate responsibility as necessary between the authority and a district or person within the boundaries of the authority.

(j) The commission and the authority may enter into a memorandum of understanding that relates to the construction of a surface water delivery system. The memorandum of understanding may:

(1)  establish standard procedures for the commission to grant conditional or final approval of authority construction projects;

(2)  establish standing waivers or conditions applicable to those construction projects;

(3)  if the delegation does not violate federal law and is not inconsistent with any agreement of this state with, or any delegation of authority to this state from, The United States Environmental Protection Agency, delegate powers to the authority to carry out any commission duty relating to an activity that the authority may undertake;

(4)  set minimum standards for construction or other projects; or

(5)  address any other matter that relates to an activity that the authority may undertake and that the commission may regulate.

(k)  To comply with commission rules that would require the authority to state specific amounts of water that may or will be provided to another entity receiving water from the authority, the authority may state the amount in ranges that the authority may change on prompt notification to the commission.

SECTION 3.  Chapter 1029, Acts of the 76th Legislature, Regular Session, 1999, is amended by adding Section 5.01A to read as follows:

Sec. 5.01A.  ANTICIPATION NOTES AND BONDS.  (a)  The board may issue negotiable revenue anticipation notes or negotiable bond anticipation notes to borrow the money needed by the authority without advertising or giving notice of the sale. The board may also issue negotiable combination revenue and bond anticipation notes. Negotiable combination revenue and bond anticipation notes may contain any term authorized under this section for revenue anticipation notes or bond anticipation notes. Any note issued must mature not later than one year after its date of issuance.

(b)  A revenue anticipation note may be issued to enable the authority to carry out any purpose authorized by this Act. A revenue anticipation note must be secured by the proceeds of revenues to be collected by the authority in the 12-month period following the date of issuance of the note.  The board may covenant with the purchasers of the notes that the board will charge and collect sufficient revenues to pay the principal of and interest on the notes and pay the cost of collecting the revenues.

(c)  A bond anticipation note may be issued for any purpose for which a bond of the authority may be issued or to refund previously issued revenue or bond anticipation notes. The authority may covenant with the purchasers of the bond anticipation notes that the authority will use the proceeds of the sale of any bonds in the process of issuance for the purpose of refunding the bond anticipation notes, in which case the board shall use the proceeds received from the sale of the bonds in the process of issuance to pay the principal, interest, or redemption price on the bond anticipation notes.

(d)  For purposes of Section 1202.007, Government Code, a note issued under this section is considered to be payable only out of:

(1)  current revenues collected in the year the note is issued; or

(2)  the proceeds of other public securities.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Lindsay moved to concur in the House amendment to **SB 331**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 716 WITH HOUSE AMENDMENT

Senator Gallegos called **SB 716** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 716** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to payroll deductions for certain employees who are peace officers.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:
SECTION 1.  Section 141.008, Local Government Code, is amended by adding Subsection (a-2) to read as follows:
(a-2) The governing body shall make the payroll deduction described by Subsection (a) if:
          (1)  requested in writing by employees who:
               (A)  are peace officers as defined by Article 2.12, Code of Criminal Procedure; and
               (B)  are not members of a police department covered by a collective bargaining agreement or meet-and-confer agreement entered into under this code; and
          (2)  the municipality permits deductions for purposes other than charity, health insurance, taxes, or other purposes for which the municipality is required by law to permit a deduction.
SECTION 2.  Section 143.357, Local Government Code, is repealed.
SECTION 3.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Gallegos moved to concur in the House amendment to **SB 716**.

The motion prevailed by the following vote:  Yeas 25, Nays 4.

Yeas:  Armbrister, Averitt, Barrientos, Brimer, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hinojosa, Janek, Lindsay, Lucio, Madla, Ogden, Seliger, Shapiro, Shapleigh, Van de Putte, Whitmire, Williams, Zaffirini.

Nays:  Jackson, Nelson, Staples, Wentworth.

Absent-excused:  Carona, West.

### SENATE BILL 1551 WITH HOUSE AMENDMENT

Senator Estes called **SB 1551** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1551** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the continuation of certain offenses and certain statutes involving the interception of certain communications.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 16.02(h), Penal Code, is repealed.

SECTION 2.  Section 18, Article 18.20, Code of Criminal Procedure, is repealed.

SECTION 3.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Estes moved to concur in the House amendment to **SB 1551**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1192 WITH HOUSE AMENDMENT

Senator Estes called **SB 1192** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Floor Amendment No. 1**

Amend **SB 1192** (House committee printing) in SECTION 1 of the bill, in added Subdivision (2), Section 43.651, Parks and Wildlife Code, between "64.001" and the underlined period (page 1, line 13), by inserting ", other than a bird that is also listed in Section 64.021, and includes any other species of upland game bird that the commission by rule designates as an upland game bird".

The amendment was read.

Senator Estes moved to concur in the House amendment to **SB 1192**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 993 WITH HOUSE AMENDMENTS

Senator Janek, on behalf of Senator Ellis, called **SB 993** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 993** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED

AN ACT

relating to the creation of the Harris County Improvement District No. 5; providing authority to impose a tax and issue a bond or similar obligation.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle C, Title 4, Special District Local Laws Code, is amended by adding Chapter 3834 to read as follows:

CHAPTER 3834.  HARRIS COUNTY IMPROVEMENT DISTRICT NO. 5

SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 3834.001.  DEFINITIONS.  In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "District" means the Harris County Improvement District No. 5.

Sec. 3834.002.  HARRIS COUNTY IMPROVEMENT DISTRICT NO. 5.  The Harris County Improvement District No. 5 is a special district created under Section 59, Article XVI, Texas Constitution.

Sec. 3834.003.  PURPOSE; DECLARATION OF INTENT.  (a)  The creation of the district is essential to accomplish the purposes of Sections 52 and 52-a, Article III, and Section 59, Article XVI, Texas Constitution, and other public purposes stated in this chapter.  By creating the district and in authorizing the City of Houston, Harris County, and other political subdivisions to contract with the district, the legislature has established a program to accomplish the public purposes set out in Section 52-a, Article III, Texas Constitution.

(b)  The creation of the district is necessary to promote, develop, encourage, and maintain employment, commerce, transportation, housing, tourism, recreation, the arts, entertainment, economic development, safety, and the public welfare in the district and adjacent areas.

(c)  This chapter and the creation of the district may not be interpreted to relieve Harris County or the City of Houston from providing the level of services provided as of the effective date of this Act, to the area in the district. The district is created to supplement and not to supplant the county services provided in the area in the district.

Sec. 3834.004.  FINDINGS OF BENEFIT AND PUBLIC PURPOSE.  (a)  The district is created to serve a public use and benefit.

(b)  All land and other property included in the district will benefit from the improvements and services to be provided by the district under powers conferred by Sections 52 and 52-a, Article III, and Section 59, Article XVI, Texas Constitution, and other powers granted under this chapter.

(c)  The creation of the district is in the public interest and is essential to:

(1)  further the public purposes of developing and diversifying the economy of the state;

(2)  eliminate unemployment and underemployment; and

(3)  develop or expand transportation and commerce.

(d)  The district will:

(1)  promote the health, safety, and general welfare of residents, employers, potential employees, employees, visitors, and consumers in the district, and of the public;

(2)  provide needed funding for the district to preserve, maintain, and enhance the economic health and vitality of the district territory as a residential neighborhood and a commercially viable area; and

(3)  promote the health, safety, welfare, and enjoyment of the public by providing pedestrian ways and by landscaping and developing certain areas in the district, which are necessary for the restoration, preservation, and enhancement of scenic beauty.

(e)  Pedestrian ways along or across a street, whether at grade or above or below the surface, and street lighting, street landscaping, and street art objects are parts of and necessary components of a street and are considered to be a street or road improvement.

(f)  The district will not act as the agent or instrumentality of any private interest even though the district will benefit many private interests as well as the public.

Sec. 3834.005.  DISTRICT TERRITORY. The district is composed of the territory described by Section 2 of the Act enacting this chapter, as that territory may have been modified under:

(1)  Subchapter J, Chapter 49, Water Code; or

(2)  other law.

Sec. 3834.0055.  DISANNEXATION OF DISTRICT 146 TERRITORY. (a)  The district does not include the area of state representative District 146 as of the effective date of the Act enacting this section.

(b)  Disannexation of territory under this section does not affect the district's right to collect any assessments, impact fees, or taxes imposed on property in the disannexed territory before the disannexation.

(c)  Disannexation of territory under this section does not diminish or impair the rights of the holders of any outstanding and unpaid bonds, warrants, or other obligations of the district. Property disannexed under this section is not released from its pro rata share of any district indebtedness at the time of the disannexation and the district may continue to tax the property until that debt is paid.

Sec. 3834.006.  APPLICABILITY OF MUNICIPAL MANAGEMENT DISTRICTS LAW.  Except as otherwise provided by this chapter, Chapter 375, Local Government Code, applies to the district.

Sec. 3834.007.  LIBERAL CONSTRUCTION OF CHAPTER. This chapter shall be liberally construed in conformity with the findings and purposes stated in this chapter.

[Sections 3834.008-3834.050 reserved for expansion]

SUBCHAPTER B.  BOARD OF DIRECTORS

Sec. 3834.051.  BOARD OF DIRECTORS; TERMS.  (a)  The district is governed by a board of 11 voting directors who serve staggered terms of four years, with five or six directors' terms expiring June 1 of each odd-numbered year.

(b)  The board by resolution may change the number of voting directors on the board, but only if the board determines that the change is in the best interest of the district.  The board may not consist of fewer than 5 or more than 15 directors.

Sec. 3834.052.  QUALIFICATIONS.  (a)  Three voting directors on the board must reside in a residential area adjacent to the district and eight voting directors must represent commercial property owners or tenants in the district.

(b)  If the total number of voting directors of the board is increased or reduced, the board must maintain the same percentage of representation of residential and commercial areas on the board.

Sec. 3834.053.  APPOINTMENT OF DIRECTORS. The mayor and members of the governing body of the City of Houston shall appoint directors from persons recommended by the board. A person is appointed if a majority of the members of the governing body, including the mayor, vote to appoint that person.

Sec. 3834.054.  NONVOTING DIRECTORS. (a)  The following persons serve as nonvoting directors:

(1)  the directors of the following departments of the City of Houston or a person designated by that director:

(A)  parks and recreation;

(B)  planning and development; and

(C)  public works; and

(2)  the City of Houston's chief of police.

(b)  If a department described by Subsection (a) is consolidated, renamed, or changed, the board may appoint a director of the consolidated, renamed, or changed department as a nonvoting director. If a department described by Subsection (a) is abolished, the board may appoint a representative of another department that performs duties comparable to those performed by the abolished department.

Sec. 3834.055.  QUORUM.    (a)  Section 375.071, Local Government Code, does not apply to the district.

(b)  A majority of the board is a quorum.

(c)  Nonvoting directors and vacant director positions are not counted for the purposes of establishing a board quorum.

Sec. 3834.056.  CONFLICTS OF INTEREST; ONE-TIME AFFIDAVIT.  (a)  Except as provided by this section:

(1)  a director may participate in all board votes and decisions; and

(2)  Chapter 171, Local Government Code, governs conflicts of interest for directors.

(b)  Section 171.004, Local Government Code, does not apply to the district. A director who has a substantial interest in a business or charitable entity that will receive a pecuniary benefit from a board action shall file a one-time affidavit declaring the interest. An additional affidavit is not required if the director's interest changes. After the affidavit is filed with the board secretary, the director may participate in a discussion or vote on that action if:

(1)  a majority of the directors have a similar interest in the same entity; or

(2)  all other similar business or charitable entities in the district will receive a similar pecuniary benefit.

(c)  A director who is also an officer or employee of a public entity may not participate in the discussion of or vote on a matter regarding a contract with that public entity.

(d) For purposes of this section, a director has a substantial interest in a charitable entity in the same manner that a person would have a substantial interest in a business entity under Section 171.002, Local Government Code.

Sec. 3834.057.  INITIAL VOTING DIRECTORS. (a)  The initial board consists of the following voting directors:

| Pos. No. | Name of Director |
|----------|------------------|
| 1 | Laura Jaramillo |
| 2 | Sylvia Nguyen |
| 3 | C. Fred Meyer |
| 4 | Frank Rollow |
| 5 | Charles T. Spears |
| 6 | Etan Mirwis |
| 7 | Allen Goodlow |
| 8 | Elaine Gascamp |
| 9 | Kevin Robbins |
| 10 | David Mincberg |
| 11 | |

(b)  Of the initial voting directors, the terms of directors appointed for positions 1 through 6 expire June 1, 2009, and the terms of directors appointed for positions 7 through 11 expire June 1, 2007.

(c)  Section 3834.053 does not apply to this section.

(d)  This section expires September 1, 2009.

[Sections 3834.058-3834.100 reserved for expansion]

SUBCHAPTER C.  POWERS AND DUTIES

Sec. 3834.101.  ADDITIONAL POWERS OF DISTRICT.  The district may exercise the powers given to:

(1)  a corporation under Section 4B, Development Corporation Act of 1979 (Article 5190.6, Vernon's Texas Civil Statutes); and

(2)  a housing finance corporation under Chapter 394, Local Government Code, to provide housing or residential development projects in the district.

Sec. 3834.102.  NONPROFIT CORPORATION.  (a)  The board by resolution may authorize the creation of a nonprofit corporation to assist and act for the district in implementing a project or providing a service authorized by this chapter.

(b)  The nonprofit corporation:

(1)  has each power of and is considered for purposes of this chapter to be a local government corporation created under Chapter 431, Transportation Code; and

(2)  may implement any project and provide any service authorized by this chapter.

(c)  The board shall appoint the board of directors of the nonprofit corporation. The board of directors of the nonprofit corporation shall serve in the same manner as, for the same term as, and on the same conditions as the board of directors of a local government corporation created under Chapter 431, Transportation Code.

Sec. 3834.103.  AGREEMENTS; GRANTS.   (a)  The district may make an agreement with or accept a gift, grant, or loan from any person.

(b)  The implementation of a project is a governmental function or service for the purposes of Chapter 791, Government Code.

Sec. 3834.104.  AUTHORITY  TO  CONTRACT  FOR  LAW ENFORCEMENT.  To protect the public interest, the district may contract with Harris County or the City of Houston for the county or the city to provide law enforcement services in the district for a fee.

Sec. 3834.105.  APPROVAL BY CITY OF HOUSTON.  (a)  Except as provided by Subsection (b), the district must obtain the approval of the City of Houston's governing body for:

(1)  the issuance of a bond for each improvement project;

(2)  the plans and specifications of the improvement project financed by the bond; and

(3)  the plans and specifications of any district improvement project related to the use of land owned by the City of Houston, an easement granted by the City of Houston, or a right-of-way of a street, road, or highway.

(b)  If the district obtains the approval of the City of Houston's governing body of a capital improvements budget for a period not to exceed five years, the district may finance the capital improvements and issue bonds specified in the budget without further approval from the City of Houston.

Sec. 3834.106.  MEMBERSHIP  IN  CHARITABLE  ORGANIZATIONS.  The district may join and pay dues to an organization that:

(1)  enjoys tax-exempt status under Section 501(c)(3), (4), or (6), Internal Revenue Code of 1986; and

(2)  performs a service or provides an activity consistent with the furtherance of a district purpose.

Sec. 3834.107.  REMOVAL OF DANGEROUS BUILDINGS.  (a)  The district may cooperate with the City of Houston to have the City of Houston demolish and remove dangerous buildings in or outside the district as provided by this section.

(b)  The district may cooperate with the City of Houston to demolish and remove dangerous buildings outside the district if:

(1)  the district makes a determination that demolition and removal would benefit the district; and

(2)  the City of Houston agrees.

(c)  The district may borrow money to finance the demolition and removal of dangerous buildings under this section without complying with Section 3834.152.

(d)  The City of Houston may reimburse the district for all costs financed by the district from:

(1)  the proceeds of foreclosure on any demolition lien on the property; or

(2)  any other money the city collects or appropriates for the costs.

Sec. 3834.108.  NOTICE.  Notice required by Chapter 375, Local Government Code, may be sent by first class U.S. Mail rather than certified mail, return receipt requested, if the board of directors determines that first class mail is preferable and provides adequate notice.  If the board determines that first class mail is preferable, the board must publish notice in a newspaper of general circulation in the district at least 20 days before the event of which the district is giving notice.

Sec. 3834.109.  NO EMINENT DOMAIN.  The district may not exercise the power of eminent domain.

[Sections 3834.110–3834.150 reserved for expansion]

## SUBCHAPTER D. FINANCIAL PROVISIONS

Sec. 3834.151. DISBURSEMENTS AND TRANSFERS OF MONEY. The board by resolution shall establish the number of directors' signatures and the procedure required for a disbursement or transfer of the district's money.

Sec. 3834.152. PETITION REQUIRED FOR FINANCING SERVICES AND IMPROVEMENTS. (a) The board may not finance a service or improvement project with assessments under this chapter unless a written petition requesting that service or improvement has been filed with the board.

(b) A petition requesting a project financed by assessment must be signed by:

(1) the owners of a majority of the assessed value of real property in the district subject to assessment according to the most recent certified tax appraisal roll for Harris County; or

(2) at least 50 owners of real property in the district that will be subject to the assessment, if more than 50 persons own real property subject to the assessment in the district according to the most recent certified tax appraisal roll for Harris County.

Sec. 3834.153. MAINTENANCE TAX. (a) If authorized at an election held in accordance with Section 3834.157, the district may impose an annual ad valorem tax on taxable property in the district to:

(1) administer the district;

(2) maintain and operate the district;

(3) construct or acquire improvements; or

(4) provide a service.

(b) The board shall determine the tax rate.

Sec. 3834.154. ASSESSMENTS; LIENS FOR ASSESSMENTS. (a) The board by resolution may impose and collect an assessment for any purpose authorized by this chapter.

(b) An assessment, a reassessment, or an assessment resulting from an addition to or correction of the assessment roll by the district, penalties and interest on an assessment or reassessment, an expense of collection, and reasonable attorney's fees incurred by the district:

(1) are a first and prior lien against the property assessed;

(2) are superior to any other lien or claim other than a lien or claim for county, school district, or municipal ad valorem taxes; and

(3) are the personal liability of and a charge against the owners of the property even if the owners are not named in the assessment proceedings.

(c) The lien is effective from the date of the board's resolution imposing the assessment until the date the assessment is paid. The board may enforce the lien in the same manner that the board may enforce an ad valorem tax lien against real property.

(d) The board may make a correction to or deletion from the assessment roll that does not increase the amount of assessment of any parcel of land without providing notice and holding a hearing in the manner required for additional assessments.

Sec. 3834.155. UTILITY PROPERTY EXEMPT FROM IMPACT FEES AND ASSESSMENTS. The district may not impose an impact fee or assessment on the property, including the equipment, rights-of-way, facilities, or improvements, of:

(1) an electric utility or a power generation company as defined by Section 31.002, Utilities Code;

(2) a gas utility as defined by Section 101.003 or 121.001, Utilities Code;

(3) a telecommunications provider as defined by Section 51.002, Utilities Code; or

(4) a person who provides to the public cable television or advanced telecommunications services.

Sec. 3834.156. BONDS AND OTHER OBLIGATIONS. (a) The district may issue bonds or other obligations payable wholly or partly from assessments, impact fees, revenue, grants, or other money of the district, or any combination of those sources of money, to pay for any authorized purpose of the district.

(b) In exercising the district's power to borrow, the district may issue a bond or other obligation in the form of a bond, note, certificate of participation or other instrument evidencing a proportionate interest in payments to be made by the district, or other type of obligation.

Sec. 3834.157. TAX AND BOND ELECTIONS. (a) The district shall hold an election in the manner provided by Subchapter L, Chapter 375, Local Government Code, to obtain voter approval before the district imposes a maintenance tax or issues bonds payable from ad valorem taxes.

(b) The board may not include more than one purpose in a single proposition at an election.

(c) Section 375.243, Local Government Code, does not apply to the district.

Sec. 3834.158. MUNICIPALITY NOT REQUIRED TO PAY DISTRICT OBLIGATIONS. Except as provided by Section 375.263, Local Government Code, a municipality is not required to pay a bond, note, or other obligation of the district.

Sec. 3834.159. COMPETITIVE BIDDING. Section 375.221, Local Government Code, applies to the district only for a contract that has a value greater than $25,000.

[Sections 3834.160-3834.200 reserved for expansion]

SUBCHAPTER E. DISSOLUTION

Sec. 3834.201. DISSOLUTION OF DISTRICT WITH OUTSTANDING DEBT. (a) The board may dissolve the district regardless of whether the district has debt. Section 375.264, Local Government Code, does not apply to the district.

(b) If the district has debt when it is dissolved, the district shall remain in existence solely for the purpose of discharging its debts. The dissolution is effective when all debts have been discharged.

SECTION 2. As of the effective date of this Act, the Harris County Improvement District No. 5 includes all territory contained in the following described area:

Beginning at point approximately 600 feet from the intersection of the south right-of-way line of Murphy Road and the south right-of-way line of Highway 59;

Thence in a northeasterly direction along the southeast right-of-way line of Highway 59 approximately 10,900 feet to the south right-of-way line of Bissonnet Street;

Thence in an easterly direction along the south right-of-way line of Bissonnet Street a distance of approximately 3,500 feet to the east right-of-way line of South Gessner Boulevard;

Thence in a southerly direction along the east right-of-way line of South Gessner Boulevard a distance of approximately 1,100 feet to the north right-of-way line of Braeswood Bayou;

Thence in an easterly direction along the north right-of-way line of Braeswood Bayou a distance of approximately 9,500 feet to the east right-of-way line of Hillcroft Avenue;

Thence in a southerly direction along the east right-of-way line of Hillcroft Avenue a distance of approximately 3,800 feet to the south right-of-way line of Willowbend Drive;

Thence in a westerly direction along the south right-of-way line of Willowbend Drive a distance of approximately 1,500 feet to east line of Harris County Flood Control Ditch D-139-03;

Thence in a southerly direction along the east line of Harris County Flood Control Ditch 139-03 continuing south along the east line of Harris County Flood Control Ditch 140-05-02 continuing further south along the east line of Harris County Flood Control Ditch 140-05-01 a total distance of approximately 9,500 feet to the north right-of-way line of Highway 90A;

Thence in an easterly direction along the north right-of-way line of Highway 90A a distance of approximately 4,600 feet to the east line of Harris County Flood Control Ditch C-156;

Thence crossing Highway 90A in a southerly direction along the east line of Harris County Flood Control Ditch C-156 a distance of approximately 3,900 feet to the south right-of-way line of West Orem Drive;

Thence in a westerly direction along the south right-of-way line of West Orem Drive a distance of approximately 3,200 feet to the east right-of-way line of Blue Ridge Drive;

Thence in a southerly direction along the east right-of-way line of Blue Ridge Drive a distance of approximately 4,300 feet to the south right-of-way line of Sam Houston Tollway (Beltway 8);

Thence in a northwesterly direction along the south right-of-way line of Sam Houston Tollway a distance of approximately 13,800 feet to the east line of Reserve D, Block 1, Sanders Ridge Replat;

Thence in a southwesterly direction along east line of Reserve D, Block 1, Sanders Ridge Replat a distance of approximately 1,900 feet to the north right-of-way line of Cravens Street;

Thence in a northwesterly direction along the north right-of-way line of Cravens Street a distance of approximately 1,100 feet to the south right-of-way line of Stafford Road;

Thence in a northeasterly direction along the south right-of-way line of Stafford Road a distance of approximately 1,500 feet to a point;

Thence in a westerly direction a distance of approximately 1,000 feet to the west right-of-way line of New Stafford Road;

Thence in a northwesterly direction along the west right-of-way line of New Stafford Road a distance of approximately 300 feet to the south right-of-way line of West Airport Boulevard;

Thence in a westerly direction along the south right-of-way line of West Airport Boulevard a distance of approximately 2,800 feet to the east line of Harris County Flood Control Ditch D-118–05;

Thence in a northerly direction along the east line of Harris County Flood Control Ditch D-118–05 a distance of approximately 2,200 feet to the south right-of-way line of Dorrance Street;

Thence in a westerly direction along the south right-of-way line of Dorrance Street a distance of approximately 4,500 feet to the south right-of-way line of Highway 59 and the Point of Beginning

SAVE AND EXCEPT all property or lots that have been plated and recorded for use solely for single family residential purposes, are designated by the Harris County Appraisal District as single-family residential or are otherwise determined to be single-family residential, and all property, both real and personal, in the following described area:

TRACT I:

A parcel of land containing 4.9328 acres (214,875 square feet) more or less, being a remainder of that certain tract conveyed from Albert S. Weycer, Trustee to Smith, Liu & Corbin, Inc., as recorded in County Clerk's File No. K349561, Official Public Records of Real Property, Harris County, Texas, and also being a remainder of that certain tract conveyed from Greater Southwest Office Park, Ltd. to Smith, Liu & Corbin, Inc., as recorded in County Clerk's File No. K347824, Official Public Records of Real Property, Harris County, Texas, said 4.9328 acre tract being situated in the H.T & B.R.R. Co. Survey, Abstract No. 397, in Harris County, Texas and being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod in the southeast line of U.S. Highway 59 (right-of-way varies), for the most east corner of that certain 0.091 acre tract described in a judgement, the State of Texas v. Jay marks, Trustee, et al, as recorded in County Clerk's File No. M917764, Official Public Records of Real Property, Harris County, Texas, same being the mot south corner of that certain 0.122 acre tract described in a Judgement, the State of Texas v. Smith, Liu & Corbin, Inc. as recorded in County Clerk's File No. M191871, Official Public Records of Real Property, Harris County, Texas, also being the most north corner of the remainder of that certain tract conveyed from Greater Southwest Office Park, Ltd. to Jay Mark, Trustee, as recorded in County Clerk's File No. K347823, Official Public Records of Real Property, Harris County, Texas, and also being the most west corner of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K347824, from which a found TxDot Monument bears, North 46 deg. 35 min. 00 sec. East, 1.11 feet;

THENCE North 43 deg. 59 min. 40 sec. East, with the said southeast line of U.S. Highway 59, and the southeast line of the said 0.122 acre tract, and first with the northwest line of said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K347824, then with the northwest line of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, a distance of 319.19 feet to a found TxDot Monument;

THENCE North 44 deg. 55 min. 44 sec. East, continuing with the said southeast line of U.S. Highway 59, and the said southeast line of the 0.122 acre tract, same being the said northwest line of the remainder of the Smith, Liu & Corbin, Inc. Tract, recorded in File No. K349561, a distance of 11.74 feet to a found TxDot Monument, for a point of curvature;

THENCE continuing with the said southeast line of U. S. Highway 59, and the said southeast line of the 0.122 acre tract, same being the said northwest line of the remainder of the Smith, Liu & Corbin, Inc. Tract, recorded in File No. K349561, a distance of 172.67 feet along the arc of a curve to the left, having a radius of 5702.38 feet, a central angle of 01 deg. 44 min. 06 sec., and a chord which bears, North 44 deg. 03 min. 41 sec. East, a distance of 172.66 feet to a set 5/8 inch iron rod, for the most west corner of that certain tract conveyed from Smith, Liu & Corbin, Inc. to Paramount Southwest, Inc., as recorded in County Clerk's File No. R800583, Official Public Records of Real Property, Harris County, Texas, same being the most west corner of that certain tract conveyed from Paramount Southwest, Inc. to Foyt Motors, Inc., as recorded in County Clerk's File No. R800584, Official Public Records of Real Property, Harris County, Texas, and also being the most north corner of the said remainder of the Smith, Liu & Corbin Tract, recorded in File No. K349561;

THENCE South 47 deg. 09 min. 02 sec. East, with the southwest line of the said Paramount Southwest, Inc., Tract, and the southwest line of the said Foyt Motors, Inc. Tract, same being the northeast line of the said remainder of the Smith, Liu & Corbin, Inc. Tract, recorded in File No. K349561, a distance of 31.53 feet to a found 5/8 inch iron rod, for the most north corner of that certain tract conveyed from Paramount Southwest, Inc. to Smith, Liu & Corbin, Inc. as recorded in County Clerk's File No. R800582, Official Public Records of Real Property, Harris County, Texas, same being the south corner of the said Paramount Southwest, Inc., Tract, and also being a corner of the said remainder of the Smith, Liu & Corbin, Inc., Tract recorded in File No. K349561;

THENCE South 00 deg. 04 min. 44 sec. East, with the west line of the said Smith, Liu & Corbin, Inc. Tract recorded in File No. R800582, same being an east line of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, a distance of 279.10 feet to a found 5/8 inch iron rod, for the southwest corner of the said Smith, Liu & Corbin, Inc., Tract, recorded in. File No. R800582, same being a corner of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561;

THENCE North 89 deg. 52 min. 49 sec. East, with the north line of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, same being the south line of the said Smith, Liu & Corbin, Inc., Tract, recorded in File No. R800582, at a distance of 299.82 feet pass a found "X" in concrete, for the southwest corner of the said Foyt Motors, Inc., Tract, same being the southeast corner of the said Smith, Liu & Corbin, Inc., Tract, recorded in File No. R800582, then with the south line of the said Foyt Motors, Inc., Tract, a total distance of 400.48 feet to a found 5/8 inch iron rod in the west line of Paramount Fifty Nine, Section two, a recorded in Volume 390, Page 104, Map Records of Harris County, Texas, for the southeast corner of the

said Foyt Motors, Inc., Tract, same being the northeast corner of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, from which a found 5/8 inch iron rod bears, North 35 deg. 57 min. 22 sec. East, 0.40 feet;

THENCE South 00 deg. 06 min. 16 sec. East, with the said west line of Paramount Fifty Nine, Section Two, same being an east line of the said remainder of the Smith, Liu & Corbin, Inc., Tract recorded in File No. K349561, a distance of 241.29 feet to a found 5/8 inch iron rod for the northeast corner of that certain tract conveyed from Albert S. Weycer, Trustee to Jay Marks, Trustee, as recorded in County Clerk's File No. K349560, Official Public Records of Real Property, Harris County, Texas, same being the southeast corner of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, from which a found 5/8 inch iron rod bears, South 21 deg. 10 min. 37 sec. West, 0.81 feet;

THENCE North 89 deg. 58 min. 26 sec. West, with the north line of the said Jay Marks, Trustee Tract, recorded in File No. K349560, same being the south line of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, a distance of 445.00 feet, to a set 5/8 inch iron rod, for a corner;

THENCE North 76 deg. 24 min. 49 sec. West, first with the said south line of the remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K349561, same being the said north line of the Jay Marks, Trustee Tract, recorded in File No. K349560, then with the southwest line of the said remainder of the Smith, Liu & Corbin, Inc. Tract, recorded in File No. K347824, same being the northeast line of the said remainder of the Jay Marks, Trustee Tract, recorded in File No. K347823, a distance of 198.06 feet to a found "X" in concrete, for a corner, from which a found "X" in concrete bears, South 65 deg. 56 min. 55 sec. West, 0.39 feet;

THENCE North 46 deg. 00 min. 19 sec. West, continuing with the said southwest line of the remainder of the Smith, Liu & Corbin, Inc., Tract, recorded in File No. K347824, and the said northeast line of the remainder of the Jay Marks, Trustee Tract, recorded in File No. K347823, a distance of 190.31 feet to the POINT OF BEGINNING and containing 4.9328 acres (214,875 square feet) of land more or less, and together with any and all rights to the non-exclusive easement and right-of-way for storm sewer purposes set forth under Harris County Clerk File No (s). K349562.

TRACT II:

A parcel of land containing 0.9605 acre (41,840 square feet) more or less, being that same tract conveyed from Paramount Southwest, Inc. to Smith, Liu & Corbin, Inc., as recorded in County Clerk's File No. R800582, Official Public Records of Real Property, Harris County, Texas, and being more particularly described by metes and bounds as follows:

COMMENCING at a set 5/8 inch iron rod in the southeast line of U.S. Highway 59 (right-of-way varies), same being in the east line of that certain 0.122 acre tract described in a Judgment, the State of Texas, v. Smith, Liu & Corbin, Inc., as recorded in County Clerk's File No. M191871, Official Public Records of Real Property, Harris County, Texas, for the most north corner of the remainder of that certain tract conveyed from Albert S. Weycer, Trustee to Smith, Liu & Corbin, Inc., as recorded under County Clerk's File No. K349561, Official Public Records of real Property, Harris County, Texas, same being the most wet corner of that certain tract conveyed from Smith, Liu & Corbin, Inc. to Paramount Southwest, Inc., as recorded under

County Clerk's File No. R800583, Official Public Records of Real Property, Harris County, Texas, and also being the most west corner of that certain tract conveyed from Paramount Southwest, Inc., to Foyt Motors, Inc., as recorded under County Clerk's File No. R800584, Official Public Records of Real Property, Harris County, Texas;

THENCE South 47 deg. 09 min. 02 sec. East, with the Northeast line of the said remainder of the Smith, Liu & Corbin, Inc., Tract recorded in file No. K349561, same being the Southwest line of the said Paramount Southwest, Inc. tract and the southwest line of the said Foyt Motors, Inc. tract, a distance of 31.53 feet to a found 5/8 inch iron rod for a corner of the said remainder of the Smith, Liu & Corbin, Inc., Tract, recorded under Harris County Clerk's File No. K349561, same being the South corner of the said Paramount Southwest, Inc. tract, also being the most north corner of the said Smith, Liu & Corbin, Inc., Tract, recorded in File No. R800582, and also being the POINT OF BEGINNING;

THENCE South 47 deg. 09 min. 02 sec. East, with the said southwest line of the Foyt Motors, Inc. Tract, same being the northeast line of the said Smith, Liu & Corbin, Inc. Tract, recorded in File No. R800582, a distance 409.48 feet, to a found "X" in concrete, in the north line of the said remainder of the Smith, Liu & Corbin, Inc. Tract, recorded in File No. K349561, for the southwest corner of the said Foyt Motors, Inc. Tract, same being the southwest corner of the said Smith, Liu & Corbin, Inc., Tract, recorded in File No. R8005822;

THENCE South 89 deg. 52 min. 49 sec. West, with the said north line of the remainder of the Smith, Liu & Corbin, Inc. Tract, recorded under Harris County Clerk's File No. K349561, same being the south line of the said Smith, Liu & Corbin, Inc. tract recorded under Harris County Clerk's File No. R800582, a distance of 299.82 feet to a found 5/8 inch iron rod, for a corner of the said remainder of the Smith, Liu & Corbin, Inc. Tract, recorded in File No. K349596, same being the southwest corner of the said Smith, Liu & Corbin, Inc. Tract, recorded in File No. R800582;

THENCE North 00 deg. 04 min. 44 sec. West, with an east line of the said remainder of the Smith, Liu & Corbin, Inc. Tract, recorded under Harris County Clerk's File No. K349561, same being the West line of the said Smith, Liu & Corbin, Inc. Tract, recorded in File No. R800582, a distance of 279.10 feet to the POINT OF BEGINNING, and containing 0.9605 of an acre (41,840 square feet) of land more or less, together with any and all rights in and to the storm sewer easement set forth under Harris County Clerk File No.(s) R800586.

2.1207 acres of land being pat of the H.T. & B.R.R. Company Survey, Abstract No. 397, Harris County, Texas, and being out of that certain tract of land conveyed to Frances M. Britton in deed recorded in Volume 979, Page 40, Harris County Deed Records, said 2.1207 acres of land being more particularly described by metes and bounds as follows:

COMMENCING at a 5/8 inch iron rod found for the most northerly northwest corner of the said Britton tract, said corner being on the southeasterly right-of-way line of U.S. Highway 59;

THENCE along said right-of-way line South 40 deg. 20 min. 05 sec. West, a distance of 150.00 feet to a found 5/8 inch iron rod for POINT OF BEGINNING of the herein described tract;

THENCE leaving said right-of-way line, South 49 deg. 39 min. 55 sec. East, a distance of 392.61 feet to a 5/8 inch iron rod found for the Northeast corner of the herein described tract of land;

THENCE South 02 deg. 31 min. 49 sec. East, a distance of 179.26 feet to a point for corner at a concrete fence base at the southeast corner of the herein described tract of land, same being the Northeastern corner of Southwest Plaza, a subdivision recorded in Volume 319, Page 117, Harris County, Texas;

THENCE South 87 deg. 21 min. 56 sec. West, a distance of 100.66 feet along the northerly line of unrestricted Reserve B to a found 5/8 inch iron rod marking the most southwest corner of the herein described tract;

THENCE North 49 deg. 39 min. 55 sec. West, a distance of 441.01 feet to a found 5/8 inch iron rod along the southeasterly right-of-way line of U.S. Highway 59;

THENCE on a curve to the left along said right-of-way having a central angle of 00 deg. 20 min. 22 sec., a radius of 5702.38 feet, and length of 33.79 feet to a found 5/8 inch iron rod;

THENCE North 40 deg. 20 min. 05 sec. East along the southeast right-of-way of U.S. Highway 59, a distance of 166.21 feet to the POINT OF BEGINNING and containing 2.1207 acres (92,376 sq. ft.) of land.

A 9.9800 acre tract of land in the H.T. & B. R.R. Survey, Abstract No. 397, Harris County Texas, being all of Paramount Fifty Nine Section One, a subdivision recorded in Film Code 381083, Harris County Map Records, said tract being more particularly described by metes and bounds as follows:

BEGINNING at a fence post in the east line of said subdivision, and the Southeast corner of a 0.3248 acre tract described in a deed recorded in Volume 3567, Page 698 of the Harris County Deed Records and being in the west line of a 40-foot wide drainage easement described in instruments recorded in Volume 4000, Page 62 and Volume 4014, Page 496, both of the Harris County Deed Records;

THENCE South 02 deg 39' 43" East, a distance of 1171.40 feet along the east line of said subdivision and along the west line of said 40 foot wide drainage easement to a 5/8 inch iron rod found for corner;

THENCE South 87 deg 20' 17" West, a distance of 315.00 feet to a 5/8 inch iron rod found for corner;

THENCE North 02 deg 39' 43" West, a distance of 649.83 feet to a 5/8 inch iron rod found for an angle point;

THENCE North 48 deg 09' 23" West, a distance of 359.77 feet to 5/8 inch iron rod found in the southeasterly right-of-way line of U.S. Highway No. 59 (Southwest Freeway);

THENCE North 41 deg 50' 37" East, a distance of 377.05 feet along the southeasterly right-of-way line of U.S. Highway 59, same being the southeasterly line of a 2.6034 acre tract recorded in Vol. 3567, Page 554, of the Harris County Deed Records, to a cut "x" for the southwest corner of said 0.3248 acre tract, and the most northerly northwest corner of the herein described tract;

THENCE North 87 deg 14' 58" East, along the south line of said 0.3248 acre tract, a distance of 307.28 feet to the POINT OF BEGINNING and containing 9.9800 acres (434,730 sq. ft.) of land.

A tract of land containing .4679 acre, being a portion of Lots 3 & 4, Block 12, Country Club Villas, a subdivision in Harris County, Texas, recorded in Volume 34, Page 9, Harris County Map Records, and being in the H.T.& B Survey, A 398 and being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod found on the North right-of-way line of Whitechapel Lane (30 feet wide) as recorded in Volume 34, Page 9, Harris County Map Records, said 5/8 inch iron rod being the on the west right-of-way line of Plainfield Road, and further being the southeast corner of Lot 4, Block 12, of said Country Club Villas;

THENCE South 87 deg 24' 10" West, leaving the West right-of-way line of Plainfield Road, a distance of 160.41 feet to a found 5/8 inch iron rod marking the most Southwesterly corner of Lot 4, Block 12;

THENCE North 02 deg 48' 23" West, a distance of 54.54 feet to a found 5/8 inch iron rod located in the Southerly right-of-way line of U.S. Hwy 59 (300 feet wide);

THENCE North 41 deg 39' 26" East, along the Southerly right-of-way line of U.S. Hwy 59, a distance of 149.09 feet to a set 5/8 inch iron rod marking the most Northerly Northwest corner of the herein described tract;

THENCE North 87 deg 24' 10" East, leaving the Southerly right-of-way line of U.S. Hwy 59, a distance of 57.00 feet to a set 5/8 inch iron rod, said point located on the most Westerly right-of-way line of Plainfield Road;

THENCE South 02 deg 25' 48" East, along the west right-of-way line of said Plainfield Road, a distance of 161.33 feet to the POINT OF BEGINNING and containing .4679 acres (20,384 sq ft) of land.

DESCRIPTION OF A TRACT OF LAND CONTAINING
1.0352 ACRES (45,092 SQUARE FEET) SITUATED
IN THE JAMES ALSTON SURVEY, A-100, HARRIS
COUNTY, TEXAS

Being a tract of land containing 1.0352 acres (45,092 square feet) situated in the James Alston Survey, A-100 in Harris County, Texas, and also being out of a 3.000-acre tract as conveyed unto Texas Commerce Bancshares, Inc. by deed recorded under County Clerk's File No. H209495, Film Code No. 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 of the Official Public Records of Real Property of Harris County, Texas.  Said 1.0352-acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a point located in the easterly right-of-way line of U.S. Highway 59 for the northwest corner of said 3.000-acre tract and the southwest corner of said 143,000-square foot tract as conveyed unto the First National Bank of Stafford by deed recorded under County Clerk's File No. F416621, Film Code No. 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 of the Official Public Records of Real Property of Harris County, Texas, from which a metal disk in a concrete filled 3-inch by 3-inch iron post bears East, a distance of 0.2 feet and a 1/2-inch iron rod bears South, a distance of 0.2 feet and West, a distance of 0.1 feet;

THENCE South 69° 56' 00" East with the north line of said 3.000-acre tract and the south line of said 143,000-square foot tract, a distance of 203.14 feet to a PK nail set in concrete for the northeast corner of said tract herein described;

THENCE South 21° 27' 03" West, a distance of 189.51 feet to a 5/8-inch iron rod set for the southeast corner of said tract herein described located in the south line of said 3.000-acre tract;

THENCE North 68° 32' 57" West with the south line of said 3.000-acre tract, a distance of 280.05 feet to a 5/8-inch iron rod set for the southwest corner of said tract herein described located in the easterly right-of-way line of said U.S. Highway 59;

THENCE North 44° 05' 00" East with the easterly right-of-way line of said U.S. Highway 59, a distance of 200.00 feet to the POINT OF BEGINNING and containing 1.0352 acres (45,092 square feet) of land, more or less.

TRACT 1

BEING THAT CERTAIN TRACT OF LAND CONTAINING 2.1764 ACRES, IN THE H.T. & B.R.R. COMPANY SURVEY, ABSTRACT NO. 397, HARRIS COUNTY, TEXAS, OUT OF THAT SAME 39.855 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 7853, PAGE 52 OF HARRIS COUNTY DEED RECORDS, SAID TRACT BEING IN RESERVE "B" OF BLOCK 2 AS SHOWN ON THE PLAT OF SOUTHWEST PLAZA RECORDED IN VOLUME 319, PAGE 117 OF THE HARRIS COUNTY MAP RECORDS, SAID TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND IN THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO. 59 (SOUTHWEST FREEWAY) AS WIDENED FOR ITS INTERCHANGE WITH BELTWAY 8 AND DESCRIBED AS 12,827 SQUARE FEET IN A DEED FROM GREATER SOUTHWEST OFFICE PARK, LTD. TO THE STATE OF TEXAS, DATED JULY 7, 1983 (SAID 12,827 SQUARE FOOT TRACT BEING RESERVE "F" OF SAID BLOCK 2), AT THE SOUTHWEST CORNER OF SAID RESERVE "B", AT THE NORTHWEST CORNER OF RESERVE "C" OF SAID BLOCK 2, AND IN THE CENTERLINE OF A HOUSTON LIGHTING & POWER COMPANY 80-FOOT WIDE EASEMENT AS DESCRIBED IN INSTRUMENTS RECORDED IN VOLUME 3455, PAGE 515, VOLUME 3455, PAGE 518 AND VOLUME 7847, PAGE 532, ALL OF THE HARRIS COUNTY DEED RECORDS:

THENCE, N 37° 48' 21" E, 110.93 FEET ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF THE SAID WIDENING OF U.S. HIGHWAY NO. 59 FOR THE INTERCHANGE WITH BELTWAY 8, SAME BEING THE SOUTHEASTERLY LINE OF SAID RESERVE "F" AND ALONG THE NORTHWESTERLY LINE OF SAID RESERVE "B" TO A 5/8" IRON ROD WITH ALUMINUM CAP FOUND AT THE MOST NORTHERLY CORNER OF SAID RESERVE "F";

THENCE, N 43° 59' 41" E, 326.50 FEET ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO. 59 (300 FEET OF R.O.W.) AND ALONG THE NORTHWESTERLY LINE OF SAID RESERVE "B" TO A 5/8" IRON ROD SET AT THE MOST NORTHERLY CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, S 46° 00' 19" E, 200.00 FEET TO A 5/8" IRON ROD SET FOR CORNER;

THENCE, S 76° 24' 49" E, 50.92 FEET TO A 5/8" IRON ROD SET FOR CORNER IN A WEST LINE OF THAT CERTAIN 21.4670 ACRE TRACT DESCRIBED IN A DEED RECORDED IN VOLUME 4758, PAGE 584 OF THE HARRIS COUNTY DEED RECORDS;

THENCE, S 00° 12' 53" E, 171.88 FEET ALONG A WEST LINE OF SAID 21.4670 ACRE TRACT AND ALONG THE EAST LINE OF SAID 39.855 ACRE TRACT TO A 5/8" IRON ROD FOUND FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, AND BEING IN THE CENTERLINE OF THE SAID HOUSTON LIGHTING & POWER COMPANY 80-FOOT WIDE EASEMENT;

THENCE, N 89° 58' 26" W, 488.80 FEET ALONG THE SOUTH LINE OF SAID RESERVE "B", ALONG THE NORTH LINE OF SAID RESERVE "C" AND ALONG THE CENTERLINE OF THE SAID HOUSTON LIGHTING & POWER COMPANY 80-FOOT WIDE EASEMENT TO THE POINT OF BEGINNING AND CONTAINING 2.1764 ACRES OF LAND, SAVE AND EXCEPT THAT CERTAIN TRACT CONTAINING 3,975 SQUARE FEET OF LAND AWARDED TO THE STATE OF TEXAS UNDER CONDEMNATION AWARD, A COPY OF WHICH IS RECORDED UNDER COUNTY CLERK'S FILE NO. M917764 OF THE OFFICIAL RECORDS OF HARRIS COUNTY, TEXAS AND BEING DESCRIBED THEREIN.

Tract 1 also being described as follows:

A PARCEL OF LAND CONTAINING 2.0854 ACRES (90,840 SQUARE FEET) MORE OR LESS BEING OUT OF UNRESTRICTED RESERVE "B", BLOCK 2, SOUTHWEST PLAZA, AS RECORDED IN VOLUME 319, PAGE 117, MAP RECORDS OF HARRIS COUNTY AND ALSO BEING THE REMAINDER PORTION OF THAT CERTAIN 2.1764 ACRE TRACT, CONVEYED FROM GREATER SOUTHWEST OFFICE PARK, LTD. TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K347823, OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS, O.P.R.R.P.H.C.T., SAID 2.0854 ACRE TRACT BEING SITUATED IN THE H.T. & B.R.R. CO. SURVEY, ABSTRACT NO. 397, IN HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, RIGHT-OF-WAY VARIES, FOR THE MOST SOUTHERLY CORNER OF THAT CERTAIN 0.122 ACRE TRACT DESCRIBED IN A JUDGMENT, THE STATE OF TEXAS V. SMITH, LIU & CORBIN, INC. ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M191871, O.P.R.R.P.H.C.T., SAME BEING THE MOST EASTERLY CORNER OF THAT CERTAIN 0.091 ACRE TRACT DESCRIBED IN A JUDGEMENT, THE STATE OF TEXAS V. JAY MARKS, TRUSTEE, ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M917764, O.P.R.R.P.H.C.T., ALSO BEING THE MOST WESTERLY CORNER OF THAT CERTAIN 4.9328 ACRE TRACT I, CONVEYED FROM SMITH LIU, & CORBIN, INC. TO CAR GRI, L.P., AS RECORDED IN COUNTY CLERK'S FILE NO. T483127, O.P.R.R.P.H.C.T., AND

ALSO BEING THE MOST NORTHERLY CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, FROM WHICH A FOUND TX DOT MONUMENT BEARS, N 46° 35' 00" E, 1.11 FEET;

THENCE, WITH THE SOUTH LINE OF THE SAID 4.9328 ACRE TRACT I, SAME BEING THE NORTH LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, THE FOLLOWING (2) TWO COURSES AND DISTANCES:

1. S 46° 00' 19" E, A DISTANCE OF 190.31 FEET TO A FOUND "X" CUT IN CONCRETE, FROM WHICH ANOTHER FOUND "X" CUT IN CONCRETE, BEARS, S 65° 56' 55" W, 0.39 FEET, AND

2. S 76° 24' 49" E, A DISTANCE OF 50.92 FEET TO A SET 5/8 INCH IRON ROD WITH CAP STAMPED CIVIL-SURV, FOR THE NORTHWEST CORNER OF THAT CERTAIN 1.9102 ACRE TRACT CONVEYED FROM ALBERT S. WEYCER, TRUSTEE, TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K349560, O.P.R.R.P.H.C.T., SAME BEING THE NORTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT;

THENCE, S 00° 12' 53" E, WITH THE WEST LINE OF THE SAID 1.9102 ACRE TRACT, SAME BEING THE EAST LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, A DISTANCE OF 171.88 FEET. TO A SET PK NAIL, IN THE NORTH LINE OF UNRESTRICTED RESERVE "C", OF SAID BLOCK 2, SOUTHWEST PLAZA, SAME BEING IN THE SOUTH LINE OF UNRESTRICTED RESERVE "B", FOR THE NORTHWEST CORNER OF THAT CERTAIN 0.9442 ACRE TRACT, CONVEYED FROM ALBERT S. WEYCER, TRUSTEE TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. N472331, O.P.R.R.P.H.C.T., SAME BEING THE NORTHEAST CORNER OF THAT CERTAIN 0.8144 ACRE TRACT, CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. M080219, O.P.R.R.P.H.C.T., ALSO BEING THE SOUTHWEST CORNER OF THE SAID 1.9102 ACRE TRACT, AND ALSO BEING THE SOUTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT;

THENCE, N 89° 58' 26" W, WITH THE SAID NORTH LINE OF UNRESTRICTED RESERVE "C" WITH THE NORTH LINE OF THE SAID 0.8144 ACRE TRACT, SAME BEING THE SAID SOUTH LINE OF UNRESTRICTED RESERVE "B", AND THE SOUTH LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, A DISTANCE OF 482.85 FEET, TO A POINT ON THE CONCRETE BASE OF A PIPE FENCE POST, IN THE SAID SOUTHWEST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, FOR THE MOST SOUTHERLY CORNER OF THE SAID 0.091 ACRE TRACT, SAME BEING THE MOST EASTERLY CORNER OF THAT CERTAIN 0.008 ACRE PARCEL 70, CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO THE STATE OF TEXAS, AS RECORDED IN COUNTY CLERK'S FILE NO.

M083134, O.P.R.R.P.H.C.T., ALSO BEING THE NORTHWEST CORNER OF THE SAID 0.8144 ACRE TRACT, AND ALSO BEING THE MOST WESTERLY CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, FROM WHICH A FOUND "X" CUT IN CONCRETE BEARS N 35° 35' 41" E, 4.48 FEET, AND A FOUND TX DOT MONUMENT BEARS, N 31° 30' 55" W, 3.37 FEET:

THENCE, WITH THE SAID SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, AND THE SOUTHEAST LINE OF THE SAID 0.091 ACRE TRACT, SAME BEING THE NORTHWEST LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, THE FOLLOWING (3) THREE COURSES AND DISTANCES:

    1. N 39° 35' 41" E, A DISTANCE OF 10.68 FEET TO A SET "X" CUT IN CONCRETE FOR A POINT OF CURVATURE, FROM WHICH A FOUND TX DOT MONUMENT BEARS, N 22° 55' 16" W, 3.31 FEET,

    2. A DISTANCE OF 145.34 FEET ALONG THE ARC OF A CURVE TO THE RIGHT, HAVING A RADIUS OF 1902.86 FEET, A CENTRAL ANGLE OF 04° 22' 34" AND A CHORD WHICH BEARS, N 41° 46' 52" E, A DISTANCE OF 145.30 FEET TO A SET "X" CUT IN CONCRETE, FOR A POINT OF TANGENCY, FROM WHICH A FOUND "X" CUT IN CONCRETE, BEARS, S 41° 20' 34" W, 6.02 FEET, AND A FOUND TX DOT MONUMENT BEARS, N 38° 43' 27" W, 2.70 FEET, AND

    3. N 43° 58' 09" E, A DISTANCE OF 276.81 FEET TO THE POINT OF BEGINNING AND CONTAINING 2.0854 ACRES (90,840 SQUARE FEET) OF LAND MORE OR LESS.

TRACT 2

BEING THAT CERTAIN TRACT OF LAND CONTAINING 1,9102 ACRES, IN THE H.T. & B.R.R. COMPANY SURVEY, ABSTRACT NO. 397, HARRIS COUNTY, TEXAS, BEING OUT OF THAT CERTAIN 21.4670 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 4758, PAGE 584 OF THE HARRIS COUNTY DEED RECORDS, SAID TRACT BEING IN RESERVE "B" OF BLOCK 2 AS SHOWN ON THE PLAT OF SOUTHWEST PLAZA RECORDED IN VOLUME 319, PAGE 117 OF THE HARRIS COUNTY MAP RECORDS, SAID TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A 5/8" IRON ROD FOUND IN THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY 59 (SOUTHWEST FREEWAY) AS WIDENED FOR ITS INTERCHANGE WITH BELTWAY 8 AND DESCRIBED AS 12,827 SQUARE FEET IN A DEED FROM GREATER SOUTHWEST OFFICE PARK, LTD. TO THE STATE OF TEXAS, DATED JULY 7, 1983 (SAID 12,827 SQUARE FOOT TRACT BEING RESERVE "F" OF SAID BLOCK 2), AT THE SOUTHWEST CORNER OF SAID RESERVE "B", AT THE NORTHWEST CORNER OF RESERVE "C" OF SAID BLOCK 2, AND IN THE CENTERLINE OF A HOUSTON LIGHTING & POWER COMPANY 80-FOOT WIDE EASEMENT AS DESCRIBED IN INSTRUMENTS RECORDED IN VOLUME 3455, PAGE 515, VOLUME 3455, PAGE 518 AND VOLUME 7847, PAGE 532, ALL OF THE HARRIS COUNTY DEED RECORDS;

THENCE, S 89° 58' 26", E, 488.80 FEET ALONG THE SOUTH LINE OF SAID RESERVE "B", ALONG THE NORTH LINE OF SAID RESERVE "C" AND ALONG THE CENTERLINE OF SAID HOUSTON LIGHTING & POWER COMPANY 80-FOOT EASEMENT TO A 5/8" IRON ROD FOUND FOR THE MOST SOUTHERLY SOUTHWEST CORNER AND POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT;

THENCE,N 00° 12' 53" W, 171.88 FEET ALONG THE EAST LINE OF THAT CERTAIN 39.855 ACRE TRACT DESCRIBED IN A DEED RECORDED IN VOLUME 7853, PAGE 52 OF THE HARRIS COUNTY DEED RECORDS, AND ALONG THE WEST LINE OF SAID 21.4670 ACRE TRACT TO A 5/8" IRON ROD SET AT THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, S 76° 24' 49" E, 147.14 FEET TO A 5/8" IRON ROD SET FOR CORNER;

THENCE, S 89° 58' 26" E, 445.00 FEET TO A 5/8" IRON ROD SET IN THE EAST LINE OF SAID RESERVE "B" FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, S 00° 06' 16" E, 137.37 FEET ALONG AN EAST LINE OF SAID RESERVE "B", AND OF SAID 21.4670 ACRE TRACT TO A 5/8" IRON ROD FOUND IN THE CENTERLINE OF THE SAID HOUSTON LIGHTING & POWER COMPANY 80-FOOT WIDE EASEMENT FOR THE SOUTHEAST CORNER OF SAID RESERVE "B" AND OF THE HEREIN DESCRIBED TRACT;

THENCE, N 89° 58' 26" W, 587.63 FEET ALONG THE CENTERLINE OF THE SAID HOUSTON LIGHTING & POWER COMPANY 80-FOOT WIDE EASEMENT, ALONG THE SOUTH LINE OF SAID RESERVE "B" AND ALONG THE NORTH LINE OF SAID RESERVE "C" TO THE POINT OF BEGINNING AND CONTAINING 1.9102 ACRES OF LAND.

Tract 2 also being described as follows:

A PARCEL OF LAND CONTAINING 1.9102 ACRES (83,208 SQUARE FEET) MORE OR LESS BEING OUT OF UNRESTRICTED RESERVE "B", BLOCK 2, SOUTHWEST PLAZA, AS RECORDED IN VOLUME 319, PAGE 117, MAP RECORDS OF HARRIS COUNTY AND BEING THAT CERTAIN 1.9102 ACRE TRACT, CONVEYED FROM ALBERT S. WEYCER, TRUSTEE TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K349560, OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS, O.P.R.R.P.H.C.T., SAID 1.9102 ACRE TRACT BEING SITUATED IN THE H.T. & B.R.R. CO. SURVEY, ABSTRACT NO. 397, IN HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A FOUND 5/8 INCH IRON ROD IN THE SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, RIGHT-OF-WAY VARIES, FOR THE MOST SOUTHERLY CORNER OF THAT CERTAIN 0.122 ACRE TRACT DESCRIBED IN A JUDGMENT, THE STATE OF TEXAS V. SMITH, LIU & CORBIN, INC. ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M191871, O.P.R.R.P.H.C.T., SAME BEING THE MOST EASTERLY CORNER OF

THAT CERTAIN 0.091 ACRE TRACT DESCRIBED IN A JUDGEMENT, THE
STATE OF TEXAS V. JAY MARKS, TRUSTEE, ET AL, AS RECORDED IN
COUNTY CLERK'S FILE NO. M917764, O.P.R.R.P.H.C.T., ALSO BEING THE
MOST WESTERLY CORNER OF THAT CERTAIN 4.9328 ACRE TRACT I,
CONVEYED FROM SMITH LIU, & CORBIN, INC. TO CAR GR1, L.P., AS
RECORDED IN COUNTY CLERK'S FILE NO. T483127, O.P.R.R.P.H.C.T., AND
ALSO BEING THE MOST NORTHERLY CORNER OF THE REMAINDER
PORTION OF THAT CERTAIN 2.1764 ACRE TRACT, CONVEYED FROM
GREATER SOUTHWEST OFFICE PARK, LTD. TO JAY MARKS, TRUSTEE, AS
RECORDED IN COUNTY CLERK'S FILE NO. K347823, O.P.R.R.P.H.C.T.,
FROM WHICH A FOUND TX DOT MONUMENT BEARS, N 46°35'00", 1.11
FEET;
THENCE, WITH THE SOUTH LINE OF THE SAID 4.9328 ACRE TRACT I,
SAME BEING THE NORTH LINE OF THE SAID REMAINDER OF THE 2.1764
ACRE TRACT, THE FOLLOWING (2) TWO COURSES AND DISTANCES:
    3.  S 46°00'19" E, A DISTANCE OF 190.31 FEET TO A FOUND "X" CUT IN
CONCRETE, FROM WHICH ANOTHER FOUND "X" CUT IN CONCRETE,
BEARS, S 65°56'55" W, 0.39 FEET, AND
    4.  S 76°24'49" E, A DISTANCE OF 50.92 FEET TO A SET 5/8 INCH IRON
ROD WITH CAP STAMPED CIVIL-SURV, FOR THE NORTHWEST CORNER OF
THE SAID 1.9102 ACRE TRACT, SAME BEING THE NORTHEAST CORNER
OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, AND THE POINT
OF BEGINNING;
THENCE, WITH THE SAID SOUTH LINE OF THE 4.9328 ACRE TRACT I,
SAME BEING THE NORTH LINE OF THE SAID 1.9102 ACRE TRACT, THE
FOLLOWING (2) TWO COURSES AND DISTANCES:
    1.  S 76°24'49" E, A DISTANCE OF 147.14 FEET TO A FOUND 5/8 INCH
IRON ROD, AND
    2.  S 89°58'26" E, A DISTANCE OF 445.00 FEET TO A FOUND 5/8 INCH
IRON ROD, IN THE WEST LINE OF THE FINAL PLAT OF MOMENTUM
PORSCHE/AUDI, AS RECORDED IN FILM CODE NO. 527300, MAP
RECORDS, HARRIS COUNTY, TEXAS, SAME BEING IN THE EAST LINE OF
SAID UNRESTRICTED RESERVE "B", FOR THE SOUTHEAST CORNER OF
THE SAID 4.9328 ACRE TRACT I, SAME BEING THE NORTHEAST CORNER
OF THE SAID 1.9102 ACRE TRACT, FROM WHICH A FOUND 5/8 INCH IRON
ROD BEARS, S 21°10'37" W, 0.87 FEET;
THENCE, S 00°06'16" E, WITH THE SAID WEST LINE OF MOMENTUM
PORSCHE/AUDI, SAME BEING THE EAST LINE OF THE SAID 1.9102 ACRE
TRACT, AND THE SAID EAST LINE OF UNRESTRICTED RESERVE "B", A
DISTANCE OF 137.37 FEET, TO A SET "V" CUT IN CONCRETE, FOR THE
NORTHEAST CORNER OF UNRESTRICTED RESERVE "C", OF SAID BLOCK
2, SOUTHWEST PLAZA, AND THE NORTHEAST CORNER OF THAT CERTAIN
0.9442 ACRE TRACT, CONVEYED FROM ALBERT S. WEYCER, TRUSTEE TO
LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY

CLERK'S FILE NO. N472331, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHEAST CORNER OF SAID UNRESTRICTED RESERVE "B", AND THE SOUTHEAST CORNER OF THE SAID 1.9102 ACRE TRACT;

THENCE, N 89°58'26" W, WITH THE NORTH LINE OF SAID UNRESTRICTED RESERVE "C" AND THE NORTH LINE OF THE SAID 0.9442 ACRE TRACT, SAME BEING THE SOUTH LINE OF SAID UNRESTRICTED RESERVE "B", AND THE SOUTH LINE OF THE SAID 1.9102 ACRE TRACT, A DISTANCE OF 587.63 FEET, TO A SET PK NAIL, FOR THE NORTHEAST CORNER OF THAT CERTAIN 0.8144 ACRE TRACT, CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. M080219, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, ALSO BEING THE NORTHWEST CORNER OF THE SAID 0.9442 ACRE TRACT, AND ALSO BEING THE SOUTHWEST CORNER OF THE SAID 1.9102 ACRE TRACT;

THENCE, N 00°12'53" W, WITH THE EAST LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, SAME BEING THE WEST LINE OF THE SAID 1.9102 ACRE TRACT, A DISTANCE OF 171.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.9102 ACRES (83,208 SQUARE FEET) OF LAND MORE OR LESS.

TRACT 3

ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 0.8144 ACRE (35,474.68 SQUARE FEET), SITUATED IN THE H.T. & B.R.R. COMPANY SURVEY, ABSTRACT NO. 397, HARRIS COUNTY, TEXAS, BEING OUT OF AND A PART OF THAT SAME 39.855 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 7853, PAGE 52 OF THE HARRIS COUNTY DEED RECORDS, AND BEING A PART OF RESERVE "C" OF BLOCK TWO (2) AS SHOWN ON THE PLAT OF SOUTHWEST PLAZA RECORDED IN VOLUME 319, PAGE 117 OF THE HARRIS COUNTY MAP RECORDS, SAID 0.8144 ACRE (35,474.68 SQUARE FEET) OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND IN THE NORTH LINE OF THE SAID RESERVE "C" AND THE SOUTH LINE OF RESERVE "B" OF THE SAID SOUTHWEST PLAZA, AND BEING THE NORTHEAST CORNER OF A STRIP OF LAND CONTAINING 337 SQUARE FEET SHOWN ON A TEXAS HIGHWAY DEPARTMENT RIGHT-OF-WAY SKETCH AS PARCEL NO. 70, ACCT. 8012-1-90, DATED FEBRUARY 1987, SAID CORNER BEING LOCATED S 89° 58' 26" E, 5.95 FEET FROM A 5/8 INCH IRON ROD FOUND IN THE EXISTING SOUTHEAST RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO. 59 (THE SOUTHWEST FREEWAY) FOR THE NORTHWEST CORNER OF THE SAID RESERVE "C" AND THE SOUTHWEST CORNER OF THE SAID RESERVE "B";

THENCE, S 89° 58' 26" E, A DISTANCE OF 482.85 FEET ALONG THE NORTH LINE OF THE SAID RESERVE "C" AND THE SOUTH LINE OF THE SAID RESERVE "B", AND ALSO BEING THE CENTERLINE OF A HOUSTON LIGHTING & POWER COMPANY 80 FOOT WIDE EASEMENT AS DESCRIBED IN INSTRUMENTS RECORDED IN VOLUME 3455, PAGE 515, VOLUME 3455, PAGE 518 AND VOLUME 7847, PAGE 532 OF THE HARRIS COUNTY DEED RECORDS, AND ALSO BEING THE SOUTH LINE OF THAT CERTAIN 2.7778 ACRE TRACT DESCRIBED AS "SAVE AND EXCEPT" IN DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. L-445414 OF THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS, TO A 5/8-INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF THE SAID 2.7778 ACRE TRACT, AND BEING THE NORTHEAST CORNER OF THIS TRACT;

THENCE, S 0° 12' 53" E, A DISTANCE OF 69.33 FEET TO A 1/2-INCH IRON ROD SET FOR THE SOUTHEAST CORNER OF THIS TRACT;

THENCE, N 89° 58' 26" W, A DISTANCE OF 540.53 FEET TO A 1/2-INCH IRON ROD SET IN THE SOUTHEAST LINE OF THE SAID 337 SQUARE FOOT TRACT FOR THE SOUTHWEST CORNER OF THIS TRACT;

THENCE, N 39° 38' 38" E, A DISTANCE OF 90.00 FEET ALONG THE SOUTHEAST LINE OF THE SAID 337 SQUARE FOOT TRACT TO THE POINT OF BEGINNING AND CONTAINING 0.8144 ACRE (35,474.68 SQUARE FEET) OF LAND.

Tract 3 also being described as follows:

A PARCEL OF LAND CONTAINING 0.8144 OF AN ACRE (35,475 SQUARE FEET) MORE OR LESS BEING OUT OF UNRESTRICTED RESERVE "C", BLOCK 2, SOUTHWEST PLAZA, AS RECORDED IN VOLUME 319, PAGE 117, MAP RECORDS OF HARRIS COUNTY AND BEING THAT CERTAIN 0.8144 ACRE TRACT CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. M080219, OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS, O.P.R.R.P.H.C.T. SAID 0.8144 ACRE TRACT BEING SITUATED IN THE H.T. & B. R.R. CO. SURVEY, ABSTRACT NO. 397, IN HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A FOUND 5/8 INCH IRON ROD IN THE SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, RIGHT-OF-WAY VARIES, FOR THE MOST SOUTHERLY CORNER OF THAT CERTAIN 0.122 ACRE TRACT DESCRIBED IN A JUDGEMENT, THE STATE OF TEXAS V. SMITH, LIU & CORBIN, INC., ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M191871, O.P.R.R.P.H.C.T., SAME BEING THE MOST EASTERLY CORNER OF THAT CERTAIN 0.091 ACRE TRACT DESCRIBED IN A JUDGEMENT, THE STATE OF TEXAS V. JAY MARKS, TRUSTEE, ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M917764, O.P.R.R.P.H.C.T., ALSO BEING THE MOST WESTERLY CORNER OF THAT CERTAIN 4.9328 ACRE TRACT I,

CONVEYED FROM SMITH LIU, & CORBIN, INC. TO CAR GR1, L.P., AS RECORDED IN COUNTY CLERK'S FILE NO. T483127, O.P.R.R.P.H.C.T., AND ALSO BEING THE MOST NORTHERLY CORNER OF THE REMAINDER PORTION OF THAT CERTAIN 2.1764 ACRE TRACT, CONVEYED FROM GREATER SOUTHWEST OFFICE PARK, LTD. TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K347823, O.P.R.R.P.H.C.T;

THENCE, WITH THE SOUTH LINE OF THE SAID 4.9328 ACRE TRACT I, SAME BEING THE NORTH LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, THE FOLLOWING (2) TWO COURSES AND DISTANCES:

1. S 46° 00' 19" E, A DISTANCE OF 190.31 FEET TO A FOUND "X" CUT IN CONCRETE, FROM WHICH ANOTHER FOUND "X" CUT IN CONCRETE, BEARS, S 65°56"55" W, 0.39 FEET, AND

2. S 76° 24' 49" E, A DISTANCE OF 50.92 FEET TO A SET 5/8 INCH IRON ROD WITH CAP STAMPED CIVIL-SURV, FOR THE NORTHWEST CORNER OF THE THAT CERTAIN 1.9102 ACRE TRACT CONVEYED FROM ALBERT S. WEYCER, TRUSTEE, TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K349560, O.P.R.R.P.H.C.T., SAME BEING THE NORTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT;

THENCE, S 00° 12' 53" E, WITH THE WEST LINE OF THE SAID 1.9102 ACRE TRACT, SAME BEING THE EAST LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, A DISTANCE OF 171.88 FEET, TO A SET PK NAIL, IN THE SOUTH LINE OF UNRESTRICTED RESERVE "B", OF SAID BLOCK 2, SOUTHWEST PLAZA, SAME BEING IN THE NORTH LINE OF SAID UNRESTRICTED RESERVE "C", FOR THE NORTHWEST CORNER OF THAT CERTAIN 0.9442 ACRE TRACT, CONVEYED FROM ALBERT S. WEYCER, TRUSTEE TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. N472331, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHWEST CORNER OF THE SAID 1.9102 ACRE TRACT, ALSO BEING THE SOUTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, AND ALSO BEING THE NORTHEAST CORNER OF THE SAID 0.8144 ACRE TRACT, AND THE POINT OF BEGINNING;

THENCE, S 00° 12' 53" E, WITH THE WEST LINE OF THE SAID 0.9442 ACRE TRACT, SAME BEING THE EAST LINE OF THE SAID 0.8144 ACRE TRACT, A DISTANCE OF 69.33 FEET TO A SET 5/8 INCH IRON ROD WITH CAP STAMPED CIVIL-SURV, FOR THE NORTHEAST CORNER OF THAT CERTAIN 5.9065 ACRE TRACT CONVEYED FROM COMMERCE BANK NATIONAL ASSOCIATION TO FISHER-HAAS INFINITI, AS RECORDED IN COUNTY CLERK'S FILE NO. M624681, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHEAST CORNER OF THE SAID 0.8144 ACRE TRACT, FROM WHICH A FOUND 5/8 INCH IRON ROD, FOR THE NORTHWEST CORNER OF THE REMAINDER OF THAT CERTAIN 5.2866 ACRE TRACT CONVEYED FROM ALBERT S.

WEYCER, TRUSTEE, TO FARZANA SAMEMY, AS RECORDED IN COUNTY CLERK'S FILE NO. T026325, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHWEST CORNER OF THE SAID 0.9442 ACRE TRACT BEARS, S 00° 12' 53" E, 0.67 FEET;

THENCE, N 89° 58' 26" W, WITH THE SOUTH LINE OF THE SAID 0.8144 ACRE TRACT, SAME BEING THE NORTH LINE OF THE SAID 5.9065 ACRE TRACT, AT A DISTANCE OF 302.85 FEET PASS A FOUND 5/8 INCH IRON ROD FOR THE NORTHEAST CORNER OF THE FINAL PLAT OF SOUTHWEST PLAZA PARK, AS RECORDED IN VOLUME 345, PAGE 118, MAP RECORDS, HARRIS COUNTY, TEXAS, AND ALSO WITH THE NORTH LINE OF SAID SOUTHWEST PLAZA PARK, A TOTAL DISTANCE OF 540.53 FEET TO A FOUND 1/2 INCH IRON ROD, IN THE SAID SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, AND THE SOUTHEAST LINE OF THAT CERTAIN 0.008 ACRE PARCEL 70 CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO THE STATE OF TEXAS, AS RECORDED IN COUNTY CLERK'S FILE NO. M083134, O.P.R.R.P.H.C.T., FOR THE NORTHWEST CORNER OF SAID SOUTHWEST PLAZA PARK, AND THE NORTHWEST CORNER OF THE SAID 5.9065 ACRE TRACT, SAME BEING THE SOUTHWEST CORNER OF THE SAID 0.8144 ACRE TRACT;

THENCE, N 39° 38' 38" E, WITH THE SAID SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, AND THE SAID SOUTHEAST LINE OF THE 0.008 ACRE PARCEL 70, SAME BEING THE NORTHWEST LINE OF THE SAID 0.8144 ACRE TRACT, A DISTANCE OF 90.00 FEET TO A POINT ON THE CONCRETE BASE OF A PIPE FENCE POST, IN THE SAID SOUTH LINE OF UNRESTRICTED RESERVE "B", SAME BEING THE SAID NORTH LINE OF UNRESTRICTED RESERVE "C", FOR THE MOST SOUTHERLY CORNER OF THE SAID 0.091 ACRE TRACT, SAME BEING THE MOST EASTERLY CORNER OF THE SAID 0.008 ACRE PARCEL 70, AND BEING THE MOST WESTERLY CORNER OF THE SAID REMAINDER PORTION OF THE 2.1764 ACRE TRACT, AND ALSO BEING THE NORTHWEST CORNER OF THE SAID 0.8144 ACRE TRACT, FROM WHICH A FOUND "X" CUT IN CONCRETE, BEARS, N 35° 35' 41" E, 4.48 FEET, AND A FOUND TX DOT MONUMENT, BEARS, N 31° 30' 55" W, 3.37 FEET;

THENCE, S 89° 58' 26" E, WITH THE SAID SOUTH LINE OF UNRESTRICTED RESERVE "B", AND WITH THE SOUTH LINE OF THE SAID REMAINDER OF 2.1764 ACRE TRACT, SAME BEING THE SAID NORTH LINE OF UNRESTRICTED RESERVE "C", AND THE NORTH LINE OF THE SAID 0.8144 ACRE TRACT, A DISTANCE OF 482.85 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.8144 OF AN ACRE (35,475 SQUARE FEET) OF LAND MORE OR LESS.

TRACT 4

FIELD NOTE DESCRIPTION TO A TRACT OF LAND CONTAINING 0.9442 ACRES (41,131 SQUARE FEET), MORE OR LESS, SITUATED IN THE W.E. SANDERS SURVEY IN HARRIS COUNTY, TEXAS, AND BEING PART OF RESERVE "C" OF SOUTHWEST PLAZA, AN ADDITION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 319, PAGE 117, OF THE HARRIS COUNTY MAP RECORDS, SAID 0.9442 ACRES BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD MARKING THE NORTHEAST CORNER OF THE AFOREMENTIONED RESERVE "C";

THENCE, S 00 DEGREES 06 MINUTES 16 SECONDS E, ALONG THE EAST LINE OF SAID RESERVE "C" AND THE EAST LINE OF SAID SOUTHWEST PLAZA ADDITION A DISTANCE OF 70.00 FEET TO A SET 1/2 INCH IRON ROD FOR CORNER;

THENCE, N 89 DEGREES 58 MINUTES 26 SECONDS W, PARALLEL TO AND 70 FEET SOUTH OF THE NORTH LINE OF SAID RESERVE "C" A DISTANCE OF 587.51 FEET TO A FOUND 5/8 INCH IRON ROD FOR CORNER;

THENCE, N 00 DEGREES 12 MINUTES 55 SECONDS W, A DISTANCE OF 70.00 FEET TO A FOUND 5/8 INCH IRON ROD FOR CORNER;

THENCE, S 89 DEGREES 58 MINUTES 26 SECONDS E, ALONG THE NORTH LINE OF SAID RESERVE "C" A DISTANCE OF 587.65 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.9442 ACRES OF LAND, MORE OR LESS.

Tract 4 also being described as follows:

A PARCEL OF LAND CONTAINING 0.9442 OF AN ACRE (41,129 SQUARE FEET) MORE OR LESS BEING OUT OF UNRESTRICTED RESERVE "C", BLOCK 2, SOUTHWEST PLAZA, AS RECORDED IN VOLUME 319, PAGE 117, MAP RECORDS OF HARRIS COUNTY AND BEING THAT CERTAIN 0.9442 ACRE TRACT CONVEYED FROM ALBERT S. WEYCER, TRUSTEE, TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. N472331, OFFICIAL PUBLIC RECORDS OF REAL PROPERTY, HARRIS COUNTY, TEXAS, O.P.R.R.P.H.C.T., SAID 0.9442 ACRE TRACT BEING SITUATED IN THE H.T. & B. R.R. CO. SURVEY, ABSTRACT NO. 397, IN HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A FOUND 5/8 INCH IRON ROD IN THE SOUTHEAST LINE OF U.S. HIGHWAY 59, SOUTHWEST FREEWAY, RIGHT-OF-WAY VARIES, FOR THE MOST SOUTHERLY CORNER OF THAT CERTAIN 0.122 ACRE TRACT DESCRIBED IN A JUDGMENT, THE STATE OF TEXAS V. SMITH, LIU & CORBIN, INC. ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M191871, O.P.R.R.P.H.C.T., SAME BEING THE MOST EASTERLY CORNER OF THAT CERTAIN 0.091 ACRE TRACT DESCRIBED IN A JUDGMENT, THE STATE OF TEXAS V. JAY MARKS, TRUSTEE, ET AL, AS RECORDED IN COUNTY CLERK'S FILE NO. M917764, O.P.R.R.P.H.C.T., ALSO BEING THE MOST WESTERLY CORNER OF THAT CERTAIN 4.9328 ACRE TRACT I, CONVEYED FROM SMITH LIU, & CORBIN, INC. TO CAR GR1, L.P., AS RECORDED IN COUNTY CLERK'S FILE NO. T483127, O.P.R.R.P.H.C.T., AND

ALSO BEING THE MOST NORTHERLY CORNER OF THE REMAINDER PORTION OF THAT CERTAIN 2.1764 ACRE TRACT, CONVEYED FROM GREATER SOUTHWEST OFFICE PARK, LTD. TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K347823, O.P.R.R.P.H.C.T;

THENCE, WITH THE SOUTH LINE OF THE SAID 4.9328 ACRE TRACT I, SAME BEING THE NORTH LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, THE FOLLOWING (2) TWO COURSES AND DISTANCES:

3. S 46° 00' 19" E, A DISTANCE OF 190.31 FEET TO A FOUND "X" CUT IN CONCRETE, FROM WHICH ANOTHER FOUND "X" CUT IN CONCRETE, BEARS, S 65° 56' 55" W, 0.39 FEET, AND

4. S 76° 24' 49" E, A DISTANCE OF 50.92 FEET TO A SET 5/8 INCH IRON ROD WITH CAP STAMPED CIVIL-SURV, FOR THE NORTHWEST CORNER OF THAT CERTAIN 1.9102 ACRE TRACT CONVEYED FROM ALBERT S. WEYCER, TRUSTEE, TO JAY MARKS, TRUSTEE, AS RECORDED IN COUNTY CLERK'S FILE NO. K349560, O.P.R.R.P.H.C.T., SAME BEING THE NORTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT;

THENCE, S 00° 12' 53" E, WITH THE WEST LINE OF THE SAID 1.9102 ACRE TRACT, SAME BEING THE EAST LINE OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, A DISTANCE OF 171.88 FEET, TO A SET PK NAIL, IN THE SOUTH LINE OF UNRESTRICTED RESERVE "B", OF SAID BLOCK 2, SOUTHWEST PLAZA, SAME BEING IN THE NORTH LINE OF SAID UNRESTRICTED RESERVE "C", FOR THE NORTHEAST CORNER OF THAT CERTAIN 0.8144 ACRE TRACT, CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO LESTER A. MARKS AND FRANCES M. LOWE, AS RECORDED IN COUNTY CLERK'S FILE NO. M080219, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHWEST CORNER OF THE SAID 1.9102 ACRE TRACT, ALSO BEING THE SOUTHEAST CORNER OF THE SAID REMAINDER OF THE 2.1764 ACRE TRACT, AND ALSO BEING THE NORTHWEST CORNER OF THE SAID 0.9442 ACRE TRACT, AND THE POINT OF BEGINNING;

THENCE, S 89° 58' 26" E, WITH THE SAID SOUTH LINE OF UNRESTRICTED RESERVE "B", AND THE SOUTH LINE OF THE SAID 1.9102 ACRE TRACT, SAME BEING THE SAID NORTH LINE OF UNRESTRICTED RESERVE "C", AND THE NORTH LINE OF THE SAID 0.9442 ACRE TRACT, A DISTANCE OF 587.63 FEET TO A SET "V" CUT IN CONCRETE, IN THE WEST LINE OF THE FINAL PLAT, MOMENTUM PORSCHE/AUDI, AS RECORDED IN FILM CODE NO. 527300, MAP RECORDS, HARRIS COUNTY, TEXAS, FOR THE SOUTHEAST CORNER OF SAID UNRESTRICTED RESERVE "B", AND THE SOUTHEAST CORNER OF THE SAID 1.9102 ACRE TRACT, SAME BEING THE NORTHEAST CORNER OF SAID UNRESTRICTED RESERVE "C", AND THE NORTHEAST CORNER OF THE SAID 0.9442 ACRE TRACT;

THENCE, S 00° 06' 16" E, WITH THE SAID WEST LINE OF MOMENTUM PORSCHE/AUDI, SAME BEING THE EAST LINE OF THE SAID 0.9442 ACRE TRACT, AND THE EAST LINE OF SAID UNRESTRICTED RESERVE "C", A DISTANCE OF 70.00 FEET TO A SET 5/8 INCH IRON ROD WITH CAP STAMPED CIVIL-SURV, FOR THE NORTHEAST CORNER OF THE REMAINDER OF THAT CERTAIN 5.2866 ACRE TRACT, CONVEYED FROM ALBERT S. WEYCER, TRUSTEE, TO FARZANA SAMEMY, AS RECORDED IN COUNTY CLERK'S FILE NO. T026325, O.P.R.R.P.H.C.T., SAME BEING THE SOUTHEAST CORNER OF THE SAID 0.9442 ACRE TRACT, FROM WHICH A FOUND 5/8 INCH IRON ROD FOR THE SOUTHWEST CORNER OF SAID MOMENTUM PORSCHE/AUDI BEARS, S 00° 06' 16" E, 219.70 FEET;

THENCE, N 89° 58' 26" W, WITH THE NORTH LINE OF THE SAID REMAINDER OF THE 5.2866 ACRE TRACT, SAME BEING THE SOUTH LINE OF THE SAID 0.9442 ACRE TRACT, A DISTANCE OF 587.49 FEET TO A FOUND 5/8 INCH IRON ROD, IN THE EAST LINE OF THAT CERTAIN 5.9065 ACRE TRACT, CONVEYED FROM TEXAS COMMERCE BANK NATIONAL ASSOCIATION TO FISHER-HAAS INFINITI, AS RECORDED IN COUNTY CLERK'S FILE NO. M624681, O.P.R.R.P.H.C.T., FOR THE NORTHWEST CORNER OF THE SAID REMAINDER OF THE 5.2866 ACRE TRACT, SAME BEING THE SOUTHWEST CORNER OF THE SAID 0.9442 ACRE TRACT, FROM WHICH A FOUND 5/8 INCH IRON ROD, FOR THE SOUTHEAST CORNER OF THE SAID 5.9065 ACRE TRACT, SAME BEING THE SOUTHWEST CORNER OF THE SAID REMAINDER OF THE 5.2866 ACRE TRACT BEARS, S 00° 12' 53" E, 409.13 FEET;

THENCE, N 00° 12' 53" W, WITH THE WEST LINE OF THE SAID 0.9442 ACRE TRACT, SAME BEING THE SAID EAST LINE OF THE 5.9065 ACRE TRACT, AT A DISTANCE OF 0.67 FEET, PASS A SET 5/8 INCH IRON ROD WITH CAP STAMPED CIVIL-SURV, FOR THE SOUTHEAST CORNER OF THE SAID 0.8144 ACRE TRACT, SAME BEING THE NORTHEAST CORNER OF THE SAID 5.9065 ACRE TRACT, AND WITH THE EAST LINE OF THE SAID 0.8144 ACRE TRACT, A TOTAL DISTANCE OF 70.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.9442 OF AN ACRE (41,129 SQUARE FEET) OF LAND MORE OR LESS.

BEING a 7.5317 acre tract of land in the W. E. Sanders Survey, Abstract No. 1137, Harris County, Texas, and being part of that same 11.6222 acre tract described in a deed recorded under the Harris County Clerk's File No. F903899, said 7.5317 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod set in the southeasterly right-of-way line of U. S. Highway No. 59 (Southwest Freeway) at the most westerly corner of One Forum Plaza as shown on the plat recorded in Volume 307, Page 36 of the Harris County Map Records;

THENCE S 46 Deg 00 Min 26 E, 528.35 feet along the southwesterly line of said One Forum Plaza to a 5/8" iron rod set for the most southerly corner of One Forum Plaza and being in the most westerly line of Southwest Plaza as shown on the plat recorded in Volume 319, Page 117 of the Harris County Map Records;

THENCE S 00 Deg 10 Min 10 Sec E, 31.31 feet along the most westerly line of said Southwest Plaza to a 5/8" iron rod set for corner, being the most westerly southwest corner of said Southwest Plaza and being a corner of a sewage treatment plant site;

THENCE S 43 Deg 59 Min 00 Sec W, 450.76 feet along the northwesterly line of said sewage treatment plant site and along the southeasterly line of said 11.6222 acre tract to a 5/8" iron rod found for the most southerly corner of said 11.6222 acre tract;

THENCE N 70 Deg 11 Min 03 Sec W, 603.15 feet along the northeasterly line of the access road for the sewage treatment plant and along the southwesterly line of said 11.6222 acre tract to a 5/8" iron rod set for corner in the southeasterly right-of-way line of U. S. Highway No. 59;

THENCE N 43 Deg 59 Min 34 Sec E, 720.24 feet along the southeasterly right-of-way line of U. S. Highway No. 59, same being the southeasterly line of a 1.2306 acre tract awarded to the State of Texas as described in an instrument recorded under the Harris County Clerk's File No. H169515 to the POINT OF BEGINNING and containing 7.5317 acres.

FIELD NOTES FOR 128,955 SQUARE FEET OR 2.960 ACRES OF LAND, BEING THE RESIDUE OF LOTS 2, 3, 4, AND 16 OF SHAMROCK ESTATES, AN UNRECORDED SUBDIVISION, AS DESCRIBED IN DEEDS DATED JUNE 24, 1987 TO FIRST REPUBLICBANK-FANNIN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NOS. L194994 (RESIDUE OF LOT 16), L194995 (RESIDUE OF LOTS 2 AND 3), AND L194996 (RESIDUE OF LOT 4), OFFICIAL PUBLIC RECORD OF REAL PROPERTY, LOCATED IN THE JAMES ALSTON SURVEY, ABSTRACT NO. 100, HARRIS COUNTY, TEXAS:

(All bearings referenced to Texas Coordinate System, South Central Zone)

BEGINNING at a 1/2 inch iron rod set for the intersection of the west line of said Lot 2 with the easterly line of U.S. Highway 59 (Southwest Freeway, variable width) as established by deed to the State of Texas recorded under Clerk's File No. D837154; said point being on the east line of a certain 20,673 square foot tract described in deeds to the State of Texas recorded under Clerk's File Nos. H214443 and H214444;

THENCE N 41 deg. 28 min. 50 sec. E, along the easterly line of U.S. Highway 59, 436.92 feet to a 1/2 inch iron rod set in the common line between Lots 15 and 16 for the most northerly corner of the herein described tract;

THENCE S 08 deg. 14 min. 45 sec. E, along said common line, at 77.13 feet pass an "X" in concrete found in the north line of Emerald Drive (a 40 foot wide private roadway easement per Volume 3397, Page 699, Harris County Deed Records, and Clerk's File No. F679918), at 87.32 pass a found 5/8 inch iron rod, in all 97.13 feet to a 1/2 inch iron rod found in the centerline of Emerald Drive for the southeast corner of Lot 16 and the re-entrant corner of the herein described tract;

THENCE in an easterly direction with the centerline of Emerald Drive along a curve to the left having a radius of 800.00 feet, a central angle of 07 deg. 14 min. 51 sec., a chord bearing of N 77 deg. 33 min. 10 sec. E, and a chord length of 101.13 feet, an arc distance of 101.19 feet to a 1/2 inch iron rod set in the common line between Lots 4 and 5 for the northeast corner of said Lot 4 and the herein described tract;

THENCE S 16 deg. 03 min. 47 sec. E, along said common line between Lots 4 and 5, 292.20 feet to a 5/8 inch iron rod found in the north line of Keegans Bayou, (Harris County Flood Control District Unit D-118-00-00), as described in deed recorded under Clerk's File No. F256087, for the southeast corner of the herein described tract;

THENCE along the north line of said Keegans Bayou as established by deeds recorded under Clerk's File Nos. F256087 and B206039 the following courses and distances:

S 59 deg. 16 min. 53 sec. W, 125.24 feet to a 1/2 inch iron rod set for corner;

N 88 deg. 41 min. 30 sec. W, 204.96 feet to an "X" mark in concrete set for corner;

S 72 deg. 26 min. 22 sec. W, 119.15 feet to an "X" mark in concrete set for corner;

N 82 deg. 37 min. 27 sec. W, 80.37 feet to a 1/2 inch iron rod set in the common line between Lot 2 and the aforementioned 20,673 square feet tract for the southwest corner of the herein described tract;

THENCE N 11 deg. 30 min. 26 sec. E, along said common line, 115.03 feet to the POINT OF BEGINNING and containing 128,955 square feet or 2.960 acres of land.

DESCRIPTION OF A 5.9065 ACRE TRACT OF LAND<br>IN THE H.T.& B.R.R. SURVEY, A-397<br>HARRIS COUNTY, TEXAS

BEING a 5.9065 acre tract of land in the H.T.&B. R.R. survey, Abstract No. 397, Harris County, Texas and being part of unrestricted Reserve "C" as shown on the plat of Southwest Plaza recorded in Volume 319, Page 117 of the Harris County Map Records, said 5.9065 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8" iron rod found at a westerly corner of said Reserve "C", in the northeasterly right-of-way line of Southwest Plaza Drive (100 feet of R.O.W.), in the southeasterly right-of-way line of U.S. Highway No. 59 (Southwest Freeway) and at the most southerly corner of Reserve "F" (restricted for use as U.S. Highway No. 59 right-of-way) as shown on said plat of Southwest Plaza;

THENCE N 01 Deg 29 Min 08 Sec W, 35.66 feet along the southeasterly right-of-way line of U.S. Highway No. 59 and along a common line of said Reserves "F" and "C" to a 5/8" iron rod found for corner, a 5/8" iron rod with aluminum cap bears S 37 Deg 48 Min 21 Sec E, 3.92 feet and a brass disc in concrete bears S 32 Deg E, 0.70 feet;

THENCE N 37 Deg 48 Min 21 Sec E, 205.01 feet continuing along the southeasterly right-of-way line of U.S. Highway No. 59 and along a common line of said Reserves "F" and "C" to a 5/8" iron rod found for an angle point;

THENCE N 39 Deg 38 Min 32 Sec E, 56.76 feet continuing along the southeasterly right-of-way line of U.S. Highway No. 59 and leaving the common line of said Reserves "F" and "C" to a 5/8" iron rod set for corner, a 1/2" iron rod bears N 89 Deg 58 Min 26 Sec W, 0.38 feet;

THENCE S 89 Deg 58 Min 26 Sec E, 540.53 feet to a 5/8" iron rod set for corner, a 1/2" iron rod bears N 89 Deg 58 Min 26 Sec W, 0.44 feet;

THENCE S 00 Deg 12 Min 53 Sec E, 409.80 feet to a 5/8" iron rod set for corner in the northerly right-of-way line of Southwest Plaza Drive;

THENCE in a westerly direction, 217.52 feet along the northerly right-of-way line of Southwest Plaza Drive (65 feet of R.O.W.) and following the arc of a curve to the right having a radius of 1318.00 feet, a central angle of 9 Deg 27 Min 21 Sec and a chord which bears S 87 Deg 15 Min 20 Sec W, 217.27 feet to a 5/8" iron rod found for the point of tangency of said curve;

THENCE N 88 Deg 01 Min 00 Sec W, 120.09 feet continuing along the northerly right-of-way line of Southwest Plaza Drive (65 feet of R.O.W.) to a 5/8" iron rod found for the point of curvature of a curve to the right;

THENCE in a westerly direction, 236.55 feet continuing along the northerly right-of-way line of Southwest Plaza Drive (65 feet of R.O.W.) and following the arc of said curve to the right having a radius of 567.50 feet, a central angle of 23 Deg 52 Min 58 Sec and a chord which bears N 76 Deg 04 Min 31 Sec W, 234.84 feet to a 5/8" iron rod found for a point of compound curvature;

THENCE in a northwesterly direction, 114.92 feet, continuing along the northerly right-of-way line of Southwest Plaza Drive (width of R.O.W. varies) and following the arc of a curve to the right having a radius of 300.00 feet a central angle of 21 Deg 56 Min 54 Dec and a chord which bears N 53 Deg 09 Min 35 Sec W, 114.22 feet to a 5/8" iron rod found for the point of tangency of said curve;

THENCE N 42 Deg 11 Min 07 Sec W, 43.36 feet continuing along the northerly right-of-way line of Southwest Plaza Drive (width of R.O.W. varies) to a 5/8" iron rod found for the point of curvature of a curve to the left;

THENCE in a northwesterly direction, 20.00 feet continuing along the northerly right-of-way line of Southwest Plaza Drive (width of R.O.W.) varies and following the arc of said curve to the left having a radius of 300.00 feet, a central angle of 03 Deg 49 Min 11 Sec and a chord which bears N 44 Deg 05 Min 43 Sec W, 20.00 feet to a 5/8" iron rod found for the point of tangency of said curve;

THENCE N 46 Deg 00 Min 19 Sec W, 5.01 feet continuing along the northerly right-of-way line of Southwest Plaza Drive (100 feet of R.O.W.) to the POINT OF BEGINNING and containing 5.9065 acres of land.

One Reserve - One Block A Replat of 4.3452 acre tract of land out of Reserve "A" Southwest Plaza, Vol. 319, Pg. 117, of the Map Records of Harris County, which is part of the H.T. & B.R.R. Survey, Abstract No. 397, Harris County, Texas.

SECTION 3.  The Harris County Improvement District No. 5 may reimburse the cost of creating the district from assessments or other revenues created by the district.

SECTION 4.  The legislature finds that:

(1)  proper and legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished by the constitution and laws of this state, including the governor, who has submitted the notice and Act to the Texas Commission on Environmental Quality;

(2) the Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, lieutenant governor, and speaker of the house of representatives within the required time;

(3) the general law relating to consent by political subdivisions to the creation of districts with conservation, reclamation, and road powers and the inclusion of land in those districts has been complied with; and

(4) all requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act have been fulfilled and accomplished.

SECTION 5.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

**Floor Amendment No. 1**

Amend **CSSB 993** (House committee report) in SECTION 1 of the bill by striking added Section 3834.0055, Special District Local Laws Code (page 3, line 25, through page 4, line 12).

**Floor Amendment No. 2**

Amend **CSSB 993** (House committee report) in SECTION 1 of the bill, in added Section 3834.057(a), Special District Local Laws Code, by striking board position 11 (page 7, line 18) and substituting "11        Dr. Dawn Bradford".

**Floor Amendment No. 3**

Amend **CSSB 993** by inserting the following appropriately numbered SECTION and renumbering subsequent SECTIONS accordingly:

SECTION ___.  (a) The Greater Southeast Management District does not include the area of state representative District 146 as of the effective date of the Act enacting this section.

(b)  Disannexation of territory under this section does not affect the Greater Southeast Management District's right to collect any assessments, impact fees, or taxes imposed on property in the disannexed territory before the disannexation.

(c)  Disannexation of territory under this section does not diminish or impair the rights of the holders of any outstanding and unpaid bonds, warrants, or other obligations of the district.  Property disannexed under this section is not released from its pro rata share of any district indebtedness at the time of the disannexation, and the district may continue to tax the property until that debt is paid.

(d)  The residents in the area of state representative District 146 may join the area of the Harris County Improvement District No. 5 by following the procedure for the creation of a new municipal management district in Subchapter B, Chapter 375, Local Government Code.

The amendments were read.

Senator Janek, on behalf of Senator Ellis, moved to concur in the House amendments to **SB 993**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 91 WITH HOUSE AMENDMENTS

Senator Hinojosa called **SB 91** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 91** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the punishment imposed on certain defendants charged with the offense of assault.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 22.01(b), Penal Code, as amended by Section 1, Chapter 294, and Section 1, Chapter 1019, Acts of the 78th Legislature, Regular Session, 2003, is reenacted and amended to read as follows:

(b)  An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:

(1)  a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;

(2)  a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code [member of the defendant's family or household], if it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this chapter against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code [member of the defendant's family or household under this section]; [or]

(3)  a person who contracts with government to perform a service in a facility as defined by Section 1.07(a)(14), Penal Code, or[;] Section 51.02(13) or (14), Family Code[; or Section 51.02(14), Family Code], or an employee of that person:

(A)  while the person or employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by government to provide the service; or

(B)  in retaliation for or on account of the person's or employee's performance of a service within the scope of the contract; or[.]

(4)  [(3)]  a person the actor knows is a security officer while the officer is performing a duty as a security officer.

SECTION 2.  Section 22.01(f), Penal Code, is amended to read as follows:

(f)  For the purposes of Subsection (b)(2):

(1)  [this section,] a defendant has been previously convicted of an offense under this chapter against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code, [member of the defendant's family or a member of the defendant's household under this section] if the defendant was adjudged guilty of the offense or entered a plea of guilty or nolo contendere in return for a grant of deferred adjudication, regardless of

whether the sentence for the offense was ever imposed or whether the sentence was probated and the defendant was subsequently discharged from community supervision; and

(2) a conviction under the laws of another state for an offense containing elements that are substantially similar to the elements of an offense under this chapter is a conviction of an offense under this chapter.

SECTION 3.  Sections 22.01(e)(1) and (2), Penal Code, are repealed.

SECTION 4.  The change in law made by this Act applies only to an offense committed on or after September 1, 2005. An offense committed before September 1, 2005, is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose. For the purposes of this section, an offense was committed before September 1, 2005, if any element of the offense occurred before that date.

SECTION 5.  This Act takes effect September 1, 2005.

### Floor Amendment No. 1

Amend **CSSB 91** (House committee printing) by adding the following appropriately numbered SECTION to the bill and renumbering existing SECTIONS of the bill accordingly:

SECTION __.  Section 22.02(b), Penal Code, is amended to read as follows:

(b) An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:

(1) the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code; or

(2) regardless of whether the offense is committed under Subsection (a)(1) or (a)(2), the offense is committed:

(A) [(1)] by a public servant acting under color of the servant's office or employment;

(B) [(2)] against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;

(C) [(3)] in retaliation against or on account of the service of another as a witness, prospective witness, informant, or person who has reported the occurrence of a crime; or

(D) [(4)] against a person the actor knows is a security officer while the officer is performing a duty as a security officer.

### Floor Amendment No. 2

Amend **CSSB 91** (House committee printing) as follows:

(1) In SECTION 1 of the bill, in proposed Subsection (b)(2), Section 22.01, Penal Code (page 1, line 21), between "chapter" and "against", insert ", Chapter 19, or Section 20.03, 20.04, or 21.11".

(2) In SECTION 2 of the bill, in proposed Subsection (f)(1), Section 22.01, Penal Code (page 2, line 19), strike "under this chapter" and substitute "listed in Subsection (b)(2) committed".

(3)  In SECTION 2 of the bill, in proposed Subsection (f)(2), Section 22.01, Penal Code (page 3, lines 4-5), strike "under this chapter is a conviction of an offense under this chapter" and substitute "listed in Subsection (b)(2) is a conviction of an offense listed in Subsection (b)(2)".

## Floor Amendment No. 1 on Third Reading

Amend **CSSB 91** on third reading by adding the following appropriately numbered SECTIONS to the bill and renumbering existing SECTIONS of the bill accordingly:

SECTION __. Article 14.03(a), Code of Criminal Procedure, as amended by Section 2, Chapter 460, Section 2, Chapter 836, Section 1, Chapter 989, and Section 2, Chapter 1164, Acts of the 78th Legislature, Regular Session, 2003, is reenacted and amended to read as follows:

(a)  Any peace officer may arrest, without warrant:

(1)  persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, violation of Title 9, Chapter 42, Penal Code, breach of the peace, or offense under Section 49.02, Penal Code, or threaten, or are about to commit some offense against the laws;

(2)  persons who the peace officer has probable cause to believe have committed an assault resulting in bodily injury to another person and the peace officer has probable cause to believe that there is danger of further bodily injury to that person;

(3)  persons who the peace officer has probable cause to believe have committed an offense defined by Section 25.07, Penal Code (violation of Protective Order), or by Section 38.112, Penal Code (violation of Protective Order issued on basis of sexual assault), if the offense is not committed in the presence of the peace officer; [or]

(4)  persons who the peace officer has probable cause to believe have committed an offense involving family violence; [assault resulting in bodily injury to a member of the person's family or household; or]

(5)  persons who the peace officer has probable cause to believe have prevented or interfered with an individual's ability to place a telephone call in an emergency, as defined by Section 42.062(d), Penal Code, if the offense is not committed in the presence of the peace officer; or [.]

(6)  [(5)] a person who makes a statement to the peace officer that would be admissible against the person under Article 38.21 and establishes probable cause to believe that the person has committed a felony.

SECTION __.  Articles 14.03(c) and (f), Code of Criminal Procedure, are amended to read as follows:

(c)  If reasonably necessary to verify an allegation of a violation of a protective order or of the commission of an offense involving family violence [assault against a member of the family or household], a peace officer shall remain at the scene of the investigation to verify the allegation and to prevent the further commission of the violation or of family violence.

(f)  In this article, "family violence" has ["family," "household," and "member of a household" have] the meaning [meanings] assigned [to those terms] by Section 71.004 [Chapter 71], Family Code.

The amendments were read.

Senator Hinojosa moved to concur in the House amendments to **SB 91**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### RECESS

On motion of Senator Gallegos, the Senate at 6:36 p.m. recessed until 10:30 p.m. today.

### AFTER RECESS

The Senate met at 11:07 p.m. and was called to order by Senator Armbrister.

### CONFERENCE COMMITTEE ON HOUSE BILL 843

Senator Nelson called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 843** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 843** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Nelson, Chair; Fraser, Carona, Estes, and Eltife.

### CONFERENCE COMMITTEE ON HOUSE BILL 2639

Senator Brimer called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2639** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2639** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Brimer, Chair; Harris, Jackson, Averitt, and Staples.

### CONFERENCE COMMITTEE ON HOUSE BILL 789

Senator Fraser called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 789** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 789** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Fraser, Chair; Nelson, Averitt, Estes, and Van de Putte.

### CONFERENCE COMMITTEE ON HOUSE BILL 2217

Senator Staples called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2217** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2217** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Staples, Chair; Ogden, Madla, Shapleigh, and Williams.

### CONFERENCE COMMITTEE ON HOUSE BILL 1610

Senator Brimer called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 1610** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 1610** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Brimer, Chair; Harris, Jackson, Averitt, and Madla.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
May 27, 2005

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the House to inform the Senate that the House has taken the following action:

THE HOUSE HAS CONCURRED IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES:

**HB 107** (non-record vote)

**HB 120** (140 Yeas, 0 Nays, 2 Present, not voting)

**HB 192** (142 Yeas, 0 Nays, 2 Present, not voting)

**HB 269** (141 Yeas, 1 Nays, 2 Present, not voting)

**HB 401** (non-record vote)

**HB 467** (139 Yeas, 0 Nays, 2 Present, not voting)

**HB 603** (143 Yeas, 0 Nays, 2 Present, not voting)

**HB 607** (non-record vote)

**HB 867** (non-record vote)

**HB 972** (non-record vote)

**HB 1053** (non-record vote)

**HB 1079** (non-record vote)

**HB 1172** (non-record vote)

**HB 1274** (138 Yeas, 0 Nays, 2 Present, not voting)

**HB 1317** (133 Yeas, 8 Nays, 4 Present, not voting)

**HB 1379** (non-record vote)

**HB 1483** (non-record vote)

**HB 1546** (142 Yeas, 0 Nays, 2 Present, not voting)

**HB 1583** (non-record vote)

**HB 1611** (non-record vote)

**HB 1751** (non-record vote)

**HB 1765** (non-record vote)

**HB 1771** (143 Yeas, 0 Nays, 2 Present, not voting)

**HB 1799** (non-record vote)

**HB 1826** (138 Yeas, 0 Nays, 2 Present, not voting)

**HB 1829** (142 Yeas, 0 Nays, 2 Present, not voting)

**HB 1867** (non-record vote)

**HB 1939** (non-record vote)

**HB 1940** (138 Yeas, 0 Nays, 2 Present, not voting)

**HB 2026** (140 Yeas, 0 Nays, 2 Present, not voting)

**HB 2104** (non-record vote)

**HB 2110** (non-record vote)

**HB 2157** (non-record vote)

**HB 2303** (non-record vote)

**HB 2667** (non-record vote)

**HB 2767** (non-record vote)

**HB 2815** (non-record vote)

**HB 2883** (non-record vote)

**HB 2894** (131 Yeas, 7 Nays, 2 Present, not voting)

**HB 2941** (non-record vote)

**HB 2965** (142 Yeas, 0 Nays, 2 Present, not voting)

**HB 3016** (non-record vote)

**HB 3024** (non-record vote)

**HB 3162** (141 Yeas, 0 Nays, 2 Present, not voting)

**HB 3235** (non-record vote)

**HB 3262** (142 Yeas, 0 Nays, 2 Present, not voting)

**HJR 80** (non-record vote)

THE HOUSE HAS REFUSED TO CONCUR IN SENATE AMENDMENTS TO THE FOLLOWING MEASURES AND REQUESTS THE APPOINTMENT OF A CONFERENCE COMMITTEE TO ADJUST THE DIFFERENCES BETWEEN THE TWO HOUSES:

**HB 10** (non-record vote)
House Conferees: Pitts - Chair/Davis, John/Dukes/Guillen/Isett

**HB 183** (non-record vote)
House Conferees: Brown, Fred - Chair/Anchia/Callegari/Flores/Krusee

**HB 260** (non-record vote)
House Conferees: Goodman - Chair/Casteel/Nixon/Phillips/Strama

**HB 872** (non-record vote)
House Conferees: West, George "Buddy" - Chair/Corte/Crabb/Howard/Gonzalez Toureilles

**HB 880** (non-record vote)
House Conferees: Delisi - Chair/Allen, Alma/Davis, John/Laubenberg/McReynolds

**HB 925** (non-record vote)
House Conferees: Chavez - Chair/Castro/Griggs/Keel/Solis

**HB 1116** (non-record vote)
House Conferees: Solomons - Chair/Cook, Byron/Chisum/Hamric/Truitt

**HB 1126** (non-record vote)
House Conferees: Uresti - Chair/Delisi/Laubenberg/Solis/Zedler

**HB 1188** (non-record vote)
House Conferees: Hartnett - Chair/Anchia/Geren/Hughes/Solis

**HB 1357** (non-record vote)
House Conferees: Flores - Chair/Chisum/Homer/Morrison/Solis

**HB 1449** (non-record vote)
House Conferees: Dutton - Chair/Castro/Goodman/Nixon/Strama

**HB 1701** (non-record vote)
House Conferees:  Keel - Chair/Hamric/Hodge/Pena/Riddle

**HB 1772** (non-record vote)
House Conferees:  Miller - Chair/Casteel/Leibowitz/Mowery/Rose

**HB 2027** (non-record vote)
House Conferees:  Hilderbran - Chair/Baxter/Gallego/Kuempel/Phillips

**HB 2145** (non-record vote)
House Conferees:  Hupp - Chair/Dutton/Seaman/Solis/Taylor

**HB 2161** (non-record vote)
House Conferees:  West, George "Buddy" - Chair/Crabb/Crownover/Howard/
Gonzalez Toureilles

**HB 2201** (non-record vote)
House Conferees:  Hughes - Chair/Cook, Robby/Hopson/King, Phil/Kolkhorst

**HB 2221** (non-record vote)
House Conferees:  Luna - Chair/Callegari/Morrison/Seaman/Turner

**HB 2233** (non-record vote)
House Conferees:  Keffer, Jim - Chair/Chisum/Edwards/Rose/Solomons

**HB 2329** (non-record vote)
House Conferees:  Morrison - Chair/Pitts/Rose/Turner/Woolley

**HB 2572** (non-record vote)
House Conferees:  Truitt - Chair/Davis, John/Farabee/Hupp/Isett

**HB 2793** (non-record vote)
House Conferees:  Bonnen - Chair/Howard/Homer/Kuempel/King, Tracy

**HB 2795** (non-record vote)
House Conferees:  Hartnett - Chair/Gattis/Hughes/Phillips/Solis

**HB 2876** (non-record vote)
House Conferees:  Callegari - Chair/Geren/Hardcastle/Hope/Puente

**HB 2959** (non-record vote)
House Conferees:  Paxton - Chair/Davis, John/Hupp/Gonzalez Toureilles/Veasey

**HB 3001** (non-record vote)
House Conferees:  Morrison - Chair/Branch/Dawson/Kolkhorst/Turner

**HB 3333** (non-record vote)
House Conferees:  Chavez - Chair/Campbell/Griggs/Hill/Hunter

**HB 3556** (non-record vote)
House Conferees:  Brown, Betty - Chair/Crownover/Hopson/Denny/Puente

THE HOUSE HAS GRANTED THE REQUEST OF THE SENATE FOR THE
APPOINTMENT OF A CONFERENCE COMMITTEE ON THE FOLLOWING
MEASURES:

**SB 11** (non-record vote)
House Conferees: Delisi - Chair/Berman/Corte/Dutton/Noriega, Melissa

**SB 34** (non-record vote)
House Conferees: Morrison - Chair/Campbell/Goolsby/Harper-Brown/Rose

**SB 330** (non-record vote)
House Conferees: McReynolds - Chair/Dawson/Delisi/Martinez/Zedler

**SB 409** (non-record vote)
House Conferees: King, Phil - Chair/Baxter/Cook, Robby/Crabb/Turner

**SB 712** (non-record vote)
House Conferees: Cook, Robby - Chair/Bonnen/Geren/King, Phil/West, George
"Buddy"

**SB 743** (non-record vote)
House Conferees: King, Phil - Chair/Baxter/Cook, Robby/Swinford/Turner

**SB 757** (non-record vote)
House Conferees: Solomons - Chair/Flynn/Guillen/McCall/Orr

**SB 771** (non-record vote)
House Conferees: Hartnett - Chair/Anchia/Giddings/Geren/Veasey

**SB 982** (non-record vote)
House Conferees: Puente - Chair/Corte/Hunter/Leibowitz/Straus

**SB 988** (non-record vote)
House Conferees: Flynn - Chair/King, Tracy/McCall/Madden/Riddle

**SB 1142** (non-record vote)
House Conferees: Hamric - Chair/Dukes/Hilderbran/Hodge/Hunter

**SB 1176** (non-record vote)
House Conferees: Eiland - Chair/Baxter/Flynn/Kolkhorst/Straus

**SB 1297** (non-record vote)
House Conferees: Talton - Chair/Bailey/Farrar/Hilderbran/Van Arsdale

**SB 1604** (non-record vote)
House Conferees: Cook, Byron - Chair/Eissler/Griggs/Hardcastle/Jones, Delwin

**SB 1830** (non-record vote)
House Conferees: Luna - Chair/Davis, John/Crownover/Dukes/Hopson

**SB 1863** (non-record vote)
House Conferees: Pitts - Chair/Chisum/Dukes/Gattis/Isett

THE HOUSE HAS ADOPTED THE FOLLOWING CONFERENCE COMMITTEE
REPORTS:

**HB 225** (non-record vote)

**HB 261** (non-record vote)

**HB 747** (non-record vote)

**HB 1077** (113 Yeas, 25 Nays, 3 Present, not voting)

**HB 1820** (142 Yeas, 0 Nays, 2 Present, not voting)

**SB 122** (142 Yeas, 0 Nays, 2 Present, not voting)

**SB 1050** (142 Yeas, 0 Nays, 2 Present, not voting)

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

### CONFERENCE COMMITTEE ON HOUSE BILL 2120

Senator Lindsay called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2120** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2120** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lindsay, Chair; West, Brimer, Wentworth, and Madla.

### CONFERENCE COMMITTEE ON HOUSE BILL 266

Senator Lindsay called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 266** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 266** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lindsay, Chair; Madla, Wentworth, Eltife, and Seliger.

### CONFERENCE COMMITTEE ON HOUSE BILL 580

Senator Gallegos called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 580** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 580** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Gallegos, Chair; Armbrister, Jackson, Wentworth, and Lindsay.

### SENATE BILL 1626 WITH HOUSE AMENDMENT

Senator Whitmire called **SB 1626** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1626** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to local option elections to legalize or prohibit the sale of alcoholic beverages.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subsection (a), Section 251.11, Alcoholic Beverage Code, is amended to read as follows:

(a) The commissioners court, at its next regular session on or after the 30th day after the date the petition is filed, shall order a local option election to be held on the issue set out in the petition if the petition is filed with the registrar of voters not later than the 60th day after the date the petition is issued and bears the actual signatures of a number of qualified voters of the political subdivision equal to:

(1) 35 percent of the registered voters in the subdivision who voted in the most recent gubernatorial election for a ballot issue that permits voting for or against:

(A) "The legal sale of all alcoholic beverages for off-premise consumption only.";

(B) "The legal sale of all alcoholic beverages, except mixed beverages.";

(C) "The legal sale of all alcoholic beverages including mixed beverages."; or

(D) "The legal sale of mixed beverages.";

(2) 25 percent of the registered voters in the subdivision who voted in the most recent general election for a ballot issue that permits voting for or against "The legal sale of wine on the premises of a holder of a winery permit."; or

(3) 35 percent of the registered voters in the subdivision who voted in the most recent gubernatorial election for an election on any other ballot issue.

SECTION 2. Section 251.14, Alcoholic Beverage Code, is amended by adding Subsection (h) to read as follows:

(h) Subject to Section 251.81, a wine only package store permit may be issued for premises in an area in which the sale of wine has been legalized by a local option election under Subsection (b)(3) or (4).

SECTION 3. Subsection (a), Section 251.11, Alcoholic Beverage Code, as amended by this Act, applies only to a local option election for which an application for a petition is filed on or after the effective date of this Act. A local option election

for which an application for a petition is filed before the effective date of this Act is governed by the law in effect immediately before that date, and that law is continued in effect for that purpose.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Whitmire moved to concur in the House amendment to **SB 1626**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### CONFERENCE COMMITTEE ON HOUSE BILL 2309

Senator Jackson called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2309** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2309** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators Jackson, Chair; Duncan, Fraser, Lucio, and Madla.

### CONFERENCE COMMITTEE ON HOUSE BILL 2525

Senator Lindsay called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2525** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2525** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lindsay, Chair; Eltife, Jackson, Whitmire, and West.

### CONFERENCE COMMITTEE ON HOUSE BILL 872

Senator Brimer, on behalf of Senator Armbrister, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 872** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 872** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Armbrister, Chair; Brimer, Lucio, Jackson, and Whitmire.

### CONFERENCE COMMITTEE ON HOUSE BILL 1207

Senator Lindsay called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 1207** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 1207** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Lindsay, Chair; Armbrister, Jackson, Madla, and Staples.

### CONFERENCE COMMITTEE ON HOUSE BILL 2668

Senator Wentworth called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2668** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2668** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Wentworth, Chair; Duncan, Hinojosa, Averitt, and Harris.

### CONFERENCE COMMITTEE ON HOUSE BILL 2423

Senator Brimer, on behalf of Senator Armbrister, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2423** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2423** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Armbrister, Chair; Lucio, Jackson, Harris, and Madla.

### SENATE BILL 42 WITH HOUSE AMENDMENTS

Senator Nelson called **SB 42** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 42** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED

### AN ACT

relating to health education and physical activity in public primary and secondary schools.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 28.002, Education Code, is amended by amending Subsections (a), (k), and (l) and adding Subsections (l-1) and (l-2) to read as follows:

(a) Each school district that offers kindergarten through grade 12 shall offer, as a required curriculum:

        (1) a foundation curriculum that includes:

            (A) English language arts;

            (B) mathematics;

            (C) science; and

            (D) social studies, consisting of Texas, United States, and world history, government, and geography; and

        (2) an enrichment curriculum that includes:

            (A) to the extent possible, languages other than English;

            (B) health<u>, with emphasis on the importance of proper nutrition and exercise</u>;

            (C) physical education;

            (D) fine arts;

            (E) economics, with emphasis on the free enterprise system and its benefits;

            (F) career and technology education; and

            (G) technology applications.

(k) The State Board of Education, in consultation with the [~~Texas~~] Department of <u>State</u> Health <u>Services</u> and the Texas Diabetes Council, shall develop a diabetes education program that a school district may use in the health curriculum under Subsection (a)(2)(B).

(l) The State Board of Education, after consulting with educators, parents, and medical professionals, by rule may require a student enrolled in kindergarten or a grade level below grade <u>nine</u> [~~seven in an elementary school setting~~] to participate in daily physical activity as part of a school district's physical education curriculum or through structured activity during a school campus's daily recess, except that the

board may not require more than 30 minutes of daily physical activity. <u>If the board adopts rules under this subsection, the board must ensure by rule that students enrolled in middle and junior-high school settings are allowed to meet the physical activity requirement by participating in physical activity twice each week throughout the school year.</u>  If the board adopts rules under this subsection, the board must provide for an exemption for<u>:</u>

   <u>(1)</u> any [a] student who is unable to participate in daily physical activity because of illness or disability<u>; and</u>

   <u>(2)  a middle school or junior high school student who participates in an extracurricular activity with a physical activity component that is considered a structured activity under rules adopted by the State Board of Education.</u>

  <u>(l-1)  In adopting rules relating to an activity described by Subsection (l)(2), the State Board of Education may permit an exemption for a student who participates in a school-related activity or an activity sponsored by a private league or club only if the student provides proof of participation in the activity.</u>

  <u>(l-2)  To encourage school districts to promote physical activity for children through classroom curricula for health and physical education, the agency, in consultation with the Department of State Health Services, shall designate nationally recognized health and physical education program guidelines that a school district may use in the health curriculum under Subsection (a)(2)(B) or the physical education curriculum under Subsection (a)(2)(C).</u>

  SECTION 2.  Section 28.004(k), Education Code, is amended to read as follows:

  (k)  A school district shall <u>publish in the student handbook and post on the district's Internet website, if the district has an Internet website</u> [make available for reasonable public inspection]:

   (1)  a statement of the policies adopted to ensure that [students in] elementary <u>school, middle school, and junior high school students</u> [grades] engage in at least 30 minutes per school day or 135 minutes per school week of physical activity; and

   (2)  a statement of:

    (A)  the number of times during the <u>preceding</u> year the district's school health advisory council has met;

    (B)  whether the district has adopted and enforces policies to ensure that district campuses comply with agency vending machine and food service guidelines for restricting student access to vending machines; and

    (C)  whether the district has adopted and enforces policies and procedures that prescribe penalties for the use of tobacco products by students and others on school campuses or at school-sponsored or school-related activities.

  SECTION 3.  The heading to Section 38.013, Education Code, is amended to read as follows:

  Sec. 38.013.  COORDINATED HEALTH PROGRAM FOR ELEMENTARY<u>,</u> MIDDLE, AND JUNIOR HIGH SCHOOL STUDENTS.

  SECTION 4.  Section 38.013, Education Code, is amended by amending Subsections (a) and (a-1) and adding Subsection (c) to read as follows:

(a) The agency shall make available to each school district one or more coordinated health programs designed to prevent obesity, cardiovascular disease, and Type 2 diabetes in elementary school, middle school, and junior high school students. Each program must provide for coordinating:

(1) health education;

(2) physical education and physical activity;

(3) nutrition services; and

(4) parental involvement.

(a-1) The commissioner by rule shall adopt criteria for evaluating a coordinated health program before making the program available under Subsection (a). Before adopting the criteria, the commissioner shall request review and comment concerning the criteria from the [Texas] Department of State Health Services [Health's] School Health Advisory Committee. The commissioner may make available under Subsection (a) only those programs that meet criteria adopted under this subsection.

(c) The commissioner by rule shall adopt criteria for evaluating the nutritional services component of a program under this section that includes an evaluation of program compliance with the Department of Agriculture guidelines relating to foods of minimal nutritional value.

SECTION 5. The heading to Section 38.014, Education Code, is amended to read as follows:

Sec. 38.014. IMPLEMENTATION OF COORDINATED HEALTH PROGRAM FOR ELEMENTARY, MIDDLE, AND JUNIOR HIGH SCHOOL STUDENTS.

SECTION 6. Section 38.014(a), Education Code, is amended to read as follows:

(a) Each school district shall:

(1) participate in appropriate training for the implementation of the program approved by the agency under Section 38.013; and

(2) implement the program in each elementary school, middle school, and junior high school in the district.

SECTION 7. Subchapter A, Chapter 38, Education Code, is amended by adding Section 38.0141 to read as follows:

Sec. 38.0141. REPORTING OF CERTAIN HEALTH AND SAFETY INFORMATION REQUIRED. Each school district shall provide to the agency information as required by the commissioner, including statistics and data, relating to student health and physical activity and information described by Section 28.004(k), presented in a form determined by the commissioner. The district shall provide the information required by this section for the district and for each campus in the district.

SECTION 8. Section 39.182(a), Education Code, is amended to read as follows:

(a) Not later than December 1 of each year, the agency shall prepare and deliver to the governor, the lieutenant governor, the speaker of the house of representatives, each member of the legislature, the Legislative Budget Board, and the clerks of the standing committees of the senate and house of representatives with primary jurisdiction over the public school system a comprehensive report covering the preceding school year and containing:

(1) an evaluation of the achievements of the state educational program in relation to the statutory goals for the public education system under Section 4.002;

(2) an evaluation of the status of education in the state as reflected by the academic excellence indicators adopted under Section 39.051;

(3) a summary compilation of overall student performance on academic skills assessment instruments required by Section 39.023 with the number and percentage of students exempted from the administration of those instruments and the basis of the exemptions, aggregated by grade level, subject area, campus, and district, with appropriate interpretations and analysis, and disaggregated by race, ethnicity, gender, and socioeconomic status;

(4) a summary compilation of overall performance of students placed in a disciplinary [an] alternative education program established under Section 37.008 on academic skills assessment instruments required by Section 39.023 with the number of those students exempted from the administration of those instruments and the basis of the exemptions, aggregated by district, grade level, and subject area, with appropriate interpretations and analysis, and disaggregated by race, ethnicity, gender, and socioeconomic status;

(5) a summary compilation of overall performance of students at risk of dropping out of school, as defined by Section 29.081(d), on academic skills assessment instruments required by Section 39.023 with the number of those students exempted from the administration of those instruments and the basis of the exemptions, aggregated by district, grade level, and subject area, with appropriate interpretations and analysis, and disaggregated by race, ethnicity, gender, and socioeconomic status;

(6) an evaluation of the correlation between student grades and student performance on academic skills assessment instruments required by Section 39.023;

(7) a statement of the dropout rate of students in grade levels 7 through 12, expressed in the aggregate and by grade level, and a statement of the completion rates of students for grade levels 9 through 12;

(8) a statement of:

(A) the completion rate of students who enter grade level 9 and graduate not more than four years later;

(B) the completion rate of students who enter grade level 9 and graduate, including students who require more than four years to graduate;

(C) the completion rate of students who enter grade level 9 and not more than four years later receive a high school equivalency certificate;

(D) the completion rate of students who enter grade level 9 and receive a high school equivalency certificate, including students who require more than four years to receive a certificate; and

(E) the number and percentage of all students who have not been accounted for under Paragraph (A), (B), (C), or (D);

(9) a statement of the projected cross-sectional and longitudinal dropout rates for grade levels 9 through 12 for the next five years, assuming no state action is taken to reduce the dropout rate;

(10) a description of a systematic, measurable plan for reducing the projected cross-sectional and longitudinal dropout rates to five percent or less for the 1997-1998 school year;

(11) a summary of the information required by Section 29.083 regarding grade level retention of students and information concerning:

(A)  the number and percentage of students retained; and

(B) the performance of retained students on assessment instruments required under Section 39.023(a);

(12) information, aggregated by district type and disaggregated by race, ethnicity, gender, and socioeconomic status, on:

(A) the number of students placed in a disciplinary [an] alternative education program established under Section 37.008;

(B) the average length of a student's placement in a disciplinary [an] alternative education program established under Section 37.008;

(C) the academic performance of students on assessment instruments required under Section 39.023(a) during the year preceding and during the year following placement in a disciplinary [an] alternative education program; and

(D)  the dropout rates of students who have been placed in a disciplinary [an] alternative education program established under Section 37.008;

(13) a list of each school district or campus that does not satisfy performance standards, with an explanation of the actions taken by the commissioner to improve student performance in the district or campus and an evaluation of the results of those actions;

(14)  an evaluation of the status of the curriculum taught in public schools, with recommendations for legislative changes necessary to improve or modify the curriculum required by Section 28.002;

(15)  a description of all funds received by and each activity and expenditure of the agency;

(16)  a summary and analysis of the instructional expenditures ratios and instructional employees ratios of school districts computed under Section 44.0071;

(17)  a summary of the effect of deregulation, including exemptions and waivers granted under Section 7.056 or 39.112;

(18)  a statement of the total number and length of reports that school districts and school district employees must submit to the agency, identifying which reports are required by federal statute or rule, state statute, or agency rule, and a summary of the agency's efforts to reduce overall reporting requirements;

(19)  a list of each school district that is not in compliance with state special education requirements, including:

(A)  the period for which the district has not been in compliance;

(B)  the manner in which the agency considered the district's failure to comply in determining the district's accreditation status; and

(C)  an explanation of the actions taken by the commissioner to ensure compliance and an evaluation of the results of those actions;

(20)  a comparison of the performance of open-enrollment charter schools and school districts on the academic excellence indicators specified in Section 39.051(b) and accountability measures adopted under Section 39.051(g), with a separately aggregated comparison of the performance of open-enrollment charter schools predominantly serving students at risk of dropping out of school, as defined by Section 29.081(d), with the performance of school districts; [and]

(21) a summary of the information required by Section 38.0141 regarding student health and physical activity from each school district; and

(22) any additional information considered important by the commissioner or the State Board of Education.

SECTION 9.  Subchapter D, Chapter 1001, Health and Safety Code, is amended by adding Section 1001.0711 to read as follows:

Sec. 1001.0711.  SCHOOL HEALTH ADVISORY COMMITTEE. (a) The commission by rule shall establish a School Health Advisory Committee at the department to provide assistance to the council in establishing a leadership role for the department in support for and delivery of coordinated school health programs and school health services.

(b)  The committee shall include at least:

(1)  one representative from the Department of Agriculture, appointed by the commissioner of agriculture; and

(2)  one representative from the Texas Education Agency, appointed by the commissioner of education.

(c)  Section 2110.008, Government Code, does not apply to a committee created under this section.

SECTION 10.  Section 38.013, Education Code, as amended by this Act, applies only to approval of a coordinated health program evaluated on or after the effective date of this Act.  The Texas Education Agency shall continue to make available to school districts a coordinated health program evaluated and approved before the effective date of this Act under Section 38.013, Education Code, as that section existed before amendment by this Act, until the approval of the program expires as provided by 19 T.A.C. Section 102.1031.

SECTION 11.  Except as provided by Section 10 of this Act, this Act applies beginning with the 2006-2007 school year.

SECTION 12.  Not later than January 1, 2006, the Health and Human Services Commission shall adopt rules to establish the School Health Advisory Committee as provided by Section 1001.0711, Health and Safety Code, as added by this Act.

SECTION 13. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

**Floor Amendment No. 1**

Amend **CSSB 42** as follows:

(1) On page 2, line 19, after the word "year." insert the following:
or the option to schedule at least two semesters overall.

**Floor Amendment No. 2**

Amend **CSSB 42** on page 3, between lines 13 and 14 by inserting the following:

"(l-3)(a)  This section may be cited as "Lauren's Law".

(b)  The State Board of Education, the Department of State Health Services, or a school district may not adopt any rule, policy, or program under Subsections (a), (k), (l), (l-1), or (l-2) that would prohibit a parent or grandparent of a student from providing any food product of the parent's or grandparent's choice to:

(1)  children in the classroom of the child of the parent or grandparent on the occasion of the child's birthday; or

(2)  children at a school-designated function."

The amendments were read.

Senator Nelson moved to concur in the House amendments to **SB 42**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 45 WITH HOUSE AMENDMENTS

Senator Nelson called **SB 45** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Amendment**

Amend **SB 45** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to the establishment of an advisory committee on health care information technology.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter B, Chapter 104, Health and Safety Code, is amended by adding Section 104.0156 to read as follows:

Sec. 104.0156.  HEALTH CARE INFORMATION TECHNOLOGY ADVISORY COMMITTEE. (a)  The statewide health coordinating council shall form an advisory committee on health care information technology. The committee must include representatives of interested groups, including the academic community, health plans, pharmacies, and associations of physicians, hospitals, and nurses.  The committee must also include at least one member with at least 10 years of experience in the health care information technology industry.

(b)  The advisory committee shall develop a long-range plan for health care information technology, including the use of electronic medical records, computerized clinical support systems, computerized physician order entry, regional data sharing interchanges for health care information, and other methods of incorporating information technology in pursuit of greater cost-effectiveness and better patient outcomes in health care.

(c)  The advisory committee shall elect a presiding officer.

(d)  Members of the advisory committee serve without compensation but are entitled to reimbursement for the members' travel expenses as provided by Chapter 660, Government Code, and the General Appropriations Act.

(e)  Chapter 2110, Government Code, does not apply to the size, composition, or duration of the advisory committee.

(f)  Meetings of the advisory committee under this section are subject to Chapter 551, Government Code.

SECTION 2.  Subsections (e) and (f), Section 104.022, Health and Safety Code, are amended to read as follows:

(e) The state health plan shall be developed and used in accordance with applicable state and federal law. The plan must identify:

(1) major statewide health concerns;

(2) the availability and use of current health resources of the state, including resources associated with <u>information technology and</u> state-supported institutions of higher education; and

(3) future health service<u>, information technology,</u> and facility needs of the state.

(f) The state health plan must:

(1) propose strategies for the correction of major deficiencies in the service delivery system;

(2) <u>propose strategies for incorporating information technology in the service delivery system;</u>

<u>(3)</u> propose strategies for involving state-supported institutions of higher education in providing health services and for coordinating those efforts with health and human services agencies in order to close gaps in services; and

<u>(4)</u> [<del>(3)</del>] provide direction for the state's legislative and executive decision-making processes to implement the strategies proposed by the plan.

SECTION 3. This Act takes effect September 1, 2005.

## Floor Amendment No. 1

Amend **CSSB 45** in SECTION 1 of the bill, in added Subsection (b) of Section 104.0156, Health and Safety Code (House committee printing, page 1, line 21), immediately following "<u>health care.</u>", by inserting "<u>In developing the long-range plan, the advisory committee shall study the effect of health care information technology on price disparities in insurance coverage for residents of this state.</u>"

The amendments were read.

Senator Nelson moved to concur in the House amendments to **SB 45**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 451 WITH HOUSE AMENDMENT

Senator Wentworth called **SB 451** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

## Floor Amendment No. 1 on Third Reading

Amend **SB 451** on third reading by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION ____. Article 19.06, Code of Criminal Procedure, is amended to read as follows:

Art. 19.06. SHALL SELECT GRAND JURORS. The jury commissioners shall select not less than 15 nor more than 40 persons from the citizens of the county to be summoned as grand jurors for the next term of court, or the term of court for which said commissioners were selected to serve, as directed in the order of the court

selecting the commissioners. The commissioners shall, to the extent possible, select grand jurors who the commissioners determine represent a broad cross-section of the population of the county, considering the factors of race, sex, and age. A commissioner is not qualified to be selected for or to serve as a grand juror during the term of court for which the commissioner is serving as a commissioner.

The amendment was read.

Senator Wentworth moved to concur in the House amendment to **SB 451**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 827 WITH HOUSE AMENDMENT

Senator Zaffirini called **SB 827** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 827** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to systems for identifying colonias and for tracking the progress of state-funded projects that benefit colonias and the submission of a related report to the legislature.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subchapter B, Chapter 405, Government Code, is amended by adding Section 405.021 to read as follows:

Sec. 405.021. REPORT ON STATE-FUNDED PROJECTS SERVING COLONIAS. (a) In this section, "colonia" means a geographic area that:

(1) is an economically distressed area as defined by Section 17.921, Water Code; and

(2) is located in a county any part of which is within 62 miles of an international border.

(b) Based on information provided under Subsections (c) and (d), the secretary of state shall establish and maintain a classification system that allows the secretary of state to track the progress of state-funded projects in providing water or wastewater services, paved roads, and other assistance to colonias.

(c) The secretary of state shall compile information received from the Office of Rural Community Affairs, the Texas Water Development Board, the Texas Transportation Commission, the Texas Department of Housing and Community Affairs, the Department of State Health Services, and any other agency considered appropriate by the secretary of state for purposes of the classification system.

(d) The secretary of state shall compile information on colonias that is received from the colonia ombudsmen under Section 775.004.

(e) The secretary of state shall:

(1) prepare a report on the progress of state-funded projects in providing water or wastewater services, paved roads, and other assistance to colonias; and

(2) submit the report to the presiding officer of each house of the legislature not later than December 1 of each even-numbered year.

(f) The report to the legislature must include a list of colonias with the highest health risk to colonia residents, based on factors identified by the secretary of state.

(g) In conjunction with the establishment of the classification system required by this section, the secretary of state shall establish and maintain a statewide system for identifying colonias.

(h) The secretary of state may contract with a third party to develop the classification system or the identification system or to compile or maintain the relevant information required by this section.

SECTION 2. Subchapter C, Chapter 487, Government Code, is amended by adding Section 487.060 to read as follows:

Sec. 487.060. REPORT TO SECRETARY OF STATE. (a) In this section, "colonia" means a geographic area that:

(1) is an economically distressed area as defined by Section 17.921, Water Code; and

(2) is located in a county any part of which is within 62 miles of an international border.

(b) To assist the secretary of state in preparing the report required under Section 405.021, the office on a quarterly basis shall provide a report to the secretary of state detailing any projects funded by the office that serve colonias by providing water or wastewater services, paved roads, or other assistance.

(c) The report must include:

(1) a description of any relevant projects;

(2) the location of each project;

(3) the number of colonia residents served by each project;

(4) the cost or anticipated cost of each project;

(5) a statement of whether each project is completed and, if not, the expected completion date of the project; and

(6) any other information, as determined appropriate by the secretary of state.

SECTION 3. Chapter 775, Government Code, is amended by amending Section 775.003 and adding Section 775.004 to read as follows:

Sec. 775.003. COLONIA OMBUDSMAN PROGRAM. The colonia initiatives coordinator shall [may] appoint a colonia ombudsman in each of the six border counties that the coordinator determines have the largest colonia populations.

Sec. 775.004. INFORMATION ON COLONIAS. (a) The colonia ombudsmen shall gather information about the colonias in the counties for which the ombudsmen were appointed and provide the information to the secretary of state, to assist the secretary of state in preparing the report required under Section 405.021.

(b) To the extent possible, the ombudsmen shall gather information regarding:

(1) the platting of each colonia;

(2) the infrastructure of each colonia;

(3) the availability of health care services;

(4) the availability of financial assistance; and

(5) any other appropriate topic as requested by the secretary of state.

(c) The ombudsmen shall provide the information to the secretary of state not later than September 1 of each even-numbered year.

SECTION 4. Subchapter D, Chapter 2306, Government Code, is amended by adding Section 2306.083 to read as follows:

Sec. 2306.083. REPORT TO SECRETARY OF STATE. (a) In this section, "colonia" means a geographic area that:

(1) is an economically distressed area as defined by Section 17.921, Water Code; and

(2) is located in a county any part of which is within 62 miles of an international border.

(b) To assist the secretary of state in preparing the report required under Section 405.021, the board on a quarterly basis shall provide a report to the secretary of state detailing any projects funded by the department that provide assistance to colonias.

(c) The report must include:

(1) a description of any relevant projects;

(2) the location of each project;

(3) the number of colonia residents served by each project;

(4) the cost or anticipated cost of each project;

(5) a statement of whether each project is completed and, if not, the expected completion date of the project; and

(6) any other information, as determined appropriate by the secretary of state.

SECTION 5. Subchapter B, Chapter 1001, Health and Safety Code, is amended by adding Section 1001.033 to read as follows:

Sec. 1001.033. REPORT TO SECRETARY OF STATE. (a) In this section, "colonia" means a geographic area that:

(1) is an economically distressed area as defined by Section 17.921, Water Code; and

(2) is located in a county any part of which is within 62 miles of an international border.

(b) To assist the secretary of state in preparing the report required under Section 405.021, Government Code, the commissioner on a quarterly basis shall provide a report to the secretary of state detailing any projects funded by the department that provide assistance to colonias.

(c) The report must include:

(1) a description of any relevant projects;

(2) the location of each project;

(3) the number of colonia residents served by each project;

(4) the cost or anticipated cost of each project;

(5) a statement of whether each project is completed and, if not, the expected completion date of the project; and

(6) any other information, as determined appropriate by the secretary of state.

SECTION 6. Subchapter C, Chapter 201, Transportation Code, is amended by adding Section 201.116 to read as follows:

Sec. 201.116. REPORT TO SECRETARY OF STATE. (a)   In this section, "colonia" means a geographic area that:

(1)  is an economically distressed area as defined by Section 17.921, Water Code; and

(2)  is located in a county any part of which is within 62 miles of an international border.

(b)  To assist the secretary of state in preparing the report required under Section 405.021, Government Code, the commission on a quarterly basis shall provide a report to the secretary of state detailing any projects funded by the department that serve colonias by providing paved roads or other assistance.

(c)  The report must include:

(1)  a description of any relevant projects;

(2)  the location of each project;

(3)  the number of colonia residents served by each project;

(4)  the cost or anticipated cost of each project;

(5)  a statement of whether each project is completed and, if not, the expected completion date of the project; and

(6)  any other information, as determined appropriate by the secretary of state.

SECTION 7. Subchapter E, Chapter 6, Water Code, is amended by adding Section 6.1565 to read as follows:

Sec. 6.1565. REPORT TO SECRETARY OF STATE. (a)   In this section, "colonia" means a geographic area that:

(1)  is an economically distressed area as defined by Section 17.921; and

(2)  is located in a county any part of which is within 62 miles of an international border.

(b)  To assist the secretary of state in preparing the report required under Section 405.021, Government Code, the board on a quarterly basis shall provide a report to the secretary of state detailing any projects funded by the board that serve colonias by providing water or wastewater services or other assistance.

(c)  The report must include:

(1)  a description of any relevant projects;

(2)  the location of each project;

(3)  the number of colonia residents served by each project;

(4)  the cost or anticipated cost of each project;

(5)  a statement of whether each project is completed and, if not, the expected completion date of the project; and

(6)  any other information, as determined appropriate by the secretary of state.

SECTION 8.  This Act takes effect September 1, 2005.

The amendment was read.

Senator Zaffirini moved to concur in the House amendment to **SB 827**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 183 WITH HOUSE AMENDMENT

Senator Lucio called **SB 183** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Committee Amendment No. 1

Amend **SB 183** as follows:

(1)  On page 1, lines 16 and 17 delete "located adjacent to the border with the United Mexican States"

(2)  On page 1, line 18 after the second "," and before "or" by inserting "Odessa,".

The amendment was read.

Senator Lucio moved to concur in the House amendment to **SB 183**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 1044 WITH HOUSE AMENDMENTS

Senator Janek called **SB 1044** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

### Floor Amendment No. 1

Amend **SB 1044** (House committee printing) as follows:

(1)  In SECTION 2 of the bill, in added Section 33.653, Natural Resources Code (page 4, lines 13-14), strike Subsection (b) and substitute the following:

(b)  The fund consists of:

(1)  gifts and grants; and

(2)  appropriations of money to the fund by the legislature.

(2)  In SECTION 2 of the bill, in added Section 33.654, Natural Resources Code (page 4, line 26, through page 5, line 4), strike Subsection (a) and substitute the following:

(a)  The coastal protection and improvement fund shall be used only to make a qualified payment to a coastal county sponsoring a qualified project under this subchapter.

(3)  In SECTION 2 of the bill, in added Section 33.654, Natural Resources Code (page 5, lines 13-22), strike Subsections (d) and (e).

(4)  In SECTION 2 of the bill, in added Subsection (b), Section 33.655, Natural Resources Code (page 5, line 27), strike "or equalization payment under Section 33.659".

(5)  In SECTION 2 of the bill, in Section 33.656, Natural Resources Code (page 6, line 4), strike "(a)".

(6)  In SECTION 2 of the bill, in added Subdivision (5), Subsection (a), Section 33.656, Natural Resources Code (page 6, line 15), strike "except as provided by Subsection (b),".

(7)  In SECTION 2 of the bill, in added Section 33.656, Natural Resources Code (page 6, lines 17-18), strike Subsection (b).

(8)  In SECTION 2 of the bill, strike added Section 33.659, Natural Resources Code (page 8, line 12, through page 9, line 1), and renumber subsequent sections in added Subchapter I, Natural Resources Code, accordingly.

(9)  Strike SECTION 3 of the bill (page 11, line 15, through page 12, line 12) and renumber subsequent SECTIONS of the bill accordingly.

(10)  In SECTION 4 of the bill (page 12, line 13), strike "The Commissioner" and substitute "To the extent money is available, the Commissioner".

## Floor Amendment No. 1 on Third Reading

Amend **SB 1044** on third reading as follows:

(1)  Between SECTIONS 1 and 2 of the bill (House committee printing, page 2, between lines 6 and 7), insert the following appropriately numbered SECTIONS and renumber subsequent SECTIONS of the bill accordingly:

SECTION __.  Section 33.605(a), Natural Resources Code, is amended to read as follows:

(a)  Money in the account may be used for any action authorized by this subchapter, except for a restoration project authorized by Section 33.613.

SECTION __.  Subchapter H, Chapter 33, Natural Resources Code, is amended by adding Section 33.613 to read as follows:

Sec. 33.613.  PROPERTY RIGHTS: RESTORATION BY BEACHFRONT OWNER OF PRIVATE PROPERTY AFFECTED BY COASTAL EROSION. (a) This section applies to land that:

(1)  on December 31, 1955, was privately owned and not submerged or owned by the School Land Board; and

(2)  fronts on a bay and not the Gulf of Mexico.

(b)  In accordance with land office rules, the owner of property immediately landward of a public beach or submerged land, including state mineral lands, that has been affected by coastal erosion shall restore the affected land to its original boundaries as evidenced in a residential subdivision plat for residential lots of one acre or less filed in the real property records of each county in which the affected land is located. The owner shall use only private resources and money for restoration authorized by this section. After restoration the owner owns the restored land in fee simple, subject to:

(1)  the common law rights of the public in public beaches as affirmed by Subchapter B, Chapter 61; and

(2)  the rights of a public school land lessee holding a lease on the property on September 1, 2005.

(c)  In accordance with land office rules, the owner shall build bulkheads on the restored land to prevent further erosion of the restored land.

(d)  The land office shall adopt reasonable rules to govern the restoration of land under this section, including rules that:

(1)  prescribe the type and quality of materials that may be used to backfill or build a bulkhead;

(2)  require maintenance of backfill and bulkheads;

          (3)  authorize land office maintenance or removal of abandoned or dilapidated structures;
          (4)  require consideration of any adverse effects on adjacent property owners; and
          (5)  establish penalties for the violation of this section or rules adopted under this section.
      (e)  State money may not be used to restore land under this section.
      (2)  In SECTION 2 of the bill, in added Subdivision (4), Section 33.651, Natural Resource Code (House committee printing, page 2, lines 22-26), strike Paragraphs (A) and (B) and substitute the following:
          (A)  acquiring fee title to property or a right of public access to a public beach;
          (B)  constructing or maintaining public roads, parking, or other facilities in aid of public access to or use of a public beach; or
          (C)  requiring a landowner, as prescribed by land office rules, to restore land affected by coastal erosion to its original boundaries.
      (3)  Immediately before the last SECTION of the bill, insert the following appropriately numbered SECTION and renumber subsequent SECTIONS of the bill accordingly:
      SECTION __.  Not later than December 1, 2005, the General Land Office shall adopt rules for the administration and regulation of the restoration of land affected by coastal erosion as authorized by Section 33.613, Natural Resources Code, as added by this Act.

      The amendments were read.

      Senator Janek moved to concur in the House amendments to **SB 1044**.

      The motion prevailed by the following vote:  Yeas 29, Nays 0.

      Absent-excused:  Carona, West.

### SENATE BILL 1481 WITH HOUSE AMENDMENT

      Senator Shapleigh called **SB 1481** from the President's table for consideration of the House amendment to the bill.

      The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

      Amend **SB 1481** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to powers and duties of the Texas Military Preparedness Commission.
      BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:
      SECTION 1.  Section 436.101, Government Code, is amended to read as follows:
      Sec. 436.101.  POWERS AND DUTIES OF COMMISSION.  The commission shall:
          (1)  advise the governor and the legislature on military issues and economic and industrial development related to military issues;

(2)  make recommendations regarding:

(A)  the development of policies and plans to support the long-term viability and prosperity of the military, active and civilian, in this state, including promoting strategic regional alliances that may extend over state lines; and

(B)  [the development of methods to improve private and public employment opportunities for former members of the military residing in this state; and

[(C)] the development of methods to assist defense-dependent communities in the design and execution of programs that enhance a community's relationship with military installations and defense-related businesses;

(3)  [develop and maintain a database of the names and public business information of all prime contractors and subcontractors operating in this state who perform defense-related work;

[(4)] provide information to communities, the legislature, the state's congressional delegation, and state agencies regarding federal actions affecting military installations and missions;

(4)  [(5)] serve as a clearinghouse for:

(A)  defense economic adjustment and transition information and activities along with the Texas Business and Community Economic Development Clearinghouse; and

(B)  information about:

(i)  issues related to the operating costs, missions, and strategic value of federal military installations located in the state;

(ii)  employment issues for communities that depend on defense bases and in defense-related businesses; and

(iii)  defense strategies and incentive programs that other states are using to maintain, expand, and attract new defense contractors;

(5)  [(6)] provide assistance to communities that have experienced a defense-related closure or realignment;

(6)  [(7)] assist communities in the design and execution of programs that enhance a community's relationship with military installations and defense-related businesses, including regional alliances that may extend over state lines;

(7)  [(8)] assist communities in the retention and recruiting of defense-related businesses, including fostering strategic regional alliances that may extend over state lines;

[(9)  prepare a biennial strategic plan that:

[(A)  fosters the enhancement of military value of the contributions of Texas military installations to national defense strategies;

[(B)  considers all current and anticipated base realignment and closure criteria; and

[(C)  develops strategies to protect the state's existing military missions and positions the state to be competitive for new and expanded military missions;] and

(8)  [(10)] encourage economic development in this state by fostering the development of industries related to defense affairs.

SECTION 2.  Sections 436.103(b) and (d), Government Code, are amended to read as follows:

(b)  Not later than July 1 of each <u>even-numbered</u> year, the commission shall prepare and submit a report to the governor and the legislature about the active military installations, communities that depend on military installations, and defense-related businesses in this state. <u>The commission may update the report in an odd-numbered year.</u> The report must include:

(1)  an economic impact statement describing in detail the effect of the military on the economy of this state;

(2)  a statewide assessment of active military installations and current missions;

(3)  a statewide strategy to attract new military missions and defense-related business and include specific actions that add military value to existing military installations;

(4)  a list of state and federal activities that have significant impact on active military installations and current missions;

(5)  a statement identifying:

(A)  the state and federal programs and services that assist communities impacted by military base closures or realignments and the efforts to coordinate those programs; and

(B)  the efforts to coordinate state agency programs and services that assist communities in retaining active military installations and current missions;

(6)  an evaluation of initiatives to retain existing defense-related businesses; and

(7)  a list of agencies with regulations, policies, programs, or services that impact the operating costs or strategic value of federal military installations and activities in the state.

(d)  The commission shall <u>periodically meet</u> [coordinate annual meetings] with [the head of] each state agency <u>that has defense-related programs or is engaged in a project in a defense-dependent community and with each</u> [or] member of the legislature whose district contains an active, closed, or realigned military installation to discuss <u>defense-related issues and</u> the implementation of the recommendations outlined in the report required under Subsection (b).

SECTION 3.  Subchapter D, Chapter 436, Government Code, is amended by adding Sections 436.1531 and 436.1532 to read as follows:

<u>Sec. 436.1531.  LOANS FOR COMMUNITIES ADVERSELY AFFECTED BY DEFENSE BASE REDUCTION.  (a)  The commission may provide a loan of financial assistance to a defense community for an economic development project that minimizes the negative effects of a defense base reduction on the defense community as a result of a United States Department of Defense base realignment process that occurs during 2005 or later. The loan shall be made from the Texas military value revolving loan account established under Section 436.156.</u>

<u>(b)  On receiving an application for a loan under this section, the commission shall evaluate the economic development project to determine how the project will minimize the negative effects of a defense base reduction on the defense community, including the number of jobs that the project will create and the economic impact the project will have on the community.</u>

(c) If the commission determines that a project will reduce the negative effects of a defense base reduction on the defense community, the commission shall:

(1) analyze the creditworthiness of the defense community to determine the defense community's ability to repay the loan; and

(2) evaluate the feasibility of the project to be financed to ensure that the defense community has pledged a source of revenue or taxes sufficient to repay the loan for the project.

(d) If the commission determines that the funds will be used to finance an economic development project that will reduce the negative effects of a defense base reduction on the defense community and that the project is financially feasible, the commission may award a loan to the defense community for the project. The commission shall enter into a written agreement with a defense community that is awarded a loan. The agreement must contain the terms and conditions of the loan, including the loan repayment requirements.

(e) The commission shall notify the Texas Public Finance Authority of the amount of the loan and the recipient of the loan and request the authority to issue general obligation bonds in an amount necessary to fund the loan. The commission and the authority shall determine the amount and time of a bond issue to best provide funds for one or multiple loans.

(f) The commission shall administer the loans to ensure full repayment of the general obligation bonds issued to finance the project.

(g) A project financed with a loan under this section must be completed on or before the fifth anniversary of the date the loan is awarded.

(h) The amount of a loan under this section may not exceed the total cost of the project.

Sec. 436.1532. LOANS FOR COMMUNITIES POSITIVELY AFFECTED BY DEFENSE BASE RESTRUCTURING. (a) The commission may provide a loan of financial assistance to a defense community for an infrastructure project to accomodate new or expanded military missions assigned to a military facility located in, near, or adjacent to the defense community as a result of a United States Department of Defense base realignment process that occurs during 2005 or later. The loan shall be made from the Texas military value revolving loan account established under Section 436.156.

(b) On receiving an application for a loan under this section, the commission shall evaluate the infrastructure project to determine how the project will assist the defense community in accommodating the new or expanded military missions that are assigned to the military facility.

(c) If the commission determines that the project will assist the defense community in accommodating the new or expanded military missions that are assigned to the military facility, the commission shall:

(1) analyze the creditworthiness of the defense community to determine the defense community's ability to repay the loan; and

(2) evaluate the feasibility of the project to be financed to ensure that the defense community has pledged a source of revenue or taxes sufficient to repay the loan for the project.

(d) If the commission determines that the funds will be used to finance an infrastructure project to accommodate new or expanded military missions assigned to the military facility located in, near, or adjacent to the defense community and that the project is financially feasible, the commission may award a loan to the defense community for the project. The commission shall enter into a written agreement with a defense community that is awarded a loan. The agreement must contain the terms and conditions of the loan, including the loan repayment requirements.

(e) The commission shall notify the Texas Public Finance Authority of the amount of the loan and the recipient of the loan and request the authority to issue general obligation bonds in an amount necessary to fund the loan. The commission and the authority shall determine the amount and time of a bond issue to best provide funds for one or multiple loans.

(f) The commission shall administer the loans to ensure full repayment of the general obligation bonds issued to finance the project.

(g) A project financed with a loan under this section must be completed on or before the fifth anniversary of the date the loan is awarded.

(h) The amount of a loan under this section may not exceed the total cost of the project.

SECTION 4. Section 397.001(1), Local Government Code, is amended to read as follows:

(1) "Defense base" means a federally owned or operated military installation or facility that is presently functioning or was closed as a result of the United States Department of Defense base realignment process.

SECTION 5. Section 397.002(a), Local Government Code, is amended to read as follows:

(a) A defense community that applies for financial assistance from the Texas military value revolving loan account under Section 436.153, Government Code, shall prepare, in consultation with the authorities from each defense base associated with the community, a defense base military value enhancement statement that illustrates specific ways the funds will enhance the military value of the installations and must include the following information for each project:

(1) the purpose for which financial assistance is requested, including a description of the project;

(2) the source of other funds for the project;

(3) a statement on how the project will enhance the military value of the installation;

(4) whether the defense community has coordinated the project with authorities of the military installation and whether any approval has been obtained from those authorities;

(5) whether any portion of the project is to occur on the military installation;

(6) whether the project will have any negative impact on the natural or cultural environment;

(7) a description of any known negative factors arising from the project that will affect the community or the military installation; and

(8) a description of how the project will address future base realignment or closure.

SECTION 6. Chapter 397, Local Government Code, is amended by adding Section 397.0021 to read as follows:

Sec. 397.0021. DEFENSE COMMUNITY ECONOMIC REDEVELOPMENT VALUE STATEMENT. (a) A defense community that is adjacent to a closed military installation and applies for financial assistance from the Texas military value revolving loan account shall prepare an economic redevelopment value statement that illustrates specific ways the funds will be used to promote economic development in the community and include the following information for each project:

(1) the purpose for which financial assistance is requested, including a description of the project;

(2) the source of other funds for the project;

(3) a statement on how the project will promote economic development in the community;

(4) whether any portion of the project is to occur on a closed military installation;

(5) whether any approval has been obtained from those authorities retaining or receiving title to that portion of the closed installation to be affected by the project;

(6) whether the project will have any negative impact on the natural or cultural environment; and

(7) a description of any known negative factors arising from the project that will affect the defense community.

(b) The Texas Military Preparedness Commission may require a defense community to provide any additional information the commission requires to evaluate the community's request for financial assistance under this section.

(c) Two or more defense communities near the same defense base that apply for financial assistance from the Texas military value revolving loan account may prepare a joint statement.

(d) A copy of the economic redevelopment value statement shall be distributed to the Texas Military Preparedness Commission and any defense community which may be affected by the resulting project.

(e) This section does not prohibit a defense community that is not applying for financial assistance from preparing an economic redevelopment value statement under this section.

SECTION 7. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Shapleigh moved to concur in the House amendment to **SB 1481**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

### SENATE BILL 132 WITH HOUSE AMENDMENTS

Senator Nelson called **SB 132** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

**Committee Amendment No. 1**

Amend **SB 132** (Senate engrossment) as follows:

(1) In SECTION 2 of the bill, strike amended Paragraph (B), Subdivision (1), Subsection (a), Section 61.9623, Education Code (page 2, lines 14-16), and substitute "(B) nursing faculty enhancement in accordance with Section 61.96231 [assuring the retention of an adequate number of qualified faculty, including providing faculty salaries];[or]".

(2) In SECTION 3 of the bill, in amended Section 61.9624, Education Code (page 3, line 21), strike "Sections 61.9623(a)(1)(A), [and] B, and (D)" and substitute "Sections 61.9623(a)(1)(A) and (D) [B]".

(3) Add the following appropriately numbered new SECTIONS to the bill and renumber subsequent SECTIONS of the bill accordingly:

SECTION ___. Subchapter D, Chapter 54, Education Code, is amended by adding Sections 54.221 and 54.222 to read as follows:

Sec. 54.221. CHILDREN OF PROFESSIONAL NURSING PROGRAM FACULTY. (a) In this section:

(1) "Child" means a child of any age, including an adult child. The term includes an adopted child.

(2) "Graduate professional nursing program" means an educational program of a public or private institution of higher education that prepares students for a master's or doctoral degree in nursing.

(3) "Undergraduate professional nursing program" means a public or private educational program for preparing students for initial licensure as registered nurses.

(b) The governing board of an institution of higher education shall exempt from the payment of tuition a resident of this state enrolled as an undergraduate student at the institution who is a child of a person who, at the beginning of the semester or other academic term for which an exemption is sought, holds a master's or doctoral degree in nursing, if not employed or under contract as a teaching assistant under Subdivision (1) or (2), or a baccalaureate degree in nursing, if employed or under contract as a teaching assistant under Subdivision (1) or (2), and:

(1) is employed by an undergraduate or graduate professional nursing program in this state as a full-time member of its faculty or staff with duties that include teaching, serving as a teaching assistant, performing research, serving as an administrator, or performing other professional services; or

(2) has contracted with an undergraduate or graduate professional nursing program in this state to serve as a full-time member of its faculty or staff to perform duties described by Subdivision (1) during all or part of the semester or other academic term for which an exemption is sought or, if the child is enrolled for a summer session, during all or part of that session or for the next academic year.

(c) A child who would qualify for an exemption under this section but for the fact that the child's parent is not employed full-time is eligible for an exemption on a pro rata basis equal to the percentage of full-time employment the parent is employed, except that a parent employed for less than 25 percent of full-time employment is considered to be employed for 25 percent of full-time employment.

(d) A person is not eligible for an exemption under this section if the person:

(1) has previously received an exemption under this section for 10 semesters or summer sessions at any institution or institutions of higher education; or

(2) has received a baccalaureate degree.

(e) For purposes of Subsection (d), a summer session that is less than nine weeks in duration is considered one-half of a summer session.

(f) A person attending an institution of higher education who becomes eligible to receive an exemption from tuition under this section is eligible for a refund of the amount of money that the person paid to any institution of higher education for tuition as a resident student in the three-year period preceding the beginning of the first semester or other academic term for which the person receives the exemption.

(g) To receive a refund under Subsection (f), the person must apply to the institution from which the refund is sought before the first anniversary of the date the person becomes eligible for the refund. The institution shall pay the refund from any available funds of the institution.

(h) The Texas Higher Education Coordinating Board shall adopt:

(1) rules governing the granting or denial of an exemption under this section, including rules relating to the determination of eligibility for an exemption or for a refund of previously paid tuition; and

(2) a uniform application form for an exemption under this section.

Sec. 54.222. PRECEPTORS FOR PROFESSIONAL NURSING EDUCATION PROGRAMS. (a) In this section, "child" and "undergraduate professional nursing program" have the meanings assigned by Section 54.221.

(b) The governing board of an institution of higher education shall exempt from the payment of $500 of the total amount of tuition a resident of this state enrolled as a student at the institution who:

(1) is a registered nurse; and

(2) is serving under a written preceptor agreement with an undergraduate professional nursing program as a clinical preceptor for students enrolled in the program for the semester or other academic term for which the exemption is sought.

(c) The governing board of an institution of higher education shall exempt from the payment of $500 of the total amount of tuition a resident of this state enrolled as an undergraduate student at the institution who is a child of a person who meets the requirements of Subsections (b)(1) and (2).

(d) Notwithstanding Subsections (b) and (c), if a person eligible for an exemption under this section owes less than $500 in tuition, the governing board of the institution of higher education in which the person is enrolled shall exempt the person from the payment of only the amount of tuition the person owes.

(e) A person is not eligible for an exemption under Subsection (c) if the person:

(1) has previously received an exemption under this section for 10 semesters or summer sessions at any institution or institutions of higher education; or

(2) has received a baccalaureate degree.

(f) For purposes of Subsection (e), a summer session that is less than nine weeks in duration is considered one-half of a summer session.

(g) The Texas Higher Education Coordinating Board shall adopt:

(1) rules governing the granting or denial of an exemption under this section, including rules relating to the determination of eligibility for an exemption; and

(2) a uniform application form for an exemption under this section.

SECTION ___. Subchapter Z, Chapter 61, Education Code, is amended by adding Section 61.96231 to read as follows:

Sec. 61.96231. NURSING FACULTY ENHANCEMENT GRANTS. (a) Under the professional nursing shortage reduction program, the board may award nursing faculty enhancement grants to professional nursing programs to assist the programs in the education, recruitment, and retention of a sufficient number of faculty members to enable the programs to enroll a sufficient number of students to meet the state's need for registered nurses.

(b) A grant awarded under this section may be used only for the purposes specified by Subsection (a), including providing salary supplements and enhancements and reducing the number of hours a faculty member must teach.

(c) In awarding a grant under this section, the board may require matching funds from a professional nursing program or may give preference in awarding a grant to a program providing matching funds.

(d) The board may appoint an advisory committee to advise the board on successful strategies, in addition to the grants awarded under this section, for educating, recruiting, and retaining qualified professional nursing program faculty members who hold master's or doctoral degrees.

SECTION ___. Section 824.602(a), Government Code, is amended to read as follows:

(a) Subject to Section 825.506, the retirement system may not, under Section 824.601, withhold a monthly benefit payment if the retiree is employed in a Texas public educational institution:

(1) as a substitute only with pay not more than the daily rate of substitute pay established by the employer and, if the retiree is a disability retiree, the employment has not exceeded a total of 90 days in the school year;

(2) in a position, other than as a substitute, on no more than a one-half time basis for the month;

(3) in one or more positions on as much as a full-time basis, if the work occurs in not more than six months of a school year that begins after the retiree's effective date of retirement;

(4) in a position, other than as a substitute, on no more than a one-half time basis for no more than 90 days in the school year, if the retiree is a disability retiree;

(5) in a position as a classroom teacher on as much as a full-time basis, if the retiree has retired under Section 824.202(a), is certified under Subchapter B, Chapter 21, Education Code, to teach the subjects assigned, is teaching in an acute shortage area as determined by the board of trustees of a school district as provided by Subsection (m), and has been separated from service with all public schools for at least 12 months;

    (6)  in a position as a principal, including as an assistant principal, on as much as a full-time basis, if the retiree has retired under Section 824.202(a) without reduction for retirement at an early age, is certified under Subchapter B, Chapter 21, Education Code, to serve as a principal, and has been separated from service with all public schools for at least 12 months; [or]

    (7)  as a bus driver for a school district on as much as a full-time basis, if the retiree has retired under Section 824.202(a); or

    (8)  as a faculty member, during the period beginning with the 2005 fall semester and ending on the last day of the 2015 spring semester, in an undergraduate professional nursing program or graduate professional nursing program, as defined by Section 54.221, Education Code.

    SECTION ___.  Subchapter B, Chapter 1372, Government Code, is amended by adding Section 1372.0223 to read as follows:

    Sec. 1372.0223.  DEDICATION OF PORTION OF STATE CEILING FOR PROFESSIONAL NURSING PROGRAM FACULTY MEMBER HOME LOAN PROGRAM. Until August 1, out of that portion of the state ceiling that is available exclusively for reservations by issuers of qualified mortgage bonds under Section 1372.022, $5 million shall be allotted each year and made available exclusively to the Texas State Affordable Housing Corporation for the purpose of issuing qualified mortgage bonds in connection with the professional nursing program faculty member home loan program established under Section 2306.5622.

    SECTION ___.  (a)  This section takes effect only if the Act of the 79th Legislature, Regular Session, 2005, relating to the nonsubstantive additions to and corrections in enacted codes (the general code update bill) is enacted and becomes law.

    (b)  Section 2306.553(a), Government Code, is amended to read as follows:

    (a)  The public purpose of the corporation is to perform activities and services that the corporation's board of directors determines will promote the public health, safety, and welfare through the provision of adequate, safe, and sanitary housing primarily for individuals and families of low, very low, and extremely low income, for professional educators under the professional educators home loan program as provided by Section 2306.562, [and] for fire fighters and police officers under the fire fighter and police officer home loan program as provided by Section 2306.5621, and for professional nursing program faculty members under the professional nursing program faculty member home loan program as provided by Section 2306.5622 [2306.563]. The activities and services shall include engaging in mortgage banking activities and lending transactions and acquiring, holding, selling, or leasing real or personal property.

    SECTION ___.  (a)  This section takes effect only if the Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes (the general code update bill) does not become law.

    (b)  Section 2306.553(a), Government Code, is amended to read as follows:

    (a)  The public purpose of the corporation is to perform activities and services that the corporation's board of directors determines will promote the public health, safety, and welfare through the provision of adequate, safe, and sanitary housing primarily for individuals and families of low, very low, and extremely low income, for

professional educators under the professional educators home loan program as provided by Section 2306.562, [and] for fire fighters and police officers under the fire fighter and police officer home loan program as provided by Section 2306.563, and for professional nursing program faculty members under the professional nursing program faculty member home loan program as provided by Section 2306.5622. The activities and services shall include engaging in mortgage banking activities and lending transactions and acquiring, holding, selling, or leasing real or personal property.

SECTION ___. Section 2306.553(b), Government Code, is amended to read as follows:

(b) The corporation's primary public purpose is to facilitate the provision of housing by issuing qualified 501(c)(3) bonds and qualified residential rental project bonds and by making affordable loans to individuals and families of low, very low, and extremely low income, to professional educators under the professional educators home loan program, [and] to fire fighters and police officers under the fire fighter and police officer home loan program, and to professional nursing program faculty members under the professional nursing program faculty member home loan program. The corporation may make first lien, single family purchase money mortgage loans for single family homes only to individuals and families of low, very low, and extremely low income if the individual's or family's household income is not more than the greater of 60 percent of the median income for the state, as defined by the United States Department of Housing and Urban Development, or 60 percent of the area median family income, adjusted for family size, as defined by that department. The corporation may make loans for multifamily developments if:

(1) at least 40 percent of the units in a multifamily development are affordable to individuals and families with incomes at or below 60 percent of the median family income, adjusted for family size; or

(2) at least 20 percent of the units in a multifamily development are affordable to individuals and families with incomes at or below 50 percent of the median family income, adjusted for family size.

SECTION ___. Subchapter Y, Chapter 2306, Government Code, is amended by adding Section 2306.5622 to read as follows:

Sec. 2306.5622. PROFESSIONAL NURSING PROGRAM FACULTY MEMBER HOME LOAN PROGRAM. (a) In this section:

(1) "Graduate professional nursing program" and "undergraduate professional nursing program" have the meanings assigned by Section 54.221, Education Code.

(2) "Home" means a dwelling in this state in which a professional nursing program faculty member intends to reside as the faculty member's principal residence.

(3) "Mortgage lender" has the meaning assigned by Section 2306.004.

(4) "Professional nursing program faculty member" means a full-time member of the faculty of either an undergraduate or graduate professional nursing program.

(5) "Program" means the professional nursing program faculty member home loan program.

(b)  The corporation shall establish a program to provide eligible professional nursing program faculty members with low-interest home mortgage loans.

(c)  To be eligible for a loan under this section, at the time a person files an application for the loan, the person must:

(1)  be a faculty member of an undergraduate or graduate professional nursing program;

(2)  reside in this state; and

(3)  have an income of not more than 115 percent of area median family income, adjusted for family size.

(d)  The corporation may contract with other agencies of the state or with private entities to determine whether applicants qualify as professional nursing program faculty members under this section or otherwise to administer all or part of this section.

(e)  The board of directors of the corporation may set and collect from each applicant any fees the board considers reasonable and necessary to cover the expenses of administering the program.

(f)  The board of directors of the corporation shall adopt rules governing:

(1)  the administration of the program;

(2)  the making of loans under the program;

(3)  the criteria for approving mortgage lenders;

(4)  the use of insurance on the loans and the homes financed under the program, as considered appropriate by the board to provide additional security for the loans;

(5)  the verification of occupancy of the home by the professional nursing program faculty member as the professional nursing program faculty member's principal residence; and

(6)  the terms of any contract made with any mortgage lender for processing, originating, servicing, or administering the loans.

(g)  The corporation shall ensure that a loan under this section is structured in a way that complies with any requirements associated with the source of the funds used for the loan.

(h)  In addition to funds set aside for the program under Section 1372.0223, the corporation may solicit and accept funding for the program from the following sources:

(1)  gifts and grants for the purposes of this section;

(2)  available money in the housing trust fund established under Section 2306.201, to the extent available to the corporation;

(3)  federal block grants that may be used for the purposes of this section, to the extent available to the corporation;

(4)  other state or federal programs that provide money that may be used for the purposes of this section; and

(5)  amounts received by the corporation in repayment of loans made under this section.

(i)  This section expires September 1, 2016.

SECTION ___. (a) Except as provided by Subsection (b) of this section, Sections 54.221 and 54.222, Education Code, as added by this Act, take effect beginning with the 2006 fall semester.

(b) Not later than January 1, 2006, the Texas Higher Education Coordinating Board shall adopt rules and forms relating to tuition exemptions under Sections 54.221 and 54.222, Education Code, as added by this Act.

SECTION ___. The change in law made by this Act to Section 61.9623(a), Education Code, applies only to expenditure of grant money under that section after this Act takes effect. Expenditure of grant money under that section before this Act takes effect is governed by the law in effect at the time grant money was spent, and that law is continued in effect for that purpose.

SECTION ___. The change in law made by this Act to Section 824.602, Government Code, applies beginning with the 2005 fall semester.

SECTION ___. The Texas State Affordable Housing Corporation shall:

(1) aggressively pursue funding for the professional nursing school faculty member home loan program required by Section 2306.5622, Government Code, as added by this Act; and

(2) implement the professional nursing school faculty member home loan program required by that section not later than September 1, 2005, or as soon thereafter as practicable.

**Amendment No. 2**

Amend Committee Amendment No. 1 to **SB 132**, in added Section 54.221, Education Code, as follows:

(1) In Subsection (a), strike Subdivision (a) and substitute the following:

(1)  "Child" means a child 25 years of age or younger and includes an adopted child.

(2)  Strike Subsections (f) and (g), substitute the following, and reletter Subsection (h) as Subsection (g):

(f)  The tuition exemption provided by this section applies only to enrollment of a child at the institution at which the child's parent is employed or is under contract.

(3)  In existing Subdivision (1), Subsection (h), strike "or for a refund of previously paid tuition".

**Floor Amendment No. 3**

Amend Committee Amendment No. 1 to **SB 132** by striking page 11, line 12 through page 12, line 23.

**Floor Amendment No. 1 on Third Reading**

Amend **SB 132** on third reading in Section ___ of the bill, in proposed Subsection (a)(8) Section 824.602, Government Code, (page 11, line 11), between "Code" and the period, by inserting "and if the retiree has been separated from service with all public schools for at least 12 months"

The amendments were read.

Senator Nelson moved to concur in the House amendments to **SB 132**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 1037 WITH HOUSE AMENDMENT

Senator Lucio called **SB 1037** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House amendment before the Senate.

### Committee Amendment No. 1

Amend **SB 1037** on line 8 as follows: Strike "an institution of higher education", and substitute "The University of Texas at Brownsville and Texas Southmost College".

The amendment was read.

Senator Lucio moved to concur in the House amendment to **SB 1037**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## CONFERENCE COMMITTEE ON HOUSE BILL 2129

Senator Jackson, on behalf of Senator Armbrister, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2129** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2129** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Armbrister, Chair; Jackson, Madla, Estes, and Hinojosa.

## SENATE BILL 1820 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1820** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

### Amendment

Amend **SB 1820** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the creation of the West Fort Bend Management District; providing authority to levy an assessment, impose a tax, and issue bonds.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. WEST FORT BEND MANAGEMENT DISTRICT. Subtitle C, Title 4, Special District Local Laws Code, is amended by adding Chapter 3835 to read as follows:

CHAPTER 3835.  WEST FORT BEND MANAGEMENT DISTRICT
SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 3835.001.  DEFINITIONS.  In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "District" means the West Fort Bend Management District.

Sec. 3835.002.  WEST FORT BEND MANAGEMENT DISTRICT.  The West Fort Bend Management District is a special district created under Section 59, Article XVI, Texas Constitution.

Sec. 3835.003.  PURPOSE; DECLARATION OF INTENT.  (a)  The creation of the district is essential to accomplish the purposes of Sections 52 and 52-a, Article III, and Section 59, Article XVI, Texas Constitution, and other public purposes stated in this chapter.  By creating the district and in authorizing the cities of Richmond and Rosenberg, Fort Bend County, and other political subdivisions to contract with the district, the legislature has established a program to accomplish the public purposes set out in Section 52-a, Article III, Texas Constitution.

(b)  The creation of the district is necessary to promote, develop, encourage, and maintain employment, commerce, transportation, housing, tourism, recreation, the arts, entertainment, economic development, safety, and the public welfare in the district territory.

(c)  The creation of the district will establish an economic climate that encourages sustainable growth and improves the quality of life of citizens.

(d)  This chapter and the creation of the district may not be interpreted to relieve Fort Bend County and the Cities of Richmond and Rosenberg from providing the level of services provided as of the effective date of the Act enacting this chapter, to the area in the district. The district is created to supplement and not to supplant the county or city services provided in the area in the district.

Sec. 3835.004.  FINDINGS OF BENEFIT AND PUBLIC PURPOSE.  (a)  The district is created to serve a public use and benefit.

(b)  All land and other property included in the district will benefit from the improvements and services to be provided by the district under powers conferred by Sections 52 and 52-a, Article III, and Section 59, Article XVI, Texas Constitution, and other powers granted under this chapter.

(c)  The creation of the district is in the public interest and is essential to:

(1)  further the public purposes of developing and diversifying the economy of the state;

(2)  eliminate unemployment and underemployment; and

(3)  develop or expand transportation and commerce.

(d)  The district will:

(1)  promote the health, safety, and general welfare of residents, employers, potential employees, employees, visitors, and consumers in the district, and of the public;

(2)  provide needed funding for the district to preserve, maintain, and enhance the economic health and vitality of the district territory as a community and business center; and

(3) promote the health, safety, welfare, and enjoyment of the public by providing pedestrian ways and by landscaping and developing certain areas in the district, which are necessary for the restoration, preservation, and enhancement of scenic beauty.

(e) Pedestrian ways along or across a street, whether at grade or above or below the surface, and street lighting, street landscaping, parking, and street art objects are parts of and necessary components of a street and are considered to be a street or road improvement.

(f) The district will not act as the agent or instrumentality of any private interest even though the district will benefit many private interests as well as the public.

Sec. 3835.005. DISTRICT TERRITORY. (a) The district is composed of the territory described by Section 2 of the Act enacting this chapter, as that territory may have been modified under:

(1) Subchapter J, Chapter 49, Water Code; or

(2) other law.

(b) The boundaries and field notes of the district contained in Section 2 of the Act enacting this chapter form a closure. A mistake in the field notes or in copying the field notes in the legislative process does not in any way affect the district's:

(1) organization, existence, or validity;

(2) right to issue any type of bond for a purpose for which the district is created or to pay the principal of and interest on the bond;

(3) right to impose or collect an assessment or tax; or

(4) legality or operation.

Sec. 3835.006. ELIGIBILITY FOR INCLUSION IN SPECIAL ZONES. All or any part of the area of the district is eligible to be included in:

(1) a tax increment reinvestment zone created by a municipality under Chapter 311, Tax Code;

(2) a tax abatement reinvestment zone created by a municipality under Chapter 312, Tax Code; or

(3) an enterprise zone created by a municipality under Chapter 2303, Government Code.

Sec. 3835.007. APPLICABILITY OF MUNICIPAL MANAGEMENT DISTRICTS LAW. Except as otherwise provided by this chapter, Chapter 375, Local Government Code, applies to the district.

Sec. 3835.008. LIBERAL CONSTRUCTION OF CHAPTER. This chapter shall be liberally construed in conformity with the findings and purposes stated in this chapter.

[Sections 3835.009-3835.050 reserved for expansion]

SUBCHAPTER B. BOARD OF DIRECTORS

Sec. 3835.051. BOARD OF DIRECTORS; TERMS. (a) The district is governed by a board of five voting directors who serve staggered terms of four years, with two or three directors' terms expiring June 1 of each odd-numbered year.

(b) The board by resolution may change the number of voting directors on the board, but only if the board determines that the change is in the best interest of the district. The board may not consist of fewer than five or more than 15 voting directors.

Sec. 3835.052. APPOINTMENT OF DIRECTORS. (a) From persons recommended by the board:

    (1)  the City of Richmond shall appoint two voting directors;

    (2)  the City of Rosenberg shall appoint two voting directors; and

    (3)  the cities shall jointly appoint one voting director.

(b)  For an appointment under Subsection (a)(1) or (2), a person is appointed if a majority of the members of the governing body of the city, including the mayor, vote to appoint that person. For an appointment under Subsection (a)(3), a person is appointed if a majority of the members of the governing body of each city, including the mayor, vote to appoint that person.

(c)  If the board increases the number of voting directors from five, an equal number of directors must be appointed by the Cities of Richmond and Rosenberg. The remaining director, if any, must be appointed jointly by the cities as provided by this section.

Sec. 3835.053. NONVOTING DIRECTORS.   The board may appoint nonvoting directors to serve at the pleasure of the voting directors.

Sec. 3835.054. QUORUM.  For purposes of determining the requirements for a quorum, the following are not counted:

    (1)  a board position vacant for any reason, including death, resignation, or disqualification;

    (2)  a director who is abstaining from participation in a vote because of a conflict of interest; or

    (3)  a nonvoting director.

Sec. 3835.055. INITIAL VOTING DIRECTORS. (a) The initial board consists of the following voting directors:

| Pos. No. | Name of Director |
|---|---|
| 1 | Lane Ward |
| 2 | Paul J. Council |
| 3 | Joey Dupres |
| 4 | Bill Knesek |
| 5 | Pat Gubbels |

(b)  Of the initial voting directors, the terms of directors appointed for positions 1 through 3 expire June 1, 2007, and the terms of directors appointed for positions 4 and 5 expire June 1, 2009.

(c)  Section 3835.052 does not apply to this section.

(d)  This section expires September 1, 2010.

[Sections 3835.056-3835.100 reserved for expansion]

SUBCHAPTER C.  POWERS AND DUTIES

Sec. 3835.101. ADDITIONAL POWERS OF DISTRICT. The district may exercise the powers given to:

    (1)  a corporation under Section 4B, Development Corporation Act of 1979 (Article 5190.6, Vernon's Texas Civil Statutes), including the power to own, operate, acquire, construct, lease, improve, or maintain a project described by that section; and

    (2)  a housing finance corporation under Chapter 394, Local Government Code, to provide housing or residential development projects in the district.

Sec. 3835.102.  POWER TO ESTABLISH DEVELOPMENT STANDARDS AND GUIDELINES; DISSOLUTION.  (a) The board may establish architectural and landscaping standards and guidelines, and may require new construction, development, or redevelopment in the district to comply with those standards and guidelines.  The board may not establish standards or guidelines under this section unless the governing bodies of the cities of Richmond and Rosenberg each consent by resolution or ordinance to the establishment of the standards or guidelines.

(b)  A standard or guideline established by the board under this section is in addition to regulations of the City of Richmond or Rosenberg. To the extent of any conflict between a board standard or guideline established under this section and a regulation of the City of Richmond or Rosenberg, the more restrictive standard, guideline, or regulation controls.

(c)  The board may provide in a standard or guideline that if the district dissolves, the restriction in the standard or guideline continues in effect after the dissolution as a regulation of the city with jurisdiction over the territory to which the standard or guideline applies until modified or repealed by the governing body of the City of Richmond or Rosenberg, as appropriate.

(d)  The district may not regulate land use.

Sec. 3835.103.  NONPROFIT CORPORATION.  (a)  The board by resolution may authorize the creation of a nonprofit corporation to assist and act for the district in implementing a project or providing a service authorized by this chapter.

(b)  The nonprofit corporation:

(1)  has each power of and is considered for purposes of this chapter to be a local government corporation created under Chapter 431, Transportation Code; and

(2)  may implement any project and provide any service authorized by this chapter.

(c)  The board shall appoint the board of directors of the nonprofit corporation. A director of the corporation is not required to reside in the district.

(d)  The board of directors of the nonprofit corporation shall serve in the same manner as the board of directors of a local government corporation created under Chapter 431, Transportation Code.

Sec. 3835.104.  AGREEMENTS; GRANTS.  (a)  The district may make an agreement with or accept a gift, grant, or loan from any person.

(b)  The implementation of a project is a governmental function or service for the purposes of Chapter 791, Government Code.

Sec. 3835.105.  AUTHORITY TO CONTRACT FOR LAW ENFORCEMENT. To protect the public interest, the district may contract with Fort Bend County or the City of Richmond or Rosenberg for the county or the city to provide law enforcement services in the district for a fee.

Sec. 3835.106.  MEMBERSHIP IN CHARITABLE ORGANIZATIONS. The district may join and pay dues to an organization that:

(1)  enjoys tax-exempt status under Section 501(c)(3), (4), or (6), Internal Revenue Code of 1986; and

(2)  performs a service or provides an activity consistent with the furtherance of a district purpose.

Sec. 3835.107.  ECONOMIC DEVELOPMENT PROGRAMS.  (a) The district may establish and provide for the administration of one or more programs to promote state or local economic development and to stimulate business and commercial activity in the district, including programs to:

(1)  make loans and grants of public money; and

(2)  provide district personnel and services.

(b)  For purposes of this section, the district has all of the powers of a municipality under Chapter 380, Local Government Code.

Sec. 3835.108.  NO EMINENT DOMAIN.   The district may not exercise the power of eminent domain.

[Sections 3835.109–3835.150 reserved for expansion]

SUBCHAPTER D.  FINANCIAL PROVISIONS

Sec. 3835.151.  DISBURSEMENTS AND TRANSFERS OF MONEY.   The board by resolution shall establish the number of directors' signatures and the procedure required for a disbursement or transfer of the district's money.

Sec. 3835.152.  MONEY USED FOR IMPROVEMENTS OR SERVICES.  The district may acquire, construct, finance, operate, or maintain any improvement or service authorized under this chapter or Chapter 375, Local Government Code, using any money available to the district.

Sec. 3835.153.  PETITION REQUIRED FOR FINANCING SERVICES AND IMPROVEMENTS WITH ASSESSMENTS.  (a) The board may not finance a service or improvement project with assessments under this chapter unless a written petition requesting that service or improvement has been filed with the board.

(b)  A petition filed under Subsection (a) must be signed by the owners of a majority of the assessed value of real property in the district subject to assessment according to the most recent certified tax appraisal roll for Fort Bend County.

Sec. 3835.154.  METHOD OF NOTICE FOR HEARING. The district may mail the notice required by Section 375.115(c), Local Government Code, by certified United States mail or an equivalent service that can provide a record of mailing or other delivery.

Sec. 3835.155.  ASSESSMENTS; LIENS FOR ASSESSMENTS.   (a)    The board by resolution may impose and collect an assessment for any purpose authorized by this chapter in all or any part of the district.

(b)  An assessment, a reassessment, or an assessment resulting from an addition to or correction of the assessment roll by the district, penalties and interest on an assessment or reassessment, an expense of collection, and reasonable attorney's fees incurred by the district:

(1)  are a first and prior lien against the property assessed;

(2)  are superior to any other lien or claim other than a lien or claim for county, school district, or municipal ad valorem taxes; and

(3)  are the personal liability of and a charge against the owners of the property even if the owners are not named in the assessment proceedings.

(c)  The lien is effective from the date of the board's resolution imposing the assessment until the date the assessment is paid. The board may enforce the lien in the same manner that the board may enforce an ad valorem tax lien against real property.

(d)  The board may make a correction to or deletion from the assessment roll that does not increase the amount of assessment of any parcel of land without providing notice and holding a hearing in the manner required for additional assessments.

Sec. 3835.156.  AD VALOREM TAX.  (a)  If authorized at an election held in accordance with Section 3835.160, the district may impose an annual ad valorem tax on taxable property in the district for any district purpose, including to:

(1)  promote economic development;

(2)  maintain and operate the district;

(3)  construct or acquire improvements; or

(4)  provide a service.

(b)  The board shall determine the tax rate.

Sec. 3835.157.  PROPERTY  EXEMPT  FROM  IMPACT  FEES  OR ASSESSMENTS. (a)  The district may not impose an impact fee or assessment on the property, including the equipment, rights-of-way, facilities, or improvements, of:

(1)  an electric utility or a power generation company as defined by Section 31.002, Utilities Code;

(2)  a gas utility as defined by Section 101.003 or 121.001, Utilities Code;

(3)  a telecommunications provider as defined by Section 51.002, Utilities Code; or

(4)  a person who provides to the public cable television or advanced telecommunications services.

(b)  The district may not impose an assessment on single-family residential property.

Sec. 3835.158.  BONDS AND OTHER OBLIGATIONS. (a) The district may issue by competitive bid or negotiated sale bonds or other obligations payable wholly or partly from taxes, assessments, impact fees, revenue, grants, or other money of the district, or any combination of those sources of money, to pay for any authorized purpose of the district.  The sources of money may include economic development money contributed by the City of Richmond or Rosenberg or by an economic development corporation created under the Development Corporation Act of 1979 (Article 5190.6, Vernon's Texas Civil Statutes).

(b)  In exercising the district's power to borrow, the district may issue a bond or other obligation in the form of a bond, note, certificate of participation or other instrument evidencing a proportionate interest in payments to be made by the district, or other type of obligation.

Sec. 3835.159.  TAXES FOR BONDS AND OTHER OBLIGATIONS. At the time bonds or other obligations payable wholly or partly from ad valorem taxes are issued:

(1)  the board shall impose a continuing direct annual ad valorem tax, without limit as to rate or amount, for each year that all or part of the bonds are outstanding; and

(2)  the district annually shall impose an ad valorem tax on all taxable property in the district in an amount sufficient to:

(A)  pay the interest on the bonds or other obligations as the interest becomes due;

          (B)  create a sinking fund for the payment of the principal of the bonds or other obligations when due or the redemption price at any earlier required redemption date; and

          (C)  pay the expenses of imposing the taxes.

Sec. 3835.160.  TAX AND BOND ELECTIONS. (a) The district shall hold an election in the manner provided by Subchapter L, Chapter 375, Local Government Code, to obtain voter approval before the district imposes an ad valorem tax or issues bonds payable from ad valorem taxes.

(b)  Section 375.243, Local Government Code, does not apply to the district.

Sec. 3835.161.  CITIES NOT REQUIRED TO PAY DISTRICT OBLIGATIONS.  Except as provided by Section 375.263, Local Government Code, the Cities of Richmond and Rosenberg are not required to pay a bond, note, or other obligation of the district.

Sec. 3835.162.  COMPETITIVE BIDDING.  Section 375.221, Local Government Code, applies to the district only for a contract that has a value greater than $25,000.

Sec. 3835.163.  TAX AND ASSESSMENT ABATEMENTS. The district may grant in the manner authorized by Chapter 312, Tax Code, an abatement for a tax or assessment owed to the district.

[Sections 3835.164-3835.200 reserved for expansion]

SUBCHAPTER E.  DISSOLUTION

Sec. 3835.201.  DISSOLUTION OF DISTRICT WITH OUTSTANDING DEBT. (a)  The board may dissolve the district regardless of whether the district has debt. Section 375.264, Local Government Code, does not apply to the district.

(b)  If the district has debt when it is dissolved, the district shall remain in existence solely for the purpose of discharging its debts. The dissolution is effective when all debts have been discharged.

SECTION 2.  BOUNDARIES. As of the effective date of this Act, the West Fort Bend Management District includes all territory contained in the following described area:

TRACT A - U.S. HIGHWAY 59

FIELD NOTES FOR A 6,683.04 ACRE TRACT OF LAND IN THE LESTER E. CROSS SURVEY, ABSTRACT 384, THE I. & G. N. RAILROAD COMPANY SURVEY, ABSTRACT 355, THE J. B. WATSON SURVEY, ABSTRACT 639, THE E. A. GIRAUD SURVEY, ABSTRACT 721, THE JOHN HUMMEL SURVEY, ABSTRACT 476, THE S. A. & M. G. RAILROAD COMPANY SURVEY SECTION 17, ABSTRACT 331, THE W. J. JONES SURVEY, ABSTRACT 553, THE ALEXANDER VALLET SURVEY, ABSTRACT 535, THE S. A. & M. G. RAILROAD CO. SURVEY SECTION 19, ABSTRACT 330, THE H. & T.C. RAILROAD CO. SURVEY SECTION 7, ABSTRACT 210, THE LESTER E. CROSS SURVEY, ABSTRACT 408, THE EMMA MEYER SURVEY, ABSTRACT 701, THE J. M. COOPER SURVEY, ABSTRACT 707, THE F. AUGUST MOERS SURVEY, ABSTRACT 695, THE CHARLES N. SIMPSON SURVEY, ABSTRACT 485, THE H. & T.C. RAILROAD COMPANY SURVEY SECTION 11, ABSTRACT 212, THE J. F. WEED SURVEY, ABSTRACT 663, THE HUGH ROGERS SURVEY, ABSTRACT 310, THE HENRY SCOTT LEAGUE, ABSTRACT 83, THE

S. A. STONE SURVEY, ABSTRACT 392, THE KINCH HILLYER SURVEY, ABSTRACT 749, THE I. & G. N. RAILROAD COMPANY SURVEY, ABSTRACT 358, THE JOSEPH D. VERMILLION SURVEY, ABSTRACT 341, THE G. M. STONE SURVEY, ABSTRACT 312, THE B. B. B. & C. RAILROAD COMPANY SURVEY SECTION 13, ABSTRACT 140, THE JOSEPH D. VERMILLION SURVEY, ABSTRACT 340, THE FRANCIS H. DEMAY SURVEY, ABSTRACT 350, THE ANTHONY P. DEMAY SURVEY, ABSTRACT 349, THE S. B. PENTECOST SURVEY, ABSTRACT 378, THE ROBERT HANDY SURVEY, ABSTRACT 187, THE SIMON JONES SURVEY, ABSTRACT 271, THE WILLIAM LUSK SURVEY, ABSTRACT 276, THE JANE LONG LEAGUE, ABSTRACT 55, AND THE JOSEPH KUYKENDALL SURVEY, ABSTRACT 49, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD83(1993) BASED UPON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED = 0.99987165.

BEGINNING at the point of intersection of the centerline of U.S. Highway 59 with the west most line of the City Limits of the City of Rosenberg for an angle point in the southwest line and Place of Beginning of the herein described tract, said point having coordinates X = 2,952,885.92, Y = 13,743,180.79, from which point U.S. Highway 59 Engineer's Station 439+42.47 bears South 24 degrees 55 minutes 21 seconds West, 920.01 feet;

THENCE North 36 degrees 44 minutes 27 seconds West along the southwest line the herein described tract, same being the most westerly line of the City Limits of the City of Rosenberg, at 182.01 feet pass a 1/2 inch iron pipe with cap marked "Kalkomey Surveying" (X = 2,952,777.05, Y = 13,743,326.63) on said line in the northerly right-of-way of U.S. Highway 59, at 923.72 feet pass a 1/2 inch iron pipe with cap marked "Kalkomey Surveying" found on said line at its intersection with the south right-of-way line of Spur Highway 540, same being a westerly corner of the City Limits of the City of Rosenberg, and continuing for a total distance of 2,265.57 feet to a point being in a curve to the right for the most westerly corner of the herein described tract, said point being the point of intersection of said line with a curve being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59;

THENCE along said curve to the right having a central angle of 25 degrees 46 minutes 13 seconds, a radius of 5,820.28 feet, an arc length of 2,617.84 feet, and a chord bearing North 40 degrees 24 minutes 33 seconds East, 2,595.82 feet to the Point of Tangency of said curve;

THENCE North 53 degrees 17 minutes 40 seconds East along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, 5,962.44 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 07 degrees 30 minutes 00 seconds, a radius of 24,918.33 feet, at an arc length of 1,594.47 feet pass a point on said curve for the southwest corner of an adjoining 1,619.75 acre tract (Tract B) surveyed by the undersigned this date, and continuing for a total arc length of 3,261.79 feet, and a chord bearing North 57 degrees 02 minutes 39 seconds East, 3,259.46 feet to the Point of Tangency of said curve;

THENCE North 60 degrees 47 minutes 40 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, same being the common line of the herein described tract and said adjoining Tract B, 53.90 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 14 degrees 59 minutes 09 seconds, a radius of 5,639.49 feet, at an arc length of 369.70 feet pass a point on said line at its intersection with the centerline of Spur Highway 10, and continuing for a total arc length of 1,475.02 feet, and a chord bearing North 53 degrees 18 minutes 05 seconds East, 1,470.82 feet to the Point of Tangency of said curve;

THENCE North 45 degrees 48 minutes 31 seconds East continuing along a line being 2,000.00 feet northerly of parallel to the centerline of U.S. Highway 59, same being the common line of the herein described tract and said adjoining Tract B, 225.00 feet to the Point of Curvature of the curve to the right;

THENCE along said curve to the right having a central angle of 04 degrees 00 minutes 00 seconds, a radius of 24,918.33 feet, at an arc length of 689.02 feet pass a point on said curve at its intersection with a line being 2,000.00 feet easterly of and parallel to the centerline of Spur Highway 10, being the southeast corner of said adjoining Tract B, and continuing for a total arc length of 1,739.63 feet, and a chord bearing North 47 degrees 48 minutes 31 seconds East, 1,739.27 feet to the Point Compound Curvature of curve to the right;

THENCE along said curve to the right having a central angle of 01 degree or 30 minutes 00 seconds, a radius of 13,459.19 feet, an arc length of 352.36 feet, and a chord bearing North 50 degrees 33 minutes 31 seconds East, 352.35 feet to the Point of Compound Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 04 degrees 00 minutes 00 seconds, a radius of 24,918.33 feet, an arc length of 1,739.64 feet, and a chord bearing North 53 degrees 18 minutes 30 seconds East, 1,739.28 feet, to the Point of Tangency of said curve;

THENCE North 55 degrees 18 minutes 31 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, 1,329.87 feet to Point of Curvature to curve to the right;

THENCE along said curve to the right having a central angle of 41 degrees 05 minutes 14 seconds, a radius of 5,818.08 feet, an arc length of 4,172.17 feet, and a chord bearing North 75 degrees 51 minutes 07 seconds East, 4,083.35 feet to the Point of Tangency of said curve;

THENCE South 83 degrees 36 minutes 16 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, 8,162.08 feet to Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 09 degrees 11 minutes 45 seconds, a radius of 3,730.59 feet, an arc length of 598.75 feet, and a chord bearing South 88 degrees 12 minutes 08 seconds East, 598.10 feet to the Point of Tangency of said curve;

THENCE North 87 degrees 11 minutes 59 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, 3,123.96 feet to Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 01 degree 01 minute 27 seconds, a radius of 20,648.79 feet, at an arc length of 238.32 feet pass a point on said curve for the lower southwest corner of an adjoining 3,581.82 acre tract (Tract C) surveyed by the undersigned this date, and continuing for a total arc length of 369.35 feet, and a chord bearing North 86 degrees 41 minutes 16 seconds East, 369.35 feet to the Point of Tangency of said curve;

THENCE North 86 degrees 10 minutes 32 seconds East continuing along a line being 2,000.00 feet and northerly of and parallel to the centerline of U.S. Highway 59, at 1,936.12 feet pass a point on said line for the lower southeast corner of said adjoining Tract C, and continuing for a total distance of 7,940.68 feet to the Point of Curvature of a curve to the left;

THENCE around said curve to the left having a central angle of 23 degrees 43 minutes 07 seconds, a radius of 9,465.15 feet, at an arc length of 1,691.84 feet pass a point on said curve for the west corner of an adjoining 588.94 acre tract (Tract F) surveyed by the undersigned this date, and continuing for a total arc length of 3,918.33 feet, and the chord bearing North 74 degrees 18 minutes 58 seconds East, 3,890.41 feet to the Point of Tangency of said curve;

THENCE North 62 degrees 27 minutes 31 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, at 585.56 feet pass a point on said line at its intersection with the centerline of F.M. Highway 2218, at 3,685.79 feet pass a point on said line for the southeast corner of said adjoining Tract F, at 6,371.31 feet pass a point on said line for the south corner of an adjoining 755.95 acre tract (Tract G) surveyed by the undersigned this date, at 8,297.81 feet pass a point on said line at its intersection with the centerline of the Burlington Northern & Santa Fe Railroad right-of-way, at 10,325.69 feet pass a point on said line for the east corner of said adjoining Tract G, and continuing for a total distance of 12,724.94 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 12 degrees 47 minutes 15 seconds, a radius of 13,453.51 feet, an arc length of 3,002.63 feet, and a chord bearing North 68 degrees 51 minutes 09 seconds East, 2,996.40 feet to the Point of Tangency of said curve;

THENCE North 75 degrees 14 minutes 47 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, 7,966.31 feet to a point on said line at its intersection with the centerline of Ransom Road, same being the northerly limits of the City of Richmond Extraterritorial Jurisdiction according to City Ordinance Number 85-25;

THENCE along the northerly line of the herein described tract, same being the northerly limits of the City of Richmond Extraterritorial Jurisdiction, as located within the margins of Ransom Road, the following courses:

South 72 degrees 02 minutes 27 seconds East, 120.81 feet,
South 76 degrees 30 minutes 07 seconds East, 376.22 feet,
South 82 degrees 35 minutes 55 seconds East, 191.02 feet,
North 87 degrees 12 minutes 44 seconds East, 119.95 feet,
North 81 degrees 06 minutes 53 seconds East, 229.38 feet,
North 76 degrees 54 minutes 58 seconds East, 130.63 feet,
North 68 degrees 58 minutes 05 seconds East, 59.05 feet,

North 55 degrees 58 minutes 05 seconds East, 111.03 feet,

North 68 degrees 42 minutes 06 seconds East, 195.91 feet, and

South 89 degrees 07 minutes 32 seconds East, 831.00 feet to a point on said line being the northeast corner of said City Ordinance Number 85-25, same being the northwest corner of a tract of land establishing the limits of the City of Richmond Extraterritorial Jurisdiction according to City Ordinance number 85-34;

THENCE South 88 degrees 38 minutes 28 seconds East along the northerly line of the herein described tract and the northerly limits of the City of Richmond Extraterritorial Jurisdiction, 552.45 feet to a point on said line for the northeast corner of said City Ordinance Number 85-34, same being the northwest corner of a tract of land establishing the limits of the City of Richmond Extraterritorial Jurisdiction according to Ordinance Numbers and 85-36 and 85-37;

THENCE South 88 degrees 38 minutes 28 seconds East continuing along the northerly line the herein described tract and the northerly limits of the City of Richmond Extraterritorial Jurisdiction, 248.90 feet to an angle point on said line;

THENCE South 81 degrees 55 minutes 29 seconds East continuing along said line, 1,308.17 feet to a point for the northeast corner of the herein described tract;

THENCE South 08 degrees 04 minutes 31 seconds West along the easterly line the herein described tract, 26.19 feet to a concrete monument (X = 3,020,160.95, Y = 13,751,305.04) found on said line for angle point, being at the intersection of the northerly right-of-way of U.S. Highway 59 with the westerly right-of-way of State Highway 99;

THENCE South 12 degrees 06 minutes 37 seconds East continuing along the easterly line of the herein described tract, 47.61 feet to a 5/8 inch iron rod with cap marked "6311" found on said line at the beginning of a non-tangent curve to the left having a radius bearing South 50 degrees 03 minutes 15 seconds East;

THENCE along said curve to the left having a central angle of 17 degrees 42 minutes 17 seconds, a radius of 423.00 feet, an arc length of 130.71 feet, and a chord bearing South 31 degrees 05 minutes 36 seconds West, 130.19 feet to a 5/8 inch iron rod found at the end of said curve;

THENCE South 22 degrees 08 minutes 46 seconds West continuing along the easterly line of the herein described tract, 91.09 feet to a 5/8 inch iron rod with TxDOT disk found at the beginning of a non-tangent curve to the right having a radius bearing North 67 degrees 56 minutes 22 seconds West;

THENCE along said curve to the right having a central angle of 14 degrees 28 minutes 40 seconds, a radius of 877.19 feet, an arc length of 221.65 feet, and a chord bearing South 29 degrees 17 minutes 58 seconds West, 221.06 feet to a point on said curve at its intersection with the City Limits of the City of Sugar Land;

THENCE South 75 degrees 14 minutes 47 seconds West along a line being 175.00 feet northerly of and parallel to the centerline of U.S. Highway 59, same being the City Limits of the City of Sugar Land, 1,218.22 feet to a point for reentry corner of the herein described tract;

THENCE South 14 degrees 45 minutes 13 seconds East continuing along the City Limits line of the City of Sugar Land, at 350.00 feet pass a point on said line at its intersection with the centerline of U.S. Highway 59 (X = 3,018,872.43, Y = 13,766,126.53), being U.S. Highway 59 Engineer's Station 553+50.00, at 5000.00

feet pass a southwest corner of the City Limits of the City of Sugar Land, and continuing for total distance of 555.00 feet to a point for reentry corner of the herein described tract, said point being in the southerly right-of-way line of U.S. Highway 59;

THENCE North 75 degrees 14 minutes 47 seconds East along the southerly right-of-way line of U.S. Highway 59, 489.74 feet to a 5/8 inch iron rod found for an angle point on said line;

THENCE South 84 degrees 52 minutes 34 seconds East continuing along the southerly right-of-way line of U.S. Highway 59, 357.38 feet to a concrete monument found on said line for angle point;

THENCE South 65 degrees 20 minutes 57 seconds East continuing along the southerly right-of-way line of U.S. Highway 59, 281.14 feet to a concrete monument found on said line for angle point;

THENCE South 31 degrees 45 minutes 27 seconds East continuing along the southerly right-of-way line of U.S. Highway 59, 158.65 feet to a concrete monument found on said line for angle point, being at the intersection of the southerly right-of-way of U.S. Highway 59 with the westerly right-of-way of F.M. Highway 2759 (Crabb River Road), and being at the beginning of a non-tangent curve to the right having a radius bearing North 78 degrees 25 minutes 25 seconds West;

THENCE along said curve to the right having a central angle of 03 degrees 08 minutes 53 seconds, a radius of 1,849.86 feet, an arc length of 101.64 feet, and a chord bearing South 13 degrees 09 minutes 02 seconds West, 101.63 feet to a point for the end of said curve;

THENCE South 22 degrees 38 minutes 03 seconds West along the easterly line of the herein described tract, same being the easterly line of Fort Bend County Municipal Utility District No.116, 186.57 feet to a point on said line, said point being the south corner of a called 0.9865 acre tract of land described in deed recorded under County Clerk's File Number 1999008371, Official Public Records, Fort Bend County, Texas, same being the east corner of an adjoining called 0.5 acre tract described in deed recorded in Volume 74, Page 59, Deed Records, Fort Bend County, Texas;

THENCE North 69 degrees 17 minutes 42 seconds West along the common line of said called 0.9865 acre tract and said adjoining called 0.5 acre tract, 103.05 feet to a point on said line for reentry corner to the herein described tract, said point being the north corner of said adjoining called 0.5 acre tract;

THENCE South 20 degrees 36 minutes 36 seconds West along the northwesterly line of said adjoining called 0.5 acre tract, 210.10 feet to a point on said line for reentry corner to the herein described tract, same being the west corner of said adjoining called 0.5 acre tract;

THENCE South 57 degrees 04 minutes 50 seconds East along the southwesterly line of said adjoining called 0.5 acre tract, 107.43 feet to a point on said line at its intersection with the westerly right-of-way line of F.M. Highway 2759, same being the south corner of said adjoining called 0.5 acre tract;

THENCE South 25 degrees 49 minutes 20 seconds West along the easterly line the herein described tract, and the easterly line of said Fort Bend County Municipal Utility District No. 116, same being the westerly right-of-way line of F.M. Highway

2759, 1,192.94 feet to a concrete monument found on said line, and being at the beginning of a non-tangent curve to the left having a radius bearing South 64 degrees 10 minutes 40 seconds East;

THENCE along said curve to the left having a central angle of 00 degrees 06 minutes 24 seconds, a radius of 5,789.58 feet, an arc length 10.77 feet, and a chord bearing South 25 degrees 46 minutes 08 seconds West, 10.77 feet to a point on said curve at its intersection with a line being 2,000.00 feet southerly of parallel to the centerline of U.S. Highway 59 for the southeast corner of the herein described tract, from which point a found concrete monument ( X = 3,019,398.43, Y = 13,7664,205.58) bears South 24 degrees 26 minutes 49 seconds West, 254.10 feet;

THENCE South 75 degrees 14 minutes 47 seconds West along the southerly line of the herein described tract, being a line 2,000.00 feet southerly of parallel to the centerline of U.S. Highway 59, 10,666.43 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 12 degrees 47 minutes 15 seconds, a radius of 9,453.51 feet, at an arc length of 1,669.99 feet pass a point on said curve for the northwest corner of an adjoining 976.98 acre tract (Tract H) surveyed by the undersigned this date, and continuing for a total arc length of 2,109.89 feet, and a chord bearing South 68 degrees 51 minutes 09 seconds West, 2,105.51 feet to the Point of Tangency of said curve;

THENCE South 62 degrees 27 minutes 31 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, same being the common line of the herein described tract and said adjoining Tract H, at 2,821.68 feet pass a point on said line at its intersection with the centerline of F.M. Highway 762, at 5,251.13 feet pass a point on said line for the southwest corner of said adjoining Tract H, and continuing for a total distance of 12,724.87 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 23 degrees 43 minutes 07 seconds, a radius of 13,465.15 feet, an arc length of 5,574.14 feet, and a chord bearing South 74 degrees 18 minutes 59 seconds West, 5,534.42 feet to the Point of Tangency of said curve;

THENCE South 86 degrees 10 minutes 32 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 7,940.89 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 01 degree 01 minute 27 seconds, a radius of 24,648.79 feet, an arc length of 440.43 feet, and a chord bearing South 86 degrees 41 minutes 16 seconds West, 440.43 feet to the Point of Tangency of said curve;

THENCE South 87 degrees 11 minutes 59 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 3,124.18 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 09 degrees 11 minutes 45 seconds, a radius of 7,730.59 feet, an arc length of 1,240.73 feet, and a chord bearing North 88 degrees 12 minutes 08 seconds West, 1,239.40 feet to the Point of Tangency of said curve;

THENCE North 83 degrees 36 minutes 16 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 8,162.07 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 41 degrees 05 minutes 13 seconds, a radius of 1,818.08 feet, an arc length of 1,303.75 feet, and a chord bearing South 75 degrees 51 minutes 07 seconds West, 1,275.99 feet to the Point of Tangency of said curve;

THENCE South 55 degrees 18 minutes 31 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 1,329.86 feet to the Point of Curvature curve to the left;

THENCE along said curve to the left having a central angle of 04 degrees 00 minutes 00 seconds, a radius of 20,918.33 feet, an arc length of 1,460.38 feet, and a chord bearing South 53 degrees 18 minutes 30 seconds West, 1,460.09 feet to the Point of Compound Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 01 degree 30 minutes 00 seconds, a radius of 9,459.19 feet, an arc length of 247.64 feet, and a chord bearing South 50 degrees 33 minutes 31 seconds West, 247.63 feet to the Point of Compound Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 04 degrees 00 minutes 00 seconds, a radius of 20,918.33 feet, an arc length of 1,460.37 feet, and a chord bearing South 47 degrees 48 minutes 31 seconds West, 1,460.08 feet to the Point of Tangency of said curve;

THENCE South 45 degrees 48 minutes 31 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 225.00 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having central angle of 14 degrees 59 minutes 09 seconds, a radius of 9,639.49 feet, an arc length of 2,521.23 feet, and a chord bearing South 53 degrees 18 minutes 05 seconds West, 2,514.05 feet to the Point of Tangency of said curve;

THENCE South 60 degrees 47 minutes 40 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 53.90 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 07 degrees 30 minutes 00 seconds, a radius of 20,918.33 feet, an arc length of 2,738.19 feet, and a chord bearing South 57 degrees 02 minutes 39 seconds West, 2,736.24 feet to the Point of Tangency of said curve;

THENCE South 53 degrees 17 minutes 40 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 5,962.45 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to left having a central angle of 28 degrees 22 minutes 19 seconds, a radius of 1,820.28 feet, an arc length of 901.37 feet, and a chord bearing South 39 degrees 06 minutes 30 seconds West, 892.19 feet to the Point of Tangency of said curve;

THENCE South 24 degrees 55 minutes 21 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, 811.36 feet to a point on said line for the southwest corner of the herein described tract;

THENCE North 65 degrees 04 minutes 39 seconds West along the westerly line of the herein described tract, 2,000.00 feet to the Place of Beginning and containing 6,683.04 acres of land, more or less.

TRACT B - SPUR HIGHWAY 10

FIELD NOTES FOR A 1,619.63 ACRE TRACT OF LAND IN THE B.B.B. & C. RAILROAD COMPANY SURVEY, SECTION 17, ABSTRACT 134, THE YANDELL FERRIS SURVEY, ABSTRACT 374, THE BROOKS & BURLESON SURVEY, ABSTRACT 146, THE B.B.B. & C. RAILROAD COMPANY SURVEY SECTION 25, ABSTRACT 138, THE FRED G. SCHMIDT SURVEY, ABSTRACT 461, THE LILLIARD, ARNOLD & STERZING SURVEY, ABSTRACT 649, THE LESTER E. CROSS SURVEY, ABSTRACT 419, THE LESTER E. CROSS SURVEY, ABSTRACT 408, AND THE S.A. & M. G. RAILROAD COMPANY SURVEY SECTION 19, ABSTRACT 330, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND ALL COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD-83(1993) BASED UPON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED = 0.99987165.

BEGINNING at a point being at the intersection of the centerline of Spur Highway 10 with a line being 2,000.00 feet southwesterly of and parallel to State Highway 36, same being the southerly line of an adjoining 3,581.82 acre tract (Tract C) surveyed by the undersigned this date, said point having coordinates of X = 2,957,021.63, Y = 13,769,100.78;

THENCE South 75 degrees 58 minutes 33 seconds East along the northerly line of the herein described tract, same being the southwesterly line of the aforementioned adjoining Tract C, 2,082.19 feet to a point on said line for the northeast corner of the herein described tract;

THENCE South 02 degrees 07 minutes 40 seconds East along a line being 2,000.00 feet easterly of and parallel to the centerline of Spur Highway 10, 1,581.40 feet to the Point of Curvature of a curve to the left;

THENCE around said curve to the left having a central angle of 07 degrees 47 minutes 13 seconds, a radius of 864.79 feet, and arc length of 117.52 feet, and a chord bearing South 06 degrees 01 minute 16 seconds East, 117.43 feet to the Point of Tangency of said curve;

THENCE South 09 degrees 47 minutes 53 seconds East continuing along a line being 2,000.00 feet easterly of and parallel to the centerline of Spur Highway 10, 1,381.08 feet to an angle point on said line;

THENCE South 09 degrees 03 minutes 15 seconds East, continuing along said line, 1,387.00 feet to the Point of Curvature of a curve to the right;

THENCE around said curve to the right having a central angle of 09 degrees 00 minutes 01 second, a radius of 5,000.00 feet, an arc length of 785.41 feet, and a chord bearing South 04 degrees 33 minutes 16 seconds East, 784.60 feet to the Point of Tangency of said curve;

THENCE South 00 degrees 03 minutes 15 seconds East, continuing along a line being 2,000.00 feet easterly of and parallel to the centerline of Spur Highway 10, 778.25 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 09 degrees 04 minutes 35 seconds, a radius of 20,918.31 feet, an arc length of 3,313.70 feet, and a chord bearing South 04 degrees 35 minutes 33 seconds East, 3,310.24 feet to the Point of Tangency of said curve;

THENCE South 09 degrees 07 minutes 50 seconds East, continuing along a line being 2,000.00 feet easterly of and parallel to the centerline of Spur Highway 10, 3,206.83 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 38 degrees 51 minutes 27 seconds, a radius of 1,050.00 feet, an arc length of 712.12 feet, and a chord bearing South 28 degrees 33 minutes 34 seconds East, 698.55 feet to the Point of Tangency of said curve;

THENCE South 47 degrees 59 minutes 17 seconds East, continuing along a line being 2,000.00 feet easterly of and parallel to the centerline of Spur Highway 10, 2,538.59 feet to a point for the southeast corner of the herein described tract, said point being in a line being 2,000.00 feet northwesterly of and parallel to the centerline of U.S. Highway 59, same being the northwesterly line of an adjoining 6,683.04 acre tract (Tract A) surveyed by the undersigned this date, and being in a curve to the left;

THENCE around said curve to the left having a central angle of 01 degree 35 minutes 03 seconds, a radius of 24,918.33 feet, an arc length of 689.02 feet, and a chord bearing South 46 degrees 36 minutes 02 seconds West, 689.00 feet to the Point of Tangency of said curve;

THENCE South 45 degrees 48 minutes 31 seconds West along the southeasterly line of the herein described tract, same being the northwesterly line of said adjoining Tract A, 225.00 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 11 degrees 13 minutes 47 seconds, a radius of 5,639.49 feet, an arc length of 1,105.33 feet, and a chord bearing South 51 degrees 25 minutes 24 seconds West, 1,103.56 feet to a point on said curve being at the intersection of the centerline of Spur Highway 10 with a line being 2,000.00 feet northwesterly of and parallel to the centerline of U.S. Highway 59, said point having coordinates of X = 2,961,091.27, Y = 13,752,525.81;

THENCE continuing along said curve to the right having a central angle of 03 degrees 45 minutes 22 seconds, a radius of 5,639.49 feet, an arc length of 369.69 feet, and a chord bearing South 58 degrees 54 minutes 59 seconds West, 369.63 feet to the Point of Tangency of said curve;

THENCE South 60 degrees 47 minutes 40 seconds West, continuing along the common line of the herein described tract and said adjoining Tract A, 53.90 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 03 degrees 50 minutes 02 seconds, a radius of 24,918.33 feet, an arc length of 1,667.33 feet, and a chord bearing South 58 degrees 52 minutes 39 seconds West, 1,667.01 feet to a point on said curve for the southwest corner of the herein described tract;

THENCE North 47 degrees 59 minutes 17 seconds West along a line being 2,000.00 feet westerly of and parallel to the centerline of Spur Highway 10, 1,667.03 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 38 degrees 51 minutes 27 seconds, a radius of 5,050.00 feet, an arc length of 3,424.88 feet, and a chord bearing North 28 degrees 33 minutes 34 seconds West, 3,359.62 feet to the Point of Tangency of said curve;

THENCE North 09 degrees 07 minutes 50 seconds West continuing along a line being 2,000.00 feet westerly of and parallel to the centerline of Spur Highway 10, 3,194.23 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 09 degrees 04 minutes 35 seconds, a radius of 24,918.31 feet, an arc length of 3,947.35 feet, and a chord bearing North 04 degrees 35 minutes 33 seconds west, 3,943.23 feet to the Point of Tangency of said curve;

THENCE North 00 degrees 03 minutes 15 seconds West, continuing along a line being 2,000.00 feet westerly of and parallel to the centerline of Spur Highway 10, 778.25 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 09 degrees 00 minutes 01 second, a radius of 1,000.00 feet, an arc length of 157.08 feet, and a chord bearing North 04 degrees 33 minutes 16 seconds West, 156.92 feet to the Point of Tangency of said curve;

THENCE North 09 degrees 03 minutes 15 seconds West, continuing along a line being 2,000.00 feet westerly of and parallel to the centerline of Spur Highway 10, 1,387.00 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 00 degrees 51 minutes 37 seconds, a radius of 20,918.31 feet, an arc length of 314.04 feet, and a chord bearing North 09 degrees 29 minutes 04 seconds West, 314.04 feet to the Point of Tangency of said curve;

THENCE North 09 degrees 54 minutes 53 seconds West continuing along a line being 2,000.00 feet westerly of and parallel to the centerline of Spur Highway 10, 1,007.00 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 07 degrees 47 minutes 13 seconds, a radius of 4,864.79 feet, an arc length of 661.12 feet, and a chord bearing North 06 degrees 01 minute 16 seconds west, 660.61 feet to the Point of Tangency of said curve;

THENCE North 02 degrees 07 minutes 40 seconds West continuing along a line being 2,000.00 feet westerly of and parallel to the centerline of Spur Highway 10, 2739.89 feet to a point for the northwest corner of the herein described tract, said point being the point of intersection of said line with a line being 2,000.00 feet southerly of and parallel to the centerline of State Highway 36, same being the southerly line of said adjoining Tract C;

THENCE South 75 degrees 58 minutes 33 seconds East, along the northerly line of the herein described tract, same being the southerly line of said adjoining Tract C, 2,082.89 feet to the Place of Beginning and containing 1,619.63 acres of land, more or less.

TRACT C - STATE HIGHWAY 36

FIELD NOTES FOR A 3,581.82 ACRE TRACT OF LAND IN THE YANDELL FERRIS SURVEY, ABSTRACT 376, THE B. B. B. & C. RAILROAD COMPANY SURVEY SECTION 21, ABSTRACT 136, THE NANCY SPENCER SURVEY,

ABSTRACT 88, THE GRIFFIN WILGUS SURVEY, ABSTRACT 381, THE GRIFFIN WILGUS SURVEY, ABSTRACT 382, THE B. B. B. & C. RAILROAD COMPANY SURVEY SECTION 17, ABSTRACT 134, THE YANDELL FERRIS SURVEY, ABSTRACT 377, THE YANDELL FERRIS SURVEY, ABSTRACT 375, THE B. B. B. & C. RAILROAD COMPANY SURVEY SECTION 15, ABSTRACT 133, THE J. F. DYER SURVEY, ABSTRACT 371, THE HENRY SCOTT LEAGUE, ABSTRACT 83, AND THE SAMUEL ISAACS SURVEY, ABSTRACT 36, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD-83 (1993) BASED ON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED =0.99987165.

BEGINNING at a point in the centerline of State Highway 36 at its intersection with the west most line of the city limits of the City of Rosenberg, said point having coordinates of X = 2,948,119.61, Y = 13,773,672.81;

THENCE North 16 degrees 50 minutes 07 seconds east along the northwesterly line of the herein described tract, 2,000.00 feet to a point for the northwest corner of the herein described tract;

THENCE South 73 degrees 09 minutes 53 seconds East along a line being 2,000.00 feet northerly of and parallel to the centerline of State Highway 36, 5,402.23 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 02 degrees 48 minutes 40 seconds, a radius of 9,516.38 feet, an arc length of 466.88 feet, and a chord bearing South 74 degrees 34 minutes 13 seconds East, 466.84 feet to the Point of Tangency of said curve;

THENCE South 75 degrees 58 minutes 33 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of State Highway 36, 7,925.72 feet to an angle point on said line;

THENCE South 75 degrees 58 minutes 16 seconds East continuing along a line being 2,000.00 feet northerly of and parallel to the centerline of State Highway 36, 17,419.98 feet to the beginning of a non-tangent curve to the right having a radius bearing South 15 degrees 11 minutes 36 seconds West;

THENCE along said curve to the right having a central angle of 06 degrees 41 minutes 04 seconds, a radius of 2,956.76 feet, an arc length of 344.96 feet, and a chord bearing South 71 degrees 27 minutes 52 seconds East, 344.76 feet to a point on said curve for a corner of the herein described tract;

THENCE South 01 degree 47 minutes 59 seconds East along the upper east line of the herein described tract, at 1,818.80 feet pass a fence corner post found on said line at its intersection with the north right-of-way line of Walnut Street, and continuing for a total distance of 1,921.58 feet to a point in the centerline of the Burlington Northern & Santa Fe railroad right-of-way for a reentry corner to the herein described tract;

THENCE South 75 degrees 57 minutes 53 seconds East along the centerline of said railroad, 2,572.36 feet to a point for a reentry corner to the herein described tract, said point being at the intersection of the centerline of said railroad with a line within the right-of-way of Mulcahy Street, said point having coordinates of X = 2,981,787.91, Y = 13,765,101.83;

THENCE North 02 degrees 45 minutes 32 seconds West along a line within the right-of-way of Mulcahy Street, 1,997.03 feet to a point for a corner of the herein described tract, said point being on the southerly bank of the Brazos River;

THENCE North 65 degrees 28 minutes 06 seconds East along the southerly bank of the Brazos River, 1,115.10 feet to an angle point on said line;

THENCE North 84 degrees 20 minutes 33 seconds East continuing along the southerly bank of the Brazos River, 1,021.25 feet to a point for the northeast corner of the herein described tract, said point being at the intersection of said line along the southerly bank of the Brazos River with a line being within the right-of-way of 4th Street;

THENCE South 02 degrees 49 minutes 09 seconds East along a line within the right-of-way line of 4th Street, at 2,240.00 feet pass a point on said line at its intersection with the centerline of the Burlington Northern & Santa Fe Railroad ($X = 2,983,832.41$, $Y = 13,765,422.87$), same being the lower northwest corner of an adjoining 2,572.01 acre tract (Tract D) surveyed by the undersigned this date, at 4,114.64 feet pass a point on said line at its intersection with a line within the right-of-way of Avenue J, same being the southwest corner of said adjoining Tract D, and continuing for a total distance of 10,742.73 feet to a point for the southeast corner of the herein described tract ($X = 2,983,832.41$, $Y = 13,765,422.87$), said point being at the intersection of the east line of the herein described tract with a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, same being the north line of an adjoining 6,683.04 acre tract (Tract A) surveyed by the undersigned this date;

THENCE South 86 degrees 10 minutes 32 seconds West along the common line of the herein described tract and said adjoining Tract A, same being a line 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, 1,936.12 feet to the Point of Curvature of a curve to the right;

THENCE around said curve to the right having a central angle of 00 degrees 21 minutes 32 seconds, a radius of 20,648.79, an arc length of 131.03 feet, and a chord bearing South 86 degrees 21 minutes 26 seconds West, 131.03 feet to a point on said curve for the lower southwest corner of the herein described tract, said point being at the intersection of said curve with the extension of a line within the right-of-way of Mulcahy Street;

THENCE North 02 degrees 45 minutes 32 seconds West along the extension of a line within the right-of-way line of Mulcahy Street, at 3,058.40 feet pass a point on said line within the intersection of Southgate Street, and continuing for a total distance of 6,759.59 feet to a point on said line at its intersection with a line within the right-of-way of Avenue J ($X = 2,981,682.94$, $Y = 13,763,544.97$) for a reentry corner to the herein described tract;

THENCE South 87 degrees 11 minutes 35 seconds West along a line within the right-of-way of Avenue J, 2,470.43 feet to the point of intersection of said line with the east line of a called 3.0 acre tract described in deed recorded under County Clerk's File Number 2000025113, Official Public Records, Fort Bend County, Texas, same being the west right-of-way line of Bamore Road, for a reentry corner to the herein described tract;

THENCE South 02 degrees 01 minute 41 seconds East along the east line of said called 3.0 acre tract, same being the west right-of-way line of Bamore Road, 161.29 feet to a 5/8 inch iron rod found at the southeast corner of said called 3.0 acre tract, same being the northeast corner of Encapsulate Subdivision as recorded under Slide Number 2140B, Plat Records, Fort Bend County, Texas

THENCE South 03 degrees 07 minutes 01 second East continuing along the west right-of-way line of Bamore Road, same being the east line of Encapsulate Subdivision, 296.85 feet to a 5/8 inch iron rod (X = 2,979,417.64, Y = 13,762,966.45) found for the upper southeast corner of the herein described tract, said point being the southeast corner of Encapsulate Subdivision;

THENCE South 87 degrees 12 minutes 33 seconds West along the upper south line of the herein described tract, 789.67 feet to a 5/8 iron rod found for the middle southwest corner of the herein described tract, same being the southwest corner of said Encapsulate Subdivision, said point also being in the east line of an adjoining called 25.647 acre tract in deed to CenterPoint Energy in instrument recorded under County Clerk's File Number 2002094441, Official Public Records, Fort Bend County, Texas, described in Volume 1908, Page 207, Official Records, Fort Bend County, Texas;

THENCE North 06 degrees 21 minutes 51 seconds East along the west line of said Encapsulate Subdivision, same being the east line of said adjoining called 25.647 acre tract, and leaving said line and crossing said called 25.647 acre tract, 757.97 feet to a point on said line at its intersection with a line being 2,000.00 feet southerly of and parallel to the centerline of State Highway 36, for a reentry corner to the herein described tract;

THENCE North 75 degrees 58 minutes 16 seconds West along a line being 2,000.00 feet southerly of and parallel to the centerline of State Highway 36, 18,220.86 feet to an angle point on said line;

THENCE North 75 degrees 58 minutes 33 seconds West, continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of State Highway 36, at 2,057.99 feet pass a point on said line for the northeast corner of an adjoining 1,619.63 acre tract (Tract B) surveyed by the undersigned this date, at 4,140.18 feet pass a point on said line at its intersection with the centerline of Spur Highway 10, at 6,222.37 feet pass a point on said line for the northwest corner of said adjoining Tract B, and continuing for a total distance of 7,925.55 feet to the Point of Curvature of a curve to the right;

THENCE around said curve to the right having a central angle of 02 degrees 48 minutes 40 seconds, a radius of 13,516.38 feet, an arc length of 663.13 feet, and a chord bearing North 74 degrees 34 minutes 13 seconds West, 663.06 feet to the Point of Tangency of said curve;

THENCE North 73 degrees 09 minutes 53 seconds West continuing along a line being 2,000.00 feet southerly of and parallel to the centerline of State Highway 36, 5,402.23 feet to a point for the upper southwest corner of the herein described tract;

THENCE North 16 degrees 50 minutes 07 seconds East along the northwest line of the herein described tract, 2,000.00 feet to the Place of Beginning and containing 3,581.82 acres of land, more or less.

TRACT D - U.S. HIGHWAY 90-A

FIELD NOTES FOR A 2,572.01 ACRE TRACT OF LAND IN THE HENRY SCOTT LEAGUE, ABSTRACT 83, THE JAMES LOWERY SURVEY, ABSTRACT 275, THE JOHN W. MOORE SURVEY, ABSTRACT 61, THE JOHN G. EDWARDS SURVEY, ABSTRACT 23, THE WILLIAM MORTON SURVEY, ABSTRACT 63, THE WILLIAM MORTON SURVEY, ABSTRACT 62, THE RANDALL JONES SURVEY, ABSTRACT 42, THE JANE LONG LEAGUE, ABSTRACT 55, AND THE JANE WILKINS LEAGUE, ABSTRACT 96, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD-83 (1993) BASED UPON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED =0.99987165.

BEGINNING at a point in the centerline of the Burlington Northern & Santa Fe Railroad at its intersection with a line within the right-of-way of 4th Street (City of Rosenberg), said point having coordinates of X = 2,983,832.41, Y = 13,765,422.87, for the lower northwest corner and Place of Beginning of the herein described tract, said point being in the east line of an adjoining 3,581.82 acre tract (Tract C) surveyed by the undersigned this date;

THENCE North 80 degrees 59 minutes 39 seconds East along the centerline of said railroad, 3,562.24 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to the left having a central angle of 39 degrees 10 minutes 15 seconds, a radius of 5,729.58 feet, an arc length of 3,917.09 feet, and a chord bearing North 61 degrees 24 minutes 31 seconds East, 3,841.25 feet to the Point of Tangency of said curve;

THENCE North 41 degrees 49 minutes 23 seconds East, continuing along the centerline of the Burlington Northern & Santa Fe Railroad, 7,635.61 feet to a point being at the intersection of the centerline of said railroad with the centerline of Preston Street (City of Richmond), from which point a nail (X = 2,995,810.37, Y = 13,773,506.30) found at the intersection of the centerline of Preston Street with the centerline of Tenth Street bears South 65 degrees 13 minutes 31 seconds West, 3.67 feet;

THENCE North 65 degrees 13 minutes 31 seconds East along the centerline of Preston Street, at 1,676.33 feet pass a nail found on said line at its intersection with the centerline of 4th Street (City of Richmond), and continuing for a total distance of 4,565.64 feet to an angle point on said line, said point being at the intersection of the extension of the centerline of Preston Street with the northwest line of Richmond Landing II Subdivision recorded under Slide Numbers 2557A and B, Plat Records, Fort Bend County, Texas;

THENCE North 52 degrees 57 minutes 35 seconds East along the northerly line of the herein described tract, same being the northwesterly line of said Richmond Landing II Subdivision, 2,864.54 feet to a 1/2 inch iron pipe with cap marked "Kalkomey Surveying" (X = 3,002,244.83, Y = 13,777,146.14) found for corner of the herein described tract, said point being the lower north corner of said Richmond Landing II Subdivision;

THENCE South 37 degrees 02 minutes 25 seconds East along the west most northeasterly line of said Richmond Landing II Subdivision, 50.00 feet to a 1/2 inch iron pipe found for reentry corner to the herein described tract, same being a reentry corner to said Richmond Landing II Subdivision;

THENCE North 52 degrees 57 minutes 35 seconds East continuing along the northwesterly line of said Richmond Landing II Subdivision, 670.17 feet to a point on said line for reentry corner to the herein described tract, from which point a found 1/2 inch iron pipe with cap marked "Kalkomey Surveying" bears North 52 degrees 57 minutes 35 seconds East, 265.97 feet, said point being the north most corner of said Richmond Landing II Subdivision;

THENCE North 15 degrees 44 minutes 53 seconds West establishing the upper west line of the herein described tract, 481.79 feet to an angle point on said line;

THENCE North 29 degrees 52 minutes 14 seconds West continuing along the upper west line of the herein described tract, 566.48 feet to an angle point on said line;

THENCE North 02 degrees 54 minutes 53 seconds West continuing along the upper west line of the herein described tract, 1,181.11 feet to a point for the upper northwest corner of the herein described tract, same being the lower southwest corner of an adjoining 693.80 acre tract (Tract E) surveyed by the undersigned this date, said point being in a curve to the right;

THENCE around said curve to the right having a central angle of 25 degrees 56 minutes 25 seconds, a radius of 7,492.00 feet, at an arc length of 1,341.90 feet pass a point on said curve at its intersection with the centerline of F.M. Highway 359, at an arc length of 2,880.68 feet pass a point on said curve at its intersection with the lower east line of said adjoining Tracts E, and continuing for a total arc length of 3,391.97 feet, and a chord bearing North 68 degrees 29 minutes 25 seconds East, 3,363.07 feet to the Point of Tangency of said curve;

THENCE North 81 degrees 27 minutes 38 seconds East along a line being 2,000.00 feet northerly of and parallel to the baseline of U.S. Highway 90-A, 13,589.24 feet to a point in the common line of the Jane Wilkins League, Abstract 96 and the J. H. Cartwright League, Abstract 16, for the northeast corner of the herein described tract;

THENCE South 03 degrees 05 minutes 57 seconds East along the common line of the Jane Wilkins League, Abstract 96 and the J. H. Cartwright League, Abstract 16, 1,883.48 feet to a point in the northerly line of the Union Pacific Railroad right-of-way for corner;

THENCE South 81 degrees 27 minutes 38 seconds West along the northerly line of the Union Pacific Railroad right-of-way, 1,343.92 feet to a point for a reentry corner to the herein described tract;

THENCE South 02 degrees 59 minutes 40 seconds East, at 50.24 feet pass the centerline of the Union Pacific Railroad, at 274.71 feet pass a 3/4 inch iron rod found in the southerly right-of-way line of U.S. Highway 90-A at the northwest corner of a Levee Improvement Drainage Easement west of and adjacent to High Meadows Subdivision, Section One, Partial Replat (Slide Nos. 784A&B, 785A, Plat Records, Fort Bend County, Texas), and continuing for a total distance of 1,679.11 to a 5/8 inch iron rod found on said line, said point being the northwest corner of Restricted Reserve A, New Territory Austin Ridge Subdivision (Slide Nos. 1218A&B, Plat Records, Fort Bend County, Texas);

THENCE South 02 degrees 01 minute 13 seconds East along the west line of said Restricted Reserve A, 456.71 feet to the point of intersection of said line with a line being 2,000.00 feet southerly of and parallel to the baseline of U.S. Highway 90-A for the southeast corner of the herein described tract;

THENCE South 81 degrees 27 minutes 38 seconds West along a line being 2,000.00 feet southerly of and parallel to the baseline of U.S. Highway 90-A, 12,653.37 feet to a point for reentry corner to the herein described tract;

THENCE South 44 degrees 39 minutes 34 seconds West along the southerly line of the herein described tract, 2,233.60 feet to a point for a corner of the herein described tract, said point being within the right-of-way of Edgewood Drive;

THENCE North 24 degrees 32 minutes 53 seconds West along a line within the right-of-way of Edgewood Drive, 1,276.25 feet to a point on said line for a reentry corner to the herein described tract;

THENCE South 44 degrees 39 minutes 34 seconds West along the southerly line of the herein described tract, said line being 800.00 feet southerly of and parallel to the baseline of U.S. Highway 90-A, 3,380.43 feet to point for a corner of the herein described tract, said point being within the right-of-way of Damon Street (City of Richmond);

THENCE North 45 degrees 24 minutes 03 seconds West along a line within the right-of-way of Damon Street, 267.90 feet to a point on said line for a reentry corner to the herein described tract;

THENCE South 65 degrees 13 minutes 31 seconds West along the southerly line of the herein described tract, at 2,943.93 feet pass a point on said line at its intersection with the centerline of 4th Street (City of Richmond), and continuing for a total distance of 3,783.93 feet to a point for a reentry corner to the herein described tract, said point being at the intersection of the centerline of Houston Street with the centerline of 7th Street;

THENCE South 24 degrees 46 minutes 29 seconds East along the centerline of 7th Street, 875.00 feet to a point for a corner of the herein described tract, same being the upper northeast corner of an adjoining 755.95 acre tract (Tract G) surveyed by the undersigned this date, said point also being at the intersection of the centerline of 7th Street with the centerline of Austin Street;

THENCE South 65 degrees 13 minutes 31 seconds West along the centerline of Austin Street, 1,837.59 feet to a point on said line within the intersection of Union Street and Austin Street;

THENCE South 82 degrees 22 minutes 47 seconds West, continuing along the centerline of Austin Street, 1,003.47 feet to a point for reentry corner to the herein described tract, said point being at the intersection of the centerline of Austin Street with the extension of the easterly right-of-way line of the Burlington Northern & Santa Fe Railroad, same being the upper northwest corner of said adjoining Tract G;

THENCE South 37 degrees 02 minutes 44 seconds East, along the extension of the easterly right-of-way of said railroad, 1,375.26 feet to the point of intersection of a line being 1,600.00 feet southeasterly of and parallel to the centerline of U.S. Highway 90-A with the easterly right-of-way line of said railroad for corner;

THENCE South 41 degrees 49 minutes 50 seconds West along a line being 1,600.00 feet southeasterly of and parallel to the centerline of U.S. Highway 90-A, 7,983.02 feet to a point for a corner of the herein described tract, being at the intersection of said line with the extension of a line with the right-of-way of Avenue J (City of Rosenberg);

THENCE South 87 degrees 41 minutes 42 seconds West along the southerly line the herein described tract within the right-of-way of Avenue J, 3,144.52 feet to a point on said line at its intersection with the centerline of Damon Street (City of Rosenberg);

THENCE South 87 degrees 27 minutes 03 seconds West continuing along a line within the right-of-way of Avenue J, 1,952.50 feet to a point on said line within the intersection of 8th Street;

THENCE South 87 degrees 10 minutes 08 seconds West continuing along a line within the right-of-way of Avenue J 1,360.07 feet to a point on said line in the intersection of 4th Street for the southwest corner of the herein described tract, said point being in the east line of said adjoining Tract C;

THENCE North 02 degrees 49 minutes 09 seconds West along the west line of the herein described tract, same being the east line of said adjoining Tract C, and being within the right-of-way of 4th Street, 1,874.64 feet to the Place of Beginning and containing 2,572.01 acres of land, more or less.

TRACT E - F.M. HIGHWAY 359

FIELD NOTES FOR A 693.80 ACRE TRACT OF LAND IN THE WILLIAM MORTON SURVEY, ABSTRACT 62, AND THE RANDALL JONES SURVEY, ABSTRACT 42, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD83(1993) BASED UPON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED = 0.99987165.

BEGINNING at the point of the intersection of a line being 1,200.00 feet westerly of and parallel to the centerline of F.M. 359 with the northerly line of an adjoining 2,572.01 acre tract (Tract D) surveyed by the undersigned this date, for the lower southwest corner and Place of Beginning to the herein described tract, said point also being the upper northwest corner of said adjoining Tract D, said point having coordinates of X = 3,002,336.92, Y = 13,779,644.12;

THENCE North 02 degrees 54 minutes 53 seconds West along a line being 1,200.00 feet westerly of and parallel to the centerline of F.M. Highway 359, 3,759.09 feet to the Point of Curvature of curvature of a curve to the left;

THENCE around said curve to left having a central angle of 03 degrees 59 minutes 00 seconds, a radius of 4,553.95 feet, an arc length of 316.60 feet, and a chord bearing North 04 degrees 54 minutes 24 seconds West, 316.55 feet to the Point of Tangency of said curve;

THENCE North 06 degrees 53 minutes 53 seconds West continuing along a line being 1,200.00 feet westerly of and parallel to the centerline of F.M. Highway 359, 1,896.67 feet to the Point of Curvature of a curve to the right;

THENCE around said curve to the right having a central angle of 04 degrees 27 minutes 22 seconds, a radius of 6,921.42 feet, an arc length of 538.30 feet, and a chord bearing North 04 degrees 40 minutes 13 seconds West, 538.17 feet to the Point of Tangency of said curve;

THENCE North 02 degrees 26 minutes 32 seconds West continuing along a line being 1,200.00 feet westerly of and parallel to the centerline of F.M. Highway 359, 3,018.61 feet to a point for reentry corner to the herein described tract, said point being in the north line of the Replat of Pecan Lakes Subdivision, Section 3, recorded under Slide Numbers 1866B and 1867A, Plat Records, Fort Bend County, Texas, from said point the northeast corner of the Replat of Pecan Lakes Subdivision, Section 3 bears North 87 degrees 17 minutes 11 seconds East, 732.08 feet;

THENCE South 87 degrees 17 minutes 11 seconds West along the upper south line of the herein described tract, same being the north line of said Replat of Pecan Lakes Subdivision, Section 3, 2,365.50 feet to a point for the upper southwest corner of the herein described tract;

THENCE North 02 degrees 26 minutes 32 seconds West along the upper west line of the herein described tract, at 690.15 feet pass a point on said line at its intersection with the centerline of F.M. Highway 359 at the crossing of Jones Creek, and continuing for a total distance of 1,890.67 feet to a point for the northwest corner of the herein described tract, said point being the point of intersection of said line with a line being 1,200.00 feet northerly of and parallel to the centerline of F.M. Highway 359 (East-West);

THENCE North 89 degrees 14 minutes 28 seconds East along a line being 1,200.00 feet northerly of and parallel to the centerline of F.M. Highway 359 (East-West), 4,567.45 feet to a point for the upper northeast corner of the herein described tract (X = 3,003,841.87, Y = 13,790,984.92), said point being the point of intersection of a line being 1,200.00 feet northerly of and parallel to the centerline of F.M. Highway 359 (East-West) with a line being 1,000.00 feet easterly of and parallel to the centerline of F.M. Highway 359 (North-South);

THENCE South 02 degrees 26 minutes 32 seconds East along a line being 1,000.00 feet easterly of and parallel to the centerline of F.M. Highway 359, 4,763.90 feet to the Point of Curvature of a curve to the left;

THENCE along said curve to left having a central angle of 04 degrees 27 minutes 22 seconds, a radius of 4,721.42 feet, an arc length of 367.20 feet, and a chord bearing South 04 degrees 40 minutes 13 seconds East, 367.11 feet to the Point of Tangency of said curve;

THENCE South 06 degrees 53 minutes 53 seconds East along a line being 1,000.00 feet easterly of and parallel to the centerline of F.M. Highway 359, 851.15 feet to a point for reentry corner to the herein described tract, said point being in the south line of Plantation Place Subdivision recorded under Slide Numbers 1016B and 1017A, Plat Records, Fort Bend County, Texas;

THENCE North 85 degrees 49 minutes 30 seconds East along the south line of said Plantation Place Subdivision, 572.02 feet to a point for the lower northeast corner of the herein described tract, said point being the southeast corner of said Plantation

Place Subdivision, and being in the west line of the adjoining The Grove Subdivision, Section 2, recorded under Slide Numbers 351A & B, Plat Records, Fort Bend County, Texas;

THENCE South 03 degrees 08 minutes 13 seconds East along the west line of said adjoining The Grove Subdivision, Section 2, 859.32 feet to a 3/8 inch iron rod found on said line for angle point;

THENCE South 02 degrees 30 minutes 28 seconds East continuing along the west line of said adjoining The Grove Subdivision, Section 2, 769.98 feet to 5/8 inch iron rod with cap marked "1535/4035" (X = 3,004,828.08, Y = 13,783,429.80) found on said line for angle point in the lower east line the herein described tract, said point being the southwest corner of said adjoining The Grove Subdivision, Section 2;

THENCE South 02 degrees 54 minutes 53 seconds East along a line being 1,480.79 feet easterly of and parallel to the centerline of F.M. Highway 359, 2,649.60 feet to a point for the southeast corner of the herein described tract, said point being in the northerly line of said adjoining Tract D, and being in a curve to the left;

THENCE along said curve to the left having a central angle of 22 degrees 01 minute 49 seconds, a radius of 7,492.00 feet, at an arc length of 1,538.78 feet pass a point on said curve at its intersection with the centerline of F.M. Highway 359, and continuing for a total arc length of 2,880.68 feet, and a chord bearing South 66 degrees 32 minutes 07 seconds West, 2,862.97 feet to the Place of Beginning and containing 693.80 acres of land, more or less.

TRACT F - F.M. HIGHWAY 2218

FIELD NOTES FOR A 588.94 ACRE TRACT OF LAND IN THE JOHN W. MOORE SURVEY, ABSTRACT 61, THE JAMES LOWERY SURVEY, ABSTRACT 275, THE FRANCIS H. DEMAY SURVEY, ABSTRACT 350, THE ANTHONY P. DEMAY SURVEY, ABSTRACT 349, THE ROBERT HANDY SURVEY, ABSTRACT 187, AND THE JANE LONG LEAGUE, ABSTRACT 55, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD83(1993) BASED UPON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED = 0.99987165.

BEGINNING at the point of intersection of a line being 1,900.00 feet southwesterly of and parallel to the centerline of the Burlington Northern & Santa Fe Railroad with a line being 2,000.00 feet northwesterly of and parallel to the centerline of F.M. Highway 2218 for the north corner and Place of Beginning of the herein described tract, said point being the west corner of an adjoining 755.95 acre tract (Tract G) surveyed by the undersigned this date, and having coordinates of X = 2,996,026.47, Y = 13,766,107.95;

THENCE South 37 degrees 03 minutes 15 seconds East along a line being 1,900.00 feet southwesterly of and parallel to the centerline of said railroad, same being the common line of the herein described tract and said adjoining Tract G, at 2,063.15 feet pass a point on said line at its intersection with the centerline of F.M. Highway 2218, and continuing for a total distance of 4,126.30 feet to a point on said line for the east corner of the herein described tract;

THENCE South 38 degrees 44 minutes 00 seconds West along a line being 2,000.00 feet southeasterly of and parallel to the centerline of F.M. Highway 2218, 460.58 feet to an angle point on said line;

THENCE South 22 degrees 17 minutes 04 seconds West continuing along a line being 2,000.00 feet southeasterly of and parallel to the centerline of F.M. Highway 2218, 2,560.01 feet to the point of intersection of said line with a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, for the southeast corner of the herein described tract, same being on the northerly line of an adjoining 6,683.04acre tract (Tract A) surveyed by the undersigned this date, and having coordinates of X = 2,997,253.76, Y = 13,760,087.57;

THENCE South 62 degrees 27 minutes 31 seconds West along the common line of the herein described tract and said adjoining Tract A, being a line 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, at 3,100.22 feet pass a point on said line at its intersection with the centerline of F.M. Highway 2218, and continuing for total distance of 3,685.79 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 13 degrees 28 minutes 40 seconds, a radius of 9,465.15 feet, an arc length of 2,226.49 feet, and a chord bearing South 69 degrees 11 minutes 44 seconds West, 2,221.36 feet to a point on said curve for the southwest corner of the herein described tract, said point having coordinates of X = 2,991,909.82, Y = 13,757,594.65;

THENCE North 22 degrees 17 minutes 04 seconds East along a line being 2,000.00 feet northwesterly of and parallel to the centerline of F.M. Highway 2218, 6,975.52 to feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 16 degrees 26 minutes 56 seconds, a radius of 3,434.23 feet, an arc length of 985.92 feet, and a chord bearing North 30 degrees 30 minutes 32 seconds East, 982.54 feet to the Point of Tangency of said curve;

THENCE North 38 degrees 44 minutes 00 seconds East continuing along a line being 2,000.00 feet northwesterly of and parallel to the centerline of F.M. Highway 2218, 1,555.43 feet to the Place of Beginning and containing 588.94 acres of land, more or less.

TRACT G - F.M. 762 NORTH OF U.S. HIGHWAY 59

FIELD NOTES FOR A 755.95 ACRE TRACT OF LAND IN THE JANE LONG LEAGUE, ABSTRACT 55, THE JOHN G. EDWARDS SURVEY, ABSTRACT 23, THE JOHN W. MOORE SURVEY, ABSTRACT 61, THE ROBERT HANDY SURVEY, ABSTRACT 187, AND THE SIMON JONES SURVEY, ABSTRACT 271, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH CENTRAL ZONE, NAD83(1993) BASED ON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED =0.99987165.

BEGINNING at the point of intersection of the centerline of 7th Street with the centerline of Austin Street (City of Richmond) for the upper northeast corner and Place of Beginning of the herein described tract, said point also being a corner of an adjoining 2,572.01 acre tract (Tract D) surveyed by the undersigned this date, said point having coordinates of X = 2,997,532.47, Y = 13,771,779.29;

THENCE South 24 degrees 46 minutes 29 seconds East along the extension of the centerline of 7th Street, same being the upper easterly line of the herein described tract, 4,240.35 feet to a point for reentry corner to the herein described tract, said point being within the right-of-way of Golfview Drive;

THENCE North 61 degrees 15 minutes 44 seconds East along a line in Golfview Drive, 183.91 feet to the point of intersection of said line with a line being 2,000.00 feet northeasterly of and parallel to the centerline of Burlington Northern & Santa Fe Railroad for the lower northeast corner of the herein described tract;

THENCE South 37 degrees 03 minutes 15 seconds East along a line being 2,000.00 feet northeasterly of and parallel to the centerline of the Burlington Northern & Santa Fe Railroad, 6,091.43 feet to a point for the southeast corner of the herein described tract, said point being in a line being 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, same being the north line of an adjoining 6,683.04 acre tract (Tract A) surveyed by the undersigned this date, said point having coordinates of X = 3,003,140.46, Y = 13,763,157.39;

THENCE South 62 degrees 27 minutes 31 seconds West along the southerly line of the herein described tract, same being the northerly line of said adjoining Tract A, same being a line 2,000.00 feet northerly of and parallel to the centerline of U.S. Highway 59, at 2,027.89 feet pass a point on said line at its intersection with the centerline of the Burlington Northern & Santa Fe Railroad, and continuing for a total distance of 3,954.38 feet to a point on said line for the southwest corner of the herein described tract;

THENCE North 37 degrees 03 minutes 15 seconds West along a line being 1,900.00 feet southwesterly of and parallel to the centerline of the Burlington Northern & Santa Fe Railroad, at 1,862.43 feet pass a point on said line at the point of intersection with a line being 2,000.00 feet southeasterly of and parallel to the centerline of F.M. Highway 2218, said point also being the east corner of an adjoining 588.94 acre tract (Tract F) surveyed by the undersigned this date, at 3,925.58 feet pass a point on said line at the point of intersection with the centerline of F.M. Highway 2218, and continuing for total distance of 5,988.73 feet to a point for the lower northwest corner of the herein described tract, said point being the point of intersection of said line with a line being 2,000.00 feet northwesterly of and parallel to the centerline of F.M. Highway 2218, and being the north corner of said adjoining Tract F;

THENCE North 38 degrees 44 minutes 00 seconds East along a line being the extension of a line being 2,000.00 feet northwesterly of and parallel to F.M. Highway 2218, 330.95 feet to a point for the lower northwest corner of the herein described tract, said point being in the north line of a called 3.495 acre tract of land described in deed recorded in County Clerk's File No. 2000018947, Official Public Records, Fort Bend County, Texas, same being the south line of an adjoining Centerpoint Energy (formerly Houston Lighting and Power Company) 80-foot wide strip (Volume 384, Page 572, Deed Records, Fort Bend County, Texas);

THENCE North 87 degrees 48 minutes 11 seconds East along the common line of said called 3.495 acre tract and said adjoining 80-foot wide strip, the common line of Clairmont Acres Subdivision (Volume 5, Page 38, Plat Records, Fort Bend County, Texas) and said adjoining 80-foot wide strip, at 564.92 feet pass a 1/2-inch iron rod found (X = 2,996,797.96, Y = 13,766,387.73) at the northeast corner of Clairmont Acres Subdivision, same being the northwest corner of that certain Wharton County Junior College called 25.00 acre tract (Volume 1535, Page 616, Official Records, Fort Bend County, Texas), at 1,863.05 feet pass a 1/2 inch iron pipe found at the northeast corner of said called 25.00 acre tract, same being in the westerly line of the Burlington Northern & Santa Fe Railroad, and continuing for a total distance of 1,984.83 feet to a point for reentry corner to the herein described tract, same being the point of intersection of said line with the easterly right-of-way of the Burlington Northern & Santa Fe Railroad;

THENCE North 37 degrees 02 minutes 44 seconds West along the easterly line of said railroad, at 4,180.92 feet pass a point on said line being the point of intersection of the easterly right-of-way of said railroad with a line being 1,600.00 feet southeasterly of and parallel to the centerline of U.S. Highway 90-A, said point also being a corner of said adjoining Tract D, and continuing for total distance of 5,556.18 feet to a point for the upper northwest corner of the herein described tract, same being a reentry corner to said adjoining Tract D, and being the point of intersection of the extension of the easterly line of said railroad with the centerline of Austin Street (City of Richmond);

THENCE North 82 degrees 22 minutes 47 seconds East along the centerline of Austin Street, same being the common line the herein described tract and said adjoining Tract D, 1,003.47 feet to a point on said line within the intersection of Austin Street and Union Street;

THENCE North 65 degrees 13 minutes 31 seconds East continuing along the centerline of Austin Street, same being the common line of the herein described tract and said adjoining Tract D, 1,837.59 feet to the Place of Beginning and containing 755.95 acres of land, more or less.

TRACT H - F.M. HIGHWAY 762 EAST OF U.S. HIGHWAY 59

FIELD NOTES FOR A 976.98 ACRE TRACT OF LAND IN THE ROBERT HANDY SURVEY, ABSTRACT 187, THE WILLIAM LUSK SURVEY, ABSTRACT 276, THE WILEY MARTIN LEAGUE, ABSTRACT 56, THE JOSEPH KUYKENDALL LEAGUE, ABSTRACT 49, AND THE JANE LONG LEAGUE, ABSTRACT 55, FORT BEND COUNTY, TEXAS, WITH ALL BEARINGS BEING GRID AND COORDINATES BEING TEXAS STATE PLANE, SOUTH-CENTRAL ZONE, NAD83(1993) BASED UPON GPS OBSERVATIONS OF THE CITY OF ROSENBERG MONUMENTATION SYSTEM, SCALE FACTOR USED = 0.99987165.

BEGINNING at the point of intersection of a line being 2,000.00 feet southwesterly of and parallel to the centerline of F.M. Highway 762 with a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59, for the southwest corner and Place of Beginning of the herein described tract of land, said point being in

the southerly line of an adjoining 6,683.04 acre tract (Tract A) surveyed by the undersigned this date, said point having coordinates of X = 3,002,461.40, Y = 13,758,292.63;

THENCE North 62 degrees 27 minutes 31 seconds East along the common line of the herein described tract and said adjoining Tract A, at 2,429.44 feet pass a point on said line at its intersection with the centerline of F.M. Highway 762, and continuing for a total distance of 5,251.12 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 02 degrees 39 minutes 29 seconds, a radius of 9,453.51 feet, an arc length of 438.56 feet, and a chord bearing North 65 degrees 42 minutes 56 seconds East, 438.52 feet to a point on said curve for the northwest corner of the herein described tract, being the point of intersection of a line being 2,000.00 feet northerly of and parallel to the centerline of F.M. Highway 762 with a line being 2,000.00 feet southerly of and parallel to the centerline of U.S. Highway 59;

THENCE South 83 degrees 11 minutes 51 seconds East along a line being 2,000.00 feet northerly of and parallel to the centerline of F.M. Highway 762, 6,126.08 feet to a point for the upper northeast corner of the herein described tract, said point being in the westerly line of the adjoining Brazos Village Subdivision, Section 1, recorded under County Clerk's Slide No. 2289B, Plat Records, Fort Bend County, Texas;

THENCE South 20 degrees 56 minutes 09 seconds West along the westerly line of said adjoining Brazos Village Subdivision, Section 1, 369.19 feet an angle point on said line;

THENCE South 21 degrees 46 minutes 36 seconds West continuing along the westerly line of said adjoining Brazos Village Subdivision, Section 1, at 566.79 feet pass the southwest corner of said adjoining Brazos Village Subdivision, Section 1, same being the northwest corner of the adjoining Brazos Village Subdivision, Section 2, recorded under Slide No. 2444A&B, Plat Records, Fort Bend County, Texas, at 1,609.31 feet pass the southwest corner of Lot 9, Block 1, Brazos Village Subdivision, Section 2, same being the northwest corner of Restricted Reserve "C", and continuing for a total distance of 1,635.19 feet to a 1/2 inch iron pipe (X = 3,012,860.24 Y = 13,758,312.11) found for reentry corner to the herein described tract, same being the southwest corner of said adjoining Brazos Village Subdivision, Section 2, and being in the northerly right-of-way of F.M. Highway 762;

THENCE South 83 degrees 10 minutes 25 seconds East along the northerly right-of-way of F.M. Highway 762, 3,677.59 feet to a 5/8 inch iron rod found for reentry corner to the herein described tract, same being the southwest corner of Crabb River Center Subdivision recorded under Slide Number 2052B, Plat Records, Fort Bend County, Texas;

THENCE North 07 degrees 04 minutes 23 seconds East along the westerly line of said Crabb River Center Subdivision, 277.95 feet to a point for a corner of the herein described tract, same being the northwest corner of said Crabb River Center Subdivision;

THENCE South 67 degrees 30 minutes 03 seconds East along the northerly line of said Crabb River Center Subdivision, 325.66 feet to a point for the northeast corner of the herein described tract, same being the northeast corner of said Crabb River Center Subdivision, and being in the westerly right-of-way of Crabb River Road;

THENCE South 22 degrees 52 minutes 26 seconds West along the easterly line of said Crabb River Center Subdivision, same being the westerly right-of-way line of Crabb River Road, at 109.47 feet pass the east cut-back corner of said Crabb River Center Subdivision, and continuing along the extension of said line, at 260.81 feet pass a point on said line at its intersection with the centerline of F.M. Highway 762 (Northwest-Southeast), and continuing for total distance of 313.96 feet to a point for reentry corner of the herein described tract;

THENCE South 20 degrees 40 minutes 09 seconds East along the westerly right-of-way line of F.M. Highway 762 (North-South), 2,196.62 feet to a point on said line for the southeast corner of the herein described tract, said point being the point of intersection of the westerly right-of-way of F.M. Highway 762 (North-South) with a line being 2,000.00 feet southerly of the centerline of F.M. Highway 762 (Northwest-Southeast);

THENCE North 83 degrees 11 minutes 51 seconds West along a line being 2,000.00 feet southerly of and parallel to the centerline of F.M. Highway 762 (Northwest-Southeast), 11,817.23 feet to the Point of Curvature of a curve to the right;

THENCE along said curve to the right having a central angle of 26 degrees 38 minutes 16 seconds, a radius of 7,641.90 feet, an arc length of 3,552.86 feet, and a chord bearing North 69 degrees 52 minutes 43 seconds West, 3,520.95 feet to the Place of Beginning and containing 976.98 acres of land, more or less.

SECTION 3. LEGISLATIVE FINDINGS. The legislature finds that:

(1) proper and legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished by the constitution and laws of this state, including the governor, who has submitted the notice and Act to the Texas Commission on Environmental Quality;

(2) the Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, lieutenant governor, and speaker of the house of representatives within the required time;

(3) the general law relating to consent by political subdivisions to the creation of districts with conservation, reclamation, and road powers and the inclusion of land in those districts has been complied with; and

(4) all requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act have been fulfilled and accomplished.

SECTION 4. EFFECTIVE DATE. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 1820**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 1872 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1872** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1872** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the addition of road district powers to the Fort Bend County Municipal Utility District No. 134.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Chapter 1342, Acts of the 77th Legislature, Regular Session, 2001, is amended by adding Section 3.015 to read as follows:

Sec. 3.015. ROAD PROJECTS. (a)  To the extent authorized by Section 52, Article III, Texas Constitution, the district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

(b)  A road project must meet all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of the municipality or county in whose jurisdiction the district is located.

(c)  The district may not undertake a road project unless each municipality or county in whose jurisdiction the district is located consents by ordinance or resolution.

(d)  If the district exercises the power of eminent domain for a road project authorized by this section, the district may use the power of eminent domain only to acquire land, an easement, or a right-of-way inside district boundaries.

SECTION 2. Chapter 1342, Acts of the 77th Legislature, Regular Session, 2001, is amended by adding Section 5.015 to read as follows:

Sec. 5.015. AUTHORITY TO ISSUE BONDS AND OTHER OBLIGATIONS FOR ROAD PROJECTS; TAX. (a) The district may issue bonds or other obligations as provided by Chapters 49 and 54, Water Code, to finance, or assist in the financing of, projects under Section 3.015 of this Act.

(b)  The district may not issue bonds or other obligations under Subsection (a) of this section unless the issuance is approved by a vote of a two-thirds majority of the voters of the district voting at an election called for that purpose.

(c)  Bonds or other obligations issued or incurred by the district under this section may not exceed one-fourth of the assessed value of the real property in the district.

(d)  Sections 49.181 and 49.182, Water Code, do not apply to a road project undertaken by the district under Section 3.015 of this Act or to bonds issued by the district to finance the project.

(e)  The district may impose an ad valorem tax to pay the principal of or interest on bonds issued under this section.

SECTION 3. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 1872**.

The motion prevailed by the following vote: Yeas 29, Nays 0.

Absent-excused: Carona, West.

## SENATE BILL 1873 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1873** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1873** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the creation of the Fort Bend County Municipal Utility District No. 167; providing authority to impose taxes and issue bonds; granting the power of eminent domain.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subtitle F, Title 6, Special District Local Laws Code, is amended by adding Chapter 8142 to read as follows:

### CHAPTER 8142. FORT BEND COUNTY MUNICIPAL
### UTILITY DISTRICT NO. 167
### SUBCHAPTER A. GENERAL PROVISIONS

Sec. 8142.001. DEFINITIONS. In this chapter:

(1) "Board" means the board of directors of the district.

(2) "City" means the City of Rosenberg, Texas.

(3) "County" means Fort Bend County.

(4) "Director" means a member of the board.

(5) "District" means the Fort Bend County Municipal Utility District No. 167.

Sec. 8142.002. NATURE OF DISTRICT. The district is a municipal utility district in Fort Bend County created under and essential to accomplish the purposes of Section 59, Article XVI, Texas Constitution.

Sec. 8142.003. CONFIRMATION ELECTION REQUIRED. The board shall hold an election to confirm the creation of the district as provided by Section 49.102, Water Code.

Sec. 8142.004. FINDINGS OF BENEFIT AND PUBLIC PURPOSE. (a) All land and other property included in the district will benefit from the improvements and services to be provided by the district under powers conferred by Section 52, Article III, and Section 59, Article XVI, Texas Constitution.

(b) The district is created to accomplish:

(1) the same purposes as a municipal utility district as provided by Section 54.012, Water Code; and

(2) the construction, acquisition, improvement, maintenance, or operation of macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, to the extent authorized by Section 52, Article III, Texas Constitution.

Sec. 8142.005. INITIAL DISTRICT TERRITORY. (a) The district is initially composed of the territory described by Section 2 of the Act creating this chapter.

(b) The boundaries and field notes contained in Section 2 of the Act creating this chapter form a closure. A mistake made in the field notes or in copying the field notes in the legislative process does not affect the district's:

(1) organization, existence, or validity;

(2) right to issue any type of bond for the purposes for which the district is created or to pay the principal of and interest on a bond;

(3) right to impose or collect an assessment or tax; or

(4) legality or operation.

[Sections 8142.006-8142.050 reserved for expansion]

SUBCHAPTER B. BOARD OF DIRECTORS

Sec. 8142.051. DIRECTORS; TERMS. (a) The district is governed by a board of five directors.

(b) Except as provided by Section 8142.053, directors serve staggered four-year terms.

Sec. 8142.052. ELECTION OF DIRECTORS. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

Sec. 8142.053. INITIAL DIRECTORS. (a) The initial board consists of:

(1) Lisa Prejean;

(2) Yvonne Cummins;

(3) James Swanson;

(4) Deana Day; and

(5) Jerry Schultza.

(b) The terms of the first three directors named in Subsection (a) expire on the uniform election date in May of 2006, and the terms of the last two directors named in Subsection (a) expire on the uniform election date in May of 2008.

(c) This section expires September 1, 2009.

[Sections 8142.054-8142.100 reserved for expansion]

SUBCHAPTER C. GENERAL POWERS AND DUTIES

Sec. 8142.101. GENERAL POWERS AND DUTIES. The district has the powers and duties necessary to accomplish the purposes for which the district is created.

Sec. 8142.102. MUNICIPAL UTILITY DISTRICT POWERS AND DUTIES. The district has the powers and duties provided by the general law of this state, including Chapters 49 and 54, Water Code, applicable to municipal utility districts created under Section 59, Article XVI, Texas Constitution.

Sec. 8142.103. ROAD PROJECTS. The district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

Sec. 8142.104. MUNICIPAL OR COUNTY CONSENT AND STANDARDS. (a) The district may not undertake a road project unless each municipality in whose corporate limits or extraterritorial jurisdiction the district is located consents by ordinance or resolution. If the district is located outside the extraterritorial jurisdiction of a municipality, the district may not undertake a road project unless each county in which the district is located consents by ordinance or resolution.

(b) A road project must meet all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each municipality in whose corporate limits or extraterritorial jurisdiction the district is located. If the district is located outside the extraterritorial jurisdiction of a municipality, a road project must meet all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each county in which the district is located.

Sec. 8142.105. COMPLIANCE WITH MUNICIPAL CONSENT ORDINANCES OR RESOLUTIONS. Subject to the limitations of Section 54.016, Water Code, the district shall comply with all applicable requirements of any ordinance or resolution adopted by the city council of the City of Rosenberg that consents to the creation of the district or to the inclusion of lands within the district.

Sec. 8142.106. LIMITATION ON USE OF EMINENT DOMAIN. The district may exercise the power of eminent domain outside the district only to acquire an easement necessary for underground water, sewage, or drainage facilities that serve the district.

[Sections 8142.107-8142.150 reserved for expansion]

SUBCHAPTER D. GENERAL FINANCIAL PROVISIONS

Sec. 8142.151. ELECTIONS REGARDING TAXES OR BONDS. (a) The district may issue, without an election, bonds and other obligations secured by revenue or contract payments from any lawful source other than ad valorem taxation.

(b) The district must hold an election in the manner provided by Chapters 49 and 54, Water Code, to obtain voter approval before the district may impose a maintenance tax or issue bonds payable from ad valorem taxes.

Sec. 8142.152. AD VALOREM TAX. (a) If authorized at an election held under Section 8142.151, the district may impose an annual ad valorem tax on taxable property in the district for the provision of services or for the maintenance and operation of the district, including the improvements constructed or acquired by the district.

(b) The board shall determine the tax rate. The rate may not exceed the rate approved at the election.

[Sections 8142.153-8142.200 reserved for expansion]

SUBCHAPTER E. BONDS AND OTHER OBLIGATIONS

Sec. 8142.201. AUTHORITY TO ISSUE BONDS AND OTHER OBLIGATIONS. (a) The district may issue bonds or other obligations payable wholly or partly from ad valorem taxes, impact fees, revenue, grants, or other district money, or any combination of those sources, to pay for any authorized district purpose.

(b)  In exercising the district's borrowing power, the district may issue a bond or other obligation in the form of a bond, note, certificate of participation, or other instrument evidencing a proportionate interest in payments to be made by the district, or other type of obligation.

(c)  The district may not issue bonds to finance projects authorized by Section 8142.103 unless the issuance is approved by a vote of a two-thirds majority of the voters of the district voting at an election called for that purpose.

(d)  Bonds or other obligations issued or incurred to finance projects authorized by Section 8142.103 may not exceed one-fourth of the assessed value of the real property in the district.

Sec. 8142.202.  TAXES FOR BONDS AND OTHER OBLIGATIONS. At the time bonds or other obligations payable wholly or partly from ad valorem taxes are issued:

(1)  the board shall impose a continuing direct annual ad valorem tax, without limit as to rate or amount, for each year that all or part of the bonds are outstanding; and

(2)  the district annually shall impose an ad valorem tax on all taxable property in the district in an amount sufficient to:

(A)  pay the interest on the bonds or other obligations as the interest becomes due;

(B)  create a sinking fund for the payment of the principal of the bonds or other obligations when due or the redemption price at any earlier required redemption date; and

(C)  pay the expenses of imposing the taxes.

Sec. 8142.203.  CERTAIN AUTHORITY OF TEXAS COMMISSION ON ENVIRONMENTAL QUALITY NOT APPLICABLE. Sections 49.181 and 49.182, Water Code, do not apply to a road project undertaken by the district or to bonds issued by the district to finance the project.

SECTION 2.  The Fort Bend County Municipal Utility District No. 167 initially includes all the territory contained in the following area:

TRACT 1:

121.81 acres in the Jane H. Long League, Abstract No. 55, and the Simon Jones Survey, Abstract No. 271, City of Rosenberg, Fort Bend County, Texas

A FIELD NOTE DESCRIPTION of 121.81 acres of land in the Jane H. Long League, Abstract No. 55 and in the Simon Jones Survey, Abstract No. 271, City of Rosenberg, Fort Bend County, Texas; said 121 .81 acre tract being out of Reserve "H" and all of Reserve "K", Block 4, The Villages At Rosenberg, according to the map or plat recorded under Slide No. 1954 A&B of the Fort Bend County Plat Records; said tract being more particularly described by metes and bounds as follows with the bearings being based on Texas State Plane Coordinate System, South Central Zone (NAD83) per GPS Observations on May 07, 2004 using National Geodetic Survey Continuously Operating Reference Stations:

BEGINNING at a 2-inch iron pipe found in the northeasterly right-of-way line of Reading Road (60 feet wide) for a westerly corner of said Reserve "H" and for a westerly corner of this tract;

THENCE; North 22° 17' 11" East - 1,438.33 feet (called North 22° 16' 48" East - 1,437.90 feet) with the southeasterly line of Fort Bend Business Center according to the map or plat recorded under Slide No. 1461 B of the Fort Bend County Plat Records to a 1/2-inch iron pipe found for an angle point of this tract;

THENCE; North 22° 13' 39" East - 1,438.40 (called North 22° 12' 40" East) with the southeasterly line of a called 49.6426 acre tract of land described as "Tract B" conveyed to Nancy McFarlane Bonner, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records and with the southeasterly line of a called 49.6426 acre tract of land described as "Tract A" conveyed to Thelma McFarlane Zwiener, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records to a 2-inch iron pipe found for an interior corner of this tract;

THENCE; North 68° 04' 11" West - 545.57 feet (called North 68° 03' 27" West - 545.08 feet) with the northeasterly line of said "Tract A" to a 3/4-inch iron rod found for a westerly corner of this tract;

THENCE; North 21° 41' 06" East - 1,979.04 feet (called North 21° 41' 49" East - 1,978.77 feet) with the southeasterly line of a called 115.7247 acre tract of land conveyed to C.E. Myska, Trustee, as recorded in Volume 934, Page 66 of the Fort Bend County Deed Records to a 5/8-inch iron rod with cap set for the northerly corner of this tract;

THENCE; South 37° 02' 26" East - 3,374.42 feet (called South 37° 01' 19" East) with the southwesterly right-of-way line of the Gulf Coast & Santa Fe Railway Company right-of-way, as recorded in Volume 75, Page 312 of the Fort Bend County Deed Records to point for an easterly corner of this tract;

THENCE; South 52° 42' 48" West - 974.91 feet (called South 52° 43' 31" West) with the northwesterly line of Reserve "D" of said The Villages At Rosenberg to a 5/8-inch iron rod with cap set for an angle point of this tract;

THENCE; South 62° 39' 13" West - 1,205.30 feet (called South 62° 38' 30" West - 1,205.22 feet) with the northwesterly line of Reserve "E" and Reserve "F" of said The Villages At Rosenberg to a cut "x" in concrete found for a point-of-curvature;

THENCE; in an easterly direction with the northerly line of said Reserve "F" and Reserve "G" of said The Villages At Rosenberg and with said curve to the right having a radius of 100.00 feet, a central angle of 50° 13' 34", a length of 87.66 feet and a chord bearing South 87° 46' 00" West - 84.88 feet to a cut "x" in concrete found for a point-of-tangency for this tract;

THENCE; North 67° 07' 14" West - 206.27 feet with the northeasterly line of said Reserve "G" to a cut "x" in concrete found for a southwesterly corner of this tract;

THENCE; North 22° 52' 43" East - 838.38 feet (called north 22° 52' 24" East - 838.44 feet) with the southeasterly line of Reserve "A", The Villages At Rosenberg, Section 2, according to the map or plat recorded under Slide No. 2214B; of the Fort Bend County Plat Records conveyed to Rosenberg Venture LTD., as recorded under Fort Bend County Clerk's File No. 2001119747 to a 5/8-inch iron rod found for an interior corner of this tract;

THENCE; North 63° 20' 55" West - 400.66 feet (called North 63° 21' 05" West - 400.66 feet) with the northeasterly line of said Reserve "A" to a point for an interior corner of this tract;

THENCE; South 61° 07' 04" West - 71.39 feet (called South 61° 06' 54" West - 71.39 feet) with a northwesterly line of said Reserve "A" to an angle point of this tract;

THENCE; North 72° 59' 22" West - 163.95 feet (called North 73° 06' 44" West - 163.98 feet) with a northeasterly line of said Reserve "A" to a hole punch in reinforced concrete pipe found for an angle point of this tract;

THENCE; North 51° 19' 13" West - 19.63 feet (called North 50° 17' 30" West - 19.67 feet) with a northeasterly line of said Reserve "A" to a 5/8-inch iron rod found for an angle point of this tract;

THENCE; North 22° 12' 51" East - 55.94 feet (called North 22° 12' 40" East - 55.84 feet) with the southeasterly right-of-way line of Vista Drive (60 feet wide) according to the map or plat recorded under Slide No. 2214 B of the Fort Bend County Plat Records to a 5/8-inch iron rod with cap set for an interior corner of this tract;

THENCE; North 67° 47' 09" West - 60.00 feet to a 5/8–inch iron rod with cap set for an interior corner of this tract;

THENCE; South 22° 12' 51" West - 767.88 feet (called South 22° 12' 40" West - 761.21 feet) with the northwesterly right-of-way line of said Vista Drive to a point for an angle point of this tract;

THENCE; South 22° 17' 31" West - 1,416.44 feet (called South 22° 16' 48" West - 1,423.85 feet) with the northwesterly right-of-way line of said Vista Drive to a 5/8-inch iron rod with cap set for the easterly end of a cutback at the intersection of the northwesterly right-of-way line of said Vista Drive with the northeasterly right-of-way line of said Reading Road;

THENCE; South 67° 34' 19" West - 21.11 feet (called South 67° 33' 28" West - 21,11 feet) with said cutback to a 5/8-inch iron rod with cap set for an angle point of this tract;

THENCE; North 67° 08' 54" West - 84.71 feet (called North 67° 09' 53" West - 85.00 feet) with the northeasterly right-of-way line of said Reading Road to the POINT OF BEGINNING and containing 121.81 acres (5,306,130 square feet) of land.

TRACT 2:

0.1377 acre in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas

A FIELD NOTE DESCRIPTION of 0.1377 acre (6,000 square feet) of land in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas; said 0.1377 acre tract being out of Reserve "H", Block 4, The Villages At Rosenberg, according to the map or plat recorded under Slide No. 1954 A&B of the Fort Bend County Plat Records; said tract being more particularly described by metes and bounds as follows with the bearings being based on Texas State Plane Coordinate System, South Central Zone (NAD83) per GPS Observations on May 07, 2004 using National Geodetic Survey Continuously Operating Reference Stations:

COMMENCING FOR REFERENCE at a 2-inch iron pipe found in the northeasterly right-of-way line of Reading Road (60 feet wide) for a southwesterly corner of said Reserve "H";

THENCE; North 22° 17' 11" East - 1,438.33 feet (called North 22° 16' 48" East - 1,437.90 feet) with the southeasterly line of Fort Bend Business Center, according to the map or plat recorded under Slide No. 1461 B of the Fort Bend County Plat Records to a 1/2-inch iron pipe found;

THENCE; North 22° 13' 39" East - 1,438.40 feet (called North 22° 12' 40" East) with the southeasterly line of a called 49.6426 acre tract of land described as "Tract B" conveyed to Nancy McFarlane Bonner, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records, with the southeasterly line of a called 49.6426 acre tract of land described as "Tract A" conveyed to Thelma McFarlane Zwiener, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records and with the northwesterly line of said Reserve "H" to a 2-inch iron pipe found for corner,

THENCE; South 68° 04' 11" East - 790.00 feet to a point for the southwesterly corner and POINT OF BEGINNING of this tract;

THENCE; North 21' 55' 49" East - 100.00 feet to a point for the northwesterly corner of this tract;

THENCE; South 68° 04' 11 " East - 60.00 feet to a point for the northeasterly corner of this tract;

THENCE; South 21° 55' 49" West - 100.00 feet to a point for the southeasterly corner of this tract;

THENCE; North 68° 04' 11" West - 60.00 feet to the POINT OF BEGINNING and containing 0.1377 acre (6,000 square feet) of land.

TRACT 3:

0.1377 acre in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas

A FIELD NOTE DESCRIPTION of 0.1377 acre (6,000 square feet) of land in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas; said 0.1377 acre tract being out of Reserve "H", Block 4, The Villages At Rosenberg, according to the map or plat recorded under Slide No. 1954 A&B of the Fort Bend County Plat Records; said tract being more particularly described by metes and bounds as follows with the bearings being based on Texas State Plane Coordinate System, South Central Zone (NAD83) per GPS Observations on May 07, 2004 using National Geodetic Survey Continuously Operating Reference Stations:

COMMENCING FOR REFERENCE at a 2-inch iron pipe found in the northeasterly right-of-way line of Reading Road (60 feet wide) for a southwesterly corner of said Reserve "H";

THENCE; North 22° 17' 11" East- 1,438.33 feet (called North 22° 16' 48" East - 1,437.90 feet) with the southeasterly line of Fort Bend Business Center, according to the map or plat recorded under Slide No. 1461 B of the Fort Bend County Plat Records to a 1/2–inch iron pipe found;

THENCE; North 22° 13' 39" East - 1,438.40 feet (called North 22° 12' 40" East) with the southeasterly line of a called 49.6426 acre tract of land described as "Tract B" conveyed to Nancy McFarlane Bonner, as recorded in Volume

1851, Page 424 of the Fort Bend County Deed Records, with the southeasterly line of a called 49.6426 acre tract of land described as "Tract A" conveyed to Thelma McFarlane Zwiener, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records and with the northwesterly line of said Reserve "H" to a 2-inch iron pipe found for corner,

THENCE; South 68° 04' 11" East - 730.00 feet to a point for the southwesterly corner and POINT OF BEGINNING of this tract;

THENCE; North 21° 55' 49" East - 100.00 feet to a point for the northwesterly corner of this tract;

THENCE; South 68° 04' 11" East - 60.00 feet to a point for the northeasterly corner of this tract;

THENCE; South 21° 55' 49" West - 100.00 feet to a point for the southeasterly corner of this tract;

THENCE; North 68° 04' 11" West - 60.00 feet to the POINT OF BEGINNING and containing 0.1377 acre (6,000 square feet) of land.

TRACT 4:

0.1377 acre in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas

A FIELD NOTE DESCRIPTION of 0.1377 acre (6,000 square feet) of land in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas; said 0.1377 acre tract being out of Reserve "H", Block 4, The Villages At Rosenberg, according to the map or plat recorded under Slide No. 1954 A&B of the Fort Bend County Plat Records; said tract being more particularly described by metes and bounds as follows with the bearings being based on Texas State Plane Coordinate System, South Central Zone (NAD83) per GPS Observations on May 07, 2004 using National Geodetic Survey Continuously Operating Reference Stations:

COMMENCING FOR REFERENCE at a 2-inch iron pipe found in the northeasterly right-of-way line of Reading Road (60 feet wide) for a southwesterly corner of said Reserve "H";

THENCE; North 22° 17' 11" East - 1,438.33 feet (called North 22° 16' 48" East - 1,437.90 feet) with the southeasterly line of Fort Bend Business Center, according to the map or plat recorded under Slide No. 1461 B of the Fort Bend County Plat Records to a 1/2-inch iron pipe found;

THENCE; North 22° 13' 39" East -1,438.40 feet (called North 22° 12' 40" East) with the southeasterly line of a called 49.6426 acre tract of land described as "Tract B" conveyed to Nancy McFarlane Bonner, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records, with the southeasterly line of a called 49.6426 acre tract of land described as 'Tract A" conveyed to Thelma McFarlane Zwiener, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records and with the northwesterly line of said Reserve "H" to a 2-inch iron pipe found for corner;

THENCE; South 68° 04' 11" East - 670.00 feet to a point for the southwesterly corner and POINT OF BEGINNING of this tract;

THENCE; North 21° 55' 49" East - 100.00 feet to a point for the northwesterly corner of this tract;

THENCE; South 68° 04' 11" East - 60.00 feet to a point for the northeasterly corner of this tract;

THENCE; South 21° 55' 49" West - 100.00 feet to a point for the southeasterly corner of this tract;

THENCE; North 68° 04' 11" West - 60.00 feet to the POINT OF BEGINNING and containing 0.1377 acre (6,000 square feet) of land.

TRACT 5:

0.1377 acre in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas

A FIELD NOTE DESCRIPTION of 0.1377 acre (6,000 square feet) of land in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas; said 0.1377 acre tract being out of Reserve "H", Block 4, The Villages At Rosenberg, according to the map or plat recorded under Slide No. 1954 A&B of the Fort Bend County Plat Records; said tract being more particularly described by metes and bounds as follows with the bearings being based on Texas State Plane Coordinate System, South Central Zone (NAD83) per GPS Observations on May 07, 2004 using National Geodetic Survey Continuously Operating Reference Stations:

COMMENCING FOR REFERENCE at a 2-inch iron pipe found in the northeasterly right-of-way line of Reading Road (60 feet wide) for a southwesterly corner of said Reserve "H";

THENCE; North 22° 17' 11" East - 1,438.33 feet (called North 22° 16' 48" East - 1,437.90 feet) with the southeasterly line of Fort Bend Business Center, according to the map or plat recorded under Slide No. 1461 B of the Fort Bend County Plat Records to a 1/2-inch iron pipe found;

THENCE; North 22° 13' 39" East - 1,438.40 feet (called North 22° 12' 40" East) with the southeasterly line of a called 49.6426 acre tract of land described as "Tract B" conveyed to Nancy McFarlane Bonner, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records, with the southeasterly line of a called 49.6426 acre tract of land described as "Tract A" conveyed to Thelma McFarlane Zwiener, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records and with the northwesterly line of said Reserve "H" to a 2-inch iron pipe found for corner;

THENCE; South 68° 04' 11" East - 610.00 feet to a point for the southwesterly corner and POINT OF BEGINNING of this tract;

THENCE; North 21° 55' 49" East - 100.00 feet to a point for the northwesterly corner of this tract;

THENCE; South 68° 04' 11" East - 60.00 feet to a point for the northeasterly corner of this tract;

THENCE; South 21° 55' 49" West - 100.00 feet to a point for the southeasterly corner of this tract;

THENCE; North 68° 04' 11" West - 60.00 feet to the POINT OF BEGINNING and containing 0.1377 acre (6,000 square feet) of land.

TRACT 6:

0.1377 acre in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas

A FIELD NOTE DESCRIPTION of 0.1377 acre (6,000 square feet) of land in the Jane H. Long League, Abstract No. 55, City of Rosenberg, Fort Bend County, Texas; said 0.1377 acre tract being out of Reserve "H", Block 4, The Villages At Rosenberg, according to the map or plat recorded under Slide No. 1954 A&B of the Fort Bend County Plat Records; said tract being more particularly described by metes and bounds as follows with the bearings being based on Texas State Plane Coordinate System, South Central Zone (NAD83) per GPS Observations on May 07, 2004 using National Geodetic Survey Continuously Operating Reference Stations:

COMMENCING FOR REFERENCE at a 2-inch iron pipe found in the northeasterly right-of-way line of Reading Road (60 feet wide) for a southwesterly corner of said Reserve "H";

THENCE; North 22° 17' 11" East - 1,438.33 feet (called North 22° 16' 48" East - 1,437.90 feet) with the southeasterly line of Fort Bend Business Center, according to the map or plat recorded under Slide No. 1461 B of the Fort Bend County Plat Records to a 1/2-inch iron pipe found;

THENCE; North 22° 13' 39" East - 1,438.40 feet (called North 22° 12' 40" East) with the southeasterly line of a called 49.6426 acre tract of land described as "Tract B" conveyed to Nancy McFarlane Bonner, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records, with the southeasterly line of a called 49.6426 acre tract of land described as "Tract A" conveyed to Thelma McFarlane Zwiener, as recorded in Volume 1851, Page 424 of the Fort Bend County Deed Records and with the northwesterly line of said Reserve "H" to a 2-inch iron pipe found for corner;

THENCE; South 68° 04' 11" East - 550.0,0 feet to a point for the southwesterly corner and POINT OF BEGINNING of this tract;

THENCE; North 21° 55' 49" East - 100.00 feet to a point for the northwesterly corner of this tract;

THENCE; South 68° 04' 11" East - 60.00 feet to a point for the northeasterly corner of this tract;

THENCE; South 21° 55' 49" West - 100.00 feet to a point for the southeasterly corner of this tract;

THENCE; North 68° 04' 11" West - 60.00 feet to the POINT OF BEGINNING and containing 0.1377 acre (6,000 square feet) of land.

SECTION 3. (a) The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b) The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c) The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d) All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 1873**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1891 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1891** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1891** by substituting in lieu thereof the following:

#### A BILL TO BE ENTITLED
#### AN ACT

relating to the creation of the La Salle Water Control and Improvement District No. 1; providing authority to impose a tax and issue bonds; granting the power of eminent domain.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subtitle I, Title 6, Special District Local Laws Code, is amended by adding Chapter 9008 to read as follows:

#### CHAPTER 9008. LA SALLE WATER CONTROL AND
#### IMPROVEMENT DISTRICT NO. 1
#### SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 9008.001.  DEFINITIONS. In this chapter:

(1)  "Board" means the board of directors of the district.

(2)  "Director" means a member of the board.

(3)  "District" means the La Salle Water Control and Improvement District No. 1.

Sec. 9008.002. NATURE OF DISTRICT. The La Salle Water Control and Improvement District No. 1 is a water control and improvement district in Calhoun County created under and essential to accomplish the purposes of Section 52, Article III, and Section 59, Article XVI, Texas Constitution.

Sec. 9008.003.  CONFIRMATION ELECTION REQUIRED. If the creation of the district is not confirmed at a confirmation election held under Section 9008.024 before September 1, 2007:

(1)  the district is dissolved September 1, 2007, except that:

(A)  any debts incurred shall be paid;

(B)  any assets that remain after the payment of debts shall be transferred to Calhoun County; and

        (C)  the organization of the district shall be maintained until all debts are paid and remaining assets are transferred; and

       (2)  this chapter expires September 1, 2010.

   Sec. 9008.004.  INITIAL DISTRICT TERRITORY. (a)  The district is initially composed of the territory described by Section 2 of the Act creating this chapter.

    (b)  The boundaries and field notes contained in Section 2 of the Act creating this chapter form a closure. A mistake made in the field notes or in copying the field notes in the legislative process does not affect:

       (1)  the organization, existence, or validity of the district;

       (2)  the right of the district to impose ad valorem taxes;

       (3)  the validity of the district's bonds, notes, or indebtedness; or

       (4)  the legality or operation of the district or the board.

            [Sections 9008.005-9008.020 reserved for expansion]

            SUBCHAPTER A1. TEMPORARY PROVISIONS

   Sec. 9008.021.  TEMPORARY DIRECTORS. (a)  The temporary board consists of:

       (1)  Douglas A. Baker;

       (2)  W. H. "Bill" Bauer, Jr.;

       (3)  Waymond Boyd;

       (4)  Lawrence A. Korenek; and

       (5)  Edwin A. Wagner.

    (b)  If a temporary director fails to qualify for office, the Texas Commission on Environmental Quality shall appoint a person to fill the vacancy.

    (c)  Temporary directors serve until the earlier of:

       (1)  the date directors are elected under Section 9008.024; or

       (2)  the date this chapter expires under Section 9008.003.

   Sec. 9008.022.  ORGANIZATIONAL MEETING OF TEMPORARY DIRECTORS. As soon as practicable after all the temporary directors have qualified under Section 49.055, Water Code, the temporary directors shall meet at a location in the district agreeable to a majority of the directors. If a location cannot be agreed upon, the meeting shall be at the Calhoun County Courthouse. At the meeting, the temporary directors shall elect officers from among the temporary directors and conduct any other district business.

   Sec. 9008.023.  CONSENT OF MUNICIPALITY OR COUNTY REQUIRED. (a)  The temporary directors may not hold an election under Section 9008.024 until each municipality in whose corporate limits or extraterritorial jurisdiction the district is located has adopted a resolution consenting to the creation of the district.

    (b) If the district is located outside the extraterritorial jurisdiction of a municipality, the temporary directors may not hold the election until the county in which the district is located has adopted a resolution consenting to the creation of the district.

    (c) A municipality or county may not adopt a resolution under this section before the effective date of the Act creating this chapter.

Sec. 9008.024. CONFIRMATION AND INITIAL DIRECTORS' ELECTION. If each municipality or county has consented to the creation of the district under Section 9008.023, the temporary directors shall hold an election to confirm the creation of the district and to elect five directors as provided by Section 49.102, Water Code.

Sec. 9008.025. INITIAL ELECTED DIRECTORS; TERMS. The directors elected under Section 9008.024 shall draw lots to determine which two shall serve until the first regularly scheduled election of directors under Section 9008.052 and which three shall serve until the second regularly scheduled election of directors.

Sec. 9008.026. EXPIRATION OF SUBCHAPTER. This subchapter expires September 1, 2010.

[Sections 9008.027-9008.050 reserved for expansion]

SUBCHAPTER B. BOARD OF DIRECTORS

Sec. 9008.051. DIRECTORS; TERMS. (a) The district is governed by a board of five directors.

(b) Directors serve staggered four-year terms.

Sec. 9008.052. ELECTION OF DIRECTORS. On the uniform election date in May of each even-numbered year, the appropriate number of directors shall be elected.

[Sections 9008.053-9008.100 reserved for expansion]

SUBCHAPTER C. POWERS AND DUTIES

Sec. 9008.101. WATER CONTROL AND IMPROVEMENT DISTRICT POWERS AND DUTIES. The district has the powers and duties provided by the general law of this state, including Chapters 49 and 51, Water Code, applicable to water control and improvement districts created under Section 59, Article XVI, Texas Constitution.

Sec. 9008.102. ROAD PROJECTS. (a) To the extent authorized by Section 52, Article III, Texas Constitution, the district may construct, acquire, improve, maintain, or operate macadamized, graveled, or paved roads or turnpikes, or improvements in aid of those roads or turnpikes, inside the district.

(b) A road project must meet or exceed all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of each municipality in whose corporate limits or extraterritorial jurisdiction the district is located. If the district is located outside the extraterritorial jurisdiction of a municipality, a road project must meet all applicable construction standards, zoning and subdivision requirements, and regulatory ordinances of the county in which the district is located.

(c) The district may not undertake a road project unless each municipality in whose corporate limits or extraterritorial jurisdiction the district is located consents by ordinance or resolution. If the district is located outside the extraterritorial jurisdiction of a municipality, the district may not undertake a road project unless the county in which the district is located consents by ordinance or resolution.

Sec. 9008.103. COMPLIANCE WITH MUNICIPAL ORDINANCES OR RESOLUTIONS. Notwithstanding Section 51.714, Water Code, and subject to the limitations of Section 54.016, Water Code, the district shall comply with all applicable

requirements of any ordinance or resolution adopted by the governing body of a municipality in whose corporate limits or extraterritorial jurisdiction the district is partly or wholly located.

Sec. 9008.104. LIMITATION ON USE OF EMINENT DOMAIN. The district may exercise the power of eminent domain outside the district only to acquire an easement necessary for a pipeline that serves the district.

[Sections 9008.105-9008.150 reserved for expansion]

SUBCHAPTER D. GENERAL FINANCIAL PROVISIONS

Sec. 9008.151. TAX TO REPAY BONDS. The district may impose a tax to pay the principal of or interest on bonds issued under Section 9008.201.

[Sections 9008.152-9008.200 reserved for expansion]

SUBCHAPTER E. BONDS

Sec. 9008.201. AUTHORITY TO ISSUE BONDS AND OTHER OBLIGATIONS. (a) The district may issue bonds or other obligations as provided by Chapters 49 and 51, Water Code, to finance the construction, maintenance, or operation of projects under Sections 9008.101 and 9008.102.

(b) The district may not issue bonds to finance projects authorized by Section 9008.102 unless the issuance is approved by a vote of a two-thirds majority of the voters of the district voting at an election called for that purpose.

(c) Bonds or other obligations issued or incurred to finance projects authorized by Section 9008.102 may not exceed one-fourth of the assessed value of the real property in the district.

(d) Sections 49.181 and 49.182, Water Code, do not apply to a project undertaken by the district under Section 9008.102 or to bonds issued by the district to finance the project.

SECTION 2. The La Salle Water Control and Improvement District No. 1 initially includes all the territory contained in the following described area:

All of that certain tract or parcel containing 3396.3 acres, being 1934.1 acres situated in the Faustino Albarado Survey, Abstract No. 1 and 1462.2 acres situated in the Cleto Garcia Survey, Abstract No. 14 of Calhoun County, Texas and being a part of the same property described as 13,326.88 acres in Exhibit "A" in Deed dated December 13, 1995 from W. H. Bauer, et ux, to Bauer Family Ranches, LTD., a Texas Limited Partnership recorded in Volume 153, Page 15 of the Official Records of Calhoun County, Texas. This 3396.3 acres is more particularly described by metes and bounds as follows:

BEGINNING in the North line of the above referenced 13,326.88 acre tract at the intersection of the Northerly projection of the West line of a 1019.707 acre tract described in deed recorded in Volume 175, Page 521 of the Calhoun County Official Records and in the North line of 8.163 acre tract described as Part II in Right-of-Way Easement described in Volume 263, Page 509 of the Calhoun County Deed Records for Northeast corner of this 3396.3 acres being described;

THENCE South 25° 50' 49" East, with the Northerly projection of the West line of the said 1,019.707 acre tract, pass the South line of the said 8.163 acre tract and the present Right-of-Way of State Highway No. 185 and the Northwest corner of the said 1,019.707 acre tract at a distance of 13.00 feet, and continuing with the West line of the said 1,019.707 acre tract and continuing a total distance of 6,706.96 feet to the

Northwest line of the Intracoastal Waterway (Volume 33, Page 618 of the Calhoun County Deed Records) and the Southwest corner of the said 1,019.707 acre tract for the Southeast corner of this 3396.3 acres being described;

THENCE South 61° 15' 14" West, with the Northwest line of the said Intracoastal Waterway a distance of 1,613.99 feet to a point of curve for corner of this 3396.3 acres being described;

THENCE with the Northwest line of the said Intracoastal Waterway along a curve to the right with a Delta of 00° 50' 41"; a Radius of 5,423.42 feet; and a Long Chord of South 61° 40' 35" West a distance of 79.95 feet to a point of tangency for a corner of this 3396.3 acres being described;

THENCE South 62° 05' 55" West, with the Northwest line of the said Intracoastal Waterway a distance of 13,506.22 feet to a point for a corner of this 3396.3 acres being described;

THENCE North 25° 50' 49" West, a distance of 12,751.14 feet to a point in the North line of the 13,326.88 acre tract and the North line of the said Right-of-Way Easement for the West corner of this 3396.3 acres being described;

THENCE North 83° 58' 28" East, with the North line of the said 13,326.88 acre tract and the North line of said Right-of-Way Easement a distance of 16,145.90 feet to the PLACE OF BEGINNING, containing within these metes and bounds 3396.3 acres.

The bearings and distances recited herein refer to Texas State Plane Lambert Grid Nad 83 (1986) and are based on NGS Monument "Porto 2" with published coordinates of (Northing = 13,348,963.42) and (Easting = 2,779,103.72).

SECTION 3.  (a)  The legal notice of the intention to introduce this Act, setting forth the general substance of this Act, has been published as provided by law, and the notice and a copy of this Act have been furnished to all persons, agencies, officials, or entities to which they are required to be furnished under Section 59, Article XVI, Texas Constitution, and Chapter 313, Government Code.

(b)  The governor, one of the required recipients, has submitted the notice and Act to the Texas Commission on Environmental Quality.

(c)  The Texas Commission on Environmental Quality has filed its recommendations relating to this Act with the governor, the lieutenant governor, and the speaker of the house of representatives within the required time.

(d)  All requirements of the constitution and laws of this state and the rules and procedures of the legislature with respect to the notice, introduction, and passage of this Act are fulfilled and accomplished.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 1891**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 1798 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1798** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1798** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the creation of the North Fort Bend Water Authority; providing authority to issue bonds; granting the power of eminent domain; providing an administrative penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  AMENDMENT. Subtitle H, Title 6, Special District Local Laws Code, is amended by adding Chapter 8813 to read as follows:

### CHAPTER 8813. NORTH FORT BEND WATER AUTHORITY
### SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 8813.001.  DEFINITIONS. In this chapter:

(1)  "Authority" means the North Fort Bend Water Authority.

(2)  "Board" means the board of directors of the authority.

(3)  "Commission" means the Texas Commission on Environmental Quality or its successor.

(4)  "Director" means a member of the board.

(5)  "District" means any district created under Sections 52(b)(1) and (2), Article III, or Section 59, Article XVI, Texas Constitution, regardless of the manner of creation, other than:

(A)  a navigation district or port authority;

(B)  a district governed by Chapter 36, Water Code; or

(C)  a district that does not have the legal authority to supply water.

(6)  "Groundwater reduction plan" means a plan adopted or implemented to supply water, reduce reliance on groundwater, regulate groundwater pumping and usage, or require and allocate water usage among persons in order to comply with or exceed requirements imposed by the Fort Bend Subsidence District or the Harris-Galveston Coastal Subsidence District, as applicable, including any applicable groundwater reduction requirements.

(7)  "Local government" means a municipality, county, district, or other political subdivision of this state or a combination of two or more of those entities.

(8)  "Person" includes an individual, corporation, organization, government or governmental subdivision or agency, district, local government, business trust, estate, trust, partnership, association, and any other legal entity.

(9)  "Subsidence" means the lowering in elevation of the surface of land by the withdrawal of groundwater.

(10) "System" means a network of pipelines, conduits, valves, canals, pumping stations, force mains, treatment plants, and any other construction, device, or related appurtenance used to treat or transport water.

(11) "Water" includes:

(A) groundwater, percolating or otherwise;

(B) any surface water, natural or artificial, navigable or nonnavigable; and

(C) industrial and municipal wastewater.

(12) "Well" includes a facility, device, or method used to withdraw groundwater from a groundwater source within the boundaries of the authority.

Sec. 8813.002. NATURE OF AUTHORITY. The authority is a regional water authority in Fort Bend and Harris Counties created under and essential to accomplish the purposes of Section 59, Article XVI, Texas Constitution, including the acquisition and provision of surface water and groundwater for residential, commercial, industrial, agricultural, and other uses, the reduction of groundwater withdrawals, the conservation, preservation, protection, and recharge of groundwater and of groundwater reservoirs or their subdivisions, the prevention of waste of groundwater, the control of subsidence caused by the withdrawal of water from groundwater reservoirs or their subdivisions, and other public purposes stated in this chapter. The authority is a political subdivision of this state.

Sec. 8813.003. CONFIRMATION ELECTION NOT REQUIRED. An election to confirm the creation of the authority is not required.

Sec. 8813.004. INITIAL AUTHORITY TERRITORY. (a) The authority is initially composed of the territory described by Section 2 of the Act creating this chapter.

(b) The boundaries and field notes contained in Section 2 of the Act creating this chapter form a closure. A mistake made in the field notes or in copying the field notes in the legislative process does not affect:

(1) the organization, existence, or validity of the authority;

(2) the right of the authority to issue any type of bond or note for the purposes for which the authority is created or to pay the principal of and interest on a bond or note;

(3) the right of the authority to impose or collect a fee, user fee, rate, charge, or special assessment; or

(4) the legality or operation of the authority.

(c) All of the territory of a local government created after the effective date of the Act creating this chapter that encompasses any territory within the boundaries of the authority, immediately on the creation and without any action required of the authority, is subject to all of the rights, powers, privileges, and rules of the authority to the same extent as the territory was before the local government was created.

Sec. 8813.005. EXCLUSION OF CERTAIN TERRITORY. (a) A district or municipality that, on the effective date of the Act creating this chapter, is located, wholly or partly, within the territory described by Section 2(a) or (b) of the Act creating this chapter may petition for exclusion of all of its territory from the authority's boundaries by a petition signed by a majority of the members of the governing body of the district or municipality.

(b) The board shall:

(1) not later than the 120th day after the effective date of the Act creating this chapter, grant the petition and order the territory excluded if the petition:

(A) includes an accurate legal description of the boundaries of the territory to be excluded; and

(B) is filed with the authority not later than the 60th day after the effective date of the Act creating this chapter; and

(2) if the board grants the petition, file for recording in the office of the county clerk for the applicable county or counties a copy of the order and a description of the authority's boundaries as they exist after the exclusion of the territory.

(c) If a district or municipality is excluded from the authority's boundaries under this section, the authority is not required to:

(1) provide water or any other service to the district or municipality; or

(2) include the district or municipality in any groundwater reduction plan adopted or implemented by the authority.

(d) If, not later than the 60th day after the effective date of the Act creating this chapter, a district or municipality files a petition for exclusion under this section, the authority may not impose fees, user fees, rates, charges, or special assessments on the district or municipality after the petition is filed with the authority unless the district or municipality is annexed by the authority under Section 8813.006.

(e) If a district or municipality excluded from the authority's boundaries under this section petitions the authority to be annexed under Section 8813.006, the authority may annex the district or municipality. The authority may, as a condition of annexation, require terms and conditions the board considers appropriate. The authority may require the district or municipality to pay the authority the fees, user fees, charges, and special assessments, with interest, that, as determined by the authority, the district or municipality would have been charged by the authority if the district or municipality had not been excluded from the authority under this section.

Sec. 8813.006. ANNEXATION. (a) Except to the extent the authority agrees in writing, a municipality's annexation of territory within the authority does not affect:

(1) the authority's powers inside or outside the annexed territory;

(2) the authority's boundaries or contracts; or

(3) the authority's ability to assess fees, user fees, rates, charges, or special assessments inside or outside the territory annexed by the municipality.

(b) Territory may be annexed to the authority, regardless of whether the territory is contiguous to the authority, as provided by Chapter 49, Water Code.

(c) In addition to the authority granted by Subsection (b), regardless of whether the territory is contiguous to the authority, the authority may annex some or all of the territory located within a district or municipality if the district or municipality files with the authority a petition requesting the annexation signed by a majority of the members of the governing body of the district or municipality. The petition must include an accurate legal description of the boundaries of the territory to be included. If the authority has bonds, notes, or other obligations outstanding, the authority shall require the petitioning district or municipality to be obligated to pay its share of the principal of and interest on the outstanding bonds, notes, or other obligations, and

related costs. The board may grant the petition and order the territory described by the petition annexed to the authority if it is feasible, practicable, and to the advantage of the authority.

(d)  Any territory that a district located within the authority annexes becomes territory of the authority on the effective date of the annexation without any action required of the authority. The authority by rule may require all districts located within the authority to send to the authority written notice of the effective date of an annexation and require the districts to send to the authority copies of any necessary documents describing the annexed land and describing the districts' boundaries as they exist after inclusion of the annexed land.

(e)  The annexation to the authority of territory under this section does not affect the validity of the authority's bonds issued before or after the annexation.

(f)  A municipality that annexes territory of the authority for limited purposes under Subchapter F, Chapter 43, Local Government Code, does not have the right to:

(1)  receive notices from the authority under Section 8813.103(c);

(2)  participate in the appointment of directors under Subchapter B; or

(3)  receive information about or have the opportunity to fund its share of capital costs in the manner provided by the authority under Section 8813.104.

Sec. 8813.007.  APPLICABILITY OF OTHER LAW. (a)  Except as otherwise provided by this chapter, Chapter 49, Water Code, applies to the authority.

(b)  This chapter does not prevail over or preempt a provision of Chapter 36, Water Code, Chapter 8801 of this code, or Chapter 1045, Acts of the 71st Legislature, Regular Session, 1989, that is being implemented by the Harris-Galveston Coastal Subsidence District or Fort Bend Subsidence District, as applicable.

Sec. 8813.008.  FINDING OF BENEFIT. All the land, property, and persons included within the boundaries of the authority will be directly benefited by the works, projects, improvements, and services to be provided by the authority under powers conferred by Section 59, Article XVI, Texas Constitution, and this chapter. The authority is created to serve a public use and benefit. The creation of the authority will serve to promote the health, safety, and general welfare of persons within the authority and the general public. Any fees, user fees, rates, charges, or special assessments imposed by the authority under this chapter are necessary to pay for the costs of accomplishing the purposes of the authority as set forth in Section 59, Article XVI, Texas Constitution, and this chapter, including:

(1)  the reduction of groundwater withdrawals;

(2)  the facilitation of compliance with the requirements of the Fort Bend Subsidence District or the Harris-Galveston Coastal Subsidence District, as applicable; and

(3)  the provision of services, facilities, and systems.

[Sections 8813.009-8813.020 reserved for expansion]

SUBCHAPTER A-1. TEMPORARY PROVISIONS

Sec. 8813.021.  INITIAL DIRECTORS. (a) The initial board consists of:

| Name of Director: | Representing Director Precinct: |
| --- | --- |
| David Spell | 1 |
| Robert Darden | 2 |
| Bruce Fay | 3 |

| | |
|---|---|
| Melony Gay | 4 |
| Robert Patton | 5 |
| Peter Houghton | 6 |
| Pat Hebert | 7 |

(b)  The directors for director precincts 1, 3, 5, and 7 shall serve until the appointment of directors under Section 8813.056 in 2008. The directors for director precincts 2, 4, and 6 shall serve until the appointment of directors under Section 8813.056 in 2010.

Sec. 8813.022.  EXPIRATION OF SUBCHAPTER. This subchapter expires September 1, 2010.

[Sections 8813.023-8813.050 reserved for expansion]

SUBCHAPTER B.  BOARD OF DIRECTORS

Sec. 8813.051.  DIRECTORS; TERMS.   (a)  The authority is governed by a board of seven directors.

(b)  The directors serve staggered four-year terms that expire May 15 of even-numbered years.

Sec. 8813.052.  ELIGIBILITY TO SERVE AS DIRECTOR. (a) To be eligible to serve as a director of the authority or to be listed on a ballot as a candidate for director of the authority representing a director precinct, an individual must:

(1)  be at least 18 years of age;

(2)  be a resident of the authority; and

(3)  have served as a director of one or more districts for a total of at least four years.

(b)  Notwithstanding Subsection (a), to serve as a director representing, or to be listed on a ballot as a candidate for director representing, a director precinct that includes any part of the City of Fulshear, an individual must:

(1)  meet the qualifications provided by Subsections (a)(1) and (2); and

(2)  have served as:

(A)  the mayor or a member of the city council of the City of Fulshear for any period; or

(B)  a director of one or more districts for a total of at least four years.

Sec. 8813.053.  DISQUALIFICATION OF DIRECTORS. The common law doctrine of incompatibility does not disqualify an official or employee of a public entity from serving as a director of the authority. A director who is also an officer or employee of a public entity may not participate in the discussion of or vote on a matter regarding a contract with that public entity.

Sec. 8813.054.  CONFLICTS OF INTEREST. Chapter 171, Local Government Code, governs conflicts of interest of board members.

Sec. 8813.055.  SINGLE-MEMBER DIRECTOR PRECINCTS. (a)   The authority is divided into seven single-member director precincts, as described by Section 3 of the Act creating this chapter.

(b)  The board may redraw the single-member director precincts in a manner that is reasonable and equitable:

(1)  after any change in the boundaries of the authority; or

(2)  by a resolution redrawing the director precincts adopted by a two-thirds majority of the board based on changed circumstances.

Sec. 8813.056. METHOD OF APPOINTMENT OF DIRECTORS. (a) The governing bodies of the districts and municipalities located within each director precinct jointly shall appoint one director to represent the precinct by a vote conducted as provided by this section.

(b) If a district or municipality is located within two or more director precincts, the district or municipality is considered, for purposes of this section, to be located only within the director precinct in which the greatest amount of territory of the district or municipality is located.

(c) For the appointment of a director for a director precinct, the board shall determine the number of votes each district or municipality may cast. The number of votes for a governing body of a district or municipality within the precinct is equal to the number computed by dividing the total number of units of water, as determined by the board, used within the precinct by the district or municipality during the calendar year preceding the year in which the director is selected by the total number of units of water used within the precinct by all districts and municipalities in the precinct, multiplying that quotient by 100, and rounding that result to the nearest one-tenth. The board shall provide the presiding officer of each governing body of a district or municipality within each director precinct written notice of the number of votes computed for that governing body to cast.

(d) For purposes of Subsection (c), the board shall determine the amount of water usage of all districts and municipalities within each director precinct.

(e) In the appropriate even-numbered year, the governing body of each district or municipality in a director precinct by resolution may nominate one candidate for the position of director for that director precinct. Each district or municipality shall submit the name of its candidate, if any, to the presiding officer of the authority by February 15 of that year. If by February 15 of that year only one candidate's name is submitted for the position of director for a director precinct, the board may declare the unopposed candidate elected and may cancel the director appointment procedures generally required by this section for that position. If more than one candidate's name is submitted for the position of director for a director precinct, before March 15 of that year the board shall prepare, for the director precinct or precincts from which a director is being appointed, a ballot listing all of the candidates for that director precinct and shall provide a copy of the appropriate ballot to the presiding officer of the governing body of each district or municipality located within the director precinct from which a director is being appointed.

(f) An individual may not be listed as a candidate on the ballot for more than one director position. If a candidate is nominated for more than one director position, the candidate must choose to be on the ballot for only one director position.

(g) The governing body of each district or municipality shall determine its votes for director by resolution and submit them to the presiding officer of the authority before May 1 of the appropriate even-numbered year. In casting its votes for director, the governing body of each district or municipality may vote for only one candidate on the ballot for the director precinct in which the district or municipality is located. For each director precinct from which a director is being appointed, the board shall count the votes, declare elected the candidate who received the greatest number of

votes from districts and municipalities located within that director precinct, and submit the results before May 15 of that year to the governing body of each district or municipality within that director precinct.

(h) The board may adopt rules regarding:

(1) the manner and timing of determinations and calculations required by this section;

(2) the reporting of water usage to the authority by districts and municipalities; and

(3) the conduct and process of the appointment of directors.

Sec. 8813.057. VACANCY IN OFFICE OF DIRECTOR. A vacancy in the office of director shall be filled by appointment by the governing bodies of the districts and municipalities that are located within the director precinct for which the vacancy occurred. The appointment process shall follow the procedures of Section 8813.056. The board may establish dates different from those specified by Sections 8813.056(e) and (g), but the date for the board's submission of the voting results to each district and municipality may not be later than the 120th day after the date the vacancy occurs.

Sec. 8813.058. MEETINGS AND ACTIONS OF BOARD. (a) The board may meet as many times each year as the board considers appropriate.

(b) Directors of the authority are public officials and are entitled to governmental immunity for their actions in their capacity as directors and officers of the authority.

Sec. 8813.059. GENERAL MANAGER. (a) The board may employ a general manager of the authority or contract with a person to perform the duties of a general manager. The board may delegate to the general manager full authority to manage and operate the affairs of the authority subject only to orders of the board.

(b) The board may delegate to the general manager the authority to employ all persons necessary for the proper handling of the business and operation of the authority and to determine the compensation to be paid to all employees, other than the general manager.

[Sections 8813.060-8813.100 reserved for expansion]

SUBCHAPTER C. POWERS AND DUTIES

Sec. 8813.101. GENERAL POWERS AND DUTIES. (a) The authority may:

(1) provide for the conservation, preservation, protection, recharge, and prevention of waste of groundwater, and for the reduction of groundwater withdrawals as necessary to develop, implement, or enforce a groundwater reduction plan, in a manner consistent with the purposes of Section 59, Article XVI, Texas Constitution, and facilitate compliance with Fort Bend Subsidence District or Harris-Galveston Coastal Subsidence District, as applicable, rules, orders, regulations, or requirements;

(2) acquire or develop surface water and groundwater supplies from sources inside or outside the boundaries of the authority, conserve, store, transport, treat, purify, distribute, sell, and deliver water to or among persons inside and outside the boundaries of the authority, and allocate water among persons participating in the authority's groundwater reduction plan whether they are located inside or outside the authority's boundaries;

(3)  enter into contracts with persons inside or outside the authority on terms and conditions the board considers desirable, fair, and advantageous for the performance of its rights, powers, and authority under this chapter;

(4)  coordinate water services provided inside, outside, or into the authority;

(5)  provide wholesale and retail water services to any users or customers within the authority's boundaries without being required to execute contracts with those users or customers;

(6)  adopt policies establishing whether, when, and the manner in which the authority uses requests for proposals in obtaining services, including professional services;

(7)  determine whether to adopt administrative policies in addition to those required by Section 49.199, Water Code; and

(8)  administer and enforce this chapter.

(b)  Sections 49.451-49.455, Water Code, do not apply to the authority.

(c)  Notwithstanding Subsection (a)(5), the authority may not provide retail water service to a retail user within the authority's boundaries that is located within the boundaries of a district or municipality on the date the authority awards a contract for the construction or executes a contract for the acquisition of water facilities to serve that retail user, unless:

(1)  the district or municipality consents in writing to the authority's provision of retail water service; or

(2)  the retail user owns or operates a well.

(d)  If a retail user that does not own or operate a well is added to the boundaries of a district or municipality after the date the authority awards a contract for the construction or executes a contract for the acquisition of water facilities to serve that retail user, the authority may provide retail service to that retail user without the written consent of the district or municipality.

Sec. 8813.102.  AUTHORITY RULES.  The authority may adopt and enforce rules reasonably required to implement this chapter, including rules governing procedures before the board and rules regarding implementation, enforcement, and any other matters related to the authority's water supply or groundwater reduction plan.

Sec. 8813.103.  FEES, USER FEES, RATES, AND CHARGES.  (a) The authority may establish fees, user fees, rates, and charges and classifications of payers of fees and rates as necessary to enable the authority to fulfill the authority's purposes and regulatory functions provided by this chapter. The authority may impose fees, user fees, rates, and charges on any person within the authority.

(b)  The authority may charge the owner of a well located within the authority's boundaries a fee or user fee according to the amount of water pumped from the well. If ownership of a well changes, both the prior and subsequent well owners are liable to the authority, jointly and severally, for all fees and user fees imposed by the authority under this subsection, and any related penalties and interest, for water pumped from that well before the change in well ownership.

(c) The board shall make reasonable efforts to send districts and municipalities written notice of the date, time, and location of the meeting at which the board intends to adopt a proposed charge under Subsection (b) and the amount of the proposed charge. The board's failure to comply with this subsection does not invalidate a charge adopted by the board under Subsection (b).

(d) For wells located in Harris County or Fort Bend County, the board shall exempt from the charge under Subsection (b) classes of wells that are not subject to any groundwater reduction requirement imposed by the Harris-Galveston Coastal Subsidence District or the Fort Bend Subsidence District, as applicable. If any of those classes of wells become subject to a groundwater reduction requirement imposed by the applicable subsidence district, the authority may impose the charge under Subsection (b) on those classes. The board by rule may exempt any other classes of wells from the charge under Subsection (b). The board may not apply the charge under Subsection (b) to a well:

(1) with a casing diameter of less than five inches that serves only a single-family dwelling; or

(2) regulated under Chapter 27, Water Code.

(e) For purposes of Subsection (d), a well is subject to a groundwater reduction requirement if the applicable subsidence district has adopted or adopts a requirement or rule that groundwater withdrawals from the well, or from the well and other wells collectively, be reduced, including a groundwater reduction that is not required until a future date.

(f) The authority may establish fees, user fees, rates, and charges that are sufficient to:

(1) achieve water conservation;

(2) prevent waste of water;

(3) serve as a disincentive to pumping groundwater;

(4) develop, implement, or enforce a groundwater reduction plan;

(5) accomplish the purposes of this chapter, including making available alternative water supplies;

(6) enable the authority to meet operation and maintenance expenses;

(7) pay the principal of and interest on notes, bonds, and other obligations issued in connection with the exercise of the authority's general powers and duties; and

(8) satisfy all rate covenants relating to the issuance of notes, bonds, and other obligations.

(g) The authority may charge rates established by the authority for water purchased from the authority.

(h) The authority may impose fees, user fees, or charges for the importation of water into the authority's boundaries from a source located outside the authority's boundaries.

Sec. 8813.104. PURCHASE OF WATER FROM ANOTHER ENTITY. (a) If the authority purchases water from another entity for resale to local governments, the authority shall use its best efforts in negotiating with the entity to determine the amount of capital costs included in any rates or charges paid by the authority. The authority shall determine the amount of expected capital costs of its own system.

(b)　The authority shall provide each district or municipality within its boundaries information regarding the share of the capital costs to be paid by the district or municipality, as determined by the authority, and shall provide each district or municipality the opportunity, in a manner and by a procedure determined by the authority, to fund its share of the capital costs with proceeds from the sale of bonds or fees and charges collected by the districts or municipalities. A district or municipality may use any lawful source of revenue, including bond funds, to pay any sums due to the authority.

(c)　The authority may adopt a procedure by which a district or municipality may receive a credit from the authority. The board may adopt any other procedure necessary to accomplish the goals of this section.

(d)　In complying with this section, the authority may use any reasonable basis to calculate from time to time the share of the capital costs of a district or municipality. The authority may calculate the shares of the capital costs based on the amount of water used within the authority by the district or municipality during the calendar year preceding the year in which the calculation is made.

(e)　This section or any failure to comply with this section does not limit or impede the authority's ability to issue bonds or notes or invalidate any fees, user fees, charges, rates, or special assessments imposed by the authority.

Sec. 8813.105.　ASSESSMENTS.　(a)　The board may undertake improvement projects and services that confer a special benefit on all or a definable part of the authority. The board may impose special assessments on property in that area, including property of a local government, based on the benefit conferred by the improvement project or services, to pay all or part of the cost of the project and services. The board may provide improvements and services to an area outside the boundaries of the authority if the board determines that there is a benefit to the authority. The authority may finance with special assessments any improvement project or service authorized by this chapter or any other applicable law.

(b)　Services or improvement projects may be financed with special assessments under this chapter only after the board holds a public hearing on the advisability of the improvements and services and the proposed assessments.

(c)　The board shall publish notice of the hearing in a newspaper or newspapers with general circulation in Harris and Fort Bend Counties.　The publication must be made not later than the 30th day before the date of the hearing.

(d)　Notice provided under this section must include:

(1)　the time and place of the hearing;

(2)　the general nature of the proposed improvement project or services;

(3)　the estimated cost of the improvement, including interest during construction and associated financing costs; and

(4)　the proposed method of assessment.

(e)　Written notice containing the information required by Subsection (d) shall be mailed by certified mail, return receipt requested, not later than the 30th day before the date of the hearing.　The notice shall be mailed to each person within the authority who holds a permit for a well issued by the Harris-Galveston Coastal Subsidence District or Fort Bend Subsidence District, as applicable, and whose well is subject to a

groundwater reduction requirement imposed by that district. The Harris-Galveston Coastal Subsidence District and Fort Bend Subsidence District shall provide to the authority a list of persons who hold such a permit.

(f) The board may establish rules regarding procedures for a hearing. A hearing on the services or improvement project, whether conducted by the board or a hearings examiner, may be adjourned from time to time. At the conclusion of a hearing conducted by the board, the board shall make written findings and conclusions relating to the advisability of the improvement project or services, the nature of the improvement project or services, the estimated cost, and the area benefited. If the board appoints a hearings examiner to conduct the hearing, after conclusion of the hearing, the hearings examiner shall file with the board a written report of the examiner's findings and conclusions.

(g) At a hearing on proposed assessments, on adjournment of the hearing, or after consideration of the hearings examiner's report, the board shall hear and rule on all objections to each proposed assessment. The board may amend proposed assessments for any property. After the board hears and takes action on those objections, the board, by order:

(1) shall impose the assessments as special assessments on the property;

(2) shall specify the method of payment of the assessments; and

(3) may provide that those assessments, including interest, be paid in periodic installments.

(h) Periodic installments must be in amounts sufficient to meet annual costs for services and improvements as provided by Subsection (j) and continue for the number of years required to retire the indebtedness or pay for the services to be rendered. The board may provide interest charges or penalties for failure to make timely payment and may impose an amount to cover delinquencies and expenses of collection.

(i) If assessments are imposed for more than one service or improvement project, the board may provide that assessments collected for one service or improvement project may be borrowed to be used for another service or improvement project. The board shall establish a procedure for the distribution or use of any assessments in excess of those necessary to finance the services or improvement project for which those assessments were collected.

(j) The board shall apportion the cost of an improvement project or services to be assessed against the property in the authority according to the special benefits that accrue to the property because of the improvement project or services. The board may assess the cost only according to the number of gallons of groundwater pumped from wells within the authority that are subject to a groundwater reduction requirement imposed by the Harris-Galveston Coastal Subsidence District or Fort Bend Subsidence District, as applicable. The board may not assess the cost according to groundwater pumped from:

(1) a well with a casing diameter of less than five inches that serves only a single-family dwelling; or

(2) a well that is regulated by Chapter 27, Water Code.

(k) The area of the authority to be assessed according to the findings of the board may be the entire authority or any part of the authority and may be less than the area proposed in the notice of the hearing.

(l)  The area to be assessed may not include property that is not within the authority boundaries at the time of the hearing unless there is an additional hearing, following the required notice.

(m)  Notwithstanding Subsection (l), the owner of land annexed to the authority after the authority has imposed assessments may waive the right to notice and an assessment hearing and may agree to the imposition and payment of assessments at an agreed rate for land annexed to the authority. A district or municipality may waive the right to notice and an assessment hearing for land within its boundaries annexed to the authority and may agree to the imposition and payment of assessments at an agreed rate for the annexed land.

(n)  The board shall have prepared an assessment roll showing the assessments against each property and the board's basis for the assessment. The assessment roll shall be:

(1)  filed with the secretary of the board or other officer who performs the function of secretary; and

(2)  open for public inspection.

(o)  After notice and hearing in the manner required for an original assessment, the board may make supplemental assessments to correct omissions or mistakes in the assessment:

(1)  relating to the total cost of the improvement project or services; or

(2)  covering delinquencies or costs of collection.

Sec. 8813.106.  INTEREST AND PENALTIES.   The board may require the payment of interest on any late or unpaid fees, user fees, rates, charges, and special assessments due the authority, but the interest rate may not exceed the interest rate permitted by Section 2251.025, Government Code. The board may also impose penalties for the failure to make a complete or timely payment to the authority.  In addition, the board may exclude a person, or any territory or well owned or controlled by a person, from the authority's groundwater reduction plan for failure to make a complete or timely payment to the authority.

Sec. 8813.107.  ATTORNEY'S FEES AND COLLECTION EXPENSES.   (a) The authority is entitled to reasonable attorney's fees incurred by the authority in enforcing its rules.

(b)  The authority is entitled to collection expenses and reasonable attorney's fees incurred by the authority in collecting any delinquent fees, user fees, rates, and charges and any related penalties and interest.

Sec. 8813.108.  LIEN.   (a)  Fees and user fees imposed by the authority under Section 8813.103(b), any related penalties and interest, and collection expenses and reasonable attorney's fees incurred by the authority:

(1)  are a first and prior lien against the well to which the fees or user fees apply;

(2)  are superior to any other lien or claim other than a lien or claim for county, school district, or municipal ad valorem taxes; and

(3)  are the personal liability of and a charge against the owner of the well.

(b)  A lien under this section is effective from the date of the resolution or order of the board imposing the fee or user fee until the fee or user fee is paid.

(c)  The board may enforce the lien in the same manner that a municipal utility district operating under Chapter 54, Water Code, may enforce an ad valorem tax lien against real property.

Sec. 8813.109.  ADMINISTRATIVE PENALTY; INJUNCTION.  (a)  A person who violates a rule or order of the authority is subject to an administrative penalty of not more than $5,000, as determined by the board, for each violation or each day of a continuing violation. The person shall pay the penalty to the authority.

(b)  The authority may bring an action to recover the penalty in a district court in the county where the violation occurred.

(c)  The authority may bring an action for injunctive relief in a district court in the county where a violation of an authority rule or order occurs or is threatened to occur. The court may grant to the authority, without bond or other undertaking, a prohibitory or mandatory injunction that the facts warrant, including a temporary restraining order, temporary injunction, or permanent injunction.

(d)  The authority may bring an action for an administrative penalty and injunctive relief in the same proceeding.

Sec. 8813.110.  WATER SUPPLY OR DROUGHT CONTINGENCY PLANS. The authority by rule may develop, prepare, revise, adopt, implement, enforce, and manage comprehensive water supply or drought contingency plans for the authority, or any portion of the authority.

Sec. 8813.111.  GROUNDWATER REDUCTION PLAN.  (a)  The authority may wholly or partly develop, prepare, revise, adopt, implement, enforce, manage, or participate in a groundwater reduction plan that is applicable only to the authority and one or more persons outside the authority. The authority may require that any groundwater reduction plan that the authority wholly or partly develops, prepares, revises, adopts, implements, enforces, or manages or in which the authority participates be the exclusive groundwater reduction plan that is binding and mandatory on some or all of the territory, persons, or wells located within the authority. A groundwater reduction plan may:

(1)  specify the measures to be taken to reduce groundwater withdrawals;

(2)  identify alternative sources of water, including water from the authority, to be provided to those affected;

(3)  identify the rates, terms, and conditions under which alternative sources of water will be provided, which may be changed from time to time as considered necessary by the authority;

(4)  specify the dates and extent to which persons or districts within the authority's boundaries shall reduce or cease reliance on groundwater and accept water from alternative sources, including water from the authority;

(5)  include other terms and measures that are consistent with the powers and duties of the authority;

(6)  exceed the minimum requirements imposed by the Harris-Galveston Coastal Subsidence District or Fort Bend Subsidence District, as applicable, including any applicable groundwater reduction requirements; and

(7)  be amended from time to time at the discretion of the authority.

(b)  Fees, user fees, rates, charges, and special assessments of the authority may be imposed under this chapter for a person's participation in and benefit derived from the authority's groundwater reduction plan or a groundwater reduction plan in which the authority participates.

Sec. 8813.112.  ACQUISITION, CONSTRUCTION, AND OPERATION OF SYSTEMS.  (a)  The authority may:

(1)  acquire by purchase, gift, lease, contract, or any other legal means a water treatment or supply system, or any other works, plants, improvements, or facilities necessary or convenient to accomplish the purposes of the authority, or any interest of the authority, inside or outside the authority's boundaries;

(2)  design, finance, operate, maintain, or construct a water treatment or supply system or any other works, plants, improvements, or facilities necessary or convenient to accomplish the purposes of the authority and provide water services inside or outside the authority's boundaries;

(3)  lease or sell a water treatment or supply system or any other works, plants, improvements, or facilities necessary or convenient to accomplish the purposes of the authority that the authority constructs or acquires inside or outside the authority's boundaries;

(4)  contract with any person to operate or maintain a water treatment or supply system the person owns; or

(5)  acquire water rights under any law or permit.

(b)  The authority may contract, according to terms and conditions the board considers desirable, fair, and advantageous, with a person outside the authority's boundaries:

(1)  to allow the person, or the person's well, to be included in a groundwater reduction plan adopted or implemented wholly or partly by the authority or in a groundwater reduction plan in which the authority participates;

(2)  to sell water to the person; or

(3)  to sell the person available excess capacity or additional capacity of the authority's water treatment or supply system.

(c)  The authority by rule may require that the plans and specifications of water lines to be constructed within the authority that are designed or intended to serve more than one district or more than one person owning or holding a well permit issued by the Harris-Galveston Coastal Subsidence District or Fort Bend Subsidence District, as applicable, be approved by the authority before the commencement of construction of the water lines.

Sec. 8813.113.  SALE OR REUSE OF WATER OR BY-PRODUCT.   The authority may store, sell, or reuse:

(1)  water; or

(2)  any by-product from the authority's operations.

Sec. 8813.114.  CONTRACTS.  (a)  The authority may enter into a contract with a person for the performance of a purpose or function of the authority, including a contract to design, construct, finance, lease, own, manage, operate, or maintain works, improvements, facilities, plants, equipment, or appliances necessary to accomplish a purpose or function of the authority. A contract may be of unlimited duration.

(b)  The authority may purchase, acquire, finance, or lease an interest in a project used for a purpose or function of the authority.

(c)  The authority may contract for:

(1)  the purchase, sale, or lease of water or water rights;

(2)  the performance of activities within the powers of the authority through the purchase, construction, or installation of works, improvements, facilities, plants, equipment, or appliances; or

(3)  the design, construction, ownership, management, maintenance, or operation of any works, improvements, facilities, plants, equipment, or appliances of the authority or another person.

(d)  The authority may purchase surplus property from this state, the United States, or another public entity through a negotiated contract without bids.

Sec. 8813.115.  COOPERATION WITH AND ASSISTANCE OF OTHER GOVERNMENTAL ENTITIES.  (a)  In implementing this chapter, the board may cooperate with and request the assistance of the Texas Water Development Board, the commission, the United States Geological Survey, the Fort Bend Subsidence District, other local governments, and other agencies of the United States and this state.

(b)  The Fort Bend Subsidence District may enter into an interlocal contract with the authority to carry out the authority's purposes and may carry out the governmental functions and services specified in the interlocal contract.

(c)  In an attempt to minimize costs associated with preparing a groundwater reduction plan, the board may consider the usefulness of water supply studies and plans prepared by or on behalf of the North Harris County Regional Water Authority, the West Harris County Regional Water Authority, the City of Houston, or other governmental entities to the extent those studies or plans are available and applicable to the authority.

Sec. 8813.116.  GIFTS AND GRANTS.  The authority may accept a gift or grant from money collected by the Fort Bend Subsidence District to fund the construction, maintenance, or operation of a water treatment or supply system.

Sec. 8813.117.  EXPENDITURES.  (a)  The authority's money may be disbursed only by check, draft, order, federal reserve wire system, or other instrument or authorization.

(b)  Disbursements of the authority must be signed by at least a majority of the directors. The board by resolution may allow the general manager, treasurer, bookkeeper, or other employee of the authority to sign disbursements, except as limited by Subsection (c).

(c)  The board by resolution may allow disbursements to be transferred by federal reserve wire system to accounts in the name of the authority without the necessity of any directors signing the disbursement. Disbursements of the authority's money by federal reserve wire system to any accounts not in the name of the authority must be signed by at least a majority of the directors.

Sec. 8813.118.  AD VALOREM TAXATION.  The authority may not impose an ad valorem tax.

Sec. 8813.119.  EMINENT DOMAIN.  (a)  The authority may acquire by condemnation any land, easements, or other property inside the authority's boundaries to further authorized purposes, powers, or duties of the authority. The authority may

acquire by condemnation any land, easements, or other property outside the authority's boundaries for the purposes of pumping, storing, treating, or transporting water. When exercising the power of eminent domain granted by this section, the authority may elect to condemn either the fee simple title or a lesser property interest.

(b) The authority shall exercise the right of eminent domain in the manner provided by Chapter 21, Property Code. The authority is not required to give bond for appeal or bond for costs in a condemnation suit or other suit to which it is a party. The authority is not required to deposit more than the amount of an award in a suit.

(c) The authority may not use the power of eminent domain for the condemnation of land for the purpose of acquiring rights to groundwater or for the purpose of acquiring water or water rights.

[Sections 8813.120-8813.150 reserved for expansion]

SUBCHAPTER D. BONDS AND NOTES

Sec. 8813.151. REVENUE BONDS AND NOTES. (a) The authority may issue bonds or notes payable solely from revenue from any source, including:

(1) tolls, charges, rates, fees, user fees, and special assessments the authority imposes or collects;

(2) the sale of water, water services, water rights or capacity, water transmission rights or services, water pumping, or any other service or product of the authority provided inside or outside the boundaries of the authority;

(3) grants or gifts;

(4) the ownership or operation of all or a designated part of the authority's works, improvements, facilities, plants, or equipment; and

(5) contracts between the authority and any person.

(b) Notes issued by the authority may be first or subordinate lien notes at the board's discretion.

(c) In connection with any bonds or notes of the authority, the authority may exercise any power of an issuer under Chapter 1371, Government Code.

(d) The authority may conduct a public, private, or negotiated sale of the bonds or notes.

(e) The authority may enter into one or more indentures of trust to further secure its bonds or notes.

(f) The authority may issue bonds or notes in more than one series as necessary to carry out the purposes of this chapter. In issuing bonds or notes secured by revenue of the authority, the authority may reserve the right to issue additional bonds or notes secured by the authority's revenue that are on a parity with or are senior or subordinate to the bonds or notes issued earlier.

(g) A resolution of the board authorizing the bonds or notes or a trust indenture securing the bonds or notes may specify additional provisions that constitute a contract between the authority and its bondholders or noteholders.

(h) Bonds and notes may be additionally secured by deed of trust or mortgage on any or all of the authority's facilities.

(i) The authority may issue refunding bonds or notes to refund any of its bonds or notes in any manner provided by law.

(j)  Sections 49.153, 49.154, and 49.181, Water Code, do not apply to bonds or notes issued by the authority.  Commission rules regarding bonds or notes do not apply to bonds or notes issued by the authority.

SECTION 2.  INITIAL AUTHORITY TERRITORY.  (a) The North Fort Bend Water Authority initially includes the territory that is contained in the following area, regardless of whether the territory contains noncontiguous parcels of land or whether the territory is located within the boundaries of any other governmental entity or political subdivision of the state:

BEGINNING at a point marking the Northwest corner and Point of Beginning of Regulatory Area A as defined in the Fort Bend Subsidence District 2003 Regulatory Plan, said point being near the intersection of Jordan Road and the common line between Waller and Fort Bend Counties and having approximate coordinates of North 29° 45' 10" and West 95° 55' 15";

THENCE in a Northeasterly direction, along and with the common line between said Waller and Fort Bend Counties to its intersection with the West line of the Willow Point Municipal Utility District (as it existed December 20, 2004), same being the West line of the W.W. Bains Survey, Abstract No. 753 (Fort Bend County) and Abstract No. 385 (Waller County);

THENCE in a Northerly direction, along and with the West line of said Willow Point Municipal Utility District (as it existed December 20, 2004), same being the West line of said W.W. Bains Survey, Abstract No. 385 to a point in the South right-of-way line of Interstate 10 and marking the Northwest corner of said Willow Point Municipal Utility District (as it existed December 20, 2004);

THENCE in an Easterly direction, along and with the South right-of-way line of said Interstate 10 to the Northeast corner of said Willow Point Municipal Utility District (as it existed December 20, 2004), said point also being a Southwest corner of the current corporate limits of the City of Katy;

THENCE in a Southerly direction, along and with the East line of said Willow Point Municipal Utility District (as it existed December 20, 2004), same being the East line of said W.W. Bains Survey, Abstract No. 385 to a point in the common line between Waller and Fort Bend Counties;

THENCE in a Northeasterly direction, along and with the common line between said Waller and Fort Bend Counties to its intersection with a Southerly line of the current corporate limits of said City of Katy, same being the South right-of-way line of said Interstate 10 and having approximate coordinates of North 29° 46' 40" and West 95° 51' 20";

THENCE in a generally Southeast direction and along and with the southerly limits of the current corporate limits of the City of Katy the following courses:

Easterly, along and with the South right-of-way line of said Interstate 10 to approximately 2,350 feet;

Southerly, approximately 2,350 feet;

Easterly, to its intersection with the Northeasterly line of the C.W. Schrimph Survey, Abstract No. 412;

Southeasterly, along and with the Northeasterly line of said Schrimph Survey and the Northeasterly line of the E. Everett Survey, Abstract No. 385 to point in the centerline of Katy-Flewellen Road and being the most Easterly corner of said Everett Survey;

Northeasterly, along and with the centerline of said Katy-Flewellen Road to its intersection with the Easterly right-of-way line of Pin Oak Road, same being a Westerly line of Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004);

Southeasterly, along and with the Easterly right-of-way line of said Pin Oak Road, same being a Westerly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004) to its intersection with the Southeasterly right-of-way line of said Katy-Flewellen Road;

Southwesterly, along and with the Southeasterly right-of-way line of said Katy-Flewellen Road, same being a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004) to the most Westerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004);

Southeasterly, along and with the most Southwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004) to the most Westerly South corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004),

Northeasterly, along and with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004), same being the most Northerly corner of Pin Oak Village Section 1;

Southeasterly, along and with the Northeasterly line of said Pin Oak Village Section 1, same being a Southwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004) to the most Easterly corner of said Pin Oak Village Section 1, same being the most Southerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004);

Northeasterly, along and with the meanders of the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004), passing the most Westerly corner of Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004), continuing along and with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004), same being the Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004), passing the line common to Harris and Fort Bend Counties for the most East corner of said current corporate limits of the City of Katy, continuing along and with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004), same being the Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004) to a point in the West right-of-way line of Falcon Point

Drive for the most Westerly North corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004), same being the most Easterly corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed December 20, 2004);

THENCE Easterly, along and with the North line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004) to the most Easterly North corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004);

THENCE Southeasterly, along and with the Northeast line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004) to the Northeast corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004);

THENCE Southwesterly, along and with a Southeast line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004);

THENCE Southeasterly, along and with a Northeast line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004), crossing the line common to Harris and Fort Bend Counties, passing the most Easterly corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed December 20, 2004), continuing along and with a Southeasterly extension of said Northeast line, crossing Roesner Road to a point in the Southeasterly right-of-way line of said Roesner Road, same being the Northwesterly line of Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Northeasterly, along and with the Southeasterly right-of-way line of said Roesner Road, same being the Northwesterly line of Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004) to a point in the line common to said Harris and Fort Bend Counties for the most Northerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Southeasterly, along and with said county line, same being a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004) to a point in the Northwesterly line of the Cimarron Municipal Utility District (as it existed December 20, 2004) for the most Easterly North corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Southwesterly, along and with the Northwesterly line of said Cimarron Municipal Utility District (as it existed December 20, 2004), same being a Southeast line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Southeasterly, along and with a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004), same being a Southwesterly line of said Cimarron Municipal Utility District (as it existed December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Northeasterly, along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004), same being a Southeasterly line of said Cimarron Municipal Utility District (as it existed December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Southeasterly, along and with a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004), same being a Southwesterly line of said Cimarron Municipal Utility District (as it existed December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004), same being the most Southerly corner of said Cimarron Municipal Utility District (as it existed December 20, 2004);

THENCE Northeasterly, along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004), same being a Southeasterly line of said Cimarron Municipal Utility District (as it existed December 20, 2004), crossing the line common to said Harris and Fort Bend Counties and the Grand Parkway (State Highway 99) passing a point in the Easterly right-of-way of said Grand Parkway, continuing along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004) to point in a Southwesterly line of Cinco Municipal Utility District No. 9 (as it existed December 20, 2004) for the most Northerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004) East of said Grand Parkway;

THENCE Northwesterly, along and with a Southwesterly line of said Cinco Municipal Utility District No. 9 (as it existed December 20, 2004) to a point in the South line of said Cimarron Municipal Utility District (as it existed December 20, 2004) for the West corner of said Cinco Municipal Utility District No. 9 (as it existed December 20, 2004);

THENCE Easterly, along and with the North line of said Cinco Municipal Utility District No. 9 (as it existed December 20, 2004), same being the South line of said Cimarron Municipal Utility District (as it existed December 20, 2004) passing the common North corner of said Cinco Municipal Utility District No. 9 (as it existed December 20, 2004) and Cornerstones Municipal Utility District (as it existed December 20, 2004), also passing the common South corner of said Cimarron Municipal Utility District (as it existed December 20, 2004) and Harris County Municipal Utility District No. 81 (as it existed December 20, 2004), continuing along and with a South line of said Harris County Municipal Utility District No. 81 (as it existed December 20, 2004) to a point in Mason Road for the Northeast corner of said Cornerstones Municipal Utility District (as it existed December 20, 2004);

THENCE Southerly, along and with Mason Road, same being the East line of said Cornerstones Municipal Utility District (as it existed December 20, 2004), passing the common West corner of said Harris County Municipal Utility District No. 81 (as it existed December 20, 2004) and Memorial Municipal Utility District (as it existed December 20, 2004), continuing along and with Mason Road and along and with the East line of said Cornerstones Municipal Utility District (as it existed December 20, 2004) crossing the line common to Harris and Fort Bend Counties to the Southeast

corner of said Memorial Municipal Utility District (as it existed December 20, 2004), same being the Northwest corner of Cinco Municipal Utility District No. 3 (as it existed December 20, 2004);

THENCE Easterly, along and with South line of said Memorial Municipal Utility District (as it existed December 20, 2004), same being the North line of said Cinco Municipal Utility District No. 3 (as it existed December 20, 2004) crossing the line common to Harris and Fort Bend Counties, passing the common North corner of said Cinco Municipal Utility District No. 3 (as it existed December 20, 2004) and Cinco Municipal Utility District No. 6 (as it existed December 20, 2004), continuing along and with the South line of said Memorial Municipal Utility District (as it existed December 20, 2004) to the most Easterly Northwest corner of said Cinco Municipal Utility District No. 6 (as it existed December 20, 2004);

THENCE Southeasterly, along and with the Northeasterly meanders of said Cinco Municipal Utility District No. 6 (as it existed December 20, 2004), same being partly the Southwesterly line of a Harris County Flood Control District right-of-way to the most Easterly corner of said Cinco Municipal Utility District No. 6 (as it existed December 20, 2004), same being an angle point in the Westerly current corporate limits of the City of Houston, same being the Westerly line of the United States Government Barker Reservoir, same further being the Easterly limits of Tract 1 of the West Harris County Regional Water Authority;

THENCE along and with the Easterly limits of said West Harris County Regional Water Authority, same being the Westerly current corporate limits of said City of Houston, same further being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 6 (as it existed December 20, 2004) the following courses and distances: (bearings and distances based on the description of said West Harris County Regional Water Authority dated December 22, 2000)

South 23° 42' West, a distance of 1178.3 feet;

North 59° 10' West, a distance of 517.8 feet;

South 23' 32' West, to a point in the line common to Harris and Fort Bend Counties for the most Westerly Southeast corner of Tract 1 of said West Harris County Regional Water Authority and having approximate coordinates of North 29° 44' 05" and West 95° 43' 50"

THENCE Southwesterly and Northwesterly, continuing along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 6 (as it existed December 20, 2004) to a point in the Easterly right-of-way line of Fry Road, same being the Easterly line of Cinco Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Southwesterly and Southeasterly, along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 5 (as it existed December 20, 2004) to a point in the centerline of the Willow Fork of Buffalo Bayou

for the corner common to said Cinco Municipal Utility District No. 5 (as it existed December 20, 2004) and Cinco Municipal Utility District No. 7 (as it existed December 20, 2004);

THENCE along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) to a point in the West line of the H.E. Looney Survey, Abstract No. 277 for an angle point;

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) and the West line of said Looney Survey to a point in the North line of Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) for the Southwest corner of said Looney Survey, same being the Southeast corner of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004);

THENCE Easterly, along and with the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Northerly line of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) to the Northeast corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004);

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), passing the most Easterly Southeast corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) to an angle point;

THENCE Westerly, along and with the meanders of the Westerly current corporate limits of said City of Houston, same being a Northerly line of said United States Government Barker Reservoir (Barker Dam Strip), same further being the Southerly line of the Northerly portion of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), passing the common South corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) and Grand Lakes Municipal Utility District No. 1 (as it existed December 20, 2004), continuing along and with the meanders of the Westerly current corporate limits of said City of Houston, same being a Northerly line of said United States Government Barker Reservoir (Barker Dam Strip), same further being the Southerly line of said Grand Lakes Municipal Utility District No. 1 (as it existed December 20, 2004), passing the Southwest corner of said Grand Lakes Municipal Utility District No. 1 (as it existed December 20, 2004) in the centerline of Peek Road, continuing along and with the meanders of the Westerly current corporate limits of said City of Houston, same being a Northerly line of said United States Government Barker Reservoir (Barker Dam Strip) to the Northwest corner of said Barker Dam Strip, same being the most Westerly Northeast corner of the Southern portion of Grand Lakes Municipal Utility District No. 4 (as it existed December 20, 2004);

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being a Westerly line of said United States Government Barker Reservoir (Barker Dam Strip), same further being an Easterly line of said Grand Lakes Municipal Utility District No. 4 (as it existed December 20, 2004) to the Southwest corner of said Barker Dam Strip;

THENCE Easterly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir (Barker Dam Strip), same further being a Northerly line of the Southerly portion of said Grand Lakes Municipal Utility District No. 4 (as it existed December 20, 2004), passing the most Easterly Northeast corner of the Southern portion of Grand Lakes Municipal Utility District No. 4 (as it existed December 20, 2004), continuing along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir (Barker Dam Strip), same being partly the Northerly line of the Southerly portion of said Grand Lakes Municipal Utility District No. 1 (as it existed December 20, 2004), passing the Northwest corner of the Southerly portion of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), continuing along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir (Barker Dam Strip), same being the partly Northerly line of the Southerly portion of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) to a point in the West line of the John Brock Survey, Abstract No. 4 for an angle point;

THENCE Northerly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir, same further being the West line of said Brock Survey, an approximate distance of 62.8 feet to an angle point;

THENCE Easterly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir, an approximate distance of 3,635 feet to an angle point;

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir to a point in the Northerly right-of-way line of Farm To Market Highway 1093 (Westheimer Road),

THENCE Easterly, along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Northerly right-of-way line of said Highway 1093 to its intersection with the Easterly right-of-way line of Farm To Market Highway 1464;

THENCE Southerly, along and with the Easterly right-of-way line of said Highway 1464, passing the Northwest corner of West Harris County Municipal Utility District No. 4 (as it existed December 20, 2004), continuing along and with the Easterly right-of-way line of said Highway 1464, same being the Westerly line of said West Harris County Municipal Utility District No. 4 (as it existed December 20, 2004) to the intersection of the North right-of-way line of Alief-Clodine Road with said Easterly right-of-way line for the Southwest corner of said West Harris County Municipal Utility District No. 4 (as it existed December 20, 2004);

THENCE Easterly, along and with the North right-of-way line of said Alief-Clodine Road, same being the South line of said West Harris County Municipal Utility District No. 4 (as it existed December 20, 2004) to a point in the line common to Harris and Fort Bend Counties;

THENCE Southeasterly, along and with said county line to the South right-of-way line of said Alief-Clodine Road, same being the North line of Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004);

THENCE along and with the Northerly and Easterly limits of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004) the following courses and distances: (bearings and distances based on an exhibit of said Fort Bend County Municipal Utility District No. 30 prepared by Total Surveyors, Inc. and dated March 28, 2000, revised August 30, 2002);

South 56° 52' 06" East, along and with said county line, a distance of 285.62 feet to an angle point;

South 00° 03' 43" West, a distance of 369.13 feet to an interior corner;

North 85° 19' 43" East, crossing said county line, a distance of 1,585.75 feet to the most Southerly Northeast corner;

South 01° 33' 14" West, a distance of 244.10 feet to an angle point;

North 89° 18' 17" East, a distance of 32.93 feet to an angle point;

South 01° 33' 14" West, crossing said county line, a distance of 1,530.25 feet to an interior corner of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004);

South 01° 15' 14" West, along and with the West line of the Chelford City Municipal Utility District (as it existed December 20, 2004), departing the East line of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004), a distance of 463.95 feet to an interior corner of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004);

South 01° 35' 26" West, along and with the East line of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004), a distance of 564.29 feet to an angle point;

South 01° 33' 11" West, a distance of 1,028.29 feet to an angle point;

South 89° 41' 05" West, a distance of 977.24 feet to an angle point;

South 00° 14' 11" West, a distance of 3,248.96 feet to an angle point;

North 85° 58' 03" East, a distance of 276.35 feet to an angle point;

North 89° 56' 54" East, a distance of 564.71 feet to an angle point;

North 86° 13' 12" East, a distance of 131.40 feet to an angle point;

North 86° 09' 25" East, a distance of 59.92 feet to an angle point;

North 85° 19' 10" East, a distance of 165.19 feet to an angle point;

North 81° 39' 13" East, a distance of 248.15 feet to an angle point;

North 86° 51' 58" East, along and with the South line of the Mission Bend Municipal Utility

District No. 1 (as it existed December 20, 2004), a distance of 307.84 feet to an angle point in the East line of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004), same being the Northwest corner of the North Mission Glen Municipal Utility District (West Tract) (as it existed December 20, 2004);

THENCE Easterly, along and with the North line of said North Mission Glen Municipal Utility District (West Tract) (as it existed December 20, 2004), same being the South line of said Mission Bend Municipal Utility District No. 1 (as it existed December 20, 2004) to the Northeast corner of said North Mission Glen Municipal Utility District (West Tract) (as it existed December 20, 2004);

THENCE Southerly, along and with the East line of said North Mission Glen Municipal Utility District (West Tract) (as it existed December 20, 2004), same being a West line of said Mission Bend Municipal Utility District No. 1 (as it existed December 20, 2004), passing an interior Southwest corner of said Mission Bend Municipal Utility District No. 1 (as it existed December 20, 2004), continuing along and with the East line of said North Mission Glen Municipal Utility District (West Tract) (as it existed December 20, 2004) to a Westerly extension of the South right-of-way line of Forest Briar Drive;

THENCE Easterly, along and with said Westerly extension, passing the intersection of the East right-of-way line of Gaines Road with the South right-of-way line of said Forest Briar Drive, same being the Northwest corner of the Kingsbridge Municipal Utility District (as it existed December 20, 2004);

THENCE Easterly, along and with the South right-of-way line of said Forest Briar Drive, same being the North line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004) to its intersection with the South line of the North Mission Glen Municipal Utility District (East Tract) (as it existed December 20, 2004);

THENCE along and with the meanders of the Westerly and Northerly line of said North Mission Glen Municipal Utility District (East Tract) (as it existed December 20, 2004), same partly being an Easterly and Southerly Line of said Mission Bend Municipal Utility District No. 1 (as it existed December 20, 2004) to a point in the West right-of-way line of State Highway 6 for the common East corner of said North Mission Glen Municipal Utility District (East Tract) and Mission Bend Municipal Utility District No. 1 (as they existed December 20, 2004);

THENCE Westerly and Southerly, along and with the West line of said North Mission Glen Municipal Utility District (East Tract) (as it existed December 20, 2004) to its intersection with the North line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004);

THENCE Easterly, along and with the North line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004), crossing the line common to Harris and Fort Bend Counties to a point in the West right-of-way line of Sugarland-Howell Road for the Northeast corner of said Kingsbridge Municipal Utility District (as it existed December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of Sugarland-Howell Road, same being the East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004) to the North right-of-way line of Bissonnet Street, same being an interior North line of the Renn Road Municipal Utility District (as it existed December 20, 2004);

THENCE Westerly, along and with the North right-of-way line of Bissonnet Street, same being a South line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004), same further being an interior North line of said Renn Road Municipal Utility District (as it existed December 20, 2004) to a point in the line common to Harris and Fort Bend Counties for the most Westerly corner of said Renn Road Municipal Utility District (as it existed December 20, 2004), same being an interior corner in the East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004);

THENCE Southeasterly, along and with said county line to the intersection of the centerline of said Sugarland-Howell Road with said county line for an angle point in the East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004), same being an angle point in the West line of said Renn Road Municipal Utility District (as it existed December 20, 2004);

THENCE Southerly, along and with the centerline of said Sugarland-Howell Road, same being an East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004) to the intersection of the South right-of-way line of said Bissonnet Street with said centerline for an angle point in the East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004);

THENCE Westerly, along and with the South right-of-way line of said Bissonnet Street to the intersection of the West right-of-way line of said Sugarland-Howell Road with said South right-of-way line for an angle point in the East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of Sugarland-Howell Road, same being the East line of said Kingsbridge Municipal Utility District (as it existed December 20, 2004) to a Westerly extension of the most Westerly South line of said Renn Road Municipal Utility District (as it existed December 20, 2004);

THENCE Easterly, along and with said Westerly extension passing a point in the East right-of-way line of said Sugarland-Howell Road for the most Westerly Southwest corner of said Renn Road Municipal Utility District (as it existed December 20, 2004), continuing Easterly and Southerly along and with the meanders of the Southwesterly and Southerly lines of said Renn Road Municipal Utility District (as it existed December 20, 2004) to the intersection of the West right-of-way line of Eldridge Road with the South line of said Renn Road Municipal Utility District (as it existed December 20, 2004);

THENCE Northerly, along and with the West right-of-way line of said Eldridge Road same being an Easterly line of said Renn Road Municipal Utility District (as it existed December 20, 2004) to a point in the line common to Harris and Fort Bend Counties;

THENCE Southeasterly, along and with said county line, same being a Southwesterly line of said Renn Road Municipal Utility District (as it existed December 20, 2004), passing a point in the Easterly right-of-way line of said Eldridge Road for an interior corner of said Renn Road Municipal Utility District (as it existed December 20,

2004), continuing along and with said county line, passing a point for the Northeast corner of Tract C of the Fort Bend County Municipal Utility District No. 2 (as it existed December 20, 2004), continuing along and with said county line, same being the Northeasterly line of said Tract C (as it existed December 20, 2004) to the intersection of a North current corporate limit of the City of Houston with said county line and being the most Easterly corner of said Tract C (as it existed December 20, 2004);

THENCE Westerly, along and with a South line of said Tract C (as it existed December 20, 2004), same being a Northerly current corporate limit of the City of Houston, a distance of 579.60 feet to an interior corner of said Tract C (as it existed December 20, 2004);

THENCE Southerly, along and with an East line of said Tract C (as it existed December 20, 2004), same being a Westerly current corporate limit of the City of Houston, at a distance of 227.76 feet passing the most Westerly Southeast corner of said Tract C (as it existed December 20, 2004), continuing along and with said Westerly corporate limits to an interior corner of said Westerly corporate limits;

THENCE Westerly, along and with a Northerly line of the current corporate limits of said City of Houston passing a point in the East right-of-way line of said Eldridge Road, continuing along and with a Westerly extension of said Northerly current corporate limit of said City of Houston to a point in the West right-of-way line of said Eldridge Road, same being the East line of Tract A of said Fort Bend County Municipal Utility District No. 2 (as it existed December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of said Eldridge Road, same being the East line of said Tract A (as it existed December 20, 2004) to the Southeast corner of said Tract A (as it existed December 20, 2004);

THENCE, along and with the Southerly line of said Tract A (as it existed December 20, 2004), same being a Northerly current corporate limit of the City of Houston the following courses and distances (bearings and distances based on the Fort Bend County Municipal Utility District No. 2 District Boundary Map prepared by Pate Engineers and dated November, 1996);

    South 89° 19' 00" West, a distance of 309.57 feet to an angle point;

    North, a distance of 211.22 feet to an angle point;

    West, a distance of 273.60 feet to an angle point;

    North, a distance of 240.97 feet to a point;

    North 89° 52' 59" West to a Northwest corner of said Northerly corporate limit;

THENCE in a general Southeasterly direction, along and with the Westerly and Southerly current corporate limits of said City of Houston to a point in the West line of Tract B of said Fort Bend County Municipal Utility District No. 2 (as it existed December 20, 2004);

THENCE, along and with the boundary of said Tract B (as it existed December 20, 2004) the following courses and distances (bearings and distances based on the Fort Bend County Municipal Utility District No. 2 District Boundary Map prepared by Pate Engineers and dated November, 1996);

    South 89° 59' 49" East, a distance of 1,159.05 feet to the Northeast corner;

    South 00° 00' 25" West, a distance of 1,399.19 feet to an angle point;

South 00° 01' 54" West, a distance of 867.48 feet to the Southeast corner;

North 89° 58' 30" West, a distance of 1,995.67 feet to the Southwest corner;

North 00° 00' 07" West, a distance of 618.91 feet to the Northerly Southeast corner;

South 89° 57' 30" East, a distance of 699.62 feet to an interior corner;

North 00° 07' 34" East, a distance of 250.22 feet to an interior corner in the South right-of-way line of Florence Road;

South 89° 54' 40" East, along and with the South right-of-way line of said Florence Road, a distance of 136.12 feet to an interior corner;

North 00° 02' 30" East, to a point in the North right-of-way line of said Florence Road;

THENCE Westerly, along and with the Northerly right-of-way line of said Florence Road, passing the most Westerly Southeast corner of Tract A of said Fort Bend County Municipal Utility District No. 2 (as it existed December 20, 2004), continuing along and with the North right-of-way line of said Florence Road, same being the South line of said Tract A (as it existed December 20, 2004) to the intersection of the East right-of-way line of Burney Road with said North right-of-way line, same being the Southwest corner of said Tract A (as it existed December 20, 2004);

THENCE Southerly, along and with a Southerly extension of the East right-of-way line of said Burney Road to a point in the South right-of-way line of said Florence Road, same being the Northerly current corporate limits of the City of Sugar Land;

THENCE in a generally Southwesterly direction and along and with the meanders of the most Northerly and Westerly current corporate and/or extra territorial jurisdictional (ETJ) limits of the City of Sugar Land to the intersection of the North right-of-way line of U.S. Highway 90 with said limits and having approximate coordinates of North 29° 36' 15" and West 95° 40' 25";

THENCE Westerly, along and with the meanders of the North right-of-way line of said U.S. Highway 90, same being the North current ETJ limits of the City of Sugar Land to the intersection of the East right-of-way line of Farm To Market Highway 1464 with said North right-of-way line, same being the corner common with the current ETJ limits of the City of Houston, the City of Sugar Land, and the City of Richmond and having approximate coordinates of North 29° 36' 08" and West 95° 41' 00";

THENCE in a generally Northerly and Westerly direction and along and with the meanders of the most Easterly and Northerly current corporate and/or ETJ limits of the City of Richmond to a point in the centerline of Farm To Market Highway 723 and being the corner common with the current ETJ limits of the City of Fulshear, the City of Richmond, and the City of Rosenberg and having approximate coordinates of North 29° 36' 00" and West 95° 48' 40";

THENCE in a generally Westerly direction and along and with the meanders of the most Northerly current corporate and/or ETJ limits of the City of Rosenberg to the intersection of the West line of said Regulatory Area A as defined in the Fort Bend Subsidence District 2003 Regulatory Plan with said current ETJ limits of said City of Rosenberg and having approximate coordinates of North 29° 35' 33" and West 95° 55' 00";

THENCE North, along and with a meridian having a Longitude of West 95° 55' 00", same being the West line of said Regulatory Area A to the POINT OF BEGINNING.
SAVE AND EXCEPT:
That portion of the right-of-way of said Eldridge Road contained within this description.

(b) In addition to the territory described by Subsection (a) of this section, the authority includes all territory in Harris County of any district the territory of which includes, on the effective date of this Act, any of the territory described by Subsection (a) of this section, regardless of whether the territory contains noncontiguous parcels of land.

(c) Notwithstanding Subsections (a) and (b) of this section, the authority does not include any area that, on the effective date of this Act, is inside:

(1) the municipal limits or extraterritorial jurisdiction, as determined under Subchapter B, Chapter 42, Local Government Code, of the Cities of Stafford, Missouri City, Sugar Land, Richmond, Rosenberg, and Katy;

(2) the municipal limits of the City of Houston;

(3) the territory of the West Harris County Regional Water Authority;

(4) the boundaries of Waller County; or

(5) the boundaries of Fort Bend County Water Control and Improvement District No. 2.

(d) Notwithstanding Subsection (c)(3) of this section, the area within the following districts, as their boundaries existed on December 20, 2004, is included within the authority:

(1) Harris-Fort Bend Counties Municipal Utility District No. 1;

(2) Harris-Fort Bend Counties Municipal Utility District No. 5; and

(3) Fort Bend County Municipal Utility District No. 30.

SECTION 3. DESCRIPTION OF DIRECTOR PRECINCTS. (a) The authority includes seven single-member director precincts as follows:

(1) Director Precinct No. 1 includes the territory that is contained in the following area:
BEGINNING at the intersection of an Easterly extension of the North line of the Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) and State Highway 6;
THENCE Southerly, along and with the centerline of said Highway 6 to the intersection of the centerline of Voss Road with the centerline of said Highway 6, same being the Northerly current extra territorial jurisdictional (ETJ) limits of the City of Sugar Land;
THENCE in a generally Southwesterly direction and along and with the meanders of the most Northerly and Westerly current corporate and/or current ETJ limits of the City of Sugar Land to the intersection of the North right-of-way line of U.S. Highway 90 with said limits and having approximate coordinates of North 29° 36' 15" and West 95° 40' 25";
THENCE Westerly, along and with the meanders of the North right-of-way line of said U.S. Highway 90, same being the North current ETJ limits of the City of Sugar Land to the intersection of the East right-of-way line of Farm To Market Highway 1464 with said North right-of-way line, same being the corner common with the

current ETJ limits of the City of Houston, said City of Sugar Land, and the City of Richmond and having approximate coordinates of North 29° 36' 08" and West 95° 41' 00";

THENCE in a generally Northerly and Westerly direction and along and with the meanders of the most Easterly and Northerly current corporate and/or current ETJ limits of said City of Richmond to a point in the centerline of Farm To Market Highway 723 and being the corner common with the current ETJ limits of the City of Fulshear, said City of Richmond, and the City of Rosenberg and having approximate coordinates of North 29° 36' 00" and West 95° 48' 40";

THENCE Northerly, along and with the centerline of said Highway 723 to the intersection of a Westerly extension of the centerline of Wessendorf Road with the centerline of said Highway 723 and having approximate coordinates of North 29° 38' 54" and West 95° 48' 43";

THENCE Easterly, along and with said Westerly extension and the centerline of said Wessendorf Road to the intersection of the centerline of Holmes Road with the centerline of said Wessendorf Road;

THENCE Northerly, along and with the centerline of said Holmes Road, passing an angle point in said Holmes Road, continuing along and with a Northerly extension of the centerline of said Holmes Road that runs coincident with the West line of the Knight & White Survey, Abstract No. 46 to the intersection of the centerline of the proposed Winner-Foster Thoroughfare as depicted on the Fort Bend County Major Thoroughfare Plan (as it existed on December 20, 2004) with said Northerly extension;

THENCE Northeasterly and Easterly, along and with the centerline of said proposed Winner-Foster Thoroughfare to the intersection of the centerline of the Grand Parkway with the centerline of said proposed Winner-Foster Thoroughfare;

THENCE Southeasterly, along and with the centerline of said Grand Parkway, passing the intersection of Skinner Lane and said Grand Parkway to a Westerly extension of the Southerly line of a 166.5718 acre tract described in a conveyance to J.A.B. Development Corporation and recorded under Clerk's File No. 2002038808 of the Fort Bend County Deed Records;

THENCE Easterly, along and with said Westerly extension, passing the Northeast right-of-way line of the Grand Parkway, continuing along and with the Southerly line of said 166.5718 acre tract to a point in the West line of a 335.948 acre tract described in a conveyance to LM Land Holdings, LP and recorded under Clerk's File No. 2002106104 of the Fort Bend County Deed Records for the Southeast corner of said 166.5718 acre tract;

THENCE Northerly, along and with the Westerly line of said 335.948 acre tract to a point in the North line of the I.& G.N. R.R. Survey, Abstract No. 353 for the Northwest corner of said 335.948 acre tract;

THENCE Easterly, along and with the common North line of said I. & G.N. R.R. Survey and said 335.948 acre tract to the intersection of a Southerly extension of the Westerly line of the Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004) with said North line;

THENCE Northerly, along and with said Southerly extension, passing the South right-of-way line of Canal Road (Beechnut extension) to a point in the North line of said Canal Road for the Southwest corner of said Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004);

THENCE Easterly, along and with the North right-of-way line of said Canal Road, same being the South line of said Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004) to a point in the West line of the John Frederick Survey, Abstract No. 171 for the Southeast corner of said Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004);

THENCE, Southerly, along and with the West line of said John Frederick Survey, Abstract No. 171, passing the common West corner of the John Frederick Survey, Abstract No. 172 and said John Frederick Survey, Abstract No. 171, continuing along and with the West line of said John Frederick Survey, Abstract No. 172 to a point in the centerline of Morton Road for the Southwest corner of said John Frederick Survey, Abstract No. 172;

THENCE Easterly, along and with the centerline of said Morton Road, and partly along and with the North line of the Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004) to the Northeast corner of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004);

THENCE Southerly, along and with the East line of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004), passing the Grand Parkway, continuing along and with the East line of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004) to the most Easterly Southeast corner of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004), and being located at the intersection of said Oyster/Flatbank Creek and the East line of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004);

THENCE Easterly, to a point in the centerline of Harlem Road and being located approximately 1,200 feet South of the Bullhead Slough crossing with said Harlem Road and having approximate coordinates of North 29° 38' 44" and West 95° 42' 52";

THENCE Easterly, to the intersection of the centerline of proposed Airport Boulevard as depicted on the Fort Bend County Major Thoroughfare Plan (as it existed on December 20, 2004) with the centerline of the Grand Parkway, said intersection being located approximately midway between the Oyster/Flatbank Creek and Bullhead Slough crossings with said Grand Parkway and having approximate coordinates of North 29° 38' 46" and West 95° 42' 29";

THENCE Easterly, along and with the meanders of the centerline of said Airport Boulevard, proposed or existing, to the intersection of an interior West line of the Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004) with the centerline of existing Airport Boulevard;

THENCE Northerly, along and with an interior West line of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004) to the most Northerly Northwest corner of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004);

THENCE Easterly, along and with the meanders of the North line of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004) to a point in the West right-of-way line of Gaines Road for the Northeast corner of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of said Gaines Road to the intersection of a Westerly extension of the Northerly line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) with said right-of-way line;

THENCE Easterly, along and with said Westerly extension, passing the Northwest corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) in the East right-of-way line of said Gaines Road, continuing along and with the North line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) to an interior corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004);

THENCE Northerly, along and with an interior West line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) to the most Northerly Northwest corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004);

THENCE Easterly, along and with the North line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) to the POINT OF BEGINNING.

(2) Director Precinct No. 2 includes the territory that is contained in the following area:

BEGINNING at the intersection of the East right-of-way line of Gaines Road with the South right-of-way line of Forest Briar Drive (also known as Gaines Road), same being the Northwest corner of Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE Easterly, along and with the South right-of-way line of said Forest Briar Drive, same being the North line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004) to its intersection with the South line of the North Mission Glen Municipal Utility District (East Tract) (as it existed on December 20, 2004);

THENCE along and with the meanders of the Westerly and Northerly line of said North Mission Glen Municipal Utility District (East Tract) (as it existed on December 20, 2004), same partly being an Easterly and Southerly Line of the Mission Bend Municipal Utility District No. 1 (as it existed on December 20, 2004) to a point in the West right-of-way line of State Highway 6 for the common East corner of said

North Mission Glen Municipal Utility District (East Tract) (as it existed on December 20, 2004) and Mission Bend Municipal Utility District No. 1 (as it existed on December 20, 2004);

THENCE Southerly and Westerly, along and with the East line of said North Mission Glen Municipal Utility District (East Tract) (as it existed on December 20, 2004) to its intersection with the North line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE Easterly, along and with the North line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004), crossing the line common to Harris and Fort Bend Counties to a point in the West right-of-way line of Sugarland-Howell Road for the Northeast corner of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of Sugarland-Howell Road, same being the East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004) to the North right-of-way line of Bissonnet Street, same being an interior North line of the Renn Road Municipal Utility District (as it existed on December 20, 2004);

THENCE Westerly, along and with the North right-of-way line of Bissonnet Street, same being a South line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004), same further being an interior North line of the Renn Road Municipal Utility District (as it existed on December 20, 2004) to a point in the line common to Harris and Fort Bend Counties for the most Westerly corner of said Renn Road Municipal Utility District (as it existed on December 20, 2004), same being an interior corner in the East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE Southeasterly, along and with said county line to the intersection of the centerline of said Sugarland-Howell Road with said county line for an angle point in the East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004), same being an angle point in the West line of said Renn Road Municipal Utility District (as it existed on December 20, 2004);

THENCE Southerly, along and with the centerline of said Sugarland-Howell Road, same being an East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004) to the intersection of the South right-of-way line of said Bissonnet Street with said centerline for an angle point in the East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE Westerly, along and with the South right-of-way line of said Bissonnet Street to the intersection of the West right-of-way line of said Sugarland-Howell Road with said South right-of-way line for an angle point in the East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of Sugarland-Howell Road, same being the East line of said Kingsbridge Municipal Utility District (as it existed on December 20, 2004) to a Westerly extension of the most Westerly South line of said Renn Road Municipal Utility District (as it existed on December 20, 2004);

THENCE Easterly, along and with said Westerly extension passing a point in the East right-of-way line of said Sugarland-Howell Road for the most Westerly Southwest corner of said Renn Road Municipal Utility District (as it existed on December 20, 2004), continuing Easterly and Southerly along and with the meanders of the Southwesterly and Southerly lines of said Renn Road Municipal Utility District (as it existed on December 20, 2004) to the intersection of the West right-of-way line of Eldridge Road with the South line of said Renn Road Municipal Utility District (as it existed on December 20, 2004);

THENCE Northerly, along and with the West right-of-way line of said Eldridge Road same being an Easterly line of said Renn Road Municipal Utility District (as it existed on December 20, 2004) to a point in the line common to Harris and Fort Bend Counties;

THENCE Southeasterly, along and with said county line, same being a Southwesterly line of said Renn Road Municipal Utility District (as it existed on December 20, 2004), passing a point in the Easterly right-of-way line of said Eldridge Road for an interior Southeast corner of said Renn Road Municipal Utility District (as it existed on December 20, 2004), continuing along and with said county line, passing a point for the Northeast corner of Tract C of the Fort Bend County Municipal Utility District No. 2 (as it existed on December 20, 2004), continuing along and with said county line, same being the Northeasterly line of said Tract C (as it existed on December 20, 2004) to the intersection of a North current corporate limit of the City of Houston with said county line and being the most Easterly corner of said Tract C (as it existed on December 20, 2004);

THENCE Westerly, along and with a South line of said Tract C (as it existed on December 20, 2004), same being a Northerly current corporate limit of the City of Houston, a distance of 579.60 feet to an interior corner of said Tract C (as it existed on December 20, 2004);

THENCE Southerly, along and with an East line of said Tract C (as it existed on December 20, 2004), same being a Westerly current corporate limit of the City of Houston, at a distance of 227.76 feet passing the most Westerly Southeast corner of said Tract C (as it existed on December 20, 2004), continuing along and with said Westerly current corporate limits of the City of Houston to an interior corner of said Westerly current corporate limits of the City of Houston;

THENCE Westerly, along and with a Northerly line of the current corporate limits of said City of Houston passing a point in the East right-of-way line of said Eldridge Road, continuing along and with a Westerly extension of said Northerly current corporate limit to a point in the West right-of-way line of said Eldridge Road, same being the East line of Tract A of said Fort Bend County Municipal Utility District No. 2 (as it existed on December 20, 2004);

THENCE Southerly, along and with the West right-of-way line of said Eldridge Road, same being the East line of said Tract A (as it existed on December 20, 2004) to the Southeast corner of said Tract A (as it existed on December 20, 2004);

THENCE, along and with the Southerly line of said Tract A (as it existed on December 20, 2004), same being a Northerly current corporate limit of the City of Houston the following courses and distances (bearings and distances based on the Fort Bend County Municipal Utility District No. 2 District Boundary Map prepared by Pate Engineers and dated November, 1996);

South 89° 19' 00" West, a distance of 309.57 feet to an angle point;

North, a distance of 211.22 feet to an angle point;

West, a distance of 273.60 feet to an angle point;

North, a distance of 240.97 feet to a point;

North 89° 52' 59" West to a Northwest corner of said Northerly current corporate limit;

THENCE, in a general Southeasterly direction, along and with the Westerly and Southerly current corporate limits of said City of Houston to a point in the West line of Tract B of said Fort Bend County Municipal Utility District No. 2 (as it existed on December 20, 2004);

THENCE, along and with the boundary of said Tract B (as it existed on December 20, 2004) the following courses and distances (bearings and distances based on the Fort Bend County Municipal Utility District No. 2 District Boundary Map prepared by Pate Engineers and dated November, 1996);

North 00° 02' 30" East to the Northwest corner;

South 89° 59' 49" East, a distance of 1,159.05 feet to the Northeast corner;

South 00° 00' 25" West, a distance of 1,399.19 feet to an angle point;

South 00° 01' 54" West, a distance of 867.48 feet to the Southeast corner;

North 89° 58' 30" West, a distance of 1,995.67 feet to the Southwest corner;

North 00° 00' 07" West, a distance of 618.91 feet to the Northerly Southeast corner;

South 89° 57' 30" East, a distance of 699.62 feet to an interior corner;

North 00° 07' 34" East, a distance of 250.22 feet to an interior corner in the South right-of-way line of Florence Road;

South 89° 54' 40" East, along and with the South right-of-way line of said Florence Road, a distance of 136.12 feet to an interior corner;

North 00° 02' 30" East, to a point in the North right-of-way line of said Florence Road;

THENCE Westerly, along and with the Northerly right-of-way line of said Florence Road, passing the most Westerly Southeast corner of Tract A of said Fort Bend County Municipal Utility District No. 2 (as it existed on December 20, 2004), continuing along and with the North right-of-way line of said Florence Road, same being the South line of said Tract A (as it existed on December 20, 2004) to the intersection of the West right-of-way line of Burney Road with said North right-of-way line, same being the Southwest corner of said Tract A (as it existed on December 20, 2004);

THENCE Southerly, along and with a Southerly extension of the East right-of-way line of said Burney Road to a point in the South right-of-way line of said Florence Road, same being the Northerly current corporate limits of the City of Sugar Land;

THENCE in a generally Southwesterly direction and along and with the meanders of the most Northerly and Westerly current corporate and/or extra territorial jurisdictional (ETJ) limits of the City of Sugar Land and along and with the East right-of-way line of Burney Road and the centerline of Voss Road to the intersection of the centerline of said Voss Road with the centerline of State Highway 6;

THENCE Northerly, along and with the centerline of said Highway 6 to the intersection of an Easterly extension of the North line of the Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) with said centerline;

THENCE Westerly, along and with said Easterly extension, passing the Northeast corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) in the West right-of-way line of said Highway 6, continuing along and with the North line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004), to the most Northerly Northwest corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004);

THENCE Southerly, along and with an interior West line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) to an interior corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004);

THENCE Westerly, along and with the North line of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) passing the Northwest corner of said Fort Bend County Municipal Utility District No. 41 (East of Gaines Road) (as it existed on December 20, 2004) in the East right-of-way line of said Gaines Road, continuing along and with a Westerly extension of said Northerly line to a point in the West right-of-way line of said Gaines Road, same being the East line of the Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004);

THENCE Northerly, along and with the West right-of-way line of said Gaines Road to the Northeast corner of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004);

THENCE Westerly, along and with the meanders of the North line of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004) to the most Northerly Northwest corner of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004);

THENCE Southerly, along and with the West line of said Fort Bend County Municipal Utility District No. 41 (West of Gaines Road) (as it existed on December 20, 2004) to the intersection of the centerline of Airport Boulevard with said West line;

THENCE Westerly, along and with the meanders of the centerline of Airport Boulevard, proposed or existing as depicted on the Fort Bend County Major Thoroughfare Plan (as it existed on December 20, 2004) to the intersection of the centerline of the Grand Parkway with the centerline of said proposed Airport

Boulevard, said intersection being located approximately midway between the Oyster/Flatbank Creek and Bullhead Slough crossings with said Grand Parkway and having approximate coordinates of North 29° 38' 46" and West 95° 42' 29";

THENCE Westerly, to a point in the centerline of Harlem Road and being located approximately 1,200 feet South of the Bullhead Slough crossing with said Harlem Road and having approximate coordinates of North 29° 38' 44" and West 95° 42' 52";

THENCE Westerly to the most Easterly Southeast corner of the Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004) and being located at the intersection of said Oyster/Flatbank Creek and the East line of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004);

THENCE Northerly, along and with the East line of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004), passing the Grand Parkway, continuing along and with the East line of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004) to the Northeast corner of said Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004) in the centerline of Morton Road, same being the centerline of the proposed West Belfort;

THENCE Easterly, along and with the meanders of the centerline of West Belfort, proposed or existing as depicted on the Fort Bend County Major Thoroughfare Plan (as it existed on December 20, 2004), said West Belfort following parts of the existing rights-of-way of Morton Road, Madden Road and Boss Gaston Road to the intersection of the West line of the John Leverton Survey, Abstract No. 402 with the centerline of said West Belfort, same being the centerline of Boss Gaston Road at this point;

THENCE Northerly, along and with the West line of the John Leverton Survey, Abstract No. 402 to a point in the South line of the North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004);

THENCE Easterly, along and with the Southerly line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004), passing the Southeast corner of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004) in the West right-of-way line of said Gaines Road, continuing along and with an Easterly extension of the Southerly line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004) to a point in the East right-of-way of said Gaines Road;

THENCE Northerly, along and with the East right-of-way line of said Gaines Road to the Southwest corner of that portion of the North Mission Glen Municipal Utility District that lies East of said Gaines Road (as it existed on December 20, 2004);

THENCE in a general Northerly direction, along and with the Southerly, Easterly and Northerly sides of said portion of the North Mission Glen Municipal Utility District (as it existed on December 20, 2004) that lies East of said Gaines Road to the Northwest corner of said portion in the East right-of-way line of said Gaines Road;

THENCE Northerly, along and with the East right-of-way line of said Gaines Road to the POINT OF BEGINNING.

SAVE AND EXCEPT:

That portion of the right-of-way of said Eldridge Road contained within this description.

(3) Director Precinct No. 3 includes the territory that is contained in the following area:

BEGINNING at the intersection of the centerline of Farm To Market Highway 1093 (Westheimer Road) with a Southerly extension of a West line of the Westerly current corporate limits of the City of Houston and being located approximately 60 feet West of the intersection of the centerline of Harlem Road with said Highway 1093;

THENCE Northerly, along and with said Southerly extension to a point in the North right-of-way line of said Highway 1093 to a Southwest corner of the Westerly current corporate limits of said City of Houston, same being the Southerly line of the United States Government Barker Reservoir;

THENCE Easterly, along and with the meanders of a Southerly line of the Westerly current corporate limits of said City of Houston, same being the Northerly right-of-way line of said Highway 1093 to its intersection with the Easterly right-of-way line of Farm To Market Highway 1464;

THENCE Southerly, along and with the Easterly right-of-way line of said Highway 1464, passing the Northwest corner of the West Harris County Municipal Utility District No. 4 (as it existed on December 20, 2004), continuing along and with the Easterly right-of-way line of said Highway 1464, same being the Westerly line of said West Harris County Municipal Utility District No. 4 (as it existed on December 20, 2004) to the intersection of the North right-of-way line of Alief-Clodine Road with said Easterly right-of-way line for the Southwest corner of said West Harris County Municipal Utility District No. 4 (as it existed on December 20, 2004);

THENCE Easterly, along and with the North right-of-way line of said Alief-Clodine Road, same being the South line of said West Harris County Municipal Utility District No. 4 (as it existed on December 20, 2004) to a point in the line common to Harris and Fort Bend Counties;

THENCE Southeasterly, along and with said county line to the South right-of-way line of said Alief-Clodine Road, same being the North line of Fort Bend County Municipal Utility District No. 30 (as it existed on December 20, 2004);

THENCE along and with the Northerly and Easterly limits of said Fort Bend County Municipal Utility District No. 30 (as it existed on December 20, 2004) the following courses and distances: (bearings and distances based on an exhibit of said Fort Bend County Municipal Utility District No. 30 prepared by Total Surveyors, Inc. and dated March 28, 2000, revised August 30, 2002);

    South 56° 52' 06" East, along and with said county line, a distance of 285.62 feet to an angle point;

    South 00° 03' 43" West, a distance of 369.13 feet to an interior corner;

    North 85° 19' 43" East, crossing said county line, a distance of 1,585.75 feet to the most Southerly Northeast corner;

    South 01° 33' 14" West, a distance of 244.10 feet to an angle point;

    North 89° 18' 17" East, a distance of 32.93 feet to an angle point;

    South 01° 33' 14" West, crossing said county line, a distance of 1,530.25 feet to an interior corner of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004);

South 01° 15' 14" West, along and with the West line of the Chelford City Municipal Utility District (as it existed December 20, 2004), departing the East line of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004), a distance of 463.95 feet to an interior corner of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004);

South 01° 35' 26" West, along and with the East line of said Fort Bend County Municipal Utility District No. 30 (as it existed December 20, 2004), a distance of 564.29 feet to an angle point;

South 01° 33' 11" West, a distance of 1,028.29 feet to an angle point;

South 89° 41' 05" West, a distance of 977.24 feet to an angle point;

South 00° 14' 11" West, a distance of 3,248.96 feet to an angle point;

North 85° 58' 03" East, a distance of 276.35 feet to an angle point;

North 89° 56' 54" East, a distance of 564.71 feet to an angle point;

North 86° 13' 12" East, a distance of 131.40 feet to an angle point;

North 86° 09' 25" East, a distance of 59.92 feet to an angle point;

North 85° 19' 10" East, a distance of 165.19 feet to an angle point;

North 81° 39' 13" East, a distance of 248.15 feet to an angle point;

North 86° 51' 58" East, along and with the South line of the Mission Bend Municipal Utility District No. 1 (as it existed on December 20, 2004), a distance of 307.84 feet to an angle point in the East line of said Fort Bend County Municipal Utility District No. 30 (as it existed on December 20, 2004), same being the Northwest corner of the North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004);

THENCE Easterly, along and with the North line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004), same being the South line of said Mission Bend Municipal Utility District No. 1 (as it existed on December 20, 2004) to the Northeast corner of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004);

THENCE Southerly, along and with the East line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004), same being a West line of said Mission Bend Municipal Utility District No. 1 (as it existed on December 20, 2004), passing an interior Southwest corner of said Mission Bend Municipal Utility District No. 1 (as it existed on December 20, 2004), continuing along and with the East line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004) to a Westerly extension of the South right-of-way line of Forest Briar Drive;

THENCE Easterly, along and with said Westerly extension, to the intersection of the East right-of-way line of Gaines Road with the South right-of-way line of said Forest Briar Drive, same being the Northwest corner of the Kingsbridge Municipal Utility District (as it existed on December 20, 2004);

THENCE, Southerly, along and with the East right-of-way line of said Gaines Road to the Northwest corner of that portion of the North Mission Glen Municipal Utility District that lies East of said Gaines Road (as it existed on December 20, 2004);

THENCE, in a general Southerly direction, along and with the Northerly, Easterly and Southerly sides of said portion of the North Mission Glen Municipal Utility District (as it existed on December 20, 2004) that lies East of said Gaines Road to the Southwest corner of said portion (as it existed on December 20, 2004) in the East right-of-way line of said Gaines Road;

THENCE, Southerly, along and with the East right-of-way line of said Gaines Road to an Easterly extension of the Southerly line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004);

THENCE, Westerly along and with said extension passing the Southeast corner of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004) in the West right-of-way line of said Gaines Road, continuing along and with the South line of said North Mission Glen Municipal Utility District (West Tract) (as it existed on December 20, 2004) to a point in the West line of the John Leverton Survey, Abstract No. 402;

THENCE Southerly, along and with the West line of said John Leverton Survey to a point in the centerline of the proposed West Belfort, same more or less being Boss Gaston Road;

THENCE Westerly, along and with the meanders of the centerline of West Belfort, proposed or existing as depicted on the Fort Bend County Major Thoroughfare Plan (as it existed on December 20, 2004), said West Belfort following parts of the existing rights-of-way of Boss Gaston Road and Madden Road to the intersection of the centerline of Morton Road with the centerline of said proposed West Belfort;

THENCE Westerly, along and with the centerline of said Morton Road, same more or less being the centerline of said proposed West Belfort and partly along and with the North line of the Fort Bend County Municipal Utility District No. 118 (as it existed on December 20, 2004) to the Southwest corner of the John Frederick Survey, Abstract No. 172;

THENCE, Northerly, along and with the West line of said John Frederick Survey, Abstract No. 172, passing the common West corner of the John Frederick Survey, Abstract No. 171 and said John Frederick Survey, Abstract No. 172, continuing along and with the West line of said John Frederick Survey, Abstract No. 171 to the Southeast corner of the Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004) in the North line of Canal Road (Beechnut extension);

THENCE Westerly, along and with the North right-of-way line of said Canal Road, same being the South line of said Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004) to the Southwest corner of said Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004);

THENCE Southerly, along and with a Southerly extension of the Westerly line of said Fort Bend County Municipal Utility District No. 123 (South Portion) (as it existed on December 20, 2004) passing the South right-of-way line of said Canal Road (Beechnut extension) to the North line of the I.& G.N. R.R. Survey, Abstract No. 353, same being the North line of a 335.948 acre tract described in a conveyance to LM Land Holdings, LP and recorded under Clerk's File No. 2002106104 of the Fort Bend County Deed Records;

THENCE Westerly, along and with the common North line of said I. & G.N. R.R. Survey and said 335.948 acre tract to the Northwest corner of said 335.948 acre tract;

THENCE, Southerly, along and with the Westerly line of said 335.948 acre tract to the Southeast corner of a 166.5718 acre tract described in a conveyance to J.A.B. Development Corporation and recorded under Clerk's File No. 2002038808 of the Fort Bend County Deed Records;

THENCE Westerly, along and with the Southerly line of said 166.5718 acre tract, passing the Northeast right-of-way line of the Grand Parkway, continuing along and with a Westerly extension of said Southerly line to the centerline of said Grand Parkway;

THENCE, Northwesterly, along and with the centerline of said Grand Parkway, passing the intersection of Skinner Lane and said Grand Parkway to the intersection of the centerline of the proposed Winner-Foster Thoroughfare as depicted on the Fort Bend County Major Thoroughfare Plan (as it existed on December 20, 2004),

THENCE Southwesterly and Westerly, along and with the centerline of said proposed Winner-Foster Thoroughfare to the intersection of a Northerly extension of the centerline of that portion of Holmes Road that runs coincident with the West line of the Knight & White Survey, Abstract No. 46 with said proposed Winner-Foster Thoroughfare;

THENCE Southerly, along and with said Northerly extension of the centerline of said Holmes Road, passing an angle point in said Holmes Road, continuing along and with the centerline of said Holmes Road to the intersection of the centerline of Wessendorf Road with the centerline of said Holmes Road;

THENCE Westerly, along and with the centerline of said Wessendorf Road and a Westerly extension of said centerline to the intersection of the centerline of Farm To Market Highway 723 with said Westerly extension and having approximate coordinates of North 29° 38' 54" and West 95° 48' 43";

THENCE Northerly, along and with the centerline of said Highway 723 to the intersection of the centerline of said Highway 1093 with the centerline of said Highway 723;

THENCE Easterly, along and with the centerline of said Highway 1093 to the POINT OF BEGINNING.

　　　　(4) Director Precinct No. 4 includes the territory that is contained in the following area:

Tract A

BEGINNING at the intersection of the centerline of the Grand Parkway (State Highway 99) with the Southeasterly line of Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004), same being the most Northerly corner of Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004);

THENCE Southerly, along and with the meanders of the centerline of said Grand Parkway, same being the Easterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004) to the intersection of the centerline of Cinco Ranch Boulevard with the centerline of said Grand Parkway, same being the most Northerly Southeast corner of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004);

THENCE Southwesterly, along and with the meanders of the centerline of said Cinco Ranch Boulevard, same being a Southeasterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004) to the intersection of the centerline of Westheimer Parkway with the centerline of said Cinco Ranch Boulevard, same being an interior corner of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004);

THENCE Southeasterly, along and with the meanders of the centerline of said Westheimer Parkway, same partly being a Northeasterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004) to the intersection of the West right-of-way line of said Grand Parkway with the centerline of said Westheimer Parkway;

THENCE Southerly, along and with the West right-of-way line of said Grand Parkway to the intersection of the South right-of-way line of said Westheimer Parkway with said West right-of-way line, same being the most Southerly Northeast corner of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004);

THENCE Easterly, along and with the South right-of-way line of said Westheimer Parkway passing the intersection of the East right-of-way line of said Grand Parkway with said South right-of-way line, same being the Northwest corner of the West portion of Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004), continuing along and with said South right-of-way line to the most Northerly corner of the West portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004);

THENCE Southeasterly, along and with the Northeasterly line of the West portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) to the intersection of the Southwesterly line of the Willow Fork Drainage District Ditch VA1;

THENCE Northerly, along and with the Southwesterly and Westerly line of said Ditch VA1 to the intersection of the South right-of-way line of said Westheimer Parkway with said Westerly line;

THENCE Easterly, along and with the South right-of-way line of said Westheimer Parkway, passing the Easterly line of said Ditch VA1, same being the Northwest corner of the Northerly West Portion of Cinco Municipal Utility District No. 7 (as it existed December 20, 2004), same being the James Williams Elementary School Site, continuing along and with the South right-of-way line of Westheimer Parkway to the intersection of the South right-of-way line of Westheimer Parkway with the Westerly right-of-way line of Peek Road;

THENCE Southerly, along and with the meanders of the Westerly right-of-way line of said Peek Road passing the Northeasterly line of said Ditch VA1 for the most Southerly corner of the Northerly West Portion of Cinco Municipal Utility District No. 7 (as it existed December 20, 2004), same being the James Williams Elementary School Site, continuing along and with the meanders of the Westerly right-of-way line of said Peek Road passing the Southwesterly line of said Ditch VA1 for the most Easterly corner of the West portion of said Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004), continuing along and with the meanders of the Westerly right-of-way line of said Peek Road, passing the Southeast corner of the

West portion of said Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004), continuing along and with the meanders of the Westerly right-of-way line of said Peek Road to the intersection of the centerline of the Willow Fork of Buffalo Bayou with the Westerly right-of-way line of said Peek Road;

THENCE Westerly, along and with the meanders of the centerline of said Willow Fork of Buffalo Bayou, passing the centerline of said Grand Parkway, continuing along and with the centerline of said Willow Fork of Buffalo Bayou, same being the Northeasterly line of Grand Lakes Municipal Utility District No. 2 (as it existed on December 20, 2004) to the most Easterly North corner of said Grand Lakes Municipal Utility District No. 2 (as it existed December 20, 2004);

THENCE Southwesterly, along and with an interior line of said Grand Lakes Municipal Utility District No. 2 (as it existed December 20, 2004) to a point in the Southerly line of said Willow Fork of Buffalo Bayou;

THENCE Northwesterly, along and with the Southerly line of said Willow Fork of Buffalo Bayou to the most Westerly North corner of said Grand Lakes Municipal Utility District No. 2 (as it existed December 20, 2004), same being the Northeast corner of the East portion of Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with the meanders of the Southeasterly line of the East portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004), crossing Fry Road to a point in the Southeasterly right-of-way line of said Fry Road for the most Southerly corner of the East portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004);

THENCE Northwesterly, along and with the Southwest line of the East portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004) to a point in the centerline of Cinco Ranch Boulevard, same being the Southeast line of Cinco Municipal Utility District No. 1 (as it existed on December 20, 2004) for the most Westerly corner of the East portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004);

THENCE Southwesterly, along and with the Southeast line of said Cinco Municipal Utility District No. 1 (as it existed December 20, 2004), passing the most Southerly corner of said Cinco Municipal Utility District No. 1 (as it existed December 20, 2004), same being the most Easterly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004), continuing along and with the Southeast line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004) to an angle point in the Northeasterly right-of-way line of Katy-Gaston Road, same being the most Southerly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004);

THENCE Northwesterly, along and with a Northeasterly right-of-way line of said Katy-Gaston Road, same being the Southwesterly line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004) to an angle point in the Easterly right-of-way line of said Katy-Gaston Road, same being the most Westerly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004);

THENCE Northeasterly, along and with a Southeasterly right-of-way line of said Katy-Gaston Road, same being the Northwesterly line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004) to an angle point in the Easterly right-of-way line of said Katy-Gaston Road, same being the most Northerly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004);

THENCE Southeasterly, along and with the Northeasterly line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed December 20, 2004) to a point in the Northwesterly line of said Cinco Municipal Utility District No. 1 (as it existed December 20, 2004);

THENCE Northeasterly, along and with the Northwesterly line of said Cinco Municipal Utility District No. 1 (as it existed December 20, 2004), passing the intersection of the centerline of said Willow Fork of Buffalo Bayou with the Northwesterly line of said Cinco Municipal Utility District No. 1 (as it existed December 20, 2004), same being the most Westerly corner of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004), continuing along and with the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004) and partly along and with the Southeasterly line of Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004) to an angle point in the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004);

THENCE Southeasterly, along and with a Northeasterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004) to an angle point in the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004);

THENCE Northeasterly, along and with the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004), an approximate distance of 733.5 feet to an interior corner of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004);

THENCE Northwesterly, along and with a Southwesterly line of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004), to the most Northerly West corner of said Cinco Municipal Utility District No. 10 (as it existed December 20, 2004), same being the most Southerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004);

THENCE Northeasterly, along and with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed December 20, 2004) to the POINT OF BEGINNING.

Tract B

BEGINNING at the intersection of the South line of the Willow Fork of Buffalo Bayou with the Northeasterly line of a Detention Ditch for the most Westerly corner of the East portion of said Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004);

THENCE Northwesterly, perpendicular to the centerline of said Willow Fork of Buffalo Bayou to the centerline of said Willow Fork of Buffalo Bayou;

THENCE Easterly, along and with the meanders of the centerline of said Willow Fork of Buffalo Bayou, passing Mason and Fry Roads, downstream to the intersection of the Westerly current corporate limits of the City of Houston, same being the Westerly line of the United States Government Barker Reservoir with said centerline;

THENCE in a generally Southeast direction, along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) to a point in the West line of the H.E. Looney Survey, Abstract No. 277 for an angle point;

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) and the West line of said Looney Survey to a point in the North line of the Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004) for the Southwest corner of said Looney Survey, same being the Southeast corner of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004);

THENCE Easterly, along and with the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Northerly line of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) to the Northeast corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004);

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Westerly line of the John Brock Survey, Abstract No. 110, passing the most Easterly Southeast corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), continuing along and with the Westerly line of said John Brock Survey passing a corner of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, continuing along and with the Westerly line of said John Brock Survey crossing a portion of said United States Government Barker Reservoir to the intersection of the Westerly current corporate limits of said City of Houston, same being the Southerly line of said United States Government Barker Reservoir;

THENCE Easterly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir, an approximate distance of 3,635 feet to an angle point;

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir passing the North right-of-way line of Farm to Market Highway 1093 (Westheimer Road), continuing along and with a Southerly extension of said Westerly current corporate limits of said City of Houston to a point in the centerline of said Highway 1093;

THENCE Westerly along and with the centerline of said Highway 1093 to the intersection of the Northwesterly line of the Brooks & Burleson Survey, Abstract No. 145 with said centerline and being in a Southwesterly extension of the Northwesterly line of the South portion of Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004) (located South of the United States Government Barker Reservoir Dam);

THENCE Northeasterly, along and with the Northwesterly line of said Brooks & Burleson Survey, passing a point in the North right-of-way line of said Highway 1093 for the Southwest corner of the South portion of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), continuing along and with the Northwesterly line of said Brooks & Burleson Survey, passing a point in the Westerly current corporate limits of the City of Houston, same being a Southerly line of said United States Government Barker Reservoir (Barker Dam Strip) for the Northwest corner of the South portion of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), continuing along and with the Northwesterly line of said Brooks & Burleson Survey across a portion of said United States Government Barker Reservoir (Barker Dam Strip) passing the Westerly current corporate limits of the City of Houston, same being a Northerly line of said United States Government Barker Reservoir (Barker Dam Strip) for the Southwest corner of the North portion of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), continuing along and with the Northwest line of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004) to an interior corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), same being the most Easterly corner of Grand Lakes Municipal Utility District No. 1 (as it existed December 20, 2004);

THENCE Northwesterly, along and with a Southwesterly line of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), passing the Northwest corner of said Cinco Municipal Utility District No. 8 (as it existed December 20, 2004), same being the Southwest corner of the East portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004), continuing along and with the Southwesterly line of the East portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) to an angle point in the Southwesterly line of the East portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004);

THENCE Westerly, along and with a Southerly line of the East portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) to the POINT OF BEGINNING.

SAVE AND EXCEPT:

That portion of the Westerly current corporate limits of said City of Houston, same being said United States Government Barker Reservoir (Barker Dam Strip) contained within this description.

(5) Director Precinct No. 5 includes the territory that is contained in the following area:

BEGINNING at the Northwest corner of Cornerstones Municipal Utility District (as it existed on December 20, 2004), same being the Northeast corner of Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004);

THENCE Easterly, along and with the North line of said Cornerstones Municipal Utility District (as it existed on December 20, 2004), same being the South line of Cimarron Municipal Utility District (as it existed on December 20, 2004) passing the common South corner of said Cimarron Municipal Utility District (as it existed on December 20, 2004) and Harris County Municipal Utility District No. 81 (as it existed on December 20, 2004), continuing along and with a South line of said Harris County Municipal Utility District No. 81 (as it existed on December 20, 2004) to a point in the centerline of Mason Road for the Northeast corner of said Cornerstones Municipal Utility District (as it existed on December 20, 2004);

THENCE Southerly, along and with the centerline of Mason Road, same being the East line of said Cornerstones Municipal Utility District (as it existed on December 20, 2004), passing the common West corner of said Harris County Municipal Utility District No. 81 (as it existed on December 20, 2004) and Memorial Municipal Utility District (as it existed on December 20, 2004), continuing along and with the centerline of Mason Road and along and with the East line of said Cornerstones Municipal Utility District (as it existed on December 20, 2004) crossing the line common to Harris and Fort Bend Counties to the Southeast corner of said Memorial Municipal Utility District (as it existed on December 20, 2004), same being the Northwest corner of Cinco Municipal Utility District No. 3 (as it existed on December 20, 2004);

THENCE Easterly, along and with South line of said Memorial Municipal Utility District (as it existed on December 20, 2004), same being the North line of said Cinco Municipal Utility District No. 3 (as it existed on December 20, 2004) crossing the line common to Harris and Fort Bend Counties, passing the common North corner of said Cinco Municipal Utility District No. 3 (as it existed on December 20, 2004) and Cinco Municipal Utility District No. 6 (as it existed on December 20, 2004), continuing along and with the South line of said Memorial Municipal Utility District (as it existed on December 20, 2004) to the most Easterly Northwest corner of said Cinco Municipal Utility District No. 6 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with the Northeasterly meanders of said Cinco Municipal Utility District No. 6 (as it existed on December 20, 2004), same being partly the Southwesterly line of a Harris County Flood Control District right-of-way to a the most Easterly corner of said Cinco Municipal Utility District No. 6 (as it existed on December 20, 2004), same being an angle point in the Westerly current corporate limits of the City of Houston, same also being the Westerly line of the United States Government Barker Reservoir, same further being the Easterly limits of Tract 1 of the West Harris County Regional Water Authority;

THENCE along and with the Easterly limits of said West Harris County Regional Water Authority, same being the Westerly current corporate limits of said City of Houston, same further being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 6 (as it existed on December 20, 2004) the following courses and distances: (bearings and distances based on the description of said West Harris County Regional Water Authority dated December 22, 2000)

South 23° 42' West, a distance of 1178.3 feet;
North 59° 10' West, a distance of 517.8 feet;

South 23° 32' West, to a point in the line common to Harris and Fort Bend Counties for the

most Westerly Southeast corner of Tract 1 of said West Harris County Regional Water Authority and having approximate coordinates of North 29° 44' 05" and West 95° 43' 50"

THENCE Southwesterly and Northwesterly, continuing along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 6 (as it existed on December 20, 2004) to a point in the Easterly right-of-way line of Fry Road, same being the Easterly line of Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southwesterly and Southeasterly, along and with the meanders of the Westerly current corporate limits of said City of Houston, same being the Westerly line of said United States Government Barker Reservoir, same further being the Easterly line of said Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004) to a point in the centerline of the Willow Fork of Buffalo Bayou for the corner common to said Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004) and Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004);

THENCE Westerly, along and with the meanders of the centerline of said Willow Fork of Buffalo Bayou, upstream to the intersection of the centerline of said Mason Road, with the centerline of said Willow Fork of Buffalo Bayou, same being the common South corner of Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004) and said Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Northerly, along and with the meanders of the centerline of said Mason Road, same being the Easterly line of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004), same also being the Westerly line of said Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004), passing the intersection of the centerline of Westheimer Parkway with the centerline of said Mason Road, same being the common West corner of said Cinco Municipal Utility District No. 3 (as it existed on December 20, 2004) and said Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004), continuing along and with the meanders of the centerline of said Mason Road, same being the Easterly line of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004), same also being the Westerly line of said Cinco Municipal Utility District No. 3 (as it existed on December 20, 2004) to the Northeast corner of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004), same being the Southeast corner of said Cornerstones Municipal Utility District (as it existed on December 20, 2004);

THENCE Westerly, along and with the Southerly line of said Cornerstones Municipal Utility District (as it existed on December 20, 2004) to the Southwest corner of said Cornerstones Municipal Utility District (as it existed on December 20, 2004);

THENCE Northerly, along and with the Westerly line of said Cornerstones Municipal Utility District (as it existed on December 20, 2004) to the POINT OF BEGINNING.

      (6) Director Precinct No. 6 includes the territory that is contained in the following area:

Tract A

BEGINNING at a point in the South line of the Cimarron Municipal Utility District (as it existed on December 20, 2004) marking the Northwest corner of Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004) in the intersection of the Grand Parkway and Katy Fort Bend Roads;

THENCE Easterly, along and with the North line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004), same being the South line of said Cimarron Municipal Utility District (as it existed on December 20, 2004) to the Northeast corner of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004), same being the Northwest corner of Cornerstones Municipal Utility District (as it existed on December 20, 2004);

THENCE Southerly, along the Easterly line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004), passing the Southeast corner of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004), same being the most Westerly Northeast corner of Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004), continuing along and with the Easterly line of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004) to the Southwest corner of said Cornerstones Municipal Utility District (as it existed on December 20, 2004);

THENCE Easterly, along and with a North line of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004), same being the South line of said Cornerstones Municipal Utility District (as it existed on December 20, 2004) to a point in the West line of Cinco Municipal Utility District No. 3 (as it existed on December 20, 2004), same being the centerline of Mason Road for the Southeast corner of said Cornerstones Municipal Utility District (as it existed on December 20, 2004), same being the Northeast corner of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004);

THENCE Southerly, along and with the meanders of the centerline of said Mason Road, same being the Easterly line of said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004) to a point in the centerline of the Willow Fork of Buffalo Bayou, same being the Northerly line of Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004) for the common Southerly corner of Cinco Municipal Utility District No. 5 (as it existed on December 20, 2004) and said Cinco Municipal Utility District No. 2 (as it existed on December 20, 2004);

THENCE Westerly and Southwesterly, along and with the centerline of said Willow Fork of Buffalo Bayou to the intersection of the Westerly right-of-way line of Peek Road with the centerline of said Willow Fork of Buffalo Bayou;

THENCE Northerly, along and with the Westerly right-of-way line of said Peek Road, passing the North line of said Willow Fork of Buffalo Bayou, same being the Southeast corner of the West portion of Cinco Municipal Utility District No. 7 (as it existed December 20, 2004), continuing along and with the West right-of-way line of said Peek Road to the intersection of the Southerly right-of-way line of Westheimer

Parkway with said Westerly right-of-way line, same being the Northeast corner of the Northerly West Portion of Cinco Municipal Utility District No. 7 (as it existed December 20, 2004), same being the James Williams Elementary School Site;

THENCE Westerly, along and with the South right-of-way of said Westheimer Parkway to the intersection of the Westerly line of the Willow Fork Drainage District Ditch VA1 with said South right-of-way line;

THENCE Southerly, along and with the Westerly line of said Willow Fork Drainage District Ditch VA1 to the intersection of the Northeasterly line of the West portion of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) with said Westerly line;

THENCE Northwesterly, along and with the Northeasterly line of said Cinco Municipal Utility District No. 7 (as it existed December 20, 2004) to the intersection of the South right-of-way of said Westheimer Parkway with said Northeasterly line;

THENCE Westerly, along and with the Southerly right-of-way line of said Westheimer Parkway to a point in the West right-of-way line of said Grand Parkway;

THENCE Northerly, along and with the West right-of-way line of said Grand Parkway to a point in the centerline of said Westheimer Parkway;

THENCE Northwesterly, along and with the meanders of the centerline of said Westheimer Parkway to the intersection of the centerline of Cinco Ranch Boulevard with the centerline of said Westheimer Parkway for the most Westerly corner of said Cinco Municipal Utility District No. 12 (as it existed on December 20, 2004);

THENCE Northeasterly and Easterly, along and with the centerline of said Cinco Ranch Boulevard to the intersection of the centerline of said Grand Parkway, same being the West line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004) with the centerline of said Cinco Ranch Boulevard for the most Northerly Southeast corner of Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004);

THENCE Northerly, along and with the meanders of the centerline of said Grand Parkway to the most Northerly corner of said Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004), same being an angle point in the Westerly line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with the Northwesterly line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004), crossing the line common to said Harris and Fort Bend Counties to a point in the Northeasterly line of the I.& G.N.R.R. Survey, Abstract No. 1448 for an angle point in the Westerly line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004);

THENCE Northwesterly, along and with the Northeasterly line of said I.& G.N.R.R. Survey, Abstract No. 1448 to an angle point in the Westerly line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004);

THENCE Northerly, along and with the Westerly line of said Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004) to the Northeast corner of the Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) East of said Grand Parkway;

THENCE Northwesterly, along and with the Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) East of said Grand Parkway to the POINT OF BEGINNING.

Tract B

BEGINNING at a the intersection of the centerline of Westheimer Parkway with the Northwesterly line of Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004) for the most Southerly corner of the Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004);

THENCE Northwesterly, along and with the centerline of said Westheimer Parkway, same being partly the Southwesterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004) to the most Westerly corner of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with the Northwesterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004) to the most Northerly corner of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004), same being an angle point in the Southwesterly line of the Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southeasterly along and with the Northeasterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004), same being a Southwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) to an angle point;

THENCE Southwesterly, along and with a Southeasterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004) approximately 160 feet to an interior corner in the Northeasterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004);

THENCE Southeasterly along and with the Northeasterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004), to the most Easterly corner of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with the Southeasterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004), same being partly the Northwesterly line of the Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004) to the POINT OF BEGINNING.

(7) Director Precinct No. 7 includes the territory that is contained in the following area:

BEGINNING at a point marking the Northwest corner and Point of Beginning of Regulatory Area A as defined in the Fort Bend Subsidence District 2003 Regulatory Plan, said point being near the intersection of Jordan Road and the common line between Waller and Fort Bend Counties and having approximate coordinates of North 29° 45' 10" and West 95° 55' 15";

THENCE in a Northeasterly direction, along and with the common line between said Waller and Fort Bend Counties to its intersection with the West line of the Willow Point Municipal Utility District (as it existed on December 20, 2004), same being the West line of the W.W. Bains Survey, Abstract No. 753 (Fort Bend County) and Abstract No. 385 (Waller County);

THENCE in a Northerly direction, along and with the West line of said Willow Point Municipal Utility District (as it existed on December 20, 2004), same being the West line of said W.W. Bains Survey, Abstract No. 385 to a point in the South right-of-way line of Interstate 10 and marking the Northwest corner of said Willow Point Municipal Utility District (as it existed on December 20, 2004);

THENCE in an Easterly direction, along and with the South right-of-way line of said Interstate 10 to the Northeast corner of said Willow Point Municipal Utility District (as it existed on December 20, 2004), said point also being a Southwest corner of the current corporate limits of the City of Katy;

THENCE in a Southerly direction, along and with the East line of said Willow Point Municipal Utility District (as it existed on December 20, 2004), same being the East line of said W.W. Bains Survey, Abstract No. 385 to a point in the common line between Waller and Fort Bend Counties;

THENCE in a Northeasterly direction, along and with the common line between said Waller and Fort Bend Counties to its intersection with a Southerly line of said current corporate limits of the City of Katy, same being the South right-of-way line of said Interstate 10 and having approximate coordinates of North 29° 46' 40" and West 95° 51' 20";

THENCE in a generally Southeast direction and along and with the southerly limits of said current corporate limits of the City of Katy the following courses:

Easterly, along and with the South right-of-way line of said Interstate 10 approximately 2,350 feet;

Southerly, approximately 1,335 feet;

Easterly, to its intersection with the Northeasterly line of the C.W. Schrimph Survey, Abstract No. 412;

Southeasterly, along and with the Northeasterly line of said Schrimph Survey and the Northeasterly line of the E. Everett Survey, Abstract No. 385 to point in the centerline of Katy-Flewellen Road and being the most Easterly corner of said Everett Survey;

Northeasterly, along and with the centerline of said Katy-Flewellen Road to its intersection with the Easterly right-of-way line of Pin Oak Road, same being a Westerly line of Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004);

Southeasterly, along and with the Easterly right-of-way line of said Pin Oak Road, same being a Westerly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004) to its intersection with the Southeasterly right-of-way line of said Katy-Flewellen Road;

Southwesterly, along and with the Southeasterly right-of-way line of said Katy-Flewellen Road, same being a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004) to the most Westerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004);

Southeasterly, along and with the most Southwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004) to the most Westerly South corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004);

Northeasterly, along and with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004), same being the most Northerly corner of Pin Oak Village Section 1;

Southeasterly, along and with the Northeasterly line of said Pin Oak Village Section 1, same being a Southwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004) to the most Easterly corner of said Pin Oak Village Section 1, same being the most Southerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004);

Northeasterly, along and with the Southeast line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004), passing the most Westerly corner of Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004), continuing along and with said course and along and with the meanders of the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004), same being the Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004), to a point in the common line between Harris and said Fort Bend Counties for the most Easterly corner of the current corporate limits of the City of Katy in Fort Bend County;

THENCE Northeasterly, along and with the meanders of the Southeasterly line of the Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004), same being the Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004) to a point in the West right-of-way line of Falcon Point Drive for the most Westerly North corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004), same being the most Easterly Northeast corner of said Harris-Fort Bend Counties Municipal Utility District No. 4 (as it existed on December 20, 2004);

THENCE Easterly, along and with the North line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004) to the most Easterly North corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with the Northeast line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004) to the Northeast corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with a Southeast line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with a Southeast line of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004), crossing the line common to said Harris and Fort Bend Counties, passing the most

Easterly corner of said Harris-Fort Bend Counties Municipal Utility District No. 1 (as it existed on December 20, 2004), continuing along and with a Southeasterly extension of said Northeast line, crossing Roesner Road to a point in the Southeasterly right-of-way line of said Roesner Road, same being the Northwesterly line of Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with the Southeasterly right-of-way line of said Roesner Road, same being the Northwesterly line of Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) to a point in the line common to said Harris and Fort Bend Counties for the most Northerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with said County Line, same being a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 05 to a point in the Northwesterly line of the Cimarron Municipal Utility District (as it existed on December 20, 2004) for the most Easterly North corner of said Harris-Fort Bend Counties Municipal Utility District No. 05;

THENCE Southwesterly, along and with the Northwesterly line of said Cimarron Municipal Utility District (as it existed on December 20, 2004), same being a Southeast line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being a Southwesterly line of said Cimarron Municipal Utility District (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being a Southeasterly line of said Cimarron Municipal Utility District (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being a Southwesterly line of said Cimarron Municipal Utility District (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being the most Southerly corner of said Cimarron Municipal Utility District (as it existed on December 20, 2004);

THENCE Northeasterly, along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being a Southeasterly line of said Cimarron Municipal Utility District (as it existed on December 20, 2004), crossing the line common to said Harris and Fort Bend Counties and the Grand Parkway (State Highway 99), passing a point in the East right-of-way of said Grand Parkway, continuing along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on

December 20, 2004) to point in a Southwesterly line of Cinco Municipal Utility District No. 9 (as it existed on December 20, 2004) for the most Northerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) East of said Grand Parkway;

THENCE Southeasterly, along and with a Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) to an angle point in the Easterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southerly, along and with an Easterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) to an angle point in the Easterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with a common Northeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) and the I.& G.N.R.R. Survey, Abstract No. 1448 to the most Easterly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), crossing the line common to said Harris and Fort Bend Counties, passing the intersection of the centerline of said Grand Parkway with the Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) for the most Northerly corner of Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004), continuing along and with Southeasterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004) to the most Southerly corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being the most Northerly West corner of said Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with a Northwesterly line of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004) to an interior corner of said Harris-Fort Bend Counties Municipal Utility District No. 5 (as it existed on December 20, 2004), same being the most Northerly corner of Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004),

THENCE Southwesterly, along and with the Northwesterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004) to a point in the centerline of Westheimer Parkway for the most Westerly corner of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with the centerline of said Westheimer Parkway, same being partly the Southwesterly line of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004) to the intersection of the Northeast line of Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004) with said centerline for the most Southerly corner of said Fort Bend County Municipal Utility District No. 124 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004), passing the intersection of the centerline of said Willow Fork of Buffalo Bayou with the Northwesterly line of said Cinco Municipal Utility District No. 10 (as it existed on December 20, 2004), same being the Northwest corner of the Cinco Municipal Utility District No. 1 (as it existed on December 20, 2004), continuing along and with the Northwesterly line of said Cinco Municipal Utility District No. 1 (as it existed on December 20, 2004) to the intersection of the Northeast line of the West portion of the Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004) with the Northwesterly line of said Cinco Municipal Utility District No. 1 (as it existed on December 20, 2004);

THENCE Northwesterly, along and with the Northeasterly line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004) to an angle point in the Easterly right-of-way line of said Katy-Gaston Road, same being the most Northerly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with a Southeasterly right-of-way line of said Katy-Gaston Road, same being the Northwesterly line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004) to an angle point in the Easterly right-of-way line of said Katy-Gaston Road, same being the most Westerly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with a Northeasterly right-of-way line of said Katy-Gaston Road, same being the Southwesterly line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004) to an angle point in the Northeasterly right-of-way line of Katy-Gaston Road, same being the most Southerly corner of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with the Southeast line of the West portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004), passing the most Easterly corner of said West portion (as it existed on December 20, 2004), same being the most Southerly corner of said Cinco Municipal Utility District No. 1 (as it existed on December 20, 2004), continuing along and with the Southeast line of said Cinco Municipal Utility District No. 1 (as it existed on December 20, 2004) to the most Westerly corner of the East portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004), said point being in the centerline of Cinco Ranch Boulevard;

THENCE Southeasterly, along and with the Southwest line of the East portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004) to a point in the Southeasterly right-of-way line of Fry Road for the most Southerly corner of the East portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with the meanders of the Southeasterly line of the East portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004), passing the center line of said Fry Road for the most Southerly corner of Grand Lakes Municipal Utility District No. 2 (as it existed on December 20,

2004), continuing along and with the meanders of the Southeasterly line of the East portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004), same being the Northwest line of said Grand Lakes Municipal Utility District No. 2 (as it existed on December 20, 2004) to a point in the Southerly line of the Willow Fork of Buffalo Bayou for the most Westerly North corner of said Grand Lakes Municipal Utility District No. 2 (as it existed on December 20, 2004), same being the Northeast corner of the East portion of said Cinco Municipal Utility District No. 14 (as it existed on December 20, 2004);

THENCE Southeasterly, along and with the Southerly line of said Willow Fork of Buffalo Bayou to an interior corner of said Grand Lakes Municipal Utility District No. 2 (as it existed on December 20, 2004);

THENCE Northeasterly, along and with an interior line of said Grand Lakes Municipal Utility District No. 2 (as it existed on December 20, 2004) to a point in the centerline of said Willow Fork of Buffalo Bayou for the most Easterly North corner of said Grand Lakes Municipal Utility District No. 2 (as it existed on December 20, 2004);

THENCE Easterly, along and with the meanders of the centerline of said Willow Fork of Buffalo Bayou, passing the Grand Parkway and Peek Road to a point opposite of the most Westerly corner of the East portion of the Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004);

THENCE Southeasterly, perpendicular to the centerline of said Willow Fork of Buffalo Bayou to the most Westerly corner of the East portion of the Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004);

THENCE Easterly, along and with a Southerly line of the East portion of said Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004) to an angle point in the Southwesterly line of said East portion (as it existed on December 20, 2004);

THENCE Southeasterly, along and with the Southwesterly line of the East portion of said Cinco Municipal Utility District No. 7 (as it existed on December 20, 2004), passing the Southwest corner of said East portion (as it existed on December 20, 2004), same being the Northwest corner of the Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004), continuing along and with a Southwesterly line of said Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004), to an interior corner of said Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004), same being the most Easterly corner of said Grand Lakes Municipal Utility District No. 1 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with the Northwesterly line of said Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004) to a point in the Westerly current corporate limits of said City of Houston, same being a Northerly line of the United States Government Barker Reservoir (Barker Dam Strip) for the common South corner of said Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004) and said Grand Lakes Municipal Utility District No. 1 (as it existed on December 20, 2004),

THENCE Westerly, along and with the meanders of the Westerly current corporate limits of said City of Houston, same being a Northerly line of said United States Government Barker Reservoir (Barker Dam Strip), same being the Southerly line of

Grand Lakes Municipal Utility District No. 1 (as it existed on December 20, 2004), passing the Southwest corner of said Grand Lakes Municipal Utility District No. 1 (as it existed on December 20, 2004) in the centerline of Peek Road, continuing along and with the meanders of the Westerly current corporate limits of said City of Houston, same being a Northerly line of said United States Government Barker Reservoir (Barker Dam Strip) to the Northwest corner of said Barker Dam Strip, same being the most Westerly Northeast corner of the Southern portion of Grand Lakes Municipal Utility District No. 4 (as it existed on December 20, 2004);

THENCE Southerly, along and with the Westerly current corporate limits of said City of Houston, same being a Westerly line of said United States Government Barker Reservoir (Barker Dam Strip), same further being an Easterly line of said Grand Lakes Municipal Utility District No. 4 (as it existed on December 20, 2004) to the Southwest corner of said Barker Dam Strip;

THENCE Easterly, along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir (Barker Dam Strip), same further being a Northerly line of the Southerly portion said Grand Lakes Municipal Utility District No. 4 (as it existed on December 20, 2004), passing the most Easterly Northeast corner of the Southern portion of Grand Lakes Municipal Utility District No. 4 (as it existed on December 20, 2004), continuing along and with the Westerly current corporate limits of said City of Houston, same being a Southerly line of said United States Government Barker Reservoir (Barker Dam Strip), same being partly the Northerly line of the Southerly portion of said Grand Lakes Municipal Utility District No. 1 (as it existed on December 20, 2004), to the Northwest corner of the Southerly portion of said Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004);

THENCE Southwesterly, along and with the Northwesterly line of the Southerly portion of said Cinco Municipal Utility District No. 8 (as it existed on December 20, 2004), passing a point in the North right-of-way line of Farm To Market Highway 1093 (Westheimer Road), continuing along and with a Southwesterly extension of said Northeasterly line to a point in the centerline of said Highway 1093;

THENCE Westerly, along and with the centerline of said Highway 1093 to the intersection of the centerline of said Highway 723 with the centerline of said Highway 1093;

THENCE Southerly, along and with the centerline of said Highway 723 to the corner common with the current ETJ limits of the City of Fulshear, the City of Richmond, and the City of Rosenberg and having approximate coordinates of North 29° 36' 00" and West 95° 48' 40";

THENCE in a generally Westerly direction and along and with the meanders of the most Northerly current corporate and/or current ETJ limits of said City of Rosenberg to the intersection of the West line of said Regulatory Area A as defined in the Fort Bend Subsidence District 2003 Regulatory Plan with said current ETJ limits and having approximate coordinates of North 29° 35' 33" and West 95° 55' 00";

THENCE North, along and with a meridian having a Longitude of West 95° 55' 00", same being the West line of said Regulatory Area A to the POINT OF BEGINNING.

SECTION 4. FINDINGS RELATED TO PROCEDURAL REQUIREMENTS.
(a)  The proper and legal notice of the intention to introduce this Act, setting out the
general substance of this Act, has been published as provided by law, and the notice
and a copy of this Act have been furnished to all persons, agencies, officials, or
entities to which they are required to be furnished by the constitution and other laws
of this state, including the governor, who has submitted the notice and this Act to the
commission.

(b)  The commission has filed its recommendations relating to this Act with the
governor, lieutenant governor, and speaker of the house of representatives within the
required time.

(c)  All requirements of the constitution and laws of this state and the rules and
procedures of the legislature with respect to notice, introduction, and passage of this
Act are fulfilled and accomplished.

SECTION 5. EFFECTIVE  DATE.    This Act takes effect immediately if it
receives a vote of two-thirds of all the members elected to each house, as provided by
Section 39, Article III, Texas Constitution.  If this Act does not receive the vote
necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House
amendment to **SB 1798**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1170 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1170** from the
President's table for consideration of the House amendment to the bill.

The Presiding Officer, Senator Armbrister in Chair, laid the bill and the House
amendment before the Senate.

**Amendment**

Amend **SB 1170** by substituting in lieu thereof the following:

A BILL TO BE ENTITLED
AN ACT

relating to the regulation of gas production by the Railroad Commission of Texas.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subsection (a), Section 86.081, Natural Resources Code, is
amended to read as follows:

(a)  For the protection of public and private interests, the commission, on written
complaint by an affected party or on its own initiative and after notice and an
opportunity for a hearing, shall prorate and regulate the daily gas well production
from a [each] common reservoir if the commission finds that action to be necessary
to:

(1)  prevent waste; or [and]

(2)  adjust the correlative rights and opportunities of each owner of gas in a
common reservoir to produce and use or sell the gas as permitted in this chapter.

SECTION 2.  Subsection (a), Section 86.084, Natural Resources Code, is amended to read as follows:

(a) The commission, on written complaint by an affected party or on its own initiative, may [shall] determine the status of gas production from any reservoir [all reservoirs] in the state.

SECTION 3.  Section 86.085, Natural Resources Code, is amended to read as follows:

Sec. 86.085.  DETERMINATION OF DEMAND AND VOLUME.   On or before the last [25th] day of each month, the commission or a person authorized by the commission[, after notice and hearing,] shall determine:

(1) the lawful market demand for gas to be produced from each prorated reservoir during the following month; and

(2) the volume of gas that can be produced without waste from each prorated [the] reservoir and each well in the reservoir during the following month.

SECTION 4.  Section 86.086, Natural Resources Code, is amended to read as follows:

Sec. 86.086.  MONTHLY RESERVOIR ALLOWABLE.   After determining demand for and volume of production from a prorated reservoir as provided in Section 86.085 [of this code], the commission shall fix the monthly reservoir allowable of gas to be produced from the reservoir at the lawful market demand for the gas or at the volume that can be produced from the reservoir without waste, whichever is the smaller quantity.

SECTION 5.  Section 86.087, Natural Resources Code, is amended to read as follows:

Sec. 86.087.  MONTHLY WELL ALLOWABLE.   The monthly reservoir allowable shall be allocated among all wells entitled to produce gas from a prorated [the] reservoir to give each well its fair share of the gas to be produced from the reservoir, but each well is restricted to the amount of gas that can be produced from it without waste. The volume of gas allocated to each well is the monthly allowable for that well.

SECTION 6.  Subsection (a), Section 86.089, Natural Resources Code, is amended to read as follows:

(a) In determining the daily allowable production for each gas well in a prorated reservoir, the commission shall take into account:

(1) the size of the tract segregated with respect to the surface position and common ownership on which the gas well or wells are located;

(2) the relation between the daily producing capacity of each gas well and the aggregate daily capacity of all gas wells producing the same kind of gas in the same common reservoir or zone; and

(3) other factors that are pertinent.

SECTION 7.  Section 86.094, Natural Resources Code, is amended to read as follows:

Sec. 86.094.  AUTHORITY TO INCREASE TAKE ABOVE ALLOWABLE. If unforeseen contingencies increase the demand for gas required by a distributor, transporter, or purchaser to an amount in excess of the total allowable production of the wells in a prorated reservoir to which the person [he] is connected, the distributor,

transporter, or purchaser may increase the person's [his] take ratably from all these wells in order to supply the person's [his] demand for gas, provided that notice of the increase and the amount of the increase are given to the commission within five days; and provided further, the commission [, at its next hearing,] shall adjust the inequality of withdrawals caused by the increase in fixing the allowable production of the various wells in the common reservoir or zone.

SECTION 8.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 1170**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

## SENATE BILL 1175 WITH HOUSE AMENDMENT

Senator Jackson, on behalf of Senator Armbrister, called **SB 1175** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Amendment**

Amend **SB 1175** by substituting in lieu thereof the following:

### A BILL TO BE ENTITLED
### AN ACT

relating to the regulation of oil and gas production by the Railroad Commission of Texas.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 85.043, Natural Resources Code, is amended to read as follows:

Sec. 85.043.  APPLICATION OF CERTAIN RULES AND ORDERS.  If the commission requires a showing that refined products were manufactured from oil legally produced, the requirement shall be of uniform application throughout the state; provided that, if the rule or order is promulgated for the purpose of controlling a condition in any local area or preventing a violation in any local area, then on the complaint of a person that the same or similar conditions exist in some other local area and the promulgation and enforcement of the rule could be beneficially applied to that additional area, the commission may [shall] determine whether or not those conditions do exist, and if it is shown that they do, the rule or order may [shall] be enlarged to include the additional area.

SECTION 2.  Subsection (a), Section 85.053, Natural Resources Code, is amended to read as follows:

(a)  If a rule or order of the commission limits or fixes in a pool or portion of a pool the production of oil, or the production of gas from wells producing gas only, the commission, on written complaint by an affected party or on its own initiative and

after notice and an opportunity for a hearing, shall distribute, prorate, or otherwise apportion or allocate the allowable production among the various producers on a reasonable basis if the commission finds that action to be necessary to:

  (1) prevent waste; or

  (2) adjust the correlative rights and opportunities of each owner of oil or gas in a common reservoir to produce and use or sell the oil or gas as permitted in this chapter.

SECTION 3.  Subsections (a) and (c), Section 85.054, Natural Resources Code, are amended to read as follows:

(a)  To prevent unreasonable discrimination in favor of one pool as against another, and on written complaint and proof of such discrimination or if the commission on its own initiative finds such an action to be necessary, the commission may allocate or apportion the allowable production of oil on a fair and reasonable basis among the various pools in the state.

(c)  The commission may [shall] determine the reasonable market demand of the respective pool as the basis for determining the allotments to be assigned to the respective pool so that discrimination may be prevented.

SECTION 4.  Subsections (a), (b), and (c), Section 85.055, Natural Resources Code, are amended to read as follows:

(a)  If, on written complaint by an affected party or on its own initiative and after notice and an opportunity for a hearing, the commission finds that full production from wells producing gas only from a common source of supply of gas in this state is in excess of the reasonable market demand, the commission shall inquire into the production and reasonable market demand for the gas and shall determine the allowable production from the common source of supply.

(b)  The allowable production from a prorated common source of supply is that portion of the reasonable market demand that can be produced without waste.

(c)  The commission shall allocate, distribute, or apportion the allowable production from the prorated common source of supply among the various producers on a reasonable basis and shall limit the production of each producer to the amount allocated or apportioned to the producer.

SECTION 5.  Section 85.058, Natural Resources Code, is amended to read as follows:

Sec. 85.058.  COMMISSION INQUIRY AND DETERMINATION.  From time to time, the commission may [shall] inquire into the production, storage, transportation, refining, reclaiming, treating, marketing, and processing of oil and gas, and the reasonable market demand for oil and gas, so that it may determine whether or not waste exists or is imminent or whether the oil and gas conservation laws of this state or the rules and orders of the commission promulgated under those laws are being violated.

SECTION 6.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The amendment was read.

Senator Jackson, on behalf of Senator Armbrister, moved to concur in the House amendment to **SB 1175**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### CONFERENCE COMMITTEE ON HOUSE BILL 3539

Senator Fraser called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 3539** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 3539** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate:  Senators Fraser, Chair; Estes, Averitt, Armbrister, and Madla.

### SENATE BILL 1528 WITH HOUSE AMENDMENTS

Senator Zaffirini called **SB 1528** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

#### Floor Amendment No. 1

Amend **SB 1528** by adding the following Section.

Section __.  Amend Section 54.203, (g), Education Code to read as follows:

(g)  The governing board of a junior college district may establish a fee for extraordinary costs associated with a specific course or program and may provide that the exemptions provided by Subsections (a) and (b) do not apply to this fee provide that the exemptions provided by Subsections (a) and (b) do not apply to a course fee or training fee charged a student by the junior college district to cover the flight time costs associated with a course in aircraft flight training, to the extent those costs are incurred by a student:

1.  who does not have a private pilot rating; or

2.  who has a private pilot rating but is not actively seeking to fulfill the requirements of the Federal Aviation Administration for an additional certification or rating.

#### Floor Amendment No. 2

Amend **SB 1528** (House committee report) by adding the following appropriately numbered sections to the bill and renumbering subsequent sections of the bill accordingly:

SECTION __.   Section 54.203, Education Code, is amended by adding Subsection (h) to read as follows:

(h)  In determining whether to admit a person to any certificate program or any baccalaureate, graduate, postgraduate, or professional degree program, an institution of higher education may not consider the fact that the person is eligible for an exemption under this section.

SECTION __.  Subsection (h), Section 54.203, Education Code, as added by this Act, applies beginning with admissions to a public institution of higher education for the 2006 spring semester. Admissions to a public institution of higher education before that semester are covered by the law in effect before the effective date of this Act, and the former law is continued in effect for that purpose.

**Floor Amendment No. 3**

Amend **SB 1528** by adding the appropriately numbered section as follows and by renumbering any remaining sections accordingly:

"SECTION __.  The Coordinating Board shall compile data on the tuition and fees charged at each two-year and four-year institution of public higher education, beginning with the fall semester of 2003 through the spring semester of 2007, and shall submit a report to the 80th Texas Legislature describing the amount and percent change per semester for each institution and ranking the two- and four-year institutions in order of the total increase."

**Floor Amendment No. 6**

Amend **SB 1528** by adding the following section, appropriately numbered, and renumbering subsequent sections accordingly:

SECTION __.  Section 65.45, Education Code, is amended by adding Subsection (d) to read as follows:

(d)  To the extent provided for in an agreement authorized by this section, a person employed by the entity with whom the system enters such an agreement, or the person's spouse or child, may pay the tuition and fees charged to residents of this state when enrolled in a system institution.

The amendments were read.

Senator Zaffirini moved to concur in the House amendments to **SB 1528**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### SENATE BILL 1452 WITH HOUSE AMENDMENT

Senator Lucio called **SB 1452** from the President's table for consideration of the House amendment to the bill.

The Presiding Officer laid the bill and the House amendment before the Senate.

**Committee Amendment No. 1**

Amend **SB 1452** (Senate engrossment) in SECTION 1 of the bill, in added Subsection (c), Section 78.10, Education Code (page 2, line 20), by striking "nonresidential,".

The amendment was read.

Senator Lucio moved to concur in the House amendment to **SB 1452**.

The motion prevailed by the following vote:  Yeas 29, Nays 0.

Absent-excused:  Carona, West.

### CONFERENCE COMMITTEE ON HOUSE BILL 2491

Senator Jackson, on behalf of Senator Armbrister, called from the President's table, for consideration at this time, the request of the House for a conference committee to adjust the differences between the two Houses on **HB 2491** and moved that the request be granted.

The motion prevailed without objection.

The Presiding Officer asked if there were any motions to instruct the conference committee on **HB 2491** before appointment.

There were no motions offered.

Accordingly, the Presiding Officer announced the appointment of the following conferees on the part of the Senate: Senators Armbrister, Chair; Madla, Eltife, Seliger, and Deuell.

### (Saturday, May 28, 2005)

### HOUSE CONCURRENT RESOLUTION 30
### ON SECOND READING

On motion of Senator Fraser and by unanimous consent, the regular order of business, Senate Rule 8.02, and all necessary rules were suspended to take up for consideration **HCR 30** at this time on its second reading:

**HCR 30**, Designating Dublin as the official Irish Capital of Texas.

The resolution was read second time and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of the resolution except as follows:

Absent-excused:  Carona, West.

### SENATE RULE 12.09(a) SUSPENDED
### (Printing and Notice of Conference Committee Reports)

Senator Ogden moved to suspend Senate Rule 12.09(a) as it relates to the Conference Committee Report on **SB 1** for consideration Saturday, May 28, 2005.

The motion prevailed by the following vote:  Yeas 25, Nays 2.

Yeas:  Armbrister, Averitt, Brimer, Deuell, Duncan, Eltife, Estes, Fraser, Harris, Hinojosa, Jackson, Janek, Lindsay, Lucio, Madla, Nelson, Ogden, Shapiro, Shapleigh, Staples, Van de Putte, Wentworth, Whitmire, Williams, Zaffirini.

Nays:  Barrientos, Gallegos.

Absent:  Ellis, Seliger.

Absent-excused:  Carona, West.

## SENATE BILL 89 WITH HOUSE AMENDMENTS

Senator Averitt called **SB 89** from the President's table for consideration of the House amendments to the bill.

The Presiding Officer laid the bill and the House amendments before the Senate.

### Floor Amendment No. 1

Amend **SB 89** as follows:

(1)  Add the following appropriately numbered section to the bill and renumber the remaining sections of the bill appropriately:

SECTION __.  Chapter 63, Election Code, is amended by adding Section 63.0102 to read as follows:

Sec. 63.0102.  USE OF CERTAIN ELECTRONICALLY READABLE INFORMATION.  (a)  An election officer may access electronically readable information on a driver's license or personal identification card for proof of identification when determining whether a voter shall be accepted for voting.

(b)  The secretary of state shall prescribe any necessary procedures to implement this section.

(2)  On page 1, strike lines 23-24 and substitute the following:

(5)  an election officer who accesses or uses the information to determine the identity of a voter as authorized by Section 63.0102, Election Code.

### Floor Amendment No. 2

Amend **SB 89** (House committee printing) as follows:

(1)  Add the following appropriately numbered section to the bill and renumber the remaining sections appropriately:

SECTION __.  (a)  Chapter 62, Election Code, is amended by adding Section 62.016 to read as follows:

Sec. 62.016.  NOTICE OF ACCEPTABLE IDENTIFICATION OUTSIDE POLLING PLACES.  The presiding judge shall post in a prominent place on the outside of each polling location notice that a provisional ballot will be provided to a person who executes the appropriate affidavit and a list of the acceptable forms of photographic and nonphotographic identification.  The notice and list must be printed:

(1)  in English, Spanish, and any other language appropriate to the precinct in which the polling place is located; and

(2)  using a font that is at least 24 point.

(b)  Section 63.001, Election Code, is amended by amending Subsections (b), (c), (d), and (f) and adding Subsection (g) to read as follows:

(b)  On offering to vote, a voter must present to an election officer at the polling place the voter's voter registration certificate and either:

(1)  one form of identification listed in Section 63.0101(a); or

(2)  two different forms of identification listed in Section 63.0101(b) [to an election officer at the polling place].

(c)  On presentation of the documentation required by Subsection (b) [a registration certificate], an election officer shall determine whether the voter's name on the registration certificate is on the list of registered voters for the precinct.

(d) If the voter's name is on the precinct list of registered voters <u>and the voter's identity can be verified from the proof presented</u>, the voter shall be accepted for voting.

(f) After determining whether to accept a voter, an election officer shall return the voter's <u>documentation</u> [~~registration certificate~~] to the voter.

(g) If the requirements for identification prescribed by Subsection (b)(1) or (2) are not met, the voter shall be accepted for provisional voting only under Section 63.011.

(c) Chapter 63, Election Code, is amended by adding Section 63.0012 to read as follows:

<u>Sec. 63.0012. USE OF ADDRESS ON IDENTIFICATION. (a)  This section applies only to a voter who:</u>

<u>(1)  presents a registration certificate;</u>

<u>(2)  is on the list of registered voters for the precinct; and</u>

<u>(3)  confirms the address on the list of registered voters is current under Section 63.0011.</u>

<u>(b)  In verifying the identity of a voter described by Subsection (a) under Section 63.001, an election officer may not consider whether the voter's address on a form described by Section 63.001(b)(1) or (2) matches the voter's address on the registration certificate or the list of registered voters.</u>

(d) Section 63.006(a), Election Code, is amended to read as follows:

(a) A voter who, when offering to vote, presents a voter registration certificate indicating that the voter is currently registered in the precinct in which the voter is offering to vote, but whose name is not on the precinct list of registered voters, shall be accepted for voting <u>if the voter's identity can be verified from the proof presented</u>.

(e) Section 63.007(a), Election Code, is amended to read as follows:

(a) A voter who, when offering to vote, presents a voter registration certificate indicating that the voter is currently registered in a different precinct from the one in which the voter is offering to vote, and whose name is not on the precinct list of registered voters, shall be accepted for voting if <u>the voter's identity can be verified from the proof presented and</u> the voter executes an affidavit stating that the voter:

(1)  is a resident of the precinct in which the voter is offering to vote or is otherwise entitled by law to vote in that precinct;

(2)  was a resident of the precinct in which the voter is offering to vote at the time that information on the voter's residence address was last provided to the voter registrar;

(3)  did not deliberately provide false information to secure registration in a precinct in which the voter does not reside; and

(4)  is voting only once in the election.

(f) Section 63.008(a), Election Code, is amended to read as follows:

(a) A voter who does not present a voter registration certificate when offering to vote, but whose name is on the list of registered voters for the precinct in which the voter is offering to vote, shall be accepted for voting if the voter executes an affidavit stating that the voter does not have the voter's voter registration certificate in the

voter's possession at the polling place at the time of offering to vote and the <u>voter's identity can be verified from the proof presented</u> [~~voter presents proof of identification in a form described by Section 63.0101~~].

(g) Section 63.0101, Election Code, is amended to read as follows:

Sec. 63.0101. DOCUMENTATION OF PROOF OF IDENTIFICATION. (a) The following documentation is an acceptable form [~~as proof~~] of photo identification under this chapter:

(1) a driver's license or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than two years before the date of presentation [~~or a similar document issued to the person by an agency of another state, regardless of whether the license or card has expired~~];

(2) a United States military identification card that contains the person's photograph [~~form of identification containing the person's photograph that establishes the person's identity~~];

(3) a valid employee identification card that contains the person's photograph and is issued by an employer of the person in the ordinary course of the employer's business [~~birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity~~];

(4) a United States citizenship certificate [~~papers~~] issued to the person that contains the person's photograph;

(5) a United States passport issued to the person;

(6) a student identification card issued by a public or private institution of higher education that contains the person's photograph [~~official mail addressed to the person by name from a governmental entity~~];

(7) a license to carry a concealed handgun issued to the person by the Department of Public Safety;

(8) an identification card issued by a state agency of this state that contains the person's photograph; or

(9) an identification card that contains the person's photograph and is issued by a county elections administrator or a county clerk.

(b) The following documentation is acceptable as proof of identification under this chapter:

(1) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter;

(2) official mail addressed to the person by name from a governmental entity;

(3) a certified copy of a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;

(4) United States citizenship papers issued to the person;

(5) an original or certified copy of the person's marriage license or divorce decree;

(6) court records of the person's adoption, name change, or sex change;

(7) an identification card issued to the person by a governmental entity of this state or the United States for the purpose of obtaining public benefits, including veteran's benefits, Medicaid, or Medicare;

(8)  a temporary driving permit issued to the person by the Department of Public Safety;

(9)  a pilot's license issued to the person by the Federal Aviation Administration or another authorized agency of the United States;

(10)  a library card that contains the person's name issued to the person by a public library located in this state; or

(11)  a hunting or fishing license issued to a person by the Parks and Wildlife Department [or

[(8)  any other form of identification prescribed by the secretary of state].

(c)  The commissioners court of a county may authorize the county elections administrator or the county clerk, as applicable, to issue photo identification cards that may be used as proof of a voter's identification under Subsection (a).

(h)  Sections 63.011(a) and (b), Election Code, are amended to read as follows:

(a)  A person to whom Section 63.001(g), 63.008(b), or 63.009(a) applies may cast a provisional ballot if the person executes an affidavit stating that the person:

(1)  is a registered voter in the precinct in which the person seeks to vote; and

(2)  is eligible to vote in the election.

(b)  A form for the affidavit shall be printed on an envelope in which the provisional ballot voted by the person may be placed and must include a space for entering the identification number of the provisional ballot voted by the person and a space for an election officer to indicate whether the person presented proof of identification as required by Section 63.001(b)(1) or (2). The affidavit form may include space for disclosure of any necessary information to enable the person to register to vote under Chapter 13. The secretary of state shall prescribe the form of the affidavit under this section.

(i)  Section 65.054(b), Election Code, is amended to read as follows:

(b)  A provisional ballot may be accepted only if:

(1)  the board determines that, from the information in the affidavit or contained in public records, the person is eligible to vote in the election; and

(2)  the voter presents proof of identification as required by Section 63.001(b)(1) or (2):

(A)  at the time the ballot was cast; or

(B)  in the period prescribed under Section 65.0541.

(j)  Subchapter B, Chapter 65, Election Code, is amended by adding Section 65.0541 to read as follows:

Sec. 65.0541.  PRESENTATION OF IDENTIFICATION FOR CERTAIN PROVISIONAL BALLOTS. (a) A voter who is accepted for provisional voting under Section 63.011 because the voter does not present proof of identification as required by Section 63.001(b)(1) or (2) may submit proof of identification to the voter registrar by personal delivery or by mail for examination by the early voting ballot board not later than the fifth day after the date of the election.

(b)  The early voting ballot board shall accept a provisional ballot under Section 65.054 if the voter:

(1)  presents proof of identification in the manner required by this section; and

(2)  is otherwise eligible to vote in the election.

(c)  The office of the voter registrar shall be open on a Saturday that falls within the five-day period described by Subsection (a) for a voter to present identification as provided under this section.

(d)  The secretary of state shall prescribe procedures as necessary to implement this section.

(k)  Section 521.422, Transportation Code, is amended by amending Subsection (a) and adding Subsection (d) to read as follows:

(a)  Except as provided by Subsection (d), the [The] fee for a personal identification certificate is:

(1)  $15 for a person under 60 years of age;

(2)  $5 for a person 60 years of age or older; and

(3)  $20 for a person subject to the registration requirements under Chapter 62, Code of Criminal Procedure.

(d)  The department may not collect a fee for a personal identification certificate issued to a person who executes an affidavit stating that the person is financially unable to pay the required fee and:

(1)  who is a registered voter in this state and presents a valid voter registration certificate; or

(2)  who is eligible for registration under Section 13.001, Election Code, and submits a registration application to the department.

(2)  Strike SECTION 2 of the bill (page 2, lines 1-5) and substitute the following:

SECTION 2.  (a)  Except as otherwise provided by this section, this Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

(b)  Section __ of this Act, amending Chapters 62, 63, and 65, Election Code, and Section 521.422, Transportation Code, takes effect September 1, 2005.

**Floor Amendment No. 6**

Amend **SB 89** by adding a new appropriately numbered section to read as follows and by renumbering the existing sections as appropriate:

SECTION __.  Chapter 63, Election Code, is amended by adding Section 63.0012 to read as follows:

Sec. 63.0012.  USE OF ADDRESS ON IDENTIFICATION. (a)  This section applies only to a voter who:

(1)  presents a registration certificate;

(2)  is on the list of registered voters for the precinct; and

(3)  confirms the address on the list of registered voters is current under Section 63.0011.

(b)  In verifying the identity of a voter described by Subsection (a) under Section 63.001, an election officer may not consider whether the voter's address on a form described by Section 63.001(b)(1) or (2) matches the voter's address on the registration certificate or the list of registered voters.

**Floor Amendment No. 7**

Amend **SB 89** by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. The requirements contained in this Act of providing two forms of identification do not apply to a person who is 85 years of age or older.

**Floor Amendment No. 1 on Third Reading**

Amend **SB 89** on third reading by adding the following appropriately numbered SECTION to the bill and renumbering existing SECTIONS of the bill accordingly:

SECTION __. (a) The manual provided to each election judge at each polling place during each election shall include a description of:

(1) all acceptable forms of identification required to vote in the election; and

(2) the availability of provisional ballots and the rules for obtaining those ballots.

(b) The election judge shall make a record of each voter who is not permitted to vote in the election and the reasons for precluding the voter from participating in the election.

(c) The election judge shall submit the list of voters for whom a record is made under Subsection (b) of this section and any other required documents to the secretary of state.

**Floor Amendment No. 2 on Third Reading**

Amend **SB 89** on third reading by adding the following appropriately numbered SECTION to the bill and renumbering subsequent SECTIONS of the bill accordingly:

SECTION __. Section 521.126(e), Transportation Code, is amended to read as follows:

(e) For the purpose of preventing fraud and other violations of law, the [The] prohibition provided by Subsection (b)(1) does not apply to a financial institution or a business if the information is accessed and used only for purposes of identification verification of an individual or check verification at the point of sale for a purchase of a good or service by check. The prohibition provided by Subsection (b)(2) does not apply to a financial institution if each license or certificate holder whose information is included in the compilation or database consents to the inclusion of the person's information in the compilation or database. Consent under this subsection must be on a separate document, signed by the license or certificate holder, that explains in at least 14-point bold type the information that will be included in the compilation or database. For the purposes of this subsection, "financial institution" has the meaning assigned by 31 U.S.C. Section 5312(a)(2), as amended.

The amendments were read.

Senator Averitt moved to concur in the House amendments to **SB 89**.

### (President in Chair)

### POINT OF ORDER

Senator Van de Putte raised a point of order that the House amendments to **SB 89** were not germane to the body of the bill and further consideration was in violation of Senate Rule 7.15 and Section 30, Article III, Texas Constitution.

## POINT OF ORDER RULING

The President ruled that the point of order was well-taken and sustained.

Senator Averitt moved that the Senate do not concur in the House amendments, but that a conference committee be appointed to adjust the differences between the two Houses on the bill.

The motion prevailed without objection.

The President asked if there were any motions to instruct the conference committee on **SB 89** before appointment.

Senator Barrientos moved to instruct the conferees to adhere to the orginal bill as it left the Senate.

Senator Barrientos withdrew the motion to instruct.

The President then announced the appointment of the following conferees on the part of the Senate: Senators Averitt, Chair; Van de Putte, Nelson, Shapiro, and Staples.

## REMARKS ORDERED PRINTED

On motion of Senator Gallegos and by unanimous consent, the remarks between Senators Averitt and Barrientos regarding **SB 89** were ordered reduced to writing and printed in the *Senate Journal.*

The remarks are printed in the addendum to today's journal.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 167

Senator Jackson submitted the following Conference Committee Report:

Austin, Texas
May 26, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 167** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| JACKSON | W. SMITH |
| FRASER | HOWARD |
| LUCIO | MCREYNOLDS |
| MADLA | WEST |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 167** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 1830

Senator Ellis submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 1830** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| ELLIS | WONG |
| MADLA | TALTON |
| LINDSAY | NIXON |
| WENTWORTH | VAN ARSDALE |
| | VO |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 1830** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## SENATE BILL 1641

Senator Lucio submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **SB 1641** have had the same under consideration, and beg to report it back with the recommendation that it do pass in the form and text hereto attached.

| | |
|---|---|
| LUCIO | OLIVEIRA |
| ELTIFE | SOLIS |
| MADLA | GRIGGS |
| SHAPLEIGH | FLORES |
| On the part of the Senate | On the part of the House |

A BILL TO BE ENTITLED
AN ACT

relating to the continuation of the law authorizing the issuance of oversize or overweight vehicle permits by certain port authorities.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 623.219, Transportation Code, is amended to read as follows:

Sec. 623.219. EXPIRATION. This subchapter expires June 1, 2009 [2007].

SECTION 2. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

The Conference Committee Report on **SB 1641** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## SENATE BILL 757

Senator Armbrister submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **SB 757** have had the same under consideration, and beg to report it back with the recommendation that it do pass in the form and text hereto attached.

| ARMBRISTER | SOLOMONS |
|---|---|
| FRASER | MCCALL |
| LUCIO | ORR |
| ESTES | HOMER |
| On the part of the Senate | On the part of the House |

A BILL TO BE ENTITLED
AN ACT

relating to property in the custody of a pawnbroker; providing criminal penalties.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subchapter D, Chapter 371, Finance Code, is amended by adding Section 371.1821 to read as follows:

Sec. 371.1821. LAW ENFORCEMENT HOLD PROCEDURE; PLEDGE OR SALE OF MISAPPROPRIATED PROPERTY. (a)  In this section:

(1)  "Chief law enforcement officer" means:

    (A) the sheriff of the county in which the pawnshop is located or an officer of the sheriff's department designated by the sheriff, if the pawnshop is not located in a municipality that maintains a police department; or

    (B) the police chief of the municipality in which the pawnshop is located or a police officer designated by the police chief, if the pawnshop is located in a municipality that maintains a police department.

    (2) "Misappropriated" means stolen, embezzled, converted, or otherwise wrongfully appropriated, or pledged against the will of the owner of the goods or a person holding a perfected security interest in the goods.

  (b) If a chief law enforcement officer has reasonable suspicion to believe that goods in the possession of a pawnbroker are misappropriated, the officer may place a hold order on the goods.

  (c) Goods subject to a hold order must be physically retained by the pawnbroker in a secure area and may not be released, sold, redeemed, or disposed of unless:

    (1) the chief law enforcement officer delivers a written release to the pawnbroker;

    (2) the hold order and any extension of the hold order expire; or

    (3) a court order, including a search warrant, requires the release, sale, or disposal of the property.

  (d) A hold order is effective only if it contains:

    (1) the name of the pawnbroker;

    (2) the name and mailing address of the pawnshop where the goods are located;

    (3) the name, title, badge number, and phone number of the chief law enforcement officer placing the hold order;

    (4) the case number of the criminal proceeding or investigation involving the goods to be held;

    (5) a complete description of the goods to be held, including any available model number and serial number, and the related pawn or purchase ticket number;

    (6) the expiration date of the hold order; and

    (7) the name of the law enforcement agency that prepared the investigative report and the associated number of the report.

  (e) The hold order and any extension of the hold order must be signed and dated by the chief law enforcement officer and the pawnbroker or the pawnbroker's designee, as evidence of the hold order's issuance by the chief law enforcement officer, the pawnbroker's receipt of the hold order, and the beginning of the holding period. The chief law enforcement officer shall provide at no cost to the pawnbroker an executed copy of the hold order for the pawnbroker's records.

  (f) The initial holding period of the hold order may not exceed 60 days. A hold order may be extended for up to three successive 60-day periods on written notification to the pawnbroker before the expiration of the immediately preceding holding period or extension. A hold order may be released before the expiration of the holding period or extension by written release from the chief law enforcement officer. A hold order is considered expired on the expiration date stated on the hold order if the holding period is not extended under this subsection.

(g)  Notwithstanding Subsection (e) or (f), the chief law enforcement officer may place a verbal hold order on property, or may verbally extend a hold order, for up to 10 days while a written hold order or extension is being prepared.  A verbal hold order must include the information required by Subsection (d).

(h)  Goods subject to a hold order may be released to the custody of the chief law enforcement officer for use in a criminal investigation if the officer:

(1)  has probable cause to believe that the goods subject to a hold order are misappropriated; and

(2)  furnishes a written receipt for the goods.

(i)  The release of the goods to the custody of the chief law enforcement officer is not considered a waiver or release of the pawnbroker's rights or interest in the goods. Goods in the custody of the chief law enforcement officer are subject to Chapter 47, Code of Criminal Procedure.

(j)  A person commits an offense if the person pledges with or sells to a pawnbroker misappropriated property. An offense under this subsection is a Class B misdemeanor.  If conduct that constitutes an offense under this subsection also constitutes an offense under any other law, the person may be prosecuted under this subsection or the other law.

(k)  This section does not affect the authority of a chief law enforcement officer to seize contraband under Chapters 18 and 59, Code of Criminal Procedure.

SECTION 2.  Chapter 371, Finance Code, is amended by adding Subchapter H to read as follows:

SUBCHAPTER H. PROVIDING DATA TO LAW ENFORCEMENT AGENCIES BY ELECTRONIC MEANS

Sec. 371.351.  DEFINITIONS. In this subchapter:

(1)  "Chief law enforcement officer" has the meaning assigned by Section 371.1821.

(2)  "Law enforcement agency" means the department of the chief law enforcement officer.

(3)  "Provider" means a commercial enterprise primarily engaged in the business of establishing and maintaining one or more Internet repositories.

(4)  "Reportable data" means the following information from a transaction in which a pawnshop customer pledges or sells personal property:

(A)  the name and address of the pawnshop;

(B)  the date of the transaction;

(C)  an identification and complete description of the goods pledged or sold, including any available model numbers and serial numbers, and other identifying characteristics; and

(D)  the pawn or purchase ticket number related to the transaction.

(5)  "Repository" means an electronic storage of transaction data.

(6)  "Transaction data" means information from a transaction in which a pawnshop customer pledges or sells personal property, including:

(A)  the name and address of the pawnshop;

(B)  the date of the transaction;

(C)  an identification and complete description of the goods pledged or sold, including any available model numbers and serial numbers, and other identifying characteristics;

(D)  the customer's name, address, and physical description;

(E)  a driver's license number, military identification number, identification certificate number, or other official number that identifies the customer; and

(F)  the pawn or purchase ticket number related to the transaction.

Sec. 371.352.  ELECTRONIC REPORTING TO LAW ENFORCEMENT AGENCY OR PROVIDER. (a) A pawnbroker who generates computerized pawn and purchase tickets shall, as required by the chief law enforcement officer, transmit all:

(1)  reportable data to the law enforcement agency electronically in a format used by the pawnbroker's computer software; or

(2)  transaction data electronically in the format used by the pawnbroker's computer software directly to a provider of a repository system approved by the commissioner under Section 371.358.

(b) A pawnbroker may transmit transaction data to the chief law enforcement officer. A pawnbroker and the chief law enforcement officer may agree to another means of transferring transaction data to a law enforcement agency.

(c) A pawnbroker who reports information under this subchapter shall transmit data pertaining to a transaction not later than the seventh day after the date of the transaction, or within a shorter period as agreed to by the chief law enforcement officer and the pawnbroker.

(d) If the chief law enforcement officer requires a pawnbroker to submit reportable data to the law enforcement agency, the law enforcement agency shall maintain a secure database using a minimum of 128-bit encryption for all electronic transmissions under this subchapter that occur through the Internet. The law enforcement agency shall implement appropriate security measures to ensure that its database of reportable data may be accessed only by the chief law enforcement officer.

(e) A law enforcement agency may not charge a fee to a pawnbroker or customer of a pawnbroker for the preparation, compilation, conversion, or transmission of data under this section.

Sec. 371.353.  PROVIDER REPOSITORY. (a) A provider may establish a repository for the purpose of providing law enforcement agencies with access to transaction data to facilitate the investigation of alleged property crimes.

(b) A provider shall collect and maintain the transaction data and shall update the repository at least daily.

(c) A provider shall implement appropriate security measures and data recovery measures necessary to ensure the integrity of the data. A provider shall ensure that the repository can be accessed only by a chief law enforcement officer in accordance with this subchapter.

Sec. 371.354.  CHARGES FOR USE OF REPOSITORY. (a)  A provider may charge a law enforcement agency a fee to access the repository. The fee must be reasonable in relation to the provider's costs in establishing and maintaining the repository.

(b)  A provider may not charge a pawnbroker or customer of a pawnbroker a fee for the compilation or transmission of reportable data or for the creation, maintenance, or use of any repository.

Sec. 371.355.  REPOSITORY REQUIREMENTS. A repository must:

(1)  enable reporting pawnbrokers to transmit data for each pawn and purchase transaction over the Internet in the format used by the pawnbroker's computer software;

(2)  enable authorized chief law enforcement officers who provide a secure identification or access code to access the reportable data contained in the repository over the Internet;

(3)  prevent unauthorized persons from accessing the data contained in the repository;

(4)  require authorized chief law enforcement officers seeking access to the identity of the customer in a pawn or purchase transaction to:

(A)  represent that the information is sought in connection with the investigation of a crime involving the goods delivered by the customer in that transaction; and

(B)  present:

(i)  a valid case number of a criminal proceeding or investigation for which the customer's identity is needed; or

(ii)  if a case number is not available, the name and badge number of the chief law enforcement officer seeking access to the customer's identity;

(5)  record the following information for each search of the repository:

(A)  the identity of the law enforcement personnel searching the repository;

(B)  the pawn or purchase transaction involved in the search; and

(C)  the identity of any customer whose information was accessed through the search; and

(6)  use a minimum of 128-bit encryption for all transmissions to and from the repository.

Sec. 371.356.  CONFIDENTIALITY.   (a)  The data in the repository is confidential and may be released or disclosed only to a law enforcement agency for the investigation of a crime or to the commissioner for administrative purposes.

(b)  A person who releases or discloses data in violation of this section commits an offense.  An offense under this section is a Class A misdemeanor.

Sec. 371.357.  FRAUDULENT ACCESS OF REPOSITORY. A person who gains access to the information in the repository through fraud or false pretenses commits an offense.  An offense under this section is a Class A misdemeanor.

Sec. 371.358.  COMMISSIONER APPROVAL AND OVERSIGHT. (a) The commissioner, after ensuring compliance with this subchapter, may approve repository systems of providers for use under this subchapter. If the commissioner

approves repository systems under this subsection, the commissioner shall evaluate the compliance of approved repository systems with this subchapter at least once every two years.

(b) The commissioner may require appropriate documentation demonstrating that a provider or a law enforcement agency that collects reportable data meets the requirements of this subchapter.

(c) On or before January 31 of each year, a provider or law enforcement agency that collects reportable data electronically under this subchapter shall report to the commissioner the total number of transactions reported by each reporting pawnbroker in the preceding calendar year. The provider or law enforcement agency shall provide the report at no cost to the commissioner.

Sec. 371.359. COMPUTER-RELATED MALFUNCTIONS AND ERRORS. (a) A pawnbroker who electronically reports information under this subchapter may not be held responsible for a delay in submitting data that results from a computer-related malfunction or error caused by the pawnbroker's equipment or software, if:

(1) the pawnbroker makes a bona fide effort to repair the malfunction or correct the error; and

(2) the pawnbroker and the chief law enforcement officer arrange a mutually acceptable alternative method by which the pawnbroker provides the data to the law enforcement agency.

(b) A pawnbroker who electronically reports information under this subchapter may not be held responsible for a delay in submitting data that results from a computer-related malfunction or error that is the responsibility of a provider or a law enforcement agency. A pawnbroker and a chief law enforcement officer shall arrange a mutually acceptable alternative method by which the pawnbroker provides the data to the law enforcement agency until the malfunction or error is corrected.

(c) The Finance Commission of Texas may adopt rules to establish procedures to address computer-related malfunctions and errors under this subchapter.

Sec. 371.360. PAPER COPIES. (a) A pawnbroker who electronically reports information under this subchapter shall make available for on-site inspection, to any appropriate law enforcement officer on request, paper copies of pawn or purchase transaction documents.

(b) After the 180th day after the date a pawnbroker transmits data under this subchapter, the pawnbroker is not required to make available to any law enforcement personnel paper copies of the pawnbroker's information related to the pawnbroker's pawn or purchase transactions, except as provided by Subsection (c) and for evidentiary purposes for which a law enforcement officer makes a specific request related to a specific transaction.

(c) For a reasonable period following the repair of a computer-related malfunction or error, a pawnbroker shall make available for on-site inspection, to any appropriate law enforcement officer on request, paper copies of pawn or purchase transaction documents for transactions that occurred during the period beginning when the malfunction or error occurs and ending when the chief law enforcement officer is reasonably certain the malfunction or error has been corrected.

(d) The Finance Commission of Texas may adopt rules to implement this section.

SECTION 3.  This Act takes effect January 1, 2006.

The Conference Committee Report on **SB 757** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 1358

Senator Armbrister submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 1358** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| ARMBRISTER | FLORES |
| HINOJOSA | HOMER |
| SELIGER | GEREN |
| JACKSON | R. COOK |
| MADLA | PUENTE |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 1358** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## SENATE BILL 368

Senator Duncan submitted the following Conference Committee Report:

Austin, Texas
May 25, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **SB 368** have had the same under consideration, and beg to report it back with the recommendation that it do pass in the form and text hereto attached.

| | |
|---|---|
| DUNCAN | HARTNETT |
| AVERITT | CRABB |
| ELLIS | DUTTON |

OGDEN                          HUGHES
WHITMIRE                       LUNA
On the part of the Senate      On the part of the House

## A BILL TO BE ENTITLED
## AN ACT

relating to the compensation of state judges and county judges and to the computation of retirement benefits for state judges and for members of the elected class of the Employees Retirement System of Texas.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 659.012, Government Code, is amended to read as follows:

Sec. 659.012. JUDICIAL SALARIES. (a) Notwithstanding Section 659.011:

(1) a judge of a district court is entitled to an annual salary from the state of at least $125,000, except that the combined salary of a district judge from state and county sources, including compensation for any extrajudicial services performed on behalf of the county, may not exceed the amount that is $5,000 less than the salary provided for a justice of a court of appeals other than a chief justice [justice of the supreme court is entitled to an annual salary from the state that is at least $102,463];

(2) a justice of a court of appeals other than the chief justice is entitled to an annual salary from the state that is equal to 110 percent of the salary of a district judge [five percent less than the salary provided by the General Appropriations Act for a justice of the supreme court], except that the combined salary of a justice of the court of appeals other than the chief justice from all state and county sources, including compensation for any extrajudicial services performed on behalf of the county, may not exceed the amount that is $5,000 [$1,000] less than the salary provided for a justice of the supreme court;

(3) a justice of the supreme court other than the chief justice or a judge of the court of criminal appeals other than the presiding judge is entitled to an annual salary from the state that is equal to 120 percent of the salary of a district judge; and

(4) the chief justice or presiding judge of an appellate [a] court [of appeals] is entitled to an annual salary from the state that is $2,500 more than the salary provided for the other justices or judges of the court [of appeals], except that the combined salary of the chief justice of a court of appeals may not exceed the amount that is $2,500 [$500] less than the salary provided for a justice of the supreme court[;
and

[(4) a judge of a district court is entitled to an annual salary from the state that is 10 percent less than the salary provided in the General Appropriations Act for a justice of the supreme court, except that unless otherwise provided by law, the combined salary of a district judge from state and county sources may not exceed the amount that is $2,000 less than the salary provided for a justice of the supreme court].

(b) To the extent of any conflict, the salary limitations [differential] provided by this section for the combined salary of a state [district] judge or justice from state and local sources prevails over any provision of Chapter 31 or [differential set by] Chapter 32 that authorizes the payment of additional compensation to a state judge or justice.

(d) In a county with more than five district courts, a district judge who serves as a local administrative district judge under Section 74.091 is entitled to an annual salary from the state that is $5,000 more than the salary from the state to which the judge is otherwise entitled under Subsection (a)(1) [(e)].

(e) For the purpose of salary payments by the state, the comptroller shall determine from sworn statements filed by the justices of the courts of appeals and district judges that the required salary limitations [differentials] provided by this section are maintained. If a salary combined with additional compensation from a county [supplement] would be in excess of the limitations [differential] provided by this section, the comptroller shall reduce the state salary by the amount of the excess.

SECTION 2. Section 26.006(a), Government Code, is amended to read as follows:

(a) A county judge is entitled to an annual salary supplement from the state of $15,000 [$10,000] if at least 40 percent of the functions that the judge performs are judicial functions.

SECTION 3. Section 31.001, Government Code, is amended to read as follows:

Sec. 31.001. AUTHORITY FOR COUNTY PAYMENT OF COMPENSATION. The commissioners courts in the counties of each of the 14 courts of appeals districts may pay additional compensation in an amount that does not [to] exceed the limitations of Section 659.012 [$15,000 a year] to each of the justices of the courts of appeals residing within the court of appeals district that includes those counties. The compensation [payment] is for all extrajudicial [judicial and administrative] services performed by the justices.

SECTION 4. The heading to Chapter 32, Government Code, is amended to read as follows:

CHAPTER 32. ADDITIONAL [SUPPLEMENTAL] COMPENSATION OF
DISTRICT JUDGES [FOR CERTAIN DUTIES]

SECTION 5. The heading to Subchapter A, Chapter 32, Government Code, is amended to read as follows:

SUBCHAPTER A. ADDITIONAL COMPENSATION [SUPPLEMENTAL
SALARY] PAID BY COUNTY FOR EXTRAJUDICIAL SERVICES

SECTION 6. Section 32.001, Government Code, is amended to read as follows:

Sec. 32.001. AUTHORITY FOR ADDITIONAL COMPENSATION [ANDERSON COUNTY]. (a) The commissioners court of a county [Commissioners Court of Anderson County] may pay the judges of the district courts having jurisdiction in the county additional compensation in an amount that does not exceed the limitations of Section 659.012 for extrajudicial [an annual salary not to exceed $1,200 for judicial and administrative] services performed by the district judges.

(b) The compensation [salary] shall be paid in monthly installments from the county general fund or other available funds of the county.

(c) The compensation [salary] is in addition to the salary paid by the state and any other compensation authorized by law.

[(d)  The aggregate amount of $2,900 is the maximum supplemental salary that may be paid under this subchapter to a judge of a district court having jurisdiction in Anderson County from all counties that comprise a part of a judicial district consisting of not less than four counties, of which two of those counties have two or more district courts.]

SECTION 7.  Section 152.0003, Human Resources Code, is amended to read as follows:

Sec. 152.0003.  COMPENSATION.   The compensation authorized under this chapter for a judge serving on a juvenile board is in addition to all other compensation provided or allowed by law for a judge.  Notwithstanding any other law, the combined salary from all state and local sources of a district judge serving on a juvenile board may not exceed an amount that is $5,000 less than the salary provided by the state for a justice of a court of appeals other than the chief justice.

SECTION 8.  Subchapter C, Chapter 72, Government Code, is amended by adding Section 72.030 to read as follows:

Sec. 72.030.  COLLECTION OF DATA RELATING TO JUDICIAL TURNOVER.  (a)  The office biennially shall collect data relating to:

(1)  the rate at which state judges resign from office or do not seek reelection; and

(2)  the reason for action under Subdivision (1).

(b)  Not later than December 1 of each even-numbered year, the office shall file a report containing the data collected under Subsection (a) for the preceding state fiscal biennium with the governor, the lieutenant governor, the speaker of the house of representatives, and the presiding officers of the standing committees of each house of the legislature with jurisdiction over the judiciary or appropriations.

(c)  The report filed under Subsection (b) must include the following findings:

(1)  whether the compensation of state judges exceeds, is equal to, or is less than the compensation of judges at corresponding levels in the five states closest in population to this state; and

(2)  whether the compensation of state judges exceeds, is equal to, or is less than the average salary of lawyers engaged in the private practice of law, using data collected by the state bar under Section 81.116.

(d)  The purpose of filing the report with the legislature is to provide the legislature with information to facilitate legislation that ensures that the compensation of state judges is adequate and appropriate.

SECTION 9.  Subchapter H, Chapter 81, Government Code, is amended by adding Section 81.116 to read as follows:

Sec. 81.116.  COLLECTION OF DATA RELATING TO ATTORNEY COMPENSATION.  (a)  The state bar shall biennially collect data relating to the compensation of lawyers engaged in the private practice of law.

(b)  Not later than December 1 of each even-numbered year, the state bar shall file a report containing the data collected under Subsection (a) for the preceding state fiscal biennium with the governor, the lieutenant governor, the speaker of the house of representatives, and the presiding officers of the standing committees of each house of the legislature with jurisdiction over the judiciary or appropriations.

SECTION 10. Section 814.103, Government Code, is amended to read as follows:

Sec. 814.103. SERVICE RETIREMENT BENEFITS FOR ELECTED CLASS SERVICE. (a) Except as provided by Subsection (b), the standard service retirement annuity for service credited in the elected class of membership is an amount equal to the number of years of service credit in that class, times 2.3 [two] percent of the state salary, as adjusted from time to time, being paid a district judge.

(b) The standard service retirement annuity for service credited in the elected class may not exceed at any time 100 percent of the state salary being paid a district judge.

SECTION 11. Subchapter B, Chapter 833, Government Code, is amended by adding Section 833.1035 to read as follows:

Sec. 833.1035. SERVICE IN EXCESS OF 20 YEARS. (a) Subject to the limitation on the amount of a retirement annuity under Section 834.102(c), an eligible member may establish service credit in the retirement system for service in excess of 20 years performed before September 1, 2005.

(b) A member eligible to establish credit under Subsection (a) is one who elects to make contributions under Section 835.1015.

(c) A member may not establish more than 120 months of service credit under this section.

(d) A member may establish credit under this section by depositing with the retirement system a contribution computed for each month of qualifying service claimed at the rate of six percent of the member's current monthly state salary.

(e) The board of trustees may adopt rules to administer this section.

SECTION 12. Section 834.102, Government Code, is amended by adding Subsection (c) to read as follows:

(c) The service retirement annuity of a member qualifying for retirement under Section 834.101(a) is the applicable state salary under Subsection (a), multiplied by a percentage amount that is the sum of 50 percent plus the product of two percent multiplied by the number of years of subsequent service credit the member accrues under Section 835.1015(a). After including any increase under Subsection (b), the service retirement annuity under this subsection may not be an amount that is greater than 80 percent of the applicable salary under Subsection (a).

SECTION 13. Subsection (c), Section 835.101, Government Code, is amended to read as follows:

(c) Except as provided by Section 835.1015, a [A] member who accrues 20 years of service credit in the retirement system ceases making contributions under this section.

SECTION 14. Subchapter B, Chapter 835, Government Code, is amended by adding Section 835.1015 to read as follows:

Sec. 835.1015. CONTRIBUTIONS AFTER 20 YEARS OF SERVICE CREDIT. (a) A judicial officer who is a member of the retirement system and who accrues 20 years of service credit in the retirement system may elect to make contributions for each subsequent year of service credit that the member accrues by filing an application with the retirement system.

(b) A member who elects to make contributions under Subsection (a) shall contribute six percent of the member's state compensation for each payroll period in the manner provided by Sections 835.101(a) and (b).

(c) A member may not make contributions under this section for more than 10 years of subsequent service credit that the member accrues.

SECTION 15. Subchapter B, Chapter 838, Government Code, is amended by adding Section 838.1035 to read as follows:

Sec. 838.1035. SERVICE IN EXCESS OF 20 YEARS. (a) Subject to the limitation on the amount of a retirement annuity under Section 839.102(d), an eligible member may establish service credit in the retirement system for service in excess of 20 years performed before September 1, 2005.

(b) A member eligible to establish credit under Subsection (a) is one who elects to make contributions under Section 840.1025.

(c) A member may not establish more than 120 months of service credit under this section.

(d) A member may establish credit under this section by depositing with the retirement system a contribution computed for each month of qualifying service claimed at the rate of six percent of the member's current monthly state salary.

(e) The board of trustees may adopt rules to administer this section.

SECTION 16. Section 839.102, Government Code, is amended by amending Subsection (a) and adding Subsection (d) to read as follows:

(a) Except as provided by Subsections (b), [and] (c), and (d), the standard service retirement annuity is an amount equal to 50 percent of the state salary being paid at the time the member retires to a judge of a court of the same classification as the last court to which the retiring member was elected or appointed.

(d) The service retirement annuity of a member qualifying for retirement under Section 839.101(a) is the applicable state salary under Subsection (a) multiplied by a percentage amount that is the sum of 50 percent plus the product of two percent multiplied by the number of years of subsequent service credit the member accrues under Section 840.1025(a). After including any increase under Subsection (b), the service retirement annuity under this subsection may not be an amount that is greater than 80 percent of the applicable salary under Subsection (a).

SECTION 17. Subsection (g), Section 840.102, Government Code, is amended to read as follows:

(g) Except as provided by Section 840.1025, a [A] member who accrues 20 years of service credit in the retirement system ceases making contributions under this section but is considered a contributing member for all other purposes under this subtitle.

SECTION 18. Subchapter B, Chapter 840, Government Code, is amended by adding Section 840.1025 to read as follows:

Sec. 840.1025. CONTRIBUTIONS AFTER 20 YEARS OF SERVICE CREDIT. (a) A judicial officer who is a member of the retirement system and who accrues 20 years of service credit in the retirement system may elect to make contributions for each subsequent year of service credit that the member accrues by filing an application with the retirement system.

(b) A member who elects to make contributions under Subsection (a) shall contribute six percent of the member's state compensation for each payroll period in the manner provided by Sections 840.102(b)-(f).

(c) A member may not make contributions under this section for more than 10 years of subsequent service credit that the member accrues.

SECTION 19. Section 133.003, Local Government Code, is amended to read as follows:

Sec. 133.003. CRIMINAL FEES. This chapter applies to the following criminal fees:

(1) the consolidated fee imposed under Section 133.102;

(2) the time payment fee imposed under Section 133.103;

(3) fees for services of peace officers employed by the state imposed under Article 102.011, Code of Criminal Procedure, and forwarded to the comptroller as provided by Section 133.104;

(4) costs on conviction imposed in certain statutory county courts under Section 51.702, Government Code, and deposited in the judicial fund;

(5) costs on conviction imposed in certain county courts under Section 51.703, Government Code, and deposited in the judicial fund;

(6) the administrative fee for failure to appear or failure to pay or satisfy a judgment imposed under Section 706.006, Transportation Code; [and]

(7) fines on conviction imposed under Section 621.506(g), Transportation Code; and

(8) the cost on conviction imposed under Section 133.105 and deposited in the judicial fund.

SECTION 20. Section 133.004, Local Government Code, is amended to read as follows:

Sec. 133.004. CIVIL FEES. This chapter applies to the following civil fees:

(1) the consolidated fee on filing in district court imposed under Section 133.151;

(2) the filing fee in district court for basic civil legal services for indigents imposed under Section 133.152;

(3) the filing fee in courts other than district court for basic civil legal services for indigents imposed under Section 133.153;

(4) the filing fees for the judicial fund imposed in certain statutory county courts under Section 51.702, Government Code;

(5) the filing fees for the judicial fund imposed in certain county courts under Section 51.703, Government Code;

(6) the filing fees for the judicial fund imposed in certain statutory probate courts under Section 51.704, Government Code;

(7) fees collected under Section 118.015;

(8) marriage license fees for the family trust fund collected under Section 118.018; [and]

(9) marriage license or declaration of informal marriage fees for the child abuse and neglect prevention trust fund account collected under Section 118.022; and

(10) the filing fee for the judicial fund imposed in district court, statutory county court, and county court under Section 133.154.

SECTION 21. Subchapter C, Chapter 133, Local Government Code, is amended by adding Section 133.105 to read as follows:

Sec. 133.105. FEE FOR SUPPORT OF COURT–RELATED PURPOSES. (a) A person convicted of any offense, other than an offense relating to a pedestrian or the parking of a motor vehicle, shall pay as a court cost, in addition to all other costs, a fee of $7 to be used for court–related purposes for the support of the judiciary.

(b) The treasurer shall deposit 60 cents of each fee collected under this section in the general fund of the municipality to promote the efficient operation of the municipal court and the investigation, prosecution, and enforcement of municipal and state offenses that are within the jurisdiction of the municipal court.

(c) The treasurer shall remit $3 of each fee collected under this section to the comptroller for deposit in the fair defense account.

(d) The treasurer shall remit the remainder of the fees collected under this section to the comptroller in the manner provided by Subchapter B. The comptroller shall deposit the fees in the judicial fund.

SECTION 22. Subchapter D, Chapter 133, Local Government Code, is amended by adding Section 133.154 to read as follows:

Sec. 133.154. ADDITIONAL FILING FEE IN DISTRICT COURT, STATUTORY COUNTY COURT, OR COUNTY COURT FOR SUPPORT OF JUDICIARY. (a) In addition to other fees authorized or required by law, the clerk of a district court, statutory county court, or county court shall collect a fee of $37 on the filing of any civil suit to be used for court-related purposes for the support of the judiciary.

(b) The treasurer shall remit the fees collected under this section to the comptroller in the manner provided by Subchapter B. The comptroller shall deposit the fees in the judicial fund.

SECTION 23. Section 101.061, Government Code, is amended to read as follows:

Sec. 101.061. DISTRICT COURT FEES AND COSTS. The clerk of a district court shall collect fees and costs as follows:

(1) filing fee in action with respect to a fraudulent court record or fraudulent lien or claim filed against property (Sec. 12.005, Civil Practice and Remedies Code) . . . $15;

(2) fee for service of notice of action with respect to a fraudulent court record or fraudulent lien or claim filed against property (Sec. 12.005, Civil Practice and Remedies Code) . . . not to exceed $20, if notice delivered in person, or the cost of postage, if service is by registered or certified mail;

(3) court cost in certain civil cases to establish and maintain an alternative dispute resolution system, if authorized by the county commissioners court (Sec. 152.004, Civil Practice and Remedies Code) . . . not to exceed $10;

(4) appellate judicial system filing fees for:

(A) First or Fourteenth Court of Appeals District (Sec. 22.2021, Government Code) . . . not more than $5;

(B) Second Court of Appeals District (Sec. 22.2031, Government Code) . . . not more than $5;

(C) Fourth Court of Appeals District (Sec. 22.2051, Government Code) . . . not more than $5;

(D) Fifth Court of Appeals District (Sec. 22.2061, Government Code) . . . not more than $5; and

(E) Thirteenth Court of Appeals District (Sec. 22.2141, Government Code) . . . not more than $5;

(5) additional filing fees:

(A) for each suit filed for insurance contingency fund, if authorized by the county commissioners court (Sec. 51.302, Government Code) . . . not to exceed $5;

(B) for each civil suit filed, for court-related purposes for the support of the judiciary and for civil legal services to an indigent:

(i) for family law cases and proceedings as defined by Section 25.0002, Government Code (Sec. 133.151, Local Government Code) . . . $45; or

(ii) for any case other than a case described by Subparagraph (i) (Sec. 133.151, Local Government Code) . . . $50;

(C) to fund the improvement of Dallas County civil court facilities, if authorized by the county commissioners court (Sec. 51.705, Government Code) . . . not more than $15; [and]

(D) on the filing of any civil action or proceeding requiring a filing fee, including an appeal, and on the filing of any counterclaim, cross-action, intervention, interpleader, or third-party action requiring a filing fee, to fund civil legal services for the indigent:

(i) for family law cases and proceedings as defined by Section 25.0002, Government Code (Sec. 133.152, Local Government Code) . . . $5; or

(ii) for any case other than a case described by Subparagraph (i) (Sec. 133.152, Local Government Code) . . . $10; and

(E) for each civil suit filed, to be used for court–related purposes for the support of the judiciary (Sec. 133.154, Local Government Code) . . . $37;

(6) for filing a suit, including an appeal from an inferior court:

(A) for a suit with 10 or fewer plaintiffs (Sec. 51.317, Government Code) . . . $50;

(B) for a suit with at least 11 but not more than 25 plaintiffs (Sec. 51.317, Government Code) . . . $75;

(C) for a suit with at least 26 but not more than 100 plaintiffs (Sec. 51.317, Government Code) . . . $100;

(D) for a suit with at least 101 but not more than 500 plaintiffs (Sec. 51.317, Government Code) . . . $125;

(E) for a suit with at least 501 but not more than 1,000 plaintiffs (Sec. 51.317, Government Code) . . . $150; or

(F) for a suit with more than 1,000 plaintiffs (Sec. 51.317, Government Code) . . . $200;

(7) for filing a cross-action, counterclaim, intervention, contempt action, motion for new trial, or third-party petition (Sec. 51.317, Government Code) . . . $15;

(8) for issuing a citation or other writ or process not otherwise provided for, including one copy, when requested at the time a suit or action is filed (Sec. 51.317, Government Code) . . . $8;

(9) for records management and preservation (Sec. 51.317, Government Code) . . . $10;

(10) for issuing a subpoena, including one copy (Sec. 51.318, Government Code) . . . $8;

(11) for issuing a citation, commission for deposition, writ of execution, order of sale, writ of execution and order of sale, writ of injunction, writ of garnishment, writ of attachment, or writ of sequestration not provided for in Section 51.317, or any other writ or process not otherwise provided for, including one copy if required by law (Sec. 51.318, Government Code) . . . $8;

(12) for searching files or records to locate a cause when the docket number is not provided (Sec. 51.318, Government Code) . . . $5;

(13) for searching files or records to ascertain the existence of an instrument or record in the district clerk's office (Sec. 51.318, Government Code) . . . $5;

(14) for abstracting a judgment (Sec. 51.318, Government Code) . . . $8;

(15) for approving a bond (Sec. 51.318, Government Code) . . . $4;

(16) for a certified copy of a record, judgment, order, pleading, or paper on file or of record in the district clerk's office, including certificate and seal, for each page or part of a page (Sec. 51.318, Government Code) . . . $1;

(17) for a noncertified copy, for each page or part of a page (Sec. 51.318, Government Code) . . . not to exceed $1;

(18) jury fee (Sec. 51.604, Government Code) . . . $30;

(19) for filing a report of divorce or annulment (Sec. 194.002, Health and Safety Code) . . . $1;

(20) for filing a suit in Comal County (Sec. 152.0522, Human Resources Code) . . . $4;

(21) additional filing fee for family protection on filing a suit for dissolution of a marriage under Chapter 6, Family Code, if authorized by the county commissioners court (Sec. 51.961, Government Code) . . . not to exceed $15;

(22) fee on filing a suit for dissolution of a marriage for services of child support department in Harris County, if authorized by the county commissioners court (Sec. 152.1074, Human Resources Code) . . . not to exceed $12;

(23) fee on filing a suit requesting an adoption in Montague County (Sec. 152.1752, Human Resources Code) . . . $25;

(24) court cost on citation for contempt of court for failure to comply with child support order in Nueces County, if authorized by the commissioners court (Sec. 152.1844, Human Resources Code) . . . not to exceed $10;

(25) fee on filing a suit for divorce in Orange County (Sec. 152.1873, Human Resources Code) . . . not less than $5;

(26) court costs on citation for contempt of court in Orange County for failure to comply with a child support order or order providing for possession of or access to a child (Sec. 152.1873, Human Resources Code) . . . amount determined by district clerk;

(27) fee on filing a suit requesting an adoption in Orange County (Sec. 152.1874, Human Resources Code) . . . not less than $25;

(28) fee on filing a suit requesting an adoption in Wichita County (Sec. 152.2496, Human Resources Code) . . . $100;

(29) additional filing fee to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . not to exceed $5;

(30) additional filing fee for filing documents not subject to certain filing fees to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . $1;

(31) additional filing fee to fund the courthouse security fund in Webb County, if authorized by the county commissioners court (Sec. 291.009, Local Government Code) . . . not to exceed $20;

(32) court cost in civil cases other than suits for delinquent taxes to fund the county law library fund, if authorized by the county commissioners court (Sec. 323.023, Local Government Code) . . . not to exceed $35;

(33) when administering a case for the Rockwall County Court at Law (Sec. 25.2012, Government Code) . . . civil fees and court costs as if the case had been filed in district court;

(34) at a hearing held by an associate judge in Dallas County, a court cost to preserve the record, in the absence of a court reporter, by other means (Sec. 54.509, Government Code) . . . as assessed by the referring court or associate judge; and

(35) at a hearing held by an associate judge in Duval County, a court cost to preserve the record (Sec. 54.1151, Government Code, as added by Chapter 1150, Acts of the 78th Legislature, Regular Session, 2003) . . . as imposed by the referring court or associate judge.

SECTION 24. Section 101.081, Government Code, is amended to read as follows:

Sec. 101.081. STATUTORY COUNTY COURT FEES AND COSTS.   The clerk of a statutory county court shall collect fees and costs as follows:

(1) court cost in certain civil cases to establish and maintain an alternative dispute resolution system, if authorized by the county commissioners court (Sec. 152.004, Civil Practice and Remedies Code) . . . not to exceed $10;

(2) appellate judicial system filing fees:

(A) First or Fourteenth Court of Appeals District (Sec. 22.2021, Government Code) . . . not more than $5;

(B) Second Court of Appeals District (Sec. 22.2031, Government Code) . . . not more than $5;

(C) Fourth Court of Appeals District (Sec. 22.2051, Government Code) . . . not more than $5;

(D) Fifth Court of Appeals District (Sec. 22.2061, Government Code) . . . not more than $5; and

(E) Thirteenth Court of Appeals District (Sec. 22.2141, Government Code) . . . not more than $5;

(3) an official court reporter fee, County Court at Law No. 2 of Bexar County (Sec. 25.0172, Government Code) . . . $3;

(4) a court reporter fee when testimony is taken in a county court at law in McLennan County (Sec. 25.1572, Government Code) . . . $3;

(5) a stenographer fee, if a record or part of a record is made:

(A) in a county court at law in Hidalgo County (Sec. 25.1102, Government Code) . . . $20; and

(B) in a county court at law in Nolan County (Sec. 25.1792, Government Code) . . . $25;

(6) jury fee (Sec. 51.604, Government Code) . . . $22;

(7) an additional filing fee:

(A) for each civil case filed to be used for court-related purposes for the support of the judiciary, if authorized by the county commissioners court (Sec. 51.702, Government Code) . . . $40;

(B) to fund the improvement of Dallas County civil court facilities, if authorized by the county commissioners court (Sec. 51.705, Government Code) . . . not more than $15; [and]

(C) for filing any civil action or proceeding requiring a filing fee, including an appeal, and on the filing of any counterclaim, cross-action, intervention, interpleader, or third-party action requiring a filing fee, to fund civil legal services for the indigent (Sec. 133.153, Local Government Code) . . . $5; and

(D) for each civil suit filed, to be used for court–related purposes for the support of the judiciary (Sec. 133.154, Local Government Code) . . . $37;

(8) for filing an application for registration of death (Sec. 193.007, Health and Safety Code) . . . $1;

(9) fee for judge's services on an application for court-ordered mental health services (Sec. 574.031, Health and Safety Code) . . . not to exceed $50;

(10) fee for prosecutor's services on an application for court-ordered mental health services (Sec. 574.031, Health and Safety Code) . . . not to exceed $50;

(11) for filing a suit in Comal County (Sec. 152.0522, Human Resources Code) . . . $4;

(12) additional filing fee to fund contingency fund for liability insurance, if authorized by the county commissioners court (Sec. 82.003, Local Government Code) . . . not to exceed $5;

(13) civil court actions (Sec. 118.052, Local Government Code):

(A) filing of original action (Secs. 118.052 and 118.053, Local Government Code):

(i) garnishment after judgment (Sec. 118.052, Local Government Code) . . . $15; and

(ii) all others (Sec. 118.052, Local Government Code) . . . $40;

(B) filing of action other than original (Secs. 118.052 and 118.054, Local Government Code) . . . $30; and

(C) services rendered after judgment in original action (Secs. 118.052 and 118.0545, Local Government Code):

(i) abstract of judgment (Sec. 118.052, Local Government Code) . . . $5; and

(ii) execution, order of sale, writ, or other process (Sec. 118.052, Local Government Code) . . . $5;

(14)  probate court actions (Sec. 118.052, Local Government Code):

(A)  probate original action (Secs. 118.052 and 118.055, Local Government Code):

(i)  probate of a will with independent executor, administration with will attached, administration of an estate, guardianship or receivership of an estate, or muniment of title (Sec. 118.052, Local Government Code) . . . $40;

(ii)  community survivors (Sec. 118.052, Local Government Code) . . . $40;

(iii)  small estates (Sec. 118.052, Local Government Code) . . . $40;

(iv)  declarations of heirship (Sec. 118.052, Local Government Code) . . . $40;

(v)  mental health or chemical dependency services (Sec. 118.052, Local Government Code) . . . $40; and

(vi)  additional, special fee (Secs. 118.052 and 118.064, Local Government Code) . . . $5;

(B)  services in pending probate action (Secs. 118.052 and 118.056, Local Government Code):

(i)  filing an inventory and appraisement after the 120th day after the date of the initial filing of the action (Sec. 118.052, Local Government Code) . . . $25;

(ii)  approving and recording bond (Sec. 118.052, Local Government Code) . . . $3;

(iii)  administering oath (Sec. 118.052, Local Government Code) . . . $2;

(iv)  filing annual or final account of estate (Sec. 118.052, Local Government Code) . . . $25;

(v)  filing application for sale of real or personal property (Sec. 118.052, Local Government Code) . . . $25; and

(vi)  filing annual or final report of guardian of a person (Sec. 118.052, Local Government Code) . . . $10;

(C)  adverse probate action (Secs. 118.052 and 118.057, Local Government Code) . . . $40; and

(D)  claim against estate (Secs. 118.052 and 118.058, Local Government Code) . . . $2;

(15)  other fees (Sec. 118.052, Local Government Code):

(A)  issuing document (Secs. 118.052 and 118.059, Local Government Code):

(i)  original document and one copy (Sec. 118.052, Local Government Code) . . . $4; and

(ii)  each additional set of an original and one copy (Sec. 118.052, Local Government Code) . . . $4;

(B)  certified papers (Secs. 118.052 and 118.060, Local Government Code):

(i)  for the clerk's certificate (Sec. 118.052, Local Government Code) . . . $5; and

(ii) a fee per page or part of a page (Sec. 118.052, Local Government Code) . . . $1;

(C) noncertified papers, for each page or part of a page (Secs. 118.052 and 118.0605, Local Government Code) . . . $1;

(D) letters testamentary, letter of guardianship, letter of administration, or abstract of judgment (Secs. 118.052 and 118.061, Local Government Code) . . . $2;

(E) safekeeping of wills (Secs. 118.052 and 118.062, Local Government Code) . . . $5;

(F) mail service of process (Secs. 118.052 and 118.063, Local Government Code) . . . same as sheriff; and

(G) records management and preservation fee (Secs. 118.052, 118.0546, and 118.0645, Local Government Code) . . . $5;

(16) additional filing fee to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . not to exceed $5;

(17) additional filing fee for filing documents not subject to certain filing fees to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . $1;

(18) additional filing fee to fund the courthouse security fund in Webb County, if authorized by the county commissioners court (Sec. 291.009, Local Government Code) . . . not to exceed $20;

(19) court cost in civil cases other than suits for delinquent taxes to fund the county law library fund, if authorized by the county commissioners court (Sec. 323.023, Local Government Code) . . . not to exceed $35;

(20) fee for deposit of a will with the county clerk during testator's lifetime (Sec. 71, Texas Probate Code) . . . $3;

(21) court cost for each special commissioner in an eminent domain proceeding (Sec. 21.047, Property Code) . . . as taxed by the court, $10 or more; and

(22) fee for county attorney in a suit regarding a railroad company's failure to keep roadbed and right-of-way in proper condition (Art. 6327, Vernon's Texas Civil Statutes) . . . $10.

SECTION 25. Section 101.121, Government Code, is amended to read as follows:

Sec. 101.121. COUNTY COURT FEES AND COSTS. The clerk of a county court shall collect:

(1) fee for hearing on application for a license to manufacture, distribute, store, or sell beer (Sec. 61.31, Alcoholic Beverage Code) . . . $5;

(2) court cost in certain civil cases to establish and maintain an alternative dispute resolution system, if authorized by the county commissioners court (Sec. 152.004, Civil Practice and Remedies Code) . . . not to exceed $10;

(3) appellate judicial system filing fees:

(A) First or Fourteenth Court of Appeals District (Sec. 22.2021, Government Code) . . . not more than $5;

(B) Second Court of Appeals District (Sec. 22.2031, Government Code) . . . not more than $5;

    (C) Fourth Court of Appeals District (Sec. 22.2051, Government Code) . . . not more than $5;

    (D) Fifth Court of Appeals District (Sec. 22.2061, Government Code) . . . not more than $5; and

    (E) Thirteenth Court of Appeals District (Sec. 22.2141, Government Code) . . . not more than $5;

   (4) a jury fee (Sec. 51.604, Government Code) . . . $22;

   (5) a filing fee in each civil case filed to be used for court-related purposes for the support of the judiciary (Sec. 51.703, Government Code) . . . $40;

   (6) for filing an application for registration of death (Sec. 193.007, Health and Safety Code) . . . $1;

   (7) fee for judge's services on an application for court-ordered mental health services (Sec. 574.031, Health and Safety Code) . . . not to exceed $50;

   (8) fee for prosecutor's services on an application for court-ordered mental health services (Sec. 574.031, Health and Safety Code) . . . not to exceed $50;

   (9) additional filing fee to fund contingency fund for liability insurance, if authorized by the county commissioners court (Sec. 82.003, Local Government Code) . . . not to exceed $5;

   (10) civil court actions (Sec. 118.052, Local Government Code):

    (A) filing of original action (Secs. 118.052 and 118.053, Local Government Code):

     (i) garnishment after judgment (Sec. 118.052, Local Government Code) . . . $15; and

     (ii) all others (Sec. 118.052, Local Government Code) . . . $40;

    (B) filing of action other than original (Secs. 118.052 and 118.054, Local Government Code) . . . $30; and

    (C) services rendered after judgment in original action (Secs. 118.052 and 118.0545, Local Government Code):

     (i) abstract of judgment (Sec. 118.052, Local Government Code) . . . $5; and

     (ii) execution, order of sale, writ, or other process (Sec. 118.052, Local Government Code) . . . $5;

   (11) probate court actions (Sec. 118.052, Local Government Code):

    (A) probate original action (Secs. 118.052 and 118.055, Local Government Code):

     (i) probate of a will with independent executor, administration with will attached, administration of an estate, guardianship or receivership of an estate, or muniment of title (Sec. 118.052, Local Government Code) . . . $40;

     (ii) community survivors (Sec. 118.052, Local Government Code) . . . $40;

     (iii) small estates (Sec. 118.052, Local Government Code) . . . $40;

     (iv) declarations of heirship (Sec. 118.052, Local Government Code) . . . $40;

     (v) mental health or chemical dependency services (Sec. 118.052, Local Government Code) . . . $40; and

       (vi) additional, special fee (Secs. 118.052 and 118.064, Local Government Code) . . . $5;

       (B) services in pending probate action (Secs. 118.052 and 118.056, Local Government Code):

       (i) filing an inventory and appraisement after the 120th day after the date of the initial filing of the action (Sec. 118.052, Local Government Code) . . . $25;

       (ii) approving and recording bond (Sec. 118.052, Local Government Code) . . . $3;

       (iii) administering oath (Sec. 118.052, Local Government Code) . . . $2;

       (iv) filing annual or final account of estate (Sec. 118.052, Local Government Code) . . . $25;

       (v) filing application for sale of real or personal property (Sec. 118.052, Local Government Code) . . . $25; and

       (vi) filing annual or final report of guardian of a person (Sec. 118.052, Local Government Code) . . . $10;

       (C) adverse probate action (Secs. 118.052 and 118.057, Local Government Code) . . . $40; and

       (D) claim against estate (Secs. 118.052 and 118.058, Local Government Code) . . . $2;

     (12) other fees (Sec. 118.052, Local Government Code):

       (A) issuing document (Secs. 118.052 and 118.059, Local Government Code):

       (i) original document and one copy (Sec. 118.052, Local Government Code) . . . $4; and

       (ii) each additional set of an original and one copy (Sec. 118.052, Local Government Code) . . . $4;

       (B) certified papers (Secs. 118.052 and 118.060, Local Government Code):

       (i) for the clerk's certificate (Sec. 118.052, Local Government Code) . . . $5; and

       (ii) a fee per page or part of a page (Sec. 118.052, Local Government Code) . . . $1;

       (C) noncertified papers, for each page or part of a page (Secs. 118.052 and 118.0605, Local Government Code) . . . $1;

       (D) letters testamentary, letter of guardianship, letter of administration, or abstract of judgment (Secs. 118.052 and 118.061, Local Government Code) . . . $2;

       (E) safekeeping of wills (Secs. 118.052 and 118.062, Local Government Code) . . . $5;

       (F) mail service of process (Secs. 118.052 and 118.063, Local Government Code) . . . same as sheriff; and

       (G) records management and preservation fee (Secs. 118.052, 118.0546, and 118.0645, Local Government Code) . . . $5;

     (13) deposit on filing petition requesting permission to create a municipal civic center authority (Sec. 281.013, Local Government Code) . . . $200;

(14) additional filing fee to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . not to exceed $5;

(15) additional filing fee for filing documents not subject to certain filing fees to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . $1;

(16) additional filing fee to fund the courthouse security fund in Webb County, if authorized by the county commissioners court (Sec. 291.009, Local Government Code) . . . not to exceed $20;

(17) court cost in civil cases other than suits for delinquent taxes to fund the county law library fund, if authorized by the county commissioners court (Sec. 323.023, Local Government Code) . . . not to exceed $35;

(18) fee for deposit of a will with the county clerk during testator's lifetime (Sec. 71, Texas Probate Code) . . . $3;

(19) fee for county attorney in a suit regarding a railroad company's failure to keep roadbed and right-of-way in proper condition (Art. 6327, Vernon's Texas Civil Statutes) . . . $10;

(20) appeal bond from a petitioner or taxpayer in a water control and preservation district (Art. 7818, Vernon's Texas Civil Statutes) . . . $100; [and]

(21) additional filing fee for filing any civil action or proceeding requiring a filing fee, including an appeal, and on the filing of any counterclaim, cross-action, intervention, interpleader, or third-party action requiring a filing fee, to fund civil legal services for the indigent (Sec. 133.153, Local Government Code) . . . $5; and

(22) additional filing fee for each civil suit filed, to be used for court–related purposes for the support of the judiciary (Sec. 133.154, Local Government Code) . . . $37.

SECTION 26. Section 102.021, Government Code, is amended to read as follows:

Sec. 102.021. COURT COSTS ON CONVICTION. A person convicted of an offense shall pay, in addition to all other costs:

(1) court costs on conviction of a felony (Sec. 133.102, Local Government Code) . . . $133;

(2) court costs on conviction of a Class A or Class B misdemeanor (Sec. 133.102, Local Government Code) . . . $83;

(3) court costs on conviction of a nonjailable misdemeanor offense, including a criminal violation of a municipal ordinance, other than a conviction of an offense relating to a pedestrian or the parking of a motor vehicle (Sec. 133.102, Local Government Code) . . . $40;

(4) court costs on certain convictions in statutory county courts (Sec. 51.702, Government Code) . . . $15;

(5) court costs on certain convictions in certain county courts (Sec. 51.703, Government Code) . . . $15;

(6) a time payment fee if convicted of a felony or misdemeanor for paying any part of a fine, court costs, or restitution on or after the 31st day after the date on which a judgment is entered assessing the fine, court costs, or restitution (Sec. 133.103, Local Government Code) . . . $25;

 (7) a fee for services of prosecutor (Art. 102.008, Code of Criminal Procedure) . . . $25;

 (8) fees for services of peace officer:

  (A) issuing a written notice to appear in court for certain violations (Art. 102.011, Code of Criminal Procedure) . . . $5;

  (B) executing or processing an issued arrest warrant or capias (Art. 102.011, Code of Criminal Procedure) . . . $50;

  (C) summoning a witness (Art. 102.011, Code of Criminal Procedure) . . . $5;

  (D) serving a writ not otherwise listed (Art. 102.011, Code of Criminal Procedure) . . . $35;

  (E) taking and approving a bond and, if necessary, returning the bond to courthouse (Art. 102.011, Code of Criminal Procedure) . . . $10;

  (F) commitment or release (Art. 102.011, Code of Criminal Procedure) . . . $5;

  (G) summoning a jury (Art. 102.011, Code of Criminal Procedure) . . . $5;

  (H) attendance of a prisoner in habeas corpus case if prisoner has been remanded to custody or held to bail (Art. 102.011, Code of Criminal Procedure) . . . $8 each day;

  (I) mileage for certain services performed (Art. 102.011, Code of Criminal Procedure) . . . $0.29 per mile; and

  (J) services of a sheriff or constable who serves process and attends examining trial in certain cases (Art. 102.011, Code of Criminal Procedure) . . . not to exceed $5;

 (9) services of a peace officer in conveying a witness outside the county (Art. 102.011, Code of Criminal Procedure) . . . $10 per day or part of a day, plus actual necessary travel expenses;

 (10) overtime of peace officer for time spent testifying in the trial or traveling to or from testifying in the trial (Art. 102.011, Code of Criminal Procedure) . . . actual cost;

 (11) court costs on an offense relating to rules of the road, when offense occurs within a school crossing zone (Art. 102.014, Code of Criminal Procedure) . . . $25;

 (12) court costs on an offense of passing a school bus (Art. 102.014, Code of Criminal Procedure) . . . $25;

 (13) court costs on an offense of truancy or contributing to truancy (Art. 102.014, Code of Criminal Procedure) . . . $20;

 (14) cost for visual recording of intoxication arrest before conviction (Art. 102.018, Code of Criminal Procedure) . . . $15;

 (15) cost of certain evaluations (Art. 102.018, Code of Criminal Procedure) . . . actual cost;

 (16) additional costs attendant to certain intoxication convictions under Chapter 49, Penal Code, for emergency medical services, trauma facilities, and trauma care systems (Art. 102.0185, Code of Criminal Procedure) . . . $100;

(17) cost for DNA testing for certain felonies (Art. 102.020, Code of Criminal Procedure) . . . $250;

(18) court cost on an offense of public lewdness or indecent exposure (Art. 102.020, Code of Criminal Procedure) . . . $50;

(19) court cost on conviction of a misdemeanor under Subtitle C, Title 7, Transportation Code (Sec. 542.403, Transportation Code) . . . $3;

(20) cost for impoundment of vehicle (Sec. 601.263, Transportation Code) . . . $15 per day; [and]

(21) a civil and criminal enforcement cost on conviction of an offense of, or related to, the nonpayment of a toll in certain counties (Sec. 284.2031, Transportation Code) . . . $1; and

(22) court cost on conviction of any offense, other than a conviction of an offense relating to a pedestrian or the parking of a motor vehicle (Sec. 133.105, Local Government Code) . . . $7.

SECTION 27.  Section 51.607, Government Code, does not apply to court costs or fees imposed under this Act.

SECTION 28.  The following laws are repealed:

(1) Section 2, Chapter 100, Acts of the 78th Legislature, Regular Session, 2003;

(2) Section 4, Chapter 62, Acts of the 78th Legislature, Regular Session, 2003;

(3) Sections 2 and 4, Chapter 675, Acts of the 78th Legislature, Regular Session, 2003; and

(4) Sections 32.002 through 32.253 and 659.0125, Government Code.

SECTION 29. (a)   Not later than December 1, 2005, the Office of Court Administration of the Texas Judicial System shall begin collecting the data required by Section 72.030, Government Code, as added by this Act.

(b) Not later than December 1, 2005, the State Bar of Texas shall begin collecting the data required by Section 81.116, Government Code, as added by this Act.

SECTION 30. (a)  Section 814.103, Government Code, as amended by this Act, applies only to an annuity payment made on or after September 1, 2005.

(b) The Employees Retirement System of Texas shall recompute an annuity that first became payable before September 1, 2005, as though Section 814.103, Government Code, as amended by this Act, was in effect on the date the annuity first became payable.

(c) The first payment of the recomputed annuity is payable on the first payment date occurring on or after September 1, 2005.

SECTION 31.  Sections 834.102 and 839.102, Government Code, as amended by this Act, apply only to a benefit payment made by the Judicial Retirement System of Texas Plan One or the Judicial Retirement System of Texas Plan Two on or after September 1, 2005.

SECTION 32. On September 1, 2005, the Employees Retirement System of Texas shall recompute under Section 839.102, Government Code, as amended by this Act, the annuities of persons who have retired, or the annuities of beneficiaries of persons who have died, as if the persons had retired or died under the lesser of the

salary provisions of Subtitle E, Title 8, Government Code, or the salary provisions of S.B. No. 1, Acts of the 79th Legislature, Regular Session, 2005 (the General Appropriations Act).  The first payment of the recomputed annuities becomes payable on the first date a payment becomes due after the effective date of this Act.

SECTION 33.  For purposes of determining the salary of a county official that is based on the salary paid to a district judge by the state, the changes in law made by this Act take effect October 1, 2005, and apply only to a salary payment made on or after that date. A salary payment made before October 1, 2005, is governed by the law in effect on the date the salary payment was made, and that law is continued in effect for that purpose.

SECTION 34.  This Act takes effect September 1, 2005.

The Conference Committee Report on **SB 368** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 2678

Senator Seliger submitted the following Conference Committee Report:

Austin, Texas
May 26, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 2678** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| SELIGER | SMITHEE |
| ARMBRISTER | TAYLOR |
| AVERITT | ROSE |
| | SEAMAN |
| | EILAND |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 2678** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 836

Senator Ogden submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 836** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| OGDEN | GATTIS |
| ARMBRISTER | ROSE |
| DEUELL | VAN ARSDALE |
| NELSON | PAXTON |
| GALLEGOS | HOPSON |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 836** was filed with the Secretary of the Senate.

### CONFERENCE COMMITTEE REPORT ON
### HOUSE BILL 7

Senator Staples submitted the following Conference Committee Report:

Austin, Texas
May 25, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 7** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| STAPLES | SOLOMONS |
| DUNCAN | GIDDINGS |
| FRASER | ROSE |
| MADLA | TAYLOR |
| NELSON | ZEDLER |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 7** was filed with the Secretary of the Senate.

### CONFERENCE COMMITTEE REPORT ON
### HOUSE BILL 2438

Senator Armbrister submitted the following Conference Committee Report:

Austin, Texas
May 26, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 2438** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| ARMBRISTER | HAGGERTY |
| HARRIS | HAMILTON |
| FRASER | D. JONES |
| LUCIO | GUILLEN |
| | QUINTANILLA |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 2438** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## SENATE BILL 6

Senator Nelson submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **SB 6** have had the same under consideration, and beg to report it back with the recommendation that it do pass in the form and text hereto attached.

| | |
|---|---|
| NELSON | HUPP |
| JANEK | GOODMAN |
| LINDSAY | J. DAVIS |
| | URESTI |
| On the part of the Senate | On the part of the House |

### A BILL TO BE ENTITLED
### AN ACT

relating to protective services and certain family law matters; providing penalties.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

ARTICLE 1. CHILD PROTECTIVE SERVICES

SECTION 1.01. Section 54.211, Education Code, is amended to read as follows:

Sec. 54.211. EXEMPTIONS FOR STUDENTS IN FOSTER OR OTHER RESIDENTIAL CARE. (a) A student is exempt from the payment of tuition and fees authorized in this chapter if the student:

(1)  was in foster care or other residential care under the conservatorship of the Department of Family and Protective [and Regulatory] Services on or after:

(A)  the day preceding the student's 18th birthday;

(B)  the day of the student's 14th birthday, if the student was also eligible for adoption on or after that day; or

(C)  the day the student graduated from high school or received the equivalent of a high school diploma; and

(2)  enrolls in an institution of higher education as an undergraduate student not later than:

(A)  the third anniversary of the date the student was discharged from the foster or other residential care, the date the student graduated from high school, or the date the student received the equivalent of a high school diploma, whichever date is earliest; or

(B)  the student's 21st birthday.

(b)  The Texas Education Agency and the Texas Higher Education Coordinating Board shall develop outreach programs to ensure that students in foster or other residential care in grades 9-12 are aware of the availability of the exemption from the payment of tuition and fees provided by this section.

SECTION 1.02.  Section 54.2111, Education Code, is amended to read as follows:

Sec. 54.2111.  EXEMPTIONS FOR ADOPTED STUDENTS FORMERLY IN FOSTER OR OTHER RESIDENTIAL CARE. (a) A student is exempt from the payment of tuition and fees authorized by this chapter if the student:

(1)  was adopted; and

(2)  was the subject of an adoption assistance agreement under Subchapter D, Chapter 162, Family Code.

(b)  The Texas Education Agency and the Texas Higher Education Coordinating Board shall develop outreach programs to ensure that adopted students in grades 9-12 formerly in foster or other residential care are aware of the availability of the exemption from the payment of tuition and fees provided by this section.

SECTION 1.03.  Section 101.024, Family Code, is amended to read as follows:

Sec. 101.024.  PARENT. (a) "Parent" means the mother, a man presumed to be the father, a man legally determined to be the father, a man who has been adjudicated to be the father by a court of competent jurisdiction, a man who has acknowledged his paternity under applicable law, or an adoptive mother or father. Except as provided by Subsection (b), the [The] term does not include a parent as to whom the parent-child relationship has been terminated.

(b)  For purposes of establishing, determining the terms of, modifying, or enforcing an order, a reference in this title to a parent includes a person ordered to pay child support under Section 154.001(a-1) or to provide medical support for a child.

SECTION 1.04.  (a) Section 107.004, Family Code, is amended to read as follows:

Sec. 107.004.  ADDITIONAL DUTIES OF ATTORNEY AD LITEM FOR CHILD. (a) Except as otherwise provided by this chapter, the attorney ad litem appointed for a child shall:

      (1)  seek to elicit in a developmentally appropriate manner the child's expressed objectives of representation;

      (2)  advise the child;

      (3)  provide guidance to the child;

      (4)  represent the child's expressed objectives of representation and follow the child's expressed objectives of representation during the course of litigation if the attorney ad litem determines that the child is competent to understand the nature of an attorney-client relationship and has formed that relationship with the attorney ad litem;

      (5)  consider the impact on the child in formulating the attorney ad litem's presentation of the child's expressed objectives of representation to the court; and

      (6)  become familiar with:

        (A)  the American Bar Association's standards of practice for attorneys who represent children in abuse and neglect cases; and

        (B)  the suggested amendments to those standards adopted by the National Association of Counsel for Children.

    (b)  An attorney ad litem appointed for a child in a proceeding under Chapter 262 or 263 shall complete at least three hours of continuing legal education relating to child advocacy as described by Subsection (c) as soon as practicable after the attorney ad litem's appointment.  An attorney ad litem is not required to comply with this subsection if the court finds that the attorney ad litem has experience equivalent to the required education.

    (c)  The continuing legal education required by Subsection (b) must:

      (1)  be low-cost and available to persons throughout this state, including on the Internet provided through the State Bar of Texas; and

      (2)  focus on the duties of an attorney ad litem in, and the procedures of and best practices for, a proceeding under Chapter 262 or 263.

    (d)  Except as provided by Subsection (e), an attorney ad litem appointed for a child in a proceeding under Chapter 262 or 263 shall meet before each court hearing with:

      (1)  the child, if the child is at least four years of age; or

      (2)  the individual with whom the child ordinarily resides, including the child's parent, conservator, guardian, caretaker, or custodian, if the child is younger than four years of age.

    (e)  An attorney ad litem appointed for a child in a proceeding under Chapter 262 or 263 is not required to comply with Subsection (d) before a hearing if the court finds at that hearing that the attorney ad litem has shown good cause why the attorney ad litem's compliance with that subsection is not feasible or in the best interest of the child.

    (b)  The changes in law made by this section apply only to an attorney ad litem for a child appointed in a proceeding under Chapter 262 or 263, Family Code, on or after the effective date of this section. An attorney ad litem for a child appointed in a proceeding under Chapter 262 or 263, Family Code, before the effective date of this section is governed by the law in effect on the date the attorney ad litem was appointed, and the former law is continued in effect for that purpose.

(c) The State Bar of Texas shall adopt rules governing the reporting of an attorney ad litem's timely completion of the continuing legal education required by Subsection (b), Section 107.004, Family Code, as added by this section.

SECTION 1.05. Subchapter A, Chapter 107, Family Code, is amended by adding Section 107.0045 to read as follows:

Sec. 107.0045.  DISCIPLINE OF ATTORNEY AD LITEM.   An attorney ad litem who fails to perform the duties required by Sections 107.003 and 107.004 is subject to disciplinary action under Subchapter E, Chapter 81, Government Code.

SECTION 1.06. Section 107.013, Family Code, is amended by adding Subsection (c) to read as follows:

(c) In a suit filed by a governmental entity requesting temporary managing conservatorship of a child, the court shall appoint an attorney ad litem to represent the interests of an indigent parent of the child who responds in opposition to the suit.

SECTION 1.07. Subsection (c), Section 107.015, Family Code, is amended to read as follows:

(c) If indigency of the parents is shown, an attorney ad litem appointed to represent a child or parent in a suit filed by a governmental entity [in which termination of the parent-child relationship is requested] shall be paid from the general funds of the county according to the fee schedule that applies to an attorney appointed to represent a child in a suit under Title 3 as provided by Chapter 51. The court may not award attorney ad litem fees under this chapter against the state, a state agency, or a political subdivision of the state except as provided by this subsection.

SECTION 1.08. (a) Section 154.001, Family Code, is amended by adding Subsection (a-1) to read as follows:

(a-1)  The court may order each person who is financially able and whose parental rights have been terminated with respect to a child in substitute care for whom the department has been appointed managing conservator to support the child in the manner specified by the order:

(1)  until the earliest of:

(A)  the child's adoption;

(B)  the child's 18th birthday or graduation from high school, whichever occurs later;

(C)  removal of the child's disabilities of minority by court order, marriage, or other operation of law; or

(D)  the child's death; or

(2)  if the child is disabled as defined in this chapter, for an indefinite period.

(b) Section 154.001, Family Code, as amended by this section, applies only to a person whose parent-child relationship with respect to a child is terminated on or after the effective date of this section. A person whose parent-child relationship is terminated before the effective date of this section is governed by the law in effect on the date the parent-child relationship was terminated, and the former law is continued in effect for that purpose.

SECTION 1.09. Section 162.304, Family Code, is amended by adding Subsection (f) to read as follows:

(f)  Subject to the availability of funds, the department shall work with the Health and Human Services Commission and the federal government to develop a program to provide medical assistance under Chapter 32, Human Resources Code, to children who were in the conservatorship of the department at the time of adoptive placement and need medical or rehabilitative care but do not qualify for adoption assistance.

SECTION 1.10.  Subchapter B, Chapter 231, Family Code, is amended by adding Section 231.122 to read as follows:

Sec. 231.122.  MONITORING CHILD SUPPORT CASES; ENFORCEMENT. The Title IV-D agency shall monitor each Title IV-D case from the date the agency begins providing services on the case. If a child support obligor in a Title IV-D case becomes more than 60 days delinquent in paying child support, the Title IV-D agency shall expedite the commencement of an action to enforce the child support order.

SECTION 1.11.  Subdivisions (2) and (4), Section 261.001, Family Code, are amended to read as follows:

(2)  "Department" means the Department of Family and Protective [and Regulatory] Services.

(4)  "Neglect" includes:

(A)  the leaving of a child in a situation where the child would be exposed to a substantial risk of physical or mental harm, without arranging for necessary care for the child, and the demonstration of an intent not to return by a parent, guardian, or managing or possessory conservator of the child;

(B)  the following acts or omissions by a person:

(i)  placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child;

(ii)  failing to seek, obtain, or follow through with medical care for a child, with the failure resulting in or presenting a substantial risk of death, disfigurement, or bodily injury or with the failure resulting in an observable and material impairment to the growth, development, or functioning of the child;

(iii)  the failure to provide a child with food, clothing, or shelter necessary to sustain the life or health of the child, excluding failure caused primarily by financial inability unless relief services had been offered and refused; [or]

(iv)  placing a child in or failing to remove the child from a situation in which the child would be exposed to a substantial risk of sexual conduct harmful to the child; or

(v)  placing a child in or failing to remove the child from a situation in which the child would be exposed to acts or omissions that constitute abuse under Subdivision (1)(E), (F), (G), (H), or (K) committed against another child; or

(C)  the failure by the person responsible for a child's care, custody, or welfare to permit the child to return to the child's home without arranging for the necessary care for the child after the child has been absent from the home for any reason, including having been in residential placement or having run away.

SECTION 1.12.  Section 261.002, Family Code, is amended by adding Subsection (c) to read as follows:

(c) The department may enter into agreements with other states to allow for the exchange of reports of child abuse and neglect in other states' central registry systems. The department shall use information obtained under this subsection in performing the background checks required under Section 42.056, Human Resources Code. The department shall cooperate with federal agencies and shall provide information and reports of child abuse and neglect to the appropriate federal agency that maintains the national registry for child abuse and neglect, if a national registry exists.

SECTION 1.13. The heading to Section 261.107, Family Code, is amended to read as follows:

Sec. 261.107. FALSE REPORT; CRIMINAL PENALTY; CIVIL PENALTY.

SECTION 1.14. (a) Section 261.107, Family Code, is amended by amending Subsection (a) and adding Subsections (d) and (e) to read as follows:

(a) A person commits an offense if, with the intent to deceive, the person knowingly [or intentionally] makes a report as provided in this chapter that [the person knows] is false [or lacks factual foundation]. An offense under this subsection [section] is a state jail felony [Class A misdemeanor] unless it is shown on the trial of the offense that the person has previously been convicted under this section, in which case the offense is a [state jail] felony of the third degree.

(d) The court shall order a person who is convicted of an offense under Subsection (a) to pay any reasonable attorney's fees incurred by the person who was falsely accused of abuse or neglect in any proceeding relating to the false report.

(e) A person who engages in conduct described by Subsection (a) is liable to the state for a civil penalty of $1,000. The attorney general shall bring an action to recover a civil penalty authorized by this subsection.

(b) The changes in law made by Subsection (a), Section 261.107, Family Code, as amended by this section, and Subsection (d), Section 261.107, Family Code, as added by this section, apply only to an offense committed on or after the effective date of this section. An offense committed before the effective date of this section is covered by Section 261.107, Family Code, as it existed on the date the offense was committed, and the former law is continued in effect for that purpose. For purposes of this subsection, an offense is committed before the effective date of this section if any element of the offense occurs before that date.

(c) Subsection (e), Section 261.107, Family Code, as added by this section, applies only to conduct that occurs on or after the effective date of this section. Conduct that occurs before the effective date of this section is governed by the law in effect on the date the conduct occurred, and the former law is continued in effect for that purpose.

SECTION 1.15. Section 261.201, Family Code, is amended by adding Subsection (f-1) to read as follows:

(f-1) The department shall provide to a relative or other individual with whom a child is placed any information the department considers necessary to ensure that the relative or other individual is prepared to meet the needs of the child. The information required by this subsection may include information related to any abuse or neglect suffered by the child.

SECTION 1.16. (a) Subsections (a), (d), (f), (g), and (h), Section 261.301, Family Code, are amended to read as follows:

(a)  With assistance from the appropriate state or local law enforcement agency as provided by this section, the department or designated agency shall make a prompt and thorough investigation of a report of child abuse or neglect allegedly committed by a person responsible for a child's care, custody, or welfare.  The investigation shall be conducted without regard to any pending suit affecting the parent-child relationship.

(d)  The department shall [may] by rule assign priorities and prescribe investigative procedures for investigations based on the severity and immediacy of the alleged harm to the child. The primary purpose of the investigation shall be the protection of the child. The rules must require the department, subject to the availability of funds, to:

(1)  immediately respond to a report of abuse and neglect that involves circumstances in which the death of the child or substantial bodily harm to the child would result unless the department immediately intervenes;

(2)  respond within 24 hours to a report of abuse and neglect that is assigned the highest priority, other than a report described by Subdivision (1); and

(3)  respond within 72 hours to a report of abuse and neglect that is assigned the second highest priority.

(f)  An investigation of a report to the department [that is assigned the highest priority in accordance with department rules adopted under Subsection (d) and] that alleges that a child has been or may be the victim of conduct that constitutes a criminal offense that poses an immediate risk of physical or sexual abuse of a child that could result in the death of or serious harm to the child shall be conducted jointly by a peace officer, as defined by Article 2.12, Code of Criminal Procedure, from the appropriate local law enforcement agency and the department or the agency responsible for conducting an investigation under Subchapter E.

(g)  The inability or unwillingness of a local law enforcement agency to conduct a joint investigation under this section [Subsection (f)] does not constitute grounds to prevent or prohibit the department from performing its duties under this subtitle. The department shall document any instance in which a law enforcement agency is unable or unwilling to conduct a joint investigation under this section [Subsection (f)].

(h)  The department and the appropriate local law enforcement agency shall conduct an investigation, other than an investigation under Subchapter E, as provided by this section and Article 2.27, Code of Criminal Procedure, if the investigation is of a report [of child abuse or neglect that is assigned the highest priority in accordance with department rules adopted under Subsection (d) and] that alleges that a child has been or may be the victim of conduct that constitutes a criminal offense that poses an immediate risk of physical or sexual abuse of a child that could result in the death of or serious harm to the child. Immediately on receipt of a report described by this subsection, the department shall notify the appropriate local law enforcement agency of the report.

(b)  The change in law made by this section to Section 261.301, Family Code, applies to the investigation of a report of child abuse or neglect made on or after the effective date of this section. The investigation of a report of child abuse or neglect made before the effective date of this section is governed by the law in effect on the date the report was made, and the former law is continued in effect for that purpose.

(c) The Department of Family and Protective Services shall develop and implement an automated tracking and reporting system that enables the department to track information on initial contacts to monitor compliance with the requirements of Subsection (d), Section 261.301, Family Code, as amended by this section, relating to the timely response to reports of abuse and neglect.

(d) The executive commissioner of the Health and Human Services Commission shall adopt the rules as required by Subsection (d), Section 261.301, Family Code, as amended by this section, not later than September 1, 2007.

SECTION 1.17. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3011 to read as follows:

Sec. 261.3011. JOINT INVESTIGATION GUIDELINES AND TRAINING. (a) The department shall, in consultation with the appropriate law enforcement agencies, develop guidelines and protocols for joint investigations by the department and the law enforcement agency under Section 261.301. The guidelines and protocols must:

(1) clarify the respective roles of the department and law enforcement agency in conducting the investigation;

(2) require that mutual child protective services and law enforcement training and agreements be implemented by both entities to ensure the integrity and best outcomes of joint investigations; and

(3) incorporate the use of forensic methods in determining the occurrence of child abuse and neglect.

(b) The department shall collaborate with law enforcement agencies to provide to department investigators and law enforcement officers responsible for investigating reports of abuse and neglect joint training relating to methods to effectively conduct joint investigations under Section 261.301. The training must include information on interviewing techniques, evidence gathering, and testifying in court for criminal investigations, as well as instruction on rights provided by the Fourth Amendment to the United States Constitution.

SECTION 1.18. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3012 to read as follows:

Sec. 261.3012. COMPLETION OF PAPERWORK. An employee of the department who responds to a report that is assigned the highest priority in accordance with department rules adopted under Section 261.301(d) shall identify, to the extent reasonable under the circumstances, forms and other paperwork that can be completed by members of the family of the child who is the subject of the report. The department employee shall request the assistance of the child's family members in completing that documentation but remains responsible for ensuring that the documentation is completed in an appropriate manner.

SECTION 1.19. (a) Section 261.3015, Family Code, is amended by amending Subsection (a) and adding Subsection (a-1) to read as follows:

(a) In assigning priorities and prescribing investigative procedures based on the severity and immediacy of the alleged harm to a child under Section 261.301(d), the department [board by rule] shall establish a flexible response system to allow the department to make the most effective use of [allocate] resources by investigating serious cases of abuse and neglect and by screening out less serious cases of abuse

and neglect if the department determines, after contacting a professional or other credible source, that the child's safety can be assured without further investigation. The department may administratively close the less serious cases without providing services or making a referral to another entity for assistance [providing assessment and family preservation services in less serious cases].

(a-1) For purposes of Subsection (a), a case is considered to be a less serious case of abuse or neglect if the circumstances of the case do not indicate an immediate risk of abuse or neglect that could result in the death of or serious harm to the child who is the subject of the case.

(b) To ensure the safety of children, the Department of Family and Protective Services shall use highly skilled caseworkers to perform the screening functions described by Subsection (a), Section 261.3015, Family Code, as amended by this section, and develop standardized policy guidelines, including accountability measures to monitor closed cases, to ensure that screening guidelines do not result in the closing of cases that should not be closed.

SECTION 1.20. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3016 to read as follows:

Sec. 261.3016. TRAINING OF PERSONNEL RECEIVING REPORTS OF ABUSE AND NEGLECT. The department shall develop, in cooperation with local law enforcement officials and the Commission on State Emergency Communications, a training program for department personnel who receive reports of abuse and neglect. The training program must include information on:

(1) the proper methods of screening reports of abuse and neglect; and

(2) ways to determine the seriousness of a report, including determining whether a report alleges circumstances that could result in the death of or serious harm to a child or whether the report is less serious in nature.

SECTION 1.21. Section 261.302, Family Code, is amended by adding Subsections (b-1) and (f) and amending Subsection (e) to read as follows:

(b-1) Before the department may transport a child as provided by Subsection (b)(3), the department shall attempt to notify the parent or other person having custody of the child of the transport.

(e) An interview with a child conducted by the department during the investigation stage shall be audiotaped or videotaped. An interview with a child alleged to be a victim of physical abuse or sexual abuse conducted by an investigating agency other than the department shall be audiotaped or videotaped unless the investigating agency determines that good cause exists for not audiotaping or videotaping the interview in accordance with rules of the agency. Good cause may include, but is not limited to, such considerations as the age of the child and the nature and seriousness of the allegations under investigation. Nothing in this subsection shall be construed as prohibiting the investigating agency from audiotaping or videotaping an interview of a child on any case for which such audiotaping or videotaping is not required under this subsection. The fact that the investigating agency failed to audiotape or videotape an interview is admissible at the trial of the offense that is the subject of the interview.

(f) A person commits an offense if the person is notified of the time of the transport of a child by the department and the location from which the transport is initiated and the person is present at the location when the transport is initiated and attempts to interfere with the department's investigation. An offense under this subsection is a Class B misdemeanor. It is an exception to the application of this subsection that the department requested the person to be present at the site of the transport.

SECTION 1.22. Subchapter D, Chapter 261, Family Code, is amended by adding Sections 261.3021, 261.3022, 261.3023, and 261.3024 to read as follows:

Sec. 261.3021. CASEWORK DOCUMENTATION AND MANAGEMENT. Subject to the appropriation of money for these purposes, the department shall:

(1) identify critical investigation actions that impact child safety and require department caseworkers to document those actions in a child's case file not later than the day after the action occurs;

(2) identify and develop a comprehensive set of casework quality indicators that must be reported in real time to support timely management oversight;

(3) provide department supervisors with access to casework quality indicators and train department supervisors on the use of that information in the daily supervision of caseworkers;

(4) develop a case tracking system that notifies department supervisors and management when a case is not progressing in a timely manner;

(5) use current data reporting systems to provide department supervisors and management with easier access to information; and

(6) train department supervisors and management on the use of data to monitor cases and make decisions.

Sec. 261.3022. CHILD SAFETY CHECK ALERT LIST. (a) Subject to the availability of funds, the Department of Public Safety of the State of Texas shall create a child safety check alert list as part of the Texas Crime Information Center to help locate a family for purposes of investigating a report of child abuse or neglect.

(b) If the child safety check alert list is established and the department is unable to locate a family for purposes of investigating a report of child abuse or neglect, after the department has exhausted all means available to the department for locating the family, the department may seek assistance under this section from the appropriate county attorney, district attorney, or criminal district attorney with responsibility for representing the department as provided by Section 264.009.

(c) If the department requests assistance, the county attorney, district attorney, or criminal district attorney, as applicable, may file an application with the court requesting the issuance of an ex parte order requiring the Texas Crime Information Center to place the members of the family the department is attempting to locate on a child safety check alert list. The application must include a summary of:

(1) the report of child abuse or neglect the department is attempting to investigate; and

(2) the department's efforts to locate the family.

(d)  If the court determines after a hearing that the department has exhausted all means available to the department for locating the family, the court shall approve the application and order the appropriate law enforcement agency to notify the Texas Crime Information Center to place the family on a child safety check alert list. The alert list must include:

(1)  the name of the family member alleged to have abused or neglected a child according to the report the department is attempting to investigate;

(2)  the name of the child who is the subject of the report;

(3)  a code identifying the type of child abuse or neglect alleged to have been committed against the child;

(4)  the family's last known address; and

(5)  the minimum criteria for an entry as established by the center.

Sec. 261.3023.  LAW ENFORCEMENT RESPONSE TO CHILD SAFETY CHECK ALERT. (a)  If a law enforcement officer encounters a person listed on the Texas Crime Information Center's child safety check alert list who is alleged to have abused or neglected a child, or encounters a child listed on the alert list who is the subject of a report of child abuse or neglect the department is attempting to investigate, the officer shall request information from the person or the child regarding the child's well-being and current residence.

(b)  If the law enforcement officer determines that the circumstances described by Section 262.104 exist, the officer may take possession of the child without a court order as authorized by that section if the officer is able to locate the child. If the circumstances described by Section 262.104 do not exist, the officer shall obtain the child's current address and any other relevant information and report that information to the department.

Sec. 261.3024.  REMOVAL FROM CHILD SAFETY CHECK ALERT LIST. (a)  A law enforcement officer who locates a child listed on the Texas Crime Information Center's child safety check alert list who is the subject of a report of child abuse or neglect the department is attempting to investigate and who reports the child's current address and other relevant information to the department under Section 261.3023 shall report to the Texas Crime Information Center that the child has been located.

(b)  If the department locates a child described by Subsection (a) through a means other than information reported by a law enforcement officer under Subsection (a), the department shall report to the Texas Crime Information Center that the child has been located.

(c)  On receipt of notice under this section that a child has been located, the Texas Crime Information Center shall remove the child and the child's family from the child safety check alert list.

SECTION 1.23.  Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3031 to read as follows:

Sec. 261.3031.  FAILURE TO COOPERATE WITH INVESTIGATION; DEPARTMENT RESPONSE. If a parent or other person refuses to cooperate with the department's investigation of the alleged abuse or neglect of a child and the refusal poses a risk to the child's safety, the department shall seek assistance from the

appropriate county attorney or district attorney or criminal district attorney with responsibility for representing the department as provided by Section 264.009 to obtain a court order as described by Section 261.303.

SECTION 1.24. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3032 to read as follows:

Sec. 261.3032. INTERFERENCE WITH INVESTIGATION; CRIMINAL PENALTY. (a) A person commits an offense if, with the intent to interfere with the department's investigation of a report of abuse or neglect of a child, the person relocates the person's residence, either temporarily or permanently, without notifying the department of the address of the person's new residence or conceals the child and the person's relocation or concealment interferes with the department's investigation.

(b) An offense under this section is a Class B misdemeanor.

(c) If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section or the other law.

SECTION 1.25. (a) Section 261.307, Family Code, is amended to read as follows:

Sec. 261.307. INFORMATION RELATING TO INVESTIGATION PROCEDURE. (a) As soon as possible after initiating an investigation of a parent or other person having legal custody of a child, the department shall provide to the person:

(1) a [brief and easily understood] summary that [of]:

(A) is brief and easily understood;

(B) is written in a language that the person understands, or if the person is illiterate, is read to the person in a language that the person understands; and

(C) contains the following information:

(i) [(1)] the department's procedures for conducting an investigation of alleged child abuse or neglect, including:

(a) [(A)] a description of the circumstances under which the department would request to remove the child from the home through the judicial system; and

(b) [(B)] an explanation that the law requires the department to refer all reports of alleged child abuse or neglect to a law enforcement agency for a separate determination of whether a criminal violation occurred;

(ii) [(2)] the person's right to file a complaint with the department or to request a review of the findings made by the department in the investigation;

(iii) [(3)] the person's right to review all records of the investigation unless the review would jeopardize an ongoing criminal investigation or the child's safety;

(iv) [(4)] the person's right to seek legal counsel;

(v) [(5)] references to the statutory and regulatory provisions governing child abuse and neglect and how the person may obtain copies of those provisions; and

(vi) [(6)] the process the person may use to acquire access to the child if the child is removed from the home;

(2) if the department determines that removal of the child may be warranted, a proposed child placement resources form that:

(A) instructs the parent or other person having legal custody of the child to:

(i) complete and return the form to the department or agency; and

(ii) identify in the form three individuals who could be relative caregivers or designated caregivers, as those terms are defined by Section 264.751; and

(B) informs the parent or other person of a location that is available to the parent or other person to submit the information in the form 24 hours a day either in person or by facsimile machine or e-mail; and

(3) an informational manual required by Section 261.3071.

(b) The child placement resources form described by Subsection (a)(2) must include information on the periods of time by which the department must complete a background check.

(b) The Department of Family and Protective Services shall develop the proposed child placement resources form required to be provided under Section 261.307, Family Code, as amended by this section, not later than November 1, 2005.

(c) The Department of Family and Protective Services shall provide the proposed child placement resources form required under Section 261.307, Family Code, as amended by this section, to the parent or other person having legal custody of a child who is the subject of an investigation of abuse or neglect that is commenced on or after November 1, 2005.

SECTION 1.26. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3071 to read as follows:

Sec. 261.3071. INFORMATIONAL MANUALS. (a) In this section, "relative caregiver" and "designated caregiver" have the meanings assigned those terms by Section 264.751.

(b) The department shall develop and publish informational manuals that provide information for:

(1) a parent or other person having custody of a child who is the subject of an investigation under this chapter; and

(2) a person who is selected by the department to be the child's relative or designated caregiver.

(c) Information provided in the manuals must be in both English and Spanish and must include, as appropriate:

(1) useful indexes of information such as telephone numbers;

(2) the information required to be provided under Section 261.307(a)(1);

(3) information describing the rights and duties of a relative or designated caregiver; and

(4) information regarding the relative and other designated caregiver program under Subchapter I, Chapter 264.

SECTION 1.27. Section 261.310, Family Code, is amended by amending Subsections (a), (c), and (d) and adding Subsection (e) to read as follows:

(a) The department shall by rule develop and adopt [~~voluntary~~] standards for persons who investigate suspected child abuse or neglect at the state or local level. The standards shall encourage professionalism and consistency in the investigation of suspected child abuse or neglect.

(c) The professional training curriculum developed under this section shall include:

(1) information concerning:

(A) [~~(1)~~] physical abuse and neglect, including distinguishing physical abuse from ordinary childhood injuries;

(B) [~~(2)~~] psychological abuse and neglect;

(C) [~~(3)~~] available treatment resources; and

(D) [~~(4)~~] the incidence and types of reports of child abuse and neglect that are received by the investigating agencies, including information concerning false reports;

(2) law-enforcement-style training, including training relating to forensic interviewing and investigatory techniques and the collection of physical evidence; and

(3) training regarding applicable federal law, including the Adoption and Safe Families Act of 1997 (Pub. L. No. 105-89) and the Child Abuse Prevention and Treatment Act (Pub. L. No. 93-247) and its subsequent amendments by the Keeping Children and Families Safe Act of 2003 (Pub. L. No. 108-36).

(d) The standards shall [~~recommend~~]:

(1) recommend that videotaped and audiotaped interviews [~~with a suspected victim~~] be uninterrupted;

(2) recommend a maximum number of interviews with and examinations of a suspected victim;

(3) provide procedures to preserve evidence, including the original recordings of the intake telephone calls, original notes, videotapes, and audiotapes, for one year; and

(4) provide that an investigator of suspected child abuse or neglect make a reasonable effort to locate and inform each parent of a child of any report of abuse or neglect relating to the child.

(e) The department, in conjunction with the Department of Public Safety, shall provide to the department's residential child-care facility licensing investigators advanced training in investigative protocols and techniques.

SECTION 1.28. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3101 to read as follows:

Sec. 261.3101. FORENSIC INVESTIGATION SUPPORT.   The department shall, subject to the availability of money:

(1) employ or contract with medical and law enforcement professionals who shall be strategically placed throughout the state to provide forensic investigation support and to assist caseworkers with assessment decisions and intervention activities;

(2) employ or contract with subject matter experts to serve as consultants to department caseworkers in all aspects of their duties; and

(3)  designate persons who shall act as liaisons within the department whose primary functions are to develop relationships with local law enforcement agencies and courts.

SECTION 1.29.  Section 261.3125, Family Code, is amended to read as follows:

Sec. 261.3125.  CHILD SAFETY SPECIALISTS [INVESTIGATIONS COORDINATOR].  (a) The department shall employ in each of the department's administrative regions [region of the department for child protective services] at least one child safety specialist [protective services investigations coordinator]. The job responsibilities of the child safety specialist [investigations coordinator] must focus [only] on child abuse and neglect investigation issues, including reports of child abuse required by Section 261.101, to achieve a greater compliance with that section, and on assessing and improving the effectiveness of the department in providing for the protection of children in the region.

(b) The duties of a child safety specialist [protective services investigations coordinator] must include the duty to:

(1)  conduct staff reviews and evaluations of cases determined to involve a high risk to the health or safety of a child, including cases of abuse reported under Section 261.101, to ensure that risk assessment tools are fully and correctly used;

(2)  review and evaluate [monitor] cases in which there have been multiple referrals to the department of child abuse or neglect involving the same family, child, or person alleged to have committed the abuse or neglect; and

(3)  approve decisions and assessments related to investigations of cases of child abuse or neglect that involve a high risk to the health or safety of a child.

SECTION 1.30. Subchapter D, Chapter 261, Family Code, is amended by adding Section 261.3126 to read as follows:

Sec. 261.3126.  COLOCATION OF INVESTIGATORS.  (a)  In each county, to the extent possible, the department and the local law enforcement agencies that investigate child abuse in the county shall colocate in the same offices investigators from the department and the law enforcement agencies to improve the efficiency of child abuse investigations.  With approval of the local children's advocacy center and its partner agencies, in each county in which a children's advocacy center established under Section 264.402 is located, the department shall attempt to locate investigators from the department and county and municipal law enforcement agencies at the center.

(b)  A law enforcement agency is not required to comply with the colocation requirements of this section if the law enforcement agency does not have a full-time peace officer solely assigned to investigate reports of child abuse and neglect.

(c)  If a county does not have a children's advocacy center, the department shall work with the local community to encourage one as provided by Section 264.402.

SECTION 1.31. Subchapter E, Chapter 261, Family Code, is amended by adding Section 261.410 to read as follows:

Sec. 261.410.  REPORT OF ABUSE BY OTHER CHILDREN.  (a)  In this section:

(1)  "Physical abuse" means:

(A) physical injury that results in substantial harm to the child requiring emergency medical treatment and excluding an accident or reasonable discipline by a parent, guardian, or managing or possessory conservator that does not expose the child to a substantial risk of harm; or

(B) failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child.

(2) "Sexual abuse" means:

(A) sexual conduct harmful to a child's mental, emotional, or physical welfare; or

(B) failure to make a reasonable effort to prevent sexual conduct harmful to a child.

(b) An agency that operates, licenses, certifies, or registers a facility shall require a residential child-care facility to report each incident of physical or sexual abuse committed by a child against another child.

(c) Using information received under Subsection (b), the agency that operates, licenses, certifies, or registers a facility shall, subject to the availability of funds, compile a report that includes information:

(1) regarding the number of cases of physical and sexual abuse committed by a child against another child;

(2) identifying the residential child-care facility;

(3) regarding the date each allegation of abuse was made;

(4) regarding the date each investigation was started and concluded;

(5) regarding the findings and results of each investigation; and

(6) regarding the number of children involved in each incident investigated.

SECTION 1.32. Subchapter B, Chapter 262, Family Code, is amended by adding Section 262.1041 to read as follows:

Sec. 262.1041. RELEASE OF CHILD BY LAW ENFORCEMENT OR JUVENILE PROBATION OFFICER. (a) A law enforcement or juvenile probation officer who takes possession of a child under this chapter may release the child to:

(1) a child-placing agency licensed by the Department of Family and Protective Services under Chapter 42, Human Resources Code, if the agency is authorized by the department to take possession of the child;

(2) the Department of Family and Protective Services; or

(3) any other person authorized by law to take possession of the child.

(b) A child-placing agency or other authorized person who takes possession of a child under this section shall:

(1) immediately notify the Department of Family and Protective Services that the agency or other authorized person has taken possession of the child; and

(2) with the assistance of the law enforcement or juvenile probation officer who releases the child to the agency or other authorized person, complete a form prescribed by the Department of Family and Protective Services that contains basic information regarding the child and the circumstances under which the officer took possession of the child and promptly submit the completed form to the department.

SECTION 1.33. Subchapter B, Chapter 262, Family Code, is amended by adding Section 262.114 to read as follows:

Sec. 262.114. EVALUATION OF IDENTIFIED RELATIVES AND OTHER DESIGNATED INDIVIDUALS; PLACEMENT. (a)  Before a full adversary hearing under Subchapter C, the Department of Family and Protective Services must perform a background and criminal history check of the relatives or other designated individuals identified as a potential relative or designated caregiver, as defined by Section 264.751, on the proposed child placement resources form provided under Section 261.307.  The department shall evaluate each person listed on the form to determine the relative or other designated individual who would be the most appropriate substitute caregiver for the child and must complete a home study of the most appropriate substitute caregiver, if any, before the full adversary hearing. Until the department identifies a relative or other designated individual qualified to be a substitute caregiver, the department must continue to explore substitute caregiver options. The time frames in this subsection do not apply to a relative or other designated individual located in another state.

(b) The department may place a child with a relative or other designated individual identified on the proposed child placement resources form if the department determines that the placement is in the best interest of the child. The department may place the child with the relative or designated individual before conducting the background and criminal history check or home study required under Subsection (a).  The department shall provide a copy of an informational manual required under Section 261.3071 to the relative or other designated caregiver at the time of the child's placement.

SECTION 1.34.  (a)  Subsection (c), Section 262.201, Family Code, is amended to read as follows:

(c)  If the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child, the court shall issue an appropriate temporary order under Chapter 105. The court shall require each parent, alleged father, or relative of the child before the court to submit the proposed child placement resources form provided under Section 261.307, if the form has not been previously provided, and provide the Department of Family and Protective [and Regulatory] Services with information necessary to locate any other absent parent, alleged father, or relative of the child. The court shall inform each parent, alleged father, or relative of the child before the court that the person's failure to submit the proposed child placement resources form will not delay any court proceedings relating to the child.  The court shall inform each parent in open court that parental and custodial rights and duties may be subject to restriction or to termination unless the parent or parents are willing and able to provide the child with a safe environment. If the court finds that the child requires protection from family violence by a member of the child's family or household, the court shall render a protective order under Title 4 for the child. In this subsection, "family violence" has the meaning assigned by Section 71.004.

(b) The change in law made by this section to Subsection (c), Section 262.201, Family Code, applies only to a full adversary hearing that occurs on or after November 1, 2005. A full adversary hearing that occurs before that date is governed by the law as it existed before amendment by this section, and the former law is continued in effect for that purpose.

SECTION 1.35. Subsection (b), Section 262.2015, Family Code, is amended to read as follows:

(b) The court may find under Subsection (a) that a parent has subjected the child to aggravated circumstances if:

(1) the parent abandoned the child without identification or a means for identifying the child;

(2) the child is a victim of serious bodily injury or sexual abuse inflicted by the parent or by another person with the parent's consent;

(3) the parent has engaged in conduct against the child that would constitute an offense under the following provisions of the Penal Code:

(A) Section 19.02 (murder);

(B) Section 19.03 (capital murder);

(C) Section 19.04 (manslaughter);

(D) Section 21.11 (indecency with a child);

(E) Section 22.011 (sexual assault);

(F) Section 22.02 (aggravated assault);

(G) Section 22.021 (aggravated sexual assault);

(H) Section 22.04 (injury to a child, elderly individual, or disabled individual);

(I) Section 22.041 (abandoning or endangering child);

(J) Section 25.02 (prohibited sexual conduct);

(K) Section 43.25 (sexual performance by a child); or

(L) Section 43.26 (possession or promotion of child pornography);

(4) the parent voluntarily left the child alone or in the possession of another person not the parent of the child for at least six months without expressing an intent to return and without providing adequate support for the child;

(5) the parent's parental rights with regard to another child have been involuntarily terminated based on a finding that the parent's conduct violated Section 161.001(1)(D) or (E) or a substantially equivalent provision of another state's law; [or]

(6) the parent has been convicted for:

(A) the murder of another child of the parent and the offense would have been an offense under 18 U.S.C. Section 1111(a) if the offense had occurred in the special maritime or territorial jurisdiction of the United States;

(B) the voluntary manslaughter of another child of the parent and the offense would have been an offense under 18 U.S.C. Section 1112(a) if the offense had occurred in the special maritime or territorial jurisdiction of the United States;

(C) aiding or abetting, attempting, conspiring, or soliciting an offense under Subdivision (A) or (B); or

(D) the felony assault of the child or another child of the parent that resulted in serious bodily injury to the child or another child of the parent; or

(7) the parent's parental rights with regard to two other children have been involuntarily terminated.

SECTION 1.36. Subdivision (1), Subsection (a), Section 263.001, Family Code, is amended to read as follows:

(1) "Department" means the Department of <u>Family and</u> Protective [<del>and Regulatory</del>] Services.

SECTION 1.37. (a) Section 263.201, Family Code, is amended by adding Subsection (c) to read as follows:

(c) The court shall require each parent, alleged father, or relative of the child before the court to submit the proposed child placement resources form provided under Section 261.307 at the status hearing, if the form has not previously been submitted.

(b) The change in law made by this section to Section 263.201, Family Code, applies only to a status hearing that occurs on or after November 1, 2005. A status hearing that occurs before that date is governed by the law as it existed before amendment by this section, and the former law is continued in effect for that purpose.

SECTION 1.38. (a) Section 263.102, Family Code, is amended by amending Subsection (a) and adding Subsections (d) and (e) to read as follows:

(a) The service plan must:

(1) be specific;

(2) be in writing <u>in a language that the parents understand, or made otherwise available</u>;

(3) be prepared by the department or other agency in conference with the child's parents;

(4) state appropriate deadlines;

(5) state whether the goal of the plan is:

(A) return of the child to the child's parents;

(B) termination of parental rights and placement of the child for adoption; or

(C) because of the child's special needs or exceptional circumstances, continuation of the child's care out of the child's home;

(6) state steps that are necessary to:

(A) return the child to the child's home if the placement is in foster care;

(B) enable the child to remain in the child's home with the assistance of a service plan if the placement is in the home under the department's or other agency's supervision; or

(C) otherwise provide a permanent safe placement for the child;

(7) state the actions and responsibilities that are necessary for the child's parents to take to achieve the plan goal during the period of the service plan and the assistance to be provided to the parents by the department or other authorized agency toward meeting that goal;

(8) <u>state any specific skills or knowledge that the child's parents must acquire or learn, as well as any behavioral changes the parents must exhibit, to achieve the plan goal;</u>

(9) state the actions and responsibilities that are necessary for the child's parents to take to ensure that the child attends school and maintains or improves the child's academic compliance;

(10) state the name of the person with the department or other agency whom the child's parents may contact for information relating to the child if other than the person preparing the plan; and

(11) [(9)] prescribe any other term or condition that the department or other agency determines to be necessary to the service plan's success.

(d) The department or other authorized entity must write the service plan in a manner that is clear and understandable to the parent in order to facilitate the parent's ability to follow the requirements of the service plan.

(e) Regardless of whether the goal stated in a child's service plan as required under Subsection (a)(5) is to return the child to the child's parents or to terminate parental rights and place the child for adoption, the department shall concurrently provide to the child and the child's family, as applicable:

(1) time-limited family reunification services as defined by 42 U.S.C. Section 629a for a period not to exceed the period within which the court must render a final order in or dismiss the suit affecting the parent-child relationship with respect to the child as provided by Subchapter E; and

(2) adoption promotion and support services as defined by 42 U.S.C. Section 629a.

(b) Subsection (c), Section 263.202, Family Code, is amended to read as follows:

(c) The court shall advise the parties that progress under the service plan will be reviewed at all subsequent hearings, including a review of whether the parties have acquired or learned any specific skills or knowledge stated in the service plan.

(c) The changes in law made by Section 263.102 and Subsection (c), Section 263.202, Family Code, as amended by this section, apply only to a child placed in the custody of the Department of Family and Protective Services on or after the effective date of this section. A child placed in the custody of the department before the effective date of this section is governed by the law in effect on the date the child was placed in the department's custody, and the former law is continued in effect for that purpose.

SECTION 1.39. Section 263.202, Family Code, is amended by amending Subsection (b) and adding Subsection (e) to read as follows:

(b) Except as provided by Subsection (e), a [A] status hearing shall be limited to matters related to the contents and execution of the service plan filed with the court. The court shall review the service plan that the department or other agency filed under this chapter for reasonableness, accuracy, and compliance with requirements of court orders and make findings as to whether:

(1) a plan that has the goal of returning the child to the child's parents adequately ensures that reasonable efforts are made to enable the child's parents to provide a safe environment for the child; and

(2) the child's parents have reviewed and understand the service plan and have been advised that unless the parents are willing and able to provide the child with a safe environment, even with the assistance of a service plan, within the

reasonable period of time specified in the plan, the parents' parental and custodial duties and rights may be subject to restriction or to termination under this code or the child may not be returned to the parents.

(e)  At the status hearing, the court shall make a finding as to whether the court has identified the individual who has the right to consent for the child under Section 266.003.

SECTION 1.40.  Subsection (b), Section 263.401, Family Code, is amended to read as follows:

(b)  The court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a)[, if the court finds that continuing the appointment of the department as temporary managing conservator is in the best interest of the child]. If the court retains the suit on the court's docket, the court shall render an order in which the court:

(1)  schedules the new date for dismissal of the suit not later than the 180th day after the time described by Subsection (a);

(2)  makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and

(3)  sets a final hearing on a date that allows the court to render a final order before the required date for dismissal of the suit under this subsection.

SECTION 1.41.  (a)  Subsection (c), Section 263.502, Family Code, is amended to read as follows:

(c)  The placement review report must:

(1)  evaluate whether the child's current placement is appropriate for meeting the child's needs;

(2)  evaluate whether efforts have been made to ensure placement of the child in the least restrictive environment consistent with the best interest and special needs of the child if the child is placed in institutional care;

(3)  contain a discharge plan for a child who is at least 16 years of age that identifies [identify] the services and specific tasks that are needed to assist the [a] child [who is at least 16 years of age] in making the transition from substitute care to adult [independent] living and describes the services that are available through the Preparation for Adult Living Program operated by the department [if the services are available in the community];

(4)  evaluate whether the child's current educational placement is appropriate for meeting the child's academic needs;

(5)  identify other plans or services that are needed to meet the child's special needs or circumstances; and

(6) [(5)] describe the efforts of the department or authorized agency to place the child for adoption if parental rights to the child have been terminated and the child is eligible for adoption, including efforts to provide adoption promotion and support services as defined by 42 U.S.C. Section 629a and other efforts consistent with the federal Adoption and Safe Families Act of 1997 (Pub. L. No. 105-89).

(b) In implementing the provisions of Subdivision (3), Subsection (c), Section 263.502, Family Code, as amended by this section, the Department of Family and Protective Services shall, to the extent that funding is appropriated for this purpose, contract with outside entities to assist in the discharge planning process.

SECTION 1.42. Section 264.001, Family Code, is amended to read as follows:

Sec. 264.001. DEFINITIONS [DEFINITION]. In this chapter:

(1) "Department"[, "department"] means the Department of Family and Protective [and Regulatory] Services.

(2) "Commission" means the Health and Human Services Commission.

(3) "Executive commissioner" means the executive commissioner of the Health and Human Services Commission.

(4) "Residential child-care facility" has the meaning assigned by Section 42.002, Human Resources Code.

SECTION 1.43. Subchapter A, Chapter 264, Family Code, is amended by adding Section 264.0091 to read as follows:

Sec. 264.0091. USE OF TELECONFERENCING AND VIDEOCONFERENCING TECHNOLOGY. Subject to the availability of funds, the department, in cooperation with district and county courts, shall expand the use of teleconferencing and videoconferencing to facilitate participation by medical experts and other individuals in court proceedings.

SECTION 1.44. Subchapter A, Chapter 264, Family Code, is amended by adding Section 264.013 to read as follows:

Sec. 264.013. EXCHANGE OF INFORMATION WITH OTHER STATES. Subject to the availability of funds, the department shall enter into agreements with other states to allow for the exchange of information relating to a child for whom the department is or was the managing conservator. The information may include the child's health passport and education passport.

SECTION 1.45. Section 264.101, Family Code, is amended by adding Subsection (d-1) to read as follows:

(d-1) The executive commissioner may adopt rules that prescribe the maximum amount of state money that a residential child-care facility may spend on nondirect residential services, including administrative services. The commission shall recover the money that exceeds the maximum amount established under this subsection.

SECTION 1.46. Section 264.106, Family Code, is amended to read as follows:

Sec. 264.106. REQUIRED CONTRACTS FOR SUBSTITUTE CARE AND CASE MANAGEMENT SERVICES. (a) In this section:

(1) "Case management services" means the provision of case management services to a child for whom the department has been appointed temporary or permanent managing conservator, including caseworker-child visits, family visits, the convening of family group conferences, the development and revision of the case plan, the coordination and monitoring of services needed by the child and family, and

the assumption of court-related duties, including preparing court reports, attending judicial hearings and permanency hearings, and ensuring that the child is progressing toward permanency within state and federal mandates.

(2)  "Independent administrator" means an independent agency selected through a competitive procurement process to:

(A)  secure, coordinate, and manage substitute care services and case management services in a geographically designated area of the state; and

(B)  ensure continuity of care for a child referred to the administrator by the department and the child's family from the day a child enters the child protective services system until the child leaves the system.

(3)  "Permanency services" means services, other than family-based safety services, provided to secure a child's safety, permanency, and well-being, including substitute care services, family reunification services, adoption and postadoption services, preparation for adult living services, and case management services.

(4)  "Substitute care provider" means a child-care institution or a child-placing agency, as defined by Section 42.002, Human Resources Code.

(5)  "Substitute care services" means services provided to or for children in substitute care and their families, including the recruitment, training, and management of foster parents, the recruitment of adoptive families, and the facilitation of the adoption process, family preservation, independent living, emergency shelter, residential group care, foster care, therapeutic foster care, and post-placement supervision, including relative placement. The term does not include the regulation of facilities under Subchapter C, Chapter 42, Human Resources Code.

(b)  The department shall, in accordance with Section 45.004, Human Resources Code:

(1)  assess the need for substitute care and case management services throughout the state; [and]

(2)  either contract directly with private agencies as part of regional community-centered networks for the provision of all necessary substitute care and case management [substitute care providers only to the extent necessary to meet the need for those] services or use an independent administrator to contract for those services;

(3)  contract with an independent administrator, if cost beneficial, to coordinate and manage all services needed for children in the temporary or permanent managing conservatorship of the department in a designated geographic area;

(4)  monitor the quality of services for which the department and each independent administrator contract under this section; and

(5)  ensure that the services are provided in accordance with federal law and the laws of this state, including department rules and rules of the Department of State Health Services and the Texas Commission on Environmental Quality.

(c)  An independent administrator may not:

(1)  directly provide substitute care services; or

(2)  be governed by a board that has a member who has a financial interest in a substitute care or case management provider with whom the independent administrator subcontracts.

(d) Administrative services to be provided by an independent administrator include:

(1) recruiting and subcontracting with community-based substitute care and case management providers to ensure a full array of services in defined geographic areas;

(2) managing placements and making referrals for placement based on department-approved protocols;

(3) monitoring services delivered by subcontractors;

(4) providing training and technical assistance to contract providers;

(5) maintaining data systems that support tracking and reporting key performance and outcome data; and

(6) ensuring accountability for achieving defined client and system outcomes.

(e) [(b) Before contracting with a substitute care provider, the department shall determine whether:

[(1) community resources are available to support children placed under the provider's care; and

[(2) the appropriate public school district has sufficient resources to support children placed under the provider's care if the children will attend public school.

[(c)] In addition to the requirements of Section 40.058(b), Human Resources Code, a contract with an independent administrator [a substitute care provider] must include provisions that:

(1) enable the department to monitor the effectiveness of the [provider's] services; [and]

(2) specify performance outcomes;

(3) authorize the department to terminate the contract or impose sanctions for a violation of a provision of the contract that specifies performance criteria;

(4) ensure that an independent administrator may not refuse to accept a client who is referred for services or reject a client who is receiving services unless the department has reviewed the independent administrator's decision and approved the decision in writing;

(5) authorize the department, an agent of the department, and the state auditor to inspect all books, records, and files maintained by an independent administrator relating to the contract; and

(6) the department determines are necessary to ensure accountability for the delivery of services and for the expenditure of public funds.

(f) A contract with an independent administrator for substitute care and case management services under Subsection (b)(2) must include department-approved provisions that:

(1) enable the independent administrator and the department to:

(A) monitor the effectiveness of substitute care and case management services; and

(B) specify performance standards and authorize termination of the contract for cause;

(2) describe how performance is linked to reimbursement amounts or schedules to provide incentives for desired results;

(3)　require all independent administrators and private contractors to disclose to the department any information that may indicate an actual or potential conflict of interest with the commission, the department, or another health and human services agency, including information regarding actual or potential related-party transactions, relationships, interests, or business history, and any other factor that may indicate an actual or potential conflict of interest;

(4)　authorize the independent administrator, an agent of the independent administrator, the department, an agent of the department, and the state auditor to inspect all books, records, and files maintained by a contractor relating to the contract; and

(5)　the department determines are necessary to ensure accountability for the delivery of services and for the expenditure of public funds.

(g) [(d)]　In determining whether to contract with a substitute care provider or an independent administrator, the department shall consider the provider's or administrator's performance under any previous contract [for substitute care services] between the department and the provider or administrator.

(h)　A contract under this section does not affect the rights and duties of the department in the department's capacity as the temporary or permanent managing conservator of a child.

(i)　Except as provided by Subsections (j) and (k) and notwithstanding any other law, on and after September 1, 2011, the department may not directly provide substitute care and case management services for children for whom the department has been appointed temporary or permanent managing conservator.

(j)　On and after September 1, 2011, the department may provide substitute care and case management services in an emergency. The executive commissioner shall adopt rules describing the circumstances in which the department may provide those services.

(k)　The department may provide substitute care and case management services as a provider of last resort in any region of the state in which the department or an independent administrator contracting with the department is unable to contract with a private agency to provide those services

[(e)　In this section, "substitute care provider" means a person who provides residential care for children for 24 hours a day, including:

[(1)　a child-care institution, as defined by Section 42.002, Human Resources Code;

[(2)　a child-placing agency, as defined by Section 42.002, Human Resources Code;

[(3)　a foster group home or foster family home, as defined by Section 42.002, Human Resources Code; and

[(4)　an agency group home or agency home, as defined by Section 42.002, Human Resources Code, other than an agency group home, agency home, or a foster home verified or certified by the department].

SECTION 1.47.　Subchapter B, Chapter 264, Family Code, is amended by adding Sections 264.1062 and 264.1063 to read as follows:

Sec. 264.1062.  EVALUATION OF INDEPENDENT ADMINISTRATORS. The department shall develop and implement a comprehensive multidisciplinary team to monitor and evaluate the performance of independent administrators.  The team must consist of specialized staff who can enable the department to measure critical dimensions of community-based organization performance, obtained through the quality assurance functions of the independent administrator, including:

(1)  achievement of client and system outcomes;

(2)  compliance with contractual terms and conditions; and

(3)  any history of the community-based organization's noncompliance with the department's licensing standards.

Sec. 264.1063.  MONITORING PERFORMANCE OF SUBSTITUTE CARE AND CASE MANAGEMENT PROVIDERS. (a) The department, in consultation with private entities under contract with either an independent administrator or the department to provide substitute care or case management services, shall establish a quality assurance program that uses comprehensive, multitiered assurance and improvement systems based, subject to the availability of funds, on real-time data to evaluate performance.

(b)  The contract performance outcomes specified in a contract under Section 264.106 must be consistent with the fiscal goals of privatizing substitute care and case management services and must be within the contractor's authority to deliver. The contract must clearly define the manner in which the substitute care or case management provider's performance will be measured and identify the information sources the department and, if applicable, the independent administrator will use to evaluate the performance.

SECTION 1.48. Section 264.107, Family Code, is amended by adding Subsections (c) through (f) to read as follows:

(c)  The contract between the department and an independent administrator or other authorized entity must require, not later than September 1, 2009, the use of real-time technology in the independent administrator's or other authorized entity's placement system to screen possible placement options for a child and match the child's needs with the most qualified providers with vacancies.

(d)  The department shall institute a quality assurance system in monitoring the independent administrators or other authorized entities to ensure that placement decisions are reliable and are made in a consistent manner.

(e)  In making placement decisions, an independent administrator or other authorized entity shall use clinical protocols to match a child to the most appropriate placement resource.

(f)  The department may create a regional advisory council in a region to assist the department and independent administrator or other authorized entity in:

(1)  assessing the need for resources in the region; and

(2)  locating substitute care services in the region for hard-to-place children.

SECTION 1.49. Section 264.1075, Family Code, is amended to read as follows:

Sec. 264.1075.  ASSESSING NEEDS OF CHILD [USE OF ASSESSMENT SERVICES]. (a)  On removing a child from the child's home [Before placing a child in substitute care], the department shall use assessment services provided by a child-care facility, a [or] child-placing agency, or the child's medical home during the

initial substitute care placement. The assessment may be used [~~in accordance with Section 42.0425, Human Resources Code,~~] to determine the most appropriate substitute care placement for the child, if needed.

(b)  As soon as possible after a child begins receiving foster care under this subchapter, the department shall assess whether the child has a developmental disability or mental retardation. The commission shall establish the procedures that the department must use in making an assessment under this subsection. The procedures may include screening or participation by:

(1)  a person who has experience in childhood developmental disabilities or mental retardation;

(2)  a local mental retardation authority; or

(3)  a provider in a county with a local child welfare board.

SECTION 1.50.  (a)  Subchapter B, Chapter 264, Family Code, is amended by adding Sections 264.116, 264.117, and 264.118 to read as follows:

Sec. 264.116.  TEXAS FOSTER GRANDPARENT MENTORS.  (a)  The department shall make the active recruitment and inclusion of senior citizens a priority in ongoing mentoring initiatives.

(b)  An individual who volunteers as a mentor is subject to state and national criminal background checks in accordance with Sections 411.087 and 411.114, Government Code.

(c)  The department shall require foster parents or employees of residential child-care facilities to provide appropriate supervision over individuals who serve as mentors during their participation in the mentoring initiative.

(d)  Chapter 2109, Government Code, applies to the mentoring initiative described by this section.

Sec. 264.117.  NOTICE TO ATTORNEY AD LITEM. (a)  The department shall notify the attorney ad litem for a child in the conservatorship of the department about each event involving the child that the department reports in the child's case file.

(b)  The department shall give a child's attorney ad litem written notice at least 48 hours before the date the department changes the child's residential care provider. The department may change the child's residential care provider without notice if the department determines that an immediate change is necessary to protect the child.

Sec. 264.118.  ANNUAL SURVEY. (a)  The department shall conduct an annual random survey of a sample of children from each region of the state who are at least 14 years of age and who receive substitute care services. The survey must include questions regarding:

(1)  the quality of the substitute care services provided to the child;

(2)  any improvements that could be made to better support the child; and

(3)  any other factor that the department considers relevant to enable the department to identify potential program enhancements.

(b)  The identity of each child participating in a department survey is confidential and not subject to public disclosure under Chapter 552, Government Code. The department shall adopt procedures to ensure that the identity of each child participating in a department survey remains confidential.

(b) The Department of Family and Protective Services shall implement the provisions of Section 264.116, Family Code, as added by this section, not later than June 1, 2006.

SECTION 1.51. Subchapter B, Chapter 264, Family Code, is amended by adding Section 264.121 to read as follows:

Sec. 264.121. PREPARATION FOR ADULT LIVING PROGRAM. (a) The department shall address the unique challenges facing foster children in the conservatorship of the department who must transition to independent living by:

(1) expanding efforts to improve discharge planning and increasing the availability of transitional family group decision-making to all youth age 16 or older in the department's permanent managing conservatorship;

(2) coordinating with the Health and Human Services Commission to obtain authority, to the extent allowed by federal law, the state Medicaid plan, the Title IV-E state plan, and any waiver or amendment to either plan, necessary to:

(A) extend foster care eligibility and transition services for youth up to age 21 and develop policy to permit eligible youth to return to foster care as necessary to achieve the goals of the Preparation for Adult Living Program; and

(B) extend Medicaid coverage for foster care youth and former foster care youth up to age 21 with a single application at the time the youth leaves foster care; and

(3) entering into cooperative agreements with the Texas Workforce Commission and local workforce development boards to further the objectives of the Preparation for Adult Living Program. The department, the Texas Workforce Commission, and the local workforce development boards shall ensure that services are prioritized and targeted to meet the needs of foster care and former foster care children and that such services will include, where feasible, referrals for short-term stays for youth needing housing.

(b) In this section "local workforce development board" means a local workforce development board created under Chapter 2308, Government Code.

SECTION 1.52. Subchapter C, Chapter 264, Family Code, is amended by adding Section 264.2015 to read as follows:

Sec. 264.2015. FAMILY GROUP CONFERENCING. The department may collaborate with the courts and other appropriate local entities to develop and implement family group conferencing as a strategy for promoting family preservation and permanency for children.

SECTION 1.53. Subchapter C, Chapter 264, Family Code, is amended by adding Section 264.204 to read as follows:

Sec. 264.204. COMMUNITY-BASED FAMILY SERVICES. (a) The department shall administer a grant program to provide funding to community organizations, including faith-based or county organizations, to respond to:

(1) low-priority, less serious cases of abuse and neglect; and

(2) cases in which an allegation of abuse or neglect of a child was unsubstantiated but involved a family that has been previously investigated for abuse or neglect of a child.

(b) The executive commissioner shall adopt rules to implement the grant program, including rules governing the submission and approval of grant requests and the cancellation of grants.

(c) To receive a grant, a community organization whose grant request is approved must execute an interagency agreement or a contract with the department. The contract must require the organization receiving the grant to perform the services as stated in the approved grant request. The contract must contain appropriate provisions for program and fiscal monitoring.

(d) In areas of the state in which community organizations receive grants under the program, the department shall refer low-priority, less serious cases of abuse and neglect to a community organization receiving a grant under the program.

(e) A community organization receiving a referral under Subsection (d) shall make a home visit and offer family social services to enhance the parents' ability to provide a safe and stable home environment for the child. If the family chooses to use the family services, a case manager from the organization shall monitor the case and ensure that the services are delivered.

(f) If after the home visit the community organization determines that the case is more serious than the department indicated, the community organization shall refer the case to the department for a full investigation.

(g) The department may not award a grant to a community organization in an area of the state in which a similar program is already providing effective family services in the community.

(h) For purposes of this section, a case is considered to be a less serious case of abuse or neglect if:

(1) the circumstances of the case do not appear to involve a reasonable likelihood that the child will be abused or neglected in the foreseeable future; or

(2) the allegations in the report of child abuse or neglect:

(A) are general in nature or vague and do not support a determination that the child who is the subject of the report has been abused or neglected or will likely be abused or neglected; or

(B) if substantiated, would not be considered abuse or neglect under this chapter.

SECTION 1.54. (a) Subchapter C, Chapter 264, Family Code, is amended by adding Section 264.2041 to read as follows:

Sec. 264.2041. CULTURAL AWARENESS. The department shall:

(1) develop and deliver cultural competency training to all service delivery staff;

(2) increase targeted recruitment efforts for foster and adoptive families who can meet the needs of children and youth who are waiting for permanent homes;

(3) target recruitment efforts to ensure diversity among department staff; and

(4) develop collaborative partnerships with community groups, agencies, faith-based organizations, and other community organizations to provide culturally competent services to children and families of every race and ethnicity.

(b)  The Health and Human Services Commission and the Department of Family and Protective Services shall analyze data regarding child removals and other enforcement actions taken by the department during state fiscal years 2004 and 2005. Based on the analysis, the commission and the department shall determine whether enforcement actions were disproportionately initiated against any racial or ethnic group, in any area of the state, taking into account other relevant factors, including poverty, single-parent families, young-parent families, and any additional factor determined by other research to be statistically correlated with child abuse or child neglect.

(c)  The rate of enforcement actions shall be deemed disproportionate for a given racial or ethnic group if it is significantly different from the rate of enforcement actions against the population as a whole, taking into account other relevant factors.

(d)  Not later than January 1, 2006, the Health and Human Services Commission shall report the results of the analysis to the lieutenant governor, the speaker of the house of representatives, the presiding officer of each house and senate standing committee having jurisdiction over child protective services, and the Parental Advisory Committee created under Section 40.073, Human Resources Code, as added by this Act.

(e)  If the results of the analysis indicate that enforcement actions are initiated disproportionately against any racial or ethnic group, in any area of the state, taking into account other relevant factors, the Health and Human Services Commission and Department of Family and Protective Services shall:

(1)  evaluate the policies and procedures the department uses in deciding to take enforcement actions to determine why racial or ethnic disparities exist;

(2)  develop and implement a remediation plan to prevent racial or ethnic disparities not justified by other external factors from affecting the decision to initiate enforcement actions; and

(3)  not later than July 1, 2006, submit a report to the lieutenant governor, the speaker of the house of representatives, and the presiding officer of each house and senate standing committee having jurisdiction over child protective services that explains:

(A)  the evaluation of policies and procedures; and

(B)  the remediation plan.

SECTION 1.55.  Subsection (c), Section 264.203, Family Code, is amended to read as follows:

(c)  If the person ordered to participate in the services fails to follow the court's order, the court may impose appropriate sanctions in order to protect the health and safety of the child, including the removal of the child as specified by Chapter 262 [community service as a sanction for contempt].

SECTION 1.56.  Subsection (b), Section 264.502, Family Code, is amended to read as follows:

(b)  The members of the committee who serve under Subsections (a)(1) through (3) shall select the following additional committee members:

(1)  a criminal prosecutor involved in prosecuting crimes against children;

(2)  a sheriff;

(3)  a justice of the peace;

    (4) a medical examiner;

    (5) a police chief;

    (6) a pediatrician experienced in diagnosing and treating child abuse and neglect;

    (7) a child educator;

    (8) a child mental health provider;

    (9) a public health professional;

    (10) a child protective services specialist;

    (11) a sudden infant death syndrome family service provider;

    (12) a neonatologist;

    (13) a child advocate; [and]

    (14) a chief juvenile probation officer; and

    (15) a child abuse prevention specialist.

  SECTION 1.57. Section 264.503, Family Code, is amended by amending Subsections (b) through (f) and adding Subsections (d-1) and (g) to read as follows:

  (b) To ensure that the committee achieves its purpose, the department and the [Texas] Department of State Health Services shall perform the duties specified by this section.

  (c) The department shall:

    (1) recognize the creation and participation of review teams; and

    (2) work cooperatively with the committee and with individual child fatality review teams [promote and coordinate training to assist the review teams in carrying out their duties;

    [(3) assist the committee in developing model protocols for:

      [(A) the reporting and investigating of child fatalities for law enforcement agencies, child protective services, justices of the peace and medical examiners, and other professionals involved in the investigations of child deaths;

      [(B) the collection of data regarding child deaths; and

      [(C) the operation of the review teams; and

    [(4) develop and implement procedures necessary for the operation of the committee].

  (d) The Department of State Health Services [department] shall:

    (1) promote and coordinate training to assist the review teams in carrying out their duties;

    (2) assist the committee in developing model protocols for:

      (A) the reporting and investigating of child fatalities for law enforcement agencies, child protective services, justices of the peace and medical examiners, and other professionals involved in the investigations of child deaths;

      (B) the collection of data regarding child deaths; and

      (C) the operation of the review teams;

    (3) develop and implement procedures necessary for the operation of the committee; and

    (4) promote education of the public regarding the incidence and causes of child deaths, the public role in preventing child deaths, and specific steps the public can undertake to prevent child deaths.

(d-1)  The committee shall enlist the support and assistance of civic, philanthropic, and public service organizations in the performance of the duties imposed under Subsection (d) [this subsection].

(e)  In addition to the duties under Subsection (d), the [The Texas] Department of State Health Services shall:

(1)  collect data under this subchapter and coordinate the collection of data under this subchapter with other data collection activities; and

(2)  perform annual statistical studies of the incidence and causes of child fatalities using the data collected under this subchapter.

(f)  The committee shall issue a report for each preventable child death. The report must include [annual reports on the committee's activities, including] findings related to the child's death, [and] recommendations on how to prevent similar deaths, and details surrounding the department's involvement with the child prior to the child's death [relating to each purpose and duty of the committee described by this section]. Not later than December 1 of each [even-numbered] year, the committee shall publish a compilation of the reports published under this subsection during the year, [the report and] submit a copy of the compilation [report] to the governor, lieutenant governor, [and] speaker of the house of representatives, and department, and make the compilation available to the public. Not later than June 1 of each year, the department shall submit a written response on the compilation from the previous year to the committee, governor, lieutenant governor, and speaker of the house of representatives describing which of the committee's recommendations regarding the operation of the child protective services system the department will implement and the methods of implementation.

(g)  The committee shall perform the functions and duties required of a citizen review panel under 42 U.S.C. Section 5106a(c)(4)(A).

SECTION 1.58.  Subsection (c), Section 264.504, Family Code, is amended to read as follows:

(c)  Information identifying a deceased child, a member of the child's family, a guardian or caretaker of the child, or an alleged or suspected perpetrator of abuse or neglect of the child may not be disclosed during a public meeting. On a majority vote of the committee members, the members shall remove from the committee any member who discloses information described by this subsection in a public meeting.

SECTION 1.59.  Subsection (c), Section 264.505, Family Code, is amended to read as follows:

(c)  A review team may include:

(1)  a criminal prosecutor involved in prosecuting crimes against children;

(2)  a sheriff;

(3)  a justice of the peace or medical examiner;

(4)  a police chief;

(5)  a pediatrician experienced in diagnosing and treating child abuse and neglect;

(6)  a child educator;

(7)  a child mental health provider;

(8)  a public health professional;

(9)  a child protective services specialist;

    (10) a sudden infant death syndrome family service provider;

    (11) a neonatologist;

    (12) a child advocate; [and]

    (13) a chief juvenile probation officer; and

    (14) a child abuse prevention specialist.

SECTION 1.60. Subsection (b), Section 264.509, Family Code, is amended to read as follows:

(b) On request of the presiding officer of a review team, the custodian of the relevant information and records relating to a deceased child shall provide those records to the review team at no cost to the review team.

SECTION 1.61. Section 264.602, Family Code, is amended by adding Subsection (e) to read as follows:

(e) The department, in cooperation with the statewide organization with which the attorney general contracts under Section 264.603 and other interested agencies, shall support the expansion of court-appointed volunteer advocate programs into counties in which there is a need for the programs. In expanding into a county, a program shall work to ensure the independence of the program, to the extent possible, by establishing community support and accessing private funding from the community for the program.

SECTION 1.62. (a) Chapter 264, Family Code, is amended by adding Subchapter I to read as follows:

SUBCHAPTER I. RELATIVE AND OTHER DESIGNATED
CAREGIVER PLACEMENT PROGRAM

Sec. 264.751. DEFINITIONS. In this subchapter:

    (1) "Designated caregiver" means an individual who has a longstanding and significant relationship with a child for whom the department has been appointed managing conservator and who:

        (A) is appointed to provide substitute care for the child, but is not licensed or certified to operate a foster home, foster group home, agency foster home, or agency foster group home under Chapter 42, Human Resources Code; or

        (B) is subsequently appointed permanent managing conservator of the child after providing the care described by Paragraph (A).

    (2) "Relative" means a person related to a child by consanguinity as determined under Section 573.022, Government Code.

    (3) "Relative caregiver" means a relative who:

        (A) provides substitute care for a child for whom the department has been appointed managing conservator, but who is not licensed or certified to operate a foster home, foster group home, agency foster home, or agency foster group home under Chapter 42, Human Resources Code; or

        (B) is subsequently appointed permanent managing conservator of the child after providing the care described by Paragraph (A).

Sec. 264.752. RELATIVE AND OTHER DESIGNATED CAREGIVER PLACEMENT PROGRAM. (a) The department shall develop and procure a program to:

(1)  promote continuity and stability for children for whom the department is appointed managing conservator by placing those children with relative or other designated caregivers; and

(2)  facilitate relative or other designated caregiver placements by providing assistance and services to those caregivers in accordance with this subchapter and rules adopted by the executive commissioner.

(b)  To the extent permitted by federal law, the department shall use federal funds available under Title IV-E, Social Security Act (42 U.S.C. Section 670 et seq.), to administer the program under this subchapter.

(c)  The executive commissioner shall adopt rules necessary to implement this subchapter.  The rules must include eligibility criteria for receiving assistance and services under this subchapter.

Sec. 264.753.  EXPEDITED PLACEMENT. The department or other authorized entity shall expedite the completion of the background and criminal history check, the home study, and any other administrative procedure to ensure that the child is placed with a qualified relative or caregiver as soon as possible after the date the caregiver is identified.

Sec. 264.754.  INVESTIGATION OF PROPOSED PLACEMENT. Before placing a child with a proposed relative or other designated caregiver, the department must conduct an investigation to determine whether the proposed placement is in the child's best interest.

Sec. 264.755.  CAREGIVER ASSISTANCE AGREEMENT.  (a) The department shall, subject to the availability of funds, enter into a caregiver assistance agreement with each relative or other designated caregiver to provide monetary assistance and additional support services to the caregiver.  The monetary assistance and support services shall be based on a family's need, as determined by rules adopted by the executive commissioner.

(b)  Monetary assistance provided under this section must include a one-time cash payment of not more than $1,000 to the caregiver on the initial placement of a child or a sibling group.  The cash payment must be provided on the initial placement of each child with the caregiver and is provided to assist the caregiver in purchasing essential child-care items such as furniture and clothing.

(c)  Monetary assistance and additional support services provided under this section may include:

(1)  case management services and training and information about the child's needs until the caregiver is appointed permanent managing conservator;

(2)  referrals to appropriate state agencies administering public benefits or assistance programs for which the child, the caregiver, or the caregiver's family may qualify;

(3)  family counseling not provided under the Medicaid program for the caregiver's family for a period not to exceed two years from the date of initial placement;

     (4) if the caregiver meets the eligibility criteria determined by rules adopted by the executive commissioner, reimbursement of all child-care expenses incurred while the child is under 13 years of age, or under 18 years of age if the child has a developmental disability, and while the department is the child's managing conservator;

     (5) if the caregiver meets the eligibility criteria determined by rules adopted by the executive commissioner, reimbursement of 50 percent of child-care expenses incurred after the caregiver is appointed permanent managing conservator of the child while the child is under 13 years of age, or under 18 years of age if the child has a developmental disability; and

     (6) reimbursement of other expenses, as determined by rules adopted by the executive commissioner, not to exceed $500 per year for each child.

    Sec. 264.756. ASSISTANCE WITH PERMANENT PLACEMENT. The department shall collaborate with the State Bar of Texas and local community partners to identify legal resources to assist relatives and other designated caregivers in obtaining conservatorship, adoption, or other permanent legal status for the child.

    Sec. 264.757. COORDINATION WITH OTHER AGENCIES. The department shall coordinate with other health and human services agencies, as defined by Section 531.001, Government Code, to provide assistance and services under this subchapter.

    Sec. 264.758. FUNDS. The department and other state agencies shall actively seek and use federal funds available for the purposes of this subchapter.

    (b) Not later than December 1, 2005, the executive commissioner of the Health and Human Services Commission shall adopt rules for implementing and administering the relative and other designated caregiver placement program under Subchapter I, Chapter 264, Family Code, as added by this section.

    (c) Not later than March 1, 2006, the Department of Family and Protective Services shall implement the relative and other designated caregiver placement program in accordance with Subchapter I, Chapter 264, Family Code, as added by this section.

    (d) As soon as possible after the effective date of this Act, the Department of Family and Protective Services shall take all necessary actions to apply for a federal waiver under Title IV-E, Social Security Act (42 U.S.C. Section 670 et seq.), to use federal funds available under that title to implement the relative and other designated caregiver placement program under Subchapter I, Chapter 264, Family Code, as added by this section.

    SECTION 1.63. Chapter 264, Family Code, is amended by adding Subchapter J to read as follows:

SUBCHAPTER J. FAMILY DRUG COURT PROGRAM

    Sec. 264.801. FAMILY DRUG COURT PROGRAM DEFINED. In this subchapter, "family drug court program" means a program that has the following essential characteristics:

     (1) the integration of substance abuse treatment services in the processing of civil cases in the child welfare system with the goal of family reunification;

(2) the use of a comprehensive case management approach involving department caseworkers, court-appointed case managers, and court-appointed special advocates to rehabilitate a parent who has had a child removed from the parent's care by the department because of suspected child abuse or neglect and who is suspected of substance abuse;

(3) early identification and prompt placement of eligible parents who volunteer to participate in the program;

(4) comprehensive substance abuse needs assessment and referral to an appropriate substance abuse treatment agency;

(5) a progressive treatment approach with specific requirements that a parent must meet to advance to the next phase of the program;

(6) monitoring of abstinence through periodic alcohol or other drug testing;

(7) ongoing judicial interaction with program participants;

(8) monitoring and evaluation of program goals and effectiveness;

(9) continuing interdisciplinary education to promote effective program planning, implementation, and operations; and

(10) development of partnerships with public agencies and community organizations.

Sec. 264.802. AUTHORITY TO ESTABLISH PROGRAM. The commissioners court of a county may establish a family drug court program for persons who:

(1) have had a child removed from their care by the department; and

(2) are suspected by the department or a court of having a substance abuse problem.

Sec. 264.803. OVERSIGHT. (a) The lieutenant governor and the speaker of the house of representatives may assign to appropriate legislative committees duties relating to the oversight of family drug court programs established under this subchapter.

(b) A legislative committee or the governor may request the state auditor to perform a management, operations, or financial or accounting audit of a family drug court program established under this subchapter.

Sec. 264.804. PARTICIPANT PAYMENT FOR TREATMENT AND SERVICES. A family drug court program may require a participant to pay the cost of all treatment and services received while participating in the program, based on the participant's ability to pay.

Sec. 264.805. FUNDING. A county creating a family drug court under this chapter shall explore the possibility of using court improvement project funds to finance the family drug court in the county. The county shall also explore the availability of federal and state matching funds to finance the court.

SECTION 1.64. Chapter 265, Family Code, is amended by adding Section 265.004 to read as follows:

Sec. 265.004. USE OF EVIDENCE-BASED PROGRAMS FOR AT-RISK FAMILIES. (a) To the extent that money is appropriated for the purpose, the department shall fund evidence-based programs offered by community-based organizations that are designed to prevent or ameliorate child abuse and neglect.

(b) The department shall place priority on programs that target children whose race or ethnicity is disproportionately represented in the child protective services system.

(c) The department shall periodically evaluate the evidence-based abuse and neglect prevention programs to determine the continued effectiveness of the programs.

SECTION 1.65. (a) Subtitle E, Title 5, Family Code, is amended by adding Chapter 266 to read as follows:

CHAPTER 266. MEDICAL CARE AND EDUCATIONAL SERVICES
FOR CHILDREN IN FOSTER CARE
SUBCHAPTER A. GENERAL PROVISIONS

Sec. 266.001. DEFINITIONS. In this chapter:

(1) "Commission" means the Health and Human Services Commission.

(2) "Department" means the Department of Family and Protective Services.

(3) "Executive commissioner" means the executive commissioner of the Health and Human Services Commission.

(4) "Foster child" means a child who is in the managing conservatorship of the department.

(5) "Medical care" means all health care and related services provided under the medical assistance program under Chapter 32, Human Resources Code, and described by Section 32.003(4), Human Resources Code.

Sec. 266.002. CONSTRUCTION WITH OTHER LAW. This chapter does not limit the right to consent to medical, dental, psychological, and surgical treatment under Chapter 32.

Sec. 266.003. MEDICAL SERVICES FOR CHILD ABUSE AND NEGLECT VICTIMS. (a) The commission shall collaborate with health care and child welfare professionals to design a comprehensive, cost-effective medical services delivery model, either directly or by contract, to meet the needs of children served by the department. The medical services delivery model must include:

(1) the designation of health care facilities with expertise in the forensic assessment, diagnosis, and treatment of child abuse and neglect as pediatric centers of excellence;

(2) a statewide telemedicine system to link department investigators and caseworkers with pediatric centers of excellence or other medical experts for consultation;

(3) identification of a medical home for each foster child on entering foster care at which the child will receive an initial comprehensive assessment as well as preventive treatments, acute medical services, and therapeutic and rehabilitative care to meet the child's ongoing physical and mental health needs throughout the duration of the child's stay in foster care;

(4) the development and implementation of health passports as described in Section 266.006;

(5) establishment and use of a management information system that allows monitoring of medical care that is provided to all children in foster care;

(6) the use of medical advisory committees and medical review teams, as appropriate, to establish treatment guidelines and criteria by which individual cases of medical care provided to children in foster care will be identified for further, in-depth review;

(7) development of the training program described by Section 266.004(h);

(8) provision for the summary of medical care described by Section 266.007; and

(9) provision for the participation of the person authorized to consent to medical care for a child in foster care in each appointment of the child with the provider of medical care.

(b) The commission shall collaborate with health and human services agencies, community partners, the health care community, and federal health and social services programs to maximize services and benefits available under this section.

(c) The executive commissioner shall adopt rules necessary to implement this chapter.

Sec. 266.004. CONSENT FOR MEDICAL CARE. (a) Medical care may not be provided to a child in foster care unless the person authorized by this section has provided consent.

(b) Except as provided by Section 266.010, the court may authorize the following persons to consent to medical care for a foster child:

(1) an individual designated by name in an order of the court, including the child's foster parent or the child's parent, if the parent's rights have not been terminated and the court determines that it is in the best interest of the parent's child to allow the parent to make medical decisions on behalf of the child; or

(2) the department or an agent of the department.

(c) If the person authorized by the court to consent to medical care is the department or an agent of the department, the department shall, not later than the fifth business day after the date the court provides authorization, file with the court and each party the name of the individual who will exercise the duty and responsibility of providing informed consent on behalf of the department. If that individual changes, the department shall file notice of the change with the court and each party not later than the fifth business day after the date of the change.

(d) A physician or other provider of medical care acting in good faith may rely on the representation by a person that the person has the authority to consent to the provision of medical care to a foster child as provided by Subsection (b).

(e) The department, a person authorized to consent to medical care under Subsection (b), the child's parent if the parent's rights have not been terminated, a guardian ad litem or attorney ad litem if one has been appointed, or the person providing foster care to the child may petition the court for any order related to medical care for a foster child that the department or other person believes is in the best interest of the child. Notice of the petition must be given to each person entitled to notice under Section 263.301(b).

(f) If a physician who has examined or treated the foster child has concerns regarding the medical care provided to the foster child, the physician may file a letter with the court stating the reasons for the physician's concerns. The court shall provide a copy of the letter to each person entitled to notice under Section 263.301(b).

(g)  On its own motion or in response to a petition under Subsection (e) or Section 266.010, the court may issue any order related to the medical care of a foster child that the court determines is in the best interest of the child.

(h)  Notwithstanding Subsection (b), a person may not be authorized to consent to medical care provided to a foster child unless the person has completed a department-approved training program related to informed consent and the provision of all areas of medical care as defined by Section 266.001. This subsection does not apply to a parent whose rights have not been terminated unless the court orders the parent to complete the training.

(i)  The person authorized under Subsection (b) to consent to medical care of a foster child shall participate in each appointment of the child with the provider of the medical care.

(j)  Nothing in this section requires the identity of a foster parent to be publicly disclosed.

Sec. 266.005.  PARENTAL NOTIFICATION OF SIGNIFICANT MEDICAL CONDITIONS. (a)  In this section, "significant medical condition" means an injury or illness that is life-threatening or has potentially serious long-term health consequences, including hospitalization for surgery or other procedures, except minor emergency care.

(b)  Except as provided by Subsection (c), the department shall make reasonable efforts to notify the child's parents within 24 hours of a significant medical condition involving a foster child.

(c)  The department is not required to provide notice under Subsection (b) to a parent who:

(1)  has failed to give the department current contact information and cannot be located;

(2)  has executed an affidavit of relinquishment of parental rights;

(3)  has had the parent's parental rights terminated; or

(4)  has had access to medical information otherwise restricted by the court.

Sec. 266.006.  HEALTH PASSPORT.  (a)  The commission, in conjunction with the department, and with the assistance of physicians and other health care providers experienced in the care of foster children and children with disabilities and with the use of electronic health records, shall develop and provide a health passport for each foster child.  The passport must be maintained in an electronic format and use the commission's and the department's existing computer resources to the greatest extent possible.

(b)  The executive commissioner shall adopt rules specifying the information required to be included in the passport.  The required information may include:

(1)  the name and address of each of the child's physicians and health care providers;

(2)  a record of each visit to a physician or other health care provider, including routine checkups conducted in accordance with the Texas Health Steps program;

(3)  an immunization record that may be exchanged with ImmTrac;

(4)  a list of the child's known health problems and allergies;

(5)  information on all medications prescribed to the child in adequate detail to permit refill of prescriptions, including the disease or condition that the medication treats; and

(6)  any other available health history that physicians and other health care providers who provide care for the child determine is important.

(c)  The system used to access the health passport must be secure and maintain the confidentiality of the child's health records.

(d)  Health passport information shall be part of the department's record for the child as long as the child remains in foster care.

(e)  The commission shall provide training or instructional materials to foster parents, physicians, and other health care providers regarding use of the health passport.

(f)  The department shall make health passport information available in printed and electronic formats to the following individuals when a child is discharged from foster care:

(1)  the child's legal guardian, managing conservator, or parent; or

(2)  the child, if the child is at least 18 years of age or has had the disabilities of minority removed.

Sec. 266.007.  JUDICIAL REVIEW OF MEDICAL CARE. (a)  At each hearing under Chapter 263, or more frequently if ordered by the court, the court shall review a summary of the medical care provided to the foster child since the last hearing. The summary must include information regarding:

(1)  the nature of any emergency medical care provided to the child and the circumstances necessitating emergency medical care, including any injury or acute illness suffered by the child;

(2)  all medical and mental health treatment that the child is receiving and the child's progress with the treatment;

(3)  any medication prescribed for the child and the condition, diagnosis, and symptoms for which the medication was prescribed and the child's progress with the medication;

(4)  the degree to which the child or foster care provider has complied or failed to comply with any plan of medical treatment for the child;

(5)  any adverse reaction to or side effects of any medical treatment provided to the child;

(6)  any specific medical condition of the child that has been diagnosed or for which tests are being conducted to make a diagnosis;

(7)  any activity that the child should avoid or should engage in that might affect the effectiveness of the treatment, including physical activities, other medications, and diet; and

(8)  other information required by department rule or by the court.

(b)  At or before each hearing under Chapter 263, the department shall provide the summary of medical care described by Subsection (a) to:

(1)  the court;

(2)  the person authorized to consent to medical treatment for the child;

(3)  the guardian ad litem or attorney ad litem, if one has been appointed by the court;

(4) the child's parent, if the parent's rights have not been terminated; and

(5) any other person determined by the department or the court to be necessary or appropriate for review of the provision of medical care to foster children.

(c) At each hearing under Chapter 263, the foster child shall be provided the opportunity to express to the court the child's views on the medical care being provided to the child.

Sec. 266.008. EDUCATION PASSPORT. (a) The commission shall develop an education passport for each foster child. The commission, in conjunction with the department, shall determine the format of the passport. The passport may be maintained in an electronic format. The passport must contain educational records of the child, including the names and addresses of educational providers, the child's grade-level performance, and any other educational information the commission determines is important.

(b) The department shall maintain the passport as part of the department's records for the child as long as the child remains in foster care.

(c) The department shall make the passport available to the person authorized to consent to medical care for the foster child and to a provider of medical care to the foster child if access to the foster child's educational information is necessary to the provision of medical care and is not prohibited by law.

(d) The department and the commission shall collaborate with the Texas Education Agency to develop policies and procedures to ensure that the needs of foster children are met in every school district.

Sec. 266.009. PROVISION OF MEDICAL CARE IN EMERGENCY. (a) Consent or court authorization for the medical care of a foster child otherwise required by this chapter is not required in an emergency during which it is immediately necessary to provide medical care to the foster child to prevent the imminent probability of death or substantial bodily harm to the child or others, including circumstances in which:

(1) the child is overtly or continually threatening or attempting to commit suicide or cause serious bodily harm to the child or others; or

(2) the child is exhibiting the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the child's health in serious jeopardy, serious impairment of bodily functions, or serious dysfunction of any bodily organ or part.

(b) The physician providing the medical care or designee shall notify the person authorized to consent to medical care for a foster child about the decision to provide medical care without consent or court authorization in an emergency not later than the second business day after the date of the provision of medical care under this section. This notification must be documented in the foster child's health passport.

(c) This section does not apply to the administration of medication under Subchapter G, Chapter 574, Health and Safety Code, to a foster child who is at least 16 years of age and who is placed in an inpatient mental health facility.

Sec. 266.010. CONSENT TO MEDICAL CARE BY FOSTER CHILD AT LEAST 16 YEARS OF AGE. (a) A foster child who is at least 16 years of age may consent to the provision of medical care, except as provided by Chapter 33, if the

court with continuing jurisdiction determines that the child has the capacity to consent to medical care. If the child provides consent by signing a consent form, the form must be written in language the child can understand.

(b)  A court with continuing jurisdiction may make the determination regarding the foster child's capacity to consent to medical care during a hearing under Chapter 263 or may hold a hearing to make the determination on its own motion. The court may issue an order authorizing the child to consent to all or some of the medical care as defined by Section 266.001.  In addition, a foster child who is at least 16 years of age, or the foster child's attorney ad litem, may file a petition with the court for a hearing. If the court determines that the foster child lacks the capacity to consent to medical care, the court may consider whether the foster child has acquired the capacity to consent to medical care at subsequent hearings under Section 263.503.

(c)  If the court determines that a foster child lacks the capacity to consent to medical care, the person authorized by the court under Section 266.004 shall continue to provide consent for the medical care of the foster child.

(d)  If a foster child who is at least 16 years of age and who has been determined to have the capacity to consent to medical care refuses to consent to medical care and the department or private agency providing substitute care or case management services to the child believes that the medical care is appropriate, the department or the private agency may file a motion with the court requesting an order authorizing the provision of the medical care.

(e)  The motion under Subsection (d) must include:

(1)  the child's stated reasons for refusing the medical care; and

(2)  a statement prepared and signed by the treating physician that the medical care is the proper course of treatment for the foster child.

(f)  If a motion is filed under Subsection (d), the court shall appoint an attorney ad litem for the foster child if one has not already been appointed. The foster child's attorney ad litem shall:

(1)  discuss the situation with the child;

(2)  discuss the suitability of the medical care with the treating physician;

(3)  review the child's medical and mental health records; and

(4)  advocate to the court on behalf of the child's expressed preferences regarding the medical care.

(g)  The court shall issue an order authorizing the provision of the medical care in accordance with a motion under Subsection (d) to the foster child only if the court finds, by clear and convincing evidence, after the hearing that the medical care is in the best interest of the foster child and:

(1)  the foster child lacks the capacity to make a decision regarding the medical care;

(2)  the failure to provide the medical care will result in an observable and material impairment to the growth, development, or functioning of the foster child; or

(3)  the foster child is at risk of suffering substantial bodily harm or of inflicting substantial bodily harm to others.

(h)  In making a decision under this section regarding whether a foster child has the capacity to consent to medical care, the court shall consider:

(1)  the maturity of the child;

        (2) whether the child is sufficiently well informed to make a decision regarding the medical care; and

        (3) the child's intellectual functioning.

    (i) In determining whether the medical care is in the best interest of the foster child, the court shall consider:

        (1) the foster child's expressed preference regarding the medical care, including perceived risks and benefits of the medical care;

        (2) likely consequences to the foster child if the child does not receive the medical care;

        (3) the foster child's prognosis, if the child does receive the medical care; and

        (4) whether there are alternative, less intrusive treatments that are likely to reach the same result as provision of the medical care.

    (j) This section does not apply to emergency medical care. An emergency relating to a foster child who is at least 16 years of age, other than a child in an inpatient mental health facility, is governed by Section 266.009.

    (k) This section does not apply to the administration of medication under Subchapter G, Chapter 574, Health and Safety Code, to a foster child who is at least 16 years of age and who is placed in an inpatient mental health facility.

    (l) Before a foster child reaches the age of 16, the department or the private agency providing substitute care or case management services to the foster child shall advise the foster child of the right to a hearing under this section to determine whether the foster child may consent to medical care. The department or the private agency providing substitute care or case management services shall provide the foster child with training on informed consent and the provision of medical care as part of the Preparation for Adult Living Program.

    Sec. 266.011. STUDY OF INCENTIVES TO PRESCRIBE PSYCHOTROPIC DRUGS. (a) The department shall study the level of care system the department uses to determine a child's foster care needs to ascertain whether the system creates incentives for prescribing psychotropic medications to children in foster care.

    (b) No later than October 1, 2006, the department shall report the results of the study to the legislature. The report must include the department's proposed changes to the level of care system.

    (c) This section expires January 1, 2007.

    (b) Not later than September 1, 2007, the Department of Family and Protective Services shall implement the health passport required by Section 266.006, Family Code, as added by this section.

    (c) The Health and Human Services Commission is required to develop and implement the education passport program required by Section 266.008, Family Code, as added by this section, if the legislature appropriates money specifically for that purpose. If the legislature does not appropriate money specifically for that purpose, the commission may, but is not required to, develop and implement the education passport program using other appropriations available for that purpose. In addition, the commission may develop and implement the education passport program required by Section 266.008, Family Code, as added by this section, only if technology necessary to ensure privacy is available.

(d) If the Health and Human Services Commission develops and implements the education passport program required by Section 266.008, Family Code, as added by this section, the commission shall finalize the form and content of the passport not later than March 1, 2006.

SECTION 1.66. Section 51.961, Government Code, is amended to read as follows:

Sec. 51.961. FAMILY PROTECTION FEE. (a) The commissioners court of a county shall [may] adopt a family protection fee in an amount not to exceed $30 [$15].

(b) Except as provided by Subsection (c), the district clerk or county clerk shall collect the family protection fee at the time a suit for dissolution of a marriage under Chapter 6, Family Code, is filed. The fee is in addition to any other fee collected by the district clerk or county clerk.

(c) The clerk may not collect a fee under this section from a person who is protected by an order issued under:

(1) Subtitle B, Title 4, Family Code; or

(2) Article 17.292, Code of Criminal Procedure.

(d) The clerk shall pay one-half of the [a] fee collected under this section to the appropriate officer of the county in which the suit is filed for deposit in the county treasury to the credit of the family protection account. The account may be used by the commissioners court of the county only to fund a service provider located in that county or an adjacent county. The commissioners court may provide funding to a nonprofit organization that provides services described by Subsection (e).

(e) A service provider who receives funds under Subsection (d) may provide family violence and child abuse prevention, intervention, family strengthening, mental health, counseling, legal, and marriage preservation services to families that are at risk of experiencing or that have experienced family violence or the abuse or neglect of a child.

(f) In this section, "family violence" has the meaning assigned by Section 71.004, Family Code.

(g) The clerk shall pay one-half of the fee collected under this section to the comptroller, who shall deposit the money to the credit of the child abuse and neglect prevention trust fund account established under Section 40.105, Human Resources Code.

SECTION 1.67. Section 101.061, Government Code, is amended to read as follows:

Sec. 101.061. DISTRICT COURT FEES AND COSTS. The clerk of a district court shall collect fees and costs as follows:

(1) filing fee in action with respect to a fraudulent court record or fraudulent lien or claim filed against property (Sec. 12.005, Civil Practice and Remedies Code) . . . $15;

(2) fee for service of notice of action with respect to a fraudulent court record or fraudulent lien or claim filed against property (Sec. 12.005, Civil Practice and Remedies Code) . . . not to exceed $20, if notice delivered in person, or the cost of postage, if service is by registered or certified mail;

(3) court cost in certain civil cases to establish and maintain an alternative dispute resolution system, if authorized by the county commissioners court (Sec. 152.004, Civil Practice and Remedies Code) . . . not to exceed $10;

(4) appellate judicial system filing fees for:

(A) First or Fourteenth Court of Appeals District (Sec. 22.2021, Government Code) . . . not more than $5;

(B) Second Court of Appeals District (Sec. 22.2031, Government Code) . . . not more than $5;

(C) Fourth Court of Appeals District (Sec. 22.2051, Government Code) . . . not more than $5;

(D) Fifth Court of Appeals District (Sec. 22.2061, Government Code) . . . not more than $5; and

(E) Thirteenth Court of Appeals District (Sec. 22.2141, Government Code) . . . not more than $5;

(5) additional filing fees:

(A) for each suit filed for insurance contingency fund, if authorized by the county commissioners court (Sec. 51.302, Government Code) . . . not to exceed $5;

(B) for each civil suit filed, for court-related purposes for the support of the judiciary and for civil legal services to an indigent:

(i) for family law cases and proceedings as defined by Section 25.0002, Government Code (Sec. 133.151, Local Government Code) . . . $45; or

(ii) for any case other than a case described by Subparagraph (i) (Sec. 133.151, Local Government Code) . . . $50;

(C) to fund the improvement of Dallas County civil court facilities, if authorized by the county commissioners court (Sec. 51.705, Government Code) . . . not more than $15; and

(D) on the filing of any civil action or proceeding requiring a filing fee, including an appeal, and on the filing of any counterclaim, cross-action, intervention, interpleader, or third-party action requiring a filing fee, to fund civil legal services for the indigent:

(i) for family law cases and proceedings as defined by Section 25.0002, Government Code (Sec. 133.152, Local Government Code) . . . $5; or

(ii) for any case other than a case described by Subparagraph (i) (Sec. 133.152, Local Government Code) . . . $10;

(6) for filing a suit, including an appeal from an inferior court:

(A) for a suit with 10 or fewer plaintiffs (Sec. 51.317, Government Code) . . . $50;

(B) for a suit with at least 11 but not more than 25 plaintiffs (Sec. 51.317, Government Code) . . . $75;

(C) for a suit with at least 26 but not more than 100 plaintiffs (Sec. 51.317, Government Code) . . . $100;

(D) for a suit with at least 101 but not more than 500 plaintiffs (Sec. 51.317, Government Code) . . . $125;

(E) for a suit with at least 501 but not more than 1,000 plaintiffs (Sec. 51.317, Government Code) . . . $150; or

(F)  for a suit with more than 1,000 plaintiffs (Sec. 51.317, Government Code) . . . $200;

(7)  for filing a cross-action, counterclaim, intervention, contempt action, motion for new trial, or third-party petition (Sec. 51.317, Government Code) . . . $15;

(8)  for issuing a citation or other writ or process not otherwise provided for, including one copy, when requested at the time a suit or action is filed (Sec. 51.317, Government Code) . . . $8;

(9)  for records management and preservation (Sec. 51.317, Government Code) . . . $10;

(10)  for issuing a subpoena, including one copy (Sec. 51.318, Government Code) . . . $8;

(11)  for issuing a citation, commission for deposition, writ of execution, order of sale, writ of execution and order of sale, writ of injunction, writ of garnishment, writ of attachment, or writ of sequestration not provided for in Section 51.317, or any other writ or process not otherwise provided for, including one copy if required by law (Sec. 51.318, Government Code) . . . $8;

(12)  for searching files or records to locate a cause when the docket number is not provided (Sec. 51.318, Government Code) . . . $5;

(13)  for searching files or records to ascertain the existence of an instrument or record in the district clerk's office (Sec. 51.318, Government Code) . . . $5;

(14)  for abstracting a judgment (Sec. 51.318, Government Code) . . . $8;

(15)  for approving a bond (Sec. 51.318, Government Code) . . . $4;

(16)  for a certified copy of a record, judgment, order, pleading, or paper on file or of record in the district clerk's office, including certificate and seal, for each page or part of a page (Sec. 51.318, Government Code) . . . $1;

(17)  for a noncertified copy, for each page or part of a page (Sec. 51.318, Government Code) . . . not to exceed $1;

(18)  jury fee (Sec. 51.604, Government Code) . . . $30;

(19)  for filing a report of divorce or annulment (Sec. 194.002, Health and Safety Code) . . . $1;

(20)  for filing a suit in Comal County (Sec. 152.0522, Human Resources Code) . . . $4;

(21)  additional filing fee for family protection on filing a suit for dissolution of a marriage under Chapter 6, Family Code, if authorized by the county commissioners court (Sec. 51.961, Government Code) . . . not to exceed $30 [$15];

(22)  fee on filing a suit for dissolution of a marriage for services of child support department in Harris County, if authorized by the county commissioners court (Sec. 152.1074, Human Resources Code) . . . not to exceed $12;

(23)  fee on filing a suit requesting an adoption in Montague County (Sec. 152.1752, Human Resources Code) . . . $25;

(24)  court cost on citation for contempt of court for failure to comply with child support order in Nueces County, if authorized by the commissioners court (Sec. 152.1844, Human Resources Code) . . . not to exceed $10;

(25)  fee on filing a suit for divorce in Orange County (Sec. 152.1873, Human Resources Code) . . . not less than $5;

(26) court costs on citation for contempt of court in Orange County for failure to comply with a child support order or order providing for possession of or access to a child (Sec. 152.1873, Human Resources Code) . . . amount determined by district clerk;

(27) fee on filing a suit requesting an adoption in Orange County (Sec. 152.1874, Human Resources Code) . . . not less than $25;

(28) fee on filing a suit requesting an adoption in Wichita County (Sec. 152.2496, Human Resources Code) . . . $100;

(29) additional filing fee to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . not to exceed $5;

(30) additional filing fee for filing documents not subject to certain filing fees to fund the courthouse security fund, if authorized by the county commissioners court (Sec. 291.008, Local Government Code) . . . $1;

(31) additional filing fee to fund the courthouse security fund in Webb County, if authorized by the county commissioners court (Sec. 291.009, Local Government Code) . . . not to exceed $20;

(32) court cost in civil cases other than suits for delinquent taxes to fund the county law library fund, if authorized by the county commissioners court (Sec. 323.023, Local Government Code) . . . not to exceed $35;

(33) when administering a case for the Rockwall County Court at Law (Sec. 25.2012, Government Code) . . . civil fees and court costs as if the case had been filed in district court;

(34) at a hearing held by an associate judge in Dallas County, a court cost to preserve the record, in the absence of a court reporter, by other means (Sec. 54.509, Government Code) . . . as assessed by the referring court or associate judge; and

(35) at a hearing held by an associate judge in Duval County, a court cost to preserve the record (Sec. 54.1151, Government Code, as added by Chapter 1150, Acts of the 78th Legislature, Regular Session, 2003) . . . as imposed by the referring court or associate judge.

SECTION 1.68. Section 102.021, Government Code, is amended to read as follows:

Sec. 102.021. COURT COSTS ON CONVICTION. A person convicted of an offense shall pay, in addition to all other costs:

(1) court costs on conviction of a felony (Sec. 133.102, Local Government Code) . . . $133;

(2) court costs on conviction of a Class A or Class B misdemeanor (Sec. 133.102, Local Government Code) . . . $83;

(3) court costs on conviction of a nonjailable misdemeanor offense, including a criminal violation of a municipal ordinance, other than a conviction of an offense relating to a pedestrian or the parking of a motor vehicle (Sec. 133.102, Local Government Code) . . . $40;

(4) court costs on certain convictions in statutory county courts (Sec. 51.702, Government Code) . . . $15;

(5) court costs on certain convictions in certain county courts (Sec. 51.703, Government Code) . . . $15;

(6) a time payment fee if convicted of a felony or misdemeanor for paying any part of a fine, court costs, or restitution on or after the 31st day after the date on which a judgment is entered assessing the fine, court costs, or restitution (Sec. 133.103, Local Government Code) . . . $25;

(7) a fee for services of prosecutor (Art. 102.008, Code of Criminal Procedure) . . . $25;

(8) fees for services of peace officer:

(A) issuing a written notice to appear in court for certain violations (Art. 102.011, Code of Criminal Procedure) . . . $5;

(B) executing or processing an issued arrest warrant or capias (Art. 102.011, Code of Criminal Procedure) . . . $50;

(C) summoning a witness (Art. 102.011, Code of Criminal Procedure) . . . $5;

(D) serving a writ not otherwise listed (Art. 102.011, Code of Criminal Procedure) . . . $35;

(E) taking and approving a bond and, if necessary, returning the bond to courthouse (Art. 102.011, Code of Criminal Procedure) . . . $10;

(F) commitment or release (Art. 102.011, Code of Criminal Procedure) . . . $5;

(G) summoning a jury (Art. 102.011, Code of Criminal Procedure) . . . $5;

(H) attendance of a prisoner in habeas corpus case if prisoner has been remanded to custody or held to bail (Art. 102.011, Code of Criminal Procedure) . . . $8 each day;

(I) mileage for certain services performed (Art. 102.011, Code of Criminal Procedure) . . . $0.29 per mile; and

(J) services of a sheriff or constable who serves process and attends examining trial in certain cases (Art. 102.011, Code of Criminal Procedure) . . . not to exceed $5;

(9) services of a peace officer in conveying a witness outside the county (Art. 102.011, Code of Criminal Procedure) . . . $10 per day or part of a day, plus actual necessary travel expenses;

(10) overtime of peace officer for time spent testifying in the trial or traveling to or from testifying in the trial (Art. 102.011, Code of Criminal Procedure) . . . actual cost;

(11) court costs on an offense relating to rules of the road, when offense occurs within a school crossing zone (Art. 102.014, Code of Criminal Procedure) . . . $25;

(12) court costs on an offense of passing a school bus (Art. 102.014, Code of Criminal Procedure) . . . $25;

(13) court costs on an offense of truancy or contributing to truancy (Art. 102.014, Code of Criminal Procedure) . . . $20;

(14) cost for visual recording of intoxication arrest before conviction (Art. 102.018, Code of Criminal Procedure) . . . $15;

(15) cost of certain evaluations (Art. 102.018, Code of Criminal Procedure) . . . actual cost;

(16)  additional costs attendant to certain intoxication convictions under Chapter 49, Penal Code, for emergency medical services, trauma facilities, and trauma care systems (Art. 102.0185, Code of Criminal Procedure) . . . $100;

(16-a)  additional costs attendant to certain child sexual assault and related convictions, for child abuse prevention programs (Art. 102.0186, Code of Criminal Procedure) . . . $100;

(17)  cost for DNA testing for certain felonies (Art. 102.020, Code of Criminal Procedure) . . . $250;

(18)  court cost on an offense of public lewdness or indecent exposure (Art. 102.020, Code of Criminal Procedure) . . . $50;

(19)  court cost on conviction of a misdemeanor under Subtitle C, Title 7, Transportation Code (Sec. 542.403, Transportation Code) . . . $3;

(20)  cost for impoundment of vehicle (Sec. 601.263, Transportation Code) . . . $15 per day; and

(21)  a civil and criminal enforcement cost on conviction of an offense of, or related to, the nonpayment of a toll in certain counties (Sec. 284.2031, Transportation Code) . . . $1.

SECTION 1.69.  Subdivision (2), Subsection (a), Section 411.114, Government Code, is amended to read as follows:

(2)  The Department of Family and Protective [and Regulatory] Services shall obtain from the department criminal history record information maintained by the department that relates to a person who is:

(A)  an applicant for a license, registration, certification, or listing under Chapter 42, Human Resources Code, or Chapter 249, Health and Safety Code[, or a person who registers with or has been issued a certificate to operate under accreditation by the Department of Protective and Regulatory Services under Subchapter E, Chapter 42, Human Resources Code];

(B)  an owner, operator, or employee of or an applicant for employment by a child-care facility, child-placing agency, family home, or maternity home licensed, registered, certified, or listed under Chapter 42, Human Resources Code, or Chapter 249, Health and Safety Code[, or by a child-care facility or child-placing agency that is seeking to register with or has been issued a certificate to operate under accreditation by the Department of Protective and Regulatory Services under Subchapter E, Chapter 42, Human Resources Code];

(C)  a person 14 years of age or older who will be regularly or frequently working or staying in a child-care facility, family home, or maternity home while children are being provided care, other than a child in the care of the home or facility;

(D)  an applicant selected for a position with the Department of Family and Protective [and Regulatory] Services, the duties of which include direct delivery of protective services to children, elderly persons, or persons with a disability;

(E)  an employee of, an applicant for employment with, or a volunteer or an applicant volunteer with a business entity or person that contracts with the Department of Family and Protective [and Regulatory] Services to provide direct

delivery of protective services to children, elderly persons, or persons with a disability, if the person's duties or responsibilities include direct contact with children, elderly persons, or persons with a disability;

(F)  a registered volunteer with the Department of Family and Protective [and Regulatory] Services;

(G)  a person providing or applying to provide in-home, adoptive, or foster care for children in the care of the Department of Family and Protective [and Regulatory] Services and other persons living in the residence in which the child will reside;

(H)  a Department of Family and Protective [and Regulatory] Services employee who is engaged in the direct delivery of protective services to children, elderly persons, or persons with a disability;

(I)  a person who is the subject of a report the Department of Family and Protective [and Regulatory] Services receives alleging that the person has abused, neglected, or exploited a child, an elderly person, or a person with a disability, provided that:

(i)  the report alleges the person has engaged in conduct that meets the statutory definition of abuse, neglect, or exploitation under Chapter 261, Family Code, or Chapter 48, Human Resources Code; and

(ii)  the person who is the subject of the report is not also the victim of the alleged conduct;

(J)  a person providing child care for a child who is in the care of the Department of Family and Protective [and Regulatory] Services and who is or will be receiving adoptive, foster, or in-home care;

(K)  through a contract with a nonprofit management center, an employee of, an applicant for employment with, or a volunteer or an applicant volunteer with a nonprofit, tax-exempt organization that provides any service that involves the care of or access to children, elderly persons, or persons with a disability; or

(L)  an applicant for a child-care administrator or child-placing agency administrator license under Chapter 43 [seeking accreditation as provided by Section 43.003], Human Resources Code.

SECTION 1.70.  (a)  Subchapter B, Chapter 531, Government Code, is amended by adding Section 531.078 to read as follows:

Sec. 531.078.  POOLED FUNDING FOR FOSTER CARE PREVENTIVE SERVICES.  (a)  The commission and the Department of Family and Protective Services shall develop and implement a plan to combine, to the extent and in the manner allowed by Section 51, Article III, Texas Constitution, and other applicable law, funds of those agencies with funds of other appropriate state agencies and local governmental entities to provide services designed to prevent children from being placed in foster care. The preventive services may include:

(1)  child and family counseling;

(2)  instruction in parenting and homemaking skills;

(3)  parental support services;

(4)  temporary respite care; and

(5)  crisis services.

(b)  The plan must provide for:

(1)  state funding to be distributed to other state agencies, local governmental entities, or private entities only as specifically directed by the terms of a grant or contract to provide preventive services;

(2)  procedures to ensure that funds received by the commission by gift, grant, or interagency or interlocal contract from another state agency, a local governmental entity, the federal government, or any other public or private source for purposes of this section are disbursed in accordance with the terms under which the commission received the funds; and

(3)  a reporting mechanism to ensure appropriate use of funds.

(c)  For the purposes of this section, the commission may request and accept gifts and grants under the terms of a gift, grant, or contract from a local governmental entity, a private entity, or any other public or private source for use in providing services designed to prevent children from being placed in foster care.  If required by the terms of a gift, grant, or contract or by applicable law, the commission shall use the amounts received:

(1)  from a local governmental entity to provide the services in the geographic area of this state in which the entity is located; and

(2)  from the federal government or a private entity to provide the services statewide or in a particular geographic area of this state.

(b)  Not later than November 1, 2006, the Health and Human Services Commission shall provide to the governor and the Legislative Budget Board a report on the status and progress of the preventive services funding plan required by Section 531.078, Government Code, as added by this section.

SECTION 1.71.  Section 651.004, Government Code, is amended by adding Subsection (e) to read as follows:

(e)  The Department of Family and Protective Services is not required to comply with management-to-staff ratio requirements of this section with respect to caseworker supervisors, program directors, and program administrators.

SECTION 1.72.  (a)  Subchapter C, Chapter 2155, Government Code, is amended by adding Section 2155.1442 to read as follows:

Sec. 2155.1442.  FOSTER CARE RESIDENTIAL CONTRACT MANAGEMENT.  (a)  Subject to Subsection (e), the state auditor shall conduct a management review of the residential contract management employees of the Health and Human Services Commission and the Department of Family and Protective Services and make recommendations regarding the organization of, and skills and educational requirements for, those employees.  The state auditor shall also make recommendations regarding the implementation of financial accountability provisions and processes to ensure effective and efficient expenditure of state and other contract funds.  The state auditor shall report annually to the governor, the lieutenant governor, the speaker of the house of representatives, and the comptroller on the auditor's recommendations and the commission's and department's implementation of each recommendation.

(b)  The Health and Human Services Commission shall contract with the state auditor to perform on-site financial audits of selected residential contractors as necessary.  The state auditor, in consultation with the commission, shall select the

contractors to audit based on the contract's risk assessment rating, allegations of fraud or misuse of state or other contract funds, or other appropriate audit selection criteria. The residential contractors selected to be audited must be included in the audit plan and approved by the legislative audit committee under Section 321.013.

(c)  The Department of Family and Protective Services shall require that all files related to contracts for residential care of foster children:

(1)  be complete and accurately reflect the contractor's actual updated contract performance; and

(2)  be maintained in accordance with the department's record retention procedures and made available to the state auditor when requested.

(d)  Subject to the availability of funds appropriated for the purpose, the Department of Family and Protective Services may develop an Internet-based system to enable residential contractors to review their reimbursement accounts or other pertinent financial data and reconcile their accounts.

(e)  Work performed under Subsections (a) and (b) by the state auditor is subject to approval by the legislative audit committee for inclusion in the audit plan under Section 321.013(c).

(b)  Section 2155.1442, Government Code, as added by this section, applies only to a contract that is entered into or renewed on or after the effective date of this section.  A contract entered into or renewed before that date is governed by the law in effect on the date the contract is entered into or renewed, and the former law is continued in effect for that purpose.

(c)  Not later than December 1, 2005, the state auditor shall complete and publish the management review and report required by Subsection (a), Section 2155.1442, Government Code, as added by this section.  This subsection applies only if the auditor's work is approved by the legislative audit committee in time to meet this deadline.

(d)  Not later than October 1, 2011, the state auditor shall begin the on-site financial reviews of selected contractors required by Subsection (b), Section 2155.1442, Government Code, as added by this section.

SECTION 1.73.  The heading to Subtitle D, Title 2, Human Resources Code, is amended to read as follows:

SUBTITLE D. DEPARTMENT OF FAMILY AND PROTECTIVE [AND REGULATORY] SERVICES; CHILD WELFARE AND PROTECTIVE SERVICES

SECTION 1.74.  The heading to Chapter 40, Human Resources Code, is amended to read as follows:

CHAPTER 40. DEPARTMENT OF FAMILY AND PROTECTIVE [AND REGULATORY] SERVICES

SECTION 1.75.  Subdivisions (3) and (5), Section 40.001, Human Resources Code, are amended to read as follows:

(3) "Department" means the Department of Family and Protective [and Regulatory] Services.

(5) "Family preservation" includes the provision of services designed to assist families, including adoptive and extended families, who are at risk or in crisis, including:

(A)  preventive services designed to help a child at risk of foster care placement remain safely with the child's family; and

(B)  services designed to help a child return, when the return is safe and appropriate, to the family from which the child was removed [~~the protection of parents and their children from needless family disruption because of unfounded accusations of child abuse or neglect. It does not include the provision of state social services for the rehabilitation of parents convicted of abusing or neglecting their children~~].

SECTION 1.76. Subsection (b), Section 40.002, Human Resources Code, is amended to read as follows:

(b)  Notwithstanding any other law, the department shall:

(1)  provide protective services for children and elderly and disabled persons, including investigations of alleged abuse, neglect, or exploitation in facilities of the Texas Department of Mental Health and Mental Retardation or its successor agency;

(2)  provide family support and family preservation services that respect the fundamental right of parents to control the education and upbringing of their children;

(3)  license, register, and enforce regulations applicable to child-care facilities, [~~and~~] child-care administrators, and child-placing agency administrators; and

(4)  implement and manage programs intended to provide early intervention or prevent at-risk behaviors that lead to child abuse, delinquency, running away, truancy, and dropping out of school.

SECTION 1.77.  Section 40.003, Human Resources Code, is amended to read as follows:

Sec. 40.003.  SUNSET PROVISION.  The Department of Family and Protective [~~and Regulatory~~] Services is subject to Chapter 325, Government Code (Texas Sunset Act). Unless continued in existence as provided by that chapter, the department is abolished and this chapter expires September 1, 2009.

SECTION 1.78.  Section 40.030, Human Resources Code, is amended to read as follows:

Sec. 40.030.  ADVISORY COMMITTEES.  The executive commissioner or the executive commissioner's designee [~~board~~] may appoint advisory committees in accordance with Chapter 2110, Government Code [~~Article 6252-33, Revised Statutes~~].

SECTION 1.79.  The heading to Section 40.0305, Human Resources Code, is amended to read as follows:

Sec. 40.0305.  STRATEGIC USE OF TECHNOLOGY [~~STEERING COMMITTEE~~].

SECTION 1.80.  Subsections (a), (d), and (e), Section 40.0305, Human Resources Code, are amended to read as follows:

(a)  The department shall continually explore the strategic use of technology as a means to improve services, reduce workload burdens, increase accountability, and enhance the overall efficiency and effectiveness of department operations. The department shall develop strategic plans and seek funding to implement technology

enhancements that the department determines are feasible and cost-effective [establish a strategic technology steering committee within the department to evaluate major information technology project proposals].

(d)  In evaluating major information technology project proposals, the department, in cooperation with the commission, [steering committee] shall:

(1)  assess the major information needs of the department;

(2)  define standard criteria for setting priorities for the department's information needs;

(3)  forecast the returns to the department on project investments;

(4)  evaluate the department's available information resources; and

(5)  review, approve, and evaluate the status of projected costs and benefits related to project proposals.

(e)  To the extent that funds are appropriated for these specific purposes, the department shall implement the following technology projects:

(1)  a mobile technology project, including online transcription services designed to:

(A)  increase caseworker access to department policy and family case history;

(B)  facilitate communication between caseworkers and supervisors;

(C)  allow timely and accurate data entry; and

(D)  reduce backlogged investigations; and

(2)  a modified design of the department's automated case management system to improve risk and safety assessment and service plan development, and to facilitate incorporation of historical case data [The steering committee shall make recommendations to the executive director based on the committee's performance of its duties].

SECTION 1.81.  Subchapter B, Chapter 40, Human Resources Code, is amended by adding Section 40.03051 to read as follows:

Sec. 40.03051.  PAPERLESS INFORMATION EXCHANGE PILOT PROGRAM.  (a)  The department shall develop and implement a pilot program to allow the paperless exchange of information between the department and courts with jurisdiction over child protective services cases.

(b)  The pilot program must:

(1)  include one or more courts with jurisdiction over child protective services cases; and

(2)  be designed to facilitate the progression of child protective services cases through the judicial process.

(c)  The executive commissioner shall adopt rules necessary to implement this section.

(d)  Notwithstanding any other provision of this section, the department is not required to implement the pilot program unless funds are appropriated for that purpose.

(e)  Not later than December 1, 2006, the department shall submit a report to the governor, the lieutenant governor, and the speaker of the house of representatives regarding the preliminary results of the pilot program. The report must include:

(1)  a description of the status of the pilot program;

(2) a description of the effects of the pilot program on the progression of child protective services cases through the judicial process; and

(3) an evaluation of the feasibility of expanding the system statewide.

(f) This section expires September 1, 2009.

SECTION 1.82. Section 40.031, Human Resources Code, is amended to read as follows:

Sec. 40.031. DIVISIONS OF DEPARTMENT. (a) The executive commissioner [board] may establish divisions within the department as necessary for efficient administration and for the discharge of the department's functions.

(b) The executive commissioner shall establish an investigations division to oversee and direct the investigation functions of the child protective services program, including the receipt and screening of all reports of alleged child abuse or neglect.

(c) The commissioner shall designate a person with law enforcement experience as the director of the investigations division.

(d) The investigations division shall, as appropriate, refer children and families in need of services to other department divisions or to other persons or entities with whom the department contracts for the provision of the needed services.

(e) Reports of alleged child abuse or neglect investigated under Section 261.401 or 261.404, Family Code, are not subject to investigation by the investigations division [board may allocate and reallocate functions, programs, and activities among the department's divisions].

SECTION 1.83. (a) Subchapter B, Chapter 40, Human Resources Code, is amended by adding Section 40.0324 to read as follows:

Sec. 40.0324. CASEWORKER REPLACEMENT PROGRAM. (a) To the extent that funding is available, the department shall develop a program to provide for the timely replacement of caseworkers with trainees hired in anticipation of vacancies.

(b) In developing the program, the department shall consider the turnover rate for caseworkers by region.

(b) Unless sufficient funds are not available, the Department of Family and Protective Services shall develop the program required under Section 40.0324, Human Resources Code, as added by this section, not later than December 31, 2005.

SECTION 1.84. Subchapter B, Chapter 40, Human Resources Code, is amended by adding Section 40.036 to read as follows:

Sec. 40.036. ENHANCED TRAINING OF CHILD PROTECTIVE SERVICES CASEWORKERS. To improve the quality and consistency of training provided to child protective services caseworkers, the department shall:

(1) augment classroom-based training with a blended learning environment using computer-based modules, structured field experience, and simulation for skills development;

(2) use a core curriculum for all new department caseworkers and specialized training for specific jobs;

(3) require that department caseworkers transferring from one specialty to another must complete the core curriculum and advanced training for the new specialty before assuming their new responsibilities; and

(4) centralize accountability and oversight of all department training in order to ensure statewide consistency.

SECTION 1.85. Subsection (c), Section 40.0525, Human Resources Code, is amended to read as follows:

(c) Subject to Section 40.031(b), this [This] section does not require the department to establish separate departments for investigations and service delivery.

SECTION 1.86. Subchapter C, Chapter 40, Human Resources Code, is amended by adding Section 40.0526 to read as follows:

Sec. 40.0526. BUILDING COMMUNITY PARTNERSHIPS TO SUPPORT CHILDREN AND FAMILIES.    (a) The department shall develop a statewide strategy to build alliances and networks at the local level that support the detection and treatment of child abuse and neglect and enhance the coordination and delivery of services to children and families.

(b)  The strategy must include plans to:

(1)  move staff from centralized office sites into community-based settings to the greatest extent feasible; and

(2)  enter into agreements for the establishment or development of joint offices or workplaces with local officials and organizations, including:

(A)  children's advocacy centers;

(B)  law enforcement officials;

(C)  prosecutors;

(D)  health care providers; and

(E)  domestic violence shelters.

(c)  The department may employ specialized staff, to the extent that funds are appropriated for that purpose, to serve as:

(1)  local legal liaisons who support the prosecution in each region of legal cases through the judicial system by improving coordination and cooperation in case consultation and preparation of cases for court; and

(2)  local community initiative specialists in each region who focus on building community alliances and networks.

(d)  An agreement made in accordance with this section for the joint location of department personnel with other local officials or organizations is not subject to Chapter 2167, Government Code.

SECTION 1.87. Subchapter C, Chapter 40, Human Resources Code, is amended by adding Section 40.0528 to read as follows:

Sec. 40.0528.  COMPREHENSIVE STAFFING AND WORKLOAD DISTRIBUTION PLAN FOR CHILD PROTECTIVE SERVICES. (a) The department shall develop and implement a staffing and workload distribution plan for the child protective services program to:

(1)  reduce caseloads;

(2)  enhance accountability;

(3)  improve the quality of investigations;

(4)  eliminate delays; and

(5)  ensure the most efficient and effective use of child protective services staff and resources.

(b) In developing and implementing the plan, the department shall, subject to available funds:

(1)  develop a methodology for the equitable distribution of investigative and other staff to ensure an equitable assignment of cases in each area of the state;

(2)  evaluate the duties of investigators and supervisors and identify and reassign functions that may be performed more efficiently by support or other paraprofessional staff;

(3)  ensure that investigative and service units contain adequate supervisory and support staff;

(4)  provide incentives to recruit and retain:

(A)  caseworkers and supervisors assigned to investigative units; and

(B)  specialized staff with law enforcement or forensic investigation experience;

(5)  ensure that caseworkers and supervisors who are not in an investigations unit are paid appropriately to increase employee retention;

(6)  when appropriate, identify and use alternative work schedules;

(7)  use a system of regional hiring supervisors for targeted recruitment efforts;

(8)  improve staff recruitment and screening methods to promote the hiring of the most qualified candidates and improve an applicant's understanding of the job requirements;

(9)  reduce the time necessary to complete a plan of service for a child and family when providing family-based safety services; and

(10)  identify methods to reduce the administrative area that a manager is responsible for to increase accountability.

SECTION 1.88.  Section 40.058, Human Resources Code, is amended by adding Subsection (b-1) to read as follows:

(b-1)  A contract for the purchase of substitute care services, as defined by Section 264.106, Family Code, must be procured using:

(1)  department procurement procedures; or

(2)  procurement procedures approved by the executive commissioner that promote open and fair competition.

SECTION 1.89.  Subchapter C, Chapter 40, Human Resources Code, is amended by adding Sections 40.071, 40.072, and 40.073 to read as follows:

Sec. 40.071.  DRUG-ENDANGERED CHILD INITIATIVE.   The department shall establish a drug-endangered child initiative aimed at protecting children who are exposed to methamphetamine or to chemicals and other hazardous materials used in the illicit manufacture of methamphetamine.

Sec. 40.072.  DUTY TO REPORT; DEPARTMENT RECORDS.   (a) To the extent that reporting does not interfere with an ongoing criminal investigation, the Department of Public Safety and each local law enforcement agency shall report to the department on discovering the presence of a child in a location where methamphetamine is manufactured.

(b)  The department shall maintain a record of reports received under this section and shall include in the record information regarding actions taken by the department to ensure the child's safety and well-being.

Sec. 40.073. PARENTAL ADVISORY COMMITTEE. (a) The Parental Advisory Committee shall advise the department on policies affecting parents and their involvement with the department, including:

(1) investigations of allegations of abuse or neglect;

(2) designations of alternative placements for children; and

(3) standards for persons who investigate reports of abuse or neglect on the state or local level.

(b) The Parental Advisory Committee consists of members appointed by the governor. The governor shall establish:

(1) the qualifications for committee members;

(2) the terms for committee members; and

(3) the number of committee members.

(c) Chapter 2110, Government Code, does not apply to the committee.

(d) A committee member may not receive compensation for serving on the committee but is entitled to reimbursement of travel expenses incurred by the member while conducting the business of the committee as provided by the General Appropriations Act.

SECTION 1.90. Section 42.002, Human Resources Code, is amended by adding Subdivisions (18) and (19) to read as follows:

(18) "Controlling person" means a person who, either alone or in connection with others, has the ability to directly or indirectly influence or direct the management, expenditures, or policies of a residential child-care facility.

(19) "Residential child-care facility" means a facility licensed or certified by the department to provide assessment, care, training, education, custody, treatment, or supervision for a child who is not related by blood, marriage, or adoption to the owner or operator of the facility, for all of the 24-hour day, whether or not the facility is operated for profit or charges for the services it offers. The term includes child-care institutions, child-placing agencies, foster group homes, foster homes, agency foster group homes, and agency foster homes.

SECTION 1.91. Subsections (b) and (d), Section 42.021, Human Resources Code, are amended to read as follows:

(b) The commissioner [executive director of the department] shall appoint as director of a division designated under Subsection (a) a person who meets the qualifications set by the executive commissioner [board].

(d) The commissioner [director] may divide the state into regions for the purpose of administering this chapter.

SECTION 1.92. Subsections (a) and (b), Section 42.023, Human Resources Code, are amended to read as follows:

(a) The department [executive director] shall prepare an annual written report regarding the department's activities under this chapter.

(b) The annual report shall include:

(1) a report by regions of applications for licensure or certification, of initial [provisional] licenses issued, denied, or revoked, of licenses issued, denied, suspended or revoked, of emergency closures and injunctions, and of the compliance of state-operated agencies, if such agencies exist, with certification requirements;

(2)  a summary of the <u>training programs required by the department and their effectiveness</u> [<s>amount and kind of in-service training and other professional development opportunities provided for department staff</s>];

(3)  a summary of training and other professional development opportunities offered to facilities' staffs; [<s>and</s>]

(4)  a report of new administrative procedures, of the number of staff and staff changes, and of plans for the coming year<u>; and</u>

<u>(5)  a report of trends in licensing violations on a statewide and regional basis and the department's plans to address those trends through the provision of technical assistance.</u>

SECTION 1.93.  (a)  Subsection (c), Section 42.041, Human Resources Code, is amended to read as follows:

(c)  A single license that lists addresses and the appropriate facilities may be issued to a child-care institution that operates noncontiguous facilities that are <u>across the street from, in the same city block as, or on the same property as one another</u> [<s>nearby</s>] and that are demonstrably a single operation as indicated by patterns of staffing, finance, administrative supervision, and programs.

(b)  Subsection (c), Section 42.041, Human Resources Code, as amended by this section, applies only to a license issued or renewed on or after the effective date of this section. A license issued or renewed before the effective date of this section is governed by the law in effect at the time the license is issued or renewed, and the former law is continued in effect for that purpose.

SECTION 1.94.  (a)  Section 42.042, Human Resources Code, is amended by adding Subsections (h-1) and (q) to read as follows:

<u>(h-1)  The executive commissioner shall adopt rules governing:</u>

<u>(1)  the placement and care of children by a child-placing agency, as necessary to ensure the health and safety of those children;</u>

<u>(2)  the verification and monitoring of agency foster homes, agency foster group homes, and adoptive homes by a child-placing agency; and</u>

<u>(3)  if appropriate, child-placing agency staffing levels, office locations, and administration.</u>

<u>(q)  Each residential child-care facility shall notify the department and the appropriate local law enforcement agency immediately on determining that a child is missing from the facility.</u>

(b)  As soon as possible after the effective date of this Act, the executive commissioner of the Health and Human Services Commission shall adopt rules and establish standards, policies, and procedures to implement and administer Subsections (h-1) and (q), Section 42.042, Human Resources Code, as added by this section.

SECTION 1.95.  Section 42.0426, Human Resources Code, is amended to read as follows:

Sec. 42.0426.  TRAINING OF PERSONNEL.  <u>(a)</u> A licensed facility shall provide training for staff members in:

(1)  the recognition of symptoms of child abuse, neglect, and sexual molestation and the responsibility and procedure of reporting suspected occurrences of child abuse, neglect, and sexual molestation to the department or other appropriate entity;

       (2)  the application of first aid; and

       (3)  the prevention and spread of communicable diseases.

   (b)  A residential child-care facility shall implement a behavior intervention program approved by the department for the benefit of a child served by the facility who needs assistance in managing the child's conduct. The program must include:

       (1)  behavior intervention instruction for staff members who work directly with children served by the facility; and

       (2)  training for all employees regarding the risks associated with the use of prone restraints.

   SECTION 1.96.  Section 42.044, Human Resources Code, is amended by adding Subsections (e) and (f) to read as follows:

   (e)  The department shall periodically conduct inspections of a random sample of agency foster homes and agency foster group homes.  The department shall use the inspections to monitor and enforce compliance by a child-placing agency with rules and standards established under Section 42.042.

   (f)  The department shall use an inspection checklist that includes a list of all required items for inspection in conducting a monitoring inspection under this section.

   SECTION 1.97.  The heading to Section 42.0441, Human Resources Code, is amended to read as follows:

   Sec. 42.0441.  INSPECTION RESULTS FOR CERTAIN NONRESIDENTIAL CHILD-CARE FACILITIES.

   SECTION 1.98.  Subchapter C, Chapter 42, Human Resources Code, is amended by adding Section 42.04411 to read as follows:

   Sec. 42.04411.  INSPECTION RESULTS AND EXIT CONFERENCE FOR RESIDENTIAL CHILD-CARE FACILITIES.  (a)  On completion of an inspection of a residential child-care facility under Section 42.044, the inspector shall hold an exit conference with a representative of the inspected facility.  The inspector shall provide to the representative a copy of the inspection checklist used by the inspector.

   (b)  The inspector shall provide the representative an opportunity to communicate regarding potential violations.

   SECTION 1.99.  Section 42.046, Human Resources Code, is amended by adding Subsection (e) to read as follows:

   (e)  The department may deny an application under this section if the applicant:

       (1)  has a residential child-care facility license revoked in another state; or

       (2)  is barred from operating a residential child-care facility in another state.

   SECTION 1.100.  Subsections (f) and (g), Section 42.0461, Human Resources Code, are amended to read as follows:

   (f)  A child-placing agency that proposes to verify an agency foster home or agency foster group home that is located in a county with a population of less than 300,000 that provides child care for 24 hours a day at a location other than the actual residence of a child's primary caretaker shall:

       (1)  comply with the notice and hearing requirements imposed by Subsections (a) and (b); and

       (2)  after conducting the required public hearing, provide the department with information relating to the considerations specified in Subsection (d).

(g) The department may prohibit the child-placing agency from verifying the proposed agency <u>foster</u> home or agency <u>foster</u> group home on the same grounds that the department may deny an application under Subsection (e). <u>The department may invalidate the verification of an agency foster home or agency foster group home that was not verified using the procedures required by Subsection (f) on or after September 1, 1997.</u>

SECTION 1.101. Section 42.051, Human Resources Code, is amended to read as follows:

Sec. 42.051. <u>INITIAL</u> [<del>PROVISIONAL</del>] LICENSE. (a) The department shall issue <u>an initial</u> [<del>a provisional</del>] license when a facility's plans meet the department's licensing requirements and one of the following situations exists:

    (1) the facility is not currently operating;

    (2) the facility has relocated and has made changes in the type of child-care service it provides; or

    (3) there is a change in ownership of the facility resulting in changes in policy and procedure or in the staff who have direct contact with the children.

(b) <u>An initial</u> [<del>A provisional</del>] license is valid for six months from the date it is issued and may be renewed for an additional six months.

SECTION 1.102. Subsection (b), Section 42.054, Human Resources Code, is amended to read as follows:

(b) The department shall charge each child-care facility a fee of $35 for <u>an initial</u> [<del>a provisional</del>] license. The department shall charge each child-placing agency a fee of $50 for <u>an initial</u> [<del>a provisional</del>] license.

SECTION 1.103. (a) Section 42.056, Human Resources Code, is amended by adding Subsections (a-1), (d), (e), and (f) and amending Subsection (b) to read as follows:

<u>(a-1) In accordance with rules adopted by the executive commissioner, the director, owner, or operator of a residential child-care facility shall submit to the department for use in conducting background and criminal history checks the name of each prospective employee who will provide direct care or have direct access to a child in the residential child-care facility.</u>

(b) The department shall conduct background and criminal history checks using:

    (1) the information provided under <u>Subsections</u> [<del>Subsection</del>] (a) <u>and (a-1)</u>;

    (2) the information made available by the Department of Public Safety under Section 411.114, Government Code, or by the Federal Bureau of Investigation or other criminal justice agency under Section 411.087, Government Code; and

    (3) the department's records of reported abuse and neglect.

<u>(d) A person described by Subsection (a) or (a-1) may not provide direct care or have direct access to a child in a residential child-care facility before completion of the person's background check and criminal history check.</u>

<u>(e) If the residential child-care facility does not receive the results of the background or criminal history check within two working days, the facility may obtain that information for the facility's employee, subcontractor, or volunteer directly from the Department of Public Safety. If the information obtained verifies that the</u>

person does not have a criminal record, the facility may allow the person to have unsupervised client contact until the department has performed the department's own criminal history check and notified the facility.

(f) As part of a background check under this section, the department shall provide any relevant information available in the department's records regarding a person's previous employment in a residential child-care facility to the person submitting the request.

(b) The director, owner, or operator of a residential child-care facility shall begin providing information to the Department of Family and Protective Services as required by Subsection (a-1), Section 42.056, Human Resources Code, as added by this section, as soon as possible after the effective date of this section and not later than January 1, 2006.

SECTION 1.104. (a) Subchapter C, Chapter 42, Human Resources Code, is amended by adding Section 42.057 to read as follows:

Sec. 42.057. DRUG TESTING. (a) Each residential child-care facility shall establish a drug testing policy for employees. A residential child-care facility may adopt the model employee drug testing policy adopted by the executive commissioner under Subsection (b) or may use another employee drug testing policy approved by the executive commissioner.

(b) The executive commissioner by rule shall adopt a model employee drug testing policy for use by a residential child-care facility. The policy must be designed to ensure the safety of resident children through appropriate drug testing of employees while protecting the rights of employees. The model policy must require:

(1) preemployment drug testing;

(2) random, unannounced drug testing of each employee who has direct contact with a child in the care of the facility;

(3) drug testing of an employee against whom there is an allegation of drug abuse; and

(4) drug testing of an employee whom the department is investigating for the abuse or neglect of a child in the care of the facility, if the allegation of abuse or neglect includes information that provides good cause to suspect drug abuse.

(c) The department shall require a drug test of a person who directly cares for or has access to a child in a residential child-care facility within 24 hours after the department receives notice of an allegation that the person has abused drugs.

(d) An employee may not provide direct care or have direct access to a child in a residential child-care facility before completion of the employee's initial drug test.

(e) A residential child-care facility shall pay any fee or cost associated with performing the drug test for an employee.

(b) Not later than December 1, 2005, the executive commissioner of the Health and Human Services Commission shall adopt the model drug testing policy required by Section 42.057, Human Resources Code, as added by this section.

(c) Not later than January 1, 2006, each residential child-care facility shall adopt a drug testing policy required by Section 42.057, Human Resources Code, as added by this section.

SECTION 1.105. Subchapter C, Chapter 42, Human Resources Code, is amended by adding Section 42.062 to read as follows:

Sec. 42.062.  CERTAIN EMPLOYMENT PROHIBITED.  A residential child-care facility may not employ in any capacity a person who is not eligible to receive a license or certification for the operation of a residential child-care facility under Section 42.072(g) or who has been denied a license under Section 42.046.

SECTION 1.106.  Subchapter C, Chapter 42, Human Resources Code, is amended by adding Section 42.063 to read as follows:

Sec. 42.063.  REPORTING OF INCIDENTS AND VIOLATIONS. (a)  In this section, "serious incident" means a suspected or actual incident that threatens or impairs the basic health, safety, or well-being of a child. The term includes:

(1)  the arrest, abuse, neglect, exploitation, running away, attempted suicide, or death of a child;

(2)  a critical injury of a child; and

(3)  an illness of a child that requires hospitalization.

(b)  A person licensed under this chapter shall report to the department each serious incident involving a child who receives services from the person, regardless of whether the department is the managing conservator of the child.

(c)  An employee of a person described by Subsection (b) shall report suspected abuse or neglect directly to the statewide intake system.

(d)  An employee or volunteer of a child-care institution, child-placing agency, foster home, or foster group home shall report any serious incident directly to the department if the incident involves a child under the care of the institution, agency, or home.

(e)  A foster parent shall report any serious incident directly to the department if the incident involves a child under the care of the parent.

(f)  The executive commissioner by rule shall prescribe:

(1)  procedures governing reporting required under this section; and

(2)  the manner in which a report under this section must be provided.

(g)  The department shall implement this section using existing appropriations.

SECTION 1.107.  Section 42.072, Human Resources Code, is amended by amending Subsection (c) and adding Subsection (g) to read as follows:

(c)  The department may not issue a license, listing, registration, or certification to a [A] person whose license, listing, registration, or certification is revoked or whose application for a license, listing, registration, or certification is denied for a substantive reason under this chapter [may not apply for any license, listing, registration, or certification under this chapter] before:

(1)  the fifth anniversary of the date on which the revocation takes effect by department or court order or the decision to deny the application is final, if the facility is a residential child-care facility; or

(2)  the second anniversary of the date on which the revocation takes effect by department or court order or the decision to deny the application is final, if the facility is not a residential child-care facility.

(g)  Notwithstanding Subsection (c), the department may refuse to issue a license, listing, registration, or certification to:

(1)  a person whose license or certification for a residential child-care facility was revoked by the department or by court order;

(2)  a person who was a controlling person of a residential child-care facility at the time conduct occurred that resulted in the revocation of the license or certification of the facility;

(3)  a person who voluntarily closed a residential child-care facility or relinquished the person's license or certification after:

(A)  the department took an action under Subsection (a) in relation to the facility or person; or

(B)  the person received notice that the department intended to take an action under Subsection (a) in relation to the facility or person; or

(4)  a person who was a controlling person of a residential child-care facility at the time conduct occurred that resulted in the closure of the facility or relinquishment of the license or certification in the manner described by Subdivision (3).

SECTION 1.108.  Subsection (c), Section 42.073, Human Resources Code, is amended to read as follows:

(c)  An order is valid for 10 days after the effective date of the order, except that an order relating to a residential child-care facility is valid for 30 days after the effective date of the order.

SECTION 1.109.  Section 42.077, Human Resources Code, is amended by adding Subsection (d-1) to read as follows:

(d-1)  If the department determines that the license of a residential child-care facility should be revoked or suspended, the facility shall mail notification of the action or proposed action by certified mail to a parent of each child served by the facility, if the person's parental rights have not been terminated, and to the child's managing conservator, as appropriate.  The residential child-care facility shall mail the notification not later than the fifth day after the date the facility is notified of the department's determination that revocation or suspension of the license is appropriate.

SECTION 1.110.  (a)  Section 42.078, Human Resources Code, is amended by amending Subsections (a) through (i) and (l), (m), and (n) and adding Subsection (a-1) to read as follows:

(a)  The department may impose an administrative penalty against a facility or family home licensed or registered under this chapter that violates this chapter or a rule or order adopted under this chapter.  In addition, the department may impose an administrative penalty against a residential child-care facility or a controlling person of a residential child-care facility if the facility or controlling person:

(1)  violates a term of a license or registration issued under this chapter;

(2)  makes a statement about a material fact that the facility or person knows or should know is false:

(A)  on an application for the issuance or renewal of a license or registration or an attachment to the application; or

(B)  in response to a matter under investigation;

(3)  refuses to allow a representative of the department to inspect:

(A)  a book, record, or file required to be maintained by the facility; or

(B)  any part of the premises of the facility;

(4)  purposefully interferes with the work of a representative of the department or the enforcement of this chapter; or

(5) fails to pay a penalty assessed under this chapter on or before the date the penalty is due, as determined under this section.

(a-1) Nonmonetary, administrative penalties or remedies, including but not limited to corrective action plans, probation, and evaluation periods, shall be imposed when appropriate before monetary penalties.

(b) Each day a violation continues or occurs is a separate violation for purposes of imposing a penalty. The penalty for a violation may be in an amount not to exceed the following limits, based on the maximum number of children for whom the facility or family home was authorized to provide care or the number of children under the care of the child-placing agency when the violation occurred [receiving care at the facility or family home at the time of the violation]:

(1) for violations that occur in a facility other than a residential child-care facility:

| Number of children | Maximum amount of penalty |
| --- | --- |
| 20 or less | $50 [ $20] |
| 21-40 | $60 [ $30] |
| 41-60 | $70 [ $40] |
| 61-80 | $80 [ $50] |
| 81-100 | $100 [ $75] |
| More than 100 | $150 [$100] |

(2) for violations that occur in a residential child-care facility:

| Number of children | Maximum amount of penalty |
| --- | --- |
| 20 or less | $100 |
| 21-40 | $150 |
| 41-60 | $200 |
| 61-80 | $250 |
| 81-100 | $375 |
| More than 100 | $500 |

(c) In addition to the number of children, the [The] amount of the penalty shall be based on:

(1) the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited acts, and the hazard or potential hazard created to the health, safety, or economic welfare of the public;

(2) the economic harm to property or the environment caused by the violation;

(3) the history of previous violations;

(4) the amount necessary to deter future violations;

(5) efforts to correct the violation; and

(6) any other matter that justice may require.

(d) Monetary penalties shall not be assessed for violations that are the result of clerical errors [or standards which do not clearly apprise the facility or family home of the action required by the standard].

(e) If the department [executive director] determines that a violation has occurred, the department [executive director] may issue a recommendation on the imposition of a penalty, including a recommendation on the amount of the penalty.

(f) Within 14 days after the date the recommendation is issued, the department [executive director] shall give written notice of the recommendation to the person owning or operating the facility or family home or to the controlling person, if

applicable. The notice may be given by certified mail. The notice must include a brief summary of the alleged violation and a statement of the amount of the recommended penalty and must inform the person that the person has a right to a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(g) Within 20 days after the date the person receives the notice, the person in writing may accept the determination and recommended penalty of the department [executive director] or may make a written request for a hearing on the occurrence of the violation, the amount of the penalty, or both the occurrence of the violation and the amount of the penalty.

(h) If the person accepts the determination and recommended penalty of the department [executive director] or fails to respond to the notice in a timely manner, the department [executive director] shall issue an order and impose the recommended penalty.

(i) If the person requests a hearing, the department [executive director] shall set a hearing and give notice of the hearing to the person. The hearing shall be held by an administrative law judge of the State Office of Administrative Hearings. The administrative law judge shall make findings of fact and conclusions of law and issue a final decision finding that a violation has occurred and imposing a penalty or finding that no violation occurred.

(l) Within the 30-day period, a person who acts under Subsection (k)(3) may:

(1) stay enforcement of the penalty by:

(A) paying the amount of the penalty to the court for placement in an escrow account; or

(B) giving to the court a supersedeas bond that is approved by the court for the amount of the penalty and that is effective until all judicial review of the order is final; or

(2) request the court to stay enforcement of the penalty by:

(A) filing with the court a sworn affidavit of the person stating that the person is financially unable to pay the amount of the penalty and is financially unable to give the supersedeas bond; and

(B) giving a copy of the affidavit to the department [executive director] by certified mail.

(m) On receipt of a copy of an affidavit under Subsection (l)(2), the department [executive director] may file with the court, within five days after the date the copy is received, a contest to the affidavit. The court shall hold a hearing on the facts alleged in the affidavit as soon as practicable and shall stay the enforcement of the penalty on finding that the alleged facts are true. The person who files an affidavit has the burden of proving that the person is financially unable to pay the amount of the penalty and to give a supersedeas bond.

(n) If the person does not pay the amount of the penalty and the enforcement of the penalty is not stayed, the department [executive director] may refer the matter to the attorney general for collection of the amount of the penalty.

(b) Section 42.078, Human Resources Code, as amended by this section, applies to conduct that occurs on or after the effective date of this section.  Conduct that occurs before the effective date of this section is governed by Section 42.078, Human Resources Code, as it existed before amendment by this section, and the former law is continued in effect for that purpose.

SECTION 1.111. The heading to Chapter 43, Human Resources Code, is amended to read as follows:

## CHAPTER 43. REGULATION OF CHILD-CARE
## AND CHILD-PLACING AGENCY ADMINISTRATORS

SECTION 1.112. Section 43.001, Human Resources Code, is amended by amending Subdivision (1) and adding Subdivisions (3) and (4) to read as follows:

(1) "Child-care institution" has the meaning assigned by Section 42.002 [means a profit or nonprofit children's home, orphanage, institution, or other place that receives and provides 24-hour-a-day care for more than six children who are dependent, neglected, handicapped, delinquent, in danger of becoming delinquent, or in need of group care].

(3) "Child-placing agency" has the meaning assigned in Section 42.002.

(4) "Child-placing agency administrator" means a person who supervises and exercises direct control over a child-placing agency and who is responsible for the child-placing agency's program and personnel, regardless of whether the person has an ownership interest in the child-placing agency or shares duties with other persons.

SECTION 1.113. (a) Section 43.003, Human Resources Code, is amended by adding Subsection (c) to read as follows:

(c) A person may not serve as a child-placing agency administrator without a license issued by the department under this chapter.

(b) Notwithstanding Subsection (c), Section 43.003, Human Resources Code, as added by this section, a person is not required to hold a license issued under Chapter 43, Human Resources Code, to act as a child-placing agency administrator until January 1, 2006.

SECTION 1.114. (a) Section 43.004, Human Resources Code, is amended to read as follows:

Sec. 43.004. QUALIFICATIONS FOR LICENSE.  (a) To be eligible for a child-care administrator's license a person must:

(1) provide information for the department's use in conducting a criminal history and background check under Subsection (c) [present evidence in writing of good moral character, ethical commitment, and sound physical and emotional health];

(2) pass an examination developed [devised] and administered by the department that demonstrates competence in the field of child-care administration;

(3) have one year of full-time experience in management or supervision of child-care personnel and programs; and

(4) have one of the following educational and experience qualifications:

(A) a master's or doctoral [doctor of philosophy] degree in social work or other area of study; or

(B) a bachelor's degree and two years' full-time experience in child care or a closely related field[;

~~[(C) an associate degree from a junior college and four years'~~
~~experience in child care or a closely related field; or~~

~~[(D) a high school diploma or its equivalent and six years' experience in~~
~~child care or a closely related field~~].

(b) To be eligible for a child-placing agency administrator's license a person
must:

(1) provide information for the department's use in conducting a criminal
history and background check under Subsection (c);

(2) pass an examination developed and administered by the department that
demonstrates competence in the field of placing children in residential settings or
adoptive homes;

(3) have one year of full-time experience in management or supervision of
child-placing personnel and programs; and

(4) have one of the following educational and experience qualifications:

(A) a master's or doctoral degree in social work or other area of study;
or

(B) a bachelor's degree and two years' full-time experience in the field
of placing children in residential settings or adoptive homes or a closely related field.

(c) Before the department issues a license under this chapter, the department
must conduct a criminal history and background check of the applicant using:

(1) the information made available by the Department of Public Safety
under Section 411.114, Government Code, or by the Federal Bureau of Investigation
or other criminal justice agency under Section 411.087, Government Code; and

(2) the information in the central registry of reported cases of child abuse or
neglect established under Section 261.002, Family Code.

(b) Except as provided by Subsection (c) of this section, Subsection (a), Section
43.004, Human Resources Code, as amended by this section, applies only to a person
who applies for a license or license renewal on or after the effective date of this
section.

(c) A person who is qualified for a license under Paragraph (C) or (D),
Subdivision (4), Section 43.004, Human Resources Code, as that section existed prior
to the effective date of this section, and who is licensed or has applied for a license as
a child-care administrator prior to the effective date of this section is eligible for a
child-care administrator license under Subsection (a), Section 43.004, Human
Resources Code, as amended by this section, or license renewal.

SECTION 1.115. (a) Section 43.0041, Human Resources Code, is amended by
adding Subsection (c) to read as follows:

(c) A person who fails an examination three times may not submit a new
application for a license until after the first anniversary of the date the person last
failed the examination.

(b) Subsection (c), Section 43.0041, Human Resources Code, as added by this
section, applies only to an examination taken on or after the effective date of this
section.  An examination taken before the effective date of this section is not
considered in determining whether a person is prohibited from seeking a new license
for the period specified by Subsection (c), Section 43.0041, Human Resources Code,
as added by this section.

SECTION 1.116. Subsection (a), Section 43.0081, Human Resources Code, is amended to read as follows:

(a) The department may issue a provisional <u>child-care administrator's</u> license to an applicant licensed in another state who applies for a license in this state. An applicant for a provisional license under this section must:

(1) be licensed in good standing as a child-care administrator for at least two years in another state, the District of Columbia, a foreign country, or a territory of the United States that has licensing requirements that are substantially equivalent to the requirements of this chapter;

(2) have passed a national or other examination recognized by the department that demonstrates competence in the field of child-care administration; and

(3) be sponsored by a person licensed by the department under this chapter with whom the provisional license holder may practice under this section.

SECTION 1.117. (a) Subsection (a), Section 43.009, Human Resources Code, is amended to read as follows:

(a) To be eligible for license renewal, a license holder shall present evidence to the department of participation in a program of continuing education <u>for 15</u> [approximating 15 actual] hours of formal study <u>each year</u> during the two-year period before the renewal.

(b) Subsection (a), Section 43.009, Human Resources Code, as amended by this section, applies to a person who seeks license renewal on or after September 1, 2007. A person who seeks license renewal before September 1, 2007, is governed by the law in effect before amendment by this section, and the former law is continued in effect for that purpose.

SECTION 1.118. The heading to Section 43.010, Human Resources Code, is amended to read as follows:

Sec. 43.010. LICENSE <u>DENIAL,</u> REVOCATION, SUSPENSION, OR REFUSAL <u>TO RENEW</u>; REPRIMAND OR PROBATION.

SECTION 1.119. (a) Subsections (a), (b), and (d), Section 43.010, Human Resources Code, are amended to read as follows:

(a) The department <u>may deny,</u> [shall] revoke, suspend, or refuse to renew a license, <u>or</u> place on probation [a person whose license has been suspended,] or reprimand a license holder for<u>:</u>

<u>(1) violating</u> [a violation by the license holder of] this chapter or a rule <u>adopted under this chapter;</u>

<u>(2) circumventing or attempting to circumvent the requirements of this chapter or a rule adopted under this chapter;</u>

<u>(3) engaging in fraud or deceit related to the requirements of this chapter or a rule adopted under this chapter;</u>

<u>(4) providing false or misleading information to the department during the license application or renewal process for any person's license;</u>

<u>(5) making a statement about a material fact during the license application or renewal process that the person knows or should know is false;</u>

(6)  having a criminal history or central registry record that would prohibit a person from working in a child-care facility, as defined by Section 42.002, under rules applicable to that type of facility;

(7)  using drugs or alcohol in a manner that jeopardizes the person's ability to function as an administrator; or

(8)  [of the board.

[(b)  The department may revoke a license if the license holder is:

[(1)  convicted of a felony;

[(2)  convicted of a misdemeanor involving fraud or deceit;

[(3)  addicted to a dangerous drug or intemperate in the use of alcohol; or

[(4)  grossly negligent in] performing duties as a child-care administrator in a negligent manner.

(b)  A person whose license is revoked under Subsection (a) is not eligible to apply for another license under this chapter for a period of five years after the date the license was revoked.

(d)  If a license holder is placed on probation [suspension is probated], the department may require the license holder:

(1)  to report regularly to the department on the conditions of the probation;

(2)  to limit practice to the areas prescribed by the department; or

(3)  to continue or renew professional education until the practitioner attains a degree of skill satisfactory to the department in those areas in which improvement is a condition of the probation.

(b)  Subsection (b), Section 43.010, Human Resources Code, as amended by this section, applies only to a person whose license is revoked on or after the effective date of this section.  A person whose license is revoked before the effective date of this section is governed by the law in effect at the time of the revocation, and the former law is continued in effect for that purpose.

SECTION 1.120.  Section 43.0105, Human Resources Code, is amended to read as follows:

Sec. 43.0105.  REVOCATION OF PROBATION.  The department may revoke the probation of a license holder [whose license is suspended] if the license holder violates a term of the conditions of probation.

SECTION 1.121.  Section 43.0106, Human Resources Code, is amended to read as follows:

Sec. 43.0106.  ADMINISTRATIVE [DISCIPLINARY] HEARING.  (a) If the department denies a license or proposes to suspend, revoke, or refuse to renew a person's license, the person is entitled to a hearing conducted by the State Office of Administrative Hearings. Proceedings for a disciplinary action are governed by the administrative procedure law, Chapter 2001, Government Code. Rules of practice adopted by the executive commissioner [board] under Section 2001.004, Government Code, applicable to the proceedings for a disciplinary action may not conflict with rules adopted by the State Office of Administrative Hearings.

(b)  A person may not continue to operate as a licensed child-care administrator or child-placing agency administrator during the appeal process if the department determines that the person is an immediate threat to the health or safety of a child.

(c) The department must notify the person, and if applicable, the governing body of the facility that employs the person, of the department's determination under Subsection (b).

SECTION 1.122.  Section 43.012, Human Resources Code, is amended to read as follows:

Sec. 43.012.  PENALTY.  A person who serves as a child-care or child-placing agency administrator without the license required by this chapter commits a Class C misdemeanor.

SECTION 1.123.  Subtitle D, Title 2, Human Resources Code, is amended by adding Chapter 45 to read as follows:

## CHAPTER 45. PRIVATIZATION OF SUBSTITUTE CARE AND CASE MANAGEMENT SERVICES
### SUBCHAPTER A. GENERAL PROVISIONS

Sec. 45.001.  DEFINITIONS. In this chapter:

(1)  "Case management services" means the provision of case management services to a child for whom the department has been appointed temporary or permanent managing conservator, including caseworker-child visits, family visits, the convening of family group conferences, the development and revision of the case plan, the coordination and monitoring of services needed by the child and family, and the assumption of court-related duties, including preparing court reports, attending judicial hearings and permanency hearings, and ensuring that the child is progressing toward permanency within state and federal mandates.

(2)  "Commission" means the Health and Human Services Commission.

(3)  "Department" means the Department of Family and Protective Services.

(4)  "Executive commissioner" means the executive commissioner of the Health and Human Services Commission.

(5)  "Family-based safety services" means services designed to help children at risk of being placed in foster care to remain safely with their families.

(6)  "Independent administrator" means an independent agency selected through a competitive procurement process to:

(A)  secure, coordinate, and manage substitute care services and case management services in a geographically designated area of the state; and

(B)  ensure continuity of care for a child referred to the administrator by the department and the child's family from the day a child enters the child protective services system until the child leaves the system.

(7)  "Performance-based contracting" means the structuring of all aspects of the procurement of services around the purpose of the work to be performed and the desired results with the contract requirements set forth in clear, specific, and objective terms with measurable outcomes. Contracts may also include provisions that link the performance of the contractor to the level and timing of reimbursement.

(8)  "Permanency services" means services, other than family-based safety services, provided to secure a child's safety, permanency, and well-being, including substitute care services, family reunification services, adoption and postadoption services, preparation for adult living services, and case management services.

(9)  "Placement assessment" means the process used by the department or another authorized entity to determine the most appropriate, least restrictive, safe placement resource for a child who must be separated temporarily from the care of the child's parents.

(10)  "Privatize" means to contract with a private entity to provide certain governmental services.

(11)  "Psychotropic medication" means a drug that affects the mind through action on the central nervous system and is prescribed for depression, schizophrenia, attention deficit hyperactivity disorder, seizures, and a variety of other similar conditions.

(12)  "Substitute care provider" means a child-care institution or a child-placing agency, as defined by Section 42.002.

(13)  "Substitute care services" means services provided to or for children in substitute care and their families, including the recruitment, training, and management of foster parents, the recruitment of adoptive families, and the facilitation of the adoption process, family reunification, independent living, emergency shelter, residential group care, foster care, therapeutic foster care, and post-placement supervision, including relative placement.  The term does not include the regulation of facilities under Subchapter C, Chapter 42.

Sec. 45.002.  PRIVATIZING SUBSTITUTE CARE AND CASE MANAGEMENT SERVICES; DEPARTMENT DUTIES.  (a) Not later than September 1, 2011, the department shall complete the statewide privatization of the provision of substitute care and case management services in this state.

(b)  On and after September 1, 2011:

(1)  all substitute care and case management services for children for whom the department has been appointed temporary or permanent managing conservator must be provided by child-care institutions and child-placing agencies;

(2)  all substitute care and case management service providers shall, to the best extent possible, honor the cultural and religious affiliations of a child placed in the service provider's care, regardless of the religious affiliation of the service provider; and

(3)  except as provided by Subsections (d) and (e) and notwithstanding any other law, the department may not directly provide substitute care and case management services.

(c)  On and after September 1, 2011, the department shall:

(1)  monitor the quality of services for which the department and each independent administrator contract under this chapter; and

(2)  ensure that the services are provided in accordance with federal law and the laws of this state, including department rules and rules of the Department of State Health Services and the Texas Commission on Environmental Quality.

(d)  On and after September 1, 2011, the department may provide substitute care and case management services in an emergency. The executive commissioner shall adopt rules describing the circumstances in which the department may provide those services.

(e)  The department may provide substitute care and case management services as a provider of last resort as provided by Section 264.106(k), Family Code.

Sec. 45.003.  HIRING PREFERENCE.  A substitute care or case management services provider that contracts with the department to provide substitute care or case management services shall:

(1)  give a preference in hiring to qualified department employees in good standing with the department who provide substitute care or case management services and whose positions with the department may be eliminated as a result of the privatization of substitute care and case management services; and

(2)  ensure that each subcontractor with whom the substitute care or case management services provider contracts for the provision of substitute care or case management services also gives a preference in hiring to current and former qualified department employees whose positions with the department may be or were eliminated as a result of the privatization of substitute care and case management services.

Sec. 45.004.  INDEPENDENT ADMINISTRATORS; DEPARTMENT DUTIES. (a)  The department shall research and develop a comprehensive strategy for contracting for management support services from independent administrators on a regional basis. If the department determines that an independent administrator could manage and procure substitute care and case management services contracts with private agencies and conduct placement assessments in a more cost-beneficial manner, the department shall implement a transition plan to transfer the procurement, management, and oversight of substitute care and case management services from the department to an independent administrator, as well as responsibility for placement assessments. If the department determines that contracting for management support from an independent administrator is not cost beneficial, the privatization of substitute care and case management services will occur as provided by Section 45.002(b).

(b)  The comprehensive strategy, at a minimum, must:

(1)  use competitively procured independent administrators to procure and manage substitute care and case management providers in a geographic region designated by the department;

(2)  require independent administrators to contract with private agencies that will:

(A)  increase local foster and adoptive placement options for all children, especially teenagers, sibling groups, children whose race or ethnicity is disproportionately represented in foster care, children with severe or multiple disabilities, and other children who are difficult to place; and

(B)  expand efforts to recruit foster families, adoptive families, and alternative care providers through faith-based and other targeted recruitment programs; and

(3)  allow permanency services providers to enter client, service, and outcome information into the department's client data system.

(c)  Subject to the appropriation of funds, the department shall:

(1)  enhance existing data systems to include contract performance information; and

(2)  implement a contracting data system developed or procured by the department, to track quality assurance and other contracting tools to effectively manage, monitor, and evaluate performance-based contracting functions.

[Sections 45.005-45.050 reserved for expansion]
SUBCHAPTER B. DEPARTMENT DUTIES

Sec. 45.051. REORGANIZING STAFF RESPONSIBILITIES. Not later than March 1, 2006, the department shall develop a plan for reorganizing the department's operation to support future procurement of, contracting with, and monitoring of private contractors and enforcement of the licensing of facilities. The plan must include provisions for reducing duplication of the department's program monitoring activities.

Sec. 45.052. FINANCING. The department shall create financing and payment arrangements that provide incentives for an independent administrator and substitute care and case management providers to achieve safety, permanency, and well-being outcomes and improved system performance. In developing this financing arrangement, the department shall examine:

(1) the use of case rates or performance-based fee-for-service contracts that include incentive payments or payment schedules that link reimbursement to results; and

(2) ways to reduce a contractor's financial risk that could jeopardize the solvency of the contractor, including the use of a risk-reward corridor that limits risk of loss and potential profits or the establishment of a statewide risk pool.

Sec. 45.053. ADOPTION OF TRANSITION PLAN. (a) Not later than September 30, 2005, the commission and the department shall submit to the legislature a plan for the development of the transition plan, including the planning structure and process, engagement of stakeholders, and access to experienced consultation and technical assistance.

(b) Not later than March 1, 2006, the commission and the department shall, in consultation with private entities under contract to provide substitute care services for the department, including members of the boards of directors of the private entities and other community stakeholders, develop and adopt a substitute care and case management services transition plan consistent with the requirements of Subchapter C.

(c) The executive commissioner shall adopt rules to implement the privatization of substitute care and case management services in this state.

Sec. 45.054. REGIONAL IMPLEMENTATION. (a) The department shall implement the privatization of substitute care and case management services on a regional basis in accordance with the transition plan. The transition plan must include a schedule with deadlines for implementation of the plan. Subject to the requirements of Subsections (c), (d), and (e), statewide implementation of the plan shall be completed not later than September 1, 2011. The commission shall propose the first three regions of the state for implementation of privatization based on state demographics and shall consider including a rural region, a metropolitan region, and a region including border areas of the state.

(b) The transition plan must include a schedule with the following deadlines for implementation of the plan:

(1) completion of the transition plan, not later than March 1, 2006;

(2) release of a request for proposal for a geographic region of the state designated by the department, not later than April 30, 2006;

(3)  the awarding of the contract described by Subdivision (2), not later than September 30, 2006;

(4)  establishment of the multidisciplinary team and necessary processes, evaluation criteria, and monitoring tools to be used to monitor and evaluate the performance of the contractor, not later than September 30, 2006;

(5)  completion of the transition of substitute care and case management services in the first region, not later than December 31, 2007;

(6)  the review and evaluation of the multidisciplinary team's reports pertaining to the contractor's achievement of performance-based milestones and the effect on the quality of permanency services provided, annually beginning December 31, 2007;

(7)  completion of the transition of substitute care and case management services in the second and third regions, not later than December 1, 2009; and

(8)  completion of the statewide implementation of contracted substitute care and case management services for additional geographic regions, not later than September 1, 2011.

(c)  Not later than the first anniversary of the date the department enters into the first contract for substitute care and case management services under this section, the department shall contract with a qualified, independent third party to evaluate each phase of the privatization of substitute care and case management services. Each evaluation must:

(1)  assess the performance of substitute care and case management services based on compliance with defined quality outcomes for children;

(2)  assess the achievement of performance measures;

(3)  compare for quality the performance of substitute care and case management services provided by contractors to substitute care and case management services provided by the department in similar regions;

(4)  determine if contracted services are cost beneficial; and

(5)  assess the private sector's ability to meet the performance measures, including service capacity, for the remaining regions.

(d)  The independent third party with whom the department contracts under Subsection (c) shall submit its reports and recommendations to the House Human Services Committee, or its successor, and the Senate Health and Human Services Committee, or its successor.

(e)  The department shall continue to implement the transition plan for the second and third regions only after:

(1)  the commission reports to the House Human Services Committee, or its successor, and the Senate Health and Human Services Committee, or its successor, the status of the initial transition of services to a contractor in the first region not later than December 31, 2006;

(2)  the independent third party with whom the department contracts under Subsection (c) evaluates and reports to the House Human Services Committee, or its successor, and the Senate Health and Human Services Committee, or its successor, on the performance of contracted substitute care and case management services in the first region not later than December 31, 2008; and

(3) the commission determines, based on the report prepared under Subdivision (2) or information obtained by the review required under Subsection (b)(6), whether material modifications to the model for privatization of substitute care and case management services are necessary and submits a report and recommendations to the House Human Services Committee, or its successor, and the Senate Health and Human Services Committee, or its successor, not later than December 31, 2008.

(f) The department may not implement the transition plan for the second and third regions before September 1, 2009.

(g) The department shall continue to implement the transition plan for the remaining regions of the state only after:

(1) the independent third party with whom the department contracts under Subsection (c) evaluates and reports to the House Human Services Committee, or its successor, and the Senate Health and Human Services Committee, or its successor, on the performance of contracted substitute care and case management services in the second and third regions not later than September 1, 2010; and

(2) the commission determines, based on the report prepared under Subdivision (1) or information obtained by the review required under Subsection (b)(6), whether material modifications to the model for privatization of substitute care and case management services are necessary and submits a report and recommendations to the House Human Services Committee, or its successor, and the Senate Health and Human Services Committee, or its successor, not later than December 31, 2010.

(h) Nothing in this chapter, including the deadlines for implementing this section, precludes the department from immediately converting from an open-enrollment system to a statewide competitive procurement system for substitute care.

[Sections 45.055-45.100 reserved for expansion]
SUBCHAPTER C. TRANSITION PLAN

Sec. 45.101. GOALS FOR PRIVATIZATION. The transition plan adopted under Section 45.053 must provide for a new structural model for the community-centered delivery of substitute care and case management services that is based on a goal of improving protective services, achieving timely permanency for children in substitute care, including family reunification, placement with a relative, or adoption, and improving the overall well-being of children in substitute care consistent with federal and state mandates.

Sec. 45.102. TRANSITION PLAN REQUIREMENTS. The transition plan developed by the department and the commission must:

(1) identify barriers to privatization, including regional disparities in resources, provider capacity, and population, and propose solutions to stimulate capacity and adjust program delivery;

(2) provide details regarding the target population and services by region that will be part of the system redesign, including the number of children and families, historic caseload trends and service utilization information, and projected caseloads;

(3) provide details regarding the roles, responsibilities, and authority assigned to the public and private entities, including the department, independent administrators, and substitute care and case management providers, in making key decisions throughout the child and family case;

(4) include an implementation plan to transfer all foster homes certified by the department to private child-placing agencies, ensuring minimum disruption to the children in foster care and to current foster parents;

(5) specify the limited circumstances under which a foster home verified by the department may continue to be verified by the department when continuation would be in the best interest of a child in the care of the foster home;

(6) include a process for assessing each child who is transferred to a private substitute care provider to verify the child's service needs;

(7) include an implementation plan to transfer all adoption services to private agencies, including details of how and when cases will be transferred and how adoption provider contracts and reimbursements methods will be structured;

(8) describe the process to transfer the duties of case management and family reunification services from department staff to private agency staff, including the integration of family group conferencing into private agency case management;

(9) describe the manner in which the department will procure and contract for kinship services that are funded by the state;

(10) provide details regarding financial arrangements and performance expectations for independent administrators and substitute care and case management providers that:

(A) provide incentives for desired results and explicit contract performance and outcome indicators;

(B) describe how various risk-based arrangements will be weighed and realistically assessed using sound actuarial data and risk modeling and how mechanisms will be selected to limit uncontrollable risks that could threaten provider stability and quality;

(C) describe how financing options will increase flexibility to promote innovation and efficiency in service delivery; and

(D) provide balance between control over key decisions and the level of risk the contractor assumes;

(11) require the executive commissioner to evaluate whether existing rate structures are appropriate to compensate substitute care providers who enter into contracts with an independent administrator under Section 264.106, Family Code, considering new functions to be served by the providers, and, if necessary, require the executive commissioner to adjust the rates accordingly;

(12) require the department to enter into contracts for the provision of substitute care and case management services as required by Section 264.106, Family Code, and describe the procurement and contracting process, including:

(A) stating how the department will shift from an open-enrollment system to a competitive procurement system;

(B) identifying the services that will be procured and contracted for directly with the department and the services that will be procured by an independent administrator; and

(C)  developing a procurement and contracting schedule to ensure full implementation not later than September 1, 2011;

(13)  provide for the implementation of Sections 264.1062 and 264.107, Family Code, by describing each party's responsibility and ensuring that the department retains the legal authority to effectively provide oversight;

(14)  describe formal training required for department staff, independent administrators, and substitute care and case management providers;

(15)  define roles and expectations related to reporting and managing data required to ensure quality services and meet state and federal requirements, including data collection responsibilities for an independent administrator and service provider;

(16)  describe how the transition will impact the state's ability to obtain federal funding and examine options to further maximize federal funding opportunities and increased flexibility; and

(17)  describe the costs of the transition, the initial start-up costs, and mechanisms to periodically assess the overall adequacy of funds and the fiscal impact of the change.

[Sections 45.103-45.150 reserved for expansion]

SUBCHAPTER D. MISCELLANEOUS PROVISIONS

Sec. 45.151.  PROHIBITION ON CERTAIN CONTRACTS.    (a)  The department may not accept a bid under this chapter from a person or award to a person a contract under this chapter that includes proposed financial participation by the person if:

(1)  the person participated in preparing the bid specifications or request for proposals on which the bid or contract is based; and

(2)  the bid specifications or request for proposals on which the bid or contract is based:

(A)  requires a work plan, project design, or other criteria for participation in the contract that is specific to that person or likely to limit or exclude competitors who provide similar goods or services; or

(B)  includes a scope of required goods or services that is so narrowly defined that it is specific to that person or likely to limit or exclude competitors who provide similar goods or services.

(b)  The department may not accept a bid under this chapter from or award a contract under this chapter to an individual or business entity that is barred from participating in state contracts under Section 2155.077, Government Code.

(c)  The department may not accept a bid under this chapter from or award a contract under this chapter to an individual or business entity that was awarded a contract valued at $1 billion or more during the four-year period immediately before the date of the issuance of relevant requests for proposals under Section 45.054.

(d)  If the department determines that an individual or business entity holding a contract under this chapter was ineligible to have the contract accepted or awarded under Subsection (a), (b), or (c), the department may immediately terminate the contract without further obligation to the vendor.

Sec. 45.152. SUBCONTRACTOR PAYMENT. The existence of a dispute between the department and a contractor regarding a contract under this chapter does not justify nonpayment of a subcontractor for work completed by the subcontractor under the contract if the subcontractor has completed the work in a satisfactory manner and the work has been approved by the department and the contractor.

Sec. 45.153. EXPIRATION. This chapter expires September 1, 2012.

SECTION 1.124. Section 21.01, Penal Code, is amended by adding Subdivision (4) to read as follows:

(4) "Spouse" means a person to whom a person is legally married under Subtitle A, Title 1, Family Code, or a comparable law of another jurisdiction.

SECTION 1.125. (a) Section 22.04, Penal Code, is amended by adding Subsection (a-1) and amending Subsections (b) through (g) to read as follows:

(a-1) A person commits an offense if the person is an owner, operator, or employee of a group home, nursing facility, assisted living facility, intermediate care facility for persons with mental retardation, or other institutional care facility and the person intentionally, knowingly, recklessly, or with criminal negligence by omission causes to a child, elderly individual, or disabled individual who is a resident of that group home or facility:

(1) serious bodily injury;

(2) serious mental deficiency, impairment, or injury;

(3) bodily injury; or

(4) exploitation.

(b) An omission that causes a condition described by Subsection (a)(1), (2), or (3) or (a-1)(1), (2), (3), or (4) [Subsections (a)(1) through (a)(3)] is conduct constituting an offense under this section if:

(1) the actor has a legal or statutory duty to act; or

(2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual.

(c) In this section:

(1) "Child" means a person 14 years of age or younger.

(2) "Elderly individual" means a person 65 years of age or older.

(3) "Disabled individual" means a person older than 14 years of age who by reason of age or physical or mental disease, defect, or injury is substantially unable to protect himself from harm or to provide food, shelter, or medical care for himself.

(4) "Exploitation" means the illegal or improper use of an individual or of the resources of the individual for monetary or personal benefit, profit, or gain.

(d) For purposes of an omission that causes a condition described by Subsection (a)(1), (2), or (3), the [The] actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child, elderly individual, or disabled individual. For purposes of an omission that causes a condition described by Subsection (a-1)(1), (2), (3), or (4), the actor acting during the actor's capacity as owner, operator, or employee of a group home or facility described by Subsection (a-1) is considered to have accepted responsibility for protection, food, shelter, and medical care for the child, elderly individual, or disabled individual who is a resident of the group home or facility.

(e)  An offense under Subsection (a)(1) or (2) or (a-1)(1) or (2) is a felony of the first degree when the conduct is committed intentionally or knowingly. When the conduct is engaged in recklessly, the offense is [it shall be] a felony of the second degree.

(f)  An offense under Subsection (a)(3) or (a-1)(3) or (4) is a felony of the third degree when the conduct is committed intentionally or knowingly. When the conduct is engaged in recklessly, the offense is [it shall be] a state jail felony.

(g)  An offense under Subsection (a) is a state jail felony when the person acts with criminal negligence [shall be a state jail felony]. An offense under Subsection (a-1) is a state jail felony when the person, with criminal negligence and by omission, causes a condition described by Subsection (a-1)(1), (2), (3), or (4).

(b)  The change in law made by this section applies only to an offense committed on or after the effective date of this section.  An offense committed before the effective date of this section is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose.  For the purposes of this subsection, an offense was committed before the effective date of this section if any element of the offense was committed before that date.

SECTION 1.126.  Subdivision (3), Article 56.01, Code of Criminal Procedure, is amended to read as follows:

(3)  "Victim" means a person who is the victim of the offense of sexual assault, kidnapping, [or] aggravated robbery, or injury to a child, elderly individual, or disabled individual or who has suffered bodily injury or death as a result of the criminal conduct of another.

SECTION 1.127.  (a)  Subchapter A, Chapter 102, Code of Criminal Procedure, is amended by adding Article 102.0186 to read as follows:

Art. 102.0186.  ADDITIONAL COSTS ATTENDANT TO CERTAIN CHILD SEXUAL ASSAULT AND RELATED CONVICTIONS. (a)  A person convicted of an offense under Section 21.11, 22.011(a)(2), 22.021(a)(1)(B), 43.25, 43.251, or 43.26, Penal Code, shall pay $100 on conviction of the offense.

(b)  Costs imposed under this article are imposed without regard to whether the defendant is placed on community supervision after being convicted of the offense or receives deferred adjudication for the offense.

(c)  The clerks of the respective courts shall collect the costs and pay them to the county treasurer or to any other official who discharges the duties commonly delegated to the county treasurer for deposit in a fund to be known as the county child abuse prevention fund. A fund designated by this subsection may be used only to fund child abuse prevention programs in the county where the court is located.

(d)  The county child abuse prevention fund shall be administered by or under the direction of the commissioners court.

(b)  The change in law made by this section applies only to an offense committed on or after the effective date of this section. An offense committed before the effective date of this section is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose. For purposes of this section, an offense was committed before the effective date of this section if any element of the offense was committed before that date.

SECTION 1.128. TRAINING FOR CHILD PROTECTIVE SERVICES. (a) In this section:

(1) "Commission" means the Health and Human Services Commission.

(2) "Health and human services agencies" has the meaning assigned by Section 531.001, Government Code.

(3) "Training for child protective services" means training administered by a state agency or an institution of higher education that is provided to individuals working or interested in working in the field of child protective services and that is intended to assist the individuals in performing that work more effectively or efficiently.

(b) The commission shall study the feasibility of providing a financial incentive to individuals to assist the individuals in receiving training for child protective services.

(c) The study must:

(1) consider the feasibility of creating a private foundation to solicit and receive money that will be used to assist those individuals;

(2) consider possible means of providing a financial incentive, including educational or living stipends or reimbursement of tuition costs, to assist those individuals and determine the most effective means to deliver the incentives;

(3) suggest criteria that those individuals must meet to receive the financial incentives;

(4) estimate the initial cost and annual cost to this state of providing the financial incentives to those individuals; and

(5) estimate the savings and costs associated with improved training of those individuals that may result from providing the financial incentives.

(d) In conducting the study under Subsection (b) of this section, the commission may cooperate as necessary with any appropriate state agency.

(e) Not later than September 1, 2006, the commission shall report the results of the study to the standing committees of the senate and house of representatives with primary jurisdiction over health and human services programs or appropriations.

SECTION 1.129. REPEALER. The following provisions of the Human Resources Code are repealed:

(1) Subdivision (1), Section 40.001;

(2) Section 40.028;

(3) Section 40.029;

(4) Subsections (b) and (c), Section 40.0305; and

(5) Subsection (c), Section 43.010.

ARTICLE 2. ADULT PROTECTIVE SERVICES

SECTION 2.01. Subchapter B, Chapter 40, Human Resources Code, is amended by adding Section 40.0315 to read as follows:

Sec. 40.0315. INVESTIGATION UNIT FOR ADULT PROTECTIVE SERVICES. (a) The adult protective services division of the department shall maintain an investigation unit to investigate allegations of abuse, neglect, and exploitation of elderly and disabled persons reported to the division.

(b) An investigator in the unit shall determine whether an elderly or disabled person who is the subject of a report made under Section 48.051(a) may have suffered from abuse, neglect, or exploitation as a result of the criminal conduct of another person. If the investigator determines that criminal conduct may have occurred, the investigator shall immediately notify the appropriate law enforcement agency.

SECTION 2.02. Subchapter B, Chapter 40, Human Resources Code, is amended by adding Sections 40.0322 and 40.0323 to read as follows:

Sec. 40.0322. QUALIFICATIONS FOR ADULT PROTECTIVE SERVICES PERSONNEL; RECRUITMENT. (a) In hiring department employees whose duties include providing services as part of, or relating to, the provision of adult protective services directly to an elderly or disabled person, the commissioner shall ensure that the department hires, as often as possible, persons with professional credentials related to adult protective services, including persons who are licensed master social workers, as defined by Section 505.002, Occupations Code, or licensed professional counselors.

(b) Subject to the availability of funds, the executive commissioner by rule shall develop and the department shall implement a recruiting program designed to attract and retain for employment in the adult protective services division persons with professional credentials described by Subsection (a).

(c) Subject to the availability of funds, the executive commissioner by rule shall develop and the department shall implement an incentive program to encourage each department employee whose duties include the duties described by Subsection (a) to obtain professional credentials described by that subsection if the employee does not have those credentials.

Sec. 40.0323. COORDINATION REGARDING RECRUITMENT FOR AND CURRICULUM OF CERTAIN CERTIFICATE OR DEGREE PROGRAMS. Subject to the availability of funds, the department and the Texas Higher Education Coordinating Board jointly shall develop strategies to:

(1) promote certificate or degree programs in the fields of social work and psychology to individuals enrolled in or admitted to institutions of higher education in this state; and

(2) ensure that persons receiving a certificate or degree, including a graduate degree, in social work or psychology from an institution of higher education in this state have the knowledge and skills regarding protective services that are provided directly to elderly or disabled persons and necessary for successful employment by the adult protective services division of the department.

SECTION 2.03. Subchapter B, Chapter 40, Human Resources Code, is amended by adding Section 40.035 to read as follows:

Sec. 40.035. TRAINING PROGRAM FOR ADULT PROTECTIVE SERVICES; CONTINUING EDUCATION. (a) The department shall develop and implement a training program that each newly hired or assigned department employee must complete before:

(1) initiating an investigation of a report of alleged abuse, neglect, or exploitation of an elderly or disabled person under Chapter 48; or

(2) providing protective services to elderly or disabled persons under that chapter.

(b)  The training program must:
(1)  provide the person with appropriate comprehensive information regarding:
(A)  the incidence and types of reports of abuse, neglect, and exploitation of elderly or disabled persons that are received by the department, including information concerning false reports; and
(B)  the use and proper implementation of:
(i)  the risk assessment criteria developed under Section 48.004;
(ii)  the criteria used by caseworkers to determine whether elderly or disabled persons lack capacity to consent to receive protective services; and
(iii)  the legal procedures available under Chapter 48 for the protection of elderly or disabled persons, including the procedures for obtaining a court order for emergency protective services under Section 48.208;
(2)  include best practices for management of a case from the intake process to the provision of protective services, including criteria that specify the circumstances under which an employee should:
(A)  consult a supervisor regarding a case; or
(B)  refer an elderly or disabled person to an appropriate public agency or community service provider for guardianship or other long-term services after the delivery of protective services to that person has been completed;
(3)  provide appropriate specialized training in any necessary topics, including:
(A)  investigation of suspected identity theft and other forms of financial exploitation and suspected self-neglect; and
(B)  establishment and maintenance of working relationships with community organizations and other local providers who provide services to elderly and disabled persons;
(4)  include on-the-job training, which must require another department caseworker with more experience to accompany and train the caseworker in the field;
(5)  provide for the development of individualized training plans;
(6)  include training in working with law enforcement agencies and the court system when legal intervention is sought for investigations or emergency orders;
(7)  to the maximum extent possible, include nationally recognized best practices in addition to the best practices required under Subdivision (2); and
(8)  include testing, progress reports, or other evaluations to assess the performance of trainees.
(c)  The department at least annually shall provide comprehensive case management training to supervisors of department employees who conduct investigations under Chapter 48. The training must be designed to enable the supervisors to provide guidance on investigations of reports of alleged abuse, neglect, or exploitation that are complex or present unique problems.
(d)  The department shall develop and implement appropriate continuing education programs for employees of the adult protective services division who have completed initial training under this section. The continuing education programs must include nationally recognized best practices to the maximum extent possible and must be designed to provide an annual update regarding changes in:

        (1)  adult protective services division policies and procedures; and

        (2)  applicable law, including statutory changes affecting the adult protective services division or elderly or disabled persons served by the division.

    (e)  A department employee required to participate in a continuing education program under this section must complete the program at least once each calendar year.

    (f)  The department shall:

        (1)  make curriculum developed for a training or continuing education program under this section readily available to department employees in written form; and

        (2)  periodically revise a training and continuing education program established under this section as necessary to satisfy training needs identified by the department or department employees.

    (g)  The circumstances specified under Subsection (b)(2) under which an employee should consult a supervisor regarding a case must be consistent with the risk assessment criteria developed under Section 48.004 that require consultation with a supervisor.

    (h)  The executive commissioner by rule shall provide policies and procedures by which the department incorporates examples of actual cases investigated by the department in the training programs under this section for use as training tools.

    (i)  In implementing the training program and continuing education programs under this section, the department, to the maximum extent possible, shall contract with persons who are not department employees to conduct the programs.

    SECTION 2.04.  (a)  Subchapter C, Chapter 40, Human Resources Code, is amended by adding Section 40.0515 to read as follows:

    Sec. 40.0515.  QUALITY ASSURANCE PROGRAM FOR ADULT PROTECTIVE SERVICES; QUARTERLY REPORTS. (a)  The department shall develop and implement a quality assurance program for adult protective services provided by or on behalf of the department.

    (b)  In developing the program, the department shall establish:

        (1)  client-centered outcome measures for each of the following functions of the adult protective services program:

            (A)  intake process;

            (B)  investigations;

            (C)  risk assessment determinations; and

            (D)  delivery of protective services;

        (2)  minimum job performance standards for personnel and each work department of the adult protective services division of the department; and

        (3)  procedures for conducting periodic performance reviews to monitor compliance with the standards established under Subdivision (2), which must include requirements that, for each caseworker in the adult protective services division of the department, a supervisor shall conduct:

            (A)  at least two performance reviews each year, if the employee has less than two years of adult protective services casework experience; and

            (B)  at least one performance review each year, if the employee has at least two years of adult protective services casework experience.

(c)  The department shall promptly address a person's or work department's failure to meet minimum job performance standards established under Subsection (b)(2):

(1)  by issuing to the person or work department, as appropriate, a corrective action plan detailing the actions required to comply with the standards; or

(2)  if necessary, through disciplinary action, including a person's demotion or discharge, for repeated failure to meet the standards.

(d)  A performance review conducted under Subsection (b)(3) is considered a performance evaluation for purposes of Section 40.032(c). The department shall ensure that disciplinary or other corrective action is taken against a supervisor or other managerial employee who is required to conduct a performance evaluation under Section 40.032(c) or a performance review under Subsection (b)(3) and who fails to complete that evaluation or review in a timely manner.

(e)  The annual performance evaluation required under Section 40.032(c) of the performance of a supervisor in the adult protective services division must:

(1)  be performed by an appropriate program administrator; and

(2)  include:

(A)  an evaluation of the supervisor with respect to the job performance standards applicable to the supervisor's assigned duties; and

(B)  an evaluation of the supervisor with respect to the compliance of employees supervised by the supervisor with the job performance standards applicable to those employees' assigned duties.

(f)  A summary of the findings of outcome measures established and performance reviews conducted under this section must be reported to regional directors and other senior management employees of the adult protective services division.

(g)  Each fiscal quarter the department shall file with the governor and the presiding officer of each house of the legislature a report that includes:

(1)  a comprehensive review of the adult protective services division's overall performance during the preceding quarter; and

(2)  a summary of the adult protective services division's performance during the preceding quarter on each of the outcome measures established under Subsection (b)(1).

(b)  The Department of Family and Protective Services shall submit the initial report required under Section 40.0515, Human Resources Code, as added by this section, not later than February 1, 2006.

SECTION 2.05.  Subchapter C, Chapter 40, Human Resources Code, is amended by adding Section 40.0527 to read as follows:

Sec. 40.0527.  PUBLIC AWARENESS. (a)  Subject to the availability of funds, the executive commissioner by rule shall develop and the department shall implement a statewide public awareness campaign designed to educate the public regarding the abuse, neglect, and exploitation of elderly and disabled persons.

(b)  The department may use mass communications media, the Internet, publications, or other means of public education in conducting the campaign.

(c)  A public awareness strategy implemented for the program must include:

    (1) the provision of information on the incidence and types of reports of abuse, neglect, and exploitation of elderly or disabled persons; and

    (2) practices that can reduce the incidences of abuse, neglect, and exploitation of elderly or disabled persons in this state.

   (d) The department shall enlist the support and assistance of civic, philanthropic, and public service organizations in the performance of the duties imposed under this section.

  SECTION 2.06. Subchapter A, Chapter 48, Human Resources Code, is amended by adding Section 48.004 to read as follows:

  Sec. 48.004. RISK ASSESSMENT. The executive commissioner by rule shall develop and maintain risk assessment criteria for use by department personnel in determining whether an elderly or disabled person is in imminent risk of abuse, neglect, or exploitation or in a state of abuse, neglect, or exploitation and needs protective services. The criteria must:

    (1) provide for a comprehensive assessment of the person's:

     (A) environmental, physical, medical, mental health, and financial condition;

     (B) social interaction and support; and

     (C) need for legal intervention; and

    (2) specify the circumstances under which a caseworker must consult with a supervisor regarding a case.

  SECTION 2.07. Subchapter A, Chapter 48, Human Resources Code, is amended by adding Sections 48.005 and 48.006 to read as follows:

  Sec. 48.005. MAINTENANCE OF RECORDS. Notwithstanding Chapter 441, Government Code, or any other law, and subject to the availability of funds, the department shall maintain in an electronic format a summary of all records related to investigations of reports made under Section 48.051 that includes only critical information with respect to those investigations that will enable the department to research the history of a person's involvement in the investigated cases.

  Sec. 48.006. COMMUNITY SATISFACTION SURVEY. (a) Subject to the availability of funds, the department shall develop a community satisfaction survey that solicits information regarding the department's performance with respect to providing investigative and adult protective services. In each region, the department shall send the survey at least annually to:

    (1) stakeholders in the adult protective services system, including local law enforcement agencies and prosecutors' offices;

    (2) protective services agencies, including nonprofit agencies; and

    (3) courts with jurisdiction over probate matters.

   (b) The department shall send the results of each region's survey to:

    (1) the region for evaluation by regional and program administrators and implementation of changes necessary to address community concerns;

    (2) the presiding judge of the statutory probate courts in that region; and

    (3) courts with jurisdiction over probate matters in that region.

   (c) The department may not include any confidential information in the results of the survey provided under Subsection (b)(2) or (3) unless ordered by a court.

SECTION 2.08.  Section 48.051, Human Resources Code, is amended by adding Subsection (e) to read as follows:

(e)  If a person who makes a report under this section chooses to give self-identifying information, the caseworker who investigates the report shall contact the person if necessary to obtain any additional information required to assist the person who is the subject of the report.

SECTION 2.09. Section 48.101, Human Resources Code, is amended by amending Subsections (d) and (e) and adding Subsections (d-1), (e-1), (g), and (g-1) to read as follows:

(d)  The executive commissioner shall adopt rules providing [department or investigating state agency by rule shall provide] for the release, on request, to a person who is the subject of a report of abuse, neglect, or exploitation or to that person's legal representative of otherwise confidential information relating to that report. The department or investigating state agency shall edit the information before release to protect the confidentiality of information relating to the reporter's identity and to protect any other individual whose safety or welfare may be endangered by disclosure.

(d-1)  Subject to Subsection (e-1), the executive commissioner shall adopt rules providing for the release, on request, by the department or investigating state agency of otherwise confidential information relating to a person who is the subject of a report or investigation of abuse, neglect, or exploitation or to whom the department has provided protective services, to:

(1)  a court that has a matter pending before it that involves the person;

(2)  the attorney ad litem or any other legal representative, other than a guardian, appointed for the person; and

(3)  the person's legal guardian.

(e)  The executive commissioner [department or investigating state agency] may adopt rules relating to the release of information by the department or investigating state agency that is contained in the record of a deceased individual who was the subject of an investigation conducted by the department or investigating state agency or to whom the department has provided protective services. The rules must be consistent with the purposes of this chapter and any applicable state or federal law. The executive commissioner shall adopt rules, subject to Subsection (e-1), that provide for the release, on request, of otherwise confidential information in the deceased person's record to the personal representative appointed for the person's estate.

(e-1)  Information released by the department or an investigating state agency under Subsection (d-1) or to a personal representative under Subsection (e) may not include the identity of the person who made the report of abuse, neglect, or exploitation.

(g)  The department may establish procedures to exchange with a community service provider or local governmental entity confidential information relating to a report made under Section 48.051(a) that is necessary for the department, provider, or entity to provide protective services, health care services, housing services, or social

services to the person who is the subject of the report.  An exchange of information under this subsection does not affect whether the information is subject to disclosure under Chapter 552, Government Code.

(g-1)  The executive commissioner by rule shall provide policies and procedures that are designed to guard against the unauthorized release or dissemination of confidential information that is exchanged under Subsection (g).

SECTION 2.10. (a) Subchapter D, Chapter 48, Human Resources Code, is amended by adding Section 48.1521 to read as follows:

Sec. 48.1521.  INVESTIGATION OF COMPLEX CASES.  (a) The department shall develop and implement a system to ensure that, to the greatest extent possible, investigations conducted by the department that involve especially complex issues of abuse, neglect, or exploitation, such as issues associated with identity theft and other forms of financial exploitation, are:

(1)  assigned to personnel who have experience and training in those issues; and

(2)  monitored by a special task unit for complex cases.

(b)  Each county with a population of 250,000 or more shall appoint persons to serve as standing members of a special task unit to monitor cases that arise in the county and require monitoring as provided by Subsection (a). The standing members of each special task unit must include:

(1)  a provider of mental health services or aging services or a representative of a nonprofit entity serving persons with disabilities;

(2)  a representative of a law enforcement agency; and

(3)  a legal expert.

(c)  In addition to the standing members specified by Subsection (b), the special task unit:

(1)  must include, for purposes of monitoring a particular case, the caseworker on the case and the caseworker's supervisor; and

(2)  may include a financial forensics expert and any other person with expertise that would be useful in monitoring a particular case.

(d)  The department shall develop and make available to each county described by Subsection (b) a manual to assist the county in establishing and operating the special task unit required by this section. The manual must describe:

(1)  the purpose and potential benefits of the unit;

(2)  a description of the monitoring process the unit is expected to follow and potential problems the unit may encounter;

(3)  the composition and administration of the unit; and

(4)  the department's criteria for selecting cases to be monitored by the unit.

(e)  Before the special task unit makes a recommendation that a guardian be appointed for a person in a case being monitored by the unit, the unit shall thoroughly consider all less-restrictive alternatives for legal intervention in the case.

(b) The Department of Family and Protective Services shall develop the manual required by Subsection (d), Section 48.1521, Human Resources Code, as added by Subsection (a) of this section, as soon as possible after the effective date of this article. In developing the manual, the department shall use Wisconsin's Elder Abuse Interdisciplinary Team Manual as a model.

SECTION 2.11. Subchapter D, Chapter 48, Human Resources Code, is amended by adding Section 48.1522 to read as follows:

Sec. 48.1522. REPORTS OF CRIMINAL CONDUCT TO LAW ENFORCEMENT AGENCY. If during the course of the department's or another state agency's investigation of reported abuse, neglect, or exploitation a caseworker of the department or other state agency, as applicable, or the caseworker's supervisor has cause to believe that the elderly or disabled person has been abused, neglected, or exploited by another person in a manner that constitutes a criminal offense under any law, including Section 22.04, Penal Code, the caseworker or supervisor shall:

(1)  immediately notify an appropriate law enforcement agency; and

(2)  provide the law enforcement agency with a copy of the investigation report of the department or other state agency, as applicable, in a timely manner.

SECTION 2.12. Subchapter D, Chapter 48, Human Resources Code, is amended by adding Section 48.1523 to read as follows:

Sec. 48.1523. MANAGEMENT REVIEW FOLLOWING CERTAIN INVESTIGATIONS. If the department receives and investigates a report made under Section 48.051, the subject of which is a person with respect to whom the department received and investigated two previous reports under that section and closed those investigations, an adult protective services supervisor shall:

(1)  classify the case as a recidivist case;

(2)  review the reports and investigation files concerning that person; and

(3)  assist the caseworker and supervisor investigating the third report in developing a long-term plan for resolving the issues involved in the case.

SECTION 2.13. Subchapter D, Chapter 48, Human Resources Code, is amended by adding Section 48.159 to read as follows:

Sec. 48.159. INTERNAL REVIEW OF DEPARTMENT INVESTIGATION. The department shall establish procedures for conducting an internal review of completed investigations conducted by the department under this chapter to:

(1)  determine whether information obtained during the intake process was sufficient and accurate;

(2)  assess whether telephone calls were appropriately routed;

(3)  assess whether investigations were appropriately classified and prioritized;

(4)  evaluate the case reports for any special issues or requirements;

(5)  assess whether appropriate law enforcement agencies were notified of any suspected criminal conduct; and

(6)  identify other relevant information to enable the department to take any corrective action necessary to improve the process of conducting investigations under this chapter.

SECTION 2.14. Section 48.202, Human Resources Code, is amended to read as follows:

Sec. 48.202. SERVICE DETERMINATION BY DEPARTMENT OR AGENCY. (a)  In an investigation the department or state agency, as appropriate, shall determine:

(1)  whether the person needs protective services from the department;

(2)  what services are needed;

(3)  whether services are available from the department, from the state agency, or in the community and how they can be provided;

(4)  whether the person, acting alone, would be capable of obtaining needed services and could bear the cost or would be eligible for services from the department or state agency;

(5)  whether a caretaker would be willing to provide services or would agree to their provision [provisions];

(6)  whether the elderly or disabled person desires the services; [and]

(7)  whether the person needs legal intervention to resolve the person's abuse, neglect, or exploitation and, if so, what type of intervention is needed; and

(8)  other pertinent data.

(b)  If the department or state agency, as appropriate, determines under Subsection (a)(1) that a person needs protective services, the department or agency shall, in determining how those services can be provided as required by Subsection (a)(3), determine whether the person is eligible for community-based long-term care services and whether those services are available. If the person is eligible for those services, but the services are not immediately available, the department or state agency shall ensure that the person is placed on an appropriate waiting list for the services and that the person's abuse, neglect, or exploitation is resolved before the department closes the case.

SECTION 2.15.  Subsections (a) and (b), Section 48.205, Human Resources Code, are amended to read as follows:

(a)  Subject to the availability of funds, the [The] department shall [may] provide direct protective services or contract with protective services agencies for the provision [provisions] of those services.

(b)  The department shall use existing resources and services of public and private agencies in providing protective services. If the department does not have existing resources to provide direct protective services to elderly or disabled persons, the department, subject to the availability of funds, shall contract with protective services agencies for the provision of those services, especially to elderly or disabled persons residing in rural or remote areas of this state or not previously served by the department.

SECTION 2.16.  Section 48.208, Human Resources Code, is amended by amending Subsection (e) and adding Subsections (c-1), (c-2), (c-3), (c-4), (c-5), (d-1), (e-1), and (e-2) to read as follows:

(c-1)  Notwithstanding Subsection (c)(4), in lieu of a medical report described by Subsection (c)(4), the petition may include an assessment of the elderly or disabled person's health status as described by Subsection (c-2) or psychological status as described by Subsection (c-3), or a medical opinion of the elderly or disabled person's health status as described by Subsection (c-4), if the department determines, after making a good faith effort, that a physician from whom the department may obtain the medical report is unavailable. The department shall ensure that the person who performs an assessment of the elderly or disabled person's health or psychological status has training and experience in performing the applicable assessment.

(c-2)  Except as provided by Subsection (c-4), an assessment of the elderly or disabled person's health status must be performed by a physician assistant or advanced practice nurse. The person performing the assessment shall sign a report stating:

(1)  that the elderly or disabled person is reported to be suffering from abuse, neglect, or exploitation, which may present a threat to the person's life or physical safety;

(2)  whether the elderly or disabled person has provided the person's medical history to the physician assistant or advanced practice nurse, as applicable; and

(3)  that in the professional opinion of the physician assistant or advanced practice nurse, as applicable, the issuance of an emergency order authorizing protective services without the elderly or disabled person's consent is necessary under the circumstances.

(c-3)  An assessment of the elderly or disabled person's psychological status must be performed by a licensed psychologist or master social worker who has training and expertise in issues related to abuse, neglect, and exploitation. The person performing the assessment shall sign a report stating:

(1)  that the elderly or disabled person is reported to be suffering from abuse, neglect, or exploitation, which may present a threat to the person's life or physical safety; and

(2)  that in the professional opinion of the licensed psychologist or master social worker, as applicable, the issuance of an emergency order authorizing protective services without the elderly or disabled person's consent is necessary under the circumstances.

(c-4)  A registered nurse may perform a nursing assessment of the elderly or disabled person's health status. If the registered nurse, based on the registered nurse's professional nursing judgment, determines that the elderly or disabled person is likely to be suffering from abuse, neglect, or exploitation, which may present a threat to the person's life or physical safety, the registered nurse shall report that assessment to a physician. After the registered nurse reports the assessment, the physician shall sign a written opinion stating whether:

(1)  the elderly or disabled person is reported to be suffering from abuse, neglect, or exploitation, which may present a threat to the person's life or physical safety; and

(2)  the issuance of an emergency order authorizing protective services without the elderly or disabled person's consent is necessary under the circumstances.

(c-5)  The physician may use the registered nurse's assessment of the elderly or disabled person's health status as the basis of the physician's professional opinion under Subsection (c-4).

(d-1)  If the court renders an order that is based on a petition including an assessment under Subsection (c-2) or (c-3) or a medical opinion under Subsection (c-4), the court shall order that the elderly or disabled person be examined by a physician not later than 72 hours after the time the provision of protective services begins. After performing the examination, the physician shall sign and submit to the court a medical report stating the physician's opinion whether the elderly or disabled person is:

(1)  suffering from abuse, neglect, or exploitation presenting a threat to life or physical safety; and

(2)  physically or mentally incapable of consenting to services.

(e)  The emergency order expires at the end of 72 hours from the time [of] the order is rendered unless:

(1)  the emergency order terminates as provided by Subsection (e-1);

(2)  the 72-hour period ends on a Saturday, Sunday, or legal holiday in which event the order is automatically extended to 4 p.m. on the first succeeding business day; or

(3)  the court extends the order as provided by Subsection (e-2).

(e-1)  An emergency order that was rendered based on a petition that included an assessment under Subsection (c-2) or (c-3) or a medical opinion under Subsection (c-4) immediately terminates if the medical report issued under Subsection (d-1) states the physician's opinion that the elderly or disabled person:

(1)  is not suffering from abuse, neglect, or exploitation presenting a threat to life or physical safety; or

(2)  is physically or mentally capable of consenting to services.

(e-2)  The court may extend an emergency order issued under this section [An order may be renewed] for a period of not more than 30 [14 additional] days. An extension [A renewal] order that ends on a Saturday, Sunday, or legal holiday is automatically extended to 4 p.m. on the first succeeding business day. The court may modify or terminate the emergency order on petition of the department, the incapacitated person, or any person interested in his welfare.

SECTION 2.17.  Section 531.0162, Government Code, is amended by adding Subsections (c) and (d) to read as follows:

(c)  Subject to available appropriations, the commission shall use technology whenever possible in connection with the adult protective services program of the Department of Family and Protective Services to:

(1)  provide for automated collection of information necessary to evaluate program effectiveness using systems that integrate collection of necessary information with other routine duties of caseworkers and other service providers; and

(2)  consequently reduce the time that caseworkers and other service providers are required to use in gathering and reporting information necessary for program evaluation.

(d)  The commission shall include representatives of the private sector in the technology planning process used to determine appropriate technology for the adult protective services program of the Department of Family and Protective Services.

SECTION 2.18.  (a)  Section 531.048, Government Code, is amended by adding Subsection (g) to read as follows:

(g)  The executive commissioner shall develop and, subject to the availability of funds, implement a caseload management reduction plan to reduce, not later than January 1, 2011, caseloads for caseworkers employed by the adult protective services division of the Department of Family and Protective Services to a level that does not exceed professional caseload standards by more than five cases per caseworker. The plan must provide specific annual targets for caseload reduction.

(b) Not later than January 1, 2006, the executive commissioner of the Health and Human Services Commission shall adopt rules establishing the caseload management reduction plan as provided by Subsection (g), Section 531.048, Government Code, as added by this section.

(c) Not later than December 31 of each even-numbered year, the executive commissioner of the Health and Human Services Commission shall prepare a report regarding the implementation of the plan provided by Subsection (g), Section 531.048, Government Code, as added by this section. The report must include an assessment of the effect of the plan on reducing caseloads and the amount of funding necessary to fully implement the plan during the next biennium. The executive commissioner shall submit the report to the governor, the lieutenant governor, the speaker of the house of representatives, and the presiding officer of each house and senate standing committee having jurisdiction over adult protective services.

SECTION 2.19. LOCAL ADULT PROTECTIVE SERVICES BOARDS. (a) The standing committee of the senate having jurisdiction over adult protective services shall conduct a study regarding the feasibility of establishing a system by which adult protective services are provided through a statewide network of local adult protective services boards. Each local adult protective services board would:

(1) serve a designated local adult protective services area;

(2) develop a local adult protective services plan for approval by the Department of Family and Protective Services; and

(3) receive a block grant through the department to provide adult protective services in accordance with the approved local adult protective services plan.

(b) The standing committee of the senate having jurisdiction over adult protective services must include the results of the study conducted under this section and recommendations regarding implementation of the local adult protective services board system in the committee's interim report to the 80th Legislature.

SECTION 2.20. PILOT PROGRAM FOR MONITORING CERTAIN UNLICENSED LONG-TERM CARE FACILITIES. (a) In this section:

(1) "Disabled person" has the meaning assigned by Section 48.002, Human Resources Code.

(2) "Elderly person" has the meaning assigned by Section 48.002, Human Resources Code.

(3) "Long-term care facility" means:

(A) a nursing home or related institution;

(B) an assisted living facility;

(C) an ICF-MR, as defined by Section 531.002, Health and Safety Code;

(D) a community home subject to Chapter 123, Human Resources Code; or

(E) any other residential arrangement that provides care to four or more adults who are unrelated to the proprietor of the establishment.

(b) The executive commissioner of the Health and Human Services Commission by rule shall develop and implement a pilot program in which local task forces composed of health care providers, representatives from governmental entities, and local government officials are created to:

(1)  identify, through a coordination of efforts and resources, persons establishing or operating:

(A)  long-term care facilities providing personal care services, health-related services, or other care to elderly or disabled persons without being licensed or providing disclosures as required by state law; or

(B)  residential facilities or arrangements providing personal care services or other care in violation of state law to three or fewer elderly or disabled persons who are unrelated to the proprietor of the establishment; and

(2)  take appropriate action necessary to:

(A)  report the facilities or arrangements described by Subdivision (1) of this subsection to the appropriate state regulatory agencies or local law enforcement agencies;

(B)  assist, whenever practicable, a long-term care facility described by Paragraph (A), Subdivision (1) of this subsection, in obtaining the appropriate licensure or making the appropriate disclosures on request of the facility; and

(C)  assist, if it is feasible and practicable, a facility or arrangement described by Paragraph (B), Subdivision (1) of this subsection, in complying with applicable regulatory requirements of state or local law.

(c)  Not later than January 1, 2006, the executive commissioner of the Health and Human Services Commission shall implement the pilot program in at least one rural area and one urban area of this state.

(d)  Not later than January 1, 2007, the Health and Human Services Commission shall submit a report on the status and progress of the pilot program to the governor, the lieutenant governor, the speaker of the house of representatives, and the presiding officer of each house and senate standing committee having jurisdiction over adult protective services. The report must include a recommendation regarding the advisability of expanding the pilot program statewide.

(e)  This section expires September 1, 2007.

SECTION 2.21.  REPEALER.    Section 48.157, Human Resources Code, is repealed.

ARTICLE 3. GUARDIANSHIP AND RELATED SERVICES

SECTION 3.01.  The heading to Subchapter E, Chapter 48, Human Resources Code, is amended to read as follows:

SUBCHAPTER E.  PROVISION OF SERVICES; [GUARDIANSHIP SERVICES;] EMERGENCY PROTECTION

SECTION 3.02.  Section 48.209, Human Resources Code, is amended to read as follows:

Sec. 48.209.  REFERRAL FOR GUARDIANSHIP SERVICES [GUARDIANSHIPS].  (a)  The department shall refer an individual to the Department of Aging and Disability Services for guardianship services under Subchapter E, Chapter 161, if the individual is:

(1)  a minor in the conservatorship of the department who:

(A)  is 16 years of age or older; and

(B)  the department has reason to believe will, because of a physical or mental condition, be substantially unable to provide for the individual's own food, clothing, or shelter, to care for the individual's own physical health, or to manage the individual's own financial affairs when the individual becomes an adult; or

(2)  an elderly or disabled person who:

(A)  has been found by the department to be in a state of abuse, neglect, or exploitation; and

(B)  the department has reason to believe is an incapacitated person as defined by Section 601(14)(B), Texas Probate Code.

(b)  Notwithstanding Subsection (a), if a less restrictive alternative to guardianship is appropriate and available for the individual, the department shall pursue that alternative instead of making a referral to the Department of Aging and Disability Services for guardianship services.

(c)  The department and the Department of Aging and Disability Services shall enter into a memorandum of understanding that sets forth in detail the roles and duties of each agency regarding the referral for guardianship services under Subsection (a) and the provision of guardianship services to individuals under Subchapter E, Chapter 161.

(d)  Nothing in this section shall prohibit the department from also making a referral of an individual to a court having probate jurisdiction in the county where the individual is domiciled or found, if the court has requested the department to notify the court of any individuals who may be appropriate for a court-initiated guardianship proceeding under Section 683, Texas Probate Code.  In making a referral under this subsection and if requested by the court, the department shall, to the extent allowed by law, provide the court with all relevant information in the department's records relating to the individual.  The court, as part of this process, may not require the department to:

(1)  perform the duties of a guardian ad litem or court investigator as prescribed by Section 683, Texas Probate Code; or

(2)  gather additional information not contained in the department's records.

(e)  The department may not be appointed to serve as temporary or permanent guardian for any individual.  [(a)  The department shall file an application under Section 682 or 875, Texas Probate Code, to be appointed guardian of the person or estate or both of an individual who is a minor, is a conservatee of the department, and, because of a physical or mental condition, will be substantially unable to provide food, clothing, or shelter for himself or herself, to care for the individual's own physical health, or to manage the individual's own financial affairs when the individual becomes an adult. If a less restrictive alternative to guardianship is available for an individual, the department shall pursue the alternative instead of applying for appointment as a guardian.

[(b)  As a last resort, the department may apply to be appointed guardian of the person or estate of an elderly or disabled person who is found by the department to be in a state of abuse, neglect, or exploitation, and who, because of a physical or mental condition, will be substantially unable to provide food, clothing, or shelter for himself or herself, to care for the individual's own physical health, or to manage the individual's own financial affairs. A representative of the department shall take the

oath required by the Texas Probate Code on behalf of the department if the department is appointed guardian. If the department knows that an individual is willing and able to serve as the guardian, the department may inform the court of that individual's willingness and ability.

[(e) If appropriate, the department may contract with a political subdivision of this state, a private agency, or another state agency for the provision of guardianship services under this section. The department or a political subdivision of the state or state agency with which the department contracts under this section is not required to post a bond or pay any cost or fee otherwise required by the Texas Probate Code.

[(d) If the department is appointed guardian, the department is not liable for funding services provided to the department's ward, including long-term care or burial expenses.

[(e) The department may not be required to pay fees associated with the appointment of a guardian ad litem or attorney ad litem.

[(f) The department shall file an application with the court to name a successor guardian if the department becomes aware of a qualified and willing individual or guardianship program serving the area in which the ward is located.]

SECTION 3.03. Section 161.071, Human Resources Code, is amended to read as follows:

Sec. 161.071. GENERAL POWERS AND DUTIES OF DEPARTMENT. The department is responsible for administering human services programs for the aging and disabled, including:

(1) administering and coordinating programs to provide community-based care and support services to promote independent living for populations that would otherwise be institutionalized;

(2) providing institutional care services, including services through convalescent and nursing homes and related institutions under Chapter 242, Health and Safety Code;

(3) providing and coordinating programs and services for persons with disabilities, including programs for the treatment, rehabilitation, or benefit of persons with developmental disabilities or mental retardation;

(4) operating state facilities for the housing, treatment, rehabilitation, or benefit of persons with disabilities, including state schools for persons with mental retardation;

(5) serving as the state unit on aging required by the federal Older Americans Act of 1965 (42 U.S.C. Section 3001 et seq.) and its subsequent amendments, including performing the general functions under Section 101.022 to ensure:

(A) implementation of the federal Older Americans Act of 1965 (42 U.S.C. Section 3001 et seq.) and its subsequent amendments, including implementation of services and volunteer opportunities under that Act for older residents of this state through area agencies on aging;

(B) advocacy for residents of nursing facilities through the office of the state long-term care ombudsman;

(C) fostering of the state and community infrastructure and capacity to serve older residents of this state; and

(D)  availability of a comprehensive resource for state government and the public on trends related to and services and programs for an aging population;

(6)  performing all licensing and enforcement activities and functions related to long-term care facilities, including licensing and enforcement activities related to convalescent and nursing homes and related institutions under Chapter 242, Health and Safety Code;

(7)  performing all licensing and enforcement activities related to assisted living facilities under Chapter 247, Health and Safety Code;

(8)  performing all licensing and enforcement activities related to intermediate care facilities for persons with mental retardation under Chapter 252, Health and Safety Code; [and]

(9)  performing all licensing and enforcement activities and functions related to home and community support services agencies under Chapter 142, Health and Safety Code; and

(10)  serving as guardian of the person or estate, or both, for an incapacitated individual as provided by Subchapter E of this chapter and Chapter XIII, Texas Probate Code.

SECTION 3.04.  Chapter 161, Human Resources Code, is amended by adding Subchapter E to read as follows:

SUBCHAPTER E.  GUARDIANSHIP SERVICES

Sec. 161.101.  GUARDIANSHIP SERVICES. (a)  The department shall file an application under Section 682 or 875, Texas Probate Code, to be appointed guardian of the person or estate, or both, of a minor referred to the department under Section 48.209(a)(1) for guardianship services if the department determines:

(1)  that the minor, because of a mental or physical condition, will be substantially unable to provide for the minor's own food, clothing, or shelter, to care for the minor's own physical health, or to manage the individual's own financial affairs when the minor becomes an adult; and

(2)  that a less restrictive alternative to guardianship is not available for the minor.

(b)  The department shall conduct a thorough assessment of the conditions and circumstances of an elderly or disabled person referred to the department under Section 48.209(a)(2) for guardianship services to determine whether a guardianship is appropriate for the individual.  In determining whether a guardianship is appropriate, the department may consider the resources and funds available to meet the needs of the elderly or disabled person. The executive commissioner shall adopt rules for the administration of this subsection.

(c)  If after conducting an assessment of an elderly or disabled person under Subsection (b) the department determines that a guardianship is appropriate for the elderly or disabled person, the department shall file an application under Section 682 or 875, Texas Probate Code, to be appointed guardian of the person or estate, or both, of the individual. If after conducting the assessment the department determines that a less restrictive alternative to guardianship is available for the elderly or disabled person, the department shall pursue the less restrictive alternative instead of applying for appointment as the person's guardian.

(d) The department may not be required by a court to file an application for guardianship, and the department may not be appointed as permanent guardian for any individual unless the department files an application to serve or otherwise agrees to serve as the individual's guardian of the person or estate, or both.

(e) A guardianship created for an individual as a result of an application for guardianship filed under Subsection (a) may not take effect before the individual's 18th birthday.

Sec. 161.102. REFERRAL TO GUARDIANSHIP PROGRAM, COURT, OR OTHER PERSON. (a) If the department becomes aware of a guardianship program, private professional guardian, or other person willing and able to provide the guardianship services that would otherwise be provided by the department to an individual referred to the department by the Department of Family and Protective Services under Section 48.209, the department shall refer the individual to that person or program for guardianship services.

(b) If requested by a court, the department shall notify the court of any referral made to the department by the Department of Family and Protective Services relating to any individual who is domiciled or found in a county where the requesting court has probate jurisdiction and who may be appropriate for a court-initiated guardianship proceeding under Section 683, Texas Probate Code. In making a referral under this subsection and if requested by the court, the department shall, to the extent allowed by law, provide the court with all relevant information in the department's records relating to the individual. The court, as part of this process, may not require the department to:

(1) perform the duties of a guardian ad litem or court investigator as prescribed by Section 683, Texas Probate Code; or

(2) gather additional information not contained in the department's records.

Sec. 161.103. CONTRACT FOR GUARDIANSHIP SERVICES. If appropriate, the department may contract with a political subdivision of this state, a guardianship program as defined by Section 601, Texas Probate Code, a private agency, or another state agency for the provision of guardianship services under this section.

Sec. 161.104. QUALITY ASSURANCE PROGRAM. The department shall develop and implement a quality assurance program for guardianship services provided by or on behalf of the department. If the department enters into a contract with a political subdivision, guardianship program, private agency, or other state agency under Section 161.103, the department shall establish a monitoring system as part of the quality assurance program to ensure the quality of guardianship services for which the department contracts under that section.

Sec. 161.105. OATH. A representative of the department shall take the oath required by the Texas Probate Code on behalf of the department if the department is appointed guardian of the person or estate, or both, of a ward under Chapter XIII of that code.

Sec. 161.106. GUARDIANSHIP POWERS AND DUTIES. In serving as guardian of the person or estate, or both, for an incapacitated individual, the department has all the powers granted and duties prescribed to a guardian under Chapter XIII, Texas Probate Code, or any other applicable law.

Sec. 161.107. EXEMPTION FROM GUARDIANSHIP BONDS, CERTAIN COSTS, FEES, AND EXPENSES. (a) The department or a political subdivision of this state or state agency with which the department contracts under Section 161.103 is not required to post a bond or pay any cost or fee associated with a bond otherwise required by the Texas Probate Code in guardianship matters.

(b) The department is not required to pay any cost or fee otherwise imposed for court proceedings or other services, including:

(1) a filing fee or fee for issuance of service of process imposed by Section 51.317, 51.318(b)(2), or 51.319, Government Code;

(2) a court reporter fee imposed by Section 51.601, Government Code;

(3) a judicial fund fee imposed by Section 51.702, Government Code;

(4) a judge's fee imposed by Section 25.0008 or 25.0029, Government Code;

(5) a cost or security fee imposed by Section 12 or 622, Texas Probate Code; or

(6) a fee imposed by a county officer under Section 118.011 or 118.052, Local Government Code.

(c) The department may not be required to pay fees associated with the appointment of a guardian ad litem or attorney ad litem.

(d) A political subdivision of this state or state agency with which the department contracts under Section 161.103 is not required to pay any cost or fee otherwise required by the Texas Probate Code.

(e) If the department is appointed guardian, the department is not liable for funding services provided to the department's ward, including long-term care or burial expenses.

Sec. 161.108. SUCCESSOR GUARDIAN. The department shall review each of the department's pending guardianship cases at least annually to determine whether a more suitable person, including a guardianship program or private professional guardian, is willing and able to serve as successor guardian for a ward of the department. If the department becomes aware of any person's willingness and ability to serve as successor guardian, the department shall notify the court in which the guardianship is pending as required by Section 695A, Texas Probate Code.

Sec. 161.109. ACCESS TO RECORDS OR DOCUMENTS. (a) The department shall have access to all of the records and documents concerning an individual referred for guardianship services under this subchapter that are necessary to the performance of the department's duties under this subchapter, including client-identifying information and medical, psychological, educational, or residential information.

(b) The department is exempt from the payment of a fee otherwise required or authorized by law to obtain a medical record, including a mental health record, from a hospital or health care provider if the request for a record is made in the course of an assessment for guardianship services conducted by the department.

(c) If the department cannot obtain access to a record or document that is necessary to properly perform a duty under this subchapter, the department may petition the probate court or the statutory or constitutional court having probate jurisdiction for access to the record or document.

(d)  The court with probate jurisdiction shall, on good cause shown, order the person or entity who denied access to a record or document to allow the department to have access to the record or document under the terms and conditions prescribed by the court.

(e)  A person or entity is entitled to notice of and a hearing on the department's petition for access as described by this section.

(f)  Access to, or disclosure of, a confidential record or other confidential information under this section does not constitute a waiver of confidentiality for other purposes or as to other persons.

Sec. 161.110.  LEGAL REPRESENTATION OF DEPARTMENT.  (a) Except as provided by Subsection (b), (c), or (f), the prosecuting attorney representing the state in criminal cases in the county court shall represent the department in any proceeding under this subchapter unless the representation would be a conflict of interest.

(b)  If the attorney representing the state in criminal cases in the county court is unable to represent the department in an action under this subchapter because of a conflict of interest, the attorney general shall represent the department in the action.

(c)  If the attorney general is unable to represent the department in an action under this subchapter, the attorney general shall deputize an attorney who has contracted with the department under Subsection (d) or an attorney employed by the department under Subsection (e) to represent the department in the action.

(d)  Subject to the approval of the attorney general, the department may contract with a private attorney to represent the department in an action under this subchapter.

(e)  The department may employ attorneys to represent the department in an action under this subchapter.

(f)  In a county having a population of more than 2.8 million, the prosecuting attorney representing the state in civil cases in the county court shall represent the department in any proceeding under this subchapter unless the representation would be a conflict of interest.  If such attorney is unable to represent the department in an action under this subchapter because of a conflict of interest, the attorney general shall represent the department in the action.

Sec. 161.111.  CONFIDENTIALITY AND DISCLOSURE OF INFORMATION.  (a) All files, reports, records, communications, or working papers used or developed by the department in the performance of duties relating to the assessment for or the provision of guardianship services to an individual referred for guardianship services under this subchapter are confidential and not subject to disclosure under Chapter 552, Government Code.

(b)  Confidential information may be disclosed only for a purpose consistent with this subchapter, as required by other state or federal law, or as necessary to enable the department to exercise its powers and duties as guardian of the person or estate, or both, of an individual.

(c)  A court may order disclosure of confidential information only if:

(1)  a motion is filed with the court requesting release of the information and a hearing on that request;

(2)  notice of the hearing is served on the department and each interested party; and

(3)  the court determines after the hearing and an in camera review of the information that disclosure is essential to the administration of justice and will not endanger the life or safety of any individual who:

(A)  is being assessed by the department for guardianship services under this subchapter;

(B)  is a ward of the department; or

(C)  provides services to a ward of the department.

(d)  The department shall establish a policy and procedures for the exchange of information with another state agency or governmental entity, including a court, with a local guardianship program to which an individual is referred for services, or with any other entity who provides services to a ward of the department, as necessary for the department, state agency, governmental entity, or other entity to properly execute its respective duties and responsibilities to provide guardianship services or other needed services to meet the needs of the ward under this subchapter or other law.  An exchange of information under this subsection does not constitute a release for purposes of waiving the confidentiality of the information exchanged.

Sec. 161.112.  INDEMNIFICATION FOR LEGAL EXPENSES.  If a present or former employee of the department who was involved in activities related to the provision of guardianship services under this subchapter is criminally prosecuted for conduct related to the person's misfeasance or nonfeasance in the course and scope of the person's employment and is found not guilty after a trial or appeal or if the complaint or indictment is dismissed without a plea of guilty or nolo contendere being entered, the department may indemnify the person or the person's estate for the reasonable attorney's fees incurred in defense of the prosecution up to a maximum of $10,000.

Sec. 161.113.  IMMUNITY.  (a)  In this section, "volunteer" means a person who:

(1)  renders services for or on behalf of the department under the supervision of a department employee; and

(2)  does not receive compensation that exceeds the authorized expenses the person incurs in performing those services.

(b)  A department employee or an authorized volunteer who performs a department duty or responsibility under this subchapter is immune from civil or criminal liability for any act or omission that relates to the duty or responsibility if the person acted in good faith and within the scope of the person's authority.

SECTION 3.05.  Section 601, Texas Probate Code, is amended by adding Subdivision (12-a) and amending Subdivisions (13) and (24) to read as follows:

(12-a)  "Guardianship Certification Board" means the Guardianship Certification Board established under Chapter 111, Government Code.

(13)  "Guardianship program" has the meaning assigned by Section 111.001, Government Code [means a local, county, or regional program that provides guardianship and related services to an incapacitated person or other person who needs assistance in making decisions concerning the person's own welfare or financial affairs].

(24) "Private professional guardian" has the meaning assigned by Section 111.001, Government Code [means a person, other than an attorney or a corporate fiduciary, who is engaged in the business of providing guardianship services].

SECTION 3.06. The heading to Subpart J, Part 2, Chapter XIII, Texas Probate Code, is amended to read as follows:

SUBPART J. LIABILITY OF GUARDIAN [FOR CONDUCT OF WARD]

SECTION 3.07. The heading to Section 673, Texas Probate Code, is amended to read as follows:

Sec. 673. LIABILITY OF GUARDIAN FOR CONDUCT OF WARD.

SECTION 3.08. Subpart J, Part 2, Chapter XIII, Texas Probate Code, is amended by adding Section 674 to read as follows:

Sec. 674. IMMUNITY OF GUARDIANSHIP PROGRAM. A guardianship program is not liable for civil damages arising from an action taken or omission made by a person while providing guardianship services to a ward on behalf of the guardianship program, unless the action or omission:

(1) was wilfully wrongful;

(2) was taken or made with conscious indifference or reckless disregard to the safety of the incapacitated person or another;

(3) was taken or made in bad faith or with malice; or

(4) was grossly negligent.

SECTION 3.09. Section 682, Texas Probate Code, is amended to read as follows:

Sec. 682. APPLICATION; CONTENTS. Any person may commence a proceeding for the appointment of a guardian by filing a written application in a court having jurisdiction and venue. The application must be sworn to by the applicant and state:

(1) the name, sex, date of birth, and address of the proposed ward;

(2) the name, relationship, and address of the person the applicant desires to have appointed as guardian;

(3) whether guardianship of the person or estate, or both, is sought;

(4) the nature and degree of the alleged incapacity, the specific areas of protection and assistance requested, and the limitation of rights requested to be included in the court's order of appointment;

(5) the facts requiring that a guardian be appointed and the interest of the applicant in the appointment;

(6) the nature and description of any guardianship of any kind existing for the proposed ward in any other state;

(7) the name and address of any person or institution having the care and custody of the proposed ward;

(8) the approximate value and description of the proposed ward's property, including any compensation, pension, insurance, or allowance to which the proposed ward may be entitled;

(9) the name and address of any person whom the applicant knows to hold a power of attorney signed by the proposed ward and a description of the type of power of attorney;

(10) if the proposed ward is a minor and if known by the applicant:

(A)  the name of each parent of the proposed ward and state the parent's address or that the parent is deceased;

(B)  the name and age of each sibling, if any, of the proposed ward and state the sibling's address or that the sibling is deceased; and

(C)  if each of the proposed ward's parents and siblings are deceased, the names and addresses of the proposed ward's next of kin who are adults;

(11)  if the proposed ward is a minor, whether the minor was the subject of a legal or conservatorship proceeding within the preceding two-year period and, if so, the court involved, the nature of the proceeding, and the final disposition, if any, of the proceeding;

(12)  if the proposed ward is an adult and if known by the applicant:

(A)  the name of the proposed ward's spouse, if any, and state the spouse's address or that the spouse is deceased;

(B)  the name of each of the proposed ward's parents and state the parent's address or that the parent is deceased;

(C)  the name and age of each of the proposed ward's siblings, if any, and state the sibling's address or that the sibling is deceased;

(D)  the name and age of each of the proposed ward's children, if any, and state the child's address or that the child is deceased; and

(E)  if the proposed ward's spouse and each of the proposed ward's parents, siblings, and children are deceased, or, if there is no spouse, parent, adult sibling, or adult child, the names and addresses of the proposed ward's next of kin who are adults;

(13)  facts showing that the court has venue over the proceeding; and

(14)  if applicable, that the person whom the applicant desires to have appointed as a guardian is a private professional guardian who is certified under Subchapter C, Chapter 111, Government Code, and has complied with the requirements of Section 697 of this code.

SECTION 3.10.  Section 695A, Texas Probate Code, is amended by adding Subsection (a-1) to read as follows:

(a-1)  If, while serving as a guardian for a ward under this chapter, the Department of Aging and Disability Services becomes aware of a guardianship program or private professional guardian willing and able to serve as the ward's successor guardian and the department is not aware of a family member or friend of the ward or any other interested person who is willing and able to serve as the ward's successor guardian, the department shall notify the court in which the guardianship is pending of the guardianship program's or private professional guardian's willingness and ability to serve.

SECTION 3.11.  Section 696, Texas Probate Code, is amended to read as follows:

Sec. 696.  APPOINTMENT OF PRIVATE PROFESSIONAL GUARDIANS.  A court may not appoint a private professional guardian to serve as a guardian or permit a private professional guardian to continue to serve as a guardian under this code if the private professional guardian:

(1)  has not complied with the requirements of Section 697 of this code; or

(2)  is not certified as provided by Section 697B of this code.

SECTION 3.12.  Subpart A, Part 3, Texas Probate Code, is amended by adding Sections 696A and 696B to read as follows:

Sec. 696A.  APPOINTMENT OF PUBLIC GUARDIANS. (a) An individual employed by or contracting with a guardianship program must be certified as provided by Section 697B of this code to provide guardianship services to a ward of the guardianship program.

(b) An employee of the Department of Aging and Disability Services must be certified as provided by Section 697B of this code to provide guardianship services to a ward of the department.

Sec. 696B.  APPOINTMENT OF FAMILY MEMBERS OR FRIENDS.  A family member or friend of an incapacitated person is not required to be certified under Subchapter C, Chapter 111, Government Code, or any other law to serve as the person's guardian.

SECTION 3.13.  Subsections (a), (c), and (e), Section 697, Texas Probate Code, are amended to read as follows:

(a) A private professional guardian must apply annually to the clerk of the county having venue over the proceeding for the appointment of a guardian for a certificate of registration [certification]. The application must include a sworn statement containing the following information concerning a private professional guardian or each person who represents or plans to represent the interests of a ward as a guardian on behalf of the private professional guardian:

(1)  educational background and professional experience;

(2)  three or more professional references;

(3)  the names of all of the wards the private professional guardian or person is or will be serving as a guardian;

(4)  the aggregate fair market value of the property of all wards that is being or will be managed by the private professional guardian or person;

(5)  place of residence, business address, and business telephone number; and

(6)  whether the private professional guardian or person has ever been removed as a guardian by the court or resigned as a guardian in a particular case, and, if so, a description of the circumstances causing the removal or resignation, and the style of the suit, the docket number, and the court having jurisdiction over the proceeding.

(c) The term of the registration [certification] begins on the date that the requirements are met and extends through December 31 of the initial year. After the initial year of registration [certification], the term of the registration [certification] begins on January 1 and ends on December 31 of each year. A renewal application must be completed during December of the year preceding the year for which the renewal is requested.

(e) Not later than February 1 of each year, the clerk shall submit to the Guardianship Certification Board and the Health and Human Services Commission the names and business addresses of private professional guardians who have satisfied the registration [certification] requirements under this section during the preceding year.

SECTION 3.14. Subpart A, Part 3, Texas Probate Code, is amended by adding Sections 697A and 697B to read as follows:

Sec. 697A. LIST OF CERTAIN PUBLIC GUARDIANS MAINTAINED BY COUNTY CLERKS. (a) Each guardianship program operating in a county shall submit annually to the county clerk a statement containing the name, address, and telephone number of each individual employed by or volunteering or contracting with the program to provide guardianship services to a ward or proposed ward of the program.

(b) The Department of Aging and Disability Services, if the department files an application for and is appointed to serve as guardian for one or more incapacitated persons residing in the county as provided by Subchapter E, Chapter 161, Human Resources Code, shall submit annually to the county clerk the information required under Subsection (a) of this section for each department employee who is or will be providing guardianship services in the county on the department's behalf.

(c) Not later than February 1 of each year, the county clerk shall submit to the Guardianship Certification Board the information received under this section during the preceding year.

Sec. 697B. CERTIFICATION REQUIREMENT FOR PRIVATE PROFESSIONAL GUARDIANS AND PUBLIC GUARDIANS. (a) The following persons must be certified under Subchapter C, Chapter 111, Government Code:

(1) an individual who is a private professional guardian;

(2) an individual who will represent the interests of a ward as a guardian on behalf of a private professional guardian;

(3) an individual providing guardianship services to a ward of a guardianship program on the program's behalf, except as provided by Subsection (d) of this section; and

(4) an employee of the Department of Aging and Disability Services providing guardianship services to a ward of the department.

(b) A person whose certification has expired must obtain a new certification under Subchapter C, Chapter 111, Government Code, to be allowed to provide or continue to provide guardianship services to a ward under this code.

(c) The court shall notify the Guardianship Certification Board if the court becomes aware of a person who is not complying with the terms of a certification issued under Subchapter C, Chapter 111, Government Code, or with the standards and rules adopted under that subchapter.

(d) An individual volunteering with a guardianship program is not required to be certified as provided by this section to provide guardianship services on the program's behalf.

SECTION 3.15. Subsections (a) and (c), Section 698, Texas Probate Code, are amended to read as follows:

(a) The clerk of the county having venue over the proceeding for the appointment of a guardian shall obtain criminal history record information that is maintained by the Department of Public Safety or the Federal Bureau of Investigation identification division relating to:

(1) a private professional guardian;

(2)  each person who represents or plans to represent the interests of a ward as a guardian on behalf of the private professional guardian; [or]

(3)  each person employed by a private professional guardian who will:

(A)  have personal contact with a ward or proposed ward;

(B)  exercise control over and manage a ward's estate; or

(C)  perform any duties with respect to the management of a ward's estate;

(4)  each person employed by or volunteering or contracting with a guardianship program to provide guardianship services to a ward of the program on the program's behalf; or

(5)  an employee of the Department of Aging and Disability Services who is or will be providing guardianship services to a ward of the department.

(c)  The court shall use the information obtained under this section only in determining whether to appoint, remove, or continue the appointment of a private professional guardian, a guardianship program, or the Department of Aging and Disability Services.

SECTION 3.16.  Subsection (b), Section 700, Texas Probate Code, is amended to read as follows:

(b)  A representative of the Department of Aging and Disability [Protective and Regulatory] Services shall take the oath required by Subsection (a) of this section if the department is appointed guardian.

SECTION 3.17.  Subsection (a), Section 767, Texas Probate Code, is amended to read as follows:

(a)  The guardian of the person is entitled to take [the] charge [and control] of the person of the ward, and the duties of the guardian correspond with the rights of the guardian. A guardian of the person has:

(1)  the right to have physical possession of the ward and to establish the ward's legal domicile;

(2)  the duty to provide [of] care, supervision [control], and protection for [of] the ward;

(3)  the duty to provide the ward with clothing, food, medical care, and shelter;

(4)  the power to consent to medical, psychiatric, and surgical treatment other than the in-patient psychiatric commitment of the ward; and

(5)  on application to and order of the court, the power to establish a trust in accordance with 42 U.S.C. Section 1396p(d)(4)(B), as amended, and direct that the income of the ward as defined by that section be paid directly to the trust, solely for the purpose of the ward's eligibility for medical assistance under Chapter 32, Human Resources Code.

SECTION 3.18.  Subsections (c) and (j), Section 875, Texas Probate Code, are amended to read as follows:

(c)  A sworn, written application for the appointment of a temporary guardian shall be filed before the court appoints a temporary guardian. The application must state:

(1)  the name and address of the person who is the subject of the guardianship proceeding;

(2)  the danger to the person or property alleged to be imminent;

(3)  the type of appointment and the particular protection and assistance being requested;

(4)  the facts and reasons supporting the allegations and requests;

(5)  the name, address, and qualification of the proposed temporary guardian;

(6)  the name, address, and interest of the applicant; and

(7)  if applicable, that the proposed temporary guardian is a private professional guardian who is certified under Subchapter C, Chapter 111, Government Code, and has complied with the requirements of Section 697 of this code.

(j)  The court may not customarily or ordinarily appoint the Department of Aging and Disability [Protective and Regulatory] Services as a temporary guardian under this section. The appointment of the department as a temporary guardian under this section should be made only as a last resort.

SECTION 3.19.  Subdivisions (3) and (5), Section 531.121, Government Code, are amended to read as follows:

(3)  "Guardianship program" has the meaning assigned by Section 111.001 [601, Texas Probate Code].

(5)  "Private professional guardian" has the meaning assigned by Section 111.001 [601, Texas Probate Code].

SECTION 3.20.    The heading to Section 531.122, Government Code, is amended to read as follows:

Sec. 531.122.  ADVISORY BOARD; MEMBERSHIP [AND DUTIES].

SECTION 3.21. Subsections (a), (b), and (d), Section 531.122, Government Code, are amended to read as follows:

(a)  The Guardianship Advisory Board [shall advise the commission in adopting standards under Section 531.124 and in administering the commission's duties under this subchapter.

[(b)  The advisory board] is composed of one representative from each of the health and human services regions, as defined by the commission, three public representatives, and one representative of the Department of Aging and Disability [Protective and Regulatory] Services. The representatives of the health and human services regions are appointed by a majority vote of the judges of the statutory probate courts in each region. If a health and human services region does not contain a statutory probate court, the representative shall be appointed by a majority vote of the judges of the statutory probate courts in the state. The public representatives are appointed by the executive commissioner and the representative of the Department of Aging and Disability [Protective and Regulatory] Services is appointed by the commissioner of aging and disability services [Board of Protective and Regulatory Services].

(d)  A member of the advisory board serves at the pleasure of a majority of the judges of the statutory probate courts that appointed the member, of the executive commissioner, or of the commissioner of aging and disability services [Board of Protective and Regulatory Services], as appropriate.

SECTION 3.22.    Section 531.1235, Government Code, is amended to read as follows:

Sec. 531.1235. ADVISORY BOARD; [ADDITIONAL] DUTIES; STATEWIDE GUARDIANSHIP SYSTEM. (a) The advisory board shall advise the commission in administering the commission's duties under this subchapter. In addition [to performing the duties described by Section 531.122], the advisory board shall:

(1) advise the commission and the Department of Aging and Disability [Protective and Regulatory] Services with respect to a statewide guardianship program and develop a proposal for a statewide guardianship program; and

(2) review and comment on the guardianship policies of all health and human services agencies and recommend changes to the policies the advisory board considers necessary or advisable.

(b) The advisory board shall prepare an annual report with respect to the recommendations of the advisory board under Subsection (a). The advisory board shall file the report with the commission, the Department of Aging and Disability [Protective and Regulatory] Services, the governor, the lieutenant governor, and the speaker of the house of representatives not later than December 15 of each year.

SECTION 3.23. Section 531.124, Government Code, is amended to read as follows:

Sec. 531.124. COMMISSION DUTIES. (a) With the advice of the advisory board, the commission shall[:

[(1) adopt minimum standards for the provision of guardianship and related services by:

[(A) a guardianship program;

[(B) a person who provides guardianship and related services on behalf of a guardianship program or local guardianship center, including a person who serves as a volunteer guardian; and

[(C) a person who serves as a private professional guardian; and

[(2)] develop and, subject to appropriations, implement a plan to:

(1) [(A)] ensure that each incapacitated individual in this state who needs a guardianship or another less restrictive type of assistance to make decisions concerning the incapacitated individual's own welfare and financial affairs receives that assistance; and

(2) [(B)] foster the establishment and growth of local volunteer guardianship programs.

(b) [The commission shall design the standards under Subsection (a)(1) to protect the interests of an incapacitated individual or other individual who needs assistance in making decisions concerning the individual's own welfare or financial affairs.

[(c)] The advisory board shall annually review and comment on the minimum standards adopted under Section 111.041 [Subsection (a)(1)] and the plan implemented under Subsection (a)[(2)] and shall include its conclusions in the report submitted under Section 531.1235.

SECTION 3.24. Title 2, Government Code, is amended by adding Subtitle J to read as follows:

## SUBTITLE J. GUARDIANSHIPS
## CHAPTER 111. GUARDIANSHIP CERTIFICATION BOARD
## SUBCHAPTER A. GENERAL PROVISIONS

Sec. 111.001. DEFINITIONS. In this chapter:

(1) "Administrative director" means the administrative director of the courts as appointed by Chapter 72.

(2) "Board" means the Guardianship Certification Board.

(3) "Corporate fiduciary" has the meaning assigned by Section 601, Texas Probate Code.

(4) "Director" means the administrative officer of the board, as provided by Section 111.021.

(5) "Guardian" has the meaning assigned by Section 601, Texas Probate Code.

(6) "Guardianship program" means a local, county, or regional program that provides guardianship and related services to an incapacitated person or other person who needs assistance in making decisions concerning the person's own welfare or financial affairs.

(7) "Incapacitated person" has the meaning assigned by Section 601, Texas Probate Code.

(8) "Office of Court Administration" means the Office of Court Administration of the Texas Judicial System.

(9) "Private professional guardian" means a person, other than an attorney or a corporate fiduciary, who is engaged in the business of providing guardianship services.

(10) "Ward" has the meaning assigned by Section 601, Texas Probate Code.

Sec. 111.002. RULES. The supreme court may adopt rules consistent with this chapter, including rules governing the certification of individuals providing guardianship services.

Sec. 111.003. SUNSET PROVISION. The board is subject to Chapter 325, Government Code (Texas Sunset Act). Unless continued in existence as provided by that chapter, the board is abolished and this chapter expires September 1, 2015.

[Sections 111.004-111.010 reserved for expansion]
## SUBCHAPTER B. ADMINISTRATIVE PROVISIONS

Sec. 111.011. BOARD. (a) The Guardianship Certification Board is composed of:

(1) 11 members appointed by the supreme court; and

(2) four public members appointed by the supreme court from a list of nominees submitted by the governor.

(b) The supreme court shall appoint members under Subsection (a)(1) from the different geographical areas of this state.

(c) In making an appointment under Subsection (a)(2), the supreme court may reject one or more of the nominees on a list submitted by the governor and request a new list of different nominees.

(d) To be eligible for appointment to the board other than as a public member, an individual must have demonstrated experience working with:

(1) a guardianship program;

(2)  an organization that advocates on behalf of or in the interest of elderly individuals;

(3)  an organization that advocates on behalf of or in the interest of individuals with mental illness or mental retardation or individuals with physical disabilities; or

(4)  incapacitated individuals.

(e)  The public members of the board must be:

(1)  caretakers of individuals with mental illness or mental retardation or individuals with physical disabilities; or

(2)  persons who advocate on behalf of or in the interest of individuals with mental illness or mental retardation or individuals with physical disabilities.

(f)  Appointments to the board shall be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointees.

(g)  The members of the board serve for staggered six-year terms, with the terms of one-third of the members expiring on February 1 of each odd-numbered year. Board members are not entitled to receive compensation or reimbursement for expenses.

(h)  The board shall elect from among its members a presiding officer and other officers considered necessary.

(i)  The board shall meet at least quarterly at the call of the presiding officer.

(j)  Any action taken by the board must be approved by a majority vote of the members present.

Sec. 111.012.  ADMINISTRATIVE ATTACHMENT. (a) The board is administratively attached to the Office of Court Administration.

(b)  Notwithstanding any other law, the Office of Court Administration shall:

(1)  provide administrative assistance, services, and materials to the board, including budget planning and purchasing;

(2)  accept, deposit, and disburse money made available to the board;

(3)  pay the salaries and benefits of the director;

(4)  reimburse the travel expenses and other actual and necessary expenses of the director incurred in the performance of a function of the board, as provided by the General Appropriations Act; and

(5)  provide the board with adequate computer equipment and support.

Sec. 111.013.  ELIGIBILITY OF PUBLIC MEMBERS. A person is not eligible for appointment as a public member of the board if the person or the person's spouse:

(1)  is certified by the board;

(2)  is registered, certified, or licensed by a regulatory agency in the field of guardianship;

(3)  is employed by or participates in the management of a business entity or other organization regulated by the board or receiving money from the Office of Court Administration;

(4)  owns or controls, directly or indirectly, more than a 10 percent interest in a business entity or other organization regulated by the board or receiving money from the Office of Court Administration; or

(5)  uses or receives a substantial amount of tangible goods, services, or funds from the Office of Court Administration.

Sec. 111.014.  MEMBERSHIP AND EMPLOYEE RESTRICTIONS.   (a)  In this section, "Texas trade association" means a cooperative and voluntarily joined statewide association of business or professional competitors in this state designed to assist its members and its industry or profession in dealing with mutual business or professional problems and in promoting their common interest.

(b)  A person may not be a member of the board or may not be the director in a "bona fide executive, administrative, or professional capacity," as that phrase is used for purposes of establishing an exemption to the overtime provisions of the federal Fair Labor Standards Act of 1938 (29 U.S.C. Section 201 et seq.), if:

(1)  the person is an officer, employee, or paid consultant of a Texas trade association in the field of guardianship; or

(2)  the person's spouse is an officer, manager, or paid consultant of a Texas trade association in the field of guardianship.

(c)  A person may not be a member of the board if the person is required to register as a lobbyist under Chapter 305 because of the person's activities for compensation on behalf of a profession related to the operation of the board.

Sec. 111.015.  GROUNDS FOR REMOVAL FROM BOARD. (a)  It is a ground for removal from the board that a member:

(1)  does not have at the time of appointment the qualifications required by Section 111.011;

(2)  does not maintain during service on the board the qualifications required by Section 111.011;

(3)  is ineligible for membership under Section 111.013 or 111.014;

(4)  cannot, because of illness or disability, discharge the member's duties for a substantial part of the member's term; or

(5)  is absent from more than half of the regularly scheduled board meetings that the member is eligible to attend during a calendar year without an excuse approved by a majority vote of the board.

(b)  The validity of an action of the board is not affected by the fact that it is taken when a ground for removal of a board member exists.

(c)  If the director has knowledge that a potential ground for removal exists, the director shall notify the presiding officer of the board of the potential ground. The presiding officer shall then notify the chief justice of the supreme court that a potential ground for removal exists. If the potential ground for removal involves the presiding officer, the director shall notify the next highest ranking officer of the board, who shall then notify the chief justice of the supreme court that a potential ground for removal exists.

Sec. 111.016.  POWERS AND DUTIES OF BOARD. (a)  The board is charged with the executive functions necessary to carry out the purposes of this chapter under rules adopted by the supreme court.

(b)  The board shall:

(1)  administer and enforce this chapter;

(2)  develop and recommend proposed rules and procedures to the supreme court as necessary to implement this chapter;

(3)  set the amount of each fee prescribed by Section 111.042, subject to the approval of the supreme court;

(4)  establish the qualifications for obtaining certification or recertification under Section 111.042;

(5)  issue certificates to individuals who meet the certification requirements of Section 111.042; and

(6)  perform any other duty required by this chapter or other law.

(c)  The board may appoint any necessary or proper subcommittee.

(d)  The board shall maintain:

(1)  a complete record of each board proceeding; and

(2)  a complete record of each certification issued, renewed, suspended, or revoked under Section 111.042.

Sec. 111.017.  TRAINING. (a)  A person who is appointed to and qualifies for office as a member of the board may not vote, deliberate, or be counted as a member in attendance at a meeting of the board until the person completes a training program that complies with this section.

(b)  The training program must provide the person with information regarding:

(1)  this chapter;

(2)  the role and functions of the board;

(3)  the current budget for the board;

(4)  the results of the most recent formal audit of the board; and

(5)  any applicable ethics policies adopted by the board.

Sec. 111.018.  USE OF TECHNOLOGY.  The Office of Court Administration shall research and propose appropriate technological solutions to improve the board's ability to perform its functions. The technological solutions must:

(1)  ensure that the public is able to easily find information about the board on the Internet;

(2)  ensure that persons who want to use the board's services are able to:

(A)  interact with the board through the Internet; and

(B)  access any service that can be provided effectively through the Internet; and

(3)  be cost-effective and developed through the board's planning processes.

Sec. 111.019.  ALTERNATIVE DISPUTE RESOLUTION PROCEDURES. (a)  The board shall develop and implement a policy to encourage the use of appropriate alternative dispute resolution procedures to assist in the resolution of internal and external disputes under the board's jurisdiction.

(b)  The procedures relating to alternative dispute resolution under this section must conform, to the extent possible, to any model guidelines issued by the State Office of Administrative Hearings for the use of alternative dispute resolution by state agencies.

Sec. 111.020.  PUBLIC ACCESS. The board shall develop and implement policies that provide the public with a reasonable opportunity to appear before the board and to speak on any issue under the jurisdiction of the board.

Sec. 111.021.  DIRECTOR.    (a)  The administrative director shall employ a director from a list of candidates submitted by the board. The administrative director may request an additional list of candidates if the administrative director does not select any of the initial candidates recommended by the board.

(b)  The list may contain the hiring preference of the board.

(c) The director is the administrative officer of the board and is charged with carrying out the duties and functions conferred on the director by the board, this subchapter, and other law.

Sec. 111.022. DIVISION OF RESPONSIBILITIES. The board shall develop and implement policies that clearly separate the policy-making responsibilities of the board and the management responsibilities of the director.

Sec. 111.023. QUALIFICATIONS AND STANDARDS OF CONDUCT INFORMATION. The director shall provide to members of the board, as often as necessary, information regarding the requirements for office under this chapter, including information regarding a person's responsibilities under applicable laws relating to standards of conduct for state officers.

[Sections 111.024-111.040 reserved for expansion]

SUBCHAPTER C. REGULATION OF CERTAIN GUARDIANS

Sec. 111.041. STANDARDS FOR CERTAIN GUARDIANSHIPS AND ALTERNATIVES TO GUARDIANSHIP. (a) The board shall adopt minimum standards for:

(1) the provision of guardianship services or other similar but less restrictive types of assistance or services by:

(A) guardianship programs; and

(B) private professional guardians; and

(2) the provision of guardianship services by the Department of Aging and Disability Services.

(b) The board shall design the standards to protect the interests of an incapacitated person or other person needing assistance making decisions concerning the person's own welfare or financial affairs.

Sec. 111.042. CERTIFICATION REQUIRED FOR CERTAIN GUARDIANS. (a) To provide guardianship services in this state, the following individuals must hold a certificate issued under this section:

(1) an individual who is a private professional guardian;

(2) an individual who will provide those services to a ward of a private professional guardian or the Department of Aging and Disability Services on the guardian's or department's behalf; and

(3) an individual, other than a volunteer, who will provide those services to a ward of a guardianship program on the program's behalf.

(b) An applicant for a certificate under this section must:

(1) apply to the board on a form prescribed by the board; and

(2) submit with the application a nonrefundable application fee in an amount determined by the board, subject to the approval of the supreme court.

(c) The supreme court may adopt rules and procedures for issuing a certificate and for renewing, suspending, or revoking a certificate issued under this section. Any rules adopted by the supreme court under this section must:

(1) ensure compliance with the standards adopted under Section 111.041;

(2) provide that the board establish qualifications for obtaining and maintaining certification;

(3) provide that the board issue certificates under this section;

(4)  provide that a certificate expires on the second anniversary of the date the certificate is issued;

(5)  prescribe procedures for accepting complaints and conducting investigations of alleged violations of the minimum standards adopted under Section 111.041 or other terms of the certification by certificate holders; and

(6)  prescribe procedures by which the board, after notice and hearing, may suspend or revoke the certificate of a holder who fails to substantially comply with appropriate standards or other terms of the certification.

(d)  If the requirements for issuing a certificate under this section include passage of an examination covering guardianship education requirements:

(1)  the board shall develop and the director shall administer the examination; or

(2)  the board shall direct the director to contract with another person or entity the board determines has the expertise and resources to develop and administer the examination.

(e)  In lieu of the certification requirements imposed under this section, the board may issue a certificate to an individual to engage in business as a guardian or to provide guardianship services in this state if the individual:

(1)  submits an application to the board in the form prescribed by the board;

(2)  pays a fee in a reasonable amount determined by the board, subject to the approval of the supreme court;

(3)  is certified, registered, or licensed as a guardian by a national organization or association the board determines has requirements at least as stringent as those prescribed by the board under this subchapter; and

(4)  is in good standing with the organization or association with whom the person is licensed, certified, or registered.

(f)  An employee of the Department of Aging and Disability Services who is applying for a certificate under this section to provide guardianship services to a ward of the department is exempt from payment of an application fee required by this section.

(g)  An application fee or other fee collected under this section shall be deposited to the credit of the guardianship certification account in the general revenue fund and may be appropriated only to the Office of Court Administration for the administration and enforcement of this chapter.

(h)  The Texas Department of Licensing and Regulation shall advise and assist the board as necessary in administering the certification process established under this section.

Sec. 111.043.  INFORMATION FROM PRIVATE PROFESSIONAL GUARDIANS. In addition to the information submitted under Section 697(e), Texas Probate Code, the director may require a private professional guardian or a person who represents or plans to represent the interests of a ward as a guardian on behalf of the private professional guardian to submit information considered necessary to monitor the person's compliance with the applicable standards adopted under Section 111.041 or with the certification requirements of Section 111.042.

Sec. 111.044.  ANNUAL DISCLOSURE. Not later than January 31 of each year, each guardianship program and private professional guardian shall provide to the board a report containing for the preceding year:

(1)  the total number of wards served by the guardianship program or private professional guardian, as applicable;

(2)  the total amount of money received from this state for the provision of guardianship services; and

(3)  the total amount of money received from any other public source, including a county or the federal government, for the provision of guardianship services.

SECTION 3.25.  TRANSFERS TO THE DEPARTMENT OF AGING AND DISABILITY SERVICES. (a)  On September 1, 2005:

(1)  all powers, duties, functions, programs, and activities of the Department of Family and Protective Services related to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law are transferred to the Department of Aging and Disability Services;

(2)  all employees of the Department of Family and Protective Services who primarily perform duties related to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law become employees of the Department of Aging and Disability Services;

(3)  a rule or form adopted by the executive commissioner of the Health and Human Services Commission that relates to the provision of guardianship services by the Department of Family and Protective Services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law, as those laws existed immediately before that date, is a rule or form of the Department of Aging and Disability Services and remains in effect until altered by the executive commissioner;

(4)  a reference in law to the Department of Family and Protective Services or its predecessor agency, the Department of Protective and Regulatory Services, that relates to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law means the Department of Aging and Disability Services;

(5)  a waiver in effect that was issued by the Department of Family and Protective Services relating to the provision of guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law is continued in effect as a waiver of the Department of Aging and Disability Services;

(6)  a proceeding involving the Department of Family and Protective Services that is related to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law is transferred without change in status to the Department of Aging and Disability Services, and the Department of Aging and Disability Services assumes,

without a change in status, the position of the Department of Family and Protective Services in a proceeding relating to guardianship matters to which the Department of Family and Protective Services is a party;

(7)  all money, contracts, rights, and obligations of the Department of Family and Protective Services related to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law are transferred to the Department of Aging and Disability Services, subject to Subsection (b) of this section;

(8)  all property and records in the custody of the Department of Family and Protective Services related to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law shall be transferred to the Department of Aging and Disability Services; and

(9)  all funds appropriated by the legislature to the Department of Family and Protective Services for purposes related to providing guardianship services for incapacitated persons under Chapter 48, Human Resources Code, Chapter XIII, Texas Probate Code, or other law are transferred to the Department of Aging and Disability Services.

(b)  The Department of Aging and Disability Services shall administer a contract of the Department of Family and Protective Services transferred under Subdivision (7), Subsection (a) of this section, until the contract expires or is otherwise lawfully terminated.

(c)  To effectuate a smooth and orderly transfer of existing guardianship status, a court may not require the Department of Family and Protective Services or the Department of Aging and Disability Services to comply with the provisions concerning resignation of a guardian and appointment of a successor guardian under Subpart D, Part 4, Chapter XIII, Texas Probate Code, with respect to guardianship cases of the Department of Family and Protective Services transferred to the Department of Aging and Disability Services under this section and Section 3.26 of this article.

(d)  A reference in a legal document, including a letter of guardianship issued under Section 659, Texas Probate Code, to the Department of Family and Protective Services as guardian in an existing guardianship or application for guardianship that is pending on the effective date of this Act is considered to be a reference to the Department of Aging and Disability Services.

(e)  A public entity, a private entity, or any other person, including a bank, a service provider, law enforcement personnel, or medical personnel, is required to accept the Department of Aging and Disability Services' authority as guardian in the same manner the entity or person would have accepted the Department of Family and Protective Services' authority as guardian of a particular ward.

(f)  The Department of Aging and Disability Services may not be required to take a new oath of guardianship under Section 700, Texas Probate Code, with respect to a guardianship case transferred to the department from the Department of Family and Protective Services under this section and Section 3.26 of this article.

SECTION 3.26.  TRANSITION PLAN.  The executive commissioner of the Health and Human Services Commission shall establish a plan for the transfer of guardianship cases of the Department of Family and Protective Services to the Department of Aging and Disability Services on or before the period prescribed by the executive commissioner.

SECTION 3.27.  PROPOSED RULES AND PROCEDURES.  Not later than March 1, 2006, the Guardianship Certification Board established under Chapter 111, Government Code, as added by this article, shall develop rules and procedures for consideration by the supreme court as required by Chapter 111, Government Code, as added by this article.

SECTION 3.28.  APPOINTMENT OF BOARD MEMBERS.  (a) As soon as practicable after the effective date of this Act, the supreme court shall appoint 11 members who are not public members to the Guardianship Certification Board in accordance with Chapter 111, Government Code, as added by this article. In making the initial appointments, the supreme court shall designate three members for terms expiring February 1, 2007, four members for terms expiring February 1, 2009, and four members for terms expiring February 1, 2011.

(b)  As soon as practicable after the effective date of this Act, the supreme court shall appoint four public members to the Guardianship Certification Board in accordance with Chapter 111, Government Code, as added by this article. In making the initial appointments, the supreme court shall designate two members for terms expiring February 1, 2007, one member for a term expiring February 1, 2009, and one member for a term expiring February 1, 2011.

SECTION 3.29.  EFFECTIVE DATE OF CERTIFICATION.  A person is not required to hold a certificate issued under Subchapter C, Chapter 111, Government Code, as added by this article, to provide or continue to provide guardianship services to a ward before September 1, 2007.

ARTICLE 4.  CERTAIN REQUIREMENTS AND LIMITATIONS RELATING TO MARRIAGE; PROVIDING CRIMINAL PENALTIES

SECTION 4.01.  Article 38.10, Code of Criminal Procedure, is amended to read as follows:

Art. 38.10.  EXCEPTIONS TO THE SPOUSAL ADVERSE TESTIMONY PRIVILEGE. The privilege of a person's spouse not to be called as a witness for the state does not apply in any proceeding in which the person is charged with:

(1) a crime committed against the person's spouse, a minor child, or a member of the household of either spouse; or

(2)  an offense under Section 25.01, Penal Code (Bigamy).

SECTION 4.02. Subsections (e) and (f), Section 22.011, Penal Code, are amended to read as follows:

(e)  It is an affirmative defense to prosecution under Subsection (a)(2) that:

(1)  the actor was not more than three years older than the victim and at the time of the offense:

(A)  was not required under Chapter 62, Code of Criminal Procedure, [as added by Chapter 668, Acts of the 75th Legislature, Regular Session, 1997,] to register for life as a sex offender; or

(B) was not a person who under Chapter 62, Code of Criminal Procedure, had a reportable conviction or adjudication for an offense under this section; and

(2) the victim:

(A) was a child of 14 years of age or older; and

(B) was not a person whom the actor was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under Section 25.01.

(f) An offense under this section is a felony of the second degree, except that an offense under this section is a felony of the first degree if the victim was a person whom the actor was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under Section 25.01.

SECTION 4.03. Subsections (c) and (e), Section 25.01, Penal Code, are amended to read as follows:

(c) It is a defense to prosecution under Subsection (a)(1) that the actor reasonably believed at the time of the commission of the offense that the actor and the person whom the actor married or purported to marry or with whom the actor lived under the appearance of being married were legally eligible to be married because the actor's prior [his] marriage was void or had been dissolved by death, divorce, or annulment. For purposes of this subsection, an actor's belief is reasonable if the belief is substantiated by a certified copy of a death certificate or other signed document issued by a court.

(e) An offense under this section is a felony of the third degree, except that if at the time of the commission of the offense, the person whom the actor marries or purports to marry or with whom the actor lives under the appearance of being married is:

(1) 16 years of age or older, the offense is a felony of the second degree; or

(2) younger than 16 years of age, the offense is a felony of the first degree [Class A misdemeanor].

SECTION 4.04. Subsections (a) and (c), Section 25.02, Penal Code, are amended to read as follows:

(a) A person [An individual] commits an offense if the person [he] engages in sexual intercourse or deviate sexual intercourse with another [a] person the actor [he] knows to be, without regard to legitimacy:

(1) the actor's [his] ancestor or descendant by blood or adoption;

(2) the actor's current or former [his] stepchild or stepparent[, while the marriage creating that relationship exists];

(3) the actor's [his] parent's brother or sister of the whole or half blood;

(4) the actor's [his] brother or sister of the whole or half blood or by adoption; [or]

(5) the children of the actor's [his] brother or sister of the whole or half blood or by adoption; or

(6) the son or daughter of the actor's aunt or uncle of the whole or half blood or by adoption.

(c) An offense under this section is a felony of the third degree, unless the offense is committed under Subsection (a)(6), in which event the offense is a felony of the second degree.

SECTION 4.05. Section 2.004, Family Code, is amended by amending Subsection (b) and adding Subsections (c) and (d) to read as follows:

(b) The application form must contain:

(1) a heading entitled "Application for Marriage License, _____ County, Texas";

(2) spaces for each applicant's full name, including the woman's maiden surname, address, social security number, if any, date of birth, and place of birth, including city, county, and state;

(3) a space for indicating the document tendered by each applicant as proof of identity and age;

(4) spaces for indicating whether each applicant has been divorced within the last 30 days;

(5) printed boxes for each applicant to check "true" or "false" in response to the following statement: "I am not presently married and the other applicant is not presently married.";

(6) printed boxes for each applicant to check "true" or "false" in response to the following statement: "The other applicant is not related to me as:

(A) an ancestor or descendant, by blood or adoption;

(B) a brother or sister, of the whole or half blood or by adoption;

(C) a parent's brother or sister, of the whole or half blood or by adoption; [or]

(D) a son or daughter of a brother or sister, of the whole or half blood or by adoption;

(E) a current or former stepchild or stepparent; or

(F) a son or daughter of a parent's brother or sister, of the whole or half blood or by adoption.";

(7) printed boxes for each applicant to check "true" or "false" in response to the following statement: "I am not presently delinquent in the payment of court-ordered child support.";

(8) a printed oath reading: "I SOLEMNLY SWEAR (OR AFFIRM) THAT THE INFORMATION I HAVE GIVEN IN THIS APPLICATION IS CORRECT.";

(9) spaces immediately below the printed oath for the applicants' signatures;

(10) a certificate of the county clerk that:

(A) each applicant made the oath and the date and place that it was made; or

(B) an applicant did not appear personally but the prerequisites for the license have been fulfilled as provided by this chapter;

(11) spaces for indicating the date of the marriage and the county in which the marriage is performed; and

(12) a space for the address to which the applicants desire the completed license to be mailed.

(c)  An applicant commits an offense if the applicant knowingly provides false information under Subsection (b)(1), (2), (3), or (4). An offense under this subsection is a Class C misdemeanor.

(d)  An applicant commits an offense if the applicant knowingly provides false information under Subsection (b)(5) or (6). An offense under this subsection is a Class A misdemeanor.

SECTION 4.06.  Section 2.005, Family Code, is amended by adding Subsection (c) to read as follows:

(c)  A person commits an offense if the person knowingly provides false, fraudulent, or otherwise inaccurate proof of an applicant's identity or age under this section. An offense under this subsection is a Class A misdemeanor.

SECTION 4.07.  Section 2.007, Family Code, is amended to read as follows:

Sec. 2.007.  AFFIDAVIT OF ABSENT APPLICANT.  The affidavit of an absent applicant must include:

(1)  the absent applicant's full name, including the maiden surname of a female applicant, address, date of birth, place of birth, including city, county, and state, citizenship, and social security number, if any;

(2)  a declaration that the absent applicant has not been divorced within the last 30 days;

(3)  a declaration that the absent applicant is:

(A)  not presently married; or

(B)  married to the other applicant and they wish to marry again;

(4)  a declaration that the other applicant is not presently married and is not related to the absent applicant as:

(A)  an ancestor or descendant, by blood or adoption;

(B)  a brother or sister, of the whole or half blood or by adoption;

(C)  a parent's brother or sister, of the whole or half blood or by adoption; [or]

(D)  a son or daughter of a brother or sister, of the whole or half blood or by adoption;

(E)  a current or former stepchild or stepparent; or

(F)  a son or daughter of a parent's brother or sister, of the whole or half blood or by adoption;

(5)  a declaration that the absent applicant desires to marry and the name, age, and address of the person to whom the absent applicant desires to be married;

(6)  the approximate date on which the marriage is to occur;

(7)  the reason the absent applicant is unable to appear personally before the county clerk for the issuance of the license; and

(8)  if the absent applicant will be unable to attend the ceremony, the appointment of any adult, other than the other applicant, to act as proxy for the purpose of participating in the ceremony.

SECTION 4.08.  Subsections (a) and (b), Section 2.009, Family Code, are amended to read as follows:

(a)  Except as provided by Subsections (b) and (d), the county clerk may not issue a license if either applicant:

(1)  fails to provide the information required by this subchapter;

(2) fails to submit proof of age and identity;

(3) is under 16 [14] years of age and has not been granted a court order as provided by Section 2.103;

(4) is 16 [14] years of age or older but under 18 years of age and has not presented at least one of the following:

(A) parental consent as provided by Section 2.102;

(B) documents establishing that a prior marriage of the applicant has been dissolved; or

(C) a court order as provided by Section 2.103;

(5) checks "false" in response to a statement in the application, except as provided by Subsection (b) or (d), or fails to make a required declaration in an affidavit required of an absent applicant; or

(6) indicates that the applicant has been divorced by a decree of a court of this state within the last 30 days, unless:

(A) the applicants were divorced from each other; or

(B) the prohibition against remarriage is waived as provided by Section 6.802.

(b) If an applicant checks "false" in response to the statement "I am not presently married and the other applicant is not presently married," the county clerk shall inquire as to whether the applicant is presently married to the other applicant. If the applicant states that the applicant is currently married to the other applicant, the county clerk shall record that statement on the license before the administration of the oath. The county clerk may not refuse to issue a license on the ground that the applicants are already married to each other.

SECTION 4.09. Section 2.102, Family Code, is amended by amending Subsection (a) and adding Subsections (g) and (h) to read as follows:

(a) If an applicant is 16 [14] years of age or older but under 18 years of age, the county clerk shall issue the license if parental consent is given as provided by this section.

(g) A person commits an offense if the person knowingly provides parental consent for an underage applicant under this section and the person is not a parent or a judicially designated managing conservator or guardian of the applicant. An offense under this subsection is a Class A misdemeanor.

(h) A parent or judicially designated managing conservator or guardian of an applicant commits an offense if the parent, managing conservator, or guardian knowingly provides parental consent under this section for an applicant who is younger than 16 years of age or who is presently married to a person other than the person the applicant desires to marry. An offense under this subsection is a felony of the third degree.

SECTION 4.10. Section 2.202, Family Code, is amended by adding Subsections (c) and (d) to read as follows:

(c) Except as provided by Subsection (d), a person commits an offense if the person knowingly conducts a marriage ceremony without authorization under this section. An offense under this subsection is a Class A misdemeanor.

(d)  A person commits an offense if the person knowingly conducts a marriage ceremony of a minor whose marriage is prohibited by law or of a person who by marrying commits an offense under Section 25.01, Penal Code. An offense under this subsection is a felony of the third degree.

SECTION 4.11.  Section 2.302, Family Code, is amended to read as follows:

Sec. 2.302.  CEREMONY CONDUCTED BY UNAUTHORIZED PERSON. The validity of a marriage is not affected by the lack of authority of the person conducting the marriage ceremony if:

(1)  there was a reasonable appearance of authority by that person; [and]

(2)  at least one party to the marriage participated in the ceremony in good faith and that party treats the marriage as valid; and

(3)  neither party to the marriage:

(A)  is a minor whose marriage is prohibited by law; or

(B)  by marrying commits an offense under Section 25.01, Penal Code.

SECTION 4.12.  Section 2.401, Family Code, is amended by adding Subsection (d) to read as follows:

(d)  A person may not be a party to an informal marriage or execute a declaration of an informal marriage if the person is presently married to a person who is not the other party to the informal marriage or declaration of an informal marriage, as applicable.

SECTION 4.13.  Subsection (b), Section 2.402, Family Code, is amended to read as follows:

(b)  The declaration form must contain:

(1)  a heading entitled "Declaration and Registration of Informal Marriage, _____ County, Texas";

(2)  spaces for each party's full name, including the woman's maiden surname, address, date of birth, place of birth, including city, county, and state, and social security number, if any;

(3)  a space for indicating the type of document tendered by each party as proof of age and identity;

(4)  printed boxes for each party to check "true" or "false" in response to the following statement: "The other party is not related to me as:

(A)  an ancestor or descendant, by blood or adoption;

(B)  a brother or sister, of the whole or half blood or by adoption;

(C)  a parent's brother or sister, of the whole or half blood or by adoption; [or]

(D)  a son or daughter of a brother or sister, of the whole or half blood or by adoption;

(E)  a current or former stepchild or stepparent; or

(F)  a son or daughter of a parent's brother or sister, of the whole or half blood or by adoption.";

(5)  a printed declaration and oath reading: "I SOLEMNLY SWEAR (OR AFFIRM) THAT WE, THE UNDERSIGNED, ARE MARRIED TO EACH OTHER BY VIRTUE OF THE FOLLOWING FACTS: ON OR ABOUT (DATE) WE AGREED TO BE MARRIED, AND AFTER THAT DATE WE LIVED TOGETHER AS HUSBAND AND WIFE AND IN THIS STATE WE REPRESENTED TO

OTHERS THAT WE WERE MARRIED.  SINCE THE DATE OF MARRIAGE TO THE OTHER PARTY I HAVE NOT BEEN MARRIED TO ANY OTHER PERSON. THIS DECLARATION IS TRUE AND THE INFORMATION IN IT WHICH I HAVE GIVEN IS CORRECT.";

       (6) spaces immediately below the printed declaration and oath for the parties' signatures; and

       (7) a certificate of the county clerk that the parties made the declaration and oath and the place and date it was made.

    SECTION 4.14.  Section 2.403, Family Code, is amended to read as follows:

    Sec. 2.403.  PROOF OF IDENTITY AND AGE; OFFENSE.  (a)  The county clerk shall require proof of the identity and age of each party to the declaration of informal marriage to be established by a certified copy of the party's birth certificate or by some certificate, license, or document issued by this state or another state, the United States, or a foreign government.

    (b)  A person commits an offense if the person knowingly provides false, fraudulent, or otherwise inaccurate proof of the person's identity or age under this section. An offense under this subsection is a Class A misdemeanor.

    SECTION 4.15.  Section 6.101, Family Code, is amended to read as follows:

    Sec. 6.101.  ANNULMENT OF MARRIAGE OF PERSON UNDER AGE 16 [14].  (a)  The court may grant an annulment of a licensed marriage of a person under 16 [14] years of age unless a court order has been obtained as provided in Subchapter B, Chapter 2.

    (b)  A petition for annulment under this section may be filed by a next friend for the benefit of a person under 16 [14] years of age or on the petition of the parent or the judicially designated managing conservator or guardian, whether an individual, authorized agency, or court, of the person.

    (c)  A suit by a parent, managing conservator, or guardian of the person may be brought at any time before the person is 16 [14] years of age.

    (d)  A suit under this section to annul the marriage of a person 16 [14] years of age or older that was entered into before the person was 16 [14] years of age is barred unless the suit is filed within the later of:

       (1)  90 days after the date the petitioner knew or should have known of the marriage; or

       (2)  90 days after the date of the 16th [14th] birthday of the underage party.

    SECTION 4.16.  Subsection (a), Section 6.102, Family Code, is amended to read as follows:

    (a)  The court may grant an annulment of a licensed or informal marriage of a person 16 [14] years of age or older but under 18 years of age that occurred without parental consent or without a court order as provided by Subchapters B and E, Chapter 2.

    SECTION 4.17.  Subchapter C, Chapter 6, Family Code, is amended by adding Sections 6.205 and 6.206 to read as follows:

    Sec. 6.205.  MARRIAGE TO MINOR.  A marriage is void if either party to the marriage is younger than 16 years of age.

    Sec. 6.206.  MARRIAGE TO STEPCHILD OR STEPPARENT.  A marriage is void if a party is a current or former stepchild or stepparent of the other party.

SECTION 4.18.  Under the terms of Subsection (b), Section 22.109, Government Code, Rule 504(b)(1), Texas Rules of Evidence, is disapproved to the extent that the rule conflicts with Article 38.10, Code of Criminal Procedure, as amended by this article.

SECTION 4.19.  The changes in law made by this article in amending Article 38.10, Code of Criminal Procedure, and Sections 22.011, 25.01, and 25.02, Penal Code, apply only to an offense committed on or after the effective date of this Act. An offense committed before the effective date of this Act is covered by the law in effect at the time the offense was committed, and the former law is continued in effect for that purpose. For purposes of this section, an offense was committed before the effective date of this Act if any element of the offense was committed before that date.

SECTION 4.20.  The changes in law made by this article to Sections 2.004, 2.005, 2.007, 2.009, and 2.102, Family Code, apply only to an application for a marriage license filed on or after the effective date of this Act. An application filed before the effective date of this Act is governed by the law in effect on the date the application was filed, and the former law is continued in effect for that purpose.

SECTION 4.21.  The changes in law made by this article to Sections 2.202 and 2.302, Family Code, apply only to a marriage ceremony that is conducted on or after the effective date of this Act. A marriage ceremony conducted before the effective date of this Act is governed by the law in effect on the date the ceremony was conducted, and the former law is continued in effect for that purpose.

SECTION 4.22.  Subsection (d), Section 2.401, Family Code, as added by this article, applies to an informal marriage or a declaration of an informal marriage regardless of when the informal marriage was entered into or the declaration was executed.

SECTION 4.23.  The changes in law made by this article to Subsection (b), Section 2.402, and Section 2.403, Family Code, apply to a declaration of an informal marriage executed on or after the effective date of this Act. A declaration executed before the effective date of this Act is governed by the law in effect on the date the declaration was executed, and the former law is continued in effect for that purpose.

SECTION 4.24.  The changes in law made by this article by the amendment of Section 6.101 and Subsection (a), Section 6.102, Family Code, and the enactment of Sections 6.205 and 6.206, Family Code, apply only to a marriage entered into on or after the effective date of this Act. A marriage entered into before the effective date of this Act is governed by the law in effect on the date the marriage was entered into, and the former law is continued in effect for that purpose.

ARTICLE 5.  REPORT; EFFECTIVE DATE

SECTION 5.01.  (a)  Not later than the 180th day after the effective date of this Act, and every six months after that date, the Health and Human Services Commission shall provide a detailed progress report on the implementation of the provisions of this Act to:

     (1)  the governor;

     (2)  the Legislative Budget Board;

     (3)  the lieutenant governor;

     (4)  the speaker of the house of representatives;

     (5)  appropriate oversight committees of the legislature; and

(6) the state auditor.

(b) Each progress report must address:

(1) the achievement status of each major element of reform and each of the performance milestones specified in this Act;

(2) any significant obstacles encountered by the Health and Human Services Commission, Department of Family and Protective Services, or Department of Aging and Disability Services in implementing the provisions of this Act, and the steps proposed to resolve those obstacles;

(3) any provision of this Act the Health and Human Services Commission, Department of Family and Protective Services, or Department of Aging and Disability Services determines that it is unable to fully implement due to insufficient funds;

(4) any significant unanticipated fiscal implications associated with the implementation of this Act, and recommendations for addressing the fiscal implications in the most cost-effective manner; and

(5) steps taken to enhance internal and external accountability for:

(A) achieving favorable outcomes for children needing protective services and adults needing protective services or guardianship services; and

(B) the expenditure of public funds.

(c) In accordance with Chapter 321, Government Code, the state auditor may conduct financial and compliance audits related to the implementation of this Act as specified in an audit plan. The state auditor shall coordinate an audit performed under this subsection with the Health and Human Services Commission, Department of Family and Protective Services, and Department of Aging and Disability Services internal auditors and the commission's office of inspector general to avoid duplication of effort.

(d) Except as provided by this subsection, this section expires September 1, 2010. Subsections (a) and (b) of this section expire September 1, 2009.

SECTION 5.02. This Act takes effect September 1, 2005.

The Conference Committee Report on **SB 6** was filed with the Secretary of the Senate.

### CONFERENCE COMMITTEE REPORT ON HOUSE BILL 2465

Senator Fraser submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 2465** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| FRASER | DENNY |
| DUNCAN | ANDERSON |
| WILLIAMS | BOHAC |
| LUCIO | CHISUM |
| | PICKETT |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 2465** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 283

Senator Zaffirini submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 283** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| ZAFFIRINI | HOPE |
| VAN DE PUTTE | DUTTON |
| SHAPIRO | THOMPSON |
| HINOJOSA | GOOLSBY |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 283** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## SENATE BILL 872

Senator Nelson submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **SB 872** have had the same under consideration, and beg to report it back with the recommendation that it do pass in the form and text hereto attached.

| | |
|---|---|
| NELSON | DELISI |
| DEUELL | TRUITT |

ZAFFIRINI                 MCREYNOLDS
CARONA
HINOJOSA
On the part of the Senate       On the part of the House

## A BILL TO BE ENTITLED

## AN ACT

relating to a study regarding the impact of niche hospitals on other general hospitals, to certain reports and disclosure requirements regarding niche hospitals, and to the establishment of an advisory panel to conduct a study on the reporting of health care associated infection rates and process measures.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Section 105.002, Occupations Code, is amended by amending Subsection (a) and adding Subsections (c) and (d) to read as follows:

(a) A health care provider commits unprofessional conduct if the health care provider, in connection with the provider's professional activities:

(1) knowingly presents or causes to be presented a false or fraudulent claim for the payment of a loss under an insurance policy; [or]

(2) knowingly prepares, makes, or subscribes to any writing, with intent to present or use the writing, or to allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy; or

(3) knowingly directs or requires a patient to obtain health care goods or services from a niche hospital in which the health care provider or an immediate family member of the provider has a financial interest, unless the provider:

(A) discloses to the patient, in writing, that the provider or the provider's family member has a financial interest in the niche hospital; and

(B) informs the patient that the patient has the option of using an alternative health care facility.

(c) Subsection (a)(3) does not apply to a financial interest in publicly available shares of a registered investment company, such as a mutual fund, that owns publicly traded equity securities or debt obligations issued by a niche hospital or an entity that owns the niche hospital.

(d) In this section:

(1) "Diagnosis-related group" means the classification system mandated by Medicare regulations for reimbursement purposes that groups patients according to principal diagnosis, presence of a surgical procedure, age, presence or absence of significant complications, and other relevant criteria.

(2) "Niche hospital" means a hospital that:

(A) classifies at least two-thirds of the hospital's Medicare patients or, if data is available, all patients:

(i) in not more than two major diagnosis–related groups; or

(ii) in surgical diagnosis-related groups;

(B) specializes in one or more of the following areas:

(i) cardiac;

(ii) orthopedics;

(iii) surgery; or

(iv)  women's health; and

(C)  is not:

(i)  a public hospital;

(ii)  a hospital for which the majority of inpatient claims are for major diagnosis-related groups relating to rehabilitation, psychiatry, alcohol and drug treatment, or children or newborns; or

(iii)  a hospital with fewer than 10 claims per bed per year.

SECTION 2.  Subchapter B, Chapter 162, Occupations Code, is amended by adding Section 162.052 to read as follows:

Sec. 162.052.  NOTICE OF CERTAIN OWNERSHIP INTERESTS.  (a)  In this section, "niche hospital" has the meaning assigned by Section 105.002.

(b)  A physician shall notify the Department of State Health Services of any ownership interest held by the physician in a niche hospital.

(c)  Subsection (b) does not apply to an ownership interest in publicly available shares of a registered investment company, such as a mutual fund, that owns publicly traded equity securities or debt obligations issued by a niche hospital or an entity that owns the niche hospital.

(d)  The board, in consultation with the Department of State Health Services, shall adopt rules governing the form and content of the notice required by Subsection (b).

SECTION 3.  Subtitle D, Title 2, Health and Safety Code, is amended by adding Chapter 96 to read as follows:

CHAPTER 96.  HEALTH CARE ASSOCIATED INFECTION RATE
AND PROCESS MEASURE REPORTING
SUBCHAPTER A.  GENERAL PROVISIONS

Sec. 96.001.  DEFINITIONS.  (a)  In this chapter:

(1)  "Advisory panel" means the Advisory Panel on Health Care Associated Infections.

(2)  "Commissioner" means the commissioner of state health services.

(3)  "Department" means the Department of State Health Services.

(4)  "Health care associated infection" means a localized or symptomatic condition resulting from an adverse reaction to an infectious agent or its toxins to which a patient is exposed in the course of health care delivery.

(5)  "Health care facility" means a hospital licensed under Chapter 241 or an ambulatory surgical center licensed under Chapter 243.

(6)  "Infection rate" means the number of health care associated infections at a health care facility divided by a numerical measure over time of the population at risk for contracting the infection.

(7)  "Process measure" means a measure of a health care facility's compliance with recommended infection control practices.

(b)  The advisory panel may modify or define the term "infection rate" as necessary to accomplish the purposes of this chapter.

Sec. 96.002.  APPLICABILITY OF OTHER LAW.  Chapter 2110, Government Code, does not apply to the advisory panel created under Subchapter B.

Sec. 96.003.  EXPIRATION.  This chapter expires January 1, 2007.

[Sections 96.004-96.050 reserved for expansion]
SUBCHAPTER B.  ADVISORY PANEL ON
HEALTH CARE ASSOCIATED INFECTIONS

Sec. 96.051.  ESTABLISHMENT.   The commissioner shall establish the Advisory Panel on Health Care Associated Infections within the regulatory licensing unit of the health care quality section of the department.

Sec. 96.052.  MEMBERSHIP.  The advisory panel is composed of 14 members as follows:

(1)  two infection control practitioner members who:

(A)  are certified by the Certification Board of Infection Control and Epidemiology; and

(B)  are practicing in hospitals in this state, at least one of which must be a rural hospital;

(2)  two infection control practitioner members who:

(A)  are certified by the Certification Board of Infection Control and Epidemiology; and

(B)  are nurses licensed to engage in professional nursing under Chapter 301, Occupations Code;

(3)  three board-certified or board-eligible physician members who:

(A)  are licensed to practice medicine in this state under Chapter 155, Occupations Code, at least two of whom have active medical staff privileges at a hospital in this state;

(B)  are active members of the Society for Healthcare Epidemiology of America; and

(C)  have demonstrated expertise in infection control in health care facilities;

(4)  one member who is a chief executive officer of a hospital licensed under Chapter 241;

(5)  one member who is a chief executive officer of an ambulatory surgical center licensed under Chapter 243;

(6)  three members who:

(A)  are department employees representing the department in epidemiology and the licensing of hospitals or ambulatory surgical centers; and

(B)  serve as nonvoting members of the advisory panel; and

(7)  two members who represent the public as consumers.

Sec. 96.053.  MEMBER ELIGIBILITY.  A person may not be a member of the advisory panel if the person is required to register as a lobbyist under Chapter 305, Government Code, because of the person's activities for compensation on behalf of a profession related to health care.

Sec. 96.054.  OFFICERS.   The members of the advisory panel shall elect a presiding officer and an assistant presiding officer from among the members.

Sec. 96.055.  COMPENSATION; EXPENSES.   (a) Except as provided by Subsection (b), a member of the advisory panel is not entitled to compensation for service on the advisory panel and is not entitled to reimbursement for travel expenses.

(b)  A member who is a representative of a state agency shall be reimbursed for travel expenses incurred while conducting the business of the advisory panel from the funds of the agency the person represents in accordance with the General Appropriations Act.

Sec. 96.056.  VACANCY.  A vacancy on the advisory panel shall be filled by the commissioner.

Sec. 96.057.  ABOLISHED.  The Advisory Panel on Health Care Associated Infections is abolished January 1, 2007.

[Sections 96.058-96.100 reserved for expansion]

SUBCHAPTER C.  POWERS AND DUTIES OF ADVISORY PANEL

Sec. 96.101.  GENERAL POWERS AND DUTIES.  (a)  The advisory panel, using nationally accepted measures, shall study and recommend definitions and methodologies for collecting and reporting evidence-based data on:

(1)  infection rates;

(2)  process measures; or

(3)  both infection rates and process measures.

(b)  In developing the recommendations described in Subsection (a), the advisory panel shall consider:

(1)  adjusting the reported infection rates to account for the differences in patient populations and for factors outside the control of the health care facility;

(2)  standardizing data collection methodology and reporting;

(3)  reviewing data collection and reporting systems of other entities related to infection rates, such as the National Nosocomial Infections Surveillance System of the federal Centers for Disease Control and Prevention;

(4)  reviewing data collection and reporting systems of other entities related to process measures, such as the Joint Commission on Accreditation of Healthcare Organizations or the Centers for Medicare and Medicaid Services;

(5)  maximizing the efficient use of the resources required for health care facilities to conduct required surveillance and reporting;

(6)  recognizing the potential unintended consequences of public reporting that is poorly designed or executed and that may diminish the overall quality of this state's health care or mislead or fail to protect health care consumers who use the data; and

(7)  providing additional benefits to health care consumers.

Sec. 96.102.  REPORT TO LEGISLATURE.  (a)  Not later than November 1, 2006, the commissioner shall file a report with the presiding officer of each house of the legislature on the advisory panel's recommendations for legislation regarding the collection and reporting of infection rates, process measures, or both.

(b)  The report shall include a recommendation that the legislation set September 1, 2007, as the date for hospitals and ambulatory surgical centers to comply with the legislation.

SECTION 4.  Section 108.011, Health and Safety Code, is amended by adding Subsections (c-1) and (c-2) to read as follows:

(c-1)  The council shall use public use data to prepare and issue reports that provide information for review and analysis by the Health and Human Services Commission relating to services that are provided in a niche hospital, as defined by Section 105.002, Occupations Code, and that are provided by a physician with an ownership interest in the niche hospital.

(c-2)  Subsection (c-1) does not apply to an ownership interest in publicly available shares of a registered investment company, such as a mutual fund, that owns publicly traded equity securities or debt obligations issued by a niche hospital or an entity that owns the niche hospital.

SECTION 5.  (a)  In this section, "niche hospital" has the meaning assigned by Section 105.002, Occupations Code.

(b)  The Department of State Health Services shall conduct a study regarding the impact of niche hospitals on the financial viability of other general hospitals located in this state.

(c)  In conducting the study, the Department of State Health Services shall evaluate:

(1)  the number of niche hospitals currently operating in this state;

(2)  the number of niche hospitals in this state that are currently under construction or in the planning phase of construction;

(3)  the location of each niche hospital and its proximity to other general hospitals;

(4)  the financial impact of niche hospitals on other general hospitals;

(5)  the referral patterns of physicians with an ownership interest in a niche hospital as compared to the referral patterns of physicians with privileges at a niche hospital who do not have an ownership interest in the niche hospital; and

(6)  the range of services provided by niche hospitals in this state, with particular emphasis on the provision of emergency and charity care services.

(d)  Not later than December 1, 2006, the Department of State Health Services shall submit a report to the legislature regarding the results of the study conducted under this section.

(e)  This section expires September 1, 2007.

SECTION 6.  Section 105.002, Occupations Code, as amended by this Act, applies only to conduct that occurs on or after the effective date of this Act.  Conduct that occurs before the effective date of this Act is governed by the law as it existed immediately before the effective date of this Act, and that law is continued in effect for that purpose.

SECTION 7.  As soon as practicable after the effective date of this Act, the commissioner of the Department of State Health Services shall appoint members to the Advisory Panel on Health Care Associated Infections as required by Chapter 96, Health and Safety Code, as added by this Act.

SECTION 8.  This Act takes effect September 1, 2005.

The Conference Committee Report on **SB 872** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 1835

Senator Armbrister submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 1835** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| ARMBRISTER | TALTON |
| FRASER | BAILEY |
| LUCIO | R. COOK |
| MADLA | HOWARD |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 1835** was filed with the Secretary of the Senate.

## CONFERENCE COMMITTEE REPORT ON
## HOUSE BILL 1855

Senator Ellis submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 1855** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| FRASER | GIDDINGS |
| HINOJOSA | BOHAC |
| VAN DE PUTTE | ELKINS |
| | ZEDLER |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 1855** was filed with the Secretary of the Senate.

**ORDERED NOT PRINTED**

On motion of Senator Ogden and by unanimous consent, the Conference Committee Report on **SB 1** was ordered not printed in the *Senate Journal.*

**CONFERENCE COMMITTEE REPORT ON**
**SENATE BILL 1**

Senator Ogden submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **SB 1** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| OGDEN | PITTS |
| ZAFFIRINI | LUNA |
| WHITMIRE | TURNER |
| DUNCAN | KOLKHORST |
| AVERITT | GATTIS |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **SB 1** was filed with the Secretary of the Senate.

**CONFERENCE COMMITTEE REPORT ON**
**HOUSE BILL 3540**

Senator Ogden submitted the following Conference Committee Report:

Austin, Texas
May 27, 2005

Honorable David Dewhurst
President of the Senate

Honorable Tom Craddick
Speaker of the House of Representatives

Sirs:

We, Your Conference Committee, appointed to adjust the differences between the Senate and the House of Representatives on **HB 3540** have had the same under consideration, and beg to report it back with the recommendation that it do pass.

| | |
|---|---|
| OGDEN | ISETT |
| WHITMIRE | BERMAN |
| SHAPIRO | PENA |
| STAPLES | |
| AVERITT | |
| On the part of the Senate | On the part of the House |

The Conference Committee Report on **HB 3540** was filed with the Secretary of the Senate.

## RESOLUTIONS OF RECOGNITION

The following resolutions were adopted by the Senate:

### Memorial Resolutions

**SR 1043** by Wentworth, In memory of Melvin Lachman of San Antonio.

**SR 1044** by Wentworth, In memory of Douglas Lloyd Saunders, Sr., of San Antonio.

**SR 1050** by Barrientos, In memory of Kenneth Dale Zimmerman of Austin.

**SR 1052** by Barrientos, In memory of Luis Ernesto Rodriguez of Austin.

**SR 1062** by Williams, In memory of Jeanne M. Terrill Miller of Austin.

### Congratulatory Resolutions

**SR 1040** by Nelson, Commending the Texas Institute for Health Policy Research for their endeavors in health-care issues.

**SR 1042** by Barrientos, Congratulating Joe M. Uriegas for being awarded France's National Order of the Legion of Honor.

**SR 1045** by Wentworth, Congratulating George C. "Tim" Hixon for receiving the 2005 Freeman Award.

**SR 1048** by Duncan, Recognizing William Earl "Blackie" Kines on the occasion of his 80th birthday.

**SR 1049** by Lucio, Recognizing John C. Lerma on the occasion of his retirement.

**SR 1051** by Barrientos, Commending the Hendrickson High School Hawk Band for its dedication.

**SR 1053** by Whitmire, Commending Will Luton of Houston for achieving the rank of Eagle Scout.

**SR 1054** by Whitmire, Commending Nigel Walsh for achieving the rank of Eagle Scout.

**SR 1055** by Whitmire, Recognizing William R. Eckert III on the occasion of his retirement.

**SR 1056** by Ellis, Commending Laura W. Murphy for her accomplishments.

**SR 1057** by Ellis, Recognizing Cydney Alexandra Washington on the occasion of her graduation from Bastrop High School.

**SR 1058** by Ellis, Congratulating Romeo and Basetsana Kumalo on the birth of their son, Nkosinathi Gabriel Kumalo.

**SR 1059** by West, Recognizing members of the Williams-Livingston family on the occasion of their family reunion.

**SR 1063** by Hinojosa, Commending Ruben Bonilla, Jr., of Corpus Christi for his accomplishments.

**SR 1064** by Duncan, Commending the students of the Engineering and Architecture Academy at Estacado High School in Lubbock for their accomplishments.

**HCR 204** (Deuell), Recognizing George Law of Sulphur Springs on his selection as Sulphur Springs Kiwanis Layperson of the Year.

**HCR 207** (Seliger), Honoring Dilly Mendoza of Austin for her outstanding tenure as captain's secretary for the Department of Public Safety Capitol Detail.

**HCR 216** (Seliger), Honoring U.S. Marine Corps Captain Van Taylor of Dallas for his service to his country.

**HCR 222** (Seliger), Congratulating Francis Vernon Ruble and Aimer Loutency Ruble on their 63rd wedding anniversary.

### Official Designation Resolution

**SR 1041** by Barrientos, Recognizing November 4 through 6, 2005, as Many Faces of Adoption Weekend in Austin.

### ADJOURNMENT

On motion of Senator Whitmire, the Senate at 1:35 a.m. Saturday, May 28, 2005, adjourned, in memory of Marcia Shedden, until 12:00 noon today.

---

## APPENDIX

---

### SENT TO GOVERNOR

May 27, 2005

**SB 189**, **SB 271**, **SB 291**, **SB 308**, **SB 314**, **SB 423**, **SB 465**, **SB 471**, **SB 483**, **SB 502**, **SB 511**, **SB 593**, **SB 702**, **SB 739**, **SB 815**, **SB 829**, **SB 866**, **SB 867**, **SB 920**, **SB 951**, **SB 955**, **SCR 12**, **SCR 16**, **SCR 17**, **SCR 18**, **SCR 19**, **SCR 21**, **SCR 27**, **SCR 30**, **SCR 36**

### SIGNED BY GOVERNOR

May 27, 2005

**SB 248**, **SB 403**, **SB 466**, **SB 846**, **SB 929**, **SB 1027**, **SB 1471**, **SB 1472**, **SB 1537**, **SCR 8**

Plaintiff Exhibit
PL1180

FILED UNDER SEAL

PL1181
9/2/2014
2:13-cv-000193

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |
|---|---|
| MARC VEASEY, *et al.*,<br><br>         Plaintiffs,<br><br>      v.<br><br>RICK PERRY, *et al.*,<br><br>         Defendants. | Civil Action No. 2:13-cv-193 (NGR) |

## DECLARATION OF COLEMAN BAZELON

I, Coleman Bazelon, make the following declaration pursuant to 28 U.S.C. § 1746:

1.    Pursuant to the agreement of the parties and this Court's minute order dated September 10, 2014, I hereby submit my second amended expert report (attached as Exhibit A) and amended reply report (attached as Exhibit B) in this matter. Consistent with the Court's order of September 10, these amended reports contain updated figures in light of Defendants' September 9, 2014 amendment to answers to the Deposition on Written Questions to the Texas Department of Public Safety (DPS).

2.    The amended reports also reflect updated information regarding persons that DPS considers to be deceased, thus ensuring that no such persons are included in my calculation of the population of voters who must obtain an SB 14-compliant ID in order to vote in person. My previously filed reports did not reflect this information regarding deceased voters because I had not received the latest information in time to incorporate it into my analysis. The updated information has no material effect on my analysis but is included for completeness.

3.      The substance of the amended reports attached to this Declaration otherwise remains the same as my first amended expert report and reply report filed on August 15, 2014. For clarity of the record, however, I wish to clarify one fact. In calculating the travel costs to obtain an Election Identification Certificate, *see* Exhibit A, Section VII, I assumed a starting departure time of 9:30am for trips taken via public transit. In my deposition and at trial, I testified that I used a departure time of noon. *E.g.*, Trial Tr. 122:23-25 (Day 6). That was incorrect. The amended reports attached to this Declaration, as well as the reports I previously filed on June 27, 2014 and August 15, 2014, all reflect an analysis that assumes a departure time of 9:30am for public transit. My calculations of the travel costs for the other two modes of travel I consider in my analysis—walking and taxi trips—are not dependent on, and are thus unaffected by, any choice of travel departure time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 17, 2014

Coleman Bazelon
The Brattle Group
1850 M St. NW #1200
202-955-5050

2

PL1182
9/2/2014
2:13-cv-000193

PP. 455-457

## Carolyn Guidry

**From:** Carolyn Guidry <guidry@co.jefferson.tx.us>
**Sent:** Tuesday, February 11, 2014 11:26 AM
**To:** 'Brent Weaver'
**Subject:** RE: EIC Mobile Station

The voters requiring an EIC may have limited transportation available.  I think the location should be where there are at least public transportation routes.  I believe that is part of the problem with the DPS offices are so far removed from those types of transportation.

CG

**From:** Brent Weaver [mailto:bweaver@co.jefferson.tx.us]
**Sent:** Tuesday, February 11, 2014 10:59 AM
**To:** 'Carolyn Guidry'
**Subject:** RE: EIC Mobile Station

What about airport area?  seems like we discussed this when you first mentioned about them deploying mobile units to our area.

*Brent Weaver*

### *Jefferson County Commissioner*
*Road & Bridge Precinct 2*
7759 Viterbo Road
Beaumont, Texas 77705
Office (409) 727-2173
Fax (409) 722-1916
http://co.jefferson.tx.us/prct2/BrentWeaver.htm
bweaver@co.jefferson.tx.us
*Session 229th*




**From:** Carolyn Guidry [mailto:guidry@co.jefferson.tx.us]
**Sent:** Tuesday, February 11, 2014 8:40 AM
**To:** 'Brent Weaver'
**Subject:** RE: EIC Mobile Station

Perhaps the new Nederland City Hall at 207 N 12th Street, Nederland, TX .  We are going to be using it instead of Highland Park Elementary for future elections, but did not have time to change prior to the Primary.

CG

**From:** Brent Weaver [mailto:bweaver@co.jefferson.tx.us]
**Sent:** Tuesday, February 11, 2014 8:07 AM

**To:** 'Carolyn Guidry'
**Subject:** RE: EIC Mobile Station

What is your suggestion for my precinct? I was thinking somewhere centrally located?

*Brent Weaver*

### *Jefferson County Commissioner*
**Road & Bridge Precinct 2**
7759 Viterbo Road
Beaumont, Texas 77705
Office (409) 727-2173
Fax (409) 722-1916
http://co.jefferson.tx.us/prct2/BrentWeaver.htm
bweaver@co.jefferson.tx.us
*Session 229th*



---

**From:** Carolyn Guidry [mailto:guidry@co.jefferson.tx.us]
**Sent:** Tuesday, February 11, 2014 8:01 AM
**To:** Brent Weaver; Eddie Arnold ; Everette "Bo" Alfred ; Jeff Branick; Michael Sinegal
**Subject:** FW: EIC Mobile Station

Commissioners,

I received this email from the SOS for the mobile units to set up in Jefferson County. With the start of Early
Voting Tuesday, our locations are limited. Please send your suggested location for a mobile unit as soon as possible.

Thanks,

Carolyn L. Guidry
County Clerk

---

**From:** EIC [mailto:EIC@sos.texas.gov]
**Sent:** Monday, February 10, 2014 12:33 PM
**To:** guidry@co.jefferson.tx.us
**Subject:** EIC Mobile Station

Hi Carol

I am following up to your request for the EIC Mobile Station. We will deploy mobile stations to various
locations across Texas in an ongoing effort to ensure Texans have access to Election Identification Certificates
(EICs).

We would like to come to Jefferson County next week for a one or two day set up the week of February 18.

Could you please send back the location, date and hours you would like the EIC Mobile Station to locate?

2

If you have any questions please contact me at EIC@sos.texas.gov or 1/800-252-2216 option four.

Thank you
Louri O'Leary

*Louri O'Leary*
Office of the Texas Secretary of State
Elections Division ◊ Elections Administration Manager
P.O. Box 12060 ◊ Austin, TX ◊ 78711-2060
T: 800.252. 8683 ◊ www.sos.state.tx.us/elections
D: 512.463.3204 ◊ F: 512.475.2811
loleary@sos.texas.gov
For Voter Related Information, please visit:



Twitter - https://twitter.com/#!/votetexas
Facebook - http://www.facebook.com/votetexas

*Please update your records to reflect my new email address: loleary@sos.texas.gov which is effective immediately.*

P. 473-474

## Carolyn Guidry

**From:**      Carolyn Guidry <guidry@co.jefferson.tx.us>
**Sent:**      Wednesday, February 19, 2014 8:28 AM
**To:**        'EIC'
**Subject:**   RE: EIC Mobile Station

Laura,

The Director at the Library is out until 1pm today, I cannot confirm the change until then.  This has been publicized and it is unfortunate that I was not informed about the 5 day advance survey of a public building.

Carolyn

**From:** EIC [mailto:EIC@sos.texas.gov]
**Sent:** Wednesday, February 19, 2014 7:27 AM
**To:** Carolyn Guidry; EIC
**Cc:** ndoyle@co.jefferson.tx.us
**Subject:** RE: EIC Mobile Station

Carlolyn
We were closed Monday for the holiday. DPS requires 5 business days to come out and survey the location so these dates will not work.
Today the earliest day would be Feb 26. Would you like to plan for the sites below for Feb 26 & 27?
Thanks
Louri

**From:** Carolyn Guidry [mailto:guidry@co.jefferson.tx.us]
**Sent:** Monday, February 17, 2014 9:40 AM
**To:** EIC
**Cc:** ndoyle@co.jefferson.tx.us
**Subject:** RE: EIC Mobile Station

Louri,

I forgot to send the schedule to you, I was so busy trying to get the word out to the public.

The following is the EIC mobile station schedule for Jefferson County, Texas:

Thursday, February 20, 2014          Alice Keith Community Center
  9 a.m. – 4 p.m.                     4075 Highland
                                      Beaumont, Texas 77705

Friday, February 21, 2014            Port Arthur Public Library
  9 a.m. – 4 p.m.                     4615 Ninth Ave.
                                      Port Arthur, Texas 77642

The Election Manager, Naomi Doyle will meet the team at each site.  Thanks for your assistance.

1

Carolyn L. Guidry
County Clerk

---

**From:** EIC [mailto:EIC@sos.texas.gov]
**Sent:** Monday, February 10, 2014 12:33 PM
**To:** guidry@co.jefferson.tx.us
**Subject:** EIC Mobile Station

Hi Carol

I am following up to your request for the EIC Mobile Station. We will deploy mobile stations to various locations across Texas in an ongoing effort to ensure Texans have access to Election Identification Certificates (EICs).

We would like to come to Jefferson County next week for a one or two day set up the week of  February 18.

Could you please send back the location, date and hours you would like the EIC Mobile Station to locate?

If you have any questions please contact me at EIC@sos.texas.gov or 1/800-252-2216 option four.

Thank you
Louri O'Leary

*Louri O'Leary*
Office of the Texas Secretary of State
Elections Division ◊ Elections Administration Manager
P.O. Box 12060 ◊ Austin, TX ◊ 78711-2060
T: 800.252. 8683 ◊ www.sos.state.tx.us/elections
D: 512.463.3204 ◊ F: 512.475.2811
loleary@sos.texas.gov
For Voter Related Information, please visit:



**VOTETEXAS.GOV**
POWERED BY THE *TEXAS SECRETARY OF STATE*

Twitter - https://twitter.com/#!/votetexas
Facebook - http://www.facebook.com/votetexas

*Please update your records to reflect my new email address: loleary@sos.texas.gov which is effective immediately.*



**Carolyn Guidry**

| | |
|---|---|
| **From:** | Theresa Goodness <thegood@co.jefferson.tx.us> |
| **Sent:** | Wednesday, February 19, 2014 8:56 AM |
| **To:** | Ken Seholm |
| **Cc:** | Carolyn Guidry |
| **Subject:** | EIC Mobile station notice |

| | |
|---|---|
| **Importance:** | High |

Ken:

Please remove the EIC mobile station notice from the website.  Our state government (SOS and DPS) have a problem with those dates.

Sincerely,

Theresa Goodness, CRM, CDIA+
Chief Deputy

Jefferson County Clerk's Office
P.O. Box 1151
Beaumont, TX 77704-1151
409.835.8480
https://jeffersontxclerk.manatron.com

**Carolyn Guidry**

| | |
|---|---|
| **From:** | Theresa Goodness <thegood@co.jefferson.tx.us> |
| **Sent:** | Thursday, March 06, 2014 8:12 AM |
| **To:** | 'Sherri Boudreaux' |
| **Cc:** | Carolyn Guidry; Naomi Doyle |
| **Subject:** | RE: Election Day |

Sherri:

Thank you for your email. We will continue our training efforts concerning the photo identification requirement. Ms. Guidry went to considerable expense procuring the large white stand up boards with all of the acceptable photo ID's. Also we gave each poll worker a copy of the slide presentation from the banquet training in which the acceptable photo identifications were discussed.

I think you are correct that sometimes a poll worker falls back on what the rules were in prior elections, and fails to recall any recent changes. This is particularly an issue with our more seasoned poll workers.

We will also continue our training efforts concerning assisting voters when pulling up a ballot. If the voter does not ask for help in how to use the machine, none should be given. We have been utilizing this electronic equipment since 2006.

Thanks again for your comments, and for volunteering to assist with the election process!

Sincerely,

Theresa Goodness, CRM, CDIA+
Chief Deputy

Jefferson County Clerk's Office
P.O. Box 1151
Beaumont, TX 77704-1151
409.835.8480
https://jeffersontxclerk.manatron.com

---

**From:** Sherri Boudreaux [mailto:shrrbdrx@gmail.com]
**Sent:** Wednesday, March 05, 2014 10:01 AM
**To:** Theresa Goodness
**Subject:** Re: Election Day

Theresa:

I just wanted to share with you a few things that voters brought to my attention yesterday that concerned me. I was at the Port Arthur Library.

I had multiple people who told me this happened at early voting at the Port Arthur Library. An elderly gentleman came to vote early and brought his wife on Election Day. He stood with his wife as she checked in. He then pulled me aside and told me that he was never asked for ID because he had his voter registration card. He questioned it, but they never

1

took his ID. He heard me explain to another person in line that an ID was now required to vote and what was acceptable forms. This concerned him.

A young woman voted early at the same location and brought her elderly mother on Election Day. Her mother did not have ID with her. I asked if she had a valid drivers license, which she did so her daughter went home to get it. She didn't complain about having to get the ID for her mother, but she did tell me that she was not required to show ID. I explained the legislation and showed she the board. She was concerned about the lack of training for election workers not knowing the rules/laws. She witnessed an individual going through the line in front of her without a card or ID. The election worker "knew her" from church so it was "okay" and she was active in the system.

The County Clerks Office does an amazing job getting everything together and pulling off elections. I commend each and every one of you. The problem lies with the worker who has been doing elections for years and think they know everything and know best because they have been doing it so long and "know everyone". Rules are rules and have been in place for reasons. That is what makes things fair and unbiased no matter what party you are affiliated. We have a standard to uphold as election workers.

As a first time judge for this primary, I learned a lot if valuable things. I did have to have a talk with one worker giving what I though was too much help to their own parties voters, by showing them how to scroll through the pages and "making sure that they read the propositions very carefully because of the wording" while not even completing the process of pulling up the ballot for the other parties voters. I didn't let her know that I knew of the bias, I just explained that she was taking too much time explaining. If they were not a first time voter, they should know how to work the machine. I concluded telling her that she is a wonderful and friendly person and asked her if she would be a door greeter and make sure everyone knew they needed ID. She had a good time with that.

I apologize for the long narrative, but felt it important to bring the early voting problem to your attention.

Once again, thank you for all you do.

Sherri Boudreaux

Sent from my iPhone

On Mar 3, 2014, at 5:53 PM, "Theresa Goodness" <thegood@co.jefferson.tx.us> wrote:

> Election Judges and Poll workers:
>
> The dispatch number to call tomorrow for any kind of assistance with election equipment or procedural questions is 409-835-8791.
>
> - If you don't have all your supplies, call us.
> - If you can't get into the building, call us.
> - If the power is off, call us.
> - If you have difficulty with the equipment, call us.
>
> Thank you for volunteering!
>
>
> Sincerely,
>
> Theresa Goodness, CRM, CDIA+
> Chief Deputy



# Voting Age Citizens, by Race/Ethnicity, for Whom a Roundtrip to an EIC Location Would Take 90 Minutes or Longer

PL1183
9/2/2014
2:13-cv-00193

All CVAP — 4.7%

White, Non-Hispanic — 3.3%

Hispanic/Latino — 5.0%

African-American — 10.9%

0.0%   2.0%   4.0%   6.0%   8.0%   10.0%   12.0%

Source: Chatman Report, Figure 5

## Voting Age Citizens Below the Poverty Line, by Race/Ethnicity, for Whom a Roundtrip to an EIC Location Would Take 90 Minutes or Longer



Source: Chatman Report, Figure 7