JAMES ABSHIER                                                    JUNE 15, 2012

## 1

```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                   )
                                  )
            Plaintiff,            )
                                  )
VS.                               )
                                  )
ERIC H. HOLDER, JR. in his        )
official capacity as Attorney     )
General of the United States,     )
                                  )
            Defendant,            )
                                  )
ERIC KENNIE, et al,               )
                                  )
     Defendant-Intervenors,       )
                                  )
TEXAS STATE CONFERENCE OF         )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                   )   (RMC-DST-RLW)
                                  )   Three-Judge Court
     Defendant-Intervenors,       )
                                  )
TEXAS LEAGUE OF YOUNG VOTERS      )
EDUCATION FUND, et al,            )
                                  )
     Defendant-Intervenors,       )
                                  )
TEXAS LEGISLATIVE BLACK           )
CAUCUS, et al,                    )
                                  )
     Defendant-Intervenors,       )
                                  )
VICTORIA RODRIGUEZ, et al.,       )
                                  )
     Defendant-Intervenors.       )

**********************************************
              ORAL DEPOSITION OF
                 JAMES ABSHIER
                 JUNE 15, 2012
**********************************************
```

## 2

```
 1        ORAL DEPOSITION OF JAMES ABSHIER, produced as a
 2   witness at the instance of the Defendant, was duly
 3   sworn, was taken in the above-styled and numbered cause
 4   on the JUNE 15, 2012, from 9:14 a.m. to 10:58 a.m.,
 5   before Chris Carpenter, CSR, in and for the State of
 6   Texas, reported by machine shorthand, at the offices of
 7   DECHERT, LLP, 300 West 6th, Suite 2010, Austin, TX
 8   78701, pursuant to the Federal Rules of Civil Procedure
 9   and the provisions stated on the record or attached
10   hereto.
```

## 3

```
 1
 2
 3                    A P P E A R A N C E S
 4   FOR THE PLAINTIFF, STATE OF TEXAS:
 5       John McKenzie
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 6       P.O. Box 12548
         Austin, TX  78711-2548
 7
         209 West 14th Street
 8       8th Floor
         Austin, TX  78701
 9       (512) 936-1307
         john.mckenzie@texasattorneygeneral.gov
10
11   FOR THE DEFENDANT, HOLDER, ET AL:
12       Elizabeth S. Westfall
         Jennifer Maranzano
13       U.S. DEPARTMENT OF JUSTICE
         950 Pennsylvania Avenue, NW
14       NWB - Room 7202
         Washington, DC  20530
15       (202) 305-7766
         elizabeth.westfall@usdoj.gov
16
     FOR THE TEXAS LEGISLATIVE BLACK CAUCUS, THE LEAGUE OF
17   WOMEN VOTERS OF TEXAS, THE JUSTICE SEEKERS, REVEREND
     PETER JOHNSON, REVEREND RONALD WRIGHT AND DONALD WRIGHT:
18
         Nancy Abudu (appearing by telephone)
19       AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.
         230 Peachtree Street, NW
20       Suite 1440
         Atlanta, GA 30303 -1227
21       (404) 523-2721
         nabudu@aclu.org
22
23
24
25
```

## 4

```
 1                        INDEX
 2   Appearances.......................3
 3   JAMES ABSHIER
 4        Examination by Ms. Westfall................5
          Examination by Mr. McKenzie..............70
 5        Examination by Ms. Abudu.................71
 6   Signature and Changes...........................77
 7   Reporter's Certificate..........................79
 8                      EXHIBITS
 9   NO. DESCRIPTION                     PAGE MARKED
10   900  Deposition Notice               13
11   901  List of Requirements for and EIC     16
12   902  Application to Order Birth Certificate  28
13   903  Description Method of Ordering a Birth   32
          Certificate and ID Requirements and
14        Applications
15   904  List of County Clerks, District Clerks,   45
          Local Registrars, and Remote Access
16        Issuance Listings
17   905  Nueces County Clerk Printout and      50
          Application for Birth or Death
18        Certificates
19   906  DL/State ID Document              65
20
21
22
23
24
25
```

JAMES ABSHIER                                        JUNE 15, 2012

| 9 |
|---|

1     A.  I think about an hour.
2     Q.  Did you review any documents?
3     A.  No.
4     Q.  Other than your attorney, did you speak with
5  anyone else today about your deposition?
6     A.  No.  Well, I told my wife I had a deposition
7  today, but that's about it.
8     Q.  Did you bring any notes or documents with you
9  today?
10    A.  No.
11    Q.  Tell me about your educational background.
12    A.  I have a Bachelor of Science in physics with a
13 minor in math from Sam Houston State University, an EE
14 degree, which is electrical engineering, from Texas A&M
15 University, and then an MBA from Texas State University.
16    Q.  Do you understand that you are testifying today
17 on behalf the State of Texas and not in your individual
18 capacity?
19    A.  Yes.
20    Q.  When did you first learn -- without talking
21 about any conversations that you've had with your
22 attorney, when did you first learn that you would be
23 testifying on behalf of the State?
24    A.  On the 12th.
25    Q.  What is your current title?

| 10 |
|---|

1     A.  Manager of Record Issuance at Vital Statistics.
2     Q.  What are your responsibilities?
3     A.  I manage the teams that handle basic records
4  issuance with Vital Statistics servicing customer
5  requests for vital records.
6     Q.  Is that all type of vital records or a certain
7  type of vital record?
8     A.  It's birth, death, marriage, and divorce.
9     Q.  Are those all of the records that are
10 maintained by the Vital Statistics Department?
11    A.  We do -- we do maintain what's called
12 Acknowledgement of Paternities, disinterments, other
13 things that are related to the vital records.
14    Q.  How many people do you manage?
15    A.  31.
16    Q.  And who do you report to?
17    A.  I report to the branch manager, who is directly
18 under the state registrar.  There is not a person in
19 that position right now, though.
20    Q.  Are you located in Austin?
21    A.  I am.
22    Q.  Do you do anything -- as part of your
23 responsibilities, do you do anything related to the fee
24 schedule issued by Vital Statistics related to fees
25 charged to people who want to request those documents?

| 11 |
|---|

1     A.  I can make recommendations.  I don't make any
2  of the decisions, but I can make recommendations to the
3  state register.
4     Q.  Do you have any dealings with the legislature?
5     A.  The only time I have any dealings is when we do
6  legislative analysis for bills that come through our
7  department.  I have done two or three different
8  legislative analysis, budget analysis.
9     Q.  Did you do any such analysis for any voter ID
10 legislation that was considered by the state
11 legislature?
12    A.  No, I personally didn't.
13    Q.  Do you work with the Lieutenant Governor's
14 Office?
15    A.  No.
16    Q.  Do you work with the Governor's Office?
17    A.  We get complaints or -- or -- yeah, actually,
18 complaints from the Governor's Office, and I take care
19 of servicing those orders or resolving the complaints.
20    Q.  Do you know who in your office conducted
21 analysis for -- strike that.
22        Was there anyone in your office who
23 conducted analysis for Senate Bill 14?
24    A.  I don't have any direct knowledge.  I would --
25 it would be appropriate for somebody to conduct an

| 12 |
|---|

1  analysis any time there's vital records involved, but
2  personally, I don't know.
3     Q.  Did somebody, to your knowledge, conduct such
4  analysis with regard to Senate Bill 14?
5     A.  I am not sure.
6     Q.  Who would know the answer to that question?
7        MR. McKENZIE:  I'm going to go ahead and
8  object as beyond the scope of what he has been noticed
9  for.
10        So you can answer.
11        And you can make your record, but it's not
12 going to bind the State.  Go ahead.
13    A.  Okay.  Geraldine Harris, State Registrar.
14    Q.  (By Ms. Westfall) How long have you been in
15 your current position as a manager?
16    A.  Six years.
17    Q.  Did you work for Vital Statistics before that
18 time?
19    A.  No.
20    Q.  Were you previously employed before that time?
21    A.  I was.
22    Q.  Where were you employed?
23    A.  I was with Advanced Micro Devices for 16 years,
24 and then I worked for a company called Gunze
25 Electronics.

## 13

1    Q.  Could you describe that first employer?
2    A.  Advanced Micro Devices is a manufacturer of
3    semiconductors.  We manufactured various different
4    microchips, microprocessors, memories, PLAs, things like
5    that.
6    Q.  How did you get the position in Vital
7    Statistics?
8    A.  I applied and was interviewed.
9    Q.  How did you hear about the position?
10   A.  Through the Work In Texas website.  I was
11   searching for a job at the time.
12   Q.  Have you ever -- other than your position
13   currently as the manager of Vital Statistics, have you
14   ever worked for State of Texas in another capacity?
15   A.  As a student at Sam Houston State University, I
16   worked as a grounds keeper at Sam Houston National Park.
17   Q.  That's the --
18   A.  That's it.
19   Q.  That's the only other position you've held with
20   the State?
21   A.  Yes.
22       MS. WESTFALL:  Could you mark this U.S.
23   900.
24       (Exhibit U.S. 900 marked for
25   identification.)

## 14

1    Q.  (By Ms. Westfall) You've been handed what's
2    been marked U.S. Exhibit 900.  Do you recognize this
3    document?
4    A.  I do.
5    Q.  What is it?
6    A.  It's the request for the deposition that I was
7    sent when I was informed that I would need to do a
8    deposition.
9    Q.  And what topics are you prepared to testify to
10   today?
11   A.  My understanding is Number 7.
12   Q.  Could you --
13   A.  The process and cost for a voter to obtain
14   secondary information.
15   Q.  Could you describe Number 7?
16   A.  It looks like it's the -- a method of obtaining
17   secondary identification necessary to obtain the ID
18   card, the EIC, from the DPS.
19   Q.  Are you familiar with Senate Bill 14?
20   A.  I am.
21   Q.  Have you actually read Senate Bill 14?
22   A.  I have not.
23   Q.  Could you describe Senate Bill 14?
24   A.  My understanding of it is a requirement to --
25   for voters to have ID prior to voting.

## 15

1    Q.  Do you understand that it includes a provision
2    related to EICs?
3    A.  I understood that there was a system being put
4    into place for an ID for people that don't have IDs, is
5    how I understand it.
6       MS. WESTFALL:  I'm going to hand the
7    witness what's been previously marked at U.S. Exhibit
8    Number 5.
9    Q.  (By Ms. Westfall) You've been handed what's
10   been previously marked as U.S. Exhibit Number 5.  Do you
11   recognize this document?
12   A.  I see that it's labeled as SB Number 14.
13   Q.  And could I turn your attention to Page 13 of
14   this document at Section 20, about halfway down the
15   page?
16   A.  Yes.
17   Q.  Do you see it says "Election Identification
18   Certificate"?
19   A.  Yes.
20   Q.  Could you take a moment to just review those
21   paragraphs silently and what follows on Page 14, and let
22   me know when you've had a chance to take a look at that.
23   A.  (Witness reviewing document.)
24   Q.  Have you had a chance to take a look at that
25   section?

## 16

1    A.  I have.
2    Q.  And what is your understanding of an Election
3    Identification Certificate based on your reading of
4    Exhibit 5?
5    A.  My understanding is, it's issued to a person
6    who is eligible to vote and does not have any other ID,
7    and it's to be free of charge.
8    Q.  And by free of charge, is it your understanding
9    that the Department of Public Safety cannot charge
10   voters for that form of ID?  Is that your understanding?
11   A.  That's how I understand it, yes.
12   Q.  But indeed, voters may need to obtain other
13   records, such as from Vital Statistics, that have a cost
14   associated therewith to get an EIC; is that right?
15   A.  I haven't seen a list of requirements for the
16   EIC.
17   Q.  Thank you.
18       Could you mark this as 901, please.
19       (Exhibit U.S. 901 marked for
20   identification.)
21   Q.  (By Ms. Westfall) You've been handed what's
22   been marked United States Exhibit 901.  Have you seen
23   this document before?
24   A.  I have.
25   Q.  What is it?

JAMES ABSHIER                                              JUNE 15, 2012

---

17

1    A.  It's a list of identification information
2  required for a driver's license -- oh, election
3  identification certificate.  I'm sorry.
4    Q.  Thank you.  Have you seen this document before
5  today?
6    A.  I have not.  I thought it was for the driver's
7  license.
8    Q.  And I'll represent to you that this is Texas
9  Administrative Code Section 15.182, which you just
10  testified about.  Do you know what the purpose of this
11  code provision is?
12    A.  To prove identity in obtaining the EIC.
13    Q.  If you could look at the forms of
14  identification listed in Exhibit 901 and let me know
15  which forms of identification are maintained by Vital
16  Statistics.
17    A.  Section 3A, original or a certified copy of
18  birth certificate issued by the appropriate State Bureau
19  of Vital Statistics.  That's the only one that we
20  maintain.
21    Q.  Sir, is that the form the identification that
22  you were prepared to testify about under Topic 7 of the
23  Rule 30(b)(6) notice that was noticed?
24    A.  Yes.
25    Q.  So that is the sole ID which you have

---

18

1  familiarity with?
2    A.  Which we issue and maintain, yes.
3    Q.  Turning your attention to U.S. 901, are you
4  familiar with any office in the state of Texas that
5  maintains original or certified copies of the United
6  States Department of State certification of birth?
7    A.  No, that's federal function.
8    Q.  So are there any offices, to your knowledge,
9  within the state of Texas that would issue those copies?
10    A.  No.  We refer those people to Department of
11  State.
12    Q.  Okay.  So there are no such offices in Texas;
13  is that correct?
14       MR. McKENZIE:  I'm going to object as
15  mischaracterizing his testimony.
16    Q.  (By Ms. Westfall) Do you refer individuals
17  seeking a United States Department of State
18  certification of birth to the State Department in
19  Washington, D.C.?
20    A.  I refer them to the website for Department of
21  State, which has a description of the method to obtain
22  one.
23    Q.  Are there any offices in the state of Texas, to
24  your knowledge, that issue original or certified copies
25  of the United States Department of State certification

---

19

1  of birth?
2       MR. McKENZIE:  Objection, asked and
3  answered.
4    Q.  (By Ms. Westfall) You may answer.
5    A.  Not to my knowledge.
6    Q.  Are you familiar with court orders indicating
7  an official change of name or gender?
8    A.  I am familiar with that.
9    Q.  And where does one obtain one of those
10  documents?
11    A.  From the court where the name change was
12  granted.
13    Q.  What type of court that is?
14    A.  I believe it's -- well, I'm not positive.  I
15  think it's a district court.
16    Q.  Would it be a -- would it be a county court?
17    A.  Yes.
18    Q.  Would it be a county clerk's office or court
19  that would maintain that?
20    A.  The clerk's office would maintain it, and
21  that's where people would go to get the copy.
22    Q.  So when an individual has a change of name or
23  gender and has it filed with a particular county court
24  and then later wants to obtain a copy of it, they have
25  to go back to that particular court; is that correct?

---

20

1    A.  They do have to go back to that court.
2    Q.  It would not be available anywhere else in the
3  state or at the state level; is that correct?
4    A.  Not that I'm aware of.
5    Q.  Are you familiar -- if someone has been born
6  abroad in a military hospital, do you also refer that
7  individual to the Department of State or to a different
8  entity?
9    A.  It's Department of State.  It's called the
10  Consular Report of Birth Abroad.
11    Q.  Are you familiar with U.S. citizenship or
12  naturalization papers?
13    A.  To a small degree.
14    Q.  Do you know where those are maintained?
15    A.  No.
16    Q.  If someone comes to Vital Statistics seeking a
17  U.S. citizenship or a naturalization paper, where do you
18  send that individual?
19    A.  I have not had that incident happen.
20    Q.  Is it fair to say, looking at document U.S.
21  901, of the secondary identification listed, birth
22  certificate, U.S. Department of State certification,
23  court order of name change or gender change, that
24  probably the most commonly-held form of ID is a birth
25  certificate.

JAMES ABSHIER                                    JUNE 15, 2012

---

21

1      MR. McKENZIE:  Objection, speculation.
2      Q.   (By Ms. Westfall) You may answer.
3      A.   I have no way of knowing that would be the most
4   common method of identification.
5      Q.   Well, based on your expertise in working in
6   Vital Statistics for six years, do you think -- do you
7   have any opinion about whether that's the most commonly-
8   held form of ID of those four in the state of Texas?
9      MR. McKENZIE:  Same objection.
10     Q.   (By Ms. Westfall) You may answer.
11     A.   My impression is that most people use the birth
12  certificate to obtain their ID because it's probably the
13  easiest to obtain.
14     Q.   Do you know where Texas boat titles are
15  maintained, what state entity maintains those?
16     MR. McKENZIE:  Objection, beyond the scope
17  of the notice, but you may answer.
18     A.   I'm not sure.  I think it's the DMV.
19     Q.   (By Ms. Westfall) Would it be DPS?
20     A.   DPS.
21     Q.   Thank you.
22          And who maintains -- or which entity
23  maintains copies of marriage license and divorce
24  decrees?
25     A.   The local clerks.  The county clerks maintain

---

22

1   the marriage.  The divorce decrees are maintained by the
2   court that grants the divorce.
3      Q.   Are those maintained by any state office in
4   addition to the local office?
5      A.   Marriage records, we get the applications for
6   marriage, and we issue what's called a Marriage
7   Verification Letter.  It's used in many different legal
8   applications.  As far as divorces, we get from the court
9   what's called a -- what is it -- Suit Affecting Parent-
10  Child Relationship document, which gives details of the
11  divorce.  We don't get the decree.  We just get what's
12  called a SAPCR report.  That's an acronym for Suits
13  Affecting Parent-Child Relationship.
14     Q.   You just described certain marriage and divorce
15  records that are maintained by Vital Statistics.  Are
16  any of those records listed on U.S. 901, or is it simply
17  the marriage license and divorce decree which are not
18  held by Vital Statistics?
19     A.   It looks like they specify marriage license or
20  divorce decree, neither of which we provide.
21     Q.   Could you tell me which birth certificates are
22  maintained in Vital Statistics?  What scope of those
23  records are maintained?
24     A.   We maintain birth certificates for persons born
25  within the United States -- or within Texas from 1903 to

---

23

1   current.  We also maintain what's called Foreign
2   Adoption Records.  That's a situation where a person
3   adopts a child from a foreign country and files that
4   with the court.  We also maintain what's called a
5   delayed records, where a person will file a birth
6   certificate more than a year after the person is born.
7      Q.   So turning back to U.S. Exhibit 901, an
8   acceptable secondary identification is an original or
9   certified copy of birth certificate issued by the
10  appropriate State Bureau of Vital Statistics; is that
11  correct?
12     A.   Yes.
13     Q.   And when it says "equivalent agency" after
14  that, what do you take that to refer to?
15     A.   Texas is what's called a dual registration
16  state.  The birth is filed both in the local registrar's
17  office and with the state, so there's two different
18  locations where that original record is maintained, and
19  that's what they mean by that.  We also maintain what's
20  called a remote system.  They can print out an abstract
21  birth certificate which is sufficient for Texas ID.
22     Q.   So I think you talked about several entities
23  that maintain birth certificates; one is the state Vital
24  Statistics; is that right?
25     A.   That's correct.

---

24

1      Q.   And then what are the local or county entities
2   that maintain those records as well?
3      A.   It's the local vital records.  The local
4   registrar maintains a copy of the record in the county
5   where the person was born.
6      Q.   Is that the county registrar?
7      A.   Yes.
8      Q.   Is there a county registrar in every single
9   county in the state of Texas, to your knowledge?
10     A.   I'm -- I'm not sure if one is in every county.
11  Local registrars can be in the city, in the county, and
12  there has been many times where the functions have been
13  combined, so I'm not sure exactly what specific offices
14  are in which specific counties.
15     Q.   Are birth certificates issued at the birth of a
16  child?
17     A.   Only if the parent requests it.  It's not
18  issued automatically.
19     Q.   Could you describe the process for issuing
20  original birth certificates when a child is born?
21     A.   The parent or other qualified applicant would
22  have to submit an application through either the local
23  registrar or the state office along with sufficient ID
24  and fees, and then a certificate would be issued.
25     Q.   How much does it cost to get an original birth

JAMES ABSHIER                                              JUNE 15, 2012

## 25

1  certificate?
2       A.   The state office charges $22.  The law allows
3  the local registrar to charge an extra dollar for
4  preservation and maintenance of their office, so the
5  local charge is 23.
6       Q.   Are you able to obtain an original birth
7  certificate for your child even if the child was born
8  outside a hospital, birthing center, or home?
9       A.   You can obtain a copy of that.  Now, they don't
10  get the original birth certificate.  They get a
11  certified copy.  But whoever attends the birth is
12  required to file the birth certificate, and a copy of
13  that goes to the local, and then we get a copy of it.
14       Q.   So once a parent submits an application for a
15  birth certificate, is that submitted to the county
16  registrar, or where is that application submitted to?
17       A.   Okay.  You're talking about an application to
18  get a certified copy?
19       Q.   No.  I'm talking about originally.  When you
20  have -- when you have a child and you want to get a
21  birth certificate issued originally.
22       A.   If the -- if the parent or whoever attends it
23  files a hard copy, it must be filed with the local
24  registrar.  The local registrar takes that copy, files a
25  copy in their office, and sends the original document to

## 26

1  us.
2       Q.   And when the parent is submitting that
3  application, I believe you testified that there's a fee
4  associated with that application, and it's $22; is that
5  right?
6       A.   There is no fee to file the birth, to report
7  the birth.
8       Q.   I see.
9       A.   There's a fee to obtain a certified copy.
10       Q.   Do you have to present any sort of ID when you
11  are registering your child for an original birth
12  certificate?
13       A.   Not that I'm aware of.
14       Q.   How do you indicate that your child is who you
15  are saying the child is?  Does a hospital certify that,
16  or how does the county registrar understand that this
17  newborn child is who the parents says he or she is?
18       A.   I don't work in the Registration Department of
19  Vital Statistics.  It's a completely separate branch
20  within the same organization.  The local has -- if it's
21  submitted by hard copy, the local has to have sufficient
22  proof that the child was born to that person.  They have
23  to show, like, doctors' records that they had attended,
24  and, you know, somebody had treated the mother during
25  the pregnancy.  They may need to show proof of residency

## 27

1  and things like that.  But that's up to the local.
2            If a child is born in a hospital, it
3  usually goes through what's called the Texas Electronic
4  Registrar system, and it's filed electronically so the
5  hospital has knowledge, and the parent has to file an
6  affidavit, which is a Certification of Birth Facts, and
7  then they file it electronically with our office.
8       Q.   So after the local registrar receives the
9  application for the original birth certificate, then
10  that information is immediately forwarded to the state
11  level?
12       A.   The terminology is a little -- is a little
13  confusing, because it's not an application.  They're
14  filing an original birth certificate.  The application
15  has to do with ordering.
16       Q.   I see.
17       A.   But whenever the local files a birth
18  certificate, they make the copy, and they they'll send
19  it to our office.  They send it by regular mail
20  usually.  And so there can be a lag time, depending on
21  when the parent files, when the -- when the local
22  registrar accepts the document, and when it's received
23  and proofed by our office.
24       Q.   How long has the State of Texas maintained a
25  dual system of the county maintaining the birth

## 28

1  certificates as well as the state?
2       A.   1903.
3       Q.   And is it your experience that sometimes people
4  lose their birth certificates?
5       A.   They do.
6       Q.   If a person is born -- was born in Texas and
7  loses her birth certificate, what steps must she take to
8  obtain a certified copy of her birth certificate?
9       A.   Now, you're talking about applying for a
10  certified copy, right?
11       Q.   Yes.
12       A.   Okay.  They have to apply either through the
13  local registrar or through the state office.  With our
14  office, they -- they can go through three different
15  methods:  Either mail-in forms, in person in our lobby,
16  or through our online service, Texas.gov, and they can
17  order it through any of those three methods.
18            MS. WESTFALL:  Could you mark this as 902.
19            (Exhibit U.S. 902 marked for
20  identification.)
21       Q.   (By Ms. Westfall) You've been handed what's
22  been marked U.S. 902.  Do you recognize this document?
23       A.   I do.
24       Q.   Could you describe this document for the
25  record, please.

JAMES ABSHIER                                                    JUNE 15, 2012

---

### 29

1    A.   This is the application for a regular mail --
2    to apply through the regular mail system for a birth
3    certificate.
4    Q.   Is this application, U.S. 902, similar to the
5    application that a person would submit if she or he
6    appeared in person at Vital Statistics?
7    A.   It is.
8    Q.   Does it seek the same type of information?
9    A.   Yes.
10   Q.   Does it, in fact, seek the identical type of
11   information from the applicant?
12   A.   Yes.
13   Q.   How does one obtain a copy of U.S. 902?
14   A.   They can go online to our website and print out
15   a copy.  They can call our office and we can mail them a
16   copy of that.  Some hospitals maintain a copy of the
17   application for the parents.  There's, you know, a
18   variety of different ways they can get an application.
19   Q.   If someone does not have access to a computer
20   or the Internet, could you describe the ways that one
21   could obtain a copy of the mail-in application for a
22   birth record?
23   A.   Usually what they do is, they'll call our
24   office and ask us to send them a copy, and we'll mail a
25   copy of the application to them.

---

### 30

1    Q.   How much does it cost to obtain a certified
2    copy of a birth certificate?
3    A.   The state-issued copy is $22.
4    Q.   Is that the minimum cost for a birth
5    certificate?
6    A.   It is.
7    Q.   If the birth occurred in the past 75 years,
8    does the applicant need to include photo ID?
9    A.   They do.
10   Q.   Could you describe the type of ID that is
11   required?
12   A.   Vital Statistics has a two-tiered system.  One
13   is a primary identification, which is a government-
14   issued identification.  Those would include the driver's
15   license of a state, military ID, concealed carry
16   license, pilot license, passport, student ID.  Any of
17   those are considered primary.  The secondary is two
18   documents different from each other that has the name
19   and current address of the individual.
20   Q.   For those two forms of ID, which we'll discuss
21   a little bit later, do those not have the individual's
22   photo on them?
23   A.   No, not the secondary.  Many of the secondary
24   don't.
25   Q.   Does that list of ID, both the photo ID and the

---

### 31

1    forms of nonphoto ID, do those, from the standpoint of
2    Vital Statistics, indicate the individual's identity?
3    A.   It would have their name and current address.
4    Q.   So would --
5    A.   And one of the documents should have a
6    signature of the applicant.
7    Q.   Would that be sufficient, from the standpoint
8    of Vital Statistics, to confirm someone's identity?
9    A.   Yes.
10   Q.   Could you describe the type of information that
11   an applicant needs to supply on the application form to
12   get a certified copy of the birth certificate?
13   A.   There's two sections on the application.  One
14   is the registrant information.  The registrant is the
15   person's name that's on the birth certificate, and the
16   person must fully identify the information on the record
17   before we can issue a copy.  So they have to have
18   knowledge of parents, date of birth, place of birth.
19   The second section is the requester
20   information, which is the person buying it, and they
21   have to identify their name, address, reason for
22   obtaining it, what the relationship is, and, of course,
23   they have to sign it, because there is a warning
24   statement on it and we require a signature.
25   MS. WESTFALL:  Could you mark 903.

---

### 32

1    (Exhibit U.S. 903 marked for
2    identification.)
3    Q.   (By Ms. Westfall) You've been handed what's
4    been marked U.S. 903.  Do you recognize this document?
5    A.   I do.
6    Q.   Could you describe this document?
7    A.   This is the description of method of ordering
8    through the state office for a birth certificate.  It
9    has our online service, ID requirements in general, and
10   the applications.
11   Q.   Were you involved in drafting any of the text
12   for this Exhibit U.S. 903?
13   A.   No.
14   Q.   If I could turn your attention to the list of
15   ID at Paragraph 2 --
16   A.   Yes.
17   Q.   -- that must be submitted, could you describe
18   for the record the types of ID that are required?
19   A.   According to the list, it's state-issued
20   driver's license, state -- state, city, county ID,
21   student ID, government employment badge or card, prison
22   ID, military ID.  It also has a section where, if you
23   don't have a photo ID, it gives ideas or suggestions on
24   how to resolve or supply ID.
25   Q.   On the second page of U.S. Exhibit 903, does it

## 33

1    include a chart that indicates the methods of submitting
2    an application for a certified copy of a birth
3    certificate?
4        A.   Yes.  It has what we call offline ordering
5    methods.  We offer, either in person, an expedited
6    service or regular mail.
7        Q.   So I want to turn your attention to the
8    in-person application for a birth certificate.  Do you
9    see that section of the chart?
10       A.   Yes.
11       Q.   Are you familiar with where that particular
12   office is of the Vital Statistics in Austin?
13       A.   Yes, I am.
14       Q.   Could you name the address for the record?
15       A.   It's at 1100 West 49th Street.
16       Q.   Is that in downtown Austin?
17       A.   It's on the north side of the city, yes.
18       Q.   Do you know what the hours of operation of that
19   office are?
20       A.   8:00 to 5:00, Monday through Friday.
21       Q.   Is there a break for lunch, or is it open
22   continuously from 8:00 to 5:00?
23       A.   It's open continuously.
24       Q.   Is that where you maintain your office?
25       A.   Yes.

## 34

1        Q.   How is that office accessible to people?  Do
2    you need to drive there, or is it on public
3    transportation or both?
4            MR. McKENZIE:  I'm going to object to the
5    extent it's a little outside the scope, but go ahead and
6    answer.
7        A.   There are -- there are bus -- bus routes that
8    go right by the building.  We're also located near a
9    main road, Lamar, and, of course, we do have parking for
10   people that drive.
11       Q.   (By Ms. Westfall) How frequently does the bus
12   come by your office?
13       A.   I'm not sure of the schedule.
14       Q.   Does it have any weekend hours?
15       A.   No.
16       Q.   So it's Monday through Friday, 8:00 to 5:00; is
17   that correct?
18       A.   That's correct.
19       Q.   So if a voter who wanted to obtain a copy, a
20   certified copy of a birth certificate, was working
21   business, would that voter need to take time off and
22   leave his or her place of employment to go to this
23   office if he or she wanted to go in person to get a copy
24   of the birth certificate?
25           MR. McKENZIE:  Objection, speculation.  Go

## 35

1    ahead and answer.
2        Q.   (By Ms. Westfall) You may answer.
3            MR. McKENZIE:  You can answer.
4        A.   Oh, okay.  I assume they would, unless they did
5    it during their lunch hour, and that's -- that's not
6    uncommon.  We're very busy during lunch hours, yes.
7        Q.   (By Ms. Westfall) What is your experience of
8    the customer wait time in your main office?
9        A.   Usually about 10 to 15 minutes to come in, get
10   the application, fill it out, and go through the line.
11   It can range higher, up to about 30 minutes.  But
12   usually it's somewhere in that range, 15 to 30 minutes.
13       Q.   Do you see that line every day when you go to
14   work?
15       A.   No.  Usually the line is only during peak
16   times.
17       Q.   What are the peak times?
18       A.   We have peaks during the lunchtime.  We'll have
19   peaks on Monday and Fridays, and during certain times of
20   the year, it has peak times.
21       Q.   Are there any wait times that you have seen or
22   experienced or heard about that are longer than 30
23   minutes?
24       A.   There are times, if we have technical
25   difficulties, we have to ask the customer to come

## 36

1    back.  If we have to search, do a manual search, we do
2    our searches overnight, and we ask them to come back at
3    10:30, anytime after 10:30 in the morning the next
4    day.  It's usually very specific situations like that.
5        Q.   How often do you have technical problems with
6    your computer in searching for birth certificates?
7        A.   Well, some birth certificates have to be
8    searched just because they are delayed records, probate
9    records, or older records.  If it's something like that,
10   we'll have to do a search.  If the customer is needing
11   them right away, we'll try to get it to them right away.
12   Now, technical difficulties is hard to predict.  It
13   doesn't happen very often.
14       Q.   And I believe you just testified that sometimes
15   you have to do a manual search?
16       A.   That's correct.
17       Q.   Is that for birth certificates?
18       A.   Yes.
19       Q.   When does that arise?
20       A.   If a birth certificate is an older record and
21   not in our system, our electronic indexing system, if
22   it's a delayed record, then we have to index that.
23       Q.   What do you mean by a delayed record?
24       A.   A delayed record is a record a person files
25   that's more than one year after the person is

JAMES ABSHIER                                                    JUNE 15, 2012

---

## 37

1   born.  Those are not yet electronically indexed.
2       Q.  So is it your testimony that sometimes people
3   come to your office, they are seeking a certified birth
4   certificate, and they need to come back the following
5   day because of these manual searches?
6       A.  Occasionally they did, yes.
7       Q.  How often does that happen?
8       A.  A very small percentage of the time.  One or
9   two percent of the time.
10      Q.  How do you know that?
11      A.  It's an estimate.
12      Q.  Is that based on talking to someone?  Is that
13  based on records that you review in your capacity as a
14  manager?
15      A.  It's based on the number of applications that
16  we have to submit to our team that does the searches.
17  Sometimes it's usually no more than two or three in a
18  day.  We'll do -- we'll do a hundred to 200 people in a
19  day.  And so I estimate it's probably about 1 or 2
20  percent.
21      Q.  And turning your attention, again, to the chart
22  at U.S. Exhibit 903, is it your testimony that it is a
23  minimum of $22 to obtain a certified copy of a birth
24  certificate?
25      A.  That's correct.

## 38

1       Q.  How are the fees for certified copies of birth
2   certificates set?
3       A.  The fees are set by the -- in the Texas
4   Administrative Code.  They have to be -- and statute, I
5   believe, has the -- the fees.
6       Q.  Are you involved in the Vital Statistics
7   setting of the fee schedule at all in any way?
8       A.  I can make recommendations to the state
9   registrar.  That's all I can do.
10      Q.  During your six years as a manager of Vital
11  Statistics, have the fees increased for birth
12  certificates?
13      A.  No.
14      Q.  Have they before that time, if you're aware of
15  it?
16      A.  The fee went from $11 to $22 in 2005.
17      Q.  Is there any plan or contemplation of
18  increasing the fees of birth certificates?
19      A.  No, not that I'm aware of.
20      Q.  Do you know what steps Vital Statistics takes
21  when its contemplating increasing fees?
22      A.  It has to go through the -- through the TAC
23  approval process, the Texas Administrative Code.
24      Q.  So is it your understanding it needs to go
25  through a rule-making process?

## 39

1       A.  Yes.
2       Q.  How long does that process take?
3       A.  I am not sure myself.  I understand that it can
4   be pretty time consuming.
5       Q.  What part of Vital Statistics handles changes
6   in the fees?
7       A.  That would be through the State Registrar's
8   office, the administrative area.  She may seek advice
9   and recommendations, but their office is who submits the
10  recommendation for the TAC changes.
11      Q.  Are you aware of any -- strike that.
12          Must every person applying for a certified
13  copy of a birth certificate pay the $22 fee?
14      A.  There are specific situations in statute that
15  allow for a free copy to be issued, but they're very
16  specific.
17      Q.  Are you familiar with those --
18      A.  I am.
19      Q.  -- specific instances?
20      A.  I am.
21      Q.  Could you describe those for the record,
22  please?
23      A.  One is what's called a school certificate.
24  It's really not a certified copy.  It's a -- it's
25  essentially a certified letter that's given to parents

## 40

1   so that children can go in to school.  Those are
2   free.  We can issue a free copy to a military person
3   that's being -- that has orders to be deployed to a
4   hostile war zone.  And we can give a free copy to a
5   veteran that has a claim against the government.  And we
6   give a free copy to CPS for a child whose parents have
7   been -- custody has been severed and that child is
8   available for adoption.  Those are the only times I'm
9   aware of where we issue free copies.
10      Q.  Are you aware of whether the legislature, in
11  developing Senate Bill 14, contemplated making a similar
12  exception for voters who didn't have copies of photo IDs
13  required under the statute?
14      A.  I don't know.
15          MR. McKENZIE:  Objection, beyond the
16  scope.
17      Q.  (By Ms. Westfall) Turning your attention back
18  to U.S. 903, with this very illuminating chart, could
19  you describe the process by which a person could obtain
20  offline expedited service for obtaining a certified copy
21  of a birth certificate?
22      A.  The person would print out what's called the
23  expedited application.  There is a five dollar expedited
24  fee associated with that.  And when they -- they send
25  the copy, the fee, and a copy of their ID in, it has to

JAMES ABSHIER                                          JUNE 15, 2012

---

## 41

1   come by express carrier, because that's how it's routed
2   through the campus to our office.
3       Q.   How long does that take?
4       A.   We quote 10 to 15 days, but I think right now,
5   we have it down to two or three days.
6       Q.   Do you see at the bottom of the Exhibit U.S.
7   903, it says, "Last updated, November 16th, 2011"?
8       A.   Yes.
9       Q.   Are you aware of whether any changes have been
10  made in any of the information that's set forth in U.S.
11  Exhibit 903, or is this all accurate and up to date, to
12  the best of your knowledge?
13      A.   It is up to date, as far as I'm aware.  The
14  latest change, I believe, was the Express Mail fee,
15  which the post office raised relatively recently.
16      Q.   How much is the Express Mail fee now?
17      A.   18.50.
18      Q.   So it's accurate in Exhibit 903; is that
19  correct?
20      A.   To the best of my knowledge, it is, yes.
21      Q.   Could you describe the process for ordering a
22  copy of a certified birth certificate through the U.S.
23  Postal Service?
24      A.   Yes.  The customer would fill out the
25  application and send the application ID and fee to the

---

## 42

1   address that we have on the application, the P.O. Box
2   12040.  That would come in to the comptroller's office,
3   who would deposit the money and send the application to
4   us, and then we would service the application.
5       Q.   How long does that process take?
6       A.   We quote six to eight weeks.
7       Q.   Is that accurate?
8       A.   Right now, I think we're getting pretty close
9   to around the six-week mark, yes.
10      Q.   Could you describe the process for ordering a
11  certified copy of a birth certificate via the Internet?
12      A.   Yes.  We have a website.  It's through the
13  Texas.gov website.  There's a link on the website that
14  -- that states "Order vital record," and it takes a
15  person to a web page that allows them either to continue
16  by electronics or takes them to our website where they
17  can get the offline ordering method.  If they hit
18  "continue," it takes them through several pages where a
19  person's information on the registrant and requester is
20  requested, and then there is a credit card payment
21  option.
22      Q.   Does it indicate on Page 1 of U.S. 903 that
23  process for online ordering?
24      A.   Yes.
25      Q.   Must you have a copy of a current driver's

---

## 43

1   license or a government-issued ID card to participate in
2   online ordering --
3       A.   Yes.
4       Q.   -- of birth certificates?
5       A.   Yes.
6       Q.   Must they be current driver's licenses or
7   government-issued ID cards?
8       A.   I'm not sure if an expired one will work or
9   not.
10      Q.   Does it indicate on U.S. 903 that it must be a
11  valid state-issued driver's license or government-issued
12  ID card?
13      A.   It does say valid.
14      Q.   Do you take that to mean that it must be
15  current and not unexpired?
16      A.   Yes.
17      Q.   And are you familiar with the forms of
18  allowable ID under Senate Bill 14?
19      A.   Based on the form that I have here, yes.
20      Q.   Is it your understanding that -- and your
21  review of the provision related to the EIC, that most
22  people who would be applying for an EIC who needed to
23  get a copy of the birth certificate would not have a
24  current unexpired driver's license in their possession?
25          MR. McKENZIE:  Objection, speculation.

---

## 44

1       Q.   (By Ms. Westfall) You may answer.
2       A.   Oh.  If I understand correctly, they would not
3   have a copy of the ID?  Yeah, a valid picture ID, yes.
4       Q.   So therefore, those people who are seeking an
5   EIC would not likely to be -- strike that.
6           People seeking an EIC because they would
7   not have a form of allowable ID pursuant to Senate Bill
8   14 would not be eligible to seek a birth certificate
9   through an online application process, as a general
10  matter?
11      A.   That's not necessarily true, because the law
12  allows a qualified applicant to obtain it, and a
13  qualified applicant may have an ID like a parent, a
14  child, a spouse, somebody like that, which happens very
15  often.
16      Q.   Is it your understanding that a voter who is
17  seeking an EIC must be seeking the birth certificate for
18  that -- on his or her own behalf?
19      A.   Ask that again.
20          MR. McKENZIE:  Objection, speculation and
21  vague.
22          MS. WESTFALL:  Strike that question.
23      Q.   (By Ms. Westfall) I believe you were testifying
24  earlier about county and local offices that maintain
25  certified copies of birth certificates; is that right?

## 45

1    A.   Yes.
2    Q.   And a voter who was trying to seek an EIC and
3  get a copy of a certified birth certificate could also
4  go to the county registrar; is that correct?
5    A.   That's correct.
6        MS. WESTFALL:  Could you mark this 904.
7        (Exhibit U.S. 904 marked for
8  identification.)
9    Q.   (By Ms. Westfall) You've been handed what's
10  been marked U.S. Exhibit 904.  Do you recognize this
11  document?
12    A.   I do.
13    Q.   Could you describe this document?
14    A.   This is a list of county clerks, local
15  registrars and remote sites.  It allows a person to
16  access any of those to go to find out where -- where
17  documentation or certificates can be issued.
18    Q.   Which of these entities maintains certified
19  copies of birth certificates?
20    A.   Only two entities maintains the birth
21  certificate.  The county where the person was born or
22  the state has the copy they maintain.  Any of these can
23  go on to our electronic registrar system and print out
24  an extract copy, which is sufficient for DPS.
25    Q.   So is it your testimony that county clerks --

## 46

1  if you go to a county clerk's office, you can request a
2  certified copy of your birth certificate?
3    A.   Yes.
4    Q.   And that county clerk, even if the county clerk
5  does not itself maintain that birth certificate, they
6  can go online and get the birth certificate; is that
7  correct?
8    A.   If they're on the -- if they're on the TER
9  system, yes.  I believe -- I'm not sure if all of them
10  are on it.  That's outside of what -- what I know about
11  the system.  But I believe they can.
12    Q.   Are there some county clerks who are not part
13  of that system?
14    A.   I don't know.  But we do have remote sites
15  which -- which have access to TER.
16    Q.   Do you see on Exhibit 904 that it indicates
17  that you can obtain copies of a marriage license or a
18  divorce decree through a county clerk?
19    A.   Yes.
20    Q.   Is there a reason why it doesn't reference
21  birth certificates?
22    A.   I'm not sure.  The county clerk may not be the
23  local registrar for the district, which is the only
24  thing I can think of.
25    Q.   Do you see in the second column, "List of Local

## 47

1  Registrars," it indicates that copies, certified copies
2  of birth records may be obtained from the local
3  registrars; is that correct?
4    A.   Yes.
5    Q.   Is the local registrar available in every
6  single county in the state of Texas?
7    A.   I believe they are.
8    Q.   Is it separate and apart from the county
9  clerk's office?
10    A.   I think it can be.  It's not always
11  separate, I believe.
12    Q.   And do you see the third column lists, "Remote
13  birth certificate issuance sites"?
14    A.   Uh-huh.
15    Q.   Could describe what those entities are?
16    A.   I'm not very familiar with the remote system.
17  I'm not really sure.
18    Q.   Could you take a minute just to read the text
19  on U.S. Exhibit 904 regarding those sites and see if
20  that familiarizes you or refreshes your recollection as
21  to what these entities are?
22    A.   It doesn't really specify what the government
23  office is.  I'm not really sure if it's the local
24  registrar or the county clerk.
25    Q.   Do you see that on the pages that follow, the

## 48

1  first page of U.S. Exhibit 904, it has a list?
2    A.   Uh-huh.
3    Q.   A number of pages that follow.  Would you take
4  a look at the pages that follow and tell me what you
5  think they are, to the extent you can recognize them?
6    A.   Well, it shows the counties, the county clerks'
7  offices and the cities, the registrars that have access
8  to the remote system.
9        MR. McKENZIE:  I'm going to object.  I
10  don't think this is complete.  It goes A through C.
11        MS. WESTFALL:  I will represent for the
12  record and for counsel and for the witness that this is
13  an excerpt of certain counties.
14        MR. McKENZIE:  Okay.
15        MS. WESTFALL:  As I did not want to make
16  an exhibit with all of the counties, because it would be
17  voluminous.
18        MR. McKENZIE:  Understood.
19    A.   What was the question?
20    Q.   (By Ms. Westfall) Have you had a chance -- have
21  you had a chance to take a look at the exhibit?
22    A.   Yes.
23    Q.   Do you see where it says, at the top of the
24  page, "Remote Access List"?
25    A.   Yes.

JAMES ABSHIER                                                JUNE 15, 2012

## 49

1       Q.   At the top of that list of counties starting at
2   Page 2?
3       A.   Uh-huh.  Remote Access Sites.
4       Q.   Does that refer to Column 3 of Page 1 of U.S.
5   904 regarding remote birth certificate issuance sites?
6       A.   Yes.
7       Q.   And so these are offices throughout the state
8   of Texas where one may obtain a copy of one's birth
9   certificate; is that right?
10      A.   Yes, a standard or abstract-sized birth
11  certificate, yes.
12      Q.   Do you see that on the second page of Exhibit
13  904 where it lists the counties beginning with B?
14      A.   Uh-huh.
15      Q.   That it indicates Bailey County, Bandera
16  County, Bastrop County, and Baylor County, and Blanco
17  County do not have remote access at this time?
18      A.   Yes.
19      Q.   Turning your attention to the part of the
20  exhibit that begins with C.  Are you there?
21      A.   Yes.
22      Q.   Do you see that it lists Calhoun County,
23  Callahan County, Camp County --
24      A.   Yes.
25      Q.   -- and Clay County on the next page as not

## 50

1   having any remote access sites at this time?
2       A.   Yes.
3       Q.   And on the next page that follows, do you see
4   that Coke County, Collingsworth County and Colorado
5   County, Concho County and Coryell County likewise have
6   no remote access at this time?
7       A.   Yes.
8       Q.   Do you know how many counties, sitting here
9   today, don't have remote access at this time?
10      A.   I don't, no.
11      Q.   But certainly looking at Exhibit U.S. 904, it's
12  fair to say that some counties do not have remote access
13  at this time?
14      A.   Yes.
15           MS. WESTFALL:  Could you mark this 905?
16           (Exhibit U.S. 905 marked for
17  identification.)
18      Q.   (By Ms. Westfall) You've been handed what's
19  been marked U.S. Exhibit 905.  Do you recognize this
20  document?
21      A.   No, I've never seen it.
22      Q.   Could you take a look at this document and tell
23  me when you've had a chance to review it.  You don't
24  have to read every single word on the page, but just
25  familiarize yourself with it?

## 51

1       A.   Okay.  (Witness reviewing document.)  Okay.
2       Q.   Now that you've had a chance to take a look at
3   U.S. Exhibit 905, could you tell me what it is?
4       A.   It's a website from the county clerk of -- I
5   believe it's -- is it Nueces?
6       Q.   Yes.  Turning your attention to the top left.
7       A.   Okay.  Yes.  County of Nueces.  It's the
8   website of the county clerk for Nueces County.
9       Q.   Do you see the bottom part of the first page,
10  on the left, it lists the hours of operation?
11      A.   Yes.
12      Q.   What are the hours of operation?
13      A.   8:00 to 12:00, and then 1:00 to 5:00 Monday
14  through Friday.
15      Q.   Are these hours of operation fairly typical for
16  county clerks?
17           MR. McKENZIE:  Objection, speculation.
18  You may answer.
19      A.   I'm not sure.  Each county sets its rules for
20  operation.
21      Q.   (By Ms. Westfall) Is it -- I mean, do you have
22  the general sense that county clerks' offices are open
23  business hours?
24      A.   Yes.
25      Q.   They are generally not open on the weekends; is

## 52

1   that right?
2       A.   Yes.
3           MR. McKENZIE:  Same objection.
4       Q.   (By Ms. Westfall) They are generally not open
5   after 5:00 p.m.; is that correct?
6           MR. McKENZIE:  Same objection.
7           THE WITNESS:  Do I answer?
8           MR. McKENZIE:  Yes.
9       A.   That's how I understand it.
10      Q.   (By Ms. Westfall) You may answer.  Your counsel
11  is making his record, but okay.
12      A.   Okay.
13      Q.   So it's your understanding that they're
14  generally not open after 5:00 p.m.; is that correct?
15           MR. McKENZIE:  Same objection.
16      A.   I understand that they're not, yes.
17      Q.   (By Ms. Westfall) Is it your understanding that
18  many county clerks' offices close for lunchtime, around
19  12:00 to 1:00?
20           MR. McKENZIE:  Same objection.
21      A.   I don't know.
22           MR. McKENZIE:  If you could give me like a
23  brief second to make my objection.
24           THE WITNESS:  Oh, okay.
25           MR. McKENZIE:  So I'm not talking over

## 53

1  everybody.
2       THE WITNESS:  Okay.
3       MS. WESTFALL:  Thank you, Counsel.
4       Q.  (By Ms. Westfall) And I believe you testified
5  before that given that these are business hours, if an
6  individual works business hours, that individual would
7  have to leave his or her place of employment during
8  working hours to come to the county clerk's office; is
9  that right?
10      MR. McKENZIE:  Objection.  It slightly
11  mischaracterizes his testimony, but you may answer.
12      A.  Okay.  Then I would understand, yeah, unless
13  they have some break in the day or something, yes.
14      Q.  (By Ms. Westfall) I believe you testified
15  earlier that it is -- that county clerk's offices and
16  registrars may likewise charge had $22 plus one dollar,
17  which equals $23 for certified copies of birth
18  certificates; is that correct?
19      A.  That's correct.
20      Q.  To your knowledge, does every single registrar
21  and county clerk office and remote birth certificate
22  issuance site charge $23?
23      A.  To the best of my knowledge, yes.
24      Q.  There aren't any that charge less; is that
25  correct?

## 54

1       A.  No.
2       Q.  And to your knowledge, is that set by statute
3  or regulation that they may charge that amount?
4       A.  The statute allows for them to charge one
5  dollar more for -- for maintenance and preservation of
6  their office and records.
7       Q.  Is the county clerk, local registrar, and
8  remote birth certificate issuance site fee schedules
9  tied to what Vital Statistics and their fee schedule?
10      A.  I believe it would be, but I'm -- I'm not
11  really positive.  I think it is, yes.
12      Q.  In other words, if Vital Statistics decided to
13  raise it to $30, would the local entities be able to
14  charge $31 at that point?
15      MR. McKENZIE:  Objection, speculation, but
16  you may answer.
17      A.  I believe so, yes.
18      Q.  (By Ms. Westfall) Turning your attention to
19  Page 3 of U.S. Exhibit 905.  Do you see that?
20      A.  Yes.
21      Q.  And what is it?
22      A.  It's an application for Nueces County birth
23  certificates.
24      Q.  Could you take a look -- have you seen this
25  document before?

## 55

1       A.  No, I haven't.
2       Q.  Could you take a moment to look at it and let
3  me know when you've had a chance to read it.
4       A.  Okay.  I have looked at it.
5       Q.  Does it require the same information that Vital
6  Statistics requires to apply for a certified copy of a
7  birth certificate?
8       A.  It does.
9       Q.  Are there any differences you can identify
10  sitting here today?
11      A.  No.  Let me see.  It does not -- it does not
12  require a signature.  I don't see where there's a
13  requirement for a signature, is the only difference in
14  information that I can tell.
15      Q.  When you apply --
16      A.  Also, they don't -- they don't do full size.
17  It looks like they just do standard and wallet size.
18      Q.  Are there any other differences you can
19  identify sitting here today?
20      A.  No.
21      Q.  Do you see at the bottom, it likewise requires
22  that applicants supply proof of identification?
23      A.  Yes.
24      Q.  Do you believe that proof of identification to
25  be the same list of identification that is set forth on

## 56

1  U.S. 903 that's required by Vital Statistics?
2       A.  I'm not sure.  Each county will take direction
3  from the state office, but they -- they offer -- they
4  operate semi independently, so they may have specific
5  rules for a given county.
6       Q.  Would you say there might be slight variations,
7  but in the main they will likewise require
8  identification from applicants for birth certificates?
9       A.  Yes, I --
10      MR. McKENZIE:  Objection, speculation.
11      A.  Yes, I believe so.
12      Q.  (By Ms. Westfall) If a person was born outside
13  of Texas and wanted to obtain a certified copy of his
14  birth certificate, how would that person do that?
15      A.  They have to go to the state where the event
16  occurred.
17      Q.  Is there -- do you know any more about the
18  process than what you've just described?
19      A.  What we do is, we will -- we have printed out
20  the information for each of the states, the Department
21  of State, Puerto Rico, Guam, and if a person is born in
22  those territories or states, we can give them that
23  information, and they can contact those entities.
24      Q.  To your knowledge, are those processes in other
25  states generally similar or generally not similar to the

JAMES ABSHIER                                          JUNE 15, 2012

---

## 57

1  process in Texas?
2          MR. McKENZIE:  Objection, speculation, but
3  you can answer.
4      A.  It varies widely, very widely.
5      Q.  (By Ms. Westfall) Are you aware of the National
6  Center For Health Statistics?
7      A.  I'm aware of it, yes.
8      Q.  What is that entity?
9      A.  It's the national office that compiles
10  statistical information from the states.
11      Q.  I believe you just testified that it varies
12  widely as to how you would get a copy of your certified
13  birth certificate in other states.  Could you describe,
14  sort of, one extreme and the other extreme, in terms of
15  process?
16      A.  Some states go through a third-party vendor
17  that they've contracted with online, and they can obtain
18  it that way.  I know with Department of State, they only
19  have mail-in requests, and they detail on their list.
20  This is as far as I know.  There's -- just every state
21  is different, so I'm not really sure how they might, you
22  know, operate.
23      Q.  Do you have a sense of the cost charged by
24  other states and the variations therein from state to
25  state?

## 58

1          MR. McKENZIE:  Objection, speculation, but
2  you may answer.
3      A.  My understanding is, it varies from as low as
4  seven or eight dollars all the way up to $50.  The
5  Department of State copy has recently gone up to $50, so
6  it does vary widely.
7      Q.  (By Ms. Westfall) And what are those states on
8  the low end that only charge seven to eight dollars?
9      A.  I don't know.
10      Q.  What do you think is the average, based on your
11  experience as a manager Vital Statistics?
12      A.  I don't know.
13          MR. McKENZIE:  The same speculation
14  objection.
15      Q.  (By Ms. Westfall) Is it approximately like 20
16  or $30, would you say?
17          MR. McKENZIE:  Same objection.  You may
18  answer.
19      A.  I really have no idea of what the average would
20  be.
21      Q.  (By Ms. Westfall) Do you know what other states
22  charge close to what the Department of State charges in
23  terms of $50 for a copy?
24          MR. McKENZIE:  Same objection.
25      A.  I don't.

## 59

1      Q.  (By Ms. Westfall) Can you identify any states
2  that charge 30 or $40 for a copy?
3          MR. McKENZIE:  Same objection.
4      A.  No.  I'd have to go and look at the individual
5  websites and see.
6      Q.  (By Ms. Westfall) Would the National Center for
7  Health Statistics be able to provide reliable
8  information about how much certified copies of birth
9  certificates in states other than Texas charge?
10          MR. McKENZIE:  Same objection.
11      A.  They do have a link that takes you to the
12  different states for ordering birth certificates, so
13  they'll be able to route you to the information.
14      Q.  (By Ms. Westfall) If a person was not born in a
15  hospital and a birth certificate was not created
16  contemporaneously by the parents, how would a person
17  obtain a copy, or, I guess, an original of a birth
18  certificate if a person was an adult?
19      A.  If the record wasn't filed, then they have to
20  go through a procedure called delayed records.  In that
21  situation, they provide documents that have the facts of
22  the birth and they build a birth certificate based on
23  that documentation during their life.
24      Q.  How do you do that process?
25      A.  They have to come in and have a search done.

## 60

1  There's a $22 fee to do the search.  Once we search the
2  records, we will give them a certified "not found"
3  letter and a delayed record package.  The delayed record
4  package is a packet of applications and directions
5  outlining what's needed as supporting documentation.
6  There's affidavits and things like that, and they submit
7  that package, along with the $25 fee, and then we can
8  file the delayed record.
9      Q.  Is it a total of $22 still in that instance to
10  get the record, or are there additional costs because of
11  the additional searches you have to conduct and forms
12  you need to process?
13      A.  Well, the $22 is for the search, and the $25 is
14  the filing fee for the delayed record.
15      Q.  I see.  So it's a total of $22 plus $25?
16      A.  Yes.
17      Q.  Does Vital Statistics keep any information
18  about the demographic breakdown of who files -- who
19  seeks a birth certificate when his or her child is born?
20      A.  I don't believe they do.  I don't believe they
21  track that statistic.
22      Q.  Do you have a sense, based on being a manager
23  of Vital Statistics, of whether white parents tend to
24  seek birth certificates more than minority parents when
25  their child is born?

## 61

1          MR. McKENZIE:  Objection, speculation.
2      A.  I have no way of knowing.  We don't mark race
3  on the application.
4      Q.  (By Ms. Westfall) Do you know whether low
5  income people are less likely to seek an original birth
6  certificate when their child is born --
7          MR. MCKENZIE:  Same --
8      Q.  -- than higher income people?
9          MR. McKENZIE:  Same objection.
10          I kind of jumped the gun, because I need a
11  little pause before you answer, but the same objection,
12  but you may answer.
13      A.  Okay.  I do know that several social programs
14  require a birth certificate in order to get assistance,
15  and so a lot of people will get a birth certificate for
16  their child in order to get the assistance.  So as far
17  as what the breakdown is, I'm not sure of the exact
18  numbers or anything, but I know it's not uncommon.  We
19  do service a lot of people that buy a birth certificate
20  for Medicaid, housing, different things like that.
21      Q.  (By Ms. Westfall) Are you aware of whether, in
22  the history of Texas, certain groups of minorities have
23  had less access to hospitals for birth?
24          MR. McKENZIE:  Objection, speculation.
25  But you may answer.  And also objection, it's a little

## 62

1  beyond the scope of what you've been noticed for, but go
2  ahead and answer.
3      A.  I do know that certain facilities were
4  segregated.  We have a lot of birth certificates from
5  the specific segregated hospitals and things like that.
6      Q.  (By Ms. Westfall) Are you aware of whether
7  African Americans were excluded from certain hospitals
8  at some period in Texas's history?
9          MR. McKENZIE:  Objection, speculation, and
10  also beyond the scope of your notice, but you may
11  answer.
12      A.  I'm not aware of a specific denial for
13  services, no, because I've -- I've seen -- well, no, I'm
14  not aware of a specific denial, no.
15      Q.  (By Ms. Westfall) Are you aware of whether
16  Hispanic women with children were less -- at some period
17  in Texas's history, less likely to have access to a
18  hospital to deliver their child?
19          MR. McKENZIE:  The same two objections.
20      A.  I'm not aware of any.
21      Q.  (By Ms. Westfall) How long does it take to have
22  a delayed record search conducted that you describe when
23  a person doesn't have an original birth certificate?
24      A.  The search can be done overnight usually.  We
25  have a team that takes care of the searches at night, so

## 63

1  we -- we get those done fairly quickly.
2          Now, the filing of the delayed record can
3  be time consuming, because we verify all the documents
4  that are submitted, the supporting documents.  An
5  example is like a baptismal.  If the child goes through
6  an infant baptism process, then we'll get that document
7  and check back with the Archdiocese and confirm the
8  information.  If they submit an elementary school
9  record, we'll check back with the school district and
10  confirm the information.  So it really depends on the
11  records that the person submits and how difficult it is
12  to obtain verification.
13      Q.  What is the longest period of time it could
14  take to do a delayed record search and issue a person a
15  birth certificate?
16      A.  I'm not sure of a specific time.  It can take
17  several months.  If the person -- if there's incorrect
18  information on the supporting documentation, if the
19  information needed is not on there, because everything
20  has to match.  It can't be incorrect.
21      Q.  Could you identify and describe the supporting
22  documentation that is required from your office of
23  applicants in that circumstance?
24      A.  One that is usually readily accessible is an
25  affidavit from an older relative.  That's usually the

## 64

1  easiest one.  We can also use, like I said, an early
2  elementary school record that has the parents and date
3  of birth on it.  We can use baptismals for infant
4  baptismals.  We also use what's called a Numident.  A
5  Numident is the record of the history of a social
6  security account.  It's obtained from Baltimore,
7  Maryland.  And I'm really not sure of whatever
8  supporting documentation they would accept.  That's like
9  a different department.
10      Q.  Oh, I see.  So it's not within your department?
11      A.  No, it's not in my department.
12      Q.  You don't -- you don't ordinarily handle these
13  type of requests; is that right?
14      A.  No.  My -- my department would handle the
15  search.  We would do the search, get the packet, and
16  then the packet would be routed to delayed records.
17      Q.  Did you just testify that a person has to
18  submit all of that supporting documentation or some of
19  it, or what is the minimum documentation required for
20  delayed records research?
21      A.  The delayed record requires three documents.
22      Q.  From a menu of list of documents as you just
23  described?
24      A.  Yes.
25      Q.  And it's $22 for the search plus a $25 fee

65

1    for --
2         A.  To file the delayed record.
3         Q.  Any other fees associated with that --
4         A.  No.
5         Q.  -- application?
6         A.  No.
7              MS. WESTFALL:  Could you mark this as 906.
8              (Exhibit U.S. 906 marked for
9    identification.)
10        Q.  (By Ms. Westfall) You've been handed what's
11   been marked U.S. Exhibit 906.  Do you recognize this
12   document?
13        A.  No, I don't think I've seen it before.
14        Q.  Well, I will represent to you that this was a
15   document that was created by a bill opponent to Senate
16   Bill 14 by the name of Senator Wendy Davis, and it was
17   submitted to the Committee of the Whole Senate, which is
18   a committee in the Senate during the Senate's
19   consideration of Senate Bill 14.
20        A.  Uh-huh.
21        Q.  Could you take a moment to look at Exhibit 906
22   and let me know when you've had a chance to review it.
23        A.  (Witness reviewing document.)  Okay.
24        Q.  Do you know whether it costs six dollars to
25   have a notarized affidavit?

66

1              MR. McKENZIE:  Objection, speculation, but
2    you may answer.
3         A.  Okay.  I'm not sure what different businesses
4    charge.  My bank doesn't charge anything, so...
5         Q.  (By Ms. Westfall) It's one of the benefits that
6    you get by being an account holder at that bank; is that
7    correct?
8         A.  Yes.
9         Q.  So if you did not have a bank account and had
10   to go to a notary, you might conceivably have to pay
11   some sort of -- there might be a cost associated with a
12   having a notary notarize an affidavit; is that correct?
13        A.  Yes.
14        Q.  Do you know whether a passport costs $145?
15             MR. McKENZIE:  Objection, speculation, but
16   you may answer.
17        A.  I'm not sure of the exact cost.  I know they
18   recently raise their rates.  I believe that's correct.
19        Q.  (By Ms. Westfall) Do you know the cost
20   associated with obtaining a driver's license in Texas?
21        A.  I haven't renewed in a long time, so I'm due,
22   but this looks right to me.
23        Q.  And turning your attention to the square
24   reading "Birth Certificate" --
25        A.  Uh-huh.

67

1         Q.  -- is there anything inaccurate in that square,
2    to the best of your knowledge?
3         A.  Well, she put the cost as 20 -- she or he
4    put the cost at $23.  That would be a local copy.  She
5    just put -- she or he put driver's license or state ID,
6    and we have a pretty large list of picture IDs that are
7    primary.  The only affidavit that I can think of that
8    the legislator may have been referring to is an
9    affidavit by a qualified applicant giving somebody else
10   an authorization to buy one.  And in that case, an
11   authorization would allow somebody else that's not
12   otherwise a qualified applicant to obtain it.  But I'm
13   not really sure about this notarized affidavit and two
14   documents with your name.  I'm not sure where that came
15   from.
16        Q.  Do you think that two documents with your name
17   might be referring to the nonphoto options?
18        A.  Well, I'm sure the two documents are referring
19   the our secondary list, but I'm not sure what she means
20   by notarized affidavit unless a qualified applicant is
21   giving authorization to somebody that does not have a
22   picture ID.  That's the only thing I can figure.
23        Q.  Thank you.
24             MS. WESTFALL:  I'm going to go off the
25   record for a second one and take a quick break and then

68

1    we can, hopefully, wrap things up.
2              (Recess from 10:34 a.m. to 10:38 a.m.)
3              MS. WESTFALL:  Back on the record.
4         Q.  (By Ms. Westfall) Thank you.  If you could turn
5    your attention to Exhibit 904 --
6         A.  Okay.
7         Q.  -- at the top of that pile.
8              I believe you testified earlier that you
9    could go to a local registrar close to, you know, maybe
10   where you live if one is available, to get a copy, a
11   certified copy of your birth certificate; is that right?
12        A.  That's correct.
13        Q.  Do you see and Exhibit 904 that it indicates
14   that you should go to the registrar in which the event
15   occurred, in italics?
16        A.  Yes.
17        Q.  Do you know why it directs you to the registrar
18   at which the event occurred as opposed to another
19   registrar?
20        A.  The -- the county in which the event occurred
21   is the only one that will have a copy of the full size,
22   and that's the one we recommend because it's accepted by
23   everybody.  So you can get passport, travel
24   registration, anything like that.  In cases like DPS,
25   for ID, they do accept the standard or abstract copy.

---

**69**

1    Q.   So if you are currently residing far away from
2    Austin and not close to the county in which you were
3    born, assuming you were born in Texas, you could go to a
4    local registrar and get a short form, is that correct,
5    of your birth certificate?
6    A.   Right, if they're on the system, yes.
7    Q.   And I believe you testified some are -- some
8    registrars are on the system and some are not; is that
9    right?
10        MR. McKENZIE:   Objection, it
11   mischaracterizes your testimony a little, but go ahead
12   and answer.
13   A.   To the best of my knowledge, yes.  I don't --
14   I'm not -- I don't think everybody is on it.
15   Q.   (By Ms. Westfall) Do you have any sense of the
16   percentage or number of local registrars that are on the
17   system --
18   A.   I don't.
19   Q.   -- so to speak?
20   A.   I would have to go find that particular county
21   and see.
22   Q.   Do you know, as a general matter, whether
23   registrars located in smaller areas or rural areas would
24   be less likely to be connected to the system?
25        MR. McKENZIE:   Objection, speculation.

**70**

1    But you may answer.
2    A.   I don't know.
3         MS. WESTFALL:   Thank you.  I don't think I
4    have any more questions at this time.  Thank you for
5    your time.
6         MR. McKENZIE:   I have one or two questions
7    for redirect.
8              EXAMINATION
9    BY MR. McKENZIE:
10   Q.   I just want to make clear for the record:  Is a
11   photo ID required to get a birth certificate?
12   A.   It's a primary form of ID that we accept.  If
13   they don't have a picture ID, then we have a list of
14   secondary IDs that we will accept.  It's to make it
15   easier on the customer.
16   Q.   Is an affidavit required per se, with those
17   secondary form of IDs, to get a birth certificate if you
18   lack a photo ID?
19   A.   No.
20   Q.   And --
21   A.   Let me -- let me correct that.  An affidavit
22   would be required if the person ordering is not a
23   normally qualified applicant, which is a direct family
24   member by blood or marriage.
25   Q.   Okay.

**71**

1    MR. McKENZIE:   That's it.
2    MS. WESTFALL:   Thank you.
3         Nancy, I forgot to ask if you had any
4    questions.
5         MS. ABUDU:   Yes, I do.  I have a few.
6              EXAMINATION
7    BY MS. ABUDU:
8    Q.   All right.  Well, hello, Mr. Abshier, my name
9    is Nancy Abudu.  I'm an attorney representing several of
10   the Defendant Intervenors in this case, and I do have a
11   couple of questions for you.  And of course, you're
12   still under oath.
13   A.   Okay.
14   Q.   I just wanted to follow up.  You indicated that
15   there are certain instances where you or someone from
16   your office would advocate for a fee waiver with respect
17   to birth certificate applications, correct?
18   A.   No, that's not quite correct.  There's --
19   there's specific situations in the law that allows us to
20   issue a certified birth certificate free of charge and
21   those are very specific.  I would not be able to
22   advocate for a fee waiver.  What I -- what I do offer
23   recommendations on would be fee increases or changes in
24   the fees, things like that.  But I -- that wouldn't -- I
25   wouldn't be the decision maker on that.

**72**

1    Q.   Okay.  Well, with respect to those situations
2    involving a fee waiver, does that include the five
3    dollars expedited processing fee?
4    A.   No.  No.  If there is an expedited application,
5    they must pay the five dollar expedite fee.
6    Q.   Okay.  And then --
7    A.   Can I qualify that real quick?
8    Q.   Sure.
9    A.   The application can be expedited if they come
10   into our lobby and we process it.  We usually turn
11   people around pretty quickly there.  And if they order
12   online, which has the same processing time as the
13   expedited application, we do not charge an expedite fee
14   for that service if they order through Texas.gov.
15   Q.   Okay.  Now, you were asked a question earlier,
16   a series of questions about whether you all track
17   applications by race, and I believe your response was
18   that the birth certificate application form does not ask
19   about race; is that correct?
20   A.   That's correct.
21   Q.   But there is a question on the form that asks
22   whether the record is being used to obtain a passport
23   for immigration purposes, correct?
24   A.   Let me check to be sure.  Yes.  Specifically,
25   it's passport, immigration, or Indian registry.  In

73

1  those cases, they want a full-sized copy, so we'll know
2  that if -- if the customer asks for a standard size,
3  we'll tell them, no, you really need a full size for
4  that.
5       Q.  Okay.  And if the answer to that question is
6  yes, do you all request any additional information
7  verifying that indeed, you know, they should have
8  answered yes to the question?
9       A.  No.
10      Q.  Okay.
11      A.  No, that's just --
12      Q.  So once a person -- I'm sorry.  Go ahead.
13      A.  That's just for us to recommend a full size so
14  that we can let them know that's what they're going to
15  need for that.
16      Q.  Okay.  And then do you all track the number of
17  application requests you all receive?
18      A.  We do track the number of requests or orders
19  that we get in our office, yes.
20      Q.  And what is the time basis used in terms of
21  tracking?  And by that question I mean, is it on a
22  monthly basis?  On a weekly basis?
23      A.  We track -- the metric that we use, we do track
24  total number of orders, but we also track days to
25  completion.  That's the other metric, and it's based on

74

1  a weekly measure.
2       Q.  And do you track the method by which the
3  application is made?  And by that question I mean
4  whether it's done online or in person or a mail-in form?
5       A.  We track the number of each ordering method,
6  mail-in, Texas online.  We break it out into those two,
7  two methods, yes.
8       Q.  And then with respect to any grievances or
9  complaints against the Vital Statistics Office, I
10  believe your website allows people to either call the
11  office or send an e-mail, correct?
12      A.  Well, there's different methods of filing a
13  grievance.  They can call our office, and I do handle --
14  I resolve situations with customers.  They can also file
15  through -- we have an office in DSHS that handles
16  communications with customers.  There's also a ombudsman
17  with HHSC, and I've also resolved issues that's come
18  through the Governor's Office.  So there's multiple
19  different paths to handle any grievance or complaint.
20      Q.  And can you tell us what kinds of grievances or
21  complaints you personally handled?
22      A.  Usually the ones that I handle have to do with
23  the length of time processing.  It's -- people want them
24  quickly, and usually I'll either handle it myself or
25  have one of my people handle it.  I have had complaints

75

1  about if there's something incorrect on the certificate,
2  they get frustrated about having to file an amendment.
3  I try to help them with that.  That's the most common
4  complaints.
5       Q.  Anything else?
6       A.  There's -- I've had complaints about particular
7  processors that I've received.  I have had complaints
8  about receiving the wrong record.  In that particular
9  case, a wrong record might be sent to the person.  We do
10  treat that as a security violation, and I deal with that
11  one personally.  But I think that's -- that's the
12  majority of complaints.
13      Q.  And so once you get a complaint, what do you do
14  with it?  I mean, do you make a record of it that you
15  received it and where is that record kept?
16      A.  There is different means of recording the
17  complaint.  The ones that come through our -- through
18  our agency in DSHS, they have a system called HEART,
19  H-E-A-R-T, and I'm not sure what the acronym stands
20  for.  But that's the system for recording both
21  complaints and compliments.  And they record those
22  there.  Of course, the Office of the Governor and the
23  ombudsman with HHSC has their own methods for tracking
24  communications.
25      When I handle a complaint, what I usually

76

1  do, the majority of times I can call the customer
2  directly and find out what the problem is and resolve it
3  quickly.  There are other times where I need to write a
4  formal business letter and send it to the customer.  In
5  that case, I'll make a copy for the agency that has
6  directed the external communication.
7       Q.  Are there any others steps you take in the
8  process?
9       A.  No, not usually.  It's either a letter or a
10  direct contact with the customer.
11      Q.  Okay.  And are those documents publicly
12  available?
13      A.  I believe that an open records can be done on
14  those.  I keep a copy of every letter I write.
15      Q.  Okay.
16      MS. ABUDU:  I think those are all the
17  questions I have.  Thank you very much.
18      THE WITNESS:  Okay.  Thank you.
19      MS. WESTFALL:  Thank you for your time.
20  Let's go off the record.
21      (Signature reserved.)
22      (Deposition concluded at 10:58 a.m.)
23
24
25

Jose Aliseda                                                                  June 6, 2012

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                 *
        Plaintiff              *
                               *
V.                             *
                               *
ERIC H. HOLDER, JR., in        *
his official capacity as       *
Attorney General of the        *
United States,                 *
        Defendant.             *
                               *
ERIC KENNIE, et al.,           *
        Defendant-Intervenors,*
                               *
TEXAS STATE CONFERENCE OF*
NAACP BRANCHES, et al., * CASE NO. 1:12-CV-00128
    Defendant-Intervenors,* (RMC-DST-RLW)
                               * Three-Judge Court
TEXAS LEAGUE OF YOUNG          *
VOTERS EDUCATION FUND,         *
et al.,                        *
    Defendant-Intervenors,*
                               *
TEXAS LEGISLATIVE BLACK        *
CAUCUS, et al.,                *
    Defendant-Intervenors,*
                               *
VICTORIA RODRIGUEZ, et         *
al.,                           *
    Defendant-Intervenors.*

* * * * * * * * * * * *
ORAL DEPOSITION
OF
JOSE ALISEDA
JUNE 6, 2012
* * * * * * * * * * * *

---

**2**

2    ORAL DEPOSITION OF JOSE ALISEDA, produced as a

3  witness at the instance of the Defendants, and duly

4  sworn, was taken in the above-styled and numbered

5  cause on the 6th of June, 2012, from 9:30 a.m. to

6  6:46 p.m., before RHONDA HOWARD, CSR in and for the

7  State of Texas, reported by machine shorthand, in

8  at the offices of Attorney General, 816 Congress, Suite

9  320, Bluebonnet Room, Austin, Texas, pursuant to the

10  Federal Rules of Civil Procedure and the provisions

11  stated on the record or attached hereto.

---

**3**

1                    APPEARANCES
2
3   FOR THE PLAINTIFF:
4   Mr. John McKenzie
    TEXAS ATTORNEY GENERAL'S OFFICE
5   209 West 14th Street, 8th Floor
    Austin, Texas  78701
6   (512) 836-2155
7
8   FOR THE DEFENDANT:
9   Mr. Daniel J. Freeman
    U.S. DEPARTMENT OF JUSTICE
10  Civil Rights Division
    950 Pennsylvania Avenue NW
11  NWB Room 7203
    Washington, DC  20530
12  (202) 305-4355
13
14  ALSO PRESENT:
15  Mr. Jose Garza
    Mr. Martin Golando
16
17
18
19
20
21
22
23
24
25

---

**4**

1                     INDEX
2   Appearances                          3
    Change Page                          N/A
3
4   EXAMINATION
5   Examination by Mr. Freeman           5
    Examination by Mr. McKenzie          299
6   Further Examination by Mr. Freeman   299
7
8   SIGNATURE SHEET                      N/A
    REPORTER'S CERTIFICATION             303
9
10                    EXHIBITS
11  NUMBER          DESCRIPTION          PAGE
12  490      TEXAS TRIBUTE ARTICLE    11
13  491      NOTICE OF DEPOSITION     17
14  492      LIST OF DPS OFFICES      74
15  493      TWITTER ACTIVITY         99
16  494      ARTICLE          100
17  495      STATE-PRODUCED DATA      109
18  496      ARTICLE          140
19  497      ARTICLE          143
20  498      TX GOP VOTE INTERVIEW   202
21  499      LETTER BY WITNESS        205
22  500      PRESS RELEASE        207
23  501      ARTICLE IN SPANISH     212
24  502      DOCUMENT         253
25  503      OP-ED            267

Jose Aliseda                                                    June 6, 2012

---

**21**

1    A   Let me think.  I told my staff I was
2    coming.
3    Q   And --
4    A   If you mean get prepared for the
5    deposition, no.
6    Q   Okay.  I know that Ms. Michel in your last
7    deposition covered some basic depositions [sic]
8    about your personal background, but if we can go
9    through your background quickly, I would appreciate
10   it.
11   A   Uh-huh.
12   Q   Where were you born?
13   A   I was born in Mexico City, Mexico.
14   Q   And when did you come to the United
15   States?
16   A   At the age of four.
17   Q   And where did you move to when you
18   immigrated?
19   A   My father was already here in Illinois,
20   and he -- he was here when I was three.  He brought
21   us when I was four.  So I immigrated to the area
22   around the Chicago area.
23   Q   Okay.  And did you grow up around the
24   Chicago area?
25   A   Yes.  My last year of high school, we

---

**22**

1    moved to McAllen.  And that's where I graduated from
2    high school, McAllen, Texas.
3    Q   Okay.  And what is your educational
4    background after high school?
5    A   I attended the University of -- Pan
6    American University for two years.  That's in
7    Edinburg, Texas.  Transferred to University of Texas
8    at Austin.  I got a Bachelor of Arts in English.
9    Went into law school after that.  Graduated from law
10   school here at the University of Texas in 1981.
11   Q   And since law school, what is your
12   employment history?
13   A   All right.  While I was in law school, I
14   joined the United States Navy and I was a United
15   States naval officer, JAG Corps, for approximately
16   five years.
17        After that, my last duty station was
18   Beeville, Texas, Naval Air Station Chase Field,
19   where I was the Staff Judge Advocate, which was the
20   advisor for all the commands on the naval air
21   station.  I liked the town, so I bought a house.
22        And as soon as I got out of the Navy, I
23   opened a law practice there, solo practice out of my
24   house.  And for two years I was a solo practitioner.
25   Some people talked me into running for county

---

**23**

1    attorney as a Democrat, and I ran as -- for county
2    attorney unopposed as a Democrat in 19 -- that would
3    have been '88.  And I was elected.
4        Four years later I ran again as a
5    Republican, was elected again.  Took a brief rest, I
6    think, for about a year.  And I ran for U.S.
7    Congress and lost that election in the primary.
8    Q   And what year was that?
9    A   That would have been '90 -- let's see.  I
10   left the County Attorney's office in '96, so it
11   would have been probably in '98.  I would have been
12   running in '97, I think.
13   Q   And do you recall, was that District 27?
14   A   I think it was 15, because Reuben Hinojosa
15   won it.  He's the current Congressman, and he's been
16   there since then.
17        They talked me into running for county
18   judge, and I ran for county judge in -- I believe I
19   was elected in '98.
20   Q   Who -- who do you mean by "they"?
21   A   The people in the community.
22   Q   Okay.  Anyone in specific?
23   A   No.
24   Q   Anyone specifically memorable?
25   A   No.  The community leaders, the mayors,

---

**24**

1    the -- the other party officials, the commissioners.
2    But it -- it was something -- the current county
3    judge -- and that was one of the -- I forgot that
4    was one of the people that was also charged with
5    Open Meetings Act violation.  His name was Jimmy
6    Martinez, Santiago Jimmy Martinez.  So it would have
7    been State of Texas versus Santiago Jimmy Martinez.
8    Q   Is he one of the people who convinced you
9    to run for county judge?
10   A   No.  He was generally my opponent in many
11   races.
12   Q   Okay.  Okay.
13   A   So when I say they talked me into it --
14   because I was already tired of politics, but I got
15   talked into it.
16   Q   And what year was that?
17   A   I think it was '98 --
18   Q   No, Congress was '98 --
19   A   Oh, Congress --
20        THE REPORTER:  Okay.  Okay.  Thank
21   you, guys.
22   A   I'm starting to get my dates confused.  I
23   know it was after I was county attorney, but before
24   I ran for county judge.  So I -- maybe you're right.
25   Maybe it was '98 I ran for Congress, and then -- for

Jose Aliseda                                                    June 6, 2012

---

## 29

1    I mean, I volunteered to help them, if that's what
2    you're asking.
3        Q.  Yes.
4        A.  A little bit on Ted Cruz's campaign and
5    little bit on Mr. Dewhurst's campaign.  So, I mean,
6    basically, I'm an active party official.
7        Q.  Okay.
8        A.  I would like to consider myself an active
9    Republican party official.
10       Q.  And would it be fair to say that you've
11   specifically worked for a few Hispanic Republicans
12   in the Valley, Mr. Lozano, Ms. Garza?
13       A.  Yes.  I've worked on my brother's
14   campaign.  He ran for district judge.  He was a
15   district judge.  He ran.
16       Q.  Where was that?
17       A.  In the Valley, McAllen.
18       Q.  Okay.
19       A.  And I've worked on some Democrats'
20   campaigns.
21       Q.  How recently?
22       A.  This last election.
23       Q.  Whose?
24       A.  Bebe Adamis, B-E-B-E Adamis.
25       Q.  And where did Ms. Adamis run?

## 30

1        A.  He ran for Commissioner.
2        Q.  Mister.  I apologize.
3            Was that in Bee County?
4        A.  Yes.
5        Q.  Did he have a Republican opponent?
6        A.  No.
7        Q.  In Bee County are there frequently not
8    Republicans running in some of the more
9    predominantly Hispanic precincts?
10       A.  No.
11       Q.  Okay.
12       A.  We have Republicans running in Hispanic
13   precincts.
14       Q.  Okay.
15       A.  And we have Republicans winning in
16   Hispanic precincts.
17       Q.  When did you last renew your driver's
18   license?
19       A.  May I look at it?
20       Q.  Sure, if that will refresh your
21   recollection.
22       A.  I -- let's see.  2009.  September 28th,
23   2009.
24       Q.  Where did you go to do that?
25       A.  I believe I just sent it in or they sent

## 31

1    it to me in the mail.
2        Q.  Do you remember the last time you renewed
3    it in person?
4        A.  I think it was the time right before that.
5    I may have -- I may have actually gone to take --
6    because this picture looks fairly current.  I still
7    look chunky in it, so -- so I may have actually gone
8    to the -- the driver's license bureau to get it
9    done.  Honestly, I -- I don't remember.  I do
10   remember they sent me one once over the mail.
11       Q.  Do you recall where you went --
12       A.  The driver's license office is not too far
13   from my office, my law office.
14       Q.  In Beeville?
15       A.  Yes.  It's -- it's about four blocks
16   away --
17       Q.  Okay.
18       A.  -- on Hillside Drive.
19       Q.  And do you know what the hours of
20   operation of that office are?
21       A.  For driver's licenses, I -- at the time I
22   went, I would assume they were 8:00 to 5:00, but I
23   think they've cut down some of their hours.
24       Q.  And do you recall at all what time of day
25   you would have gone?

## 32

1        A.  No.
2        Q.  Where are you normally between 8:00 and
3    5:00, the hours that the office is at least open?
4        A.  At my office.
5        Q.  Working?
6        A.  Yes.
7        Q.  And you said it was only about four blocks
8    from your office --
9        A.  Uh-huh.
10       Q.  -- so how would you get there?
11       A.  Drive.
12       Q.  Okay.
13       A.  It's too hot to walk.
14       Q.  Fair enough.
15           Do you recall how long you had to wait in
16   line?
17       A.  There was hardly anybody there.
18       Q.  Okay.
19       A.  There was one or two people.  That's all I
20   can remember is that I didn't have to wait very
21   long.
22       Q.  Do you recall what documents you brought
23   with you?
24       A.  I think I brought my old driver's license.
25       Q.  Anything else?

Jose Aliseda                                                    June 6, 2012

## 33

1     A   I used to carry my Reserve military I.D.
2   I don't carry it anymore.
3     Q   And you had mentioned a moment ago that
4   that office has reduced hours at this point?
5     A   I believe it does, but I'm not certain.
6     Q   Do you know if statewide some driver's
7   license offices --
8     A   Bless you.
9         THE REPORTER:  Bless you.
10    Q   (By Mr. Freeman)  Sorry.
11        Some driver's license offices have been
12  closed because of lack of funding?
13    A   I believe there was some discussion about
14  that on the floor of the House.
15    Q   And do you know if some offices have
16  been -- other than the Beeville office, have had
17  reduced hours even if they haven't been closed?
18    A   That, I don't know.
19    Q   Do you know if there are operational
20  driver's license offices in every county in Texas?
21    A   I don't believe there are.  There are 254
22  counties in Texas.
23    Q   Do you know if there are operational
24  driver's license offices in every county in your
25  district?

## 34

1     A   I don't believe there are.  I have one --
2   one county that only has 800 people, McMullen
3   County.  I doubt if there's a driver's license
4   office there.
5     Q   Okay.
6     A   But there's one less than 30 miles away
7   from there --
8     Q   Where --
9     A   -- in George West.
10    Q   What county is George West in?
11    A   George West is in Live Oak County.
12    Q   Live Oak.  Okay.
13    A   There are some counties, which isn't in my
14  district, but Kenedy County -- Sarita is the county
15  seat for that.  And I believe they have less than
16  800 people, probably 3 or 400 people.
17        There's some counties in West Texas that
18  have the same thing.  In the Amarillo area, some are
19  sparsely populated.
20    Q   There's always Loving County, which has
21  fewer than 100 people, and people always enjoy
22  talking about it.
23        Are you aware of whether there's a
24  particular driver's license office in Austin that is
25  used by legislators and their staff?

## 35

1     A   I don't know anything about that.
2     Q   Okay.  Do you have a copy of your birth
3   certificate?
4     A   Do I have a copy of my birth certificate?
5   In my personal papers, yes.
6     Q   Do you know where you would get a copy if
7   it were lost?
8     A   It would be very difficult.  I was born in
9   Mexico City, Mexico.
10    Q   Do you know how much it would cost?
11    A   I don't know.
12    Q   Do you know how long it would take?
13    A   You know, I've had clients that have had
14  to get birth certificates, and I believe they can go
15  to the County Clerk -- even if they weren't born in
16  Bee County, for example, they can go to the County
17  Clerk and the Clerk can print them a copy from the
18  State database.  I may be wrong.
19        I think I've sent clients before to the
20  County Clerk's office to get it, and they very
21  happily helped them.  And they charge them a fee to
22  do that.
23    Q   Do you know what that fee is?
24    A   Ten, 20, $25.
25    Q   Is it $22, by any chance?

## 36

1     A   It might be that now.
2     Q   Okay.
3     A   Back then it was probably around ten.
4     Q   Fair enough.
5         Do you know how you would get a copy for
6   yourself or a client who was born abroad?
7     A   I would probably hire somebody in Mexico
8   City, Mexico, to do that for me.
9     Q   Okay.  So there would be a significant
10  expense.  Correct?
11    A   I don't know.  They're not that expensive.
12  My aunt's a notaria publica.  My grandfather was a
13  lawyer.  They're not as expensive as people are
14  here, that's for sure.
15    Q   And notaria publica is a notary public.
16  Right?
17    A   Notary public but with paralegal
18  qualities.  In Mexico it's almost like being an --
19  an attorney.
20    Q   Okay.  But it would cost -- approximately
21  how much do you think it would cost?
22        MR. MCKENZIE:  Objection; asked and
23  answered.  You may answer.
24    A   Honestly, I don't know, but --
25    Q   (By Mr. Freeman)  Okay.  That's fine.

Jose Aliseda                                                    June 6, 2012



**37**

1    A    I would find it strange that somebody's
2    here without some kind of documentation in this
3    country.
4    Q    Of --
5    A    They would need to be -- to have a birth
6    certificate to get certain documents, so...
7    Q    For example, if there were a natural
8    disaster or a hurricane of some kind, would it be
9    possible that an individual would need a copy of
10   their birth certificate even if they were born
11   abroad?
12   A    Yes.
13   Q    What I.D. are you carrying on your person
14   today?
15   A    May I look?
16   Q    Yes, of course.
17   A    I know I have my State Rep I.D.  I have --
18   you're talking about photo I.D.?  Because I have
19   other forms of I.D.
20   Q    I'd love to hear about all of them.
21   A    Okay.  Credit cards aren't really an I.D.
22   I have my State Bar of Texas, which I have to use
23   when I go visit a prisoner.  My State Rep I.D.  I
24   have my pilot's license, which I think you have to
25   have a photo I.D. in order to use, because it's not

**38**

1    good enough in and of itself.
2    Q    Does a pilot's license not have a photo on
3    it?
4    A    That's correct, it does not.
5    Q    But it does look like a -- it does have a
6    hologram on it, does it not?
7    A    Yes.  That's all I have.
8    Q    Okay.  This is --
9    A    You don't want all -- count my Sam's card,
10   and they don't have any picture on them.  And my
11   Texas Agriculture Timber registration, that -- that
12   doesn't have a picture on it, either.
13   Q    Let's at least focus on -- on the four
14   that you have --
15   A    My hunting license, hunting and fishing
16   license.
17   Q    Let's focus on the four that you have in
18   front of you --
19   A    All right.
20   Q    -- which is a Texas driver's license, a
21   Texas -- State Bar of Texas identification card --
22   A    Uh-huh.
23   Q    -- State Rep. identification card, and
24   your pilot's license.
25   A    Uh-huh.

**39**

1    Q    Do -- which of those four, just for the
2    record, have a photograph on them?
3    A    My driver's license and my -- it's
4    actually an informal card that they give us to get
5    through security.  And it also gives an exemption
6    for hotel and motel tax, but we always pay it.  It
7    says, "Official identification, Member Texas House
8    of Representatives."  And I thought I had my
9    other -- yes, I have one more.  This one is another
10   State Rep. card that they give us to get through
11   security.
12   Q    Okay.
13   A    It has some kind of electronic chip in it.
14   Q    And that's a printed card with your
15   photograph on it.  Correct?
16   A    Yes.
17   Q    Okay.  And which of these cards establish
18   your citizenship, any?
19   A    No.
20   Q    Okay.
21   A    Well, I take that back.  I believe to get
22   a driver's license, you have to be a citizen.
23   Q    Can't a --
24   A    Or -- or you can be a U.S. registered
25   alien.

**40**

1    Q    Yes.
2    A    Uh-huh.
3    Q    So it's possible that someone with a green
4    card or a long-term permanent resident could have a
5    Texas driver's license?
6    A    Yes --
7    Q    Okay.
8    A    -- because I think I had one when I had --
9    I became a U.S. citizen at 17.
10   Q    What is the drinking age in Texas?
11   A    21.
12   Q    Have I.D. in Texas ever created
13   counterfeit photographic identification cards for
14   the purpose of obtaining alcohol?
15   A    Sure, they have.
16   Q    Are you aware of how many convictions for
17   fake I.D.s have been obtained in the State of Texas
18   for the last ten years?
19   A    No, I'm not.  I've represented some of
20   those people.
21   Q    How many have you --
22   A    Probably two or three kids that did
23   something foolish like that.
24   Q    And how many have you prosecuted?  That's
25   what I was going to ask.

Jose Aliseda                                              June 6, 2012

## 41

1   A   I don't recall any, to be honest with you.
2   Can I put these up now?
3       Q   Yes, of course.  Thank you for showing
4   them to me.  I would be curious to see some of them.
5   What are the security features on a Texas driver's
6   license, which I think you still have out?
7       A   Uh-huh.  Well, it's got my picture, it has
8   my signature, it has my address, it has a brief
9   physical description, it has a number, it has on the
10  back a magnetic strip with a bar code and that's --
11  that's about it.
12      Q   Do polling places in Texas have a bar code
13  reader that can be used to verify the validity of
14  that bar code?
15      A   They could.
16      Q   Is there funding in SB 14 for bar code
17  readers?
18      A   I don't believe so.
19      Q   Have you ever seen a bar code reader at a
20  polling place in Texas?
21      A   No.
22      Q   Does SB 14 provide financing for black
23  lights to test for any security features on an
24  identification card that require a black light such
25  as --

## 42

1       A   I don't think so --
2       Q   -- at an airport?
3       A   No, I don't think so.
4       Q   Have you ever seen those lights used at a
5   Texas polling place?
6       A   No, I don't think so.
7       Q   Do you have a copy of your citizenship
8   certificate?
9       A   With me?  No.
10      Q   In general.
11      A   Yes, of course.
12      Q   Does it have your photograph on it?
13      A   Yes, when I was 17 years old.
14      Q   And how old are you today, if you don't
15  mind?
16      A   I'm 55.
17      Q   And earlier you -- you mentioned that you
18  could tell that your driver's license picture was --
19  was recent --
20      A   Uh-huh.
21      Q   -- because it looks like how you look now?
22      A   Yeah.  I think it's within the -- yeah,
23  I'm losing hair and I look overweight.  That's me.
24          MR. GARZA:  Could be me.
25          MR. MCKENZIE:  Let the record reflect

## 43

1   that counsel for the Attorney General believes that
2   Representative Aliseda looks quite healthy.
3       Q   (By Mr. Freeman)  Would you say that you
4   look similar to how you looked when you were 17?
5       A   You know, surprisingly I do.  The only
6   difference is the hair.  But I still have the big
7   nose, and I could tell it's me.
8       Q   As a practical matter, does your
9   citizenship certificate identify you better than
10  your legislator I.D. with your more recent photo?
11      A   No.
12      Q   Does your citizenship certificate have any
13  security features that your two legislator I.D.s do
14  not have?
15      A   It -- from what I remember -- and I looked
16  at it recently, because I had to send it to my
17  brother.  He needed the number -- I didn't have to
18  send him the certificate.  He needed the number off
19  of it for some commission the Governor was putting
20  him on, a background check.
21          So I was -- I remember it had a funny kind
22  of paper and it had a seal, an embossed seal.  And
23  over the picture, I believe it had a way that you
24  could tell if the picture had been changed; the seal
25  wouldn't line up correctly.

## 44

1       Q   The embossed seal --
2       A   Right.
3       Q   -- goes through the picture?
4       A   I think it does.
5       Q   Okay.
6       A   And it had an identification number.  The
7   colors were kind of unique.  It was almost like --
8   it was almost like cash in the sense that it seemed
9   to be a funny kind of paper that you wouldn't
10  ordinarily get at the five and dime store.
11      Q   Okay.  Does -- strike that.
12          Do you -- did you have a student I.D. when
13  you were a student at U.T. --
14      A   Yes.
15      Q   -- in law school?
16      A   Uh-huh.
17      Q   And did that have your photograph on it?
18      A   Yes.
19      Q   And even after a couple decades, do you
20  look like how you looked in that photograph?
21      A   I don't know what I did with it.  I'm sure
22  it was kind of like my military I.D.  I had a lot
23  more hair.  Different -- different -- in fact, I
24  think I was using contact lenses back then.  I may

Jose Aliseda                                              June 6, 2012

45

1    not have been.
2        So I'm sure that you could recognize me as
3    a younger man.
4        Q   Have you seen a recent U.T. I.D. in any
5    circumstance?
6        A   No.
7        Q   Would you say that your legislator I.D.,
8    not the laminated one, but the printed one --
9        A   Uh-huh.
10       Q   -- has just as many security features as
11   the citizenship certificate?
12       A   No.
13       Q   Why is that?
14       A   Because I think I could make something
15   like this, if that's what you're asking.  I'd have a
16   hard time, I think, making that citizenship
17   certificate with all the other things that I
18   remember it had on it.
19       Q   But people do create fraudulent
20   citizenship certificates, do they not?
21       A   I'm sure they do.
22       You know, the whole -- the whole point of
23   an I.D. of any sort is to get -- it's kind of like a
24   burglar alarm.  If you're a burglar and you have a
25   choice between going to a house that has an alarm

46

1    and the house that doesn't have an alarm, you're
2    going to pick the house that doesn't have the alarm.
3    Anything that you -- anything that man creates, I
4    think, can be forged.  But if it's difficult enough,
5    you move on to something else.
6        Q   Do you have a burglar alarm on your house?
7        A   I do.
8        Q   Is it -- is it an expensive burglar alarm?
9        A   No.
10       Q   And so you could --
11       A   My best burglar alarm are my six dogs
12   outside.
13       Q   That's a lot of dogs.
14       But you could have a more expensive
15   burglar alarm --
16       A   I could --
17       Q   -- right?
18       A   -- uh-huh.
19       Q   But you made a decision that you didn't
20   need something that expensive, I assume.  Is that
21   correct?
22       A   Because of where I live, right.  I live
23   three-quarters of a mile from my gate, and I have
24   dogs outside.  And most people don't know there's a
25   house down there, so --

47

1        Q   So there's a tradeoff?
2        A   Yes, uh-huh.
3        Plus I have an electric gate.  So if
4    they're going to come to my house, they're going to
5    have to go through a number of impediments before
6    they get there.
7        Q   Do you know how you would get a copy of
8    your citizenship certificate if you were to lose it?
9        A   I'm sure it would be a hassle, because I
10   remember applying for a passport, and I was
11   terrified to send it off to get the passport.  So it
12   was -- it's a very important document that I keep in
13   a safe.
14       Q   Are you aware of whether there are any
15   criminal penalties for making a copy of a
16   citizenship certificate even for records or
17   safekeeping?
18       A   That, I don't know.  There probably are.
19       Q   Would you be concerned to carry your
20   citizenship certificate to the polling place?
21       A   I would be careful with it.  I would take
22   it, because I think it's an important enough thing
23   to do.  I do it for -- for example, for getting --
24   when I was employed by the Board of Pardons and
25   Parole, I had to produce it.  When I was in the

48

1    United States Navy, I had to produce it for them.
2    For just about anything I've had to do that's
3    important, like getting a job, I've had to produce
4    it.  So I take care of it.
5        Q   Would it be fair to say that you don't
6    like carrying it around unless you have to?
7        A   It's a document that's about 8 by 11
8    that's folded up in three places.  And I carry it in
9    a plastic package-type deal like what you would put
10   insurance documents in or something.
11       Would I put it in my back pocket?  No.
12       Q   But you keep it in a safe because you
13   don't want to carry it around unless you have to and
14   you want it to be safe.  Right?
15       A   Yes.  If there's a fire, if there's a
16   hurricane, if somebody breaks in, they might want to
17   try to get at it.
18       Q   How much is gas going for in Bee County
19   these days?
20       A   3.39 a gallon.
21       Q   That's actually -- I should be gassing up
22   in Bee County.
23       And when was the last time you voted?
24       A   I voted in this last primary.
25       Q   How far is your polling place from your

Jose Aliseda                                           June 6, 2012

## 49

1    house?
2        A   I voted at the courthouse.  I voted early.
3        Q   Okay.
4        A   So I voted when I was at the courthouse
5    for a -- a case.
6        Q   How far is the courthouse from your house?
7        A   From my house, it's seven minutes.  From
8    my office, it's two minutes.
9        Q   And when was the last time you voted on
10   Election Day?
11       A   I think the last general election.
12       Q   And how far was the polling place from
13   your house or your office?
14       A   Minutes or miles?
15           Two-and-a-half miles, probably two
16   minutes.
17       Q   You drive fast, sir.
18       A   Well, it's on -- it's on the bypass, so
19   it's 60 miles an hour.
20       Q   Okay.  And so are those -- are those
21   closer than the driver's license office?
22       A   I don't live in town.  I live outside the
23   city limits.
24       Q   Uh-huh.
25       A   The driver's license office is in city

## 50

1    limits, but the driver's license office is ten
2    minutes from my house.
3        Q   Okay.  We've been going for about an hour.
4    Are you okay to keep going --
5        A   Yeah, I'm fine.
6        Q   -- or do you want to take a break?  I just
7    want to make sure you're comfortable.
8            So we previously discussed that prior to
9    this deposition you conducted a search for
10   documents.  Prior to this last batch of documents
11   that your counsel gave me today, did you produce any
12   documents to the State, any relevant documents that
13   you found?
14       A   I don't know --
15           MR. MCKENZIE:  Clarifying question.
16   I'm sorry to interrupt.  Are you referring to "you"
17   as him and his staff?
18       Q   (By Mr. Freeman)  We can start with you or
19   we can start with -- we'll just say you and your
20   staff.
21       A   I had my staff search.  I don't know if
22   they sent him -- sent him anything or not, to the
23   honest with you.
24       Q   Okay.
25       A   I don't think -- I think the general

## 51

1    discussion with my staff was we didn't have a whole
2    lot, because we just didn't.
3        Q   Okay.
4        A   I mean, I don't even remember getting a
5    whole lot on the issue.
6        Q   At any time did you perform a
7    keyword-based search on your official E-mail
8    account?
9        A   Yes.
10       Q   Did you produce any E-mails to the State?
11       A   No.
12       Q   Did you have no responsive documents?
13       A   Yes.
14       Q   How do you usually communicate with your
15   legislative colleagues?
16       A   More often than not, it was just talking
17   to them.
18       Q   How often during a week of the legislative
19   session do you communicate by E-mail with your
20   legislative colleagues?
21       A   Hardly none.
22       Q   How about when the Legislature is not in
23   session?
24       A   Never.
25       Q   How about on the phone?

## 52

1        A   Other than to talk a little bit about
2    campaigns, hardly ever.
3        Q   Who are your staff?
4        A   My -- my chief of staff is named Aaron
5    Gibson, A-A-R-O-N, Gibson, G-I-B-S-O-N.  My
6    legislative director would be Matt Lamon, M-A-T-T
7    L-A-M-O-N.  My district director is Judy Hooge,
8    J-U-D-Y, Hooge, H-O-O-G-E.  And I had some interns.
9        Q   Okay.  Were Mr. Gibson, Mr. Lamon, or
10   Ms. Hooge -- are any of them attorneys?
11       A   No.
12       Q   Okay.  How do you usually communicate with
13   your staff?
14       A   By telephone.  Sometimes I text them.
15       Q   How are documents maintained in your
16   office?
17       A   We have a filing cabinet.  And if there is
18   a document that I want to preserve for reference
19   purposes, I ask them to file it.  Other than
20   that, that's it.
21       Q   Is any single person in your staff
22   responsible for document retention?
23       A   Matt normally does it.
24       Q   And if you don't ask your staff to hold
25   onto a certain document --

## 57

1    A   Uh-huh.
2    Q   -- and review by the committee clerk, do
3  you take any other steps in drafting legislation,
4  when voting on legislation, to make sure a bill
5  complies with the Texas Constitution?
6        MR. McKENZIE:  And I'm going to
7  instruct the witness not to answer in terms of
8  SB 14.  He can answer generally as an attorney.
9    A   As a general approach with me, I am an
10  attorney and I have read the U.S. Constitution and I
11  have read the Texas Constitution.  So I have a
12  general idea of the framework.  And I believe I
13  would -- if there was something that, as a general
14  principle, would seem to be unconstitutional, I
15  would have known.
16    Q   Okay.  Any -- nothing else?
17    A   That's basically it.
18    Q   Okay.  Do you believe that compliance with
19  federal law is an important consideration in the
20  law-making process?
21    A   Sure, it is.
22    Q   And what steps do you take to ensure
23  compliance with the federal laws when you're working
24  on bills in the Texas Legislature?
25        MR. McKENZIE:  Again, same

## 58

1  instruction, don't answer to any particular bills.
2  In fact, the whole line of questioning is right on
3  the edge, because if he does it universally for all
4  bills, then by implication he necessarily does it on
5  SB 14.  So I would say answer in a very general
6  format and don't offer specifics as to how you
7  conduct legislative acts and research and things to
8  that effect.
9    A   I would say that my answer for that
10  question would be the same that I gave to the last
11  one, which is I am an attorney.  I have probably on
12  the scheme of things a very broad background in --
13  in a lot of law, military law, criminal law,
14  constitutional law.  And I have a general idea of
15  how these things work.
16        So in -- with respect to me, if I had a
17  red flag in my mind about something, I would look
18  something up.
19    Q   (By Mr. Freeman)  Okay.  And do you
20  believe that compliance with the Federal Voting
21  Rights Act is important in the duration with the
22  Texas law-making process?
23    A   Yes.
24        MR. McKENZIE:  Same instruction.
25    A   Yes.

## 59

1    Q   (By Mr. Freeman)  And how do you ensure in
2  the legislative process that Texas laws that you are
3  voting in favor of involve --
4        MR. McKENZIE:  Again, I would
5  instruct you to answer very generally.  Don't answer
6  with respect to SB 14.  If answering generally to
7  this question will require you to reveal any of the
8  deliberations you did for SB 14, I will instruct you
9  not to answer.
10        THE REPORTER:  Thank you.
11        MR. McKENZIE:  No problem.
12    A   I would give the same answer I've given
13  for the last two questions.  It's the same process I
14  would have gone through.
15    Q   (By Mr. Freeman)  We've been going for
16  about an hour and 15 minutes.  I know that your
17  counsel wants to take lunch very early.
18        MR. McKENZIE:  Uh-huh.
19        MR. FREEMAN:  I would appreciate if
20  we could take approximately five minutes off the
21  record.
22        MR. McKENZIE:  Yeah.
23        (Off the record from 10:43 to 10:55)
24    Q   (By Mr. Freeman)  Representative, what
25  committees did you sit on in the 82nd Legislature?

## 60

1    A   I was on the Voter I.D. Select Committee,
2  on the Environmental Legislation Committee, and the
3  Criminal Juris Prudence Committee.
4    Q   And what's the Select Committee?
5    A   It was a committee that was outside of
6  where it would normally be.  For example, normally
7  Elections Committee would handle elections law, but
8  the Speaker created a committee specifically for
9  voter I.D.
10    Q   Now, am I correct that the name of the
11  committee was actually the Select Committee on Voter
12  Identification And Voter Fraud?
13    A   Yes.
14    Q   And at the beginning of the Session, it
15  was not necessarily known that the committee would
16  only hear voter I.D.  Is that correct?
17    A   That's correct.
18    Q   Are you aware of any other select
19  committees related to voting or elections in current
20  or past Legislatures?
21    A   No.
22    Q   Do all select committees relate to a
23  standing committee in the way that you just
24  described as a select committee --
25    A   I know there's --

---

## 61

1    Q    -- voter fraud related to elections?

2    A    I know that there was more than one select

3    committee this last legislative session --

4    Q    Uh-huh.

5    A    -- but I can't -- the only one I can

6    remember was the one I was on.  I can't remember the

7    others.

8        Q    Was there one related to federalism or

9    federal intrusions on state law in some way?

10    A    I think there was.  Brian Crayton was on

11    that committee, I believe.

12        Q    And would that committee relate directly

13    to another committee in the way that the Select

14    Committee on Voter Identification and Voter Fraud

15    relates to elections or was that a special need?

16    A    I don't know.  I never thought about it

17    that way.

18        Q    Okay.  If there hadn't been a select

19    committee on federalism or whatever it was called,

20    where would bills related to that subject matter

21    have gone?

22    A    I don't know.

23    Q    Okay.

24    A    The -- the way I understand, legislation

25    is assigned through the Speaker's office.

---

## 62

1        Q    Was the Select Committee on Voter

2    Identification and Voter Fraud a fast track,

3    quote/unquote, committee?

4        MR. MCKENZIE:  Objection; vague.  You

5    can answer.

6        A    It was a fast track in the sense that the

7    Governor declared it an emergency item.  I can't

8    remember the exact term that was -- that was used.

9    The Governor had the power to elect -- to select

10    certain things and call them emergency items.  And

11    all that did was allow us to consider it before the

12    60 days that normal legislation would be considered.

13        Q    (By Mr. Freeman)  Is it the case that

14    there were a total of four legislative emergencies

15    declared by the Governor in the last session?

16    A    I know there was more than one, more than

17    two.  I can't remember how many there were.

18    Q    So at least three?

19    A    At least three, I believe, yeah.

20    Q    Were the other legislative emergencies

21    referred to, quote, "fast track", closed quote

22    committees?

23        MR. MCKENZIE:  Objection; form.  You

24    may answer.

25    A    I don't know.

---

## 63

1        Q    (By Mr. Freeman)  Let's try and clear up

2    the vagueness.

3    A    Okay.

4    Q    This has previously been marked U.S.

5    Exhibit 12.

6    A    Okay.

7        MR. MCKENZIE:  Thank you.

8        THE WITNESS:  Do you need to mark it?

9        THE REPORTER:  No.  It's already

10    marked.  Thanks.

11    Q    (By Mr. Freeman)  Have you seen this

12    document before?

13    A    I believe I have.

14    Q    And do you see on the second to the last

15    line where the -- of the first page where key facts

16    on committees, it states, "Fast track Select

17    Committee on Voter Identification and Voter Fraud"?

18    A    Uh-huh.

19    Q    Why is the term "fast track" there as

20    opposed to the Select Committee on the State

21    Sovereignty?

22        MR. McKENZIE:  And I would instruct

23    you not to answer to the extent that it would reveal

24    prior communication between you and the other

25    Senators, but you may answer if it doesn't reveal

---

## 64

1    that.

2    A    I don't know.

3        Q    (By Mr. Freeman)  Okay.  How many bills

4    did the Select Committee on Voter Identification and

5    Voter Fraud introduce?

6    A    Voter I.D.

7    Q    Just that?

8    A    I believe so.  That's all I remember.

9    Q    Did you ask to be on the Select Committee

10    for Voter Identification and Voter Fraud?

11        MR. MCKENZIE:  Again, I'll instruct

12    you not to answer to the extent that question -- if

13    it involves private communications between you and

14    other Senators.

15    A    I'll assert my privilege.

16    Q    (By Mr. Freeman)  Did you have any general

17    discussions concerning committees?

18        MR. FREEMAN:  I'm asking general

19    subject matter --

20        MR. MCKENZIE:  Yeah.

21        MR. FREEMAN:  -- what, who, where,

22    when, et cetera.

23        MR. MCKENZIE:  If you had a

24    communication on -- well, the problem is that he's

25    only been on -- how many committees did he answer?

Jose Aliseda                                                    June 6, 2012

---

## 65

1    THE WITNESS:  Three.
2    MR. MCKENZIE:  He's only been on
3    three committees.  So if he answers that question,
4    it's going to necessarily reveal the subject matter
5    of what he was communicating later.
6    MR. FREEMAN:  We are entitled under
7    multiple orders of this Court for privileged law
8    questions to ask a general subject matter.  And I --
9    I think that a general subject -- you would have in
10   a privilege log, for example, discussions about
11   committee assignments.
12   MR. MCKENZIE:  Yeah, you can
13   answer -- you can answer to that effect if you had
14   discussion about committee assignments.
15   A    Yes.
16   Q    (By Mr. Freeman)  When did you have those
17   discussions?
18   A    Between the time I got sworn in and the
19   time I was assigned the committees.
20   Q    And based on Exhibit 12, it appears that
21   committees were assigned on February 9th.  Is that
22   correct?
23   A    Right.
24   Q    Who did you have those discussions with?
25   A    They would have been with Speaker Straus.

---

## 66

1    Q    Was anyone else present?
2    A    No.
3    Q    Where did those discussions occur?
4    A    In his office.
5    Q    Did you discuss committee assignments
6    after they were made --
7    A    No.
8    Q    -- as a general matter?
9    A    No.
10   Q    Okay.
11   A    Other than to just talk with my
12   colleagues, hey, I got this committee, hey, I got
13   that committee, that was basically it.
14   Q    Got it.
15   Did you know the other legislators when
16   you came into the House?
17   A    I'm trying to think.
18   I may have known one.
19   Q    And who was that?
20   A    That would have been Aaron Pena.
21   Q    Did you know him from growing up in
22   Edinburg?
23   A    No.  I ran into him.  His father's an
24   attorney, a criminal defense lawyer.  And I think I
25   ran into him before the Session at one of my

---

## 67

1    brother's functions or something else, uh-huh.
2    Q    Okay.  Did you ever make any public
3    statements that you were hoping to introduce
4    legislation about mail-in voter fraud to be heard by
5    the Select Committee?
6    A    Yes.
7    Q    But, in fact, none of those things were
8    referred to the Select Committee.  Is that correct?
9    A    That's correct.
10   Q    They were referred to the Elections
11   Committee?
12   A    Right.
13   Q    And you previously testified, just to
14   clear this up, that the Speaker is responsible for
15   those referrals?
16   A    Right.
17   Q    Okay.  I'd like to talk to you about your
18   district, which is District 35.  Correct?
19   A    Uh-huh.
20   Q    How big geographically is your district?
21   A    If I went from one edge of the district,
22   like Premont, which is in Jim Wells County, and I
23   drove all the way to the edge of Atascosa County,
24   we're probably talking 120 miles --
25   Q    Okay.

---

## 68

1    A    -- north to south.  And probably if you
2    went from Fannin, which would have been the farthest
3    east, all the way to Tilden, which would have been
4    the farthest west, another 100 miles or 90 miles.
5    So it's a pretty big area, yeah.
6    Q    (By Mr. Freeman)  Fair enough.  How would
7    you describe your district in terms of its
8    demographics, age, race, et cetera?
9    A    It is a predominately Hispanic-Latino
10   district.  I would say it's close to 60 percent
11   Hispanic.  Probably -- I would say the average
12   population age is in the 30s.
13   Q    Okay.  A lot of non-citizens?
14   A    A lot of non-citizens?  Not a lot, but I
15   would say -- I can only go on what I -- what I know
16   about Beeville in particular.  But Beeville is the
17   largest municipality in the district -- no, I take
18   that back.  Jim Wells is -- Alice is, but we're like
19   the second.
20   So in Beeville, 1 percent maybe --
21   Q    Okay.
22   A    -- non-citizen.
23   Q    Any knowledge about Alice?
24   A    Alice?  A little more.  It's farther
25   south, and it has more jobs that somebody that is

Jose Aliseda                                              June 6, 2012

## 69

1    illegal might gravitate towards.
2        Q   And were the percentages that you were
3    saying for undocumented immigrants or non-citizens
4    in general?
5        A   No, we have a lot on the non-citizens in
6    general. I'm talking about undocumented citizens, 1
7    to 2 percent.
8        Q   How about aliens --
9        A   We have green cards in Beeville --
10       Q   Uh-huh.
11       A   -- that I know of.
12       Q   Are the folks who are green cardholders or
13   have other visa, is that a substantial share of the
14   Hispanic population?
15       A   Not substantial, no.
16       Q   Are most of the non-citizens Hispanic?
17       A   Yes.
18       Q   And is that true across Texas?
19       A   Yes. I think there's pockets of
20   non-citizens in the big cities of different ethnic
21   origins, Vietnamese, Guatemalans. Well, Hispanic --
22   you said Hispanic. Okay. Vietnamese would be
23   another large minority group that's non-citizen.
24       Q   But the biggest group is Hispanics.
25   Right?

## 70

1        A   Right.
2        Q   How would you describe your district in
3    terms of economics?
4        A   Now or back when I ran? Because now it's
5    booming.
6        Q   Let's talk -- let's talk now.
7        A   Okay. Now.
8            I think we have a very low unemployment
9    rate, and we have -- it's doing very well
10   economically because of Eagle Ford Shale.
11       Q   And has the wealth from the Eagle Ford
12   Shale spread, do you think, to both the landowners
13   and the workers?
14       A   Yes.
15       Q   Is there oil in Jim Wells County?
16       A   Jim Wells County is what they call Hub
17   City. And it is a oil and gas hub city in the sense
18   that there's always been oil in the area, oil and
19   gas in the area, but because those things kind of
20   played out, it had been going downhill. Now with
21   Eagle Ford Shale, all those companies are starting
22   back up again. And Alice is one of the cities that
23   is taking huge advantage of Eagle Ford Shale even
24   though Eagle Ford Shale is not in Jim Wells County.
25       Q   Okay. Are most of the landowners whose

## 71

1    land has oil on it Anglo?
2        A   In my district?
3        Q   Uh-huh.
4        A   That's hard to say, because in the city,
5    believe it or not, people own their house and their
6    lot. And some of them kept the mineral rights. And
7    there are a lot of Hispanics that for a little --
8    you know, a 150 by 100 foot lot get a royalty check.
9        Q   Okay.
10       A   So it's hard to say. I'm -- I'm --
11       Q   Are most of the landowners Anglo?
12           MR. MCKENZIE:  Objection; vague. You
13   may answer.
14       A   As a general rule, I think that would be
15   true, although I know a lot of -- for example, I own
16   720 acres. I know a lot of Hispanics that have
17   ranches. And, you know, there's a lot of also
18   Anglos that have intermarried with Hispanics over
19   the generations --
20       Q   (By Mr. Freeman) Uh-huh.
21       A   -- these are old -- some of the grants in
22   Bee County, for example, are old Spanish land
23   grants. And you can have an individual, for
24   example, called "Risito welder." You know, he's a
25   welder, but he has some grandparent or something in

## 72

1    the past who was a Hispanic.
2        Q   Uh-huh.
3        A   So it's hard to say.
4        Q   Okay. Do many adults in your district
5    work for hourly wages?
6        A   Yes.
7        Q   Most adults?
8        A   I would say -- I would say -- well, that's
9    hard to say, because you have the prison system,
10   which is the biggest employer in Bee County, for
11   example. That's a salaried position. But you could
12   reduce that salary to an hourly wage if you wanted
13   to, math-wise.
14           I -- I can't answer that. I would say
15   as -- as -- we do have a lot of hourly wage workers
16   in the district, yes.
17       Q   Okay. And is there a difference between
18   Anglo and Hispanic communities based on one being
19   more or less likely to be working an hourly wage
20   job?
21           MR. MCKENZIE:  Objection; calls for
22   speculation. You may answer.
23       Q   (By Mr. Freeman) To the extent of your
24   knowledge.
25       A   Right now, I don't think so. I think that

Jose Aliseda                                                    June 6, 2012

## 73

1  the oil companies are hiring everybody and anybody
2  And most of it is not salaried.  Most of it is -- is
3  hourly wage.
4      Q   Okay.  Historically?
5      A   Historically?
6          MR. MCKENZIE:  Same objection.
7      A   See, I can only go -- historically, I
8  could say this about my district.  I probably know
9  Bee County better than any county --
10     Q   (By Mr. Freeman)  Okay.
11     A   -- in the district.  Okay?  So
12 historically Bee County, believe it or not, has had
13 salaried positions.  We have the base there --
14     Q   Uh-huh.
15     A   -- and the Navy base hired Hispanic, and
16 that was a salaried federal job.  And now we have
17 the prison system, and those are salaried state jobs
18 and probably manned by more than 50 percent
19 Hispanic.
20     Q   Okay.  Do you know how many voting
21 precincts there are -- let's start in Bee County.
22     A   At one time I knew that number, and now I
23 don't.
24     Q   Do you have a rough idea of how many
25 polling places there are?

## 74

1      A   Probably 20, 23, 24.
2      Q   Do you know how many -- how many polling
3  places there are in the district as a whole, rough
4  approximation?
5      A   In the district as a whole, I don't know.
6      Q   Do you know how many driver's license
7  offices there are in your district as a whole that
8  are in operation?
9      A   With the exception of McMullen County,
10 which I told you had 800 people --
11     Q   Uh-huh.
12     A   -- and the county seat there is Tilden, I
13 think every other county in my district has a DPS
14 office -- license office out of the seven counties.
15         MR. SMITH:  If we could have that
16 marked as U.S. 492.
17         (Deposition Exhibit No. 492 marked)
18     Q   (By Mr. Freeman)  Have you seen this
19 document before?
20     A   No.
21     Q   Are you able to determine from the face of
22 the document what the document is?
23     A   It looks like a list of DPS offices.
24     Q   And with this list in front of you, are
25 you able to determine whether or not there is a --

## 75

1  an operational driver's license office in Karnes
2  City?
3      A   Karnes City?  That would be Karnes County.
4  It says, "Closed temporarily."
5      Q   And with this list in front of you, are
6  you able to determine if there's any other
7  operational driver's license office in Karnes
8  County?
9      A   That would be the only place it would be.
10 That's a --
11     Q   And --
12     A   -- that's the county seat.  That's
13 normally the way Texas is set up.  Most of these
14 types of governmental offices are set up in the
15 county seat of the county.
16     Q   How about Goliad County, the city of
17 Goliad?
18     A   It says, "Temporary closed."
19     Q   So there are seven counties in your
20 district.  Correct?
21     A   Yes.
22     Q   But only four of those counties have
23 operational driver's license offices?
24     A   Looks that way.
25     Q   Would you agree that for most voters a

## 76

1  polling place is going to be closer to a driver's
2  license office, then?
3      A   As a rule.
4          In South Texas, most county seats are
5  30 miles apart.  Do you know why?
6      Q   I would love to know why.
7      A   Because that is how long it would take to
8  ride somewhere on a horse.  So that's why Beeville
9  is 30 miles from Goliad, 30 miles from Karnes City.
10 And the county seat for Live Oak County used to be
11 Oakville, which is 30 miles, but now it's George
12 West, which is 22 miles.  But San Patricio, Sinton,
13 is 30 miles from us.  So that's -- usually you're
14 30 miles away from another county seat if you live
15 at the county seat.
16     Q   And -- but most people are able to vote in
17 their own county.  Correct?
18     A   Yes.
19     Q   And usually there are many precincts in
20 each county, too.  So if you live away from the
21 county seat, you'll have a precinct that's closer to
22 you than the county seat.  Right?
23     A   Yes.  The -- and, for example, in Bee
24 County it would be closer for people in Pawnee to go
25 to the George West Live Oak -- the Live Oak DPS

Jose Aliseda                                                    June 6, 2012

---

77

1  office, I believe, than to come to Beeville.
2  That -- Pawnee is one of the cities that's farthest
3  away from Beeville.
4      Q   Okay.  How long does it usually take a
5  voter to cast a ballot in person, to the extent of
6  your knowledge?
7      A   Took me just a few minutes.
8      Q   Would you agree that that's less time than
9  the amount of time it takes to get an I.D. at a
10  driver's license office?
11     A   I think it depends when you show up at
12  polling places.  If you show up at 7:00 o'clock or
13  6:58 on Tuesday evening, you're going to be in line
14  for a long time versus if I go to the driver's
15  license, I normally try to go there early to -- to
16  avoid any kind of line.  As a general rule, it just
17  depends.
18     Q   Okay.  Is there a high voter turnout in
19  your district?
20     A   Yes.
21     Q   What percent -- do you have an idea of
22  what percent of registered voters turned out in 2010
23  when you were elected?
24     A   In the district?
25     Q   Uh-huh.

---

78

1      A   More than -- more than 40 percent,
2  probably 50 something.
3      Q   Is that considered high for Texas?
4      A   I think it is.
5      Q   Do you know how many turned out in 2008?
6      A   I think it was even higher than that.  It
7  was a Presidential election.  Most off years when
8  it's not Presidential, it's -- it's a higher
9  turnout.
10     Q   And are you aware whether 40 or 50 percent
11  turnout would be considered high nationally?
12     A   Nationally as a national average?
13     Q   Uh-huh.
14     A   I think that as a national average it's
15  somewhere around 40, 50 percent.
16     Q   Okay.
17     A   So I think it's -- well, I don't know.
18     Q   Okay.
19     A   I'm speculating at this point.
20     Q   No one wanted you to do that.
21     A   Uh-huh.
22     Q   We're just here for your knowledge.
23         Do you know if the turnout is higher for
24  the Anglo voters or the Hispanic voters in your
25  district?

---

79

1      A   In my district?
2      Q   Uh-huh.
3      A   On a percentage basis, is turnout higher
4  for an Anglo -- Anglo population versus the
5  Hispanic?  I would say as a general rule, yes.
6      Q   Okay.  And I should have asked these
7  questions before, but just to wrap them up, is the
8  closest driver's license to Karnes City in Beeville?
9      A   No.  I think it would probably be in --
10  well, it's almost exactly the same.  Floresville is
11  30 miles away from Karnes City.  Beeville is
12  30 miles away from Beeville -- I mean, from Karnes
13  City.
14     Q   Is it possible that it's actually 38 miles
15  away?
16     A   Beeville?
17     Q   From Karnes City.
18     A   Karnes City?  It's possible.  I mean, if
19  you take -- you have to jog to the courthouse
20  from -- after you hit 181, you have to take a left
21  and it's like 2, 3 miles from there.  So, yeah,
22  that's possible.
23     Q   Okay.  Is Victoria the closest driver's
24  license office to the city of Goliad if there isn't
25  one in Goliad?

---

80

1      A   Yes.
2      Q   And that's about 30 -- 26 miles?
3      A   26 miles.  Beeville is 30 miles from
4  Goliad.
5      Q   Okay.  And you said there isn't an
6  operational office in Tildon.  Right?
7      A   It looks like they had one at one time, if
8  you look at your list.
9      Q   Uh-huh.
10     A   It says that it's closed temporarily.  It
11  would shock me if they even had one, to be honest
12  with you, because it was such a small place.
13     Q   And there wouldn't be one anywhere else in
14  McMullen County -- or in -- yeah, McMullen County.
15  Right?
16     A   Tildon is the only county seat in
17  McMullen, and I think it's the only city in
18  McMullen.  So...
19     Q   Is Beeville the closest city?
20     A   No.  I think Jourdanton would be.
21     Q   Okay.  And that's about 30 miles?
22     A   Yes.
23     Q   Okay.
24         MR. MCKENZIE:  Counsel, I don't know
25  when you're going to be ready.  I don't want to

## 81

```
1   interrupt your line of questioning, but sometime
2   soon --
3               MR. FREEMAN:  One more question and
4   we'll take a break.
5               MR. MCKENZIE:  Okay.
6       Q   (By Mr. Freeman)  How much would it cost
7   you to drive in terms of gas roundtrip 75 miles?
8       A   In terms of gas?
9       Q   Uh-huh.
10      A   My car gets about 25 miles to the gallon,
11  so it would be 3 gallons, 3.39 a gallon.  I don't
12  know.  Fifteen bucks, 20 bucks.
13              MR. FREEMAN:  All right.  Let's take
14  that break.
15              (Off the record from 11:22 to 1:05)
16              THE REPORTER:  We're back on.
17      Q   (By Mr. Freeman)  Okay.  We're back after
18  lunch and some document productions and all sorts of
19  other things.
20          Representative, I would like to talk to
21  you about the forms of photographic identification
22  that are available in Texas.
23      A   Uh-huh.
24      Q   Do you know how many registered voters in
25  Texas lack a driver's license, state I.D. card, or a
```

## 82

```
1   license to carry?
2               MR. MCKENZIE:  I'm going to object to
3   the extent you gathered that knowledge in the course
4   of your deliberations on SB 14.  To the extent you
5   have independent knowledge of that, you may answer
6   the question.
7       A   No, I don't know.
8       Q   (By Mr. Freeman)  Do you ever try to find
9   out that number?
10              MR. MCKENZIE:  Again, I'm going to
11  object to the extent you tried to find out in the
12  course of your deliberations on SB 14 and instruct
13  you not to answer.  Sorry.
14              THE WITNESS:  Okay.  Okay.
15      A   I...
16      Q   (By Mr. Freeman)  Well, if you attempted
17  to find out after the passage of SB 14 --
18              MR. MCKENZIE:  Yeah, that would be
19  fine.
20      Q   (By Mr. Freeman)  -- then you can answer.
21      A   After the passage of SB 14, I have read
22  articles about speculation as to what that number
23  is, yes.
24      Q   What do you mean by speculation?
25      A   Well, I've read articles that say they
```

## 83

```
1   tried to match the DPS records with the voting
2   records and say, okay, if there's X number of people
3   that have driver's license and there's X number of
4   people that are registered to vote, that that
5   somehow means that all these people that are
6   registered to vote that aren't listed as having a
7   driver's license are somehow not -- it's not the
8   same -- I mean, there's somehow a larger number
9   there than those that have driver's license.  And I
10  don't think that that is necessarily a good
11  correlation, given what I know about the way voter
12  registration works and the way driver's license
13  work.
14              MR. MCKENZIE:  Sorry.
15      Q   (By Mr. Freeman)  And what do you know
16  about the way the voter registration works and the
17  way that driver's licenses work that would lead you
18  to believe that a match would not indicate the
19  number of people who lack I.D.s?
20      A   Okay.
21              MR. MCKENZIE:  Well, again, I'm going
22  to object to the extent you have required that
23  knowledge as part of your deliberations as a
24  legislator before the enactment of SB 14.  And to
25  the extent you don't have that, you may answer.  But
```

## 84

```
1   I'm going to instruct you not to answer if the
2   source of your knowledge is deliberations in SB 14.
3       A   The source of my knowledge is not my
4   deliberations with SB 14.
5       Q   (By Mr. Freeman)  Uh-huh.
6       A   I can give you a perfect example of
7   something that happened just this last election.
8       Q   Okay.
9       A   The person I was helping run for Congress
10  had an opponent, a Republican opponent.
11      Q   Uh-huh.
12      A   We did a background check.  It turns out
13  that, one, she's using a political name that is not
14  her real name and that she has a driver's license in
15  her real name, but she's registered to vote twice,
16  once here in Austin and once in -- in -- in Cameron
17  County.
18          So there's a perfect example of what can
19  happen with people that, one, can register to vote
20  using their legal name, but can run for an office,
21  but, two, can have more than one voter
22  registration at the same time.
23      Q   Is it the responsibility of the states or
24  localities to eliminate duplicate voter
25  registrations or registrations of individuals who
```

Jose Aliseda                                                    June 6, 2012

## 85

1  have moved away?
2      A   It is, but there's a problem, because the
3  State -- if you un-register someone, there is a --
4  and they were properly registered, there's a
5  criminal penalty attached to it versus if you just
6  leave them on the registration rolls.  And I think
7  that that's part of the problem.
8          We've got -- for example, in this state,
9  there's -- there was an audit done in 19 -- no,
10  2007 --
11     Q   Uh-huh.
12     A   -- that said we have probably several
13  thousand people that are dead that are still on the
14  registration rolls, because the State or county
15  voter registrar hasn't purged them in the rolls.
16     Q   Uh-huh.
17     A   You have people in this state, which is a
18  very mobile state, that move around and register
19  somewhere else.  You have -- for example, in Bee
20  County - this is another good example - we have one
21  house where 18 people are registered to vote, and I
22  know for a fact that they don't live there.  So
23  that's the part of the problem, is that you can --
24  you can register to vote without having to show any
25  I.D.

## 86

1      Q   But isn't it the case that voter
2  registrars can send out after someone doesn't vote
3  some kind of notice seeing if they still live at
4  that residence?
5      A   It is a fact that they do that or they can
6  do it.
7      Q   Uh-huh.
8      A   A good voter registrar will do that.
9      Q   Okay.
10     A   What will happen is when it's time to
11  issue the new voter registration --
12     Q   Uh-huh.
13     A   -- it goes to the address that they had
14  listed.  And if it comes back, then there's a
15  challenge issued.
16     Q   Okay.
17     A   They can say, "Well, what's happened?
18  Your voter registration came back.  Are you not
19  there anymore?"
20         So a good voter registrar will do it.  In
21  fact, that was one of the problems in Bee County,
22  that we had a bad voter registrar.  And she didn't
23  do it, and she lost.  So the -- the new voter
24  registrar, that was one of the issues that she ran
25  on, the tax assessor collector, was the fact that

## 87

1  our voter registrar at the time was not doing her
2  job and that we had numbers -- numbers of people
3  that were registered that should have been purged
4  from the registration.
5          I can give you another example.  Goliad
6  County census in 2000 -- I think it was this most
7  recent census -- census.  We had a census that
8  showed Goliad County should have X number of people
9  that were eligible -- eligible to vote.  But, in
10  fact, they had more people registered to vote than
11  eligible to vote.
12         Jim Wells County in my district, we have
13  almost a 90 percent -- over 90 percent registration,
14  which is beyond the State average.  McMullen County,
15  99 percent registration.  I mean, you have example
16  after example, at least in my district --
17     Q   Uh-huh.
18     A   -- of registration beyond the State
19  average.  And Goliad -- Goliad County, for example,
20  is probably the best because they are over
21  registration if you use the census figures.
22     Q   And I -- we can talk about some of those
23  things later --
24     A   Uh-huh.
25     Q   -- but just to sort of stay on what I was

## 88

1  going to ask about now, with regard to I.D. on voter
2  registration lists who are dead, can't the voter
3  registrar check against the Social Security death
4  master file and see who's dead and take them off?
5          MR. MCKENZIE:  I'm going to make an
6  objection on foundation grounds --
7      Q   (By Mr. Freeman) To the extent of your
8  knowledge.  Yeah, of course.
9      A   I honestly can't answer that.
10     Q   And you had said before some voter
11  registrars hadn't been doing their jobs --
12     A   Uh-huh.
13     Q   -- and you cited your own.
14         Are there ever times when the voter
15  registrars aren't doing their jobs with regard to
16  the current voter I.D. law in Texas with regard to
17  showing your I.D. or your voter I.D. certificate?
18         MR. MCKENZIE:  Same objection.
19     Q   (By Mr. Freeman) To the extent of your
20  knowledge?
21     A   I can only go by example of when I voted.
22  I either had to show my voter registration --
23     Q   Uh-huh.
24     A   -- or show my identification to vote --
25     Q   Okay.

Jose Aliseda                                      June 6, 2012

---

89

1    A   -- picture -- picture identification to
2    vote.
3          I thought they would accept -- and I may
4    be wrong -- that they would accept a light bill or
5    something else in your name with the same address
6    and allow you to vote.  I don't think it required
7    necessarily a photo I.D. to vote.  But my registrar
8    has been pretty good about it.
9    Q   So in your experience, they always ask?
10   A   In my county they have.
11   Q   Uh-huh.  All right.
12   A   I haven't voted --
13   Q   Yeah.
14   A   -- anywhere else --
15   Q   Okay.
16   A   -- so it's hard to say.
17   Q   Glad to hear it, especially with those
18   double registrations.
19          Okay.  Now, we may have some disagreement
20   with the scope -- the number of people --
21   A   Uh-huh.
22   Q   -- who are -- who may lack I.D. --
23   A   Uh-huh.
24   Q   -- or can't be matched up against the
25   driver's license database.

---

90

1          Do you have any understanding or belief,
2    based on your personal experience living in Texas
3    and as a legislator, as to who will make up the
4    group of people who may lack I.D.?
5    A   I just can't imagine in 2012 that people
6    could function in this society without
7    identification.  There is -- I can't think of
8    anything you can do that doesn't require a voter --
9    I mean, with -- that doesn't require identification.
10   Anything even semi-important --
11   Q   Can I ask --
12   A   -- like renting a movie, checking into a
13   hotel -- you know, I -- I once sat down and did a
14   list of all the things that I've been asked for an
15   I.D., opening a bank account, cashing a check,
16   buying liquor if you look under age, buying
17   cigarettes if you look under age.  You'd have to
18   live off the grid to not need an I.D.
19          The type of person that -- the people that
20   we're saying we were going to disenfranchise, I
21   would think they would be the most likely to have an
22   I.D., because they depend heavily on government.  So
23   they would need an I.D. to get the government
24   services that -- that you would expect they --
25   they'd want.

---

91

1    Q   Can I ask you --
2    A   The only person I can think of that
3    wouldn't have an I.D. is the Unibomber.
4    Q   Do you need to show an I.D. of any kind or
5    to show the I.D.s that are required by SB 14?
6    A   Well, for example, to go to the Attorney
7    General's office yesterday to talk to him about this
8    deposition, I had to give him my driver's license
9    and they had to swipe it.  And I don't know what
10   they were doing with it, but ultimately they printed
11   out a name I.D. -- I mean, a name tag for me to come
12   into this office.
13          I almost got wanded downstairs.  I mean,
14   we weren't -- this was -- I really was expecting to
15   get -- I had to show an I.D.  They were asking me
16   for an I.D., and they were going to run me that
17   through a metal detector.
18          To get on an airplane, normally it
19   requires a -- a government-issued identification
20   card.
21   Q   Now, does SB 14 allow you to use any
22   government-issued identification card to vote?
23   A   It requires a state government-issued I.D.
24   card or a federal government-issued I.D. card or --
25   or a other document that might have a picture that's

---

92

1    issued by the government like a passport or a
2    naturalization certificate.
3    Q   Does it allow state or federal employee
4    I.D. cards?
5    A   I don't believe it does.
6    Q   Is there a fundamental constitutional
7    right to rent a gun?
8    A   No.  I wouldn't say that there is a
9    fundamental constitutional right.
10          There is a fundamental constitutional
11   right to keep and bear arms, and I still have to
12   jump through a bunch of hoops to get a gun.
13          There's a constitutional right to -- to
14   assemble and protest, but I still have to get a
15   permit to do that.  So there are a number of
16   constitutional rights that require you to jump
17   through certain hoops in order to exercise them.
18   Q   But I'm asking about renting movies,
19   because you were giving that as an example --
20   A   Okay.
21   Q   -- as something that requires an I.D.
22   Is there a fundamental constitutional right to rent
23   a movie?
24   A   No.
25   Q   And can't you just rent a movie if you

93

1   have a Blockbuster card; you don't need a
2   state-issued I.D.?
3       A   In order to get that Blockbuster card, I'd
4   have to show them a state-issued I.D.
5       Q   Are you sure about that?
6       A   Yes.  Registered for Blockbuster --
7   they're not in -- they are bankrupt now.  But when I
8   registered for them, I had to give them a photo
9   I.D., because they want to make sure you're the
10  person that's going to have this card and you're
11  going to use it responsibly and that they're not
12  going to be out a movie.
13      Q   Let's go to Redbox, then.
14      A   Okay.
15      Q   Do you need to show an I.D. to use a
16  Redbox?
17      A   I don't know.  I don't have a Redbox card.
18      Q   Okay.  You have mentioned you needed I.D.
19  to travel on an airplane.
20      A   Uh-huh.
21      Q   Do you need one of the I.D.s that's listed
22  on SB 14 to travel on an airplane?
23      A   I've always showed my driver's license.
24  And I've let my passport expire; I could have used a
25  passport.  I probably could have used my

94

1   naturalization certificate.  But I believe they
2   require you to get through ICE or whatever you want
3   to call it, Homeland Security, that it be some kind
4   of state-issued or federal-issued I.D. card.  I
5   could use my military I.D.  I don't remember if we
6   in SB 14 allowed military I.D.s or not.
7       Q   Would it surprise you if I were to
8   represent to you that I used an employee I.D. to get
9   on my plane yesterday?
10      A   A federal employee I.D.?
11      Q   Yes.
12      A   That would not surprise me, because I
13  think you could use a military I.D., and that's a
14  federal employee -- that's somewhat of a federal
15  employee.
16      Q   But I couldn't use a federal employee I.D.
17  to vote in Texas, could I?
18      A   I would find that a little bit
19  problematic, because you're not a -- you're not a
20  citizen of the state of Texas.
21      Q   You couldn't use a federal employee -- if
22  you were an employee of the federal government --
23  for employees of federal government who live in Bee
24  County --
25      A   Okay.

95

1       Q   -- they couldn't use their federal
2   employee I.D.s to vote in Bee County if SB 14 were
3   implemented.  Is that correct?
4       A   I think you're probably right there.  I'd
5   have to pull out the law and look at all the
6   different forms.  I know we had three or four or
7   five possible forms.  And there was some
8   discussion -- well, I won't say.  I won't go any
9   further.
10      Q   And the last time you cashed a check, was
11  that -- was that at a bank or using an ATM?
12      A   That was at a bank.
13      Q   Okay.  Have you ever cashed a check at an
14  ATM?
15      A   No.  I don't think it's possible to cash a
16  check.  I could use my debit card.
17      Q   Uh-huh.
18      A   But to run a check through the ATM, I
19  don't think that they do that.
20          If I were to take my paycheck and take it
21  to a paycheck cashing place, I would have to give
22  them my driver's license.
23          But if I were to represent to you that
24  many ATMs around the city of Austin, including the
25  Bank of America that's right across the street,

96

1   allow you to deposit checks, mainly by signing a
2   check and slipping it into the ATM without showing
3   any I.D., would that surprise you?
4       A   Deposited.  But cash is a different
5   matter, where they actually give you cash --
6       Q   You can subsequently withdraw cash?
7       A   Yeah, but you have to use your ATM card.
8       Q   But you can't use your ATM card to vote in
9   Texas, can you?
10      A   No.  It doesn't have a picture.  It
11  doesn't prove who you are.  You would have -- you
12  would be able to use it if you had your PIN.
13      Q   My question is, is it possible to cash a
14  check without any of the I.D.s that's required under
15  SB 14?
16      A   It would be possible, but you would need
17  to have a number of other things in order to do it.
18      Q   Okay.  Okay.  And, lastly, to open a bank
19  account, you mentioned that before, what's your
20  basis for believing that you need a -- one of the
21  photo I.D.s that would allow you to vote under SB 14
22  to open a bank account?
23      A   If I opened a bank account, they want my
24  driver's license and they want my Social Security
25  number.

Jose Aliseda                                             June 6, 2012

## 97

1      Q   Is it possible to open a numbered account
2  that is not related to your name that doesn't
3  require an I.D.?
4      A   I'm trying to understand what kind of an
5  account that would be.
6      Q   Well, the equivalent of a Swiss bank
7  account but in the United States where it's based on
8  a number and not a name.
9      A   I would find that a little difficult,
10  because, you know, they have to report to the
11  government about X number of funds in the -- that
12  they paid interest to them.  And I don't know how
13  they would get a 1099.
14      I don't know.  I mean, I'm not a banker.
15  But I'm telling you from my experience, every time
16  I've opened a bank account, show me your driver's
17  license and give me your Social Security number, and
18  that's what I've done.
19      Q   And I don't want to go through too many of
20  these, but you rattled off a bunch.
21      With regard to checking into a hotel, did
22  you show an I.D. last night when you checked in?
23      A   Yes, I did.
24      Q   Would it surprise you if I told you that
25  the Sheraton down the street did not ask me for an

## 98

1  I.D., just a credit card?
2      A   Well, they probably asked me -- well,
3  yeah, that would surprise me, because they do --
4  even when I'm not paying State rate, they've
5  always asked me for identification, because they
6  want to make sure I'm the guy that is checking in.
7  And I could see a number of problems if they don't
8  ask for identification.  It's kind of a security
9  issue at that point.  I mean, we don't know if
10  Jeffery Dahmer is checking in using somebody's
11  credit card.  I think they do it to make sure, okay,
12  this guy has a credit card; is this him and we're
13  letting him stay in our hotel?  I think it would be
14  a liability issue if they didn't, but --
15      Q   Hotels don't run background checks on
16  everyone that stays in their hotel, do they?
17      A   No, they don't.  But they -- it's like a
18  very basic security.  Okay?  You're paying with a
19  credit card, and they want to make sure you're the
20  person that is, in fact, registered to stay there.
21  If something were to happen and there were to be a
22  fire and you were to be burned up, could they
23  honestly say that was you if you didn't check in
24  with an I.D.?
25      Q   I'm just asking basically for your basis

## 99

1  for your belief that every hotel transaction
2  requires a --
3      A   I've -- I've stayed at some real seedy
4  hotels, and I've had to show driver's license.  And
5  that was before I was a State employee.
6      Q   Well, I don't want to defame the Sheraton
7  in the context of your sworn -- of your deposition.
8  Okay.
9          MR. McKENZIE:  It's a privilege.
10  Right?
11          MR. FREEMAN:  If I could have this
12  marked as 49 -- U.S. 493.
13          (Deposition Exhibit No. 493 marked)
14          MR. McKENZIE:  Do you have a copy?
15          THE REPORTER:  He's getting the
16  original.
17          MR. McKENZIE:  You can take a look at
18  that when you get it.
19          THE REPORTER:  There you go.
20          THE WITNESS:  Okay.
21      Q   (By Mr. Freeman)  Do you recognize this
22  document?
23      A   It looks like some record of my activity
24  on Twitter.  I'm not a big Twitter guy, but I did do
25  a little.

## 100

1      Q   Is JoseAliseda1 your Twitter handle?
2      A   That is me.
3      Q   And on April 4th --
4      A   Uh-huh.
5      Q   -- did you re-tweet a post from
6  Latinosreadytovote.com?
7      A   I sure did.
8      Q   Why did you re-tweet that document?
9      A   I --
10          MR. McKENZIE:  Again, I'm going to
11  instruct you not to answer to the extent it reflects
12  your motives as to SB 14.  To the extent it doesn't
13  reflect those motives, you may answer the question.
14      A   I read the article and thought it was a
15  good article.
16          MR. FREEMAN:  If we could have this
17  marked as U.S. 494.
18          (Deposition Exhibit No. 494 marked)
19          THE REPORTER:  There you go, sir.
20      Q   (By Mr. Freeman)  Do you recognize this
21  document?
22      A   This looks like it's the article.
23      Q   Okay.  Is this the article that you
24  re-tweeted?
25      A   Yes.

## 101

1    Q   Take a look at Page 3, the bottom of Page
2  3, the last paragraph where it's beginning,
3  "Furthermore."
4    A   Uh-huh.
5    Q   Do you agree with the statement that --
6  that "A study of Latino access to voter I.D.
7  conducted by calling Indiana residents is not as
8  likely to be accurate as measuring actual turnout in
9  actual voter records"?
10        MR. MCKENZIE:  I'm sorry.  I'm going
11  to object as to foundation, but you may answer.
12    A   I -- rephrase the question.  I don't
13  understand.
14    Q   (By Mr. Freeman)  Sure, sure.
15        Do you see on Page 3 at the bottom where
16  it says that the -- only at that statistical
17  analysis with regard to Latinos comes from a phone
18  poll?  The word "statistical" is in quotes.
19    A   Yes, I see that.
20    Q   Do you agree with that statement?
21        MR. MCKENZIE:  Again, I'm going to
22  object as to foundation, but you may answer the
23  question.
24    A   I -- I honestly don't know if that's the
25  only statistical analysis.

## 102

1    Q   (By Mr. Freeman)  Well, do you agree with
2  the statement that the study conducted by calling
3  500 residents in Indiana, not actual turnout in
4  Indiana, is less useful than a measure of the actual
5  effect of the bill?
6        MR. MCKENZIE:  And it's the same
7  objection.
8    A   I -- I really don't understand what you're
9  asking me.  But -- I don't understand what you're
10  asking me.
11    Q   (By Mr. Freeman)  Okay.
12    A   I'm sorry.
13    Q   That's fine.
14    Do you -- do you agree with the notion
15  behind this - and this will be the last try - that a
16  phone poll asking people about their access to I.D.s
17  is less likely to be accurate than government
18  records concerning I.D.s?
19        MR. MCKENZIE:  I'm going to object
20  again as to the foundation.
21        THE WITNESS:  Uh-huh, uh-huh.
22        MR. MCKENZIE:  And also to the extent
23  you're trying to characterize the sentence, I'll
24  object to the characterization.  But you may answer
25  the question.

## 103

1    A   I tried to give you an example earlier of
2  a situation that I was intimately familiar with --
3    Q   (By Mr. Freeman)  Uh-huh.
4    A   -- where I'm aware of at least one
5  individual who has a driver's license and has two
6  voter registrations.  I'm aware of registered aliens
7  that have voter registrations when they shouldn't
8  have voter registrations in Bee County itself.
9  So do I think a poll of 500 people done over the
10  telephone is necessarily accurate?  The answer is
11  no.
12        Do I think that government -- matching
13  government records to each other as has been
14  attempted in what I've read after the passage of
15  SB 14 to be an accurate representation of what the
16  reality is?  The answer is no.
17    Q   Okay.  Now, you just mentioned that there
18  are -- you're aware of aliens who are registered to
19  vote --
20    A   Uh-huh.
21    Q   -- in Bee County.
22    A   Uh-huh.
23    Q   I assume you mean noncitizens?
24    A   Yes.
25    Q   What is your foundation for that?  What is

## 104

1  the basis for your belief?
2    A   They've come to me to ask me advice.
3    Q   Okay.  So you have an attorney/client
4  privilege with those I.D.
5    A   An attorney/client's privilege.  But I'm
6  aware of at least three.
7    Q   Okay.  Do those I.D. have driver's
8  licenses --
9    A   Yes.
10    Q   -- to the extent you're able to --
11    A   Yes.
12    Q   Okay.  So they wouldn't be in the no match
13  list, would they?
14    A   No, they wouldn't.
15    Q   Okay.  Are you aware that the State of
16  Texas in the context of this litigation, not -- not
17  prior to the passage of SB 14, has stated that there
18  are 795,955 registered voters whose records couldn't
19  be matched to driver's license records?  Have you
20  heard that figure?
21    A   I've heard a figure similar to that, yes.
22    Q   Okay.
23    A   But I tried to explain why that might be.
24    Q   Okay.  Are you familiar with the term
25  Spanish surname voter registration?

Jose Aliseda                                                    June 6, 2012

---

## 105

1    A    Yes.
2    Q    Can you tell me my understanding of that
3 term?
4    A    It is someone that has a name that's
5 considered Spanish and they're registered to vote.
6    Q    Is that a proxy, but not 100 accurate
7 [sic] proxy, of whether or not a voter is actually
8 Hispanic?
9    A    No.
10    Q    It's not a proxy at all?
11    A    No, it's not.  I can give you an example
12 in my own family.  Both my sons are Hispanics.
13    Q    Uh-huh.
14    A    They're registered -- I mean, they're
15 married to two Anglo women.
16    Q    Sure.
17    A    -- whose wife -- who carry their last
18 names.
19    Q    Uh-huh.
20    A    Their children carry their last names.
21    Q    Uh-huh.
22    A    So there is Hispanics -- the Hispanics in
23 Texas, there's a lot of interethnic marriage.
24    Q    So you don't think it's a proxy at all --
25    A    No.

---

## 106

1    Q    -- whether it's 100 percent accurate,
2 90 percent accurate?
3    A    No.  In my family alone -- I mean, I have
4 three children.
5    Q    Uh-huh.
6    A    Of those three, two are married to Anglos,
7 which would mean their wives are turning up with a
8 Spanish surname.  That's just my personal example.
9 But I could tell you about their friends.
10    I think it's pretty common, at least in my
11 area of South Texas, that there's a lot of
12 intermarriage between Hispanics and Anglos, and they
13 each carry each other's last name.  So I would not
14 agree that that's a good figure.
15    Q    Do you know if the Census Bureau has
16 actually done studies on the accuracy of its Spanish
17 surname lists to determine whether someone is a
18 self-identified Hispanic?
19    A    They probably have.
20    Do I know?  No.
21    Q    Okay.  That's all I'm asking for, yeah.
22 Otherwise, your attorney will get very upset with
23 me.  No one wants that.
24    Okay.  Are you aware of whether the State
25 has produced county-by-county totals of registered

---

## 107

1 voters without -- for whom they could not match to
2 a -- a valid driver's license?
3    A    Give me a second, because I just thought
4 of another thing.
5    What is strange - and this goes back to a
6 Spanish surname, as I probably wouldn't show up as
7 Spanish surname.  Aliseda isn't necessarily a very
8 common Spanish name.  It's a little common in Spain,
9 but it wouldn't necessarily -- somebody might even
10 think that's an Arabic name, because I've been told
11 that.  But that's just an observation on the Spanish
12 surname issue.
13    Getting back to your question, ask me
14 again, please.
15    Q    Sure.
16    Are you aware of whether the State has
17 produced county-by-county totals of registered
18 voters for whom it could not match the registration
19 to a valid driver's license or State I.D. card?
20    MR. MCKENZIE:  And this is all post
21 enactment of SB 14?
22    MR. FREEMAN:  Yes.  I don't think you
23 produced it.
24    A    I'm not aware of it --
25    Q    (By Mr. Freeman)  Okay.

---

## 108

1    A    -- to be honest with you.
2    Q    So you haven't looked at those totals,
3 have you?
4    A    No.
5    Q    Would it concern you if over 30 percent of
6 those Spanish surname registered voters in your
7 district could not be matched to a Texas driver's
8 license or State I.D.?
9    MR. MCKENZIE:  If you may have
10 acquired that knowledge prior to the enactment of SB
11 14, I would instruct you not to answer.  Otherwise,
12 you may answer the question.
13    A    If the question is after the passage of SB
14 14, would it concern me that we have 30 percent of
15 Hispanic registered voters that do not have a
16 driver's license, I could find it concerning both
17 ways.
18    One way I could find it concerning is that
19 we might have people that are registered to vote
20 that shouldn't be voting, or another way I could
21 find it concerning is that -- is that if that's
22 true, we might have a situation where we have people
23 that should be allowed to vote, but they should also
24 go get an I.D. so they can vote and prove who they
25 are.

## 109

1    MR. FREEMAN:  If we can mark these as
2  U.S. 495.
3    (Deposition Exhibit No. 495 marked)
4  Q    (By Mr. Freeman)  I will represent to you
5  that this is all data produced by the State, but
6  I've done two things to it.  I've cut out the
7  counties that aren't in your district --
8    THE REPORTER:  Have you --
9    MR. FREEMAN:  I'll stop in a second.
10    THE REPORTER:  Okay.
11  Q    (By Mr. Freeman)  -- and I've added the
12  Hispanic voters without TDL/I.D., which is simply a
13  percentage of totals with Spanish surnames as the
14  denominator and voters with Hispanics only lacking
15  I.D., which is at the top right --
16    MR. MCKENZIE:  Just so we can be
17  clear for the record --
18    MR. FREEMAN:  Sure, yes.
19    MR. MCKENZIE:  -- the source of the
20  data, is that the information provided to you by the
21  Secretary of State's office as part of the
22  administrative re-clearance office?
23    MR. FREEMAN:  Yes.
24    MR. MCKENZIE:  Okay.
25  Q    (By Mr. Freeman)  There you are.  Sorry.

## 110

1  Your copy has to come from the court reporter just
2  in case you mark something on it, because it goes in
3  the record of the deposition.
4  A    Tell me what I am looking at here.
5  Q    This is all data produced from the State.
6  Without TDL/I.D. column, it is -- that top row is
7  the number of voters who could not be matched to a
8  Texas driver's license or Texas non-driver I.D.
9  Total voters with Spanish surnames is the
10  total number of -- your SSVR, which we discussed
11  earlier.  And that last column is just dividing the
12  Hispanics only without TDL/I.D. divided by total
13  SSVR.
14    And just for the record, could you tell me
15  what percentage of Spanish surname registered voters
16  in Atascosa County --
17  A    Atascosa.
18  Q    Atascosa?
19  A    Atascosa.
20  Q    Atascosa.  I'm working on my accent.  My
21  accent is improving very slowly, because I've been
22  too busy on this case to study.
23    But could you tell me what percentage,
24  according to the State's record, of the SSVR could
25  not be matched because of Texas driver's license or

## 111

1  I.D.?
2  A    If this figure is correct, according to
3  this, it's 24.11 percent, I think it's saying.
4  Q    And how about Bee County?
5  A    Bee County, 21.62.
6  Q    And how about Goliad County?
7  A    46.66.
8  Q    Jim Wells?
9  A    That's funny, because Goliad County
10  happens to be the one that has over 100 percent
11  registration.  Jim Wells 35.39.
12  Q    Karnes?
13  A    Jim Wells has over 90 percent
14  registration.  Karnes, 35.11.
15  Q    Live Oak?
16  A    30.93.
17  Q    McMullen?
18  A    55.50.  That is -- that is crazy.  That --
19  that -- that just can't be, what I know about
20  McMullen County.  Something -- there's something --
21  these things are not correlated in any way.  I can't
22  explain how this could be in any way.  There is not
23  35.39 percent of people in Bee County that don't
24  have a driver's license and they're Hispanic.  There
25  is just not.  And certainly not in -- in McMullen

## 112

1  County, because there's not that many people in
2  McMullen County.  It's showing 709 people in
3  McMullen County.
4  Q    That's 709 Spanish surnames.
5  A    Okay.  I don't think that's correct,
6  because I don't think --
7  Q    Oh, excuse me.  709 total registered
8  voters --
9    MR. MCKENZIE:  Yeah, yeah, yeah.
10  A    209 Spanish surname --
11  Q    (By Mr. Freeman)  Uh-huh.
12  A    -- that there's -- there's something wrong
13  here.  I -- I can't explain.  There is absolutely no
14  Hispanics I know that does not have a driver's
15  license.
16  Q    Okay.
17  A    And I can say I -- you know, I've -- when
18  I've -- I've been campaigning my -- my -- almost my
19  whole life since I got out of the Navy.  And I touch
20  a lot of hands and talk to a lot of people.
21    Something is not -- this is -- how can I
22  explain it?  I mean, it's just -- it just can't be.
23  Q    Okay.
24  A    This Congressional candidate I was telling
25  you about, she was born in Mexico, is a Hispanic,

Jose Aliseda                                                June 6, 2012

## 113

1  but she has an Anglo name.  She wouldn't show up as
2  Spanish surname.
3     Q   Didn't you say her name is a De La Garza?
4     A   No, that's the one I helped.
5     Q   Okay.
6     A   Her opponent.
7     Q   Her opponent.
8     A   Her opponent was Jessica Roberts, but she
9  used her political name, Jessica Puenta Bradshaw.
10 And I found it interesting that she could be
11 registered to vote in Austin and in the Valley, and
12 her husband could be registered to vote in Austin
13 and in the Valley.  That's two people I know that
14 have voter registrations in two different places.
15    Q   But if she moved, it's not -- strike that.
16 It's not relevant.
17            Does SB 14 require employers to provide
18 paid leave so that their employees can go obtain an
19 I.D.?
20    A   No.
21    Q   Do you think that some of your
22 constituents need all the wages that they make?
23    A   I think everybody needs all the wages that
24 they make.  Everybody wants to be paid for their
25 work.  If -- if you're trying to say that Hispanics

## 114

1  are some helpless class out there, I find it kind of
2  insulting, because they're not.
3            You know, the accounts that I've read that
4  somehow we are some minority group out there that
5  needs to be patronized and taken care of and coddled
6  is insulting to me.  And, you know, I -- I believe
7  that as a people, we are self-reliant.
8     Q   My question was only whether having to
9  take a few hours off from work to drive 30 miles
10 each way, wait in line and lose a few hours of
11 wages, would that burden an individual?
12            And I'm not asking whether that burden
13 should be balanced against something, but would that
14 be a burden?
15    A   Okay.  Let's talk about driving.
16            In Bee County we have a community action
17 agency that if for some reason you cannot -- if you
18 don't have a vehicle and you need to go for a
19 doctor's appointment in Victoria, Texas, 56 miles
20 away, you call them up, you make an appointment,
21 they'll come pick you up for $1.  You just need to
22 take the time to get in the -- in the -- in the bus,
23 and they'll take you there and they'll wait for you
24 and bring you back for $1.
25            So as far as financial burden, for a DPS

## 115

1  office to be at a distance, I don't think that's a
2  big financial burden.
3     Q   My question was the amount of time you
4  have to skip from work --
5     A   Okay.
6     Q   -- if the DPS office is only open during
7  the workday?
8     A   I will tell you this, if they're working,
9  they probably had to produce an I.D. in order to
10 work.  They would have had to produce a state I.D.
11 to work.  They would have needed to provide a Social
12 Security number and a -- some kind of driver's
13 license to work so they would have it.  So I don't
14 think that's a good example.
15            MR. FREEMAN:  I'll object to that as
16 nonresponsive.
17    Q   (By Mr. Freeman)  And ask the simple
18 question of whether having to take three hours to
19 drive during working hours to a driver's license
20 office, wait in line for however amount of time it
21 takes and drive back, would be a burden?
22            MR. McKENZIE:  To the extent you
23 considered this a burden in your deliberations on
24 working on SB 14, I instruct you not to answer.
25 Otherwise, you may answer the question.

## 116

1     A   Okay.  To vote is a burden and --
2            MR. FREEMAN:  I'm going to object
3  again.
4     A   -- a lot people don't.
5            Yes, I could see where someone could find
6  doing anything a burden that gets them out of the
7  house.
8     Q   (By Mr. Freeman)  Okay.  But I'm talking
9  about missing -- missing work.
10    A   Okay.
11    Q   Is that a burden?
12    A   I'm not ready to accept your premise that
13 they -- if they're working, that they don't have a
14 license.  I can't accept that premise.
15    Q   What if the license expired after they got
16 the job, somebody who's been on the same job for ten
17 years?
18    A   How do they get to work?
19    Q   I don't have a car.
20    A   I mean, I'll just...
21    Q   What if they get a ride from their wife?
22    A   Okay.  If that's the hypothetical, a
23 hypothetical person that's working that has to drive
24 30 miles somewhere to get a driver's license and
25 then come back and miss work in the meantime is --

## 117

1  as a burden, yes, I could say that's a burden.  But
2  they're going to have that same problem when they
3  vote, because they're going to -- with the exception
4  of the last two hours of a voting day, that would be
5  about the only opportunity they could vote without
6  taking time off, unless they work for a cushy
7  federal job or state job which gives you time to go
8  vote, and in which case they would have a driver's
9  license.
10      Q   But isn't it likely that the voting
11  precinct would be much closer to their home than the
12  driver's license office?
13          MR. MCKENZIE:  I would object as to
14  speculation, but you may answer the question.
15      A   Texas is probably -- well, it is the
16  second largest state in the union.  Everything in
17  Texas is far away.  So, yeah, I could understand
18  that in some cases, a precinct location, voting
19  location, may be closer than the driver's license
20  office.
21      Q   (By Mr. Freeman)  Well, there are a lot
22  more precincts than the driver's license offices.
23  Right?
24      A   Yes, yes.
25      Q   Okay.  Do you think that an expected $22

## 118

1  expense is a burden on a voter, if they had to pay
2  $22 more in the process of voting than they
3  obviously were going to have to?
4          THE WITNESS:  Are you going to make
5  an objection or what?
6          MR. MCKENZIE:  Yeah, I'm going to
7  object there's no foundation.  There is no $22 fee
8  to vote, but you may answer.
9      A   Okay.  If you're referring to a birth
10  certificate -- to get a birth certificate in order
11  to get a driver's license or a voter I.D. card, I
12  think that that person that goes and pays that $22
13  and gets that particular document is much better off
14  having gotten it, because they can do so much more
15  with it than just vote.
16      Q   (By Mr. Freeman)  But the actual $22
17  expense is itself a burden.  Correct?
18          MR. MCKENZIE:  I mean, again, I would
19  object to the extent there's no fee to vote, so
20  there's no foundation.  But you may answer.
21      A   How are they getting to the polling place?
22  What's that costing them?
23      Q   (By Mr. Freeman)  But that's a preexisting
24  expense under current law, isn't it?
25      A   Uh-huh.  Yeah.

## 119

1      Okay.  Somebody is spending $22 to get a
2  birth certificate so that they can get a driver's
3  license or a voter I.D., which we provide for free,
4  by the way.  If they can't afford the voter I.D.,
5  that's part of the bill.  I could see paying $22.
6  Anything that cost something has a worth.
7      Q   But you just said the voter identification
8  is free.  But if it takes three hours during a
9  workday to vote, is it really free?
10          MR. MCKENZIE:  Objection; vague, but
11  you may answer.
12      A   Three hours during a workday and this
13  mythical or hypothetical person has no other I.D.
14  that qualifies under the -- I -- I just don't -- I
15  can't imagine anybody that exists like that, to be
16  honest with you, that has actually got a job that
17  doesn't have an I.D. of the type we're talking about
18  and then has to go get one three hours away and
19  can't afford to pay $22 for a birth certificate.
20      I mean, there's just so many ifs in there,
21  that it strains my imagination to think of such a
22  person, because I, frankly, don't know anybody like
23  that.
24      Q   (By Mr. Freeman)  I'll restate my
25  question.

## 120

1      If it takes three hours to get an I.D. --
2      A   Uh-huh, uh-huh.
3      Q   -- round trip during a workday, is the
4  I.D. really free?
5          MR. MCKENZIE:  Same objection as to
6  vagueness, but you may answer.
7      A   To actually get the I.D. where they have
8  to pay the State for it, it is free.  They are not
9  paying the State by doing all these other things
10  that they have to do.
11      Q   (By Mr. Freeman)  But it cost them money,
12  doesn't it?
13      A   Yes, it costs them money.  Yes.
14      Q   Okay.  And if it costs 20 bucks, as we
15  were discussing before, for gas to get to the
16  driver's license office and back, it's going to
17  cost -- they'll be out 20 bucks in order to get the
18  I.D.  Right?
19      A   I was trying to explain to you it doesn't
20  necessarily cost them 20 bucks.  They can ride a
21  BCA.  In fact, I think they'll waive that dollar
22  fee.  If you're truly indigent and have to get
23  somewhere, they'll waive it.  And that's a
24  government-provided service that we did for our
25  citizens and that I believe every rural community

## 121

1   has, is some kind of a rural transportation system
2   funded through COG, Council of Governments.  And I
3   believe that's federal money passed back through the
4   Council of Governments.
5        Q    And if we could turn back to Exhibit 494,
6   the "Latinos Ready To Vote" article by Alex
7   Gonzales.
8        Do you see on Page 4, second-to-last
9   paragraph where the article asks whether we should
10  entrust citizens with democracy if they can't spend
11  an hour to get an I.D.?
12       Do you agree with that statement?
13            MR. MCKENZIE:  Where is this?
14            MR. FREEMAN:  It's in the
15  second-to-last paragraph beginning, "And if citizens
16  cannot spend."
17            MR. MCKENZIE:  Okay.
18       A   No, I probably wouldn't agree with -- with
19  that statement.
20       Q   (By Mr. Freeman)  And do you see the --
21  a -- the next statement where -- the next sentence
22  where it says that -- that Democrats should stop
23  cuddling [sic] Latino adults who presume it is the
24  Government's responsibility to bus in unregistered
25  voters to the nearest DPS to get an I.D.?

## 122

1            MR. MCKENZIE:  Again, I'm going to
2   object to the extent public opinion is to that
3   effect or that consideration on that topic informed
4   your vote on SB 14 or acquired in deliberations.  I
5   would instruct you not to answer.  To the extent
6   we're talking about post enactment, what his
7   opinions are, you may answer the question.
8        A   Okay.  Let me read this statement.
9        (Discussion off the record)
10       A   Okay.  Looking at that -- at that
11  statement, one, I would say, that the proper word is
12  "coddling" rather than "cuddling."  But I would -- I
13  do agree that -- and this kind of brings me back to
14  the very first question you asked me, did I make
15  this statement in -- in this interview about not
16  being happy about how things were said and what was
17  said on the mic somehow becoming the truth.
18       You have a -- you have a political party -
19  and it happens on both sides - that tries to
20  victimize people, make them feel like victims, and
21  then try to exploit that feeling in order to stay in
22  power.  So I think that's all that statement is
23  trying to say, is that -- is this propensity by the
24  political parties to - and it happens on both sides.
25  I mean, Republicans do it on different groups, as

## 123

1   well - to say that we're -- that there's victims out
2   there and that we're trying to take care of them in
3   order to stay in power is a common political tactic.
4        Q   (By Mr. Freeman)  And just to clarify, by
5   "this statement," you meant your statement in the
6   Texas Tribune article --
7        A   Yes.  Yes, uh-huh.
8        Q   -- marked as Exhibit 490?
9        A   Yes.
10       Q   Just wanted to make sure.
11       Okay.  So you were, as we discussed
12  earlier, first selected to the House in 2010.
13  Correct?
14       A   Yes.
15       Q   Did you have a primary opponent?
16       A   No.
17       Q   But you had a general opponent.  Correct?
18       A   Yes.  Uh-huh.
19       Q   What issues did you campaign on?
20       A   Voter I.D.
21       Q   Any other issues?
22       A   Voter fraud.
23       Q   Any other issues?
24       A   Life, pro-life, fiscal responsibility.
25  Those were probably my big four -- oh, and

## 124

1   redistricting.  That would be the other issue that I
2   campaigned on.
3        Q   Did you print any campaign material?
4        A   Yes.
5        Q   Did you print any campaign materials in
6   Spanish?
7        A   Print -- print any?  I don't think I did,
8   but I did often speak in Spanish.
9        Q   At events, on the radio, in what?
10       A   At events.
11       Q   Okay.
12       A   And when I would talk to constituents.
13       Q   Okay.  And did you include voter I.D. on
14  your printed materials?
15       A   Yes.
16       Q   Do you still have copies of any of those
17  materials?
18       A   I'm sorry.  And I did look for them,
19  thinking that you might want them, and I don't have
20  them.  But somebody might have saved them.  My
21  opponent -- I mean, she might have them.  My
22  consultant at the time might have them, but I don't
23  have them.
24       You know, I -- let me look on my -- they
25  might be on my website.  Have you looked at my

Jose Aliseda                                                                June 6, 2012

---

125

1   campaign website to see if they're there?  They
2   might be there.  I might have actually put them on
3   there.
4        Q   Okay.  Do you recall stating in an
5   interview with KXAN-TV in Austin that, quote, "The
6   reality is they have Republicans now representing
7   minorities, as well.  That, I think, is what really
8   upset the Democrats"?
9        A   Yes.
10       Q   Do you believe that you were supported by
11   a majority of Hispanic voters on SB what, 4?
12       A   I'd like to think so, but I've been told I
13   wasn't by -- by people that conducted a study.
14       Q   Did you ever look at precinct level
15   returns yourself?
16       A   No.
17            THE REPORTER:  Precinct what returns?
18            MR. FREEMAN:  Precinct level.
19       A   I do think voter I.D. is an issue that
20   Hispanics wanted, because I personally talked to a
21   number of Hispanics, including Hispanic-elected
22   officials, from counties that had been victims of
23   voter fraud; for example, Jim Wells County.  I had
24   several elected Representatives from Jim Wells
25   County tell me they were anxious to see voter I.D.

---

126

1   pass and any other bill I could pass with respect to
2   voter fraud, because they were sick and tired of it.
3        Q   (By Mr. Freeman)  Who were those people?
4        A   The county judge, for one.
5        Q   Who is that?
6        A   Arnulfo Saenz.
7        Q   Could you spell that out for me?  I'm
8   sorry.
9        A   Arnulfo, A-R-N-U-L-F-O, Saenz, S-A-E-N-Z,
10   I believe.
11            Oh, the fellow who represented the Chamber
12   of Commerce was there.  They had a little Jim Wells
13   County Day come here to town.  And I -- I went with
14   them for lunch, and I gave them a tour of the
15   Capitol.  And we discussed things that were going on
16   in -- in the Legislature.  And I asked them about
17   this issue.  There must have been 15, 20, 25
18   community leaders from Jim Wells County, and I would
19   say 90 percent of those were Hispanic.
20       Q   Any other individuals you can remember?
21       A   That I particularly talked to about voter
22   I.D.?
23       Q   Yes, please.
24       A   Oh, Hispanics that would show up at my
25   events, people in my county, Hispanics that are

---

127

1   serving in office in my county.
2        Q   And who are they?
3        A   The county judge, David Silva.  The
4   district clerk, her last name is Silva too,
5   Z-e-n-a-i-d-a, I believe is the way it's spelled,
6   her first name, Silva.  The tax assessor collector,
7   Linda Bridge.
8        Q   And that's in Bee County?
9        A   Yes.
10       Q   Anyone else that you remember from Jim
11   Wells County --
12       A   From Jim --
13       Q   -- other than those people?
14       A   They had a number of officials, but if you
15   look at -- I -- I had some newsletters.  Whenever we
16   had these county days -- and normally we would take
17   a group picture and their names would be on -- on
18   the picture.  So if you look at my particular House
19   website, I think you'll find their names on that
20   website, because they would have listed their names
21   on the picture.
22       Q   Okay.  So I would like to talk to you
23   about your prosecutions concerning election
24   integrity as a county attorney for Bee County.
25       A   Uh-huh, uh-huh.

---

128

1        Q   In 1990, am I correct that you
2   investigated elections in Beeville and Skidmore?
3        A   They would have actually been county
4   elections.  So Skidmore is one of the cities in
5   Beeville.  I wouldn't say I investigated them, but I
6   asked the Texas Rangers to come in and investigate
7   some of these allegations, yes.
8        Q   Was 1990 the first set of election
9   integrity --
10       A   I think so, yes.
11       Q   -- investigations?
12            And in Beeville your investigation
13   concerned absentee ballots and registration in a
14   jurisdiction in which the voter was not domiciled.
15   Right?
16       A   Actually, I remember it had more to do
17   with mail-in ballot fraud.  But that's 20 years --
18       Q   Also absentee ballots, but then also a
19   registration in the wrong area?
20       A   Absentee ballots, that's what used to be
21   the name for mail-in ballots.  Okay?
22       Q   Okay.
23       A   I don't remember if it was people that
24   were voting in our county that were registered to
25   vote but didn't actually live there, although that's

Jose Aliseda                                              June 6, 2012

### 129

1  always been a thorn in the side of a lot of people
2  in the county.  Because I gave you an example of we
3  have a house there that has 18 registered voters and
4  they don't all live there.  It can't physically hold
5  18 people.  But I don't think that was the biggest
6  issue I was looking at.
7       Q   Okay.  But the biggest additional was
8  mail-in ballots.  Right?
9       A   Yes.
10      Q   It wasn't voter appropriation?
11      A   No.
12      Q   And you said that the Texas Rangers were
13  called in to investigate, but they actually
14  concluded there was no wrongdoing.  Isn't that
15  correct?
16      A   That -- that was their original conclusion
17  until I went to the golf course and obtained the
18  golf log and showed it to their supervisor and
19  proved that instead of investigating voter fraud in
20  Bee County, these guys were playing golf with the
21  very person that was suspected of voter fraud.  So
22  they ended up having to come back and -- and do a
23  new investigation and they actually produced some
24  cases for me.  Imagine that.
25      But they came out publicly initially after

### 131

1  or politiqueros --
2       THE WITNESS:  Do you need me to spell
3  that?  P-O-L-I-Q-E-T-E-R-A-S is a politiqueras,
4  which is a female term, and then politiquero would
5  be the same except for an O at the end.  Did I spell
6  it right?
7       (Discussion off the record)
8       A   So what would happen is these vote
9  harvesters would, one, get -- go to these elderly
10 people's homes and say, "You're going to vote this
11 time.  Right?"  And the old person would be happy to
12 even have them come into their home.  So they fill
13 out a mail-in ballot application and send it in.
14 And when that mail-in ballot application arrived at
15 the County Clerk's office, she would promptly get
16 out the ballot.  And these people would literally at
17 that time follow the mailman to the person's home
18 and, quote, "assist them" in voting, which in
19 reality was vote for them in -- in one way or other,
20 either tell them by word, sign, or gesture who to
21 vote for, or complete the ballot form and have them
22 sign it, send it in.  They wouldn't even send it in.
23 They would give it to the politiquero or
24 politiquera.  Then that person would then go on to
25 the next voter and en masse all these ballots.

### 130

1  being in Bee County for about a week or so, saying,
2  "No voter fraud in Bee County."  And I proved that
3  they hadn't been doing their investigation.
4       Q   All right.
5       A   I'm not a push-around or a pushover.
6       Q   Yeah.
7       So that investigation -- four charges came
8  out of that investigation.  Right?
9       A   Yes.
10      Q   Four Class B misdemeanors for unlawful
11 assistance?
12      A   Yeah, and it was hell getting those.
13      Q   But only two people were convicted.
14 Correct?
15      A   Yes.
16      Q   What happened to the other two?
17      A   Witnesses -- you've got to understand
18 what's going on here.  Are you interested?
19      Q   I am interested.  That why I asked.
20      A   Okay.  Let's talk about mail-in ballots.
21 Normally what you have is an elderly person, because
22 most people don't qualify to vote by mail-in.
23      Q   Uh-huh.
24      A   So what happens is these vote harvesters
25 in my area of South Texas, we call them politiqueras

### 132

1  And so what you would have is an election,
2  for example, for commissioner where you'd have 500
3  total votes in an election and 200, 300 of those
4  would be mail-in ballots.  And they were ballots
5  that were required -- acquired through this process
6  of politiqueros and politiquera.
7       Well, these old people weren't the best of
8  witnesses.  One had rarely ever spoke English.  And
9  if they did, they did not want to be involved in the
10 legal system.  So the only way I was able to catch
11 these people was if I had actual witnesses in the
12 home at the time that this vote harvester showed up
13 that were willing to testify, "Yes, I saw that
14 person do that to my parents or do that to my uncle
15 or do that to my grandma."  And to get those kind of
16 people was very difficult.
17      In one of my cases, I actually had
18 somebody testify, "Yeah, I saw them do that to my
19 grandma and give my grandma $5 for that vote."
20 So one of the reasons that these cases were very
21 difficult is, one, you had unwilling witnesses.
22 And -- and memories seem to fade with time.  So it
23 was a very difficult thing to do --
24      Q   Okay.
25      A   -- and I was lucky enough to actually get

Jose Aliseda                                    June 6, 2012

---

133

1   convictions.
2            But what it did -- what it did do is the
3   next election cycle people got worried.  These
4   politiqueros and politiqueras got worried that
5   someone was actually going to do something.  So the
6   mail-in ballot activity on their part was much
7   smaller.
8            And the other thing it did is - and this
9   is probably the most important reason why I did it -
10  is it made the people of Bee County think that
11  somebody was actually watching these elections and
12  gave them more confidence in the system, because for
13  years they had heard about Grand Jury investigations
14  about these shenanigans going on and nobody had ever
15  done anything about it.  And they were happy to see
16  me do something about it.
17       Q   Okay.  The people who were convicted,
18  they -- they only got fines and probation.  Right?
19       A   Yes.
20       Q   But there's --
21       A   It's a Class B misdemeanor.
22       Q   I'm barred in New York, not Texas.
23       A   Yes.
24       Q   Okay.
25       A   I mean, if I could have given them a

---

134

1   felony conviction, I would have, because to me
2   you're messing with something that is the fabric of
3   American society.
4        Q   Now, the -- not everything that the
5   politiqueras were doing was illegal.  Right?
6            They were -- bringing someone a voter
7   registration application or an application for a
8   mail-in ballot.  That's not illegal.  Right?
9        A   No, that's not illegal.  The crime of
10  actually -- the Republican party does it.  What they
11  do is they have a list of people over 65 that intend
12  to vote Republican.  They fill out -- send a
13  filled-out mail-in ballot application to the
14  individual.  And if that individual wants to send it
15  in and vote at home, they can.  All they have to do
16  is sign it and send it to the voter registrar and
17  they get their ballot in the mail the next few days.
18       Q   Okay.
19       A    So that part's not illegal.
20           The part that was illegal was suggesting
21  by word, sign, or gesture who to vote for.  And the
22  other interesting thing that we found out is that if
23  they voted the wrong way, for some reason that
24  ballot would disappear.  And so it's not a -- and
25  the same applied for registration, if they were

---

135

1   registering someone that wasn't of the right
2   political persuasion, that voter registration would
3   disappear.  So they could skew the numbers that way.
4        Q   Okay.  Can I just ask, requiring
5   photographic voter identification at the polls
6   wouldn't have prevented these crimes or aided in the
7   prosecution of them.  Right?
8        A   If -- if -- but if you're asking would
9   voter I.D. stop mail-in ballot fraud, I think it
10  would help.  And the reason I say that is if you
11  think about it logically, if someone actually has a
12  driver's license, you're going to have a record of
13  them.  If someone actually has a voter
14  identification, you're going to have a record of
15  them.  You're going to have a copy of your signature
16  and what it looks like.
17           So how do you show that someone is perhaps
18  not the person that actually voted that mail-in
19  ballot?  You compare their signature to the voter
20  registration -- I mean, to their I.D.
21       Q   Don't you already have a signature on the
22  voter registration file?
23       A   You do, yes.
24       Q   So the -- so then how does having a --
25  I.D. requirement for in-person voting at all relate

---

136

1   to mail-in voter fraud like you were discussing?
2        A   Other than the fact that they would have a
3   photo I.D. or driver's license, then you would have
4   a record of those people of some kind.
5        Q   But if someone lacks a driver's license or
6   the other required I.D., they can still do it by
7   mail --
8        A   Yes, they can.
9        Q   -- if they're eligible.  Correct?
10       A   Yes, they can.
11       Q   Okay.
12       A   But the logical congressional fee,
13  eventually those people will not be there, because
14  they would have voted earlier and gotten I.D.s
15  earlier.
16           In other words, we're talking about a very
17  small class of people voting by mail, and they're 65
18  or older.  Eventually at some point everybody is
19  going to have an identification or a voter I.D.
20       Q   But right now all the people who are 65
21  and older --
22       A   Can vote by mail, yes.
23       Q   Can vote by mail.  And these are the
24  people that the politiqueros are going after --
25       A   Victimizing, yes.

Jose Aliseda                                          June 6, 2012

---

**137**

1   Q   -- with unlawful assistance?
2   A   Yes.
3   Q   And requiring voter I.D. for in-person
4   voting right now will not do anything about unlawful
5   assistance by politiqueros?
6   A   Right now you're correct --
7   Q   Okay.
8   A   -- but eventually I think everybody would
9   have either a state-issued identification card or a
10  driver's license.
11  Q   Okay.  So in 1992 you claimed that an
12  elderly voter had called you and told you that he
13  was told that his receipt of food assistance would
14  be contingent on voting a straight Democratic
15  ticket.  Is that correct?
16  A   Yes.  Uh-huh.
17  Q   Who was that voter?
18  A   1992.  I can't tell you in 1992, but I did
19  get calls like that.  Not just one.  It was more
20  than one.
21      You know, it -- that was a funny time.  I
22  was a Democrat county attorney, and I would have
23  political bosses come to see me to intimidate me to
24  not do anything about this practice.  And -- and not
25  only that, in the end they ended up filing a

---

**138**

1   complaint with the Justice Department saying that I
2   was somehow too -- intimidating voters into not
3   voting.  Nothing ever came of that, but I found --
4   it actually scared me that they had done that, that
5   they were -- that they were that desperate to keep
6   the system alive that they would do something like
7   that and make claims like that.
8   Q   Did you ever open an investigation --
9   A   No.
10  Q   -- into these claims?
11      THE WITNESS:  I'm sorry.  These
12  things got a little wet.  We might have to get a
13  better copy.  Okay.
14  A   Did I do what?
15  Q   (By Mr. Freeman)  Did you ever open an
16  investigation into any of these allegations related
17  to the receipt of food assistance?
18  A   That was the same thing that the Rangers
19  were looking for.  I have -- the County Attorney's
20  office, I was a one-man office with no investigator,
21  one secretary.  And -- and it was a part-time
22  position.
23  Q   Okay.
24  A   I was paid $24,000 a year for that job.
25  And the only way I could get any kind of

---

**139**

1   investigation was either to ask the sheriff's
2   department or the police department to do something;
3   police department only if it was in the city
4   boundaries, sheriff's department I had countywide
5   jurisdiction.  And they were not willing to touch
6   this thing with a ten-foot pole.  So I had to
7   request -- I had to write a request to the Texas
8   Rangers to do this for me.
9   Q   Now, I'm just -- I'm asking if there was
10  separate incidents only because the time -- the
11  timelines on different newspaper articles addressing
12  them were different years.  So -- and I'm trying to
13  sort of get a handle on all the different
14  prosecutions you were involved in --
15  A   Uh-huh.
16  Q   -- and incidents you are involved in --
17  A   Uh-huh.
18  Q   -- so do you know --
19  A   That particular -- that particular
20  complaint, I don't remember if it was an anonymous
21  complaint or I actually had the name of the victim
22  in that case.
23      MR. FREEMAN:  If we can have this
24  marked as, I believe, 495.
25      THE REPORTER:  No, six.

---

**140**

1       MR. FREEMAN:  496.  Thank you.
2       THE REPORTER:  Uh-huh.
3   Q   (By Mr. Freeman)  And this is just to
4   refresh your recollection to try to clear up some of
5   the dates.  If you could just take a quick look at
6   that and then...
7       (Deposition Exhibit No. 496 marked)
8   A   Okay.  I don't doubt that my memory's
9   starting to not put these things together.
10  Yeah, I remember that quote and I do remember it
11  happening.
12  Q   (By Mr. Freeman)  So you've seen this --
13  A   I've seen this, yeah.
14  Q   What is this document?
15  A   It's an article that showed up here in
16  Austin American Statesman.
17  Q   And when is the article from?
18  A   It is from October 24th, 1992.
19  Q   And when does the article say that the --
20  the prosecution that we discussed earlier for legal
21  assistance, what year did that occur in or what year
22  do you know this occurred in after your
23  recollection --
24  A   1990 --
25  Q   -- had been refreshed?

## 141

1    1990.
2    Q   And what year was the incident in which --
3    A   '92.
4    Q   -- you received the complaint about food
5  assistance?  1992?
6    A   Uh-huh.
7    Q   Okay.
8    A   It would have been for the election for
9  1992.  So that would have been some -- sometime in
10  November, would have been that election.
11    Q   Do you recall if you opened -- if you
12  brought a prosecution or investigated it or anything
13  else?
14    A   Well, the step that was taken, which was
15  to stop using that as a voting station, was a good
16  solution.  But, you know, once again, I would have
17  had the same problem I had with the other case.
18  You -- at some point I felt like I was beating my
19  head up against a wall, because it was so
20  frustrating to spend a lot of time and energy
21  investigating these things in order to not have
22  people willing to come forward and say, "This --
23  this happened to me."
24    Q   Okay.  And you said using that as a voting
25  station.  You mean senior centers where food

## 142

1  assistance is being distributed?
2    A   This is specifically about the Beeville
3  Senior Citizens Center.
4    Q   And requiring photographic voter
5  identification at the polls would not have changed
6  anything with regards to those kinds of threats
7  being made?
8    A   I don't believe there would, uh-huh.
9    Q   In 1992 do you recall also impounding 1800
10  voter registration applications that you asserted
11  had been improperly approved prior to the November
12  election?
13    A   Yes.
14    Q   What was improper about the applications.
15  Do you recall?
16    A   These were -- these were mail-in ballot
17  applications or -- run that -- run that by me again.
18    Q   Let's -- I think the better thing to do
19  would be to see if we can refresh your
20  recollection --
21    A   Okay.
22    Q   -- with another newspaper article.
23       MR. FREEMAN:  If we can mark this as
24  U.S. Exhibit 497.
25       THE REPORTER:  Uh-huh.

## 143

1       MR. MCKENZIE:  You can look at this
2  while --
3       THE REPORTER:  Here you go.  It
4  doesn't take long.
5    Q   (By Mr. Freeman)  And that's -- if you can
6  look at just the second page.
7       (Deposition Exhibit No. 497 marked)
8    A   I don't -- I don't honestly remember what
9  the problem was, but this was, I'm pretty sure,
10  relating to that same voter registration -- that
11  same tax assessor collector that was not doing her
12  job.  And I'm trying to remember her -- remember her
13  name.  I think her last name was Frazier, but I
14  can't remember her first name.  I can't remember
15  what the -- the problem was with what she had done
16  prior to that election.
17    Q   (By Mr. Freeman)  Were any of these
18  registrations ultimately invalidated?
19    A   I think what we did was the judge examined
20  them in camera, the district judge --
21    Q   Uh-huh.
22    A   -- looking for some things.  And I don't
23  remember anything that came of it.
24    Q   So no prosecutions?
25    A   No.

## 144

1       MR. MCKENZIE:  I just wanted to be
2  clarified for the record, this article says that the
3  district judge actually impounded them, not the
4  witness.
5       THE WITNESS:  Right.
6       MR. MCKENZIE:  At the very bottom.
7    A   I made an application, and she -- then she
8  issued the order.
9       MR. FREEMAN:  Okay.  Thank you for
10  the clarification.
11    A   And she ultimately looked at them.  And
12  there was some resolution.  I can't remember what it
13  was of -- but I think the article -- if you let me
14  read it, I think it talks about what was going on.
15    Q   I mean, if you would like to take a moment
16  to look at it, that's fine.
17    A   I don't remember what the outcome of that
18  was, to be honest with you.
19    Q   That's fine.  It's a long time ago.
20    A   I know.
21    Q   But can I ask, this is -- this had nothing
22  to do with in-person voter impersonation.  Correct?
23    A   I thought it did.
24       "Votes were cast and counted by persons
25  not eligible to vote, persons who were not

Jose Aliseda                                          June 6, 2012

---

145

1  registered to vote, persons who did not reside in
2  Bee County, Commissioner Precinct 3, convicted
3  felons and residents of other city -- cities other
4  than Beeville, Texas."
5        So I would say that that was in-person
6  voting occurring.
7     Q   But it wasn't something where they were
8  pretending to be someone else.  Right?
9     A   Goodness, it's been so long.  It may have.
10 I don't know.
11    Q   But you have no basis to believe that it
12 was?
13    A   I don't remember.
14    Q   Okay.  And so this isn't anything that
15 could have been prevented by requiring photo I.D. to
16 vote.  Right?
17    A   I don't know.
18    Q   Okay.  And in 1993 you brought charges
19 against two county commissioners and a county judge
20 based on a violation of the Texas Open Meetings Act.
21 Correct?
22    A   Yes.
23    Q   But that was not related to elections?
24    A   No.
25    Q   And in 1994 --

---

146

1     A   Uh-huh.
2     Q   -- you requested that an early voting
3  ballot box in Bee County be impounded based on
4  allegations of tampering.  Correct?
5     A   Yes.
6     Q   Who made the allegations?
7     A   Can't remember if it was the election
8  judge or -- I -- I don't remember.
9     Q   What type of tampering was the concern
10 about?
11    A   The seal was broken.
12    Q   So after the voting day --
13    A   Right.
14    Q   -- and the next voting day --
15    A   I'm pretty sure.
16    Q   -- somebody took something --
17    A   I'm sorry.  I'm pretty sure it had -- part
18 of the allegation was that somehow some stuffing had
19 occurred in the ballot box.
20    Q   Okay.  But requiring photographic voter
21 identification at the polls couldn't have prevented
22 tampering between voting days.  Correct?
23    A   Let me think about this.
24        That kind of tampering -- I don't
25 remember.  If -- if you require someone to show an

---

147

1  I.D. and their name is checked off that they voted
2  and then the ballot box gets stuffed, then you would
3  have a record of those people that voted.  And you
4  could go back and see if, in fact, they had voted.
5  So it -- you know, it could be a situation where
6  we're talking about a ballot box being stuffed or a
7  ballot box having ballots taken out for a particular
8  candidate and new ballots inserted for -- for
9  another candidate.  And if they had an I.D., I would
10 think you could go back and find out who they were
11 and ask them, because that did happen on occasion.
12 We had lawsuits where -- we actually had lawsuits in
13 Bee County where results were challenged and -- and
14 voters were called in and asked about who they voted
15 for.
16    Q   But -- that's -- that's a remarkable
17 proceeding.  Can I ask --
18    A   It was bizarre.
19    Q   -- can I ask --
20    A   I mean, you've got to understand, we're --
21 for a while there, the county was -- the confidence
22 in the electoral system in the county was in -- in
23 question by a lot of the citizens of that county.  I
24 don't think that more -- I don't think so anymore.
25 But back then that was what's happening, that there

---

148

1  was a lack of confidence.
2     Q   Can I ask, a person who's going to stuff a
3  ballot --
4     A   Uh-huh.
5     Q   -- they're not going to care if there's a
6  rule on the books about having to show I.D., right,
7  they're going to just put them in?
8         MR. MCKENZIE:  Objection; form.
9     A   I don't know.
10    Q   (By Mr. Freeman)  I mean, I'm trying to
11 understand better how a photographic voter I.D. --
12    A   Uh-huh.
13    Q   -- requirement would stop someone from
14 stuffing a ballot box or from taking out ballots?
15    A   It would keep someone who's not the person
16 that is voting from voting.
17    Q   Sure.
18        But if someone is already committing the
19 crime --
20    A   Uh-huh.
21    Q   -- by stuffing a ballot --
22    A   Uh-huh.
23    Q   -- an obvious crime, do you believe --
24    A   I think that --
25    Q   -- that things are being changed outside

Jose Aliseda                                                    June 6, 2012

## 149

1  of normal voting hours, do you think that a
2  photographic voter I.D. required for in-person
3  voting would prevent that activity outside of normal
4  voting hours that is already plainly unlawful?
5        A   The only thing I think it could do is
6  somehow allow you to investigate backwards --
7        Q   Okay.
8        A   -- as to who was there and who wasn't
9  there and allow you to reconstruct what happened.
10       Q   How would it do that?
11       A   Well, they've come in, they've showed an
12  identification.  That identification is going to
13  have an address, you know, a way to find them.  And
14  if you did an investigation or there was a lawsuit,
15  they could be brought into court and -- and asked,
16  "Okay.  What -- could you tell me what you did?"
17       Q   Doesn't a voter registration application
18  already have an address so they can assign you to a
19  precinct?
20       A   Yeah, but you can have multiple voter
21  registrations.  That's the problem.  That was one of
22  the things that was testified to in our -- in our --
23  I just told you an example of a perfect -- we have a
24  Republican Congressional candidate.
25           But we had testimony in the committee of

## 150

1  judges, election judges, seeing people come in with
2  multiple registration cards and voting more than
3  once.
4           You can have -- you can be registered in
5  one part of the state and voting in -- and
6  registered in another part of the State.  That -- so
7  there's -- you know, I think having one I.D. with a
8  unique identifier number that is state-issued that
9  has a magnetic strip on the back that -- that --
10  that has a number that is unique to that individual
11  would prevent, for example, this lady from Austin
12  somehow going to register in -- in Cameron County
13  and the system not being able to catch the fact that
14  she's registered here and registered there.
15       Q   Well, you've raised a bunch of new things,
16  but I want to come back to my actual question --
17       A   Okay.
18       Q   -- which was, with regard to the voter
19  registration --
20       A   Uh-huh.
21       Q   -- the voter registration is someone
22  voting on, it's getting marked off --
23       A   Uh-huh.
24       Q   -- whether or not they have to show a
25  photo I.D., that's going to have an address so that

## 151

1  they will be assigned to that precinct.  Correct?
2        A   Right.
3        Q   So you can trace back and find that person
4  if you need them for the investigation without
5  having them having to show an I.D.  Isn't that
6  right?
7        A   Yes.  But I do think a voter I.D. issued
8  by the State would allow us to crosscheck to see if
9  there is multiple registrations.
10       Q   And a citizenship certificate --
11       A   Uh-huh.
12       Q   -- which is one of the forms of
13  permissible identification under SB 14 --
14       A   Uh-huh.
15       Q   -- that doesn't have an address, does it?
16       A   No, it doesn't.  But it does prove who
17  are.
18       Q   I don't disagree with that.
19       A   See, what's really going on here is you're
20  trying to set up a system that -- nothing is
21  foolproof.  You could make scenarios.  But what
22  you're trying to do is make it so difficult that
23  someone who has the idea, hey, I'm going to steal an
24  election -- and you've got to understand, I don't
25  think national elections are stolen.  I don't think

## 152

1  statewide elections are stolen.  I don't think, for
2  that matter, many of the other races.  But where
3  this practice is really prevalent is in the small
4  elections, the school boards, the board of trustees
5  for a college, the commissioners' races.  Why are
6  these races critical to these people?  Because
7  that's where the money comes out of.  You
8  know, these little contracts for building a new
9  school, these jobs for your relatives, they're all
10  intertwined in this -- in this patronage system that
11  you have in South Texas and -- and that have passed
12  down through Spanish corruption.  And one of the
13  reasons you have, for example, a requirement for a
14  photo I.D. in Mexico is because the people in that
15  country lost trust in their system.  So now they
16  have not just a photo I.D., but a biometric photo
17  I.D., because they want to instill confidence in the
18  system.  People don't vote if they don't have
19  confidence in the system, because they think what's
20  the use.
21           So -- so where these little gangs of
22  politiqueras and politiqueros and having people with
23  multiple registrations really come in helpful is in
24  these local -- the elections where the money is,
25  where the contracts are, where the patronage is.

## 153

1   That's where these races are being affected.
2       Q   Now, you said a moment ago that people --
3   that you heard testimony that multiple
4   registration -- that people were coming to a single
5   polling place with multiple registration cards.  Who
6   provided that testimony?
7       A   You'd have to pull the record.  I don't
8   remember.  I didn't write those names down.
9       Q   Okay.  And you also were just mentioning
10  that -- that it would be good if there were a unique
11  I.D. so that people could only vote once.
12      A   Yes.
13      Q   But under SB 14, in theory, someone could
14  vote with a driver's license and then vote with
15  their concealed handgun license.  Right?
16          Those are different IDs, aren't they?
17      A   I would think that to get a concealed
18  handgun license, it's going to have to jive with
19  your driver's license address.  So those two records
20  are going to -- there's going to be some kind of
21  computer cross check to make sure that you are the
22  person that has this.
23      Q   But weren't you just saying before that
24  the computer cross-checks between the voter
25  registration database and the driver's license

## 154

1   database were a mess and that's why there were so
2   many missing records?
3       A   There are.  I think that if -- if -- if we
4   had a system where every person had a unique
5   identifier for a voter registration and a driver's
6   license you wouldn't have -- for example, you don't
7   have multiple driver's licenses.  You don't normally
8   have multiple driver's licenses given to an
9   individual by a state government, whereas you might
10  have multiple voter registrations.
11          Most of the time the check -- the state
12  will catch the fact that, okay, this guy has a
13  driver's license here.  He's trying to get a
14  driver's license over there.  They're not going to
15  issue you -- you -- you a driver's license.  In
16  fact, there's a law that says, you move, you have X
17  number of days - I can't remember if it's 30 or 15 -
18  to get your new driver's license address.  It's
19  important for the state to know that, you know, they
20  have a driver's license, where they live, to make
21  sure that that is, in fact, the person that we're
22  talking about.
23      Q   Okay.  But am I correct that currently you
24  don't have a system where there's one unique ID
25  across all these applications.  Correct?

## 155

1       A   Actually, the voter registration card does
2   have a unique ID.
3       Q   Uh-huh.
4       A   The problem is, is you can go register
5   somewhere else, not provide that I.D. number and
6   obtain a new registration with another I.D. number.
7       Q   But there's not a unique I.D. for the same
8   person for a voter registration card, the driver's
9   license, the concealed handgun license.  Right?
10      A   That's correct.
11      Q   And SB 14 doesn't create that system, does
12  it?
13      A   It could.
14      Q   But that -- the bill that is specifically
15  at issue here does not create that system?
16      A   No.
17      Q   Okay.  Now, you had said that there were X
18  number of days that a person has to get a new
19  driver's license --
20      A   Uh-huh.
21      Q   -- after they move.
22          Are you aware of the rate of compliance
23  with that law, whether or not people get that I.D.
24  changed right after they move, every time they move?
25          MR. MCKENZIE:  And, again, to the

## 156

1   extent your awareness was developed in the course of
2   your legislative duties, I would not -- I would
3   instruct you not to answer.
4       A   Okay.  I'm not answering in that part.  I
5   have defended people that have been with that --
6   with a ticket for that.
7       Q   (By Mr. Freeman)  Okay.
8       A   So it does happen --
9       Q   Okay.
10      A   -- that they have moved, not changed their
11  new -- their address on their new driver's license
12  and they've gotten a ticket for it.
13      Q   Okay.
14      A   Because they've been foolish enough to
15  tell the officer, hey, I move three months ago and I
16  haven't changed my license.  So they end up getting
17  a ticket for it, because you do have -- I can't
18  remember the time period, but I think it's like 30
19  days.
20      Q   I mean, you describe Texas as a very
21  mobile state.  Right?
22      A   Yeah.
23      Q   So if people move around a bunch, they're
24  not always going to change their driver's license in
25  time.  Right?

Jose Aliseda                                                June 6, 2012

## 157

1    A   I'll tell you when they're -- when they're
2  going to do it, when they need to do something that
3  requires an I.D.  For example, if they want to cash
4  a check, they're not going to have their check
5  cashed if it has an address of a bank that's local,
6  but an I.D. that has a different address.  So when
7  you want to do something financially, you're going
8  to update your -- your address.
9        Do you understand the logic of what I'm
10 saying?
11   Q   No, I do.  I do.  I --
12   A   You open a bank account and you want to
13 see a check, they want to see that you live there to
14 make sure they cash your check, because they're
15 taking a chance on accepting a check.
16   Q   But couldn't you cash a check in Austin if
17 you were up here for work?
18   A   Some businesses will do it.  Some won't.
19   Q   Okay.  Okay.
20   A   If I bank at my normal bank - I don't even
21 think I have a branch here - I could do it.  Some
22 banks won't do it.  They say no out-of-town checks.
23 You know, it's very common.
24       Checks are very uncommon these days.  I
25 don't know if that's a good thing or a bad thing.

## 158

1  Most people pay with debit cards now.
2    Q   Well, we went a little bit far afield, but
3  just to wrap up with your prosecutions as a County
4  Attorney --
5    A   You know, I had forgotten about all of
6  that.  It's been so long.  I do remember the
7  voter -- the mail-in voter fraud stuff, because that
8  was something that really was upsetting, because we
9  had a class of victims there that were being
10 exploited.  And it was so frustrating.
11       But this other stuff, it's been so long, I
12 didn't even remember.  I'm surprised you found it.
13   Q   Now, aren't you glad that you got deposed
14 today?
15   A   No.  I mean, it doesn't have anything --
16 well, it's been a while.
17   Q   Okay.  Do you recall any other
18 investigations of election irregularities that you
19 conducted while you were Bee County Attorney?
20   A   Just to make it clear, I did not conduct
21 the investigations.  One, it would probably be
22 illegal for a prosecutor to actually investigate
23 something and then prosecute it.  Okay?
24   Q   Okay.
25   A   Because I think there's an ethical rule on

## 159

1  that.
2        I would ask agencies to co it, that --
3  that investigation.
4        And do I recall anymore other than the
5  ones you've pointed out?  No.
6    Q   Okay.  So you didn't bring any other
7  charges?
8    A   No.
9    Q   Okay.  So just to be clear, you never
10 investigated or prosecuted in-person voter
11 impersonation while you were County Attorney for Bee
12 County?
13       MR. MCKENZIE:  Objection.  I think
14 that -- I thought you mischaracterized his
15 testimony, but he may answer.
16   A   I never investigated.  I think I just
17 said -- explained I never investigated.  I would
18 have other agencies investigate.
19   Q   (By Mr. Freeman)  My apologies.
20       But did I prosecute --
21   A   Yes.
22   Q   -- did I take some steps that I think
23 might have had something to do with in-person --
24 voter fraud impersonation in person -- voter fraud
25 impersonation, I'm -- I'm thinking this might have

## 160

1  actually had something to do with it, and I'm
2  referring to Exhibit 497.
3    Q   And that's the story about ballot
4  stuffing?
5    A   That's the story that I remember some --
6  something having to do with impounding 1800 ballots,
7  which is --
8    Q   Oh.
9    A   -- before the ballot stuffing.
10   Q   I'm sorry.
11   A   Right.
12   Q   That's the one about voter registration
13 applications?
14   A   Right.
15   Q   So let's take a step back then, so we can
16 clear that up.
17       Is it your testimony that any individual
18 who registered to vote under one of those 1800
19 applications showed up at the polling place
20 pretending to be someone that they were not?
21   A   I can't remember.
22   Q   Is it your testimony that any individual
23 showed up at the polling place with an election
24 registration certificate identifying them as an
25 individual that they were not?

Jose Aliseda                                                    June 6, 2012

## 161

1    A   I can't remember, but I'll try to give you
2  an example.  I know of a house that had 18 people
3  registered to vote.  One person could vote for all
4  those 18 people, if they wanted to, and there was
5  nothing we could do to stop it.
6    Q   Isn't it the case that the poll workers
7  would see the same person coming in?
8    A   Well, they wouldn't necessarily -- for a
9  while there, you know, Bee County was a one-party
10 county for a long time.  So you didn't have things
11 like poll watchers.  And you had collusion between
12 the election officials and candidates.  So if -- if
13 one individual was in collusion with the election
14 judge and a candidate, that individual could come in
15 and vote 18 times with a different voter
16 registration and nothing could be done about it --
17    Q   If a --
18    A   -- because there was no poll watch.
19    Q   If an election official was in collusion
20 with a candidate and wants to promote voter fraud,
21 couldn't that election official just ignore the
22 voter I.D. requirement?
23    A   They could, yes.
24    Q   So SB 14 does nothing to prevent
25 collusion, because it does nothing more than an --

## 162

1  an -- or than individual's ability to see the same
2  person voting 14 times would do.  Correct?
3    A   Well, this is where I disagree, because I
4  do think at some point -- one, the -- both parties
5  now have poll watching.  They've learned from --
6  from this corruption.  So I think that you would
7  have other people in the -- in the -- in the
8  precinct election place that would be in a position
9  to catch that kind of shenanigans.
10    Q   But wouldn't that poll watcher also see
11 that it was the same person coming in 14 times?
12    A   Yeah, they would.
13    Q   And so they would be able to stop it in
14 the same way that --
15    A   Well, they could --
16    Q   -- that they could stop the individual
17 from voting 14 times, regardless of whether there
18 was an I.D. requirement?
19    A   The poll watcher can't stop a voter from
20 voting.  All a poll watcher can do is lodge a
21 complaint with the election judge.  And then if the
22 election judge doesn't do something, eventually they
23 can report it to the candidate or to someone else.
24    But one thing an I.D. requirement would be
25 able to do is you could find the person that

## 163

1  actually did this, because they'd have a photo and
2  you could put them in a lineup and say, okay, which
3  of these people did this and who did they
4  impersonate?
5    Q   But how would the photo on a person's I.D.
6  help more than actually seeing the person in the
7  polling place prior to the lineup?
8    A   Well, you'd know, at least at one of these
9  times that they actually had a valid ID.  I would
10 expect if they voted 18 times, at least one of those
11 votes is probably their own vote.
12    Q   Sure.
13    But if they're voting fraudulently, it
14 doesn't matter if they have the right photo I.D.
15    A   No, but you --
16    Q   -- it only matters that they're showing up
17 and voting fraudulently?
18    A   You could take each one of those I.D.s, 18
19 of them, and say, okay -- put them in a lineup and
20 say, okay, which guy did this, which gal did this,
21 and you could point to that individual.
22    Q   How would they have the I.D.?  Do -- does
23 SB 14 require the poll workers to record photo or
24 other image of the I.D.s that are used to vote?
25    A   No, but the State has in its database the

## 164

1  picture.
2    Q   Okay.
3    A   So the State -- okay.  You've got an
4  allegation, eighteen people, one voter.
5    Q   Uh-huh.
6    A   You -- you -- you collect the pictures of
7  all 18 of those individuals from the State database,
8  put them in a lineup and say, which one voted what.
9    Q   Okay.  But if there is collusion, isn't it
10 possible that the person doesn't show -- sorry.
11 Strike that.
12    A   Maybe we're talking about past each other.
13    Q   That's what I'm trying to solve, because
14 I'm trying to --
15    A   I'm --
16    Q   -- trying to get through your hypothetical
17 here.
18    A   It's like -- a lot like cashing a check.
19 Okay?  How do you catch someone that is trying to
20 cash a check that really isn't theirs?  I mean,
21 you -- you look at their I.D. and you trust that,
22 okay, they've got a valid I.D.  You look to see if
23 it's a pretty good I.D., if it -- you know, it's not
24 a counterfeit I.D., and you make the decision, "I'm
25 going to cash this check for this individual."  And

Jose Aliseda                                                    June 6, 2012

---

## 165

1    if the I.D. doesn't match, if it looks fake, you're
2    not going to do it.  So --
3        Q   So if we can jump back to your same person
4    voting 18 times --
5        A   Uh-huh.
6        Q   -- example, whether or not that person
7    shows an I.D. at the polling place, if they have the
8    I.D. and it will be in the State's database and you
9    can use it for that lineup that you described --
10       A   Uh-huh.
11       Q   -- if the -- if there's collusion, if the
12   election judge is letting this same individual and
13   seeing this same individual voting 18 times --
14       A   Uh-huh.
15       Q   -- wouldn't it be possible that they could
16   show something that wasn't a proper I.D. and the
17   judge would let them vote and they wouldn't be in
18   the database at all?
19       A   Yes, they could.
20       Q   So why would the in-person voting -- or
21   in-person I.D. requirement guarantee or help even --
22       A   They're --
23       Q   -- with this type of prosecution?
24       A   That's what I've been saying from the very
25   beginning about this law.  It's not a guarantee.  It

---

## 166

1    is not a guarantee.  It is just one additional step
2    that if -- if someone is really trying to steal an
3    election through some kind of scheme, it is much
4    more difficult to arrange all of these things that
5    people would have false I.D.s, that they would --
6    that they would come in and take the chance of being
7    caught with a false I.D.  So what it is, it's like
8    the burglar alarm I discussed.  It's just one
9    additional step to safeguard the system.  It's the
10   same step that Homeland Security takes in trying to
11   ascertain who's coming on an airplane and who's not.
12   It's the same step that they take downstairs to make
13   sure that you're -- you're a real person and not
14   some kind of terrorist coming in here to hurt
15   somebody.  It is a step that makes it just a little
16   more difficult for someone to game the system.
17       Q   You keep saying that your I.D. was checked
18   downstairs.  Your I.D. was not checked downstairs,
19   was it?
20       A   We were going to be --
21           MR. MCKENZIE:  Well, I think he's
22   talking about the tenth floor, actually.
23           MR. FREEMAN:  Okay.
24           MR. MCKENZIE:  I don't think he means
25   downstairs.  I think he means --

---

## 167

1            MR. FREEMAN:  Okay.
2            MR. McKENZIE:  -- the U.S.
3    Attorney's office.
4        A   It was checked downstairs when I checked
5    into his office.
6        Q   (By Mr. Freeman)  Okay.  Not here?
7        A   Not here.  And it is checked in when I
8    check into the Capitol.  Anybody that comes into a
9    public building has to show a photo I.D.
10           THE REPORTER:  Can we take a break
11   when you guys get to a good point?
12           MR. FREEMAN:  You know, it will be
13   just a couple more questions and then we'll be at a
14   good point.  Okay?
15           THE REPORTER:  Thanks.
16       Q   (By Mr. Freeman)  Do you recall speaking
17   with an individual named Adryana Boyne from Texas
18   GOP Vote?
19       A   Yes.
20       Q   Do you recall telling her that you did not
21   prosecute any in-person voter impersonation cases?
22       A   Yes.
23       Q   And that's --
24       A   That's true.
25       Q   That is true.  Okay.

---

## 168

1            Do you recall speaking to -- telling that
2    same person that your experience as a prosecutor is
3    relevant to knowing whether in-person voter
4    impersonation occurs?
5        A   In what context?  I don't...
6        Q   All right.
7            MR. FREEMAN:  Why don't we just take
8    a break now.
9            (Off the record 2:55 to 3:15)
10       Q   (By Mr. Freeman)  We're back on the
11   record.  So, Representative Aliseda, we talked a
12   bunch about fraud in the context of prosecutions
13   that you brought.  I have a couple more followup
14   questions that I'm wanting to ask.
15           Now, you previously mentioned that you
16   spoke to officials from Jim Wells County who were in
17   favor of voter I.D.  Did any of them express
18   concerns about individual voters not being able to
19   vote because they lacked an I.D.?
20       A   No.
21       Q   Did they express support specifically for
22   SB 14 or for the concept of voter I.D.?
23           MR. MCKENZIE:  Are you asking his
24   constituents?
25           MR. FREEMAN:  Yes, his constituents

## 169

1  that elected him in Jim Wells County.
2      A   See, I don't remember when I met with
3  them.  I think it was a House bill and not a Senate
4  bill.  It came back to us as a Senate bill.  So I
5  think just the concept, to be honest with you.
6      Q   (By Mr. Freeman)  Okay.
7      A   Because I wouldn't have gone into the
8  details of the bill at the time.  I mean, it was
9  just a question, "Look, this is what I'm doing as
10 your State rep.  What do you think?  This -- these
11 are some other ideas.  What do you think?"  And they
12 responded that they were all in favor of it.
13     Q   Okay.  Are you familiar with the term
14 "Magical Box 13"?
15     A   The Magical Box 13?  Mythical Box 13, I'm
16 familiar with.
17         MR. MCKENZIE:  I would instruct you
18 not to reveal your knowledge of Magical Box 13 to
19 the extent that you acquired it in the course of
20 your legislative duties.
21         THE WITNESS:  In the course of my
22 legislative duties?
23         MR. MCKENZIE:  Through communications
24 with legislators or through research you did for the
25 bill or anything of that nature.

## 170

1      A   I'm wondering if I did the research before
2  I became a State rep or after.
3      Q   (By Mr. Freeman)  Had you heard of Magic
4  Box 13 or --
5      A   Uh-huh.
6      Q   -- Mythic Box 13 before you became a State
7  legislator?
8      A   Yes.  It's famous -- infamous.  Not
9  famous.  Infamous is the proper word.
10     Q   What was Magical -- Mythical Box 13?
11     A   It was a box that was stuffed with ballots
12 to give Lyndon Johnson the victory for State Senate.
13     Q   And what year was that?
14     A   I don't remember.  It was some -- either
15 in the '60s or the '70s, I believe.  Maybe it was in
16 the '50s, but it was a long time ago.
17     Q   Well, Lyndon Johnson was Vice-President
18 beginning in 1960.  Right?  1961.
19     A   Okay.  So it would have been prior to
20 that, so it would have been in the '50s.
21     Q   Okay.  Were there any similar fraud
22 allegations of which you're aware an entire box of
23 ballots was stuffed since Magic Box 13?
24         MR. MCKENZIE:  And, again, I would
25 instruct you not to answer for fraud that you

## 171

1  learned of through investigations you did as a
2  legislator prior to -- in your investigations
3  pertaining to SB 14.  But your knowledge independent
4  of that, you may answer.
5      A   Am I aware of other allegations of boxes
6  being stuffed?  I had those in Bee County.
7          Is there a publicized case?  That's
8  probably the best publicized case that I was aware
9  of prior to becoming a legislator.
10     Q   (By Mr. Freeman)  In the 1950s were Texas
11 elections equally open to voters of all races?
12     A   It was pre-civil -- pre-Voting Rights Act.
13 I don't know.  I was born in 1956, so I don't know.
14     Q   Okay.  Are you aware of any incidents of
15 in-person voter impersonation that have occurred
16 in House District 35 in the last 20 years?
17     A   Last 20 years?
18         MR. MCKENZIE:  All right.  Same
19 legislative instruction I always give.  To the
20 extent you developed knowledge in your job as a
21 legislator, don't answer.  To the extent you have
22 knowledge independent of that, you may answer.
23     A   In-person voter fraud.  Honestly, I can't
24 remember if that wasn't some of the allegations that
25 turned up in this case where I -- I can't remember.

## 172

1      Q   (By Mr. Freeman)  So you don't have a
2  specific basis to believe that there was --
3      A   No.
4      Q   -- in-person voter impersonation?
5      A   That's not what I'm saying.  I'm saying I
6  don't remember if that's one of the allegations in
7  this case where I impounded those ballots that there
8  had been in-person voter fraud.
9      Q   So you can't state with certainty --
10     A   That's right.
11     Q   -- under oath that you -- that there was
12 in-person voter --
13     A   And I can't state with certainty that
14 there wasn't, because I don't know.
15     Q   Okay.
16         MR. FREEMAN:  And, John, can that
17 just be a standing objection that you're -- that the
18 Representative is aware?
19         MR. MCKENZIE:  Uh-huh.
20         MR. FREEMAN:  And if you want to
21 state it one more time, just for the sake of setting
22 out a standing objection.
23         MR. MCKENZIE:  Yeah.  I'm going to
24 have a standing objection as to anything that's
25 legislatively privileged, which basically means any

Jose Aliseda                                                    June 6, 2012

## 173

1   thoughts, opinions, or deliberation or
2   communications among legislators or executive
3   agencies for the purpose of considering a
4   legislative act, I would instruct you not to answer
5   to the extent your answer will reveal any of those
6   type of opinions, deliberations, thoughts,
7   communications.  And if you need a refresher on the
8   scope of the privilege, when I say "standard
9   objection," just ask me for it.  But for the rest of
10  the deposition, I'll just have a standing objection
11  and I'll just say "legislative privilege objection."
12          MR. FREEMAN:  That will make things
13  easier --
14          MR. MCKENZIE:  Faster.
15          MR. FREEMAN:  -- and we can get you
16  out of here sometime that will resemble a dinner
17  hour.
18          THE WITNESS:  Okay.
19      Q   (By Mr. Freeman)  Are you aware of any
20  incidents of in-person voter impersonation that
21  occurred anywhere --
22          MR. MCKENZIE:  I'm sorry.
23      Q   (By Mr. Freeman)  -- in the last 20 years?
24          MR. McKENZIE:  Legislative privilege
25  objection.

## 174

1       A   I'd ask that you look at the committee
2   record, because I thought that there was some
3   discussion about it in the committee record.
4       Q   (By Mr. Freeman)  Any prior knowledge
5   before the committee record or beyond the committee
6   record or beyond the legislative process?
7       A   Other than what I've already said in this
8   with respect to something I did in 1992.  I -- you
9   know, I -- I thought I've already explained I don't
10  remember whether there was an allegation or not.
11      Q   Okay.  What is Texas' current voter
12  identification system?
13      A   Okay.
14          MR. MCKENZIE:  It's the same
15  legislative privilege objection.  Go ahead.
16      A   Texas' current identifying system, you
17  have a card that's issued to you.
18          You apply.  You have a card that's issued
19  to you.  It has no identification other than that
20  the card -- the card itself.
21      Q   (By Mr. Freeman)  Okay.  Do you have to
22  show that card at the polls before you vote?
23      A   You either show that card or you show some
24  other kind of identification that you are, in fact,
25  that individual.  Obviously, most people use their

## 175

1   voter -- their driver's license.  But I believe it
2   allows you to use something with your name on it but
3   that has the address of your voter registration.
4       Q   What would a voter need to do under the
5   existing system to commit in-person voter fraud or
6   voter impersonation?
7           MR. MCKENZIE:  Same legislative
8   privilege objection.
9       A   What would they need to do?
10      Q   (By Mr. Freeman)  How would they do it?
11      A   They could take in a voter registration.
12      Q   How would they obtain that voter
13  registration?
14          MR. MCKENZIE:  Same objection.
15      A   There's a number of ways they could do it.
16  You could have, for example, somebody that wants to
17  game the system, so they apply for several
18  registrations and get them at a particular address,
19  use those registrations to vote or give them to
20  other I.D. who are not the person that's registered
21  to vote.  And there's nothing you can do about it.
22  All they have to do is show a card that says they're
23  registered to vote, and there's no way to prove that
24  that's not the person.
25      Q   (By Mr. Freeman)  What is the punishment

## 176

1   under current law for in-person voter impersonation?
2       A   I believe it's a felony.  I may be wrong.
3       Q   Okay.  How many convictions for in-person
4   voter impersonation have been obtained in the last
5   20 years in Texas?
6       A   I don't know --
7           MR. MCKENZIE:  Same objection.
8       A   I don't know the answer to that.
9       Q   (By Mr. Freeman)  Isn't it the case that
10  Attorney General Abbott has dedicated substantial
11  resources over the last decade to investigate
12  allegations of voter fraud?
13          MR. MCKENZIE:  Same objection.
14      A   Well, I'm not answering as a legislator,
15  but prior to becoming a legislature -- legislator, I
16  believe he did do that; that is, commit substantial
17  resources to find it.
18          But the problem with -- with in-person
19  voter identification fraud is how do you catch the
20  person?  How do you catch them?  They vote.  They're
21  gone.  How do you ever find the person?  All they
22  had to do was show a card, they vote, they're gone,
23  you're never going to find them.  So it's -- it's
24  almost impossible to catch.
25      Q   (By Mr. Freeman)  But they had to have the

177

1    card in the first place.  Right?
2        A    Yeah.  But, you know, we have testimony in
3    committee from people that said that they were aware
4    that there were I.D. in their jurisdictions that had
5    drawer-fulls of voter registration cards.  And when
6    it -- the time came around for the election they
7    would pass them out, say, "Go vote."
8        So you can't catch it.  It's something
9    that would be almost impossible to catch short of --
10   this is the only way you would catch it.  Somebody
11   comes in to vote with the voter registration card,
12   the judge knows or the poll watcher knows that's not
13   the individual.  And then you'd know.  You -- you --
14   you'd call -- unfortunately, you're not even allowed
15   a cell phone in the polling place.  But somehow
16   you're not even allowed to take a picture of -- of
17   the polling place.  So it's almost impossible
18   that -- you don't have a video camera to -- to
19   capture the -- the event of the -- of the voter
20   using the fraudulent card.  So there's -- it's
21   almost impossible to catch.
22       Q    Who would an individual with a drawer full
23   of voter registration cards give those registration
24   cards to?
25       A    I could see, for example -- you know,

178

1    Texas is not a big union state.  But I could see a
2    union wanting to sway an election, busing in people,
3    giving them a registration card.  Say, "Go vote."
4        Q    Why wouldn't those people just vote where
5    they're from?
6        A    Oh, there's not -- there's nothing to say
7    they couldn't.  They could come in from out of state
8    to do that.  They could come in from out of town to
9    do that.  There's nothing to stop them.  They could
10   have voted in their own hometown using their own
11   voter registration and to help somebody with a
12   scheme to cheat an election in -- in another town,
13   pick up a voter registration card with that -- from
14   that person that has that scheme and take it and go
15   vote.
16       Q    Do you have any basis to believe that any
17   such busing has ever occurred?
18       A    Yes.
19       MR. MCKENZIE:  Same objection.
20       Q    (By Mr. Freeman)  What is that based on?
21       A    Well, I read about it and heard about it
22   last night on the Governor Walker race.
23       Q    And you believe that busloads of people
24   came in and voted as other people --
25       A    Yes.

179

1        Q    -- in Wisconsin yesterday?
2        A    Yes.
3        Q    Doesn't Wisconsin have a voter I.D. law in
4    place?
5        A    Yeah.  It was -- it was -- there was an
6    injunction put on by the judge.  From what I
7    understand, they had almost 110 percent vote in --
8    in Madison, Wisconsin last night.
9        Q    How would you have 110 percent vote?
10   Wouldn't each --
11       A    Because they had some --
12       Q    -- voter be checked off?
13       A    -- they had same-day voter registration in
14   Wisconsin.  Can you believe it or not?  Want to talk
15   about a potential for abuse.  You bus somebody in,
16   have them claim that they live in Wisconsin,
17   register to vote that same day and they vote that
18   same day.
19       Q    Doesn't same-day voter registration
20   require I.D.?
21       A    I don't believe so.
22       Q    Okay.
23       A    I believe all you have to do is say you
24   are somebody, and they register you to vote and you
25   get a voter registration.

180

1        Q    So it's your belief that busloads of
2    people committed felonies yesterday willingly to try
3    to slant an election?
4        A    I think somebody ought to look at that,
5    yes.  But I think you will find that something like
6    that is going to be very difficult to prove.
7        Q    Would you agree that mail-in ballots are a
8    greater source of Election Code-related violations
9    or fraud than in-person voting?
10       MR. MCKENZIE:  And it's the same
11   legislative privilege objection.
12   A    I -- I --
13       THE WITNESS:  This is an opinion that
14   I had prior to becoming State rep, so can I answer
15   it or not?
16       MR. MCKENZIE:  Well, the problem with
17   the prior view -- opinions is it may have informed
18   your vote.  So the question is really whether that
19   opinion informed your vote.  If it informed your
20   vote, then I would say don't answer.  But if I
21   didn't, then I would say answer.
22   A    I don't know if -- I'm trying to think how
23   this could work, because the question is -- ask me
24   the question one more time.
25       Q    (By Mr. Freeman)  Whether you believe

Jose Aliseda                                          June 6, 2012

---

181

1   that -- or whether it is your understanding that
2   mail-in ballots are a greater source of election
3   fraud than in-person voting.
4      A   I know that that is something I've worked
5   on, mail-in fraud.  And I will tell you this about
6   mail-in ballot fraud is that it takes a lot of work
7   to do it, and you can do it on a very small scale.
8   But to do it on a large scale, it's very difficult.
9   You can sway an election with mail-in ballot fraud
10  if -- on a -- on a small election like a school
11  board election or commissioner's race or city
12  councilman's race, because it is so hard to do
13  what -- the process that I discussed with you
14  earlier, to get -- to get the mail-in ballot
15  application in and then to get the mail-in ballot
16  back, then to help the voter vote the mail-in
17  ballot -- or to fill out the mail-in ballot and send
18  it in and then to get that in the mail in time to
19  count.  So it takes a lot of effort to do mail-in
20  ballot fraud.  But if you're really interested, you
21  can do -- you can really sway a small election.
22  You can have, for example, an election in Jim Wells
23  County of -- a school board election where more than
24  two-thirds of the ballots are mail-in ballots.  You
25  can have a commissioner's race - we just had one in

---

182

1   Bee County - where there was five or 600 votes and
2   250 of those are mail-in ballots.  So you would sway
3   an election with the mail-in ballot, but it's a lot
4   of work.  And the reason that they can do it is
5   because you're allowed to mail in your ballot over
6   several weeks, so you can do ten a day, 15 a day, 20
7   a day.
8      One of the laws I passed has to do with
9   trying to -- one of the laws I got passed was trying
10  to aggregate these mail-in ballots.  There was a
11  scheme to make it look like -- to make it a felony
12  instead of a Class A or Class B misdemeanor.
13     Q   Would you agree that changing the law in a
14  way that promotes people who would normally vote in
15  person to vote by mail increases the opportunity for
16  that mail-in ballot fraud?
17          MR. MCKENZIE:  Same objection.
18     A   I wouldn't agree with that just for the
19  very reason I just explained is that the mail-in
20  ballot process is so -- has so many steps that it is
21  a difficult thing to do on a large scale.
22     Q   (By Mr. Freeman) But doesn't in-person
23  voter impersonation require somehow acquiring
24  someone else's voter registration card prior to
25  going in and voting?

---

183

1      A   Yes.
2      Q   Isn't that also a substantial impediment
3   to that form of ballot fraud?
4      A   One is harder than the other, but you can
5   do it.  See, the -- this is -- I keep going back
6   to -- my original point is if you -- if you build in
7   a step, just an additional step, that makes it a
8   little more difficult, such as getting an
9   identification card with a photo on it to safeguard
10  the system, that those -- just that one additional
11  step would make it more difficult.
12      But the other thing that you're doing, and
13  what has been lost in a lot of this discussion on
14  the floor and much of this, you know, that -- is that
15  you're trying to build confidence in the system.
16  Americans -- this is 2012.  Americans are used to
17  showing their I.D. for just about everything they
18  do.  And they expect that when they go to the ballot
19  box, they are exercising a sacred right and that it
20  deserves some safeguard.  And they don't understand
21  how it is that they are not required to show an I.D.
22  In fact, some will show their I.D. as a matter of
23  form whether they have to or not.  They don't
24  understand that all they have to do is show their
25  voter registration certificate under previous law.

---

184

1   All they had -- most people will actually take out
2   their -- their driver's license and say, "This is
3   me."
4      Look what happened in -- in Washington,
5   D.C.  Somebody came into a polling place in
6   Washington, D.C., and said they were Eric Holder.
7   And they were about to be handed an ident -- a
8   ballot impersonating our very Attorney General.  Is
9   that not ridiculous?
10     Q   Do you know if they were actually handed a
11  ballot?
12     A   No.  They -- this person didn't follow
13  through with it.  You know why?  Because they knew
14  at that point it would be a crime if they accepted
15  the ballot, but was the -- was the election worker
16  ready and able to give them a ballot?  Yes.  It's
17  all caught on tape.
18     Q   Are you aware of any incidents of
19  non-citizen voting that occurred in HD 35?
20          MR. MCKENZIE:  Same standard
21  objection.
22     A   Yes.
23     Q   (By Mr. Freeman) Are you aware of any
24  prosecutions for non-citizen voting that have
25  occurred in HD-35?

Jose Aliseda                                                    June 6, 2012

---

185

1     A   No.
2     Q   Are there any prosecutions for non-citizen
3  voting that have occurred in Texas as a whole?
4         MR. MCKENZIE:  Same objection.
5     A   I thought there were.  I thought we heard
6  something about in Lavaca County that there were
7  several non-citizens that were prosecuted for
8  voting.
9     Q   (By Mr. Freeman)  Where --
10    A   I thought the Attorney General did that
11 prosecution.  I may be wrong.
12    Q   With regard to the non-citizen voting that
13 has occurred in HD 35, are you aware if those
14 individuals had photographic I.D.?
15        MR. MCKENZIE:  Same objection.
16    A   Did they have a driver's license?
17    Q   (By Mr. Freeman)  Uh-huh.
18    A   Yes, they had a driver's license.
19    Q   Are you aware of any public statements
20 made by advocates of photographic voter I.D. that
21 such laws will deter illegal immigrants from voting?
22        MR. MCKENZIE:  Same objection.
23    A   That came up in the committee.
24    Q   (By Mr. Freeman)  With regard to
25 constituents, constituent communication, lobbyists

---

186

1  or advocacy groups, I believe that -- let me just --
2         MR. MCKENZIE:  Yeah.
3     Q   (By Mr. Freeman)  I believe your counsel
4  will agree that you can testify as to the substance
5  of those communications.
6         MR. FREEMAN:  Right?
7         MR. MCKENZIE:  Yeah.  I mean, it says
8  although the communications have been produced,
9  questioning a legislator or staff about the
10 communication to the extent it will require the
11 legislator to reveal its objective about SB 14 or
12 any are covered under the privilege.  So it's kind
13 of a fine line.  I think you can --
14        MR. FREEMAN:  I'm asking awareness.
15        MR. MCKENZIE:  Well, to the extent it
16 would reveal your subjective motivations, I would
17 instruct you not to answer.  To the extent it
18 doesn't, you can answer the question.
19    A   Okay.  The question is did citizens in HD
20 35 have their belief that illegal aliens are
21 voting in our election or have the potential to vote
22 in our election?  The answer is yes.
23    Q   (By Mr. Freeman)  Okay.  However, do you
24 recall telling Jim Cardle of Texas Insider that you
25 don't think illegal aliens voting are a big problem

---

187

1  in our elections?
2     A   I do.  I do remember saying that.
3     Q   Why did you say that?
4     A   Because I believe it.
5     Q   Okay.  Is it necessary to swear under oath
6  that you are a U.S. citizen in order to register to
7  vote?
8     A   No.
9     Q   Are you certain?
10    A   I'm trying to think.
11        There is an issue about that where either
12 our application doesn't require you to swear that
13 you're a citizen or the federal application doesn't
14 require.  There's some discrepancy there, but I
15 believe that there is one form out there, be it our
16 own Texas application for voter registration or the
17 federal application for registration, that does not
18 require you to check a box saying, "I am a U.S.
19 citizen."
20    Q   Are you familiar with the federal Help
21 America Vote Act?
22    A   Vaguely.
23    Q   Do you know if the federal Help America
24 Vote Act requires that all voter -- voter
25 registration applications that will register an

---

188

1  individual for federal elections require you to
2  check a box affirming under oath that you're a U.S.
3  citizen?
4         MR. MCKENZIE:  Two objections.  One
5  is the standard legislative privilege objection, and
6  the second is assuming facts not in evidence.  But
7  you may answer to the extent you are not revealing
8  your subjective motivations.
9     A   Okay.  This is what I think has happened.
10 I believe that your act does require that the
11 application have a -- a checkoff box.
12    Q   (By Mr. Freeman)  Uh-huh.
13    A   But I think the government promulgates a
14 form - I think that's the proper word - that
15 doesn't --
16    Q   Promulgated?
17    A   Promulgated a form that doesn't have that
18 checkoff box.
19    Q   Okay.
20    A   So I believe it's the federal government's
21 own form that doesn't have a checkmark, believe it
22 or not.
23    Q   Okay.
24    A   But -- but getting back to -- you -- you
25 asked about illegal alien voting, do you think it's

Jose Aliseda                                                    June 6, 2012

## 189

1  a problem in our elections.
2       In House District 35, I don't think it's a
3  problem.
4       Do I think it's a potential problem?  Yes,
5  because you do have under our current system the
6  ability for someone to register and claim that
7  they're a citizen and be registered and vote if they
8  want to.
9       Now, I'm not -- most of the time what you
10  have, though, is these people that are illegals,
11  they're not interested in -- in voting.  But --
12  but in this current climate where you have a big
13  push for amnesty or other things that affect illegal
14  aliens, is the potential for them to be interested
15  in voting in our elections there?  Yes.
16       Q   Are you -- sorry.  Strike that.
17       Why would Patricia Harless connect voter
18  I.D. to undocumented immigrants voting?
19            MR. MCKENZIE:  Standard objection to
20  the extent that it reveals private communications,
21  and also to the extent it assumes facts not in the
22  record.  But you may answer subject to the standard
23  objection.
24       A   Well, I would not have gotten this from
25  her.  I suspect that she was at the committee

## 190

1  hearing, and we had people come in and testify that
2  they understand that was a problem.
3       In addition, she's been a State rep a lot
4  longer than I have, and apparently this legislation
5  has been considered more than one time.
6       Q   (By Mr. Freeman)  This has previously been
7  marked as U.S. Exhibit 7.
8       A   Thank you.
9       Q   Can you tell me what this document is?
10       A   Looks to be like some kind of document off
11  of Patricia Harless' campaign website.
12       Q   And under what category does
13  Representative Harless list immigration reform --
14  excuse me, does Representative Harless list photo
15  I.D. for voting?
16       A   Immigration -- under immigration reform.
17       Q   Why would Representative Harless make this
18  connection in the context of a campaign website?
19            MR. MCKENZIE:  Same standard
20  objection.
21       A   One, it requires me to speculate on her
22  motive.
23       I can just tell you I was in the committee
24  hearing, and there was testimony from individual
25  saying that they believed that that was happening.

## 191

1  And --
2       Q   (By Mr. Freeman)  But would presenting a
3  driver's license prevent non-citizens from voting?
4       A   I believe it would, because a non-citizen
5  can't get a driver's license.
6       Q   But can't a green card holder get a
7  driver's license?
8       A   Yes.
9       Q   So can't a non-citizen get a driver's
10  license?
11       A   You're right.  I mean, there is a category
12  of non-citizens that could get a driver's license,
13  yes.  But an illegal alien can't get a driver's
14  license.
15       Q   So preventing non-citizens as a category
16  from voting can't be the actual purpose of SB 14.
17  Correct?
18            MR. MCKENZIE:  Objection to the
19  extent it would -- standard objection.
20       A   If you're asking me what -- what I had in
21  my mind --
22       Q   (By Mr. Freeman)  I'm not.
23       A   -- when I voted for -- when I voted for SB
24  14, I'm not going to answer that.  I'm going to
25  claim a privilege.

## 192

1       Q   I'm --
2       A   Can it be a -- a result -- I mean, a --
3  yeah, a result of SB 14?  I think it could be.
4       Q   I'm -- I'm not asking your --
5       A   Uh-huh.
6       Q   -- subjective mental intent.
7       A   Okay.
8       Q   That is subject to the legislative
9  privilege as the Court has ruled, and we've
10  preserved our disagreement with that ruling.
11            MR. MCKENZIE:  Uh-huh.
12       Q   (By Mr. Freeman)  What I am asking is the
13  purpose of the legislation, which is the -- I guess
14  I would say the objective broader statutory aim.  So
15  not what you thought as an individual or what one
16  other person thought, but the collective purpose of
17  the legislature.
18       A   Okay.
19       Q   It's a tricky distinction.
20       A   Yeah.
21       Q   But to the extent that you understand what
22  I'm saying, to the extent that the bill's --
23       A   That could be -- that could be one
24  purpose.  There could be another purpose, and that
25  is to stop Mickey Mouse from voting.  And the other

Jose Aliseda                                                      June 6, 2012

---

193

1   purpose could be to stop -- to instill confidence in
2   the system by our citizens in a state like Texas,
3   which has a large percentage of citizens that are
4   here illegally.  That -- that could be something
5   that citizens of Texas think is happening or has the
6   potential to happen in our elections.
7       Q    Can I ask, if SB 14 allows you to vote
8   using documents that non-citizens can have, how is
9   it logical that the purpose of SB 14 is to prevent
10  non-citizens from voting?
11           MR. MCKENZIE:  That's the same
12  standard objection.
13      A    Because there is a category of
14  non-citizens that would not have a driver's license
15  or any of the other things that we've discussed,
16  such as an illegal alien.
17      Q    (By Mr. Freeman)  Okay.  And with regard
18  to Mickey Mouse voting --
19      A    Uh-huh.
20      Q    -- is it your belief that anyone has ever
21  voted under a voter registration for a cartoon
22  character such as I -- I assume you're talking about
23  ACORN -- ACORN employees having --
24      A    That's exactly what I'm talking about,
25  because -- because for several years the press has

---

194

1   played up stories about ACORN registering, for
2   example, the Dallas Cowboy football team that won
3   the Super Bowl and registered -- and registered them
4   to vote in -- in a Nevada election.
5           So when you have stories about groups
6   actively out who are registering false I.D., the
7   public tends to think, okay, why are they doing
8   this?  Are they doing this to sway an election and
9   is our -- is our system in a position to catch it?
10  I do think voter I.D. would help catch a situation
11  like that.  If Mickey Mouse was registered, would he
12  have a driver's license?  The answer is no.
13      Q    Has Mickey Mouse ever voted?
14      A    I don't know.
15      Q    Okay.
16      A    Do I think Mickey Mouse has been
17  registered to vote?  Yes.
18      Q    Do you know whether ACORN was paying its
19  employees based on the number of voter registration
20  applications they were submitting?
21           MR. MCKENZIE:  It's the same
22  objection.
23      A    Do I know?
24      Q    (By Mr. Freeman)  Uh-huh.
25      A    Only what I would have read either -- and

---

195

1   I'm answering this to not say that it -- it entered
2   my mind in deliberations on voter I.D. or my vote.
3   But what I read prior to the -- the legislative
4   session and what I've read after, I don't know.
5   I've -- I've heard -- I read some things that that's
6   what they were doing.
7       Q    If ACORN had been paying its employees
8   based on the number of voter registration
9   applications that they were submitting --
10      A    Let me -- let me tell you my experience --
11      Q    Sure.
12      A    -- with voter registration, okay, because
13  I think it's important.  I mentioned that I helped
14  Jimmy Martinez in his election in Bee County.  He
15  was a Democrat, very well known in the county.  And
16  he got me involved with the Southwest Voter
17  Registration Project, which was a precursor to, I
18  think, ACORN and those types of organizations.  And
19  here I was a young attorney.  I wasn't even County
20  Attorney then, and they got me involved in this
21  organization.  And I think we went to San Antonio
22  for training.  And this is what we were told,
23  "Register, register, register.  And don't ask, don't
24  tell about citizenship."
25      Q    Who told you that?

---

196

1       A    The trainers that gave us our
2   training there --
3       Q    Do you remember --
4       A    -- in San Antonio.
5           I don't remember.  It's been almost --
6   it's been almost -- this is 2012.  It would have
7   been, goodness, 1985, '86.
8       Q    So why then did you tell Jim Cardle from
9   Texas Insider that you don't think non-citizen
10  voting was a big deal?
11      A    Because do I think --
12           MR. MCKENZIE:  Again, I would caution
13  the witness not to use subjective motivation in the
14  answer.
15      A    Because I think that people that are here
16  illegally would be worried about voting.  That's
17  why.  Because I think that that -- most -- most of
18  the people that I know that are -- that have entered
19  this country illegally -- and understand, I've
20  represented illegal aliens and quite a bit, in fact,
21  in federal court -- are more worried about getting
22  caught, making a living, then they are about voting
23  on our elections.
24           On the other hand -- on the other hand,
25  you have places like Arizona where you have people

Jose Aliseda                                                    June 6, 2012

## 197

1  that are very politically active that are here
2  illegally and I think have the potential to game the
3  system.
4       Q   (By Mr. Freeman)  And I'd like to turn --
5  you said previously that part of the purpose of
6  SB 14 was to increase public confidence.  I'd like
7  to turn to that.
8       Do you believe that there are some --
9  sorry.  Strike that.
10      Have any people ever told you that they
11  are -- that they do not vote because they feel it's
12  useless because of fraud?
13      A   Yes.
14      Q   Who?
15      A   I can't name names.
16      I can tell you that part of my motivation
17  in doing the voter fraud --
18      MR. MCKENZIE:  I would caution you
19  to -- not to express subjective motivations that are
20  not in the public record.
21      THE WITNESS:  I talked about that in
22  the public record.  He's got that straight out of my
23  speech on the floor.  I said that.
24      A   So to the extent that one of the reasons
25  that I was motivated to do these prosecutions and to

## 198

1  request the investigations were to inspire
2  confidence in the Electoral system in Bee County.
3  And I had people telling me, "Look, what's the use
4  of voting if my vote is going to be canceled by a
5  fraudulent vote?"
6       MR. FREEMAN:  I'm going to object to
7  that as nonresponsive and ask again.
8       Q   (By Mr. Freeman)  Who told you that?
9       A   I can't name a name.  I can tell you that
10  it was said to me more than -- they were
11  constituents of -- of Bee County when I was a County
12  Attorney.
13      Q   So this was back in the early '90s?
14      A   Yes.
15      Q   And --
16      A   And then I --
17      Q   -- you said.
18      A   And I can also say that I believe that was
19  part of committee testimony on the voter I.D. issue.
20  And I can say that when I campaigned as a State
21  representative that people said that to me, that
22  they didn't -- they didn't think that with an
23  I.D. -- without an I.D. that our system was safe.
24      Q   Did they -- people during your 2010
25  campaign tell you that they don't vote because they

## 199

1  think it's useless because of fraud?
2       A   Yes.
3       Q   But you don't recall who, you just recall
4  that in 2010 they told you so?
5       A   Yes.
6       Q   Why did you not produce these people as
7  witnesses during the hearings on SB 14?
8       MR. MCKENZIE:  I'm going to object on
9  legislative privilege and instruct the witness not
10  to answer.
11      Q   (By Mr. Freeman)  Did you have any
12  conversations with constituents about a lack of
13  confidence related to mail-in voting?
14      A   In 2010?
15      Q   Yes.
16      A   Yes.
17      Q   Do you remember who spoke with you about
18  that?
19      A   It would sometimes come up in meetings of
20  the Republican club, individuals in that club.
21      Q   Did you ever have conversations with
22  constituents about a lack of confidence because of
23  in-person fraud?
24      MR. MCKENZIE:  These are constituent
25  communications.  Correct?

## 200

1       THE WITNESS:  Yes.
2       A   People coming up to me and saying that
3  they thought people that should not be voting were
4  eligible to vote, yes.
5       Q   (By Mr. Freeman)  That's eligibility.
6  My question was in-person impersonation to clarify.
7       A   Okay.
8       Q   Did they -- did you ever have any
9  conversations with constituents because those
10  constituents believed that people were impersonating
11  other people at the polls?
12      A   I think I -- I did have some discussion
13  about that when I was at a campaign event in -- in
14  Atascosa County.
15      Q   Do you recall who the person was?
16      A   No.
17      Q   Do you recall --
18      A   You're talking I went to a function where
19  there was three, 400 people.  It would have been
20  a -- just a, you know, function for various elected
21  officials to come and talk about the issues.
22      Q   Do you recall if that person was Hispanic?
23      A   I can't say.  It's not likely.  At this
24  particular event, I don't think it was likely.
25      Q   And the individuals who you mentioned who

Jose Aliseda                                                June 6, 2012

## 205

1  of one house with 18 different names.
2      Q    And I guess if I can just look back to
3  say, why did you say that you think -- rather than
4  hypotheticals, why did you say that you think that
5  identification theft is happening with regard to
6  voting?
7          MR. MCKENZIE:  That's the same
8  standard objection.
9      A    Maybe I didn't artfully phrase it, but do
10  I think that someone could pretend to be somebody
11  and apply for a voter registration and then vote
12  that individual, yes, just like an individual can
13  have multiple credit cards with different names.
14  That's what -- that's what these people do is you
15  have an individual say they are, you know,
16  Mr. Smith, Mr. James, Mr. Franks.  And they have
17  multiple credit cards, identifications, et cetera.
18      Q    Representative Aliseda, do you recall
19  sending a letter to Civil Rights Division in support
20  of SB 14?
21      A    I don't remember.
22          MR. FREEMAN:  If we could have this
23  marked as U.S. 499.
24          (Deposition Exhibit No. 499 marked)
25      A    Okay.

## 206

1      Q    (By Mr. Freeman)  In your letter to the
2  Attorney General -- well, first off -- sorry.
3      A    Uh-huh.
4      Q    Have you seen this document before?
5      A    Yes.
6      Q    What is this document?
7      A    This is a letter to the U.S. Department of
8  Justice, Civil Rights Division in support of SB 14.
9      Q    And did you sign this letter?
10      A    Yes.
11      Q    Did you draft this letter?
12      A    I believe my staff --
13          MR. MCKENZIE:  I'm going to object --
14  well, this is not in connection with the legislative
15  act -- I withdraw the objection.
16      A    I believe my staff drafted it.
17
18
19      Q    (By Mr. Freeman)  Okay.  Did you review it
20  prior to signing it?
21      A    Yes.
22      Q    Okay.  Do you recall telling the Attorney
23  General that in 2004 a woman in Bee County cast a
24  ballot as if she was her deceased mother?
25      A    Yes.

## 207

1      Q    Wasn't that a mail-in ballot?
2      A    Yes.
3      Q    Hadn't the ballot actually been ordered
4  before the woman's mother passed away?
5      A    I don't know the particulars of the case
6  to be honest with you.
7      Q    Okay.
8      A    I just know that it was a famous case out
9  of Bee County.
10      Q    Big 500.
11          (Deposition Exhibit No. 500 marked)
12          MR. FREEMAN:  If we can have this
13  marked as U.S. 500.
14          MR. MCKENZIE:  Is that cumulative of
15  all exhibits of all depositions?
16          MR. FREEMAN:  We have ranges of all
17  depositions preassigned.
18          MR. MCKENZIE:  Got it.  Go it.
19          This is your -- you didn't use this -- was
20  this marked as an exhibit?
21      Q    (By Mr. Freeman)  It had previously been
22  marked.
23      A    Okay.  So I can keep this one or you're
24  going to --
25      Q    If you would like.

## 208

1      A    This one is an exhibit so I better get it
2  over here.  This is an exhibit.  All right.  500.
3      Q    Have you seen this document before?
4      A    No, I don't think so.
5      Q    Could you review this document and see if
6  it refreshes your recollection with regard to the
7  2004 case in Bee County.
8      A    I -- honestly, I had very little personal
9  knowledge of that case in -- in Bee County.  But
10  this appears to be a press release from Attorney
11  General Abbott that gives details that I would or
12  would not have been familiar with --
13      Q    Okay.
14      A    -- about that case.
15      Q    If you didn't know, you didn't know.
16  But given that that was a mail-in ballot case --
17      A    Uh-huh.
18      Q    -- which you did know, wouldn't it have
19  been -- sorry.
20          Would that case have been prevented or
21  thwarted by a photographic I.D. card?
22      A    Let me think about it, because I thought
23  it would.  Just give me a second to think about how
24  eventually I think it will.
25          As I said earlier, if -- if the State

---

### 209

1  implements this voter I.D. requirement and
2  eventually everybody that votes is going to have a
3  voter I.D., so even these people that have -- that
4  were requesting mail-in ballots at some point in the
5  future will have a voter I.D.  And at some point
6  what's going to happen if someone dies, there's
7  going to be a process where the death will be
8  entered into some vital statistics form and -- I
9  mean, computer entry, and their voter I.D. will be
10  canceled.  So someone would not be in a position to
11  do this.
12          We're talking several years in the future,
13  but eventually, I think, yes, voter I.D. will stop
14  something like this.
15      Q   If SB 14 had been implemented in 2003 --
16      A   Uh-huh.
17      Q   -- one year before this event --
18      A   Uh-huh.
19      Q   -- would it have prevented this mail-in
20  ballot fraud from occurring?
21      A   Maybe not one year, but 15, 20 years in
22  the future, yes.
23      Q   And so if someone tried to do the same
24  thing a year after -- if SB 14 were implemented in
25  this coming election --

---

### 210

1      A   Uh-huh.
2      Q   -- and someone tried to do this exact
3  thing in this coming election, SB 14 wouldn't stop
4  it.  Right?
5      A   Probably not.  Not now.  In the future I
6  think it would.
7      Q   Now, you previously were discussing how
8  corruption and fraud dated back to the Spanish
9  regime in Texas.
10          Would you agree that manipulation of
11  mail-in voting via politiqueros is an issue that
12  affects Spanish voters?
13      A   Yes.
14          MR. MCKENZIE:  It's the same
15  objection.
16      A   Politiqueros.  Obviously, it wouldn't be
17  politiqueros.  That's a Spanish word if they weren't
18  trying to influence Spanish voters.
19      Q   (By Mr. Freeman) Okay.  Would you say
20  that it's an issue that affects Hispanic voters more
21  than Anglo voters?
22          MR. MCKENZIE:  It's the same
23  objection.
24      A   I've heard that the same kinds of things
25  go on in the black community and the Vietnamese

---

### 211

1  community.  They have the equivalent of politiqueros
2  in those communities.  And I suspect that the same
3  thing occurs in Anglo communities in certain areas
4  of the state.  So I can only talk about my
5  experience with -- because all I know is south
6  Texas.
7      Q   (By Mr. Freeman) So you have a suspicion,
8  but you don't have a basis --
9      A   No, I actually --
10      Q   -- for those beliefs?
11      A   I've actually heard of the same types of
12  things occurring in ethnic communities in Harris
13  County for different ethnic groups.
14          Political bosses are political bosses, and
15  mail-in ballot fraud can be exploited by anyone, I
16  think, if -- if they really want to.  They could
17  really use it to advantage to influence primarily
18  local elections.
19      Q   Do you recall telling Al Dia that --
20          MR. FREEMAN:  Which is A-L space
21  D-I-A.
22          THE REPORTER:  Thank you.
23      Q   (By Mr. Freeman) That voter I.D. would
24  prevent fraud by politiqueros taking others' ballots
25  and mailing them?

---

### 212

1      A   That, I don't recall.
2          MR. FREEMAN:  I will apologize to the
3  court reporter in advance.  This newspaper article
4  is in Spanish.  It can be marked as 501.
5          MR. MCKENZIE:  Thank you.
6          (Deposition Exhibit No. 501 marked)
7          THE REPORTER:  Are you all going to
8  read it?
9          MR. FREEMAN:  You'll have it front of
10  you.
11          THE REPORTER:  Okay.  Let me tell you
12  what we do here.
13          MR. FREEMAN:  Uh-huh.
14          THE REPORTER:  I don't know how they
15  do it -- we can't -- I don't speak Spanish.
16          MR. FREEMAN:  Okay.
17          THE REPORTER:  So I wouldn't -- I
18  can't even read it.  Isn't that sad?
19          MR. FREEMAN:  Okay.
20          THE REPORTER:  I can't even read it.
21  So if you do read it, all I'm going to be able to
22  put is "reading in Spanish."
23          MR. FREEMAN:  That's fine.
24          THE REPORTER:  Okay.  Sorry.  I just
25  wanted you to know that.

Jose Aliseda                                                      June 6, 2012

---

## 213

1    MR. FREEMAN:  Just need it in the
2  record as Exhibit 501.  That's fine.
3    THE REPORTER:  Right.  I just wanted
4  you to know and not be upset when you saw that.
5    MR. FREEMAN:  That's fine.
6    Q   (By Mr. Freeman)  Have you seen this
7  article before?
8    A   No.
9    Q   Do you recall speaking with a reporter
10 from Al Dia?
11   A   Honestly, I don't.  I talked to a lot
12 of -- a lot of Spanish-speaking media, but I can't
13 remember, in particular, talking to this person.
14 What's the reporter's name?
15   Q   Unfortunately, it does not appear that a
16 reporter's name is connected with the story.
17   A   The only way I would know is if -- what
18 would happen -- how -- how I would get a media
19 interview is it would come through my office, and my
20 staff would say, "It's so and so.  Do you want to
21 take the call," or they would take the number and
22 then I would call them back.
23      So honestly, I don't know if I -- the name
24 does not sound familiar.
25   Q   Okay.

---

## 214

1    A   Now, they may have taken some statement I
2  made in some other media and used it.  I don't know.
3    Q   Do you see on Page 3 the last two
4  paragraphs beginning with (speaking in Spanish)
5  voter I.D., beginning there?
6    A   Can you point it out to me?
7    Q   (Indicating).
8    MR. FREEMAN:  And for the record, I
9  pointed to the second to last paragraph in
10 Exhibit 501 beginning with (speaking in Spanish).
11   A   That just doesn't look like a statement
12 I'd make, because voter I.D. -- the only -- the only
13 connection I could make with voter I.D. and
14 mail-in -- and mail-in ballot fraud is what I've
15 just discussed, which is that eventually with the
16 implementation of voter I.D., you are going to have
17 a system that is tied to a computer that eventually
18 will phase out, and everyone will have a voter I.D.
19 Yes, they can vote at home.  But if they pass away,
20 like what happened in Bee County, at some point you
21 will know they passed away and that their I.D. is no
22 longer valid, because eventually everything will
23 mesh, the databases would mesh.
24      So, honestly, that particular statement I
25 can't say that I made without that kind of

---

## 215

1  explanation.
2    Q   (By Mr. Freeman)  Okay.
3    A   I'm not even familiar with that.
4    Q   Now, you've spoken to this before, but
5  I've never actually asked you.
6    A   Uh-huh.
7    Q   So what would you say are the full list of
8  purposes, and not your individual beliefs, but
9  purposes for SB 14?
10   MR. MCKENZIE:  And I'd also caution
11 the witness not to reveal subjective motivations
12 communicated to you by other legislators, but we're
13 talking collective -- the legislature as a body, its
14 purpose.
15   THE WITNESS:  Legislative intent --
16   MR. MCKENZIE:  Yes.
17   THE WITNESS:  -- is what we're
18 talking about?
19   MR. MCKENZIE:  Yes, as a body.
20   A   Okay.  You want them listed in -- in
21 priority?
22   Q   (By Mr. Freeman)  That would be great.
23   A   Okay.  First and foremost, to instill
24 confidence in the system followed by to prevent
25 in-person voter fraud.  That's basically it.  To

---

## 216

1  secure -- to make it a more secure system.
2    Q   Was the purpose in any part to decrease
3  the number of Hispanic voters who could effectively
4  cast a ballot?
5    MR. MCKENZIE:  Same standard
6  objection as to the subjective personal purposes of
7  anybody, but you may answer as to general purposes.
8    A   No.
9    Q   (By Mr. Freeman)  Was the purpose in any
10 part to decrease the number of African-American
11 voters who could effectively cast a ballot?
12   MR. MCKENZIE:  Same.
13   A   I would never have voted for it if that
14 was the purpose.  In fact, we were given studies
15 that voter -- voter participation among minorities
16 actually increased with the passage of voter I.D.
17 laws.
18   Q   What studies were those?
19   A   They were studies out of Georgia and I
20 believe Indiana.  And I thought we had -- I thought
21 we had testimony from the -- some individual out of
22 Georgia at the Committee that came and brought us
23 that information.
24   Q   What --
25   A   I may be wrong, but I do remember

## 217

1  something being said about Georgia.
2      Q   Who were the authors of those studies?
3      A   I -- I don't know.
4          MR. MCKENZIE:  I would just caution
5  the witness to the extent it's not public, these
6  studies, I would instruct you not to talk beyond
7  here generalities for them.
8      A   I thought there was -- this is -- I'm only
9  testifying from memory from the Committee.
10     So, you know, a lot of this stuff that I
11 keep referring back to -- you've -- you've managed
12 to dig into a lot of stuff about me.  But a lot of
13 this stuff was said at the Committee.  We had a
14 couple days' worth of hearings, and by the same
15 token, we had testimony from the opposition to voter
16 I.D. in that Committee.  So those things would have
17 been public record, as well.  And then I found it --
18 found it kind of interesting that -- that there were
19 no voters that came in that said they could not vote
20 with the passage of voter I.D.  We just had
21 allegations that people aren't going to be able to
22 vote if you pass voter I.D., but there was no
23 evidence that that was ever going to be the case,
24 because nobody could ever produce a mythical voter
25 that did not have an I.D. or could not get an I.D.

## 218

1      Q   (By Mr. Freeman)  Did you have anyone come
2  in and testify that they don't vote because of voter
3  fraud?
4          MR. MCKENZIE:  Same objection to the
5  extent --
6          THE WITNESS:  We're talking about
7  testimony at the hearing.  I think I can talk about
8  that.  Right?
9          MR. MCKENZIE:  Sure.  But the fact
10 that you requested it would not be public, perhaps.
11 May be, may not be.  I don't know.
12     A   I don't remember that anybody came in at
13 the Committee and testified that they don't vote
14 because they -- because of voter fraud.
15     Q   (By Mr. Freeman)  Why was the burden
16 different on the opponents of the bill?
17     A   I --
18         MR. MCKENZIE:  And it's the same
19 objection.
20     A   I don't think there was a different burden
21 at all.
22     Q   (By Mr. Freeman)  But by saying that no
23 one came in and said they didn't have an I.D.,
24 weren't you putting a burden on the opponents of the
25 bill to produce someone when you weren't producing

## 219

1  anyone to them that said they don't vote?
2          MR. MCKENZIE:  I'm going to object on
3  argumentative grounds to you, but you may answer.
4      A   Okay.  I don't think the two are the same.
5  One is somebody comes in and says, "You pass this
6  law and you are going to disenfranchise people," but
7  they produced absolutely no evidence to support that
8  statement.
9      We had people come in and say that voter
10 I.D. was necessary because they personally witnessed
11 voter fraud.  So I do think we had evidence to
12 support -- to support the position that legislation
13 like this might stop voter fraud.
14     But on the other -- the other thing we had
15 was the fact that people had lost confidence in the
16 system.  By the way they were -- they were
17 testifying, they did not believe the system without
18 requiring an I.D. was going to be a safe system.  So
19 that also came out during the testimony.
20     Q   (By Mr. Freeman)  Okay.  Didn't you also
21 have -- sorry.  Strike that.
22     Are you aware of any studies that have
23 shown that minority voters are less able or less
24 likely to vote under a voter I.D. regime?
25         MR. MCKENZIE:  It's the same standard

## 220

1  objection.
2      A   I believe we had, during the Committee
3  hearing, people coming in testifying that they had
4  done studies to that effect.
5      Q   (By Mr. Freeman)  Why did you believe one
6  set of studies and not the other?
7      A   It's not that I didn't believe it.  To --
8  to -- to the extent that -- how can I put it?
9  This -- this issue is -- is more about 2011/2010
10 modern society, commonsense and a pervasive image
11 that the media has painted that our elections have
12 the potential for being stolen by people registered
13 by ACORN, by the possibility of ineligible voters
14 voting in our elections.
15     I'm not saying that I didn't believe that
16 there was a possibility based on these studies that
17 were presented at the Committee, but, you know, to
18 the extent that I'm saying that those things entered
19 into my decision to vote for or against voter I.D.,
20 I assert --
21         MR. MCKENZIE:  I would caution --
22     A   -- a privilege.
23         MR. MCKENZIE:  Yeah.
24     A   I assert a privilege.
25     Q   (By Mr. Freeman)  Are you aware of the

Jose Aliseda                                                        June 6, 2012

221

1    type of I.D.s that were permissible under the
2    Indiana federal law?
3              MR. MCKENZIE:  Same standard
4    objection.
5         A    Was I aware -- I'm aware now, because
6    I -- I did a little research for the debate I have
7    tomorrow.  I pulled up the Indiana statute for that.
8         Q    (By Mr. Freeman)  Okay.  Isn't it the case
9    that Indiana permits any state or federal I.D. with
10   a name, photo and expiration date that is either
11   unexpired or expired after the last general
12   election?
13        A    I believe that's the language they use,
14   yes.
15        Q    Does the Indiana law establish identity?
16        A    I -- I don't understand the question.
17        Q    Do the identifications that the Indiana
18   law uses establish an individuals' identity for
19   voting purposes?
20        A    Maybe I'm being thick-headed.  I don't
21   understand the question.
22        Q    My questioning is thick-headed then.
23        A    No, I'm --
24        Q    No, no.
25        A    I'm not trying to be evasive.  I don't

222

1    understand the question.
2              Who do you mean --
3         Q    The forms of I.D. that are permissible
4    under Indiana law that you show prior to voting --
5         A    Uh-huh.
6         Q    -- do those establish an individual's
7    identity effectively so that an election judge knows
8    that the person showing that I.D. is the person that
9    they say they are?
10        A    Well, it is a government-issued I.D.,
11   which I would assume requires some steps to acquire
12   if it is a valid I.D., which I would assume requires
13   some kind of establishment as to who you are in
14   order to get that.
15        Q    Did you also research for your debate
16   tomorrow the forms of I.D. that are permissible
17   under Georgia law?
18        A    That, I did not.
19        Q    Okay.  Do you know what forms of I.D. --
20        A    No.
21        Q    -- are permissible under Georgia law?
22   And this has previously been marked as U.S.
23   Exhibit 6.
24              MR. MCKENZIE:  Thank you.
25        Q    (By Mr. Freeman)  If you could, look at

223

1    the first page.
2         A    Uh-huh.
3              Okay.  One's a driver's license, another
4    is a voter I.D., another is a U.S. passport, another
5    is an employee I.D. issued by any branch of
6    government, department, agency, or entity of the
7    United States government, this state or county
8    municipality -- okay.  A valid U.S. military I.D.
9    card, a valid tribal I.D. card.  Isn't that it?
10        Q    That's about it.
11        A    Okay.
12        Q    Does -- do the forms of I.D. used for
13   voting under the Georgia law establish a voter's
14   identity?
15        A    I think I understand what you're asking.
16   Are you saying would these types of identifications
17   have some safeguards to establish who those -- that
18   individual is, in fact, the individual?  I would
19   say, yes, if that's what you're asking.
20        Q    Do you recall what forms of identification
21   are allowable under SB 14?
22        A    All right.  Now, let me see if I got it --
23        Q    I'm happy to refresh your recollection
24   if --
25        A    Refresh, please.  I believe there is three

224

1    or four, but...
2         Q    This has previously been marked as U.S.
3    Exhibit 5.
4              MR. MCKENZIE:  Thanks.
5         Q    (By Mr. Freeman)  And the Section 14 on
6    Page 9 --
7         A    Uh-huh.
8         Q    -- is the one you're going to want to take
9    a look at.
10        A    Okay.  One's a driver's license, another
11   is a military I.D. card, another is a -- I would
12   assume it's a naturalization certificate, another is
13   a U.S. passport, and the other is a concealed to
14   carry handgun permit, and that's it.
15        Q    And also under elect -- or excuse me,
16   under Subsection 1 of Section 63.0101 doesn't it
17   also include an election identification certificate
18   or personal identification card issued by the
19   Department of Public Safety?
20        A    Yes.
21        Q    Okay.
22        A    The voter I.D.
23        Q    Okay.  Isn't this list smaller than the
24   list in Indiana?
25        A    Refresh my recollection on Indiana again.

Jose Aliseda                                                    June 6, 2012

---

225

1      Q   You were able to -- you were able to
2   answer that one for me before.
3      A   I know.
4      Q   Does Indiana allow any state or
5   federal-issued I.D. --
6      A   I believe --
7      Q   -- expired?
8      A   -- yes, yes.
9          So the difference between Texas would be
10  number -- for example, the Georgia I.D. card, "A
11  valid employee identification card containing the
12  photograph of the elector and issued by any branch,
13  department, agency or entity of the United States
14  government, this state or any county municipality,
15  board authority or any other entity of this state."
16  The difference between Texas law and that law would
17  be we are not accepting anything from the federal
18  government -- basically an employee I.D. card from
19  the federal government, the county government, the
20  state government, the municipality, board or
21  authority or other entities of the state.
22     Q   Wouldn't that also include college I.D.s
23  if it's a public college?
24     A   College I.D. for a student?
25     Q   Uh-huh.

---

226

1      A   I think that would be extremely hazardous.
2      Q   But wouldn't -- isn't that also included
3   under the Georgia law?
4      A   No, because it says a valid employee I.D.
5   card.  Is a --
6      Q   I'm sorry.
7      A   -- is a student an employee of a school?
8   I don't think so.
9      Q   I'm sorry.  I -- I -- I was thinking of
10  Indiana.  I apologize.
11     A   Does Indiana allow students?  I don't
12  remember.
13     Q   Well, didn't you previously say that it's
14  any State-issued photo I.D.?
15     A   Okay.  So it would be a state college, but
16  not all colleges are state colleges and -- or
17  universities.
18     Q   But I believe you could have a community
19  college?
20     A   Yes, uh-huh.
21     Q   I believe that actually your esteemed
22  counsel attended a state university in the State of
23  Indiana and probably had Indiana photo I.D.  Not
24  going to bring him into this.
25         MR. FREEMAN:  My apologies.

---

227

1          MR. MCKENZIE:  I did.
2      Q   (By Mr. Freeman)  And so -- and you -- you
3   testified that those documents produced that are
4   allowable in Indiana and Georgia establish identity.
5   Right?
6      A   I -- I have the opinion that if a
7   governmental agency of that type would -- would
8   have -- and I'm -- you know, I'm hoping that they're
9   as good as, for example, a military I.D. or a -- I
10  would not think that the current state I.D. that I
11  have is very good, to be honest with you.  I think
12  someone could forge it pretty easily.
13         I can tell you that a student I.D. could
14  be forged pretty easily, because they -- they don't
15  have the same thing as, for example, a Texas
16  voter -- excuse me, a Texas driver's license has
17  almost a -- it's got a -- you know, if I had to
18  describe it, it's got like a funny seal on it that
19  is holographic, it looks like.
20     Q   And so if those documents for Indiana and
21  Georgia establish identity, doesn't the Texas bill
22  exclude some documents that establish identity?
23         MR. MCKENZIE:  I'm going to object to
24  the extent you slightly mischaracterized his
25  testimony as to what established identity means, but

---

228

1   you may answer.
2      A   If your question is does Georgia appear to
3   allow a different kind of I.D. than Texas does, my
4   answer to that is yes.
5      Q   (By Mr. Freeman)  Okay.
6      A   If -- if you would have just asked it that
7   way, yes.  Georgia seems to allow another type of
8   I.D. that can be used other than Texas.
9      Q   Are you familiar with the Supreme Court's
10  decision in Crawford v. Marion County Election
11  Board?
12     A   Yes.
13         MR. MCKENZIE:  Same objection.
14     Q   (By Mr. Freeman)  In preparation for your
15  debate tomorrow?
16     A   Yes.
17     Q   Did the decision address whether the law
18  would have a disparate impact on minority voters in
19  Indiana?
20     A   I believe one of the opinions --
21  concurring opinions did talk about that.
22     Q   Did the majority opinion?
23     A   I don't believe it did.
24     Q   Is Texas more demographically diverse than
25  the State of Indiana?

Jose Aliseda                                                June 6, 2012

## 233

1     MR. McKENZIE:  Same general
2  instruction.
3     A   This is an employee I.D.  We just
4  discussed how -- and I'm pointing at my State rep
5  card.  We just discussed how it's not in any way as
6  secure as a Texas driver's license.
7     Q   (By Mr. Freeman)  But is it more secure
8  than your citizenship certificate?
9     A   Yes.  Not -- this I.D. --
10    Q   Uh-huh.
11    A   -- is it more secure than my citizenship?
12  No, I don't think so.
13    Q   What was the purpose of omitting tribal
14  I.D.s?
15       MR. McKENZIE:  Same objection.
16    A   If I told you the answer to that, it -- it
17  would entail discussions between State
18  representatives about -- about how secure tribal
19  I.D. cards were.
20    Q   (By Mr. Freeman)  Well, the response to
21  the question itself is not privileged --
22    A   Uh-huh.
23    Q   -- and your attorney has made no
24  objection.
25       MR. MCKENZIE:  I said same objection.

## 234

1        MR. FREEMAN:  Pardon?
2        MR. MCKENZIE:  I said same objection,
3  but I said is softly, so you may not have heard it.
4  I'm sorry.
5        MR. FREEMAN:  I missed it.
6     Q   (By Mr. Freeman)  And so I would ask that
7  you answer the question in terms of your
8  understanding of the general purpose of omitting --
9     A   Tribal I.D. cards.
10    Q   -- a tribal I.D.
11       MR. MCKENZIE:  Well, it's the same
12  objection, I think, because it's premised on this
13  idea that the earlier versions of the bill were
14  templates for later version of the bill, so there's
15  discussions about removing it.  And it's hard for me
16  to disentangle the sort of subjective communication
17  that may have happened to the people who were
18  drafting it or in Committee or whatever, unless
19  there's a public statement on the record that talks
20  about that sort of thing, like we're going to get
21  rid of tribal I.D.s because of XYZ, if there is
22  something to that effect.
23       THE WITNESS:  I know there was never
24  a public statement on the record about why tribal
25  I.D. cards were stricken from the original draft of

## 235

1  the bill.  I can answer the question to you outside,
2  and you can tell me whether I should answer the
3  question or not.
4     Q   (By Mr. Freeman)  There's a question
5  pending and to some extent --
6     A   Uh-huh.
7     Q   -- you can understand our frustration with
8  this, as well, given the purpose is the ultimate
9  issue.
10       You know what, we can move on from that.
11  That's fine.
12       What does the term "legislative emergency"
13  mean within the Texas Legislature?
14    A   It means that we can take it outside of
15  its normal 60 day -- 60 days prior -- I mean, 60
16  days after the session began.  That's all it means.
17  It doesn't mean it's a high priority.  What it does
18  do - and this is something that a lay person may not
19  understand - is because everything tends to pile up
20  at the end in the session when you only have a
21  140-day session and you only meet once every two
22  years -- what it does allow you to do is to keep it
23  from ending up in that pile at the end and allow you
24  to consider it and debate it and flesh it out and
25  amend it and do whatever you need to do so that it

## 236

1  can be voted on, because that is what happened in
2  prior sessions.  Sometimes it -- this particular
3  bill would end up being, in effect, filibustered
4  with a thing called chubbing, which was a kind of
5  filibustering.
6     Q   Okay.
7     A   So what it did is allow you to take it up
8  earlier.  And actually, I think it's better that
9  way, because you actually get to debate it.  It
10  doesn't end up with a bunch of the crap at the end.
11    Q   Was photographic voter I.D. declared to be
12  a legislative emergency in 2011?
13    A   Yes.
14    Q   Who was responsible for declaring
15  photographic I.D. to be a legislative emergency?
16    A   Texas Governor Rick Perry.
17    Q   Okay.  Are you aware of any conversations
18  concerning legislative emergencies declared before
19  the declaration was issued in 2011?
20       MR. MCKENZIE:  It's the same
21  objection to the extent they're private, not public.
22       MR. FREEMAN:  It's just a "yes" or
23  "no" question.
24       MR. McKENZIE:  Are you aware?
25       MR. FREEMAN:  Yes, are you aware.

## 237

1    MR. MCKENZIE:  The thing is, though,
2  is that the awareness touches on subject matter that
3  is more specific than just voter I.D. generally.
4  It's about emergency legislation.
5    MR. FREEMAN:  It's pretty broad.
6    MR. McKENZIE:  I know, but if you red
7  the Court's -- if you read the Court's order about
8  what's sufficed for attorney-client privilege, I
9  think it's more specific than what were
10 communications offered for the purpose of giving or
11 seeking legal advice sufficient to establish the
12 privilege.
13   So this is, I think, more specific than
14 that.  I don't think it's stuff we would necessarily
15 have to include on a privilege log.
16   THE WITNESS:  So what -- what should
17 I do?
18   MR. MCKENZIE:  Well, I'm going to
19 instruct you not to answer if it reveals private
20 communications among elected government officials
21 about emergency legislation.
22   To the extent you can recollect stuff
23 about the public record or other reasons why it
24 might have been declared a legislative emergency,
25 then you may --

## 238

1    A   I don't know.
2    Q   (By Mr. Freeman)  Okay.
3    A   That's my answer.  I don't know.
4    Q   Okay.  Problem solved.
5        Was any election set to occur during the
6  first 60 days of the session?
7    A   I don't think so.
8    Q   Okay.
9    A   Do I know for a fact that there were no
10 school board elections?  I don't think that that --
11 you know, I have to go to elections calendar.
12 You're only allowed to hold elections on certain
13 years at certain times of the year, and I'm sure
14 that there were the potential for some
15 municipalities to hold an election or a school to
16 hold a bond election or something like that.
17   Q   Aren't the election dates just May and
18 November for general elections in Texas?
19   A   For -- for general elections, yes.  But
20 there are different election dates that you can hold
21 an election.  I -- I'm not an expert in it, but I
22 believe that a city can hold a -- or a school can
23 hold a bond election on a particular day.  I may be
24 wrong.
25   Q   Did you speak with any lobbyists

## 239

1  concerning SB 14?
2    A   Lobbyists, no.
3    MR. MCKENZIE:  Objection; vague, but
4  you may answer.
5    A   What's your definition of a lobbyist?  I
6  mean, I think a constituent coming in and telling me
7  something would be somewhat of a lobbyist.
8        This is not a lobby-type bill.  I mean,
9  this is -- if you -- on what I consider a lobbyist
10 is somebody that wants certain legislation because
11 it affects their business in some way.  And this is
12 not one of those types of bills that -- that would
13 necessarily garner lobbying.
14   Q   (By Mr. Freeman)  Why don't I define a
15 lobbyist as an individual representing a larger
16 organization?
17   A   Okay.
18   Q   Did you have anyone coming in for any such
19 organization?  An example would be Texans for
20 Lawsuit Reform.
21   A   No, TLR didn't talk to me about it.  But I
22 can tell you I had a group for the disabled come in
23 and request some accommodation for people with
24 disabilities.
25   Q   What group was that?

## 240

1    A   You'd have to ask my staff, because she
2  came to see me, and she was a very sweet lady.  She
3  came to see me two or three times.  I had an
4  organization called the Kings -- King Street
5  Patriots.  Somebody with them came and talked to me
6  about it.
7    Q   Who from the King Street Patriots came to
8  talk to you about it?
9    A   Tall, blonde lady, Engelbrecht.
10   Q   Catherine Engelbrecht?
11   A   Yeah, Engelbrecht.
12   MR. FREEMAN:  And for the court
13 reporter it is Catherine, and the last name is
14 spelled, E-N-G-L-E-B-R-E-C-H-T [sic.]
15   THE REPORTER:  Thank you.
16   MR. FREEMAN:  You're welcome.
17   Q   (By Mr. Freeman)  What did Catherine
18 Engelbrecht have to say about SB 14?
19   A   It wasn't about SB 14.  It was our -- the
20 House version of SB 14.  So it would have been prior
21 to -- prior to this thing going to the Senate and
22 coming back as SB 14.  Other than she was in favor
23 of it, I mean, that...
24   Q   Did she say why she was in favor of it?
25   A   I vaguely remember her talking about some

Jose Aliseda                                              June 6, 2012

## 241

1  of the things that she had witnessed in Harris
2  County, things that they had looked into.
3       Q   What did she say she had witnessed in
4  Harris County?
5       A   I think it had something to do with
6  inordinately high registrations, much like the same
7  stuff I talked about in my floor speech, that you
8  had areas in Harris County that were beyond the
9  State average, and the opportunity for fraud was
10 there.
11      Q   Okay.  Did Ms. Engelbrecht advocate for
12 any particular changes to the bill?
13      A   I don't remember that.
14      Q   Did she recommend that you speak with
15 anyone else?
16      A   No, I don't remember that.
17      Q   Do you recall anything else she said?
18      A   She had some list of things that she
19 thought would help clean up some of our elections.
20 I remember that.  And I think she gave it to me and
21 I looked at it to see if I was interested in doing
22 any of it.  They mostly had to do with -- with --
23 well, from what I remember mail-in stuff.
24          The stuff I ended up doing, whatever it is
25 I picked up, would have gone -- I think I would have

## 242

1  discussed it with the Attorney General's office to
2  see if it was something that would be helpful to
3  clean up our election system.
4       Q   Okay.
5       A   Because I did sign off on a bunch of
6  bills, sponsor, try to push some things.  I don't
7  know if any of those were her ideas.  I think some
8  of them were.  But -- but the ones I picked up were
9  the ones that I thought were actually designed to
10 fix some of the problems we had in our election
11 system.
12      Q   Were there some that were not designed to
13 fix some of the problems in our election system?
14      A   I think a better way to characterize it
15 would be that they would have had little to no
16 effect.
17          In other words, that they were either
18 impractical or designed to fix a problem that could
19 be fixed by some other methods, so that's vaguely
20 what I remember.
21      Q   Do you recall what any of them were?
22      A   No, to be honest with you.
23 I don't think her -- her list -- I don't
24 have her list, for one.  But I don't think it was a
25 secret.  I think it's on there -- I think it's on

## 243

1  their website.  You ought to pull up their website
2  and see if it's there --
3       Q   Okay.
4       A   -- because I think it came off of their
5  website that she gave to me.
6       Q   Did -- did Ms. Engelbrecht talk at all
7  about Hispanic voters in Harris County?
8       A   No.
9       Q   Did she talk at all about African-American
10 voters in Harris County?
11      A   I don't think that's what the discussion
12 was.  I think it had more to do with there were
13 pockets in Harris County that had strange things
14 going on.  And there was really no reference as to
15 think -- from what I remember, no reference as to
16 race or ethnic origin on that -- on those issues.
17      Q   Where were those pockets?
18      A   I don't remember.  I don't have any
19 familiarity with Harris County.
20      Q   Okay.
21      A   This is what I gleaned from what she told
22 me --
23      Q   Okay.
24      A   -- is that the types of things that were
25 occurring in South Texas were occurring in other

## 244

1  areas of the State, in urban areas of the State.
2  And that's why I mentioned earlier you could have
3  political bosses doing mail-in stuff, you could have
4  them doing other things to influence elections
5  regardless of ethnic origin or -- or race.
6       Q   So this is the urban parts of Harris
7  County, not the suburban parts of Harris County.
8  Right?
9       A   I just know it was Harris County.
10      Q   Correct.
11      A   So I -- to me I think Harris County
12 effectively is a entire city in and of itself.  I
13 mean, it's a metropolis or megalopolis of a bunch of
14 communities together.  And they overlap into
15 outlying counties, as well, Fort Bend County,
16 Galveston County.  They all seem to be -- I forgot
17 what the term is for something like that where you
18 have communities that have effectively become one
19      Q   Did you ever speak with Paul Bettencourt?
20      A   Bettencourt.  That name sounds familiar,
21 but I can't say.
22      Q   The former tax collector and voter -- for
23 Harris County?
24      A   That name sounds real familiar.  I think
25 he came and testified at a Committee.

---

245

1    Q   Did you ever speak with any experts on --
2  on this issue?
3         MR. MCKENZIE:  And I'm going to just
4  assert the same objection.
5    A   That came into my office?
6    Q   (By Mr. Freeman)  Yes.
7    A   Experts.  I would have considered that
8  young lady that was talking to me about her concerns
9  with respect to any of the voter fraud legislation
10 that I was pushing and how it might affect people
11 with disabilities an expert.  The only other expert
12 I would have heard would have been through the
13 testimony at the Committee.
14   Q   Okay.  Did you ever have any
15 representatives from minority groups come and speak
16 to you, MALDEF, LULAC, GI Forum, NAACP?
17   A   The problem is I would confuse them with
18 their testimony at -- at the Committee.  I may have
19 had them come prior to the Committee or after the
20 Committee, but can I say with any certainty, no.
21   Q   Okay.
22   A   I could look at -- I had a -- a log of
23 people that would come into my office.
24 Unfortunately, they weren't very good about signing
25 it.  I could look to see who logged in while I was

---

246

1  in session and tell -- better answer you that.  If
2  you want, I'll check tomorrow.
3         MR. FREEMAN:  Do you want to take
4  five minutes?
5         THE WITNESS:  No, I'm fine.
6         MR. FREEMAN:  Do you?
7         THE REPORTER:  Yes.  Can we?
8         (Off the record from 4:58 to 5:15)
9    Q   (By Mr. Freeman)  Okay.  I just want to
10 follow up real quickly.  Just a couple more quick
11 questions to close off on your conversations with
12 Ms. Engelbrecht just to make sure that the record is
13 clear.
14        So she had said that the problems that she
15 had seen in Harris County were related to mail-in
16 ballot fraud?
17   A   I'm not saying she said that.  I thought a
18 number of her proposals had something to do with
19 mail-in ballot fraud.
20   Q   What were the problems that she said she
21 had seen in Harris County?
22   A   The best answer I could give is she gave
23 me a sheet of things that she thought would be good
24 legislation, and she put a reason to the side as to
25 why she thought that they -- that that legislation

---

247

1  was necessary and why she thought it was necessary
2  from -- based on what she had seen.  I can't
3  remember exactly what those problems that she
4  identified are, but I do believe they're available
5  on -- on their website.
6    Q   What were the problems that she identified
7  with regard to voter I.D.?
8    A   Other than that it was necessary,
9  I -- it's hard for me to put her conversation in
10 context with all the other stuff that people have
11 talked to me about over my year of campaigning and,
12 you know, the -- the hustle and bustle of
13 Legislative Session.
14   Q   So you can't recall any specific --
15   A   That's right.
16   Q   -- factual incidents that were --
17   A   Most of the people that came to talk to me
18 about voter I.D. constituents, they were -- one,
19 they would say it's commonsense.  I mean, you
20 can't -- you can't do anything without an I.D.
21 nowadays.  They felt it was a commonsense mess --
22 measure that would help inspire confidence in the
23 system.  And they would talk about the -- the law
24 would have an intended effect to safeguard the

---

248

1  system.
2    Q   Safeguard the system against what?
3    A   In-person -- in-person voter fraud.
4    Q   But Ms. Engelbrecht didn't say that she
5  had seen any instance of in-person voter fraud, did
6  she?
7    A   I don't recall.
8    Q   Okay.  When did the Select Committee on
9  voter identification and voter fraud begin
10 considering SB 14?
11   A   I don't remember.  I know it was earlier
12 in the session.
13   Q   This has previously been marked as U.S.
14 Exhibit 8.
15        MR. MCKENZIE:  Thank you.
16   Q   (By Mr. Freeman) One for you.  One for
17 you.
18        What is this document?
19   A   Texas Legislature Online History.
20   Q   Have you seen this document before or a
21 document similar to it?
22   A   I know what they look like, if that's the
23 question.  So -- let's see.  SB 14, we didn't get it
24 back.
25        If you want to talk about when did the

Jose Aliseda                                              June 6, 2012

## 249

1  House Committee consider its -- the House version, I
2  think it's got a date here.
3      Q   If you would look at Page 6 of 19,
4  referral to voter identification and voter fraud
5  select --
6      A   Yeah.
7      Q   -- when did that occur?
8      A   Can you point to the area?  I'm having
9  trouble --
10     Q   Six of nine.  It's the third H from the
11 bottom.
12     A   Third H, "Referred to voter
13 identification, voter fraud, select two --
14 2/11/2011."
15     Q   And how long did the bill take to pass
16 from the Committee?
17     A   I have trouble reading these things.
18     Q   Reported favorably as substituted?
19     A   Where's that?
20     Q   That's still on Page 6.
21     A   Uh-huh.
22     Q   About ten lines up from the one you were
23 looking at before.
24     A   Okay.  One, two, three, four, five, six --
25 reported favorably substituted, 3/7/2011.

## 250

1      Q   Is that -- just as a general matter, is
2  that a shorter time than usual for a major bill to
3  pass through Committee?
4      A   I don't think so.
5      Q   Okay.
6      A   No, it's actually a longer time, to be
7  honest with you.  I mean, I've had bills that would
8  come in and come out that same -- same day if we
9  wanted to.
10     Q   Major bills?
11     A   You know, on the committee that I was on,
12 yeah, I'm talking substantial criminal laws that we
13 would -- that we would -- depending on -- depending
14 on who the author was and depending on the Chair's
15 knowledge of previous activity regarding a similar
16 bill or something, yeah, we could have it go through
17 the Criminal Juris Prudence Committee pretty quick.
18 We could have the -- I'm trying to think --
19 Environmental Right Committee.  That was a lot
20 slower committee because of the Chair.  It was
21 just -- depended on the Chair.
22     Q   What is the emergency calendar?
23     A   I don't understand the question.
24     Q   Isn't it the case that there's a Calendars
25 Committee in the House?

## 251

1      A   Yes.
2      Q   And the Calendars Committee place bills
3  onto different types of committees and calendars,
4  local and consent?
5      A   I believe that's the way it works, yes.
6      Q   Is there a calendar called the emergency
7  calendar?
8      A   If there is, I think it would -- would be
9  a calendar with respect to something that the
10 Governor's declared an emergency.
11     Q   You have no other knowledge of what that
12 means?
13     A   Yeah.
14     Q   Okay.
15     A   I think you better ask the Calendar Chair,
16 Todd Hunter, which brings me back to you asked me a
17 one time had I ever met with anyone else that was a
18 legislature -- legislator before I became a State
19 representative.  And I can say that I met with Todd
20 Hunter, Raul Torres, J.M. Lozano and Connie Scott
21 before we were sworn in as State representatives.
22     Q   Was that some sort of Coastal Bend
23 delegation?
24     A   Yes, yes.
25     Q   Okay.

## 252

1      A   And it was -- Todd Hunter, I can probably
2  say I met him before I became a State representative
3  in other political functions, because it's very
4  close to -- to -- Nueces County and San Patricio
5  County are counties very close to my county, Bee
6  County.
7      Q   Did you serve on the Conference Committee
8  for SB 14?
9      A   I believe I did.
10     Q   Were any changes introduced to SB 14 in
11 Conference that had not been in the version of the
12 bill passed by either House?
13     A   That's not the way the Conference
14 Committee works.  The way the Conference Committee
15 works is normally the Chair of each -- the Chair of
16 each respective committee gets together and they
17 decide, okay, you know, what's going to jive.  And
18 then they approach us as committee members on the
19 Conference Committee and say, "Are you okay with
20 these changes?"And if we are, we say yes.  And if
21 we're not, then that's recorded as a no vote.  There
22 is no particular actual meeting of the Conference
23 Committee.  So we never met as a committee.  It was
24 more meeting as a -- how can I put it?
25     Q   Meeting on paper?

Jose Aliseda                                                    June 6, 2012

## 253

1     A   Yeah, meeting on paper.  It was not a --
2     called a meeting, if that's what you want to call
3     it.
4     Q   Okay.  Were any changes to SB 14 made
5     during a conference process --
6     A   I don't remember.
7     Q   -- that added -- okay.
8         MR. FREEMAN:  If this can be marked
9     as U.S. 502.
10        (Deposition Exhibit No. 502 marked)
11    Q   (By Mr. Freeman)  Representative, have you
12    seen this document before?
13    A   It looks like where I signed off on the
14    report out of the Conference Committee.
15    Q   What is this document?
16    A   Conference Committee report form.
17    Q   Okay.  And if you turn to the second to
18    last page, do you see --
19    A   Page 15?
20    Q   Page 9.
21        MR. MCKENZIE:  Way back, the whole
22    packet.
23        THE WITNESS:  Oh, okay.  I'm sorry.
24        MR. MCKENZIE:  No problem.
25    Q   (By Mr. Freeman)  Page 9 of the

## 254

1     section-by-section analysis, do you see where it
2     says, "The Conference Committee may have exceeded
3     the limitations imposed on its jurisdiction," under
4     "Conference," in italics?
5     A   Maybe if you could point to me.  I'm
6     sorry.  It's real small.
7     Q   Sure.
8         For the record, counsel for the Attorney
9     General is pointing to the top right paragraph of
10    Page 9 in the section-by-section analysis, Bates
11    stamped TX_00003544.  And there is a section of text
12    that is bracketed and in italics.
13    A   Yeah, I -- I read it.
14    Q   What does that mean?
15    A   I don't know.
16    Q   Is the scope of the Conference Committee's
17    jurisdiction limited to resolving differences
18    between the House and Senate bills?
19    A   Yes.
20    Q   So if it adds new text that was in neither
21    bill, is that beyond the scope of the Conference
22    Committee's jurisdiction?
23    A   I'm not -- I'm not legislative counsel, so
24    I can't say.
25    Q   Can you explain the scope of material that

## 255

1     is contained in Section 20 in the Conference
2     Committee version?
3     A   It looks like it has to do with what was
4     going to be charged for an identification card -- or
5     a voter identification card.
6     Q   Had you previously heard testimony
7     concerning the burden that would relate to acquiring
8     those voter identification cards?
9         MR. MCKENZIE:  Objection; vague.  You
10    may answer.
11    A   Testimony in Committee?
12    Q   (By Mr. Freeman)  Yes.
13    A   Testimony?  I don't remember if there was
14    testimony.  I wish I had the Committee transcript.
15    I can't say that there was testimony.  I know there
16    was a lot of comments from legislators on the mic
17    about the potential that this could cost somebody
18    something.
19    Q   Did you receive any analysis or testimony
20    concerning the hours of operation of driver's
21    license offices?
22        MR. MCKENZIE:  And I'm going to
23    assert the standard objection to the extent you got
24    it in your duty as a legislator.
25    A   From what I recall, there wasn't testimony

## 256

1     in the Committee.  I believe that there was -- that
2     there was argument on the mic about it.  And
3     that's -- that relates somewhat to what we began
4     this deposition on, and that is that anybody could
5     say anything in argument that the mic without any
6     evidence of what they were saying.
7         So I do recall that there was some
8     discussion in the arguments at the mic about costs
9     and the closure of DPS offices and the distance of
10    some DPS offices from people.
11    Q   (By Mr. Freeman)  Did you receive any
12    information concerning the accessibility of such
13    offices via public transportation?
14    A   Once again, I go back to there wasn't that
15    kind of testimony at the Committee.  There was
16    argument at the mic about it, which is not evidence.
17    It's different from testimony.
18    Q   I don't disagree.
19        Can you identify any other instances where
20    the Conference Committee added language that was
21    neither in the House version or the Senate version
22    of the bill?
23    A   This -- this document you gave me which is
24    what, Exhibit 502, I think would be better to answer
25    that question than I can at this point.

Jose Aliseda                                                      June 6, 2012

---

261

1   the necessary I.D., would that concern you?
2       A   No.  You want to know why?
3       Q   Why?
4       A   Well, let's give you -- I know how you
5   work this thing.  Disparate -- disparate effect --
6   effect.  You have -- let's say you have a million
7   Anglo voters and 98.9 percent are registered to
8   vote, and you have a million Hispanic voters and
9   98 -- 99.8 percent are registered to vote.  With
10  your disparate effect treatment, just that -- that
11  minimal 1 percent difference means that a Hispanic
12  is twice as likely -- twice as more likely than an
13  Anglo to having a voter registration.
14      Q   And we can avoid the fancy math --
15      A   Okay.
16      Q   -- hypothetical.
17      A   Okay.
18      Q   100,000 voters don't have the necessary
19  I.D.  70,000 of them are -- no.  Let's say 60,000 of
20  them are Hispanic, 10,000 are African-American and
21  3,000 -- or -- and 30,000 are Anglo.
22      A   Okay.
23      Q   Would that concern you?
24      A   Now, that would concern me.
25      Q   Why would that concern you?

---

262

1       A   Well, because it's -- one, a lot larger
2   number.  And it is, in fact, a true disparate effect
3   versus the example I gave you, where we're talking
4   about 1/1,000th of a percentage.  But you could say
5   the same arguments.  You could say twice as likely
6   in that scenario, and you could say in your argument
7   twice as likely in your scenario.
8       So, you know, what are we talking about?
9   You can -- you can play with statistics like that.
10  When you say "disparate treatment," if -- you would
11  be telling the truth.  It's a disparate treatment
12  if -- if you have 1/1,000th versus 2/1,000ths in
13  your -- in my scenario, and you would be telling the
14  truth in your scenario, as well.
15      So I don't think it's -- it's -- how can I
16  put it?  I would find it extremely difficult to
17  conceive of a person in the State of Texas that
18  would not have an identification card of the type
19  that we have listed and that could function in the
20  society in any way, short of the Unabomber.
21      Q   Well, short of the Unabomber --
22      A   Uh-huh.
23      Q   -- I'm just asking if the facts play out
24  differently from what you believe?
25      A   I don't know how you're going to get that,

---

263

1   though.  How are you going to -- if you're trying to
2   compare -- I've tried to explain to you why it is
3   that I don't think that you're trying to mesh the
4   driver's license records to the voter registration
5   records are going to give you any kind of indication
6   of -- of whether there are people out there without
7   a driver's license, because I gave you several
8   examples of why.  So I -- I just don't think you get
9   there.
10      Q   I understand.  And we're a little short on
11  time, and I'll -- I'll, I guess, leave that part to
12  us.
13      A   Okay.
14      Q   My question is hypothetically, again, if
15  we were to show that with a large number of people,
16  we're talking about tens of thousands --
17      A   Uh-huh.
18      Q   -- that are Hispanic voters, twice as many
19  Hispanic voters lack the I.D.s as Anglo voters,
20  would --
21      A   If you're talking a large number, yes,
22  that would bother me.
23      Q   Okay.  Are you aware of any analysis prior
24  to May 2011 setting out such numbers?
25          MR. MCKENZIE:  And, again, I'm going

---

264

1   to instruct you not to answer to the extent it would
2   require that study or that information --
3           THE WITNESS:  If I answer, it won't
4   be because of that.
5       A   The only thing I remember is
6   testimony in -- not testimony -- yeah, testimony
7   from experts in the Committee.
8       Q   (By Mr. Freeman)  Okay.  Has --
9       A   And I -- and I'm not sure that was
10  discussed, but I have a feeling it was.
11      Q   Had such information been available, would
12  you have wanted to see it?
13          MR. MCKENZIE:  Same objection.
14      Q   (By Mr. Freeman)  Hypothetically?
15          MR. MCKENZIE:  Still reflects his
16  deliberations potentially, so same objection.
17          THE WITNESS:  So are you instructing
18  me not to answer?
19          MR. MCKENZIE:  Well, I'm instructing
20  you not to answer if it would reflect the type of
21  information you would consider deliberating about a
22  bill -- about this bill.
23          THE WITNESS:  I don't know how I
24  could separate the two.  So how does that --
25          MR. MCKENZIE:  Then I'm instructing

Jose Aliseda                                              June 6, 2012

---

265

1    you not to answer.
2        A    Then I don't answer.
3        Q    (By Mr. Freeman)  Why do you think there
4    was such strong opposition to SB 14?
5            MR. MCKENZIE:  Same objection.
6        Why do I think?
7        Okay.  I can only go on what was said in
8    the deliberations of --
9            MR. MCKENZIE:  Public --
10       A    -- on the House floor by the primarily
11   Democratic Caucus.
12       Q    (By Mr. Freeman)  Do you believe that your
13   Democratic colleagues benefit from voter fraud?
14       A    I believe my Democrat colleagues benefit
15   from portraying themselves as champions of
16   minorities.  I believe my Democrat colleagues were
17   not representing their constituents, because they
18   would know that their constituents wanted voter I.D.
19           MR. FREEMAN:  I'll object to that as
20   nonresponsive and ask again.
21       Q    (By Mr. Freeman)  Do you believe that your
22   Democrat colleagues benefit from voter fraud?
23           MR. MCKENZIE:  Same general
24   objection.
25       A    My colleagues in the House?

---

266

1        Q    (By Mr. Freeman)  Yes.
2            THE WITNESS:  Run -- run the
3    objection by me again why I would need -- I mean,
4    I'm trying to...
5            MR. MCKENZIE:  If it's going to
6    reveal subjective motivations or deliberations or
7    communications that are private between the
8    legislators, then I would say -- I would instruct
9    you not to answer.
10           THE WITNESS:  I wouldn't answer it
11   that way.
12       A    I believe that in my experience as a -- as
13   a prosecutor and in my experience as a legislator,
14   who supports the legislators, that the voter fraud
15   when it does happen tends to be on the Democratic
16   side.
17       Q    (By Mr. Freeman)  Do you believe that your
18   Democratic colleagues knowingly benefit from voter
19   fraud?
20           MR. MCKENZIE:  Same general
21   objection.
22       A    I don't think that they would knowingly
23   want to benefit from voter fraud.
24       I do think that they knowingly want to
25   continue with the -- a system where voter fraud

---

267

1    helps people within their district for lower
2    positions.
3            MR. FREEMAN:  If we could have this
4    marked as U.S. Exhibit 503.
5            (Deposition Exhibit No. 503 marked)
6        A    Okay.
7        Q    (By Mr. Freeman)  Have you seen this
8    document before?
9        A    Yes.
10       Q    What is this document?
11       A    It's an op-ed that I wrote.
12       Q    Did you draft this op-ed?
13       A    I can't remember if I did it all or if I
14   did part of it with my staff.
15       Q    Did anyone ask you to publish this op-ed?
16       A    No.
17       Q    Did this -- what inspired you to publish
18   this op-ed?
19       A    Something that the Justice Department did.
20       Q    Was that the objection under Section 5?
21       A    I believe so, yes.  I think it was the
22   Justice Department trying to discredit our voter
23   I.D. law.
24       Q    Who took care of placing the op-ed in the
25   papers?

---

268

1        A    I did.
2        Q    What papers did it appear in?
3        A    It showed up in the Corpus Christi Caller
4    Times and the Beeville Bee-Picayune, and I don't
5    know for sure anywhere else, to be honest with you.
6        Q    The Nueces County Record Star?
7        A    That -- I didn't put it there.  They
8    probably picked it up from the -- from the Corpus
9    Christi Caller Times.
10       Q    Do you see in the second pair -- excuse
11   me -- the third paragraph where you say, "Despite
12   Texans' enthusiastic support for this bill, the
13   Obama administration has aligned itself with
14   left-wing fringe groups that oppose it"?
15       A    Yes.
16       Q    Do you consider your colleagues to all be
17   members of left-wing fringe groups who voted against
18   this bill?
19       A    I consider -- yes, I would say that I
20   consider them extreme -- extremely -- at least
21   during this last legislative section, extremely
22   left-leaning --
23       Q    Okay.
24       A    -- on a number of issues, this being one
25   of them.

---

269

1      Q   How did you prepare for the floor debate?
2          MR. MCKENZIE:  Again, I would
3      instruct you not to reveal any private deliberations
4      or communications that you may have had.
5      A   How did I prepare?
6          MR. MCKENZIE:  Any research you may
7      have done or anything to that effect.
8          THE WITNESS:  Okay.
9      A   Well, then, I really can't answer that if
10     I -- if it's privileged.
11         MR. MCKENZIE:  Okay.
12     Q   (By Mr. Freeman)  Okay.
13     A   Uh-huh.
14     Q   This has previously been marked as
15     Exhibit 9 -- U.S. Exhibit 9.
16     A   Thank you.
17     Q   If you could turn to Page 969.
18         MR. FREEMAN:  For the record, this is
19     the House Journal from the 40th day of the
20     Legislative Session, March 23, 2011.
21     Q   (By Mr. Freeman)  If you could turn to
22     Page 969 and take a look at Amendment 15.  If you
23     can just look up when you've taken a look.
24     A   Okay.  I'm looking at Amendment 15.
25     Q   And this amendment would prohibit fees for

---

270

1      underlying documents necessary to obtain an election
2      identification certificate.  Is that correct?
3      A   That's what it looks like, yes.
4      Q   What was the purpose of this bill -- or
5      this amendment?
6          MR. MCKENZIE:  Again, give the same
7      instruction.  You may speak to general legislative
8      purpose.
9      A   I don't -- I don't know.
10     Q   (By Mr. Freeman)  You voted to table this
11     amendment.  Correct?
12     A   Yes.
13     Q   Why did you vote to table this amendment?
14         MR. MCKENZIE:  Same objection.  In
15     fact, I'm just going to instruct you not to answer.
16     The reasons why you voted are privileged.
17     A   I assert a privilege.
18     Q   (By Mr. Freeman)  Do you believe that a
19     cost for a document necessary to get an I.D. that is
20     necessary to a vote -- or necessary to vote is a
21     cost to vote?
22         MR. McKENZIE:  It's the same
23     objection to the extent you developed that opinion
24     in your deliberations.
25     A   I would assert privilege.

---

271

1          MR. FREEMAN:  This is just a question
2      of logic.
3          MR. MCKENZIE:  But it's -- still
4      could reveal his reasoning for why he voted yes.
5      And to that extent, I'm going to instruct him not to
6      answer.
7      Q   (By Mr. Freeman)  Okay.  If you could turn
8      to Page 979 and take a look at Amendment 23.
9      A   Okay.
10     Q   What was the purpose of this amendment?
11     A   It looks like they wanted a student I.D.
12     card issued by a public or private high school or
13     institution of higher education that contains the
14     person's photograph.
15     Q   And you voted to table this amendment, as
16     well?
17     A   Yes.
18     Q   Why did you vote to table this amendment?
19         MR. MCKENZIE:  Same objection.  I
20     instruct you not to answer.
21     Q   (By Mr. Freeman)  Are you familiar with
22     how many forms of identification are issued by the
23     United States Military?
24     A   I think I am, because I've had them.
25     Q   How many forms of identification?

---

272

1      A   I would say probably you can -- you can
2      have a Reserve I.D. card, and you can have an
3      dependent I.D. card, and you can have an active duty
4      I.D. card.  And I'm not sure if they have an
5      inactive Reserve I.D. card, but I would think
6      somewhere around three or four.
7      Q   Is there a veteran's I.D. card?
8      A   Yeah.  That would be another one, yes.
9      Q   Is there an I.D. card for military
10     contractors?
11     A   Yes, I think there would be, but they
12     would not be a military I.D. card.  They would be a
13     contract -- contractor's I.D. card.
14     Q   In areas away from military bases or
15     former military bases, do you believe that military
16     I.D. will be easily recognized by poll workers?
17         MR. MCKENZIE:  It's the same
18     objection to the extent you developed that opinion
19     considering the bill.
20     A   I'm just trying to think from my own
21     experience, because I have used my I.D. card, and I
22     used it to buy -- to get a hunting and fishing
23     license for free, because Texas waives hunting and
24     fishing licenses.  And I didn't have a problem with
25     the clerk recognizing it in some town that didn't

Jose Aliseda                                                June 6, 2012

273

1   have a -- military base.
2       Q   (By Mr. Freeman)  If you could turn to
3   Page 987.
4           Real quickly, what town was that?
5       A   I'm trying to think.  I got it in Karnes
6   County, and it was several -- several years ago.
7       Q   Karnes County -- Karnes County is not
8   particularly far from Nueces County.  Isn't that
9   correct?
10      A   It is three counties removed, probably
11  90 miles away.
12      Q   And Nueces County has traditionally had a
13  large naval presence.  Right?
14      A   You're better saying that San Antonio had
15  a large naval presence and that was 90 miles away.
16  They were both about 90 miles away.  But this would
17  have been -- I mean, I don't think people in Karnes
18  County would necessarily have experience with
19  military I.D.s if that's what your question is,
20  because most people that are in the military would
21  not reside in Karnes County even if they worked in
22  San Antonio or Corpus Christi.
23      Q   My question is more if there are two
24  military presences both 90 miles away, isn't it
25  likely that there have been other people like you

274

1   that passed through?
2           MR. MCKENZIE:  Objection;
3   speculation.
4       A   It is speculation.  But I can tell you we
5   have a lot of military bases in Texas.
6       Q   (By Mr. Freeman)  Okay.
7       A   I think we have more military bases than
8   any other state.
9       Q   Big state?
10      A   It's a big state, and we have a lot of
11  open spaces where the military can function very
12  well.
13      Q   So on Page 987, if you could take a quick
14  look at Amendment 34.
15      A   Uh-huh.
16      Q   And this amendment would have rendered the
17  act unenforceable if it did not comply with
18  Section 5, Section 203 or Section 4F-4 of the Voting
19  Rights Act.  Correct?
20      A   Uh-huh.
21      Q   What is the purpose of this amendment?
22          MR. MCKENZIE:  It's the same
23  instruction.  You may answer as to general purpose.
24      A   I think it's self explanatory in the
25  record of the statement of legislative intent.

275

1       Q   (By Mr. Freeman)  And you voted to table
2   this amendment.  Correct?
3       A   Well --
4           MR. MCKENZIE:  Can you direct us to
5   the page where the votes are?
6       A   I don't remember.  I think it's 991 --
7   992 -- 990.
8       Q   (By Mr. Freeman)  990, Representative
9   Aliseda's vote.
10      A   Yes, I did.
11      Q   Do you believe that Section 5 of the
12  Voting Rights Act is still necessary in Texas?
13      A   No.
14      Q   Why not?
15      A   Because we've gotten so far beyond that.
16  I think we --
17      Q   And what do you mean by that?
18      A   I think at one point it was necessary, but
19  we've been almost 50 years removed from it.  When
20  did it pass, 1965?  And we're already 2012.  I -- I
21  have no idea why -- why anybody would think it's
22  necessary any longer in this state and why Texas
23  should be treated any different than any other
24  state.
25      Q   Didn't you previously say that you had

276

1   clients who -- on whose behalf you had brought EEOC
2   complaints?
3       A   They weren't EO -- they weren't Voting
4   Rights Act complaints.  They were EEOC complaints.
5       Q   It's a "yes" or "no" question.
6       A   Yes, uh-huh.
7       Q   Did those clients believe that they had
8   been discriminated against -- any of them on the
9   basis of race?
10          MR. MCKENZIE:  Objection; asked and
11  answered.  But you may answer.
12      A   Yes.
13      Q   (By Mr. Freeman)  Is it your belief that
14  discrimination in the employment context but not in
15  the voting context?
16      A   It is my belief that discrimination occurs
17  in every state in this Union and it's not any more
18  or less prevalent in Texas than anywhere else.  But
19  in voting, I think people are even more careful than
20  I think in an employment context.  A lot of this
21  stuff is a matter of perception rather than a matter
22  of fact.
23      Q   If we could turn to Amendment 35 on
24  Page 991.
25      A   35.

277

1    Q   And this amendment would have simply --
2    would have simply stated that Section 203 and
3    Section 14F-4, which is probably 4F-4, apply to
4    SB 14.  Correct?
5    A   A lot of the problems with these types of
6    things is it's already understood that we have to
7    comply with the Voting Rights Act.  Why state it in
8    the -- in the bill?  It's -- we're under the Voting
9    Rights Act.  Why put it in the bill?
10   Q   What does Section 203 of the Voting Rights
11   Act do?
12   A   I couldn't tell you.  I don't remember.
13   Q   What does Section 4F-4 of the Voting
14   Rights Act do?
15   A   I couldn't tell you.  I don't remember.
16   I'd have to pull it out and look at it.
17   Q   But you voted to table this amendment,
18   didn't you?
19   A   Yeah, for the exact same reason I told
20   you.
21       MR. MCKENZIE:  I wouldn't get into
22   your subjective motivations.
23   Q   (By Mr. Freeman)  Turn to Page 1009.  This
24   amendment would have reimbursed the cost for poor
25   individuals to travel to obtain I.D.  Correct?

278

1    Take your time if you need it.
2    A   What page did you say?  I'm sorry.
3    Q   1009 to 1010.
4    A   Okay.  At the bottom.
5        Okay.  That's what it looks like, yes.
6    Q   And you voted to table this amendment.
7    Correct?
8    A   Yes.
9    Q   Isn't it the case that the majority of
10   I.D. who live below the federal poverty line in
11   Texas are members of racial or minority groups?
12       MR. MCKENZIE:  Objection to
13   foundation.
14   Q   (By Mr. Freeman)  If -- to the extent of
15   your knowledge.
16   A   If you're asking as a general rule are
17   people of ethnic minorities more likely to be in
18   poverty situations than people that are not?  Is
19   that more or less what you're asking?
20   Q   It's a different question, but a good one,
21   as well.
22   A   Ask your question again, please.
23   Q   I'm happy to ask yours.
24   A   I think as a general rule if you look at
25   what I would call welfare rolls that that would be

279

1    the case, yes.
2    Q   But you voted to table this amendment.
3    Correct?
4    A   Yes.
5    Q   And so under SB 14 as it was passed, the
6    cost incurred by poor, I.D. to travel to obtain I.D.
7    to vote, will be borne by those I.D.  Correct?
8    A   Not necessarily.  I gave you several
9    examples earlier how the government would be -- and,
10   in fact, subsidizing some of those trips if the I.D.
11   wanted to allow the government to do that.
12   Q   But not for -- not for all I.D., not where
13   those types of bus services are not available.
14   Correct?
15   A   I think that they're available across the
16   State.  These -- these are federal funds that come
17   through the COG, Council of Governments, for a
18   particular region.  And each region has Council of
19   Governments, and one of the things that these
20   regions do is establish some kind of rural
21   transportation system for citizens that need it.
22   Q   So if these costs were already being
23   covered, why vote to table this amendment?
24       MR. MCKENZIE:  Again, I instruct
25   you not to answer that question --

280

1        THE WITNESS:  He's asking my
2    subjective --
3    Q   (By Mr. Freeman)  Okay.
4    A   I'll assert a privilege.
5    Q   If you could turn to 1015 and take a look
6    at Amendment 54.
7    A   Okay.
8    Q   And this amendment would require the
9    Secretary of State to determine who was prevented
10   from voting based on not having a necessary photo
11   I.D. --
12   A   Uh-huh.
13   Q   -- and who filed provisional ballots that
14   were eventually not counted and to determine the
15   demographics of that population.  Correct?
16   A   That's what it looks like it's doing.
17   Q   What was the purpose of this amendment?
18       MR. MCKENZIE:  Did you say purpose or
19   focus?
20       MR. FREEMAN:  Purpose.
21       MR. MCKENZIE:  Again, same
22   instruction.  You can answer to general purpose.
23   A   If you read the amendment, I think it's in
24   plain English.
25   Q   (By Mr. Freeman)  What is your

## 281

1    understanding of the why on the amendment?
2          MR. MCKENZIE:  Same instruction.
3       A   I don't know if there was much debate on
4    it, to be honest with you, that I could give you
5    other than I can read it, and I could do as well as
6    you in determining what the look -- the ostensible
7    purpose of the amendment.
8       Q   Well, what is the ostensible purpose of
9    the amendment?
10      A   (Witness reading to himself.)
11         It looks like to keep some kind of record
12   as to who was not allowed to vote because they
13   didn't have the proper I.D.
14      Q   And you voted to table this amendment.
15   Correct?
16      A   Yes.
17      Q   Would it concern you if Hispanic voters
18   were disproportionately likely to only show up at
19   the polling places lacking the necessary I.D. and
20   their votes were disproportionately not counted?
21         MR. MCKENZIE:  It's the same
22   objection to the extent your reasons for considering
23   this particular amendment.
24      A   You're asking my opinion today?
25      Q   (By Mr. Freeman)  Today.

## 282

1       A   Today.  Yes, it would concern me today.
2       Q   Will you turn to Amendment 55, next page?
3       A   Yes.
4       Q   And Amendment 55, am I correct that it
5    would require the Secretary of State to determine
6    whether the majority of voters casting provisional
7    ballots because they lacked photo I.D. were
8    minority, and if that were the case, to allow the
9    use of voter registration certificates as official
10   documents prior to voting?  Is that correct?
11      A   We're looking at Page 1016?
12      Q   1016.
13      A   That's what it looks like it reads like,
14   yes.
15      Q   What was the purpose of the amendment?
16         MR. MCKENZIE:  Same instruction.
17      A   Other than what it reads -- I mean, I
18   can't...
19      Q   (By Mr. Freeman)  What's --
20      A   There's apparently -- there's apparently
21   on the same -- there was some exchange between
22   Representative Lozano and Representative Veasey and
23   Representative Harless that you could determine the
24   purpose.
25      Q   I'm asking your understanding of the

## 283

1    purpose as the witness.
2          MR. MCKENZIE:  And it's the same --
3    it's the same objection -- or instruction, I should
4    say.
5       A   To me, it looks like it was a poison pill.
6       Q   (By Mr. Freeman)  What do you mean by
7    "poison pill"?
8       A   It was basically intended to completely
9    gut the entire Voter I.D. Act.
10      Q   But it would only gut the Voter I.D. Bill
11   if the majority of those who are not allowed to vote
12   and whose votes weren't counted were minorities.
13   Isn't that correct?
14      A   I mean, let's look at the logic of what
15   you're saying.  Let's say that the -- that -- that
16   the majority of the people that were attempting to
17   commit in-person voter fraud were minorities and
18   that, in fact, they had fraudulent voter
19   registrations.  This would gut the bill.  I mean, it
20   was like a poison pill.
21         So just because the -- the -- the majority
22   of the people that were, in fact, trying to cast a
23   fraudulent vote for minorities that would throw out
24   the bill, that just -- that just wouldn't make
25   sense.

## 284

1       Q   Is it your understanding that those who
2    show up to cast a vote without the necessary I.D.
3    are more likely to be trying to commit voter fraud
4    than trying to cast a legitimate ballot without the
5    necessary I.D.?
6          MR. MCKENZIE:  Same objection to the
7    extent you developed opinions during your
8    deliberations.
9       A   I'm trying to understand your question,
10   but --
11      Q   (By Mr. Freeman)  It was inartful at best,
12   so allow me to rephrase it.
13         Is it your belief that voters who show up
14   at the polls without the necessary I.D. and are
15   going to be counted in this amendment are going to
16   be the voters who are trying to commit in-person
17   voter fraud and not voters who would try to cast
18   legitimate ballots?
19         MR. MCKENZIE:  Same objection to the
20   extent you developed these beliefs or could have
21   developed these beliefs during the course of your
22   deliberations.
23      A   My position on the Voter I.D. Law would be
24   if it stops one, 1,000 or 100,000 people that are
25   ineligible to vote from voting, then it's served its

285

1   purpose.
2       Q   Let's turn to Amendment 58 on Page 1021.
3           MR. McKENZIE:  Can we take a real
4   quick break so I can go to the restroom?
5           MR. FREEMAN:  This is the last one.
6           THE WITNESS:  Hang on, hang on.
7           MR. FREEMAN:  If you want to take a
8   break now, that's fine.
9           MR. McKENZIE:  I'm holding on.
10          THE WITNESS:  You can do it.
11      Q   (By Mr. Freeman)  Amendment 58, if you can
12  take a quick look at it.
13      A   Okay.  That would be actually on page --
14      Q   1021 through 1022.
15      A   Okay.
16      Q   No, just 1021.  I'm sorry.
17      A   1021, Amendment 58.
18      Q   Am I correct that this would have required
19  a study by county and ethnicity to access the
20  necessary photo I.D. along with potential impact on
21  voter turnout?
22      A   Yes.
23      Q   And you said earlier that you would want
24  to know if Hispanics actually were likely to lack
25  the necessary I.D., not -- not based on a match that

286

1   you think won't work, but actually --
2       A   Yes.
3       Q   -- match that you wanted to know?
4       A   Yes, yes.
5       Q   But you voted to table this amendment?
6       A   Yes.
7           Can I explain to you --
8           MR. McKENZIE:  I wouldn't go into
9   subjective motivations.
10          THE WITNESS:  No, no, this is not.
11  Let me talk to you just for a second while you --
12          MR. McKENZIE:  Well, the question's
13  pending.
14          THE WITNESS:  Okay.
15          MR. McKENZIE:  Unless you don't mind,
16  but I'm assuming you do.  So...
17      A   Yeah.  I better -- I'll just assert a
18  privilege.
19      Q   (By Mr. Freeman)  If you'd like to talk
20  for a second with your counsel...
21      A   Okay.  Let me talk to him for a second,
22  because I think it's important that we develop a
23  record on this issue.
24          (Off the record from 6:13 to 6:15)
25      A   I'll assert a privilege to your question

287

1   again.
2           MR. FREEMAN:  Okay.  And I think
3   we're going to take a five-minute break.
4           (Off the record from 6:15 to 6:22)
5       Q   (By Mr. Freeman)  Now, you made the
6   closing statement in favor of SB 14.  Correct?
7       A   Yes.
8       Q   And this was --
9       A   Actually, it was in favor of the House
10  Bill, I believe.
11      Q   In favor of the voter registration -- the
12  Voter Identification Bill --
13      A   Right.
14      Q   -- that passed the House?
15      A   Right.  It wasn't the SB 14.  It was the
16  House Bill.
17      Q   Was this the same in substance to the
18  letter that you sent to the Attorney General in
19  support of the bill, which is exhibit --
20      A   Could you tell me what exhibit number it
21  is?  I'm sorry.
22      Q   I'm sorry.  It's hard to be only one
23  person.
24          MR. McKENZIE:  What exhibit are we
25  looking for?

288

1           THE WITNESS:  The one where I wrote a
2   letter to support the --
3       Q   (By Mr. Freeman)  Exhibit 499.
4       A   Okay.  Eight 8, 2012.  It looks like I
5   incorporated my speech on the House floor, too.
6       Q   Do freshman frequently provide the closing
7   remarks on the debate on a major bill?
8       A   No.
9       Q   Can you name any other times when they
10  did?
11      A   That, I can't answer.  I've only been
12  there as a freshman one time, and I'm not coming
13  back in.
14      Q   This is your one term?
15      A   Right.
16      Q   Do you know if any other freshman
17  commented on your bills?
18      A   I don't know.
19          MR. McKENZIE:  Objection; vague, but
20  go ahead.
21      A   I don't know.
22      Q   (By Mr. Freeman)  Are you aware of any
23  conversations concerning who would deliver the
24  closing remarks for SB 14?
25          MR. McKENZIE:  I'm going to object on

Jose Aliseda                                                                June 6, 2012

---

## 289

1  legislative privilege grounds, because the awareness
2  is near to the subject matter on who would give the
3  closing remarks on SB 14 or Voter I.D. Bill.  And I
4  think that's more information than we put on
5  privileged log.
6          THE WITNESS:  So you're instructing
7  me not to answer?
8          MR. MCKENZIE:  Yes.
9      A   I'm not going to answer.
10         MR. FREEMAN:  I mean, we may have a
11  disagreement, but I don't think I can convince you
12  on this deposition.
13         MR. MCKENZIE:  Yeah.  I mean, we have
14  to agree to disagree until the Court decides to tell
15  us something else or what have you.
16     A   I really don't think our answer -- my
17  answer would hurt, but my counsel's instructing me
18  not to answer, so I'm not going to answer.
19         MR. MCKENZIE:  He can use it as a
20  sword, so I can't selectively give the good stuff
21  and then...
22         THE WITNESS:  Okay.
23     Q   (By Mr. Freeman)  Are you aware that when
24  Representative Larry Gonzalez was deposed in this
25  case that he was not carrying a photographic I.D.?

---

## 290

1      A   I was not aware of that, no.
2      Q   Does that at all affect your belief that
3  an I.D. is necessary to do everything in our
4  society?
5      A   If -- he wasn't even allowed to get in the
6  building until somebody from the Attorney General's
7  office was able to vouch for him.  So, I mean, at
8  least with respect to --
9      Q   Well, you didn't need an I.D. to get into
10  this room, did you?
11     A   It looked like I was going to, yes.
12     Q   But then you didn't?
13     A   But then I didn't.
14         I did need my I.D. to drive to here.  In
15  Texas you're required to have an I.D. card.
16     Q   Are you required in Texas to have a
17  photographic I.D. card on you at all times?
18     A   Yes.
19         MR. MCKENZIE:  I don't know.
20         THE WITNESS:  Yes.
21         MR. FREEMAN:  I would request that
22  you not coach the witness on the voracity of the
23  statements.
24         MR. MCKENZIE:  Oh, no.  He -- I said
25  I don't know.

---

## 291

1          MR. FREEMAN:  Oh.
2      A   I think you are except in your house.  I
3  don't know how anybody could drive here, I don't
4  know how anybody could get in the building and in
5  the Capitol building without an I.D. card.
6      Q   (By Mr. Freeman)  Now, we previously
7  discussed that you introduced other bills in the
8  82nd Legislature concerning administration.  Is that
9  correct?
10     A   Yes.
11     Q   How many bills did you introduce
12  approximately?
13     A   More than a dozen.
14     Q   Did you introduce any bills for the
15  purpose of voter fraud?
16         MR. MCKENZIE:  Object -- go ahead.
17     Q   (By Mr. Freeman)  Purpose?
18         MR. MCKENZIE:  Again, assert the --
19  yeah.
20     A   Uh-huh.
21     Q   (By Mr. Freeman)  What specific type of
22  voter fraud?
23     A   I did amend a bill to increase the penalty
24  if an illegal alien voted in one of our elections.
25  I did a number of mail-in ballot proposals.

---

## 292

1      Q   Did it increase the penalty for
2  noncitizens or for illegal aliens?
3      A   I believe it was noncitizens.  I'm trying
4  to remember the exact language of the bill.  It was
5  actually a bill that was -- the original author
6  was -- what's his name?  Judge Lewis, Tron Lewis.
7  And I amended it with something and then I added an
8  additional penalty to it.  And that was one of the
9  things that we did get passed, another voter
10  fraud-type legislation that we did get passed.
11     Q   And you had previously -- we had
12  previously discussed that you were aware of several
13  incidents of noncitizens being registered or casting
14  ballots.  Correct?
15     A   Yes.
16     Q   And so this was a -- this was a bill that
17  addressed a real world incident of an election
18  problem, something that undermines the democratic
19  process.  Correct?
20     A   Yes.
21     Q   Was this bill referred to the Select
22  Committee on Voter Identification and Voter Fraud?
23     A   No.
24     Q   And this -- that was the Speaker's
25  decision.  Right?

Jose Aliseda                                                    June 6, 2012

---

293

1        MR. MCKENZIE:  I would object if it's
2    not public.  But if it is public, then...
3        A    That, I can't answer.  I don't know.
4        Q    (By Mr. Freeman)  You don't know.
5    It was referred to the Elections Committee, that
6    bill?
7        A    It wasn't -- it was already existing law
8    that, I believe, we amended.  So, yes, I think it
9    went through the Elections Committee.
10       Q    Did Catherine Engelbrecht talk to you
11   about noncitizen voting?
12       A    I don't remember.
13       Q    Was this one of the bills that she asked
14   you to carry?
15       A    I don't remember.  I don't think so, but I
16   don't remember.
17       Q    How many bills did you introduce
18   concerning voter fraud that didn't make it?
19       A    A bunch.  I mean, I would say the majority
20   of them.
21           I got -- I got one piece of legislation on
22   mail-in ballot fraud and then this other bill that I
23   co-authored -- joint-authored -- there's a
24   difference between joint-authoring and co-authoring.
25   This other bill that I joint-authored on illegal

---

294

1    alien voting, I amended and got that through.  So...
2        Q    Why do you keep saying illegal alien
3    rather than noncitizen voting?
4        A    Because I think the title of the bill was
5    illegal alien voting.
6        Q    Did the bill, in substance, address or
7    distinguish between undocumented immigrants and
8    those who were noncitizens?
9        A    I wish I had it in front of me to answer
10   it.  To be honest with you, it's been a long time,
11   but I thought the title of the bill was illegal
12   alien voting.  I may be wrong.
13       Q    Do you recall the bill number?
14       A    No.  It wouldn't be that hard to find.  I
15   mean, it would be a bill that was authored by Tron
16   Lewis.  And -- it's not hard to find a bill if you
17   have access to the Legislative website.  It's not
18   difficult, but I don't remember right now.
19       Q    And all of your other bills were referred
20   to the Elections Committee and not to the Select
21   Committee?
22       A    Yes.
23       Q    And most of them died?
24       A    Actually, I got some through.  It's just
25   they died in the end of the Session.

---

295

1        Q    Did they come through the Committee late?
2        A    Yes, they came through the Committee late
3    and everything piles up at the end.
4        Q    And that's -- that's typical if --
5        A    I think I was this close to getting one
6    more done before the clock ran out.
7           (Off-the-record discussion.)
8        Q    (By Mr. Freeman)  Would you agree that
9    prioritizing photographic photo I.D. is real
10   practical concerns regarding election integrity?
11          MR. McKENZIE:  I would object.  Same
12   objection if it reveals your thoughts in
13   deliberations.
14          THE WITNESS:  So are you instructing
15   me not to answer it?
16          MR. MCKENZIE:  Well, I'm going to
17   need your help, because I don't know if you
18   developed these thoughts after your tenure as a
19   legislator or during it.
20       A    You're asking me my current opinion today?
21       Q    (By Mr. Freeman)  Uh-huh.
22       A    Ask me the question, again.
23       Q    Would you agree that prioritizing
24   photographic photo I.D. are real practical concerns
25   regarding election integrity?

---

296

1        A    I would disagree with that statement.  And
2    the reason I would disagree with that statement is
3    the main focus of -- of voter I.D. was to -- at
4    least from my perspective today, is to give the
5    public what it wanted and believed was necessary to
6    safeguard their electoral system and to give the
7    public confidence in that system.
8        Q    Okay.
9           MR. FREEMAN:  Let's take five minutes
10   and then we're going to wrap up.
11          MR. MCKENZIE:  Okay.
12          (Off the record from 6:33 to 6:38)
13       Q    (By Mr. Freeman)  Just a couple more
14   questions, and then I will let you go watch the
15   Spurs game.
16       A    Thank you.
17       Q    You're welcome.  I have that terrible
18   power.
19       A    Oh, I'm hoping that they get past today,
20   but they may not.  They didn't look very good these
21   last three games.
22       Q    Now, you've said several times that part
23   of the purpose -- the main purpose of SB 14 was to
24   give the public what it wanted.  Correct?
25       A    Uh-huh.

Jose Aliseda                                                    June 6, 2012

## 297

1    Q   Is it possible that some members of the
2  public had a discriminatory reason to want this kind
3  of bill?
4    A   I -- you know, you're asking me to
5  speculate, but --
6    MR. MCKENZIE:  Object.  I'd like to
7  object on speculation grounds.
8    A   It's hard to understand what people's
9  motivations are sometimes.
10   Q   (By Mr. Freeman)  Okay.  Are there any
11 answers that you wish to change from earlier in the
12 deposition?
13   A   I don't think so.  I -- I -- the only
14 questions that I really don't remember a whole lot
15 about are the stuff with True The Vote, which was --
16 was that King Street Patriots group, exactly how
17 that went down.  And -- and I don't remember if I
18 had Luis Figueroa from MALDEF come see me --
19   Q   Uh-huh.
20   A   -- prior to going into the Committee.  I'd
21 have to go back and look at my log and hope that
22 they logged in as guests in my office to see if they
23 came to see me before any part of this bill.  And
24 I'll do that.
25   Q   Do you -- so you don't recall any

## 298

1  substance of conversation with Luis in your office?
2    A   See, I confuse sometimes -- because we
3  have got -- done briefings from MALDEF on -- and I
4  don't remember -- on things -- on the Voting Rights
5  Act, for example.
6    Q   Uh-huh.
7    A   And -- and I don't remember if they were
8  pre-legislative briefings or briefings that I
9  attended as a candidate or after I was sworn in.
10   Q   Okay.
11   A   So I confused those things.  It's been
12 almost two years.
13   Q   Any other answers you wish to change?
14   A   Not right now.
15   Q   Any other information that you recall now
16 that you didn't recall earlier in the deposition?
17   A   I think I've interspersed my memory
18 whenever it came up as best I could.
19   Q   Great.  That's all I can ask for.
20   A   Uh-huh.
21   Q   Anything else you'd like to add so that we
22 can understand your answers more clearly?
23   A   I just ask you to look at my floor speech
24 and understand that that was where I was coming from
25 on this thing.

## 299

1    MR. FREEMAN:  The deposition is left
2  open pending minor privilege issues that I can't
3  imagine would ever recall -- ever require recalling
4  you as a witness.  But I do have to leave it open.
5  But other than that, I pass the witness.  If you
6  have any redirect.
7    EXAMINATION
8  BY MR. MCKENZIE:
9    Q   I have one quick question and that is, if
10 a bill stops some but not all voting by noncitizens,
11 do you think that bill can have a purpose in
12 preventing noncitizen voting?
13   A   Yes.
14   MR. MCKENZIE:  That's it.
15   MR. FREEMAN:  Wait one second.  I may
16 have a question in response to that.
17   FURTHER EXAMINATION
18 BY MR. FREEMAN:
19   Q   In your experience from which you have
20 knowledge of noncitizen voting, were any of those
21 I.D. undocumented immigrants?
22   A   My personal experience?
23   Q   Yes.
24   A   No.
25   Q   Do you have any other basis to believe

## 300

1  that non -- that undocumented immigrants are voting
2  in the State of Texas?
3    A   Yes.
4    Q   What is that basis?
5    A   What people have told me --
6    Q   Who are those people?
7    A   -- is occurring in the -- in the Valley.
8  I ran into a guy not long ago in Kingsville that
9  was -- had a background much like mine.  He was a
10 Mexican immigrant.  And he disclosed to me how on
11 the border - and he was very active in border
12 politics - that it's very common for people on our
13 side of the border to go and vote in Mexican
14 elections for candidates in municipal elections over
15 there and vice versa; that the -- that the -- at
16 least on the border, some of the election process
17 is -- is confused.
18   Q   Who was that individual?
19   A   If I heard his name again, I would
20 remember.  A tall Hispanic fellow, very -- he was at
21 a campaign event for that Adela Garza (phonetic)
22 that I mentioned, and he talked to me because he was
23 aware that I was a State representative, and I was
24 supporting this Congressional candidate.  And we
25 talked a little bit about life on the border,

301

1   because I'd lived in McAllen, and life in Mexico,
2   because he was from there.  So I can't remember his
3   name.
4       Q    Do you recall --
5       A    And I think there would be a list of those
6   people that were there at that campaign event.  I
7   don't know if it would be a public list, though.
8       Q    Do you recall what county he was from?
9       A    He was from Cameron County.
10      Q    Cameron County.
11           And had he been County Attorney?
12      A    No, he had not been County Attorney.
13      Q    Okay.
14      A    No, he was a --
15      Q    Just asking, because you said he had a
16  similar background.
17      A    Similar background in that he was a
18  Mexican immigrant that had immigrated to the United
19  States and had lived a little bit on the border --
20  actually, lived almost his whole life on the border,
21  whereas I had only lived a little bit on the border.
22      Q    Any basis other than that conversation?
23      A    The testimony of the Committee.
24      Q    Whose testimony specifically?
25      A    I'd have to look.

302

1       Q    Okay.
2            MR. FREEMAN:  I have no further
3   questions.  I pass the witness if you --
4            MR. MCKENZIE:  I don't have any
5   redirect of the recross.
6            (Deposition adjourned at 6:46 p.m.)

303

1              IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF COLUMBIA
3   STATE OF TEXAS,                *
                Plaintiff          *
4                                  *
    V.                             *
5                                  *
    ERIC H. HOLDER, JR., in        *
6   his official capacity as       *
    Attorney General of the        *
7   United States,                 *
                Defendant.         *
8                                  *
    ERIC KENNIE, et al.,           *
9       Defendant-Intervenors,*
10  TEXAS STATE CONFERENCE OF*
    NAACP BRANCHES, et al.,  * CASE NO. 1:12-CV-00128
11     Defendant-Intervenors,* (RMC-DST-RLW)
                              * Three-Judge Court
12  TEXAS LEAGUE OF YOUNG     *
    VOTERS EDUCATION FUND,    *
13  et al.,                   *
        Defendant-Intervenors,*
14                            *
15  TEXAS LEGISLATIVE BLACK   *
    CAUCUS, et al.,           *
16     Defendant-Intervenors,*
17  VICTORIA RODRIGUEZ, et    *
    al.,                      *
18     Defendant-Intervenors.*
19        REPORTER'S CERTIFICATION
          DEPOSITION OF JOSE ALISEDA
20             JUNE 6, 2012
21      I, Rhonda Howard, Certified Shorthand
22  Reporter in and for the State of Texas, hereby
23  certify to the following:
24      That the witness, JOSE ALISEDA, was duly
25  sworn by the officer and that the transcript of the

304

1   oral deposition is a true record of the testimony
2   given by the witness;
3            That signature is waived;
4            That pursuant to information given to the
5   deposition officer at the time testimony was taken,
6   the following includes counsel for all parties of
7   record:
8            Mr. John McKenzie, Attorney for Plaintiff
         Mr. Daniel J. Freeman, Attorney for
9   Defendant
10           I further certify that I am neither
11  counsel for, related to, nor employed by any of the
12  parties or attorneys in the action in which this
13  proceeding was taken, and further that I am not
14  financially or otherwise interested in the outcome
15  of the action.
16           Further certification requirements
17  pursuant to Rule 203 of TRCP will be certified to
18  after they have occurred.



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
         Plaintiff,                )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
         Defendant,                )
                                   )
ERIC KENNIE, et al,                )
                                   )
         Defendant-Intervenors,    )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
         Defendant-Intervenors,    )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
         Defendant-Intervenors,    )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
                                   )
         Defendant-Intervenors,    )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
         Defendant-Intervenors.    )

*************************************************
ORAL DEPOSITION OF
REPRESENTATIVE RAFAEL ANCHIA
JUNE 6, 2012
*************************************************

**Page 2**

ORAL DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA,
produced as a witness at the instance of the Defendant,
was duly sworn, was taken in the above-styled and
numbered cause on the JUNE 6, 2012, from 1:48 a.m. to
5:07 p.m., before Chris Carpenter, CSR, in and for the
State of Texas, reported by machine shorthand, at the
offices of The Texas Attorney's Office, 209 West 14th
Street, 1st Floor Conference Room, Austin, TX 78701,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

**Page 3**

A P P E A R A N C E S
FOR THE PLAINTIFF, STATE OF TEXAS:
    Patrick K. Sweeten
    Stacey Napier
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, TX 78711-2548
    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 936-1307
    patrick.sweeten@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:

    Jennifer Maranzano
    Angela Miller
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    (202) 305-7766
    jennifer.maranzano@usdoj.gov
FOR THE DEFENDANT-INTERVENOR MEXICAN AMERICAN
LEGISLATIVE CAUCUS:

    Jose Garza
    LAW OFFICE OF JOSE GARZA
    7414 Robin Rest Dr.
    San Antonio, TX 98209
    (210) 392-2856
    garzapalm@aol.com
    Martin Golando (MALC)
    Tricia Horatio (MALC)

**Page 4**

INDEX

Appearances........................................3
REPRESENTATIVE RAFAEL ANCHIA
    Examination by Mr. Sweeten.................5
    Examination by Ms. Maranzano.............140
    Further Examination by Mr. Sweeten.......141
Signature and Changes...........................143
Reporter's Certificate..........................145

EXHIBITS

NO. DESCRIPTION                              PAGE MARKED

1    Defendant United States' First          21
     Supplemental Rule 26 Disclosures
2    Members Who Have Waived Privilege            25
3    Declaration of Rafael Anchia            29
4    Minute Order,  April 3, 2012            29
5    Lighthouse Opinion Polling              64
6    Questions About Voter Identification        67
7    Amendment for SB 14                     100
8    House Journal, 82nd Legislature, Monday     124
     Jan. 24, 2011

9    House Journal, 82nd Legislature, Monday,    133
     May 16, 2011

5

1         REPRESENTATIVE RAFAEL ANCHIA,
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5               EXAMINATION
6   BY MR. SWEETEN:
7       Q.  Good afternoon.
8       A.  Good afternoon.
9       Q.  Would you please state your full name for the
10   record?
11       A.  Rafael Michael Anchia.
12       Q.  Okay.  What's your date of birth?
13       A.  9-26-68.
14       Q.  Okay.  And where do you live?
15       A.  I live in Dallas, Texas.
16       Q.  Okay.  What's your residence address?
17       A.  1418 Yakimo, that's Y-A-K-I-M-O, Drive, Dallas,
18   Texas, 75208.
19       Q.  Okay.  And I'm going to be asking you some
20   questions today.  This is -- let me ask you, have you
21   take a -- have you been deposed before?
22       A.  One time --
23       Q.  Okay.
24       A.  -- when I was on the Dallas School Board.
25       Q.  Okay.  We can talk about that.  But today, when

6

1   I'm asking you questions, if you don't understand
2   anything that I'm asking you, if you would just ask me
3   to rephrase it, I'd be happy to do that.  Otherwise,
4   I'll assume you understood the question that was asked;
5   is that fair?
6       A.  Yes.
7       Q.  In addition, the court reporter is here to take
8   down everything and so he can't take down shakes of the
9   head, nods, uh-huhs, nuh-huhs, that sort of thing.  And
10   so we just need a verbal response to any questions that
11   we pose.
12       A.  Yes.
13       Q.  We'll take a break if you need to.  I typically
14   would like to take a break about every -- once every
15   hour or so.  I don't currently have an estimate as to
16   how long we're going to be here today, but I certainly
17   hope we can avoid some of the lengthy depositions that
18   we've had over the last several weeks.  So we'll --
19   we'll do our best to make this as efficient and make it
20   go by as quickly as possible.
21       A.  Thank you.
22       Q.  Let's talk about your deposition.  When -- you
23   gave it while you were a member of the Dallas school
24   board; is that right?
25       A.  Yes.

7

1       Q.  Can you just give me a general description of
2   the litigation involved?
3       A.  There was a school desegregation case that had
4   been filed in the early '70s.  And the Dallas school
5   board had petitioned the court in Judge Barefoot
6   Sanders' federal court.  He had jurisdiction over this
7   particular desegregation case and we petitioned him to
8   get out from under the desegregation case.
9       Q.  Okay.  So you were a petitioner.  On behalf of
10   the school board, you petitioned to -- yeah, was it a
11   federal court order?
12       A.  Yes, I think that's right; it was a federal
13   court order, as far as I recall.
14       Q.  Okay.  So you were the petitioner asking the
15   court to lift the desegregation order that had been put
16   in place since what time period?
17       A.  The '70s, I believe.
18       Q.  Okay.  What was the basis of that petition?
19       A.  That the school district was desegregated, I
20   believe.  And I don't recall all the facts.  It was
21   about 10, 11 years ago, but to my recollection, that --
22   the district had complied and the school district was
23   desegregated.
24       Q.  Okay.  So there wasn't a need from the view of
25   you or the Dallas school board to continue with the

8

1   federal court order imposing orders related to
2   desegregation, correct?
3       A.  That was the sense of the board.
4       Q.  Things have changed since the 1970s?
5       A.  That was the sense of the board.
6       Q.  Okay.  And you gave testimony in that case?
7       A.  I did.
8       Q.  Was that your sense as well?
9       A.  That I gave testimony in that case, yes.
10       Q.  Back up, no.  That as to -- was it your sense
11   as well that the -- that the Dallas school district had
12   been desegregated at that point or had been --
13       A.  It was my sense that the order had been
14   complied with.
15       Q.  Okay.  Tell me, specifically, what had changed
16   between the time that that order had entered, had been
17   entered, and the time that you petitioned the federal
18   court to vacate that order.
19       A.  My sense was that the district had complied
20   with the requirements of the -- of the court order.
21       Q.  Okay.
22       A.  So it was a compliance -- it was a compliance
23   question.
24       Q.  And compliance, how did they comply?
25       A.  There were a series of programs that had been

Representative Rafael Anchia                                    June 6, 2012

## 9

```
 1    instituted at the school district, and at the time,
 2    there was only one majority school -- there was one
 3    majority high school left and that was Seagoville High
 4    School.  We had a program called the M & M Program,
 5    minority-to-majority schools to comply with that court
 6    order; we instituted the program and it had been working
 7    well.  And even the monitor that was reviewing the
 8    district's progress had made the point that compliance
 9    had -- compliance was occurring on that court order.
10        Q.  Okay.  In working on that litigation, did you
11    have some familiarity with the conditions that existed
12    at the time that the federal court order had been
13    entered?
14        A.  I did read quite a bit of history.
15        Q.  Okay.  Can you give us a sense of what the
16    precursor events that led to the entry of that order?
17        A.  There were two different -- essentially, there
18    were two different school districts.  There was a school
19    district for an Anglo majority and there was a separate
20    school for either African-Americans or Hispanics.
21        Q.  I want to ask you, who first contacted you
22    about this lawsuit?
23        A.  I don't recall.
24        Q.  Okay.
25        A.  Who first contacted me about it?  I don't know.
```

## 10

```
 1        Q.  When did you first talk with attorneys at the
 2    Department of Justice regarding this case?
 3        A.  Maybe a month and a half ago, two months ago.
 4        Q.  Okay.  Who did you talk to at the Department of
 5    Justice?
 6        A.  The names escape me.  I think we spoke at the
 7    -- and I forgot your name, I'm sorry.
 8        Q.  You're pointing to Jennifer Maranzano; is that
 9    right?
10        A.  Jennifer Maranzano.  I believe Jennifer
11    Maranzano and I spoke on the phone.  There was another
12    lawyer but I'm unaware -- I don't recall that person's
13    name.
14        Q.  Okay.  Do you have a more specific date as to
15    when you were contacted?
16        A.  I don't.
17        Q.  You filed an affidavit in this case.  Do you
18    remember signing an affidavit?
19        A.  I do.
20        Q.  Okay.  Do you think that you were contacted or
21    you had contact with the Department of Justice at or
22    near the time that the affidavit was signed?
23        A.  Prior to is my recollection.
24        Q.  Okay.  How long prior to?
25        A.  I don't recall exactly.  But possibly a week to
```

## 11

```
 1    two weeks.
 2        Q.  Okay.  Had you had any contact with the
 3    Department of Justice prior to that time?
 4        A.  No.
 5        Q.  Do you know who else, was it a man or woman you
 6    talked to at the Department of Justice?
 7        A.  I don't recall.
 8        Q.  Who was a party to the conversation?
 9        A.  Members of the Department of Justice and
10    myself.
11        Q.  Okay.  Tell me what was discussed during the
12    conversation.
13        A.  My recollection of the photo ID bills that had
14    been filed from my first session to the present day, and
15    the processes surrounding those photo ID, the
16    legislative processes surrounding the photo ID
17    legislation.
18        Q.  Okay.  And so went through sort of the history
19    of the photo ID bills within the -- and your involvement
20    with them in the House?
21        A.  Yeah.  Among other things, right.
22        Q.  Okay.  What are the other things?
23        A.  We referenced -- or I referenced studies that I
24    had read, research that I had done.  I talked about
25    committee reports, testimony that I had heard.  I had
```

## 12

```
 1    been on the Elections Committee for three terms, prior
 2    to the 2011 session, which talked about those
 3    experiences as well.
 4        Q.  How long did the meeting last?
 5        A.  It wasn't a meeting, it was a phone conference.
 6        Q.  How long did the phone conference last?
 7        A.  Less than an hour.
 8        Q.  Have you -- have you had follow-up
 9    conversations with the Department of Justice?
10        A.  There have been two phone conferences, but I
11    have not spoken to the Department -- any representative
12    of the Department of Justice until I saw Ms. Maranzano
13    today, outside this building.
14        Q.  Okay.  So you saw her today and you had --
15    you've described two conferences --
16        A.  Uh-huh.
17        Q.  -- teleconferences.
18        A.  Phone conferences.
19        Q.  Okay.  And so you've described for me the first
20    one.  Tell me about the second teleconference.  When did
21    it happen?
22        A.  In close proximity to the first one, maybe a
23    week to ten days out.  So I had the first conference,
24    and the second one related to the affidavit --
25        Q.  Okay.
```

## 13

1    A.  -- just to follow up on whether or not the
2    contents of the affidavit were reflective of our prior
3    conversation.
4        Q.  Who drafted the affidavit?
5        A.  I don't know.
6        Q.  You didn't draft the affidavit?
7        A.  No.
8        Q.  Okay.  The affidavit was drafted for you by
9    somebody at the Department of Justice?
10       A.  Yes.
11       Q.  Were you sent drafts of the affidavit?
12       A.  Yes.
13       Q.  Do you have drafts of the affidavit?
14       A.  No.
15       Q.  Okay.  Did you make changes on the affidavit?
16       A.  I don't recall, but I think -- I don't recall
17   exactly but I think there were some minor changes to the
18   affidavit.
19       Q.  When you were contacted, were you -- did you
20   talk about the allegations made in this case by the
21   Department of Justice by the intervenors, by the Texas
22   Attorney General's Office?
23       A.  No.  It was mainly to recount my recollection
24   of the legislative process and the bills that had been
25   filed.

## 14

1        Q.  The second one you've indicated that the
2    substance of the conversation related to the affidavit
3    that you were executing, correct?
4        A.  Yes.
5        Q.  Anything else discussed in that conversation?
6        A.  Not that I recall.
7        Q.  Were you told that you were going to testify at
8    trial or that they would call you to testify at trial in
9    this case?
10       A.  No.
11       Q.  Have you had discussions with the Department of
12   Justice about whether or not you were going to testify
13   in case?
14       A.  No.
15       Q.  Do you have plans to be in Washington, D.C., in
16   July?
17       A.  I am holding dates open in case I am called to
18   testify in July.
19       Q.  It's my understanding you are not asserting the
20   legislative privilege in this litigation; is that
21   correct?
22       A.  Yes.
23       Q.  Okay.  Let me back up before we get into
24   that.  And I want to ask you, you're represented today
25   by counsel; is that right?

## 15

1        MR. GARZA:  Yes.
2        Q.  And who is your counsel?
3        MR. GARZA:  Jose Garza.
4        Q.  (By Mr. Sweeten) Okay.  And when did you first
5    contact Mr. Garza regarding his representation of you
6    for this deposition?
7        A.  I don't recall.
8        Q.  Okay.  Would it have been sometime this year,
9    last year?
10       A.  No, this year.
11       Q.  Okay.  Would it have been within the last two
12   months?
13       A.  Yes.
14       Q.  Okay.  Who is paying for your legal services?
15       A.  I'm not sure.  Nobody, as far as I can tell.
16       Q.  Okay.  Are you -- have you had discussions with
17   other attorneys who represent intervenors in this
18   litigation?
19       A.  Yes.
20       Q.  Okay.  Tell me who you've talked to?
21       A.  Nina Perales.
22       Q.  Okay.  Anyone else?
23       A.  Luis Figueroa.
24       MR. GARZA:  Okay.  He's not a lawyer.
25       THE WITNESS:  Oh, he's not?  I didn't know

## 16

1    that.
2        Q.  (By Mr. Sweeten) All right.  So let's talk
3    about your discussions with Ms. Perales.  Can you tell
4    me the dates that those occurred?
5        A.  Today.
6        Q.  Okay.  Have you talked with her before today?
7        A.  No.
8        Q.  Okay.
9        A.  Well, yes, I have talked to her before today.
10       Q.  Tell me about Mr. Figueroa.  Well, let me back
11   up then.  When did you talk to Ms. Perales -- let me ask
12   you this:  Did you talk to about her this litigation?
13       A.  No.
14       Q.  Okay.  You know her from other occasions or?
15       A.  Yes, from having testified before the Elections
16   Committee, from having worked on redistricting, --
17       Q.  Okay.
18       A.  -- a number -- a number of other initiatives.
19       Q.  Let me ask you:  Did you -- did you talk to her
20   about voter ID any time prior to today?
21       A.  Yes.
22       Q.  And about this litigation?
23       A.  No.
24       Q.  Okay.  You talked to her during sessions?
25       A.  During sessions, correct.

## 29

1          (Exhibit 3 marked for identification.)
2     Q.   (By Mr. Sweeten) Okay.  Can you generally
3  identify what this exhibit is, Exhibit 3?
4     A.   This appears to be the Declaration of Rafael
5  Anchia.
6     Q.   Okay.  And let's turn to the back page.  Is
7  this your signature on the -- Page 4, correct?
8     A.   Yes.
9     Q.   Okay.  And it's signed 4-9-12.  So April 9th of
10 this year.  Was this the date that you exchanged the
11 draft and then ultimately the final product that was the
12 -- your declaration?
13    A.   Yes.
14    Q.   Okay.  Were you told by the Department of
15 Justice that this document would be used in a legal
16 proceeding?
17    A.   I don't recall.
18    Q.   Was it your understanding that it would be?
19    A.   Yes.
20    Q.   Okay.
21         MR. SWEETEN:  And we'll have this marked
22 as Anchia 4.
23         (Exhibit 4 marked for identification.)
24    Q.   (By Mr. Sweeten) And I will represent to you
25 that this is a Minute Order from the United States

## 30

1  District Court, District of Columbia.
2     A.   Can I ask you a question about that?
3     Q.   Sure.
4     A.   What is a minute order?
5     Q.   It's an order from the Court.
6     A.   Okay.
7     Q.   Okay.  I'm going to ask you to just read the
8  minute order to yourself and then I'm going to ask you
9  questions about it.
10    A.   Okay.
11    Q.   Okay.  So the date of this minute order, if
12 you'll look at the top, it's an e-mail.  It's April 3,
13 2012.  Do you see that?
14    A.   I do.
15    Q.   Had you had any conversations with the
16 Department of Justice prior to this minute order
17 issuing?
18    A.   I don't recall the exact date of the -- our
19 discussions, so it would be impossible for me to say
20 whether it was before or after.
21    Q.   When you were contacted by the Department of
22 Justice, were you told that they had a impending
23 deadline to file information as set forth in this minute
24 order?
25    A.   I don't recall.

## 31

1     Q.   Okay.  You don't know one way or the other
2  whether you were contacted prior to the entry of this
3  minute order?
4     A.   I do not.
5     Q.   Were you contacted during -- at any time during
6  the preclearance portion of this case, which would have
7  ended with the preclearance denial on March 12, 2012?
8     A.   I don't recall.  Well, I don't recall that I
9  was.
10    Q.   Okay.  Have you had any written correspondence
11 with the Department of Justice, at any time, prior to
12 exchanging this declaration that we've talked about as
13 Anchia 3?
14    A.   I had a initial conference call that I referred
15 to earlier.  So, yes.  So the answer is yes.
16    Q.   I've asked written communications?
17    A.   Oh, written?
18    Q.   Yeah.
19    A.   Yes.
20    Q.   Okay.  Can you tell me when did you have
21 written communication with the Department of Justice?
22    A.   It would have been draft -- a draft of this --
23 of this declaration prior to the 9th of April.
24    Q.   During the preclearance process, before March
25 12, 2012, did you have any discussions with anybody at

## 32

1  the Department of Justice about Senate Bill 14?
2     A.   Not that I'm aware of.  Not -- not that I
3  recall.
4     Q.   Did you have any discussions, of any kind,
5  about the matters -- about the preclearance process?
6     A.   Yes.
7     Q.   Okay.  With the Department of Justice?
8     A.   No.
9     Q.   Okay.
10    A.   Not that I recall.
11    Q.   So your first contact with the Department of
12 Justice would have been after the March 12, 2012
13 preclearance denial date; is that right?
14    A.   As far as I can recall, yes.
15    Q.   You can put that aside.  Thank you.
16         All right.  Let's look at your
17 declaration.  Let me ask you:  Do you know if this was
18 filed with the District Court in Washington, D.C.?
19    A.   What is this?
20    Q.   This is Deposition Exhibit Number 3, the
21 declaration.
22    A.   Anchia 3?
23    Q.   Yes.  Were you aware this was filed with the --
24 with the D.C. Circuit Court?
25    A.   Yes.

Representative Rafael Anchia                                    June 6, 2012

## 33

1    Q.  All right.  Let's look at the first paragraph.
2  All right.  The first sentence says, "My name is Rafael
3  Anchia.  I am a resident of Dallas, Texas, registered to
4  vote in Dallas County.  I am Hispanic."
5           Who wrote that first sentence?
6    A.  I think I did.
7    Q.  Okay.
8    A.  At least, I furnished the information that
9  comprised that first sentence.
10   Q.  Okay.
11   A.  So wrote -- if you're asking did I type this
12 in, is that the question you're asking?  I just want
13 some  -- when you -- when you say "wrote," since this is
14 a typed document -- and I'm not trying to be -- I'm just
15 trying to answer the question that's asked.
16   Q.  That's fair.  Go ahead.
17   A.  So I furnished this information.  I did not
18 type this information.
19   Q.  Okay.  Did you write -- did you -- did you give
20 them a draft of your declaration or was that given to
21 you?
22   A.  I received the first draft after we had spoken
23 during that -- that first conference call that we had --
24 that I referenced earlier.
25   Q.  So the first written product that became your

## 34

1  declaration was sent to you by the Department of
2  Justice?
3    A.  Yes.
4    Q.  Okay.  And how long was the first draft that
5  they sent you?
6    A.  It was roughly -- roughly, these three-plus
7  pages.
8    Q.  Okay.  This declaration has 18 paragraphs.  Do
9  you remember how many paragraphs the first draft had?
10   A.  I do not.
11   Q.  Okay.  Do you have a copy of the first draft
12 that the Department of Justice sent you?
13   A.  I do not.
14   Q.  Okay.  What did you do with that?
15   A.  Probably recycled it.
16   Q.  Was that sent to you on e-mail?
17   A.  Yes.
18   Q.  And do you save your e-mails?
19   A.  Sometimes.
20   Q.  Okay.  What's your retention policy regarding
21 e-mails such as this?
22   A.  It depends.  In the -- at the State office, our
23 retention policy -- I asked that our retention policy be
24 consistent with whatever Leg Council or the Governor's
25 Office has as a retention policy.

## 35

1    Q.  So I guess -- I guess that's another question:
2  Were you sent the e-mail on a State account or was this
3  on your private e-mail account or was it a work e-mail
4  account?
5    A.  I don't recall.
6    Q.  Do you recall any e-mail communications you've
7  had with the Department of Justice and which account
8  that would have been on?
9    A.  I don't recall the exact account but it would
10 relate to the draft.
11   Q.  Did you send a red-line draft back with
12 changes?
13   A.  I don't believe so, no.
14   Q.  Did you sign the first draft given to you?
15   A.  No.
16   Q.  Okay.  Did you call them and tell them what you
17 wanted changed?
18   A.  I believe that's right, yes.  We did have a
19 phone conversation.  We --
20   Q.  What did you ask -- go ahead.
21   A.  Yes.
22   Q.  You can finish.  I'm sorry.  I don't want to
23 trip on your answer.
24   A.  No.  We had a phone conversation related to the
25 draft.

## 36

1    Q.  What did you ask to have changed?
2    A.  I don't recall, to be honest.
3    Q.  Let's look at the second paragraph.  "I'm
4  currently a member of the Texas House of
5  Representatives, representing District 103 in western
6  Dallas County.  District 103 is a majority Hispanic
7  district in which Hispanic voters are able to control
8  the outcome of the election."  Is that what you wrote?
9    A.  That is what I said.
10   Q.  And what does that mean, that last sentence.
11 It's "a majority Hispanic district in which Hispanic
12 voters are able to control the outcome of the election,"
13 what does that mean?
14   A.  That based on the voter turnout in the
15 district, if Hispanic registered voters were to turn out
16 in large numbers, they could elect the person of their
17 choice.
18   Q.  Okay.  What is the racial makeup of District
19 103?
20   A.  The prior District 103, so that the 103 that I
21 have run in previously, pre-redistricting, is about
22 70-plus percent Hispanic.
23   Q.  Okay.  Can you give me the general parameters
24 of your district, geographically?
25   A.  Goes from North Oak Cliff, essentially,

Representative Rafael Anchia                          June 6, 2012

---

### 37

1  Methodist Hospital is in Dallas, all the way up to old
2  downtown Carrollton.  And, again, this is the
3  pre-redistricting, the pre-redistricting parameter.  And
4  on the east side, it goes -- the eastern most edge is
5  the intersection of Inwood and Lovers -- Inwood and
6  Mockingbird.  And the western most edge is Loop 12 at,
7  what used to be, Texas Stadium.
8       Q.  Okay.  What are the other racial groups that
9  make up your district?
10      A.  It's about 70 to 74 percent Hispanic, somewhere
11 in there, and about 10 percent African-American -- and
12 these are round numbers.  And I'd say about 4 percent
13 Asian, maybe 3 to 4 percent Asian, and then the
14 remainder is Anglo.
15      Q.  Let's go to Paragraph 3.  "I was first selected
16 to represent District 103 in November 2004 and I've
17 continued to represent the district since that date."
18           Is that your first election of any kind
19 outside of the school board?
20      A.  Yes.
21      Q.  Have you served as House member since 2004?
22      A.  Yes.
23      Q.  "I have been a member of the Mexican American
24 Legislative Caucus during every session in which I have
25 served.  I also served on the House Elections Committee

---

### 38

1  in my first three terms from 2005 to 2010."
2       A.  That is correct.
3       Q.  What other groups are you a member of?  I
4  understand you're a member of Democratic party?
5       A.  Correct.
6       Q.  Okay.  What other groups?
7       A.  I sit on the Bill and Rita Clemens Center for
8  Southwest Studies at my alma mater, Southern Methodist
9  University.  I'm on the president's -- President Gerald
10 Turner's advisory council for young leaders at Southern
11 Methodist University.  I am a member of a group called
12 the Dallas Assembly, which is a group of leaders in the
13 Dallas area.  I'm a member -- I'm an alumnae of a group
14 called Leadership Dallas.  I am a member of the Catholic
15 Campus Community at SMU.  There are a lot of groups I'm
16 a member of.
17      Q.  Okay.
18      A.  I -- I serve on the board of the Hoblitzelle
19 Foundation.  H-O-B-L-I-T-Z-E-L-L-E, is my best
20 recollection of how to spell that.  Member of the Oak
21 Cliff Lions Club.
22      Q.  Lot of groups.
23      A.  Yeah.  UT Southwestern Foundation -- medical
24 school foundation.
25      Q.  Okay.  The next paragraph, you discuss -- you

---

### 39

1  say, "The House Elections Committee considered bills to
2  require voters to show photo identification in the 79th
3  Legislature, House Bill 1706; 80th Legislature, House
4  Bill 218; and the 81st Legislature, Senate Bill
5  362."  Let's start with that paragraph.  Did you support
6  any of that legislation?
7       A.  No.
8       Q.  Okay.  You were opposed to House Bill 1706?
9       A.  Yes.
10      Q.  House Bill 218?
11      A.  Yes.
12      Q.  And Senate Bill 362?
13      A.  Yes.
14      Q.  Okay.  You've opposed any legislative bills
15 related to the photo identification at polls -- poll
16 places, correct?
17      A.  Bills, yes.  I've supported amendments that
18 would have created a photo identification requirement,
19 but they were unsuccessful.
20      Q.  Okay.  Now, the next sentence says, "Each photo
21 identification bill introduced in the prior legislative
22 sessions allowed for more forms of identification than
23 does Senate Bill 14," right?
24      A.  Yes.
25      Q.  Did I read that right?

---

### 40

1       A.  Yes.
2       Q.  That's a true statement?
3       A.  To the best of my recollection, yes.
4       Q.  But in any event, you opposed all of them?
5       A.  Yes.
6       Q.  Can you tell us why it is that you have not
7  supported any of these versions of photo identification
8  bills?
9       A.  Because I think they would have the tendency to
10 disenfranchise many groups including ethnic and racial
11 minorities.
12      Q.  Okay.  What I'm -- what I'm hearing is you
13 think that they would have a discriminatory effect; is
14 that what you're saying?
15      A.  Yes.
16      Q.  Okay.  Let me ask you:  As you're sitting here,
17 do you believe that House Bill 1706 had a discriminatory
18 purpose?
19      A.  Yes.
20      Q.  Okay.  Do you believe that House Bill 218 had a
21 discriminatory purpose?
22      A.  Yes.
23      Q.  Do you believe that Senate Bill 362 had a
24 discriminatory purpose?
25      A.  Yes.

Representative Rafael Anchia                                June 6, 2012

## 41

1    Q.  And you believe Senate Bill 14 had a
2    discriminatory purpose?
3    A.  Yes.
4    Q.  As to each of those, and we could go down the
5    list, do you believe all four of them had a
6    discriminatory effect?
7    A.  Yes.
8    Q.  Okay.  And we'll get into that more later.
9    Now, Paragraph 5.  "Throughout
10   consideration of these bills, proponents of voter photo
11   identification attempted to gain support for the bills
12   by making statements about large numbers of undocumented
13   Hispanics arriving and illegally voting in elections."
14   Did I read that sentence right?
15   A.  Yes.
16   Q.  Okay.  So without revealing matters of
17   legislative privilege, can you tell me who made such
18   statements?
19   A.  Betty Brown, Leo Berman, and a number of
20   witnesses who testified before the committee, including
21   Paul Bettencourt from Harris County, George Hammerlein
22   from Harris County, and a number of other witnesses who
23   I have not -- who I don't recall, but came to testify
24   before the committee.
25   Q.  Okay.  So you're saying those four individuals

## 42

1    and maybe others --
2    A.  At least those four individuals.
3    Q.  Okay.  Let me finish my question.
4    A.  Sorry.
5    Q.  You said that those four individuals and maybe
6    other witnesses who testified --
7    A.  (Witness nods head yes.)
8    Q.  -- made statements that large numbers of
9    undocumented Hispanics arriving and illegally -- let me
10   -- let me start over.
11   You said that they made statements that
12   attempted to gain support for the bills by making
13   statements about large numbers of undocumented Hispanics
14   arriving and illegally voting in elections.  Each one of
15   those did?
16   A.  Yes.  The essence of their -- the essence of
17   their testimony was to that effect, yes.
18   Q.  When you say testimony -- and you've -- you've
19   talked about two people that provided testimony.  And
20   then you've talked about two legislators, Betty Brown
21   and Leo Berman.  So I want to take those separately.
22   A.  Yes.
23   Q.  Let's start with Betty Brown.  Is the statement
24   that you're referring to from Betty Brown, was that a
25   matter of public record on the Floor?

## 43

1    A.  Yes.
2    Q.  Okay.  Can you tell me exactly what she said
3    that aligns with what you've written on Paragraph 5?
4    A.  I'd have to look at the -- at the House Journal
5    to tell you exactly what she said.  But the essence of
6    what she said, she had stacks of paper at the dais, and
7    she said that these -- these are illegal immigrant
8    voters and that is why we need this legislation.  And I
9    can't recall if she read the names of these folks,
10   whether that was in committee or on the Floor.  There
11   were many Spanish surnames in that stack of papers.  And
12   I don't recall, when I was looking through the papers,
13   whether the Spanish surnames -- whether I discovered
14   that they were Spanish surnames and that was discussed
15   in committee or on the House floor, but it was related
16   to Betty Brown's comments.
17   Q.  Okay.  So Betty Brown made public statements
18   that you believe are set forth or described in Paragraph
19   5?
20   A.  Yes.  The essence of her comments is consistent
21   with my statement.
22   Q.  Okay.  Those are matters of public record that
23   Betty Brown made?
24   A.  Yes.
25   Q.  When did she make them, what session?

## 44

1    A.  Betty Brown would have made those, I believe,
2    in the 2000 -- let me look back.  I believe in the 80th
3    legislative session.
4    Q.  Okay.  So the 80th Legislature, House Bill 218.
5    A.  Okay.
6    Q.  So in connection with House Bill 218, Betty
7    Brown made public statements that you believe are
8    described in Paragraph 5?
9    A.  Yes.
10   Q.  Okay.  Let's talk about Leo Berman.  And we're
11   going to get back to Betty Brown because you address it
12   in the affidavit --
13   A.  Okay.
14   Q.  -- so we'll talk about that.
15   A.  Okay.
16   Q.  Leo Berman.  Actually, let me back up.  Is
17   there any other statement that you're aware of that
18   Betty Brown made, other than what you've just described?
19   A.  I think in committee, Betty Brown made
20   statements related to undocumented immigrants voting as
21   well.
22   Q.  Okay.  What did she specifically say in
23   committee?
24   A.  I don't recall specifically.  But -- but my
25   recollection is that that was the sense of her -- some

Representative Rafael Anchia                          June 6, 2012

## 45

1   of her comments in committee.
2       Q.   Okay.  That the sense of these comments that
3   she made is that large numbers of undocumented Hispanics
4   are arriving and illegally voting?
5       A.   Uh-huh.
6       Q.   Yes?
7       A.   Yes.
8       Q.   Now, let me just ask you:  Is it illegal if a--
9   an undocumented alien votes, under current law, without
10  any of these photo identification bills, is that
11  illegal?
12      A.   Yes.
13      Q.   Okay.  What about a permanent resident who's a
14  non-citizen, would that be illegal for somebody like
15  that to vote?
16      A.   Yes.
17      Q.   Let's talk about your discussions or your --
18  what you've said about Mr. Berman, okay?
19      A.   (Witness nods head yes.)
20      Q.   Representative Berman, when did he -- first of
21  all, are these public statements that you're referring
22  to that Representative Berman made?
23      A.   Yes.
24      Q.   Okay.  And can you tell me what legislative --
25  in what legislative session Mr. Berman made those

## 46

1   remarks?
2       A.   I'm trying to think when he was committee
3   chair, but that may have been in the 80th legislative
4   session as well.  I may be confusing the 80th and the
5   81st but...
6       Q.   So Representative Berman made public statements
7   in either the 80th or the 81st --
8       A.   In fact, they were written.
9       Q.   Okay.
10      A.   They were written.
11      Q.   All right.  Let me back up then.  In the 80th
12  or 81st Legislature, he made a public written statement
13  that indicated that undocumented Hispanics are arriving
14  and illegally voting?
15      A.   Yes, "illegal aliens voting," I believe were
16  his -- his exact written -- I'd have to go back and look
17  at his letter, but yes.
18      Q.   And how is that a matter of public record?  Is
19  that introduced in -- in?
20      A.   I believe he wrote it as a letter to the editor
21  to the Tyler paper.
22      Q.   Okay.
23      A.   And we discussed it in committee.
24      Q.   So there was a letter to the editor from
25  Representative Berman and it was discussed in committee?

## 47

1       A.   Correct.
2       Q.   Okay.  And both those discussions -- and by the
3   way, was the discussion with Representative Berman?
4       A.   Yes.
5       Q.   Okay.  So --
6       A.   He was the chair of the committee at the time.
7       Q.   Okay.  So both the discussion with
8   Representative Berman and the letter to the editor, you
9   believe evidenced that -- that he's saying that large
10  numbers of undocumented Hispanics are arriving and
11  illegally voting?
12      A.   Correct.
13      Q.   By itself, is that statement, "that large
14  numbers of undocumented Hispanics are arriving and
15  illegally voting," does that show discrimination or
16  discriminatory purpose in your view?
17      A.   I think it's part of a -- statement, by the
18  way, I believe to be untrue.  And is part of, I think, a
19  manipulation of public opinion to try to put a Hispanic
20  face on a problem, or an alleged problem, as it is
21  designed, I think, to stoke fears about Hispanics
22  voting, generally.
23      Q.   Well, you're -- you're addressing a subjective
24  element to that.
25      A.   Uh-huh.

## 48

1       Q.   You're interpreting those remarks that --
2       A.   That is my interpretation, correct.
3       Q.   So when you're saying that those evidenced
4   discriminatory purpose, you're saying my interpretation,
5   as Representative Anchia, is that those remarks are
6   discriminatory?
7       A.   I think that is evidence of discriminatory
8   purpose, yes.  Which I think that -- yeah, yes.
9       Q.   Is there anything else that Representative
10  Berman uttered publicly or privately that you believe
11  evidence what you set forth in Paragraph 5?
12      A.   I imagine private communications would be
13  privileged.
14      Q.   And -- and that's a good catch.  And I'm not
15  asking you for the substance, I'm asking you:  Have you
16  had private conversations with him that you believe
17  evidence discrimination?  So just a general subject
18  matter.
19      A.   Yes.
20      Q.   And can you tell me when those communications
21  occurred?
22      A.   It occurred before a debate that we had where
23  we were set to go on TV and we were visiting at the TV
24  station and he was getting makeup put on.
25      Q.   Okay.

Representative Rafael Anchia                                June 6, 2012

## 49

1    A.   And we had a -- we had a discussion.
2    Q.   Okay.  How long was the discussion?
3    A.   Five minutes.
4    Q.   Who else was present?
5    A.   The makeup artist.
6    Q.   Okay.  Can you tell me the station where this
7    occurred?
8    A.   I don't know the call letters.
9    Q.   Who -- who interviewed you that day?
10   A.   I believe it was Paul Stekler.
11   Q.   Who is Paul Stekler?
12   A.   He's a -- he is a PBS TV interviewer --
13   Q.   In Dallas?
14   A.   No, no.  In Austin.
15   Q.   In Austin.  Any other statements by
16   Representative Berman that you believe are part of your
17   description of -- set forth in Paragraph 5?
18   A.   Not that I recall.
19   Q.   Okay.  Can you tell me the time frame that that
20   occurred, that interview?
21   A.   I think it was either during the 2005 or 2007
22   session.
23   Q.   Okay.  Now you've referenced something that
24   Mr. Berman said, I think you said in either the 80th or
25   81st session.  You haven't referenced anything he said

## 50

1    in the 82nd.  Can you identify -- is there any time in
2    the 82nd that Representative Berman uttered such a
3    statement?
4    A.   No.  I don't believe he was involved in the
5    legislation.
6    Q.   Okay.  He wasn't involved in the legislation,
7    Senate Bill 14?
8    A.   Yeah.  Not that I recall.
9    Q.   Okay.  Because Representative Berman wasn't on
10   the Select Committee that considered the bill?
11   A.   I don't recall.
12   Q.   Well, what did you mean that he wasn't involved
13   in the legislation?
14   A.   He wasn't the author of the legislation.  I
15   think in prior sessions, he had authored legislations to
16   this effect.
17   Q.   All right.  You talked about Paul Bettencourt.
18   Who is that?
19   A.   I want to say he's the Harris County Tax
20   Assessor.  He was the Harris County Tax Assessor-
21   Collector.
22   Q.   Okay.  And he uttered statements that -- that
23   you generally described as "large numbers of
24   undocumented Hispanics arriving and illegally voting in
25   elections," something to that affect.

## 51

1    A.   Something along those lines.
2    Q.   And he made those statements in public, in
3    testimony?
4    A.   Yes.
5    Q.   And he made those during which session?
6    A.   Either during the -- I think during the 2007
7    session, if not during the 2009 session.
8    Q.   Okay.  Any other sessions?
9    A.   I don't recall.
10   Q.   Do you recall specifically what he said?
11   A.   Not exactly.
12   Q.   It would be on the record, I assume?
13   A.   Yes.
14   Q.   Okay.  If we want to read it for ourselves,
15   it's there?
16   A.   Yes.
17   Q.   Any other statements Mr. Bettencourt made?
18   A.   Not that I recall.
19   Q.   Okay.  You ever talk to him?
20   A.   No.
21   Q.   Okay.  You're referring to his public
22   testimony?
23   A.   Yes.
24   Q.   All right.  George Hammerly?
25   A.   Hammerlein, I think.

## 52

1    Q.   And who is George Hammerlein?
2    A.   I believe he worked for Paul Bettencourt at the
3    Harris County tax assessor-collector's office in the
4    voting division.
5    Q.   When did Mr. Hammerlein testify?
6    A.   Either in 2007 or 2009.
7    Q.   The testimony was public?
8    A.   Yes.
9    Q.   Was in it committee or was it on the --
10   A.   I believe it was in committee.
11   Q.   And, again, you think what Mr. Hammerlein said
12   fits the description of "large numbers of undocumented
13   Hispanics arriving and illegally voting in elections"?
14   A.   Yes.
15   Q.   Do you know what he said specifically?
16   A.   He talked about a match that his office had
17   done between the jury pool lists and the voter
18   registration lists, and he asserted that the two
19   inconsistent statements where a person says they're a
20   U.S. citizen and their voter registration card -- and on
21   -- and the inconsistent statement where the person said
22   that they were not a U.S. citizen in the jury pool,
23   confirmed that there were undocumented persons voting in
24   these elections.  And in fact, the stack of papers that
25   he handed out had many Spanish surname persons that he

Representative Rafael Anchia                    June 6, 2012

---

53

1  was alleging were voting illegally -- or illegal
2  immigrants who were voting.
3        Q.   Everything that he said was on the public
4  record?
5        A.   Yes.
6        Q.   Did you find out information that later led you
7  to believe that what he was saying is not true?
8        A.   Yes.
9        Q.   Okay.  Can you tell me what you found out?
10       A.   Well, we talked to -- we talked to some of the
11 same people that he said were illegal immigrants and
12 they, in fact, were U.S. citizens.
13       Q.   Who is "we"?
14       A.   Our office, our state office.
15       Q.   Did you talk with anyone?
16       A.   I'm trying to think.  Yes, I believe I did talk
17 to some of those persons who were alleged to have been
18 illegal immigrants.
19       Q.   You got their names from his testimony sometime
20 if the --
21       A.   From the stack -- I'm sorry.
22       Q.   Let me finish the question.  Sometime in the
23 2007 or 2009 time frame?
24       A.   Yes.
25       Q.   You got his -- whatever he testified to

---

54

1  publicly, you got the names of the individuals?
2        A.   Yes.
3        Q.   And you or someone from your office contacted
4  these individuals?
5        A.   Yes.
6        Q.   Who did you specifically talk to?
7        A.   I don't recall.
8        Q.   Who did the members of your office talk to?
9        A.   I don't recall.
10       Q.   And what did you -- what was the substance of
11 -- when you contacted these people, what did you find
12 out?
13       A.   I asked them whether they were undocumented or
14 not.
15       Q.   Okay.  And how many people did you talk to?
16       A.   I don't know.
17       Q.   Was it more than one?
18       A.   I don't remember.
19       Q.   Can you give -- is there a record you could
20 look at and get us the name of that individual?
21       A.   It's possible.  I'll look to see if we still
22 have those records.  But we talked about some of that
23 research in one of my committee reports when Chairman --
24 when Chairman Berman was the chair of the committee.  It
25 was included in public, in the Elections Committee

---

55

1  report.
2        Q.   So the results of those communications are set
3  forth in what?
4        A.   In a -- the Elections Committee report.  To the
5  best of my recollection, from either the 2007 or 2009
6  session, whenever Chairman Berman was Chair.
7        Q.   Okay.  Now you've identified --
8        A.   May I also --
9        Q.   Go ahead.
10       A.   I'd also like to point out that on the House
11 floor when Betty Brown had that same stack, it appeared,
12 of what she was calling illegal alien voters,
13 Representative Hochberg went and inspected those
14 documents and found them to be -- found her statements
15 to be inaccurate as well.  Because you asked me earlier
16 how I -- how I believe that not to be true.
17       Q.   Okay.  And now we're talking about Betty Brown.
18 And we can talk about that but --
19       A.   I may have jumped ahead.
20       Q.   No, that's okay.  In fact, let's talk about it.
21       A.   Okay.
22       Q.   You, in Paragraph 6 of this affidavit, you say
23 that, "In 2009, former Representative Betty Brown, who
24 is Anglo, held up a stack of papers during the House
25 floor debate and said they proved that illegal aliens

---

56

1  were voting."  Is that what she said?
2        A.   Yes.
3        Q.   That's what you're referring to when you
4  discussing Betty Brown's statement?
5        A.   Correct.
6        Q.   And in this affidavit filed with the court,
7  you're relating to the court that it's Representative
8  Hochberg is the one who spoke with her or that
9  subsequently examined the papers and said they didn't
10 contain any evidence, right?
11       A.   Yes.
12       Q.   You -- you didn't do that yourself; you didn't
13 do that inspection yourself?
14       A.   Well -- I mean, to the extent that it was the
15 same stack of papers, and I believe it was the same
16 stack that George Hammerlein and Paul Bettencourt had
17 presented to our office, then, yes, we had examined
18 those papers.
19       Q.   So you're indicating that what Betty Brown held
20 up is the same thing that --
21       A.   It is my recollection that it was the same
22 stack of papers.
23       Q.   Okay.  Let me finish the question and I'll try
24 to let you finish the answer.
25       A.   I apologize.

Representative Rafael Anchia                          June 6, 2012

---

## 57

1  Q.  When we read it, it will be crazy.
2  A.  Right.  I understand.
3  Q.  Okay.  Let's -- let me just ask you to make
4  sure it's clear:  The stack of payments that you're
5  indicating were in Betty Brown's hands, you're
6  indicating were the same stack of papers that
7  Mr. Bettencourt had held up or referenced in his public
8  testimony?
9  A.  It is my recollection that they were the same.
10  Q.  You didn't add, in Paragraph 6, that you had
11  personally discussed this matter with individuals listed
12  on those papers though, did you?
13  A.  No.
14  Q.  Okay.  Is there reason you didn't put that in
15  there?
16  A.  No.
17  Q.  In fact, what you say is, is you
18  referenced Representative Hochberg and say that he's the
19  one that examined the papers?
20  A.  Yes.
21  Q.  Okay.  Why didn't you put what you had done in
22  there?
23  A.  I -- I assume I forgot.
24  Q.  Okay.  Let go back up to Paragraph 5.  We
25  didn't go over one of your sentences here.  It is, "In

---

## 58

1  essence, they sold the concept of photo identification
2  requirements for voting on the backs of Latinos."  Did I
3  read that right?
4  A.  Yes.
5  Q.  All right.  So when you're saying "they sold,"
6  you're referring to Betty Brown, Leo Berman, Paul
7  Bettencourt and George Hammerlein?
8  A.  And many other people who testified before the
9  committee.
10  Q.  Okay.  Anyone else you're referring to?
11  A.  I mean, not by name -- not that I can recall by
12  name.
13  Q.  And it's your interpretation of what they're
14  saying is that they are selling the concept of photo
15  identification on the backs of Latinos?
16  A.  Yes.
17  Q.  Is that right?
18  A.  Yes.
19  Q.  Is that all Latinos?
20  A.  I'm not sure I understand the question.
21  Q.  Okay.  Well, when you say the words "on the
22  backs of Latinos," what do you mean?
23  A.  What I mean by that is that there was this
24  narrative that I heard during my three sessions on the
25  Elections Committee from people who would come and

---

## 59

1  testify as to the need for photo identification, that
2  there were undocumented persons -- and either explicitly
3  or implicitly, that there were Hispanic voting at the
4  polls.  When I would ask people at the committee, you
5  know, whether or not they knew they were -- whether they
6  were documented or undocumented, whether they were
7  illegally voting or not illegally voting, could never
8  come up with a -- with an example.  But it was
9  generally, there was this sense that the Hispanics that
10  were voting were somehow illegal and if that is -- and
11  if that is the case, we need this photo identification
12  to stop them from doing so.
13  Q.  There would not be a discriminatory purpose, in
14  your view, of trying to curb non-citizens voting?
15  A.  No.
16  Q.  But your interpretation of these remarks is
17  that they are selling this on the backs of Latinos?
18  That's your interpretation, right?
19  A.  That's right.
20  Q.  Are there any other individuals that we haven't
21  yet discussed?  You've referenced some witnesses who
22  testified, and you referenced Brown, Berman,
23  Bettencourt, and Hammerlein.  Anybody else who, in your
24  view, was selling the concept of photo identification on
25  the backs of Latinos?

---

## 60

1  A.  No.  Other than the people who testified before
2  the committee, sort of, you know, the blog
3  infrastructure where you would read things out in blogs,
4  you know, where there were concerns about illegal
5  immigrants, Hispanic illegal immigrants voting in
6  elections, and then some direct statements that we heard
7  during the legislative process, then I would say no.
8  Q.  Okay.
9  MR. SWEETEN:  Can you read the answer
10  back, please.
11  (The requested portion was read back by
12  the reporter.)
13  Q.  So in that answer, you're referencing bloggers,
14  you're referencing these four individuals, and then
15  others who testified.  Okay.  Now, none of those
16  references that you've made relate to anything that
17  occurred in the 82nd Legislature.  Would you agree with
18  that?
19  A.  No.
20  Q.  Okay.  Well, let's go through it.  Brown's
21  remarks weren't in the 82nd?
22  A.  Right.
23  Q.  Berman's weren't in the 82nd?
24  A.  Right.
25  Q.  Bettencourt's weren't in the 82nd?

61

1      A.   Right.
2      Q.   Hammerlein's weren't in the 82nd?
3      A.   Right.
4      Q.   Other witnesses?
5      A.   Yes.
6      Q.   Who?
7      A.   I don't have names for you but we did have
8   other witnesses during the 82nd legislative session.
9      Q.   If we wanted to check to see who those
10   witnesses are --
11     A.   It would probably be in the public record.
12     Q.   Okay.  Let me -- let me just finish the
13   question.
14     A.   Sorry.
15     Q.   If we want to check to see who those witnesses
16   are, who made statements that there were -- that the
17   concept of photo identification was being sold on the
18   backs of Latinos, we can just look at the 82nd
19   legislature transcript to find those; is that right?
20     A.   I don't think they would have said this exact
21   thing.  This is my interpretation of their comments.  So
22   would you have had a witness that was in favor of photo
23   ID, would have said, "We're selling this on the backs of
24   Latinos," then I'd say you will not find that in the
25   transcript.

62

1      Q.   So as far as participation in the 82nd
2   legislature, either as a legislator or as a witness,
3   those individuals who sold this on the backs of Latinos,
4   the court could just look at the transcript and they can
5   make their own interpretation as to whether or not those
6   statements made in public record were selling it on the
7   backs of Latinos, right?
8      A.   Yes.
9      Q.   Okay.  Let's go to Paragraph 7.  "In 2011,
10   House leadership formed the Select Committee on Voter
11   Identification and Fraud which solely addressed Senate
12   Bill 14."  Let's talk about that first sentence.  How
13   many select committees have you been a member of?
14     A.   None.
15     Q.   How many select committees --
16     A.   Oh, not true.  One.
17     Q.   Okay.  Which select committee was that?
18     A.   The Select Committee on School Finance.
19     Q.   Okay.  How many bills did the Select Committee
20   on School Finance consider?
21     A.   None.  It is a -- it is a committee that has
22   recently been formed and has had one hearing.
23     Q.   And are you familiar with other select
24   committees being established within the House?
25     A.   No.

63

1      Q.   Okay.  Is this the -- so the only two select
2   committees you're aware of are the Select Committee on
3   Voter Identification and Fraud in 2011 and this recent
4   select committee that you're a member of now on School
5   Finance?
6      A.   Yes.  As far as I recall, those are the only
7   two.
8      Q.   Who established the Select Committee on School
9   Finance?
10     A.   I imagine the Speaker of the House.
11     Q.   Okay.  And you were -- you're a member or do
12   you have a leadership position on the committee?
13     A.   No.
14     Q.   As you're sitting here, you don't know how many
15   bills the select committee that you're on is going to
16   consider?
17     A.   No.
18     Q.   You don't have an estimate?
19     A.   Because the bill filing period hasn't opened.
20     Q.   Okay.
21     A.   So I -- we don't know.
22     Q.   Or whether this committee will even hear bills?
23     A.   I think it's just an interim committee.
24     Q.   Okay.
25          MR. GARZA:  We've been going for about an

64

1   hour and quarter.  Can we take a break?
2          MR. SWEETEN:  Sure.  Absolutely.  Let's do
3   that.
4          (Recess from 2:59 to 3:10 p.m.)
5      Q.   (By Mr. Sweeten)  Photo identification bills are
6   popular with the general population, right?
7      A.   I don't know.
8      Q.   Okay.  Have you consulted any polls regarding
9   that issue?
10     A.   No.
11     Q.   Okay.  Let me show you what we'll mark as
12   Anchia Exhibit 5.
13          (Exhibit 5 marked for identification.)
14     Q.   (By Mr. Sweeten)  I have handed you what we've
15   marked as Anchia Exhibit 5.  Do you see that in front of
16   you?
17     A.   I do.
18     Q.   And that document is a Lighthouse Opinion Poll,
19   Fall 2010, Statewide Landscape Benchmark Survey.  Have
20   you ever seen this poll before?
21     A.   No.
22     Q.   Okay.  If you could turn to Page 3.  There's a
23   section called Voter ID Requirement.
24     A.   Okay.  That is the bottom of Page 3?
25     Q.   That's correct.

## 65

1   A.  Photo Voter ID Requirement?
2   Q.  Correct.  That poll asks the question:  "Do you
3   favor or oppose requiring a valid photo ID before a
4   person is allowed to vote," correct?
5   A.  Yes.
6   Q.  Okay.  And underneath the numbers, it says 86
7   percent favor it.  Do you see that on the left column?
8   A.  Yes.
9   Q.  It says 94 percent of Republicans favor it, and
10  75 percent of Democrats favor it.  Did I read that
11  correctly?
12  A.  Yes.
13  Q.  Okay.  And then it has, underneath it says 22
14  percent of Democrats are opposed to it, and 5 percent of
15  Republicans are opposed to it, for a total of 12
16  percent.  Did I read that correctly?
17  A.  Walk me through that one more time.  I didn't
18  follow.
19  Q.  Okay.  12 percent oppose -- according to the
20  poll, 12 percent oppose this question, correct?
21  A.  Yes.
22  Q.  All right.  And that includes 22 percent of
23  Democrats polled oppose it, right?
24  A.  Yes.
25  Q.  And 5 percent of Republicans?

## 66

1   A.  Yes.
2   Q.  Now, if you'll look at the racial breakdown to
3   the right, it says, "White, Black, Hispanic," and there
4   it says, "86 percent of whites favor it, 82 percent of
5   blacks favor it, 83 percent of Hispanics favor it."  Did
6   I read all that correctly?
7   A.  Yes.
8   Q.  Do you have any reason to dispute the results
9   of this poll?
10  A.  I don't know the sample size.  I don't know who
11  they talked to.  I don't know the questions that were
12  asked and how they were asked.  I don't know the
13  fundamentals of the poll.
14  Q.  You have not seen this poll before?
15  A.  So I would have no information to dispute or
16  affirm the results.
17  Q.  Does it matter to you if people support a bill,
18  when you're making a calculation such as you have here,
19  that a bill is discriminatory?
20  A.  Restate your question.
21  Q.  Okay.  You have made allegations that this bill
22  has a discriminatory purpose.  You have said that today,
23  right?
24  A.  Yes.
25  Q.  Okay.  Does it factor into your consideration

## 67

1   that the -- whether or not something is supported by the
2   populace, by voters?
3   A.  It might.
4   Q.  Okay.  You hadn't seen this before, this
5   Lighthouse Poll?
6   A.  No.
7   Q.  Okay.  I'm going to hand you what we'll go
8   ahead and mark as Anchia 6.
9   (Exhibit 6 marked for identification.)
10  MR. SWEETEN:  Here's a copy for you,
11  Counsel, and just to make it official, here's another
12  copy as well.
13  Q.  (By Mr. Sweeten) And what I'm showing you are
14  one, two, three, four, five, six, seven, -- 11 boxes
15  that represent questions about voter identification,
16  okay?  So I want to ask you:  Have you -- there's a poll
17  -- the first box references a survey by Fox News, from
18  April 9th through April 11, 2012, based on 910 telephone
19  interviews.  Do you see that?
20  A.  I do.
21  Q.  And do you see above that 70 percent of voter
22  identification -- 70 percent of those polled said that
23  voter identification are laws needed to stop illegal
24  voting.  Do you see that?  Did I read that right?
25  A.  Yes.

## 68

1   Q.  Are you aware of this poll, outside of what I'm
2   showing you today?
3   A.  No.
4   Q.  Okay.  It says, "26 percent of voter
5   identification laws are unnecessary and discourage legal
6   voting," right?
7   A.  Yes.
8   Q.  According to this poll, it is -- by 70 to 26,
9   is it popular with those surveyed, correct?
10  A.  Yes.
11  Q.  But you've never seen this poll before?
12  A.  No.
13  Q.  Okay.  Let's look at the next one.  This is a
14  survey by Fox News, January 12 through January 14, 2012
15  based on 906 telephone interviews.  The question asked,
16  "Do you think people should be required to show a valid
17  form of state or federally-issued photo identification
18  to prove U.S. citizenship before being allowed to vote?"
19  Do you see that 80 percent of people surveyed say "Yes"?
20  A.  Yes.
21  Q.  And 19 percent say "No"?
22  A.  Yes.
23  Q.  And would you agree that that poll shows that
24  it is overwhelmingly popular, this question as posed in
25  the telephone survey?

---

77

1    Q. It's not on there. It's not sourced.
2    A. Okay. Okay.
3    Q. Would you agree that -- I have just shown you a
4   number of national and Texas state polls. Would you
5   agree that every single one that I showed you -- we just
6   went through them all. Every one of them shows that
7   photo identification is a popular issue with voters?
8    A. Yes, in each of the polls you showed me, it was
9   a -- it was a popular proposition.
10   Q. Are you aware of any polls that show the
11  contrary?
12   A. I am aware of no polls.
13   Q. Are those who agree with photo identification,
14  as represented in that poll, any of those polls, are
15  those people attempting to purposefully discriminate
16  against blacks, Hispanics, or any other minority groups?
17   A. I don't know.
18   Q. Let's go back to the -- to your declaration.
19  If we can turn to Paragraph 7. I'm sorry. I think we
20  did 7. Let's do Paragraph 8.
21       Here you say, "Based on my experience in
22  the legislature, I believe the proponents of Senate Bill
23  14 wanted to move the bill through the legislative
24  process as quickly as possible to ensure its passage."
25  Did I read that correctly?

---

78

1    A. Yes.
2    Q. Is it unusual for individuals to want to move
3   their bills quickly through the legislative process?
4    A. It is not unusual for individuals to want to
5   move their bills quickly through the legislative
6   process.
7    Q. If you have a bill that you think is important
8   to you, do you try to move those quickly through the
9   legislative process?
10   A. Yes.
11   Q. Okay. And because, if they get hung up, they
12  may not get enacted, right?
13   A. Yes.
14   Q. Now, here you add that, "The demographics of
15  Texas are changing, and a photo identification
16  requirement, like redistricting, is a way to decrease
17  the impact of the minority vote."
18   A. Yes.
19   Q. What's the basis for that statement?
20   A. The basis is the 2010 census for the first part
21  of the -- for the first part of the phrase, the
22  demographics are changing, of Texas are changing. The
23  second part speaks to legislative initiatives that can
24  be used to reduce the impact of minority vote.
25   Q. Okay. What are you aware of, as far as any

---

79

1   sort of data analysis, that indicates that Senate Bill
2   14 will decrease the impact of the minority vote?
3    A. We received testimony, during the legislative
4   session, that in the Select Committee -- and to be
5   clear, I was not on the Select Committee, but sat
6   through the one hearing that we had in committee -- that
7   suggested that the minority vote would be decreased if
8   Senate Bill 14 was enacted.
9    Q. Whose testimony are you referring to?
10   A. I don't recall.
11   Q. Can you give us a description of what they
12  said?
13   A. Toby Moore has testified, and I believe he is
14  the former project manager for the Carter-Baker
15  Commission. He has testified in the past, and I believe
16  during the 82nd Session, either in writing or in person,
17  I don't recall which, that Senate Bill 14 and a photo ID
18  requirement would have a disenfranchising impact on
19  minority voters.
20   Q. What was the basis of his statement?
21   A. His experience as the program manager for the
22  Carter-Baker Commission and a statistical analysis.
23   Q. Okay. Can you tell us the basis of his
24  statistical analysis?
25   A. No, I don't recall. I just know -- I just

---

80

1   remember his conclusions.
2    Q. Okay. Now, you also understand the Carter-
3   Baker Commission recommended having photo
4   identification?
5    A. Among a number of different proposals. And I
6   think President Carter and Secretary Baker wrote an
7   op-ed, years later, that said that the intent of the --
8   the recommendations of the Carter-Baker Commission could
9   not be taken in isolation, but must be taken as a
10  totality. And the proponents of photo ID were taking
11  that one recommendation out of context. And that was a
12  New York Times editorial that we distributed on the
13  House floor.
14   Q. Okay. And we probably ought to take that
15  editorial in context, too. We don't have it here to
16  discuss. Let me just ask you this: Was it a finding of
17  the Carter-Baker Commission that it would be -- that
18  photo identification would be a good thing? Was it a
19  recommendation?
20   A. It was a recommendation among about eight --
21  maybe about 80 recommendations, that taken together
22  would improve elections.
23   Q. Did you interpret the Carter-Baker Commission's
24  recommendation about photo ID as an attempt to sell
25  photo identification requirements on the backs of

81

1     Latinos?
2         A.   No, because their recommendations included an
3     expansion of the franchise, and also they recommended
4     mechanisms by which less people would be disenfranchised
5     if you did include a -- did include a photo ID
6     requirement.  So there were offsets to that -- to that
7     requirement included.
8         Q.   Okay.  Did you -- did you read, in the Carter-
9     Baker report where they say, "Greater uniformity and
10    procedures for voter registration and identification is
11    essential to guarantee the free exercise of the vote all
12    U.S. citizens"?
13        A.   I did.
14        Q.   Do you agree with that statement?
15        A.   I do.
16        Q.   Okay.  Did you see where they indicated --
17        A.   If I can add to my last answer.  I do, but I
18    don't see that that -- the passage that you quoted to me
19    is a -- that calls for a photo ID regime consistent with
20    SB 14.
21        Q.   Okay.  Are you familiar with their
22    recommendation, quote, "We rejected the first option,
23    eliminating any requirements, because we believe that
24    citizens should identify themselves as the correct
25    person on the registration list when they vote."

83

1     and our current -- we've consistently ranked in the
2     lowest quintile, in terms of voter participation in the
3     state, and I think that, that requires reform.
4         Q.   It's a true statement, I think you would agree,
5     that strengthening the integrity of the election system
6     is an important and laudable goal?
7         A.   Yes.
8         Q.   Do you agree that ensuring that those who show
9     up to the polls are who they say they are is a laudable
10    goal?
11        A.   Yes.
12        Q.   So it's your opinion that photo identification
13    is a way to decrease the impact of the minority vote?
14        A.   Yes.
15        Q.   You've told me about the testimony from
16    Mr. Toby Moore?
17        A.   Yes.
18        Q.   Is there any other data that you have reviewed
19    that indicates that?
20        A.   The Brennan Center on -- the Brennan Center at
21    New York University has released studies related to the
22    percentage of persons that are out of ID, who do not
23    have the requisite ID to show at the polls, the
24    requisite photo ID, I should say.  And that appeared to
25    be a very large number, and we've received testimony on

82

1         A.   I agree with that.  And Texas has a voter ID
2     identification standard currently.
3         Q.   It's not one that requires photo
4     identification, though, is it?
5         A.   That's correct.  But I don't believe the
6     passage that you read --
7         Q.   Okay.
8         A.   -- speaks to the photo identification.
9         Q.   All right.  Well, you understand that the
10    Carter-Baker Commission reported that, quote, "We
11    believe that the need for additional electoral reform is
12    abundantly clear, and our recommendations will bolster
13    HAVA to further strengthen public confidence in the
14    electoral process."
15        A.   Yes.
16        Q.   Do you believe that electoral reform and the
17    need for it was abundantly clear in the 2007 session?
18        A.   I think it continues to be abundantly clear.
19        Q.   So, and by saying that, you're saying that --
20    what specific -- what's abundantly clear to you?
21        A.   The data related to voter participation.  Texas
22    ranks 50th amongst 50 states in voter participation.
23    And so I do believe that election reform is necessary.
24             It is my belief that in order to have a
25    strong democracy, you need robust voter participation,

84

1     that as well.
2         Q.   Any other testimony that you're referring to?
3         A.   Not that I recall.
4         Q.   Okay.  Any other data you have reviewed?
5         A.   Not -- not that I recall.
6         Q.   Okay.
7         A.   I couldn't name it for you today.
8         Q.   So you were persuaded that the impact of photo
9     identification requirements in impacting minorities, by
10    the testimony or Mr. Moore and the testimony of someone
11    from the Brennan Center, those two were persuasive to
12    you?
13        A.   Yes.
14        Q.   Okay.  You haven't identified any other
15    information.  Is there anything else that you're relying
16    upon?
17        A.   Yeah.  I have read other scholarly studies that
18    I just don't recall right now.
19        Q.   Okay.  Let's go the ninth paragraph.  Here you
20    say, "During the Floor debate of Senate Bill 14,
21    Representative Patricia Harless, who is Anglo, served as
22    the bill's primary sponsor in the House, but refused to
23    provide substantive responses to many questions posed by
24    legislators representing minority constituents."  Did I
25    read that correctly?

Representative Rafael Anchia                                    June 6, 2012

---

85

1    A.   Yes.
2    Q.   First of all, you're referring to her public
3    testimony?
4    A.   Yes.
5    Q.   And her public participation in dialogue, and
6    is that in the committee, or is that on the Floor, or
7    both?
8    A.   Both.
9    Q.   Now, you added that she is Anglo.  Why did you
10   put that in there?
11   A.   It describes her ethnicity.
12   Q.   I mean, but it's in an affidavit filed with the
13   court.  Why is it important that she is Anglo in that
14   sentence?
15   A.   I don't know.
16   Q.   Okay.  Who put that in there; the Department of
17   Justice or you?
18   A.   It's probably something we discussed on the
19   phone, but I don't recall.
20   Q.   Okay.  So its importance is, to you, of no
21   moment?
22   A.   I think it is a descriptor of her ethnicity.
23   Q.   So, you put it in there because it describes
24   her ethnicity.  I mean, you didn't say she's blonde.
25   You didn't say that she's anything.  You said she's

---

86

1    Anglo?
2    A.   Correct.
3    Q.   Okay.  And why is that important to put in your
4    declaration, her race?
5    A.   I don't recall.  I may have been asked question
6    what is her ethnicity, and that was -- that might have
7    been my response.  But I don't recall exactly.
8    Q.   Okay.  Now, you're saying, on the Floor, she
9    "refused to provide substantive responses to many
10   questions posed by legislators representing minority
11   constituencies."  Who?  Who were the legislators
12   representing minority constituencies that she refused to
13   provide substantive responses to?
14   A.   I recall that she was evasive when I questioned
15   her from the back microphone.
16   Q.   Okay.  So you?
17   A.   So, me.
18   Q.   Okay.  Who else?
19   A.   I'd have to go back and look at the Journal.
20   At this -- at this time, I don't recall.
21   Q.   Okay.  So certainly we know your testimony is
22   that in Paragraph 9, who she's refusing to provide
23   substantive responses to is you, right?
24   A.   Yeah.  Today, that's what I remember.
25   Q.   Okay.  Now, you were a known opponent of this

---

87

1    bill?
2    A.   Yes.
3    Q.   If anybody asked about Rafael Anchia, they
4    would know that he is opposed to photo identification,
5    because you have been opposed in '07, 09, and '11,
6    right?
7    A.   Opposed to House Bill 1706, House Bill 218,
8    362, and SB 114, yes.
9    Q.   All right.  So you were her opponent, and you
10   were questioning her on the Floor of the House?
11   A.   Correct.
12   Q.   Okay.  And you're saying that in that context,
13   that she was refusing to provide substantive responses?
14   A.   Yes.
15   Q.   Okay.  Can you give us a specific instance when
16   that occurred?
17   A.   I'd have to look at the House Journal.  It was
18   very difficult to get her to answer questions.  I don't
19   know that I have that journal entry in front of me.
20   Q.   Okay.
21   A.   But when I was asking her questions at the
22   outset of the litigation, it appeared that as though she
23   did not want to answer direct questions and instead was
24   referring to talking points.  And I would answer -- I
25   would ask questions on a number of different occasions

---

88

1    and would not receive direct responses.
2    Q.   Okay.  Now --
3    A.   That was my perception.
4    Q.   She's not the only person you've ever talked to
5    that you didn't get direct responses from?
6    A.   No.  Usually members, you know, in a debate
7    will try to answer directly, yes.
8    Q.   Okay.  Is it your testimony --
9    A.   But then she is not the only person, no.
10   Q.   Fine.  I've got a 14-year-old boy.
11   A.   (Laughing.)
12   Q.   But my question is:  Are you suggesting that
13   her lack of responsiveness indicates some purposeful
14   discrimination about Senate Bill 14?
15   A.   I think that her lack of responsiveness related
16   to her being defensive about the impact of Senate
17   Bill 14.
18   Q.   Okay.  You interpreted her nonresponsiveness as
19   being defensive?
20   A.   Yes.
21   Q.   Not as being -- evidencing some sort of
22   discriminatory purpose of her bill?
23   A.   Her -- her evasiveness, I don't think -- it is
24   difficult to infer what her -- what the motivation for
25   her defensiveness was, but when I asked her about the

Representative Rafael Anchia                                    June 6, 2012



**89**

1   impact of the bill on Hispanics and African Americans
2   and Asians, she did not want to answer those questions.
3        Q.   You're doing -- you're interpreting how she was
4   responding to your questions, and I'm asking you what
5   does your interpretation, how does it inform your view
6   on whether or not Senate Bill 14 in the House was
7   discriminatory or not, from a discriminatory purpose?
8             MR. GARZA:  Asked and answered,
9   objection.  You can answer the question.
10       A.   Okay.  My perception and what -- and my
11  inference from her evasiveness is that she either knew
12  but didn't want to disclose the adverse impacts on -- on
13  minority voters, or did not want to know the adverse
14  impacts so she wouldn't have to answer.
15       Q.   (By Mr. Sweeten) So it's either conscious
16  indifference, the second part, or she intentionally
17  didn't want to answer that question?
18       A.   Yeah, or -- and maybe this is covered by your
19  first part, like a plausible deniability.  So I just
20  don't -- yeah, I don't know.
21       Q.   But --
22       A.   Because the answer would be damning.
23       Q.   You would agree with me, wouldn't you, that
24  that is your subjective interpretation of your dialogue
25  with her?

**90**

1        A.   Yes.
2        Q.   Okay.  And if we want to know what was said, we
3   would go to the record.
4        A.   Yes.
5        Q.   Okay.  And you would also, wouldn't you, agree
6   that there is certainly room for other interpretations?
7        A.   It is possible.
8        Q.   Let's go to the next paragraph.  Let me just
9   ask you:  Are you saying, based upon that dialogue, that
10  Representative Harless had a purposeful intent to
11  discriminate against racial minorities based on that
12  dialogue?
13       A.   I was trying -- based on that dialogue, I
14  perceived that she was not answering questions that
15  would have been telling about the discriminatory impact
16  of the bill on racial and ethnic minorities.  I do
17  believe that.
18       Q.   Do you -- in saying that, are you inferring,
19  based upon your subjective interpretation of
20  Representative Harless's discussion with you, that she
21  had a discriminatory purpose in pursuing this bill?
22       A.   I don't know what her purpose was.
23       Q.   Now, there's another sentence, which is,
24  "Representative Harless had a BlackBerry or phone with
25  her during the debate, and at times she seemed to be

**91**

1   reading from it."
2        A.   Yes.
3        Q.   Do you have a BlackBerry?
4        A.   No.
5        Q.   Do you have an iPhone?
6        A.   Yes.
7        Q.   Okay.  Do you sometimes look at your iPhone on
8   the Floor?
9        A.   On the Floor, yes, but not when I'm on the
10  front microphone --
11       Q.   Okay.
12       A.   -- laying out a bill.
13       Q.   Have you seen other members use a BlackBerry
14  device or an iPhone when they're on the Floor?
15       A.   Yes.
16       Q.   Okay.  What about when they're on the mic?
17       A.   It's extremely rare --
18       Q.   But it happens?
19       A.   -- from what I can tell.
20       Q.   It happens?
21       A.   I don't recall another instance of a member
22  laying out a bill with a BlackBerry or an iPhone and
23  periodically going to it, and what appeared to be
24  receiving instructions or answers, and was that my
25  perception.

**92**

1        Q.   And there's no House rule against looking at a
2   BlackBerry?
3        A.   No, not at all.
4        Q.   There's no House rule against looking at an
5   iPhone?
6        A.   No.
7        Q.   She wasn't in violation of any rule in doing
8   that?
9        A.   No, I don't believe so.
10       Q.   All right.  It's your interpretation that she's
11  -- in looking at the BlackBerry, how does that in any
12  way inform anyone's view as to whether or not this bill
13  had a discriminatory purpose?
14       A.   What it said to me was that she was receiving
15  some coaching from a third party.
16       Q.   Okay.
17       A.   On her answers.
18       Q.   So, do you know --
19       A.   And I guess I would add that whether -- and it
20  was unclear to me whether she had a discriminatory
21  purpose or whether a third party might have a
22  discriminatory purpose, that may have been sending her
23  e-mails.  So that's why I included it, although I don't
24  know who that was.  I don't know for a fact.
25       Q.   Okay.  So you're not inferring that because she

Representative Rafael Anchia                                    June 6, 2012



93

1  was looking at a BlackBerry, that that evidences any
2  sort of discriminatory purpose?
3      A.   No, I am not.
4      Q.   Discriminatory intent by her?
5      A.   No.
6      Q.   Nor -- okay.  So your interpretation is that
7  she's receiving information from someone while she's on
8  the mic?
9      A.   Yes.
10     Q.   Would that be unusual for -- and let me finish.
11  I'm sorry.  I'm sorry.
12     Q.   Would it be unusual for a Representative or a
13  Senator to receive information from someone when they're
14  answering questions about a bill they're supporting?
15     A.   Yes, I believe it would be.
16     Q.   Okay.  Is it the means that's unusual or -- in
17  other words, the fact that it was a BlackBerry, or is it
18  the fact she was receiving any sort of help?
19     A.   No, it's not unusual for people to receive help
20  from other members on the House floor, and you do see
21  that typically.  And, in fact, I believe Representative
22  Harless received help from other members in laying out
23  the bill and answering questions.
24     Q.   Okay.  So it's not unusual to receive
25  assistance when you're answering questions --

94

1      A.   No.
2      Q.   -- from smart people like you, right?  Right?
3      A.   It is not unusual to receive --
4      Q.   Okay.
5      A.   -- from others.
6      Q.   All right.  It sounds like to me that it's the
7  fact she -- your interpretation is the fact she received
8  it digitally is unusual?
9      A.   That -- that is correct.
10     Q.   But in no way does that evidence racial animus?
11     A.   I don't -- I don't see -- it is impossible for
12  me to discern what -- what that would evidence.
13     Q.   Okay.  Paragraph 10, "On the Floor, I expressed
14  concern that Senate Bill 14 would have a
15  disproportionate impact on the ability of African
16  American and Hispanic voters to participate in
17  elections."  Did I read that correctly?
18     A.   Yes.
19     Q.   You expressed that in the -- on the House floor
20  debate, right?
21     A.   Yes.
22     Q.   Okay.  We've already talked about the sources
23  by which you had the view that this would have a
24  discriminatory impact, correct, or are additional
25  sources that support your view?

95

1      A.   During the four sessions that I spent working
2  on photo identification, I consulted experts and read
3  scholarly publications that I may not recall now, but I
4  did do quite a bit of research on it.
5      Q.   You were fairly vocal on the House floor about
6  this bill?
7      A.   Yes.
8      Q.   You used what you had at your disposal; you
9  expressed to the other members of the House when you
10  were engaged in the debate, correct?
11     A.   Yes.
12     Q.   Would you say that there is something that you
13  didn't express in the debate regarding the alleged
14  disproportionate impact of this bill on racial
15  minorities?
16     A.   I suspect I expressed it, either on the House
17  floor or in committee, yeah.
18     Q.   Okay.
19     A.   I'm sorry.  I've expressed it publicly.
20     Q.   You've been very public in your expressions
21  about this bill.  If you -- I'm asking it this way,
22  which is:  Are you saying that you've expressed in full
23  your views in the support for you indicating that this
24  bill has a disproportionate impact in a public
25  statement?

96

1      A.   I believe I have, yes.
2      Q.   Okay.  Is there any other information that you
3  have that would suggest that Patricia Harless's purpose
4  in supporting this bill was a discriminatory one?
5      A.   No.
6      Q.   Okay.  On Paragraph 10, I think we've talked
7  about that first sentence, but the second one is, "I and
8  a number of other representatives of African American
9  and Hispanic constituencies repeatedly raised the
10  concern on the Floor during the legislative debate on
11  Senate Bill 14."  And when you're saying that concern,
12  it's the disproportionate impact of Senate Bill 14,
13  correct?
14     A.   Yes.  On minority voters, yes.
15     Q.   Okay.  And we've talked about, I think, the
16  waterfront on that issue, what you had, right?  What you
17  had at your disposal, you expressed it?
18     A.   Yes.
19     Q.   Okay.  "As a result, few, if any, members of
20  the Texas House could have lacked knowledge of this
21  issue."  So you're saying my views, and other African
22  American and Hispanic -- representatives of African
23  American and Hispanic constituencies were raised during
24  the hearings?
25     A.   Yes.

Representative Rafael Anchia                                      June 6, 2012

---

## 97

1    Q.  Okay.  Then you say, "As a result, few, if any,
2    members of the Texas House could have lacked knowledge
3    of this issue."  Okay.  Now, by "this issue" that means
4    what?
5        A.  The disproportionate impact -- the suggestions
6    by African American and -- representatives of African
7    American and Hispanic constituencies that Senate Bill 14
8    would have a disproportionate adverse impact on minority
9    constituencies.
10       Q.  Okay.  And the bill ultimately passed, all
11   right?  And I want to ask you:  You understand that
12   there was testimony for and there was testimony against
13   the bill, and there was a -- would you agree there was
14   full public airing of the issues on the House floor or
15   in committee?
16       A.  Over the course of -- yeah, over the course of
17   eight years, I believe there were.  Or four sessions, I
18   should say.  Not eight years.  But four sessions.
19       Q.  So the arguments for and the arguments against
20   have been expressed in all those sessions?
21       A.  Yes.
22       Q.  There weren't hidden -- the issues for and
23   against, they were not concealed, they were out in the
24   open?
25       A.  Yes.  I will note that they did change over

---

## 98

1    time.
2        Q.  Right.
3        A.  Your original -- during earlier sessions, the
4    suggestion was that this bill was designed to combat
5    voter fraud generally.  And then when it was pointed out
6    that this photo identification legislation is designed
7    to deal with a specific type of voter fraud, then there
8    was also a discussion about illegal immigrant voting --
9    I shouldn't say illegal immigrant -- noncitizen voting,
10   and that this was a way to deal with noncitizen voting.
11           And then in the 82nd legislative session,
12   the pretext or the motivation or the reason given for
13   this bill became integrity of elections.  And then at
14   the end of the debate, it was -- in fact, I think
15   Representative Harless said it wasn't -- it was no
16   longer about voter fraud.  It was just about integrity
17   of elections.  And then at the end of the debate, it
18   became about a mechanism to increase voter turnout.
19           So, I think the motivation or the
20   ostensible reason for the bill evolved over time.
21       Q.  But your view that the reasons for the bill
22   evolved over time, is based on what?
23       A.  The reasons given by the authors of the bill
24   for the need for photo ID.
25       Q.  So it's an interpretation of matters of the

---

## 99

1    public record?
2        A.  Yes.
3        Q.  Testimony for or against or statements made by
4    the representatives that would all be contained in the
5    public record?
6        A.  That's correct.
7        Q.  And that's your opinion?
8        A.  Yes.
9        Q.  Okay.  And you understand that many other
10   people, just as many people supported this bill against
11   your view, don't share that opinion?
12       A.  Yes.
13       Q.  Okay.  You say that, quote, "The proponents of
14   SB 14 rejected opportunities to amend the bill to
15   respond to this concern or other criticisms of the bill
16   raised by minority legislators."  Do you know, as you're
17   sitting here, how many amendments were offered to the
18   bill?
19       A.  I don't recall.
20       Q.  Okay.  Do you know if one of your amendments
21   was accepted to the bill?
22       A.  I don't think so.
23       Q.  Would it surprise you if you had an amendment
24   to the bill that was accepted?
25       A.  Yeah, I guess it would surprise me.

---

## 100

1            (Exhibit 7 marked for identification.)
2        A.  Oh, yes.
3        Q.  (By Mr. Sweeten) I have handed you what's been
4    marked as Anchia Exhibit 7; is that right?
5        A.  Yes.
6        Q.  And can you tell me what Anchia Exhibit 7 is?
7        A.  Yes.  It relates to a duplicate license or
8    certificate fee, and the laundry list of types of state
9    IDs that SB 14 rejected opportunities -- or that
10   would be not charged for did not include a duplicate
11   license or certificate.  So there were two categories
12   that were spelled out in the legislation, but they had
13   forgotten this one, and this was a cleanup amendment to
14   make sure that they picked up all three.
15       Q.  Okay.
16       A.  Because the author was unaware of this
17   duplicate license.
18       Q.  So you offered an amendment?
19       A.  And it was accepted, yeah.  I remember it now.
20       Q.  Okay.  You can put that aside.
21       A.  And I'm surprised.
22       Q.  There were minority members who supported this
23   bill; is that right?
24       A.  Yes.
25       Q.  Okay.  Can you name some of them?

## 105

1   Q.  All right.  I just want to make sure there's
2   nothing else that we haven't discussed -- that we
3   haven't discussed thus far on the discriminatory effect
4   on this bill?
5   A.  Yes.
6   Q.  All right.  Paragraph 16 you say, "The 82nd
7   legislature had the tensest racial climate of any
8   session in which I have served."
9   A.  Yes.
10   Q.  Can you -- now, below you say, "Debates
11   concerning redistricting, the Sanctuary Cities bill,
12   which would have allowed Texas peace officers to
13   investigate the immigration status of individuals who
14   are arrested or lawfully detained were characterized by
15   thinly-veiled hostility of Texas's growing Hispanic
16   population."  Did I read that correctly?
17   A.  Yes.
18   Q.  Now, this -- let me just ask you:  What
19   happened with this Sanctuary Cities bill?
20   A.  It was ultimately defeated in a special
21   session.  But versions of it passed both the House and
22   Senate.  And I think it wasn't defeated.  It died in
23   conference committee, as far as I can tell or recall.
24   Q.  Okay.  So, the topic sentence of 16 talks about
25   the tensest racial climate.  The second sentence talks

## 106

1   about that there were -- basically it refers to three
2   legislative initiatives:  Redistricting, Sanctuary
3   Cities bill -- actually, it was just those two.
4   A.  Two, yeah.
5   Q.  Okay.  Are those the reasons, those two bills
6   the reasons that you felt that the 82nd Legislature was
7   the tensest racial climate you've been through?
8   A.  Yes.
9   Q.  So, it is because the topic of those two pieces
10   of legislation is what leads you to your belief that
11   that was the tensest racial climate of any session,
12   correct?
13   A.  Yes.  Those are among the two reasons, yeah.
14   Q.  And, what -- well, they're among the two.  I
15   need to know the -- what are the reasons for why it was
16   the tensest racial climate, in your view?
17   A.  Yeah.  Those two bills, other immigration-
18   related legislation that was filed, I think, gave rise
19   to -- to that feeling.
20   Q.  Which bill is that?
21   A.  There were a number of them that were -- there
22   were probably a couple dozen that were filled -- that
23   were filed.  And then, I mean, the backdrop of this
24   session, on the run-up to the session, you would hear,
25   in campaigns, immigration, the immigration issue brought

## 107

1   up quite a bit.  And I think that, on a lead-up to the
2   -- to the session, the rhetoric around immigration
3   seemed to be pretty hostile.
4   Q.  So, you've referred to some legislative
5   matters, and that you're saying the rhetoric around the
6   issue, correct?
7   A.  Around the immigration issue, yeah.
8   Q.  Okay.  Is that the rhetoric around the bill?
9   A.  Around -- well, typically, it was during --
10   during election cycles, people on the run-up to the
11   legislative session, there was a lot of discussion on
12   immigration-related issues.  I had seen mailers that had
13   been dropped against certain candidates that were
14   immigration related that had Spanish -- or that had
15   Hispanic persons depicted in them.  And it was -- so I
16   considered it pretty -- pretty hostile.
17   And then as we led into the session, there
18   were a number of anti-immigrant bills filed, and there
19   were rallies where criticisms were made of Hispanic
20   legislators who got a lot of hate mail, you know, on
21   immigration-related issues.  When I spoke against the
22   Sanctuary Cities legislation, that video was -- excerpts
23   of that video was posted on YouTube, and there was a lot
24   of really -- there were, I think, hateful things said
25   there.  So I think the cumulative impact of all these

## 108

1   things created a pretty tense environment.
2   Q.  Okay.  So let's talk about the rhetoric, and I
3   want to make sure I've got it all.  You said that there
4   was lot of rhetoric around these issues outside of the
5   committee and process; is that right?
6   A.  Yeah.  Yes, sir.
7   Q.  What is -- can you give me a sense of what that
8   rhetoric you're referring to was?
9   A.  The essence -- and, you know, I can't give you
10   specific examples of this at this time.  But the essence
11   was that the growth in the Hispanic population is driven
12   by illegal immigration, and that, you know, we needed to
13   do something at the state level to deal with this, and
14   it manifested itself in different pieces of immigration-
15   related legislation.  And then different candidates --
16   you got the sense that different candidates were being
17   attacked for their positions related to immigration, and
18   which usually meant Hispanic immigration.
19   Q.  You said that you couldn't refer to specific
20   instances of this rhetoric.
21   A.  Yeah.
22   Q.  Okay.  Is it fair -- and then you did mention
23   something about a Spanish language newspaper?
24   A.  No.  It was a mailer that was dropped against a
25   colleague in the House that somebody sent to me that

Representative Rafael Anchia                          June 6, 2012

## 109

1  showed Hispanic gang members and, you know, Hispanics
2  holding somebody up in their kitchen, and it was
3  pretty -- it was pretty provocative.  I don't know where
4  that mailer is now, but it made -- it made a big impact
5  on me.
6      Q.   Who sent the mailer?
7      A.   I don't recall.  I don't recall.  And I don't
8  think there was a disclaimer on it.  I mean, it just...
9      Q.   Was a legislator involved in sending that?
10     A.   I couldn't tell.  I don't know.
11     Q.   And it was sent about who in particular?
12     A.   I can't remember the candidate, but --
13     Q.   Do you have a copy?
14     A.   No, I don't.
15     Q.   Okay.  But you saw a mailer that you thought
16 looked like it was racially offensive?
17     A.   Yes.
18     Q.   Because it had pictures of a Hispanic
19 legislator with gang members around him?
20     A.   No.  I don't -- no, it's just Hispanic gang
21 members or, you know, ostensibly criminals, so you
22 couldn't tell.  You know, in one picture, it really did
23 look like gang members, and there was three pictures.
24 And another picture, there was -- I want to say a DEA
25 agent or an ICE agent handcuffing people and putting

## 110

1  them in a van.  And then the final picture was what
2  appeared to be a couple being held at shotgun point by
3  two Latinos.
4      Q.   Okay.  Where did you see this?
5      A.   It got e-mailed to me, I want to say.
6      Q.   And who -- a constituent e-mailed it?
7      A.   I don't remember.
8      Q.   And it referenced some --
9      A.   A race.  Yeah, a race.  I don't remember if it
10 was legislative race or not, but yeah.
11     Q.   Oh, it was about candidates?
12     A.   Yes.
13     Q.   And you don't remember which candidates?
14     A.   No, I don't recall.
15     Q.   Okay.
16     A.   I could -- I could dig a little bit and try to
17 remember.
18     Q.   You don't know where it originated?
19     A.   No.
20     Q.   Okay.  It was just something you saw in 2011?
21     A.   Yes.  I believe in 2011, yes, sir.
22     Q.   What other evidence, outside of the actual
23 legislative process, did you see of a racially-tense
24 climate?
25     A.   I saw a video of a Tea Party rally on the

## 111

1  Capitol steps, where there was a suggestion that the
2  reason we couldn't move -- or the reason that certain
3  legislation didn't move is because we had too many
4  Hispanic legislators.
5      Q.   Who uttered those statements?
6      A.   I don't know.
7      Q.   Was the legislator even there?
8      A.   I don't know.
9      Q.   Anything involving the legislature that you
10 felt like lent itself a racially-intense climate?
11     A.   The bills that were filed, I think.  And
12 especially these two bills.  I think these are -- you
13 know, I think touch points or --
14     Q.   Okay.  And I just want to get clear in my mind,
15 but what I'm hearing you say is, there were a couple of
16 instances of rhetoric that didn't involve legislators,
17 and then there were a couple of bills.  Is there
18 anything else that you think that -- and we'll talk
19 about the bills.
20     A.   Yeah.
21     Q.   Is there anything else that you think lent
22 itself to a tense racial climate?
23         MR. GARZA:  I don't think those are the
24 only things that he mentioned, but anyway.
25     Q.   (By Mr. Sweeten) But if there's something else?

## 112

1      A.   At this -- at this time, I don't -- I don't
2  know that I have anything else.
3      Q.   Okay.  And so you think the Sanctuary Cities
4  bill was -- which didn't pass, by the way, right?
5      A.   That is correct.
6      Q.   Okay.  You think the Sanctuary Cities bill had
7  -- was evidenced racial tension?
8      A.   Yes.
9      Q.   Okay.  And you think redistricting evidenced
10 racial tension?
11     A.   Yes.
12     Q.   Is there anything else that you believe
13 contributed to a tense racial climate that we haven't
14 discussed?
15     A.   Not that I recall at this time.
16     Q.   Okay.  And the Sanctuary Cities bill, was it
17 brought to a vote at the House?
18     A.   Yes.
19     Q.   How many did it -- what was the vote; do you
20 recall?
21     A.   I don't recall.
22     Q.   But it lost, so somewhere over --
23     A.   The Sanctuary Cities bill, I think, passed.
24     Q.   Okay.  And then what happened to it afterwards?
25     A.   It went to the Senate.

## 113

1   Q.  Okay.  And did it pass the Senate?
2   A.  Not the -- not the House bill.  There was a
3   separate Sanctuary Cities bill that the Senate passed
4   and sent over to the House.
5   Q.  Okay.  And then what happened with that bill?
6   A.  I don't recall, but I don't think it got a vote
7   in the House.
8   Q.  Okay.  So for whatever reason, it did not
9   become law?
10  A.  Yes, that is correct.
11  Q.  Okay.  The Senate voted on a different bill
12  than the House had voted for?
13  A.  That is my recollection, yes.
14  Q.  Okay.  So, Paragraph 17, you say, "Based
15  on the history of photo identification bills in Texas,
16  the comments made about the bills, the procedures
17  employed to enact Senate Bill 14, and the likely result
18  of Senate Bill 14 on minority voters, I believe Senate
19  Bill 14 was passed, at least in part, with racially-
20  discriminatory intent."  So I want to exam you on some
21  of these statements.
22  A.  Yes.
23  Q.  The first is:  Comments made about the
24  bills.  Have we discussed -- we talked about the
25  comments made in other sessions.  What are the comments

## 114

1   made about Senate Bill 14 that lead you to believe that
2   Senate Bill 14 was passed, at least in part, with
3   racially-discriminatory intent?
4   A.  It was mainly things that I heard in the
5   committee that would be public record.
6   Q.  Okay.  So if we were -- if we want to look and
7   say, "This is what Representative Anchia thinks
8   evidences racially-discriminatory intent," we would look
9   to the public record from 2011, right?
10  A.  Yes, specifically committee hearings.
11  Q.  And there's not anything else outside of that,
12  that we would look at?
13  A.  Not that I recall.
14  Q.  Okay.  Then you say, "The procedures employed
15  to enact Senate Bill 14."  What procedures, in your
16  view, evidenced that Senate Bill 14 was passed, at least
17  in part, with racially-discriminatory intent?
18  A.  Well, there were a couple of rules that --
19  Q.  Did you say "rules"?
20  A.  Rules.  I'm sorry.  Rules that were changed.
21  The two-thirds rule in the Senate, I thought, was
22  unusual.  It had occurred one time before on the photo
23  ID legislation in 2009, as far as I recall.  The
24  creation of the Select Committee I thought was unusual
25  and a different -- a different tactic.

## 115

1   The fact that in the conference committee,
2   a new ID was created and the legislature had to go
3   outside the bounds for this new ID, was also very
4   unusual.  I think the procedure differed from a typical
5   procedure on a bill.
6   Q.  What are select committees?  What is the
7   purpose of a select committee?
8   A.  From my experience, select committees are
9   usually convened in the interim to study an issue and
10  make recommendations to the legislature.
11  Q.  Okay.  So you're not -- you're not opposed to
12  the concept of a select committee because you sit on
13  one?
14  A.  Right.
15  Q.  Okay.  You're not opposed to a select committee
16  being convened?
17  A.  No.
18  Q.  So what is it about the select committee that
19  leads you to believe that that was, quote, "in part,
20  passed with a racially-discriminatory intent"?
21  A.  I think the select committee being convened
22  during the session to hear one bill was extremely
23  unusual, and it was designed to, I think, speed the
24  process along, and the result of that bill, in my view,
25  is a discriminatory effect.

## 116

1   Q.  Okay.
2   A.  So, I have not seen, during my four sessions in
3   the legislature, the creation of a select committee to
4   deal with just one bill.
5   Q.  Okay.  But you testified it's to speed the bill
6   along is what you testified that you believe the reason
7   for the select committee?
8   A.  Uh-huh.
9   Q.  Is that right?
10  A.  Yeah.  Yes, sir.
11  Q.  And certainly not a motivation that you're
12  unfamiliar with, right?
13  A.  Certainly.
14  Q.  You like to speed your legislation along so it
15  gets passed?
16  A.  Although I've never received a select committee
17  to hear just one of my bills.  I'd like that very much.
18  Q.  Okay.  How long have you been in the House?
19  A.  Four regular sessions and four special
20  sessions.
21  Q.  Okay.  Have Democrats had control of the
22  House?  Did they have it in '05?
23  A.  No.
24  Q.  '07?
25  A.  No.

## 117

```
 1    Q.  '09?
 2    A.  No.
 3    Q.  '11?
 4    A.  No.
 5    Q.  Okay.  Let's talk the two-thirds rule.  You're
 6  talking about the two-thirds rule in the Senate?
 7    A.  In the Senate.
 8    Q.  Okay.  So this is not -- when you're talking
 9  about the two-thirds rule, you're -- and let me make
10  sure I'm clear.  You're saying that the use of the
11  two-thirds rule was, in part, used for racially-
12  discriminatory intent; is that right?
13    A.  I think the -- the two-thirds rule was used to
14  move the bill -- a bill along that would have the effect
15  of discriminating against minority voters.
16    Q.  So you don't have a problem with the procedure
17  of the two-thirds rule being -- what's the term?
18    A.  Suspended?  Waived?
19    Q.  Yeah.  You don't have a problem with the
20  two-thirds rule being suspended?
21    A.  I do, yes, because I think the two-thirds rule
22  is in place in order to protect minority rights, and
23  those minorities rights can be racial or ethnic
24  minorities where they can be minority views in the
25  legislature generally.  They can be rural versus urban
```

## 118

```
 1  views.  They can be North Texas versus South Texas.  And
 2  they can be partisan views.  But the two-thirds rule is
 3  designed to protect minority positions in the
 4  legislature.
 5    Q.  Okay.  But --
 6    A.  So -- I'm sorry.
 7    Q.  Go ahead, no, finish.
 8    A.  So I believe a waiver of that rule is extremely
 9  unusual, and I think it is not appropriate.
10    Q.  How unusual is it?
11    A.  Very.
12    Q.  Okay.
13    A.  I don't think it -- I think it -- my
14  understanding is that it's been only done once before,
15  or maybe twice before the last 50 years.  It could be
16  more.
17    Q.  It was done in '09?
18    A.  For photo ID.
19    Q.  But in '09?
20    A.  Yes.
21    Q.  The two-thirds rule was suspended?
22    A.  Yes, for the same issue.
23    Q.  It was done in '11?
24    A.  Yes.
25    Q.  Are you familiar with whether or not --
```

## 119

```
 1  Lieutenant Governor Bullock, it was done under his
 2  administration?
 3    A.  I'm not familiar with that.
 4    Q.  Would that change your view, if you were to
 5  learn that Lieutenant Governor Bullock, under his --
 6  when he was the lieutenant governor, he suspended the
 7  two-thirds rule, would that?
 8    A.  It would likely not change my view.  The
 9  frequency of the suspension of the rule might change my
10  view.  It is my understanding that the view was -- or
11  that the rule is waived infrequently, and based on my
12  experience -- and just four sessions in the legislature,
13  granted, the legislature has been around a lot longer
14  than me -- but that is -- that is extremely unusual.
15    Q.  Lieutenant Governor Bullock was of what party?
16    A.  He was a Democrat.
17    Q.  Okay.  What about Lieutenant Governor Hobby;
18  are you familiar with --
19    A.  A Democrat.
20    Q.  Okay.  And are you familiar with whether the
21  two-thirds rule was in any way suspended?
22    A.  I am not -- I am not familiar.
23    Q.  Do you know how long it's been around?
24    A.  Over a hundred years.  Maybe 140 years, in that
25  ballpark.
```

## 120

```
 1    Q.  You're familiar with the concept that each
 2  session, the Senate sets the new Senate rules, right?
 3    A.  Yes.  Yes.
 4    Q.  Those are not always the same?
 5    A.  No, that is correct.
 6    Q.  That is not even a rule.  What you're saying,
 7  the two-thirds rule is not even a rule.  It's a
 8  tradition, you're saying, or is it a rule?
 9    A.  I have been under the impression that it is a
10  -- it is either a rule or tradition.
11    Q.  But the 83rd Legislative Session, the Senate
12  will come and adopt what rules they think that they want
13  to operate under, right?
14    A.  Yes, that is correct.
15    Q.  They have absolute right to change the
16  parliamentary rules as it relates to the two-thirds
17  rule, correct?
18    A.  They do.
19    Q.  It's not illegal the two-thirds rule being
20  changed; it's something you're just saying doesn't
21  happen a lot?
22    A.  That is correct.
23    Q.  You're not saying it invalidates the
24  legislation?
25    A.  No, I'm saying that.
```

## 121

1    Q.  It's purely up to the Senate that's sitting in
2    any given session, correct?
3    A.  That is correct.
4         MR. SWEETEN:  Let's take a quick break.
5         (Recess from 4:25 p.m. to 4:34 p.m.)
6    Q.  (By Mr. Sweeten) Prior to the break, we were
7    talking about the two-thirds rule, and this is in -- let
8    me just bring you back to the context.
9         In Paragraph 17, you talked about the
10   procedures employed to enact Senate Bill 14.  And then
11   the last part of the statement says, "Was passed, at
12   least in part, with racially-discriminatory intent."
13        Have you testified to all the reasons you
14   believe the Select Committee was a procedure that was --
15   in part, had racially-discriminatory intent to it?
16   A.  I believe so.
17   Q.  Okay.  Let's go back to the two-thirds rule,
18   and I want to you ask:  Do House bills -- if a Senate
19   bill is passed and comes to over to the House and you
20   want to amend a piece of legislation to the Senate
21   bill -- first of all, you've done that before?
22   A.  Yes.
23   Q.  Okay.  And when you do it, it doesn't go back
24   to the Senate for a full vote and require a two-thirds
25   vote, correct?

## 122

1    A.  That is correct.
2    Q.  Okay.  So, in the instance where a House member
3    amends a Senate bill, adding their legislation to the
4    Senate bill, that's an instance where you don't have a
5    two-thirds vote of the Senate as to that provision,
6    correct?
7    A.  I believe that is correct.
8    Q.  Okay.  And in fact what happens is, once the
9    House bill amends the Senate bill, it goes to conference
10   committee after that point, and you are not on a
11   two-thirds rule in that instance, correct?
12   A.  That is correct.
13   Q.  And you've utilized that procedure for -- on
14   bills that you have wanted to get passed, you have used
15   that procedure?
16   A.  Yes.
17   Q.  In other words, you've gone around the
18   two-thirds rule to get your bill, gone around the Senate
19   two-thirds rule yourself, to get your own bill passed in
20   that instance?
21   A.  Through an amendment strategy?
22   Q.  Uh-huh.
23   A.  Yes.
24   Q.  Is there anything discriminatory about the
25   times you have done it?

## 123

1    A.  No.
2    Q.  Okay.  I'm going to ask you about chubbing.  In
3    2009, were you -- well, let me find the questions.  Tell
4    the court, what is chubbing?
5    A.  My understanding that chubbing is the
6    equivalent of a filibuster, where members will ask
7    questions of bill authors in order to run out the clock
8    on a particular legislative session, or, I shouldn't say
9    session, but run out the clock during the period which
10   bills may be considered on the House floor.
11   Q.  Okay.  And that's just the local calendar
12   matters, right, local matters?
13   A.  Correct.
14   Q.  Did you engage in chubbing during the House
15   calendar of -- during 2009, that session?
16   A.  I don't believe I did.
17   Q.  Was chubbing -- did chubbing occur during that
18   time?
19   A.  It's difficult to tell whether chubbing
20   occurred or not.  I suspect, my gut instinct is that
21   some members of the legislature were filibustering photo
22   ID legislation.
23   Q.  Okay.  What is the purpose of chubbing?
24   A.  To kill a bill.
25   Q.  Okay.  Now, in 2011, there was an amendment to

## 124

1    the House rule to limit the practice of chubbing; is
2    that correct?
3    A.  That's my understanding, yes.
4    Q.  Okay.  And you supported that rule change?
5    A.  I don't recall.
6    Q.  Okay.
7         (Exhibit 8 marked for identification.)
8    Q.  (By Mr. Sweeten) So I want to turn your
9    attention to page 173 of the -- by the way, can you just
10   identify for the record what this document is, Anchia 8
11   is?
12   A.  Anchia 8 appears to be the House Journal of the
13   82nd Legislature, Regular Session, proceedings on the
14   7th day Monday, January 24th, 2011.
15   Q.  Thank you.  Can you turn to Page 173 of the
16   House journal, please.  You have a shortened version of
17   that.  It's the first page after --
18   A.  Thank you.
19   Q.  And I'm pointing in particular to the very last
20   paragraph.  If you would just read that to yourself.
21   You don't have to read it out loud.
22   A.  (Reviewing document.)
23   Q.  So that -- what I've handed to you relates to
24   House Bill 4, correct, House Resolution 4?
25   A.  Yes.

Representative Rafael Anchia                                   June 6, 2012

---

## 125

1  Q.   And House Resolution 4 was to eliminate the
2  chubbing procedure for that session, correct?
3  A.   I believe House Bill 4 was the entirety of the
4  House rules.  And contained within the entirety of the
5  House rules, there was -- I believe there was this
6  provision that you're referring to at the bottom
7  paragraph of page 173.
8  Q.   Okay.  And thank you for the clarification.
9      So you're saying that as part of the
10  overall House Resolution 4, part of it was the provision
11  on chubbing, which eliminates chubbing for that session
12  right?
13  A.   And I'm not trying to split hairs, but I
14  believe that this deals exclusively with chubbing
15  related to the local and consent calendar, which is how
16  the filibuster in 2009 occurred.  But I believe chubbing
17  would be available as -- even under these House rules,
18  as you got close to the end of a -- of the last day for
19  bills to be considered on the House floor.
20  Q.   Okay.
21  A.   But with respect to the local and consent
22  calendar, that is correct.
23  Q.   So what had happened in 2009 was, there was
24  chubbing taking place as to the local calendar?
25  A.   That is correct.

---

## 126

1  Q.   All right.  This House Resolution 4 eliminates
2  that for the 2011 session, correct?
3  A.   I believe that is right.
4  Q.   And how did you vote on that?  If you could
5  turn to Page 232.
6  A.   I believe I was "No."  On Page 232, I was
7  "Nay."
8  Q.   Okay.  The final vote of the resolution is at
9  the bottom of 232.  Do you see that, where it says,
10  "HR 4 as amended was adopted by Record 30 -- 143 Yeas,
11  zero Nays."
12  A.   Yes, I do see that.
13  Q.   Okay.  And on the next page, it shows who the
14  Yeas were.
15  A.   I'm sorry.  I see it now.
16  Q.   Okay.
17  A.   I was looking at the wrong page.
18  Q.   That's okay.
19  A.   It looks as if I voted "Yea."
20  Q.   Okay.  So you voted "Yea" for a House
21  resolution that eliminated chubbing on the local
22  calendar for the 2011 session?
23  A.   That is correct.
24  Q.   Okay.  Now, I want to go back.  We were talking
25  about procedures when I moved you to chubbing, so let's

---

## 127

1  go back to the procedures that you've identified -- or
2  that you allude to in Paragraph 17 that you think were
3  utilized and that showed that SB 14 was passed, at least
4  in part, with racially-discriminatory intent.  Okay?
5  Are you with me?
6  A.   Yes.
7  Q.   Okay.  So we've talked about the two-thirds
8  rule.  We've talked about the Select Committee.  Now,
9  you said something about an outside of the bounds
10  resolution?
11  A.   Yes.
12  Q.   Can you tell me what you mean by that?
13  A.   Well, we pointed out, during the Floor debate,
14  that paying for free IDs by hitting the Texas Mobility
15  Fund -- by "hitting it," we mean by charging the Texas
16  Mobility Fund -- might be violative of bond covenants
17  for the Texas Mobility Fund and how we raise money for
18  -- raise money to build roads through long-term
19  indebtedness.  And I think we tried to deal with that on
20  the House floor, and it was -- we were unsuccessful.
21      And then in conference committee, it was
22  my recollection that the new ID -- or the ID regime that
23  was originally in Senate Bill 4, as it passed the House
24  and the Senate was eliminated, and the revenue stream to
25  pay for it was eliminated, and a new ID and revenue

---

## 128

1  stream was substituted in conference committee.
2      And I seem to recall that I objected to
3  that.  And because that was a completely new issue, that
4  it required a resolution by the House to go outside of
5  the bounds, which means that is what -- that is a
6  legislative maneuver to -- or legislative motion that is
7  made to -- to change things in conference committee is
8  probably the easiest way to describe it.  I'm sorry I
9  wasn't more artful.
10  Q.   No, no.  That's fine.  But it sounds to me like
11  this related to a funding issue.  Funding of what?
12  A.   And of an ID.
13  Q.   Funding of a --
14  A.   Of an ID that a person under certain -- a
15  strict set of circumstances could go in and receive for
16  free.
17  Q.   Okay.  What specifically was the change?
18  A.   That the funding for this was no longer coming
19  out of the Texas Mobility Fund, and that my recollection
20  was -- and without looking at it, it would be tough to
21  say -- but my recollection was that a new form of ID was
22  created by the conference committee.  So it was -- and
23  I'm sorry.  But it was a funding issue, yes, but it also
24  related to the form of ID, a form of free ID.
25  Q.   And what form of ID are you talking about?

---

129

1    A.  I don't remember, but different than the ID as
2  were included in Senate Bill 14 as it came out of the
3  House and the Senate.
4    Q.  Okay.  And the funding source was changed to
5  what?
6    A.  I don't recall, but it was changed out of the
7  Texas Mobility Fund.
8    Q.  So it no longer came from the Texas Mobility
9  Fund, but came from another source?
10   A.  Yes, sir.
11   Q.  Okay.  So the funding source change, and you're
12  saying -- is it your testimony here today that out of
13  conference committee, there was an ID added to Senate
14  Bill 14?
15   A.  Substituted.  I think there was an ID
16  substituted for those that were previously -- my
17  recollection is, that there was a new form of ID that
18  was substituted in to the conference committee or by the
19  conference committee in to the legislation.  That's my
20  best recollection.
21   Q.  Okay.  How often do outside of the bounds
22  resolutions -- or resolutions, how often do they occur?
23   A.  I'm not sure, but it doesn't occur often, from
24  my experience.  Again, only four sessions, but in my
25  experience, it does not occur frequently.

---

130

1    Q.  Okay.  Can you think of other instances where
2  that's occurred?
3    A.  I know that it has occurred during my four
4  sessions, but I can't think of specific instances.
5    Q.  Okay.  Have you ever called a point of order on
6  a bill?
7    A.  Yes.
8    Q.  When did you do that?
9    A.  I can't remember.  It's been more than once.
10   Q.  Okay.  When is a point of order typically used
11  during a legislative session?
12   A.  When there is a violation of the House rules or
13  the Constitution.
14   Q.  Did you call a point of order on the voter ID
15  bill?
16   A.  I believe I did on that, yes.
17   Q.  Okay.  In what instance?
18   A.  I believe I called a point of order related to
19  the constitutionality of the revenue stream from the
20  Texas Mobility Fund, so this very same funding issue
21  that we just discussed.  I read the use of that Mobility
22  Fund as being unconstitutional.  But my point of order
23  was overruled.  It was not sustained.
24   Q.  Any other points of order that you raised?
25   A.  It's possible, but I don't recall.

---

131

1    Q.  As a general matter, it's true that House rules
2  can be used to both to expedite a bill, as in the
3  suspension of a five-day posting rule, as well as to
4  kill a bill?
5    A.  Oh, yes.
6    Q.  Can be used to delay a bill?
7    A.  Yes.
8    Q.  And that's not unusual?
9    A.  To delay a bill?  No.
10   Q.  Okay.
11   A.  Using the House rules, no, that is not unusual.
12   Q.  I want to talk about Senate Bill 14 in the
13  Senate, first of all.  That was heard -- I imagine you
14  had your own work going on in the House, so were you a
15  person that -- were you involved at all in the Senate
16  proceedings?
17   A.  I watched some of it, but a very small
18  fraction.
19   Q.  Okay.  And you watched the proceedings there?
20   A.  Either in the Senate chambers or on TV.
21   Q.  Okay.  And is there any -- you haven't talked
22  about it other than in the context of the two-thirds
23  rule.  Is there anything that you saw with respect to
24  the Senate bill that was heard in the Senate that you
25  believe -- that you haven't testified to so far that you

---

132

1  believe shows a discriminatory intent or purpose?
2    A.  No.
3    Q.  Okay.  Have we talked about all of the
4  procedural issues that you believe evidenced that Senate
5  Bill 14 was passed, at least in part, with a racially-
6  discriminatory intent?  Have we covered those here?
7    A.  Yes, sir.
8    Q.  Okay.  Are there any other procedural issues
9  that you believe evidence?
10   A.  Not that I recall at this time.
11   Q.  Now, we've talked about why you believe that
12  the bill has a racially-discriminatory effect.
13   A.  Yes.
14   Q.  Are there additional reasons other than what
15  we've discussed that you believe evidence a
16  discriminatory purpose of this bill?
17   A.  I just want to make sure I understand.  The
18  lead into the question was related to effect, and the
19  second part of the question was related to purpose?
20   Q.  Yes, and I can break them up if it's a problem.
21   A.  No.  No.
22   Q.  All right.
23   A.  So, I'm sorry.  Can you restate the question?
24  I confused myself.
25   Q.  No problem.  No problem.

## 133

1    We've discussed at length your belief as
2  to why you believe that this had a discriminatory
3  effect.  Is there anything else that we haven't covered
4  today that lends to that belief you have?
5    A.  No.  I think we've covered most of it, yeah.
6    Q.  Now, I want to go back to discriminatory
7  purpose.  We've gone through your affidavit.  We have
8  gone through some testimony that you've had about
9  certain individuals.  Is there anything else that you
10 believe evidences a discriminatory purpose of this bill
11 other than what you've testified to?
12   A.  Not that I recall at this time.
13   Q.  Okay.  Okay.  We're going to mark this as
14 Anchia Exhibit 9.
15       (Exhibit 9 marked for identification.)
16   Q.  (By Mr. Sweeten) Okay.  I'm going to ask you to
17 turn to page 4054, which shows the yeas as to Senate
18 Bill 14, and adoption of the conference committee
19 report.
20   A.  4054?
21   Q.  Yes, sir.
22   A.  Okay.
23   Q.  Are you there?
24   A.  I'm on page 4054.
25   Q.  Take your time to orient yourself, and I'll ask

## 134

1  you a few questions about it.
2    A.  Okay.
3    Q.  Okay.
4    A.  Now, if you can walk me through what I'm
5  looking here.  Senate Bill 14, Adoption of Conference
6  Committee Report.  Okay.  I'm oriented.
7    Q.  Okay.  So here we have the adoption of the
8  conference committee report.  So on the bottom of 4054
9  is where it starts.  And here, "Representative Harless
10 submitted the conference committee report on Senate
11 Bill 14.  She moved to adopt the conference committee
12 report on SB 14.  The motion to adopt the conference
13 committee report on SB 14 prevailed by 98 to 46."
14       First, did I read that correctly?
15   A.  Yes, sir.
16   Q.  So, you, on this, voted, show as a nay?
17   A.  Yes, sir.
18   Q.  So you voted against there.  And the
19 individuals that are yea are the individuals within the
20 House of Representatives that voted for this bill,
21 correct?
22   A.  Yes.
23   Q.  I want to ask you to circle on this which one
24 of these legislators had a discriminatory purpose in
25 passing Senate Bill 14.

## 135

1    A.  I don't know.
2    Q.  Okay.  Senate Bill 14 provided for the free
3  identification within the bill, correct?
4    A.  Yes.
5    Q.  It allows any citizen that wants to vote to get
6  a free identification from the Department of Public
7  Safety.  Is that what it says?
8    A.  Yes, provided they did certain things.
9    Q.  Provided they did what?
10   A.  They had to fill out an affidavit.  They could
11 state a religious objection, and I think the affidavit
12 related to indigency.  And I seem to recall there was a
13 cure period, when you had to come back and issue the
14 affidavit related to religious objection or indigency.
15 So you had to actually go to the DPS -- excuse me.  That
16 was to cure a vote.
17   A.  Uh-huh.
18   A.  A provisional ballot.  But I'm trying to
19 remember how that worked.  So I don't recall exactly
20 what the mechanisms were.
21   Q.  Okay.
22   A.  But you didn't get a -- I recall you had to do
23 a couple of different things before you got a free ID.
24   Q.  And I think you're talking about -- some
25 of this has been about the religious exemption portion.

## 136

1    A.  I think there was a religious exemption where
2  your religion didn't permit you to have a photograph
3  taken or something like that.
4    Q.  Okay.  I would assume that your opinion it's a
5  tiny fraction of the individuals who would --
6    A.  Yes, sir.
7    Q.  Okay.  So the free -- in order for someone of
8  limited means to get a free identification, what is it
9  they have to do?
10   A.  Under SB 14?
11   Q.  Yes.
12   A.  I'd have to go back and look at the
13 legislation.
14   Q.  Okay.  But nonetheless, they don't have to pay
15 for the issuance of an identification in order to vote?
16   A.  That is correct.
17   Q.  Do you know, as you're sitting here, any
18 statistical data about the different forms of
19 identification that appear on Senate Bill 14, as to
20 which forms of ID racial minorities are more or less
21 likely to have?
22   A.  No.  We asked for that data in committee over
23 the years, and I believe the Secretary of State's Office
24 was unable to provide it, and DPS was unable to provide
25 it, because I don't think they -- they were unable to

---

137

1  match the voter registration rolls with the ID, those
2  who held ID. I think I carried the amendment that asked
3  that we have the Secretary of State study this issue
4  before we implemented the legislation. I don't know,
5  sitting here, and I don't think the legislators knew at
6  the time.
7        Q.  Now, this is something that you have been --
8  you've been against photo identification in '07 -- in
9  '05, actually, in '05, '07, '09, and '11, correct?
10       A.  Yeah. I've been against those bills as filed
11 and amended.
12       Q.  What studies have you commissioned in order to
13 assess that?
14       A.  None.
15       Q.  Do you know, as you're sitting here, the number
16 of individuals that will be -- that can potentially be
17 impacted by Senate Bill 14?
18       A.  I do not. I do not know that.
19       Q.  Is it a fair statement that if I were to ask
20 you what those numbers were, that it would be pure
21 supposition on your part?
22       A.  That is correct.
23       Q.  You agree, Representative Anchia, don't you,
24 that representatives of the House have a duty to
25 represent their constituents?

---

138

1        A.  Yes.
2        Q.  And do you try to do that?
3        A.  Yes.
4        Q.  Okay. There is nothing wrong with a
5  representative voting for policies favored by his or her
6  constituents, correct?
7        A.  No.
8        Q.  Is it politically rational for an elected
9  official to vote for policies favored by his or her
10 constituents?
11       A.  Yes.
12       Q.  Do you have any basis to dispute that voter
13 identification is supported by a majority of voters in
14 the state of Texas?
15       A.  No.
16       Q.  Do you have any personal knowledge of a single
17 Texas registered voter who does not possess a form of ID
18 that will permit him or her to vote if SB 14 is
19 enforced?
20       A.  If you could read that to me one more time.
21       Q.  Do you have any personal knowledge of a single
22 Texas registered voter who does not possess a form of ID
23 that will permit him or her to vote if SB 14 is
24 enforced?
25       A.  No.

---

139

1        Q.  Do you have a driver's license?
2        A.  Yes.
3        Q.  A passport?
4        A.  Yes.
5        Q.  Okay. Do those in your home have a driver's
6  license that live with you?
7        A.  No.
8        Q.  Okay. Do they have passports?
9        A.  Yes.
10       Q.  Are you registered to vote?
11       A.  Yes.
12           MR. SWEETEN: Let me take a five-minute
13 break.
14           (Recess from 5:01 p.m. to 5:04 p.m.)
15       Q.  (By Mr. Sweeten) Representative Anchia, we're
16 back on the record.
17           Now, I've asked you a number of questions
18 today. Have we communicated today? You think that
19 you've understood my questions?
20       A.  Yes, sir.
21       Q.  Have I been polite to you during this
22 examination?
23       A.  Extremely.
24       Q.  Okay.
25           MR. SWEETEN: At this time, I have no

---

140

1  further questions for the witness, and I'll pass. I
2  will reserve questions the time of trial.
3           THE WITNESS: Thank you.
4           MR. GARZA: I reserve questions until time
5  of trial.
6           EXAMINATION
7  BY MS. MARANZANO:
8        Q.  My name is Jennifer Maranzano. I'm
9  representing Defendant Attorney General Eric Holder in
10 this matter. I just have a couple of questions for you.
11       You testified earlier that you believed
12 SB 14 was passed with discriminatory intent; is that
13 right?
14       A.  Yes.
15       Q.  And you said earlier that this was your
16 subjective interpretation; is that correct?
17       A.  Yes.
18       Q.  Are you basing this interpretation of the
19 legislative intent of SB 14, in part, on your years of
20 experience in the legislature?
21           MR. SWEETEN: Objection, leading. Go
22 ahead.
23       A.  Yes.
24       Q.  (By Ms. Maranzano) Are you basing this
25 interpretation also in part on your years of service in

## 141

1  the Elections Committee?
2       MR. SWEETEN:  Same objection.
3       A.  Yes.
4       Q.  (By Ms. Maranzano) And are you also basing your
5  interpretation, in part, on your years of working with
6  some of the very same legislators who supported SB 14?
7       MR. SWEETEN:  Objection, leading.
8       A.  Yes.
9       MR. MARANZANO:  I have nothing further.
10      FURTHER EXAMINATION
11 BY MR. SWEETEN:
12      Q.  Have we discussed here today the basis for your
13 opinion that Senate Bill 14 has a discriminatory purpose
14 in full?
15      A.  Yes.
16      Q.  Have we discussed here today your basis for
17 claiming that Senate Bill 14 has a discriminatory
18 impact?
19      A.  Yes.
20      MR. SWEETEN:  Okay.  Nothing further.
21      MR. GARZA:  We'll continue to reserve
22 questions until time of trial.
23      MR. SWEETEN:  All right.  Thank you very
24 much.
25      THE WITNESS:  Appreciate you.

## 142

1       (Signature reserved.)
2       (Deposition concluded at 5:07 p.m.)

## 143

1  CHANGES AND SIGNATURE
2       RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20      I, REPRESENTATIVE RAFAEL ANCHIA, have read the
21 foregoing deposition and hereby affix my signature that
22 same is true and correct, except as noted above.
23
24 _____
25 REPRESENTATIVE RAFAEL ANCHIA

## 144

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4       Before me,_____, on this day
5  personally appeared REPRESENTATIVE RAFAEL ANCHIA, known
6  to me (or proved to me under oath or
7  through_____ (description of identity
8  card or other document) to be the person whose name is
9  subscribed to the foregoing instrument and acknowledged
10 to me that they executed the same for the purposes and
11 consideration therein expressed.
12      Given under my hand and seal of office
13 this_____day of _____, 2012.
14
15
16 _____
17 NOTARY PUBLIC IN AND FOR
17 THE STATE OF _____

## 1

343861 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                      *
        Plaintiff,                   *
VS.                                  *
ERIC H. HOLDER, JR., in his          *
official capacity as Attorney        *
General of the United States,        *
        Defendant,                   *
ERIC KENNIE, et al,                  *
        Defendant-Intervenors,       *
TEXAS STATE CONFERENCE OF NAACP  * CASE NO.
BRANCHES, et al,                 * 1:12-CV-00128
        Defendant-Intervenors,   * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS     * THREE-JUDGE COURT
EDUCATION FUND, et al,           *
        Defendant-Intervenors,   *
TEXAS LEGISLATIVE BLACK CAUCUS,  *
et al,                           *
        Defendant-Intervenors,   *
VICTORIA RODRIGUEZ, et al        *
        Defendant-Intervenors.   *

TELEPHONIC DEPOSITION OF SENATOR KENNETH LYNN ARMBRISTER
UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
             DEPOSITION WILL BE IN THE CUSTODY OF:

            Spencer R. Fisher, Esquire
            U.S. Department of Justice
            950 Pennsylvania Avenue, NW
            Northwestern Building, Suite 7146
            Washington, DC 20530

Date            Edith A. Boggs, CSR

6-8-12          HOUSTON, TEXAS

## 2

8     DEPOSITION OF SENATOR KENNETH LYNN ARMBRISTER

11    DEPOSITION AND ANSWERS of SENATOR KENNETH LYNN
12    ARMBRISTER, taken before Edith A. Boggs, a certified
13    shorthand reporter in Harris County for the State of
14    Texas, taken at the offices of Dechert, LLP, 300 West
15    6th Street, Suite 2010, Austin, Texas, on the 8th day of
16    June, 2012, between the hours of 9:25 a.m. and 4:59 p.m.

## 3

1
2
3
4         A P P E A R A N C E S
5
      ATTORNEY FOR PLAINTIFF, STATE OF TEXAS:
5
      Office of the Attorney General of Texas
6     P.O. Box 12548 (78711-2548)
      209 West 8th Street, 8th Floor
7     Austin, Texas  78701
8     By:  Reynolds Bascom Brissenden, IV, Esquire
9     (512) 936-1307
      reynolds.brissenden@aog.state.tx.us
10
11
      ATTORNEYS FOR DEFENDANT, HOLDER, ET AL:
12
13    U.S. Department of Justice
      950 Pennsylvania Avenue, NW
14    Northwestern Building, Suite 7146
      Washington, DC  20530
15
      By:  Spencer R. Fisher, Esquire,
16    Jennifer Maranzano, Esquire,
      Angela Miller, Esquire,
17    and Victor Williamson, Esquire
18    (202) 305-7766
      spencer.fisher@usdoj.gov
19
20
21
22
23
24
25

## 4

1
      A P P E A R A N C E S (Continued)
2
3
      ATTORNEY FOR DEFENDANT-INTERVENORS, TEXAS LEAGUE OF
4     YOUNG VOTERS EDUCATION FUND:
5     Fried, Frank, Harris, Shriver & Jacobson, LLP
      One New York Plaza
6     New York, New York  10004
7     By:  Adam Harris, Esquire
      (Present telephonically)
8
      (212) 859-8000
9     adam.harris@friedfrank.com
10
11    ALSO PRESENT:
12
      David Morales, Esquire, Office of the Governor
13    Jessica Olson, Esquire, Office of the Governor
14
15    REPORTED BY:
16
      Ms. Edith A. Boggs
17
18
19
20
21
22
23
24
25

## 5

1
2                    EXAMINATION INDEX
3       QUESTIONS BY                    PAGE
4
        Mr. Fisher                      7
5
        Mr. Harris                      226
6
        Mr. Fisher                      231
7
8
                    INDEX OF EXHIBITS
9
10      NO.  MARKED    DESCRIPTION
             OR FIRST
11           REFERENCED
12      5    189       SB 14
13      8    204       Texas Legislature Online History
                       for SB 14
14
        28   138       HB 218
15
        29   162       SB 362
16
        44   114       HB 1706
17
        45   153       Declaration of Carlos Uresti
18
        163  162       Texas Legislature Online History
19                     for SB 362
20      168  180       Senate Journal, Second Day,
                       Wednesday, January 14, 2009
21
        170  186       Senate Rules adopted by 82nd
22      Legislature January 19, 2011, Senate Resolution No. 36
23      190  18        Second Amended Notice of Deposition
24      191  114       Texas Legislature Online History
                       for HB 1706
25

## 6

1
2       192  127       Texas Politics, Wednesday, May 4,
                       2005
3
        193  129       Minutes, Senate Committee on State
4       Affairs, Tuesday, April 18, 2006
5       194  139       Texas Legislature Online History
                       for HB 218
6
        195  190       2011 Session Accomplishments
7
        196  201       Article - After Six-Year Fight,
8       Perry Signs Voter ID into Law
9       197  211       Emergency legislation letter signed
        by Rick Perry dated January 20, 2011
10
        198  211       Senate Journal, Fourth Day, Monday,
11      January 24, 2011
12      310  25        Amended Notice of Deposition of
        Michael Schofield
13
14
15
16
17
18
19
20
21
22
23
24
25

## 7

1                    PROCEEDINGS
2       THE COURT REPORTER:  Would counsel please
3   introduces themselves for the record, and their
4   affiliations.
5       MR. FISHER:  Yes, Spencer Fisher,
6   representing the Attorney General of the United States.
7       MS. MARANZANO:  Jennifer Maranzano
8   representing the Attorney General.
9       MS. MILLER:  Angela Miller representing the
10  Attorney General.
11      MS. OLSON:  Jessica Olson, State of Texas.
12      MR. MORALES:  David Morales, Governor's
13  Office.
14      MR. BRISSENDEN:  Reynolds Brissenden for the
15  State of Texas and the witness.
16      THE WITNESS:  Senator Ken Armbrister,
17  Legislative Director for the Governor's Office.
18      SENATOR KENNETH LYNN ARMBRISTER
19  was called as a witness and, being first duly sworn by
20  the notary, testified as follows:
21                    EXAMINATION
22      Q.  (BY MR. FISHER)  Good morning, sir.
23      If I could have you state and spell your name for
24  the record, please.
25      A.  Yes.  Title Senator, first name Kenneth,

## 8

1   K E N N E T H, middle initial L, last name Armbrister,
2   A R M B R I S T E R.
3       Q.  Okay.  Senator, I'll go over a few ground rules
4   of the deposition today.
5       First, obviously, you just gave your oath to
6   testify truthfully, accurately and completely at all
7   times.  And you understand that, correct?
8       A.  I understand.
9       Q.  The court reporter sitting here to my right will
10  prepare a transcript of everything that is said today.
11  So, you must respond to my questions verbally.  So, no
12  head shaking.  Even uh-huh or anything that's nonverbal
13  is not acceptable because we can't make a transcript.
14  So, you understand that as well?
15      A.  I understand.
16      Q.  And if you could please wait for me to finish my
17  questions, and I'll try to do the same for you, wait for
18  you to finish answering before I ask a question and that
19  way, you know, when someone reads the transcript, it's
20  clear who is speaking and when.  Is that clear?
21      A.  That is clear.
22      Q.  And I'll try to ask clear questions at all times
23  but I might not be successful at all times.  So, if you
24  don't understand a question, could you please let me
25  know and I will do my best to make it clear for you?

## 33

1  A. Once I retired, then -- I mean, I was in the
2  Legislature 24 years.  So, my staff, every so often,
3  with the State's policy, would move things over.
4  Q. So, I'm assuming over 24 years, you had 1 or 2
5  documents you had to send over; is that correct?
6  A. That's correct.
7  Q. Or maybe 1 or 2 million documents you had to send
8  over.
9  So, let's move away from records and retention.
10  A. Okay.
11  Q. I notice some sleepy eyes in the room after
12  discussing that in detail.
13  Can you tell me a little bit about your
14  educational background, Senator?
15  A. Yes.  How far back do you want to go?
16  Q. We can start with college undergraduate.
17  A. Okay.  You don't want to hear about public school
18  and all that.
19  I have an undergraduate from Sam Houston State
20  University and graduate studies while I was attending
21  the FBI National Academy through the University of
22  Virginia.
23  Q. And can you tell me a little bit about the FBI
24  Academy?  Under what circumstances did you go?  Did you
25  get a certification?  Were you ever -- let me ask you

## 34

1  first -- I'm sorry for the multiple questions.
2  A. Sure.
3  Q. Did you ever serve with the FBI?
4  A. No.
5  Q. So, what were the circumstances of you going to
6  the FBI Academy and getting a certification?
7  A. There were -- at the time, 1975, there were two
8  ways to become an agent.  One is to apply directly.  And
9  if you're not an attorney or a CPA, you have to have at
10  least three years degree experience.  That was what got
11  me into law enforcement on graduation from college was
12  to do the three years degree experience.
13  The other road was you were nominated.  You go
14  through an extensive background check and all the things
15  that would be for a new agent, and you attend what's
16  called the FBI National Academy.  It's essentially the
17  same curriculum as a new agent.
18  I attended the 103rd session of the National
19  Academy, which began in September of '75 and ended the
20  week before Christmas in '75.
21  We had what we call NA people, and then you had
22  new agents' class going through at the same time.  So,
23  we got exactly the same type and nature of training
24  other than we missed the section of who to salute and
25  the agency hierarch and the organizational chart.

## 35

1  At that time, you could make an election to
2  either stay with the Bureau and there would be another
3  two weeks of training, where you would get that who to
4  salute and those type of things, or you could tell them,
5  "Thank you for all the training," and come back home.
6  And I elected to come back home.
7  Q. Okay.  So, you had already been employed with law
8  enforcement?
9  A. Yes.
10  Q. You went to the FBI Academy and then just went
11  back to law enforcement, having received some training
12  from the FBI; is that correct?
13  A. Right.
14  Q. So, can you tell me about your law
15  enforcement experience?
16  A. Sure.
17  Q. And that's either prior to the FBI or after you
18  came back, just kind of encompass that all in one, I
19  guess.
20  A. Upon graduation from college, I was employed by
21  the Victoria Texas Police Department, and this was in
22  June of 1969.
23  You worked starting right at the bottom,
24  regardless of degree.  You started at the bottom of rank
25  and position and job functions.

## 36

1  I attended the Victoria Police Academy the fall
2  of 1969 and, upon graduation, then was assigned Patrol
3  Division -- or Operations Division duties, which
4  entailed everything from traffic enforcement, to
5  investigation, to felon.
6  Anything that happened on my 8-hour shift in my
7  particular area of responsibility, geographic area of
8  responsibility, I would get the call and go out and
9  process the complaint.
10  And I served in that role for three and a half
11  years, and then I was promoted to a Sergeant's position,
12  which was more supervisory of people doing what I used
13  to do for the first three and a half years.
14  And a year later, I was promoted to Lieutenant
15  and took over the Regional Police Academy.  At the same
16  time, I was also teaching at the Victoria Community
17  College in their criminal justice curriculum.
18  And I did that until I left to go to the FBI
19  National Academy.  Like I say, you had to be a
20  nominated, and an agent out of Corpus Christi nominated
21  me, that we had worked together on some bank fraud
22  cases, nominated me to go.  And so, that was when I went
23  to the FBI National Academy.
24  I came back.  The reason I came back, my son was
25  three years old, my daughter was eight months old, my

Senator Kenneth  Lynn Armbrister                     June 8, 2012

---

### 37

1  class' first five-year duty assignment was going to be
2  New York City, and I wasn't going to take babies and a
3  wife who had never been out of Texas to New York for
4  five years.
5     Q.  Understood.
6     A.  So, I chose to come back, and I came back to take
7  over -- again take over the Coordinator's job or the
8  Director's job of the Regional Police Academy, and I was
9  doing that until I was chose to run for the House of
10  Representatives.
11    Q.  Okay.  So, it was basically patrol work, which
12  was -- I guess the subject matter there would be kind of
13  general, correct?
14    A.  Yeah.  I mean, my first six months there, also
15  because I wasn't from Victoria, Texas, I was a
16  natural -- and I was only 21 years old.  I was a natural
17  for undercover work as well and drug enforcement.
18        And so, I had to do what you see on TV they had
19  to do, grow the long hair and work in that.
20        And then after graduation from the Victoria
21  Police Academy, then patrol functions.
22    Q.  Let me just interjection, you said "natural for
23  undercover" -- and I'm still trying to picture the long
24  hair.
25    A.  Yeah.

### 38

1     Q.  That was because you weren't from the town; is
2  that correct?
3     A.  Nobody knew me in that town.
4     Q.  No one knew you?
5     A.  No.
6     Q.  Okay.  And then you moved on to the Sergeant's
7  job; is that right?
8     A.  Yes.
9     Q.  And then went to the FBI?
10    A.  Lieutenant's job.  And that's when I first was
11  assigned to the Police Academy.
12    Q.  Okay.
13    A.  The local Police Academy, which was a ten-county.
14  When I say "regional," we provided mandated training.
15  The State requires X number of hours to be a licensed or
16  certified peace officer in the State, and our academy
17  was -- at the time, we handled the training for ten
18  counties.
19    Q.  And what -- what was your position at the Police
20  Academy?  I think you mentioned it but --
21    A.  I was the Director.
22    Q.  And how long were you the Director of the Police
23  Academy?
24    A.  From 1974 until 1983, with that break of time
25  from September to December of '75 when I was gone.

### 39

1     Q.  Okay.  And so, in this capacity either as a
2  Director at a Police Academy or as someone that was
3  working as a Patrol Agent, did the topic of voter fraud
4  ever come up that you recollect?
5     A.  No, not back then.
6     Q.  And in these capacities either as the Police
7  Academy Director or as Patrol Officer in Victoria, did
8  the topic of illegal immigration come up?
9     A.  Oh, yes.  We -- in fact, I used to be -- prior
10  to -- I believe it was the Arizona case where the
11  Supreme Court ruled that only the INS, at the time, had
12  jurisdiction over illegals, we were expected to arrest
13  illegals.  In fact, INS, for each illegal, would send me
14  my choice of either a box of .357 Magnum shells or .38
15  Special shells for every illegal I picked up.
16    Q.  So, that was something that you were involved in
17  as a Patrol Officer?
18    A.  Yes.
19    Q.  And then when you moved on to be the Director of
20  the Police Academy, did you give instruction on, you
21  know, the methods that you used as a Patrol Officer as
22  far as what to do when you encounter an illegal
23  immigrant or how to take care of that situation?
24    A.  No, because the law had changed, and we didn't
25  have jurisdiction any more.

### 40

1     Q.  So, the law removed jurisdiction over what you
2  had previously done as a Patrol Officer?
3     A.  Right.
4     Q.  You mentioned that the issue of voter fraud did
5  not come up at that time, and that was the time you were
6  patrolling and also the time you were Director of the
7  Police Academy, you didn't have any classes that you
8  gave on voter fraud or any information you gave to your
9  students; is that correct?
10    A.  No -- or that's correct.
11    Q.  So, at that time, did you serve in any elected
12  capacity while in Victoria while you were with the
13  police?
14    A.  In 1978 -- no -- 1979, I was elected to the
15  Victoria Independent School District Board of Trustees.
16  I was a school board member.
17    Q.  And how long did you serve on that board?
18    A.  One term.
19    Q.  So, that would have been a two-year term?
20    A.  Three-year term.  I was elected to the House of
21  Representatives in '82.  So, in Texas, under our
22  constitution, as soon as you announce for a different
23  office, you vacate the current office.
24        So, there was an opening for a State
25  Representative position.  And I was serving at that time

## 41

1   as Vice Chair of the School Board, and as soon as I
2   announced that I was going to run for that open State
3   House seat, my term on the School Board was over.
4       Q.  And you mentioned elected, so, you were elected
5   to the position with the School Board; is that correct?
6       A.  Yes.
7       Q.  Was that a partisan position or nonpartisan?
8       A.  Nonpartisan.
9       Q.  Do you remember if you were elected based upon a
10  district or was it at large, meaning --
11      A.  It was at large at the time.
12      Q.  Has that changed since then?
13      A.  Yes.
14      Q.  You mentioned you were the Vice Chair, did you
15  hold any other positions on the School Board?
16      A.  No.
17      Q.  And in your capacity as the Vice Chair of the
18  School Board, with regard to School Board elections
19  which you participated in, did the issue of voter fraud
20  ever come up at that time?
21      A.  No, sir.
22      Q.  And in this capacity as Vice Chair of the School
23  Board, did the issue of illegal immigration ever come
24  up?
25      A.  No, sir.  Well, only from the standpoint of

## 42

1   the -- there was a question by another board member at a
2   board meeting, and the superintendent said, "We are
3   obligated to provide an education to anybody that comes
4   in the door regardless of status."  I remember that.
5   That was at an open meeting.
6       Q.  So, there was a question by a board member
7   regarding providing education to illegal immigrants, and
8   the response was, "We're obligated to do so"?
9       A.  That's correct.
10      Q.  And you were just an observer of that
11  communication; is that right?
12      A.  Yes.
13      Q.  So, you were elected in 1982 to the House.  What
14  district were you elected from?
15      A.  It was a district that was comprised of three
16  counties.  At the time the number was 32, District 32.
17  The three counties were Refugio.  It's R E F U G I O but
18  it's pronounced like it has an R.  Refugio, Calhoun and
19  Victoria Counties, Victoria being the most populace of
20  the three.
21      Q.  And just for clarification if we can go back,
22  when you were mentioning that you served on the
23  Victoria, you know, police, was that -- was there a City
24  of Victoria and a County of Victoria?
25      A.  That's correct.

## 43

1       Q.  And was this for the county or the city?
2       A.  This was the city.
3       Q.  And when you were elected to the House, you
4   served as a representative of Victoria County, so,
5   expanded to the whole county as representative?
6       A.  That's correct.
7       Q.  And how long did you serve in the Texas House?
8       A.  Two terms or four years.  I served from -- like I
9   say, you take office the second Tuesday of January in an
10  odd numbered year.  So, it was January of 1983, and I
11  served in that capacity until I ran for the Senate in
12  1986.
13      And the Senator before me had moved on to another
14  office as well.  That opened that seat.  So, I ran for
15  that seat and won election to the Senate.  And I took
16  the oath of office in the Senate that January of 1987.
17      Q.  Okay.  And when you were a member of the House --
18  and so, just a member of the House and we'll talk about
19  the Senate shortly -- did you serve on any committees
20  that involved or dealt with election law issues?
21      A.  No.  No.
22      Q.  Did you sponsor any legislation that you remember
23  or amendments that dealt with election law issues?
24      A.  No.
25      Q.  And this is a similar question to the questions

## 44

1   I've asked previously but now we're talking about your
2   service in the House.
3       A.  Okay.
4       Q.  Did the issue of voter fraud come up during your
5   service in the House?
6       A.  I can't remember.  That was 1983.
7       Q.  And the issue of illegal immigration, was that an
8   issue that was dealt with during your time in the Texas
9   House?
10      A.  No.
11      Q.  So, you mentioned you were elected to the Senate
12  in 1986?
13      A.  Elected in '86, took the office in '87.
14      Q.  And from what district?
15      A.  The Senate District would be 18.
16      Q.  And did that share the geographic area of
17  District -- you said 32 or was that different?
18      A.  It was -- it encompassed District 32 but it went
19  from three counties in the House District to, at that
20  time under that particular -- before the '91
21  redistricting, there were 18 other counties -- or 18
22  counties total.
23      Q.  About how many folks did you represent?
24      A.  About 500,000.
25      Q.  Am I correct that the Texas Senate districts are

Senator Kenneth  Lynn Armbrister                    June 8, 2012

## 45

1  drawn so that they are roughly equal in population; is
2  that correct?
3      A.  Yes.  Yes.  You take the Decennial census, take
4  31 -- there's only 31 State Senators -- 31 divided into
5  whatever the official census number is, and that's
6  theoretically how many people each Senator represents.
7      Q.  And your district, obviously -- let me ask you
8  first -- strike that.
9          How long did you serve in the Senate?
10     A.  20 years.
11     Q.  And that would be from 1987 --
12     A.  1987 to 2007.
13     Q.  And so, your district did change, I'm guessing,
14  at least two times?
15     A.  Yes.
16     Q.  Did you serve on any committees that involved or
17  dealt with election law during your time in the Texas
18  Senate?
19     A.  Yes.
20     Q.  Okay.  What committees did you serve on that
21  dealt with election law during your time in the Texas
22  Senate?
23     A.  State Affairs.
24     Q.  Did you serve on any other committees?
25     A.  Yes.  I served on several.  Like I say, with just

## 46

1  31 members, you have to essentially do the same volume
2  of work as 150 House members.  So, we all -- in the
3  Senate, you serve on quite a few committees.
4      Q.  And do you remember some of those?
5      A.  Sure.  I served on every committee in the
6  Senate -- when I went over there, there were only nine
7  standing committees.  Now, there are more than that, and
8  the Senate decides through their rules how many
9  committees that you have but at the time -- but
10  virtually every committee I served on or chaired other
11  than the Jurisprudence Committee because of not being an
12  attorney.  I believe that was the only one that I did
13  not either serve on or chair.
14     Q.  And did you have leadership positions in these
15  committees?
16     A.  Yes.
17     Q.  And what were those?
18     A.  I chaired the Intergovernmental Relations
19  Committee during one period of time.  I was the Chair of
20  the State Affairs Committee for a period of time.  I was
21  the Chair of the Criminal Justice Committee for a period
22  of time.  And then my last chairmanship was Natural
23  Resources, water, air, those noncontroversial issues.
24     Q.  And does the State Affairs Committee have
25  oversight over elections law issues?

## 47

1      A.  When I chaired it, it did.
2      Q.  And has that changed since you chaired it?
3      A.  I believe it has.
4      Q.  And what's the current situation?
5      A.  I think they have a separate committee that
6  handles elections.
7      Q.  And do you know the title of that committee?
8      A.  I do not.
9      Q.  And we're going to jump ahead just a little bit
10  but just because I think the subject matter is somewhat
11  similar.
12         Have you been appointed to any kind of task
13  forces since you've left the Senate to serve with the
14  Governor, as a member of a task force?
15     A.  No.
16     Q.  And so, you haven't served on the Task Force For
17  Homeland Security?
18     A.  I did but I was still in the Senate.
19     Q.  Okay.
20     A.  This was right after 911, and Governor Perry,
21  like then President Bush, it was his first year when, of
22  course, 911 occurred.
23         And Governor Perry at the time nominated me to be
24  on this -- our Homeland Security Task Force, chaired by
25  at that time Land Commissioner David Dewhurst,

## 48

1  subsequently then Lieutenant Governor David Dewhurst.
2      Q.  Okay.
3      A.  And with members of the general public, as well
4  as elected members on that committee.
5      Q.  So, in addition to your job as a Texas State
6  Senator and in addition to your service on, as we've
7  talked about, multiple, multiple committees, you served
8  on the Governor's Task Force on Homeland Security as an
9  elected Senator?
10     A.  Yes.
11     Q.  Is that right?
12     A.  Yes.
13     Q.  And did you serve on any other task force
14  projects, I guess, while you were an elected Senator?
15     A.  Define "task force."  I'm not trying to be
16  evasive.  Here's the deal:  As you know, the Legislature
17  means 140 days every odd numbered year.  So, that
18  18-month period between sessions, your committee is
19  still in place, and we're tasked with interim charges,
20  we refer to them, where we'll look at bills either that
21  have passed or that were introduced that were of such
22  nature that it -- we didn't want to take them up in
23  140 -- there's too much here, it represented too much of
24  a change.
25         Chairing the Natural Resources Committee and the

Senator Kenneth  Lynn Armbrister                    June 8, 2012

49

1  water issues, air quality issues, those type things
2  required a lot of time during that interim, not really a
3  task force but we were meeting in various locales around
4  the state on those particular subject matters.
5      Q.  So, there could be, between sessions, certain
6  subject matters that you're assigned to handle?
7      A.  That's correct.
8      Q.  And they might not have the formal term of task
9  force but it is other subject matter that you're
10  addressing, correct?
11      A.  Yes.
12      Q.  So, given your experience -- we've talked about
13  with the Task Force on Homeland Security, we've talked
14  about your work as the Chair of the State Affairs
15  Committee, as well as your law enforcement experience,
16  are you aware of the types of documents in Texas that
17  establish citizenship?
18      A.  Not specifically.
19      Q.  Do you know whether you have to be a citizen to
20  get a driver's license in Texas?
21      A.  I don't know.  I think you do but I don't know.
22      Q.  And do you know whether you have to be a citizen
23  to get a license to carry a concealed handgun in Texas?
24      A.  You do, a Texas resident.
25      Q.  Could you be a Texas resident without being a

50

1  citizen of the United States?
2      A.  Sure.
3      Q.  So --
4      A.  Not for concealed handgun, though.
5      Q.  So, for concealed handgun, by Texas resident, you
6  mean someone who is a citizen of the United States,
7  correct?
8      A.  That's correct.  I don't have one, by the way.  I
9  don't have a concealed --
10      Q.  Handgun or -- let me clarify.
11      A.  I don't have a license.
12      Q.  So, that means you don't have the handgun, fair
13  enough?
14      A.  That doesn't mean that.  It doesn't mean that.
15  You know, you carry one for 14 years every day, the
16  novelty is not there.
17      Q.  Understood, Senator.  Understood.
18      So, during your time as a Senator, did you
19  sponsor or author any legislation or amendments that
20  involved elections that you are aware of that you
21  remember?
22      A.  No.
23      Q.  And similar question to what I've asked:  During
24  your time as a Senator, did the issue of voter fraud
25  come up generally?

51

1      A.  From time to time.
2      Q.  And do you remember in what context that issue
3  came up?
4          MR. BRISSENDEN:  I'm going to instruct you
5  that to the extent you have knowledge or information
6  that requires you -- to the extent this question
7  requires you to disclose information, analysis, work
8  that you did with regard to specific pieces of
9  legislation, I'd instruct you not to answer that
10  question.
11          To the extent you can answer that question
12  based upon information that's in the public record, you
13  may answer.
14          THE WITNESS:  Okay.
15      Q.  (BY MR. FISHER)  Did you have anything publicly
16  that you're aware of that came up with regard to voter
17  fraud during your time as a Texas State Senator?
18      A.  Not publicly.
19      Q.  So, with regard to any information regarding when
20  voter fraud came up, you would be asserting legislative
21  privilege over that information on the advice of
22  counsel; is that correct?
23      A.  That's correct.
24      Q.  And similar question, generally, did the issue of
25  illegal immigration come up during your time as the

52

1  Texas State Senator?
2          MR. BRISSENDEN:  My instruction to you would
3  be the same.
4      Q.  (BY MR. FISHER)  Just for the record, we have to
5  make it clear.
6      A.  Okay.
7      Q.  So, did the issue of illegal immigration come up
8  with regard to public information during your time as a
9  Texas State Senator?
10      A.  It came up.
11      Q.  Okay.  But with regard to actual substance, are
12  you asserting legislative privilege over that
13  information based on the advice of counsel?
14      A.  I am.
15      Q.  So, we talked about your law enforcement
16  experience, we talked about your time in the House, in
17  the Senate.  Your current position, if you can just tell
18  me about that and how you came to be employed by the
19  Governor.
20      A.  When I chose not to seek reelection for another
21  term, the Governor called me and asked would I be
22  interested in coming and filling this position with his
23  staff, and I told him that I would.
24      Q.  And who had the position prior to you having it?
25      A.  I believe it was Dan Shelley, another former

## 53

1  member of the Senate.
2      Q.  And if we could just make clear, your actual
3  title is Legislative Affairs Director; is that correct?
4      A.  Legislative Director.
5      Q.  Legislative Director?
6      A.  Right.
7      Q.  And do you know how you were selected for the
8  position?
9      A.  I was the best for the -- no.  Like I say, he
10  called me.  And once I made the announcement that I
11  would not be seeking reelection, it was the very next
12  day I received a phone call from the Governor.
13      Q.  So, is it fair to say you weren't seeking the
14  position?
15      A.  No.
16      Q.  And you received a phone call asking if you were
17  interested in it?
18      A.  That's correct.
19      Q.  And did you know Governor Perry prior to that?
20      A.  Yes.
21      Q.  Had you interacted with him?
22      A.  Yes.
23      Q.  Obviously, we talked about your service on the
24  Task Force.  Was it with things like the Task Force and
25  other things between legislative sessions and during

## 54

1  legislative sessions that you had an opportunity to
2  interact with the Governor?
3      A.  Yes.
4      Q.  And in your experience and your knowledge -- and
5  let me clarify.  Let me make it clear for the record.
6      During your time as a member of the Texas House
7  and a member of the Texas State Senate, you were elected
8  as a Democrat; is that correct?
9      A.  That's correct.
10      Q.  And so, in your experience, has a Democrat served
11  in the Legislative Director role for a Republican
12  Governor that you know of?
13      A.  There could have been one, Hilary Doran under
14  Governor Clements.
15      Q.  And so, the reverse also, do you know of any
16  Republicans that have served for a Democratic Governor
17  of Texas?
18      A.  I'm trying to think of the five Governors I've
19  worked with.  No.
20      Q.  And the next question -- and this is, I know,
21  a general question but it is very important for us to
22  get this figured out now as we move forward so I don't
23  ask you questions that you don't know the answer to, or
24  I try not to anyway.
25      A.  Okay.

## 55

1      Q.  So that we're clear on the questions I'm asking
2  you -- and this goes all the way back to when we started
3  and talked about, you know, if I'm asking you questions
4  about what you do, what your staff does or what folks in
5  the Governor's Office do or what the Governor does, it's
6  helpful for me to know what your job duties as the
7  Legislative Director are.  So, if you can let me know
8  what those are and be specific, and then we'll try to
9  get that even more figured out so that I know kind of
10  what your role is in the Governor's Office.
11      A.  Okay.  It's -- I guess you could categorize it
12  under several different elements.  I'll use that term.
13  If it's -- when he can't be somewhere --
14      Q.  And by "he," you mean the Governor, correct?
15      A.  When the Governor can't be somewhere in the House
16  or the Senate, I'm the face that they see.  If it's --
17  if it's legislation related, I work with our policy
18  staff, and if they have a problem getting into an
19  office, then I usually can go through the -- break
20  through the speed bump.
21      Q.  Okay.  Let me stop you there real quickly just
22  because I don't want to have to go back and then we'll
23  all get confused about what I'm asking.
24      First of all -- and this is just a question for
25  clarification -- do you believe you had some kind of

## 56

1  area of expertise that made you particularly qualified
2  so that the Governor called you and offered you the
3  position or was it based on your lengthy term in the
4  Senate or --
5      MR. BRISSENDEN:  Objection.  Speculation.
6  And to the extent that information -- or that
7  question requires you to divulge information as part of
8  the deliberative process in which the Governor selected
9  you, to the extent you have any information based upon
10  communications you had from individuals within your
11  office, I instruct you not to disclose that information.
12      THE WITNESS:  Okay.
13      Q.  (BY MR. FISHER)  Okay.  So, you're not going to
14  answer based on the deliberative process privilege on
15  the advice of your counsel; is that correct?
16      A.  That's correct.
17      Q.  So, let me rephrase.
18      When the Governor called you -- and this is aside
19  from any communications that might have taken place --
20  what was your thought about why you were being called?
21  The length of time in the Senate, was that it, or
22  something else, some kind of particular area of
23  expertise you had developed, perhaps your law
24  enforcement experience or something else that you
25  thought made you an attractive candidate?

## 57

1     A. Not being in an elected office any more, I was
2  the best one for the job.
3     Q. Do you have any --
4     A. The reason I said not being in politics, we like
5  to say me, me, me, but I was it.
6     Q. So, you feel you were the most qualified person
7  for the job; is that correct?
8     A. That's correct.
9     Q. So, we were talking about -- and I had a couple
10 of questions that I wanted to ask before we moved on
11 with your duties because you mentioned a couple of
12 things I wanted to ask about.
13       The first thing you said is when the Governor
14 can't be the face that members of the House and Senate
15 see, what do you mean by being the face that House and
16 Senate members see?
17    A. A House member or Senate member sometimes says,
18 "I've got to talk to the Governor. I've got to talk to
19 him," they will call me first.
20    Q. Okay. So, if the Governor is not available, as
21 you mentioned earlier, you are the person --
22    A. Right.
23    Q. -- who will take a call from a House member or
24 Senate member or meet in person as well, I guess; is
25 that correct?

## 58

1     A. That's correct.
2     Q. And when someone has to talk to the Governor, are
3  those discussions about -- I'm not asking the substance
4  but are those communications about legislation, things
5  that are pending?
6     A. The whole gamut. It runs the gamut of what
7  members want to talk to him about.
8     Q. So, it could be legislation that's pending,
9  legislation that's up for consideration; is that
10 correct?
11    A. Could be.
12    Q. And it could be any other number of issues that a
13 State Legislator would need to talk to the Governor
14 about; is that right?
15    A. That's correct.
16    Q. And can you identify some other areas where a
17 State Legislator would want to talk to the Governor or
18 need to talk to the Governor?
19       MR. BRISSENDEN: I'm going to instruct you
20 that to the extent you can answer that question
21 generally, at a general level, you may do so.
22       To the extent that question requires you to
23 rely upon specific communications that you have had with
24 Legislators, communications that those Legislators have
25 had with you, I instruct you that those are privileged

## 59

1  communications and not to disclose those.
2     A. Okay. Generally, the requests range from trying
3  to get a constituent appointed to a board or commission.
4  At times over the five years I've been there, when a
5  member has decided that he or she has had all this fun
6  they want, and before they announce to the public, they
7  want to tell the Governor first. More of a protocol
8  type thing, "Hey, I want to tell you, Governor, I'm not
9  running any more and before I" -- those type things.
10       So, when I say it runs the gamut of things that
11 they want to talk about, very seldom does it ever broach
12 on issues specific.
13    Q. (BY MR. FISHER) In this role, do you see
14 yourself as -- since you're the face for the Governor in
15 this role, do you see yourself as a gatekeeper? Do you
16 determine whether certain things you can deal with and
17 pass information to the Governor or certain things maybe
18 that person does need to go see the Governor face to
19 face? For instance, if someone is leaving, do you want
20 them to actually see the Governor and are there other
21 instances where you just kind of pass information along?
22       MR. BRISSENDEN: My instruction to you would
23 be the same.
24       THE WITNESS: Okay. Generally?
25       MR. BRISSENDEN: Yes, generally.

## 60

1     A. Generally, there is some gatekeeping role.
2  What was the other part of it?
3     Q. (BY MR. FISHER) Just do you see yourself as
4  someone who has to make a determination about what
5  information or if -- you know, if a Legislator comes to
6  you with certain information, do you make a
7  determination I can tell the Governor that information
8  and that's fine or do I need to put that person face to
9  face with the Governor on this topic?
10       MR. BRISSENDEN: Objection. Vague.
11       And my instruction to you would be the same.
12    A. Generally, at times, that has occurred.
13    Q. (BY MR. FISHER) Okay. And so, you also
14 mentioned -- and I guess this would be more of a gate
15 opener role -- policy staff getting into an office, and
16 that would be, I guess, the reverse. So, these are
17 folks from the Governor's Office trying to talk to
18 specific Legislators; is that correct?
19    A. That's correct.
20    Q. And so, there are times generally where --
21    A. Or staff.
22    Q. And so, there are -- it's fair to say there are
23 times where folks from your office need to meet with
24 folks from either staff or Legislators, Texas
25 Legislators, and you help facilitate those meetings or

Senator  Kenneth  Lynn  Armbrister                    June 8, 2012

---

## 61

1  conversations; is that correct?
2      A.  That's correct, if they can't get in.
3      Q.  What would be a reason why someone couldn't get
4  into an office?
5          MR. BRISSENDEN:  My instruction to you would
6  be the same.  Again, we're talking in general terms.
7          THE WITNESS:  Okay.
8          MR. BRISSENDEN:  And to the extent you can
9  answer that question based upon general procedure and
10  general knowledge, you may answer.
11          To the extent that that question requires
12  you to rely upon specific instances and specific
13  examples in dealing with specific Legislators, I would
14  instruct you not to answer.
15          THE WITNESS:  Okay.
16      A.  Generally, when the availability -- we'll call it
17  that -- occurs, it's during a legislative session while
18  either the House or the Senate are actually in session.
19  Analysts don't have floor privileges, and if it's
20  something through the process, they have to get --
21  either the member has requested some information or
22  there's something about -- an amendment placed on there
23  and they have to tell that member, "We don't like that,"
24  or, "We do like that," they don't have access to the
25  floor.  I do.

---

## 62

1          So, I can go and pull the member off and say,
2  "Hey, this thing that you just agreed to is" -- so,
3  generally, that's what I'm talking about.
4          I don't ever recall in my five years that an
5  analyst was barred from at least talking to staff.  That
6  has not occurred.
7      Q.  (BY MR. FISHER)  Okay.  And when you mentioned
8  access to the floor, is this some kind of formalized
9  access or is this just based on your position as a
10  long-standing member of the Legislature?
11      A.  It's formalized.  If I'm not in this position and
12  I'm not a registered lobbyist, then as a former member,
13  I would have access since I served in both Houses but --
14  because if you are a, quote, lobbyist, registered
15  lobbyist or you don't have experience, then it's a
16  formal process by which you are granted access to the
17  floor while they are in session.
18      Q.  So, there's really a few ways to get access to
19  the floor.  One is someone in your position as a
20  Legislative Director.  Two is a lobbyist?
21      A.  Lobbyists are not.
22      Q.  Lobbyists are not?
23      A.  No.
24      Q.  Three would be former House and Senate members.
25  So, really, you're allowed under two of those positions,

---

## 63

1  I guess?
2      A.  Right.
3      Q.  As Legislative Director and as a former
4  longstanding member of the Legislature as well?
5      A.  Right.  But I have to have an ID card and go
6  through the House procedure and the Senate procedure.
7      Q.  So, it is very formalized --
8      A.  Yes.
9      Q.  -- as far as who is allowed to go in that
10  building?
11      A.  No, the floor while they are in session.  Anybody
12  can go in the building.
13      Q.  Are you, in your capacity as Legislative
14  Director, involved in drafting legislation?
15      A.  Define "drafting."  Do I actually write it?
16      Q.  Yes.
17      A.  No.
18      Q.  Do you suggest changes for legislation based upon
19  the Governor's priorities?
20      A.  I can.
21      Q.  Have you done that in the past five years, the
22  time that you've served as Legislative Director?
23      A.  I've helped formulate policy.
24      Q.  Have you helped formulate legislation?
25      A.  Yes.

---

## 64

1      Q.  And are you involved in analyzing existing
2  legislation and bills?
3      A.  To a certain extent, yes.
4      Q.  And so, if you're involved in analyzing an
5  existing bill or piece of legislation, how does your
6  role in potentially being involved in, you know -- as we
7  mentioned earlier just a few seconds ago, drafting or
8  redrafting legislation, how does that come into play?
9  So, if we have an existing bill, where does your role
10  come in as far as someone who might make changes or, as
11  you mentioned, suggest changes to existing policy or
12  bills?
13          MR. BRISSENDEN:  Again, we're talking just
14  general terms.
15      A.  Generally, any bill that gets filed, bill or
16  resolution, the Governor's role in the legislative
17  process comes at the end of the process.  In other
18  words, we can either sign it, we can veto it or, under
19  Texas law, a bill that reaches us before the 130th day
20  of the legislative session, we can do nothing and it
21  becomes a law without the Governor's signature.  That's
22  in the constitution.  If it comes to us from the 130th
23  day to the 140th day, then we have 20 days to analyze
24  it.
25          So, because every bill -- I don't have the luxury

Senator Kenneth Lynn Armbrister                          June 8, 2012

## 65

1  of not assuming that they may end up on our desk, we --
2  that's why we have analysts in each subject area, if you
3  will, that reviews those bills, and we have -- during a
4  session, we have frequent meetings on -- for a group of
5  people to review.
6      Q.  (BY MR. FISHER)  You mentioned policy analysts
7  who are assigned certain subject matters, and would one
8  of those policy analysts be someone we mentioned
9  earlier, Mr. Schofield?  Was he in that position?
10     A.  He would have been.
11     Q.  And would you be someone who would read the bill
12  analyses prepared by Mr. Schofield?
13     A.  At times, yeah, generally, at times.
14     Q.  Do you know who else would read those analyses
15  that are prepared by him?
16     A.  I would guess his direct supervisory person.
17     Q.  And what role do those analyses play in making a
18  determination -- well, strike that.
19         When are the analyses prepared?
20     A.  When a bill gets filed, we assign them to an
21  analyst, and we ask them to do their analysis within
22  three days.
23     Q.  So, prior to the bill being filed, do you or
24  members of your staff have any information about the
25  bill or is it all after the bill is filed and the

## 66

1  analysis is conducted?
2      A.  All after.
3      Q.  Okay.  So, a bill is filed and --
4      A.  I mean, from time to time, if somebody before the
5  session starts or before they file a bill says, "I'm
6  thinking about filing a bill doing this, do you think
7  the Governor would support that," general terms, and
8  without seeing the bill I'd say, "We have to see the
9  bill."
10     Q.  So, is it fair to say there might be what could
11  be called a 10,000-foot discussion that gets narrowed
12  down after the actual language of a bill is filed; is
13  that correct?
14     A.  That's correct.
15     Q.  And so, after a bill is actually filed, a bill
16  analysis is done by someone like Mr. Schofield; is that
17  correct?
18     A.  That's correct.
19     Q.  And the folks that review that might be yourself;
20  is that correct?
21     A.  At some point in the process, I would.
22     Q.  And another person that might look at that might
23  be his director or supervisor; is that correct?
24     A.  That's correct.
25     Q.  And are these -- I'm sorry.

## 67

1      A.  I was just clearing my throat.
2      Q.  Are these -- do these bill analysts play a role
3  in determining whether the Governor will support a bill
4  or not?
5      A.  No.
6          MR. BRISSENDEN:  I'm going to -- yeah, to
7  the extent that question requires you to disclose
8  information, thoughts, opinions, mental impressions
9  about legislation, I instruct you not to answer.
10         To the extent you can, as a matter of
11  general procedure, answer that question, you may.
12     A.  Generally, no.
13     Q.  (BY MR. FISHER)  And how does the Governor
14  determine whether to support a bill or not if not based
15  upon an analysis conducted by someone like
16  Mr. Schofield?
17         MR. BRISSENDEN:  Objection to the extent it
18  calls for speculation but it also requires the witness
19  to divulge information in regards to deliberation, the
20  deliberation process, as well as what the Court has
21  determined to be legislative acts and is part of the
22  legislative privilege.  And so, under both privileges, I
23  instruct the witness not to answer.
24         THE WITNESS:  Okay.
25     Q.  (BY MR. FISHER)  And you're not going to answer

## 68

1  that question based on the advice of counsel, correct?
2      A.  That's correct.
3      Q.  Would you ever read -- you said -- you mentioned
4  you would read bill analyses prepared by policy
5  analysts, correct?
6      A.  At times.
7      Q.  And would you ever go back and look at the
8  underlying documents that a policy analyst relied on?
9  So, if Mr. Schofield provides you with a bill analysis,
10  would you look at what he looked at to come up with that
11  analysis?
12     A.  No.
13     Q.  So, a bill has been filed.  We have a policy
14  analysis that's done in your office by someone like
15  Mr. Schofield.  That's reviewed by folks in your office,
16  correct?
17     A.  There is one person that makes a review, did he
18  fill in all the blanks.
19     Q.  Okay.
20     A.  But she doesn't -- it's more -- and I don't use
21  it in a demeaning term.  It's more secretarial, did you
22  turn a document with all the blanks filled in or not.
23  She makes no analysis of the quality or what's in there.
24     Q.  And by "she," you're referring to?
25     A.  Julie Kopycinski.

Senator Kenneth  Lynn Armbrister                        June 8, 2012

---

**69**

1    Q.  Fair enough.  So, it's fair to say, based upon
2    what you just said, that you wouldn't, in your capacity,
3    or a member of your staff, tell a policy analyst what to
4    look at before doing their bill analysis?
5    A.  No, not at that point.
6    Q.  So, you mentioned that the Governor's role comes
7    later in the process --
8    A.  Right.
9    Q.  -- a few minutes ago?
10   A.  His official role.
11   Q.  Okay.
12   A.  Sign, veto or --
13   Q.  So, his official role, whether to sign or veto a
14   bill, comes later in the process.  Does he have an
15   unofficial role prior to that determination?
16        MR. BRISSENDEN:  Instruct you that to the
17   extent that question requires you to disclose thoughts,
18   opinions, mental impressions, analysis about
19   legislation, specific pieces of legislation,
20   communications that you've had with staff members in
21   your office, I'd instruct you not to answer that
22   question.
23        THE WITNESS:  Okay.
24   Q.  (BY MR. FISHER)  So, just to be clear for the
25   sake of the record, you are not answering that question

---

**70**

1    on the advice of counsel?
2    A.  That's correct.
3    Q.  In your role as Legislative Director, do you talk
4    to members of the Legislature about the Governor's
5    priorities during a session?
6    A.  Yes.
7    Q.  And do you discuss certain bills, specific bills?
8    A.  I have to -- in Texas, a Governor is not allowed
9    to file a bill -- and if of his own signature.  So, I have
10   to get a bill sponsor in the House and a bill sponsor in
11   the Senate.
12   Q.  So, there might be times where you're seeking to
13   have a bill sponsored in the House or the Senate on
14   behalf of the Governor?
15   A.  Yes.
16   Q.  And where would that -- where would a bill like
17   that come from --
18        MR. BRISSENDEN:  To the extent that you --
19   Q.  (BY MR. FISHER)  -- just generally?
20        MR. BRISSENDEN:  To the extent you can
21   answer that question as a matter of general procedure,
22   you may do so.
23        To the extent that question requires you to
24   disclose communications that you've had with the
25   Governor or other members of the Governor's staff, I

---

**71**

1    instruct you not to disclose those.
2        Also, to the extent that that requires you
3    to disclose your thoughts, opinions, mental impressions
4    or analysis about legislation, I'd instruct you -- and
5    including deliberations, I would instruct you not to
6    answer.
7    A.  Okay.  In general, you have an initiative.  The
8    House and the Senate have their own rules that all of
9    those bills -- or those that result in the filing of a
10   bill must be drafted by legislative counsel.
11   I could take them something that these attorneys
12   here have written up, it wouldn't be good enough for the
13   House and the Senate.  They have to have their own
14   attorneys draft up a bill.
15   So, when I talk to a member about an initiative,
16   in general, then they take that general initiative and
17   they go and talk to their attorneys at Legislative
18   Council.
19   They then draft up a bill and file the bill, and
20   at that time then, we will review it to see if it
21   matches what we had in mind.
22   Q.  (BY MR. FISHER)  So, there might be things that
23   you term initiatives that are priorities of the Governor
24   that would engender a bill being filed eventually in the
25   House or the Senate?

---

**72**

1    A.  That's correct.
2    Q.  So, we talked a little bit about your legislative
3    duties.  We talked about -- and I termed it a gatekeeper
4    and a gate opener role.  I think that was a fair
5    characterization; is that correct?
6    A.  Sure.
7    Q.  Do you have any nonlegislative related duties in
8    the Governor's Office, so, things that aren't related to
9    dealing with legislation?
10   A.  Sure.  The Governor will get invitations to speak
11   probably 10 times a day in 20 different events.  He
12   can't be at all of them.  So, a lot of those, they get
13   me rather than him.
14   Yesterday -- there's a -- I think it's a
15   nationwide initiative.  Chambers of Commerce have this
16   program called -- yesterday was Mid Valley Leadership
17   where they bring in young professionals in their
18   community and they learn about city government, county
19   government, state government and they even travel to
20   Washington to learn about federal government.
21   When they come to the State, as yesterday a group
22   did, I was the one -- they wanted the Governor.  He
23   couldn't be here.  Unfortunately, a house member died,
24   and his funeral was there that he had to attend.
25   I did that.  It's nonlegislative in the pure

Senator Kenneth  Lynn Armbrister                    June 8, 2012

---

## 73

1   sense but it's one of the functions that I do is fill in
2   on speeches and those type things.
3       Q.  So, you fill in for the Governor when he can't be
4   somewhere, and sometimes folks are a little disappointed
5   they didn't get Governor Perry; is that correct?
6       A.  Sure.
7       Q.  I wanted to clear up one thing.  I just have one
8   more question on kind of what goes on when a bill is
9   filed by a Legislator.
10      A.  Okay.
11      Q.  We talked about a bill is filed.  You all become
12  aware of it.  There is kind of a secretarial procedure
13  where a policy analysis is done?
14      A.  Right, not in my shop but they -- any bill that's
15  filed -- and in the legislative session, there will be
16  anywhere from 6,500 to 7,000 proposed law changes.  Yes,
17  that's always amazed me.
18      But we get a notice that that's been filed.  I
19  review this, and I say, "Okay.  This needs to go to
20  Reynolds.  This one needs to go to David.  This one
21  needs to go here," and we'll assign it to an analyst who
22  works in another building under another director.
23      Q.  Okay.  And that's a lot of bills, 6,500 to 7,000,
24  correct?
25      A.  (Witness indicated by nodding his head

---

## 75

1   upon that information, you may answer the question as a
2   matter of general procedure.
3       To the extent that you have to rely upon
4   specific instances dealing with legislation, then I
5   instruct you not to answer.
6       A.  Okay.  On the advice of my attorney, I won't
7   answer.
8       Q.  (BY MR. FISHER)  Let me take another try.
9       A.  Okay.
10      Q.  It's just as a general matter, you know, a bill
11  has been filed, a policy analysis has been done, it
12  could be one of these 7,000 bills, and that's a lot of
13  bills, does the Governor weigh in on 7,000 bills?
14      A.  No.  No.
15      Q.  Do you know, for instance, the general priorities
16  of the Governor with regard to legislation?
17      A.  Generally.
18      Q.  And do those general priorities factor into
19  whether you pay attention to a bill or not, one of those
20  7,000 bills?  Do those priorities of the Governor
21  determine whether you are tracking that bill or not?
22      MR. BRISSENDEN:  My instruction to you would
23  be the same as just previously.
24      THE WITNESS:  Right.
25      Q.  (BY MR. FISHER)  And you're not going to answer

---

## 74

1   affirmatively.)
2       Q.  So, those are all assigned out.  Do they all come
3   back to you or do only some come back to you that are of
4   certain interest or is it just -- you don't get -- do
5   you get 7,000 bills back to take a look at?
6       A.  No.  No.  The only time that we get bills back
7   is -- as we like to say, if the system works, the
8   majority of those never pass.
9       If we see movement or nonmovement over an
10  initiative that we support is the only time that they
11  will come back to me.
12      By movement, I'm talking about it's been filed,
13  oh, they've granted a hearing, oh, it's out of
14  committee, oh, it's passed the Senate or the House,
15  whatever.
16      Q.  And if a bill has just merely been filed and a
17  policy analysis has been done, what is the step that's
18  taken to determine whether it has the Governor's support
19  or not?
20      MR. BRISSENDEN:  I'm going to instruct you
21  to the extent you can answer that question without
22  disclosing information or rely upon specific instances
23  of legislation that have been deliberated or where
24  recommendations have been made or opinions have been
25  formulated, to the extent you can do so without relying

---

## 76

1   that on the advice of counsel; is that correct?
2       A.  On the advice of counsel, I'll forego that
3   answer.
4       Q.  Do you advise the Governor on what legislation he
5   should support or not support?
6       A.  No.
7       Q.  Does -- is he provided that advice by someone in
8   the --
9       A.  Well, let me be -- under oath, once a bill
10  reaches us, it goes through a process where several
11  different people have to actually sign off on the bill.
12  So, that could be construed as advice.
13      So, in all honesty, under oath, I guess you could
14  say if I didn't sign off on the bill, I would be
15  advising him not to sign it.  If I did sign off on it, I
16  guess that would be --
17      Q.  And by sign off, is there a form that you fill
18  out or --
19      A.  That's correct.
20      Q.  And you're not looking at all 7,000 bills,
21  correct?
22      A.  No.
23      Q.  So, you're only deciding whether to sign off on a
24  certain subset of those bills; is that correct?
25      A.  Right.

Senator Kenneth  Lynn Armbrister                                June 8, 2012

## 77

1    Q.  And you mentioned earlier that's based upon
2    movement, potentially movement within either the House
3    or the Senate?
4    A.  Sure.  Yes.  Excuse me.
5    Q.  Could it also be based upon the Governor's
6    priorities?
7            MR. BRISSENDEN:  Same instruction as before.
8    A.  On advice of counsel, I won't.
9    Q.  (BY MR. FISHER)  So, you decline to answer based
10   on advice of counsel?
11   A.  I decline, yes.
12   Q.  So, we talked about your role on the actual floor
13   of the House and the Senate and then within the
14   chambers, which you said anyone has access to but I'm
15   assuming you factor in more importantly in that than,
16   for instance, I would.  Are you the point of contact
17   between the Governor's Office and the Legislature when
18   it comes to legislation?
19   A.  I am one of the points of contact.
20   Q.  And who would other points of contact be in the
21   office?
22   A.  I have a person that works with me whose sole
23   function is to help with the Senate and a person that
24   works with me whose sole purpose is the House liaison.
25   House liaison, Senate liaison.

## 78

1    Q.  So, you have a House and Senate liaison.  Do they
2    sit in your office or do they sit in the Senate and
3    House building?
4    A.  They sit in the division.  They are in my
5    division, yeah.
6    Q.  And your division is?
7    A.  It's on the first floor of the Capitol.
8    Q.  The title of your division?
9    A.  Legislative Division.
10   Q.  And you're the head of that division; is that
11   correct?
12   A.  That's correct.
13   Q.  And do you have -- you mentioned a couple -- I
14   know you have a House and Senate liaison.  What are
15   their names?
16   A.  Currently, David Eichler, E I C H L E R, is the
17   Senate liaison.  Jennifer White, common spelling
18   Jennifer, is the House liaison, but she's only been in
19   that position for about two and a half months.
20   Q.  Okay.  And prior to that, who was the --
21   A.  Sarah Floerke, F L O E R K E --
22   Q.  Thank you.
23   A.  -- was the House liaison.
24   Q.  And do you have other staff that you supervise
25   aside from the House and Senate liaisons?

## 79

1    A.  Yes.  I had my administrative assistant.
2    Unfortunately, she passed away in January with cancer.
3    Q.  Sorry to hear that.
4    A.  Thank you.
5        And then Julie Kopycinski, K O P Y C I N S K I, I
6    believe.  And recently as of maybe January, a young man
7    named Travis Richmond, who is kind of a researcher.
8    Q.  Do you have interns?
9    A.  From time to time, we've had interns, yes.  I
10   don't have any currently or didn't during the last
11   session.
12   Q.  Are these staff employed with you full-time,
13   meaning between sessions as well?
14   A.  Yes.
15   Q.  And specifically your staff, who on your staff
16   has worked on election law issues that you know of?
17   A.  I don't know anybody specifically on my staff
18   that's worked with that other than, in general, if it's
19   a bill involving -- if it's going through the Senate, it
20   would be David, and if it was going through the House,
21   it would have been Sarah or now Jennifer.
22   Q.  Okay.  So, if a voter identification bill or
23   photo identification bill was going through the Senate,
24   David would have been the staffer that was assigned that
25   bill as his responsibility; is that correct?

## 80

1    A.  No.  No.  The analysts have control of the bill.
2    We -- our role is more interpersonal rather than an
3    actual bill.
4    Q.  So, what do the liaisons do for you?
5    A.  They do more for the members than they do
6    actually for me.  In that role that we have -- if I
7    happen to be on the House floor, one of them has always
8    got a question or -- in general, they've got a request,
9    "Hey, can you get me in to see the Governor in two
10   weeks?"
11       "Yeah, we'll put you down and see what his
12   schedule looks like," that kind of thing.
13   Q.  So, it's fair to say -- you know, I've
14   characterized these as the gatekeeper and gate opener
15   role.  Is it fair to say that your liaisons are kind of
16   gate openers, people who want to see the Governor that
17   are in the Legislature?
18   A.  Sure.
19   Q.  How often do you communicate with Legislators, or
20   members of your staff?  So now we've kind of identified
21   the universe of your staff.  So, how often do you or the
22   members you just mentioned in your staff communicate
23   with the Legislators, let's say during session first?
24   A.  Oh, during session?
25   Q.  Yes.

81

1   A.  Probably there's not a day that doesn't go by
2   that I don't have a conversation with 1 of the 181 of
3   them.
4   Q.  You mentioned conversation, is this in-person
5   communication mostly?
6   A.  Uh-huh.
7   Q.  Do you do E-mails at all with members of the
8   Legislature?
9   A.  I would have to say I might have over the time
10  but it's not a current deal.  Every one of them has got
11  my cell phone number and --
12  Q.  So --
13  A.  -- I'm there every day.  So, they know where to
14  find me.
15  Q.  Face-to-face conversations is one way?
16  A.  Uh-huh.  Telephone.
17  Q.  Telephone conversations are another way --
18  A.  Right.
19  Q.  -- that you could speak with Legislators?
20  A.  Yes.
21  Q.  Do you do E-mail yourself?
22  A.  I do E-mails but it's not a way that a member
23  during a legislative session uses to correspond with me
24  Q.  Would members of your staff E-mail Legislators?
25  A.  They could.

83

1   courtesy, we alert members if the Governor is going to
2   be in Tyler, Texas, and so, I will call the House member
3   and the Senate member from Tyler and say, "The Governor
4   is going to be at this event in your town on this date
5   and time.  If you care to go, just give me a heads up."
6   So, those type calls.
7   Q.  So, you would alert folks if the Governor is
8   going to be in their area?
9   A.  Yeah.
10  Q.  During session, how do members generally learn
11  about the Governor's priorities or agenda?
12  MR. BRISSENDEN:  I would object to the
13  extent that the question calls for speculation as to how
14  those members learn.
15  To the extent you can answer that question
16  as a matter of general procedure, you may do so but to
17  the extent that question requires you to disclose
18  communication that you've had with Legislators, with
19  Legislators' staff, among your own staff, with state
20  agencies or Texas Legislative Council, I would instruct
21  you not to answer.
22  A.  Okay.  In general, the Governor is required to
23  present to a Joint Session of the Legislature early in
24  the session.  I can't give you the exact date because
25  it, you know, ebbs and flows with whatever the calendar

82

1   Q.  Would they E-mail Legislators' staff potentially?
2   A.  They could.  I don't know.
3   Q.  And out of session, is there a difference in the
4   level of communication between --
5   A.  Oh, sure.  They are not here but -- instead of
6   every single day, it may be -- well, this week, I talked
7   to one by telephone.  When I came in this morning to the
8   Capitol, there were two House members fixing to go to
9   the Democratic convention and stopped and we visited,
10  just chitchat.
11  And I talked to one about a lady I know from
12  Victoria whose daughter died of a particular illness is
13  going to have a walk here and needed an Austin
14  Legislator if she would kick it off.  And I talked to
15  her because she's also a nurse, and she said she would
16  be happy to kick off this event, you know, things like
17  that.
18  Q.  Okay.  So --
19  A.  That was this morning at 8:00 o'clock, but yeah,
20  the level of contact goes way down during the interim.
21  Q.  And given that Legislators are not here, do you
22  have to do more telephone communications rather than
23  face-to-face?
24  A.  Yeah, they will call me mostly.  Mine when I call
25  them now is if the Governor is going -- as a matter of

84

1   is for that particular year.
2   He's required to address the Joint Session with a
3   State of the State speech, and usually that is the
4   format for -- the official format for the Governor
5   laying out his vision and initiatives.
6   The Governor, like any political animal, there is
7   a bully pulpit and, generally, that's done by a variety
8   of means with -- but those are all public events.  They
9   are press releases or --
10  Q.  (BY MR. FISHER)  Okay.  So, the other way -- by
11  bully pulpit, I think you mean that he might give
12  speeches --
13  A.  Yeah.
14  Q.  -- he might write an editorial or other ways to
15  get folks --
16  A.  He doesn't write editorials but they're all press
17  events.  So, they're public events where he plays out
18  his positions and initiatives.
19  Q.  So, earlier when we talked about initiatives a
20  few minutes ago, there are some initiatives you said
21  that the Governor takes on and has drafted.
22  A.  Uh-huh.
23  Q.  And so, how would Legislators find out about
24  those initiatives?  Because, obviously, as you mentioned
25  earlier, as the Governor, you can't bring legislation

Senator Kenneth  Lynn Armbrister                           June 8, 2012

---

### 85

1  into the House or Senate.  So, how would a House or
2  Senate member know about those initiatives?
3      MR. BRISSENDEN:  Same objection and same
4  instruction.
5      A.  In general, if the initiative takes a statutory
6  change, they will know as soon as I show up and ask them
7  would they carry this piece of legislation.
8      Q.  (BY MR. FISHER)  So, in general, it's fair to say
9  that the Governor, through you or a member of your
10  staff, would ask House or Senate members to take up an
11  initiative of his?
12      A.  That's correct.
13      Q.  All right.  We've been going at it for a little
14  while here, so, let's take a quick break.  I do want to
15  be respectful of your time.
16      A.  I'm with you guys, whatever you all need.
17      Q.  We'll do ten minutes.
18      A.  I blocked out the whole month for you, save the
19  19th.
20      Q.  I can't stay that long.
21          (Short recess.)
22      Q.  (BY MR. FISHER)  We'll get started again.
23      A.  I need to amend one of your background questions.
24      Q.  Sure.  And let me just mention at any time -- and
25  I will ask you a question at the end --

---

### 86

1      A.  Okay.
2      Q.  -- but at any time that you have something else
3  that you want to say about a question that was
4  previously asked, just let me know.
5      A.  Okay.  This is on the depositions.  I don't know
6  why I didn't think of it before.
7          In 1993, I passed -- again, I don't want it to
8  sound like me, me, me but it was the keynote piece of
9  legislation having to do with the Edwards Aquifer
10  Authority, which was a water supply for the City of San
11  Antonio and points south.
12          Because in that bill we had removed an existing
13  groundwater board and replaced it with a new board, it
14  was a Department of Justice issue on the Voter Rights
15  Act.
16      Q.  Okay.
17      A.  The board -- and so, I was deposed on that
18  particular issue.  And the law stood because I had
19  removed or gotten rid of an old board that had at large
20  districts and replaced it with a single member district
21  board.
22      Q.  And so, we'll skip ahead then.  I was --
23      A.  I just wanted to give you that input.  I don't
24  know why I didn't think of that when you were asking me
25  the depo questions before.

---

### 87

1      Q.  And you were deposed in that case?
2      A.  Yes, I was, in the federal courthouse in Victoria
3  by a gentleman and lady from the Department of Justice
4      Q.  And so, the case involved a school district that
5  had moved from at large to single member or the other
6  way around?
7      A.  Water district, groundwater district.
8      Q.  And it moved from at large to single member
9  districts; is that correct?
10      A.  That's right.  That was part of it.  That wasn't
11  the whole issue.  The whole issue was a result of a
12  federal endangered species lawsuit.
13          The region that this aquifer authority covered --
14  and the federal judge, Judge Bunton, allowed the state
15  to come up with a new regulatory scheme or policy over
16  that six-county region.  And I was the one carrying that
17  legislation.
18          And part of -- we realized that the old authority
19  was not getting the job done.  They weren't protecting
20  the endangered species, and so, we replaced it, as one
21  of the sections in a multi-page regulatory bill, with
22  this new authority.  By authority, I'm talking about the
23  board.
24          And when we designed that, we designed it as
25  single member districts rather than at large.  And so,

---

### 88

1  the deposition was about the formation -- the section of
2  the bill, the formation of that.  You've taken an old
3  elected board out and replaced it with a new elected
4  board but they liked the configuration that we had done
5  so, it passed.
6      Q.  And was this a case?
7      A.  Yes.  There was -- some of the former board
8  members filed under the Voters Right Act that we were
9  denying voters.
10          Well, the Court then ruled, "No, you actually
11  enhance voters with single member districts rather than
12  at large positions."
13      Q.  And do you remember the name of the case, the
14  name of the members?
15      A.  I don't remember the name of the case.  The bill
16  was Senate Bill 1477 from the 93rd -- 1993 Legislature,
17  whatever legislative session that was.
18      Q.  Okay.  So, you mentioned the Voting Rights Act
19  and, I assume, based upon that case and any other
20  context you've mentioned as well, the State Affairs
21  Committee, law enforcement, are you familiar with
22  Section 5 of the Voting Rights Act?
23      MR. BRISSENDEN:  I'm going to instruct you
24  to the extent you can answer that question without
25  disclosing analysis and thoughts and work that you've

Senator Kenneth  Lynn Armbrister                June 8, 2012

---

## 89

1    done in regard to particular pieces of legislation as
2    part of your legislative experience, you may answer.
3           But to the extent you cannot answer that
4    question without relying on that information, then I
5    instruct you not to answer.
6    A.  I would have to look at it to see if I was -- I
7    may be familiar with concepts but I --
8    Q.  (BY MR. FISHER)  Okay.
9    A.  -- the legal aspects, I'm --
10   Q.  Fair enough.  Are you familiar with the fact that
11   Texas -- and you mentioned that in the context of the
12   '93 suit, there was a change made to the election of the
13   water district members.
14   A.  Right.
15   Q.  Are you familiar that to make those kind of
16   changes, it has to go through a preclearance process
17   with the Justice Department?
18   A.  I've always heard that, yes.  I never knew why
19   but I've always heard that.
20   Q.  Do you believe that compliance with the Voting
21   Rights Act is an important goal?
22          MR. BRISSENDEN:  Objection.  Vague.
23          To the extent that you have knowledge or
24   information that you have -- that's responsive to that
25   question that you have learned as part of your process

---

## 90

1    and experience as a Legislator working and developing
2    thoughts, opinions, mental impressions, analysis based
3    on the work that you've done regarding pieces of
4    legislation, I'd instruct you not to answer.
5           To the extent that you have knowledge,
6    thoughts about the Voters Right Act separate and apart
7    from your work in the Legislature or in the Governor's
8    Office, you may answer.
9    A.  Repeat the question again.
10   Q.  (BY MR. FISHER)  Sure.  The question was do you
11   believe that compliance -- and we talked about the
12   Voting Rights Act.  You mentioned it being brought up in
13   the context of the case that you were involved in.  Do
14   you believe that compliance with the Voters Right Act is
15   important?
16          MR. BRISSENDEN:  Same objection and same
17   instruction.
18   A.  If I'm -- can I have a side-bar?  Is that what
19   you call it?  Can I have a conversation with my
20   attorney?
21   Q.  (BY MR. FISHER)  If it's about privilege issues,
22   then yes.  If it doesn't concern issues of privilege,
23   related to privilege, then I would ask you to answer the
24   question.
25          MR. BRISSENDEN:  Do you need a break?  Do

---

## 91

1    you need a side-bar to discuss privilege?
2           THE WITNESS:  Yeah.  I'm not real sure.
3           MR. FISHER:  We'll go off the record.
4           (Short recess.)
5    A.  Thank you for that.  My answer is while I was an
6    elected official, I had to take an oath to support,
7    defend, protect Constitution laws of this state and of
8    the United States.
9           My opinion as a U.S. citizen is we're obligated
10   to follow all of the laws -- whether we agree or not, we
11   are obligated to follow all the laws of the land at the
12   time.
13   Q.  (BY MR. FISHER)  And so, Section 5 is the law of
14   the land now and your understanding of the Voters Right
15   Act -- I know you're not familiar maybe with the
16   specific provisions but the Voting Rights Act is the law
17   of the land now?
18   A.  That's correct.
19   Q.  So, could you describe, as a general matter, what
20   steps either you or your staff take in the Governor's
21   Office to ensure that bills comply with the law of the
22   land?
23          MR. BRISSENDEN:  I believe that question
24   would require you to divulge your opinions,
25   recommendations and deliberations that you have

---

## 92

1    undertaken as a part of the Governor's Office, the
2    Governor's decisions and policies.
3           Also, to the extent that it invokes your
4    thoughts and opinions and mental impressions and
5    analysis about legislation and its process of having
6    legislation precleared, specifically SB 14, I would
7    instruct you not to answer.
8    A.  I will follow my attorney's advice, and if you
9    want to clarify.
10   Q.  (BY MR. FISHER)  So, you're not answering that
11   question on the advice of your counsel, correct?
12   A.  That's correct.
13   Q.  Are you aware of any communications in the
14   Governor's Office regarding compliance with the Voting
15   Rights Act?
16   A.  No.
17   Q.  Does the Texas Department of State have any
18   involvement in the proposal or enactment of legislation
19   to your knowledge?
20   A.  Secretary of State's Office?
21   Q.  Secretary of State's Office, correct.
22   A.  Ask it again.
23   Q.  Do they have any involvement in the proposal or
24   enactment of laws in Texas?
25          MR. BRISSENDEN:  Objection.  Compound.

## 93

1     To the extent that you can answer that
2  question as a general matter, you may do so.
3     To the extent that requires you to disclose
4  communications you've had with your staff and with state
5  agencies, including the Secretary of State's office, I
6  would instruct you not to answer.
7     A. Okay. In general, I have been aware of a bill or
8  a set of bills that have been requested by the Secretary
9  of State's office having to do generally with logistic
10 practices, corporate filing sections.
11     There was one last session involving sports
12 agents and those type but anything outside of the
13 logistics of the operation of the office, they don't
14 have any role.
15     Q. (BY MR. FISHER) You mentioned the Secretary of
16 State potentially requesting bills.
17     A. Uh-huh.
18     Q. Would those requests go to the Governor's Office
19 or would those requests go to Legislators?
20     A. Legislators.
21     Q. So, the Governor's Office wouldn't have any role
22 in -- I guess it would be an initiative -- proposing an
23 initiative based upon the needs of the Texas Secretary
24 of State's Office?
25     MR. BRISSENDEN: My instruction to you would

## 94

1  be the same as before.
2     A. In general, no.
3     Q. (BY MR. FISHER) Texas also has a Department of
4  Protective Services, correct? Is that the correct
5  terminology?
6     A. Let's see. Is that Regulatory Protective -- the
7  children?
8     Q. DPS.
9     A. Oh, Department of Public Safety.
10     Q. Public Safety.
11     A. Yes. Yes. We have a DFPS that I was getting
12 confused about. That's family -- children, used to be
13 called Child Welfare.
14     Q. Thank you for the clarification on the
15 terminology.
16     So, would DPS, in a similar vein as the Secretary
17 of State's Office, be involved in legislation involving
18 license requirements, driver's license requirements,
19 anything that falls under their general jurisdiction?
20     MR. BRISSENDEN: Same instruction.
21     A. I'm -- generally, if they did, they would go to
22 the Legislature. They wouldn't come to us.
23     Q. (BY MR. FISHER) And is the Department of Vital
24 Statistics, is that another agency within the Texas
25 government?

## 95

1     A. I believe that's under the Health Department.
2  You're talking about births and deaths?
3     Q. Correct.
4     A. I think that's under the Health Department.
5     Q. So, would the Health Department, similarly, come
6  to the Governor's Office with any proposals for
7  legislation?
8     MR. BRISSENDEN: Same instruction.
9     A. Generally, no, they would go to the Legislature.
10     Q. (BY MR. FISHER) Are you aware that anyone in the
11 Secretary of State's Office has asked the Governor to
12 include initiatives in his public speeches, such as
13 State of the State and other the public forums that you
14 mentioned earlier?
15     A. I'm not aware.
16     Q. So, would it be fair to characterize the State of
17 the State speech and you mentioned no editorials but the
18 other speeches and other public appearance that you
19 characterized as bully pulpit, is it fair to
20 characterize that as the Governor's legislative agenda
21 for the year, or session? I know it's every other year.
22     A. That would be a -- that would be a format that he
23 uses. The official format is the State of the State.
24     Q. Is it fair to say that the Governor has a
25 legislative agenda for each session?

## 96

1     A. It would be fair to say that.
2     Q. And who would be involved in preparing that
3  legislative agenda within the Governor's Office broadly,
4  not just your staff?
5     A. The entire office usually participates in that,
6  all the divisions, other than IT. I mean, they may put
7  it on the web site but they don't formulate policy.
8     Q. And specifically with regard to certain subject
9  areas, would certain subject areas be developed by
10 certain folks in the office?
11     A. The analysts, our Budget Planning & Policy
12 Division.
13     Q. So, the Budget Planning & Policy Division would
14 handle the legislative agenda; is that correct?
15     A. They would be charged with bringing all the
16 information to the table, not necessarily handling the
17 agenda.
18     Q. And who acts on that information or who handles
19 the agenda?
20     A. That's when -- once a decision is made that it
21 would take a statutory change to effect this initiative,
22 that's when I go visit with members to see if they will
23 have a bill drafted.
24     Q. And just for clarification, by "statutory change"
25 you mean something --

Senator  Kenneth  Lynn Armbrister                      June 8, 2012

## 97

1    A. As opposed to a rule.
2    Q. Okay. So --
3    A. A rule, an agency can change protocol by just
4    changing their rules. And there's a process you follow
5    to change their rules. It's got to be published and
6    have hearings and all of that but if it requires a law
7    change, a statute change, then we have to have a bill
8    drafted.
9    Q. And that would also encompass something that's
10   not a change, meaning new legislation as well; is that
11   correct?
12   A. That's right. Right. Change could be amending
13   an existing law or brand new law is a change.
14   Q. And are you familiar with the American
15   Legislative Exchange Council, known as ALEC?
16   A. Yes.
17   Q. And can you generally describe for me what it is?
18   A. There are probably a myriad of associations but
19   the three that is most often attended by members of the
20   Texas Legislature when I was in the Legislature was ALEC
21   or American Legislative Exchange Council, the NCSL,
22   National Conference of State Legislators, and then
23   there's a subset of that, the SLC, Southern Legislative
24   Conference. And those three are the ones commonly
25   attended, their conferences, by various members of the

## 98

1    Legislature.
2    Q. Are you familiar also with a group called Safe
3    Texas, Safe and Fair Elections Texas?
4    A. No.
5    Q. So, going back to the three that you did mention,
6    ALEC, NCSL and SLC --
7    A. Uh-huh.
8    Q. -- as a member of -- or as the Legislative
9    Director and a member of the Governor's Office, are
10   those things that you would attend now?
11   A. I could but I haven't.
12   Q. Would members of the Governor's staff attend
13   those type of meetings or events?
14   A. We have one gentleman that attends regularly a
15   subset of, I believe, NCSL Budget Writers. And from
16   time to time, there may be some analysts that have
17   attended various conferences of NCSL or SLC or ALEC but
18   they don't go through me to sign off to attend. That
19   involves travel and hotels and expenses. I don't do
20   that part of it.
21   Q. If we could just take one step back and let me
22   just ask you what your knowledge or what your
23   understanding is about the role of ALEC?
24   A. They are a group that's available to State
25   Legislators. I'm sure they have staff that formulate

## 99

1    general policy that if a House member or Senate member
2    said, you know, "I'm thinking about changing daylight
3    savings time," and he would call up there and say, "Do
4    you all have any proposals or have you all researched
5    this?" It's just a resource really. They act as a
6    resource to -- for members if they want to use them
7    to -- under the guise of why reinvent the wheel if
8    somebody has already invented it, what have you all
9    done.
10   Q. You mentioned members and Legislators. Is this
11   organization catered to Legislators and not to Governors
12   or members of the Governor's staff?
13   A. Right. Governors are usually either the NGA,
14   National Governors Association, that we're not a member
15   of, or the RGA, Republican Governors Association.
16   Governor Perry was Chair of that.
17       And I'm sure there's a DGA, Democratic Governors
18   Association but I'm not familiar. I know Ann Richards,
19   when she was Governor, was a member of that.
20       But DGA and NGA have kind of coalesced into one
21   group because that's everybody, the Rs and Ds.
22   Q. The RGA, what role do they provide for the
23   Governor?
24       MR. BRISSENDEN: I'm going to instruct you
25   to the extent --

## 100

1    A. I don't know. I don't go to those.
2    Q. (BY MR. FISHER) Are you aware of either ALEC,
3    NCSL or SLC providing any technical assistance to the
4    Governor with regard to his initiatives and legislation?
5    A. No.
6    Q. You mentioned you don't know about RGA but are
7    you aware of RGA providing any technical assistance to
8    the Governor with regard to his initiatives or the
9    legislative agenda?
10       MR. BRISSENDEN: I'm going to instruct you
11   to the extent that --
12   A. I don't know.
13       MR. BRISSENDEN: -- you have information
14   that would be privileged not to disclose that.
15   A. I don't.
16   Q. (BY MR. FISHER) Your answer is you don't know?
17   A. I don't know.
18   Q. And you haven't personally attended any RGA
19   conferences; is that correct?
20   A. I went to one RGA conference on health. I look
21   at her, she used to be our go-to person on health
22   issues.
23       When her predecessor was there, I attended a
24   morning session at Reynolds Plantation in Georgia and
25   played golf in the afternoon.

## 105

1  Q. And where is the new office?  How far would that
2  be?
3  A. I think they've moved it out -- I'm not sure
4  where they moved it but I guess you would go to the DPS
5  headquarters.  They are on Lamar Street, which would be,
6  from the Capitol, as the crow flies, we say, maybe four
7  miles.
8     I could have done it in -- in fact, my wife did
9  it in Round Rock, and that's about two miles from where
10  we live.  They have a substation there.  You can go in
11  and get your driver's license.
12  Q. And do you know how long it took you to take care
13  of the change in address on your driver's license?
14  A. The effective change was immediate.  You get a
15  temporary piece of paper, and you still have your old
16  one with the old address but you have a piece of paper.
17     And then it took about -- I think I got it in the
18  mail four days later maybe.
19  Q. Did the piece of paper have your photo
20  identification on it?
21  A. No.  It's just a receipt.
22  Q. So, while you were waiting for the license with
23  the renewed address to come, you didn't have an
24  address -- you didn't have a license with a photo
25  identification that reflected your current address; is

## 106

1  that correct?
2  A. That's correct.
3  Q. Were you born in Texas?
4  A. Yes.
5  Q. Do you have a copy of your birth certificate?
6  A. Not with me but I do have a copy of it.
7  Q. And do you know where you would go to get a copy
8  if you didn't have yours any more, if, for instance,
9  between Victoria and Round Rock, the movers left the box
10  somewhere?
11  A. Yes, I can go online and get it from the Health
12  Department.
13  Q. And do you know how much that would cost?
14  A. No, I don't.
15  Q. Do you know how long that would take to get?
16  A. No, I don't.
17  Q. And did you vote a couple of weeks ago in the
18  Texas primary?
19  A. Yes, I did.
20  Q. And how far was the polling place from your home
21  or work, wherever you go?
22  A. From my home, mile and a half, two miles.
23  Q. And did you vote in person?
24  A. Yes.
25  Q. Do you prefer to vote in person?

## 107

1  A. I usually do, yes.
2  Q. Have you ever voted by absentee?
3  A. No.  Well, under the old system, I did a couple
4  of times in city elections because we were in session
5  and I couldn't get back to Victoria when I lived there.
6     So, I would request an absentee ballot be mailed
7  to me, and I would fill it out and mail it back in.  I
8  did that a couple of times over the years but it was for
9  city elections or local elections when they came up
10  during the session.
11  Q. I know you've been a candidate numerous, numerous
12  times, so, that might preclude this happening but do you
13  have any experience related to election administration,
14  for instance, working as a poll worker, as a poll
15  watcher, anything of that sort?
16  A. No.
17  Q. Have you, while voting, ever witnessed someone
18  trying to impersonate another voter in the polling
19  place?
20  A. I have not witnessed that.
21  Q. Have you ever witnessed someone other than a U.S.
22  citizen trying to vote in a polling place?
23  A. I have not.
24  Q. And the system for absentee ballots that you
25  mentioned that went through a change, can you just tell

## 108

1  me what it was previously and what it is now?
2  A. Yes.  Used to, before we had early voting, all we
3  had was absentee voting.  And once we initiated early
4  voting, then it pretty much did away with the reason
5  that you do absentee, other than folks that cannot get
6  to the polls.  Nursing home, those type people, we still
7  have that available to them but basically when we
8  changed the law -- and I can't remember when it was.  It
9  was back several years ago -- that allowed you a certain
10  period of time for early voting.  The intent was if you
11  knew you were going to be out of town or whatever, which
12  everybody is eligible for early voting.  You didn't have
13  to give a reason.
14  Q. I assume that doesn't apply to folks in the
15  military or overseas for some reason?
16  A. Yes, they have a different -- HAVA, is it?
17  Q. There's a federal rule that covers that?
18  A. Right.
19  Q. Another acronym?
20  A. Right.
21  Q. You said a few years ago, was this during your
22  time in the Governor's office or were you still in the
23  Senate?
24  A. No, I was in the Senate when that changed.
25  Q. Were you involved in that legislation at all in

## 109

1  the Senate?
2  A. No.
3  Q. Did you vote on it?
4  A. I'm sure I probably did if it was in the Senate,
5  yeah.
6  Q. Do you remember which way you voted on that
7  legislation?
8  A. I would have probably voted for it.
9  Q. Do you remember the bill number or anything?
10  A. (Witness indicated by shaking his head
11  negatively.)
12  Q. No?
13  A. No.  Excuse me.  No.
14  Q. So, we've talked a little bit about Texas'
15  current voting system.  We just talked about a change
16  that it went through.  What is your understanding of the
17  current system in Texas for verifying the identity of a
18  voter?
19  A. When we vote, I take my voter registration card
20  and present that to the man or lady that's manning the
21  desk, and then they hand me a ballot -- or they hand
22  me -- they walk me over to an electronic carousel and we
23  vote electronically now.
24  If I don't have my card -- and a couple of times
25  I've met my wife.  She said, "Hey, we need to vote

## 110

1  before 7:00 o'clock."  And I will give them my name, and
2  I was asked for my ID, and I would give them my driver's
3  license.
4  Q. So, you either present a voter registration card
5  or a license; is that correct?
6  A. Right.
7  Q. And has that been your experience in all of the
8  elections you've voted in?
9  A. That I've had to do it that way, yes.
10  Q. And that's the way you voted a couple of weeks
11  ago in the primary?
12  A. I had my voter registration card, uh-huh.
13  Q. Are you aware of any problems with the current
14  system in Texas?
15  MR. BRISSENDEN:  Objection.  Vague.
16  To the extent that you have knowledge or
17  information that is responsive to that question and that
18  question requires you to divulge that knowledge in
19  connection with your work on legislation pertaining to
20  voter ID legislation, including SB 14, your thoughts,
21  opinions, mental impressions and analysis, I would
22  instruct you not to answer the question.
23  To the extent that you have information that
24  is contained as a part of the public record, you may
25  answer.

## 111

1  A. Okay.  And tell me your question again.
2  Q. (BY MR. FISHER)  Yes.  And I'll rephrase slightly
3  to do away with the vagueness.
4  But are you aware of any problems with Texas'
5  current system for verifying the identity of a voter
6  when voting, which we've just described as voter
7  registration card or, in the absence of that, some other
8  form of ID, which you said was a license?
9  MR. BRISSENDEN:  My instruction to you would
10  be the same.
11  THE WITNESS:  Okay.  And that instruction is
12  not to answer?
13  MR. BRISSENDEN:  To the extent that you can
14  answer the question based on information that's in the
15  public record --
16  THE WITNESS:  Oh, okay.
17  MR. BRISSENDEN:  -- testimony, evidence that
18  was presented in the public record, you may --
19  A. I don't have any information in the public
20  record.
21  Q. (BY MR. FISHER)  Let's keep in mind as we move
22  forward, I know SB 14 was mentioned, you were not in the
23  Texas Legislature when SB 14 was passed; is that
24  correct?
25  A. That's correct.

## 112

1  Q. When did you first hear of any support for
2  enacting photo identification for voting in Texas?
3  MR. BRISSENDEN:  I'm sorry, could you read
4  the question back?
5  (Whereupon, the requested testimony was read
6  back as follows:
7  QUESTION:  When did you first hear of any support
8  for enacting photo identification for voting in
9  Texas?)
10  MR. BRISSENDEN:  Again, to the extent that
11  you have knowledge that's contained in the public
12  record --
13  THE WITNESS:  In the public record?
14  MR. BRISSENDEN:  -- as a source of
15  information, you may disclose that.
16  To the extent that you have knowledge or
17  information that is a part of your work in connection
18  with legislation, particularly voter ID bills and SB 14,
19  do not disclose that information.
20  A. Okay.  In the public record, the first time I was
21  aware of a bill was in 19 -- excuse me -- 2009.
22  Q. (BY MR. FISHER)  So, a quick question.  Just back
23  up for a second on your understanding of Texas' current
24  system for verifying the identity of a voter.  If you
25  didn't have that registration card, is it your

Senator Kenneth  Lynn Armbrister                           June 8, 2012

---

113

1    understanding you could present a nonphoto ID, so, a
2    utility bill, for instance, to verify your
3    identification as well?
4         A. I don't know what they have to do.  I always
5    just -- as a matter of course, I walk in and put it down
6    and they take it.  I don't know what's actually required
7    but I use it because it's easy to pull out and hand it
8    to them and say, "Here's who I am."
9         Q. So, it's fair to say the election worker doesn't
10   ask you for your driver's license, you just produce it
11   and --
12        A. I just produced it.
13        Q. So, a similar question.  We talked about in the
14   ground rules portion the difference between voter ID and
15   photo ID.  And I'll ask you the same question.
16            When did you first hear about support for
17   enacting a voter ID identification requirement in Texas?
18            MR. BRISSENDEN: My instruction would be the
19   same to you.  To the extent you have information that's
20   contained in the public record, you may disclose that.
21            To the extent you have information that's
22   not in the public record, that's part of your work on
23   legislation that you developed or gained, I instruct you
24   not to answer.
25        A. Okay.  Public records would be the bill that was

---

114

1    filed in the 2009 session.
2         Q. (BY MR. FISHER)  And what bill was that, Senator?
3         A. I don't know what the number was.  It was a photo
4    ID, voter ID.
5         Q. Do you recall supporting any voter ID or photo ID
6    measures while you were in the Texas Legislature?
7         A. When I was in the Legislature, I don't recall.
8         Q. Do you recall ever voting on either photo ID or
9    voter ID legislation?
10        A. No.
11        Q. All right.  I'm going to hand you what's been
12   previously marked as Exhibit 44.  And so, what this is
13   is a copy of a bill.  You notice in the upper right-hand
14   corner it says HB No. 1706?
15        A. Uh-huh.
16        Q. I'll let you take a look at this prior to asking
17   you any questions about it.
18            Did you have a chance to take a look?
19        A. Okay.
20        Q. So, just for clarification purposes -- and we'll
21   make this easier.  I can walk and chew gum at the same
22   time.  So, I'll introduce as well -- I'll give you
23   Exhibit 191.
24            (Exhibit 191 marked.)
25        Q. (BY MR. FISHER)  And Exhibit 191 is a three-page

---

115

1    document.  You'll see in the upper left-hand corner
2    Texas Legislature Online History, Bill HB 1706.  And so,
3    to the extent that that helps you with this piece of
4    legislation, do you recognize Exhibit 191 and Exhibit
5    44?
6         A. Is this 44?
7         Q. Yes.  The copy of the legislation is Exhibit 44,
8    and 191 is the Texas Legislature Online History I just
9    handed you.
10        A. I recognize it as a bill.  I don't -- whether
11   it's final or as filed or whatever, I can't recognize
12   that.  This is the first time I've seen this but I'm
13   familiar with the Texas Legislature Online and their
14   format.
15            MR. BRISSENDEN: So our record is clear and
16   clean, can we have the exhibit here marked as
17   Exhibit 44?
18            MR. FISHER: Yes.
19            MR. BRISSENDEN: Great.  Thank you.
20        Q. (BY MR. FISHER) So, Senator, were you in the
21   Senate in 2005?  Is that correct?
22        A. That is correct.
23        Q. And based upon the bill history, does it appear
24   that HB 1706 came to the Senate in 2005?  And I direct
25   you to probably the first page of that Online History

---

116

1    where you'll see the --
2         A. Okay.  Yeah, it looks like it was.  It was
3    referred to State Affairs.
4         Q. And were you on the State Affairs Committee in
5    2005 in the Senate?
6         A. I'll have to check.  I think I was.  I wasn't
7    Chair of it by then.  I had moved over to Chair of
8    Natural Resources.
9         Q. So, as a member -- if you were a member of the
10   State Affairs Committee, would this have been a bill
11   that would have come to your committee and been
12   considered by it based on the Online history in
13   Exhibit 191?
14        A. If the Chairman would have granted a hearing, it
15   would have come to the full committee.  We wouldn't have
16   seen it until the Chair decides to grant a hearing.
17   According to this history, it was just referred.
18        Q. What does referred mean?
19        A. Bills are required three readings, if you will.
20   The first time a bill -- the first reading is the
21   Secretary of the Senate says, "House Bill 1706 referred
22   to the Senate Committee on State Affairs."  That's the
23   first reading.
24            Then it's referred to the committee, and the
25   committee Chairman makes a determination whether to

Senator Kenneth  Lynn Armbrister                    June 8, 2012

---

### 117

1   grant a hearing on that particular bill.  If the Chair
2   decides, "I'm not giving it a hearing," it's done, it's
3   dead, it's gone.
4       Q.  And based on the Online History here, what does
5   it appear?
6       A.  It appears it was just referred.  There was no
7   committee action, so, we didn't have a hearing on it,
8   according to this.
9       Q.  And --
10      A.  If you'll look in the House, what I'm talking
11  about, it was filed February 28th of '05, read for the
12  first time, referred to the Elections Committee,
13  referred directly to subcommittee by Chair, that means
14  the Chairman decided to give it a hearing but
15  immediately referred it to that subcommittee.
16          Then they scheduled a public hearing of the
17  subcommittee.  So, that's an indication that the bill --
18  there was some action other than just arriving, and you
19  can read on and on and on.
20          The way this reads in this History, it was
21  received from the House 05-04.  It was -- has the first
22  reading.
23          And when that occurs, the Secretary of the Senate
24  has usually got a stack of bills, and she's just going
25  through, "House Bill 1706 referred to State Affairs.

---

### 118

1   House Bill 2105 referred to" -- it's just boom, boom,
2   machine gun.
3           And then when you see here, "Referred to State
4   Affairs," that means there was no action taken by the
5   committee.  So, other than the Chairman and staff
6   looking at it and saying, "I'm not giving that a
7   hearing," that's all that happened.
8       Q.  To come to that conclusion, you've compared
9   what's on the third page that indicates the actions of
10  the House to what's on the first page of the exhibit
11  indicating the actions of the Senate?
12      A.  Right.
13      Q.  So, if I could direct your attention back to
14  Exhibit 44, which was the actual bill language.
15      A.  Okay.
16      Q.  Are you testifying here today that you are not
17  familiar with the bill or not familiar with the
18  language?  Is that correct?
19      A.  That's correct.
20      Q.  Just backing up for a second, do you have any
21  knowledge based on the public record as to why the
22  Online History from the Senate State Affairs Committee
23  reads as it does, meaning read for the first time,
24  referred and then no further action?
25          MR. BRISSENDEN:  Again, we're limiting that

---

### 119

1   to what is in the public record.
2       A.  Under the public record, it means no action was
3   taken by the Senate.
4       Q.  (BY MR. FISHER)  So, returning back to
5   Exhibit 44 -- and, like I said, I'm going to walk and
6   chew gum at the same time here with two exhibits -- are
7   you aware of the forms of allowable voter ID under HB
8   1706?
9       A.  I'm not familiar.  I could read.
10      Q.  And if I could direct your attention to Page 4
11  under Documentation of Proof of Identification.
12      A.  Okay.
13      Q.  And that's 63.0101.
14      A.  Okay.
15      Q.  And so, if you could just take a look at those
16  forms of identification for me.
17      A.  Okay.
18      Q.  And I believe that goes until Page 7.
19      A.  Right.  And if it helps you, when you're reading
20  Texas proposals, anything not underlined is existing
21  language in law.  Anything underlined would be proposed
22  new language.
23      Q.  And you did mention --
24      A.  If that helps.
25      Q.  You did mention the form of the bill earlier.

---

### 120

1   The bills we're using -- we'll use some more -- I
2   believe are the engrossed versions.  We've checked that
3   but we can always go back to the exhibit and verify
4   that.
5       A.  Okay.
6       Q.  So, the language you're looking at would be that
7   version.
8       A.  Okay.  Engrossed meaning the language that came
9   over from the House?
10      Q.  Correct.
11      A.  Okay.  All right.  Okay.
12      Q.  So, could you describe the types of
13  identification that were permissible under this version
14  of the bill?
15          And I can be more specific.
16          Does it include photo identification and nonphoto
17  identification?
18      A.  It does include both.
19      Q.  And as far as the driver's license, the
20  expiration date of the driver's license in A 1, what is
21  that?
22      A.  Wait a minute.  That has not expired or that
23  expired no earlier than two years before the date of
24  presentation.
25      Q.  Okay.  And under 3, does it allow -- that would

## 121

1  be the next page -- a valid employee identification
2  card, is that correct, that contains the person's
3  photograph?
4      A. Yes.  Uh-huh.
5      Q. And does it allow in 6 for student identification
6  cards issued by either public or private institutions of
7  higher education?
8      A. It does.
9      Q. And does it allow for identification cards issued
10  by a Texas State agency?  And I direct your attention to
11  8.
12      A. It does.
13      Q. And does it allow for photo identification cards
14  issued by a County Elections Administrator or a County
15  Clerk?  And I direct your attention to 9.
16      A. It does.
17      Q. And so, sitting here today, are you aware of any
18  communications you had relating to HB 1706 while you
19  were in the Texas State Senate?
20      A. I'm not aware.
21      Q. And are you aware of the source of any of the
22  legislative language in that HB 1706?
23      A. No.
24      Q. And when we talked about your search for
25  documents earlier, would your search for documents have

## 122

1  turned up any documents related to HB 1706?
2      A. No.
3      Q. So, we talked about 1706 being referred to the
4  State Affairs Committee, correct?
5      A. Yes.
6      Q. And --
7      A. In the Senate.
8      Q. In the Senate.  Correct.  And so, what is the
9  purpose of referring a bill to the State Affairs
10  Committee?
11      MR. BRISSENDEN:  I'm going to instruct you
12  at this time that to the extent you can answer that
13  question as a general matter, what the general procedure
14  is or the purpose is, you may answer.
15      To the extent that it requires you to
16  disclose your thoughts, analysis, opinions or mental
17  impressions as to this specific piece of legislation at
18  this time, I instruct you not to answer.
19      A. Okay.  Generally, when a bill is received in the
20  Senate, either it has a Senate origination or, in this
21  case, a House bill that has come over from the House.
22      The Lieutenant Governor makes a determination of
23  an assignment to the various committees in the Senate.
24  Then, as I mentioned, after, in this case, he, Governor
25  Dewhurst, makes a determination where the bill will go.

## 123

1  There's nothing in the Senate rules that says every bill
2  on elections has got to go here, every bill on water has
3  got to go there.  It's really up to -- the Lieutenant
4  Governor makes the determination.
5      And then it's given back to the Secretary of the
6  Senate, and she goes through the formality of the first
7  reading, and that's when it's -- that's when it's read.
8      Q. (BY MR. FISHER)  And my question may be slightly
9  different than that.
10      A. Okay.
11      Q. Based on your -- and we talked about longstanding
12  experience in the Senate and we talked about numerous,
13  numerous committees, given the small size of the Senate
14  they made you do everything -- what is the purpose of
15  referring a bill to one of these committees?  What
16  actions do they take on these bills?
17      MR. BRISSENDEN:  My instruction to you would
18  be the same.
19      A. Okay.  Generally, the purpose of the committee
20  process is to allow members of the public to participate
21  in the process.
22      At that point, if a hearing is granted, anybody
23  for or against a proposal comes in and testifies and
24  offers testimony or exhibits or whatever they want to
25  bring to the members' attention, their likes or dislikes

## 124

1  of a particular proposal.
2      Q. (BY MR. FISHER)  And as a Chair of committees, as
3  someone who has served on committees, do you think that
4  is an important role for the public to play in
5  consideration of a bill?
6      MR. BRISSENDEN:  Objection.  Vague.
7      To the extent you can answer that question
8  without disclosing your thoughts, opinions, mental
9  analysis and impressions about your experience in
10  connection with specification legislation, pieces of
11  legislation, including SB 14, you may answer.
12      A. Okay.  I extremely support the public's right to
13  participate in the process.
14      Q. (BY MR. FISHER)  And did you find that the public
15  participating in the process, as a committee member and
16  as a Chair of a committee, was helpful when determining
17  what to do about certain pieces of legislation?
18      MR. BRISSENDEN:  Same instruction.
19      You're asking him as a general matter?
20      A. As a general matter?
21      Q. (BY MR. FISHER)  We can read back the question.
22      A. Okay.
23      (Whereupon, the requested testimony was read back
24  as follows:
25      QUESTION:  And did you find that the public

## 125

1   participating in the process, as a committee
2   member and as a Chair of a committee, was helpful
3   when determining what to do about certain pieces
4   of legislation?)
5        MR. BRISSENDEN:  Because you include the
6   term "specific legislation," in that question --
7        MR. FISHER:  The term was "certain pieces of
8   legislation."
9        MR. BRISSENDEN:  "Certain pieces of
10  legislation," that implicates specific litigation and
11  would require him to disclose his mental impressions,
12  thoughts, analysis and impressions as to specific pieces
13  of legislation and call upon his experience in relation
14  to that legislation, that specific legislation.
15        So, I would instruct you not to answer.
16  A.  Okay.  On advice of counsel, I'll not answer.
17  Q.  (BY MR. FISHER)  Was the input of the public
18  helpful when you served as a committee member and also
19  as a Chair of a committee?
20  A.  Generally?  Generally?
21  Q.  Yes, generally.
22  A.  Yes, generally, it was.
23  Q.  So, with regard to Exhibit 44 and the
24  accompanying exhibit describing the legislative
25  history -- and I'm not going to make you go back through

## 126

1   and read any more --
2   A.  Okay.
3   Q.  -- but do you recall a letter from Senate
4   Democrats -- and you were a Senate Democrat at the time,
5   correct?
6   A.  Uh-huh.
7   Q.  Is that correct?
8   A.  Yes.
9   Q.  Do you recall a letter from Senate Democrats
10  indicating that they would not support bringing this
11  bill to a vote in the Senate?
12        MR. BRISSENDEN:  To the extent that that
13  question requires you to disclose communications that
14  you've had with other Legislators or their staff or your
15  own staff, I would instruct you not to answer the
16  question.
17  A.  On advice of attorney, I will -- I'll not answer
18  the question.
19  Q.  (BY MR. FISHER)  Are you aware of a public letter
20  issued by Senate Democrats in 2005 in relation to HB
21  1706 saying that they would not support bringing HB 1706
22  to a vote on the floor in the Senate?
23  A.  I don't recall.  Did I sign it?  I don't recall.
24  Q.  Are you aware of whether the Governor took a
25  public position on 1706?

## 127

1   A.  I'm not aware.
2        MR. FISHER:  I think here is a good time --
3   it's almost 12:45.  We'll take a lunch break.
4        (Lunch recess.)
5        (Exhibit 192 marked.)
6   Q.  (BY MR. FISHER)  Okay.  Senator, I'm going to
7   give you what has been marked as Exhibit 192, if you
8   could take a look at that.  And Exhibit 192 says Texas
9   Politics on the top.  It's dated May 4th, 2005.  It
10  says, "Notes from the left on the state of politics in
11  Texas today."
12        And I'll go ahead and just read the first two
13  lines for you.  It says, "Latinos for Texas blog
14  breaking:  Senator Dems unite since against HB 1706.
15  Senate Democrats block HB 1706 before it is passed.  11
16  Democrats sign letter to block voter picture ID bill.
17  As the Texas House tries once again to pass HB 1706 by
18  Mary Denny, Senate Democrats have signed its death
19  warrant."
20        And so, we were just discussing HB 1706.  We were
21  discussing a letter written by Senate Democrats at the
22  time.  Do you remember -- does this refresh your
23  recollection at all about the circumstances of HB 1706
24  at that time?
25  A.  None.

## 128

1   Q.  And how many Democrats were --
2   A.  No.  Excuse me.
3   Q.  How many Democrats were in the Senate at that
4   time in 2005?
5   A.  I can't remember.  I'd have to look.
6   Q.  Is it possible that there were more than 11
7   Democrats in the Senate in 2005?
8   A.  Yeah, it's possible.  I would have to look.  I
9   just don't recall.
10  Q.  So, it is possible that you either signed or did
11  not sign the letter?
12  A.  That's possible.
13  Q.  Okay.  We can go ahead and put that one to the
14  side.
15        So, between the 2005 and 2007 sessions, do you
16  recall holding a public hearing on a committee interim
17  charge in the State Affairs Committee?
18  A.  No.
19  Q.  Do you recall holding a public hearing regarding
20  a committee interim charge concerning a study and
21  recommendations on how election officials could verify
22  the identity of a voter without hindering a person's
23  right to vote?
24  A.  No.  And let me be sure that we're clear.  I was
25  just on the committee at that time, so, I wouldn't have

## 129

1 been -- when you asked me the question, "Did you hold
2 it," only the Chairman can call for holding, but I don't
3 recall any study on the issue.
4 Q. Okay. Thank you for the clarification. I'll
5 rephrase.
6 Do you remember being part of a hearing on a
7 committee interim charge that addressed voter ID issues?
8 A. No.
9 (Exhibit 193 marked.)
10 Q. (BY MR. FISHER) So, I'll hand you what's been
11 marked as Exhibit 193. And if you would take a look,
12 please, at the top, you'll see the notation Senate
13 Committee on State Affairs, Tuesday, April 18, 2006,
14 8:00 a.m., Senate Chamber. "Pursuant to a notice posted
15 in accordance with Senate Rule 11.18, a public hearing
16 of the Senate Committee on State Affairs was held on
17 Tuesday, April 18, 2006 in the Senate Chamber at Austin,
18 Texas." Members present, do you see your name there
19 listed?
20 A. Yes, I do.
21 Q. And if you would, I can make it a little easier.
22 We can turn to the second page, which is on the back.
23 And you'll see, "At 10:42 a.m. the Chair recessed the
24 committee until upon adjournment of the full Senate.
25 The committee reconvened at 12:10 p.m. and took

## 130

1 testimony on Committee Interim Charge #3."
2 And if you would, go ahead and read Committee
3 Interim Charge #3 for me.
4 A. "Study and make recommendations on how election
5 officials could verify the identity of a voter without
6 hindering a person's right to vote. Include an analysis
7 of the extent to which individuals are casting multiple
8 votes because of any lack of voter identification
9 verification. Make recommendations on how the State
10 could improve its vote by mail system to ensure the
11 authenticity of those ballots."
12 Q. And, Senator, we did touch on this very, very
13 briefly in the beginning but could you please describe
14 what a committee interim charge is, how this Interim
15 Charge #3 in this exhibit would have come to the
16 attention of the State Affairs Committee?
17 A. When the legislature has completed its regular
18 session business, after the conclusion of the 140 days,
19 then the Lieutenant Governor traditionally issues out
20 interim charges of various subject matters to the
21 various committees in the Senate for them to take up and
22 consider.
23 One of the things I first looked at on this
24 letter was the date. '06, that's an even year. So, I
25 knew they weren't -- we weren't in session. And so,

## 131

1 that would indicate that this is an interim committee,
2 as specified in the minutes of the committee.
3 Q. So, if you're -- and let's just get the logistics
4 straight, and you've mentioned this earlier. You, as a
5 Texas State Senator, are part-time essentially, correct?
6 A. Uh-huh.
7 Q. So, between sessions, you go back home; is that
8 right?
9 A. That's correct.
10 Q. So, in April, 2006, you would have been back in
11 Victoria, Texas; is that right?
12 A. For the most part, yes.
13 Q. So, if a hearing like this is convened on
14 April 18th, 2006, and in 2006, you are back in Victoria,
15 Texas, do you have to take a trip to Austin to be a part
16 of this hearing?
17 A. Yes, you do.
18 Q. And so, the members that are present here, these
19 are all members that have traveled back from wherever it
20 is that they are located to be part of this hearing on
21 the interim charge; is that right?
22 A. That's correct.
23 Q. And where would an interim charge come from? So
24 who gives the interim charge -- generally, who gives an
25 interim charge to a committee?

## 132

1 A. Traditionally, any member may request or any
2 interest may request that the Legislature take up as an
3 interim charge.
4 Interim charges usually fall in two categories.
5 You have passed a bill in the previous session and you
6 want the committee to take a further look to see do we
7 need to fine tune this in the next session, is it
8 working, was the intent realized in the language of the
9 bill, recognizing the fact that any piece of legislation
10 is a statement of -- or establishment of policy without
11 regards to logistics, sometimes the logistics don't
12 match up.
13 And so, interim committees take a look and see,
14 okay, is this working or do we need to do some tweaking
15 in the next regular session.
16 The other category that they fall in is that
17 someone has brought an issue that represents such a
18 change in the way that Texans carry out their lives and
19 businesses and whatnot that the Lieutenant Governor or
20 at somebody's request will agree and say, "Yeah, let's
21 take a look at that. We'll give you -- instead of
22 having just a few minutes in a committee to consider the
23 issue that didn't pass, now we've got 18 months to take
24 a look at it and see what's happened or see if this is
25 something we really need to do."

Senator Kenneth   Lynn Armbrister                         June 8, 2012

---

133

1       So, in those two instances, usually they result
2   in an interim charge, which upon completion of the
3   study, if you will -- because that's all -- there can be
4   no official action taken by an interim committee.  They
5   do produce at the end a report that takes each charge
6   and issues the findings and recommendations of the
7   charge so that at the next session of the Legislature,
8   the proponents can take that report and find things in
9   the report that -- not justifies but strengthens their
10  position or the opponents can also do the same as well.
11  You're not making a decision for or against.  You're
12  trying to get down into the weeds, as we say, on a
13  particular issue.
14       Q.  Okay.  Do you recall the interim charge
15  referenced in this exhibit?
16       A.  No.
17       Q.  So, you couldn't characterize whether this was --
18  and you mentioned two categories, tweaking or, for major
19  issues, considering issues further at the behest of the
20  Lieutenant Governor.  You wouldn't be able to say
21  whether this was in that first category or in that
22  second category; is that correct?
23       A.  No, I wouldn't.  It's strictly up to the
24  Lieutenant Governor to decide what goes on there.
25       Q.  And you can't tell by looking at this whether it

---

134

1   was broached by a member of the committee or by the
2   Lieutenant Governor; is that right?
3       A.  Not by what this says.
4       Q.  And you mentioned producing a report.  Do you
5   know if a report was produced with regard to Committee
6   Interim Charge #3?
7       A.  There should have been.
8       Q.  Okay.
9       A.  Every interim charge, there should be a report on
10  that charge.
11       Q.  And do you recall the testimony given on this
12  charge?  It mentions that there was testimony given.
13       A.  I don't recall.  And let me kind of explain.  At
14  any point during a hearing, if you show up, you get
15  counted as present.  That doesn't mean that you were
16  there for the entire time or for every testimony and
17  everything else.
18       I was looking at the one before that, the Kelo
19  versus City of New London decision.
20       Q.  Correct.
21       A.  I was very interested in it from a natural
22  resources perspective, and I wanted to see, also
23  representing the coast, that we had a similar thing to
24  Kelo on the coast of Texas that I was there for.  I do
25  see that.

---

135

1       Q.  So, given you remember that interim charge, do
2   you know if a report -- do you know for sure if a report
3   was produced on that interim charge --
4       A.  Yes.
5       Q.  -- Kelo versus New London?
6       A.  Right.
7       Q.  And is that something that you looked at, that
8   report?
9       A.  Right.
10       Q.  And did you consider that as you moved forward
11  with any potential legislation about Kelo or issues
12  regarding Kelo?
13       MR. BRISSENDEN:  I'm going to have to
14  instruct you not to answer the question based on
15  privilege as that delves into opinions, recommendations
16  and thought processes as to what you did and did not
17  consider as to that particular piece of legislation.
18  And the Court has instructed that that's already -- or
19  that is privileged.  Instruct you not to answer.
20       A.  Okay.  On the advice of counsel, I won't answer
21  that question.
22       Q.  (BY MR. FISHER)  Do you consider reports issued
23  based upon committee interim charges -- did you consider
24  them just as a general matter important in how you would
25  address things during the next legislative session?

---

136

1       MR. BRISSENDEN:  If you can answer that
2   question without relying upon your experience as to
3   specific pieces of legislation, you may do so but to the
4   extent that that requires you to draw upon your
5   experience in connection with your work on legislation,
6   then I instruct you not to answer.
7       A.  Okay.  Generally, if it was an issue that I was
8   either involved in -- then I would find some value.
9   Otherwise, I wouldn't pay any attention.  I would hope
10  they get wrapped in bright paper so I wouldn't trip over
11  them.
12       Q.  (BY MR. FISHER)  I haven't heard that one before.
13       A.  It's a common saying that we use up there.
14       Q.  All right.  So, you've said you don't recall and
15  don't even know if you were present during the hearing
16  on Committee Interim Charge #3, correct?
17       A.  I can't remember.
18       Q.  And you don't recall if you had any
19  communications with other Legislators about Committee
20  Interim Charge #3?
21       A.  I don't recall.
22       Q.  Do you recall if you had any communications with
23  the Governor's Office concerning Committee Interim
24  Charge #3?
25       MR. BRISSENDEN:  And I'm going to at this

Senator Kenneth  Lynn Armbrister                          June 8, 2012

---

## 137

1  time invoke the privilege and instruct you not to answer
2  as to communications that you had in regards to
3  legislation.
4      A.  Okay.  On the advice of counsel, I won't respond
5  to that one or answer that question.
6      Q.  (BY MR. FISHER)  And I'll rephrase just as a yes
7  or no question.
8      Did you have any communications concerning
9  Committee Interim Charge #3 with anyone from the
10  Governor's Office?
11      MR. BRISSENDEN:  And I'm going to instruct
12  the same instruction.
13      A.  I'll follow my attorney's advice.
14      Q.  (BY MR. FISHER)  And if you -- if there was a
15  report produced based on Committee Interim Charge #3,
16  would you have run across that report in your search for
17  documents responsive to today's Amended Notice of
18  Deposition?
19      A.  No.  No, I wouldn't have those in my possession.
20      Q.  And where would those documents be?  Where would
21  that report be?
22      A.  It's either still in the Senate or it's in the
23  Legislative Library.  Possibly online.  I don't know
24  where they put those.
25      Q.  Let's go ahead and put that aside.

---

## 138

1      And in 2007 -- and forgive me if -- I just don't
2  remember -- did you serve the full session in 2007?  Is
3  that correct?
4      A.  I was in the Governor's Office in 2007.
5      Q.  So, you left the Senate in 2007 in January?
6      A.  January 4th, 2007.  I began with Governor Perry
7  January 7th, three days later.
8      Q.  And the session would have started on?
9      A.  The next Tuesday, whichever -- let's see.  Let's
10  see.  Whatever the --
11      Q.  Fair enough.
12      A.  The second Tuesday in January, whatever that date
13  was.
14      Q.  Fair enough.  Do you recall in your capacity as
15  Legislative Director that there was a photo ID bill
16  introduced in that legislative session in 2007?
17      A.  I don't.  The earliest one I remember is '09.
18      Q.  Okay.  I'm going to hand you what's previously
19  been marked as Exhibit 28.  And on Exhibit 28, you'll
20  notice it's a 13-page document.  It's got the notation
21  HB 218 in the upper right-hand corner.
22      A.  Yes.
23      Q.  And does that look familiar to you at all, HB
24  218?
25      A.  No.

---

## 139

1      Q.  Okay.  Well, let's consider the additional
2  information provided in Exhibit -- what will be marked
3  as Exhibit 194 as well.
4      (Exhibit 194 marked.)
5      Q.  (BY MR. FISHER)  And that states in the upper
6  left-hand corner Texas Legislature Online History HB
7  218?
8      A.  Correct.
9      Q.  In looking at Exhibit 194 and Exhibit 28, does
10  that refresh your recollection at all of the bill that
11  was introduced in 2007 concerning voter ID?
12      A.  Like I say, I don't remember this one at all.
13      Q.  Do you recall, as the Legislative Director, voter
14  ID being one of the Governor's legislative priorities --
15  publicly stated legislative priorities in 2007?
16      A.  No, I don't remember that.
17      Q.  And do you remember it being any part of the
18  Governor's legislative agenda in 2007?
19      A.  No.
20      Q.  And do you know whether you or your staff had any
21  communications with Legislators in 2007 regarding voter
22  ID?
23      A.  I didn't.  Whether the two gentlemen that are
24  different than the two that I mentioned earlier did but
25  for me personally, I had no communication with any

---

## 140

1  member.
2      Q.  And you mentioned that you're not familiar with
3  HB 218.  If we could turn -- I'll direct your attention
4  again, similar to the last bill we looked at, to Page 9.
5  And this is Section 63.0101.
6      A.  Got it.
7      Q.  Documentation of Proof of Identification, if you
8  can go ahead and take a look at that.  And that runs
9  until -- again, until Page 11.  If you could, go ahead
10  and take a look at those forms of ID.
11      A.  Okay.
12      Q.  And so, taking a look at that, do you notice
13  that, similar to HB 1706, it does provide for nonphoto
14  ID?
15      A.  Yes.
16      Q.  And if you look at an A 1 on Page 9, do you see the
17  expiration for driver's license?
18      A.  Yes.  It's similar to the previous reviewed
19  document.
20      Q.  And if you look at number 3, do you see a valid
21  employee identification card that contains the person's
22  photograph; is that correct?
23      A.  That's correct.
24      Q.  And if you look at number 6, do you see a student
25  identification card issued by a public or private

Senator Kenneth  Lynn Armbrister                    June 8, 2012

## 141

1    institution of higher education?
2        A.  That's correct.
3        Q.  And if you look at number 8, do you see a valid
4    identification card that contains the person's
5    photograph and is issued by, A, an agency or institution
6    of the federal government or, B, an agency, institution
7    or political subdivision of the state?
8        A.  I see that.
9        Q.  And so, does it appear to you, just looking at
10   the two requirements, that HB 218 is similar or
11   dissimilar to HB 1706 from 2005?
12       A.  It's -- I would have to say those two choices, it
13   is similar.  There is a change, it looks like.  In that
14   one, I didn't see military ID but it's replaced by an
15   institution of the federal government and I think that
16   was what they -- I think the other one had military ID.
17       Q.  At any time, if you want to look at the previous
18   exhibit, we can do that as well.
19           If you look at Page 9, number 2, I think you'll
20   see United States military ID.
21       A.  Okay.  Then I'll have to say similar.
22       Q.  But to the extent you want to look at a previous
23   exhibit, let me know.
24       A.  Okay.
25       Q.  You've stated you don't recall HB 218.  Do you

## 142

1    know if anyone in the Governor's Office played any role
2    in the development of HB 218?
3        A.  I don't recall.
4        Q.  Are you aware of any communications concerning
5    the development of HB 218?
6        A.  No.
7        Q.  Do you recall monitoring -- and you've mentioned
8    that monitoring the course of bills is something that
9    you do as the Legislative Director.  Do you recall
10   monitoring the consideration of HB 218 in the House?
11       A.  If it was filed, there would have been somebody
12   assigned to it to monitor it but I don't know if that
13   was Schofield at the time or who was handling those in
14   '07.
15       Q.  Do you recall monitoring consideration of HB 218
16   in the Senate?  And if you look at what we marked as
17   Exhibit 194, I think you'll see that it was considered
18   in the Senate.
19       A.  Yes.
20       Q.  Do you recall doing that monitoring at all?
21       A.  No.  No.
22       Q.  Do you know if -- and you mentioned Mr.
23   Schofield.  Do you know if a policy analysis was
24   performed by Mr. Schofield on HB 218?
25       A.  I don't know because I didn't see it, but

## 143

1    following our protocol, there would have been something
2    but I can't say with certainty that yeah, I know for
3    sure it was done.  I'm just saying our protocol at the
4    time hadn't changed.  Every bill assigned to them, they
5    have to do an analysis.
6        Q.  Are you aware or do you remember any
7    communications within the Governor's Office concerning
8    HB 218?
9        A.  I don't recall it ever even coming up.
10       Q.  Do you recall any conversations originating from
11   outside of the Governor's Office concerning HB 218, for
12   instance, constituent communications to the Governor
13   concerning HB 218?
14       A.  I wouldn't know that information.
15       Q.  Who would know that?  Would that be the
16   Constituents Communications Director that you mentioned
17   earlier?  And I'm sorry, his name, I forgot.
18       A.  Greg Davidson.
19       Q.  And I got that name wrong earlier.  I apologize
20   for that.
21       A.  That's okay.
22       Q.  If you look at what's been marked as
23   Exhibit 194 -- and you were very helpful in walking
24   through HB 1706.  I wonder if I could ask you to do the
25   same here.

## 144

1        A.  Okay.
2        Q.  After the House passed HB 218, was it considered
3    by the Senate?
4        A.  Received in the House on 4-25.  Had its first
5    reading on 4-26.  Referred to State Affairs.  It was
6    scheduled for a public hearing on the 30th.  They had
7    the public hearing.  Testimony was taken.
8            There was a substitute apparently adopted and
9    reported out of the committee after the substitute.
10   Substitute means that if a bill comes either as an
11   original or from the House in this case, if the Senate
12   makes any changes, that represents a substitute, and so
13   then it is voted on as substituted or as amended, you
14   can say that as well, but as substituted.
15           So, it indicates that there was a change made in
16   the Senate to the original bill as received from the
17   House and there -- on 5-1, May 1st, committee report
18   printed and distributed, and then it was placed on the
19   Senate Intent Calendar.
20       Q.  And just backing up for a second, Senator -- and
21   I do appreciate you walking through this -- I do see --
22   and this is prior to what you just said -- that it was
23   referred to the State Affairs Committee on 4-26-2007; is
24   that correct?
25       A.  That's correct.

Senator Kenneth Lynn Armbrister                    June 8, 2012

---

**145**

1    Q.  And if you could -- and I thank you for the
2    explanation of a substitution.  Let me ask you, based on
3    the interim charge in 2006, are you aware that any
4    change -- that substitution was made on the basis of
5    Committee Interim Charge #3 from April, 2006?
6    A.  I don't have any information for that.
7    Q.  So, you mentioned placed on the Intent Calendar.
8    What is the Intent Calendar, if I can ask you what that
9    is, please?
10   A.  Okay.  In the Senate, to bring a bill up out of
11   its regular order, what that refers to, this being --
12   has a number 218, that means before you hear 218, you
13   have to have heard 217, '16, '15, '14, all the way back
14   down to House Bill 1 before you can take this up.
15        The way -- the work around of that is what's
16   referred to as the two-thirds rule.  So, any bill that
17   comes to the Senate floor that's out of the regular
18   order of business, you have to have two-thirds or 21
19   votes.
20        If I'm the author of a bill and I put that bill
21   on the Intent Calendar, that serves notice to all of my
22   colleagues and to anyone in the general public that I
23   intend to ask to bring this bill up out of its regular
24   order, get my 21 votes so that we can take it up for
25   floor debate or second reading, and that's what the

---

**146**

1    Intent Calendar serves.
2    Q.  And you mentioned the two-thirds rule, what's
3    your understanding about the purpose of that rule?
4    A.  The rule is because the rules -- because of the
5    regular order of business, it's a methodology by which
6    you can take up bills that are not sequentially in
7    order.  And to do that under Senate rules, you have to
8    have two-thirds of the members agree to let you do that.
9    That's what the two-thirds rule is.
10   Q.  Let me ask you why two-thirds, why not
11   three-fifths or some other number?
12   A.  That's just a number that's just kind of always
13   been there.
14   Q.  Do you know how long it's been there, how long
15   it's been in place?
16   A.  I went there in '87 and it was there.  So, it's
17   always kind of been there.
18   Q.  Is it fair to say it's been in place for a while?
19   A.  That's absolutely fair.  You see, over in the
20   House, they have a separate committee.  It's called a
21   Calendars Committee.  Another way for the laymen to look
22   at it, they're the agenda setting.  They determine when
23   bills will come up to the House floor.
24        In the Senate, the entire Senate acts as the
25   Calendars Committee.  That's why we have the two-thirds

---

**147**

1    that are bringing it up.  So, we all look at all of the
2    bills that are eligible.  So, we can decide as a body,
3    all 31, that if two-thirds of our body agrees, we'll let
4    you take a run, as we call it.
5    Q.  And two-thirds seems like a pretty high number.
6    Would you agree that it requires a general consensus
7    on bills before they are brought up before the Senate?
8    A.  Pretty much.
9         MR. BRISSENDEN:  Objection.  Vague.
10        THE WITNESS:  Oh, I'm sorry.
11   Q.  (BY MR. FISHER)  You can still answer, Senator.
12   A.  What was the question?
13   Q.  The question was that two-thirds seems like a
14   pretty high number.  Would you agree that a two-thirds
15   vote to bring a bill before the Senate engenders a
16   certain general consensus on a bill prior to it being
17   voted on?
18        MR. BRISSENDEN:  Objection.  Vague.
19        THE WITNESS:  Do what?
20        MR. BRISSENDEN:  Go ahead.  You may answer.
21   A.  That would indicate that you've got support.
22   We've had -- there was one Lieutenant Governor that
23   wouldn't give you -- let you bring your bill up unless
24   you brought 21 names to him, Governor Hobby.  You had to
25   show him that you had 21 names.

---

**148**

1         That doesn't mean they are going to vote for it
2    if something -- you bring it up and somebody puts an
3    amendment on it and everybody peals off of it.
4    Q.  (BY MR. FISHER)  Would you agree or disagree that
5    the vast majority of bills in the Texas State Senate are
6    brought up by operation of the two-thirds rule?
7         MR. BRISSENDEN:  Objection.  Vague.
8         To the extent you can answer that question
9    relying upon general information that's a matter of
10   public record, you may do so.
11        To the extent you have information that you
12   are relying upon based upon your experience in
13   connection with your work on specific legislation that
14   you've been involved with, I'd instruct you not to
15   answer.
16   A.  Okay.  Generally, that is but there have been
17   exceptions.
18   Q.  (BY MR. FISHER)  And do you remember what those
19   exceptions were?
20        MR. BRISSENDEN:  Same instruction.
21   A.  I'll follow my attorney's advice and not answer
22   that one under privilege.
23   Q.  (BY MR. FISHER)  Okay.  And so, based upon the
24   public record, do you remember examples of -- public
25   examples where the two-thirds rule was not followed when

## 149

1  a bill was brought before the Senate floor?
2      A.  Governor Hobby '91 redistricting.  Governor
3  Bullock.  I don't remember the thing.  I just remember
4  we had one under Governor Bullock, and he cited Governor
5  Hobby.  And then Governor Dewhurst on Congressional
6  redistricting in '03 or '01, whenever it was, citing
7  both Governor Bullock and Governor Hobby.
8      Q.  So, about how many bills would you say that you
9  vote on per session on average?  And I know you said the
10  number earlier was 6,500 to 7,000 but I know all of
11  those are not voted on.  How many bills would you vote
12  on as a Senator during each session?
13      A.  Can I ask for a clarification?  And I'll explain
14  for the clarification.
15      Q.  Sure.
16      A.  As a member of the Senate, you could have say
17  Bill A.  If you're on a committee, you're voting for or
18  against Bill A.  If it then comes to the floor, you're
19  voting again on -- for or against Bill A.  So, is your
20  question about roughly how many votes are cast on the
21  floor or in total committee and --
22      Q.  Let me clarify.  I'm talking about votes that are
23  taken on the floor.
24      A.  Okay.
25      Q.  About average, if you had to guess, how many, on

## 150

1  average, would you vote on during a session?
2      MR. BRISSENDEN:  If you can answer, I don't
3  want you guessing.
4      A.  On the advice of my attorney, it would be a
5  guess, so, I won't answer that.
6      Q.  (BY MR. FISHER)  Would you say it's more than a
7  hundred bills?
8      A.  Yes.
9      Q.  And so, you've given -- and you've served on the
10  Senate for over 20 years; is that correct?
11      A.  Yes.
12      Q.  So, was that about ten sessions; is that correct?
13      A.  Ten regular sessions and a myriad of specials.
14      Q.  So, during those ten regular sessions, about a
15  hundred bills a session or over a hundred bills a
16  session, we can safely assume more than a thousand
17  bills; is that correct?
18      A.  Oh, yes.
19      Q.  And so, you've given me -- was it three examples
20  of bills where the two-thirds rule was not followed; is
21  that right?  Governor Hobby, Governor Bullock and
22  Lieutenant Governor Dewhurst; is that correct?
23      A.  That I can remember.
24      Q.  So, would you say that the vast majority of bills
25  that were brought to the floor during your time in the

## 151

1  Senate were voted on by two-thirds of the Senators to
2  bring the bill to the floor before being voted on by --
3  you know, an up or down vote by the Senate?
4      MR. BRISSENDEN:  Objection.  Vague.
5      THE WITNESS:  I'm sorry?
6      MR. BRISSENDEN:  Go ahead.  You may answer.
7      A.  Yes.
8      Q.  (BY MR. FISHER)  Could you tell me just based
9  on -- we can go back to Exhibit 194.  Can you tell me
10  what happened to HB 218?  And I think we've gotten up to
11  placed on the Intent Calendar, which is on the first
12  page.
13      A.  Yes, placed on the Intent Calendar.
14      Q.  Can you tell me what happened?
15      A.  Co-sponsor authorized, that means once I get it
16  to the floor, another way to try to indicate support is
17  you sign a card allowing other members of the Senate to
18  co-author the bill.  The author has to give permission
19  for -- say if you wanted to sign on, you liked the bill,
20  you wanted to be a co-author, I would have to give you
21  permission.  So, that's what that indicates,
22  co-sponsorship was authorized.
23      Then the two-thirds rule, see rules suspended,
24  regular order of business occurred on the 15th of May.
25  They had a record vote to do that, to suspend the rules.

## 152

1      Then it's read the second time.  In other words,
2  the Secretary of the Senate again gets up and she reads
3  the caption.  In this instance she would say, "House
4  Bill 218 relating to requiring a voter to present proof
5  of identification."
6      There is considerable debate between when the
7  author brings it up, suspending the regular order of
8  business, it's read the second time, and then after the
9  debate, you request a vote.
10      And at that point, according to this, a motion to
11  suspend the regular order fails.  You have another vote
12  there, and that failed on the 15th by record vote.
13      And they tried to bring it back to life, it looks
14  like there, because they offered another opportunity for
15  more people to sign onto it.
16      Q.  Okay.
17      A.  And that was the last that happened.  In other
18  words, once it failed on second reading to go to third
19  reading -- and to go to third reading, it takes
20  two-thirds because you're suspending the Constitution,
21  and that's why that two-thirds is there.
22      So, it looks like it didn't get the required 21
23  votes or two-thirds.  It's two-thirds of the members
24  present and voting.  So, it doesn't have to be 21.  It
25  can be a combination.  You take however many happen to

Senator Kenneth  Lynn Armbrister                    June 8, 2012

---

153

1   be in the room, two-thirds of those that are present and
2   voting.
3        Without seeing the actual vote, that's what
4   happened to it.  It died on the second reading -- or
5   movement to the third reading.
6        Q.  I think we can discuss a little bit more the
7   issue with quorum that you just mentioned in the context
8   of the next exhibit.
9        A.  Okay.
10       Q.  And that's been previously marked as Exhibit 45.
11  And Exhibit 45 says Declaration of Carlos Uresti.  And
12  you'll notice, Senator, if you turn to the last page,
13  you'll see his signature and the date of April 9th,
14  2012.  You have to flip it over there.
15       A.  Okay.
16       Q.  I'll let you take a look briefly.  Have you seen
17  this document before?
18       A.  No.  No, I have not.
19       Q.  Who is Carlos Uresti?
20       A.  Carlos Uresti is a Senator from the home county
21  of San Antonio, Texas.
22       Q.  And did you serve with Senator Uresti?
23       A.  I did not in the Senate.  He came to the Senate
24  after I had left.  I think his first session was '07.
25       Q.  I'm going to go ahead and direct your attention

---

154

1   to paragraphs 6 and 7, if you would take a look at
2   those.
3        A.  Okay.
4        Q.  And so, we're discussing the context of HB 218,
5   the legislative history of HB 218, and you mentioned
6   that it passed a two-thirds vote and then failed a
7   two-thirds vote.
8        And what I wanted to ask you is if paragraph 6
9   and 7 concerning HB 218 provide you with any knowledge
10  about what happened during that vote?
11       You can actually go ahead and read 8 and 9 as
12  well.
13       A.  Okay.
14       Q.  Do you recall the events described in these
15  paragraphs?
16       A.  No.  No, I wasn't on the floor.
17       Q.  As a matter of public knowledge, public
18  information, do you recall the events described in
19  paragraphs 6, 7, 8 and 9?
20       A.  No.  No.
21       Q.  If you were to compare paragraphs 6, 7, 8 and 9
22  and what's described there, does that seem consistent
23  with Exhibit 194, which was the history you just read me
24  where you said that the rules were suspended and the
25  motion to suspend the rules later failed?

---

155

1        A.  Right.
2        Q.  Does that seem consistent with the exhibit?
3        A.  Right.  Like I say, the two-thirds is not a firm
4   21.  It's two-thirds of the members present and voting.
5   So, if you had 29 members, then two-thirds of 29, you
6   would need 19 votes --
7        Q.  And during your time in the Senate --
8        A.  -- or 20 votes, whatever two-thirds is.
9        Q.  And during your time in the Senate, do you recall
10  votes being taken when Senators were not on the floor in
11  order to establish a quorum, such as what's described in
12  paragraphs 6, 7, 8 and 9?
13       A.  Yes.
14       Q.  And so, you recall instances where -- and I'm not
15  talking about Senators just not being present because
16  they are not there --
17       A.  Right.
18       Q.  -- but where Senators have checked in and they
19  are just not on the floor --
20       A.  Right.
21       Q.  -- where votes have been taken to establish a
22  quorum in their absence?
23       A.  Right.
24       Q.  Do you recall instances like that happening?
25       A.  Yes.

---

156

1        Q.  Can you tell me about those instances?
2        A.  When the Senate convenes, you have roll call.
3   And, theoretically, you can't continue unless there is a
4   quorum.  A quorum is 16 votes.
5        So, it's very possible, especially this time -- I
6   believe the date on here we were reading, that's the
7   last part of the session.  It's not unusual at all for
8   you to be there for roll call, be counted as present at
9   that time -- point in time and then you've got a bill
10  that you're working on -- this was a House bill.  You're
11  working on a Senate bill, and you're over in the House
12  talking to House members about trying to get your bill
13  out of committee.
14       This is the last part of the session, you're in
15  that final two or three weeks before a bill can actually
16  get out of either House.  So, it's not unusual for them
17  to be off the floor for a lot of reasons.  They could be
18  in the bathroom.  They could be --
19       And what can happen is any member of the Senate
20  at any time, before a vote is actually called for, they
21  can call for a quorum.  And then they would have to
22  stop, recall the roll to establish how many people are
23  present and voting on the floor.  And at that point,
24  that number can be different than what happened at the
25  morning's roll call.  So, yes, this would happen.

## 157

1    The significance of, "I was sick with the flu"
2    statement, several years ago another member of the
3    Senate from San Antonio, Bexar County, was going through
4    dialysis.
5        Q.  Is that Senator Gallegos, Senator?
6        A.  No.  He died.  Senator Gallegos was another one
7    that was -- he had a liver transplant.
8        Senator Greg Luna was going through dialysis, and
9    we delayed action on a bill at his request until his
10   three-hour dialysis treatment.  And we did that as a
11   courtesy.  Everybody in the Senate agreed and let him
12   get there so that he could vote on a particular bill.
13   As it was, they didn't need his vote but he wanted to be
14   on record as voting for this -- it was a children's
15   education bill that he wanted to be sure and have his
16   name on there.  Otherwise, it would have shown in the
17   record that he was not present for the vote.
18       So, that happens at times.  They will give each
19   other a courtesy to do that but there's been many
20   instances when it wasn't that firm 21 but it was the
21   firm two-thirds.
22       And our rule is -- the Senate's rule is very
23   specific, it's two-thirds of the members present and
24   voting.
25       Q.  Let's read paragraphs 8 and 9 together.

## 158

1        A.  All right.
2        Q.  And I mean together as in reading them in
3    context.  "When I arrived at the Senate" -- and this is
4    Senator Uresti talking -- "Senator John Whitmire, an
5    opponent of HB 218, told me that he was counted absent
6    from the vote even though he had checked in on the
7    Senate floor and had only momentarily stepped out, prior
8    to the vote.  It is highly unusual, and a deviation of
9    Senate procedures, to consider a Senator absent after he
10   or she has checked in on the Senate floor.  Although HB
11   218 passed on its first vote prior to my arrival,
12   opponents of the bill forced a second vote.  Because HB
13   218 did not receive the support of two-thirds of Senate
14   members, HB 218 was defeated."
15       A.  Right.
16       Q.  Is that consistent with the usual practice of the
17   Texas State Senate, in your opinion?
18       MR. BRISSENDEN:  Let me instruct you that to
19   the extent you can answer that question based upon
20   public record and based upon your general experience,
21   you may answer.
22       To the extent that this question requires
23   you to rely upon statements that are contained in this
24   exhibit that you've already testified to twice that
25   you're not familiar with and requires you to rely upon

## 159

1    your thoughts, opinions, your impressions and analysis
2    in connection with your work on this particular piece of
3    legislation and offer an opinion about this procedure,
4    I'd instruct you not to answer.
5        Q.  (BY MR. FISHER)  And, Senator, let me ask you,
6    did you work on this piece of legislation?
7        A.  No.
8        Q.  I thought that was your previous testimony.
9        A.  This was in '07?
10       Q.  Correct.
11       A.  No.  I was in the Governor's Office in '07.
12       Q.  Correct.
13       A.  I didn't work on this one.  My first was '09.
14       MR. FISHER:  Can you read back the last
15   question, please?
16       (Whereupon, the requested testimony was read back
17   as follows:
18       QUESTION:  Is that consistent with the usual
19   practice of the Texas State Senate, in your
20   opinion?)
21       A.  And the answer was yes.  As a matter of public
22   record as stated in here, what Senator Whitmire said was
23   indicated on here, as a matter of public record.
24   If he was out, they didn't need the firm 21.
25   They still needed two-thirds.  So, if a Senator -- in

## 160

1    this case 2 were missing if you count Whitmire and
2    Uresti, then it's two-thirds of 29, which they wouldn't
3    have needed 21.  That would have been -- quick math.
4    They would have needed 19 votes to bring up the bill.
5    So, that was here when the rules were suspended there on
6    5-15, Journal Page 2063.
7        Then when -- in 8 when Senator Whitmire was back
8    on the floor and Senator Uresti had got there, then they
9    needed 21 and they didn't have that.
10       Q.  (BY MR. FISHER)  And earlier you mentioned that
11   accommodations are sometimes made, you mentioned someone
12   on dialysis, are you aware of other instances where
13   accommodations were not made for Senators that were sick
14   that were not on the floor?
15       A.  I don't know of any.
16       Q.  Do you remember at this time -- so, the time
17   period we're discussing is May, 2007.  If you look at
18   the Legislative History, I think you'll see that.
19       A.  Right.
20       Q.  And do you remember at that time the Lieutenant
21   Governor issued a letter concerning the votes on HB 218?
22   I think we've established there were two votes.  Do you
23   remember the Lieutenant Governor issuing a letter on
24   that?
25       A.  No.

Senator Kenneth Lynn Armbrister                                          June 8, 2012

## 161

1    Q. Do you recall reading any information in the
2  newspaper, any public information about the votes that
3  were taken on HB 218?
4    A. I don't remember that. I can't remember what I
5  read in the newspaper yesterday. And I'm not trying to
6  be facetious with you. No, I don't remember reading
7  anything about it.
8    Q. Senator, we went through in detail your knowledge
9  of the Senate, your long-time service in the Senate, as
10  well as the fact that you had just taken a job with
11  Governor Perry at the time; is that correct?
12    A. During that session, yes.
13    Q. And so, about four months earlier, you had taken
14  a job?
15    A. Yes.
16    Q. You can't recall at this time whether -- and do
17  you agree that this situation would have been something
18  that's newsworthy, the fact that votes were being taken
19  with Senators that were possibly not in the chamber, you
20  know, is this something that you expect would make an
21  impact on the public?
22           MR. BRISSENDEN: Objection. Vague. Calls
23  for speculation.
24    A. You'll have to be more -- you're -- I agree with
25  my attorney that the question was a little vague.

## 162

1    Q. (BY MR. FISHER) Well, as the Legislative
2  Director for the Governor and someone who had just
3  served for over 20 years in the Senate, is it unusual
4  that a situation like this is something that would not
5  have an impact on you so that you remember it --
6    A. No.
7    Q. -- you know, five years later?
8    A. No.
9    Q. Okay. And we've talked about 2009. You can put
10  those exhibits to side. We've talked about 2009 a few
11  times.
12    A. Yes.
13    Q. You've mentioned 2009. So, was a photo
14  identification bill introduced in the Senate in 2009?
15    A. It was either the House or the Senate.
16    Q. I'll go ahead and give you what's been previously
17  marked as Exhibit 29. And you'll notice that Exhibit 29
18  looks like a lot of the other exhibits we've looked at.
19  It's a Bill to Be Entitled an Act, and in the upper
20  right-hand corner it says SB No. 362?
21    A. Yes, sir.
22    Q. And at the same time -- this has been, I think,
23  working efficiently for us. I'll go ahead and give you
24  what was previously marked as Exhibit 163.
25    A. Okay.

## 163

1    Q. In the upper left-hand corner of Exhibit 163,
2  you'll see Texas Legislature Online History, and you'll
3  notice the bill is SB 362.
4    A. Okay.
5    Q. Is that correct?
6    A. That is correct.
7    Q. Okay. And so, is this the bill that was
8  introduced in 2009 that you've mentioned concerning
9  voter ID?
10    A. Yes. Uh-huh.
11    Q. And in your capacity as the Governor's
12  Legislative Director, was voter ID on the Governor's
13  legislative priorities in 2009?
14    A. It was not one of our priority bills.
15    Q. Was any part of the Governor's legislative agenda
16  in 2009 photo ID?
17    A. No.
18    Q. Do you know if the Governor's Office had any --
19  this is either you or your staff -- had any
20  communications with outside groups in 2009 regarding
21  voter ID?
22    A. I did not have any outside communications with
23  anybody.
24    Q. Did anyone on your staff have communications with
25  outside groups concerning voter ID in 2009?

## 164

1    A. I'm sorry, I don't know if they did or not.
2    Q. Are you aware of anyone in the Governor's Office,
3  more broadly, having communications with outside groups
4  in 2009 concerning voter ID?
5    A. I'm not aware of anybody. Nobody ever said
6  anything to me about it.
7    Q. Are you familiar with the provisions of SB 362?
8    A. Generally. I'd have to look through this to
9  refresh myself.
10    Q. I think I can direct you kind of to the similar
11  areas that we've been looking at in the previous bills.
12  If you'll look at Page 5, I think you'll see Section
13  63.0101.
14    A. Okay.
15    Q. And that's under Section 10. So, I'll go ahead
16  and let you take a look at that. And that runs to Page
17  7.
18    A. Right. Got it.
19    Q. And so, what forms of ID would have been
20  allowable under SB 362?
21         And I can ask you more specific questions.
22         Would a valid identification card that contains
23  the person's photograph issued by an agency or
24  institution of the federal government or an agency,
25  institution or political subdivision of this state have

165

1  been allowed under number 6?
2      A. Yes. Number 7.
3      A. Well, it looks like --
4      A. Oh, it's 6 yes, you're correct.
5      Q. You mentioned there's crossed-outs and
6  underlines, and I understand it makes things a little
7  confusing at times.
8      A. Yes. Right.
9      Q. In Section B, do you see there was a provision
10 for nonphoto identification as well in Section B?
11     A. Yes, I do.
12     Q. And if you look at Section A 1, do you see the
13 expiration date listed there for a driver's license
14 issued by the Department of Public Safety?
15     A. I don't see a date but it does have a -- it does
16 have a statement about expired or not expired within two
17 years.
18     Q. Okay.
19     A. It's not a date certain. I think we are talking
20 about the same thing.
21     Q. So, the answer is expired no earlier than two
22 years before the date of presentation; is that right?
23     A. That's correct.
24     Q. Do you notice differences -- and feel free to
25 take HB 218 up again but do you notice any differences

166

1  between SB 362 and HB 218 as far as allowable forms of
2  ID?
3      A. I hate to be slow but you've asked me do I see
4  any differences rather than a while ago you asked me do
5  I see similarities.
6      3 is different on 218. It talks about the valid
7  employee ID card.
8      Q. Okay.
9      A. And here 3 is United States citizenship
10 certificate.
11     Q. Okay. And do you know what a United States
12 citizenship certificate is?
13     A. I don't have any idea.
14     Q. Do you notice that --
15     Q. Is that a passport?
16     Q. Do you notice that --
17     A. I don't know.
18     Q. -- nonphoto identification is provided for in
19 both bills? Is that correct?
20     A. Let's see. Yes.
21     Q. And with regard to the expiration date listed in
22 Sections A 1 of both bills, are those expiration dates
23 similar?
24     A. The expiration statement but, again, there's no
25 date but there's a statement. It may be semantics but

167

1  you're calling for a date, and this says it expired or
2  if you're using that synonymous, okay, but -- yeah, I
3  agree they are both the same language.
4      Q. And do both provide for a valid identification
5  card that contains the person's photograph and is issued
6  by an agency or institution of the federal government or
7  an agency, institution or political subdivision of the
8  state?
9      A. Yes. 6 in Senate Bill 362, and House Bill 218,
10 subsection 8.
11     Q. Thank you, Senator.
12        And were you or anyone in the Governor's
13 Office -- are you aware that anyone was involved in the
14 development of SB 362?
15     A. I was not involved with it. I don't know if
16 anybody else was in our office.
17     Q. Are you aware of any communications between
18 yourself or your staff with those who were developing SB
19 362?
20     A. Again, I was not, and I'm not aware of any of the
21 staff that was involved with the development of it.
22     Q. Are you aware of the source of the legislative
23 language in SB 362?
24     A. No.
25     Q. Are you aware of any communications with

168

1  Legislators from the Governor's Office concerning what
2  forms of ID were included in SB 362?
3      A. No.
4      Q. Are you aware of any -- are you aware of the
5  Governor's Office being aware of any analysis about
6  which registered voters did or did not possess one of
7  the forms of ID required by SB 362?
8      A. No, I'm not aware of that.
9      Q. Did you or any members of your staff have
10 communications about SB 362 with current or former
11 Legislators who had worked on or introduced past photo
12 identification bills?
13     A. I did.
14     Q. And who did you have those conversations with?
15     A. Todd Smith in the House. He was the committee
16 Chair of the committee that it was going through in the
17 House. It had already passed the Senate. My
18 conversations were with him and no other member.
19     Q. And there was no one else present during those
20 conversations; is that correct?
21     A. Not that I recall.
22     Q. And was that a face-to-face conversation?
23     A. It was a face-to-face conversation.
24     Q. Are you aware of anyone else in the Governor's
25 Office having communications about SB 362 with at that

Senator Kenneth  Lynn Armbrister                    June 8, 2012

169

1  time current or former Legislators who had offered
2  previous photo identification bills?
3      A.  No, I'm not aware of anybody else.
4      Q.  So, was it just one meeting with Todd Smith; is
5  that correct?
6      A.  Right.
7      Q.  Are you aware of communications from you or your
8  staff with officials or Legislators from other states
9  about SB 362?
10     A.  I had no outside communication about it with
11  anybody.
12     Q.  Did anyone on your staff have outside
13  communications?
14     A.  I don't know.
15     Q.  Would you know if they did?  Is that something
16  they would report to you?
17     A.  No, not necessarily.
18     Q.  Are you aware of any communications about SB 362
19  with outside interest groups from you or your staff in
20  the Governor's Office?
21     A.  I had none with any outside interest groups, and
22  I don't know about staff.
23     Q.  More broadly, anyone in the Governor's Office
24  that had outside communications about SB 326 with
25  outside interest groups?

170

1      A.  I wouldn't have known that.
2      Q.  Are you aware of any communications that you and
3  your staff had with groups representing minority voters
4  during the consideration of SB 362?
5      A.  I had no such meetings, and I wouldn't know if
6  the staff did.  I would doubt it but I don't know if
7  they did or not.
8      Q.  And going back to the communication you had with
9  Representative Smith, can you tell me the general nature
10  of that conversation?
11         MR. BRISSENDEN:  I think the witness has
12  answered the question that you posed earlier about
13  whether or not he had communication regarding the bill.
14  Going beyond that and asking the nature of the
15  communications would be privileged, and I instruct you
16  not to answer.
17     A.  On the advice of the attorney, I would not answer
18  that under privilege.
19     Q.  (BY MR. FISHER)  Do you know if a policy analysis
20  was performed on SB 362 at any point?  And we talked
21  about Mr. Schofield and the job that he does.  Are you
22  aware of that analysis being conducted?
23     A.  I've not seen it but, again, protocol dictates
24  that one be done.
25     Q.  And so, you would say that you didn't review the

171

1  analysis then --
2      A.  No.
3      Q.  -- based on the answer to your last question; is
4  that correct?
5      A.  That's correct.
6      Q.  And we talked a little bit earlier about things
7  that would go into that analysis, the underlying facts,
8  the documents that Mr. Schofield or someone like him
9  would rely upon.  Are you aware of you or anyone in your
10  staff reviewing the underlying documentation that would
11  go into an analysis -- or that went into the analysis of
12  SB 362?
13     A.  I didn't personally review that, and I don't know
14  if anybody in the staff did.
15     Q.  And would that kind of analysis, the underlying
16  analysis, underlying bill analysis, would that involve
17  legislation from other states?  Would it consider things
18  that had been done in other states?  For instance, in
19  this case, photo identification bills from other states?
20         MR. BRISSENDEN:  I'm going to instruct you
21  not to answer.  That question delves into privileged
22  deliberations and analysis as to what was and was not
23  considered in particular in this piece of legislation in
24  the Governor's Office, and the Court has considered that
25  to be -- I believe in the orders that have come out on

172

1  June 5th and June 7th, that would be privileged, the
2  legislative privilege.  Instruct you not to answer.
3      A.  Under advice of my attorney, I will not answer
4  under privileged communication.
5      Q.  (BY MR. FISHER)  And let me be clear about my
6  question.  I'm not asking about your time in the
7  Legislature.  I'm not asking about the work that's been
8  done in the Governor's Office.  I'm asking about the
9  underlying facts that have gone into an analysis that's
10  gone by the Governor's staff and I'm asking if those
11  underlying facts would take into consideration photo
12  identification bills from other states, other
13  jurisdictions that have those laws on the books?
14         MR. BRISSENDEN:  And the Court's order
15  issued yesterday, June 7th, specifically addresses work
16  that is done by the Governor and his office pertaining
17  to legislative acts, legislative functions, the Court
18  has found that legislative privilege applies, and I
19  would instruct you not to answer the question.
20     A.  On the advice of the attorney, I won't answer
21  under privileged communication.
22     Q.  (BY MR. FISHER)  And so, what was the purpose of
23  SB 362, according to your understanding?
24         MR. BRISSENDEN:  Let me instruct the witness
25  that the Court has found that you may answer the

Senator Kenneth  Lynn Armbrister                    June 8, 2012

---

173

1  question with regards to the general purpose of a piece
2  of legislation but with regards to your opinions, your
3  analysis, your views and motivations of supporting or
4  not supporting a piece of legislation, I instruct you
5  not to answer.
6      THE WITNESS:  Could you read me the question
7  again?
8      (Whereupon, the requested testimony was read back
9  as follows:
10     QUESTION:  And so, what was the purpose of SB
11 362, according to your understanding?)
12     A. To enhance the credibility of -- the vote on
13 a particular election.
14     Q. (BY MR. FISHER)  And are you aware there was a
15 problem in Texas with the credibility of the votes in
16 particular elections?
17     MR. BRISSENDEN:  To the extent that question
18 requires you to divulge information that you developed
19 in the course of your work as the Director of
20 Legislative Affairs of the Governor's Office in
21 connection with this piece of legislation, I'd instruct
22 you not to answer.
23     To the extent you can rely upon information
24 that would be contained in the public record, you can do
25 so.

---

174

1      A. I don't have any information on the public
2  record.  So, on advice of attorney, I won't answer.
3      Q. (BY MR. FISHER)  And who are the main opponents
4  to SB 362?
5      A. Define "main opponents."
6      Q. Who are the opponents to SB 362?
7      A. Probably every member of the House and the Senate
8  that were Democrats.
9      Q. And did the Governor -- strike that.
10     Did you or your staff in the Governor's Office
11 have any communications with Legislators who opposed SB
12 362?
13     A. I didn't.
14     Q. Did any members of your staff have communications
15 with Legislators who opposed SB 362?
16     A. I don't know.
17     Q. And, more broadly, just for the sake of the
18 record, anyone in the Governor's Office that you're
19 aware of that had conversations with Legislators who
20 opposed SB 362?
21     A. Not to my knowledge.
22     Q. All right.  So, we have Exhibit 163, which I've
23 handed you, and that's the Texas Legislature Online
24 History and based on --
25     A. Okay.  Exhibit 163?

---

175

1      Q. It's been previously marked and that's why the
2  numbering is a little different.
3      A. I got it.
4      Q. And if you take a look at that, can you tell me
5  what happened to SB 362?
6      A. Okay.  It was prefiled this date 12-15, that's
7  December 15th of '08.  Members are allowed to prefile
8  bills within 30 days of a legislative session.  And with
9  that date, that tells me that bill was prefiled in the
10 Senate.
11     The Senate convened the second Tuesday of
12 January, and that -- in '09.  It had its first reading
13 there on 2-17, and it was referred to the Committee of
14 the Whole.
15     Now, you have standing committees, such as we've
16 talked about before, State Affairs.  When you see a
17 notation Committee of the Whole, that means the entire
18 Senate then becomes the committee.  And that's been done
19 quite a few times on various issues that are of such
20 statewide import we want to give everybody a bite of the
21 apple, so to speak, at the committee hearing.
22     Again, co-authorization was authorized.  It got
23 scheduled for a public hearing, and then they had the
24 public hearing the next month, March the 10th.
25     Testimony was taken.  Co-author authorized, that

---

176

1  means somebody has probably signed onto it and had to
2  get that authorization in the record.
3      Q. Senator, if I can just stop you there and ask you
4  a question.
5      A. Okay.
6      Q. You talked about the consideration of the
7  Committee of the Whole?
8      A. Yes.
9      Q. And we talked earlier about bills being referred
10 to specific committees in order to get feedback from the
11 public.  Is it your understanding that a bill that's
12 referred to the Committee of the Whole, that same
13 procedure is not followed; is that correct?  It doesn't
14 go to an individual committee?
15     A. It doesn't go to an individual committee.  It
16 goes to the entire Senate, and they act as the
17 committee.
18     Q. And you said that it has happened before.  Can
19 you tell me in what instances you recall other bills
20 being filed with the Committee of the Whole without
21 going to an individual specific committee first?
22     A. Most of the redistricting bills follow that
23 track.  I had a particular 50-year state water plan
24 because it was truly for the entire state, wanted to get
25 everybody involved with the formulation of that.

Senator Kenneth  Lynn Armbrister                    June 8, 2012

## 177

1  We've had other bills over time.  If I had time
2  to look, I could tell you specifics but those are some
3  of the -- it's really an activity -- if you're a Senator
4  not sitting on a particular committee and you have a
5  vested interest in an issue, it gives you that
6  opportunity to lobby on the full committee.  So, it's
7  done really as a convenience to ensure that statewide
8  every member of the Senate gets in there and gets to do
9  work on a bill in the committee setting.
10  Q.  Is the public heard from in these Committee of
11  the Whole hearings as well?
12  A.  Absolutely.  Right.  They meet on the Senate
13  floor.  And at that point, the entire floor is open and
14  people sign up to testify, and they take testimony until
15  the last one gets through.
16  Q.  And you started to read the history of the bill
17  somewhat.
18  A.  Right.
19  Q.  And we had looked in the context of HB 218, and
20  you pointed out to me the point where the bill survived
21  the two-thirds vote to be brought to the floor, and I
22  know we had some more discussion about that but are you
23  able to show me on here any point where SB 362 received
24  a two-thirds vote --
25  A.  Yes.

## 178

1  Q.  -- from the Senate?
2  A.  After the committee process, as you're going down
3  through -- down here closer to the bottom, testimony
4  taken in committee, it was reported out of the committee
5  favorably without amendments.  In other words, the bill
6  is filed, was not amended in the committee.  Then it was
7  set as a special order.  And the next entry there, 3-11
8  over here it looks like Journal Page 464, a record vote
9  was taken.
10  The special order is a process within the
11  committee still.  So, that's where it's voted out of
12  committee, and the report was printed and distributed,
13  and there's what we call a 24-hour layout rule.  You
14  can't just take a bill and get out of committee and have
15  it up there unless, again, you suspend that rule.  Well,
16  they didn't do it with this one.  There was no vote
17  taken to do it.
18  So, it -- you see here it came out of committee
19  on the 12th, didn't come before the Senate until the
20  17th, so there's five days there.
21  It was read for the second time on the 17th.
22  Point of order was called on it.  The point of order was
23  overruled.
24  Remarks ordered printed, which any member of the
25  Senate for whatever reason, debate, testimony, whatever,

## 179

1  can ask for the discussion between two members to be
2  printed, and that's what that indicates.
3  There were amendments offered, and the bill was
4  amended.  They had a record vote on that amendment.
5  Another amendment offered.  You keep going, and then
6  right up here on 3-17, Journal Entry 520, you see that
7  record vote.
8  Q.  Okay.
9  A.  And then the next entry is passed to engrossment
10  The record vote, that means that it passed.
11  Q.  Senator --
12  A.  Now, the two-thirds -- let me go back here.  When
13  it says laid before the Senate --
14  Q.  Well, Senator, if I could just ask you -- I
15  see -- we could pull out the previous exhibit on HB 218
16  and you pointed out to me exactly where the rules were
17  suspended in the regular order of business, and you
18  described that to me in great detail.
19  A.  Right.
20  Q.  Can you point anywhere on this history --
21  A.  Yeah, laid before the Senate.
22  Q.  So, laid before the Senate, that means the same
23  thing?
24  A.  Yes.
25  Q.  Would it surprise you at all if the two-thirds

## 180

1  rule was set aside for SB 362 and actually was not
2  followed?
3  A.  Wouldn't surprise me, no.  And as I read this
4  entry laid before the Senate, that wasn't a two-thirds.
5  Q.  So, I hand you what's been marked as Exhibit 168,
6  previously marked as Exhibit 168, and you'll see that it
7  says Senate Journal, 81st Legislature, Regular Session,
8  Second Day, Wednesday, January 14, 2009.
9  A.  Uh-huh.
10  Q.  And would that be the beginning of the
11  legislative session?  Is that correct?
12  A.  That would have been -- being Wednesday, that
13  would have been the second day.
14  Q.  Second day of the legislative session.  Thank
15  you, Senator.
16  A.  If the 13th was the first day.
17  Q.  And if we go to --
18  A.  Could have been the week -- well, that's about
19  right.  The 13th would have been probably about the
20  second day.  Not having a calendar here, I can only
21  guess.  Second day means second day of the session.
22  Q.  If we turn to -- and it's numbered Page 23 in the
23  upper right-hand corner.  I didn't give you all the
24  pages just to save some trees.
25  A.  Right.  I got it.

181

1  Q. And I'll turn your attention to Rule 5.11 A on
2  the second page -- or on this page of the exhibit.
3  A. I have it.
4  Q. And could you go ahead and read that?
5  A. "Special orders. Rule 5.11 A, any bill,
6  resolution or other measure may on any day be made a
7  special order for a future time of the session by an
8  affirmative vote of two-thirds of the members present."
9  Q. And, Senator, let me ask you is that, you know,
10 what we've been discussing here, the two-thirds rule or
11 what you've also called the 21-vote rule, which is only
12 required if there's 31 present but essentially the
13 two-thirds rule; is that correct?
14 A. No. Special order is different.
15 Q. Okay. Can you tell me how special order is
16 different?
17 A. Well, the two-thirds is so that you can take a
18 bill up out of its regular order. So, special orders,
19 you make a motion to declare something a special order
20 and it takes two-thirds. That's what this is referring
21 to.
22 Q. The language here in Rule 5.11 A, is this a
23 description of how the two-thirds rule essentially
24 works? Is that correct?
25 A. Let's see. Which two-thirds rule are you talking

182

1  about? The one to suspend the regular order or special
2  orders?
3  Q. I guess if you could explain to me the difference
4  between suspending the regular order and the special
5  orders.
6  A. Okay. The regular order is before they could
7  have taken up 362, they would have had to have heard
8  Senate Bill 1 all the way to Senate Bill 361 before they
9  could take it up. So, because they are going to take it
10 up before any or all of those have been heard, that's
11 out of its regular order. That requires two-thirds
12 vote.
13 A special order is a little bit -- it's another
14 process or procedure, if you will. As it says, "Any
15 bill, resolution or other measure may on any day be made
16 a special order for a future time of the session by an
17 affirmative vote of two-thirds."
18 In other words, Ladies and Gentleman of the
19 Senate, I move to make Senate Bill 14 a special order
20 bill to be taken up April 1st, that requires two-thirds.
21 That gives a time certain.
22 In other words, as I explained on the Intent
23 Calendar, I've given my intent I'm going to do it. By
24 special order now, the Senate can vote for a time
25 certain for a bill to be taken up, and that's what

183

1  special orders are.
2  Q. So, a special order requires a two-thirds vote?
3  A. A two-thirds vote.
4  Q. And if you look at Section D, so, Rule 5.11 D, if
5  you could read that for me.
6  A. "Notwithstanding Subsection A" -- and this is new
7  language apparently -- "a bill or resolution relating to
8  voter identification requirements reported favorably
9  from the Committee of the Whole Senate may be set as a
10 special order for a time at least 24 hours after the
11 motion is adopted by a majority of the members of the
12 Senate."
13 Q. And so, that language there, "majority of the
14 members of the Senate," is that different than the
15 two-thirds requirement?
16 A. Yes, it is. That's -- the majority of the
17 members are 16.
18 Q. Are you aware of the purpose of specifying voter
19 identification requirements in Rule 5.11 D?
20 MR. BRISSENDEN: Objection. Privileged.
21 Instruct the witness not to answer under legislative
22 privilege.
23 A. Okay. I would not answer under -- on advice of
24 the attorney under legislative privilege.
25 Q. (BY MR. FISHER) Are you aware of any

184

1  communications regarding Rule 5.11 D between yourself or
2  your staff and Legislators in the Texas Legislature?
3  A. No, there were none by me or staff that I know
4  of.
5  Q. And prior to 2009 -- and so we are -- you know,
6  the date on this is January 14th, 2009. Are you aware
7  of any similar -- and this is based on your experience
8  as a long-time Senator -- similar carve-outs, if you
9  will, that are similar in nature to Rule 5.11 D from the
10 rule that we talked about in 5.11 A?
11 MR. BRISSENDEN: Objection. Vague and
12 ambiguous and conclusory.
13 To the extent you can answer the question
14 based upon information that's in the public record, you
15 may do so.
16 A. I don't recall if it's in the public record or
17 not. I don't recall. There may have been. I don't
18 remember any.
19 Q. (BY MR. FISHER) Do you know if anyone -- are you
20 aware of anyone in the Governor's Office being involved
21 in drafting the language that appears in Rule 5.11 D?
22 A. No.
23 Q. Did you have a -- and some Senators -- do some
24 Senators have a public stance on the two-thirds rule,
25 either for it or against it?

Senator Kenneth  Lynn Armbrister                    June 8, 2012

---

185

1   A. (Witness indicated by nodding his head
2   affirmatively.)
3   Q. Is that a yes?
4   A. Yes. That's correct. Excuse me.
5   Q. And did you have a public stance on the
6   two-thirds rule while you were in the Senate?
7   A. Not publicly.
8   Q. Are you aware of any other communications related
9   to the rules contained in 5.11 A or D within the
10  Governor's office?
11  A. I'm not aware of any communication in the
12  Governor's Office about it.
13  Q. Did you ever have an occasion to vote on any
14  rules similar to Rule 5.11 A?
15      MR. BRISSENDEN: Objection. Vague.
16  A. I can't remember.
17  Q. (BY MR. FISHER) Is this similar to language that
18  you saw while you were serving in the Texas State
19  Senate, Rule 5.11 A?
20      MR. BRISSENDEN: Objection. Vague and
21  ambiguous.
22      THE WITNESS: I'm sorry?
23      MR. BRISSENDEN: You can answer.
24  A. D was never there when I was there but A, B and C
25  were there. Those were existing.

---

186

1   Q. (BY MR. FISHER) So, I'll hand you what's been
2   marked as Exhibit 170.
3   A. Okay.
4   Q. It's similar to the last exhibit.
5   A. Spencer, are we through with these?
6   Q. Yes.
7   A. Okay.
8   Q. Senate Rules adopted by the 82nd Legislature,
9   January 19, 2011.
10  A. Got it.
11  Q. And I'll turn your attention to Rule 5.11 A and D
12  and ask you if those appear similar to what you just
13  read in the previous exhibit?
14  A. They appear similar.
15  Q. And with regard to the rules in 2011 now,
16  referencing specifically the year 2011, are you aware of
17  any communications that the Governor's staff or you had
18  concerning Rule 5.11?
19  A. I had no communication, and I don't know about
20  staff.
21  Q. And is this -- would this operate in a similar
22  way as the rule we just looked at and discussed in
23  detail as far as the two-thirds vote for Rule 5.11 A and
24  then the majority vote for Rule 5.11 D in order to bring
25  a bill to the floor?

---

187

1   A. That appears correct. Okay. Yeah.
2   Q. And did you or your staff have any communications
3   with any Legislators concerning the adoption of Rule
4   5.11 A through D?
5   A. I certainly didn't, and I don't know about staff.
6   Q. All right.
7       MR. FISHER: Let's go off the record here.
8   I think we've been at it for a while. Take ten minutes.
9       (Short recess.)
10      MR. FISHER: Back on the record.
11  Q. (BY MR. FISHER) Senator, if we could return back
12  to -- we looked at Exhibit 45 a minute ago, and that was
13  the Declaration of Senator Uresti. I'm just going to
14  point your attention to a different section of that
15  declaration. We'll look at paragraphs 10 and 11 now.
16  We've been talking about the two-thirds rule.
17      We see in 10, "In 2011, the Senate majority
18  exempted SB 14 outright from requiring support of
19  two-thirds of the Senate. In other words, the
20  requirement that at least 20 Senators agree on SB 14
21  before it could be called up for debate on the Senator
22  floor was waived."
23      And then we continue on to the next page and in
24  11 we see, "Requiring two-thirds of the Senate to
25  support a bill is a basic, foundational rule of the

---

188

1   Senate, which was highly unusual to waive, especially
2   when the waiver was only applied to one bill. Of the
3   thousands of bills awaiting debate on the Senate floor,
4   the two-thirds rule was only waived for SB 14 and was
5   applied to all other pending Senate bills."
6       Did you have a different view of whether -- and
7   we talked about Rule 5.11 D was highly unusual activity?
8   A. In regards to 10 -- excuse me -- 10 and 11 --
9       MR. BRISSENDEN: Let me instruct you, first
10  of all, that to the extent that question requires you to
11  divulge information that you have, knowledge that you
12  have and have developed with regards to SB 14 as a part
13  of your work as the Director of Legislative Affairs for
14  the Governor, your thoughts, mental impressions,
15  opinions and analysis, I would instruct you not to
16  answer.
17      But to the extent that you can answer that
18  based upon matters of the public record, then you may do
19  so.
20      THE WITNESS: Can I ask you a question?
21      MR. BRISSENDEN: Do you need to take a
22  break?
23      THE WITNESS: A real quick question.
24      (Off the record.)
25  A. In regards to the statements in 10 and 11,

Senator Kenneth Lynn Armbrister                                    June 8, 2012

---

189

1  publicly, I think anybody could come to that conclusion.
2  Q.  (BY MR. FISHER)  So, I'm going to hand you
3  Exhibit No. 5, previously marked as Exhibit No. 5.  And,
4  again, we're dealing with legislative language, which
5  maybe you thought you had gotten away from since you
6  left the Texas State Senate but I'm going to make you
7  relive today.
8         And so, Exhibit 5, we'll see that it's, again, a
9  bill.  In the upper right-hand corner, you'll see SB No.
10  14.  And on this one, I can point you to the last page,
11  and you can take a look at that, and I think that will
12  give you some context as far as the version you're
13  looking at.
14  A.  Last page.  Okay.
15  Q.  And do you recognize this document?
16  A.  Yes.
17  Q.  And what is it?
18  A.  It is a photocopy of a bill that was passed by
19  the Legislature and signed by the Governor into law.
20  Q.  And was that in 2011?  Is that correct?
21  A.  May 27th, 2011.
22  Q.  Are you familiar with SB 14 and its general
23  subject matter?
24  A.  Yes.
25  Q.  And what was that?

---

190

1  A.  This was a bill for the purpose of enhancing
2  public integrity of elections.
3  Q.  I'm going to hand you what you'll mark as
4  Exhibit 195.
5         (Exhibit 195 marked.)
6  Q.  (BY MR. FISHER)  And you'll see at the top of
7  that is -- the words 2011 Session Accomplishments.
8  A.  Okay.
9  Q.  And if you look at the upper left-hand corner, we
10  see Governor's Priorities?
11  A.  Got it.
12  Q.  And we see there's one, two, three, four, five,
13  six, seven priorities listed underneath that heading.
14  And we see in the middle, the third one down is, "Voter
15  ID:  Texas now requires voters to present a photo ID at
16  the polls, which will protect the integrity of our
17  elections."  And have you seen this document before?
18  A.  I haven't seen this document.
19  Q.  Have you seen documents similar to this document?
20  A.  I've seen documents similar to it, yes.
21  Q.  And who typically creates these types of
22  documents in the Governor's Office?
23  A.  Our Budget Planning & Policy Group, as well as
24  our press section.
25  Q.  And for what purposes are these types of

---

191

1  documents created?
2  A.  As anybody in elected office, you want to give
3  kind of a report card out to your constituency of what
4  you were able to do during the legislative session.  I
5  used to do it in when I was in the Senate, tell people
6  what bills I carried, passed, what they -- those types
7  of things.
8  Q.  And so, the audience for this would be the public
9  at large?
10  A.  Yes.
11  Q.  Residents of Texas, I guess?
12  A.  Public at large.
13  Q.  And under voter ID, is it your understanding that
14  that would refer to SB 14?  Is that correct?
15  A.  It doesn't say it here, but yes, that was the
16  only, as we say, dog in the hunt.
17  Q.  And do you believe it's accurate concerning --
18  its statement about the Governor's priorities is
19  accurate, concerning the Governor's priorities and voter
20  ID being one of those?
21  A.  Yes.
22  Q.  And did you and your staff consider voter ID to
23  be a priority in 2011?
24  A.  Yes, we did.
25  Q.  And was it part of the Governor's legislative

---

192

1  agenda in 2011?
2  A.  It was a priority.  It was not a bill that we
3  asked to be drafted.
4  Q.  And what's your understanding about -- if it was
5  not a bill that you asked to be drafted, what's your
6  understanding about the drafting of SB 14 as far as the
7  authorship of SB 14?
8  A.  My understanding by that statement, it's not a
9  bill we asked to be drafted.  For instance, I went to a
10  member on the sonogram and asked them to have it
11  drafted.  I went to them on eminent domain reform.  So,
12  that was one we were really pushing for after working
13  with various groups and all, as opposed to one that you
14  had authors that had carried the bill before that had
15  indicated they were going to file it again.  As it was,
16  I think we saw it was prefiled.  So, we already knew it
17  was in the hopper.
18  Q.  And so, this -- and I guess you termed those, as
19  you just referred to the sonogram and the eminent domain
20  bills, those would be termed, I guess, initiatives from
21  the Governor's Office; is that correct?
22  A.  Right.
23  Q.  And so, voter ID was fairly characterized, based
24  upon your testimony, as not an initiative; is that
25  correct?

Senator Kenneth  Lynn Armbrister                        June 8, 2012

---

193

1    A. It was a priority but as far as a -- was this
2    part of the package that we tried to get through, that's
3    correct.
4    Q. It's correct that it was not part of the package?
5    A. It was not part of the package.
6    Q. So, we'll do this one more time, and this is the
7    last time we'll make you do this but we'll take a look
8    at --
9    A. Oh, Spencer.
10   Q. I know you're enjoying yourself, Senator.
11       We'll take a look at the allowable forms of ID
12   under SB 14.  And if you'll take a look at Exhibit
13   No. 5, I think it might be right here.
14   A. Got it.
15   Q. And I can draw your attention to Page 9, and we
16   have Section 14, 63.0101.  And I'll ask you to just go
17   to the middle of Page 10.
18   A. Okay.
19   Q. If you could take a look at those forms of ID.
20   A. Middle of Page 10.  Okay.  Let's see.  Okay.
21   Q. And we've spent some time.  We talked about HB
22   1706 first.  We talked about HB 218.  We talked about SB
23   362.  And we talked about some of the things that those
24   had in common, some of the things they didn't have in
25   common.  And some of the things we have talked about

---

194

1    along the way, we talked about nonphoto ID.  Do you see
2    any provision for nonphoto ID in SB 14?
3    A. I'm not familiar with the United States
4    citizenship -- oh, it says that contains -- so, I would
5    assume that does.  Passport I know does.  Handgun
6    license does.  Military ID does.  And driver's license
7    does.  I see none in this one.
8    Q. And with regard to -- and we talked about -- we
9    had a little bit of a discussion about the word
10   "expiration date," so, I'll use a different term.
11       As far as the expiration time period, if you take
12   a look at what's number 1 now under 63.0101 --
13   A. Got it.
14   Q. -- we see the expiration time period listed there
15   as expired no earlier than 60 days before the date of
16   presentation.  And is that different than what we saw in
17   SB 362, HB 218 and HB 1706?
18   A. Yes.
19   Q. And what did we see in those bills as far as the
20   expiration time period?
21   A. 2 years as opposed to 60 days before the date of
22   presentation.
23   Q. And if you look at the allowable forms of ID, do
24   you see in SB 14 any provision for IDs issued by federal
25   agencies or state agencies?

---

195

1    A. No.  That was stricken in this version.
2    Q. And where is it stricken?
3    A. It's not in here.  So, it was -- whereas the
4    others had it in there, I don't see that in there.
5    Q. We talked a little bit about -- well, let me ask
6    you do you see a difference between SB 14 and SB 362 as
7    far as the allowable forms of identification?
8    A. Yes.
9    Q. And do you see a difference between SB 14 and HB
10   218 as far as the allowable forms of identification?
11   A. Yes.
12   Q. And do you see a difference between SB 14 and HB
13   1706 as far as the allowable forms of identification?
14   A. Yes.
15   Q. Would you say there are more allowable forms of
16   identification under SB 362 than SB 14?
17   A. More.
18   Q. And would you say there are more available under
19   HB 218 than SB 14, more forms of allowable
20   identification?
21   A. More.
22   Q. And would you say there are more forms of
23   allowable identification under HB 1706 than SB 14?
24   A. More.
25   Q. And so, would you say that SB 14 is more or less

---

196

1    restrictive with regard to the allowable forms of
2    identification than previous bills that have been
3    offered and have failed passage in the Legislature?
4        MR. BRISSENDEN:  I'm going to object to the
5    extent that requires the witness to offer his opinion as
6    to SB 14.  And I would consider that privileged under
7    legislative privilege and instruct him not to answer.
8        A. On the advice of my attorney, I would invoke
9    legislative privilege.
10   Q. (BY MR. FISHER)  We talked about the election
11   identification certificate.  I believe we talked about
12   that previously.  Do you know what an election
13   identification certificate is?  And that's mentioned in
14   number 1, 63.01011, and it actually is underlined
15   language there.
16   A. Where are you?
17   Q. We're at Section 14, 63.0101, number 1 and then
18   you have driver's license and after it says election
19   identification certificate.
20   A. Right.
21   Q. Are you aware of what an election identification
22   certificate is?
23   A. No.
24   Q. And are you aware of what a citizenship
25   certificate is?  And I'm referring to -- I guess it

Senator Kenneth  Lynn Armbrister                    June 8, 2012

---

197

1   would be number 3.  We have a number 4 stricken out in
2   front of it.
3       A.  Right.  I'm not familiar with that.
4       Q.  And it talks about military identifications in
5   number 2.
6       A.  Yes.
7       Q.  And we have language here, and we talked about
8   expiration time period language.  The expiration time
9   period language we have here is expired no earlier than
10  60 days before the date of presentation.  Do you know
11  how often military identifications expire?
12      A.  No, sir.
13      Q.  Are you aware of any communications that either
14  you or your staff in the Governor's Office had regarding
15  the forms of ID that are included in SB 14?
16          MR. BRISSENDEN:  I would instruct you not to
17  disclose communications that you had with regards to
18  specific provisions of SB 14 with your staff, other
19  state agencies, other Legislators, their staff, Texas
20  Legislative Council.  Instruct you not to answer.
21      A.  On the advice of attorney, I will not answer due
22  to privilege.
23      Q.  (BY MR. FISHER)  Let me be clear, I'm not
24  referring to the substance of your communications.  I'm
25  asking whether you had any communications with anyone

---

198

1   about the forms of ID to be included in SB 14, either
2   you or your staff?
3           MR. BRISSENDEN:  I believe the question goes
4   beyond simply asking him as a general matter whether
5   he's had communications regarding SB 14, and I instruct
6   him not to answer.
7       A.  On the advice of my attorney, I will invoke the
8   privilege.
9       Q.  (BY MR. FISHER)  Did you or your staff have any
10  communications regarding SB 14?
11      A.  I'm sorry?
12      Q.  Did you or your staff have communications with
13  anyone regarding SB 14?
14      A.  I did with staff.  No one outside of the office.
15      Q.  Okay.  And who were the staff that you had
16  communication regarding SB 14?
17      A.  Mike Schofield.
18      Q.  And we've talked about Mr. Schofield today in
19  your testimony.  Did Mr. Schofield conduct a policy
20  analysis of SB 14?
21      A.  If he followed protocol, yes.
22      Q.  And when did you have discussions with
23  Mr. Schofield about SB 14?
24      A.  It would have occurred after the bill had passed
25  out of the Senate to the House in a general discussion

---

199

1   with analysts over a packet of bills, where are we on
2   this, where are we on that, where are we on this.
3       Q.  And would that have been in person?
4       A.  Yes.
5       Q.  And was there anyone else present during that
6   discussion?
7       A.  Yes.  That would have been quite a few people in
8   our office.
9       Q.  So, was this in the context of a meeting?  Is
10  that correct?
11      A.  Yes.  During the legislative session -- it
12  depends on what part of the session it's in, we get
13  updates weekly, every two weeks, every three.  Depends
14  on -- early parts of the session, you don't need those
15  but later in the session, we get updates, status reports
16  of where things are.
17      Q.  And you mentioned previously that SB 14 was not
18  an initiative, as you've described it today, on behalf
19  of the Governor, that's correct?
20      A.  Right.
21      Q.  And so, with regard to input regarding the
22  drafting of SB 14, you're not aware of the Governor's
23  Office having any input into the drafting of SB 14?
24      A.  I don't know of any -- I certainly didn't, and I
25  don't know -- and my staff surely wouldn't have.  I

---

200

1   don't know -- I don't know of any if we did.
2       Q.  Are you aware of any correspondence the Governor
3   received urging him to veto SB 14?
4       A.  I'm not aware.
5       Q.  Any correspondence urging him to sign it?
6       A.  I'm not aware of that either.
7       Q.  Correspondence concerning general opposition to
8   SB 14?
9       A.  I'm not aware of that.  That would be Greg
10  Davidson.
11      Q.  And are you aware of the purpose of SB 14?
12      A.  Yes.
13          MR. BRISSENDEN:  Objection.  Asked and
14  answered.  I believe -- to the extent -- let me instruct
15  the witness to the extent you can answer the question,
16  the Court has said you can answer that question as a
17  matter of general purpose.
18          Beyond that, though, in terms of divulging
19  or disclosing information about the intent of SB 14,
20  your opinions, your analysis, mental thought processes
21  about SB 14, that would be privileged.
22      A.  Okay.  The general intent was to enhance the
23  integrity of elections.
24      Q.  (BY MR. FISHER)  Do you know which bills the
25  Governor vetoed during the last session, which would be

Senator Kenneth  Lynn Armbrister                      June 8, 2012

## 201

1    the session we're talking about?
2        A.  It was somewhat of a record for those that we did
3    not veto this time.  I say that again not in a facetious
4    term but the Governor's very first session, he set
5    almost a record of vetoes.  And for the last three
6    sessions, they've come down.  Less than 15 bills were
7    vetoed.
8                    (Exhibit 196 marked.)
9        Q.  (BY MR. FISHER) So, we'll move to Exhibit 196.
10   And I'll just instruct you to keep Exhibit 5, SB 14,
11   handy.
12       A.  Okay.
13       Q.  But we'll take a look at Exhibit 196.  And you'll
14   notice at the top of this document it reads, "After
15   six-year fight, Perry signs voter ID into law."
16       A.  Right.
17       Q.  It's from the Texas Observer, and it's dated
18   May 27, 2011?
19       A.  Yes, sir.
20       Q.  And I'll just direct your attention to the third
21   paragraph.  And you'll see the quote -- and this is
22   actually -- I just asked you about veto, and this is
23   actually -- and we have a picture here of the Governor
24   signing the bill into law.
25           "'This simple action, no more complicated than

## 202

1    cashing a check down at the HEB or applying for a
2    library card down the street, will appropriately help
3    maintain the integrity and fairness of our electoral
4    system here in the Lone Star State,' Governor Perry said
5    at the signing."
6        A.  Okay.
7        Q.  And in your role as Legislative Director, would
8    you -- well, first of all, would you be at the signing?
9        A.  Not necessarily.
10       Q.  And are you aware of -- or do you play any role
11   in formulating the quotes that appear here?
12       A.  No.  Our press people handle all of the quotes,
13   speeches, all of that.
14       Q.  And do you see any difference between voting and
15   cashing a check or applying for a library card?
16       A.  Currently?
17       Q.  Yes.  As you sit here today, do you see any
18   difference in those activities?
19       A.  Yeah.  I need a photo ID to cash a check.  I
20   don't need one to vote.
21       Q.  Well, do you have --
22       A.  Well, now I do.
23       Q.  Do you believe that voting is a fundamental
24   right?
25       A.  I do.

## 203

1        Q.  And is cashing a check a fundamental right?
2        A.  No.
3        Q.  And is getting a library card a fundamental
4    right?
5        A.  No.
6        Q.  Are you aware of any communications either you or
7    your staff or the Governor's Office had concerning the
8    impact of SB 14 on minority voters?
9            MR. BRISSENDEN:  I'm going to object and,
10   under privilege, instruct the witness not to answer.
11       A.  On advice of attorney, I would invoke the
12   privilege.
13       Q.  (BY MR. FISHER)  And are you aware of --
14           THE WITNESS:  Is it privilege, clause?
15           MR. BRISSENDEN:  Privilege.
16           THE WITNESS:  Okay.
17       Q.  (BY MR. FISHER)  And are you aware of any
18   communications either you or your staff in the
19   Governor's Office had about SB 14 with other current or
20   former Legislators?
21           MR. BRISSENDEN:  Just to be clear, you're
22   asking in general terms about SB 14?
23           MR. FISHER:  Correct.
24       A.  I had a conversation after the bill passed with
25   the House author.

## 204

1        Q.  (BY MR. FISHER)  And the House author was?
2        A.  Patricia Harless.
3        Q.  And when did this -- you said after the bill
4    passed?  Do you have a --
5        A.  After the bill passed.  I wasn't there during the
6    floor debate.  I was there later in the day, and she
7    walked over to me and she said, "I passed voter ID."
8            And my conversation was, "Congratulations.  Good
9    work."
10       Q.  And after it passed the House, it was signed into
11   law by the Governor; is that correct?
12       A.  Not immediately but yeah, subsequent.  Let's see.
13   Well, let's see.  When did it pass the House?  Do we
14   have that?  Here we go.  No, that's 362.
15           (Off the record.)
16       Q.  (BY MR. FISHER)  Okay.  So, Senator, I'm going to
17   hand you what's been previously introduced as Exhibit
18   No. 8.
19       A.  Okay.
20       Q.  And, again, this is similar to the other Texas
21   Legislature Online Histories that we've looked at, the
22   difference being this is related to SB 14.
23       A.  Okay.
24       Q.  And so, my previous question was about signature
25   by the Governor, and I asked you whether it was signed

Senator Kenneth  Lynn Armbrister                        June 8, 2012

## 205

1   by the Governor after it passed the House, SB 14?
2       A.  Right.  We received the bill in our office on May
3   the 18th of 2011, and the Governor signed the bill looks
4   like 9 days later on May the 27th.  The difference in
5   time, we're allowed ten days, except this -- May 18th
6   fell within that other time where we have 20 days to
7   sign.  So, there was a 9-day lag between the time we had
8   it, it's reviewed and processed and then he actually is
9   on campus, as we say, for him to actually officially
10  sign the bill.
11      Q.  You said that after it passed the House, you had
12  a conversation with Representative Harless where you
13  said, "Good job"?
14      A.  Right.
15      Q.  Is it a fair assumption that you -- the Governor,
16  prior to getting this bill -- prior to getting any
17  bill -- let's make it more general.
18          Prior to getting any bill, does the Governor
19  already know whether he's going to sign it or not or is
20  there some consideration period that takes place?  And
21  I'm talking generally, not just with relation to SB 14.
22          MR. BRISSENDEN:  To the extent that -- well,
23  first of all, objection.  Speculation.
24          To the extent that you can answer that
25  question as a general matter, I'll allow you to do so.

## 206

1          To the extent that requires you to rely upon
2   your experience based upon specific pieces of
3   legislation during your experience as Director of
4   Legislative Affairs, I'd instruct you not to answer.
5       A.  Okay.  Generally, you passed a water plan, he's
6   in favor of planning for water, but somewhere in the
7   process in its final -- before final passage, an
8   amendment goes on that he can't, then generally that
9   would offset but from general, he knows -- he won't sign
10  anything until after we've gone through our review of
11  bills that we've received.
12      Q.  (BY MR. FISHER)  And you mentioned earlier -- we
13  talked about in detail your job you're currently doing,
14  and you said one of those responsibilities is to monitor
15  legislation.  So, you would, as a general matter, keep
16  the Governor informed of changes that happen to bills,
17  amendments that happen on a real time basis as things
18  are going on, you wouldn't wait until the bill passed to
19  find out what's in it, for lack of a better term?
20      A.  Generally, real time, no.  Like the president,
21  they've got a lot of other duties.  He relies upon me
22  plus staff to get down into the weeds on all the bills
23  and see if there's anything.
24          And then we have a sit down with him and go over
25  the bills for him to sign.  And it's still his call at

## 207

1   the end of the day but he won't in and of himself want
2   to know or need to know until it's time for him to make
3   a decision.
4       Q.  And you said -- and we talked about the general
5   intent of SB 14 is enhancing the integrity of elections;
6   is that correct?
7       A.  That's correct.
8       Q.  And are you aware of any other purpose of SB 14,
9   general purpose of SB 14 besides that?
10      A.  I'm not aware.
11      Q.  And are you aware of you or your staff having
12  conversations with officials or Legislators from other
13  states regarding SB 14?
14      A.  I had no other conversations with people from
15  other states or organizations.
16      Q.  Are you aware of you or your staff in the
17  Governor's Office having communications about SB 14 with
18  interest groups?
19      A.  No.
20      Q.  And so, we talked about Mr. Schofield.  We talked
21  about, under a general protocol, a policy analysis would
22  have been performed on SB 14; is that correct?
23      A.  That's correct.
24      Q.  And are you aware of the underlying facts upon
25  which that analysis relied?

## 208

1       A.  No.
2       Q.  Are you aware of you or your staff in the
3   Governor's Office conducting any analysis as to how many
4   registered voters possess the required forms of ID
5   required by SB 14?
6           MR. BRISSENDEN:  I'm going to instruct you
7   at this time that that question invokes both the
8   legislative process privilege as well as the
9   deliberative process privilege, and I'll instruct you
10  not to answer.
11      A.  On the advice of my attorney, I will not answer
12  under privilege.
13      Q.  (BY MR. FISHER)  Prior to signing SB 14, did you
14  or anyone on your staff in the Governor's Office have
15  communications regarding -- and we talked about it
16  earlier -- the Voting Rights Act and SB 14?
17          MR. BRISSENDEN:  Same instruction.
18      A.  Okay.  On advice of attorney -- my attorney, I
19  will invoke the privilege.
20      Q.  (BY MR. FISHER)  Going back to the bill analysis
21  that's performed on a bill, is any of that bill
22  analysis -- and this is a general question -- does any
23  of that bill analysis take into consideration the impact
24  of the bill on citizens of Texas as a whole?
25          MR. BRISSENDEN:  And the same instruction.

## 209

1   THE WITNESS:  The privilege instruction?
2   MR. BRISSENDEN:  Yes, same instruction.
3   A.  Okay.  On advice of my attorney, I will not
4   answer that under privilege.
5   Q.  (BY MR. FISHER)  So, we talked about your role
6   earlier as Legislative Director with regard to bills
7   that are moving through the House and the Senate.  Did
8   you or your staff play any role in a strategy ensuring
9   that SB 14 move through the House or the Senate?
10   A.  I didn't.  I don't think either one of my staff
11   did.  I don't know if they did but they never reported
12   to me that they were actively involved at all.
13   Q.  We also talked about your role -- your being able
14   to go on the floor.  Were you on the floor during the
15   consideration of SB 14, on the Senate floor?
16   A.  No.
17   Q.  And did you read the floor debate transcript --
18   A.  No.
19   Q.  -- of SB 14?
20   A.  No.
21   Q.  Let me ask you a general question just based on
22   your experience as a Texas Legislator.  Are you aware of
23   the term -- someone using the term, "I am not advised,"
24   on the floor in response to questions?
25   A.  That's been used for years.

## 210

1   Q.  And what does that mean?
2   A.  "I don't know.  I'm not advised."
3   MR. FISHER:  Let's take a quick break here.
4   (Short recess.)
5   MR. FISHER:  We'll go back on the record.
6   Q.  (BY MR. FISHER)  Senator, after the passage of SB
7   14 and we did just see the article indicating that the
8   Governor signed the bill --
9   A.  Yes.
10   Q.  -- did you or your staff in the Governor's Office
11   have any role in seeking preclearance from the Justice
12   Department?
13   A.  No.  That would be our legal people or the
14   State's -- the Attorney General's Office, I guess.  We
15   don't handle that part of it.
16   Q.  So, that would be handled outside of the
17   Governor's Office; is that correct?
18   A.  Yes.
19   Q.  Okay.  Senator, is it your understanding that SB
20   14 was submitted by the Governor as an emergency matter
21   to be considered by the 82nd Legislature in 2011?
22   A.  I believe it was, yes.
23   Q.  And I have -- actually, I'm going to hand you two
24   exhibits, and they'll be marked as 197 and 198.
25   A.  Okay.

## 211

1   (Exhibits 197-198 marked.)
2   Q.  (BY MR. FISHER)  They are not bill drafts, so,
3   they are hopefully a little easier to look at and
4   process.
5   A.  Okay.
6   Q.  On 197, you'll see on the top it says State of
7   Texas, Office of the Governor.  To the Senate and House
8   of Representatives of the 82nd Texas Legislature,
9   Regular Session.
10   And then Exhibit 198 will be the Senate Journal,
11   82nd Legislature, Regular Session, and that's dated
12   January 24, 2011.
13   A.  Got it.
14   Q.  And so, what are we looking at?  I guess with the
15   first exhibit, are you familiar with this document at
16   all?  And that's Exhibit 197.
17   A.  Yes.
18   Q.  And what is that document?
19   A.  This is a document that the Governor signed that
20   designated the concept of legislation that requires a
21   voter to present proof of identification when voting and
22   declaring that particular issue an emergency matter for
23   immediate consideration to the Senate and House.
24   Q.  And if we take a look at the second exhibit,
25   which was Exhibit 198 --

## 212

1   A.  Okay.
2   Q.  -- we see on the second page, which is actually
3   paginated as 54, a statement from the Office of the
4   Governor, and it uses the same language, "Legislation
5   that requires a voter to present proof of identification
6   when voting"?
7   A.  Yes.
8   Q.  And can you explain what this document is, based
9   upon your time in the Senate and your work for the
10   Office of Governor, what this proclamation constitutes
11   in this Senate bill?
12   A.  The Constitution of Texas is specific in not only
13   setting when a legislation will begin but it's also
14   specific when members of the Legislature, either House,
15   may actually take up legislation.
16   The Constitution also provides an exception to
17   that limitation.  The emergency order is the exception
18   or complies with the exception piece in the
19   constitution.  It's a methodology that is used many
20   times in our history to allow both Houses of Legislature
21   to begin work in earnest at a faster pace.
22   Q.  And in your experience as a Legislator and
23   working for the Governor's Office, just generally, who
24   would initiate a bill of this kind that circumvents -- I
25   guess what you said was the Texas Constitution?

Senator Kenneth   Lynn Armbrister                    June 8, 2012

213

1    A. Right.
2    Q. And we can refer to it as an emergency article?
3    A. Right.
4    Q. Who would initiate that process?
5    A. Generally, it's the members wanting to -- knowing
6    they only have 140 days -- if I had my way when I was in
7    the Senate, I would want everything I had declared an
8    emergency so I could get the ball rolling sooner.
9         It is a methodology that the Governor can use on
10   his own but as a general matter, we wait until we
11   receive a request from an author.
12        Q. And in your experience as a member of the
13   Legislature, is the designation of an emergency item a
14   common event?   Is it typical or is it something
15   atypical?
16   A. It's a common event.
17        Q. And by common event, do you mean something that
18   happens every session?
19   A. Every session for vast different topics.  With
20   181 of them up there, every one of them wanting to get
21   going, especially those with some tenure and experience,
22   they know that the crush of the -- toward the end of the
23   session, the likelihood of a piece of legislation that
24   they have may get caught up in just the bundle and it
25   never gets out.

214

1         Q. And you mentioned that each Legislator would like
2    to have all of their bills --
3    A. Right.
4    Q. -- designated as emergency legislation.  Does
5    that ever happen, that all of your bills are designated
6    as emergency legislation?
7    A. No.
8    Q. Would you say it happens to the majority of a
9    Legislator's bills, as a general matter?
10   A. As a general matter, no, not under Governor
11   Perry.
12   Q. And under Governor Perry, has he, as a general
13   matter, resisted adding things as emergency items in
14   legislative sessions?
15   A. I don't know if I would use the term "resist."
16   He hasn't honored the request on several different
17   things.
18   So, he's been asked to do this with regard to
19   some legislation and has declined in certain instances
20   to do that?
21   A. Right.
22   Q. And after the emergency designation is given to a
23   piece of legislation, does it automatically get
24   considered within the first 60 days?
25   A. It depends on each House.  And as I laid out kind

215

1    of the protocols that occur, if the speaker or the
2    Lieutenant Governor -- then it falls to them to see how
3    far on the gas pedal that they push, and then it would
4    fall to a committee Chair to see how much further down
5    the gas pedal they want to push to determine the
6    rapidity by which a bill is taken up.
7         This is a just a protocol that sets in place the
8    car moving down the track faster than what the
9    Constitution says they can be on the track of moving.
10   Q. And we talked a little bit about how this is
11   done.  You mentioned it typically comes from members.
12   A. Right.
13   Q. Is there a formalized process or is this
14   something that -- for instance -- and we talked a long
15   time ago -- well, more than five hours ago -- about your
16   role as a gate opener.
17   A. Right.
18   Q. Would this be something where a member would seek
19   to talk to the Governor about an emergency bill issue?
20   A. It could be.  In times past, it has been.
21   Q. And based upon your experience in the
22   Legislature, can declaring a bill an emergency item be
23   viewed as a political decision?  I know it has a
24   procedural impact but can the designation itself be
25   considered a political move by the Governor or the

216

1    member who sought emergency designation?
2         MR. BRISSENDEN:  Objection.  Speculation and
3    vague.
4         To the extent you can answer, go ahead.
5    A. Well, that was going to be my answer, I could
6    only speculate what the Governor's perception is of a
7    request.  I don't know what -- in all candor, I don't
8    know what he considers.
9         I think he looks at the merits of the issue
10   rather than the politics of it, if it's something that,
11   one, he would want to support, two --
12   Q. (BY MR. FISHER)  When the Governor makes a
13   decision to designate something as an emergency piece of
14   legislation, have you, in your experience, seen that
15   taken by the public and in the public arena as a
16   political decision on a certain bill, meaning does that
17   indicate that there's politics at work beyond the
18   procedure?  And the procedure is the procedure but are
19   there politics involved beyond that?
20        MR. BRISSENDEN:  Objection.  Vague and
21   ambiguous.  Calls for speculation.
22   A. Not by the public.
23   Q. (BY MR. FISHER)  Do you see the designation of a
24   piece of legislation as an emergency bill as indicating
25   that the Governor supports that piece of legislation or

Senator Kenneth  Lynn Armbrister                    June 8, 2012

## 217

1  is it more broad than that?
2  A. It's not any more broad. The language in this
3  particular one --
4  Q. And you're referring to Exhibit 197?
5  A. 197, legislation that requires a voter to present
6  proof of identification when voting, it doesn't say what
7  kind of proof or getting down into the details.
8  Obviously, that could be read that he's interested in
9  the integrity of the electoral process.
10  Q. And so, I'm going to kind of ask a question out
11  of context here but are you aware of who Travis Richmond
12  is?
13  A. Yes.
14  Q. And what is his role in Governor Perry's office?
15  A. Currently now he has been reassigned to my shop.
16  He was one of the gentlemen that I mentioned earlier
17  that's in there. He's our research person within my
18  shop.
19  Q. Okay.
20  A. If an issue is there, I'm going to really get --
21  what good researchers do best, they get down as far as
22  they can go, Travis does that for me now.
23  Q. And in his work doing research for you, does he
24  provide you with -- as a general matter, does he provide
25  you with memorandum or how does he convey the results of

## 219

1  Deputy Chief of Staff, Brandy Marty, who was at that
2  time the Director of Budget Planning & Policy, and Jeff
3  Boyd, who at the time was our General counsel.
4  Q. And, so you said after prefiling, do you have a
5  general idea of what month this conversation took place?
6  A. That would have been in December or January. He
7  didn't file it until -- I believe the history line said
8  12-15.
9  Q. And what was the general nature of that
10  discussion?
11  MR. BRISSENDEN: I'm going to instruct the
12  witness that the question invokes a matter that is
13  privileged and not to disclose the substance of the
14  communication.
15  A. Okay. On the advice of attorney, I'll invoke the
16  privilege.
17  (Short recess.)
18  Q. (BY MR. FISHER) Okay. Senator, we'll go back on
19  the record.
20  So, in your role as the Legislative Director, you
21  monitor -- we talked about you monitoring bills. If a
22  bill has been designated as an emergency item, as a
23  general matter, is that something that you would follow
24  the progress of?
25  A. Not any more so than the myriad of other bills

## 218

1  his research to you? I assume he doesn't hand you a
2  stack of documents?
3  A. No. It's verbal.
4  Q. Okay.
5  A. And he's only been in that role with me three
6  months maybe.
7  Q. And what was his previous role prior to coming to
8  work for you?
9  A. He was Special Assistant to Ray Sullivan, who is
10  the Chief of Staff.
11  Q. Do you know if he's an attorney?
12  A. No, he's not. He used to be a newspaper
13  reporter, probably Fort Worth Star Telegram, I believe.
14  Q. And are you aware of any communications with you
15  or your staff regarding designation of voter
16  identification as an emergency matter for the 82nd
17  Legislature?
18  A. I know within our office -- by our office, I'm
19  talking the Governor's Office -- once this bill was
20  prefiled, there was a discussion.
21  Q. And do you know who took part in that discussion?
22  A. I was at the meeting, Sarah Floerke, David
23  Eichler both -- at the time, Sarah was the House
24  liaison, David was the Senate liaison, Ray Sullivan,
25  Kathy Walt, Ray was the Chief of Staff, Kathy was the

## 220

1  going through. I mean, it -- unless, of course, it was
2  one of our designated -- one of our priority bills.
3  Q. And as a general matter, are you aware of the
4  criteria that the Governor's Office uses to designate
5  bills as emergency matters?
6  MR. BRISSENDEN: To the extent that that
7  question requires you to disclose information, thoughts,
8  opinions, analysis, deliberations, motivations
9  pertaining to emergency declaration that we've been
10  discussing and SB 14, legislation pertaining to voter
11  identification bills, I would instruct you not to
12  answer.
13  To the extent you can answer that question
14  on a general -- based upon general information,
15  information that's in the record and based upon your
16  experience outside of the Governor's Office, you may
17  answer.
18  A. Okay. As a general, we don't have a set
19  criteria. Each instance is taken up on its own merits.
20  Q. (BY MR. FISHER) And were you or your staff in
21  the Governor's Office involved in any communications
22  regarding emergency items in the 2011 session?
23  A. Say it again.
24  Q. Were you or your staff involved in any
25  communications regarding the designation of emergency

Senator Kenneth Lynn Armbrister                    June 8, 2012

---

### 221

1  items in the 2011 session?
2      A.  I was not.
3      Q.  Are you aware of your staff --
4      A.  Other than just the discussion phase that I
5  talked about earlier with senior staff.
6      Q.  And that was the meeting that we had discussed
7  previously, correct?
8      A.  Yeah.
9      Q.  So, I've got a list of other folks to ask you
10  about, and these names, I don't believe, have come up
11  previously.  So, we just talked about -- was it
12  Travis --
13      A.  Richmond.
14      Q.  Richmond.  Can you tell me who Jeff Boyd is?
15      A.  Jeff Boyd, during the session, was our General
16  Counsel.  David Morales, who had to leave, is the
17  General Counsel now.  Jeff Boyd is now the Chief of
18  Staff.
19      Q.  So, Jeff Boyd is now Chief of Staff for the
20  Governor?
21      A.  Right.  Ray Sullivan left, and Jeff Boyd is now
22  Chief of Staff.
23      Q.  About what time did Jeff Boyd take over that
24  position and did Mr. Morales take over the General
25  Counsel position?

---

### 223

1  witness that to the extent that requires you to disclose
2  your thoughts, opinions, mental analysis and impressions
3  about legislation involving voter ID legislation, I
4  would instruct you not to answer.
5      A.  On advice of attorney, I would invoke the
6  privilege.
7      Q.  (BY MR. FISHER)  Have you heard publicly anyone
8  make an assertion about photo ID being necessary because
9  of a growth of noncitizen population in Texas?
10      A.  No.
11      Q.  Are you aware of any cases of voter fraud
12  occurring in Texas?
13          MR. BRISSENDEN:  To the extent that question
14  requires you to rely upon your analysis, opinions and
15  thoughts, mental impressions, information that you
16  learned about in your role as Governor in relation to SB
17  14 or other voter ID legislation or, actually, in your
18  role as Senator prior to serving in the Governor's
19  Office in connection with pieces of legislation, I would
20  instruct you not to answer.
21          To the extent that you have information
22  aside from your roles in the Legislature or in the
23  Governor's Office or to the extent there's information
24  that you're aware of in the public record, you may
25  answer the question.

---

### 222

1      A.  Probably the closest I can get you is Ray
2  probably left September, October, and Jeff moved over to
3  take Chief of Staff two or three days later.
4      Q.  And do you know a Jimmy Blacklock?
5      A.  I know Jimmy.  He's with the Attorney General's
6  Office, works with Daniel Hodge.
7      Q.  And David Schneck?
8      A.  No, I don't know that name.
9      Q.  Reed Clay, do you know a Reed Clay?
10      A.  No, I don't know that name.
11      Q.  And for the folks that you mentioned you knew,
12  and that was Jeff Boyd and Jimmy Blacklock, are you
13  aware of them being involved in the preclearance process
14  for SB 14?
15      A.  No.
16      Q.  Are you aware of any Legislators making public
17  statements about illegal aliens voting?
18      A.  Like I say, I wasn't involved with the floor
19  debate in either House.  So, I haven't heard that
20  statement made.
21      Q.  Do you believe that there's a connection between
22  voter photo identification bills and growth of the
23  noncitizen population in Texas?
24      A.  I wouldn't have any --
25          MR. BRISSENDEN:  I'm going to instruct the

---

### 224

1      A.  Okay.  On the one part, I would follow the advice
2  of my attorney.
3          On the other, I have no personal knowledge of
4  that.
5      Q.  (BY MR. FISHER)  Are you aware of the Governor's
6  Office receiving any complaints regarding voter fraud
7  from constituents?
8      A.  That would be Greg Davidson.  They wouldn't come
9  to me.
10      Q.  Is it fair to say that -- and you've mentioned
11  Greg Davidson a few times.
12      A.  Right.
13      Q.  Do the concerns -- and this is a general
14  question -- concerns of citizens and constituents play a
15  role in determinations about whether to support or
16  oppose bills or propose initiatives?
17      A.  Sure.  Citizen input we value in our office.
18  Each week, Greg gives us an update on different issues,
19  whatever they may be.  We received 3,000 phone calls or
20  letters on the last shuttle flight to save Johnson Space
21  Center and that type of thing.
22      Q.  So, in the questions that I've asked you today,
23  and we have referred to Mr. Davidson's name, is it fair
24  to say that on any -- let's just go with regard to the
25  last question I asked -- that issue of voter fraud did

## 225

1   not come up in any kind of context where you would be
2   made aware of constituent concerns through Mr. Davidson?
3       A. Absolutely.
4       Q. And are you aware of you or your staff receiving
5   any complaints about voter fraud from local election
6   officials?
7       A. I didn't receive any. I don't know about staff.
8       Q. And with regard to your knowledge -- public
9   knowledge, information that's in the public record, are
10  you aware of any incidents of mail-in ballot fraud
11  occurring in the State of Texas?
12      A. I have no knowledge of that.
13      Q. And we've got another name to ask you about. Do
14  you know an Eric Wilson?
15      A. Yes.
16      Q. And what is his role in the Governor's Office?
17      A. He's not in the Governor's Office. He's over at
18  the Secretary of State's office, if it's the same Eric
19  Wilson. His father used to be a House member years ago.
20      Q. And what does he do at the Secretary of State's
21  office?
22      A. I'm not real sure.
23          (Off the record.)
24          MR. FISHER: At this time, we'll go back on
25  the record.

## 226

1          And, Mr. Harris, if you'd like to go ahead
2   with your questioning for the Senator.
3          MR. HARRIS: Thank you.
4               EXAMINATION
5       Q. (BY MR. HARRIS) I'm Adam Harris with the law
6   firm of Fried, Frank, Harris, Shriver & Jacobson. We
7   are counsel to defendant-intervenors, Texas League of
8   Young Voters Education Fund.
9          I'll keep this brief because I know you've been
10  answering questions for a long time now.
11         My first question is are you familiar with the
12  group known as the King Street Patriots?
13      A. The what?
14      Q. The King Street Patriots.
15      A. No, I'm not familiar with that group.
16      Q. You're not? Okay. How has the Governor done --
17  Governor Perry done in his elections amongst Hispanic
18  voters?
19         MR. BRISSENDEN: Objection. Vague.
20      A. I don't have anything to do with elections. I
21  don't know.
22      Q. (BY MR. HARRIS) Do you generally follow the
23  Governor's election results?
24      A. Only if he won, or the presidential race if he
25  lost.

## 227

1       Q. You don't have any understanding as to how the
2   Governor has done amongst Hispanic voters?
3          MR. BRISSENDEN: Same objection.
4       Q. (BY MR. HARRIS) You can answer the question.
5       A. I have no idea.
6       Q. How about amongst African American voters, do you
7   have any understanding as to how the Governor has done
8   in his elections amongst African American voters in
9   Texas?
10         MR. BRISSENDEN: Objection. Vague and
11  ambiguous.
12      A. No, sir.
13      Q. (BY MR. HARRIS) I think you testified previously
14  that unlike some of the previous voter ID bills, SB 14
15  would not allow an individual to vote with a student ID.
16  Is that your understanding?
17      A. If you'll give me a moment to relook at -- is
18  that Exhibit 5?
19      Q. Certainly.
20      A. For the five criteria in Senate Bill 14, I don't
21  see that on there.
22      Q. Do you have any understanding as to why SB 14
23  does not allow an individual to vote with a student ID?
24         MR. BRISSENDEN: Objection. Privileged.
25  Instruct the witness not to answer.

## 228

1       Q. (BY MR. HARRIS) Senator, putting aside any
2   privileged communications, do you have any understanding
3   based on the public record as to why SB 14 does not
4   allow an individual to vote with a student ID?
5          MR. BRISSENDEN: Same objection. I instruct
6   the witness not to answer.
7          MR. HARRIS: Well, I believe the question
8   was putting aside any privileged communications, whether
9   the Senator has any knowledge based on the public
10  record. So, I would ask that you reconsider the
11  objection.
12         MR. BRISSENDEN: And to the extent the
13  question requires him to do an analysis of information
14  that is both within the public record and not within the
15  public record, that question would be privileged, and I
16  would instruct him not to answer.
17      A. On my advice of my attorney --
18      Q. (BY MR. HARRIS) We'll move on.
19         Senator, do you have any reason to think that a
20  student ID is not a good indicator that someone is who
21  they say they are?
22      A. Say it again.
23      Q. Do you have any reason to think that a student ID
24  would not be a good indicator that someone is who they
25  say they are?

Senator Kenneth Lynn Armbrister                                June 8, 2012

---

### 229

1  MR. BRISSENDEN:  I'm going to instruct the
2  witness not to answer the question.  Again, it's
3  pertaining to particular provisions within SB 14.
4  Instruct the witness not to answer.
5      Q.  (BY MR. HARRIS)  Beyond any particular provisions
6  of SB 14, in general, do you have any opinion as to
7  whether a student ID would or would not be a good
8  indicator if someone is who they say they are?
9      MR. BRISSENDEN:  Again, same instruction.
10     Q.  (BY MR. HARRIS)  I believe you testified earlier
11  that Governor Perry designated voter ID as an emergency
12  item; is that correct?
13     A.  That's correct, sir.
14     Q.  In general, putting aside any particular piece of
15  legislation, how does the Governor or the Governor's
16  Office decide which legislation to designate as an
17  emergency item?
18     MR. BRISSENDEN:  Objection.  Asked and
19  answered.
20     Q.  (BY MR. HARRIS)  You can answer the question.  I
21  apologize if my phone connection was not great during
22  this but you may answer the question.
23     MR. BRISSENDEN:  I caution you that to the
24  extent that that question requires you to divulge
25  information that you have, knowledge that you've learned

---

### 230

1  as a part of your role as Director of Legislative
2  Affairs in the Governor's Office, I would instruct you
3  not to answer the question.
4      To the extent that you can, I believe you've
5  already answered the question in general terms, you may
6  do so.
7      A.  In general terms, Mr. Harris, we have no written
8  criteria that is used.  It's strictly up to him.  I've
9  carried things to him before and he gave me a flat,
10  "No," and I've carried other things and he said, "Let's
11  do it."  It's strictly up to him.
12     Q.  (BY MR. HARRIS)  You testified earlier that the
13  general purpose of SB 14 was to, quote, enhance the
14  integrity of elections.  Do you recall that testimony?
15     A.  Yes.
16     Q.  Do you assert that the current election system in
17  Texas lacks integrity?
18     MR. BRISSENDEN:  To the extent that that
19  question requires you to divulge your opinions, your
20  analysis, thought processes in regards to voter ID
21  legislation, including SB 14, I would instruct you not
22  to answer the question.
23     A.  On advice of my attorney, I won't answer.
24     Q.  (BY MR. HARRIS)  Senator, are you able to answer
25  the question?

---

### 231

1      A.  On the advice of my attorney, I'm not able to
2  answer the question.
3      Q.  Have you ever heard any Texas voter or any of the
4  constituents in Texas express the view that the current
5  system of elections in Texas lacks integrity?
6      A.  I have not -- I have no knowledge of that.
7      Q.  Now, have you ever heard any Texas voter or
8  constituent in Texas express the view that he or she
9  lacks confidence in the current system of elections in
10  Texas?
11     A.  They have not expressed that to me.
12     MR. HARRIS:  At this time, I have no further
13  questions.
14     THE WITNESS:  Thank you, Mr. Harris.
15     FURTHER EXAMINATION
16     Q.  (BY MR. FISHER)  Okay.  Senator, we talked
17  about -- today we've talked about HB 1706, HB 218, SB
18  362 and SB 14, and we've kind of did a bill comparison.
19  We looked at the individual provisions of those bills
20  today.  Are you aware of the circumstances changing in
21  Texas with regard to the electoral process during the
22  consideration of those bills?  And that would be from
23  2005 to 2011.
24     MR. BRISSENDEN:  To the extent that that
25  question requires you to divulge information that you

---

### 232

1  analyzed or considered or did not consider as a part of
2  your analysis, consideration, deliberations in
3  connection with voter ID legislation and including SB
4  14, I would instruct you not to answer.
5      A.  On advice of my attorney, I cannot answer.
6      Q.  (BY MR. FISHER)  And do you believe SB 14 will
7  have an effect on voting in Texas?
8      MR. BRISSENDEN:  Same objection.  Same
9  instruction.
10     A.  Same answer, on advice of my attorney.
11     Q.  (BY MR. FISHER)  As a general matter, does SB 14
12  require a voter to do something that they are not
13  required to do now under current law as it stands?
14     A.  Yes.
15     Q.  At any time since the passage of SB 14, have you
16  come to believe it was passed with a discriminatory
17  purpose?
18     MR. BRISSENDEN:  To the extent that that
19  question requires you to divulge your opinions, your
20  analysis, your views of SB 14 as part of your role in
21  the Governor's Office in connection with that work, I
22  instruct you not to answer.
23     A.  On the advice of the attorney -- my attorney, I
24  will invoke not to answer.
25     Q.  (BY MR. FISHER)  And you said that SB 14 will

## 233

1   require some action beyond what is currently required
2   under Texas law in order for a person to vote, correct?
3       A.  Yes.
4       Q.  Do you believe that that requirement will have
5   any effect on minority voters?
6       MR. BRISSENDEN:  And I would instruct you
7   under the privilege not to answer the question.
8       A.  On the advice of my attorney, I invoke the
9   privilege.
10      Q.  (BY MR. FISHER)  Have you heard any Texas
11  Legislator express to you or to your staff the view that
12  SB 14 could prevent a legitimately registered voter from
13  voting in Texas?
14      MR. BRISSENDEN:  And I would instruct the
15  witness not to disclose communications that you've had
16  with either your staff, with other Legislators and their
17  staff and not to disclose those communications in
18  answering the question.  Instruct you not to answer.
19      A.  On the advice of my attorney, I will honor my
20  attorney's request, however you want to say it.
21      Q.  (BY MR. FISHER)  Senator, I only have about ten
22  more bills for us to go through and then we're --
23      A.  Okay.  I like this.
24      Q.  The old Legislator is coming out in you.
25          Would you like to change any of the answers

## 234

1   you've provided today, Senator, now that you've had a
2   chance to reflect on answers you've given?  And you did
3   change one earlier.  Is there anything else you'd like
4   to change as we sit here?
5       A.  Just looking at this --
6       Q.  And by "this," you're referring to?
7       A.  To Exhibit 5.
8       Q.  Okay.
9       A.  On the question relating to forms of
10  identification that do not have a photo associated --
11  and I want to -- they can under -- on Page 1, under
12  written documentation -- well, it's -- there starting on
13  line 5 and then going down to line 19, number 2 there on
14  line 17, a statement in a form prescribed by the
15  Secretary of State that the applicant does not have a
16  form of identification acceptable under 63.0101, I don't
17  know what preceded -- the preceding number 1 A and B
18  have to do with a disability or whatever.  I don't know
19  if 2 provides if you don't have one of these other ones
20  that this one then comes into play and you do that just
21  by filling out a form with the Secretary of State.  I
22  don't know what that is.
23      Q.  Well, Senator, if you look at little i, which is
24  on Section 7, I think you'll see that it's referring to
25  the basis of disability.

## 235

1       A.  Okay.  So, I don't want to change my answer then.
2   I just saw that and I said, "Well, wait a minute, I
3   answered you one way a while ago."
4       Q.  The question we asked on SB 14 was whether it
5   provided -- and we saw in the other bills --
6       A.  Okay.
7       Q.  -- there was kind of a spelling out and we talked
8   about the issues of nonphoto ID --
9       A.  Right.
10      Q.  -- and if there was something similar that you
11  saw in SB 14.
12      A.  Okay.
13      Q.  Do you see anything similar with regard to
14  nonphoto ID in SB 14 that we saw in HB 218, SB 362 or HB
15  1706?
16      A.  Did I see anything different?
17      Q.  Do you see anything similar, meaning we looked at
18  those bills and we saw Section B --
19      A.  There's some similarities but the vast majority
20  are different.
21      Q.  So, the vast majority are different in SB 14 than
22  in the previous bills; is that correct?
23      A.  Right, as far as inclusive of these other things.
24      Q.  Okay.  Is there any information that you recall
25  now?  So, any questions I asked you where you said you

## 236

1   didn't remember that you later remembered?
2       A.  No.
3       Q.  Anything additional that you want to share at
4   this time?
5       A.  No.
6       MR. FISHER:  So, I have no additional
7   questions.  Thank you, Senator.
8       I think we'll, as the practice has been,
9   keep it open.
10      THE WITNESS:  Okay.
11      MR. FISHER:  And with that, we'll conclude.
12      (Whereupon at 4:59 p.m. the
13      deposition was adjourned.)
14
15
16
17
18
19
20
21
22
23
24
25

Yannis Banks                                                                May 25, 2012



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
        Defendant,                 )
                                   )
ERIC KENNIE, et al,                )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS STATE CONFERENCE OF          )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )  (RMC-DST-RLW)
                                   )  Three-Judge Court
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
        Defendant-Intervenors.     )

*********************************************
            ORAL DEPOSITION OF
               YANNIS BANKS
               MAY 25, 2012
*********************************************

**2**

1       ORAL DEPOSITION OF YANNIS BANKS, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the MAY 25, 2012, from 9:10 a.m. to 3:52 p.m., before
5   Chris Carpenter, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the Offices of the
7   Attorney General of Texas, first floor conference room,
8   209 West 14th Street, Austin, Texas 78701, pursuant to
9   the Federal Rules of Civil Procedure and the provisions
10  stated on the record or attached hereto.

**3**

1
2
3            A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS:
5       Matthew Frederick
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
6       P.O. Box 12548
        Austin, TX 78711-2548
7
        209 West 14th Street
8       8th Floor
        Austin, TX  78701
9       (512) 475-4330
        matthew.frederick@texasattorneygeneral.gov
10
11  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
    NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
12  CAUCUS:
13      Amy L. Rudd
        DECHERT, LLP
14      300 W. 6th Street
        Suite 2010
15      Austin, TX  78701
        (512) 394-3000
16      amy.rudd@dechert.com
17      Gary L. Bledsoe
        LAW OFFICE OF GARY L. BLEDSOE AND ASSOCIATES
18      316 W. 12th Street, Suite 307
        Austin, TX  78701
19      (512) 322-9992
        garybledsoe@sbcglobal.net
20
        Ian Vandewalker (by telephone)
21      Myrna Perez (by telephone)
22
23
24
25

**4**

1               INDEX
2   Appearances.........................................3
3   Stipulations pages attached after Page...........166
4   YANNIS BANKS
5       Examination by Mr. Frederick................6
        Examination by Mr. Vandewalker............156
6
7   Signature and Changes............................163
8   Reporter's Certificate...........................165
9
    EXHIBITS
10
    NO. DESCRIPTION                      PAGE MARKED
11
    1   Notice of Deposition                11
12
    2   Defendant-Intervenor Texas State    73
13      Conference of NAACP Branches' Responses
        and Objections to the State of Texas'
14      First Set of Interrogatories
    3   Brennan Center for Justice Letter, Sept.  91
15      14, 2011
16  4   Brennan Center for Justice Letter, Nov.   91
17      16, 2011
18
19
20
21
22
23
24
25

## 5

1             (at 9:10 a.m.)
2             (Witness sworn.)
3        MR. FREDERICK:  Good morning.  My name is
4  Matt Frederick.  I represent the State of Texas.
5             And I guess maybe we could go around and
6  announce for the record who all is appearing.
7        MS. RUDD:  Amy Rudd from Dechert on behalf
8  of the Texas Conference of the NAACP and Mr. Banks.
9        MR. BLEDSOE:  Gary Bledsoe for the Texas
10  NAACP.
11        MR. VANDEWALKER:  I'm sorry.  For the
12  people on the phone, I don't know if the phone could be
13  maybe arranged more centrally, but I couldn't really
14  hear Amy or Gary very well.
15        MS. RUDD:  Is it better if we talk like
16  this?
17        MR. VANDEWALKER:  Yes, that's much better.
18  Thank you.
19        MS. RUDD:  Okay.  We'll just make sure to
20  speak into the microphone.
21        MR. FREDERICK:  Do you all on the phone
22  want to announce for the record?
23        MR. VANDEWALKER:  Sure.  This is Ian
24  Vandewalker with the Brennan Center representing
25  Defendant Intervenors NAACP and Mexican American --

## 6

1        MS. PEREZ:  And I'm Myrna Perez.  It's
2  M-y-r-n-a, P-e-r-e-z, also with --
3        MS. RUDD:  You know what, guys, you're
4  cutting out.
5        MR. VANDEWALKER:  Okay.  I'm not sure what
6  the solution to that is.  Did you get our names?
7        THE REPORTER:  Yes.
8        MR. VANDEWALKER:  Okay.  Maybe we'll have
9  to repeat some things.
10        THE REPORTER:  The only thing that didn't
11  come out -- this is Chris Carpenter, the court reporter,
12  and the only thing that didn't come out, you said you
13  were with the NAACP and the Mexican American, and then
14  it cut out.
15        MR. VANDEWALKER:  The Mexican American
16  Legislative Caucus.
17        THE REPORTER:  Got it.  MALC.
18             YANNIS BANKS,
19  having been first duly sworn to testify the truth, the
20  whole truth, and nothing but the truth, testified as
21  follows:
22             EXAMINATION
23  By MR. FREDERICK:
24        Q.  Mr. Banks, will you please state your name for
25  the record?

## 7

1        A.  Sure.  My name is Yannis Banks, and I'm with
2  the Texas NAACP.
3        Q.  Mr. Banks, have you been deposed before?
4        A.  No, sir.  It's my first time.
5        Q.  Well, I'm going to ask you a couple of
6  preliminary questions --
7        A.  Okay.
8        Q.  -- just to, kind of, tell you the ground rules
9  and make sure we understand each other going forward.
10        A.  Sure.
11        Q.  First, are you suffering from any illness today
12  that would affect your ability to provide accurate
13  answers to my questions?
14        A.  No, sir.
15        Q.  Are you taking any medications that might
16  affect your ability to provide accurate answers to my
17  questions?
18        A.  No, sir.
19        Q.  Are you aware of anything else this morning
20  that might prevent you from accurately answering my
21  questions?
22        A.  I am not aware.
23        Q.  Great.
24             Let me give you a couple of ground rules.
25  The first one, as we've all be figuring out is, I need

## 8

1  you to answer audibly, just so the court reporter can
2  hear.  So rather than shaking your head or nodding, if
3  you could just say "yes" or "no."
4        A.  Okay.
5        Q.  Second, if you don't understand a question that
6  I ask, please tell me.  I'll be happy to rephrase or
7  clarify.
8        A.  Okay.
9        Q.  And again, for the court reporter, if you would
10  let me finish my question before you answer, just so
11  we're not speaking over each other, and I will try and
12  do the same for you.  I may forget.  But if we can just
13  try and let each other finish, so that he can get an
14  accurate record.
15        A.  Yes, sir.  Not a problem.
16        Q.  Great.
17             Your lawyers may object to my questions.
18  Generally, even if your lawyers object, you can still
19  answer the question.  Do you understand that?
20        A.  I do, yes.
21        Q.  Now, there may be times when your lawyers
22  instruct you not to answer.  In that case, we'll make it
23  clear on the record, but in that instance, you can
24  refuse to answer if you were so instructed.  Do you
25  understand that?

Yannis Banks                                                          May 25, 2012

---

**13**

1    Q.   Sure.

2    A.   So the different things I've read and seen, I'm

3    not sure.  I don't want to say yes, and it was something

4    else.  I'm not sure.

5    Q.   Okay.

6    A.   To the question.

7    Q.   Fair enough.  Do you feel like you are prepared

8    to testify about the factual basis of the Texas NAACP's

9    claims or defenses in this lawsuit?

10   A.   Yes.

11   Q.   Now, have you -- have you been designated to

12   testify about Topic Number 2 on this notice?

13   A.   (Reading document.) I don't think I was

14   designated for that one, if I remember correctly.

15   Q.   Okay.  Do you believe that you are prepared to

16   testify to Topic Number 2?

17   A.   No.

18   Q.   Okay.  Is it your understanding that you have

19   been designated to testify about Topic Number 3?

20   A.   Yes.

21   Q.   Did you do anything specific to prepare to

22   testify about Topic Number 3?

23   A.   Just looking over documents that was produced

24   and talking to my attorneys.

25   Q.   Okay.  Do you feel like you're prepared to

---

**14**

1    testify about Topic Number 3 this morning?

2    A.   To the -- only to the extent that I can.  I'm

3    not 100 percent on that one.  But I can only speak to

4    the knowledge that I do have on it.

5    Q.   Okay.  Is it your understanding that you have

6    been designated to testify as to Topic Number 4?

7    A.   Yes.

8    Q.   Okay.  Other than reviewing the documents that

9    were produced by the Texas NAACP in this litigation,

10   have you reviewed anything or done anything specific to

11   prepare to testify on that topic?

12   A.   Just try to reflect mentally what -- what we've

13   done and besides what you stated.

14   Q.   Okay.  And then Topic Number 5, is it your

15   understanding that you have been designated to testify

16   as to that topic?

17   A.   Yes.

18   Q.   Other than the documents that have been

19   produced by the Texas NAACP in this litigation, have you

20   done anything to prepare to testify on Topic Number 5?

21   A.   No.

22   Q.   Do you feel that you are prepared to testify as

23   to Topic Number 5 today?

24   A.   Yes.

25   Q.   All right.  Topic Number 6.  Is it your

---

**15**

1    understanding that you have been designated to testify

2    as to Topic Number 6?

3    A.   Yes.

4    Q.   Okay.  Other than reviewing the documents that

5    have been produced by the Texas NAACP in this

6    litigation, have you done anything specific to prepare

7    for your testimony on Topic Number 6?

8    A.   No.

9    Q.   Okay.  Do you feel that you are prepared to

10   testify as to Topic Number 6?

11   A.   Yes.

12   Q.   Moving down to Topic Number 10.  Is it your

13   understanding that you have been designated to testify

14   as to Topic Number 10?

15   A.   Yes.

16   Q.   And again, other than reviewing the documents

17   that have been produced by the Texas NAACP in this

18   litigation, have you done anything specific to prepare

19   for your testimony on Topic Number 10?

20   A.   No.

21   Q.   Do you feel that you are prepared to testify on

22   Topic Number 10?

23   A.   Yes.

24   Q.   Topic Number 11.  Is it your understanding that

25   you are prepared to testify about Top Number 11?

---

**16**

1    A.   Yes.

2    Q.   Other than reviewing the documents that have

3    been produced by the Texas NAACP in this litigation,

4    have you done anything specific to prepare for your

5    testimony on Topic Number 11?

6    A.   No.

7    Q.   Do you feel that you are prepared to testify

8    about Topic Number 11 today?

9    A.   Yes.

10   Q.   Is it your understanding that you are here to

11   testify on behalf of the Texas NAACP on all of the

12   topics that we have just gone through?

13   A.   Yes.

14   Q.   Okay.  Mr. Banks, can you tell me what your --

15   do you have a position with Texas NAACP?

16   A.   I do.  It's one of many, many hats.  We are --

17   I'm staffed by them, but it's a one-staff position.  So

18   I handle many roles, whether it's day-to-day operations

19   of the office, I guess you'd call it office manager, if

20   you will, just details, doing everything in the office,

21   making sure whatever supplies we need, we have.

22        I have done the legislative outreach as

23   well during the session.  Done the web master work for

24   them, if you will.  I have attended meetings when

25   President Bledsoe isn't able to go, or even when he can

Yannis Banks                                                    May 25, 2012

## 17

1  I tend to go -- to go with him.  I have kept track of
2  his schedule, to a degree that I can, working with his
3  paralegal to where he needs to be.  I have done, you
4  know, other little jobs for them, as well.  Just
5  whatever comes up that needs to be done, I've done that
6  as well.  So I do quite a few different things for the
7  NAACP.
8        Q.  Do you have a title within NAACP?
9        A.  It rotates.  I have learned -- I have --
10  depending, I guess, on what the situation or where I
11  am.  If I've gone to, you know, different meetings, I
12  may be there as a representative for the NAACP.
13             I may have done, you know, legislative
14  liaison during the session.  You know, just depending on
15  where we are, I kind of give myself flexibility to --
16  since I wear so many hats, it's kind of hard to say,
17  well, I'm doing one specific thing.  So it kind of
18  rotates and floats around to as needed.
19        Q.  Are you employed full time by the Texas NAACP?
20        A.  Yes.
21        Q.  How long have you been employed by the Texas
22  NAACP?
23        A.  I think since 2007.  I guess around May of
24  2007, or maybe June, somewhere in that area.
25        Q.  When you started with the Texas NAACP, did you

## 18

1  have a title at that time or a specific job?
2        A.  When I started, I had been doing an internship,
3  so kind of just when I started, I did as needed from the
4  very beginning.
5        Q.  So in May 2007, when you started, you were an
6  intern at that point; is that right?
7        A.  I had finished the intern.  I had to do some
8  internship for them.  But I wasn't employed until May,
9  and it was just a nontitle, just kind of do what you had
10  to do at the office.
11        Q.  So you had been an intern before, and then you
12  kind of became an employee in May of 2007?
13        A.  Correct, yes.
14        Q.  Other than the roles that you've just gone
15  through, has there been any other specific job or role
16  that you've had at the Texas NAACP?
17        A.  None that I am recalling right.  It's been many
18  years, but those are the ones that are sticking out at
19  the moment.
20        Q.  Okay.  Are you aware of whether the Texas NAACP
21  contends that the United States does not adequately
22  represent its interests in this litigation?
23        A.  I am, yes.
24             MR. VANDEWALKER:  I'm going to have to
25  object.  We talked about -- we had an agreement that the

## 19

1  NAACP objects to that line of questioning as --
2             MS. RUDD:  Ian, was that "irrelevant"?
3             MR. VANDEWALKER:  Yes.
4             MR. FREDERICK:  Okay.  Well, I'm going to
5  ask some questions, and you're free, of course, to
6  object as you see fit.
7             MR. VANDEWALKER:  Okay.
8        Q.  (BY MR. FREDERICK)  Can you explain your
9  understanding of what the Texas NAACP's position is on
10  the adequacy of the United States representation in this
11  litigation?
12             MR. VANDEWALKER:  Objection, calls for a
13  legal conclusion, irrelevant.
14             MR. BLEDSOE:  Go ahead and answer.
15        A.  Okay.  Well, as I am not an attorney, I think
16  that whatever answers that we gave, submitted already,
17  speaks for why that is, because I don't have a legal
18  background.
19        Q.  (BY MR. FREDERICK)  Do you know what answers
20  have been given on that subject before?
21        A.  Off the top of my head, I cannot recall.  I've
22  read the document, but I can't recall what was -- what
23  was said.
24        Q.  Okay.  But you testified a moment ago that in
25  your understanding, the Texas NAACP contends that the

## 20

1  United States does not adequately represent it in this
2  litigation?
3        A.  Yes.
4             MR. VANDEWALKER:  Objection, misstates
5  prior testimony.
6        Q.  (BY MR. FREDERICK)  Do you -- do you know what
7  the basis of that contention is?
8             MR. VANDEWALKER:  Objection, calls for a
9  legal conclusion.
10        A.  Yeah.  As an attorney, I can't really say,
11  because I don't have the legal expertise to state it.
12        Q.  (BY MR. FREDERICK)  Well, without giving a legal
13  conclusion, can you explain, in your own words, how the
14  United States's representation of the Texas NAACP in
15  this litigation is inadequate?
16             MR. VANDEWALKER:  Objection.  The
17  question, while prefaced with the idea that it doesn't
18  call for a legal conclusion, still calls for a legal
19  conclusion and is irrelevant.
20        A.  I would stick with what was -- what was
21  submitted as the answers already for why we feel, how we
22  feel.
23        Q.  (BY MR. FREDERICK)  Okay.  And as you sit here
24  today, you can't recall what those answers are; is that
25  correct?

Yannis Banks

May 25, 2012

## 21

1   A.   That is correct.

2   Q.   Can you describe for me the Texas NAACP's

3   activities related to voter ID legislation in Texas?

4   MR. VANDEWALKER: Objection, vague.

5   A.   Could you be a little bit more specific as far

6   as what you're asking?

7   Q.   (BY MR. FREDERICK) Sure.  Did you understand

8   the question?

9   A.   It seemed little too vague for me to really

10   understand, I guess, what you're asking, so I just need

11   some clarification.

12   Q.   Can you tell me about the Texas NAACP's

13   activities related to Senate Bill 14?

14   A.   I guess my -- my -- I'm trying to figure out

15   in what aspect of -- are you -- are you asking when it

16   comes to activities.  So could you -- is there another

17   way the question can be phrased?

18   Q.   Did you have any involvement with Senate Bill

19   14?

20   A.   Okay.  Involvement meaning -- I guess

21   "involvement" is throwing me off.  Involvement.  How you

22   do mean when you say did I have any involvement?

23   Q.   Do you know what I mean when I say "Texas

24   Senate Bill 14"?

25   A.   I do.

## 22

1   Q.   And what is that?

2   A.   That would be the bill that was passed, that's

3   concerning the voter ID that was passed by the Texas

4   Legislature last session.

5   Q.   Did you give any testimony in the Legislature

6   on Senate Bill 14?

7   A.   Yes.

8   Q.   Can you tell me when you gave testimony?

9   A.   I believe it was for the House hearing on

10   Senate Bill 14, and I don't recall the date.  But I

11   believe I did do testimony for the House hearing.

12   Q.   And was that the House -- that was the House

13   Committee hearing?

14   A.   House Committee, yes, I'm sorry.

15   Q.   That's all right.

16   A.   Yes.  House Committee hearing.

17   Q.   And you don't remember exactly what date it

18   was?

19   A.   I don't.  It may have been in February.  I

20   think it was in February-ish, but I don't remember the

21   date from last year.

22   Q.   But it was in 2011?

23   A.   Yes.

24   Q.   And it was during the legislative session?

25   A.   Yes, sir.

## 23

1   Q.   Was that live testimony or written testimony?

2   A.   I believe it was live testimony.

3   Q.   Okay.  Did you submit any written testimony?

4   A.   I don't think I did.

5   Q.   Did the Texas NAACP submit any written

6   testimony on SB 14?

7   A.   Yes.  President Bledsoe.  He did live and he

8   did written testimony as well.

9   Q.   Did anyone else submit live -- did anyone else

10   submit written testimony for the Texas NAACP?

11   A.   I think so, but I'm not 100 percent sure.  But

12   I believe -- I know we had people who were there, and I

13   think they may have.

14   Q.   Did anyone else, to your knowledge, present

15   live testimony for the Texas NAACP in the Legislature in

16   2011?

17   A.   Once again, I think so, but I'm not 100 percent

18   with that.  I know we had our -- our members there, and

19   I know it was a long hearing, so I can't say with 100

20   percent accuracy.  But I do believe so.

21   Q.   Other than providing live and written

22   testimony, what else did the Texas NAACP do in the

23   Legislature with respect to Senate Bill 14?

24   A.   We worked with different groups to provide

25   information to legislators to let them know our concerns

## 24

1   with the bill.  And I'm trying to remember what else

2   were done -- was done.  I believe our members contacted

3   their legislators as well to let them know concerns

4   about Senate Bill 14 as well.  And that's all I can

5   recall at the moment.

6   Q.   Did the NAACP, the Texas NAACP, provide any

7   materials to its members dealing with SB 14?

8   A.   I think we did, yes.

9   Q.   Do you recall what those materials were?

10   A.   It may have just been talking point e-mails

11   about what's in the bill, so they would be informed and

12   understanding what -- what the bill entails, and maybe

13   even a copy of the bill.  It's possible.  But just so

14   that when they will have an understanding and be

15   knowledgeable about what's happening.

16   Q.   And when you say talking points, would that be

17   sort of a summary or list of issues about the bill?

18   A.   Yes.  It would be a summary and -- yes, a

19   summary and a list of what's in the bill.  I'm pretty

20   sure a copy of the bill as well, so that they can read

21   it and have an understanding, but -- because I know, you

22   know, the language can be kind of confusing and

23   difficult to read.  So just so they have a better grasp

24   of it.

25   Q.   Other -- other than talking points and maybe a

Yannis Banks                                              May 25, 2012

## 85

1    A.  Right.  I still couldn't do it with just -- I'm
2   not that fresh on it.  I just know how, just from
3   comparing it.  I couldn't sit back and say "It was this
4   part and that part," but I know just from when I looked
5   over and saw it.  So I wouldn't be comfortable right now
6   saying "This is that part, and this is that part."  I
7   just can't recall at the moment.
8    Q.  Well just so I'm clear, I'm asking you only
9   with respect to the ALEC shell bill.
10   A.  Right.
11   Q.  What is it that, you know, with that -- you
12  know, setting aside SB 14 for the moment, what is it in
13  that shell bill that you believe -- that you believe
14  would impact minority voters?
15   A.  And I can't recall it well enough right now to
16  sit down and say "This part from the ALEC shell bill."
17  I couldn't sit down and recall the parts right now at
18  the moment.
19   Q.  And when this says -- and I'm going back to
20  Page 8 --
21   A.  Okay.
22   Q.  -- of the exhibit, down at the bottom, where it
23  says, "The general knowledge of the national wave of
24  support for organizations," do you know what -- what
25  "general knowledge" refers to?

## 86

1    A.  Let's see.  Well, I guess the question is not
2   registering with me.  Is there another way you could, I
3   guess, rephrase it?  I'm just not --
4    Q.  Sure.  So this paragraph on Page 8, it refers
5   to "general knowledge of a national wave of support for
6   certain organizations."  Do you know what it means where
7   it says -- when it says "general knowledge"?
8    A.  Okay.  I guess we're talking about general
9   knowledge.
10   Q.  Maybe I can -- maybe I can ask it a different
11  way.
12   A.  Sure.
13   Q.  So does "general knowledge," does that mean
14  that it's just kind of something that everyone would be
15  aware of?
16   A.  Okay.  Yeah.
17   Q.  Is that fair to say?
18   A.  I would say, yeah, it would be fair to say
19  general knowledge would be something that everybody, the
20  majority of people, would know and be aware of, yes.
21   Q.  And so where, with respect to this, the
22  national wave of support for these organization, where
23  would people get that general knowledge?  Where would
24  it -- how would I know about that?
25   A.  I can't profess to be an expert of the topic,

## 87

1   but, I guess, my understanding would be news or
2   different media outlets or general conversations that
3   people would have.  I think that's historically been
4   defined as "general knowledge."  Like, if you do a
5   school paper and you don't cite it, it's kind defaulted
6   to well that's just general knowledge.
7    Q.  Okay.  Are you aware -- can you give me, as we
8   sit here, any specific source or reference for the
9   statement that there's a national wave of support for
10  organizations that support the disenfranchisement of
11  minority voters?
12   A.  Ask the question again, please.
13   Q.  Sure.  Can you identify any specific source of
14  information that would show the national wave of support
15  for organizations that support the disenfranchisement of
16  minority voters?
17   A.  I cannot recall any at this moment.  I know I
18  do a lot of reading, but at this exact moment, I don't
19  think I can recall a specific source right now.
20   Q.  So just to cover it:  So I asked about specific
21  organizations that support disenfranchisement of
22  minority voters.  You identified the KKK, white
23  supremacists groups, generally, ALEC.  Are there other
24  organizations that -- that are included in this
25  reference to organizations that support

## 88

1   disenfranchisement of minority voters?
2    A.  At this moment, none that I could
3   recall.  But...
4    Q.  Are there any groups -- strike that.
5    A.  Okay.
6    Q.  With respect to ALEC, you mentioned the shell
7   bill they prepared, this document indicating that
8   certain legislators are members of ALEC.  Is there
9   anything else -- is there anything else that you're
10  aware of that shows that ALEC was somehow involved in SB
11  14?
12   A.  Nothing that I can recall at the moment.
13   Q.  Okay.  So you mentioned -- we were talking
14  about the ALEC draft legislation SB 14, but let's --
15  let's move specifically to SB 14.
16   A.  Okay.
17   Q.  You mentioned, when we were talking about the
18  other bills, that there would be an impact on minority
19  voters.
20   A.  Yes.
21   Q.  What impact will SB 14 have on minority voters?
22   A.  From my understanding and reading of the bill
23  interpretation, I -- we believe that the impact would be
24  harmful to minority voters, in that, from the standpoint
25  of -- and maybe many more reasons, but from what I can

## 89

1  recall right now, though, is that it could decrease the
2  number of minority voters who are able to participate in
3  expressing their -- their right to vote.  And that's a
4  very big concern for us if -- excuse me -- if they -- if
5  they are not able to express their right to vote.
6      Q.   Is there any other impact that you or the Texas
7  NAACP contends SB 14 will have on minority voters?
8      A.   From what I recall, I know there's many, but
9  from what I'm recalling and what I'm remembering right
10 now, is that we're definitely worrying about it being a
11 disenfranchisement and it's very well -- and in the
12 process of even trying to get the required documents to
13 vote, could be a financial impact on the minority
14 voters, depending on what they have to do to try to get
15 documents they even need to have, which is another
16 concern amongst many that I recall at the moment.
17     Q.   So how would SB 14 decrease the number of
18 minority voters who were able to vote?
19     A.   I think if you look at -- one of the things I
20 can think of at moment, if you look at, you know, what
21 you have and how you can vote now it's -- and then what
22 you would need from SB 14, it could decrease the numbers
23 who would be able to participate to vote.  So that would
24 have the impact -- it would have the impact that way.
25     Q.   So when you say impact, is the impact that

## 90

1  minority voters -- that certain minority voters would
2  not have one of the forms of ID required by SB 14, is
3  that how it would prevent people from voting?
4      A.   I think if you look at the information that the
5  Secretary of State had submitted to DOJ and would have
6  us show that, you know, not everybody would have or has,
7  you know, said IDs that is required.  I would say that
8  it would decrease the number or it would have an impact
9  on those who would be able to vote.
10     Q.   Okay.  And the impact would be because they --
11 they wouldn't have the ID?
12     A.   Correct.
13     Q.   So -- so that's -- so that's based on numbers
14 that were prepared by the Texas Secretary of State?
15     A.   Secretary of State and I believe a report was
16 done by the Brennan Center that has showed who --
17 different populations of who lack sufficient forms of ID
18 that would be needed to vote.
19     Q.   Was the Brennan Center study, was that specific
20 to Texas or was it nationwide?
21     A.   I can't recall at the moment.  I really can't.
22     Q.   Okay.  Does the Texas NAACP conduct any studies
23 to determine how SB 14 would impact -- would impact
24 voters?
25     A.   No.

## 91

1      Q.   Other than the Texas Secretary of State's --
2  well let me clarify just -- I think I know what you're
3  talking about, but I want to clarify.
4      A.   Okay.
5      Q.   When you say the Texas Secretary of State's,
6  that their analysis, was that -- is that the analysis
7  that was -- or the numbers or whatever it was, that was
8  provided to the Department of Justice --
9      A.   Yes.
10     Q.   -- by the Secretary of State?
11     A.   Yes.
12     Q.   Okay.  So other than the Secretary of State's
13 numbers and the Brennan Center report, is there anything
14 else that -- that supports the claim that SB 14 will
15 decrease the number of minority voters who can vote?
16     A.   I -- I would say, well, I guess, you could also
17 include the letters that we also submitted during the
18 preclearance process that we mentioned earlier.
19     Q.   Okay.
20          MR. FREDERICK:  If you don't mind, why
21 don't we mark those as exhibits.  I don't have copies
22 with me, but, if that's all right, let's mark them, just
23 so we can talk about moving.
24          THE WITNESS:  Sure.
25          (Exhibits 3 and 4 marked for

## 92

1  identification.)
2          MS. RUDD:  Matt, do you want to take a
3  break and make copies so you'll have copies to work
4  from?
5          MR. FREDERICK:  Yeah, why don't we do
6  that.
7          MS. RUDD:  We'll stay put if you just want
8  to run and make copies or have someone come and get
9  them.
10         MR. FREDERICK:  Let me just send a quick
11 e-mail and we can have someone bring one down and I
12 think we can keep moving.  Let me go ahead and ask.
13     Q.   (BY MR. FREDERICK) So you've got Exhibit 3
14 there, which I believe is the September letter.  What I
15 will ask you in a minute and if you can just look in
16 there, I'd like for you to show me what, in that letter,
17 supports the claim that SB 14 will decrease the number
18 of minority voters who can vote.  And I'll give you some
19 time to look through it.
20     A.   Sure, sure, sure.  (Reading Exhibit 3.)
21     Q.   So Mr. Banks, just to get everybody on the same
22 page, I had asked you to show me in Exhibit 3 what in
23 that letter supported your contention that SB 14 would
24 have a negative impact on minority voters.
25     A.   Sure.  I'm on Page 4.

## 93

1    Q.   Okay.
2    A.   Of the September 14th dated document.  And,
3    actually, could probably even start on Page 3 where at
4    the very top how it says, "The Senate Bill 14 photo
5    identification requirements for in-person voting will
6    have a retrogressive affect on African-American or
7    Latino citizens' ability to vote."  I guess is where
8    they start.  And, I guess, the November 2008 current
9    population survey, 54.3 percent of voting-eligible
10   Latinos in Texas said they were registered to vote
11   compared to 73.6 of voting-eligible Whites, 73.7 of
12   voting-eligible African-Americans.  That data would show
13   that voting-eligible Latinos in Texas are significantly
14   less likely to be registered than Whites.  So if you
15   look how it already is, and then if you go to Page 4, it
16   speaks on the how available data show that African
17   Americans and Latino citizens are less likely than White
18   citizens to possess a form of identification required by
19   Senate Bill 14.  And they point to the national data to
20   demonstrate the disproportionate impact of photo ID
21   requirements.  And they quote a national survey from
22   2008 showing 10 percent of registered African-American
23   voters, 5.8 percent Asian-American, and 5.5 percent of
24   Latino voters do not own any form of government-issued
25   photo ID, and in contrast, only 5.2 percent of White

## 94

1    voters lacked a valid form of photo ID.
2    Q.   Okay.  So is there anything else in that letter
3    that you would point to as supporting the claim that SB
4    14 will have a negative impact on minority voters?
5    A.   Yeah.  I would say the whole letter would be, I
6    guess, the easiest way of doing it.  The whole
7    document.  It speaks for itself.  It stands alone, on
8    its own, without me having to go into detail about it.
9    Q.   The survey that was discussed in that letter is
10   a national survey.  Are there any -- is the Texas NAACP
11   aware of any surveys of Texas voters that show different
12   levels of ID possession by -- by race or ethnicity?
13   A.   I'm not aware of any.  None time that I'm aware
14   of at this moment.  So I'm not sure.
15   Q.   But the NAACP -- the Texas NAACP never
16   conducted that kind of study on ID possession?
17   A.   None that I can recall.
18   Q.   Do you know if the study that's cited in the
19   September --
20   A.   2011.
21   Q.   Yeah, the September 2011 letter, do you know
22   what kinds of ID that study considered?
23   A.   It's a government-issued photo ID in the
24   letter, so I couldn't go into detail about what that
25   would consist of.

## 95

1    Q.   Okay.  So you can't say whether that, that
2    national study looked specifically at the kinds of ID
3    listed in SB 14?
4    A.   Not with 100 percent certainty.
5    Q.   Okay.  Do you have any reason to believe that
6    it -- that the national survey did consider the forms of
7    ID listed in SB 14?
8    A.   I would --
9         MR. VANDEWALKER:  Objection.
10        MR. FREDERICK:  I'm sorry.  Can you repeat
11   the objection.  You broke up.
12        MR. VANDEWALKER:  I'm sorry.  The
13   objection is asked and answered.
14   Q.   (BY MR. FREDERICK)  You can answer if you
15   remember the question.  I'm happy to ask it again.
16   A.   Could you ask it again?
17   Q.   Of course.
18        So you -- you said a moment ago that you
19   can't say with 100 percent certainty that that national
20   study in that letter considered forms of ID listed in SB
21   14.  And my question is whether you have any reason to
22   believe, even if it's less than 100 percent, that that
23   national study considered the specific forms of ID
24   listed in SB 14?
25   A.   I would -- yeah.  I would say they looked at

## 96

1    the governmental ID and that's all I could say -- or
2    government-issued, I should say, IDs and that's left up
3    to interpretation of what is a governmental ID.
4    Q.   Have you looked at the actual study that's
5    referred to in that article -- or that letter rather?
6    A.   I don't believe I have.  Not that I'm aware
7    that I have.  I couldn't say.
8    Q.   Okay.  Do you know what specific forms of ID
9    were considered in the study mentioned in the September
10   2011 letter?
11   A.   Only governmental ID or government-issued IDs.
12   Q.   Okay.  So you don't know what types of
13   government-issued IDs that study considered?
14        MR. VANDEWALKER:  Objection, asked and
15   answered.
16   A.   Not that I'm aware of.
17   Q.   (BY MR. FREDERICK)  Okay.  Thank you.
18        MR. FREDERICK:  Okay.  I've got a copy
19   now.
20        MR. VANDEWALKER:  I'm sorry, if I could
21   just say I hope we could take a break at half past, if
22   that's a good stopping point.
23        MR. FREDERICK:  Yeah, I think we can do
24   that.
25        MR. VANDEWALKER:  Okay.  I mean, I'm

Yannis Banks                                                    May 25, 2012

## 101

1   submitted, but I couldn't -- there's no -- I guess I
2   could recall but...
3       Q.  Okay.  Can you point me to a specific study or
4   set of data in -- anywhere, including in these letters,
5   that -- that concludes that African-American voters in
6   Texas disproportionately lack photo ID?
7       A.  Could you restate your question for me, please?
8       Q.  Yeah.  Could you point me to any study or any
9   data that shows that African-American voters in Texas
10  lack photo ID at a higher rate than other groups?
11      A.  Okay.  I would still -- I'm thinking.  If you
12  just say it one more time to make sure I got it right.
13      Q.  Of course.  Can you identify any study or data
14  that shows specifically that African-American voters in
15  Texas lack photo ID disproportionately at a higher rate
16  than other groups?
17      A.  Well, I think on Page 5 of the -- the November
18  letter we submitted, it -- it's -- to me, my
19  interpretation, it says that -- as my understanding
20  goes, where it says "Absent of any evidence to the
21  contrary provided by the State, it appears that these
22  racial disparities also exist in Texas, not only as to
23  Latino voters, but as to African-American and Asia-
24  Americans as well.  This further underscores the
25  retrogressive impact that Senate Bill 14 would have on

## 102

1   minority voter strength if Texas implements the proposed
2   photo ID requirement."
3       Q.  Okay.  And so those two sentences you've just
4   identified there on Page 5 at the top, I'm looking at
5   them.  I don't see any -- any footnotes or citations; is
6   that -- is that correct?
7       A.  That's correct.
8       Q.  Okay.  So this -- this is absent any evidence
9   to the contrary.  I understand that.  Are you aware of
10  any evidence that shows that African-Americans lack
11  photo ID disproportionately in Texas?
12      A.  I -- well, beside these two reports, nothing I
13  can say at the moment.
14      Q.  Okay.
15          MR. FREDERICK:  Okay, I think now is an
16  okay time to break for lunch.
17          MS. RUDD:  All right.
18          MR. FREDERICK:  I've got 12:38.  You want
19  to say 1:45?
20          MS. RUDD:  That would be great.
21          (Recess from 12:38 to 1:50 p.m.)
22      Q.  (BY MR. FREDERICK) Does the Texas NAACP contend
23  that SB 14 will have a negative impact on Asian American
24  voters?
25      A.  We believe so.

## 103

1       Q.  What is the basis for that contention?
2       A.  I think it goes back to the letters we
3   submitted that shows the data of -- is going to affect
4   all minorities.  We didn't just look at African
5   Americans when it came to who the effect would have.  We
6   looked at all minorities.  And we believe that it would
7   have an effect on the Asian Americans as well.  I think
8   even in 2009, a friend of mine -- 2009, a friend of
9   mine, Ramey Ko, had testified how this voter ID bill
10  would have the impact and effect it would have on Asian
11  Americans as well.
12      Q.  Did the Texas NAACP conduct any studies on the
13  impact of SB 14 on Asian American voters?
14      A.  We did not, no.
15      Q.  Did the Texas NAACP conduct any studies on
16  rates of photo ID possession by Asian American voters?
17      A.  We did not, no.
18      Q.  Are you familiar with the polls regarding
19  support for voter ID legislation among Texas residents?
20      A.  Somewhat, yes.
21          MR. VANDEWALKER:  Objection, vague.
22      Q.  (BY MR. FREDERICK) Are you familiar with any
23  the polls that were cited in the legislative record for
24  SB 14?
25      A.  I would have to actually, I guess, see

## 104

1   those.  I couldn't tell you offhand which ones were --
2   were cited.
3       Q.  Are you aware of polls showing that the
4   majority of Texans support a photographic ID requirement
5   to vote regardless of political affiliation?
6           MR. VANDEWALKER:  I object on the basis of
7   relevance.
8       A.  Okay.  I'm familiar with them, but I look at
9   all polls based on how the question is asked.
10      Q.  (BY MR. FREDERICK) Are you aware of any --
11  well, can you identify any specific problem or flaw with
12  a poll of Texas voters about support for photo ID?
13          MR. VANDEWALKER:  Objection, vague.
14      A.  Is there a specific poll are we talking about
15  or just --
16      Q.  (BY MR. FREDERICK) No.
17      A.  Okay.  Well, my understanding would be, I think
18  if you ask the question without going into details of
19  what's going on or what's -- what said bill would look
20  like, then I think that's when you get -- when you just
21  ask general questions about, you know, what something
22  is, then your answer will be very general.  If I asked
23  somebody if it's hot outside, and I don't give them
24  temperature or whatever, then, yeah, I think the
25  majority of people you may poll today will say "It's

## 105

1    hot," but there may be a couple who will say that the
2    temperature isn't that bad.
3         Q.   Based on the materials that you've read, is it
4    your understanding that the majority of Texans support
5    the voter ID requirement to vote?
6         A.   I've seen numbers, with a vague question, that
7    may say as such.  But more research will still need to
8    be done on saying, you know, what was told, was anything
9    more told up.  There's still concerns when it just says,
10   flat out, well, how do you feel, there's concerns with
11   that.  So I don't know how reliable some of the polls
12   are.
13        Q.   Are you aware of polls showing that the
14   majority of Texans support photographic ID requirements
15   to vote regardless of race?
16        A.   I think I've heard or seen some -- some of
17   those polls.
18        Q.   Are you aware of polls showing that the
19   majority of Texans support photographic ID requirement
20   to vote regardless of minority language status?
21        A.   I think I've seen some polls saying that.
22        Q.   Does the Texas NAACP contend that African
23   American voters in Texas are -- are more likely than
24   other voters to lack qualifying photo ID under SB 14?
25        A.   Yes, we do.

## 106

1         Q.   And I know we had talked about this some
2    before.  Can you tell me -- can you tell me what that
3    conclusion is based on?
4         A.   I think if you look at data that deals with --
5    socioeconomic data that shows how your lower income
6    population tends to be minority, African American,
7    Hispanic, what have you, it would show that, you know,
8    there -- there -- the data that the people who could be
9    possessing any forms of ID, more likely would be your
10   minorities, when you looks at any form.
11             And then even the access to be able to get
12   documents that would needed to get the ID would be a --
13   could be an issue in itself, if you, you know, have to
14   travel hundreds of miles to get there because of where
15   you live or, you know, you don't have private
16   transportation.  So the public transportation doesn't
17   get you, you know, in a good area to get there, or, you
18   note, the kind of jobs they may have or taking off work
19   to have to travel these many miles could be a hindrance
20   in itself.  And like I say, even getting documents to
21   get it, the cost behind that, the financial strain, that
22   can be placed upon them, will be a burden, just so they
23   can -- and, you know, we feel that it's very important
24   to vote and have your voice heard.  And so for them to
25   be able to do that and have to go through all that.

## 107

1         And then even if they are given
2    provisional ballots, the process that they would have
3    come back and try to verify who they are is cumbersome
4    in itself, and that's a -- that was a concern also.
5         Q.   Does the Texas NAACP contend that -- that an
6    African American voter is less likely -- an African
7    American voter in Texas is less likely to possess a
8    qualifying form of ID, under SB 14, than an Anglo or a
9    Hispanic voter of the same socioeconomic status?
10        A.   Could you say the question again?
11        Q.   Of course.  So if had -- well, if
12   you assume -- strike that.  I'll just ask it again.
13        A.   Okay.
14        Q.   Does the Texas NAACP contend that African
15   American voters in Texas, are less likely to possess a
16   qualifying form of photo ID than Anglo or Spanish voters
17   of the same socioeconomic status?
18        A.   I would -- I think so.  I think -- I think even
19   there's been data that show that even if they are the
20   same background or what have you, but it still would be
21   maybe a little bit more, have less access to it or what
22   have you.  So I would think the data will show it.  At
23   least I can say I'm pretty sure compared with Anglos,
24   I'd say yes.  But I'm not 100 percent positive about
25   Hispanics.

## 108

1         Q.   Okay.  And you referred to -- data.  What --
2    what data were you referring to when you said the data
3    will show that African Americans are less likely to
4    possess photo ID regardless of socioeconomic status?
5         A.   I can't think of any I can cite specifically
6    off the top of my head right now.  But I think from
7    stuff I've seen and read overall, I would believe that
8    they would, even though they're from the same background
9    from different studies, that they still had the
10   disadvantages.  So I would still say yeah.
11        Q.   Okay.  You can't identify a specific study to
12   support that?
13        A.   Not off the top of my head right now, no.
14        Q.   Okay.  Can you identify for us any articles or
15   books or newspaper stories, anything like that?
16        A.   Not that I can call -- recall right now
17   specifically, no.
18        Q.   Does the Texas NAACP contend that Latino voters
19   in Texas are less likely to possess qualifying forms of
20   photo ID, under SB 14, than Anglo and African American
21   voters of the same socioeconomic status?
22        A.   I would probably go back to my previous
23   answer.  And I couldn't say compared with African
24   Americans, but I think when you look at overall data,
25   still that they would more than likely, compared with

Yannis Banks                                                    May 25, 2012

---

## 109

1   Anglos, would -- would not have -- even in the same
2   economic area, would still not have the same -- would
3   have ID, the forms of ID.
4       Q.   Can you identify any study or paper or anything
5   that supports that conclusion?
6       A.   Not at -- at this point, I couldn't, no.
7       Q.   Do you think that you have seen a specific
8   study that makes that conclusion?
9       A.   I feel like I have, but I'm not -- I've done a
10  lot of reading, and I think it just -- I think -- I
11  think I've seen, you know, data overall stating that
12  even when you look at economic in the same group, for --
13  for whatever reasons, is that minorities still will seem
14  to be worse off overall when even in the same economic
15  group, so...
16      Q.   Does Texas NAACP contend that elderly voters
17  are less likely to have qualifying identification under
18  SB 14?
19      A.   We believe so, yes.
20      Q.   Can you tell me what that conclusion -- or that
21  belief is based on?
22      A.   That you will have -- there will still be
23  people around now who may have been born by midwife or
24  what have you.  And so what it comes to, they may have
25  had IDs before, but they could be no longer driving or

## 111

1       Q.   And what is that conclusion based on?
2       A.   For the fact that -- well, they're indigent, so
3   they -- they haven't the funds, the excess funds
4   necessary to get, I think, certain things that some
5   people take for -- for granted of, you know, you just
6   have.  But when -- when you set your priorities of what
7   you may need to have to live, you know, the form of ID,
8   may not be on your high list of "I have to have this",
9   but I need to be worried about other things.  So, you
10  know, that's a concern.  Or even if somebody who's been
11  homeless for while and hasn't had to have ID, what have
12  you, that's a concern as well.
13      Q.   Can you think of a specific study or article
14  that specifically finds that indigent voters are less
15  likely to have photo ID?
16      A.   Not off the top of my head right now, no, I
17  can't.
18      Q.   Do you believe that you have seen a study or
19  article at some point that specifically finds indigent
20  voters to be less likely to have photo ID?
21      A.   I think I may have seen something, but I can't
22  recall at this moment.
23      Q.   Does Texas NAACP contend that disabled voters
24  are less likely than nondisabled voters to have a form
25  of ID required by SB 14?

---

## 110

1   have need to drive or what have you, so they let their
2   ID relapse, and now to go get one, and you're asking for
3   records that may not exist anymore because of when they
4   were born and the time period or the hospital that was
5   there could have been burnt down and records lost, and
6   it's never been an issue or a concern before, now to
7   have to do it, so there's a concern that they wouldn't
8   have documentations needed to -- to obtain the IDs
9   mentioned.
10      Q.   Can you identify any study or article that
11  supports that?
12      A.   At this moment, I could not, no.
13      Q.   Do you believe that you have seen a study
14  specifically finding that elderly voters are more likely
15  to lack photo ID?
16      A.   I think a newspaper article or -- or a study,
17  it seems like I've -- I've read one, but I can't say
18  with a hundred percent certainty.
19      Q.   Does Texas NAACP contend that indigent voters
20  are less likely than nonindigent voters to have a form
21  of ID required by SB 14?
22      A.   You said less likely?
23      Q.   Yeah.  Are indigent voters less likely to have
24  qualifying ID?
25      A.   Yes.

## 112

1       A.   We think it's possible, yes.
2       Q.   Has the Texas NAACP conducted any studies about
3   rates of ID possession among disabled voters?
4       A.   No, we haven't.
5       Q.   To backtrack a bit, has Texas NAACP conducted
6   any studies about rates of ID possession among elderly
7   voters in Texas?
8       A.   No, we haven't.
9       Q.   Has the Texas NAACP conducted any studies on
10  rates of ID possession among indigent voters in Texas?
11      A.   No, we haven't.
12      Q.   Can you tell me what -- can you give me the
13  basis for the belief that disabled voters may be less
14  likely to have photo ID?
15      A.   With that, you know, it's from a conversation
16  with -- with the disability -- one of the disability
17  group, disability, what -- what are they called?  The
18  disability group.  I think it's Disability Rights of
19  Texas.  And I know they had concerns, so...
20      Q.   Do you recall if they -- if Disability Rights
21  Texas showed you any studies about photo ID possession
22  by disabled voters?
23      A.   Not that I recall seeing.
24      Q.   Does Texas NAACP contend that rural voters are
25  less likely than urban or suburban voters to have

Yannis Banks
May 25, 2012

## 113

1   qualifying photo ID under SB 14?

2      A.   I would say so, yes.

3      Q.   And what is that conclusion based on?

4      A.   Locations of DPS offices, the access to be able

5   to -- to get to them, it could be burdensome in itself,

6   where you have to travel hundreds of miles or what you

7   have to get to the offices.

8      Q.   Is that conclusion based on anything else?

9      A.   At this moment, that's all I can recall.

10     Q.   Does Texas NAACP contend that voters without a

11  high school diploma are less likely than voters with a

12  high school diploma to have qualifying photo ID under

13  SB 14?

14     A.   Could you restate -- restate the question?

15     Q.   Of course.  Does Texas NAACP contend that

16  voters without a high school diploma are less likely to

17  have qualifying photo ID under SB 14?

18     A.   I would say yes, they would.

19     Q.   And what is that conclusion based on?

20     A.   I've seen, I guess, different studies about how

21  level of activity, when you're looking at whether you

22  have the high school diploma or equipment to not, when

23  you see how involved civically they are, the chances of

24  their having -- I'm sorry, when you see the level of

25  civic activity, how involved they are, there's a chance

## 115

1   ID?

2      A.   At the moment, that's -- that's all I can

3   recall at this moment.

4      Q.   Has Texas NAACP conducted any studies of rates

5   of photo ID possession among young voters?

6      A.   No, we haven't.

7      Q.   Okay.  I'm going to move on to talk about the

8   Texas NAACP membership.  Who are -- who are the members

9   of the Texas State Conference of NAACP Branches?

10     A.   We are made up of our elected officers, as well

11  as the appointed members of the executive committee, and

12  then our individual state units.  The local units would

13  comprise the -- the members in the -- in the state will

14  comprise the Texas State Conference.

15     Q.   Okay.  So am I correct in understanding that

16  the Texas State Conference of NAACP Branches is made up

17  of other -- other organizations?

18     A.   Not organizations.  We have the state

19  conference, and then we have our chapters of the NAACP.

20  So Austin has a NAACP chapter.

21     Q.   Uh-huh.

22     A.   Killeen, Houston, what have you, and then those

23  all form to make up the Texas State Conference.

24     Q.   Okay.  And so for -- other than officers and

25  the executive committee, are there individuals who are

## 114

1   that they may not -- and they also tend to be -- the

2   ones without the high school diploma tends to more be

3   fall back to the indigent or your economically

4   disadvantaged group, so there's a chance of -- having an

5   ID is not one of their focuses whatever.

6      Q.   Has Texas NAACP conducted any studies, that

7   you're aware of, about rates of ID possession among

8   voters with or without a high school diploma?

9      A.   No, we haven't, that I'm aware of.

10     Q.   Has Texas NAACP conducted any studies about

11  rates of ID possession for rural voters?

12     A.   Not that I'm aware of, no.

13     Q.   Does Texas NAACP contend that young voters are

14  less likely than other voters to have qualifying ID

15  under SB 14?

16     A.   Yes.

17     Q.   Can you tell me what that conclusion is based

18  on?

19     A.   You have voters who may be from out of state

20  who are going to school here and may not have the

21  required ID that you're asking for, and so they, you

22  know, may have a hard time as well getting the ID

23  necessary.

24     Q.   Is there any other reason, that you're aware

25  of, that a young voter would be less likely to have an

## 116

1   -- who would be members of the Texas State Conference of

2   NAACP Branches?

3      A.   This is my understanding of -- of our bylaws,

4   as I've read them and try to get familiar with them.  My

5   understanding is our members, individual members will be

6   considered members of the Texas State Conference, if

7   that is --

8      Q.   When you say "our individual members," are you

9   talking about actual individuals or individual branches?

10     A.   Both.

11     Q.   Okay.  Maybe it's --

12     A.   Both.

13     Q.   It's a little bit confusing, because I don't --

14  I'm trying to figure it out myself.

15     A.   Not a problem.

16     Q.   So if -- are individuals, would they be

17  considered members of the individual branches, or would

18  they also be members of the Texas State Conference?

19     A.   Kind of both.

20     Q.   Both?

21     A.   So you're a member of the Austin branch, and by

22  being a member of Austin branch, and Austin branch is a

23  part of the state -- you're a member of the Texas State

24  Conference.

25     Q.   Okay.  It's kind of like if you're a Texas

## 125

1  mean the Georgia --
2      A.  Yes.
3      Q.  -- photo ID bill?
4      A.  Yes.
5      Q.  And what's that understanding based on?
6      A.  Conversation -- conversations --
7          MR. VANDEWALKER:  Objection, relevance.
8      A.  Conversations that were had.  I think it's also
9  in Mr. Bledsoe's -- one of his testimonies that he gave
10  to the Legislature, I think he mentioned it.  And that
11  I'm not 100 percent, but I think he -- he may have.
12      Q.  (BY MR. FREDERICK)  Okay.  What is your
13  understanding about -- scratch that.  I'll ask it
14  another way.
15          Is it your understanding that African
16  American voters in Georgia possess photo ID at a
17  different rate than, say, Anglo voters in Georgia?
18          MR. VANDEWALKER:  Objection, relevance.
19      A.  That -- I haven't seen data that show -- ask
20  the question again so I wrap my head around it.
21      Q.  Sure.  Sure.
22          MR. FREDERICK:  Actually, can you read the
23  question back?
24          (The question was read by the reporter.)
25      A.  Okay.  I haven't seen data from Georgia as far

## 126

1  as how that may go, so I couldn't say.  I wouldn't feel
2  comfortable saying.
3      Q.  (BY MR. FREDERICK)  Okay.  Are you familiar with
4  levels of photo ID possession by voters in Indiana?
5      A.  No.
6          MR. VANDEWALKER:  Objection, relevance.
7      Q.  (BY MR. FREDERICK)  Are you familiar with levels
8  of photo ID possession by voters in Texas?
9      A.  Would you ask the question again?
10      Q.  Sure.  Are you familiar with the levels of
11  photo ID possession by voters in Texas?
12      A.  And when you say "levels," I guess explain what
13  you mean by levels, levels in Texas.
14      Q.  Sure.  Are you familiar with the percentage of
15  various racial or ethic groups of voters in Texas who
16  possess a photo ID that would qualify under SB 14?
17      A.  Somewhat.  I think I've -- I feel like I've
18  seen information or read about -- read about it, yeah.
19      Q.  Okay.  Can you tell me what that information
20  was?
21      A.  Well, from our report, I think the letters we
22  submitted show that when it comes to having the
23  necessary ID, that minorities rank lower than Anglos
24  when it comes to having photo ID.
25      Q.  Do you know what percentage of African American

## 127

1  registered voters in Texas possess a qualifying form of
2  photo ID under SB 14?
3      A.  Not that I can right now, no.
4      Q.  Do you know what percentage of Anglo voters,
5  registered voters in Texas possess a form of photo ID
6  required by SB 14?
7      A.  Not that I can recall, no.
8      Q.  Do you know what percentage of Asian American
9  voters, registered voters in Texas, possess a qualifying
10  form of photo ID under SB 14?
11      A.  Not that I can recall at this moment, no.
12      Q.  Do you know what percentage of Hispanic voters,
13  registered voters in Texas, possess a qualifying form of
14  photo ID under SB 14?
15      A.  Not that I'm aware of, no.
16      Q.  Does the Texas NAACP contend that minority
17  voters in Texas possess photographic identification at a
18  lower rate than minority voters in Georgia?
19          MR. VANDEWALKER:  Objection, relevance.
20      A.  I don't think that's something we've ever
21  compared or talked about, so I'm not -- I'm not that
22  familiar with, not to my knowledge anyway.
23      Q.  (BY MR. FREDERICK)  And does the Texas NAACP
24  contend that minority voters in Texas possess
25  photographic identification at a lower rate than

## 128

1  minority voters in Indiana?
2          MR. VANDEWALKER:  Objection, relevance.
3      A.  Once again, that's -- I don't think that's
4  anything that we've ever -- that I recall us talking
5  about, so I'm not sure.
6      Q.  (BY MR. FREDERICK)  All right.  Let's go back to
7  Exhibit 2.
8      A.  Okay.
9      Q.  And I ask you to turn to Page 9.  We were
10  talking about this earlier.  This is Interrogatory 3,
11  which is:  If you contend that preventing voter fraud is
12  not the purpose of SB 14 -- I'm paraphrasing -- identify
13  and describe all facts and information that support your
14  contention.  And then on Page 9, let's see, this is the
15  last paragraph before Interrogatory Number 4 starts, and
16  it's the second sentence in that paragraph.  It says,
17  "The forms of identification required by Senate Bill 14
18  are arbitrary and inequitable and appear calculated to
19  marginalize minority voting power."  Do you see that?
20      A.  I do, yes.
21      Q.  How are the forms of identification required by
22  Senate Bill 14 calculated to marginalize minority voting
23  power?
24      A.  Well, if you go back to 2009, when we -- when
25  -- I don't remember the voting bill, the number that was

Yannis Banks                                          May 25, 2012

## 129

1  up in 2009, but the Voter ID bill in '09, we had
2  discussions about other provisions or other forms of ID
3  that can be used as well to try to be more inclusive,
4  whether you have a voter ID or you can bring in two
5  other forms of identification to include -- to include
6  -- to vote.  I'm sorry, I lost my thought.  To vote.
7  You can bring in two other forms of ID to vote.
8         So, and even when -- when offering, I
9  think Gary may have made recommendations in his speech
10 or when he spoke before the Leg about other forms or
11 what have you that can be used to -- to be more
12 inclusive, and those were ignored or what have you, or
13 -- or not considered.  Then, I guess you could look at
14 it and interpret it that way of -- of it's -- they're
15 not wanting to be inclusive and to say, you know,
16 minorities do not have the forms that you're listing.
17         I think in here, in our report, it speaks
18 about when it comes your hunting license -- excuse me --
19 how it's not something that a lot of minorities, African
20 Americans have.  So I think Gary probably had mentioned
21 other forms or other things that could be more inclusive
22 to say well, if we want to have -- we want to be secure
23 and have people voting, this is how you can still do
24 that, and it was ignored.
25    Q.  Do you recall whether a hunting license was

## 130

1  included as a qualifying ID in the 2009 bill, SB 362?
2    A.  A hunting license?
3    Q.  Yeah.
4    A.  I don't believe it was.
5    Q.  Did the Texas NAACP provide the Legislature
6  with any data showing the levels of photo ID possession
7  among various groups of voters in Texas?
8    A.  Not that I recall.
9    Q.  So when you say that the Legislature didn't
10 include other forms of ID that would have been more
11 inclusive, has the Texas NAACP conducted any studies
12 about the rates or the percentage of minority voters in
13 Texas who would possess the other forms of ID that
14 weren't included?
15    A.  Ask the question again.  I'm sorry.
16    Q.  Sure.  Did the Texas NAACP conduct any studies
17 on the percentage or proportion of minority voters in
18 Texas who possessed the forms of ID that were not
19 included in SB 14?
20    A.  I don't believe we have, no.
21    Q.  Does the Texas NAACP contend that the Texas
22 Legislature intended to harm African American voters by
23 passing SB 14?
24    A.  Yes.
25    Q.  And what's the basis for that, that contention?

## 131

1    A.  Well, once again, you go back to -- excuse me
2  -- you see the datas that's shown that shows how it's
3  been -- minorities who will be lacking said
4  identification.  If you go back to 2009, when the bill
5  was being debated, there was some insensitive comments
6  that were made about minorities.  If you look at what --
7  that then Representative Brown made about telling Ramey
8  -- or when Ramey Ko was testifying about how IDs could
9  be a problem with Asian Americans, and she made the
10 comments along the line -- and I don't have the direct
11 quote -- but along the line of, you know, "Why don't
12 y'all change your name to something more American."
13         You see that -- you -- you look at when
14 Gary as testifying and saying how, you know, there's
15 other forms and other things can you do to be more
16 inclusive if you want to make it secure.  Even though he
17 didn't have -- have the data presented, but, you know,
18 you can get the data from DPS or whoever before you pick
19 these forms of ID that you did or that they didn't have
20 the data themselves to show that these will be inclusive
21 forms.  These are just going off of, you know, feeling,
22 I guess, or whatever.  You know, they were saying where
23 they don't have, when it comes to minorities, you know,
24 a gun license and passports and driver license and what
25 have you, and that is something that is always -- that

## 132

1  everybody has.
2         And I think even when they mentioned,
3  well, there will be a free ID to have, and it was said
4  that, well, even getting a free ID, there's still costs
5  to a free ID, and you should really look into, is that
6  going to fix anything, and that kind of fell on deaf
7  ears, where they didn't want to look into costs that are
8  going to be associated even in that process.  When you
9  mention of distance that has to be traveled by people in
10 rural and low income, what have you, areas, or even in
11 urban, even in -- in cities.  If you live in a place
12 that may have public transportation in it, but the city
13 bus drops you off five, six miles from the DPS office.
14 Then you say well, you can take a bus -- take a bus and
15 then catch a cab.  Well, for them, catching the bus was
16 a cost in itself, and the cab money is not going to be
17 there.  And if your birthday is in the summer, in Texas,
18 a six-mile walk is not very pleasant, so.  And then, you
19 know, the six miles back and the time you have to walk
20 get to the bus.  So, I think when you look at instances
21 like that, there is some concern.
22    Q.  So the comments by Representative Brown, were
23 those directed at Asian American voters?
24    A.  Yeah.
25    Q.  Well, Representative Brown, she was not a

Yannis Banks                                          May 25, 2012

## 133

1   member of the 82nd, the 2011 Legislature, was she?
2        A.  She was not, no.
3        Q.  So she, obviously, didn't vote on Senate
4   Bill 14?
5        A.  Correct.
6        Q.  Are you aware of other insensitive comments,
7   like the one made by Representative Brown in 2009, are
8   you aware of any other insensitive comments made in
9   2011?
10       A.  Let me think.
11       Q.  Yes.  Take your time.
12       A.  Sure.  Sure.  At this moment, I can't recall.
13  I'd really have to do some -- it's been a while, so I
14  would have to do some really good thinking to see what I
15  can recall.  But right now, at this moment, I can't
16  recall.
17       Q.  Do you contend -- does the Texas NAACP contend
18  that the Texas Legislature intended to harm Hispanic
19  voters by passing SB 14?
20       A.  Yes.
21       Q.  And can you tell me what that contention is
22  based on?
23       A.  I think it goes back to -- just to be basically
24  what I just said earlier.  A lot of the same issues of
25  what I said in the answer to your previous question, we

## 134

1   felt it was in the same way directed towards Hispanic,
2   and it kind of covered, you know, all minorities,
3   because they fall in the same areas.  So when we looked
4   at it -- looked at it, it was -- it appeared that way to
5   us.
6        Q.  Okay.  So if I understand correctly, it's Texas
7   NAACP's contention that -- that the Texas Legislature --
8   well, let me rephrase.
9            So am I correct in understanding that the
10  contention about intentional harm to African American
11  voters and intentional harm to Hispanic voters are based
12  on the same -- the same evidence?
13       A.  Yeah.  We believe that it was out to harm
14  minorities, and we looked at it as out to harm Minority
15  voters.  And if you break it down by the different
16  groups, that we still look at it as it, it was still the
17  same for one would be the same for others, for the most
18  part.  And you know, there's probably something I've
19  forgotten that I just don't remember at this moment, but
20  what I said earlier is what I can remember at this time.
21       Q.  Are you aware of any fact or any evidence that
22  would indicate a specific intent to harm African
23  American voters?
24            MR. VANDEWALKER:  Objection, vague.
25       A.  Well, is there any way you can be, I guess a

## 135

1   little more --
2        Q.  (BY MR. FREDERICK)  Of course.  Of course.
3        A.  -- specific?
4        Q.  Are you aware of any facts or evidence that
5   would indicate a specific intent by the Legislature to
6   harm African Americans voters specifically as opposed to
7   all minority voters?
8            MR. VANDEWALKER:  Objection, vague.
9        A.  Could you ask that question again?
10       Q.  (BY MR. FREDERICK)  Uh-huh.  Are you aware of
11  any evidence that indicates that the Legislature
12  specifically intended to harm African American voters as
13  opposed to all minority voters, as a larger group?
14       A.  Not that I'm aware of at this moment.
15       Q.  Are you aware of any evidence that would
16  indicate the Legislature specifically intended to harm
17  Hispanic voters as opposed to all minority voters as a
18  group?
19       A.  Not that I can recall at this moment.
20       Q.  Does the Texas NAACP contend that the Texas
21  Legislature intended to harm Asian American voters by
22  passing SB 14?
23       A.  Yes.
24       Q.  And what is that contention based on?
25       A.  They would also fall into the group of minority

## 136

1   voters, and they would fall into the same reasons stated
2   -- stated previously, early on, before.
3        Q.  And so I understand, and the reason that you
4   mentioned some -- you mentioned an insensitive comment,
5   but also, I think you talked about minority voters
6   lacking the photo ID.  So would that go for African
7   American, Hispanic, and Asian American voters?
8        A.  Yes.  I think even when you leave room for the
9   people working the polls at the -- the discretion of it
10  if your name matches, what have you, especially when it
11  comes to Asian American voters, as I think Ramey was
12  saying, that it could look different than what's on the
13  polls to what's on an ID -- ID card.  So it would be
14  issues there.
15       Q.  So is it accurate to say that the Texas NAACP
16  contends that SB 14 was passed with a discriminatory
17  purpose because of the effect it will have on minority
18  voters?
19            MR. VANDEWALKER:  Objection vague.
20       A.  Yeah.  Could you be a little --
21       Q.  (BY MR. FREDERICK)  Of course.  So as I
22  understand, the Texas NAACP contends that part of the
23  problem with SB 14 is that it will have an adverse
24  impact on minority voters?
25       A.  Well, we believe that the data we -- we

Yannis Banks                                                    May 25, 2012

| 137 |
|---|

1   submitted in -- in the letter to the DOJ shows that it
2   will have an adverse impact on minority voters.
3       Q.   Okay.  And my question is:  Other than the --
4   other than its alleged effect on minority voters, is
5   there any other basis for the Texas NAACP's contention
6   that SB 14 was passed with a discriminatory purpose?
7       A.   Ask the question again.
8       Q.   Other than the alleged effect of SB 14 on
9   minority voters, is there any other evidence that the
10  Texas NAACP relies on for its conclusion that the bill
11  was passed with a discriminatory purpose?
12      A.   I think we've looked at -- there were
13  representatives who were in office in 2009 who may have
14  been against the bill being passed, and I think Tommy
15  Merritt was one of them.  And, you know, he voted that
16  way on the sole purpose of not getting that bill done.
17  It was, you know, nothing else but his.  There was some
18  people saying, you know, he didn't do the bill, and he
19  had -- had an opponent.  He lost because of -- of that.
20      I think the Chairman in '09 was Todd
21  Smith, but that he -- and he tried to work out a deal
22  for the bill that, you know, be agreed upon by
23  everybody, for the most part, I think could be a
24  consensus since it was -- since the shape of the House.
25  And I looked at his race and what his opponent was

| 138 |
|---|

1   saying and why people were saying it was solely voter ID
2   driven.  It was, this is, yeah, he didn't do what he --
3   what he should have, he had pushed this through, what
4   have you.  So, I think when we look at what people were
5   saying, I guess folks who either were against the bill
6   or they felt like it push it through or ram it down or
7   whatever, we look at those and that brings concern.  I
8   guess we looked at that as being problematic also.
9       Q.   Okay.  So you said Tommy Merritt?
10      A.   I believe his name is Merritt, yes.
11      Q.   Was he a House member?
12      A.   He was a House member.
13      Q.   And he got voted out after the 2009 session?
14      A.   Yes.
15      Q.   And it's your understanding that he was voted
16  out solely on the issue of voter ID?
17      A.   My understanding was that that was the, the
18  contention.  I think he was actually -- he was -- he was
19  not in favor of voter ID, and he was a Republican from
20  West Texas.  I can't remember exactly where he was
21  from.  But what they were pushing against him for was
22  that he wasn't for -- so the voter ID bill that didn't
23  have, I guess, whatever was talked about it could be a
24  better bill.
25      Q.   And so his opponent in the race made voter ID a

| 139 |
|---|

1   big issue?
2       A.   Yes.
3       Q.   Specifically, I guess, Tommy Merritt's lack of
4   support for it?
5       A.   Right.  And Todd Smith also.
6       Q.   Okay.  Do you know who replaced Tommy Merritt?
7       A.   David Simpson, I believe.
8       Q.   All right.  So is it the Texas NAACP's position
9   that because David Simpson campaigned on voter ID, that
10  SB 14 has a discriminatory purpose?
11          MR. VANDEWALKER:  Objection.
12          MR. FREDERICK:  Shall I restate the
13  question?
14          MR. VANDEWALKER:  You are welcome to
15  restate the question or give --
16      A.   Oh, I didn't know anything was coming after
17  that objection.  I'm sorry.  Could you restate the
18  question?
19      Q.   (BY MR. FREDERICK)  Sure.  Is it the Texas
20  NAACP's position that, because David Simpson campaigned
21  against Tommy Merritt on voter ID, that SB 14 was passed
22  with a discriminatory purpose?
23      A.   I wouldn't say that or wouldn't as that -- I'd
24  say when you look at overall, not just David Simpson,
25  and how Todd Smith had a close primary race and that was

| 140 |
|---|

1   the focus of what he needed the bill that we wanted
2   passed through -- the focus of his primary, primary race
3   that Todd Smith had.  When you -- when you look at how,
4   you know, the focus was, was the bill that, that we felt
5   was a bad bill, and with the makeup House that year,
6   could have been a better compromise or makeup or it
7   could have looked better, and there was no -- it's what
8   was done, but what -- should have just been 362 when 362
9   wasn't a good bill.  When you look at that -- and I
10  think it was stated then that how that bill, the effect
11  that it would have on minority voters.  You look at
12  that, and then that becomes a concern.
13      Q.   Is it the Texas NAACP's position that any
14  legislator who voted for SB 14 acted with a
15  discriminatory purpose?
16      A.   I would say yes.  Yes.
17      Q.   And why is that?
18      A.   We feel like it's a discriminatory bill, and I
19  think if you see the discriminatory -- how the bill is
20  going to discriminate against somebody or a group of
21  people, you don't vote for it.  So by voting for it, it
22  was --
23      Q.   Is there anything -- is there anything about
24  SB 14, other than the impact that -- that you think it
25  would have on minority voters, is there anything other

Yannis Banks                                                    May 25, 2012

---

149

1   Legislature?
2        A.   Yes.
3        Q.   What other legislators do you contend that this
4   insensitive comment was reflective of?
5        A.   I -- I couldn't say.  I couldn't say who else
6   it could be reflective of.  But it's just a thought that
7   she could not be -- she may not be the only person
8   thinking that way or ...
9        Q.   But you don't know of anything specific that
10  would indicate that any other legislators were thinking
11  that way?
12       A.   Nothing I can recall right now.
13       Q.   Does the Texas NAACP contend that the
14  Legislature intended to harm poor or indigent people by
15  passing SB 14?
16       A.   Yes.
17       Q.   Okay.  What's the basis for that?
18       A.   I think once you look at -- there were -- and I
19  can't remember all amendments offered.  But, you know,
20  there were amendments offered that would try to make it
21  more accessible and easier on them to be able to vote.
22  Whether it was saying, you know, you need to have the
23  voting locations in better places.  I know during
24  discussion, it was brought up about how the free ID
25  would not be free, when they would have to, you know,

---

150

1   pay to get the documents needed to get the free ID,
2   because those documents weren't free, and there was no
3   kind of waiver trying to put it before them saying if
4   you meet the financial requirement you can get since
5   you're trying to vote.  I think it was just some of the
6   -- that's coming to head right now, when you look at
7   those things that could have been done to make it easier
8   and have it accessible to your indigent and low income
9   people, there was -- it was brought to their attention.
10       Q.   Does Texas NAACP contend that the Legislature
11  intended to harm young people, young voters in
12  particular, by passing SB 14?
13       A.   Yes.
14       Q.   And what's the basis for that contention?
15       A.   You look at the forms of ID that is offered to
16  be used, and when it's -- I'm next to positive one of
17  the amendments would have had college ID used, because
18  on college campuses, that's what a lot of students have
19  on them all the time anyway, and you have students who
20  come from out of state who are able to vote where they
21  live, and they are not able to vote or -- sorry --
22  students who -- who come from out of state to -- to
23  Texas, and they are eligible to vote in Texas, is what I
24  was trying to say.  My brain just shut down on me for a
25  second.  You know, so when you take away IDs, the form

---

151

1   of IDs that they would have or normally have and use,
2   and, you know, we look at the college, the cost of
3   college is going up, so to try to put any more burden on
4   -- on them for what they have to pay, that's
5   unnecessary.
6        There has been -- you know, we -- it seems
7   like, you know, every election cycle, there's always
8   something in Waller County that's happening, when it
9   comes to students being able to vote.  Every election
10  cycle.  And I think in Gary's testimony, he -- I can't
11  remember if it was the 2009 testimony or just 2011
12  testimony, but he had mentioned in there about the
13  Prairie View 19, when you had 19 students who were --
14  who I believe the applications were processed down in
15  Waller County, and the Secretary of State and the AG's
16  Office had to step in to get that done.  But here,
17  you're causing another hurdle.  It seems like every
18  year, every election cycle, we always hear of Waller
19  County, Waller County, Waller County, which is -- I say
20  Waller County because that's where Prairie View A&M
21  University is, just to clarify that.
22       So you don't want to have any other
23  obstacle that could be created to -- that would cause a
24  young person to vote, especially, you know, when it
25  comes to African Americans, then you look at the other

---

152

1   forms of IDs that are offered, the number that African
2   Americans who have, I guess, the higher percentage of --
3   and I'm sounding confusing -- would be college IDs, when
4   it compares, come down to the others.  So when you take
5   away forms that college students would normally have,
6   that's a concern.
7        And I think even when -- it was a couple
8   of months ago, I can't remember if it was a newspaper
9   article or what it was, where there was a Republican
10  Congressman in D.C., you know, and during one of the
11  committee hearings, it was mentioned, they brought up
12  Texas voter ID, and it was mentioned how -- he made a
13  comment, they mentioned, "What do you think that they
14  can't use college ID?"  He said, "Of course you can use
15  college ID.  I'm sure it's in the bill.  I've seen it."
16  And one of his colleagues read to him, "No, you can't."
17  He said, "No, I know it's there."  And when they read it
18  to him, it then became, "oh, well, I don't think they
19  would do that, but I'm pretty sure I read it, and now
20  I'll read it and find it."  So you have others of the
21  party that said they should pass the bill, push the
22  bill, you know, saying that college ID should be there,
23  I think we get a concern.
24       Q.   Does the Texas NAACP contend that the Texas
25  legislature intended to harm elderly people by passing

Yannis Banks

May 25, 2012

## 153

1    SB 14?

2       A.  Yes.

3       Q.  Can you explain the basis of that contention?

4       A.  Sure.  Well, once again, you -- you look at --

5    you have elderly who -- who may not be driving anymore

6    and haven't been driving for a while, so they've let

7    their ID lapse, and, you know, they may not need an ID

8    because they're taken care of by family or what have you

9    or whatever.  So they may not have the ID or the ID may

10   have lapsed, so now when it's time to get, go and get an

11   ID, documents even necessary to produce to get the ID,

12   they may not have.  When it comes to if you had a

13   midwife birth, or, you know, your birth certificate

14   could be long lost and gone, or, you know, anything, and

15   the hospital where you were born could -- especially if

16   you were born, you know, in maybe in one of the rural

17   areas or what have you, may no longer be operational and

18   hasn't been for a while and you can't get, you know, the

19   necessary documents to get the ID, you know, that's a

20   concern also.

21      Q.  Is there anything other than that, that leads

22   you to believe that the Legislature intended to harm

23   elderly people with SB 14?

24      A.  At the moment, that's all I can recall.

25      Q.  Does Texas NAACP contend that the Legislature

## 154

1    intended to harm rural voters by passing SB 14?

2       A.  Yes.

3       Q.  Can you explain the basis for that contention?

4       A.  Sure.  There were -- there was amendments

5    offered that would -- that would say that, you know, you

6    would need to have a DPS office in every county, so if I

7    live in one county, I don't have -- have this great area

8    to travel to get what I need to vote.  And we're saying

9    we want to have, make that required.  That's to help

10   them out so they can, you know, have access to get to a

11   DPS office to get their IDs.  Those amendments were --

12   or it may have been just one, I can't remember how many,

13   but the amendment was, you know, voted down.

14           I think there still could be, you know, a

15   cost, the cost of -- of having to get to -- to

16   locations, the cost of having to get documents needed to

17   get the IDs as well, that could be -- that's a factor as

18   well, when you're looking to whatever the burden you are

19   putting on them in that aspect.

20      Q.  Is there anything else that you would point to,

21   to support the contention that the Legislature intended

22   to harm rural voters with SB 14?

23      A.  At the moment, that's -- that's all I can

24   remember at -- at the moment.

25      Q.  Does the Texas NAACP contend that the Texas

## 155

1    Legislature intended to harm urban voters by passing SB

2    14?

3       A.  Yes.

4       Q.  Can you explain the basis for that contention?

5       A.  Sure.  Once again, there were amendments that

6    were recommended -- or amendments made, I should say

7    sorry -- that would say, you know, you need to have more

8    locations even in some of your rural cities, I can think

9    of, like Houston.  You know, the DPS offices that you

10   will in Houston may not be in every -- I mean, Houston's

11   a big city.  It takes an hour to go from one half -- to

12   one side to the other side.  So you can live in Houston,

13   and you can use the public transportation and still be

14   far away from a DPS office.  So that amendment was --

15   was made.

16           They can still have the costs would be

17   there for them as well.  The cost, that could be a

18   burden on them if they live in the inner city, and the

19   money that they have is kind of budgeted already for

20   what they need, and they wouldn't have the extra money

21   for -- to get documents or to get a new ID or what have

22   you, whatever.  That could be -- that -- that was a

23   concern of ours.  When you -- and you look how, you

24   know, there was amendments made for that as well -- as

25   well, that were stricken down, and you would -- at the

## 156

1    moment, that's all I can think of at the moment.

2       Q.  Those are all the questions that I have.

3           Before we go off the record, are there any

4    answers that you want to supplement or change from

5    earlier?

6       A.  Can I have a minute?

7       Q.  Oh, of course.  Take your time.

8       A.  Thank you.

9       Q.  And I don't mean to suggest that you should

10   change any.  I just want to give you the chance.

11      A.  Right.  Okay.  I think I'm okay.

12          MR. FREDERICK:  All right.  Well, thank

13   you very much for your time today.  I appreciate it.

14          MR. VANDEWALKER:  If I could just -- the

15   defendant intervenors have a few questions on redirect.

16          MR. FREDERICK:  Okay.

17          EXAMINATION

18   BY MR. VANDEWALKER:

19      Q.  Mr. Banks, do you remember the Legislature

20   supported SB 14 talking about --

21          THE REPORTER:  I'm sorry.

22          MR. VANDEWALKER:  Let me try to take it

23   off speaker phone.  Is that better?

24          THE REPORTER:  That's much better.

25          MR. VANDEWALKER:  Okay.  Great.

Yannis Banks                                    May 25, 2012

## 157

1    Q.   (By Mr. Vandewalker) So my question is:
2    Mr. Banks, do you remember the justification that the
3    legislators who supported SB 14 offering why did they
4    think it was a good bill?
5        A.   They felt that -- from what I can recall, they
6    thought it was a -- that everybody would have -- access
7    would be there, and they said that there was -- you
8    know, they need to have protection from voter fraud.
9    But when you look at the data that has been produced,
10   voter fraud is not rampant or widespread throughout the
11   state.  There's been -- we haven't seen any cases that
12   -- that's showing there is voter fraud or a need for a
13   voter ID bill.
14       Q.   So just so I can understand, are you expressing
15   doubt that voter fraud is the real reason that SB 14 was
16   enacted?
17       A.   Yes.  I think there hasn't been any evidence
18   shown or proven or otherwise that there is a voter fraud
19   issue in Texas.
20       Q.   Thank you.  And you talked a lot about -- or
21   you talked some about amendments that were offered to SB
22   4 but were rejected, and I believe you said that you
23   think that some of those amendments would have decreased
24   the discriminatory effect on various populations?
25       A.   Yes.

## 158

1        Q.   Do you think that's also true of African
2    Americans?
3        A.   Yeah.  I think the amendments that were offered
4    would have decreased the discriminatory effect against
5    African Americans.
6        Q.   Thank you.  And do you recall if in passing
7    SB 14, the Legislature changed any of its own rules?
8        A.   Yes, they did.  On the Senate side, they
9    suspended the two-third rule, which two-third votes is
10   needed to bring a bill up on the floor to have floor
11   debate.  They suspended that, that rule and had the
12   debate as the Committee as a Whole on the House -- or
13   the Senate floor.
14       Q.   Thank you.  And do you recall any members of
15   other minority groups testifying about the
16   discriminatory effects that SB 14 might have?
17       A.   Yes.  MALDEF testified of discriminatory
18   effects it would have on Hispanics and minorities.  I do
19   believe the League of Women Voters did, as well as the
20   ACLU.
21       Q.   Thank you.  Do you know whether or not Texas
22   tried to convince the U.S. Department of Justice to
23   allow it to enforce SB 14?
24       A.   Yes.  They did submit information to the
25   Department of Justice, but I believe the Department of

## 159

1    Justice said that the information was insufficient,
2    because it wouldn't show the effects that it would have
3    on the minority population with the data that Texas was
4    able to -- that Texas sent them.
5        Q.   Do you know what the data that Texas submitted
6    did show?
7        A.   I think it -- they sent them the Spanish
8    surname, which would give information about -- it was --
9    it would be limited information of those that just have
10   a Spanish surname, but they can tell they have IDs, but
11   it would not be reflective of African American, Asian,
12   and other communities, and low income communities if
13   they are able to have an ID or not.
14       Q.   And do you recall what the data showed about
15   people with Spanish surnames?
16       A.   It showed that some did have voter ID, but if I
17   remember correctly, and I know it's not a letter, I
18   think there was a larger number of those where they
19   could tell they didn't have a voter ID, or didn't have a
20   government ID.
21       Q.   Do you remember if the rate that Hispanic
22   residents of Texas didn't have a photo ID was more or
23   less than other racial groups?
24       A.   It was less than Anglo.  I think when it came
25   to -- there definitely was disparity between the

## 160

1    Hispanic surname and the Anglo group, and I think it was
2    able to show that there was a disparity with -- between
3    Anglos and Hispanic groups.
4        Q.   And turning to the concealed handgun license,
5    the data about people who have concealed handgun
6    licenses, do you know anything about the relative
7    proportion of different races within -- I'm sorry,
8    strike that.
9            Do you know anything about the relative
10   proportion of different racial minorities having
11   concealed handgun licenses?
12       A.   Somewhat, yes.  I believe the data that they
13   also submitted showed that African Americans and other
14   minorities are at least likely to have concealed handgun
15   licenses then when compared to Anglos.
16       Q.   Thank you.  Do you know, is SB 14 currently in
17   effect right now?
18       A.   It is not, no.
19       Q.   If SB 14 goes into effect, will the NAACP have
20   to change its programming or activities?
21       A.   We will have to make some adjustments, yes.  We
22   would -- we would definitely need to get our members and
23   constituents informed of what the new law entails.  And
24   so we'll have to use our resources or divert resources
25   that would be used for other things to inform others,

Yannis Banks                                                      May 25, 2012

## 161

1   and to whatever extent that we could, to -- to help
2   people get to what -- get what they need to be able to
3   vote as well.  So it could have an impact on us.
4        Q.   When you say get what they need to be able to
5   vote, what do you mean?
6        A.   Well, one, we would have to give them the
7   information so they know, you know, which IDs they would
8   need, or it may be having to try to help some of the,
9   you know, elderly, try to track down, if they can, what
10  they need, if not, help them in other ways.  Or if it's
11  -- our branches may try to do shuttles or, you know, try
12  to help out some of the people who will be affected, and
13  that would take away resources that they could use
14  implement to help people in other ways would have to be
15  diverted, whether it's doing shuttle services or things
16  of that nature.
17       Q.   So if the Texas NAACP has to actually do those
18  kinds of things, do you think you'll find members and
19  constituents who don't have the ID and need those kinds
20  of services.
21       A.   I would think so.  I think, as of right now,
22  with this not being in force and people are knowing you
23  can vote as you normally do, there's no concern about
24  it.  I think once -- or if it becomes enforced, I think
25  more people would come forward and be worried and

## 162

1   concerned that they cannot vote because they are not
2   able to get -- or able to obtain the necessary forms of
3   identification.
4        MR. VANDEWALKER:  Thank you.  We have no
5   further questions.
6        MR. FREDERICK:  Reserve further questions.
7        MR. VANDEWALKER:  We would like to review
8   and sign the transcript.  And could the court reporter
9   give us a reading on the time, since this has only been
10  part of this 30(b)(6) deposition.
11       (Signature reserved.)
12       (Deposition concluded at 3:52 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

## 163

1   CHANGES AND SIGNATURE
2        RE: TEXAS VS. HOLDER, ET AL
3   PAGE LINE CHANGE        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20       I, YANNIS BANKS, have read the foregoing deposition
21  and hereby affix my signature that same is true and
22  correct, except as noted above.
23
24       _____
25       YANNIS BANKS

## 164

1   THE STATE OF _____)
2   COUNTY OF_____)
3
4        Before me,_____, on this day
5   personally appeared YANNIS BANKS, known to me (or proved
6   to me under oath or through_____
7   (description of identity card or other document) to be
8   the person whose name is subscribed to the foregoing
9   instrument and acknowledged to me that they executed the
10  same for the purposes and consideration therein
11  expressed.
12       Given under my hand and seal of office
13  this_____day of _____, 2012.
14
15
16       _____
17       NOTARY PUBLIC IN AND FOR
18       THE STATE OF _____
19
20
21
22
23
24
25