## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR., IN            )
HIS OFFICIAL CAPACITY AS           )
ATTORNEY GENERAL OF THE            )
UNITED STATES,                     )
                                   )
        Defendant,                 )
                                   )
ERIC KENNIE, ET AL.,               )
                                   )
        Defendant-Intervenors,     )
                                   )
THE TEXAS SATE CONFERENCE          ) CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, ET              ) (RMC-DST-RLW)
AL.,                               ) Three-Judge Court
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, ET          )
AL.,                               )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, ET AL.,                    )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, ET             )
AL.,                               )
                                   )
        Defendant-Intervenors.     )

## 2

1   ******************************************************
2
3              ORAL DEPOSITION OF
4              GLENN BAYRON
5              JUNE 12, 2012
6   ******************************************************
7        ORAL DEPOSITION OF GLENN BAYRON, produced as a
8   witness at the instance of the Defendants Eric H. Holder,
9   et al., and duly sworn, was taken in the above-styled and
10  numbered cause on Wednesday, June 12, 2012, from
11  12:28 p.m. to 2:23 p.m., before Tamara K. Chapman, CSR in
12  and for the State of Texas, reported by machine shorthand,
13  at the Omni, 9821 Colonnade Boulevard, San Antonio, Texas,
14  pursuant to the Federal Rules of Civil Procedure and the
15  provisions stated on the record or attached hereto.

## 3

1                      A P P E A R A N C E S
2
3   FOR THE PLAINTIFF STATE OF TEXAS:
      Mr. Adam Aston
4     ATTORNEY GENERAL OF TEXAS
      Civil Medicaid Fraud Division
5     209 W. 15th Street
      Austin, Texas  78701
6     adam.aston@oag.state.tx.us
7
8   FOR THE DEFENDANTS ERIC H. HOLDER, ET AL.:
      Ms. Michelle McLeod
9     U.S. DEPARTMENT OF JUSTICE
      1800 G Street, 7254
10    NWB - Room 7202
      Washington, DC  20006
11    michelle.mcleod@usdoj.gov
12
13  RODRIGUEZ DEFENDANT-INTERVENORS:
      Ms. Nina Perales
14    110 Broadway, Suite 300
      San Antonio, Texas  78205
15    nperales@maldef.org
16
17  ALSO PRESENT:
      MR. Luis Figueroa - Legislative Staff Attorney
18    MALDEF
      110 Broadway, Suite 300
19    San Antonio, Texas  78205
      lfigueroa@maldef.org
20
21
22
23
24
25

## 4

1                      I N D E X
2                                              PAGE
3
    APPEARANCES................................  2
4
5     GLENN BAYRON
6   EXAMINATION
      Examination By Mr. Aston ..............  5
7   CHANGES AND SIGNATURE.....................  58
8
9   SIGNATURE PAGE............................  59
10
11  REPORTER'S CERTIFICATION..................  61
12
13                   E X H I B I T S
14  NO.  DESCRIPTION                         PAGE
15  1   Notice
        (No Bates - 7 pages)
16                                               8
    2   SB 14
17      (no Bates - 17 pages)
                                                16
18  3   Defendant-Intervenor Southwest Voter
        Registration Eduction Project's
19      Response to Plaintiff's First
        Request for Production
20      (no Bates - 7 pages)
                                                54
21
22
23
24
25

## 5

1      GLENN BAYRON,
2  having been first duly sworn, testified as follows:
3      EXAMINATION
4  BY MR. ASTON:
5      Q.  Good afternoon.
6      A.  Hello.
7      Q.  Once again, my name is Adam Aston.  I represent
8  the State of Texas.  Would you please state and then spell
9  your name for the record.
10     A.  Glenn Bayron, G-L-E-N-N B-A-Y-R-O-N.
11     Q.  Have you ever been deposed?
12     A.  No.
13     Q.  Have you ever seen a deposition?
14     A.  Just the one I saw just prior to this.
15     Q.  Are you suffering from any illness or taking any
16  medication that will affect your ability to provide
17  accurate answers to my questions?
18     A.  No.
19     Q.  You aware of anything else that might prevent you
20  from accurately answering my questions?
21     A.  Okay.
22     Q.  Go over a few things like we did for the
23  deposition this morning.  Please answer audibly so the
24  reporter can take down your answers.  A nod or a head
25  shake cannot be reported.  Do you understand?

## 6

1      A.  Yes.
2      Q.  If you don't understand my question or if you'd
3  like for me to speak slower at any time, please let me
4  know and I will do so.
5      A.  Okay.
6      Q.  Please wait until I finish my question to answer,
7  and I will try and wait until you finish your answers to
8  ask the next question.  Okay?
9      A.  Okay.
10     Q.  Your lawyer may object to a question.  Even if
11  she objects, unless she instructs you not to answer,
12  please do so.
13     A.  Okay.
14     Q.  Are you represented by counsel today?
15     A.  Yes.
16     Q.  And who is your counsel?
17     A.  Nina Perales.
18     Q.  Anyone else?
19     A.  Luis Figueroa.
20     Q.  And when did that representation begin?
21     A.  I guess whenever Mi Familia Vota came on board
22  with the suit.  I don't have an exact date.
23     Q.  Do you understand that you have been designated
24  to provide testimony on behalf of the Mi Familia Vota
25  Education Fund today?

## 7

1      A.  Yes.
2      Q.  And unless I indicate otherwise, when I use the
3  term "you" or "Mi Familia or "your organization" during
4  the questions in this deposition, that term includes the
5  Mi Familia Vota Education Fund and anyone acting on its
6  behalf.  Do you understand?
7      A.  Yes.
8      Q.  Did you do any preparation for your deposition
9  today?
10     A.  Yes.
11     Q.  What did you do?
12     A.  I met with the attorneys yesterday upon my
13  arrival in San Antonio and prior to that, reviewed some of
14  the materials related to the case that were made available
15  to me.
16     Q.  When you say "materials," do you mean the
17  pleadings in this case?
18     A.  I'm not exactly sure what the term of the
19  document is.  I believe that looks a lot like the
20  document, the one that's next to you there.  I believe
21  it's a notice.
22     Q.  You said "the document."  Did you only review one
23  document?
24     A.  No.  No, there was an additional document that I
25  believe was a summary of specific answers to questions

## 8

1  that was submitted to Mi Familia Vota to my boss, Carlos
2  Duarte.
3      Q.  Can you spell that name, please?
4      A.  C A-R-L-O-S D-U-A-R-T-E.
5      Q.  Did you meet with anyone else at Mi Familia in
6  order to prepare for this deposition?
7      A.  No.
8      Q.  Did you have any e-mail discussions or phone
9  conversations?
10     A.  No.
11         (Exhibit 1 was marked.)
12     Q.  (BY MR. ASTON)  You've been handed what has been
13  marked Exhibit 1.  Would you please review it and then
14  we'll discuss it briefly.
15         (Witness reviews document.)
16     Q.  (BY MR. ASTON)  Are you familiar with this
17  document?
18     A.  Yes.
19     Q.  And this is the one marked "Notice" --
20     A.  Correct.
21     Q.  -- "of Intention to Take Deposition"?
22     A.  (Witness nods.)
23     Q.  You've been asked -- or I guess Mi Familia has
24  been asked to designate someone to testify as to 11
25  topics.  Are you familiar with all 11 topics here?

## 9

1    A. Yes.
2    Q. And you've been designated to testify as to all
3 of the topics?
4    A. That is correct.
5    Q. And you're prepared to testify --
6    A. Yes.
7    Q. -- as to all...
8        Your preparations to testify as to these topics,
9 anything in addition to what we've already discussed?
10   A. No.
11   Q. Look at Topic 6, please, on Page 2.  Topic 6:
12 Any policy making or advocacy-related work performed by or
13 on behalf of Mi Familia Vota Education Fund regarding
14 voter identification.
15   A. To my knowledge, Mi Familia Vota Education Fund
16 has not engaged in any specific advocacy-related work
17 pursuant to this work.
18   Q. Not just as to Senate Bill 14 or this current,
19 but previously before?
20   A. Correct.  To my knowledge.
21   Q. Does Mi Familia generally engage in
22 policy-related activities such as these as to other topics
23 perhaps?
24   A. The Educational [sic] Fund, because if it's
25 501(c)(3) status, is limited in its ability to engage in

## 10

1 public policy advocacy.  Our mission primarily is related
2 to promoting civic -- specific engagement in the Latino
3 community through voter registration and information on
4 citizenship classes as well as promoting voter
5 mobilization.
6    Q. Topic 8 on your list:  Mi Familia Vota Education
7 Fund's election-related activities, including but not
8 limited to, driving voters to the polls, assistance with
9 mail-in ballots and poll watching.
10       Are those the sorts of activities that you're
11 referring to?
12   A. Among others, yes.
13   Q. And the others would be like registration and
14 voter education?
15   A. Exactly.
16   Q. And that would be Topic 7?
17   A. Yes.
18   Q. A few background questions on the organization
19 itself.  When was the organization founded?
20   A. To be honest with you, I don't know.  I believe
21 it was in the early 2000s.  I've only been with the
22 organization since late 2011.
23   Q. And the corporate structure of the organization,
24 as you mentioned a moment ago, 501(c)(3); is that correct?
25   A. That is correct.  That is one aspect.  There is a

## 11

1 501(c)(4) element -- branch to the organization as well.
2    Q. And what does that branch do?
3    A. Currently that -- well, within Texas?  Is that
4 what you're referring to?
5    Q. Yes.
6    A. Okay.  That branch is currently involved in
7 organizing community groups along issues that are of
8 importance to those groups and facilitating their
9 involvement in the civic engagement process.
10   Q. Now, might that include things other than
11 election and voting-related --
12   A. Yes.
13   Q. -- activities.
14       Do you know how many employees Mi Familia has?
15   A. I believe at this point currently -- again,
16 talking about the Texas operation total -- in total, about
17 16 employees.
18   Q. In Texas?
19   A. Uh-huh.
20   Q. And what is your role?
21   A. I am the state coordinator.
22   Q. And what do you do as the state coordinator?
23   A. I work directly under the state director in
24 managing and overseeing both the (c)(3) and the (c)(4)
25 aspects of the organization.  And I should probably

## 12

1 clarify that when I say the (c)(4), that I am, by
2 definition, not talking about Mi Familia Vota Educational
3 Fund.
4       I supervise a voter registration coordinator and
5 his team of canvass leads and canvassers.
6    Q. Now, you mentioned a minute ago the (c)(4)
7 portion has a different name.  What is that name?
8    A. Mi Familia Vota Texas.
9    Q. Does the organization rely on volunteers?
10   A. Yes.
11   Q. Do you know about how many volunteers the
12 organization would have in a given year?
13   A. Since I've only been with the organization for
14 about eight or nine months, I couldn't say in total.  I
15 know that depending on the activity.  Currently, for
16 example, we probably work with about 15 or 20 volunteers
17 at any given time.
18   Q. And what is the organization -- I think at this
19 point we're going back to the Education Fund portion --
20   A. Right.
21   Q. -- their primary activities?
22   A. Voter registration, voter education.  And we will
23 eventually be engaging in a get-out-the-vote.  I guess
24 "voter mobilization" is the term.
25   Q. And where is -- where are they headquartered, the

## 13

1  office?
2      A.  In Houston.
3      Q.  Is that the only Texas office?
4      A.  Yes.
5      Q.  And do they have offices in other states?
6      A.  Mi Familia Vota has offices in other states.
7      Q.  Do you know how many states?
8      A.  Yes.
9      Q.  How many?
10     A.  California, Colorado, Nevada, Arizona and
11 Florida.
12     Q.  And does the Texas portion interact significantly
13 with the others or are they generally independent?
14     A.  What do you mean by "significantly"?
15     Q.  That's a good question.
16         Is it fair to say that each state sort of
17 operates independently of the others with some supervision
18 from maybe a national group?
19     A.  I believe perhaps "autonomously" is a better word
20 than "independently."  My boss interacts more with his
21 peers among state directors, for example, on a regular
22 basis than I would with the -- my peers who were
23 coordinators.  But I would say there is a regular amount
24 of interaction among the state staffs.
25     Q.  And would you have an idea of how many employees

## 14

1  the entire organization would have?
2      A.  I could not guess.  I do not know.
3      Q.  Would you consider Texas to be one of the larger
4  staffs?
5      A.  I don't know.
6      Q.  Is Mi Familia a membership organization?
7      A.  No.
8      Q.  So they do not have individual members?
9      A.  Correct.
10     Q.  What is the annual budget for Mi Familia Vota
11 here in Texas?
12     A.  I can only speak to the annual budget of
13 Educational Fund.  To my knowledge, I believe it is
14 approximately $700,000.
15     Q.  And that would be the Texas portion --
16     A.  Correct.
17     Q.  -- of the Education Fund?
18     A.  Yes.  That would be the Mi Familia Vota
19 Educational Fund budget.
20     Q.  How does the organization raise money?
21     A.  Through foundation grants and -- well, actually
22 foundation grants are the only ones I am specifically
23 aware of.  I believe we may receive funding from SEIU, but
24 I'm not sure.  We do not have individual donor bases, to
25 my knowledge.

## 15

1      Q.  And what about grants from governmental agencies?
2      A.  I do not believe we receive grants from
3  government entities.
4      Q.  Do you know how much money has been received from
5  these private grants --
6      A.  No.
7      Q.  -- in the last year?
8      A.  No, I do not.
9      Q.  Has the organization made plans to assist voters
10 with compliance with Senate Bill 14?
11     A.  We have -- I have not engaged in any specific
12 conversations thus far related to any sort of, quote,
13 what-if type scenarios if the passage of the law were to
14 be permanent.
15     Q.  Are you aware of anyone else at Mi Familia making
16 those plans?
17     A.  No.
18     Q.  So then is it fair to also say that no plans have
19 been implemented, to your knowledge?
20     A.  To my knowledge, no plans have been implemented.
21     Q.  If it is implemented, will the organization
22 educate voters about the requirements of Senate Bill 14?
23     A.  With serious reservations.
24     Q.  Why the reservations?
25     A.  Because the organization holds that the intent

## 16

1  and impact of this bill are both detrimental and
2  counterproductive to Latino citizen slash civic
3  participation.
4      Q.  What will the organization do, how will they
5  conduct that education?
6      A.  We will continue our efforts to inform eligible
7  voters within the Latino community as to where they can
8  vote; if necessary, how the process works in terms of
9  registering to vote; and provide information on polling
10 locations and rules and regulations.
11     Q.  Will the organization help voters obtain either
12 the identification required or the underlying documents
13 necessary to obtain the identification required by Senate
14 Bill 14?
15     A.  We have not -- or I have not been involved in any
16 conversations thus far that have talked about specific
17 steps in helping people obtain identification documents.
18         (Exhibit 2 was marked.)
19     Q.  (BY MR. ASTON)  You have been given what has been
20 marked as Exhibit No. 2.  Would you please review it and
21 we'll discuss it briefly.
22         (Witness reviews document.)
23     Q.  (BY MR. ASTON)  Are you familiar with this
24 document?
25     A.  Yes.

## 21

1    citizenship certificate and a U.S. passport.  You agree
2    that those forms of identification are acceptable forms
3    under Senate Bill 14, correct?
4         A.  I have never seen in my personal experience a
5    U.S. military identification card.  The only type of
6    citizenship certificate that I'm familiar with are those
7    that are provided in the context of naturalization
8    ceremonies, and I'm a holder of a U.S. passport.  Without
9    actually having seen the first two, going on the
10   assumption that they are legitimate documents, my answer
11   would be yes.
12        Q.  You mentioned earlier that Mi Familia does not
13   have members but has employees and staff.  Are you aware
14   of any of the employees or staff at your organization that
15   lack a photo ID required by Senate Bill 14 to vote?
16        A.  Mi Familia Vota employees are not only U.S.
17   citizens but legal residents of the United States.
18        Q.  In those 16?
19        A.  Correct.
20        Q.  Okay.  Of those who are citizens and registered
21   to vote, are you aware of any of the staff or employees
22   that are registered but who do not have one of the photo
23   ID documents on that list?
24        MS. PERALES:  You can answer if you know.
25        A.  I do not know of any that do not, but -- that, to

## 22

1    me, is, you know, I -- I don't -- I haven't seen all of
2    their IDs.
3         Q.  (BY MR. ASTON)  Fair enough.
4         Does Mi Familia represent anyone else besides
5    the organization in this litigation?
6         A.  Can you repeat -- can you expand on that?  I'm
7    not exactly sure what I you mean by "represent."
8         Q.  Mi Familia, as an organization, has entered this
9    lawsuit and -- on behalf of itself.
10        A.  Uh-huh.
11        Q.  Does it purport to be entering this lawsuit on
12   behalf of anyone else?
13        A.  To my knowledge, no.
14        Q.  Let's talk about Senate Bill 14.  And if the
15   Court preclears that law, how does Mi Familia believe the
16   implementation of Senate Bill 14 will harm Mi Familia?
17        A.  First and foremost, we are of the position that
18   our constituents, as eligible voters within the Latino
19   community, would be harmed; that the process and ability
20   for them to exercise their legal right to vote would be
21   hindered and obstructed and, therefore, by definition, our
22   work, which is designed to facilitate and help enable them
23   to exercise their voting rights more easily, would be
24   burdened and obstructed.
25        Q.  Anything else?

## 23

1    A.  No.
2         Q.  You mentioned constituents.  I guess that would
3    be distinct from members.  But who does Mi Familia believe
4    to be its constituents?
5         A.  The Latino community.  We are -- our mission is
6    to promote civic engagement within the Latino community.
7         Q.  Throughout --
8         A.  In --
9         Q.  -- the state in its entirety?
10        A.  In -- well, currently we're operating only within
11   the confines of Harris County.
12        Q.  But do you consider that your constituents are
13   the Latino and Hispanic community in Harris County or in
14   the state of Texas or something different?
15        A.  Specifically Harris County.  But conceptually,
16   throughout the state of Texas.
17        Q.  Does Mi Familia register voters?
18        A.  Yes.
19        Q.  What percentage of the budget -- the annual
20   budget is dedicated to voter registration?
21        A.  The (c)(3) budget as it stands now is dedicated
22   exclusively to our voter registration efforts at this
23   time.
24        Q.  Does Mi Familia conduct voter education
25   activities?

## 24

1    A.  Yes.  And I should clarify that when I speak of
2    voter registration activities, I am including within that,
3    from a programmatic perspective, that voter education is
4    part of voter registration.
5         Q.  So is it fair to say your organization does not
6    break down between registration and education activities?
7         A.  We view voter education as part of the
8    registration process, as well as part of voter
9    mobilization process.
10        Q.  That would include getting people to vote and
11   taking them to the polls?
12        A.  If requested to do so.
13        Q.  And so you would say all of those things you
14   would consider to be one -- they're not distinct functions
15   in your organization's view?
16        A.  I would characterize them as complementary
17   functions.
18        Q.  And other than -- well, would you say that for
19   those three basic functions, the registration, education,
20   and mobilization, that constitutes, combined, what
21   percentage of the budget?
22        A.  Well, factoring in my staff time and that of the
23   state directors, that is pretty much 100 percent of what
24   we are doing in (c)(3) -- in the educational fund side.
25   That is what we do.

## 25

1    Q.  Has Mi Familia hosted any speakers about voter ID
2  legislation, either SB 14 or previous legislation?
3    A.  No, not to my knowledge.
4    Q.  Has your organization produced any reports on
5  voter ID legislation?
6    A.  No.
7    Q.  Has it conducted any surveys?
8    A.  No.
9    Q.  Conducted any studies?
10   A.  No.
11   Q.  And again, just to be clear, that's not just for
12  Senate Bill 14, but that's previous voter ID legislation.
13   A.  No.  To my knowledge, no.
14   Q.  Did your organization provide its staff with any
15  materials on voter ID during the 2011 legislative session?
16   A.  Can you repeat that question again?  I'm sorry.
17   Q.  Sure.  Did your organization provide its staff
18  with any materials, written documents, regarding voter ID
19  during the 2011 legislative session?
20   A.  I came on board to Mi Familia Vota in my current
21  capacity in February of 2012.  Any communications prior to
22  that related to this or any other issue before the Texas
23  legislature, I am unaware of.
24   Q.  Did Mi Familia meet with any interest groups
25  during the legislative session or before regarding Senate

## 26

1  Bill 14?
2    A.  Can you clarify the parameters of what you are
3  calling the 2011 legislative session?
4    Q.  The session would have been from January until, I
5  believe, June when they left.  And before I would
6  certainly include the months certainly leading up to,
7  during the bill filing, and then the consideration.
8    A.  To my knowledge, no.
9    Q.  To your knowledge, has the organization met with
10  any of those groups about voter ID legislation in previous
11  years?
12   A.  Prior to 2011?
13   Q.  In earlier legislative sessions when other bills
14  were considered.
15   A.  I do not know.  My understanding is that
16  Mi Familia Vota Educational Fund is a relatively young
17  organization in the state of Texas.  So I do not think so,
18  no.
19   Q.  Did any groups provide your organization's staff
20  with written materials or documents regarding voter ID
21  legislation, say between the legislative session, during
22  the session, and now?
23   A.  Mi Familia Vota Educational Fund interacts
24  regularly with a variety of other (c)(3) organizations
25  within the state of Texas that have similar missions.  We

## 27

1  discuss issues pertaining to voter registration, the
2  empowerment of our constituencies.  And where our missions
3  coincide, we collaborate in discussions.  But I do not
4  know of any specific meetings or strategy sessions of this
5  nature.
6    Q.  And to your knowledge, no documents were traded
7  back and forth?  Or no written materials?
8    A.  In recent months we have received updates from
9  other organizations as far as the status of some of this
10  legislation.  But it has been distributed in the context
11  of casual information exchange with no specific strategies
12  that I have been involved in.
13   Q.  When you say "in recent months," are you
14  referring to maybe calendar year 2012?
15   A.  During my tenure with the organization.
16   Q.  Which began in February?
17   A.  In my current position, yes.
18   Q.  Mi Familia Vota Education Fund intervened with
19  other parties; is that correct?
20   A.  I don't know what you mean by "intervene" -- oh,
21  do you mean in the context of this --
22   Q.  In this litigation, yes, sir.
23   A.  My understanding is that the Mexican American
24  Legal Defense and Educational Fund is representing both
25  Mi Familia Vota and the Southwest Texas Voter Education

## 28

1  Project.  This is my understanding.
2    Q.  Has Mi Familia met with Southwest Voter
3  Registration Education Project?
4    A.  Not to my knowledge, no.
5    Q.  Have they met with the two individual women?
6    A.  No.
7    Q.  So you're not aware of any conversations or
8  e-mails or exchange of documents between Southwest Voter
9  and Mi Familia with regard to Senate Bill 14 or this
10  litigation?
11   A.  Correct.
12       THE WITNESS:  Do you think we might be able
13  to take a five-minute restroom break?
14       MR. ASTON:  We certainly can.
15       THE WITNESS:  Okay.
16   Q.  (BY MR. ASTON)  I do have one more question on
17  this section, if we could.
18   A.  Sure.
19   Q.  The claims of Southwest Voter and Mi Familia, to
20  your knowledge, are they based upon the same legal and
21  factual contentions?
22   A.  We challenge the intent of this bill.  We believe
23  it is detrimental of the voter interests of the Latino
24  community and other minority communities.  We see its
25  impact as very negative for eligible voters in this state.

## 29

1    Q. But are you aware of any of the legal or factual
2  contentions that you're making -- your organization is
3  making that are independent from those of Southwest Voter?
4        MS. PERALES: You can answer, if you know.
5    A. I do not know of anything that specifically would
6  distinguish us from the position in the Southwest Voter
7  Education Project.
8        MR. ASTON: Can we go off the record?
9        (Break.)
10   Q. (BY MR. ASTON) Did you personally speak with
11 anyone at the Department of Justice about Senate Bill 14?
12   A. No.
13   Q. Did Mi Familia speak, to your knowledge, with the
14 Department of Justice about Senate Bill 14?
15   A. To my knowledge, no.
16   Q. And that would include during the legislative
17 session, afterwards during the preclearance proceedings,
18 and during this litigation?
19   A. Correct.
20   Q. And that would include phone conversations,
21 e-mails and letter, and any other correspondence?
22   A. To my knowledge, correct.
23   Q. Does Mi Familia contend that Senate Bill 14 will
24 have the effect of denying or abridging Hispanics' and
25 Latinos' right to vote on account of race, color, or

## 30

1  membership in a language minority group?
2    A. Yes, this is our contention.
3    Q. What is the basis for that contention?
4    A. The historical framework of minority voting in
5  the State of Texas; the demonstrated relative disadvantage
6  that the Latino community has in being able to produce the
7  identification documents outlined in the bill; various
8  structural limitations, including cost,
9  location/accessibility, to obtaining such documents.
10   Q. Anything else?
11   A. Again, we feel that it is the intent of a
12 majority of Texas legislators to curtail and impede the
13 full voting power of the Latino and other minority
14 communities through passage of this bill. We believe that
15 this presents added undue burden and obstruction to the
16 free exercise of eligible voting among Latinos and our
17 ability as an organization to complete our mission.
18   Q. You mentioned a moment ago something to the
19 effect that you believe Hispanics and Latinos might be
20 less likely to have photo IDs as listed in Senate Bill 14.
21 Is it your contention that they are less likely than
22 others to have each of those or some of those photo IDs?
23   A. I cannot speak to the specific statistical
24 percentages for each form of identification. But overall,
25 I believe it has been demonstrated that the Latino

## 31

1  community in general has a lower likelihood of meeting
2  these newer, more stringent requirements for voting, and
3  that, therefore, by definition, it is a violation of the
4  Voting Rights Act.
5    Q. Is it possible that Latinos have an ID such as a
6  passport at a greater or higher rate than other Texas
7  citizens?
8    A. I have no empirical information regarding the
9  percentage of Latinos who hold passports vis-à-vis other
10 ethnic groups.
11       Given what is required to obtain a passport,
12 first and foremost, cost. In addition to that, limited
13 number of U.S. passport agencies in the state of Texas,
14 and the need for, at times, interurban transportation to
15 obtain one, I would think that it is an additional burden
16 on an identifiable percentage of the Latino community. I
17 have no specific numbers in mind.
18   Q. I just want to make sure you have an opportunity
19 to provide all of the answers that you wish to provide.
20 Is that the entire version of your organization's evidence
21 that Senate Bill 14 will have the effect of denying or
22 abridging Hispanics and Latinos' right to vote?
23   A. I think that when we look at not only issues of
24 effect, but given how the law or, rather, the bill came
25 into being, the historical framework of voting vis-à-vis

## 32

1  minority voting in Texas among other states governed by
2  the Voting Rights Act, the timing of the legislation,
3  given the larger national discussion of voting and voter
4  fraud that is particularly targeted to the Latino
5  community presumptively, I feel that it is a reasonable
6  connection to think that there is sufficient evidence of
7  purposeful intent to disempower the Latino voting group.
8    Q. We will definitely talk about purpose in a
9  minutes. But again, I don't want to cut you off short.
10       As far as effect goes, is there anything else
11 that you wanted to add?
12   A. No.
13   Q. Does Mi Familia contend that Senate Bill 14 will
14 have the effect of denying or abridging African-Americans'
15 right to vote on account of race, color or membership in a
16 language minority group?
17   A. We are not empowered to speak for the
18 African-American community; however, we feel that many of
19 the barriers that are faced by Latinos in this bill are
20 similarly faced by African Americans.
21   Q. What is the basis for that contention? Is it
22 everything you've said before, or are there other things
23 you'd like to add?
24   A. I think everything's been said. If I had to
25 emphasize one concept, it would be history.

Glenn Bayron                                          June 12, 2012

## 33

1   Q.  Does Mi Familia contend that Senate Bill 14 will
2   have the effect of denying or abridging Asian-Americans'
3   right to vote on account of race, color or membership in a
4   language minority group?
5   A.  Again, I cannot speak to specific issues related
6   to the Asian community.  Our focus is working with the
7   Latino community in representing the legitimate interests
8   of the Latino community.
9   Q.  Has Mi Familia conducted any studies or any
10  surveys on the effect of Senate Bill 14 on minority
11  voters?
12  A.  No.
13  Q.  Is Mi Familia familiar with polls regarding
14  support for voter ID legislation?
15  A.  I am not specifically familiar with individual
16  polls.  I have not seen any specific reports of that
17  nature.
18  Q.  Is your organization aware of polls showing that
19  the majority of Texans support a photographic ID
20  requirement to vote regardless of their political
21  affiliation?
22  A.  Again, I have not seen any specific polling data
23  related to that question; however, I will say that the
24  popularity of the legislation is irrelevant, as far as we
25  view it.

## 34

1   Q.  Are you aware of any polls showing that the
2   majority of Texans support a photographic ID requirement
3   to vote regardless of their race?
4   Q.  Can you repeat the question, please?
5   Q.  Sure.  Are you aware of any polls showing that
6   the majority of Texans support a photographic ID
7   requirement to vote regardless of their race?
8   A.  No.
9   Q.  Are you aware of any polls showing that the
10  majority of Texans support a photographic ID requirement
11  to vote, regardless of their membership in a language
12  minority?
13  A.  No.
14  Q.  Does Mi Familia believe that elderly voters are
15  more likely than the average voter to lack a form of
16  identification required by Senate Bill 14?
17  A.  I believe that in the context that I've outlined,
18  meaning as it impacts the Latino community, the barriers
19  that I have referenced are present for the elderly
20  community within the Latino community.
21  Beyond that, I am not prepared to speak on a
22  larger scale about the impact on the elderly.
23  Q.  Does Mi Familia believe that indigent voters are
24  more likely than the average voter to lack a form of
25  identification required by Senate Bill 14?

## 35

1   A.  In the context of indigent Latinos, we view that
2   this bill would be a detriment to their ability to
3   exercise the legitimate right to vote.
4   Q.  Do you believe that disabled voters are more
5   likely than the average voter to lack a form of
6   identification required by Senate Bill 14?
7   A.  I do not know.
8   Q.  Do you believe that rural voters are more likely
9   than the average voter to lack a form of identification
10  required by Senate Bill 14?
11  A.  Given what I know about the 70-some-odd counties
12  within the State of Texas, assuming a good portion of them
13  are rural in nature that do not have departments of public
14  safety as offices that would be issuers of some of the IDs
15  in question here, I would think that, yes, the rural
16  population is at a specific disadvantage.  And within that
17  context, the Latino rural population is at an even larger
18  disadvantage.
19  Q.  Do you believe that young voters are more likely
20  than the average voter to lack a form of identification
21  required by Senate Bill 14?
22  A.  I think that particularly since student IDs have
23  been specifically excluded from the list of eligible
24  acceptable forms of identification in this bill, that that
25  would put youth at a higher rate of burden and being

## 36

1   prevented from voting.
2   Again, specifically as it pertains to the Latino
3   community, that that burden is even more present.
4   Q.  And now, we're going to shift from currently
5   having to obtaining the IDs.  Do you believe that indigent
6   voters are less likely than nonindigent voters to be able
7   to obtain the underlying documents and then to obtain a
8   form of identification required under Senate Bill 14?
9   A.  Can you repeat the question again?  I'm sorry.
10  MR. ASTON:  Sure.
11  Could you read it back?
12  (The requested material was read.)
13  A.  I would think that indigent voters are presented
14  with a wide variety of challenges, but I cannot pretend to
15  be able to enumerate them.
16  Q.  (BY MR. ASTON)  What about the elderly, do you
17  believe that they are less likely than the nonelderly to
18  be able to obtain the documents and then an ID?
19  A.  I feel like we've -- that this question sounds
20  like a question you've asked previously or it is just --
21  is there a specific wording maybe that's maybe different?
22  Have we not covered how the elderly perhaps are impacted
23  or what I perceive is how the elderly are impacted in this
24  bill?  I want to be able to answer your question
25  completely, but it's -- I'm -- it's starting to feel like

Glenn Bayron
June 12, 2012

## 37

1   maybe I'm mishearing things, but I've heard this question
2   before.
3          Q.  I don't believe I've asked the question before.
4   You may have -- you've certainly discussed the elderly in
5   other contexts.  But I guess the question is, do you
6   believe that the elderly are less likely than nonelderly
7   to be able to obtain the documents they would need and
8   then to obtain --
9          A.  I don't know.
10         Q.  -- the photo ID?
11         A.  I don't know.
12         Q.  What about rural voters?
13         A.  I think my previous statement about limitations
14   in the rural area, particularly those given the absence of
15   the issuing offices --
16         Q.  You're referring to the DPS office?
17         A.  Correct.
18             -- present challenges.  And given the good
19   number of Latinos who live in the rural area, I think the
20   challenges are presented to them specifically.
21         Q.  Okay.  Finally, young voters.  Do you believe
22   that they are less likely than non-young voters to be able
23   to obtain the underlying documents and then to obtain a
24   photo ID?
25         A.  I think I can say with some certainty that the

## 38

1   Latino, young eligible voters are at a disadvantage in
2   terms of as it relates to what's proposed in this bill.
3          Q.  Specifically as to obtaining the documents
4   necessary and then obtaining an ID?
5          A.  You say the documents necessary and then
6   obtaining the ID as if they are two different --
7          Q.  Well, for example, obtaining the birth
8   certificate that you would then use to obtain the photo
9   ID.
10         A.  I don't know.
11         Q.  Does Mi Familia know how many Texas registered
12   voters lack one of the forms of photo ID that is required
13   by Senate Bill 14?
14         A.  I recall seeing some data about particularly the
15   percentage of Latinos versus the larger population.  And I
16   seem to recall that Latinos do not have the identification
17   at a higher percentage than other groups.
18         Q.  Do you know what information you're referring to
19   when you say you've seen some information?
20         A.  I can't -- I don't remember the specific report.
21   I want to say it may be the information that was produced
22   leading up to -- or actually, no.  I believe it might have
23   been a newspaper article, but I don't recall.
24         Q.  Do you know if that information discussed or
25   included all types of photo ID listed by Senate Bill 14?

## 39

1          A.  I don't recall.
2          Q.  Can Mi Familia identify any Texas registered
3   voter who does not currently have one of the types of
4   photo ID required by Senate Bill 14?
5          A.  No.
6          Q.  Does Mi Familia know how many Texas registered
7   voters lack the documents that would be necessary to
8   obtain a state-issued photo ID?
9          Q.  Can you repeat that, please.
10             MR. ASTON:  Would you read it back, please.
11             (The requested material was read.)
12         A.  I don't have a specific number in my head, no.
13         Q.  (BY MR. ASTON)  Can Mi Familia identify any Texas
14   registered voter who does not have the documents necessary
15   to get a state-issued photo ID?
16         A.  No.
17         Q.  Has Mi Familia done any studies of photo ID
18   possession by Texas registered voters?
19         A.  No.
20         Q.  Has Mi Familia conducted any surveys of photo ID
21   possession by Texas registered voters?
22         A.  No.
23         Q.  You mentioned at the beginning that Mi Familia
24   Texas is affiliated -- or not affiliated, perhaps, but
25   there are other states in which Mi Familia overall --

## 40

1          A.  Yes.
2          Q.  -- operates?
3          A.  Yes.
4          Q.  Is Georgia one of those states?
5          A.  No.
6          Q.  Is Indiana one of those states?
7          A.  No.
8          Q.  Is Mi Familia aware that both of those states
9   have photo identification laws currently in place?
10         A.  We are aware.  I don't have any specific details
11   as to the nature of those laws.
12         Q.  But Mi Familia is aware that there are other
13   states that have photo identification requirements to
14   vote?
15         A.  That have -- that are in place currently?
16         Q.  That have -- that are in place currently?
17         A.  Yes.
18         Q.  Let's talk for a few minutes about purpose.  Does
19   Mi Familia contend that Senate Bill 14 was enacted with a
20   discriminatory purpose?
21         A.  Yes.
22         Q.  What is the basis for that contention?
23         A.  I believe I outlined several of the points in a
24   related question earlier, but I will recall the main
25   points.

Glenn Bayron                                          June 12, 2012

## 41

1    Q.  Before you do, you're referring to your answer to
2  the, I believe, initial question, does Mi Familia contend
3  that Senate Bill 14 was enacted -- will have a
4  discriminatory effect.
5    A.  Yes.
6    Q.  That answers what you're referring to?
7    A.  Yes.  But just to be on the safe side, I want to
8  make sure that I restate for purposes of clarity.
9      First and foremost, the historical framework
10  that put Texas under the jurisdiction of the Voting Rights
11  Act and the National Voter Registration Act.
12  Subsequently, the manner in which the legislation evolved
13  through both Houses of the Texas State Legislature in
14  which any and all attempts among minority legislators to
15  submit amendments or other recommended changes to the
16  legislation were rejected.
17      The focus on a supposed crisis of voter fraud
18  that had has yet to be demonstrated by the authors of this
19  bill.
20      The focus on a supposed crisis of voter
21  impersonation that has yet to be demonstrated by the
22  authors of this bill and the supporters of this bill.
23  The correlation between the timing of its evolution and
24  other national political dialogues in other states related
25  to voter identification, particularly as they impact the

## 42

1  Latino community.
2      And the indisputable importance of the fact that
3  we're about to embark on a presidential election.
4    Q.  I want to be absolutely clear that we got all of
5  that.
6      MR. ASTON:  Would you mind reading it back
7  to make sure that he's satisfied that he didn't leave
8  anything out.
9      (The requested material was read.)
10    Q.  (BY MR. ASTON)  That covers it?
11    A.  Yes.
12    Q.  Okay.  First you discussed the history that got
13  us within the Voting Rights Act.  How does -- we're all
14  aware of the history, but how is it that -- how is it that
15  Mi Familia contends -- what are the contentions -- that
16  what happened long ago in the past continues to inform
17  what the legislature does today?
18    A.  I think the one similarity that comes to mind is
19  that people who are otherwise eligible to vote are being
20  presented with undue and unnecessary burdens to do so.
21  That's the best and simplest way I can draw that
22  correlation.
23    Q.  You mentioned minority amendments.
24    A.  (Witness nods.)
25    Q.  Is it your contention that every amendment

## 43

1  offered by a member of the legislature who was a member of
2  a minority group was rejected?
3    A.  I have read anecdotally that that is the case.  I
4  cannot name specific legislators nor can I name specific
5  amendments.
6    Q.  You mentioned how the bill evolved through both
7  Houses.  I think you followed that with the minority
8  amendment discussion.  Is there anything else about how
9  the bill evolved through the Houses that Mi Familia
10  contends constituted discriminatory purpose?
11    A.  I have no specific information to suggest
12  additional items related to that.
13    Q.  The last one, national political dialogue.  What
14  are you referring to?
15    A.  I'm drawing a connection to what we see happening
16  in other states as far as voter ID laws being proposed in
17  areas of the country where there are high percentages of
18  Latino voters and where the issue of Latino eligibility to
19  participate in the voting process appears to be put on the
20  defensive.  Without demonstrating cause.
21    Q.  Is there anything else, before we move on to a
22  different topic, that you would like to add to your
23  contention as to the discriminatory purpose that
24  Mi Familia believes underlies Senate Bill 14?
25    A.  No.

## 44

1    Q.  Does Mi Familia contend that preventing voter
2  fraud was not a purpose of Senate Bill 14?
3    A.  We challenge the assertion that voter fraud
4  exists on any sizable, significant or otherwise noticeable
5  level at all, absent any proof to the contrary.
6    Q.  Is it your contention that the members of the
7  legislature could not have thought preventing voter fraud
8  was one of the purposes of this bill?
9    A.  Again, I struggle with the invocation of the term
10  "voter fraud" in this conversation given the absence of
11  demonstrable data to show that it is even an issue.
12    Q.  Do you contend that the Texas legislature
13  intended to harm poor people by passing Senate Bill 14?
14    A.  I do not see anything in this bill that
15  demonstrates that they are representing the interest --
16  interests, rather, of poor people.
17    Q.  I think that's at least slightly different.  Do
18  you believe that they intended to harm poor people when
19  they passed the bill?
20    A.  I can't speak to what is in the individual hearts
21  and minds of every legislator who voted in favor of this
22  bill.  I have not seen anything to indicate that they are
23  taking into consideration the impact on a wide number of
24  citizens -- or, rather, a wide cross-section of citizens,
25  including poor people, as far as their ability to exercise

## 45

1 the right to vote.
2        Perhaps it depends on how you define "harm."
3    Q. Does Mi Familia contend that the Texas
4 legislature intended to harm young people by passing
5 Senate Bill 14?
6    A. Again, insomuch as a -- what I would call a
7 blatant disregard for the importance of preserving the
8 civil rights of young people, particularly Latinos.
9    Q. Does Mi Familia contend that the Texas
10 legislature intended to harm elderly people by passing
11 Senate Bill 14?
12    A. I think my answer is probably the same.
13    Q. Does Mi Familia contend that the Texas
14 legislature intended to harm rural voters in passing
15 Senate Bill 14?
16    A. Again, in the disregard over impact?  Yes.
17    Q. And does Mi Familia contend that the Texas
18 legislature intended to harm urban voters by passing
19 Senate Bill 14?
20    A. I think particularly in the context of limiting
21 the legitimate voting rights of Latinos and other minority
22 groups who tend to be overrepresented in urban areas, yes.
23    Q. I just want to make clear that I have it right.
24 As to poor, young, elderly and rural, you contend that it
25 was a disregard for their interests?

## 46

1    A. Purposeful disregard.
2    Q. Is there any other evidence or anything else
3 Mi Familia contends other than that disregard?
4    A. I want to emphasize that by stating "purposeful"
5 I am demonstrating a perception on our part that there is
6 intent, yes.  That is my point.
7    Q. Can you name any members of the Texas legislature
8 that Mi Familia contends acted with a discriminatory
9 purpose in supporting and voting for Senate Bill 14?
10    A. I cannot name specific names, no.  We are
11 inferring that by voting for the bill in support of the
12 bill -- in other words, a yay -- that all of the
13 intentions that I have previously expressed hold true for
14 every legislator or who did so.
15    Q. So it's Mi Familia's contention that everyone who
16 voted to support this bill did so with the discriminatory
17 intent that we've been discussing?
18    A. At a minimum insofar as described in my use of
19 the term "purposeful disregard."
20    Q. Do you know if any members of the legislature who
21 are a member of a minority group voted for the bill?
22    A. I don't have a list in my head of all of the
23 legislators who voted for the bill.
24        MR. ASTON:  Go off the record a minute.
25        (Break.)

## 47

1    Q. (BY MR. ASTON)  Does Mi Familia support the idea
2 that one should have to register to vote?
3    A. Yes.
4    Q. And does the organization support the idea to
5 make sure that those who show up to vote are registered?
6    A. Yes.  We believe that there are already laws in
7 place to ensure that.
8    Q. And should Texas make sure that when someone
9 shows up to vote, he or she is who he or she says he or
10 she is?
11    A. Yes.  And, again, we believe that there are
12 already laws in place to ensure that.
13        (Brief disturbance.)
14        (Discussion off the record.)
15    Q. (BY MR. ASTON)  Do you know how many other states
16 have photo ID requirements in place at this time?
17    A. No.
18    Q. Are you aware that the United States Supreme
19 Court considered Indiana's photo ID law in a case called
20 Crawford versus Marion County Election Board?
21    A. I am not aware of the specifics of that case.
22    Q. But you're aware that it exists?
23    A. Only insofar that you referenced Indiana's voter
24 ID law some time ago.
25    Q. Before today had you heard that the Supreme Court

## 48

1 had reviewed a photo ID law a few years ago?
2    A. I have a vague recollection but I don't have -- I
3 don't recall any specifics.
4    Q. How would Mi Familia define voter fraud?
5    A. Not being a lawyer, I would define voter fraud as
6 someone who is ineligible to vote either attempting to or
7 actually voting.
8    Q. Would you also include an eligible voter who
9 votes by saying that he or she is someone else and votes
10 for someone else?
11    A. Do you mean -- by saying that, do you mean voter
12 impersonation?
13    Q. Yes.  Either in person or by collecting mail-in
14 ballots, filling them out for someone else, and submitting
15 them?
16    A. I would say yes.  But given the -- again, going
17 back to a previous statement about the absence of any
18 significant evidence to suggest that either voter fraud or
19 voter impersonation is a problem in the state of Texas, I
20 don't see the relevance.
21    Q. Following up on your most recent answer, and it's
22 an answer that you've given a couple of other times, do
23 you believe Texas should have to wait until it discovers a
24 significant amount of in-person voter fraud before the
25 legislature enacts a bill designed to prevent that fraud?

## 49

1    A.  First, I would suggest that Texas already has
2    mechanisms in place to prevent voter fraud in the current
3    books.  And if there were going to be any justification
4    for adding undue burden on the electorate, particularly
5    the Latino electorate, to address any sort of purported
6    problem with either voter fraud or voter impersonation,
7    that it is reasonable to expect that the proponents of
8    such a law demonstrate that the problem exists in the
9    first place.
10       Q.  You just mentioned that Mi Familia believes there
11   are currently laws in place designed to prevent in-person
12   voter fraud.  Is that a fair characterization of something
13   that you -- of one of the things you just said in that
14   previous answer?
15       A.  In the larger context of voter fraud in general,
16   yes, I believe that the current Texas statutes that are
17   designed to implement our election laws are sufficient.
18       Q.  What I'm wondering, what I'm asking, is that
19   Mi Familia asserts there is not currently evidence of
20   voter fraud but that we already have laws on the books
21   designed to prevent that fraud.  Mi Familia contends that
22   because there is not this fraud, Texas should not be
23   allowed to enact Senate Bill 14.  My question is, does
24   Mi Familia contend that the other laws that are currently
25   in place designed to prevent fraud should not have been

## 50

1    enacted?
2        A.  You'd have to give me a specific law before I can
3    speak about it.  I can't answer --
4        Q.  Well, I guess I would ask you, the laws that
5    you're referring to when you say -- you referred to laws
6    we have in place designed to prevent voter fraud.  Maybe
7    let's start there.
8           What laws are you referring to?
9        A.  I cannot enumerate for you every single law on
10   the books that relates to voting or the elections process.
11   But Mi Familia Vota in its role as an organization that
12   promotes civic engagement, specifically voter
13   registration/education, abides by the laws.
14          We have some issues with some of the more recent
15   laws, particularly those pertaining to what we perceive as
16   burdensome requirements placed on those who seek to
17   register voters, but we're in compliance with the laws.
18   I've come here today specifically prepared to speak about
19   the detrimental impact and the intent behind that impact
20   on Senate Bill 14.  I cannot speak specifically about any
21   other legislation individually.
22       Q.  How about as a collective whole?  Is it your
23   contention that what we have in place is proper but Senate
24   Bill 14 goes too far, or something else?
25       A.  I believe Senate Bill 14 moves us backwards.  And

## 51

1    I'll refer back to my comments about its impact directly
2    on the -- on Texas' role in the Voting Rights Act.  I
3    believe it is regressive.  I believe it hinders the
4    legitimate rights of eligible Latino voters.
5        Q.  Do you believe that a law requiring one to
6    vote -- I'm sorry -- requiring one to register in advance
7    of election day serves -- has those same concerns?
8        A.  I think it would depend on the specific aspects
9    of the requirements and limitations on when and how one
10   can register.  The concept of registering in and of itself
11   is a value-neutral concept.  But it cannot be seen as such
12   without a context.  And so, therefore, I would state that
13   for me to fully answer the question, you would have to
14   give me the context and requirements under which a person
15   could legally register to vote.
16       Q.  How about the requirements currently in place in
17   Texas that require you to register weeks in advance of an
18   election?
19       A.  Going on the assumption -- and this is an
20   assumption -- that those requirements are applied equally
21   across constituents, in and of itself, registration, one
22   could argue that there pros and cons for a shortened or
23   long -- lengthened time frames.  But in and of itself,
24   registration applied equally across to its citizens in and
25   of itself is not a hindrance.

## 52

1        Q.  What about the requirement that you show up to
2    the poll with a form of an identification?
3        A.  I believe that the voter registration certificate
4    currently fulfills that requirement.
5        Q.  And requiring them to keep it -- requiring a
6    voter not to lose it and to bring it with him or her to
7    the polls?
8           MS. PERALES:  Objection to the extent it
9    mischaracterizes the current law, which provides for a
10   number of forms of identification beyond the voter
11   certificate.
12          MR. ASTON:  Sure.
13       Q.  (BY MR. ASTON)  You're not required to take the
14   voter registration certificate.  You can bring other forms
15   that people might have.
16       A.  (Witness nods.)
17       Q.  But you're required to show up to the polls with
18   an identification of some sort, whether it's the one that
19   they send you when you register or it's one that you have
20   otherwise?
21       A.  Correct.  And going on the assumption, again,
22   that the vote -- the mechanism for registering to vote
23   which produces the voter registration certificate is made
24   available to all constituencies and communities.  And that
25   is acceptable.

## 53

1    I'm not clear -- well, I'll leave it at that.
2    Q.  Does Mi Familia believe laws like we've just been
3    discussing, requiring one to register and requiring one to
4    present an identification of some sort at the poll, are
5    laws designed to prevent voter fraud?
6        MS. PERALES:  You can answer if you know.
7        A.  Beyond the purpose of implementing a legitimate
8    election, Mi Familia Vota is not in a position to
9    speculate on the motivation -- specific motivations of the
10   State of Texas in terms of any specific regulation related
11   to voting, whether that's the registration process, long
12   or short, or the specific requirements that are -- that
13   one needs to abide by to go and vote.
14       Q.  (BY MR. ASTON)  Would you think Mi Familia agree that such
15   requirements would make it harder for one to commit voter
16   fraud?
17       A.  Are you referring to the current requirements in
18   place?
19       Q.  The current requirements in place that we've been
20   discussing, the registration requirement and the
21   presentation of --
22       A.  So beyond -- not those related to SB 14?
23       Q.  Not SB 14.  Those currently that are in place
24   that we've been discussing the last few minutes,
25   requirements such as those.  Would you agree they make it

## 54

1    harder for one to commit voter fraud?
2        A.  I would argue at face value that that is
3    specifically why there is no need for SB 14.
4        Q.  Which gets us to the question I asked sort of at
5    the beginning of this line.  Is it your contention that
6    there would need to be some or substantial or a great deal
7    of additional voter fraud already discovered before Texas
8    could enact a law designed to prevent that fraud?
9        MS. PERALES:  Objection to the extent that
10   it suggests that there has been voter fraud discovered to
11   date.
12       You may answer.
13       A.  Where I struggle with this is because I -- I am
14   not aware of any such voter fraud problem to begin with,
15   which fuels my contention -- and perhaps I should take
16   this opportunity to reinforce that contention -- that
17   there is a demonstrated intent on the part of the Texas
18   legislators who voted in favor of this legislation, and
19   the absence of any evidence of the kinds of voter fraud
20   and voter impersonation that get discussed, about intent
21   to curtail and limit the legitimate voting power of the
22   Latino community.
23       (Exhibit 3 was marked.)
24       Q.  (BY MR. ASTON)  Please take a minute to review
25   what's been marked as Exhibit 3.

## 55

1        (Witness reviews document.)
2        A.  Okay.
3        Q.  (BY MR. ASTON)  Have you ever seen this document?
4        A.  Some of the talking points, or bullet items,
5    rather, ring a bell, but I don't know if -- I don't recall
6    seeing this specific e-mail, if that's what you're asking.
7        Q.  And remind us again, the name in bold, Carlos
8    Duarte --
9        A.  Duarte.
10       Q.  -- Duarte, I'm sorry -- what is his position at
11   Mi Familia?
12       A.  Texas state director.
13       Q.  About a third of the way down the page, do you
14   see the four bullet points?
15       A.  Yes.  That first one begins:  The voter
16   suppression law, et cetera?
17       Q.  Yes.  Bullet point No. 3, the second piece of
18   that.
19       A.  "Proponents of voter suppression laws have no
20   evidence to support those claims" --
21       Q.  Starting with "meanwhile."
22       A.  "Meanwhile at least nine people around the
23   country have been denied their right to vote because of
24   these laws."
25       Yes.

## 56

1        Q.  Okay.  Yes.  It says:  Meanwhile, at least nine
2    people around the country have been denied their right to
3    vote because of these laws.
4        Does Mi Familia have any evidence or any -- are
5    they aware of anything about those nine people?
6        A.  I am unaware about this specific item.
7        Q.  Is Mi Familia aware of any other people in any
8    state in which there is currently a photo ID law in place
9    that have not been allowed to vote in 2010 or 2012 or 2008
10   as a result of not having a photo identification?
11       A.  I have no information about any specific cases
12   that have been brought to my attention.
13       Q.  So Mi Familia is not aware of any voter in any of
14   those states?
15       A.  I am not aware.  Insofar as I am speaking for
16   Mi Familia Vota, I am limited, given the amount of time
17   I've been with the organization.  And so I don't -- I'm
18   not aware of.  So to my knowledge, no, I don't know.
19       MS. PERALES:  And then just to point out for
20   the record, the text that you're discussing is part of an
21   e-mail that's going to Mr. Duarte at Mi Familia.
22       MR. ASTON:  That is correct.
23       Q.  (BY MR. ASTON)  To your knowledge, did Mi Familia
24   receive that e-mail and do any investigation as to those
25   nine people or any others?



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
          Plaintiff,               )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
          Defendant,               )
                                   )
ERIC KENNIE, et al,                )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
     Defendant-Intervenors,        )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS LEGISLATIVE BALCK            )
CAUCUS, et al.,                    )
                                   )
     Defendant-Intervenors,        )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
     Defendant-Intervenors.        )

*************************************************
          ORAL DEPOSITION OF
             COLBY BEUCK
             MAY 14, 2012
*************************************************

**2**

1        ORAL DEPOSITION OF COLBY BEUCK, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the MAY 14, 2012, from 9:50 a.m. to 6:08 p.m., before
5   Chris Carpenter, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the offices of The
7   United States Attorney, 816 Congress Avenue, Suite 1000,
8   Austin, Texas 78701, pursuant to the Federal Rules of
9   Civil Procedure and the provisions stated on the record
10  or attached hereto.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                 A P P E A R A N C E S
2   FOR THE PLAINTIFF, STATE OF TEXAS:
3       Patrick K. Sweeten
        Matthew Frederick
4       Jonathan F. Mitchell
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
5       P.O. Box 12548
        Austin, TX  78711-2548
6
        209 West 8th Street
7       8th Floor
        Austin, TX  78701
8
        (512) 936-1307
9       patrick.sweeten@aog.state.tx.us
10  FOR THE DEFENDANT, HOLDER, ET AL:
11      Elizabeth S. Westfall
        Daniel Freeman
12      Risa Berkower
        Jennifer Maranzano
13      Bruce Gear
        U.S. DEPARTMENT OF JUSTICE
14      950 Pennsylvania Avenue, NW
        NWB - Room 7202
15      Washington, DC  20530
        (202) 305-7766
16      elizabeth.westfall@usdoj.gov
17  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
    NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
18  CAUCUS:
19      Ezra D. Rosenberg
        DECHERT, LLP
20      Suite 500
        902 Carnegie Center
21      Princeton, NJ  08540-6531
        (609) 955-3200
22      ezra.rosenberg@dechert.com
23
24
25

**4**

1   FOR THE KENNIE INTERVENORS:
2       Chad W. Dunn
        BRAZIL & DUNN, LLP
3       4201 Cypress Creek Parkway
        Suite 530
4       Houston, TX  77068
        (281) 580-6310
5       chad@brazilanddunn.com
6   FOR THE RODRIGUEZ INTERVENORS:
7       Amy Pederson (by telephone)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COLBY BEUCK                                                            MAY 14, 2012

## 5

1                       INDEX
2    Appearances.........................2
3    COLBY BEUCK
4        Examination by Ms. Westfall...............7
         Examination by Mr. Rosenberg.............249
5
     Signature and Changes.........................278
6
     Reporter's Certificate.........................280
7
                       EXHIBITS
8
     NO. DESCRIPTION                    PAGE MARKED
9
10   2   Notice of Deposition              19

11   3   Letter From Lt. Governor Dewhurst on Voter   32
         I.D. Bill
12   4   House Bill 112                    56
13   5   Senate Bill 14                    111
14   6   Georgia Statute on Photo Indentification   142
15   7   Printout from the Website of Rep.   157
         Patricia Harless
16
     8   Bill History of SB 14            190
17
18   9   House Journal, March 23, 2011    214

19   10  Bloomberg Article: Texas Voter    220
         Identification Law Blocked by Justice
         Department as Biased
20
21
22
23
24
25

## 7

1    Texas Attorney General's Office on behalf of the State
2    of Texas and on behalf of the witness.
3        THE REPORTER:  And on the phone?
4        MS. PEDERSON:  Amy Pederson for the
5    Rodriguez Intervenors.
6        MS. WESTFALL:  Thank you.
7            COLBY BEUCK,
8    having been first duly sworn to testify the truth, the
9    whole truth, and nothing but the truth, testified as
10   follows:
11           EXAMINATION
12   BY MS. WESTFALL:
13       Q.  Good morning, Mr. Beuck.  Could you state and
14   spell your name for the record, please.
15       A.  Yes.  My name is Colby, C-o-l-b-y, and my last
16   name is Beuck, and it's spelled B-e-u-c-k.
17       Q.  Have you ever been deposed?
18       A.  No.  This is my first time.
19       Q.  Great.  I'm going to go over some ground rules
20   so you'll understand how today will go, will operate.
21           Today you will be -- you're under oath.
22   You have been sworn in, and you'll be testifying
23   truthfully, accurately, and completely.  Do you agree
24   with that?
25       A.  Yes.

## 6

1            (Witness sworn)
2        THE REPORTER:  Would all counsel present
3    state their names and affiliations.
4        MS. WESTFALL:  I'm Elizabeth Westfall.
5    I'm with the U.S. Department of Justice.  I represent
6    the Attorney General in this matter.
7        MR. FREEMAN:  Dan Freeman, also with the
8    Department of Justice representing the Attorney General.
9        MS. BERKOWER:  Risa Berkower, also with
10   the Justice Department.
11       MS. MARANZANO:  Jennifer Maranzano, also
12   with the Justice Department.
13       MR. GEAR:  Bruce Gear, also with the
14   Justice Department.
15       MR. ROSENBERG:  Ezra Rosenberg from
16   Dechert, LLP, representing the Texas State Conference of
17   NAACP Branches and the Mexican-American Legislative
18   Caucus.
19       MR. DUNN:  Chad Dunn for the Defendant
20   Kennie Intervenors.
21       MR. MITCHELL:  Jonathan Mitchell for the
22   State of Texas.
23       MR. FREDERICK:  Matthew Frederick for the
24   State of Texas.
25       MR. SWEETEN:  Patrick Sweeten with the

## 8

1        Q.  The court reporter will prepare a transcript of
2    everything that's said today, so you must respond to
3    questions orally without shaking your head or nodding.
4    Okay?
5        A.  Okay.
6        Q.  You must wait for me to finish my question
7    before you answer; otherwise, we'll be talking over each
8    other.  Do you understand?
9        A.  Yes.
10       Q.  I will try to ask you clear questions, but if
11   you don't understand a question, will you let me know?
12       A.  Yes.
13       Q.  If you would like to take a break, you may do
14   so, but please tell me, and I'll try to accommodate you,
15   but if there is a question pending, I would ask that you
16   answer that question first.  Do you agree?
17       A.  Yes.
18       Q.  And you understand that you're under oath
19   today; is that right?
20       A.  Yes.
21       Q.  And you may be subject to penalty of perjury
22   for giving false or misleading testimony; is that
23   correct?
24       A.  Yes.
25       Q.  Do you understand these instructions?

## 17

1  question that was left pending with you?
2      MR. SWEETEN:  I do.  I think, as you said,
3  that the bill was passed in May of 2011.  Our position
4  would be that he can discuss -- he could reveal
5  discussions with Representative Harless that occurred
6  after passage, except to the extent that those
7  conversations relate to matters that occurred before the
8  passage of the bill.  So if he's discussing --
9      Any discussions that you've had with
10 Patricia Harless or other members who have claimed the
11 privilege or their staffs that related to the passage of
12 Senate Bill 14, that legislation, do not reveal
13 those.  However, if any discussions that you've had, you
14 can reveal -- after passage of May 2011, you can reveal
15 information or discussions that you've had, as long as
16 they don't relate to the prepassage matters.  Does that
17 make sense?  We can talk about that if you --
18     THE WITNESS:  Can we talk about it?
19     MR. SWEETEN:  Okay.  Let me talk with the
20 witness about it.
21     MS. WESTFALL:  Let's go off the record
22 again.
23     (Recess at 10:09 a.m to 10:10 a.m.)
24     MS. WESTFALL:  We're going back on the
25 record.  Thank you.

## 18

1  Q.   (By Ms. Westfall) Mr. Beuck, how many
2  conversations did you have with Representative Harless
3  in advance of this deposition about this deposition?
4  A.   Several.
5  Q.   Fewer than ten?
6  A.   Yes.
7  Q.   More than five?
8  A.   I would say between five and ten.
9  Q.   What was the general subject matter of the
10 topics that you discussed?
11 A.   The majority of the conversations were
12 regarding scheduling, the fact of when I was going to be
13 deposed, when she was going to be deposed.  That was the
14 majority of the conversations.
15 Q.   Did you discuss Senate Bill 14 at all?
16     MR. SWEETEN:  I'm going to, again, caution
17 the witness that based upon the legislative privilege,
18 do not reveal discussions that you've had with
19 Representative Harless at any time that relate to the
20 passage of Senate Bill 14.  You can discuss matters that
21 don't relate to legislation that occurred after the
22 passage of Senate Bill 14.
23     THE WITNESS:  Okay.
24 Q.   (By Ms. Westfall) Did you bring any notes or
25 documents with you today?

## 19

1  A.   No.
2      (Exhibit 2 marked for identification.)
3  Q.   (By Ms. Westfall)  I'm going to hand you a
4  document that's been marked U.S. Exhibit 2.  Have you
5  seen this document before?
6  A.   Yes.
7  Q.   What is it?
8  A.   This is my Notice of Deposition, I believe.
9  Q.   When did you first receive this?
10 A.   A week ago, I believe, or several weeks ago.
11 Q.   What did you do when you received this?
12 A.   I went back through our documents and made sure
13 I -- we had produced all the documents requested.
14 Q.   How did you conduct that search?
15 A.   The search for e-mails, there were a keyword
16 search through our e-mail system, a document search
17 through our files.
18 Q.   And when you talk about files, these are paper
19 files?
20 A.   Paper files, yes.
21 Q.   Where are they located?
22 A.   In the Capitol office.
23 Q.   Are they located in Representative Harless's
24 office itself?
25 A.   No.  They would be located in our -- our file

## 20

1  system, which is not located in her office.
2  Q.   And where is that file system located?
3  A.   In the front room.
4  Q.   What is --
5  A.   File cabinets.
6  Q.   What is the front room?
7  A.   I'm sorry?
8  Q.   What is the front room?
9  A.   The -- the common area of the office.
10 Q.   And by "office," do you mean the Capitol
11 office?
12 A.   Capitol office, yes.
13 Q.   Who maintains those documents?
14 A.   Myself, and I would say I would be the
15 custodian of those records.
16 Q.   And you're the custodian of the records for
17 Senate Bill 14 or a broader category of documents?
18 A.   Could you be -- a broader category of
19 documents.
20 Q.   For all documents in the front office or only
21 certain bills?
22 A.   Not all documents.  We have other employees in
23 the office who -- who maintain the files as
24 well.  Senate Bill 14 was -- I was the primary staff
25 person responsible for that legislation, so those files

COLBY BEUCK                                                MAY 14, 2012

---

## 21

1  were under my supervision.

2  Q.   So you searched hard copy files.  You searched

3  e-mail.  What other records and documents did you search

4  in response to Exhibit 2?

5  A.   Electronic files as well.  Not just

6  e-mails.  Our saved files.

7  Q.   Did you look on a shared drive?

8  A.   Yes.

9  Q.   Where did you look on the shared drive?  What

10  particular drive on the --

11  A.   Looking for the -- the X drive is our shared

12  file -- our shared drive for the office.

13  Q.   How did you conduct that search of the X drive?

14  A.   With keywords, and as well as manually going

15  through and looking through the documents.

16  Q.   How many documents did you discover through

17  that search on the X drive?

18  A.   The electronic files on the X drive, I would

19  say more than -- more than 50.

20  Q.   What did you do with those documents?

21  A.   I turned them over to my attorneys.

22  Q.   And which of your attorneys here today did you

23  turn them over to?

24  A.   Stacey Napier -- Schiff -- I'm sorry.  She

25  changed her last name.  But it was an attorney with the

---

## 23

1  Q.   Where did you search for those documents?

2  A.   I have a file for the documents that are --

3  that would be under that, that request.

4  Q.   Did you produce any documents to your attorney?

5  A.   Yes.

6  Q.   How many?

7  A.   I don't know the number of files.

8  MR. SWEETEN:  He's asked you to speak up

9  just a little bit, if you would.

10  THE WITNESS:  I'm sorry.

11  MR. SWEETEN:  No, you're doing fine.

12  Q.   (By Ms. Westfall)  Turning to your attention to

13  Number 8 in U.S. Exhibit 2, do you see that number?

14  A.   Yes.

15  Q.   And what is it?

16  A.   All public statements you or others in your

17  office, including the Legislature, have made about voter

18  ID.

19  Q.   Did you conduct a search for these documents?

20  A.   Yes, I did.

21  Q.   How many documents did you find?

22  A.   I would say five to ten.

23  Q.   Representative Harless didn't make more public

24  statements on SB 14?

25  A.   That we had in our possession, I would say five

---

## 22

1  Attorney General's Office.

2  Q.   When did you turn those documents over to

3  Ms. Napier?

4  A.   I believe it was -- the majority of the

5  documents I turned over several weeks ago.  There was

6  additional documents in here that were not -- we

7  received several, and I believe there was another

8  request for documents.  This covered the majority of

9  that.  What this did not cover, we produced recently.  I

10  believe it was last week.

11  Q.   Turning your attention now to Exhibit -- U.S.

12  Exhibit 2, do you see the list of documents in that

13  document, a numbered list after Attachment A?

14  A.   Okay.  This is Number 2, "All documents and

15  communications not limited to --"

16  Q.   I was just turning your attention to the list

17  of documents.  And you now see that list of documents --

18  A.   Yes.

19  Q.   -- correct?

20  A.   Yes.  Yes.

21  Q.   Turning your attention to Number 7, do you see

22  that request?

23  A.   Yes.

24  Q.   Did you search for those documents?

25  A.   Yes.

---

## 24

1  to ten.

2  Q.   Did she make other -- more than five to ten

3  public statements about SB 14?

4  A.   I would believe so.

5  Q.   And who would know where those are maintained?

6  A.   I can't answer.  I don't know.

7  MR. SWEETEN:  Objection, assumes facts not

8  in evidence.

9  Q.   (By Ms. Westfall)  Did you provide those public

10  statements to Ms. Napier?

11  A.   That was -- that was part of the documents that

12  I turned over, yes.

13  Q.   Turning your attention to Number 11, what is

14  that request?

15  A.   All documents and communications concerning

16  civil and criminal allegations, investigations,

17  warnings, enforcement actions.

18  Q.   Did you conduct a search for those documents?

19  A.   Yes.

20  Q.   Did you find any documents?

21  A.   Yes.

22  Q.   What were those documents?

23  A.   We had -- there was --

24  MS. WESTFALL:  I would note for the record

25  that the witness is reviewing the document.

COLBY BEUCK                                                    MAY 14, 2012

---

25

1      A.  Yes.  I did turn over information regarding
2  that.  There were statistics on the Attorney General's
3  investigations into voter fraud.
4      Q.  (By Ms. Westfall)  Was that the sum total of
5  the documents that you turned over in response to Number
6  11?
7      A.  I believe there was also some newspaper
8  articles on fraud investigations.
9      Q.  Were those fraud investigations in the state of
10 Texas?
11     A.  Yes.  And there could have been some that were
12 nationwide.  The majority of them were for Texas.
13     Q.  Thank you, Mr. Beuck.
14         Could you tell me where you went to
15 college?
16     A.  The University of Georgia.
17     Q.  What year did you graduate?
18     A.  1999.
19     Q.  Did you go to law school?
20     A.  Yes.
21     Q.  Where did you go to law school?
22     A.  The University of Texas.
23     Q.  What year did you graduate?
24     A.  2002.
25     Q.  As a general matter, do you vote in elections

---

26

1  in Texas?
2      A.  Yes.
3      Q.  Do you vote in person or absentee?
4      A.  I vote in person.
5      Q.  How far is your polling place from your
6  residence?
7      A.  I would say it's close.  Several blocks.  I'm
8  not very good with distance, but I would say it's close
9  walkable.
10     Q.  Do you have a driver's license?
11     A.  Yes, I do.
12     Q.  How far is the nearest driver license office
13 from your residence?
14     A.  I believe it's on North Lamar.  I can't tell
15 you the distance, but it is -- I'm not very good
16 distance.  So I know where it is.  It's driveable.
17 About a 15-minute drive, perhaps.
18     Q.  Do you know its hours of operation?
19     A.  No, I do not.
20     Q.  When was the last time you visited that driver
21 license office?
22     A.  I don't know.  I don't know.
23     Q.  When did you last renew your driver's license?
24     A.  I do not know.  I'd have to look at my -- I
25 cannot remember when I renewed my license.

---

27

1      Q.  Do you have a Texas driver's license?
2      A.  Yes, I do.
3      Q.  Do you recall ever waiting in line at the
4  driver license office?
5      A.  I believe I did.  Yes, I have waited in a
6  driver's license office.
7      Q.  Do you recall how long you waited in line?
8      A.  That was several years ago.  No, I do not
9  remember.
10     Q.  Were you born in Texas?
11     A.  Yes, I was.
12     Q.  Do you have a certified copy of your birth
13 certificate?
14     A.  Yes.
15     Q.  Do you have any experience related to election
16 law?
17     A.  Could you be -- elaborate on that?
18     Q.  Outside of your work on voter ID in the
19 Legislature, do you have any experience in election law?
20     A.  No, I do not.
21     Q.  Have you ever worked as a poll worker?
22     A.  No, I have not.
23     Q.  Have you ever worked as a poll watcher?
24     A.  No, I have not.
25     Q.  Have you ever witnessed any problems in the

---

28

1  polls while you were voting?
2      A.  No.
3      Q.  Have you ever witnessed any voter trying to
4  impersonate another voter?
5      A.  No, I have not.
6      Q.  What was your first job out of law school?
7      A.  I was employed with the County Attorney's
8  Office, Travis County Attorney's Office.
9      Q.  What year was that?
10     A.  That was immediately after graduation, 2002.
11     Q.  How long were you employed in that office?
12     A.  That job was, I believe, for several months
13 while I was studying for the bar exam.
14     Q.  Was it a clerkship, in essence?
15     A.  Yes.
16     Q.  And what was your next legal job after that?
17     A.  That would be with the Office of the Lieutenant
18 Governor beginning in 2003.
19     Q.  Did you ever work for a law firm named Chapel
20 Hill and Lawrence?
21     A.  Yes, I did.
22     Q.  When did you work there?
23     A.  That was a summer internship, and I can't
24 remember.
25     Q.  Was it during law school?

COLBY BEUCK                                                    MAY 14, 2012

## 29

1    A.  It was during law school.  I'm trying to
2    remember which year.  I believe it was my -- I guess it
3    would have been in 2000.
4    Q.  What year did --
5    A.  Or thereabouts.
6    Q.  I'm sorry.  I'm doing something I wasn't
7    supposed to, which was to talk over you.
8         What year did you start working for
9    Lieutenant Governor Dewhurst?
10   A.  That was in 2003.
11   Q.  In what capacity were you hired?
12   A.  I was hired as a policy analyst.
13   Q.  How did you come about getting this job?
14   A.  I interviewed for the position.
15   Q.  Why did you decide you wanted to work for the
16   Lieutenant Governor for Dewhurst?
17   A.  I've always been interested in state
18   government, and I thought I would be very good for the
19   position.
20   Q.  Could you describe the policy analyst position?
21   A.  Yes.  My duties?  I was to track legislation
22   and monitor the issues that I was responsible for, for
23   the Lieutenant Governor and senior staff.
24   Q.  Did you have any connection with the Lieutenant
25   Governor before interviewing for his office -- with his

## 30

1    office?
2    A.  No.
3    Q.  What issues did you handle for him?
4    A.  Initially, jurisprudence issues.  The
5    Jurisprudence Committee was my committee that I was
6    tasked with following.  Then criminal justice issues and
7    -- criminal justice was mainly my policy area.
8    Q.  What did the Jurisprudence Committee handle as
9    a general matter?
10   A.  A variety of legal issues.  I would say
11   anything from family law matters to other civil -- civil
12   legal matters.
13   Q.  Did you handle election issues for Governor --
14   Lieutenant Governor Dewhurst?
15   A.  No, I did not.
16   Q.  Did you handle voter ID?
17   A.  No, I did not.
18   Q.  How long were you employed with Lieutenant
19   Governor Dewhurst?
20   A.  Seven years.
21   Q.  So you didn't handle voter ID at all?
22   A.  I was not in -- Voter ID was not my -- it was
23   not my area.
24   Q.  Did you remain a policy analyst for the
25   duration of your employment with Mr. Dewhurst?

## 31

1    A.  Yes.  I believe my title was Counsel For Public
2    Policy.
3    Q.  Who handled voter ID issues for Mr. Dewhurst
4    when you were working for him?
5    A.  Bryan Hebert.
6    Q.  Would you spell list last name?
7    A.  I believe it's H-e-b-e-r-t.
8    Q.  What was his title?
9    A.  I do not know.
10   Q.  Was he -- did he handle all aspects of voter ID
11   for the Lieutenant Governor or certain aspects?
12   A.  I can't speak to that.  I don't know.  He was
13   the policy analyst in charge of that issue.  I don't
14   know his scope.
15   Q.  How big is the office?
16   A.  25 to 35 people.
17   Q.  How many policy analysts?
18   A.  Ten.
19   Q.  And you were employed there --
20   A.  Plus or minus ten.
21   Q.  You were employed there until 2009; is that
22   correct?
23   A.  2009, yes.
24   Q.  Would you say that voter ID was one of the
25   Lieutenant Governor's signature issues?

## 32

1         MR. SWEETEN:  Objection, calls for
2    speculation.
3    Q.  (By Ms. Westfall)  You may answer.
4    A.  I know it was an issue he was very interested
5    in.  I can't speculate on his priorities, but I know it
6    was an important issue.
7    Q.  Did he have a press person handle voter IDs
8    issues?
9    A.  Yes.
10   Q.  Who was that person?
11   A.  While I was employed?
12   Q.  Yes.
13   A.  Mike Wintemute.
14   Q.  Are you aware of whether he drafted a letter
15   that Lieutenant Governor Dewhurst wrote in 2007
16   regarding voter ID?
17   A.  No, I don't have any knowledge of that.
18        MS. WESTFALL:  Could you please mark this
19   U.S. 3 and hand it to the witness?
20        (Exhibit 3 marked for identification.)
21   Q.  (By Ms. Westfall)  You've been handed U.S. 3.
22   Do you recognize this document?
23        MR. SWEETEN:  Caution the witness to
24   review the document before answering a question about
25   it.

COLBY BEUCK                                                    MAY 14, 2012

## 33

1  A.  (Viewing documents.) It appears this is a
2  letter from the Lieutenant Governor or a -- printed in
3  the Texas Weekly.
4  Q.  (By Ms. Westfall)  Have you ever seen this
5  letter before?
6  A.  I do not remember it.
7  Q.  Do you know who wrote this for Mr. Dewhurst?
8  A.  No, I do not.
9  Q.  Why did you stop working for Mr. Dewhurst?
10  A.  I was looking to grow as my -- in my -- my
11  position, I was looking to just grow professionally, and
12  I felt that a change was good.
13  Q.  So when did you stop working for him?
14  A.  November of 2009.
15  Q.  Did you come to be employed elsewhere at that
16  time?
17  A.  Yes.
18  Q.  Where did you become employed?
19  A.  With Representative Patricia Harless.
20  Q.  How did you obtain that position?
21  A.  Interviewed.
22  Q.  Did you have any connection with Representative
23  Harless prior to November 2009?
24  A.  No.
25  Q.  So it was a cold interview?

## 34

1  A.  I was informed of the position through a
2  friend.
3  Q.  Who was the friend?
4  A.  Lisa Kaufman.
5  Q.  Is Lisa Kaufman employed by Ms. Harless?
6  A.  No.
7  Q.  Who is Lisa Kaufman?
8  A.  She works -- she is a former employee of the
9  Speaker.
10  Q.  Speaker Straus?
11  A.  Yes.
12  Q.  Did you she tell you about the availability of
13  a chief of staff position with Ms. Harless?
14  A.  Yes.
15  Q.  When did you interview with her?
16  A.  Fall 2009.
17  Q.  How long have you -- have you held that
18  position continuously up to the present?
19  A.  Yes.
20  Q.  What are your responsibilities as chief of
21  staff for Representative Harless?
22  A.  It varies during the time of year.  During
23  session, my responsibilities are different than during
24  the interim.  Primarily during session, I'm responsible
25  for the Representative's legislation.  As chief of

## 35

1  staff, also responsible for operating the office,
2  employees, and also constituent communications.
3  Q.  Do you also engage in communications with the
4  executive branch on behalf of Representative Harless?
5  A.  Meaning the Governor's Office?
6  Q.  Well, we'll start with the Governor's Office.
7  Do you engage in those communications on her behalf or
8  with her?
9  A.  If the Governor's Office calls, I'm usually the
10  one to answer the phone.
11  Q.  And would the same be true for the Lieutenant
12  Governor's Office?
13  A.  Currently, I'm the only employee, so yes, I'm
14  the one answering the phone.
15  Q.  So the office is you, currently, for
16  Representative Harless?
17  A.  Full-time employee, yes.
18  Q.  Do you have any legislative areas that you
19  focus on?
20  A.  With my current employee?  I'm sorry.  In my
21  current employment?
22  Q.  Yes.
23  A.  My areas -- Representative Harless is on the
24  State Affairs Committee.  Those were the issues that she
25  had asked me to -- to monitor specifically.

## 36

1  Q.  State Affairs handles voter ID issues; does it
2  not?
3  A.  No, it does not.
4  Q.  What does it handle?
5  A.  It handles a wide variety of issues related to
6  electric, dereg -- electric.  Some social issues.  It's
7  a fairly large committee that receives a lot of
8  different legislation.  Electric power,
9  telecommunications are the major issues that come from
10  through that committee, as well as social issues.
11  Q.  Is she running for reelection this year?
12  A.  Yes.
13  Q.  Are you involved in the campaign in any way?
14  A.  No.
15  Q.  When Representative Harless is considering how
16  to vote on a bill, do you advise her on that?
17  MR. SWEETEN:  I'm going to caution the
18  witness to the extent that your answer may reveal
19  thoughts or opinions about legislation or in furtherance
20  of the legislative process, don't answer that.  You can
21  answer as a general matter.
22  MS. WESTFALL:  Mr. Sweeten, I understand
23  your -- I understand your concerns about privilege, but
24  I would ask that you not -- that you refrain from
25  speaking objections as general matter, and that the

COLBY BEUCK                                              MAY 14, 2012

---

## 37

1  witness be able to answer questions about the fact of a
2  communication having occurred.
3           MR. SWEETEN:  Okay.  And thus far, I have
4  let him answer questions about the fact of the
5  communication.  However, it's my duty to assert the
6  privilege that is appropriate here, and that is the
7  legislative privilege with respect to these issues.  And
8  so I will caution him, as we proceed, to avoid providing
9  information related to the communications that we've
10  outlined.  With that, you can go ahead.
11       A.   As -- as part of my job duties, I -- I do --
12  I'm asked to make recommendations on legislation.
13       Q.   (By Ms. Westfall)  Do you generally do that for
14  Representative Harless?
15       A.   Yes.
16       Q.   And how do those recommendations -- how are
17  those recommendations conveyed?
18       A.   A variety of ways.
19       Q.   In-person meetings?
20       A.   Yes.
21       Q.   Telephone meetings?
22       A.   Yes.
23       Q.   E-mail?
24       A.   Yes.
25       Q.   Texting?

---

## 38

1       A.   Yes.
2       Q.   Do you e-mail her on a work e-mail, or her
3  personal e-mail, or all the above?
4       A.   All of the above.
5       Q.   What do you generally -- what e-mail do you
6  generally use with Representative Harless?
7       A.   It depends.  Typically, it is her -- her -- a
8  personal account.
9       Q.   Under Texas FOIA, public information law, are
10  citizens able to obtain e-mails through the government
11  account?
12       A.   I'm not an expert --
13       Q.   To the extent you know.
14       A.   -- on the public information law, so I can't --
15  I know state e-mails are subject to the open records
16  law.
17       Q.   Do you know whether legislators sometimes use
18  personal e-mail to avoid FOIA?
19           MR. SWEETEN:  Objection, calls for
20  speculation.
21       Q.   (By Ms. Westfall)  You may answer.
22       A.   I can't speak to that.  I don't know.  I can't
23  speak for other legislators.
24       Q.   Do you know whether Representative Harless has
25  a Gmail account?

---

## 39

1       A.   I don't believe she does.
2       Q.   She uses Yahoo?
3       A.   No.
4       Q.   What is your role, generally, when
5  Representative Harless sponsors a bill?
6       A.   Sponsoring a bill is, the legislation comes
7  over from the Senate.  As other legislation, I prepare
8  the legislation to make its way through the process, the
9  legislative process.
10       Q.   So is it your testimony that bills all
11  originate in the Senate, or do some originate in the
12  House?
13       A.   No.  No.  Bills do originate in the House.  You
14  said sponsor a bill.  That would be -- sponsoring
15  legislation is -- for Representative Harless would be a
16  Senate bill.  An author, she would be the author of the
17  bill if it was House bill.
18       Q.   I see.  Thank you for clarifying that for me.
19           Have your responsibilities changed during
20  the course of your employment with Representative
21  Harless?
22       A.   No.
23       Q.   Do you represent Representative Harless in an
24  attorney-client capacity?
25       A.   Yes, I have.

---

## 40

1       Q.   On what occasion?  Just -- and I'm not asking
2  you to talk about privileged communications.  Just
3  generally, when have you represented her as her
4  attorney?
5       A.   When she requests legal advice.
6       Q.   And is that in your capacity as chief of
7  staff?  You're providing her with legal advice?  Is that
8  your testimony?
9       A.   When -- when there is a question on legal
10  issues, I provide my legal advice.
11       Q.   So I believe you testified that you're the sole
12  staff person right now; is that right?
13       A.   Full time.  We do have part-time staff.
14       Q.   Is there anyone else in the office who has ever
15  handled voter ID issues while you've been employed with
16  Representative Harless?
17       A.   No.
18       Q.   You're the person who does everything on that
19  issue for her right now?
20       A.   Yes.
21       Q.   How many election-related bills has
22  Representative Harless sponsored?
23       A.   Besides voter ID, we -- we had two bills last
24  session.  I don't know other sessions.  I can speak to
25  the past session.  But I'm not qualified to speak on the

COLBY BEUCK                                           MAY 14, 2012

---

**41**

1  other sessions when I was not there.
2      Q.   Could you tell me the bill number for the first
3  one?
4      A.   The bill number for?
5      Q.   You said there were two bills, election-related
6  bills?
7      A.   No.  I don't know the bill numbers.
8      Q.   Could you describe the bills for me?
9      A.   There was one bill regarding school board --
10  school board elections, there in Harris County, to help
11  our local school district with the costs associated with
12  running an election.
13      Q.   Would you describe the other bill?
14      A.   The other bill had to do with translating the
15  election materials, the costs associated with Harris
16  County translating the election materials.  Harris
17  County had asked to -- for our office to help with that,
18  to see if the Secretary of State would translate those
19  materials so that there's uniformity across the state.
20  That's what the legislation did.
21      Q.   And so the purpose of the bill was to provide
22  funding for the printing of those materials; is that
23  right?
24      A.   The actual translation of the election
25  materials.

---

**42**

1      Q.   Why did Representative Harless sponsor that
2  legislation?
3          MR. SWEETEN:  I'm going to object to the
4  extent that the question may ask him to reveal thoughts
5  or opinions about legislation in furtherance of the
6  legislative process, and you're asking about a specific
7  communication between Ms. Harless and Mr. Beuck.
8          MS. WESTFALL:  Let me strike that
9  question.
10      Q.   (By Ms. Westfall)  What was the purpose of that
11  legislation?
12      A.   The purpose was to -- Harris County had
13  concerns regarding the translation of those election
14  materials.  They felt that because there were several
15  other counties that were now going be required to
16  translate into these other languages, that there should
17  be a uniform translation across -- across the state.
18      Q.   What is your understanding of why Harris County
19  decided that Representative Harless was the person to
20  carry that bill?
21          MR. SWEETEN:  Objection, calls for
22  speculation.
23      Q.   (By Ms. Westfall)  You may answer.
24      A.   I can't speak to that.
25          MS. WESTFALL:  Mr. Sweeten, I would ask

---

**43**

1  that you make your objections in a shorter fashion so
2  that there is not coaching of the witness.
3          MR. SWEETEN:  Counsel, I just said,
4  "Objection, calls for speculation."  How would you like
5  me to rephrase that?
6          MS. WESTFALL:  "Objection, speculation."
7          MR. SWEETEN:  Okay.  I will shorten it to
8  that.
9      Q.   (By Ms. Westfall)  I believe you testified
10  earlier, and this was of interest to me the, the
11  difference between sponsoring and authoring a bill.
12          So when a bill comes from the Senate and
13  it comes to the House and it's being sponsored in the
14  House?  Is that right?  That's a correct term?
15      A.   Yes.  House -- we House sponsor the
16  legislation.
17      Q.   How is it decided which member will be
18  sponsoring the Senate Bill?
19      A.   From my experience, it is the committee, and
20  leadership will make that determination.
21      Q.   Is it leadership in both the House and the
22  Senate decide who will carry that bill in House?
23      A.   Typically, I would say it would just be the
24  House leadership makes that determination.
25      Q.   And in the House, when you refer to leadership,

---

**44**

1  who, other than the Speaker, is involved in that
2  decision?
3      A.   I can't say.  I don't know.
4      Q.   Is it chiefly the decision of the Speaker?
5          MR. SWEETEN:  Objection, calls for
6  speculation.
7      A.   I don't know.
8      Q.   (By Ms. Westfall)  How many immigration-related
9  bills has Representative Harless sponsored, authored, or
10  co-sponsored during your employment with her office?
11      A.   We had a -- one bill.
12      Q.   Could you tell me about that bill?
13      A.   Yes.  It was a bill -- I believe it was called
14  a Sanctuary City Bill.
15      Q.   What did Sanctuary City Bill do?
16      A.   This was legislation she had filed in previous
17  sessions.  It was -- it was not my focus this session,
18  so I'm not the expert on it.  So I really -- the details
19  of the legislation, I know it's to -- I really don't
20  know the details on it, to be honest.
21      Q.   Could you describe the basic purpose of the
22  bill?
23      A.   The purpose of the bill was to --
24          MR. SWEETEN:  I'm going to make sure
25  that -- with respect to this question, I'm going to

COLBY BEUCK                                                    MAY 14, 2012

---

45

1   object to it to the extent it calls for you to provide
2   information that's covered by the legislative privilege
3   which could be communications with Representative
4   Harless. With that, you can go ahead and answer.
5           MS. WESTFALL: Mr. Sweeten, are you taking
6   the position that questions related to the purpose of
7   legislation are covered by legislative privilege, so I
8   understand this for the record?
9           MR. SWEETEN: Just so it's clear, I'm
10  saying that any communications that he's had with
11  Representative Harless about the purpose of the bill
12  would be covered by legislative privilege. If you're
13  asking him based on the text of the bill or his general
14  understanding, I think that would be -- that's fair
15  game.
16      Q.  (By Ms. Westfall) My question stands. What
17  was the purpose of the Sanctuary Cities Bill? You may
18  answer.
19          MR. SWEETEN: My instruction stands.
20      A.  The purpose of the legislation was to prohibit
21  cities from providing a sanctuary regarding immigration
22  laws, federal immigration laws.
23      Q.  (By Ms. Westfall) Could you explain that a
24  little bit further? It's not clear to me. Could you
25  describe it a little further?

---

46

1           MS. WESTFALL: I want to note for the
2   record that the witness is pausing and thinking about
3   his answer.
4       A.  The legislation was in response to cities that
5   were not enforcing immigration laws, and the legislation
6   was intended to -- to prohibit that.
7       Q.  (By Ms. Westfall) And she sponsored this bill
8   in 2009; is that correct?
9       A.  Yes.
10      Q.  Had this bill been introduced prior to 2009 in
11  some way, shape, or form?
12      A.  Yes.
13      Q.  Who introduced it previously?
14      A.  I -- I don't know.
15      Q.  Do you know why Representative Harless
16  introduced the bill in 2009?
17          MR. SWEETEN: Objection, speculation.
18      Q.  (By Ms. Westfall) You may answer.
19      A.  Her constituents had requested it.
20      Q.  What area does she represent?
21      A.  Spring, Texas.
22      Q.  Where is that?
23      A.  Northwest Harris County.
24      Q.  Northwest Harris County. Which of her
25  constituents asked her to sponsor the bill?

---

47

1           MR. SWEETEN: Objection. I'm going to
2   instruct the witness not to answer to the extent that
3   that information reveals thoughts and opinions about
4   legislation or furtherance of the legislative process,
5   and it relates to communications between you and
6   Representative Harless, communications between
7   constituents and legislative staff or Representative
8   Harless, communications between legislators or
9   legislative staff.
10          With that cautionary instruction, you can
11  go ahead and answer to the extent you have an answer.
12          MS. WESTFALL: Mr. Sweeten, I want to
13  clarify whether you are including within the privilege a
14  promise that a legislature makes for a constituent to
15  sponsor a bill. Would you say that that is privileged?
16          MR. SWEETEN: I am saying that any
17  communications between constituents and a legislator
18  would be covered by the legislative privilege.
19          MS. WESTFALL: And that is about
20  legislation, generally, in either direction?
21          MR. SWEETEN: In either direction
22  regarding legislation, that's correct.
23          MS. WESTFALL: Court reporter, could you
24  read back the question?
25          (The requested portion was read by the

---

48

1   reporter.)
2       A.  I can't speak to an individual constituent who
3   asked. I know several have been in contact.
4       Q.  (By Ms. Westfall) Could you tell me the
5   identity of the constituents?
6           MS. WESTFALL: And that's outside the
7   privilege, Mr. Sweeten.
8       A.  The identity?
9       Q.  (By Ms. Westfall) Who were these constituents?
10      A.  Constituents. That's about -- I don't know the
11  individual identities of these -- these people.
12      Q.  Were there any lobbyists who requested her to
13  sponsor the bill?
14      A.  I don't know.
15      Q.  Were there any interest groups that asked her
16  to sponsor the bill?
17      A.  I don't know.
18      Q.  Are you familiar with a group ALEC?
19      A.  Yes.
20      Q.  Did ALEC ask her to sponsor the bill?
21      A.  I cannot speculate. I don't know.
22      Q.  How many bills did she sponsor in 2009?
23      A.  I think we sponsored around -- more than five
24  Senate bills, five to ten Senate bills. We authored
25  approximately ten House bills, 10 to 15.

COLBY BEUCK                                                        MAY 14, 2012

---

49

1    Q.  And could you remind me:  Did she sponsor or
2    author the Sanctuary Cities Bill in the House in 2009?
3    A.  She was an author.  We had filed legislation on
4    that.
5    Q.  Do you know why she was selected to carry the
6    bill rather than Representative Solomons?
7    A.  Which bill?
8    Q.  Sanctuary Cities.
9    A.  There were several Sanctuary City bills last
10   session.  Representative Solomons, I believe, had one as
11   well.
12   Q.  What happened to Representative Harless's
13   Sanctuary Cities bill?
14   A.  It did not move.
15   Q.  Did not move out of committee?
16   A.  Correct.
17   Q.  What committee was it considered by?
18   A.  State Affairs.
19   Q.  Why did it not move out of committee?
20   A.  I can't speculate.  I don't know.
21   Q.  Who was Chair of State Affairs at that time,
22   committee?
23   A.  Byron Cook.  Representative Byron Cook.
24   Q.  Is it generally the Chair who decides which
25   bills move out of committee?

---

50

1    A.  Typically.
2    Q.  Do you believe that compliance with the Texas
3    Constitution is an important consideration in the
4    law-making process?
5    A.  Yes.
6    Q.  How do you ensure that there is compliance with
7    the Texas Constitution in drafting a bill?
8    A.  Reading the Constitution helps.
9    Q.  Take any other steps?
10   A.  Consulting with Texas Legislative Council.
11   Q.  Could you describe generally for me your role
12   in drafting a bill between you and the Council?
13   A.  Generally speaking, there is an idea for
14   legislation, and I take that legislation, the ideas, the
15   general ideas, and request counsel to assist in drafting
16   the legislation.
17   Q.  So the Texas Legislative Council does the
18   actual -- provides the technical support in drafting the
19   bill; is that correct?
20   A.  As well as legal.
21   Q.  And you provide the concept and get it to
22   them?  Is that how it works?
23   A.  Yes.
24   Q.  Do you believe that the compliance with federal
25   law is an important consideration in the law-making

---

51

1    process?
2    A.  Yes.
3    Q.  How do you ensure compliance with federal law
4    in drafting legislation?
5    A.  The same as with Texas constitutional law.  You
6    study the federal law, as best you can, and consult with
7    Texas Legislative Council.
8    Q.  Are you familiar with Section 5 of the Voting
9    Rights Act?
10   A.  Yes.
11   Q.  When did you first learn about Section 5?
12   A.  Quite sometime ago.  I can't say.  Probably
13   high school.
14   Q.  How does the Legislature ensure compliance with
15   Section 5 of the Voting Rights Act?
16   MR. SWEETEN:  Objection, speculation.
17   (By Ms. Westfall)  You may answer.
18   A.  Could you repeat the question?
19   Q.  How does the Legislature ensure compliance with
20   Section 5?
21   MR. SWEETEN:  Same objection.
22   A.  By taking the same steps of studying the law
23   and consulting with counsel.
24   Q.  (By Ms. Westfall)  Do you believe that
25   compliance with the Federal Voting Rights Act is an

---

52

1    important consideration in the law-making process?
2    MR. SWEETEN:  Objection, vague.  Go ahead,
3    you can answer.
4    A.  I believe following all laws is important, all
5    federal law is important.
6    Q.  (By Ms. Westfall)  Are there any particular
7    steps that you take with regard to ensuring that
8    election laws comply with Section 5, that you haven't
9    already testified to?
10   A.  No.
11   Q.  What is Texas's current system for determining
12   how to verify the identity of a voter at the polls?
13   A.  The current voting system.
14   Q.  Before SB 14 --
15   A.  Yes.
16   Q.  -- since that's not being implemented?
17   A.  -- for regular voting, not early voting?
18   Q.  Let me withdraw the question.  Strike the
19   question.  I will rephrase.
20   What is the current system, under Texas
21   law, for determining how to verify the identity of a
22   voter who is voting in person on either early voting or
23   on election day?
24   A.  I believe with early voting, there is a -- I
25   show my driver's license when I early vote.  That's

COLBY BEUCK                                                              MAY 14, 2012

## 53

1    typically what I do.  When you are voting on election
2    day, you have the option of showing your registration
3    card, your voter registration card, or there are a
4    couple of other documents that you are able to show to
5    verify your identity.
6        Q.    What are those documents?
7        A.    It's a pretty long list.  I don't know.  I've
8    never used that.  So I know there is a -- there's
9    personal records of some sort.
10       Q.    So when you're answering these questions, are
11   you testifying based on your personal experience as a
12   voter?
13       A.    My personal experience?  No.  As well as what I
14   know from the issue.
15       Q.    Are there any problems with the current system
16   you just described for verifying a voter's identity when
17   he shows up at the polls on election day?
18       A.    Yes, I think there are concerns.
19       Q.    What are those concerns?
20       A.    That an individual would be able to -- to vote
21   and use someone else's identity.
22       Q.    Are you aware of any times that that's occurred
23   in Texas?
24       A.    Yes, I believe there are examples.
25       Q.    Could you tell me about what those examples

## 55

1        A.    Yes.
2        Q.    And then you just testified about in-person
3    voter fraud, and we had some discussion about that,
4    right?
5        A.    Yes.
6        Q.    Are there any other problems or concerns that
7    the current system, in your view, fails to address?
8        A.    Beyond somebody voting for somebody else?
9        Q.    Correct.
10       A.    I think that's the major concern.
11       Q.    Okay.
12       A.    That I'm aware of.
13       Q.    That's the sum total of the problem, as you see
14   it, with the current system; is that correct?
15       A.    Well, I can't speak to the sum total.  I know
16   that's the -- major -- the major issue.
17       Q.    As you sit here today testifying, I want to
18   know every single concern and problem with the current
19   system, and that's my question.  Does that clarify the
20   question for you?
21       A.    I believe I've answered it.
22       Q.    Okay.  You testified earlier that you started
23   to work for Representative Harless in November of 2009,
24   correct?
25       A.    Correct.

## 54

1    are?
2        A.    The specific cases, I can't say.  I can't speak
3    to.
4        Q.    Do you know how many cases there have been?
5        A.    No, I do not.
6        Q.    Do you know how many allegations of in-person
7    voting fraud there have been in Texas?
8        A.    No, I do not.
9        Q.    Do you know how many convictions of in-person
10   voting fraud in Texas?
11       A.    No, I don't have those numbers.
12       Q.    Are there any other concerns with the current
13   system for verifying a voter's identity that you haven't
14   already testified about today?
15           MR. SWEETEN:  Are you asking if he has
16   concerns?  Just to clarify the question.  Any concerns?
17       A.    My personal concerns?
18       Q.    (By Ms. Westfall)  Is the question -- you had
19   testified that there were concerns with the system.  I
20   asked you whether there were concerns.  Is the question
21   not clear to you?
22       A.    No.  If you could --
23       Q.    You said earlier that there were problems with
24   the current system for verifying a voter's identity.  Do
25   you remember testifying about that?

## 56

1        Q.    Was there a time after you were hired by
2    Representative Harless that you started to work on photo
3    ID issues?
4        A.    When did I begin working on photo ID issues?
5        Q.    For Representative Harless.
6        A.    For Representative Harless?  We prefiled
7    legislation, in the fall of 2010, so there about,
8    around.
9           MS. WESTFALL:  Could you mark this as U.S.
10   Exhibit 4.
11           (Exhibit 4 marked for identification.)
12           MS. WESTFALL:  Thank you.
13       Q.    (By Ms. Westfall)  You've been handed what's
14   been marked U.S. 4.  Take a look at it.  Let me know
15   when you've had a chance to review it.
16       A.    (Viewing documents.)
17       Q.    Have you had a chance to take a look?
18       A.    Yes.  This is the House Bill 112, the
19   legislation we -- Representative Harless prefiled.
20       Q.    Were you involved in developing this bill?
21       A.    Yes.
22       Q.    Were you involved in drafting this bill?
23       A.    In the drafting process?
24       Q.    Yes.
25       A.    Yes.

COLBY BEUCK                                                    MAY 14, 2012

---

57

1    Q.   Could you describe that process for me?
2    A.   The process is as with other bills, as I
3  described earlier, the idea for the legislation was
4  brought up, and I researched the issue, and I contacted
5  Texas Legislative Council for assistance in drafting.
6    Q.   Did you do anything else, in the drafting or
7  development process, for HB 112?
8    A.   Beyond researching the issue and that's -- no.
9    Q.   Thank you for your testimony.
10        Could you describe the basic provisions of
11  HB 112?
12   A.   (Viewing documents.)
13        MS. WESTFALL:  Please note for the record
14  that the witness is reviewing Exhibit 4.
15   A.   Could you repeat -- you're asking the basic --
16   Q.   (By Ms. Westfall)  Could you describe the basic
17  provisions of HB 112?
18   A.   Yes.  There is -- this is the voter
19  identification legislation.  There is a -- voter must
20  present to an election officer one form of
21  identification.  And then that lists -- those are, I
22  guess, what you would consider to be photo ID, or two
23  different forms of identification.  Then that lists
24  several -- I believe that's -- that's the -- the list of
25  other documents that you would be able to show.

---

58

1    Q.   How long did it take to draft this bill?
2    A.   I don't recall.
3    Q.   Did it take more than three months?
4    A.   I don't believe so.  I don't think it took
5  longer than three months.
6    Q.   How many meetings did you have with
7  Representative Harless about this bill?
8    A.   Several.
9    Q.   Less than ten?
10   A.   I'd say five to ten.
11   Q.   Did you have meetings about HB 112 in 2010,
12  prior to the filing in November of 2010?
13   A.   It would be in the fall of 2010, early -- I'm
14  sorry, excuse me.  Later summer, early fall.
15   Q.   How long did it take to draft the bill with the
16  Texas Legislative Council?
17   A.   I do not remember.
18   Q.   A matter of weeks?
19   A.   I think it was several weeks.
20   Q.   How many communications did you have with the
21  Texas Legislative Council about HB 112?
22   A.   No more than five.
23   Q.   Did you consider any other -- turning your
24  attention to U.S. 4, did you consider any other,
25  including any other kinds of ID in this bill, as

---

59

1  allowable by voters?
2    A.   Additional forms of photo identification?  No.
3    Q.   Did you consider any other forms of nonphoto
4  identification?
5    A.   No.
6    Q.   So HB 112 allowed for two forms of nonphoto ID;
7  is that correct?
8    A.   Yes.
9    Q.   Does that establish a person's identity?
10   A.   Would two forms of identification establish a
11  person's identity?
12   Q.   That's the question, yes.
13   A.   I believe it's -- I believe there's a greater
14  likelihood of identifying the person -- correctly
15  identifying the person more than current law under this
16  bill, yes.
17   Q.   So the use of two forms of nonphoto ID would
18  increase the likelihood that you could confirm a voter's
19  identity; is that correct?
20   A.   Yes, I believe it would.
21   Q.   And that's why Representative Harless included
22  it in this bill; is that right?
23        MR. SWEETEN:  Objection to the form.  Also
24  objection to the fact that you're asking him to
25  speculate as to what Representative Harless believes and

---

60

1  you're asking -- it implicates communications that he
2  may have had with Representative Harless.  So to the
3  extent -- and so I'm going to object to privilege.
4        Do not answer that if your answer reveals
5  communications you've had with Representative Harless.
6        MS. WESTFALL:  I'm gonna strike that
7  question.  Actually, I'm not going to strike.  I'm going
8  to leave it pending, because I'm going to move on that
9  question to that question.
10   Q.   (By Ms. Westfall)  I'm gonna ask you another
11  question.  What was the purpose of allowing the use of
12  two nonphoto forms of ID in HB 112?
13        MR. SWEETEN:  Again, do not reveal
14  communications that you've with Representative Harless
15  in answering that question.
16        MS. WESTFALL:  Mr. Sweeten, I'm not asking
17  him to talk about communications.  I'm asking him what
18  was the purpose of a particular provision in a
19  particular bill.
20        MR. SWEETEN:  You're asking him what the
21  purpose of this bill is, is that the question?
22        MS. WESTFALL:  Are you taking the position
23  that asking questions about the purpose of provisions in
24  legislation is protected by legislative privilege?  Is
25  that your position?

COLBY BEUCK                                             MAY 14, 2012

## 61

1    MR. SWEETEN:  What I'm saying is, that if
2    there's a discussion that he's had with Representative
3    Harless, that he does not have to reveal that, and that
4    is privileged.  So to the extent that he can answer
5    based upon his own testimony, I'm gonna let him -- on
6    his own perception, I'm going to let him do that.  But I
7    will not let him reveal communications that he's had
8    with Representative Harless.
9    MS. WESTFALL:  That's abundantly clear,
10   and I'm not -- that's not the question.  So thank you
11   for your testimony, Mr. Sweeten.
12   Q.  (By Ms. Westfall)  You may answer.
13   MR. SWEETEN:  I'm not testifying.  I'm
14   trying to make sure that the record is clear, and I'm
15   trying to make sure that the witness is clear on my
16   instruction as to privilege.  With that, go ahead.
17   MS. WESTFALL:  Thank you.
18   Q.  (By Ms. Westfall)  You may answer.
19   A.  Could you repeat the question?
20   I certainly could.
21   What was the purpose of allowing the use
22   of two forms of nonphoto ID in HB 112?
23   A.  To improve the likelihood that the person
24   voting is who they say they are.
25   Q.  Turning your attention to Section 63.0101 on

## 62

1    Page 5.  Do you see that?
2    A.  Uh-huh.
3    Q.  And continuing on to Page 6, do you see that it
4    allowed the use of driver's licenses that had not
5    expired earlier than two years before the date of
6    presentation?
7    A.  Under Subsection 1?
8    Q.  Correct.
9    A.  Yes.
10   Q.  Why was the two-year number selected?
11   A.  I don't know.
12   Q.  Do you see under Subsection 2 of that same
13   section a reference to United States military
14   identification cards?
15   A.  Yes.
16   Q.  Could you describe the form of identification
17   cards that is described or referenced by that statement?
18   A.  A United States military identification card?
19   Q.  Yes.  What kind of cards does that include?
20   A.  I think that would be identification from the
21   United States military.  I can't say beyond that --
22   Q.  Do you know --
23   A.  -- what that would include.
24   Q.  Do you know where this particular provision
25   came from?

## 63

1    A.  I believe this language was from the
2    legislation as from the 2009 legislation.
3    Q.  And what was that bill?
4    A.  I do not remember the bill number.
5    Q.  Was much of this list of acceptable forms of ID
6    from the 2009 bill?
7    A.  Yes.
8    Q.  I believe you testified that you were involved
9    in development of HB 112?
10   A.  Yes.
11   Q.  Could you describe that process, to the extent
12   you haven't already testified about it?
13   A.  I believe I answered as my -- my involvement, I
14   believe I already answered.
15   Q.  So it's simply communications with
16   Representative Harless on five occasions in -- or ten
17   occasions in the fall of 2010; is that correct?
18   MR. SWEETEN:  Objection, misstates his
19   testimony.
20   Q.  (By Ms. Westfall)  You may answer.
21   A.  My -- my involvement with House Bill 112, yes,
22   conversations with Representative Harless, five to ten,
23   approximately, researching the issue and communications
24   with counsel.
25   Q.  Were there any activities related to the

## 64

1    development of the bill before the fall of 2010?
2    A.  Activities?  Could you be --
3    Q.  Were you involved in developing the bill prior
4    to the fall of 2010?
5    A.  House Bill 112?
6    Q.  Yes.
7    A.  No.
8    Q.  I believe you testified that you looked to the
9    bill in 2009 as a model, in part or in whole, for
10   HB 112; is that correct?
11   A.  That's correct.
12   Q.  Did you look at any other previous bills in
13   drafting HB 112?
14   A.  When I was researching the issue, I looked at
15   previous legislation, so I believe 2007, 2009.
16   Q.  Do you remember what parts of those previous
17   bills you drew from in drafting HB 112?
18   A.  No, I don't.  The specifics on which parts, I
19   don't remember.
20   Q.  Did you look at any other states' photo ID laws
21   in drafting HB 112?
22   A.  In my research, yes, I did.
23   Q.  Which states?
24   A.  Specifically, the Indiana legislation on voter
25   identification, the Georgia, were states that I looked

COLBY BEUCK                                                    MAY 14, 2012

---

65

1  to.
2       Q.  Did anyone direct you to look at those states?
3            MR. SWEETEN:  Objection to the extent that
4  it attempts to reveal communications between he and
5  other legislative staff and/or Representative Harless.
6  He can answer it if it does not implicate those
7  communications or other communications I've articulated
8  today.
9       A.  Did anybody direct me to look at those states
10  specifically?
11       Q.  (By Ms. Westfall)  Yes.
12       A.  I came to that conclusion on my own, after
13  researching the issue, that those were two states I
14  needed to look at.
15       Q.  Do you remember any provisions that you drew
16  from the Georgia photo ID law to include in HB 112?
17       A.  No, I don't remember specifically.
18       Q.  Do you recall anything in the Georgia photo ID
19  law that you rejected and did not include in HB 112?
20       A.  No.
21       Q.  Do you recall any aspect of the Indiana photo
22  ID law that you included in HB 112?
23       A.  No, I don't know the specific provisions from
24  the individual states.
25       Q.  Did you take any steps in the drafting process

---

66

1  or development of HB 112 as a result of looking to any
2  states' other photo ID laws?
3       A.  Can you restate?  I'm sorry.
4       Q.  Did you make any changes to HB 112 as a result
5  of reviewing other states' photo ID laws?
6       A.  My primary model for this bill was the
7  legislation from 2009.  I know the -- those were taken
8  into consideration when that was drafted in 2009.  As
9  far as my -- I can't -- I don't know.
10       Q.  Did you look to any models from any interest
11  group or lobbyist in drafting HB 112?
12       A.  No.
13       Q.  Did you have any communications with other
14  legislators other than Representative Harless, about
15  HB 112?
16            MR. SWEETEN:  Can you read the question
17  back.
18            (The requested portion was read by the
19  court reporter.)
20            MR. SWEETEN:  I'm going to instruct him
21  not to reveal any communications that you've had.  The
22  fact of the communication, I will allow you to answer
23  that.
24            MS. WESTFALL:  Thank you, Mr. Sweeten.
25            MR. SWEETEN:  You're welcome.

---

67

1       A.  No, I have not.
2       Q.  (By Ms. Westfall)  So you solely talked to
3  Representative Harless, is that correct, as to
4  legislators, about 112?
5       A.  That's correct.
6       Q.  Did you talk to any legislative staff in
7  developing HB 112?
8       A.  Yes.
9       Q.  Who were those staff people?
10            MR. SWEETEN:  Same instruction.  You can
11  reveal who you talked to or the facts about the
12  communication, but not the substance of the
13  communication.
14            (By Ms. Westfall)  You may answer.
15       A.  Okay.  Senator Fraser's office and the
16  Lieutenant Governor's Office.
17       Q.  Could you identify the particular staff person
18  in Senator Fraser's office with whom you had
19  communications about HB 112?
20       A.  Janice McCoy.
21            MR. ROSENBERG:  Would you speak up,
22  please?
23            THE WITNESS:  I'm sorry.
24       A.  Janice McCoy.
25       Q.  (By Ms. Westfall)  Was there anyone else in the

---

68

1  office you had communications with?  I'm sorry, in
2  Senator Fraser's office?
3       A.  No.
4       Q.  How many communications did you have with
5  Ms. McCoy?
6       A.  Less than five.
7       Q.  Were these communications in the fall of 2010?
8       A.  I don't remember.
9       Q.  Were any of these conversations in 2009?
10       A.  In 2009?  No.
11       Q.  Were any of these conversations in the first
12  half of 2010?
13       A.  With --
14       Q.  With Ms. McCoy?
15       A.  With Ms. -- no, no.  The first half of -- no,
16  2010, no.
17       Q.  Were the two of you sole parties to these
18  conversations?
19       A.  Yes.
20       Q.  Were these conversations conducted in person?
21       A.  No.
22       Q.  Were these conversation on the telephone?
23       A.  Yes.
24       Q.  Were any of these conversations on e-mail?
25       A.  Not that I remember.

COLBY BEUCK                                    MAY 14, 2012

## 69

1    Q.  Were any of these conversations on text?
2    A.  No.
3    Q.  And you just testified that you also had
4    communications with a staff person from Mr. Dewhurst's
5    office.  Is that correct?
6    A.  Yes.
7    Q.  Who was that staff person?
8    A.  Bryan.  Bryan Hebert.
9    Q.  H-e-b-e-r-t?
10   A.  Yes.
11   Q.  What is his title?
12   A.  I don't know his exact title.
13   Q.  Were these conversations in the fall of 2010?
14   A.  Yes.
15   Q.  How many conversations did you have with
16   Mr. Hebert?
17   A.  Less than five.
18   Q.  Were the two of you sole parties to those
19   communications?
20   A.  Yes.
21   Q.  Were those communications in person?
22   A.  Yes.
23   Q.  Where was the location of those communications?
24   A.  In Mr. Hebert's office.
25   Q.  How long were the meetings?

## 70

1    A.  Less than 30 minutes.
2    Q.  Did you have any e-mail communication between
3    the two of you after those meetings?
4    A.  Yes.
5    Q.  Have you produced those e-mails to your
6    attorneys?
7    A.  I did not have those documents.
8    Q.  They no longer existed in your e-mail system?
9    A.  That's correct.
10   Q.  What happened to them?
11   A.  They were -- I don't know what happened to
12   them.  I do not have them.  They were deleted.
13   Q.  Who would know what happened to those e-mails?
14   A.  I don't know.
15   Q.  Now that you remember you had e-mail --
16       MR. SWEETEN:  Can we work towards a break
17   maybe in about five minutes?  Just pretty soon we'd like
18   to take a break.
19       MS. WESTFALL:  Certainly.
20   Q.  (By Ms. Westfall)  Now that you remember you
21   had e-mail with Mr. Hebert, did you have any e-mail
22   communication with Ms. McCoy?
23   A.  In 2000 --
24   Q.  In 2010?
25   A.  No, not that I remember.

## 71

1    Q.  Do you remember whether you had any other
2    meetings with any other legislative staff or staff in
3    the Governor's Office in 2010 regarding HB 112?
4    A.  No.  That's all.
5    Q.  Did you have any other communications regarding
6    HB 112 in which Representative Harless was present?
7    A.  I'm sorry.  Can you repeat the question?
8    Q.  Any other communications -- any communications
9    regarding HB 112 at which Representative Harless was
10   present?
11   A.  Communications with myself and Representative
12   Harless?
13   Q.  And a third party.
14   A.  No, I don't remember.
15   Q.  Did you have any communications with officials
16   or legislators in other states in the fall of 2010
17   regarding the development of HB 112?
18   A.  No.
19   Q.  Did you have any communications with anyone in
20   Georgia regarding their photo ID law?
21   A.  No.
22   Q.  Did you have any communications with --
23   Q.  I'm sorry.  Regarding House Bill 112?
24   Q.  Correct.
25   A.  No, no communications.

## 72

1    Q.  Did you have any communications with anyone
2    anybody in Indiana regarding their law?
3    A.  No.
4    Q.  Did you have any communications with any
5    interest groups or lobbyists concerning HB 112?
6    A.  No.
7    Q.  Did you have any communications with any
8    interest group representing minority voters regarding
9    the development of HB 112?
10   A.  No.
11   Q.  Did you have -- other than what you just
12   testified about, did you have any discussions with
13   anybody about the forms of ID to include in HB 112?
14       MR. SWEETEN:  Objection to the extent that
15   you're asking to him to reveal communications that are
16   specifically covered by the legislative privilege.  I
17   can go through those if you need to me to familiarize.
18   But otherwise, are you familiar with what we're talking
19   about?
20       THE WITNESS:  Yes.
21       MR. SWEETEN:  Okay.  Then with that
22   instruction, you can go ahead and answer Ms. Westfall's
23   question.
24   A.  Okay.  Could you repeat it?
25   Q.  (By Ms. Westfall)  Sure.  Did you have any

COLBY BEUCK                                              MAY 14, 2012

---

### 73

1   discussions with anyone about the forms of ID to include
2   in HB 112?
3       A.   Besides who I --
4       Q.   Besides the people you already testified about?
5       A.   No.
6       Q.   Conversations.  Thank you.
7            Mr. Sweeten, if you don't mind, I have
8   about five more minutes just to get through the section.
9            MR. SWEETEN:  That's fine.  Go ahead.
10           MS. WESTFALL:  And it will be a logical
11  break.
12      Q.   (By Ms. Westfall)  Did you analyze which
13  registered voters did not possess any or all of the
14  forms of ID identified in HB 112?
15      A.   No, I did not.
16      Q.   Did you read any research or analysis of voter
17  ID to assist you in drafting HB 112, that you haven't
18  already testified to?
19      A.   Yes, I did research the issue.
20      Q.   I believe you testified earlier that you had
21  researched other states' laws?
22      A.   Yes.
23      Q.   Was there anything else, any other research
24  that you conducted to assist you in new drafting HB 112?
25      A.   Yes, I -- yes.

---

### 74

1       Q.   Tell me what that research consisted of.
2       A.   My research on voter ID generally consisted of
3   law review articles; basically what I could get my hands
4   on, as far as research goes.
5       Q.   Which law review articles did you review?
6       A.   I can't remember.
7       Q.   Do you remember the authors of the law review
8   articles?
9       A.   No.
10      Q.   Do you remember the publications in which they
11  were published?
12      A.   No.
13      Q.   Did you conduct or instruct anyone to conduct
14  an analysis of the impact of HB 112 on minority voters?
15      A.   No.
16      Q.   Why didn't you?
17           MS. WESTFALL:  Please note for the record
18  that the witness is thinking about a response.
19      A.   Can you repeat it?
20      Q.   (By Ms. Westfall)  Certainly.  Did you conduct
21  or --
22           MS. WESTFALL:  Actually, court reporter,
23  could you read back that question?
24           (The requested portion was read by the
25  court reporter.)

---

### 75

1       Q.   (By Ms. Westfall)  The question before that
2   was:  Did you conduct or instruct anyone to conduct an
3   analysis of the impact of HB 112 on minority voters?
4       A.   Okay.
5       Q.   "Why didn't you?" was the question.
6       A.   And why didn't I?  Okay.
7       Q.   Yes, thank you.
8       A.   For House Bill 112, I was not -- I was not
9   asked.
10      Q.   You testified earlier that you understood this
11  change would be subject to Section 5 of the Voting
12  Rights Act, correct?
13      A.   I'm sorry.  I don't remember that.  Could
14  you --
15      Q.   Is it your understanding or was -- I'm sorry,
16  strike that.
17           Was it your understanding, at the time of
18  the drafting of HB 112, that it would be subject to
19  preclearance for Section 5 of the Voting Rights Act?
20      A.   The voter ID legislation would be subject to
21  preclearance, yes.  Yes, that was my understanding.
22      Q.   Did you take any steps in response to your
23  understanding of that?
24      A.   With House Bill 112?
25      Q.   Yes.

---

### 76

1       A.   With my research and my conversations and
2   consulting with Legislative Council.
3       Q.   Were you directed not to analyze the impact of
4   HB 112 on minority voters?
5            MR. SWEETEN:  Objection.  Don't reveal any
6   communications between legislators, staff, and you, or
7   any of the other areas that we've discussed.
8            THE WITNESS:  Okay.
9       Q.   (By Ms. Westfall)  To the extent you can
10  answer, can you answer?
11      A.   Was I directed to not --
12      Q.   Analyze the impact of HB 112 on minority
13  voters?
14      A.   I think --
15           MR. SWEETEN:  Again, if the answer to the
16  question involves you revealing communications between a
17  legislator, staff members, staff state agencies,
18  including the Governor or Lieutenant Governor's Office
19  or communications between the Texas Legislative Council,
20  if that's the basis of your answer, do not reveal that.
21      A.   No, I was not directed.
22      Q.   (By Ms. Westfall)  Is your answer you weren't
23  directed or you're not answering because your counsel
24  has instructed you not to answer?
25      A.   I'm sorry?

COLBY BEUCK                                                    MAY 14, 2012

---

## 77

1   Q.   Are you not answering the question?
2   A.   No.
3   Q.   You are not able to answer the question?
4   A.   I am answering the question:  That was not a
5   directive.
6   Q.   Are you familiar with the concept of Spanish
7   surname voter registration?
8   A.   I am now.
9   Q.   Were you at the time of the drafting of HB 112?
10  A.   No.
11  Q.   And just to go back to the -- to the testimony
12  that you just provided about not having been instructed
13  not to analyze the impact, that is your answer with
14  regard to outside of any communications that your
15  counsel is asserting is privileged; is that correct?
16  A.   I'm sorry.  Could you --
17  Q.   I'm just trying to understand the answer that
18  you just gave, the testimony that you just gave when I
19  asked you:  Were you directed not to analyze the impact
20  of HB 112 on minority voters, and you said, "I was not
21  instructed that."  Is that correct?
22  A.   Yes.
23  Q.   But you were at --
24  A.   I'm sorry.  I'm getting twisted.
25  Q.   That's okay.  We're going to take a break

---

## 78

1   shortly.
2        Your counsel had just instructed you that
3   you should not answer that question if it meant
4   revealing any communications that you had --
5   A.   Right.
6   Q.   -- with Representative Harless, other
7   legislators, or staff; is that correct?
8   A.   Yes.
9   Q.   So that question you did not answer with regard
10  to any directives you had made -- you may have received
11  from those individuals; is that correct?
12  A.   Okay.
13       MR. SWEETEN:  Do you need a take a minute
14  and we can discuss the privilege assertion, if you --
15       MS. WESTFALL:  Mr. Sweeten, I have a
16  question pending and you've instructed him, and I'm
17  trying to clarify his testimony for the record.
18       MR. SWEETEN:  I understand.  But I'm also
19  -- I'm allowed, per the rules, to discuss with him the
20  assertion of privilege when appropriate.  This is
21  certainly a time -- the entire premise of your question
22  is based upon privilege.  I can talk with him about that
23  assertion.
24       MS. WESTFALL:  Why don't we move on and
25  finish these questions, and we can take a break in five

---

## 79

1   minutes?  How about that?
2   Q.   (By Ms. Westfall)  What was the purpose of
3   HB 112?
4        MR. SWEETEN:  Objection to the extent that
5   that question calls for you to provide information about
6   communications between legislators, legislative staff,
7   or any of other enumerated areas.  Do not provide an
8   answer to that question if it does implicate those
9   communications.
10  A.   Okay.  I believe the purpose of House Bill 112
11  is to improve the elections process by strengthening the
12  identity requirements for voters.
13  Q.   (By Ms. Westfall)  Did Representative Harless
14  make any public statements concerning HB 112?
15  A.   I can't remember.
16  Q.   Was there a press release concerning HB 112?
17  A.   I can't remember.
18  Q.   Did HB 112 generate any support?
19  A.   Support?
20  Q.   For the bill from any source?
21       MR. SWEETEN:  You can answer it to the
22  extent that it doesn't implicate the areas of
23  communication that we previously discussed.
24       THE WITNESS:  Okay.
25       MR. SWEETEN:  If it does implicate those,

---

## 80

1   do not provide an answer to that question.
2   A.   The question again.  Did we receive positive
3   supportive --
4   Q.   (By Ms. Westfall)  Did it generate any support
5   from any source?
6   A.   Positive comments.
7   Q.   Yeah.  Support would be positive, not negative.
8   A.   Yes.  Yes.
9   Q.   And from what sources?
10  A.   Constituents.
11  Q.   Who were those constituents?
12       MR. SWEETEN:  I'm going to instruct you
13  not to answer communications because I think it would
14  reveal communications between you, your office, and
15  constituents.
16       MS. WESTFALL:  Are you not -- are you
17  instructing him not to identify constituents?  Because
18  that a privilege log issue, and I need to have that
19  answered today, Mr. Sweeten.
20       MR. SWEETEN:  What I'm telling you is that
21  the way you've come into this question, which is "what
22  did you talk about," and now you're asking that.
23       I mean, I -- as far as -- as I've told
24  you, he can provide information about the fact that the
25  conversation occurred or that he received -- or with

COLBY BEUCK                                                MAY 14, 2012

## 81

1  whom he spoke.  But he's not going to reveal
2  communications and the substance of those communication
3  with constituents as --
4          MS. WESTFALL:  A privilege log includes a
5  general generic description of the subject matter of the
6  communication, does it not, Mr. Sweeten?
7          MR. SWEETEN:  I think a general
8  description, yes.  Now, you've asked him, "Did you get
9  supportive constituent comments," and I think we're
10  really beyond the general description of it.
11         MS. WESTFALL:  That's extremely general,
12  in my mind.  I would like to know for the record whether
13  you are refusing to provide a very basic standard entry
14  in a privilege log, which is:  Who made the
15  communication, generally what it was about, and who
16  received it?  And right now, I have an extremely generic
17  description of the communication, which was support for
18  a bill, and I have the recipient, who was the sender.
19  Who was the constituent is my question.
20         MR. SWEETEN:  Yeah, I think the way you
21  phrased the question, I think that you're asking him to
22  reveal communications regarding Senate Bill 14, and
23  you're asking him about the substance of those.  I'm
24  going to instruct him not to answer that question.
25         MS. WESTFALL:  And that's with regard to

## 82

1  all supporters, not just constituents?
2          MR. SWEETEN:  It's with respect to all
3  constituents.  It's not -- that's part of what we've
4  asserted in the court documents, as well as today, is
5  privileged.  It's communications between constituents
6  and Representative Harless's office, which would include
7  Mr. Beuck.
8      Q.  (By Ms. Westfall)  Was there any support from
9  any interest groups for HB 112?
10     A.  Could you be more specific on interest group?
11     Q.  A group, an organization of people.  Were there
12  any organizations of people, nonprofit, for profit,
13  lobbyists, other groups that expressed support for
14  HB 112?
15     A.  I can't remember.
16     Q.  And the bill was introduced in 2010, correct?
17     A.  Yes.
18     Q.  It's years ago, right?  By my math.  Am I
19  right?
20     A.  Correct.
21     Q.  After it was filed -- after HB 112 was filed in
22  November 2010, what happened to the bill?
23     A.  The bill did not move forward.
24     Q.  Was it referred to a committee?
25     A.  I believe it was referred to a committee.

## 83

1      Q.  Was it the Select Committee on Voter ID?
2      A.  I believe so.
3      Q.  What happened to it after that?
4      A.  It did not move forward.
5      Q.  Okay.
6          MR. SWEETEN:  Let's go ahead and take a
7  break.
8          MS. WESTFALL:  Oh, let me ask one
9  question.
10     Q.  (By Ms. Westfall)  Did --
11         MS. WESTFALL:  Actually, let's take a
12  break.
13         (Recess 11:43 a.m. to 12:01 p.m.)
14     Q.  (By Ms. Westfall)  Could you describe the
15  record retention policy in Representative Harless's
16  office?
17     A.  There is a -- e-mails -- the Texas Legislative
18  Council runs the -- the e-mail system -- are typically
19  delete every 30 days.  We -- I archive materials.  You
20  have to archive materials in order for them to not be
21  deleted.
22     Q.  Did you take any steps to archive materials
23  related to voter ID?
24     A.  Yes.
25     Q.  When did you take those steps?

## 84

1      A.  The -- I saved the initial archive, I believe,
2  was a communication from the Attorney General's Office.
3      Q.  So that was this year, in 2012?
4      A.  Yes.
5      Q.  Did you archive any photo ID-related materials
6  prior to 2012?
7      A.  Yes, I did have some.
8      Q.  What were those materials?
9      A.  My documents and e-mails and electronic files.
10     Q.  Where did you save those files?
11     A.  They were located -- the electronic files were
12  on the X drive, the e-mails were in my e-mail archive,
13  and the documents were located in the file.
14     Q.  What was the approximate date on which you
15  started to archive those materials?
16     A.  Really, from the beginning of the Senate Bill
17  14, the important documents, the documents that I
18  believed needed to be saved, they were, beginning with
19  the committee hearing on Senate Bill 14.
20     Q.  Did you start to archive bills related to the
21  development of Senate Bill 14 at the end of 2010,
22  beginning of 2011?
23     A.  I don't -- could you repeat it?  The documents
24  in preparation for Senate Bill 14 --
25     Q.  That is correct.

COLBY BEUCK                                         MAY 14, 2012

## 89

1  A.  It's possible there could be some other --
2  other constituent communication letters and that type of
3  thing.  I can't say specifically.
4  Q.  Was there any communication with Mr. Paul
5  Bettencourt and Representative Harless or your office
6  concerning HB 112?
7  A.  Not to my knowledge.
8  Q.  Was there any communication between any member
9  of the King Street Patriots and Representative Harless
10  or anyone in her office concerning HB 112?
11  A.  Not to my knowledge.
12  Q.  Was there any communication between Catherine
13  Engelbrecht and Representative Harless or anyone in her
14  office concerning HB 112?
15  A.  Not to my knowledge.
16  Q.  Who would know whether these communications
17  were made in your office besides you?
18  A.  Who would be the best judge of who has
19  communicated with Representative Harless?  I believe
20  Representative Harless.
21  Q.  Would anyone else besides her know?
22  A.  I believe that's probably the most appropriate
23  person.
24  Q.  Were there any communications between anyone at
25  the American Legislative Exchange Council, otherwise

## 90

1  known as ALEC, and Representative Harless or anyone at
2  her office concerning HB 112?
3  A.  I don't know.  Not to my knowledge.
4  Q.  Would Representative Harless be the only one
5  who would be able to answer that question?
6  A.  I'm answering these questions based on my
7  knowledge of who is -- I did not have a conversation
8  with them, and I can't speak for Representative Harless.
9  Q.  Thank you.
10      What does the term Legislative Emergency
11  mean within the Texas Legislature?
12  A.  An emergency item as declared, as issued by
13  Governor?
14  Q.  (Nods head yes.)
15  A.  Typically, an emergency item is not subject to
16  the rules, the calendar rules associated with
17  nonemergency item legislation.
18  Q.  What types of bills, typically, are emergency
19  legislation?
20  A.  It varies.  Since I've been at the Capitol,
21  there's local bills that -- it's entirely up to the
22  Governor.  It varies.
23  Q.  What is your understanding of the criteria for
24  becoming emergency legislation?
25      MR. SWEETEN:  Objection, speculation.

## 91

1  A.  My thought is that it's an item that needs
2  immediate attention.
3  Q.  (By MS. WESTFALL)  Turning back to the
4  newsletters that were sent to the constituents regarding
5  HB 112 that you just testified about, could you describe
6  the substance of that communication?
7      MR. SWEETEN:  I'm going to instruct you
8  not to provide and reveal information regarding the
9  substance of correspondence between Representative
10  Harless's office and constituents.
11      MS. WESTFALL:  Just to clarify, you are
12  taking the position that communications sent in to a
13  large number of constituents, a mass form mailing, to
14  lots and lots of people, falls within legislative
15  privilege?  Is that right, Mr. Sweeten?
16      MR. SWEETEN:  Well, I mean, I think I've
17  been clear on the fact that if it's a public record,
18  including committee hearings, House Floor proceedings,
19  debates, public speeches, that sort of thing.  We're
20  talking about -- if you're asking about mass mailings, I
21  mean, there would probably be -- we'd have to have a
22  discussion.  Okay.  I think at this point, since -- if
23  you're talking about a mass mailing, we're going to
24  allow him to answer questions about that, because I
25  think that falls within, sort of, more of the public

## 92

1  record.
2      MS. WESTFALL:  And I believe he testified
3  it was a newsletter.  Have you produced those
4  newsletters in this litigation to us?  Are they on your
5  privilege log?
6      MR. SWEETEN:  We can check that.
7      MS. WESTFALL:  To extent that they haven't
8  been produced, since you're agreeing that they're not
9  privileged, I ask they be produced immediately.
10      MR. SWEETEN:  Okay.
11  Q.  (By Ms. Westfall)  And what was the substance
12  of communication regarding HB 112 in the newsletter you
13  just testified about?
14  A.  Okay.  The -- as I remember it, there was a --
15  I believe there was a newsletter which contained the
16  bills that we prefiled.
17  Q.  Did it describe HB '12?
18  A.  Briefly, yes, I think it did.
19  Q.  What did it say?
20  A.  I can't remember without -- I can't remember.
21  It briefly described that it was a -- I'm not going to
22  speculate.  I can't remember.
23  Q.  Did it talk about the purposes of HB '12?
24  A.  The basic purpose, yes, I think it did.
25  Q.  Do you recall what it said?

COLBY BEUCK                                              MAY 14, 2012

### 93

1    A.   No, I don't.
2    Q.   Would it refresh your recollection to have that
3  document in front of you?
4    A.   You know, it might.  I can -- I believe it said
5  it was a photo identification bill.  It was a fairly
6  short newsletter briefly describing the bills that we
7  prefiled.
8    Q.   Was photo ID declared to be a legislative
9  emergency for the 82nd Legislature?
10   A.   Yes, it was.
11   Q.   Do you know how that decision was made?
12   A.   No, I do not.
13   Q.   Were you at all involved in that decision?
14   A.   No, I was not.
15   Q.   Did you attend any meetings regarding that
16  decision?
17   A.   No.
18   Q.   Did you see any written materials about that
19  decision?
20   A.   Other than the Governor's proclamation, no.
21   Q.   Did you receive any e-mail on that subject?
22   A.   News reports.
23   Q.   Are you aware of any communications in which
24  you were involved regarding declaring photo ID
25  legislative emergency in the 82nd Congress at which

### 94

1  Representative Harless was not present?
2    A.   Go back.  I'm sorry.
3    Q.   Sorry.  I'm going to strike that question,
4  because it was very long.
5         Are you aware of any communications
6  regarding declaring photo ID to be a legislative
7  emergency in which Representative Harless did not
8  participate?
9         MR. SWEETEN:  Objection, vague.  Go ahead.
10   A.   Okay.  Meetings where she did not -- meetings
11  that went on where she did not participate.  No, I'm not
12  may.
13   Q.   (BY MS. WESTFALL) Why was voter ID a
14  legislative emergency?
15        MR. SWEETEN:  Objection, speculation.
16   A.   That would be speculating.  The Governor's
17  decision.
18   Q.   (BY MS. WESTFALL)  What was the purpose of
19  declaring a legislative emergency?
20        MR. SWEETEN:  Same objection.
21   A.   I can't speak for to purpose.  I can tell you
22  what that effect is, but I can't speak to the purpose.
23   Q.   (BY MS. WESTFALL)  Was any election set to
24  occur within the first 60 days of 2011?
25   A.   I'm sorry?

### 95

1    Q.   Were there any elections scheduled to be held
2  in the first 60 days of the legislative session in 2011?
3    A.   I don't remember.
4    Q.   Are you aware of anything that made SB 14
5  urgent for the legislators' consideration in 2011?
6    A.   The concerns -- I mentioned it earlier when we
7  were talking about the intent of House Bill 112, the
8  concerns of -- regarding the integrity of the elections
9  process.
10   Q.   Is there any other reason why photo ID was such
11  a high priority for the Governor, that you're aware of?
12   A.   Not that I'm aware of.
13   Q.   Was Representative Harless the House sponsor of
14  SB 14?
15   A.   Yes.
16   Q.   And when did you learn that Representative
17  Harless would be the sponsor of the SB 14?
18        MR. SWEETEN:  Caution the witness not to
19  reveal communications between -- in the areas that I've
20  already described.  You can rely upon information
21  contained within the public record, as we have already
22  outlined as well.  Go ahead.
23   A.   I first learned she was going to be the House
24  sponsor in a press release from Chairman Bonnen,
25  B-o-n-n-e-n.

### 96

1    Q.   (BY MS. WESTFALL)  When was that press release?
2    A.   February, I believe.  I don't remember the
3  date.  Some point in February.
4    Q.   That was -- your testimony is, you had no idea
5  she was sponsoring the bill until you saw a press
6  release?
7    A.   That was my first knowledge of it, yes.
8    Q.   Did you have any communications at all
9  regarding Representative Harless's sponsorship of SB
10  14?
11        MR. SWEETEN:  Can you read the question
12  back, please.
13        (The requested portion was read by the
14  court reporter.)
15        MR. SWEETEN:  Okay.  I'm going to instruct
16  the witness that to the extent -- and I'm going to
17  object to the question.  But to an extent that your
18  answer would reveal thoughts and opinions about
19  legislation or in furtherance of the legislative
20  process, do not reveal communications between
21  legislators and staff members, communications between
22  legislators and other legislators and their staff,
23  communication between constituents and legislative
24  staff, communications between legislative staff and
25  state agencies, including the Governor and Lieutenant

COLBY BEUCK                                                    MAY 14, 2012

## 97

1   Governor's Office, and communications between
2   legislators' staff and the Texas Legislative Council.
3        To the extent you can answer it without
4   revealing those communications, you are free to do so.
5        MS. WESTFALL:  And Mr. Sweeten, to
6   clarify, you are not objecting to him testifying about
7   the fact that a communication occurred, because that is
8   not privileged, correct?
9        MR. SWEETEN:  Counsel, as this deposition
10  has proceeded, I have allowed you to establish the fact
11  of the communication, and I will continue to do so.
12       MS. WESTFALL:  Thank you.  Thank you.
13  Q.  (By MS. WESTFALL Can you answer my question?
14  A.  Yes.  Yes.  I did have communications.
15  Q.  How many?
16  A.  Less than ten.
17  Q.  When were those communications held?
18  A.  January, February of 2011.
19  Q.  Who was a party to those communications?
20  A.  Representative Harless.
21  Q.  Anybody else?
22  A.  Senator Fraser's office.
23  Q.  Are you referring to the staff person you
24  testified?
25  A.  Yes.  Yes.  Janice McCoy.

## 98

1   Q.  Janice --
2   A.  Janice McCoy.
3   Q.  Were all ten of these discussions with --
4   A.  It wasn't exactly ten.
5   Q.  I'm sorry.  Were these discussions about
6   Representative Harless sponsoring SB 14 with
7   Representative Harless, you, and Ms. McCoy?  All of
8   them?
9   A.  No.  No.  No, that's not what I --
10  Q.  Maybe -- why don't we start with the first
11  communication about --
12  A.  Okay.
13  Q.  -- that you were involved in.
14  A.  My communications with Representative Harless.
15  Q.  And was that in January 2011?
16  A.  I would say January and February.
17  Q.  Were those communications in person?
18  A.  Yes.
19  Q.  Were those meetings in her office?
20  A.  Yes.
21  Q.  Were they all in her office?
22  A.  Yes, we did have -- I believe we had a phone
23  conversation as well.
24  Q.  Did you have any e-mail communication with
25  Representative Harless about her sponsorship of SB 14?

## 99

1   A.  Not that I remember.
2   Q.  Did you have any meetings with Representative
3   Harless and Ms. McCoy?
4   A.  Not that I remember.
5   Q.  Did you have any meetings just with Ms. McCoy?
6   A.  I had a phone conversation.
7   Q.  Did you only have one?
8   A.  At the most, two.  I can remember one.  I would
9   say at the most two.
10  Q.  When were these phone conversations?
11  A.  January and February.
12  Q.  How long were the phone conversations?
13  A.  Brief.
14  Q.  And just to make the record, Mr. Sweeten, what
15  were the conversations about?
16       MR. SWEETEN:  Objection.  Do not reveal
17  the content of those communications, to the extent it
18  would -- if it would implicate legislative privilege.
19  I'm going to instruct you not to answer that question.
20  Q.  (By MS. WESTFALL And what were the
21  conversations you had with Representative Harless about
22  regarding her sponsorship of SB 14?
23       MR. SWEETEN:  The same objection.  It
24  calls for him to reveal legislative privileged
25  information.

## 100

1   Q.  (By Ms. Westfall)  Is it your testimony there
2   were no e-mail whatsoever regarding -- that you were
3   aware of or party to involving Representative Harless's
4   sponsorship of SB 14?
5   A.  Not that I remember.
6   Q.  Did you have any communications with the
7   Governor's Office, the Lieutenant Governor's Office,
8   regarding Representative Harless's sponsorship of SB 14?
9       MR. SWEETEN:  Again, don't reveal the
10  content of the conversation, but you can discuss if you
11  had such conversations with those offices.
12  A.  The Lieutenant Governor's Office.
13  Q.  (By MS. WESTFALL) Was it a staff person in that
14  office that you had the communication with?
15  A.  Yes.
16  Q.  Who was the staff person?
17  A.  Bryan, Bryan Hebert.
18  Q.  How many communications did you have with him?
19  A.  One.
20  Q.  When were these communications -- that
21  communication?  I'm sorry.
22  A.  February, January of 2011.
23  Q.  Was that a phone call?
24  A.  Yes.
25  Q.  What was it about?

COLBY BEUCK                                                    MAY 14, 2012

## 101

1     A.  I can't speak to that without revealing --
2  without the privilege.
3          MR. SWEETEN:  Objection, it calls for him
4  to reveal matters that are legislative privileged.
5          Q.  (By MS. WESTFALL) Did you have any
6  communications with the Department of Public Safety
7  regarding SB 14 and Representative Harless's sponsorship
8  of that bill?
9          MR. SWEETEN:  Can you read that back?  I'm
10 sorry, I didn't get that whole question.
11         (The requested portion read back by the
12 reporter.)
13         MR. SWEETEN:  Don't reveal
14 communications.  You can reveal whether or not such a
15 conversation -- if a conversation at that time occurred.
16     A.  No.
17     Q.  (By Ms. Westfall)  Did you have any such
18 conversations with anyone from the Secretary of State's
19 Office?
20         MR. SWEETEN:  The same instruction.
21     A.  No.
22     Q.  (By Ms. Westfall)  Were you involved in the
23 development of drafting of SB 14?
24     A.  Yes.
25     Q.  Can you describe your role in development of

## 102

1  SB 14?
2      A.  I was -- my responsibility was to research the
3  issue, review past legislation, and to work with the
4  Texas Legislative Council on of drafting the
5  legislation.
6      Q.  When did you start undertaking those
7  activities?
8      A.  With regard to Senate Bill 14?
9      Q.  Yes.
10     A.  I think that would have been late -- late
11 February.  When it was determined that Representative
12 Harless would be the sponsor, that's when I actually
13 started working on Senate Bill 14.
14     Q.  How did you come to have that responsibility
15 for developing SB 14?
16         MR. SWEETEN:  Don't reveal any
17 communications, but if you can do so without revealing
18 those, you can go ahead and answer the question.
19     A.  As her chief of staff, my responsibilities
20 include legislation.  That's my primary responsibility
21 during the legislative sessions, to help with her
22 legislative package.
23     Q.  (By MS. WESTFALL) Did you work with other staff
24 people or members in developing SB 14?
25     A.  Yes.

## 103

1      Q.  Who were those members or staff?
2      A.  The two previous staff I've mentioned with
3  Senator Fraser's office and the Lieutenant Governor's
4  Office.  I also had conversations with the Speaker's
5  office, Meredith Fowler.
6      Q.  What's her title with Speaker Straus?
7      A.  She's a policy analyst.  I don't know her
8  title.
9      Q.  Anybody else?
10     A.  Steven Schar is the committee clerk for the --
11 the Select Committee on Voter Identification.  I had
12 communications with him as well.
13     Q.  So how did the development work amongst this
14 group you just identified?
15         MR. SWEETEN:  Don't reveal the
16 communications that occurred between you and anyone in
17 those offices that you've mentioned, but to the extent
18 you can answer it without doing so, you can answer.
19         THE WITNESS:  Okay.
20     A.  The process, when it came over and the Senate
21 Bill 14 came over from the Senate, Representative
22 Harless was asked to be the House sponsor.  I then went
23 about my job of seeing the legislation, helping her with
24 moving the legislation through the process.
25     Q.  (By Ms. Westfall) Did you have any involvement

## 104

1  with SB 14 before it arrived in the House?
2      A.  No, I did not.
3      Q.  Did Representative Harless?
4      A.  Not to my knowledge.  I can't speak for her.
5      Q.  Are you aware of any discussions about how to
6  structure or draft the ID requirements or the allowable
7  forms of ID under SB 14?
8          MR. SWEETEN:  Don't reveal any
9  communications between the legislators or their staff in
10 answering this question.  If you -- go ahead.
11     A.  The -- I'm sorry.  Could you repeat it?
12     Q.  Certainly.
13     A.  It's the forms of identification, the
14 discussions behind which ones to --
15     Q.  (Nods head yes.)
16     A.  No, I'm not aware of it, not to my knowledge.
17     Q.  So you just got the bill from the Senate, and
18 you didn't talk about the forms of ID that were
19 required; is that right?
20         MR. SWEETEN:  Objection.  You're asking
21 him to reveal the communications.  You're asking him,
22 did he discuss the forms of ID, which is a
23 particularized conversation about Senate Bill 14;
24 therefore, I'm going to instruct him not to answer that
25 question.

COLBY BEUCK                                                    MAY 14, 2012

## 105

1  Q.  (By Ms. Westfall)  Who were the people who know
2  who could tell us about the ID -- strike that.
3      Other than the staff that you've just
4  listed, are there any other people who could -- with
5  information about the types of allowable forms of ID
6  that were considered to be included in SB 14 when it
7  arrived in the House?
8  A.  You're asking before it arrived in the House
9  who was involved in --
10  Q.  No, when it arrived in the House.
11  A.  Okay.  When it arrived in the House, who had --
12  the staff?
13  Q.  (Nods head yes.)
14  Q.  Okay.  And you asked if there was anybody else?
15  Q.  (Nods head yes.)
16  A.  No.
17  Q.  Did you have discussions about the form of ID
18  to include in SB 14?
19      MR. SWEETEN:  I'm going to instruct him
20  not to answer that.  I think that you're asking him
21  about the specific communication which is legislatively
22  privileged.
23  Q.  (By Ms. Westfall) Are you aware of whether
24  Representative Harless had any discussions about the
25  forms of ID to include in SB 14?

## 106

1  A.  I can't -- I can't say that.  I can't speak for
2  her.  I don't know.
3  Q.  Are you aware of any written communications
4  about the forms of ID that were included in SB 14?
5  A.  Other than what was in the bill, no.
6  Q.  There was no e-mail on this topic at all?
7  A.  On the --
8  Q.  Forms of ID to include in SB 14?
9  A.  Not that I remember.
10  Q.  Who would know the answer to that question?
11  A.  I can't speak for other people.  I don't know.
12  Q.  Can you describe the drafting process for
13  SB 14?
14  A.  The bill, as it came over from the Senate,
15  there were several amendments that were added on in the
16  Senate.  The bill that we had in committee was -- was
17  the product of the Senate and their amendments on the
18  floor, and that -- that was the -- that was the drafting
19  process, was rolling those -- those amendments in.
20  Q.  So that was kind of like technical in nature?
21  A.  Technical, yes.  And there were also changes
22  that we had made.
23  Q.  Did you have communications with the
24  Legislative Council back and forth with drafts of SB 14
25  when it arrived in the House?

## 107

1  A.  Yes.
2  Q.  How many drafts did you exchange?
3  A.  Two to three.
4  Q.  When were those drafts exchanged?
5  A.  February.
6  Q.  Who was the person at the Legislative Council
7  with whom you communicated?
8  A.  Jennifer is her first name, I believe.
9  Q.  Jennifer Jackson?
10  A.  Yes.  Thank you.
11  Q.  She was the sole person you had communications
12  with at the Council?
13  A.  Yes.
14  Q.  Were the other staff people you just listed
15  earlier involved in those communications as well; i.e.,
16  Ms. McCoy, staff from the Lieutenant Governor's Office,
17  staff from Speaker Straus's office?
18  A.  Were they involved in my communications with --
19  no.  It was my communicating with Jennifer.
20  Q.  So the two of you were the sole parties to
21  those drafts; is that correct?
22  A.  Yes.
23  Q.  Did Representative Harless look at these
24  drafts?
25  A.  Yes.

## 108

1  Q.  Was she part of communications with
2  Ms. Jackson?
3  A.  No.  I was the -- I was the point of contact
4  with Council.
5  Q.  What were the changes that were made through
6  the drafting process with the Council?
7  A.  The changes that Council made in the various
8  drafts?  Is that you're asking?
9  Q.  Yes.
10  A.  I don't remember the specific changes that were
11  made.  I know there were at least two drafts.
12  Q.  Did you play any role before -- you may have
13  testified about this earlier, but please remind me.  Did
14  you have any role in the development of SB 14 before it
15  arrived in the House?
16  A.  No.
17  Q.  So you not do any research to figure out how to
18  craft that bill as it originated in the Senate; is that
19  correct?
20  A.  No.  That was for the Senators and -- no.
21  Q.  Did you conduct any research when it arrived in
22  the House, in terms of looking to other states' models?
23  Doing any other research?
24  A.  Yes.
25  Q.  Could you tell me about that research.

COLBY BEUCK                                                    MAY 14, 2012

---

## 109

1  A.  The research fell in line with my research on
2  House Bill 112.  It involved looking to other states,
3  Georgia, Indiana, researching legal opinions.
4  Q.  What sort of legal opinions?
5  A.  Specifically the Indiana case.
6  Q.  Did you read Crawford, the Crawford decision?
7  A.  Yes.  Yes.
8  Q.  Did it cause you to change any of the drafting
9  of the bill, SB 14?
10  MR. SWEETEN:  I'm going to object to that.
11  I think that calls for his thought process in how he
12  reacted to the Crawford decision, et cetera.  I think
13  that's out -- I think that is legislatively privileged,
14  so I'm going to instruct him not to answer that
15  question.
16  Q.  (By Ms. Westfall)  Did you have any
17  communications with any interest group about SB 14 as
18  you were developing it?
19  A.  No.
20  Q.  Did you have any communications with any
21  lobbyist?
22  A.  No.
23  Q.  Did you have any communications with other
24  legislators or staff, who you haven't already testified
25  about, in developing SB 14?

---

## 110

1  MR. SWEETEN:  Don't reveal any
2  communications in that category.  You can reveal whether
3  or not you've had discussions with individuals and other
4  staff.
5  A.  It was -- could you repeat the question?  I'm
6  sorry.
7  Q.  (By Ms. Westfall)Did you have any
8  communications with any interest groups or constituents
9  regarding the development of SB 14?
10  MR. SWEETEN:  The same instruction.
11  THE WITNESS:  Is that a different --
12  Q.  (By Ms. Westfall)  Answer that question,
13  please.
14  A.  Okay.  Constituents regarding the development
15  of SB 14?  No.
16  Q.  Did you have any communication with the
17  American Legislative Exchange Council?
18  A.  No.
19  Q.  Did you have communications with any experts on
20  the topic of voter ID in developing SB 14?
21  A.  And experts?
22  Q.  Any people from outside the state who write or
23  think about voter ID.
24  A.  No, I didn't have any discussions.
25  MS. WESTFALL:  Could you mark this is

---

## 111

1  Exhibit 5.
2  (Exhibit 5 marked for identification.)
3  Q.  (By Ms. Westfall) I'm handing you what's been
4  marked as U.S. Exhibit 5.  Do you recognize this?
5  A.  It appears to be Senate Bill 14.  I'm not --
6  Senate Bill 14 as it was signed by the Governor.
7  Q.  Was this a different form of the bill from what
8  was received in the House?
9  A.  Yes.
10  Q.  What were the differences?
11  A.  Would you like me to go through the bill?
12  Q.  Well, the major differences.
13  A.  The major differences.  Okay.
14  Q.  The major differences.
15  A.  The Section 1 has to do with the disability
16  exemption.  As that came over from the Senate, the
17  standard was different.  I believe it was based on a
18  physician's note.  And in the version as it was signed
19  by the Governor, there is a written documentation from
20  the Social Security Administration or Department of
21  Veterans Affairs.
22  The -- I believe in the Senate bill, the
23  concealed handgun license, there was no language
24  regarding the expired -- the House added the language
25  regarding the -- that it's not expired 60 days before

---

## 112

1  the date of presentation.
2  The exemption for the religion objection
3  was worded -- I believe was worded differently in the
4  Senate's version of the bill.
5  The natural -- excuse me -- the natural
6  diaster language contained -- the final version of the
7  bill was added in the House, so that was not contained
8  in the Senate's version of the bill.
9  The language on the election
10  identification certificate was not in the Senate's
11  version of the bill.  I might have missed some, but from
12  my reading through the bill, those are the ones I
13  remember right now.
14  Q.  Thank you.
15  Going back to your development of SB 14,
16  did you have any communications with any groups
17  representing minority voters in developing SB 14?
18  A.  Can you repeat that?
19  MS. WESTFALL:  Could you read back the
20  question please, sir.
21  (The requested portion was read by the
22  court reporter.)
23  MR. SWEETEN:  Don't reveal the substance
24  of any communication.  You can answer, identify the fact
25  of the communication.

COLBY BEUCK                                                      MAY 14, 2012

## 113

1    A.  Yes.
2    Q.  (By Ms. Westfall) What were those groups?
3    A.  I believe we received communications from -- it
4    was either LULAC or MALC, and as well as the -- those
5    are the ones I remember.
6    Q.  Are you talking about MALDEF?
7    A.  I'm sorry.  MALDEF.
8    Q.  And were any steps taken in response -- in
9    drafting SB 14, in response to those communications?
10   A.  I don't remember the nature of the
11   communications, so I can't say.
12   Q.  So you're --
13   A.  But I do remember we were -- we were contacted
14   by them.
15   Q.  Did you receive written communications?
16   A.  I don't remember.  I know there was
17   communication.  I believe there was an office visit from
18   an individual.
19   Q.  Do you recall one visit from someone from
20   MALDEF?
21   A.  Yes.
22   Q.  Do you recall who that person was?
23   A.  No, I don't.
24   Q.  Do you recall when that meeting took place?
25   A.  No, I don't.

## 114

1    Q.  Do you recall whether it was Luis Figueroa?
2    A.  I can't remember.
3    Q.  Were you at that meeting?
4    A.  The office visit, I don't remember.
5    Q.  Who was at that meeting, besides the
6    representative from MALDEF and the representative?
7    A.  I don't remember.
8    Q.  And sitting here today, you can't recall
9    whether any steps were taken in response to that meeting
10   with regard to the development of SB 14; is that right?
11   A.  I don't.
12   Q.  You don't recall?
13   A.  I don't recall.
14   Q.  You can't identify any steps, in other words,
15   that were taken in response to that?
16       MR. SWEETEN:  Objection, argumentative.
17   Q.  (By Ms. Westfall) You may answer.
18   A.  I don't recall the specifics of the
19   communication; therefore, I can't speak to what was
20   changed.
21   Q.  And Representative Harless is the only person
22   who would be able to speak to that; is that right?
23       MR. SWEETEN:  Objection as to -- you don't
24   have to answer that question.
25       MS. WESTFALL:  What's your basis?

## 115

1        MR. SWEETEN:  The basis is, you're asking
2    him to say, will Representative Harless answer that
3    question, and how would he possibly --
4        MS. WESTFALL:  I said, is she the only
5    person who would know, and that goes to the motion to
6    compel which we will file.
7        MR. SWEETEN:  Okay.  I'm going to go
8    ahead, and I'll let you answer the question, but I'm
9    going to object to the question for speculation.  Go
10   ahead.
11   A.  I don't know.  I can't --
12   Q.  (By Ms. Westfall) Turning back to Exhibit 5,
13   SB 14, how was the decision reached on the forms of ID
14   to include in SB 14 on the House side?
15       MR. SWEETEN:  Objection.  Don't answer the
16   question.  That calls for him to provide thoughts and
17   opinions about legislation in furtherance of the
18   legislative process and is legislatively privileged.
19   Q.  (By Ms. Westfall) Did you conduct or
20   Representative Harless conduct any analysis to determine
21   what forms of ID to include in SB 14 when it came to the
22   House?
23       MR. SWEETEN:  Objection, compound.
24   Q.  (By Ms. Westfall) You may answer.
25   A.  I can answer for myself, and yes, I did look at

## 116

1    forms of identification.
2    Q.  What analysis did you conduct?
3    A.  In my research on voter identification issues,
4    there were different forms of identification out there,
5    and they were considered.
6    Q.  So you looked at -- as you testified earlier,
7    you looked at Georgia and Indiana; is that correct?
8    A.  Correct.
9    Q.  Did you look to previous iterations of voter ID
10   in the House or Senate?
11   A.  Correct.
12   Q.  Which previous iterations did you look to?
13   A.  In my research on the issue, I looked at -- I
14   believe I looked at 2007, 2009.
15   Q.  Could you describe the forms of ID that are
16   acceptable under Senate Bill 14?
17   A.  Acceptable forms of identification would be a
18   driver's license, an election identification
19   certificate, a personal identification card issued by
20   DPS.  Those are DPS issued identification.  Next would
21   be a military identification card.  A United States
22   citizens certificate, a United States passport, and a
23   license -- concealed carry license.
24   Q.  Were any other forms of ID considered during
25   the drafting and development of SB 14 on the House side?

COLBY BEUCK                                              MAY 14, 2012

## 117

1    MR. SWEETEN:  Objection to the question.
2  You're asking him to reveal thoughts and opinions about
3  what was considered in formulating this legislation.  It
4  also calls for speculation.
5    So I'm going to instruct you, if you can
6  answer based upon your own personal knowledge, but I
7  don't want you to reveal any communications between any
8  of the categories that we've been discussing today.
9    A.  In the committee and on the House floor, there
10 were, I believe, a few other forms of identification
11 that were discussed and brought up as a --
12    MR. SWEETEN:  Let me be clear also.  To
13 the extent -- and I want to be consistent that this --
14 I'm not including in this instruction matters of public
15 record, including committee hearings or House Floor
16 debates, so that is not included in that instruction.
17    Q.  (By Ms. Westfall)  My question is limited to
18 the time when the House received SB 14, to the time the
19 committee considered it.
20    A.  Okay.
21    Q.  Were any other forms of ID considered in the
22 development to be added to SB 14?
23    MR. SWEETEN:  Same objection.
24    A.  I think if I answer that, that's going to be
25 privileged.

## 118

1    MR. SWEETEN:  Elizabeth, I'm sorry, I've
2  got to go to take a break.
3    MS. WESTFALL:  Absolutely.  By all means.
4  Let's take a break.  Do you want to do lunch?
5    (Lunch recess from 12:53 to 1:51 p.m.)
6  BY MS. WESTFALL:
7    Q.  I believe we were talking about U.S. Exhibit
8  Number 5, SB 14.
9    A.  Yes.
10    Q.  During consideration and development of SB 14,
11 did you consider allowing the use of expired forms of
12 ID?
13    A.  During the development, after it came over from
14 the Senate, did I consider other -- expired forms of
15 identification?
16    Q.  Yes.
17    A.  The --
18    MR. SWEETEN:  Hold on a second.  I'm going
19 to object.  I think to the extent that this requires him
20 to reveal thoughts and opinions about legislation or in
21 furtherance of the legislative process, I think that
22 this is potentially legislatively privileged.
23    If you're asking him in the drafting
24 stage, as he's drafting this, was that considered his --
25 as he looking at it?  I can let him answer as to that,

## 119

1  but don't reveal any -- you're not to reveal your
2  thought process or any communications surrounding that
3  issue.  Go ahead.
4    MS. WESTFALL:  So just to be clear, you're
5  directing him not to answer as to communications he had
6  with Representative Harless, other staff, other
7  legislators regarding expired forms of ID?
8    MR. SWEETEN:  Yeah.  I'm absolutely
9  instructing him not to answer with respect to the
10 conversations that he's had with any of those
11 individuals or any of them that I've named.  And so I
12 guess to the extent that you can answer her question
13 without revealing that information, you can do so.
14    A.  The -- the issue of expired licenses, that --
15 yes, that was something that was -- I thought of.
16    Q.  (By Ms. Westfall)  And it wasn't included in SB
17 14 as enacted by the House; is that right?
18    A.  That's correct.
19    Q.  Turning your attention to Exhibit 5 --
20    A.  Well, some expired are, I mean, past 60 days.
21 Sorry to interrupt.
22    Q.  Right.  And you testified earlier that HB 112
23 allowed for forms of I.D. that had expired two years
24 earlier; is that correct?
25    A.  I believe -- yes, I believe that's what's in

## 120

1  112.
2    Q.  So why the change in Representative Harless's
3  position from HB 112 to SB 14?
4    MR. SWEETEN:  Don't answer as to Harless's
5  position.  We're not here to answer on what Harless's
6  position is.  That's legislatively privileged.  So don't
7  answer that question.
8    THE WITNESS:  Okay.
9    Q.  (By Ms. Westfall)  Turning your attention back
10 to SB 14, can you tell me how the -- how it came to be
11 included, the license to carry a concealed handgun, why
12 was that a form of acceptable ID?
13    MR. SWEETEN:  Hold on.  You're asking
14 about the thought process of the development of this
15 legislation.  This witness cannot provide that
16 information.  It's legislatively privileged for him to
17 talk about any conversations he's had or the thought
18 process or opinions about the legislation.  So I think
19 your -- your question invades the legislative privilege
20 as phrased.
21    Q.  (By Ms. Westfall)  Who were the persons who
22 would know about the development and inclusion of that
23 form of ID in SB 14?
24    A.  The concealed handgun license?
25    Q.  Yes.

COLBY BEUCK                                                    MAY 14, 2012

## 121

1    A.  That was a Senate floor amendment.  I believe
2  Senator Hinojosa offered that amendment.
3    Q.  To the Senate bill?
4    A.  Correct.
5    Q.  Why was it included on the Senate, do you know?
6    MR. SWEETEN:  Objection.  I think that
7  that asks for him to speculate as to what -- why the
8  Senate included it.  It also invades the legislative
9  privilege protections, and he doesn't have to provide
10  that information.
11    Q.  (By Ms. Westfall)  Do you know anything else
12  about the -- that was in the public record about why
13  license to carry licenses were included as allowable ID?
14    MR. SWEETEN:  You can answer.  It's of
15  public record.
16    A.  Okay.  I don't remember the debate, just -- the
17  specific part of that debate.  It was a lengthy debate,
18  but beyond that, it was Senator Hinojosa.
19    Q.  (By Ms. Westfall)  What was the purpose of
20  including the license to carry ID as an allowable form
21  of ID in SB 14?
22    MR. SWEETEN:  I'm going to object to
23  that.  You're asking for matters that are legislatively
24  privileged.  You're also asking him to speculate as to
25  the intent of individuals who passed Senate Bill 14.

## 122

1  That's outside of what he's able to testify about, and
2  it's privileged.
3    MS. WESTFALL:  Just to be clear,
4  Mr. Sweeten, the purpose of -- questions about the
5  purpose of particular provisions of SB 14 are privileged
6  according to your client?
7    MR. SWEETEN:  What I'm saying is that you
8  asked him to speculate as to what the purpose was when
9  Senate Bill 14 came over to the House.  You're asking
10  him to go into the mindset of what those senators --
11  what their thought process was.  So on two points, one,
12  it's asking for speculation.  You're calling for
13  speculation for him to do so.
14    MS. WESTFALL:  But you're not instructing
15  the witness --
16    MR. SWEETEN:  Secondly --
17    MS. WESTFALL:  -- not to answer on that
18  basis.
19    MR. SWEETEN:  Secondly, I do believe that
20  it invades -- it asks him to reveal thoughts and
21  opinions about legislation or in furtherance of the
22  legislative process.  I think it does that.  So I --
23  with respect to that issue, I'm going to instruct him
24  not to answer that question.
25    MS. WESTFALL:  Okay.  Just to be clear, I

## 123

1  believe earlier in this deposition, you've allowed him
2  to answer questions regarding purpose, have you not?
3    MR. SWEETEN:  You asked him specifically
4  about what -- I don't know that you said the word
5  "purpose," so we'll have to look at the transcript.  But
6  I think you asked him about what he did when he was
7  drafting the bill and other matters that were within his
8  purview when he was looking at the bill.
9    That's a different thing than asking
10  him with a final -- with a Senate Bill 14 coming over
11  from the Senate, it's a completely different thing for
12  you to ask him to glean what the purpose of that bill
13  was.
14    Q.  (By Ms. Westfall)  Do you know the racial
15  composition of Texans who have license to carry
16  licenses?
17    A.  No, I do not.
18    Q.  Do you know whether anyone in the legislature
19  or their staff looked into that issue in considering SB
20  14?
21    A.  No, I do not.
22    Q.  Do you know whether holders of these licenses
23  are disproportionately White relative to Texas
24  registered voters?
25    A.  I don't have -- I don't know.  I don't have

## 124

1  information on that.
2    Q.  Do you know whether anyone in the legislature
3  or their staff looked into that issue when considering
4  whether to include license to carry as a form of
5  allowable ID in SB 14?
6    MR. SWEETEN:  I'm going to let you answer
7  that, but do not reveal conversations you've had with
8  other legislators, legislative staff, or any
9  conversations you've had with Representative Harless or
10  any state agencies, including those that I've enumerated
11  before.
12    A.  I can't speak for other offices and their
13  research that they did when this amendment was offered
14  in the Senate.
15    Q.  (By Ms. Westfall)  But answering my question,
16  do you know whether anyone looked into that issue of
17  racial composition of those licensed holders?
18    A.  No, I can't --
19    Q.  You don't know?
20    A.  I don't know.
21    Q.  Are you aware of any discussions with
22  legislators or staff expressing concern or opinions that
23  including this form of ID might disproportionately favor
24  White voters?
25    MR. SWEETEN:  Don't reveal any

COLBY BEUCK                                          MAY 14, 2012

125

1   conversations you've had as enumerated previously.  I
2   can list those if you're not familiar with what I'm
3   telling you, but don't list the -- do not discuss
4   communications you've had with staff members,
5   legislators or the other entities.
6       A.   Conversations regarding CHL license and the --
7   I'm sorry?
8           MS. WESTFALL:  Could you read back the
9   question, please?
10          (Requested portion read back by the court
11  reporter.)
12          MR. SWEETEN:  I'm going to instruct you
13  not to answer the question based upon the legislative
14  privilege.  I will allow you to discuss matters of
15  public record in answering this question.
16      A.   Okay.  And no, I don't remember any
17  conversations.
18      Q.   (By Ms. Westfall)  Was there anything on the
19  public record about the discussion of the racial
20  composition of people who hold license to carry licenses
21  in Texas?
22      A.   I don't remember from the Senate debate.
23      Q.   Was there anything in the House debate?
24      A.   I don't remember that issue coming up.
25      Q.   Turning your attention back to SB 14, how did

126

1   the disability exception that you testified about
2   earlier arose -- arise?
3           MR. SWEETEN:  Don't reveal communications
4   that you've had with any of the legislative staff,
5   legislators, state agencies, constituents.
6       A.   How did the initial language, the initial --
7   this was also an amendment placed on the Senate -- an
8   amendment from the Senate, a floor amendment, and in our
9   committee substitute, we -- we -- we made some
10  modifications to the disability exemption.
11      Q.   (By Ms. Westfall)  Do you know whether the
12  disability exemption was included in SB 14 in response
13  to any concerns that were raised about the bill?
14          MR. SWEETEN:  Don't reveal any
15  conversations you've had.  You can testify as to the
16  public record.
17      A.   I -- I can't say.  Senator Patrick offered that
18  amendment, and I can't speak for his office.
19      Q.   (By Ms. Westfall)  With regard to SB 14, how
20  did the exception regarding religious objections to
21  photo IDs arise?
22          MR. SWEETEN:  Don't testify as to any
23  conversations that you've had with respect to this.  You
24  can testify as to matters revealed in the public record.
25      A.   I believe that exemption came from another

127

1   Senate floor amendment.  I can't remember the author of
2   that amendment.
3       Q.   (By Ms. Westfall)  Was that exemption not put
4   in, in the conference committee of SB 14?
5       A.   The religious exemption?
6       Q.   Yes.
7       A.   I believe it's in the -- yes, it's in the
8   final.
9       Q.   But was it inserted during conference?
10      A.   The language was -- I believe there were a few
11  changes to that language, but as a whole, it was kept
12  throughout the process after it was put on in the
13  Senate.
14      Q.   Do you know whether putting in that exemption
15  was in response to any concerns that were raised?
16          MR. SWEETEN:  Don't reveal the thought
17  process revealed within conversations.  You can testify
18  as to matters within the public record.
19      A.   Concerns, when you mentioned -- when you say
20  "concerns," are you -- can you elaborate on that, or is
21  that just concerns from --
22      Q.   (By Ms. Westfall)  Was the religious
23  exemption or -- that was included in SB 14, included
24  because there were concerns expressed by any outside
25  group, constituent, et cetera, that you're aware of?

128

1           MR. SWEETEN:  You can testify as to
2   matters of the public record.  Don't reveal
3   conversations.
4       A.   Okay.  I don't remember the Senate debate when
5   that amendment came up.  Senator -- I think it was
6   Senator Duncan, I'm not a hundred percent sure on that,
7   offered that amendment, but I do not remember the
8   justification for placing it in there.
9       Q.   (By Ms. Westfall)  SB 14 includes military ID
10  as a form of appropriate identification, does it not?
11      A.   Yes.
12      Q.   What does that mean?
13          MR. SWEETEN:  Objection, asked and
14  answered.
15      Q.   (By Ms. Westfall)  You may answer.
16      A.   I'm sorry.  I missed that.
17          MR. SWEETEN:  Just asked and answered.
18  You can go ahead and answer her question.
19      A.   Okay.  The -- that shows up in Section 36.0101
20  and the United States military identification
21  card.  You're asking what does that include?  I think
22  that's the language speaks for itself.
23      Q.   (By Ms. Westfall)  Actually, it really
24  doesn't.  Do you have any specific information about
25  what types of cards or the providence of such cards?

COLBY BEUCK                                                    MAY 14, 2012

## 129

1    A.   Beyond the text of the bill, no.
2    Q.   Did you have any discussion with Representative
3  Harless or any other staff or legislators concerning how
4  to define military ID under SB 14?
5         MR. SWEETEN:  Don't reveal the substance
6  of discussions.
7    A.   Yes.
8    Q.   (By Ms. Westfall)  When were those
9  discussions?  When did they take place?
10   A.   The summer of 2011.
11   Q.   That was after the bill was passed?
12   A.   Correct.
13   Q.   Who was involved in those discussions?
14   A.   Representative Harless and myself.
15   Q.   Just the two of you?
16   A.   In that instance, yes, Representative Harless
17  and myself.
18   Q.   Was there more than one conversation?
19   A.   Yes.
20   Q.   And how many other conversations?
21   A.   I'm going to say less than five.
22   Q.   Was this related to any legislative act?
23        MR. SWEETEN:  Objection to the question as
24  vague.  I also am going to tell you, don't reveal the
25  substance of any discussions that you've had with

## 130

1  Representative Harless, any other legislator or any
2  other staff member.
3    Q.   (By Ms. Westfall)  This was after the bill was
4  signed into law, was it not?
5    A.   Correct.
6    Q.   So you had more than -- you had a handful of
7  conversations with Representative Harless about military
8  IDs, correct?
9    A.   Yes.
10   Q.   And it was you and Representative Harless for
11  at least one of those conversations; is that right?
12   A.   For those conversations, yes.
13   Q.   Was this an in-person conversation?
14   A.   A telephone conversation.
15   Q.   Who were the parties to the other conversations
16  about military ID in the summer of 2011?
17   A.   I had a conversation with the Secretary of
18  State's Office.
19   Q.   Was that just between you and the Secretary of
20  State --
21   A.   Yes.
22   Q.   -- office?  Who in that office did you talk to?
23   A.   At that time, John Sepehri, I believe, that's
24  who was working with.
25        THE REPORTER:  Sorry.  What was that last

## 131

1  name?
2         THE WITNESS:  Sepehri is how you pronounce
3  it.  I'm not sure on the spelling.
4         MR. FREDERICK:  S-e-p-e-h-r-i.
5    Q.   (By Ms. Westfall)  When you -- what prompted
6  your conversation with Representative Harless about
7  military IDs?
8         MR. SWEETEN:  Don't reveal it if it
9  relates to any conversations you've had with any of the
10  enumerated people.  You can answer it if it does not do
11  that.  Okay?
12   A.   Okay.  I think that's part of the privilege.
13   Q.   (By Ms. Westfall)  So you can't answer?
14   A.   What prompted me to look into this issue, that
15  would be.
16   Q.   Does that answer apply to questions that I have
17  about the other conversations that you've had with
18  Secretary of State's office about military ID?
19   A.   What prompted me to contact the Secretary --
20  yes.
21   Q.   Yes.
22   A.   Yes.
23   Q.   When you were drafting SB 14 and developing it
24  in the House side, did you assess the number of forms of
25  military ID that would be included in the bill?

## 132

1    A.   No.
2    Q.   Did you believe that the forms of military ID
3  would be easily recognizable by poll workers?
4    A.   I believe that was the testimony or the
5  thought.
6         MS. WESTFALL:  Mr. Sweeten, could you
7  explain why you have directed the witness not to testify
8  about conversations related to SB 14 that occurred after
9  its enactment?
10        MR. SWEETEN:  Yeah.  Conversations that
11  occurred after the enactment of Senate Bill 14 that
12  discuss the Senate Bill 14 process, as well as the
13  legislative process in enacting it, are just as I said
14  earlier today, we're asserting that those are
15  privileged.
16            As to conversations that don't relate
17  to the passage development of Senate Bill 14, you know,
18  he can answer those questions.  I haven't stopped you
19  from doing that.  But as they relate back to the process
20  by which Senate Bill 14 was passed, I'm instructing him
21  not to answer those questions.
22   Q.   (By Ms. Westfall)  Now that you've heard from
23  your counsel, Mr. Sweeten, on his position on the
24  privilege, do you want to amend or clarify any of the
25  responses that you've given today in answer to any of my

COLBY BEUCK                                                    MAY 14, 2012

---

### 133

1  questions?
2      A.  I'm sorry.  The --
3      Q.  Mr. Sweeten has explained a distinction about
4  conversations concerning the development of SB 14 that
5  occurred after --
6      A.  Post passage, if it involves Senate Bill 14, is
7  that --
8      Q.  Correct.  Do you want to amend any of the
9  answers to any of the questions that I've asked?
10     A.  Not that -- no.
11     Q.  Okay.  Why does Senate Bill 14 include military
12 ID and not student ID?
13         MR. SWEETEN:  Objection.  I think that
14 calls for matters that are legislatively privileged.
15 They also impact conversations that occurred regarding
16 the bill that are not a public matter.
17         He can testify as to the public
18 hearing, the public aspects of this case, including
19 committee, et cetera, but not to the matters that are
20 nonpublic.
21     A.  The -- the debate in committee and on the
22 floor, these forms of identification were chosen because
23 they were readily identifiable and secure.
24     Q.  (By Ms. Westfall)  Aren't there many, many
25 forms of military IDs?

---

### 134

1      A.  I -- I'm not advised.  I don't --
2      Q.  Do you know or do you not know?
3          MR. SWEETEN:  Objection, asked and
4  answered.
5      Q.  (By Ms. Westfall)  You may answer.
6      A.  I don't know.
7      Q.  Why is it that Senate Bill 14 that
8  Representative Harless carried does not include nonphoto
9  ID as acceptable ID?
10         MR. SWEETEN:  Objection.  I think that
11 you're asking him to reveal conversations that relate --
12 that would be legislatively privileged, conversations
13 that we've enumerated before.
14         And to the -- so I'm going to object
15 to the extent that those conversations reveal thoughts
16 and opinions about legislation or in furtherance of the
17 legislative process, that I'm instructing him not to
18 answer those questions.
19     Q.  (By Ms. Westfall)  Do you have any --
20 response to that question that is not -- that is outside
21 the privilege that your counsel is asserting?
22     A.  Why photo identification, is that --
23     Q.  Why SB 14 did not include nonphoto ID as
24 acceptable ID?
25         MR. SWEETEN:  Again, you can testify as to

---

### 135

1  the public record.  Don't reveal conversations,
2  communications, that we've enumerated.
3      A.  Photo identification is -- is -- further
4  strengthens the -- the ability of the poll workers to
5  verify these people are who they say they are.
6      Q.  (By Ms. Westfall)  So you testified earlier
7  that Representative Harless filed the bill in November
8  2010 that included nonphoto ID as acceptable ID, did she
9  not?
10     A.  That's correct.
11     Q.  Why did she change her position in the
12 intervening months between when she filed HB 112 in
13 November 2010 and when she started carrying SB 14 at the
14 beginning of 2011?
15         MR. SWEETEN:  Objection, speculation.
16 Objection.  It calls for him to provide matters that are
17 legislatively privileged, reveal -- potentially reveal
18 conversations with Representative Harless.
19         To the extent that you can answer that
20 based upon the public record, you can do so.
21     Q.  (By Ms. Westfall)  Can you provide any
22 testimony in response to my question given your
23 counsel's instruction?
24     A.  No.  I think that would be within the
25 privilege.

---

### 136

1      Q.  Did you have any discussions with anyone other
2  than Representative Harless about why there was such a
3  shift between HB 112 and SB 14 in terms of allowable
4  forms of identification?
5          MR. SWEETEN:  Court reporter, could you
6  please read that question back?
7          (Requested portion read back by the court
8  reporter.)
9          MR. SWEETEN:  I'm going to instruct you
10 not to reveal discussions with legislators, with staff
11 members, with any members of state agencies, with the
12 Texas Legislative Council, other staffers.  Those are
13 legislatively privileged.  Do not reveal those.
14 However, if you can answer her question based upon the
15 public record, I will allow you to do so.
16     Q.  (By Ms. Westfall)  Do you have any response
17 in -- in response -- any testimony in response to my
18 question given your counsel's instruction?
19     A.  No.  I did not have any -- I did not have
20 conversations.
21     Q.  You did not have conversations with
22 Representative Harless about why she changed your
23 position, is that your testimony?
24     A.  No, that's not my testimony.  You -- this -- my
25 understanding was that your question was about people

COLBY BEUCK                                                    MAY 14, 2012

---

137

1  outside of Representative Harless.
2  Q.   Okay.  So to the extent that it was public, did
3  not involve staff, did not involve legislators, you did
4  not have conversations about why there was a shift in
5  allowable forms of ID from HB 112 to SB 14; is that
6  right?
7  A.   Correct.
8          MR. SWEETEN:  Don't reveal any
9  conversations you've had with Representative Harless
10  regarding that issue.
11         THE WITNESS:  Okay.
12  Q.   (By Ms. Westfall)  Did you have any discussions
13  outside of the legislature with anyone about the change
14  in the form of the bill from HB 112 to SB 14?
15  A.   No.
16  Q.   Did you have any conversations with any
17  constituents about the change in the bill -- bills?
18  A.   No.
19  Q.   Any groups?
20  A.   No.
21  Q.   Did you have any discussion with anyone in the
22  -- actually, strike that.
23         Did anyone in the media or the press ask
24  you or Representative Harless, any other staff or any
25  legislators, why -- why the bill changed from HB -- why

---

138

1  the forms of allowable ID changed from HB 112 to SB 14?
2          MR. SWEETEN:  Objection, compound.
3  Q.   (By Ms. Westfall)  You may answer.
4  A.   Not that I remember.
5  Q.   There was no scrutiny of that issue at all?
6          MR. SWEETEN:  Objection to form, vague.
7  Q.   (By Ms. Westfall)  You may answer.
8  A.   Not that I remember.
9  Q.   Is it your testimony here today that you don't
10  recall a single question about why the use of nonphoto
11  ID was included in HB 112 and not included in SB 14?  Is
12  that your testimony?
13         MR. SWEETEN:  Are you saying "media
14  question," because your last question --
15         MS. WESTFALL:  I'm saying any question.
16         MR. SWEETEN:  Any question from anyone?
17         MS. WESTFALL:  Correct.
18         MR. SWEETEN:  Don't reveal any constituent
19  questions or any questions between legislators,
20  legislative staff, TLC or state agencies in answering
21  that question.
22  A.   I -- I don't remember it.  If it happened, I
23  don't remember.
24  Q.   (By Ms. Westfall)  Why in your mind did the --
25  did SB 14 not include nonphoto ID?

---

139

1          MR. SWEETEN:  Don't reveal any
2  communications in answering that.  You can rely on the
3  public record, or if you can provide your personal
4  opinion, in your mind, as to that question.
5  A.   I mentioned it earlier.  I think it provides,
6  it strengthens the election workers' ability to prove
7  they are who they say they are when they come to vote.
8  Q.   (By Ms. Westfall)  Was there anything that
9  happened in the beginning of 2011 or end of 2010 that
10  prompted the legislature to feel there was a need for
11  stricter ID?
12         MR. SWEETEN:  Objection.  I think that
13  calls for legislatively privileged information.  And
14  don't reveal any sort of communication that was
15  discussed.  Don't reveal the -- don't reveal the
16  thoughts and opinions about legislation or furtherance
17  of the legislative process that you've learned through
18  communications.
19  A.   Anything that happened as far as -- that's
20  pretty broad.  Can you be more specific?
21  Q.   (By Ms. Westfall)  Was there -- were there any
22  changes in circumstance, any changes with regard to
23  election administration, any in-person voter fraud, any
24  decrease in public confidence at elections that you can
25  point to, that would cause the legislature to conclude

---

140

1  that it needed to a legislation about nonphoto
2  forms of ID?
3          MR. SWEETEN:  Same instruction.  Don't
4  reveal legislatively privileged information.
5  A.   Without revealing privileged communications, I
6  would say no.
7  Q.   (By Ms. Westfall)  So you testified earlier
8  that you drafted HB 112, correct?
9  A.   The --
10  Q.   At the request of Representative Harless; is
11  that right?
12         MR. SWEETEN:  Objection, misstates prior
13  testimony.  And don't reveal conversations that you had
14  with Representative Harless.
15  A.   Okay.  The bill came over from the Senate.  Did
16  I have it drafted to -- I did have it drafted to
17  incorporate the Senate amendments, technical, and then
18  the changes that we made in the committee substitute.
19  Q.   (By Ms. Westfall)  Are you referring to HB 112
20  or SB 14?
21  A.   SB 14.
22  Q.   Okay.  Turning your attention to HB 112, you
23  drafted that --
24  A.   I'm sorry.  Was that -- yes.  Yes, I did.
25  Q.   -- at Representative Harless's request; is that

COLBY BEUCK                                                MAY 14, 2012

## 141

1  correct?
2      A.  Yes.  Yes.
3      Q.  And it informs -- forms -- it included forms of
4  nonphoto ID, correct?
5      A.  That's correct.
6      Q.  Why was it included in HB 112 and not in SB
7  14?
8          MR. SWEETEN:  Don't reveal legislatively
9  privileged information.  That includes all the
10 communications that we've talked about.  To the extent
11 you can answer based on your own personal knowledge,
12 I'll let you do that.
13         THE WITNESS:  Okay.
14         MR. SWEETEN:  Or matters of the public
15 record, okay?
16     Q.  (By Ms. Westfall)  Do you have any testimony in
17 response to my question?
18     A.  No.
19     Q.  Did you review the Georgia photo ID bill in
20 crafting, drafting or developing SB 14?
21     A.  Yes, I did in my research.
22     Q.  Are you familiar with the law?
23     A.  I am familiar with it.  I'm by no means an
24 expert.
25         MS. WESTFALL:  Would you mark this as U.S.

## 142

1  6?
2          (Exhibit 6 marked for identification.)
3      Q.  (By Ms. Westfall)  You've been handed U.S. 6.
4  Would you look at the document and tell me if you
5  recognize it?
6      A.  This appears to be a Georgia statute on photo
7  identification -- I'm sorry, on voter identification.
8      Q.  Have you seen this before?
9      A.  Yes.
10     Q.  When did you last review it?
11     A.  I'd say early 2011.
12     Q.  Given the list of IDs in the Georgia statute,
13 is it fair to say that SB 14 allows for a narrower range
14 of IDs that are allowable than does the Georgia statute?
15     A.  I would say it allows for a different, looks
16 like two different forms that the Senate bill does not.
17     Q.  What are those forms?
18     A.  A valid employee identification card, and then
19 a valid tribal identification card.
20     Q.  Do you know why SB 14 does not allow for
21 employee identification cards?
22         MR. SWEETEN:  I'm going to object.  I'm
23 going to instruct you not to answer to the extent that
24 it reveals any communications that you've had with
25 respect to any of the categories that we've previously

## 143

1  talked about.  Do not reveal the thoughts and opinions
2  on legislation in furtherance of the legislative
3  process.  Okay?  If you can answer it based on matters
4  of public record, you can go ahead and do so.
5      A.  That issue was discussed on the House floor.  I
6  remember the debate.  And the concerns with employee
7  identification cards were standardization of the form
8  and security of the form, of the form of identification.
9      Q.  (By Ms. Westfall)  And do you know why tribal
10 IDs were not included?
11         MR. SWEETEN:  In Senate Bill 14, is that
12 the question?
13         MS. WESTFALL:  In Senate Bill 14.
14         MR. SWEETEN:  Okay.  I'm going to instruct
15 you not to answer unless based upon the public record.
16     A.  Similar concerns with readily identifiable and
17 a standardized readily identifiable form, from my
18 recollection of the debate.
19     Q.  (By Ms. Westfall)  Is it fair to say that there
20 are differences between the Georgia law and the Texas
21 law, Senate Bill 14?
22     A.  You can say there are differences.
23     Q.  Are you familiar with the Indiana photo ID law?
24     A.  Yes.
25     Q.  Are there any differences between SB 14 and the

## 144

1  Indiana law?
2      A.  I believe there are.
3      Q.  Do you know what they are?
4      A.  Without a copy of the Indiana law, I can't say
5  specifically.
6      Q.  Could you list each and every purpose for the
7  enactment of SB 14?
8          MR. SWEETEN:  Don't answer that question,
9  other than unless you can do so based upon matters of
10 public record.
11         MS. WESTFALL:  Mr. Sweeten.
12         MR. SWEETEN:  Uh-huh.
13         MS. WESTFALL:  You have allowed repeatedly
14 him -- you've allowed this witness to answer that
15 question repeatedly on other topics during this
16 deposition.  Are you changing -- is this --
17         MR. SWEETEN:  I'm saying --
18         MS. WESTFALL:  Is your position on this
19 topic changing because we're now talking about SB 14?
20         MR. SWEETEN:  You're talking about a piece
21 of legislation.  You're asking him to glean and provide
22 information as to the legislative -- all the legislative
23 intent behind the passage of that.  He cannot do that.
24 It's legislatively privileged.
25         So I'm going to instruct him not to

COLBY BEUCK                                           MAY 14, 2012

## 145

1   answer that question because -- except for to the extent
2   it implicates matters of public record.
3       Q.  (By Ms. Westfall)  As to matters of public
4   record, tell me every single purpose you're aware of for
5   SB 14.
6       A.  To deter and detect voter fraud, to increase
7   voter confidence.
8       Q.  Anything else?
9       A.  Those are the ones I'm aware of.
10      Q.  Was any part of the purpose of SB 14 to
11  decrease the number of Hispanic voters?
12          MR. SWEETEN:  I'm going to instruct you
13  not to answer that question based on any conversations
14  you've had with legislators, with staff, with state
15  agencies, with anyone else in those enumerated
16  categories related to the legislative process.  I will
17  allow you to answer based upon matters of public record.
18      A.  No.  That was not a stated purpose for the
19  bill.
20      Q.  (By Ms. Westfall)  And are you asserting that
21  you can't answer that question based on advice of
22  counsel that that's privileged?
23          MR. SWEETEN:  I think you misstate his
24  answer.  I've allowed him to answer based only upon the
25  public record, and he's done so.

## 146

1       Q.  (By Ms. Westfall)  Are you aware of any -- the
2   existence of any conversations about decreasing the
3   number of Hispanic voters in SB 14?
4           MR. SWEETEN:  Other than matters of public
5   record, do not reveal any conversations you've had with
6   any legislator, legislative staff, state agency, Texas
7   Legislative Council or anyone else.  Okay?  You can
8   testify about matters of public record.
9           MS. WESTFALL:  Mr. Sweeten, are you
10  instructing him not to answer about the existence of
11  conversations, because that is depriving me of the right
12  to make my record on a privilege log basis.
13          MR. SWEETEN:  You are asking him --
14          MS. WESTFALL:  -- so we can move to
15  compel.
16          MR. SWEETEN:  -- the -- the preface of
17  your question is as to substance.
18          MS. WESTFALL:  Existence.
19          MR. SWEETEN:  You're asking him substance
20  of -- you're asking about him a topic, a specific
21  topic:  Are you aware of conversations regarding X
22  topic?  He can talk to you about individuals.  I've let
23  him today talk about individuals he's had discussions
24  with, dates of those, approximately.  Whether they were
25  by e-mail or in person.  I've let him do that.

## 147

1       But you're now asking about him
2   substance of conversations, and he's not going to
3   provide substance of conversations.  That is
4   legislatively privileged.
5           MS. WESTFALL:  You're instructing him not
6   to answer?
7           MR. SWEETEN:  That's correct.
8       Q.  (By Ms. Westfall)  Are you aware of any
9   discussions or communications about the racial impact of
10  SB 14?
11          MR. SWEETEN:  You can answer that question
12  to the extent it appears on the public record.  You
13  cannot -- I'm instructing you not to answer with respect
14  to matters that are conversations that we've enumerated
15  before that are legislatively privileged.
16      Q.  (By Ms. Westfall)  Do you have any testimony in
17  response to my question?
18      A.  The -- could you --
19      Q.  Are you aware of any communications regarding
20  the racial impact of SB 14?
21      A.  It was an issue that was discussed on the House
22  floor.
23      Q.  Those are the only discussions you're aware of;
24  is that correct, that you can testify about based on the
25  instructions of your counsel?

## 148

1       A.  Yes.  And in the committee.
2       Q.  Are you aware of any discussions of SB 14 and
3   Hispanic voters?
4           MR. SWEETEN:  Confine your answer to
5   matters of the public record and committee hearing
6   testimony.  I'm going to instruct you not to answer
7   based upon the conversations that we've enumerated
8   because they're legislatively privileged.
9           Go ahead.
10      A.  Any discussions involving SB 14 and Hispanic
11  voters?  I believe that it was discussed in committee
12  and on the House floor.
13      Q.  (By Ms. Westfall)  Other than that, you're not
14  going to answer my question based on privilege?
15      A.  Correct.
16      Q.  Are you aware of anyone else who knows about
17  any communications regarding SB 14 and Hispanic voters?
18          MR. SWEETEN:  Don't reveal matters that
19  are legislatively privileged or implicate the
20  conversation or the categories of conversations that
21  we've discussed earlier.  You can discuss matters of the
22  public record.
23      A.  Based on that, no, based on the public record.
24      Q.  (By Ms. Westfall)  You mean based on the public
25  record, no?

COLBY BEUCK                                                    MAY 14, 2012

---

153

1      MR. SWEETEN:  Are you talking about his
2  personal thoughts on the matter?
3      MS. WESTFALL:  The purpose of the
4  legislation.
5      MR. SWEETEN:  And what I'm telling you,
6  and I've tried to be consistent with respect to this, is
7  that he's not going to testify about the purpose of
8  Senate Bill 14 as to every conversation that every
9  legislator had.  He's not going to reveal that
10 information.  I'm going to instruct him not to.
11     If you're going to ask him as to his
12 personal understanding of this legislation, you know,
13 I've let you do that to some degree.  So he can provide
14 that, but don't reveal any sort of legislatively
15 privileged information.
16     Q.  (By Ms. Westfall)  As to the issue of voter
17 fraud, isn't it true that voter ID only would prevent
18 in-person voter impersonation; is that correct?
19     A.  That -- that is my understanding.
20     Q.  It's not the universe of voter fraud, it's that
21 category of voter fraud; is that correct?
22     MR. SWEETEN:  Objection, that calls for
23 speculation.  Are you asking him specifically about this
24 letter?
25     MS. WESTFALL:  I am not.

---

154

1      MR. SWEETEN:  Okay.  All right.  Can you
2  restate the question, or we can have him read it back if
3  you prefer?
4      Q.  (By Ms. Westfall)  Can you answer my question?
5      MR. SWEETEN:  No, no, no, no.  I don't
6  know the question.  I'm going to ask the court reporter
7  to read it back first.
8      (Requested portion read back by the court
9  reporter.)
10     MR. SWEETEN:  I'm going to let you answer
11 that.  I don't want you to reveal anything that's the
12 subject of legislative privilege in the areas that I've
13 enumerated.  Go ahead and answer based upon your
14 personal understanding of the public record.
15     A.  And I was speaking from my -- this most recent
16 session.  I can't speak for the Lieutenant Governor back
17 in two thousand and -- I believe this was in 2009.
18     Q.  (By Ms. Westfall)  Okay.  You were working for
19 the Lieutenant Governor at that point though, correct?
20     A.  Correct.
21     Q.  Okay.  So in answer to my question, the two
22 things you testified about in terms of the purposes of
23 SB 14 were voter fraud and voter confidence, correct?
24     MR. SWEETEN:  Don't reveal matters of
25 legislative privilege.  You can testify as to the public

---

155

1  record or your personal understanding.
2      A.  Yes.  I believe that's right.
3      Q.  (By Ms. Westfall)  And voter fraud is limited
4  to in-person voter impersonation; is that correct?
5      A.  Yes.
6      Q.  SB 14?
7      A.  In SB 14, yes.
8      Q.  SB 14 would not prevent the whole range of
9  voter fraud set forth in the Texas election code; is
10 that correct?
11     A.  Yes.  There is -- yes.
12     Q.  Are you aware of incidents of mail-in ballot
13 fraud that have occurred in Texas?
14     A.  Yes.
15     Q.  Tell me what you know about that.
16     A.  I understand it is -- there are concerns about
17 the mail-in ballot process and fraud within the mail-in
18 ballot process.
19     Q.  What do you know about any convictions that
20 have occurred over that conduct?
21     MR. SWEETEN:  Objection, vague.
22     A.  I don't know the specifics, specific number of
23 convictions.  I understand it's a concern.
24     Q.  (By Ms. Westfall)  Has the Texas legislature
25 taken any steps to address that concern?

---

156

1      MR. SWEETEN:  Don't reveal matters of the
2  legislative privilege.  You can testify based upon the
3  public record and information you've gleaned from that.
4      A.  Yes.  I believe there were several bills filed
5  of legislation to address those issues.
6      Q.  (By Ms. Westfall)  When were those bills filed?
7      A.  I can speak to the 2011 session.  I know there
8  were bills filed in the 2011 session.  I'm not sure
9  about other sessions.  I can't say.
10     Q.  And who sponsored those bills?
11     A.  Representative Aliseda had a mail-in ballot --
12 Aliseda, Jose Aliseda.
13     Q.  What happened with that bill?
14     A.  I believe he -- he had several.  I think there
15 were other bills regarding mail-in.  His was not the
16 only one.  I don't know the -- I do not believe -- I
17 don't believe that his bill passed.
18     Q.  Were these put on the emergency calendar by the
19 governor?
20     MR. SWEETEN:  Just keep your testimony to
21 the matters of public record with respect to this.
22     A.  The governor --
23     MS. WESTFALL:  Mr. Sweeten, isn't the
24 emergency calendar a matter of public record?
25     MR. SWEETEN:  If the emergency calendar is

COLBY BEUCK                                            MAY 14, 2012

## 157

1  a matter of public record, then he is going to be able
2  to testify about that, and I will allow --
3          MS. WESTFALL:  That was my question was
4  about the emergency calendar.  It was a question that
5  was within the scope of public matters.  I don't think
6  it warranted an objection, and I'd ask you to withdraw
7  that.
8          MR. SWEETEN:  Okay.  As I've already -- as
9  I've been saying in a constant loop, I will let him
10 testify as to matters of public record.
11         Okay.  You can do so.
12     A.  I believe the governor's emergency item had to
13 do with in-person.  I don't believe it had to -- excuse
14 me -- the governor's proclamation had to do with
15 in-person voter fraud.
16     Q.  (By Ms. Westfall)  Did not include any of this
17 mail-in ballot bills that were filed by Representative
18 Aliseda and others; is that correct?
19     A.  That's my understanding.
20         (Exhibit 7 marked for identification.)
21     Q.  (By Ms. Westfall)  I'm handing you what's been
22 marked as US-7.  Do you recognize it?
23     A.  That is Representative Patricia Harless.
24     Q.  And is this from her website, or what is this
25 exactly?

## 158

1      A.  This appears to be her campaign website.
2      Q.  Have you seen this before?
3      A.  Yes.
4      Q.  Did you draft it?
5      A.  No.
6      Q.  Do you know who did?
7      A.  No.
8      Q.  Do you see under "Immigration Reform" it lists
9  "Require Texas photo ID to vote"?
10     A.  Yes, I do.
11     Q.  Do you know what requiring Texas photo ID to
12 vote has any -- has to do with immigration reform?
13         MR. SWEETEN:  Don't reveal conversations
14 you've had with anyone in answering this question.
15     A.  I didn't draft this document so I don't know.
16     Q.  (By Ms. Westfall)  Are you personally aware of
17 any connection between immigration reform and requiring
18 Texas photo ID to vote?
19     A.  Not to my knowledge.
20     Q.  What -- what does SB 14 have to do with
21 increasing public confidence in voting?
22         MR. SWEETEN:  I'm going to instruct you to
23 answer only based upon matters in the public record.
24 Don't reveal conversations that we've previously
25 enumerated, including legislators, legislative staff,

## 159

1  et cetera.
2      A.  My knowledge, increasing voter confidence by
3  giving election workers a tool to verify people are who
4  they say they are when they go to vote.
5      Q.  (By Ms. Westfall)  Do you have any -- can you
6  point me to any research studies or analysis that would
7  show there's an increase in public confidence when photo
8  ID laws are enacted?
9      A.  In committee there was testimony from the
10 Secretary of State, Georgia Secretary of State, who
11 testified that voter turnout increased after their voter
12 identification laws were implemented.  Indiana, also,
13 there was a representative from the state of Indiana who
14 testified to the same, that when Indiana's voter
15 identification laws were implemented, voter turnout
16 increased.
17     Q.  And was there any exploration during the
18 hearing of whether any other factors increased voter
19 turnout in Georgia or Indiana other than photo ID laws?
20     A.  Yes.  I remember a discussion regarding the
21 2008 election.
22     Q.  And it was possible that was the presidential
23 election and there was significant turnout and interest
24 in that election?
25     A.  Correct.

## 160

1      Q.  Is that correct?
2      A.  Correct.
3      Q.  And it's true that the increase in turnout
4  might not have had anything to do with the photo ID law
5  in place; is that correct?
6          MR. SWEETEN:  Objection, argumentative.
7      A.  The --
8          MS. WESTFALL:  You can answer.
9          MR. SWEETEN:  Keep your matters -- keep
10 what your testimony is to matters of public record.  I
11 think she is asking about the hearing so you're free to
12 do that.
13     A.  The information showed that even after the
14 presidential election, I believe in 2010, that there was
15 also an increase in turnout.  I know from the Secretary
16 of State's office, Georgia Secretary of State, provided
17 us with that information, the committee.
18     Q.  (By Ms. Westfall)  And it had been specifically
19 attributed to photo ID through an analysis that you're
20 aware of?
21     A.  That was his testimony.  He attributed it.
22     Q.  Are there any other studies or research that
23 you're aware of related to increases in public
24 confidence as a result of photo ID?
25     A.  I believe I have seen some studies that show

COLBY BEUCK                                                    MAY 14, 2012

### 161

1    that.
2         Q.   Did you take into account as you were drafting
3    SB 14 or considering SB 14 any studies about public
4    confidence?
5              MR. SWEETEN:  Don't reveal any
6    legislatively privileged matters.  You can testify about
7    matters of public record, but any discussions,
8    conversations that you've had, don't reveal those.
9         A.   Did I -- did I consider any?
10        Q.   (By Ms. Westfall)  Studies or research on
11   increases in public confidence?
12        A.   Did I -- yes, they were considered.
13        Q.   What were those?
14        A.   The studies, I can't say specifically.  I
15   remember reading -- reading studies on that issue --
16        Q.   Is this --
17        A.   -- which point -- the studies pointed to
18   Indiana and Georgia as positive.  There was a positive
19   result after the voter -- voter -- voter identification
20   laws had been passed, there was a positive result in
21   turnout.
22        Q.   Did the Texas legislature find any -- that
23   there was a problem with public confidence in voting?
24             MR. SWEETEN:  Don't reveal any matters
25   that are legislatively privileged, including all the

### 162

1    conversations that we've enumerated previously.  You can
2    go ahead and testimony based on matters of the public
3    record on that issue.
4         A.   Yes.  I think there was discussion about there
5    being a problem of -- problem with voter confidence
6    in elections, I remember that being discussed during the
7    debate.
8         Q.   (By Ms. Westfall)  What was the basis of that
9    concern factually?
10             MR. SWEETEN:  Confine to matters of the
11   public record.  Don't reveal legislatively privileged
12   information.
13        A.   I remember from the testimony there were
14   accounts of -- from constituents of incidences, some
15   personal accounts of witnessing incidences of voter --
16   voter fraud.
17        Q.   (By Ms. Westfall)  Are you talking about
18   in-person voter impersonation or other forms of voter
19   fraud?
20             MR. SWEETEN:  Same instruction.
21        A.   All forms.
22        Q.   (By Ms. Westfall)  I believe you testified
23   earlier you were unaware of any specific allegations of
24   in-person voter impersonation or convictions based on
25   that crime; is that correct?

### 163

1              MR. SWEETEN:  Objection.  I think that
2    misstates his testimony, but go ahead.  You can answer
3         A.   My understanding was that that was my personal
4    -- there are -- there was testimony.  There was
5    discussion about that.  Other people might -- I'd have
6    to go back and look, but I thought that was regarding
7    myself.
8         Q.   (By Ms. Westfall)  What -- what hearing are you
9    talking about at which individuals testified about
10   concerns about public confidence in voting?
11        A.   I believe it was discussed on the floor as well
12   as in committee.  I'm not --
13        Q.   Does --
14        A.   There were lengthy committees and they -- it
15   was also discussed in the Senate, so it might have been
16   brought up in the Senate as well.  I can't identify
17   which committee hearing that came from, but I know it
18   was an issue that was discussed.
19        Q.   There was testimony before the House or Senate
20   committees from a particular witness on voter
21   confidence, public confidence?
22        A.   Yes, I believe so.
23        Q.   Do you know the name or identity of the
24   witness?
25        A.   No, I do not.

### 164

1         Q.   Do you know the year in which this testimony
2    occurred?
3         A.   This most recent session, 2011.
4         Q.   Who are the main opponents of Senate Bill 14?
5              MR. SWEETEN:  Confine your answer to
6    matters of the public record.  Don't reveal
7    conversations with other legislators, other staff.
8         A.   I believe the vote was along party lines, so I
9    would say the Democratic members of the House and
10   Senate.
11        Q.   (By Ms. Westfall)  And were there any outside
12   groups that opposed the bill?
13        A.   Yes.
14        Q.   What were those groups?
15             MR. SWEETEN:  Don't reveal legislatively
16   privileged matters, including constituent
17   correspondence, discussions with legislators, as well as
18   other staffers.  You can confine your answer to
19   matters of the public record.
20        A.   The minority interest groups, the League of
21   Women Voters, I believe.
22        Q.   (By Ms. Westfall)  How did you learn about
23   their opposition?
24        A.   Through my research.  They were -- weren't shy
25   about it.

COLBY BEUCK                                                    MAY 14, 2012

---

### 165

1  Q.  Was there any opposition to SB 14 amongst
2  election officials in Texas?
3  A.  Election officials meaning?
4  Q.  Secretary of State or county officials?
5  A.  Was there any opposition, yes.
6  MR. SWEETEN:  Just confine your answers to
7  matters of the public record.  Don't reveal any
8  categories of information we've gone over many times.
9  Q.  (By Ms. Westfall)  Your answer was "yes"?
10  A.  I believe there was concern from local
11  officials.
12  Q.  And which local officials?
13  A.  I can't remember who exactly.
14  Q.  What were those concerns?
15  A.  I remember one local official account of
16  concerns regarding the costs associated with
17  implementation of the bill.
18  Q.  Who was that county official?
19  A.  I don't remember.
20  Q.  What county was it?
21  A.  I don't remember.
22  Q.  How did you learn about this concern?
23  A.  Through the media.
24  Q.  Were there any constituents who had any
25  concerns about SB 14 other than the minority voting

---

### 166

1  rights groups that you just testified about?
2  MR. SWEETEN:  Don't reveal matters or
3  discussions between constituents and you or
4  Representative Harless or in any other areas of
5  conversation that we discussed earlier, including
6  legislators, legislative staff, state agencies,
7  regarding that.
8  A.  Yes.  There were constituents who had concerns
9  as well.
10  Q.  (By Ms. Westfall)  What were their concerns?
11  MR. SWEETEN:  Same instruction.
12  A.  I think expressing their concerns would take me
13  into the privileged area of communications.
14  Q.  (By Ms. Westfall)  So you have no answer to
15  that question?
16  A.  Correct.
17  Q.  Did Representative Harless take any steps to
18  address any of the concerns raised by bill opponents.
19  MR. SWEETEN:  Don't reveal communications
20  that are legislatively privileged.  If you cannot do so
21  without -- if you cannot answer the question without
22  doing so, then do not answer the question.
23  A.  I think my answer would get into that so I
24  would say no.  It would -- my answer would get into that
25  privilege so no.

---

### 167

1  Q.  (By Ms. Westfall)  Can you point to anything in
2  SB 14 that was added in the House in response to
3  concerns by groups or individuals representing minority
4  voters?
5  MR. SWEETEN:  You can confine your answers
6  to the public record.  Do not reveal legislatively
7  privileged information.
8  MS. WESTFALL:  Mr. Sweeten, I'm asking
9  about a publicly signed law, and I'm asking him about
10  provisions in the law.  I'm not asking him about
11  privileged information.  Would you please withdraw?
12  MR. SWEETEN:  What was your question
13  again?
14  MS. WESTFALL:  I said -- my question was:
15  Is there any provision in SB 14 that was added in
16  response to concerns raised by people, groups
17  representing minority voters or minority voters
18  themselves?  Anything in the law?
19  MR. SWEETEN:  You can confine your answers
20  to matters of the public record.  Do not reveal
21  communications as we've outlined before between
22  legislators, legislative staff, state agencies, Texas
23  legislative council, constituents.
24  A.  Okay.  I know from the debate there were
25  several amendments offered by opponents to the bill that

---

### 168

1  were to address concerns.
2  Q.  (By Ms. Westfall)  And were any of them
3  adopted?
4  A.  Yes.
5  Q.  Which ones?
6  MR. SWEETEN:  Same instruction.
7  A.  Specifically, I can't remember which amendments
8  were the total number of amendments which were added in
9  the Senate.
10  Q.  (By Ms. Westfall)  Could you confine your
11  answer to the House?
12  A.  Well, I can -- I can -- I remember from some of
13  the debate, so I was going to -- just was clarifying
14  that this is not the sum total of all the changes that
15  were made by opponents to the bill.
16  And Senator Davis had a -- Senator Davis
17  had an amendment to allow for there to be substantially
18  similar -- when an election worker is reviewing the
19  identification, the names can be substantially similar.
20  That was -- that was added in the Senate and kept in the
21  bill through the House.  And that was to address
22  concerns from that there would be -- that was to address
23  some of the opponents' concerns.
24  Q.  Can you think of any other changes to the bill,
25  or that is the sum total?

COLBY BEUCK                                              MAY 14, 2012

---

### 169

1          MR. SWEETEN:  Same instruction.
2      A.   This is by no means the sum total, so I'm going
3  to qualify that.
4      Q.   (By Ms. Westfall)  As you're sitting here
5  today, can you think of any other, or should we move on
6  to another question?
7      A.   I believe there was increased notice
8  requirements placed in the Senate.
9      Q.   By "increased notice," do you mean public
10  notification or notice to voters?
11      A.   Yes.
12      Q.   Can you think of any other changes?
13          MR. SWEETEN:  Same instruction.
14      A.   I apologize.  I was looking at the -- the
15  language regarding the election identification
16  certificate, I believe that was an issue.
17      Q.   (By Ms. Westfall)  Was that certificate put in
18  the bill in response to the concerns of minority groups?
19          MR. SWEETEN:  Same objection and
20  instruction.
21      A.   It was a concern first brought up by
22  Representative Anchia during the House debate, and that
23  language is -- was in response.
24      Q.   Anything else?
25          MR. SWEETEN:  Same instruction.

---

### 170

1      A.   The disability exemption was something we heard
2  from that was, I believe, a concern and --
3      Q.   (By Ms. Westfall)  Was that a concern of
4  minority voters?
5      A.   I'm sorry.  Okay.  (Reading document.)
6  I'll leave it there.  That's my -- that's,
7  from reviewing it, that's not the sum total of the
8  changes that were done on behalf of --
9      Q.   But that's, sitting here today, you're here to
10  testify.  I gave you plenty of opportunity to testify
11  about all changes that were made to the bill in response
12  to minority concerns, and you've testified, and that's
13  your testimony today; is that correct?
14      A.   That's correct.
15      Q.   And to clarify in terms of the concerns about
16  the bill from minority voting groups and minority
17  voters, did Representative Harless seek those opinions
18  out from those groups, or were those -- was that
19  opposition in the public sphere, and you became aware of
20  them that way?
21          MR. SWEETEN:  Don't reveal any matters
22  that are legislatively privileged.  Don't reveal
23  conversations that I've enumerated previously.  You can
24  testimony based upon matters that are public record.
25      A.   I can't speak for Representative Harless, but

---

### 171

1  these groups, the information was -- their opposition
2  was -- was out there in the public sphere.
3      Q.   (By Ms. Westfall)  So you're saying the way you
4  learned about it was -- was from it being in the public
5  sphere; is that correct?
6      A.   Their concerns?
7      Q.   Yes.
8      A.   Through the debate and my research on the
9  issue, yes.
10      Q.   Were you concerned that failing to address the
11  concerns of minority voters might have an impact on
12  preclearance of SB 14 under Section 5 of the Voting
13  Rights Act?
14          MR. SWEETEN:  Was he personally
15  concerned?  Is that the question?
16          MS. WESTFALL:  Yes.
17          MR. SWEETEN:  Okay.  I'm going to let you
18  answer that question, but I want you to confine any sort
19  of information you learned about this from any of the
20  sources we've enumerated to the matters of the public
21  record.  Otherwise, don't answer it and reveal its
22  communication.
23      A.   Okay.  My concerns were that the legislation
24  would comply with federal law and in so much as those
25  minority concerns meshed with that.  It was something

---

### 172

1  that I did, I did think about, of course.
2          MR. SWEETEN:  I also object to the last
3  question, based on it assumes facts not in evidence, but
4  go ahead.
5      Q.   (By Ms. Westfall)  Did you take any steps to
6  address your concerns that not responding to the
7  concerns of minority voters could have an adverse impact
8  on Session 5 consideration of SB 14?
9          MR. SWEETEN:  Don't reveal any
10  communications you've had with legislators, staff
11  members, state agencies, et cetera.
12          THE WITNESS:  Oh, okay.
13          MR. SWEETEN:  As I've previously
14  instructed.
15      A.   I thought the bill as it was drafted would --
16  would comply.
17      Q.   (By Ms. Westfall)  So you took no steps,
18  because you thought the bill was satisfactory; is that
19  correct?
20      A.   I took no steps to address --
21      Q.   The concerns of minority voters, because you
22  thought they were adequately addressed; is that correct?
23      A.   I don't know if feel comfortable saying that
24  the concerns of minority -- that's pretty broad.  That's
25  a large -- that's a large number, so unless it's a

COLBY BEUCK                                                            MAY 14, 2012

---

## 173

1  specific one, I can't answer that.
2     Q.   Does Representative Harless have any minority
3  groups as recipients of her newsletter distribution or
4  her e-mail blasts?
5     A.   I don't know.
6       MS. WESTFALL:  Okay.  Why don't we take a
7  break for a few minutes?
8       (Recess 3:10 p.m. to 3:25 p.m.)
9       MS. WESTFALL:  We're back on the record.
10     Q.   (By MS. WESTFALL) You testified earlier about
11  studies and research that you had done in advance of
12  drafting SB 14.  Did you share any of those studies with
13  Representative Harless?
14       MR. SWEETEN:  Don't reveal any
15  communications you've had with Representative
16  Harless.  I instruct you not to answer.
17       MS. WESTFALL:  As to whether he shared any
18  studies with Representative Harless?
19       MR. SWEETEN:  He's not going to reveal any
20  communications that he's had with Representative
21  Harless.  I'm going to instruct him not to answer based
22  on that question.
23     Q.   (By MS. WESTFALL) Did Representative Harless
24  make any public statements about the opposition to
25  SB 14?

---

## 174

1     A.   I don't remember.
2     Q.   Did you handle her public statements on SB 14?
3     A.   I believe her public statements are her own.
4     Q.   Did you draft press releases for her?
5     A.   I was the contact person for press releases.
6     Q.   Did you draft the press releases?
7     A.   Yes.
8     Q.   Did you draft all the press releases on SB 14?
9     A.   I believe so.
10     Q.   How many were there?
11     A.   Two or three.
12     Q.   What was the first one that you issue about?
13     A.   We did a press release when it was determined
14  that we would be lead House sponsor of Senate Bill
15  14.  We did a press release on passage, House passage of
16  Senate Bill 14.  There was another one, I believe,
17  another press release on Senate Bill 14 regarding the
18  Department of Justice rejection of -- the Department of
19  Justice denying preclearance, and we did a press release
20  for that as well.
21     Q.   Did you draft all three of those?
22     A.   Yes.
23     Q.   Do you recall what the first press release
24  said?
25     A.   No.

---

## 175

1     Q.   Did Representative Harless ever discuss whether
2  SB 14 might disproportionately impact minority voters?
3       MR. SWEETEN:  Don't reveal communications
4  you've had with Representative Harless.  To the extent
5  that public statements made that can help you answer
6  that question, you can rely on the public record.
7     A.   Did Representative Harless make any statements
8  regarding whether --
9     Q.   (By MS. WESTFALL) Whether SB 14 might
10  disproportionately impact minority voters?
11     A.   I don't recall.
12     Q.   Is it possible she might have?
13       MR. SWEETEN:  Are you asking about public
14  statements or are you talking about -- obviously, he
15  can't --
16       MS. WESTFALL:  I'm asking about --
17       MR. SWEETEN:  -- discuss the statements
18  that he's made.
19     Q.   (By MS. WESTFALL) I'm asking about any
20  statements that Representative Harless has ever made or
21  discussions she's had about possible impact of SB 14 on
22  minority voters.
23     A.   Okay.
24       MR. SWEETEN:  Don't reveal information
25  that's legislatively privileged or that -- don't reveal

---

## 176

1  communications between Representative Harless and you,
2  Representative Harless and other legislators.  You can
3  confine your answer to matters of public record.
4     A.   I don't know.  It's possible.  I don't know.
5     Q.   (By MS. WESTFALL) So as to the public record,
6  you don't know; is that your testimony?
7     A.   Correct.
8     Q.   Have you ever had any discussion with
9  Representative Harless about whether SB 14 might
10  disproportionately impact minority voters?
11       MR. SWEETEN:  Don't answer that question.
12  It's legislatively privileged.
13     Q.   (By MS. WESTFALL) Are you aware of whether
14  Representative Harless has ever discussed whether SB 14
15  might disproportionately impact minority voter with
16  persons other than yourself?
17       MR. SWEETEN:  Don't reveal communications
18  that you had or that you're aware of that she had with
19  legislators, legislator staff, state agencies.  You can
20  confine your answer to matters of the public record.
21     A.   I don't recall.  I can't speak for
22  Representative Harless, so I don't recall.
23     Q.   (By MS. WESTFALL) And so your answer is to
24  public information; is that correct?
25     A.   Correct.

COLBY BEUCK                                                    MAY 14, 2012

---

## 177

1  Q.  And you're not testifying about any other
2  conversations that Representative Harless might have had
3  based on the advice of counsel?
4  A.  Correct.  I don't know of those conversations,
5  so...
6  Q.  Was Representative Harless concerned that SB 14
7  might disproportionally impact minority voters?
8  MR. SWEETEN:  Don't reveal communications
9  that you've had with Representative Harless.  You can
10  testify as to matters of the public record as to that
11  issue.
12  THE WITNESS:  Okay.
13  MR. SWEETEN:  Objection, calls for
14  speculation.  Go ahead.
15  A.  I would -- based upon the privilege, I would
16  say I don't know.
17  Q.  (By MS. WESTFALL) You do know the public
18  record?
19  A.  I can't -- I can't speculate to her -- her
20  thoughts.
21  Q.  Right.  But your testimony is just about the
22  public record.  Are you aware of any indication in the
23  public record where Representative Harless indicated any
24  concern about the impact of SB 14 on minority voters?
25  MR. SWEETEN:  You can answer.

---

## 178

1  A.  No, I'm not aware of any.
2  Q.  (By MS. WESTFALL) Did Representative Harless
3  seek any advice from anyone on whether SB 14 complied
4  with Section 5 of the Voting Rights Act?
5  MR. SWEETEN:  Again, don't reveal
6  conversations that Representative Harless had with any
7  legislators or with staff members with TLC or state
8  agencies' constituents.  To the extent you can answer it
9  without revealing those, you can go ahead and do so.
10  A.  Based on the public record, I'm not aware of.
11  Q.  (By MS. WESTFALL) And you're acting on the
12  advice of counsel not to testify about any private
13  conversations that Representative Harless might have had
14  about SB 14 and the Voting Rights Act; is that correct?
15  A.  That's correct.
16  Q.  Did you, outside of Representative Harless's
17  presence, have any discussions yourself about opposition
18  to SB 14?
19  MR. SWEETEN:  Don't reveal communications
20  that you've had with other legislators, their staff,
21  state agencies, TLC, or Representative Harless herself.
22  To the extent that you can answer that question without
23  revealing those, you can go ahead and do so, including
24  matters of the public record.
25  A.  Did I -- did I have conversations?  Yes.

---

## 179

1  Q.  (By MS. WESTFALL) With whom?
2  A.  Regarding?
3  Q.  Regarding the opposition to SB 14.
4  MR. SWEETEN:  Same objection and
5  instruction.
6  THE WITNESS:  Okay.
7  A.  Conversations with staff regarding opposition
8  of Senate Bill 14.
9  Q.  (By MS. WESTFALL) You had conversations with
10  staff?
11  A.  No.  That's your question.  I'm sorry.  I'm
12  repeating your question.
13  Q.  My question is:  Did you, outside of
14  Representative Harless's presence, have any discussions
15  about the opposition to SB 14?
16  A.  Okay.
17  MR. SWEETEN:  And, again, the same
18  instruction.
19  THE WITNESS:  Okay.
20  A.  Yes.  And then you asked with who, correct?
21  Okay.  The individuals, the staff I have mentioned.  I
22  believe I had conversations regarding the opposition
23  with the staff I've mentioned previously, as well as
24  other legislators' staff.
25  Q.  (By MS. WESTFALL) And you're talking about

---

## 180

1  staff from Senator Fraser's office, the Lieutenant
2  Governor's Office, Speaker Straus's Office; is that
3  correct?
4  A.  Correct.
5  Q.  And as a result of those conversations, were
6  any changes made to SB 14?
7  A.  I think --
8  MR. SWEETEN:  Don't reveal any sort of
9  privileged information.
10  THE WITNESS:  Okay.
11  MR. SWEETEN:  Okay?  Don't reveal the
12  conversations that you've had with anyone that are
13  legislatively privileged.  I've enumerated what those
14  are.  So don't reveal that information.
15  A.  I think my conversations with those staff
16  members would be within the privilege.
17  Q.  (By MS. WESTFALL) When did you have those
18  conversations with the staff members about opposition to
19  SB 14?
20  A.  From January until passage of the bill.
21  Q.  Did you have many, many conversations about the
22  opposition to SB 14?
23  MR. SWEETEN:  Objection, vague.
24  Q.  (By MS. WESTFALL) Did you have them on a
25  periodic basis?

COLBY BEUCK                                                    MAY 14, 2012

## 181

1     A.   Representative Harless was the House sponsor of
2    the legislation.  I think staff knew that I was -- yes,
3    there were many conversations with staff.
4     Q.   And what were the nature of your discussions
5    about the opposition of SB 14 with staff and Senator
6    Fraser's office?
7          MR. SWEETEN:  Don't answer the question.
8    It would reveal legislatively-privileged information.
9     Q.   (By MS. WESTFALL) What was the nature of the
10   conversations that you had with staff in the Lieutenant
11   Governor's Office?
12         MR. SWEETEN:  Same objection.  Same
13   instruction.
14    Q.   (By MS. WESTFALL) What was the nature of the
15   conversations that you had with staff in Speaker
16   Straus's office?
17         MR. SWEETEN:  Same objection.  Same
18   instruction.
19    Q.   (By MS. WESTFALL) During the drafting or the
20   Legislature's consideration of SB 14, was there efforts
21   to determine the number of registered voters in Texas
22   who lack a driver's license?
23         MR. SWEETEN:  Don't reveal any
24   legislatively-privileged discussions, conversations.
25   That includes discussions with other staff members,

## 183

1    ID under SB 14; is that correct?
2     A.   The issue came up.  I don't know if it was
3    Representative Anchia.  The issue did come up regarding
4    registration cards, voter registrations, and those being
5    associated with a social security number or a driver's
6    license number.  The issue did come up, yes.
7     Q.   And was there a response from the Secretary of
8    State's Office?
9          MR. SWEETEN:  Are you asking him in the
10   hearing?
11    Q.   (By MS. WESTFALL) Yes, in the hearing.
12    A.   Yes.  Yes.
13    Q.   There was a response?  And what was the
14   response?
15    A.   I believe the number was in the range of
16   600,000 Texans have a voter registration card without an
17   associated social security number or driver's license
18   number.  I can't remember the exact number.  But it was
19   in that range.
20    Q.   Was there any analysis of the racial
21   composition of those voters?
22         MR. SWEETEN:  Are you asking about is this
23   public record again?
24    A.   (By MS. WESTFALL) I'm asking public record,
25   private record, every record.

## 182

1    other legislators.  That includes the state agencies.
2    That includes constituents.  That includes the TLC.
3          THE WITNESS:  Okay.
4          MR. SWEETEN:  If you can confine your
5    answer to the matters of public record, you are free to
6    do so.
7     A.   The committee.  There was testimony that the
8    information was sought from the Secretary of State's
9    Office regarding those who do not have a social security
10   number or a driver's license number associated with
11   their voter registration.
12    Q.   (By MS. WESTFALL) How did that issue come to
13   the attention of the committee?
14         MR. SWEETEN:  Again, don't reveal any
15   legislatively-privileged discussions that I've
16   enumerated previously.
17    A.   There was testimony from the Secretary of
18   State's Office, and the issue came up.  I believe
19   Representative Anchia asked the questions regarding
20   that.
21    Q.   (By MS. WESTFALL) Was this during the House
22   Select Committee's consideration of SB 14?
23    A.   Yes.
24    Q.   Representative Anchia asked questions about
25   which registered voters did not have allowable forms of

## 184

1          MR. SWEETEN:  To the extent that the
2    question asks you to reveal conversations between
3    legislative staff, the legislators, state agencies, the
4    TLC, or constituents, do not reveal that information.
5    To the extent that you can answer it without revealing
6    those conversations or matters of the public record, you
7    can do so.
8     A.   Based on the public record, I know the issue
9    came up.  I cannot remember at which point the Secretary
10   of State's office does not have their voter -- racial
11   data is not kept in -- racial data is not collected with
12   voter registration cards, so the Secretary of State's
13   Office, my understanding is, did not have that
14   information.
15    Q.   (By MS. WESTFALL) So the answer my question,
16   there was no racial analysis -- there was no analysis by
17   race of persons who are registered voters who do not
18   have allowable forms of ID under SB 14; is that right?
19         MR. SWEETEN:  Same instruction.  Same
20   objection.
21    A.   The Secretary of State's Office did not have
22   the racial data associated with the voter registration
23   data.
24    Q.   (By MS. WESTFALL) Did Representative Harless or
25   you take any further steps to try to obtain that

COLBY BEUCK                                                    MAY 14, 2012

---

## 185

1  information during consideration of SB 14?
2       MR. SWEETEN:  Don't reveal any
3  communications you've had with Representative Harless,
4  that you've had with legislative staff, the state
5  agencies, with TLC, or constituents.
6       Q.  (By MS. WESTFALL) Do you have no answer to that
7  question?
8       A.  No answer to that question.
9       Q.  Because --
10      A.  Correct.
11      Q.  -- based on the advice of counsel that --
12      A.  Correct.
13      Q.  -- it's privileged?
14           It was a pretty important issue, huh,
15  figuring out the racial impact of people who did not
16  have ID; isn't that right?  A pretty important, central
17  issue in the debate?
18      MR. SWEETEN:  Objection.  Can you just
19  keep it to one question at a time?  Also, objection,
20  argumentative.
21      MS. WESTFALL:  I will withdraw that
22  question.
23      Q.  (By MS. WESTFALL) Was it not an important
24  issue, during consideration of SB 14, as to the racial
25  composition of people who did not have an allowable form

---

## 186

1  of ID?
2       MR. SWEETEN:  I'm going to instruct you
3  not to reveal discussions or communications between you,
4  state agencies, legislators, legislative staff,
5  constituents, or the TLC.  To the extent you have
6  information where you can answer her question, you can
7  go ahead and do so.
8       A.  The information was not available from the
9  Secretary of State's Office, because they do not collect
10  racial data.
11      Q.  (By MS. WESTFALL) Other than making an inquiry
12  of the Secretary of State about registered voters with
13  forms of ID, were there any other efforts to determine
14  the racial composition of people without allowable IDs?
15      MR. SWEETEN:  Same objection.  Same
16  instruction.
17      A.  They are the record keepers for voter
18  registration in Texas.  I think they would be the
19  appropriate agency for that.  That was -- they are the
20  -- they did not have that information available at the
21  committee hearing.
22      Q.  (By MS. WESTFALL) So is it your testimony there
23  weren't further efforts other than to make that inquiry
24  to the Secretary of State; is that correct?
25      MR. SWEETEN:  Do you understand my

---

## 187

1  instruction?
2       THE WITNESS:  Uh-huh.
3       MR. SWEETEN:  Okay.  With that
4  instruction, you can go ahead and answer, to the extent
5  you have any information.
6       A.  My answer is not based on.
7       Q.  (By MS. WESTFALL) Because you have nothing that
8  was in the public record that indicates an answer to my
9  question; is that correct?
10      A.  Correct.
11      Q.  There may be something in the private record
12  that indicates an answer to my question; is that
13  correct?
14      MR. SWEETEN:  Don't answer that question.
15  She is asking you about the content of communications.
16  You don't have to answer that question.  There were
17  legislatively-privileged discussion that occurred.
18      Q.  (By MS. WESTFALL) Did the Secretary of State
19  testify about any analysis of Spanish surname registered
20  voters and their access to forms of allowable ID under
21  SB 14?
22      A.  I don't recall that information being presented
23  at the committee hearing.
24      Q.  Did Representative Harless or anyone on the
25  committee ask for that information from the Secretary of

---

## 188

1  State?
2       MR. SWEETEN:  Do not reveal communications
3  between you, state agencies, or any of the other
4  enumerated areas.  Okay?  Don't reveal those.  You can
5  answer to the extent that you can based on public record
6  or to the extent it doesn't implicate communications
7  that we've outlined.  Okay.  Go ahead.
8       A.  No, based on --
9       Q.  (By MS. WESTFALL) There's nothing in the public
10  record on that issue; is that correct?
11      A.  That's correct.
12      Q.  Are you aware of any efforts, at any point
13  during the development of SB 14, to attempt to craft a
14  bill that would accomplish the bill's objectives without
15  disproportionately harming minority voters?
16      MS. WESTFALL:  Colby, don't reveal any
17  communications that you've had with legislators, with
18  legislative staff, with state agencies, the TLC, their
19  constituents.  To the extent that there's information
20  that you have that is outside of those areas, you can go
21  ahead and answer Ms. Westfall's question, to the extent
22  can.
23      A.  Am I aware of any other efforts -- I'm sorry.
24  I've got to repeat it.  Am I aware of any other efforts
25  outside of Senate Bill 14?

COLBY BEUCK                                                      MAY 14, 2012

---

189

1    Q.   (By MS. WESTFALL) During the development of
2  SB 14, to attempt to craft a bill that would accomplish
3  the bill's objectives without disproportionately falling
4  upon minority voters?
5              MR. SWEETEN:  Objection.  Argumentative as
6  well.  Repeat my previous objection and instruction.
7    Q.   (By MS. WESTFALL) You may answer.
8    A.   It's my opinion that the bill addresses that as
9  it is.
10   Q.   And how does the bill address that issue?
11   A.   By providing free ID, a provisional ballot
12  period.
13   Q.   Okay.  We'll talk about that a little about it
14  later.
15        Can you tell me each and every effort that
16  is made to ensure that the forms of ID included in SB 14
17  were equally accessible to all registered voters
18  regardless of race or ethnicity?
19              MR. SWEETEN:  Don't reveal any
20  communications you've had with a legislative staff or
21  legislators, with members of the TLC, state agencies, or
22  constituents.  To the extent you can answer without
23  revealing those, you can go ahead and try to do so.
24   A.   Accessibility of other IDs.
25   Q.   (By MS. WESTFALL) To ensure that the forms of

---

190

1  ID included in SB 14 were equally accessible to all
2  voters, all registered voters regardless of race or
3  ethnicity?
4    A.   Not to my knowledge.
5    Q.   There is nothing in the public record; is that
6  correct?
7    A.   Not to my knowledge.  I'm -- there might be.
8    Q.   But as you sit here today, you can't think of
9  any; is that correct?
10   A.   Correct.
11   Q.   Thank you.
12        When was SB 14 filed in the Senate?
13   A.   I'm not sure if I understand.  When was the
14  bill filed?  The bill was filed --
15   Q.   In the Senate?
16   A.   I not sure when it was filed in the Senate.
17   Q.   Was the sometime in January 2011?
18   A.   The bill has a low bill number, so I imagine it
19  was -- it's one of the bill numbers reserved.
20              MS. WESTFALL:  Could you mark this as
21  Exhibit 8, please.
22              (Exhibit 8 marked for identification.)
23   A.   I imagine it was early on.
24   Q.   (By MS. WESTFALL) That's a good tip about low
25  bill numbers.

---

191

1    A.   It's not always the case.  Not always the case.
2    Q.   That is very sensible.
3              MR. WESTFALL:  Could you hand this to the
4  witness?
5    Q.   (By MS. WESTFALL) You've been handed U.S.
6  Exhibit 8.  Do you recognize this document?
7    A.   This is a printout of the bill history of
8  Senate Bill 14 from, it looks like, the Texas
9  Legislature online.
10   Q.   Have you seen this document before?
11   A.   I've seen a similar document.  Yes, I've seen a
12  similar document.
13   Q.   Could you -- referring to Exhibit U.S. 8, could
14  you tell me when Senate Bill 14 was filed in the Senate?
15   A.   The 12th of January 2011.
16   Q.   And what is a House Select Committee?  And you
17  can turn your attention away from that, but hold on to
18  that, because we may look at it again.
19   A.   Okay.
20   Q.   What is a House Select Committee?
21   A.   A Select Committee is -- it's outside of the
22  standard -- sorry, not standard.  The standing
23  committees that the House has.  It's a separate
24  committee outside of the standing committees.
25   Q.   Are you familiar with the House Select

---

192

1  Committee on voter identification and voter fraud?
2    A.   I am.
3    Q.   Could you describe the committee for me?
4    A.   The -- describe the committee?  The makeup of
5  the committee?
6    Q.   Or the purpose of the committee.
7    A.   Oh, okay.
8    Q.   Tell me about the committee.
9    A.   The committee was tasked with legislation
10  regarding voter identification and voter fraud, and it
11  was created for that purpose.
12   Q.   Was it convened for one legislative session
13  only?
14   A.   I can't speak to future, future sessions.  It
15  was created in the 82nd Legislative Session.
16   Q.   Can you describe the circumstances of the
17  committee's creation?
18              MR. SWEETEN:  Don't reveal any
19  communications that are legislatively privileged that
20  we've previously outlined.  But go ahead, you can answer
21  the question to the extent you can do so without
22  revealing those.
23   A.   To my knowledge, from news reports and the
24  public record, is that it was created for the specific
25  purpose of the voter identification legislation.

COLBY BEUCK                                          MAY 14, 2012

## 193

1      Q.   (By MS. WESTFALL) Was Speaker Straus behind its
2   creation?
3           MR. SWEETEN:  Don't reveal any
4   legislatively-privileged communications.  To the extent
5   that you -- and also objection, speculation.  But to the
6   extent you can answer that question based on -- without
7   revealing those, go ahead.
8      A.   Typically, the Speaker's office is responsible
9   for creating -- creating committees.
10     Q.   (By MS. WESTFALL) Including special committees?
11     A.   Yes.
12     Q.   Or -- I'm sorry, Select Committees?
13     A.   Yes.
14     Q.   And was it your understanding that Speaker
15  Straus and his office was involved in creating the House
16  select Committee on voter identification and voter fraud
17  in 2011?
18          MR. SWEETEN:  Objection, calls for
19  speculation.
20     A.   I can't speculate, but typically, the Speaker's
21  Office has the ability to create committees.
22     Q.   (By MS. WESTFALL) Would anyone else in
23  leadership have been involved in the creation of the
24  committee?
25          MR. SWEETEN:  Objection, speculation.

## 194

1   Also, don't reveal legislatively-privileged
2   communications.  But go ahead.
3      A.   I don't know if anybody else was involved.
4      Q.   (By MS. WESTFALL) How many bills did the Select
5   Committee on -- and I'm just going the refer to this as
6   the Select Committee, if that's okay, for purposes of
7   this discussion.  How many bills did the Select
8   Committee consider?
9      A.   There were several bills that were referred to
10  the committee.  I believe the -- Senate Bill 14 was the
11  single bill heard by the committee.
12     Q.   Did it hear any bills on mail-in ballot fraud
13  that were filed in 2011?
14     A.   No.  I believe those were referred to the
15  Committee on Elections.
16     Q.   Why did they go to the Committee on Elections?
17          MR. SWEETEN:  Objection, calls for
18  speculation.  You can answer to the extent you're not
19  revealing legislatively-privileged communications.  Go
20  ahead.
21     A.   I can't speculate as to why they went where
22  they did.
23     Q.   (By MS. WESTFALL) Did Representative Harless
24  serve on the Select Committee?
25     A.   Yes.

## 195

1      Q.   Can you tell me about the circumstances under
2   which she was appointed to that committee?
3           MR. SWEETEN:  Don't reveal any
4   communications that I've previously outlined that are
5   legislatively privileged.  To the extent you can answer
6   without revealing those, you can go ahead.
7      A.   I don't know the circumstances behind her
8   appointment.
9      Q.   (By MS. WESTFALL) How did you first learn about
10  her appointment?
11          MR. SWEETEN:  Don't reveal any
12  legislatively-privileged communications.  You can answer
13  to the extent you have information outside of that.
14     A.   I believe it was a press release from the
15  Speaker's Office.
16     Q.   (By MS. WESTFALL) Is that ordinarily how you
17  learn about Representative Harless's appointments to
18  committees, is via a press release?
19     A.   Typically, that's how it's done.  A press
20  release to all the members so they all find out at the
21  same time.  That's how I learned of it.
22     Q.   When was the first time that the committee met?
23     A.   Early March.
24     Q.   How many times did the committee meet?
25     A.   Less than five times.  I believe it was four,

## 196

1   but I cannot be sure on that.  I think it was four
2   times.  Less than five.
3      Q.   Do members of the House generally submit their
4   preferences for serving on committees to the Speaker's
5   office?
6      A.   Yes.
7      Q.   Do you know whether Representative Harless
8   indicated to the Speaker's Office that she wanted to
9   serve on the Select Committee?
10          MR. SWEETEN:  If that's a matter of public
11  record, you can feel free to answer that.  If it's
12  something that falls within what we've outlined as being
13  legislatively privileged, do not.
14          THE WITNESS:  Okay.
15     Q.   (By MS. WESTFALL) Can you not answer that
16  question?
17     A.   I can't answer that question.
18     Q.   On the basis of it being privileged, on the
19  basis of counsel's advice?
20     A.   Correct.
21     Q.   When did Senate Bill 14 pass the Senate?  And
22  if you want to take a look at Exhibit 8, feel free to do
23  so.
24     A.   Senate Bill 14 was reported engrossed on
25  January 26th, 2011.  It was received by the House on the

COLBY BEUCK                                              MAY 14, 2012

### 197

1   27th of January.
2       Q.  How usual is it for a bill of this substantive
3   nature to be enacted in one chamber in two weeks on
4   January?
5           MR. SWEETEN:  Objection, assumes facts not
6   in evidence.  Objection, calls for speculation.  You can
7   answer if you have information responsive to that
8   question.  So don't reveal any legislatively-privileged
9   information.
10          MS. WESTFALL:  Mr. Sweeten, I think the
11  timing of bills being passed is a matter of public
12  record, and you have no basis for making a privilege
13  objection.
14          MR. SWEETEN:  Well, I mean, first of all,
15  with respect to my objections, you loaded that question
16  chock full of conclusory statements.
17          MS. WESTFALL:  Those are different
18  objections.
19          MR. SWEETEN:  So those are my objections.
20          MS. WESTFALL:  That's not basis for
21  instructing the witness not to answer.
22          MR. SWEETEN:  Okay.  And I'm not
23  instructing him not to answer.  I'm instructing him not
24  to reveal privileged information, if he needs to do so
25  in order to answer that question.  I'm not saying he

### 198

1   does.  I've already instructed him, he can testify as to
2   the public record.  So if it truly is public record,
3   he's free to answer that question.
4           MS. WESTFALL:  I'm not sure how it could
5   possibly be privileged.
6           MR. SWEETEN:  Okay.  Well, and the
7   instruction don't apply, then, if it's publicly
8   available.
9           MS. WESTFALL:  Then I'm not sure why you
10  made the objection.
11      Q.  (By MS. WESTFALL) Can you think of any other
12  bills that are substantive that got passed in two weeks
13  in the Senate?
14      A.  I'm not a Senate historian, so I can't speak to
15  that.
16      Q.  You've worked in the Senate since 2003, have
17  you not?
18      A.  I have worked in the Senate since 2003, so I
19  can speak to that.  Past 2003, I'm no expert.  The
20  emergency legislation, I guess it's possible.  That is
21  in the beginning of the session, so it is...
22      Q.  Can you recall, based on your experience
23  working in the Senate from 2003 to the present, whether
24  any other substantive bills have been enacted in the
25  Senate in two weeks in January, that are substantive in

### 199

1   nature, such as Senate Bill 14?
2       A.  Not that I recall.
3       Q.  Did you or Representative Harless have any
4   involvement in the Senate's consideration of SB 14 from
5   the time it was filed on January 12th until it was
6   referred to the Select Committee?
7           MR. SWEETEN:  Don't reveal any
8   legislatively-privileged communications.  I've outlined
9   before.
10      A.  Do we have any involvement in the sense -- no.
11      Q.  (By MS. WESTFALL) So you simply watched what
12  happened in the Senate?  Is that your testimony?
13      A.  That's correct.  And I'm speaking of behalf of
14  myself, not Representative Harless.  I had no
15  involvement in it.  I was a spectator.
16      Q.  Do you know whether she had any involvement in
17  SB 14, from the time it was filed in the Senate to the
18  time it was referred to the House Committee?
19          MR. SWEETEN:  Same instruction.
20      A.  Not to my knowledge.
21      Q.  (By MS. WESTFALL) Not to your knowledge based
22  on the public record?  Is that your testimony?
23      A.  That's, I think -- I don't want to -- I don't
24  know if she did.
25      Q.  Have any private conversations?

### 200

1       A.  I can't speak for her, so I don't know her
2   involvement.
3       Q.  Did you have any conversations or
4   communications with the media or the public when SB 14
5   was filed in January?
6           MR. SWEETEN:  If they're public
7   communications, if there's discussions with the media,
8   I'm going to let you answer that.  If it's says to
9   constituent communications, I think that that would be
10  privileged, so I don't want you to provide that
11  information.
12      A.  I don't recall having any conversations with
13  the media on the filing of Senate Bill 14.
14      Q.  (By MS. WESTFALL) Did Representative Harless?
15      A.  Not to my knowledge.
16      Q.  Can you describe the Select Committee's
17  consideration of SB 14?
18          MR. SWEETEN:  You're asking about matters
19  of the public record, is that correct, the
20  consideration?
21          MS. WESTFALL:  No.  I'm asking about
22  public and private consideration by the Select Committee
23  of SB 14.
24          MR. SWEETEN:  Well, I don't want you to
25  are reveal any communications that we have already

COLBY BEUCK                                                MAY 14, 2012

## 201

```
 1   outlined or that are legislatively-privileged, but to
 2   the extent that you have information that is not
 3   legislatively-privileged.
 4       A.   Can I get, because -- I was -- what was the
 5   question again?
 6       Q.   (By MS. WESTFALL) Can you describe the
 7   committee's consideration of SB 14?
 8       A.   Okay.
 9            MR. SWEETEN:  You can testify about
10   matters of the public record, okay?  Don't reveal
11   communications that have -- that you're aware of that
12   occurred between legislators, legislative staff, TLC,
13   state agencies, or constituents.
14            THE WITNESS:  Okay.
15       A.   The committee process, there was a full day
16   hearing in early March on the issue.  I believe it began
17   early in the morning and continued.  There was a break
18   during the legislative session.  Then the committee
19   readjourned after session and continued to hear
20   testimony from the -- and invited testimony as well as
21   public testimony.  There was a considerable.
22       Q.   (By MS. WESTFALL) And were any substantive
23   changes made to SB 14 during the committee's
24   consideration of it?
25       A.   There were not -- no, there were not any
```

## 202

```
 1   committee -- committee amendments.  It was the committee
 2   substitute as it went through.
 3       Q.   During the first few months of 2011, did you
 4   gather any information to assist Representative Harless
 5   in her work on SB 14?
 6            MR. SWEETEN:  To the extent that this
 7   question is asking you to reveal communications that you
 8   had with Representative Harless, or any other staff
 9   members, I don't want you to provide that information.
10   That's legislatively-privileged.  If you can provide
11   that answer without revealing those communications that
12   we've outlined previously, I'm going to let you do so.
13       Q.   (By MS. WESTFALL) Did you contact the
14   Department of Public Safety during the first few months
15   of 2011?
16            MR. SWEETEN:  You're just asking the
17   contact?
18            MS. WESTFALL:  Yeah.
19            MR. SWEETEN:  Okay.  I'm going to let you
20   answer whether or not you had contact, including,
21   as this is along the lines of a privilege log
22   questions.  You can talk about the contact and the date
23   of.  Do not reveal the substance of any sort.
24       A.   Yes.
25       Q.   (By MS. WESTFALL) What prompted you to contact
```

## 203

```
 1   DPS?
 2            MR. SWEETEN:  Unless matter is a matter of
 3   public record, you do not have to reveal that
 4   information.  That is legislatively-privileged.
 5       Q.   (By MS. WESTFALL) Do you have any answer based
 6   on public record?
 7       A.   There was an expert witness in committee from
 8   DPS.
 9       Q.   Which prompted you to contact DPS?
10       A.   Yes.
11       Q.   Do you have any further explanation of why you
12   contacted DPS, based on this expert testimony?
13            MR. SWEETEN:  And based on the public
14   record.  Don't reveal legislatively-privileged
15   communications.
16       A.   No.
17       Q.   (By MS. WESTFALL) What did you learn from DPS?
18            MR. SWEETEN:  I'm going to advise you not
19   reveal that conversation.
20            MS. WESTFALL:  Is this based on
21   legislative privilege, Mr. Sweeten.
22            MR. SWEETEN:  It is.  Legislative fact
23   gathering is within the privilege.  We've asserted
24   that.  He is not going to reveal information or
25   communications between state agencies and him.
```

## 204

```
 1            MS. WESTFALL:  Is that the sole privilege
 2   you're asserting over those conversations?
 3            MR. SWEETEN:  I believe we've also
 4   asserted the deliberative process privilege over the
 5   state agency considerations.
 6       Q.   (By MS. WESTFALL) What steps did you take, if
 7   any, upon receiving information from the Department of
 8   Public Safety.
 9       A.   I'm sorry.  Could you repeat the question?
10       Q.   Certainly.  What steps did you take, if any,
11   upon receipt of information from the Department of
12   Public Safety?
13            MR. SWEETEN:  Don't reveal communications
14   that relate -- don't reveal it if revealing so reveals
15   communications you've had with any state agents.
16       A.   What actions were taken upon any conversations
17   with DPS?
18       Q.   (By MS. WESTFALL) Correct.
19       A.   Okay.  None that I can recall.
20       Q.   Is this based on recollection or based on
21   privilege and the instructions of counsel or both?
22       A.   On my recollection.
23       Q.   Of after the committee voted -- actually, the
24   committee voted SB 14 out of committee; is that correct?
25       A.   Correct.
```

COLBY BEUCK                                          MAY 14, 2012

## 205

1    Q.  And was it placed on the House's emergency
2  calendar?
3    A.  Yes.
4    Q.  Do you know why that happened?
5        MR. SWEETEN:  Don't reveal any
6  communications related to that, that would be
7  legislatively privileged.  To the extent it's a matter
8  of public record, you can freely answer that.
9    A.  I believe the emergency calendar, there are
10  certain items that are eligible for it.  I don't know
11  beyond why that decision was made, but if...
12    Q.  (By MS. WESTFALL) Who was responsible for
13  making the decisions about what gets on the emergency
14  calendar in the House?
15    A.  The chair of the Calendars Committee typically
16  has jurisdiction over the House Floor calendar.
17    Q.  And who is that person?
18    A.  That would be Representative Hunter.
19    Q.  Was he the person who decided to put SB 14 on
20  the emergency calendar in the House?
21        MR. SWEETEN:  Objection to the extent it
22  calls for speculation.  Go ahead.
23    A.  I can't speculate, but he is the Chair, and
24  typically Calendars Committee does have jurisdiction
25  over the House Floor calendars.  I can't speculate if he

## 206

1  was the person who made the final decision or not.
2    Q.  (By MS. WESTFALL) And going back to the Select
3  Committee's consideration of SB 14, did a representative
4  from DPS testify at that hearing?
5    A.  Yes.
6    Q.  Who was the person that testified?
7    A.  I believe her name was Rebecca.  Rebecca Davio.
8    Q.  And what was the testimony concerning?
9    A.  The DPS's involvement is -- as it --
10  identification -- their involvement in the
11  identification parts of the legislation.
12    Q.  Are you referring to the election
13  identification certificate, or are you referring to
14  drivers' licenses?
15    A.  I believe at that time, it was not the election
16  identification certificate.  I think it was just the
17  personal identification used for voting purposes and the
18  free ID.  That's the part of her testimony that I
19  remember.  There might have been other parts of the
20  testimony, but that's the specific part I remember.
21    Q.  Turning to Floor consideration, House Floor
22  consideration of SB 14, did Representative Harless have
23  a strategy to ensure that SB 14 was passed on the House
24  Floor?
25        MR. SWEETEN:  Don't reveal any

## 207

1  communications you've had with Representative Harless or
2  any other communications that we've discussed and
3  enumerated today multiple times.  To the extent that you
4  can answer that question without revealing those
5  communications, you can do so.
6        THE WITNESS:  Okay.
7    Q.  (By MS. WESTFALL) Can you answer the question
8  based on advice of counsel?
9    A.  Correct.
10    Q.  What was your role during the House
11  consideration, the Floor consideration of SB 14?
12    A.  I was monitoring the debate.  It was a full --
13  full day's debate, and I was monitoring it.
14    Q.  Did you prepare talking points for her?
15        MR. SWEETEN:  Objection.  I think you're
16  asking for communications that he's had with
17  Representative Harless.  I don't believe that those are
18  -- I think those are subject to legislative privileged.
19  I'm going to instruct him not to answer that question.
20        MS. WESTFALL:  I'm asking about the
21  existence of documents, not the substance of the
22  documents, Mr. Sweeten.
23        MR. SWEETEN:  What you asked was:  Did you
24  prepare talking points for Representative Harless?
25        MS. WESTFALL:  Right.

## 208

1        MR. SWEETEN:  And if you're asking if
2  there is an existing document, that is a very different
3  question.
4        MS. WESTFALL:  It's a privilege log
5  question.
6        MR. SWEETEN:  Okay.
7        MS. WESTFALL:  But you can stick with your
8  objection if that's the story you're sticking to.
9        MR. SWEETEN:  I'm sticking with the facts,
10  which are, you asked two separate questions there now.
11  So if you're asking if there's an existing document with
12  talking points?  Is that your question?
13        MS. WESTFALL:  It is.
14        MR. SWEETEN:  Okay.
15        MS. WESTFALL:  Think about a privilege
16  log, Mr. Sweeten.
17        MR. SWEETEN:  Well, and I have let you,
18  during today's questioning, establish facts that you
19  would establish in a privilege log.  So if you're
20  asking:  Is there a document in existence that is
21  talking points, then I think we can let him answer that.
22    A.  Is there a document that exists that contains
23  talking points?
24    Q.  (By MS. WESTFALL) That you prepared or someone
25  in your office prepared for Representative Harless for

COLBY BEUCK                                              MAY 14, 2012

## 209

1  Floor consideration.
2          MR. SWEETEN:  The problem is that you're
3  asking him now what he prepared, and that would
4  implicate communications between he and Representative
5  Harless.
6          MS. WESTFALL:  The fact of the
7  communication is not privileged, correct?  You have a
8  privilege log that indicates he authored communications
9  to DPS.  They were received by DPS.  You have a subject
10  matter line.  You have a date line.  That's called the
11  privilege log.  I'm asking him similar questions with
12  regard to communications during this deposition.
13          MR. FREDERICK:  If I may, this is Matt
14  Frederick for the record.  Let me just point out that
15  counsel for the United States representation of the
16  privilege log is not totally consistent with the
17  privilege log that the United States has produced, as
18  far as the level of detail.  I believe that the
19  questions go for more detail than has been provided on
20  any party's privilege log in this litigation.
21          MS. WESTFALL:  Well, I think that's a non
22  sequitur, to the point at hand, Mr. Frederick.
23          Mr. Sweeten, are you to going to let him
24  answer the question about the existence of the document,
25  or no?

## 210

1          MR. SWEETEN:  I'm going to let him answer
2  whether or not there is a document in existence.  We
3  won't describe it.  I'm not going to let him provide any
4  detail, but if -- does -- do you want to ask your
5  question again with that?
6          Q.   (By MS. WESTFALL) My stands to the extent you
7  remember what I asked.  Could you please answer the
8  question so I don't have to repeat it, please,
9  Mr. Beuck?
10          A.   There is a document in existence.
11          Q.   Are you the author of such document?
12          A.   I am the author.
13          MS. WESTFALL:  And for the record,
14  Mr. Sweeten, what did the talking points say?
15          MR. SWEETEN:  No.  We're not going to
16  answer that question.  That would reveal communications
17  between Mr. Beuck and Representative Harless.
18          Q.   (By MS. WESTFALL) Did you prepare
19  Representative Harless for questions she might receive
20  on the Floor during consideration of SB 14?
21          MR. SWEETEN:  Objection.  You're asking
22  him for communications he had with Representative
23  Harless.  Do not provide an answer to that.
24          Q.   (By MS. WESTFALL) Getting back to the talking
25  points, did you have anyone else review the talking

## 211

1  points, outside of your office, in advance of providing
2  them to Representative Harless?
3          MR. SWEETEN:  Objection.  It assumes facts
4  not in evidence, and I'm going to object to the extent
5  that it would implicate any sort of communications
6  you've had with any legislative staff or any other
7  enumerated areas.
8          Q.   (By MS. WESTFALL) So can you not testify --
9          A.   No.
10          Q.   -- in response to my question based on advice
11  of counsel?
12          A.   I cannot testify based on advice from counsel.
13          Q.   Besides the talking points we've discussed, did
14  you have meetings with Representative Harless to prepare
15  her for Floor consideration of SB 14?
16          MR. SWEETEN:  Don't reveal -- in answering
17  that question, you would be revealing the substance of
18  communications; therefore, I don't want you to do that.
19  If she wants to ask whether you've had meetings with
20  Representative Harless prior to a Floor appearance,
21  that's a different question.  But don't reveal the
22  substance of the communication.  It is legislatively
23  privileged.
24          Q.   (By MS. WESTFALL) Did you have any meetings
25  with Representative Harless before the Floor

## 212

1  consideration of SB 14?
2          A.   Yes.
3          Q.   How long were those meetings?
4          A.   30 minutes to an hour.
5          Q.   Was anyone else at that meeting besides the two
6  of you?
7          A.   No.
8          Q.   Did you have this meeting in person?
9          A.   Yes.
10          Q.   Did you have this meeting in her office?
11          A.   Yes.
12          Q.   Did Representative Harless review any
13  documents, besides the talking points we talked about,
14  before she engaged in the Floor consideration of SB 14?
15          MR. SWEETEN:  Yeah.  The question is a
16  yes-or-no question.  I'm going to let you answer that,
17  but as to what those documents are, if that's the next
18  question, we're not going to -- I'm going to assert the
19  legislative privilege as to that.  You can yes or no to
20  her question.
21          A.   I believe she did review other documents.
22          Q.   (By MS. WESTFALL) How many?
23          A.   I don't know.
24          Q.   Who were the documents authored by?
25          MR. SWEETEN:  Don't -- you don't have to

COLBY BEUCK                                          MAY 14, 2012

## 213

1   answer that question.  That's legislatively privileged.
2        Q.  (By MS. WESTFALL) Did they come from a
3   lobbyist?
4             MR. SWEETEN:  The same objection and the
5   same instruction.  Don't answer the question.  It's
6   legislatively privileged.
7        Q.  (By MS. WESTFALL) Did they come from the
8   Lieutenant Governor's Office?
9             MR. SWEETEN:  Same objection.
10       Q.  (By MS. WESTFALL) Did they come from the
11  Governor's office, interest groups, or constituents?
12            MR. SWEETEN:  Same objection.
13       Q.  (By MS. WESTFALL) Are you not answering based
14  on advice of counsel?
15       A.  Yes.
16       Q.  What did the documents say?
17            MR. SWEETEN:  Same objection.
18       Q.  (By MS. WESTFALL) Do you recall that during the
19  Floor debate, Representative Harless stated she was not
20  advised concerning the number of voters that lacked the
21  required identification and what percentage of these
22  voters are African American or Hispanic?
23       A.  It was a fairly lengthy debate.  I don't recall
24  that specific statement by her.
25       Q.  We'll get an exhibit on that in a minute.

## 214

1             Are you familiar with the amendments
2   offered to SB 14 on the House Floor?
3        A.  Some of them, yes.  There were several.  There
4   were many amendments offered.
5             MS. WESTFALL:  Would you mark this as
6   Exhibit U.S. 9.
7             (Exhibit 9 marked for identification.)
8        Q.  (By MS. WESTFALL) You have been handed U.S.
9   Exhibit 9.  Do you recognize this exhibit?
10            MR. SWEETEN:  Do we get one of those?
11            MS. WESTFALL:  Certainly.  I'm eager not
12  to carry this home.
13       Q.  (By MS. WESTFALL) Do you recognize this
14  document?
15       A.  This appears to be a copy the House Journal
16  from March 23rd.
17       Q.  By the way, were you on the Floor with
18  Representative Harless during the Floor consideration,
19  or were you elsewhere?
20       A.  I was not on the Floor.
21       Q.  Where were you?
22       A.  I was in an office.
23       Q.  What office?
24       A.  It would be considered the -- it's a conference
25  room within the Speaker's Office.

## 215

1        Q.  Who were you with?
2        A.  Myself.
3        Q.  Turning your attention to Amendment 15, which
4   is on Page 969 of Exhibit 8.
5             MR. ROSENBERG:  What page was that,
6   Ms. Westfall?
7             MS. WESTFALL:  969.
8        Q.  (By MS. WESTFALL) Amendment 15, could you take
9   a look at that and let me know when you're ready?
10       A.  (Viewing documents.)
11       Q.  Have you had a chance the to review that?
12       A.  Yes.
13       Q.  What is this amendment designed to accomplish?
14       A.  The amendment appears to prohibit fees for the
15  issuance of any document under Senate Bill 14.
16       Q.  And how did Representative Harless respond to
17  this amendment?
18            MR. SWEETEN:  Are you asking a matter of
19  public record?
20            MS. WESTFALL:  Yes.  I'm asking a matter
21  of public record.  It's right here, Mr. Sweeten?
22       A.  Representative Harless moved to table Amendment
23  Number 15.
24       Q.  (By MS. WESTFALL) Why did she do that?
25            MR. SWEETEN:  Objection, calls for

## 216

1   speculation.  Also, don't reveal any communications
2   you've had with Representative Harless as to the issue.
3        A.  I can't speculate to her motives on that
4   amendment.
5        Q.  (By MS. WESTFALL) Did you advise her to table
6   that amendment?
7             MR. SWEETEN:  Objection.  It would reveal
8   communications between Mr. Beuck and Representative
9   Harless, and it would be legislatively-privileged.
10            Instruct you not to answer.
11       Q.  (By MS. WESTFALL) Did you have any
12  conversations with Representative Harless about this
13  amendment?
14            MR. SWEETEN:  The subject matter is
15  contained within the question; therefore, I'm going to
16  instruct not to answer, as it would reveal matters of
17  the legislative privilege.
18       Q.  (By MS. WESTFALL) Was Representative Harless
19  holding a cell phone during the House Floor
20  consideration of Senate Bill 14?
21       A.  I don't recall.
22       Q.  Did you receive any texts from her during House
23  Floor consideration of SB 14?
24            MR. SWEETEN:  You can testify as to
25  whether or not you received a text.  Don't testify as to

## 217

1    what those communications were or the substance of
2    those.
3        A.   I believe I did.
4        Q.   (By MS. WESTFALL) More than one?
5        A.   More than one.  Probably less than five.
6        Q.   Do you know whether she was texting persons
7    other than you during House Floor consideration of
8    SB 14?
9            MR. SWEETEN:  Objection, calls for
10   speculation.
11       A.   I don't know.
12       Q.   (By MS. WESTFALL) Turning your attention to
13   Amendment 23 at House Journal 979.  Could you describe
14   this amendment?
15       A.   This is an amendment from Representative Dutton
16   adding a student identification card to the list of
17   acceptable forms of photo identification.
18       Q.   How did Representative Harless vote on this
19   amendment?
20       A.   She voted for the motion to table.
21       Q.   Did you advise her to do that?
22           MR. SWEETEN:  Objection.  Don't reveal any
23   conversation you had with Representative Harless.  I
24   instruct you not to answer that.
25       Q.   (By MS. WESTFALL) So the answer is no, you're

## 218

1    not going to respond based on privilege?
2            MR. SWEETEN:  You've asked him to reveal
3    the substance of communication between he and
4    Representative Harless.  That is clearly within the
5    lines of legislatively privilege that I'm very
6    consistently drawing today.
7            MS. WESTFALL:  I just want to make sure
8    the witness is indicating on the basis of privilege for
9    the record.  Okay?
10           MR. SWEETEN:  Fair enough.  I am
11   instructing you not to answer that question.  It would
12   reveal legislatively-privileged information.
13       Q.   (By MS. WESTFALL) Why do you think she voted
14   against this amendment?
15       A.   I can't speculate.
16       Q.   Weren't student IDs included in previous
17   iterations of the bills?
18           MR. SWEETEN:  Objection, vague.
19       Q.   (By MS. WESTFALL) You can answer.
20       A.   I'd have to go back and look at the previous
21   versions of voter ID through the last sessions.
22       Q.   Did you do any analysis, or did Representative
23   Harless do any analysis, as to whether student IDs would
24   be more frequently possessed by minorities than the
25   general population?

## 219

1            MR. SWEETEN:  I'm going to object to the
2    question.  It think it calls for matters that are
3    legislatively privileged.  Don't reveal any
4    communications you've had with Representative Harless.
5    And legislative fact-gathering is well contained within
6    the privilege, so I'm going to instruct you
7    accordingly.  To the extent you can provide information,
8    matters of public record that are not part of the
9    legislative privilege, you can provide an answer to that
10   question.
11       A.   No, based upon the advice from my counsel.
12       Q.   (By MS. WESTFALL) I believe you testified
13   earlier that there are lots of different forms of ID
14   that would be considered allowable; U.S. Military IDs;
15   is that correct?
16       A.   I don't remember phrasing my answer that way.
17       Q.   There's more than a handful of military IDs, is
18   there not?
19       A.   Not to my knowledge.  I don't know.
20       Q.   Or do you not know the number of U.S. military
21   IDs?
22       A.   I don't know.
23       Q.   Okay.  And turning back to House Bill 112,
24   Representative Harless had filed a bill, in November
25   2010, that provided for the use of photo IDs issued by

## 220

1    the state, its agencies, and subdivisions; isn't that
2    right?
3        A.   I'm looking at House Bill 112, identification
4    card issued to person by government entity, correct.
5        Q.   And that would be quite a few IDs, would it
6    not?
7        A.   Correct.
8        Q.   Representative Harless indicated publicly that
9    her concern with student IDs was the number of student
10   IDs; isn't that right?
11           MR. SWEETEN:  You can answer to the extent
12   she's asking about matters of public record.
13       A.   I remember the student ID issue coming up
14   during the debate.  I don't remember her specific
15   testimony on...
16           MR. SWEETEN:  Hold one second.
17           MS. WESTFALL:  Would you mark this as
18   Exhibit 10, please.
19           (Exhibit 10 marked for identification).
20       Q.   (By MS. WESTFALL) You've been handed U.S.
21   Exhibit Number 10.  Have you seen this document before?
22       A.   (Viewing documents.)
23       Q.   If I could turn your attention to the top of
24   the third page.  I'm sorry, the third page, double
25   sided.  There is some quotations from Representative

COLBY BEUCK                                                    MAY 14, 2012

### 221

1    Harless.  If you could just take a look at those and let
2    me know when you've had a chance review it.
3        A.  Okay.
4        Q.  By the way, have you seen this article before?
5        A.  I do remember this.  I remember when it was --
6        Q.  Okay.
7        A.  I do remember the article.  I don't remember
8    the specifics of it.  (Viewing documents.)  Just this top
9    portion.  Yes.  Okay.
10       Q.  So it indicates, does it not, that
11   Representative Harless excludes student IDs because,
12   quote, "We wanted a form of identification that was
13   easily recognized by the poll workers at the election
14   site."  Is that correct?
15       A.  That's what --
16           MR. SWEETEN:  You're asking him is that
17   what -- if that's correct, that's what that says?
18           MS. WESTFALL:  That's correct.  Correct.
19       Q.  (By MS. WESTFALL) Does Exhibit 10 indicate
20   that?
21       A.  The exhibit does indicate that.
22       Q.  Did Representative Harless consider whether
23   those same concerns would apply to the number of
24   military IDs for example, which could be varied?
25           MR. SWEETEN:  I'm going to object to the

### 222

1    extent that she's asking you to reveal conversations
2    that you've had with Representative Harless.  And I'm
3    going to instruct you not to answer based upon that.  If
4    you can answer based upon public record or matters that
5    don't implicate this communications of legislative
6    privilege, but I'm going to instruct you not to answer.
7        A.  I don't recall in the public record, if that
8    was something.  I don't recall.
9        Q.  (By MS. WESTFALL) Did you have any
10   conversations with Representative Harless about this
11   amendment, Amendment 23?
12       A.  Regarding student IDs?
13           MR. SWEETEN:  Don't reveal the substance
14   of any conversations.
15       Q.  (By MS. WESTFALL) Did you have any
16   conversations with about her this amendment?
17       A.  Not that I recall.
18       Q.  Turning your attention to Amendment 35 at House
19   Journal 991, are you familiar with this amendment?
20       A.  Yes, I remember.  I remember this from the
21   debate.
22       Q.  Could you describe the amendment?
23       A.  It's applying the Voting Rights Act to certain
24   sections of Senate Bill 14.
25       Q.  And how did Representative Harless vote on this

### 223

1    amendment?
2        A.  She voted for the motion to table.
3        Q.  Did you advise her to vote that way?
4            MR. SWEETEN:  Objection.  Don't reveal
5    communications you had with Representative Harless.
6    Those are legislatively privileged.
7        Q.  (By MS. WESTFALL) Did you have any other
8    testimony in response to that question, or no?
9            MR. SWEETEN:  Objection.  The question is
10   vague.
11       A.  No.
12       Q.  (By MS. WESTFALL) Does Representative Harless
13   believe that materials printed under SB 14 should only
14   be in English?
15           MR. SWEETEN:  I'm going to object.  Do not
16   reveal any communications that you've had with
17   Representative Harless.  To the extent that the public
18   record reveals answers to this question, you can refer
19   counsel to that.
20       A.  Not that -- not that I know of.
21       Q.  (By MS. WESTFALL) Do you know what Section 203
22   does of the Voting Rights Act?  Sorry.
23       A.  I know I have expert here to answer that in
24   case I don't.  I'm not going to assume to know.  I
25   remember the debate.  I remember it had to do with

### 224

1    Section -- I can't remember if that's Section 2 or
2    Section 5.
3        Q.  Turning to your attention now to Amendment
4    Number 50 at House Journal 1009 and 1010.
5        A.  Okay.
6        Q.  Are you familiar with this amendment?
7        A.  Okay.
8        Q.  What would this amendment have done?
9        A.  This provides a travel reimbursement, provides
10   travel reimbursement for individuals under a certain --
11   under certain -- certain poverty guidelines.  They may
12   recover expenses for traveling to a DPS office for
13   obtaining photo identification.
14       Q.  How did Representative Harless vote on this
15   amendment?
16       A.  She voted for the motion to table.
17       Q.  Why did she vote that way?
18           MR. SWEETEN:  Objection to the extent that
19   that would reveal communications you had with
20   Representative Harless.
21           Don't provide an answer to that question.
22   If there are matters on the public record that you can
23   refer counsel to, you can answer that question.
24       Q.  (By MS. WESTFALL) Do you have an answer?
25       A.  No, I do not.

COLBY BEUCK                                                    MAY 14, 2012

---

225

1    Q.   Isn't it the case that the majority of
2  individuals who live below the federal poverty line in
3  Texas are members of racial minorities?
4        MR. SWEETEN:  Objection, assumes facts not
5  in evidence.  Objection, argumentative.  If you have
6  personal knowledge of what she's asking you, I'll let
7  you answer.
8    A.   No, I don't have any personal knowledge on
9  that.
10   Q.   (By MS. WESTFALL) Did you have any
11 conversations with Representative Harless about
12 Amendment 50?
13       MR. SWEETEN:  Objection.  The question
14 asks about the subject matter.  Therefore, I'm going to
15 instruct you not to reveal communications you had with
16 Representative Harless and the other communications that
17 I've outlined previously.
18   Q.   (By MS. WESTFALL) Turning your attention to
19 Amendment 54 at Page 1015 of the House Journal, are you
20 familiar with this amendment?
21   A.   This is an amendment directed to the Secretary
22 of State to require certain records be kept regarding
23 Senate Bill 14.
24   Q.   How did Representative Harless vote on this
25 amendment?

---

226

1    A.   She voted for the motion to table.
2    Q.   Why did she vote that way?
3        MR. SWEETEN:  Objection.  Don't reveal
4  communications between you and Representative Harless.
5  To the extent there's public information about that
6  issue, you can answer based upon the public record.
7    Q.   (By MS. WESTFALL) Why did Representative
8  Harless not want this information to be gathered?
9        MR. SWEETEN:  Same objection.  Your
10 question asks for matters that are privileged by the
11 legislative privilege, that are covered under that.  It
12 also asks for communications between Mr. Beuck and
13 Representative Harless, and I'm going to instruct him
14 not to answer that question.  It also calls for
15 speculation.
16   Q.   (By MS. WESTFALL) Did Representative Harless or
17 you have any concerns that this information would be
18 harmful because it would show a disparate effect on
19 SB 14 on minority voters?
20       MR. SWEETEN:  I'm going to instruct you
21 not to answer that question in that question asks for
22 you to reveal matters that are subject to the
23 legislative privilege and impact communications you may
24 have had with Representative Harless.
25   Q.   (By MS. WESTFALL) How far in advance were --

---

227

1  was there a requirement that these amendments be filed
2  within a certain time period before Floor consideration
3  of SB 14?
4    A.   No, there was not a -- I think what's referred
5  to as a prefiling rule.  These amendments, many of them,
6  from my observation, were being drafted, and a good
7  number of them were being drafted and submitted during
8  the debate.  And I understand a lot of them were
9  prepared beforehand.  But, no, there was no prefiling.
10   Q.   Did you have any awareness or knowledge of
11 Amendment Number 54 in advance of the Floor debate?
12   A.   Not that I recall.
13   Q.   Did you consult with the Secretary of State's
14 Office about her position on this amendment before it
15 was considered?
16       MR. SWEETEN:  I'm going to instruct you
17 not to answer.  That is a matter subject to the
18 legislative privilege.  It's communication between your
19 -- potentially, communication between your office, you,
20 or Representative Harless with a state agency, which is
21 covered by the legislative privilege.
22   Q.   (By MS. WESTFALL) Turning to your attention to
23 Amendment Number 55 on the following page, Page 1016,
24 are you familiar with this amendment?
25   A.   This is an amendment which is requesting the

---

228

1  Secretary of State -- or it's requiring the Secretary of
2  State to make a determination on the racial or ethnic
3  identity of -- of those that are required to cast a
4  provisional ballot under Senate Bill 14.
5    Q.   How did Representative Harless vote on this
6  amendment?
7    A.   She voted for the motion to table.
8    Q.   Why did she vote that way?
9        MR. SWEETEN:  Objection.  It calls for
10 matters in communications between Mr. Beuck and
11 Representative Harless.  It implicates those
12 communications, and therefore, it's legislatively
13 privileged.  I instruct you not to answer that question.
14   Q.   (By MS. WESTFALL) Did Representative Harless
15 have any concern that the burden of SB 14 might be felt
16 disproportionately by minority voters?
17       MR. SWEETEN:  Objection, calls for
18 speculation.  Objection, also to the extent that it
19 implicates legislative privilege and communications that
20 Mr. Beuck had with Representative Harless, I instruct
21 you not to answer on that basis.
22   Q.   (By MS. WESTFALL) Did you have any
23 communications with Representative Harless about this
24 amendment?
25       MR. SWEETEN:  I'm going to let you answer

COLBY BEUCK                                             MAY 14, 2012

## 229

1   as to the fact of a communication.  Otherwise, I will
2   not -- I'm not going to let you discuss the specific
3   communications involved.
4       A.  Not that I recall.
5       Q.  (By MS. WESTFALL) Turning your attention to
6   Amendment 58 on Page 1021.
7       A.  Yes.
8       Q.  Can you describe this amendment?
9       A.  This is an amendment which requires the
10  Secretary of State to conduct a study on the ethnicity,
11  the potential impact on voter turnout, turn-out data.
12  It's requiring the Secretary of State to conduct a
13  study, and it makes that study conditional on the
14  implementation of Senate Bill 14.
15      Q.  How did Representative Harless vote on this
16  amendment?
17      A.  She voted for the motion to table.
18      Q.  Why did she vote that way?
19          MR. SWEETEN:  Objection, it calls for
20  matters that are covered under the legislative privilege
21  and communications between Mr. Beuck and Representative
22  Harless.  I'm going to instruct you not to answer on
23  that basis.  To the extent that there are matters of
24  public record that you can testify that provide you the
25  ability to answer that question, you can do so.

## 230

1       Q.  (By MS. WESTFALL) Is there anything in the
2   public record that would enable you to answer that
3   question?
4       A.  No.
5       Q.  Why did Representative Harless not want this
6   information gathered?
7           MR. SWEETEN:  I'm going to make the same
8   objection.  You're asking for matters that are contained
9   within the legislative privilege.  You're asking to
10  reveal communications between Mr. Beuck and
11  Representative Harless.  Also, communications with
12  others, potentially.  I'm going to instruct you not to
13  answer on that basis.
14          THE WITNESS:  Okay.
15      Q.  (By MS. WESTFALL) Isn't it true that
16  Representative Anchia raised the issue with
17  Representative Harless as to why this information wasn't
18  gathered prior to the bill being drafted?
19          MR. SWEETEN:  Don't reveal communications
20  between Representative Harless and Representative Anchia
21  unless those are matters of public record.  These are
22  covered by the legislative privilege.
23      Q.  (By MS. WESTFALL) Do you have an answer to my
24  question, based on the public record?
25      A.  I believe that was a conversation they had in

## 231

1   committee.
2       Q.  What was Representative Harless's reaction to
3   Representative Anchia's statement in that regard?
4           MR. SWEETEN:  You can testify as to the
5   public record, if that's what this is, and if you
6   recall.
7       A.  I don't recall.
8       Q.  (By MS. WESTFALL) How would you respond to
9   someone who would say that not studying the impact of
10  allowable forms of ID on minority voters shows a callous
11  disregard for their voting rights?
12          MR. SWEETEN:  I'm going to object to the
13  question as argumentative.  I don't know if you're
14  attempting to find out Representative Harless's
15  position.  If so, it reveals those communications.  If
16  you're asking him his personal opinion, then I will let
17  him answer with respect to his personal opinion on that
18  issue.
19      Q.  (By MS. WESTFALL) What is your opinion as a
20  legislative staffer on that issue, Mr. Beuck?
21      A.  The disregard for the impact?
22      Q.  By not investigating, that it would appear to
23  show disregard for the interests of minority voters?
24          MR. SWEETEN:  Same instruction.
25      A.  I think that statement assumes there was not an

## 232

1   investigation into the impact.
2       Q.  (By MS. WESTFALL) Was there an investigation
3   into the impact?
4           MR. SWEETEN:  Don't reveal information
5   that is subject to the legislative privilege, including
6   communications with any state agencies, with
7   constituents, or the Legislative Council, with
8   Representative Harless, other legislators or staffers.
9       A.  Well, with the testimony and the committee, the
10  turnout shows that voter participation increased in the
11  states that have implemented voter identification.
12      Q.  (By MS. WESTFALL) How is that responsive to the
13  concern that there was no investigation as to the impact
14  of the allowable forms of ID in Senate Bill 14 on
15  minority voters?
16          MR. SWEETEN:  Objection, argumentative.
17      Q.  (By MS. WESTFALL) You may answer.
18      A.  I think that illustrates the impact in the
19  other states, and it would carry over to Texas.
20      Q.  Was there any study conducted or investigation
21  of the impact of the allowable forms of ID under Senate
22  Bill 14 on minority voters that was not disclosed to the
23  public?
24          MR. SWEETEN:  I'm going to object to the
25  extent that your question asks for research conducted

## 233

1   prior to the bill that is potentially impacted by the
2   legislative privilege, including communications with all
3   of the various state agencies, the representatives,
4   representatives' staffs, the Texas Legislative
5   Council. And I'm going to instruct him not to answer on
6   that basis, except to the extent that you can do so
7   based upon the matters of public record.
8       Q.  (By MS. WESTFALL) Is there any publicly-
9   available information on that topic?
10      A.  On the -- specific to Senate Bill 14?
11      A.  Yes.
12      A.  Not to my knowledge.
13      Q.  Is there any publicly-available information of
14  any research or studies conducted as to impact of
15  allowable forms of ID under prior photo ID bills
16  introduced in the Texas House or Senate that you're
17  aware of?
18      A.  Not that I'm aware of.
19      Q.  Did Representative Harless serve on the
20  Conference Committee of the bill?
21      A.  Yes.
22      Q.  Did she chair it?
23      A.  As the House sponsor of the legislation, I
24  think it's -- yes, she did chair it.  She was the chair
25  of the House conferees.

## 234

1       Q.  Were there any changes that were put in during
2   the conference consideration of the bill that had not
3   been in either version passed in the House or Senate?
4       MR. SWEETEN:  I assume those are matters
5   of public record, if so, you can go ahead and answer.
6       A.  Yes.  There was the -- election identification
7   certificate that was not contained in either the Senate
8   version or the House version.
9       Q.  (By MS. WESTFALL) Could you describe the
10  circumstances of the insertion of that provision into
11  the conference bill?
12      MR. SWEETEN:  You can discuss matters of
13  public record.  Don't discuss conversations that you had
14  with any of the areas with we've been discussing.
15      A.  I know it was a concern brought up by
16  Representative Anchia during the House Floor debate.
17      Q.  (By MS. WESTFALL) What did he ask for?
18      A.  His concerns were that -- having to do with the
19  personal identification and DPS, DPS revenues.
20      Q.  I'm not sure I understand.  Can you clarify?
21      A.  He had -- I remember him discussing the issue,
22  the details of which I don't know.  It had to do with
23  receipt -- the revenue received by DPS and their
24  identification.  The revenue received from DPS from
25  identifications.

## 235

1       Q.  Could you describe the election identification
2   certificate provision in SB 14?
3       A.  The election identification certificate, I
4   remember during the debate that it was modeled after the
5   provisions in current law for a personal identification,
6   for a DPS personal identification.  It's modeled after
7   that language.
8       Q.  Were you involved in the drafting of that
9   particular provision that went in, in the conference
10  committee?
11      A.  No.
12      Q.  Who drafted it?
13      MR. SWEETEN:  I caution the witness not to
14  reveal any communications between other legislative
15  staffers, Representative Harless, or any of the other
16  enumerated areas.
17      Q.  (By MS. WESTFALL) On the basis of that
18  instruction, are you not answering the question?
19      A.  Correct.  I'm sorry.
20      Q.  But it wasn't -- it wasn't you?
21      A.  That's correct.
22      Q.  During the drafting or the legislators'
23  consideration of SB 14, was there any analysis of cost
24  or steps that a voter would need to take to obtain an
25  election identification certificate?

## 236

1       MR. SWEETEN:  Again, as to matters and
2   communications that relate that are covered by the
3   legislative privilege with the enumerated groups that
4   I've provided today, don't reveal those communications.
5   If you can answer based upon the public record or with
6   information that does not implicate those
7   communications, you can go ahead and try to do so.
8       A.  The cost associated with obtaining a -- the
9   personal identification, election identification
10  certificate.  Are you referring to the documents
11  necessary for an identification?  The election
12  identification certificate is a free ID.
13      Q.  (By MS. WESTFALL) DPS is prohibited from
14  charging --
15      A.  Correct.
16      Q.  -- for an election identification certificate;
17  is that correct?
18      A.  That's my understanding.
19      Q.  What documents are necessary to obtain an
20  election identification certificate under SB 14?
21      A.  They have to be a registered voter.  It
22  references a Section 52. -- 521.142, that DPS may
23  require from the applicant identification.  It doesn't
24  list out the necessary identification.
25      Q.  Are you familiar with any regulations or

## 237

1  proposals for implementing the election identification
2  certificate that have been developed by either DPS or
3  the Secretary of State?
4      A.  It's my understanding that it is to be
5  implemented in a manner similar -- as the bill says, in
6  a manner similar to the driver's license and personal
7  identification certificate.
8      Q.  Do you have any knowledge or information about
9  the plans to implement the election identification
10 certificate?
11     MR. SWEETEN:  Don't reveal any
12 communications that you've had or Representative Harless
13 has had with state agencies with respect to this matter
14 and in addition to the other enumerated areas, but to
15 the extent that you can answer based upon public
16 information, you can feel free to do so.
17     THE WITNESS:  Okay.
18     Q.  (By MS. WESTFALL) Do you have any knowledge --
19     A.  No.
20     Q.  -- based on public information?  Did you have
21 any conversations with Representative Harless about how
22 this certificate would be implemented?
23     MR. SWEETEN:  Don't answer that, because
24 it would reveal communications that you've had with
25 Representative Harless which are covered by the

## 238

1  legislative privilege.
2      Q.  (By MS. WESTFALL) Are you aware at any time
3  during consideration of SB 46 of any legislators or
4  their staff making any statements about illegal aliens
5  voting?
6      MR. SWEETEN:  I'm going to object to the
7  extent that the question calls for you to reveal
8  communications between legislators, legislative staff,
9  state agencies, the TLC or constituents.  Don't reveal
10 any of those communications.  To the extent that you can
11 do so based on the public record, on matters not
12 implicated by that, then you can go ahead and try to
13 answer that.
14     A.  Any statements, public statements of staff or
15 members regarding the illegal immigration, not that I
16 recall.
17     Q.  (By Ms. Westfall) Not based on the public
18 record because your counsel has instructed you not to
19 talk about the private record; is that correct?
20     A.  That's correct.
21     Q.  Are you aware of the claims that SB 14
22 attempted to exploit fears of illegal immigrants voting?
23     MR. SWEETEN:  Again, don't reveal
24 legislatively-privileged information, which are the
25 categories that we've discussed.  To the extent that you

## 239

1  have information from the public record, from those
2  sources, if you can answer the question, go ahead and do
3  so.
4      A.  Senate -- my understanding is and I've said it
5  earlier is that Senate Bill 14 was about the elections
6  process and improving that.  How other people feel about
7  it, I can't speculate.
8      Q.  I know it's the end of the day, but you need to
9  listen carefully to the question and answer the question
10 so we can move on to the next question.
11     So I'm going to ask the question again:
12 Are you aware of claims that Senate Bill 14 attempted to
13 exploit fears of illegal immigrants voting?
14     MR. SWEETEN:  The same instruction.  You
15 can testify as to matters of the public record.
16     Q.  (By Ms. Westfall) Are you aware of that claim
17 in your own head sitting here today?
18     A.  Okay.  Okay.  I remember the issue coming up
19 during the committee hearing, public testimony.  There
20 were some individuals.  I remember that being discussed,
21 so yes.
22     Q.  And who testified about those concerns?
23     A.  I don't recall.
24     Q.  Outside of the hearings at which concerns about
25 illegal aliens voting was raised, did Representative

## 240

1  Harless or you become aware of those concerns from any
2  other sources communicated to the representative or to
3  you?
4      MR. SWEETEN:  Objection to the question,
5  it calls for speculation.  In addition, I'm going to
6  instruct you as I previously have:  Do not reveal
7  communications that you have had with Representative
8  Harless, staff members, state agencies, constituents or
9  TLC.  Let me also tell you that if you've got
10 information as to that question based upon the public
11 record, you can go ahead and try to answer her question.
12     THE WITNESS:  Okay.
13     MS. WESTFALL:  And to be clear,
14 Mr. Sweeten, I'm asking about communications from
15 members of the public, groups, interest groups that were
16 communications to Representative Harless or Mr. Beuck.
17     MR. SWEETEN:  Again, as to constituent
18 communications, we've held that there is a privilege as
19 to that information, so...
20     THE WITNESS:  Okay.
21     MS. WESTFALL:  Therefore, you're
22 instructing him not to answer if he received those
23 communications; is that correct?
24     MR. SWEETEN:  I'm instructing him not to
25 reveal the substance of the communication that he

COLBY BEUCK                                                    MAY 14, 2012

## 241

1  received from constituents; that's correct.
2  Q.  Have there been elections held since SB 14 was
3  signed into law in July -- I mean, pardon me -- in May
4  2011?
5  A.  There was a -- yes, a constitutional election
6  -- a constitutional amendment election in November, and
7  we're currently having an election right now.
8  Q.  To your knowledge, has the Secretary of State
9  or any County election officials enforced SB 14?
10  A.  Not to my knowledge.
11  Q.  Are you aware of any in-person voter
12  impersonation having occurred during these elections?
13  A.  Not to my personal knowledge, no.
14  Could I get a drink of water real fast?
15  MS. WESTFALL:  Why don't we take a little
16  break, because I think we'll be concluding and passing
17  the baton.
18  (Recess 5:05 p.m. to 5:16 p.m.)
19  Q.  (By Ms. Westfall)  I believe you testified
20  earlier about provisional ballots in SB 14?
21  A.  Yes.
22  Q.  Could you describe how provisional ballots work
23  in the bill?
24  A.  Okay.  There is a provision in the bill that
25  allows for a voter to cast a provisional ballot if they

## 242

1  do not have the required photo identification.
2  Q.  And could you describe the circumstances under
3  which a provisional ballot is counted?
4  A.  Yes.  They must -- they must state that they do
5  not have any other form of identification that meets the
6  requirements of Senate Bill 14.  Wait.  No.  Excuse
7  me.  Those are the exceptions.
8  Q.  Is it true that a person who casts a
9  provisional ballot under SB 14 must present one of the
10  allowable forms of ID in order for it to be counted
11  except narrow circumstances related to religious
12  objection or natural disaster?
13  A.  They have within six days to return and show
14  the identification.
15  Q.  And if they don't show the identification or
16  fall into one of these exceptions, the religious
17  exception or the natural disaster exception, their
18  provisional ballot will not be counted; is that correct?
19  A.  That is my understanding.
20  Q.  And I think you testified earlier that there
21  may have been nonpublic investigations of the impact of
22  Senate Bill 14; is that correct?
23  MR. SWEETEN:  Objection.  You're asking
24  him to reveal information that's protected by the
25  legislative privilege.  He's not going to answer that

## 243

1  question.  So I'm going to instruct you not to answer
2  the question, unless public information reveals the
3  answer, which I think by its own terms, it could not.
4  Q.  (By Ms. Westfall)  I believe you testified
5  earlier that you answered phone calls for Representative
6  Harless; is that correct?
7  A.  Correct.
8  Q.  Did you ever receive any phone calls from
9  anyone from the King Street Patriots regarding voter ID?
10  MR. SWEETEN:  Objection, asked and
11  answered.  I'm also going to object, because it
12  potentially implicates communications from a
13  constituent.  And so with that, I'm going to go ahead
14  and instruct you not to answer that.  It's already been
15  asked and answered.
16  Q.  (By Ms. Westfall)  Did you already -- did you
17  take any phone calls from Paul Bettencourt related to
18  photo ID on behalf of Representative Harless?
19  MR. SWEETEN:  Objection, asked and
20  answered.
21  MS. WESTFALL:  You may answer.
22  MR. SWEETEN:  Same instruction.
23  MS. WESTFALL:  Are you instructing him not
24  to answer?
25  MR. SWEETEN:  I am.  I think you're asking

## 244

1  for constituent communications.  I think that's within
2  the privilege.  It's one of the categories that we've
3  been asserting.
4  MS. WESTFALL:  Are you asserting a
5  privilege over the fact that a communication was made?
6  MR. SWEETEN:  First of all, he's already
7  answered this question.  So if you're just asking the
8  fact, was a communication made, I will let him answer
9  whether he received those.  I think I know the answer,
10  though, but I'm going to let him answer it again.
11  So you can go ahead and do it, Colby, if
12  you can.
13  THE WITNESS:  Okay.
14  Q.  (By Ms. Westfall)  Did you receive any phone
15  call from anyone with the King Street Patriots related
16  to photo ID that were made in to Representative Harless?
17  A.  Yes.
18  MR. SWEETEN:  That were made in to?
19  MS. WESTFALL:  That were called in to
20  Representative Harless's office.
21  MR. SWEETEN:  Okay.  All right.  He's --
22  he can answer as to whether contact was made.  He will
23  not answer the substance.
24  Once again, the prefatory remarks on
25  your question, you're asking about substance, and I'm

COLBY BEUCK                                                    MAY 14, 2012

---

## 245

1  not going to continue to allow you to do that. That is
2  improper. You're asking about substance of
3  conversation. So I'll let him talk about contact.
4  We'll talk about the privilege log like you said, but
5  I'm not going to let him get into the substance of any
6  conversations.
7          MS. WESTFALL: I understand that. The
8  question's not improper. It's relevant. It's within
9  Rule 26. You're asserting a privilege. You can
10  instruct your witness not to answer. That's how we've
11  been operating today.
12         MR. SWEETEN: Okay. He's answered the
13  question I think you asked. I'm not going to let him
14  reveal substance of the communication. I've been very
15  clear about that.
16         MS. WESTFALL: I'm now going to ask my
17  question to make my record. I understand your position
18  on privilege.
19     Q. (By Ms. Westfall) What was the nature and the
20  substance of the communication and phone call from the
21  King Street Patriots regarding photo ID?
22         MR. SWEETEN: Do not answer the question
23  proposed. She's asking about substance of
24  communications. You don't have to do that.
25     Q. (By Ms. Westfall) Did you receive a phone

## 246

1  call --
2          MR. SWEETEN: Let me just say for the
3  record, it's protected by the legislative privilege. Go
4  ahead.
5      Q. (By Ms. Westfall) Did you receive a phone call
6  from Paul Bettencourt regarding photo ID issues in
7  Representative Harless's office?
8      A. No.
9      Q. Did you receive any phone call from Catherine
10  Engelbrecht concerning photo ID issues?
11         MR. SWEETEN: Objection, asked and
12  answered.
13     Q. (By Ms. Westfall) You may answer.
14     A. Yes.
15     Q. What was that call regarding or concerning?
16         MR. SWEETEN: Don't reveal communications
17  between constituents that contacted your office. It's
18  covered by the legislative privilege.
19     Q. (By Ms. Westfall) In Texas, are there as many
20  driver's license offices as polling locations to your
21  knowledge?
22         MR. SWEETEN: You can answer if you know.
23     A. I don't know the exact numbers of either of
24  those.
25     Q. (By Ms. Westfall) Have there been any driver

## 247

1  license offices that have closed due to lack of funding
2  to your knowledge?
3      A. Not that I'm aware of.
4      Q. Did you conduct any research or have any
5  knowledge about availability or locations of driver
6  license offices in either the state of Georgia or the
7  state of Indiana?
8          MR. SWEETEN: I'm going to object. I
9  think this falls within legislative fact-gathering,
10  which is within the privilege. He doesn't have to
11  answer what occurred with respect to legislative fact-
12  gathering.
13     Q. (By Ms. Westfall) Are there any answers that
14  you want to change at this point in response to any
15  question that I asked you today?
16     A. Not that I can think offhand.
17     Q. Is there any information that you didn't recall
18  that you now recall now that we're at the end of the day
19  in answer to any of my questions?
20     A. You had mentioned, you had asked a -- if groups
21  contacted me in the preparation of Senate Bill 14. And
22  I -- the groups that had contacted me, and I -- there
23  was a group before while I was drafting it that
24  contacted me, and add -- Advocacy, Inc.
25     Q. I see. And what was the concern of that

## 248

1  organization?
2          MR. SWEETEN: Don't reveal communications
3  from potential constituents that's subject to the
4  legislative privilege.
5      Q. (By Ms. Westfall) Is there anything you would
6  like to add so that we can understand your answers more
7  clearly to any of the questions you asked today?
8      A. Not that I can think of right now.
9      Q. Is there any further information beyond the
10  phone call that you received from Advocacy, Inc. that
11  you didn't recall earlier today when I asked you a
12  question that you now recall, or is that the sum total?
13     A. That's what I can think of right now.
14         MS. WESTFALL: So throughout today, your
15  counsel has instructed you not to answer many questions
16  on the basis of legislative privilege. The Attorney
17  General intends to move to compel responses to or will
18  consider moving to compel responses to many of the
19  questions that you did not answer. We therefore leave
20  this deposition open in the event that the Attorney
21  General's motion is granted in whole or in part. And I
22  will now conclude my questioning for today. For the
23  time being, we leave the deposition open and turn over
24  questioning to Mr. Rosenberg.
25         EXAMINATION

COLBY BEUCK                                                    MAY 14, 2012

253

1      A.   I understand.
2      Q.   -- in an attorney-client context.  Is it your
3  testimony that you actually operate as Representative
4  Harless's attorney?
5      A.   In matters where she is asking my -- my opinion
6  on a legal issue, that is my understanding.
7      Q.   Just because it calls for your knowledge of the
8  law, you think you're operating as her attorney?
9      A.   That's my understanding.
10     Q.   Have documents been withheld from production in
11 this case on the basis of attorney-client privilege
12 focusing on your relationship with Representative
13 Harless as her attorney?
14     A.   I'm not aware.  I don't know.
15     Q.   Did you review the privilege log in this matter
16 relating to documents from Representative Harless?
17     A.   No.
18     Q.   Did you advise your attorneys here as to any
19 documents that you believed were privileged under
20 attorney-client privilege because of your relationship
21 as Representative Harless's attorney?
22     A.   Any documents that we produced?
23     A.   Yeah.
24     A.   No.
25     Q.   Does Representative Harless maintain any

254

1  documents in her own office?  And when I say "her own
2  office," I don't mean her office complex, I mean her own
3  office.
4      A.   Capitol office?
5      Q.   Yeah.  Well, does she have more than one
6  office?
7      A.   We have a district office.
8      Q.   Okay.  Well, that's good.  Let's talk about
9  that, too, but let's start with the Capitol office.
10     A.   Okay.
11     Q.   Does Representative Harless maintain any
12 documents in the room that's her office in the Capitol
13 office?
14     A.   Yes.
15     Q.   And you searched those files in connection with
16 the production of documents in this case?
17     A.   Yes.
18     Q.   And documents were produced from those files?
19     A.   I don't recall where the documents -- if
20 documents came from specifically those files.  I
21 produced all documents in the office that were
22 responsive, so, but I can't recall which file folder it
23 actually came from.
24     Q.   Sure.  Was a search also made of her district
25 office for responsive documents?

255

1      A.   Yes.
2      Q.   And documents were produced from that office
3  also?
4      A.   There were not responsive documents there.
5      Q.   I think in response to a question from
6  Ms. Westfall, you testified that you received text
7  messages from Representative Harless during the floor
8  debates; is that correct?
9      A.   A few, yes.
10     Q.   Was any search made of text messages on
11 Representative Harless's telephone to the extent that
12 they're kept?
13     A.   I believe she did search that.  I searched mine
14 as well.  I did not have any responsive documents.
15     Q.   And --
16     A.   Texts.  Excuse me.
17     Q.   And during the floor debates, were you able to
18 view the floor debates through a closed-circuit
19 television?
20     A.   I had the debate pulled up on the Internet.
21     Q.   So you were able to watch it as it was going?
22     A.   Correct.
23     Q.   And were you also able to speak with
24 Representative Harless by telephone during the floor
25 debates?

256

1      A.   I believe we did have a phone conversation.
2      Q.   Do you recall what the phone conversation was
3  about?
4          MR. SWEETEN:  Don't reveal the substance
5  of any conversations you've had.  If the question is, do
6  you recall what it's about, you can go ahead and answer
7  "yes" or "no," but do not reveal the substance of those
8  communications.
9      A.   Okay.  I don't recall the specifics of the
10 phone conversation.  It was -- I don't recall the
11 specifics.
12     Q.   (By Mr. Rosenberg)  Do you recall anything
13 about the phone conversation?
14         MR. SWEETEN:  Don't reveal the substance
15 of it.  It's legislatively privileged.  But you can
16 answer that question.
17     A.   Based on that, I can't.
18     Q.   (By Mr. Rosenberg)  Well, the question was
19 whether you recalled anything.  You can give me a "yes"
20 or a "no" answer.
21     A.   Okay.  Okay.  Yeah.  I thought you were asking
22 -- yes, I do recall.
23     Q.   What do you recall about it?
24         MR. SWEETEN:  Same objection.
25         THE WITNESS:  Okay.  Sorry.  Jumped ahead.

COLBY BEUCK                                                           MAY 14, 2012

---

265

1  privilege.  I'm going to instruct him that that is
2  privileged.
3       Q.  (By Mr. Rosenberg)  Did you have any -- so
4  you're not going to answer that question?
5       A.  Correct.
6       Q.  Did you have any discussions with local
7  officials as to voter fraud in connection with SB 14?
8           MR. SWEETEN:  Same objection.  Same
9  instruction.
10      A.  I'm going to -- the answer is no based on --
11      Q.  (By Mr. Rosenberg)  Did you have any
12  discussions with local election officials in connection
13  with SB 14?
14          MR. SWEETEN:  Same objection.  Same
15  instruction.
16          MR. ROSENBERG:  Whether he had any
17  discussions with local election officials.
18          MR. SWEETEN:  You can ask if he has had
19  contact with local election officials.  I'll allow that
20  question.  I think the line is I think you're treading
21  into the substance of conversations and legislative
22  fact-gathering that I think is privileged.  But go
23  ahead, you can answer if you've had contact with local
24  election officials.
25      A.  Yes.

---

266

1       Q.  (By Mr. Rosenberg)  With whom did you have
2  contact?
3       A.  The Harris County clerk's office.
4       Q.  Who at the Harris County clerk's office?
5           MR. SWEETEN:  You can answer if you know.
6       A.  I'm trying to remember.  George is his first
7  name.  George Hammerline.
8       Q.  (By Mr. Rosenberg)  Hammerline?
9       A.  Yes.
10      Q.  Anyone else?
11      A.  He's -- George.  George is the contact.
12      Q.  And when did you have a conversation with
13  George Hammerline?
14      A.  Late February.
15      Q.  Of 2011?
16      A.  2011.  Yes.
17      Q.  And what was your -- the purpose of your having
18  a conversation with Mr. Hammerline?
19          MR. SWEETEN:  Once again, I think the
20  question implicates legislative fact-gathering.  We
21  believe that that's part of the legislative privilege.
22  I've made that assertion and continue to do so.
23          You can answer to the extent that it
24  implicates matters of public record, however.
25      Q.  (By Mr. Rosenberg)  Can you answer the

---

267

1  question?
2       A.  No, I cannot.
3       Q.  Was it related to SB 14?
4       A.  Yes.
5       Q.  And what was the substance of your conversation
6  with Mr. Hammerline?
7           MR. SWEETEN:  Same objection.  Same
8  instruction.
9       Q.  (By Mr. Rosenberg)  And you're not going to
10 answer the question?
11      A.  Correct.
12      Q.  Other than Mr. Hammerline, did you have
13 discussions with any other local election officials
14 concerning SB 14?
15      A.  Not that I remember.
16      Q.  Do you know if Representative Harless had any
17 discussions with any local election officials concerning
18 SB 14?
19      A.  I can't speculate.  Not that I know of.
20      Q.  Do you know if there is any investigation or
21 analysis of voter impersonation that has not been made
22 public?
23          MR. SWEETEN:  I object.  You're asking for
24 information related to the legislative fact-gathering
25 process.  It also could implicate communications that

---

268

1  he's had with these various parties that I believe are
2  subject to the legislative privilege.  So I think that
3  is within the legislative privilege.  I think that is
4  not a proper question.  I'm going to instruct you not to
5  answer.
6       Q.  (By Mr. Rosenberg)  Are you going to answer?
7       A.  No.
8       Q.  Do you know a guy named Ed Johnson?
9       A.  Yes.
10      Q.  Who is he?
11      A.  He works for the Harris County clerk's office.
12      Q.  Okay.  Clerk's office or the tax office?
13      A.  Oh.  He works for Harris County.  I don't know
14 which division he works in.
15      Q.  Have you ever spoken to him about SB 14?
16      A.  Yes.
17      Q.  When did you speak to him?
18      A.  It was in 2011.  I don't know the exact date.
19 It was during the session in 2011.
20      Q.  What was your purpose in speaking with
21 Mr. Johnson?
22          MR. SWEETEN:  Objection to the extent that
23 it reveals legislative fact-gathering with respect to
24 Senate Bill 14.  I believe that's within the legislative
25 privilege and instruct you not to answer that question.

COLBY BEUCK                                                    MAY 14, 2012

---

## 269

1  Q.  (By Mr. Rosenberg)  Are you going to answer the
2  question?
3  A.  No.
4  Q.  On that basis?
5  A.  Yes.
6  Q.  Did any legislators contact you in order to get
7  preapproval for any amendments to SB 14?
8         MR. SWEETEN:  I'm going to object to the
9  extent that that implicates communications between a
10 legislator and you subject to the legislative privilege
11 and communications.
12 A.  Were there any communications?  Can I -- can
13 you repeat the question?
14 Q.  (By Mr. Rosenberg)  Sure.  Did any legislators
15 contact you in connection with preapproval of any
16 amendments that were going to be offered to SB 14?
17        MR. SWEETEN:  Don't answer to the extent
18 that that implicates any communications that you've had
19 with legislators, which it plainly does, unless this is
20 a matter of public record, for example, a colloquy on
21 the floor, discussions that are public.
22 A.  Got you.  Okay.  I'm going to not answer the
23 question.
24 Q.  (By Mr. Rosenberg)  On that basis?
25 A.  Correct.

---

## 270

1         Q.  In connection with the production of e-mails, I
2  think you said that they were deleted after 30 days; is
3  that correct?
4  A.  Correct.
5  Q.  Are you aware of any backup system or archiving
6  of e-mails?
7  A.  There is an archive within our e-mail
8  system.  We have to manually move the e-mail over to
9  that, to that archive.  I'm not aware of any automatic
10 archiving system.
11 Q.  And were your archives and Representative
12 Harless's archives searched in connection with the
13 e-mail production in this case?
14 A.  Yes.
15 Q.  Have you spoken with anyone from your IT
16 department as to whether or not there is any kind of
17 backup system over and above the archiving?
18 A.  No, I have not.
19 Q.  Do you know if there is one?
20 A.  I do not know.
21        MR. ROSENBERG:  Why don't we take a
22 couple-minute break.  I might be just about done.
23 A.  Okay.
24        (Recess at 5:57 p.m. to 6:01)
25 Q.  (By Mr. Rosenberg)  Just a couple of more

---

## 271

1  questions, Mr. Beuck.  Getting back to Mr. Hammerline,
2  do you know whether he testified as a witness at any of
3  the hearings in connection with the photo ID
4  legislation?
5         MR. SWEETEN:  I'm sorry.  Can you repeat
6  the question?  I apologize.  My fault.
7         MR. ROSENBERG:  I just asked whether
8  Mr. Hammerline testified as a witness at any of the
9  hearings.
10        MR. SWEETEN:  Go ahead and answer.
11 A.  I don't believe he was a witness.  He -- he --
12 my memory is that he was not a witness in the House.  I
13 can't speak to the -- I don't believe he was in the
14 Senate.  I'm not a hundred percent sure.  It's possible
15 he was in previous sessions.  I'm not sure.
16 Q.  (By Mr. Rosenberg)  Is there such a thing
17 called "interim hearings" in Texas legislature?
18 A.  Yes.
19 Q.  What are interim hearings?
20 A.  Committees, there are -- during the interim,
21 the speaker will issue an interim charge for committees
22 to study issues.  The committees typically will hold
23 hearings, one, maybe two hearings on the
24 issue.  Sometimes public testimony is taken.  Sometimes
25 it's not.

---

## 272

1         Q.  Were there interim hearings on photo ID
2  legislation?
3  A.  Yes.  I believe there was.
4  Q.  Were you involved in those interim hearings?
5  A.  No, I was not.
6  Q.  Were you aware of the interim hearings?
7  A.  Yes.  I was aware of the interim hearings.
8  Q.  Do you know if Mr. Hammerline testified at any
9  of the interim hearings?
10 A.  I don't know.
11 Q.  Were you involved in organizing witnesses for
12 any of the hearings in connection with SB 14?
13 A.  Yes.
14 Q.  Were you involved in gathering witnesses in
15 connection with -- organizing witnesses in connection
16 with any of the hearings on HB 112?
17 A.  No.
18 Q.  Which witnesses were you involved with in
19 connection with SB 14?
20        MR. SWEETEN:  Which witnesses did he
21 contact?  I just want to make sure I'm clear on the
22 question.
23 Q.  (By Mr. Rosenberg)  Well, let's start with
24 contacting them.  We'll go from there.
25 A.  The Georgia Secretary of State.  The gentleman

COLBY BEUCK                                          MAY 14, 2012

---

273

1    from Indiana.  Wheeler was his last name.  Thomas
2    Wheeler.
3         Q.  Anyone else?
4         A.  There was another individual from -- from
5    Austin.  I cannot remember his name.  I contacted him as
6    well.
7         Q.  Do you remember what issue that witness from
8    Austin spoke on or testified on?
9         A.  His experience with the -- I remember his
10   committee testimony was with his experience on the -- he
11   was -- he's an attorney from Austin and his experience
12   with the Voting Rights Act cases.
13        Q.  Anyone else?
14        A.  The expert witnesses.
15        Q.  Which expert witnesses?
16        A.  DPS, I mentioned earlier, Rebecca Davio.
17   Davio.  I'm not sure how it's pronounced.
18        Q.  Anyone else?
19        A.  The Attorney General -- Attorney General's
20   office have a representative there.
21        Q.  Do you recall who that was?
22        A.  No, I do not.
23        Q.  Ever hear of a guy named Mike Hull?  H-U-L-L.
24        A.  Yes.  Yes.  I am familiar with his name.
25        Q.  Who is he?

---

275

1         MR. SWEETEN:  I'm saying that when there's
2    legislative fact-gathering occurring with respect to
3    this bill, Senate Bill 14, that that is squarely within
4    the privileges that we've asserted in our briefing, that
5    that information he does not have to reveal the
6    information related to that fact-gathering.  I've let
7    him answer as to the contacts.  I will let him answer as
8    to the public record with respect to these individual
9    witnesses.  However, as far as the fact-gathering,
10   that's squarely on all fours with how we've been
11   asserting legislative privilege.
12        Q.  (By Mr. Rosenberg)  Can you answer my question?
13        A.  What was the nature of the conversation?
14        MR. SWEETEN:  Yeah.  Same objection and
15   instruction with respect to legislative fact-gathering.
16        Q.  (By Mr. Rosenberg)  Can you answer?
17        A.  I cannot.  Sorry.
18        Q.  Same question as to your communication with
19   Mr. Wheeler from Indiana.  Can you tell me the substance
20   of your conversation or correspondence with Mr. Wheeler?
21        MR. SWEETEN:  Same objection and
22   instruction.  To the extent that you can reveal
23   information from a public record, you can feel free to
24   do so.
25        A.  Okay.  No, I cannot.

---

274

1         A.  I know his name.  I don't really know what he
2    does or who he is.  I am familiar with his name.
3         Q.  You ever have any contact with him?
4         A.  Regarding?
5         Q.  SB 14?
6         A.  No.
7         Q.  Do you know if Representative Harless did?
8         A.  I don't know.
9         Q.  You were contacted with the Georgia Secretary
10   of State's office.  Were those telephone, mail or both?
11        A.  Telephone, e-mails.
12        Q.  And what was the nature of your conversation
13   with them?
14        MR. SWEETEN:  Don't reveal your
15   communications which relate to legislative fact-
16   gathering for Senate Bill 14.  To the extent you can
17   answer based upon the public record, you can feel free
18   to do so.  Otherwise, it's legislatively privileged.  Go
19   ahead.
20        MR. ROSENBERG:  Just so I'm clear.  A
21   communication that Mr. Beuck had with a third party
22   who's not a constituent, and I'm assuming that Georgia
23   Secretary of State is not within your broad definition
24   of constituency, is you're asserting privilege over that
25   communication?

---

276

1         Q.  (By Mr. Rosenberg)  And the gentleman or
2    gentlewoman from Austin, I think you said was a lawyer
3    experienced with the Voting Rights Act.  Do you recall
4    that person's name?
5         A.  No, I do not.  He also testified in the Senate.
6         Q.  And can you tell me the substance of your
7    conversations or other communications with that person?
8         MR. SWEETEN:  Same objection and
9    instruction.
10        A.  No, I cannot.
11        Q.  (By Mr. Rosenberg)  Was that person's name Eric
12   Opiela?
13        A.  That does not sound familiar.
14        Q.  The name Eric Opiela doesn't sound --
15        A.  Not -- not in this case.  I have heard that
16   name before, but not -- he was not --
17        Q.  Where have you heard that name?
18        A.  I can't say.
19        Q.  You can't say because you don't want to say?
20        A.  No.  I don't know where I've heard that name
21   before.
22        MR. ROSENBERG:  I have no further
23   questions.  Thank you.
24        MR. SWEETEN:  Thank you.  Reserve
25   questions for time of trial.

DENNIS BONNEN                                                                June 6, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS,              )
     Plaintiff,              )
                             )
VS.                          )
                             )
ERIC R. HOLDER, JR., in      )
his official capacity as     )
Attorney General of the      )
United States,               )
     Defendant,              )
                             )
ERIC KENNIE, ET AL,          )
     Defendant-              )
     Intervenors,            )
                             )
TEXAS STATE CONFERENCE OF    ) CASE NO. 1:12-CV-00128
NAACP BRANCHES,              ) (RMC-DST-RLW)
     Defendant-              ) Three-Judge Court
     Intervenors,            )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al,               )
     Defendant-              )
     Intervenors,            )
                             )
VICTORIA RODRIGUEZ, et       )
al,                          )
     Defendant-              )
     Intervenors.            )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

DENNIS BONNEN

JUNE 6, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF DENNIS BONNEN, produced as a
witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause

## 2

1  on June 6, 2012, from 9:54 a.m. to 7:35 p.m., before

2  Donna Wright, CSR in and for the State of Texas,

3  reported by machine shorthand, at the offices of THE

4  UNITED STATES ATTORNEY, 816 Congress Avenue, Suite

5  1000, Austin, Texas, pursuant to the Federal Rules of

6  Civil Procedure and the provisions stated on the record

7  or attached hereto.

## 3

1
2                    A P P E A R A N C E S
3    FOR THE PLAINTIFF:
        Mr. Reynolds Brissenden
4       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        209 West Eighth Street
5       Austin, Texas 78701
        (512) 936-1307
6
7    FOR THE DEFENDANT HOLDER, ET AL:
        Ms. Risa Berkower
8       Mr. Bruce Gear
        U.S. DEPARTMENT OF JUSTICE
9       950 Pennsylvania Avenue, NW
        Washington, DC 20530
10      (202) 305-7766
11
     FOR THE RODRIGUEZ DEFENDANT-INTERVENORS:
12      Ms. Nina Perales
        Mr. Luis Orlando Figueroa, Jr.
13      Ms. Karolina Lyznik
        MALDEF
14      110 Broadway
        San Antonio, Texas 78205-1910
15      (210) 224-5476
16
17
18
19
20
21
22
23
24
25

## 4

1                          INDEX
2
3    Appearances...................................  3
4
5
6    DENNIS BONNEN
7
     Examination by Ms. Berkower....................  7
8    Examination by Ms. Perales................... 243
     Examination (Continued) by Ms. Berkower........ 294
9
     Witness' Signature Page........................ 324
10   Reporter's Certificate......................... 326
11
12             GOVERNMENT EXHIBITS
13   NUMBER  DESCRIPTION                        PAGE
14   430    ........................... 13
            Notice of Deposition
15   431    ........................... 48
            Report about Bills Voted on a Committee
16   432    ........................... 75
            Letter to Rep. Dennis Bonnen from
17          Thomas E. Wheeler, II
     433    ........................... 91
18          Document Regarding H.B. 1706
     434    ........................... 113
19          S.B. 362
     435    ........................... 124
20          Pledge Concerning Voter ID
     436    ........................... 130
21          H.B. 3556
     437    ........................... 142
22          Correspondence Between Representative
            Bonnen and Kathy Rogers
23   438    ........................... 152
            Interim House Committee Elections
24          Report Filed January 2011
     439    ........................... 166
25          H.B. 624

DENNIS BONNEN                                             June 6, 2012

## 29

1    Q.   And you moved back from Washington, D.C. to
2    run?
3    A.   Correct.
4    Q.   You were the youngest House member when you
5    first won; is that correct?
6    A.   Well, at -- during that session, yes, at the
7    time.  I was not the youngest historically.
8    Q.   So what year were you first elected to the
9    House?
10   A.   It was the '96 election cycle, and I was sworn
11   in, I guess, January of '97.
12   Q.   What are the demographics of your district?
13   A.   I don't know.
14   Q.   Have you ever known?
15   A.   Have I ever reviewed them on a website, yes.
16   But have I ever probably had that information where I
17   could regurgitate it, no.
18   Q.   And I should have asked this before.
19   A.   That's okay.
20   Q.   Which district do you represent?
21   A.   District 25.
22   Q.   Where is that located?
23   A.   Well, presently it is basically Southern
24   Brazoria County.  But from re-districting, it will,
25   moving forward, include Matagorda County for the first

## 30

1    time.
2    Q.   How big is your district, population-wise.
3    A.   Gosh, presently -- I don't know.  Presently
4    it's probably around, as we sit today, 140,000 -- well,
5    maybe more like 130,000.
6    Q.   Was it -- has it grown a lot in the time that
7    you've represented it?
8    A.   Let me think about this.  That's a little
9    difficult to answer because in the late '90s it did
10   grow a lot because I had the north end of Brazoria
11   County.
12        In the 2000 and 2001 redistricting, I no
13   longer retained the north end of the county and
14   remained in the southern end of the county.  And in the
15   last decade the district actually shrunk slightly.  So
16   in the beginning of my tenure, I guess you could say it
17   grew a fair amount, and then in the last ten years due
18   to the change of the makeup of the district it was
19   really probably more flat with maybe a slight decline.
20   Q.   How many staff do you have?
21   A.   Three.
22   Q.   Does that include both the district office and
23   the Austin office?
24   A.   Correct.
25   Q.   Who are those staff members?

## 31

1    A.   Jessica Effenberger, who I believe started in
2    February of this year, somewhere around there.
3    Steven Schar, who started with us after last session at
4    some point.  And then Shera Eichler, who's been with
5    me -- I don't know -- eight years or so, eight or
6    nine years.
7    Q.   Do they work in both the district office and
8    the Capitol office?
9    A.   Not really.  Jessica Effenberger is in the
10   district office and Shera Eichler and Steven Schar are
11   in the Capitol office.  Obviously, there are rare
12   occasions where they maybe travel to one or the other,
13   but that's very rare.
14   Q.   Could you list each and every person who's
15   voted on voter ID legislation from your office from
16   2005 to the present?
17   A.   I will certainly try.  I will probably not do
18   it effectively, but I will try.  Shera Eichler
19   certainly has worked on it.  I guess Steven Schar has.
20   Gosh, you know, going back to '05, I don't even know.
21   I apologize.
22   Q.   What about --
23   A.   Certainly if we pulled a roster of staff I
24   could tell you.
25   Q.   What if we focus just on the 81st and

## 32

1    82nd Legislative Sessions?
2    A.   Sure.
3    Q.   Who worked on it in those sessions, do you
4    remember?
5    A.   Shera Eichler definitely would have.
6    Linda Winder would have in a limited extent in that
7    Linda Winder was in the district office.  Actually, in
8    all fairness, Linda wouldn't have worked on
9    legislation.  She would have more dealt with
10   constituent comments and issues.
11        I apologize.  I'm trying to think who --
12   oh, I guess Carson Hooks may have worked on it.  He, I
13   believe, worked the '09 session.
14   Q.   What was his position with you in the
15   2009 session?
16   A.   Legislative staff.
17   Q.   And what was Ms. Winder's position with you?
18   A.   District assistant and district director.  She
19   wouldn't have worked specifically on legislation.  She
20   would have, I stated, more done correspondence with
21   constituents and things of that sort.
22   Q.   But Mr. Hooks would have worked on
23   legislation?
24   A.   To some extent, sure.
25   Q.   Did you recently campaign for office?

DENNIS BONNEN                                            June 6, 2012

## 33

1    A.  No, not really.
2    Q.  What do you mean by that?
3    A.  I was lucky enough to be unopposed.
4    Q.  Was that in the election on May 29th?
5    A.  Correct.  And in November.
6    Q.  You were also unopposed in November?
7    A.  Correct.
8    Q.  So what was the extent of any campaign that
9  you did?
10    A.  In my mind, I did no campaigning, to be candid
11  and honest.  I certainly went to community events,
12  civic events and was involved in the community.  But I
13  don't consider that -- that's more my responsibility as
14  a representative and things I do year in and year out
15  regardless of campaign or not.
16        So from a true campaigning election
17  perspective, I did really nothing and simply did my
18  normal activities in being a positive representative
19  involved in his local community as I should be.
20    Q.  When is the last time you had to campaign
21  against an opponent?
22    A.  I don't know.  I guess maybe six years ago.
23  And probably then it was not much of one.
24    Q.  Do you remember if voter identification was an
25  issue in that campaign?

## 34

1    A.  I don't think it was.  I've not had much of a
2  campaign.
3    Q.  When is the last time you voted?
4    A.  I guess it would be May 29th.
5    Q.  Did you vote in person that day?
6    A.  No, I voted early, in person early.
7    Q.  So in person early for the May 29th election?
8    A.  Correct.
9    Q.  How far is your polling place from where you
10  live?
11    A.  It depends on which one they're sending me to
12  that day.  I guess -- well, to be clear, do you mean
13  the one that I used for early voting or the one that
14  would be used on the day of the election?
15    Q.  Well, I guess both.  Just first, where is your
16  early voting location and how far is it located from
17  your house?
18    A.  I don't know exactly by miles.  It's on the
19  other side of town.  But I live in a town of about
20  19,000, so the other side is not significantly far.
21  It's probably -- please don't hold me to this.  I'm
22  guessing -- five to ten miles at the most for the early
23  voting pole.
24        The election day location is probably,
25  you know, three miles away.

## 35

1    Q.  Do you usually vote in person?
2    A.  Not to be ignorant, but when you say "in
3  person," you mean -- obviously, I'm not allowed to vote
4  by mail.  So you mean early or on election day,
5  correct?
6    Q.  Yes.
7    A.  Yes, absolutely.
8    Q.  When you have gone in person to vote, have you
9  ever witnessed anyone trying to impersonate another
10  voter?
11    A.  No.
12    Q.  Have you ever witnessed a noncitizen trying to
13  vote?
14    A.  Not that I would be aware of.  But I pretty
15  much stick to myself and leave people alone when I'm
16  voting, as you should.
17    Q.  So maybe the next question you've already
18  answered, but have you ever challenged a voter's
19  eligibility at the polls?
20    A.  Have I?  No.
21    Q.  Have you ever seen it happen?
22    A.  Well, no.
23    Q.  Have you ever served on any committees in the
24  House that have handled election issues?
25    A.  Yes, I guess I have.

## 36

1    Q.  What are those?
2    A.  I guess in 2009 I was on the elections
3  committee, and then last session I guess the select
4  committee.  In the 11th session, the select committee I
5  chaired, that only handled one issue.
6    Q.  What's the name of that committee?
7    A.  I apologize.  I'm not even sure.  It's the
8  select committee on -- I don't know.
9    Q.  Voter identification and voter fraud maybe?
10    A.  You're exactly right.
11    Q.  Okay.
12    A.  I'm not trying to be -- I just --
13    Q.  Were you also on a House select committee on
14  election contests?
15    A.  Oh, I apologize.  Yes.  Yes, I was.  Well, I
16  don't know if it was -- you would know.  I'm sure
17  you've done your homework.  It was on a specific
18  contest, not broadly speaking.
19    Q.  Okay.  I was going to ask you exactly what
20  that committee was.
21    A.  It -- well, now I'm going to screw up, but to
22  the best of my ability I will describe it.  We have a
23  process in Texas that I will screw up royally.  But to
24  my knowledge, or to my limited understanding, after the
25  election, if there has been, I guess, a recount and

DENNIS BONNEN                                          June 6, 2012

## 37

1    someone chooses to continue in a legislative race -- I
2    think it's only a legislative race -- I could be wrong
3    about that, though -- chooses to contest that race,
4    chooses to continue the -- to question the outcome, the
5    validity of that, they are able to then take that to
6    the Texas Legislature.
7         And that committee was created to review
8    the election in question, which I don't remember the
9    House district. I know it was an Austin district,
10   Travis County, and that we sided with the -- we sided
11   against the Republican candidate who brought the
12   contest and sided with the Democratic candidate, who
13   was Donna Howard.
14        Q.  What years did you serve on the elections
15   committee?
16        A.  I guess that would be the 2009 session and
17   then into the 2010 era.
18        Q.  Were you on the elections committee in any
19   other sessions?
20        A.  I'm pretty certain I wasn't.
21        Q.  And what about the select House committee and
22   voter identification fraud?  What years did you serve
23   on that committee?
24        A.  I guess technically I currently am on it now
25   and in 2009.

## 38

1         Q.  There -- it was in 2009 as well?
2         A.  I'm sorry.  I misspoke.  Thank you.  2011.  I
3    apologize.
4         Q.  So just the 82nd Legislative Session?
5         A.  Correct.  That's correct.
6         Q.  How did you come to serve on those committees?
7             MR. BRISSENDEN:  I'm going to instruct
8    you that to the extent that you had communications with
9    other legislators about the selection process, your
10   appointment to serve on those committees, I instruct
11   you not to answer.
12            THE WITNESS:  I'm simply appointed.
13        Q.  (BY MS. BERKOWER)  Who appointed you?
14        A.  It is through the committee appointment
15   process that the Speaker of the House is responsible
16   for.
17        Q.  Did you have any communications with the
18   Speaker of the House about your appointment?
19        A.  I guess that would be privileged, wouldn't it?
20            MR. BRISSENDEN:  I'll instruct you --
21   same instruction.
22            If you can answer the question generally
23   without disclosing substance of communications or
24   privilege, you may answer.
25            THE WITNESS:  The only communication I

## 39

1    had was the Speaker calling me to tell me that I was
2    being put on the committee.
3         Q.  (BY MS. BERKOWER)  Was that the first time you
4    had heard about the committee?
5         A.  I had no clue it existed before then.
6         Q.  Okay.  Have you -- had you had any experience
7    in election law prior to serving on the House Elections
8    Committee in 2009?
9         A.  What would you mean by "experience"?
10        Q.  In any capacity, I guess.  Well, you're not an
11   attorney --
12        A.  Right.
13        Q.  -- so was that your first involvement with
14   election law, being on that committee?
15        A.  I would say that's accurate.  Certainly being
16   an elected official and going through some campaigns
17   and things you have to be aware of some things
18   regarding election law.  But to suggest that I even be
19   on that committee, much less became a particular expert
20   on it, wouldn't be entirely accurate.
21        Q.  Have you ever been the chair of a committee
22   relating to election issues?
23        A.  I guess in 2011 and the select committee.
24        Q.  So maybe just for ease of reference, when we
25   talk about the select committee we'll just be assuming

## 40

1    we're referring to the select committee and voter
2    identification voter fraud?
3         A.  Correct, yes, because I don't know the name of
4    it.
5         Q.  Okay.  If it turns out that you're referring
6    to a different select committee you can just specify.
7         A.  Absolutely.
8         Q.  Okay.  So what responsibilities does a House
9    member have as chair of a committee?
10        A.  I think the greatest responsibility is to
11   ensure that the committee is conducted within the rules
12   of the House and that all members and all witnesses and
13   all issues are given the highest degree of respect and
14   the opportunity to be heard.
15        Q.  What, in particular, rules -- are there
16   particular rules that you're referring to when you say
17   the rules of the House have to be respected?
18            MR. BRISSENDEN:  I'm going to instruct
19   you that in terms of your knowledge and experience
20   based upon the particular -- your service on a
21   particular select committee, if you developed a
22   knowledge and experience based upon your service on
23   that select committee with regards to voter ID and
24   S.B. 14, if that requires you to disclose that
25   information in regards to this question, I instruct you

DENNIS BONNEN                                                    June 6, 2012

---

## 41

1  not to answer.

2          To the extent that you can answer the

3  question without disclosing that information based upon

4  general experience and in general terms, you may

5  answer.

6          THE WITNESS:  I mean, just -- what I'm

7  referring to is simply generally following the rules

8  that the House adopts at the beginning of each

9  legislative session that govern the practices of the

10  Texas House and its committee and its work procedure.

11          Q.  (BY MS. BERKOWER)  And what are the procedures

12  in place -- sorry.  Let me start that question over.

13          A.  Sure.

14          Q.  You said that you felt that as the chairman of

15  the -- the chairman of the House committee has the

16  responsibility to ensure that everyone has an

17  opportunity to be heard.

18          A.  Uh-huh.

19          Q.  What procedural -- what procedures are there

20  to ensure that everyone has an opportunity to be heard?

21          MR. BRISSENDEN:  Again, I'm going to

22  instruct you that with regards to information,

23  experience, knowledge that you have in relation to your

24  service on the select committee related to the voter ID

25  bill, if it requires you to disclose that information,

---

## 42

1  rules, procedures, I would instruct you not to answer.

2          To the extent that you can answer the

3  question without disclosing that information in general

4  terms, you may answer.

5          MS. BERKOWER:  I think -- just to be

6  clear, I think your objection is a little premature.

7  I'm asking him general questions about the House -- the

8  responsibilities of a chairman of any committee in the

9  House, and generally what the House procedures are to

10  ensure.

11          MR. BRISSENDEN:  Well, I believe your

12  question was a little bit more in particular about his

13  service.  And so if he can -- if he can answer the

14  question based on general terms and general procedure,

15  I believe that's permissible and I'll allow him to

16  answer.

17          MS. BERKOWER:  I said what

18  responsibilities does a member have as chair of a

19  committee in the House.  That's a general question, and

20  I don't think your objection is applicable to that

21  question.

22          MR. BRISSENDEN:  My instruction is the

23  same.

24          THE WITNESS:  Generally speaking, the

25  responsibilities are what are in the rule book that we

---

## 43

1  approve at the beginning of every legislative session.

2          Q.  (BY MS. BERKOWER)  And I think I also had

3  asked you a question about what procedures do the House

4  rules have to ensure that everyone has an opportunity

5  to be heard?

6          A.  Specifically, I'm -- you know, it's what's in

7  the book.  I don't have it in front of me.

8          Q.  Do you remember any of the procedures?

9          A.  Not off the top of my head.

10          Q.  So as the chair of the select committee, were

11  you familiar with the committee?  Just as a general

12  matter, do you have familiarity with the committee,

13  when it met, the proceedings?

14          A.  Generally speaking.

15          Q.  What year was the committee convened?

16          A.  2011.

17          Q.  What was the purpose of convening the

18  committee?

19          MR. BRISSENDEN:  I'm going to instruct

20  you, to the extent that that question requires you to

21  disclose your thoughts, opinions, mental impressions,

22  and analysis about legislation, about the legislative

23  act of convening the committee, I'm going to instruct

24  you not to answer the question.

25          THE WITNESS:  I wouldn't know.

---

## 44

1          Q.  (BY MS. BERKOWER)  Why wouldn't you know?

2          MR. BRISSENDEN:  Same instruction.

3          Q.  (BY MS. BERKOWER)  Are you following the

4  advice of counsel and not answering?

5          A.  Yes, I'm following the advice of counsel.

6          Q.  Okay.  Who convened the committee?

7          MR. BRISSENDEN:  Same instruction.

8          MS. BERKOWER:  I think we're allowed to

9  ask foundational questions like who convened a

10  committee.  I think that's also probably in the public

11  record.  Can he answer to the extent that it's in the

12  public record?

13          MR. BRISSENDEN:  If it's a matter that's

14  within public record, information that you have, then

15  you can answer.

16          THE WITNESS:  What do you mean by

17  "convened the committee"?

18          Q.  (BY MS. BERKOWER)  Did somebody convene the

19  committee or call the committee or create the committee

20  in some way?  It's not a standing committee, right?

21          A.  It's in the record when committees are

22  announced.  This committee was also a part of that

23  announcement by the Speaker of the House.

24          Q.  Okay.  What types of legislation did the

25  committee hear?

DENNIS BONNEN                                          June 6, 2012

## 45

1    A.  I believe we heard simply one bill on voter
2    ID, Senate Bill 14.
3         Q.  Was there a reason given in the public record
4    as to why that committee was convened?
5         A.  Maybe.  I don't know.  I don't recall.
6         Q.  Can you identify any other committees that
7    were formed to consider just one bill?
8         A.  I wouldn't know.
9         Q.  Do you remember any during your time in the
10   House?
11        A.  Oh, I'm certain of it, yes.
12        Q.  Do you remember --
13        A.  Maybe not one bill, but certainly one issue.
14        Q.  So in your memory, there were not any other
15   committees that were formed to consider just one bill
16   during your time in the House?
17        A.  I'm not saying there weren't.  I don't know.
18        Q.  Well, you don't remember any?
19        A.  No, I remember -- you're speaking specifically
20   to one bill, but committees are not arranged for a
21   bill; they're arranged for a subject matter.  And there
22   have been multiple committees arranged for one specific
23   subject matter.
24        Q.  Did any of those committees consider just one
25   bill, to your memory?

## 46

1         A.  I don't know.  I would imagine some did, but I
2    don't know.
3         Q.  And I think you said that your committee
4    considered just one bill, right?
5         A.  I'm almost certain of that.
6         Q.  Are you aware of any communications among
7    legislators concerning the creation of a special
8    committee?
9         A.  No.
10        Q.  Does the Speaker also assign members to the
11   committee?
12        A.  That is the Speaker's responsibility, yes.
13        Q.  Was the select committee a fast-track
14   committee?
15             MR. BRISSENDEN:  Objection, vague.
16             To the extent that you can answer the
17   question based upon information that you have -- or
18   knowledge that you have from the public record that's
19   contained therein, you may answer.  To the extent that
20   you have knowledge, information based upon information
21   not in the public record or that you learned from
22   communications with other legislators, legislators'
23   staff, your own staff, Texas Legislative Council, and
24   state agencies, I would instruct you not to answer.
25             THE WITNESS:  I don't know what a

## 47

1    fast-track committee is.
2         Q.  (BY MS. BERKOWER)  Okay.  Were there any bills
3    submitted during the 82nd Legislature to address
4    mail-in voter fraud?
5         A.  I do -- I would assume there was, but I don't
6    know.
7         Q.  Were they referred to the select committee?
8         A.  I do not know for certain.
9         Q.  I think you said a few minutes ago that the
10   select committee considered only one bill.
11        A.  That would be correct.  I'm almost certain
12   that's correct.  I would have to check the record, but
13   I think that's accurate.
14        Q.  Well, actually, I can --
15        A.  Yeah, no.  That's -- I just don't want to give
16   you inaccurate information, but I believe that's right.
17        Q.  Okay.
18        A.  Can I visit with Reynolds a moment?
19        Q.  Yes.
20             MR. BRISSENDEN:  Do you want to take a
21   short break?
22             MS. BERKOWER:  Sure.  Or if -- I'm just
23   looking for this exhibit.
24             MR. BRISSENDEN:  Yeah, just -- no, we
25   only need to take a second.  I want to visit with him

## 48

1    privately.
2             MS. BERKOWER:  Okay.  That's fine.  We'll
3    take a short break.
4             MR. BRISSENDEN:  Okay.
5             (Recess from 10:43 a.m. to 10:51 a.m.)
6         Q.  (BY MS. BERKOWER)  I think we were talking
7    before the break about the special -- the select
8    committee, and I have what we will mark as Exhibit 431.
9             (Exhibit No. 431 marked)
10        Q.  (BY MS. BERKOWER)  Do you know what this is?
11        A.  It appears to be the committee notice of a
12   meeting.  I'm sorry.  No, this is -- this says it's --
13   it seems to be a report about the bills that were voted
14   on a committee.
15        Q.  Okay.  So would this explain which bills were
16   heard by the committee?
17        A.  Technically, no, it wouldn't, but, yes, it
18   does.  You know, there's another report that would tell
19   you what all bills were heard.  But, yes, this says --
20   this is what bills were -- came out of the committee is
21   what this report covers.
22             With that said, I believe it is the only
23   bill that was also heard.  But that's not what this
24   report speaks to.
25        Q.  I see.  But it is accurate that this is the

DENNIS BONNEN                                                June 6, 2012

---

### 49

1    only bill that the select committee heard?
2        A.   I believe that is accurate.
3        Q.   Sir, I think before the break I had asked you
4    if any bills submitted during the 82nd Legislature that
5    addressed mail-in voter fraud were referred to this
6    committee and you couldn't remember.
7        A.   No.
8        Q.   Does this refresh your memory?
9        A.   No, it doesn't.
10       Q.   Well, you said this is the only bill that the
11   committee heard.  Is that true?
12       A.   I believe it's the only one heard.  But the
13   question you asked is if any had been referred to the
14   committee.  And I don't know what bills had been
15   referred over there versus what was heard.
16       Q.   Okay.  So sometimes bills are referred to a
17   committee but not heard?
18       A.   That's correct.
19       Q.   I see.  But to your memory, you don't remember
20   hearing any bills about mail-in voter fraud as part of
21   the select committee.  Is that accurate?
22       A.   That would be accurate.
23       Q.   And who decides where bills are sent with
24   regard to which committee they're sent to?
25           MR. BRISSENDEN:  To the extent you can

---

### 50

1    answer that question based upon -- the question refers
2    to as a general matter.  I believe you're asking as
3    general matter, general procedural?
4           MS. BERKOWER:  I'm asking as a general
5    matter who decides where bills are referred to.
6           MR. BRISSENDEN:  You can answer.
7           THE WITNESS:  You know, that's a
8    mysterious question that many legislators would like to
9    better know the answer to.  And the accuracy of my
10   comment is proven by laughter at the end.
11          But from a technical matter -- well, I
12   don't want to be incorrect.  I think technically
13   speaking it is the Speaker's office or the
14   parliamentarian -- or maybe it's the House
15   parliamentarian -- who would decide the referral of
16   bills.
17       Q.   (BY MS. BERKOWER)  So when you said -- just to
18   follow up on what you said, that a lot of legislators
19   would like to know more specifically who decides, why
20   don't -- like, what do you mean by that?
21       A.   Well, I think more generally they're obviously
22   being -- I don't know if it's specifically -- I guess
23   it is specifically described in the rules, and I don't
24   know what the rules say in that area.  Is it the
25   parliamentarian or --

---

### 51

1        Q.   I'm asking you.
2        A.   I'm not certain.
3        Q.   Is there --
4        A.   I don't know whether it's parliamentarian or
5    the Speaker's office who has declared the authority on
6    that.
7        Q.   Are those generally referred according to
8    subject matter to different committees?
9        A.   Usually.
10       Q.   Sometimes they're not, though?
11       A.   That would be correct.
12       Q.   Is there any rhyme or reasoning as to when
13   they're not referred by subject matter?
14          MR. BRISSENDEN:  To the extent you can
15   answer that question based upon information that's in
16   the public record or with regards to general procedural
17   rules, you may answer.  To the extent that you have any
18   knowledge and the question requires you to disclose
19   communications, information that you have based upon
20   communications with other legislators or your staff or
21   their staff, I instruct you not to answer.
22          THE WITNESS:  I think, to answer your
23   question, the issue is -- and it would be specific to
24   the issue you're concerned about -- is that many times
25   there are bills that fall clearly within the

---

### 52

1    jurisdiction of more than one committee.  And so that
2    bill or other similar bills may be referred in some
3    instances.  Some of those bills that look the same may
4    go to one committee while other bills who look the same
5    may go to another committee because both committees, or
6    even three or four committees -- not normally as many
7    as four, but maybe two or three -- have overlapping
8    jurisdiction where arguments can be made intelligently
9    that they could go to those committees.
10       Q.   (BY MS. BERKOWER)  So do you know why S.B. 14
11   was not referred to the elections committee?
12       A.   I do not.
13          MR. BRISSENDEN:  Objection, legislative
14   privilege.  I instruct you not to answer.
15          MS. BERKOWER:  Well, to be clear,
16   Reynolds, I asked him if he knew.  I did not ask him
17   the substance of what he knew.  And those are questions
18   that we've been permitted to ask, initial questions,
19   throughout all of the depositions that we've conducted
20   in this case.
21          MR. BRISSENDEN:  I disagree with your
22   analysis.
23          MS. BERKOWER:  Well, we can cite
24   authority in the court -- from the court's opinions if
25   you would like.  We can take a break and go through

DENNIS BONNEN

June 6, 2012

## 53

1  that and I can show you excerpts from other depositions
2  in which those questions have been permitted.
3      MR. BRISSENDEN: Well, I've gone through
4  the court's order of yesterday that was issued, and it
5  specifically addresses and outlines all the different
6  landscape of the privilege. And then I think -- well,
7  I think my analysis is correct and I'll stand by the
8  instruction.
9      MS. BERKOWER: Well, to be clear, we're
10  tailoring our questions today in accordance with the
11  court's instructions because you recognize that the
12  court did actually rule on the motion and defined
13  several areas of privilege in which we are not supposed
14  to be asking questions.
15      MR. BRISSENDEN: Okay.
16      MS. BERKOWER: And, for the record, we do
17  not agree with the court's view on that, but we will
18  be -- we plan to preserve our objections for the future
19  and for the record. But with regard to question of "do
20  you know why," a yes or no question that's
21  foundational, doesn't get into substance, we believe
22  those questions are permissible even under the court's
23  order of yesterday.
24      MR. BRISSENDEN: And I disagree with your
25  analysis. It's invading his opinions, his thought

## 54

1  processes, what he knows and doesn't know. And that's
2  with regard to legislative acts and specifically
3  S.B. 14.
4      MS. BERKOWER: Okay. We'll move on.
5      Q. (BY MS. BERKOWER) Are you familiar with the
6  Federal Voting Rights Act?
7      A. I know of its existence.
8      Q. Are you familiar with Section 5 of the Voting
9  Rights Act?
10      A. I'm aware it exists.
11      Q. What is your understanding of the
12  requirements, if you --
13      A. It's the law of the land.
14      Q. Do you know any specifics about what Section 5
15  requires?
16      A. Not really. I know you're to not
17  discriminate.
18      Q. What do you mean by that?
19      A. What I said.
20      Q. Well, in what way are you not supposed to
21  discriminate?
22      A. In any way.
23      Q. Does it relate specifically to voting?
24      A. I assume so. I've not studied the Act.
25      Q. And is the -- when you say you're "not to

## 55

1  discriminate," does that relate to racial and ethnic
2  minorities?
3      A. Usually that's what discrimination means.
4      Q. What about language minorities, people who are
5  limited in English proficiency?
6      MR. BRISSENDEN: I'm going to instruct
7  you to the extent that you can answer that question
8  with regards to your general knowledge outside of the
9  work that you did in relation to S.B. 14, you may
10  answer. To the extent that you have knowledge with
11  regards to -- that you developed with regards to the
12  Voting Rights Act in connection with your work
13  specifically on S.B. 14, I would instruct you not to
14  answer.
15      THE WITNESS: I'll accept his
16  instruction.
17      Q. (BY MS. BERKOWER) Okay. Do you believe that
18  compliance with the Federal Voting Rights Act is an
19  important consideration in the lawmaking process?
20      MR. BRISSENDEN: Objection, vague.
21      Q. (BY MS. BERKOWER) You may answer.
22      A. Could you repeat the question?
23      Q. Do you believe that compliance with the
24  Federal Voting Rights Act is an important consideration
25  in the lawmaking process?

## 56

1      MR. BRISSENDEN: Again, I'm going to
2  instruct -- first of all, the question is vague.
3  Secondly, I'm going to instruct you that to the extent
4  that you have information and knowledge and the
5  question requires you to disclose information and
6  knowledge in connection with your work specifically in
7  connection with S.B. 14, I instruct you not to answer.
8  To the extent you can answer the question in general
9  terms, you may answer.
10      THE WITNESS: Repeat it again.
11      Q. (BY MS. BERKOWER) I asked if you believe that
12  compliance with the Federal Voting Rights Act is an
13  important consideration in the lawmaking process?
14      MR. BRISSENDEN: Same instruction.
15      THE WITNESS: Generally we try to follow
16  the law.
17      Q. (BY MS. BERKOWER) Prior to S.B. 14's passage
18  did you understand that it would be subject to
19  preclearance under Section 5?
20      MR. BRISSENDEN: I'm going to instruct
21  the witness if that information -- that question
22  requires you to disclose thoughts, opinions, mental
23  analysis, mental impressions about S.B. 14, I instruct
24  you not to answer the question.
25      MS. BERKOWER: You're not letting him

## 65

1    A.  Absolutely.
2    Q.  Do you remember who attended an ALEC
3  conference with you?
4    A.  Not really.  I mean, you know, we could go
5  through the roster and I could make some fairly
6  accurate guesses and some fairly inaccurate guesses.
7    Q.  Do you remember who -- which of the Texas --
8  which other Texas legislators attended the National
9  Conference of State Legislators conference that you
10  attended?
11    A.  Not specifically, no.  I think
12  Senator Van de Putte was the chair of the organization
13  at the time and was there.
14    Q.  What is the current system under state law for
15  determining -- for determining how to verify the
16  identity of a voter?
17    A.  It's whatever the law says.  I don't know the
18  law off the top of my head.
19    Q.  Do you have any sense of what the law
20  currently says?
21    A.  Not really, no.
22    Q.  Do you know if the counties issue voter
23  registration cards to voters?
24    A.  My understanding is that they do.
25    Q.  And they mail the voter registration cards to

## 66

1  their voters?
2    A.  They're supposed to.
3    Q.  And voters can bring those cards with them to
4  the polls?
5    A.  Yes.  They don't have to, I don't think,
6  though.
7    Q.  And if they don't have that card can a voter
8  show any ID from a various long list of IDs, including
9  non-photo IDs in order to vote?
10    A.  I don't know.
11    Q.  What about if a voter doesn't have those, can
12  they cast a provisional ballot?
13    A.  I don't know absolutely, but I believe that
14  they can.
15    Q.  Have you ever heard any reports of voter
16  registration cards being stolen?
17    MR. BRISSENDEN:  To the extent that that
18  question requires you to disclose information that
19  you -- or knowledge that you received in relation to
20  your work on S.B. 14, I instruct you not to answer.
21    To the extent that you have general
22  information or knowledge beyond your work on S.B. 14 or
23  that is information that is part of the public record
24  you may answer.
25    THE WITNESS:  Only -- only information

## 67

1  presented in the public conversation in the committee
2  process.
3    Q.  (BY MS. BERKOWER)  And were there reports of
4  voter registration cards being stolen during the public
5  committee?
6    A.  I don't remember specifically if that was some
7  of what was discussed, but I know generally there were
8  those type issues talked about in the public, and
9  expert testimony.
10    Q.  So the current system does require voters to
11  present identification of some sort.  Is that accurate?
12    A.  I believe it is.
13    Q.  So what was the purpose of photo
14  identification legislation in Texas given that the law
15  already requires identification?
16    MR. BRISSENDEN:  To the extent that you
17  can answer that question, generally speaking, as to
18  what the general purpose of the legislation was, you
19  may answer.
20    THE WITNESS:  The general purpose is to
21  provide the highest degree of confidence and integrity
22  in our elections.
23    Q.  (BY MS. BERKOWER)  Is there any other purpose?
24    A.  Not that I know of.
25    MS. BERKOWER:  Okay.  I think -- can we

## 68

1  take a short break, please, off the record?
2    (Recess from 11:15 a.m. to 11:53 a.m.)
3    Q.  (BY MS. BERKOWER)  So I think we're going to
4  go back through a few questions we went through before,
5  and your counsel will instruct you pursuant to a
6  discussion we had off the record.
7    MR. BRISSENDEN:  For the record, the only
8  question you've asked about is one question in
9  particular.  If you have more questions you want to
10  review we need to take another break and discuss those.
11    MS. BERKOWER:  Okay.  Then we need to
12  take another break.
13    (Discussion off the record.)
14    MS. BERKOWER:  We'll go back on now.
15    Q.  (BY MS. BERKOWER)  Sir, like I said a minute
16  ago, we'll go back to some questions and make our
17  record.
18    So are you familiar with the Federal
19  Voting Rights Act?
20    MR. BRISSENDEN:  Same objection, same
21  answer, same instruction.  The question has been asked
22  and answered.  In terms of instructing you not to
23  disclose your mental impressions, thoughts, information
24  that you have in connection with your work, either
25  legislative activities involving drafting, debating

## 69

1  information, gathering with respect to S.B. 14.
2       Now, to the extent that you have
3  information or have knowledge with regards to HABA Act
4  that you learned separate and apart from your work in
5  connection with S.B. 14, outside of the context of
6  legislature, you may -- or if the knowledge that you
7  have is information that was part of the public record,
8  debate on the floor, you may -- or in committee, you
9  may answer the question.
10      Do you understand?
11      THE WITNESS:  Yes, I do.
12      MS. BERKOWER:  Okay.  So just to be
13  clear, I think you just said "HABA."  That's not
14  actually what I asked him about.  I asked him about the
15  Federal Voting Rights Act.  So can you just --
16      MR. BRISSENDEN:  Oh, I'm -- I'll change
17  that and amend it to the Federal -- what was it?
18      MS. BERKOWER:  Voting Rights Act.
19      MR. BRISSENDEN:  -- Voting Rights Act.
20      MS. BERKOWER:  And I think you said,
21  "Same objection, same instruction."  I'm not exactly
22  sure what you were referring to there.
23      MR. BRISSENDEN:  The question that you
24  asked is the same as what you asked previously.
25      MS. BERKOWER:  Okay.  So you're referring

## 70

1  back to the time you objected when I asked the question
2  before?
3       MR. BRISSENDEN:  That's right.
4       MS. BERKOWER:  Okay.  Well, I'm not --
5       Q.  (BY MS. BERKOWER)  Well, can you answer based
6  on his instruction?
7       A.  No.
8       Q.  Okay.  Well --
9       A.  Other -- other -- well, based on his
10  instruction, I can answer that it was discussed in the
11  public setting of the House floor and in the committee.
12      Q.  Okay.  So you're familiar with -- you were
13  aware of the Federal Voting Rights Act through the
14  public debate?
15      A.  And the committee discussion.
16      Q.  And the committee discussion.
17      MS. BERKOWER:  And, to be clear, I wasn't
18  asking him about whether he considered the Federal
19  Voting Rights Act in connection with any deliberation
20  or legislative activity.  I was merely asking him
21  whether -- or even in connection specifically with any
22  voter identification legislation or S.B. 14.  I merely
23  asked if he was aware of the Federal Voting Rights Act
24  as a general matter.
25      Q.  (BY MS. BERKOWER)  Are you familiar with

## 71

1  Section 5 of the Voting Rights Act?
2       MR. BRISSENDEN:  My instruction would be
3  the same.  To the extent that you have knowledge or
4  information about the section in regards to your -- or
5  information that was in the public record or apart from
6  your work on S.B. 14 as a general matter, you may
7  answer.  Otherwise, I'm instructing you not to.
8       THE WITNESS:  The same answer.
9       It was mentioned on the House floor and
10  it was discussed during committee deliberations -- not
11  deliberations, but committee hearing.
12      Q.  (BY MS. BERKOWER)  Do you know what The Help
13  America Vote Act is?
14      MR. BRISSENDEN:  Again, same instruction.
15  To the extent that you have knowledge or information
16  about that act in connection with -- or information
17  that was presented in the public record or that you
18  have knowledge about aside from your work on S.B. 14,
19  you may answer.  Otherwise, I instruct you not to
20  answer.
21      THE WITNESS:  I'll follow the
22  instruction.  I mean, the answer is the same.  I mean,
23  it was mentioned on the House floor and it was
24  mentioned during committee hearing.
25      Q.  (BY MS. BERKOWER)  Okay.  To be clear on that,

## 72

1  I'm asking you whether you knew it in connection with
2  legitimate legislative activity or any deliberation.
3  And I also did not ask for it in the context that would
4  reveal anything about your deliberations or legislative
5  activities.
6       MR. BRISSENDEN:  But the question as
7  phrased encompasses both his work in connection with
8  his legislative activity and outside of the context of
9  his work on the legislative activity.  So because of
10  the broad scope of the question I'm having to assert
11  the privilege.
12      MS. BERKOWER:  And as we explained off
13  the record -- we had a discussion about this, and I
14  referred you to Page 8 of the court's June 5th order.
15  We're not asking -- we're asking this purely as a
16  general matter to find out if he knew generally about
17  it.  We're not asking for anything in connection
18  specifically, anything that leads it specifically to
19  his deliberations or legislative activities.
20      As a result, we view this as a basic
21  foundational question that we're permitted to ask under
22  that order and under the court's May 17th order.
23      MR. BRISSENDEN:  I'm directing your
24  attention to the top of Page 8.  Because the question
25  is very broad, it implicates public or otherwise

DENNIS BONNEN                                              June 6, 2012

## 73

1  nonprivileged information in terms of whether -- or his
2  state of knowledge, consideration as a Texas legislator
3  in connection with legislative activities.
4      MS. BERKOWER:  And we view the question
5  as broad enough to encompass -- broad enough not to
6  require specific information that connects it to his
7  specific legislative activities.
8      Unless you have something further, we'll
9  move on.
10      MR. BRISSENDEN:  We'll move on.
11      Q.  (BY MS. BERKOWER)  Have you ever heard of a
12  Supreme Court decision in the case Crawford versus
13  Marion County concerning Indiana voter identification
14  law?
15      MR. BRISSENDEN:  My instruction to you is
16  the same.  We've just reviewed and just discussed in
17  connection with this question as well.
18      THE WITNESS:  I believe, again, it was
19  discussed possibly on the House floor and I think
20  brought up in committee.
21      Q.  (BY MS. BERKOWER)  When was it mentioned in
22  committee?
23      A.  I believe it was mentioned when we had a
24  public hearing.
25      Q.  Do you remember when that was?

## 74

1      A.  The date of the public hearing?
2      Q.  Do you remember the date?
3      A.  Not off the top of my head.  I think it was
4  February of '11.
5      Q.  Who was present during that hearing?
6      A.  Lots of people.  I mean, the public is invited
7  in and welcome, and so many people.
8      Q.  Do you remember if anyone in particular
9  testified about the decision?
10      A.  No.
11      Q.  Do you remember what they said about the
12  decision?
13      A.  No.
14      Q.  Do you remember any discussion generally about
15  the decision during that hearing?
16      A.  Not at this time.
17      Q.  You also said it was mentioned on the floor.
18  Is that a separate time?
19      A.  Well, possibly.  Yeah, possibly.  I don't
20  specifically remember.
21      Q.  Did anyone mention during their testimony that
22  it impacted the State's ability to develop photo
23  identification laws?
24      A.  I don't recall.
25      Q.  Are you aware of any communications between

## 75

1  Texas legislators and officials in Indiana regarding
2  its photo ID law or the proper decision?
3      A.  I'm not, no.
4      Q.  Did you have any communications with Indiana
5  officials?
6      A.  The reason for my hesitation is that I did not
7  personally have any direct communication with them.
8  I'm unable to recall whether someone connected to
9  Indiana testified in public hearing or not.  And I
10  don't remember the record on that.  I personally did
11  not, though, in a private setting.
12      Q.  I'm going to mark this as Exhibit 432, please.
13      (Exhibit No. 432 marked)
14      Q.  (BY MS. BERKOWER)  Do you recall -- do you
15  know what this is?
16      A.  It looks like a letter.
17      Q.  Who is the letter addressed to?
18      A.  Rep. Dennis Bonnen, Chair.
19      Q.  Would that be you?
20      A.  Yes, it would.
21      Q.  Was it addressed to you in the context of your
22  chairmanship on the select committee?
23      A.  It appears it was.
24      Q.  Do you remember the letter at all?
25      A.  No.

## 76

1      Q.  Can you review it now, please?
2      A.  Certainly.  (Reading).
3      Q.  Let me know when you've had a chance to look
4  through the whole thing.
5      A.  Sure.  No, go ahead.  I can't promise I've got
6  it all down.
7      Q.  What was the substance of this -- this
8  letter as a general matter?
9      MR. BRISSENDEN:  Objection to the extent
10  the document speaks for itself.
11      Q.  (BY MS. BERKOWER)  You can answer.
12      A.  "I would like to share with you Indiana's
13  experiences with regard to our photo ID voting
14  requirement."
15      Q.  Did anyone solicit this input from Indiana,
16  from this person in Indiana?
17      A.  I did not.  I can't speak for others.
18      Q.  And just to be clear, who was it who wrote the
19  letter?  If you turn to the last page, I think it says.
20      A.  It has no signature on it, but it has a typed
21  name of Thomas E. Wheeler, II.
22      Q.  So do you know -- does the letter explain what
23  the ID requirements in Indiana are under their voter ID
24  law?
25      A.  It might.

77

1      Q.  Can you turn to Page 3 at the top.
2      A.  It appears that it does.
3      Q.  And what are those requirements?
4      A.  "Indiana's photo ID law requires that all
5   Indiana residents present photo ID before casting a
6   ballot in person at the polls on election day.  The
7   photo ID must meet full criteria to be acceptable for
8   voting purposes.  The ID must be issued by the State of
9   Indiana or the US Government, display the voter's
10  photo, display an expiration date that is either
11  current or expired no earlier than the date of the last
12  general election, and display the voter's name such
13  that it reasonably conforms with the name on the voter
14  registration card" (as read).
15          And then in quotes it says "poll book,"
16  period.
17      Q.  Is that what you understand the requirements
18  of the Indiana law to be?
19      A.  I have no real knowledge to know whether this
20  is accurate or inaccurate.
21      Q.  Do you have any idea what the process was by
22  which this particular person was selected to provide
23  input on Indiana law?
24          MR. BRISSENDEN:  To the extent the
25  question requires you to disclose any information that

78

1   you may have conducted as part of your investigation,
2   your work, your staff may have done as part of your
3   analysis in regards to S.B. 14, I instruct you not to
4   answer.  To the extent that you can answer the question
5   without disclosing that information, you may proceed.
6          THE WITNESS:  Could you repeat the
7   question?
8      Q.  (BY MS. BERKOWER)  I said, what was -- do you
9   know what the process was by which this person was
10  selected to provide input about the Indiana voter ID
11  law.
12          MR. BRISSENDEN:  And, also, do not
13  disclose any communications that you had with other
14  legislators.
15          THE WITNESS:  I do not know.
16      Q.  (BY MS. BERKOWER)  Do you know who
17  Thomas E. Willard, III is?
18      A.  Not at all.
19      Q.  Have you ever met him?
20      A.  Not that I'm aware of.
21      Q.  And what was the date on which this letter was
22  received?
23      A.  It appears that it was after the committee
24  hearing and it was on March the 1st of 2011.
25      Q.  In your memory, was that before the House

79

1   voted on Senate Bill 14?
2      A.  I do not know.  If I had to guess -- I imagine
3   you'll have the record.  My guess is it was probably
4   before the House voted.
5      Q.  Do you know, was this letter entered into the
6   public record as a result of it being sent to you as
7   the chair of the select committee?
8      A.  I do not know.  My guess is it probably was
9   not for the reason that the committee had already had
10  its public meeting and submitted its report by
11  March 1st is my guess.  I don't know absolutely.
12      Q.  And does the letter explain at all why Indiana
13  decided to pass this law?
14      A.  I guess you could say he makes an attempt at
15  that by discussing on the first page, according to
16  press reports during the East Chicago City primary
17  election on May 6th, 2003, and then he continues on to
18  discuss a concern.
19      Q.  That there was an incident of voter fraud that
20  was prosecuted?
21      A.  That's what it appears to describe.
22      Q.  Do you know of any similar incident that was
23  included in the public record involving a prosecution
24  for in-person election fraud in Texas?
25          MR. BRISSENDEN:  Again, you're asking

80

1   him --
2          MS. BERKOWER:  I said in the public
3   record.
4          MR. BRISSENDEN:  The public record.
5          THE WITNESS:  Yes.  I know in the
6   committee hearing there was discussion of a case, but I
7   believe due to the fact that the case may have been
8   ongoing the discussion was limited.
9      Q.  (BY MS. BERKOWER)  Was it just that one case
10  that you're remembering?
11      A.  There may have been two, but I'm not positive
12  of that.
13      Q.  And do you also see in Paragraph 2 of the
14  letter -- sorry.  On the first page --
15      A.  Right.
16      Q.  -- in the third full paragraph, it says, "Data
17  collected by the election assistance committee in 2004
18  indicated that 19 of Indiana's 96 counties had
19  registration totals exceeding 100 percent of the 2004
20  voting age population" (as read).
21          Do you see that?
22      A.  Yes, ma'am.
23      Q.  Do you know of any similar problem in any
24  Texas counties?
25          MR. BRISSENDEN:  To the extent that you

DENNIS BONNEN                                                                June 6, 2012

---

81

1   have information or knowledge in connection with your
2   S.B. 14, including analysis --
3             MS. BERKOWER:  I'll limit this to the
4   public record.  How about that?
5             MR. BRISSENDEN:  Let me finish.
6             -- then do not answer and disclose that.
7   If you can answer the question limited to the public
8   record, information that's contained therein, you may
9   answer.
10            THE WITNESS:  I'm not sure whether --
11  similar type issues were raised in the public record.
12  I don't know specifically if they were on target with
13  that or not.
14       Q.   (BY MS. BERKOWER)  "Similar type issues"
15  meaning what?
16       A.   In the public.  Issues of irregularities with
17  voter registration.
18       Q.   Do you remember more specifically what those
19  irregularities were?
20       A.   No, I do not.  They're in the public record,
21  though.
22       Q.   Were there any incidences that you remember
23  where a Texas county had a registration total that
24  exceeded 100 percent of the voting age population?
25            MR. BRISSENDEN:  Again, I'm going to

---

82

1   instruct you to the extent that that question is asking
2   you for information that's beyond the public record not
3   to answer the question.  To the extent that you can
4   answer the question based upon information that's in
5   the public record, you can answer.
6             THE WITNESS:  I'll follow his
7   instruction.
8        Q.   (BY MS. BERKOWER)  So to be clear, then, with
9   regard to the public record, do you remember any
10  incident reported on the public record where a Texas
11  county had more than 100 percent registration based on
12  the voting age population in that county?
13       A.   I recall issues being raised.  I don't know if
14  that specifically was.
15       Q.   Okay.  Are you familiar with the voter
16  identification bill that was introduced in the House in
17  2005?
18       A.   In the regard that I'm aware something was
19  probably filed.  Specifically, I don't recall it.
20       Q.   I have what has been previously marked
21  Exhibit 44, so I will remark it here as Exhibit 44.
22       A.   Thank you.
23       Q.   Do you recognize this?
24       A.   I do have a recollection of it, yes.
25       Q.   What is it?

---

83

1        A.   It is a bill, House Bill 1706, by
2   Mrs. Renny and others.
3        Q.   Can you describe the basic provisions of the
4   bill, if you remember them?
5        A.   I don't really remember them.
6        Q.   Okay.  Were you involved in the development of
7   this bill?
8        A.   No.
9        Q.   Turning to Page 4 of the exhibit, can you
10  review that page and the next?  I think the pages
11  include Pages 4 through 7 of this exhibit.
12       A.   Okay.  Certainly.  (Reading).
13       Q.   Let me know when you're done.
14       A.   Sure.
15            I'm done.
16       Q.   Okay.  Could you list the forms of allowable
17  identification provided in the bill?
18       A.   I can try.  "The following documentation is an
19  acceptable form of photo identification under this
20  chapter.  No. 1, a driver's license or personal
21  identification card issued to the person by the
22  Department of Public Safety or the equivalent agency
23  for another -- of another state that is not expired or
24  that expired no later than two years before the date of
25  presentation; 2, a United States military

---

84

1   identification card that contains the person's
2   photograph; No. 3, a valid employee identification card
3   that contains the person's photograph and is issued by
4   an employer of the person in the ordinary course of the
5   employer's business; No. 4, a United States citizenship
6   certificate issued to the person that contains the
7   person's photograph; 5, a United States passport issued
8   to the person; 6, a student identification card issued
9   by public or private institution of higher education
10  that contains the person's photograph; 7, a license to
11  carry a concealed handgun issued to the person by the
12  Department of Public Safety; No. 8, an identification
13  card issued by a state agency of this state that
14  contains the person's photograph; or, 9, an
15  identification card that contains the person's
16  photograph and/or is issued by a county elections
17  administrator or a county clerk" (as read).
18       Q.   Okay.  I'll stop you there.
19       A.   Okay.
20       Q.   Do you know the next section, Section B --
21       A.   B, uh-huh.
22       Q.   -- as a general matter, does that permit a
23  voter to also show two forms of non-photo ID?
24       A.   "The following documentation is acceptable as
25  proof of identification under this chapter.  1, a copy

DENNIS BONNEN                                    June 6, 2012

---

## 85

1  of a current utility bill, bank statement, government
2  check, paycheck, or other government document that
3  shows the name and address of voter; and, 2, official
4  mail addressed to the person by name from a
5  governmental entity" (as read).
6      Q.   I think the reason I stopped you is I know
7  there's -- I don't want to make you read pages and
8  pages --
9      A.   Right.
10     Q.   -- and I know there's a number of others.
11     A.   Right.
12     Q.   But as a general matter, does it look like it
13  also permits a voter to show two forms of what is
14  generally non-photo ID?  And you can review the
15  different types of ID on that page in order to -- to
16  vote.
17     A.   It appears to do so.
18     Q.   What was the purpose of H.B. 1706?
19          MR. BRISSENDEN:  I'm going to instruct
20  you that to the extent that you have knowledge about
21  the general purpose of H.B. 1706 as a general matter,
22  you may answer.
23          THE WITNESS:  I'll follow the
24  instruction.
25     Q.   (BY MS. BERKOWER)  You don't know what the

---

## 86

1  general purpose of H.B. 1706 was?
2      A.   Well, it was to provide greater integrity and
3  confidence in the election process.
4      Q.   How did it do that?
5          MR. BRISSENDEN:  Objection, privileged.
6  Instruct the witness not to disclose his mental
7  impressions, thoughts, analysis about the bill and
8  instruct you not to answer the question.
9      Q.   (BY MS. BERKOWER)  Do you know of any
10  communication concerns -- excuse me.  I'll start over.
11         Do you know of any communications
12  concerning the forms of allowable identification to be
13  included in H.B. 1706?
14     A.   I do not.
15     Q.   Do you know who drafted the bill?
16     A.   I would have to assume legislative council,
17  but I don't know that factually.
18     Q.   Do you know what -- sorry.
19     A.   That's okay.
20     Q.   Were you present during any of the legislative
21  public debates on H.B. 1706?
22     A.   I assume I was on the House floor when we
23  debated the bill.
24     Q.   Do you remember the justifications for
25  H.B. 1706 as expressed by supporters during the public

---

## 87

1  debate?
2      A.   I do not.
3      Q.   Are you familiar with any of the legislators
4  who opposed H.B. 1706 during the public debate?
5      A.   I don't recall.
6      Q.   Do you know of any action taken by any
7  legislator to address concerns raised by opponents of
8  H.B. 1706 as would be contained in the public record?
9      A.   I don't recall.
10     Q.   Any amendments that might have addressed the
11  concerns of opponents of the bill?
12     A.   I don't recall the specifics of the bill or
13  amendments to the bill.
14     Q.   Do you remember if any amendments that would
15  have addressed concerns raised by the opponents of 1706
16  were ultimately included in the bill?
17         MR. BRISSENDEN:  Objection, vague.
18         THE WITNESS:  I just don't recall.  I
19  don't know.  The record would indicate that one way or
20  the other.
21     Q.   (BY MS. BERKOWER)  Was H.B. 1706 designed in
22  part to prevent noncitizens from voting?
23         MR. BRISSENDEN:  Objection, privilege.
24  Instruct the witness not to disclose mental
25  impressions, thoughts, opinions, mental analysis

---

## 88

1  regarding this.  Instruct you not to answer.
2          THE WITNESS:  I'll follow the
3  instruction.
4      Q.   (BY MS. BERKOWER)  Was part of the legislative
5  purpose to prevent noncitizens from voting?
6          MR. BRISSENDEN:  Same instruction.
7          THE WITNESS:  I'll follow the
8  instruction.
9      Q.   (BY MS. BERKOWER)  Did supporters of H.B. 1706
10  including legislators, publicly indicate that the bill
11  is designed to prevent noncitizens from voting?
12         MR. BRISSENDEN:  You can answer to the
13  extent that is part of the public record.
14         THE WITNESS:  I don't know.  I would hope
15  not.
16     Q.   (BY MS. BERKOWER)  Why would you hope not?
17     A.   That would not be appropriate.
18     Q.   Why not?
19     A.   Because that's not the intent.
20     Q.   Are you aware of any private communications
21  where legislators indicated that H.B. 1706 was designed
22  to keep noncitizens from voting?
23         MR. BRISSENDEN:  Again, instruct the
24  witness not to answer if it discloses thoughts, mental
25  impressions, or opinions of conversations.

DENNIS BONNEN                                                    June 6, 2012

---

**93**

1    the Senate?

2        A.  It appears to be fair to say that.

3        Q.  Are you familiar with the voter ID bill that

4    was introduced in the House in 2007?

5        A.  I'm sure there was one, but specifically, no,

6    I'm not.

7        Q.  I have what will be -- what was previously

8    marked as Exhibit 28 in a different deposition.

9            MR. BRISSENDEN:  Did you say 28?

10           MS. BERKOWER:  Yes.

11           THE WITNESS:  This is from when, '7?

12       Q.  (BY MS. BERKOWER)  Yes.  Are you familiar with

13   this document?

14       A.  In a general, vague sense, yes.

15       Q.  What is it?

16       A.  Is it House Bill 218 by Representative

17   Betty Brown of Kaufman County and others.

18       Q.  Are you familiar with the basic provisions of

19   the bill?

20       A.  No.

21       Q.  Did you play any role in development of

22   H.B. 218?

23       A.  I did not.

24       Q.  Turning to Page 9, can you -- can you list

25   every form of identification that is acceptable for

---

**94**

1    proof of identification under H.B. 218?

2        A.  Certainly.  "The following documentation is an

3    acceptable form of photo identification under this

4    chapter."  The chapter is Section 11, Section 63.0101.

5            "No. 1, a driver's license or personal

6    identification card issued to the person by the

7    Department of Public Safety that is not expired or that

8    expired no later than two years before the date of

9    presentation; No. 2, a United States Military

10   identification card that contains the person's

11   photograph; No. 3, a valid employee identification card

12   that contains the person's photograph and is issued by

13   an employer of the person in the ordinary course of the

14   employer's business; No. 4, a United States citizenship

15   certificate issued by the person that contains the

16   person's photograph; 5, a United States passport issued

17   to the person; No. 6, a student identification card

18   issued by a public or private institution of higher

19   education located in the United States that contains

20   the person's photograph; No. 7, a license to carry a

21   concealed handgun issued to the person by the

22   Department of Public Safety; or, No. 8, a valid

23   identification card that contains the person's

24   photograph and is issued by, A, an agency or

25   institution of the Federal Government or, B, an agency,

---

**95**

1    institution or political subdivision of this state" (as

2    read).

3        Q.  And Section B, which begins where you left

4    off, does that provide additional documentation that's

5    acceptable as proof of identification?

6        A.  It does appear to do so.

7        Q.  And just taking -- if you can just quickly

8    review those yourself, do each of those forms of

9    identification require a photo identification?

10           MR. BRISSENDEN:  Take your time.

11           THE WITNESS:  Can you repeat the

12   question?

13       Q.  (BY MS. BERKOWER)  Well, that section,

14   Section B, does that list additional documentation

15   that's acceptable as proof of identification under this

16   bill?

17       A.  It appears it does, yes.

18       Q.  And do all of the forms of identification

19   listed in that section, are those all photo

20   identifications?

21       A.  Not all of them, no.

22       Q.  In fact, doesn't that include a library card

23   that contains the person's name under Item 10 on

24   Page 11?

25       A.  A library card that contains a person's name

---

**96**

1    issued to the person by a public library located in the

2    state.

3        Q.  Does it specify that that must be a photo

4    identification?

5        A.  It doesn't speak to that.

6        Q.  And Item 11, a hunting or fishing license

7    issued to the person by the Parks and Wildlife

8    Department, that doesn't have to be a photo

9    identification either, does it?

10           MR. BRISSENDEN:  If you know.

11       Q.  (BY MS. BERKOWER)  Well, based on the language

12   in the bill, is what I'm asking.

13       A.  I don't think so, but you have to show an ID

14   to receive a hunting or fishing license.

15       Q.  This bill does not specify that that license

16   has to contain a photograph; is that correct?

17       A.  I believe it is.

18       Q.  Item 9 says, "A pilot's license issued to the

19   person by the Federal Aviation Administration or other

20   authorized agency of the United States" (as read).

21           Does that section require the license to

22   be a photo ID?

23       A.  I don't know what a pilot's license looks

24   like.

25       Q.  Well, does the bill say it has to have a

DENNIS BONNEN                                                    June 6, 2012

---

97

1    photograph?
2            MR. BRISSENDEN:  Objection to the extent
3    it mischaracterizes the language.
4        Q.  (BY MS. BERKOWER)  I'm asking if this section
5    says the pilot's license has to have a photograph on
6    it.
7            MR. BRISSENDEN:  Same objection.
8        Q.  (BY MS. BERKOWER)  You can still answer.
9            MR. BRISSENDEN:  If you know.
10           THE WITNESS:  I don't know.
11       Q.  (BY MS. BERKOWER)  Okay.  Well, turning back
12   to Part A on Page 9, it says, "The following
13   documentation is an acceptable form of photo
14   identification under this chapter" (as read).
15           Did I read that correctly?
16       A.  You did.
17       Q.  And then Part B says, "The following" -- on
18   Page 10 -- sorry -- Line 20, "The following
19   documentation is acceptable as proof of identification
20   under this chapter" (as read).
21           Did I read that correctly?
22       A.  You did.
23       Q.  Does Part B require it to be photo
24   identification?
25           MR. BRISSENDEN:  Same objection.  If you

---

98

1    know.
2            THE WITNESS:  It simply requires it to be
3    identification.
4        Q.  (BY MS. BERKOWER)  It doesn't specify photo
5    identification?
6        A.  It doesn't say it is or it isn't.
7        Q.  So it may be, but it doesn't have to be?
8        A.  Correct.  And I simply answered I don't know
9    whether the pilot license has a photo ID or not.
10       Q.  Okay.  So all of the identifications specified
11   in Part B may or may not have photographs?  It's not
12   required?
13       A.  Correct.
14       Q.  What was the purpose of H.B. 218?
15           MR. BRISSENDEN:  Again, I'll instruct you
16   in terms of answering the question, to the extent that
17   you know what the general purpose of HB 218 is, you may
18   answer the question.
19           THE WITNESS:  It's to provide confidence
20   and trust in the election process.
21       Q.  (BY MS. BERKOWER)  Was there any other purpose
22   for H.B. 218?
23           MR. BRISSENDEN:  Same instruction.
24           THE WITNESS:  I'll follow the
25   instruction.

---

99

1        Q.  (BY MS. BERKOWER)  You'll follow the
2    instruction, meaning -- I'm a little confused.
3            MR. BRISSENDEN:  To the extent that he
4    has information or knowledge about House Bill 218 in
5    terms of purpose that is a part of his thoughts,
6    opinions, mental impressions, analysis, I instruct the
7    witness not to disclose that information.  But in terms
8    of what the general purpose of the bill is, he has
9    answered that.
10           MS. BERKOWER:  Well, I said is there more
11   than one purpose to H.B. 218, and then he --
12           MR. BRISSENDEN:  I don't believe that was
13   the question.
14           MS. BERKOWER:  Can you read back the
15   question, please?
16           (The requested portion was read)
17           MR. BRISSENDEN:  Same instruction.
18           THE WITNESS:  I'll follow the
19   instruction.
20       Q.  (BY MS. BERKOWER)  Okay.  Are you aware of any
21   communications where the forms of allowable
22   identification under H.B. 218 were discussed?
23       A.  Well, I'm sure they were discussed on the
24   House floor in the public record.
25       Q.  Are you aware of any nonpublic communications

---

100

1    where the forms of allowable identification under
2    H.B. 218 were discussed?
3            MR. BRISSENDEN:  Objection.  I also
4    instruct you not to answer.
5            MS. BERKOWER:  Well, I didn't ask what
6    was -- I didn't ask the nature of the discussions.  I
7    just asked the general topic.  That's a foundational
8    question that we've been permitted to answer in prior
9    depositions under the court's May 17th order.
10           MR. BRISSENDEN:  I believe that you asked
11   about the substance of the communications as opposed to
12   simply asking him about communications regarding House
13   Bill No. 218.
14           MS. BERKOWER:  I said are you aware of
15   communications where the forms of allowable
16   identification were discussed.
17           MR. BRISSENDEN:  That's right.
18           MS. BERKOWER:  That's a privileged law
19   question?
20           MR. BRISSENDEN:  If the question is
21   regarding communications regarding House Bill No. 218,
22   I'll allow that.  But in terms of the substance of the
23   communications, I believe your question delves into
24   more substance about the communications regarding House
25   Bill No. 218.  Instruct the witness not to answer.

DENNIS BONNEN                                                          June 6, 2012

## 101

1      MS. BERKOWER:  For the record, we view
2  this as a basic foundational question of the type that
3  would be permitted or even required under the federal
4  rules of the privilege log, and we ask the State to
5  withdraw their objection.
6      Will you withdraw it?
7      MR. BRISSENDEN:  At this time, I'm
8  standing on my objection.
9      Q.  (BY MS. BERKOWER)  Will you answer the
10  question?
11     A.  I'll follow his recommendation.
12     Q.  Are you aware of any communications concerning
13  H.B. 218?
14     A.  No.
15     Q.  Public or private?
16     A.  Well, obviously, I'm aware of public
17  discussion, as I was a member of the Legislature when
18  it was debated on the House floor.  But privately, no,
19  I'm not.
20     Q.  Are you -- were you aware of any concerns
21  raised on the public record during the development,
22  drafting, or considering of H.B. 218 about the impact
23  of H.B. 218 on minority voters?
24     A.  I was not involved in that.
25     Q.  Were you involved in the public debate on

## 102

1  H.B. 218?
2      A.  What does "involved" mean?
3      Q.  Well, were you present, do you remember?
4      A.  I'm certain I was present.  But, respectfully,
5  "involved" would more so mean that I was a part of the
6  debate.  And I don't think I -- I don't know
7  absolutely, but I -- if I participated at all, it was
8  extraordinarily limited.
9      Q.  Okay.
10     A.  But I was present, to answer that, yes.
11     Q.  Do you remember the public debate at all for
12  H.B. 218?
13     A.  Not specifically, no.
14     Q.  What, if anything, do you remember about the
15  public debate of H.B. 218?
16     A.  Pretty much nothing.
17     Q.  Did you have any role in HB 218 after it was
18  filed in the House?
19     A.  None that I recall.
20     Q.  During the time that the House considered
21  H.B. 218, did you learn of any concerns raised about
22  the bill by constituents or interest groups?
23     A.  Not that I recall.
24     Q.  During the time the House considered H.B. 218,
25  did you learn of any concerns raised about the bill by

## 103

1  other legislators on the public record?
2      MR. BRISSENDEN:  And, again, your
3  question is --
4      MS. BERKOWER:  On the public record.
5      MR. BRISSENDEN:  -- your question is
6  limited to the public record?
7      THE WITNESS:  Certainly in debate on the
8  floor there were those who were for and against the
9  bill.
10     Q.  (BY MS. BERKOWER)  Do you remember what the
11  supporters of H.B. 218 on the floor were saying in
12  support of the bill?
13     A.  No.
14     Q.  Do you remember what the concerns of opponents
15  to the bill were as expressed in the public record?
16     A.  I don't, but we can check the record.
17     Q.  Are you aware of the existence of any analysis
18  or report as entered into the public record that would
19  raise any concerns that the bill would have an adverse
20  impact on minority voters?
21     MR. BRISSENDEN:  Again, your answer is
22  limited to what's in the public record.
23     MS. BERKOWER:  That's all I asked him
24  about.
25     THE WITNESS:  I don't know.

## 104

1      Q.  (BY MS. BERKOWER)  H.B. 218 permits a voter to
2  show a driver's license in order to vote.  Is that
3  correct based on what we just reviewed in this on
4  Page 9?
5      A.  That would be Line 17 on Page 9, yes.  A
6  driver's license or personal identification card that
7  has not expired or that expired no later than two years
8  before the date of the presentation.
9      Q.  Didn't supporters of H.B. 218, including
10  legislators, publicly indicate that the bill was
11  designed to keep noncitizens from voting?
12     MR. BRISSENDEN:  Again, the question is
13  limited to what's in the public record.
14     THE WITNESS:  I'm unaware of that.
15     Q.  (BY MS. BERKOWER)  Were you present on the
16  floor during the house debate of 218?
17     A.  We've covered that.  Yes.
18     Q.  Did Representative Betty Brown state on the
19  House floor that the bill was, quote, "designed to keep
20  illegal aliens, noncitizens, and other people otherwise
21  not qualified from voting"?
22     MR. BRISSENDEN:  To the extent that the
23  question mischaracterizes the statement on the record,
24  I would object to the question.
25     THE WITNESS:  I don't know.

DENNIS BONNEN                                                June 6, 2012

## 105

1   Q.  (BY MS. BERKOWER)  Do you remember her saying
2   that?
3   A.  I don't.
4   Q.  Did Ms. Brown write this bill?
5   A.  She was -- I'm not suggesting she didn't.  I'm
6   telling you I don't recall that she did.  I didn't hang
7   on every word that day.  I barely remember it.
8   Q.  But answer in answer to the question, she did
9   write the bill, correct?
10  A.  Yes, that certainly appears to be the case.  I
11  doubt she actually wrote it, but she was the sponsor
12  who carried it.
13  Q.  Okay.  Can noncitizens obtain a Texas driver's
14  license?
15  A.  I don't know.
16  Q.  If they can, how would H.B. 218 have been
17  designed to keep illegal aliens and noncitizens from
18  voting?
19          MR. BRISSENDEN:  Objection, calls for
20  speculation.  Instruct the witness not to disclose
21  mental impressions, thoughts, analysis about the
22  legislation.  Instruct not to answer.
23          THE WITNESS:  I'll follow the
24  instruction.
25          MS. BERKOWER:  Well, I don't think that

## 106

1   that question necessarily asks him for privileged
2   information.  This is just based on, like I said, a
3   hypothetical if a noncitizen could get a driver's
4   license and H.B. 218 permits a voter to show a driver's
5   license to vote.
6           MR. BRISSENDEN:  It is a hypothetical.
7           MS. BERKOWER:  How would that prevent the
8   noncitizens from voting?
9           MR. BRISSENDEN:  It is a hypothetical and
10  you're specifically asking him for his mental
11  impressions, thoughts, opinions about a specific piece
12  of legislation that would be privileged.  I instruct
13  him not to answer.
14  Q.  (BY MS. BERKOWER)  Are you following that
15  instruction?
16  A.  Yes, ma'am, I am.
17  Q.  Can a noncitizen in Texas contain a concealed
18  handgun license?
19  A.  I don't know.
20  Q.  Can a noncitizen in Texas obtain a military
21  ID, US military ID?
22  A.  I would assume only military personnel can
23  obtain an ID.
24  Q.  Do you know if there are any noncitizens who
25  are military personnel?

## 107

1   A.  I don't know.
2   Q.  Sitting here today, would you agree that if
3   the prevention of noncitizens voting was a purpose of
4   H.B. 218, H.B. 218 would not actually serve that
5   purpose?
6           MR. BRISSENDEN:  First of all, I object
7   that it's a hypothetical and calls for speculation.
8   Also, the question is requiring the witness to disclose
9   his thoughts and mental impressions and analysis of the
10  specific legislation.  I instruct you not to answer.
11          MS. BERKOWER:  Well, I didn't ask him
12  with regard to a legislative act that would have taken
13  place at the time.  I'm asking him, sitting here today,
14  looking at the bill's terms, would this prevent
15  noncitizens from voting.  I'm not asking him to draw on
16  anything that he learned as a legislator, nor am I
17  asking him to draw on any considerations he took into
18  account in voting for the bill.  I'm just asking him
19  simply sitting here today, would this bill, if enacted,
20  prevent noncitizens from voting.
21          MR. BRISSENDEN:  And my objection is the
22  same and my instruction is the same.
23  Q.  (BY MS. BERKOWER)  Are you following that
24  instruction?
25  A.  I'll follow the instruction, yes, ma'am.

## 108

1   Q.  Do you know if members of the public or
2   interest groups opposed H.B. 218?
3   A.  I'm sure somebody did.
4   Q.  Do you remember who that was?
5   A.  Not at all.
6   Q.  Do you remember what their concerns were?
7   A.  I do not.
8   Q.  Do you know if any legislators opposed
9   H.B. 218 in the public record?
10  A.  I believe -- I'm sure the public record would
11  indicate that, yes.
12  Q.  Do you remember who they were or what their
13  concerns were?
14  A.  I do not.
15  Q.  Do you know of any action taken as part of the
16  public record by any legislator in 2007 to address
17  concerns raised by the opponents of H.B. 218?
18  A.  Personally, I do not know.
19  Q.  Are you aware of any analysis conducted by
20  anyone unrelated to H.B. 218 that was made part of the
21  public record?
22  A.  I'm not aware.  I'm sure someone did.
23  Q.  Are you aware of any analysis generally
24  conducted by anyone related to H.B. 218, public or
25  private?

DENNIS BONNEN                                                    June 6, 2012

## 109

1    A.  I am not, publicly speaking.
2          MR. BRISSENDEN:  To the extent that the
3    question requires you to disclose information that is
4    private, not part of the public record, I instruct you
5    not to answer.
6          MS. BERKOWER:  You would object to the
7    question of any analysis conducted by anyone related to
8    the bill?
9          MR. BRISSENDEN:  That is not part of the
10   public record.  That is part of his work and analysis
11   in relation to the bill, yes.
12         MS. BERKOWER:  I didn't ask what the
13   analysis was.  I asked if he was aware -- just aware of
14   any analysis.  Not how he considered it, not how it
15   factored into his deliberations; just if he was aware
16   of any analysis related to the bill as conducted at
17   all.
18         MR. BRISSENDEN:  Same instruction.
19         MS. BERKOWER:  You also did not object to
20   that question earlier in this deposition.
21         MR. BRISSENDEN:  To the extent that you
22   have knowledge based upon information that is contained
23   in the public record, you may answer the question.
24         THE WITNESS:  I'm -- I don't recall.
25   Q.  (BY MS. BERKOWER)  Are you aware of any

## 110

1    studies about the number of registered voters without
2    allowable forms of ID under H.B. 218 that were entered
3    into the public record?
4    A.  I don't remember.
5    Q.  Are you aware of any attempt by any legislator
6    in 2007 to determine who among registered voters did
7    not possess the forms of identification required by
8    H.B. 218 that were discussed in the public record?
9    A.  I do not remember.
10   Q.  Are you aware of any attempt to determine the
11   impact of H.B. 218 on minority voters that was included
12   in the public record?
13   A.  I'm not aware, no.
14   Q.  Did the House pass H.B. 218?
15   A.  I don't remember.
16   Q.  Are you aware of a photographic -- excuse me.
17       Are you aware of a photographic voter
18   identification bill that was introduced in the
19   81st Legislature in 2009?
20   A.  There were several filed.
21   Q.  Are you aware of any?
22   A.  I'm aware that several were filed, yes.
23   Q.  You're aware of a few?
24   A.  Uh-huh.
25   Q.  Were you a member of the House Elections

## 111

1    Committee that session?
2    A.  This would be the '09 session?
3    Q.  Yes.
4    A.  Yes, I was.
5    Q.  Do you remember S.B. 362's introduction into
6    the house?
7    A.  Vaguely.
8    Q.  Since you were a member of the House Elections
9    Committee, did you have any role in the development of
10   S.B. 362?
11   A.  I probably did.
12   Q.  Do you remember?
13   A.  I don't recall.  Not really.
14   Q.  What was your involvement with the bill once
15   it was sent to the House?
16   A.  Which bill?
17   Q.  Sorry.  S.B. 362.
18   A.  I don't know.  I don't know which one 362 is.
19   There were -- I may have filed my own bill that
20   session.  So specifically speaking, I don't know which
21   one 362 is.  Not to be difficult, but we -- we really
22   don't -- at least I don't, and many members don't,
23   recall bills by bill number.  And so --
24   Q.  How do you recall them?
25   A.  By bill on voter ID.  Or Betty Brown had a

## 112

1    bill on voter ID, or what have you.
2    Q.  What if I told you --
3          MR. BRISSENDEN:  I was just going to say
4    it's now 1:00, and we haven't taken a break for lunch.
5    Whenever you get to a good time to break, maybe we can
6    take a break and get some food.
7          MS. BERKOWER:  We can take a break now.
8    How long do you want to take a break for?
9          THE WITNESS:  We can go ahead and finish
10   this.
11         MR. BRISSENDEN:  Are you at a good
12   breaking point?  How long would you like to take a
13   break for?
14         MS. BERKOWER:  I think 40 minutes is what
15   it takes.  I guess we'll be back at 1:35.
16         (Recess from 12:53 p.m. to 1:57 p.m.)
17   Q.  (BY MS. BERKOWER)  I don't remember exactly
18   where we left off.  If I repeat a question or two, I'm
19   sorry.
20   A.  No problem.
21   Q.  So we were talking about the 81st Legislature
22   in 2009.
23   A.  Yes.
24   Q.  Are you aware that photo -- photographic voter
25   identification bills were introduced in that session?

DENNIS BONNEN                                                    June 6, 2012

---

### 113

1      A.   Yes.

2      Q.   Do you remember in particular S.B. 362?

3      A.   Not specifically, but generally I'm sure it

4  existed.

5      Q.   Were you a member of the House Elections

6  Committee that year?

7      A.   In '09 I was, yes.

8      Q.   And did you have any role in the development

9  of S.B. 62 due to your position on that committee?

10     A.   No, not if it was a senate bill I would not

11  have.

12     Q.   Once the bill was sent to the House, what was

13  your involvement given that you were on the elections

14  committee?

15     A.   Simply to -- I'm assuming that the committee

16  heard the bill, and I simply would have been a member

17  of the committee while the bill was being heard for

18  public testimony and discussion.

19     Q.   I have what's been -- I know this has been

20  previously marked, but I'm not sure what number it is.

21  So we'll just introduce it again.  This is going to be

22  Exhibit 434.

23          (Exhibit No. 434 marked)

24     Q.   (BY MS. BERKOWER)  Do you know what this is?

25     A.   Senate Bill No. 362 by Senator Frazier and

---

### 114

1  others.

2      Q.   Take a minute to review the document and let

3  me know when you're finished.

4      A.   (Reading).

5          Okay.

6      Q.   Do you remember this bill now that you've

7  taken a look at it?

8      A.   Generally speaking, yes.

9      Q.   Do you remember what forms of identification

10  were permitted under S.B. 362?

11     A.   I would have to refer to the bill to be able

12  to do that.

13     Q.   Okay.  I think it starts on Page 5.

14     A.   "The following identification is an acceptable

15  form of photo identification under this chapter, a

16  driver's license or personal identification card issued

17  to the person by the Department of Public Safety that

18  is not expired or that expired no earlier than two

19  years before the date of presentation" (as read).

20     Q.   Okay.  I'll just ask you questions.  You don't

21  have to read out loud every single --

22     A.   Okay.

23     Q.   So does it permit a Texas driver's license?

24  That's on Page 5.

25     A.   Yeah, Page 5.  On Page 5, Lines 22, 23, and 24

---

### 115

1  it does permit a Texas Department of Public Safety

2  issued license.

3      Q.   And a qualifying on that was it must have

4  expired no earlier than two years before the date of

5  the presentation?

6      A.   Correct.

7      Q.   Does the bill permit identification issued by

8  an agency or institution of the Federal Government?

9  And I'll direct your attention to Page 6.

10     A.   Yes.  If an agency or institution of the

11  Federal Government or an agency or institution of a

12  political subdivision of this state, on Page 8 -- on

13  Line 18 and 19 on Page 6.

14     Q.   The part of the bill that -- that permits an

15  identification from an agency institution or political

16  subdivision of the state, would that include state

17  institution of higher education, like student IDs?

18     A.   I -- I do not know what the -- what that would

19  have included.  I don't know.  It certainly could have.

20  I do not know for certain.

21     Q.   Are the state universities of Texas an

22  institution of the state?

23     A.   State -- state-funded ones, yes, I guess they

24  would be considered that.

25     Q.   Does the bill permit employee identification

---

### 116

1  to be used?

2      A.   Let's see.

3      Q.   I guess I can make that question more

4  specific.  Does that -- does the bill permit employee

5  identification to be used if it's issued by an agency

6  or institution of the Federal Government or an agency,

7  institution or political subdivision of Texas?

8          MR. BRISSENDEN:  Objection, compound.

9      Q.   (BY MS. BERKOWER)  Did you understand the

10  question?

11     A.   Could you repeat it?

12     Q.   Sure.  I can break it down.  On Page 6,

13  Line 16 --

14     A.   Okay.

15     Q.   -- the bill permits a valid identification

16  card that contains the person's photograph and is

17  issued by -- and then it says --

18     A.   Federal Government.

19     Q.   -- Federal Government agency or an agency,

20  institution, or political subdivision of this state.

21          Does that -- does that mean that employee

22  identification issued by those authorities containing

23  the person's photograph would be permitted?

24     A.   I guess logically that would follow, yes.

25     Q.   And then at Line 22 there's another set of

DENNIS BONNEN                                              June 6, 2012

## 117

1  documentation that's acceptable as proof of
2  identification, and that goes on Page 6 and 7, and
3  those are non- -- those forms of identification do not
4  have to be photographic identification; is that
5  correct?
6       A.   Let me review them.  Many of them appear not
7  to require a photo or have a photo.
8       Q.   And I know you've taken a break now, but if
9  you can remember back to H.B. 218.
10      A.   Okay.
11      Q.   And you can take a look to review if you'd
12  like.  Does it appear that for the most part S.B. 362
13  and H.B. 218 require the same identification to vote?
14      A.   No, not really.  If you look at Page 10 of
15  H.B. 218 under Section B, No. 1 is a copy of a current
16  utility bill, bank statement, government check,
17  paycheck, or other relevant document that shows the
18  name and address of the voter, whereas No. 1 under
19  Senate Bill 362, Page 6 is a voter's voter registration
20  certificate.  So that's the difference.
21      Q.   Okay.  But it does still permit a current
22  utility bill, paycheck, or government check -- paycheck
23  or other government document that shows the name and
24  address of the voter?
25      A.   Correct, but they also have listed the voter's

## 118

1  voter registration certificate, which is -- yes, which
2  is the difference there.
3       Q.   Okay.  So -- but -- so in 362 they added voter
4  register cards to --
5       A.   It appears to, yes, yes.
6       Q.   -- be one of the non-photo ID that was
7  permitted under that Section B; is that correct?
8       A.   Yes, that seems to be the case.
9       Q.   Are there other significant differences that
10  you know of?
11           MR. BRISSENDEN:  Objection, form.
12           THE WITNESS:  No, it appears to be very
13  similar.
14      Q.   (BY MS. BERKOWER)  And to be clear, both of --
15  both bills would permit a voter to present non-photo
16  identification under some circumstances to be allowed
17  to vote; is that correct?
18      A.   It appears to be the case, yes.
19      Q.   What were the purposes of -- sorry --
20  S.B. 362?
21           MR. BRISSENDEN:  Again, I'm going to
22  instruct the witness that in terms of the question as
23  it is asking about the general purpose of the bill in
24  the legislation, you may answer.
25           THE WITNESS:  Generally speaking, to

## 119

1  ensure the integrity and confidence in the elections in
2  Texas.
3       Q.   (BY MS. BERKOWER)  Was there any evidence of
4  these problems in the public record?
5       A.   I don't know.
6       Q.   Did anyone explain how the terms of this bill
7  would solve any of the problems related to in-person
8  voter fraud in comparison to current -- current law on
9  the public record?
10      A.   I do believe there was a discussion of that on
11  the House floor, but I don't know absolutely.
12      Q.   Do you recall what the explanation was of how
13  the terms of this bill would solve any problems related
14  to in-person voter fraud as expressed on the public
15  record?
16      A.   Specifically, I do not.
17      Q.   Do you know how the terms of this bill would
18  solve any problems related to in-person voter fraud in
19  comparison to current law?
20           MR. BRISSENDEN:  I would instruct the
21  witness that the question requires you to divulge your
22  thoughts, opinions, mental impressions, and analysis of
23  the legislation and I instruct you not to answer.
24           MS. BERKOWER:  It's actually just a yes
25  or no question, do you know.  I did not ask for the

## 120

1  substance of what he knows.
2           MR. BRISSENDEN:  If you're limited to
3  just whether he knows or not, I'll allow that.
4           THE WITNESS:  Do you mind repeating the
5  question?
6       Q.   (BY MS. BERKOWER)  Sure.  Do you know if the
7  terms of this bill would solve any problems related to
8  in-person voter fraud in comparison to current law?
9       A.   Generally the belief is that it would improve
10  that situation.
11      Q.   When you say "improve that situation," what
12  are you referring to?
13           MR. BRISSENDEN:  Now I'm going to have to
14  instruct him --
15           MS. BERKOWER:  Well, I just think the
16  answer is not clear.  So --
17           MR. BRISSENDEN:  Now you're asking him to
18  clarify and offer his opinion and explain his answer
19  beyond just providing an answer as to whether or not he
20  has knowledge or not.  That delves into his mental
21  impressions and thoughts and opinions, and I instruct
22  you not to answer the question.
23           MS. BERKOWER:  I understand.  But I asked
24  a yes or no question and he didn't respond with a yes
25  or no answer.  He responded with an answer that,

DENNIS BONNEN                                           June 6, 2012

## 121

1  frankly, was nonresponsive to a yes or no question, and
2  so I didn't understand what he meant.  That's why I
3  asked for the clarification.  If you'd rather, I can
4  re-ask the question if he can answer yes or no.
5           MR. BRISSENDEN:  If he can answer the
6  question with a yes or no.  It was a rather long
7  question that doesn't necessarily allow for a simple
8  yes or no answer without an explanation.  And so with
9  that, I'm going to instruct him not to answer the
10 question.
11          MS. BERKOWER:  Can I re-ask the question?
12          MR. BRISSENDEN:  You can certainly
13 rephrase it, certainly.
14     Q.  (BY MS. BERKOWER)  Do you know if the terms of
15 this bill would solve any problems related to in-person
16 voter fraud?
17          MR. BRISSENDEN:  And so the way that
18 question is phrased is do you know, yes or no?  Do you
19 have that knowledge?
20          THE WITNESS:  Being I'm not an expert, I
21 would say no.
22     Q.  (BY MS. BERKOWER)  Do you know if the terms of
23 this bill would solve problems with current law?
24          MR. BRISSENDEN:  Again, the way the
25 question is phrased is do you know, yes or no.

## 122

1           THE WITNESS:  This bill being Senate
2  Bill 362 with current law being --
3      Q.  (BY MS. BERKOWER)  The current practice.
4      A.  -- the current practice, do I know -- I
5  apologize.  Do I know what now?  Would it solve
6  problems?
7      Q.  Do you know if the terms of 362 would solve
8  problems related to in-person fraud under current law?
9           MR. BRISSENDEN:  Do you have that
10 knowledge?
11          THE WITNESS:  No, I don't have that
12 knowledge.  I'm not an expert.
13     Q.  (BY MS. BERKOWER)  Did you follow the bill at
14 all while it was in the Senate as part of your duties
15 on the election committee?
16     A.  I did not, no.
17     Q.  How does that work just as a general matter if
18 you're on a committee that has a parallel committee in
19 the Senate?  Do you interact at all?
20     A.  In a general matter, it -- it varies greatly.
21 I would suggest that more often than not you don't
22 particularly interact.  I mean, obviously there might
23 be conversations where there's a significant
24 interaction or conversation.  But, respectfully,
25 obviously, that can vary.  But largely the House does

## 123

1  kind of the House thing and the Senate does the Senate
2  thing and we don't have that much communication.
3      Q.  What are the examples of committees that have
4  more interaction between House and Senate?
5      A.  I don't think it's specific to a committee.  I
6  think maybe it's more specific to members, if that
7  makes sense.  There may be a specific time or instance
8  or member relationship where there may be more
9  interaction than otherwise.
10     Q.  Are there any members that you interact with
11 regularly in the Senate?
12     A.  Not to be difficult, obviously regularly is,
13 you know, definable.  But I would -- I would deal more
14 with the state senators who have representation
15 overlapping with my House district, but generally
16 speaking, I don't have any significant interaction with
17 Senate members.
18     Q.  Okay.  Did you have communications with Senate
19 members concerning your duties on the elections
20 committee in 2009?
21     A.  Not -- no, not really.  And I want to be
22 respectful.  I mean, I think Frazier -- did Senator
23 Frazier and I visit with each other during that
24 session, yes.  Did we have visits about voter ID, no,
25 not really.

## 124

1      Q.  So the visits covered other topics?
2      A.  Usually of no substance.
3      Q.  Okay.  In April 2009, did some House members
4  sign a pledge circulated by the Republican Party of
5  Texas concerning voter ID?
6      A.  I believe you're correct, yes, I think so.
7      Q.  Did you sign the pledge?
8      A.  Not to be -- I don't remember.  I think I
9  didn't, but I don't really recall.  I'm sure you have
10 the records.
11     Q.  I have what's going to be Exhibit 435.
12     A.  Thank you.
13          (Exhibit No. 435 marked)
14     Q.  (BY MS. BERKOWER)  Take a minute to review it
15 and let me know when you're done.
16     A.  (Reading).
17          Okay.  I reviewed it.
18     Q.  Can you describe generally what the pledge
19 required members to agree to?
20     A.  On principles concerning what the bill must
21 contain are clear.  This bill must ensure a valid photo
22 identification as needed to vote, take effect at the
23 next possible uniform election date, be free of any
24 restriction -- registration, I apologize, registration
25 requirement, such as same day voter registration that

DENNIS BONNEN                                                                June 6, 2012

## 125

1  dilutes the intent of the bill, which is ensuring fair
2  and accurate election, and increase criminal penalties
3  for voter fraud and registration.  And then members
4  signing their commitment to those principles as stated.
5      Q.  Are you on the list of members who signed the
6  commitment?
7      A.  It appears I am not.
8      Q.  If you turn to Page 4 of the document, the
9  last page.
10     A.  Yes, ma'am.
11     Q.  Do you see the first full paragraph, the last
12  sentence says, "Representative Dennis Bonnen, as a
13  member of the House Elections Committee, has issued a
14  principle stating explaining his revision below" (as
15  read).
16     A.  Yes.
17     Q.  On Tuesday -- and then it quotes you as
18  saying, "On Tuesday, many Texas House Republican caucus
19  members issued a statement calling for four principles
20  to be included in the voter ID bill.  While I choose to
21  stand firmly behind these key elements, I choose not to
22  add my name to the statement" (as read).
23         Do you remember saying that?
24     A.  I do.
25     Q.  Did you, in fact, not choose to add your name

## 126

1  to the statement?
2      A.  That is correct.
3      Q.  Why didn't you add your name to the statement?
4         MR. BRISSENDEN:  I'm going to instruct
5  the witness at this time not to disclose, in response
6  to the question, information with thoughts and mental
7  impressions, analysis regarding the voter ID bill and
8  in connection with your query.  I instruct you not to
9  answer.
10        MS. BERKOWER:  Well, we view promises --
11  I think it's actually pretty well settled that promises
12  concerning support of legislation, agreeing to
13  introduce legislation are actually not privileged under
14  the Supreme Court case of United States versus Saltsky
15  [phonetic] --
16        THE REPORTER:  Saltsky?
17        MS. BERKOWER:  I will get the name for
18  you in a second.
19        And that's why usually that question is
20  proper.  Are you willing to withdraw your objection on
21  that basis?
22        MR. BRISSENDEN:  No, I'm not.
23        MS. BERKOWER:  Are you aware of that
24  Supreme Court case?
25        MR. BRISSENDEN:  I'm not -- I'm not the

## 127

1  witness and I'm not being examined here today.  I will
2  say to you that I'm standing by the objection and the
3  instruction.  Your question didn't talk about promises.
4  It asked about why he chose not to add his name to the
5  statement, and that asks for his mental impressions.
6  I'm going to instructing the witness not to answer.
7      Q.  (BY MS. BERKOWER)  Are you going to follow
8  your counsel's instruction?
9      A.  Yes, ma'am.
10     Q.  Did you, in fact, make any promises to support
11  a particular type of voter identification legislation?
12        MR. BRISSENDEN:  I'm again going to
13  instruct the witness not to answer the question based
14  upon legislative privilege.
15        MS. BERKOWER:  Can you explain your basis
16  for that objection, given the relative set of authority
17  on that point?
18        MR. BRISSENDEN:  I'm not going to be
19  examined here today during the deposition, but I'm
20  standing on the privilege, and based upon the court's
21  orders of -- and as I understand them from yesterday,
22  June 5th, May 17th, and May 21st.
23        MS. BERKOWER:  Can you point to any
24  direct citation in any of those opinions just for my
25  personal information that supports your objection on

## 128

1  this point?
2      MR. BRISSENDEN:  I have stated my
3  objection.
4      Q.  (BY MS. BERKOWER)  Okay.  Are you going to
5  answer the question?
6      A.  No, ma'am.
7      Q.  I think, then, the quotation -- the pledge
8  continues to quote you after that paragraph.
9      A.  Well --
10     Q.  Sorry.
11     A.  This isn't a pledge.  It's simply a statement.
12     Q.  Sorry.  The pledge ends with the end of the --
13  you're right.  Well, this -- this article or
14  communication, whatever it is, from the Republican
15  Party of Texas --
16        MR. BRISSENDEN:  For the record, it's a
17  press release dated Wednesday, April 29th, 2009.
18     Q.  (BY MS. BERKOWER)  Okay.  So this press
19  release quotes you; is that a fair statement?
20     A.  That is -- that is a fair statement.
21     Q.  And it continues to quote you saying, "As a
22  member of the election committee, my focus remains to
23  advance this bill to the House floor.  I will not sign
24  a commitment that threatens to kill the bill by
25  preventing it from being voted out of committee and

DENNIS BONNEN                                      June 6, 2012

---

## 133

1    A.   Lines 18 through 20 on Page 6 say that, yes.
2    Q.   And the next section says, "Official mail
3    addressed to the person by name of a governmental
4    entity"?
5    A.   Correct.
6    Q.   The next section says, "A certified copy of a
7    birth certificate or other document confirming birth
8    that is admissible in a court of law and establish the
9    person's identity" (as read).  Yes?
10   A.   Correct.
11   Q.   The next section permits citizenship papers;
12   is that correct?
13   A.   Yes, issued to that person, correct.
14   Q.   The next section permits an original or
15   certified copy of the person's marriage license or
16   divorce decree; is that correct?
17   A.   That is correct.
18   Q.   The next section permits court records that
19   the person's adoption, name change, or sex change; is
20   that correct?
21   A.   That is correct.
22   Q.   And then the next section permits an
23   identification card issued to the person by a
24   governmental entity of this state or the United States
25   for the purposes of obtaining public benefits,

---

## 135

1    proof -- proof of identification; is that correct?
2    A.   Can you repeat -- say that again?
3    Q.   This section of the bill, which starts on
4    Line 16 of Page 5 --
5    A.   Page 6.
6    Q.   Sorry, Page 6, yes, right -- permits 11
7    categories of non-photo ID that would be acceptable as
8    proof of identification for voting?
9    A.   Yes, that's correct.
10        MR. BRISSENDEN:  Objection to the extent
11   the question mischaracterizes the bill -- the language
12   in the bill.
13   Q.   (BY MS. BERKOWER)  You may answer.  Does it
14   in fact, do that?
15   A.   I guess it does.
16   Q.   Now, turning back to the press release we were
17   just looking at on the last page, when you said this
18   was an accurate quotation of you --
19   A.   Uh-huh.
20   Q.   -- you said, "One can simply look at the voter
21   ID bill that I filed, H.B. 3556, to see where I stand
22   on the issues" (as read).
23   A.   Yes.
24   Q.   Do you see that?
25   A.   I do.

---

## 134

1    including veteran's benefits, Medicaid, or Medicare.
2    Do you see that?
3    A.   I do see it.
4    Q.   Then it further permits a temporary driving
5    permit issued to the person by the Department of Public
6    Safety; is that correct?
7    A.   It is correct.
8    Q.   And then the next section permits a pilot's
9    license issued to the person by the Federal Aviation
10   Administration or another authorized agency of the
11   United States.  Do you see that?
12   A.   I do.
13   Q.   And then there's two more.  One -- the next is
14   a library card that contains the person's name issued
15   to the person by a public library located in this
16   state; is that correct?
17   A.   It is correct.
18   Q.   Or -- and then the last -- the last one,
19   No. 11 there says, "A hunting or fishing license issued
20   to the person by the Parks and Wildlife Department" (as
21   read).  Is that correct?
22   A.   Yes.
23   Q.   So this section that starts on Page 6 and runs
24   to Page 7 permits, it looks like, 11 categories of
25   non-photo identification that are permitted for

---

## 136

1    Q.   Does that mean that this bill 3556 documents
2    or includes the types of voter identification that you
3    find acceptable for voter ID?
4        MR. BRISSENDEN:  I'm going to instruct
5    the witness that to the extent that the question
6    requires you to divulge your mental impressions, your
7    thoughts, analysis of House Bill 3556, I would instruct
8    you not to answer.  To the extent you can answer the
9    question without disclosing information that is
10   privileged, you may answer.
11       THE WITNESS:  I will use my privilege.
12   Q.   (BY MS. BERKOWER)  Would you agree, though,
13   that you introduced a bill into the House that would
14   permit a voter to show an employee ID card as proof of
15   identification?  That's Page 5, Line 23.
16   A.   I'm sorry.  Repeat that again.
17   Q.   I said would you agree that you introduced a
18   bill into the House that would allow a voter to present
19   employee identification cards as proof of
20   identification to vote?
21   A.   No.  I filed a bill that would allow for valid
22   employee identification card that contains a person's
23   photograph that is issued by an employed person in the
24   ordinary course of the employer's business.
25   Q.   In order to vote?

DENNIS BONNEN

June 6, 2012

## 137

1    A.  Correct.

2    Q.  And you introduced -- is it true that you

3  introduced a bill into the House that would allow a

4  voter to present a driver's license or personal

5  identification card issued by the Texas Department of

6  Public Safety that had expired within two years before

7  the date of presentation?  Now I'm looking at Lines 13

8  through 16 on Page 5.

9    A.  I don't know if I heard you exactly.  But that

10  has not expired or that expired no earlier than two

11  years before the date of the presentation, yes.

12    Q.  Yes.  Isn't it true -- and now I'm looking at

13  Page 6, Line 4 -- isn't it true that you introduced a

14  bill into the House that would allow a voter to use a

15  student identification card issued by a public or

16  private institution of higher education located in

17  Texas that contains the person's photograph in order to

18  vote?

19    A.  That is correct.

20    Q.  Now I'm looking at Line 12.  Isn't it true

21  that you would allow a voter to present photographic

22  identification that has not expired from an agency or

23  institution of the Federal Government in order to vote?

24    A.  Correct.

25    Q.  And you introduced a bill into the House that

## 138

1  would allow a voter to present valid photo

2  identification from a state agency, institution, or

3  political subdivision in order to vote; is that

4  correct?

5    A.  That is correct.

6    Q.  And you introduced -- now starting again on

7  Line 16 on Page 6 -- you introduced a bill into the

8  House that would allow voters to present non-photo

9  identification as acceptable proof of identification in

10  order to vote; is that correct?

11    A.  Yes.

12    Q.  Getting back to the pledge, just a couple more

13  questions about that.  Did anyone ask you to sign the

14  pledge?

15       MR. BRISSENDEN:  I'm going to instruct

16  the witness not to disclose communications you had with

17  your staff and with other legislators and their staff.

18  To the extent that you can answer the question without

19  disclosing communications that you had with those

20  legislators or their staff members, you may answer.

21       THE WITNESS:  I don't believe anyone

22  asked me to sign the pledge.

23    Q.  (BY MS. BERKOWER)  In your view, did the bill

24  that you introduced in the House, 3556, comply with the

25  pledge?

## 139

1       MR. BRISSENDEN:  I'm going to instruct

2  the witness not to -- instruct you not to disclose

3  thoughts, opinions, mental impressions, analysis of the

4  legislation and instruct you not to answer.

5       THE WITNESS:  I would agree with that.

6    Q.  (BY MS. BERKOWER)  Okay.  Well, turning back

7  to Page 1 of the pledge.

8    A.  Certainly.

9    Q.  Does the bill that you introduce ensure that a

10  valid photo identification is needed to vote?

11       MR. BRISSENDEN:  I'm going to instruct

12  the witness not to disclose your mental impression,

13  thoughts and opinions, analysis of the legislation.

14  You may answer as to what the general purpose of the

15  legislation was.

16    Q.  (BY MS. BERKOWER)  I'll rephrase the question,

17  actually.  Item 1 on the pledge says that, "The bill

18  must ensure a valid photo identification is needed to

19  vote" (as read).  Is that an accurate -- did I

20  accurately read that?

21    A.  You did accurately read it.

22    Q.  Isn't it true that the bill you introduced in

23  the House does not require a valid photo identification

24  in order to vote?

25    A.  No, it does require a valid photo

## 140

1  identification to vote.

2    Q.  Can't a voter under the bill you introduce

3  provide nonvoter identification in order to vote?

4    A.  It does.

5    Q.  So does it require, in all circumstances, that

6  a valid photo identification is needed to vote?

7    A.  It doesn't, but the pledge doesn't say that

8  either.

9    Q.  What was the purpose of the bill you

10  introduced, H.B. 3556?

11    A.  To ensure confidence and integrity in the

12  election process in Texas.

13       MR. BRISSENDEN:  And just so the record

14  is clear, I'm instructing the witness to limit his

15  answer to general purpose.

16    Q.  (BY MS. BERKOWER)  What happened to H.B. 3556

17  that you introduced?  Do you remember?

18    A.  I don't, but I think it didn't even get a

19  hearing, or maybe it was heard.  I actually don't know.

20  But it didn't move through the process at any level.

21    Q.  Did you ultimately vote for S.B. 362?

22    A.  I'm certain if it -- well, yeah, I don't know.

23  The record would reflect that.  I don't recall.

24    Q.  Was there opposition to S.B. 362 in the House

25  on the public record?

DENNIS BONNEN                                              June 6, 2012

## 145

1   have been produced.  I think there were some technical
2   problems that might have delayed some of them.  But I
3   know at least an attempt at the production has been
4   made.
5              MR. BRISSENDEN:  Right.  I believe there
6   was a -- some technical difficulties that made
7   production slightly after noontime.  But I believe from
8   our office standpoint those documents that Elizabeth
9   specifically asked for have been produced.  And I
10  believe there will be more produced that weren't a part
11  of Elizabeth's letter.  Those will be produced later
12  today.
13             MS. BERKOWER:  Thank you for that
14  clarification.
15  Q.  (BY MS. BERKOWER)  Are you ready?
16  A.  Yes, ma'am, sure.
17  Q.  So turning to the last page first, before I
18  forget, it says -- it looks like Ms. Rogers signed her
19  initial correspondence to you.  Do you see that?
20  A.  I don't know exactly what you mean.
21  Q.  On the last page, one more page at the top
22  there.
23  A.  Okay.  What do you mean "to me"?
24  Q.  Well, on the page -- on Page 5 it looks like
25  her -- her initial correspondence to you is reproduced,

## 146

1   and then the end of it spills on to Page 6 and she
2   signs her name, Kathy Rogers.  Do you see that?
3   A.  Yes, I do.
4   Q.  And then she signed underneath that Jenai's
5   friend's mom?
6   A.  Correct.
7   Q.  Who is Jenai?
8   A.  Jenai is my niece.
9   Q.  Have you received other requests or
10  communications from Jenai or another constituent that
11  indicated you'd be getting communication is from
12  Ms. Rogers?
13  A.  No.  Jenai is my niece who is a young -- she's
14  now I think a sophomore or junior in high school.  At
15  the time she would have been in middle school or a
16  freshman.  And I think Kathy Rogers was providing --
17  trying to provide context and significance to her
18  correspondence by presenting and knowing of my family.
19  Q.  When she said Jenai's friend's mom, did you
20  know who --
21  A.  Well, I know who Jenai is, absolutely.
22  Q.  Okay.  On Page 2 of this letter -- well, okay.
23  So it looks like this document reproduces her letter to
24  you and then most of the document is your letter back
25  to her.  Would you agree with that characterization?

## 147

1   A.  I believe that's correct, yes.
2   Q.  On Page 2 you said that you requested to be a
3   member of the House Elections Committee so that we
4   could pass a powerful and meaningful piece of
5   legislation.  Did I read that accurately?
6   A.  You did.
7   Q.  Is that true?
8   A.  It is true that it says so that we could pass
9   a powerful and meaningful piece of legislation and that
10  I requested to be a member of the House Elections
11  Committee, yes.
12  Q.  Did you request to be a member of the House
13  Elections Committee?
14  A.  I would assume I did.
15  Q.  I just wanted to be sure because earlier I
16  don't know that we covered that information, or at
17  least I'm not sure you remembered if you had.
18  A.  Earlier I believe we were referencing the
19  select committee.
20  Q.  Okay.
21  A.  And that was in the 2011 session, and we're
22  now referring to my appointment to the elections
23  committee in 2009.
24  Q.  So you did request to be a member of that
25  committee?

## 148

1   A.  Yes.  And for clarity, the elections committee
2   is a standing committee that members are able to
3   request, whereas the select committee is exactly that,
4   and it's not a committee that members would have been
5   aware of that it was going to exist and therefore
6   request it.
7   Q.  In the previous paragraph you say that you
8   voted against -- well, I guess maybe we should back up
9   earlier.
10  A.  Okay.
11  Q.  Do you know which -- what Ms. Rogers' concern
12  was in writing to you?
13  A.  Well, she says, "I've been tasked by the
14  Galveston County GOP to find out why you voted against
15  the voter ID bill.  They don't want to hear that you
16  didn't think it was strong enough because" -- in
17  quotes -- "that is always sorted out in the House
18  Senate Committee.  I hope you'll support it when it
19  comes to the floor.  Thanks in advance for any
20  nonautomated reply" (as read), and then there's a "J."
21  Q.  And then I think it looks like above her
22  e-mail to you on the left-hand it says "881 R.S. 362."
23  Can you explain what that means?
24  A.  I assume, because I don't really deal with
25  this system; my staff does -- I assume it would mean

DENNIS BONNEN                                    June 6, 2012

---

149

1    that it was -- it is -- it is indicating that this
2    individual is for a bill in the 81st regular session,
3    that is Senate Bill 362.
4        Q.  Okay.  So do you think we can conclude that
5    the bill Ms. Rogers is referring to you that voted
6    against is S.B. 362?
7        A.  Yes, but for clarity, I believe it would be
8    362 as carried in the House by Representative Smith.
9        Q.  Okay.  Thank you for that clarification.  So
10   turning now to Page 2 -- turning now to Page 2, the
11   first full paragraph, the last line.
12       A.  Uh-huh.
13       Q.  I'm sorry.  Sorry.  The second full paragraph,
14   the last sentence, you said that you "Voted against the
15   bill to send a strong message to Chairman Smith and to
16   all Texans that his bill is completely unacceptable and
17   it is an outright insult to citizens who have demanded
18   effective voter ID legislation" (as read).
19              Did I read that accurately?
20       A.  "I voted against the bill to send a strong
21   message to Chairman Smith and to all Texans that this
22   bill is completely in acceptable and is outright insult
23   to citizens who have demanded effective voter ID
24   legislation" (as read), that is correct.
25       Q.  Doesn't S.B. 362 contain many of the same

---

150

1    identification requirements that you included in House
2    Bill 3556?
3              MR. BRISSENDEN:  I instruct the witness
4    not to disclose his thoughts, impressions, and analysis
5    of the legislation and instruct him not answer.
6        Q.  (BY MS. BERKOWER)  Okay.  Well, then let's
7    turn back to House Bill 3556 and also Senate Bill 362.
8    Please turn to Page 5 in both documents.
9        A.  Which exhibits are you referring to?
10       Q.  I'm sorry.  That's Exhibit 434.
11       A.  436.
12       Q.  So turning to Page 5 --
13       A.  What version of the bill is this?
14       Q.  Of that bill, I believe it's as filed.
15              MR. BRISSENDEN:  We're referring to
16   Exhibit 434 for the record.
17              THE WITNESS:  Right.  So the issue I
18   would have concern with here is that you're asking me
19   to compare a bill as filed in trying to create context
20   in the bill I voted against coming out of committee,
21   which is not this bill.
22       Q.  (BY MS. BERKOWER)  Okay.
23       A.  It was changed in the House.
24       Q.  Okay.  In that case we'll come back to this
25   later and leave it alone for now.  Can I just take a

---

151

1    minute to confer with counsel?
2        A.  Absolutely.
3              (Conferring.)
4        Q.  (BY MS. BERKOWER)  So now that we've talked
5    about this correspondence with Ms. Rogers, I think -- I
6    think maybe you said earlier you didn't remember if you
7    had voted for Representative Smith's bill.  Does this
8    refresh your recollection?
9        A.  It refreshes the recollection that I voted
10   against it in the committee.
11       Q.  Did you vote for it on the floor?
12       A.  I don't remember.  I think I did, but I'm not
13   certain of that.  The record would show us that.
14       Q.  What ultimately happened to S.B. 362 in the
15   House?  Do you remember?
16       A.  I don't.
17       Q.  Do you remember there being interim charge to
18   the committee on elections after the 2009 session?
19       A.  There are always interim charges given to
20   committees after sessions, so I'm certain there were.
21   I don't know specifically what those charges were.
22       Q.  Do you remember being involved with a report
23   prepared pursuant to an interim session charge?
24       A.  I wasn't -- I'm sure I signed a report.  I
25   don't know if I did or not.  I'm sure there was a

---

152

1    report written.  I didn't write the report, though.
2        Q.  Do you remember if the charge asked the
3    committee to investigate the prevalence of voter fraud
4    in Texas?
5        A.  There would be a record of whether it said
6    that or not.  I -- I personally don't recall.
7        Q.  I'm going to show you what I'm going to mark
8    as Exhibit 438.
9              MS. BERKOWER:  Is that what we're up to?
10   438.
11              (Exhibit No. 438 marked)
12       Q.  (BY MS. BERKOWER)  This one, the cover stages
13   didn't get stapled on to it, but I will represent to
14   you that this is an excerpt of --
15       A.  Certainly, charges.  Fair enough.
16       Q.  And I don't have the cover pages.  Does this
17   help refresh your recollection about the interim
18   charge?
19       A.  Well, it is a copy of the report filed --
20   House Committee Elections report filed January 2011,
21   interim report.
22       Q.  Were you involved with the preparation of that
23   report?
24       A.  Very insignificantly.
25       Q.  What was your role with regard to the

DENNIS BONNEN                                      June 6, 2012

## 153

1   preparation of that report?
2       A.  I don't remember if we had a hearing that I
3   may have attended.  But beyond that, I wouldn't have
4   had any more involvement.
5       Q.  To be clear, do you remember if there was a
6   hearing?
7       A.  I don't.
8       Q.  Do you remember --
9       A.  Well, let me -- let me state it more
10  accurately.  I'm sure there was probably a hearing.  I
11  don't recall whether I attended a hearing or not.
12  There would be a record.  There might have been more
13  than one hearing for that matter.
14      Q.  You don't remember any of the hearings,
15  though?
16      A.  I don't recall whether -- and I'm talking
17  about in the interim.
18      Q.  Yes.
19      A.  Yeah.  I don't recall specifically whether
20  there were hearings or not and if I was at the
21  hearings.
22      Q.  Turning to Page 27, which is --
23      A.  I've got it.
24      Q.  This is an excerpt.
25      A.  Yes.

## 154

1       Q.  The fourth full paragraph.
2       A.  Under testimony or including background?
3       Q.  Under -- under testimony.
4       A.  Okay.
5       Q.  Does that -- well, does the testimony --
6   there's a section called "Testimony."  Do you see that?
7       A.  Correct.  Yes, ma'am.
8       Q.  Does it indicate that someone from the
9   Attorney General's office came to testify before the
10  committee?
11      A.  Well, yes, you know, it says above that the
12  committee held a hearing on June 14th, 2010, to gather
13  more information about issues related to voter
14  identification to fulfill the interim charge.  You are
15  correct.  It says Jay Dyer, Deputy Attorney General for
16  government and external affairs testified.  Yes.
17      Q.  Okay.  And then does -- do the next couple of
18  paragraphs summarize Mr. Dyer's testimony?
19      A.  I assume it does, but I can't say accurately
20  whether it does or not because I don't recall his
21  testimony.  I don't even think I was at the hearing.
22      Q.  Is that the intent of these paragraphs, to
23  summarize what he testified to?
24      A.  As I said, I assume it is.  But I can't vouch
25  for it.

## 155

1       Q.  So the -- in the third paragraph of that
2   section, the last line, does it -- it reads, "To get a
3   complete picture of voter fraud in Texas, further
4   analysis is needed to gather additional information
5   from local election and law enforcement officials" (as
6   read).  Do you see that?
7       A.  Yes, ma'am.
8       Q.  Do you know of any -- if any such analysis was
9   ever conducted pursuant to what's in the public record?
10          MR. BRISSENDEN:  And just the record --
11  we're clear, the question is limited to what is in the
12  public record.  To the extent you can answer that
13  question, go ahead.
14      Q.  (BY MS. BERKOWER)  I can rephrase the
15  question, actually.
16          Do you know if there is any such analysis
17  included in the public record?
18      A.  I know in public testimony there have been
19  examples of -- from local election officials and law
20  enforcement officials of concerns with voter integrity.
21      Q.  Were those presented in the public record
22  before or after this testimony?
23      A.  My recollection is that it was presented
24  before and after.
25      Q.  And were those -- were those public

## 156

1   presentations in the form of analysis, or were they in
2   the form of individual anecdotal accounts for case
3   studies?
4       A.  I'm not sure what you would specifically call
5   them.  I believe there were different individuals and
6   different election officials from different parts of
7   the state who gave reports of concerns with voter
8   integrity.
9       Q.  Did any of those reports conduct a broad
10  analysis of local election enforcement on -- of
11  election fraud enforcement on the local or county
12  level, to your knowledge, in the public record?
13      A.  Well, I don't think the issue was about
14  reports.  It was about specific instances and concerns
15  of voter fraud.
16      Q.  So, to -- to your knowledge, was there any
17  comprehensive analysis that gathered additional
18  information from local election and law enforcement
19  many officials concerning voter fraud?
20          MR. BRISSENDEN:  Objection, vague.
21  Objection, compound.  Again, the question is limited to
22  what's in the public record.
23      Q.  (BY MS. BERKOWER)  Indeed.
24      A.  I believe that information was brought to us
25  showing reports from certain counties or from counties

DENNIS BONNEN                                          June 6, 2012

## 157

1   who had reviewed for voter fraud and voter
2   irregularities.
3       Q.   But, to be clear, were any of those reports a
4   statewide analysis?  And I'm limiting go this to the
5   public record.
6       A.   No, I don't think they were statewide
7   analysis, because they were -- they were requested from
8   local election and law enforcement officials.
9       Q.   In the paragraph above that it describes
10  Mr. Dyer's testimony concerning referrals and instances
11  of alleged illegal voting.  Do you see that?
12      A.   Is that the second sentence, allegations of
13  voter fraud without being asked, or where?
14      Q.   I think it's the second paragraph about
15  Mr. Dyer's testimony that starts, "Since 2002."
16      A.   Okay.
17      Q.   So do you see that paragraph?
18      A.   Yes, ma'am.
19      Q.   Does it -- does it say Mr. Dyer testified that
20  the Attorney General's office received 267 referrals of
21  incidences of alleged illegal voting since 2002?
22      A.   It does.
23      Q.   Does it also say Mr. Dyer testified that 35 of
24  those alleged violations were resolved with guilty
25  pleas?

## 158

1       A.   It does.
2       Q.   Dismissals or plea agreements, while 12 cases
3   remain active.
4       A.   Yes, ma'am.
5       Q.   Out of the 267.
6       A.   That -- that is what it reads.
7           MR. BRISSENDEN:  For the record, it goes
8   on to --
9           MS. BERKOWER:  Sorry.  Did you want to
10  say something?
11          MR. BRISSENDEN:  I was going to ask you
12  to complete the sentence.
13      Q.   (BY MS. BERKOWER)  I thought -- okay.  35 -- I
14  thought I cited 12 cases remain active, and the
15  remainder of the cases are still being investigated
16  where the statute of limitations has expired.  So it
17  doesn't explain how many cases can -- are no longer
18  being pursued; is that correct?
19      A.   No, it does not give a number to that.  It
20  simply says 35 were resolved with pleas of guilty,
21  dismissals, or plea agreements.  12 cases remain
22  active.  And the rest are under current investigation
23  or have had the statute run.  So we don't know
24  specifically the number.
25      Q.   And the purpose of this interim charge, what

## 159

1   was it?  What was the purpose of the interim charge?
2       A.   It was --
3           MR. BRISSENDEN:  I'm going to instruct
4   the witness that you can answer the question in terms
5   of generally speaking, what is the general purpose of
6   an interim charge.
7           THE WITNESS:  Well, she -- I'm sorry.
8           MR. BRISSENDEN:  With regards to the
9   purpose of this particular charge as it relates to this
10  particular legislation.  If you can answer the question
11  without divulging your thoughts, analysis, and mental
12  impressions with regards to this legislation, you may
13  answer.  If you can't without disclosing, then I
14  instruct you not to answer.
15          THE WITNESS:  To the best of my knowledge
16  interim charge No. 3, "Examine the prevalence of fraud
17  in Texas elections, study new laws in other states
18  regarding voter identification, and recommend statutory
19  changes necessary to ensure that only eligible voters
20  can vote in Texas elections" (as read).
21      Q.   (BY MS. BERKOWER)  Did the report make a
22  recommendation?
23      A.   It appears it did.
24      Q.   And was that recommendation based on the
25  evidence that the committee reviewed?

## 160

1       A.   Possibly.
2       Q.   Why is it possible that it would be based
3   on --
4       A.   They could have based it on whatever they felt
5   necessary.  I can't be certain what they -- they
6   wrote -- someone else wrote the report.  So I can't
7   speak to what they chose to make a recommendation
8   entirely or partially based upon.
9       Q.   Does that mean that sometimes recommendations
10  are made to the Legislature that are not based on
11  evidence before whatever committee is making the
12  recommendation?
13          MR. BRISSENDEN:  Objection, calls for
14  speculation.
15      Q.   (BY MS. BERKOWER)  You may answer.
16          MR. BRISSENDEN:  I'm going to instruct
17  the witness that to the extent you have knowledge that
18  is based upon your personal experience with regards to
19  specific legislative matters, I would instruct you not
20  to answer and disclose that information.  To the extent
21  that you can answer that question as a general
22  procedural matter, you may.
23          THE WITNESS:  I think the point of my
24  answer is that I don't know factually what they base
25  their recommendations on.  And to your question, the

DENNIS BONNEN                                                    June 6, 2012

## 161

1  Legislature does not act as a judicial body that takes
2  evidentiary information or is required to draw
3  conclusions.
4       Q.  (BY MS. BERKOWER)  Okay.  Thank you for the
5  clarification.
6       MS. BERKOWER:  How are we doing?  Do you
7  need to take a break?
8       MR. BRISSENDEN:  Sure.  Why don't we take
9  a short break.
10           (Recess from 3:07 p.m. to 3:27 p.m.)
11      Q.  (BY MS. BERKOWER)  Do you remember if there
12  was -- turning back to the 2009 legislative session
13  just for a few more moments, do you remember if a bill
14  on voter identification was voted out of the elections
15  committee on -- into the full House that year?
16      A.  I believe there was, yes.
17      Q.  Do you remember which bill was voted out of
18  committee?
19      A.  It was a senate bill carried by
20  Representative Smith in the House, I believe.
21      Q.  Do you remember if that was Senate Bill 362?
22      A.  I mean, the record would show us that.  I
23  don't know specifically.  It probably was.  But I don't
24  know absolutely.
25      Q.  Do you remember if the bill voted out of

## 162

1  committee had been amended while it was in the
2  committee?
3       A.  I'm pretty certain -- well, I don't know if it
4  was amended, not to be difficult.  I think it was -- I
5  think a substitute of the bill was produced.  And I
6  don't know if it was amended or not.  But I don't know.
7       Q.  How did you vote on Senate Bill 362?
8       A.  When?
9       Q.  When it -- sorry.  When it was -- when the
10  vote was to send it out of the committee to the full
11  House?
12      A.  I believe I voted no.
13      Q.  No?
14      A.  I believe I voted no.
15      Q.  Do you remember if the bill that you voted no
16  on allowed for nonphotographic identification as --
17      A.  I imagine it did, but I don't know
18  specifically.
19      Q.  Didn't the bill that you introduced, that
20  Session 3556, include nonphotographic identification?
21      A.  We've been over that, and it did.
22      Q.  Did you issue any public statements about why
23  you voted against the bill?
24      A.  I may have.  I don't recall.
25      Q.  Did you communicate with any constituents

## 163

1  about why you voted against the bills?
2       MR. BRISSENDEN:  Don't disclose any
3  thoughts, impressions, or mental analysis about
4  conversations.
5       Q.  (BY MS. BERKOWER)  I asked a yes or no
6  question, did you communicate with constituents about
7  the bill.  I didn't ask for the content of the
8  communications.
9       MR. BRISSENDEN:  I don't -- I believe
10  your question was more along the lines about why he
11  voted against the bill as opposed to just a more
12  general question about the legislation.
13      Q.  (BY MS. BERKOWER)  Okay.  I'll rephrase the
14  question.
15           Did you communicate with any constituents
16  about the fact that you voted against the bill?
17      A.  Well, technically speaking, Mrs. Rogers, whose
18  correspondence we've already gone through rather
19  thoroughly, is not my constituent.  But I obviously did
20  communicate with her.  I don't know.  We did a document
21  search and provided the appropriate individuals with
22  the information.  I'm sure if I did, it's there.  But I
23  don't know -- I struggle to recall specific
24  correspondences with constituents from three and fours
25  years ago.

## 164

1       Q.  Okay.  Well, just to briefly turn your
2  attention back to that correspondence with Ms. Rogers,
3  I think you have it there in front of you.
4       A.  Yes.
5       Q.  What's the exhibit number on that?
6       A.  437.
7       Q.  437.  On Page 2, in the second full paragraph.
8       A.  Uh-huh.
9       Q.  You said, "Before casting my nay vote in
10  committee, I took a pass on voting to ensure that there
11  were enough votes being billed to the House floor.
12  Upon seeing that there were five votes, I voted against
13  the bill to send a strong message to Chairman Smith and
14  to all Texans that this bill is completely unacceptable
15  and that it is an outright insult to citizens who have
16  demanded effective voter ID legislation" (as read).
17           Is that a different bill than the bill
18  that was ultimately sent to the full House?
19      A.  I don't know.  What do you mean?
20      Q.  Did you vote no on the bill that went out of
21  committee?
22      A.  Yes, we -- we established that earlier.
23      Q.  Is that the bill you're referencing in this
24  paragraph?
25      A.  Absolutely.

## 165

1      Q.   Do you remember what the provisions of that
2   bill were?
3      A.   I do not.
4      Q.   Do you remember if that bill allowed for
5   nonphotographic identification for voters?
6      A.   Specifically I don't recall, but my assumption
7   is -- is that it did.
8      Q.   But you don't remember any of the specific
9   provisions of that bill?
10     A.   No.
11     Q.   During the 2011 legislative session, were you
12   staffed on any committees this addressed
13   election-related or voter ID-related legislation?
14     What?
15     Q.   During the 2011 legislative session, were you
16   staffed on any committees that addressed
17   election-related or voter ID-related legislation?
18         MR. BRISSENDEN:  Objection.
19         THE WITNESS:  What do you mean by
20   "staffed"?  I don't know what that means.  Was I
21   assigned to one, you mean?
22     Q.   (BY MS. BERKOWER)  That's what I mean.
23     A.   Okay.  I'm sorry.  I didn't mean to be
24   difficult.  Yes, I was assigned to the select
25   committee.

## 166

1      Q.   Did you also introduce election-related --
2   sorry -- election-related legislation that session?
3         MR. BRISSENDEN:  Objection, vague.
4      Q.   (BY MS. BERKOWER)  You can answer.
5         MR. BRISSENDEN:  You can answer.
6         THE WITNESS:  In 2011?
7      Q.   (BY MS. BERKOWER)  Yes.
8      A.   I believe I did.
9      Q.   Do you remember which bill that was?
10     A.   No, I don't.
11         (Exhibit No. 439 marked)
12     Q.   (BY MS. BERKOWER)  I have Exhibit 439 here.
13   Do you recognize this?
14     A.   It's House Bill No. 624 filed by Bonnen, which
15   is myself.
16     Q.   What did this bill do?
17     A.   It would have ensured the integrity and
18   confidence in elections in the State of Texas.
19     Q.   What were the bill's terms?
20     A.   Its terms.
21     Q.   Well, let me back up a second.  Do you
22   remember when you introduced this bill?
23     A.   I do not.  With it being the number of 624, I
24   imagine it was probably earlier in the process.
25     Q.   I don't know if I necessarily need to

## 167

1   introduce this as an exhibit.  But I can give it to you
2   to see if it refreshes your recollection.
3      A.   Sure.  Yeah, it doesn't bother me.
4         MR. BRISSENDEN:  Why don't we go ahead
5   and mark that as an exhibit.
6         MS. BERKOWER:  Okay.  I'll mark that as
7   Exhibit 440.
8         (Exhibit No. 440 marked)
9      Q.   (BY MS. BERKOWER)  Do you know what this is?
10     A.   This is the Texas Legislature on-line history
11   for House Bill 624.
12     Q.   Does it refresh your recollection as to when
13   you filed --
14     A.   It does.  It indicates -- this record
15   indicates that I filed the bill on January 12th of
16   2011.
17     Q.   Do you remember if that was before or after
18   you were assigned to be chairman of the select
19   committee?
20     A.   It was before.
21     Q.   At the time that you introduced this bill, had
22   you seen or heard anything about Senate Bill 14?
23     A.   I doubt it.  I can't say absolutely, but I
24   doubt that I have.
25     Q.   Had you had any communications with

## 168

1   Senator Frazier in the fall of 2010?
2      A.   I don't think I had any, but I wouldn't want
3   to lie and say I hadn't.  I doubt I did.  I mean, I
4   don't --
5      Q.   You can't remember any?
6      A.   No.  We don't communicate a lot.
7      Q.   Just as a general matter, if you are working
8   on a piece of legislation and you know there's
9   something similar being drafted in the Senate, do you
10   try to communicate with the senators who are working on
11   that legislation?
12     A.   As a general matter, it really just depends.
13   Sometimes you might, sometimes you might not.
14   Candidly, sometimes there's some competition to try to
15   be the lead author, be it a House bill versus a Senate
16   bill.  So it really truly varies as to whether there
17   would be any real communication or positive working in
18   that regard.  So there's no -- there was no patent
19   scenario there.
20     Q.   Do you recall any communications with members
21   of Senator Frazier's staff in the fall of 2010?
22     A.   I do not recall any.
23     Q.   What was the purpose of House Bill 624?
24         MR. BRISSENDEN:  I'm instructing the
25   witness that -- to answer the question in terms of the

DENNIS BONNEN                                                    June 6, 2012

## 169

1    general purpose of the legislation and not to disclose
2    mental impressions, analysis, and opinions about the
3    legislation.
4              THE WITNESS:  General purpose was to
5    ensure integrity and confidence in the election process
6    in Texas.
7         Q.  (BY MS. BERKOWER)  Turning your attention to
8    Page 5, do you see the Section 63.0101, document of
9    proof of identification?
10        A.  Yes, ma'am.
11        Q.  And under Item 1 --
12        A.  Yes.
13        Q.  -- do you see that it permits a driver's
14   license or personal identification card issued to the
15   person by the Department of Public Safety that is not
16   expired or that has expired no earlier than one year
17   before the date of presentation?
18        A.  Correct.
19        Q.  Turning to the next page, Item 6 on Page 6 at
20   Line 10.
21        A.  Yes, ma'am.
22        Q.  Do you see that this bill would permit a voter
23   to use a student identification card from a public or
24   private institution of higher education that contains
25   the person's photograph?

## 170

1         A.  I do see that.
2         Q.  And it looks like that is not limited to
3    institutions in the State of Texas; is that correct?
4         A.  It says, "Student identification card issued
5    by a public or private institution of higher education
6    that contains the person's photograph," yes.
7         Q.  So it doesn't have to be in Texas?
8         A.  It does not appear to have limiting language,
9    no.
10        Q.  Then the next section, Section 17 that starts
11   at Line 14, it permits a voter to use a valid
12   identification card that contains the person's photograph
13   and is issued by either an agency or institution of the
14   Federal Government, an agency, institution, or
15   political subdivision of this state, or a tribal
16   organization.  Do you see that?
17        A.  I do.
18        Q.  Is this bill different from the bill you
19   introduced in the previous Legislature with regard to
20   the types of identifications that are permitted for
21   voters to use at the polls?
22             MR. BRISSENDEN:  Just so we're clear and
23   the record is clear, which bill are you referring to?
24             MS. BERKOWER:  3556.
25             MR. BRISSENDEN:  Exhibit 436?

## 171

1              (Discussion off the record.)
2              THE WITNESS:  The bill is not the same.
3    I forget -- I apologize.  What was the question about
4    the two?
5         Q.  (BY MS. BERKOWER)  Is the House Bill 624 that
6    you introduced during the 2011 Legislature different
7    from the House Bill 556, which you introduced in the
8    2009 Legislature?
9         A.  It is different.
10        Q.  How is it different?  And I'm asking with
11   regard to the types of identification voters may use to
12   vote at the polls.
13        A.  Well, House Bill 3556 says a driver's license
14   or personal identification card issued to the person by
15   the Department of Public Safety that is not expired or
16   that expired no earlier than two years before the date
17   of presentation; and House Bill 624 says a driver's
18   license or personal identification card issued to the
19   person by the Department of Public Safety that is not
20   expired or that expired no later than one year before
21   the date of presentation.  And then --
22        Q.  Okay.  Does --
23        A.  Yes, ma'am.
24        Q.  Sorry.  Maybe to make this go a little faster
25   I'll just ask you some questions about -- about some of

## 172

1    the terms.
2         A.  Yes, ma'am.
3         Q.  Does House Bill 3556 permit a voter to show a
4    valid employee identification card -- a photo
5    identification card issued by an employee -- an
6    employer?  That's on Page 5 at Line 23.
7              MR. BRISSENDEN:  Objection, asked and
8    answered.
9              THE WITNESS:  I believe it does.
10        Q.  (BY MS. BERKOWER)  Does House Bill 624 allow
11   that type of identification to be used?
12        A.  Not that specific type, no.
13        Q.  Is there any evidence in the public record
14   that indicated that employee identification cards
15   should be -- should not be permitted to be used for
16   voters at the polls?
17        A.  I believe that was discussed at times during
18   hearings and on the floor.
19        Q.  Was it discussed in the time between when you
20   introduced 3556 and 624?
21             MR. BRISSENDEN:  Again, you're limiting
22   your question to what's in the public record?
23             MS. BERKOWER:  Yes.
24             THE WITNESS:  I don't recall when
25   something like that was discussed or not discussed.

---

173

1    Q.  (BY MS. BERKOWER)  And with regard to -- you
2    initially said that 3556 permitted a license -- a
3    Department of Public Safety identification card or
4    driver's license that expired within two years, and 624
5    limits that to one year?
6    A.  That's correct.
7    Q.  Was there any evidence in the public record in
8    the time between which you -- between when you
9    introduced 3556 and 624 that supported a shorter period
10   of time?
11   A.  I don't know whether there was or not.
12   Q.  Does H.B. 624 allow a tribal identification to
13   be used?
14   A.  It does.
15   Q.  Does 3556 allow a tribal identification to be
16   used?
17   A.  I don't believe that it includes that.
18   Q.  Is there any evidence in the public record
19   that supported adding tribal identifications in the
20   time between when you introduced 3556 and 624?
21   A.  I don't recall.
22   Q.  After -- turning your attention now just to
23   House Bill 624.
24   A.  Okay.
25   Q.  Do you know of any analysis available in the

---

175

1    bill contains different provisions and what the purpose
2    of those provisions are, it's my understanding that
3    those are privileged.
4    Q.  (BY MS. BERKOWER)  Do you think that -- just
5    as a general matter, why is an expired
6    identification -- why won't an expired identification
7    verify a person's identity?
8    MR. BRISSENDEN:  Because the question
9    pertains to specific provisions of legislation,
10   including S.B. 14, and you are now asking the witness
11   about questions regarding mental impressions and asking
12   why particular provisions were included, I'm going to
13   instruct the witness not to answer.
14   MS. BERKOWER:  I think this falls into
15   the category of things that we believe are basic
16   background general information that don't necessarily
17   relate directly to a legislative act or to his mental
18   impressions or any deliberations that he participated
19   in as a legislator, and as a consequence -- also,
20   notwithstanding the fact that that question has been
21   answered in many, many depositions in this case without
22   an objection, we believe that that's not actually
23   seeking to uncover privileged information.  We ask that
24   the state withdraws its objection.
25   MR. BRISSENDEN:  And I disagree with the

---

174

1    public record relating to who many registered voters
2    possess the forms of identification specified in the
3    bill?
4    A.  Well, considering the bill never received a
5    hearing, it was not even referred to the committee that
6    I was chairing as a select committee, I don't think
7    that kind of analysis was ever required in the bill.
8    Q.  Do you know why it wasn't referred to the
9    select committee?
10   A.  I don't make those decisions.
11   Q.  What was the purpose of including a driver's
12   license, a personal ID that expired within one year of
13   presentation?
14   MR. BRISSENDEN:  Let me assert an
15   objection as to privilege.  I'm going to instruct the
16   witness not to answer the question.
17   THE WITNESS:  I agree with privilege.
18   MS. BERKOWER:  I think our position is
19   we're allowed to question on general legislative
20   purpose.
21   MR. BRISSENDEN:  As I understand from the
22   court's orders from yesterday and back in May, the
23   court is allowing questions with regard to general
24   purpose of a particular piece of legislation in
25   general, but in terms of asking questions as to why the

---

176

1    analysis because I believe that the question is
2    requiring the witness to disclose his thoughts,
3    opinions, mental impressions, and analysis about
4    provisions of legislation that is directly related to
5    provisions of different voter ID bills, including
6    S.B. 14.
7    Obviously the question is being asked
8    because it does relate and has relevance to provisions
9    of voter-ID bills, including S.B. 14, and I would
10   instruct the witness not to answer.
11   Q.  (BY MS. BERKOWER)  How many years is a Texas
12   driver's license valid for?
13   A.  I don't know.
14   Q.  How -- when was the last time did you renewed
15   your own driver's license?
16   A.  I do not know.  I'm certain it was shortly
17   after it expired or just before.
18   Q.  Do you remember --
19   A.  Which you can do on-line now, I believe.
20   Q.  That was my next question.  Do you remember if
21   you renewed it on-line?
22   A.  I don't believe I did, but I don't know for
23   certainty.
24   Q.  If you renewed it on-line, would you have to
25   take a new photograph?

DENNIS BONNEN

June 6, 2012

---

### 177

1    A.  I don't know absolutely, but I think that's
2  one of the positive natures of an on-line renewal is
3  that you do not take a new photograph.
4    Q.  Do you have an estimate of -- so you said you
5  don't know how long a driver's license is valid for; is
6  that accurate?
7    A.  Yeah.  I don't want to be incorrect.  I think
8  it's six years, but I'm not certain of that.
9    Q.  So more than a year?
10    A.  That's correct.
11    Q.  Probably -- maybe more than five years?
12    A.  Maybe, but I don't know.  I mean, it's not
13  something that's debated or unknown.  I mean, we could
14  find that out.
15    Q.  If you don't have to take a new photograph
16  when you renew, does that mean that you could have the
17  same photograph for up to maybe 12 years?
18    A.  I don't know what the facts are, but I imagine
19  that could be the case.  But I don't know.
20    Q.  Well, assume that it's six years.  You know
21  you can renew on-line.
22    A.  Uh-huh.
23    Q.  If it is, in fact, six years, does that mean
24  you would have a 12-year period with the same
25  photograph.

---

### 178

1          MR. BRISSENDEN:  Objection, asked and
2  answered.
3          THE WITNESS:  Assuming those facts are
4  accurate, that certainly could happen.
5    Q.  (BY MS. BERKOWER)  Do you know how long a US
6  passport is valid for?
7    A.  I have no idea.  I think it's ten years, but I
8  don't really know.  Isn't it ten years?
9    Q.  Do you know how long a citizenship certificate
10  is valid for?
11    A.  I have no idea.
12    Q.  Do you know how long a naturalization
13  certificate is valid for?
14    A.  No.
15    Q.  Is it possible that someone who possesses a
16  valid photo identification might no longer look like
17  the photograph?
18          MR. BRISSENDEN:  Objection, calls for
19  speculation.
20    Q.  (BY MS. BERKOWER)  You can answer that.
21    A.  I think it's speculative.
22    Q.  Okay.  But is it possible that someone could
23  have a photo ID and they know longer look like the
24  photograph?
25          MR. BRISSENDEN:  Same objection.

---

### 179

1          THE WITNESS:  Possible.
2    Q.  (BY MS. BERKOWER)  Do you look the same way
3  you looked 12 years ago?
4    A.  Let me think about that.  I don't remember
5  when I started shaving my head.  So if I did 12 years
6  ago, which I very well could have, I would look pretty
7  much the same.
8    Q.  Do you know other people who no longer look
9  the same way they looked 12 years ago?
10    A.  There are some.
11    Q.  If you don't like the photo on your photo
12  ID, how does that verify your identity?
13          MR. BRISSENDEN:  Objection, calls for
14  speculation, assumes facts not in evidence.
15    Q.  (BY MS. BERKOWER)  You can answer that.
16          MR. BRISSENDEN:  If you can.
17          THE WITNESS:  Repeat the question.
18          MS. BERKOWER:  Can you read it back,
19  please?
20          (The requested portion was read)
21          MR. BRISSENDEN:  Same objection.
22    Q.  (BY MS. BERKOWER)  You may answer.
23    A.  I choose not to.
24    Q.  That's not an option.
25    A.  Okay.  I'll explain it to you.  How it works

---

### 180

1  is if I have a valid Texas driver's license and my
2  photo does not look the same as maybe I presently do,
3  there are statistics and data verified by our
4  government that will line-up with the statistics and
5  data in the voter registration.  And that is how you
6  verify.  It's not purely and simply in relation to the
7  photo.
8    Q.  What statistics are you referring to?
9    A.  Someone's address, someone's height, weight.
10    Q.  What if they moved or gained weight or lost
11  weight?
12    A.  Well, those are separate issues.  If they
13  moved, you're supposed to renew your license with that
14  new address on it.
15    Q.  And what if they gained or lost a significant
16  amount of weight?
17          MR. BRISSENDEN:  Objection, calls for
18  speculation.  To the extent you're able to answer the
19  question, go ahead.
20          THE WITNESS:  That's not necessarily a
21  factor that's being used to decide that you are the
22  person you say are when you're going in to cast a
23  ballot.
24    Q.  (BY MS. BERKOWER)  Doesn't the photo, though,
25  factor into whether or not the -- the ID card verifies

DENNIS BONNEN                                                    June 6, 2012

---

181

1   your identity?

2           MR. BRISSENDEN:  Objection, calls for

3   speculation.

4           THE WITNESS:  Yeah.

5   Q.  (BY MS. BERKOWER)  You may answer.

6   A.  I think it's speculative.

7           MS. BERKOWER:  Okay.  That answer is

8   nonresponsive.  I would ask the witness to provide a

9   responsive answer.

10          THE WITNESS:  Repeat the question.

11          MR. BRISSENDEN:  Objection, asked and

12  answered.  Objection, calls for speculation.  Let's

13  move on.

14          MS. BERKOWER:  You're telling me to move

15  on?

16          MR. BRISSENDEN:  He's tried to answer

17  your question the best he can given the speculative

18  nature of the question.

19  Q.  (BY MS. BERKOWER)  Have you ever seen a

20  naturalization certificate?

21  A.  I don't know if I have or not.

22  Q.  Have you ever known of a person who

23  naturalized -- became a naturalized US citizen at a

24  very young age, say, an adopted child?

25  A.  I -- I don't know about the "very young age"

---

182

1   part.

2   Q.  Do you know anyone who has become a US citizen

3   as a child?

4   A.  I believe so.

5   Q.  Do you know if that person has ever had to

6   retake the photograph on their naturalization

7   certificate?

8   A.  I do not know.

9   Q.  If they didn't have to take -- retake the

10  photograph on their naturalization certificate, would

11  that photograph look the same when they were

12  naturalized versus some decades later?

13          MR. BRISSENDEN:  Objection, calls for

14  speculation.  He's already answered that he does not

15  know.  Now you've gone one step further and asked him a

16  follow-up question on what he already does not know.

17  So I would instruct him --

18          THE WITNESS:  I don't know.

19  Q.  (BY MS. BERKOWER)  Have you ever seen a tribal

20  identification?

21  A.  I do believe I have, yes, I think so.

22  Q.  What does it look like?

23  A.  I think they vary depending on the tribe.

24  Q.  Which one have you seen, if you remember?

25  A.  I don't.

---

183

1   Q.  Do you know how often the photographs are

2   taken for tribal identifications?

3   A.  I have no idea.

4   Q.  Do you remember a bill being filed in the

5   House in 2011 called S.B. 14?

6   A.  Well, not to be difficult in any way, but it

7   wouldn't have been filed in the House if it was an S.B.

8   Q.  Sorry.  Do you remember a bill -- well, what

9   would it be?

10  A.  Well, it would have been -- it would have been

11  a Senate bill, it would have come over to the House

12  after having passed the Senate.

13  Q.  Do you remember a Senate bill coming over to

14  the House after having passed the Senate that's called

15  S.B. 14?

16  A.  I do.

17          (Exhibit No. 441 marked)

18  Q.  (BY MS. BERKOWER)  I have what's marked as

19  Exhibit 441.

20  A.  Thank you.

21  Q.  Do you recognize this?

22  A.  Vaguely, yes.

23  Q.  What is it?

24  A.  It is Senate Bill No. 14 filed by

25  Senator Frazier and others.

---

184

1   Q.  Turning to page -- hold on a second.  Turning

2   to Page 3, Section 7, do you see that that section

3   explains who must provide photographic identification

4   at the polls?

5   A.  I think it's saying who they provide it to.

6   Q.  Okay.

7   A.  And then I guess it goes on and lists.

8   Q.  Do you see Line 14 on Page 4, Section G?

9   A.  I do.

10  Q.  And it says that the requirement for

11  identification prescribed by Subsection B, it's

12  referring to Section B above that, are not met, the

13  voter may be accepted for provisional voting?

14  A.  Yes.

15          MR. BRISSENDEN:  Just so the record is

16  clear, not to be difficult, Exhibit 441 is a version of

17  S.B. 14 that has lines through it and edits.  Do you

18  have -- I think there was an exhibit that he used

19  before that's been signed.

20          MS. BERKOWER:  This is S.B. 14 as filed,

21  and we have specific questions about the bill as filed,

22  which is why we introduced that as an exhibit at this

23  time.

24          MR. BRISSENDEN:  Very good.

25  Q.  (BY MS. BERKOWER)  Turning to Page 5 of the

DENNIS BONNEN                                                June 6, 2012

---

185

1  bill, Part H at Line 4.
2      A.  Part H, Line 4, yes.
3      Q.  It says, "Requirements for identification
4  described by Subsection B do not apply to a voter, one,
5  who presents the voter registration certificate on
6  offering to vote; and, two, 70 years of age or older on
7  January 1st, 2012, as indicated by the date of birth on
8  the voter registration certificate" (as read).
9          Did I read that correctly?
10     A.  I believe you did.
11     Q.  Does that section mean that someone who is
12 over age 70 and presents a voter registration card does
13 not have to comply with the bill's identification
14 requirements?
15         MR. BRISSENDEN:  I'm going to instruct
16 you to the extent that you know the answer to that
17 question based upon public record, based upon your
18 review of the Exhibit 441, as you sit here today, you
19 may answer to the extent that it requires you to
20 disclose your mental impressions, thoughts, analysis,
21 and impressions as to S.B. 14, and I instruct you not
22 to answer.
23         THE WITNESS:  I'll follow his
24 instruction.
25     Q.  (BY MS. BERKOWER)  Well, I think he said -- to

---

186

1  be clear -- to be clear, just so I understand, does
2  that mean that you cannot answer this question based
3  solely on reading the language of the bill today?
4      A.  Well, I agreed with you on what the language
5  said.
6      Q.  But the question I asked was, does this mean
7  that a person who is 70 years of age or more who
8  presents a voter registration certificate does not have
9  to meet the other identification requirements, and you
10 invoked legislative privilege.  Is that accurate?
11     A.  That would be accurate.
12     Q.  So his instruction, though, said you should
13 answer the question or you may answer the question if
14 you could answer it based just on what's here in the
15 document.
16     A.  I've already agreed with you on what the
17 document says.  I'm not arguing with you about what the
18 document says.
19     Q.  Okay.  Turning to Page 8, Section 63.0101,
20 what does this section do?
21     A.  Documentation of proof of identification.
22     Q.  And does this section list the types of
23 identifications that are acceptable photo
24 identifications that a voter may present in order to
25 vote at the polls?

---

187

1      A.  It says, "The following documentation is an
2  acceptable form of photo identification under this
3  chapter," and then it lists several.
4      Q.  Does it list only four types of photo
5  identification that may be presented?
6      A.  It appears to -- well, yes, it appears to have
7  four types, correct.
8      Q.  And one of those is a driver's license or
9  personal identification card issued by DPS that has not
10 expired.  Is that accurate?
11     A.  That is accurate.
12     Q.  Another is United States military
13 identification card that contains a person's photograph
14 that has not expired.  Is that accurate?
15     A.  It is.
16     Q.  The third is United States citizenship
17 certificate that contains a photograph.  Is that
18 accurate?
19     A.  Yes.
20     Q.  Or a US passport that has not expired.  Is
21 that accurate?
22     A.  It is.
23     Q.  Is this bill different from -- are the
24 requirements for photo ID in this bill different from
25 that in S.B. 362 from the 2009 Legislature?

---

188

1          MR. BRISSENDEN:  Are you referring the
2  witness to another exhibit?
3      Q.  (BY MS. BERKOWER)  Yes, I'm referring to
4  exhibit --
5      A.  Is that 434?  Is that it?
6      Q.  Yes.
7      A.  Okay.
8      Q.  Do you remember the question?
9      A.  Is it different, I believe, that you asked.
10     Q.  Yes.
11     A.  Yes.  And give me one second.  It appears
12 there is some difference.
13     Q.  What are the differences?
14     A.  A difference would be that the driver's
15 license in Senate Bill 14 that is required to not have
16 expired, whereas in Senate Bill 362 the language says,
17 "A driver's license from the Department of Public
18 Safety that has not expired or that expired no earlier
19 than two years before the date of presentation" (as
20 read).  So that's a difference.
21     Q.  Does it also require an unexpired military ID
22 versus not including that requirement in 362?
23     A.  Well, you're correct except that I guess 362
24 is silent on the issue of whether it can be expired or
25 not.  Where 14 specifically states it cannot be

DENNIS BONNEN                                                June 6, 2012

---

### 189

1   expired, 362 doesn't make it clear.
2      Q.   Does 362 permit federal or state issue photo
3   ID; whereas, the S.B. 14 as filed does not?
4      A.   You are correct.
5      Q.   Does S.B. 362 permit non-photo identification
6   in some circumstances; whereas, S.B. 14 as filed does
7   not?
8      A.   That is correct.
9      Q.   Is it safe to say that S.B. 14 has fewer types
10  of permissible identification than S.B. 362?
11     A.   It appears that would be correct in comparing
12  them.
13     Q.   Is there any evidence in the public record in
14  the time between when S.B. 362 was developed and the
15  time that S.B. 14 was developed that indicated that
16  fewer types of identifications should be accepted at
17  the polls in order to ensure election integrity?
18     A.   I don't know.
19     Q.   Is it fair to say that S.B. 14 was
20  substantially different from S.B. 362?
21         MR. BRISSENDEN:  Objection, vague.
22         THE WITNESS:  I don't know what
23  "substantially" means.
24     Q.   (BY MS. BERKOWER)  Is it fair to say there
25  were a number of changes from S.B. 362 to S.B. 14?

---

### 190

1      A.   I would agree that there were changes.
2      Q.   Is it fair to say that S.B. 14 was stricter
3   than S.B. 362?
4          MR. BRISSENDEN:  Objection, vague.  And
5   to the extent that the question is requiring the
6   witness to disclose mental impressions, his opinions,
7   his views about S.B. 14, I instruct him not to answer.
8      Q.   (BY MS. BERKOWER)  Are you following your
9   counsel's instruction?
10     A.   Do you mean repeating the question?
11     Q.   I said, is it fair to say that S.B. 14 is
12  stricter than S.B. 362?
13         MR. BRISSENDEN:  Same objection and same
14  instruction.
15         THE WITNESS:  I follow the instruction.
16     Q.   (BY MS. BERKOWER)  Is it fair to say there are
17  fewer options for voters to present identification
18  under S.B. 14 as filed than S.B. 362?
19         MR. BRISSENDEN:  Objection, vague.  To
20  the extent that you can answer the question based upon
21  your review of the two exhibits that are in front of
22  you and the number of -- and comparing the two exhibits
23  and the number of identifications listed there, you may
24  answer.  Otherwise, if you cannot, then I instruct you
25  not to answer on the basis of privilege.

---

### 191

1          THE WITNESS:  Senate Bill 362 appears to
2   have six options and Senate Bill 14 appears to have
3   four.
4      Q.   (BY MS. BERKOWER)  Doesn't Senate Bill 362
5   also have a number of nonphotographic identification
6   options there as well?
7      A.   Certainly.
8      Q.   So would that be more than six options?
9      A.   Well, it would be more than six options that
10  don't -- well, six options that require a photo and
11  then there are others that do not.
12     Q.   So is it fair to say there are fewer -- fewer
13  acceptable identification options for voters under
14  S.B. 14?
15     A.   I'm certain that's easily said.  I don't know
16  where you need my expertise for that.
17     Q.   Okay.  What is a military ID?
18     A.   I am not an expert on that.  I would assume
19  it's an ID issued to a member of the United States
20  military.
21     Q.   Do you know how many different forms of
22  military ID there are?
23     A.   I know there are several, but I don't know the
24  number.
25     Q.   Do you know if military ID is issued to

---

### 192

1   noncitizens?
2      A.   I do not know.
3      Q.   Do you know if military ID is issued to
4   contractors?
5      A.   I do not know.
6      Q.   If I've asked you this, I'm sorry.  I don't
7   remember.  Do you know what a citizenship certificate
8   is?
9      A.   Yeah, you did ask that, and I don't really
10  know.  Actually, you may have asked if I've seen one.
11  I don't know if you asked me whether I know what one
12  is.
13     Q.   Do you know what one is?
14     A.   I'm familiar with it, but I'm not --
15     Q.   Do you know how much it costs -- I'm sorry.
16     A.   Go ahead.
17     Q.   Do you know how much it costs to obtain one?
18     A.   I do not.
19     Q.   Do you know how much it costs to obtain a
20  replacement citizenship certificate?
21     A.   I do not know.
22     Q.   Do you know what you would have to do to get a
23  replacement citizenship certificate?
24     A.   I do not.
25     Q.   Do you know how long it would take to get a

DENNIS BONNEN                                          June 6, 2012

---

193

1   replacement citizenship certificate?
2        A.   I do not.
3        Q.   Do you know if citizenship certificates always
4   contain a photograph?
5        A.   I don't know.
6        Q.   Do you know how much it cost to obtain a US
7   passport?
8        A.   I don't know.
9        Q.   Do you know what underlying documents you
10   would need to get a US passport?
11        A.   I could guess, but I don't really know.
12        Q.   Do you know how long it would take to get a
13   US passport?
14        A.   I think the timeframe varies, but I don't know
15   absolutely.
16        Q.   What does the term "legislative emergency"
17   mean within the Texas Legislature?
18        A.   I believe there's a record or a document of
19   that.  I can't quote it to you.
20        Q.   Are there any -- who declares a legislative
21   emergency?
22        A.   The governor.
23        Q.   Are there any constraints on what he may
24   declare to be a legislative emergency?
25        A.   I am not an expert on that part of the law and

---

194

1   what's the procedure.  But I don't believe there are
2   constraints, but I don't know.
3        Q.   Was photographic voter ID declared to be a
4   legislative emergency for the 82nd Legislature?
5        A.   I believe the record reflects that it was.
6        Q.   When did you first learn about this
7   designation?
8        A.   I don't recall.  I would imagine within a day
9   or two of it being declared an emergency.
10        Q.   Do you know why Governor Perry designated
11   voter ID as a legislative emergency?
12        MR. BRISSENDEN:  I'm going to instruct
13   the witness not to divulge or disclose his thoughts or
14   mental analysis and questions about S.B. 14 and the
15   legislative act of -- in which the emergency -- the
16   legislation has deemed to be an emergency and instruct
17   the witness not to answer.
18        MS. BERKOWER:  I asked if he knows why,
19   not why.
20        MR. BRISSENDEN:  I don't believe that was
21   the question.
22        MS. BERKOWER:  It was the question.  I
23   just read it right off the screen.  But can you read it
24   back, please?
25        MR. BRISSENDEN:  Yes, ma'am.  If the

---

195

1   question is limited to whether the -- whether or not
2   the witness has knowledge as to why that allows him to
3   answer the question with a simple yes or no answer, he
4   may answer.
5        MS. BERKOWER:  All right.
6        Q.   (BY MS. BERKOWER)  Do you need me to restate?
7        A.   I believe the question is do I know why that
8   was done.  And I do not.
9        Q.   Do you know if any other election law has ever
10   been designated a legislative emergency?
11        A.   I don't know.
12        Q.   What other types of legislation do you know of
13   that were designated as legislative emergencies?
14        A.   Off the top of my head, I don't recall.  I
15   know there have been.
16        Q.   Do you remember if any immigration-related
17   issues have been designated a legislative emergency?
18        A.   No.  I know there's a record.  I don't -- I
19   don't know.
20        Q.   What are the consequences of legislation being
21   designated an emergency?
22        A.   They're rather insignificant, frankly.  To the
23   best of my knowledge -- I could be inaccurate with the
24   fact to some degree.  I'm not intending to be.  But
25   it's simply their rules in the legislative process that

---

196

1   you cannot bring a bill to the floor within the first
2   100 days.  And the governor declaring something an
3   emergency simply allows that legislation to come before
4   the body in that first 100 days.  It doesn't require
5   that it does and it simply means that it could.
6        Q.   Basically it can jump the line?
7        A.   No.
8        MR. BRISSENDEN:  Objection to the extent
9   that it mischaracterizes testimony and the record.
10        Q.   (BY MS. BERKOWER)  I don't -- I don't know if
11   you said this or not, but after the governor declares a
12   legislative emergency, does that Legislature have to
13   consider the issue within the first 60 days?
14        A.   It does not, and there is precedent to show
15   that we don't.
16        Q.   But it may.  It doesn't have to?
17        A.   It allows it to.
18        Q.   Do you know who was involved with the decision
19   to designate S.B. 14 as a legislative emergency?
20        A.   I do not -- well, that's unfair.  I have to
21   assume being the governor did it, he was.  But beyond
22   that, I don't know.
23        Q.   Did you follow S.B. 14 at all during its
24   progress through the Senate?
25        A.   Vaguely, you know, just from an extraordinary

DENNIS BONNEN                                                June 6, 2012

---

197

1   periphery of it.
2        Q.   Did -- what is your memory of its progress in
3   the Senate just as far as the public record goes?
4        A.   I don't have much of one other than I was
5   paying attention to it to know when I would have to
6   then hold a hearing in the House.
7        Q.   Is that -- were you filing it because you were
8   the chair of the select committee?
9        A.   No, because I don't even know if I was the
10  chair of the select committee, at that point.  I don't
11  recall.  And I wasn't following it closely.  I think
12  the -- well --
13       Q.   Did you attend any Senate hearings on S.B. 14?
14       A.   Not at all, no.
15       Q.   Did you have any conversations with senators
16  about S.B. 14?
17       A.   I believe I had one that was brief letting me
18  know that if I need any background --
19            MR. BRISSENDEN:  I'll instruct you that
20  in terms of disclosing the substance of a
21  communication, I'll instruct you not to disclose that
22  communication that you had with the legislator.
23       Q.   (BY MS. BERKOWER)  Who was the communication
24  with?
25       A.   Senator Fraser.

---

198

1        Q.   When did it take place?
2        A.   I don't recall exactly.
3        Q.   Was it early in the legislative session?
4        A.   Yes, it was early.
5        Q.   Do you remember if it was before the bill
6   passed the Senate?
7        A.   I don't think so.  I think it was there
8   afterward.  I think it was between the time it passed
9   the Senate and we held the hearing in the House.  And
10  it was a very brief conversation.
11       Q.   And I guess I should have specified this
12  before.  When I asked about communications with
13  legislators I also should have asked you, did you have
14  any communications with the staff members of
15  legislators concerning S.B. 14?
16       A.   I don't think I did, actually.
17       Q.   Who were the sponsors of S.B. 14 in the House?
18       A.   There's record of that.  I -- I think it ended
19  up being numerous members.
20       Q.   I'm sorry.  Who?
21       A.   I said I think it ended up being numerous
22  members.  There's a record.  I don't off the top of my
23  head recall.
24       Q.   Do you remember who any of the sponsors were?
25       A.   I know Representative Harless was the House

---

199

1   sponsor of the Senate Bill.  There's a record we can
2   look at.
3        Q.   Do you know how it came about that Ms. Harless
4   was the main sponsor of the bill?
5            MR. BRISSENDEN:  And to the extent that
6   you have information or knowledge that is part of the
7   public record and you are relying upon that and you can
8   answer that question, you may do so.  To the extent
9   that that question requires you to disclose
10  communications that you had with other legislators,
11  their staff, or your own staff, with Texas legislative
12  counsel or state agencies or it requires you to
13  disclose thoughts, opinions, and mental analysis with
14  regards to S.B. 14, I instruct you not to answer.
15           THE WITNESS:  I will have to use
16  privilege on that.
17           MS. BERKOWER:  I did ask that as a yes or
18  no question.  Will you still -- are you still going to
19  interpose your objection to that?  I asked if you
20  know how -- I said, do you know how Senator Harless
21  became the main sponsor.
22           MR. BRISSENDEN:  To the extent you can
23  answer that question limited to whether you have
24  knowledge or don't have knowledge, you can answer
25  limited to a yes or no.  But beyond that, I instruct

---

200

1   you not to answer.
2            THE WITNESS:  I was provided anecdotal
3   information, but I don't know if it's accurate.
4        Q.   (BY MS. BERKOWER)  Okay.  Where was the bill
5   sent when it arrived in the House?
6        A.   Again, that would be part of the record.  I
7   assume it was sent to the select committee, but I'm not
8   certain.  But we can check the record in that.
9        Q.   That was the committee we talked about
10  earlier?
11       A.   Yes, ma'am.
12       Q.   Did the special committee hold any hearings?
13       A.   It held one.
14       Q.   Did witnesses provide testimony at that
15  hearing?
16       A.   Yes, they did.
17       Q.   Do you remember who provided testimony?
18       A.   Again, the record would have the witness list,
19  and it would show us everybody who testified.
20       Q.   Do you remember if somebody named
21  Skipper Wallace testified?
22       A.   Do I specifically remember that?  No.  My
23  guess would be he did.
24       Q.   Do you remember what he said?
25       A.   Not at all.

DENNIS BONNEN                                          June 6, 2012

## 201

1    Q.  Have you ever met or spoken with him?
2    A.  Absolutely.
3    Q.  Yes?
4    A.  Yes.
5    Q.  What have you talked about with
6  Skipper Wallace with regard to voter identification?
7        MR. BRISSENDEN:  Can we take a break just
8  a minute?
9        MS. BERKOWER:  Sure.  Well, can he answer
10  the question first?  I guess there's a question
11  pending.
12        MR. BRISSENDEN:  Well, it depends on --
13  it depends on his answer to my question real quick.
14  And it will help -- it will help make the flow go a lot
15  quicker.
16        MS. BERKOWER:  So you're saying you want
17  to consult with him about a privilege issue?  Is that
18  what you're getting at?
19        MR. BRISSENDEN:  Yes.  Well, it could
20  potentially implicate a privilege issue.
21        MS. BERKOWER:  All right.  Let's take
22  a --
23        MR. BRISSENDEN:  We just need two
24  minutes, yeah.
25        MS. BERKOWER:  Yeah.  I mean, my

## 202

1  understanding is that the reason -- my concern is that
2  Skipper Wallis is -- is not a legislator.  He is not
3  well.
4        MR. BRISSENDEN:  Well, that's -- let's --
5  let me just find that out and then let's -- we'll
6  reconvene this.
7        MS. BERKOWER:  Okay.  That's fine.
8        MR. BRISSENDEN:  Give me just a minute.
9  Recess.
10        (Discussion off the record.)
11        MR. BRISSENDEN:  Thank you for allowing
12  me to take a break.  I was not aware of who Mr. Wallace
13  was.  I was just trying to make sure that it wasn't
14  something that would invoke privilege.
15        THE WITNESS:  And it doesn't, so let's
16  go.
17    Q.  (BY MS. BERKOWER)  So who is Skipper Wallace?
18    A.  To the best of my knowledge, I believe he is a
19  Republican party chair who was the head of his -- not
20  to make a joke.  I guess there was an organization of
21  the Republican party chairs, and was the head of that.
22  A very, very prestigious position.
23    Q.  Do you know if he supported S.B. 14?
24    A.  Oh, I'm sure that he did.
25    Q.  Well, do you remember his position on S.B. 14?

## 203

1    A.  I mean, I -- yeah, sure.  He was for it.  I
2  mean --
3    Q.  Do you remember what he testified about
4  concerning S.B. 14?
5    A.  I really don't remember specifically.
6    Q.  You said you've met and spoken with him
7  before?
8    A.  I have.
9    Q.  What was -- when did you meet with him?
10    A.  I met with him during the last legislative
11  session.  I think it's in the documents you-all
12  received today.  And I met with him very briefly and
13  told him that his assistance and help was not needed to
14  pass Senate Bill 14.
15    Q.  What type of help and assistance did he want
16  to provide you?
17    A.  I didn't bother to find out.
18    Q.  Okay.  Did you ever solicit any help from
19  Skipper Wallace?
20    A.  Not at all.
21    Q.  Do you know who Katherine Engelbrecht is?
22    A.  I do simply because I was shown a document
23  that her name was on.
24    Q.  Who is she?
25    A.  Otherwise, I wouldn't have known who she was.

## 204

1    Q.  Who is she?
2    A.  She's is the leader of the King Street
3  Patriots, which is a group out of Houston.
4    Q.  What do the King Street Patriots do?
5    A.  I really don't know.  I guess they're a
6  citizen active grassroots-type organization.
7    Q.  Do you know if she attended the special
8  committee hearing?
9    A.  That I do not know.  If I had to take a guess,
10  I would think she or someone from her group did.  But I
11  don't know because I don't know who she is.
12    Q.  Do you remember if she participated at all
13  during that -- during that hearing?
14    A.  I don't recall.  But, again, it would be in
15  the record if she did.
16    Q.  Have you ever met or spoken with her?
17    A.  I want to be very clear with this.  I have
18  not.  I was shown a document this morning that showed
19  that she was on my schedule to meet with a member of my
20  staff.  I did not meet with her.  And so there is
21  clarity on that.  There is a document that shows that
22  she had a meeting scheduled with a member of my staff.
23  I was not present at that meeting and I have never, to
24  my knowledge, met the woman.
25    Q.  Did your staff relay any information to you

DENNIS BONNEN                                                    June 6, 2012

## 205

1  that they received from Ms. Engelbrecht?
2      A.  I believe that they did.
3      Q.  What was that information?
4      A.  She wants you to pass better ID.
5      Q.  What -- other than her opinion, was there
6  anything else she provided to your office?
7      A.  Not at all.
8      Q.  Did she -- do you know of anymore details of
9  why she supported the bill?
10     A.  I have no idea.
11     Q.  And I guess something I should have asked you
12  earlier --
13     A.  Sure.
14     Q.  -- do you approve all of the correspondence
15  that goes out of your office?
16     A.  I'm probably not perfect at that, no.
17     Q.  Do you as a general matter try to approve the
18  correspondence that goes out of your office?
19     A.  Not all of it.  Most of it.
20     Q.  How do you decide what to approve and what not
21  to approve?
22     A.  It's usually probably based on time or
23  importance.
24     Q.  Do you usually review constituents'
25  communications with your office?

## 206

1      A.  Most usually, but not always.
2      Q.  Do you remember if you reviewed constituent
3  communications concerning voter identification
4  legislation?
5      A.  I probably reviewed some, but not all.
6      Q.  If there -- do you ever have form letters that
7  you send to respond to constituents?
8      A.  Not really.  And -- let me explain.  Many
9  times -- I try not to send form letters, but many times
10  there's only so many responses or so many different
11  variations of response, so letters become somewhat of a
12  form letter.  But usually we try to be very specific to
13  questions and not create a -- we do not have a practice
14  of creating a boilerplate form letter that is simply
15  sent generally to any question.
16     Q.  Would you say there is some repetition in
17  language?
18     A.  Oh, absolutely, yes.
19     Q.  And do you approve that type of language
20  that's going to be going out in more than one piece of
21  correspondence?
22     A.  Usually I do, but there's certainly been times
23  where it has happened and I did not.
24     Q.  Who is responsible for those communications if
25  you're not approving them?

## 207

1      A.  It -- it would depend.  It would most likely
2  be Shera Eichler, my chief of staff.  But it may also
3  be the staff member who's dealing with that
4  correspondence.
5      Q.  Have you ever had communications with
6  Ms. Eichler -- like do you have a general policy with
7  her on how to respond to communications when you're not
8  able to review them before they go out?
9      A.  Yes.
10     Q.  What is that policy?
11     A.  Answer their question.
12     Q.  Based on what?
13     A.  The facts.
14     Q.  Will she -- if you're not able to review a
15  particular piece of correspondence, will she ask you
16  questions to get your views on a particular issue?
17         MR. BRISSENDEN:  Objection to the extent
18  the question calls for speculation.
19     Q.  (BY MS. BERKOWER)  You may answer.
20         MR. BRISSENDEN:  If you know.
21         THE WITNESS:  It just depends.
22     Q.  (BY MS. BERKOWER)  Has that happened?
23     A.  Has what happened?
24     Q.  Where you weren't able, due to time pressure,
25  to review a particular piece of --

## 208

1      A.  Yes, that has happened and something has gone
2  out and I didn't review it.  Yes, that has happened.
3      Q.  And has, in those circumstances, Ms. Eichler
4  spoken with you --
5      A.  It may not have been her.  I want to be clear.
6  It may not have only been with her.  It could have
7  been with --
8      Q.  Will someone in your office speak with you
9  generally about the correspondence to get your approval
10  if you're not able to review it personally?
11     A.  Usually, yes, but not always.
12     Q.  Do you know of any times where you have
13  neither been able to review the correspondence nor been
14  able to speak with a staff person before it went out?
15     A.  Specifically, no, but I know it's happened.
16     Q.  Do you know if that happened with regard to
17  any correspondence concerning voter ID legislation?
18     A.  Again, specifically, I don't know, but I
19  actually believe it probably has because at times we
20  receive more than not.
21     Q.  When S.B. 14 was heard by your committee, did
22  you publicly state that the bill was too weak?
23     A.  I don't know.  I may have.
24     Q.  Do you ever produce anything called an
25  Insider's Report?

DENNIS BONNEN                                                June 6, 2012

---

## 209

1     A.  Absolutely.
2     Q.  What is that?
3     A.  It is an e-mail newsletter that I send to
4  constituents in my district.
5     Q.  Do you write that personally?
6     A.  No.
7     Q.  Who writes that?
8     A.  My staff.
9     Q.  Would that be Ms. Eichler?
10    A.  It really varies.
11    Q.  Do they speak with you about the contents of
12 the report?
13    A.  Sure.
14    Q.  Do you review it before it goes out?
15    A.  Not always, but usually.
16    Q.  I have something that -- I think it's going to
17 be Exhibit 441.
18    A.  I think you're right.
19        (Exhibit No. 442 marked)
20        THE WITNESS:  Oh, I'm sorry.  No, it's
21 not 441.
22    Q.  (BY MS. BERKOWER)  No, I'm sorry.  442.  Thank
23 you for the correction.  442.
24        Do you recognize this?
25    A.  I guess.

---

## 210

1     Q.  What is it?
2     A.  Well, the printing looks a little different,
3  but I assume it is my Insider's Report.
4     Q.  What's the date on it?
5     A.  March 6th of 2011.
6     Q.  Is there a section that talks about voter
7  identification legislation?
8     A.  Yes, there is.
9     Q.  That -- reading from that section, you say,
10 "As the chair of" -- and is it fair to say that reading
11 from this is more or less stating your views or
12 expressing your views?
13        MR. BRISSENDEN:  I'm going to object to
14 the extent that the question of the witness -- that
15 would require him to reveal his opinions, motivations,
16 mental thought processes about S.B. 14.  I would
17 instruct the witness not to answer.
18        MS. BERKOWER:  All I asked is whether the
19 newsletter, the Insider's Report, as a general matter
20 can be characterized as expressing his views on
21 whatever its contents contain.  You're objecting to
22 that?
23        MR. BRISSENDEN:  That is correct.
24        MS. BERKOWER:  Newsletters and other
25 similar types of political communications are not

---

## 211

1  privileged acts by legislators.
2         MR. BRISSENDEN:  That is my understanding
3  of the court's order, although the court states on
4  Page 6 of the order issued yesterday that although the
5  communications are not privileged, questioning a
6  legislator or staff about the communication that would
7  require him to reveal his thought processes and his
8  subjective motivations about S.B. 14 or any legislative
9  activity with respect to the law are -- apply to
10 privilege.
11        So based upon that, the court's order
12 there, I'm instructing the witness not to answer the
13 question about his opinions and views as stated in the
14 question.
15        MS. BERKOWER:  Okay.  Well, I think
16 that -- I'm not sure you heard my question correctly
17 because this was more of a question generally about the
18 creation of the Insider's Report, not anything specific
19 to any legislation, not anything specific to any voter
20 identification legislation, but merely a matter of
21 whether it's fair to say that when Mr. Bonnen -- or
22 Representative Bonnen produces his Insider's Report and
23 distributes it as a newsletter to his constituents that
24 it can be fairly characterized as expressing his views
25 on what is happening in the Legislature.

---

## 212

1         MR. BRISSENDEN:  And my response would
2  be, first of all, that was not the question that you
3  phrased.  And, secondly, the paragraph that you're
4  quoting from makes specific reference to S.B. 14.
5         MS. BERKOWER:  I didn't quote.  I didn't
6  quote.  I restated the question and said, as a general
7  matter do those newsletters reflect -- or can they be
8  characterized as expressing your views on what's going
9  on in the House.  Will you accept that question?
10        MR. BRISSENDEN:  If the question is, do
11 these reports, as a general matter, typically reflect
12 your communication as to what is going on in the House,
13 I'll allow that -- I'll allow him to answer.
14    Q.  (BY MS. BERKOWER)  Do these Insider's Reports
15 as a general matter -- is it fair to characterize them
16 as expressing your views on what's going on in the
17 House?
18    A.  I guess, yes.
19    Q.  So turning your attention to the section
20 entitled "Voter Identification Legislation" --
21    A.  Yes.
22    Q.  -- you wrote, "My committee is working to
23 strengthen the voter ID bill, S.B. 14, that was passed
24 in the Senate and contained exception, but
25 substantially weakened the effectiveness of the bill"

DENNIS BONNEN                                                    June 6, 2012

## 213

1  (as read).

2          Is that accurate?

3      A.  It's accurate that that's what it reads.

4      Q.  Did your committee then modify S.B. 14?

5      A.  I don't remember.  I think -- and there's a

6  record of all of it.  I think Representative Harless

7  may have brought in a committee substitute that may

8  have changed the bill, but I'm not positive whether we

9  did that or not.

10     Q.  I have what's going to be marked as

11 Exhibit 443.

12         (Exhibit No. 443 marked)

13     Q.  (BY MS. BERKOWER)  Do you know what this is?

14     A.  It appears to be the House Journal.

15     Q.  What day is it the House Journal from?

16     A.  Monday, March the 21st of 2011.

17     Q.  Were you present that day?

18     A.  It appears the record reflects that I was

19 present.

20     Q.  Do you know if S.B. 14 was considered on that

21 day?

22     A.  I do not know, but I'll look further in the

23 journal and find out.

24     Q.  Will you turn to Page 910?

25     A.  Okay.  It appears that the committee's

## 214

1  substitute to S.B. 14 was heard on the second reading.

2      Q.  Turning your attention now to Page 911, do you

3  see that there is an exchange there between

4  Representative Anchia and Representative Harless?

5      A.  It appears there was.

6      Q.  Are we still on Page 911?

7      A.  Yes, ma'am.

8      Q.  Okay.  Do you see there is a paragraph --

9  well, the third entry from the bottom,

10 Representative Anchia says, "We have studied this thing

11 for eight years now -- almost six years -- seven years,

12 actually, and we haven't been able to find much said

13 voter impersonation" (as read).

14         Do you see that?

15     A.  Actually, I don't.

16     Q.  It's the section that Anchia says, "Are you

17 sure?"

18     A.  Okay.

19     Q.  And then about two lines down from there.

20     A.  Okay.  I see it now.

21     Q.  Based on the evidence in the public record, is

22 that accurate?

23     A.  I don't think it is.

24     Q.  Why not?

25         MR. BRISSENDEN:  Again, to the extent

## 215

1  that you're able to answer that question relying solely

2  upon what's been represented in the public record, you

3  may answer.  To the extent that you have information or

4  knowledge beyond public record that is part of your

5  knowledge or thoughts and opinions with regards to

6  legislation, I instruct you not to answer.

7          MS. BERKOWER:  Well, I asked with regards

8  to the public record.  He said --

9          THE WITNESS:  Well --

10     Q.  (BY MS. BERKOWER)  Sorry?

11     A.  Go ahead.

12     Q.  Unless you need clarification.

13     A.  Then go ahead and clarify.

14     Q.  I heard a quote from Representative Anchia

15 that says he's "studied this thing for eight years now,

16 almost six years, seven years actually, and we haven't

17 been able to find much said voter impersonation."  And

18 I said, "Is this true based on the evidence in the

19 public record?"

20     A.  And I don't believe Representative Anchia is

21 the authority on this, and I don't agree with it.

22     Q.  Well, based on the public record, what is in

23 there to discredit his statement that there isn't much

24 voter fraud or voter impersonation?

25     A.  I don't have the record in front of me, but I

## 216

1  believe there are pieces of information in the record.

2  I think the fact of the record we read earlier about

3  the testimony from Jay Dyer of the Attorney

4  General's -- from the Attorney General's office, where

5  I go back to that exhibit -- I believe there were a

6  couple hundred cases that were being dealt with.

7      Q.  I think it's 267 cases --

8      A.  That sounds right.

9      Q.  -- that was referred to the --

10     A.  Attorney General's office.

11     Q.  -- Attorney General's, with 35 convictions,

12 dismissals and/or plea agreements, and 12 ongoing

13 cases?

14     A.  I think there was more than that or there

15 wasn't clarity on the rest.  But, yes, that sounds

16 reasonably accurate.

17     Q.  Other than that, do you know of any other

18 examples of voter impersonation in the public record?

19     A.  I believe there are others.  I don't have any

20 in front of me.

21         MR. BRISSENDEN:  Just so the record is

22 clear, the record that the witness is referring to is,

23 I believe, Exhibit 438.

24         THE WITNESS:  267 incidences of alleged

25 illegal voting is defined by Section 64.012 of the

DENNIS BONNEN                                                June 6, 2012

---

**217**

1   Texas Election Code.  35 of those alleged violations
2   have been resolved with guilty pleas, dismissals or
3   plea agreements.  12 cases remain active and the
4   remainder of the cases are still -- either still being
5   investigated or the statute of limitations has expired.
6   So --
7        Q.   (BY MS. BERKOWER)  And that's you reading from
8   the exhibit --
9        A.   Correct.
10       Q.   -- that your counsel just mentioned?
11       A.   That is, yes, ma'am.
12            So for that reason and others, I do not
13   agree with Mr. Anchia's statement.
14       Q.   Have you ever during your time on the
15   elections committee or the special select committee
16   heard evidence concerning mail-in ballot fraud?
17            MR. BRISSENDEN:  Again, the question, I
18   believe, as phrased, is limited to what is in the
19   public record?
20       Q.   Yes.
21       A.   I believe we have.
22       Q.   Do you remember what that evidence was?
23       A.   I do not.  And I don't know if we heard much
24   specific evidence.
25       Q.   Does S.B. 14 address mail-in ballot fraud, to

---

**218**

1   your knowledge?
2        A.   I don't believe it does.
3        Q.   Does any of the predecessor legislation we've
4   discussed today, S.B. 362, or HB 1706, or S.B. 218
5   address mail-in ballot fraud?
6            MR. BRISSENDEN:  Objection, compound.
7        Q.   (BY MS. BERKOWER)  Do you understand the
8   question?
9            Does S.B. 362 address mail-in ballot
10   fraud?
11       A.   I don't understand the relevance.
12       Q.   Well, I don't --
13            MR. BRISSENDEN:  Do the best you can and
14   answer the question.
15            THE WITNESS:  No, I do not believe that
16   they do.
17       Q.   (BY MS. BERKOWER)  Did H.B. 1706 address
18   mail-in ballot fraud?
19       A.   Which one -- or which one is 1706?
20       Q.   That was the first one we discussed today.
21       A.   I don't believe it did.
22       Q.   Did HB 218 address mail-in ballot fraud?  That
23   was the second --
24       A.   I don't think the intention of that bill was
25   to address mail-in ballot fraud.

---

**219**

1        Q.   Did any of the legislation that you introduced
2   that we've discussed today address mail-in ballot
3   fraud?
4        A.   I never suggested that it would have.
5        Q.   In your memory of the public record, is there
6   more evidence of mail-in ballot fraud versus in-person
7   ballot fraud?
8        A.   I don't remember exactly, but I don't believe
9   there was.
10       Q.   Do you think there was more evidence in the
11   public record of in-person voter fraud than mail-in
12   ballot fraud?
13       A.   I believe there was.  For the periods in which
14   the bills were being heard, that was the issue, was
15   in-person voter fraud.
16       Q.   What do you mean by that?
17       A.   I mean that we were hearing bills that
18   addressed the issue of voting with photo ID and were
19   not addressing an issue of mail-in voter fraud, which
20   is certainly an issue that can be addressed.
21       Q.   Just so I understand, are you saying that if
22   mail-in voter fraud were a bigger problem than
23   in-person voter fraud, you would likely have heard more
24   bills about mail-in voter fraud?
25       A.   Not at all.

---

**220**

1            MR. BRISSENDEN:  Object.
2        A.   That's not what I'm saying.
3            MS. BERKOWER:  I'm just trying to
4   understand his testimony.
5            THE WITNESS:  Well, my testimony is that
6   we heard testimony on the issue we were hearing.  And
7   the issue we were hearing was on voter identification
8   and in-person voter fraud or fraud in voter rolls.  Not
9   legislation and issues dealing with voter mail-in
10   fraud.  It's a separate issue.  Was it raised?  Yes.
11       Q.   (BY MS. BERKOWER)  Wasn't the interim charge
12   in 2010 to examine the presence of fraud in Texas
13   elections?
14            MR. BRISSENDEN:  Are you referring to a
15   prior exhibit?
16            MS. BERKOWER:  Your Honor, I'm sorry.  I
17   don't have the number in front of me.  But I think --
18            THE WITNESS:  Yeah, it's right here.
19            MS. BERKOWER:  -- should have it.
20            MR. BRISSENDEN:  438.
21            THE WITNESS:  It very well could have
22   been, but none of the bills that we ever heard a
23   hearing on dealt with that issue.
24       Q.   (BY MS. BERKOWER)  Okay.  But I think you have
25   the exhibit in front of you now.  Do you --

DENNIS BONNEN                                                                    June 6, 2012

---

229

1  information that you have in terms of the thought
2  processes as part of your analysis of S.B. 14, I would
3  request that you not disclose that.
4         Also, do not disclose communications that
5  you have had with state agencies and with legislators,
6  their staff or your staff, or Texas Legislative
7  Council. To extent that you can answer the question
8  without disclosing that, you may answer.
9         THE WITNESS: Do you mind repeating?
10        (The requested portion was read)
11        MR. BRISSENDEN: Same objection, same
12  instruction.
13        THE WITNESS: I would only be able to
14  speculate.
15     Q. (BY MS. BERKOWER) When you sponsor a bill and
16  a state agency conducts an analysis of the bill, are
17  you informed of that analysis?
18        MR. BRISSENDEN: Same objection, same
19  instruction. Do not disclose communications that you
20  have had with state agencies and -- including Texas
21  Legislative Council and the Secretary of State's
22  office.
23        To the extent you are able to answer that
24  question that does not pertain to communications
25  that -- from those agencies that relate to specific

---

230

1  legislation but more in terms a general procedure --
2         MS. BERKOWER: Which is exactly what I
3  asked.
4         MR. BRISSENDEN: Please let me finish.
5         -- you may answer that question.
6         THE WITNESS: No. There is no
7  requirement or absolute that you would.
8         MS. BERKOWER: I think the lengthy
9  objection, I'm not -- I need to just -- need to restart
10  this.
11     Q. (BY MS. BERKOWER) As a general matter, as a
12  general practice, if a state agency conducts an
13  analysis of a bill of which you are the sponsor, are
14  you generally informed of that analysis?
15        MR. BRISSENDEN: My same instruction.
16        THE WITNESS: The answer is no, you would
17  not absolutely be informed. Let me clarify. I don't
18  believe that the Secretary of State's office conducted
19  an analysis of the bill.
20     Q. (BY MS. BERKOWER) Did you participate in the
21  House floor debate on the bill?
22     A. Sure. I'm sure I did. I think it was
23  limited.
24     Q. Why -- what do you mean "it was limited"?
25     A. Well, I mean, I wasn't deeply involved in the

---

231

1  debate on the floor.
2     Q. You were present every day, though, or you
3  were present during the debate?
4     A. You asked if I was involved in the debate.
5  You didn't ask if I was present. You asked if I was
6  involved.
7     Q. Did you offer amendments?
8     A. I did, I think one or two. Again, it's all in
9  the record. It will be there.
10        I think we're at 444.
11        (Exhibit No. 444 marked)
12     Q. (BY MS. BERKOWER) Actually, this is such a
13  lengthy exhibit I only --
14     A. Sure.
15     Q. -- have one, if you don't mind sharing.
16     A. No problem.
17     Q. Can you turn your attention --
18     A. May I make a comment? I don't mean to be
19  difficult at all. I mean, when you ask if I was
20  involved, I take that to mean whether I am
21  participated. Obviously I was there, so I'm not
22  suggesting I wouldn't have been there. I take that
23  more as a question of whether I actually was at the
24  front of that mic making an argument.
25     Q. Okay. Thank you for that clarification.

---

232

1         Can you turn your attention to Page 961,
2  please.
3     A. Yes.
4     Q. Do you see Amendment 7?
5     A. Amendment No. 7, yes, ma'am.
6     Q. Were you one of the sponsors of this
7  amendment?
8     A. It appears I was, yes.
9     Q. What did this amendment do?
10     A. Let me look. Amendment to Committee
11  Substitute 14, Section 9 of the bill, added Section
12  63.001(h), Election Code (page 6, lines 17-21), by
13  striking the following: Was 70 years of age or older
14  on January 1 of 2012 as indicated by the date of birth
15  on the voters registration certificate; or (2)."
16     Q. So would this provision have removed the
17  exemption for individuals over 70 years of age from
18  having to show one of the required forms of
19  identification under S.B. 14?
20     A. I believe that's correct.
21     Q. What was the purpose of that amendment?
22        MR. BRISSENDEN: I'm going to instruct
23  the witness not to close his opinions, analysis, and
24  thoughts and mental impressions about this amendment
25  and the legislation, and instruct him not to answer.

DENNIS BONNEN                                                    June 6, 2012

## 233

1        THE WITNESS:  Follow his instruction.
2        Q.   (BY MS. BERKOWER)  Are you aware of any
3   testimony on the public record expressing concerns that
4   some elderly voters might not be able to access -- may
5   not be able to obtain the required documentation under
6   S.B. 14?
7        MR. BRISSENDEN:  Objection to the extent
8   that it mischaracterizes testimony in the record.
9        But you can answer.
10        THE WITNESS:  I'm aware of public
11   testimony that people over 71 had to show ID.
12        Q.   (BY MS. BERKOWER)  I'm sorry?
13        A.   That people over 71 had to show ID.
14        Q.   Are you aware of any testimony that expresses
15   concerns that some minority voters over the age of 70
16   would be unable to obtain appropriate identification
17   due to prior discrimination?
18        A.   No.
19        Q.   Do you recall Representative Veasey raising
20   the concern that some elderly minority voters were not
21   born in public hospitals because they were not allowed
22   to at the time that they were born, and so they don't
23   have access to birth certificates the same way other
24   voters may have?
25        MR. BRISSENDEN:  Objection to the extent

## 234

1   that the testimony mischaracterizes prior testimony in
2   the record.
3        You may answer.
4        THE WITNESS:  I don't remember.
5        Q.   (BY MS. BERKOWER)  Turning your attention to
6   Amendment 15 at Page 969.
7        A.   Okay.
8        MR. BRISSENDEN:  We have been going for
9   well over an hour.  Is this a good time to take a
10   break?
11        MS. BERKOWER:  Sure.
12        Let's go off the record, please.
13        (Recess from 5:07 p.m. to 5:21 p.m.)
14        Q.   (BY MS. BERKOWER)  Sir, just to let you know,
15   I have some more questions to ask, but then Ms. Perales
16   needs to return back to her family in San Antonio and
17   so I'm going to --
18        A.   Certainly.
19        Q.   -- let her go before I finish so she can get
20   home.
21        A.   No problem.
22        MS. BERKOWER:  Can you read me back the
23   last question?
24        (The requested portion was read back)
25        Q.   (BY MS. BERKOWER)  Turning your attention to

## 235

1   Amendment 15 at Page 969.
2        A.   Yes.
3        Q.   Do you remember this amendment?
4        A.   No.
5        Q.   Would this amendment prohibit the use for the
6   underlying documents required to vote under S.B. 14?
7        A.   It says, "Fees prohibited for certain forms of
8   identification documentation, notwithstanding any other
9   law and agency, institution, or political subdivision,"
10   and so forth.
11        Q.   "May not charge any fee for the issuance of a
12   document that may be used as proof of identification
13   under this chapter."  Is that accurate?
14        A.   That is accurate.
15        Q.   And then it also says, "or to obtain a
16   document that may be used as proof of identification
17   under this chapter."  Is that accurate?
18        A.   That is accurate.
19        Q.   Do you know what the practical effect of that
20   amendment would have been?
21        MR. BRISSENDEN:  I'm going to object and
22   instruct the witness not to answer the question on the
23   basis of privilege.
24        Q.   (BY MS. BERKOWER)  Is the effect of this
25   amendment that it would have been to prohibit fees for

## 236

1   documentation used to vote under S.B. 14?
2        MR. BRISSENDEN:  Same instruction.
3        Q.   (BY MS. BERKOWER)  Did you vote in favor of
4   this amendment?
5        A.   I voted yes.
6        Q.   Yes to what?
7        A.   It appears I voted yes on the motion to table
8   the amendment.
9        Q.   Is that effectively a vote against the
10   amendment?
11        A.   It would be, yes.
12        Q.   Do you know of any concerns in the public
13   record that the cost that would be imposed on voters to
14   obtain identification compliant with S.B. 14 might have
15   an adverse impact on minorities?
16        MR. BRISSENDEN:  Can you read back the
17   question?
18        (The requested portion was read)
19        Q.   (BY MS. BERKOWER)  Do you know of any such
20   publicly made concerns?
21        A.   Not off the top of my head, no.
22        Q.   Do you know if S.B. 14 provided for an
23   identification free of charge to voters?
24        A.   I don't recall.
25        MS. BERKOWER:  This will be Exhibit 445.

DENNIS BONNEN                                          June 6, 2012

## 237

1          (Exhibit No. 445 skipped)
2          MS. BERKOWER:  This is the final filed
3    version of S.B. 14.  I think you had asked about this
4    earlier.
5          MR. BRISSENDEN:  Thank you.
6    Q.  (BY MS. BERKOWER)  Turning to Page 13.  I
7    should actually mark that as Exhibit 5 instead of 445.
8    We have used it previously in other depositions.  Let
9    me just change that.
10   A.  Sure.
11   Q.  Turning to Page 13 --
12   A.  All right.
13   Q.  -- Chapter 521A, Election Identification
14   Certificate.  Do you see that?
15   A.  I do.
16   Q.  Can you review this section briefly to
17   yourself?  Well, are you familiar with this section?
18   A.  Vaguely.  Go ahead.
19   Q.  Did you review this section now?
20   A.  Briefly, I have.
21   Q.  Does this section provide an identification
22   issued by the Department of Public Safety free of
23   charge to voters who do not have another form of
24   identification required by S.B. 14?
25   A.  It says the department may not collect a fee

## 239

1    identification effectively no longer be free?
2          MR. BRISSENDEN:  Objection, calls for
3    speculation, assumes facts not in evidence.
4    Q.  (BY MS. BERKOWER)  You may answer.
5          MR. BRISSENDER:  If you know.
6    A.  It says, "The department may issue an election
7    identification certificate to a person who states that
8    the person is obtaining the certificate for the
9    purposes of satisfying Section 63.001(b), Election
10   Code, and does not have another form of identification
11   described by Section 63.0101, Election Code, and" so
12   forth.
13         Q.  (BY MS. BERKOWER)  Okay.  Directing your
14   attention to Line 9 -- sorry, 19 of Page 14.
15   A.  Okay.
16   Q.  It says, "The department may require each
17   applicant for an original or renewal election
18   identification certificate to furnish to the department
19   the information required by Section 521.142."
20         Do you see that?
21   A.  Actually, I don't.  Tell me where we are
22   again.
23   Q.  Line 19 on Page 14.
24   A.  Okay.
25   Q.  Do you see that?

## 238

1    for an election identification certificate or a
2    duplicate election identification certificate issued
3    under this section.
4    Q.  Do you know if there are certain documents
5    required for a voter -- that a voter must present in
6    order to obtain one of these certificates?
7    A.  I do not, no.
8    Q.  Do you know if a voter who wanted to obtain
9    one of these certificates might have to provide
10   documents -- official State documents?
11   A.  I do not know.
12   Q.  If a voter had to present certain documents to
13   obtain the certificate and those documents cost money,
14   would the identification still be free?
15         MR. BRISSENDEN:  Objection, calls for
16   speculation and assumes facts not in evidence.
17   Q.  (BY MS. BERKOWER)  You may answer.
18   A.  I believe that it's stated here, "The
19   department may not collect a fee for an election
20   identification certificate or the duplicate election
21   identification certificate issued under this section."
22   Q.  But if the voter had to -- if the voter had to
23   provide documentation -- underlying documentation to
24   obtain the certificate, and that underlying
25   documentation cost money, would the -- would this

## 240

1    A.  I do.
2    Q.  If the -- if the documents required by Section
3    521.142 cost money, would this identification still be
4    free?
5          MR. BRISSENDEN:  Same objection.
6          THE WITNESS:  Well, it says the
7    department may require.
8    Q.  (BY MS. BERKOWER)  If it does, in fact, choose
9    to require documentation that costs money, would this
10   identification still be free?
11   A.  I don't know if they require it or not.
12   Q.  But what if they do require it?
13         MR. BRISSENDEN:  Same objection.
14         The witness has tried to, as best he can,
15   answer your question.
16         MS. BERKOWER:  The witness -- the witness
17   has provided nonresponsive answers.  So I ask that he
18   answer the question, please.
19         MR. BRISSENDEN:  I disagree.  I think the
20   question has been asked and answered, and he has tried
21   to answer it the best he can given the information
22   provided.
23         MS. BERKOWER:  The witness has only
24   answered this question to the extent that the
25   department may not, in fact, require underlying

DENNIS BONNEN                                                    June 6, 2012

---

## 241

1 documentation that costs money.  The witness has not
2 answered my question which is if the department does in
3 fact require underlying documentation that costs money,
4 would this identification still be free.
5     A.  I guess only if it costs money.  But even
6 though it costs money, it doesn't mean that it costs
7 them money to get this.  They may already have that
8 documentation.
9     Q.  (BY MS. BERKOWER)  What if they don't?
10    A.  Then I guess it --
11        MR. BRISSENDEN:  Objection, calls for
12 speculation.
13        THE WITNESS:  Then I guess it would cost
14 money.
15    Q.  (BY MS. BERKOWER) Okay.  Turning your
16 attention back to the House Journal.  Amendment 15 that
17 we just discussed a few minutes ago.  Part two of that
18 amendment would have prohibited a fee to obtain a
19 document that may be used -- actually, I'll withdraw
20 that.
21        Turning your attention to Amendment 23, I
22 think that's on Page 979.  Do you see Amendment 23?
23    A.  I do.
24    Q.  Would Amendment 23 have allowed voters to
25 present a student identification card containing the

---

## 242

1 person's photograph in order to vote?
2     A.  It appears it would.
3     Q.  Did you vote in favor of the motion to table
4 this amendment?
5     A.  It appears I did.
6     Q.  Have you ever worked as a poll worker?
7     Q.  What do you mean by "a poll worker"?
8     Q.  Have you ever worked as an election judge or
9 in any capacity at the polls on election day?
10    A.  I stood in front of a poll encouraging people
11 to vote for myself, but I have not worked in the
12 capacity of helping run an election.
13    Q.  I have never heard that defined as a poll
14 worker before.
15    A.  We call it that all the time.  I apologize.
16    Q.  I guess I mean inside the poll.
17    A.  No, I have not worked inside the poll.
18    Q.  How did -- do you know how many forms of
19 identification are issued by the United States
20 military?
21    A.  I do not.
22    Q.  Do you believe that military IDs will be
23 easily recognized by poll workers?
24        MR. BRISSENDEN:  Objection, calls for
25 speculation as to poll workers.

---

## 243

1        THE WITNESS:  I wouldn't know.
2        MS. BERKOWER:  I think at this point I'm
3 actually going to turn -- give Ms. Perales a chance to
4 ask some questions, and then I'll return after she's
5 finished.
6        EXAMINATION
7 BY MS. PERALES:
8     Q.  Good afternoon, Chairman Bonnen.  My name is
9 Nina Perales, and I represent the Rodriguez defendant
10 intervenors in this lawsuit.
11        I'm going to skip the questions that I
12 think have already been answered and so I will not go
13 in depth with you about 2005 or 2007 and those
14 sessions.  You have already testified you were not on
15 the elections committee for those sessions.  That's
16 correct?
17    A.  That is correct.
18    Q.  Okay.  Now, you had earlier testified that you
19 didn't exactly remember what had happened with those
20 bills ultimately, but I did want to ask if you recall
21 in 2005 and 2007 that the voter ID bills originated in
22 the House and died in the Senate.
23    A.  Respectfully, all of that is record.  I don't
24 walk around recalling things like that day in and day
25 out.  But it's a record.  We can check it, and I

---

## 244

1 wouldn't argue with the record.
2     Q.  Is your answer, then, that sitting here today
3 you can't recall whether the 2005 and '7 voter ID bills
4 originated in the House and died in the Senate?
5     A.  That is correct.
6     Q.  Okay.
7     A.  But I wouldn't disagree with you if you are
8 telling me what the facts are.
9     Q.  No, I just wanted to ask about your
10 recollection.
11        (Rodriguez Exhibit No. 30 marked)
12    Q.  (BY MS. PERALES)  Chairman Bonnen, the court
13 reporter has handed you what has been marked as
14 Deposition Exhibit Rodriguez 30.  Do you happen to
15 recognize this document?
16        THE WITNESS:  I do not.
17    Q.  (BY MS. PERALES)  You were on the elections
18 committee in 2009, correct?
19    A.  That is correct.
20    Q.  Even though you don't recognize this document
21 specifically, would it have been normal for you to have
22 reviewed a memo sent to the members of the committee by
23 the Secretary of State following up on some questions
24 that came up at hearing?
25    A.  Would I have send it to my office?  Certainly.

DENNIS BONNEN                                                      June 6, 2012

---

## 245

1  Would I have reviewed it?  No, there's no guarantee of
2  that.
3      Q.   I was hoping it might refresh your
4  recollection whether in March of 2009, as the voter ID
5  bill is being heard, that there were some questions
6  raised by members regarding whether some voters might
7  lack a drivers license.
8      A.   Uh-huh.
9      Q.   And that's specifically addressed in response
10 number 5 on Page 3.
11     A.   Go ahead.
12     Q.   No, I have a question on the table.  I was
13 waiting for your answer.
14     A.   Oh, Im sorry.  What did you ask?  I apologize.
15          MS. PERALES:  Can you read it back?
16          THE WITNESS:  I didn't hear your
17 question.
18          MS. PERALES:  That's okay.  It's late in
19 the day.
20          (The requested portion was read back)
21     Q.   (BY MS. PERALES)  Do you recall concerns being
22 raised at that time regarding voters who might lack a
23 driver's license?
24          MR. BRISSENDEN:  To the extent that the
25 question requires information that's not a part of the

---

## 246

1  public record, I would instruct you not to answer.  To
2  the extent you can answer the question based upon
3  information that's of public record, you may answer.
4          THE WITNESS:  I think the statistics were
5  requested, and that's what this has provided.
6      Q.   (BY MS. PERALES)  During the public hearing on
7  the --
8      A.   I assume that's where it was asked.
9      Q.   And do you recall that from your time on the
10 committee, that questions were being raised or
11 statistics were being requested regarding voters who
12 might lack a driver's license?
13     A.   I vaguely recall that questions were asked
14 about the numbers.
15          MS. PERALES:  I would like to mark this
16 Rodriguez 31, please.
17          (Rodriguez Exhibit No. 31 marked)
18     Q.   (BY MS. PERALES)  Chairman Bonnen, you have
19 been handed what has been marked Rodriguez Deposition
20 Exhibit No. 31.  You may not have ever seen a
21 transcription of these hearings.  They were done for
22 this case.  But I will represent to you that it is a
23 transcription.
24          If you would turn with me to Page 613.
25 Do you see where the -- line 15 where it says,

---

## 247

1  "Representative Bonnen," and then it has a colon?
2      A.   I do.
3      Q.   Would you mind just taking a look at what you
4  said there?
5      A.   Okay.
6      Q.   And then right before that, if you wouldn't
7  mind, at line three, reading Ms. Collins' remark, just
8  to get some context.
9          MR. BRISSENDEN:  On the same page?
10         MS. PERALES:  Yes, Page 613.
11         THE WITNESS:  Okay.
12     Q.   (BY MS. PERALES)  Now, would it be fair to say
13 that here Ms. Collins is saying that she likes the
14 inclusion of an option to present a valid employee
15 identification card, and you are basically responding
16 saying that you appreciate that because you have some
17 familiarity with an employee ID card for the Dow
18 company in your district.  Is that right?
19     A.   I know of the significance of what security
20 requirements a Dow employee or BASF -- not BAS -- BASF
21 employee goes through to receive credentials.
22     Q.   I see.  And do you have a Dow company plant in
23 your district?  Is that why you said this?
24     A.   Correct.
25     Q.   Okay.  What is --

---

## 248

1      A.   And a BASF plant.
2      Q.   What is BASF?
3      A.   It is a large petrochemical company.
4      Q.   So are those two different companies, then,
5  the Dow company --
6      A.   Yes.
7      Q.   Thank you.
8          If you could identify in your little pile
9  there US 435, which is the S.B. 362.  US 435.
10     Q.   Okay.  435 is a memo or press release.
11         MR. BRISSENDEN:  Do you believe it's 434?
12         MS. PERALES:  Well, if the witness can
13 find it, I will mark mine accordingly.
14     Q.   (BY MS. PERALES)  It should say S.B. 362 in
15 the corner.
16     A.   Here it is.
17     Q.   All right.  What exhibit number do you have
18 for that?
19     A.   434.
20     Q.   434.  I'll go ahead and mark mine.
21          And does it say in the upper left-hand
22 corner, "By Fraser, Estes, Nelson, Nichols"?
23     A.   Correct.
24     Q.   All right.  So we're looking at the same
25 document.

DENNIS BONNEN                                                    June 6, 2012

---

249

1          Now, I believe you testified a little bit
2    earlier today about S.B. 362 as it came over from the
3    Senate to the House in 2009?
4          A.   Possibly.  I don't think I was very specific,
5    but sure.
6          Q.   All right.  Well, I want to try to refresh
7    your recollection a little bit about this time when
8    S.B. 362 or Senator Fraser's voter ID bill comes over
9    to the House.  You are on the committee, Todd Smith is
10   the chair.
11         A.   Correct.
12         Q.   And there is -- there is some material in the
13   public record about what was going on during this time.
14         A.   Certainly.
15         Q.   I know you had an exchange earlier with
16   Ms. Brekower about Todd Smith's attempt to draft a
17   compromise bill for an alternative or substitute bill,
18   quite frankly, to 362.
19              MR. BRISSENDEN:  Objection to the
20   extent that calls for speculation.
21              THE WITNESS:  Those all have many
22   different meanings.
23         Q.   (BY MS. PERALES)  I'll call it a committee
24   substitute, then.
25         A.   That would be fine.

---

250

1          Q.   All right.  So you recall based on your
2    knowledge from the public record that there was an
3    effort behind Chairman Smith to craft a committee
4    substitute to S.B. 362, correct?
5          A.   I do recall that, correct.
6          Q.   Do you recall there was some opposition by
7    Representatives Betty Brown and Linda Harper-Brown to
8    Chairman Smith's committee substitute?
9          A.   I don't -- without breaking privilege, I just
10   think that there was issues with who would get what
11   they wanted in what bills.
12         Q.   And a lot of that was covered in the Quorum
13   Report --
14         A.   Yeah.
15         Q.   -- so I don't want you break any privilege
16   there.
17         A.   Not that what I know is always accurate.
18         Q.   Correct.
19              And lastly -- and I am informed by having
20   been in Chairman Smith's deposition last Friday --
21         A.   No, I understand.
22         Q.   -- where he did talk about some of that.
23         A.   Certainly.
24         Q.   And I want to hopefully refresh your
25   recollection.  Do you recall in the public record that

---

251

1    when the bill was finally voted on by the Elections
2    Committee, that it had gone back to Senator Fraser's
3    version; that essentially Chairman Smith gave up on his
4    committee substitute and basically had the committee
5    vote on S.B. 362 as it came from the Senate?
6              MR. BRISSENDEN:  I'm going to object to
7    the extent that the question mischaracterizes prior
8    testimony.
9              But you may answer.
10         Q.   (BY MS. PERALES)  Does that sound familiar?
11         A.   Vaguely familiar.  With that said, though,
12   there would be a clear record of what the committee
13   voted on, and if it was Senator Fraser's original bill
14   passed by the Senate, I respectfully believe you.  I
15   wouldn't try and argue that with you.
16         Q.   And let me see if I can help further.
17         A.   And, respectfully, that bill at that time was
18   one of the issues that was a challenge, changed
19   frequently and often.
20              MS. PERALES:  Okay.  Let's go ahead and
21   mark this.
22              (Rodriguez Exhibit No. 32 marked)
23              THE WITNESS:  So, respectfully, if you
24   are telling me that the bill that was voted on by the
25   Elections Committee, the record shows that it was

---

252

1    Senator Fraser's bill that was passed by the Senate, I
2    wouldn't argue with you.
3          Q.   (BY MS. PERALES)  The court reporter has
4    handed you what has been marked Rodriguez Deposition
5    Exhibit 32.
6          A.   Okay.
7          Q.   And I'm doing this because I don't want to
8    question you about things that seem unfamiliar.
9              Do you recognize this as a committee
10   report for S.B. 2362?
11         A.   It does appear to be a committee report, yes.
12         Q.   Okay.  Do you see where it says "unamended" in
13   parenthesis up on the front page?
14         A.   I do.
15         Q.   Okay.  So I just want to make sure that you
16   feel comfortable when I'm talking about this bill
17   coming out of the House Elections Committee unamended?
18         A.   Sure.
19         Q.   Now, this is also the time when you testified
20   previously to some correspondence with people who had
21   written you e-mails -- third parties that had written
22   you e-mails.  And a couple of these e-mails mentioned
23   that you had voted no in committee?
24         A.   Correct.
25         Q.   Now, is it correct to say that you voted no in

DENNIS BONNEN                                                      June 6, 2012

## 253

1    committee following Representative Heflin casting his
2    vote?  Do you recall that?
3         A.  I do recall it.  I believe you are correct,
4    but to be very correct, the record would reflect that
5    my name was called before.  I passed.  Chairman Smith
6    went through the rest of the committee roster.
7    Representative Heflin did vote yes.  He came back to me
8    at the end when all members had voted, and I voted no.
9         Q.  Okay.  And I seem to recall from your e-mail
10   correspondences with third parties that you had some
11   concerns about the bill not being strong enough as
12   written?
13        A.  That is correct.
14        Q.  And when you were writing that in your
15   correspondence to the third parties, were you referring
16   to S.B. 362 as it had come over from the Senate, or
17   were -- were those concerns more expressed towards
18   Chairman Smith's committee substitute?
19            MR. BRISSENDEN:  I'm going to object to
20   the extent that that question delves into the thought
21   process, mental impressions, about the legislation, and
22   instruct you not to answer the question because it
23   does -- although it does relate to correspondence and
24   public communication to third parties, your thought
25   processes, mental impressions about that statement I

## 254

1    believe would be privileged and I instruct you not to
2    answer.
3            MS. BERKOWER:  The privilege does not
4    apply here because if you write a statement to a third
5    party, then you can answer a question about that
6    statement.  So I want to be very, very clear that what
7    I'm asking with respect to the e-mail is when you
8    express that specific concern in that e-mail.  I'm not
9    asking about your deliberative process, but simply the
10   specific concern that you expressed in the e-mail,
11   whether you were referring to S.B. 362 as it came out
12   of the Senate, or whether you were referring to
13   Chairman Smith's committee substitute.
14            MR. BRISSENDEN:  And let me caution the
15   witness, and I do not believe that is an accurate
16   representation of what the Court's order stated
17   yesterday on Page 6 where it makes reference to public
18   documents; that although they are public
19   communications, questioning a legislator about
20   communications to the extent that it would require the
21   legislator to reveal his thought processes.  Subjective
22   motivations on any legislative activity with respect to
23   the law are covered by the privilege, so that based
24   upon that, that's what I am trying to follow when I'm
25   instructing the witness not to divulge mental

## 255

1    impressions.
2            Do you understand that?
3            THE WITNESS:  I do.
4            MR. BRISSENDEN:  Very good.
5         Q.  (BY MS. PERALES)  Okay.  And so just so I can
6    be clear about this, I am not asking you about your
7    thought process, I'm not asking you about your thoughts
8    about the bill.  I'm asking you a question about this
9    document.  And when I say "this document," I mean US
10   437.
11        A.  Correct.
12        Q.  And you make a couple of references to "this
13   bill" --
14        A.  Correct.
15        Q.  -- right here in the e-mail.
16        A.  Uh-huh.
17        Q.  There is a sentence -- second sentence.  "This
18   bill is not a true voter ID bill."  And so I believe it
19   is not privileged to explain what "this bill" means in
20   this correspondence.  Not anything about your
21   deliberations or about your thought process.
22            MR. BRISSENDEN:  Let me get the exhibit
23   here.  This may not be one that I had an extra copy of.
24        Q.  The second sentence of the first real
25   paragraph.

## 256

1            MR. BRISSENDEN:  And just so I
2    understand, your question was what is this bill --
3            MS. PERALES:  What does "this bill" mean.
4            MR. BRISSENDEN:  -- that he's referring
5    to?  That is your question?
6            MS. PERALES:  Yes.
7            MR. BRISSENDEN:  You may answer.
8            THE WITNESS:  Being only a few minutes
9    ago, I didn't remember whether we voted out Senator
10   Fraser's bill from the Senate or not.  I don't recall.
11        Q.  Okay.  Let me try to help you remember by
12   referring you to the bottom of the page.  There is a
13   sentence that begins there, "Chairman Smith, who will
14   be among the 20 House conferees, has made his
15   assistance clear.  He is not committed to strictly
16   requiring photo IDs to vote, nor does he feel that
17   immediate effect of the mandatory voter ID is
18   necessary.  He supports phasing in the changes over a
19   four-year period.
20            Now, do you recall that as being
21   associated with his committee substitute which had a
22   phase-in of four years?
23        A.  I do recall that now that you mention it to
24   me, yes.
25        Q.  It also had some additional funding for voter

DENNIS BONNEN                                                    June 6, 2012

---

265

1  publicly -- this is exactly I think where the Court is
2  coming down on this.  If you have written those words,
3  then I can at least ask you what those words mean.
4        MR. BRISSENDEN:  I disagree -- I disagree
5  with your analysis and representations of the Court.
6  I'm looking at the Court's order on Page 6, and the
7  Court has specifically stated that questioning the
8  legislature or staff without communications that
9  include public communications, just like you are
10 talking about -- to the extent it would require the
11 legislator to reveal his motivations, his thought
12 processes about S.B. 14 and the opinions of the
13 legislative activity with respect to the law, the Court
14 has specifically ruled that that is covered, and I
15 would instruct you not to answer.
16      Q.  We will take it up later.  Thank you very
17 much.
18      A.  Thank you.
19      Q.  This is from a prior deposition.
20          MS. PERALES:  Can you put a sticker on
21 this that says Rodriguez 20.
22          (Rodriguez Exhibit No. 20 marked)
23      Q.  (BY MS. PERALES)  The court reporter has
24 handed you what is marked Rodriguez Deposition
25 Exhibit 20.  I would ask you to turn to Page 340, if

---

266

1  you would, please.
2      A.  Sorry.  Could you say the number again?
3      Q.  340.
4      A.  Okay.
5      Q.  Okay.  Now, it says Q and A here.
6      A.  Okay.
7      Q.  So I need you to go back to Page 337.
8      A.  Okay.
9      Q.  And you'll see on Page 337 --
10     A.  Yes.
11     Q.  -- on Line 17, it will say Question -- it
12 says," Question by Representative Bonnen."  Do you see
13 that?
14     A.  Yes.
15     Q.  Then what follows is basically an exchange
16 back and forth between you and the witness.
17     A.  Okay.
18     Q.  So then if you wouldn't mind reading your
19 statement on Page 340 now, beginning with Line 11, just
20 to refresh your recollection.
21         MR. BRISSENDEN:  I can't tell from
22 reading the document what he is speaking to.
23     Q.  (BY MS. PERALES)  Oh, I'm sure you can if you
24 read back.  I have a portion that goes back a little
25 bit farther.  If it helps, this is Jenigh Garrett from

---

267

1  the Legal Defense Fund.
2      A.  Yes.
3      Q.  Would it be fair to say that here you are
4  basically suggesting that there is a possible
5  correction to students not having photo ID and that
6  correction would be having the university issue a photo
7  ID?
8      A.  "If there is a significant problem, I would
9  really want to know specifics in terms of the absence
10 of photo identification documents that are already
11 available in most universities rather than simply
12 presuming the problem.  I would like to see some
13 identification" -- indication, excuse me -- "I would
14 like to see some indication that it can't be corrected
15 simply by the university issuing a photo identification
16 to their students."
17     Q.  So is it fair to say there that you're
18 suggesting that whatever problem the witness might be
19 describing could be corrected by simply having the
20 university issue a photo ID to its students?
21     A.  Again, I would say I would like to see some
22 indication that it can't be corrected simply by a
23 university issuing a photo identification to their
24 students.
25     Q.  Do you remember in 2009 whether any member of

---

268

1  the House offered a hard photo ID bill?
2      A.  I do not remember.
3      Q.  Okay.  And when I say "a hard photo ID," I'm
4  using a shorthand that's come up that it would be a
5  bill that would require -- whatever form of voter ID
6  that would be offered had to have a photo on it.
7      A.  Right.
8      Q.  Okay.  I would like to move with you to 2001.
9  You see how fast we're going through time.  The years
10 are spinning by.
11         In 2011 you become -- you're named the
12 chair of the select committee, correct?
13     A.  Correct.
14     Q.  Did you file a shell bill for voter ID?
15     A.  No.
16     Q.  Are you familiar with any other house
17 committees that only considered one bill?
18         MR. BRISSENDEN:  Objection, asked and
19 answered.
20     Q.  (BY MS. PERALES)  Was that asked?
21     A.  She asked it this morning.
22     Q.  Okay.  Did she ask you?
23     A.  Yes.
24     Q.  Did the select committee on voter fraud and
25 voter identification exist in past legislatures -- past

## 269

1  sessions of the legislature?
2       A.  I believe the record will reflect whether it
3  did or didn't.  I don't believe the committee
4  specifically did, no.
5            (Rodriguez Exhibit No. 33 marked)
6       Q.  (BY MS. PERALES)  I want to give you a minute
7  to take a look at the document which has been handed to
8  you and marked Rodriguez Deposition Exhibit 33.
9       A.  Sure.
10      Q.  Do you recognize this as a House Research
11 Organization bill analysis for S.B. 14?
12      A.  Sure.
13      Q.  If you wouldn't mind coming with me to --
14 where is it?  Okay.  Last page on the section that
15 says, "Notes."  Do you see it there?  The last page --
16      A.  Sure.
17      Q.  -- Page 11 --
18      A.  Okay.
19      Q.  -- the section entitled "Notes."
20           Do you see where it says, "During floor
21 consideration of S.B. 13 on March 21st the bill was
22 resubmitted to committee on a point of order"?
23      A.  Correct.
24      Q.  Do you remember what that point of order was?
25           MR. BRISSENDEN:  Sorry, what page?

## 270

1            MS. PERALES:  The last page, Page 11.
2            THE WITNESS:  No, I do not.
3       Q.  (BY MS. PERALES)  Do you remember how long it
4  took to get the bill back out on the House floor?
5       A.  Well, I don't think it ever got to the House
6  floor.
7       Q.  This is S.B. 14.
8       A.  Correct.  Are you talking about in-house
9  deliberations?
10      Q.  House deliberations.
11      A.  Right.  I don't -- one, I don't think this is
12 accurately presented.
13      Q.  Really?
14      A.  I think it would have been the committee
15 substitute to Senate Bill 14, if it's on the house
16 side.  And I also think -- and also, the bill never
17 went to the floor.  And it was not -- it did not go to
18 the floor and then get recommitted from there.  The
19 bill had been voted out of committee, was in calendars,
20 and then was sent back to the committee for correction
21 to the committee report.  And then -- so it was not
22 taken up on the floor at all.
23      Q.  So -- that was the first time, you mean?
24 Because eventually it had to have been taken up on the
25 floor in the past.

## 271

1       A.  Well, we would have -- right.  My point is it
2  was not -- it did not get to the floor at that point.
3  And we could -- we could find out, but it was -- I
4  don't remember specifically what the issue was.  I do
5  remember that it was debatable if it was an issue.  And
6  it was an extraordinary abundance of caution with which
7  it was returned.
8       Q.  So the issue came up in calendars and the bill
9  returned to the committee for a small fix?
10      A.  Correct.
11      Q.  Do you recall?
12      A.  To the committee report.
13      Q.  To the committee report?
14      A.  Correct.
15      Q.  And do you recall how long it took from the
16 time the bill went from calendars back into committee?
17      A.  I do not at all, but I assume the record would
18 indicate that.
19      Q.  Okay.
20           (Rodriguez Exhibit No. 34 marked)
21      Q.  (BY MS. PERALES)  The court reporter has
22 handed you what has been marked Rodriguez Exhibit
23 No. 34.  Do you recognize this as a page from the House
24 Journal from April 8, 2011?
25      A.  It appears to be.

## 272

1       Q.  Okay.  The question is, is it correct to say
2  that you were appointed to the conference committee for
3  S.B. 14?
4       A.  It appears I was.
5       Q.  Do you remember serving on the conference
6  committee for S.B. 14?
7       A.  Vaguely, yes.
8            MS. PERALES:  Mark this, please.
9            (Rodriguez Exhibit No. 35 marked)
10      Q.  (BY MS. PERALES)  The court reporter has
11 handed you what has been marked as Rodriguez
12 Exhibit 35.
13      A.  Correct.
14           (Discussion off the record)
15      Q.  (BY MS. PERALES)  Now, I'm going to ask you
16 one or two questions.
17      A.  Sure.
18      Q.  And I -- you have the conference report to
19 refresh your recollection --
20      A.  Absolutely.
21      Q.  -- about things that happened in conference.
22           Do you recall in conference that a
23 provision was added that DPS would issue a voter
24 certificate.
25      A.  Vaguely.

DENNIS BONNEN                                    June 6, 2012

## 277

1        THE WITNESS: It may have. Again, I'm
2    looking at the report now and I'll have an answer when
3    I find it.
4        Q. (BY MS. PERALES) Do you -- in the meantime,
5    do you have any recollection -- you mentioned that you
6    thought there was some vague discussion -- you have a
7    vague recollection of some discussion in the House
8    about a potential problem with bill language requiring
9    DPS to give out free driver's licenses. Do you recall
10   anything in the public record about those same issues
11   being raised on the Senate side?
12       A. I do not at all.
13       Q. Do you want some more time to take a look at
14   the conference report or do you want to me -- do you
15   want to answer the question whether you recollect?
16       A. Well, I guess the answer would be I don't have
17   a clear recollection of whether we went outside the
18   bounds or not. But, respectfully, the record will tell
19   us that and I don't see any point to guess.
20       Q. Well. Well, I can move on, then, if it's all
21   right with you.
22       A. That's fine. Sure.
23       Q. Take a look at the part of the conference
24   committee report that looks like a chart.
25       A. That's a lot of --

## 278

1        Q. It should be near the -- these are Pages 1 and
2    2 --
3        A. Okay.
4        Q. -- following the bill language attachment.
5        A. Sure.
6        Q. And I'm going to hold it up so you can take a
7    look, Pages 1 and 2.
8        A. Yes, I have it. Thank you.
9        Q. You're welcome.
10           Near the bottom of Page 1 and flowing
11   onto Page 2 --
12       A. Yes.
13       Q. -- there's a discussion about Section 5 in the
14   Senate version, Section 5 in the House version, and
15   then Section 5 in the conference version. And I
16   believe one is meant to read it from left to right --
17       A. That's correct.
18       Q. -- to compare the versions. Yes?
19       A. It's Senate version, House version, and then
20   conference version.
21       Q. Okay. Now, if you would look with me on the
22   House version of Section 5 where it says,
23   "Substantially the same as Senate version --
24       A. Uh-huh.
25       Q. -- "except requires the Secretary of State

## 279

1    statewide effort to include education targeted at
2    low-income and minority voters."
3        Do you see that sentence there?
4        A. I do.
5        Q. Would it be correct to say that in the
6    conference version of the bill, the language was kept
7    from the Senate version without a provision involving
8    low-income and minority special targeted education?
9        MR. BRISSENDEN: To the extent you can
10   answer that based upon information in the public
11   record, you can answer.
12       THE WITNESS: Could you restate the
13   question?
14       Q. (BY MS. PERALES) Uh-huh. Would it be fair to
15   say, then -- well, I can say it shorthand, but then
16   Reynolds is going to object.
17       A. That's okay.
18       Q. Would it be fair to say that the minority --
19   the education targeted low-income and minority voters
20   that was in the House version of the bill was stripped
21   out in the conference committee?
22       MR. BRISSENDEN: My instruction to you
23   would be the same.
24       THE WITNESS: What it says is that, among
25   other provisions, requires the Secretary of State to

## 280

1    conduct the statewide efforts to educate voters
2    regarding the identification requirements for voting.
3    That is the Senate version.
4        Q. (BY MS. PERALES) Okay. And do you see in the
5    House version where it says requires --
6        A. Targeted.
7        Q. -- targeted -- well, education targeted at
8    low-income and minority voters?
9        A. I do see that.
10       Q. All right. Is it fair to say that that
11   specific provision, targeting education to low-income
12   and minority voters, was stripped out in conference?
13       MR. BRISSENDEN: My instruction to you
14   would be the same. To the extent it is part of the
15   public record, you can disclose it. To the extent the
16   question requires you to disclose information that is
17   not part of the public record, I instruct you not to
18   answer.
19       THE WITNESS: I think more appropriately
20   I would say that the Senate version was used, which has
21   a broader statewide effort to educate voters regarding
22   identification and requirements of voting.
23       Q. (BY MS. PERALES) But isn't it true that the
24   House version makes reference to the Secretary of
25   State's statewide effort?

DENNIS BONNEN                                          June 6, 2012

## 281

1     A.  It does.

2     Q.  And then says that specifically it needs to

3  include education targeted at low-income and minority

4  voters?

5          MR. BRISSENDEN:  Objection to the extent

6  the question mischaracterizes the statement.  I believe

7  you said needs to.  I don't believe I see that language

8  in the --

9          MS. PERALES:  Okay.  I'll rephrase.

10         MR. BRISSENDER:  -- House version.

11    Q.  (BY MS. PERALES)  Do you see over in the House

12 version that the Section 5 is substantially the same as

13 the Senate version except that it requires the

14 statewide effort to include education targeted at

15 low-income and minority voters?

16         MR. BRISSENDEN:  Objection, vague.

17    Q.  (BY MS. PERALES)  You may answer.

18    A.  The assumption is that the Senate version

19 would not have them target at low-income and minority

20 voters, and I don't agree that that assumption is

21 correct.

22    Q.  No, I'm not making any assumptions.  I just

23 want an answer to the question.

24    A.  Well, the answer is that it says, "Same as

25 Senate version except incorporates effective date same

## 282

1  as House version."

2     Q.  That's right.  So it takes the effective date

3  from the House version?

4     A.  Correct.

5     Q.  And then it takes Section 5 from the Senate

6  version?

7     A.  Correct.

8     Q.  All right.

9     A.  Which requires a statewide education effort.

10    Q.  Right.  So I'll say my question, which is a

11 yes or no question.

12         Is it fair to say that the specific

13 provision that says, "include education targeted at

14 low-income and minority voters" was taken out in

15 conference committee?

16         MR. BRISSENDEN:  My instruction would be

17 to the extent that is matters of public record, you may

18 answer.  To the extent that it is not part of the

19 public report and requires you to divulge thoughts,

20 opinions, analysis and deliberations with regards to

21 the conference, I would instruct you not to answer.

22         THE WITNESS:  I don't agree with that

23 statement.  I think it's semantics as language.

24    Q.  (BY MS. PERALES)  Okay.  But the language that

25 says "targeted at" --

## 283

1     A.  Correct.

2     Q.  -- "low-income and minority voters" is not in

3  the conference version, is it?

4     A.  That's -- those specific words are not, but it

5  doesn't infer that that does not occur.

6     Q.  I understand.  But the language is not in the

7  conference version?

8     A.  Targeted at low-income and minority voters, I

9  assume it's not, but I'm not certain of that.

10    Q.  All right.  And the language was in the House

11 version as passed by the House?

12    A.  It apparently was, yes.

13    Q.  Okay.  Thank you.  Do you recall that when

14 S.B. 14 came over to the House, it contained an

15 exemption for persons over age 70 so that they might

16 present a voters certificate as acceptable ID for

17 voting?

18    A.  I believe we talked about this.

19    Q.  Okay.  And that exception was not included in

20 the version that was passed by the House, correct?

21    A.  I believe we discussed that, yes.

22    Q.  And I wanted to ask you, putting aside your

23 thought process and your deliberations, just as a

24 separate stand-alone matter, how -- what is the

25 connection between voter fraud and persons over 70

## 284

1  presenting a voter certificate?

2          MR. BRISSENDEN:  That question, I

3  believe, would require the witness to divulge his

4  thought processes, communications, his deliberations,

5  his views about the purpose of that particular

6  exemption, and I would instruct the witness not to

7  answer the question.

8          THE WITNESS:  I don't know how to answer

9  that without breaking privilege.

10    Q.  (BY MS. PERALES)  Okay.  Do you recall whether

11 there was a vote by the House, a record vote, on

12 removing the exemption for persons over age 70?

13    A.  Yeah.  We discussed it earlier.  We went over

14 that amendment.

15    Q.  Do you recall whether there was a record vote

16 on that?

17    A.  I believe there was.  I believe we discussed

18 it earlier in the deposition.

19    Q.  Is it possible that it was -- that the change

20 was made at the agreement of the sponsor of the bill

21 and there was no record vote on the exemption?

22         MR. BRISSENDEN:  I'm going to instruct

23 you, to the extent you can answer that question as a

24 matter of public record, you may do so.  To the extent

25 that it requires you to divulge communications from

DENNIS BONNEN                                                   June 6, 2012

---

## 285

1   legislators, I instruct you not to answer.
2       Q.   (BY MS. PERALES) And I'm only asking about
3   the public record here.  I'm not asking about --
4       A.   No, no, I understand.
5            MS. PERALES:  And the representative
6   knows that there is a process on the House floor.
7            THE WITNESS:  No, no, I know that.
8            MS. PERALES:  -- regarding making
9   changes.
10           THE WITNESS:  My point is I know we
11  discussed it earlier.
12      Q.   (BY MS. PERALES) I'm just trying to fix it.
13      A.   I can't remember whether there was a vote or
14  not.  I can't believe there wouldn't have been.  Wasn't
15  there -- didn't we talk about that?  There was a vote.
16      Q.   There was a vote?
17      A.   Correct.
18      Q.   Okay.  And did you -- how did you vote on
19  that?
20      A.   Being it was my amendment, I voted for it.
21      Q.   Oh, okay.
22           MS. PERALES:  Let's go ahead and mark
23  this.
24           (Rodriguez Exhibit No. 36 marked)
25           THE WITNESS:  Let me clarify my earlier

---

## 286

1   statement.  When I say I voted for it, I don't
2   recall -- I didn't look closely if there was a motion
3   to table, which in turn I may have voted against a
4   motion to table, which obviously would have been
5   considered a vote in favor of the amendment.  So I
6   don't recall specifically whether it was a motion to
7   table or an up and down vote.
8       Q.   (BY MS. PERALES) Is it possible that an
9   amendment can survive a motion to table and then never
10  experience a record vote because --
11      A.   Absolutely.
12      Q.   -- because the author agrees?
13      A.   Yes.  But legislatively speaking, the motion
14  to table is considered a record vote.
15      Q.   Got it.
16      A.   Many campaigns have been run where it's been
17  hard to dodge that.
18      Q.   Okay.  And you mentioned that your vote was in
19  support of the amendment?
20      A.   Correct, absolutely.
21      Q.   Go ahead and take a look at Rodriguez --
22      A.   36.
23      Q.   -- 36 for me on Page 69, going over to 70.
24  And that's just to give you some -- some context.  You
25  begin speaking on 69 at Page 16, and then it flows over

---

## 287

1   to Page 70.
2       A.   Okay.
3       Q.   Go ahead and look at Page 70, Lines 11 and 12,
4   which is still you speaking.
5       A.   Yes.
6       Q.   I'll move past the part about how your mom
7   married a younger man, when you told the whole world
8   about it there on the floor.
9       A.   Certainly.
10      Q.   And is it correct there that you say, "So
11  there's no need to set a line of age that says beyond
12  that age you don't need an ID to go cast a ballot"?
13      A.   That's correct, leaving out previous
14  statements.
15      Q.   Yes.  I figured that was just kind of the sum
16  of what you were saying there.
17      A.   Possibly.
18      Q.   Is it fair to say, then, based on this
19  statement, that you are saying there were other
20  provisions in the bill that you thought were sufficient
21  to protect older voters?
22           MR. BRISSENDEN:  I'm going to instruct
23  the witness that the question requires -- to the extent
24  requires you to divulge your opinions, your thought
25  processes, your analysis, mental impressions about the

---

## 288

1   legislation of that particular provision of S.B. 14, I
2   would instruct you not to answer the question.
3       Q.   (BY MS. PERALES) I'm just asking for the
4   summary of your statement here.
5       A.   We have other provisions in this bill that
6   provided exemptions to individuals that may be in their
7   later years, that are indigent, may be handicapped with
8   disabilities, that could allow them to be precluded
9   from using an ID.
10      Q.   All right.  Let me step back a little bit from
11  S.B. 14.
12           During 2009 and 2011, did you receive
13  communications from constituents or third parties
14  expressing concerns about noncitizen voter fraud?
15           MR. BRISSENDEN:  Can you clarify when you
16  say "third parties"?
17      Q.   (BY MS. PERALES) People who are not in the
18  legislature, people to whom privilege does not apply.
19  These are just people out there in the world, whether
20  they live in your district or don't.
21      A.   I'm sure I did.  I don't know.  I mean, I
22  shouldn't say I'm sure I did.  The record would either
23  reflect that or not.  I mean, you would have those
24  documents.
25      Q.   Well, we don't have all of the communications

DENNIS BONNEN                                          June 6, 2012

---

### 289

1    because you mentioned that some of the e-mails
2    regularly dealt with.  And so I'm hoping you'll be able
3    to search your memory and tell me whether in 2009 and
4    2011 you received nonprivileged communications from
5    either constituents or interest groups or others
6    expressing concern about noncitizen election fraud.
7         A.  Actually, I don't believe I did.
8         Q.  You don't remember anybody coming to you --
9         A.  I remember saying I don't think anyone did.
10        Q.  Okay.  So you remember, and nobody came to you
11   with those concerns?
12        A.  I believe that's correct.
13        Q.  If somebody did try to express that concern to
14   you in writing, where would those communications be
15   today?
16        A.  I don't understand.
17        Q.  Would they be in your files, would they have
18   been in your e-mail, would they have been produced
19   today?
20        A.  They would have been produced.
21        Q.  Okay.  Do you remember people expressing those
22   concerns earlier than 2009 --
23        A.  I can't remember --
24        Q.  -- let's say 2007.
25        A.  I don't recall dinner last night, so I don't

---

### 290

1    know.
2             MS. PERALES:  Go ahead and mark this,
3    please.
4             (Rodriguez Exhibit No. 37 marked)
5         Q.  (BY MS. PERALES)  Representative Bonnen, you
6    have been handed what has been marked Rodriguez
7    Exhibit 37.  Do you recognize this as correspondence to
8    your office?
9         A.  I do.
10        Q.  Okay.  Can you take a look at that line where
11   the writer says -- it's not in the first paragraph --
12   well, in the first paragraph, do you see where it says,
13   "I feel cheated as an American and Texan that our Texas
14   Congress couldn't get voter ID passed"?
15        A.  I see that.
16        Q.  Do you see in the next paragraph where it
17   says, "So basically our saying, you have to have an ID
18   to drive and purchase liquor, but forget about voting
19   proof of citizenship"?
20        A.  I see where a constituent wrote that.
21        Q.  Okay.  Does this help refresh your
22   recollection whether you received communications from
23   either constituents or other persons not in the
24   legislature expressing concern about noncitizen voter
25   fraud?

---

### 291

1         A.  Well, I wish I could say that the
2    correspondence on 6/18 of 2007 from Mr. Murphy, who has
3    a rather extreme view, is etched in my brain, but it's
4    not.
5             MS. PERALES:  Let's go ahead and mark
6    this.
7             (Rodriguez Exhibit No. 38 marked)
8         Q.  (BY MS. PERALES)  The court reporter has
9    handed you what has been marked Rodriguez Deposition
10   Exhibit 38.  Do you recognize this as a letter from you
11   back to Mr. Murphy?
12        A.  It appears to be, yes.
13        Q.  Okay.  It's also from 2007, isn't it?
14        A.  It appears to be, yes.
15        Q.  Now, in the first paragraph, is it true that
16   you're talking to him about H.B. 218 and H.B. 626?
17        A.  It does.
18        Q.  Okay.  And you describe H.B. 626 as requiring
19   a voter applicant to prove US citizenship?
20        A.  It does.
21        Q.  And in the next paragraph, is it true here
22   where you say, "I am just as frustrated as you are at
23   the outcome of these bills," that you're expressing
24   frustration that these two bills didn't make it through
25   the legislature.

---

### 292

1         A.  I want to be very clear --
2             MR. BRISSENDEN:  Objection to the extent
3    that the question mischaracterizes the statement --
4         Q.  (BY MS. PERALES)  You may answer.
5         A.  I am expressing frustration bills did not
6    pass.  But it doesn't adopt his views.
7         Q.  Oh, no.  I'm certainly not suggesting that you
8    were.
9         A.  I appreciate that.
10        Q.  But it seems to me that at least at this time
11   the issue is on your radar screen in terms of
12   communications with either constituents or third
13   parties.
14        A.  What issue?
15        Q.  The issue of noncitizen voter fraud.  Someone
16   is writing to you with that concern, you're responding,
17   expressing frustration.  Would it be fair to say, then,
18   that --
19        A.  No.
20        Q.  -- the issue was coming up --
21        A.  No.
22        Q.  It was not coming up?
23        A.  Right.
24        Q.  Okay.  Can you explain that answer since we're
25   looking at some exhibits?

293

1    A.  Certainly.  I represent 140-, -50,000 people,
2  and one individual writes a letter.  I have a policy in
3  my office that we respond to every single constituent
4  letter, and this is our response to one of 140-plus
5  thousand people.
6    Q.  Uh-huh.  Were you a supporter of H.B. 626?
7    A.  Absolutely.
8    Q.  Okay.  And were you frustrated when it didn't
9  pass?
10   A.  I was.
11   Q.  Okay.  And did you share that with Mr. Murphy
12  in Lake Jackson?
13   A.  I certainly did.
14   Q.  Is Lake Jackson in your district?
15   A.  It absolutely is.
16   Q.  Okay.  So Mr. Murphy is a constituent?
17   A.  As I have already stated, yes.
18   Q.  Okay.
19       MR. BRISSENDEN:  I believe we have been
20  going for about an hour and a half.  Can we take a
21  short break?
22       MS. PERALES:  Yes.
23       (Recess from 6:44 p.m. to 7:00 p.m.)
24       MS. BERKOWER:  Okay.  Ms. Perales asked
25  me to make a note that she had to leave to return home

294

1  and she passed the witness back to me.
2       EXAMINATION (CONTINUED)
3  BY MS. BERKOWER:
4    Q.  So after S.B. 14 passed the House, did you --
5  do you remember if you issued another one of the
6  Insider's Reports, one of your newsletters to
7  constituents about the bill's passage?
8    A.  I'm sure I did.
9       (Exhibit No. 446 marked)
10   Q.  (BY MS. BERKOWER)  I have what's marked as
11  Exhibit 446.
12   A.  Thank you.
13   Q.  Do you remember this document?
14   A.  Vaguely.
15   Q.  What is it?
16   A.  It is Insider's Report, Volume 8, No. 7, about
17  House passes voter ID bill, dated March 25th of 2011.
18   Q.  And that was after the House passed S.B. 14?
19   A.  Correct.
20   Q.  Do you see the second line of the first
21  paragraph says, Senate Bill 14, which I co-sponsored,
22  restores the basic principle of one person, one vote
23  within our electoral system by requiring a photo ID to
24  cast ballot"?
25   A.  I do.

295

1    Q.  What did you mean by "restores our basic
2  principle"?
3    A.  I mean what I wrote.
4    Q.  Had the basic principle of one person, one
5  vote somehow been abrogated in some way?
6       MR. BRISSENDEN:  I would like to instruct
7  the witness that to the extent that that question
8  requires him to divulge mental impressions, analysis,
9  mental thoughts that you had pre-enactment of S.B. 14
10  in your analysis of S.B. 14, I would instruct you not
11  to answer that question.
12       THE WITNESS:  I agree.
13   Q.  (BY MS. BERKOWER)  You're following his
14  advice?
15   A.  Yes, ma'am.
16   Q.  You said in Paragraph 3 there, "Despite some
17  of the vocal and misleading rhetoric opposing the voter
18  ID act, this vote is based on a simple and nonobtrusive
19  principle," and you go on to talk about what.
20       What was the vocal and misleading
21  rhetoric that you were referring to?
22       MR. BRISSENDEN:  First of all, for
23  clarification, what are you referring to?
24       MS. BERKOWER:  The first sentence of the
25  third paragraph.

296

1       MR. BRISSENDEN:  And my instruction to
2  you would be the same.
3       THE WITNESS:  I agree.
4       MS. BERKOWER:  And to clarify, what was
5  the instruction?
6       MR. BRISSENDEN:  The instruction is to
7  the extent that the question requires the witness to
8  disclose his thoughts, his mental impressions, his
9  motivations, his opinions about S.B. 14 and analysis
10  pre-enactment, I would instruct him not to answer.
11   Q.  (BY MS. BERKOWER)  Okay.  Well, maybe I'll ask
12  this:  Was the vocal and misleading rhetoric you are
13  referring to there available publicly as part of the
14  public record?
15   A.  It could have been at times.
16   Q.  Do you remember which vocal and misleading
17  rhetoric is part of the public record?
18   A.  Testimony that the bill was to attack people
19  in this country illegally.
20   Q.  So rhetoric about noncitizen voting was
21  misleading?  Is that what your -- public testimony
22  about noncitizen voters?
23   A.  Despite some of the vocal, misleading rhetoric
24  opposing that bill, opposing the voter ID act, this
25  bill is based on the simple and nonobtrusive premise

DENNIS BONNEN

June 6, 2012

## 297

1  that Texans should provide a photo ID to vote, just as
2  they present identification to open a bank account and
3  such.
4      Q.  Okay.  And then I think I asked you if any of
5  the local and misleading rhetoric you are referring to
6  there was part of the public record, and you said yes.
7  So which parts of the public record contain the vocal
8  and misleading rhetoric that you are referring to
9  there?
10     A.  I don't have the record in front of me.  But
11  it usually would have been comments made on the floor
12  or witnesses who came before committees to testify.
13     Q.  What were those comments; do you remember?
14     A.  Not specifically, no.
15     Q.  And then you said, as you read just now, "This
16  bill is based on a simple and nonobtrusive premise that
17  Texans should provide a photo ID just as they
18  identification to open a bank account, board a plane,
19  obtain a fishing license, rent a car, or pick up a
20  prescription at the pharmacy."
21         Is that accurate -- an accurate reading
22  of that?
23     A.  It is an accurate reading.
24     Q.  Do you have a right to open a bank account?
25         MR. BRISSENDEN:  I'm going to object to

## 298

1  extent the question as vague.
2      Q.  (BY MS. BERKOWER)  You can answer that.
3      A.  I don't understand the question.
4      Q.  Do you have a constitutional right to vote?
5      A.  You do.
6      Q.  Do you have a constitutional right to open a
7  bank account?
8      A.  I don't believe it's stated in the
9  constitution.
10     Q.  Do you have a constitutional right to board a
11  plane?
12     A.  Some people would argue you might.
13     Q.  Do you have a constitutional right to obtain a
14  fishing license?
15     A.  Again, some people might argue you do.
16     Q.  Would you?
17     A.  That gets into speculation.
18     Q.  You may speculate.
19         MR. BRISSENDEN:  I'm going to instruct
20  the witness not to speculate.
21         MS. BERKOWER:  Well --
22         MR. BRISSENDER:  I object to the question
23  to the extent it requires him to speculate.  It also
24  requires the witness to -- it calls for a legal
25  conclusion, and I object on those grounds as well.

## 299

1      Q.  (BY MS. BERKOWER)  Okay.  Well, have you ever
2  read the US Constitution?
3      A.  Sure.
4      Q.  So based on your reading of that -- I'm not
5  asking for any legal conclusion -- but do you recall
6  anything in there that would give you a constitutional
7  right to obtain a fishing license?
8          MR. BRISSENDEN:  Same objection.
9      Q.  (BY MS. BERKOWER)  You may answer.
10     A.  I would prefer not to.
11         MS. BERKOWER:  All right.  I'll note for
12  the record that answer is nonresponsive.
13     Q.  (BY MS. BERKOWER)  Do you have a
14  constitutional right to rent a car?
15     A.  Again, you could argue you do.
16         MR. BRISSENDEN:  Same objection.
17     Q.  (BY MS. BERKOWER)  Would you argue that you
18  do?
19         MR. BRISSENDEN:  Same objection.
20     Q.  (BY MS. BERKOWER)  Are you not going to answer
21  the question?
22     A.  That is correct.
23     Q.  Do you have a constitutional right to pick up
24  prescriptions at the pharmacy?
25     A.  Again, you could argue you do.

## 300

1      Q.  What would those arguments be?
2          MR. BRISSENDEN:  Same objection, legal
3  conclusion.
4          THE WITNESS:  I agree with the objection.
5          MS. BERKOWER:  Okay.  That answer is
6  nonresponsive.  I would ask the witness to answer the
7  question presented, please.
8      Q.  (BY MS. BERKOWER)  Are you refusing to answer?
9      A.  Could you repeat the question.
10     Q.  Do you have a constitutional right to pick up
11  a prescription at the pharmacy?
12         MR. BRISSENDEN:  Same objection.  To the
13  extent that the witness has not conducted an analysis
14  to make that determination, he may not be able to
15  answer the question.
16         Do you know if you are able to answer the
17  question?
18         THE WITNESS:  I do not.
19     Q.  (BY MS. BERKOWER)  So is your answer you don't
20  know if you have a constitutional right to pick up a
21  prescription at the pharmacy?
22     A.  My previous answer is I believe there are
23  people who would argue they do.
24     Q.  Well, I'm not asking about other people.  I'm
25  asking about you.  Do you believe that you have a

DENNIS BONNEN                                                June 6, 2012

## 301

1   constitutional right to pick up a prescription at the
2   pharmacy?
3         MR. BRISSENDEN:  My objection would be
4   the same, if you are able to answer.  If you don't
5   know, you don't know.
6         THE WITNESS:  I don't know.
7   Q.   (BY MS. BERKOWER) Do you know anyone who has
8   made such arguments, that you have a constitutional
9   right to do any of the things we have just discussed,
10  other than vote?
11  A.   I actually do.
12  Q.   Who are those people?
13  A.   Constituents of mine.
14  Q.   Which constituents?
15  A.   I don't have the names in front of me.
16  Q.   Are you aware of any existing document or
17  report that identifies how many Texas voters are in
18  possession of a concealed handgun license?  And I will
19  limit that to the public record.
20        MR. BRISSENDEN:  Thank you.
21        THE WITNESS:  Am I aware of one?
22  Q.  (BY MS. BERKOWER)  Yes.
23  A.   I'm sure one exists but I'm not aware of it.
24  Q.   What makes you sure it exists?
25  A.   Because we keep records here in the State of

## 303

1   during the legislative debate on S.B. 14 that helps
2   form -- well, I'll leave it there -- during the
3   legislative debate on S.B. 14.
4         Do you want me to restart that question?
5   A.   Please.
6   Q.   Could you identify each report or analysis
7   that was given to House members as part of the public
8   record during the legislative debate on S.B. 14?
9   A.   I can't, no.
10  Q.   Do you remember receiving such reports?
11  A.   I don't know which ones you are referring to.
12  I mean, I certainly receive information.  I don't know
13  specifically what reports or what information that I
14  have.
15  Q.   Do you believe that S.B. 14 will have a
16  negative impact on minority voters?
17        MR. BRISSENDEN:  Objection, privileged.
18  Instruct the witness not to answer.
19  Q.   (BY MS. BERKOWER)  Are you aware of any
20  publicly available studies or analysis that would
21  support your position that S.B. 14 would enhance public
22  confidence in elections?  I did limit the question to
23  the public record.
24  A.   I don't specifically know, but I believe some
25  have been presented.

## 302

1   Texas of those licenses.
2   Q.   Are you aware if there is any publicly
3   available document that says how many minority Texans,
4   black or Hispanic, are in possession of a concealed
5   handgun license?
6         MR. BRISSENDEN:  Again, your question is
7   unlimited to what is in the public record.
8         MS. BERKOWER:  Yes.  I said any publicly
9   available document.
10        THE WITNESS:  I don't know.
11  Q.  (BY MS. BERKOWER)  Are you aware of any
12  publicly existing document or report that identifies
13  how many minority Texans are in possession of a US
14  military card?
15  A.   Again, I personally am not aware.
16  Q.   Are you aware of any existing document or
17  report that identifies how many Texas voters are in
18  possession of a passport?
19        MR. BRISSENDEN:  Objection.  Again, the
20  question is not limited to the public --
21  Q.  (BY MS. BERKOWER)  Limited to public record.
22  A.   Again, I -- these are not areas of my
23  expertise.  I don't know.
24  Q.   Could you identify each report or analysis
25  that was presented to you as part of the public record

## 304

1   Q.   Have you publicly supported this lawsuit?
2         MR. BRISSENDEN:  Objection, vague.
3   Q.   (BY MS. BERKOWER)  Have you issued public
4   statements that support Texas' efforts in this lawsuit?
5         MR. BRISSENDEN:  Same objection.
6         THE WITNESS:  I probably have, but I'm
7   not positive.
8         MS. BERKOWER:  This will be Exhibit 447.
9         (Exhibit No. 477 marked)
10  Q.  (BY MS. BERKOWER)  Do you know what this is?
11  A.   It appears to be a portion, or maybe in total,
12  a post, it seems -- although I'm confused why it would
13  be a post at 2:00 a.m. on January 24th of 2012 -- in
14  The Facts news.  I think it would have been a news
15  article, but it doesn't appear to be.
16  Q.   What is the title of this?
17  A.   Well, it's confusing.  The title is "Voter ID
18  push has Bonnen's backing," but it's presented as
19  posted Tuesday, January 24th, 2012, at 2:00 a.m.  It
20  seems to be unclear.
21  Q.   Okay.  Well, does this document quote you?
22  A.   It does.
23  Q.   Does it quote you about this lawsuit?
24  A.   It states, "State Representative Dennis Bonnen
25  fully supports Texas Attorney General Greg Abbott's

DENNIS BONNEN                                          June 6, 2012

## 321

1  that this availability of a free photo ID addresses
2  your concern of cost in obtaining a photo ID?
3      A.  Correct.
4      Q.  Didn't we discuss earlier that S.B. 14 may
5  require documents that cost money in order to obtain
6  the free photo ID?
7          MR. BRISSENDEN:  Objection, asked
8  answered.  We have covered that already.
9      Q.  (BY MS. BERKOWER)  Do you remember when we
10 discussed that and you agreed that if the underlying
11 documentation costs money, then the ID would
12 effectively cost money?
13     A.  Respectfully, I think that I was answering the
14 question of a constituent who said that it could cost
15 somebody money to go get an ID, and he was unaware of
16 the fact that in the legislation a free ID is offered
17 to someone.
18         Now, are you correct that earlier we
19 discussed that there could be underlying documents
20 requiring -- could be, not guaranteed, but could be --
21 that may cost money, that is accurate.  Does that make
22 the statement in this letter I'm inaccurate?  It does
23 not.
24     Q.  Does it make it slightly misleading?
25     A.  Not at all.

## 322

1          MS. BERKOWER:  Okay.  We're leaving this
2  open and pending due to the fact that we got these
3  documents late and also due to the lengthy objections
4  of counsel.
5          MR. BRISSENDEN:  For the record,
6  documents that were produced today were produced
7  actually early, before the Court's order that required
8  us to produce it today.
9          Ms. Westfall communicated with counsel in
10 our office, and we made every effort to get these
11 documents that she requested to you today before
12 noontime so you could ask him questions this afternoon,
13 which you have now had them for about seven hours to
14 answer those questions.  And so we accommodated your
15 request and we got -- we focused on those documents.
16 We had them here at noontime today.
17         And, so in that regard, I don't believe
18 the characterization that we were somehow late in
19 producing them is accurate.
20         MS. BERKOWER:  You're late in producing
21 them in that you improperly withheld them and we were
22 required to seek a court order in order to obtain them.
23 That's what I was referring to.
24         MR. BRISSENDEN:  I disagree with your
25 characterization.

## 323

1              THE WITNESS:  Thank you.
2          (Proceedings concluded at 7:35 p.m.)
3
4
5
6          -- SIGNATURE REQUIRED --
7
8
9
10
11         *   *   *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 324

1              CHANGES AND SIGNATURE
2  WITNESS NAME:  DENNIS BONNEN
3  DATE OF DEPOSITION:  JUNE 6, 2012
4  PAGE       LINE       CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          )
                                         )
              Plaintiff,                 )
                                         )
VS.                                      )
                                         )
ERIC H. HOLDER, JR. in his               )
official capacity as Attorney            )
General of the United States,            )
                                         )
              Defendant,                 )
                                         )
ERIC KENNIE, et al,                      )
                                         )
      Defendant-Intervenors,             )
                                         )
TEXAS STATE CONFERENCE OF                )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                          )   (RMC-DST-RLW)
                                         )   Three-Judge Court
      Defendant-Intervenors,             )
                                         )
TEXAS LEAGUE OF YOUNG VOTERS             )
EDUCATION FUND, et al,                   )
                                         )
      Defendant-Intervenors,             )
                                         )
TEXAS LEGISLATIVE BLACK                  )
CAUCUS, et al,                           )
                                         )
      Defendant-Intervenors,             )
                                         )
VICTORIA RODRIGUEZ, et al.,              )
                                         )
      Defendant-Intervenors.             )

*********************************************
              ORAL DEPOSITION OF
            STATE OF TEXAS 30(b)(6)
              WALTER SCOTT BRANDT
                 JUNE 19, 2012
*********************************************

## 2

1        ORAL DEPOSITION OF WALTER SCOTT BRANDT, produced as
2    a witness at the instance of the Defendant, was duly
3    sworn, was taken in the above-styled and numbered cause
4    on the JUNE 19, 2012, from 9:50 a.m. to 10:55 a.m.,
5    before Chris Carpenter, CSR, in and for the State of
6    Texas, reported by machine shorthand, at the Offices of
7    the Texas Attorney General, 209 West 14th Street, 6th
8    Floor, Austin, TX 78701, pursuant to the Federal Rules
9    of Civil Procedure and the provisions stated on the
10   record or attached hereto.

## 3

1    A P P E A R A N C E S
2    FOR THE PLAINTIFF, STATE OF TEXAS, AND THE WITNESS:
3        Reynolds Brissenden
         Patrick K. Sweeten
4        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         P.O. Box 12548
5        Austin, TX 78711-2548
6        209 West 14th Street
         8th Floor
7        Austin, TX 78701
         (512) 936-1307
8        patrick.sweeten@texasattorneygeneral.gov
         reynolds.brissenden@texasattorneygeneral.gov
9
10   FOR THE DEFENDANT, HOLDER, ET AL:
11       Daniel Freeman
         Victor Williamson
12       U.S. DEPARTMENT OF JUSTICE
         950 Pennsylvania Avenue, NW
13       NWB - Room 7202
         Washington, DC  20530
14       (202) 305-7766
         daniel.freeman@usdoj.gov
15
16
17
18
19
20
21
22
23
24
25

## 4

1                        INDEX
2    Appearances.........................3
3    WALTER SCOTT BRANDT
4        Examination by Mr. Freeman.............5
5    Signature and Changes.........................45
6    Reporter's Certificate.........................47
7                    EXHIBIT INDEX
8    970   DOJ Project Requirements            19
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1    THE COURT REPORTER:  Will counsel please
2    make their announcements, and then I will swear in the
3    witness.
4         MR. FREEMAN:  Daniel Freeman on behalf of
5    the Defendant Attorney General Eric H. Holder, Jr.
6         MR. WILLIAMSON:  I'm Victor Williamson
7    with the U.S. Department of Justice.
8         MR. BRISSENDEN:  Reynolds Brissenden for
9    the State of Texas and the witness, Mr. Brandt.
10        And Dan, just before we get started, I
11   just have a quick statement to make for the record.
12        MR. FREEMAN:  Sure.
13        MR. BRISSENDEN:  As this is a 30(b)(6)
14   deposition, we have designated -- the State of Texas is
15   designating Mr. Brandt here this morning, presenting him
16   for Topic Number 11 of the Attorney General's Notice of
17   Rule 30(b)(6) Deposition Notice, to discuss the process,
18   manner, and method of compiling, cleaning, and filtering
19   data from the TEAM voter registration database and
20   producing such data to the Attorney General and
21   Defendant Intervenors in this litigation.
22        MR. FREEMAN:  Thank you.
23        WALTER SCOTT BRANDT,
24   having been first duly sworn to testify the truth, the
25   whole truth, and nothing but the truth, testified as

**6**

1    follows:
2              EXAMINATION
3    BY MR. FREEMAN:
4    Q.  Sir, could you state your name for the record.
5    A.  My name is Walter Scott Brandt.
6    Q.  Thank you.  My name is Dan Freeman, and with me
7    is my colleague, Victor, and your counsel has already
8    introduced himself, and I'm sure you know him already.
9    A.  Uh-huh.
10   Q.  Have you ever been deposed before?
11   A.  No, I haven't.
12   Q.  So a deposition works in the form of a question
13   and answer, and the court reporter needs to be able to
14   record your answers, so you need to articulate rather
15   than gesture, you know, shrug, nod your head, et cetera.
16   Do you understand?
17   A.  Okay. Yes.
18   Q.  The purpose of the deposition is to obtain your
19   full and complete answers, so I need you to respond
20   fully to the extent of your knowledge to each of my
21   questions.  Do you understand?
22   A.  Yes.
23   Q.  I may not always be clear in my questioning.
24   If you don't understand, please ask me to restate my
25   question, and I'll try and be clearer.  Do you

**7**

1    understand?
2    A.  Yes.
3    Q.  If you need to take a break, please tell me,
4    and we'll finish up the question and see about a break.
5    Is that all right?
6    A.  Yes.
7    Q.  Thank you.
8         If you need to get up for a new bottle of
9    water, which the Office of the Attorney General has
10   kindly provided, that's fine, but please do so after --
11   between answers after you've answered.  Is that all
12   right?
13   A.  Yes.
14   Q.  If you want to talk to your attorney, that's
15   fine, but if there's a question pending or you're in the
16   middle of the answer, please finish that up first, and
17   then you can talk to your attorney.  Is that all right?
18   A.  Yes.
19   Q.  Sometimes you may remember things later in the
20   deposition, after I have asked additional questions.  If
21   that happens, please let me know while it's on your
22   mind, and we'll add it to the record.  Will you do that?
23   A.  Yes.
24   Q.  And I'll give you a chance to do that at the
25   end as well.  Sometimes after we have been talking for a

**8**

1    while, you'll realize that a prior answer was not
2    entirely accurate.  If you realize that, will you let me
3    know so that we can correct the record?
4    A.  Yes.
5    Q.  Sometimes while you're answering, you may think
6    of a document that would help you remember or help you
7    answer more accurately, if you do, please let me know.
8    We have a few documents here, and if we don't have it
9    here, we may be able to get it in order to help you.  Is
10   that correct okay?
11   A.  Yes.
12   Q.  Are you on any medication or drugs of any kind
13   that might make it difficult for you to understand or
14   answer questions today?
15   A.  No.
16   Q.  Have you had anything alcoholic to drink in the
17   last eight hours?
18   A.  No.
19   Q.  Are you at all sick today?
20   A.  No.
21   Q.  Are you currently under a doctor's care for any
22   illness that would impede your ability to answer
23   questions today?
24   A.  No.
25   Q.  Is there any other reason you can think of why

WALTER SCOTT BRANDT                                           June 19, 2012

## 9

1  you will not be able to answer my questions fully and
2  accurately?
3      A.  No.
4      Q.  And the last thing:  I want to remind you that
5  you're under oath and subject to federal penalties for
6  giving false or misleading testimony, so it's important
7  to answer my questions truthfully, accurately, and
8  completely.  Do you understand?
9      A.  Yes.
10     Q.  Any questions so far?
11     A.  No.
12         Okay.  Thanks.
13            Do you understand that you are testifying
14 on behalf of the State of Texas and not in your
15 individual capacity?
16     A.  Yes.
17     Q.  What is your position?
18     A.  I'm the IT, Information Technology Director for
19 the Texas Secretary of State's Office.
20     Q.  And does that give you supervisory authority
21 over the Department of Elections?
22     A.  No, it does not.
23     Q.  Do they have separate IT staff, or are their IT
24 staff part of your staff?
25     A.  My staff are the IT staff for the agency.

## 10

1      Q.  Okay.
2      A.  All departments.  It's a centralized IT.
3      Q.  Okay.  Thank you.
4            How long have you held your position?
5      A.  I have been the IT director at SOS since
6  December of 2004.
7      Q.  And had you been in SOS prior to that?
8      A.  No.
9      Q.  What is your educational background?
10     A.  I have a bachelor of science degree in
11 aerospace engineering from Texas A&M University.
12     Q.  Okay.  And since you graduated from college,
13 what is your employment background?
14     A.  I have been employed most recently with the
15 Texas Secretary of State.  Before that, I was with the
16 Texas Workforce Commission.
17     Q.  Okay.
18     A.  I worked briefly with Applied Materials here in
19 Austin.  Before that, I was with the Workforce
20 Commission and the Employment Commission.  The Texas
21 Employment Commission became the Texas Workforce
22 Commission.  Before that, I worked as a substitute
23 teacher in the Houston area.
24     Q.  Okay.  And when you were working for the
25 Employment Commission, was that in the information

## 11

1  technology capacity?
2      A.  Yes.
3      Q.  What was your position?
4      A.  I started at the Employment Commission as a --
5  well, my position was temporary interviewer.  It was not
6  information technology.
7      Q.  Okay.
8      A.  I was working on the extended unemployment
9  claims process.
10     Q.  Okay.
11     A.  I moved over to information technology as a PC
12 support person, and held various positions in
13 information technology, up to and including the Director
14 of Distributed Systems at the Workforce Commission.
15     Q.  And that was prior to your leaving for Applied
16 Materials?
17     A.  No.  I did a year at Applied Materials in
18 between those.
19     Q.  Okay.  And what was your position at Applied
20 Materials?
21     A.  I was a quality assurance technologist, I
22 believe.
23     Q.  Okay.  Can you explain --
24     A.  Yes.
25     Q.  -- very briefly what that meant?

## 12

1      A.  Applied Materials makes semiconductor
2  manufacturing equipment.
3      Q.  Okay.
4      A.  Part of their manufacturing process is to have
5  a quality department that goes in and performs quality
6  checks on the equipment at various stages of production.
7      Q.  Okay.
8      A.  I was one of the guys that did those quality
9  checks.
10     Q.  Okay.  Sounds good.
11            And then you returned to the Texas
12 Workforce Commission, and the last position you had
13 there before you left was what?
14     A.  Director of Distributed systems.
15     Q.  Okay.  And what did that entail?
16     A.  It was an IT position.  I was in charge of the
17 groups responsible for the user support help desk,
18 Windows servers, Unix servers, and data networking.  I
19 think that's it.
20     Q.  Okay.  And then when you came over to the
21 office of the Secretary of State, you were -- that was
22 to become the head of IT, right?
23     A.  Yes.
24     Q.  Okay.  So it sounds like IT was a good fit for
25 you.

WALTER SCOTT BRANDT                                                          June 19, 2012

## 13

1          When did you first learn that you would be
2     testifying on behalf of the State?
3          A.  Probably late last week.
4          Q.  Okay.  This document has been previously marked
5     in a prior deposition as U.S. Exhibit 830.  Could you
6     take a look at it for a moment?
7          A.  (Witness reviewing document.)  Okay.
8          Q.  Okay.  Have you seen that document before?
9          A.  Yes.
10         Q.  What is that document?
11         A.  I don't know the official term for it.
12         Q.  Is it a notice of deposition?
13         A.  I don't know.
14         Q.  Okay.  Is there a list of topics in an appendix
15     of an exhibit to that notice?
16         A.  Yes, there is.
17         Q.  And what topics are you prepared to testify
18     about today within that list?
19         A.  Topic Number 11.
20         Q.  And for the record, could you read what that
21     topic states?
22         A.  Yes.  "The process, manner, and method of
23     compiling, cleaning, and filtering data from the TEAM
24     voter registration database and producing such data to
25     the Attorney General and Defendant Intervenors in this

## 14

1     litigation."
2          Q.  Okay.  What did you do to prepare for this
3     deposition?
4          A.  I met with my lawyers, had a brief meeting with
5     my staff to go over the timeline of the data that we
6     have produced.
7          Q.  And when you met with your lawyers, when was
8     that?
9          A.  Yesterday afternoon.
10         Q.  And who did you meet with?
11         A.  Excuse me.  Yesterday morning.
12         Q.  Who did you meet with?
13         A.  Reynolds and Patrick.
14         Q.  Okay.  Was anyone else present?
15         A.  No.
16         Q.  Okay.  And when you met with your staff, who
17     did you meet with?
18         A.  That was Lee Guyette and John Mendoza.
19         Q.  And where did you meet with them?
20         A.  In my office.
21         Q.  And was anyone else present --
22         A.  No.
23         Q.  -- besides those two?
24              If possible, I know it's very hard for the
25     court reporter if we talk over each other, so I will try

## 15

1     not to talk over you, and if you can try to wait until I
2     have finish my question, just for Chris's sake.
3          A.  Okay.
4          Q.  Chris has worked very hard, and I don't want to
5     make his life any harder.
6              And what did you discuss beyond the simple
7     time line?
8          A.  We discussed when we produced the data and what
9     that data was.
10         Q.  Okay.  Did you review any documents?
11         A.  No.
12         Q.  Did you bring any documents with you here
13     today?
14         A.  Just my notes, notes on the timeline.
15         Q.  And for the record, just so we don't have to
16     bother with producing them, the first line of the note
17     says "March 14, with SSN, DOJ, April 14, without SSN,
18     INT."  And then the third line says, "May voters,
19     cancelled voters, count history."  The next line says,
20     "Arrow DOJ."  The next lines says "Arrow INT."  The next
21     line says, "Arrow DOJ."  And now we won't have to worry
22     about productions or copies or anything like that.
23     Thank you.
24              Did you speak with anyone else about your
25     deposition today?

## 16

1          A.  I told several of my staff that I was going to
2     be deposed, but I didn't speak with anyone regarding the
3     content of it.
4          Q.  Okay.  Great.
5              What steps did you take, from beginning to
6     end, to produce the data from the Office of the
7     Secretary of State that you produced to the Department
8     of Justice?
9              MR. BRISSENDEN:  Objection, vague.
10         A.  Which time?
11         Q.  (By MR. FREEMAN)  Well, let's skip ahead, then.
12              On what dates did you produce data to the
13     Department of Justice?
14         A.  We produced data in March.  I believe it was
15     late March.  We produced data in April.  And we produced
16     data in May.
17         Q.  And March, would that be March 30th?
18         A.  Could be.
19         Q.  And April, would that be April 2nd?
20         A.  I don't recall.
21         Q.  And May, would that be May 4th?
22         A.  Could be.
23         Q.  Was there one production in May or two?
24         A.  There were two for Department of Justice, I
25     believe.

WALTER SCOTT BRANDT                                          June 19, 2012

## 17

1    Q.   Were those May 4th and May 9th?
2    A.   I don't recall the dates.
3    Q.   And on what dates did you produce data to the
4    Defendant Intervenors?
5    A.   I believe we produced data to the Intervenors
6    in April and in May.
7    Q.   And in April, was that also April 2nd?
8    A.   I don't know the exact date.
9    Q.   And in May, was that May 8th?
10   A.   I don't recall the exact date.
11   Q.   All right.  So let's start with March 30th.
12   What steps did you take, prior to March 30th production,
13   to produce the data that you produced to the Attorney
14   General from the Office of the Secretary of State?
15   A.   Okay.  The data that we produced in March was,
16   I believe, a file with 14 fields.  My staff wrote a
17   program to extract those 14 data fields from our
18   database, and saved them in a -- I believe was a comma
19   separated value file.  We provided the CSV comma
20   separated value file to the Office of the Attorney
21   General, and they provided it to the DOJ.
22   Q.   What database did the data originate in?
23   A.   It originated in our TEAM database, TEAM system
24   database.
25   Q.   And is TEAM an acronym?

## 18

1    A.   Yes.
2    Q.   What does TEAM stand for?
3    A.   I believe it stands for Texas Election
4    Administration Management.
5    Q.   Okay.  Does the TEAM database consist of one
6    table or multiple tables?
7    A.   It's multiple tables.
8    Q.   And what tables were the data at issue drawn
9    from?
10   A.   I don't know.
11   Q.   What are the tables in the TEAM database?
12   A.   There are numerous tables.  I'm not familiar
13   with all of them.
14   Q.   What are the primary tables in the TEAM
15   database?
16   A.   I don't know.
17   Q.   Okay.  Does the program that your staff wrote
18   to execute the March 30th data production still exist?
19   A.   I don't know.
20   Q.   Was the data produced on March 30th extracted
21   from the TEAM database on that date or on a prior date?
22   A.   If it was produced on March 30th, it was
23   probably extracted prior to that.
24   Q.   Do you know on what date the data was extracted
25   from the database?

## 19

1    A.   I do not know.
2    Q.   Are you aware of what fields were produced to
3    the Office of the Attorney General?
4    A.   For the March data?
5    Q.   Yes.
6    A.   I've seen a list of 14 fields.
7    Q.   Do you recall what they were?
8    A.   I do not recall them.
9    Q.   I'm going to put a document in front of you.
10       Well, first, if I could have the court
11   reporter mark this document at U.S. Exhibit 970.
12       (U.S. Exhibit 970 marked for
13   identification.)
14   Q.   (By MR. FREEMAN) Would you take a look at that
15   document?
16   A.   (Witness reviewing document.) Okay.
17   Q.   Have you seen this document before?
18   A.   No.
19   Q.   Now, am I correct that this document sets out a
20   protocol for matching databases, not for producing
21   databases; am I correct?
22       MR. BRISSENDEN:  If you know.
23   Q.   (By MR. FREEMAN) If you know.
24   A.   I don't know.
25   Q.   Do you see on Page 3 a list of fields?

## 20

1    A.   Yes.
2    Q.   Does this list of fields look familiar to you
3    as similar to the list of fields produced to the
4    Department of Justice?
5    A.   Some of the fields look familiar, yes.
6    Q.   Does it help you recall what fields were
7    produced to the Department of Justice?
8    A.   No.
9    Q.   Okay.  And so you couldn't tell me, even with
10   this document in front of you, which of the fields here
11   were produced and which were not?
12   A.   No, I couldn't.
13   Q.   Okay.  Do you know if there were any additional
14   fields produced to the Department of Justice that are
15   not listed here?
16   A.   I don't know.
17   Q.   As of the date of the March 30th production,
18   are you aware of how many cases existed in the TEAM
19   database?
20   A.   Could you clarify the term "cases"?
21   Q.   Sure.  Individual records.
22   A.   I'm not aware of the number of individual
23   records.
24   Q.   Are you aware of any cases or individual
25   records were dropped from the database prior to

WALTER SCOTT BRANDT                                          June 19, 2012

---

## 21

production for any reason?

   A.  So, could you clarify "prior to production;"
what do you mean by that?

3

4    Q.  Were there any cases contained in the TEAM

5  database that were, as part of the process of

6  production, eliminated from the data prior to sending

7  that data to the Attorney General?

8          MR. BRISSENDEN:  Objection, vague.

9    Q.  (By MR. FREEMAN) You can answer.

10    A.  So, for the March data production, my

11  understanding is that included only active voters, not

12  cancelled voters.

13    Q.  By cancelled, do you mean voters who are on the

14  suspense list?

15    A.  I don't know.

16    Q.  What do you mean by cancelled voters?

17    A.  So, there are codes within the database.

18    Q.  Uh-huh.

19    A.  And I'm not familiar with the specifics of each

20  one, but my understanding is that there are active

21  voters and cancelled voters, and the active voters were

22  the ones produced for the March data.

23    Q.  Is it possible that you were referring to the

24  voters status code field?

25    A.  It is possible.

---

## 22

1    Q.  And are there three potential values for that,

2  active, suspense, and live check?

3    A.  Based on my recollection -- I don't know.

4    Q.  But your recollection is for the March 30th

5  production, you produced only -- only the active voters?

6    A.  That is my recollection, yes.

7    Q.  Did anyone instruct you only to produce the

8  active voters?

9    A.  I don't know what instructions specifically my

10  programmers were given from the business area.

11    Q.  Okay.  Do you know what the field entry S, or

12  suspense, means for a given voter in the TEAM database?

13    A.  I'm not familiar with the business rules behind

14  the codes in the fields, so, no.

15    Q.  Do you know who from the business side of the

16  Secretary of State's Office provided instructions to you

17  or your staff?

18    A.  I don't know.

19    Q.  Okay.  Do you know what the live check entry

20  means in the database?

21    A.  I believe the live check status indicates that

22  we received the application, and they are waiting for

23  the live check to complete to determine the outcome of

24  that application.

25    Q.  What is the live check?

---

## 23

1    A.  I'm not completely familiar with all details.

2    Q.  To the best of your knowledge, what is the live

3  check?

4    A.  It is checking the voter against the DPS

5  database and the social security database.

6    Q.  And so am I correct that those voters are not

7  fully registered until the live check is complete?  And

8  the best of your knowledge.

9    A.  I don't know.

10    Q.  Okay.  That's fine.

11    A.  That's a business rule rather than a technical.

12    Q.  Okay.  So you just know that there are voters

13  or folks in the TEAM database, and they are either

14  active, suspense, or live check?

15    A.  I know that there are voters in the database,

16  and they have a status code.

17    Q.  Okay.  And those status codes are V, S, and L?

18    A.  I don't know.

19    Q.  Okay.  When in the process was the database

20  filtered to only include the active voters for the March

21  30th production?

22    A.  I believe that was part of the coding that my

23  programmer did to pull that data.

24    Q.  Okay.  Is there such a thing as test entries in

25  the TEAM database?

---

## 24

1          MR. BRISSENDEN:  Objection, vague.

2    A.  Could you rephrase the question?

3    Q.  (By MR. FREEMAN) Are there entries in the TEAM

4  database that are described by technical personnel as

5  test entries?

6          MR. BRISSENDEN:  Same objection.

7    Q.  (By MR. FREEMAN) You can answer to the extent

8  that you understand.

9    A.  I don't know.

10    Q.  Okay.  Well, that solves the objection.

11        Prior to production, was any search

12  performed for duplicates in the database?

13    A.  As part of the production process?

14    Q.  Yes.

15    A.  I don't know.

16    Q.  So you're not aware of any protocols for

17  matching duplicates that may have been performed prior

18  to production, the March 30th production?

19    A.  As part of that production process?

20    Q.  Yes.

21    A.  No, sir.

22    Q.  So let's move to the April 2nd production.

23    A.  Okay.

24    Q.  Are you aware of what the date of the data

25  extraction was for the April 2nd production?

## 25

1     A.   No, I'm not.
2     Q.   Was it the same data that was used for the
3   March 30th extraction, but with different data produced?
4     A.   I don't know.
5     Q.   Are you aware of what additional fields were
6   added or what fields were subtracted between the March
7   30th and the April 2nd production?
8     A.   No, I'm not.
9     Q.   Are you aware of whether there were more or
10   fewer cases in the TEAM database at the time of the
11   April 2nd production?
12     A.   Cases meaning?
13     Q.   Individuals in the database.
14     A.   I'm not specifically aware, no.
15     Q.   Okay.
16     A.   The TEAM database tends to grow over time.
17     Q.   Okay.  But it also sometimes shrinks, correct?
18     A.   Yes.
19     Q.   And for the April 2nd database, am I correct
20   full social security numbers were provided -- the April
21   2nd production, am I correct that full social security
22   numbers were provided to the Attorney General to the
23   extent that they existed within the database?
24     A.   I believe so, yes.
25     Q.   And did the April 2nd production include both

## 26

1   active and suspense voters, or were suspense voters
2   again eliminated from the production?
3     A.   I believe the suspense voters are included, but
4   cancelled voters were not.
5     Q.   Okay.  So what is a cancelled voter?
6     A.   I don't know.
7     Q.   Do you know what field indicates whether a
8   voter is cancelled?
9     A.   I'm not familiar with the specific fields.
10     Q.   Do you know what table contains data related to
11   cancelled voters?
12     A.   I'm not familiar with the database structure.
13     Q.   Do you know when voters become cancelled, what
14   event?
15     A.   I do not.
16     Q.   Are individuals who are dead and known to the
17   state to be dead contained within the TEAM database as
18   cancelled voters?
19         MR. BRISSENDEN:  At this time, I'm going
20   to assert an objection as to not being behind the scope
21   of Topic Number 11; that is, pertains to the process,
22   manner, and method of compiling, cleaning, and filtering
23   data from the TEAM database.
24         I believe previously, the State had
25   designated a witness to -- for a 30(b)(6) deposition,

## 27

1   and questions were asked about the TEAM database at the
2   deposition of -- I believe it was Ms. Martinez, Gloria
3   Martinez, and those questions were posed to her about
4   what was in the TEAM database.
5         MR. FREEMAN:  Mr. Brissenden, the witness
6   has indicated that records were removed from the
7   database prior to the production to the Attorney
8   General.  I am asking him what those records were.  And
9   the idea, the notion that my question is beyond the
10   scope is -- borders on absurd.  So I would ask you to
11   object only when it is warranted.
12         I will try to stay within the scope, but I
13   can certainly ask the witness what these records were
14   that are in the TEAM database, but are not produced to
15   the Attorney General.  The prior 30(b)(6) deposition
16   does not prejudice our ability to ask questions related
17   to this topic of this witness, and so I'll ask you to
18   withdraw your objection.
19         MR. BRISSENDEN:  And I'll maintain the
20   objection at this time.  The question, I believe, as
21   posed is not was or was not data or fields of data that
22   was included or not included.  Your question is
23   specifically as to what -- what is meant or not meant by
24   particular fields of data.  And I'm just stating for the
25   record that we have presented a witness on that topic

## 28

1   previously to address what is in the fields of data in
2   the TEAM database.
3         MR. FREEMAN:  Are you instructing the
4   witness not to answer or --
5         MR. BRISSENDEN:  I haven't instructed the
6   witness not to answer.  I am asserting my objection as
7   beyond the scope of this topic, Topic 11 of the 30(b)(6)
8   deposition that we're here to discuss today.
9         MR. FREEMAN:  Okay.  I'm sorry to ask you
10   to read the question back, but if we can scroll back, I
11   would appreciate it.
12         (Requested portion was read back by the
13   court reporter.)
14         MR. BRISSENDEN:  Same objection.
15     Q.   (By MR. FREEMAN)  You may answer to the extent
16   of your knowledge.
17     A.   I don't know.
18     Q.   Okay.  Are individuals who are eliminated from
19   the voter rolls, as part of a purge of duplicate voters
20   or voters who have moved, part of that group of voters
21   who are cancelled within the database?
22         MR. BRISSENDEN:  Objection, vague.  The
23   same objection as before; beyond the scope of the topic.
24     Q.   (By MR. FREEMAN)  You may answer to the extent
25   that you understand my question.

WALTER SCOTT BRANDT                                    June 19, 2012

## 29

1   A.  So, I'm not familiar with the election code or
2   the business rules that govern what happens to voters.
3   I'm familiar with the technical operation of the
4   database.  I don't know.
5   Q.  Okay.  That's fine.
6       Do you know how many cancelled voters were
7   eliminated from the database or taken out as part of the
8   process of producing the April 2nd data to the Attorney
9   General?
10  A.  I don't know.
11  Q.  What steps did you go through in order to
12  eliminate the nine digit social security number for data
13  produced to the defendant intervenors in this matter?
14  A.  I believe that my staff, as part of their --
15  their program, redacted the first five digits of the
16  social security number.
17  Q.  And so was the data produced to some central
18  new table and then -- or a new file and then redacted so
19  that the Attorney General and the Defendant Intervenors
20  received, sort of, the same extraction and then the
21  redaction occurred, or were these separate runs from the
22  main database?
23  A.  I don't know.
24      MR. BRISSENDEN:  Objection, vague and
25  compound.

## 30

1   Q.  (BY MR. FREEMAN) Okay.  Let's move forward to
2   the May 4th production to the Attorney General.  Are you
3   aware of the date of the data extraction for the May 4th
4   production to the Attorney General?
5   A.  I'm not.
6   Q.  Okay.  And are you aware of what fields were
7   contained in that production?
8   A.  Specifically fields, no, I'm not.
9   Q.  And are you aware of whether -- are you aware
10  of how many cases were contained in the TEAM database at
11  of the May 4th production?
12  A.  No, I'm not.
13  Q.  And were the cancelled voters again removed
14  prior to producing the data to the Attorney General for
15  the May 4th production?
16  A.  My understanding is that there were three sets
17  of data that were produced:  Voters, cancelled voters,
18  and county voting history.
19  Q.  So for the May 4th data, the cancelled voters
20  were produced?
21  A.  I believe so, yes.
22  Q.  Okay.  Is there a field that indicates a
23  positive or negative result for whether a voter is
24  cancelled?
25  A.  I don't know.  I believe there's a status field

## 31

1   that indicates the status of the voter, but I'm not
2   familiar with the specific fields.
3   Q.  And so there could be a different field that
4   indicates cancelled?
5   A.  I don't know.
6   Q.  And to your understanding of the fields and the
7   values that may be contained in those fields, suspense
8   is a distinct value from cancelled?
9       MR. BRISSENDEN:  Objection, vague and
10  beyond the scope.
11  Q.  (BY MR. FREEMAN) You may answer it.
12  A.  I believe so.
13  Q.  Okay.  Do you know if the cancelled voter field
14  is generated by a formula or manually entered or entered
15  in some other manner?
16  A.  I don't know.
17  Q.  Okay.  And so if the cancelled voters were
18  produced in the May 4th production, am I correct that
19  there were no cases dropped from the TEAM database in
20  that production?
21  A.  I don't know.
22  Q.  Are you aware of any other basis on which cases
23  was dropped from the TEAM database in the prior --
24  A.  No.
25  Q.  Pardon me, sir?

## 32

1   A.  No.
2   Q.  Okay.  And was the May 4th production conducted
3   by an algorithm from your staff?
4   A.  Yes.
5   Q.  Do you know who wrote that program?
6   A.  I believe it was John Mendoza.
7   Q.  And was there a production to the Defendant
8   Intervenors on May 8th or thereabouts?
9   A.  Yes, I believe so.
10  Q.  And was the data draw for the May 8th
11  production a separate draw from the May 4th production
12  to the Attorney General?
13  A.  I don't know.
14  Q.  What were the differences between the data
15  produced to the Intervenors on May 8th and the data
16  produced to the Attorney General on May 4th?
17  A.  I believe that it was the same, because I
18  believe that the first production to the Attorney
19  General in May mistakenly only included the four digit
20  SSN instead of the nine digit SSN.  We subsequently ran
21  a second production to the Attorney General in May that
22  included the full SSN.
23  Q.  So the May 4th data to the Attorney General and
24  the May 8th data to the Intervenors was identical, to
25  the extent of your knowledge?

## 33

1    A.   To the extent of my knowledge, yes.
2    Q.   And the May 9th production to the Attorney
3 General, was that a new data draw, vis-a-vis, the May
4 4th production?
5    A.   Yes, I believe so.
6    Q.   And were cancelled voters, again, included in
7 that production?
8    A.   Yes.
9    Q.   Do you know, just for the record, what fields
10 were contained in that production?
11   A.   I do not.
12   Q.   And do you know what tables those fields were
13 drawn from?
14   A.   No.
15   Q.   But they're all drawn from TEAM, right?
16   A.   Yes.
17   Q.   And all these productions are from TEAM,
18 correct?
19   A.   Yes.
20   Q.   Okay.  And the May 9th production, you're not
21 aware of any cases having been dropped from the
22 production?
23   A.   No.
24   Q.   And was the May 9th production the same
25 algorithm or program that produced the May 4th

## 34

1 production, except that it did not truncate the social
2 security numbers?
3    A.   I believe so.
4    Q.   Are you aware of any form of quality control
5 that was performed on the data to be produced to the
6 parties prior to producing it?
7    A.   Could you clarify quality control, what you
8 mean by that?
9    Q.   Well, this was a term -- I'll represent to you
10 that this was a term that was used by counsel for the
11 State repeatedly in terms of explaining the timeline for
12 production of data.
13   A.   Uh-huh.
14   Q.   And so my question is:  What types of checks or
15 any other procedures that might be identified as quality
16 control were performed on this data prior to production?
17   A.   Okay.  I believe that my staff wrote the
18 program algorithm that pulls the data from our database,
19 provides it to the Office of Attorney General.  I
20 believe they had two checks on the Intervenors' data;
21 one performed by their IT security department using a
22 commercial off-the-shelf program to look for unredacted
23 SSNs, and I believe they didn't find any.  Their second
24 check was performed by their legal technical services
25 staff, again, to look for unredacted SSNS.  I believe

## 35

1 they found two:  One in the voters' data and one in the
2 cancelled voters data.
3    Q.   Okay.
4    A.   And that quality control was done only to the
5 intervenor data.
6    Q.   Okay.
7    A.   To check to make sure that there weren't any
8 unredacted SSNS.
9    Q.   So there were no quality control procedures, to
10 the extent of your knowledge, performed on the Attorney
11 General's data?
12   A.   No.
13   Q.   Okay.  And are you aware of who within the
14 legal technical support section or division of the
15 Office of the Attorney General performed those checks?
16   A.   I believe it was a gentleman named Oscar.
17   Q.   Do you know Oscar's last name?
18   A.   I don't recall Oscar's last name.
19   Q.   That's all right.
20        Are you aware of any changes that were
21 made to the database that would explain a decrease in
22 the number of cases or voters contained in the database
23 between productions?
24   A.   No.
25   Q.   Are you aware of whether any purges were

## 36

1 performed --
2    A.   No.
3    Q.   -- between or --
4    A.   No.
5    Q.   Let me finish my question.
6    A.   Sorry.
7    Q.   Were you aware of whether any purges were
8 performed between productions or prior to any of these
9 productions?
10   A.   No.
11   Q.   Do you know that they were not or you're not
12 aware?
13   A.   I'm not aware.
14   Q.   Do staff from your department execute code to
15 run a check for a purge, or is that done with
16 preexisting code by folks on the business side?
17        MR. BRISSENDEN:  Objection, vague.
18   Q.   (By MR. FREEMAN) You can to the extent you
19 understand.
20   A.   Can you rephrase it?
21   Q.   Sure.  Happy to.  Always happy to.
22   A.   Thank you.
23   Q.   When a purge is performed on the voter
24 database, do you have to ask one of your staff to write
25 new code to do that, or is there existing code that

## 37

1 someone on the business side can run in order to search
2 for duplicates; people who have moved, people who've
3 died, et cetera?
4      A.  I believe that there is existing code within
5 the TEAM system that takes care of that business logic.
6      Q.  Okay.  And so a purge could be performed
7 without your knowledge; is that correct?
8      A.  Without my knowledge?
9      Q.  Yes.
10      A.  Yes.
11      Q.  Okay.  Just to close the loop:  Are you aware
12 of whether eliminating records, bringing down the number
13 of records is done at the state level or at the county
14 level?
15            MR. BRISSENDEN:  Objection, vague.
16      Q.  (By MR. FREEMAN) You can answer if you
17 understand.  If you don't --
18      A.  Can you rephrase?
19      Q.  Yes.  Of course.  Always.
20          Are you aware of when a purge is
21 performed, do you know if folks are doing that in the
22 Office of the Secretary of State in Austin, or do you
23 know if that's being done in each county that --
24            MR. BRISSENDEN:  Objection, vague.
25      A.  I don't.

## 38

1      Q.  (By MR. FREEMAN) You don't know.  Okay.
2          Are new records added to the TEAM database
3 on a daily basis or in batches of some form?
4      A.  Both.
5      Q.  Okay.  Can you explain the circumstances under
6 which they would be added on a daily basis?
7      A.  For the counties that use the online system for
8 TEAM, the web interface, they are capable of adding new
9 voters during their normal course of business.
10      Q.  Okay.  And are some counties not online?
11      A.  Some counties are what we call offline
12 counties.
13      Q.  Okay.
14      A.  They send us a file that we process nightly.
15      Q.  So those are coming in every day once a day?
16      A.  Yes.
17      Q.  And the other folks are coming in on,
18 essentially, a live basis?
19      A.  Yes.
20      Q.  Close to live?
21      A.  The offline counties, I am not sure if they
22 send us files on the weekends or not.  I don't know.
23      Q.  Nearly daily basis?
24      A.  Yes.
25      Q.  Okay.  Do you know if there are any nonroutine

## 39

1 or irregular changes, either additions or subtractions,
2 from the TEAM database between March 1st and the
3 present?
4            MR. BRISSENDEN:  Objection, vague and
5 compound.
6      A.  Could you rephrase that, please?
7      Q.  (By MR. FREEMAN) Sure.  Are you aware of
8 whether there were any irregular additions made to the
9 TEAM database since March 1st?
10            MR. BRISSENDEN:  Same objection.
11      A.  I'm not aware.
12      Q.  (By MR. FREEMAN) Are you aware of whether there
13 were any irregular subtractions or purges from the TEAM
14 database since March 1st, nonroutine?
15            MR. BRISSENDEN:  Objection, vague.
16      A.  I'm not aware.
17            MR. BRISSENDEN:  If I can just take a two-
18 minute break to caucus with my co-counsel, and then
19 we'll hopefully be done with this witness.
20          (Recess from 10:42 a.m. to 10:48 a.m.)
21            MR. FREEMAN:  Back on the record for more
22 follow-up questions before we wrap up.
23      Q.  (By MR. FREEMAN) What other databases do you
24 manage as the IT director for the Austin SOS?
25      A.  We have numerous databases.  They range from

## 40

1 Access databases, Microsoft Access -- hundreds of those
2 maintained by users, but we support them -- up to our
3 other major database, relative to the TEAM system, is
4 our business and public filings database.  We maintain
5 in excess of 60 million document images in that
6 database.
7      Q.  And is that related to licensing and
8 regulation?
9      A.  I don't know.
10      Q.  Just to clarify, did John Mendoza do the
11 programing for each of the productions?
12      A.  I believe so.
13      Q.  And can you think of any other reason, other
14 than we have discussed already today, why the varying
15 productions to the Attorney General and to the
16 Intervenors would have different numbers of records or
17 voters or cases, however you want to describe it?
18            MR. BRISSENDEN:  Objection, vague.
19      A.  Would you rephrase?
20      Q.  (By MR. FREEMAN) Sure.  Can you think of any
21 reason, other than what we've discussed today, why there
22 would be different numbers of total records in each of
23 the productions to the Office of the U.S. Attorney
24 General?
25      A.  I'm not familiar with the business rules

## 41

1  governing how the data is used or maintained, so I'd
2  have to say no, I wouldn't know that.
3      Q.  Okay.  So there were no changes in your
4  procedures that would excise additional records in any
5  way?
6      A.  Not that I'm aware of.
7      Q.  During the quality check procedure for the
8  Defendant Intervenors, when a nine digit social security
9  number was discovered, what procedure was subsequently
10  followed?
11      A.  I believe it was redacted.  I believe all nine
12  digits were redacted on the two occurrences that it was
13  discovered.
14      Q.  And no other changes were made?
15      A.  Not my knowledge, no.
16      Q.  Did any problems come up during the production
17  process that you got involved in?
18          MR. BRISSENDEN:  Objection, vague.
19      A.  Rephrase, please.
20      Q.  (By MR. FREEMAN) Sure.  While you were
21  developing the program needed to produce data to the
22  Department of Justice, did your programmers ever come to
23  you or to any of their supervisors with questions
24  concerning the method of production or the program or
25  anything else?

## 42

1          MR. BRISSENDEN:  Objection, vague.  You
2  may answer.
3          THE WITNESS:  I'm sorry?
4          MR. BRISSENDEN:  You may answer.
5      A.  Not that I'm aware of.
6      Q.  (By MR. FREEMAN) So you didn't provide any
7  direct input as to how the production would be
8  executed?
9      A.  No, other than the timeline.  I need it now.
10      Q.  Okay.  Was the guidance from the business side
11  transmitted orally or in writing?
12      A.  No.
13      Q.  So you never saw any written documents
14  explaining what was needed?
15      A.  No.  Let me go back just a second on that.
16      Q.  Sure.
17      A.  After the conference call we had, where we
18  discussed the different fields and trying to answer
19  those questions, there was a document that came over
20  requesting information, telling us what DOJ and the
21  Intervenors wanted to receive.  So that would have been
22  a document that identified information that we needed to
23  pull.
24      Q.  Okay.  So you saw a document from the U.S.
25  Department of Justice and the Defendant Intervenors, but

## 43

1  you never saw any documents from within the State of
2  Texas, originating from within the State of Texas?
3      A.  Correct.
4      Q.  Do you recall when that conference call
5  occurred?
6      A.  I don't recall.
7      Q.  And that conference call was with attorneys
8  from both sides, correct?
9      A.  Yes.
10      Q.  Okay.  Do you know who, besides John Mendoza,
11  received any of the guidance concerning what fields were
12  needed?
13      A.  I don't know.
14      Q.  And other than Mr. Mendoza and Mr. Guyette, do
15  you know anyone else who was involved in the process of
16  producing data from the TEAM database to the Department
17  of Justice on the technical side?
18      A.  Right.  On my staff, there's another gentleman
19  named Jalal, who may have been involved at one point
20  when Mr. Mendoza was out sick or indisposed.  He's
21  another programmer.
22      Q.  And what is Jalal's last name?
23      A.  I don't know.
24      Q.  Would you spell Jalal?
25      A.  I believe it's J-a-l-a-l.  He has a very long,

## 44

1  difficult-to-pronounce last name.
2      Q.  How many individuals do you supervise, roughly?
3      A.  I'm responsible for 26 full-time equivalent.
4      Q.  Okay.  Are there any answers that you wish to
5  change that you recall differently?
6      A.  No.
7      Q.  Anything you would like to add so that we can
8  understand your answers more clearly?
9      A.  No.
10      Q.  Okay.
11          MR. FREEMAN:  Well, thank you very much
12  for your testimony, sir.
13          THE WITNESS:  You're welcome.
14      (Signature reserved.)
15      (Deposition concluded at 10:55 a.m.)
16
17
18
19
20
21
22
23
24
25

## 1

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS        )
                      )
                      )
VS.                   )   NO. 12-CV-128
                      )   (DST, RMC, RLW)
                      )
ERIC H. HOLDER, JR.,  )
In his official       )
Capacity as Attorney  )
General of the United )
States                )

*******************************************
     ORAL DEPOSITION OF BLAINE BRUNSON
*******************************************

    ANSWERS AND DEPOSITION OF BLAINE BRUNSON, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 30th day of May, 2012, between the hours of 1:00
p.m. and 6:00 p.m., in the offices Dechert, LLP, 300
West 6th Street, Suite 2101, Austin, Texas, pursuant to
the agreement of counsel for the respective parties as
hereinafter set forth.
```

## 3

```
                     INDEX
                                  PAGE
Appearances...........................   2

BLAINE BRUNSON
  Examination by Ms. Maranzano ........   5
  Examination by Mr. Harris.  .........  151

Signature and Changes...................  187
Reporter's Certificate.  ...............  189
```

## 2

```
               A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    OFFICE OF THE ATTORNEY GENERAL:
    By: MR. MATTHEW FREDERICK
    - and -
    MS. STACEY NAPIER
    209 West 14th Street
    Austin, Texas 78701
    PH: (512) 936-6432

FOR THE DEFENDANT:
    DEPARTMENT OF JUSTICE
    By: MS. JENNIFER MARANZANO
    - and -
    MS. RISA BERKOWER
    - and -
    MS. MARIA H. RIOS
    950 Pennsylvania Avenue, NW
    Room 7161 NWB
    Washington, DC  20530
    PH: (202) 305-0185

FOR THE INTEVENORS:
    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
    By: MR. ADAM M. HARRIS
    One New York Plaza
    New York, NY  10004-1980
    Ph: (212) 859-8952
FOR THE INTEVENORS:
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    By: NANCY G. ABUDU
    230 Peachtree Street
    Atlanta, GA  30303-1227
    Ph: (404) 523-2721
```

## 4

```
                    EXHIBITS
NO.      DESCRIPTION               PAGE
DOJ EXHIBITS
111    Press Release              118
112    Fact Check                  83
114    Talking Points             138
115    Talking Points              75
119    Overview                    85
120    Standard Reviews           142
130    Notice of Deposition        11
131    Senate Rules                24
132    Texas Legislature Code      53
133    Senate Bill 14              59
134    Letter               90
135    Letter               96
136    Senate Rule               101
137    Fiscal Note               123
138    Email               140
139    Email               146

TLYV
1    Email                       173
```

Blaine Brunson
May 30, 2012

---

## 5

1        BLAINE BRUNSON,
2  having being first duly sworn, testified as follows:
3        EXAMINATION
4  BY MS. MARANZANO:
5    Q. Good afternoon?
6    A. Hello.
7    Q. My name is Jennifer Maranzano. I'm representing
8  the defendant, Attorney General Eric Holder, in this
9  matter. Can you please state your name for the record?
10    A. Blaine Brunson.
11    Q. And have you ever been known by any other names?
12    A. No.
13    Q. Have you ever been deposed before?
14    A. Yes.
15    Q. What was the name of that case?
16    A. I don't know the name of the case.
17    Q. What was the case matter about?
18    A. It was about a salary dispute at the Parks &
19  Wildlife department.
20    Q. Were you a party to that case?
21    A. No. I was just a witness, I guess.
22    Q. Okay.
23    A. Whatever the term is.
24    Q. I'm going to go over some ground rules today.
25    A. Okay.

---

## 6

1    Q. You're probably familiar with some of these since
2  you've been deposed before. But you've been placed
3  under oath so it's important to testify truthfully,
4  accurately and completely. The court reporter is
5  preparing a transcript of everything we say today so
6  please make verbal responses and not nods?
7    A. Sure.
8    Q. Great. It's also important that we try not to
9  talk over each other. So if you could wait until I
10  finish my question before you answer and I'll wait until
11  you answer before I ask my next question. If you need a
12  break, please let me and I will do my best to
13  accommodate you. If I have a question open I may ask
14  you to finish answering before we take a break?
15    A. Okay.
16    Q. From time to time your attorney my make an
17  objection. He's making these objections for the record
18  and you can go ahead and answer the question unless he
19  instructs you not to. If he advises you not to answer
20  based on privilege, I would ask that you state on the
21  record whether you're following his advice so we can
22  have a clean record.
23    A. Okay.
24    Q. Do you understand these instructions?
25    A. Yes.

---

## 7

1    Q. Do you have any questions?
2    A. No.
3    Q. Are you on any medication today that would impact
4  your ability to testify truthfully and accurately?
5    A. No.
6    Q. Is there any other reason why you cannot testify
7  truthfully and accurately today?
8    A. No.
9    Q. I may use some shorthand today. If I say "the
10  Lieutenant Governor," I'm referring to Lieutenant
11  Governor Dewhurst or anybody who's acting on his behalf.
12  Do you understand that?
13    A. Yes.
14    Q. I may use the terms voter ID and photo ID
15  interchangeably, I'd like you to interpret these terms
16  broadly to include a requirement that a voter present a
17  form of identification whether it has a photo or
18  otherwise in order to cast a regular ballot at the
19  polls. Do you understand that?
20    A. I think so.
21    Q. Okay. Do you have any questions about it?
22    A. No. When we get to it I'll ask if I don't
23  understand the term.
24    Q. Okay. Perfect. When I refer to the term
25  "minority voters," I mean voters who are non-white or

---

## 8

1  non-Anglo.
2    A. Okay.
3    Q. Any questions about anything I have said so far?
4    A. No.
5    Q. Are you represented by counsel today?
6    A. Yes.
7    Q. And who is that?
8    A. Matthew Frederick.
9    Q. And when did this representation begin?
10    A. I guess when I received my notice to be deposed.
11    Q. Other than the case that we've talked about
12  earlier, have you been involved in any other litigation?
13    A. No.
14    Q. And that was the only time that you've been
15  deposed in that matter?
16    A. Yes. Yes.
17    Q. Have you ever been involved in a case where the
18  State of Texas was a plaintiff or a defendant other than
19  this matter?
20    A. No. And depending -- I mean I've always worked
21  at the Capital for quite a while. And there's always
22  been lawsuits that we have to work on or around as far
23  as, you know, if -- if the law needs to change or
24  different things that need to be addressed. But not as
25  a personal party.

Blaine Brunson                                              May 30, 2012

---

## 17

1  working for the Lieutenant Governor besides budget
2  director and chief of staff?
3     A.  No.
4     Q.  Do you have any experience related to election
5  law?
6     A.  No.
7     Q.  Any experience related to election
8  administration?
9     A.  No.
10    Q.  What were your responsibilities as the Lieutenant
11 Governor's budget director?
12    A.  To work on the -- on the State's budget and keep
13 the Senate Finance Committee process moving smoothly in
14 order to have a -- a budget for the State at the end of
15 the legislative session.
16    Q.  Do you -- did you have any role with the
17 Legislative Budget Board?
18    A.  As far as while I worked for the Lieutenant
19 Governor?
20    Q.  Yes.
21    A.  Just as the liaison between our offices.  I mean,
22 I did previously work -- that's where I actually started
23 was at the Legislative Budget Board.  So...
24    Q.  Okay.
25    A.  And then in the budget director role, a lot of

## 18

1  coordinating has to happen between the Legislative
2  Budget Board and the Legislature.  So there's not a
3  formal title, but it's just part of the job.
4     Q.  Part of your job as budget director for
5  Lieutenant Governor?
6     A.  Yes, ma'am.
7     Q.  Okay.  Did you -- is part of that working with
8  the Legislative Budget Board to score legislation?
9     A.  Score?
10    Q.  I'm sorry.  To provide a fiscal note for the --
11 for the legislation -- for legislation?
12    A.  Did I do that?
13    Q.  Uh-huh.
14    A.  No.  The -- actually the Legislative Budget Board
15 does the costing out or scoring on their own.  I mean,
16 it's -- it's intended to be kind of an independent
17 process.  So that, you know, everyone can look at them
18 and say this is an objective fiscal note.
19    Q.  Okay.  Does the Lieutenant Governor have an
20 advisory role to the Legislative Budget Board?
21    A.  He's the Co-Chairman of the Board.
22    Q.  And how do you in sure the board stays
23 independent?
24    A.  Well, the -- as far as on the cost estimates?
25    Q.  Right.  I was -- I was referring to what I

## 19

1  thought you said that -- that the Legislative Budget
2  Board was designed to be sort of an independent body?
3     A.  As far as when a piece of legislation is filed,
4  you asked if I had a role in the scoring of the bills.
5  I did not, as the Lieutenant Governor's staff.  I look
6  at it -- it would be two separate staffs.  He is the
7  Co-Chairman of the Board.  But his Senate office -- the
8  Lieutenant Governor's office does not actively
9  participate or direct how they do fiscal notes.
10 Their -- they have an independent process that in order
11 for the members to have trust that they're not being
12 told what to do, the two staffs are kept separately.
13       And so my role is more as the liaison between --
14 mainly working on the budget, some on fiscal notes for
15 miscellaneous bills, but primarily on the budget.
16    Q.  Okay.  Did you -- when you say you worked some on
17 fiscal notes, would you review their fiscal notes?
18    A.  I would review them after they -- as they
19 published them.  We don't have a role of looking at them
20 and saying that looks good or does not look good.  We
21 review them.  As you pass a budget, you have to account
22 for whatever else is out there that costs money.  And so
23 I would review them from that standpoint, but not, you
24 know, not an editing role.
25    Q.  Okay.  Are the employees of the Legislative

## 20

1  Budget Board employees under Lieutenant Governor
2  Dewhurst?
3     A.  He's the Co-Chair of the Board.
4     Q.  Do they report to him?
5     A.  As for as organizational structure, yes.  But
6  there -- there is a staff executive director who is
7  the -- who the board delegates the duty of running the
8  office to.  So at the end of the day, he's at the top of
9  the organizational chart, but they don't have a
10 direct -- it's not a daily report to the Lieutenant
11 Governor.  And the Speaker is also a Co-Chair.  So they
12 balance, not only House and Senate, but intended balance
13 between Republican Democrat.  It's -- it's intended to
14 be an independent body.
15    Q.  As -- as the chief of staff to the Lieutenant
16 Governor, do you oversee those employees?
17    A.  No.
18    Q.  What -- what are your current responsibilities
19 for the Lieutenant Governor?
20    A.  Duties as assigned.  It's just making sure that
21 the trains run smoothly.  Anything that's, you know,
22 current issue that's a problem that needs to be dealt
23 with or, you know, personnel type issues.
24    Q.  How many staff does Lieutenant Governor have?
25    A.  It's probably 30, 35.

Blaine Brunson                                                    May 30, 2012

## 21

1   Q.  Are there some staff who -- is there a breakdown
2   of staff between executive functions and legislative
3   functions?
4   A.  No.  Because he's part of both branches.
5   Q.  Uh-huh.
6   A.  No, they're all one -- one group.
7   Q.  How many -- how many people in your office have
8   legislative responsibilities?
9   A.  Depending on how you define it, pretty much
10  everyone.
11  Q.  Does everyone report to you?
12  A.  I guess, most of the time.
13  Q.  How many people in your office have legislative
14  responsibilities dealing with election related bills?
15  A.  Probably two or three at the max.
16  Q.  And who are those people?
17  A.  During the -- are you talking about right now or
18  during the session?
19  Q.  About right now.
20  A.  Right now we've got a vacancy and the general
21  counsel would handle it or Julia Rathgeber of the Deputy
22  Chief of Staff.
23  Q.  And the general counsel, is that Frank Battle?
24  A.  Yes.
25  Q.  While you've served as chief of staff, can you

## 23

1   guess, '09 there was a provision put in the budget to
2   pay for, I believe it was for voter education.  But it
3   was -- my role was more -- they said, "We need to put
4   this in the budget."  And I said, "Okay."  And -- but it
5   wasn't -- I didn't get into the -- I didn't know the
6   details of voter identification.  Just the fact that
7   there was some amount of money, I believe it was $3
8   million -- $2 or $3 million that needed to be
9   appropriated to the Secretary of State for that.  But
10  beyond that, not much on the substance of the -- of
11  voter ID.
12  Q.  Okay.  Who do you report to?
13  A.  The Lieutenant Governor.
14  Q.  What -- what executive functions does Lieutenant
15  Governor have?
16  A.  Say that again.
17  Q.  What -- what are the Lieutenant Governor's
18  executive functions?
19  A.  The primary function is when the governor is out
20  of state he serves as the acting governor.  Beyond that
21  there's not a lot of executive function.
22  Q.  Does the Lieutenant Governor maintain separate
23  offices for an executive office and a legislative
24  office?
25  A.  No.  It's -- it's one single office.

## 22

1   tell me every person who worked on the voter
2   identification issue?
3   A.  Yeah.  I mean, I can try.  As far as from his
4   office?
5   Q.  Yes.
6   A.  I would say Bryan Hebert, Frank Battle and Julia
7   Rathgeber.
8   Q.  Anybody else?
9   A.  No -- no major rolls beyond that.  I mean --
10  Q.  Did you also work on the issue?
11  A.  From a high -- from a high level.  I mean, not
12  the details of it.  But as far as, you know, the
13  planning process, yes.
14  Q.  Uh-huh.  Did the Lieutenant Governor also work on
15  the issue?
16  A.  Yes.
17  Q.  Does -- does Julia Rathgeber -- or do Julia
18  Rathgeber, Frank Battle and Bryan Hebert -- did they --
19  did Bryan Hebert all report to you while they were
20  working on this issue?
21  A.  Yes.
22  Q.  Were you at all involved in the voter
23  identification issue while you were serving as budget
24  director?
25  A.  In a -- on a -- in an ancillary way.  In, I

## 24

1   Q.  What are the Lieutenant Governor's legislative
2   duties?
3   A.  To preside over the Senate and all that entails
4   as far as appointing committees and referring bills to
5   those committees.  And he has a signing duty on each
6   piece of legislation as it passes.  And as far as
7   legislative -- I guess it would still be legislative,
8   but like the Legislative Budget Board, those roles are
9   part of his, I guess, ex-officio duties from being
10  Lieutenant Governor, Legislative Council, Legislative
11  Budget Board, any of the legislative agencies.
12  Q.  Uh-huh.  Okay.
13      MS. MARANZANO:  Can we have this marked.
14      (Exhibit No. 131 was marked.)
15  BY MS. MARANZANO:
16  Q.  Mr. Brunson, I'm showing you what we're marking
17  as Deposition Exhibit 131.  If you can take a look at
18  this quickly.  I'm going to represent to you this is
19  actually an excerpt from the 2011 Senate rules.
20  A.  Okay.
21  Q.  Because the entire thing is somewhat voluminous.
22  If you can take a look at rule 13.01 for me which
23  describes the Lieutenant Governor's role in regards to
24  the Committee-of-the-Whole.
25  A.  Okay.

Blaine Brunson                                                    May 30, 2012

## 25

1    Q.  Do you see that?
2    A.  Yes.
3    Q.  Does Lieutenant Governor have a right to vote on
4  bills being considered by the Senate?
5    A.  If it's in the Committee-of-the-Whole or in the
6  Senate in general?
7    Q.  Well, let's start with the Senate in general?
8    A.  He can vote to break a tie.  And then in the
9  Committee-of-the-Whole I believe he has a vote -- a
10  right to vote just like any of the other members.
11    Q.  So in the Senate as a whole, is the only time
12  he's permitted to vote to break a tie?
13    A.  That's my understanding.
14    Q.  And in the Committee-of-the-Whole, he's allowed
15  to, pursuant to that rule, he has a right to debate and
16  vote on all questions?
17    A.  Yes, under 13.03.
18    Q.  Do you play any role in advising Lieutenant
19  Governor when to be involved in the debate and when to
20  vote on questions in the Committee-of-the-Whole?
21        MR. FREDERICK:  Objection; vague.  You can
22  answer.
23    A.  Can you --
24    Q.  Pursuant to rule 13.01, it says in the
25  Committee-of-the-Whole Lieutenant Governor has a right

## 26

1  to debate and vote on all questions, correct?
2    A.  No.  13 -- 13 -- yeah, 03.
3    Q.  13.03.  I apologize.
4    A.  No.  That's fine.
5    Q.  So -- so my question is about your role in
6  advising Lieutenant Governor, if you have a role in
7  advising Lieutenant Governor when to exercise this right
8  of debating or voting the Committee-of-the-Whole?
9    A.  It would be on a case-by-case basis.
10    Q.  Well, how do you determine when to play that
11  role?
12    A.  Well, if we were in the Committee-of-the-Whole
13  and he asked if he should debate or vote I would advise
14  him, yes.
15    Q.  How often does he ask you for advice on that?
16    A.  Not very often.  I mean...
17    Q.  How often does he participate and vote during the
18  Committee-of-the-Whole?
19    A.  He participates -- if there is a
20  Committee-of-the-Whole he'll participate in each one of
21  them and vote.  I believe -- and I'm not 100 percent
22  sure, but I believe like in this case -- I believe he
23  voted on the voter ID bill.
24    Q.  And are you referring to SB 14?
25    A.  Yes.

## 27

1    Q.  Did he ask for your advice on that vote?
2    A.  I don't recall.
3    Q.  In any given legislative session, about how many
4  times does the Senate go into the
5  Committee-of-the-Whole?
6    A.  Generically speaking, I would say maybe once a
7  session.  It depends on the issues that are being looked
8  at.
9    Q.  What sorts of issues would prompt it going to the
10  Committee-of-the-Whole?
11    A.  The bill we're talking -- the Senate bill 14 did.
12  And I -- I believe in the past the school finance bills.
13  Any -- any legislation that there was a majority of the
14  members that wanted to have the testimony in front of
15  everyone so everyone could hear the same thing at the
16  same time.
17    Q.  And is it the Lieutenant Governor's decision to
18  resolve to the Committee-of-the-Whole?
19    A.  I believe so.
20    Q.  Well, let's -- let's look at rule 7.06.  Do you
21  see that?
22    A.  Yeah.
23    Q.  And Section A says, "The president shall refer
24  each bill to the proper committee or standing
25  sub-committee and shall cause such referral to be

## 28

1  announced when the bill is first read"?
2    A.  Yes.
3    Q.  So would that include -- and "the president," is
4  that referring to Lieutenant Governor?
5    A.  Yes.
6    Q.  And would that include, when it talks about
7  referring a bill to the proper Committee, the
8  Committee-of-the-Whole?
9    A.  I believe so.
10    Q.  And so the Lieutenant Governor -- just to ask you
11  the question again, does the Lieutenant Governor make
12  decision to refer bills to the Committee-of-the-Whole?
13    A.  Yes.
14    Q.  And do you play a role in advising him on that
15  decision?
16    A.  Yes.
17    Q.  How do you decide whether to refer a bill to the
18  Committee-of-the-Whole?
19        MR. FREDERICK:  Object on the basis of
20  legislative privilege.  I would instruct you not to
21  answer that question on that ground.
22  BY MS. MARANZANO:
23    Q.  Are you following your counsel's instruction?
24    A.  Yes.
25    Q.  Do chairs of committees make request to have

Blaine Brunson                                          May 30, 2012

---

**29**

1  bills heard in their committee?
2      A.  Yes.
3      Q.  Frequently?
4      A.  Yes.
5      Q.  Is the assignment of a bill to a committee
6  connected at all to who is the chair?
7      A.  No.  It's more -- it's more connected to the
8  subject matter of the committee.
9      Q.  It's more connected to the subject matter of the
10  committee.  Is there anything else that would inform
11  your decision of where to refer a bill?
12      MR. FREDERICK:  Let me just object on
13  legislative privilege to the extent that this question
14  asks you to reveal your own thought process or mental
15  impressions about a specific bill or Lieutenant
16  Governor's thought process or mental impressions or any
17  communications with another legislator or staff, I would
18  instruct you not to answer.  However, to the extent you
19  can answer without revealing that kind of information,
20  you may answer the question.
21      A.  Can you repeat the question?
22      Q.  BY MS. MARANZANO:  Can you read it back?
23      (Requested question was read.)
24      A.  I -- I don't believe I can answer without
25  revealing legislative privilege.

---

**30**

1      Q.  Okay.  And just to be clear, I'm asking you right
2  now just about sort of a general procedural matter, not
3  about any particular bill.  Does that change your answer
4  at all or change your ability to answer?
5      A.  I don't think so.
6      Q.  Okay.  Can you also take a look at rule 11.01 for
7  me?  Actually, before we do that, can I just ask you --
8  let's go back to the assignment of bills.  Does the
9  Lieutenant Governor personally make that decision of
10  where to refer a bill?
11      A.  Yes.
12      Q.  And does Lieutenant Governor also personally make
13  the decision of when to resolve into the
14  Committee-of-the-Whole?
15      A.  Yes.
16      Q.  Okay.  Can you look at 11.01?  Does Lieutenant
17  Governor also make Committee appointments pursuant to
18  rule 11.01?
19      A.  Yes.
20      Q.  And do you have a role in this duty of Lieutenant
21  Governor's?
22      A.  Yes.
23      Q.  What's your role?
24      A.  My role is to help him decide which members best
25  fit which committee.

---

**31**

1      Q.  And how do you do that?
2      MR. FREDERICK:  I'll object -- I'll object
3  on the grounds of privilege and just caution the witness
4  that to the extent this is asking generally about what
5  factors go into a decision, that that's -- you may
6  answer.  I would caution you not to reveal any specific
7  thought process or decision about a particular bill.
8      A.  The -- it generally matches different member's
9  experience, subject matter, expertise and member's
10  request different committee assignments.
11      Q.  When are committee assignments made in a
12  legislative session?
13      A.  It depends.  Sometimes it -- it depends on how
14  much turn over there has been.  If there's new members,
15  they'll do some reassignments.  And I believe for -- for
16  example, last session I believe we did the committee
17  assignments before session so that the committees would
18  be in place for the session.
19      Q.  Do you ever or does it ever happen that bills are
20  considered before committee assignments are made?
21      A.  No, because they wouldn't have anywhere to go.
22      Q.  Even if they went to the Committee-of-the-Whole?
23      A.  Well, you would have to form the
24  Committee-of-the-Whole to do it.
25      Q.  So you have never seen that happen?

---

**32**

1      A.  Not to my knowledge.
2      Q.  In terms of the final decision about committee
3  appointments who makes that decision?
4      A.  The Lieutenant Governor.
5      Q.  Can you look at rule 12.01 for me?  Does
6  Lieutenant Governor also play a role in appointing
7  conferees for conference committees?
8      A.  Yes.
9      Q.  And -- I'm sorry.  His role is to make the
10  appointment, correct?
11      A.  Yes.
12      Q.  And do you play a role in that?
13      A.  Yes.
14      Q.  What's your role?
15      A.  My role is -- is the members will request who
16  they would like to have on the conference committee.
17  And again, in this specific piece, my role is more
18  50,000 feet.  I don't deal with every conference
19  committee.  But the members will request the people that
20  they would like to have on it, turn it into the
21  Lieutenant Governor.  We just make sure that he has the
22  request and then makes the appointment.
23      Q.  What criteria does he use to make that
24  appointment?
25      A.  Generally he takes the recommendation of the

Blaine Brunson                                                      May 30, 2012

## 33

1   pertinent -- I guess the bill sponsor or the chairman
2   who sends the -- the request in.
3       Q.  And I believe you said that you don't get
4   involved in every conference committee?
5       A.  Right.
6       Q.  Appointment?
7       A.  Right.  I would -- I guess technically they would
8   come through my -- across my desk.  But because there's
9   so many of them I don't look at every one.
10      Q.  Are there some that you have been involved in?
11      A.  Yes.
12      Q.  Which ones?
13      A.  Probably too many to recall.  But if there's
14  any -- like on the budget, if there's -- it's always a
15  very coveted position.  So you'll have, you know, ten
16  members ask for only five spots.  So if there's issues
17  like that, that's when I would work.
18      Q.  Were you involved in appointing conferees for SB
19  14?
20      A.  I would have had to have been.  I don't recall
21  the specifics of who it was and how it came to pass, but
22  I would say that, yes.
23      Q.  Can you tell me what you meant when you said it's
24  a "coveted spot" on the Committee?
25      A.  People want it.

## 34

1       Q.  Why is that?
2       A.  Because it's a good role to have if you're
3   working on the budget to be one of the conferees.
4       Q.  And beyond the budget is it also coveted?
5           MR. FREDERICK:  Objection; vague.  You can
6   answer.
7       A.  It depends on the bill.
8       Q.  BY MS. MARANZANO:  Do the conferees have a
9   significant role in shaping the final -- the final
10  legislation?
11      A.  Usually, yes.
12      Q.  Do you recall how many people -- you said you
13  were involved in the appointment of conferees for SB 14?
14      A.  Yes.
15      Q.  How many members asked to be on that conference
16  committee?
17      A.  I don't remember.
18      Q.  Is your role -- when you're involved in this
19  decision of who's going to be on the conference
20  committee, is your role, in part, to make a
21  recommendation to the Lieutenant Governor?
22      A.  If he asks, yes.
23      Q.  Does he usually ask?
24      A.  Yes.
25      Q.  And then does he make the final decision?

## 35

1       A.  Yes.
2       Q.  Can you look at rule 1.01 and also 5.15?  In
3   terms of rule 5.15, can you tell me about -- does
4   Lieutenant Governor also rule on questions of order?
5       A.  Yes.
6       Q.  How does Lieutenant Governor do that, what's the
7   process he use -- uses to make those rules?
8       A.  While the Senate is in session?
9       Q.  Yes.  While the Senate is in session?
10      A.  He does it from the podium, from the chair.  And
11  if there's a -- I guess if someone is out of order,
12  he'll just gavel the Senate needs to be in order.
13      Q.  Are there also questions of order that he rules
14  on?
15      A.  I'm not sure I understand.
16      Q.  Because rule 5.15 refers to every question of
17  order.  Is it -- is that connected to a point of order
18  or is that a different issue?
19      A.  I believe it's -- I believe it's point of order.
20  I believe it is point of orders.
21      Q.  Do you know how the Lieutenant Governor
22  determines rulings on points of order?
23      A.  He's advised by the parliamentarian.
24      Q.  Do you play any role in that -- in those rulings
25  that he makes?

## 36

1       A.  No.
2       Q.  Is anybody on the Lieutenant Governor staff
3   available to him as a resource when those questions of
4   order arise?
5       A.  The general counsel -- it's primarily the
6   parliamentarian.  It's almost exclusively the
7   parliamentarian.
8       Q.  Is the parliamentarian an employee of the
9   Lieutenant Governor?
10      A.  I think -- I think technically, yes.  But the
11  parliamentarian works for both the Lieutenant
12  Governor -- it's a weird balance between the Senate body
13  and the Lieutenant Governor, but I could be wrong on
14  this.  But I believe the -- I believe that the
15  parliamentarian is technically an employee of the
16  Lieutenant Governor.
17      Q.  Who is the current parliamentarian?
18      A.  Karina Davis.
19      Q.  And was she there during the consideration of SB
20  14 as well?
21      A.  Yes.
22      Q.  In rule 5.15, do you see it makes reference to
23  rules being appealed?
24      A.  Yes.
25      Q.  How often does that happen?

Blaine Brunson                                         May 30, 2012

---

### 37

1    A.  Not -- not very often.

2    Q.  In any given legislative session would you say --

3  what would be an approximation for how many times that

4  might happen?

5    A.  I've probably seen it once or twice in four or

6  five sessions?

7    Q.  Can you look now at rule 1.01 where it talks

8  about -- let me get there.  Does that refer to the

9  Lieutenant Governor's duty or ability to appoint a

10  member to perform duties of the chair?

11    A.  Yes.

12    Q.  So he has that duty as well?

13    A.  Yes.

14    Q.  How does Lieutenant Governor decide who to

15  appoint as the chair?

16    A.  Are you -- and you mean a temporary chair?

17    Q.  That's right.  That's -- that's his duties -- or

18  his right, correct, under rule 1.01?

19    A.  Right.

20    Q.  I'm looking at a sentence that's a couple in in

21  that rule.  It says the president shall have the right

22  to name a member to perform the duties of the chair.

23    A.  Right.

24    Q.  Are you familiar with that rule for the

25  Lieutenant Governor?

---

### 38

1    A.  Not -- not very.  If it's referring to just a

2  temporary appointment, during the course of a long day

3  he'll periodically have a member of the Senate come up

4  an preside over the Senate.

5    Q.  I see.  So if he -- if he's presiding over the

6  Senate and he wants to take a break, he might have

7  somebody sit in as chair?

8    A.  Yes.

9    Q.  Does he ever appoint somebody to be chair for and

10  entire debate on an issue?

11      MR. FREDERICK:  Objection; vague.  But you

12  can answer.

13    A.  Do you -- do you mean while the Senate is in

14  session?

15    Q.  BY MS. MARANZANO:  I'm referring to -- I'm

16  referring to rule 1.01 which I believe is referring to

17  while the Senate is in session, not the

18  Committee-of-the-Whole; is that correct?

19    A.  Yes.  I believe so.

20    Q.  So for -- for rule 1.01 which allows him to name

21  members to temporarily be the chair, would he ever

22  appoint somebody to be the chair for consideration of a

23  piece of legislation?

24    A.  He could.  He could.

25    Q.  Have you seen that happen?

---

### 39

1    A.  Well, while members are presiding entire bills

2  pass.  So, yes.  If a member is up there and presides

3  over three or four bills, they would preside over the

4  entire debate or process of each one of those bills.

5    Q.  While SB 14 was being considered by the Senate,

6  not by the Committee-of-the-Whole, but by the Senate,

7  did Lieutenant Governor preside over that?

8    A.  I don't recall.  I would -- I believe yes, but I

9  don't recall.

10    Q.  Can you turn to rule 7.23 which is about signing

11  of bills.  I believe you actually mentioned this

12  earlier.  Is that -- is that a discretionary rule for

13  the Lieutenant Governor to sign -- the rule says, "the

14  president of the Senate or presiding officer shall in

15  the presence of the Senate sign all bills and joint

16  resolutions passed by the Legislature."  Is that -- is

17  that a discretionary role of his or is that mandatory

18  role?

19    A.  I'm looking at -- I'm not a rules expert, but

20  looking at the bottom of rule 7.23, I think that

21  constitutional reference, I believe the constitution

22  requires that each bill be publicly read and the fact of

23  signing entered into the journal.

24    Q.  Is it somewhat of a ceremonial duty?

25    A.  I think it's constitutional.

---

### 40

1    Q.  Okay.  Do you -- do you work on -- well, strike

2  that.  Does the Lieutenant Governor create a legislative

3  agenda at the beginning of a legislative session?

4    A.  Yes.

5    Q.  Do you work on that?

6    A.  As far as compiling the agenda?

7    Q.  Well, in any way.

8    A.  Yes.

9    Q.  And what's your role?

10    A.  The role of compiling an agenda would be working

11  with the Lieutenant Governor to determine what issues

12  need to be addressed during the session and making sure

13  that those issues -- that, you know, the process is

14  moving on each one of the issues on the list.  Like

15  every session the budget has to pass, so it's obviously,

16  you know, for any Lieutenant Governor would be a

17  priority agenda item and then any other items that would

18  need to be addressed, yes.

19    Q.  How many priorities does Lieutenant Governor

20  usually have in any given legislative session?

21    A.  Well, every session is different.

22    Q.  How many did he have in the 2011 legislative

23  session?

24    A.  I don't -- I don't know.  I mean --

25    Q.  Did you work on a agenda -- a legislative agenda

## 41

1   for 2011?
2        A. There was definitely a discussion of what items
3   needed to be passed.
4        Q. Was a voter ID bill on his legislative
5   priority -- among his legislative priorities?
6        A. Yes.
7        Q. Did you work on a legislative agenda for the 2009
8   legislative session?
9        A. No.
10        Q. Are you aware if a voter ID bill was on his list
11   of legislative priorities for that legislative session?
12        A. I'm not aware.
13        Q. Do you assist with developing legislation?
14        A. No, not really.
15        Q. Not at all?
16        A. Depends on what you mean by developing. I don't
17   write legislation. I think the more specific staff
18   would work on developing legislation.
19        Q. Do you have any role in insuring that the
20   legislation that's created is -- fits with the
21   Lieutenant Governor's goal?
22        A. Yes.
23        Q. So do you oversee this process of a piece of
24   legislation getting drafted?
25        A. No.

## 42

1        Q. No. How do you ensure that the legislation
2   that's created meets the Lieutenant Governor's goals?
3        A. Usually the staff that works on it will brief him
4   on it and ask him if it meets his expectations.
5        Q. And are you usually in on those meetings?
6        A. If I can be, yes.
7        Q. Do you interact with the Texas Legislative
8   Council at all?
9        A. Some, but not a whole lot. It's more of -- the
10   relationship is more directly between the analyst --
11   policy analyst and the drafter.
12        Q. And are the policy analyst the people who are
13   working on the -- the policy analyst works for the
14   Lieutenant Governor, correct?
15        A. Yes.
16        Q. And the policy analysts are the people in the
17   Lieutenant Governor's office who would be involved in
18   the drafting of a bill?
19        A. They would do the instructions. The attorneys at
20   the legislative counsel would do the actual drafting.
21        Q. And how involved is the Lieutenant Governor
22   himself in that process?
23        A. Not very much.
24        Q. Not very much in the process of the drafting of
25   the bill?

## 43

1        A. Yeah. I would say not at all.
2        Q. And then do the policy analyst -- the policy
3   analyst would then meet with him to talk about the
4   drafts of the legislation that they are working on. Is
5   that what you testified to?
6        A. Yes.
7        Q. Okay. Do you play any role in deciding which
8   members of the Legislature will carry a bill?
9        A. No.
10        Q. If the Lieutenant Governor -- if the Lieutenant
11   Governor's policy analyst are working on a piece of
12   legislation, is it correct that the Lieutenant Governor
13   himself cannot introduce that legislation?
14        A. That's correct.
15        Q. So how do you -- how does the office ensure that
16   that legislation will actually get introduced?
17        A. Normally a member brings the legislation forward
18   and -- it would -- you kind of move the process a little
19   bit backwards. Because our policy analyst would
20   normally not go out and do all of the drafting or
21   working on a bill without a legislator involved just
22   because the point that you mentioned, Lieutenant
23   Governor can't introduce legislation. So normally a
24   member would have a legislative idea and then they would
25   request a bill to be filed and then -- so our policy

## 44

1   analyst simply tract an follow members bills that have
2   been filed. So our staff generally does not -- it's
3   more the members and their staff's role to do the
4   requesting of drafts and the changes.
5        Q. Does the Governor ever request legislation to be
6   introduced?
7        A. The Governor -- the main way the Governor would
8   request it is through emergency call which he does at
9   the beginning of each session -- I guess he does it
10   every session. He has the right to do it every session.
11        Q. How often do you communicate with the Lieutenant
12   Governor?
13        A. During a session or outside of session?
14        Q. Let's start with during a session.
15        A. Very -- very routinely. I mean, our offices are
16   pretty close to each other. And then when we're out of
17   session less frequently. If he's travelling we talk on
18   the phone. But -- but during session it's, you know,
19   it's like any job. Your co-worker is right next door.
20   It just happens to be the Lieutenant Governor.
21        Q. So during a session you would interact with him
22   daily?
23        A. Yes.
24        Q. And not during legislative session how often do
25   you interact with him?

Blaine Brunson                                                    May 30, 2012

## 49

1       (Ms. Maria H. Rios joins deposition.)
2       Q. (By Ms. Maranzano)  Prior to submitting a piece
3   of legislation for preclearance, are there any steps
4   that are taken by the Legislature to increase the chance
5   that that law will be precleared by the Department of
6   Justice?
7       A. I don't know the answer to that.
8       Q. Who would know the answer to that?
9       A. One of our attorneys.
10      Q. Do you know if the Lieutenant Governor takes any
11  steps to ensure a piece of legislative -- to increase
12  the chances that a piece of legislation will be
13  precleared?
14      A. I don't know the answer to that, either.
15      Q. And who would know that answer?
16      A. Our attorneys.
17      Q. Does the Lieutenant Governor receive any legal
18  advice about an election related change and whether or
19  not it meets the requirements of Section 5?
20      A. I would -- I believe he would receive legal
21  advice on any bill, whether Section 5 or any other State
22  or federal law, he would obviously want to know if there
23  was some conflict.  So the answer is, I guess, yes.
24      Q. He would receive legal advice from your general
25  counsel or someone else?

## 50

1       A. Either general counsel or if there's a staff
2   attorney working on a piece of legislation.
3       Q. And part of that advice is whether that statute
4   complies with federal laws?
5       A. Federal, yes.
6       Q. Are you aware of any communications involving the
7   Lieutenant Governor's office regarding Section 5 and
8   voter ID?
9       A. No.
10      Q. Are you aware of any communications involving the
11  Lieutenant Governor's office involving Section 5 and
12  Senate bill 14?
13      A. No.
14      Q. Are you familiar with a group called the American
15  legislative exchange counsel or ALEC?
16      A. Yes.
17      Q. What's that group?
18      A. It's a national group that does conferences and
19  works -- I believe they have model legislation for
20  different issues.
21      Q. Do you have any affiliation with that group?
22      A. I've been to -- I believe I've been to one of
23  their meetings.  But I don't have like a membership or
24  any role with them.
25      Q. But the meeting you attended, was voter ID

## 51

1   discussed at all?
2       A. I don't believe so.
3       Q. Does Mr. Dewhurst have any affiliation with ALEC?
4       A. No.
5       Q. Have you ever received any documents from ALEC
6   related to voter ID?
7       A. Not that I'm aware of.
8       Q. Are you familiar with a group called the National
9   Council of State Legislatures -- I'm sorry.  The
10  National Conference of State Legislators?
11      A. Yes.
12      Q. Have you ever been to any of their meetings?
13      A. Yes.
14      Q. Was voter ID discussed at any of the meetings
15  that you attended?
16      A. Not that I recall.
17      Q. Have you ever received any materials from them
18  about voter ID?
19      A. Not that I recall.
20      Q. And in relation to ALEC, have you ever received
21  any materials from ALEC related to voter ID?
22      A. No.
23      Q. Has Mr. Dewhurst ever been to any meetings held
24  by the National Conference of State Legislators?
25      A. He helped host the meeting last summer in

## 52

1   San Antonio.
2       Q. Were you also at that meeting?
3       A. Yes.
4       Q. Are you familiar with the group called the
5   Federation For American Immigration Reform?
6       A. No.
7       Q. So I assume you have never been to any of their
8   meetings?
9       A. Not that I'm aware of.
10      Q. Are there any other group whose meetings you've
11  attended where voter ID has been discussed?
12      A. Not that I can think of.
13      Q. Any groups that have provided you with written
14  materials on voter ID?
15      A. Not that I can think of.
16      Q. What's Texas's current system for determining the
17  identity of a voter at the polls?
18      A. My -- what I -- my personal understanding is you
19  can either have your voter card that's issued by the
20  Secretary of the State or I just use my driver's license
21  when I vote because I can never find my voter card.
22      Q. Do you know what forms of identification are
23  acceptable if a person doesn't have their voter
24  registration card with them?
25      A. The only one I know of is the driver's license.

Blaine Brunson                                                      May 30, 2012

## 53

1          MS. MARANZANO:  Can you mark this?
2          (Exhibit No. 132 was marked.)
3     BY MS. MARANZANO:
4          Q.  I'm showing you what we're marking as Deposition
5     Exhibit 132.  I'm going to represent to you that this is
6     a copy of the current Texas legislative code.  Do you
7     see that there's a list of identifications that -- do
8     you see that list of identifications?
9          A.  Yes.
10         Q.  Does that refresh your recollection at all as to
11    what forms of identification are acceptable under
12    current State statute?
13         A.  Yes.
14         Q.  And are there more than just a driver's license
15    listed there?
16         A.  Yes.
17         Q.  Are you aware of any problems that have existed
18    under the system?
19         MR. FREDERICK:  Objection; vague.  You can
20    answer.
21         A.  I haven't spent enough time working on the issue.
22    So the answer is no.
23         Q.  BY MS. MARANZANO:  Has this system failed to
24    prevent in person voter fraud?
25         A.  I don't have any way of knowing that.

## 54

1          Q.  Do you know of any voter fraud, in person voter
2     fraud that has occurred under this system?
3          A.  I don't.
4          Q.  Have you ever witnessed any voter fraud occurring
5     when you've gone to vote yourself?
6          A.  Who knows?  Not that I know of.
7          Q.  Are there any other problems that you're aware of
8     under the current system?
9          MR. FREDERICK:  Objection; vague.  You can
10    answer.
11         A.  No.
12         Q.  When did you first hear support for enacting a
13    photo identification requirement for voting Texas?
14         A.  I knew that they worked on the legislation in
15    '09.  I didn't follow it very closely.  And so '09,
16    2009.
17         Q.  And do you hear about this -- what were the
18    circumstances under which you heard about the voter ID?
19         A.  It was the budget provision that I told you about
20    earlier when they were working on the bill we put money
21    in the budget to do voter education.
22         Q.  What were the basis' for support for voter ID
23    when you first learned about it?
24         A.  I don't know.
25         Q.  So I believe you've testified, but I just want to

## 55

1     be clear that in 2005 you did not have any involvement
2     in any efforts to pass a photo identification law?
3          A.  Yes.  That's right.
4          Q.  And in 2007 you did not have any involvement in
5     efforts to pass a voter photo identification law?
6          A.  That's right.
7          Q.  Are you familiar with the Lieutenant Governor's
8     involvement in efforts to pass a photo voter
9     identification law in 2005?
10         A.  No.
11         Q.  Are you familiar with the Lieutenant Governor's
12    involvement in attempts to pass a photo voter
13    identification law in 2007?
14         A.  No.
15         Q.  Not at all?
16         A.  Not at all.
17         Q.  How are you doing?  Do you want to take a
18    5-minute break?
19         A.  I'm good.
20         Q.  You're good?  Okay.
21         THE WITNESS:  Unless you think I need one.
22         MR. FREDERICK:  No.  You're good.
23    BY MS. MARANZANO:
24         Q.  So in 2009 I believe you've testified that there
25    was a provision in the voter identification -- in a

## 56

1     voter identification bill that required certain amount
2     of funding for voter education?
3          A.  Yes.
4          Q.  Do you know if that bill was Senate bill 362?
5          A.  I don't know.
6          Q.  Would it refresh your recollection to look at the
7     bill?
8          A.  No.  It's whatever bill passed out of the Senate
9     in 2009 on the voter ID.
10         Q.  Do you know what happened to that bill?
11         A.  I believe it died in the House.
12         Q.  And at that time you were working as the budget
13    director in '09?
14         A.  Yes.
15         Q.  And in relation to this funding that was -- that
16    was requested for voter education, was that a part of
17    the language of the bill?
18         A.  I don't know.  I believe it was part of the -- I
19    believe it was the fiscal note.
20         Q.  And did you work at all on coming up with the
21    amount of money that would be required for that voter
22    education program?
23         A.  No.
24         Q.  So can you tell me everything that you did in
25    regard to the 2009 voter identification bill?

Blaine Brunson                                          May 30, 2012

## 61

1  been listed on the State of Texas interrogatory's
2  responses as somebody who was involved in the
3  development of Senate bill 14.  Can you tell me each way
4  that you were involved in the development of this piece
5  of legislation?
6      MR. FREDERICK:  I'll object only to the
7  extent that it may not represent the entire statement of
8  his involvement.  I don't disagree necessarily.  But I
9  want the record to reflect that we're not actually
10 looking at the response.
11     MS. MARANZANO:  Okay.
12     THE WITNESS:  But I have no specific reason
13 to disagree that that's what I says.
14     MS. MARANZANO:  Okay.
15     A.  So the question is.
16     Q.  BY MS. MARANZANO:  Can you list for me each and
17 every way that you were involved in the development of
18 Senate bill 14?
19     A.  I guess if you look at it at several different
20 levels of development.  Well, the policy analyst was
21 doing the actual -- the person that worked on this I
22 believe had worked on it the prior session where they
23 had had, you know, 24 hours or something of public
24 testimony.  And I assume multiple drafts.  So the person
25 that was working on it was intimately familiar with the

## 62

1  policy and what was going on and was a very good
2  independent staffer.  So I didn't have a whole lot of
3  reason to learn the details of the bill.  And when you
4  think about the levels, I was more just making sure that
5  the pieces of legislation that needed to move forward
6  moved forward, not necessarily the details.
7      Q.  Who was the policy analyst who worked on Senate
8  bill?
9      A.  Brian Hebert.
10     Q.  And did he report to you?
11     A.  Yes.  He reported directly to Julia and then
12 especially on this issue since she had worked on it in
13 2009 as well.
14     Q.  Do you have any knowledge of, I believe you
15 said -- well, do you have any knowledge of the sources
16 of the development of SB 14, the sources of the language
17 of SB 14?
18     A.  I don't.
19     Q.  Other than Brian Hebert and Julia Rathgeber, are
20 there other individuals in your office who worked on the
21 development of Senate bill 14?
22     A.  The only one that would have had any role would
23 be Frank Battle, our general counsel.  But I think he
24 primarily relied on Brian Hebert, as well.
25     Q.  Did you have any communications about the

## 63

1  development or drafting of Senate bill 14?
2      A.  I'm sure just in the general course of the bill
3  moving through the legislative process, yes.
4      Q.  Do you recall any specific communications?
5      A.  No, not any specific.  I mean Brian was -- Brian
6  would try to keep us updated of what was going on.  But
7  we kind of let him work on the details.
8      Q.  Did you have any communication with legislatures
9  about the development of SB 14?
10     A.  Yes.
11     Q.  With who?
12     A.  Senator Fraser, the bill sponsor or author.  I
13 think he's the author.  And maybe other ones, but not
14 that I recall specifically.
15     Q.  Did you have communications with legislative
16 staff about the development of Senate bill 14?
17     A.  I'm sure I did.  But I don't -- I mean, I don't
18 recall specific instance.
19     Q.  Did you have communications with the Governor's
20 office about the development of Senate bill 14?
21     A.  Maybe at a very high level of -- if you put it on
22 the emergency call and were working on it.
23     Q.  What do you mean by at a "very high level."
24     A.  Not any details.
25     Q.  Got it.  Who would that communication have been

## 64

1  with?
2      A.  Probably the Governor's chief of staff.
3      Q.  And who is that person?
4      A.  Ray -- it was Ray Sullivan.
5      Q.  Did you have communications with any local
6  elected officials about the development of Senate bill
7  14?
8      A.  I don't think so, no.
9      Q.  Did you have communications with any constituents
10 about Senate bill -- the development of Senate bill 14?
11     A.  No, not me personally.
12     Q.  Did the Governor's office contact your office to
13 ask for updates on the progress of Senate bill 14?
14     A.  I'm sure they -- I don't know.  Specifically I
15 don't -- I would say probably yes, as they do with any
16 other things.  But most of it happens in public and once
17 they put it on the call we worked on it.  If they called
18 and asked what was going on, we normally would tell
19 them.
20     Q.  Did anyone from Lieutenant Governor's office
21 request that Senate bill 14 be put on the emergency
22 call?
23     A.  We might have said this is an issue that was in
24 '09 and we need to work on it.  I don't think there was
25 any official request.

## 65

1    Q. And who would that conversation have taken place
2    with?
3    A. Probably -- it would have been me.
4    Q. It would have been you.  And it would have been
5    Mr. Sullivan or somebody else from the Governor's
6    office?
7    A. Ray, yeah, Ray Sullivan.
8    Q. It would have been you, but do you --
9    A. I don't recall a specific conversation.  But I
10   would have -- I would have said this is an -- this is an
11   issue that we know is going to have to be worked on in
12   the 2011 session and I would have -- I would have asked
13   him to put it on there.
14   Q. And what -- what would be the reasons for putting
15   it on the emergency call?
16       MR. FREDERICK:  I'm going to object on the
17   basis of privilege to the extent this calls for your
18   thought process or the Lieutenant Governor's thought
19   process about impending bill and instruct you not to
20   answer.
21   BY MS. MARANZANO:
22   Q. Are you following your counsel's instruction?
23   A. Yes.
24   Q. I believe you testified that this was
25   something -- if you had made the request it is because

## 66

1    this is something that would have to be worked on in the
2    2011 legislative session?
3    A. Yes.
4    Q. Why is that?
5       MR. FREDERICK:  Object as vague, also object
6    to the extent it calls for your thought process or the
7    Lieutenant Governor's thought process about pending
8    legislation.  I think, as phrased, I have to instruct
9    you not to answer the question on the basis of
10   privilege.
11   BY MS. MARANZANO:
12   Q. Let me try another way and see if it works.  I'm
13   trying to understand what you meant by this would have
14   to be worked on in the 2011 session.  Why did this bill
15   have to be worked on?  What was the -- well, what do you
16   mean by that statement?
17       MR. FREDERICK:  Let me just make the same
18   cautionary objection.  If you can answer the question
19   generally without revealing a privileged communication
20   between the Lieutenant Governor's office and any
21   legislator or the Lieutenant Governor or his staff's
22   thought process about the specific bill, you may answer.
23   If you would have to reveal that, I would instruct you
24   not to answer.
25   A. I think that -- maybe I used a poor choice of

## 67

1    words when I said have to.  My point was it had not
2    passed in '09 and given the amount of public testimony
3    that had been -- that had been taken during the '09
4    session it was just a safe assumption that it was going
5    to come up again in 2011.  Probably the words have to --
6    were probably a bad choice of words.
7    Q. When you say it was the safe assumption that it
8    was going to come up in 2011, was the Lieutenant
9    Governor working to make sure it would come up in 2011?
10      MR. FREDERICK:  I'm going to object on the
11   basis of privilege and instruct you not to answer.
12   BY MS. MARANZANO:
13   Q. In terms of the 2009 consideration of voter
14   identification, are you familiar with the testimony that
15   occurred around that bill?
16   A. I just know that it was 2009.  I remember that
17   night because they all stayed up there working on it and
18   I got to go home that time.
19   Q. Well, in regards to the testimony, am I
20   understanding you correctly that it was the significant
21   interest in the bill was one of the things that led you
22   to think this issue would come up again in the 2011
23   legislative session?
24   A. Yes.
25   Q. And was that significant interest both support

## 68

1    and opposition for the bill?
2    A. There was definitely support and opposition for
3    the bill.
4    Q. Who were the main supporters of the bill?
5       MR. FREDERICK:  I will just object and -- on
6    the basis of privilege and just caution you -- I think
7    the question as phrased does not seek the substance of
8    any confidential privileged communication.  So I just
9    caution you not to reveal the substance of any
10   communication with the Legislature.
11   A. I think, generically, it was a very party line
12   issue.  Republicans supported it and the Democrats did
13   not.
14   Q. Were there other people testifying about the bill
15   other than legislators during the consideration of the
16   voter identification bill in 2009?
17   A. I don't know.  I think the answer is yes.
18   Q. Do you know if any group supporting -- I'm sorry.
19   Do you know if any groups representing minority voters
20   were in support of the voter identification bill in
21   2009?
22      MR. FREDERICK:  Objection; vague.
23   Objection; relevance.  But you can answer.
24   A. I don't know.
25   Q. BY MS. MARANZANO:  Why was this a party -- a very

Blaine Brunson                                                    May 30, 2012

## 69

1   party line issue?
2           MR. FREDERICK:  I would object on the basis
3   of privilege to the extent this asks for a thought
4   process or mental impression of yourself, the Lieutenant
5   Governor or a legislator or any privileged
6   communications about the bill, if you can answer
7   generally, you may do so.
8       A.  Generally any news story that you looked at
9   clearly showed that it was a party line issue.
10      Q.  BY MS. MARANZANO:  Do you know if any of the
11  minority members of the Senate were supporting the voter
12  identification bill in 2009?
13      A.  I don't know.
14      Q.  Do you know if any supported the voter
15  identification bill in Senate bill 14 in 2011?
16          MR. FREDERICK:  Objection; vague.
17  Objection; relevance.  You can answer.
18      A.  I don't think so.  Did you say on the Senate
19  side?
20      Q.  BY MS. MARANZANO:  I did say on the Senate side?
21      A.  I don't think so.
22      Q.  Did it concern the Lieutenant Governor that no
23  minority members of the Senate were supporting Senate
24  bill 14?
25          MR. FREDERICK:  Objection; legislative

## 70

1   privilege.  Instruct you not to answer.
2   BY MS. MARANZANO:
3       Q.  For the record, you're following your counsel's
4   instruction?
5       A.  Yes.
6       Q.  How many Senate Republicans are minority members
7   or members of a racial or ethnic minorities?
8           MR. FREDERICK:  Objection; relevance.  But
9   you may answer.
10      A.  None.
11      Q.  In regards to the drafting of Senate bill 14, was
12  the Lieutenant Governor himself involved in the drafting
13  of this bill?
14      A.  No.
15      Q.  Did you or anyone from your office exchange
16  drafts of Senate bill 14 with anybody?
17      A.  The staff would have exchanged it with Senator
18  Fraser or the Legislative Council.
19      Q.  Did the Lieutenant Governor mark out any drafts
20  of Senate bill 14?
21      A.  Not that I'm aware of.
22      Q.  If he'd done that, do you think you would be
23  aware?
24      A.  Maybe.  But not every time.
25      Q.  Would anybody -- who would know the answer to

## 71

1   that question?
2       A.  Brian Hebert.
3       Q.  And would the Lieutenant Governor know?
4       A.  I'm sure if he marked something up, I'm sure.
5       Q.  Were any additional forms of identification
6   considered to be added to Senate bill 14?
7           MR. FREDERICK:  Objection; legislative
8   privilege.  Instruct you not to answer.
9       Q.  Did the Lieutenant Governor or anyone in your
10  office conduct any analysis as to how many registered
11  voters possessed the forms of identification required in
12  Senate bill 14?
13          MR. FREDERICK:  Object on the basis of
14  privilege and instruct you not to answer.
15  BY MS. MARANZANO:
16      Q.  Are you familiar with the concept of a Spanish
17  surname voter analysis?
18      A.  No.
19      Q.  You never heard of that?
20      A.  No.
21      Q.  What was the purpose of Senate bill 14?
22      A.  My personal opinion of the purpose was to make
23  sure that a person was, via a photo ID, who they say
24  they were when they went to vote in person.

## 72

1       Q.  Any other purposes?
2       A.  Not that I'm aware of.
3       Q.  And how does Senate bill 14 ensure that the
4   person is who they say they are when they go to vote?
5           MR. FREDERICK:  Object on the basis of
6   privilege only to the extent that this seeks your
7   thought process, the Lieutenant Governor's thought
8   process about this bill or any legislators understanding
9   that has been communicated to you to the extent that you
10  have a general understanding not based on privilege.
11  You can answer if you can.
12      A.  I don't think I would have anything to add that
13  wasn't privileged.
14      Q.  BY MS. MARANZANO:  Okay.  Would forms of
15  identification that are not listed in Senate bill 14
16  also ensure that a person is who they say they are at
17  the polls?
18          MR. FREDERICK:  Object.  Calls for
19  speculation.  Also object on the basis of privilege to
20  the extent it calls for any thought process, mental
21  impressions or communications.  If you can answer
22  without revealing any privileged matters, you can do so.
23      A.  I don't know.  I don't know what other forms
24  would fit that bill.
25      Q.  BY MS. MARANZANO:  You don't know what other

## 73

1  forms of identification might verify that a person is
2  who they say they are?
3      A.  No.
4      Q.  Were there any specific problems with a person
5  voting not as the person that -- were there any specific
6  problems with in person voter impersonation that Senate
7  bill 14 was attempting to address?
8      MR. FREDERICK:  I'll object on the basis of
9  privilege.  To the extent this would call for thought
10  process, mental impressions of yourself, the Lieutenant
11  Governor or his staff or any communications by a
12  legislator other than on the floor or in a debate.  If
13  you can answer without revealing those matters, you can
14  do so.
15      A.  I don't have any personal history with it as far
16  as knowing about it.  And there was testimony, I
17  believe, on the floor that -- other than following
18  debate, you know, the entire debate.  But I know there
19  was some discussion examples of voter fraud.  But I
20  couldn't tell you myself what they were.
21      Q.  By MS. MARANZANO:  So are you -- are you aware of
22  whether those examples of voter fraud were convictions
23  of voter fraud?
24      A.  I don't know.
25      Q.  Do you know anything more about those examples of

## 74

1  voter fraud than what you've already testified to?
2      A.  No.
3      Q.  Is there any other type of voter fraud other than
4  in person voter impersonation that SB 14 would solve?
5      A.  I don't know.
6      Q.  You have no opinion on that?
7      A.  No.
8      Q.  Are you aware of any incidents of in person voter
9  fraud in the State of Texas in the last 20 years?
10      MR. FREDERICK:  I'll object on the basis of
11  privilege only to the extent that this would call for
12  something that was communicated to you in confidence by
13  a legislator or with the Lieutenant Governor or his
14  staff, but if you can answer without revealing that, you
15  may do so.
16      A.  I don't know.  The testimony that happened during
17  the debate would have to stand on its own.  And I didn't
18  follow it closely.
19      Q.  BY MS. MARANZANO:  Do you believe it would be a
20  sufficient deterrent to voter fraud to increase criminal
21  penalties for committing voter fraud?
22      MR. FREDERICK:  I'll object on the basis of
23  relevance.  To the extent it seeks his personal opinion
24  and to the extent it seeks the thought process of the
25  Lieutenant Governor or his staff about SB 14

## 75

1  specifically, I instruct you not to answer on the basis
2  of privilege.
3  BY MS. MARANZANO:
4      Q.  And you're following your counsel's instruction?
5      A.  Yes.
6      (Exhibit No. 115 was marked)
7      (By Ms. Maranzano)  This has been previously
8  marked.  I'm going to show you what we previously marked
9  as Deposition Exhibit 115.  Can you take a look at that?
10  Does this look familiar to you?
11      A.  Sort of.  I think I've seen it before.  But I
12  don't -- I don't know who produced this.
13      Q.  Do you -- do you believe this came from your
14  office?
15      A.  I don't -- I don't know.
16      Q.  You don't know if you've seen it in the context
17  of your --
18      A.  I don't know if my office produce it.
19      Q.  Okay.  But when you said you've seen it before,
20  would you have seen it in your capacity as chief of
21  staff for the Lieutenant Governor?
22      A.  Yes.  It looks familiar, but I don't remember
23  exactly where I've seen it.
24      Q.  So do you know who wrote this?
25      A.  No.

## 76

1      Q.  Do you know what it was written for?
2      A.  It was just talking -- or talking points for,
3  looks like for the voter ID bill.
4      Q.  And what would be the purpose of these talking
5  points for the voter ID bill?
6      A.  I don't -- I don't know.  You know --
7      Q.  Oh, I'm sorry.
8      A.  I don't know.  Whose document is this?
9      Q.  Well, this document -- I will represent to you
10  that this document was produced as a document from the
11  Lieutenant Governor's office?
12      A.  Okay.  Okay.
13      Q.  So are talking points created for the Lieutenant
14  Governor on pieces of legislation?
15      A.  Yes.
16      Q.  Could this -- would this be talking points for
17  the Lieutenant Governor?
18      A.  It could have been if we produced it.
19      Q.  And who would have written this?
20      A.  Probably Brian Hebert.
21      Q.  And do you see up at the top where it says AD2R?
22      A.  Yes.
23      Q.  Do you -- do you think that refers to legislation
24  session?
25      A.  Yes.  Probably.

Blaine Brunson                                                    May 30, 2012

---

## 77

1   Q. So this is most likely was about Senate bill 14;
2   is that correct?
3   A. Yes.
4   Q. And do you see on the top right-hand corner there
5   is a number written?
6   A. Yes.
7   Q. Do you know what that is?
8   A. This one?
9   Q. Yeah. Not the exhibit number. But that
10  handwritten number?
11  A. No.
12  Q. Is that -- is that a reference to the Texas code?
13  A. I'm not sure.
14  Q. You're not sure?
15  A. No. Looks like a coding -- some kind of coding.
16  Q. Can you look at what's listed as Roman Numeral 1,
17  the threat of fraud is real, and I would like to direct
18  your attention to the first bullet there?
19  A. Yeah.
20  Q. Can you tell me, apart from Senate bill 14, what
21  efforts is Texas making to ensure that it's voter
22  registration rules are accurate?
23  A. I'm not advised.
24  Q. You don't know?
25  A. No.

---

## 78

1   Q. Are you familiar with a federal law called the
2   National Voter Registration Act?
3   A. No.
4   Q. Not at all?
5   A. Not at all.
6   Q. Can you look at the third bullet in that same
7   talking point?
8   A. Yes.
9   Q. And it says, "Texas election administration
10  management system is improving, but continues to have
11  accuracy problems"?
12  A. Okay.
13  Q. Can you tell me how Senate bill 14 would impact
14  the accuracy level of the Texas election administration
15  management system?
16  MR. FREDERICK: Just object to the extent
17  this would require you to reveal any privileged
18  communications or matters. But to the extent you can
19  answer it without getting into that, you can.
20  A. I don't -- I don't know.
21  Q. Okay.
22  A. I don't know what that system is.
23  Q. Okay. Was any part of the purpose of Senate bill
24  14 to decrease the number of Hispanic voters?
25  A. No.

---

## 79

1   Q. What's your basis for saying that?
2   A. It's never -- that never came up.
3   Q. Okay. Never came up in what?
4   A. As far as why people were working on the bill.
5   Q. And you're basing that on your conversations with
6   who?
7   A. Well, I guess with members as the process moved
8   along.
9   Q. And can you tell me specifically what members
10  you're referring to?
11  MR. FREDERICK: Object on the basis of
12  misstates -- it mischaracterizes the prior testimony. I
13  want to let him answer the question. I'm not sure I
14  quite understand what the question is getting at.
15  BY MS. MARANZANO:
16  Q. Okay. Let's back up. I asked you whether any
17  purpose of the -- whether any part of the purpose of
18  Senate bill 14 was to decrease the number of Hispanic
19  voters and you said no?
20  A. No. Right.
21  Q. And when I asked you your basis, you said that
22  was not what anybody working on the bill, that never
23  came up from anybody working on the bill? Is that --
24  A. Right.
25  Q. So I just want to know who specifically you're

---

## 80

1   talking about?
2   MR. FREDERICK: I'll object as vague to the
3   extent that it seems to be asking who didn't say
4   something. I'll object on the basis of privilege to the
5   extent it asks Mr. Brunson to reveal the content of a
6   specific conversation with a member. I think on that
7   basis, I would instruct you not to answer.
8   BY MS. MARANZANO:
9   Q. And you're following your counsel's instruction?
10  A. Yes.
11  Q. Was any part of the purpose of SB 14 to decrease
12  the number of minority voters?
13  MR. FREDERICK: I'm going to object on the
14  basis of legislative privilege. You may answer based on
15  your own knowledge, but don't reveal -- I'll caution
16  you, based on privilege, not to reveal the content of
17  any communication with legislator or Lieutenant
18  Governor.
19  A. Not that I'm aware of.
20  Q. BY MS. MARANZANO: And what's your basis for
21  saying that?
22  MR. FREDERICK: Same instruction.
23  BY MS. MARANZANO:
24  Q. Was any part of the purpose of Senate bill 14 to
25  deter non-citizens from voting?

Blaine Brunson                                    May 30, 2012

---

81

1    A. Not that I'm aware of.

2    Q. And what's your basis for saying that?

3        MR. FREDERICK: Just a cautionary objection

4    on the basis of privilege not to reveal the content of

5    any privileged communication. But you may answer if you

6    can do so.

7    A. I just never heard it discussed.

8    Q. BY MS. MARANZANO: Was any part of the purpose

9    for Senate bill 14 for partisan purposes?

10   A. It was divided on party lines. But I'm not --

11   the law would apply equally to Democrats and

12   Republicans.

13   Q. Was any part of the purpose of Senate bill 14 to

14   depress the turn out of Democratic voters?

15   A. Not that I'm aware of.

16   Q. What's your basis for saying that?

17       MR. FREDERICK: Same cautionary objection

18   not to reveal any privileged communications, but you may

19   answer if you can do so without revealing.

20   A. It's the same answer as the others. It just

21   never was discussed as a reason for working on the bill.

22   Q. BY MS. MARANZANO: Do you think if that was a

23   reason it would be discussed?

24       MR. FREDERICK: Objection; relevance.

25   Objection; calls for speculation.

---

82

1    A. Could you repeat it?

2    Q. BY MS. MARANZANO: If -- if said motivation was

3    for partisan purposes, would that actually come up in

4    discussions?

5        MR. FREDERICK: Same objection, but you can

6    answer.

7    A. I would assume it would.

8    Q. BY MS. MARANZANO: Was any part of the purpose of

9    Senate bill 14 to discriminate in any way against any

10   group or groups of minority voters?

11   A. No, not that I'm aware of.

12   Q. And what's your basis for saying that?

13   A. It was never discussed.

14   Q. And do you think that would be discussed if that

15   was part of the purpose of Senate bill 14?

16       MR. FREDERICK: Objection; relevance and

17   calls for speculation. You can answer.

18   A. I would assume so.

19   Q. BY MS. MARANZANO: Have you ever heard that come

20   up as a purpose for any legislation you've worked on in

21   any of your discussions while serving as a staffer for

22   the Lieutenant Governor?

23   A. No.

24       MR. FREDERICK: Jennifer, when you get to a

25   good stopping point can we take a quick break?

---

83

1        MS. MARANZANO: Yeah. Why don't we take a

2    quick break now, 5 minutes.

3        THE WITNESS: Sounds good.

4        (Brief recess.)

5    BY MS. MARANZANO:

6    Q. Let's go back on the record. Mr. Brunson, before

7    the break we were talking about the purposes of SB 14.

8    Does a bill ever have unspoken but understood purposes?

9        MR. FREDERICK: Objection; vague. You can

10   answer.

11   A. Not that I'm aware of.

12   Q. BY MS. MARANZANO: You don't know of any instance

13   where -- where that would be your understanding of the

14   purpose of a bill?

15   A. None that I can think of.

16       (Exhibit No. 112 was marked.)

17   Q. (By Ms. Maranzano) I'm going to show you what

18   we've previously marked as Deposition Exhibit 112. Does

19   this look familiar to you? Does it look like it could

20   be from the Lieutenant Governor's campaign website?

21   A. Yes.

22   Q. Can you look at what is the third page, but since

23   it's back to back it appears on the second page under

24   the topic that says strongly opposes illegal

25   immigration? Do you see the first item under that says

---

84

1    Dewhurst pushed for voter ID in two sessions?

2    A. Yes.

3    Q. What does voter identification have to do with

4    opposing illegal immigration?

5        MR. FREDERICK: I'll object on the basis of

6    privilege only to the extent this would call for

7    privileged communications or the Lieutenant Governor's

8    thought process about a specific bill. If you can

9    answer without doing that, you can do so.

10   A. I don't know why the campaign would lay it out

11   like this.

12   Q. BY MS. MARANZANO: Do you see any connection

13   between the voter ID bills and opposing illegal

14   immigration?

15       MR. FREDERICK: Objection; relevance, but

16   you can answer.

17   A. I haven't thought about it. And I don't really

18   have an opinion on it.

19   Q. BY MS. MARANZANO: Are non-citizens able to

20   obtain the forms of identification required by Senate

21   14?

22   A. I don't know.

23   Q. Are non-citizens able to obtain a Texas driver's

24   license?

25   A. I don't know the answer to that.

Blaine Brunson                                          May 30, 2012

---

85

1    Q.  Are non-citizens able to obtain a military
2   identification card?
3    A.  I don't know the answer to that, either.
4    Q.  Are non-citizens able to obtain a concealed
5   handgun license?
6    A.  I don't know the answer.
7    Q.  Are you familiar with a federal law called the
8   Help America Vote Act?
9    A.  Yes.
10    Q.  Do you know what that act requires?
11    A.  I don't.
12    Q.  Do you know if pursuant to that act certain voter
13   registration applications are verified against other
14   State databases?
15    A.  I don't.
16       THE WITNESS:  Other State what?
17       MS. MARANZANO:  Databases.
18   BY MS. MARANZANO:
19    Q.  Are you aware of whether a voter registration
20   applicant needs to swear on their -- or sign under oath
21   on their voter registration application that they are a
22   United States citizen?
23    A.  I don't know.
24       (Exhibit No. 119 was marked)
25    Q.  (By Ms. Maranzano)  I'm going to show you what we

---

86

1   previously marked as Deposition Exhibit 119.  Does this
2   look familiar to you?
3       MR. FREDERICK:  No wonder it was hot.  We
4   pushed it all the way up and it's supposed to be all the
5   way down.  Go team.
6   BY MS. MARANZANO:
7    Q.  Does this document look familiar to you?
8    A.  It looks very similar to the earlier document.
9    Q.  Is this something that you've seen before?  Oh,
10   it's because I -- I think I may have given you the wrong
11   one.  Sorry.  Let me get my -- let me get my exhibits
12   organized in a second.  All right.  Sorry about that.
13   Do you know if previous versions of voter identification
14   bills allowed for a voter to show one form of photo
15   identification or two forms of non-photo identification?
16    A.  I don't know.
17    Q.  Is it your opinion that two forms of non-photo
18   identification would verify the identify of a voter?
19       MR. FREDERICK:  Objection; relevance, but
20   you may answer.
21    A.  I don't have an -- I don't have an opinion on
22   that.
23    Q.  BY MS. MARANZANO:  Do you know what steps are
24   necessary to take to acquire a United States passport?
25    A.  I don't.

---

87

1    Q.  Do you know how much it costs to acquire a United
2   States passport?
3    A.  I do not.
4    Q.  What is a military identification card?
5    A.  A card that someone in the military has.  An ID
6   the card for military personnel.
7    Q.  How many forms of military identification cards
8   are there?
9    A.  I have no idea.
10    Q.  Have you ever seen a military identification
11   card?
12    A.  Yes.
13    Q.  In what context?
14    A.  A friend that had one.
15    Q.  Okay.  And what branch of the military was that?
16    A.  Air Force.
17    Q.  Do you know if every branch of the military
18   issues an identification card?
19    A.  I don't know.
20    Q.  Is a veteran's identification an acceptable form
21   of identification under SB 14?
22    A.  I don't know.
23    Q.  Who would know that?
24    A.  Probably Brian Hebert.
25    Q.  Do you know what steps are required to obtain a

---

88

1   citizen -- citizenship certificate?
2    A.  I do not.
3    Q.  Are you familiar with the portion of SB 14 that
4   allows for a form of identification called the election
5   identification certificate?
6    A.  No.
7    Q.  You're not familiar with that at all?
8    A.  Not at all.
9    Q.  Are you familiar with the provisions of Senate
10   bill 14 that deal with provisional ballots?
11    A.  No.
12    Q.  Who would be familiar with those two provisions
13   of SB 14 from the Lieutenant Governor's office?
14    A.  Brian Hebert or maybe Julia, but for sure Brian.
15    Q.  I believe you testified earlier that SB 14 was
16   placed on the Governor's emergency call list; is that
17   correct?
18    A.  Yes.
19    Q.  Do you think that it was an emergency to consider
20   this bill?
21       MR. FREDERICK:  Objection; relevance.  You
22   may answer.
23    A.  It wasn't -- wasn't my call to make.
24    Q.  BY MS. MARANZANO:  I believe you testified
25   earlier that you may have actually asked for it to be

Blaine Brunson                                      May 30, 2012

---

**89**

1  given that designation; isn't that correct?
2          MR. FREDERICK:  Objection; mischaracterizes
3  testimony.  You may answer.
4      A. I said I would have.  I wouldn't put it past to
5  ask for it just because of the timing.  You can work on
6  emergency legislation in the first 60 days of the
7  session.
8      Q. BY MS. MARANZANO:  Were there any elections
9  occurring within the first 60 days of the session?
10     A. There may have been a Dallas Mayoral election.
11     Q. A local election?
12     A. I think so.  I don't -- there weren't any --
13  I don't believe there were any statewide elections.  There
14  were not any statewide elections.
15     Q. Was there an effort to -- on the part of the
16  Lieutenant Governor to move this bill very quickly
17  through Legislature?
18         MR. FREDERICK:  I'll object based on
19  privilege.  To the extent this would called for the
20  Lieutenant Governor's thought process or mental
21  impressions or communications that you had with him or
22  he had with other legislators.  If you can answer the
23  specific question without getting into privileged
24  matters, you may do so.
25         THE WITNESS:  Do you mind repeating the

---

**90**

1  question?
2          THE REPORTER:  Sure.
3          THE WITNESS:  Sorry.
4          THE REPORTER:  No problem.
5          (Requested question was read.)
6          MR. FREDERICK:  Same instruction and
7  objection.
8      A. I guess the fact of the matter is it moved
9  earlier in the session, but that's because it was on the
10  emergency call.
11     Q. BY MS. MARANZANO:  But I guess my question is, is
12  somewhat the reverse of that.  Was it placed on the
13  emergency call so that it could be moved very quickly
14  through the session?
15         MR. FREDERICK:  Objection.  To the extent
16  this calls for Lieutenant Governor's thought process or
17  that of his staff or any communications you had with him
18  about SB 14, I would instruct you not to answer.  If you
19  can answer based on non-privileged matters, you may do
20  so.
21     A. I think it is based on his thought process.  So I
22  wouldn't -- I think I can't answer that question.
23     Q. BY MS. MARANZANO:  Okay.
24         MS. MARANZANO:  Can we mark this.
25         (Exhibit No. 134 was marked.)

---

**91**

1  BY MS. MARANZANO:
2      Q. I'm showing you what we're marking as Deposition
3  Exhibit 134.  Do you recognize this document?
4      A. Yes.
5      Q. What is it?
6      A. It's a letter from the Lieutenant Governor to
7  Senator Birdwell.
8      Q. And who would have drafted this letter?
9      A. Probably Brian Hebert.
10     Q. Do you know why it was being sent to Senator
11  Birdwell?
12         MR. FREDERICK:  Objection to the extent it
13  calls for the Lieutenant Governor's thought process or
14  any privileged communications, I would instruct you not
15  to answer.  However, if you can answer based on
16  non-privileged matters, you may do so.
17     A. I'm going to follow his advice.
18     Q. BY MS. MARANZANO:  Okay.  Do you know if a letter
19  like this would be distributed to all members of the
20  Senate?
21     A. I believe it was.
22     Q. And do you see in the first sentence it says, "on
23  Monday January 24th, it's my intent to recognize Senator
24  Robert Duncan for a motion of resolving the Senate into
25  a Committee-of-the-Whole to consider Senate bill 14"?

---

**92**

1  Is your recollection that that is indeed what happened
2  on January 24, 2011?
3      A. I don't recall the exact date.  But I think it
4  did.
5      Q. Did the Senate resolve into the
6  Committee-of-the-Whole when it considered Senate bill
7  14?
8      A. Yes.
9      Q. Why was Senator Duncan recognized for the purpose
10  of bringing that motion?
11         MR. FREDERICK:  Objection; legislative
12  privilege.  I would instruct you not to answer unless
13  you can do so without revealing the Lieutenant
14  Governor's thought process or any privileged
15  communications.
16     A. I can't.
17     Q. BY MS. MARANZANO:  Was Senate bill 14 considered
18  in any other committees other than the
19  Committee-of-the-Whole?
20     A. Not that -- not that I'm aware of.
21     Q. Is that common for a bill to only be considered
22  by the Committee-of-the-Whole?
23     A. It's not common, but the Committee-of-the-Whole
24  serves as a traditional committee when it's formed and
25  so the only difference is all the members are there to

Blaine Brunson                                               May 30, 2012

## 93

1   enter testimony at the same time.
2       Q.  Does it also mean that the Lieutenant Governor
3   has a different role in the proceedings?
4       A.  He does have a different role in the proceedings.
5       Q.  And what is that role during the
6   Committee-of-the-Whole?
7       A.  As we discussed earlier in the rules, he can
8   participate in the debate and vote.
9       Q.  And if a bill was referred to a different
10  Committee, would he have any role in those proceedings?
11      A.  No direct role.
12      Q.  Would he have an indirect role?
13      A.  Just referring which bill the Committee went to
14  and -- no.
15      Q.  Was Senate bill 14 referred to the
16  Committee-of-the-Whole so the Lieutenant Governor could
17  debate and vote on it?
18          MR. FREDERICK:  Objection.  Calls for
19  legislative privilege.  Instruct you not the answer.
20  BY MS. MARANZANO:
21      Q.  Was Senate bill 14 referred to the
22  Committee-of-the-Whole so the bill could move more
23  quickly through Senate?
24          MR. FREDERICK:  Objection; legislative
25  privilege.  Instruct you not to answer.

## 94

1   BY MS. MARANZANO:
2       Q.  Were there any communications that you or others
3   in your office had about the decision to refer Senate
4   bill 14 to the Committee-of-the-Whole?
5           MR. FREDERICK:  Objection; vague.  I would
6   also object -- I think that the question is actually
7   asking for the content of communications.  However, on
8   the basis of legislative privilege I just caution you
9   not to reveal the substance of any communications.
10      A.  Yes, there were discussions.
11      Q.  BY MS. MARANZANO:  And when were those
12  discussions?
13      A.  Prior to -- prior to January 20th, probably
14  between the first two or three weeks of January, maybe
15  some in December.
16      Q.  And who were those discussions with?
17      A.  Primarily -- primarily the bill sponsor.
18      Q.  And that's Senator Fraser?
19      A.  Yes.
20      Q.  And those conversations were with you or with
21  others in the office?
22      A.  I -- probably -- probably some level me, but
23  probably more likely Brian Hebert and his staff
24  discussing the content of the bill.
25      Q.  Did Senator Fraser request that this bill get

## 95

1   referred to the Committee-of-the-Whole?
2       A.  I don't recall.
3       Q.  Did the Lieutenant Governor participate in the
4   debate during the Committee-of-the-Whole?
5       A.  I don't -- I don't think he did.
6       Q.  Were you -- what was your role during the
7   Committee-of-the-Whole's consideration of Senate bill 14
8   in regards to this piece of legislation?
9       A.  During the debate?
10      Q.  Uh-huh.
11      A.  I was probably working on something else.  But I
12  did not have a role during the debate.
13      Q.  You weren't necessary in touch with the
14  Lieutenant Governor during the debate?
15      A.  I was in touch with him, but probably not related
16  to voter ID.  It was probably what else was going on and
17  because Brian Hebert would have been staffing the
18  Lieutenant Governor during the debate.
19      Q.  And so would Brian Hebert have been with the
20  Lieutenant Governor on the floor during the debate?
21      A.  Probably.  Most likely.
22      Q.  Was one of your roles in connection with Senate
23  bill 14 to try to ensure that it was passed?
24      A.  Yes.
25      Q.  How did you do that?

## 96

1       A.  Just made sure the process was orderly and moved
2   forward.
3       Q.  What do you mean by "orderly"?
4       A.  Well, that the members knew that it was coming up
5   for debate.  But as far as a decision-making role on the
6   bill, I didn't have a decision-making role.  Just more
7   of just making sure that if that's what they were going
8   to discuss.  Just like any other issue.  If that is what
9   they were going to discuss, then people were there,
10  staff wise and make sure the Lieutenant Governor was
11  there.  So it was -- it was not a policy role.
12      Q.  And in terms of a decision-making role, did
13  anybody other than the Lieutenant Governor have a role
14  in making decisions on this bill?
15      A.  The members, the members of the Senate.
16      Q.  I'm sorry.  I mean in reference to your office,
17  in reference to the Lieutenant Governor's office?
18      A.  He had the final decision-making authority.
19          MS. MARANZANO:  Can you mark this?
20          (Exhibit No. 135 was marked.)
21  BY MS. MARANZANO:
22      Q.  Can you take a look at this for me?  I'm sorry.
23  I'm showing you what we're marking as Deposition
24  Exhibit 135.  Can you tell me if you have seen this
25  letter before?  Does it look familiar to you?

Blaine Brunson

May 30, 2012

## 97

1   A. Yes. Absolutely.

2   Q. You have. And what context have you seen it?

3   A. I received it -- at least a copy of it when she

4   sent this during session.

5   Q. And can you look at the second paragraph for me

6   that says, "first of all the Lieutenant Governor fully

7   aware that most, if not all of the Senators have left

8   town on Thursday." Is that referring -- that paragraph

9   where it talks about the letter being distributed to all

10  members; is that referring to the letter that we just

11  looked at and marked as Exhibit 134?

12  A. That's -- I think that's right.

13  Q. Do you know if that letter was left under

14  people's doors, slid under the members of the Senate's

15  doors?

16          MR. FREDERICK: Objection; relevance. You

17  may answer.

18  A. I'm not -- I'm not aware if it was slipped under

19  doors. If a member had gone home early and that was the

20  only way to get it there, I'm sure the messengers put it

21  either in their mailbox or under their door.

22  Q. BY MS. MARANZANO: Do you know if when you say

23  "if a member had left early," do you know if the Senate

24  had suspended its business for the weekend?

25  A. I don't recall. But judging from her letter, she

## 98

1   says that -- it looks like it was towards the end of the

2   week and they had finished working on the floor for that

3   week.

4   Q. Who from the Lieutenant Governor's office would

5   have handled distribution of the letter? And just to be

6   clear, I don't mean the actual delivery, but the

7   decision to distribute it on that day.

8   A. The actual decision would be the Lieutenant

9   Governor's.

10  Q. And certainly he would have been aware of whether

11  or not the Senate had suspended their business for the

12  weekend, wouldn't he?

13          MR. FREDERICK: Objection; assumes facts not

14  in evidence. You may answer.

15  A. If hey had gaveled out earlier that week, yes.

16  Q. BY MS. MARANZANO: Okay. Were there any concerns

17  that distributing a letter about Senate bill 14 being

18  considered four days later could be perceived as

19  attempting to exclude people from the debate?

20          MR. FREDERICK: Objection; legislative

21  privilege. Instruct you not to answer.

22  BY MS. MARANZANO:

23  Q. What was the purpose of only giving four days

24  notice before consideration of Senate bill 14?

25          MR. FREDERICK: Objection; legislative

## 99

1   privilege. Instruct you not to answer.

2   BY MS. MARANZANO:

3   Q. Was the Lieutenant Governor aware that Senators

4   had expressed concerns about Senate bill 14?

5          MR. FREDERICK: Objection; legislative

6   privilege. Instruct you not to answer.

7   BY MS. MARANZANO:

8   Q. Wouldn't it be important to ensure that Senators

9   had a chance to voice their opinions during a debate

10  like Senate bill 14?

11          MR. FREDERICK: Objection; argumentative.

12  Objection; relevance, but you may answer.

13  A. Yes.

14  Q. BY MS. MARANZANO: And do you know if the

15  Lieutenant Governor was aware that certain Senators had

16  concerns about the impacts Senate bill 14 might have on

17  voters?

18          MR. FREDERICK: Objection; legislative

19  privilege. Instruct you not to answer.

20  MS. MARANZANO: Mr. Frederick, can he answer

21  the yes or no question of whether or not he was aware of

22  that?

23          MR. FREDERICK: I believe that the question

24  itself implies what he was aware of. So it presumes the

25  substance of his mental -- his thought process. So I

## 100

1   would stand by the objection.

2   BY MS. MARANZANO:

3   Q. Okay. And you're following your counsel's

4   instruction?

5   A. Yes.

6   Q. Are you familiar with the procedure by which

7   Senate bill 14 was considered in the Senate?

8   A. In 2011?

9   Q. Yes.

10  A. Yes.

11  Q. And are you aware of whether there was any change

12  in the rules that the Senate traditionally uses when it

13  considered Senate bill 14?

14  A. Yes. I believe they use the same rule process

15  that they did -- I think they use the same rule process

16  in 2009.

17  Q. And what rule process are you referring to?

18  A. The special order.

19  Q. Uh-huh. And can you describe what that is for

20  me?

21  A. I may not have the exact terms, but it's

22  generically -- it basically puts -- a bill that's in the

23  special order does not have a blocker bill that would

24  require two-thirds vote to suspend to go to that bill.

25  So it's inside the Senate rules, but it's an order of

Blaine Brunson                                                    May 30, 2012

## 101

1   its own that has no blocker bill.
2       Q.  Okay.  I'm going to show you --
3       MS. MARANZANO:  Let's mark this as
4   Exhibit 136.
5           (Exhibit No. 136 was marked.)
6   BY MS. MARANZANO:
7       Q.  I'm showing you what we're marking as Deposition
8   Exhibit 136.  And if you can turn to the second page.
9   Does this look to be the Senate rule that we were just
10  talking about, rule 5.11?
11      A.  Yes.
12      Q.  And can you direct your attention to
13  subsection D?
14      A.  Yes.
15      Q.  Do you see that there's a special -- a special
16  carve-out that says, "notwithstanding subsection A of
17  this rule a bill of resolution relating to voter
18  identification requirements reported favorably from a
19  Committee of the Whole Senate may be set as a special
20  order for a time at least 24 hours after the motion is
21  adopted by the majority of the Senate; is that correct?
22      A.  Yes.
23      Q.  So in other words, if the voter identification
24  bill was voted favorably out of the
25  Committee-of-the-Whole, it could be considered if it was

## 102

1   just voted by a majority of the members; is that right?
2       A.  Yes.
3       Q.  And as a usual matter, is that different than the
4   way the Senate considers legislation?
5       A.  It is a special order that is different than the
6   normal order of business that's used on other
7   legislation.
8       Q.  And other legislation is usually voted by
9   two-thirds majority; is that correct?
10      A.  If there's a blocker bill in place.
11      Q.  Have you ever seen another time when a category
12  of legislation is carved out at the two-thirds rule as a
13  voter identification requirements in subsection D?
14      A.  Yes.  The entire special session was done without
15  a blocker bill.
16      Q.  And what special session are you referring to?
17      A.  June of 2011, right after the last legislative
18  session.
19      Q.  So in other words, no legislation during the
20  special session was passed with a two-thirds majority?
21      A.  Something might have passed with more than
22  two-thirds of the vote.  But there was not a blocker
23  bill in place for the whole special session.
24      Q.  Okay.  So let me rephrase.  Nothing was required
25  to be passed with a two-thirds majority during the

## 103

1   special session; is that correct?
2       A.  As long as -- so long as it was the first bill in
3   order of the -- on the calendar.  There was no blocker
4   bill in place.
5       Q.  Okay.  So the usual order of business was not
6   that it had to be passed by two-thirds majority vote?
7       MR. FREDERICK:  Object to the form of the
8   question.  You can answer.
9       A.  Yes.  I don't think --
10      Q.  BY MS. MARANZANO:  What?
11      A.  I'm not sure I understand.
12      Q.  Okay.  Can you just explain to me what happened
13  during the special session in June 2011 and how that
14  differs from what would happen -- what usually happens
15  in other sessions.
16      A.  In a normal session the -- there is a bill -- a
17  blocker bill that's first on the calendar.  And so in
18  the Senate's rules if you want to -- if you want to pass
19  that bill first it only requires a majority vote.  So
20  whatever bill is first on the calendar is only a
21  majority.  If you say we're going to move out past the
22  first bill to some other bill on the calendar, that's
23  when you do a two-thirds rule.  In a special session and
24  in the special session there was basically no -- there
25  was -- there is no blocker bill in the special order and

## 104

1   there is no blocker bill -- or there was no blocker bill
2   during the 2011 special session.  So all those bills --
3   I think all of them were probably just a majority, but
4   there might have been one or two that every one agreed
5   upon?
6       Q.  And how many pieces of legislation were passed in
7   the June 2011 special session?
8       A.  Approximately?  Five or six.
9       Q.  And am I understanding you correctly that there
10  wasn't a special carve-out during that session.  There
11  was just no blocker bill?
12      A.  Yes.  So you're right.
13      Q.  What do you think the purpose of the two-thirds
14  rule is?
15      MR. FREDERICK:  Object on relevance.  But
16  you can answer.
17      A.  The purpose -- traditionally the purpose has been
18  to make people that are working in good faith to
19  compromise to get at least two-thirds of the members of
20  the Senate to agree to a compromise.
21      Q.  BY MS. MARANZANO:  Do you think it's effective at
22  doing that?
23      MR. FREDERICK:  Objection; relevance, but
24  you may answer.
25      A.  It depends.

Blaine Brunson                                                    May 30, 2012

## 105

1  Q. BY MS. MARANZANO:  What do you mean by that?
2  A. I mean, bills that didn't pass it was not
3  effected, but ones that do it does -- if does make
4  people negotiate, usually.
5  Q. So in other words, if people aren't able to
6  compromise, a bill wouldn't pass without the two-thirds
7  majority?
8  A. That's right.
9  Q. Did the Lieutenant Governor request that the
10  two-thirds rule be suspended for Senate bill 14?
11  MR. FREDERICK:  Objection; privileged.
12  Instruct you not to answer.
13  BY MS. MARANZANO:
14  Q. You're following your counsel's instruction?
15  A. Yes.
16  Q. Did the Lieutenant Governor have any
17  communications with anyone about the suspension of the
18  two-thirds rule?
19  MR. FREDERICK:  Object on the legislative
20  privilege only to caution you not to reveal the
21  substance of any communication, but as to the existence
22  of the communication you may answer that.
23  A. Yes.  He had -- he had conversations about it.
24  Q. BY MS. MARANZANO:  And who were those
25  conversations with?

## 106

1  A. Members of the Senate that were working on the
2  bill.  Probably -- particularly Senator Fraser.
3  Q. Anyone else?
4  A. I'm sure there was.  But I'm not...
5  Q. You're not -- you're not aware whether there were
6  or there weren't?
7  A. I'm sure there were, but I just couldn't point to
8  specific conversations.
9  Q. Do you know if the Lieutenant Governor or others
10  in his office had any conversations with individuals --
11  with Senators who were opposed to Senate bill 14 about
12  the suspension of the two-thirds rule?
13  A. Yes.
14  Q. And who were those people?
15  A. The members that were opposed to it.  I'm sure he
16  didn't talk to all of them, but I would be surprised if
17  he didn't talk to different members on the floor or
18  during this process about the whole issue.
19  Q. But you don't have specific testimony about who
20  particularly he talked to who was opposed to the bill?
21  A. I don't.
22  Q. Did he talk to the parliamentarian about the
23  suspension of the two-thirds rule?
24  A. He would have had to because it's in the rules
25  that they have to adopt at the beginning of session.

## 107

1  Q. And why would that have required him to talk to
2  the parliamentarian?
3  A. The parliamentarian is the keeper of the rules.
4  So she's the one that works with him.  Whether it's this
5  rule or any other rule.  I believe this particular
6  special order, I think it was adopted -- I didn't
7  participate in it, but I think it was adopted just like
8  this in 2009.
9  Q. Uh-huh.
10  A. And then adopted the exact same way in 2011.  But
11  the parliamentarian is responsible for making sure that
12  any rule changes are distributed and given to members so
13  they can discuss them and she would talk to the
14  Lieutenant Governor about it.
15  Q. Are you familiar with the circumstances under
16  which this similar rule that you're referring to was
17  adopted in 2009?
18  A. No.  I just know that -- I know that the
19  discussion was -- the big discussion in public debate on
20  that was in 2009.
21  Q. Are you familiar with that public debate?
22  A. No.  Not detail.  I know it happened.
23  Q. Was the Lieutenant Governor presiding over that
24  debate?
25  A. I don't recall, but I would say yes.  I'm pretty

## 108

1  sure it was yes, but I don't recall personally.
2  Q. Okay.  Does the special order rule, 5.11, that
3  prevents the use of blocker bills to slow down
4  legislation; is that correct?
5  MR. FREDERICK:  Object to the
6  characterization.  You may answer it.
7  A. It -- it doesn't -- I'm not sure the words you
8  used.  But it -- it is -- it's definitely a special
9  order that would put a bill that has been blocked by the
10  two-thirds bill on it's own special order.
11  Q. BY MS. MARANZANO:  And the carve-out is only for
12  the voter identification -- for voter identification
13  requirements; is that correct?
14  A. In this rule, yes.
15  Q. And other than the June session have you ever
16  seen -- and I think you testified that the June session
17  was not a carve-out, but just a different set of rules
18  governed; is that correct?
19  A. Yes.
20  Q. Have you ever seen another category of
21  legislation categorically carved out as the voter
22  identification requirements are?
23  A. No.
24  Q. Did the Lieutenant Governor have any concerns
25  about suspending the two-thirds rule for this

Blaine Brunson                                                    May 30, 2012

## 109

1  legislation?
2          MR. FREDERICK:  Objection; legislative
3  privilege.  Instruct you not to answer.
4  BY MS. MARANZANO:
5     Q.  Were there any communications that you or others
6  in your office had about whether carving out voter
7  identification requirements from the two-thirds rule
8  would make it appear particularly partisan in nature?
9          MR. FREDERICK:  Object to that on the basis
10  of privilege.  Instruct you not to answer.
11  BY MS. MARANZANO:
12     Q.  Are you following your counsel's instructions?
13     A.  Yes.
14     Q.  Do the Senators needs to dispense with the
15  two-thirds rule in order to pass Senate bill 14?
16          MR. FREDERICK:  Objection.  Objection;
17  relevance.  Objection calls for speculation.  Also
18  object on the basis of privilege to the extent this
19  would require you to reveal the Lieutenant Governor's
20  thought process, mental impressions or any
21  communications with other members of the Senate.  On
22  that basis, I would instruct you not to answer.
23  BY MS. MARANZANO:
24     Q.  Are you following your counsel's instructions?
25     A.  Yes.

## 110

1     Q.  Did Senate bill 14 pass with two-thirds majority
2  support?
3     A.  No, it did not.
4     Q.  Was there any consideration given to changing any
5  other rules for voter identification requirements?
6     A.  Not that I'm aware of.
7     Q.  What was the Lieutenant Governor's role --
8  actually, strike that.  What was the Lieutenant
9  Governor's role during the consideration of the
10  Committee-of-the-Whole -- Committee-of-the-Whole's
11  consideration of Senate bill 14?
12          MR. FREDERICK:  Objection.  Asked and
13  answered.
14     A.  Per the rules, participate in debate and vote as
15  necessary.
16     Q.  BY MS. MARANZANO:  Right.  But I'm asking you
17  specifically what did he do, not just sort of what he
18  has the ability to do, but what did he actually do?
19     A.  If I remember correctly he sat in the Senate area
20  and listened to the debate.
21     Q.  Did he play any role in talking to other members
22  about how they were going to vote on the bill?
23     A.  I'm sure he talked to members during the debate
24  is.  I don't know if it changed anyone's vote or not.
25     Q.  Was it part of his role to make sure Senate bill

## 111

1  14 passed?
2     A.  As much as its his role that any bill pass.
3     Q.  And I believe you testified earlier that this was
4  a particular priority for him?
5          MR. FREDERICK:  Object.  Mischaracterizes
6  prior testimony.  You can answer.
7  BY MS. MARANZANO:
8     Q.  Did -- did you not say that, Mr. Brunson?
9     A.  I said that it was -- it does definitely one of
10  the issues that -- that he felt we needed to address
11  last session in the 2011 session.
12     Q.  So because he thought it was something that
13  needed to be addressed, would he play any larger role in
14  trying to get the bill passed?
15     A.  I would say the same role he would play on any
16  bill that needed to pass.  He -- if it's something that
17  needs to be -- if it needs to be passed, he would take
18  the same action on this bill or any other bill.  I don't
19  think this was a -- that uniquely different of a bill as
20  far as priority, if you want to call it that.  But I
21  think he laid out a -- they laid out a process that
22  resulted in the bill passing.
23     Q.  So how does he determine what bills need to be
24  passed?
25          MR. FREDERICK:  Object on the basis of

## 112

1  privilege.  I don't -- as I understand the question, I
2  don't believe that it's actually seeking the Lieutenant
3  Governor's thought process, but I would caution you not
4  to reveal his actual thought process about determining
5  whether any specific bill needed to pass.  If you can
6  describe the general thought processes, I think that's
7  what she's asking, you can answer that.
8     A.  I think in -- in general terms, I think it would
9  be -- I don't know what you would call it.  An instinct
10  or common sense.  It's a bill that had passed or had
11  been discussed and had had a lot of attention for
12  several sessions.  And so -- and I'm sure in his mind
13  the -- I don't know.  I can't say what's in his mind.
14  But I'm sure -- I'm sure that just the common sense of,
15  you know, the publicity and the focus on the bill is
16  something that he said this is something that
17  ultimate -- that the members want to work on and we'll
18  work on it.
19     Q.  BY MS. MARANZANO:  Is it fair to say only some
20  members wanted to --
21     A.  A majority of the members.
22     Q.  Does he consider which political party the
23  members are from when he's deciding how to move a bill
24  through the Legislature?
25     A.  He takes lots of factors into consideration when

Blaine Brunson                                                    May 30, 2012

---

## 113

1  he works on bills.
2      Q. Can you tell me what those factors are?
3      A. Not specifically. I mean, it depends on the
4  bill. Like the budget needs to pass so that the State
5  can finance the different things that work, that the
6  State pays for and every member of the Legislature
7  regardless of party has roads and schools, et cetera.
8  And so the factors are when you look at the issues that
9  need to be worked on to make the State run, I think he
10  takes all those factors into account.
11      Q. So I guess -- I guess what I'm trying to figure
12  out is what about Senate bill 14 was addressing
13  something that needed to be worked on?
14          MR. FREDERICK: I'll object on the basis of
15  legislative privilege to the extent this calls for the
16  Lieutenant Governor's thought process about Senate bill
17  14 and instruct you not to answer.
18  BY MS. MARANZANO:
19      Q. Do you -- do you have and answer or are you able
20  to answer at all?
21      A. No.
22      Q. And I think you earlier testified that your role
23  with regard to Senate bill 14 was helping move it
24  through process?
25      A. Right.

## 115

1      A. Yes.
2      Q. Are you aware of concerns that were raised about
3  the impact Senate bill 14 would have on minority voters
4  that were raised during the consideration of the bill by
5  the Committee-of-the-Whole?
6      A. I definitely know they were raised. I don't know
7  the specifics of what the concerns were.
8      Q. Did the Lieutenant Governor make any attempt to
9  respond to those concerns?
10          MR. FREDERICK: Object on the basis of
11  legislative privilege. To the extent that calls for the
12  Lieutenant Governor's thought process, communications
13  with his staff or other legislators or any investigation
14  that was done by his office, I would instruct you not to
15  answer on the basis of legislative privilege.
16  BY MS. MARANZANO:
17      Q. Do you have any answer?
18      A. I don't.
19      Q. Do you know -- well, are you familiar with the
20  record from the Committee-of-the-Whole's consideration
21  of Senate bill 14?
22      A. There is a record. As far as the specifics of
23  the record?
24      Q. Uh-huh.
25      A. No.

## 114

1      Q. And so what -- so can you tell me specifically
2  what you did to move Senate bill 14 through the process?
3      A. Well, it was -- my role specifically whether
4  Senate bill 14 or any of the bills that were more of a
5  priority than others was just to make sure that the bill
6  sponsor had the resources, had the bill language ready,
7  if our policy people needed help in areas like on the
8  budget, if our people needed to pitch in and help to get
9  the bills ready to either come out of committee or go to
10  the floor, and then the timing of, generically, just the
11  timing of how bills would flow so that -- it was a big
12  session with a big budget deficit. So just making sure
13  that things were in place to do bills in a timely
14  manner.
15      Q. Did you have a role in determining when Senate
16  bill 14 would be considered?
17      A. Just an advisory role with the Lieutenant
18  Governor.
19      Q. Did you advice Lieutenant Governor to bring it up
20  quickly at the beginning of the session?
21          MR. FREDERICK: Objection; legislative
22  privilege. Instruct you not to answer.
23  BY MS. MARANZANO:
24      Q. And the decision of when to actually bring the
25  bill up was the Lieutenant Governor's; is that correct?

## 116

1      Q. Not at all?
2      A. No.
3      Q. You testified earlier that one of the reasons it
4  was important the pass Senate bill 14 is because a
5  similar -- or another voter identification bill had
6  passed the Senate in 2009. Is that a correct
7  restatement of your testimony?
8      A. Yes.
9      Q. Do you know if Senate bill 14 is similar to the
10  bill that had passed in the 2009 legislative session?
11      A. I'm not sure how similar they are. I think -- I
12  think they're fairly similar.
13      Q. What are you basing that testimony on?
14      A. That it was generally the same Senate body that
15  passed it in '09 and '11.
16      Q. Did you look at -- did you ever look at the text
17  of the bill that passed the 2009 legislative session?
18      A. I may have -- I mean, I may have looked at it. I
19  never studied it.
20      Q. Do you know if the forms of identification that
21  are required under the bill that passed in the 2009
22  legislative session are the same as what passed in the
23  2011 legislative session?
24      A. I don't know.
25      Q. You testified earlier that the Lieutenant

Blaine Brunson                                              May 30, 2012

---

## 117

1    Governor voted on Senate bill 14, correct?
2        A. I said I wasn't sure if he did.
3        Q. Okay. Do you believe he voted or you're not
4    sure?
5        A. I don't know.
6        Q. If he voted it would have been in the
7    Committee-of-the-Whole; is that correct?
8        A. Yes.
9        Q. Did you make any recommendation to the Lieutenant
10   Governor on whether or not to vote on Senate bill 14?
11           MR. FREDERICK: Object on the basis of
12   legislative privilege only to the extent it seeks the
13   substance of your recommendation. As to the question
14   whether or not you made a recommendation, you can answer
15   that.
16       A. I don't know. I don't think I did.
17       Q. BY MS. MARANZANO: Did you make a recommendation
18   to the Lieutenant Governor about whether or not to
19   support SB 14?
20           MR. FREDERICK: Same objection and
21   instruction.
22       A. No.
23       Q. BY MS. MARANZANO: Did the Lieutenant Governor
24   play any role in the -- in the process by which
25   amendments were introduced to Senate bill 14?

---

## 118

1        A. I don't recall.
2        Q. Are you familiar with the amendments that were
3    introduced to Senate bill 14?
4        A. No. No.
5        Q. Did the Lieutenant Governor draft any amendments
6    to be added to Senate bill 14?
7        A. Not they I'm aware of.
8        Q. And who would know the answer to that?
9        A. Probably Brian Hebert or Julia.
10           (Exhibit No. 111 was marked)
11       Q. (By Ms. Maranzano) I'm going to show you -- I'm
12   showing you what we have previously marked as Deposition
13   Exhibit 111. Can you take a look at this and tell me if
14   you recognize it?
15       A. I do.
16       Q. And what is this?
17       A. It's a press release from the Lieutenant
18   Governor's office.
19       Q. Have you seen this before?
20       A. Yes.
21       Q. Who drafts the press releases for the Lieutenant
22   Governor?
23       A. Mike -- Mike Walz.
24       Q. And can you tell me, do you see at the top
25   left-hand side it's dated January 26, 2011?

---

## 119

1        A. Yes, ma'am.
2        Q. And was Senate bill 14 already -- had it already
3    passed the Senate at that time?
4        A. Based on this statement I would say yes.
5        Q. The press release is issuing a statement about
6    the passage of the Senate; is that correct?
7        A. Yes.
8        Q. Is it unusual for a piece of legislation to pass
9    the Senate in the first two weeks of the session?
10       A. Not if it's on the emergency call.
11       Q. Has that happened before?
12       A. Yes.
13       Q. How many times?
14       A. I don't know how many times. But it's -- that's
15   the reason there is an emergency call is so that bills
16   can be heard in first 60 days in the session?
17       Q. Can you tell me about other legislation that you
18   do know about that's passed in the first two weeks of
19   the legislative session?
20       A. I don't have any -- any examples.
21       Q. Okay. But it's your understanding that that
22   happens?
23       A. It has -- I think your question was has it ever
24   happened. I'm sure it has.
25       Q. Is it unusual?

---

## 120

1        A. It would probably be -- yes, it's unusual.
2        Q. Can you look at the last sentence in this
3    statement. It says, "voter ID will help stamp out voter
4    fraud and increase confidence in our election process by
5    insuring only US citizens who are legally eligible vote
6    in Texas elections." Can you tell me if Senate bill 14
7    is about ensuring that non-citizens don't participate in
8    elections?
9        A. I don't -- I don't know the answer to that.
10       Q. Who would know the answer to that?
11       A. Brian Hebert or Julia.
12       Q. Would the Lieutenant Governor?
13       A. I don't know.
14       Q. Well, how would Senate bill 14 prevent
15   non-citizens from voting?
16       A. I don't know.
17       Q. Do you know if the Lieutenant Governor -- the
18   Lieutenant Governor's position on Senate bill 14 was
19   connected to a belief about only US citizens should be
20   able to participate in elections?
21           MR. FREDERICK: Going to object only to the
22   extent that this would call for privileged, confidential
23   communication between you and the Lieutenant Governor or
24   his thought process, mental impressions obviously that
25   weren't expressed in the public. But you can answer if

Blaine Brunson
May 30, 2012

## 121

1  you can do so.
2  A. I don't know the answer.
3  Q. BY MS. MARANZANO: Did you ever talk to the
4  Lieutenant Governor about the basis for his support for
5  Senate bill 14?
6  A. No. Most of the debate we were working on
7  happened in the previous session before I started
8  working on it. So I think by the time we got to 2011 he
9  was where he was and there wasn't a whole lot of
10  discussing about why he was doing what on the bill.
11  Q. Who would be familiar with the basis for his
12  support of Senate bill 14?
13  A. Probably -- probably Brian or Julia.
14  Q. Brian Hebert or Julia Rathgeber or the Lieutenant
15  Governor?
16  A. Yeah. Yeah.
17  Q. Did you -- did you monitor the bill after it
18  passed the Senate?
19  A. I didn't watch -- I didn't watch it on a daily
20  basis. But we did -- we did monitor it to make sure
21  that it was still moving in the House.
22  Q. Are you familiar with changes that occurred to
23  the bill in the House?
24  A. No.
25  Q. Did you play a role in picking the conferees for

## 122

1  Senate bill 14?
2  A. I don't recall any of the specifics. But the
3  Senate would have turned in the vote card or the
4  conferee request card that I probably -- I probably
5  would have had it and given to the Lieutenant Governor
6  or either Julia or I would have...
7  Q. So did you play any substantive role in picking
8  the conferees?
9  A. No. No.
10  Q. Are you familiar with changes that occurred to
11  Senate bill 14 during the conference Committee?
12  A. No.
13  Q. Not at all?
14  A. No.
15  Q. And who would be familiar with those?
16  A. Brian or Julia.
17  Q. Or the Lieutenant Governor?
18  A. Possibly. I know Brian and Julia would. Brian
19  in particular.
20  Q. Did you -- did you work on or monitor -- well, I
21  guess monitor would be a more appropriate, a fiscal note
22  that was attached to Senate bill 14?
23  A. I didn't do anything specific with the fiscal
24  note.
25  Q. Are you familiar with the fiscal note for Senate

## 123

1  bill 14?
2  A. Yes. As far as the...
3  Q. Do you know how the fiscal note for the bill was
4  arrived at?
5  A. I don't.
6  Q. Do you recall, I think you testified previously
7  to an approximate amount that you believed the fiscal
8  note in 2009 had -- the approximate amount of the fiscal
9  note in 2009?
10  A. Right.
11  Q. Do you remember exactly what that was?
12  A. I think it was $2 or $3 million.
13  Q. Do you know what the fiscal note for the bill in
14  Senate bill 14 was?
15  A. I think it's about the same, $2 or $3 million.
16  Q. And is it your understanding -- well, what is
17  your understanding of what that amount of money will be
18  used for?
19  A. I believe for like signage and voter education at
20  the polling places.
21  MS. MARANZANO: Can you mark this?
22  (Exhibit No. 137 was marked.)
23  BY MS. MARANZANO:
24  Q. Do you recognize this? I'm showing you what
25  we're marking as Deposition Exhibit 137. Can you take a

## 124

1  look and tell me if you recognize it?
2  A. It's the fiscal note for Senate bill 14 as it
3  passed the second House.
4  Q. And it looks to me like the fiscal note was a
5  little bit over $2 million; is that correct?
6  A. That's what it looks like. Yes.
7  Q. And if you can turn to Page 3 -- Page 3 under
8  Methodology, it describes how that fiscal note was
9  arrived at. Do you see that?
10  A. Yes.
11  Q. And based on that, is it your understanding that
12  the fiscal note is geared towards public education
13  primarily in the form of media advertisements,
14  television, radio, internet?
15  A. It looks like a million and a half of it is.
16  Q. A million and half or $2 million?
17  A. A million and a half for media and a half a
18  million for research.
19  Q. Research about the media, correct?
20  A. Yes.
21  Q. Based on your budget experience, can you tell me
22  why there isn't an inclusion in this fiscal note for the
23  cost of the free ID that is a part of Senate bill 14?
24  A. I think DPS testified at the -- at the -- I
25  believe at the Committee-of-the-Whole that the -- since

Blaine Brunson                                          May 30, 2012

## 125

```
 1   it would be, I guess such as small number of free IDs
 2   that it could be absorbed in their budget.
 3        Q.  And how did they know there was going to be a
 4   small number of free IDs?
 5        A.  I don't know.
 6        Q.  Okay.  Did they perform any analysis on who would
 7   need a free ID?
 8        A.  I don't know.  I'm assuming yes, but I don't
 9   know.
10        Q.  And why would you assume yes?
11        A.  That's their job.
12        Q.  You're not familiar with whether it occurred or
13   not?
14        A.  No.
15        Q.  Who would know that?
16        A.  Probably the -- either the Legislative Budget
17   Board who prepared the fiscal note and Brian Hebert
18   might know.
19        Q.  Do you believe that this $2 million cost for
20   media would be sufficient to educate the public in Texas
21   about the requirements of Senate bill 14?
22        A.  I can only rely on the -- whoever put this
23   together.  I don't have any personal reason to think
24   otherwise.
25        Q.  How many media markets are in Texas?
```

## 126

```
 1        A.  I don't know.
 2        Q.  Do you have any knowledge about how much it would
 3   cost for airtime on TV or radio?
 4        A.  I'm sure -- statewide, I'm sure it's pretty
 5   expensive.
 6        Q.  What -- what would pretty expensive mean?
 7        A.  I'm sure it would -- I'm sure the estimates were
 8   made off of some -- I'm sure you could ask how they came
 9   up with the different amendments for the different
10   medias.  But I would assume that it's somewhere -- if
11   you wanted to run some of -- some significant amount it
12   would be around $2 million.
13        Q.  In other bills that you've worked on that had any
14   sort of public education -- are there other bills you
15   have worked on that have had public education
16   components?
17        A.  None that I can recall specifically.  Just -- I
18   can't think of any others.
19        Q.  Okay.  So -- go ahead?
20        A.  Most State issues have -- usually have a public
21   service announcement component that doesn't cost the
22   State?
23        Q.  I see.  Can you look at the last sentence of that
24   first paragraph under Methodology?  It says, "the
25   Secretary of State indicates that federal funds
```

## 127

```
 1   associated with Help America Vote Act may be available
 2   for use, but the agency would first need to verify this
 3   with the federal government."  Do you know if there was
 4   an attempt to ensure that the amount of money projected
 5   for the fiscal note would be equal to or less than the
 6   amount of money that Texas had at its disposal through
 7   highway funds?
 8        A.  No.  Not that I'm aware of.
 9        Q.  And if that was the case would you be aware of
10   it?
11        A.  Probably.
12        Q.  And why is that?
13        A.  Like we talked about earlier, the fiscal note
14   process is intended to be separate and apart from the
15   legislative process so it's not where people can push
16   one way or the other to get a different outcome on cost.
17        Q.  Okay.  So if there was an attempt to make sure
18   that this amount of money matched with the HAVA funds
19   that were available, you think you would know that?
20        A.  Yes.  I think the Legislative Budget Board would
21   have called me and said someone is trying to make us
22   change our fiscal note.
23        Q.  I see.  What if the Legislative Budget Boards --
24   so in your opinion that directive would have come from
25   somebody other than a member of the Legislative Budget
```

## 128

```
 1   Board?
 2        A.  Which directive?  To make it fit?
 3        Q.  Uh-huh.
 4        A.  I'm not aware of any directive like that.
 5        Q.  Okay.  Fair enough.  Are you at all familiar with
 6   voter identification requirements that exist in Georgia?
 7        A.  No.
 8        Q.  How about voter identification requirements that
 9   exist in Indiana?
10        A.  No.
11        Q.  Have you heard of a case entitled Crawford?
12        A.  No.
13        Q.  No?
14        A.  No.
15        Q.  Why do you believe there was such strong
16   opposition to Senate bill 14?
17            MR. FREDERICK:  Objection; calls for
18   speculation.  To the extent this calls for your personal
19   opinion, I object.  But I would object on the basis of
20   privilege to the extent it seeks thought process, mental
21   impressions or any communication between yourself and
22   the Lieutenant Governor or another Legislature.
23        A.  So the question is why do I think there is such
24   strong opposition?
25        Q.  BY MS. MARANZANO:  Uh-huh.
```

Blaine Brunson                                    May 30, 2012

## 129

1    A.  I honestly don't know why the other side was
2    fighting so hard.
3    Q.  What did they say they were fighting it so hard?
4         MR. FREDERICK:  Object on the basis of
5    legislative privilege to the extent it call for
6    privilege communication from another Legislature.
7    However, to the extent you are aware of any statements
8    that were not privileged you may answer.
9    A.  Yeah.  The -- as far as like newspaper accounts,
10   the discussion from the Democrats in this case were that
11   it would suppress voter turnout -- or I guess voting
12   maybe just on their side.  I don't know.  I never did
13   understand why they were objecting to this.
14   Q.  BY MS. MARANZANO:  Do you think it would have
15   suppressed turnout?
16   A.  I don't think so.
17   Q.  Why not?
18   A.  I personally don't.  Because we have -- every one
19   of us that I can think -- during this process we even
20   talked about how many places you have to have a driver's
21   license to do anything these days.  And so I really
22   think that it's so hard to do anything in today's world
23   without a photo ID that it couldn't -- I just don't see
24   how it would have affected -- negatively affected that
25   many people.  And then with -- the way it was laid out.

## 130

1    I just think it was a -- like I said, I don't know why
2    they fought it so hard.
3    Q.  Did you ever undertake any analysis to determine
4    how it would affect people?
5    A.  I personally did not.
6    Q.  Did anybody?
7    A.  I'm sure the normal analysis that would happen on
8    any bill happened on this.  And Brian Hebert can talk to
9    you about --
10   Q.  What is -- I'm sorry.  What were you saying?
11   A.  You can talk to him about what all analysis took
12   place.
13   Q.  What is a normal analysis that gets done on a
14   bill?
15   A.  It ranges from small bills to larger bills.  You
16   spend the entire session working on the budget and all
17   that could be cast as analysis down to whatever amount
18   of due diligence needs to be done to have confidence
19   that you're doing the right thing it has to be done.  So
20   bill by bill deal.
21   Q.  Well, what do you think would have to be done to
22   give the Legislature they were doing the right thing in
23   regards to Senate bill 14?
24        MR. FREDERICK:  Objection based on
25   relevance.

## 131

1    A.  I think it's a member by member deal.
2    Q.  BY MS. MARANZANO:  Are you aware of any analysis
3    that was conducted to determine whether minority voters
4    might be disproportionately less likely to possess the
5    identification forms of Senate bill 14?
6         MR. FREDERICK:  Objection; the legislative
7    privilege and instruct you not to answer.
8    BY MS. MARANZANO:
9    Q.  Is that something that you think might be
10   important to give a member confidence that they were
11   doing the right thing?
12        MR. FREDERICK:  Objection; relevance.  You
13   can answer.
14   A.  I think each member has to decide for themselves
15   what level of analysis they need before they vote.
16   Q.  BY MS. MARANZANO:  Well, what level of analysis
17   did the Lieutenant Governor need before he voted?
18        MR. FREDERICK:  Objection.
19   BY MS. MARANZANO:
20   Q.  If he voted?
21        MR. FREDERICK:  Objection; legislative
22   privilege.  Instruct you not to answer.  Also object as
23   vague.
24   BY MS. MARANZANO:
25   Q.  When you said it's hard to do anything without an

## 132

1    ID, what are you referring to?
2    A.  The generic discussion has been to get on an
3    airplane or even most buildings that you have to have
4    some sort of ID that people can tell who you are and
5    when you present your identification.  So if you want to
6    buy, you know, Sudafed in Texas you've got to have a
7    photo ID.
8    Q.  Is it a right to get on an airplane?
9         MR. FREDERICK:  Objection.  Calls for legal
10   conclusion.  You may answer.
11   A.  I don't know.
12   Q.  BY MS. MARANZANO:  Well, I mean, would you
13   consider it to be a right to travel somewhere by plane?
14        MR. FREDERICK:  Objection; relevance.
15   Objection; calls for legal conclusion.  You can answer
16   if you can.
17   A.  I don't think it's a legal right.
18   Q.  BY MS. MARANZANO:  Is it a legal right to buy
19   Sudafed?
20        MR. FREDERICK:  Objection; calls for legal
21   conclusion.
22   A.  It's -- no, I don't think it's a legal right.
23   Q.  BY MS. MARANZANO:  Do you think it's a legal
24   right to be able to vote?
25        MR. FREDERICK:  Objection; calls for legal

Blaine Brunson                                          May 30, 2012

---

## 133

1    conclusion.  Also objects on relevance.  You can answer.
2        A.  I think it's a legal right to vote legally.
3        Q.  BY MS. MARANZANO:  And do you think Senate bill
4    14 is preventing people from voting illegally?
5            MR. FREDERICK:  Objection; relevance,
6    objection -- I guess I'll just object on relevance and
7    to the extent this is seeking your thoughts or the
8    Lieutenant Governor's thoughts or mental impressions as
9    to when Senate bill 14 was pending I would object on
10   privilege.  But I think you can answer if you can.
11       A.  What was the question?
12       Q.  BY MS. MARANZANO:  You said that it was a
13   legal -- you think it's a legal right to vote legally?
14       A.  Right.
15       Q.  So I'm asking you if Senate bill 14 prevents
16   voting illegally?
17           MR. FREDERICK:  Same objection and
18   instruction.
19       A.  I think it does help to ensure that you're voting
20   legally, my personal opinion.
21       Q.  BY MS. MARANZANO:  And what is your personal
22   opinion based on, just how are you arriving at that
23   conclusion?
24       A.  Based on the discussions that have taken place
25   around this bill as -- from the time that I began

## 134

1    focusing on it to now.  I think we should do everything
2    we can the make sure that that legal right is legal.
3        Q.  Is there -- what forms of illegal voting would
4    Senate bill 14 prevent?
5        A.  Like I said earlier, we've talked about that, I
6    don't know the specifics of the bill.  But after the
7    amount of testimony that's been taken on this and the
8    discussion, if there's something that should and can be
9    done, then if it prevents one vote that's not legal, I
10   think that's -- I think it's the right thing to do.
11       Q.  Would you believe that it was the right thing to
12   do if it prevented one vote that was illegal even if it
13   disenfranchised a large number of individuals?
14           MR. FREDERICK:  Objection; relevance.
15   Objection; calls for speculation.
16       A.  I don't know -- I don't have an opinion on that.
17       Q.  BY MS. MARANZANO:  Is there any illegal voting
18   other than in person voter impersonation that Senate
19   bill 14 would prevent?
20       A.  I don't know.  I don't think so.
21       Q.  Are there other forms of ID that could have been
22   included in Senate bill 14 that would have also verified
23   a voter's identity?
24           MR. FREDERICK:  Objection; calls for
25   speculation.  Object to relevance.  But you can answer.

## 135

1        A.  I don't know.
2        Q.  BY MS. MARANZANO:  Do you believe that other
3    forms of identification other than the ones in Senate
4    bill 14 verify somebody's identity?
5            MR. FREDERICK:  Objection; relevance.
6        A.  I don't know.  I haven't thought about it.
7        Q.  BY MS. MARANZANO:  Are you aware of any
8    legislators making any statements about illegal aliens
9    voting?
10           MR. FREDERICK:  Object based on privilege.
11   To the extent this calls for non-public confidential
12   statements made to your Lieutenant Governor by another
13   legislator, those would be privileged and I would
14   instruct you not to answer.  To the extent you can
15   answer based on non-privileged statements, you may do
16   so.
17       A.  The answer is no.
18       Q.  BY MS. MARANZANO:  And are you answering based
19   on -- based on your counsel's instruction to only talk
20   about statements on the public record; is that correct?
21       A.  I'm answering based on I've never heard anyone
22   say anything like that.
23       Q.  Have you ever heard any Texas State legislator
24   who voted in favor of Senate bill 14 say that it would
25   prevent a legitimately registered voter from voting?

## 136

1            MR. FREDERICK:  Objection; relevance.  Also
2    object on the basis of privilege.  If you can answer
3    without relying on that you may do so.
4        A.  There's not privileged information.  No one has
5    ever said that to me.
6        Q.  BY MS. MARANZANO:  Have you ever heard of any
7    Texas State legislator who voted for the bill -- who
8    voted for Senate bill 14 say that it would prevent a
9    racial or ethnic minority from voting in Texas?
10           MR. FREDERICK:  Objection; relevance.
11   Objection; privileged.  But you may answer if you can do
12   so without revealing privileged matters.
13       A.  Same answer.  There's not any privileged
14   information.  Nobody has ever said that to me.
15       Q.  BY MS. MARANZANO:  Are you aware of allegations
16   that Senate bill 14 attempted to play on people's fears
17   of illegal immigrants voting?
18       A.  Not that I'm aware of.
19       Q.  Are you familiar with a public letter from the
20   Lieutenant Governor in 2007 about photo identification
21   requirements?
22       A.  No.  I'll look at it.
23       Q.  Okay.  This has been -- it was previously marked.
24   This exhibit was previously marked as Deposition Exhibit
25   Number 3.  If you can take a moment to take a look at

Blaine Brunson                                           May 30, 2012

---

## 137

1  it?  Is that refreshing your recollection?
2      A.  I don't remember seeing this.
3      Q.  Can you turn your attention to Page 2 for me and
4  at the bottom or midway through it says a letter from
5  Lieutenant Governor David Dewhurst on voter ID bill?
6      A.  Yes.
7      Q.  In that second paragraph there's a sentence that
8  says, "I want people to consider that with 8 to 12
9  million illegal aliens currently living in the US the
10  basic principle of one person, one vote is in danger."
11  Do you see that?
12     A.  I see it.
13     Q.  Is there any connection between photo ID bills
14  and the growth of the non-citizen population in Texas?
15     A.  I don't know the answer to that.
16     Q.  Can you look at Page 3 for me and about midway
17  through the page there's a paragraph that says, "to
18  address critic's concerns," do you see that paragraph?
19     A.  Yes.
20     Q.  And it talks about allowing voters to present
21  certain forms of identification.  This is, as you can
22  see from this paragraph it's referring to a bill called
23  House bill 218?
24     A.  Okay.
25     Q.  Do you know which of these forms of

## 138

1  identification listed are also allowed Senate bill
2  14?
3      A.  I don't.
4      Q.  Do you know -- do you know if a draft of this
5  letter was released to the press?
6      A.  I don't.  But it's in the press.
7      Q.  Did the purpose of photo ID legislation in Texas
8  evolve over time?
9      A.  I don't know.
10     Q.  Who would know that?
11     A.  Brian Hebert.
12     Q.  Would the Lieutenant Governor?
13     A.  I don't know.
14     Q.  Do you believe that the Lieutenant Governor has
15  consistently indicated that one of the purposes of photo
16  ID bills is to prevent non-citizens from voting?
17         MR. FREDERICK:  Object to relevance.  You
18  can answer.
19     A.  I do not know.
20         (Exhibit No. 114 was marked)
21     Q.  (By Ms. Maranzano)  I'm showing you what we
22  previously marked as Deposition Exhibit 114.  Can you
23  take a look at this and let me know if you recognize it?
24  Have you seen this before?
25     A.  I may have.  It looks like something from our

## 139

1  office.
2      Q.  Do you know if the Lieutenant Governor made a
3  statement at the bill signing for Senate bill 14?
4      A.  I would assume so.
5      Q.  Do you know if this is the statement that he
6  made?
7      A.  I don't.
8      Q.  Who -- who would have written his statement for
9  that bill signing?
10     A.  Probably the press -- the communications director
11  or the communications office.
12     Q.  Do you see in the right-hand corner it says LRT?
13     A.  Yes.
14     Q.  Do you know who that is or what that refers to?
15     A.  Probably -- I bet it's a lady that works in our
16  press office, Lauren Thurston.  I don't know what the R
17  stands for.
18     Q.  Does she sometimes draft talking points for the
19  Lieutenant Governor?
20     A.  She works for Mike Walz.
21     Q.  Can you look at the second page of this?  It
22  says, "generations of Americans have fought and died for
23  the principal of one US citizen, one vote."  Do you know
24  if Lieutenant Governor made a statement like that after
25  the signing of Senate bill 14 or at the signing of

## 140

1  Senate bill 14?
2      A.  I don't.
3      Q.  Is that consistent with his position on Senate
4  bill 14?
5      A.  Yes.
6      Q.  So is it fair to say that part of the reason that
7  the Lieutenant Governor supported Senate bill 14 is
8  related to ensuring that only US citizens can vote?
9          MR. FREDERICK:  I'm going to object on the
10  basis of privilege only to the extent that this would
11  require you to reveal privileged communication with the
12  Lieutenant Governor and to the extent you ask answer
13  based on public documents or statements, you can do so.
14     A.  I think he would possibly say he based it on the
15  principal of people voting legally.  If you're entitled
16  to vote legally you should be able to vote.
17     Q.  BY MS. MARANZANO:  Okay.  And do you think his
18  position was based in part on a belief that there was a
19  need to ensure that non-citizens weren't voting?
20         MR. FREDERICK:  Same objection.
21     A.  I have the same answer.  His goal was to make
22  sure that people were legally voting.
23     Q.  BY MS. MARANZANO:  Okay.
24         MS. MARANZANO:  Can we have this marked.
25         (Exhibit No. 138 was marked.)

Blaine Brunson                                                    May 30, 2012

## 141

1    BY MS. MARANZANO:
2        Q.  You -- I'm showing you what we're marking as
3    Deposition Exhibit, is it 140?  138.  Have you seen this
4    before?
5        A.  I don't think so.  Let me read it.  I have not
6    seen this before today.
7        Q.  Okay.  Well, can you look at the -- the second
8    paragraph and it talks about a compilation of data on
9    race and ethnicity for redistricting bills.  And it
10   says, "historically a similar effort to obtain such
11   demographics may be required for a voter identification
12   bill."  Do you know if there was such an effort to
13   obtain demographics like that?
14       A.  I don't.
15       Q.  You don't know?
16       A.  I don't know.
17       Q.  Who would know the answer to that?
18       A.  Brian Hebert.
19       Q.  Would anybody else?
20       A.  I don't know.  Legislative Council maybe.
21       Q.  Do you see in the first paragraph it says, "the
22   State does not have statistics regarding the race or
23   ethnicity of registered voters in Texas.  We do have
24   data on the number of registered voters with Hispanic
25   surnames"?

## 142

1        A.  I see that.
2        Q.  "But this data is inconclusive as it simply
3    matches the surnames of registered voters against the
4    list of Hispanic surnames provided by the US Census
5    bureau."  Do you know if the list of Spanish surnames
6    provided by the US Census bureau is used by the State of
7    Texas in other analyses?
8        A.  I don't.
9        Q.  You don't know?
10       A.  I do not know.
11       Q.  Do you know anything about the Spanish surname
12   list provided by the US Census?
13       A.  I don't.
14       Q.  If such an analysis had been conducted, would
15   Brian Hebert be the person who would know about it?
16       A.  I believe -- yes.
17       Q.  Okay.
18       A.  If anybody would know he would know.
19       Q.  How about if we take about a 5-minute break.  I
20   am close to wrapping up.
21       A.  Sure.
22           (Brief recess.)
23           (Exhibit No. 120 was marked.)
24   BY MS. MARANZANO:
25       Q.  Mr. Brunson, I'm going to show you what was

## 143

1    previously marked as Deposition Exhibit 120.  Does this
2    look familiar to you?
3        A.  It looks like the same document -- or the same
4    format as the earlier document.
5        Q.  Do you know who wrote this?
6        A.  I don't.
7        Q.  Is it possible that Brian Hebert wrote this
8    document?
9        A.  Yeah.  If it came from our office, if it was
10   produced in our office, Brian probably wrote it.
11       Q.  Do you know what the purpose of this document
12   was?
13       A.  I don't.
14       Q.  Do you know who it would have been written for?
15       A.  I don't.
16       Q.  Do you know when it would have been written?
17       A.  Probably during the time that this was being
18   discussed on the floor.
19       Q.  During that time that Senate bill 14 was being
20   discussed?
21       A.  If it's from the last session, yes.
22       Q.  Can you look at the topic area that says, "is
23   there a retrogressive effect" and underneath that
24   there's a question posed about did Texas produce or
25   consider any evidence regarding whether Hispanics and

## 144

1    blacks are less likely to possess or obtain that photo
2    ID?
3        A.  Yes.
4        Q.  Do you know if Texas did produce or consider any
5    evidence on those issues?
6        A.  I do not.
7        Q.  And the question below that, do you know the
8    answer to that?
9        A.  Only what we covered earlier for the Senate.
10       Q.  You're not familiar with the House vote?
11       A.  No.
12       Q.  Can you look at the topic area that says is there
13   a less retrogressive alternative?
14       A.  Yes.
15       Q.  And in regards to non-photo identification or
16   non-photo identification proving to be unreliable, do
17   you know the answer to that?
18       A.  I don't.
19       Q.  You don't have a position on whether non-photo
20   documents are unreliable?
21       A.  I don't.
22       Q.  Do you know what the Lieutenant Governor's
23   position on that topic is?
24           MR. FREDERICK:  Object; legislative
25   privilege to the extent it calls for mental impressions.

Blaine Brunson                                                    May 30, 2012

## 145

1   To the extent he's actually taken a position publicly
2   that you know of, you may answer.
3       A. I don't know.
4       Q. BY MS. MARANZANO: Do you know if the Lieutenant
5   Governor has a position on the third question that says,
6   "are there additional forms of photo ID that could be
7   accepted for voting"?
8       A. I do not.
9       Q. And the third topic area says, "does the new law
10  include mitigating effects." The first question is "are
11  photo IDs free of charge and widely available." Is that
12  the case under Senate bill 14?
13      A. I think so.
14      Q. How would you define "widely available"?
15          MR. FREDERICK: Objection; relevance, but
16  you may answer.
17      A. Available around the State.
18      Q. BY MS. MARANZANO: Do you know how the free ID --
19  how the free ID provision under Senate bill 14 is going
20  to be implemented or would be implemented if Senate bill
21  14 was in effect?
22      A. I don't.
23      Q. So then do you know if the free IDs are widely
24  available?
25      A. I do not.

## 146

1       Q. And the third question under that topic says,
2   "are there fail-safe procedures." Do you know if that's
3   the case under Senate bill 14?
4       A. I don't know.
5       Q. And the fourth question right under that do you
6   know if that's the case with education efforts targeted
7   at minority communities?
8       A. I don't -- I do not know.
9       Q. And the question under that, do you know if
10  that's the case in Senate bill 14? A program designed
11  to provide photo ID's in isolated and impoverished
12  areas?
13      A. I don't know.
14      Q. Do you know if these items were considered by the
15  Lieutenant Governor during his consideration of Senate
16  bill 14?
17      A. I do not know.
18          MS. MARANZANO: Can we have this marked?
19          (Exhibit No. 139 was marked.)
20  BY MS. MARANZANO:
21      Q. I'm showing you what we're marking as Deposition
22  Exhibit 139. Can you take a look at it and let me know
23  if you recognize this document?
24      A. I don't recognize it.
25      Q. You don't?

## 147

1       A. No, ma'am.
2       Q. Can I direct your attention to the second page of
3   this document? I'm sorry. The third page of the
4   document, but the second page of the text? Okay. And
5   on the third full paragraph there, there's a sentence
6   that says, "Lieutenant Governor Dewhurst has indicated
7   that he asked Attorney General to file suit to defend
8   the policy choices made by the Texas Legislature with
9   regard to voter identification if US DOJ prevents the
10  law from taking effect." Did the Lieutenant Governor
11  ask the Attorney General to file this lawsuit?
12      A. I don't know if he specifically asked him, but he
13  supported it.
14      Q. In looking at this document does it refresh your
15  recollection at all about Section 552103 which is I
16  think what we had talked about earlier which was a label
17  on one of the documents?
18      A. No. What is 552?
19      Q. I was just asking you if you knew what it was.
20      A. No.
21      Q. Do you know who Jesse Ancira is?
22      A. Yes.
23      Q. Who is that?
24      A. He is was general counsel and now chief of staff.
25      Q. Do you know why Mr. Battle would have been

## 148

1   sending this document?
2       A. They were both the general counsels between the
3   two offices.
4       Q. And so in other words -- I'm not sure that fully
5   explains it to me. Do you know why this would have been
6   sent to Mr. Ancira?
7       A. Ancira.
8       Q. Ancira? Thank you.
9       A. I don't know why. Unless -- I don't even know
10  what it is.
11      Q. Okay. And you said you hadn't seen it before; is
12  that correct?
13      A. I had not seen it.
14      Q. Okay.
15      A. I'm sorry.
16      Q. No problem. I'm showing you what we previously
17  marked as Deposition Exhibit 119. Have you seen this
18  document before?
19      A. It looks like the ones from earlier. It looks
20  like one of the earlier ones.
21      Q. Have you actually seen it before?
22      A. I don't think so.
23      Q. Do you know if this came from your office who
24  would have drafted it?
25      A. Probably Brian Hebert.

Blaine Brunson                                              May 30, 2012

## 149

1    Q.  And can you look at the -- at the bottom where it
2  says, "likely questions from opponents," do you know
3  what the purpose of that section of this document would
4  be?
5    A.  I'm sure it was just to -- if it was a briefing
6  document, I'm sure it was just to have the likely
7  questions and some potential answers fleshed out.
8    Q.  And would this be something that would be for the
9  Lieutenant Governor?
10   A.  It could have been or for the -- or for the chair
11  of the -- or the author of the bill.  I don't know who
12  it was written for.
13   Q.  Can you look at the third question under that
14  that says, "what about people who do not have access to
15  photo ID"?
16   A.  Yes.
17   Q.  And then the first bullet is "I'm confident that
18  every voter in Texas has or can obtain an acceptable
19  photo ID."  Do you know why your office would be taking
20  that position, what that confidence would be based upon?
21   A.  I don't.
22   Q.  You have no idea?
23   A.  I have no idea.
24   Q.  Who would know the answer to that?
25   A.  Probably Brian Hebert.

## 150

1    Q.  Would the Lieutenant Governor?
2    A.  I don't know.
3    Q.  And under the first question?
4    A.  Yes.
5    Q.  Do you see the first bullet says, "there is
6  potential for fraud and registration in person voting
7  and counting of ballots.  This bill addresses one type
8  of potential fraud."  Does that refresh your
9  recollection at all to what we were talking about
10  previously as to whether or not Senate bill 14 would
11  address any other types of fraud other than in person
12  voter impersonation?
13   A.  I think it just relates to in person.
14   Q.  At any time since the passage of Senate bill 14,
15  have you come to believe that this bill would have a
16  discriminatory effect on minority voters?
17   A.  No.
18   Q.  At any time since the passage of Senate bill 14
19  have you come to believe it was passed with a
20  discriminatory purpose?
21   A.  No.
22   Q.  If you are called to testify at trial in this
23  matter would you testify that Senate bill 14 had not
24  been passed with a discriminatory purpose?
25   A.  Yes.

## 151

1    Q.  And would you testify that it -- similarly that
2  Senate bill 14 did not have a discriminatory effect on
3  minority voters in Texas?
4    A.  Yes, to the best of my knowledge.
5    Q.  Are there any answers that you've previously
6  answered that you wish to change at this point?
7    A.  Not that I can think of.
8    Q.  Anything that you previously didn't recall that
9  you now recall?
10   A.  I don't think so.
11   Q.  Okay.  Well, my questioning is complete.  I want
12  to note on the record as Mr. Frederick no doubt is aware
13  that we are keeping these depositions open because we
14  have a pending motion with the court about a privilege
15  issue.  And I will now turn it over to Mr. Harris?
16         EXAMINATION
17  BY MR. HARRIS:
18   Q.  Good evening, Mr. Brunson.  I'm Adam Harris from
19  the law firm of Fried, Frank, Harris, Shriver &
20  Jacobson.  We represent the Texas League of Young Voters
21  Education Fund in this litigation.  I believe in
22  response to questioning by Ms. Maranzano you stated that
23  you spoke to Julia Rathgeber about last night; is that
24  correct?
25   A.  Yes.

## 152

1    Q.  And you spoke to her deposition which took
2  place yesterday; is that correct?
3    A.  Only the length of time that it took.
4    Q.  And I believe you stated earlier that that was
5  about it, that you had talked about the length and that
6  was about it.  Did you talk about anything beyond the
7  length of her deposition?
8    A.  No.  It was in a social setting and there wasn't
9  really time to talk about anything except that she was
10  late getting to the event.
11   Q.  Was that event a campaign event for the
12  Lieutenant Governor?
13   A.  Yes.
14   Q.  You testified previously that the Lieutenant
15  Governor has authority to refer a bill to the
16  Committee-of-the-Whole; is that correct?
17   A.  Yes.
18   Q.  Putting aside any piece of legislation in general
19  how does the Lieutenant Governor decide whether to refer
20  a bill to the Committee-of-the-Whole?
21   A.  It's a deliberative process that takes into
22  account different factors.  In this case, it was a
23  chance for all 31 members of the Senate to hear the same
24  testimony at the same time.
25   Q.  Are there other means to make sure that all

Blaine Brunson                                          May 30, 2012

## 153

1  Senators hear the same testimony other than signing a
2  bill to the Committee-of-the-Whole?
3      A. Sure.
4      Q. What are those means?
5      A. Make each one of them listen to the record or the
6  recording from the committee hearings.
7      Q. I believe you testified that the Lieutenant
8  Governor had the authority to appoint conferees?
9      A. Yes.
10     Q. On a particular bill?
11     A. Yes.
12     Q. And I believe you also stated that under
13  questioning by Ms. Maranzano that you would have had to
14  have been involved in appointing conferees on SB 14.  Is
15  that your testimony?
16     A. I believe my testimony was I'm not 100 percent
17  sure whether I looked at the -- or had any substantive
18  input into the picking of conferees, but on a bill like
19  this I would definitely have seen who the bill sponsor
20  or bill author was requesting to be on the conference
21  committee.
22     Q. And when you say "on a bill like this," what do
23  you mean?
24     A. There's a few bills every session that have a lot
25  of either publicity or like the budget, a lot of, you

## 154

1  know, a very big bill.  And so because there's whatever
2  it was 4,000 bills filed, I don't know, 1,500 bills that
3  finally passed, I don't -- I don't look at all of them.
4  I mean, I'm sure they come across the desk.  But on this
5  one I probably would have at least seen who they were
6  requesting to have.
7      Q. Why was SB 14 a very big deal?
8      A. Well --
9          MR. FREDERICK:  Object to the extent it
10  mischaracterizes the testimony.  But you can answer.
11     A. As we discussed earlier, it's a bill that had
12  been in front of the Legislature for at least two
13  sessions, maybe more than that.  And it was something
14  that was in the news almost every day as we got headed
15  into session.
16     Q. BY MR. HARRIS:  Were there any other reasons why
17  you or the Lieutenant Governor considered SB 14 a very
18  big deal?
19         MR. FREDERICK:  Object based on privilege.
20  To the extent this calls for your mental impressions or
21  the Lieutenant Governor's, but to the extent you can
22  answer without revealing that, you may do so.
23     A. I would say any answer would have to include
24  privileged information from the Lieutenant Governor.
25     Q. BY MR. HARRIS:  I believe previously you referred

## 155

1  to SB 14 as a party line issue; is that correct?
2      A. I think that's the way it's been characterized in
3  the press.
4      Q. What is your understanding as to why SB 14 was a
5  party line issue?
6      A. Because members from each party voted on the
7  other side from the -- from the other.
8      Q. Do you have an understanding as to why that was?
9      A. They disagreed on the issue.
10     Q. And what is your understanding as to what that
11  disagreement was based upon?
12         MR. FREDERICK:  Object based on legislative
13  privilege only to the extent this would require you to
14  reveal specific communication from legislators about SB
15  14 or your own or the Lieutenant Governor's thought
16  process.  If you have and understanding that doesn't
17  require you to reveal those matters, you may answer.
18     A. I don't have anything additional to add than
19  earlier.  I'm not quite sure what the -- at the end of
20  the day, what the objection is for the bill.
21     Q. BY MR. HARRIS:  You stated earlier that you
22  sometimes have communications with the Lieutenant
23  Governor's campaign staff; is that right?
24     A. Yes.
25     Q. Did you ever discuss SB 14 with the Lieutenant

## 156

1  Governor's campaign staff?
2      A. Yes.
3      Q. When did those discussions take place?
4      A. Probably prior to the legislative session.
5      Q. And with whom from the campaign did you speak
6  about SB 14?
7      A. I don't recall specifically.  It would have been
8  one of the either probably Buddy Barfield.
9      Q. And who is Mr. Barfield?
10     A. He is currently the campaign manager.
11     Q. Did you speak to Mr. Barfield about SB 14 on more
12  than one occasion?
13     A. Probably.
14     Q. What was the substance of your discussion with
15  Mr. Barfield?
16         MR. FREDERICK:  Object based on legislative
17  privilege, caution you not to reveal privileged
18  communications, but you may identify the general subject
19  matter of any conversation.
20         MR. HARRIS:  Mr. Frederick, are you
21  asserting a privilege both -- as between statements --
22  over statements by Mr. Brunson and statements by
23  Mr. Barfield or just statements by Mr. Brunson?
24         MR. FREDERICK:  Well, I'm not sure yet
25  whether Mr. Barfield made any statements.  I think in

Blaine Brunson                                    May 30, 2012

## 157

1  order to ensure that we don't take any steps that could
2  be construed as waiver, I am asserting privilege at the
3  moment.  I will however, allow Mr. Brunson to identify
4  the subject matter of the conversation and it's possible
5  that we may be able to -- we may be able to proceed
6  without violating any privilege.
7  BY MR. HARRIS:
8      Q.  What was the subject matter of your discussion
9  with Mr. Barfield concerning SB 14?
10     A.  Whether or not it was going to be discussed or
11 passed in the legislative session.  If it was going to
12 be something that was worked on during the legislative
13 session or not.
14     Q.  And what, if anything, did you say to
15 Mr. Barfield about that question?
16     A.  I don't recall the specifics.  Just that it was
17 an issue that's been out there for at least two sessions
18 and from his end there were a lot of -- I'm sure a lot
19 of people on the political side, grass roots type people
20 that were asking when this kind of a bill would be
21 finally passed.
22     Q.  What is your basis for that statement?
23     A.  I think it -- at the convention it was actually
24 something adopted in the platform of the party.  But I
25 know that there was a lot of interest in getting it

## 158

1  done.
2      Q.  What if anything else did you discuss with
3  Mr. Barfield concerning SB 14?
4      A.  I don't recall any other specifics.
5      Q.  Do you recall any specific statements
6  Mr. Barfield made with respect to SB 14?
7      A.  I do not.
8      Q.  Did you speak to anyone from the campaign other
9  than Mr. Barfield about SB 14?
10     A.  Not that I recall.
11     Q.  Have you spoken with the Lieutenant Governor's
12 campaign regarding any other voter ID bill aside from SB
13 14?
14     A.  I don't think so.  I don't think -- I wouldn't
15 have worked on it prior -- I didn't work on it prior to
16 SB 14 is.
17     Q.  Have you spoken with the campaign about SB 14
18 since the bill passed?
19     A.  I'm sure we have.  I'm sure we have.
20     Q.  And what was the substance of those discussions?
21         MR. FREDERICK:  Object on the basis of
22 legislative privilege only to the extent that this
23 question would ask for the Lieutenant Governor's thought
24 process or mental impressions formed during
25 consideration of SB 14 or a communication from a

## 159

1  legislator about the bill during -- before passage.
2  Otherwise, you can answer the question.
3      A.  I think the discussions would have been pretty
4  generic about the bill passed and probably discussions
5  about the timing of this lawsuit and that it was being
6  filed and whether or not the law was in effect for this
7  election cycle.  But beyond that, nothing -- nothing
8  that they couldn't have read in the newspaper.
9      Q.  BY MR. HARRIS:  Did you have any discussions with
10 Mr. Barfield or anyone else from the campaign about the
11 impact of SB 14 on the Lieutenant Governor's electoral
12 chances in any races for which he was running?
13         MR. FREDERICK:  Objection; relevance.  You
14 may answer.
15     A.  No.
16     Q.  BY MR. HARRIS:  Not at any time?
17     A.  Not at any time.
18     Q.  I believe you stated that you attended Angelo
19 State and Texas State University; is that right?
20     A.  Yes.
21     Q.  Were you issued a student ID at either of those
22 schools?
23     A.  It's been a long time ago.  Yes.
24     Q.  Do you have any reason to question the
25 reliability of student ID's?  And by reliability I mean,

## 160

1  do you have any reason to think that an ID is issued by
2  a Texas State University or another State institution
3  would not be a good indicator that someone is who they
4  say they are?
5          MR. FREDERICK:  Objection; relevance.  You
6  may answer.
7      A.  I haven't thought about it.  I don't have an
8  opinion on it.
9      Q.  BY MR. HARRIS:  Have you ever worked on the
10 Lieutenant Governor's campaigns?
11     A.  Just in a volunteer basis.
12     Q.  And what did you do on a volunteer basis?
13     A.  Make phone calls for turn out and answer
14 questions -- if any questions came up that related to
15 his work on State side.
16     Q.  Do you generally follow the news about the
17 Lieutenant Governor's campaigns at all?
18     A.  Yes.
19     Q.  Have you been following the recent Republican
20 primary for the US Senate for which Lieutenant Governor
21 is running?
22     A.  Yes.
23     Q.  And I understand that yesterday was the primary
24 election; is that right?
25     A.  Yes.

Blaine Brunson                                              May 30, 2012

## 161

1   Q.  What were the results of that election?
2         MR. FREDERICK:  Objection; relevance.
3   A.  He ended up -- he finished in first at 44 or
4   45 percent.  And there's a run off in 2-month.
5   Q.  BY MR. HARRIS:  And who is that run off going to
6   be against?
7   A.  Ted Cruz.
8   Q.  And who is Ted Cruz?
9   A.  He is as a guy that's running for the United
10  States Senate that worked for the Attorney General's
11  office here in Texas and is a lawyer.
12  Q.  Have you had any discussions at any time with the
13  Lieutenant Governor about Mr. Cruz?
14        MR. FREDERICK:  Objection; relevance.  You
15  may answer.
16  A.  Yes.
17  Q.  BY MR. HARRIS:  How often have you discussed
18  Mr. Cruz with the Lieutenant Governor?
19  A.  Not very often.
20  Q.  Can you describe the substance of your
21  discussions with the Lieutenant Governor about Mr. Cruz?
22        MR. FREDERICK:  Objection; relevance.
23  A.  No.
24  Q.  BY MR. HARRIS:  You cannot describe the
25  substance?

## 162

1   A.  I can.  It's a close race and he hopes -- you
2   know, obviously hoping to get over 50 percent last
3   night.
4   Q.  Do you have any understanding as to Mr. Cruz's
5   racial or ethnic background?
6         MR. FREDERICK:  Objection; relevance.  You
7   may answer.
8   A.  I do personally?
9   Q.  BY MR. HARRIS:  Yes?
10  A.  Yes.
11  Q.  What is his background, to your knowledge?
12        MR. FREDERICK:  Same objection.
13  A.  His public statements have been that his father
14  came over from Cuba and worked at the University of
15  Texas.  And so he's Cuban.
16  Q.  BY MS. MARANZANO:  Have you had any discussions
17  with Lieutenant Governor or his campaign staff about
18  that fact, the fact that Mr. Cruz ask Cuban?
19        MR. FREDERICK:  Objection; relevance.  You
20  may answer.
21  A.  No.
22  Q.  BY MR. HARRIS:  Have you had any discussions with
23  the Lieutenant Governor or his campaign staff about the
24  importance of the Hispanic vote in this years Republican
25  primary for the Senate?

## 163

1         MR. FREDERICK:  Objection; relevance.  You
2   may answer.
3   A.  No.
4   Q.  BY MR. HARRIS:  Have you ever discussed with the
5   Lieutenant Governor or his campaign staff the importance
6   of the Hispanic vote in Texas in general?
7         MR. FREDERICK:  Objection; relevance.  You
8   may answer.
9   A.  Not recently, but yes.
10  Q.  BY MR. HARRIS:  When did you have those
11  discussions?
12  A.  It's been several years ago.  Based on the fact
13  that the Lieutenant Governor is fluent in Spanish and
14  he's always had an ability to communicate very fluently
15  in Spanish.  And the conversations have been generally,
16  about him doing media interviews in Spanish to reach out
17  to Spanish speaking only voters.
18  Q.  And what is your understanding as to why the
19  Lieutenant Governor would reach out to Spanish only
20  speaking voters?
21        MR. FREDERICK:  Objection; relevance.  You
22  my answer.
23  A.  Because he would like to reach out to all voters.
24  Q.  BY MR. HARRIS:  Have you ever had any discussions
25  with Lieutenant Governor about the size of the Hispanic

## 164

1   voting block in Texas?
2         MR. FREDERICK:  Objection; relevance.  You
3   may answer.
4   A.  No.
5   Q.  BY MR. HARRIS:  Have you ever had any such
6   discussions with the Lieutenant Governor's campaign
7   staff?
8         MR. FREDERICK:  Objection; relevance.
9   A.  About?
10  Q.  BY MR. HARRIS:  About the size of the Hispanic
11  voting block in Texas?
12        MR. FREDERICK:  Same objection.
13  A.  No.
14  Q.  BY MR. HARRIS:  Have you ever had any discussions
15  with the Lieutenant Governor or his campaign staff about
16  the importance of the African-American vote in Texas?
17        MR. FREDERICK:  Objection; relevance.  You
18  may answer.
19  A.  Not that I recall.
20  Q.  BY MR. HARRIS:  Do you have any understanding as
21  to disparities in the extent to which particular racial
22  group support one party or another in Texas?
23        MR. FREDERICK:  Objection; relevance.  You
24  may answer.
25  A.  I do not.

Blaine Brunson                                          May 30, 2012

## 165

1    Q.  BY MR. HARRIS:  Do you follow the Lieutenant
2   Governor Governor's election results?
3    A.  Yes.
4    Q.  And do you have any understanding -- let's say
5   taking his last election in 2010, do you have any
6   understanding as to how the Lieutenant Governor did
7   amongst Hispanic voters in Texas?
8    MR. FREDERICK:  Objection; relevance.  You
9   may answer.
10    A.  I do not.
11    Q.  BY MR. HARRIS:  How about amongst
12   African-Americans, do you have any understanding as to
13   how the Lieutenant Governor did amongst African-American
14   vote engineers 2010?
15    MR. FREDERICK:  Objection; relevance.  You
16   may answer.
17    A.  I don't.
18    Q.  BY MR. HARRIS:  If I ask those same two questions
19   about any previous election would you give the same
20   answer?
21    A.  Yes.
22    Q.  How about Governor Perry?  I assume you must
23   generally at least follow his elections; is that right?
24    MR. FREDERICK:  Objection; relevance.
25    A.  Yes.

## 166

1    Q.  BY MR. HARRIS:  Do you have any understanding as
2   to how Governor Perry did amongst Hispanic voters in
3   2010?
4    MR. FREDERICK:  Objection; relevance.
5    A.  No.
6    Q.  BY MR. HARRIS:  Do you have any understanding as
7   to how Governor Perry did amongst African-American
8   voters in 2010?
9    MR. FREDERICK:  Objection; relevance.
10    A.  I don't.
11    Q.  BY MR. HARRIS:  What is your understanding as to
12   the importance of the issue of immigration in this
13   year's US Senate primary -- Republican primary, excuse
14   me?
15    MR. FREDERICK:  Objection; relevance.  You
16   may answer.
17    A.  I know it's an issue that's definitely discussed
18   during the campaign.
19    Q.  BY MR. HARRIS:  Can you elaborate on that?
20    MR. FREDERICK:  Objection; relevance.
21   Objection; form.  You may answer.
22    A.  It is an -- immigration has been an issue that's
23   been on the public radar for several years that comes up
24   pretty often as the political season heats up in
25   particular.

## 167

1    Q.  BY MR. HARRIS:  And how would you characterize
2   the Lieutenant Governor's position on immigration as
3   opposed to Mr. Cruz's position on immigration?
4    MR. FREDERICK:  Objection; relevance.
5    A.  I'm not advised of what Ted Cruz's position is.
6   And so I couldn't do a -- I don't know how the
7   comparison would be.
8    Q.  BY MR. HARRIS:  Have you been following any of
9   the televised adds or radio adds or any form of adds in
10   the campaign?
11    A.  Yes.
12    Q.  And have any of those adds dealt with the issue
13   of immigration?
14    A.  I would say yes.
15    Q.  And can you describe the adds that you've seen
16   that relate to immigration?
17    MR. FREDERICK:  Objection; relevance.
18   Objection; form.  You can answer.
19    A.  I have not seen any adds that relate to
20   immigration except if there was a mention of it in an
21   add that said illegal immigration or something like
22   that.
23    Q.  BY MR. HARRIS:  And the add that you're
24   describing, would that be an add by the Lieutenant
25   Governor or by another candidate?

## 168

1    MR. FREDERICK:  Objection; relevance.
2   Objection; assumes facts not in evidence.  You may
3   answer.
4    A.  Probably most candidates.
5    Q.  BY MR. HARRIS:  Are you familiar with assertions
6   by Mr. Cruz in this year's Republican Senate primary to
7   the affect that the Lieutenant Governor's advisors
8   believe that GOP voters in Texas would not support a
9   Hispanic candidate?
10    MR. FREDERICK:  Objection; relevance.
11    A.  I'm not aware of that.
12    Q.  BY MR. HARRIS:  You didn't read anything?
13    A.  No.
14    Q.  Are you aware of the assertions Lieutenant
15   Governor campaign for this year's Republican nomination
16   for the Senate have involved resorts to bigotry?
17    MR. FREDERICK:  Objection; relevance.
18   Objection; assumes facts not in evidence.  You answer if
19   you can.
20    A.  Have I seen an article about that?
21    Q.  BY MR. HARRIS:  Yes.  What did you readable that?
22    MR. FREDERICK:  Objection; relevance.
23   Objection; form.
24    A.  That Cruz's campaign said that some statement or
25   issue being bigotry, that the Lieutenant Governor --

Blaine Brunson                                              May 30, 2012

### 169

1    yeah, the Lieutenant Governor laid out.
2         Q.  BY MR. HARRIS:  Did you discuss those allegations
3    with the Lieutenant Governor?
4              MR. FREDERICK:  Objection; relevance.
5         A.  I did not.
6         Q.  BY MR. HARRIS:  Have you discussed those
7    allegations with anyone on the Lieutenant Governor's
8    staff at the Capital or his campaign staff?
9              MR. FREDERICK:  Objection; relevance.
10        A.  No.
11        Q.  BY MR. HARRIS:  What do you think of those
12   allegations?
13             MR. FREDERICK:  Objection; relevance.
14   Objection; form.
15        A.  I don't have an opinion on them.  I haven't
16   looked at it close enough to have an opinion.
17        Q.  BY MR. HARRIS:  So your testimony is that you
18   don't have an opinion on the assertion that the
19   Lieutenant Governor's campaign has resorted to bigotry?
20             MR. FREDERICK:  Objection; form.  Objection;
21   misstates prior testimony.  You may answer.
22        A.  Could you repeat the question?
23        Q.  BY MR. HARRIS:  I would ask the court reporter to
24   please read back the question?  That's okay.  Let's move
25   on.  I know your time is scarce.  Have you discussed

### 170

1    this -- putting aside your attorneys, have you discussed
2    this litigation -- and by this litigation I mean the
3    case you're here testifying about, with anyone?
4              MR. FREDERICK:  Objection; relevance.  You
5    may answer.
6         A.  Just with our general counsel.
7         Q.  BY MR. HARRIS:  Have you discussed litigation
8    with the Lieutenant Governor?
9              MR. FREDERICK:  Objection; relevance.
10        A.  I have discussed it from the standpoint that he
11   knows that myself and Julia are being deposed.
12        Q.  BY MR. HARRIS:  Have you discussed the litigation
13   with the Lieutenant Governor from any other standpoint?
14             MR. FREDERICK:  Objection; relevance.
15        A.  At the time the lawsuit was filed, just that the
16   lawsuit had been filed.
17        Q.  BY MR. HARRIS:  I believe you testified -- excuse
18   me.  Going back -- when the lawsuit was filed, what if
19   anything in particular did you discuss about that fact
20   with the Lieutenant Governor?
21             MR. FREDERICK:  Objection; relevance.
22        A.  Just the fact that it had been filed.
23        Q.  BY MR. HARRIS:  And what, if anything, did the
24   Lieutenant Governor say about the fact that the lawsuit
25   had been filed?

### 171

1              MR. FREDERICK:  Objection; relevance.
2         A.  Keep me posted on what's happening.
3         Q.  BY MR. HARRIS:  Did he say anything else?
4         A.  That's about it.
5         Q.  Can you recall anything else he said?
6              MR. FREDERICK:  Objection, relevance.
7         A.  No.
8         Q.  BY MR. HARRIS:  Have you discussed this
9    litigation -- again putting aside your attorneys and I
10   think putting aside the Lieutenant Governor's general
11   counsel as well and putting aside the Lieutenant
12   Governor since we just spoke about him, have you
13   discussed this litigation with anyone else?
14             MR. FREDERICK:  Objection; relevance.
15        A.  Not that I recall.  If there was any discussions
16   it was nothing substantive.
17        Q.  BY MR. HARRIS:  I believe you testified earlier
18   that SB 14 would apply equally to Democrats and
19   Republicans; is that right?
20        A.  Well, if it's -- if it's finally made law.
21        Q.  Are you aware of any analysis showing whether
22   Democrats and Republicans are equally likely to possess
23   the required forms of ID under SB 14?
24             MR. FREDERICK:  Objection; relevance.
25        A.  I am not.

### 172

1         Q.  BY MR. HARRIS:  What was the Lieutenant
2    Governor's role in including a carve out for voter ID
3    laws from the two-thirds rule under the Senate rules in
4    2011?
5              MR. FREDERICK:  Object to form of the
6    question.  Object it assumes facts not in evidence.  You
7    may answer.
8              MR. HARRIS:  I'll take the objection under
9    advisement and rephrase.
10   BY MR. HARRIS:
11        Q.  Did the Lieutenant Governor have a role including
12   a carve-out for the two-thirds rules under the Senate
13   rules?
14             MR. FREDERICK:  Objection; form.  Assumes
15   facts not in evidence.  Object to the characterization
16   of the Senate rule.  You may answer.
17        A.  Yes.
18        Q.  BY MR. HARRIS:  What was Lieutenant Governor's
19   role?
20             MR. FREDERICK:  Object to the form.  Also
21   caution you not to reveal any privileged information.
22   But you can answer if you can do so.
23        A.  Traditionally the Lieutenant Governor and the
24   Senators work together at the beginning of session to
25   adopt the rules.  And he's -- he and any other

Blaine Brunson                                    May 30, 2012

### 173

1  Lieutenant Governor would have participated in
2  discussions with any set of Senators about what the
3  rules of Senate would be for the upcoming session.
4      MR. HARRIS:  I'm going to ask this document
5  be marked as League of Young Voters Exhibit 1?
6      (Exhibit No. 1 was marked.)
7  BY MR. HARRIS:
8      Q.  Mr. Brunson, the court reporter has handed you
9  what's been marked as League of Young Voters Exhibit 1
10  which bears the Bates number TX0006413.  Do you
11  recognize this document?
12      A.  I don't.
13      Q.  I see at the top left of the page there's a name,
14  Sheera Ikeler.  Do you know who that is?
15      A.  I don't.
16      Q.  It appears from the face of this document that
17  it's an e-mail.  Do you agree with that?
18      A.  Yes.
19      Q.  And it looks like this e-mail was both sent from
20  and to someone named Skipper Wallace.  Do you see that?
21      A.  Yes.
22      Q.  Who is Skipper Wallace?
23      A.  He is the TRCCA legislative chairman.
24      Q.  And when you say "TRCCA," what does that stand
25  for?

### 174

1      A.  I think it's the Texas Republican County Chairman
2  Association.
3      Q.  And do you have any understanding as to what that
4  group is?
5      A.  It's the collection of the Republican county
6  chairman around the State.
7      Q.  I see that the subject line here, it looks like
8  it's a forward it says FW and then the subject is voter
9  ID bill?
10      A.  Yes.
11      Q.  It looks like the date of this e-mail was May 22,
12  2011.  Do you see that?
13      A.  Yes.
14      Q.  Do you understand the subject voter ID bill to
15  mean SB 14?
16      A.  Yes.
17      Q.  And it looks like the first line of this -- of
18  the body of this e-mail in all caps and it says, "a big
19  thank you."  Do you see that line?
20      A.  I do.
21      Q.  Then going on it says that "the Texas Republican
22  County Chairman's Association would like to go on record
23  as thanking the following people for the passage of the
24  voter ID bill."  And then skipping -- it looks like
25  there's a list of names after that.  Do you see that?

### 175

1      A.  Yes.
2      Q.  And under the -- two lines down from what I just
3  read it states, "Lieutenant Governor Dewhurst for
4  suspending the two-thirds rule on the Senate that
5  allowed the bill to be considered."  Do you see that
6  line?
7      A.  I do see it.
8      Q.  Why would Skipper Wallace issue a big thank you
9  to Lieutenant Governor Dewhurst for suspending the
10  two-thirds rule in the Senate that allowed the bill the
11  be considered?
12      MR. FREDERICK:  Objection; calls for
13  speculation.
14      A.  I would say you have to ask Skipper Wallace.
15      Q.  BY MR. HARRIS:  Do you have any understand as to
16  why Skipper Wallace would issue a big thank you to the
17  Lieutenant Governor for suspending the two-thirds rule
18  and allowing the bill to be considered?
19      MR. FREDERICK:  Objection; relevance.
20      A.  You would have to ask Skipper Wallace.
21      Q.  BY MR. HARRIS:  Is it your testimony that you do
22  not have any understanding as to why Skipper Wallace
23  would issue a big thank you to Lieutenant Governor
24  Dewhurst for suspending the two-thirds rule?
25      MR. FREDERICK:  Objection; mischaracterizes

### 176

1  testimony.  Objection; relevance.  You may answer.
2      A.  I think if I had an answer it would be an
3  assumption.  If you ask Skipper Wallace he would be able
4  to tell you.
5      Q.  BY MR. HARRIS:  Have you heard of a group called
6  the King Street Patriots?
7      A.  I've heard of them.
8      Q.  Who are the King Street Patriots?
9      A.  I think it's a Houston -- Houston based -- I
10  believe it's Houston based -- somewhere in the Houston
11  area tea party group.
12      Q.  And to your knowledge has the Lieutenant Governor
13  attended any events hosted or sponsored by the King
14  Street Patriots?
15      A.  He probably has.  I actually think he has gone to
16  one or more of their meetings.
17      Q.  Do you know whether he has done so recently?
18      A.  I don't know.
19      Q.  I believe you testified earlier that because you
20  think it's hard to do things in general without a
21  driver's license, SB 14 cannot negatively effect that
22  many people.  Was that your testimony?
23      A.  I said I find it hard to -- I find it hard to
24  believe that it would be -- there would be that many
25  people without some form of photo ID given in the

Blaine Brunson                                                May 30, 2012

---

**177**

1  current society how much you have to have a photo ID --
2  voter photo ID to do anything.
3      Q.  Do you know how many registered voters in Texas
4  lack a driver's license?
5      A.  I don't.
6      Q.  Do you know whether any analysis of that question
7  was performed when SB 14 was being considered?
8      A.  I do not.
9      Q.  Do you know whether any such analysis has been
10  done since SB 14 was passed?
11      A.  I do not.
12      Q.  Do you know how many voters in Texas lack --
13  excuse me, registered voters in Texas lack the other
14  forms of identification permitted to vote under SB 14?
15      A.  I don't.
16      Q.  If we could just take a 2-minute break I'll just
17  confirm that I don't have any other questions and then
18  you can be on your way?
19      A.  Sure.
20      Q.  Thank you.
21         (Brief recess.)
22  BY MR. HARRIS:
23      Q.  I believe you testified in 2011 Governor Perry
24  designated the voter ID law as an emergency item; is
25  that correct?

---

**178**

1      A.  Yes.
2      Q.  Why did Governor Perry designate SB 14 as an
3  emergency item?
4      MR. FREDERICK:  Objection; relevance.
5  Objection; calls for speculation.  You can answer if you
6  know.
7      A.  I don't know.
8      Q.  BY MR. HARRIS:  Did you have any discussions with
9  Governor Perry about why he designated SB 14 as an
10  emergency item?
11      A.  No.
12      Q.  Did you any discussions with any of Governor
13  Perry's staff about why the Governor designated SB 14 as
14  an emergency item?
15      A.  Yes.
16      Q.  With whom did you -- with whom from the
17  Governor's staff did you discuss why the Governor
18  designated SB 14 as an emergency item?
19      A.  With Ray Sullivan.  I don't know if we discussed
20  why he did it.  I thought the question was did we
21  discuss voter ID.
22      Q.  Okay.  Well, we can certainly talk about both?
23  Who is Mr. Sullivan?
24      A.  He was the Governor's chief of staff.
25      Q.  When did you discuss with Mr. Sullivan the

---

**179**

1  designation of SB 14 as an emergency item?
2      A.  It would have had to have been in December of
3  2010 or early January of 2011, prior to the order coming
4  out.
5      Q.  And what was the substance of your discussion
6  with Mr. Sullivan about the designation of SB 14 as an
7  emergency legislation?
8      MR. FREDERICK:  Objection; relevance.
9      A.  That it was an issue that was definitely going to
10  come up in the session.  And as far as the emergency
11  order, the discussion was if you have a whole bunch of
12  other issues to work on during the session if you did
13  make an emergency item you would work on it in the first
14  60 days of the session.
15      Q.  BY MR. HARRIS:  Did you and Mr. Sullivan at any
16  time discuss why the Governor had designated SB 14 as an
17  emergency item?
18      A.  Not that I recall.
19      Q.  Did you at any time discuss the designation of SB
20  14 as an emergency item with anyone on the Governor's
21  staff other than Mr. Sullivan?
22      A.  Not that I recall.  Probably not.
23      Q.  Are there individuals who you think you may have
24  had discussions with from the Governor's staff with
25  regard to SB 14 as an emergency item?

---

**180**

1      MR. FREDERICK:  Objection; vague.  You may
2  answer.
3      A.  No.
4      Q.  BY MR. HARRIS:  Did you have any discussions with
5  the Lieutenant Governor about the designation of SB 14
6  as emergency legislation?
7      MR. FREDERICK:  Object only to the extent it
8  calls for the substance of those discussions.  You may
9  however answer the question whether or not a discussion
10  occurred.
11      A.  Yes, we discussed voter ID.
12      Q.  BY MR. HARRIS:  Did you particularly discuss the
13  designation of voter ID as an emergency item?
14      MR. FREDERICK:  Again, same objection.
15      A.  Yes.
16      Q.  BY MR. HARRIS:  Did you discuss that subject on
17  more than one occasion with the Lieutenant Governor?
18      A.  I'm sure we did.
19      Q.  When did these discussions occur?
20      A.  Prior to the session and during the session.
21      Q.  What was the substance of your discussion with
22  the Lieutenant Governor regarding why SB 14 was
23  designated as an emergency item?
24      MR. FREDERICK:  Objection; legislative
25  privilege and instruct you not to answer.

Blaine Brunson
May 30, 2012

## 181

1  BY MR. HARRIS:
2      Q.  Are you taking your counsel's advice?
3      A.  Yes.
4      Q.  Are you familiar with statements which -- let me
5  step back.  Do you know an individual named Mike Walz?
6      A.  Yes.
7      Q.  Who is Mr. Walz?
8      A.  He is the Lieutenant Governor's communications
9  director?
10      Q.  Do you recall any public statements by Mr. Walz
11  regarding why SB 14 was designated as an emergency item?
12      A.  I don't recall his statements.
13      Q.  In a typical legislative session how many items
14  are designated as an emergency?
15      A.  It depends on the session.  I think last time --
16  last session there were, I don't remember.  Three to
17  five.  There's normally not a lot of emergency items.
18      Q.  Is three to five a pretty typical number in a
19  session as far as how many items get designated as an
20  emergency?
21      A.  Probably.  Yes.
22      Q.  In the 2011 session what other items were
23  designated as an emergency besides SB 14?
24      A.  I think the Governor designated voter ID and
25  sanctuary cities.

## 182

1      Q.  Do you recall anything else?
2      A.  Yeah.  There was -- I have to think about it for
3  a second.  Give me a second.
4      Q.  Sure.
5      A.  The sonogram bill and seems like there was one
6  more.  I can't recall.  It may have had something to do
7  with like some -- I don't remember what it was.
8      Q.  Since you've worked for the Lieutenant Governor
9  how many times has the Senate met as the
10  Committee-of-the-Whole?
11      A.  I don't know the exact number.  But probably
12  three or four.
13      Q.  The -- you -- besides SB 14 -- I apologize if you
14  testified this previously, but I just want the clarify
15  the record, besides SB 14 what other issues has the
16  Senate deliberated on as the Committee-of-the-Whole?
17      A.  I believe school finance.  Like maybe the '06,
18  '07 time period.  There may be others.  I just --
19  honestly, until last session didn't have to pay
20  attention to anything except the budget.
21      Q.  Does the Lieutenant Governor consider it
22  important to reach out to minority communities?
23          MR. FREDERICK:  Objection; relevance.  And I
24  would also object on the basis of privilege to the
25  extent that this seeks the Lieutenant Governor's thought

## 183

1  process about any specific bill.  I suppose if you can
2  answer without revealing privileged information you may
3  do so.
4  BY MR. HARRIS:
5      Q.  Let me clarify that I'm not asking about any
6  particular legislation.  But in general does Lieutenant
7  Governor consider it important to reach out to minority
8  communities in Texas?
9          MR. FREDERICK:  Objection; relevance.
10  Objection; vague.  You may answer if you can.
11      A.  I think he feels it's important to reach out to
12  all groups in Texas.
13      Q.  BY MR. HARRIS:  What, if anything, has the
14  Lieutenant Governor done since you've -- since you've
15  worked for him to reach out to the Hispanic community in
16  Texas?
17          MR. FREDERICK:  Objection; relevance.
18  Objection; vague.  You may answer.
19      A.  He has -- like we talked about earlier he's done
20  a lot of Spanish language media.  One that is
21  particularly in South Texas when we were travelling on
22  the border and, you know, he's probably been down to the
23  border area more than any other statewide -- no offense
24  to General Abbott, but I think given that he's a fluent
25  Spanish speaker he feels like it's an easy win for him

## 184

1  to be able to communicate and reach out.  It's, I
2  think -- I was trying to think of any other specific
3  things.  But I think he thinks outreach is important.
4      Q.  BY MR. HARRIS:  And just to clarify, since your
5  counsel objected, if I use the term reach out or
6  political outreach, do you have an understanding of what
7  that means?
8      A.  Yes.
9      Q.  Just for the record, what is that understanding?
10      A.  Could you --
11          MR. FREDERICK:  Object to relevance, but you
12  can answer.
13      A.  Could you repeat the question?
14      Q.  BY MR. HARRIS:  Sure.  What is your understanding
15  of the term political outreach?
16      A.  Reaching out to the political voters.
17      Q.  When you say that the -- that the Lieutenant
18  Governor has reached out to Spanish speakers because
19  it's an easy win for him, what do you mean by that?
20          MR. FREDERICK:  Objection; relevance.  You
21  may answer.
22      A.  He's perfectly fluent in Spanish.  It's a natural
23  fit is what I mean.  It's a win for the voters that only
24  speak Spanish and a win for the Lieutenant Governor
25  because not all the elected officials can fluently speak

Blaine Brunson
May 30, 2012



185

1  Spanish.
2     Q.  BY MR. HARRIS:  I'm a little confused because I
3  think I asked you earlier if you had any understanding
4  of how the Lieutenant Governor has done in terms of his
5  elections amongst Hispanic voters.  And now you're
6  testifying that Hispanic vote because the Lieutenant
7  Governor is a Spanish speaker is an easy win for him.
8  Do you wish to revise your earlier answer with regard to
9  your understanding of how the Lieutenant Governor has
10  done amongst Hispanic voters?
11     MR. FREDERICK:  Objection; vague.
12  Objection; relevance.  You can answer if you can.
13     A.  No.  Because you asked if I knew specifics about
14  Hispanic voter turn out or election results and I don't.
15     Q.  BY MR. HARRIS:  Putting aside specifics, do you
16  have any general understanding as to how the Lieutenant
17  Governor has done in his elections amongst Hispanic
18  voters in Texas?
19     MR. FREDERICK:  Objection; relevance.
20     A.  I think he's held his own.
21     Q.  BY MR. HARRIS:  When you say "held his own," what
22  do you mean?
23     MR. FREDERICK:  Objection; relevance.
24     A.  He's done as good as he can.
25     Q.  BY MR. HARRIS:  How good is that?

186

1     MR. FREDERICK:  Objection; relevance.
2  Objection; form.  You can answer.
3     A.  It is what it is.  He's done as well as he can.
4  I think he's tried to outreach to all groups, not just
5  any one specific group.
6     Q.  BY MR. HARRIS:  Has the Lieutenant Governor ever
7  won a majority of the Hispanic vote in any of his
8  elections?
9     MR. FREDERICK:  Objection; relevance.
10     A.  I don't know the answer to that.
11     Q.  BY MR. HARRIS:  Do you know whether Lieutenant
12  Governor has ever won a majority of African-American
13  voters?
14     A.  I don't know the answer to that, either.
15     Q.  At this time the Texas League has no further
16  questions, but we reserve the right to recall
17  Mr. Brunson subject to the court's ruling on the motion
18  to compel?
19     (Deposition concluded.)
20
21
22
23
24
25

187

                    CHANGES AND SIGNATURE
                RE: STATE OF TEXAS VS. HOLDER

PAGE  LINE   CHANGE           REASON

188

     I, BLAINE BRUNSON, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.

          BLAINE BRUNSON
THE STATE OF TEXAS   )
                     )
COUNTY OF TRAVIS     )
     Before me,            , on this day
personally appeared BLAINE BRUNSON, known to me (or
proved to me under oath or through
(description of identity card or other document) to be
the person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
expressed.
     Given under my hand and seal of office this ____
day of       ,    .

          NOTARY PUBLIC IN AND FOR
          THE STATE OF



**189**

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
    STATE OF TEXAS        )
3                         )
                          )
4    VS.          ) NO. 12-CV-128
                  ) (DST, RMC, RLW)
5                         )
    ERIC H. HOLDER, JR., )
6    In his official      )
    Capacity as Attorney  )
7    General of the United )
    States                )
8
    **********************************************
9        CERTIFICATE FROM THE
          ORAL DEPOSITION OF
10           BLAINE BRUNSON
              MAY 30, 2012
11
    **********************************************
12      I, Janalyn Reeves, a Certified Shorthand Reporter
13   in and for the State of Texas, do hereby certify that
14   the foregoing deposition is a full, true and correct
15   transcript;
16      That the foregoing deposition of BLAINE BRUNSON, the
17   Witness, hereinbefore named was at the time named, taken
18   by me in stenograph on May 30, 2012, the said Witness
19   having been by me first duly cautioned and sworn to tell
20   the truth, the whole truth, and nothing but the truth,
21   and the same were thereafter reduced to typewriting by
22   me or under my direction.  The charge for the completed
23   deposition is $_____ due from Defendant.
24   () That pursuant to the Federal Rules of Civil
25   Procedure, the Witness shall have 30 days after being

**190**

1    notified by certified mail, return receipt requested, by
2    the deposition officer that the original deposition
3    transcript is available in her office for review and
4    signature by the Witness and if any corrections made are
5    attached hereto;
6      () That by agreement of counsel, a reading condensed
7    copy of the deposition transcript along with the
8    full-size original changes and Signature Sheet has been
9    sent to_____ on_____ for review and
10   signature within 30 days and if any corrections returned
11   are attached hereto;
12     () That by agreement of counsel, the deposition
13   officer is instructed to release the original deposition
14   transcript to_____ on_____, for review and
15   signature, and the deposition officer is thereafter
16   released of any further responsibility with regard to
17   the original.
18     () That the Witness shall have thirty (30) days for
19   review and signature of the original transcript and if
20   any corrections returned are attached hereto.
21     () That the signed transcript () was () was not
22   received from the Witness within 30 days.
23     () That the examination and signature of the Witness
24   is waived by the Witness and the parties;
25     That the amount of time used by each party at the

**191**

1    deposition is as follows:
             Ms. Maranzano - 3 hours 16 minutes
2            Mr. Harris - 41 minutes
             Mr. Frederick - no time
3            Ms. Abudu - no time
4      I further certify that I am neither counsel for,
5    related to, nor employed by any of the parties in the
6    action in which this proceeding was taken, and further
7    that I am not financially or otherwise interested in the
8    outcome of the action.
9      WITNESS MY HAND, this the_____ day
10   of_____, A.D., 2012.
11   _____
         JANALYN REEVES
12       Cert. No. 3631
         Expires Dec. 12
13       100 Congress
         Suite 220
14       Austin, Texas  78701
         (512)634-1980
15       Firm Registration No. 283
16
17
18
19
20
21
22
23
24
25