Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,            )
                          )
  Plaintiff,              )
                          )
VS.                       )
                          )
ERIC H. HOLDER, JR., IN   )
HIS OFFICIAL CAPACITY AS  )
ATTORNEY GENERAL OF THE   )
UNITED STATES,            )
                          )
  Defendant,              )
                          )
ERIC KENNIE, ET AL.,      )
                          )
  Defendant-Intervenors,  )
                          )
THE TEXAS SATE CONFERENCE )
OF NAACP BRANCHES, ET     )  CASE NO. 1:12-CV-00128
AL.,                      )  (RMC-DST-RLW)
                          )  Three-Judge Court
  Defendant-Intervenors,  )
                          )
TEXAS LEAGUE OF YOUNG     )
VOTERS EDUCATION FUND, ET )
AL.,                      )
                          )
  Defendant-Intervenors,  )
                          )
TEXAS LEGISLATIVE BLACK   )
CAUCUS, ET AL.,           )
                          )
  Defendant-Intervenors,  )
                          )
VICTORIA RODRIGUEZ, ET    )
AL.,                      )
                          )
  Defendant-Intervenors.  )

Page 2

1  *********************************************************
2
3            ORAL DEPOSITION OF
4              LYDIA CAMARILLO
5              JUNE 12, 2012
6  *********************************************************
7       ORAL DEPOSITION OF LYDIA CAMARILLO, produced as a
8  witness at the instance of the Defendants Eric H. Holder,
9  et al., and duly sworn, was taken in the above-styled and
10 numbered cause on Wednesday, June 12, 2012, from 9:00 a.m.
11 to 10:41 a.m., before Tamara K. Chapman, CSR in and for
12 the State of Texas, reported by machine shorthand, at the
13 Omni, 9821 Colonnade Boulevard, San Antonio, Texas,
14 pursuant to the Federal Rules of Civil Procedure and the
15 provisions stated on the record or attached hereto.

Page 3

1              A P P E A R A N C E S
2
3   FOR THE PLAINTIFF STATE OF TEXAS:
      Mr. Adam Aston
4     ATTORNEY GENERAL OF TEXAS
      Civil Medicaid Fraud Division
5     209 W. 15th Street
      Austin, Texas  78701
6     adam.aston@oag.state.tx.us
7
8   FOR THE DEFENDANTS ERIC H. HOLDER, ET AL.:
      Ms. Michelle McLeod
9     U.S. DEPARTMENT OF JUSTICE
      1800 G Street, 7254
10    NWB - Room 7202
      Washington, DC  20006
11    michelle.mcleod@usdoj.gov
12
13  RODRIGUEZ DEFENDANT-INTERVENORS:
      Ms. Nina Perales
14    110 Broadway, Suite 300
      San Antonio, Texas  78205
15    nperales@maldef.org
16
17  ALSO PRESENT:
      MR. Luis Figueroa - Legislative Staff Attorney
18    MALDEF
      110 Broadway, Suite 300
19    San Antonio, Texas  78205
      lfigueroa@maldef.org
20
21    Mr. Glenn Bayron - Mi Familia Vota
22
23
24
25

Page 4

1              I N D E X
2                        PAGE
3
   APPEARANCES...............................  2
4
   EXAMINATION
5    Examination By Mr. Aston .............   5
   CHANGES AND SIGNATURE....................   67
7
8  SIGNATURE PAGE............................  68
9
10 REPORTER'S CERTIFICATION.................   70
11
12            E X H I B I T S
13 NO.  DESCRIPTION                   PAGE
   1   Notice
14     (No Bates - 2 pages)            9
   2   SB 14
15     (No Bates - 17 pages)          20
   3   5/1/12 e-mail from Carlos Duarte,
16     Subject:  Fwd: Take Action against
       "True the Vote"
17     (Bates RODR-138)               32
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

```
 1              LYDIA CAMARILLO,
 2   having been first duly sworn, testified as follows:
 3                 EXAMINATION
 4   BY MR. ASTON:
 5        Q. Good morning.
 6        A. Good morning.
 7        Q. My name is Adam Aston.  I represent the State of
 8   Texas.  Could you please state and then spell your full
 9   name for the record?
10        A. Lydia Camarillo, L-Y-D-I-A C-A-M-A-R-I-L-L-O.
11        Q. Have you ever been deposed before?
12        A. Yes, I have.
13        Q. How many times?
14        A. I believe once.
15        Q. Can you explain the case or was it for
16   litigation?
17        A. It was the -- it was the redistricting case.
18        Q. And when was that deposition taken?
19        A. I do not remember.  I believe it was January, but
20   I'm not absolutely sure.
21        Q. So four or five months ago?
22        A. Yes.
23        Q. Okay.  We're going to go over a few things to
24   hopefully make this run smoothly, and then we'll get
25   started.  Okay?
```

Page 6

```
 1        A. Okay.
 2        Q. Please answer audibly so the court reporter can
 3   hear you.  No shaking or nodding of the head because those
 4   answers cannot be recorded.  Okay?
 5        A. I understand.
 6        Q. If you don't understand my question or if you'd
 7   like for me to slow down at any point, please let me know.
 8        A. I will.
 9        Q. Please wait until I finish my question to answer,
10   and I will try to wait until you finish an answer before I
11   ask another question.  Okay?
12        A. All right.  Thank you.
13        Q. Your lawyer may object to a question, but even if
14   she objects, unless she instructs you not to answer,
15   you'll still be answering the question.  Do you
16   understand?
17        A. I do.
18        Q. Are you represented by counsel today?
19        A. Yes, I am.
20        Q. Who is your counsel?
21        A. Nina Perales and Luis Figueroa.  And MALDEF.
22        Q. And when -- with MALDEF?
23        A. Yes.
24        Q. And could you please spell their names for the
25   record?
```

Page 7

```
 1        A. Oh, my goodness.  Nina, N-I-N-A.  Perales.  I
 2   always spell it with --
 3           MS. PERALES:  P-E-R-A-L-E-S.
 4           MR. FIGUEROA:  Luis Figueroa, L-U-I-S
 5   F-I-G-U-E-R-O-A.
 6           THE WITNESS:  Thank you for the help.
 7           MS. PERALES:  You're very welcome.
 8        Q. (BY MR. ASTON)  And when did that representation
 9   begin?
10        A. I think it began informally when we began the
11   conversations about redistricting.  Oh, for this case?
12        Q. Yes, ma'am.
13        A. As soon as we decided to move forward with this
14   case.
15        Q. Do you know about when that was?
16        A. I do not remember, but we felt that as soon as we
17   knew that the legislation was going to move forward and it
18   was going to be signed by the governor, we were going to
19   prepare ourselves to move forward with the lawsuit if
20   necessary.
21        Q. So this would have been before the lawsuit was
22   filed sometime last fall?
23        A. Well, you asked formally.  So it wasn't until we
24   signed the form.
25        Q. Do you understand that you've been designated to
```

Page 8

```
 1   provide testimony today on behalf of the Southwest Voter
 2   Registration Education Project?
 3        A. Yes.
 4        Q. Unless I indicate otherwise, when I use the term
 5   "you" or "Southwest Voter" or "your organization" during
 6   this deposition, that term includes the Southwest Voter
 7   Registration Education Project and anyone acting on its
 8   behalf.  Do you understand?
 9        A. I do believe that I'm speaking for Southwest
10   Voter Registration Education Project, and I have the
11   authority to do so.
12        Q. But what I'm saying is if at any point in this
13   deposition I say "you" or "your organization," what I'm
14   referring to you is not you individually unless I make
15   that explicitly clear --
16        A. I understand.
17        Q. -- I'm referring to your organization.  Thank
18   you.
19           Did you prepare for your deposition today?
20        A. I did.
21        Q. What did you do to prepare?
22        A. I read my former testimony.  I reviewed SB 14.  I
23   looked at the notice, and I looked at other materials
24   provided by my attorney.
25        Q. When you're referring to your former testimony,
```

Page 13

```
 1        Q.  And you're prepared on Topic 8?
 2        A.  Yes.
 3        Q.  No. 9:  Southwest Voter Registration Education
 4   Project's plans to assist registered voters to obtain
 5   identification required by Senate Bill 14.
 6            You've been designated on this topic?
 7        A.  Yes.
 8        Q.  And you're prepared on this topic?
 9        A.  Yes.
10        Q.  No. 10:  Any activities by or on behalf of
11   Southwest Voter Registration Education Project regarding
12   Senate Bill 14.
13            Have you been designated on this topic?
14        A.  Yes.
15        Q.  And you are prepared?
16        A.  Yes.
17        Q.  And finally No. 11.  Any activities by or on
18   behalf of Southwest Voter Registration Education Project
19   regarding Senate Bill 362 in 2009?
20        A.  Yes.
21        Q.  You've been designated?
22        A.  Yes.
23        Q.  And you're prepared?
24        A.  Yes.
25        Q.  I'd like to look at Topic 6 before we get any
```

Page 14

```
 1   further on:  Any policy making or advocacy-related work
 2   performed by or on behalf of Southwest Voter Registration
 3   Education Project regarding voter identification.
 4            Does Southwest Voter engage in policy-related
 5   activity regarding voter ID legislation?
 6        A.  We have.
 7        Q.  And can you describe that advocacy activity?
 8        A.  We met with several members of the legislature to
 9   discuss this bill and other bills in the past, and we also
10   provided testimony and I not only wrote but actually gave
11   the testimony on SB 14.  We also spoke to community
12   leaders about this issue.
13        Q.  You gave testimony in 2011 on this bill.  Have
14   you testified in the past on previous bills?
15        A.  I believe I've testified every year that this
16   issue was brought forth since '05.
17        Q.  Does Southwest Voter write articles or conduct
18   seminars?
19        A.  We do, but we haven't done this issue.
20        Q.  Present speakers?
21        A.  We do, but we haven't done this issue.
22        Q.  What about conduct studies or surveys?
23        A.  No, that's another organization.  No, we do not.
24        Q.  And if it was testimony before the legislature in
25   either a committee hearing or something like that, that
```

Page 15

```
 1   would be publically available, correct?
 2        A.  That is correct.
 3        Q.  And as far as you know, you have -- or you
 4   believe you've testified not only in 2011 but in 2009 and
 5   perhaps in '7 and '05 as well?
 6        A.  I'm absolutely sure that I have.
 7        Q.  Let's talk a little bit about the background of
 8   Southwest Voter.  When was the organization founded?
 9        A.  1974.
10        Q.  And do you know the corporate structure of the
11   organization as a partnership or a 501(c)(3)?
12        A.  It's a 501(c)(3).
13        Q.  Do you know how many employees Southwest Voter
14   has?
15        A.  It has ten.
16        Q.  And what is your role?
17        A.  I'm the vice president.
18        Q.  And what do you do as vice president?
19        A.  Everything, including faxing.
20        Q.  What else do you do in addition to the faxing?
21        A.  One of my major roles is figuring out the ground
22   operation, fundraising, media and being the spokesperson
23   on these issues.
24        Q.  Does your organization rely on volunteers?
25        A.  Absolutely.
```

Page 16

```
 1        Q.  Do you know about how many volunteers you have in
 2   a given year?
 3        A.  We could have as many as 10,000 or more depending
 4   on the election cycle.
 5        Q.  So it fluctuates with whether it's an election
 6   year, but it can be up to 10,000?
 7        A.  Yes.
 8        Q.  And very possibly this year, it being not only an
 9   election year but a presidential election year, will this
10   year be on the higher end?
11        A.  This year would be on a higher end.  That is
12   correct.  Unlike last year.
13        Q.  You said "Unlike last year"?
14        A.  Last year was not a presidential year.
15        Q.  What are the organization's primary activities?
16        A.  Voter registration, voter education and
17   mobilization of the Latino voters.
18        Q.  Does your organization drive voters to the polls?
19        A.  We have.  And we do.
20        Q.  Anything else in addition to the registration and
21   the education?
22        A.  I'm not sure I understand what you're asking me.
23        Q.  Any other sort of primary activities?
24        A.  Well, if you're asking me what do I do in voter
25   registration, that's a certain activity.
```

                                              4 (Pages 13 to 16)

Page 17

1   Q.  No, no.  The organization itself, what are the
2   primary activities in addition to --
3      A.  Our primary activities are voter registration,
4   voter education and mobilization of the voters and, when
5   necessary, have conversations about making sure the voters
6   have a the right to vote.  In this case, stopping a voter
7   ID because we believe it's unconstitutional and it's
8   intentional against the right of voters to vote and to
9   cast a vote.
10     Q.  How many offices do you have in the State of
11  Texas?
12     A.  One.
13     Q.  And where is that office located?
14     A.  San Antonio.
15     Q.  Do you have offices in any other states?
16     A.  Los Angeles.
17     Q.  And do you have operations outside of Texas or
18  California?
19     A.  We have operations in other states depending on
20  the year.  In a presidential cycle it will likely be in
21  five to ten states depending on how much money we raise.
22  We are currently working in Los Angeles and we have just
23  completed voter registration projects in Las Cruces and of
24  course in Texas.  We expect to do other states this year.
25     Q.  Do you know what other states you might?

Page 18

1      A.  Arizona, New Mexico, Colorado, Florida and of
2   course California and Texas for now.
3      Q.  Is Southwest Voter a membership organization?
4      A.  It is not.  It is a 501(c)(3).
5      Q.  So you don't really have members or anyone joins,
6   they just -- there's the ten employees and then whoever
7   volunteers to assist, but it's not a collection of
8   members?
9      A.  It is not a collection of members, that is
10  correct.
11     Q.  Do you know what the annual budget is for
12  Southwest Voter?
13     A.  It depends on the election cycle.  This year is
14  probably going to be a little bit over 1.5 million and it
15  can go as high as 3 million depending on how much money we
16  raise.
17     Q.  And are most of your -- the way you raise money,
18  is it mostly through donations?
19     A.  It's all through donations.
20     Q.  Private?
21     A.  It's all private.  It's either individuals,
22  corporations, foundations.  It's all private.  You're
23  welcome to make a donation as well, and we take them from
24  Republicans and Democrats, if that's what you want to
25  know.

Page 19

1      Q.  But you don't receive grants from governmental
2   entities?
3      A.  Never.  On purpose.
4      Q.  The past year do you know about how much you've
5   taken in in donations?
6      A.  I don't remember right now.  Last year was a hard
7   year.  So I think it was not a big year.  I don't remember
8   right now.  I can get you that later if you want it.
9      Q.  Has your organization made plans to assist voters
10  with compliance with SB 14 if it goes into effect?
11     A.  We are hoping that the courts will agree with our
12  assumption and assertion that this law violates the
13  voters.  So at this point we're not making plans.  Should
14  the courts agree with you and not us, then we have to
15  refocus and figure out how we use resources that are very
16  precious and limited to do so.  So we're hoping that the
17  courts agree with us so that we don't have to go there.
18     Q.  So if you haven't made plans, is it also fair to
19  say that you have not implemented any plans to go into
20  effect should Senate Bill 14 take effect at this time?
21     A.  We haven't implemented any plans.  We know what
22  we need to do if it needs to be done, but it hasn't been
23  implemented.
24     Q.  If it's implemented, you said you know what you
25  need to do.  Can you explain what that is?

Page 20

1      A.  Part of it will have to be a wide media campaign.
2   It's very difficult for people to understand what are the
3   rights and what are the requirements and what documents
4   they can use or not use in order to be able to vote.  As
5   well as figuring out how we get them to places in order to
6   get their IDs.
7      Q.  And then your organization, would you help them
8   obtain those IDs if that became a requirement?
9      A.  I don't know yet.  It depends on how much money
10  it would take to do that.  It depends.  We might.
11     Q.  But you'll certainly educate the voters about
12  what is required under the new law?
13     A.  That is correct.  You know, it's 2.1 million
14  voters that we're speaking of.  In Texas.
15         (Exhibit No. 2 was marked.)
16     Q.  (BY MR. ASTON)  You've been given what is marked
17  Exhibit 2.  Take a minute to familiarize yourself with
18  that.
19     A.  I remember this document.
20         MR. ASTON:  This is the document, or this
21  version of it is the one that we attached to our complaint
22  and that is what the Exhibit 1 designation means on the
23  front cover.
24         MS. PERALES:  It's not signed.
25     Q.  (BY MR. ASTON)  So you are familiar with Senate

**Page 21**

1  Bill 14?
2      A. I sure am.
3      Q. And you've read it?
4      A. I have read it.
5      Q. When did you first hear about the bill?
6      A. Oh, gosh. Probably in '05. It's evolving.
7      Q. What about this bill?
8      A. It's an evolving document. Probably in the
9  middle of 2010. We anticipated that this bill was going
10 to be brought forth.
11     Q. And when was the first time that you read the
12 bill?
13     A. When it was in the -- available to the public.
14     Q. After bill filing --
15     A. Yes.
16     Q. -- in the -- --
17     A. Well, whenever it's ready.
18     Q. Just before 2011.
19         Have you read it again since then?
20     A. Yes. Last night.
21     Q. Have you discussed this bill with other employees
22 at Southwest Voter?
23     A. With my president.
24     Q. And what did you discuss and when?
25     A. Simply that we're going to get deposed today.

**Page 22**

1      Q. But prior to learning of the deposition, did you
2  discuss this bill during the legislative --
3      A. Yes.
4      Q. -- session with --
5      A. Yes.
6      Q. -- employees at Southwest Voter?
7      A. I discussed the idea and the intent of the bill,
8  and I discussed what we thought would be the outcome
9  should this bill become a law.
10     Q. And with whom did you have those discussions?
11     A. With my president.
12     Q. Anyone else?
13     A. No.
14     Q. You've read the bill. Are you familiar with what
15 the different provisions of the bill do?
16     A. Yes.
17     Q. And --
18     A. Right now if you ask me what Section A, B, C is,
19 I will have to review it.
20     Q. Do you understand what forms of photo ID will be
21 accepted for voting at the polls?
22     A. Yes.
23     Q. Section 14 on Page 9. Turn there.
24     A. I do. What did you say? Page what?
25     Q. Page 9.

**Page 23**

1      A. I heard you say 14.
2      Q. Section 14.
3      A. Yes.
4         (Witness reviews document.)
5      Q. (BY MR. ASTON) Driver's license, personal
6  identification card. I think those are probably
7  self-explanatory.
8         Do you know what an election identification
9  certificate is?
10     A. I sure do.
11     Q. Military identification card?
12         MS. PERALES: I'm sorry. What's the
13 question?
14         MR. ASTON: If she's familiar that these are
15 the documents that -- or the photo IDs that would be
16 accepted.
17     A. Yes, I'm also familiar with the documents not
18 accepted.
19     Q. (BY MR. ASTON) United States citizenship
20 certificate that contains the person's photograph,
21 passport and a license to carry a concealed handgun?
22     A. You know, most citizenship certificates do not
23 have photos. They have your little feet.
24     Q. Do you know if any of the Southwest Voter's
25 employees lack a photo ID that would be required by Senate

**Page 24**

1  Bill 14?
2      A. I don't know that.
3      Q. Is Southwest Voter aware of any people who do not
4  have the photo IDs required by Senate Bill 14?
5      A. I am aware.
6      Q. All right. Can you identify them by name and
7  address, please?
8      A. Name and address?
9      Q. Sure.
10     A. I cannot identify them by name and address. I
11 can identify two individuals that are part of this lawsuit
12 with us, the young ladies, the Rodriguez, but I cannot
13 tell you their first names and I cannot tell you their
14 address.
15     Q. I am familiar with those two.
16     A. But they exist.
17     Q. We're going to talk with them this afternoon. I
18 know that.
19         Are you aware of any other citizens of Texas who
20 have not?
21     A. I believe those two women reflect many young
22 people like them, and I also belive there's also elderly
23 Latinos that will be going through the same thing that
24 these young women are.
25     Q. But again, Southwest doesn't know of any

Electronically signed by Tamara Chapman (501-213-791-1192)                    0b08b52f-7f2a-4c3b-9256-3226151d6c52

Page 25

1   particular individuals --
2       A.  At this time --
3       Q.  But Southwest Voter is not aware of any other
4   individuals other than your codefendants?
5       A.  I don't have any names right now, if that's what
6   you're asking.  Which is different than your question.
7       Q.  Does Southwest Voter represent anyone else in
8   this litigation besides its organization?
9       A.  Southwest Voter represents Southwest Voter, and
10  we believe that in doing so we're representing the
11  2.2 million Latinos that are registered to vote and the
12  other 2.5 million that could register to vote in the State
13  of Texas.
14      Q.  About what percentage of the organization's
15  budget is designated to voter registration activities?
16      A.  About 80 percent.
17      Q.  And about what percent is dedicated to voter
18  education?
19      A.  It's all mixed in there because in order to
20  register somebody you ask them what's important about
21  voting, and that includes the education.  And when you
22  turn them out to vote, you're also telling them why it's
23  important for them to vote.  So it's all configured
24  together.  I don't have it split up like that.
25      Q.  So you would say education and registration

Page 26

1   combined --
2       A.  Yes.
3       Q.  -- make up about 80 percent --
4       A.  Yes.
5       Q.  -- of your budget?
6       A.  Yes, we believe that once they are registered
7   they will likely vote even if we are not able to turn them
8   out to vote ourselves.
9       Q.  So has your organization produced any reports on
10  the voter ID legislation?
11      A.  Reports, no.
12      Q.  Did your organization provide its members or
13  staff with any materials on voter ID during the 2011
14  legislative session?
15      A.  Only the MALDEF fact sheet, which I believe is
16  part of your exhibit.
17      Q.  Did your organization provide your members or
18  staff with any materials on voter ID during the 2009
19  legislative session?
20      A.  I do not remember.
21      Q.  Do you recall for 2007 or 2005?
22      A.  I do not remember.
23      Q.  Has your organization provided its members or
24  staff with any materials on voter ID during any
25  legislative interim, the time between the sessions?

Page 27

1       A.  No.
2       Q.  During the legislative session or before, did
3   Southwest Voter meet with any interest groups about Senate
4   Bill 14?
5       A.  You're speaking of the last legislative
6   legislation, correct?
7       Q.  Correct.
8       A.  Yes.
9       Q.  With whom did you meet?
10      A.  I believe we met with some in a general meeting
11  with League of Women Voters.  I believe the ACLU was there
12  as well.  Mi Familia Vota was there and other community
13  groups.
14      Q.  Do you know how often you met?
15      A.  I believe we met four times or so.  But I'm not
16  absolutely sure.
17      Q.  And do you know of any other organizations with
18  which your organization met?
19      A.  I don't remember right now.
20      Q.  Did any of those groups provide Southwest Voter
21  with any materials on voter ID legislation?
22      A.  Well, I believe MALDEF was with us, and MALDEF is
23  the one that provided the list that I was referring to.
24      Q.  The fact sheet?
25      A.  Yes.

Page 28

1       Q.  Are you aware of any other documents?
2       A.  That were presented, no.
3       Q.  Did Southwest Voter provide its members or staff
4   with talking points about Senate Bill 14?
5           MS. PERALES:  Objection to the extent that
6   it says Southwest Voter provided materials to its members,
7   because the testimony is that they don't have members.
8       Q.  (BY MR. ASTON)  Did they provide to the staff --
9   did they provide the staff with any talking points?
10      A.  No, because I'm the one that was doing it.  So
11  it's me, myself and I.
12      Q.  And did anyone provide your organization with
13  talking points, not counting the MALDEF fact sheet that we
14  discussed?
15      A.  I don't think so, no.  No, I'm pretty sure no.
16      Q.  I hope to go about 45 minutes to an hour before
17  we take breaks.  So if you need a break at any time, just
18  let me know.
19      A.  Yeah.  No, I'll ask you if I need to.  I think
20  I'm fine because I took some stuff to not cough too much.
21      Q.  Does Southwest Voter Registration Education
22  Project intervene along with other parties, correct?
23      A.  Correct.
24      Q.  And those parties include Mi Familia Vota
25  Education Fund and two individual intervenors?

Page 33

1  which was the -- in testimony.
2      Q.  Request for production No. 7:  All documents in
3  your possession, custody or control, including e-mails and
4  other communications that support your contention that
5  Texas Senate Bill 14 was enacted with an impermissible
6  purpose.
7          Answer:  Defendant-intervenor has no documents
8  responsive to this request for production.
9          And that was the answer you gave?
10     A.  That's correct.
11     Q.  And it remains true that you have no documents --
12     A.  That is correct.
13     Q.  -- with regard to --
14     A.  That is correct.
15     Q.  Let's talk for a few minutes about what you
16  believe the effect of Senate Bill 14 will be.  Does
17  Southwest Voter contend that Senate Bill 14 will have the
18  effect of denying or abridging Hispanics' and Latinos'
19  right to vote on account of race, color or membership in a
20  language minority group?
21     A.  Southwest Voter believes wholeheartedly that
22  SB 14 will have a negative impact on Latino voter turnout.
23  We believe it's a bill that ultimately was signed by the
24  governor with the intent to discriminate and dilute the
25  right of Latino voters.  We believe that it is a result of

Page 34

1  an emergency that was called by the Governor as a crisis
2  on voter fraud that is nonexistent on a couple of
3  realities that we have.
4          One, the Attorney General conducted a two-year
5  study of over $1.5 million to find a case that he never
6  found.  Second, the Secretary of State provided over
7  600,000 names of individuals that are Latino that would
8  not be able to provide the ID.  And so we believe that the
9  state of Texas in a crisis, financial crisis, was unable
10 to provide the evidence of voter fraud.
11         We believe that it was around the time that
12 redistricting was going to happen, when the state grew by,
13 over the last ten years, 2.3 million more people, of which
14 65 percent of that was Latino.  Ultimately 90 percent was
15 minority, and it was an attempt by the Governor and the
16 legislators to stop the growth of Latino voters, as well
17 other people of color.
18         We also believe that since the Attorney General
19 was not able to provide any case after spending money that
20 we don't have, that the State insists that it's going to
21 be free when in fact this is not going to be free, for a
22 couple of reasons.
23         First, a poor person may not have the resources
24 to drive to wherever they have to pick it up.  If they're
25 lucky, there might be a Department of -- DPS, the

Page 35

1  Department of -- a place where you pick up the card.
2  There might not be a place for that.  We know that 40 of
3  them are closed.  We know that another 30 were going to be
4  closed as a result of the budget shortfall.
5          We also know that even if you can drive there,
6  you might not have the right documentation to get an ID.
7  Therefore, it is not free and it is not easy to obtain,
8  and we believe it's another hidden tax poll.
9          We believe that the State of Texas created a
10 crisis that doesn't exist, attacking Latinos, and it's at
11 a moment when they wanted to create an anti-immigrant
12 opportunity, because we all know that the people that vote
13 are American citizens, not immigrants who are unable to
14 vote.
15     Q.  What is your evidence, in addition to what you
16 just said, this will have a discriminatory effect?  We can
17 talk about purpose later, but discriminatory fact.
18     A.  We believe that speaking and -- being on the
19 ground with voters and speaking to them, that there are
20 going to be individuals that are going to be harmed.  We
21 also believe in reading the Brennan report as a second
22 source, we believe that that's our evidence.  But our
23 number one evidence is 38 years of history working on the
24 ground with Latino voters and other voters of color.
25     Q.  So other than your belief and the Brennan report

Page 36

1  which says what?  What is the Brennan report?
2      A.  The Brennan report says that individuals will not
3  be able to provide the documents, as many as two million
4  in Texas.
5      Q.  Do you have any other evidence that you believe
6  supports your contention?
7      A.  My 38 years of experience with the organization
8  and speaking to voters.
9      Q.  And what is that evidence?
10     A.  Individuals telling us that they won't be able to
11 produce the documents.
12     Q.  Who are these individuals?
13     A.  Voters.
14     Q.  Can you name any of them?
15     A.  I cannot name any of them right now.
16     Q.  Is that the entire universe of your
17 organization's evidence that Senate Bill 14 will have the
18 effect of denying or abridging Hispanics' or Latinos'
19 right to vote?
20     A.  That and the history of Texas having a history of
21 discriminating against voters and having an intent against
22 Latino voters and other voters of color.
23     Q.  But that's all?
24     A.  That's enough, don't you think?
25     Q.  Does Southwest Voter contend that Senate Bill 14

Page 37

1   will have the effect of denying or abridging
2   African-Americans' right to vote on account of race,
3   color, or membership in a language minority group?
4       A.  I cannot speak for the African-American
5   community, but I believe they have similar realities that
6   the Latino community has.
7       Q.  Do you have any evidence as to what effect this
8   bill might have on African-Americans?
9       A.  I do not have any evidence.
10      Q.  Does Southwest Voter contend that Senate Bill 14
11  will have the effect of denying or abridging
12  Asian-Americans' right to vote on account of race, color,
13  or membership in a language minority group?
14      A.  I think that any voter that's Latino, Asian,
15  black, that is poor, that doesn't have the identification,
16  will be prohibited from voting if they're American
17  citizens and they have the right to vote.  I believe this
18  bill, this law, whichever you want to call it, violates
19  the constitutional rights and the Voting Rights Act of
20  American citizens in Texas.
21      Q.  Do you have any evidence as to the effect this
22  bill will have on Asian-Americans?
23      A.  I have the same evidence that I have for Latinos,
24  which is understanding how voters feel.
25      Q.  Has Southwest Voter conducted any studies or any

Page 38

1   surveys on the effect that this bill will have on minority
2   voters?
3       A.  No.
4       Q.  Has Southwest Voter conducted any surveys or any
5   studies on the effect that previous voter ID legislation
6   would have on minority voters?
7       A.  No.
8       Q.  Are you familiar with the polls regarding public
9   support for voter ID legislation?
10      A.  I am familiar with the polls.  I am also familiar
11  that there was a time when polls said that it was okay to
12  have slavery.  That doesn't make that -- that didn't make it
13  right then, and this doesn't make it right either.
14      Q.  Are you aware of polls showing that the majority
15  of Texans support a photographic ID requirement to vote,
16  regardless of political affiliation?
17      A.  I am familiar but that doesn't make it right, as
18  the case in slavery.
19      Q.  Are you aware of polls showing that the majority
20  of Texans support a photographic ID requirement to vote
21  regardless of their race?
22      A.  No.
23      Q.  Are you aware of polls showing that the majority
24  of Texans support a photographic ID requirement to vote
25  regardless of membership in a language minority?

Page 39

1       A.  I haven't seen anything like that.
2       Q.  Do you believe that elderly voters are more
3   likely than the average voter to lack a form of
4   identification required by Senate Bill 14?
5       A.  I believe that young voters and older voters will
6   have a problem.  For older voters, there was a time, if
7   you were poor, that you were delivered by a midwife, and
8   they may not have provided the right documentation, and
9   therefore they might not have in their possession their
10  correct certificate.
11      Q.  But are you -- so that means --
12          So do you or do you not believe --
13      A.  I've made my statement.
14          MS. PERALES:  It's okay if he asks the
15  question again just to get a little bit of clarity, and
16  it's all right for you to answer.
17          THE WITNESS:  Okay.
18      Q.  (BY MR. ASTON)  So your answer is yes?
19      A.  I'm sorry.  Ask again.
20      Q.  Do you believe that elderly voters are more
21  likely than the average voter to lack a form of
22  identification required by Senate Bill 14?
23      A.  I believe that elder Latino voters and young
24  Latino voters are going to have a problem to produce the
25  required IDs in order to vote in the state of Texas.

Page 40

1       Q.  Are you aware of Senate Bill 14's exception to
2   the photo ID requirement for voters over the age of 65?
3           MS. PERALES:  Objection.  I'm sorry, I
4   guess -- I will frame the objection as one for vagueness.
5   I believe that the option would be to cast a mail ballot
6   as opposed to voting in person for a person over 65.
7           MR. ASTON:  That's correct.
8           MS. PERALES:  Okay.
9       Q.  (BY MR. ASTON)  Are you aware that -- let me
10  rephrase the question.
11          Are you aware that voters over the age of 65
12  have the option to cast a mail-in ballot for which they do
13  not need a photo ID?
14      A.  If I remember correctly, the law states that you
15  must be disabled, you must be traveling, before you can
16  use the vote by mail.  Am I incorrect?
17          Second, 65-year old voters who have voted
18  traditionally love voting on election day in person.
19      Q.  Do you believe that rural voters are more likely
20  than the average voter to lack a form of identification
21  required by Senate Bill 14?
22      A.  I believe that Latino voters who live in rural
23  Texas are more than likely poor.  If they're young, they
24  won't have the IDs required by this particular bill or
25  law, and if they're older, they may definitely not have

Page 41

1   the appropriate documentation to acquire the
2   documentations provided by the State in order to vote.  I
3   do believe that this law will jeopardize the right of
4   Latino citizens who could vote in rural America Texas.
5        Q.  Do you believe that indigent voters are less
6   likely than the average voter to be appropriately educated
7   about the change in the identification requirements for
8   voting under Senate Bill 14?
9        A.  I believe that the budget proposed by the State
10  in order to educate voters is not sufficient and therefore
11  it will also cost the taxpayer voters.  And ultimately the
12  poor voters in Texas will not be informed about the right
13  to vote, or, more importantly, they will not have the
14  right documentation in order to get the required
15  documentation to vote in Texas should this law be
16  implemented.
17       Q.  Do you believe that indigent voters are more
18  likely than the average voter to lack a form of
19  identification required by Senate Bill 14?
20       A.  I believe that the voters that are poor in Texas,
21  including Latino voters who might not have the
22  documentation, even if they could get it, might not have
23  the money to be able to obtain it; therefore, it's a
24  double tax.
25            MR. ASTON:  Go off the record for a minute.

Page 42

1            (Break.)
2        Q.  (BY MR. ASTON)  A few more questions on this and
3   then we'll move to a different topic.
4        A.  Okay.
5        Q.  Do you believe that indigent voters are less
6   likely than nonindigent voters to be able to obtain a form
7   of identification prescribed under Senate Bill 14?
8        A.  Yes.
9        Q.  And do you believe that elderly voters are less
10  likely than nonelderly voters to be able to obtain a form
11  of identification required under Senate Bill 14?
12       A.  I'm sorry.  I think I lost it.  Say it again.
13       Q.  Do you believe that elderly voters are less
14  likely than nonelderly voters to be able to obtain one of
15  the forms of identification?
16       A.  Yes.
17       Q.  Do you believe that disabled voters are less
18  likely than other voters to be able to obtain a form of
19  identification required under SB 14?
20       A.  Yes.
21       Q.  Do you believe that rural voters are less likely
22  than urban or suburban voters to be able to obtain a form
23  of identification required under SB 14?
24       A.  Yes.  And I think I answered that already.
25       Q.  And I think we discussed before, you believe that

Page 43

1   young voters are less likely than other voters?
2        A.  That's correct.
3        Q.  Finally, do you believe that voters without a
4   high school diploma are less likely than voters with a
5   high school diploma to be able to obtain a form of ID?
6        A.  I'm not sure, but yes.
7        Q.  Let's talk about possession -- current possession
8   of photo IDs.  Do you know how many Texas registered
9   voters lack one of the forms of photo ID that would be
10  required under SB 14?
11       A.  I believe the Secretary of State, by her own
12  accounts, provided data that showed that there were about
13  660,000 Latino voters that would not have the proper ID in
14  order to vote.  And I believe that there is others who
15  believe that it is much higher.  So at this point I have
16  to rely on both, our perception, our understanding, our
17  history, and what the Secretary of State and others have
18  said.
19       Q.  The Secretary of State's figures, did those
20  include all of the IDs listed under SB 14 or were those
21  just people who do not currently have a driver's license
22  or a personal ID provided by the State of Texas or do you
23  recall?
24       A.  I don't remember.
25       Q.  Can Southwest Voter identify any Texas registered

Page 44

1   voter who does not have one of the types of photo ID
2   required by SB 14?  Earlier you mentioned your two
3   co-defendants.
4        A.  Our two co-defendants.
5        Q.  Are you aware of any other voters that you can
6   name?
7        A.  Not that the point.
8        Q.  Your answer was, not at this point?
9        A.  No.
10         Thank you for clarifying.
11       Q.  Do you know how many Texas registered voters lack
12  the documents necessary to get a state-issued photo ID?
13       A.  I think I answered this already.
14       Q.  This is a different question.
15            MS. PERALES:  You may answer.
16       A.  Ask me again.  Maybe I didn't understand.
17       Q.  (BY MR. ASTON)  A moment ago we talked about who
18  doesn't currently have the photo ID.  What I'm asking now
19  is do you know how many Texas registered voters lack the
20  underlying documents that would be necessary to get a
21  state-issued photo ID?
22       A.  I'm not sure.
23       Q.  Can Southwest Voter identify any Texas -- any
24  Texas registered voter who does not have those documents
25  necessary to get a state issued photo ID?

Electronically signed by Tamara Chapman (501-213-791-1192)                                    0b08b52f-7f2a-4c3b-9256-3226151d6c52

Page 49

1    federally issued photo ID, such as a passport or a
2    military ID, that would allow them to vote even if Senate
3    Bill 14 goes into effect?
4         A.  I acknowledge that but I also acknowledge that
5    they might not have it, so I think the point goes either
6    way.
7         Q.  Do you believe that Hispanic and Latino voters
8    are more likely or less likely than other voters to have a
9    passport?
10        A.  Less likely.  It costs money to travel so I don't
11   know that they would have a passport.  There is only a few
12   of us that travel.  And I don't believe that they would
13   have the gun permits, certificate, but I don't know.
14        Q.  The gun permit --
15        A.  I guess my answer to your question would be, I'm
16   not sure because it could go either way.
17        Q.  But you acknowledge the possibility?
18        A.  There is a possibility that they could have it,
19   and there is a possibility they could not have it.  So it
20   might actually be worse.  And it might be better.  I don't
21   know.
22        Q.  But you acknowledge that a Hispanic or a Latino
23   voter who has either a passport or a military ID would be
24   able to vote even if Senate Bill 14 goes into effect?
25        A.  Yes, since that's one of the allowed

Page 50

1    documentations where you could vote.
2         Q.  Let's talk about the purpose of the bill.
3         A.  Okay.
4         Q.  You've -- in sort of talking about effect you've
5    discussed purpose a bit.  But does Southwest Voter contend
6    that Senate Bill 14 was enacted with a discriminatory
7    purpose?
8         A.  I do.
9         Q.  And what is the basis for that contention, what
10   is the evidence that you have?
11        A.  The history of Texas, a long history of Texas of
12   being a state that we need to have Section 2 and Section 5
13   of the voting rights to protect our rights because it's a
14   state that is part of the southern states that have a
15   history of discrimination.
16        The fact that this year was a year of
17   redistricting and in the redistricting, people take --
18   those in control want to keep their power and they want to
19   have in -- their intent is to maintain it and so if it
20   means stopping by creating other barriers, they will do
21   so.
22        By the fact that the State claims that there was
23   a crisis when in fact there was no crisis, even after the
24   Attorney General spent significant amount of resource that
25   could have been used for higher education for something

Page 51

1    like an infrastructure or cleaning the water or whatever
2    is it is that we need.  Found no voter fraud.
3         The fact that it's an attempt to attack the
4    Latino community.  We're talking about the Latinos who are
5    the ones that are -- supposedly the ones that are voting
6    fraudulently in person.
7         So, yes, I do believe that the State of Texas
8    intentionally put this legislation to stop Latino voters
9    and other voters from fulfilling their right to vote as
10   American citizens.
11        Q.  Do you have any other evidence that supports your
12   contention that this bill was enacted with a
13   discriminatory purpose?
14        A.  I think that's evidence enough.
15        Q.  But do you have any more?
16        A.  I am sure I can find others.
17        Q.  But at this time you have no more evidence?
18        A.  At this time that's the only thing I want to say.
19        MS. PERALES:  You have to answer completely
20   for what you know right now.
21        A.  Well, we know that 2.4 million more people grew
22   in the state of Texas.  We know that that growth is a
23   result of -- 90 percent of it is because of the minority
24   community.  65 percent of that is because of the Latino
25   community.  And there is a genuine fear, and we believe -- I

Page 52

1    believe, by the laws that are being implemented.  We know
2    that the State of Texas has a history of violating and
3    stopping Latino and other voters from voting.
4         Intent, as you know, is -- can be accumulative of
5    all those things put together, and I believe that all
6    those things put together demonstrate that the State of
7    Texas has the intention to stop Latino and other voters
8    from voting and, therefore, has the intent to purposely
9    stop Latino voters who are American citizens and other
10   voters from voting that are American citizens.
11        In particular because HAVA already exists, and
12   the current law already allows us to vote with certain
13   documentations and there is -- we found no evidence -- the
14   State found no evidence of people who are -- who voted
15   fraudulently in person.
16        Q.  (BY MR. ASTON)  Do you contend that preventing
17   voter fraud was not the purpose of Senate Bill 14?
18        A.  I contend that the State used that as a veiled
19   attempt to say that in fact there was a crisis.  But after
20   the Attorney General spent $1.5 million over two years and
21   found no case, then what crisis exists?  None whatsoever.
22        If there is no crisis and there is a bill to stop
23   a crisis that doesn't exist and it's an added burden
24   because we already have HAVA, and HAVA, as you remember,
25   was established in 2000 with the idea that it would help

Electronically signed by Tamara Chapman (501-213-791-1192)                    0b08b52f-7f2a-4c3b-9256-3226151d6c52

## Page 53

1  America vote.  That's why it's even called the Help
2  America Vote Act.  And it provided for several documents.
3      People also know that when they sign the
4  certificate, it's an affidavit, a legal document.  We also
5  know that undocumented, which is really the intent of this
6  stopping supposedly American citizens, claiming that it's
7  really fraudulent because noncitizens will not vote,
8  noncitizens, if their residence is here legally, do not
9  want to jeopardize their opportunity of becoming citizens
10  somedays.  And the undocumented certainly don't want to be
11  split from their families.
12      So we know that there is no crisis, we know that
13  American citizens, because they are the only ones that can
14  vote, are the ones that are being attacked by this bill
15  and this law and, therefore, its purposeful and
16  intentional.
17      And another example of the many patterns of
18  activities that happen in the State of Texas, including
19  polarized voting, we saw when Carrillo ran for office or
20  Judge Rodriguez ran for office, they were incumbents, they
21  were supported by the establishment, they raised the most
22  money, but white voters refused to vote for them in their
23  own party.
24      I believe that that, as a cumulative, provides
25  purpose and intent.

## Page 54

1      Q.  Do you contend that the Texas legislature
2  intended to harm poor people by passing Senate Bill 14?
3      A.  Yes.  Some of the Latinos are poor, the working
4  poor.  25 percent or over.
5      Q.  So their intent was to harm people because they
6  were poor?
7      A.  Their intent was to stop Latino and other voters
8  from voting and, as a result, as a consequence, poor
9  people will be impacted, of which many of the Latino
10  voters are poor.
11      Q.  You said as consequence.  That might be an
12  effect.  Is it Southwest Voter's contention that the
13  legislature intended to harm the poor?
14      A.  Yes.
15      Q.  What is basis for that contention?
16      A.  In the statement I made earlier.
17      Q.  Are you referring to the one from just a couple
18  of minutes ago?
19      A.  Yes, sir.
20      Q.  And that provides all the information you have on
21  intent with respect to poor people?
22      A.  That's part of it, yes.
23      Q.  What else is there?
24      A.  Well, that's all I have in terms of the poor
25  people, yes.  I'm saying that Latinos, a good portion of

## Page 55

1  them, are working poor; therefore, they will be impacted
2  and, therefore, the answer as asked implies and says
3  directly that Latinos will impact it because they're poor.
4      Q.  Do you contend that the Texas legislature
5  intended to harm young people by passing Senate Bill 14?
6      A.  Yes.  By the very fact that they did not allow
7  for student IDs to be used as an official, appropriate ID,
8  yes.
9      Q.  So the intention was to harm --
10      A.  Yes.
11      Q.  -- young voters?
12      A.  Yes.  And we know that young voters in Texas are
13  mostly Latino and black.
14      Q.  Do you contend that the Texas legislature
15  intended to harm elderly people by passing SB 14?
16      A.  Yes.
17      Q.  And what is the basis for your contention that
18  they intended to harm the elderly?
19      A.  Because we know that the elderly are less likely
20  to have their documents because they either lost them,
21  they got destroyed or they were born at a time when they
22  didn't have the money to and they were not born in a
23  hospital where they were given the appropriate
24  documentation.
25      Q.  Would you acknowledge that a vote by mail counts

## Page 56

1  just as a -- an in-person ballot counts?
2      A.  I would and I also have stated in my earlier
3  testimony that elderly people prefer to vote in person, A,
4  and as I understand the law, and I asked if I was wrong
5  for you to correct me, that in order for an elderly person
6  to vote by mail they must be disabled or they must be
7  traveling.  Am I incorrect with your --
8      MS. PERALES:  You just state your best
9  understanding.
10      THE WITNESS:  Okay.  Thank you.
11      Q.  (BY MR. ASTON)  Do you contend that the Texas
12  legislature intended to harm rural voters by passing
13  Senate Bill 14?
14      A.  Yes.
15      Q.  And what is the basis for that contention?
16      A.  Because most of the offices where people can go
17  get their ID, should they not have them, in rural
18  communities have either been closed or will be shut down
19  as a result of the shortage, and rural people are usually
20  very poor people; therefore, they will not be able to have
21  the documentation because either they can't afford to buy
22  it, to get it, or they cannot afford the gas in order to
23  drive the long distances that are required and, therefore,
24  they're being intentionally discriminated against.
25      Q.  Do you have any other evidence for the basis of

14  (Pages 53 to 56)

Page 57

1  your contention with regard to rural voters?
2      A.  That's what I have.
3      Q.  Do you contend that the Texas legislature
4  intended to harm urban voters by passing Senate Bill 14?
5      A.  Yes.
6      Q.  And please explain the evidence and the basis for
7  that contention?
8      A.  Urban voters are more likely to be Latino and
9  African-American, and this bill was intended to stop
10 Latino and African-American voters from casting their
11 vote, and that vote being counted.
12     Q.  Please name for me all the members of the Texas
13 legislature that Southwest Voter contends acted with a
14 discriminatory purpose in supporting and voting for Senate
15 Bill 14.
16     A.  You would ask me this and I'm going to become a
17 citizen.  I'm sorry.  That was disrespectful.  I
18 apologize.
19         I cannot remember the names of the members right
20 now, but we can start with the authors of the bills.  And
21 I don't know the names so they're -- they're on record.
22     Q.  So Southwest Voter --
23     A.  At this point I do not remember the name of the
24 members.
25     Q.  -- contends that some or all of the authors of

Page 58

1  the bill intended to discriminate?
2      A.  Yes.  I also contend that those that voted in
3  favor intended to discriminate.
4      Q.  How many of them?
5      A.  All of them that voted in favor of this bill, as
6  well as the governor, who signed it.
7      Q.  So Southwest Voter believes that every member of
8  the Texas legislature who voted for this bill did so for
9  the purpose of discrimination?
10     A.  Yes.
11     Q.  Do you have any evidence for that contention in
12 addition to all of the things that we've been discussing
13 before?
14     A.  I do not have anything other than what I've said,
15 and accumulatively that I believe was purposely intent to
16 stop voters from voting that are Latino or otherwise.
17     MR. ASTON:  Go off the record for two
18 minutes.
19         (Break.)
20     Q.  (BY MR. ASTON)  Do you support the idea that only
21 registered voters should be allowed to vote?
22     A.  That's the law.  Yes.
23     Q.  Does Southwest Voter support the idea that one
24 should have to register prior to voting?
25     A.  Yes.

Page 59

1      Q.  What is voter fraud?  How would Southwest Voter
2  define voter fraud?
3      A.  Well, when someone does not have the right --
4  according to the law of that moment, because laws
5  change -- votes.  That's how I would define it.
6      Q.  Would you agree that voter fraud includes someone
7  showing up to vote and claiming that he or she is a person
8  that he or she is not?
9      A.  Of course.
10     Q.  And does Southwest Voter agree that voter fraud
11 should be illegal?
12     A.  Yes.  But there is a difference between voter
13 fraud and the intent of this law.  I still -- in spite of
14 me agreeing with everybody's agreement that there should
15 be no voter fraud.  And only those who have the right by
16 the current laws to vote should vote and that their vote
17 be counted.  America still does not count the -- every
18 presidential cycle, 1 million people will vote and they
19 will not be counted.  So we still have a problem in
20 America.
21         But in this particular case, I think there is a
22 problem.  There is intent.  And in spite of us believing
23 that there should be no fraud, this bill does not in any
24 way, shape, or form stop fraud.  And there was no fraud or
25 crisis established by the State.

Page 60

1      Q.  Do you believe that in-person voter fraud would
2  be harder to detect than mail-in voter fraud?
3      A.  I'm not sure I -- that question is vague.
4      MS. PERALES:  If you don't understand the
5  question, you can say that you don't understand the
6  question.
7      I don't understand.  Give me an example, please.
8      Q.  (BY MR. ASTON)  Let me ask it this way.  Do you
9  think that the State of Texas should try and stop voter
10 fraud?
11     A.  I think if the State of Texas finds that there is
12 voter fraud, then it should work to stopping it.  But in
13 this instance we know that this does not apply.
14     Q.  Do you believe it would harder to detect
15 in-person voter fraud?
16     A.  That's why I don't understand your question.  The
17 whole intent of the SB 14 was to stop Latinos and
18 African-Americans from voting, and it was really an intent
19 to stop the so-called noncitizens who do not vote, who do
20 not take part, who do not sign an affidavit saying that
21 they're registered voters; therefore, this law does not
22 apply.
23         But your questions have to do with a general
24 sense of fraud --
25     Q.  That's correct.

Page 61

1    A. -- and of course we do agree that there should be
2  no fraud.  But in this case, this bill is not the right
3  tool, it's not the right law, and it violates our
4  constitutional right as voters.
5    Q.  Do you believe it would harder for the State of
6  Texas to detect in-person voter fraud -- for example, one
7  person going into one voting booth and voting one ballot
8  for someone that he or she is not.  Would that be harder
9  to detect than someone taking a large stack of ballots,
10  filling them out in the same handwriting and mailing them
11  in?
12    A.  I'm still not understanding your question.  But
13  let me state this.  HAVA already provides for different
14  opportunities for the poll workers to determine who is a
15  voter and that that voter is a correct voter.  So I do
16  believe that there already systems in place to stop
17  fraud, if that is your question.
18    Q.  Would you agree that in order to detect in-person
19  voter fraud, one would have to be present and witness it?
20    A.  I'm not sure I understand your question.  Reframe
21  or restate or give me an example.
22    Q.  If someone goes into a voting place claiming to
23  be a person that he or she is not, and is given that
24  ballot and votes, would you agree that in order to stop
25  that sort of voter fraud, you would need to stop it at the

Page 62

1  polling place?
2    A.  Again, SB 14 does not do that.  SB 14 is an
3  attempt, purposeful and otherwise, to stop Latinos and
4  other communities of color from voting.  There are in
5  place, according to many laws that were already
6  established by the legislature and passed and signed by
7  the Governor, so the State, to make sure that the
8  elections law allows for systems to be in place to
9  prohibit people from voting that do not have the right to
10  vote.  And HAVA clearly provides for documents so that the
11  polling voters -- the watch -- the poll workers at the
12  polls can identify whether that voter was there.
13        Second, because it's being -- the poll workers
14  sign when somebody votes.  Someone cannot sign and vote
15  again.  So I think we have the systems in place to stop
16  any voter fraud, and SB 14 only is attempting to stop
17  Latino American citizens and other voters who are American
18  citizens from voting in America and in Texas specifically.
19    Q.  Do you believe that requiring a voter to show a
20  photo ID would make it harder for voters to vote claiming
21  to be someone that he or she is not?
22    A.  I do not believe that this law is going to do
23  what you're trying to do.
24    Q.  But do you believe it would be harder to vote as
25  someone you are not if you are required to show a photo ID

Page 63

1  at the poll?
2    A.  I already stated that HAVA already provides for
3  those systems, and there are systems in place to stop us
4  from having fraud in Texas.  And there are no cases that
5  we can really identify, and there is no crisis; therefore,
6  this law is not necessary and all it is is an attempt to
7  violate the voter rights of Latinos and other voters.
8    Q.  So is the answer it would not make it harder?
9    A.  My answer is that this bill will not answer your
10  question.  It will not remedy what does not exist because
11  it doesn't exist in the way that this bill is --
12    Q.  My question is just a general question.  It's not
13  about Senate Bill 14 particularly.
14    A.  I know.  But if you're going to use it, then I'm
15  putting it on the record.  My answer on the record is that
16  there is no crisis, there is no fraud, and voters already
17  know that if they are not the voter that's supposed to
18  vote, that they cannot vote.  And there are systems in
19  place to stop a voter from creating fraud, starting with
20  HAVA.
21    Q.  The question is, though, would requiring showing
22  a photo ID make it harder for someone to vote claiming to
23  be someone that he or she is not?
24    A.  I've already answered that question.
25    Q.  I don't believe you have.

Page 64

1        MS. PERALES:  Do you want to object as
2  nonresponsive?  Keep trying?
3        MR. ASTON:  I guess so.
4        MS. PERALES:  It's up to you.
5        MR. ASTON:  If she's not going to answer the
6  question, then, yes, I'll object as nonresponsive.
7        THE WITNESS:  Thank you.  Because I've
8  answered.
9        MS. PERALES:  He's looking for a yes or a
10  no --
11        THE WITNESS:  I understand.
12        MS. PERALES:  -- which you can give along
13  with an explanation of why you believe it's a yes or a no.
14  But perhaps your answer would be more responsive if you
15  started with a yes or a no, and then you are free to
16  explain your answer.
17        THE WITNESS:  But what's wrong with what I
18  said?
19        MS. PERALES:  I believe perhaps that it was
20  not -- I can't say for Mr. Aston, but perhaps he is
21  seeking a yes or a no, and then you are free in the rules
22  of the deposition to give your explanation.
23        THE WITNESS:  I understand that, but I want
24  to sustain my answer, if it's okay with you.
25    Q.  (BY MR. ASTON)  Well, you're not going to retract

Page 65

1  anything that you've said.
2      A.  I understand.  But I don't want to use any of the
3  information that I've given as an excuse for this law to
4  be implemented when we all know that this law is an
5  attempt to stop Latino voters who are citizens from
6  participating in America's democracy.
7          MS. PERALES:  Would you like to ask the
8  question again or have the court reporter ask the
9  question, and then I'll ask Ms. Camarillo to begin her
10 answer with a yes or a no and then explain her position.
11         MR. ASTON:  Would you read back the last
12 question, please.
13         MS. PERALES:  Let's go off the record.
14         MR. ASTON:  Okay.
15         (The requested material was read.)
16     A.  I don't know.  But I restate my previous
17 statements, which are that I believe that the State of
18 Texas was not able to prove, in spite of spending
19 $1.5 million that we do not have, on trying to find
20 fraudulent votes.  I believe that this bill and law is
21 specific and intended to stop citizens from voting, and
22 citizens that are Latino and are not -- and are people of
23 color.
24     I believe that HAVA and other systems that exist
25 already prohibit any voter fraud , and if -- and it's

Page 66

1  clear by the fact that the State is unable to put forth
2  any real cases of fraud.  Therefore, I believe that this
3  law, all it does is violate the voting rights of Latinos
4  and other communities of color.  And I'm speaking of
5  Latino citizens.
6      And for the record my previous answer was better.
7  So use both.
8          MR. ASTON:  I believe that's all I have.
9          THE WITNESS:  Thank you.  I know you're
10 doing your job, and I'm doing mine.
11         MS. PERALES:  Okay.  Mr. Aston is now
12 passing the witness to me, and I will reserve my questions
13 for the time of trial.
14     I think we're done.  Unless --
15         MS. McLEOD:  No.
16         (THE DEPOSITION CONCLUDED AT 10:41 A.M.)
17
18
19
20
21
22
23
24
25

Page 67

1              CHANGES AND SIGNATURE
2  PAGE    LINE    CHANGE        REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25        LYDIA CAMARILLO

Page 68

1              SIGNATURE PAGE
2
3      I, LYDIA CAMARILLO, have read the foregoing
   deposition and hereby affix my signature that same is true
   and correct, except as noted above.
4
5
6      _____
7        LYDIA CAMARILLO
8
9
   THE STATE OF _____)
10 COUNTY OF _____)
11     Before me, _____, on this
   day personally appeared LYDIA CAMARILLO, known to me (or
12 proved to me under oath or through
   _____) (description of identity card
13 or other document)) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged to
14 me that they executed the same for the purposes and
   consideration therein expressed.
15     Given under my hand and seal of office this
   _____ day of _____, 2012.
16
17
18     _____
19     NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
20     COMMISSION EXPIRES: _____
21
22
23
24
25

Electronically signed by Tamara Chapman (501-213-791-1192)                    0b08b52f-7f2a-4c3b-9256-3226151d6c52

Rebecca Davio                                                    June 15, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                        )
                                       )
              Plaintiff,               )
                                       )
VS.                                    )
                                       )
ERIC H. HOLDER, JR. in his             )
official capacity as Attorney          )
General of the United States,          )
                                       )
              Defendant,               )
                                       )
ERIC KENNIE, et al,                    )
                                       )
    Defendant-Intervenors,             )
                                       )  CASE NO. 1:12-CV-00128
TEXAS STATE CONFERENCE OF              )  (RMC-DST-RLW)
NAACP BRANCHES,                        )  Three-Judge Court
                                       )
    Defendant-Intervenors,             )
                                       )
TEXAS LEAGUE OF YOUNG VOTERS           )
EDUCATION FUND, et al.,                )
                                       )
    Defendant-Intervenors,             )
                                       )
TEXAS LEGISLATIVE BLACK                )
CAUCUS, et al.,                        )
                                       )
    Defendant-Intervenors,             )
                                       )
VICTORIA RODRIGUEZ, et al.,            )
                                       )
    Defendant-Intervenors.             )

*****************************************************
                    ORAL DEPOSITION OF
                      REBECCA DAVIO
                      JUNE 15, 2012
*****************************************************

## 2

1        ORAL DEPOSITION OF REBECCA DAVIO, produced as a

2   witness at the instance of the Defendant, was duly

3   sworn, was taken in the above-styled and numbered cause

4   on the JUNE 15, 2012, from 11:14 a.m. to 6:33 p.m.,

5   before Chris Carpenter, CSR, in and for the State of

6   Texas, reported by machine shorthand, at the offices of

7   DECHERT, LLP, 300 West 6th, Suite 2010, Austin, TX

8   78701, pursuant to the Federal Rules of Civil Procedure

9   and the provisions stated on the record or attached

10  hereto.

## 3

1                    A P P E A R A N C E S
2   FOR THE PLAINTIFF, STATE OF TEXAS AND THE DEPONENT:
3       John McKenzie
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
4       P.O. Box 12548
        Austin, TX 78711-2548
5
        209 West 14th Street
6       8th Floor
        Austin, TX 78701
7       (512) 936-1307
        john.mckenzie@texasattorneygeneral.gov
8
        Kathleen T. Murphy
9       OFFICE OF GENERAL COUNSEL
        4805 N. Lamar
10      Austin, TX 78773
        (512) 424-2420
11      Kathleen.murphy@txdps.tx.us
12  FOR THE DEFENDANT, HOLDER, ET AL:
13      Jennifer Maranzano
        Elizabeth S. Westfall
14      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
15      NWB - Room 7202
        Washington, DC  20530
16      (202) 305-7766
        jennifer.maranzano@usdoj.gov
17      elizabeth.westfall@usdoj.gov
18  FOR THE TEXAS LEGISLATIVE BLACK CAUCUS, THE LEAGUE OF
    WOMEN VOTERS OF TEXAS, THE JUSTICE SEEKERS, REVEREND
19  PETER JOHNSON, REVEREND RONALD WRIGHT AND DONALD WRIGHT:
20      Nancy Abudu (appearing by telephone)
        AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.
21      230 Peachtree Street, NW
        Suite 1440
22      Atlanta, GA 30303 -1227
        (404) 523-2721
23      nabudu@aclu.org
24
25

## 4

1                        INDEX
2   Appearances.......................................3
3   REBECCA DAVIO
4       Examination by Ms. Maranzano...............6
        Examination by Mr. McKenzie..............224
5       Further Examination by Ms. Maranzano.....226
6   Signature and Changes..........................227
7   Reporter's Certificate.........................229
8                       EXHIBITS
9   NO. DESCRIPTION                    PAGE MARKED
10  830  Notice of Deposition                    15
11  831  E-mail Jan. 24, 2011                     22
12  832  Texas Register Proposed Rulemaking Action   26
13  833  Texas Register Adopted Rulemaking Action    28
14  834  Eligibility Requirements for Issuance of   72
         Texas Election Certificate
15
16  835  E-Mail Chain, Aug. 9, 2011              98
17  836  Application for Texas Election Certificate  114
18  837  E-Mail Chain, Jan. 13, 2012             117
19  838  Response to Questions from Senate Committee  120
         of the Whole
20  839  E-Mail, Jan. 24, 2011                  128
21  840  E-Mail, Jan. 24, 2011, Re: Cards Issued   131
         Without a Photo
22
23  841  List of Offices by Region, Operating   133
         Hours, and Light Days
24  842  DLD in the Know, April 9, 2012         150
25  843  DPS Response, Oct. 7, 2011             153

## 5

844  May 2012 Average Customer Wait Time -        166
     Large Offices

845  Report:  What Will It Take to Fix Driver      173
     License?
846  Report:  Continued Driver License            181
     Transformation

847  Workstation Information                      186

848  List of Closed Offices                       187

849  E-Mail Chain, March 14, 2012 thru March      193
     15, 2012
850  E-Mail, Feb. 26, 2011                        201
851  E-Mail, April 5, 2011                        203
853  Tracking SB 14                               211
854  E-Mail Chain, March 30, 2012 to April 2,     219
     2012

855  Texas Administrative Code, Driver License    221
     Rules

## 6

                    EXAMINATION
BY MS. MARANZANO:
    Q.  Good morning, my name is Jennifer Maranzano.
I'm representing the Defendant, Attorney General Eric
Holder, in this matter.
    Can you please state your name for the
record?
    A.  My name is Rebecca Davio.
    Q.  Ms. Davio, have you ever been deposed before?
    A.  Yes.
    Q.  And what -- what was the nature of that matter?
    A.  It was regarding our temporary visitor, driver
licenses, and ID cards.
    Q.  And when was that deposition?
    A.  Several months ago.  I'm sorry, I don't recall
exactly.
    Q.  Well, I'm going to go over some ground rules
which you may be familiar with since you were just
deposed recently.  You've been placed under oath so it's
important to testify truthfully, accurately and
completely today.  Our court reporter is taking down a
transcript of everything that we say so it's important
that we not talk over each other and also that you give
verbal responses to my questions.
    If you need a break, just let me know and

## 7

I will accommodate you.  If there's a question pending,
I would just ask that you finish the question before we
take a break.
    From time to time, your attorney may make
objections; he's making those objections for the
record.  So unless he instructs you not to answer, you
can go ahead and answer.
    Do you understand these instructions?
    A.  Yes.
    Q.  Do you have any questions?
    A.  No.
    Q.  Are you on any medication today that would
affect your ability to testify truthfully, accurately
and completely?
    A.  No.
    Q.  Is there any other reason why you can't testify
truthfully, accurately and completely today?
    A.  No.
    Q.  Today, during the deposition, I may use the
term "EIC" to refer to an Election Identification
Certificate.  Do you understand that term, and is it
okay if I use that abbreviation for the deposition?
    A.  Yes.
    Q.  And if I refer to DPS, I'll be referring to the
Department of Public Safety; do you understand that?

## 8

    A.  Yes.
    Q.  Are you represented by counsel today?
    A.  Yes.
    Q.  By a number of counsel?  Who are you
represented by?
    A.  John -- and Kathleen?  Just John?  Yes, John
McKenzie.
    Q.  And when did that representation begin?
    A.  Yesterday.
    Q.  Have you ever testified in court?
    A.  No.
    Q.  The case that you were deposed in, were you
deposed in your capacity as a DPS employee?
    A.  Yes.
    Q.  And was the state of Texas a plaintiff or
defendant in that matter?
    A.  Yes.
    Q.  Have you ever been involved in any other cases
in which the state of Texas has been a plaintiff or
defendant?
    A.  No.
    Q.  And did that case go to trial?  I'm sorry, the
case that you were deposed in?
    A.  No.
    Q.  What did you do to prepare for today's

Rebecca Davio                                          June 15, 2012

---

**9**

1    deposition.
2         MR. McKENZIE:  And I'll caution the
3    witness not reveal the substance of any communications
4    with counsel but, otherwise, you may answer the
5    question.
6         A.   I reviewed documents and met with counsel.
7         Q.   (By Ms. Maranzano) What documents did you
8    review?
9         A.   I read -- I reviewed the administrative rules,
10   a list of offices that we have, the wait times in our 60
11   largest offices, and a training job aide on all EICs.
12        Q.   And when did you meet with your attorney?
13        A.   Yesterday morning.
14        Q.   For how long?
15        A.   Approximately an hour.
16        Q.   Was anybody else present?
17        A.   Not during the briefing or the review.
18        Q.   Not during this meeting?
19        A.   No.
20        Q.   Okay.  Other than your attorneys, have you
21   spoken to anybody about your deposition today?
22        A.   Only to complain.
23        Q.   And have you spoken to anyone who's been
24   deposed in this matter?
25        A.   No.

---

**11**

1         A.   I applied and was selected.
2         Q.   What did you do before you worked at DPS?
3         A.   I was the director of the vehicle title and
4    registration division at the Texas Department of Motor
5    Vehicles.
6         Q.   And that's a department that's separate from
7    the DPS?
8         A.   Yes, ma'am.
9         Q.   And how long were you there?
10        A.   The agency was created in November of 2009, so
11   I was there for approximately eight months, if I'm doing
12   the math right, and I was in that same position at the
13   Texas Department of Transportation.  My division was
14   moved.
15        Q.   I see.  So how long were you in the prior
16   position before your department was moved?
17        A.   I began in that position in January of 2006.
18        Q.   And how did you learn about the position at
19   DPS?
20        A.   A friend of mine actually told me about it.
21        Q.   And who was that person?
22        A.   Jan, sorry, Jan -- right now, last name escapes
23   my memory.
24        Q.   Is it somebody who works at DPS?
25        A.   No.

---

**10**

1         Q.   Have you reviewed any transcripts from anybody
2    who's been deposed in this matter?
3         A.   No.
4         Q.   Did you bring any notes or documents with you
5    today?
6         A.   No.
7         Q.   What's your position at DPS?
8         A.   I'm the assistant director for driver license.
9         Q.   How long have you held that position?
10        A.   Two years and 14 days.
11        Q.   And what's your educational background?
12        A.   I have a B.S. in merchandising from U.T., I
13   have a Master's of public affairs, and I have a Ph.D.,
14   an interdisciplinary Ph.D.
15        Q.   And what's your Ph.D. in?
16        MS. ABUDU:  And I apologize for
17   interrupting, but it is very difficult to hear the
18   witness.
19        MS. MARANZANO:  We just moved the phone so
20   let us know if that helps.
21        MS. ABUDU:  Okay, great.
22        Q.   (By Ms. Maranzano) And what is your Ph.D. in?
23        A.   Solid waste management and recycling.
24        Q.   And how did you come to work at the Department
25   of Public Safety?

---

**12**

1         Q.   Can you tell me what your responsibilities are
2    at the Department of Public Safety?
3         A.   I oversee the division.  There's approximately
4    1800 employees and I oversee the operation to issue
5    driver licenses and identification cards and to provide
6    driver records and maintain driver histories.
7         Q.   Do you work on developing administrative rules?
8         A.   Yes.  I oversee that process.
9         Q.   Do you work with legislators on legislation
10   that impacts DPS?
11        A.   Occasionally.
12        Q.   And when do you do that?
13        A.   When I'm asked to by our staff.
14        Q.   You'll be asked by DPS or by legislators?
15        A.   Both.
16        Q.   How many times have you worked on legislation
17   since you've been at DPS?
18        A.   Can you define "worked on legislation?"  I
19   realize --
20        Q.   Well, let me ask you this:  How many pieces of
21   legislation have you been involved in since you have
22   been at DPS?
23        MR. McKENZIE:  And I'm going to object to
24   this is beyond the scope of what she's been noticed for.
25        But you can answer the question.  It's

Rebecca Davio                                          June 15, 2012

## 13

1  just not going to bind the State.
2     A.   There were 35 bills that were passed, and I'm
3  sorry, I don't have the exact number of how many bills
4  that I looked at or reviewed or may have potentially
5  been asked to testify on.
6     Q.   (By Ms. Maranzano) Uh-huh.
7     A.   I can't recall that number.
8     Q.   So when you say there are 35 bills that were
9  passed, you mean 35 bills that impacted DPS?
10    A.   That impacted the driver license division.
11    Q.   I see.
12    A.   Last session.
13    Q.   Okay.  All right.
14    A.   And I've only worked at the department for one
15 session.
16    Q.   Okay.  And you don't recall how many you were
17 asked to testify on?
18         MR. McKENZIE:  Same objection.
19    Q.   (By Ms. Maranzano) Do you recall how many you
20 actually testified on?
21         MR. McKENZIE:  Same objection.
22    A.   No.
23    Q.   (By Ms. Maranzano) Did you testify on SB 14?
24         MR. McKENZIE:  Same objection.
25    A.   Yes.

## 14

1     Q.   (By Ms. Maranzano) And did you testify to both
2  bodies of the legislature?
3          MR. McKENZIE:  Same objection.
4     A.   I know for certain that I testified before the
5  Senate.  I'm trying to remember if I actually testified
6  before the House or if I was only there to potentially
7  be called.  I'm sorry, I don't, at this moment, I don't
8  recall.
9     Q.   (By Ms. Maranzano) Did you potentially testify
10 before the House Select Committee that was studying,
11 well, it's the House Select Committee on voter
12 identification and voter fraud?
13         MR. McKENZIE:  Objection, speculation and
14 also beyond the scope.
15         You may answer.
16    A.   I don't recall.
17    Q.   (By Ms. Maranzano) Okay.
18    A.   I don't believe I did.
19    Q.   Does DPS have a government relations division?
20    A.   Yes.
21    Q.   And do you oversee that division?
22    A.   No, I do not.
23    Q.   Do you work with the Governor's Office on any
24 issues?
25    A.   None that I can especially recall.

## 15

1          MS. MARANZANO:  May I have this marked as
2  830.
3          (Exhibit 830 marked for identification.)
4     Q.   (By Ms. Maranzano) I'm showing you what we're
5  marking as Deposition Exhibit 830, can you take a look
6  at it and tell me if you recognize it?
7     A.   Yes.
8     Q.   And what is this document?
9     A.   It's what got me here today.
10    Q.   Would that be a Notice of Deposition?
11    A.   Yes, ma'am.
12    Q.   Can you take a look at Exhibit A, which is on
13 Page 4, and just tell me what topics you are prepared to
14 testify about today?
15    A.   1, 2, 4, and 6.
16    Q.   Okay.  Great.  Ms. Davio, when did you first
17 learn about Senate Bill 14?
18    A.   When it was first -- when it first came up
19 during the last legislative session.
20    Q.   Do you remember when that was approximately?
21    A.   It was in January.
22    Q.   When you testified in front of the Committee of
23 the Whole in the Senate, were you there as a resource
24 witness?
25    A.   Yes.

## 16

1     Q.   And what was the purpose of having someone from
2  DPS act as a resource witness during that consideration
3  of the bill?
4          MR. McKENZIE:  I'm going to object on two
5  separate grounds.  One, it's beyond the topics that
6  she's been noticed for.  And two, to the extent that an
7  individual legislator may have requested you to testify,
8  do not identify the legislator who requested you to
9  testify.
10    A.   I'm sorry, could you ask your question again?
11    Q.   (By Ms. Maranzano) Sure.  I'm wondering what
12 your understanding is of DPS's role as serving as a
13 resource witness to the legislature?
14         MR. McKENZIE:  Same objections.
15    A.   The role would be that DPS was supposed to be
16 issuing the EICs.
17    Q.   (By Ms. Maranzano) And at the point that you
18 were testifying, do you recall if the EIC was a part of
19 the bill that you were testifying about?
20    A.   Yes, it was.  I'm not certain if it was
21 referred to at that point in time as an EIC.
22    Q.   Okay.
23         MS. MARANZANO:  Could I have this marked?
24         COURT REPORTER:  Sure.
25         MS. MARANZANO:  Oh, it's been previously

Rebecca Davio                                                      June 15, 2012

---

21

1     THE WITNESS:  Still answer?
2          MR. McKENZIE:  You may answer, yes.
3     A.  I don't recall the specific changes.  My guess
4  is as the legislation evolved --
5     Q.  (By Ms. Maranzano) Uh-huh.
6     A.  -- over the course of a session, that, yes, it
7  evolved, it changed.
8     Q.  Okay.
9     A.  But I can't delineate.
10    Q.  Based on the face of the bill, didn't we just
11  look at Section 18 which required a personal
12  identification certificate to be issued for free of
13  charge by DPS, and in Section 14 of the signed version,
14  it's entitled an "Election Identification Certificate";
15  is that correct?
16    A.  Yes, that appears to be correct.
17    Q.  Prior to testifying in front of the Committee
18  of the Whole, how did you prepare?
19         MR. McKENZIE:  Same objection.  It's
20  beyond the scope of what she's been noticed for.
21         So if you -- if it would reveal the
22  identity of a legislator who's requested information
23  from you, I would instruct you not reveal the identity
24  of that legislator.
25    A.  I reviewed documents, various and sundry

---

22

1  documents.
2     Q.  (By Ms. Maranzano) Okay.  Do you recall what
3  those were?
4          MR. McKENZIE:  Same objections.
5     A.  No.  You know, not in any detail.
6          MS. MARANZANO:  Can we have this marked?
7          (Exhibit 831 marked for identification.)
8     Q.  (By Ms. Maranzano) I'm showing you what we're
9  marking as Deposition Exhibit 831.  Can you take a look
10  at this and tell me if you recognize it?
11    A.  Yes.
12    Q.  And what is this document?
13    A.  It's an e-mail from Amanda Arriaga about
14  different kinds of questions that were likely to come up
15  during the Senate Committee of the Whole testimony.
16    Q.  And based on your recollection, did many of
17  these questions come up during the Committee of the
18  Whole?
19         MR. McKENZIE:  Same objection.  That is
20  way out of line of the scope.  There's nothing in here
21  about testimony before the Committee, SB 14 --
22         MS. MARANZANO:  But this is about -- if
23  you look at this, it's about the process of getting
24  identification free of charge.
25         MR. McKENZIE:  Well, this is about the

---

23

1  legislation.  The process is in the statute.
2          MS. MARANZANO:  Yeah, but all of these
3  questions are related to the process of getting
4  identification out of the driver's license offices and
5  the various issues that might come up for a person who
6  is going to get those.
7          MR. McKENZIE:  Yeah, but this isn't -- it
8  doesn't ask about the process for getting a driver's
9  license in here.  It talks about how to get an election
10  ID and what are the plans to implement and administer
11  election IDs.  I mean, I read these, this relate to
12  specifically discretely deal with election IDs and
13  forward-looking plans to implement and backward-looking
14  facts about how DPS works and --
15         MS. MARANZANO:  But these questions -- I
16  mean, Senate Bill 14 switched during the process and the
17  EIC wasn't inserted until the end, but at the beginning,
18  they were asking for an identification free of charge.
19  So this doesn't use the term EIC, but it's about that --
20  it's about the provision that became the EIC.
21         MR. McKENZIE:  Well, you can go ahead and
22  lay your record, but we're going to object and say that
23  this doesn't bind the state because it's beyond the --
24  it's our contention it's beyond the scope of the
25  deposition notice.

---

24

1          MS. MARANZANO:  Okay.
2     Q.  (By Ms. Maranzano) You can go ahead and answer.
3     A.  I'm sorry, I need you to repeat the question.
4     Q.  Yeah, I'm not sure if I remember myself.
5          Are -- all right, let me start with this:
6  Would you say that many of these issues came up during
7  your testimony to the Committee of the Whole?
8          MR. McKENZIE:  Same objection.
9     A.  Yes.
10    Q.  (By Ms. Maranzano) Do you remember any of them
11  in particular coming up?
12         MR. McKENZIE:  Same objection.
13    A.  There were questions about the offices and
14  where they were located, and I think there were
15  questions about the process in general.  But it's --
16  it's a pretty distant memory now.  I'm sorry, I don't
17  recall the specifics of exact questions that were asked.
18    Q.  (By Ms. Maranzano) Is it fair to say that there
19  was an emphasis from the questioners about challenges
20  that people might face in obtaining identification free
21  of charge from the Department of Public Safety?
22         MR. McKENZIE:  Same objection, and also
23  objection, vague.
24    A.  Were there questions about people -- that
25  people had concerns --

## 25

1  Q.  (By Ms. Maranzano) Uh-huh.
2  A.  -- about the process?  That's probably a way to
3  summarize.
4  Q.  And what -- what did you think about those
5  concerns?
6  MR. McKENZIE:  Same objection.
7  A.  I'm sorry, I don't know how to respond to that.
8  Q.  (By Ms. Maranzano) Well, let me try it another
9  way:  Did you think that those -- that there was a basis
10  for those concerns?
11  MR. McKENZIE:  Same objection.
12  A.  I think that, you know, people -- people want
13  driver license, they want state-issued identification
14  cards, whether that's a license to drive or an
15  identification card.  They want that.  And, you know,
16  we're working very hard to provide that service to them,
17  and as high a quality fashion and as quickly as
18  possible, and, you know, we're working to do that.  We
19  don't always meet everyone's expectations.
20  Q.  (By Ms. Maranzano) Okay.  Ms. Davio, were you
21  involved in developing what became the rules for
22  implementing the election identification certificate?
23  A.  Yes, ma'am.
24  Q.  And what was your involvement?
25  A.  I oversaw the development.

## 26

1  Q.  Did you receive input on the rules from
2  anybody?  Let me actually make my question a little
3  clearer:  Did you receive input before --
4  MR. McKENZIE:  Can we take a quick break?
5  My wife is repeatedly calling me.  I'm worried it's
6  about my baby.
7  MR. MARANZANO:  Yeah, let's go off the
8  record.
9  MR. McKENZIE:  I'm sorry.
10  (Recess from 11:43 to 11:45 a.m.)
11  MS. MARANZANO:  Okay, back on the record.
12  Q.  (By Ms. Maranzano) Prior to issuing your
13  proposed regulation, did you receive input during the
14  development of that regulation from anybody?
15  A.  From --
16  Q.  Anybody.
17  A.  -- driver license staff and DPS staff.
18  Q.  Anybody outside the agency?
19  A.  Not that I recall.
20  Q.  Any legislators?
21  A.  Not the that I recall.
22  (Exhibit 832 marked for identification.)
23  Q.  (By Ms. Maranzano) Did you receive any input or
24  that rule from anybody outside of Texas?
25  A.  This a is horrible copy.

## 27

1  Q.  It is a horrible copy.
2  MS. MARANZANO:  Do we have enough --
3  Q.  (By Ms. Maranzano) The next exhibit that I'm
4  going to enter also has, at the back of it, the proposed
5  reg, but I'm going to be having you flip back and
6  forth.  It may be a little clearer to look at it,
7  though.  So we could do that.
8  But prior to talking about the exhibit,
9  did you receive input in the development of the proposed
10  regulation or the final regulation from anybody outside
11  of Texas?
12  A.  From anyone outside of Texas?
13  Q.  Uh-huh.
14  A.  Not that I'm aware of.
15  Q.  Okay.  Do you think you would be aware if that
16  had occurred?
17  A.  Maybe.
18  Q.  Who was overseeing this process of developing
19  regulations for the Election Identification Certificate?
20  A.  Well, we work in concert with our general
21  counsel.
22  Q.  So is it fair to say it was you and the general
23  counsel who oversaw the process?
24  A.  Probably.
25  MR. McKENZIE:  Objection, slight

## 28

1  mischaracterization.
2  But you may answer.  Go ahead and answer.
3  Q.  (By Ms. Maranzano) Who do you mean by we work
4  in concert with our general counsel, who's that "we" in
5  that?
6  A.  The -- I have a section that's responsible for
7  legislative review and implementation and they would
8  have been staff members and that section have been
9  responsible for doing the actual development work, and
10  they coordinated with general counsel.
11  Q.  Okay.
12  A.  The office of general counsel.
13  Q.  And did they report to you?
14  A.  I reviewed the final proposed rules, yes,
15  ma'am.
16  MS. MARANZANO:  Can we have this marked
17  Exhibit 833?
18  (Exhibit 833 marked for identification.)
19  Q.  (By Ms. Maranzano) Okay.  So I've shown you now
20  two exhibits, one is marked 832 and one is marked 833.
21  Do you recognize these documents?
22  A.  Yes.
23  Q.  And what are they?
24  A.  832 is the proposed rule-making action on the
25  Election Identification Certificate and 833 is the

Rebecca Davio                                          June 15, 2012

---

29

1    adopted version of those rules.
2         Q.   Okay, if you can look at 832 for a moment, when
3    was this rule first published for comment?
4         A.   I believe it was in October.
5         Q.   October of what year?
6         A.   October of 2011.
7         Q.   Did you have any criteria that you used when
8    you developed this rule?
9         A.   Any criteria for --
10        Q.   For developing the rule, the proposed rule?
11            MR. McKENZIE:  Just for clarification, do
12   you mean "you, DPS" or "you, witness"?
13            MS. MARANZANO:  I mean you, DPS.
14            MR. McKENZIE:  Okay.
15            THE WITNESS:  That's the only
16   clarification you want from that?
17        Q.   (By Ms. Maranzano) Maybe I could ask you this:
18   How did you go about the process of creating the
19   proposed rule?
20        A.   Okay.  So we began with the law.
21        Q.   Uh-huh.
22        A.   And then we looked to see what that applicable
23   sections were for us and went through and said, "Okay,
24   what needs to be clarified as far as, you know, okay,
25   what's an Election Identification Certificate, what

---

30

1    should it look like," that kind of thing.
2         Q.   And what were your -- what were DPS's
3    priorities in trying to implement this program?
4         A.   We wanted to be able to implement this as
5    efficiently and trouble-free as possible, and so that
6    meant that the processes -- we were looking to try and
7    keep the process for issuance of an Election
8    Identification Certificate as consistent as possible
9    with that for the issuance of an identification card or
10   driver license; that way, the employees wouldn't get
11   tripped up and go, "Oh, wait, not this document or that
12   document," and it also meant that we preserved the
13   integrity of the Election Identification Certificate.
14        Q.   So I want to break that statement apart a
15   little bit.  You said you started with the law, SB 14?
16        A.   Uh-huh.
17        Q.   What did the law require for the -- in regards
18   to the EIC?
19        A.   In very general terms, it required that DPS be
20   -- to issue an Election Identification Certificate to
21   anyone that was -- did not have one of the existing
22   approved forms of photo identification, government-
23   issued photo identification, and that that be -- there
24   be no charge for that.  That's in very general memory.
25        Q.   Did it require anything more specific than

---

31

1    that?  You can look at -- it's on Page -- at the bottom
2    of Page 13 of what we marked as Deposition Exhibit 5.
3         A.   They were going to use this only for voting.
4    They had to be eligible to vote.
5         Q.   And do you see that subsection, I'm sorry, keep
6    going.
7         A.   Had to be similar in form but distinguishable
8    in color from a driver license or Personal
9    Identification Certificate.  I'm sorry, this reminds me,
10   the Section -- the E on Page 14 --
11        Q.   Uh-huh?
12        A.   -- reminds me that we did interact with the
13   Secretary of State.  That was in answer to a previous
14   question that you asked if we interacted with anyone
15   outside the state, and I just -- anyone outside of DPS.
16        Q.   And that was in response to the question that I
17   asked about interactions with people in terms of
18   developing the proposed or final rule?
19        A.   Yes, ma'am.
20        Q.   Okay.
21        A.   We had to develop the application, and then
22   work out the details of canceling if the person was not
23   eligible, and the expiration.
24        Q.   And do you see Subsection F on Page 14?
25        A.   Yes.

---

32

1         Q.   And it cites a provision of the code?  Can you
2    tell me what provision that is?
3         A.   Section 521.142?
4         Q.   Uh-huh.
5         A.   I believe that's the identification
6    requirements.
7         Q.   The identification for?
8         A.   For driver license and IDs.
9         Q.   Okay.  And so that provision of the bill says
10   that you may require applicants to furnish the same
11   information.  That would be required for driver's
12   license or personal ID; is that correct?
13        A.   Yes.
14        Q.   And do you recall when the Department of Public
15   Safety promulgated its proposed regulation, how many
16   comments you received?
17        A.   It seems like there were two, if I remember
18   correctly, something from a legislator and from The
19   League of Women Voters.
20        Q.   And you're looking at Deposition Exhibit 833,
21   for the record?
22        A.   Yes.  Yes, ma'am.
23        Q.   Does that refresh your recollection about that?
24            Can you tell me what deposition Exhibit
25   833 is?

Rebecca Davio                                        June 15, 2012

## 33

1    A.  It is the adopted rule-making action from the
2    Texas Register.
3    Q.  And do you print in the Texas Register all the
4    comments that you receive on a proposed rule?
5    A.  It appears as if we did in this particular
6    instance.  I think that's standard practice.  They may
7    be summarized if they were copious, but...
8    Q.  Is getting two comments fairly typical for a
9    proposed rule?
10   MR. McKENZIE:  Objection, no foundation.
11   You may answer.
12   A.  Of all the rules that we have proposed since
13   I've been in my position, two may be the most comments
14   that we've received.  Typically, a lot of our rules
15   don't get comment since I've been there.
16   Q.  Can you look at the first page of Deposition
17   Exhibit 832 for me?  And do you see that --
18   A.  First page or the --
19   Q.  -- first page of the text.  Yes.  And if you'll
20   look, there's a statement about the fiscal impact; it's
21   in the second paragraph.  Do you see that?
22   A.  Uh-huh.
23   A.  It says, "The fiscal impact for state
24   government cannot be determined as there is no available
25   data to support the number of individuals who may

## 34

1    request a no-cost Election Identification Certificate."
2    Is it common to propose a rule without
3    having any analysis of the fiscal impact of that rule?
4    MR. McKENZIE:  Objection, no foundation.
5    You may answer.
6    A.  I think where you can't estimate, you have to
7    be able to state that.
8    Q.  (By Ms. Maranzano) How many times have you seen
9    a proposed rule that states something similar to that,
10   that there's no ability to estimate the fiscal impact of
11   a rule?
12   MR. McKENZIE:  Same objection.
13   You may answer.
14   A.  I don't think that's necessarily common since
15   I've been there, but the -- the vast majority of our
16   rules don't have fiscal impact.
17   Q.  (By Ms. Maranzano) Why is that?
18   A.  They're modifying existing rules or, you know,
19   I mean, you have to be able to have reasonable
20   estimations to be able to make an estimation of the
21   cost.
22   Q.  And in that sentence do you see that it says,
23   "There's no available data to support the number of
24   individuals who may request a no-cost Election
25   Identification Certificate?"

## 35

1    A.  Yes, I see that.
2    Q.  Is it fair to say that DPS actually had data
3    about who possessed certain forms of identification
4    required by SB 14?
5    MR. McKENZIE:  Objection, asked and
6    answered.
7    Q.  (By Ms. Maranzano) You can answer.
8    A.  Okay.  Is it -- could you ask your question one
9    more time?
10   Q.  Sure.  Isn't it fair to say that DPS actually
11   had data about who possessed some of the forms of
12   identification required by SB 14?
13   MR. McKENZIE:  Same objection.
14   A.  Yes, ma'am, we did have the number of people
15   that had a driver license and an identification card and
16   DPS also had information about the number of people that
17   had a concealed handgun license.  What we did not have
18   was the number of people that would be interested, who
19   did not have one of other forms of identification and
20   who would be interested in obtaining an EIC.
21   Q.  Had DPS chosen to go down this path, it could
22   have done a match between its data bases and the voter
23   registration databases to at least determine who among
24   registered voters did not possess one of those forms of
25   DPS issued IDs; isn't that correct?

## 36

1    MR. McKENZIE:  Objection, speculation.
2    You can answer.  Any objection you can
3    answer unless I say "don't answer."
4    THE WITNESS:  Okay.  Thank you for
5    clarifying.  That sounds reasonable to me.
6    A.  We could have done all manner of things but
7    who's to say what would have been a viable estimate?
8    Q.  (By Ms. Maranzano) So did you make any attempts
9    to make an estimate at all of the fiscal impact of this
10   rule?
11   A.  No, ma'am.  Our -- my emphasis, in the driver
12   license division, was on figuring out what the rules
13   needed to be.  How the -- how we were going to implement
14   this, how we were going to be able to train our
15   employees to be able to issue this, it was a very short
16   deadline.  There were also requirements to develop
17   technology capability to be able to actually do the
18   issuance, that's where our focus was.
19   Q.  Did anyone at DPS express a concern that this
20   program might be a significant expense for the agency?
21   A.  We -- we do whatever the legislature tells us
22   to do.
23   Q.  So was there concern about that?
24   A.  I don't recall any specific concerns because no
25   one knew what numbers to expect.

Rebecca Davio                                          June 15, 2012

---

**37**

1    Q.   Okay.  Do you see that the sentence after the
2    sentence we were just looking at says, "The cost for
3    production and issuance of the card is a $1.67 each?
4    A.   Yes, ma'am.
5    Q.   Is that still the case today, that that's your
6    understanding of what the card would cost?
7    A.   Yes, ma'am.
8    Q.   What is the cost of producing a driver's
9    license?
10   A.   For us actually producing a card?
11   Q.   I'm sorry, for a driver's license, uh-huh?
12   A.   It's the same.
13   Q.   Okay.  And for a personal identification card?
14   A.   Yes, ma'am, it's the same as well.
15   Q.   Now earlier when we were talking about the
16   priorities DPS had in developing this rule, you said
17   efficiency and preserving the integrity of the
18   certificate, and that you wanted the system to be
19   trouble free?
20   A.   Yes.
21   Q.   So can you tell me, when you're talking about
22   efficiency, what do you mean by that?
23   A.   I'm looking at that probably primarily from the
24   employees' standpoint.  That when you have lots of
25   different things that you do that are very close but

---

**38**

1    have different nuances, that increases the complexity,
2    it increases the opportunity for problems for the
3    employees and for our customers.
4    Q.   Was there -- was there also priority in terms
5    of efficiency for the clients, the individuals, who
6    might be --
7    A.   Oh, absolutely.  I mean, if we -- if there's
8    confusion on our side, that causes confusion for the
9    customers.  That's never a good thing.  And so we wanted
10   to make this process -- we strive to -- you know, unlike
11   the reputation that we have, across the state, across
12   the country, you know, driver license offices and DMVs
13   in general are not known for providing great customer
14   service, and that's not how we're trying to do our
15   business in Texas and so we want to provide great
16   customer service.
17   Q.   Is it fair to say your reputation in Texas is
18   not providing great customer service?
19   A.   You know, I think in honesty, there's a mixed
20   bag, but I can tell you that I was just reading to
21   Kathleen -- she was trapped in a room with me, had to
22   listen -- feedback from a customer that was just going
23   on and on about how fabulous our employees were and how
24   helpful and how friendly, and we get those comments a
25   lot.

---

**39**

1    Q.   Uh-huh.  And do you also get comments from
2    people who are less satisfied with the service at DPS?
3    A.   Yes, we do.  It's very difficult to serve
4    virtually the entire population of the state and it's
5    not even just residents because driver license and ID
6    cards are available to temporary visitors to the state.
7    And it's very, very difficult to serve the entire strata
8    of the population and have everyone go away satisfied.
9    And we are virtually the only function in state
10   government that serves that entire strata of the
11   population from very, very young, because you can come
12   in and get an identification card when you're young; you
13   don't have to drive, you don't have to be driving
14   age.  And we also serve elderly customers that no longer
15   drive at all.  So that's a very wide age spectrum -- the
16   population, you know, the -- everybody.
17   Q.   So why do you think that makes it difficult?
18   The variety of clients you're serving or the number of
19   clients you're serving?
20   A.   Well, because -- go around the table and see
21   what people's expectations are.  Everybody is going to
22   have an expectation if I get four of the five people at
23   the table, then, you know, there's still one person
24   who's dissatisfied, who wanted something different.
25   Q.   Okay.  And in terms of the other priorities

---

**40**

1    that you mentioned:  Trouble -- that you said that you
2    wanted to keep the system trouble-free.  Is that --
3    A.   The customer service, yes, ma'am.
4    Q.   That's what you were testifying about, okay.
5    And the other priority, I believe you
6    said, was to preserve the integrity of the Election
7    Identification Certificate?
8    A.   Uh-huh.
9    Q.   And what do you mean by that?
10   A.   A driver license or a state-issued ID card or,
11   you know, our -- that driver license is no longer just a
12   license to drive, it's really the gateway to legitimacy
13   because it establishes your identity and, you know, it's
14   used for virtually every kind of transaction in society
15   and so we take the responsibility of, you know, making
16   sure that you are who you are before we issue you a
17   driver license or an identification card.  And we wanted
18   to carry these same principles forward in the EICs.
19   Q.   So, in other words, you want to ensure that
20   someone who applies for an EIC is who they say they are?
21   A.   Yes.
22   Q.   And that's what you meant by preserving the
23   integrity?
24   A.   Yes.
25   Q.   Okay.  What -- what was your -- well, let me

Rebecca Davio                                        June 15, 2012

## 41

1  ask you this:  In terms of how you carried out that goal
2  in preserving the integrity of the card, well, how did
3  you carry out that goal?
4      A.  It's spelled out in the rules the documents
5  that are required to be able to get an Election
6  Identification Certificate.
7      Q.  And we're going to talk through that in a
8  second, but is it, basically, modeling to some extent
9  the process that a person would go through to get either
10  a driver's license or a personal identification card?
11      A.  Yes, ma'am.
12      Q.  And what was your understanding of the purpose
13  of the Election Identification Certificate?
14      A.  To provide photo identification for voting.
15      Q.  And did you understand that the individuals who
16  would be applying for an EIC were individuals who did
17  not have one of the other forms of identification
18  required by Senate Bill 14?
19      A.  Yes.
20          MR. McKENZIE:  Objection, speculation.
21          You answered.
22      A.  Sorry.
23          MR. McKENZIE:  That's fine.  You get into
24  a rhythm, it's hard to pause.
25          THE WITNESS:  It was an easy one, I knew

## 42

1  the answer to that.
2      Q.  (By Ms. Maranzano) Did DPS make any particular
3  efforts when they developed this rule to think through
4  what population might be applying for the EIC?
5          MR. McKENZIE:  Objection, vague.
6      A.  I think we were thinking about the process.
7      Q.  (By Ms. Maranzano) And what do you mean?
8      A.  The process of implementation.  You know, we
9  have to be able to implement it.
10          OFFICE STAFF PERSON:  Lunch has arrived.
11          MS. MARANZANO:  Thank you.
12      Q.  (By Ms. Maranzano) And so I guess I'm not
13  totally understanding your answer.  Did DPS make any
14  efforts to work into this proposed rule anything in
15  particular that it felt like would address the community
16  that it thought might be most likely to apply for an
17  EIC?
18          MR. McKENZIE:  Objection, vague and
19  objection, speculation.
20          But you may answer.
21      A.  I don't think we necessarily thought about
22  particular populations that might or might not.  I mean,
23  the information about the fiscal impact said we didn't
24  know.  We didn't have any data available to be able to
25  estimate the number, so to be able to estimate

## 43

1  particular populations that may or may not be affected
2  would have been speculative.  So we were worried about
3  the integrity of the process and making sure that we
4  could meet the deadlines.
5      Q.  And what deadlines are you referring to?
6      A.  The implementation deadline to be ready and
7  able to issue election certificates beginning in January
8  of 2012.
9      Q.  Okay.  And one more question about that fiscal
10  impact paragraph that we were looking at.  Would there
11  also be a cost for training staff about the EIC?
12          MR. McKENZIE:  You've got to answer it.  I
13  can't tell you the answer.
14          THE WITNESS:  (Laughing) Okay.  I was
15  trying to pause and give you the opportunity to object.
16      A.  There is -- we routinely train our staff about
17  legislation that's coming up or policy changes or
18  procedure changes.  There were no out of -- no unusual
19  out-of-pocket costs to train over and above traditional
20  operations.
21      Q.  Well, certainly you would be needing to train
22  your staff about the new program if it were implemented,
23  correct?
24      A.  Yes, we did.
25      Q.  So am I understanding you that you would work

## 44

1  that training into other existing trainings?
2      A.  Well, we routinely have to train our employees
3  on new policies or procedures or legislation that's
4  changed or new technology even, and so that's kind of a
5  routine matter for us.  The division has trainers and,
6  you know, so I -- we do that routinely as a matter of
7  our business, to provide training.
8      Q.  Okay.  So it wasn't -- it wasn't an additional
9  cost that you were foreseeing for this program?
10      A.  Yes, ma'am.
11      Q.  Okay.  Was there an estimate as to the cost for
12  designing this new card, this new certificate?
13      A.  There was not an estimate at the time that the
14  bill was proposed or the rules were proposed so I don't
15  think the cost --
16      Q.  Why was there not an estimate for that?
17      A.  Because the card hadn't been designed at that
18  particular point in time.  We hadn't figured out how we
19  were going to do it.
20      Q.  But wouldn't you budget some amount of money
21  for the process of designing a new card?
22      A.  We looked at lots and lots and lots of pieces
23  of legislation and we didn't -- we didn't know what --
24  whether those pieces of legislation were going -- the
25  bills were going to pass, and we didn't know what all

Rebecca Davio                                              June 15, 2012

## 45

1    the costs were for those bills.
2        Q.   Okay.  So we might be -- we might be
3    miscommunicating slightly.  I'm just asking you about
4    why in -- when you're talking about the fiscal impact
5    for this particular rule, and am I correct that this
6    rule was promulgated after the SB 14 had been passed,
7    right?
8        A.   Uh-huh.
9        Q.   So I'm just wondering why there wasn't an
10   inclusion for a cost that it might -- that DPS might
11   incur to design a new card?
12       A.   So first, I should point out I'm not Denise
13   Hudson, and estimating the costs were her
14   responsibility; she is the assistant director for
15   finance at DPS.  But it appears as if the cost estimate
16   was based upon the number of -- any potential cost for
17   producing the cards for -- you know, producing the
18   cards.  That's what appears to be based on.
19       Q.   So there was no -- there was no cost estimate
20   included for designing a new -- a new identification
21   form that would be the EIC?
22       A.   Yes.
23       Q.   Yes?
24       A.   Yes, there was no cost estimate for that.  I
25   mean, you know, a lot of this stuff, it's just routine

## 46

1    course of business.  That we -- there was another piece
2    of legislation, for example, that required us to put a
3    veteran indicator on people's driver licenses.  You
4    know, it's like, that's just a cost of doing business
5    for us.  Legislation is passed, and we have to be able
6    to do those things.
7        Q.   But adding a new form of identification
8    certainly wouldn't be a routine thing that occurs,
9    right?
10       A.   Well, I think it's kind of in the realm of
11   Legislation is passed, we have to implement whatever
12   legislation is passed.
13       Q.   And when you normally include in a fiscal note
14   any costs that an agency would incur even if it's --
15   even if it's in your mind the cost of doing business, it
16   would still be a cost, correct?
17       A.   I think what the agency would have been
18   thinking about would have been -- potentially, the
19   largest cost is to issue the cards, to actually go to
20   the production and the cost, and that we couldn't figure
21   out a way to come up with any kind of a reasonable
22   estimate for that.
23       Q.   Would there be any new equipment that would be
24   needed to issue this card?
25       A.   Nuh-uh.  I'm sorry that was no.

## 47

1        Q.   Thank you.
2            Did anybody direct DPS not to come up with
3    a cost for the EIC?
4            MR. McKENZIE:  Objection.
5            If a legislator instructed you to do that,
6    don't identify the legislator or the contents of the
7    communication.  Otherwise, you may answer the question
8        A.   No, I don't believe anyone directed us to not
9    come up with a cost.
10       Q.   (By Ms. Maranzano) Other than what we've talked
11   about, are there any new materials or anything that the
12   driver's license offices -- I know you said they don't
13   need new equipment, any other new materials that they
14   might need for the EIC program that they don't already
15   have?
16       A.   We came up with a training document for our
17   employees, but like I said, that's pretty routine for
18   legislation or new policy changes or that kind of thing.
19       Q.   Okay.  So I want to talk about the final rule
20   for a moment, which we have in 833.  And can you look at
21   the first part of the first rule, which by is Admin Rule
22   15.181.  Do you see that, it's on Page Texas 00296914?
23   Do you see that -- are you there?
24       A.   Yes, ma'am.
25       Q.   Do you see that there's a requirement that an

## 48

1    applicant be registered to vote or apply to register to
2    vote?
3        A.   Yes, ma'am.
4        Q.   Does DPS do any check to verify that a person
5    is actually registered to vote if they're -- if they
6    show up to request an EIC, will there be any
7    verification of whether or not they're registered to
8    vote?
9        A.   Well, in the rules, it says, "Be a registered
10   voter in this state and present a voter registration
11   card issued to the individual or be eligible for voter
12   registration and submit an application."  So that would
13   require them to present their voter registration card if
14   they claim that they were already eligible -- I mean, if
15   they were already registered.
16       Q.   So if they show up, they need to show their
17   voter registration card or the voter registration
18   application?
19       A.   Yes, ma'am.
20       Q.   And if they don't have their voter registration
21   card but say they are registered, what would happen to
22   that applicant?
23       A.   We do not have the capability to query the
24   system, the Secretary of State system, to be able to
25   verify their voter registration.

Rebecca Davio                                                    June 15, 2012

## 49

1    Q.   Will that applicant be turned away?
2         MR. McKENZIE:  Objection, speculation.
3    A.   According to the rules, yes.
4    Q.   (By Ms. Maranzano) Is that how you are planning
5    to train your staff?
6    A.   I was trying to remember what the training
7    documents -- if they addressed that specifically, and
8    I'm sorry, I can't recall exactly.  But the rules do say
9    that the applicant must be a registered voter and
10   present their voter registration card.
11   Q.   Would it be for possible for an employee to
12   call a clerk or the Secretary of State's office and
13   determine whether that individual was a registered
14   voter?
15        MR. McKENZIE:  Objection, speculation.
16   A.   I think that would be outside the scope of our
17   capabilities, typically.
18   Q.   (By Ms. Maranzano) Do you see the -- a little
19   bit lower on the page, it says -- it lists certain forms
20   of identification that an applicant is required not to
21   possess in order to apply for and obtain an Election
22   Identification Certificate.  Does DPS plan to run any
23   checks on whether an applicant actually possesses the
24   DPS-issued forms of identification in that list?
25   A.   The procedures do specify that we have to

## 50

1    verify that there is no driver license or personal
2    identification certificate that is unexpired.  And that
3    includes if it's within the 60-day timeframe.
4    Q.   And you are verifying that by looking at a DPS
5    database?
6    A.   Yes.
7    Q.   And are you going to do the same thing for a
8    concealed handgun license?
9    A.   No.  I don't currently have that capability.
10   Q.   And when you say the procedures specify, that
11   is, you're talking about the rule, not the Senate Bill
12   14; is that correct?
13   A.   I'm sorry, in that particular instance, I was
14   actually talking about our training materials.
15   Q.   Okay.  So that's a procedure that DPS --
16   A.   That's an internal procedure for the driver
17   license division.
18   Q.   Okay.  And DPS determined that it should follow
19   that procedure, it wasn't mandated by the law; is that
20   correct?
21   A.   That's correct.
22   Q.   And why did DPS decide they wanted to check
23   that -- check whether or not a person had a driver's
24   license or ID card?
25   A.   Because it's a requirement that if you have --

## 51

1    a person already has a driver license or personal
2    identification card, that it's not expired or it hasn't
3    been expired for more than 60 days, that they are not
4    eligible for an Election Identification Certificate.
5    Q.   Was there any reason that DPS didn't feel as
6    though a person could state that to them?
7    A.   I think that we felt where we had the
8    capability to readily check, that we should exercise
9    that capability.
10   Q.   And I presume that you will not be checking
11   whether a person has a U.S. passport or U.S. citizenship
12   certificate because I wouldn't imagine that would be
13   easily accessible for DPS; is that correct?
14   A.   Yes, ma'am.
15   Q.   Is DPS going to run any other checks or compare
16   this person's information to any other databases that
17   DPS possesses?
18   A.   No.
19   Q.   Will there be any criminal history check, then,
20   to an EIC applicant?
21   A.   No.
22   Q.   And can you look at, in this document that
23   we're looking at, 833, if you flip to the first page, do
24   you see that there's comments there?  And I believe that
25   you testified earlier that the League of Women Voters

## 52

1    had submitted comments and that I believe you said it
2    was by a legislator --
3    A.   Yes.
4    Q.   -- that submitted comments?
5    A.   Yes.
6    Q.   Do you see in the third paragraph on that page,
7    it actually identifies that the legislator was Senator
8    Leticia Van de Putte?
9    A.   Yes.
10   Q.   Yes?  Can you look at the first comment and,
11   particularly, the phrase or portion of that comment that
12   suggests that League of Women Voters requested an
13   additional 30 days be allowed for processing time for an
14   expired document?  Do you see that?
15   A.   Uh-huh.  Yes, I do.
16   Q.   And what was DPS's concern with that
17   suggestion?
18   A.   Wasn't 60 days spelled out in the legislation?
19   Was it not?  Well, I mean, 60 days -- all the things
20   that are expired for 60 days, you know, that we allow 60
21   days for the -- all of the expiration of the documents,
22   and we have actually improved our processing time
23   significantly more than 10 days to produce the card
24   and get it out.  And there is a temporary receipt that's
25   issued at the time of application that can be used for

Rebecca Davio                                    June 15, 2012

## 53

1    voting.
2        Q.   Okay.  And when you say it's less than 10 days
3    to get the card out, are you referring to a personal
4    identification card?
5        A.   Driver license.  We haven't actually issued an
6    Election Identification Certificate, but since it goes
7    through the same process as a driver license or the
8    personal identification card, we'd have to assume that,
9    generally, that is available to the applicant in a very
10   timely fashion.
11       Q.   And is less than 10 days an average?
12       A.   Uh-huh.
13       Q.   Sometimes it takes more?
14       A.   The statistics that I saw for last month might
15   have had one, what looked like an 11-day and lots of 4
16   or 5 days, so, yeah, I'd say less than 10 days is my
17   summary statistic.  It's on the conservative side.  We
18   have been getting them out in a very timely fashion.
19       Q.   And the statistics you're referring to, is that
20   for all the offices across the state?
21       A.   The driver license and personal identification
22   cards are issued centrally in Texas so it's only comes
23   from one location.
24       Q.   Okay.  But it includes people who apply at any
25   location around the state?

## 54

1        A.   Yes, ma'am.
2        Q.   Okay.
3        A.   The application process is around the state.
4    The issuance process for the actual card is centralized
5    in Austin.
6        Q.   Okay.
7            MR. McKENZIE:  Can we take lunch pretty
8    soon?
9            MS. MARANZANO:  Yeah.  I just have maybe
10   one or two more questions.
11           MR. McKENZIE:  Okay.
12       Q.   (By Ms. Maranzano) Why -- why would using a
13   temporary card be preferable to extending the 60-day
14   time limit?
15       A.   Well, it gives people -- they can vote with the
16   temporary receipt.
17       Q.   Okay.  All right.  And we're going to talk more
18   about the temporary receipt in a little bit.
19           MS. MARANZANO:  But I'm okay with taking
20   lunch now if you guys want to do that.
21           MR. McKENZIE:  Okay.
22           (Recess at 12:30 to 1:11 p.m.)
23           MS. MARANZANO:  Let's go back on the
24   record.
25       Q.   (By Ms. Maranzano) So before lunch we were

## 55

1    talking about the rules, and I want to go back to
2    talking about the administrative rules for the Election
3    Identification Certificate, and if you could direct your
4    attention to Rule 15.182 about the identification of
5    applicants.  Can you just take a look at that?  And it's
6    15.182.  Are you there?
7        A.   Yes.
8        Q.   Okay.  Is it fair to say that this rule
9    essentially requires that an applicant show one form of
10   primary identification or two forms of secondary
11   identification or one secondary form of identification
12   and two supporting forms of identification?
13       A.   Yes.
14       Q.   And is that a similar structure to what is
15   required for a driver's license or a personal
16   identification card?
17       A.   Yes.
18       Q.   Are the forms of ID, or the forms of underlying
19   documentation similar to what is required for an
20   application for a driver's license or a personal
21   identification card?
22       A.   Yes, except that the driver license and
23   identification documents also allow noncitizens, so
24   those documents have been removed, but otherwise they're
25   the same.

## 56

1        Q.   Okay.  So is it fair to say that there are
2    actually a number of additional primary forms of
3    identification that could be used for a driver's license
4    or a personal identification care that are issued to
5    noncitizens?
6        A.   Yes.
7        Q.   Okay.  And is the purpose of this section and
8    these -- those requirements to show underlying
9    documentation, is the purpose of that -- or let me ask
10   you:  What do you think the purpose of that is?
11       A.   What is the purpose of the list of the
12   identifying documents?
13       Q.   What is the purpose of this requirement that a
14   person show these documents in order to obtain an EIC?
15       A.   So that there is confidence in that they are
16   who they say they are.
17       Q.   So is it the position of DPS that showing these
18   combinations of documents in the manner that we talked
19   about, either one primary form of identification, two
20   secondary or one secondary and two supporting documents,
21   those combinations would verify somebody's identity?
22       A.   Yes.
23       Q.   Did DPS ever discuss whether it's necessary to
24   have somebody show photo identification in order to
25   verify their identity?

## 57

1    A.  This is the list that we used.
2    Q.  And just for the record, you're referring to
3    the list included in 15.181?
4    A.  Yes, ma'am.
5    Q.  And that does include nonphoto identification;
6    is that correct?
7    A.  I'm sorry.  It's actually 15.182.
8    Q.  182.  Thank you.
9    A.  Yes.  There are forms of identification on
10   there that would not have a photo.
11   Q.  And can you look back for me at the portion of
12   this document beginning that has the comments?  And do
13   you see the second comment, which is part way through
14   that page, in the last sentence of that it says, "The
15   League of Women Voters asserted that only allowing the
16   driver's license or a personal identification
17   certificate that has expired for at least 60 days and no
18   more than two years is unnecessarily limiting."  What is
19   DPS's position on that comment?
20   A.  The official response found right below what
21   you just read says the, "Department disagrees with this
22   recommendation."
23   Q.  And does it also say that, "The other documents
24   allowed for primary identification are also acceptable
25   for voting purposes or are accepted only for persons who

## 58

1    are not U.S. citizens"?
2    A.  Yes.
3    Q.  Is there any reason that a document that has
4    expired two years ago might have more validity or more
5    credibility than a document that has expired two and a
6    half years ago?
7    A.  I think the reason for the dates in the rules
8    was to be consistent with the rules for -- required for
9    identification purposes for other forms.  You know, it's
10   like, okay, these are the time frames.  You had to set
11   some time frame.
12   Q.  Okay.  And when you say for other
13   identification, are you referring to the driver's
14   license and personal identification card?
15   A.  (Witness nods head yes.)
16   Q.  And is the value of consistency mostly for
17   employees of DPS?
18   A.  It's employees and customers.
19   Q.  And is that because of what we talked about
20   earlier today, that if something is simpler for
21   employees, it also means less likelihood of mistakes
22   which benefits the customers?
23   A.  Yes.
24   Q.  And in terms of this sentence about, "The other
25   documents are allowed for primary identification are

## 59

1    also acceptable for voting purposes or are accepted only
2    for persons who are not U.S. Citizens," were there any
3    documents that would be accepted for not U.S. citizens
4    but citizens might have as well?
5    A.  I'm sorry.  Could you restate the question?
6    Q.  Sure.  In the comment, "The League of Women
7    Voters was recommending allowing all photo IDs qualified
8    under SB 14 and all primary identification accepted for
9    driver's license or Personal Identification Certificate
10   as a primary identification for an Election
11   Identification Certificate."  Do you see that?
12   A.  What the League of Women Voters, the comment
13   that they made?
14   Q.  Yeah.
15   A.  Uh-huh.
16   Q.  And then the response from the Department is
17   about the primary identification would either be
18   acceptable for voting purposes or are accepted only for
19   persons who are not U.S. citizens.  And I guess what I'm
20   wondering is:  Are the forms of identification that are
21   accepted for persons who are not U.S. citizens, are
22   those also forms of identification that citizens might
23   have?
24   A.  No.
25   Q.  No?

## 60

1    A.  (Witness shakes head no.)
2    Q.  Okay.  Are you aware of whether noncitizens can
3    obtain some of the forms of identification required by
4    SB 14?
5    A.  Well, I mean, a noncitizen conceivably could
6    have a school record or an insurance policy or those
7    kinds of things that were allowed under supporting.
8    Q.  And noncitizens can also have a driver's
9    license, correct?
10   A.  Yes.
11   Q.  And can noncitizens have a personal
12   identification card?
13   A.  Yes.
14   Q.  And can noncitizens have a concealed handgun
15   license?
16   A.  I don't know that.  That's not my area.
17   Q.  And can you look at the next comment from the
18   League of Women Voters, and it says that, "The League of
19   Women Voters recommended allowing more types of
20   secondary identification than birth certificates,
21   certificates of birth abroad, or specific court orders,
22   seeing that persons who cannot afford to secure
23   certified documents or for whom no birth certificate is
24   available, may be able to provide documents to meet the
25   requirements."  And can you tell me what the

Rebecca Davio                                    June 15, 2012

## 61

1   Department's position was on that comment?
2        A.   So the response, the official response reads,
3   "The Department disagrees with part of this
4   recommendation.  Expanding the list of acceptable
5   secondary documents to include those that are not issued
6   by a verifiable government source opens the process up
7   to greater fraud potential.  That's why we request birth
8   certificates, not from a hospital, but from a government
9   entity."  And then it goes on to say, "The Department
10  agrees with the recommendation to include citizenship
11  documents without photographs to accommodate naturalized
12  citizens with older documents."  So the rules were
13  modified before they were finally adopted.
14       Q.   So with regard to that -- the first part of
15  that response, I guess I'm wondering why would
16  nongovernment -- why would a document issued by a
17  nongovernment source lead DPS to believe that that was
18  opening the process up to a greater fraud potential?
19       A.   If it was issued -- if a birth certificate was
20  issued by a governmental source, you could go to that
21  governmental source and verify it, and that there might
22  not be that same expectation if it was issued by a
23  nongovernmental source.
24       Q.   And is DPS planning to verify birth
25  certificates prior to issuing an Election Identification

## 62

1   Certificate?
2        A.   That's not a routine process.
3        Q.   Would there need to be some sort of concern
4   about the validity of birth certificate in order for DPS
5   to do that?
6        A.   We look at the -- the potential credibility,
7   the legitimacy of all the documents that we receive.
8        Q.   Okay.  And what would trigger you to do further
9   investigation?
10       A.   It's all manner of things.  If the document
11  doesn't look -- it's not consistent.  If the paper
12  doesn't feel right.
13       Q.   Who makes that determination?
14       A.   Well, the initial -- the employee makes the
15  initial assessment, and if they have an issue, then they
16  would go to their supervisor, or, you know.
17       Q.   And would it be the supervisor who would
18  actually decide whether or not there was going to be
19  further investigation of those documents?
20       A.   Yes, probably.  And it's likely that they would
21  potentially issue and have -- bring that up to other
22  sources for additional investigation.  Driver license
23  does not do full-blown investigations of any documents.
24       Q.   What -- who would they refer that to, then?
25       A.   To other folks at the Department of Public

## 63

1   Safety.  The law enforcement side of the house.
2        Q.   And you anticipate the same sort of process
3   with regards to an EIC?
4        A.   (Witness nods head yes.)  Sorry.  Yes.
5        Q.   Thank you.
6             And so you said that the government-issued
7   sources were easier to verify, correct?
8        A.   Yes, ma'am.
9        Q.   Are there some nongovernmental documents that
10  you could also verify?
11            MR. McKENZIE:  Objection, speculation, but
12  you may answer.
13       A.   There may be.
14       Q.   (By Ms. Maranzano) Did you look into including
15  any of those documents in this list?
16       A.   This is the list.  The list of documents that
17  are acceptable for Election Identification Certificates
18  is the same list of documents that we accept, we
19  currently accept for driver license and identification
20  cards, with the exception of documents that are only
21  available exclusively to noncitizens were removed.  So
22  it's the same list.
23       Q.   Okay.  But there was no requirement that it
24  needed to be the same list, correct?
25            MR. McKENZIE:  Objection, vague.  You may

## 64

1   answer.
2        A.   No, there was no specified requirement.  From
3   an operational standpoint, it was important to be as
4   consistent as possible.  And that list of documents has
5   been vetted and checked, and, you know, over the years.
6        Q.   (By Ms. Maranzano) Is it fair to say that an
7   Election Identification Certificate has a different
8   purpose than a driver's license?
9        A.   A driver license grants you the license to
10  drive, so yes.
11       Q.   And is the reason for using these secondary
12  documents to obtain a driver's license basically the
13  same reason that you've laid out here in regards to the
14  EIC in terms of you think these documents -- or you made
15  some sort of assessment that these documents are less
16  likely to open the process up to fraud?
17       A.   I think that would be a reasonable statement,
18  yes.
19       Q.   And you think that's the reason that they are
20  used in particular for the driver's license applicants?
21       A.   Uh-huh.  Yes.
22       Q.   What are -- you started to talk about this a
23  bit, but what are drivers' license staffers going to be
24  doing to verify that documents are actually legitimate?
25       A.   Well, they go through the training, the

Rebecca Davio                                          June 15, 2012

---

**65**

1   fraudulent document recognition training, and it's
2   almost just a sense, you know, of hmm, the paper doesn't
3   feel quite right.  You know, I don't routinely do that
4   as a process, so I haven't recognized a fraudulent
5   document personally, but that's what I have heard folks
6   say, that, you know, it may be something subtle about
7   it.
8        Q.  Is that training something that's provided
9   regularly through driver's license employees?
10       A.  It is typically provided to new employees and
11  would be available if there were changes or
12  modifications or something in a new document, then yes,
13  there would be refreshing.
14       Q.  And is that training program something that's
15  under your purview?
16       A.  Actually, the training is developed and
17  provided, typically, through the American Association of
18  Motor Vehicle Administrators, so that's a national
19  association that develops this training.
20       Q.  Okay.
21       A.  And we access that through their website.
22       Q.  Okay.  But do you oversee the training programs
23  that are done for driver's license employees?
24       A.  Yes.
25       Q.  Is there any anti-discrimination training

---

**66**

1   included for driver's license employees?
2        A.  Uh-huh.
3        Q.  And is any part of that training about ensuring
4   that employees would screen for fraud in an equitable
5   manner?
6            MR. McKENZIE:  Objection, it's vague.
7        A.  I don't believe that that specific phrasing is
8   in there, no.
9        Q.  (By Ms. Maranzano) Is that concept included?
10           MR. McKENZIE:  Same objection.
11       A.  I think that we are trying to provide the best
12  possible customer services, in a nondiscriminatory
13  manner, while complying with the rules and regulations
14  and laws that govern our business.  I believe those
15  concepts are covered in the training that we provide to
16  our employees.
17       Q.  (By Ms. Maranzano) When DPS created these rules
18  for an EIC, was there an attempt to balance out ensuring
19  that the card would be secure with ensuring that people
20  could have access to the franchise?
21           MR. McKENZIE:  Objection, vague.
22       A.  I think we want to provide cards to everyone
23  that qualifies, that can meet the requirements, you
24  know.  That's -- that's the goal.  We don't -- we don't
25  want to restrict them from anyone that qualifies.

---

**67**

1        Q.  (By Ms. Maranzano) Was there any concern that
2   not expanding the list of secondary identification
3   forms, as was requested by the League of Women Voters
4   would result in eliminating the ability of some
5   individuals to actually participate in the electoral
6   system?
7        A.  I don't think that that was a conscious
8   concern, no.  We issue almost six million documents a
9   year, people have to meet -- to people who meet those
10  criteria, and so...
11       Q.  It's fair to say that you don't now issue an
12  Election Identification Certificate, right, because that
13  program hasn't been implemented yet?
14       A.  That's correct.  We do not.  But we do issue
15  driver license and ID cards to the entire strata of the
16  population.
17       Q.  But it's also true that the individuals who
18  would be applying for an EIC wouldn't necessarily be
19  individuals who don't have the documents that you're
20  talking about, correct, a driver's license or an
21  identification card?
22           MR. McKENZIE:  Objection, vague, but you
23  may answer.
24       A.  Yes.  That's the only way they could get an
25  Election Identification Card.

---

**68**

1        Q.  (By Ms. Maranzano) And when these rules were
2   being developed, were there any studies that were looked
3   at or analysis that were looked in terms of how you
4   might want to issue a -- implement a program like this,
5   free identification for -- or identification free of
6   charge for voting?
7        A.  No.
8        Q.  So there was no -- there were no studies in
9   particular, then, about who might have birth
10  certificates?
11       A.  No, not that I'm aware of.
12       Q.  Do you recall, during your testimony in front
13  of the Committee of the Whole, that issue coming up?
14           MR. McKENZIE:  Same scope objection.
15       A.  Well, my focus during the development of the
16  rules and during the testimony was on issues related to
17  the driver license function and process.  Our role in
18  this is to issue the document, and the Secretary of
19  State is more about the voting requirements and...
20       Q.  (By Ms. Maranzano) Okay.  What I'm referring
21  to, just to be clear, is about the issuance of the EIC
22  and the requirements for the underlying documentation
23  that an individual would have to show in order to get an
24  EIC.  And one of those documents is a birth certificate,
25  and that's one of the secondary forms of identification;

Rebecca Davio                                                June 15, 2012

---

**69**

1    is that correct?
2        A.   Yes.
3        Q.   And I'm wondering if any legislators, to the
4    best of your recollection, raised concerns during your
5    testimony to the Committee of the Whole about
6    individuals' access to birth certificates?
7            MR. McKENZIE:   And it's the same scope
8    objection.
9        A.   I can't say that I recall a specific question
10   that was asked about that.
11       Q.   (By Ms. Maranzano) Did DPS look into what steps
12   a person needed to take to get a certified copy of a
13   birth certificate?
14       A.   I don't -- we didn't do any specific
15   investigation of that.  I think, you know, there's --
16   there's a certain level of familiarity that you have to
17   go to the county, or that kind of thing, to go get that
18   document.
19       Q.   So there was no --
20       A.   I'm not familiar with all the details.
21       Q.   Okay.  And there was no specific research
22   conducted for developing this rule that we're looking at
23   about the EIC use; is that correct?
24           MR. McKENZIE:   Objection, vague, but you
25   can answer.

---

**70**

1        A.   We worked with the Secretary of State, but
2    beyond that, I don't believe that we did any specific
3    research.
4        Q.   (By Ms. Maranzano) Do you have any knowledge or
5    was it discussed at DPS, whether or not it might have
6    been a common practice for any groups or communities or
7    populations in Texas to have been born outside of
8    hospitals?
9        A.   Do I have any specific knowledge that there are
10   groups to have been born outside of hospitals?
11       Q.   Right.  And I'm asking particularly about not
12   necessarily your personal knowledge, but the knowledge
13   that was considered when you were developing this rule.
14       A.   Yes.  There are people that do not have a birth
15   certificate and they may have been born at a point years
16   ago.
17       Q.   And you think people who are born more recently
18   probably -- am I understanding you correctly that your
19   testimony is that you think that people who might not
20   have access to birth certificates are people who are
21   born years ago?
22       A.   Those are the examples that I've heard --
23       Q.   Okay.
24       A.   -- anecdotally in the course of my two years at
25   DPS.

---

**71**

1        Q.   And was that something that was -- that was at
2    all evaluated when you were considering what to use as a
3    secondary form of identification?
4            MR. McKENZIE:   Objection, vague, but you
5    may answer.
6        A.   I think it's the same kind of thing, that
7    because these identity requirements for the EICs were so
8    similar to the driver license and ID requirements, that
9    any exceptions that would come up, we've already dealt
10   with in the driver license and ID arena, and so we would
11   handle them similarly.
12       Q.   (By Ms. Maranzano) Okay.  Can we look back at
13   15.182.  And if you look towards the end of that rule,
14   there's a provision that says, "Any document that may be
15   added to 15.24 of this title, other than those issued to
16   persons who are not citizens of the U.S.," can you tell
17   me what that provision means?
18       A.   The 15.24 is the identity documents for driver
19   license and ID, so what we wanted to do is be able to
20   keep the list in sync without always having to come back
21   and modify this list.  And so that particular phrase is
22   in there to do just that, such that if we add another
23   document to the list that's acceptable for driver
24   license, those folks seeking an Election Identification
25   Certificate are also able to use that document.

---

**72**

1        Q.   I see.  So in terms of that last phrase, "Other
2    than those issued to persons who are not citizens of the
3    U.S.," would that include documents that are issued to
4    persons who are not citizens of the U.S. and also issued
5    to persons who are citizens of the U.S.?
6        A.   I think that last portion of that phrase is
7    intended to say, if we added a document that was only
8    available to noncitizens, that that would not
9    necessarily put it on this list, because you have to be
10   at citizen to be able to vote.
11       Q.   Okay.  That's actually not exactly what it
12   says, though, correct?  Am I right that it doesn't say
13   that it would be any document that would be issued only
14   to noncitizens?
15       A.   It does not have the word "only" in it.
16       Q.   But it's your understanding that that was the
17   intention?
18       A.   (Witness nods head yes.)
19       Q.   Okay.
20           MS. MARANZANO:   Can we have this marked?
21           (Exhibit 834 marked for identification.)
22       Q.   (By Ms. Maranzano) Okay.  I'm showing you what
23   we've marked as Deposition Exhibit 834.  If you can take
24   a look at that and let me know if it looks familiar to
25   you?

## 73

1    A.   Yes.
2    Q.   And what is this document?
3    A.   I believe this is part of the training
4    documents --
5    Q.   Okay.
6    A.   -- that we gave to our employees to help them
7    understand.  I think, yeah.
8    Q.   Is this an official DPS document?
9    A.   Yes.  I'm assuming that an official DPS
10   document means that it was produced by DPS or used by
11   DPS employees.
12   Q.   So it was -- it as -- it was produced for
13   training for employees; is that correct?
14   A.   Uh-huh.
15   Q.   And can you look on the first page underneath,
16   "How does a person apply for a Texas election
17   certificate?"
18   A.   Uh-huh.
19   Q.   The second -- the second bullet there says,
20   "Bring document to verify U.S. citizenship"?
21   A.   Uh-huh.
22   Q.   Is that -- is that requirement separate from
23   what's listed in the rules, the documents that are the
24   primary, secondary or supporting documents that are
25   required by the rules?

## 74

1    A.   I think that it's really -- it's a callout of
2    something, that if you were to bring some combination of
3    -- I mean, I don't really see how you can bring a --
4    because you have to have a secondary document.  But you
5    could conceivably have a secondary document that showed
6    gender or name change that might not show citizenship.
7    So in that case, you would need to have something that
8    showed citizenship as well.
9    Q.   So in terms of the secondary documents, the one
10   that you mentioned, is that the only one that doesn't
11   automatically show citizenship?
12   A.   That's my recollection, yes.
13   Q.   And so if you bring that document and two
14   supporting documents, but the supporting documents don't
15   establish citizenship, you have to bring another form of
16   identification that would establish your citizenship?
17   A.   Yes.
18   Q.   And is there any reason that that's not written
19   into the rule itself on the EICs?
20   A.   I think that's -- no, I can't think of a reason
21   why that was there.  I think it's just kind of
22   understood, almost.
23   Q.   Are you -- are you aware of whether a voter
24   registration applicant already has to attest to their
25   citizenship when they register to vote?

## 75

1    A.   No, I'm not aware.
2    Q.   So it's your understanding that prior to
3    issuing an EIC, DPS will need have some documentation
4    that person is a citizen?
5    A.   Yes, that's what it says.
6    Q.   And was that a requirement that DPS understood
7    was required by SB 14 or that DPS developed itself?
8    A.   We would not have imposed any additional
9    requirements other than what was required either by
10   statute or by Secretary of State requirements.  DPS
11   wouldn't have established any additional requirements.
12   Q.   Okay.  So when we looked at SB 14, did you see
13   any requirement in SB 14 that -- that an applicant for
14   Election Identification Certificate would have to show
15   documentation to verify citizenship?
16   A.   I don't remember the entire -- well, it does
17   say -- on Page 10 of Exhibit 5, it says, "A United
18   States citizenship certificate."  So the implication is
19   that citizenship is required.
20   Q.   And are you looking at -- I'm sorry -- Page 10?
21   A.   Page 10 of Exhibit 5.
22   Q.   And so that is -- you're referring to one of
23   the forms of identification that would be required by
24   SB 14.  But in terms of what is specified in the law for
25   an EIC, is there any requirement that a person needs to

## 76

1    independently show documentation that establishes
2    citizenship?
3    A.   I don't see an independent requirement.
4    Q.   So I guess I'm just wondering where -- where
5    did this requirement come from, who inserted this into
6    -- into your documents or who decided that this
7    requirement was necessary?
8    A.   I was not involved in the negotiation of the
9    details of this.  My guess is that it was -- it came
10   from a requirement of the Secretary of State that you
11   have to be a U.S. citizen to vote.
12   Q.   Okay.  So you think the Secretary of State
13   probably requested that this be a requirement to obtain
14   an EIC?
15   A.   That's speculation on my part, but that would
16   be the requirement.  That would be my guess.
17   Q.   Isn't it fair to say that if a voter
18   registration applicant is attesting to their citizenship
19   on an application, that requiring them to bring
20   documentation of their citizenship is duplicative?
21   A.   I think verification is required in many
22   instances to prove something.
23   Q.   Do you think that an attestation is not a
24   sufficient verification?
25   A.   There are some things where there's

Rebecca Davio                                              June 15, 2012

## 77

1  documentation that's readily available, that's available
2  to be able to verify.  We do allow attestation for some
3  things.
4       Q.  And is it fair to say that some people who are
5  U.S. citizens may very well not have documentation
6  readily available that would prove their citizenship?
7            MR. McKENZIE:  Objection, speculation.
8       A.  I can't speak to that.  I don't know.
9       Q.  (By Ms. Maranzano) And in terms of the
10 documentation that is written into the rule for an
11 Election Identification Certificate, a person is already
12 required -- I think per your testimony, a person is
13 already required to show one form of documentation that
14 establishes citizenship.  I think -- I think you said
15 that if they did not -- if they had the secondary form
16 of ID, that that doesn't establish citizenship.  They
17 would need to bring one of these other forms of ID that
18 do; is that correct?
19      A.  Yes.
20      Q.  And so if they did that, there would not be any
21 additional requirement; is that correct?
22      A.  That's correct.
23      Q.  And just to be clear, you testified you don't
24 know why it's not specified in the rule that there has
25 to be some sort of verification of citizenship?

## 78

1       A.  I don't.
2       Q.  Can you turn back to the rule for me.  And can
3  you look at part 15.183?  And I'd like to direct your
4  attention to Section A, subsection 1, subsection little
5  A, which says --
6       A.  I'm sorry.  You said A 1 little --
7       Q.  I'm sorry.  A1, big A.  It's on the top of the
8  first full page on this rule.  And it says, "No name
9  will be used that has not been documented."
10      A.  Uh-huh.
11      Q.  Is that -- isn't it essentially saying that a
12 person needs to use the name that's on their underlying
13 documentation that they bring in?
14      A.  Yes.
15      Q.  And what if they have two forms of
16 documentation that have variations of the same name,
17 Thomas and Tom, or something like that; what name would
18 be used?
19      A.  The conflict has to be resolved, you know.  It
20 depends on the combination of the documents.  I mean,
21 it's meant primarily that you can't go by "Skip" if your
22 name is, you know, Robert Earl Smith.
23      Q.  Okay.  So there would be one decision made as
24 to what name to put on the EIC based on which name
25 showed up on which document?

## 79

1       A.  Well, I mean, you can't use Skip, if that's
2  what everybody calls you and that's -- and you don't
3  like Robert Earl.
4       Q.  Uh-huh.  What if somebody says to you that they
5  registered -- their voter registration application used
6  the name Skip, because that was their -- the name
7  everybody calls them, but their actual name on their
8  documentation is Robert.  Would they still need to have
9  an EIC that said Robert?
10      A.  Yes.  That would be the document, the name that
11 we would issue the document under.  I don't have any
12 knowledge of the Secretary of State and what rules they
13 use for naming.
14      Q.  Okay.  So there was any concern at DPS that a
15 practice like that might lead to significant poll worker
16 confusion if somebody shows up with a document that says
17 Skip or says Robert, when their name on the voter
18 registration list is Skip?
19      A.  The implementation of the rules, the use of the
20 cards at the polling place is not DPS's issue.  I
21 believe that there was discussion about that with the
22 Secretary of State and their folks, but that's not a
23 Department of Public Safety issue.
24      Q.  Okay.  So that wasn't -- even though you were
25 issuing rules for an identification that would be used

## 80

1  solely for voting, DPS did not consider it necessary to
2  think about what would happen when the voter showed up
3  at the polls and tried to use that ID?
4       A.  No, that wasn't exactly what I meant.
5       Q.  Okay.
6       A.  It was that we have standards that we issue
7  documents under, and we have rules that are consistent
8  with the driver license and the ID card rules.  How
9  those are implemented and deconflicted at the polling
10 place is not a DPS issue.
11      Q.  Okay.
12      A.  And the Secretary of State was aware of our
13 rules and what we were going to do.
14      Q.  And can you look at capital letter B on that
15 same page, and it says, "Foreign language names will be
16 spelled out as they appear on the identification
17 documents presented.  English versions of names will not
18 be substituted for the actual name."  And I have similar
19 question about -- about this.  What if somebody told you
20 that they had registered to vote with the English
21 version of their name, would they still need to use the
22 foreign version of their name on the identification
23 document?
24      A.  Yes, my answer is the same.
25      Q.  And you said you're not aware of the Secretary

Rebecca Davio                                             June 15, 2012

## 81

1  of State's rules in regard to how individuals who have
2  identification with a name that doesn't match the
3  polling -- the name on the registration list, how those
4  individuals would be handled?
5      A.  I don't know the details of that, no.
6      Q.  Returning to Section A, do you see the line
7  that says, "Three full names will be used unless the
8  applicant does not have three names, including the
9  maiden name."  Are you -- oh, and then also, the first
10 sentence says, "A married woman may use her maiden name
11 or she may adopt the surname of her husband or the
12 surname of a previous husband."  Are you --
13          MR. McKENZIE:  Objection, compound.  I'm
14 sorry.
15          MS. MARANZANO:  Oh, I'm sorry.
16     Q.  (By Ms. Maranzano) I was just trying to read
17 into the record what the rule states.  Is that correct?
18 Have I read that correctly?
19     A.  Yes.
20     Q.  Thank you.  Are you aware that, in the Spanish
21 culture, there's a tradition to keep a surname from both
22 the mother's side and the father's side of the family?
23     A.  I've heard that.
24     Q.  So would a person who came from that tradition
25 possibly have four names?

## 82

1          MR. McKENZIE:  Objection, speculation.
2  But you may answer.
3      A.  I've heard such.
4      Q.  (By Ms. Maranzano) Okay.  And how would that
5  person be -- how would an application for an EIC from a
6  person with four names be -- be handled?
7      A.  The same way as an applicant for a driver
8  license or an identification card with four names would
9  be handled.
10     Q.  And what is that?
11     A.  To be perfectly honest, I don't know.  I have
12 never processed an applicant with four names --
13     Q.  So there's no -- is there a DPS policy on that
14 issue?
15     A.  I don't know.
16     Q.  Is there any reason that the rule specifies
17 three full names will be used?
18     A.  I think what these rules are trying to do is
19 achieve consistency, and this actually is an excerpt
20 from the rules.  If I'm remembering correctly, this
21 portion is an excerpt from the rules that are about the
22 driver license and the identification card.  And so it's
23 about consistency and it's like, well, Robert Earl Smith
24 may not like Earl, and he doesn't want to use it, but
25 yet that's his legal name, and this is specifying that

## 83

1  he has Robert Earl Smith on his primary, secondary, or
2  supporting documents, that that is the name that needs
3  to be in the record.
4      Q.  But isn't it -- isn't it true that an EIC
5  actually is very different from a driver's license in
6  that it's an identification that needs to be matched?  I
7  mean, by the very nature of it being an ID solely for
8  voting, it's going to be need to be matched against a
9  list when a person tries to vote; isn't that correct?
10     A.  That makes sense, yes.
11     Q.  And so I guess what I'm having a hard time
12 figuring out is:  Why didn't DPS try to tailor some of
13 these regulations to meet the -- the specific purpose
14 that the EIC was being used for?
15     A.  I think that we really tried to remain
16 consistent to the process.  The Department of Public
17 Safety was designated by the legislature as the entity
18 to issue these identification cards, and so we assumed
19 that there was some trust in the processes that we used
20 to be able to do them.  There was a desire to not
21 replicate, you know, government processes.  And so we
22 used them consistently.  And the Secretary of State was
23 aware of these, all of these requirements and rules.
24 And so if there were things that needed to be done to
25 accommodate something at the polling place, that could

## 84

1  be done, I believe they also did rules.
2      Q.  You believe they what?
3      A.  They also did rules.
4      Q.  And can you look down the page on that same
5  page that we're looking at, where under C, number 3, it
6  talks about fingerprints are required to get an Election
7  Identification Certificate?
8      A.  Uh-huh.
9      Q.  Can you tell me why applicants for an EIC need
10 to be fingerprinted?
11     A.  It's part of the same process --
12     Q.  What --
13     A.  -- applicants for a driver license or
14 identification cards are processed, and it goes through
15 the same technology system.
16     Q.  Okay.  What -- what technology system is that?
17 You mean how a person gets fingerprinted it's the same
18 technology system?
19     A.  It's -- it's part of the same equipment setup.
20     Q.  Okay.  What does DPS do with that information?
21     A.  Nothing.
22     Q.  Is there any concern that fingerprinting
23 applicants might be intimidated?
24     A.  No.  It's a routine part of the process to get
25 a driver license or an identification card in Texas.

## 85

1  Q.  Can you look on next page for me?  Under
2  notarizations, it says, Section D, "Authorized employees
3  of the Department of Public Safety."  Are driver's
4  license employees authorized notaries?
5  A.  The employees in the field are, yes, ma'am.
6  Q.  So a person who was at a driver's license
7  office to get an EIC could have it notarized right there
8  in the office; is that correct?
9  A.  By the person taking their application, yes,
10 ma'am.
11 Q.  Is there a requirement that a first-time
12 applicant for an EIC appear in person?
13 A.  Yes.
14 Q.  And is that written into the rules somewhere?
15 A.  I think it says you have to go to a driver
16 license office, if I remember correctly.  I'm not sure
17 if it's in the rules.  I know I've read that somewhere
18 that it's -- that is the, you know, part of the steps,
19 part of the procedures.
20 Q.  Is there any reason that wasn't included in the
21 rule itself?
22     MR. McKENZIE:  Objection, no foundation,
23 but you may answer.
24 Q.  (By Ms. Maranzano) Well, do you see it in
25 rules?

## 86

1  A.  I'm -- I'm not seeing it right now.  Like I
2  said, I know I've seen it somewhere.  I'm not sure if
3  it's in the rules or not.  I don't think that there was
4  a specific reason for that.  These rules were patterned
5  after the rules for the driver license and
6  identification cards, and it probably was not spelled
7  out in there either.
8  Q.  And why is it necessary that a person show up
9  in person on their first -- the first time they're
10 applying for an EIC?
11 A.  We currently don't have technology that allows
12 us to accept pictures or fingerprints or that kind of
13 thing that's submitted, and there's a need to see the
14 documents.
15 Q.  So if the documents were mailed in, that would
16 not be sufficient?
17 A.  It needs to come as a package, and that's --
18 that's the only way that we have it.  We don't have any
19 procedures set up to accept mailed-in documents or
20 electronically-transmitted documents for the EIC, driver
21 license, or original identification card applications.
22 Q.  And that's for an original applications; is
23 that correct?
24 A.  That's correct.
25 Q.  And is a person able to -- and we can -- we can

## 87

1  look at rule -- yeah, Rule 15.184.  But is a person able
2  to renew an EIC in other ways other than showing up in
3  person?
4  A.  Yes.  15.184-B3 says, "The Department may
5  provide certificate holders with alternate means of
6  renewing or duplicating an Election Identification
7  Certificate."
8  Q.  And has the Department provided such alternate
9  means?
10 A.  Well, we haven't yet, because we haven't issued
11 an Election Identification Certificate.
12 Q.  Fair point.  Does the Department intend to
13 provide alternate means?
14 A.  We specifically set aside that requirement so
15 that we could provide alternate means.  I mean, you
16 know, that's specifically spelled out in here so that we
17 could do that.
18 Q.  Uh-huh.  So I guess what I'm wondering is:  If
19 this -- if this were to be implemented this fall, are you
20 -- and obviously, it would be new, so you wouldn't have
21 anybody applying for renewal right way, but is the
22 plan --
23 A.  It's a six-year certificate.
24 Q.  Is the plan to allow people to renew in -- in
25 ways other than in person, or is that just an option

## 88

1  that you're keeping open?
2  A.  That would be the hope, that they would be able
3  to renew in the same ways that you could renew a driver
4  license or an identification card.
5  Q.  And what are those?
6  A.  You can renew online.  You can renew via mail
7  or by phone.
8  Q.  And so as of now, you would say it's a hope
9  that you can provide that to EIC applicants?
10 A.  It's speculation that we would be able to at
11 this point in time, but it is a hope.
12 Q.  Okay.  And is it your understanding that EICs
13 will be renewed free of charge?
14 A.  Yes.
15 Q.  Is there a reason that wasn't written into the
16 rule?
17 A.  I thought it was.  No, there's no reason.  But
18 I was thinking that it was.
19 Q.  But it's your understanding that they will be
20 issued free of charge?
21 A.  Yes.
22 Q.  And duplicates --
23 A.  Yes.
24 Q.  -- I believe is written into the law as free of
25 charge --

Rebecca Davio                                                              June 15, 2012

89

1      A.  Yes.
2      Q.  -- is that correct?
3      A.  Actually, that is the reason.  It's written
4  into the law, and we tried not to duplicate all the
5  details in the law that was clear and didn't need any
6  clarification.
7      Q.  You think the renewals is written into the law
8  or duplicates?
9      A.  I think it says you can't charge for an
10  Election Identification Certificate.
11      Q.  And you took that to mean any version?
12      A.  (Witness nods head yes.)
13      Q.  Okay.  And for Rule 15.185, "The Department may
14  cancel and require surrender of an Election
15  Identification Certificate upon confirmation that the
16  certificate was issued to a person not entitled
17  thereto."  How would the Department confirm that an
18  Election Identification Certificate had been issued to a
19  person who wasn't entitled to it?
20      A.  I think it could come from a variety of
21  sources.  And, you know, General Counsel, whoever
22  brought the documents or this -- the -- the allegations,
23  and they would have to -- they'd have to just go though
24  it.  We haven't -- I mean, we haven't issued any, so I
25  can't give you a specific example of this is what we did

90

1  or how we did it or anything like that.
2      Q.  Has there been any process mapped out for what
3  that -- what that would look like?
4      A.  Not that I'm aware of.
5      Q.  And what about the process for -- the process
6  for requiring surrender; do you know what that would
7  look like?
8      A.  I think those were in there as protective, not
9  -- not that we anticipated using them, but that just in
10  case there was an example that came up.
11      Q.  If a person obtains an EIC and the EIC
12  expires, would that person have to apply again as a new
13  applicant?
14      A.  It's probably they would follow the same kind
15  of standard as we do for driver license and
16  identification cards.
17      Q.  And what's that standard?
18      A.  That if it's within a certain time frame, then
19  they -- they're just treated as a renewal.
20      Q.  And is that time frame two years?  Is that
21  correct?
22      A.  Yeah, that's probably...
23      Q.  That's probably correct?
24      A.  Yes.
25      Q.  Okay.

91

1      A.  The intention is not to make this hard.  It's
2  to follow certain standards that preserve the integrity.
3      Q.  The intention is to not make getting an EIC --
4      A.  To not make it -- right.  Just like we don't
5  want to make getting a driver license or an
6  identification card hard.
7      Q.  Well, to that end, did you -- did you look at
8  forms of identification that you were requiring people
9  to show with any eye towards not making it hard for
10  applicants?
11      A.  Not making it hard within certain standards.
12  If I gave them away like candy, it's not a good thing.
13      Q.  Is it -- is it true -- I believe this is in the
14  statute.  You can look back at the statute -- that a
15  person who is age 70 who obtains an EIC would get an EIC
16  that doesn't have an expiration date?
17      A.  That's correct, I believe.
18      Q.  Would DPS require such a person to show some
19  verification of their age?
20      A.  You would have their age, their date of birth
21  in the system for application.
22      Q.  You would have it from the actual application
23  that they filled out.
24      A.  Uh-huh.
25      Q.  And would there need to be any documentation?

92

1      A.  So it -- not -- like if you got it when you
2  were 68, or, you know, if you were -- we have to have
3  your date of birth.
4      Q.  Right.  I guess what I'm wondering is:  You
5  know, if that's the person who isn't showing the birth
6  certificate when they show up, they're using a different
7  form of secondary ID, can they just tell you that
8  they're over 70?  Do you need some documentation?  How
9  are you planning to implement that provision?
10      A.  I think the standard routine procedures would
11  be followed.
12      Q.  And what are those?
13      A.  They would have to -- I'm sorry to say that's a
14  harder question for me to answer than it should be
15  because I don't issue these on a regular basis, so it's
16  not that I can run through the process in my head.
17      Q.  Yeah, I understand.  Do you have a sense of
18  what that process is?
19      A.  I've never heard that there is an issue about
20  that at all.  I mean...
21      Q.  Is it generally your understanding that if an
22  applicant would tell you that they were a certain age,
23  you wouldn't need documentation?
24      A.  Well, they have to have some form of documents
25  that verify and identify them, and those would probably

Rebecca Davio                                                June 15, 2012

## 93

1    contain some information about their age.
2        Q.   Okay.
3        A.   And then they do routinely give us, okay,
4    what's your birth date.  Okay.  That's part of the
5    application form, and they are attesting to that.
6        Q.   Uh-huh.  But as you sit here today, you're not
7    aware of whether if they showed up with some combination
8    of the documents that's required that don't verify their
9    age, whether you would require any additional
10   documentation?
11       A.   You know, I remember now, it's on the -- it's
12   on the application form, and they are signing it, and
13   attesting it, and it's being notarized, too, so that's
14   fine.
15       Q.   Okay.  If a person who has an EIC wants to
16   obtain a driver's license or ID card, would they need to
17   surrender their EIC?
18       A.   No.
19       Q.   And would DPS know -- if such a person went to
20   apply for a driver's license, would DPS be running a
21   check to see if they had an EIC also?
22       A.   No, I don't believe so.  It works the other
23   way, that you can have -- you could have gotten an
24   Election Identification Certificate and decided that
25   want a driver license or an ID card.

## 94

1        Q.   So we've -- we've talked -- we've talked a lot
2    today about, sort of, the security measures in terms of
3    obtaining an EIC.  Is DPS taking any precautions with
4    regard to the actual card, to try to make it a difficult
5    card to -- to replicate in an authentic manner?
6        A.   There are certain security provisions in the
7    card, I believe.
8        Q.   Do you know what those are?
9        A.   I do not, no, recall the specifics.
10       Q.   Can you take a look at the -- I have it here --
11   the document we've marked as exhibit -- as Exhibit 834?
12       A.   Uh-huh.
13       Q.   And on the second page, you see there are some
14   photos there.  Is this -- this is --
15       A.   This document doesn't actually have photos.
16       Q.   Oh.  Hmm.
17            MR. McKENZIE:  Neither does mine.
18            MS. MARANZANO:  Hmm.  Let's go off the
19   record for a second.  It looks like we have different
20   documents.
21            (Recess from 2:13 p.m. to 2:32 p.m.)
22            MS. MARANZANO:  Back on the record.
23       Q.   (By Ms. Maranzano) Okay.  Before we took a
24   break, we were looking at what we are marking as
25   Deposition Exhibit 834.

## 95

1            And for the record, I have switched the
2    exhibits so that we all have the same one now.
3            And we are looking at Page 2, which has a
4    picture of a model Election Identification
5    Certificate.  Is this your understanding of what -- at
6    the present time, what the plan is for the Election
7    Identification Certificate to look like?
8        A.   Yes.
9        Q.   And are there any -- I see there's a picture of
10   the back of the card that has a bar and like a bar
11   code.  Is that -- what's the purpose of that?
12       A.   It contains the information that's on the
13   front.
14       Q.   Okay.  Is the idea that it can be scanned?
15       A.   Yes, it can be scanned.
16       Q.   And will there be any equipment for scanning at
17   polling places?
18       A.   I have no idea.
19       Q.   Is there a reason that y'all put this on the
20   back of the card?
21       A.   It comes routinely on the cards that we
22   produce.
23       Q.   Are there any security features -- well, what
24   security features exist on a driver's license?
25       A.   There's a whole host.

## 96

1        Q.   Okay.  Is an EIC going to have any of those
2    security features that exist on a driver's license?
3        A.   Yes, it will have some.
4        Q.   And which ones?
5        A.   Well, you can see that there is a water mark on
6    the picture, or partially on the picture.  That's one of
7    the examples of security features.
8        Q.   Anything else?
9        A.   You can also see the stars down below.
10       Q.   I see those.  And what are those stars for?
11       A.   They're part of the security features.
12       Q.   Okay.  Anything else?
13       A.   Those are the -- the most apparent.  I don't
14   know all the detail of the security features.  I try not
15   to know them all, so then I can't reveal them.
16       Q.   Okay.
17       A.   They told me that if I did, I would be in big
18   trouble, so I never bothered to learn them.
19       Q.   Okay.  So those are the -- as you sit here
20   today, those are the ones that you're familiar with?
21       A.   Yes.
22       Q.   Do you know if there's any images on the EIC
23   that will be visible only under a black light?
24       A.   I'm not aware of all the details of the
25   security features.

Rebecca Davio                                          June 15, 2012

## 97

1   Q.   Okay.  Is the card going to be laminated?
2   A.   It's not really -- it's not really a laminated
3   process.  It's not based on a piece of paper.
4   Q.   Okay.  Oh, is it a plastic card?
5   A.   (Witness nods head yes.)
6   Q.   Okay.  And is this image below the current
7   design -- and it's a little hard to read -- the current
8   design for a temporary Texas Election Identification
9   Certificate?
10   A.   Yes.
11   Q.   And because it's a little difficult to read, do
12   you know what information will be contained on that
13   document?
14   A.   Well, it's got the applicant's picture, their
15   name.  It says on it for an election purposes only, that
16   it can't be used for identification.  I don't remember
17   all of the -- all the pieces of information.
18   Q.   And it looks to me like, at least on the
19   nontemporary election certificate, there is no address.
20   Is that your understanding?
21   A.   That's correct.
22   Q.   So if an individual moved, they wouldn't have
23   to get a new --
24   A.   That's correct.
25   Q.   -- certificate?  Okay.

## 98

1        Is there a signature included on the
2   election certificate?
3   A.   Not on the card itself.
4   Q.   Is it included somewhere else?  I'm not
5   understanding.  What do you mean, not on the card
6   itself?
7   A.   There is not a signature on the card.  The
8   applicant signs the temporary election certificate
9   verifying that they have looked it over and that the
10   information is correct.
11   Q.   Okay.  And is there a reason that you're not
12   just issuing the temporary election certificate as the
13   official document?
14   A.   It's only a piece of paper.  It's just an
15   eight-and-a-half-by-eleven piece of paper, a temporary.
16   Q.   Okay.  So is the reason you want the plastic
17   certificate for security?
18   A.   Well, it's a six-year document.
19   Q.   So you think it will last longer?
20   A.   Yes, ma'am.
21   Q.   Okay.
22        MS. MARANZANO:  Please marks this as 835.
23        (Exhibit 835 marked for identification.)
24   Q.   (By Ms. Maranzano) I'm showing you what we're
25   marking as Deposition Exhibit 835.  Can you take a look

## 99

1   at it and let me know if you've seen this e-mail chain
2   before.
3   A.   Yes.
4   Q.   You have seen it before?
5   A.   (Witness nods head yes.)
6   Q.   And can you -- and are you included on this
7   e-mail chain?
8   A.   Yes.
9   Q.   Can you look at the e-mail that's in the middle
10   that comes from Ms. Mastracchio?
11   A.   Mastracchio.
12   Q.   Thank you.  And she's responding to a question
13   that says, "What are the security features on it?"  And
14   she said, "Currently none, especially if we need to keep
15   the cost down, which we do."  Is this -- was this
16   changed since the e-mail exchange?
17   A.   I believe so.  This e-mail exchange was in
18   August, and the card, the final design of the card
19   probably wasn't done until months after that.
20   Q.   So it's your testimony today that there are
21   security features on the card?
22   A.   I believe there are security features.  The
23   seal that I pointed out --
24   Q.   Uh-huh.
25   A.   -- that overlaps the picture and the card

## 100

1   itself on --
2   Q.   Yeah.
3   A.   -- this picture, that's actually, as my
4   understanding is, a security feature.
5   Q.   Okay.
6   A.   The fact that it overlaps both.
7   Q.   Okay.  And for the record, you're talking about
8   the picture that's on the page that's marked 2 in this
9   document, and it's a -- it's a seal that overlaps a
10   photograph and the nonphoto part of the ID; is that
11   correct?
12   A.   Yes, and it's on document 834, Exhibit 834.
13   Q.   And do you see in the e-mail exchange there is
14   a -- there's some comments about trying to keep the cost
15   down and sort of the balance between making the card
16   secure and trying to keep the cost down.  Wouldn't you
17   say that it was similarly a goal of DPS to keep the
18   costs down in issuing EICs?
19   A.   We always try and be good stewards of state
20   resources.
21   Q.   So is that a yes?
22   A.   Yes.
23   Q.   Okay.  If we can turn back the document that we
24   were looking at, Deposition Exhibit 834.  If you can
25   look at Page 4 of that document.  I'd like to direct

Rebecca Davio                                                    June 15, 2012

## 101

1    your attention to Question 4 on Page 4 that says, "What
2    if the person tells you they do not have money to pay
3    for an identification or a driver's license?  Can we
4    inform them of the election certificate?"  Do you see
5    that?
6        A.   Yes.
7        Q.   And the answer below is "No."  Is that still
8    the policy of DPS?
9            MR. McKENZIE:  Objection, no foundation.
10   You may answer.
11       A.   Well, that's the stated procedure in the
12   training document.  Yes.
13       Q.   (By Ms. Maranzano) And is that still the
14   procedure that you will be advising employees?
15       A.   Yes.
16       Q.   And why is that?
17       A.   There might be people that would come in that
18   would just try and get a free ID.  It says on the card
19   that lots of people like free things, and it says that
20   it can't be used for identification purposes; that it's
21   only for voting purposes, but that wouldn't necessarily
22   stop people from wanting to get it.
23       Q.   You think that the explicit statement on the
24   card "for voting only" would not stop people from trying
25   to get it for other purposes?

## 102

1        A.   I think people like free things.
2        Q.   Could it be used for anything other than
3    voting?
4        A.   It -- it says not, but I don't govern what
5    other -- how other entities choose to use it.
6        Q.   Is there any concern that by telling employees
7    you can't advise clients of this option, that you're
8    basically making clients use sort of specific terms?
9        A.   No.  I don't have any concern about that.
10       Q.   Okay.
11       A.   You know, if someone comes in and says, "Well,
12   I want something for voting.  I want to be able to
13   vote," they don't have use a particular combination of
14   words.  They just can't come in and say, "I don't have
15   enough money," and we offer them this because the
16   election identification card may not satisfy their needs
17   that they're actually try to satisfy.  It won't allow
18   them to drive.  It won't allow them to use it for other
19   purposes.
20       Q.   Is DPS going to have any publicly-visible
21   notices or posters or ads letting people know about the
22   option to get this identification for voting?
23       A.   I think the communication for the voting-
24   related information was primarily the responsibility of
25   the Secretary of State.

## 103

1        Q.   And so is DPS going to do any notices
2    themselves?
3        A.   I'm not responsible for the communication plans
4    of DPS, so I can't -- I can't respond to that
5    specifically.  There has been a change in the persons
6    responsible for that lately.
7        Q.   Okay.  So is it fair to say, as you sit here
8    today, you haven't had any communications about putting
9    up any signs or notices about this identification,
10   should it be implemented; is that correct?
11       A.   I don't know what the current plans would be.
12       Q.   Okay.
13       A.   I have not spoken with the current
14   communication director.
15       Q.   And can you look at Question Number 3, which
16   talks about -- the question is, "If a person has lost
17   their unexpired driver's license or identification card,
18   are they eligible to apply for an election
19   certificate?"  And the answer is "No."  Is that still
20   the policy of DPS?
21       A.   Yes.  That still follows the statute and the
22   rules.
23       Q.   And is that person who -- if that person in
24   this scenario lost -- lost their driver's license or
25   identification card but was not able to afford a new

## 104

1    one, are they entitled to get an Election Identification
2    Certificate?
3        A.   No, because they still have -- they are still
4    eligible and have their -- they still in our records
5    show as having a driver license or an ID card.
6        Q.   So is it your understanding that you would be
7    unable to issue an EIC based on the language of SB 14?
8        A.   Yes, ma'am.
9        Q.   And can you look at Page 3 for me, specifically
10   towards the bottom the page, it says, "Prior to issuance
11   of an election certificate," and under that, there's a
12   line that has some language bolded that says, "Do not
13   issue an Election Identification Certificate --" "do not
14   issue an election certificate if a matching record is
15   found under the following circumstances," and the second
16   one says, "DLS indicates the person is ineligible, i.e.,
17   suspended, revoked, canceled, or denied."  Can you tell
18   me what those categories mean?
19       A.   I can't tell you the very nuance differences
20   between suspended and revoked, but basically it means
21   that for some reason, they lost their driving privilege.
22       Q.   Okay.
23       A.   And yet they still have their card for
24   identification purposes.
25       Q.   So in each one of these categories, they would

Rebecca Davio                                              June 15, 2012

## 105

1  have lost their driving privileges, but would still
2  have --
3       A.  They'd still have the card in their possession.
4       Q.  And is the card any different than a regular
5  driver's license?
6       A.  It's still the original driver license.  It
7  just cannot be used for driving.
8       Q.  Do you know how many people are in these
9  categories of suspended, revoked, canceled, and denied
10  driver's licenses?
11      A.  No, not off the top of my head, I don't.  Those
12  were -- those details would have been in Question 3, and
13  I am not responding to Question 3.
14      Q.  I'm sorry.  Question 3?
15          MR. McKENZIE:  In the notice.
16          MS. MARANZANO:  Oh, in the notice.
17          MR. McKENZIE:  She doesn't know about that
18  stuff.
19          MS. MARANZANO:  I see.
20      Q.  (By Ms. Maranzano) Do you know if some people
21  have driver's licenses that get confiscated by law
22  enforcement?
23      A.  My understanding is yes, there are some very
24  rare occurrences where the officer is authorized to take
25  their driver licenses.  I do not -- my understanding

## 106

1  is also that the officers frequently don't exercise that
2  option.
3       Q.  Okay.  So is it your understanding that this is
4  a small group of people who would be in the category of
5  having confiscated driver's licenses?
6       A.  Yes, ma'am.
7       Q.  And is it your understanding that these
8  individuals would not be eligible for an EIC because
9  they would technically still have a valid driver's
10  license?
11          THE WITNESS:  It's part of 3.  Do you want
12  me to answer it?
13          MR. McKENZIE:  Well, she's asking about
14  Election Identification Certificates and the
15  qualifications for that, so that's why I didn't pose the
16  objection.
17          THE WITNESS:  Okay.
18      A.  Yes.  I mean, if you still have your card, it's
19  not valid for driving purposes, but it's valid for
20  identification purposes.
21      Q.  (By Ms. Maranzano) Okay.  So if it's
22  confiscated, wouldn't the person not have it?
23      A.  I'm sorry.  I didn't hear that you said it was
24  confiscated.
25      Q.  Yeah.  I'm sorry.  I'm still on the topic about

## 107

1  individuals whose license may be confiscated by law
2  enforcement.
3       A.  Uh-huh.
4       Q.  Presumably their license is still valid; is
5  that correct?
6       A.  It's not valid for driving purposes.
7       Q.  Okay.  Would they be entitled to an Election
8  Identification Certificate?
9       A.  Unless -- you know, I don't know.  Sorry.  I'm
10  getting tired.  Do you want to ask the -- ask the
11  question one more time, please?
12      Q.  Sure.  If an individual has a driver's license
13  that's confiscated by law enforcement, would that person
14  be eligible for an Election Identification Certificate?
15      A.  To be perfectly honest, I don't know the answer
16  to that question.  I'm sorry.
17      Q.  Okay.  Do you know who would know the answer to
18  that question?
19      A.  We have a whole host of people that would know
20  the answer to that question, and I might if I wasn't
21  tired.
22      Q.  I know the feeling.  Okay.  Would somebody at
23  DPS?
24      A.  Yes.
25      Q.  And I think you said it's -- it's a small

## 108

1  number of people with a confiscated license.  During the
2  Committee of the Whole, there was testimony that
3  suggested it was a hundred thousand individuals.  Does
4  that sound --
5       A.  I'm sorry.  I don't know the answer.  I don't
6  know what the numbers are.
7       Q.  Okay.  And do you know what a revocation form
8  is?
9       A.  Not in any specific detail, no, ma'am.
10      Q.  But it's your testimony that a person whose
11  license is revoked still possesses it; is that correct?
12      A.  Yes.  I believe most of the instances where
13  they are suspended or revoked or those kinds of actions
14  are taken, it's their driving privileges that are taken
15  away.
16      Q.  Okay.  And do you think that -- well, let me
17  ask this:  If the EIC program is implemented, would
18  there be any instructions or guidance provided to law
19  enforcement so that people understood that it was just
20  their driving privileges that were being taken away when
21  -- when their driver's license was either suspended or
22  revoked or canceled or denied?
23          MR. McKENZIE:  Again, I'm going to
24  object.  This is kind of -- this is mostly a question
25  about Number 3, which is beyond the scope of what she's

## 109

1  been put up for. So I'm going to -- you can make your
2  record, but I'm going to object.
3          MS. MARANZANO: Okay. And also for the
4  record, I'm just -- I'm really, actually, trying to
5  figure out, sort of, the pool of people who are eligible
6  for the EIC.
7          MR. McKENZIE: Okay.
8          MS. MARANZANO: And that's what these
9  questions are trying to get at.
10         MR. McKENZIE: Okay.
11         A.  And I don't understand why we would notify law
12  enforcement about election identification certificates,
13  so maybe you need to try and repeat your question.
14     Q.  (By Ms. Maranzano) Yeah. I'm wondering if
15  people whose licenses are suspended or revoked or
16  canceled or denied, if those people are given clear
17  instructions by law enforcement that it's only their
18  driving privileges that are being impacted by these
19  actions, whether they can still -- do they understand
20  that they can still use their identification?
21     A.  I have no knowledge of what law enforcement
22  tells people.
23     Q.  Okay. And DPS doesn't work with law
24  enforcement at all on that issue?
25     A.  Well, we may give guidance, but what -- what

## 110

1  law enforcement actually says, I have no knowledge of
2  that.
3      Q.  Okay. Do you have any knowledge of whether you
4  do give guidance?
5      A.  Well, I specifically would not give
6  guidance. THP, the Texas Highway Patrol, may give
7  guidance.
8      Q.  Okay. Anybody in DPS -- is THP a part of DPS?
9      A.  Yes, ma'am. I'm sorry.
10     Q.  Okay. Okay. Have there been any discussion
11  that this might be an area you'd want to reach out to
12  law enforcement to, should the EIC program be
13  implemented in terms of -- and just to be --
14     A.  Not to my knowledge.
15     Q.  Okay. Just to be clear for the record, I mean
16  reach out to law enforcement to give them guidance about
17  informing people that their ID is still valid as an ID,
18  just not for driving?
19         MR. McKENZIE: That's the same general
20  objection that the instructions about to law enforcement
21  on their face don't have anything to do with the EICs,
22  but you may make your record.
23     Q.  (By Ms. Maranzano) Not to your knowledge?
24     A.  Not to my knowledge.
25     Q.  Okay. If somebody applies for an EIC and

## 111

1  there's a surcharge associated with his or her record
2  when they apply, how would DPS handle that?
3      A.  It seems to me that the surcharge, the matter
4  of the surcharge is irrelevant, because that, again,
5  affects their driving privileges. They would still have
6  their document for identification purposes.
7      Q.  Okay. So would only somebody who has a
8  driver's license or an ID have a surcharge? Is that --
9      A.  It's only a driver license.
10     Q.  Okay. Now, what if they had a driver's license
11  that was expired, could there still be a surcharge
12  associated with that person's record?
13         MR. McKENZIE: The same objection as to
14  scope, but you may answer.
15     A.  Yeah. And if it was expired past that limit,
16  then they'd be eligible for an EIC.
17     Q.  (By Ms. Maranzano) Okay. Okay. So would any
18  -- would any action be taken with regard to the
19  surcharge if they came in to apply for an EIC?
20     A.  No.
21     Q.  Do you know how many people have surcharges
22  associated with their records?
23     A.  No.
24     Q.  And did you testify earlier that DPS generally
25  issues a driver's license within ten days?

## 112

1      A.  Yes.
2      Q.  And you would expect an EIC to be issued in the
3  same amount of time?
4      A.  Yes, ma'am.
5      Q.  Is there any concern that implementing the EIC
6  program will actually slow everything down?
7      A.  No.
8      Q.  Why is that?
9      A.  We -- we deal with increases. We have dealt
10  with increases in population. You know, it's -- it's
11  part of the process.
12     Q.  So it would be similar -- it would be similar
13  to other population increases that you faced?
14     A.  Population increases, different changes.
15     Q.  Can you turn back to Deposition Exhibit 834,
16  and I'm looking again at the page that has the pictures,
17  Page 2. And we talked a little bit about the security
18  features that are on the EIC. What security features
19  are on the temporary EIC?
20     A.  The picture.
21     Q.  Anything else?
22     A.  The picture is the predominant one.
23     Q.  And the temporary certificate can be used for
24  voting; is that correct?
25     A.  Yes, ma'am.

Rebecca Davio                                                    June 15, 2012

---

### 113

1          Q.   Was there any discussion, either within DPS or
2    with the Secretary of State, about whether or not it
3    will be confusing to poll workers to have two different
4    varieties of an EIC?
5          A.   I don't recall any discussion like that.
6          Q.   Are you aware that during the legislative
7    debates, legislators actually said on the public record
8    that they didn't want to accept additional forms of ID
9    because it might confuse poll workers in terms of having
10   too many forms of ID to recognize?
11             MR. McKENZIE:  Objection, beyond the
12   scope, but you may answer.
13         A.   I don't specifically recall that.
14         Q.   (By Ms. Maranzano) And we talked a little bit
15   previously about training that you plan to implement for
16   staff at driver's license offices.  How -- how long do
17   you expect the training to be for staff that's going to
18   talk about the EIC program?
19         A.   I think it's an hour or two.
20         Q.   I'm sorry.  An hour or two hours?
21         A.   Yeah.  I can't recall exactly.
22         Q.   And is there any quality control plan for
23   ensuring that driver's license employees actually
24   implement this program correctly?
25         A.   Well, we are providing the training to all

---

### 114

1    employees.
2          Q.   Uh-huh.
3          A.   And they sign a slip that says yes, I had the
4    training, yes, I understand, and yes, I'll follow the
5    procedures.
6          Q.   Anything else?
7          A.   (Witness shakes head no.)
8              MR. McKENZIE:  Say it.
9          A.   No.  I'm sorry.
10         Q.   (By Ms. Maranzano) Is there -- is there a
11   specific amount of the budget that's devoted to a
12   training program for Election Identification
13   Certificates?
14         A.   No, ma'am.
15             (Exhibit 836 marked for identification.)
16         Q.   (By Ms. Maranzano) I'm showing you what we're
17   marking as Deposition Exhibit 836.  Can you look at this
18   and let me know if it looks familiar to you?
19         A.   Yes.
20         Q.   Is this the current model for an application
21   for a Texas Election Certificate?
22         A.   Yes.
23         Q.   Would you say that it's -- it's in final form
24   such that if the program were to be implemented, you
25   would actually use this application?

---

### 115

1          A.   Yes.
2          Q.   Do you see at the bottom of the -- not at the
3    bottom.  At the bottom of the squared part of the
4    application, there's a number of things listed, such as
5    place of birth, county, state, country, father's last
6    name, mother's maiden name.  Why are you including those
7    questions on this application?
8          A.   Above the line that says place of birth, city,
9    county, state, country, it says if you are not a U.S.
10   citizen, you are not eligible for an election
11   certificate, so that seems like that would explain the
12   first part.  And my guess is that the father's last name
13   and mother's maiden name, that it's -- it's based upon
14   the driver license and identification card application.
15         Q.   So what do you do with this information?  And
16   I'm specifically referring to those fields that we just
17   discussed.
18         A.   I'm not -- it's not actively used in the
19   process.
20         Q.   So you collect it, but you don't use it?
21         A.   We -- we don't routinely use it, no.
22         Q.   At any time during the consideration of SB 14
23   or since its passage, has there been a discussion at DPS
24   about doing any sort of outreach to issue IDs without a
25   charge for voting to individuals who do not possess any

---

### 116

1    ID?
2          A.   I believe that the discussions with the
3    Secretary of State would be that that be a more
4    appropriate responsibility for them.
5          Q.   And you did discuss that with the Secretary of
6    State?
7          A.   I believe there were some discussions about
8    that.
9          Q.   Were you involved in those discussions?
10         A.   There probably was -- I was not involved in
11   every meeting with the Secretary of State.  It was
12   probably discussed generally in at least one of the
13   meetings that I was in.  I can't tell you if it was
14   discussed at other meetings.
15         Q.   Was the decision about whether or not to do
16   that left to the Secretary of State or to DPS or to some
17   other entity?
18         A.   Well, there -- there was no requirement for it,
19   and it seemed like, since it's the Secretary of State's
20   responsibility related to voting, ours is only -- our
21   process in this is only to issue the card.
22         Q.   So DPS did not feel as though it was DPS's
23   responsibility to plan any sort of outreach --
24         A.   To plan a communication and outreach campaign,
25   that's correct.

Rebecca Davio                                           June 15, 2012

## 117

1    Q.   And just to be clear, in this regard, I'm not
2    actually talking about communication, but actually some
3    sort of outreach to issue the IDs in some kind of
4    fashion other than having people come to drivers'
5    license offices?
6    A.   No, ma'am.
7    Q.   At any time since you've worked at DPS, has
8    there been outreach of any variety to issue IDs to
9    people who might not have them?
10   A.   No.
11        (Exhibit 837 marked for identification.)
12   Q.   (By Ms. Maranzano) Can you please look at
13   this?  I'm sorry.  I'm showing you what we're marking as
14   Deposition Exhibit 837.  If you can take a look and let
15   me know if this looks familiar to you.
16   A.   (Witness reviewing document.) Yes, it looks
17   familiar.
18   Q.   Did you receive this e-mail in January of 2012?
19   A.   Yes, ma'am.
20   Q.   And the subject line of the e-mail says,
21   "Suggested responses for Bloomberg."  Are these
22   suggested responses to a media request?
23   A.   Yes, I believe they were.
24   Q.   Can you look at Number 4 on -- it's on the back
25   of the page.

## 118

1    A.   Uh-huh.
2    Q.   It says, "Are there any plans to provide mobile
3    vans or other means of reaching people in counties where
4    there currently isn't an office or limited hours?"  And
5    underneath the response, you can see some writing that
6    was crossed out.  Were those -- was that a draft
7    response that was changed?
8    A.   Do you mean the first Number 4 or the second
9    Number 4?
10   Q.   I'm sorry.  I'm looking at the second
11   Number 4.  Thank you for clarifying.
12        MR. McKENZIE:  And I would -- there's no
13   foundation, but you may answer the question.
14   A.   And I'm sorry, what was your question?
15   Q.   (By Ms. Maranzano) There's writing here that
16   has a line through it.  What -- what do you think that
17   -- what is that writing?
18        MR. McKENZIE:  Same objection.
19   A.   That was probably a draft response that was
20   edited.
21   Q.   (By Ms. Maranzano) So it looks to me like
22   what's written there, that that probably was a draft
23   response.  It says, "There are no plans to deploy mobile
24   units for issuance of election certificates."  And then
25   the next sentence says, "DPS was not provided additional

## 119

1    resources for issuance of election certificates."
2         Was there any discussion at DPS that if
3    you got additional resources, you would provide mobile
4    outreach for issuing election certificates?
5    A.   No.  There's no discussion of receiving
6    additional resources for election certificates.
7    Q.   You never -- you never discussed requesting
8    additional funds from the legislature?
9         MR. McKENZIE:  Objection.  I'm sorry.
10   Q.   (By Ms. Maranzano) Or issuing, yeah, election
11   certificates?
12        MR. McKENZIE:  Objection, asked and
13   answered.
14        THE WITNESS:  I'm sorry.  If you answered
15   it, am I supposed to answer it, too?
16        MR. McKENZIE:  No, no, no, no, no.  I made
17   an objection, asked and answered.  But you still have to
18   answer the question.  We've probably lost the question
19   by now, so...
20        THE WITNESS:  Yeah.  I'm sorry.  I don't
21   have any idea what the question was.
22   Q.   (By Ms. Maranzano) Let me ask you this:  If --
23   any resources that would have gone -- that would have --
24   that could have been used for outreach would have come
25   from the legislature; isn't that correct?

## 120

1    A.   Yes.
2    Q.   And did DPS ever request any -- any funds for
3    that purpose?
4    A.   For outreach?
5    Q.   Uh-huh.
6    A.   No, ma'am.
7    Q.   Okay.
8         (Exhibit 838 marked for identification.)
9    Q.   (By Ms. Maranzano) I'm showing you what we're
10   marking as Deposition Exhibit 838.  Can you take a look
11   at this and tell me if that looks familiar to you?
12   A.   (Witness reviewing documents.) Vaguely.
13   Q.   What is this document?
14   A.   I believe it is a response to questions that
15   were received from the Senate Committee of the Whole
16   Q.   And can you look at the second -- and just to
17   be clear, were you the person who was testifying?  I
18   think you earlier said you did testify to the Senate
19   Committee of the Whole; is that correct?
20   A.   Yes, ma'am.
21   Q.   So these were responses to questions that came
22   up during your testimony?
23   A.   Yes, ma'am.
24        MR. McKENZIE:  I'm going to object as to
25   scope.  Yeah.

Rebecca Davio                                                                June 15, 2012

## 121

MS. MARANZANO:  Okay.

Q.  (By Ms. Maranzano) Can you look at the second line down that talks about, "Please comment on Department's 5 percent reduction and 10 percent proposed reduction in the legislative appropriations request."

And the first sentence says, "The Department lost 14.6 million due to the 5 percent cut in general revenue that we faced."  How did the reduction of funds affect -- affect drivers' license offices around the state?

A.  It didn't specifically -- it didn't noticeably affect us.

Q.  Not at all?

A.  Noticeably.

Q.  What do you mean by noticeably?

A.  Because I think we lost some general revenue money.  It was a small percentage of our budget.

Q.  So what is general revenue money?

A.  I'm sorry.  We get money from different pots.

Q.  Uh-huh.

A.  And that was just one of the pots.

Q.  Okay.

A.  And that was what was affected by the reduction.

Q.  Okay.  The third sentence under that bullet

## 122

says, "The Department's 10 percent produced reduction schedule identified that 11 DPS offices might have to close.  These are not necessarily drivers' license offices."  Do you recall whether or not 11 offices did close?

A.  No, ma'am.

Q.  You don't recall?

A.  I don't know about any other -- no, I don't.

Q.  Do you know if any offices had to reduce hours based on the budget cuts?

A.  No, ma'am.

Q.  Do you know if any offices had to cut their staffs based on budget cuts?

A.  No, ma'am.

Q.  Do you know if any equipment wasn't replaced based on the budget cuts?

A.  No, ma'am.

Q.  And just to be clear, you're saying no, you don't know, not no, it didn't occur; is that right?

A.  I don't believe that any driver license hours, staff, or equipment were reduced.

Q.  Okay.  And if this was produced in response to your testimony to Committee of the Whole, can I assume it was produced in early 2011?

A.  Yes, ma'am.

## 123

Q.  Have there been any reductions in offices since that time?

A.  There probably have been some offices that have closed.  And I probably need to amend the -- they would have been closed because the equipment failed and because it was so old that it was irreplaceable.

Q.  Do you know how many offices that was?

A.  I'm sorry.  I don't -- I don't know the number.

Q.  Do you know where in the state that was?

A.  I don't.  No, I don't.  I can't pinpoint locations for you.

Q.  And you're talking about since 2011 or prior to 2011?

A.  There have been some offices that have closed since 2011, or at the tail end of 2011.

Q.  Do you know about how many, approximately?

A.  I really don't, because the number has been changing.

Q.  The number has been changing?

A.  The number has been changing because some offices have reopened.

Q.  Okay.

A.  We used to move equipment, and those were called mobile offices, and we now call them scheduled offices, because we move people.  The equipment stays in

## 124

place.  So it's fluid, and that's why it's a very difficult question to answer.

Q.  Okay.  Can you look a few questions down, do you see that there's a question that says, "Are there drivers' offices within the 610 loop," and the response is "No."  Do you -- what -- what is the 610 loop?

A.  It's in Houston.

Q.  And do you know what that -- what that means, the 610 loop?

A.  They -- they were asking -- I believe it's the inner loop in Houston.

Q.  Do you know how many people reside in that area?

A.  No, ma'am, I don't.

Q.  Is it still the case today that there are no drivers' license offices within that loop?

A.  I believe that's true.  One of our offices in the Houston area moved, and I'm -- I'm not familiar.  The reason this question showed up on this list is because I don't know Houston to know, like, okay, yeah, that's inside the loop or out.  I don't -- I don't believe that there's an office inside the loop 610 in Houston.

Q.  Does DPS conduct studies on the number of residents that are serviced in particular geographic

Rebecca Davio                                                June 15, 2012

## 125

1    areas in the state?
2        A.  We actually did a study like that.  We worked
3    with -- we contracted with Texas State University in
4    San Marcos, and they did a business intelligence
5    analysis for us.  They looked at all the transactions
6    that were done in the driver license offices in 20 --
7    calendar year 2010, with the explicit goal of providing
8    recommendations on how to kind of provide the most
9    equitable level of service that we could.
10       Q.  Did they also look at wait times in offices?
11       A.  The information on wait times that was
12   available to them at that time was very limited, so not
13   really.
14       Q.  Did they look at the number of staff needed to
15   serve clients in -- at different offices?
16       A.  Yes, they did.
17       Q.  And did they look at the equipment that would
18   be needed to serve the number of clients at offices?
19       A.  No, they didn't really look at equipment.
20       Q.  And what recommendations did they make in this
21   study, generally speaking?
22       A.  Uh-huh.  Generally, they -- they looked and
23   probably the general consensus was that there was a need
24   for -- you know, they -- they looked and showed the
25   population, the variation of population distribution in

## 126

1    the state and that kind of thing and generally said
2    there's -- there's an opportunity for more resources to
3    be used.
4        Q.  So they said there's an opportunity for more
5    resources in particular areas or statewide?
6        A.  Well, they kind of did in -- across the state,
7    they looked at all of our offices.
8        Q.  And was the purpose --
9        A.  To help us make better decisions and -- and
10   really kind of understand our business.
11       Q.  Do you think it was effective?
12       A.  I think it was very helpful.
13       Q.  Was this a -- sort of a one-time deal, or is
14   this something that DPS does on periodically?
15       A.  Well, I think it was the first time that it was
16   done.  And we may do it again, but there's no specific
17   plans at this moment.
18       Q.  Were there any geographic areas in the state
19   that -- that were flagged as being particularly
20   problematic?
21       A.  I think probably the general consensus was that
22   the eastern portion of the state, that's the more
23   populated area of the state, was -- had the most need.
24       Q.  And what do you mean by that, in terms of was
25   it signaling that you needed more offices there or that

## 127

1    the offices needed more staff or?
2        A.  It was generally that more staff were needed.
3    They didn't necessarily specify, oh, you need six more
4    offices or you need -- you need more offices; that kind
5    of thing.  Now, ultimately, the report -- because the
6    report was -- the development of the report was going on
7    during the legislative session, and the report
8    ultimately said, yes, if you're going to -- because the
9    legislature gave us some additional resources, and they
10   said okay, if you get these additional resources, this
11   is where we recommend that they go.
12       Q.  And they recommended a geographic region?
13       A.  Yes.
14       Q.  Okay.  And they recommended the eastern part of
15   the state?
16       A.  Yes.  The Metroplex, Houston, San Antonio, and
17   Austin.
18       Q.  I'm sorry?
19       A.  The Metroplex, Houston, San Antonio, and
20   Austin.
21       Q.  Okay.  And at the time that this study
22   happened, this was prior to SB 14 being enacted; isn't
23   that --
24       A.  The study was started before, yes.
25       Q.  Did the study make any recommendations about

## 128

1    how to decrease wait times around the state?
2        A.  More staff.
3        Q.  More staff overall?
4        A.  (Witness nods head yes.)
5            MS. MARANZANO:  Can we get this marked?
6            (Exhibit 839 marked for identification.)
7        Q.  (By Ms. Maranzano) I'm showing you what we're
8    marking as Deposition Exhibit 839.  Can you take a look
9    at it and let me know if that looks familiar to you?
10       A.  (Witness reviewing documents.)
11       Q.  Do you recognize it?
12       A.  Yeah.
13       Q.  What is this document?
14       A.  It's another document related to answers, I
15   believe, from the Senate Committee of the Whole or
16   somehow related to that, but that's the timing
17   that's the topics.
18       Q.  Does it look like -- like draft responses to
19   some of the questions that came up during the Committee
20   of the Whole?
21           MR. McKENZIE:  Objection as to scope and
22   objection as to foundation, but you may answer the
23   question.
24       A.  Does it look like a draft document?  Is that
25   what you asked?

Rebecca Davio                                           June 15, 2012

## 129

1    Q.   (By Ms. Maranzano) Draft responses to some of
2    the questions that came up during the Committee of the
3    Whole?  And the reason why I'm saying that is,
4    underneath, it has -- it has legislators' names and
5    questions, and then it has recommendations, such as it
6    says under the first one, "Recommend saying."
7    A.   Uh-huh.  That -- that's what it looks like to
8    me.
9    Q.   And this -- this document was created in -- or
10   it looks like it was sent to you on -- on the 24th of
11   January of 2011; is that correct?
12   A.   That's what it looks like.
13   Q.   And under both the first and the second
14   question, which have to do with offices being closed
15   subject to budget cuts and operating hours being
16   affected by budget cuts, the recommendation is basically
17   to talk about this business study, which I imagine is
18   the business study you were just talking about; is that
19   correct?
20   A.   Yes, ma'am.
21   Q.   Was the business study not complete at the time
22   that you testified in front of the Committee of the
23   Whole?
24        MR. McKENZIE:  The same objection as to
25   scope, but you may answer the question.

## 130

1    A.   Yes, ma'am, it was.  Oh, the question was, was
2    it not complete?  No, it was not complete.
3    Q.   (By Ms. Maranzano) It was ongoing?
4    A.   Yes.  In fact, it had just started.
5    Q.   Was there any concern that DPS might be closing
6    offices or cutting services in areas where a lot of
7    minority voters lived and -- and that that could impact
8    the outcome on SB 14 if you were to testify to that
9    fact?
10        MR. McKENZIE:  Same objection as to scope.
11   A.   I'm sorry.  Could you ask your question again?
12   Q.   (By Ms. Maranzano) Sure.  In these questions --
13   in terms of these questions about potential offices
14   being closed or hours being affected, was there any
15   concern that you might be doing those things, closing
16   offices or cutting hours in areas of the state where
17   many minority voters lived and -- and that saying such a
18   statement during the consideration of SB 14 might
19   actually impact how people voted on it?
20        MR. McKENZIE:  And I also caution the
21   witness not to reveal individual legislator
22   communications, but otherwise, you may answer subject to
23   my earlier objections.
24   A.   The analysis really -- the business
25   intelligence analysis was not conducted with regard to

## 131

1    the race of -- you know, we didn't look at racial
2    distribution.
3    Q.   (By Ms. Maranzano) Okay.  So in other words,
4    no, that wasn't -- that wasn't a concern for you as you
5    testified?
6    A.   Nuh-uh.
7    Q.   And do you see the third question; it talks
8    about -- a question about what drivers' license
9    documents may be issued without a photo?
10   A.   Yes, I do see that.
11        MS. MARANZANO:  Can we mark this, please?
12        (Exhibit 840 marked for identification.)
13   Q.   (By Ms. Maranzano) I'm showing what we're
14   marking as Deposition Exhibit 840.  Can you take a look
15   at this and tell me if it looks familiar?
16   A.   (Witness reviewing documents.)
17   Q.   Does this look familiar to you?
18   A.   Well, I wasn't copied on it, so I can't -- I
19   can't say it's memorable.
20   Q.   Do you see in the "To," it actually says,
21   "Gallegos," and it has a name, and the subject line says
22   DIC-57, and in the -- in Deposition Exhibit 839, the
23   question that we were looking at, the response says,
24   "See attachment DIC-57"?
25   A.   I see that DIC-57 is on both -- both documents,

## 132

1    yes.
2    Q.   And that the question is from Senator Gallegos,
3    and it looks like this e-mail was sent to Senator
4    Gallegos; is that correct?
5        MR. McKENZIE:  Objection, foundation, but
6    you may answer.
7    Q.   (By Ms. Maranzano) Actually, it looks like it
8    was sent to somebody else who is in Senator Gallegos's
9    office.
10   A.   Yes, I see that, too.
11   Q.   And do you see that the content of this
12   document is about IDs that are issued without photos?
13   A.   Yes, I do see that.
14   Q.   Are you aware of whether DPS routinely issues
15   certain types of nonphoto ID?
16   A.   This is -- that's what these documents
17   reference, that there's a couple of documents that we
18   issue if we don't have any other way around it.
19   Q.   How many people have those documents?
20   A.   I don't know that.
21   Q.   And this e-mail talks about two forms of ID
22   without photo; is that correct?
23   A.   It appears to be the DI-57 and an occupational
24   driver -- well, it says there are a couple of other
25   documents and an occupational driver license and a

Rebecca Davio                                          June 15, 2012

## 133

1   driver license requiring an ignition interlock device.
2      Q.   Okay.   And in the first paragraph, it says
3   there are two documents that are routinely issued
4   without photos, correct?
5      A.   Yes.
6      Q.   And it says one is the DIC-25 and other is a
7   DIC-57?
8      A.   Yes.
9      Q.   Do you know what it means by routinely issued?
10     A.   I don't.
11          MR. McKENZIE:   Objection as to foundation
12   and speculation, but you may answer.
13          THE WITNESS:   I'm sorry.
14          MR. McKENZIE:   It's okay.
15     Q.   (By Ms. Maranzano) Do you know if these
16   individuals, individuals who possess these forms of ID
17   would be eligible for an Election Identification
18   Certificate?
19     A.   I don't.
20     Q.   Are you aware of any documents that aren't
21   referred to in this -- in this exhibit, Deposition
22   Exhibit 840, that are issued by DPS that don't have
23   photos?
24     A.   I'm not aware of any, no.
25          (Exhibit 841 marked for identification.)

## 134

1      Q.   (By Ms. Maranzano) I'm showing you what we're
2   mark as Deposition Exhibit 841.   Can you take a look at
3   that and tell me if it looks familiar to you?
4      A.   Yes.   It doesn't look exactly familiar to me,
5   but I'm basically familiar with the information.
6      Q.   Okay.   What is this document?
7      A.   It appears to be list of offices by region
8   showing their hours of operation and their light day.
9      Q.   And do you see at the bottom right-hand corner,
10   it says 6-12-2012?
11     A.   Yes, I do.
12     Q.   Do you believe this document to be current as
13   of 6-12-2012, if you know?
14     A.   That date would -- would lead me to believe
15   that.   I don't know where this document came from,
16   though.
17     Q.   Okay.   Well, I can represent to you that it was
18   produced by the State of Texas, and it has a Bates labe
19   at the bottom with a TX.   But let me ask you this:   As
20   you look through it --
21     A.   But I don't know who -- what entity generated
22   this.
23     Q.   Okay.   Can you just glance through it and let
24   me know if -- to the best of your knowledge, if it's an
25   accurate reflection of driver's license offices that are

## 135

1   open and their hours of operation.
2      A.   I'm afraid I couldn't glance through and -- and
3   do that.
4      Q.   Okay.
5      A.   So, no.
6      Q.   Okay.   Let me ask you this:   How many
7   operational drivers' licenses -- drivers' license
8   offices currently exist in Texas?
9      A.   There are 223 as of today.
10     Q.   And does that number change frequently?
11     A.   Yes, it does change.   There will be 227,
12   probably, in September.   228 predicted to be open in
13   January of 2013.   So yes, it does change.
14     Q.   Okay.   How many counties don't have a driver's
15   license office?
16     A.   You know, I really don't look at -- I really
17   don't know that off the top of my head.
18     Q.   Do you think it's more than 50?
19          MR. McKENZIE:   Objection, speculation, but
20   you may answer.
21     A.   I have seen numbers that show that, but I have
22   not personally gone through and verified, and I haven't
23   looked recently with the changes in the offices.
24     Q.   (By Ms. Maranzano) So as the assistant director
25   of, you know, the Driver's License Division, is there --

## 136

1   you know, do you keep track of offices in a different
2   way?   Is that why you're not familiar with counties
3   without drivers' license offices?
4      A.   Yeah.   I don't look at it as counties without
5   driver license offices.   We look at the service that
6   we're providing, and it could be that there may be a
7   county that doesn't have a driver license office, and
8   yet the population of that county -- Texas has 254
9   counties, and, you know, that's -- that's a very large
10   number of counties.   And so it may that be there's a
11   county that doesn't have a population -- I mean, that
12   doesn't have a driver license office in it, but there
13   are counties adjacent, contiguous counties that have a
14   driver license office.
15     Q.   Uh-huh.
16     A.   And that the population of the state -- I mean,
17   the population of that county could easily and very
18   quickly go to another county.
19     Q.   Uh-huh.
20     A.   You know, to a driver license office in another
21   county, you know.   I don't think necessarily the county
22   bounds are the most significant means of looking at and
23   evaluating driver license office locations.
24     Q.   Okay.   But you are prepared, I assume, to
25   testify about locations where people can get Election

Rebecca Davio                                          June 15, 2012

## 137

1    Identification Certificates and their hours of service
2    and the wait times and the resources available for
3    customers with limited English proficiency pursuant to
4    Number 4 of the notice of deposition?
5        A.  Yes, I am.  You can get Election Identification
6    Certificates when and if we are directed to issue them,
7    you will be able to get them at every single one of our
8    offices during the entire hours of operation.
9        Q.  Okay.  And you said you don't look at this on a
10   county level.  Do you -- and I mean DPS.  Does DPS do an
11   analysis of distances people may need to travel to get
12   to drivers' license offices?
13       A.  There was a look at that in the business
14   intelligence analysis.
15       Q.  Are there any anticipated office closings in
16   the next year?
17       A.  No.
18       Q.  Any anticipated employee layoffs in the next
19   year?
20       A.  No.
21       Q.  Any anticipated hiring freezes in the next
22   year?
23       A.  No.
24       Q.  Any anticipated reduction in hours in the next
25   year?

## 138

1        A.  No.
2        Q.  Any anticipated reductions in equipment in any
3    of these offices in the next year?
4        A.  No.
5        Q.  And do you already have your budget for the
6    next year, meaning DPS?
7        A.  Yes.  DPS has received the legislative
8    appropriation request.  I have not -- I mean, the budget
9    amount for the Department.  I have not yet received my
10   detailed budget officially yet.
11       Q.  So do you think that you would know if any of
12   these things were going to happen in the next year?
13       A.  Yes.
14       Q.  You would?
15       A.  In fact, you didn't ask the reverse of those
16   questions.
17       Q.  I haven't yet, no.  But we still have time?
18       A.  Well, in fact, the Driver License Division is
19   increasing our staff by 266 employees.
20       Q.  Okay.  And I do want to talk to you about the
21   anticipated Mega Centers, but I'm not quite there yet.
22           So I just want to ask you if the Election
23   Identification Certificate program is implemented, if
24   that will impact any of the questions I just asked you
25   about offices closing --

## 139

1        A.  No.
2        Q.  -- or a reduction in services?  Okay.
3            And can you look at where -- where this
4    column says the hours of operation?
5        A.  Uh-huh.  Yes.
6        Q.  Is it your understanding that this is an
7    accurate representation of the hours that these offices
8    are open?
9            MR. McKENZIE:  Objection as to asked and
10   answered.
11           MS. MARANZANO:  Well, I'm not sure she's
12   actually answered exactly that -- that question.
13       A.  The reason that I'm hesitating --
14       Q.  (By Ms. Maranzano) Uh-huh.
15       A.  -- is because this does not look like the
16   document I reviewed.
17       Q.  Uh-huh.
18       A.  So that's why I'm hesitating, because you're
19   asking me to certify that these -- this long list of
20   hours is accurate.  And it's like, I am hesitant to do
21   that off the top of my head.
22       Q.  But do you -- is the document that you
23   reviewed, was that from 2011?
24       A.  No.  It was from very recent.
25       Q.  Well, I can represent to you that your counsel

## 140

1    has produced this document to us.  So as you sit here --
2        A.  And I have no reason to believe -- there's a
3    great deal of level of specificity on this.
4        Q.  Uh-huh.
5        A.  So I have no reason to believe that it's
6    inaccurate.  You can just understand my hesitancy to say
7    yes, this is, because it doesn't look exactly like the
8    document that I reviewed.
9        Q.  Right.  Right.  I just wanted to be clear on
10   the record that you have no reason to believe it's
11   inaccurate?
12       A.  That's correct.
13       Q.  Okay.  Can you tell me what, in that column of
14   listed hours of operation, some offices say closed and
15   some offices say closed temporarily.  What does it mean
16   to be closed temporarily?
17       A.  It means that the person who is entering the
18   data put closed temporarily.  I cannot explain the
19   detail for why closed or closed temporarily is there.
20       Q.  So you're not aware of any difference between
21   the offices that are listed as closed and offices that
22   are closed temporarily?
23       A.  I believe that this is a master list of almost
24   every driver license office that has ever been, and so
25   some of them may have been closed for a longer period of

Rebecca Davio                                             June 15, 2012

---

## 141

1   time, and so they are closed, and I really -- no, I
2   can't.
3       Q.   As you sit here, are there any plans to reopen
4   these offices that are listed as closed temporarily?
5       A.   We have reopened some offices, and without
6   going through all the detail of the list, so...
7       Q.   Well, can you just look at the ones that are
8   listed closed and tell me if any of them --
9       A.   Well, that's what I'm trying to do.  So
10  Centerville, I believe was one that we reopened on page
11  -- the second, third page.  Centerville was one that we
12  reopened, and that information has already been recorded
13  on here.  So I'm guessing that the ones that show as --
14  that have already been reopened are marked on here.
15      Q.   Okay.  And in terms of the offices that are
16  closed, who makes the decision as to which offices are
17  closed?
18      A.   It's likely -- as I mentioned, this is like the
19  historical list, and so some of them are closed.  They
20  were still reflected on the list of driver license
21  offices, but yet they were closed before I got there,
22  years before I got there, but they were still on the
23  list.
24      Q.   Uh-huh.
25      A.   And, you know, it could be a variety of

---

## 142

1   things.  I mentioned already the equipment that have
2   broken that was so old and antiquated that it could not
3   be replaced, and that we changed the way that we -- we
4   went from a mobile to a scheduled office.  There were
5   some that the -- the counties may have said, hey, we
6   can't provide you this space, or we don't want you here
7   or whatever.
8       Q.   And when those things happen, the equipment
9   breaks or you need to find a new space, do you -- well,
10  let me -- let me break those down.  When the equipment
11  breaks, do you -- you just close the office or do you
12  get new equipment?
13      A.   In that particular instance, that was
14  information -- that was equipment that worked with our
15  Legacy system, and we have gone through and identified
16  the offices that we have reopened and we've replaced
17  that with new equipment that works with our current
18  system.
19      Q.   So you would -- for the offices that you closed
20  because of broken equipment, those are now reopened; is
21  that correct?
22      A.   Yes, some of them are.
23      Q.   But not all of them?
24      A.   I don't believe that they were all reopened,
25  no, ma'am.

---

## 143

1       Q.   And the offices that are closed because you
2   were kicked out of a space, I think you said, would you
3   find a different space for those offices, or you would
4   close down in that area?
5       A.   Typically, we could close down in that area.
6       Q.   And are those decisions made -- well, how are
7   those decisions made?
8       A.   We -- we look at the volume of transactions
9   that occur.  We look at the adjacency to a different --
10  to offices, other offices.
11      Q.   So is it fair to say if -- if one of these
12  things happen, like you were kicked out of an area, you
13  were kicked out of a building in an area that had a high
14  volume of traffic, that would impact your decision as to
15  whether or not to find new space?
16      A.   Absolutely.
17      Q.   Other than the -- the business report that we
18  talked about, does DPS track how many people use
19  offices?
20      A.   Yes.
21      Q.   Is there any -- any reason, other than a
22  budgetary one, to close an office?
23      A.   Well, I mentioned already if the equipment
24  failed, you know, it was the Legacy equipment, we're --
25  we're asked by the counties to leave, so yes.

---

## 144

1       Q.   But I think -- okay.  All right.  So just to be
2   clear, my understanding was, if those offices had a high
3   volume of traffic, you would reopen an office, correct?
4       A.   Yes.
5       Q.   So in other words, there's some sort of cost
6   benefit analysis going on, correct?
7       A.   Sure.
8       Q.   Would you phrase it differently?
9       A.   Well, I think we're trying to serve the needs
10  of our customers.
11      Q.   Right.  And so are there any other reasons to
12  close an office other than equipment breaking or getting
13  kicked out of a space by the county?
14      A.   Those would be the primary ones.
15           MS. MARANZANO:  Okay.  Well, I know you
16  want a break.  Do y'all want to break for five minutes?
17           MR. McKENZIE:  Yeah, that's fine.
18           (Recess from 3:48 p.m. to 4:01 p.m.)
19           MS. MARANZANO:  Okay.  Back on the record.
20      Q.   (By Ms. Maranzano) All right.  Before the
21  break, we were talking about Deposition Exhibit 841, and
22  I believe you testified, but I want to be clear, that
23  every driver's license office currently open will be
24  able to provide services for individuals who want to
25  apply for the Election Identification Certificate?

Rebecca Davio                                    June 15, 2012

## 145

1  A. That's correct.
2  Q. And did you say earlier that you no longer have
3  offices designated as "mobile"?
4  A. That's correct. We changed the designation to
5  "scheduled."
6  Q. And do you know how many offices you have that
7  are scheduled?
8  A. I believe there's 49.
9  Q. 49. And what exactly does that mean?
10 A. We have full-time offices and we have scheduled
11 offices. Full-time offices are open Monday through
12 Friday. Scheduled offices are not.
13 Q. So any office that is not open Monday through
14 Friday is designated as scheduled?
15 A. Yes, ma'am.
16 Q. Are some of the drivers' licenses offices
17 around the state only open a couple of times per month?
18 A. Yes. I believe there are a couple of those,
19 several of those. I don't know the exact number. And
20 that's based upon the demand.
21 Q. Are those offices concentrated in any
22 particular part of the state?
23 A. I think generally you could say they're the --
24 the offices that are open just a couple of times a
25 month?

## 146

1  Q. Uh-huh.
2  A. Generally, they would be in the lesser
3  population areas of the state, the western portion.
4  Q. Are you familiar with the demographics of that
5  -- that portion of the state?
6  A. No.
7  Q. Are any offices open on weekends?
8  A. No, ma'am.
9  Q. Have they ever been since you've been working
10 at DPS?
11 A. Not since I've been working at DPS.
12 Q. Are you aware of whether in any -- at any time
13 in the last ten years, drivers' license offices have had
14 any weekend hours?
15    MR. McKENZIE: Objection, foundation. You
16 may answer.
17 A. I don't know within the past ten years. I know
18 within the history of driver license operations, there
19 was sometime when they were open on Saturdays, but I
20 don't know if it was within the past ten years.
21 Q. (By Ms. Maranzano) Okay. Do you know why there
22 are no weekend hours currently?
23 A. I feel like I should, but I don't, really.
24 Q. Of the offices -- well, let me ask you
25 this: Has there been discussion at DPS about the

## 147

1  possibility of opening any drivers' license offices on
2  the weekends?
3  A. Yes, there has.
4  Q. Recently?
5  A. Yes.
6  Q. And are there any plans to do so?
7  A. Currently, no.
8  Q. Do you know why?
9  A. Well, I think we are trying to reduce wait
10 times, and if you just extend the hours, you don't
11 necessarily do that. So if we actually, you know, put
12 more people on the counter, then that reduces the wait
13 times.
14 Q. Okay. So am I understanding you that there was
15 a decision made that weekend hours would not actually
16 result in decreased wait times for people?
17 A. Yes.
18 Q. During those discussions, was there any
19 discussion that weekend hours might enable some people
20 to have access to drivers' license offices who had
21 difficulty getting there during the week?
22 A. Yeah. There was some discussion of that, but
23 just opening the hours on Saturday doesn't necessarily
24 ensure that they would have access. You know, I mean,
25 because then if everybody -- if the people who could

## 148

1  come Monday through Friday chose to come on Saturday,
2  then it also becomes a challenge.
3  Q. And in terms of offices that have -- was
4  labeled Late Day in the last column, do any of those of
5  offices stay open later than 6:00 p.m.?
6  A. No. We standardized our late day in hours.
7  Q. And why did you do that?
8  A. To eliminate customer confusion, and it also
9  shows that -- our analysis showed that the vast majority
10 of customers stopped coming at 6:00 or before.
11 Q. 6:00 or before?
12 A. (Witness nods head yes.)
13 Q. And in terms of standardization, it looks to me
14 like, from this chart, some of those late day offices
15 open at 8:00 and some open at 7:00. Is that true?
16 A. On the late day?
17 Q. Yes.
18 A. Yes. It does show that the El Paso offices do.
19 Q. Are those the only ones in the state that open
20 at 7:00?
21 A. To my knowledge.
22 Q. Are these hours continuous hours? Like, for
23 example, if it says 8:00 to 6:00, that means it's open
24 continuously 8:00 a.m. to 6:00 p.m.?
25 A. Yes.

Rebecca Davio                                          June 15, 2012

## 149

1    Q.   And the staff that are listed for each office,
2    would those staff be there, that number of staff would
3    be there during those hours, or are those --
4    A.   That's the total number the FDEs assigned to
5    that office.
6    Q.   I see.  So it wouldn't mean that that number of
7    people would be working each day?
8    A.   That's correct, or all day.
9    Q.   Okay.  Over the last two years, would you say
10   DPS has expanded the number of offices?  I'm sorry.  DPS
11   has expanded the number of drivers' license offices
12   around the state of Texas?
13   A.   Yes.  Well, I mean, we have opened new
14   scheduled offices.  I mentioned the Mega Centers that
15   we're opening, but the Mega Centers are not open yet.
16   Q.   Okay.
17   A.   We are training staff as we speak and preparing
18   the facilities.
19   Q.   So you've opened new offices, you're preparing
20   for the Mega Centers, and have you also closed offices?
21   A.   Over the two years?
22   Q.   Yeah.
23   A.   Yes.
24   Q.   And how would you say -- would you -- would you
25   say on average right now as compared to two years ago,

## 150

1    you're about the same, or would you say you have more
2    offices?
3    A.   You know, to be perfectly honest, that's a --
4    that's a hard question to answer because the number of
5    offices that were actually open at that time is -- is
6    not clear to me.
7    Q.   Do you know if during the consideration of
8    SB 14, you had approximately the same number of offices
9    open as you do now?
10   A.   That's really the same situation, that the
11   number of offices that were actually open.
12   Q.   If I told you that it was stated, I believe in
13   the public record, that there were 221 offices --
14   A.   Okay.
15   Q.   -- open at that time, would that sound about
16   right to you?
17           MR. McKENZIE:  Objection to scope, but go
18   ahead and answer.
19   A.   That -- that sounds like that's probably in the
20   ballpark.  And if it was stated in public testimony or
21   provided in written documents to the legislature, then I
22   would believe that yes, that was verified, and then yes,
23   I could go back and answer your previous question that
24   it's approximately the same.
25           (Exhibit 842 marked for identification.)

## 151

1    Q.   (By Ms. Maranzano) Okay.  I'm showing what
2    we're marking as Deposition Exhibit 842.  Does this
3    document look familiar to you?
4    A.   Yes.
5    Q.   What is this?
6    A.   This is a copy of my weekly blog for April the
7    9th, 2012.
8    Q.   Can you turn to page -- what's labeled at the
9    bottom as Texas 00250700?  And do you see there's --
10   there's a map on that page?
11   A.   Uh-huh.
12   Q.   And underneath the map it says, "Some offices
13   might not have a high population in their area, but they
14   are the only office for 60-plus miles."  Is that -- is
15   that still true today?
16   A.   I thought 60-plus miles is a -- is an
17   estimate.  I know when the Texas State did their
18   business intelligence study, the number that sticks in
19   my mind is 52 miles, but that's close to 60.
20   Q.   So is it fair to say that if a person needed to
21   do -- needed to conduct business at the driver's license
22   office and was required to go in person, it's possible
23   they might have to travel a hundred miles round trip to
24   do so?
25   A.   Yes, it's possible.  It's also possible that

## 152

1    they have to do that, that they have to travel that same
2    distance to go to the doctor, shop at Walmart or those
3    kinds of things.  I mean, Texas, the western portion of
4    Texas, you can go a long way, not just between driver
5    license offices, but between for a lot of basic
6    services.
7    Q.   Right.
8    A.   You're going to have to put that in
9    perspective.
10   Q.   Uh-huh.  But in terms of getting to a driver's
11   license office, which potentially, for some people,
12   might be a way to get the only possible ID that they
13   would need to get to vote, they might have to travel a
14   hundred miles round trip to get that; is that correct?
15   A.   Yes.
16   Q.   And in some parts of the state, I think people
17   might have to travel even farther than that?
18   A.   I know that we provided you information with
19   the exact mileage on it.  I didn't -- I didn't bring
20   that.  I think a hundred miles is about -- was about
21   what was kind of round trip that I -- it's in my brain.
22   I can't quote you the exact mileage.
23   Q.   You think a hundred miles is the farthest?
24   A.   Round trip.
25   Q.   Round trip?

Rebecca Davio                                                    June 15, 2012

---

### 153

1    A.  It's -- I'm sorry.  I don't remember --

2    Q.  Okay.

3    A.  -- the exact mileage.

4        (Exhibit 843 marked for identification.)

5    Q.  (By Ms. Maranzano) I'm showing you what we're

6  marking as Deposition Exhibit 843.  Can you take a look

7  at this and let me know if it looks familiar to you?

8    A.  I believe that I've seen this or a draft of it.

9    Q.  Okay.  And what is this document?

10   A.  It's a response to -- it's a letter from the

11  director of DPS to Senator Ellis answering questions

12  about Senate Bill 14.

13   Q.  And can you look at the last page there on that

14  last bullet, it says, "Does DPS plan on organizing any

15  satellite locations, temporary or otherwise, in order to

16  provide Texans with opportunities to apply for an EIC

17  outside of normal DPS office locations?"  And the

18  response is "No."  Is that still your understanding of

19  DPS's plans?

20   A.  Yes.

21   Q.  And then do you see that the response also

22  says, "The law does exempt those persons who can prove

23  disability through Social Security Administration or

24  Veterans Administration documentation from presenting

25  additional identification"?

---

### 154

1    A.  Yes.

2    Q.  And would you agree that it would be more than

3  just individuals who are disabled who might have trouble

4  making to it a driver's license office during their

5  working hours?

6        MR. McKENZIE:  Objection, speculation.

7    A.  Well, I think that this was pointing out that

8  those people that are disabled --

9    Q.  (By Ms. Maranzano) Uh-huh.

10   A.  -- are not required to provide an EIC.  I think

11  that's why that was specifically called out.

12   Q.  But in terms of the question, which is about

13  whether or not DPS would provide opportunities for

14  individuals to apply for an EIC outside of the normal

15  DPS office hours, could you imagine that a person who

16  worked an hourly wage might have trouble making it to a

17  driver's license office during their working hours?

18       MR. McKENZIE:  Objection, speculation.

19  You may answer.

20   A.  I think that --

21       (Telephone beeping.)

22       Do you we need do anything about that?

23       MS. MARANZANO:  Can we off the record for

24  a second?

25       (Recess from 4:17 p.m. to 4:18 p.m.)

---

### 155

1        MS. MARANZANO:  Back on the record.

2    A.  My thought is that people that work for an

3  hourly wage may not necessarily work 8:00 to 5:00.

4    Q.  (By Ms. Maranzano) And what's that based on?

5    A.  Well, I mean, thinking of, you know, fast food

6  workers or something like that, that they wouldn't

7  necessarily just work 8:00 to 5:00.

8    Q.  So you're not concerned about individuals who

9  work for an hourly wage having trouble making it to a

10  driver's license office?

11       MR. McKENZIE:  Objection, mischaracterizes

12  the witness's testimony, but you may answer.

13   A.  I think that we are trying to provide the level

14  of service that will enable all of our customers to get

15  in and out as quickly as possible.

16   Q.  (By Ms. Maranzano) And can you imagine that a

17  person who doesn't have access to a vehicle might also

18  have trouble making to it a driver's license office

19  during their business hours?

20       MR. McKENZIE:  Objection, speculation, but

21  you may answer.

22   A.  Many of our offices are located on bus lines.

23  It's a criteria that we use when we're looking to locate

24  an office.

25   Q.  (By Ms. Maranzano) Do you know how many of your

---

### 156

1  offices are located on bus lines?

2    A.  I do not know off the top of my head, no,

3  ma'am.  But I do know that in the search for the Mega

4  Center locations, which is the office locations that I'm

5  most familiar with, that that was a specific criteria

6  that was used in ranking locations.

7    Q.  So is it fair to say it might take somebody a

8  longer amount of time to get to an office by public

9  transportation than it would by car?

10       MR. McKENZIE:  Objection, speculation, but

11  you may answer.

12   A.  I don't think I'm able to answer that question.

13   Q.  (By Ms. Maranzano) Okay.

14   A.  There's too many variables.

15   Q.  Are you aware of whether SB 14 requires

16  employers to give paid leave for somebody to obtain an

17  identification?

18   A.  I don't recall anything in Senate Bill 14 that

19  addresses that at all.

20   Q.  Can you look at the previous page for me, and

21  one of the bullets that's about part way through the

22  page -- actually, it towards the bottom, it says,

23  "Recent press reports indicate that a top official in

24  the Wisconsin Department of Transportation instructed

25  staff at the Division of Motor Vehicle's services

Rebecca Davio                                                    June 15, 2012

---

**157**

1  centers not to tell members of the public that they can
2  obtain photo identification cards free of charge unless
3  they know to ask for it.  Will DPS be taking a similar
4  approach?"  And it says, "No, it will not."
5          Now, didn't we look earlier at a document
6  that said somebody had to basically ask for the ID for
7  voting in order to be told about the -- in order to be
8  given an EIC application?
9          MR. McKENZIE:  Objection, I think it
10 mischaracterizes the exhibit, but you may go ahead and
11 answer.
12     Q.  (By Ms. Maranzano) And for reference, I am
13 referring to the document that we looked at earlier,
14 which we labeled Exhibit 834, and it was Question Number
15 4, "What if the person tells you they do not have money
16 to pay for an identification or a driver's license, can
17 we inform them of the election certificate?"  "No, the
18 person should let you know they need a photo ID to
19 vote."
20     A.  Well, I think ours says, if they said -- you
21 know, if they said something about voting, then we would
22 -- we would tell them that.
23     Q.  So is it your testimony that a person needs to
24 basically say the word "voting" in order to --
25     A.  They don't need necessarily need to use the

---

**158**

1  word "voting," but they -- they can't just come in and
2  say, "I want an ID card," and we give them an
3  application for an Election Identification Certificate,
4  because that's says it's specifically not viable for
5  identification.
6     Q.  And so do you agree with the response to this
7  letter, you don't -- you don't see what DPS is doing is
8  requiring individuals to know that they have to ask for
9  the ID?  Is that fair?
10    A.  I'm sorry.  One more time.
11    Q.  I'm wondering if what it says in this letter is
12 that DPS seems to be responding by saying it's not going
13 to require individuals to know that they have to ask for
14 the ID, but it sounds to me like you're actually saying
15 they do need to know, they have to ask for it, so I'm
16 wondering how you reconcile those?
17    A.  There appears to be some conflict.
18    Q.  And do you know which -- which policy DPS will
19 be following?
20    A.  Well, I think we would need to go back and look
21 at our training documents, based upon the correspondence
22 that the director sent, and reconcile them.
23    Q.  So you may be updating your training documents?
24         THE WITNESS:  In fact -- can I borrow this
25 pen?

---

**159**

1          MR. McKENZIE:  Yeah, go for it.  Is that
2  the exhibit?
3          THE WITNESS:  Sorry, that's the
4  official.
5          MR. McKENZIE:  You can write it on mine.
6  Actually, why don't you mark -- here, I don't have any
7  markings on mine.
8          THE WITNESS:  Here, can we just move the
9  tag.
10         MR. McKENZIE:  Yeah, I don't have any
11 markings on mine, so we can put an exhibit tag on --
12         THE WITNESS:  Can we put 834 on his, since
13 this won't do me any good if I -- if I marked it on
14 something that I can't take with me.  I'm sorry.  It's
15 834, and then you can rip this one off of here.  I
16 apologize.
17    Q.  (By Ms. Maranzano) And how many drivers'
18 license offices do you think people would need to travel
19 50 or more miles to get to them?
20    A.  I don't know.
21    Q.  Let me -- let me phrase it this way:  How many
22 drivers' license offices serve a number of people, maybe
23 half of the clients that are traveling 50 or more miles
24 to get there?
25    A.  I have no way to be able to answer that

---

**160**

1  question.
2     Q.  Isn't this part of what you analyze when you
3  look at what drivers' license offices to close?
4     Q.  But you just asked me how many offices people
5  drive 50 or more miles to get there.
6     Q.  How many offices serve clients who are
7  traveling great distances to get there?
8          MR. McKENZIE:  Objection, speculation.
9     A.  I don't have any way to answer that.  I'm
10 sorry.
11    Q.  (By Ms. Maranzano) Do you have an estimate?
12    A.  No, ma'am.
13    Q.  Well, what geographic parts of the state are we
14 talking about in terms of drivers' license offices that
15 serve clients who are traveling great distances to, to
16 get to the office?
17    A.  Well, okay.  So first, "great" is -- is a term
18 that's unclear to me what --
19    Q.  Uh-huh.
20    A.  -- what exactly is meant by that.  I think
21 generally the western portion of the state is -- has
22 lesser population, and so therefore, it's -- it's less
23 sparsely populated.  I think there's a county in Texas
24 that has 80 people in the county, and yet it's the --
25 you know, the size of Rhode Island or something like

Rebecca Davio                                              June 15, 2012

---

### 161

1  that.
2      Q.  And when you say the western part of the state,
3  what counties are you referring to?
4      A.  I think generally you could say the area west
5  of I-35, although that's a very, very -- I mean, if
6  you're just looking for some kind of demarcation,
7  Austin, where we are now, is actually west.  Right where
8  we are right now is actually west of I-35, and so this
9  is clearly a populated area of the state.  But it's the
10  western portion.  I can't name the counties.
11     Q.  Do you know about how many counties we're
12  talking about?
13     A.  I'm sorry, I don't.
14     Q.  Approximately?
15     A.  I don't.  I mean, you can look at a population
16  map of the state.
17     Q.  But actually, what I'm -- what I'm interested
18  is not -- is not the population of the counties, but in
19  terms of drivers' license offices and the clients that
20  they're serving.  That's just around the same page about
21  what my questions are referring to.
22     A.  Okay.
23     Q.  And can you tell me particular offices that you
24  think serve clients who travel 40 or 50 miles to get
25  there?

---

### 162

1      MR. McKENZIE:  Objection, speculation.
2  Asked and answered.  But you may answer, if you can.
3      A.  Well, so I'll tell you about Angie in Floydada,
4  since I've told almost everybody about Angie in
5  Floydada.  Floydada is a small little town in the
6  vicinity of Lubbock, and I've gone out and visited a lot
7  of our offices.  It happens to be a one-person office.
8  It actually would fit under the definition of a
9  scheduled office.  And so Angie and I had a lovely visit
10  for approximately two hours, and Angie helped two
11  customers.  And, you know, I don't know exactly how far
12  -- I believe one of the customers, I recall the
13  discussion was she had come from Lubbock.  I don't know
14  how far Lubbock.  I don't know exactly how many miles
15  Lubbock was from Floydada, but that had been the
16  customer's choice.
17     Q.  (By Ms. Maranzano) And, you know, just to
18  clear, I'm not as interested in -- in sort of anecdotal
19  evidence as I am interested in more, you know, your
20  knowledge based on your position as the assistant
21  director of the drivers' license services and your
22  knowledge coming here to testify today about the offices
23  that are going to be providing Election Identification
24  Certificates.
25      So let me ask you this:  Are the offices

---

### 163

1  in the western part of the state, do they usually have
2  fewer employees working there?
3      A.  Than the offices in the western portion of the
4  state?  Yes, I would say.  Our only existing Mega Center
5  is in Houston, for example.  A Mega Center has 25 or
6  more employees.  There are no -- actually, what would be
7  more meaningful is to say there are no plans to open
8  Mega Centers in the western portion of the state,
9  because the population simply does not warrant that
10  level of employees.  The population and therefore the
11  number of transactions.
12     Q.  Okay.  Can you turn back to Exhibit 843 for me,
13  and can you look at the first page?  And do you see the
14  last bullet on the first page talks about wait times?
15  And do you see that the DPS's response indicates that
16  wait times can be as long as three hours in the
17  metropolitan areas?
18     A.  Yes, I see that.
19     Q.  And would you say that's accurate?
20     A.  I think that's accurate during our busiest
21  months of the year.
22     Q.  And what are your busiest months of the year?
23     A.  The summer and other times when students are
24  out of school, so spring break, Christmas break.
25     Q.  Does DPS receive numerous complaints about the

---

### 164

1  amount of time it takes to receive a driver's license?
2      A.  We do receive complaints about that, yes.
3      Q.  Do you receive complaints from people who are
4  unable to wait the requisite amount of time needed to
5  obtain a driver's license or ID?
6      A.  Yeah.  We might receive some.  I think really
7  the complaints are more likely to come from people who
8  don't want to have to wait.
9      Q.  And what do you mean by that?
10     A.  Well, it's not how I would chose to spend my
11  time.  So there's just a higher level of frustration,
12  the -- the expectation.  So I can't tell you that the
13  majority of the complaints that we receive about wait
14  time say, "I was unable to wait."  They said, "I don't
15  want to wait.  I didn't like having to wait."
16     Q.  Well, it's probably fair to say the vast
17  majority of people don't want to wait at a driver's
18  license office; fair?
19     A.  Yes.  I think that's a very fair statement.
20     Q.  Are there any regions of the state that are
21  particularly notable for having long wait times at
22  drivers license offices?
23     A.  I think Houston, the Metroplex area offices
24  are -- frequently have longer wait times.
25     Q.  And I'm sorry, the Metroplex area offices are

Rebecca Davio                                              June 15, 2012

## 165

1    within Houston?
2         A.   No, I'm sorry.  The Metroplex is generally a
3    term that refers to Dallas-Fort Worth metropolitan
4    statistical area.
5         Q.   Thank you.
6         A.   I'm sorry.  Texas jargon.
7              MR. McKENZIE:  Yeah.  It's where I'm from,
8    so I know.
9         Q.   (By Ms. Maranzano) Are there particular offices
10   within those areas that are notable for having long wait
11   times?
12        A.   I think that it varies depending upon if
13   there's a couple of people out sick or on vacation that
14   day, that has an influence.  If there's a surge of
15   customers that happen to all hit at the same time, all
16   of these things influence our wait times.
17        Q.   Okay.  But are there any -- just apart from,
18   sort of, extraordinary circumstances, somebody being out
19   sick or a rush of people, are there any offices that
20   just generally are sort of more known for having extreme
21   wait times?
22        A.   Well, I think as I mentioned previously, the --
23   the offices in Houston and the Metroplex, the Dallas-
24   Fort Worth area, tend to have longer wait times.
25        Q.   Okay.  So just to be clear, you're talking

## 166

1    about all of the offices in the Houston and Dallas-Fort
2    Worth area?
3         A.   Well, without going through and -- and naming
4    specific offices, those are -- that's a general -- a
5    generally safe assumption.
6         Q.   Okay.
7              (Exhibit 844 marked for identification.)
8         Q.   (By Ms. Maranzano) Okay.  I'm showing you what
9    we're marking as Deposition Exhibit 844.  Can you take a
10   look at this and let me know if it looks familiar to
11   you?
12        A.   Yes, it does.
13        Q.   And what is this?
14        A.   This is a list of the average wait times in our
15   larger offices for May of 2012.
16        Q.   And why was this compiled?
17        A.   At your request.
18        Q.   Who is you?
19        A.   I'm sorry.  We -- we compiled it in request
20   to -- or in preparation for the deposition.
21        Q.   Ah, I see.  So this was compiled -- this was a
22   study of the offices in large metropolitan areas; is
23   that correct?  I'm sorry.  At the top it says Large
24   Offices.  What do you mean by that?
25        A.   Well, it's our larger offices that have the

## 167

1    queuing system, and the queuing system is what was --
2    where -- how we were able to get this information about
3    the average wait time per person.
4         Q.   Okay.  Can you tell me what the queuing system
5    is, please?
6         A.   The queuing system is something that we use to
7    be able to mark when our customers come in to the office
8    and when their transaction is complete, so we have an
9    understanding of their wait times and the actual
10   processing time, the time that it took at the counter to
11   complete their transaction.
12        Q.   Okay.  And does it have anything to do with --
13   is there anything about the queuing system that makes it
14   -- other than what you've just talked about, that makes
15   it different from other offices?
16        A.   I'm sorry.  I don't understand that question.
17        Q.   Are people -- are people who go into an office
18   that has queuing system, are they separated into queues
19   depending on what service they are seeking?
20        A.   Yes, they are.
21        Q.   And does that happen at other offices, too?
22        A.   Typically, at smaller offices, you know,
23   because there's -- I can't remember the exact number of
24   different types of transactions, but there may be 12
25   different types of transactions, and in a two-person

## 168

1    office, it really isn't feasible to do that.
2         Q.   Okay.  And the office names on the left-hand
3    side --
4         A.   Uh-huh.
5         Q.   -- are those -- are those names each
6    representing one office or more than one office?
7         A.   That represents one office.
8         Q.   Okay.
9         A.   So Arlington, for example, is -- would be
10   considered in the Metroplex.
11        Q.   Okay.  And so these wait times, they were all
12   for May 2012, correct?
13        A.   Yes, ma'am.
14        Q.   And would you say these are about average wait
15   times for these offices?
16        A.   I would say they were average wait times for
17   the month of May 2012.  It really varies.  I don't mean
18   to be flip, but it varies a lot, depending upon the
19   number of customers, depending upon what else is going
20   on.  So I feel confident saying this -- these were the
21   average wait times for this month for these offices.
22        Q.   Okay.  And there are no -- I mean, when you say
23   it really depends on the number of customers and what
24   else is going on, are there patterns in terms of the
25   number of customers who come in to offices?

Rebecca Davio                                          June 15, 2012

## 169

1       MR. McKENZIE: Objection, vague, but you
2   can answer.
3       Q.   (By Ms. Maranzano) I guess, let me rephrase.  I
4   guess what I'm interested in finding out are some of the
5   trends in waiting times.  Can you tell me about if these
6   are indicative of, sort of, on average, kind of the
7   trend of the waiting times, say, in Arlington office,
8   that, you know, an average might be about 54 minutes?
9   Is that --
10      A.   Well, the way I look at these -- I look at the
11  wait times for offices every month.  I don't commit them
12  to memory.  I would say that these are not -- there was
13  nothing on here that I just went, oh, my gosh, that's
14  seems really strange.  I am especially impressed that
15  Laredo has 17 minute average wait time.  I know that
16  they are typically below 30, but I -- I did not have it
17  in my brain that they were 17 minutes to complete a
18  transaction.
19      Q.   Uh-huh.  And I know you said certain times of
20  the year were busier than others and you indicated a
21  couple.  Do you think that on average over -- over a
22  year, there's a pretty wide fluctuation in terms of wait
23  times at an office?
24      A.   I do think that there is a variation in wait
25  times, yes.

## 170

1       Q.   A variation of a few minutes or more than that?
2       A.   It -- it can swing.  I mean, if you look at,
3   you know, a day, it can swing quite dramatically.
4       Q.   In any given day?
5       A.   It can swing dramatically in a day.  It can
6   swing dramatically from Monday to Tuesday.  It can swing
7   dramatically from -- I mean, yes, it can swing quite
8   dramatically.  There's a number of different factors
9   that influence the wait time.
10      Q.   And what -- well, and you -- okay.  What are
11  those factors?  You've told me a couple of them.  You
12  said a rush of people.  You said if somebody is out
13  sick.  Anything else?
14      A.   Those -- those are two of the biggest.
15      Q.   Okay.  Are there times of the day that are
16  particularly -- when the wait time might be increased on
17  average?
18      A.   Well, lots of times, we see lunch times are
19  challenging because we all kind of make the assumption
20  that, "oh, I'll just sneak over there.  Nobody else will
21  have gotten that idea.  And I'll be able to get in."
22  And so there's an increase in customers.  And there's
23  actually a decrease, typically, in a lot of our offices,
24  because our employees have to eat.  So we've tried to,
25  for example, do other things to mitigate that problem,

## 171

1   like having scheduled part-time employees that only come
2   in during the lunch hours.  And so that -- those are
3   steps that we've tried to take to, to reduce that
4   particular typical peak.
5       Q.   And can you just glance back at Exhibit 843 for
6   me, and -- and in that bullet that we were talking about
7   on the first page --
8       A.   Uh-huh.
9       Q.   -- there's a sentence there that says,
10  "Customers in these offices spend an average of 50
11  minutes from the time their transaction was entered into
12  the queuing system until it was completed.  This does
13  not include the time someone would have to wait in line
14  before they could be entered into the queuing system."
15      A.   Uh-huh.
16      Q.   Are these times here that are represented in
17  this far right-hand corner also basically measuring the
18  time the person enters into the queuing system until
19  their transaction is complete?
20      A.   Yes, ma'am.
21      Q.   So it's also not including the time someone
22  waits before they entered into the queuing system?
23      A.   That's correct.
24      Q.   Okay.  Can you tell me every office on this
25  list that you think has a lower wait time than what's

## 172

1   listed here on average?
2       MR. McKENZIE: Objection, speculation, but
3   you may answer.
4       A.   No.
5       Q.   (By Ms. Maranzano) Why not?  Because you don't
6   know?
7       A.   Yeah, because what you're asking me to do is to
8   go down and say, I believe Arlington's average wait time
9   is 54 minutes.
10      Q.   I'm asking you to identify every office on this
11  list that would have a lower wait time than what's
12  listed here as the average wait time for May.
13      A.   Well, I can tell you that I was a little
14  surprised that Garland had an hour and 22 minutes.  That
15  -- that was the one that kind of, like, I went, huh,
16  wow.
17      Q.   And why did that surprise you?
18      A.   Because Garland just doesn't -- isn't on the
19  list of offices that seem to have issues.  Pat Booker
20  also has -- had very, very low wait times.  We -- we
21  educated our office supervisors about the queuing system
22  and how to use it and how to reduce the wait time, and
23  Pat Booker was one of the examples of an office where we
24  -- we really pointed that out as an example to say, wow,
25  this supervisor gets how to use the queuing system.  So

Rebecca Davio                                          June 15, 2012

---

### 173

1   that just kind of surprised me a little bit.
2       Q.   Uh-huh.  Anything else?
3       A.   Those are the two that kind of caught my
4   attention.
5       Q.   Would you describe these wait times as the
6   minimum average wait times?
7       A.   I would describe them as average.
8       Q.   Any others that you think have a lower wait
9   time than what's listed?
10           MR. McKENZIE:  The same speculation
11  objection.
12      A.   Those -- those were the two.  I haven't looked
13  at every office, but those are the two that -- in
14  looking over the list.
15      Q.   Okay.  But just in looking like right now, if
16  you could just look through the list and make sure there
17  aren't any others.
18      A.   And the question was, are there any others
19  that --
20      Q.   That you think would have a lower average wait
21  time than what is listed here?
22           MR. McKENZIE:  Objection, asked and
23  answered and speculation, but...
24      A.   No.
25      Q.   (By Ms. Maranzano) Okay.

---

### 174

1           (Exhibit 845 marked for identification.)
2       Q.   (By Ms. Maranzano) Okay.  I'm showing you what
3   we marked as Deposition Exhibit --
4       A.   845.
5       Q.   Thank you.  845.  Does this look familiar to
6   you?
7       A.   Yes, ma'am, it does.
8       Q.   And what is this?
9       A.   This is a report that was submitted to the
10  legislature in response to questions that said how can
11  we reduce the -- the wait time for our customers.
12      Q.   And this was submitted to the legislature in --
13  well, the date on this publication is February 28th,
14  2011, correct?
15      A.   Yes, ma'am.
16      Q.   And when was it submitted to the legislature?
17      A.   On or about February 28th of 2011.
18      Q.   Can you look at first page, the Executive
19  Summary, and the first sentence, it says, "Getting a
20  driver's license in Texas should not a painful
21  experience."  Is that correct?
22      A.   Yes.
23      Q.   And then the next sentence says, "The typical
24  driver license customer complaint is about uncomfortable
25  long wait times before they get to the counter to be

---

### 175

1   helped."  Would you say that's still the typical
2   customer complaint?
3       A.   Yes.
4       Q.   And the last sentence of that paragraph talks
5   about the state's population has grown and the length of
6   time that's required to process increasingly complex
7   driver license transactions.  What -- what is meant by
8   that increasingly complex driver license transactions?
9       A.   We, as part of a driver license transaction, we
10  ask people things like if they want to register to vote,
11  if they want to do an organ donation, if they want to
12  register for Selective Service, if -- you know, we -- we
13  look at documents, more documents than we did
14  historically.
15      Q.   Okay.  Anything else?
16      A.   (Witness shakes head no.)
17      Q.   Can you look at Page 6 for me?   Do you see
18  that chart on Page 6?
19      A.   Uh-huh.
20      Q.   And it has an arrow that says Additional
21  Mandates, and then another arrow that says Population
22  Growth.
23      A.   Uh-huh.
24      Q.   And the variable says Service Gap?
25      A.   Uh-huh.

---

### 176

1       Q.   And underneath that, it talks about "Additional
2   mandates include state and federal requirements placed
3   upon driver license division that impact transaction
4   times and ultimately wait times"?
5       A.   Uh-huh.
6       Q.   Anything other than what you've testified about
7   that you consider an additional mandate?
8       A.   Those are the primary ones.  The credentialing
9   requirements also.
10      Q.   And what -- what is that?
11      A.   It's an offshoot of the Federal Real ID Act.
12      Q.   And what does it require?
13      A.   It requires us to see the birth certificate, to
14  examine all the documents from someone who is here
15  temporarily.
16      Q.   Would you consider the EIC to be another
17  mandate put on the driver's license division?
18      A.   Yeah.  It's affiliated with voter registration,
19  but...
20      Q.   And do you think that's going to have any
21  impact on what's labeled in this demographic as the
22  service gap?
23      A.   You know, it's really hard to know.  As we
24  pointed out in the -- the fiscal impact statement for
25  the rules, it's -- it's hard to know how many -- what

Rebecca Davio                                                    June 15, 2012

## 177

1   the demand is going to -- how the demand is going to
2   change for EICs.
3       Q.   Has the Division made any plans that would
4   require it to come up with some sort of estimates for
5   how many people are going to be applying for an EIC?
6       A.   I think we have to service any and all
7   customers, and it's -- you know, there's no way to
8   really know.
9       Q.   Do you think it's going to impact the
10  Division's ability to provide quality services to its
11  customers?
12      A.   I don't really think so.
13      Q.   Why not?  Or what -- what are you basing -- and
14  what are you basing that opinion on?
15      A.   Well, I think the fact that this report was
16  actually what led to the addition of 266 employees and
17  new offices.  And, you know, I'm just -- you know, I
18  don't -- I don't -- personally don't think that there is
19  going to be that many people.
20      Q.   And what are you basing that on?
21      A.   It's really irrelevant.  Gut feel.  So that's
22  -- officially, I do not have any estimate.
23      Q.   And is your gut feel because you think most
24  people have one of the forms of required identification
25  under SB 14?

## 178

1           MR. McKENZIE:  Objection, speculation, but
2   you may answer it.
3       A.   Officially, I don't have any estimate.  You
4   know, I don't know.  We really don't know.  We don't
5   know how to estimate this.  We issue driver licenses and
6   identification cards, and the Secretary of State does
7   voter issues.  I do not claim any expertise in voter
8   issues.
9       Q.   (By Ms. Maranzano) Right.  But now, you're also
10  going to be issuing a form of ID for voting, correct?
11      A.   Yes, to everyone that comes in and does not
12  have another form of ID and qualifies.
13      Q.   Is it fair to say that your -- your gut feel
14  did not impact any of your planning in terms of the EIC
15  program?
16      A.   My gut feel is my gut feel.  It does not have
17  anything to do with what -- we are -- we are prepared
18  and ready to issue Election Identification Certificates
19  to everyone that comes in and requests them and qualifies
20  for them.
21      Q.   Can you turn to Page 9 of this report for me,
22  and the last two paragraphs.
23      A.   Uh-huh.
24      Q.   That's talking about the employee environment.
25  It mentions that the salary of a driver's license

## 179

1   employee is 12 dollars per hour.  Is that -- and that
2   was -- well, it looks like that was probably in January
3   of 2011.
4       A.   Uh-huh.
5       Q.   Is that -- has that gone up since that time?
6       A.   Yes, ma'am, it has.
7       Q.   And what is the salary now?
8       A.   I don't know the hourly rate.  We were -- as a
9   result of this report, we did get funds to reclassify
10  our employees, and they -- they are paid a higher rate.
11      Q.   You reclassified them as what?
12      A.   They are -- actually, their title changed as
13  part of the reclassification, but with that
14  reclassification came a salary increase.
15      Q.   Okay.  And below that paragraph in the last
16  paragraph it says, "Paying employees a salary
17  commensurate with their responsibilities will allow DPS
18  to recruit employees with more developed skills."  Do
19  you think that has occurred?
20      A.   Yes, I do.
21      Q.   And what sort of skills have you been able to
22  -- to recruit employees with or what kind of skills do
23  the employees that you're recruiting have?
24      A.   Well, the -- the new job description is
25  actually called a customer service representative.  It

## 180

1   used to be an administrative assistant, so there was
2   some confusion.  Now it's very clear to employees that
3   we're looking for customer service skills.  It's not a
4   background kind of filing job.  And so, you know, that
5   -- that's probably one of the primary things.
6       Q.   Do you look for employees who speak other
7   languages?
8       A.   We do not recruit for that.  We do have many
9   employees that speak other languages.
10      Q.   Do you know how many employees you have who
11  speak fluent Spanish?
12      A.   I don't know that at all.  We don't have a way
13  to -- to track that or to -- you know, we don't have a
14  reason.
15      Q.   It's not something that you look for in terms
16  of employees who are going to be serving the public in
17  any of your drivers' license offices?
18      A.   We do not screen for that, no, ma'am.  Our
19  employees tend to represent the population that's in
20  that community.
21      Q.   Is there a reason that you wouldn't look for
22  that in terms of hiring an employee for a region where
23  there might be a lot of Spanish speakers?
24      A.   It's not part of the screening.  If you make it
25  part of the screening, you have to typically pay

Rebecca Davio                                                  June 15, 2012

## 181

1    additional.  Many people speak lots of languages.
2        Q.   And when you say you have to pay additional, do
3    you mean you have to pay employees additional?
4        A.   Uh-huh.
5        Q.   So you would have to increase the salary if
6    you --
7        A.   Uh-huh.  And we are not authorized to do that
8    in the driver license division.
9        Q.   Okay.
10             Can we mark this?
11             (Exhibit 846 marked for identification.)
12        Q.   (By Ms. Maranzano) Do you recognize this
13    document?  I'm sorry.  I'm showing you what we marked as
14    Deposition Exhibit 845 -- 846, I apologize.  Do you
15    recognize this?
16        A.   It appears to be a subset or a -- no, I don't.
17        Q.   You don't recognize this document?
18        A.   I mean, you know, if you looked and you
19    compared it to the previous document.  I'm trying to
20    remember.
21        Q.   Is this a draft of another report for the
22    legislature?
23        A.   That's what it appears to be.
24        Q.   And you don't think you've seen this before?
25        A.   No.

## 182

1        Q.   Can you look at the first page for me, which is
2    -- actually, it's Page 3.  And do you see in the -- in
3    the Executive Summary, the second sentence.  It sounds
4    like the other reports, that the typical driver's
5    license customer complaint is about uncomfortable long
6    wait times before they get to the counter to be helped.
7             Is it fair to say that in March of 2012,
8    that's still a pretty common complaint from driver's
9    license customers?
10        A.   Yes.  The offices, the new Mega Centers and the
11    new staffing have not been -- the new offices have not
12    been opened.  We're hiring the -- I mean, we're training
13    to the staff now.  So yes, in March of 2012, we are
14    still getting complaints.
15        Q.   And do you see the last sentence of that
16    paragraph says, "The Mega Centers attack the heart of
17    this population growth, but does little for the outlying
18    areas with similar problems."  Would you say that's
19    correct?
20        A.   Well, I think that -- I'm sorry, which -- which
21    -- the first?
22        Q.   The last.
23        A.   The last?  I think the resources were applied
24    where there was the most urgent need.  Not every single
25    one of the 266 employees are actually staffing the Mega

## 183

1    Centers.
2        Q.   Okay.  So does that mean you disagree with this
3    sentence?
4        A.   Well, this sentence, the way it's written.
5        Q.   Uh-huh.
6        A.   "Does little for the outlying areas with
7    similar problems."  So yes, sure, I'll agree.
8        Q.   Can you look at page --
9        A.   I don't think the problems are as severe.  The
10    under served populations were primarily in the heavily-
11    populated areas.  In, for example, Lubbock there's no
12    Mega Center going in there, but they tend to have spikes
13    in wait times, whereas in the heavily-populated areas,
14    they tend to have pretty consistent wait -- longer wait
15    times.
16        Q.   Okay.
17        A.   So I think that -- I really think that that
18    sentence is not well worded.
19        Q.   And when you say the under served are primarily
20    in the areas with the Mega Centers, how are you defining
21    under served?
22        A.   They have a longer wait time.
23        Q.   Okay.  And that wouldn't account for travel
24    time, correct?
25        A.   Right.  My sense is that customers that live in

## 184

1    rural areas are not going to town exclusively to get a
2    driver license or an identification card or even an
3    election certificate.  They're taking care of other
4    business that they need to do at the same time.
5        Q.   What's that sense based on?
6        A.   Anecdotal information from people that live in
7    rural areas.
8        Q.   Okay.  Can you look at Page 9 for me?  Do you
9    see there's another chart on this page that has, again,
10    mandates and population and a service gap?  Do you see
11    that chart?
12        A.   Uh-huh.
13        Q.   And underneath that chart, do you see there's a
14    write-up which says at the end -- well, it's start out
15    by talking about additional mandates, and then at the
16    end it says, "Need to add 2011"?
17        A.   Uh-huh.
18        Q.   Do you know what -- what would be considered
19    additional mandates that would need to be added from
20    2011?
21        A.   I think what it's saying -- this chart is
22    exactly a copy of the one that's in Exhibit 845.
23        Q.   Uh-huh.
24        A.   And I think what they're saying is they needed
25    to add the population for 2011.

Rebecca Davio                                                    June 15, 2012

## 189

1    A.  Well, you'd -- you'd have to look at the -- the
2    regional --
3    Q.  Uh-huh.
4    A.  -- designation, and then I have to find the key
5    to find out what the color was.  I'm sorry.  I'm not
6    able to tell from this document.
7    Q.  Do you know, just from your knowledge of
8    working in the driver's license division, that there's a
9    particular area of the state where more offices have
10   closed than in other areas of the state?
11   A.  You know, I really don't, because so many of
12   these offices were closed before -- before I ever got
13   there, so they were never offices to me, if that makes
14   any sense.  They -- they were on some original list of
15   offices, but yet they were never -- I mean, you know,
16   when -- when there hasn't been a presence since June of
17   '05, you know, at some point in time, we probably should
18   take it off the list.
19       So if you look, for example, on the second
20   page --
21   Q.  Uh-huh.
22   A.  -- and you go down and look at Franklin.
23   Q.  Uh-huh.
24   A.  That was June of '05.
25   Q.  Uh-huh.

## 190

1    A.  You know.
2    Q.  But if you flip through the dates, though,
3    isn't it -- doesn't it seem as though most of the dates
4    that these were closed are '09, I assume 2009, 2010 and
5    2011?
6    A.  Uh-huh.
7    Q.  And when you say many of these should be taken
8    off the list, which ones are you talking about?
9    A.  Well, I mean, to me, if you hadn't had an
10   office open since June of '05, does it really belong on
11   the list of driver license offices?  You know.
12   Q.  Any others that you think should be taken off
13   the list?
14   A.  Well, if it was unknown and there were people
15   that have historical knowledge and nobody has a clue,
16   that may also be another one.  And the way this is
17   printed out, it's really hard to kind of for me to --
18   Q.  Uh-huh.
19   A.  And I don't recognize all the locations that
20   just -- you know, it's like, oh, I can't tell you which
21   office is in which region with certainty.  I can't go
22   down the list and tell you that.  The way it's kind of
23   printed out, it's hard to --
24   Q.  Uh-huh.  Any others that you think should be
25   taken off this list?

## 191

1    A.  Well, probably the June '07.  I mean, '05 and
2    '07 seem like that they're not -- not viable for a
3    discussion, really, in my mind.
4    Q.  Uh-huh.  Any others?
5    A.  I don't -- I don't think so.  I mean, those are
6    the ones that stand out to me.
7    Q.  Does DPS have any plans to extend the hours of
8    their offices -- of the drivers' license offices in
9    months leading up to the 2012 election?
10   A.  At this moment, there are no plans to extend
11   the office hours.
12   Q.  And if the EIC program were to be implemented,
13   would that impact that decision?
14   A.  It might.
15   Q.  Have there been discussions of that?
16   A.  There have been discussions of extending the
17   office hours.
18   Q.  In the months leading up to the 2012 election?
19   A.  Of extending the office hours.  It wasn't -- it
20   wasn't centered around --
21   Q.  Uh-huh.
22   A.  -- election certificates.
23   Q.  And what -- do you know what those extended
24   hours would look like?
25   A.  There have been different proposals

## 192

1    considered.  One was to stay open Tuesday and Thursday
2    until 7:00 and be open on Saturday from 9:00 to 3:00.
3    The other proposal that was considered was to be open
4    7:30 to 6:00 Monday through Thursday, and 7:30 to 5:00
5    on Fridays.
6    Q.  And does DPS have the budget to do that?
7    A.  That's what we were trying to be able to
8    consider, to do the calculations.
9    Q.  And did you make a determination on that?
10   A.  We looked and saw that there were some that --
11   you know, it depends on how you scope it and where you
12   cut it.  Do we have the money to open all the offices at
13   those numbers of hours?  No, we don't.
14   Q.  Do you have the money to open some of the
15   offices at those hours?
16   A.  Potentially, yes.
17   Q.  And is this a specific appropriation?
18   A.  No.
19   Q.  And when would this begin, if you were to
20   extend the hours?
21   A.  It's not beginning.  It was simply a
22   discussion.  You asked me had we ever considered it.
23   Q.  So you considered it and decided against it?
24   A.  Yes, ma'am.
25   Q.  And for what reason did you decide against it?

Rebecca Davio                                                June 15, 2012

## 193

1    A.   Because it seemed like that we needed to look
2    at other things to be able to reduce the wait times.
3    Q.   Did the legislature provide a specific
4    appropriation for EICs?
5    A.   No, ma'am.
6    (Exhibit 849 marked for identification.)
7    Q.   (By Ms. Maranzano) Okay.  I'm showing you what
8    we're marking as Deposition Exhibit 849.  Do you
9    recognize this document?
10   A.   No.
11   Q.   Can you look at the -- at the second page of
12   the document?  Toward the end it says, "There are 81
13   Texas counties without a DPS driver's license office."
14   And this was an e-mail that was sent -- it looks like
15   March 14th, 2012.  Does that seem correct to you?
16   A.   That's from the reporter, Gary Scharrer.
17   Q.   Uh-huh.
18   A.   From the Houston Chronicle.
19   Q.   But do you -- would you agree with 81 counties?
20   A.   I have heard a number close to that, but I have
21   not personally gone through and verified that.
22   Q.   And do you see after that, it says, "There are
23   very few such offices in the inner cities.  In
24   San Antonio, for example, there are three DPS drivers'
25   license offices inside Loop 410, but none north of the

## 194

1    DT area and none west of the DT area, and long waiting
2    lines for driver's licenses."  Would you agree with that
3    sentence?
4    MR. McKENZIE:  Objection, speculation, but
5    you may answer if you can.
6    A.   So in San Antonio, I am familiar with the
7    offices.
8    Q.   (By Ms. Maranzano) Uh-huh.
9    A.   There are currently four offices there, and it
10   appears that this is saying inner cities would equate to
11   minorities.  Is that what you --
12   Q.   Well, right now, I'm just asking about the --
13   well, first of all, let's focus on the part about
14   San Antonio.  Is it true that there is no offices north
15   of the DT area and no offices west of the DT area and
16   long waiting lines for driver's licenses?  Would you say
17   that's true?
18   MR. McKENZIE:  Objection, vague as to know
19   the DT area, but go ahead and answer if you know.
20   Q.   (By Ms. Maranzano) Do you know what the DT area
21   is?
22   A.   Well, I'm guessing they mean downtown.
23   I'm guessing they mean downtown as well.
24   A.   None north of the DT area and none west of the
25   DT area.  I think there are some that are north of the

## 195

1    DT area in San Antonio.
2    Q.   So are you unsure?
3    A.   Yes, I'm unsure.
4    Q.   Okay.  And regarding the statement, "There are
5    very few such offices in the inner cities," do you know
6    if that's true with regard to Dallas?
7    A.   San Antonio is where I grew up, so I have a
8    little better sense there.  I am not very familiar with,
9    with Dallas to be able to tell you what's considered an
10   inner city.
11   Q.   How about Fort Worth?
12   A.   The same thing.
13   Q.   How about San Antonio?
14   A.   Well, I mean that's where I was going to go.
15   One of the offices, when I visited there, has a very --
16   had a very large percentage of -- of minorities that
17   were served.  So that just kind of -- that's why that
18   was just tripping me up.
19   Q.   And would you say it was -- it was in the inner
20   city part of San Antonio?
21   A.   Well, I don't know what definition of inner
22   city is.  I think that it was located in an area where
23   there were a lot of minorities.
24   Q.   And can you turn to the -- if you look -- I'm
25   going to direct your attention to -- to the bottom of

## 196

1    the first page where it talks about -- you'll be excited
2    to see it's a Mega Center, and I believe that's in
3    response to an inquiry that came from the second page.
4    And I believe the inquiry is actually the second
5    paragraph of what we were just looking at, where it
6    says, "What has the state planned to make it easier for
7    folks living in counties without DPS drivers' licenses
8    or in inner cities without nearby DPS drivers' licenses
9    to get a voter ID card?  Mobile DPS drivers' licenses
10   offices in areas currently lacking such an office?
11   Evening and weekend hours in existing DPS drivers'
12   license locations?"
13   And do you see that the response that's
14   provided is about the Mega Centers --
15   A.   Uh-huh.
16   Q.   -- of DPS?
17   A.   Uh-huh.
18   Q.   So do you consider the Mega Centers and the
19   installation of these Mega Centers to be a response to
20   those questions that were asked in the e-mail?
21   A.   I think that anytime you increase the staffing
22   capacity by 266 employees, that you are going to improve
23   the service.  And we have specifically looked.  You
24   know, lots of times, people don't go to the office
25   that's closest to them.  They go to an office where they

Rebecca Davio                                                June 15, 2012

197

1   believe that the wait time may be shorter.  And so if
2   people start going to offices, I believe that the Mega
3   Centers, even if someone doesn't go to conduct their
4   transaction at a Mega Center, that it will improve the
5   service because there will be -- you know, if you go to
6   a Mega Center, then I am not standing behind you at the
7   office that's most convenient to me.  Does that make
8   sense?
9       Q.   Uh-huh.  So I guess what I'm wondering is:  Do
10  you consider the question of how is DPS making it easier
11  for people without a driver's license office in their
12  county or nearby, do you consider the answer to that
13  question to be we're installing Mega Centers?
14      A.   Yes, I think that the Mega Centers will help
15  improve service.
16      Q.   And -- okay.  So yes -- yes, you do?
17      A.   Yes.
18      Q.   And at the very top of the page, do you see
19  that there's a question, "What weekday offering hours
20  will they have and weekend hours?"  And I believe that's
21  about the -- asking about the Mega Centers.  Do you know
22  the answer to that?
23      A.   Currently, they are scheduled to open from 8:00
24  to 5:00, Monday through Friday.
25      Q.   All six -- is it six Mega Centers ---

199

1   the locations for the Mega Centers.  Did the legislature
2   direct where the Mega Centers would be?
3       A.   No, ma'am.
4       Q.   How did you determine where they were going to
5   be?
6       A.   Texas State University helped us with
7   that.  They were still conducting their business
8   intelligence analysis and they used geographic
9   information systems to be able to look at the -- where
10  the most underserved or the longest wait times were.
11      Q.   Okay.  And so these offices are going to go in
12  areas that have the longest wait times?
13      A.   Uh-huh.
14      Q.   And I believe you testified about this earlier
15  but just to be clear, how do you anticipate that the
16  Mega Centers will impact wait times overall on the
17  driver's license offices throughout Texas?
18      A.   I think it will reduce them.
19      Q.   But do you have any sense of what to expect in
20  that regard?
21      A.   No.
22      Q.   And did you say a Mega Center -- that the
23  meaning of Mega Center is how many staff will be
24  employed there?
25      A.   Twenty-five or more employees.

198

1       A.   Yes.
2       Q.   -- going to be opened?
3       A.   Yes.
4       Q.   And they're all scheduled for those hours?
5       A.   Yes, ma'am.
6       Q.   And this e-mail suggests that there will be two
7   offices in Houston and one in San Antonio; is that
8   correct?
9       A.   Yes.  Yes.
10      Q.   And where are the other three going to be?
11      A.   There's one in the Austin metropolitan
12  statistical area.  The name of the town is Pflugerville.
13      Q.   Okay.
14      A.   And there is one located in Garland and one in
15  Fort Worth.
16          MS. MARANZANO:  Okay.  Why don't we take a
17  break.
18          (Recess from 5:30 to 5:47 p.m.)
19      Q.   (By Ms. Maranzano) Before the break we were
20  looking at the document Exhibit 849, and we started to
21  talk a little bit about the Mega Centers.  The document
22  says that $63 million was appropriated by the Texas
23  Legislature; is that correct?
24      A.   Yes, ma'am.
25      Q.   And did the legislature -- and we talked about

200

1       Q.   Is that more than any of your offices
2   currently?
3       A.   We have one Mega Center.
4       Q.   Okay.  And where --
5       A.   In Houston.
6       Q.   Okay.  And when are these -- when are these
7   offices scheduled to be opened, these Mega Centers?
8       A.   It looks like five of them are going be opened
9   in September and the sixth one is scheduled for January
10  of 2013.
11      Q.   And the one in Houston that's already open,
12  that was not part of this appropriation?
13      A.   No, ma'am.
14      Q.   Okay.  Thank you.  During the consideration of
15  SB 14, was DPS consulted about preparing a fiscal note
16  to give to the legislative budget board?
17      A.   My understanding is the agency is offered the
18  opportunity to prepare to submit a fiscal impact
19  statement for every bill.
20      Q.   And did you -- did DPS submit a fiscal impact
21  statement --
22          MR. McKENZIE:  I'm --
23      Q.   (By Ms. Maranzano) -- for SB 14?
24          MR. McKENZIE:  I'm sorry, I didn't mean to
25  talk over you.  I'm going to object on scope grounds.

Rebecca Davio                                          June 15, 2012

## 201

1    But you can go ahead and answer.
2    A.   To be perfectly honest, I don't know.  I'm not
3    involved in that process, so I can't remember
4    specifically.
5    (Exhibit 850 marked for identification.)
6    Q.   (By Ms. Maranzano) I'm showing you what we're
7    marking as Deposition Exhibit 850.  Does this look
8    familiar to you?
9    A.   Yes.
10   Q.   And does this refresh your recollection that
11   during the consideration of SB 14, DPS did not provide a
12   fiscal impact statement to the legislative budget board?
13   MR. McKENZIE:  Same scope objection.
14   But you may answer.
15   A.   So this does seem to indicate that, yes, in
16   fact, we submitted a fiscal note -- DPS submitted a
17   fiscal note.
18   Q.   (By Ms. Maranzano) And the fiscal note, though,
19   said that you could make no estimate as to the fiscal
20   impact; is that correct?
21   A.   I believe that's it.
22   Q.   And in previous sessions, according to this
23   document, DPS had provided a fiscal impact statement,
24   correct?
25   MR. McKENZIE:  Same scope objection.  I'll

## 202

1    just make a standing scope objection as to this whole
2    document and then you can just --
3    MS. MARANZANO:  Okay.
4    MR. McKENZIE:  -- ask your questions.
5    MS. MARANZANO:  Okay.  Thank you.
6    A.   This indicates, yes, that there was a fiscal
7    impact statement submitted on a previous -- similarly --
8    a similar bill during previous sessions.
9    Q.   (By Ms. Maranzano) Did DPS not provide a fiscal
10   impact statement because it didn't want to publicly
11   acknowledge how many people might need an Election
12   Identification Certificate?
13   A.   I believe that we didn't submit a fiscal impact
14   statement with a specified dollar amount because we felt
15   like we were unable to estimate a specified dollar
16   amount.  There has been a change of a lot of the
17   personnel at DPS since the previous legislative
18   sessions.
19   Q.   Do you anticipate some people will need an
20   Election Identification Certificate?
21   MR. McKENZIE:  Objection, speculation.
22   But you may answer.
23   A.   I estimate that the legislature thinks that
24   there will be some people that will need them -- an EIC.
25   Q.   (By Ms. Maranzano) Okay.  And it's fair to say,

## 203

1    then, that the EIC program will cost DPS something,
2    correct?
3    MR. McKENZIE:  Same objection.
4    A.   Yes, I suppose we will have to pay for the
5    cards.
6    Q.   (By Ms. Maranzano) Did DPS monitor SB 14 as it
7    was progressing through the legislature?
8    MR. McKENZIE:  Are we still on this
9    document?
10   MS. MARANZANO:  No.
11   MR. McKENZIE:  Okay.  So scope objection
12   then.
13   MS. MARANZANO:  Okay.  Thanks.
14   Can we mark this?
15   (Exhibit 851 marked for identification.)
16   Q.   (By Ms. Maranzano) I'm showing you what we
17   marked as Deposition Exhibit 851.  Does this look
18   familiar to you?
19   A.   The initial e-mail at the bottom --
20   Q.   Uh-huh.
21   A.   -- that Janie Smith sent to me looks familiar.
22   I'm not certain that I've seen the others.
23   Q.   Okay.  Do you see that, now as you review it,
24   that there was a response to the initial e-mail that
25   says that the initial e-mail was about the Senate

## 204

1    conferees on SB 14; is that correct?
2    A.   Yes.
3    Q.   And there was a response that said, "It's good
4    for us because it means they'll strip off everything
5    that cost the bill?"
6    A.   I see that.
7    Q.   Do you know what that means?
8    A.   No, ma'am.
9    MR. McKENZIE:  Objection, speculation.
10   Q.   (By Ms. Maranzano) Was DPS concerned about
11   costs of the bill?
12   MR. McKENZIE:  Same objection to the
13   extent it's relying on this document which she did not
14   receive the top e-mail on?
15   A.   I think every state agency would probably be
16   concerned about the effects of legislation, the effects
17   that legislation will have on them, the good and bad.
18   Q.   (By Ms. Maranzano) So was DPS concerned about
19   the costs that it might incur on implementing the EIC
20   program?
21   MR. McKENZIE:  Same objection.
22   A.   In that manner, I'm not -- I'm not able to
23   speak for DPS.  My responsibility is the Driver License
24   Division.  There are other people at DPS who --
25   Q.   (By Ms. Maranzano) Was the driver's license

Rebecca Davio                                     June 15, 2012

---

## 209

1   A.   I'm sorry, would you mind asking the question
2   again?
3        Q.   (By Ms. Maranzano) Sure.  I'm wondering about
4   this last bullet which says, "The number of people
5   requesting the election ID should be fairly low."  Are
6   you aware of whether any studies or analyses were
7   conducted to try to determine how many people might be
8   requesting an election ID?
9        A.   Are you asking me if the person who wrote this
10  did it?
11       Q.   No, I'm just asking if you know of whether
12  there were any studies or analyses done?
13       A.   I don't know --
14            MR. McKENZIE:  Same objection.
15            I'm sorry, I said "same objection" and you
16  said?
17            THE WITNESS:  "I don't know."
18            MR. McKENZIE:  Okay.
19       Q.   (By Ms. Maranzano) And at the top of the page,
20  do you see that it says, "The Driver's License
21  Division"?
22       A.   Uh-huh.
23       Q.   And I know you said you have never seen this
24  document.  Do you think this may have come from your
25  division?

---

## 210

1            MR. McKENZIE:  Objection, speculation.
2        A.   There's always that possibility but I -- I
3   would be doubtful.
4        Q.   Okay.  Do you think it probably came from DPS
5   given that the bottom part of the page has comments that
6   are specifically attributed to DPS?
7            MR. McKENZIE:  Same objection.
8        A.   It appears that those comments were attributed
9   to DPS.  I don't know if the document came from DPS or
10  if that was someone outside who had talked to someone at
11  DPS or what.  I really --
12       Q.   (By Ms. Maranzano) Yeah, fair enough.  Is there
13  any reason that this hundred thousand dollar number
14  wasn't provided to the legislative budget board?
15            MR. McKENZIE:  Objection, speculation.
16            But you may answer.
17       A.   Well, if I was going to say, it would be the --
18  the fiscal note that would have been provided --
19       Q.   (By Ms. Maranzano) Uh-huh.
20       A.   -- would have been provided earlier in the
21  session.  That this -- that, you know, as time
22  progresses, you learn more.  We know more about how we
23  would approach EICs now than we did even in May or when
24  the bill immediately passed, and so my guess is that it
25  was new knowledge.

---

## 211

1        Q.   And you said L1 was a vendor?
2        A.   It's the vendor that provides -- that produces
3   the driver license and identification cards for us
4   currently, and they would also provide this card.
5        Q.   And are you aware of whether there were
6   conversations with the vendor prior to the SB 14
7   actually being passed?
8            MR. McKENZIE:  Scope objection.
9            But you may answer.
10       A.   Well, this would imply that, yes, there were.
11       Q.   Oh, you're right, there is.  5-9-11.  I
12  actually was intending to ask:  If there were
13  conversations with the vendor around the time that you
14  were consulted about a fiscal note?
15            MR. McKENZIE:  Same scope objection.
16       A.   And my guess is no because it wasn't included
17  in the fiscal note.
18       Q.   (By Ms. Maranzano) Okay.
19       A.   I think the requirement --
20       Q.   I'm sorry, what?
21       A.   Never mind.
22            (Exhibit 853 marked for identification.)
23       Q.   (By Ms. Maranzano) I'm showing you what was
24  marked as Deposition Exhibit 853.  Does this look
25  familiar to you?

---

## 212

1        A.   Yes.
2        Q.   And what is it?
3        A.   This is an extract from the DPS system to track
4   bills.
5        Q.   And do you do this extract routinely for
6   various pieces of legislation?
7        A.   Yes.
8        Q.   And do you also do it at different stages of
9   the legislation, for example, if it moves from one body
10  in the legislature to a different body?
11       A.   Yes.
12       Q.   And do you see at the top it says, "Version:
13  Enrolled as finally passed"?
14       A.   Yes.
15       Q.   And the bill is SB 14, correct?
16       A.   Yes.
17       Q.   Can you tell me who Janie Smith is?
18       A.   She's an employee in the Driver License
19  Division.
20       Q.   And what's her role?
21       A.   She -- she's a policy and legislative analyst.
22       Q.   And was she on -- did she work on SB 14?
23       A.   Yes, ma'am.
24       Q.   In what capacity?
25       A.   She coordinated the analysis of that.

## 213

```
 1        Q.  Do you see that Number 2, under Number 2, the
 2   question is about whether the bill relates to DPS's
 3   goals, and the response is "Yes."  Do you see that?
 4        A.  Uh-huh.
 5        Q.  And do you see that it states, "As with other
 6   versions of this bill, this could effect lines of wait
 7   times at DL offices, particularly surrounding major
 8   voting times like at a presidential election."  Do you
 9   agree with that statement?
10             MR. McKENZIE:  I'm going to object on
11   scope grounds.
12             But you can answer.
13        A.  Well, it says it could effect wait times.
14        Q.  (By Ms. Maranzano) Uh-huh.
15        A.  So, yes, I can agree with that.
16        Q.  And other than the Mega Centers, is DPS taking
17   any steps to address the fact that, yes, these could
18   effect wait times at driver's license offices?
19        A.  No.  Actually that's not totally true.  I mean,
20   we have a whole improvement plan -- transformation plan
21   as part of the $63 million.  There's a whole bunch of
22   things that are being done, they aren't being done
23   specifically for Election Identification Certificates,
24   but, yes, we are working to improve our customer
25   service.
```

## 214

```
 1        Q.  In what ways other than the Mega Centers?
 2        A.  So we're improving training for our employees
 3   and our leadership to help leadership be better problem
 4   solvers.  We've implemented online scheduling for drive
 5   tests.  We have -- there's just a whole bunch of
 6   different things, none of them specifically related to
 7   Election Identification Certificates.
 8        Q.  Anything else that you can think of as you sit
 9   here today, training and online scheduling and the Mega
10   Centers?
11        A.  I'm very tired because normally I can rattle
12   that stuff off the top of my head and I'd make you
13   listen for the next hour.  So, no.  Consider yourself
14   fortunate.
15        Q.  Can you look at Number 7 in this chart for me?
16   Do you see it talks about, under Number 7, training that
17   would be provided?  It says, "1,534 employees to be
18   trained in a two-to-three hour session."  Based on your
19   experience working at DPS, do you think that that two to
20   three hours is sufficient amount of time to teach
21   employees a whole new program area?
22        A.  I think they did it in two to three hours.  The
23   benefit was from, you know, the EIC procedures were
24   similar to existing ID and driver license procedures,
25   and so that was probably what enabled that to be handled
```

## 215

```
 1   in a relatively brief period of time.
 2        Q.  And when you say handled, have they -- they
 3   haven't already been trained, have they?
 4        A.  Yes, ma'am, they have.
 5        Q.  Oh, they have?
 6        A.  They have.  We were ready to issue EICs
 7   beginning in January of 2012.
 8        Q.  I see.  So they were trained in advance of
 9   January 2012 in place on this program?
10        A.  They had to be because it was uncertain whether
11   it was going to be implemented or not.
12        Q.  And if you were to implemented this fall, would
13   they be retrained?
14        A.  Quite likely.
15        Q.  Do you see that there's a cost listed to
16   produce training materials that's $3,481.70?
17        A.  I do see that, yes.
18        Q.  And what materials is that referring to?
19        A.  I believe that the way that estimate was
20   created they just said, "Okay, here, there's X number of
21   people, there's 10 pages," or whatever.  I think it was
22   some formula.
23        Q.  And --
24        A.  It was consistent for all the bills that would
25   require training for employees.
```

## 216

```
 1        Q.  I see.  And what are the materials that it's
 2   referring to?
 3        A.  Well, I -- if I'm remembering correctly, it is
 4   things like, okay, there might be a CD or you know, a
 5   packet of training materials or that kind of thing.
 6   That was just part of the blanket estimate not knowing
 7   the specifics what would actually be required.
 8        Q.  And when was that estimate made, that estimate
 9   was made in May of?
10        A.  Yes.  When this final version of the bill was
11   analyzed.
12        Q.  And is it usually analyzed pretty shortly after
13   it's signed into law?
14        A.  (Witness nods head yes.)
15        Q.  Is that was a yes, for the record?
16        A.  Yes.  I'm sorry.
17        Q.  Can you look at Number 13 of this chart?  Do
18   you see the question, "Does this bill conflict with
19   current state or federal law," and it says, "No."  Do
20   you know what that conclusion is based on?
21             MR. McKENZIE:  Objection, speculation and
22   scope.
23             You may answer.
24             Well, this was actually produced in error.
25   It should have been redacted.
```

Rebecca Davio                                                June 15, 2012

## 221

1          MR. McKENZIE:  Objection, scope.
2      A.  I'm sure you would have had it if I did.
3      Q.  (By Ms. Maranzano) Do you know why a DPS staff
4  person would say that there's a connection between voter
5  ID and non-legal status?
6          MR. McKENZIE:  Same speculation objection.
7      A.  I don't know what she's responding -- what
8  she's referring to as non-legal status.
9      Q.  All right.
10          (Exhibit 855 marked for identification.)
11      Q.  (By Ms. Maranzano) I'm showing you what we've
12  marked as Deposition Exhibit 855.  Do you recognize this
13  document?
14      A.  Yes.
15      Q.  What is this document?
16      A.  This is the rules that spell out what's
17  required to get a driver license or identification card
18  that's the basis of -- that was used as the foundation
19  for the EICs.
20      Q.  Has this requirement been effective in
21  confirming applicants' identities?
22      A.  Yes.
23      Q.  Did you have any conversations with legislators
24  during the consideration of SB 14 about confirming
25  driver's license applicants' identities?

## 222

1      A.  Did I have any conversations with legislators?
2          MR. McKENZIE:  I caution the witness not
3  to reveal the individual legislator with whom you
4  spoke.  You may broadly answer as to what you provided
5  the legislature, facts and things of that nature?
6      A.  I feel confident that there were questions
7  regarding what was required to get a driver's license or
8  ID card during legislative testimony.
9      Q.  (By Ms. Maranzano) And were there questions
10  about whether the requirements had been effective in
11  confirming -- or validating applicants' identities?
12      A.  I don't recall that specific question.
13          MS. MARANZANO:  Okay.  Can we go off the
14  record for two minutes.  I'm close to being done.
15          (Recess 6:24 to 6:28 p.m.)
16          MS. MARANZANO:  Back on the record.
17      Q.  (By Ms. Maranzano) Are there any answers that
18  you testified about earlier today that you now wish to
19  change?
20      A.  One that I was thinking about was that you
21  asked me what would happen if somebody came in and they
22  didn't have their voter registration card.
23      Q.  Uh-huh.
24      A.  And I said I didn't know.  And I'm not
25  positive, but I believe what would happen is that the

## 223

1  employee would let them re-register to vote, you know,
2  it's basically just checking a box and that kind of
3  thing, and then we would process that application as
4  normal.
5      Q.  Okay.  And just to be clear, this was an
6  applicant who is coming in to apply for an EIC?
7      A.  Uh-huh.
8      Q.  That's when the question came up, correct?
9      A.  (Witness nods head yes.)
10      Q.  Okay.  Anything else?
11      A.  Nothing else that I can, specifically,
12  remember.
13      Q.  And in terms of the issue with the registration
14  card, is that something that you've trained your
15  employees to do?
16      A.  I'm sorry?
17      Q.  You've trained your employees to re-register
18  somebody who shows up without a registration card?
19      A.  We have not specifically trained, that's why I
20  said I wasn't certain, initially, but I'm going to put
21  in it my brain and make a note of that if, in fact, we
22  will have to re-train.
23      Q.  Okay.  Any -- anything else you want to change?
24      A.  Nothing I can recall.
25      Q.  And are there any answers that you didn't

## 224

1  remember previously that do you now?
2      A.  For the most part, I remember less now.
3      Q.  Okay.  Well, I believe with that, I am done
4  with my questions.  Thank you so much for your time.
5          MR. McKENZIE:  I have a couple of
6  questions on direct.
7          MS. MARANZANO:  Okay.
8                  EXAMINATION
9  BY MR. McKENZIE:
10      Q.  One question:  Do you get a lot of complaints
11  from DPS customers about service issues stemming from
12  language proficiency?
13      A.  I don't think I ever recall getting a complaint
14  about language proficiency.
15      Q.  Okay.  And do you get a lot of complaints about
16  the DPS offices being too far away from customers?
17      A.  I'm not certain I ever recall getting a
18  complaint about that either.  The vast majority of our
19  complaints are about the wait times.
20      Q.  And how many employees does DPS currently have
21  approximately?
22      A.  8,000 approximately for DPS.
23      Q.  I'm talking, specifically, about driver's
24  license division.  I'm sorry, my question wasn't
25  precise.

Rebecca Davio                                          June 15, 2012

---

**225**

1      A.   The number of employees that the Driver License
2   Division has allocated right now is 1762.
3      Q.   Okay.  So on a percentage scale, how many more
4   employees is DPS going to add with the new appropriation
5   from the legislature?
6      A.   That includes the increase of 266.  So we had
7   1462 before, and 266, I think, is better than a 20
8   percent increase, right around a 20 percent increase.
9      Q.   And I just want to make this clear for the
10   record, I believe you testified there were 1700
11   employees in the driver's license division and just now
12   you said there's 1400 in the driver's license division.
13   Can you explain the discrepancy?
14      A.   No, I'm sorry, I meant -- wasn't clear.  There
15   were previously 1496 FTEs in the Driver License Division
16   -- and an FTE is a full-time equivalent; so that's a
17   permission to have an employee.  And we added 266 and
18   that got us 1762.  So, as of this day --
19      Q.   Uh-huh.
20      A.   -- we are allocated to have 1762 employees.
21      Q.   Okay.
22      A.   So I actually confused it because I gave you
23   the big number first.
24      Q.   Okay.
25           MR. McKENZIE:  And I'll pass the witness.

---

**226**

1           MS. MARANZANO:  Just a couple more.
2                FURTHER EXAMINATION
3   BY MS. MARANZANO:
4      Q.   Just because you haven't received any
5   complaints about the distance doesn't mean the customers
6   are satisfied; is that correct?
7           MR. McKENZIE:  Objection, speculation.
8           You may answer.
9      A.   I don't know.  Customers, generally, if they're
10   dissatisfied, seem to complain.
11      Q.   (By Ms. Maranzano) Have you ever surveyed your
12   customers as to whether or not they're satisfied with
13   how -- the distance from their home to their driver's
14   license office?
15      A.   I don't believe that that was on surveys --
16   customer satisfaction surveys that we've done.
17      Q.   Okay.
18           MS. MARANZANO:  I have nothing further.
19           MR. McKENZIE:  Nothing further.
20           MS. MARANZANO:  All right.  Thank you for
21   you time.
22           (Deposition concluded at 6:33 p.m.)
23
24
25

---

**227**

1   CHANGES AND SIGNATURE
2      RE: TEXAS VS. HOLDER, ET AL
3   PAGE  LINE  CHANGE          REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20      I, REBECCA DAVIO, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24           _____
25           REBECCA DAVIO

---

**228**

1   THE STATE OF _____)
2   COUNTY OF _____)
3
4      Before me,_____, on this day
5   personally appeared REBECCA DAVIO, known to me (or
6   proved to me under oath or through_____
7   (description of identity card or other document) to be
8   the person whose name is subscribed to the foregoing
9   instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein
11   expressed.
12      Given under my hand and seal of office
13   this_____day of _____, 2012.
14
15
16           _____
           NOTARY PUBLIC IN AND FOR
17           THE STATE OF _____
18
19
20
21
22
23
24
25

DENISE DAVIS                                          JUNE 14, 2012

## 1

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                  )
                                 )
        Plaintiff,               )
                                 )
VS.                              )  CASE NO. 1:12-CV-00128
                                 )  (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his      )  Three-Judge Court
official capacity as Attorney)
General of the United States,)
                                 )
        Defendant.               )
                                 )
ERIC KENNIE, et al.,             )
                                 )
        Defendant-Intervenors,   )
                                 )
TEXAS STATE CONFERENCE OF        )
NAACP BRANCHES, et al.,          )
                                 )
        Defendant-Intervenors,   )
                                 )
TEXAS LEAGUE OF YOUNG VOTERS     )
EDUCATION FUND, et al.,          )
                                 )
        Defendant-Intervenors,   )
                                 )
TEXAS LEGISLATIVE BLACK          )
CAUCUS, et al.,                  )
                                 )
        Defendant-Intervenors,   )
                                 )
VICTORIA RODRIGUEZ, et al.,      )
                                 )
        Defendant-Intervenors.   )
--------------------------------------------
                 ORAL DEPOSITION OF
                    DENISE DAVIS
                   JUNE 14, 2012
--------------------------------------------
    ORAL DEPOSITION of DENISE DAVIS, produced as a
```

## 2

1  witness at the instance of the Defendant, and duly
2  sworn, was taken in the above-styled and numbered cause
3  on the 14th day of June, 2012, from 10:07 a.m. to 4:19
4  p.m., before Jean Thomas Fraunhofer, CSR in and for the
5  State of Texas, reported by machine shorthand, at the
6  Law Offices of DECHERT LLP, 300 West 6th Street, Suite
7  210, Austin, Texas 78701, pursuant to the Federal Rules
8  of Civil Procedure and the provisions stated on the
9  record or attached hereto.

## 3

```
                    A P P E A R A N C E S

FOR THE PLAINTIFF:
    PATRICK K. SWEETEN
    Assistant Attorney General
    ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, Texas 78711
    Tel: (512) 936-1307
    Email: Patrick.sweeten@oag.state.tx.us

FOR THE DEFENDANT:

    RISA BERKOWER
    ANGELA MILLER
    Trial Attorneys
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    Washington, DC 20005
    Tel: (202) 305-0115
    Email: Risa.berkower@usdoj.gov

FOR THE DEFENDANT-INTERVENOR: TEXAS LEAGUE OF YOUNG
    VOTERS EDUCATION FUND,
    ADAM M. HARRIS
    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
    One New York Plaza
    New York, New York 10004
    Tel: (212) 859-8953
    Email: Adam.harris@friedfrank.com

FOR SPEAKER STRAUS:
    THOMAS R. PHILLIPS
    BAKER BOTTS
    98 San Jacinto Boulevard, Suite 1500
    Austin, Texas 78701
    Tel: (512) 322-2565
    Email: Tom.phillips@bakerbotts.com
```

## 4

```
                    I N D E X
WITNESS                              PAGE

MEREDYTH FOWLER
    Examination by Mr. Harris           5
    Examination by Ms. Berkower       132
    Examination by Mr. Sweeten        186

Signature and Changes                 188
Reporter's Certificate                189

                  E X H I B I T S
NO.        DESCRIPTION               PAGE
League Exhibit 2  House Rules          15
League Exhibit 3  SB1706               37
League Exhibit 4  SB1706 Legislative History   39
League Exhibit 5  5/4/05 House Journal        51
League Exhibit 6  HB218                67
League Exhibit 7  HB218 Legislative History   69
League Exhibit 8  3/30/09 Austin Statesman article  75
League Exhibit 9  Senate Rules        83
League Exhibit 10 SB362               90
League Exhibit 11 SB362 Legislative History   91
League Exhibit 12 SB14              113
League Exhibit 13 SB14 Legislative History   116

US Exhibit 730   Press release for committee   143
                 assignments
US Exhibit 731   SB14 Bill Report      144
US Exhibit 732   Voter fraud interim charge   157
US Exhibit 733   Email to Speaker Straus from DPS 173
```

DENISE DAVIS                                           JUNE 14, 2012

---

5

1               DENISE DAVIS,
2    having been first duly sworn, testified as follows:
3    BY MR. HARRIS
4          MR. HARRIS:  Good morning, Ms. Davis.  As
5    I told you before, I'm Adam Harris from the law firm of
6    Fried, Frank, Harris, Shriver & Jacobson.  We represent
7    the Texas League of Young Voters Education Fund,
8    defendant-intervenors in this litigation.  Would
9    everyone in the room identify themselves, please?
10         MS. BERKOWER:  Risa Berkower for the
11   Attorney General, Eric Holder.
12         MS. MILLER:  Angela Miller for the
13   Attorney General, Eric Holder.
14         MR. PHILLIPS:  Tom Phillips for Joe Straus
15   and the House of Representatives or such members and
16   former members of the staff as he may designate.
17         MR. SWEETEN:  Patrick Sweeten on behalf of
18   the State of Texas and on behalf of the witness.
19         MR. LEVY:  Jonathan Levy, summer
20   associate, Baker Botts.
21               EXAMINATION
22   BY MR. HARRIS
23         Q.  Mrs. Davis, can you please state your full name
24   for the record?
25         A.  Denise Davis.

---

6

1          Q.  And can you give your address, please?
2          A.  58 Country Oaks Drive, Buda, Texas, 78610.
3          Q.  Ms. Davis, you are an attorney; is that
4    correct?
5          A.  Yes.
6          Q.  Are you currently licensed to practice in
7    Texas?
8          A.  Yes.
9          Q.  Are you licensed to practice in any other
10   states?
11         A.  No.
12         Q.  Have you ever given a deposition before?
13         A.  Yes.
14         Q.  How many times?
15         A.  Once.
16         Q.  Can you tell me about that case?
17         A.  It was a -- just a civil suit with just a -- it
18   was a builder.
19         Q.  With what?
20         A.  A construction lawsuit between us and a
21   contractor.
22         Q.  I see.  Was that a lawsuit that you were
23   involved in your personal capacity?
24         A.  Yes.
25         Q.  Well, given that you are an attorney and you've

---

7

1    given a deposition before, I will skip the various
2    housekeeping rules -- housekeeping and ground rules,
3    but, you know, to the extent there's an issue throughout
4    the deposition, we can always talk about that, then I
5    guess I would remind you, if you need a break at any
6    time, I'll be happy to take one.  Please let me know.
7          A.  Okay.
8          Q.  Where did you go to law school?
9          A.  University of Texas.
10         Q.  When did you graduate?
11         A.  1992.
12         Q.  Can you list the jobs that you've held since
13   graduating law school in 1992?
14         A.  Yeah.  I was a drafting attorney or legislative
15   counsel for the Texas Legislative Council and --
16         Q.  Approximately what years did you hold that
17   position?
18         A.  1993 to 1996.  And then I went to work for the
19   Senate Jurisprudence Committee as committee director and
20   counsel, so from '97 to basically early 1998, somewhere
21   around that time.
22         Q.  What was the next position you held?
23         A.  Director and counsel to the Texas Judicial
24   Council from around 1998 until 2000 -- the end of 2000.
25         Q.  And what was your next position?

---

8

1          A.  General counsel for the lieutenant governor
2    from 2000 until -- from January -- from 2001 until
3    January of 2003.
4          Q.  And after serving as general counsel for the
5    lieutenant governor, what was the next position that you
6    held?
7          A.  Deputy parliamentarian -- Deputy House
8    parliamentarian from 2003 to 2004 and then House
9    parliamentarian from January 2004 until May of 2007, and
10   then from the fall of 2007, special counsel at Baker
11   Botts until January of 2009.  Then back to House
12   parliamentarian from January of 2009 until January of
13   2010, and then chief of staff from January 2010 until
14   March of 2010.
15         Q.  When you say chief of staff --
16         A.  For the speaker.
17         Q.  And that's Speaker Straus, correct?
18         A.  Yes.
19         Q.  Throughout your legal career have you ever had
20   any particular experience with election or voting law?
21         A.  I don't -- What do you mean?  Just reading the
22   Statutes or --
23         Q.  Well, starting with your time as drafting
24   counsel or counsel for the Legislative Council -- for
25   the Texas Legislative Council, excuse me, did you have

DENISE DAVIS                                          JUNE 14, 2012

---

## 9

1  any particular responsibility for drafting legislation
2  related to Texas elections?
3      A.   Not that I recall, no.
4      Q.   How about in your capacity as committee
5  director for the senate judiciary?  Was it jurisprudence
6  committee?
7      A.   Senate jurisprudence.
8      Q.   What is the subject matter that the
9  jurisprudence committee covers?
10     A.   Well, back then it was mostly tort.  The
11 jurisdiction's changed, so this was way back, but it was
12 mostly tort law and courts -- jurisdiction and
13 administration of the court system, things like that.
14     Q.   You said that you were director of the Texas
15 Judicial Council?
16     A.   Right.
17     Q.   What is the Texas Judicial Council?
18     A.   They are -- They do policy for the judiciary,
19 so they do things like public access to court records,
20 judicial compensation, judicial -- what I would call
21 judicial management, emergency management, things like
22 that, budget for the courts, technology.
23     Q.   In your capacity as general counsel for the
24 lieutenant governor, what were your duties in that role?
25     A.   Redistricting, working on that, tort issues,

---

## 10

1  open records, criminal law, general -- just regular
2  general counsel duties, personnel.
3      Q.   In your capacity as general council to the
4  lieutenant governor, did you have any experience with
5  the Voting Rights Act?
6      A.   Probably only as it related to redistricting,
7  but I can't remember directly what it would be.
8      Q.   What do you recall about your involvement with
9  redistricting as general counsel to the lieutenant
10 governor?
11     A.   Just advising on the floor proceeding and the
12 calendar, just general advice.
13     Q.   Okay.  How is it that you came to be deputy
14 House parliamentarian?
15     A.   I was asked to be.  I was just asked by the
16 person that was going to be parliamentarian if I would
17 be his deputy parliamentarian.
18     Q.   What is the House parliamentarian?
19     A.   They are a House officer, and they interpret
20 the rules and precedents, and they advise the presiding
21 officer on matters of rules and procedure and process.
22     Q.   And as deputy House parliamentarian, what would
23 your duties include?
24     A.   You would assist the parliamentarian, do some
25 research on procedural issues and matters of policy -- I

---

## 11

1  mean, matters of procedure, and when the parliamentarian
2  is unavailable, you would -- you sit in for the
3  parliamentarian whether they are not available.
4      Q.   Is the parliamentarian an employee of the
5  speaker?
6      A.   The parliamentarian is a House officer, so they
7  work for the House of Representatives.
8      Q.   Is it correct that in or around May of 2007,
9  you resigned your position as parliamentarian?
10     A.   Yes.
11     Q.   Can you tell me why you resigned?
12          MR. SWEETEN:  In answering the question, I
13 don't want you do reveal any communications you had with
14 legislative staff as the parliamentarian or any
15 communications that you've had with state agencies, with
16 Texas legislative counsel.  Those would be subject to
17 the legislative privilege, and as we've discussed, any
18 members of the House or legislative staff, okay?
19          THE WITNESS:  Okay.
20          MR. SWEETEN:  So don't reveal any
21 communications.  Also, there is -- another element to it
22 is legislative privilege.  You are protected from having
23 to provides information related to your mental
24 processes, motivations about legislation or a
25 legislative act.  So be mindful of that when answering

---

## 12

1  the question and you can answer the question to the
2  extent you are not revealing those privileges.
3      A.   Okay.  Ask it again.
4          MR. HARRIS:  Sure.  I will ask the court
5  reporter to read it back.
6          THE REPORTER:  Can you please restate it?
7  I'm having problems with the computer.
8      Q.   I believe the question was can you briefly tell
9  me why you resigned your position as House
10 parliamentarian in 2007?
11     A.   I just felt like it would be better -- in the
12 best interests of the House for someone else to serve
13 that role.
14     Q.   There were press reports in or around 2007
15 describing a letter that Speaker Tom Craddick had sent
16 you regarding your obligation with respect to
17 attorney-client privilege and that letter was published
18 in the press.  Do you recall that?
19     A.   Yes.
20     Q.   And did you consider yourself to have an
21 attorney-client relationship with Speaker Craddick?
22     A.   I considered myself to have the relationship --
23 a confidential relationship with the speaker,
24 legislative privilege.
25     Q.   And I believe you said that in the fall of '07

DENISE DAVIS                                                    JUNE 14, 2012

---

13

1    you became special counsel at Baker Botts; is that
2    right?
3        A.   Yes.
4        Q.   What sort of work did you do there?
5        A.   Just a general corporate practice, some
6    governmental relations, but mostly legal research.
7        Q.   At that time did you work on any issues
8    relating to election or voting law?
9        A.   No.
10       Q.   And what were the circumstances under which you
11   came back to become House parliamentarian again in 2009?
12       A.   There was a new speaker, and the House wanted
13   an experienced parliamentarian, so I -- I was available
14   to come back.
15       Q.   Is it correct that when you came back as House
16   parliamentarian in 2009, you also held the title of
17   special counsel?
18       A.   Yes.
19       Q.   Was that special council to the speaker of the
20   House?
21       A.   No, to the House.
22       Q.   What were the circumstances under which you
23   switched from being the House parliamentarian and
24   special counsel to the House to becoming chief of staff
25   to Speaker Straus?

---

14

1            MR. SWEETEN:  You can answer the question.
2    Just don't reveal any sort of attorney-client privilege
3    or legislative privilege matters in doing so, okay?
4        A.   The sitting chief of staff wanted to go back to
5    the private sector, and I was experienced and I was
6    there and I -- I got -- I was asked to do it.
7        Q.   And what were your duties as chief of staff to
8    Speaker Straus?
9        A.   You manage the staff, administrative role --
10   play an administrative role for the speaker of the
11   House.  You just -- What I would call just general
12   duties of the speaker's office, oversee those, work with
13   the speaker on matters of policy and work with the other
14   House officers and --
15       Q.   Can you describe the speaker's role in the
16   House?
17           MR. SWEETEN:  You can answer as a matter
18   of general parliamentary procedure.
19       A.   He is the preceding officer of the House.
20       Q.   What are his duties as preceding officer?
21       A.   He oversees the daily operations of the House
22   and works with the leadership to determine what issues
23   go before the House, and he in consultation with the
24   parliamentarian rules on matters of procedure before the
25   House.

---

15

1        Q.   A speaker can vote on legislation, correct?
2        A.   Yes.
3        Q.   Can he vote on all legislation or only certain
4    legislation?
5        A.   All.
6            (League Exhibit 2 marked.)
7        Q.   I'd like this document to be marked as Texas
8    League -- I think we are up to 2.
9            Ms Davis, the court reporter just handed
10   you Exhibit 2.  Take a moment to look this over.  I'll
11   represent to you it is not the entire document, but,
12   rather, excerpts, but my first question is do you
13   recognize what this excerpted document is?
14       A.   Yes.
15       Q.   What is it?
16       A.   It's -- It's portions of the House rules.
17       Q.   And who the writes this document?
18       A.   Well, the members write it, but the ledge
19   council drafts what the members want them to write.
20       Q.   And is there something that the members of the
21   House have to vote on?
22       A.   Yes.
23       Q.   And he see on the cover page here that this
24   refers to the -- to the 81st legislature?
25       A.   Yes.

---

16

1        Q.   Do you know what year that would have covered?
2        A.   That would have been 2009.
3        Q.   And you were House parliamentarian at that
4    time; is that correct?
5        A.   Yes.
6        Q.   Could you please turn to the second page, what
7    I've handed you?  But the page number at the bottom is
8    18.
9        A.   Yes.
10       Q.   And look at Section 9.  It says, "The
11   parliamentarian is an officer of the House who serves at
12   the pleasure of the speaker."  What does it mean to be
13   an officer of the House?
14       A.   It means that you work for the entire House as
15   an institution.
16       Q.   The next sentence says that the
17   parliamentarian -- and I'm sorry, the aspect of the
18   sentence, it says, "serves at the pleasure of the
19   speaker."  Does that mean that the speaker has the
20   authority to terminate you as parliamentarian?
21       A.   Yes.
22       Q.   And then the next sentence says,
23   "Parliamentarian shall advise and assist the presiding
24   officer and/or the members of the House on matters of
25   procedure."  I believe earlier you said that the speaker

DENISE DAVIS                                                JUNE 14, 2012

## 17

1  is generally the presiding officer; is that right?
2      A.   Yes.
3      Q.   What does it mean to "advise and assist either
4  the presiding officer and/or the members of the House on
5  matters of procedure"?
6      A.   It means is that you answer questions, do
7  research, things like that.
8      Q.   When the House is in session, does the
9  parliamentarian sit on the floor?
10     A.   Yes.
11     Q.   Do you -- or I guess in your capacity as
12  parliamentarian, did you always sit on the floor when
13  the House was in session?
14     A.   No.
15     Q.   How frequently would you sit on the floor when
16  the House was in session?
17     A.   The majority of the time the parliamentarian is
18  on the floor when the House is in the session.
19     Q.   So you said that one of the jobs of the
20  parliamentarian is to answer questions for members.  Is
21  it ever the parliamentarian's role to intervene in the
22  proceeding without a question having been asked?  So,
23  for instance, you are viewing the proceedings and you
24  think something is happening that violates a procedural
25  rule of the House, can you -- I guess the legal term

## 18

1  would be sua sponte, but let's say on your own could you
2  intervene somehow?
3          MR. SWEETEN:  You can answer as a matter
4  of parliamentary procedure.  Don't reveal your specific
5  discussion regarding specific legislation.  Go ahead.
6      A.   Well, under the rules it states you can advise
7  the presiding officer, so you could advise the presiding
8  officer if there was something going on that you had
9  issues about.
10     Q.   Reading from the next sentence, it says, "The
11  parliamentarian has a duty of confidentiality to the
12  speaker and to each member of the House and shall keep
13  confidential all requests made by members of the House
14  for advise for guidance regarding procedure unless the
15  parties otherwise agree."  Does that sort of in a
16  nutshell capture what you were describing before when
17  you said you had duties of confidentiality to the House
18  and to members of the House?
19     A.   Yes.
20     Q.   Do you know when this rule, this Section 9,
21  describing the role and duties of the parliamentarian
22  became an official part of the rules of the Texas House?
23     A.   The Rule 9, I think, it was actually enacted in
24  '09.
25     Q.   Do you recall whether there were any similar

## 19

1  rules describing the official role of the
2  parliamentarian in prior versions of the rules and
3  precedents of the Texas House?
4      A.   Well, it covered the parliamentarian's role
5  prior to that because the parliamentarian is an employee
6  of the council and then in '09, they did a specific
7  provision for the parliamentarian, but the
8  parliamentarian is a legislative council employee, and
9  so they -- prior to that time, Section 10 was used for
10  interpreting that, the role of parliamentarian.
11     Q.   I believe you said that your first job out of
12  law school was as a drafting counsel for the Texas
13  Legislative Council; is that right?
14     A.   Yes.
15     Q.   First of all, what is the Texas Legislative
16  Council?
17     A.   It's a legislative support agency for the Texas
18  legislature.
19     Q.   What role does the Texas Legislative Council
20  perform for the legislature?
21     A.   They do technology, computer support.  They do
22  research.  They draft resolutions.  They do legal work,
23  legal research.
24     Q.   As drafting counsel, what was your duties at
25  the Texas Legislative Council?

## 20

1      A.   I drafted criminal law and juvenile justice and
2  human services.
3      Q.   How would you decide what resolutions or bills
4  to draft as a general matter?
5      A.   The members would make the request for bills to
6  be drafted and then you would take their drafting
7  instructions and draft.
8      Q.   Are you aware of any time when the Texas
9  Legislative Council would take it upon itself to draft a
10  bill without a specific request from a member?
11     A.   I don't know.
12     Q.   Did you ever draft any legislation on your own
13  that you thought of?
14     A.   As a legislative counsel?
15     Q.   Correct.
16     A.   No.
17     Q.   And I apologize if we've already covered this,
18  but did you draft any bills in your time with the Texas
19  Legislative Council relating to either the Texas
20  Election Code or Texas elections in general?
21     A.   Not to my knowledge.  I did criminal law and
22  juvey justice, things like that.
23     Q.   In general without referring to any specific
24  decision you made as parliamentarian, when you would get
25  a request for advice from a member, what would you do at

DENISE DAVIS                                           JUNE 14, 2012

## 21

1   that point?
2       MR. SWEETEN:  Object.  Compound, vague,
3   but go ahead.  You can answer the question as a matter
4   of general procedure.
5       A.  Oh, consult the rules and the law.
6       Q.  And when you say "the law," we've obviously
7   talked about the rules.  What other sources of law would
8   you refer to?
9       A.  Constitutional.  The Constitution.
10      Q.  Would you ever look to case law?
11      A.  Occasionally, you could, but rarely -- rarely
12  would you get into case law.  It's usually procedural.
13      Q.  Did you receive any specialized training in
14  order to become either deputy parliamentarian or
15  parliamentarian?
16      A.  No.
17      Q.  Do you know if there exists any specialized
18  training one could take to become a parliamentarian?
19      A.  To become House parliamentarian?
20      Q.  Yes.
21      A.  Not to my knowledge.
22      Q.  There is a senate parliamentarian as well,
23  correct?
24      A.  Yes.
25      Q.  How familiar are you -- or during your time as

## 23

1       Q.  If an issue came -- In general, when issues of
2   proper procedure in the House came up, would you ever
3   consult the Senate parliamentarian as to the proper
4   ruling?
5       A.  In a House matter?
6       Q.  Correct.
7       A.  Not to my knowledge.
8       Q.  How about vice versa?  Did either Mr. Fisher or
9   Ms. Corina Davis ever consult with you regarding an
10  issue of either interpretation of the Senate rules or
11  proper procedure in the Senate?
12      A.  Not to my knowledge, no.
13      Q.  What did you do to prepare for your deposition
14  today?
15      A.  Just met with counsel and came here.
16      Q.  And you are represented here today by
17  Mr. Sweeten; is that correct?
18      A.  Correct.
19      Q.  Is anyone else in the room representing you
20  today?
21      A.  I guess technically in my capacity as chief of
22  staff, Tom Phillips.
23      Q.  Are you currently chief of staff to the
24  speaker?
25      A.  No.

## 22

1   a House parliamentarian and deputy parliamentarian, how
2   familiar were you with the rules of the Senate?
3       A.  Vaguely -- Vaguely familiar with those.
4       Q.  In general, did you have any interaction with
5   the Senate parliamentarian?
6       A.  Yes.
7       Q.  What the sort of interaction did you have with
8   the Senate parliamentarian?
9       A.  We would talk on the phone, consult about the
10  flow of and consideration of bills to make sure the
11  House and the Senate were, you know, operating in a way
12  that was efficient.
13      Q.  How frequently would you talk to the Senate
14  parliamentarian when the House was in session?
15      A.  Probably once or twice a week maybe.
16      Q.  During your time as House parliamentarian
17  between 2004 -- Let's start with the first period.  From
18  2004 to 2007, do you recall who the Senate
19  parliamentarian was during those years?
20      A.  I believe it was Walter Fisher and then Corina
21  Davis.  Corina.
22      Q.  Then how about when you returned as House
23  parliamentarian in January of 2009 through January of
24  2010?
25      A.  Corina Davis.

## 24

1       Q.  What is your current job?
2       A.  I'm in private practice.
3       Q.  As an attorney?
4       A.  Yes.
5       Q.  Can you tell me briefly what sort of practice
6   you have now?
7       A.  I have a small practice that is a regulatory
8   and corporate practice.
9       Q.  And going back to what you did to prepare for
10  this deposition, I think you said you met with
11  Mr. Sweeten.
12      A.  Yes.
13      Q.  How many times did you meet with Mr. Sweeten?
14      A.  Twice.  Yesterday and today.
15      Q.  And when you met with Mr. Sweeten yesterday,
16  how long did you meet yesterday?
17      A.  Maybe about an hour and a half.
18      Q.  Was anyone else present during that meeting?
19      A.  Stacey Napier and Tom Phillips.
20      Q.  I think you said you had a second meeting with
21  Mr. Sweeten.
22      A.  Yes.
23      Q.  When was that?
24      A.  This morning.
25      Q.  How long did that meeting last?

DENISE DAVIS                                              JUNE 14, 2012

---

## 25

1     A.   30 minutes.
2     Q.   Was anyone else besides yourself and Mr.
3 Sweeten present during that meeting?
4     A.   Yes.  The intern.
5     Q.   Without asking you to get into any specifics,
6 did you review documents in preparation for this
7 deposition?
8     A.   No.
9     Q.   I'd obviously like to talk to you a lot about
10 the legislative process, specifically on the House side.
11 Starting at the very beginning of the process, how does
12 a bill get introduced in the Texas House?
13          MR. SWEETEN:  You can answer as a general
14 matter.
15     A.   The bill gets referred or read by the -- Well,
16 it gets filed with the clerk -- with the chief clerk and
17 then it gets referred to a committee and then it at that
18 point is in the jurisdiction of the committee to decide
19 when they want to hear the billing and then at that
20 point it comes out of the committee and goes to the
21 calendar committee for consideration for House action --
22 floor action.
23     Q.   You said a bill gets referred to a committee.
24 Who makes the decision as to which committee to refer a
25 bill to in the House?

## 26

1     A.   The speaker.
2     Q.   And as a general matter what sorts of
3 considerations does he take into account in deciding
4 which committee to assign a bill to?
5          MR. SWEETEN:  Hold on a minute.  The
6 question asks for the speaker's thought process.  If
7 answering the question would impact any specific
8 legislation and considerations taken with respect to
9 specific legislation, my instruction would be not to
10 answer the question.  If you can answer as a general
11 matter without discussing specific legislation, then
12 I'll allow you to do so, but be mindful of the fact
13 that -- do not reveal it if it would reveal his mental
14 impressions.
15     A.   Okay.  Under the House rules the speaker can
16 confer with the parliamentarian to determine where bills
17 go.
18     Q.   When you were House parliamentarian, first
19 starting under Speaker Craddick, would he consult with
20 you regarding which committee to assign a bill?
21     A.   Yes.
22     Q.   And how about under Speaker Straus, as House
23 parliamentarian would Speaker Straus consult with you as
24 to which committee a bill would be assigned to?
25     A.   Yes.

## 27

1     Q.   What considerations would you take into account
2 when helping the speaker decide which committee to
3 assign a bill too?
4          MR. SWEETEN:  I'm going to object to
5 compound.  I'm also going to instruct you with respect
6 to the legislative privilege, do not reveal the thought
7 processes or mental impressions that took place with
8 respect to any sort of specific legislation.  If
9 answering this question would do so, do not answer it,
10 okay?
11     A.   Ask the question.  What was the question again?
12     Q.   What considerations would you take into account
13 when advising the speaker as to which committee a bill
14 should be assigned to?
15     A.   You would just look at the House rules, see
16 what -- the jurisdictional issues that there are.
17     Q.   Is it ever the case a committee's -- that a
18 bill could fall under more than one committee's
19 jurisdiction?
20     A.   Yes.
21     Q.   And how would you resolve that conflict as to
22 which of the two or more committees to assign a bill to?
23          MR. SWEETEN:  Same instruction.
24     A.   I think you just look at each bill and confer
25 with the speaker.

## 28

1     Q.   Stepping back for a moment, you said the first
2 step in the process is that a bill is filed.  Going back
3 even earlier in the timeline, we talked about the Texas
4 Legislative Council, but I would ask you in general who
5 writes the bills that are filed in the House?
6     A.   Well, it could be anyone that could write it.
7 It could be the member.  It could be ledge council.  It
8 could be anyone.
9     Q.   What is a co-author?
10    A.   Co-author is someone that is -- that the --
11 along with the author of the bill, they have their name
12 on the bill, another member.
13     Q.   Is there a difference between a co-author and a
14 joint author?
15    A.   I believe that the -- that there is -- that
16 there are a limited number of co-authors that you can
17 have on a bill.  Five, I believe, or there's one author
18 and four co-authors, and then you can have I believe an
19 unlimited number of joint authors.
20     Q.   What is the sponsor of the bill?
21    A.   I'd have to look at the rules and tell you.
22 It's been a long time.
23     Q.   I may have not have observed that about you,
24 but I'm asking for your recollection if you have one.
25 Well, is the person who introduces the bill, the bill's

DENISE DAVIS                                     JUNE 14, 2012

## 29

1  sponsor?
2      A.  I believe that's the author of the bill is the
3  person that introduces and then you can have -- you can
4  have lots of sponsors and then -- but you can have a
5  limited number of co-authors, I believe, is how the rule
6  is interpreted.
7      Q.  What significance is there to the date on which
8  a bill gets filed?
9      A.  Well, that's when the author of the bill brings
10 the bill into the committee clerk's office and it gets
11 stamped by the chief clerk -- I'm sorry, of the House,
12 not the committee clerk.  By the chief clerk of the
13 House.  That's when they bring the bill in and have it
14 stamped.
15     Q.  Are there any reasons why a member would want
16 to file very early in the session as opposed to waiting
17 longer in time and filing it later?
18     A.  Yes.
19     Q.  And what would those reasons be as a general
20 matter?
21         MR. SWEETEN:  Objection.  Common, but go
22 ahead.  You can answer as a general matter.  Do not
23 reveal any information about a specific piece of
24 legislation.
25     A.  It may be a high priority to the member in the

## 30

1  district or it just get it filed for whatever reason.
2  There are many numerous reasons depending on the
3  members.
4      Q.  How long is the Texas House in session for?
5      A.  140 days.
6      Q.  If someone were to introduce a bill, let's say,
7  on Day 138 with two days remaining in a session, as a
8  general matter could that impact the chances of that
9  bill going through the process in time for that session?
10     A.  Do you mean would it?  I don't understand your
11 question.  You mean, would it pass?  Is that what you
12 are asking?
13     Q.  Well, I'm just asking is there any significance
14 as to how early a bill is filed in terms of the chances
15 that it will make it through the session in time prior
16 to the end of the session.
17     A.  I think generally members want to file their
18 bills early.
19     Q.  Have you ever heard of members camping out to
20 ensure that they get an early bill number?
21     A.  Yes.
22     Q.  What does that camping out refer to or what do
23 you recall about that?
24     A.  I just -- I've heard of members bringing things
25 in and sleeping in line, I guess, to file bills.

## 31

1      Q.  Is it correct that bill numbers are assigned to
2  a bill in the order in which they are a filed?
3      A.  Generally, yes.  That's generally right.
4      Q.  Do you recall members camping out to file --
5  Let's step back for a moment.  Are you familiar with
6  bills in Texas relating to photo identification for
7  voters that voters must show at the polls?
8      A.  Yes.
9      Q.  Do you recall anyone camping out to file such a
10 bill?
11     A.  No.
12     Q.  Once a bill is referred to committee, what
13 happens then?
14     A.  Once a bill is referred to committee, then it's
15 up to the committee and the chairman of the committee to
16 decide what to do with the bill.
17     Q.  Are there normal procedures that committees
18 following in considering bills?
19         MR. SWEETEN:  Objection.  Compound.  You
20 can answer as a general matter.
21     A.  Yes.
22     Q.  Where are those procedures?
23     A.  Well, they decide what the -- when they want to
24 set it and who they -- which bills they want voted out
25 and what the testimony will be and that just general

## 32

1  administrative things and beyond that it's up to the
2  chairman.
3      Q.  If a bill is not voted out of committee, what
4  happens to it then?
5      A.  It just stays there.
6      Q.  If a bill is in fact voted out of committee,
7  what happens to the bill at that point?
8      A.  It goes to the calendars committee.
9      Q.  What is the calendar committee?
10     A.  It's a procedure or committee that sets the
11 floor action of bills for consideration by the House and
12 recommends those for consideration by the House.
13     Q.  When you say they recommend floor action or
14 consideration for the bill, what does that mean?
15     A.  That means they set a calendar -- a daily
16 calendar for House action on bills.
17     Q.  Is it possible that a bill could come out of
18 committee, but not be assigned by the -- for floor
19 action?
20     A.  You mean come out of the committee and just go
21 to the calendars and stay in calendars?
22     Q.  Correct.
23     A.  Yes.
24     Q.  To complete the process, let's say assuming
25 that the calendars committee sets the bill for floor

DENISE DAVIS                                    JUNE 14, 2012

---

**33**

1   consideration, what happens at that point in the
2   process?
3       A.   It gets puts on a calendar.
4       Q.   Is there more than one type of calendar?
5       A.   Yes.
6       Q.   What are the types of calendars?
7       A.   There's the emergency calendar, constitutional
8   calendar.  There is a whole system of calendars.  I'd
9   have to look at the rules, but there are several
10  calendars.  Emergency, constitutional, major state,
11  general state, local and consent which is through the
12  local and consent calendars committee.
13      Q.   As a general matter, what dictates which
14  calendar a bill is assigned to?
15      A.   Well, the rules and the calendars committee,
16  they consult the rules and they decide which bills go or
17  the calendar.
18      Q.   What is the process for considering a bill when
19  it's assigned to one of these calendars?
20      A.   You mean by the House?
21      Q.   Correct.
22      A.   Well, the speaker lays the bill before the
23  House.
24      Q.   What does that mean?
25      A.   He lays the bill out and then recognizes the

---

**34**

1   author of the bill to explain the bill to the members.
2       Q.   And assuming the bill is laid out and the
3   author is recognized, is it always the case that a bill
4   will get a vote by the House at that point?
5       A.   No.
6       Q.   What would prevent a bill from getting a vote
7   even though it's already been laid out before the House?
8            MR. SWEETEN:  You can answer as a general
9   matter.
10      A.   Oh, just a variety of issues.  The member may
11  not somebody ready.  There may be amendments that they
12  are working on.  It could be a timing issue.  Any number
13  of issues.
14      Q.   Who decides when an ultimate vote by the entire
15  House should occur on a bill?
16      A.   Generally, it's the member of the bill.  The
17  author of the bill will decide when they're ready.
18      Q.   And does the author of the bill have the
19  authority to call a vote on the bill or does it require
20  the speaker's involvement?
21      A.   It does.
22      Q.   It does require the speaker's involvement?
23      A.   Yes.
24      Q.   Assuming a bill is -- passes an entire vote of
25  the House, at that point the bill goes to the Senate; is

---

**35**

1   that correct?
2       A.   Yes.
3       Q.   I asked you before if there was any
4   significance to the date on which a bill is filed -- You
5   know, let's say a bill was filed or introduced on the
6   last day of the session, would there be time -- could it
7   even be possible that there would be time to go through
8   this entire process of assigning a bill to a committee,
9   voting it out of committee, referring it to the calendar
10  committee, setting it for a floor vote, having a floor
11  debate, having a floor vote, finally passing the bill
12  and sending it to the Senate, is there a reasonable
13  chance that, you know, a bill introduced that late in
14  the session could be become law?
15           MR. SWEETEN:  Objection.  Calls for
16  speculation, but you can answer.
17      A.   I suppose if there was a suspension of the
18  rules, I'd have to look at the Constitution, but it
19  would be very difficult.
20      Q.   Are there ever times when bills are not
21  referred to a specific committee, but instead are
22  referred to a committee consisting of the entire House?
23      A.   Like a committee of the whole?
24      Q.   Correct.
25      A.   The rules do allow for a committee of the

---

**36**

1   whole, but I don't have any memory of us ever doing
2   that.
3       Q.   So starting with your time as House
4   parliamentarian between 2004 and 2007, you don't recall
5   any times when the House referred a particular bill to
6   the committee of the whole House?
7       A.   I don't -- I don't remember that.  I can't
8   recall that at all.
9       Q.   How about between 2009 when you became House
10  parliamentarian again through -- Well, I think you said
11  your service as chief of staff to the speaker ended --
12  was it March 2012?
13      A.   Yes.
14      Q.   So from the time you rejoined the House as
15  parliamentarian through the time you left the speaker
16  staff in March 2012, do you recall any times when the
17  House referred -- or, excuse me -- the speaker referred
18  a bill to the committee of the whole House rather than a
19  particular committee?
20      A.   No.
21      Q.   Do you have any understanding as to why the
22  rules of the House would permit a bill to be assigned to
23  the committee of the whole House rather than a
24  particular committee?
25      A.   No.

DENISE DAVIS                                                    JUNE 14, 2012

## 41

1   names is listed under a byline here?
2       A.   No.  Other than they would be, I guess,
3   co-authors, no.
4       Q.   Then it looks like that on March 2nd, 2005, the
5   bill was read for the first time?
6       A.   Yeah, that's what the history says.
7       Q.   And does that mean that the bill is read aloud
8   on the House floor?
9       A.   Yes.
10      Q.   And then it looks like on that same day, the
11  bill was referred to -- it says, "Referred to
12  elections."  Would you understand that to mean the House
13  committee on elections?
14      A.   Yes.
15      Q.   And can you tell me generally what the subject
16  matter of that committee covers?
17      A.   Okays.  Just election law, campaign finance
18  law.
19      Q.   And then it looks like eight dates later on,
20  March 10th, 2005, the bill was referred directly to
21  subcommittee by the chair.  Do all the committees in the
22  House have subcommittees?
23      A.   Any committee can have a subcommittee.
24      Q.   And what is the -- what is the purpose of
25  having subcommittees?

## 42

1           MR. SWEETEN:  You can is answer as a
2   matter of general procedure.
3       A.   So rules allow for subcommittees whenever the
4   chairman of the committee thinks it's appropriate to
5   appoint a subcommittee.
6       Q.   Then it looks like in the March 2005, the bill
7   was considered and the testimony was taken in a
8   subcommittee; is that right?
9       A.   Yes.
10      Q.   It says that on March 17, 2005, the bill was
11  left pending in subcommittee.
12      A.   Yes.
13      Q.   What does that mean?
14      A.   It means that it wasn't voted out of committee.
15  It was just left in the committee for a -- for whatever
16  reason.
17      Q.   And then on April 4, 2005, it appears that the
18  bill was recalled from the subcommittee.
19      A.   M-hm.
20      Q.   What does that mean to recall a bill from a
21  subcommittee?
22           MR. SWEETEN:  You can answer as a general
23  matter of what these questions.
24      A.   Under the rules, you can bring a bill back from
25  a subcommittee and bring it before the entire committee.

## 43

1       Q.   It says on that same day, April 4th, that "A
2   committee substitute was considered in the committee."
3   What is a committee substitute?
4           MR. SWEETEN:  Again, and you can answer as
5   to the general meaning of that.
6       A.   Under the rules of a committee substitute, it's
7   just like an amended version or a different version of
8   the original bill.
9       Q.   And then, again, on that same day, it states
10  that "the bill was reported favorably as substituted."
11  What does that mean to be reported favorably?
12           MR. SWEETEN:  You can answer as a general
13  matter.
14      A.   It means that they voted it out of committee.
15      Q.   And then it says that "a committee report was
16  filed with the committee coordinator."  What's a --
17  What's a committee report?
18           MR. SWEETEN:  Same instruction.
19      A.   That's under the rules in the official
20  documentation of the -- of the bill and the proceedings
21  in committee.
22      Q.   And who is the committee coordinator?
23      A.   The committee coordinator is the person that
24  administratively oversees the committees, the processing
25  of paperwork, things like that.

## 44

1       Q.   Does that person work for the Speaker of the
2   House?
3       A.   The committee coordinator, I believe, is -- I
4   believe they are a House officer or they work for the
5   House at least.
6       Q.   Looks like on April 7th, 2005, it looks like
7   the committee report was sent to calendars.  Do you see
8   that?
9       A.   Yes.
10      Q.   And when it was sent to calendars, is that the
11  process you were describing before when there's a
12  process by which the bill gets assigned to a particular
13  type of calendar --
14      A.   Yes.
15      Q.   -- in the House?  What does it mean when it
16  says that the bill was on April 14th, 2005 considered in
17  calendars?
18           MR. SWEETEN:  On these -- And I just want
19  to make sure my instruction's clear.  He can ask you
20  questions about as a general matter what these -- what
21  these mean.  Now, he's handed you this in the context of
22  the specific bill, 1706.  I'm just going to caution you
23  that when you are answering these questions, don't
24  reveal any specific mental impressions or thoughts about
25  the specific legislation or interpret it as to this

## 45

1    bill, but you can answer these questions as phrased.  I
2    don't have a problem with those.
3         MR. HARRIS:  Mr. Sweeten, just to clarify,
4    in Ms. Davis's capacity as parliamentarian, putting
5    aside her role as chief of staff, what is the basis of
6    any objection with respect to her own mental impressions
7    or opinions?
8         MR. SWEETEN:  Those would be subject to
9    the legislative privilege.  She's also got an
10   attorney-client relationship based upon that position,
11   and so there are two potential privileges that apply.
12   Legislative privilege does apply, and so when -- and I
13   haven't objected to you asking these questions on what
14   the general parliamentary procedure is, and she will
15   continue to answer.  I'm just making sure that we're
16   clear that that's not going to reveal her specific
17   thoughts or mental impressions about legislation, so you
18   can continue.
19        Q.   (BY MR. HARRIS) Ms. Davis, going back, I
20   believe you stated that when I asked you before whether
21   you believed you had an attorney-client relationship
22   with the speaker, this is Speaker Craddick we are
23   referring to, I think, at this time -- Well, let me ask
24   you this.  During 2005 was Speaker Craddick the speaker
25   of the House?

## 46

1         A.   Yes.
2         Q.   Did you consider yourself to have an
3    attorney-client relationship with Speaker Craddick in
4    2005?
5         A.   In your capacity as parliamentarian, you have
6    a -- you have a relationship with the -- with the
7    presiding officer in his capacity as the presiding
8    officer as a House officer.
9         Q.   And that relationship you would describe as an
10   attorney-client relationship?
11        A.   Yeah, legislative attorney-client.
12        Q.   Okay.  So I believe the question pending was
13   what does it mean for a bill to be considered in
14   calendars?
15        A.   It just means that the calendars committee is
16   looking at the bill and deciding whether or not to set
17   the bill.
18        Q.   Who sits on the calendars committee?
19        A.   Just House members.
20        Q.   Who appoints the members of the calendars
21   committee?
22        A.   The speaker.
23        Q.   Who appoints members of the other committees?
24        A.   The speaker.
25        Q.   And then it looks like on April 19, 2005, the

## 47

1    bill was placed on the general state calendar.
2         A.   Yes.
3         Q.   It looks like the excerpt of the results I
4    handed you does not the describe the general state
5    calendar, but are you able to describe what that -- the
6    purpose of that calendar is?
7         A.   I'd have to see it -- see the rules, but it's
8    just general bills, I guess.
9         Q.   This looks -- Okay.  On that same day, April
10   19th, when you stated that the bill had been placed or
11   at least appears the bill was placed on the general
12   state calendar, that the bill was recommitted to
13   committee.  Do you see that entry?
14        A.   M-hm.
15        Q.   What does that mean?
16        A.   It just means that it was sent back to
17   committee -- back to the elections committee.
18        Q.   Is that a normal procedure?  And by normal, I
19   mean, is it typical that once a bill is placed on a
20   calendar like the general state calendar, that it would
21   be recommitted to committee?
22        A.   It's not unusual.
23        Q.   As a general matter, why would a bill be
24   recommitted to committee as opposed to proceeding to
25   consideration by the House?

## 48

1         A.   Maybe for additional work or, you know,
2    maybe -- just could be any reason to work on the bill.
3    The bill could have a problem.  It could have a
4    procedural problem.  There could be a point of order, a
5    variety of things.
6         Q.   It looks like once the bill was recommitted to
7    committee, there was a version that was substituted
8    again.
9         A.   M-hm.
10        Q.   It actually looks like that all happened on the
11   same day, April 19th; is that right?
12        A.   Yes.
13        Q.   Then it looks like the process repeated itself
14   and the committee report was filed with the court and
15   the committee coordinator on April 20th; is that right?
16        A.   Yes.
17        Q.   Then the bill was sent back to calendars and it
18   was, again, considered in calendars on April 29, 2005;
19   is that right?
20        A.   Yes.
21        Q.   And then, again, on May 2nd it was, I guess,
22   for the second time placed on the general state
23   calendar; is that right?
24        A.   Yes.
25        Q.   On May 2nd, 2005, the bill was read for a

DENISE DAVIS                                              JUNE 14, 2012

## 49

1  second time; is that right?
2      A.  Yes.
3      Q.  Does that refer to reading the bill for another
4  time on the House floor?
5      A.  That's correct, laying it out before the House.
6      Q.  And at that point looks like throughout
7  May 2nd, various amendments were considered by the House
8  and vote; is that right?
9      A.  Yes.
10     Q.  Okay.  Further down in the list of things that
11 happened on May 2nd, I see an entry that the bill was
12 passed to engrossment as amended.  Do you see that?
13     A.  Yes.
14     Q.  What does that mean, passed to engrossment as
15 amended?
16     A.  It just -- It means passed through the third
17 ringing.
18     Q.  What's required in order for a bill to be
19 passed to the third reading?
20     A.  A majority of those present.
21     Q.  A majority of those present have to vote to
22 pass the bill to the third reading?
23     A.  Yes.
24     Q.  And that's -- it looks like that's what
25 happened here?

## 50

1      A.  Yes.
2      Q.  Okay.  And then looks like the next day,
3  May 3rd, the bill was read for a third time; is that
4  right?
5      A.  Yes.
6      Q.  And it looks like on that same day, May 3rd,
7  additional amendments were considered?
8      A.  Yes.
9      Q.  Okay.  Now, I see an entry on May 3rd that says
10 that a point of order was sustained?
11     A.  Yes.
12     Q.  What is a point of order?
13     A.  It's an objection under the rules to -- to a
14 procedural defect of some sort.
15     Q.  And who can make a point of order?
16     A.  The member -- A member can raise a point of
17 order.
18     Q.  And when a point of order is raised, what
19 happens then?
20         MR. SWEETEN:  You can answer as a general
21 matter.
22     A.  The member will consult with the speaker and
23 bring their objection before the speaker, and the
24 speaker consults with the parliamentarian and then makes
25 a ruling.

## 51

1      Q.  Do you recall a point of order being raised
2  with respect to HB1706?
3         MR. SWEETEN:  You can testify as to
4  matters of public record.
5      A.  Yeah, I don't.
6         (League Exhibit 5 marked.)
7      Q.  I would ask that this document be marked as
8  League Exhibit 5.
9         Ms. Davis, have you had a few moments to
10 look over the document that was marked at Exhibit 5?
11     A.  Yes.
12     Q.  And do you recognize this to be an except or
13 does this appear to be an excerpt from the House Journal
14 of May 3rd, 2005?
15     A.  Yes.
16     Q.  And May 3rd, 2005 was the date that's reflected
17 on the bill history we were looking at for HB1706 as the
18 date on which a point of order was sustained; is that
19 right?
20     A.  Yes.
21     Q.  And looking at the middle of the first page of
22 what I handed you, which has Page No. 2543 at the top
23 right, it states that "Representative Burnam raised a
24 point of order against further consideration of HB1706
25 under Rule 6, Section 1(a), Rule 6, Section 15 and Rule

## 52

1  6, Section 17 of the House rules on the grounds that the
2  bill was placed out of order on the calendar."  Do you
3  see where it says that?
4      A.  Yes.
5      Q.  Does reading that help to refresh your
6  recollection as to a point of order that was made with
7  respect to HB1706?
8      A.  It just -- It just says that he raised the
9  journal, just reflects that he raised the point of
10 order.
11     Q.  And reading this sitting here today, does this
12 cause you to remember him raising this point of order?
13     A.  I don't remember him raising it.  I don't have
14 any reason to dispute what the journal says about it.
15     Q.  And point of order under Rule 6, these various
16 sections of Rule 6 on the grounds that the bill was
17 placed out of order on the calendar, what do you
18 understand that to mean in terms of the point of order
19 being raised with respect to HB1706?
20         MR. SWEETEN:  In answering that, don't
21 reveal your thoughts and mental impressions about the
22 bill.  You can answer as a general matter if you know
23 what that means.
24     A.  That it was in the wrong place -- you know, on
25 the wrong place on the calendar.  Maybe, you know,

DENISE DAVIS                                          JUNE 14, 2012

### 53

1  listed wrong on the calendar or something like that.
2      Q.  If you look at the next page of Exhibit 5 under
3  the heading afternoon session and then a further heading
4  that says HB1706, Pending Business, it states "That a
5  point of order against further consideration of HB1706
6  was pending prior to lunch recess on the grounds that
7  the bills were placed on today's calendar out of order."
8          As a general matter, what does it mean to
9  place a bill on a calendar out of order?  Does that
10  mean -- Well, let me ask you.
11      A.  It just means that it's in the wrong order on
12  the calendar.  Maybe it was listed one way instead of
13  the other way or a bill was put in front of it that
14  should not have been there, a clerical error or
15  something like that.
16      Q.  Does it mean that the bill was being considered
17  on the wrong day?
18          MR. SWEETEN:  Are you asking her does this
19  text mean that or can you specify what your question is?
20      Q.  First, I'll ask, as a general matter, if the
21  bill were being considered on the wrong day, would that
22  -- and it were being considered, would that be a case
23  where a bill was being taken out of order?
24      A.  On the wrong legislative day or the wrong
25  calendar day?  This just says placed on that date's

### 54

1  calendar out of order and that means that it was not
2  listed correctly on that calendar on that day.
3      Q.  And it further states here that the speaker
4  sustained the point of order; is that right?
5      A.  Yes.
6      Q.  Looking back at the bill history, it looks like
7  the bill has continued to be considered on May 3rd,
8  2005.
9      A.  Yes.
10      Q.  Does that help you to explain the manner in
11  which this bill was subject to a sustained point of
12  order?
13          MR. SWEETEN:  Objection to the question as
14  vague.  Don't reveal matters of privilege in answering
15  the question, your thoughts or mental impressions about
16  a specific piece of legislation.  You can answer based
17  on the text of what's in front of you, but don't reveal
18  privilege.
19      A.  Yeah.  This means that the bill was taken out
20  of order, that the chair ruled that the bill taken out
21  of order and that they put the bill on another calendar
22  for later in the day.
23      Q.  Then it looks like later on May 3rd, there is
24  an entry that says the bill passed as amended.  Does
25  that mean that a majority of those House members present

### 55

1  voted for the bill?
2      A.  M-hm.
3      A.  And then.
4      A.  Yes.
5      Q.  -- it looks like -- Thank you.  I should remind
6  you about that, but I appreciate you remembering to give
7  a verbal answer.  And then it looks like on May 4th, the
8  next day, 2005, the bill was reported engrossed.
9      A.  Yes.
10      Q.  What does it mean for a bill to be reported
11  engrossed?
12          MR. SWEETEN:  You can answer as a general
13  matter.
14      A.  That's the final House version of the bill that
15  was sent to the Senate.
16      Q.  And then it looks like the bill was received
17  from the House by the Senate that same day, May 4th,
18  2005; is that right?
19      A.  Yes.
20      Q.  Is there any special meaning to the term
21  received from the House?
22      A.  That means it went over on a message to the
23  Senate.
24      Q.  What does it mean for it to go over on a
25  message?

### 56

1      A.  It means that it goes over on a piece of paper
2  and it's given to the Senate clerk or the secretary of
3  the Senate.
4      Q.  And then it looks like the next day, May 5th,
5  2005, the bill was read for the first time in the Senate
6  and then that same day referred to state affairs.  Do
7  you see that?
8      A.  Yes, I see that.
9      Q.  And do you understand state affairs to mean
10  Senate State Affairs Committee?
11      A.  Yes.
12      Q.  Okay.  Since that's the last entry for this
13  bill, what do you understand about what happened to the
14  bill once it went to the senate?
15      A.  I don't know what happened.
16      Q.  Assuming this is a complete legislative
17  history, do you agree that it reflects that the bill did
18  not pass the Senate?
19          MR. SWEETEN:  Since this is a matter of
20  public record, you can answer based on the public
21  record.
22      A.  This looks like the last action was that it
23  went to state affairs and stayed in state affairs until
24  the session was over.
25      Q.  And if the bill had passed the Senate, the last

DENISE DAVIS                                              JUNE 14, 2012

---

## 65

1   A.  I have my driver's license.

2   Q.  Anything else?

3   A.  I think I have my bar card and that's it.

4   Q.  Do you own a copy of your birth certificate?

5   A.  Yes.

6   Q.  Were you born in the State of Texas?

7   A.  Yes.

8   Q.  If you lost your birth certificate, would you

9   know where to go to get another copy?

10  A.  Yes.

11  Q.  Where would that be?

12  A.  To the health department -- Bureau of Vital

13  Statistics, Health Department.

14  Q.  Have you ever heard of -- if I use the term

15  in-person voter fraud, do you have some understanding of

16  what that means?

17  A.  No.

18  Q.  Okay.  I'm going to use the term to mean an

19  instance where someone shows up at the polls claiming to

20  be a registered voter when that person is not in fact a

21  registered voter when he or she is claiming to be; is

22  that okay?

23  A.  M-hm.

24  Q.  Have you ever heard of an instance of such

25  in-person voter fraud?

---

## 66

1   A.  No.

2   Q.  In your capacity as chief of staff to Speaker

3   Straus, do you ever recall receiving any complaints from

4   constituents regarding instances of in-person voter

5   fraud?

6   A.  No.

7   Q.  How about just voter fraud generally?  Did you

8   ever hear constituents complain about voter fraud in

9   Texas in general?

10         MR. SWEETEN:  While she was with the

11  speaker's office you are asking, Adam?

12         MR. HARRIS:  Let's start with that, sure.

13         MR. SWEETEN:  This is from constituents,

14  just so I'm clear.

15         MR. HARRIS:  Correct.

16  A.  No.

17  Q.  How about at any other time before or even

18  after you worked for -- as chief of staff for Speaker

19  Straus, were you aware -- or did you hear complaints

20  of -- Let's say putting aside any -- putting aside any

21  member of the Texas House or Senate that has asserted

22  privilege in this case, have you heard complaints from

23  anybody else about voter fraud in Texas?

24         MR. SWEETEN:  Also, don't reveal

25  communications with state agencies, the Texas ledge

---

## 67

1   council, legislative staffers, and our position is even

2   if a party has waived with respect to it, that to the

3   extent if she's working for the speaker, for example,

4   and he has not waived, that that privilege attaches to

5   the communication.  With all that, you can answer the

6   question as long as you are not revealing a privileged

7   communication.

8   A.  No.

9   Q.  All right.  Ms. Davis, is this a good time for

10  you to take lunch?

11  A.  Sure.

12         MR. HARRIS:  I think we are at a natural

13  stopping point, so why don't we do that?

14         THE WITNESS:  Okay.

15         (Recess from 12:05 p.m. to 12:31 p.m.)

16  Q.  (BY MR. HARRIS)  Ms. Davis, are you ready to go

17  back on the record?

18  A.  Yes.

19  Q.  Do you recall a bill concerning voter

20  identification requirements for Texas voters being

21  introduced during the 2007 House session?

22  A.  No.

23         (League Exhibit 6 marked.)

24  Q.  I'll ask that this document be marked as League

25  Exhibit 6.

---

## 68

1         Ms. Davis, please take a few moments to

2   familiarize yourself with this document.

3   A.  Okay.

4   Q.  Ms. Davis, this appears to be a copy of a House

5   Bill No. 218; is that right?

6   A.  Yes.

7   Q.  At the top at the first page it says, "House

8   engrossment"; is that right?

9   A.  Yes.

10  Q.  What do you understand that to mean?

11  A.  That's the bill as it's passed on third reading

12  out of the House.

13  Q.  Do you recall anything about the debate over

14  this Bill HB218?

15  A.  No.

16  Q.  Now, you said that the language at the top

17  stating House engrossment refers to the fact that this

18  bill passed a vote of the House after the third reading;

19  is that right?

20  A.  Right.

21  Q.  At that point the bill would go to the Senate

22  generally; is that right?

23  A.  Right.

24  Q.  Do you recall what happened to this bill when

25  it went to the Senate?

DENISE DAVIS                                                    JUNE 14, 2012

---

69

1          MR. SWEETEN:  You can answer as to matters
2    of public record.
3       A.  No, I don't.
4          (League Exhibit 7 marked.)
5       Q.  I ask that this document be marked as League
6    Exhibit 7.  And, Ms. Davis, please take a few moments to
7    familiarize yourself with this document, Exhibit 7.
8       A.  Okay.
9       Q.  Mrs. Davis, this appears to be a legislative
10   history of HB218 from the 80th regular session.
11      A.  Right.
12      Q.  Is that right?
13      A.  Yes.
14      Q.  And this appears to reflect that HB218 was
15   reported engrossed by the House on April 24th, 2007; is
16   that right?
17      A.  Yes.
18      Q.  Then this states that the bill was read for the
19   first time on April 26, 2007, is that right, in the
20   Senate?  Excuse me.
21      A.  Yes.
22      Q.  And then it was referred to the Senate state
23   affairs committee; is that right?
24      A.  Yes.
25      Q.  Do you have any understanding as to what the

---

70

1    subject matter jurisdiction covered by the state affairs
2    committee in the Senate is?
3       A.  I don't.
4       Q.  Then it appears that on May 1st, 2007, the bill
5    was reported favorably as substituted by the committee;
6    is that right?
7       A.  Yes.
8       Q.  And then on May 2nd, it was placed on the
9    Senate intent calendar; is that right?
10      A.  M-hm.
11      Q.  Do you have any understanding as to what the
12   Senate intent calendar is?
13      A.  It's the Senate calendar for floor action for
14   bills that they'll take up on the Senate floor.
15      Q.  On May 15th, 2007, I see that there is an entry
16   that the -- it says "Rule suspended (regular order of
17   business)."
18      A.  M-hm.  Yes.
19      Q.  Do you have any understanding as to what that
20   means?
21      A.  I believe that's what the Senate does to take a
22   bill up earlier than they -- earlier than the rules
23   would allow.
24      Q.  And this reflects that there was a record vote
25   taken on May 15th, 2007?

---

71

1       A.  Yes.
2       Q.  Do you know if that would be the vote to
3    suspend the regular order of business?
4       A.  Yes.
5       Q.  Yes, it would be that vote?
6       A.  Yes.  It looks as though that's right, yeah,
7    that it was a record vote on that suspension.
8       Q.  M-hm.  It looks on that same day the bill was
9    read for a second time in the Senate.
10      A.  Yes.
11      Q.  And then it says, "Vote reconsidered on that
12   same day."  Do you see that?
13      A.  Yes.
14      Q.  Do you know what that means, "vote
15   reconsidered"?
16      A.  In this context, I don't know -- I don't know
17   what they did.
18      Q.  Again, reading from the entries for May 15th,
19   2007, that the motion to suspend regular order fails.
20      A.  Yes.
21      Q.  Do you understand that to mean that there were
22   not sufficient votes to suspend the regular order of
23   business and considered the bill out of the regular
24   order?
25          MR. SWEETEN:  You can testify based on the

---

72

1    text.
2       A.  Yes, that's right.
3       Q.  And then it looks like the last two entries
4    reflect a record vote May 15th, 2007; is that right?
5       A.  Yes.
6       Q.  And then there was a co-sponsor authorized on
7    May 16th, 2007; is that right?
8       A.  Yes.
9       Q.  And this legislative history appears to reflect
10   that HB218 did not pass a full vote of the Senate; is
11   that right?
12      A.  Yes, that's right.
13      Q.  Looking back to the text of HB218, do you have
14   any understanding of the general purpose of the
15   legislature in attempting to enact HB218?
16      A.  I don't.
17      Q.  Do you have any understanding of the general
18   purpose of HB218?
19      A.  No.
20      Q.  I think you stated previously with respect to
21   House Bill 1706 from 2005 that the general purpose was
22   to protect the integrity of the election system.  Do you
23   recall that testimony?
24      A.  Yes.
25      Q.  Do you have any understanding as to the source

DENISE DAVIS                                                          JUNE 14, 2012

---

### 73

1   of the legislative language in HB218?

2        MR. SWEETEN:  Don't answer the question as

3   it will require you to reveal matters -- as it could

4   require you to reveal matters of legislative privilege.

5        MR. HARRIS:  I think we actually resolved

6   this one last time by your stating, Mr. Sweeten, that

7   the witness could answer yes or no as to whether she was

8   aware of the sources of legislative language.

9        MR. SWEETEN:  That she was aware of the

10   source of language of 218.

11        MR. HARRIS:  Correct.

12        MR. SWEETEN:  Then we'll allow her a yes

13   or no answer.

14     A.  No.

15     Q.  Do you recall -- Without yet divulging the

16   substance of any such discussions, do you recall having

17   discussions with any members of the House regarding

18   HB218?

19     A.  No.

20     Q.  I'm not sure I asked you that question.  With

21   respect to HB1706, the bill we looked at from 2005

22   concerning voter ID, do you recall having any

23   discussions with members of the House about -- Again,

24   I'm not asking you to reveal the substance, but do you

25   recall any discussions with members of the House about

---

### 74

1   HB1706?

2     A.  No.

3     Q.  Do you know whether the lieutenant governor of

4   Texas can directly himself introduce legislation?

5        MR. SWEETEN:  You can answer as a general

6   matter.

7     A.  I don't -- I do not know the answer to that --

8   the legal answer to that.  I've never seen that, but I

9   do not know.

10     Q.  M-hm.  Do you recall a situation in 2009, now

11   skipping ahead two years, when Representative Betty

12   Brown attempted to introduce a voter ID proposal as an

13   amendment to another bill?

14        MR. SWEETEN:  You can refer to matters of

15   the public record in answering.

16     A.  Yes.

17     Q.  What do you recall about that situation?

18        MR. SWEETEN:  Okay.  That could very well

19   ask you to reveal matters of privilege.  Don't do so.

20   You can reveal matters of public record.

21     A.  I just remember her trying to do it.  I

22   don't -- I don't remember more -- anymore than that.

23     Q.  Do you remember anything about the substance of

24   the amendment that Representative Brown was attempting

25   to offer?

---

### 75

1     A.  No.  I believe it was a voter ID amendment, but

2   I don't remember what it did.

3     Q.  And do you remember the -- what -- the

4   legislation that Ms. Brown was attempting to amend to

5   include voter identification requirements, do you recall

6   what that understanding legislation was about?

7     A.  No.

8       (League Exhibit 8 marked.)

9     Q.  I'll ask that this be marked as League

10   Exhibit 8.  Please take a few moments to review

11   Exhibit 8.

12     A.  Okay.

13     Q.  Okay.  So this appears to be an article from

14   the Austin Statesman?

15     A.  Yes.

16     Q.  And it's dated March 30th, 2009; is that right?

17     A.  Yes.

18     Q.  Okay?  And this article -- Does this article

19   refer to the situation we were just speaking with in

20   which Representative Brown attempted to introduce an

21   amendment to a bill concerning voter ID requirements?

22     A.  Yes.

23        MR. SWEETEN:  You can answer about what

24   the article says.  Don't reveal privileged matters.

25     Q.  In the first two paragraphs it states that, "A

---

### 76

1   could have intense moment in the Texas House passed

2   without a blow-up today with a handshake between House

3   Speaker Joe Straus and Representative Betty Brown,

4   Republican of Terrell, according to Brown.  Brown said

5   she and Straus shook hands on his promise to ensure

6   legislation requiring voters to present photo ID or

7   identifying documents at the polls would get a full

8   hearing before the House committee on elections."  Do

9   you see where it says that?

10     A.  Yes.

11     Q.  Were you at all involved or present for any

12   discussions between Ms. Brown and Speaker Straus

13   concerning any promises that voter ID would be heard

14   before the committee on elections?

15     A.  No.  That would have been a private

16   conversation between them.

17     Q.  Skipping down a few paragraphs, it says that

18   "Perspective:  Brown couldn't have been pleased when it

19   came clear early this session that Smith would be the

20   House's lead dog on the voter ID front.  Two years ago,

21   Brown was author of the voter ID mandate that won House

22   approval before petering out in the Senate where

23   Republicans proponents couldn't hurdle the two-thirds

24   margin usually needed to take up measures for floor

25   action."  Do you see that?

## 77

1    A.  Yes.
2    Q.  Is that paragraph referring to what we saw in
3    the legislative history previously in which there
4    weren't sufficient votes to suspend the regular order of
5    business in the Senate?
6        MR. SWEETEN:  Don't reveal matters of
7    legislative privilege in answering the question, okay?
8    A.  Yes.  That refers to the Senate action -- the
9    Senate actions on the legislative report.
10   Q.  And then the next sentence is in a
11   parenthetical, but it says, "This year Senate
12   Republicans revised the body's rules enabling action on
13   the voter ID topic by a simple majority vote."  Do you
14   see that?
15   A.  Yes.
16   Q.  Are you aware of what this sentence is
17   referring to?
18       MR. SWEETEN:  Don't answer the question as
19   phrased.  It would require you to reveal matters of
20   legislative privilege and interpret the words on this
21   page, and you don't have to do that with respect to
22   legislation.
23   Q.  I'm not sure I follow the objection, but let me
24   try it another way.
25       Were you aware or are you aware as a

## 78

1    matter of public knowledge of the Senate Republicans
2    changing the rules of the Senate with respect to the
3    topic of special orders and voter ID?
4    A.  Yes.
5    Q.  When did you first learn about such a change by
6    the Senate Republicans?
7        MR. SWEETEN:  You can refer to matters of
8    public record.
9    A.  When they debated it on the Senate floor during
10   the rules debate.
11   Q.  Do you have any understanding as to why the
12   Senate changed rules with respect to special orders and
13   the topic of voter ID?
14       MR. SWEETEN:  Do not answer.  Calls for
15   matters of legislative privilege.  You can refer to
16   matters of the public record in answering the question.
17       MR. HARRIS:  Let's step back.  I think the
18   first question was do you have any understanding.  May
19   she answer that, Mr. Sweeten?
20   A.  Any understanding of?
21   Q.  Of why the Senate Republicans revised their
22   rules concerning special rules of voter ID.
23   A.  No.
24   Q.  Are you aware of any publicly stated reasons by
25   the Senate Republicans with respect to why they changed

## 79

1    the rules regarding special orders and voter ID?
2    A.  No.  I didn't really listen to the debate.  I
3    just knew they took it up on -- when they did the rules,
4    but I didn't -- I am not familiar with what they said.
5    Q.  Okay.  Well, I think we'll come back to that
6    topic in just a few moments, but we can finish with
7    Exhibit 8 for now.
8        In the next paragraph starting with, "In a
9    surprise move," it states is that, "Brown had filed her
10   ID proposal as an amendment to legislation by
11   Representative Frank Corte, Republican of San Antonio,
12   relating to providing a ballot by emails to voters in
13   the military and living overseas."  Do you see that?
14   A.  Yes.
15   Q.  And in the next paragraph it states, I believe
16   this is -- I'll ask you, but -- Excuse me.  States,
17   "Brown told me that House Parliamentarian Denise Davis
18   advised today that her amendment wasn't germane to
19   Corte's proposal, though Brown said it also was clear an
20   ultimate ruling would have been up to Straus."  Do you
21   see that?
22   A.  Yes, I do.
23   Q.  Do you recall whether there was any public
24   decision made that the -- or, I guess, a point of order
25   sustained that the amendment offered by Ms. Brown was

## 80

1    not germane to the legislation at issue?
2        MR. SWEETEN:  You can answer as to public
3    record only.
4    A.  I don't remember a point of order being raised
5    at all.  I don't remember.
6    Q.  Do you remember ruling on the question of
7    whether or not Ms. Brown's voter ID amendment was
8    germane?
9        MR. SWEETEN:  I assume a ruling is a
10   public record, so if it's a public record, you can
11   answer that question.
12   A.  What -- Do I remember ruling on whether or not
13   this was germane in a public ruling?
14   Q.  Well, let me ask it this way.  The author of
15   the article states that Brown told him that you, Ms.
16   Davis --
17   A.  Right.
18   Q.  -- advised Ms. Brown --
19   A.  Right.
20   Q.  -- that her amendment wasn't germane to the
21   proposal, and Ms. Brown apparently told that to a
22   reporter making public and certainly waiving any
23   privilege with respect to it.  So my question is is this
24   accurate?  Did you in fact tell Ms. Brown that her
25   amendment was not germane?

DENISE DAVIS                                                    JUNE 14, 2012

## 81

1      MR. SWEETEN:  One second.  I want the
2  question re-read, please.
3      (Requested portion was read.)
4      MR. SWEETEN:  No, she's not going to
5  answer.  Even assuming you're correct that Ms. Brown has
6  waived privilege, she is not going to answer the
7  question because, one, I don't think Ms. Brown has
8  provided any such waiver as to that, so -- and she's not
9  going to answer questions as to communications she had
10  with Betty Brown, so I think that would be subject to
11  the privilege.  I'm going to instruct you not to answer
12  the question.
13      MR. HARRIS:  Mr. Sweeten, do you agree
14  that had Ms. Brown communicated to the Austin Statesman
15  what Ms. Davis told Ms. Brown, that that would
16  constitute a waiver of privilege over such a statement
17  given that?
18      MR. SWEETEN:  I don't necessarily agree
19  with that.  In any event, there is no suggestion --
20  there's been no waiver of legislative privilege that I'm
21  aware of from Ms. Brown, and she's not going waive her
22  privilege.  So, in any event, it's not of no moment.  So
23  I'm going to instruct her not to answer based on
24  legislative privilege.
25      Q.  Would a voter ID requirement such as we saw in

## 82

1  the two previous House bills we've looked at today be
2  germane to a -- as an amendment to a bill concerning
3  voting by military members?
4      MR. SWEETEN:  Don't answer the question.
5  It would require you to reveal your thoughts and mental
6  impressions about legislation that are subject to the
7  legislative privilege, and I instruct you not to answer.
8      Q.  Are you taking your counsel's advice,
9  Ms. Davis?
10      A.  Yes.
11      Q.  Do you have any reason to doubt the author of
12  this article's statement starting in the paragraph
13  "Brown told me"?
14      MR. SWEETEN:  Are you asking her -- I
15  mean, I think that that would require her to provide her
16  thoughts and mental impressions about the veracity of
17  that statement.  She doesn't have to provide those if
18  they would reveal legislative privilege, so I'm going to
19  instruct her not to answer that question also.
20      Q.  As a general matter, what factors do you
21  consider in deciding whether an amendment to a bill is
22  germane?
23      A.  I mean, you look at the language of the bill.
24  You look at the amendment.  You have the -- Listen to
25  the explanation of the amendment and the precedent,

## 83

1  number of factors.
2      Q.  Can you give me some instances in which you
3  publicly ruled that an amendment to a bill was not
4  germane?
5      A.  I mean, we look at hundreds of amendments, so
6  there have to be things in the journal.  Off top of my
7  head, I couldn't say.
8      (League Exhibit 9 marked.)
9      Q.  I ask that this document be marked as League
10  Exhibit 9.  Ms. Davis, this is an excerpt -- I'll
11  represent this is an excerpt of a longer document.
12  Please take a moment to review the exhibit.
13      A.  Okay.
14      Q.  I see that the heading under -- or beginning
15  Rule 5.11 says "special orders."
16      A.  Yes.
17      Q.  Now, I know these are the Senate rules, but can
18  you tell me what a special order is?
19      MR. SWEETEN:  Objection.  Foundation.  You
20  can answer as a general matter.
21      A.  The general rule is to a bill that goes sort
22  of, I guess, to the front of the line in consideration.
23      Q.  Do you see in Rule 5.11, Section D where it
24  says -- Well, first let me read from Section A to make
25  sure we have that foundation established.  "Rule 5.11(a)

## 84

1  states that any bill, resolution or other measure may on
2  any day be made a special order for a future time of the
3  session by an affirmative vote of two-thirds of the
4  members present"; is that right?
5      A.  Yes.
6      Q.  And can you put that into lay terms, explain it
7  to someone who's not very familiar with parliamentary
8  procedure what that means?
9      MR. SWEETEN:  Hold on a minute.  She's not
10  going to interpret Senate rules.  She can testify as to
11  what a special order is or the general purpose of Rule
12  5.11, but she's not going to go down here and give whys
13  and what fors and mental processes of these.  With that,
14  you can go ahead and answer.
15      A.  Yeah.  I'm not an expert on Senate rules, so --
16  but a special order means that a bill gets special
17  consideration above other bills.
18      Q.  Is it correct that as a general matter it takes
19  a two-thirds vote of those senators present in order for
20  something to be made a special order?
21      A.  That's what this rule says.  I think it says
22  that.
23      Q.  And then so reading from Part D of Rule 5.11,
24  it states that "Notwithstanding Subsection A of this
25  rule, a bill or resolution relating to voter

DENISE DAVIS                                      JUNE 14, 2012

85

1  identification requirements reported favorably from the
2  committee of the whole Senate may be set as a special
3  order for a time at least 24 hours after the motion is
4  adopted by a majority of the members of the Senate."  Do
5  you see that?
6      A.  Yes.
7      Q.  How do you understand this Subpart D to affect
8  the rule that's set out in Part A that we just talked
9  about?
10      MR. SWEETEN:  Don't answer the question.
11  You are asking for matters of legislative privilege
12  including her interpretation of the specifics of this
13  rule.  She can give you a general purpose answer as to
14  what is the general purpose to the extent she even
15  knows, but she's not going to go through and reveal her
16  thoughts and mental impressions about the Rule 5.11.
17  General purpose is acceptable, and so we will allow her
18  to answer that if she knows.
19      A.  Just generally is -- I mean, that a voter ID
20  can be set as a special order.
21      Q.  And in order for a voter ID bill to be set as a
22  special order, this 5.11(d) would require only a
23  majority of the members of the Senate to vote to make it
24  a special orders; is that right?
25      MR. SWEETEN:  You can answer based on the

86

1  text of the bill.
2      A.  Yeah.  It says after the motion is adopted by a
3  majority of the members of the Senate that it may be set
4  as a special order.
5      Q.  Is there a similar rule to this Rule 5.11 in
6  the House rules concerning special orders?
7      MR. SWEETEN:  You can answer as a general
8  matter.
9      A.  A general rule for special orders?
10      Q.  M-hm.
11      A.  I believe, yes.
12      Q.  Do you know what vote or how many votes are
13  required in order to make a bill a special order?
14      A.  I believe it's two-thirds present, but I'd
15  have to see the rule.
16      Q.  Have you ever seen an instance under -- Let's
17  say starting with the House rules.  Have you ever seen
18  an instance in which the rule concerning special orders
19  sets out an exception for a particular type of
20  legislation such as what we saw in 5.11(d)?
21      A.  In the House rules?
22      Q.  Correct.
23      A.  Not to my knowledge, no.
24      Q.  Other than this Rule 5.11(d) in the Senate
25  rules, are you aware of any other time during which the

87

1  Senate rules carved out a particular type of legislation
2  from the general rules governing special orders?
3      MR. SWEETEN:  Objection.  Foundation.
4  Objection.  Calls for speculation.
5      A.  I don't know.
6      Q.  Can I take that to mean you are not aware of
7  any other instances besides voter identification?
8      A.  Right.  I'm not sure.  They changed the rules.
9  I don't know the answer to that.
10      Q.  And when we looked at that article from
11  March 2009 and it referred to a certain special rule governing
12  voter identification with respect to special orders, is
13  this the type of special rule that you take the article
14  to be referring to?
15      MR. SWEETEN:  Hold on a minute.  You are
16  asking her to interpret the words in an article that she
17  hasn't seen today, and you are asking her is this
18  the type of rule that is referred to in the article.
19      That is -- First of all, that calls for
20  her to speculate.  Secondly, I think that that would --
21  could implicate any conversation she's had that were
22  subject to the legislative privilege and/or her thoughts
23  and mental processes about a certain legislation
24  including legislation referred to in this article.
25      So from that standpoint, I object based on

88

1  legislative privilege.
2      Q.  (BY MR. HARRIS)  Ms. Davis, turning back to
3  Exhibit 8, the article that we were looking at in the
4  paragraph beginning with the word perspective, I think
5  we already read from a parenthetical that said, "This
6  year, Senate Republicans revised the body's rules
7  enabling action on the voter ID topic by a simple
8  majority vote."  Do you have any understanding as to
9  what that means?
10      MR. SWEETEN:  Don't reveal matters of
11  legislative privilege in answering this question
12  including your thought processes about legislation or
13  conversations that you had with anyone that would be
14  protected, okay?  If you can't answer it without doing
15  that, then don't answer the question, okay?
16      A.  There was -- There was a rules change at the
17  beginning of the session that was related to voter ID in
18  the Senate.
19      Q.  Did that rules change concern special orders?
20      A.  I don't remember the text of it, but that
21  was -- that was the rule -- that was the rules change
22  they brought up -- they considered on the first day of
23  session or at the beginning.
24      Q.  Do you know why there was a rules change
25  concerning voter identification under the Senate rules?

DENISE DAVIS                                    JUNE 14, 2012

---

93

1    the extent it would require you to reveal your thoughts,
2    mental impressions about a specific piece of
3    legislation.  If you cannot do so, do not, and, also, it
4    calls for speculation.
5        A.  I don't know.
6        Q.  Are you familiar with the lieutenant governor's
7    powers with respect to the Texas Senate?
8        A.  Generally, yes.
9        Q.  Do you know whether there's any significance
10   with respect to the lieutenant governor's role when a
11   bill is referred to the committee of the whole Senate?
12           MR. SWEETEN:  Are you asking what is his
13   public role with respect to the committee because I'll
14   let her answer as to the public role, but if you are
15   asking about specifics -- by role, that's a very vague
16   term.
17       Q.  Let me rephrase the question and maybe that
18   will solve multiple problems.  What are the lieutenant
19   governor's powers and/or duties when a bill is referred
20   to the committee of the whole Senate?
21       A.  Oh, I don't know.  Under the Senate rules, I
22   don't know.
23       Q.  It looks like on -- well, on the date column,
24   it says March 11, 2009, but there's a comment that says
25   March 16, 2009, but putting aside that wrinkle, it looks

---

94

1    like some point in mid-2011 -- excuse me, in mid-2009 --
2    Let me rephrase again.
3            At some point in mid-March of 2009, SB362
4    was set as a special order; is that right?
5        A.  Yes.
6        Q.  It looks like on March 17, 2009, there was a
7    point of order made in the Senate and then overruled.
8    Do you see that?
9        A.  Yes.
10       Q.  Do you recall anything about -- Do you recall
11   anything from the public record about this point of
12   order?
13       A.  No.
14       Q.  And then on March 18, 2009, it looks like the
15   bill was reported engrossed from the Senate; is that
16   right?
17       A.  Yes.
18       Q.  And that means that the bill passed the Senate
19   by at least a majority vote; is that right?
20       A.  Yes.
21       Q.  And it looks like on March 31st, 2009, this
22   bill was referred to the House committee on elections;
23   is that right?
24       A.  Yes.
25       Q.  Were you involved in the decision to refer the

---

95

1    bill to the committee on elections?
2        A.  It's the speaker's decision to refer bills.
3        Q.  Did he consult you with respect to which
4    committee to refer SB362 to?
5            MR. SWEETEN:  You can answer if you had
6    any conversations or communications with the him about
7    that subject matter.  Don't reveal the communications
8    themselves.
9        A.  I don't remember.
10       Q.  Do you recall having any discussions with any
11   members of the House about SB362?
12       A.  I'm sure we discussed SB362.
13       Q.  When you say "we," who are you referring to?
14       A.  Members and myself.
15       Q.  Do you recall the names of particular members
16   of the House with whom you discussed SB362?
17       A.  No, other than maybe the chairman of elections
18   maybe, but other than that, I don't.
19       Q.  Do you recall the general nature of your
20   discussion with the chairman regarding SB362?
21       A.  No.
22           MR. SWEETEN:  Don't reveal the substance
23   of the communication.
24       A.  No.
25       Q.  In the legislative history that we're looking

---

96

1    at, are you able to tell what the ultimate disposition
2    of SB362 was in the House?
3            MR. SWEETEN:  You can answer based on the
4    document and it's a matter of public record.
5        A.  It was put on the calendar.
6        Q.  And that was the last action that was taken; is
7    that right?
8        A.  Yes.
9        Q.  And it says that it was placed on the major
10   state calendar on May 23, 2009.  Do you see that?
11       A.  Yes.
12       Q.  Whats the major state calendar?
13       A.  That's just one of the calendars that the
14   calendars committee can put bills on that is -- under
15   the rules, any bill that they consider a major state
16   bill or major bill, they put on there.
17       Q.  Is it correct that SB362 did not pass out of
18   the House ultimately?
19       A.  That's correct.
20       Q.  Again, taking a look at the text of SB362 or
21   the version that's in front of you, do you have any
22   understanding as to the source of the legislative
23   language of SB362?
24       A.  No.
25       Q.  In looking at SB362 on Page 5, Section 63.0101,

DENISE DAVIS                                          JUNE 14, 2012

## 97

1  do you see that that section sets forth documentation
2  that is an acceptable form of photo identification under
3  the -- under the bill?
4      A.  Yes.
5      Q.  And you see in what looks like Subpart 7, but
6  got struck out and is now Subpart 6, that the valid
7  forms of identification include a valid identification
8  card containing the person's photograph and issued by
9  either, A, an agency or institution of the Federal
10 government or, B, an agency, institution or political
11 subdivision of this state.  Do you see that?
12     A.  Yes.
13     Q.  Do you know whether that -- that Subsection 6
14 that we just looked at would include as a valid form of
15 identification a student ID card?
16     A.  I don't know.
17     Q.  Do you know who the sponsor in the Senate of
18 SB362 was?
19     A.  Senator Fraser.
20     Q.  If Senator Fraser stated publicly on the floor
21 of the Senate that he understood Section 6 of SB362, the
22 provision providing that an individual -- that an
23 identification card issued by an agency, institution or
24 political subdivision of Texas would be an acceptable
25 form of ID, if Senator Fraser had stated that he thought

## 98

1  that section included a student ID would have any reason
2  to doubt that statement?
3          MR. SWEETEN:  Don't answer the question as
4  phrased.  Calls for matters of legislative privilege.
5  His statement is his statement.  She's not going to
6  interpret his statement.
7      Q.  Are you aware of Senator Fraser making any such
8  statement?
9      A.  No.
10     Q.  So as a general matter, do you think that the
11 author or the sponsor of a bill is in a good position to
12 interpret the language of the bill?
13         MR. SWEETEN:  Objection.  Calls for
14 speculation.  Objection.  Compound.  Objection.
15 Relevance.
16     Q.  You may answer, Ms. Davis.
17         THE WITNESS:  Can you reread the question?
18         (Requested portion was read.)
19         MR. SWEETEN:  Same objection and
20 argumentative.  Go ahead.
21     A.  Generally, yes.
22     Q.  Are you familiar with the term chub or
23 chub-a-thon?
24     A.  Yes.
25     Q.  What do those terms refer to?

## 99

1      A.  It's just when people delay, use dilatory
2  tactics to stall, like filibustering, things like that.
3      Q.  What are the common methods used to stall a
4  bill through a chub or chub-a-thon?
5          MR. SWEETEN:  You can discuss matters of
6  public record or general parliamentary procedures.
7      A.  You mean in the House or in the Senate?
8      Q.  In the House.  Excuse me.
9      A.  Questions -- I think probably asking lots and
10 lots and lots of questions, detailed questions,
11 irrelevant questions of the author of the bill or of an
12 amendment.
13     Q.  Do you recall whether SB362 was the subject of
14 a chub-a-thon in the House?
15         MR. SWEETEN:  You can refer to matters of
16 the public record.
17     A.  Well, it was not taken up on the calendar, so I
18 don't understand your question.
19     Q.  When you say the bill "was not taken up on the
20 calendar," what are you referring to?
21         MR. SWEETEN:  Again, you can answer as to
22 matters of public record.
23     A.  This says it was set on the calendar, but I
24 don't believe we ever reached the bill on the calendar.
25     Q.  Is there any means through which someone can

## 100

1  use the local and consent calendar bill -- Let me step
2  back.  Is there such a thing as a local and consent
3  calendar?
4      A.  Yes.
5      Q.  What is that?
6      A.  That is a separate calendar for bills that
7  are -- local bills that are considered to be consent
8  bills or noncontroversial bills, to pass them quickly.
9      Q.  Do you recall any -- any members using the
10 local and consent calendar as a means to stall
11 consideration of SB362?
12     A.  Yes.
13     Q.  What do you recall about that?
14         MR. SWEETEN:  You can refer only to
15 matters of the public record.  Don't reveal matters of
16 privilege including privileged conversations, okay?
17     A.  I just remember being on the local calendar for
18 a long time, days and days.
19     Q.  Who controls how long a bill stays on the local
20 calendar?
21         MR. SWEETEN:  You can answer as a general
22 matter of parliamentary procedure.
23     A.  What do you mean?  I don't understand your
24 question.
25     Q.  Well, I believe you previously stated that you

DENISE DAVIS                                                              JUNE 14, 2012

## 101

1   are aware of the local and consent calendar being used
2   to stall consideration of SB362.
3        A.   Right.  And there were lots of bills on the
4   calendar, so the members, the author of the bill and the
5   presiding officers in the chair -- the presiding officer
6   who's providing over the local and consent calendar
7   would control that.
8        Q.   With respect to SB362 in 2009, do you know who
9   had that kind of control?
10       A.   You mean who's presiding over the local
11  calendar?
12       Q.   Correct.
13       A.   That would have been Craig Eiland.
14       Q.   What can be done to overcome a chub-a-thon?
15            MR. SWEETEN:  You can answer based on
16  matters of general parliamentary procedure.  Don't
17  reveal matters of privilege.
18       A.   For the local calendar or for anything?
19       Q.   Let that's start with the local calendar.
20       A.   You can use, I guess, a variety of maybe
21  procedural things to -- to try to overcome, and I would
22  have to go back and research it.  Probably some vote
23  suspensions, maybe -- since it's a special order,
24  probably have to do some kind of extraordinary vote
25  requirement or something like that.

## 102

1        Q.   You stated that SB362 was the subject of a
2   chub-a-thon via the local consent calendar.  Do you see
3   that reflected somehow in the legislative history that
4   we looked at?
5        A.   Of 362?
6        Q.   Yes.
7             MR. SWEETEN:  You are asking her about
8   Exhibit 11 -- whether it's in Exhibit 11?  Is that the
9   question?
10            MR. HARRIS:  Correct.
11       A.   I don't see it in the calendar or on the -- on
12  this action report.  I don't see it there.
13       Q.   In January of 2010 you became chief of staff to
14  Speaker Straus; is that correct?
15       A.   Yes.
16       Q.   During your time as chief of staff to Speaker
17  Straus, did you have any involvement with respect to
18  voter ID legislation?
19            MR. SWEETEN:  You can answer yes or no to
20  that question.
21       A.   Yes.
22       Q.   What was your role with respect to voter ID
23  legislation as chief of staff to Speaker Straus?
24            MR. SWEETEN:  You can give a general
25  answer.  Do not reveal privilege including

## 103

1   communications that you had with anyone.  So in
2   answering this question, just be mindful of privilege.
3   You can answer as a general matter.
4        A.   Just a general role, moving things through,
5   things like that, like you do with all the bills, just
6   making sure you move the process.
7        Q.   As a general matter, what do you do to make
8   sure that you move the process?
9             MR. SWEETEN:  You're starting to intrude
10  by this question into matters that would be subject to
11  legislative privilege, motivations, thoughts,
12  impressions about bills, discussions that she may have
13  had.  When you are asking about strategy, you are
14  intruding in a legislative privilege.  I'm going to
15  object.  I'm going to instruct her not to answer that
16  question as phrased.
17       Q.   I'll try to rephrase.  Putting aside any
18  particular piece of legislation, what is the role of the
19  chief of staff with respect to moving bills along?
20       A.   You just listen to the members, listen to the
21  parliamentarian, the speaker and facilitate.
22       Q.   As chief of staff to Speaker Straus, did you
23  have many discussions with members of the House
24  concerning voter ID laws?
25            MR. SWEETEN:  You can answer yes or no as

## 104

1   to whether you had communications.
2        A.   Yes.
3        Q.   Which members did you discuss voter ID with?
4             MR. SWEETEN:  You can answer, but don't
5   reveal the substance of the communications.
6        A.   Todd Hunter, Patricia Harless.  That would be
7   all I would remember off top of my head.
8        Q.   How frequently did you discuss voter ID with
9   Mr. Hunter?
10       A.   Not -- Not much.
11       Q.   Can you be more specific?
12       A.   More specific as in how many times?
13       Q.   Yes.
14       A.   Maybe two or three times.
15       Q.   Do you recall when those discussions took
16  place?
17       A.   No, not -- not the specific dates.
18       Q.   Are you able to narrow it down to a particular
19  year?
20       A.   Well, in the spring -- spring of last year.
21       Q.   And how about Representative Harless?  How
22  often did you speak to her about voter ID laws?
23       A.   Oh, maybe -- maybe three or four times.
24  Meredyth Fowler was the policy person, so she was the
25  lead policy person on it, so maybe three or four times.

DENISE DAVIS                                                    JUNE 14, 2012

---

### 105

1      Q.   And you said that Meredyth Fowler was the lead
2  policy person for Speaker Straus on the issue of voter
3  ID; is that right?
4      A.   Right.
5      Q.   Who else from the speaker's office worked on
6  the issue of voter ID?
7      A.   Directly, pretty much Meredyth.  I mean, she
8  was the point person on it.
9      Q.   Would Ms. Fowler consult with you regarding
10  voter ID?
11      A.   You mean, the substance of it or what was going
12  on with it, things like that?
13      Q.   Well, let's just start as a general matter, did
14  she talk to you about it at all?
15      A.   Yes.
16      Q.   Did she ever talk to you about the substance of
17  it?
18      A.   Yes.
19          MR. HARRIS:  Let's take a short break, if
20  that's okay.
21          THE WITNESS:  Okay.
22          (Recess from 1:28 p.m. to 1:40 p.m.)
23      Q.   (BY MR. HARRIS) Are you familiar with the
24  process through which the governor of Texas may declare
25  a particular type of legislation to be an emergency

---

### 106

1  item?
2      A.   Yes.
3      Q.   Can you tell me how that process works?
4          MR. SWEETEN:  You can answer as a general
5  matter to your understanding.  Don't -- And objection to
6  the extent it calls for speculation.  Go ahead.
7      A.   The legislature gets a proclamation from the
8  governor designating an item an emergency.
9      Q.   Within a particular session, how many items
10  does the governor typically declare to be an emergency?
11      A.   I mean, it's up to the governor to decide what
12  he wants, as many as or few as he wants.
13      Q.   In your experience from your years in the Texas
14  House, how many items in a -- would be designated
15  emergency items in a particular session?
16      A.   Oh, you know, I can't say.  Off the top of my
17  head, it's -- you know.
18      Q.   Would it be like less than 10 in a year?
19      A.   In a session?
20      Q.   In a session.
21      A.   Without specials or regular?  Possibly, yeah.
22  It's just up to the governor.
23      Q.   What is the effect of the governor issuing a
24  proclamation that an item is an emergency item?
25          MR. SWEETEN:  You can answer as a general

---

### 107

1  parliamentary procedure as to matters of the public
2  record.
3      A.   Well, the governor issues a proclamation
4  designating something an emergency.  The House and the
5  Senate receive it and decide whether or not they want to
6  act on it and how they want to take it up.
7      Q.   Does it make any difference whether the
8  governor declares something to be an emergency item or
9  not in terms of how and when it gets considered by the
10  legislature?
11          MR. SWEETEN:  You can answer as matters of
12  public record.
13      A.   There's precedent in the rules that says
14  it's -- the House gets to decide how they want to handle
15  emergency matters.
16      Q.   There's an emergency calendar in the House; is
17  that right?
18      A.   Yes.
19      Q.   And the rules provide that -- that certain
20  issues -- bills concerning certain issues may be
21  assigned to the emergency calendar.  Is that your
22  understanding?
23      A.   Yes.
24      Q.   And the rules also state that a bill deemed to
25  be an emergency by the governor may be placed on the

---

### 108

1  emergency calendar; is that right?
2      A.   Yes, it may be.
3      Q.   And what is the emergency calendar?
4      A.   I mean, it's one of the calendars that the
5  calendars committee can assign bills to that it has
6  determined are important bills that are emergency in
7  nature.
8      Q.   Given that the emergency calendar is for
9  important bills that are of an emergency in nature, is
10  it the case that bills assigned to the emergency
11  calendar can be considered sooner than other bills?
12          MR. SWEETEN:  Objection.  Assumes facts
13  not in evidence.  Also, you can answer as a matter of
14  general parliamentary procedures or matters of the
15  public record.  Don't reveal matters of privilege.
16      A.   What do you mean by sooner?
17      Q.   Why have an emergency calendar?
18          MR. SWEETEN:  You can answer as a matter
19  of general parliamentary procedure.
20      A.   Well, the rules put the emergency calendar in
21  the system of calendars as the first calendar.  So if
22  the bill is assigned to an emergency calendar, then it
23  is taken up ahead of the other bills.
24      Q.   As a general matter, if a bill concerning voter
25  identification requirements were not designated by the

DENISE DAVIS                                                                JUNE 14, 2012

## 109

1   governor as an emergency item, could that bill be
2   assigned to the emergency calendar?
3          MR. SWEETEN:  You can answer as to general
4   parliamentary matters, matters of public record.  Don't
5   reveal privileged information.
6       Q.  It could be so assigned?
7       A.  Yes.
8       Q.  And I think you said that the emergency
9   calendar set forth the types of bills that could be --
10  that could be assigned to that calendar; is that right?
11      A.  Yes.
12      Q.  Which category of bills would a voter ID
13  legislation not designated as an emergency by the
14  governor fall within?
15      A.  Rule 7 says --
16          MR. SWEETEN:  Same instruction.  Go ahead.
17      A.  -- "Emergency calendar on which shall appear
18  bills considered to be of such pressing and imperative
19  import as to demand immediate action."
20      Q.  And so it could fall into that category?
21      A.  If the calendars committee believes that that
22  rule applies, yes.
23      Q.  As a general matter, why would the governor
24  deem something to be an emergency?
25          MR. SWEETEN:  Objection.  That calls for

## 110

1   matters of legislative privilege and calls for
2   speculation.  Don't answer the question as posed.
3       Q.  Putting aside any particular legislation and
4   given that the governor is not a legislator, as a
5   general matter, why would the governor deem something to
6   be an emergency?
7          MR. SWEETEN:  Objection.  Calls for
8   speculation.  Objection.  Could require her to reveal
9   her thoughts and mental processes about legislation
10  which she does not have to do or communications with
11  state agencies or other protected members.  Don't answer
12  to the extent you would do that.
13      Q.  Are you able to answer the question in spite of
14  counsel's objection?
15      A.  I don't know the answer.  I don't know why the
16  governor decides something is an emergency or not.  I
17  don't know the answer.  That is something that he does
18  with his staff in his office.
19      Q.  Does the governor's office ever consult with
20  the speaker or his staff with respect to which items to
21  designate as an emergency?
22          MR. SWEETEN:  You can answer as to whether
23  or not there are communications covering that general
24  issue.
25      A.  Do they ever consult?

## 111

1       Q.  Yes.
2       A.  Yes.
3       Q.  Did the governor's office consult with the
4   speaker or the speaker's office concerning whether or
5   not to designate voter ID as an emergency item?
6          MR. SWEETEN:  I will let her answer as to
7   the general subject matter of -- of the issue of
8   emergency legislation.  You've put too much substance in
9   that question for me to let her answer as phrased, so if
10  you want to ask her a more general subject matter question,
11  I'll let her answer.
12          MR. HARRIS:  I think that the general
13  matter was covered by the last question.  I would argue
14  that nothing more than my question would have to go on a
15  privilege log, but not interested in fighting that out
16  here in the room.
17          MR. SWEETEN:  If you want to ask her if
18  there were communications between Speaker Straus's
19  office and the governor's office about whether this was
20  an emergency, I will let her answer that question, but
21  not anymore substance than that.
22      Q.  Were there any discussions between the governor
23  or his staff and the speaker or his staff concerning
24  whether to designate voter ID as an emergency?
25          MR. SWEETEN:  It's the same question that

## 112

1   you asked.  I'm going to let you answer yes or no.
2       A.  I actually don't remember if we talked about it
3   with them or not.
4       Q.  Do you recall whether there were any
5   communications between the governor's office and the
6   speaker's office concerning the declaration of emergency
7   items in 2011?
8       A.  Yes.
9       Q.  And are you saying there were some
10  communications?
11      A.  Yes.  A variety, but I don't know if this was
12  one or not because there were -- you know, there were
13  several.
14      Q.  Do you know why the governor designated voter
15  ID as an emergency item?
16      A.  No.
17      Q.  Do you recall what other items were designated
18  as an emergency during the regular 2011 session?
19      A.  I think Sanctuary Cities, sonogram bill, voter
20  ID, the Texas windstorm -- TWIA, Texas Windstorm
21  Insurance Association, and those are the ones I remember
22  off the top of my head.  The pat-down bill -- the
23  homeless -- The pat-down bill.
24      Q.  Are you familiar with Senate Bill 14 from the
25  2011 82nd legislative session?

DENISE DAVIS                                                    JUNE 14, 2012

## 113

1    A.   Not by number.  I don't -- Not by that number.
2         (League Exhibit 12 marked.)
3    Q.   I would ask that this document be marked for
4    identification League Exhibit 12.  And, Mrs. Davis,
5    please take a few moments to look over the document.
6    A.   Okay.
7    Q.   Does this refresh your recollection as to the
8    subject matter of Senate Bill 14 from the 82nd session?
9    A.   Yes.
10   Q.   And this bill, like the previous bills we
11   looked at, concerns identification requirements for
12   voters in Texas.
13   A.   Yes.
14   Q.   Is that right?  Did you have any discussions
15   about SB14?  I think I asked you previously about
16   general discussions you had with members.  I believe you
17   said that you had discussions with Representative Hunter
18   and Representative Harless.
19   A.   Yes.
20   Q.   Did those discussions concern SB14?
21   A.   With -- With Representative Harless, we
22   probably discussed 14.
23   Q.   And what about Representative Hunter?
24   A.   I think those were mostly general discussions.
25   Q.   Other than those two representatives, did you

## 114

1    speak to any other members of the House about SB14?
2    A.   I don't -- I don't -- Not to my memory, no.
3    Q.   Did you have any discussions with constituents
4    regarding SB14?
5    A.   No.
6    Q.   If you can take a look at Page 9 of the bill in
7    Section 63.0101.
8    A.   Okay.
9    Q.   Ms. Davis, do you agree that that appears to be
10   a list of documentation that is an acceptable photo
11   identification under the bill?
12   A.   Yes.
13   Q.   And how would you compare this list in 63.0101
14   to the list of identification permitted under previous
15   bills that we've looked at today?
16        MR. SWEETEN:  Do not answer.  It would
17   require you to reveal your thoughts, mental impressions
18   about legislation instruction.  Instruct you not to
19   answer based on legislative privilege.
20   Q.   What are the forms of identification that are
21   permitted under this bill, SB14?
22        MR. SWEETEN:  You can answer based on the
23   text of the bill.
24   A.   It says an acceptable form of photo
25   identification under this chapter, a driver's license,

## 115

1    election identification certificate or personal
2    identification card issued by the Department of Public
3    Safety that hasn't expired, a US military ID card with
4    the person's photograph, a US citizenship certificate
5    with the person's photograph, a passport, a license to
6    carry a concealed handgun -- or a license to carry a
7    concealed handgun.
8    Q.   And limiting your answer solely to the text of
9    the bills that we've looked at here today, how would you
10   compare Section 63.0101 in SB14 to the prior versions of
11   the voter ID bills that we looked at?
12        MR. SWEETEN:  She's not going to reveal
13   her mental thoughts and impressions about why 14 is
14   different than something else.  If you want her to go
15   through the exercise of comparing the language of Senate
16   Bill 14 and the language of 362, as marginally relevant
17   as that would be, I will let her compare the actual text
18   in front of her.  She will not reveal her mental
19   impression and thoughts about why these are different or
20   how they're different.
21   Q.   Well, limited yourself to a comparison of SB362
22   and SB14, please tell me how the bills differ in terms
23   of the identification permissible.  And I will refer you
24   to Page 5 of SB362.
25   A.   Okay.  Well, all I can do is read what's in

## 116

1    each one of them, but 5 -- I mean in SB362, you have a
2    photo ID, which would be a driver's license or photo ID
3    that hadn't expired or a military ID or a citizenship
4    certificate with the photograph, a passport, a concealed
5    handgun license or a valid ID card issued by a -- by the
6    Federal government or an agency, institution of the
7    Federal government or a political subdivision.
8    Q.   Do you agree that SB362 would also permit a
9    valid identification card issued by an agency,
10   institution or political subdivision of the State of
11   Texas?
12   A.   Yes.
13   Q.   And do you agree that SB14 in contrast does not
14   permit one to vote with a valid identification card
15   issued by an agency, institution or political
16   subdivision of the state?
17        MR. SWEETEN:  You can answer based on the
18   text of the bills he's got in front of you.
19   A.   No, I don't see that in the -- in Senate Bill
20   14.
21   Q.   And do you recall anything about the public
22   legislative history of SB14?
23   A.   So, no, not -- not off the top of my head I
24   don't, no.
25        (League Exhibit 13 marked.)

DENISE DAVIS                                              JUNE 14, 2012

## 117

1   Q.  I'd ask that this document be marked as League
2  Exhibit 13. Mr. Davis, please take a few moments or as
3  much time as you need to familiarize yourself with the
4  documents.
5   A.  Okay.
6   Q.  Do you agree this appears to be a legislative
7  history of SB14 from the 82nd regular legislative
8  session?
9   A.  Yes.
10   Q.  And it looks like this history is in reverse
11  order of the ones we've been looking at previously, but
12  turning to the -- to the last page of the exhibit, looks
13  like SB14 was filed on January 12, 2011; is that right?
14   A.  Yes.
15   Q.  And it looks like on January 24th, 2011 the
16  bill was referred to the committee of the whole Senate.
17  Do you see that?
18   A.  Yes.
19   Q.  Do you know who makes appointments to
20  particular committees on the Senate side?
21   A.  The lieutenant governor.
22   Q.  Do you know why the lieutenant governor
23  referred SB14 to the committee of the whole Senate?
24          MR. SWEETEN: Objection. Legislative
25  privilege. Objection. Calls for speculation. It would

## 118

1  require her to reveal her mental thoughts, processes
2  about why the lieutenant governor would have referred
3  something to the committee of the whole which invades
4  the legislative privilege or it also could require her
5  to reveal communications that she's had with the various
6  entities protected under the privilege. Therefore, my
7  question is to not answer the question.
8          MR. HARRIS: As before, I'm just asking if
9  she knows why which requires a yes or no. Will you
10  permit her to answer yes or no?
11          MR. SWEETEN: You can answer that question
12  yes or no.
13   A.  No.
14   Q.  And then it looks like on January 25, 2011,
15  SB14 was set as a special order; is that right?
16   A.  Where?
17   Q.  On January 25th, 2011, you see there's a few
18  actions taken that day, but I see --
19   A.  Yes.
20   Q.  -- one entry that says "set as special order,"
21  right?
22   A.  Yes.
23   Q.  Based on our previous review of -- of the
24  Senate rules with respect to special orders in voter ID,
25  do you know how many votes would have been required to

## 119

1  set SB14 as a special order?
2   A.  The -- A majority of the members of the Senate.
3   Q.  Skipping ahead to January 26, 2011, this is on
4  Page 6 of 10 of the exhibit.
5   A.  Okay.
6   Q.  Do you see that on January 26th, 2011, SB14 was
7  reported engrossed from the Senate?
8   A.  Yes.
9   Q.  And that means the bill passed the Senate;
10  is that right?
11   A.  Yes.
12   Q.  And at that time the bill went to the House; is
13  that right?
14   A.  Yes.
15   Q.  Now, I see here that the bill was referred to
16  the voter identification and voter fraud, select. Do
17  you understand that to mean a select committee?
18   A.  Yes.
19   Q.  What is a select committee?
20          MR. SWEETEN: You can answer as a general
21  matter.
22   A.  Under the rules it's just a -- a committee
23  that -- that can be created in a House under the
24  rules, separate from a standing committee.
25   Q.  In general, what is the purpose of having a

## 120

1  select committee?
2          MR. SWEETEN: Don't reveal matters of
3  legislative privilege. If in doing so, it would, do not
4  answer the question.
5   A.  You can have a lot of reasons for it. It
6  depends on the issue, the legislature, the members'
7  interests, whatever. A variety of reasons.
8   Q.  What's the difference between a select and a
9  standing committee?
10   A.  A standing committee is considered to be a -- a
11  permanent -- permanently in the rules from session to
12  session, and a select committee usually lasts for that
13  particular legislature.
14   Q.  When was the voter identification and voter
15  fraud select committee established?
16   A.  Last -- Last session during the committee
17  appointments.
18   Q.  Were any bills other than SB14 referred to the
19  voter identification and voter fraud select committee?
20   A.  I believe, yes. I believe there were some that
21  were -- that were sent there initially, yes.
22   Q.  And which bills are you referring to?
23   A.  I don't know off the top of my head. I believe
24  some were sent there and then re-referred to elections
25  or whatever.

DENISE DAVIS                                                          JUNE 14, 2012

---

121

1    Q.   Why was SB14 bill -- let me -- Let's step back
2    for a second.  Do you know why SB14 was referred to the
3    voter identification and voter fraud select committee?
4    A.   No.
5    Q.   What is the process of creating a select
6    committee?
7         MR. SWEETEN:  Don't reveal matters of
8    privilege as to a specific piece of legislation.  If
9    doing so you would, then do not answer the question.
10   A.   It's just a proclamation that's issued by the
11   speaker.
12   Q.   During your time in the House, how many select
13   committees would typically be created in any given
14   session?
15        MR. SWEETEN:  You can answer as a matter
16   of public record.
17   A.   Well, they're created from one legislature to
18   the next, so sometimes 9, 10, 11.  I mean, just depends.
19   Q.   Are the select committees dissolved or
20   terminated in some official way?
21   A.   They last from one legislature to the next.
22   Q.   Do you know whether there was any -- there had
23   been a previous select committee on voter identification
24   and voter fraud?
25   A.   I don't know.

---

122

1    Q.   Does the speaker appoint members to select
2    committees?
3    A.   Yes.
4    Q.   As a general matter when you were chief of
5    staff to the House -- excuse me -- to Speaker Straus,
6    did he consult with you regarding whether or not to
7    create a select committee?
8         MR. SWEETEN:  You can answer as to whether
9    he consulted with you.
10   A.   Yes.
11   Q.   And would the speaker consult with you
12   regarding members as a general matter to appoint to a
13   select committee?
14   A.   Yes.
15   Q.   What sort of factors would you take into
16   account as a general matter with respect to whether or
17   not to create a select committee as opposed to just
18   assigning a bill to one of the standing committees?
19        MR. SWEETEN:  Don't answer that.  That
20   would reveal matters of privilege.  Instruct not to
21   answer.
22        MR. HARRIS:  And just for the record,
23   that -- the privilege you are asserting is a legislative
24   privilege?
25        MR. SWEETEN:  Absolutely.  With respect to

---

123

1    the speaker who she's testified designates the select
2    committees.  It would reveal thought processes.  That's
3    legislatively privileged.  Don't answer.
4    Q.   As parliamentarian, would the speaker ever
5    consult with you regarding whether or not to create a
6    select committee?
7    A.   Yes.
8    Q.   What results would govern the decision whether
9    or not to create a select committee?
10        MR. SWEETEN:  Same objection.  Don't
11   reveal the thought processes that the speaker may have
12   had or your own internal thought processes as to why a
13   select committee would be impacted in answering the
14   question.  Legislative privilege.
15   A.   Well, there are some rules in there -- in the
16   House rules for the select committees, and I don't know
17   what they are specifically, but there are rules in the
18   rules -- in the House rules for it.
19   Q.   Skipping ahead in this legislative history that
20   we've been looking at, it looks like SB14 passed the
21   House on March 24th, 2011; is that right?
22   A.   Yes.
23   Q.   It says that on April 5th, 2011, a House
24   amendment was laid before the Senate.  What do you
25   understand that entry to mean?

---

124

1    A.   That is the House version of the Senate bill
2    that is Senate bill with House amendment attached to it.
3    Q.   It says that on that same day, April 5th, 2011,
4    the Senate refuse tod the concur.  Does that mean that
5    the Senate refused to adopt the version of the bill as
6    amended by the House?
7    A.   Yes.
8         MR. SWEETEN:  You can answer based on
9    public record, which I think you are.
10   A.   Yes.
11   Q.   Then it looks like the Senate requested a
12   conference committee on April 6, 2011.  Do you see that?
13   A.   Yes.
14   Q.   What is a conference committee?
15   A.   It's just a committee between of the House and
16   the Senate that convenes to reconcile the differences
17   between the House and Senate versions of the bill.
18   Q.   Who appoints members to the -- to a conference
19   committee as a general matter?
20   A.   The lieutenant governor and the speaker.
21   Q.   Did the speaker consult with you regarding
22   appointment of members to the conference committee for
23   SB14?
24        MR. SWEETEN:  You can answer.
25   A.   Yes.

DENISE DAVIS                                                JUNE 14, 2012

---

### 125

1    Q.   How many members of the House and Senate sit on

2    a conference committee?

3    A.   Five members of the House and five members of

4    the Senate sit on a conference committee as a general

5    matter.

6    Q.   As a general matter, how are members chosen to

7    sit on the conference committee?

8         MR. SWEETEN:   Don't reveal any thought

9    processes of the speaker or yourself as to any

10   particular bill with respect to this.   You can answer as

11   to matters of the public record, but don't reveal your

12   decisional process as a matter of legislative privilege.

13   A.   Usually the author and the sponsor of the bill

14   are put on there and beyond that it's a number of

15   factors.

16   Q.   What are those factors you are referring to?

17   A.   It could be --

18        MR. SWEETEN:   Same objection.

19   A.   -- any of them.

20   Q.   Well, when you say anything, there must be some

21   factors that are more typically considered, right?

22        MR. SWEETEN:   Same instruction, but don't

23   reveal your thought processes regarding any specific

24   piece of legislation.   If in answering the question you

25   do so, do not answer it.

---

### 126

1    A.   Interest, expertise, seniority, experience, a

2    number of things.

3    Q.   Is there a required balance between Democrats

4    and Republicans that need to be appointed to a

5    conference committee?

6    A.   No.

7         MR. SWEETEN:   Same instruction.

8    Q.   How would the speaker and lieutenant governor

9    typically decide how many Republicans and how many

10   Democrats to appoint to a conference committee without

11   regard to any particular piece of legislation?

12        MR. SWEETEN:   You can answer if it will

13   not reveal motivations regarding any particular piece of

14   legislation.   If it will, do not answer the question.

15   A.   I can't answer it.

16   Q.   And as a matter of the public record, is there

17   a -- typically certain members of Democrats and

18   Republicans appointed to a conference committee?

19   A.   Yes.

20   Q.   It looks like from this legislative history

21   that on May 5th, 2011, a conference committee report was

22   distributed.   And I'm looking at the first page.

23   A.   Yes.

24   Q.   And then the last entry says that the Senate

25   adopted a resolution to go outside bounds on May 9,

---

### 127

1    2011.   Do you see that?

2    A.   Yes.

3    Q.   What does a resolution to go outside bounds

4    mean?

5         MR. SWEETEN:   You can answer as a general

6    matter.

7    A.   That is a resolution that gives the conference

8    committee permission to submit a bill that did more than

9    the original bill.

10   Q.   And when you say "that did more than the

11   original bill," what do you mean by that?

12   A.   That exceeded the jurisdiction of the original

13   bill, added new language that wasn't in either bill and

14   things like that.

15   Q.   As a matter of public record do you know what

16   this entry is referring to with respect to SB14?

17   A.   No, I don't.

18   Q.   And it looks like on May 9, 2011, the Senate

19   adopted the conference committee report; is that right?

20   A.   Yes.

21   Q.   And then on May 16th, the House adopted the

22   conference committee report?

23   A.   Yes.

24   Q.   Is that right?   And it looks like the bill was

25   signed in the House, the Senate and sent to the governor

---

### 128

1    on May 18th, 2011; is that right?

2    A.   Yes.

3    Q.   With respect to any of the four voter ID bills

4    that we've looked at today, are you aware of any

5    analysis with regard to the number of voters in Texas

6    who lack the required forms of photo ID?

7    A.   No.

8    Q.   Are you aware of with -- Respect to any of

9    those same four bills, are you aware of any analysis

10   with respect to the proportion of racial or ethnic

11   minority groups that possess the required forms of photo

12   ID?

13   A.   No.

14   Q.   Are you aware of -- with respect to any of

15   these four bills, are you aware of any concerns

16   raised -- publicly raised by members of the House with

17   regard to the impact of the bill on racial or ethnic

18   minority groups?

19        MR. SWEETEN:   He's asking about public

20   statements made about this issue.   You can answer to

21   that extent.

22   A.   Yes.

23   Q.   And what is your recollection of those

24   concerns?

25   A.   I just remember generally members in the

DENISE DAVIS                                                          JUNE 14, 2012

---

129

1    democratic caucus just raising those concerns generally.
2        Q.   Do you remember that for all four of the bills
3    or are you thinking about a particular -- particular
4    bill or session?
5        A.   I was thinking about last session, the 2011
6    session.
7        Q.   Are you aware of any similar concerns with
8    regard to the impact of the bill being raised by
9    interest groups or advocacy groups in Texas?
10       A.   No.
11       Q.   How about constituents?  Did you ever hear
12   constituents express concern that SB14 or any of the
13   three other bills we looked at would have a
14   disproportionate impact on them as minority voters?
15       A.   No.
16       Q.   Are you familiar with the Voting Rights Act?
17       A.   Yes.
18       Q.   Are you familiar with Section 5, preclearance
19   requirement under the Voting Rights Act?
20       A.   Yes.  Generally.
21       Q.   What is your general understanding of the
22   requirements of Section 5 of the Voting Rights Act?
23       A.   There are certain things that have to be
24   precleared by the justice department if they impact the
25   rights of minorities or protected groups to exercise the

---

130

1    right to vote, something along those lines.
2        Q.   From your time in the House would you say that
3    the legislature takes any steps to ensure that the bills
4    they pass are in compliance with the Voting Rights Act?
5        MR. SWEETEN:  Objection.  Legislative
6    privilege.  Don't answer the question.
7        Q.   Putting aside any particular piece of
8    legislation, are you aware of any steps taken by the
9    legislature to ensure compliance with the Voting Rights
10   Act?
11       MR. SWEETEN:  Objection.  To the extent it
12   would call for her to reveal thoughts, mental
13   impressions about a particular bill, do not answer that.
14   You can refer to matters of the public record.
15       A.   I know that they have attorneys that probably
16   look at, the ledge council.
17       Q.   When members of the democratic caucus raised
18   concerns about impact of SB14 on minority voters, what
19   was your opinion of those assessments by the democratic
20   members?
21       MR. SWEETEN:  Do not answer.  Legislative
22   privilege.  Instruct not to answer.
23       Q.   Do you have any understanding as to whether
24   Democrats or Republicans would be more or less likely to
25   possess the required forms of identification under SB14?

---

131

1        MR. SWEETEN:  In answering the question,
2    don't reveal your thoughts, mental processes about the
3    legislation, and he's asking you for an analysis of
4    that.  In fact, I'm going to instruct you not to answer
5    the question.  It's legislatively privileged.
6        MR. HARRIS:  Let's take a very short break
7    after which I expect to be able to conclude my
8    questioning quickly.
9        (Recess from 2:19 p.m. to 2:28 p.m.)
10       Q.  (BY MR. HARRIS) Ms. Davis, are you ready to go
11   back on the record?
12       A.   Yes.
13       Q.   I appreciate your time, and I have just a few
14   further questions.  First is, we were talking before
15   about -- Well, subject to many objections, my question
16   was whether there were differences in number of the
17   Republicans and Democrats who would possess the required
18   form of photo ID.  And my question is are you aware of
19   any evidence in the public to the effect that either
20   Republicans or Democrats would be more or less likely to
21   possess the kinds of ID required under SB14?
22       A.   I'm not.
23       Q.   Are you aware of any -- Putting aside the
24   specific substance of any discussions with legislators,
25   are you aware of any discussions amongst legislators

---

132

1    concerning the proportion of Republicans and Democrats
2    that would request the required forms of voter ID?
3        A.   You'll have to ask it again.
4        MR. HARRIS:  I'd ask that the court
5    reporter read back the question, please.
6        (Requested portion was read.)
7        A.   No.
8        MR. HARRIS:  I have nothing further at
9    this time, but reserve the right to reopen the
10   deposition subject to potential motions with respect to
11   privilege, and, otherwise, I would turn it over to the
12   United States to the extent it has questions.
13               EXAMINATION
14   BY MS. BERKOWER
15       Q.   Good afternoon, Ms. Davis.  My name is Risa
16   Berkower, and I'm here on behalf of the Attorney
17   General, Eric Holder.  I'll do my best not to cover any
18   ground that Mr. Harris has already covered with you
19   today.
20       A.   Okay.
21       Q.   I think to be clear though, when I use the term
22   voter ID or photo ID, I'm going to use those terms
23   interchangeably, and I want you to interpret them
24   broadly to mean a requirement that a voter present a
25   form of identification, whether it has a photo or

DENISE DAVIS                                                    JUNE 14, 2012

## 133

1  otherwise when voting in person before being permitted
2  to vote by regular ballot.  Does that make sense?
3      A.  Yes.
4      Q.  When I refer to the term minority voters, I
5  mean voters that are non-white or non-Anglo.  Does that
6  make sense?
7      A.  Yes.
8      Q.  If you have any questions about what I'm trying
9  to ask, just let me know and I'll try and rephrase.
10     A.  Okay.
11     Q.  So with regard to your duties when you were a
12  parliamentarian, focusing on those right now, you said
13  that you would provide advice to the speaker.  Was
14  that -- Just to be clear, was that limited only to
15  procedural topics or was the advice ever substantive?
16     A.  Procedural.
17     Q.  Is the speaker bound to take your advice?
18     A.  No.
19     Q.  Why -- why -- Why not?
20     A.  Well, traditionally, the parliamentarian is an
21  advisor to the speaker or to the presiding officer.
22     Q.  Does the speaker usually take the advice of a
23  parliamentarian just generally in terms of your service?
24     A.  Generally, yes.
25     Q.  What is a parliamentary inquiry exactly?

## 134

1      A.  That is a question that a member asks of the
2  chair related to procedural issues before the House.
3      Q.  And what does the parliamentarian do when a
4  parliamentary inquiry is made?
5      A.  The parliamentarian assists the speaker in
6  answering the question.
7      Q.  Is that something that occurs on the record or
8  off the record?
9      A.  Both.
10     Q.  How does -- How is it determined when it's on
11  the record or off the record?
12     A.  It's up to the member.
13     Q.  In your memory has there been any instance in
14  which the speaker has not taken your advice on the
15  public record?
16     A.  You mean, where I've given the speaker
17  confidential advice?
18     Q.  Well, I guess you said sometimes your advice is
19  made on the record; is that accurate?
20     A.  Well, yes.  I mean, the question is asked and
21  then you advise the speaker between the two of you, but
22  the parliamentarian never speaks on the record.
23     Q.  Oh, I see.  And how does a bill get brought up
24  for a vote exactly?  What are the procedures there?
25     MR. SWEETEN:  In the House?

## 135

1      MS. BERKOWER:  Yes.
2      MR. SWEETEN:  You can testify as to
3  matters of public record.
4      A.  A bill is placed on the calendar by the
5  calendar's committee and for consideration.  That
6  calendar lays out or is before the House 24 to 36 hours
7  before it's taken up and then the -- then the speaker
8  lays the bill out in the regular order of business.
9      Q.  Is every bill put -- brought up for a vote that
10  makes that committee placed on a calendar?
11     A.  Ask me that again.
12     Q.  Is every bill that's placed on the calendar
13  brought up for a vote?
14     A.  No.
15     Q.  When would a bill not be brought up for vote?
16     MR. SWEETEN:  You can answer as a matter
17  of public record.
18     A.  May not be reached in time, could be postponed
19  a member may decide they don't want the bill to be
20  brought up for a vote or just a variety of reasons.
21     Q.  Does the parliamentarian have a role in the
22  decision of whether a bill is brought up for a vote?
23     A.  No.
24     Q.  Is House leadership ever involved in the
25  decision if a bill will be brought up for a vote?

## 136

1      A.  You mean once it's on the calendar?
2      Q.  Yes.
3      A.  No.
4      Q.  When would House leadership be involved then?
5      MR. SWEETEN:  You can answer regarding
6  matters of the public record.  Don't reveal privilege.
7      A.  Well, the bill belongs to the individual
8  member, so it's usually up to the member as to whether
9  or not they want their bill brought up for a vote.
10     Q.  With regard to the voter ID legislation that
11  came up before the House during the time you were a
12  parliamentarian, 2005, 2007, 2009, is your
13  responsibility solely procedural?
14     A.  Yes.
15     Q.  Did you ever issue ruling papers during your
16  time as a parliamentarian?
17     A.  Yes.
18     Q.  Are those public?
19     A.  Yes.  They're in the journal.  If the member
20  requests a written ruling, it was placed -- requested a
21  written ruling, it was placed in the journal.
22     Q.  Did you make any these publicly issued rulings
23  during the time that voter ID -- or about any of the
24  voter ID legislation?
25     A.  I don't remember.

DENISE DAVIS                                             JUNE 14, 2012

---

### 137

1  Q.  Does the parliamentarian ever assist with the
2  development of legislation?
3  A.  Well, do you mean like the substantive drafting
4  of it, things like that?
5  Q.  Sure, or anything else really.
6  A.  Rarely.  They usually just review it once it's
7  been written.  They may -- They may review an amendment
8  with a member to assist the member, but they usually
9  don't draft legislation.  That would be very unusual.
10  Q.  Do you remember ever drafting legislation?
11  A.  Not legislation, no.
12  Q.  What about amendments?
13  A.  Usually, no, I never draft it.  I would review
14  it and legislative council's on the floor to do that.
15  Q.  Is the assistance that you provide with the
16  development of legislation as parliamentarian more
17  procedurally oriented or would you provide substantive
18  advice as well?
19  A.  No, it's procedural.
20  Q.  In your view as parliamentarian, are there any
21  areas of procedure that impact substance of bills?
22       MR. SWEETEN:  You can answer as a general
23  matter.  Don't reveal privilege.
24  A.  It's usually issues of germaneness, different
25  things like that and that is a procedural issue.

### 138

1  Q.  But it impacts the substance because it's a
2  question of what substance is germane to the bill topic.
3  Is that what you mean?
4       MR. SWEETEN:  Objection.  Vague.
5  Objection.  Calls for speculation.
6  A.  It's hard to know.  I mean, some members may
7  think it's substantive and some might not, so it's hard
8  to know, but the parliamentarian is limited to
9  interpreting whether or not the bills actually comply
10  with the rules.
11  Q.  And one of the rules is germaneness.
12  A.  Is germaneness.
13  Q.  Now, you said you were also special counsel to
14  the House.  Is there any distinction between that
15  position and the parliamentarian position?
16  A.  The special counsel deals with just a variety
17  of things, sometimes open records, different things like
18  that and legal issues.
19  Q.  As special counsel did you have any role with
20  regard to development of legislation?
21  A.  No.
22  Q.  Legislative drafting, in that capacity?
23  A.  No.
24  Q.  And I guess I meant to ask this when we were
25  speaking about your role as parliamentarian.  Will

### 139

1  members ever ask questions when they're developing
2  legislation about certain procedural points that they
3  need to address with their legislation?
4  A.  Yes.
5  Q.  What types of questions did they ask?  What
6  areas did they get into?
7       MR. SWEETEN:  In answering the question,
8  don't reveal matters of privilege or anything with
9  respect to a specific bill.  If you cannot answer that
10  question, then do not do so.
11  A.  Just one-subject issues, things like that.
12  Does it comply with the one-subject rule, things like
13  that .
14  Q.  What's the one-subject rule?
15  A.  The bill -- Under the constitution, a bill can
16  only have one subject.
17  Q.  And is that how germaneness factors in?
18  A.  Or germaneness would be another procedural
19  rule.
20  Q.  Just to be clear though, how is germaneness
21  different from one subject?
22  A.  Well, there's constitutional germaneness and
23  there is the -- the one-subject rule.  It gets really
24  confusing, but there's a germaneness rule in the rules
25  and then there's one-subject rule.

### 140

1  Q.  Okay.  How would you generally distinguish
2  between those when you were working on bills?
3  A.  Well, you're talking about --
4       MR. SWEETEN:  Hold on.  When she's working
5  on bills, how would she distinguish it?  Just don't
6  reveal matters regarding specific legislation in
7  answering this question.  You can reveal matters of
8  general procedure if you can do so without revealing
9  matters of privilege, okay?
10  A.  When you are talking about germaneness issues,
11  you typically are talking about amendment to a bill, and
12  when you are talking about the one-subject rule, you are
13  talking about the entire bill and the subject of that
14  particular piece of legislation.
15  Q.  Okay.  Now, turning your time as chief of staff
16  for Speaker Straus, when you were in that role did you
17  ever participate in legislative drafting?
18       MR. SWEETEN:  You can answer yes or no.
19  A.  Yes.
20  Q.  Did you ever participate in legislative
21  drafting relating to voter ID legislation?
22  A.  No.
23  Q.  What district does Speaker Straus represent?
24  A.  121.
25  Q.  Do you know what the demographics of that

DENISE DAVIS                                                    JUNE 14, 2012

## 141

1  district are?
2      A.  I know that it's mostly Republican and that's
3  it.
4      Q.  Turning back to -- I think you testified
5  earlier about the speaker's responsibilities concerning
6  committee appointments.  Does the parliamentarian have a
7  role in committee appointments?
8      A.  Yes.
9      Q.  What is that role?
10     A.  The parliamentarian advises the speaker on
11  seniority, different things like that.
12     Q.  Again, would that advice be more procedural
13  rather than substantive?
14     A.  Yes.
15     Q.  And with regard to the creation of select
16  committees, does the parliamentarian have a role in the
17  creation of those committees?
18     A.  A procedural role, yes.
19     Q.  What about assignment of bills to the
20  committee?  Does the parliamentarian play a role in that
21  assignment process?
22     A.  Yes.
23     Q.  What is that role?
24     A.  The parliamentarian --
25         MR. SWEETEN:  Don't reveal any matters

## 142

1  related to specific legislation.  You can answer
2  generally if you can do so without answering
3  specifically.
4      A.  The parliamentarian reviews bills and -- to see
5  where they fit in the jurisdiction of the committees and
6  advises the speaker if he has questions, things like
7  that.
8      Q.  Can the House overrule a bill referral decision
9  as a matter of procedure?
10     A.  I don't know.  I've not seen that.  I do not
11  know.
12     Q.  What about the speaker?  Can the speaker
13  overrule a decision concerning bill referral?
14     A.  Well, it's the speaker's decision as to where
15  the bills go, so --
16     Q.  Okay.  So you are advising him and then he's
17  choosing whether to take your advice or not.
18     A.  Yes.
19     Q.  He or she.
20     A.  Right.
21     Q.  Now, I know it's a little confusing just
22  because we are kind of jumping around, and you've had
23  different roles, but turning back to the creation of the
24  select committee on voter identification and voter fraud
25  in 2011 when you were the chief of staff for Speaker

## 143

1  Straus, do you remember when that occurred?
2      A.  Yes.
3      Q.  And as chief of staff did you have any
4  responsibilities concerning materials that were
5  distributed to the public from the speaker's office?
6         MR. SWEETEN:  Can you read that back?
7         (Requested portion was read.)
8         MR. SWEETEN:  You can answer.
9      A.  Yes.
10     Q.  What responsibilities did you have?
11     A.  You mean, if we put something on the internet
12  or things like that or letters or -- I'm not clear --
13     Q.  Yeah.  Well, I'll be more specific.  What about
14  press releases?  Did you have any responsibilities with
15  regard to press releases?
16     A.  Well, the press secretary would distribute
17  those.
18     Q.  Did you review them in any way?
19     A.  Occasionally I have.
20         (US Exhibit 730 marked.)
21     Q.  I have what I guess we'll mark for this
22  deposition as Exhibit 730, please.  Have you seen this
23  document before?
24     A.  I don't -- I don't remember seeing it, but --
25     Q.  Do you know what it is?

## 144

1      A.  It's a -- It's a press release for
2  committees -- committee assignments.
3      Q.  And was it released during your time as chief
4  of staff for the speaker?
5      A.  If -- It's from the House website.  I would say
6  yes.
7      Q.  Okay.  Turning your attention to just before on
8  the first page of the exhibit, there is like a gap and
9  two lines up from that it says, "Fast track select
10  committee on voter identification, voter fraud."  Do you
11  see that?
12     A.  Yes.
13     Q.  Do you know -- Do you know what it means that
14  this was labeled a fast track committee?
15     A.  I don't.
16     Q.  Have you ever seen a select committee be
17  labeled a fast track committee before?
18     A.  No, I don't, and I don't -- I don't know that
19  that's the correct title.  That's the first time I
20  remember seeing that.  So I'm not sure why that's there.
21     Q.  Okay.  Do you recall how many bills passed out
22  of the select committee on the voter identification,
23  voter fraud --
24     A.  No.
25         (US Exhibit 731 marked.)

DENISE DAVIS                                           JUNE 14, 2012

## 145

```
 1        Q.   I think this will be Exhibit 731, please.  Do
 2   you know what this?
 3        A.   Yes.  It's a report that was printed out in
 4   June of this year, bill report.
 5        Q.   What is the bill report referring to?
 6        A.   Senate Bill 14.
 7        Q.   Is a bill report specifically on Senate Bill 14
 8   or does it seek to list the number of bills out of the
 9   committee -- on the select committee on voter
10   identification and voter fraud?
11        A.   It's just for Senate Bill 14 or it's all the
12   bills that came out of committee, yes, that's true.
13        Q.   Okay.  And how many bills came out of that
14   committee?
15        A.   One.
16        Q.   That was Senate Bill 14?
17        A.   Yes.
18        Q.   So do you know if any other bills were
19   considered by the select committee?
20        A.   I believe other bills were referred to the
21   select committee at one point.  I don't know if they
22   actually took them up or not.
23        Q.   Do you know SB14, without revealing why, but do
24   you know why SB14 was not referred to the elections
25   committee?
```

## 146

```
 1        A.   No.
 2        Q.   In your experience and all of your experience
 3   in the House is it unusual for a select committee to
 4   have overlapping jurisdiction with another committee?
 5        A.   No.
 6        Q.   Can you think of other select committees that
 7   had overlapping jurisdictions with other committees?
 8             MR. SWEETEN:  You can answer as a general
 9   matter.
10        A.   School finance, emergency preparedness, special
11   districts.  There is a number of them.  Those would be
12   some examples.
13        Q.   Do you know of any other committees that passed
14   only one bill out to the House?
15             MR. SWEETEN:  You can answer as a general
16   matter.
17        A.   No, I don't.  I don't know.
18        Q.   You don't know of any?
19        A.   I don't know if -- I don't know.  There could
20   be some, but I can't -- off the top of my head, I can't
21   remember.
22        Q.   Without revealing the substance, are you aware
23   of any communications between Speaker Straus or members
24   of his office and other legislators concerning the
25   creation of the select committee?
```

## 147

```
 1             MR. SWEETEN:  You can answer.
 2        A.   Yes.
 3        Q.   Who were those communications between?
 4        A.   I don't -- I know that he conferred with
 5   different members.  I don't know exactly who they were,
 6   what they discussed, but --
 7        Q.   When you said he, who are you referring to?
 8        A.   The speaker.
 9        Q.   Do you know if the speaker conferred with the
10   lieutenant governor's office about the creation of the
11   select committee?
12        A.   I do not.
13        Q.   Do you know if the speaker conferred with the
14   governor's office concerning the creation of the select
15   committee?
16        A.   I don't.
17        Q.   Now, I think you testified that there was a
18   period of time in 2007 through 2009 -- part of 2007
19   through part of 2009 when you were not employed by the
20   legislature; is that accurate?
21        A.   Yes.
22        Q.   Were you aware of a Supreme Court decision,
23   Crawford versus Marion County Board of Elections that
24   was issued during that time?
25        A.   No.
```

## 148

```
 1        Q.   Did you become aware of that decision later on?
 2        A.   No.
 3        Q.   Are you familiar with that today?
 4        A.   No.
 5        Q.   If I told you that that decision concerned the
 6   constitutionality of a photo ID from Indiana, would that
 7   refresh your recollection at all?
 8        A.   I vaguely remember them discussing a voter ID
 9   bill from Indiana, but I don't remember a court case
10   about it.
11        Q.   Okay.  So you testified earlier that you have
12   some familiarity with the Federal Voting Rights Act; is
13   that accurate?
14        A.   Very general.
15        Q.   General.  Do you believe that compliance with
16   the Federal Rights Voting Act is an important
17   consideration of the law making process?
18             MR. SWEETEN:  Don't reveal matters of
19   legislative privilege which would be matters that --
20   mental impressions, thoughts, motivations regarding
21   legislation.  If in answering this question you would do
22   so, do not answer the question, okay?
23        A.   Can you reread the question, please?
24        Q.   I can reread the question actually.  Do you
25   believe that compliance with the Federal Voting Rights
```

## 149

1 Act is an important consideration in the law making
2 process?
3    A.  Yes.
4          MS. BERKOWER:  And, Patrick, just to be
5 clear, can you explain whose privilege -- legislative
6 privilege she is covered by here?
7          MR. SWEETEN:  She's worked for the
8 speaker -- She worked for the speaker's office.  He has
9 asserted legislative privilege.  She has asserted
10 legislative privilege, therefore, in any answers to
11 questions, it's definitely subject to legislative
12 privilege.
13          MS. BERKOWER:  I just want to make sure I
14 understand just because she has been in different roles
15 in the legislature.
16          MR. SWEETEN:  And this question is about
17 the consideration of the voting rights bill, and, I
18 mean, your question was about Senate Bill 14, so,
19 clearly, that's legislatively privileged in that
20 context, so that's what I'm asserting.
21          MS. BERKOWER:  That question didn't
22 mention Senate Bill 14.  I was asking that as a general
23 matter, and she answered the question, but I know you've
24 been asserting legislative privilege on her behalf
25 throughout the day.  I just want it to be clear.

## 150

1          MR. SWEETEN:  Understand, Ms. Davis has
2 had a number of jobs.  She is an attorney, so there
3 would be an attorney-client privilege in many of those
4 instances that we would assert.  She has worked for
5 legislative staff, and there is a legislative privilege.
6 She has worked for TLC.  That is a legislative privilege
7 and an attorney-client privilege.  So there are
8 multiple, multiple privileges that apply here with
9 respect to just I think each one of her jobs that she's
10 named, and she's -- also, as a private attorney, she
11 would have attorney-client privilege during that time
12 period.  So she's had a variety of jobs, and there are
13 numbers of privileges, so I'm instructing her as to
14 privilege as I have today.
15          MS. BERKOWER:  I understand.  I just want
16 to be clear though.  With regard to her time
17 specifically as parliamentarian, can you explain your
18 assertion of legislative privilege during that time
19 only?  I understand with regard to the other positions
20 that she's held.
21          MR. SWEETEN:  That is subject to the
22 legislative privilege.  She provides advice to
23 legislators in that capacity.  She's advising them, so I
24 would think that's subject both to the legislative
25 privilege and probably the attorney-client privilege.

## 151

1    Q.  (BY MS. BERKOWER)  Okay.  Thank you.  Are you
2 familiar with the law -- a Federal law called the Help
3 America Vote Act?
4    A.  No.
5    Q.  Are you currently a member of any community
6 organizations or groups?
7    A.  What do you mean by community organization?
8    Q.  I guess I'll be more specific.
9    A.  Okay.
10    Q.  I'll ask you about a few of them specifically.
11    A.  Okay.
12    Q.  Are you familiar with a group called ALEC?
13    A.  Yes.
14    Q.  Are you a member of that group?
15    A.  No.
16    Q.  Have you ever been a member of that group?
17    A.  No.
18    Q.  During your time working for Speaker Straus did
19 you ever receive any documents from ALEC related to
20 voter ID?
21    A.  Not my knowledge, no.
22    Q.  Did ALEC ever offer you or Speaker Straus's
23 office any special assistance on voter ID legislation?
24    A.  Not to my knowledge, no.
25    Q.  Are you familiar with the national conference

## 152

1 of state legislators?
2    A.  Yes.
3    Q.  Have you ever attended any of their meetings?
4    A.  Yes.
5    Q.  Do you remember when those were?
6    A.  Well, I went to the national conference, just
7 their convention.
8    Q.  When did you go?
9    A.  Every year that I was parliamentarian and when
10 I was chief of staff, just to their national meeting.
11    Q.  Do you recall attending any sessions concerning
12 voter ID?
13    A.  No.
14    Q.  Are there any other groups that focus on policy
15 advice or assistance to legislators that you have
16 belonged to?
17    A.  No.
18    Q.  Any other groups like that that you attend
19 meetings for?
20    A.  No.
21    Q.  I'm sorry for the pauses.  I'm just trying to
22 skip over things I think you've already answered.
23    A.  That's okay.
24    Q.  So now jumping back in time a little bit to
25 2005 when you were parliamentarian --

DENISE DAVIS                                                    JUNE 14, 2012

## 153

1  A.  Yes.
2  Q.  -- in the House.  Were you present during all
3  of the legislative public debates on HB1706?
4  A.  That was in 2005?
5  Q.  Yes.
6  A.  Yes, I would have been -- Yes.  Yes, I would
7  have been there.
8  Q.  During that time did you -- do you recall any
9  of the public debates on that bill?
10  A.  I don't.
11  Q.  Do you recall if anyone expressed as part of
12  the public record that the prevention of noncitizen
13  voting was part of the purpose of voter ID bills?
14  A.  I don't remember.
15  MS. BERKOWER:  I asked about the public
16  record.  Don't worry.
17  MR. SWEETEN:  All right.  And general
18  purpose is fine.
19  Q.  Are you aware if any part of the purpose --
20  overall purpose of HB1706 was to prevent noncitizens
21  from voting?
22  A.  I don't know.
23  Q.  During the time that you were present during
24  the public debates, were you -- do you remember any
25  analysis presented as part of the public record

## 154

1  concerning whether any individual group of voters might
2  be adversely impacted by HB1706?
3  A.  No, I don't remember.
4  Q.  Are you aware of any studies entered into the
5  public record about the number of registered voters
6  without allowable forms of ID under HB1706?
7  A.  No.
8  Q.  Jumping forward in time to 2007, were you
9  present during the legislative debate on HB218?
10  A.  I don't -- Yes.  I don't know if I was in the
11  chair or what, but I would have been there in some
12  capacity.
13  Q.  What are the circumstances in which you might
14  not be in the chair?
15  A.  Go take a break or do something in the back or
16  something.
17  Q.  Okay.  In an issue of parliamentary procedure
18  arose, would you go back to the chair or --
19  A.  Sometimes.  Sometimes the deputy would take
20  care of it and sometimes I would.
21  Q.  Do you recall any supporters of HB218 publicly
22  indicate the bill was designed to keep noncitizens from
23  voting?
24  A.  Not to my knowledge.  I don't remember.
25  Q.  Do you know if that was part of the purpose of

## 155

1  HB218?
2  A.  I don't know.
3  Q.  Now, jumping forward again in time to 2009, do
4  you know if any members of the House had a role in the
5  development of SB362?
6  A.  I don't know.
7  Q.  Did you have a role in developing SB362?
8  A.  No.  In 2009?
9  Q.  Yes.
10  A.  No.  I think the only -- only member that
11  probably would have been -- the member that I know of
12  that actually would have been involved -- I take that
13  back -- is probably Todd Smith, who was chair of the
14  elections.  Other than that, I do not know, and I did
15  not have a role.
16  Q.  Okay.  When a bill comes from -- Now, again,
17  you were parliamentarian at this time?
18  A.  Right.
19  **Q.  So when a bill comes from the Senate as opposed**
20  **to being developed in the House, what is the role of the**
21  **parliamentarian when it arrives?**
22  **MR. SWEETEN:  You can answer as a general**
23  **matter.**
24  **A.  It gets referred to committee -- to the House**
25  **committee.**

## 156

1  **Q.  Is the committee referral process similar to**
2  **what happens when a bill is assigned to committee that's**
3  **generated from the House?**
4  **A.  Yes.**
5  **Q.  So that's something that you would advise the**
6  **speaker on?**
7  **A.  Yes.**
8  Q.  Do you remember advising the speaker on SB362?
9  A.  Not specifically I don't.
10  Q.  Do you know what the purpose was of SB362?
11  MR. SWEETEN:  You can answer as to a
12  general purpose, if you know.
13  A.  I don't know the general purpose of it.
14  Q.  Now, jumping again to 2010, and now at this
15  point you were chief of staff for Speaker Straus, I
16  think --
17  A.  Right.
18  Q.  -- starting in January.
19  A.  Yes.
20  Q.  Do you remember any interim charges issued by
21  the speaker to committees in 2010?
22  A.  We issued a -- I know we issued a number of
23  charges over the interim, but I can't remember which
24  ones we issued, but periodically you would issue a
25  number of them.

DENISE DAVIS                                                    JUNE 14, 2012

---

### 157

1    Q.   What are the general circumstances under which
2    the speaker would issue interim charges?
3         MR. SWEETEN:  You can answer if in doing
4    so you would not reveal matters of privilege.
5    A.   Request of members or just issues that he
6    thinks are important or not or just a number of reasons.
7    Q.   Do you remember if voter ID was one of the
8    interim -- if an interim charge was issued concerning
9    voter ID?  Actually, I'll withdraw that.  I'll restate
10   it.
11        Do you remember if Speaker Straus issued
12   an interim charge concerning voter fraud and voter
13   identification after the 2009 session?
14   A.   I don't -- I don't believe that we did, but I
15   can't remember specifically.  I don't think so.
16        (US Exhibit 732 marked.)
17   Q.   This might refresh your recollection.  Can we
18   mark this as Exhibit 732?  I have to give it to her
19   first.
20   A.   Yes, we did.
21   Q.   What did the interim charge ask -- Well, who
22   was it issued to first?
23   A.   It was issued to the elections committee, and
24   it says, "Examine the prevalence of fraud in Texas
25   elections, study new laws in other states regarding

---

### 158

1    voter ID and recommend statutory changes to ensure that
2    only eligible voters can vote in Texas elections."
3    Q.   What is -- As a general matter, when a report
4    like this comes to you in the legislature, is it
5    presented to the whole legislature?  What happens with
6    it?
7    A.   Well, it's made public.  It's public
8    information, so it's presented to -- it's out there to
9    everyone, yes.
10   Q.   Is there an expectation when an interim charge
11   is issued that the committee will also develop
12   legislation at the time that it's working on its report?
13        MR. SWEETEN:  Don't reveal matters of
14   privilege including thought processes and motivations of
15   legislators in answering this question.  If you can't do
16   so, do not answer it.
17   A.   I think it depends on the member of the
18   committee in what they want to do.
19   Q.   Do committees sometimes legislate at the same
20   time they were working on interim charge?
21   A.   Sometimes.
22   Q.   Do you know if in this case they did?
23   A.   I don't.
24   Q.   So Interim Charge No. 3, which you just read
25   out loud, does it specify what type of fraud the

---

### 159

1    committee was to examine other than election fraud
2    generally?
3    A.   It says, "The prevalence of fraud in Texas
4    elections."  That's all it says.
5    Q.   Is there more than one kind of fraud --
6    election fraud under Texas law; do you know?
7    A.   I don't know.
8    Q.   Do you know if there's such a thing as
9    in-person voter fraud?
10   A.   I don't know.
11   Q.   Turning to Page 27 of the report, which I think
12   is the third page of this excerpt, do you see that the
13   report seeks to summarize testimony provided to the
14   committee?
15   A.   Yes.
16   Q.   Do you see the third paragraph from the bottom,
17   the last sentence?  Could you read that to yourself,
18   please -- or, actually, review the whole thing if you'd
19   like.  I should have told you to do that.  Sorry.
20   A.   Okay.
21   Q.   Would you agree that this is a summary of
22   testimony provided from Jay Dyer from the Attorney
23   General's office?
24        MR. SWEETEN:  You can answer based on the
25   text of the document.

---

### 160

1    A.   Yes.  It's the committee summary of his
2    testimony.
3    Q.   And does the report state that, "To get a
4    complete picture of voter fraud in Texas, further
5    analysis is needed to gather additional information from
6    local election and law enforcement officials"?
7    A.   Yes, it does.
8    Q.   Do you know in fact if further analysis of that
9    nature was conducted?
10   A.   I do not.
11        MR. SWEETEN:  You can testify to matters
12   of the public record.
13   A.   I don't know.
14   Q.   Did the report conclude with a recommendation;
15   do you know?  It's on Page 31.
16   A.   Yes.  On Page 31, there's a recommendation.
17   Q.   What did the committee recommend?
18   A.   "The committee recommends that the legislature
19   adopt legislation requiring voters to show photo
20   identification in order to cast a ballot at the polls."
21   Q.   Does this recommendation suggest that
22   additional research should be conducted as to the extent
23   of voter fraud in Texas just based on this paragraph?
24        MR. SWEETEN:  Just confine your answer as
25   to the text that she's showing you right now.  Don't

DENISE DAVIS                                                    JUNE 14, 2012

## 161

1   reveal your thoughts and mental impressions.
2       A.   I don't know.  I don't -- I can't tell from
3   this recommendation what it does, but --
4       Q.   Well, does the text of this recommendation also
5   recommend further study of the problem?
6       A.   I don't see a study in here, so I can't -- it
7   just -- I don't see that in here.
8       Q.   Okay.  Now, you testified earlier about SB14 --
9   I think we're done with this exhibit for now.
10      A.   Okay.
11      Q.   You testified -- You were asked some questions
12  about SB14.
13      A.   Right.
14      Q.   During your time as the chief of staff for
15  Speaker Straus, you mentioned that there was another
16  employee, Meredyth Fowler, who was primarily responsible
17  for voter ID; is that correct?
18      A.   Right.
19      Q.   She was deposed last week, and she said that
20  she occasionally spoke with Speaker Straus about the
21  issue, but not very frequently.  Is it accurate to say
22  you were an intermediary between her and Speaker Straus
23  on that issue?
24      A.   From time to time.
25      Q.   So from time to time --

## 162

1       A.   Yes.
2       Q.   -- you would --
3       A.   Yes.
4       Q.   -- you would replay information she told you to
5   Speaker Straus?
6       A.   Right.
7       Q.   So I think you had gone through earlier some of
8   the terms in SB14 concerning which ID it would permit
9   voters to use at the polls; do you recall that?
10      A.   Yes.
11      Q.   And one of the types of ID is a driver's
12  license from the Department of Public Safety; is that
13  accurate?
14      A.   Yes, that's right.
15      Q.   Do you know how long a driver's license is
16  valid for under Texas law?
17      A.   I think 12 years maybe.  6 or 12 years.  I'm
18  not sure.
19      Q.   Do you know if it's possible to renew your
20  driver's license online?
21      A.   I'm going to be finding out, I think, this
22  year, but I don't -- I don't know.  I think you can.
23      Q.   Okay.  Do you recall receiving any information
24  on the length of time that a driver's license is valid
25  from Ms. Fowler concerning voter ID?

## 163

1       A.   No, I don't -- I don't remember.
2       Q.   Do you know what a military ID is?
3       A.   No, I don't.
4       Q.   During your time working on this issue for
5   Speaker Straus, do you remember any communications
6   concerning military IDs?
7       A.   No.
8       Q.   Do you know what a citizenship certificate is?
9       A.   No.
10      Q.   Do you recall receiving any information about
11  citizenship -- excuse me -- a citizenship certificate --
12      A.   No.
13           MS. BERKOWER:  -- in Texas?  Okay.  And do
14  you actually process in which you -- Actually, can
15  we go off the record for a second?
16           (Recess from 3:11 p.m. to 3:48 p.m.)
17      Q.   (BY MS. BERKOWER)  So during your time as chief
18  of staff for Speaker Straus, do you recall receiving any
19  information from the Department of Public Safety
20  about -- relating to voter identification?
21      A.   About voter identification?
22      Q.   Just relating to it generally.
23      A.   I don't remember.  We got -- He got stuff about
24  driver's license stuff all the time because we had a
25  big -- a big DPS bill too, so I don't know if that was

## 164

1   part of that or not.
2       Q.   Which DPS bill are you referring to?
3       A.   It was like a Homeland Security bill or
4   something like that.  I mean, we had a variety of bills
5   related to driver's license stuff and all of that kind
6   of stuff, but I don't know if that was voter ID or not.
7       Q.   Do you remember receiving any information
8   concerning the wait times at DPS offices?
9       A.   Yes.
10           MR. SWEETEN:  I just want to interpose for
11  the record that counsel and I have had an off-the-record
12  discussion about a document that's been produced, and so
13  she and I will sort that out after the deposition, that
14  we've agreed to allow Ms. Davis to answer some questions
15  based upon any sort of specific data about wait times.
16  Confining it to those questions that are on the email
17  that has been produced to counsel, we'll allow those
18  questions, and I assume with respect to that -- I mean,
19  we're still asserting legislative privilege as to -- as
20  to her analysis and thought process regarding that, but
21  pursuant to Page 7 of the court's order that learned
22  counsel has pointed out to me, we think the fact of
23  analysis, that that probably can be discovered.  So
24  we'll allow limited questioning as to the specific data.
25           MS. BERKOWER:  That's my understanding as

---

165

```
 1   well of our conversation.  I think there's also a few
 2   additional facts in that communication -- factual
 3   information provided by the Department of Public Safety.
 4   Would you permit questioning on that as well?
 5            MR. SWEETEN:  Yeah.  As to whether the
 6   fact of the analysis occurred, but not as to her
 7   thoughts or mental impressions or what she did or what
 8   she implied.
 9        Q.  (BY MS. BERKOWER) That's my understanding.
10   Thank you for that clarification.  I don't remember what
11   I asked you now.  I think I asked if you had gotten any
12   information about wait times.
13        A.  Yes.
14        Q.  Do you remember what that was?
15        A.  I remember asking how long it took to get a
16   driver's license.
17        Q.  Do you remember what they told you?
18        A.  Three to four -- Depending on where you were in
19   the state.  I think longer in the urban areas or
20   something like that, three hours.
21        Q.  Do you remember if there are any cities in
22   particular that have long wait times?
23        A.  I remember hearing that the urban areas did,
24   like Dallas and Houston, but I don't -- I don't know if
25   they told me that or if I read it somewhere.
```

---

166

```
 1        Q.  Do you know if DPS gave you information about
 2   its capacity to help members of the public with their
 3   transactions?
 4        A.  Yes.
 5        Q.  What was that information?
 6        A.  I remember them saying that it was a personnel
 7   issue.  They needed more money, more personnel.
 8        Q.  Was that also relative to the number -- the
 9   increase in population state-wide?
10        A.  I don't remember that.
11        Q.  Do you know if the population in Texas has
12   increased in the last 10 years?
13        A.  Yes.
14        Q.  Has it increased?
15        A.  Yes.
16        Q.  Has it increased?
17        A.  Yes, it has.  Is that what you are asking me?
18        Q.  Yes.
19        A.  Okay.
20        Q.  Has it increased significantly?
21        A.  I don't know if it's been significant, but I
22   know it has.  I don't know the exact number.
23        Q.  Do you remember around when you received that
24   information from DPS?
25        A.  Sometime in the -- during the session in the --
```

---

167

```
 1   probably the spring or something, I'm guessing.
 2        Q.  Do you remember if it was before the House
 3   voted on SB14?
 4        A.  I don't know.
 5        Q.  Do you remember if it was after the Senate
 6   passed SB14?
 7        A.  I don't remember.
 8        Q.  Okay.  Thank you.  I'm just trying to figure
 9   out where we were.  Were you present for the House floor
10   debate on SB14?
11        A.  I was in and out of the chamber during that
12   time.
13        Q.  Were you present when amendments were offered
14   and voted on for the bill?
15        A.  Most of the time I wasn't.
16        Q.  Did you receive updates on any amendments that
17   were offered or voted on for the bill?
18        A.  Not -- Not really.  I was in my office for most
19   of it.
20        Q.  Is there any particular reason you were not
21   present during that debate?
22        A.  Chief of staff is usually in the office -- in
23   and out meeting with members, doing things in the back.
24        Q.  Do you know by any chance how many amendments
25   were offered to SB14?
```

---

168

```
 1        A.  I don't.
 2        Q.  As a general matter -- And I think this might
 3   draw partly on your knowledge as parliamentarian.  When
 4   or why would an amendment be withdrawn if there's --
 5            MR. SWEETEN:  Objection.  Compound.  Also,
 6   don't reveal as to specific legislation as a general
 7   matter.  If you can answer that question, I'll let you,
 8   but don't reveal matters about specific legislation.
 9        A.  For any number of reasons, drafting error, no
10   longer interested in the amendment, doesn't have the
11   votes or doesn't do what it wanted, just what the member
12   wanted, a number of reasons.
13        Q.  As a procedural matter if the amendment is
14   voted down, can it be reintroduced?
15        A.  Yes.
16        Q.  How does that happen?
17        A.  You would have to reconsider the vote.  You
18   would have to do a reconsideration of the vote.
19        Q.  Is it possible that a member might withdraw an
20   amendment if they didn't have the votes and then
21   reintroduce it later when they did have the votes?
22            MR. SWEETEN:  You can answer it as a
23   general matter.  Do not reveal the substance of the
24   legislation.
25        A.  Generally, yes.
```

DENISE DAVIS                                                    JUNE 14, 2012

## 169

1    Q.  Do you know -- Would you say that the amendment
2    process for SB14 was typical of bills considered by the
3    House?
4         MR. SWEETEN:  Amendment process of 14, I
5    think that's requiring her to put in a value judgment as
6    to whether it was out of the ordinary.  I think that
7    would require her to reveal matters of privilege.  I
8    would instruct her not to answer on that basis.
9    Q.  Okay.  Are you following his instruction?
10   A.  Yes.
11   Q.  If I told you there were 70 amendments offered
12   to SB14, would you view that as a higher or lower
13   number -- a high number of amendments or a low number of
14   amendments?
15        MR. SWEETEN:  I can let her answer as a
16   general amendment whether she thinks 70 amendments is
17   high or low, but I don't think the way it's phrased as
18   to Senate Bill 14 I can allow it.
19        MS. BERKOWER:  I'll rephrase it then.
20        THE WITNESS:  Okay.
21   Q.  (BY MS. BERKOWER) Is 70 a high number of
22   amendments?
23   A.  It's hard to say.  I mean, I've had
24   amendment -- bills with 800 amendments.
25   Q.  What types of bills were those?

## 170

1    A.  General government bills, budget bills, tort
2    bills.  Number of bills.
3    Q.  For a bill the size of SB14, speaking as a
4    general matter, would 730 be a high number of
5    amendments?
6    A.  I think it depends on who you ask.  You know, I
7    don't view that as a lot of amendments, but it just
8    depends.  I mean, some people might.  That will just be
9    my opinion.
10   Q.  Do you remember what the publicly articulated
11   purpose for many of the amendments was for SB14?
12   A.  No, I don't.
13   Q.  Do you remember if any of the amendments
14   offered to SB14 were included in the final bill?
15   A.  I don't know.
16   Q.  Now, I think you testified earlier about a
17   conference committee.
18   A.  Yes.
19   Q.  Conference committees in general.  I don't
20   remember if you answered this question.  Do you know how
21   the presiding officer is chosen for a conference
22   committee?
23   A.  You mean, how the chair of the conference
24   committee is chosen?
25   Q.  Yes.

## 171

1         MR. SWEETEN:  She just said do you know
2    how it's done, so you can just answer yes or no.
3    A.  Yes.
4    Q.  Is there any non-privileged reason or
5    explanation you can provide as to how that happens?
6         MR. SWEETEN:  Don't reveal the thought
7    processes, mental impressions of why those are done.
8    A.  There is no -- there is no -- I mean, it
9    just -- usually it's someone that carried the bill or
10   that has been involved or people that have been involved
11   with the issue along those lines, expertise.
12   Q.  Is there any limit of what the conference
13   committee can do with the bill?
14   A.  Yes.
15   Q.  What are those limits?
16        MR. SWEETEN:  You can answer as to general
17   parliamentary procedures of matters of public record.
18   A.  That's in Rule 13, Section 9 or somewhere.
19   It's specific in the rules as to what the jurisdiction
20   of the conference committees -- what their jurisdictions
21   are and what they can and can't do.
22   Q.  What happens if the conference committee
23   exceeds its jurisdiction?
24   A.  They have to get permission from the House or
25   the Senate or both.  They have to get permission to go

## 172

1    outside the bound of their jurisdiction.
2    Q.  Do you know if that happened for the House with
3    regard to SB14, whether they sought that permission?
4    A.  I don't remember off the top of my head.  I'd
5    have to look at --
6    Q.  I think there's an exhibit that Mr. Harris
7    introduced.
8    A.  Yeah.
9         MR. HARRIS:  Exhibit 13.
10        MS. BERKOWER:  Thank you.
11   A.  Yes.
12   Q.  They did seek to do that in the House?
13   A.  Yes.
14   Q.  Did they seek to do that in the Senate?
15   A.  Yes.
16   Q.  Was that permission granted?  Just for the
17   record, she's looking at a public record, Exhibit 13, so
18   you can answer based on the public record.
19   A.  Yes, it was.
20   Q.  It was granted for both houses?
21   A.  Yes.
22   Q.  How -- Just as a general matter, how is the
23   decision made whether a conference committee has
24   exceeded its jurisdiction?
25   A.  That is -- I think that's usually done

## 173

1  between -- that's between the sponsor and legislative
2  counsel and their legal advice and -- and the
3  parliamentarian.
4      Q.  Do you know what factors are considered when
5  that decision is made?
6      A.  I think they look at each individual thing and
7  it's hard to know.
8      Q.  Did you ever have to make such decisions when
9  you were a parliamentarian?
10     A.  I would sometimes advise members that they --
11  that they were going outside of the bounds and that they
12  should probably have a resolution, yes.
13         (US Exhibit 733 marked.)
14     MS. BERKOWER:  Okay.  I have what will be
15  marked 733.  Can we go off the record for one second?
16         (Recess from 4:00 p.m. to 4:01 p.m.)
17     Q.  (BY MS. BERKOWER) Do you recognize this
18  document?
19     A.  I don't, but it's -- I don't remember it.  It's
20  an email from Rhonda Trumble to me.
21     Q.  Do you know who Rhonda Trumble is?
22     A.  I assume she works for DPS.
23     Q.  And what did she do in this email?
24     A.  It looks to me like she was giving us just a
25  general update on driver's licenses and what they were

## 174

1  doing with the driver's license program and updating
2  it -- just giving us an update.
3      Q.  Do you see the part -- It looks like there's
4  some bullet points on the -- toward the bottom of the
5  page.
6      A.  Yes.
7      Q.  And it looks like those bullet points refer to
8  design changes to the license.  Do you see that?
9      A.  Yes.
10     Q.  Do you see it says they removed all references
11  to temporary or visitor from the face of the driver's
12  license and ID cards?
13     A.  Yes.
14     Q.  And two bullets down from that it says they
15  updated the limited term licenses to be of a horizontal
16  orientation comparable to other driver's licenses and
17  IDs?  Do you see that?
18     A.  Yes.
19     Q.  Do you know what those bullet points are
20  referring to aside from this email?
21     MR. SWEETEN:  In answering the question,
22  don't reveal any thought processes you had pre -- This
23  is an email from after the enactment, but if answering
24  the questions would require you to reveal your
25  pre-enactment thoughts, mental processes or opinions

## 175

1  about legislation, then don't reveal.
2      A.  I don't remember.
3      Q.  Do you know if these design changes were ever
4  implemented?
5      A.  I don't.
6      Q.  And do you know what these design changes are
7  referring to, which types of IDs?
8      A.  I don't.
9      Q.  Based on the document, it looks like they refer
10  to limited term driver's licenses; is that accurate?
11     A.  Yes.  Yes, it does.  Number one says that it's
12  for a limited term.
13     Q.  Do you know who receives limited term driver's
14  licenses?
15     A.  I don't.
16     Q.  Turning to the -- Well, turning to the second
17  page, there's an item marked Item 3.  Can you just
18  review that paragraph?  Let me know when you are done
19     A.  Yes, I'm done.
20     Q.  Do you remember if one of the issues raised in
21  the public record during the consideration of SB14 was
22  the availability of driver's license facilities to
23  provide identification required by the bill?
24     A.  I don't remember that specifically, but -- it's
25  possible, but I don't remember.

## 176

1      Q.  Do you remember if one of the issues raised in
2  the public record was that there were not many
3  facilities available in urban areas?
4      A.  No, I don't remember that.
5      Q.  You did remember though DPS informed you that
6  wait times in urban areas were very long?
7      A.  Right.  Yes, I do remember that.
8      Q.  And this paragraph indicates that the
9  legislature included funding for DPS to open six mega
10  centers to better serve customers.  Do you see that?
11     A.  Yes.
12     Q.  Do you know if that relates to a concern that
13  there was long wait times in certain areas?
14     MR. SWEETEN:  I think that would implicate
15  matters of privilege, if you are asking if it was in
16  response.  If this was addressed in response to that
17  would require her to reveal legislatively privileged
18  information.  So my instruction would be don't answer
19  the question.
20     Q.  Okay.  Are you following his advice?
21     A.  Yes.
22     Q.  Okay.  Do you see the last line of the last
23  sentence of that paragraph says, "We were not able to
24  find a location that was already built and able to give
25  us a 10-year lease, so this location is a new build and

DENISE DAVIS                                    JUNE 14, 2012

---

### 177

1  the facility will be built specifically to suit our
2  office needs"?
3      A.  Yes.
4      Q.  And that was in reference to a mega center in
5  the San Antonio area based on this document?
6      A.  Yes.
7          MR. SWEETEN:  You can answer based on the
8  document itself.
9      Q.  Does that -- Does that sentence imply that
10  there's going to be some time before the facility is
11  ready?
12          MR. SWEETEN:  You can testify as to what's
13  in the text of the letter, but don't reveal your
14  thoughts and mental impressions.
15      A.  I really don't know.
16      Q.  It will have to be built specifically to suit
17  the office needs?
18          MR. SWEETEN:  Same instruction.
19      A.  I don't know how long it would take to do that.
20      Q.  Okay.  Earlier today you said you would
21  sometimes talk on the phone with the Senate
22  parliamentarian to make sure that bills were moving or
23  there was an efficient movement of bills; is that
24  accurate?
25      A.  Yes.

---

### 179

1  numbers are reserved for the speaker's office and that's
2  been the tradition for, you know, many, many years.
3      Q.  So how do those bill numbers get assigned?
4          MR. SWEETEN:  Don't reveal the process by
5  which or --
6          THE WITNESS:  Right.
7          MR. SWEETEN:  You can reveal matters of
8  public record in answering that.
9      A.  The speaker has those numbers, and then they
10  assign numbers just depending on who would -- you know,
11  members request the numbers.  They usually request a
12  number.
13      Q.  Can you give an example of where a bill was
14  filed and then refiled with a lower bill number from the
15  speaker's office?
16          MR. SWEETEN:  If it's a public record, you
17  can.
18      A.  Well, refiled?
19      Q.  How do they get the lower bill number?  Do they
20  get it upon filing or do they have to re-file it or how
21  does that work?
22      A.  I don't know.  I mean, it just varies.  I mean,
23  the appropriations bill is always number one.  That's
24  just tradition.  So sometimes members will request a low
25  bill number, and if it's available, the speaker will

---

### 178

1      Q.  How often did you speak with her on that issue?
2      A.  Once or twice a week maybe.  Not often, you
3  know, unless it was a specific bill, but not much.
4      Q.  Like when would you -- Was there a scheduled
5  meeting that you would have with her or no?
6      A.  No.  Usually if we were coordinating -- if
7  there was a bill on the floor that -- towards the end of
8  the session maybe, if we were doing the conference
9  committee report or adopting, so it was sort of
10  sporadic, frankly.  We didn't have regular meetings.
11      Q.  Was it -- Was there any instance in which these
12  conversations would occur where a bill was going to move
13  from one House to the other?
14          MR. SWEETEN:  Just the existence of the
15  conversation.
16      A.  Yes.
17      Q.  Did you have any of those conversations
18  concerning any of the voter ID legislation?
19      A.  Oh, I don't remember.
20      Q.  You said earlier that generally bills are given
21  a bill number in the House in the order in which they
22  are introduced.
23      A.  That's generally true.
24      Q.  When would that not be true?
25      A.  There's a -- Sometimes there are -- low bill

---

### 180

1  give it to the member.
2      Q.  Okay.  Are any of the low bill numbers given to
3  voter ID legislation by the speaker; do you know?
4      A.  I don't remember.
5      Q.  You said earlier that a bill might be sent to
6  Senate with a message.
7      A.  M-hm.
8      Q.  Can you explain more about what a message is?
9      A.  It's just -- it's just -- That's what it's
10  called.  It's like a notice.  It's just saying we've
11  passed these bills, who they are.  So it doesn't really
12  have any substance.  It's just a notification to the
13  Senate that we've taken action on a particular bill.
14      Q.  Does every bill get a message?
15      A.  They all go over.  It's called going over on a
16  message, so they all go over on a message from the House
17  sergeant.
18      Q.  Okay.  I think there was some testimony that
19  you gave earlier about this amendment being germane.
20      A.  M-hm.
21      Q.  What are the factors as House parliamentarian
22  that you considered when assessing whether a bill was
23  germane?
24          MR. SWEETEN:  If these are matters of the
25  public record and not matters of privilege, then you can

DENISE DAVIS                                          JUNE 14, 2012

## 181

1  refer to them.  If it reveals your thought process about
2  specific legislation, then do not.
3     A.  The parliamentarian looks at the precedent text
4  of the bill and the text of the amendment.
5     Q.  Is it an exercise of the parliamentarian's
6  discretion?
7     A.  It's really the speaker's discretion, speaker's
8  decision.
9     Q.  Okay.  The parliamentarian makes a
10 recommendation to the speaker for that as well?
11    A.  Correct.
12    Q.  Do you know if House members as a general
13 matter ever try to make amendments that aren't germane
14 to harm a bill?
15    A.  Yes, they do.
16    Q.  Can you think of any instances in which that
17 has happened?
18        MR. SWEETEN:  You can refer to matters of
19 the public record.
20    A.  There are probably lot of examples.  I can't
21 think of any off the top of my head, but it does happen.
22    Q.  When they do that, is the idea that they would
23 introduce something controversial or how exactly do they
24 go about doing that, I guess?
25    A.  Well --

## 182

1         MR. SWEETEN:  Same instruction.
2     A.  -- I think they just try to get the amendment
3  adopted and see what happens.
4     Q.  Is the position of parliamentarian a partisan
5  position?
6     A.  No.
7     Q.  Is it viewed specifically as a nonpartisan
8  position?
9     A.  Yes.
10    Q.  And you provide -- as parliamentarian, the
11 parliamentarian provides advice to any member who asks;
12 is that correct?
13    A.  Yes.
14    Q.  Do you know of any instances -- Well, actually,
15 I won't ask that.  I'm getting close to the end.
16        So given all of the knowledge you have of
17 the public record about voter ID legislation, any bill
18 that's come up during your time as either
19 parliamentarian or Speaker Straus's chief of staff, are
20 you aware of any existing document or report in the
21 public record that identifies how many Texas voters are
22 in possession of a concealed handgun license?
23    A.  I don't know.
24    Q.  And, again, do you know if there's any existing
25 document or report in the public record that identifies

## 183

1  how many minority voters are in possession of a
2  concealed handgun license?
3     A.  I don't know.
4     Q.  Are you aware of any existing document or
5  report in the public record that identifies how many
6  Texas voters are in possession of a US military card?
7     A.  No, I don't know.
8     Q.  Do you know of any existing document or report
9  in the public record that identifies how many minority
10 voters are in possession of a -- minority voters in
11 Texas are in possession of a US military card?
12    A.  I do not.
13    Q.  Are you aware of any existing document or
14 report in the -- in the public record that identifies
15 how many Texas voters are in possession of a passport?
16    A.  No, I don't.
17    Q.  Are you aware of any existing document or
18 report that identifies how many Texas minority voters
19 are in possession of a passport?
20    A.  I do not.
21    Q.  In your view, is one of the purposes of SB14 to
22 increase public confidence in elections?
23        MR. SWEETEN:  Objection.  You can provide
24 the general purpose of the bill and -- but that's it,
25 okay?

## 184

1     A.  The general purpose is to -- to -- just to
2  ensure integrity of the elections.  That's my
3  understanding of the bill.
4     Q.  What is the evidence in the public record that
5  supports that SB14 will in fact increase the integrity
6  of elections?
7         MR. SWEETEN:  Don't answer the question.
8  Calls for matters of legislative privilege.  Instruct
9  not to answer.
10        MS. BERKOWER:  I asked in the public
11 record.
12        MR. SWEETEN:  No.  You asked her what is
13 the evidence in the public record that shows that Senate
14 Bill 14 will accomplish its purpose which it asks for
15 analysis and she can't provide it.
16    Q.  I'll rephrase that.  I'm sorry.  Do you know of
17 any evidence in the public record -- Well, actually,
18 I'll rephrase that.  Do you know of any analysis or
19 study in the public record that concludes that voter
20 identification would enhance public confidence in
21 elections?
22    A.  I don't.
23    Q.  At any time since the passage of SB14, have you
24 come to believe it was passed with any discriminatory
25 purpose?

Karina Casari Davis                                                    June 15, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS              §
     Plaintiff,             §
                            §
VS.                         §
                            §
ERIC H. HOLDER, JR., IN     §
HIS OFFICIAL CAPACITY AS    §
THE ATTORNEY GENERAL OF THE §
UNITED STATES,              §
     Defendant,             §
                            §
ERIC KENNIE, ET AL.,        §
     Defendant-Intervenors, §
                            §
THE TEXAS STATE CONFERENCE  §
OF NAACP BRANCHES, et al.,  §  CASE NO. 1:12-CV-00128
     Defendant-Intervenors, §  (RMC-DST-RLW)
                            §  Three-Judge Court
TEXAS LEAGUE OF YOUNG       §
VOTERS EDUCATION FUND,      §
et al.,                     §
     Defendant-Intervenors, §
                            §
TEXAS LEGISLATIVE BLACK     §
CAUCUS, ET AL.,             §
     Defendant-Intervenors, §
                            §
VICTORIA RODRIGUEZ, ET AL., §
     Defendant-Intervenors. §
```

*********************************************************
ORAL DEPOSITION OF
KARINA CASARI DAVIS
JUNE 15, 2012
*********************************************************

## 2

1          ORAL DEPOSITION OF KARINA CASARI DAVIS,
2  produced as a witness at the instance of the
3  Defendant-Intervenors Texas League of Young Voters
4  Education Fund, and duly sworn, was taken in the
5  above-styled and numbered cause on the 15th day of June,
6  2012, from 8:47 a.m. to 6:24 p.m., before Caroline
7  Chapman, CSR in and for the State of Texas, reported by
8  Computerized Stenotype Machine, Computer-Assisted
9  Transcription, at the Law Offices of Dechert, LLP, 300
10  West Sixth Street, Suite 2010, Austin, Texas pursuant to
11  the Federal Rules of Civil Procedure.

## 3

1          A P P E A R A N C E S
2  FOR THE STATE OF TEXAS:
        OFFICE OF THE TEXAS ATTORNEY GENERAL
3        BY: MR. MATTHEW FREDERICK, ESQ.
        Special Counsel
4        P.O. Box 12548
        Austin, Texas 78711-2548
5        (512) 475-4330; Fax (512) 370-9077
        matthew.frederick@texasattorneygeneral.gov
6
7  FOR THE DEFENDANT ERIC H. HOLDER, JR., IN HIS OFFICIAL
   CAPACITY AS THE ATTORNEY GENERAL OF THE
8  UNITED STATES:
        U.S. DEPARTMENT OF JUSTICE
9        BY: MS. RISA BERKOWER, ESQ.
           MS. ANGELA M. MILLER, ESQ.
10        950 Pennsylvania Avenue, NW
        Room 7161 NWB
11        Washington, D.C.  20530
        (202) 305-0150; Fax (202) 307-3961
12        risa.berkower@usdoj.gov
        angela.miller5@usdoj.gov
13
14  FOR THE DEFENDANT-INTERVENORS TEXAS LEAGUE OF YOUNG
   VOTERS EDUCATION FUND:
15        FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP
        BY: MR. ADAM HARRIS, ESQ.
16        One New York Plaza
        New York, New York 10004
17        (212) 859-8953; Fax (212) 859-4000
        adam.harris@friedfrank.com
18
19
        Also Present:  Mr. Ezra Rosenberg, Esq.
20
21  Reported by:  Caroline Chapman, CSR No. 467
22
23
24
25

## 4

1            I N D E X
2  Appearances . . . . . . . . . .  2
3  KARINA DAVIS
4                                PAGE
   Examination by Mr. Harris  . . . . . .  6
5  Examination by Ms. Berkower . . . . . .  145
   Examination by Mr. Frederick . . . . .  245
6  Examination by Ms. Berkower  . . . . .  269
   Signature and Changes  . . . . . .  286
7  Reporter's Certificate  . . . . . .  288
8
9          E X H I B I T S
10  NO. DESCRIPTION                    PAGE
   Exhibit 14  Senate Rules adopted by 81st     47
11        Legislature, January 14, 2009,
        Senate Resolution No. 14
12  Exhibit 15  Excerpt of Senate Rules adopted   66
        by 82nd Legislature, January 19,
13        2011, Senate Resolution No. 36,
        Pages 24 and 25
14  Exhibit 16  Legislative Reference Library of  88
        Texas, HB 218, 80th Regular
15        Session, downloaded on June 15,
        2012
16  Exhibit 17  Texas Legislature Online         110
        History, Senate Bill 14
17  Exhibit 18  Senate Rules adopted by 82nd     259
        Legislature, January 19, 2011,
18        Senate Resolution No. 36
19          ATTORNEY GENERAL EXHIBITS
   NO. DESCRIPTION                    PAGE
20  Exhibit 700  Email to Karina Davis from       --
        David Hanna, Attorney for the
21        Texas Legislative Council
        Exhibit retained by Ms. Berkower
22
23          PREVIOUSLY MARKED EXHIBITS
   NO. DESCRIPTION                    PAGE
24  Exhibit 4  Legislative Reference Library of   87
        Texas, HB 1706, 79th Regular
25        Session, downloaded June 13,

## 5

PREVIOUSLY MARKED EXHIBITS (CONTINUED)
NO. DESCRIPTION                                  PAGE
Exhibit 6    House Engrossment, HB No. 218,      87
             Pages 1 through 13
Exhibit 10   House Committee Report, First       100
             Printing, Senate Bill 326,
             Pages 1 through 9
Exhibit 11   Legislative Reference Library of    100
             Texas, SB 362, 81st Regular
             Session, downloaded June 13, 2012
Exhibit 12   Senate Bill No. 14, Pages 1        109
             through 17
Exhibit 44   House Bill No. 1706, Pages 1        79
             through 10
Exhibit 80   Letter to Honorable Robert Duncan  209
             from Leticia Van De Putte, R.Ph.
             dated January 21, 2011

## 6

1                 KARINA CASARI DAVIS
2    having been first duly sworn, testified as follows:
3                      EXAMINATION
4    BY MR. HARRIS:
5        Q.   Good morning, Ms. Davis.
6        A.   Good morning.
7        Q.   As I told you before, I am Adam Harris.  I am
8    from the law firm of Fried, Frank, Harris, Shriver &
9    Jacobson, LLP.  We represent the Texas League of Young
10   Voters Education Fund, Defendant-Intervenors in this
11   lawsuit.
12            Can you start by giving your full name for
13   the record, please.
14       A.   Karina Casari Davis.
15       Q.   And can you give your address, please.
16       A.   5817 Spanish Oaks Boulevard, Austin, Texas
17   78738.
18       Q.   And Ms. Davis, can you please briefly tell me
19   about your post high school education, if any?
20       A.   Yes.  I have a Bachelor's Degree from Texas A&M
21   University in Political Science.
22       Q.   Do you hold any other higher education degrees?
23       A.   No.
24       Q.   Have you ever given a deposition before?
25       A.   Yes.

## 7

1        Q.   How many times?
2        A.   I think twice.
3        Q.   And can you tell me --
4        A.   If I remember.
5        Q.   -- the first time you gave a deposition, what
6    kind of case that was?
7        A.   It was actually a -- I was a minor.
8        Q.   You were a minor at the time?
9        A.   Yes.  I was a minor at the time.  And it was --
10   actually, I had been involved in a car accident, so it
11   was -- I am sorry.  I am having to remember.  It was a
12   run-of-a-mill car accident with a lawsuit.
13       Q.   Sure.
14       A.   Long time ago.
15       Q.   And how about the second time you gave a
16   deposition, what kind of case was that?
17       A.   That was actually when I worked for the
18   Department of Insurance, I was Executive Commissioner
19   there.  We were -- the State had sued Farmers Insurance
20   actually, for discriminatory practices at the time and I
21   was kind of the lead staff person in that enforcement
22   action.
23       Q.   Okay.  Well, since you have given a couple
24   depositions before, I will keep the sort of housekeeping
25   and ground rules short.  But, obviously, there is a

## 8

1    court reporter taking down the testimony, so she will
2    need you to give a verbal answer as opposed to nodding
3    or shaking your head or "uh-huh" or the sorts of things
4    we would normally do in conversation.
5             We should, also, try not to talk over each
6    other, I will certainly try so that the record is easy
7    to read.
8             If you don't understand a question, you
9    should certainly feel free to say that, and I will be
10   happy to rephrase.  I will try to be clear but I
11   certainly will not succeed all the time.
12            And your counsel today may make some
13   objections.  Unless he particularly instructs you not to
14   answer a question, you will need to answer the question.
15            And to the extent that you need a break
16   today, I am happy to take one, so please just let me
17   know.
18            Can you tell me about each of the jobs you
19   have held since graduating college, starting, I guess,
20   with your first job out of college.
21       A.   Uhm, let me think.  You probably -- as soon as
22   I graduated, I probably helped my parents with their
23   business for a little while before I started my first
24   real job.  I started working for a State Senator from
25   Waco by the name of David Sibley in 1992.  And I worked

## 9

1  for him in various capacities through -- until the
2  beginning of 2002, so about 10 years, and have been a --
3  I had to work for him in the District as a District
4  Aide, and then I worked as Legislative Aide, as a
5  committee staffer, as his Committee Director and his
6  Chief of Staff at various points in my career with him.
7         After that, I worked at the Department of
8  Insurance for a year.  And then I returned to the Senate
9  as the Legislative Director for the current Lieutenant
10 Governor David Dewhurst, did that for about a year, and
11 then became Parliamentarian in the Texas Senate in 2004.
12        Q.  And what year did you become the Legislative
13 Director for Lieutenant Governor David Dewhurst?
14        A.  When he took office in January of 2003.
15        Q.  And then when did you transition from being his
16 Legislative Director to becoming the Senate
17 Parliamentarian?
18        A.  I think that was -- I want to say it was April
19 of 2004, we had a special session at the time and the
20 previous Parliamentarian had retired previous to that,
21 so that would be the -- you know, I think April 2004 is
22 probably a safe answer, that's about right.
23        Q.  Have you served as Senate Parliamentarian
24 continuously from about April 2004 through today?
25        A.  Yes.

## 11

1        Q.  What were your duties as Legislative Director
2  to Lieutenant Governor David Dewhurst?
3        A.  Really, it was to, you know, advise him on
4  legislative policy in the Senate to, you know, I
5  assisted the Parliamentarian, actually, in many ways,
6  and I think the -- it was somewhat of an Assistant
7  Parliamentarian.  Really, the Lieutenant Governor has a
8  lot of responsibility when it comes to the Senate
9  calendars, and so their -- as Legislative Director, I
10 was involved in helping schedule the Senate's business
11 from day-to-day.
12        Q.  And then I think you said you functioned as
13 something like an Assistant Parliamentarian at times.
14        A.  Yes.
15        Q.  Is there an official, you know, assistant or
16 Deputy Parliamentarian in the Texas Senate?
17        A.  There isn't right now.
18        Q.  Has there been in the past?
19        A.  Probably, sometimes.
20        Q.  Since you became Parliamentarian in or about
21 April 2004, have you ever had a deputy or an Assistant
22 Parliamentarian?
23        A.  No, not a formal assistant, no.
24        Q.  As Parliamentarian, does anybody report to you,
25 do you have staff at all?

## 10

1        Q.  And going back to your position with State
2  Senator, did you say Sibley was the name?
3        A.  Sibley.
4        Q.  Sibley, excuse me.
5        A.  Uh-huh.
6        Q.  As a Legislative Aide, did you cover, to
7  Senator Sibley, did you cover any particular subject
8  area?
9        A.  Education at the time, this was in 1993, that
10 was probably my biggest subject for him.
11        Q.  And then you said, you were a committee staffer
12 and then a Committee Director.
13        A.  Uh-huh.
14        Q.  Was that for a particular committee, I assume?
15        A.  Initially, it was the Economic Development
16 Committee.  The name was changed at some point, it
17 became the Senate Business and Commerce Committee.
18        I should say, there were probably some
19 interim committees that were special committees that I,
20 also, directed during that time frame, all related to
21 economic development of business and commerce.
22        Q.  And as Legislative Director to Lieutenant
23 Governor David Dewhurst, did you cover a particular
24 subject area?
25        A.  No.  No.

## 12

1        A.  I have an assistant in the office, yes, one
2  person.
3        Q.  And are you employed by Lieutenant Governor
4  Dewhurst?
5        A.  I am employed -- well, I am an officer of the
6  Senate, and the Senate decrees that I am an officer and
7  in a resolution that they adopt allows the Lieutenant
8  Governor to appoint my position.
9        Q.  Did Lieutenant Governor Dewhurst appoint you to
10 be the Senate Parliamentarian in 2004?
11        A.  Yes.
12        Q.  Where -- do you have an office in the Senate?
13        A.  Yes.
14        Q.  Where is your office located?
15        A.  It's located in front of the Senate Chamber
16 adjacent to the Sergeant at Arms.
17        Q.  What are your duties as Senate Parliamentarian?
18        A.  Generally, it is to advise the presiding
19 officer and the senators on the rules and procedures of
20 the Texas Senate.
21        Q.  As either aide to Senator Sibley or as
22 Legislative Director to Lieutenant Governor Dewhurst,
23 did you ever have any involvement with Texas election
24 law or issues around voting?
25        A.  If I did, it was -- I really -- I don't

## 17

1  Q.  Is it ever the case that the Lieutenant
2  Governor seeks to introduce a bill via another member of
3  the Senate?  So, for instance, the Lieutenant Governor
4  wants a bill to be passed and given what you just said,
5  he doesn't have the power to introduce the bill, is it
6  ever the case that he would ask another member to file a
7  bill for him?
8  A.  Probably.
9  Q.  You said that the Lieutenant Governor rules on
10  questions or points of order; is that right?
11  A.  That's right.
12  Q.  Does he consult you when a point of order is
13  raised?
14  A.  Yes.
15  Q.  And I assume part of your job is to advise him
16  on your view with respect to the point of order that's
17  been raised?
18  A.  Yes.
19  Q.  Is the Lieutenant Governor obligated to take
20  your advice?
21  A.  No.
22  Q.  Can the Lieutenant Governor vote on
23  legislation?
24  A.  Only in the case of a tie.
25  Q.  Are there any other instances in which the --

## 18

1  beyond a tie, are there any other instances in which the
2  Lieutenant Governor has the authority to vote on a
3  particular bill?
4  A.  He has the authority within the Committee of
5  the Whole to vote and debate on any matter before the
6  Committee of the Whole.
7  Q.  And what is the "Committee of the Whole"?
8  A.  The "Committee of the Whole" is a parliamentary
9  device with historical roots in parliament.  It is
10  essentially a meeting of the full Senate outside of
11  session.  It is an informal meeting where the Senate
12  would consider a wide variety of things on an informal
13  basis.  And by "informal," I mean, not bound by the
14  traditional rules of procedure governing debate in full
15  session.
16  Q.  When you say that the Committee of the Whole
17  process is not bound by the formal rules of debate, what
18  sort of rules are you referring to?
19  A.  Rules such as, that you don't get to speak a
20  second time unless every member of the Senate has
21  already had an opportunity to speak once.  Generally, in
22  a Committee of the Whole, any limitations on debate that
23  the full body might have would not be allowed in
24  Committee of the Whole unless the Senate itself in
25  session chose to place limits on discussion in the

## 19

1  Committee of the Whole, things of that nature.
2  Q.  What is the purpose of using the Committee of
3  the Whole as opposed to -- well, let me step back.
4  Bills are normally -- am I correct that bills are
5  normally referred to a particular committee that has
6  jurisdiction over particular subject matter relating to
7  that bill?
8  A.  I think, frequently, that's the case.  But the
9  Committee of the Whole in the Senate has been used quite
10  a bit for legislation, especially in the last 30
11  years --
12  Q.  How --
13  A.  -- in lieu of the standing committee.
14  Q.  How frequently is the Committee of the Whole
15  process used for bills in the Senate as opposed to
16  sending a bill to a standing committee?
17  A.  Uhm.  Well, I think that the Senate tends to
18  use the Committee of the Whole for legislation for which
19  it -- the Senate deems it more beneficial to have the
20  input of every single member of the Senate as opposed to
21  a subset of the Senate.  The standing committee might
22  have 10 members, whereas, the Committee of the Whole
23  would have 31 members.  So the kinds of bills that go to
24  the Committee of the Whole are for bills that the Senate
25  deems would benefit from an exchange amongst the 31

## 20

1  senators as opposed to fewer.
2  Q.  And since you became Senate Parliamentarian in
3  or around April 2004, would you be able to quantify how
4  many -- how many times the Committee of the Whole
5  process has been used as opposed to sending a bill to a
6  standing committee?
7  A.  Yes.  Since 2004, I believe we -- it was used
8  for school finance.  And then probably for voter ID
9  legislation.
10  Q.  Can you think of any other bills that went to
11  the -- since you became Senate Parliamentarian, that
12  went to the Committee of the Whole rather than a
13  standing committee or another committee?
14  A.  I don't remember if we referred anything else
15  to the Committee of the Whole.  I do remember the Senate
16  resolving for those two purposes.
17  Q.  As a general matter, putting aside any
18  particular bill or piece of legislation, why would the
19  Senate use the Committee of the Whole process as opposed
20  to sending a bill to a committee with particular
21  jurisdiction over some subject matter?
22  A.  I think, generally, for the reasons I just
23  explained.
24  Q.  And I think what you were saying is that, the
25  Committee of the Whole involves the entire Senate,

## 21

1   whereas, a standing committee or another committee would
2   only have 10 or so members; is that right?
3        A.   For example, yes.
4        Q.   And what's the benefit or -- what's the benefit
5   of sending a bill to the Committee of the Whole with 31
6   members as opposed to a committee that has fewer
7   members?
8        A.   I think the benefit is that you have greater
9   deliberation.  It allows the Senate to all -- basically,
10  31 members would have equal rights of participation
11  within the Committee of the Whole.  And by "equal
12  rights," I mean, equal rights to amend a bill in
13  committee, equals rights to question witnesses, equal
14  rights to debate within the informal confines of a
15  committee structure.
16       Q.   And when you say that the Committee of the
17  Whole process lends itself to greater deliberation, are
18  you able to elaborate on that beyond what you have just
19  described?
20       A.   Well, when the Senate is in session, I think --
21  you know, we have rules of debate.  Things like, you
22  should always address the President.  Committee of the
23  Whole is just -- it is an informal meeting of the Senate
24  where they can have full debate, question each other,
25  without having to worry about framing their questions

## 22

1   and conforming to the rules of debate on the Senate
2   floor.
3             The Committee of the Whole has been used
4   for investigations, for other purposes, any time the
5   committee -- the Senate, as a whole, determines informal
6   debate in consideration would be beneficial.
7        Q.   Can you walk me through the process of how a
8   bill gets filed or introduced in the Senate.
9        A.   Sure.  A member of the Senate -- you want me to
10  walk you through, administratively, what they would
11  actually do?
12       Q.   Yes, please.
13       A.   Our process in the Senate is, once you have a
14  piece of legislation, you get what we call "an orange
15  back" where you -- it is stapled to the back of the bill
16  on this orange back, has a place for the caption which
17  is required by the rules that basically notifies the
18  members in the public, generally, what the bill is
19  about, a member would sign that legislation.  The orange
20  back has room on the back where -- when the bill goes
21  through the process of the Senate, it might be stamped
22  with where it was referred that actions that take place
23  on the bill.  But essentially, a member of the Senate or
24  the staff would take this bill to the Calendar Clerk
25  where it is given a number and at some point all of

## 23

1   these actions are entered into the Senate Journal.
2        Q.   When you say "a bill is given a number," what
3   is the significance of the number that the bill is
4   given?
5        A.   Not really any significance, it is just a
6   sequential numbering system for identifying bills.
7        Q.   So is it the case that the first bill filed in
8   a session would be given Bill No. 1, the next bill would
9   be given No. 2 and so on?
10       A.   Not necessarily.  Sometimes we go out of order
11  for the convenience of the members.
12       Q.   Is it ever the case that certain low bill
13  numbers are reserved?
14       A.   Yes.  We do reserve some bill numbers.
15  Traditionally, for example, the budget is considered
16  very important and, also, we give it the designation of
17  one and that is for the convenience of the members, they
18  always know budget bill is Senate Bill 1.
19             House does the same.  Theirs is House Bill
20  1 every time, almost every time, I should say.
21       Q.   Have you ever heard of members camping out to
22  file legislation?
23       A.   Yes.
24       Q.   And what does that refer to when members, what
25  do you take that to mean when members camp out, what are

## 24

1   you describing?
2        A.   You know, I think some members think that a
3   lower bill number gives them -- you know, I think
4   they -- they think that it signals to maybe the
5   membership and the public that their piece of
6   legislation was first in idea, perhaps, or sometimes we
7   get multiple pieces of legislation on the same subject
8   and so some members think that if they have a lower bill
9   number, that indicates to the Senate that, perhaps, they
10  came up with the idea first.  There are many members who
11  don't think that, some -- and don't camp out.
12       Q.   Does the bill number have any affect on when a
13  bill gets considered by a committee?
14       A.   Not at all.
15       Q.   Does it have any affect on when a bill gets
16  considered, if at all, by the entire Senate on the
17  floor?
18       A.   No.
19       Q.   After a bill is filed, what's the next step in
20  the legislative process, what happens to it?  I think
21  you said it -- it is filed with the Calendar Clerk; is
22  that right?
23       A.   Yes.
24       Q.   What's the next step after that?
25       A.   The next step under the rules is that, the

Karina Casari Davis                                          June 15, 2012

## 25

1   Lieutenant Governor, the Presiding Officer, would refer
2   the bill to a committee.
3       Q.   And in this case, Presiding Officer, you're
4   referring to Lieutenant Governor; is that right?
5       A.   Yes.
6       Q.   As a general matter, without regard to any
7   particular bill, how does the Lieutenant Governor decide
8   which committee to assign a bill to?
9       A.   Generally, the Lieutenant Governor would
10  consider the subject of the legislation and consider
11  what committee might have the expertise to deliberate
12  that piece of legislation for the Senate to make
13  recommendations to the Senate.
14      Q.   Is it ever the case that a bill could fall
15  under the jurisdiction of more than one committee?
16      A.   Yes.
17      Q.   And in those sorts of cases, as a general
18  matter, how does the Lieutenant Governor go about
19  deciding which of those two or more committees to assign
20  the bill to?
21      A.   He might look at where that kind of legislation
22  has gone before previously.   He might determine that a
23  bigger committee may -- may -- may serve the bill -- may
24  provide better deliberation and input for a bill than
25  maybe a smaller committee.   He may be requested to send

## 26

1   a bill to a particular committee.   There is probably a
2   wide variety of factors that he could take into
3   consideration.
4       Q.   And when you say, "the Lieutenant Governor may
5   be requested to send a bill to a particular committee,"
6   who would make such a request?
7       A.   Frequently -- okay.
8            MR. FREDERICK:   Let me just object --
9       A.   Okay.
10           MR. FREDERICK:   -- on the basis of
11  privilege.   I think the question is just calling for a
12  general matter.   But I want to caution you not to reveal
13  any specific request or conversation between a member of
14  the Senate and the Lieutenant Governor.   But subject to
15  that instruction, you may answer the question.
16      A.   Sure.   Sometimes a member who files a bill sits
17  on a committee where that committee might have
18  jurisdiction, and so the member, out of convenience, may
19  ask for the bill to go to that particular committee, as
20  an example of why a member would request a referral.
21      Q.   (By Mr. Harris)   As the Parliamentarian, does
22  the Lieutenant Governor ever consult with you regarding
23  which committee to send a bill to?
24      A.   Yes.
25      Q.   And when you -- when you, as a general matter,

## 27

1   when you help the Lieutenant Governor deliberate on that
2   question, do you employ the same sorts of criteria that
3   you just talked about, such as the size of the
4   committee, which committee has jurisdiction over the
5   subject matter?
6       A.   Yes.
7       Q.   Are there any other factors that you take into
8   account?
9       A.   I think, generally, I put forward the -- the
10  bigger factors.
11      Q.   How about in deciding whether to assign a bill
12  to the Committee of the Whole, as a general matter would
13  the Lieutenant Governor consult you as a Parliamentarian
14  in deciding whether to assign a bill to the Committee of
15  the Whole as opposed to another committee of the Senate?
16      A.   He may.
17      Q.   Did you discuss the fact that you were giving a
18  deposition today with anybody?
19      A.   Yes.
20      Q.   Who did you discuss it with?
21      A.   My husband, my assistant at work, it probably
22  came up with close friends.
23      Q.   Did you discuss the substance of what you might
24  say today with anybody, other than attorneys?
25      A.   No.

## 28

1       Q.   Did you discuss --
2       A.   Oh, I take that back, my assistant.
3       Q.   And what did you discuss with your assistant
4   about the substance of today's deposition?
5       A.   Probably more of my concerns and worries that I
6   wouldn't remember things but not anything very specific.
7       Q.   Were there particular things you were worried
8   about not remembering?
9       A.   Yes.   As I mentioned previously, we have lots
10  of legislation in the Senate and sometimes I don't
11  recall, you know, very specific events.
12      Q.   Did you meet with any attorneys in preparation
13  for today's deposition?
14      A.   Yes, my counsel.
15      Q.   And who is your counsel?
16      A.   Matt Frederick.
17      Q.   And how many times did you either meet with or
18  speak to Mr. Frederick about the deposition prior to
19  today, or I guess including today?
20      A.   Probably two or three times.
21      Q.   And when -- were those in person meetings or --
22      A.   One of them was, yes, or actually probably two
23  of them.
24      Q.   And when did those in person meetings take
25  place?

Karina Casari Davis                                                June 15, 2012

## 29

1   A.   Yesterday and today.
2   Q.   And how long did you meet with Mr. Frederick
3   yesterday?
4   A.   Probably, maybe two to three hours and probably
5   weren't meeting the entire time.
6   Q.   And how about today, how long did you meet with
7   Mr. Frederick today?
8   A.   Maybe 20 minutes.
9   Q.   And did you have any other contact with
10  Mr. Frederick in preparation for the deposition, other
11  than those two in person meetings?
12  A.   We had a phone call.
13  Q.   And when did that take place?
14  A.   Late yesterday.
15  Q.   And how long did -- how long did the phone call
16  last?
17  A.   You know, 10 to 20 minutes.
18  Q.   Other than the searches for the bill histories
19  with respect to SB 14 that you talked about doing on
20  your computer, did you review any other sources or
21  documents in preparation for the deposition?
22  A.   You know, probably -- I reviewed the rules,
23  although I do that frequently anyways.  I frequently
24  read parliamentary authorities.  I have been working on
25  some research on some other things and -- for instance

## 30

1   you know, just general parliamentary law.
2   Q.   As Parliamentarian, do you have any role with
3   respect to the -- to the substance of legislation as
4   opposed to the procedure?
5   A.   No.
6   Q.   Do you review or read every bill that gets
7   filed with the Senate?
8   A.   Usually, yes.
9   Q.   Let's go back to the -- to the legislative
10  process.  I think where we left off, you had said that,
11  after the bill gets filed with the Calendar Clerk, the
12  Lieutenant Governor makes a decision about which
13  committee to appoint the bill to; is that right?
14  A.   Yes.
15  Q.   And what's the next step in the process at that
16  point?
17  A.   Once that determination is made, the bill is
18  read on its first reading in front of the Senate, read
19  first reading and referral where the committee of
20  referral is announced in the Senate and the bill is
21  actually referred.  At that point, as I mentioned
22  previously, we have an orange back on the bill, it is
23  stamped with the committee that it's been referred to,
24  the bill goes back to the Calendar Clerk at that time.
25  Q.   Why does it go back to the Calendar Clerk?

## 31

1   A.   She and the Secretary of the Senate or the
2   custodian of the bills in the Senate.
3   Q.   And after the Bill is referred to the
4   committee, read for the first time on the Senate floor
5   and then goes back to the Calendar Clerk, what happens
6   next?
7   A.   Sometimes nothing.  The bill is scheduled for
8   hearing in a committee.  The committee clerk of that
9   committee would probably go to the Calendar's Clerk and
10  check the bill out for the committee's work.
11  Q.   What has to happen for the bill to go from
12  committee to the Senate floor for consideration by the
13  entire Senate, assuming we are not talking about the
14  Committee of the Whole but a regular committee?
15  A.   Generally, a committee would have to make a
16  recommendation to the full Senate that the bill be
17  passed or not passed but usually that it would be
18  passed.
19  Q.   And in making those recommendations, is there a
20  committee vote --
21  A.   Yes.
22  Q.   -- on the bill?  And is it -- what vote would
23  be required to recommend the bill to the -- to the
24  entire Senate, to recommend to the entire Senate that
25  the bill be passed?

## 32

1   A.   For standing committees, I think those
2   procedures require a majority of the membership of the
3   committee.
4   Q.   And assuming that a bill receives a vote from
5   majority of the membership of the committee to recommend
6   it for passage to the entire Senate, what's the next
7   step of the legislative process after that?
8   A.   Well, if the author of the bill chooses to move
9   it forward, the bill, once it's reported from Committee,
10  becomes part of the Senate's Regular Order of Business.
11  A senator choosing to move that bill forward, may choose
12  to -- could choose to submit it to the local calendar
13  to the Administration Committee for consideration on a
14  local calendar.  He or she could choose to have the bill
15  brought up for consideration in the full Senate for
16  debate.
17  Q.   Okay.  You referred to -- "could be a matter of
18  Regular Order of Business."
19  A.   Uh-huh.
20  Q.   What does that mean?
21  A.   The "Regular Order of Business" is what's
22  considered the Senate's general calendar for bills and
23  resolutions.
24  Q.   And how does that work?
25  A.   The Regular Order of Business is formed under

## 33

1  the rules.  The rules provide that, as bills are
2  reported from a Senate committee, that the Calendar
3  Clerk or the Secretary of the Senate is to note the date
4  and time that those bills are actually submitted, so it
5  wouldn't be when they are voted out of committee but
6  when they are actually reported back to the committee,
7  to the Senate from the committee, excuse me.  And so the
8  Regular Order of Business is formed in the order in
9  which bills are reported out.  But there is a precedent
10 within the rules, for example, joint resolutions would
11 take precedence over Senate bills.  So if two bills are
12 reported at different times, joint resolutions are in a
13 category of themselves above Senate bills in the Regular
14 Order of Business.
15     Q.  So putting aside joint resolutions, is it the
16 case that bills that are put on the general calendar
17 would be considered by the full Senate in the order in
18 which they were submitted to the general calendar?
19     A.  That's what the rules require.
20     Q.  And you said that the author of the bill could
21 make the decision to place the bill on the local
22 calendar?
23     A.  Yes.
24     Q.  Is that right?  What's the "local calendar"?
25     A.  The "local calendar" is a designated meeting of

## 34

1  the Senate to consider a separate calendar.  Bills on
2  the local calendar are still part of the general
3  calendar but they are considered at a different time.
4  Essentially, bills that are uncontested in committee and
5  that are recommended by the chairman of the committee
6  from which they are reported have the ability to be set
7  on the local calendar by the Administration Committee,
8  an author of a bill who chooses to place his bill on the
9  local calendar would make a request to the
10 Administration Committee that his bill -- his or her
11 bill be certified for the local calendar.  The
12 Administration Committee would meet and consider the
13 request.  And if they thought that the bill should be on
14 the local calendar, and there are some requirements for
15 what kinds of bills can be on there and what can't, but
16 generally they would consider all the bills requested at
17 a particular time.  They would determine which will be
18 certified.  They would produce a calendar, and then the
19 Senate -- and the calendar would set a time for the
20 Senate to consider those bills.
21     Q.  As a general matter, why would an author of a
22 bill choose to place the bill on the local calendar as
23 opposed to the general calendar?
24     A.  I think it's probably really for efficiency
25 sake.  Bills on the local calendar, you know, are not

## 35

1  debated, they cannot be amended.  And they are -- while
2  they are uncontested in committee, on the Senate floor,
3  members can vote against them but it is unlikely, you
4  know, that there would be enough opposition that the
5  bill would fail to pass.
6      Q.  Does the Lieutenant Governor play any role in
7  deciding which calendar to assign a bill to?
8      A.  I think probably a minor role.  The authors
9  choose whether they are going to go to the local
10 calendar.  If there is a bill being considered by the
11 Administration Committee, which the Lieutenant Governor
12 you know, thinks should be considered for full debate on
13 the Senate floor from time to time, that indication may
14 be made, but usually not.
15     Q.  So assuming that a bill gets placed on the
16 general calendar, what's the next step in the process in
17 terms of the bill being considered -- well, let me ask
18 you this.  Do all bills on the general calendar
19 eventually get considered by the full Senate?
20     A.  No.
21     Q.  So --
22     A.  Not in their bill form, no.
23     Q.  What do you mean when you say, "not in their
24 bill form"?
25     A.  Well, sometimes bills are on the Regular Order

## 36

1  of Business, the Senate bills is on the Regular Order of
2  Business that's been reported out and through the
3  process, maybe it is companion House Bill has come over
4  from the House, you know, might be the equivalent or
5  very similar to the bill.  And at that point, that
6  bill -- House Bill would be more advanced in the
7  legislative process, so Senate author or the Senate
8  sometimes is required by rule to do this, would then
9  choose to move the House bill instead of the Senate
10 bill.  So that Senate bill would, you know, just remain
11 always part of the Regular Order of Business and never
12 taken up.
13     Q.  And once a bill is on the general calendar,
14 what dictates whether it will be heard by the full
15 Senate or not?
16     A.  Once it's on the Regular Order of Business?
17     Q.  Uh-huh.
18     A.  Again, it -- you know, the author plays a big
19 role in that.  But in the Senate, you know, the Senate
20 doesn't always follow its regular order.  I think it's
21 pretty well-known that we have a -- the Senate has a
22 rule, like most legislative bodies, where it can suspend
23 its calendars to take bills out of order, so that
24 happens.
25     Q.  What is the process for suspending the regular

## 37

1  calendar and taking a bill out of order?
2      A.  It's made by motion.
3      Q.  Who makes that motion?
4      A.  The author of a bill, usually.
5      Q.  And is a particular vote required to suspend
6  the Regular Order of Business and take the bill out of
7  order?
8      A.  Yes.  It's two-thirds of the members present
9  voting.
10     Q.  And once a bill is taken up by the full Senate,
11 let's say it is put on the general calendar and that it
12 does get considered by the full Senate, what's the next
13 in the process, what happens at that point?
14     A.  After the motion to suspend the Regular Order
15 of Business is made, is that your question?
16     Q.  Let's assume for now that it is a Regular Order
17 of Business and it is being called up in the regular
18 order.
19     A.  Okay.  So the Senate -- the assumption is that
20 the Senate is following its calendars.
21     Q.  Yes.
22     A.  Okay.
23     Q.  What does the Senate do at that point, is there
24 a floor debate?
25     A.  Well, if the Senate is following its calendar,

## 38

1  the Presiding Officer would lay the bill before the
2  Senate for consideration on second reading.  At that
3  point, it is open for debate and you would have debate
4  on the bill.  Once the debate is concluded, in order for
5  the bill to move forward, a member could make a motion
6  to pass the bill to either engrossment or third reading.
7      Q.  And what's "engrossment" mean?
8      A.  "Engrossment" is the term that we use for bills
9  that are passed on second reading and in the originating
10 chamber.  In other words, if it is a Senate Bill
11 considered on second reading in the Senate then it is
12 passed to engrossment.  If it is a House Bill passed on
13 second reading, in the Senate Chamber, it is passed to
14 third reading.
15     Q.  I see.  And at that point, there is a vote of
16 the full Senate on the bill; is that right?
17     A.  Yes.
18     Q.  And assuming that the bill passes, I take it
19 that that's the last step in the process on the Senate
20 side for a bill or is there something else?
21     A.  Well, no.  We have a requirement of three
22 readings.  The first reading being on referral, that
23 would be the second reading.  Once its passed to
24 engrossment or third reading for the bill to be passed
25 out of the Senate, it has to be debated again or

## 39

1  considered again, actually, I should say, considered
2  again --
3      Q.  And then --
4      A.  -- actually.
5      Q.  Excuse me.  And then there is another vote
6  taken at that point.
7      A.  Yes.  And that would be for final passage.
8      Q.  I see.  So you just described the process,
9  assuming that the Senate was proceeding in the Regular
10 Order of Business.  How would the process differ if the
11 Senate suspended the Regular Order of Business and took
12 a bill out of order?
13     A.  It would be the same.
14     Q.  So the only difference is when -- with respect
15 to suspending the Regular Order of Business is when a
16 bill gets considered?
17     A.  Yes.  Because either the Senate is following
18 the calendar or it isn't.  The calendar is meant to
19 provide a predictable system of when bills are going to
20 come up.  So if it was taken out of offered, you would
21 have a motion to suspend that calendar.  Beyond that,
22 the bill would take the same process.
23     Q.  I am sorry to jump around, but I want to go
24 back to a couple of points that we were discussing
25 before.  When you met with Mr. Frederick on those two

## 40

1  occasions, was anybody else present during those
2  meetings?
3      A.  There was another attorney yesterday present
4  from the Attorney General's Office for part of the
5  meeting.
6      Q.  And do you remember which attorney that was?
7      A.  Yes.  Stacey Napier.
8      Q.  And how about on the phone call that you had
9  later on yesterday with Mr. Frederick, was anybody else
10 on the call?
11     A.  No.
12     Q.  And is the Parliamentarian a partisan position?
13     A.  No.
14     Q.  Do you consider yourself to be a Democrat or a
15 Republican or something else?
16         MR. FREDERICK:  Objection, relevance.  You
17 can answer.
18     Q.  (By Mr. Harris)  You can answer the question.
19     A.  Uhm.  You know, I think probably I have
20 considered myself to be conservative in my voting.
21     Q.  What is the purpose of having a rule -- as a
22 general matter, what's the purpose of having a rule
23 whereby the Senate could vote to consider a bill out of
24 order?
25     A.  Can you state your question again?

## 41

1    Q.  Sure.  Do you know why there is a rule that
2  allows the Senate to vote by, you know, generally
3  two-thirds of the members present to consider a bill out
4  of order?
5    A.  That's just standard parliamentary practice in
6  legislative bodies throughout the country.
7        A calendar system exists for the benefit
8  of the members to provide predictability and a certainty
9  of as to when a business is going to come before the
10  body.  So it is considered that if you are going to take
11  something out of order, it's a -- potentially, a
12  violation of the member's fundamental rights in not
13  being apprised of that, and so it generally takes a
14  super majority to go out of order.
15    Q.  How common is it for a bill to be considered
16  out of order, as opposed to proceeding under the Regular
17  Order of Business in the Senate?
18    A.  It is fairly common for -- for general bills, I
19  would say.
20    Q.  Are you familiar with the term "Blocker Bill?
21    A.  Yes.
22    Q.  What's a "Blocker Bill?"
23    A.  A "Blocker Bill" is generally a bill that would
24  be at the very top of that regular calendar and
25  sometimes it is set there on purpose and sometimes it is

## 42

1  just there and it is the first bill.  And because it is
2  the first bill on the calendar, if it is not taken up,
3  other bills would be taken -- would have to, by
4  definition, be taken up out of order.
5    Q.  Is there generally a Blocker Bill in place each
6  session?
7    A.  I would say, since the early 1950s, that for
8  Regular Sessions, there is usually a bill at the top of
9  the calendar, it can be passed.  Sometimes the Blocker
10  Bill changes.  For special sessions, there are probably
11  many instances where a blocker bill is not used.
12    Q.  Has the Blocker Bill -- has a Blocker Bill been
13  used in all the Regular Sessions since you have been the
14  Parliamentarian in the Senate?
15    A.  All of the Regular Sessions, yes.
16        MR. HARRIS:  Why don't we take a short
17  break, if you don't mind.
18    A.  Sure.
19        (Brief recess.)
20    Q.  (By Mr. Harris)  We were talking before about
21  the ability of the Lieutenant Governor to assign a bill
22  to the Committee of the Whole as opposed to a regular
23  committee.  Are there any limitations on the Lieutenant
24  Governor's ability to assign a bill to the Committee of
25  the Whole as opposed to a different committee?

## 43

1    A.  "Limitations," I am not sure I know what you
2  mean.
3    Q.  Are there any types of bills, for instance,
4  that the Lieutenant Governor could not assign to the
5  Committee of the Whole?
6    A.  I am sorry.  I need to think about that.
7    Q.  Sure.  Please take your time.
8    A.  Probably not, I don't think so.
9    Q.  Besides the Committee of the Whole, can a
10  Lieutenant Governor sit on any other committees in the
11  Senate?
12    A.  He -- not under our rules, no.
13    Q.  Is it fair to say that the Lieutenant Governor
14  has a more powerful role when it is referred to the
15  Committee of the Whole as opposed to Lieutenant
16  Governor's role with respect to a bill being considered
17  by another committee?
18    A.  I don't think I would characterize it as "more
19  powerful."
20    Q.  But you did say before that the Lieutenant
21  Governor could vote on legislation in the Committee of
22  the Whole; is that right?
23    A.  Yes.
24    Q.  And typically beyond, besides the Committee of
25  the Whole, the Lieutenant Governor could only vote on

## 44

1  legislation if there was a tie in the Senate; is that
2  right?
3    A.  That's right.
4    Q.  What rules govern the proceedings of the
5  Committee of the Whole?
6    A.  Generally, there are rules in the Senate, I
7  think, in Article XIII that generally govern the
8  Committee of the Whole.  We, also, have -- the Senate
9  can determine rules for each sitting of the Committee of
10  the Whole by resolution or in written format, however
11  they choose to -- to do that.  You have, you know,
12  parliamentary law -- general parliamentary law and
13  precedents would apply where applicable, as would Senate
14  Rules.
15    Q.  Who writes the Senate Rules?
16    A.  The Senate.
17    Q.  Does a particular member usually draft the
18  rules?
19    A.  No.
20    Q.  Is the Legislative Council involved in writing
21  the Senate Rules?
22    A.  They are probably sometimes asked to assist.
23    Q.  And does the Senate have to vote to adopt the
24  Senate rules?
25    A.  Well, yes, I think to -- if they are to adopt

Karina Casari Davis                                      June 15, 2012

## 45

1   rules, they have to vote.
2   Q.   And can you tell me, more specifically, who
3   actually writes or drafts the rules?
4   A.   Who drafts the rules?
5   Q.   Uh-huh.
6   A.   I can -- I mean, generally, the Parliamentarian
7   will draft -- will have -- will assist in drafting the
8   rules resolution at the beginning of the session.
9   Q.   And then does the Senate vote to adopt the
10   rules at the beginning of each Regular Session of the
11   Senate?
12   A.   Usually, yes.
13   Q.   And when you say "usually," what would be the
14   exceptions to that practice?
15   A.   Well, they don't always adopt new rules in
16   special sessions.  They may not adopt their permanent
17   rules at the very beginning.  Sometimes they may choose
18   to adopt temporary rules and adopt permanent rules
19   later.  There is -- they have the prerogative to adopt
20   the rules of procedure as they see fit.
21   Q.   Since you became Senate Parliamentarian in
22   2004, what has your involvement been with respect to the
23   drafting of Senate Rules?
24   A.   Since I became Parliamentarian.
25   Q.   Uh-huh.

## 46

1   A.   You know, I usually work with the Senate in
2   drafting a resolution for their consideration on the
3   Senate Floor.  I sometimes make recommendations on rules
4   changes.
5   Q.   And is the majority vote of the Senate required
6   in order to adopt the Senate Rules for a particular
7   session?
8   A.   Yes.  It would be by majority vote.
9   Q.   What types of rules changes have you
10   recommended since you have become Parliamentarian?
11   A.   Sometimes we have to conform our rules with
12   constitutional requirements.  We had a change in the
13   constitution a couple of sessions ago dealing with
14   record votes so, at that point, I made a recommendation
15   to the Senate on how to incorporate those requirements
16   into our rules, because our rules were in conflict.
17   Q.   And what other recommendations, if any, have
18   you made to change the Senate Rules?
19   A.   I believe last session, I felt like there was
20   somewhat of a conflict on referral and introduction and
21   how those terms were used.  I made a recommendation to
22   the members on that.  Generally, I don't make many
23   recommendations.
24   Q.   Do you recall any other recommendations to
25   change the rules that you have made as Parliamentarian?

## 47

1   A.   I don't think -- not really.  We don't change
2   our rules frequently, or we haven't lately.
3   Q.   You testified previously that, in order to
4   suspend the Regular Order of Business and take a bill
5   out of the regular order would normally require a vote
6   of two-thirds of those senators present.
7   A.   And voting.
8   Q.   And voting.  Is that right?
9   A.   Uh-huh.  (Witness nodding head up and down.)
10   Q.   Are there any -- since you have been
11   Parliamentarian, have there been any exceptions to that?
12   And by "exceptions," I mean, have there been any
13   instances in which the Senate was able to suspend the
14   Regular Order of Business by something other than a
15   two-thirds vote of members present and voting?
16   A.   No.
17   Q.   I would ask that this document be marked as
18   League Exhibit 14, please.
19   (Deposition Exhibit No. 14 marked.)
20   Q.   Ms. Davis, I am handing you what's been marked
21   as League Exhibit 14.  You obviously don't need to sit
22   here and read the entire document but please feel free
23   to take a few moments to familiarize yourself with what
24   it is.
25   Ms. Davis, have you had a few moments to

## 48

1   look over the document?
2   A.   Yes.
3   Q.   And do you recognize what this document is?
4   A.   Yes.
5   Q.   And what is it, Ms. Davis?
6   A.   Senate Rules from the 81st Legislature 2009.
7   Q.   And if I could please turn your attention to
8   Page 24.  And particularly Rule 5.11.  And in 5.11(a),
9   it states that, "Any bill, resolution or any measure on
10   any day may be made a special order for a future time of
11   the session by an affirmative vote of two-thirds of the
12   members present."
13   Do you see that?
14   A.   Yes.
15   Q.   Is that the rule that you were describing when
16   you said that the Senate could vote by two-thirds of the
17   members present and voting to take a bill out of order?
18   A.   No.
19   Q.   Okay.  What rule were you referring to?
20   A.   Probably 5.12.  Actually, I take that back.
21   Well, they would suspend 5.12 as
22   prescribed by 5.13.
23   Q.   How does 5.13 differ from 5.11(a)?
24   MR. FREDERICK:  Objection, vague, but you
25   may answer.

Karina Casari Davis                                June 15, 2012

---

**49**

1    A.   5.11 is the manner in which the Senate would
2    create a special order.  A special order is actually not
3    part of the Regular Order of Business but is above the
4    Regular Order of Business in precedence on the Senate's
5    calendars.
6    Q.   (By Mr. Harris)  And when you say, "it is a
7    special order is above in precedence," what do you mean?
8    A.   Well, "special order" is a mechanism used to
9    set certain time or precedent for a bill.  So if a bill
10   is set for special order, it comes out of the regular
11   order and is put above the regular order.
12   Q.   How does that differ from what we were talking
13   about before, when you said that the Senate could
14   suspend the Regular Order of Business by a two-thirds
15   vote and take a bill out of order?
16   A.   Well, I guess that's more of an instantaneous
17   motion.  In other words, that could be on their calendar
18   and a member could move to take a bill up out of order.
19   And a special order is typically used to designate --
20   you know, for example, it could be, you know,
21   Mr. President, I move to set, you know, Senate bill
22   blank as a special order for Friday.
23   Q.   What is the effect of making a bill a special
24   order?
25   A.   The effect is that, under the Senate's

**50**

1    calendar, special orders are considered before the
2    Regular Order of Business, they are considered first.
3    Q.   And do you see on Page 24 in Rule 5.11(d), it
4    says that, "Notwithstanding Subsection (a) of this rule,
5    which we just read before, a bill or resolution relating
6    to voter identification requirements reported favorably
7    from the Committee of the Whole Senate may be set as a
8    special order for a time at least 24 hours after the
9    motion is adopted by a majority of the members of the
10   Senate."
11          Do you see that?
12   A.   Yes.
13   Q.   What do you understand Rule 5.11(d) to mean,
14   based on the text here?
15   A.   Well, I think, as you just read it, a bill with
16   a subject of voter identification requirements reported
17   from the Committee of the Whole could be set as a
18   special order at least 24 hours ahead of time by
19   majority vote of the members of the Senate.
20   Q.   And so does that mean that by a majority of the
21   vote of the Senate, a bill relating to voter
22   identification requirements reported favorably from the
23   Committee of the Whole could be considered immediately
24   as opposed to being considered in the Regular Order of
25   Business?

**51**

1    A.   Not immediately.
2    Q.   How could it be considered -- considered sooner
3    than a bill that was required to proceed in the Regular
4    Order of Business?
5    A.   Yes.  Unless you would suspend rules to take
6    other bills out of order.
7    Q.   What are the usual factors required to have a
8    bill be considered as a special order?
9    A.   Can you ask that again?  I am sorry.
10   Q.   Sure.  Putting aside Subsection D, what are the
11   factors that would normally go into whether or not a
12   bill would be considered as a special order?
13   A.   I think it is a matter of scheduling.  So it is
14   really up to the Senate to determine whether it might
15   want to schedule the bill differently.
16   Q.   Do you know why there was a rule in 2009
17   allowing a bill relating to voter identification
18   requirements reported favorably from the Committee of
19   the Whole to be considered as a special order by a
20   majority -- by a majority vote from members of the
21   Senate?
22          MR. FREDERICK:  I object on the grounds of
23   legislative privilege and instruct you not to answer the
24   question.
25          MR. HARRIS:  Well, Mr. Frederick, at this

**52**

1    point, the question is just, does the witness know.  If
2    she does know, we could get into a privilege debate.
3    But I think the question "do you know," would not
4    require her to reveal anything, let alone anything of a
5    legislative privilege.
6          MR. FREDERICK:  If you want to ask a
7    question again, I am -- I think I understand.
8    Q.   (By Mr. Harris)  Sure.  At this point, I am
9    just asking for a yes or no answer to the question of:
10   Do you know why the Senate incorporated in its 2009
11   rules, a rule allowing a bill, a resolution relating to
12   voter identification requirements reported favorably
13   from the Committee of the Whole to be set as a special
14   order by a majority vote of the Senate?
15          MR. FREDERICK:  I would caution you that
16   the way the question is phrased seeks a question of
17   whether or not you know, to the extent, you may answer.
18   I would caution you not to reveal your thought process
19   or any privileged matter relating to the actual reasons.
20   A.   Yes.
21   Q.   (By Mr. Harris)  And what are the reasons that
22   the Senate adopted this rule governing vote or
23   identification requirements as part of the special order
24   rule in 2009?
25          MR. FREDERICK:  Object on the basis of

Karina Casari Davis                                          June 15, 2012

---

### 53

1   legislative privilege.  To the extent that answering
2   this question would require you to reveal the thought
3   process or mental impressions of any member of the
4   Senate or any communications among members of the Senate
5   regarding this issue.  However, to the extent that you
6   can answer this question without revealing privileged
7   communications or subjective motivations and thought
8   process, you may answer.
9          A.   I think I will claim legislative privilege.
10         Q.   (By Mr. Harris)  Do you know of any reason,
11   based on the public record, why the Senate adopted this
12   Rule 5.11(d) under its 2009 rules?
13         A.   Yes.
14         Q.   And what is that reason?
15         A.   I think they publicly stated, the author of the
16   rules resolution publicly stated his reasons during the
17   debate in 2009.
18         Q.   And who was the author of the rules resolution
19   in 2009?
20         A.   Senator Tommy Williams.
21         Q.   And what reasons do you recall Senator Williams
22   giving for adopting this Rule 5.11(d)?
23              MR. FREDERICK:  This is confined to the
24   public record.
25         Q.   Yes.

---

### 54

1              MR. FREDERICK:  You may answer.
2          A.   I think, very generally, his reasons for the
3   rules change, is that the question?
4          Q.   Yes.
5          A.   Right?  Were that, generally, he felt like
6   making a change in the rules would be a more
7   straightforward parliamentary way of passing the
8   legislation as opposed to, you know, parliamentary
9   tactics that many have previously been used.
10         Q.   What parliamentary tactics was he referring to
11   or are you referring to?
12         A.   I don't remember if he specifically said.
13         Q.   Are you aware of any publicly known legislative
14   tactics that were used with respect to voter
15   identification bills prior to 2009?
16         A.   Yes.
17         Q.   What were those tactics?
18         A.   I believe in 2007 and, you know, I think people
19   would refer to them as parliamentary tactics.  But it's
20   fairly well-known that there was an attempt to suspend
21   the Regular Order of Business when they had the votes to
22   do so.  And I -- you know, because the requirement to
23   suspend the Regular Order of Business is a two-thirds of
24   the members present and voting, that vote total or
25   requirement can change based on the members that are

---

### 55

1   present and voting.  So I think there is an attempt to
2   in 2007, to do that when members were absent and the
3   vote total would have changed or the vote requirement
4   would have changed.
5          Q.   And which members were absent that you were
6   referring to?
7          A.   You know, I don't remember entirely.  I
8   remember one of the members.  But I think we probably
9   had more absences, and I don't remember exactly who.
10         Q.   Who is it that you do you remember being absent
11   in 2007?
12         A.   I remember Senator Uresti being absent.
13         Q.   Do you recall the reason why Senator Uresti was
14   absent in 2007?
15         A.   I don't remember whether he was excused or not
16   excused.  I don't recall.
17         Q.   So with respect to the vote to sus -- to make a
18   vote or identification bill a special order in 2007,
19   what was -- what was the result of that vote?
20         A.   The result of the vote.  I don't remember the
21   actual result.
22         Q.   Do you remember if a voter ID bill was, in
23   fact, made a special order in 2007?
24         A.   The question is whether a vote other ID was
25   made a special order in 2007.

---

### 56

1          Q.   Yes.
2          A.   No.
3          Q.   Your answer is, is that it was not made a
4   special order in 2007.
5          A.   In 2007, that's right, no, it was not made a
6   special order.
7          Q.   Apart from 5.11(d) in the 2009 rules that we
8   have just been looking at, are you familiar with any
9   other time in which the Senate rules carved out a
10   particular type of legislation from the two-thirds
11   requirement to make a bill a special order?
12         A.   Can you ask your question again, please?
13         Q.   Sure.  If fact, I would ask the court reporter
14   read it back, please.
15              (Last question read back.)
16         A.   Yes, I am familiar.
17         Q.   What is your familiarity with that?
18         A.   It was done in 1981.
19         Q.   And what type of legislation -- well, tell me
20   what you remember -- well, I take it in 1981, you were
21   not the Parliamentarian; is that right?
22         A.   That's correct.
23         Q.   What rule in the 1981 Senate Rules are you
24   referring to?
25         A.   I don't remember the specific rule.

Karina Casari Davis                                                    June 15, 2012

---

## 57

1   Q.   Do you remember what the substance or effect of
2   the rule was?
3   A.   Generally, the language was similar to this
4   language, 5.11(d) in that a bill, a particular type of
5   bill could be made a special order if it had been
6   reported from the Committee of the Whole.  And I think
7   similar language for at least 24 hours after the motion
8   is adopted by majority of the Senate.
9   Q.   And what type of legislation did the 1981 rule
10  that you have been talking about refer to?
11  A.   I don't remember their exact phrasing.  I
12  believe it was related to apportionment.  But I don't
13  remember the exact phrasing.
14  Q.   Other than 5.11(d) concerning voter
15  identification requirements and the 1981 rule that you
16  have talked about relating to apportionment, are you
17  aware of any other times when the Senate Rules have
18  allowed a particular type of bill to be set as a special
19  order by a vote of the majority of the members of the
20  Senate?
21  A.   I can't say it has never happened.  I don't
22  recall it happening in recent times.
23  Q.   Since you weren't in the Senate in 1981, how is
24  it that you're familiar with that rule that you were
25  referring to before?

---

## 58

1   A.   Parliamentary research.
2   Q.   And would that research -- if I wanted to find
3   out all the times that the Senate, let's say, in the
4   last 50 years has created a special rule for a
5   particular type of legislation, with respect to making
6   that type of legislation a special order, would I just
7   go back and read all the Senate rules for that time
8   period or is there -- do you know of a more efficient
9   way to answer that question?
10  A.   Well, that's the most exact way to answer the
11  question.  You -- depending on the resources available,
12  you could research -- you could look through rules
13  resolutions, you know, for earlier times in the Senate,
14  they are not always compiled and easy to search for, so
15  we often do have to look at the rules and the journals.
16  Q.   What sort of research did you do to look into
17  the question of whether the Senate had previously
18  created an exception for a particular type of
19  legislation with respect to making that type of
20  legislation a special order?
21  A.   Well --
22       MR. FREDERICK:  I am going to object as
23  vague.  I mean, you may answer.
24  A.   I am not sure.  That's why my answer earlier
25  was a bit tentative in the earlier parts of the Senate

---

## 59

1   history.  I am generally familiar with the rules over
2   the course of the Senate's history but that doesn't mean
3   I have performed an exhaustive analysis of whether that
4   particular change in the way Senate special orders are
5   made.
6   Q.   (By Mr. Harris)  But sitting here today, based
7   on your familiarity with the Senate Rules over -- what
8   teams to be at least a good period of time going back to
9   at least 1981, the only instances you can think of in
10  which there was an exception for a particular type of
11  legislation, with respect to making that type of
12  legislation a special order, was the 1981 example of
13  apportionment and this 2009 rule dealing with voter ID;
14  is that right?
15  A.   I think that's an accurate decipher of that
16  time period, yes.
17  Q.   Did Lieutenant Governor play any role in
18  creating this Rule 5.11(d) in 2009?
19       MR. FREDERICK:  I am going to object on
20  the basis of privilege.  You may answer the specific
21  question whether or not he played a specific role.  But
22  I caution you not to go beyond that into any privileged
23  communications or privileged matters.
24  A.   With regard -- well, as Presiding Officer, he
25  would always be somewhat involved in the rules of the

---

## 60

1   Senate.
2   Q.   (By Mr. Harris)  As a general matter, now
3   putting aside 5.11(d), what is the Lieutenant Governor's
4   role with respect to the rules adopted by the Senate?
5   A.   Well, his role in a parliamentary sense is that
6   he is the Presiding Officer, so he would likely be aware
7   of the Senate's work on the rules.
8   Q.   Did you have any discussions with the
9   Lieutenant Governor regarding the proposed Rule 5.11(d)
10  prior to the time that it was voted on by the Senate?
11  A.   Yes.
12  Q.   Did you have any discussions with Senator
13  Williams -- well, let me ask you this.  Go back for a
14  second.
15       How many times did you discuss the
16  proposed Rule 5.11(d) with the Lieutenant Governor
17  before the Senate voted on it?
18  A.   I don't remember.
19  Q.   When the Senate is in session, how frequently
20  do you communicate or interact with the Lieutenant
21  Governor?
22  A.   Interact, daily when we are in session.
23  Q.   And with respect to your discussions with the
24  Lieutenant Governor, with respect to the proposed Rule
25  5.11(d), do you recall whether you had more than one

## 65

1    up on the break and consult the Court's orders.
2              MR. FREDERICK:  And that's fine.
3              MS. BERKOWER:  Don't you want to go off
4    the record?
5              MR. HARRIS:  Let's actually go off the
6    record for a minute, please.
7              (Brief recess.)
8         Q.  (By Mr. Harris)  We have, obviously, had some
9    discussions off the record with respect to what sorts of
10   questions you can answer with respect to discussions
11   about 5.11(d) with other members.  And I think it will
12   take a little time to straighten that out, so we can
13   re-visit it a little later today.
14             But I would ask that, without revealing
15   the substance of any discussion with a particular
16   member, how is it that you came to discuss Rule 5.11(d)
17   with the members of the Senate?  What were the
18   circumstances under which you had those discussions?
19        A.  "The circumstances," what do you mean?
20        Q.  Do you regularly have meetings with all the
21   members of the Senate?
22        A.  As the Parliamentarian, I have lots of
23   day-to-day contact with the members during a session and
24   lots of meetings and discussions.
25        Q.  And how do you, typically, communicate with

## 66

1    members, is it over the phone?  Do they come up to you
2    on the Senate Floor?  How does that work?
3         A.  Most of the time, probably on the Senate Floor,
4    in person it could be a meeting, sometimes on the phone.
5         Q.  And following the adoption of Rule 5.11(d), in
6    the 2009 Senate Session, did the 2011 Senate Rules for
7    the next Regular Session of the Senate contain a similar
8    rule to Rule 5.11(d)?
9         A.  Yes.
10        Q.  I would ask that this document be marked for
11   identification as League Exhibit 15.
12             (Deposition Exhibit No. 15 marked.)
13        A.  Thank you.
14        Q.  Ms. Davis, I have handed you an excerpt of a
15   longer document, it should have the -- if everything
16   went right, it should have the cover page and Pages 24
17   and 25, is that what you have as well?
18        A.  Yes.
19        Q.  And do you recognize what this excerpted
20   document is?
21        A.  I assume it is the section in the Senate Rules
22   from 2011 dealing with special orders.
23        Q.  And do you see that on Page 24, there is a rule
24   set out under Rule 5.11(a) that says that, "Any bill,
25   resolution, or other measure may on any day be made a

## 67

1    special order for future time of the session by an
2    affirmatively vote of two-thirds of the members
3    present."
4              Do you see that rule?
5         A.  Yes.
6         Q.  And then in Rule 5.11(d) of the 2011 Senate
7    Rules, it says that, "Notwithstanding Subsection (a) of
8    this rule, a bill or resolution relating to voter
9    identification requirements reported favorably from the
10   Committee of the Whole Senate may be set as a special
11   order for a time at least 24 hours after the motion is
12   adopted by a majority of the members of the Senate."
13             Do you see that?
14        A.  Yes.
15        Q.  And that -- would you agree that that rule is
16   substantively similar to the -- to Rule 5.11(d) that we
17   looked at under the 2009 rules?
18        A.  Yes.
19        Q.  And what is your understanding of the effect or
20   the meaning, confining your answer to the text that we
21   have before us here, of this Rule 5.11(d) under the 2011
22   rules?
23        A.  I would say, it is the same as 2009.
24        Q.  And so would you agree that the effect of this
25   rule is that, a bill or resolution relating to voter ID,

## 68

1    that passed through the Committee of the Whole Senate
2    could be considered out of the Regular Order of Business
3    and could, in fact, be considered as soon as 24 hours
4    after the motion is adopted by a majority of the members
5    of the Senate?
6         A.  I think the rule says that it may be set as a
7    special order for a time at least 24 hours after the
8    motion is adopted by majority of the members of the
9    Senate.
10        Q.  Do you know why this Rule 5.11(d) was included
11   in the 2011 Senate rules?
12             MR. FREDERICK:  I will object to the
13   extent that this calls for any privileged communications
14   or privileged mental impressions or thought process.
15             The specific question as to whether or not
16   you know, however, you may answer.
17        A.  Yes.
18        Q.  (By Mr. Harris)  Are you aware of any publicly
19   stated reasons or publicly known reasons why the Senate
20   included Rule 5.11(d) in the 2011 rules?
21        A.  Uhm.  Publicly stated -- you know, I don't
22   recall the public debate on these rules very well.
23        Q.  Who drafted the 2011 Senate rules?
24        A.  I would have drafted the resolution adopting
25   the rules.

Karina Casari Davis                                          June 15, 2012

## 73

1  proposed Rule 5.11(d) under the 2009 rules with certain
2  members who are opposed to the voter identification
3  bills being considered at that time; is that right?
4      A.  Yes.
5      Q.  Which members of the Senate did you -- that
6  were in opposition to voter identification laws did you
7  discuss the proposed Rule 5.11(d) with in 2009?
8      A.  In 2009?
9      Q.  Uh-huh.
10      A.  You know, probably all of them at one point or
11  another.  Again, I have lots of discussions with the
12  members as the Parliamentarian, discussions regarding
13  rules of procedure are frequent in my job, they happen
14  daily, they happen often, so it is a safe bet to say, I
15  have discussed this rule and the rules with all of the
16  members of the Senate at one time or another of during
17  2009 and 2011 and sometimes I remember a meeting
18  happening and frequently I do not, there are multiple
19  discussions.
20      MR. HARRIS:  Can we go off the record for
21  just a moment.
22      (Brief pause.)
23      Q.  (By Mr. Harris)  So Ms. Davis, we went off the
24  record and your counsel, Mr. Frederick, and I discussed
25  those members of the Senate that you may be permitted to

## 74

1  describe communications with, with respect to border
2  identification legislation.
3      For the record, and Mr. Frederick please
4  correct me if I am wrong.  Mr. Frederick will allow me
5  to question you about communications with Senator Ellis,
6  as Senator Ellis, I think everyone agrees has
7  affirmatively waived his right to privilege -- his
8  legislative privilege in this case.  But the State's
9  position is that a member of the Senate must have
10  affirmatively waived privilege in order to overcome any
11  legislative privilege.
12      Do I understand that correctly,
13  Mr. Frederick?
14      MR. FREDERICK:  I think, generally, yes.
15      And let me just say for the record:  The
16  State does acknowledge that in the May 11th, 2012,
17  letter, Senator Ellis has clearly stated his intent,
18  based upon the advice of counsel, that he intends to
19  waive any and all privileges that would apply in this
20  case.  We recognize that and accept it.  And on that
21  basis, I will not prevent the witness from answering any
22  questions that would require her to reveal matters
23  within Senator Ellis's privilege.
24      With respect to other members who have not
25  waived their privilege, the State's position is that,

## 75

1  the privilege belongs to each member individually, many
2  of these members are represented by separate counsel.
3  And our understanding of privilege is that -- and that
4  waiver, specifically, is that waiver is an intentional
5  relinquishment of a known right.  So as -- as counsel
6  for the State, you know, I am not in a position to
7  affect a waiver or, potentially, waive the privilege of
8  a member who has not clearly stated their intention to
9  waive.  So I think that's consistent with what you said,
10  but I just want to make it clear for the record.
11      MR. HARRIS:  I think that's right.
12      And Mr. Frederick, are you able to provide
13  me or your client with a list of those members of the
14  Senate who have affirmatively invoked privilege in this
15  case?
16      MR. FREDERICK:  You know, I can't right
17  now.
18      MR. HARRIS:  Okay.  Well, subject to
19  resolving some of the legal issues around that, let's
20  proceed with the deposition as, I know, your time is
21  valuable, Ms. Davis.
22      Q.  (By Mr. Harris)  Did you have any discussions
23  in 2009 with Senator Rodney Ellis regarding Rule 5.11(d)
24  of the Senate Rules?
25      A.  I may have.

## 76

1      Q.  Do you --
2      A.  I don't recall any specific conversations.
3      Q.  Do you recall what Senator Ellis's position was
4  with respect to the Rule 5.11(d) under the Senate rules?
5      A.  I recall from the public debate that he was
6  opposed to that provision.
7      Q.  How about in 2011, did you have any discussions
8  with Senator Ellis in 2011 regarding the Rule 5.11(d) of
9  the Senate Rules?
10      A.  I don't recall any specific one-on-one
11  conversations with Senator Ellis.
12      Q.  Do you recall what Senator Ellis's position was
13  with respect to the Rule 5.11(d)?
14      A.  No.  I think I recall -- I recall that his vote
15  was "no" on the motion to adopt the rules.
16      Q.  Are you familiar with the procedure by which
17  the Governor of Texas may declare a particular type of
18  legislation to be an emergency or an emergency item?
19      A.  Yes.
20      Q.  What does it mean for the Governor of Texas to
21  declare a particular piece of legislation as an
22  emergency?
23      A.  I can only speak to the parliamentary effects.
24      Q.  Please do.
25      A.  Of that decision.

---

## 77

1    Q.  Please do.
2    A.  The Texas Legislature has a -- what we refer to
3  as "a constitutional order of business" that provides
4  for the flow of legislation during a Regular Session.
5         The constitutional order of business,
6  essentially, is sort of accumulative list of actions
7  that the Legislature may take throughout that 140 days.
8         What the constitutional order of business
9  says, is that the first 30 days is for the introduction
10  of bills, I think the consideration of gubernatorial
11  appointments.  I don't have it in front of me, but
12  that's generally the case.  Then the next 30 days would
13  be for committees to meet and consider.  So this is a
14  list that's cumulative and gives more and more authority
15  to the Legislature for the consideration of bills and
16  resolutions.
17         Constitutional order of business
18  prescribes that the Governor may declare certain items,
19  bills, subjects, I am not exactly sure how it is
20  phrased, it is not before me, that he may -- he or she
21  may declare those in emergency.  And when an emergency
22  declaration is made, essentially, the limitations within
23  the constitutional order of business would not apply to
24  those subjects.
25    Q.  Does that mean that a bill that is declared to

---

## 78

1  be an emergency by the Governor may be considered sooner
2  than it would otherwise?
3    A.  Sooner in the legislative session, in a Regular
4  Session.
5    Q.  Correct.
6    A.  Yes.
7    Q.  And are you able to quantify how much sooner
8  once -- I guess to clarify.  Once the Governor declares
9  an item or a bill to be a legislative emergency, what is
10  the effect on the timing of the consideration of that
11  bill in the Senate?
12    A.  The effect is, insofar as committees may meet
13  to consider items, that a committee could meet within
14  the first 30 days.  Whereas, the constitutional order of
15  business would prevent that without a four-fifths vote
16  of the membership of the body.
17         The second effect is for actual
18  consideration on the Senate Floor, the constitutional
19  order of business only allows consideration of bills
20  within the first 60 days on the floor without the Senate
21  itself suspending the constitutional order of business
22  with a four-fifths vote.
23    Q.  During your time as Senate Parliamentarian, do
24  you recall particular bills being introduced to alter
25  the requirements for a voter in terms of identification?

---

## 79

1  Let me rephrase that.  It wasn't too clear.
2         Do you recall particular bills being
3  introduced that alter the forms of identification
4  required to vote in Texas?
5    A.  Particular bills.  This is during my time as
6  Parliamentarian?
7    Q.  Yes.
8    A.  Okay.  Yes.
9    Q.  In which session do you first recall such a
10  bill being introduced?
11    A.  Probably, particularly and specifically, maybe
12  that bills were introduced and I just don't remember.  I
13  roughly remember 2011, 2009, 2000 -- actually, was your
14  question introduced in the Senate or in the Legislature?
15    Q.  I don't exactly remember what the question was,
16  but let's make it the entire Legislature.
17    A.  Definitely in 2007.  And then I don't really
18  recall in 2005 whether there were or there weren't.
19         (Exhibit 44 previously marked.)
20    Q.  Okay.  This document has previously been marked
21  as DOJ Exhibit 44.
22         Ms. Davis, I am handing you what's
23  previously been marked in another deposition as
24  Department of Justice Exhibit 44.  Please take a few
25  moments to look over the document.

---

## 80

1    A.  Can I -- how thoroughly do you want me to
2  review this?
3    Q.  I don't think it will be necessary for you to
4  review it too thoroughly at all.
5    A.  Thank you.
6    Q.  Does this appear to be a copy of a House Bill
7  No. 1706?
8    A.  Yes.
9    Q.  Are you able to tell, looking at this Bill, in
10  which session it was considered, which legislative
11  session, I mean?
12    A.  I would guess that it was the 2005 Legislative
13  Session, based on its effective clause at the end of the
14  Bill.
15         (League Exhibit No. 4 previously marked.)
16    Q.  This document has previously been marked as
17  League Exhibit 4.
18         And Ms. Davis, the court reporter has
19  handed you what's been marked in a previous deposition
20  as League Exhibit 4.  If you can take a few moments to
21  look over this document and familiarize yourself with
22  it.
23    A.  Okay.
24    Q.  Ms. Davis, am I correct that this appears to be
25  a legislative history for HB 1706, the Bill that we were

Karina Casari Davis                                    June 15, 2012

---

## 81

1    just looking at a moment ago?
2        A.  Yes.
3        Q.  And, according to the title of the Bill and as
4    well as its legislative history, HB 1706 was from the
5    79th Session of the Legislature; is that right?
6        A.  Yes.
7        Q.  And that -- that Legislative Session would have
8    occurred in the first half of 2005; is that right?
9        A.  Regular Session.
10       Q.  And HB 1706, according to its title and as well
11   as the legislative history, relates to requiring a voter
12   to present proof of identification; is that right?
13       A.  Yes.
14       Q.  And are you able to tell from this legislative
15   history what the -- what the ultimate disposition of
16   this -- of this Bill HB 1706 was, first, I will ask you,
17   with respect to the House?
18       A.  Appears to have passed the House of
19   Representatives.
20       Q.  And is -- are you able to tell that from the
21   entry that says, it says, "H," and then "Reported
22   engrossed on May 4th, 2005."
23       A.  Yes.
24       Q.  What does it mean for a bill to be reported
25   engrossed?

## 82

1        A.  Oh, boy.  An engrossment is:  "Reported
2    engrossed," in this particular context, what it would
3    mean is that the bill had passed the House of
4    Representatives on final passage.  And an engrossment is
5    a term that we use for the -- for a bill that passes the
6    first House, the originating chamber.  And then
7    engrossment takes the bill that is passed by that body
8    and makes all of the changes to it that were adopted.
9    You could have a committee substitute that comes out and
10   that's heavily amended on the House floor.  The
11   engrossment actually puts the bill -- rather than just
12   putting amendments on top of a committee substitute and
13   sending them to the Senate, they would actually engross
14   the bill, put it in final form as adopted by the House
15   of Representatives, and that would be the action of
16   engrossment and then that's reported, and that is the
17   actual document that the Senate would receive from the
18   House.
19       Q.  And I see that on that same day, May 4th, 2005,
20   there is an entry that appears to refer to the Senate,
21   but says that, HB 1706 was received from the House.
22           Does that have any particular meaning, the
23   fact that the bill was received from the House?
24       A.  Yes.  The significance of that is that, the
25   Senate would have received a message from the House of

## 83

1    Representatives, the message would be a formal message
2    to the Senate containing, you know, action items or, you
3    know, information from the House has to what it's
4    passed, what it is sending over.  So it would -- in this
5    case, we would have received a message saying that the
6    House is finally passed, you know, it was probably with
7    other -- a lot of other bills but it would have included
8    in bill and a list of bills that would have been passed
9    within the actual message and then the bills and the
10   engrossed version that I formally mentioned would be
11   attached to that message.
12       Q.  And then it looks like on May 5th, 2005, the
13   Bill was read for the first time in the Senate; is that
14   right?
15       A.  Yes.
16       Q.  And that's what you were referring to earlier
17   when you said that, a bill received from the House would
18   be read before the entire Senate on the floor; is that
19   right?
20       A.  Yes.  The Constitution requires three readings,
21   and then the Senate, we consider the first reading at
22   time of referral.
23       Q.  And then I see on that same day, May 5th, 2005,
24   there is an entry on the Senate side that says,
25   "referred to State Affairs."

## 84

1            Do you understand that to mean the -- the
2    Senate Committee on State Affairs?
3        A.  Yes.
4        Q.  What is the subject matter that -- that is
5    covered by the Senate Committee on State Affairs?
6        A.  Well, the State Affairs Committee has a fairly
7    large jurisdiction.  I think I tend to think of it as --
8    it has specific subjects that are frequently referred
9    to, and then kind of history of State Affairs is that it
10   tends to, also, get miscellaneous bills sometimes.  It
11   is a larger committee, so sometimes it receives bills of
12   jurisdictions from other committees.  But generally, its
13   jurisdiction would be -- let me think, you know, it
14   would have certain bills dealing with civil
15   jurisprudence, healthcare insurance, elections.  I think
16   it would receive bills -- sometimes we tend to send
17   bills that deal with matters related to the Attorney
18   General's Office, we typically would refer there.
19   Sometimes bills dealing with general state government
20   and you, know, could be, like, the computer systems
21   and computer policies of general government, it really
22   receives a kind of a -- it is quite a catchall
23   committee.
24       Q.  I see.  You said that the State Affairs
25   Committee covers the topic of elections.

## 85

1    Do any other standing committees have
2    jurisdiction over election law in Texas on the Senate
3    side?
4        A.   You know, they could.  I mean, the -- you know,
5    we don't have jurisdiction spelled out in our rules so,
6    you know, you could have another committee that might be
7    able to handle elections.  But generally speaking,
8    recent history, the State Affairs Committee is
9    considered to have the expertise in elections issues.
10       Q.   And then I see here that the -- the entry we
11   just talked about from May 5th, 2005, on the Senate
12   side, in which the bill was referred to the State
13   Affairs Committee, is actually the last -- the last
14   entry on this legislative history that we are looking
15   at.  Are you able to tell what happened to the Bill
16   after it went to the State Affairs Committee?
17       A.   Well, I can tell that it appears that nothing
18   else happened from a parliamentary sense.
19       Q.   So I take that to mean that the Bill did not
20   pass out of the State Affairs Committee?
21       A.   Based on what you have put before me, no.
22       Q.   And I will, for whatever it is worth, I will
23   represent to you that I printed out a complete
24   legislative history from the Legislative Reference
25   Library of Texas.  In fact, do you know what the

## 86

1    Legislative Reference Library of Texas is?
2        A.   Yes.
3        Q.   What is it?
4        A.   I am not sure I can do justice to -- to what it
5    is.  But it is our -- it is a -- the library has many
6    functions.  It contains -- it contains lots of volumes
7    of journals and reference material for the legislative
8    process that many users utilize on a day-to-day basis.
9             It, also, you know, in frequent cases --
10   well, I guess, primarily, it reports on -- within our
11   computer system, the actions that the Legislature takes
12   on a daily basis.
13       Q.   And is the Legislative Reference Library of
14   Texas, isn't it an agency of the State of Texas or is it
15   a private organization?
16       A.   It is an agency of the Legislature.
17       Q.   I see.  And I think you testified earlier that
18   you recall bills concerning voter identification
19   requirements in Texas being introduced in 2009 and 2011.
20   We just looked at one such bill from 2005.
21            Do you remember any voter identification
22   related laws being introduced in the 2007 Regular
23   Session of the Senate?
24       A.   In 2007, yes, I remember the bill introduced by
25   Senator Fraser.  If there were others, and there may

## 87

1    have been, I don't remember them.
2            (Exhibit No. 6 previously marked.)
3        Q.   This document has previously been marked as
4    League Exhibit 6.
5            And Ms. Davis, please take a few moments
6    to familiarize yourself with the document.  But as
7    before, I don't think it will be necessary for you to
8    read through the entire thing but rather just make sure
9    you know what it is.
10           (League Exhibit No. 6 previously marked.)
11       A.   Yes, I do.  And actually, if your recent
12   question was 2007 --
13       Q.   Yes.
14       A.   I think I understood -- I misunderstood you.  I
15   think was thinking 2009.
16       Q.   I see.
17       A.   So I apologize for that.  I don't really
18   remember what any particular -- I don't specifically
19   remember what may or may not have been introduced in the
20   Senate at that time.
21       Q.   No problem.  Thank you for clarifying.  It is
22   actually a good time to remind you that, if you do
23   determine throughout today that you want to correct
24   something from earlier or you remember something earlier
25   that you didn't remember at the time I asked you, you

## 88

1    should absolutely feel free to interject and I
2    appreciate that.
3        A.   Great.  Thank you.
4        Q.   I would ask that this document be marked for
5    identification as League Exhibit 16.
6            (Deposition Exhibit No. 16 marked.)
7        Q.   And Ms. Davis, please take a few moments to
8    look over this document.  I would offer you an apology
9    that the text is so small.  I don't know why this one
10   printed out like this, but hopefully it is legible.
11       A.   Okay.
12       Q.   Ms. Davis, have you had a sufficient
13   opportunity to look over this Document 16?
14       A.   Yes.
15       Q.   And this appears to be another legislative
16   history, this one for HB 218, the Bill we were just
17   looking at a moment ago.
18            Do you agree with that?
19       A.   Yes.
20       Q.   And HB 218 was from the 80th Regular Session of
21   the Legislature; is that right?
22       A.   Yes.
23       Q.   And that session of the Legislature met during
24   the first half of 2007; is that right?
25       A.   Yes.

Karina Casari Davis
June 15, 2012

## 89

1  Q.  And according to the -- to the title of the
2  Bill 218 that we just looked at, as well as what's
3  referenced here in the legislative history, do you agree
4  that HB 218 was a bill relating to requiring a voter to
5  present proof of identification?
6  A.  Yes.
7  Q.  And looking at this legislative history,
8  Exhibit 16, are you able to tell what the disposition of
9  the Bill was in the -- on the House side, first?
10  A.  Yes.
11  Q.  And what was the disposition of this HB 218 on
12  the House side?
13  A.  It was finally passed, engrossed, and sent to
14  the Senate.
15  Q.  And am I reading this correctly, that the Bill
16  was reported engrossed from the house on April 24th,
17  2007?
18  A.  Yes.
19  Q.  And then it looks like on April 25th, it was
20  received from the House by the Senate; is that right?
21  A.  Yes.
22  Q.  And it looks like it was read on the Senate
23  floor the next day, April 26, 2007?
24  A.  Yes.
25  Q.  And there is an entry on 4-26-2006, it says,

## 90

1  "Refer to State Affairs."  And I guess the comment at
2  the left has an "S" indicating this is relating to the
3  Senate Chamber.
4       Do you understand that entry to mean that
5  HB 218 was referred to the State Affairs Committee on
6  the Senate side?
7  A.  Yes.
8  Q.  Were you at all involved in the decision to
9  refer HB 218 to the State Affairs Committee in 2007?
10  A.  Probably.  I don't specifically recall it.
11  Q.  And are you able to tell from this legislative
12  history what happened to HB 218 once it was referred to
13  the Committee on State Affairs?  I guess, at this point,
14  I confine your answer to what happened in the Bill in
15  committee.
16  A.  Based on the actions on the list that you have
17  put in front of me, the Bill would have been heard in
18  committee, had -- had a public hearing, you know,
19  witnesses would have had the opportunity to testify.  It
20  appears that there was a substitute for the Bill.  And
21  based on what's before me, we can't determine much more
22  than that.  They would have substituted the Bill and
23  reported it favorably to the Senate.
24  Q.  When you say "the Bill was substituted," what
25  does that mean?

## 91

1  A.  What it means is that:  When committees make
2  recommendations to the full Senate, they -- they can --
3  there is really three ways that they can report a bill
4  favorably.  They can, basically, recommend a bill as
5  introduced or received from the House with no changes.
6  They can recommend a bill with changes by amendment,
7  where they would make specific amendment
8  recommendations.  And then they can, also, make a
9  recommendation based on a substitute.
10       And what a "substitute" is, is basically a
11  new document, if you will, that may be very similar to
12  the original bill, it may have substantive changes, it
13  may have minor changes, but for parliamentary purposes,
14  it is a new document for consideration.  And so when it
15  becomes before the Senate, that document would be
16  considered in lieu of the original bill.
17  Q.  And so the fact that the Committee on State
18  Affairs reported favorably -- reported the bill
19  favorably as substituted, does that mean that the
20  substitute version of the Bill passed out of the State
21  Affairs Committee?
22  A.  I guess you could say that.  The substitute is,
23  at that point, the recommendation to the full Senate.
24  Q.  And I think you said earlier that, in order to
25  recommend a bill to the full Senate would typically

## 92

1  require a majority vote of the committee members.
2  A.  Yes.
3  Q.  And then I see that on May 1st, it says that,
4  "a committee report was sent and distributed."  What's a
5  "committee report"?
6  A.  A "committee report" is, basically, a report on
7  the action of the committee.  So on this type of bill,
8  there would be a report on the front indicating to the
9  Senate the action that the committee took on the bill.
10  It would indicate what day the action was taken.  It
11  would indicate the vote on the bill.  I think it
12  indicates what form of recommendation, you know, whether
13  it's a favorable recommendation, an unfavorable
14  recommendation, also, the particular form of the
15  recommendation, as I stated earlier, whether as
16  introduced or received, amended or form substitute.
17       The committee report itself would, also,
18  include a fiscal analysis, what we call "a fiscal" that
19  is required by the rules, if -- if it is required,
20  doesn't always.  Also, a bill analysis, if required.
21  And if any witnesses testified, that would be included
22  and attached to the committee report and then, also, the
23  actual recommendation in its form, either the substitute
24  or amendments, or just the bill.
25  Q.  You referred to a fiscal note.  What's a

93

1    "fiscal note"?
2        A.   Oh, boy.  A "fiscal note" is an analysis of the
3    fiscal implications of a bill to the State that is
4    performed by the Legislative Budget Board, it is
5    advisory.  And if it is required for a particular bill,
6    it is attached to the bill.
7        Q.   When is a fiscal note required?
8        A.   You know, I may have to refer to the bills on
9    that.  But for -- I would say, in general, for most
10   bills.
11       Q.   Well, what determines whether a fiscal note is
12   required?
13       A.   We would look to the rules.
14       Q.   And you --
15       A.   And substance of the bill.  You know, for
16   example, I think the budget doesn't require a fiscal
17   note so that's the only reason why I would say it is not
18   required on all of them, not the only reason but it is
19   just not always necessary for the body.
20       Q.   I see.  And you referred to the Legislative
21   Budget Board.  What's that?
22       A.   The Legislative Budget Board is an agency of
23   the Legislature that's created in statute.  And it is
24   the Legislature's main resource for budgetary
25   information, as an agency with employees but, also, it

94

1    is governed by the leadership of the Legislature and
2    members from the House and the Senate.
3        Q.   Who appoints the members -- well, how does one
4    become a member of the Legislative Budget Board?
5        A.   I don't have the statute before me.  But my
6    recollection is accurate and let's hope it is.  The
7    Lieutenant Governor is a member, the Speaker of the
8    House is a member.  I am going to say that there is a
9    total of five representatives, if you will, from each
10   chamber of the House and the Senate and that's
11   probably -- that's including the Lieutenant Governor and
12   the Speaker.  I think that some of the positions on the
13   Legislative Board are, for example, I think it is
14   standard that the Chair of Senate Finance is
15   automatically on the Legislative Budget Board.  And I
16   think that the Lieutenant Governor makes the other
17   appointments for the Senate.
18       Q.   Going back to the bill history of HB 218 that
19   we were looking at.  I see an entry that says that, on
20   May 2nd, 2007, the Bill was placed on the Intent
21   Calendar.  What's the "Intent Calendar"?
22       A.   You're looking at of May 2nd.
23            The "Intent Calendar" is a calendar used
24   during a Regular Session of the Senate, of the
25   Legislature and it is used by a Senate, it is only in

95

1    the Senate.  It is a calendar required by the rules for
2    the members to give notice to the Senate of their
3    intention to suspend the Regular Order of Business to
4    take a bill up out of order if that -- if that is what
5    their intention is and if that is what they are going to
6    do.
7        Q.   And would it be correct that, at least during
8    the 80th Session, Regular Session in 2007, that to
9    consider HB 218 out of order would have required a
10   vote -- excuse me, a two-thirds vote of those senators
11   present and voting?
12       A.   To consider HB 218 out of its regular calendar
13   order on the Senate Floor.
14       Q.   Correct.
15       A.   Outside of a local calendar, yes, that's true,
16   we would have taken the two-thirds vote of the members
17   present and voting.
18       Q.   And from this history, it does not look like HB
19   218 was placed on the local calendar; is that right?
20       A.   That's right.  And I only qualify my answer
21   because bills are taken up out of regular order on the
22   local calendar without a suspension of the Regular Order
23   of Business.  But, yeah, you know --
24       Q.   Excuse me.
25       A.   -- this bill was not in the local calendar.

96

1        Q.   Are there any limitations on what sorts of
2    bills can be placed on the local calendar?
3        A.   Yes.  The biggest limitation is a bill that is
4    contested in committee, it is not eligible for
5    consideration by the local calendar.
6        Q.   And what does it mean for a bill to be
7    contested in committee?
8        A.   That means it -- if reported favorably, it
9    would have received a "no" vote from a member of the
10   committee.
11       Q.   Am I correct that it looks like from this
12   legislative history that on May 15th, 2007, there was a
13   vote taken to suspend the Regular Order of Business with
14   respect to HB 218?
15       A.   Yes.
16       Q.   Actually, I want to ask you one other thing
17   before we talk about the vote to suspend the regular
18   order.
19            It looks like on May 3rd, 2007, there was
20   a co-sponsor of the bill authorized.  What does that
21   mean?
22       A.   Co-sponsor authorized.  Generally, for
23   legislation introduced -- well, this is a House Bill.
24            When you have a House Bill in the Senate,
25   generally, there is what I would call a lead sponsor

## 97

1    from the Senate, so in legislative terms, we -- authors
2    are considered bills -- authors of bills for bills in
3    their originating chamber.  So the author of HB 218
4    would have been someone from the House of
5    Representatives.  When that legislation comes over from
6    the House, you know, a senator would need to move that
7    process forward, and so he would sponsor the bill.  So
8    there is usually a lead sponsor for a bill.
9         We, also, permit co-sponsors, and that's
10   usually done in writing, I believe you have to have
11   permission from the main sponsor to be able to do that
12   and it is usually, I think we have, what we call "green
13   cards" that the members would sign and that would
14   indicate a member's major support of a bill through
15   their sponsorship.
16        Q.   And turning back to the legislative history.
17        Am I correct that this legislative history
18   for HB 218 reflects that the motion to suspend the
19   Regular Order of Business failed to receive the required
20   vote on May 15th, 2007?
21        A.   I don't think you can tell that from this list
22   of actions.
23        Q.   Do you see the entry on May 15, 2007, I think
24   it is the third to last entry that, "The motion to
25   suspend" --

## 98

1         A.   Oh.
2         Q.   -- "regular order fails"?
3         A.   Yes.  I am sorry, I just didn't even see that.
4         Q.   Oh, no problem at all.  Does that mean that
5    the -- that the motion to suspend the regular order
6    failed to receive the required vote?
7         A.   Yes.  That would mean that it failed.
8         Q.   And in looking at the remainder of this
9    legislative history, are you able to tell what the
10   ultimate disposition of HB 218 in the Senate was?
11        A.   Appears that it wasn't taken up out of the
12   regular order or taken up at all.
13        Q.   We have already talked about 2009 a bit.  And I
14   think you already testified that you remember a bill
15   being introduced in the Senate with respect to voter
16   identification requirements in 2009; is that right?
17        A.   Yes.
18        Q.   And I think you stated that the bill you
19   remembered being introduced in 2009 was sponsored by
20   Senator Fraser; is that right?
21        A.   Yes.  Authored, yes.
22        Q.   Oh, excuse me, authored.
23        Did you have any discussions with Senator
24   Fraser about voter identification legislation in 2009?
25        A.   Could you be more specific?

## 99

1         Q.   Sure.  Let's say prior to the time that Senator
2    Fraser introduced voter identification related bill in
3    2009, did you have any discussions with Senator Fraser
4    about either the substance of the bill or the procedure
5    that would be used to consider the bill?
6         A.   I don't recall any conversations about the
7    substance.  As to the procedures, probably I did.
8         Q.   Did you ever discuss the substance of
9    legislation with Lieutenant Governor Dewhurst as a
10   general matter?
11        A.   Yes, I think substance does come up.
12        Q.   Do you recall discussing the substance of any
13   voter identification related bills with Lieutenant
14   Governor Dewhurst in the 2009 Regular Session?
15        MR. FREDERICK:  Just caution you not to
16   reveal the actual substance of any conversation.
17        A.   Uh-huh.
18        MR. FREDERICK:  But subject to that
19   instruction, you may answer.
20        A.   You know, I don't recall specific conversations
21   about the substance.  It's possible from a parliamentary
22   perspective that we would have had a conversation about
23   an amendment or something on the bill.  But in general,
24   I don't believe I had any conversations with him about
25   the substance of the legislation.

## 100

1         Q.   This document has previously been marked as
2    League Exhibit 10.
3         (Exhibit No. 10 previously marked.)
4         Q.   And Ms. Davis, please take as much time as you
5    need to look over the document.
6         A.   Okay.
7         Q.   And the document you're looking at appears to
8    be a copy of at least one version of SB 362.
9         Do you agree with that?
10        A.   Yes.
11        Q.   And are you able to tell which legislative
12   session this bill was considered during?
13        A.   Been considered during the 2009 Legislative
14   Session.
15        Q.   And is this the Bill you were referring to
16   earlier when you said you remembered Senator Fraser
17   offering a voter identification bill in the 2009 Regular
18   Session.
19        A.   Yes.  This would be a version of the bill.
20        Q.   This document has previously been marked as
21   League Exhibit 11.
22        (Exhibit No. 11 previously marked.)
23        Q.   And Ms. Davis, please take a moment or as much
24   time as you need to look over the document.
25        A.   Okay.

Karina Casari Davis                                              June 15, 2012

---

## 101

1    Q.   Do you agree, this appears to be a legislative
2    history from the Legislative Reference Library of Texas
3    concerning SB 362?
4    A.   Yes.
5    Q.   And that Bill was considered during the 81st
6    Regular Session; is that right?
7    A.   Yes.
8    Q.   And do you agree from the title of the Bill
9    and, also, as reflected in the legislative history that
10   SB 362 was a Bill relating to requiring a voter to
11   present proof of identification.
12   A.   Yes.
13   Q.   And I see that the first entry here on the
14   legislative history from December 15, 2008, states that,
15   "the Bill was received by the Secretary of the Senate."
16        What does that mean?
17   A.   What that means is that, it was physically
18   received in the Secretary of the Senate's Office on
19   December 15th, 2008.  We have in the Senate what's
20   called "a prefiling" and we would not have been in
21   legislative session on that date, so the action would
22   show that it was received.  And I guess the action shows
23   it is filed, but it is not really considered, you know,
24   it can't have any -- it is really prefiling, it can't
25   have any legislative activity until the Senate is

## 102

1    actually in session.
2    Q.   It looks like that the bill that was read
3    before the Senate for the first time on February 17,
4    2009.
5    A.   Yes.
6    Q.   Is that right?
7    A.   Yes.
8    Q.   And it looks like that same day the Bill was
9    referred to the Committee of the Whole Senate; is that
10   right?
11   A.   Yes.
12   Q.   Do you know why SB 362 was referred to the
13   Committee of the Whole Senate as opposed to being
14   referred to the State Affairs Committee or some other
15   standing committee?
16        MR. FREDERICK:  I am going to object on
17   the basis of legislative privilege.  To the extent that
18   this would call for you to reveal your knowledge as to
19   the reason why; as to the question of whether or not you
20   were aware why, you may answer only that question.
21   A.   Yes.
22   Q.   (By Mr. Harris)  Are you aware of any publicly
23   known or publicly stated reasons why the Bill was
24   referred to the Committee of the Whole Senate as opposed
25   to the Senate State Affairs Committee or some other

## 103

1    standing committee?
2    A.   I don't recall whether the Lieutenant Governor
3    made public comments or statements as to the referral of
4    this Bill.
5    Q.   Did you have -- without revealing the substance
6    of any discussions, did you have discussions with the
7    Lieutenant Governor regarding which committee to refer
8    SB 362 to?
9    A.   I probably would have but I don't recall.
10   Q.   Did you have -- without, at this point, did you have
11   revealing the substance of any discussions, did you have
12   any discussions with any other members of the Senate
13   regarding which committee SB 362 should be referred to?
14   A.   I don't remember.
15   Q.   Do you remember any discussions with anyone
16   other than Lieutenant Governor or other members of the
17   Senate regarding which committee to refer SB 362 to?
18   A.   I really don't remember.
19   Q.   So it looks like the Bill was considered in
20   committee in the Committee of the Whole on March 10,
21   2009; is that right?
22   A.   Yes.
23   Q.   And then the Bill was reported favorably from
24   the committee without any amendment on March 11, 2009.
25   Am I reading that right?

## 104

1    A.   That it was -- can you repeat your question?  I
2    am sorry.
3    Q.   Sure.  Am I correct that the legislative
4    history reflects that on March 11, 2009, SB 362 was
5    reported favorably out of the Committee of the Whole
6    without any amendment to the Bill?
7    A.   Yes.  You know what, I am going to need a
8    break, I think, because I am starting to not -- I need
9    to eat something.
10        MR. HARRIS:  Sure.  Let's take a lunch
11   break.
12        THE WITNESS:  Okay.
13        MR. HARRIS:  How about, I don't know, half
14   hour, 45 minutes, something like that work for you guys.
15        MS. BERKOWER:  Do you want to go off the
16   record a second?
17        MR. HARRIS:  Sure.
18        (Luncheon recess.)
19   Q.   (By Mr. Harris)  If I am not mistaken, prior to
20   the time we took a break, there was a question pending.
21        I wonder if the court reporter would be
22   able to read back the last question.
23        (Last question read back.)
24   Q.   Having taken a break, we can continue through
25   the legislative history.

Karina Casari Davis                                          June 15, 2012

## 105

1       I see that on March 11, 2009, there is an
2   entry on the legislative history for SB 362 stating that
3   the Bill was set as a special order.
4           Do you see that, Ms. Davis?
5   A.  Yes.
6       Q.  And it looks like the date in the date column
7   is March 11, 2009.  But then there is a comment that
8   say, "March 16th, '09."
9           Do you see where I am looking?
10  A.  Yes.
11      Q.  Do you know what that comment refers to?
12  A.  I really don't.  These are computer entries
13  done by people at the Legislative Reference Library.  I
14  am not positive what that means.
15      Q.  Okay.  And then it looks like on March 17,
16  2009, the Bill was laid before the Senate and then read
17  for a second time.
18  A.  Yes.
19      Q.  Right?
20          And then it looks like there was a point
21  of order made on March 17, 2009.
22          What is a "point of order"?
23  A.  A "point of order" is basically a member of the
24  legislative body pointing out what he or she may believe
25  to be a deviation from the rules of the Senate and the

## 106

1   procedures used.
2       Q.  And do you recall what the nature of the point
3   of order raised with respect to SB 362 on March 17 was?
4   A.  I -- actually, I don't.
5       Q.  In order to determine that, what documents
6   could you look to, would it be the Senate Journal?
7   A.  Yes.
8       Q.  And with respect to the entry that the SB 362
9   was set as a special order:  Am I correct that under
10  Rule 5.11(d) of the 2009 Senate Rules that we looked at
11  before, in order for SB 362 to be made a special order,
12  that would have required a vote of the majority of the
13  members present in the Senate or -- I will ask you.
14  A.  Would have required a majority of the members
15  of the Senate.
16      Q.  And then skipping ahead a bit.  It looks like
17  on March 18, 2009, the Bill was read for a third time.
18          Do you see that entry?
19  A.  For a third time.  Yes.
20      Q.  And then it looks like on that same day, I see
21  entries, one that says, "passed" and another says
22  "reported engrossed."
23          Does that mean that the Bill passed a vote
24  of the entire Senate?
25  A.  "Passed" would mean that it passed on -- that

## 107

1       it finally passed the Senate.  It would be a majority of
2   the members present to pass the Bill.
3       Q.  And then it looks like the Bill was read for
4   the first time in the House on March 31st, 2009; is that
5   right?
6   A.  Yes.
7       Q.  And then it says, "referred to elections."
8           Do you understand that to mean the House
9   Committee on Elections?
10  A.  Yes, probably.
11      Q.  Do you know what the subject matter covered by
12  the House Elections Committee is?
13  A.  I can only presume through its title that it is
14  elections, I am not familiar with the jurisdiction of
15  their committees.
16      Q.  Are you familiar with the term "chub" or
17  "chub-a-thon"?
18  A.  Yes.  It is related to chubbing.
19      Q.  And what is "chubbing"?
20  A.  I think, as I understand chubbing, it would be
21  to, you know, to extend a -- to have extensive debate
22  about bills that are probably not related to the object
23  of the chubbing, and that is, you know, chubbing is
24  basically a delay tactic to keep from getting to a piece
25  of legislation.

## 108

1       Q.  Was there chubbing with respect to SB 362 in
2   the House during the 2009 Regular Session?
3   A.  I think generally, I would probably call it
4   chubbing, I don't remember precisely how they did it or
5   how it happened, but --
6       Q.  And are you able to tell looking at this
7   legislative history for SB 362 what the ultimate outcome
8   was with respect to SB 362 on the House side?
9   A.  It appears that it was -- well, that it was not
10  passed by the House.
11      Q.  It looks like the last entry in this
12  legislative history states that the Bill was placed on
13  the major state calendar on May 23rd, 2009.  I realize
14  we are talking about the House side.  But do you have
15  any understanding of what the "major state calendar" is?
16  A.  More or less, but I really wouldn't be able to
17  answer very specific questions about it.
18      Q.  That's fine.  Can you just briefly tell me what
19  you do understand it to mean?
20  A.  I think my -- as far as my capabilities of this
21  go, it is one of their calendars.  It would have -- I
22  know that they have several calendars, so it is one of
23  the calendars that they use, they would have placed it
24  on that calendar.  I don't know what the specific
25  criteria for a bill being placed on the major state

Karina Casari Davis                                    June 15, 2012

---

### 109

1  calendar is.
2      Q.   And I think you said that a Regular Session of
3  the Legislature would last for 140 days; is that right?
4      A.   Yes.
5      Q.   I believe you previously stated that you recall
6  that a bill concerning voter identification requirements
7  was introduced in the 2011 Regular Session of the
8  Legislature; is that right?
9      A.   Yes.
10     Q.   And do you remember the bill number of that
11 Bill?
12     A.   Senate Bill 14.
13     Q.   This document has previously been marked as
14 League Exhibit 12.
15         (Exhibit No. 12 previously marked.)
16     Q.   And Ms. Davis, please take some time to look
17 over this document.
18     A.   Okay.
19     Q.   Do you recognize this to be a version of Senate
20 Bill 14 that we were just discussing?
21     A.   Yes.
22     Q.   And from the -- from the title of this Bill, do
23 you see it states that it relates to requirements to
24 vote, including presenting proof of identification,
25 providing criminal penalties?

---

### 111

1  computer records of actions by the Legislature.
2      Q.   It looks like this history is in the reverse
3  order of the ones we have been looking at previously.
4  But looking at the last page of the exhibit, it appears
5  that SB 14 was filed on January 12th, 2011.  Does that
6  look right?
7      A.   Yes.  That's right.
8      Q.   And so, prior to January 12, 2011, did you have
9  any discussions with Lieutenant Governor Dewhurst about
10 SB 14?
11     A.   I didn't have any specific conversations with
12 him about the Bill itself.
13     Q.   Did you have any general conversations with him
14 that touched upon SB 14, prior to January 12th, 2011?
15     A.   I am not even sure I had general conversations
16 about Senate Bill 14, specifically.
17     Q.   Who was the author of Senate Bill 14?
18     A.   It was Senator Troy Fraser.
19     Q.   Did you have any discussions with Senator
20 Fraser about SB 14 prior to the time it was filed?
21     A.   About the Bill itself, no.
22     Q.   Did you have any discussions with Senator
23 Fraser about the procedure related to SB 14 prior to the
24 time the Bill was filed?
25     A.   I probably did.

---

### 110

1      A.   Yes.
2      Q.   Did you discuss Senate Bill 14 with Lieutenant
3  Governor Dewhurst prior to the time that the Bill was
4  introduced in the Senate?
5      A.   I am not sure I can answer that.  I don't even
6  recall when it was introduced, actually.  I may have
7  discussed it with him.
8      Q.   Excuse me for just a moment.
9          MS. BERKOWER:  This is what I have.
10         MR. HARRIS:  Do you have enough copies?
11         MS. BERKOWER:  Yeah.
12         MR. HARRIS:  Thank you.
13         I would ask that this document be marked
14 as League Exhibit 17.
15         (Deposition Exhibit No. 17 marked.)
16     Q.   (By Mr. Harris)  And Ms. Davis, please take a
17 few moments to look over Exhibit 17.
18     A.   Okay.
19     Q.   Do you agree this appears to be a bill history
20 of SB 14?
21     A.   Yes.
22     Q.   This one says that it is from the Texas
23 Legislature Online History.  Do you know what that is?
24     A.   I think that's the -- the Legislature's -- what
25 they call sort of their Internet access into the

---

### 112

1      Q.   Do you recall having more than one such
2  discussion?
3      A.   I don't recall the number.
4      Q.   Was anyone else present during that discussion
5  with Senator Fraser?
6      A.   They probably would have been.
7      Q.   Who do you think would have been present?
8      A.   You know, it's -- about the procedures -- and
9  if you're asking about prior to January 12, I would
10 almost have to look at a calendar to really remember
11 what day that was.  But I think it is safe to say that I
12 had discussions about procedures relating to voter ID,
13 you know, at the beginning of session.  When it would
14 have coincided with the filing of the Bill, I really
15 don't know.
16     Q.   Do you recall having discussions with Senator
17 Fraser about SB 14 or the procedure used to consider SB
18 14 after the time that the Bill was filed?
19     A.   Yes.
20     Q.   How many discussions did you have with Senator
21 Fraser of that nature?
22     A.   It probably would have been multiple
23 discussions taken into consideration the number of times
24 I speak with members on the Senate Floor.
25     Q.   Do you think you had more than five such

## 113

1   discussions?
2        A.  It is possible, I --
3        Q.  Did you discuss SB 14 with Lieutenant Governor
4   Dewhurst after the time the Bill was filed?
5        A.  I would have had discussions with him of a
6   procedural nature after the Bill was filed, yes.
7        Q.  Was voter ID or voter -- laws dealing with
8   voter identification or SB 14, in particular, designated
9   as an emergency item by Governor Perry?
10       A.  Yes.
11       Q.  Do you know why Governor Perry designated voter
12  identification legislation as an emergency item in 2011?
13            MR. FREDERICK:  Object on the basis of
14  privilege.
15            I think this specific question is phrased
16  whether or not you know why and I believe you may answer
17  that question.  But I would caution you not -- to the
18  extent you even know, not to reveal any of the reasons.
19       A.  No, I don't know.
20       Q.  (By Mr. Harris) Did you have any discussions
21  with Governor Perry or his staff regarding the
22  designation of SB 14 as an emergency item?
23       A.  I don't remember having any discussions.
24       Q.  Did you have any discussions with the
25  Lieutenant Governor about the designation of SB 14 as an

## 114

1   emergency item?
2        A.  I don't remember if I did.
3        Q.  How about the Lieutenant Governor's staff?  I
4   think you previously said that you know -- you know of a
5   Mr. Bryan Hebert; is that right?
6        A.  Yes.
7        Q.  Is it correct that Mr. Herbert worked on voter
8   identification legislation as part of his role in the
9   Lieutenant Governor's office?
10       A.  Yes.
11       Q.  And did you of have any discussions with
12  Mr. Herbert about SB 14?
13       A.  I probably did.
14       Q.  Did you ever have any discussions with
15  Mr. Herbert about the designation of SB 14 or voter
16  identification legislation as an emergency item by
17  Governor Perry?
18       A.  I don't remember.
19       Q.  Do you know Julia Rathgeber?
20       A.  Yes.
21       Q.  And she is the Deputy Chief of Staff to the
22  Lieutenant Governor; is that right?
23       A.  Yes.
24       Q.  And she held that position in 2011 as well; is
25  that right?

## 115

1        A.  Yes.
2        Q.  Did you have any discussions with Ms. Rathgeber
3   regarding SB 14?
4        A.  Yes.
5        Q.  How frequently did you discuss SB 14 with
6   Ms. Rathgeber?
7        A.  I wouldn't be able to recall how frequent that
8   was.
9        Q.  Did you have any discussions with Ms. Rathgeber
10  about the designation of SB 14 or voter ID legislation
11  as an emergency item?
12       A.  Can I consult with my attorney for a moment?
13            MR. HARRIS:  Absolutely.
14            (Brief pause.)
15       Q.  (By Mr. Harris)  So I think there was a
16  question pending.  Do you want the Court reporter to
17  read it back?
18       A.  Sure, please.
19            (Last question read back.)
20       A.  I don't remember.
21       Q.  Do you know Blaine Brunson?
22       A.  Yes.
23       Q.  And Mr. Brunson is the Lieutenant Governor's
24  Chief of Staff; is that right?
25       A.  Yes.

## 116

1        Q.  Did you have any discussions with Mr. Brunson
2   about SB 14 at any time during the 2011 Regular Session?
3        A.  Yes.
4        Q.  How many times did you discuss SB 14 with
5   Mr. Brunson?
6        A.  I wouldn't be able to recall the frequency or
7   amount.
8        Q.  Would you say you had more than five
9   discussions with him?
10       A.  It is possible -- I don't know.
11       Q.  Did you discuss with Mr. Brunson the
12  designation of SB 14 or voter legislation as an
13  emergency item by the Governor?
14       A.  I don't remember.
15       Q.  Other than the other individuals we have talked
16  about which were Mr. Brunson, Ms. Rathgeber, Mr. Hebert,
17  the Governor, and the Governor' staff, did you have
18  discussions with anyone else regarding the designation
19  of SB 14 as an emergency item by Governor Perry?
20       A.  I don't remember.
21       Q.  So it looks like from the legislative history
22  that the Bill was read for the first time on January
23  24th, 2011.
24            Do you see that?
25       A.  Yes, I do.

Karina Casari Davis                                    June 15, 2012

## 117

1    Q.  If SB 14 had not been designated as an
2  emergency item by Governor Perry, would it have been
3  possible for the Bill to have been read for the first
4  time on January 24th, 2011?
5    A.  Yes.
6    Q.  I believe you testified previously that there
7  is -- there are constitutional rules governing when
8  bills could be considered; is that right?
9    A.  Yes.
10    Q.  So with respect to SB 14, what is -- what, if
11  any, significance does the fact that the Governor
12  declared the Bill to be an emergency item have on the
13  timing with respect to when the Bill could be
14  considered?
15    A.  Would have enabled the Senate to consider
16  Senate Bill 14 in committee before the first 30 days of
17  session -- or during the first 30 days of session.
18    Q.  I see.  So in the next entry, one up, it says
19  that the Bill was referred to the Committee of the Whole
20  on January 24th, 2011; is that right?
21    A.  Yes.
22    Q.  So it is the case that, had the Governor Perry
23  not designated SB 14 as an emergency item, that it would
24  not have been possible to refer the Bill to the
25  Committee of the Whole on that date?

## 118

1    A.  No.  A bill can be referred at any time.
2    Q.  I see.  So it looks like a public hearing was
3  scheduled on the Bill on January 24th, 2011, and I take
4  it that would have been in the Committee of the Whole;
5  is that right?
6    A.  Yes.
7    Q.  Would it have been possible to have a public
8  hearing on the Bill in the Committee of the Whole on
9  January 24th, 2011, had Governor Perry not designated SB
10  14 as an emergency item?
11    A.  No.  It would not have been possible for the
12  committee to consider a bill within the first 30 days
13  without the Governor either declaring it an emergency or
14  the Senate suspending the constitutional order of
15  business.
16    Q.  What vote would be required to suspend the
17  constitutional order of business?
18    A.  It's a four-fifths vote of the members.
19    Q.  Did you have discussions with Lieutenant
20  Governor Dewhurst regarding the referral of SB 14 to the
21  Committee of the Whole?
22    A.  Yes.
23    Q.  How many times did you and Lieutenant Governor
24  discuss that subject?
25    A.  I don't remember.

## 119

1    Q.  Do you remember having more than one discussion
2  with the Lieutenant Governor about referring to the Bill
3  to the Committee of the Whole?
4    A.  No, I don't remember.
5    Q.  Did you discuss referring the Bill to the
6  Committee of the Whole with any other members of the
7  Senate?
8    A.  I don't remember having a discussion.
9    Q.  Do you know why the Lieutenant Governor
10  referred SB 14 to the Committee of the Whole?
11      MR. FREDERICK:  Object on the basis of
12  privilege as phrased.  To the extent the question asks
13  whether or not you are aware of why, you may answer the
14  yes or no question.  I caution you, however, not to
15  reveal the Lieutenant Governor's thought process.  So
16  you may answer subject to that instruction.
17    A.  I am aware of why he referred --
18    Q.  Are you -- excuse me.
19    A.  -- the bill.
20    Q.  Are you aware of any publicly known or any
21  publicly stated reasons why the Lieutenant Governor
22  referred SB 14 to the Committee of the Whole?
23    A.  I don't remember if he made any public comments
24  related to the referral of the Bill.
25    Q.  It appears from the legislative history that on

## 120

1  January 25th, 2011, SB 14 was set as a special order; is
2  that right?
3    A.  On January 25th?
4    Q.  Yes.
5    A.  Yes.
6    Q.  And under Rule 5.11(d) of the 2011 Senate Rules
7  that we looked at previously, is it correct to set SB 14
8  as a special order, that would have required a vote of
9  the majority of the members of the Senate?
10    A.  Yes.
11    Q.  And what was the effect or the significance of
12  designating SB 14 as a special order?
13    A.  I am not sure it had any affect.  The
14  significance would have been to alert the members to
15  when the Bill would be taken up by the Senate.
16    Q.  Did designating SB 14 as a special order enable
17  the Senate to consider SB 14 out of the Regular Order of
18  Business?
19    A.  No, not really.
20    Q.  Then why would SB 14 be designated as a special
21  order?
22    A.  In this case, to give the members notice of
23  when the Bill was to be taken up.
24    Q.  It is your testimony that there is no other
25  reason why the Senate would want to designate SB 14 as a

Karina Casari Davis                                                    June 15, 2012

---

121

1   special order?
2              MR. FREDERICK:  Object.  Mischaracterizes
3   the testimony.
4              I would, also, interject an objection on
5   privilege to the extent this -- this seeks to discover
6   any privilege statements about why any particular
7   legislative action was undertaken.
8        Q.  Do you need the court reporter -- I think there
9   was a question pending.  Do you want the court
10  reporter --
11       A.  I am sorry.  I didn't realize that.
12       Q.  That's fine.  Maybe the court reporter can read
13  it back.
14             (Last question read back.)
15             MR. FREDERICK:  Objection,
16  mischaracterizes the testimony.  Object to the extent it
17  calls for a privileged statement about the reason why
18  any particular senator would want to engage in any
19  legislative act.  I would, also, object to vague.
20  Object to the form of the question.
21             To the extent you can answer without
22  revealing any privileged matter, you may do see, if you
23  can.
24       A.  I am not sure I can answer that.
25       Q.  (By Mr. Harris)  Is it your testimony that, had

---

123

1   revealing privileged matters, you may do so.  I would,
2   however, object to the extent it calls for speculation.
3        A.  Setting a special order gives notice to the
4   Senate of when a bill is to be taken up on the calendar,
5   and that would be the effect of making the special
6   order.
7        Q.  Are there other ways to provide notice to the
8   members as to when a bill would be considered other than
9   setting a bill as a special order?
10       A.  Procedurally, no.  It's possible -- sometimes
11  during debates or announcements, the members will tell
12  each other or discuss when they intend to take up
13  business.  But just based on a calendar system alone, it
14  would not indicate to you the time that a particular
15  bill is going to be taken up by the Senate.
16       Q.  I think you stated previously and maybe even
17  more than one time, that setting a bill as a special
18  order allows the bill to be considered out of the
19  regular order; is that correct?
20       A.  Special orders are above the regular order in
21  precedence in the Senate's orders of business.  So to
22  the extent that a bill is actually being taken out of a
23  regular order, that can be the effect.
24       Q.  Was SB 14 considered out of the Regular Order
25  of Business?

---

122

1   SB 14 not been set as a special order, that this
2   legislative history could appear no different than it
3   does now?
4              MR. FREDERICK:  Objection, vague.
5   Objection, calls for speculation.
6        A.  I really don't understand your question.
7        Q.  Simply trying to understand why the Senate --
8   and without regard to any particular legislator and,
9   especially, without revealing any privileged matter,
10  would take it upon itself to write a special rule
11  regarding the designation of voter ID legislation as a
12  special order and then vote to make the bill a special
13  order if you're saying there is really know difference
14  either way whether it does that or not.
15             MR. FREDERICK:  I object to the form of
16  the question.  Object as vague.  Object as assuming
17  facts not in evidence.
18             You may answer, if you can.
19       A.  So what is your question exactly?
20       Q.  (By Mr. Harris)  My question is:  Why would the
21  Senate vote to make SB 14 a special order?
22             MR. FREDERICK:  I will object on the basis
23  of privilege, only to the extent that it would call for
24  you to reveal privileged matters.
25             But if you can answer generally without

---

124

1        A.  It was considered as a special order.
2        Q.  Does that mean that it was considered out of
3   the Regular Order of Business?
4        A.  I wouldn't say it is "out of the order."
5   Special orders are taken up before the Regular Order of
6   Business is considered.
7        Q.  If special orders allow a bill to be considered
8   before other bills, why wouldn't senators try to get all
9   of their bills designated as special orders?
10             MR. FREDERICK:  Objection, calls for
11  speculation.  You may answer, if you can.
12       A.  Why wouldn't -- the question is:  Why wouldn't
13  they set all their bills as special orders?
14       Q.  Yes, or at least try to.
15             MR. FREDERICK:  Same objection.
16       A.  Well, I am not sure how to answer that
17  question.  I don't think members always want to schedule
18  their bills with specificity for particular times.
19       Q.  (By Mr. Harris)  I am sorry to continue to
20  dwell on this but it is an important issue and I just
21  want to make sure the record is clear.  I asked you
22  earlier what the significance of designating SB 14 as a
23  special order was, and you said that the significance
24  was that, it gave notice to all the members as to when
25  the bill would be considered.

Karina Casari Davis                                          June 15, 2012

## 125

1        Do you remember that?
2     A.   Yes.
3     Q.   But now in subsequent questioning, we have
4  established that, by setting SB 14 as a special order,
5  it enabled SB 14 to be considered before other bills
6  that were not designated as a special order.  Why don't
7  you consider that to be an effect or one of the
8  significances of designating SB 14 as a special order?
9        MR. FREDERICK:  Object to the form.
10 Object to the extent it mischaracterizes prior testimony
11 and assumes facts not in evidence.
12       You may answer, if you can.
13    A.   I think the form of your question is
14 inaccurate.
15    Q.   Please correct me.  I am really here just
16 trying to understand what happens.  Please tell me what
17 I don't have right.
18    A.   There were not other bills ahead of Senate Bill
19 14 on the Regular Order of Business.
20    Q.   So is it the case that -- well, I think you
21 previously stated that the bill number has no effect on
22 when a Bill is considered under the Regular Order of
23 Business; is that right?
24    A.   That's right.  The actual bill number which is
25 just its designation as -- for the convenience of the

## 126

1  members.
2     Q.   If SB 14 had not been designated as a special
3  order, could it still have been considered by the entire
4  Senate on January 26, 2011?
5     A.   Yes.
6     Q.   And would that be in accordance with the
7  Regular Order of Business?
8     A.   By its rules, it could have considered the bill
9  on January 26.
10    Q.   So is it your testimony that, by making a
11 special rule with respect to designating voter ID
12 legislation as a special order by a majority vote as
13 opposed to the normal two-thirds of the member's vote,
14 that the only real affect of that, is that, it provided
15 a means to give members notice of when the bill would be
16 considered?
17       MR. FREDERICK:  Object to the extent it
18 mischaracterizes the testimony.  You may answer.
19    A.   I think the only practical effect of that
20 rule's provision for this particular bill, at this
21 particular time here in the legislative session, the
22 only practical effect was to provide notice of when the
23 Bill would be taken up.
24    Q.   If the -- the only affect of making something a
25 special order, or at least in this case, making it a

## 127

1  special order would be to give members notice of when a
2  bill would be considered then why did the Senate rules
3  require a two-thirds vote to do that?
4        MR. FREDERICK:  Objection, vague.
5  Objection, assumes facts not in evidence.
6        You may answer the question, if you can.
7        I, also, object to the extent it calls for
8  speculation.
9     A.   You know, I think you have to interpret the
10 rules and their effects based on what point in the
11 parliamentary process you were at, and for this
12 particular Bill, at this particular time, the practical
13 effect of setting it for a special order would have been
14 to give the notice to the members that the Bill was
15 going to be taken up at a particular time.
16    Q.   (By Mr. Harris)  And a couple times now, you
17 have referred to "this particular Bill at this
18 particular time."  What do you mean by that?
19    A.   What I mean is, on January 25th, when the Bill
20 was made a special order for January 26th, at that point
21 in time, the effect of the special order for
22 parliamentary purposes for the members would have been
23 to give them notice that the Bill would be taken up 24
24 hours later.
25    Q.   Was there a blocker bill filed in the 2011

## 128

1  Regular Session?
2     A.   Yes.
3     Q.   Had the blocker bill been considered by the
4  Senate, by January 25th, 2011?
5     A.   I don't believe it was.
6     Q.   So isn't it correct that it would not have been
7  possible to consider SB 14 prior to consideration of the
8  Blocker Bill, had SB 14 not been set as a special order?
9        MR. FREDERICK:  Object to the extent it
10 assumes facts not in evidence.  You may answer.
11    A.   You might have to repeat your question.
12    Q.   Could the court reporter please read back the
13 question.
14       (Last question read back.)
15       MR. FREDERICK:  Object.  Assumes facts not
16 in evidence, but you may answer.
17    A.   What was the previous question to that?  Do you
18 mind reading that question.
19       (Requested testimony read back.)
20       MR. FREDERICK:  Same objection.  You may
21 answer.
22    A.   My first answer which was, no, the Senate had
23 not considered a blocker bill.
24       And I think the answer to the second
25 question, although it is convoluted way of asking the

## 129

1    question is, no, the Senate did not need -- the Blocker
2    Bill had no parliamentary interaction with Senate Bill
3    14 whatsoever.
4         Q.   So under the Regular Order of Business, is it
5    correct that the Blocker Bill would have to be
6    considered before other bills?
7         A.   Are you talking about the Blocker Bill in 2011.
8         Q.   Yes, ma'am.
9         A.   Well, at this particular time, when are you
10   asking me?
11        Q.   Yes.  At this time in January 20 -- on or
12   around January 25th, 2011.
13        A.   And your question was?
14        Q.   I am just trying to understand.  We talked
15   before about a Blocker Bill.  And I -- please correct me
16   if I am wrong.  Again, I am really trying to understand
17   this.  But I think you said that a blocker bill was a
18   bill that would be filed and under the Regular Order of
19   Business have to be considered before any other bills
20   could be considered; is that right?
21        A.   You know that's the -- that's the way it has
22   been used, yes.
23        Q.   And so I think you, also, said that, prior to
24   January 25th, 2011, there was a blocker bill filed.
25        A.   I don't believe I ever said that.

## 130

1         Q.   Okay.  So I will ask you that.
2              Prior to January 25th, 2011, was there a
3    blocker bill filed?
4         A.   I don't remember if it had been filed.
5         Q.   How would one go about answering that question
6    as to whether or not a blocker bill had been filed as of
7    January 25th, 2011?
8         A.   Filing would be hard to determine from the
9    journals, but you could -- but it is possible to tell
10   from the journals.  The act of filing isn't always
11   included in the journals.
12        Q.   Were there other bills filed prior to the time
13   that SB 14 was filed?
14        A.   Yes.
15        Q.   And under the Regular Order of Business, would
16   it have been necessary to consider those bills prior to
17   consideration of SB 14?
18        A.   No.
19        Q.   Assuming a blocker bill had been filed prior to
20   January 25th, 2011, under the Regular Order of Business,
21   would it have been necessary to consider the blocker
22   bill before considering SB 14?
23        A.   Filed, no.
24        Q.   I take it from your answer that there could be
25   some means through which a blocker bill might have

## 131

1    prevented consideration to SB 14 prior to the
2    consideration of the blocker bill but it is not
3    dependent on filing.
4         A.   That's correct.
5         Q.   What would it be dependent on?
6         A.   If a bill had been reported by a Senate
7    committee before Senate Bill 14 had been reported by a
8    committee, then on the Regular Order of Business, that
9    bill would have been above Senate Bill 14 on second
10   reading.
11        Q.   And were any bills reported by a Senate
12   committee before SB 14 was reported by the Committee of
13   the Whole?
14        A.   No.
15        Q.   And what did you mean when you said that there
16   was no parliamentary interaction between the Blocker
17   Bill and SB 14?
18        A.   I am not even sure when the Blocker Bill was
19   filed.  If it was filed on or before January 26th, it
20   wasn't reported.  It just would have existed a bill that
21   was filed.  For purpose of the calendar, a blocker bill
22   would not have been part of the calendar unless it had
23   been reported from committee.  And on this date, a
24   blocker bill had not been reported from committee, so
25   there would have been no parliamentary interaction

## 132

1    between those two bills on the calendar.
2         Q.   Were any bills considered in committee prior to
3    the time that SB 14 was considered by the Committee of
4    the Whole?
5         A.   I don't believe that any actual bills were
6    considered by committees before voter ID was considered
7    by the Committee of the Whole.
8         Q.   So now we have looked at four bills that
9    concerned voter identification requirements.  For any of
10   those four bills, are you aware of what the source of
11   the legislative language in such bills was?
12        A.   The source?
13        Q.   Well, for any of the four bills we have looked
14   at today, do you know who drafted those bills?
15        A.   No, I don't.
16        Q.   Were you present for the floor debate upon SB
17   14?
18        A.   Yeah.
19        Q.   Were you present for the consideration of SB 14
20   in the Committee of the Whole?
21        A.   For most of it, yes.
22        Q.   Are you aware of any analysis showing how many
23   Texas registered voters lack the required forms of
24   identification under SB 14?
25        A.   I wouldn't remember hardly any specifics of the

## 133

1   substantive debate on Senate Bill 14.
2       Q.   Were you aware --
3       A.   I don't remember.
4       Q.   Excuse me.  Were you aware or are you aware of
5   any concerns that SB 14 would disproportionately impact
6   racial minorities or ethnic minorities in Texas?
7           MR. FREDERICK:  I object on the basis of
8   privilege, to the extent that this would require you to
9   reveal any statements by a legislator or any legislators
10  thought process.
11              I instruct you not to answer.
12              If you can answer without revealing those
13  matters, you may do so.
14      A.   I am sure the public record indicates the
15  substance of the debate.  I really would not be able
16  to -- I don't remember specifically arguments that were
17  made.  Those were -- I am sure those were made on the
18  public record but I don't have a recollection of how
19  those arguments were made or what was said.
20      Q.   Who made the decision as to when SB 14 would be
21  considered by the Committee of the Whole?
22      A.   I think that decision was made by the
23  Lieutenant Governor and probably the Chair of the
24  Committee of the Whole, Senator Duncan.
25          MS. BERKOWER:  What was the question?  I

## 134

1   didn't hear it.
2           (Last question read back.)
3       Q.   (By Mr. Harris)  Did you have any discussions
4   with Lieutenant Governor or Senator Duncan regarding
5   when SB 14 would be considered by the Committee of the
6   Whole?
7       A.   Yes.
8       Q.   Did you have -- well, did you have discussions
9   individually with Senator Duncan and Lieutenant Governor
10  or were these joint discussions?
11      A.   Probably individually and joint.
12      Q.   How many times did you discuss the timing of
13  the consideration of SB 14 in the Committee of the Whole
14  with the Lieutenant Governor?
15      A.   I -- I don't remember the number of times.  I
16  don't think it was many times but --
17      Q.   How many times did you discuss the timing of
18  the consideration of the Bill with Senator Duncan?
19      A.   I don't remember the exact number.
20      Q.   Was it more than one?
21      A.   It would have been more than one, yes, it was.
22      Q.   Are you familiar with the Voting Rights Act?
23      A.   Not very.
24      Q.   Are you familiar with the term "legislative
25  intent" or "legislative purpose"?

## 135

1       A.   Yes.
2       Q.   What do you understand either -- either or both
3   of those terms to mean?
4           MR. FREDERICK:  Objection, calls for a
5   legal conclusion.  Objection, relevance.
6           You may answer, if you can.
7       A.   You know, I think that's a -- too broad of a
8   question to answer, it could mean different things for
9   different purposes.
10      Q.   (By Mr. Harris)  Is it always possible to tell
11  why the Legislature is enacting a piece of legislation
12  just by reading the bill itself?
13          MR. FREDERICK:  Objection, calls for a
14  legal conclusion.  Objection, calls for speculation.
15  Objection, relevance.
16          You may answer, if you can.
17      A.   Can you reread the question.
18          (Last question read back.)
19      A.   I think, generally, you can always tell by
20  reading a bill what the intent of the legislature was.
21  There are probably certain provisions in bills that may
22  be more difficult to determine and may require more
23  information.
24      Q.   Have you ever known it to be the case that,
25  putting aside any particular piece of legislation, have

## 136

1   you ever known it to be the case that the Legislature is
2   enacting a bill for reasons that are not apparent on the
3   face of the bill?
4           MR. FREDERICK:  Objection, relevance.
5           Objection, calls for speculation.
6       A.   I couldn't recall anything specifically, no.
7       Q.   (By Mr. Harris)  The public debates that the
8   Senate has, either on the floor or in committee, those
9   are reported to the -- to the public very -- via various
10  means; is that right?
11      A.   Yes.
12      Q.   Do you think it is always the case that, in
13  debate, senators express all of their reasons why they
14  are in favor or in opposition to a bill?
15          MR. FREDERICK:  Objection, calls for
16  speculation.  Objection, relevance.
17          You may answer, if you can.
18      A.   I -- I am not a member.  I don't know why they
19  would -- what their comments mean when they -- I take it
20  at face value.
21      Q.   Have you ever known it to be the case --
22  putting aside any particular bill, have you ever known
23  it to be the case that a legislator has particular
24  reasons for supporting or opposing a bill that that
25  legislator does not express in the public debate?

Karina Casari Davis                                    June 15, 2012

---

### 137

1          MR. FREDERICK: Objection, relevance.
2   Objection, calls for speculation.  Objection, vague.
3          A.  I think your questions are really broad and
4   would require me to presume to know why members do what
5   they do, and I am certainly no expert in knowing why
6   members do what they do all of the time.
7          Q.  Well, if it were possible to tell all of the
8   reasons why a member was for or against a bill from the
9   public debate, then you really wouldn't have to assume
10  anything, isn't that right?
11         MR. FREDERICK: Objection, vague.
12  Objection, calls for speculation.  Objection, calls for
13  a legal conclusion.  Objection, relevance.
14         A.  I am not even sure how to answer your question
15  and what you're asking.
16         Q.  (By Mr. Harris)  Well, I think you said
17  previously that answering my prior question would
18  require you to assume what are members thinking.
19             And I am just asking if -- if the public
20  debate on a bill contained all of the reasons why a
21  senator was for or against the bill, then that sort of
22  assumption wouldn't be required.
23             Do you agree with that?
24         MR. FREDERICK: Objection, relevance.
25  Objection, assumes facts not in evidence.  Objection,

---

### 138

1   vague.  Calls for speculation.
2          A.  I don't want to speculate on why a member says
3   or doesn't say anything about a particular bill on the
4   record, in the public record.
5          Q.  (By Mr. Harris)  Do you have any reason to
6   believe that SB 14 will disproportionately impact
7   racial, ethnic, or language minorities in Texas?
8          MR. FREDERICK: Objection, relevance.
9   Objection, calls for speculation.
10             Also, object on legislative privilege, the
11  extent it would call her to reveal any privileged
12  communications, so object to the extent it calls for a
13  legal conclusion.
14         A.  I don't know.
15         Q.  (By Mr. Harris)  Do you have any understanding
16  as to the number of racial or ethnic voters in Texas --
17  excuse me -- of racial or ethnic minority voters in
18  Texas that lack the required forms of ID under SB 14?
19         MR. FREDERICK: Objection, relevance.
20         A.  I do not know.
21         Q.  (By Mr. Harris)  What forms of ID do you care
22  you with you or do you have with you today?
23         A.  Would have my driver's license and my state ID,
24  my state employee ID.
25         Q.  Does your state employee ID contain a picture

---

### 139

1   of you?
2          A.  Yes.
3          Q.  For what purposes do you have to use your state
4   ID, your state employee ID?
5          A.  To obtain access to the Capitol building, to
6   Capitol parking.
7          Q.  Are there areas of the Capitol that you can
8   access with your ID that you wouldn't be able to access
9   otherwise?
10         A.  Well, yes.  You know, I don't -- without an ID,
11  there are certain elevators that you may not be able to
12  use, there are certain tunnels, other buildings in the
13  Capitol complex that you cannot access.
14         Q.  Do you have to show your State employee ID to
15  get onto the floor of the Senate?
16         A.  I don't.
17         Q.  Is that because the security people there know
18  you from your many years of service to the State or is
19  it -- does nobody have to show an ID to go to the floor?
20         MR. FREDERICK: Objection, form.
21         A.  We have admissions procedures on the Senate
22  floor.  And while we are in session, legislative
23  employees would have -- for the most part, unless they
24  have a position like I do, would have to show what we
25  call "a floor pass" to obtain -- to be able to be on a

---

### 140

1   Senate Floor.
2          Q.  (By Mr. Harris)  Are there times that the
3   Capitol building is closed to the general public but
4   that -- well, I will ask that question.  Are there times
5   that the Capitol building is closed to the general
6   public?
7          A.  I am not really aware of what the security
8   measures for the Capitol building are outside of my
9   access to the Capitol building.
10         Q.  Do you own a copy of your birth certificate?
11         A.  I think I do, yes.  Well, I think I do.
12         Q.  Were you born here in Texas?
13         A.  No.
14         Q.  What state were you born in?
15         A.  I was born in Argentina.
16         Q.  Assuming you didn't have a copy of your birth
17  certificate or if you lost your birth certificate, would
18  you know how to obtain another copy from Argentina?
19         MR. FREDERICK: Objection, calls for
20  speculation.
21         A.  I am not sure I would.  I would probably call
22  my family there and ask them to go get me a copy of my
23  birth certificate.
24         Q.  (By Mr. Harris)  And do you have any idea how
25  long that process would take to obtain a copy of your

Karina Casari Davis                                    June 15, 2012

---

141

1    birth certificate from Argentina?

2        A.   I don't know.

3        Q.   Do you know how much it would cost to obtain a

4    copy of your birth certificate from Argentina?

5        A.   I don't know.

6        Q.   Are you aware of any instances of in person

7    voter fraud -- actually, let's step back.

8             Are you familiar with a term called "in

9    person voter fraud"?

10       A.   I have heard the term used.

11       Q.   As I am using the term, I am asking you about

12   instances in which an individual has appeared at the

13   polls to vote claiming to be a registered voter, that

14   that individual is not.  Does that -- does that make

15   sense?

16       A.   Yes.

17       Q.   And are you aware of any instances of in person

18   voter fraud in Texas?

19       A.   I am not aware of very much having to do with

20   the actual election procedures used in administering

21   elections in Texas.

22       Q.   And just so the record is clear, I take that to

23   mean you are not aware of any instances of in person

24   voter fraud in Texas?

25            MR. FREDERICK:  Objection,

---

142

1    mischaracterizes the testimony.  Objection, relevance.

2        A.   I would have no direct knowledge of any

3    instances.

4        Q.   (By Mr. Harris)  Do you have any indirect

5    knowledge of instances of in person voter fraud in

6    Texas?

7            MR. FREDERICK:  Objection, relevance.

8        A.   Probably not.  If it's -- someone has mentioned

9    it or discussed it, or if it's been mentioned in debate,

10   it's possible, but I don't have any knowledge really in

11   specific incidences.

12            MR. HARRIS:  Let's take a five minute

13   break, after which I expect to be able to wrap up my

14   questioning very shortly.

15            (Brief recess.)

16       Q.   (By Mr. Harris)  Ms. Davis, I really do

17   appreciate your time today, and I do have just a very

18   few more questions.

19            Other than SB 14, what other bills have

20   been referred to the Committee of the Whole Senate as

21   opposed to a standing committee?

22            MR. FREDERICK:  Objection, vague.

23       Q.   (By Mr. Harris)  Do you understand my question?

24       A.   I do.  But I don't think you've been specific

25   enough.  Are you asking me about a particular session or

---

143

1    time?

2        Q.   Well, let's say since you have been

3    Parliamentarian, since 2004.  We have talked about the

4    fact that SB 14 sent to the Committee of the Whole, what

5    other bills went to the Committee of the Whole as

6    opposed to a regular standing committee of the Senate?

7        A.   I believe in 2004, the Senate used the

8    Committee of the Whole -- I think it was 2004, for

9    school finance legislation.  I don't remember if it was

10   couple bills or how many bills but --

11       Q.   And besides school finance, since 2004, are you

12   aware of any other times when a bill was referred to the

13   Committee of the Whole, putting aside SB 14?

14       A.   2009, I believe, Senate Bill 362 was

15   referred --

16       Q.   And SB 3 --

17       A.   -- also.  Sorry.

18       Q.   Excuse me.  As we talked about before, SB 362

19   was also a voter identification bill; is that right?

20       A.   Yes.

21       Q.   Beyond school finance in 2004, SB 362 in 2009,

22   SB 14 in 2011, since you became Parliamentarian, are you

23   aware of any other times when bills were referred to the

24   Committee of the Whole Senate?

25       A.   I don't remember having had any other bills in

---

144

1    the Committee of the Whole.

2        Q.   Finally, looking back at --

3        A.   At that time, I am sorry, for that time period.

4        Q.   Looking back at Exhibit 17, which is the

5    legislative history for SB 14 and, specifically, looking

6    at -- it's like Page 6 of 9.

7        A.   Okay.  Okay.

8        Q.   Am I correct that this history reflects that SB

9    14 passed a vote of the full Senate and was reported

10   engrossed on January 26th, 2011?

11       A.   Yes.

12       Q.   And I think we already established that SB 14

13   was filed in the Senate on January 12th, 2011?

14       A.   Yes.

15       Q.   So if my math is right, that would mean that SB

16   14 passed exactly two weeks or 14 days passed the

17   Senate, excuse me, two weeks or 14 days after it was

18   filed in the Senate?

19       A.   Your math -- your math sounds correct to me.

20       Q.   Are you since becoming Parliamentarian in 2004

21   are you aware of any other bills that passed the Senate

22   within the first two weeks of the session?

23       A.   Yes.  I believe, in particular, during special

24   sessions, the Senate would have very quickly passed

25   bills.

145

1    Q.   How about in Regular Session?
2         Are you aware of any other times where a
3    bill passed in the first two weeks of a Regular Session?
4    A.   I am sure it has happened.  I don't recall
5    anything specific.  I am -- you know, I am sure it has
6    happened before with emergencies during a Regular
7    Session that would be a likely result.
8    Q.   But sitting here today, you don't recall any
9    particular bills that passed within the first two weeks?
10   A.   Nothing specific.
11        MR. HARRIS:  At this time, the Texas
12   League has no further questions.  We would reserve the
13   right to reopen the deposition subject to potential
14   motions concerning some of the privilege issues and
15   would, otherwise, turn our time over to the Department
16   of Justice and the Attorney General for any questions
17   that the Attorney General may have.
18        EXAMINATION
19   BY MS. BERKOWER:
20   Q.   Good afternoon, Ms. Davis.
21        My name is Risa Berkower, to refresh your
22   memory, and I represent the Attorney General Eric Holder
23   in this case.
24        So I will be asking you some questions
25   now.  I think at the beginning of the day, Mr. Harris

146

1    went over some ground rules with you.  And I will just
2    go over a few of mine as well just be clear.
3         I will do my best to ask you clear
4    questions.  But if you don't understand a question, will
5    you let me know?
6    A.   Yes.
7    Q.   And I may use the terms "voter ID" and "voter
8    ID" interchangeably during the deposition but I think
9    you would interpret the term broadly to mean a
10   requirement that a voter presents a form of
11   identification, whether it has a photo or otherwise,
12   when voting in person before being permitted to vote by
13   regular ballot.
14        Does that make sense?
15   A.   Yes.
16   Q.   And if I refer to "minority voters," I mean
17   voters who are non-white or non-Anglo, does that make
18   sense?
19   A.   Yes.
20   Q.   So again, if you have any questions about
21   anything that I say, I would like you to interject; is
22   that alright?
23   A.   Yes.
24   Q.   So I think you have been asked a lot of
25   questions about the duties that you have as Senate

147

1    Parliamentarian.  And I am going to focus on your time
2    as Parliamentarian.  If I ask a question that asks for a
3    question outside of the time you served as
4    Parliamentarian, I will specify that, okay?
5    A.   Okay.
6    Q.   Could you, as a general matter, explain the
7    role and duties of the Parliamentarian in the Senate.
8         MR. FREDERICK:  That's asked and answered
9         You may answer.
10   A.   Generally, the Parliamentarian is a or Senate
11   officer is responsible for advising the presiding
12   officer and the members of the Senate on the rules and
13   procedures of the Senate.
14   Q.   (By Ms. Berkower)  And when you say, "rules and
15   procedures," is the advice that you -- how do you give
16   advice, is it requested of you or do you volunteer it
17   yourself?
18   A.   Probably a lot of both on a day-to-day basis.
19   Q.   What are the circumstances in which you
20   volunteer advice on rules of procedure, like, on your
21   own initiative?
22   A.   You know, on a day-to-day basis in the Senate,
23   I prepare -- well, I sit next to the presiding officer,
24   and I prepare items for consideration.  For example, you
25   know, I might -- I prepare a script for the opening of

148

1    the Senate depending on what we are doing -- to make
2    sure we follow the rules, it would include an
3    introduction of the Pastor for the day.  If there is
4    someone who is absent and has requested to be excused, I
5    would have a motion prepared for the presiding officer
6    to read.  Sometimes these are motions in writing,
7    usually.  Or I would have -- I would help cue for the
8    providing officer on various requests from the
9    membership to be recognized for introduction of guests,
10   ceremonial resolutions, memorial resolutions,
11   announcements.  And that's just within the beginning of
12   the business of the Senate.
13        When we have moved on to the actual
14   calendar, my job is to coordinate when bills are
15   actually taken up, the timing to make sure that they are
16   in order for the debate that would require me to order,
17   review amendments, you know, kind of just, you know,
18   things like, you know, if a member is ready to be
19   recognized on a certain bill, making sure that the
20   members on the floor and that any members who have filed
21   amendments are available.  And I am very heavily
22   involved in when bills are taken up, depending on our
23   schedule, our, you know, perhaps the intentions of how
24   long we are going to be there.  So I -- I would say the
25   large part of my job is coordinating the actual business

Karina Casari Davis                                    June 15, 2012

---

149

1    of the Senate while we are in session.
2        Q.  So is it fair to say that you -- you ensure
3    that the Senate's business is conducted according to the
4    rules of the Senate on a day-to-day basis or you provide
5    advice.
6        A.  Yes.  I provide advice and help accommodate
7    that.
8        Q.  And then there are, also, instances -- that's
9    when you voluntarily give advice on the rules, is that
10   accurate?
11       A.  That's accurate because times motions
12   aren't in order at particular times of the day, things
13   of that nature, and I would, you know, to the extent
14   that a member wants to do something at certain time, I
15   would voluntarily say, we cannot do that at this time,
16   we can take this up later; or I would, you know,
17   coordinate with the member and the presiding officer
18   when we would assume certain activities for the Senate.
19       Q.  And then there are, also, times when people ask
20   your advice on the rules, is that accurate?
21       A.  Yes.
22       Q.  When are those times, just generally?
23              MR. FREDERICK:  Object to vague.  You may
24   answer.
25       Q.  (By Ms. Berkower)  Do you want me to be more

---

150

1    specific?
2        A.  Yes.  I think that would be helpful.
3        Q.  Okay.  When you're in session, do members of
4    the Senate ask your advice on rules?
5        A.  Yes.
6        Q.  When you're not -- when you're not meeting,
7    when the Senate is not in session, do the members ask
8    your advice on rules?
9        A.  Yes.
10       Q.  Does anyone else other than members of the
11   Senate ask your advice on rules?
12       A.  Yes.
13       Q.  Who else asks your advice on rules?
14       A.  The staff for the members in the Senate,
15   committee staff, in particular, staffers for senators,
16   sometimes House members.  Also, most -- the presiding
17   officer would ask for my advice.  Sometimes members of
18   the public would ask.
19       Q.  Are you allowed to give members of the public
20   advice on the rules?
21       A.  Yes.  I think, general advice, I think it is
22   expected that I would be help people with general
23   advice.
24       Q.  What do you do -- I want to just get this out
25   of the way as well.  What do you do when the Senate is

---

151

1    not in session, as the Parliamentarian?
2        A.  Do you mean when we are outside of a Regular
3    Session --
4        Q.  When --
5        A.  -- or just day-to-day?
6        Q.  I guess when you're outside a Regular Session,
7    what -- just a quick summary of what you do when the
8    Legislature is not meeting.
9        A.  Okay.  I still answer questions.  Probably more
10   of my work comes from committees that are meeting
11   throughout the interim.  I would give advice on how they
12   might post for hearing.  Sometimes I would be asked
13   specifics about how to post.  There is a large number of
14   questions that can come into play with committees
15   meeting during the interim and outside of the
16   legislative session.
17              Aside from assisting staff and members
18   outside of the session, what I would do is perform a lot
19   of research in anticipation of an upcoming session and
20   generally prepare for anything that I think might come
21   before the body.
22       Q.  How do you know what areas to research that
23   might become of interest during the session?
24       A.  I -- you know, sometimes I -- you can tell just
25   by what could happen.  You know, a good example of that

---

152

1    is, we have a potential vacancy in an office.  You know,
2    I would research how that vacancy might be filled and
3    sort of anticipate what the Senate might need from me
4    and what they might need to conduct their business.
5        Q.  Do you ever research potential rule changes for
6    future sessions?
7        A.  Yes.  Sometimes, I mean, you know, I have
8    certainly been asked questions about possible changes
9    and, you know, sometimes I think after you have gone
10   through a session, things come up that were
11   unanticipated and I might research those questions
12   further and they sometimes may or may not turn into
13   rules changes.
14       Q.  I think you had discussed a rule change with
15   Mr. Harris earlier, Rule 5.11(d), which was changed in
16   2009, do you remember testifying about that?
17       A.  Yes.
18       Q.  Did you conduct any research on that rule
19   change prior to its institution?
20       A.  Prior to the time it was adopted by the Senate?
21       Q.  Yes.
22       A.  Yes.
23       Q.  Did you conduct any research before it was
24   introduced?
25       A.  Yes.

Karina Casari Davis                                          June 15, 2012

---

## 153

1    Q.   Were you asked to conduct that research?
2    A.   Some of it, yes.  And some of it, I would have
3    done on my own anyways.
4    Q.   Why -- what do you mean, you would have done it
5    on your own anyways?
6    A.   You know, it is my job to know the rules and
7    how they work and so I regularly research a lot to be
8    prepared for a lot of different situations, and so I
9    might not have specifically researched that provision
10   but I would have done a lot of research about and have
11   done a lot of research about special orders and,
12   certainly, previous rules of the Senate.
13   Q.   Who asked you to conduct the research?
14        MR. FREDERICK:  I will object on the basis
15   of privilege.  We have already established what the
16   subject matter of the research would be, so this would
17   be calling for the substance of request Parliamentarian
18   about a legislative act.
19        I am instructing you not to answer on the
20   basis of privilege.
21        MS. BERKOWER:  Can I ask you a question
22   about that, Matt?
23        MR. FREDERICK:  Of course.
24        MS. BERKOWER:  I think she said she had
25   conducted research on special orders.  So can I ask her

---

## 154

1    who asked her to conduct research on special orders?
2         MR. FREDERICK:  I thought the question was
3    whether she conducted research in connection with Rule
4    5.11(d).
5         MS. BERKOWER:  I did ask her that, she
6    said -- I think she said she did research.  And then she
7    -- I asked what the nature of that research was, I
8    thought she said it was on special orders generally.  If
9    you want, I can just drop it.  But I didn't think it was
10   as specific as I think maybe you thought it was.
11        MR. FREDERICK:  I think -- yeah.  I mean,
12   I think because of -- because of the predicate
13   questions, I think identifying who made the request
14   would have the effect of reviewing privileged
15   communication.
16   Q.   Okay.  And can I ask you -- well, actually, I
17   will just move on from there.
18        Can you explain the relationship, as a
19   general matter, of the Parliamentarian in the Senate
20   with Lieutenant Governor?
21   A.   As a general matter -- matter, the
22   Parliamentarian is a Senate Officer.  I am designated in
23   what's called "the Caucus Resolution" for the Senate.  I
24   am designated as an Office along with the other
25   officers.  The Senate names, the other officers, and

---

## 155

1    then provides that the Lieutenant Governor appoint the
2    Parliamentarian.
3         The Lieutenant Governor makes a decision
4    as to who the Parliamentarian would be and indicates
5    that to the Senate and then the Senate adopts his
6    appointment in a resolution making the Senate officer.
7    I take an oath, along with the other offices on the
8    Senate Floor.  So I think because of my appointment by
9    the Lieutenant Governor and because his role of the
10   presiding officer, in large part, it is my job to advise
11   him on the rules of procedure, particularly, given his
12   authority under the Senate rules to decide questions of
13   order.
14   Q.   Is there more you wanted to add?
15   A.   I don't think so, on a day-to-day basis, that's
16   what I do is advise the presiding officer and the
17   members of the Senate.
18   Q.   Is it the usual case that the Parliamentarian
19   will retain that position longer than one legislative
20   session?
21   A.   I think in recent practice, it is.
22   Q.   Is it the usual practice that a Parliamentarian
23   will retain the position after a new lieutenant governor
24   comes in?
25   A.   I think the recent practice is that we have had

---

## 156

1    parliamentarians work for multiple lieutenant governors.
2    Q.   And you said that you provide advice.  To be
3    clear, is that purely procedural advice?
4    A.   I think -- I don't know if I would use the word
5    "purely," I am not sure what you mean.  But I think, in
6    general, it is procedural advice.
7    Q.   Does the procedural advice ever impact -- have
8    a subsequent impact on a bill?
9         MR. FREDERICK:  Objection, vague.
10   Objection, calls for speculation.
11        You may answer.
12   A.   I -- I think there can be substantive impacts
13   based on parliamentary rulings that the presiding
14   officer would make.
15   Q.   What types of rulings would those be, where
16   that impact occurs?
17        MR. FREDERICK:  Objection, vague.
18        You may answer.
19   A.   An example would be germaneness might affect
20   the actual bill, based on parliamentary standards.
21   Q.   (By Ms. Berkower)  What is "germaneness"?
22   A.   "Germaneness" is a requirement in the Senate
23   Rules that the bills be germane to the subject matter of
24   the bill.
25   Q.   So is it about the -- would it be similar to

Karina Casari Davis                                    June 15, 2012

## 157

1  like a relevancy requirement?
2      A.  I am not sure what you would mean by "relevancy
3  requirement."
4      Q.  Okay.  What's a definite -- what's the
5  definition of "germane"?
6      A.  I mean, I think we can read the rule.  Would
7  you like for me to read the rule to you?
8      Q.  Sure.  Do you have it, the 2011 rules?
9      MR. FREDERICK:  I think we have all --
10     Q.  (By Ms. Berkower)  I have the whole 2011 rule.
11         Do you know which one it is off the top of
12  your head?
13     A.  It is 715 and it would be the same in 209.
14     Q.  Okay.
15     A.  So Senate Rule 715 reads:  "No motion or
16  proposition on a subject different from that under
17  consideration shall be admitted under color of amendment
18  or as a substitute for a motion or proposition under
19  debate."
20     Q.  And that's one of the areas where you have made
21  rulings that you feel may have had a substantive impact
22  on a bill?
23     A.  Where I would have provided the Lieutenant
24  Governor or the Presiding Officer the time with advice
25  as to whether an amendment to a Bill is germane or not

## 158

1  germane and whether their decision would affect a bill,
2  this would be the case.
3      Q.  And I guess that's a good point.  You advise
4  the Lieutenant Governor.  You don't make rulings
5  yourself, is that accurate?
6      A.  Yes.
7      Q.  Are any of the -- is any of the advice that you
8  provide to the Lieutenant Governor publicly available?
9      A.  No, I don't think it is.
10     Q.  Maybe I should have been more specific.  I know
11  the House Parliamentarian sometimes publishes, or I was
12  told that yesterday by the other Ms. Davis, that there
13  are some ruling papers that the House Parliamentarian
14  may issue from time to time, is that something that
15  happens in the Senate as well?
16     A.  I don't issue ruling papers.  I certainly may
17  assist and may even draft a ruling with the Lieutenant
18  Governor that is entered into the journals but those
19  would be the Presiding Officer's ruling.
20     Q.  Okay.
21     A.  And there are never a ruling of the
22  Parliamentarian directly.
23     Q.  So the Lieutenant Governor is not bound to take
24  your advice, is that accurate?
25     A.  That's accurate.

## 159

1      Q.  Does the -- does the Lieutenant Governor, as a
2  general matter, take the advice of a Parliamentarian?
3      MR. FREDERICK:  Objection, vague.
4      You may answer.
5      A.  Probably, yes.
6      Q.  (By Ms. Berkower)  I think you said a few
7  minutes ago that you were heavily involved in when bills
8  are taken up.  Does that mean they are taken up for
9  a vote?
10     A.  Yes.  When they are laid out for consideration
11  in the Senate.
12     Q.  What is your involvement in that when bills are
13  taken up for -- or laid out for a vote?
14     A.  You know, sometimes it is very significant and
15  sometimes it is not that significant.
16         You know, just depends on the time of the
17  session as to how much work that is.  It's -- for
18  example, if the Senate is considering, you know, 40
19  bills during the day, I would probably be -- I am very
20  heavily involved in determining when those bills would
21  be brought up and when they are ready for consideration.
22     Q.  Well, what factors make a bill ready for
23  consideration?
24     A.  Well, aside from their procedural stance as to
25  whether they are eligible for consideration on a

## 160

1  day-to-day basis, factors would be, such as, if the
2  author is present or available when he is ready, if he
3  has his notes ready, if there are amendments, if those
4  amendments are in order and I have time to order them or
5  prepare them and be ready.  Sometimes amendments are
6  submitted that are not properly drafted and would be
7  confusing for the membership.  So I would delay
8  consideration of a bill at that point until we have been
9  able to work with the author of the amendment and,
10  perhaps, even the author of a bill in getting the bill
11  ready for consideration.  This is really, largely,
12  logistical.
13     Q.  Is the Parliamentarian and the Senate averse
14  with the development of legislation?
15     MR. FREDERICK:  Object as vague.  But you
16  may answer.
17     A.  Generally, no.
18     Q.  (By Ms. Berkower)  Are there exceptions?
19     MR. FREDERICK:  Object to the form.
20     You may answer.
21     A.  I -- you know, I have assisted members in
22  developing legislation related to constitutional
23  procedures.  With regards to legislation in general, I
24  have been asked to assist and germaneness is sometimes
25  not well understood and so I may be asked from time to

Karina Casari Davis                                          June 15, 2012

---

## 161

1    time to help a member with their amendment draft.  But
2    generally, I am not involved in the substance of the
3    legislation.
4        Q.  (By Ms. Berkower)  Do members use you as a
5    resource for parliamentary procedures when they are
6    drafting legislation?
7        A.  Yes.
8        Q.  Was there any assistance that you provided any
9    Senate members who were working on voter ID legislation?
10           MR. FREDERICK:  Object as vague.
11           You may answer.
12       A.  What kind of assistance, if you said, I
13   didn't -- I don't remember.
14       Q.  (By Ms. Berkower)  Well, I think that the
15   problem is, I am going to run into an objection if I
16   asked very specific questions about what type of
17   assistance you provided.  So I am trying to find out if
18   you provided legislators with assistance in their
19   developing voter ID legislation without revealing the
20   substance of what you provided, if you did?
21           MR. FREDERICK:  Same objection.
22           You may answer.
23       Q.  (By Ms. Berkower)  Do you understand the
24   question?
25       A.  Yes, I think I do.  I am having to -- what do

---

## 162

1    you mean by "legislation"?
2        Q.  Well, okay, I will be more specific then.
3            Did you help any senators draft voter ID
4    bills that were filed in the Senate?
5        A.  No.
6        Q.  Did you help any senators develop voter ID
7    bills that were filed in the Senate?
8            MR. FREDERICK:  Objection, vague.
9            You may answer.
10       A.  No.
11       Q.  (By Ms. Berkower)  Did you help any senators
12   develop amendments to voter ID bills?
13           MR. FREDERICK:  Objection, vague.  You may
14   answer.
15       A.  I think develop, no.
16       Q.  (By Ms. Berkower)  Did you help any senators
17   draft amendments to voter ID bills?
18       A.  I can't say -- I wouldn't remember.  It's very
19   possible on the Senate floor, if somebody came up with
20   something they wanted to do at the last minute, I would
21   have helped them put the words on the paper.  But
22   likely, I wouldn't -- would not have been heavily
23   involved in the drafting of amendments.
24       Q.  So I think you were -- and you said, I just
25   want to make sure I understand this.  You don't remember

---

## 163

1    the substance of any of the debates on the voter ID
2    bills that Mr. Harris discussed with you today, is that
3    accurate?
4        A.  Yes.  I think that's accurate.
5        Q.  With regard to the Committee of the Whole, I
6    think you testified earlier that, there is a benefit
7    that the hearing will be heard by all senators, is that
8    accurate?
9        A.  Yes.
10       Q.  And is that because many bills never make it
11   out of committee to be heard by all senators?
12       A.  No.  I think at the committee level is before
13   bills are out of committee.  So at committee level, you
14   could have a bill in any number of committees.  It is
15   rare that every member of the Senate would be a member
16   of all the committees.  So a great advantage of the
17   Committee of the Whole is that all 31 members have the
18   equal right to participate in a committee deliberation
19   of a particular piece of legislation.
20       Q.  And --
21       A.  Otherwise, they might not be present for a
22   hearing.
23       Q.  And is it accurate to say that, once a Bill is
24   out of committee, any changes of the bill have to go
25   through a more formal process?

---

## 164

1        A.  Yes, in the Senate.
2        Q.  In the Senate.
3            So if the -- if the Committee of the Whole
4    is meeting, is it easier then for all senators to have
5    an opportunity to make changes to a bill?
6        A.  If the Committee of the Whole is meeting?
7        Q.  Yes.
8        A.  Yes.  Yes.
9        Q.  Is it possible to send a bill to the Committee
10   of the Whole without -- well, what is -- what is
11   required to send a bill to the Committee of the Whole?
12       A.  I don't know that there are any specific
13   requirements.  I think that the Lieutenant Governor can
14   refer a bill to the Committee of the Whole but, also,
15   the Senate, as a body, could commit a bill to the
16   Committee of the Whole itself.
17       Q.  So there is no vote or anything required to
18   designate a bill as going to the Committee of the Whole,
19   is that accurate?
20       A.  On referral by the presiding officer, no vote.
21   If the body were to commit a bill or re-refer, there
22   would be a vote.
23       Q.  What do you mean by "re-refer"?
24       A.  If they were to choose to remove a bill from
25   another committee and send it -- have it instead

## 165

1  considered in the Committee of the Whole, the body could
2  choose to do that.
3      Q.  Does that happen often?
4      A.  Re-referrals in general, you know, often it --
5  I would say it is not an infrequent occurrence for bills
6  to be re-referred by the body.  I couldn't give you a
7  number.
8      Q.  Is it fair to say that a referral to the
9  Committee of the Whole has no direct relationship to the
10  two-thirds rule for bills to be heard out of order?
11      A.  I think that's probably fair to say that.
12      Q.  Does the Committee of the Whole have strategic
13  benefits for bill passage?
14      A.  Yes.
15      Q.  What are those benefits?
16      A.  I think that the biggest benefit is what I had
17  already stated earlier, is that when a Bill is
18  considered by the Committee of the Whole, the 31 members
19  are able to participate in that deliberative process.
20  And that is a benefit to the Senate as a whole.  If you
21  know, likely means that when a bill that has gone
22  through Committee of the Whole reaches the Senate Floor
23  for consideration, it's in better form in that it has
24  the input of the entire body.  So it -- you know, as far
25  as collaboration and deliberation goes, you're going to

## 166

1  get a -- strategically, you're going to get a better
2  work-product out of the Committee of the Whole.
3      Q.  Are there any procedures that would -- are
4  there any procedures bypassed by sending a bill to the
5  Committee of the Whole as opposed to a standing
6  committee?
7      A.  "Bypass," what do you mean?
8      Q.  Well, it sounds like, I think you have heard --
9  well, I wonder if, have you heard the Senate called "the
10  most deliberative body" or something of that sort?
11      A.  Yes.
12      Q.  What does that mean, or what do you take that
13  to mean?
14      A.  Well, I mean the Senate having a fewer number
15  of members can and certainly subject to its
16  constitutional design with having longer terms, as much
17  as in the U.S. Constitution, I think it considers itself
18  more deliberate.
19      Q.  And, also, are there -- is it procedurally a
20  little slower?  Are there more procedures in place that
21  slow down bill passage?
22      A.  That slow down bill passage.
23      Q.  Or delay bill passage, more layers of
24  procedural.
25      A.  I am not sure I would know how to answer that

## 167

1  compared to what?
2      Q.  I guess, then, are you there a number of procedures
3  layers that a bill must go through before it gets a
4  final vote on the Senate Floor?
5      A.  Compared -- are you asking me more, compare it.
6      Q.  To the House.
7      A.  No.  Actually, I think -- well, this is -- I
8  think probably the Senate in many ways is simpler,
9  procedurally.
10      Q.  Coming out of -- does a bill that comes out of
11  the Committee of the Whole, is it easier to get a vote
12  on the Senate Floor before the full Senate for that bill
13  than bills that come out of committees?
14      A.  I am sorry.  Please repeat your question.
15      Q.  That was pretty convoluted.  I will start over.
16      Is it easier to get a vote on a bill that
17  comes out of the Committee of the Whole than bills that
18  come out of other committees?
19      A.  "Easier to get a vote."
20      Q.  For final passage.
21      A.  I don't know that it's easier, no.
22      Q.  Is it a majority vote requirement to send a
23  bill out of the Committee of the Whole?
24      A.  Yes.  I would say it is a majority.
25      Q.  For a bill to be sent out of a standing

## 168

1  committee, what's the -- is it, also, a majority vote
2  requirement?
3      A.  It would be majority of the membership of the
4  committee.
5      Q.  Right.  That's what I meant.  How are -- how
6  are those committees staffed?
7      A.  The standing committees?
8      Q.  Yes.
9      A.  Under the rules, and -- okay.  Under the rules,
10  the chairman of committees are empowered to hire the
11  staff for the committees, you know, and the Senate
12  Administration Committee approves budgets for the
13  individual committees that enables them to hire staff.
14      Q.  I guess I meant, are you referring to, like,
15  staffers as opposed to members of the Senate?
16      A.  Yes.  And I am sorry, maybe I misunderstood
17  your question.
18      Q.  That's okay.  I should have been more specific.
19      How are senators assigned to committees?
20      A.  Under the rules, they are appointed by the
21  Lieutenant Governor.
22      Q.  Are there any requirements concerning
23  partisanship of how senators are staffed on committees?
24      A.  No.
25      Q.  Is it possible then for a committee to be all

Karina Casari Davis                                    June 15, 2012

## 173

```
 1   your question.
 2        Q.  Is it true that under the usual rules of the
 3   Senate, to be heard out of order, a bill must have that
 4   approval by two-thirds majority of the senators?
 5        A.  Yes.  For -- for a bill to be considered out of
 6   its regular calendar order, it requires a two-thirds
 7   vote of the members present and voting.
 8        Q.  So if a bill doesn't have to meet the
 9   two-thirds threshold to be considered out of order, is
10   it more likely that it will be heard out of order?
11        A.  If it doesn't have to be considered --
12        Q.  Sorry.
13        A.  -- with the suspension of the Regular Order of
14   Business, is it more likely.  Not necessarily.  I think
15   the Senate decides whether it follows its calendar or
16   whether it takes bills out of order.
17        Q.  Okay.  I will rephrase it this way.
18             Is it procedurally easier for a bill to be
19   heard out of order if it doesn't have to meet the
20   two-thirds majority requirement?
21        A.  Well.
22             MR. FREDERICK:  Object to the form of the
23   question.  Object, assumes facts not in evidence.  But
24   you may answer.
25        A.  If a Bill is taken out of order, it requires
```

## 174

```
 1   two-thirds vote.
 2        Q.  (By Ms. Berkower)  If a Bill is put into a
 3   special category, where it doesn't require a two-thirds
 4   vote to be heard out of order, would you say it is
 5   procedurally easier to get a vote on that bill?
 6             MR. FREDERICK:  Object.  Assumes facts not
 7   in evidence.  Objection, vague.
 8             You may answer.
 9        A.  I -- is it easier to take up a bill that's not
10   in the regular order, is that what you're asking me?
11        Q.  (By Ms. Berkower)  Let me think about this a
12   second and I will rephrase it.
13             Okay.  I think we -- you did say that,
14   usually to be heard out of order, a two-thirds majority
15   of senators must agree to that, right?
16        A.  Yes.
17        Q.  Would you agree that -- would you agree that if
18   a bill only had to -- if to be heard out of order, a
19   bill required only a majority vote of senators as
20   opposed to two-thirds majority vote of senators, it may
21   be easier to get that bill heard?
22             MR. FREDERICK:  Objection, assumes facts
23   not in evidence, vague, calls for speculation.
24             You may answer.
25        A.  To get the bill heard.
```

## 175

```
 1        Q.  (By Ms. Berkower)  A final vote.
 2        A.  I would agree that if a bill is not taken up
 3   with a two-thirds vote, I think by the math, it would be
 4   easier.  I think getting 21 votes is harder, depending
 5   on the bill than getting 16.
 6        Q.  Is it fair to say, it is a reduced procedural
 7   threshold to require a simple majority rather than a
 8   two-thirds majority to have a vote -- to have a bill
 9   heard out of order?
10        A.  Well, I --
11             MR. FREDERICK:  Object.  Assumes facts not
12   in evidence.  Calls for speculation.
13             You may answer.
14        A.  I don't -- Senate calendars don't require -- I
15   think the rules require that the body follow its orders
16   of business.  And if the body chooses to go out of order
17   and -- that is -- you know, that does happen, then it is
18   a two-thirds vote to take a bill up out of order.  Is
19   that easier than a majority vote for a bill that would
20   be at the top of the calendar, you know, it is easier to
21   get to a bill that's at the top of the calendar.
22        Q.  (By Ms. Berkower)  Would you agree that a
23   simple majority is a lower threshold for going out of
24   order than a two-thirds majority?
25             MR. FREDERICK:  Object to the form.
```

## 176

```
 1   Assumes facts in evidence.  You may answer the
 2   question.
 3        A.  I don't think you have a simple majority for
 4   going out of order.  You have a simple majority for
 5   bills that are at the top of the calendar.  And then to
 6   go out of order, you have a two-thirds vote.
 7        Q.  If you change the rule to be a simple majority
 8   to go out of order, would you agree that that's a lower
 9   threshold for going out of order than requiring a
10   two-thirds majority to go out of order?
11             MR. FREDERICK:  Objection, calls for
12   speculation.
13             You may answer.
14        A.  I think there is a distinction between going
15   out of order and what your order actually is.  And if it
16   takes a majority vote to get a bill at the top of the
17   calendar, that's a majority vote to get the bill at the
18   top of the calendar.  That bill wouldn't, if it's a
19   special order, it is not part of the Regular Order of
20   Business.
21        Q.  (By Ms. Berkower)  I see.  So does Rule 5.11,
22   essentially, do what you just described, 5.11(d), for
23   voter ID permits the bill to be put at the top of the
24   calendar based upon a simple majority?
25        A.  Yes.  I think it -- yes, it does permit a bill,
```

---

177

1    if there are other bills.
2        Q.   Right.  If there were other bills.
3        A.   Right.
4        Q.   But normally in order to be put out of order
5    and potentially put at the top of the calendar, it would
6    require a two-thirds vote; is that accurate?
7        A.   To go out of order, yes.
8        Q.   Would you agree that Rule 5.11(d) reduces the
9    threshold for consideration of voter ID legislation?
10            MR. FREDERICK:  Objection, vague.
11       A.   No.
12       Q.   (By Ms. Berkower)  Why not?
13       A.   Because I think that is very dependent on the
14   factors that play, the time of the legis -- the timing
15   of the legislation, what other bills are on the
16   calendar.  There is a lot of variables that come into
17   play.
18       Q.   Okay.  So let's actually talk about the timing.
19            So this bill was deemed emergency
20   legislation, correct, or this area of legislation was
21   deemed emergency legislation, is that accurate?
22       A.   In 2011, yes.
23       Q.   Do you know -- as a result when SB 14 was
24   considered, were there any other bills up for a vote
25   before the Senate at that time?

---

178

1        A.   I don't think there were any other bills on the
2    calendar.
3        Q.   And that was because it was the emergency
4    designation allowed the bill to be considered before
5    bills are normally allowed to be considered under Senate
6    rules, is that accurate?
7        A.   Well, I mean, technically, it -- you know,
8    there had not been any bills reported from Committee, so
9    you could have a bill that's reported from Committee
10   without an emergency designation.  But you know not --
11   you know, just depends on what part of the session
12   you're in.
13       Q.   So turning back, I think it was exhibit --
14   Mr. Harris, what exhibit do you know?
15            MR. HARRIS:  That was Exhibit 17.
16       Q.   (By Ms. Berkower)  17 which was the legislative
17   history for Senate Bill 14.
18            The emergency designation allowed the bill
19   to be considered in the first 60 days of the legislative
20   session, is that accurate?
21       A.   Yes.
22       Q.   Was it in fact considered in the first 60 days
23   of the legislative session?
24       A.   Yes.
25       Q.   Are the only types of legislation that may be

---

179

1    taken up by the Senate during that time, the topics that
2    are designated in the emergency designation?
3        A.   There is two ways.  They can either be declared
4    an emergency or the Senate can suspend the
5    constitutional order of business for the four-fifths
6    vote to take up bills during the first 60 days.
7        Q.   So is it safe to say that the emergency
8    designation ensured there would be fewer other bills up
9    for consideration at the time that the Senate would
10   consider voter ID legislation, if the Senate considered
11   voter ID legislation in those first 60 days?
12       A.   I wouldn't use the word "ensured."
13            The Senate can choose to suspend the
14   constitutional order of business any time it chooses, so
15   it's -- I think the emergency designation has the
16   equivalent effect.
17       Q.   When is the last time the Senate suspended the
18   normal order of rules as you just described?
19       A.   The constitutional order of business?
20       Q.   Yes.
21       A.   You know, I -- it is possible that we did that
22   last session.  I don't remember.
23       Q.   Is it a common occurrence?
24       A.   It -- I wouldn't comment, I don't know.  It
25   used to be more common than it is.  But I -- I don't

---

180

1    remember whether we did that for any bills last session.
2        Q.   Well, is it safe to say, though, that
3    designating the voter ID as emergency legislation
4    ensured that there would not be a blocker bill ahead of
5    voter legislation when it came up for a full vote you?
6        A.   No, it wouldn't have had -- it wouldn't have
7    affected the blocker bills ability to get on the
8    calendar other than -- no, not directly, no.
9        Q.   Well, within this first 60 days, could the
10   blocker bill have gotten on the calendar in front of
11   voter ID legislation?
12       A.   Within this first 60 days -- well, the blocker
13   could have been set any time the Senate chose to set it.
14       Q.   How is that the case, though, if the Senate is
15   not allowed to consider bills other than emergency
16   legislation within the first 60 days?
17       A.   Well, for something to be on the calendar, it
18   is not considered by the Senate it is merely reported by
19   committee.
20       Q.   Okay.
21       A.   We might have had a restriction.  But it is,
22   also, always suspendable.
23       Q.   Sorry, what was the last thing you said?
24       A.   Again, outside of an emergency declaration, you
25   can, also, suspend the constitutional order of business.

## 181

1    Q.   But the Senate didn't suspend the
2  constitutional order of business in the first 60 days of
3  the 2011 Legislature, did it?
4    A.   I don't know if it did for any other bills.
5  It's entirely possible that it suspended the
6  constitutional order of business for something.
7    Q.   Is designating legislation or emergency
8  legislation one way to make it more likely that the
9  Senate will hear a particular type of legislation for a
10  full vote?
11    A.   Likely.  I don't think it makes it more likely.
12  I think maybe I answered the question earlier that
13  perhaps the Senate could consider something sooner.  But
14  beyond the Governor declaring an emergency, the Senate
15  wants -- wants to have to act on an emergency.  So it
16  doesn't necessarily make it more likely.
17    Q.   Well, if the Senate wants to act on a
18  particular type of legislation and the Governor
19  designates it as emergency legislation, does that make
20  it -- does that remove obstacles for the bill to be
21  heard before the Senate?
22        MR. FREDERICK:  Objection, vague.
23        You may answer.
24    A.   I don't know that it removes obstacles, it
25  enables a bill to be heard sooner.

## 182

1    Q.   (By Ms. Berkower)  Okay.  So if the Senate
2  wants to act on a particular type of legislation and the
3  Governor designates it emergency legislation, it helps
4  the bill be heard sooner, that's accurate?
5    A.   Yes.
6    Q.   Now turning back to the rules for the 2009
7  Senate.  Can you explain what the rule of the Senate
8  Parliamentarian is in developing new rules?
9        MR. FREDERICK:  Objection, asked and
10  answered.
11        You may answer.
12    A.   To the extent the Senate chooses to use
13  its rules from a previous session as a starting point in
14  a new session, and any changes to those rules or, you
15  know, which would actually be just -- they would all be
16  new rules for a Regular Session, they would ask the
17  advice of the Parliamentarian and the Parliamentarian
18  would be very involved in -- in their discussions.
19    Q.   (By Ms. Berkower)  Would you be providing them
20  advice?
21    A.   Yes.
22    Q.   Would your advice be based on precedence from
23  prior sessions?
24    A.   It could.
25    Q.   Well, where generally would you look to provide

## 183

1  such advice?
2    A.   Well, when the Senate adopts its rules at the
3  beginning of the session it is adopting its rules for
4  that particular session, so it is not bound by
5  precedence necessarily but it may look to those.  And
6  they may ask me questions about how things have been
7  done in the past.
8    Q.   Do you recall the 2009 rules debate?
9    A.   Yes.
10    Q.   Was it lengthy?
11        MR. FREDERICK:  Objection, vague.  You may
12  answer.
13    A.   It probably was.
14    Q.   (By Ms. Berkower)  Do you remember why it was
15  so lengthy?
16    A.   I think it was -- there was opposition to the
17  resolution.
18    Q.   Do you remember what the opposition to the
19  resolution was?
20    A.   I think that most of the opposition was to
21  Senate Rule 5.11.
22    Q.   And why did -- what were the reasons expressed
23  for opposition to that rule?
24        MR. FREDERICK:  Caution you.  I don't
25  think this question is intending to seek privileged

## 184

1  communication.  But I would just caution you, to the
2  extent you relay opinions expressed, please, don't
3  relate privileged communications.
4    A.   I think, generally, the opposition was from
5  opponents of voter ID legislation.  And I think they
6  were opposed to the rule change or, actually, the rule
7  itself.  And I think the -- you know, I think you can
8  look at the record for their specific comments.
9    Q.   To pass the rules every session, is that a
10  majority vote requirement?
11    A.   I think for permanent rules, I think -- you
12  know, under parliamentary law, it would be a majority.
13    Q.   So to pass the 2009 rules, including Rule
14  5.11(d) that just required a simple majority of
15  senators?
16    A.   You know, I think it is likely a simple
17  majority, yes.
18    Q.   So was changing the rule away from majority of
19  senators to get around requiring a two-thirds majority
20  for voter ID to be heard out of order?
21    A.   Can you rephrase -- restate your question?
22    Q.   I asked whether this rule change, 5.11(d), was
23  a way for a majority of senators to get around the
24  two-thirds usual requirement for legislation to be heard
25  out of order for purposes of voter identification

185

1    legislation?
2            MR. FREDERICK:  Objection.  Assumes facts
3    not in evidence.  Objection, calls for speculation.
4            You may answer.
5    A.  I think it was the Senate's decision to handle
6    a particular bill in a particular way.
7    Q.  (By Ms. Berkower)  Okay.  But would it be
8    accurate to say that, the rule change allowed a majority
9    of senators to put voter ID legislation in a special
10   category?
11   A.  Well, I mean, I think you have to view this --
12   I think sometimes we want to view these as rule changes.
13   But when we adopt permanent rules in any legislative
14   body, even though we may reference previous rules, they
15   always have the right to establish their rules for that
16   particular session.  They are not bound by previous
17   session.  So I -- you know -- it is their right to adopt
18   the rules and to treat bills in particular ways, and it
19   is certainly, you know, I think the rules prescribe
20   different calendar methods and I think they prescribed a
21   different calendar method potential for a voter ID bill.
22   Q.  But would you agree that 5.11(d) put voter ID
23   legislation in a special category?
24   A.  I think the Senate decided to allow voter ID
25   legislation to be considered by a majority vote, if it

186

1    chose to do so.
2    Q.  And that rule allowing that was adopted by a
3    majority of senators, is that accurate?
4    A.  Yes.
5    Q.  Do senators have to be present on the floor in
6    order to vote on a bill?
7    A.  Generally, yes.  Although, to be present, they
8    can be adjacent to the floor, they can be in a gallery,
9    they can be adjacent to a gallery; so they may not
10   visually actually be seen right there but they are --
11   they are considered present for voting purposes if they
12   are -- you know, basically around, they are either in
13   the chamber or adjacent to it, yes.
14   Q.  Do senators ever vote when they are adjacent to
15   the chamber?
16   A.  Yes.
17   Q.  Does that happen frequently?
18   A.  Yes.
19   Q.  And just as a general matter, what are the
20   reasons for allowing them to do that?
21   A.  You know, I -- we frequently work through the
22   day and frequently work through lunch.  There is a
23   lounge where members can go have lunch, it is adjacent
24   to the chamber, so they can vote from there if they are
25   having lunch.  Also, I think it is considered that there

187

1    is, you know, when we are in session, there is a lot of
2    important activity surrounding legislation occurring
3    sometimes, you know, members may be meeting with
4    constituents in the hallway.  Because -- because we have
5    limited access to the chamber itself, I think the Senate
6    rules contemplate that, it may be necessary to allow a
7    member to vote when they are close by but not
8    necessarily in the chamber.
9    Q.  Is there an outer boundary on what's considered
10   close by?
11   A.  You know, I think that we -- first of all, I
12   should say that, they can vote if they are in the
13   building and not close to the chamber, as long as we
14   actually accurately know they are voting and they are
15   giving it to us, it doesn't change the outcome.  But if
16   we are on a particular bill and the vote is very close,
17   we would not consider a member's vote if they are not
18   where we could actually hear their vote or see them or
19   have some sort of knowledge that they are there.
20   Q.  I see.
21   A.  Yeah.
22   Q.  One thing I forgot to ask you.  Do you know
23   what day the 2009 or -- sorry, let me back up a second.
24   Rule 5.11 was included in the 2011 rules
25   as well; is that correct?

188

1    A.  Yes.  It was the same as in 2009.
2    Q.  Do you know what day the 2011 rules were
3    adopted?  I think one of the exhibits might help you.
4    A.  Okay.  That's great.
5    Q.  I think one of the exhibits was -- now I can't
6    tell.  I think Exhibit 15 there earlier today.  I think
7    it might be on the front page.
8    A.  So based on the exhibit before me, it appears
9    that the Senate rules were adopted on January 19th,
10   2011.
11   Q.  Do you happen to know what day the Governor
12   issued his emergency designation for voter
13   identification?
14   A.  I don't remember the specific day.
15   Q.  Do you remember if it was before or after the
16   adoption of the Senate rules?
17   A.  I think it was after.
18   Q.  So at the time that the Senate rules were
19   passed, there was no -- there had been no public
20   announcement, yet, that there would be emergency
21   designation for voter ID legislation?
22   A.  I really don't know if the Governor might have
23   made any public statements about his emergency
24   declarations at all.
25   Q.  And turning your attention again to Rule

Karina Casari Davis                                          June 15, 2012

---

## 189

1  5.11(d), does that rule -- I will wait until you're
2  there.  I think, actually, it is in that exhibit you
3  were just looking at, 15.
4      A.  Okay.  For that particular.
5      Q.  Yeah.
6      A.  All right.
7      Q.  Do you have it?
8      A.  Yes, I do.  Uh-huh.
9      Q.  Does that rule require the Governor for to -- I
10  am sorry, the Lieutenant Governor to refer voter
11  identification legislation to the Committee of the
12  Whole?
13      A.  No, it doesn't.
14      Q.  Do you know if any of the rules require the
15  Governor to refer voter ID legislation to the Committee
16  of the Whole?
17      A.  I don't.
18          MR. FREDERICK:  Objection, assumes facts
19  not in evidence.
20          You may answer.
21      A.  No.
22      Q.  (By Ms. Berkower)  You don't know or they do
23  not?
24      A.  I am not aware of any rules that would require
25  the Lieutenant Governor to make a referral to the

## 190

1  Committee of the Whole.
2      Q.  So that would still be within the Lieutenant
3  Governor's discretion?
4      A.  Yes, for purposes of his referral.
5      Q.  Is there more?
6      A.  Well, I think I mentioned and testified
7  previously that the Senate could choose to commit a bill
8  to the Committee of the Whole --
9      Q.  I see.
10      A.  -- on its own.
11      Q.  But barring that circumstance, it would be
12  within Lieutenant Governor's discretion to refer the
13  bill to the Committee of the Whole, if he saw fit?
14      A.  Yes.  The rule authorize the Lieutenant
15  Governor to refer bills to committee.
16      Q.  And this is something I have actually wondered
17  for a long time and had been looking forward to asking
18  you.
19          When a bill -- can you explain the
20  difference between a vote in the Committee of the Whole
21  and a vote on the Senate Floor?  Because I know all the
22  senators are involved in the Committee of the Whole.
23  But I am a little unclear, procedurally, on exactly what
24  the differences are and how all that works?
25          MR. FREDERICK:  Object as vague, but you

## 191

1  may answer.
2      Q.  (By Ms. Berkower)  Do you understand what I am
3  asking about?
4      A.  I think so.  In this case, the Committee of the
5  Whole -- the Committee of the Whole is a method by which
6  the Senate can consider things informally, I think I
7  have stated that before.
8          Its vote in Committee of the Whole is, if
9  it chooses to vote, and it may not.  Really the
10  Committee of the Whole could do -- you know, could act
11  in different ways.  But really the Committee of the
12  Whole is for informal debate and deliberation and it can
13  make recommendations to the full Senate on a piece of
14  legislation or an investigation, you know, I think it is
15  heard expulsion one time.  It is an informal meeting.
16          The proceedings of the Committee of the
17  Whole aren't kept in the Senate Journal.  The Senate
18  Journal only shows, generally, the Senate resolved
19  itself into the Committee of the Whole.  Committee of
20  the Whole is a meeting of the Senate in committee but it
21  is not in session.
22      Q.  Okay.
23      A.  But it is meeting.
24      Q.  So what's the practical effect of a vote -- of
25  voting a bill out of the Committee of the Whole?

## 192

1      A.  Well, I think that we have -- we do have a
2  constitutional requirement and a Senate requirement that
3  bills have to have been reported from the committee.  So
4  a bill being heard in the Committee of the Whole would
5  satisfy that requirement, that constitutional
6  requirement, and also the requirement in the Senate
7  Rules.  So, you know, in that sense, that's a practical
8  effect.
9          If it -- if it doesn't move a bill forward
10  then the Senate would have no way of further acting on
11  that particular piece of legislation on second and third
12  readings, as required by the Constitution.
13      Q.  It was as though it had died in committee?
14      A.  That's right.  Now there could be other ways to
15  revive it, but, yes, that would be the effect.
16      Q.  So once the Committee of the Whole votes on a
17  bill, it still has to be voted on again to be passed, is
18  that accurate?
19      A.  Yes.  Because the Constitution requires three
20  readings, so the Senate, as a body would have to
21  consider it on second and third reading before it can
22  proceed to the House.
23      Q.  As a practical matter, though, does it in any
24  way short circuit the process in that all the members
25  have already voted, so it becomes more form over

## 193

1  substance when it actually is voted on for final
2  passage?
3      A.  I don't think it short circuits it.  It
4  certainly, as I stated previously, you know, it --
5  because all the members can participate in the Committee
6  of the Whole and you would -- the Senate itself, because
7  it is a member of the Committee of the Whole in its
8  actual meeting would be aware of issues related to the
9  bill, you know, so it would have a greater knowledge of
10 a piece of legislation if it's gone through Committee of
11 the Whole than if it had gone through a different
12 committee just because every member is a member of the
13 Committee of the Whole.
14     Q.  Since every member has already voted on it,
15 though, would it be more form over substance when the
16 bill goes for a final vote?
17     MR. FREDERICK:  Objection, vague.
18 Objection, calls for speculation.
19         You may answer.
20     A.  No.  I wouldn't say it is more form over
21 substance at all.
22     Q.  (By Ms. Berkower)  Do you know if circumstances
23 in which legislator -- senators have ever changed their
24 vote between a vote in the Committee of the Whole and a
25 vote for final passage?

## 194

1      A.  I -- I can't recall anything specific but I am
2  sure that that's happened.  Just sheer logic would tell
3  me it happened and been just in the last 30 years,
4  probably, close to 200 bills that have gone through the
5  Committee of the Whole.  So it is extremely likely that
6  someone might have changed their vote.
7      Q.  Is there further debate on the bill once it
8  comes out of the Committee of the Whole?
9      A.  Yes.  It's subject to the rules of the Senate
10 for debate on second and third reading.
11     Q.  Okay.  Thank you.
12         Under the Senate rules, are there
13 procedural stalling or delay tactics available to
14 senators?
15     A.  Well, I think under any parliamentary process,
16 there are -- there are you, know, ways of -- I think,
17 you know, if you avail yourself of the rights that you
18 have under the Senate rules, certainly, and you can slow
19 down legislation.
20     Q.  Can you name just a few examples of what you
21 mean by tactics to slow down legislation?
22     MR. FREDERICK:  Object to the extent it
23 mischaracterizes the testimony.
24         You may answer.
25     A.  Tactics to slow down.  Well, I think -- you

## 195

1  know -- if perhaps there is a procedural flaw in a bill
2  as it was considered in committee and a member is aware
3  of it and calls a point of order, and the point of order
4  is sustained, to the extent that the remedy for the
5  point of order might delay a bill temporarily, that
6  would be one tactic.  You know, I think certainly could
7  have a lot of debate on a bill.  You can plan a lot of
8  debate.  There may be the difference between one hour
9  versus 10 hours or 30 hours.
10     Q.  Do you think, as a general matter, the
11 two-thirds requirement to hear bills out of order slows
12 down those bill's consideration?
13     A.  Slows them down.  It can, but it can also speed
14 it up.
15     Q.  When would it speed it up?
16     A.  Well, for example, as opposed to a bill -- in
17 the Senate we can have a bill that's on both calendars,
18 could be in the Regular Order of Business in the local
19 calendar.  And we frequently have a case where the local
20 calendar is set for the next day and there is a bill on
21 it, and you know, maybe we are at a point in our session
22 where we are waiting on some amendments for another
23 bill, we don't have much to do, and a member could
24 suspend Regular Order of Business to take that bill up.
25 And in that case -- at that point, it would pass the

## 196

1  bill more quickly than if it had waited for a bill to
2  come up on a local calendar the next day.
3      Q.  For controversial pieces of legislation, as a
4  general matter, does a two-thirds majority requirement
5  to hear bills out of order slow down consideration of
6  those bills?
7      A.  For controversial bills?
8      Q.  Yes.
9      A.  First of all, it is said that there is not
10 necessarily a requirement on all bills.
11         Does it slow down them down?  If there is
12 opposition and that opposition becomes known, you know
13 at that point when it is on the calendar and members
14 have to deliberate to work out some differences, yes, it
15 could slow it down.
16     MS. BERKOWER:  I think, Matt, can we take
17 a five minute break and then I am hoping after that I
18 will be able to more or less wrap up.
19     MR. FREDERICK:  Yeah, sure.
20     MS. BERKOWER:  Okay.  Off the record,
21 please.
22         (Brief recess.)
23     Q.  (By Ms. Berkower)  So I have a few more
24 questions about the 2009 rules that were adopted by the
25 Senate, which we have talked about a lot today.  And I

Karina Casari Davis                                                    June 15, 2012

---

197

1   think you said before and correct me if I am wrong, that
2   there is no requirement to suspend the two-thirds
3   majority voting rule to refer a bill to the Committee of
4   the Whole, is that accurate?
5        A.   Right.  The Lieutenant Governor has the
6   authority to refer bills directly to a committee, it
7   doesn't require a motion by the body.
8        Q.   There is no, like, implicit connection between
9   the two-thirds -- between any vote of any sort and
10  referral of a bill to the Committee of the Whole.
11       A.   I --
12       Q.   The rules don't require it.
13       A.   Right.
14           MR. FREDERICK:  Objection, vague.
15           You may answer.
16       A.   The rules just authorize the Lieutenant
17  Governor to refer bills.
18       Q.   (By Ms. Berkower)  Rule 5.11(d) does
19  describe -- well, turning you attention back to it.  I
20  think you had that as Exhibit 15 from the Texas League.
21       A.   Yes.
22           MR. FREDERICK:  I am sorry.  Are we
23  talking about 2009?
24           MS. BERKOWER:  2011.
25           MR. FREDERICK:  Okay.

---

198

1           MS. BERKOWER:  Yes.
2        Q.   (By Ms. Berkower)  So that Rule 5.11(d), as we
3   have discussed at great length, does allow voter ID
4   legislation to be set as a special order based on a
5   majority vote.  Is that an accurate summary of the rule?
6        A.   Yes.
7        Q.   But it also mentions the Committee of the Whole
8   Senate; is that correct?
9        A.   Yes.
10       Q.   Do you recall any discussion of why the
11  Committee of the Whole Senate was included in this rule?
12           MR. FREDERICK:  Object on the basis of
13  legislative privilege and caution you that -- caution
14  you not to reveal any privileged communications about
15  the reason for any part of this rule.  As to the
16  question of whether or not you remember any
17  communications, you may answer that question.
18       A.   There were communications, yes.  I think the
19  debate would probably reveal why that was included.
20       Q.   Do you recall if that was part of -- if Senator
21  Williams raised that point as part of the public record
22  of that debate?
23       A.   I think he -- I think he probably did.  I can't
24  recall what he would have said exactly.
25       Q.   Do you recall if part of the reason he gave was

---

199

1   that the whole Senate should be present to hear debate
2   on a bill of this nature?
3        A.   He might have said that.  I don't know if he
4   would have phrased it that way but --
5        Q.   Well --
6        A.   I think he -- you know, I shouldn't speculate,
7   I am --
8        Q.   I think you had articulated previously that one
9   of the benefits of the Committee of the Whole Senate is
10  all the senators are present to hear all the evidence
11  and debate in a more informal setting; is that accurate?
12       A.   Yes.
13       Q.   Do you remember if that was one of the reasons
14  that Senator Williams gave for including the Committee
15  of the Whole in this rule?
16           MR. FREDERICK:  Is your question limited
17  to --
18           MS. BERKOWER:  Public record.
19           MR. FREDERICK:  -- reasons -- okay.
20       A.   Probably so.  I think if he had a discussion
21  about Committee of the Whole, he would have said that
22  because that's how the Senate, the Committee of the
23  Whole has been used in the Senate.
24       Q.   (By Ms. Berkower)  And with regard to the
25  purpose of suspending the two-thirds rule for this type

---

200

1   of legislation, do you recall if part of the reason he
2   gave was that the issue of voter ID legislation was a
3   divisive issue?
4           MR. FREDERICK:  Object, assumes facts not
5   in evidence.  But you may answer.
6        A.   I don't recall how he would have characterized
7   the issue.
8        Q.   Do you remember if anyone, as part of the
9   public debate over the rules, articulated a need to
10  suspend the two-thirds rule because the issue of voter
11  ID was controversial?
12           MR. FREDERICK:  Object, assumes facts not
13  in evidence.
14           You may answer.
15       A.   I -- I don't remember anybody articulating
16  that -- that that way, I don't remember.
17       Q.   Okay.
18           And Matt, I think you mentioned, you
19  cautioned the witness concerning issues of privilege.
20  Can you explain the basis for the
21  legislative privilege for the Parliamentarian?
22           MR. FREDERICK:  How so?  I am sorry.
23  Sorry.  Put that down.
24           MS. BERKOWER:  That's okay.
25           What is the basis for your assertion of

Karina Casari Davis                                    June 15, 2012

---

## 201

1  legislative privilege for the Parliamentarian in the
2  Senate?
3        MR. FREDERICK:  She is an officer.  She or
4  the Parliamentarian, generally, is an officer of the
5  Senate.
6        The purpose of the Parliamentarian is to
7  provide advice to senators on parliamentary procedure
8  and legislative acts including bills and the Senate
9  rules.  That's within the basic legislative privilege.
10       MS. BERKOWER:  Okay.  So the -- would it
11 be accurate for me to say that it is not based on the
12 privilege of any other legislator?
13       MR. FREDERICK:  I don't think so.  I mean,
14 no, I wouldn't say that.
15       MS. BERKOWER:  Is the privilege hers to
16 assert or is it other legis -- is it based on other
17 legislators as we have discussed with regard to, say,
18 staff members?
19       MR. FREDERICK:  You know, I can't -- I am
20 not prepared to take a firm position on that right now.
21 I --
22       MS. BERKOWER:  Okay.  That wasn't my
23 intent.
24       MR. FREDERICK:  Okay.  Yeah.
25       MS. BERKOWER:  That's fine.

---

## 202

1        MR. FREDERICK:  It is a fair question.
2        MS. BERKOWER:  We can move on.
3        MR. FREDERICK:  Yeah.
4     Q.  (By Ms. Berkower)  Okay.  Does the Lieutenant
5  Governor have any input into the rules that the Senate
6  passes every session, at the start of every session?
7        MR. FREDERICK:  Object, asked and
8  answered.
9        You may answer.
10    A.  Sometimes, yes; sometimes, no.
11    Q.  Do you know if he had any input into the rules
12 passed for the 2009 or 2011 legislative sessions?
13    A.  Yes.
14    Q.  I should have been more specific.
15       Do you know if he had input into the rules
16 in 2009?
17    A.  Yes.
18    Q.  Did he have input into the rules in 2011?
19    A.  Yes, he did.
20    Q.  I don't want to tread on areas of privilege.
21 But can you say if his input into the rules is
22 substantive?
23       MR. FREDERICK:  I am going to object that
24 this calls for a legal conclusion.  I, also, think it's
25 getting into matters of legislative privilege, so I

---

## 203

1  think I am going to instruct the witness not to answer.
2     Q.  Are you following his advice?
3     A.  Yes.
4     Q.  Okay.  I am only asking for the record for
5  that.
6        MR. FREDERICK:  Can I ask:  Do you plan to
7  ask a lot of privilege related questions for the record?
8        MS. BERKOWER:  Oh, no.
9        MR. FREDERICK:  Okay.  Good.
10       MS. BERKOWER:  Oh, no.  No.  I am trying
11 to do my best to stay within the Court's orders but I
12 know that there are some --
13       MR. FREDERICK:  Sure.
14       MS. BERKOWER:  -- questions that you still
15 may find objectionable, that's all.
16       MR. FREDERICK:  I understand.  And I
17 recognize that you have been cautious to do that.
18       MS. BERKOWER:  We are a different place
19 than we were two weeks ago, Matt.
20    Q.  (By Ms. Berkower)  Are you familiar with any
21 rules concerning the amount of notice given to senators
22 before committee hearings?
23    A.  Yes.
24    Q.  What are those rules?
25    A.  Depends on the kind of hearing that you have.

---

## 204

1        But for standing committees and special committees, the
2  committee is to meet outside of its regular time,
3  although the committees usually comply with this
4  anyways.  They are required to give a 24-hour notice to
5  the members that that committee meeting is going to take
6  place.  If they are going to have a public hearing on a
7  bill, they are to give a -- they are required to give a
8  24-hour notice of a public hearing on a particular bill.
9     Q.  Are there any special rules concerning notice
10 given for meetings of committee -- as the Committee of
11 the Whole?
12    A.  No.  The Senate itself, every time that the
13 Committee of the Whole is convened, determines the
14 procedures for which the Committee of the Whole use
15 outside of what might be prescribed in Article XIII.
16    Q.  When -- are those rules about notice a baseline
17 that may -- sorry, I will rephrase that.
18       Do committees ever give more than the
19 minimum amount of notice before a hearing?
20    A.  Yes.
21    Q.  Why would they do that?
22       MR. FREDERICK:  Objection, calls for
23 speculation.  Also, object on privilege to the extent it
24 calls for anyone's subjective motivation.  If you can
25 answer without revealing that, you can do so.

Karina Casari Davis
June 15, 2012

## 205

1    A.   You know, I think -- I think if they know ahead
2  of time, they might post a bill or a hearing sooner.
3  You know, I think that's largely dependent on their work
4  schedule and, you know, whether they have -- how -- for
5  one thing, you know, when an author would have requested
6  to have his bill heard, you know, if they are planning a
7  meeting for Tuesday and a member, you know, asked Monday
8  morning, it might be scheduled Monday morning.  If they
9  asked Friday, it just depends on when they schedule and
10  their work schedule.
11    Q.   Is more than the minimum amount of notice ever
12  given to senators so that they can prepare for the
13  hearing, like, by getting witnesses or scheduling --
14  scheduling purposes like that?
15    A.   Members other than the author?  Are you asking
16  me about any particular members?
17    Q.   Well, I guess, does anyone ever get more notice
18  than the minimum amount of notice?
19    A.   Yes.
20    Q.   Who is given more than the minimum amount of
21  notice?
22          MR. FREDERICK:  Objection, vague.
23          You may answer.
24    A.   The members in the public are given notice
25  whenever the Bill is posted, and that -- you know,

## 206

1  certainly 24 hours is the minimum.  It's not a maximum.
2  Could be more.  It could be less if the rules are
3  suspended and that happens quite a bit.
4    Q.   Is it customary, though, if it is anticipated
5  that a particular hearing may require witnesses to give
6  more than 24 hours notice?
7    A.   Yes, I think so.  If they indeed have the time
8  to do that procedurally, sometimes they have no choice.
9    Q.   What about the Committee of the Whole, is it
10  customary to give more than the minimum amount of notice
11  for those hearings?
12    A.   I think on a bill, probably more than 24 hours
13  would be the case.  You know, for the simple reason that
14  it involves a lot more people, so that's probably
15  likely.
16    Q.   In your memory of instances in which the
17  Committee of the Whole has met, do you remember how much
18  notice was provided of those hearings?
19    A.   I don't remember, no.
20    Q.   Do you remember if any senators --
21    A.   I am sorry.
22    Q.   Oh.
23    A.   I should rephrase that.  I do know -- I think
24  when you were asking your question, I was thinking
25  outside of voter ID, I don't know why.

## 207

1    Q.   Oh.
2    A.   So I do have some recollection for voter ID
3  for -- just because it was last session and it is more
4  fresh in my memory, I don't really remember other
5  instances.
6    Q.   Do you remember -- so you're saying you do --
7    A.   I do remember for 2011, I do.
8    Q.   How much notice was given?
9    A.   For the public hearing portion of it which
10  would have occurred on a Tuesday, so the notice for
11  public hearing, and we refer to public hearings -- it is
12  a little bit of a term of art.  But if we call something
13  a public hearing, it is the hearing at which testimony
14  will be taken from the public.  Because I think we did
15  have -- I think the Committee of the Whole did meet that
16  Monday, also.  But I think both hearings were noticed or
17  Friday morning previous to the Monday and Tuesday.
18    Q.   In your view, is that -- was that an unusual
19  amount of notice?
20    A.   I think -- I think that's a typical amount of
21  notice for a bill to be considered by committee on a
22  Tuesday.  I think it's very, very typical.  When I was
23  Committee Director and we had Tuesday hearings, we
24  almost always posted on Friday afternoon.  And I think a
25  lot of our -- a lot -- not all, I mean, there are

## 208

1  particularly smaller committees, you know, will probably
2  have a better idea of their agenda.  But a lot of our
3  committees that have hearings on Tuesday, Tuesdays post
4  on Fridays.
5    Q.   Would you view it as typical even for a larger
6  committee like the Committee of the Whole?
7    A.   I think so, yes.  I think that's typical.
8    Q.   Do you remember if any senators complained
9  about the amount of notice given for the Committee of
10  the Whole hearing in 2011?
11    A.   Yes, I do.
12    Q.   Who complained?
13    A.   I particularly remember Senator Van de Putte
14  issuing a letter.  It may have been addressed to Senator
15  Duncan or the Lieutenant Governor, I don't remember, but
16  I remember her writing a letter complaining of the
17  notice.  Or I shouldn't say "complaining," but concerned
18  about the notice.
19    Q.   Actually have the letter if it would help you
20  remember.
21    A.   Well, I -- that's what I remember.
22    Q.   Okay.  Well, let me introduce it as an exhibit
23  and then you can take a look at it.
24    A.   Okay.
25    Q.   I think this was previously Exhibit 80 in

Karina Casari Davis                                         June 15, 2012

## 209

1   another deposition.

2        (Exhibit No. 80 previously marked.)

3   Q.   Did you have a chance to review it?

4   A.   Yes, I did.

5   Q.   Did this refresh your memory as to Ms. --

6   Senator Van de Putte's notice given about that hearing?

7   A.   Yes.

8   Q.   Who makes the decision about when to give

9   notice for meetings of the Committee of the Whole?

10   A.   I think giving notice for a hearing for the

11   Committee of the Whole is a little bit difficult

12   because, unlike a regular committee, the chairman of the

13   committee can't just decide that the committee is going

14   to meet at certain time.  The Committee of the Whole

15   process requires that the Senate itself resolve into the

16   Committee of the Whole, it is the only way to actually

17   be convened.  So it would be by a vote of the Senate.

18   So to the extent that notice is provided in the public

19   of a hearing, it takes someone and likely, in this case,

20   the Lieutenant Governor had made the decision that

21   Senator Duncan would be appointed the Chair of the

22   committee.  So I think Senator Duncan, in consultation

23   with the Lieutenant Governor, had anticipated and

24   decided that the committee would meet on Monday and

25   Tuesday.  And pursuant to that plan, which is still

## 210

1   subject to Senate approval, because only the Committee

2   of the Whole can convene through a Senate action,

3   Senator Duncan, at that point, made the decision when it

4   would happen.  In terms of how it was actually posted, I

5   don't remember what we would have put in the posting

6   exactly.

7   Q.   So to be clear, was it a notice that the Senate

8   would meet to resolve itself into the Committee of the

9   Whole?

10   A.   Yes.  But, no.  Well, the Senate wouldn't have

11   had to give anyone notice to that, but to have a public

12   hearing --

13   Q.   Uh-huh.

14   A.   -- the Senate would want to have the

15   participation of a lot of people.  And so we would

16   have -- we -- the Senate availed itself of its regular

17   committee posting mechanism to get the notice out to the

18   public that there would be a hearing on the bill and the

19   Committee of the Whole on Tuesday, on that Tuesday.

20   Q.   And based on what you just explained, is it

21   accurate to say that the scheduling of that was Senator

22   Duncan and Lieutenant Governor Dewhurst made that

23   decision?

24   A.   Well, I -- yes.  You know, it would have been

25   in -- probably in consultation -- yes, they would have

## 211

1   made that decision.

2   Q.   Do you see the -- in the second paragraph,

3   Senator Van de Putte says that, the Lieutenant Governor

4   waited until very late in the day Thursday to deliver a

5   letter to senators, literally slipping it under most

6   office doors after hours, giving notice of the Committee

7   of the Whole hearing.

8        Do you see that portion?

9   A.   Yes.

10   Q.   Do you know if that's, in fact, how notice was

11   given to some senators?

12   A.   Well, I think that letter was a -- a letter

13   from the Lieutenant Governor indicating his intention to

14   appoint Senator Duncan as Chair of the Committee of the

15   Whole.  I don't remember if it -- how much more detail

16   it gave about when the public hearing would be had.  It

17   wouldn't have served as official notice.  I think, at

18   that point, it would have been more of a courtesy notice

19   in an attempt to get the information to members as

20   quickly as possible.

21   Q.   Where would the official notice have come from?

22   A.   Well, again, Committee of the Whole has to

23   choose to resolve itself, so all the Lieutenant Governor

24   at this point can do is give an indication to members

25   that, if they so choose to convene the Committee of the

## 212

1   Whole, he will appoint a certain person, that's what the

2   rules allow.  And as leadership of the Senate and

3   with -- in consultation with Senator Duncan, they, of

4   course, had planned when the best time for the Senate --

5   you know, we would have to take into consideration when

6   the Senate was coming back in, things like that.  So you

7   would have logistical issues.  There is not a

8   requirement in the rules for any kind of notice to be

9   given because the members choose to resolve themselves.

10        So the Lieutenant Governor issued a letter

11   out of courtesy to indicate to the Senate what his

12   thinking on the timing of the Committee of the Whole

13   was, even though it is their decision.  He issued the

14   letter to give them the notice as soon as he could.  And

15   I believe the Governor had made a declaration of an

16   emergency for voter ID that day, so that was very quick

17   notice.  And probably we weren't able to finalize a

18   posting of the official sort that we might do for --

19   that we would do for public hearing until, you know, the

20   next morning.  So I think that was an attempt by the

21   Lieutenant Governor to communicate information earlier.

22   Q.   I see.  In prior years, when the Committee of

23   the Whole -- when this type of committee -- when this

24   type of procedural -- well, in prior -- you said the

25   Lieutenant Governor sort of had -- the rules don't

Karina Casari Davis                                                    June 15, 2012

## 213

1  specifically provide for a committee hearing or
2  procedures to hold the committee hearing, they have to
3  resolve themselves.  And the Lieutenant Governor, is it
4  fair to say, he plays a role in the timing of that
5  because he is the President of the Senate -- actually, I
6  will withdraw that.
7         I guess what I am trying to ask, in prior
8  years, do you know if the Lieutenant Governor gave more
9  notice of his thinking concerning when the Senate would
10 resolve itself into the Committee of the Whole?
11 A.  I think a notice was given in 2009 of some
12 sort.  I have a recollection of a letter, and I don't
13 remember if it was from the Lieutenant Governor, I think
14 it was.  It is possible that it was from Senator Duncan,
15 I just -- I remember a letter.
16 Q.  Do you remember if there was more notice
17 provided by that letter than by the letter referenced in
18 this exhibit?
19 A.  For the public hearing or for the initial
20 meeting or either, I guess.
21 Q.  Either.
22 A.  I don't remember how much time.
23 Q.  Okay.  Now, turning your attention back to
24 exhibit, I think it was 15, the bill history for Senate
25 Bill 14.

## 215

1  Bill 14 as expressed in the public record?
2  A.  Yes.
3  Q.  The other bills that you saw passed in
4  similarly short time span, do you recall if there was
5  opposition on the public record to those bills?
6         MR. FREDERICK:  Objection, vague.
7         You may answer.
8  A.  There could have been.  "Opposition" is a
9  fairly broad word, I think.
10 Q.  (By Ms. Berkower)  Well, do you recall, was
11 this bill passed solely on party lines?
12 A.  Yes, I think it was.
13 Q.  Do you recall any other bill that was passed in
14 this short of a time span that was passed purely on a
15 party line vote?
16 A.  It is possible.  I don't always -- I recall
17 this one because I was here and it was recent but I
18 wouldn't always look at votes in the journals with an
19 eye for what the party breakdown was, so I don't think I
20 can remember anything.
21 Q.  Okay.  In the time -- and you were present, you
22 said, I think earlier, for the debate of all of the
23 bills that Mr. Harris raised with you today, when they
24 were debated in the Senate, is that accurate?
25 A.  Yes.

## 214

1  A.  Uh-huh.
2  Q.  No.
3  A.  Oh, the bill history for Bill 14.
4  Q.  Yes.  Oh, it is this one, 17.
5  A.  Okay.
6  Q.  There you go.
7         From the first reading -- well, how many
8  days -- based on this exhibit, can you tell how many
9  days there were between the date on which Senate Bill 14
10 was filed and the date in which it passed the Senate?
11 A.  I think earlier, we had said for the record
12 that that was 14 days and it appears to be, based on
13 Adam's math and my math, it would be 14 days.
14 Q.  And how many days between when it was read for
15 the first time and when it was passed?
16 A.  Two days.
17 Q.  In your experience as Parliamentarian, how
18 frequently is a bill passed in that short of a time
19 span?
20 A.  I would say it is not frequent but it certainly
21 has happened enough times for me to remember that it's
22 been a lot more than one time.  I mean, I have seen
23 bills passed in 45 minutes from start to finish.  So, it
24 is not frequent but it certainly occurred quite a bit.
25 Q.  Do you recall if there was opposition to Senate

## 216

1  Q.  You said you don't really remember much of the
2  substance of those debates, correct?
3  A.  That's true.  I am frequently -- I am present
4  for the debates.  I have to pay attention to make sure
5  that their discussions are germane but I am not often
6  engaged in listening to their arguments.
7  Q.  Do you recall anyone expressing, as part of the
8  public record, that -- well, before -- let me back up a
9  second.
10        Do you remember what the purpose of SB 14
11 was, as expressed in the public record?
12 A.  I don't think I can do it any more justice than
13 what they have done in the record.  I mean, I -- I can
14 read you the caption, that's their purpose, but I can't
15 do any justice to what their arguments or their state of
16 purposes were.
17 Q.  Do you recall if during the time that you were
18 present for these public debates, did you ever hear
19 anyone express that part of the purpose for these bills
20 was to prevent non-citizens from voting?
21 A.  If I was listening and I heard that, I would
22 remember, and I don't remember any of those statements
23 being made.
24 Q.  Okay.  And you said earlier today that you were
25 born abroad; is that correct?

217

1     A.   Yes.
2     Q.   Are you a U.S. citizen now?
3     A.   Yes.
4     Q.   So you became a naturalized U.S. citizen at
5  some point in time?
6     A.   Yes.
7     Q.   Do you have a citizen -- excuse me -- a
8  citizenship certificate?
9     A.   Yeah, somewhere.  Yes, I do.
10    Q.   Does it have a photo on it?
11    A.   It has a photo of me when I was in high school.
12    Q.   Do you look the same as you looked in high
13  school?
14    A.   I look better.
15    Q.   Okay.  Have you ever had to get the photograph
16  retaken or renewed in any way?
17    A.   No.  No, I subsequently -- no, I haven't had
18  the need for using it.  I have got other forms of
19  identification.
20    Q.   Do you know if the certificate ever expires?
21    A.   I don't know.  If it has an expiration date on
22  the certificate.
23    Q.   I did not say that to make you run home and
24  check.
25         Okay.  But to be clear, you haven't had

218

1  the photograph retaken in the time that you originally
2  got the certificate?
3     A.   For the actual naturalization certificate, no.
4     Q.   So -- and we are getting more towards the end
5  here, promise.
6         MR. FREDERICK:  Okay.
7     Q.   (By Ms. Berkower)  You said that part of your
8  role as Parliamentarian, you work with amendments for
9  bills.
10    A.   Yes.
11    Q.   What is your role with amendments?
12    A.   I am responsible with some assistance,
13  obviously, thinking there can be a lot of amendments for
14  ordering amendments and correct monitoring order for
15  consideration by the body.
16         And if there is a -- defect in the
17  amendment that would be confusing for the body, maybe it
18  is not drafted correctly or it's drafted to a different
19  version of the bill, to the extent that I catch that on
20  review, I would be involved in attempting to correct
21  that, sometimes the corrections are easy.  You know, I
22  can change line numbers and page numbers.  Sometimes I
23  have to consult with the member or the staff person or
24  assistants would do that for me.  I am sometimes asked
25  to review the germaneness of amendments to legislation.

219

1  Sometimes I am asked to draft on the spot amendments to
2  amendments to help the members accomplish their
3  purposes.  Usually this would be, as I said, very on the
4  spot.
5     Q.   I meant to ask you a minute ago, and then we
6  will get back to the subject.  Are you a registered
7  voter here in Texas?
8     A.   Yes.
9     Q.   Are you aware of any instances in which
10  legis -- turning your attention back to amendments now,
11  sorry.
12         Are you aware of any instances where
13  legislation was presented with the understanding that no
14  amendments would be -- would be accepted?
15         MR. FREDERICK:  I am sorry.  Could you
16  repeat the question, please.
17    Q.   (By Ms. Berkower)  Are you aware of any
18  instances where legislation was presented where there
19  was an understanding that no amendments would be made or
20  accepted?
21         MR. FREDERICK:  I am going to object.
22  Object on vagueness.
23         I am, also, going to object on the basis
24  of privilege.  I think this asks you to communicate, as
25  I understand it, the mental impressions of legislators

220

1  so I would instruct you not to answer.
2     A.   I am going to take the advice of my counsel and
3  not answer the question.
4         MS. BERKOWER:  Okay.  Can we go off the
5  record a second.
6         (Brief pause.)
7         MS. BERKOWER:  So we just had -- I will
8  say, for the record, counsel and I just had a discussion
9  on this.  And it is my understanding that he is willing
10  to let me examine this witness on this document, is that
11  accurate?  Subject to any objections to specific
12  questions.
13         MR. FREDERICK:  Right.  As I have
14  explained to Ms. Berkower, the state objects to the
15  relevance of this exhibit, maintains that it has
16  absolutely no connection to this case.  However, for
17  purposes of this deposition, I don't -- we will not --
18  subject to that objection, we will not prevent
19  questioning on the document, you know, and obviously, we
20  don't intend to waive any later objections about a
21  specific question.
22         MS. BERKOWER:  Okay.  So this will be --
23         THE REPORTER:  18.
24         MS. BERKOWER:  Well, these are actually
25  Attorney General's exhibits and I am supposed to start

Karina Casari Davis                                    June 15, 2012

---

221

1    with 700 for this deposition, so can this be 700 please.
2              (Deposition Exhibit No. 700 marked.)
3        Q.   Can you review this, please.
4        A.   Yes.  Okay.
5        Q.   Do you know what this is?
6        A.   Yes.
7        Q.   What is it?
8        A.   It's an email from David Hanna, Attorney for
9    the Texas Legislative Council to me.
10       Q.   What's the date on the email?
11       A.   May 11th, 2011.
12       Q.   And what's the subject line on the email?
13       A.   "Pre-doing committee report."
14       Q.   Do you know what the subject is referring to?
15       A.   Yes.
16       Q.   What is it referring to?
17       A.   I had -- I am pretty sure I had called David
18   Hanna --
19             MR. FREDERICK:  Actually, I am going to
20   caution you here.
21             I would object to the discussion of the
22   content of any communication, including the substance of
23   this email, based on legislative privilege.  I
24   understand that there have been rulings in the case in
25   which this was introduced.  There has not been a waiver

---

222

1    of legislative privilege in this case, and so I am not
2    quite sure how to handle it.  I mean, at this point, I
3    am not really sure that it is possible for us to -- to
4    talk about this exhibit without getting into privilege
5    problems.
6              MS. BERKOWER:  Okay.
7              MR. FREDERICK:  Would it be possible, let
8    me just ask:  Is it possible for you to ask about the
9    subject matter, generally, the rules without revealing
10   the specific content of this communication?
11             MS. BERKOWER:  Yeah.  Why don't I do this.
12   Why don't I ask questions.  I think in other depositions
13   where -- where the testimony could potentially implicate
14   a thought processes that were asserted to be privileged
15   the witness was allowed to testify about just the text
16   of the document in front of her as an Exhibit.
17             MR. FREDERICK:  Okay.
18             MS. BERKOWER:  And I can ask her general
19   questions about, that don't implicate any specific
20   communications, would that be acceptable to you?
21             THE WITNESS:  Would I be able to have a
22   discussion with my attorney about this?
23             MS. BERKOWER:  Yes.  We can finish talking
24   about this and then you can talk to him.
25             MR. FREDERICK:  Yeah.

---

223

1              THE WITNESS:  Well, some information --
2    you all, go ahead.
3              MS. BERKOWER:  If you want to talk to her
4    now, that's fine with me.
5              MR. FREDERICK:  Yeah.  I don't -- I don't
6    need to go back on our discussion.  I am having second
7    thoughts about whether this should be introduced as an
8    exhibit.  I actually ask at this time that we take this
9    exhibit out.
10             MS. BERKOWER:  Well, what about this,
11   though:  Could we treat this exhibit, since it has been
12   released to public -- and I have represented to you it
13   is represented on blogs, I think you're familiar with
14   that.  Can we treat this as though this is a public
15   statement and ask to extend the questions -- since the
16   questions have been allowed in depositions for this case
17   about public statements?
18             Do you understand what I mean?
19             MR. FREDERICK:  I do.  I do.
20             So can we go off the record?
21             MS. BERKOWER:  Yes.
22             MR. FREDERICK:  And let me talk to my
23   client for a second.
24             (Brief pause.)
25             MR. FREDERICK:  I have spoken to my client

---

224

1    about this.  And I have been reminded that this document
2    is subject not only to legislative privilege, but
3    Ms. Davis has an attorney-client relationship with
4    Mr. Hanna who is a lawyer who works for the Texas
5    Legislative Council.  And at the time that this document
6    was produced or released, or whatever, no one had
7    consulted with Ms. Davis, as the client, to see if she
8    was willing to waive her attorney-client privilege.
9    Regardless of what happened in redistricting, she has
10   not waived her attorney-client privilege over this
11   document.  To the extent that it was disclosed, it was
12   done without her consent as the client.  And I -- I
13   insist that we take this out of the deposition record
14   and that this not be introduced or discussed,
15   specifically.  I believe this is privileged.
16             MS. BERKOWER:  Can I ask one question.
17             MR. FREDERICK:  Yes.
18             MS. BERKOWER:  Who is Doug Davis?
19             MR. FREDERICK:  Doug Davis is a lawyer who
20   was employed by the Senate at the time, at the time that
21   this was raised.
22             MS. BERKOWER:  Would you -- are you
23   asserting that Karina Davis and Doug Davis have the same
24   attorney-client relationship with David Hanna?
25             MR. FREDERICK:  I am not sure.  I don't

## 225

1    know that it would be exactly the same, but they both
2    would have an attorney-client relationship, I am
3    confident of that.
4            MS. BERKOWER:  Are you confident that
5    their interests are aligned, to the extent that cc'ing
6    Doug Davis would not waive any privilege she had with
7    Mr. Hanna.
8            MR. FREDERICK:  Yes.
9            MS. BERKOWER:  And are you asserting,
10   also, that the disclosure of this document, I mean, I
11   think we all agree that legislative privilege and
12   attorney-client privilege are different in terms of
13   waiver.  And while someone else can't waive your
14   legislative privilege for you, someone else can waive
15   your attorney-client privilege for you.  So to the
16   extent that this was disclosed, you're still asserting
17   that attorney-client privilege covers it now that it's
18   been disclosed.
19           MR. FREDERICK:  Yeah.  I mean, you know,
20   am not -- at this time, I am not prepared or willing to
21   debate the specifics of waiver.  But this is subject to
22   legislative privilege and attorney-client privilege.  It
23   has not been produced by the State in this litigation.
24   And to my knowledge, neither of the clients, nor the
25   holders of the legislative privilege have waived that

## 226

1    privilege, so.
2        Q.   (By Ms. Berkower)  To your knowledge, just to
3    flesh out the record a bit and I understand your
4    position on this.  Did Ms. Davis or Doug Davis -- and
5    you guys are not related in any way?
6        A.   Well, we are married.
7        Q.   Oh, you're married.  Okay.  -- okay.  Well,
8    another type of privilege.
9            MR. FREDERICK:  I will, yeah.  We haven't
10   talked about spousal privilege, yet.
11           MS. BERKOWER:  I don't know we would need
12   to in the context of this.  Is he a doctor by any
13   chance?
14           Okay.  Did either of the Davises learn
15   prior to today that this email had been disclosed?
16           MR. FREDERICK:  I don't know.
17           I have not -- I have not spoken,
18   specifically, to Ms. Davis or to Mr. Davis about their
19   knowledge of whether it was disclosed.
20           MS. BERKOWER:  Do you know if there was
21   any effort made prior to today to get this -- I don't
22   know what the right term for it is -- clawed back by the
23   State, I guess.
24           MR. FREDERICK:  I don't know.
25           MS. BERKOWER:  So to the extent that

## 227

1    attorney-client privilege is being asserted of this
2    document, is it fair to say today is, to your knowledge,
3    is the first day to which it is being asserted?
4            MR. FREDERICK:  Actually, it is probably
5    not.  I can't say for sure this is the first day it is
6    being asserted.  It is entirely possible it was asserted
7    previously.  And I understand your questions about
8    privilege and waiver.
9            What I am asking is:  Given that this is
10   not a document that's been produced in this case, it
11   does not have anything to do with Senate Bill 14, I
12   don't think there is any purpose in including this in
13   the record of this deposition or the case and I would
14   ask that we withdraw this as an exhibit.  If you like to
15   ask Ms. Davis about the procedures that are discussed in
16   this email, I have no objection to that but I cannot
17   consent to the inclusion of this as an exhibit in this
18   deposition.
19           MS. BERKOWER:  And to be clear, that's on
20   the basis of attorney-client privilege.
21           MR. FREDERICK:  And legislative privilege.
22           ==MS. BERKOWER:  So I understand the reason==
23   ==why you are insisting on the withdrawal of this exhibit==
24   ==on the basis of attorney-client privilege.  Can you==
25   ==explain the -- your insistence on the withdrawal of this==

## 228

1    ==exhibit on the basis of legislative privilege?==
2            ==MR. FREDERICK:  What would -- sorry, what==
3    ==would you like to me to explain?==
4            ==MS. BERKOWER:  Well, do you feel this is==
5    ==in some way improperly produced on the basis of==
6    ==legislative privilege?==
7            ==MR. FREDERICK:  To the extent it is being==
8    ==produced in this case then, yes.  We have asserted==
9    ==legislative privilege.  This is subject to legislative==
10   ==privilege.==
11           ==MS. BERKOWER:  Well, it is not -- I mean,==
12   ==it is a trial exhibit used in a district court case in==
13   ==the District of D.C., so it is publicly available for==
14   ==review by anybody.  So I am just trying to understand==
15   ==how -- I am not saying you can't.  I am just trying to==
16   ==understand your theory of asserting legislative==
17   ==privilege over this document right now.==
18           ==MR. FREDERICK:  At this point, I am==
19   ==prepared to say only that we're asserting legislative==
20   ==and attorney-client privilege.  I am not prepared to==
21   ==debate attorney-client or legislative privilege with==
22   ==this document.  I am asserting our strong objection==
23   ==based on those privileges and the complete irrelevance==
24   ==of this document to its introduction in this deposition.==
25   ==I -- I really don't understand why we are looking at a==

Karina Casari Davis                                          June 15, 2012

---

## 229

1   document that was a document from the redistricting
2   case, it just doesn't have anything to do with this
3   case.
4           I am not objecting to you asking questions
5   about the subject matter, but I --
6       MS. BERKOWER:  Okay.
7       MR. FREDERICK:  I cannot -- I cannot
8   consent to this being disclosed in this case.
9       MS. BERKOWER:  Okay.  I guess given
10  that you feel that this is a privileged -- this is
11  subject to privilege, I guess I will agree to withdraw
12  it not -- reserving our right to try and re-introduce
13  this at some other time when perhaps on some sort of
14  motion or just in the future, but out of abundance of
15  caution and given the direction we have received from
16  the Court in this case to be conscious of these
17  privileges, I will agree to that in this instance only.
18  Is that acceptable to you?
19      MR. FREDERICK:  Yes.  And I appreciate it
20  very much.  I understand, and I recognize that you have
21  arguments that you want to assert, I appreciate your
22  consideration.
23      MS. BERKOWER:  I think, though, based on
24  what you said, I am still going to ask her about some of
25  the subjects covered in the exhibit and you can object

---

## 230

1   as you see fit.  Do you want it back?
2       MR. FREDERICK:  No.  When you say, "the
3   subjects," does that mean you're going to discuss the
4   actual text of that exhibit?
5       MS. BERKOWER:  No.  I am going to ask her
6   about amendments and about preclearance and about her
7   procedures relating to those things.
8       MR. FREDERICK:  Yeah, subject to potential
9   objections but, sure, I understand.
10  Q.  (By Ms. Berkower)  Okay.  Are you ready?
11  A.  Yes.
12  Q.  Do you know what "preclearance" is?
13  A.  More or less, yes.
14  Q.  What is your understanding of "preclearance"?
15  A.  My understanding is that bills involving an
16  elections process, that certain states have to submit
17  laws for preclearance either to the Department of
18  Justice or through the District Court in DC before the
19  bills can be implemented in Texas.
20  Q.  Are those bills relating to certain subject
21  matters?
22  A.  Yes.  And I should be specific, under the
23  Voting Rights Act.
24  Q.  So are those election and voting related bills?
25  A.  Voting related bills.

---

## 231

1   Q.  To your knowledge, does the Senate consider the
2   preclearance process when it is making legislation?
3   A.  I think, generally speaking, the Senate
4   considers the preclearance process when it is
5   considering certain voting bills.
6   Q.  Do you remember the way in which the Senate
7   considered preclearance during its consideration of SB
8   14?
9   A.  I think, in general, the tenor of all of the
10  debate in consideration on Senate Bill 14, I think it is
11  clear by the public record that the members understood
12  the bill would be subject to preclearance and that they
13  took that seriously and went to great lengths to build a
14  record for that eventual process.
15  Q.  What pieces of the record do you think relate
16  to that process?
17      MR. FREDERICK:  Objection, vague.
18  Q.  Do you understand the question?
19  A.  I don't know that I can distinguish one part of
20  the record versus another part.
21  Q.  Well, what did the senators do, in your view,
22  that related to preclearance?  And I am asking as a
23  matter of the public record.
24  A.  I think they had a lot of discussions about the
25  record.  They submitted, especially, in the Committee of

---

## 232

1   the Whole and I think, potentially, on the Senate floor,
2   although can't remember very specifically whether in
3   2011, 2011 and 2009 how all this occurred.  But members
4   went to great lengths to submit lots of material for the
5   record, letters, exhibits, in general, and especially in
6   the Committee as a whole process, we were labeling items
7   that were submitted by all the members with exhibit
8   numbers which is not what the Senate would usually do
9   when it is considering bills.  So I think for me, as an
10  employee in that process, it was clear to me that the
11  members were building a record for preclearance or
12  potential litigation.
13  Q.  Do you ever seek legal advice about
14  preclearance?
15  A.  I may have.
16  Q.  Have you ever sought preclear -- advice
17  concerning preclearance in the contracts regarding the
18  voter ID legislation?
19      MR. FREDERICK:  I am going to object.  On
20  the basis of attorney-client privilege, to the extent
21  any such communication occurred, that would be subject
22  to privilege, so I am going to object.
23      MS. BERKOWER:  The fact of the
24  communication is subject to the privilege.  I think I am
25  trying to get at privilege log type questions here.

Karina Casari Davis                                        June 15, 2012

## 233

1    Q.  (By Ms. Berkower)  Did you seek legal advice
2    about preclearance in the context of voter ID
3    legislation seems to me like an entry on a privilege
4    log.
5             MR. FREDERICK:  I think the question
6    requires the substance of the communication, so I stand
7    by my objection.
8             I would instruct you not to answer on the
9    basis of privilege.
10   Q.  (By Ms. Berkower)  Did you seek legal advice
11   concerning preclearance in 2011?
12            MR. FREDERICK:  To the extent that this is
13   a yes or no question, you may answer; but don't reveal
14   the substance of any communication between you and an
15   attorney.
16   A.  Yes.
17   Q.  (By Ms. Berkower)  Did you seek advice
18   concerning preclearance in 2012, legal advice, sorry?
19            MR. FREDERICK:  Going to object as vague.
20   Going to object to relevance.  I don't understand why we
21   are getting into attorney-client privilege, but that's
22   clearly where this is going.
23   A.  I will take the advice of my counsel and not
24   answer those questions.
25   Q.  Okay.  Well, in terms of relevance, she would

## 234

1    still have to answer today.  And I am not sure how, when
2    I asked, "Did you seek legal advice in 2011 about
3    preclearance," and then I asked the same question in
4    2012, how one would be an inappropriate question and one
5    would be an appropriate question.
6             MR. FREDERICK:  They are both
7    inappropriate questions.  I allowed the one because you
8    were making an effort to make a general statement.
9             MS. BERKOWER:  Okay.
10            MR. FREDERICK:  As to yes or no, whether
11   you sought legal advice about preclearance in 2012, you
12   may answer yes or no.  But beyond that, I will instruct
13   you not to answer on the basis of privilege.
14            THE WITNESS:  What was the last part of
15   your advice, I am sorry?
16            MR. FREDERICK:  You may answer yes or no
17   as to the specific question whether or not you sought
18   legal advice about a -- related to preclearance in 2012.
19   Beyond that, you may not -- I am instructing you not to
20   reveal the substance of any communication related to
21   legal advice.
22   A.  Yes.
23   Q.  Are there any procedures in the Senate for
24   preparing committee reports?
25   A.  Can you be more specific with your question?

## 235

1    There is -- committee reports are prepared.
2    Q.  Are they prepared pursuant to any rules in the
3    Senate, any of the Senate's rules?
4    A.  For a committee report to be in order on a
5    Senate Floor, it would have to comply with certain
6    rules.
7    Q.  What are those rules?
8             MR. FREDERICK:  Object to the form.
9             You may answer.
10   A.  Generally, if I may refer to the rules.
11   Q.  (By Ms. Berkower)  Yes.
12   A.  Generally, it was Rule 712.  And the Senate Rule
13   712 has a requirement on what printing a committee
14   report should include and there is a number of things
15   that may be required of bills depending on whether those
16   items exist.  And that's -- if there is other rules,
17   there may be some indirect advice, I can't recall
18   anything right now.  But the most specific rule on
19   committee reports is 712.
20   Q.  Are committees required to prepare committee
21   reports in advance of the committee meeting under the
22   rules?
23   A.  The way you characterize the question is a
24   little misleading.  I think there are components to a
25   committee report that exist at various times and

## 236

1    different parts of the committee report are being worked
2    on at different times.  And it isn't an indication of
3    whether the committee has actually taken action.  Some
4    things have to be prepared ahead of the committee's
5    consideration.  So there is not necessarily a sequential
6    requirement.
7    Q.  So you're saying that just as a logical matter,
8    to be prepared for the meeting, the member might need to
9    prepare part of the report ahead of time.
10            MR. FREDERICK:  Object to the extent
11   mischaracterizes the testimony.
12   A.  Well, I think, for example, a committee cannot
13   vote on a bill until it is in possession of the fiscal
14   note.  The LBB produces the fiscal note, has to have
15   certain amount of time to produce that fiscal note and
16   to analyze a bill.  And it is very customary practice
17   for the LBB to receive the request from the committee to
18   work on a committee -- on the fiscal note before the
19   bill sometimes is even set for hearing, maybe it has
20   already been set, or they may ask at the time that they
21   are setting.  So parts of the committee report are
22   produced, potentially, even before a Bill is set for
23   hearing.
24   Q.  Is an entire committee report prepared in its
25   entirety ever before the committee meets?

Karina Casari Davis                                                    June 15, 2012

---

## 237

1    MR. FREDERICK:  Objection, relevance.
2  Objection, vague.  You can answer.
3    A.  Well, I think there is a form that's a standard
4  form that the committee clerk fills out indicating the
5  actions of the committee, that's absolutely prepared
6  ahead of time.  The committee clerk might even have
7  already filled out information such as what the bill
8  number is and have it prepared so that can be filled out
9  after the committee takes its actions.
10    Q.  (By Ms. Berkower)  If a committee, are
11  amendments ever produced during a committee?
12    A.  Yes.
13    Q.  Are committee reports ever prepared in their
14  final form before amendments are introduced in a
15  committee hearing?
16    MR. FREDERICK:  Objection, relevance.
17    A.  Is a committee report produced -- ask your
18  question again, please.
19    Q.  (By Ms. Berkower)  Are committee reports ever
20  produced in their final form, created in their final
21  form prior to a committee hearing in which amendments
22  may be introduced to a bill?
23    MR. FREDERICK:  Objection, relevance.
24    Q.  (By Ms. Berkower)  You may answer.
25    A.  No.

## 238

1    Q.  You don't know of any instance in which that's
2  occurred?
3    MR. FREDERICK:  Same objection.
4    A.  It wouldn't be possible.
5    Q.  (By Ms. Berkower)  Why would it not be
6  possible?
7    MR. FREDERICK:  Objection, form.
8    A.  Because the committee form indicating the
9  actions of the members could not possibly be filled out
10  ahead of time.
11    Q.  How could they not be filled out ahead of time,
12  those committee forms?
13    A.  Not in their completed state.  The committee
14  form has to be signed by the clerk and by the chairman
15  of the committee.  The votes by the members on a
16  particular bill have to be filled out on a form.  The
17  committee report has to indicate the attachments
18  included with the committee report, whether there was a
19  fiscal note, whether there are amendments, whether there
20  is committee substitute, a form of the bill that's being
21  reported, so a committee report in its entirety could
22  not be produced ahead of a committee's action.
23    Q.  Do you know if members of the Senate ever
24  choose not to do certain things in writing for fear of
25  creating a paper trail?

## 239

1    MR. FREDERICK:  Objection, relevance.
2  Objection, argumentative.  Objection, calls for
3  speculation.  And, also, object to the extent it seeks
4  the mental impressions or thought process of any of the
5  legislator.
6    A.  I don't know.
7    Q.  (By Ms. Berkower)  Do you know of any
8  discussions in which -- whether or not a certain action
9  would look good for preclearance was ever raised?
10    MR. FREDERICK:  Objection, vague.
11  Objection, to the extent it calls for you to reveal the
12  substance of privileged communications or legislators
13  thought processes.  If you can answer without revealing
14  those, you may do so.
15    A.  Can you ask the question again.
16    Q.  Can you read it back, please.
17    (Last question read back.)
18    MR. FREDERICK:  Objection, vague.  Same
19  objection on privilege.  Objection, calls for
20  speculation and relevance.
21    A.  I think the Senate considered that its actions
22  would -- would be part of a preclearance process.
23    Q.  (By Ms. Berkower)  If senators were to have an
24  agreement that no amendments would be accepted for a
25  particular bill, do you think -- strike that.

## 240

1    If it were the case that, for a
2  controversial piece of legislation, senators came to an
3  agreement that no amendments from the minority -- from
4  opponents to the bill would be permitted in advance of
5  consideration of those amendments, do you think that
6  would impact the preclearance process?
7    MR. FREDERICK:  Objection.  Calls for
8  speculation.  Objection, calls for a legal conclusion.
9  Assumes facts not in evidence, relevance, argumentative.
10    MS. BERKOWER:  You may answer.
11    A.  I don't think senators can agree that
12  amendments are not permitted, so I would object to the
13  characterization of the question.
14    Q.  (By Ms. Berkower)  Representative Peña, are you
15  familiar with who he is?
16    A.  More or less, he is a member of the House of
17  Representatives.
18    Q.  During his deposition in this case, he
19  described SB 14 as, "a done deal."
20    Would you agree with that statement?
21    MR. FREDERICK:  Objection, assumes facts
22  not in evidence, relevance.
23    A.  No.
24    Q.  (By Ms. Berkower)  Why would you not agree with
25  that statement?

Karina Casari Davis                                    June 15, 2012

---

241

1      MR. FREDERICK: Object to form, assumes
2  facts not in evidence, relevance.
3      Also, you know what, I am going to
4  instruct you not to answer on the basis of privilege.
5  This is calling for your thoughts or mental impressions
6  about pending legislation. So I instruct you not to
7  answer on the basis of privilege.
8      A. I will take my attorney's advice.
9      Q. (By Ms. Berkower) Isn't it true that you
10 received an email if your Attorney, David Hanna, on
11 Wednesday, May 11th, 2011.
12         MR. FREDERICK: Objection, relevance.
13 Objection, vague.
14     A. I probably did, given that you showed me a copy
15 of an email written that shows it was written to me on
16 that date.
17     Q. Isn't it true that that email contained advice
18 concerning the preclearance process?
19         MR. FREDERICK: Objection. Object. This
20 is asking for the substance of attorney-client privilege
21 communication. I instruct you not to answer.
22         MS. BERKOWER: I think that's a privilege
23 of a question.
24         MR. FREDERICK: No. I disagree. I will
25 instruct her not to answer.

---

242

1      Q. (By Ms. Berkower) At any time since the
2  passage of SB 14, have you come to believe that it was
3  passed with any discriminatory purpose?
4      MR. FREDERICK: Objection, relevance.
5      Q. You can answer.
6      A. No.
7      Q. At any time since the passage of SB 14, have
8  you come to believe that it will have a retrogressive
9  effect on minority voters?
10         MR. FREDERICK: Objection, relevance.
11     A. No.
12     Q. (By Ms. Berkower) If you are called to trial,
13 will you testify that SB 14 has no discriminatory
14 purpose?
15         MR. FREDERICK: Object to the extent this
16 is asking her to tell you what she would testify about
17 at trial. I believe the question is improper. I would
18 object on relevance. Calls for speculation.
19         You can answer, if you can.
20     A. I don't think I can answer.
21     Q. (By Ms. Berkower) You can't answer because you
22 don't understand the question?
23     A. I don't know what I am going to think in three
24 or four weeks or whenever you would have a trial.
25     Q. Do you want to change any of the answers you

---

243

1  provided today for any reason?
2      A. Yes. I -- the very, very beginning of this
3  deposition, Adam had asked me about my employment
4  history and I had forgotten that when I worked for the
5  Senator in Waco, I had taken a brief amount of time off
6  from my State job to work on his campaign in a
7  fundraising capacity for him back in 1994, and I had
8  completely forgotten that I had done that for a
9  six-month time period and remembered. And I have
10 neglected, it was an oversight for me to mention it. I
11 just don't think about that, because it was a very short
12 duration. So I would like to add that to the record as
13 part of my answer to his question.
14     Q. (By Ms. Berkower) Okay. And getting back to
15 your answer to the question before that. You said you
16 weren't sure what you would think three or four weeks
17 from now. Is that an accurate summary of your answer?
18     A. I think so. I think the question asks for me
19 to speculate on what my answer would be in the future
20 and I think I would not like to speculate.
21     Q. Are you saying it is possible that evidence
22 that you -- or information that you obtained in the
23 interim time may change your view of whether SB 14 has a
24 discriminatory purpose?
25         MR. FREDERICK: Objection,

---

244

1  mischaracterizes the testimony. Calls for speculation,
2  relevance.
3      A. I am not saying that anything is possible. I
4  just don't know what I am going to think in a month, or
5  whenever, I am not even aware of the actual timeline for
6  this trial. So I -- you're asking me to speculate, and
7  I really haven't even given any thought to your
8  question. And I think your question would require a lot
9  of thought.
10     Q. (By Ms. Berkower) Well, then, I will ask.
11         Do you think today that SB 14 has
12 discriminatory purpose?
13         MR. FREDERICK: Objection, relevance.
14     A. I don't know.
15     Q. (By Ms. Berkower) Why don't you know?
16     A. I don't know enough about the legislation.
17 Based on what I heard in public debate, I would say the
18 answer is, no.
19     Q. But as of today, you're not sure?
20         MR. FREDERICK: Objection,
21 mischaracterizes the testimony. Objection, relevance.
22     A. I think you're asking me the purpose of a bill
23 and I -- you know, based on the stated purposes that I
24 have heard, I don't think there was a discriminatory
25 purpose.

Karina Casari Davis                                          June 15, 2012

---

245

1    Q.   (By Ms. Berkower)  Sitting here today, do you
2    think the SB 14 has a discriminatory effect?
3          MR. FREDERICK:  Objection, relevance.
4          A.   I don't know enough about the legislation or
5    its effects to provide an answer; I don't know.
6    Q.   (By Ms. Berkower)  Is there anything else you
7    want to share?
8    A.   No, I don't think so.
9          MS. BERKOWER:  Okay.  Subject to the
10   resolution of any motions that might arise from this
11   deposition testimony, I am going to leave it open,
12   subject to those potential motions but otherwise I am
13   done on questioning this witness.
14         MR. FREDERICK:  Okay.  I have a brief
15   Direct Examination.
16         Could we go off the record for about five
17   minutes, take a quick break.
18         MS. BERKOWER:  Sure.
19         (Brief recess.)
20              EXAMINATION
21   BY MR. FREDERICK:
22   Q.   Good afternoon, Ms. Davis.
23   I have a brief Direct Examination.  You
24   understand that you are still under oath, correct?
25   A.   Yes.

---

246

1    Q.   Now, as Senate Parliamentarian, is one of your
2    job duties to provide advice on the Senate rules?
3    A.   Yes.
4    Q.   Is your job to provide advice regarding the
5    Senate rules to any senator who requests such advice?
6    A.   Yes.
7    Q.   Is it, also, part of your job to assist
8    senators with Senate procedure?
9    A.   Yes.
10   Q.   Is it common for you to discuss Senate
11   procedure regarding particular bills with senators?
12   A.   Yes, very common.
13   Q.   So is it common for you to discuss the timing
14   or the procedure of a particular Senate bill with
15   senators?
16   A.   Yes.
17   Q.   Can you estimate how frequently you discuss the
18   timing or procedure of a particular bill with senators?
19   A.   It's most of what I do every day on the Senate
20   floor is discuss the timing of bills, the procedures
21   related to how they are considered.  Most of -- that's
22   most of my job right there.
23   Q.   I want to look briefly at what was introduced
24   as, I believe this was U.S. Exhibit 80 for the record.
25   This was a letter.

---

247

1    A.   Oh, here it is.
2    Q.   If you will look down in the -- on the first
3    page at the last -- the last sentence there, it is a
4    separate paragraph.  Do you see where it says -- it is
5    referring to a previous session two years ago when
6    senators knew a month or more in advance that full
7    hearing on this legislation would take place?
8          Do you see that?
9    A.   Yes.
10   Q.   Do you know what legislation that the letter is
11   referring to here?
12   A.   I would assume it was referring to Senate Bill
13   362 from the 2009 Session.
14   Q.   Do you recall how long the Committee of the
15   Whole met to consider SB 362 in 2009?
16   A.   Trying to decide how to quantify a little bit
17   short of forever.  It was -- I don't remember exactly
18   how many hours; but it was all through one day and all
19   through the night and into the morning.
20   Q.   Was it more than 12 hours?
21   A.   Definitely, yes.
22   Q.   Was it more than 24 hours?
23   A.   I don't remember specifically what time we
24   started, the days, and when it ended but it was probably
25   close to that ballpark.

---

248

1    Q.   But it went all day and all through night.
2    A.   All through the night.
3    Q.   If you will turn to the second page, please.
4    Down below the signature, does this show that there is
5    someone copied on this letter from Senator Van de Putte?
6    A.   Yes.
7    Q.   And who did Senator Van de Putte copy on this
8    letter?
9    A.   The U.S. Department of Justice Voting Rights
10   Section.
11   Q.   To your knowledge, did the Senate expect the
12   Department of Justice to attend the Committee of the
13   Whole meeting in 2011?
14   A.   No.  I would not say they would have expected
15   their attendance.
16   Q.   Is it common in your experience for the
17   Department of Justice to be copied on correspondence
18   among senators about committee hearings?
19   A.   No, it is not common.
20   Q.   Do you have any knowledge why Senator Van de
21   Putte -- Van de Putte copied the Department of Justice
22   on her letter to Senator Duncan?
23   A.   As I have stated previously, I think the Senate
24   was aware that the bill would be subject to preclearance
25   either at the Department of Justice or before a court.

## 249

1  And I would guess Senator Van de Putte wanted to make
2  the Department of Justice aware of her communications
3  with Senator Duncan.
4       Q.  And your testimony is -- is that based on any
5  personal communication with Senator Van de Putte about
6  this letter?
7       A.  No.
8       Q.  That's just based on your -- your review of the
9  letter?
10      A.  Yes.
11      Q.  If you could turn, briefly, to what was marked
12  as -- I believe it was the League Exhibit 15.  This is
13  an excerpt of the 2011 Senate rules.
14           If you will turn to the second page of
15  that exhibit and look at Rule 5.11(a).  And it says,
16  "Any bill, resolution, or other measure may on any day
17  be made a special order for a future time of the session
18  by affirmative vote of two-thirds of the members
19  present."
20           Is that an accurate reading?
21      A.  Yes.
22      Q.  What does it mean when it says, "a future time"
23  in that provision?
24      A.  Well, I think it probably specifies future time
25  because that's the purpose of making the special order

## 250

1  is to establish when a particular bill might be taken up
2  through special order.  If a Bill is part of the Regular
3  Order of Business, it might be taken up on a Tuesday, it
4  could be taken up on a Wednesday, it could be taken up
5  on a Friday, Saturday.  The regular calendar isn't
6  specific as to days; making a special order allows, or
7  its purpose is to -- to give notice of a particular time
8  or day.
9       Q.  Can a special order be taken up immediately?
10      A.  I suppose it's possible to set a special order
11  for an hour from now, if you wanted to make a motion
12  like that on the Senate Floor.
13      Q.  Okay.  Earlier, there was a discussion of a
14  limitation in the Texas Constitution on consideration of
15  legislation within the first 60 days of the session.
16           Are you familiar with that provision of
17  the Constitution?
18      A.  That's the constitutional order of business.
19      Q.  Does that limitation that applies to the first
20  60 days of a session prevent a committee from reporting
21  a bill out of committee during the first 60 days of the
22  session?
23      A.  Not during the first 60 days.  The limitation
24  for committees to meet and consider legislation is
25  during the first 30 days.  And certainly the Senate

## 251

1  could suspend the order of business and consider a bill
2  any time it chooses.
3       Q.  I want to talk about the Regular Order of
4  Business for a minute.  Do the Senate rules give the
5  Presiding Officer the authority to change the order of
6  bills in the Regular Order of Business?
7       A.  No.  He does not have that authority under the
8  rules.
9       Q.  How many votes do the Senate rules require to
10  pass a bill under the Regular Order of Business?
11      A.  For general bills would be the majority of the
12  members present and voting.
13      Q.  In the 2011 Legislative Session, to the best of
14  your recollection, how many bills were ahead of Senate
15  Bill 14 in the Regular Order of Business?
16      A.  2011, there were no bills ahead of Senate Bill
17  14.
18      Q.  Move on briefly to the local and uncontested
19  calendar.  Can you -- can a bill be removed from the
20  local and uncontested calendar?
21      A.  Yes.
22      Q.  How can a bill be removed from the local and
23  uncontested calendar?
24      A.  Rules provide that any two members can request
25  in writing that a bill be removed from the local and

## 252

1  uncontested calendar.
2       Q.  How many votes does Senate rules require to
3  pass a bill that's on the local and uncontested
4  calendar?
5       A.  The same as any bill on any calendar for a
6  general bill, would be a majority of the members.
7       Q.  Move on briefly to House Bill days.  Can you
8  explain what a "House Bill Day" is in the Senate?
9       A.  Yes.  The Senate rules provide for a deference
10  to House bills and joint resolutions on calendar
11  Wednesdays and Thursdays, the effect of which is that
12  the calendar flips and all -- any House bills and joint
13  resolutions that are on the Regular Order of Business
14  would now be above all Senate bills as opposed to other
15  calendar days.
16      Q.  How many votes do the Senate rules require to
17  pass a House Bill on a House Bill Day?
18      A.  Like any other bill, be a majority of the
19  members present and voting.
20      Q.  What vote is required to adopt Senate rules?
21      A.  To adopt permanent rules or temporary rules, it
22  would be majority of the members present and voting in
23  the Senate.
24      Q.  I want to talk briefly about Blocker Bills.
25           Do the Senate rules require a two-thirds

Karina Casari Davis                                                June 15, 2012

## 261

1    the Senate's resolving into the Committee of the Whole
2    with respect to considering bills?
3        A.  I think the effect of the Senate considering
4    bills in the Committee of the Whole is consistent with
5    the purposes of a Committee of the Whole and that is to
6    give all 31 members of the Senate equal rights of
7    participation in a committee process.  Those rights
8    include the right to unlimited debate.  The right to
9    question witnesses, if there are witnesses.  The rights
10   to amend.  They are one of 31 in that they have an equal
11   right of participation as opposed to a smaller committee
12   venue that might have a limited membership of the
13   Senate.
14       Q.  Can others -- can other Senate committees meet
15   while the Committee of the Whole is convened?
16       A.  No, they cannot.
17       Q.  And is that required by the rules?
18       A.  Yes.
19       Q.  Is the Committee of the Whole something that is
20   unique to the Texas Senate?
21       A.  Not at all.  It is -- has rich history going
22   back to at least -- at least Parliament.  It is used
23   heavily in legislative bodies throughout this country.
24   It is used in the Congress.  There are many precedents
25   in Congress on the Committee of the Whole which we would

## 263

1    for that greater participation by the Senate and it is
2    used for those purposes.
3        Q.  I want to move back very briefly to the
4    two-thirds vote mechanism in the Senate.
5    ==We were talking earlier about the use of==
6    ==the two-thirds vote to bring the bills to the floor.  In==
7    ==your experience as Parliamentarian and as a general==
8    ==matter, do you have an understanding of why the Senate==
9    ==sometimes uses the two-thirds vote mechanism to bring --==
10   bring bills to the floor.
11       A.  I think that that tradition is a tradition that
12   evolves, and it has evolved from since the late '40s and
13   early 1950s, and at times has been more heavily used
14   than at other times.  I think probably, initially, it
15   was somewhat of an accident, maybe even on purpose that
16   they discovered, you know, probably members were
17   attempting to load the calendar so they didn't get to
18   particular bills that they were opposed to.  I think
19   they discovered that as it became a practice, that I
20   think, you know, oftentimes the requirement for a
21   two-thirds vote would yield legislation that has been
22   more carefully developed, perhaps, is the word.
23   Certainly, to get two-thirds vote, you know, a member
24   would probably have to make more concessions or would
25   have to work a little harder to get the bill in the

## 262

1    look to.  It is used extensively by some legislatures to
2    consider bills.  And it is not at all unique to the
3    Texas Senate.
4        Q.  In the time that you have worked in the Texas
5    Senate, how often has the Senate resolved into a
6    Committee of the Whole?
7        A.  I am trying to think.  I don't know if I could
8    say exactly how many times they moved to resolve.
9    Certainly, while I have worked in the Senate, I recall
10   it happening in the early 1990s.  I recall it happening
11   in 1999, 2001.  I think we used it in 2003 and 2004,
12   certainly, in 2009 and 2011; so it's happened somewhat,
13   I wouldn't say frequently, but it has been used a lot.
14       Q.  Generally speaking, is there a particular type
15   of legislation that tends to be considered by the Committee
16   of the Whole?
17       A.  Yes.  I think the Senate chooses to use the
18   Committee of the Whole process for bills which it thinks
19   would benefit from the greater deliberation that the
20   participation by 31 members could provide for a piece of
21   legislation.  There are some bills for which each member
22   of the Senate has such great interest, they would want
23   to participate in that way and want to be able to
24   participate in the committee process, and so the
25   Committee of the Whole is a convenient device to allow

## 264

1    right shape for it to be able to be considered.  I think
2    any members would say that, it is a -- one of the
3    purposes of using the two-thirds tradition that it
4    yields better legislation.  That's not always the case.
5    And I think that the fact that the rules continue to
6    provide for regular orders of business and mechanisms
7    that allow a bill to be brought forward without a
8    two-thirds vote, it's the Senate's choice that, that
9    two-thirds process doesn't always work.
10       Q.  Is there a calendars committee in the Senate?
11       A.  There is not an official calendars committee in
12   the Senate.
13       Q.  In your experience, is the use of the
14   two-thirds vote mechanism used as something of a
15   calendaring mechanism by the Senate?
16       A.  My belief is that, that is its principal
17   purpose, that the effect of the Senate's sort of
18   imposing a two-thirds requirement on itself when it is
19   not required to do so is that it can continue to use a
20   Regular Order of Business which would be unwieldly when
21   you have lots and lots of bills on it.  And most
22   legislative bodies use a calendar system on the
23   Calendars Committee.  And I think the Senate has just
24   developed its system.  And the great benefit to the
25   members that they believe this, and I believe this, is

## 265

1  that they are one of 31 members on a quasi Calendars
2  Committee as opposed to the type of system such as that
3  is in the Texas House of Representatives where you would
4  have a much smaller number of members on the Calendars
5  Committee that would control the flow of legislation.
6  So this tradition, in large part, is really in its
7  essence a calendar system where each of the members of
8  the Senate have equal participation in the development
9  and the flow of legislation on a daily basis in the
10  Senate.
11      Q.  Is the two-thirds vote mechanism used when the
12  Senate meets in special session?
13      A.  It can be.  There are many instances where the
14  Senate follows its Regular Order of Business during
15  regular -- during special sessions.
16      Q.  In a special session, does the Senate,
17  typically, consider fewer bills than it would consider
18  in a Regular Session?
19      A.  Yes.  Because it is jurisdiction in its ability
20  to consider legislation in a special session is set by
21  the Governor in accordance with the Constitution.
22          The Governor has the authority to call a
23  special session, a Senate does not, the Legislature does
24  not.
25          The Governor would, when calling a special

## 266

1  session under the Constitution has to provide the
2  subject matters for consideration by the Legislature
3  during a special session.  And only those items, say,
4  those bills that fall within that subject category can
5  be considered by the Legislature; so the result is far
6  fewer bills.
7      Q.  In your experience, does that make the calendar
8  easier to manage in the Senate?
9      A.  Yes.
10      Q.  We were discussing times when the Senate
11  chooses to proceed without the two-thirds mechanism.
12  As a general matter, based upon your
13  experience in the Senate, when the Senate chooses to
14  proceed without using the two-thirds mechanism to bring
15  a bill forward, why does -- why would it choose to do
16  that?
17      A.  I think that, in general, the times that it has
18  chosen to proceed outside of the two-thirds tradition
19  usually are times when a piece of legislation can no
20  longer progress.  Usually it -- you know, it may be a
21  controversial piece of legislation.  Lots of times these
22  bills have been around multiple sessions, there has been
23  lots of attempts to get consensus with a two-thirds
24  vote, and those attempts have failed.  And I think the
25  Senate has chosen to proceed with a majority vote and

## 267

1  follow its calendars on occasions where -- to not do so
2  would, potentially, harm -- could harm the state, could
3  delegate its duties, the Legislature's duties to someone
4  else.  You know, sometimes the majority of the Senate
5  feels that it's -- and it is a difficult decision for
6  them.  But some issues are so important and that
7  perhaps, you know, might even say lines have been drawn
8  in the sand and that the two-thirds process will not
9  yield any results, further results.
10      Q.  Is the Senate's custom of using a two-thirds
11  vote procedure to bring many bills to the floor, is that
12  intended to allow a political minority of senators to
13  block legislation?
14          MS. BERKOWER:  Could she read back that
15  question, I didn't hear the first part.
16          (Last question read back.)
17      A.  No.  I don't think that that is the Senate's
18  intent with the two-thirds tradition.
19      Q.  To the best of your recollection, as you sit
20  here today, in your time as Senate Parliamentarian, how
21  many bills has the Senate passed without using the
22  two-thirds vote mechanism?
23      A.  Say that's probably the number of bills being
24  20 to 25 range.
25      Q.  Does passing a bill without using the

## 268

1  two-thirds vote mechanism circumvent the Senate rules?
2      A.  I think it's -- I would characterize it as
3  following the rules and strict enforcement of the rules.
4      Q.  Is passing a bill without using the two-thirds
5  vote mechanism contrary in any way to the Senate rules?
6      A.  Passing without a two-thirds vote?  No, it is
7  not contrary to the rules.
8      Q.  Is passing a bill without requiring a
9  two-thirds vote consistent with the Senate rules?
10      A.  Yes.
11      Q.  To the extent the Texas Senate enacted Senate
12  Bill 14 without using a two-thirds vote mechanism to
13  suspend the Regular Order of Business, did it follow
14  existing Senate rules and procedures?
15      A.  Yes.
16      Q.  To the extent the Texas Senate chose not to
17  follow the custom of requiring a two-thirds vote to
18  suspend the Regular Order of Business to consider Senate
19  Bill 14, did it follow existing Senate rules and
20  procedures?
21      A.  Yes.
22      Q.  When the Senate -- pardon me.
23          When the Texas Senate passed Senate Bill
24  14, did it violate any Senate rules?
25      A.  Not that I am aware of.  I don't believe -- I

### 269

1   don't believe that it did.
2      Q.   To the best of your understanding, was the
3   Texas Senate's consideration and passage of Senate Bill
4   14 consistent with existing Senate rules and procedures?
5      A.   Yes.
6      Q.   As you sit here today, do you have any reason
7   to believe that the Texas Legislature enacted Senate
8   Bill 14 with a discriminatory purpose?
9      A.   No.
10     Q.   As you sit here today, do you have any reason
11  to believe that Senate Bill 14 will have a
12  discriminatory effect?
13     A.   No.
14          MR. FREDERICK:  I have no further
15  questions.
16          MS. BERKOWER:  All right.  I have some
17  cross on that.
18                  EXAMINATION
19  BY MS. BERKOWER:
20     Q.   I will try to follow the same order
21  Mr. Frederick used.
22          Turn your attention to the Attorney
23  General's Exhibit No. 80, a letter from Senator Van de
24  Putte.  I don't know where my copy of it went, but.
25          Do you know if an invitation was extended

### 270

1   to anyone from the Department of Justice to attend the
2   Committee of the Whole hearing in 2011 on voter ID?
3      A.   I don't know.
4      Q.   Do you know if, in fact, anyone from the U.S.
5   Department of Justice attended that hearing?
6      A.   I don't know.
7      Q.   Have you ever heard of someone from the U.S.
8   Department of Justice attending Texas Senate hearing for
9   any legislation?
10     A.   I don't know.
11     Q.   Do you recall ever seeing anyone from the U.S.
12  Department of Justice at any Texas Senate hearing in
13  your time as Parliamentarian?
14     A.   If I had seen someone, I wouldn't recognize
15  them.
16     Q.   Well, announced as part of the record.
17     A.   I don't recall.
18     Q.   You said that you recalled in 2009, the Senate
19  had spent almost forever or something of that nature,
20  debating SB 362, is that an accurate characterization?
21     A.   Yes.  And that would be, and I don't remember
22  the question was qualified this way, but that was
23  certainly in the Committee of the Whole.
24     Q.   In the Committee of the Whole.
25     A.   Uh-huh.

### 271

1      Q.   Debate in one Senate session doesn't carry over
2   to debate in a subsequent session, does it?
3      A.   Not usually.  But in this case, it somewhat
4   did.
5      Q.   How is that?
6      A.   The senators chose to adopt the record made in
7   2009 as part of their record in 2011, the Senate chose
8   to do that.
9      Q.   But the bills were different; is that correct?
10     A.   They may have been.  I am not super familiar
11  with the content of the bills anymore.  I don't
12  remember.
13     Q.   So it was part of the record in 2011, as it was
14  adopted by the senators, is that what you're saying?
15          Sorry, I will clarify.  The 2009 record
16  from the Committee of the Whole was adopted as part of
17  the record from the 2011 Committee of the Whole meeting?
18     A.   I believe so.  I think that motion was made in
19  the Committee of the Whole.  It is possible it was made
20  on -- it had to have been in the Committee of the Whole
21  and not in the full Senate.
22     Q.   Do you remember anything in the public record
23  explaining why the choice was made to adopt that 2009
24  testimony in 2011?
25     A.   I don't remember very specifically what

### 272

1   their -- I am sure -- I am sure they stated why; I don't
2   remember exactly or even generally what they said.
3      Q.   As a new bill introduced in 2011, SB 14 was
4   procedurally entitled to full consideration by the
5   Senate, is that accurate?  And I don't mean
6   consideration by the full Senate but entitled to all of
7   the rules for -- relating to a bill's consideration that
8   any other bill introduced in a new session of the
9   Legislature would be entitled to.
10     A.   Yes.
11     Q.   So just because a bill on a similar topic was
12  debated in 2009 doesn't mean in any way that in 2011,
13  another bill on the same topic would already be viewed
14  under the rules as having been considered already?
15          MR. FREDERICK:  Objection, vague.
16     A.   I think for parliamentary purposes, I think the
17  answer is no, but I am almost going to have to ask you
18  to repeat the question, and I am sorry.
19     Q.   (By Ms. Berkower)  That's okay.  I will
20  rephrase it to be clear.
21     A.   Okay.
22     Q.   Just because a bill -- if a bill is considered
23  on a particular topic in one legislative session and
24  then another -- and it doesn't pass, and then in the
25  next legislative session, another bill, a new bill is

## 273

1   introduced on the same topic, the Senate's prior
2   consideration of a bill on the same topic doesn't
3   foreclose consideration of the new bill on the same
4   topic, does it?
5        A.   No, it wouldn't foreclose that under the rules.
6        Q.   In fact, it has no effect whatsoever under the
7   rules; is that correct?
8        A.   That's correct.
9        Q.   You testified a few minutes ago that there were
10  no bills ahead of SB 14 when it was considered for a
11  full vote before the Senate; is that correct?
12           MR. FREDERICK:   Objection,
13  mischaracterizes the testimony.
14        A.   What I said was, that there were no other bills
15  on the calendar when Senate Bill 14 was considered.
16        Q.   Okay.   So it was first in line for
17  consideration.
18        A.   Yes.
19        Q.   Isn't part of why it was first in line for
20  consideration because it had been designated emergency
21  legislation?
22        A.   I think -- well, I mean, I think -- I think
23  that certainly could be a reason.   You know, the Senate
24  could have -- they -- I think that's probably right, as
25  I think about it, yes.

## 274

1            (Attorney Ezra Rosenberg enters room.)
2        Q.   And to be clear, isn't it true that if a
3   blocker bill is in place and to be heard out of order, a
4   two-thirds majority would be required?
5            MR. FREDERICK:   Objection, vague.
6        A.   For a bill to be taken out of its regular order
7   of -- calendar order to be considered by the Senate, the
8   rules require a two-thirds vote of the members present
9   and voting to take a bill out of its calendar order.
10       Q.   (By Ms. Berkower)  Is it easier to get a vote
11  on a bill that is first in line rather than a bill that
12  is second, third, or anywhere lower in the order in
13  line?
14           MR. FREDERICK:   Objection, calls for
15  speculation.
16       A.   That would depend on the bill.
17       Q.   Well, procedurally, are there fewer procedural
18  hurdles to get over if a bill is first in line for
19  consideration for a vote on the full -- before the full
20  Senate?
21       A.   To pass a bill, it would be the same vote
22  requirement wherever it is on the calendar.
23       Q.   Well, would it be heard ahead of the other
24  bills?
25       A.   If it is heard -- if it is heard in its

## 275

1   calendar order then it would require a majority in the
2   members present and voting to pass the bill.
3        Q.   A bill that was second in line in that instance
4   would have to, first, have a majority of two-thirds
5   senators vote to hear it out of order, isn't that true?
6        A.   Yes.   If it's considered out of order.
7        Q.   So the procedural hurdle of having to get over
8   that two-thirds majority does not exist for a bill
9   that's first in line to be heard for a vote.
10       A.   I think its position on the calendar means that
11  it can be taken up and the rules would require for it to
12  be taken up before the other bills.
13       Q.   Without a two-thirds majority of senators
14  present and voting?
15           MR. FREDERICK:   Objection, form.
16       A.   I think the Senate has calendars and it is,
17  under the rules, required to follow those calendars
18  except for when it suspend the rules to take a bill up
19  out of the calendar order.
20       Q.   (By Ms. Berkower)  As a matter of practice, do
21  senators use blocker bills combined with the two-thirds
22  rule to prevent a vote on certain bills?
23           MR. FREDERICK:   I am going to object on
24  the basis of privilege only to the extent that it would
25  require you to reveal what any particular legislature --

## 276

1   legislator was thinking or intending to do.   But you may
2   answer generally, if you can do so without revealing the
3   privilege matters.
4        A.   I think, generally, a bill that's at the top of
5   the calendar and it is used as a blocker would have the
6   effect of requiring a two-thirds vote for bills that are
7   lower in calendar order beneath that bill.
8        Q.   Have you seen senators use those procedural
9   hurdles to prevent a vote on certain bills?
10           MR. FREDERICK:   The same cautionary
11  instruction.   But I don't believe this calls for
12  privilege matters.
13       A.   Did you say certain bills?
14       Q.   On any bill.
15       A.   On any bill.   I think that, generally speaking,
16  a blocker bill is a decision to be used as a
17  parliamentary device where you're using the first bill
18  to require a two-thirds vote to consider other bills, I
19  think that's a general decision by the Senate and the
20  Presiding Officer and it works, and its intent is for
21  general purposes of managing the Senate's calendar.
22       Q.   Okay.   As a practical matter, though, have you
23  ever seen a senator capitalize on that to prevent a vote
24  on a particular piece of legislation?
25       A.   "Capitalize."   Do members choose to vote no or

Karina Casari Davis
June 15, 2012

---

### 277

1    to commit to vote no to bring a certain -- to suspend
2    the Regular Order of Business to take up a bill, yes,
3    that's what they do, that's part of the calendar
4    mechanism, that's why they would consider themselves to
5    be part of the calendar process in the Senate.
6        Q.  How often does a bill that passes in the Senate
7    die in the House, just generally?
8        A.  I would say -- I am not sure I could tell you
9    percentages.  I would say that, of the House bills that
10   the Senate receives, the Senate passes half of their
11   bills.  And of the Senate bills that the House passes,
12   they would pass fewer than half of the Senate bills they
13   actually receive.  How much fewer, I couldn't tell you
14   the percentage but I know it is less.
15       Q.  How often does a bill die in the conference
16   committee?
17       A.  You know, I -- I am not sure if I could answer
18   that.  I mean, depends on the number of conference
19   committees that we would have.  It happens.  We may, you
20   know, in session to session basis, you could have --
21   generally you're in the 100 range on conference
22   committees for a Regular Session, 100, 150, I mean, the
23   number could vary.  There are probably quite a few bills
24   that die in conference committee, but there are
25   certainly a lot more that survive.

---

### 278

1        Q.  Is it fair to say that, as the bill gets
2    further and further in the legislative process, it has
3    less and less chance of dying?
4        A.  I don't think I would characterize it that way.
5        Q.  Is it fair to say that once a -- okay.
6            You testified a few minutes ago that 20 to
7    25 bills between the time -- during the time that you
8    have been Parliamentarian were heard by the Committee of
9    the Whole.
10           Do you remember testifying to that a few
11   minutes ago?
12       A.  I think --
13           MR. FREDERICK:  Objection,
14   mischaracterizes the testimony.
15       A.  I hope I didn't misspeak.  I think the question
16   was:  How many bills had been considered?  Maybe we
17   should have the court reporter read that question
18   because I don't think it was related to the Committee of
19   the Whole.
20       Q.  You know what, you're right, it was not.  I
21   withdraw that question.  Sorry.
22           Would you agree that the -- part of the
23   two-thirds, that the two-thirds rule requires senators
24   to build consensus before a bill gets heard for a final
25   vote?

---

### 279

1        A.  I think the legislative process requires
2    senators to form a consensus on passing any bill.
3        Q.  Well, a few minutes ago, you were testifying
4    about the two-thirds rule and you said that, a bill
5    that's subjected to the two-thirds rule often will have
6    more concessions made to opponents than other bills.
7            Do you remember testifying to that?
8        A.  Yes.
9        Q.  Would you agree then that the two-thirds bill
10   often requires consent -- is a mechanism that enhances
11   consensus built during the legislative process?
12       A.  I think that the difference and the number of
13   votes required makes -- does make a difference.  Needing
14   16 votes instead of 21 makes a difference.  It is a five
15   vote difference if everybody is there.  And certainly if
16   those five people are not willing to vote unless a
17   concession is made or a change is made, might not even
18   be a concession, I mean, it could be an improvement to
19   the bill in some way, I -- you know.  So, you know, I
20   think it builds consensus, yes.
21       Q.  You said that one of the reasons senators may
22   choose to suspend the two-thirds vote mechanism or
23   two-thirds rule or tradition, however we have been
24   referring to it, is that the majority may feel that
25   failure to pass a particular type of legislation would

---

### 280

1    harm the state.
2            Do you remember testifying to that a few
3    minutes ago?
4        A.  Yes.
5        Q.  Do you believe that opposition to bills harms
6    the state?
7        A.  I think continued opposition to bills that are
8    necessary to the functioning of the state, yes,
9    ultimately harms the state.
10       Q.  What are examples of bills that are necessary
11   to the functioning of the state?
12           MR. FREDERICK:  Objection, vague.
13       A.  An example of that would be the state's general
14   budget.
15       Q.  Do you believe that opposition to voter ID
16   legislation was harm -- was a harm to the state?
17           MR. FREDERICK:  Objection, relevance.
18           You may answer.
19       A.  I don't have an opinion on voter ID and the
20   policy of voter ID.  I think earlier I gave examples of
21   why the Senate might choose to forgo its two-thirds
22   tradition and to observe its calendar systems.  And I
23   gave examples of what they thought when they did this
24   with voter ID is, you know, it was really a question for
25   them.  I don't -- I don't think I can answer that

---

281

1   question.
2   Q.   (By Ms. Berkower)  Okay.  I think I got your
3   testimony wrong before, when I asked you about the 20 to
4   25 bills in the context of the Committee of the Whole.
5   I think you were actually saying, if I remember
6   correctly, and correct me if I am wrong, that
7   approximately 20 to 25 bills during your time as
8   Parliamentarian were passed without the two-thirds rule;
9   is that accurate?
10       A.   Yes.
11       Q.   How many total bills were passed during the
12   time you have been Parliamentarian?
13       A.   How many total bills in the Senate?
14       Q.   Yes.
15       A.   I would not be able to accurately answer that
16   question, I don't know.
17       Q.   Is it more than 100?
18       A.   Yes.
19       Q.   More than 1,000?
20       A.   Yes.
21       Q.   More than 5,000?
22       A.   I don't know.
23       Q.   More than 2000?
24       A.   It is probably more than 2000.
25       Q.   Mr. Frederick asked you a number of questions

---

282

1   about whether passing a bill without the two-thirds rule
2   was somehow against or contrary to the rules, and you
3   testified that, in fact, it was consistent with the
4   rules.  Is that -- do you remember that testimony?
5       A.   Yes.
6       Q.   Isn't it true, though, that the two-thirds rule
7   is the default rule for bills in the Senate?
8            MR. FREDERICK:  Object, assumes facts not
9   in evidence.
10           You may answer.
11       A.   I don't know that I would characterize it as
12   default.  I think it chooses to impose, through its
13   calendar mechanisms and its calendar systems, I think
14   the Senate chooses to require a two-thirds vote on a lot
15   of the legislation that it passes.
16       Q.   (By Ms. Berkower)  The Senate makes its own
17   rules each session, correct?
18       A.   Yes.
19       Q.   And under the rules in 2009 and 2011, which you
20   have testified are substantially similar, is that
21   accurate?
22       A.   Yes.
23       Q.   So under those two sessions rules, isn't it
24   true that most bills were subject to the two-thirds vote
25   mechanism?

---

283

1            MR. FREDERICK:  Objection, assumes facts
2   not in evidence.
3       A.   I think that many of the bills were considered
4   out of the regular calendar order.
5       Q.   (By Ms. Berkower)  But unless two-thirds vote
6   was successful, would those bills have been able to be
7   considered out of the regular calendar order?
8       A.   The rules do not allow for a bill to be
9   considered out of the regular calendar order unless the
10   rules are suspended.
11       Q.   And that requires a two-thirds vote; is that
12   correct?
13       A.   Yes.
14       Q.   So is it safe to say that the default under
15   those rules is a two-thirds vote is required to suspend
16   the usual order of business?
17           MR. FREDERICK:  Objection, assumes facts
18   not in evidence.
19       A.   I think that the default is under the rules.
20       Q.   (By Ms. Berkower)  Is it implicit in those
21   rules?
22       A.   No, I don't think it is implicit in the rules.
23       Q.   How is it not implicit in those rules?
24           MR. FREDERICK:  Objection, form.
25   Objection, vague.

---

284

1       Q.   (By Ms. Berkower)  You may answer.
2       A.   I think that the rules provide a calendar
3   mechanism.  As a general practice most legislative
4   bodies have provisions for suspending the rules to take
5   bills up out of order, the Texas Senate is no different,
6   and that is what is contained in the Senate Rules, a
7   regular calendar order, orders for the day, if you will,
8   and a requirement within the rule that if that calendar
9   is not followed then it requires a two-thirds vote to
10   take a bill up out of the calendar order.
11      Q.   Would you agree that, to the extent that the
12   2009 and 2011 rules carve out specific types of
13   legislation for which a two-thirds vote is not required
14   but a majority vote is required to take business out
15   of -- to take up bills out of the normal order of
16   business, that that would be different from the rules
17   for other bills?
18           MR. FREDERICK:  Objection, assumes facts
19   not in evidence.
20      A.   I think that the rules provide that bills
21   relating to voter ID requirements may be made a special
22   order with a majority vote of the members of the Senate
23      Q.   (By Ms. Berkower)  And that rule puts voter ID
24   legislation in a separate category from other bills; is
25   that correct?

## 285

1    A.   For purposes of setting special orders, yes.
2    Q.   So while it is within the confines of the rules
3   to pass -- or to set voter ID legislation as a special
4   order by a majority vote, it is different from the
5   practices that would be required to set other types of
6   legislation as a special order; is that correct?
7    A.   I think the rule is clear that it takes a
8   majority vote to set bills relating to voter ID
9   requirements as a special order; and that bills that are
10  not voter ID can take a two-thirds vote to be set as
11  special orders.
12   Q.   And the Legislature chose to make that -- the
13  Senate, sorry, chose to make that distinction when it
14  passed its rules, correct?
15   A.   The Senate adopted its rules and wrote those
16  rules, yes.
17   Q.   Okay.
18        MS. BERKOWER:  I don't have any further
19  questions.
20        MR. FREDERICK:  Nor I.
21        (Deposition concluded.)
22
23
24
25

## 286

1
2                    CHANGES AND SIGNATURE
2      PAGE     LINE    CHANGE      REASON
3      _____
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____

## 287

1    _____
2    _____
3    _____
4    _____
5        I, KARINA CASARI DAVIS, have read the
6   foregoing deposition and hereby affix my signature that
7   same is true and correct, except as noted above.
8
9                    _____
9                    KARINA CASARI DAVIS
10  STATE OF TEXAS   )
11  COUNTY OF TRAVIS )
12       Before me,_____, on this
13  the day personally appeared KARINA CASARI DAVIS known to
14  me to be the person whose name is subscribed to the
15  foregoing instrument and acknowledge to me that they
16  executed the same for the purposes and consideration
17  therein expressed.
18       Given under my hand and seal of office
19  this _____ day of _____, 2012.
20
21
22                    _____
23                    NOTARY PUBLIC IN AND FOR
23                    THE STATE OF_____
24
25

## 288

1              IN THE UNITED STATES DISTRICT COURT
1               FOR THE DISTRICT OF COLUMBIA
2
3   STATE OF TEXAS             §
3        Plaintiff,            §
4   VS.                        §
4                              §
5   ERIC H. HOLDER, JR., IN    §
5   HIS OFFICIAL CAPACITY AS   §
6   THE ATTORNEY GENERAL OF THE §
6   UNITED STATES,             §
7        Defendant,            §
7                              §
8   ERIC KENNIE, ET AL.,       §
8        Defendant-Intervenors, §
9                              §
10  THE TEXAS STATE CONFERENCE  §
10  OF NAACP BRANCHES, et al.,  §  CASE NO. 1:12-CV-00128
10        Defendant-Intervenors, §  (RMC-DST-RLW)
11                             §  Three-Judge Court
11  TEXAS League OF YOUNG       §
12  VOTERS EDUCATION FUND,      §
12  et al.,                    §
13        Defendant-Intervenors, §
14  TEXAS LEGISLATIVE BLACK     §
14  CAUCUS, et al.,            §
15        Defendant-Intervenors, §
16  VICTORIA RODRIGUEZ, ET AL., §
16        Defendant-Intervenors. §
17  ***********************************************
17              REPORTER'S CERTIFICATION
18              DEPOSITION OF KARINA CASARI DAVIS
18                    JUNE 15, 2012
19  ***********************************************
20       I, CAROLINE CHAPMAN, Certified Shorthand
21  Reporter in and for the State of Texas, hereby certify
22  to the following:
22       That the witness, KARINA CASARI DAVIS was
23  duly sworn by the officer and that the transcript of the
24  oral deposition is a true record of the testimony given
25

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS      )
                    )
                    )
VS.                 )  NO. 12-CV-128
                    )  (DST, RMC, RLW)
                    )
ERIC H. HOLDER, JR.,)
ET AL               )
*************************************************
     ORAL DEPOSITION OF SENATOR WENDY DAVIS
*************************************************

     ANSWERS AND DEPOSITION OF SENATOR WENDY DAVIS, a
witness called by the United States taken before Janalyn
Reeves, Certified Shorthand Reporter for the State of
Texas, on the 6th day of June, 2012, between the hours
of 1:30 p.m. and 3:48 p.m., at 48 East Avenue, Austin,
Texas, pursuant to the agreement of counsel for the
respective parties as hereinafter set forth.

## 2

1
2
3     A P P E A R A N C E S
4
      FOR THE PLAINTIFF, STATE OF TEXAS:
        OFFICE OF THE ATTORNEY GENERAL
      By:  MR. MATTHEW FREDERICK
           209 West 14th Street
           Austin, Texas  78701
           PH: (512) 936-2779

      FOR THE DEFENDANT:
        DEPARTMENT OF JUSTICE
      By:  MR. VICTOR WILLIAMSON
           950 Pennsylvania Avenue, NW
           Washington, DC 20530
           PH: (800) 253-3931
      FOR THE INTEVENORS:
        BRAZIL AND DUNN
      By:  MR. CHAD DUNN
           4201 Cypress Creek Parkway
           Suite 530
           Houston, Texas  77068
           Ph: (281) 580-6310

## 3

1                    INDEX
2                              PAGE
3     Appearances........................     2
4
5     SENATOR WENDY DAVIS
        Examination by Mr. Frederick ..........     4
6
7     Signature and Changes ....................     82
8
9     Reporter's Certificate ...................     84
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 4

1                SENATOR WENDY DAVIS,
      having being first duly sworn, testified as follows:
2                    EXAMINATION
      BY MR. FREDERICK:
3       Q.  Good afternoon, Senator Davis.  My name is Matt
4     Frederick.  I'm with the Texas Attorney General and I
5     represent the State of Texas.  Would you please state
6     your full name for the record?
7       A.  Wendy Russell Davis.
8       Q.  Senator Davis, have you been deposed before?
9       A.  Yes, I have.
10      Q.  How many times?
11      A.  Once.
12      Q.  And do you remember the case that that was for?
13      A.  Yes, it was in our redistricting litigation.
14      Q.  Is there anything that will prevent you from
15    accurately answering my questions today?
16      A.  No.
17      Q.  Okay.  Just in case you don't remember from your
18    redistricting experience, I'll go over some brief ground
19    rules.  One, answer audibly so the court reporter can
20    get it on the record.  So rather than nodding your head
21    say, "yes"?
22      A.  Okay.
23      Q.  If you don't understand a question I ask, please
24    let me know and I'll be happy to rephrase.  Okay?
25      A.  Okay.

Senator Wendy Davis                                    June 6, 2012

## 5

1    Q. And again, so the court reporter can get
2  everything on the record, please try and wait until I
3  finish my question to start answering.  I will also try
4  and not answer -- not ask a question while you are
5  answering.
6    A. Okay.
7    Q. Your lawyer may object to a question.  Unless he
8  instructs you not to answer, you may still answer the
9  question.
10    A. All right.
11    Q. Are you represented by council today?
12    A. I am.
13    Q. And who is that?
14    A. Chad Dunn is here with me today.  I'm also
15  represented by Jerry Hebert.
16    Q. Okay.  When did that representation begin?
17    A. I don't recall.
18    Q. What did you do to get ready for your deposition
19  today?
20    A. I reviewed, by e-mail, a few of the amendments
21  that I had introduced during the voter ID debate on the
22  Senate floor.
23    Q. Anything else?
24    A. That's it.
25    Q. Okay.  Did you meet with anybody to prepare for

## 6

1  your deposition?
2    A. No, I did not.
3    Q. Did you talk to your lawyer?
4    A. Yes.
5    Q. How many times did you meet with your lawyer
6  before your deposition?
7    A. I didn't meet with him.  We had one very brief
8  phone conversation yesterday.
9    Q. Did anyone else participate in that phone
10  conversation?
11    A. No.
12    Q. Have you spoken to anyone else about your
13  deposition today?
14    A. No.
15    Q. And other than the amendments that you mentioned
16  did you review any other documents to prepare for your
17  deposition?
18    A. No.
19    Q. Did you bring any documents with you today?
20    A. I did not.
21    Q. Are you currently registered to vote?
22    A. Yes.
23    Q. Do you have a current Texas driver's license?
24    A. Yes.
25    Q. Do you have a concealed handgun license?

## 7

1    A. No.
2    Q. Do you have a passport?
3    A. Yes.
4    Q. Are there other members of your household who are
5  voting age?
6    A. Yes.
7    Q. Are the voting age individuals in your household
8  registered to vote?
9    A. Yes.
10    Q. And do those individuals have a current Texas
11  driver's license?
12    A. Yes.
13    Q. Can you describe, generally, your own involvement
14  with Senate Bill 14?
15    A. Yes.  I participated in a dialogue and a debate
16  about the bill on the Senate floor.  I opposed the bill
17  and introduced amendments that I thought could improve
18  upon it.
19    Q. Do you recall how many amendments you offered?
20    A. I do not.  Probably less than ten.
21    Q. Were any of those amendments accepted?
22    A. One was.  But not as I had offered it.  I offered
23  an amendment that addressed the issue of persons who
24  were indigent.  To provide an opportunity for them to
25  vote a provisional ballot by swearing to their indigency

## 8

1  and allowing the election judge to accept their vote.
2  That was modeled after what I had read in the Supreme
3  Court opinion that upheld the Indiana voter ID law.
4    The Court specifically noted that the indigency
5  exception was included in that law.  And from my reading
6  of the Supreme Court opinion, they believed that it was
7  constitutional based on the fact that that exception had
8  been included within it.  I argued that point on the
9  Senate floor.  The amendment was tabled.
10    But Senator Duncan, I think, considering my
11  arguments, at some point during the debate asked that an
12  amendment be drawn up under his name that did,
13  essentially, the same thing.  He actually improved the
14  way it was written, I thought.  And he introduced the
15  amendment then and asked that I be shown also as an
16  author of that amendment since I had originally
17  introduced it.  And it was included in the Senate bill.
18  But it's my understanding that it was stripped out in
19  the conference committee.
20    Q. And in your understanding, was it stripped in the
21  Senate conference committee or by the House conference
22  committee?
23    A. I don't know.
24    Q. Under that amendment did it provide -- and I'll
25  ask about your original amendment for now.  You said it

Senator Wendy Davis                                      June 6, 2012

9

1  allowed an indigent person to sign an affidavit of
2  indigency; is that right?
3      A. Yes.
4      Q. And would that, assuming that the affidavit were
5  accepted, would that allow the vote to be counted?
6      A. Yes.
7      Q. Okay. So it wasn't just a provisional ballot
8  that would have to be cured at a later date?
9      A. I believe that's true, though that is not one of
10 the amendments that I went back and read. The one that
11 actually was included that Senator Duncan introduced, so
12 I don't recall. But I'm sure it's very easy to find.
13     Q. Okay. And to the extent you can recall, did
14 Senator Duncan's amendment that listed you as a
15 co-author, did it also provide that an indigent person
16 could swear -- could sign an affidavit and have his or
17 her vote counted?
18     A. Yes.
19     Q. And so it would not have to be cured later by
20 showing a photo ID?
21     A. I think that's correct, yes.
22     Q. Why -- why did you offer an amendment providing
23 for an accommodation for indigent voters?
24     A. One of the pieces of information that I
25 introduced during the debate, I had a large display

10

1  board that I had had created for purposes of introducing
2  that amendment. And on the display board I demonstrated
3  the underlying documentation that is required in the
4  State of Texas in order to be issued, either a driver's
5  license or a State ID through the Department of Public
6  Safety. And each of those underlying documents has a
7  cost associated with them. For example, a birth
8  certificate. I don't remember what some of the others
9  were, a passport.
10     And I demonstrated the circularity that occurs in
11 order to get this document, you need to have these
12 underlying documents. And in order to get a different
13 document, you needed some of the same underlying
14 documents. And for each ID or form of ID that was
15 acceptable, subsumed within them were other forms of ID
16 that also cost money.
17     My concern was that, based on information that we
18 received as part of the hearing and also in the hearing
19 in the prior legislative session, a number of persons
20 who do not have current State IDs and yet who are
21 currently legally voting, do not have the underlying
22 documentation in order to go and get those IDs. I was
23 concerned that a person who didn't have the means to be
24 able to get the underlying documents, even if the State
25 ID were offered to them for free, would be in a position

11

1  where their right to vote, which they currently exercise
2  today, would be threatened.
3      Q. So you were concerned that because of the
4  potential costs that might be imposed as a result of an
5  ID requirement, that a person might not be able to
6  afford to get an ID; is that right?
7      A. That's right.
8      Q. Was it your understanding or belief that an
9  exception allowing for indigent voters to sign an
10 affidavit rather than present photo ID, was it your
11 understanding that that amendment would have alleviated
12 any negative effect of SB 14?
13     A. It would have alleviated a significant negative
14 effect. But there were other amendments that I offered
15 as well that were unique, they each had unique concerns
16 behind them that were also important, I felt.
17     Q. I believe it was said on the Senate floor that
18 there was a concern that SB 14, if enacted, would have
19 some impact on African-American and Latino voters; is
20 that right?
21     A. Yes.
22     Q. And is that your -- is that your belief about
23 SB 14 as well?
24     A. My belief about SB 14 is that it has a uniquely
25 negative impact on persons who are currently voting

12

1  today, and who do not have the means to go out and get
2  an adequate form of ID under the way that that law was
3  passed. Information that was presented to us as part of
4  that hearing and part of the legislative session
5  indicated that that disproportionately impacted persons
6  of color, Latino and African-American primarily.
7      I also had concerns about persons who were voting
8  today who would not have their vote accepted in the
9  future. Not because they didn't have the means to
10 receive an ID, but because there may be some unintended
11 or unknown discrepancy on their voter ID card and their
12 State ID.
13     I specifically introduced an amendment for women
14 who were recently married or divorced. I believed it
15 was important. And it also was modeled after something
16 that was part of the Indiana law and that was
17 specifically spoken to in the Supreme Court's opinion.
18 The Lieutenant Governor indicated to me privately that
19 he believed that was a good exception, a good amendment
20 and that he would push that be approved through
21 Congress, although I don't believe that occurred. It
22 wasn't added.
23     I also had a fairly broad amendment for
24 discrepancies where your name may not exactly match
25 what's on your voter ID card. My own driver's license,

Senator Wendy Davis                                    June 6, 2012

## 13

1  for example, and my voter ID card do not have an exact
2  match.  My own driver's license says Wendy Russell Davis
3  on it.  My voter ID card, when I received it a few weeks
4  ago, said Wendy Davis.
5       And I had another broad amendment for a situation
6  where a person's address may not match exactly on their
7  voter ID card as it is on their driver's license.  And a
8  situation where a person may have moved subsequent to
9  getting either of those two forms of voter documentation
10  and they won't be the same because one had been changed
11  while the other one had not yet been changed.
12       It's a broader concern for me that there are a
13  number of people in the State of Texas who will show up
14  to vote, if this law goes into effect, who will not have
15  the opportunity to vote because our amendments that
16  would have allowed, in most of those situations at
17  least, for a provisional ballot to be provided to that
18  voter are not going to be provided.
19       Q.  Is it your understanding, then, that as enacted,
20  the law would not permit a person who appears to vote
21  without a qualifying photo ID to cast a provisional
22  ballot?
23       A.  Can you repeat your question?
24       Q.  Of course.  In your understanding of SB 14 as
25  enacted, would a person who shows up to vote at the

## 14

1  polls without one of the forms of ID required, would
2  that person still be able to cast a provisional ballot?
3       A.  Well, this is a good question.  And it was part
4  of a question in the debate about the bill.  While the
5  bill may address that, I had a great concern about what
6  the training for our elections officials would be.  And
7  we spent a significant amount of time talking about
8  whether there were any resources being committed by the
9  State to train our election administrators, thousands
10  and thousands of them across the State, on exactly how
11  the deal with issues like that.  If you have a voter who
12  comes in and their ID does not exactly match, what
13  should be done in that situation.
14       And I know from experience at my own polling
15  location a few months ago, when the elections
16  administrator who was working the poll the day that I
17  voted looked at my voter ID card and my license, she
18  said to me, "This won't be acceptable in November.
19  You're going to have to clear this discrepancy."  So
20  that was her understanding.  And that's a very important
21  concern, I think.
22       But regardless of what the law specifically says,
23  there is going to be, I think, a tremendous lack of
24  understanding in those who are asked to administer it
25  because the State didn't commit any resources for that

## 15

1  training.
2       Q.  The election worker that you just mentioned at
3  your polling place, to your knowledge, had that person
4  received any education or training on how SB 14 would
5  work?
6       A.  I don't know.  I know we didn't commit any
7  resources to that kind of training at the State level.
8       Q.  To your knowledge, has any -- have any training
9  materials on SB 14 been delivered to anyone in the
10  State?
11       A.  I don't know.
12       Q.  Did you -- did you write any articles or op-eds
13  about SB 14?
14       A.  Not that I recall.
15       Q.  Did you give any speeches outside the legislature
16  about SB 14?
17       A.  Not that I recall.
18       Q.  Do you recall any public statements that you made
19  about SB 14?
20       A.  Probably as I spoke to people in wrap up about
21  what happened in this past legislative sessions.  It was
22  one of the items that I mentioned, but I have never
23  given a presentation specific to that bill.
24       Q.  When you say "wrap up," what do you mean by that?
25       A.  I'm asked, as I'm sure all legislators are, to

## 16

1  speak to different organizations in my district about
2  what happened in the most recent legislative sessions.
3       Q.  So this is kind of a summary of what's happened
4  in this session that you provide in your district?
5       A.  Yes.  Yes.
6       Q.  Did you talk -- did you talk to any lobbyist
7  about SB 14, either before or during the 2011 session?
8       A.  Not that I recall.
9       Q.  Did you speak to any advocacy group about SB 14,
10  either before or during the 2011 session?
11       A.  Not independent of hearing testimony on the
12  Senate floor.
13       Q.  Did you for the -- well, for either -- I guess it
14  would have been in the committee.  But did you have any
15  witnesses appear to give testimony on SB 14?
16       A.  I, specifically, did not request any witnesses to
17  appear, no.
18       Q.  Did any of your constituents appear to testify
19  about SB 14?
20       A.  I don't recall if anyone from SD 10 was there.
21       Q.  Do you recall if anyone from your district
22  testified about the previous voter ID bill from 2009?
23       A.  I don't recall.
24       Q.  Do you recall whether you spoke to any lobbyist
25  or advocacy group about the previous 2009 voter ID bill?

Senator Wendy Davis                                    June 6, 2012

## 17

1    A. I don't recall.
2    Q. Have you spoken -- you mentioned the wrap ups.
3  Have you spoken to any of your constituents about SB 14?
4    A. I can recall having just general conversations
5  with people who have asked questions and expressed
6  concerns about it. But I can't point to anything in
7  particular.
8    Q. Do you recall having any conversations about
9  SB 14 with constituents, either during the legislative
10 session or -- or before?
11   A. I don't recall. I'm sure that we received
12 e-mails on this issue, both in favor and against it.
13   Q. Do you recall, I know that it's a long time ago
14 now, but do you recall roughly what the proportion was
15 of support and opposition?
16   A. I don't. I don't.
17   Q. To the best of your knowledge, do any of your
18 constituents support photo ID requirements for voting,
19 generally?
20   A. I believe that many of my constituents do.
21   Q. And to the best of your knowledge, do any of your
22 constituents oppose a photo ID requirement for voting?
23   A. I believe that many of them oppose it as well.
24   Q. And in your understanding, do any of your
25 constituents support SB 14?

## 18

1    A. I don't know that any of my constituents
2  understand the particulars of SB 14.
3    Q. Do you know whether any of your constituents
4  oppose SB 14?
5    A. Same answer. I'm not sure any of them understand
6  the specifics.
7    Q. Did you prepare any talking points related to
8  SB 14?
9    A. For my introduction of amendments on the Senate
10 floor or to the public at large?
11   Q. Let's start within the legislature. Did you
12 prepare any talking points or -- for any consideration
13 of SB 14 or an amendment?
14   A. My staff may have helped to prepare talking
15 points, which is typical when I'm introducing amendments
16 to bills. I don't recall personally preparing any
17 talking points. I'm sure I made little notes to myself
18 ahead of time.
19   Q. Did anyone outside of the legislature prepare
20 talking points for you on SB 14?
21   A. No.
22   Q. Did anyone outside the legislature, at any time,
23 provide you with talking points about voter -- photo
24 voter ID legislation?
25   A. No.

## 19

1    Q. Did anyone outside of the legislature provide you
2  with any kind of background materials on photo ID
3  legislation?
4    A. Not that I recall.
5    Q. Do you know whether anybody outside the
6  legislature provided your staff with materials on photo
7  ID legislation?
8    A. I don't know.
9    Q. And I can hear myself kind of going back and
10 forth. When I say "photo ID legislation" or "voter ID
11 legislation," what I intend to refer to is legislation
12 that would require a photo ID to vote.
13   A. Yes, I understand your question that way.
14   Q. Can you recall anyone providing you with -- with
15 materials about SB 14 or voter ID legislation?
16   A. I don't recall. We have a Democratic caucus, a
17 Senate caucus and we have a caucus staff person who
18 sometimes sends e-mails to us prior to working on
19 particularly controversial issues. I don't recall him
20 having sent anything to us for that, but he may have.
21   Q. Do you recall whether the Senate Democratic
22 caucus provided any -- well, I'll start with talking
23 points, any talking points for members for committee or
24 floor debate?
25   A. Not that I recall. I know for my own preparation

## 20

1  I concentrated very specifically on the Indiana law that
2  had been upheld and the reasons that the Supreme Court
3  gave for upholding it. I'm an attorney myself, so I
4  read that with my own lawyer hat on, I guess, for lack
5  of a better way of saying it. So that I would
6  understand the nuances of what they found to be
7  supportable in the law, and also expressed concerns that
8  they may have made. And having read that really formed,
9  for me, the background of the amendments that I
10 introduced and the arguments that I made in introducing
11 them.
12   Q. And that's the Crawford versus Marion County
13 case?
14   A. Yes.
15   Q. Okay. Did the Senate Democratic caucus provide
16 any -- any material that you can recall specific to
17 SB 14?
18   A. I do not recall. It's possible, but I don't
19 recall anything specific.
20   Q. Do you recall whether the Senate Democratic
21 caucus provided its members with any material specific
22 to SB 362, the 2009 voter ID bill?
23   A. I can't recall. I do believe that we were
24 provided with a copy -- I don't remember if this came
25 from my staff or if it came from our caucus staffer, but

Senator Wendy Davis                                    June 6, 2012

---

21

1  I recall reading the Baker-Carter report on photo voter
2  ID and their recommendations.  And reading that, both
3  prior to the 81st legislative session debate on the bill
4  and the 82nd legislative debate on the bill, and I
5  specifically asked the bill's author questions from that
6  report as to why some of the recommendations were
7  advanced in the bill while others were not.
8     Q.  Did you, your staff, conduct any studies about
9  the potential impact of SB 14?
10    A.  No.  Not personally, no.
11    Q.  Did you or your staff review any studies about
12 the potential impact of SB 14?
13    A.  Information was introduced in each of the two
14 sessions where the bill was debated as part of our
15 hearing.  I don't recall whether anything independent of
16 that was provided to me.
17    Q.  And when you say that "information was provided,"
18 is that information that was either discussed or
19 introduced into the official record?
20    A.  Yes, both oral testimony and I believe some
21 written testimony as well.
22    Q.  How does that typically work in the Senate?  Is
23 there kind of an organized distribution of materials to
24 senators before a debate?
25    A.  No.  There's -- especially in the context of this

---

22

1  situation, in both the 81st and the 82nd legislative
2  session, this bill was advanced using a procedural
3  maneuver that assured that it would be debated outside
4  the typical Senate rules.  Typically a bill is sent to a
5  specific committee and debated prior to being sent to
6  the floor for a vote.  And also, typically a bill
7  requires two-thirds of the members to advance the bill
8  to the floor for debate.  In both of the two sessions
9  where this bill was debated, those rules were set aside
10 for procedural maneuver that allowed that.  And so in
11 each of them, the committee hearing that took place on
12 the bill was simultaneous, really, with the Senate floor
13 debate.
14    We functioned as Committee of the Whole.  And we
15 took testimony actually on the Senate floor which is
16 very unusual.  So it was all simultaneously done as part
17 of our debate on the bill.  And it was also the case
18 that the bill was advanced without the requirement of
19 the two-thirds vote in the Senate.
20    Q.  And the two-thirds requirement, was that -- was
21 there a -- there was a specific rule, a Senate rule
22 adopted that created a particular rule for voter ID
23 bills; is that right?
24    A.  My recollection was that the bill was advanced in
25 both sessions prior to the adoption of the Senate rules.

---

23

1  The Senate rules are adopted usually the first day that
2  we actually convene to do business as a body.  And by
3  advancing this bill prior to the adoption of those
4  rules, it was allowed to come forward without a
5  two-thirds requirement.
6     I know that's what happened in the 81st session.
7  I think that's what happened in the 82nd session, though
8  I may be -- I may be remembering that incorrectly.  It
9  may have occurred through a different kind of procedural
10 mechanism.  But it certainly was something outside of
11 our regular rules.
12    Q.  And when you say it "was advanced prior to
13 adoption of the Senate rules," do you mean it was
14 introduced or filed prior to the adoption of the rules?
15    A.  This bill -- in the 82nd session the governor
16 advanced it as a piece of emergency legislation, and
17 because of that, it came outside the regular process and
18 procedures.  And it was advanced at the very, very
19 outset of the session so that it could move to the floor
20 prior to the adoption of the rules.  I believe that's
21 correct.
22    Q.  How does -- how does the governor's designation
23 of a bill as emergency legislation, how does that affect
24 the procedures that apply to that bill in the Senate?
25    A.  It moved it up in the priority order of bills to

---

24

1  be considered.  In the Senate, what typically happens is
2  a blocker bill is filed at the outset of the legislative
3  session.  It's a bill that the Republican and Democratic
4  senators agree will not ever be advanced.  So what the
5  two-thirds rule allows is for a bill to move outside the
6  regular order of business and go in front of that
7  blocker bill that's not been advanced.  Where a piece of
8  emergency legislation is filed, it can advance outside
9  of that path.
10    Q.  Okay.  Is it, in your understanding, is it
11 sufficient for -- is the governor's emergency
12 designation, is that sufficient to take a bill, for lack
13 of a better word, outside of the two-thirds blocker bill
14 procedure?
15    A.  No.  No.  In this instance, if I'm remembering
16 this right, I believe that his emergency designation on
17 the voter ID bill occurred and the bill moved forward
18 prior to adoption of the rules and the filing of the
19 blocker bill.  So there was no blocker bill in front of
20 it or the rules that required two-thirds support to move
21 a bill outside the order had not yet been adopted.  But
22 it was the only of the governor's pieces of emergency
23 legislation that advanced in that way.  The others came
24 in through the two-thirds rule.
25    Q.  Okay.  What is the -- well, let's back up a bit.

Senator Wendy Davis                                    June 6, 2012

---

### 25

1  When we talk about the two-thirds rule, am I correct in
2  understanding that -- so you said there's a blocker bill
3  that's kind of put at the front of the line.  Is that
4  accurate?
5      A.  Yes.
6      Q.  And the two-thirds vote is necessary to -- does
7  it suspend the regular order of business?
8      A.  Yes, that's exactly what it does.
9      Q.  And so by suspending the regular order of
10  business, that two-thirds vote allows for a bill to be
11  considered out of order.  Is that -- is that a fair --
12      A.  Yes.  Yes.
13      Q.  So in some sense, the -- what's thought of as the
14  normal Senate procedure is to suspend the regular order
15  of business?
16      A.  Yes.
17      Q.  Are there other -- are there any other ways in
18  the Senate that a bill can not have to go through the
19  two-thirds vote?
20      A.  There was another procedural maneuver used this
21  session that I'm not sure had been used before.  And my
22  memory is fairly vague on it.  But it was on what we
23  call House bill day.  It's when a group of House bills
24  come over and we didn't have a blocker bill in the order
25  of business on the House bills.  So a bill came through

---

### 26

1  without having to come outside the regular order of
2  business.  And therefore, the parliamentarian rules that
3  that House Bill could be considered even though it
4  didn't have a two-thirds vote to bring it to the floor.
5      And it was another controversial bill.  I believe
6  it was the sanctuary city bill.  It may have been the
7  sonogram bill, but it was one of those.
8      Q.  So on a House -- on House bill day, is it
9  customary to have a blocker bill or not?
10      A.  Yes.  Well, let me -- let me say that
11  differently.  I'm not sure that anyone had ever really
12  addressed that question before.  And it took a great
13  deal of debate in front of the parliamentarian before
14  she ruled on what should happen.
15      I think it had always been assumed that the
16  Senate blocker bill served as a blocker bill regardless
17  of whether a bill was coming over on House bill day or
18  whether it was coming in the regular order of business
19  through the Senate.  And this was the first time that
20  the question had been pressed.  And honestly, it caught
21  the Democratic minority party off-guard.  And we
22  believed that it shouldn't advance, but the
23  parliamentarian ruled that it should.  So when I
24  answered your question "yes," I think that going
25  forward, that's what she would rule.  That on House bill

---

### 27

1  day, unless you've got a blocker House bill there, as
2  long as it's the next one coming up in line, you can go
3  ahead and consider it.
4      Q.  And so are you aware in the 81st Legislature or
5  any previous legislature, are you aware of a blocker
6  bill being filed in the Senate on House bill day?
7      A.  I'm not aware that that question had ever arisen
8  or that anyone considered that there needed to be a
9  separate House blocker.
10      Q.  So to the best of your knowledge, there had not
11  been a specific blocker bill filed in the Senate on
12  House bill day?
13      A.  It would be a House bill blocker.  And to my
14  knowledge, that had never been considered or debated.
15  It was always assumed that the Senate blocker bill
16  served as a blocker for all legislation whether it
17  originated in the House or the Senate.
18      Q.  Is the blocker bill, is that something that is
19  typically provided in the Senate rules themselves?
20      A.  Yes.  Just under the regular order of business,
21  that's how it's discussed.  It's not called a blocker
22  bill.  But there's a rule about the fact that bills must
23  be taken up in order as they come, essentially.  And
24  that in order to bring a bill up to the floor outside of
25  the order, there needed to be a two-thirds vote of the

---

### 28

1  membership to allow for that to happen.
2      Q.  I see.  So there's no -- if I understand
3  correctly, there's not a rule that says a blocker bill
4  or a --
5      A.  Correct.
6      Q.  Any bill shall be filed and not acted upon?
7      A.  Correct.
8      Q.  But the regular order of business says you take
9  bills in order, right?
10      A.  Yes.
11      Q.  And it's customary to file a bill that's known as
12  a blocker bill that sits at the front of the line?
13      A.  It has always been the tradition of the Senate to
14  do that, yes.  I'm not aware of any session that's ever
15  been conducted without that practice.
16      Q.  Are you -- are you aware of any -- any other
17  bills that have been considered, I guess the word would
18  be in the regular order of business?  And by that I mean
19  without the two-thirds procedure?
20      A.  As I said, I believe either the sanctuary city
21  bill -- I believe it was the sanctuary city bill, I
22  think essentially there was a two-thirds vote sufficient
23  to bring the sonogram bill forward to the floor.  There
24  was another controversial bill this session that came
25  out of the order of business.  Again, it was the House

Senator Wendy Davis                                    June 6, 2012

## 29

1   bill day one, but I don't recall what it was.
2       Q.  In the regular order of business in the Senate,
3   how many votes are necessary to pass a bill?
4       A.  There are 31 members of the Senate.  It requires
5   21 of us to vote to bring a bill to the floor for
6   debate.  And after it's brought to the floor on second
7   reading, it only requires a simple majority in order to
8   pass a two-third reading and then to pass it on to the
9   House.
10      Q.  And you say there are 21 votes required to bring
11  it to the floor.  Is that -- is that the regular order
12  of business or is that the -- or is that to suspend the
13  regular vote?
14      A.  That's to suspend, because every time we bring a
15  bill we're suspending the regular order because of that
16  blocker bill.
17      Q.  Okay.  But if there were not a blocker bill in
18  place for whatever reason?
19      A.  Then the next bill that was in line would be the
20  one that could come up outside of a two-thirds vote.
21  But as long as it wasn't the one in the front, every
22  other bill behind it would have to come up under a
23  two-thirds vote.  It would just depend on what the
24  natural order of the bills was as they were advanced
25  through committee and sent to the Senate floor.

## 30

1       Q.  So if there were no blocker bill for whatever
2   reason, then to bring a bill to the floor, how many
3   votes would that require?
4       A.  If there were no blocker bill and it was the
5   first one in line, it would only require a simple
6   majority.
7       Q.  Do you recall seeing any studies about -- about
8   the impact of a photo ID law on voter turnout?
9       A.  I recall there being testimony about that.  And
10  there was likely written testimony introduced, but I
11  don't recall specifically what it said.
12      Q.  Do you recall generally whether there was
13  testimony or evidence of studies showing that photo ID
14  laws would increase turnout?
15      A.  No.
16      Q.  Do you recall seeing or hearing about any studies
17  that showed a decrease in turnout caused by photo ID
18  laws?
19      A.  I generally recall from the Carter-Baker report
20  that the express concern that that would be the
21  consequence of a voter ID law without adequate
22  compensating procedures to prevent that.  Very
23  specifically they talked about same day voter
24  registration, they talked about mobile voter
25  registration drives, and they talked about a fairly

## 31

1   delayed time period between adoption of such a rule and
2   implementation with a very well funded education system
3   that would be part of moving to a photo ID -- a photo ID
4   requirement.
5       Q.  Okay.  I'm sure I could read it in the report.
6   But do you recall what the -- what the recommended
7   advance period was in the Carter-Baker report?
8       A.  I'm sorry.  I don't.  I know that amendments were
9   introduced in both sessions on those counter balances,
10  recommendations that were in the Carter-Baker report to
11  enhance and improve the opportunity for people to vote
12  in spite of a photo ID requirement, but none of those
13  was accepted as part of the bill.
14      Q.  Now, in the ordinary course of business in the
15  Senate, a bill is referred to you -- you said a specific
16  committee?
17      A.  Correct.
18      Q.  And -- but SB 14 was referred to the Committee of
19  the Whole, right?
20      A.  Correct.
21      Q.  Is there a particular committee that SB 14 would
22  have been referred to had it not been referred to the
23  Committee of the Whole?
24      A.  I believe the committee -- I don't sit on it so I
25  may get the name of it wrong.  I believe it's called

## 32

1   Intergovernmental Relations.  I believe that's right.
2   And that's probably where it would have gone.  It could
3   have also gone through State Affairs.  I think either of
4   those would have been a logical place.
5       Q.  How many people typically are on a Senate
6   committee?
7       A.  Depends on the committee.  Some are as large as
8   15.  Others have, I think usually nine members.  And
9   some only have five.  It's always an odd number.
10      Q.  Uh-huh.  Do you know, as you sit here, how many
11  members the State Affairs Committee has?
12      A.  I believe State Affairs has nine members on it.
13      Q.  Okay.  Is the introduction of testimony and
14  evidence, is that limited in the Senate to the
15  committee?
16      A.  Yes.  As part of a Senate debate, we can
17  introduce information that we seek to be added as an
18  amendment to a bill.  And occasionally, but rarely, a
19  piece of information may be introduced to the secretary
20  of the Senate and a request made of her to pass it out
21  to the members for them to review prior to voting on a
22  bill.  It's fairly rare that happens, but sometimes
23  it does.
24      Q.  If that -- when that does happen, does the
25  material that gets submitted to the secretary, does that

## 33

1  become part of the record?
2       A.  If it's requested that that be done, it isn't
3  always the case.  But a member can move that a piece of
4  information that they've handed out to the other members
5  be included in the formal record and then the members
6  vote on whether they agree that that should occur.
7       Q.  In just a typical committee, who is allowed to
8  introduce evidence or provide witnesses on a committee?
9       A.  Any person who wishes to submit testimony to a
10  committee may do so.  The chair makes a decision on
11  whether that information can be submitted verbally or
12  whether in writing.  Sometimes a chair chooses only to
13  allow invited testimony.  And that invitation occurs at
14  the behest of the chair working with their staff.  And
15  then that testimony is the verbal testimony and all
16  other testimony that's introduced is done so in writing,
17  typically.  But cards are provided as part of committee
18  hearings for people to fill out, simply to express
19  whether they were in favor or against a bill.  And they
20  can put their name and their address and their
21  identifying information to create part of the formal
22  record.
23       Q.  Are members who don't sit on a committee allowed
24  to introduce evidence into the record?
25       A.  No.

## 34

1       Q.  When the Senate sits on the Committee of the
2  Whole, are all members allowed to introduce evidence
3  into the record?
4       A.  Yes.  And to -- just to supplement my answer to
5  your question a moment ago.  It's our tradition and our
6  courtesy to each other as a body, if we wish to
7  introduce testimony in a committee or evidence or
8  information in a committee, as a courtesy, a Senator not
9  sitting on the committee can request that that be done
10  through a member and the member -- I can't imagine a
11  situation where they don't agree to do that.
12       Q.  So occasionally it is possible for someone who's
13  not on the committee to, with the assistance of a
14  committee member, introduce evidence into the record?
15       A.  Yes.  Yes.
16       Q.  In an ordinary -- would it be accurate to refer
17  to what I'm calling an ordinary committee as a standing
18  committee?
19       A.  Uh-huh.  Yes.
20       Q.  In a standing committee, is it typical -- how
21  many Senators typically attend the proceedings of an
22  ordinary COMMITTEE?
23       A.  Sometimes all of the members on a committee are
24  present.  Sometimes not.  In order for a vote to be
25  taken, a quorum of the committee must be present.  In

## 35

1  fact, in order for a bill to be formally introduced to a
2  committee, a quorum must be present in order to move its
3  adoption before the committee.
4       Q.  How often do Senators who are not members of the
5  committee attend committee meetings?
6       A.  Fairly often because we introduce our own bills
7  to committees that we do not sit on.  While we do not
8  come and testify on behalf of other Senators bills or
9  provide evidence on bills that are not our own, we do
10  introduce our own bills before committee members if our
11  bill is being assigned to that committee.  So it's
12  fairly frequent that we appear at each other's committee
13  hearings.  We're usually given courtesy of sitting up at
14  the dios and we introduce our bill to the committee from
15  that position.
16       Q.  Is it typical for members not on the committee to
17  stay and listen to testimony on bills that they have not
18  introduced to the committee?
19       A.  Sometimes.  Any member is certainly provided the
20  courtesy of doing that.  And oftentimes if a bill is
21  particularly controversial or noteworthy, members
22  outside the committee will come and listen and actually
23  participate in asking questions of the witnesses at the
24  discretion of the chair.
25       Q.  Okay.  When the Senate sits as a Committee of the

## 36

1  Whole, does the chair have any discretion as to whether
2  a member of the Senate may question a witness?
3       A.  The chair in that situation is the Lieutenant
4  Governor.  I suppose he has that discretion.  I don't
5  recall any limitation of questions being a part of our
6  debate on SB 14.  Although there may have been time
7  constraints in terms of how long witnesses could
8  testify.  In fact, I'm fairly sure that there were.
9       Q.  Is it accurate to say that in the Committee of
10  the Whole any Senator has the right to introduce
11  evidence into the record?
12       A.  Yes.
13       Q.  Is it accurate to say that in the Committee of
14  the Whole any Senator has the right to question a
15  witness?
16       A.  Yes.
17       Q.  And I think you just said that in this -- in a
18  Committee of the Whole, the chair would be the
19  Lieutenant Governor?
20       A.  Correct.
21       Q.  Do you believe that SB 14 will have the effect of
22  denying or abridging African-American Texans right to
23  vote?
24       A.  Yes, I do.
25       Q.  What's the basis for that belief?

Senator Wendy Davis                                    June 6, 2012

---

37

1    A.  I believe that the bill will particularly have an
2  impact on abridging the right to vote of persons who are
3  of low income status, indigent status primarily.  There
4  was information, as I said earlier, that was introduced
5  into the record that that particular class of people in
6  the State of Texas disproportionately is made up of
7  persons who are African-American and Latino.  And that
8  therefore, if one could conclude that persons who are of
9  indigent status will no longer be able to meet the
10  requirements to vote in the State of Texas or to occur,
11  one could also conclude that that would have a
12  disproportionate impact on the African-American and
13  Latino community.
14    Q.  Is there any other reason that you believe SB 14
15  will have a negative impact on the African-American
16  community in Texas?
17    A.  I believe that that concern that I expressed
18  captures.
19    Q.  Do you believe that SB 14 will have the effect of
20  denying or abridging the right to vote of
21  African-American Texans who are not indigent?
22    A.  I believe it will disproportionately impact those
23  who don't ordinarily seek out a driver's license in the
24  State of Texas.  That person may not fall in an indigent
25  category, but my concern is that, particularly where no

---

38

1  funding was provided to create an -- a very broad based
2  education in the State about the photo ID requirement,
3  that many people will be caught off-guard by it.  That
4  those who use the bus for transportation, those who have
5  not had a driver's license for other purposes, will come
6  to vote and will not have the opportunity to do so.  Not
7  because, necessarily, at the end of the day all of them
8  fit into a category of a person who can't afford,
9  ultimately, to get an ID, but because no education
10  component was put in place to make sure that people are
11  aware.
12    Q.  Was there any evidence considered or presented in
13  the 81st or the 82nd Legislature that showed or that
14  attempted to show who -- how many non-indigent people
15  would maybe lack an ID?
16    A.  I believe the question was asked of the Secretary
17  of State, or a representative of the Secretary of
18  State's office, or any representative presumed to be
19  impacted by such as law.  I also recall that there
20  really was no specific information provided to us about
21  what that impact would look like.  And it was one of our
22  gravest concerns that we were moving forward on a bill
23  where no real analysis had been conducted with regard to
24  the disenfranchisement of persons who are currently
25  legally voting.

---

39

1    Q.  When you say -- when you say that "people who
2  would be impacted," do you mean people who might not
3  have the required ID?
4    A.  Yes.  We, you know, as part of our debate in both
5  sessions, members who are opposed to the bill raised the
6  concern that there would be a disproportionate
7  negative impact on persons in the African-American and
8  Latino community of current legal voting citizens.  And
9  we asked specifically that information be provided to us
10  that assured us that that negative impact would not
11  occur.  And it was fairly apparent to me and to many, and
12  I believe to others, that there was flagrant disregard
13  for whether it had that kind of impact.  And many of us
14  believed that that impact was the absolute intent of
15  that piece of legislation.
16    Q.  We may have already gone over this a little bit.
17  But you say many of us believed that that -- I don't mean to
18  misquote you, but many of us believed that there was a
19  negative impact on African-Americans, Latinos.  What
20  was -- I've asked you about the basis for your belief
21  about an impact.  Do you have a sense of what the
22  general basis of that belief was, that there would be a
23  negative impact on African-Americans and Latinos?
24    A.  Well, certainly information that was provided as
25  part of both the 81st and the 82nd legislation in our

---

40

1  discussions.  Testimony that was provided, as well as
2  information in the Baker-Carter report which
3  specifically refers to the possible impact on members of
4  those communities, those populations.  But the other
5  that was noted in both session's debate on the bill was
6  that there had not been any information put in front of
7  us as a Senate body, as a Legislature, that demonstrated
8  the existence of fraud sufficient to move forward with a
9  bill, a law, that would have the likely consequence of
10  disenfranchising voters who currently have the legal
11  right to vote.  And we specifically asked why this piece
12  of legislation were advancing absent that information,
13  where information that exists with regard to fraud and
14  absentee balloting was not being addressed.
15    Comparatively, the information before the State
16  in terms of where fraud occurs in the voting process
17  demonstrates that there's much more likelihood of fraud
18  occurring in the absentee voter arena than in the photo
19  ID fraud arena or voter fraud arena.  It's my belief,
20  it's other's belief, that the attempt to address the
21  absentee voter fraud would have an impact that was much
22  broader than simply on the African-American and Latino
23  community.  And that that's why that piece of voter
24  fraud is not being addressed in the State of Texas.
25    A great deal of Anglo, particularly senior vote,

Senator Wendy Davis                                    June 6, 2012

## 41

1  occurred in the absentee vote arena.  And that the
2  likelihood that those persons might be impacted by any
3  kind of a law that would address that fraud was what
4  keeps it from being an issue of concern that's advanced
5  by the majority party in the State of Texas, while a
6  piece of legislation to address undemonstrated fraud
7  is advancing simply because of the people that it will
8  most assuredly impact.
9      Q.  Is it your belief that there is no in person
10  voter fraud in Texas?
11      A.  I cannot say that with certainty.  What I can say
12  is that we, as a State, spent an enormous amount of
13  money trying to ferret out such fraud in both of the
14  legislative sessions debate on this bill.  Specific
15  questions were addressed to the attorney general's
16  office with regard to the consequences of those
17  investigations and the multiple millions of dollars that
18  were spent in trying to ferret it out.  And my
19  recollection from that testimony was that very, very
20  little fraud had been revealed.
21      Q.  Is that testimony and the effort that you're
22  describing, is that the effort by the Texas Attorney
23  General's office?
24      A.  Yes.
25      Q.  Is it -- is it your understanding that the

## 43

1  fraud in that manner.
2      Q.  But there -- are you familiar with testimony or
3  argument of proponents of the bill that in person voter
4  fraud is more difficult to detect?
5      A.  I'm not aware.
6      Q.  Do you have any understanding or a personal
7  knowledge whether or not in person voter fraud is more
8  difficult to detect than, say, mail in ballot fraud?
9      A.  I'm not aware.
10      Q.  Would you have any reason to disagree if somebody
11  said that in person voter fraud is more difficult to
12  detect than mail in ballot fraud?
13      A.  No.  I would find it surprising for that to be a
14  reason to support a bill like Senate Bill 14.  If it
15  were easier to detect voter fraud in the absentee ballot
16  arena I would think that would be sufficient reason for
17  that to be addressed through a piece of legislation like
18  SB 14.  And yet it has not been.
19      Q.  Did you introduce any bills either in 2009 or '11
20  to address mail in ballot fraud?
21      A.  I personally did not.  Though, I believe in one
22  of those two sessions, perhaps both, I believe that one
23  of our Senate Democratic members introduced such a bill,
24  or perhaps introduced as an amendment to the voter ID
25  bill such a proposal.

## 42

1  attorney -- the Texas Attorney General has the exclusive
2  ability or jurisdiction to prosecute voter fraud?
3      A.  I don't know.  I do know that as part of each of
4  these legislative sessions, we advanced an enhanced
5  penalty piece of legislation for persons who were caught
6  committing fraud at the ballot box.  And it was our
7  belief that, to the extent fraud exists, that would be
8  an appropriate way to address that fraud where it was
9  discovered.  Particularly because on ballots with the
10  very, very minimal justification for a photo voter ID
11  law, many, many, many people in the State of Texas who
12  currently have the legal right to vote will have this
13  right threatened.  And that a much greater threat to the
14  disenfranchisement to the legal voters is the
15  consequence of moving forward with that as the solution,
16  with a photo ID bill as the solution.
17      Q.  So, then it was your belief that increasing the
18  penalty for in person voter fraud was a sufficient
19  remedy or deterrent?
20      A.  Yes.  Particularly because so little had ever
21  been discovered.
22      Q.  And in your understanding, was that the belief of
23  the Democratic members of the Senate as well?
24      A.  Yes.  And I believe we collectively voted in
25  favor of an amendment that would have addressed voter

## 44

1      Q.  You mentioned you're a lawyer.  Do you have -- do
2  you have any experience with prosecution?
3      A.  No, I do not.
4      Q.  Are you -- do you have any understanding whether
5  it is more difficult to prosecute a case of in person
6  voter fraud than, say, mail in ballot fraud?
7      A.  I don't have any understanding of that.
8      Q.  Do you have any understanding whether there are
9  specific political -- well, start over.  Do you have any
10  understanding that there are potential political
11  consequences to prosecuting voter fraud?
12      A.  No.
13      Q.  Do you have any understanding whether a
14  prosecutor who prosecutes voter fraud may be accused of
15  targeting Democratic voters?
16      A.  No.
17      Q.  Would you have any reason to disagree with the
18  contention that prosecuting voter fraud creates
19  potential for accusations of political bias?
20      A.  If other types of voter fraud that are committed
21  by persons outside minority populations is not
22  addressed, I believe it's possible that that assumption
23  might be made.
24      Q.  When you say "voter fraud that's committed by
25  persons outside minority populations," are you referring

Senator Wendy Davis                                    June 6, 2012

## 45

1  to a specific kind of voter fraud?
2    A.  The absentee voter fraud that we talked about a
3  moment ago.
4    Q.  So you contend that -- is it your contention that
5  mail in ballot fraud or absentee voter fraud, is it more
6  likely to be committed by persons who aren't members of
7  minorities?
8    A.  I believe there's evidence that in person mail in
9  voter fraud is occurring at a much more frequent level
10  than in person voter fraud.  And that that fraud is
11  occurring across all populations and addressing it would
12  not have a disproportionate impact on persons who are
13  African-American or Latino.  And therefore, it's not
14  nearly the priority to address by the current
15  administration in the State of Texas.
16    Q.  Is it your understanding that in person voter
17  fraud is disproportionately engaged in by members of
18  minority group?
19    A.  It's not.  But I believe that the bill that was
20  advanced to, and I'm putting quotations around this
21  word, "purportedly" addressed in person voter fraud is
22  known to have a disproportionate impact in
23  disenfranchising legal voters who are African-Americans
24  and Latinos in the State of Texas.  I don't think in
25  either instance the question that is really at the heart

## 46

1  of addressing the fraud for the current administration
2  is to address the fraud.  I believe that it's to impact
3  the community that will be impacted by it.
4    Q.  What is your basis for that statement?
5    A.  The discussions and debates that we had as part
6  of this bill in both the 81st and the 82nd legislative
7  sessions.  The attempts to introduce amendments so that
8  that disproportionate impact in the African-American and
9  Latino community would not occur and the unanimous votes
10  against such amendments by persons in the Republican
11  party.
12    Q.  So it's your contention that because certain
13  members voted against amendments that were designed to
14  reduce the impact of voter ID laws on minority voters,
15  that's evidence that they intended to impact minority
16  voters?
17    A.  We had numerous conversations in the Senate about
18  how to improve this bill in a way that would allow voter
19  fraud at the ballot box to be addressed and yet to
20  alleviate concerns that disenfranchisement would occur.
21  I find it alarming that if the true intent of this
22  legislation is to assure integrity at the ballot box,
23  that efforts to likewise assure that disenfranchisement
24  is not the consequence of the bill should have been
25  respected and should have been welcomed as part of

## 47

1  advancing that piece of legislation.  The bipartisan
2  Baker-Carter report calls for exactly those things.  And
3  where a particular political party issues parts of that
4  and yet embraces other parts of it, yes, I believe that
5  that is evidence of what the intention of that piece of
6  legislation truly is.
7    Q.  So it's your position that there were amendments
8  that would have reduced the discriminatory impact of the
9  bills?
10    A.  Yes.
11    Q.  And so you assume -- I mean, that assumes that
12  there would be the discriminatory impact in the first
13  place, right?
14    A.  Evidence was put forward that the discriminatory
15  impact would occur, that was put before all members of
16  the Senate body.  And no member discussed or gave any
17  defensible reason for voting against amendments that
18  were offered to assure that that disenfranchisement
19  didn't occur.  Instead, without debate on behalf of the
20  Republican members of the Senate, those pieces -- those
21  amendments were, for the most part, tabled without any
22  kind of discussion, without even giving any legitimacy
23  as to whether valid points were being made in the
24  advancement of those amendments.  In other words, it was
25  a complete lack of concern about the disparate impact

## 48

1  that might occur and a predisposed decision to say no to
2  any amendment that might try to improve upon the bill.
3    Q.  Why is that a lack of concern?
4    A.  In my opinion, if an amendment that has
5  demonstrated validity is introduced by a member and
6  tabled without any kind of discussion on the merits of
7  the amendment occurs, it shows a lack of concern for the
8  arguments that are being made.
9    Q.  Would it also show a lack of concern if an
10  amendment were debated, considered and then rejected?
11    A.  Not to the same degree, not if the debate were a
12  genuine and sincere one.
13    Q.  Isn't it true though, that if someone didn't
14  believe there would be any disparate impact, then voting
15  against an amendment would not necessarily show any lack
16  of concern?
17    A.  I believe that anyone who says to you they
18  believe there would not be a disparate impact is either
19  willfully being ignorant of that fact or choosing to
20  ignore it.
21    Q.  You mentioned a moment ago that there was
22  evidence presented to everybody about a disparate
23  impact.  Can you tell me specifically what that evidence
24  was?
25    A.  It was, as I generally discussed earlier, I don't

Senator Wendy Davis                                      June 6, 2012

## 49

1  recall the specific testimony that was introduced either
2  verbally or in writing, but information that
3  demonstrated that persons in the State of Texas, and
4  certainly I think following legislative session,
5  questions that the DOJ has asked of the Secretary of
6  State has revealed this as well, that persons who are
7  most likely to be disenfranchised by a law such as this
8  fall primarily in our lowest income communities, which
9  unfortunately in the State of Texas are
10 disproportionately represented by African Americans and
11 Latinos.
12     Q.  Do you recall any specific person who provided
13 testimony to that effect?
14     A.  I don't recall.
15     Q.  Do you recall any specific conclusion from any of
16 the testimony or studies about the disparate impact of
17 SB 14?
18     A.  I don't recall.  But I certainly recall us asking
19 the Secretary of State whether those impacts would occur
20 and that the members were willing to advance a piece of
21 legislation without a real clear picture from the
22 Secretary of State on whether that was going to be the
23 case.  And, in fact, with the Secretary of State being
24 fairly candid that she had not done an analysis that
25 would really enable her to make that kind of a

## 50

1  determination.
2      Q.  Do you know if it's possible to do that kind of
3  analysis?
4      A.  Well, certainly I think the DOJ has asked some
5  very good questions about that in terms of who in the
6  State of Texas today falls into the category of persons
7  who currently have voter IDs in the State of Texas and
8  yet who do not possess Department of Public Safety photo
9  IDs.
10     Q.  Do you know if the data necessary to make that
11 determination is available -- is it available, period,
12 in Texas?
13     A.  I don't know.
14     Q.  If that information weren't available -- let me
15 ask another question first.  So it's your testimony that
16 the fact that there was no -- there was no determination
17 of who would be impacted potentially by SB 14, the fact
18 that there was no determination made shows indifference
19 toward the impact.  Is that true?
20     A.  Yes, together with the fact that information had
21 been provided that that was likely to be the case and
22 that amendments were introduced that could have
23 corrected that.  Amendments that would not have weakened
24 the ability for the law to ferret out voter fraud at the
25 ballot box and yet those amendments were rejected.

## 51

1      Q.  If an amendment provided for or allowed for
2  non-photo ID, would you contend that that would not
3  weaken the ability to ferret out in person voter fraud?
4      A.  Can you ask that question again?
5      Q.  Of course.  You mentioned a moment ago amendments
6  that would not have weakened the ability to ferret out
7  in person voter fraud?
8      A.  Yes.
9      Q.  Is it your contention that allowing non-photo
10 forms of ID would maintain the same ability to ferret
11 out in person voter fraud?
12     A.  I believe that together with some of the other
13 provisions of the law that could have occurred.  There
14 were very few exceptions that were created as part of
15 the amendments that were introduced.  And I went through
16 those earlier, where there might be some minor
17 discrepancy between a person's photo ID and their voter
18 registration card, where there might be a change of
19 someone's name because of marriage or divorce, and where
20 there might be a situation where a person is indigent,
21 but could provide other forms of voter identification
22 that would be sufficient to identify them as the person
23 who was voting.
24     Q.  Do you believe that persons who would potentially
25 have a discrepancy between their photo ID and their

## 52

1  voter registration are disproportionately members of
2  minority groups?
3      A.  I don't know.
4      Q.  Do you contend that people who might have a name
5  mismatch between their State ID and their voter
6  registration are disproportionately members of minority
7  group?
8      A.  I don't know.
9      Q.  Do you contend that people who may have a
10 discrepancy in the address on their photo ID and voter
11 registration are disproportionately members of minority
12 groups?
13     A.  I don't know.
14     Q.  But it's your contention that the photo ID
15 requirement in SB 14 will have a disproportionate impact
16 on indigent voters?
17     A.  I believe that's the case.
18     Q.  And you believe that indigent voters will
19 disproportionately be members of minority groups?
20     A.  The evidence that was put in front of us was that
21 that's the case in population in the State of Texas.
22     Q.  Is it your contention that a non-indigent
23 African-American voter would be impacted differently
24 than a non-indigent Anglo voter by SB 14?
25     A.  I don't know.

Senator Wendy Davis                                    June 6, 2012

## 53

1    Q.  Is it your contention that a non-indigent
2  Hispanic voter would be impacted differently by SB 14
3  than a non-indigent Anglo voter?
4    A.  What I can tell you from my understanding is that
5  persons who rely on public transportation in the State
6  of Texas, while they may not be indigent, again, are
7  disproportionately represented by members of our
8  African-American and Latino communities.  And that many
9  of those persons do not currently possess photo IDs
10  because they don't have a need for a driver's license.
11  And that, yes, does create a disproportionate
12  impact to members of our minority community.
13    Q.  Is it your understanding that -- well, of the
14  people who take -- who use public transportation in
15  Texas, is it your understanding that some of those
16  people use public transportation because they don't have
17  a car?
18    A.  Yes.
19    Q.  And perhaps because they're indigent?
20    A.  Perhaps.  But, you know, indigency, I think that
21  persons cannot have a car does not necessarily mean that
22  they're indigent.
23    Q.  Thank you.  Is it -- then is it your
24  understanding that non indigent people who use public
25  transportation in Texas are disproportionately

## 54

1  African-American or Latino?
2    A.  I believe that public transportation users in the
3  State of Texas, certainly in the district that I
4  represent, are disproportionately members of our
5  African-American and Latino communities.  That may not
6  be the case in all cities depending on the quality of
7  their transportation systems.  But certainly in the area
8  that I represent it's the case.
9    Q.  In the area you represent, is it your
10  understanding that the majority of people who use public
11  transportation are indigent?
12    A.  It's my belief that the majority of people who
13  use public transportation in my district rely on it as
14  their means of moving about and that they do it because
15  they do not have alternative means of transportation.
16    Q.  And you don't know whether that's because of
17  indigency or some other reason?
18    A.  No, I don't.
19    Q.  So is it your testimony, then, that
20  African-American and Latino voters will be
21  disproportionately impacted even if they aren't indigent
22  because they are more likely to use public
23  transportation?
24    A.  I'm saying that there's a greater percentage of
25  persons who are African-American and Latino who do not

## 55

1  currently have driver's licenses in the State of Texas.
2  And I believe that the information that's been requested
3  of the Secretary of State is being requested in order to
4  demonstrate whether that is indeed the case.
5    Q.  What is your basis for saying that people without
6  a driver's license are disproportionately Latino or
7  African-American?
8    A.  It's information that was presented to us during
9  these two legislative debates.
10    Q.  But you can't remember any specific?
11    A.  I can't recall the specific information, no.
12    Q.  If it was shown that there was not a significant
13  disparity in ID possession between different racial or
14  ethnic groups, would you support SB 14?
15    A.  I would support SB 14 if I didn't believe it were
16  going to have a disproportionate impact on persons who
17  are indigent.  I introduced an amendment that would have
18  resolved that concern.  Unfortunately, that's not part
19  of the law.  And I also believe that others will be
20  disenfranchised.  I don't believe that it's solely
21  limited to persons in the minority community, though I
22  believe it's certainly the case.  With the intention of
23  the bill was to pass it with the understanding that
24  disproportionately members of our minority communities
25  would be disenfranchised as a consequence of it.  But I

## 56

1  believe there's a side effect as well.  And that some
2  other persons may also be caught unaware and not be able
3  to exercise their legal right to vote in the State of
4  Texas come November if this law is upheld.
5    Q.  Are you familiar with any polls regarding support
6  for voter ID legislation in Texas?
7    A.  No.
8    Q.  Are you aware of whether or not there are
9  non-citizens who will register to vote in Texas?
10    A.  I am not aware.
11    Q.  Do you contend that there are not non-citizens
12  registered to vote in Texas?
13    A.  I don't contend that.
14    Q.  Do you believe that the expenditure of State
15  resources to take non-citizens off the Texas voter rolls
16  would be a waste of money?
17    A.  No.  But I believe in the recommendations of the
18  Baker-Carter report, that in order to address concerns
19  that that may be the case, that corresponding
20  protections for those who may be caught up in the web of
21  a solution that's too broad should also be addressed and
22  they weren't in Texas.
23    Q.  Is it your understanding that SB 14 was intended
24  to move non-citizens from voter registration list in
25  Texas?

Senator Wendy Davis                                    June 6, 2012

---

## 57

1   A. I believe that the intension of the bill is as I
2   said earlier.  I believe that if the intention of the
3   Attorney General's office were really to address voter
4   fraud in Texas, that absentee voting would have preceded
5   any kind of conversation on addressing voter fraud.
6   Q. You said "the Attorney General's office," did you
7   mean the Legislature?
8   A. Well, yes, but certainly the Attorney General's
9   office has spent multiple millions of dollars trying to
10  ferret out ballot box voter fraud and yet failed to show
11  the same energy or enthusiasm in ferreting out
12  absenteeism ballot fraud.
13  Q. So is it -- are you aware of the cases prosecuted
14  by the attorney general's office, do you know how many
15  of those dealt with mail in ballot fraud?
16  A. No.
17  Q. Do you know what percentage dealt with mail in
18  ballot fraud?
19  A. No.
20  Q. Do you know what percentage dealt with in person
21  voter fraud?
22  A. No.  But I certainly know there was a targeted
23  amount of money and effort spent on in person voter
24  fraud.  And there was not a corresponding amount of
25  money and effort spent on determining the extent and

## 58

1   level to which absentee voter fraud might be occurring.
2   Q. But you don't know how much of that money
3   actually resulted in prosecution of mail in voter fraud?
4   A. I recall in our testimony before the Senate that
5   there was a very, very small number of in person voter
6   fraud cases that were discovered in spite of that
7   investigation.
8   Q. And is it your recollection that there was a
9   higher proportion of mail in ballot fraud?
10  A. I don't recall.
11  Q. But if there were a higher proportion of mail in
12  ballot fraud that was discovered and prosecuted with the
13  money that you were referring to, then it would not be
14  accurate to say that there was not an effort to target
15  mail in ballot fraud?
16  A. I think it would be, certainly support for my
17  earlier statement that if that revealed a greater
18  percentage of mail in voter fraud occurring and yet
19  there were no pieces of legislation advanced to address
20  it, that that is evidence that one voter fraud is being
21  ignored where another one is being addressed.
22  Specifically because of the persons who will be impacted
23  by one law and not the other.
24  Q. But you don't have any understanding of the
25  relative difficulty if prosecuting in person versus mail

## 59

1   in voter fraud?
2   A. No, I don't.
3   Q. Do you believe that elderly voters are less
4   likely than average to have the ID required by SB 14?
5   A. I do.  I recall that being part of the
6   Baker-Carter report as well.  An amendment was
7   introduced to the Senate bill trying to remove its
8   application from voters, I believe of 65 years of age
9   and above, who were less likely to have photo ID.  My
10  recollection was that that amendment was not accepted
11  and instead the floor, I think was set at the age of 70
12  versus 65.  I think that's right.
13  Q. Do you recall whether an exemption of exception
14  for elderly voters was part of the final bill?
15  A. I believe there was.  Again, I don't remember
16  exactly what the age for it was.
17  Q. Do you believe that disabled voters are less
18  likely than average to have the ID required by SB 14?
19  A. I don't know.
20  Q. Do you believe that rural voters are less likely
21  than average to have the ID required by SB 14?
22  A. I don't know.  Though I think it is more
23  difficult for them to get the photo ID that's required.
24  Q. In your understanding was the Legislature aware
25  that rural voters would have a harder time getting the

## 60

1   ID required by SB 14?
2   A. I don't recall.
3   Q. Do you believe that SB 14 was enacted for the
4   purpose of keeping rural voters from voting?
5   A. No, I do not.
6   Q. Why not?
7   A. I don't.  I simply don't.
8   Q. But you believe that because it would be more
9   difficult for a rural voter to obtain the ID, there
10  might be a disparate impact on rural voters; is that
11  right?
12  A. There might be.
13  Q. Did the proponents of SB 14 express any concern
14  for rural voters?
15  A. Not that I recall.
16  Q. Do you believe they were indifferent to rural
17  voters?
18  A. I don't have a belief one way or the other.
19  Q. But you've testified that you believe the lack of
20  concern shown for minority voters indicates
21  indifference; is that right?
22  A. As part of the debate on SB 14, one of the
23  arguments that I recall being made by members who
24  represent minority rural communities was that their
25  voters would have a harder time meeting the requirements

Senator Wendy Davis                                    June 6, 2012

## 61

1  of getting a photo ID.  And arguments were made that in
2  order for the bill not to have a disproportionate impact
3  on those persons, that resources needed to be committed
4  to enhancing the opportunity to access photo ID through
5  the location of DPS offices that could support that need
6  and the expansion of hours that could allow that.  I
7  recall those arguments being made.
8      Q.  When you say "people who represent minority rural
9  communities," what do you mean by that?
10     A.  I mean members of the Senate who represent
11  minority rural communities.  I don't recall any Anglo
12  member who represents an Anglo rural community
13  expressing a concern on behalf of their rural voters.
14     Q.  Do Anglo Senators who represent rural
15  communities, don't they also represent rural minority
16  voters?
17     A.  Some do.  Some don't.  Not what we would consider
18  a majority community where the majority of the persons
19  are minority.
20     Q.  To qualify a minority rural community it would
21  have to be 50 percent?
22     A.  Yes.  For example, some of the expressed concerns
23  were specific to the Valley area, to the Colonians, to
24  areas where people don't have the resources to access a
25  DPS office.  Not because they live in a rural community,

## 63

1      Q.  Do you have any knowledge that it would be easier
2  for a resident of a rural community outside the Valley,
3  would it be easier for that person to access a DPS
4  office than a member of a rural community in the Valley?
5      A.  I'll just answer the question again this way.
6  It's easier for a person in a rural community who has a
7  car and a means of transportation to get to a DPS office
8  and to get a driver's license than it is for someone who
9  lives in a rural community and does not have a means of
10 transportation to get a driver's license.
11     Q.  Is it your understanding that members of the
12 rural communities in the Valley have less access to
13 transportation to cars than members of other rural
14 communities in Texas?
15     A.  It is my understanding that persons who are in
16 low-income communities have a greater challenge in terms
17 of access to transportation than those who do not fit
18 within that category.
19     Q.  Do you have any understanding as to the relative
20 income levels or access to transportation in rural
21 communities in any part of the State of Texas?
22     A.  Well certainly we have areas in the State of
23 Texas that are poor, much more poor than others.  Those,
24 again, disproportionately are comprised of persons who
25 are Latino primarily, and in lesser regard,

## 62

1  but because they live in a rural community without
2  public transportation and they don't possess a vehicle
3  to have the capacity to transport them.  That's the
4  distinguishing feature between some who live in rural
5  communities who may have a harder time going to get a
6  driver's license because it's far away from those who
7  live in a rural community who simply will not be able to
8  get a photo ID because they have no means of
9  transportation to get to the DPS office to begin with.
10 That was a distinguishing argument made about why there
11 was a disproportionate impact on persons who fall within
12 our low-income, minority, rural communities versus those
13 who do not fall within that category.
14     Q.  Is it your understanding that it is easier for
15 voters who live in non-minority rural communities to get
16 to a DPS office?
17     A.  It's easier for someone who has a car or a means
18 of transportation to get to a DPS office than it is for
19 someone who does not.  And again, arguments were made,
20 information was put into the record about what the
21 impact to persons in our low-income, minority, rural
22 communities would be.  With members giving, I thought,
23 very compelling testimony about what the impact of
24 persons who lived in their community would be.  Where
25 there was simply no way for them to go to a DPS office.

## 64

1  African-American.
2      Q.  In talking about the rural minority communities
3  that have problems with access to public transportation
4  and vehicles, is it your understanding that an Anglo
5  voter living in that kind of community, say a rural
6  community in the Valley, would be affected less than a
7  Latino member of that community by SB 14?
8      A.  My distinction is not whether someone is Anglo or
9  Latino or African-American.  The distinction is income
10 level, poverty, and the ability to access
11 transportation.  I believe it's the case that
12 disproportionately, that impacts persons in the minority
13 community.  It certainly, I am sure, impacts persons who
14 are Anglo as well who fit within that category of being
15 low-income and having no access to transportation.
16     Q.  Is it your understanding that younger voters are
17 less likely to have a form of ID required by SB 14?
18     A.  I don't know.
19     Q.  Do you know how many Texas registered voters lack
20 the form of ID required by SB 14?
21     A.  I don't know.  I will certainly asked that
22 question.
23     Q.  Do you know how many of your constituents don't
24 have one of the forms of ID required by SB 14?
25     A.  No.  And again, I sought that information and was

Senator Wendy Davis                                          June 6, 2012

## 65

1   not given it.
2     Q. I know you mentioned that the information was
3   sought statewide. How did you seek that information
4   about your constituents?
5     A. I recall asking that as part of either the Senate
6   hearing or perhaps outside the Senate hearing.
7     Q. Did you ever attempt to survey your constituents
8   to see who lacked a photo ID required by SB 14?
9     A. No, I don't.
10     Q. Can you identify any one of your constituents who
11   lacks one of the other IDs required by SB 14?
12     A. No, I cannot.
13     Q. Are you aware or can you identify any specific
14   Texas registered voter who lacks one of the forms of ID
15   required by SB 14?
16     A. No, I cannot.
17     Q. Do you know how many of your constituents do not
18   have the underlying documents necessary to get a photo
19   ID?
20     A. No, I don't.
21     Q. Can you identify any specific constituents who
22   lacks the documents necessary to get a photo ID?
23     A. No, I cannot.
24     Q. Can you identify any particular Texas registered
25   voter who lacks the documents necessary to get a photo

## 66

1   ID?
2     A. No.
3     Q. Are you familiar with the levels of photo ID
4   possession by different racial and ethnic groups in
5   Texas? And by levels, I mean the proportion of ID
6   possession?
7     A. No, I don't have particular information about
8   that.
9     Q. So you don't know what percentage of registered
10   African-American voters have a photo ID?
11     A. No, I do not.
12     Q. And would the same go for Anglo, Asian, Hispanic
13   voters?
14     A. Correct. What I would say is we certainly should
15   have known that before we passed the law that would
16   affect so many people.
17     Q. Do you know how that would be determined, how one
18   would go about determining the level of ID possession by
19   various ethnic groups in Texas?
20     A. Well, I know the Department of Justice is
21   certainly trying to get at the heart of that right now
22   by asking the discrepancy of persons who have a driver's
23   license in the State of Texas versus those who have
24   voter identification cards in the State of Texas.
25     Q. Are you aware of any efforts by or on behalf of

## 67

1   the State of Texas to make that determination as part of
2   the preclearance process for SB 14?
3     A. I believe that the Secretary of State has been
4   asked to do that. I don't know what the status of that
5   is.
6     Q. Are you -- do you know whether or not the
7   Secretary of State has tried to do that?
8     A. I don't know.
9     Q. You mentioned earlier that you were -- that you
10   had read the Crawford case out of Indiana. Are you
11   familiar from that or any other source of -- are you
12   familiar with the levels of photo ID possession by
13   voters in Indiana?
14     A. No.
15     Q. So you -- you don't know whether -- whether
16   African-American voters, for example, in Indiana possess
17   photo IDs at a higher rate than African-Americans in
18   Texas?
19     A. No, I don't.
20     Q. And would the same be true for Anglo and Asian
21   and Hispanic voters?
22     A. That's correct.
23     Q. Do you contend that the Texas Legislature
24   specifically intended to harm African-American voters by
25   enacting SB 14?

## 68

1     A. Yes, I do.
2     Q. And at the risk of asking you to repeat yourself,
3   can you explain to me the basis for that belief?
4     A. I'll tell you broadly, and then more narrowly.
5   Broadly, this session was certainly characterized by
6   what I believe was an unprecedented number of pieces of
7   legislation that disproportionately impacted our
8   minority communities in the State of Texas, particularly
9   African-American and Latinos. Both the redistricting
10   efforts that were made and the disenfranchisement that
11   would occur as a consequence of the maps that were drawn
12   through that process. Legislation that was advanced
13   under the sanctuary city legislation that would have
14   essentially created local police force, immigration
15   officers specifically, to have a negative impact in our
16   Latino community. Pieces of legislation that were
17   advanced in order to remove undocumented persons from in
18   State tuitions in the State of Texas as currently exist.
19   I think this piece of legislation was part and
20   parcel of a broader and purposeful effort to
21   discriminate against minorities in the State of Texas.
22   More specifically, as I said to you before, I believe
23   that valid information was presented to the body of the
24   Senate that this legislation would have a
25   disproportionate impact on members of the minority

Senator Wendy Davis                                June 6, 2012

---

## 69

1  community.  That information was part of the record.
2  That information was not disputed by members who
3  advanced this legislation.  And efforts to help to
4  alleviate that disproportionate impact while maintaining
5  the integrity of the photo ID bill were ignored, for the
6  most part, without so much as even a discussion about
7  whether to consider the legitimacy of those
8  enhancements.  I believe, collectively, all of that
9  points to a purposeful effort to suppress minority vote.
10      Q.  Is it possible that the amendments that you
11  believe would have improved the bill and not reduced its
12  effectiveness, is it possible that the proponents of the
13  bill believed that they would reduce the effectiveness
14  of the bill while combatting voter fraud?
15      A.  I can't say that that's the case.  Senator Duncan
16  advanced, as I said, the indigent amendment that I had
17  initially introduced.  I don't know whether he did that
18  thinking like a lawyer and wants to make sure that the
19  photo ID in the State of Texas could withstand the same
20  constitutional scrutiny as occurred in the Indiana case
21  or whether he, in his heart, agreed with me that that
22  was the right thing to do so as to not disenfranchise
23  currently franchised voters.
24      But I do know that he moved that amendment in,
25  that it was accepted and then it was stripped out.  And

---

## 71

1  better way to say it than that.
2      Q.  Do you contend that individual legislators voted
3  in favor of SB 14 for the specific purpose of harming
4  African-American voters?
5      A.  Yes, I do.
6      Q.  Who do you contend voted for SB 14 for the
7  specific purpose of harming African-American voters?
8      A.  Every person who voted for it.
9      Q.  Does that include House members and Senate
10  members?
11      A.  Yes.  Put a better way, I think they had flagrant
12  disregard for whether African-American voters would be
13  impacted by the voter ID bill.  That's a better way to
14  say it.  That's how I would prefer to say it.
15      Q.  Well, I mean, do you or do you not contend that
16  individuals voted for SB 14 for the purpose of harming
17  African-American voters?
18      A.  I believe they had flagrant disregard for whether
19  it would harm African-American voters.  But I believe
20  that the bill's author, and in both the House and the
21  Senate, had a very purposeful intention of that
22  occurring.
23      Q.  You believe that the bill's authors sponsored and
24  voted for SB 14 because they wanted to harm
25  African-American voters; is that right?

---

## 70

1  an amendment is not stripped from a bill without
2  purposeful action to make that happen.  And I do not
3  believe that that amendment was removed for any reason
4  other than the fact that it would have weakened what was
5  the intention of the bill in terms of who would be
6  impacted by it.
7      Q.  So you believe that the provision that would have
8  provided an exception for indigent voters was removed
9  from the bill specifically to increase the negative
10  impact?
11      A.  Yes, I do.
12      Q.  On minority voters; is that right?
13      A.  Yes, I do.
14      Q.  Has anybody said anything to you that supports
15  that belief?
16      A.  No.  But no one has otherwise argued a reason for
17  not including it that went to any other purpose.
18      Q.  And you don't think it's possible that that
19  provision was removed from the bill out of a sincere
20  belief that it would reduce the bill's effectiveness?
21      A.  That's not my belief.
22      Q.  Is there anything specific that that bill is
23  based on?
24      A.  Four years in the Texas Legislature and my
25  understanding of the way things are there.  I have no

---

## 72

1      A.  I believe they wanted to disenfranchise current
2  voters in the African-American and Latino communities,
3  yes, disproportionately.
4      Q.  What is your basis for that belief about the
5  bill's authors?
6      A.  I feel that we keep going round and round on this
7  question.  Again, more information has been advanced
8  with regard to voter fraud in the absentee ballot arena.
9  It was specifically pointed out to the bill's author as
10  part of his introduction to this bill.  That were his
11  concern truly voter fraud, that his effort and energy
12  and legislative direction would have been aimed toward
13  that purpose.  And he was unable to answer why he chose
14  instead, to concentrate his energies on an arena where a
15  very, very small amount of fraud had ever been
16  demonstrated in the face of an understanding that
17  persons would be disenfranchised as a consequence of
18  such a law being put in place.
19      Q.  You assume that the bill's authors had an
20  understanding that people would be disenfranchised?
21      A.  Absolutely.  Chairman information was presented
22  that demonstrated that that was the case.
23      Q.  And you believe that that -- it's your contention
24  that that information was irrefutable and indisputable?
25      A.  I believe that it was extremely compelling.  And

Senator Wendy Davis                                June 6, 2012

### 73

1  that in the face of understanding that that might occur,
2  a person who had concern for that impact would have
3  acted otherwise in terms of their willingness to accept
4  amendments that might address it.
5      Q.  So if somebody did not find the evidence as
6  compelling as you did or that other members might have
7  it's -- you infer from that that they were acting
8  because they wanted to hurt minority voters; is that
9  right?
10     A.  That's my inference.
11     Q.  Did any of the bill's authors ever say anything
12 to you that expressly stated their intent to harm any
13 minority voter?
14     A.  No.
15     Q.  Did any member of the legislature ever make a
16 statement to you or to anybody else that you're aware
17 of, that they supported SB 14 because they wanted to
18 harm minority voters?
19     A.  No.
20     Q.  Do you contend that the legislature intended to
21 harm Asian-American voters by introducing SB 14?
22     A.  I don't have an opinion on that.
23     Q.  Do you contend that the legislature intended to
24 harm poor people by passing SB 14?
25     A.  I believe that the legislature understood there

### 74

1  would be a disproportionate impact on poor people.  And
2  that those populations were disproportionately minority.
3      Q.  Do you believe the legislature intended to harm
4  elderly people by passing SB 14?
5      A.  No, I don't.  Not as a group, no.
6      Q.  Do you contend that any legislator intended to
7  harm elderly people by passing SB 14?
8      A.  No, I don't.  Not specifically.
9      Q.  Well, is it your testimony that you believe SB 14
10 will disproportionately impact elderly people?
11     A.  I didn't say that.
12     Q.  Okay.  I should have phrased my question
13 differently.  I meant to just ask if that was your
14 contention?
15     A.  I don't have any understanding that that's the
16 case.
17     Q.  Understood.  Other than your understanding of the
18 effect of SB 14 and awareness of that effect on the part
19 of proponents of the bill, is there any other basis for
20 your contention that this bill was passed with a
21 discriminatory purpose?
22     A.  No.
23     Q.  Would you agree that members of the Texas
24 Legislature have a duty the represent their
25 constituents?

### 75

1      A.  Yes.
2      Q.  Would you consider that an important duty of any
3  elected official to represent constituents and represent
4  policy that constituents favor?
5      A.  Yes.
6      Q.  Is there anything wrong with a representative
7  voting for a policy that's favored by his or her
8  constituents?
9      A.  No.
10     Q.  Is it political rational for an elected official
11 to vote for a policy that's favored by his or her
12 constituents?
13     A.  Well, it's politically rational.  Is it always
14 right?  Perhaps not.  Certainly it's been the case in
15 the history of the United States that there were
16 sentiments that part of the political process that were
17 expressly centered at discriminatory purposes.  Do I
18 believe that a person who's elected by his constituents
19 should advance something that's motivated by those
20 beliefs, no.  Do I believe that all persons who favor
21 voter ID in the State of Texas are motivated by racially
22 discriminatory intent, no.  But I believe that most
23 people in our communities don't really understand the
24 impact that such a law can have on members of the
25 minority community.  Nor do I think they understand the

### 76

1  nuances of how a photo ID bill can be improved, such
2  that that disproportionate impact is minimized as much
3  as possible.  That's our job as legislators to really
4  understand the nuances of the laws that we advance.
5      Q.  So it's not your contention that the majority of
6  people in Texas who support voter ID support it for an
7  illegitimate reason?
8      A.  Absolutely not.
9      Q.  And you don't contend that the majority of people
10 in Texas who support voter ID believe it will have a
11 disproportionate impact on racial minorities?
12     A.  No, I do not believe that.
13     Q.  And it's accurate to say, isn't it, that the
14 majority of voters in Texas support voter ID
15 legislation; is that right?
16     A.  I don't know.
17     Q.  Do you have any basis to dispute the majority of
18 voters in Texas support voter ID legislation?
19     A.  No, I don't.
20     Q.  So if a representative or a senator whose
21 constituents overwhelmingly favored voter ID, voted for
22 a voter ID bill, was there anything wrong with that?
23     A.  I believe if they voted for a voter ID bill where
24 evidence had been put in front of them, such that
25 persons who were minority would be disproportionately

Senator Wendy Davis                                    June 6, 2012

---

**77**

1  impacted by it and that there were ways to improve upon
2  it, then I do think there's something wrong with that.
3      Q.  What if an elected official didn't believe that
4  it would have -- that SB 14 or any voter ID bill would
5  have a disproportionate racial impact, if they sincerely
6  believed that, would there be any illegitimate purpose
7  in their voting for the bill?
8      A.  I can't be in the mind of every legislator,
9  obviously.  I can only be in my own mind.  What I can
10  tell you is I believe compelling information was
11  produced and that should have raised those concerns in the
12  minds of reasonable people.  And that solutions that
13  were advanced that could have eased those concerns
14  merited consideration.
15      Q.  So you mentioned "reasonable people."  Do you
16  believe that -- do you believe that if a legislator who
17  had considered all the evidence that you considered did
18  not -- still did not believe that there would be a
19  disproportionate racial impact of SB 14, do you believe
20  that would be an unreasonable belief?
21      A.  Yes.  I don't know how they could really
22  understand it otherwise, with all of the information
23  that was put in front of us.
24      Q.  If a legislator voted for SB 14 based on a
25  sincere, but maybe unreasonable belief in its effect,

---

**78**

1  would that be an act of intentional discrimination?
2      A.  Not as you just described it.
3      Q.  Other than your lawyer, have you discussed this
4  lawsuit with anybody?
5      A.  No, I have not.
6      Q.  You haven't discussed this lawsuit with any of
7  the parties to the lawsuit?
8      A.  No, I have not.
9      Q.  Have any of the parties to this lawsuit asked you
10  to testify?
11      A.  Any of the parties?
12      Q.  Uh-huh.
13      A.  No.
14      Q.  Did you speak with anybody at the Department of
15  Justice about Senate Bill 14?
16      A.  Yes, I did.
17      Q.  With whom did you speak?
18      A.  I don't recall.
19      Q.  Did you talk to the DOJ over the telephone?
20      A.  Yes, I did.
21      Q.  How many times did you speak to DOJ?
22      A.  Twice.
23      Q.  Do you remember, roughly, when that was?
24      A.  Within the last six months.  That's as best I can
25  tell you.

---

**79**

1      Q.  Did you send any letters or e-mails to DOJ about
2  SB 14?
3      A.  I did not, not that I recall.
4      Q.  Do you remember about how long your telephone
5  conversations lasted with DOJ?
6      A.  I had two conversations.  Each lasted probably
7  between 30 minutes and an hour.
8      Q.  Do you recall what you discussed with the
9  Department of Justice?
10      A.  My recollection of the debate about the bill, the
11  amendments that I introduced and that others introduced
12      Q.  Do you recall whether the Department of Justice
13  asked you if you believed SB 14 was passed with a
14  discriminatory purpose?
15      A.  I don't recall them asking me that question
16  specifically.
17      Q.  Do you recall that the Department of Justice
18  asked you if you believed SB 14 would have a
19  discriminatory effect?
20      A.  I don't recall them specifically asking me that.
21      Q.  Do you recall whether you told the Department of
22  Justice that SB 14 would have a discriminatory effect?
23      A.  I don't recall.
24      Q.  Do you recall whether you told the Department of
25  Justice that SB 14 had a discriminatory intent?

---

**80**

1      A.  I don't recall.
2      Q.  Did the Department of Justice ask you to provide
3  a declaration in this lawsuit?
4      A.  Not that I recall.
5      Q.  Did they ask you to provide any kind of statement
6  in this lawsuit?
7      A.  Not that I recall.
8      Q.  Did they ask you to provide -- did the Department
9  of Justice ask you to provide any declaration before
10  this lawsuit for purposes of preclearance?
11      A.  Not that I recall.
12      Q.  Has the Department of Justice asked you to
13  provide any testimony in this lawsuit?
14      A.  No, they've not.
15      Q.  Has the Department of Justice asked you to do
16  anything in this lawsuit?
17      A.  No, they've not.
18      MR. FREDERICK:  At this time I would reserve
19  all further questions for the time of trial.  Pass the
20  witness.
21      MR. DUNN:  Thank you, Mr. Frederick.  Do you
22  have any questions, Department of Justice?
23      MR. WILLIAMSON:  Department of Justice has
24  no questions.
25      MR. DUNN:  Great.  We'll reserve for trial.