## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS          )
                        )
                        )
VS.                     )   NO. 12-CV-128
                        )   (DST, RMC, RLW)
                        )
ERIC H. HOLDER, JR.,    )
In his official         )
Capacity as Attorney    )
General of the United   )
States, ET AL           )

*********************************************
         ORAL DEPOSITION OF ROBERT DUNCAN
*********************************************

   ANSWERS AND DEPOSITION OF ROBERT DUNCAN, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 7th day of June, 2012, between the hours of 9:30 a.m
and 4:25 p.m., in the offices the US Attorney, 816
Congress Avenue, Suite 1000, Austin, Texas, pursuant to
the agreement of counsel for the respective parties as
hereinafter set forth.

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
   OFFICE OF THE ATTORNEY GENERAL:
   By:  MR. PATRICK SWEETEN
   - and -
   MR. JAY DYER
   209 West 14th Street
   Austin, Texas  78701
   PH: (512) 936-6432

FOR THE DEFENDANT:
   DEPARTMENT OF JUSTICE
   By:  MS. JENNIFER MARANZANO
   - and -
   MR. VICTOR WILLIAMSON
   950 Pennsylvania Avenue, NW
   Room 7161 NWB
   Washington, DC  20530
   PH: (202) 305-0185

FOR THE INTEVENORS:
   BRAZIL & DUNN, LLP
   By:  MR. SCOTT BRAZIL
   4201 Cypress Creek Parkway
   Suite 530
   Houston, Texas  77068
   Ph: (281) 580-6310

## 3

INDEX

                                        PAGE
Appearances.............................   2

ROBERT DUNCAN
   Examination by Ms. Maranzano ........   6
   Examination by Mr. Brazil.  .........  242

Signature and Changes...................  254
Reporter's Certificate..................  256

## 4

EXHIBITS

NO.    DESCRIPTION                PAGE
520    Notice of Deposition        35
521    House Bill                  48
522    Interim Report              58
523    Online History              82
524    HB 218 Record              126
525    Senate Rules               137
526    Letter                     149
527    Letter                     149
528    Senate Journal             163
529    Email                      170
530    Senate Bill 14             172
531    Letter                     215
532    Letter                     215
533    Senate Rules               219
534    Indiana Voter ID Law       221
535    SB 14 Hearing Transcript   223
536    Senate Journal             228

PREVIOUSLY MARKED EXHIBITS
3      Letter                      98
28     HB 218                      79
29     SB 362                     105

## 5

1      MS. MARANZANO:  Good afternoon, Senator
2  Duncan.  My name is Jennifer Maranzano.  I'm
3  representing the defendant, Attorney General Eric
4  Holder, in this matter.  Can you please --
5      MR. SWEETEN:  I'm sorry.  Can we do
6  introductions?  I would like to make sure the record is
7  clear on who is here for whom.
8      MS. MARANZANO:  Yes.  Why don't we go around
9  the room and everybody state their name and who they are
10  representing.
11      MR. WILLIAMSON:  Victor Williamson,
12  Department of Justice.
13      MR. BRAZIL:  Scott Brazil for the Kennie
14  Intervenor's.
15      MS. MARANZANO:  Jennifer Maranzano with
16  defendant, Attorney General Eric Holder.
17      MR. SWEETEN:  I'm Patrick Sweeten with the
18  State of Texas and on behalf of the State and on behalf
19  of the witness, Senator Robert Duncan.  And attorney Jay
20  Dire who will be joining us very shortly.
21      MS. MARANZANO:  Thank you.
22      SENATOR ROBERT DUNCAN,
23  having being first duly sworn, testified as follows:
24
25

## 6

1                  EXAMINATION
2  BY MS. MARANZANO:
3      Q.  Senator, can you please state your name for the
4  record?
5      A.  Robert Duncan.
6      Q.  Have you been deposed before?
7      A.  Yes.
8      Q.  And what was the -- what case was that?
9      A.  I'm an attorney, so I appeared as an expert on
10  things before.  I was also deposed in the redistricting
11  case by Senator Davis's attorney that was -- occurred
12  here in 2011 I believe, or '12.
13      Q.  How many times have you been deposed?
14      A.  I don't know.  I've had depositions on
15  legislative intent back when I was in the House.  So I
16  would say four or five times, but I can't remember
17  specifically.
18      Q.  And one was the redistricting case in 2011?
19      A.  Correct.
20      Q.  And one was a case where you were an expert, did
21  you say?
22      A.  Well, more or less, yes, on workers'
23  compensation.  It's an area that I had some expertise a
24  long time ago.  Not anymore.
25      Q.  And when was that?

## 7

1      A.  90s, 1995, '94.
2      Q.  And the cases on legislative intent, can you tell
3  me about those?
4      A.  That was a case on a workers' comp bill I
5  believe, back in 1994.  And I was deposed on what was
6  the -- I can't remember the specific issue, but it had
7  something to do with workers' comp.
8      Q.  Were you deposed in your capacity as a senator?
9      A.  No, I wasn't a senator at this time.
10      Q.  Were you deposed as a member of the House of
11  Representatives?
12      A.  Correct.
13      Q.  And the other cases you were deposed in?
14      A.  They were private cases, as I was deposed as a
15  person with knowledge, specialized knowledge in a
16  certain area or field.
17      Q.  Okay.  And what field or area?
18      A.  That was workers' compensation.
19      Q.  Okay.  And the case in which you testified -- in
20  which you were deposed that dealt with legislative
21  intent, can you tell me what you mean by that
22  legislative intent?
23      A.  Well, they were -- the lawyers on one side
24  were -- there had been an amendment to a bill that I had
25  handled.  And they were trying to -- and I don't even

## 8

1  remember the bill.  And it was workers' comp -- may have
2  been something else.  I can't remember.  But it was --
3  they were trying to understand what the nature of the
4  legislation and what was in it.  That's all I really
5  remember about it.
6      Q.  Do you remember the nature of that case?
7      A.  No.
8      Q.  And the other cases, the other cases for which
9  you were deposed, other than this case that we're
10  talking about right now where you testified about the
11  legislative intent of the workers' compensation bill and
12  the redistricting case, you said you were deposed in
13  your capacity as an individual, not as a legislator; is
14  that correct?
15      A.  In the -- I don't understand the question.  I'm
16  sorry.
17      Q.  So there were two times, I think, that we've
18  talked about where you were deposed in your capacity as
19  a legislator; is that correct?
20      A.  Twice, yes.
21      Q.  And the other times you were deposed, was that in
22  your capacity as an individual?
23      A.  Correct.
24      Q.  Okay.  Well, I'm going to tell you a little bit
25  about how this is going to go today.  It sounds like you

## 13

1    A. Not about this -- about the case or the
2  deposition.
3    Q. Have you reviewed any transcripts from anybody
4  who's been deposed in this case?
5    A. No.
6    Q. Did you bring any notes or documents with you
7  today?
8    A. No.
9    Q. Is it your understanding that you, as a state
10  legislator, may invoke legislative privilege?
11    A. Yes.
12    Q. Will you be invoking the legislative privilege
13  over your deposition testimony today?
14    A. Yes.
15        MS. MARANZANO: I would like to note, for
16  the record, that we've received a court order on June
17  5th about what topics are covered by the legislative
18  privilege and what topics are not covered by the
19  legislative privilege. I'm going to ask questions in
20  compliance with that court order. Obviously your
21  attorney can object to questions that he believes invade
22  the legislative privilege and give you instructions
23  accordingly. But I want to say, for the record, that
24  we're reserving our right to appeal that decision at the
25  appropriate juncture.

## 14

1  BY MS. MARANZANO:
2    Q. Can you describe your educational background for
3  me?
4    A. Yes. I completed a BS degree in 1976 in
5  agricultural economics, a JD degree from the Texas Tech
6  University School of Law in 1981. And that's generally
7  it.
8    Q. Are you currently licensed to practice law?
9    A. Yes.
10    Q. And in what states are you admitted to the bar?
11    A. Texas.
12    Q. Any others?
13    A. Just federal courts and Supreme Courts, 5th
14  Circuit.
15    Q. And your bar license is currently active?
16    A. Yes.
17    Q. Can you tell me every legal job you've had since
18  graduating from law school?
19    A. Yes. I served as an associate in the law firm of
20  Crenshaw, Dupree & Milam until 1984. And then I was a
21  partner in that firm and have been a partner in that
22  firm since then and continue today to be a partner in
23  that firm.
24    Q. And do you have a special area you work on in
25  that firm?

## 15

1    A. I don't have a legal specialization. I primarily
2  am involved in litigation, personal injury and
3  commercial.
4    Q. How long have you served in the Senate?
5    A. I was elected in the special election and sworn
6  in in December of 1996.
7    Q. And you've served continuously since then?
8    A. Yes, ma'am.
9    Q. Have you held other elected offices?
10    A. Yes, ma'am.
11    Q. And what are those?
12    A. I was a member of the Texas House of
13  Representatives from 1993 until 1996 when I resigned to
14  run for the Senate.
15    Q. What made you decide to seek public office?
16    A. In essence, public service.
17    Q. Can you tell me about the population of the
18  district that you currently serve pre-redistricting?
19    A. Well, be more specific.
20    Q. Do you have any sense of the population
21  demographics?
22    A. I would be speculating on them. I know that the
23  region of the state I represent has Anglo and Hispanic
24  influence and Hispanic influence is growing.
25    Q. Any sense of what percentage, approximately?

## 16

1    A. Well, I would be guessing so I don't want to
2  speculate on that. I've seen the numbers and know the
3  numbers. But from a general list, but I don't want to
4  lay a number out without being specific. Those
5  demographics exist and change periodically. But
6  generally we have -- in rural West Texas we're Hispanic
7  and Anglo primarily, with African-American as well.
8    Q. Do you do any outreach in your district that's
9  geared particularly at minority communities?
10    A. I try to be available and outreach to all
11  communities. And yes, I do. I work very well with
12  Hispanic leaders and members of the Hispanic community,
13  as well as the African-American community.
14    Q. What do you mean by that, "you work well with
15  leaders of the Hispanic community"?
16    A. Well, I support their events and meet with them
17  on a regular basis. They support me. I recently had a
18  fundraiser. It was supported by and sponsored by
19  Hispanic leaders in the Lubbock community. And so, you
20  know, I try to -- my district is very broad and verse
21  and I try to do the best I can to meet the needs of the
22  members of my constituents I represent.
23    Q. Would you say that Hispanics are an important
24  constituency in your district?
25    A. They are.

## 17

1    Q.   Would you say African-Americans are an important
2    constituency in your district?
3    A.   They are.
4    Q.   What committees do you serve on in the Texas
5    Senate?
6    A.   I chair the State Affairs Committee.  I serve on
7    the Finance Committee, Higher Education Committee, on
8    Jurisprudence -- Committee on Jurisprudence and, you
9    know, various select committees that are appointed
10   during the interim.  I don't think I left anything out.
11   Q.   You what?
12   A.   I think I covered everything.
13   Q.   Okay.  How long have you served on the State
14   Affairs Committee?
15   A.   I was initially appointed to that committee in
16   2003.  And in 2000 -- excuse me, 2001 -- no, 2003.  I'm
17   sorry, 2003.  And then I became chair in 2004 or '05,
18   2004, I believe.
19   Q.   How did you become chair?
20   A.   The Lieutenant Governor appoints the chairman of
21   various committees.
22   Q.   And who was the Lieutenant Governor at that time?
23   Lieutenant Governor Dewhurst, David Dewhurst.
24   Q.   What were the -- did you say you were on a couple
25   select committees?

## 18

1    A.   Right.
2    Q.   What were those?
3    A.   Well, I've been on several.  But mostly involving
4    school finance, public school finance.
5    Q.   Anything else?
6    A.   That's all.  I think that's really, mainly it.
7    Q.   And what's the purpose of a select committee?
8    A.   Well, generally a select committee has members of
9    both the House and the Senate to study an issue in the
10   interim and often times they'll also have members of the
11   general public, as school finance did.
12   Q.   Are they always held during interim sessions?
13   A.   Normally.  I can't recall of one not.  There's no
14   requirement of that, but it would be unusual to have a
15   select committee operating during a 140-day general
16   session.
17   Q.   Other than the Committee of the Whole, is the
18   State Affairs Committee the only Senate committee that
19   considered voter ID bills?
20   A.   To my recollection, I believe that to be the
21   case, as far as I remember.
22   Q.   If a Senator wishes to introduce a bill that's
23   going to be heard by the State Affairs Committee, do
24   they usually confer with you about that bill?
25   A.   No.

## 19

1    Q.   Putting aside voter ID bills, how many election
2    related bills have you sponsored?
3    A.   That's a good question.  I don't know the answer
4    I have, because as chairman of the committee we
5    interface with the Secretary of State quite a bit and
6    during the terms that I have served as chairman we've
7    implemented HAVA, we've implemented -- last session we
8    did the MOVE Act.  So we've worked with the Secretary of
9    State's office.  And typically I will sponsor those
10   bills, or a lot of times Leticia Van de Putte will do
11   that.  She handles a lot of legislation and she and I
12   have worked together on those issues with regard to
13   election bills.
14   Q.   Is Senator Van de Putte also on the State Affairs
15   Committee?
16   A.   Yes.
17   Q.   And so am I understanding you correctly, it's a
18   number of legislation bills you've sponsored?
19       MR. SWEETEN:  You can refer to matters of
20   the public record when answering this.
21   BY MS. MARANZANO:
22   Q.   We're just talking about ones that you've
23   publicly sponsored?
24   A.   I can't give you an amount.  That would be in the
25   record.  You can look that up.

## 20

1    Q.   Right.  But are you saying you can't give me an
2    amount because it's more than a few?
3    A.   Well, that and I've carried a lot of bills over a
4    lot of things in the 14 or 15 years.  So I just can't
5    tell you specifically what they are.  I can tell you
6    like I did, the general -- the bills that basically are
7    mandated to be -- by Congress to be a part of the State
8    systems, typically I'll handle those.  But not always.
9    It depends if there's another member who wants to do
10   that, that's fine with me.
11   Q.   And how does that work, if a federal law passes
12   that the State needs to implement, does the Secretary of
13   State usually reach out to you?  How do you end up
14   proposing a law to implement HAVA or the MOVE Act, as
15   you referenced?
16       MR. SWEETEN:  I'm going to object to the
17   question to the extent it calls for him to reveal his
18   mental impressions, his thoughts, his motivation about
19   legislation or the furtherance of the legislative
20   process.  I'm going to instruct you not to answer to the
21   extent that your answer would implement those things.
22   You're free to refer to matters of the public record.
23   Also I'm going object to the question as vague and
24   compound.
25   A.   I'll follow his instruction.

Robert Duncan                                                    June 7, 2012

---

21

1    Q. (By Ms. Maranzano)  Okay.  There's nothing on the
2    public record that you could tell me about how the State
3    goes about implementing a federal election law that
4    passes?
5        A. Well, the public -- yeah, there is.  If you look
6    at the record of our committee.  When a bill is passed,
7    or introduced and then it goes to the hearing process.
8    And so there's a recorded testimony, there is evidence
9    that's put in the record and all of that is a part of
10   the legislative record and that's where it is.  It's
11   pretty clear on how it goes about what the testimony is,
12   Secretary of State will testify.  Typically the expert
13   in their office will testify as to the need for the
14   bill.  And that's how that works.
15       Q. Okay.  Are there primary areas of focus, of
16   legislative focus that you work on?
17       A. Not really.  I've had pretty -- well, work in a
18   lot of different areas.
19       Q. Other than being the chair of the State Affairs
20   Committee, do you have any leadership roles in the
21   Senate?
22       A. Today, that's it.
23       Q. In the past have you had other leadership roles?
24       A. I was chairman of the Jurisprudence and was
25   president pro tem.

---

23

1    Q. Do you have any experience related to election
2    administration?
3        A. No.
4        Q. Have you ever served as a poll worker?
5        A. No.
6        Q. While you -- well, let me ask you this.  Do you
7    vote in person?
8        A. Yes, ma'am.
9        Q. Have you ever witnessed any problems while you've
10   been voting?
11       A. No.
12       Q. Have you ever seen anybody try to impersonate
13   another voter, that you're aware of, while you've been
14   voting?
15       A. No.
16       Q. Have you ever seen a non-citizen trying to vote
17   while you've been voting, that you're aware of?
18       A. I wouldn't be aware.
19       Q. Have you ever challenged a voter's eligibility?
20       A. No.
21       Q. Are you familiar with a group called the American
22   Legislative Exchange Council, or ALEC?
23       A. I've heard of them.
24       Q. Have you ever had any affiliation with them?
25       A. No.

---

22

1    Q. And when were you chair of the Jurisprudence
2    Committee?
3        A. 2003 and 2000 -- 2001, 2003, I think.
4        Q. 2001 to 2003?
5        A. I think it was two sessions.
6        Q. Approximately.  Okay.  When were you president
7    and pro tem?
8        A. 2011.  No, 2009.  Sorry.  Sorry.
9        Q. What are the responsibilities of being president
10   pro tem?
11       A. Well, I think the main responsibility is the
12   constitutional position.  And should the Lieutenant
13   Governor not be in the state or not be able to act,
14   well, then, the pro tem immediately succeeds that
15   position.  If the Lieutenant Governor leaves office, the
16   president pro tem then must call a special session to
17   elect a presiding officer.  That's primarily -- when the
18   Lieutenant Governor and the governor are out of the
19   state temporarily, then the president pro tem moves into
20   the head of the government.  So it's primarily what it's
21   responsibilities include.
22       Q. Do you have any experience related to election
23   law?
24       A. Other than serving on the State Affairs Committee
25   no.

---

24

1    Q. Have you ever gone to any of their meetings?
2        A. No.
3        Q. Have you ever received any documents or
4    communications from them?
5        A. Not that I know of.  You know, I'm not a member
6    so I don't get their documents.  If they send something
7    generally to everybody in the legislature, maybe so.  I
8    don't know.  I don't recall seeing anything.  It might
9    not get to me.
10       Q. Are you familiar with a group called the National
11   Conference of State Legislators?
12       A. Yes, ma'am.
13       Q. Do you have any affiliation with that group?
14       A. With who?
15       Q. National Conference of State Legislators.
16       A. I think, like all legislators, we're probably
17   members, the legislature is.  But I don't have any
18   particular, individual affiliation or office or anything
19   like that.  I don't go to the meetings other than, I
20   think I've given a speech at one.  And I think I got an
21   award when I was in the House and I went to one as a
22   result of that award.
23       Q. Can you tell me when you gave the speech?
24       A. I think it was in 2009, something like that 2008
25   or '09.

Robert Duncan                                                    June 7, 2012

## 25

1  Q. Do you -- what was that about?
2  A. Retirement benefits.
3  Q. And what did you get an award for?
4  A. The National Republican Legislators Award,
5  something like that, when I was in the House.
6  Q. When was that?
7  A. '94 or '95, 95.
8  Q. And was it for anything in particular?
9  A. No.
10 Q. Just being a good legislator?
11 A. Not sure why I got it.
12 Q. Okay. Have you received materials from the
13 National Council of State Legislators?
14 A. I'm sure we have over the -- overtime.
15 Q. Do you know if any of them involved voter ID?
16 A. I don't know.
17 Q. Do you have any familiarity with a group called
18 Safe Texas?
19 A. No.
20 Q. Do you know who they are?
21 A. No.
22 Q. Do you have any familiarity with a group called
23 Secure and Fair Elections in Texas?
24 A. No.
25 Q. Are you familiar with someone by the name of

## 26

1  Melinda Frederick?
2  A. No.
3  Q. Are you familiar with someone by the name of Tony
4  Ann Dashiell, D-A-S-H-I-E-L-L?
5  A. No, ma'am.
6  Q. Do you know someone by the name of Russ Durstine?
7  A. Durstine, yes, I know Russ.
8  Q. Can you tell me who he is?
9  A. Russ is, I think the -- isn't he from San Angelo.
10 I think Russ is from San Angelo, which is in my
11 district. Or he's either that or he's active in the
12 Republican Party Chairman's Association. One of those
13 two. I think Russ is a constituent from San Angelo.
14 Q. Have you had any communications with Mr. -- say
15 his last name for me again?
16 A. Durstine.
17 Q. Durstine. About voter ID?
18 A. No. Probably not.
19 Q. Probably not?
20 A. Probably not.
21 Q. Are you familiar with someone by the name of
22 Barbara Larson?
23 A. No.
24 Q. How about -- are you familiar with someone by the
25 name Tom Mecler?

## 27

1  A. Yes.
2  Q. Who is Mr. Mecler?
3  A. He's a member of the SREC.
4  Q. And what is the SREC?
5  A. State Republican Executor's Committee.
6  Q. Have you had any --
7  A. And I think he's also a member of the -- he's on
8  the Texas Department of Criminal Justice Board as well,
9  I believe.
10 Q. I'm sorry. I didn't catch that?
11 A. The Texas Department of Criminal Justice Board, I
12 think he's on that, too.
13 Q. Have you had any communications with Mr. Mecler
14 about voter ID?
15 A. No. Not that I recall.
16 Q. Are you familiar where someone by the name of
17 Bill Nobel?
18 A. Bill who?
19 Q. Nobel.
20 A. No.
21 Q. Do you know someone by the name Eric Opiela?
22 A. No.
23 Q. Linda Rogers?
24 A. No.
25 Q. Are you familiar with someone by the name of

## 28

1  Skipper Wallace?
2  A. Yes.
3  Q. And who is Skipper Wallace?
4  A. Skipper Wallace is the person who is affiliated
5  or associated with the Republican County Chair's
6  Association, I believe.
7  Q. Do you have any communications with Mr. Wallace
8  about voter ID?
9  A. Not other than -- you know, I believe Mr. Wallace
10 probably testified in front of the committee. I would
11 assume that he did because he did on a number of
12 different issues. He would be the person who would
13 testify in front of the State Affairs Committee on
14 election issues and things like that.
15 Q. Did you have any communications, apart from his
16 testimony, from Mr. Wallace about voter ID issues?
17 A. Not that I recall.
18 Q. Are you familiar with someone by the name of
19 Maria Martinez?
20 A. No.
21 Q. Are you familiar with someone named Catherine
22 Englebreth?
23 A. Catherine who?
24 Q. Englebreth.
25 A. No.

Robert Duncan                                                    June 7, 2012

---

## 29

1    Q. Have you heard of an organization called True to
2    Vote?
3    A. No.
4    Q. Have you heard of an organization called the King
5    Street Patriots?
6    A. Yes.
7    Q. Do you have any affiliation with them?
8    A. No.
9    Q. Did you have any communications with the King
10   Street Patriots about voter ID?
11   A. If I did it would have been as an entity or a
12   person who represented that entity testifying before the
13   committee.
14   Q. I think I understand you. But just to be clear,
15   you're saying any communications you would have had with
16   them would have been them testifying at the State
17   Affairs Committee?
18   A. Right. I don't recall ever having -- and I had
19   very few meetings like that on issues like that in my
20   office. It would be something that would -- typically I
21   would just say come to the committee and talk to the
22   committee.
23   Q. Okay. So --
24   A. So that would be my interface with those folks.
25   Q. And just to be clear, when you say "you have very

---

## 30

1    few meetings like that," what do you mean by that?
2    A. Well, I mean typically serving in the
3    legislature, serving on the finance committee, other
4    capacities. I'm very seldom in my office. And so -- in
5    fact, I'm never in the office. So I'll be in a
6    committee room or in hearing or, you know, typically on
7    the floor all day long. And so I typically don't
8    entertain a lot of in office meetings with people about
9    legislation pending before my committee. My standard
10   thing is come to the committee and testify.
11   Q. Got it. Can anybody come to the committee and
12   testify?
13   A. Yes.
14   Q. During the times of the year when you are not in
15   the legislative session, do you have meetings with
16   people about potential legislative issues?
17   A. From time to time. But, you know, not that many,
18   quite frankly. I mean, there may be constituents in
19   Lubbock or there may be something on workers'
20   compensation or, you know, from time to time people will
21   come to you with ideas. But that's probably like every
22   member, you know, has some meetings and dealings with
23   different trade organizations or work constituents.
24   Q. When you say "not that many," is it -- can you
25   just give me and approximate number?

---

## 31

1    A. No.
2    Q. Like a couple a months?
3    A. I'm not going to guess. But, you know, I will
4    say this. Typically in Austin, you know, I will come
5    during the interim once, maybe, a month for one day,
6    maybe two. Usually it's before -- because of a hearing.
7    Typically, if I have a meeting with someone it
8    will be, 90 percent of the time, an agency head over an
9    issue, whether it's a budget issue or an issue that I
10   have jurisdiction over in State Affairs or in some
11   committee or if I passed a bill. And if it's an
12   insurance bill I want to meet with the commissioner and
13   say, "What are you doing with regard to that?" Those
14   are the kinds of meetings I have in Austin.
15   In Lubbock I will have meetings from time to
16   time. I try to never turn down a constituent who wants
17   to come meet with me there. Or in San Angelo. I go to
18   Childress. I have 51 counties now. I had 46. So
19   it's -- you try to meet with your constituents, but at
20   the same time, logistics also cause us some issues
21   there.
22   Q. And you said your district was in Western Texas;
23   is that right?
24   A. Yes, ma'am.
25   Q. Can you describe, just very generally, the

---

## 32

1    geographic area?
2    A. Sure. It's -- before redistricting, it was 46
3    counties that spanned from the Panhandle all the way
4    down to Eldorado, Texas. And the major -- the larger
5    cities would be Lubbock and San Angelo. Came near
6    Abilene and Amarillo and near Wichita Falls as well.
7    Q. Can you tell me your staff members who work for
8    you in your legislative capacity?
9    A. Yes. My chief of staff is Porter Wilson. At
10   that time my general council was Cory Pomeroy. The
11   director for State Affairs and also general council is
12   Jennifer Fagan. My staff person in charge of Article 2
13   and health and human service issues is Jennifer
14   Chambers. Sara Clifton is the staff person in charge
15   of -- at that time -- she was with me at this time, in
16   2011. And then numerous staff members that are -- that
17   I can't remember the names of that are interim hires or
18   rather, staff session hires, with regard to legal issues
19   and things like that that, you know, younger lawyers
20   that help us with the committee and briefing bills and
21   working through problems with bills in the committee.
22   Q. And for a couple of these people you said "at
23   that time," and you were referring to during the 2011
24   legislative session?
25   A. Right. That's legislation.

Robert Duncan                                          June 7, 2012

---

## 33

1   Q.  Which of these staff worked on the voter ID
2   issue?
3   A.  Jennifer Fagan.
4   Q.  Anybody else?
5   A.  Probably not.
6   Q.  Do you know someone by the name of Megan LaVoie?
7   A.  Uh-huh.
8   Q.  Who is Megan LaVoie?
9   A.  I'm sorry.  Megan is -- handles the media for us
10  primarily.  She's a law student who has just graduated
11  and studying for the bar now.
12  Q.  Is she a staff of yours?
13  A.  Yes, she still is.  I just -- don't tell her I
14  forgot.
15  Q.  All right.  How often do you communicate with
16  your staff during the legislative session?
17  A.  Daily.
18  Q.  And how do you usually communicate with them?
19  A.  Directly.
20  Q.  In terms of verbally?
21  A.  Right.
22  Q.  Do you ever e-mail with them?
23  A.  You know, other than "can you come to the
24  office," yes.  "Would you send me -- send down a granola
25  bar," or "would you order me lunch."  Just logistical

## 34

1   things.  I don't -- it's hard to communicate like that
2   when you're trying to listen to a hearing or something
3   like that.  So at the end of the day, we meet before we
4   go home and we debrief about what's happened.
5   Q.  So when you do communicate with them, do you have
6   a blackberry or a phone?
7   A.  At that time I had a blackberry, but I didn't --
8   we didn't communicate other than for the purpose of,
9   "can you bring me a granola bar" or, "somebody's here"
10  or whatever.  And that's it.
11  Q.  Okay.  Non-substantive communication?
12  A.  Yeah.  I'm not very good at that thumb typing
13  stuff, plus I don't -- I think if a member is at the
14  committee dios, you ought to be listening and not
15  communicating with folks.  I feel strongly about that.
16  Q.  Do you ever use -- when you said you have -- I
17  think I didn't get an answer.  Did you say you used a
18  blackberry when you do that?
19  A.  Right.
20  Q.  And is that a personal blackberry or work
21  blackberry?
22  A.  It was a personal blackberry or law firm
23  blackberry.
24  Q.  And do you save the messages on that?
25  A.  No.

## 35

1   Q.  Do you delete them or do they automatically get
2   deleted?
3   A.  I don't know what happens to them, quite frankly.
4   The blackberry quit working so I had to replace it.  And
5   because that technology is, more or less, going
6   obsolete, I replaced it with an iPhone.  And I
7   definitely can't work that.
8   Q.  Me either, actually.  Is there someone in your
9   office who maintains legislative records?
10  A.  You know, I guess everybody does.  We don't
11  have -- we follow whatever the secretary of the Senate
12  tells us to do.  I assume my chief of staff probably
13  handles most of that for the committee.  It would have
14  been Jennifer Fagan.
15  Q.  So the secretary of the Senate issues a retention
16  policy about files?
17  A.  Yes.
18  Q.  Okay.
19  A.  We follow that.
20  MS. MARANZANO:  Can we have this marked?
21  (Exhibit No. 520 was marked.)
22  BY MS. MARANZANO:
23  Q.  Senator, I'm showing you what we're marking, for
24  the record, as deposition Exhibit 520.  Can you just
25  take a look at this and let me know if it looks familiar

## 36

1   to you?
2   A.  Yes, ma'am.
3   Q.  And what is this?
4   A.  It is a notice of deposition for today.
5   Q.  And when you received this notice, can -- well,
6   did you receive this notice?
7   A.  Well, we did.  And I instructed staff to assemble
8   the documents I think that are necessary to comply.
9   Q.  And did the staff turn those documents over to
10  your attorney?
11  A.  Yes, they did.
12  Q.  Can I direct your attention to request No. 5,
13  which is on the second to last page.  Do you know how
14  many documents you turned over that were responsive to
15  that request?
16  A.  No, ma'am.
17  Q.  Who in your staff conducted the search for these
18  documents?
19  A.  I think that Ms. Fagan did.
20  Q.  Do you know if she searched electronic documents
21  as well as hard copies of documents?
22  A.  I assume that she did and followed the
23  instructions in the subpoena.
24  Q.  Did you have any communications with her about
25  her search for documents?

## 37

1    A. Other than when the subpoena came in, she called
2  and said we were notified by subpoena. Of course, we
3  get those kind of requests all the time. Typically, she
4  will do those. And I said, "Well, go ahead and comply
5  with it and turn it over to the Attorney General's
6  office." It was more or less routine in our office to
7  do that sort of thing.
8    Q. It's routine because of public information
9  request?
10   A. Sure. Yeah.
11   Q. Did you have any files compiled already that you
12 had done for public request on this issue?
13   A. No, I don't think so.
14   Q. Are you familiar with Section 5 of the Voting
15 Rights Act?
16   A. Not -- I know it exists. I'm not an expert on
17 it.
18   Q. What's your understanding of the requirements
19 under Section 5?
20   A. Well, you know, I'm not -- I don't really want to
21 go into what my understanding of it is. I think that
22 is, Section 5 of the Voting Rights Act, I believe is the
23 requirement for preclearance; is that correct? Is this
24 a test?
25   Q. No. I'm not trying to test you, sir. I'm really

## 38

1  not.
2    MR. BRAZIL: You'll be graded later.
3    A. Thank you. What I'm trying to figure out is what
4  are you asking, I guess. It's not clear to me.
5    Q. (By Ms. Maranzano) Right. Well, let me ask you
6  a different question. Are you familiar with a
7  requirement under the Voting Rights Act by which Texas
8  has to submit election related changes to either the
9  Department of Justice or federal court to get
10 preclearance?
11   A. I am familiar that we are required to do that.
12   Q. Okay. Could you describe as a general matter any
13 steps of the legislature takes to increase the chances
14 that a law is going to be precleared by the Department
15 of Justice or a federal court?
16    MR. SWEETEN: I'm going to instruct you not
17 to answer on the basis of legislative privilege. The
18 question would require you to reveal your thoughts,
19 mental impression and motivation about legislation in
20 furtherance of the legislative process. So I'm going to
21 instruct you not to answer on that basis.
22 BY MS. MARANZANO:
23   Q. All right. Let me ask you this, Senator. Is
24 there anything based on the public record that you could
25 tell me about the steps the legislature takes in regards

## 39

1  to Section 5?
2    MR. SWEETEN: Again, if you will confine
3  your answers to matters of the public record. Do not
4  reveal your thoughts, mental impressions or motivations
5  about this.
6    A. The committees in the Texas Senate hold hearings.
7  Those hearings are recorded and the documents that are
8  presented to be included in the record are included in
9  the record. And that would be the public record. The
10 Senate debates are the same way, as far as we don't use
11 exhibits on the Senate floor. But the debates and the
12 amendments to bills are in the public record.
13   Q. And again, based on the public record, does the
14 legislature usually do some sort of factual analysis to
15 determine if a law is going to have a retrogressive
16 effect on minorities?
17    MR. SWEETEN: Objection; compound.
18 Objection. Don't answer if it requires you to reveal
19 your mental impressions, opinions, motivation about
20 legislation. You can refer to matters of the public
21 record. But if in referring to the public record you
22 would be revealing your mental impressions do not do so.
23 It's subject to privilege.
24 BY MS. MARANZANO:
25   Q. And just to be clear, this isn't really -- I'm

## 40

1  not asking about what you personally do. I'm asking
2  about steps the legislature takes, available in the
3  public record, in terms of a factual analysis about
4  election related changes and whether or not they have a
5  retrogressive effect?
6    MR. SWEETEN: Same instruction.
7    A. I think the public record reflects what we do
8  very clearly and we follow, you know, the -- in the
9  committees we have hearings, we have public hearings.
10 And the testimony that we receive; pros and cons,
11 analytical, not so analytical, is in the public record.
12   Q. And just in terms of a "yes" or "no" answer for
13 this one. Do you do anything beyond that testimony. Do
14 you do any analysis beyond that testimony?
15    MR. SWEETEN: Don't answer that question.
16 That would require you --
17    MS. MARANZANO: Not even to say "yes" or
18 "no"?
19    MR. SWEETEN: No, not even a "yes" or "no."
20 You're asking him about his mental impression,
21 motivation. Whether he does something beyond the public
22 record would go into that and he's not going to provide
23 it based upon the legislative privilege objection.
24    MS. MARANZANO: Okay. This isn't about him.
25 This is about steps the legislature takes. So it's not

Robert Duncan                                              June 7, 2012

### 41

1   his mental impressions.  And I'm not trying to probe
2   what it is, I'm just asking for a "yes" or "no."
3        MR. SWEETEN:  And, you know, respectfully,
4   my response is that if you're asking him things beyond
5   the public record, if things are done, then you would
6   potentially be asking him to reveal communications he's
7   had with other senators, with legislative staff, with
8   State agencies, Texas legislative council constituents,
9   you would be asking for his mental impressions and
10  thought process.  So with respect to that, I'm going to
11  instruct him not to answer that question as posed.
12  BY MS. MARANZANO:
13       Q.  You're following your counsel's instructions,
14  just for the record?
15       A.  Yes, ma'am.
16       Q.  Thank you.  Based on the public record, are there
17  any steps that the legislature takes to build a record
18  that supports an assertion that there's no
19  discriminatory purpose behind the bill?  Based on the
20  public record.
21       MR. SWEETEN:  First of all, I think he's
22  answered based on the public record.  I think he's
23  answered this question.  Secondly, you're now asking him
24  about his process as reflected in the public record.
25  And in that regard, you're seeking to find out his

### 42

1   mental impressions, opinions and his motivations about
2   legislation.  So he's referred to the public record.  He
3   can do that, but he's not going to get into what his
4   thinking is about how something complies with the Voting
5   Rights Act.  That is absolutely subject to the
6   privilege.
7   BY MS. MARANZANO:
8        Q.  Okay.  Well, let me try it this way.  We spoke
9   about the public record in regard to the retrogressive
10  effect.  And you said people testify at hearings and
11  they're all transcribed or recorded, I think you said.
12  And now I'm just asking about, is there anything
13  additional that happens on the public record that goes
14  to building a record to support an assertion that
15  there's no discriminatory purpose?
16       A.  First, I don't recall you ever asking me about
17  specifically the retrogressive effect.  So I'm not sure
18  I understand your question.  So if you could -- the
19  foundation was fairly lengthy.  If you could just --
20       Q.  Yes.  I'm sorry.  I thought my last question had
21  been about the effect.  That was when you said to me
22  that there were hearings, the hearings were recorded
23  people testified.
24       A.  Well, I just didn't hear the word retrogression
25  effect.

### 43

1        Q.  Yes.  So this time I'm asking you about, based on
2   the public record, does the legislature take steps to
3   build a record that would support an assertion that
4   there's no discriminatory purpose behind an act?
5        MR. SWEETEN:  Okay.  You're asking him, does
6   the legislature build a record to support facts and
7   based upon the public record.  In doing that, you're
8   asking for more than what's on the public record.
9   You're asking for, are they taking steps to build a
10  record.
11       MS. MARANZANO:  On the record.
12       MR. SWEETEN:  He's not going to talk about
13  his process on what steps they take, the purpose of
14  those steps.  He's not going to answer that question.
15  You can ask him, you know, as to what's on the public
16  record.  But you're not going to get into his thoughts
17  and mental impressions.  There's a line here and these
18  last few questions you're getting into his mental
19  impressions and I'm not going to let him do that.  That
20  is subject to privilege.
21       MS. MARANZANO:  Okay.  I am actually -- I am
22  really not trying to get into his mental impressions.
23  I'm trying to ask him about the steps taken on the
24  record.  And we went through the effect and now I'm
25  asking about steps taken on the record that go to the

### 44

1   purpose of the legislature.  What sort of steps does the
2   legislature take on the public record that support an
3   assertion that there's no discriminatory purpose behind
4   the bill.
5        MR. SWEETEN:  Again, you're asking for his
6   motivations in that question.  He can testify about what
7   is on the record.  He's not going to testify about steps
8   taken to build a record.  And to answer that question.
9   So you're treading into what is subject to the
10  legislative privilege and I'm going to instruct him not
11  to answer.
12  BY MS. MARANZANO:
13       Q.  When you talked about the committee proceedings
14  are there any procedures, public procedures established
15  by the committee that relate to Section 5 of the Voting
16  Rights Act?
17       MR. SWEETEN:  You can testify about matter
18  on the public record.
19       A.  I don't know if there are any specific rules or
20  requirements with regard to any specific law of how we
21  would handle anything.
22       Q.  (By Ms. Maranzano) Senator, What is Texas'
23  current system for verifying a voter's identity?
24       MR. SWEETEN:  You can answer.
25       A.  Well, in the statute.  I think you have -- there

Robert Duncan                                                    June 7, 2012

### 45

1    is -- I think you present a voter registration card as
2    one.  If you don't have the card, you can present other
3    forms of ID.  I think generally that's it.  I mean, if
4    you can show me the statute I can tell you specifically.
5        Q.  If a voter doesn't have a voter registration
6    card, are you familiar with the forms of ID that the
7    voter would need to show?
8        A.  I believe it's a driver's license or -- there are
9    other alternative forms of ID as well.
10       Q.  Are there some non-photo IDs that a voter can
11   show?
12       A.  I believe that's correct.  Under the current law
13   before Senate Bill 14.
14       Q.  Exactly, yes.  Do you know if a utility bill is
15   one of those forms of identification?
16       A.  Whatever the statute says is what it says.
17       Q.  And if the voter doesn't have any of those forms
18   of identification, can a voter cast a provisional
19   ballot?
20       A.  I think that's correct.
21       Q.  And do you know the standards by which that
22   provisional ballot may or may not be counted?
23           MR. SWEETEN:  Hold on a second.  You're
24   asking about existing law.  I'm going to let him answer
25   that to the extent he knows.

### 46

1           MS. MARANZANO:  Thank you.
2        A.  I will be -- you know, I'm like most lawyers I
3    would have to go to the statute and look.  I'm not going
4    to guess on what it says specifically.
5        Q.  (By Ms. Maranzano)  Okay.  Is it your
6    understanding that a voter does not need to take an
7    additional trip anywhere to in -- and show the registrar
8    one of the -- this is current law, one of the forms of
9    ID under current law in order for that provisional
10   ballot the be counted?
11       A.  I would have to look at the statute.  And I
12   didn't look at the statute to prepare.
13       Q.  Okay.  Is the current system for verifying a
14   voter's identity inadequate?
15           MR. SWEETEN:  Objection.  It calls for
16   matters of legislative privilege.  Don't answer the
17   question.
18   BY MS. MARANZANO:
19       Q.  Let me ask you this.  Did anything come up on the
20   public record that reflects problems with the current
21   system for verifying a voter's identity?
22           MR. SWEETEN:  You can answer the question as
23   phrased.
24       A.  You would have to look at the public record.  I
25   think -- you know, I don't recall specific anecdotal

### 47

1    testimony.  I recall whatever is in the record, is in
2    the record is all I can say.  I didn't look at the whole
3    record.  It's a long record.  And so I would be going
4    solely off of memory.  And I'm not comfortable doing
5    that.
6        Q.  So right now as you sit here, you're not aware of
7    problems that were testified to on the public record
8    with the current system of verifying a voter's identity?
9        A.  That's not what I said.  I just said I'm not
10   prepared to go into specific instances.  It is in the
11   record.  Whatever is in the record, is in the record.
12       Q.  Okay.  But right now -- but I'm just asking you
13   what you know right now, sitting here today, and you're
14   not prepared to testify about any?
15       A.  Right now I know there was.  But I can't recall
16   the specific instances to the degree of certainty that I
17   would be comfortable testifying under oath about.
18       Q.  Okay.  You recall there were problems that were
19   testified to?
20       A.  Yes.  I think there were.  But you would have to
21   go to the record to see what they were.
22       Q.  Well, what do you remember about the record?
23       A.  I don't.
24       Q.  You don't?  So you can't tell me anything about
25   those problems?

### 48

1        A.  I can tell you this -- and, you know, there were
2    issues.  But I'm not prepared go into specific anecdotal
3    situations.  The record reflects that.  And the record
4    will have to speak for that.
5        Q.  Can you tell me when you first heard support for
6    enacting a photo identification law in Texas?
7            MR. SWEETEN:  You can answer to the extent
8    it doesn't reveal matters of legislative privilege.
9        A.  I can't remember specifically.
10       Q.  (By Ms. Maranzano)  Can you tell me
11   approximately?
12       A.  No.
13       Q.  Do you remember what the first voter
14   identification law that you worked on was?
15       A.  I don't remember the specific bill.  I know --
16   and I didn't work on them.  I was never a sponsor of any
17   of these bills.  They would either, when I took over as
18   State Affairs chairman that's the jurisdiction, voter
19   election laws are in that jurisdiction with a lot of
20   other things.  And so I think there was an interim study
21   on that.  I think there was -- there were bills that
22   were passed went through the committee after that.
23       Q.  Okay.
24           MS. MARANZANO:  Can we mark this?
25           (Exhibit No. 521 was marked.)

Robert Duncan                                                    June 7, 2012

---

### 49

1  BY MS. MARANZANO:
2      Q.  Senator, I'm showing you what we're marking as
3  deposition Exhibit 521.  If you can take a look at it
4  and tell me if it looks familiar to you?
5      A.  No.
6      Q.  No?  Have you ever seen this bill before?
7      A.  I don't -- it's a House Bill.  If it passed the
8  House and came to the committee, I would assume I would.
9  I don't know if it did pass the House.
10     Q.  Well, I'll represent to you that this bill did
11  pass the House.
12     A.  Okay.
13     Q.  And it was referred to the State Affairs
14  Committee.
15     A.  Okay.
16     Q.  Perhaps that refreshes your recollection
17  slightly.
18     A.  Well, yes.  If that's the case, then we would
19  have heard this bill in the committee.
20     Q.  Do you recall if you did hear the bill?
21     A.  If you can tell me what year.
22     Q.  I'm sorry.  This is from 2005.
23     A.  Okay.  I assume we did hear the bill, but I don't
24  know.  You will have to look at the record.
25     Q.  Well, I will represent to you that this bill was

---

### 50

1  referred to and there was not a hearing on the bill.  Do
2  you have any recollection -- you can take a couple of
3  minutes and maybe look it over and see if you have any
4  recollection.  You can see at the top it was introduced
5  by -- it's House Bill -- for the record, it's House Bill
6  1706.
7      A.  Okay.  I do not know why the bill didn't get a
8  hearing.  That was seven years ago.  There are a number
9  of reasons why bills don't get hearings.  So I couldn't
10  tell you, nor do I know if the public record reflects
11  why it didn't get a hearing.  I don't know.
12     Q.  What are some of the reasons that a bill doesn't
13  get hearing?
14         MR. SWEETEN:  Yeah.  Don't reveal your
15  thoughts, mental impressions about legislation in
16  answering the question.  That's subject to the
17  legislative privilege.
18  BY MS. MARANZANO:
19     Q.  Are you able to provide an answer?
20     A.  Well, I'm not sure I understand the question.
21     Q.  You said there are several reasons a bill might
22  not get a hearing, so I was asking you what are those
23  reasons?
24         MR. SWEETEN:  Again, don't reveal your
25  thoughts or mental impressions.  I'm also going to

---

### 51

1  object based on compound and vague.  If you can answer
2  it without revealing your thoughts and mental
3  impressions or communications that you've had, then do
4  so.  But the you can't --
5      A.  The only thing I can do without -- without going
6  into the legislative privilege is just generally in all
7  committees:  Number one, there's not support for the
8  bill.  Number two, it's not ready.  It has flaws or
9  technical flaws in it and you can't get any agreement to
10  fix it.  Number three, and sometimes this is number one,
11  is that there's just not time.  A bill doesn't get over
12  to the Senate from the House until late in the session
13  and there's just not time to take up the bill and hear
14  it, especially if it is a bill that requires a lot of
15  testimony.  And there are just a lot of discretionary
16  issues that are involved in generally -- in doing that.
17  So that's basically -- that's a few of them.  Sometimes
18  they get tagged.  They're procedural rules that members
19  follow to prevent bills from getting heard that they
20  don't want to have heard.  So it's -- you know, a lot of
21  different ways to -- and reasons why bills don't get
22  hearings or why they don't -- they don't pass.
23     Q.  But what does it mean to have a bill tagged?
24     A.  In the rules require -- there's a 48 -- when the
25  bill is in a committee, in a standing committee, it

---

### 52

1  requires -- a member can ask for a 48-hour hearing.  And
2  a 48-hour notice, which is typically twice the notice.
3  So if it's -- you don't ever see that until the end of
4  the session.  And it -- you know, somebody will tag a
5  bill and you'll run out of time to hear it.
6      Q.  I think the issue that you said before we talked
7  about tagging was that there may just not be enough
8  time.  About how much time does a committee need to have
9  a hearing and refer the bill to the floor?
10     A.  Depends on the bill.
11     Q.  Do you know about how much time a bill like
12  HB 1706 would need?
13         MR. SWEETEN:  Objection.  I think the
14  question is vague.  Also you -- don't reveal matters of
15  legislative privilege about a specific bill.  You can
16  answer about general procedures as long as they're
17  matters in public record, but don't reveal your mental
18  impressions in answer.
19     A.  Would you repeat the question?
20     Q.  (By Ms. Maranzano)  About how much time would a
21  bill, such as HB 1706 or another voter ID bill, need to
22  get heard in committee and then referred out?
23         MR. SWEETEN:  Same objection.  Instruction.
24     A.  I can't answer that specifically.  There is no
25  formula for how much time it takes.  It just depends on

Robert Duncan                                                    June 7, 2012

---

53

1   the bill.
2       Q.  (By Ms. Manzano)  Okay.  And can you just give
3   me a sense of -- just a sense of what you mean by that?
4   What about the bill informs how much time you need?
5           MR. SWEETEN:  Let's -- I'm going to object
6   based upon compound, vague.  Also don't reveal any
7   thoughts, mental impressions or communications about any
8   specific bill, legislative act in answering the
9   question.
10      A.  Logistically, depends on how many witnesses you
11  have, depends on the availability of members to be
12  there.  It depends on the length of the bill.  A number
13  of logistical objective things like that.
14      Q.  (By Ms. Manzano)  Okay.  And one of the other
15  issues you mentioned that sometimes prevents a bill from
16  getting a hearing in committee is there might not be
17  support for the bill.  Were you referring to support in
18  the committee or support in the Senate?
19          MR. SWEETEN:  And this is as a general
20  matter.
21  BY MS. MARANZANO:
22      Q.  As a general matter.
23      A.  A general matter, either way.
24      Q.  How do you usually know if a bill has support?
25          MR. SWEETEN:  You can answer as a general

---

54

1   matter.
2       A.  You don't, unless -- you may hear or know or what
3   you may have a sense as a chairman in your judgment.
4       Q.  (By Ms. Manzano)  Do you make the determination
5   of whether a bill has a hearing or not?
6           MR. SWEETEN:  Objection to the question as
7   compound.  And don't reveal matters subject to the
8   legislative privilege including your mental impressions,
9   thoughts and opinions.  You can answer as a general
10  matter of procedure, if you can.  But don't reveal
11  privilege.
12      A.  As a general matter, chairmen determine what
13  bills are heard and when they're heard.
14      Q.  (By Ms. Manzano)  Can you direct your attention
15  to Section 7 of HB 1706, and just take a quick look at
16  that.
17      A.  What page is that on?
18      Q.  I'm sorry.  Page 4 and I goes on to Page 5.  And
19  it looks like it also goes on to Page 6.  And actually
20  the top of 7?
21      A.  Okay.
22      Q.  Do you see that -- well, do you see that this
23  legislation provides for a number of different forms of
24  identification to be used?
25      A.  It appears to have a number of different options.

---

55

1       Q.  And is there both photo ID and non-photo ID
2   listed there?
3       A.  It looks like they all require that, but I may be
4   wrong.
5       Q.  I'm sorry.  It looks like they all require what?
6       A.  A photo identification.
7       Q.  Well, do you see that on Page 5 towards the
8   bottom it says there's a Section B?
9       A.  Oh, there's an alternative, yeah.  Utility bill,
10  which is current law, official mail address.
11      Q.  So would you agree that it allows for both photo
12  an non-photo ID?
13          MR. SWEETEN:  You can answer based on the
14  text of the bill.
15      A.  I think that's what it says.
16      Q.  (By Ms. Manzano)  Did you have any
17  communications about HB 1706, that you can recall?
18      A.  No, I don't recall any.  I'm not saying I didn't.
19  I just -- it's been a long time ago.
20      Q.  Right.  I understand.  Are you aware of the
21  source of the legislative language for HB 1706?
22      A.  No, ma'am.
23      Q.  Do you know if your staff had any involvement in
24  the development of HB 1706?
25      A.  I'm going to say probably not.  It's a House

---

56

1   Bill.  And so we wouldn't have been involved with that.
2   And I don't know who the Senate sponsor was.
3       Q.  Is it pretty unusual for Senate staff to be
4   involved in developing a House Bill?
5           MR. SWEETEN:  You can answer as a general
6   matter.
7       A.  As a general matter, yes.  But there were times
8   when we worked with House members to build an early
9   consensus, if that's ever possible.
10      Q.  (By Ms. Manzano)  Did you take a public
11  position on HB 1706?
12      A.  I don't recall.
13      Q.  Do you know if there was any analysis done on
14  HB 1706?
15          MR. SWEETEN:  Don't reveal matters of
16  privilege.  Objection; vague.  Go ahead.
17      A.  The House may have done a bill analysis as they
18  normally do and if it passed the House floor then --
19          MR. SWEETEN:  Yeah.  I'm also going -- go
20  ahead and finish.
21      A.  Oh, I'm sorry.  I'm not aware that the Senate did
22  anything.
23          MR. SWEETEN:  I'm going to object on the
24  foundation as it calls for speculation.
25  BY MS. MARANZANO:

Robert Duncan                                              June 7, 2012

---

## 57

1   Q.  You're not aware that the Senate did any analysis
2   on House Bill 1706?
3   A.  I don't recall any.
4   Q.  What was the purpose of 1706, if you know?
5   MR. SWEETEN:  You can answer as to the
6   general purpose.  Don't provide the subjective intent of
7   anyone if you know.
8   A.  I'm going to start by saying this is a House
9   Bill.  And it was generated by the House members.  It's
10  not a Senate Bill.  So I'm not going to speculate on
11  what their purpose was.  The general purpose of the
12  voter ID bill was to assure voter integrity or voting
13  integrity.  And that's the primary general purpose of
14  all these types of bills.  It's the general purpose of
15  what we do with a lot of the election bills.  HAVA, even
16  MOVE was designed to help military voters.  So that's
17  the general purpose.
18  Q.  (By Ms. Maranzano)  And based on the public
19  record, do you think that this would have accomplished
20  that goal?
21  MR. SWEETEN:  No.  Don't answer the
22  question.  She's asking for your mental impressions and
23  thoughts about whether this bill accomplishes a certain
24  goal.  So don't answer the question as phrased.  It's
25  legislative privilege.

---

## 58

1   BY MS. MARANZANO:
2   Q.  I assume you're not going to answer.  Just for
3   the record, you're going to follow your counsel's
4   instruction not to answer that question?
5   A.  Yes, ma'am.
6   Q.  Do you recall a photo identification bill being
7   introduced in 2007?
8   A.  No.
9   Q.  Do you recall, in 2006, an interim report that
10  the State Affairs Committee did?
11  A.  Yes, ma'am.
12  MS. MARANZANO:  Can we have this marked?
13  (Exhibit No. 522 was marked.)
14  BY MS. MARANZANO:
15  Q.  Can you take a look at that and let me know if
16  you recognize it?
17  A.  I do.
18  Q.  Is this a copy of the interim report that was
19  done in December of 2006?
20  A.  Yes.  It is.
21  Q.  By the State Affairs Committee?
22  A.  Yes, ma'am.
23  Q.  What prompted this interim report?  I mean, how
24  did it come about that the State Affairs Committee
25  issued this report?

---

## 59

1   MR. SWEETEN:  Yeah.  Don't answer the
2   question to the extent it would reveal thoughts, mental
3   impressions, opinions, motivation about legislation or
4   any communication you've had with legislators, staff,
5   State agencies, Texas ledge council.
6   A.  If you'll refer to the record, the report was a
7   part of the interim charges that the Senate State
8   Affairs Committee was to take up.
9   Q.  And do the interim charges come from the
10  governor?
11  A.  No.
12  Q.  Who do they come from?
13  A.  Generally they come from the Lieutenant Governor
14  with, I think, input from other members of the Senate.
15  MR. SWEETEN:  Are we at a point where we can
16  take a break in just a few minutes.
17  MS. MARANZANO:  Yeah.
18  MR. SWEETEN:  When you get to a logical
19  stopping point.
20  MS. MARANZANO:  Yeah.  Why don't we do it
21  now before we get into this too much.  Thanks.
22  (Brief recess.)
23  BY MS. MARANZANO:
24  Q.  So before the break we were taking a look at
25  interim report that the State Affairs Committee did.

---

## 60

1   Can you take a look for me -- at the first page is a
2   letter that's written to you.  And the signatures are on
3   the next page.  It's from Senator Lucio and Senator
4   Ellis.  Do you see that letter?
5   A.  Yes, ma'am.
6   Q.  You tell me, were there any members of the
7   committee other than Senator Lucio and Senator Ellis who
8   were minority members?
9   A.  Who?
10  Q.  Who were on the committee when this report was
11  issued?
12  A.  The names of the committee members are on the
13  first page on the letterhead.  And then I think all
14  members signed the report.
15  Q.  And were any, other than Senator Ellis and
16  Senator Lucio, racial or ethnic minorities?
17  A.  Not according to this list.  Well, Frank Madla
18  was a member, but I think he -- I'm not sure why he
19  wasn't on the list.  Maybe he had stopped serving or
20  maybe that was an old letterhead that shouldn't have
21  been used.  But I can't -- it shows that he is on the
22  committee.  And I recall that he was on the committee
23  for a while.
24  Q.  His name was?
25  A.  Frank Madla.

### 61

1    Q.  And what race or ethnicity is he?

2    A.  Hispanic.  He may have gone off and -- he may

3    have been -- I think that he lost his reelection and

4    that may have been why he didn't -- the report was done

5    after January 1st so that may have been why he wasn't on

6    it.

7    Q.  I see.  Okay.  What was the purpose of this

8    report?

9    A.  General purpose was to as stated in the charge.

10       MR. SWEETEN:  You can refer to matters of

11   public record.  I don't want you to give -- you don't

12   have to give the general -- you've answered the

13   question.

14   A.  The general purpose as stated in the charge.

15   Q.  (By Ms. Maranzano)  Can you tell me what that is?

16   A.  Well, the record reflects that -- I don't think

17   you provided the whole report.

18   Q.  I'm sorry.  I didn't.

19   A.  The entire report the charge in it.

20   Q.  Okay.  And I should have said that earlier.  This

21   is actually an excerpt from the report.  Well, what's

22   your understanding, as you sit here today, as to what

23   the purpose was?

24       MR. SWEETEN:  Again, you can refer to

25   matters of public record.

### 62

1    A.  Purpose of what?

2    Q.  (By Ms. Maranzano)  Of this report.

3    A.  The -- that you have before me?

4    Q.  Let me narrow it, because what I'm interested in

5    is the section of the report that says here, which looks

6    like there were several different issues you looked at.

7    And this was related to charge No. 3.  And I think that

8    this might be the charge that you're referring to under

9    charge No. 3 on Page 13?

10       MR. SWEETEN:  Again, you can refer to

11   matters in the public record in answering the question.

12   Don't reveal matters that are subject to the privilege.

13   A.  The charge No. 3 is -- is the purpose for

14   writing -- general purpose for writing a report.  And

15   the record here reflects the instructions provided in

16   the charge.

17   Q.  (By Ms. Maranzano)  Do you see that first

18   sentence under charge No. 3 says, "Study and make

19   recommendations on how election of firms could verify

20   the identity of a voter without hindering a person's

21   right to vote?"

22   A.  I do.

23   Q.  Did the committee come up with a recommendation

24   on that?

25       MR. SWEETEN:  Again, you can refer to

### 63

1    matters of the public record.  Don't reveal matters of

2    privilege including conversations you've had with anyone

3    or your own thoughts or mental impressions.

4    A.  The report, which was prepared in 2006, reflects

5    the committee's carrying out the charge.  Number,

6    whatever it is, 13, I believe.  Whatever the charge

7    is -- it's charge No. 3.

8    Q.  (By Ms. Maranzano)  Can you just turn back to the

9    letter for a second.  It says -- there's a sentence in

10   the second paragraph that says, "The committee makes no

11   recommendations regarding policy issues in favor or in

12   opposition to voter identification or ballot

13   authenticity."

14   A.  Where is this?  I'm sorry.

15   Q.  It's in that letter that we were looking at.

16   It's in the second -- yeah, that one.

17   A.  The one from Senator Ellis.

18   Q.  From Senator Ellis and Lucio.  And it's in that

19   second paragraph and it's a phrase of the second

20   sentence.

21       MR. SWEETEN:  It's right there.

22   A.  Okay.

23   Q.  (By Ms. Maranzano) Does that refresh your

24   recollection as to whether a recommendation was made

25   about voter identification and ballot authenticity?

### 64

1        MR. SWEETEN:  You can reveal matters of the

2    public record.

3    A.  It reflects what Senator Ellis said and Senator

4    Lucio.

5    Q.  (By Ms. Maranzano)  Do you have a different

6    recollection?

7    A.  No.

8        MR. SWEETEN:  Wait a minute.  Can you

9    rephrase the question?  Do you have a different

10   recollection of what?

11       MS. MARANZANO:  Well, he said --

12       MR. SWEETEN:  That it says this?

13       MS. MARANZANO:  He said this reflects what

14   Senator Ellis and Senator Lucio said.  I'm sorry.

15   BY MS. MARANZANO:

16   Q.  Do you have a different recollection of what

17   occurred?

18       MR. SWEETEN:  You can refer to matters of

19   the public record.  Don't reveal matters of privilege.

20       MS. MARANZANO:  I believe this should all be

21   a public record question.

22       MR. SWEETEN:  Are you asking him -- I don't

23   understand what you're asking him.  Are you asking him

24   does it say what it says.  Are you asking him did he

25   write the letter.

Robert Duncan                                                    June 7, 2012

---

## 65

1    MS. MARANZANO:  No.  I'm asking did the
2    committee make a recommendation regarding voter
3    identification.
4        MR. SWEETEN:  You can refer to matters of
5    public record.
6    A.  I think you just have to read the report and
7    determine that.  And the report speaks for itself.
8    Q.  (By Ms. Maranzano)  All right.  But I'm just
9    asking you, specifically I'm just wanting to find out
10   your knowledge.  And so as you sit here today, do you
11   have a recollection as to whether there was a
12   recommendation made?
13       MR. SWEETEN:  You can answer.
14   A.  The report reflects.
15       MR. SWEETEN:  Go ahead.  Sorry.
16   A.  The report reflects what we did seven years ago.
17   Q.  (By Ms. Maranzano)  Okay.  And did you -- did the
18   committee thoroughly study this issue prior to making
19   the report based on the public record?
20       MR. SWEETEN:  Yeah.  Don't answer the
21   question as asked.  The question directly asks your
22   thought processes.  I mean, the term "thoroughly" asks
23   for your mental impressions, opinions, motivation about
24   legislation.  Could implicate discussions.  Don't answer
25   as phrased.

## 66

1    BY MS. MARANZANO:
2    Q.  Okay.  Let me ask it this way.
3        MR. SWEETEN:  Legislative privilege.
4    BY MS. MARANZANO:
5    Q.  What did the committee do in order to issue this
6    report?
7        MR. SWEETEN:  You can refer to matters of
8    the public record.  Don't reveal your processes, mental
9    impressions, opinions, motivations about legislation.
10   A.  I believe the report is fairly clear and specific
11   what we did.
12   Q.  (By Ms. Maranzano)  And as you sit here today,
13   can you add any testimony to that?
14       MR. SWEETEN:  Don't reveal matters of
15   privilege.  You can refer to matter of the public
16   record.  But your thoughts and mental impressions are
17   your own and are subject to the legislative privilege.
18   A.  I wouldn't be able to elaborate further than
19   what's in the report.
20   Q.  (By Ms. Maranzano)  Okay.  Can you, in that same
21   paragraph that we were talking about in the letter, do
22   you see there's a sentence that says, "However,
23   Georgia"?
24   A.  Let's -- when you say "letter," you're referring
25   to Senator Ellis's letter.

## 67

1    Q.  Yes.  Exactly.  Same paragraph -- second
2    paragraph.  But this one is towards the bottom.  The
3    sentence starts with, "However, Georgia Secretary of
4    State, Cathy Cox, recently completed a demographic
5    analysis revealing that between a quarter and a third of
6    senior and African-American voters lacked State photo
7    identification, thus disenfranchising them from the
8    election process."  Do you know if that was a study that
9    was looked at by the State Affairs Committee in the
10   public record prior to issuing this report?
11   A.  No, I do not know.
12   Q.  And can you look at the last paragraph on that
13   page?  There's a sentence that says, "It is our shared
14   belief that anti-fraud measures adopted by the federal
15   Help America Vote Act sufficiently deter voter fraud and
16   that additional photo identification measures are
17   unnecessary."  Did the committee, based on the public
18   record, analyze whether the identification under the
19   Help America Vote Act would sufficiently deter voter
20   fraud?
21       MR. SWEETEN:  Yeah.  Don't answer the
22   question to the extent it requires you to reveal your
23   mental thoughts, impressions, analysis, motivation about
24   legislation.  You can refer to matters of the public
25   record in answering it, but other than that don't answer

## 68

1    it.
2    A.  I don't recall other than what's in the report.
3    Q.  (By Ms. Maranzano)  Can you look at Page 25 and
4    26 in the report for me?  On Page 25, do you see a chart
5    that talks about voter fraud investigation from 2006?
6    A.  Yes.
7    Q.  And the fourth one down says, "unspecified
8    allegations."  Can you tell me what that means?
9        MR. SWEETEN:  You can refer to matters of
10   the public record.  Don't reveal your thoughts or mental
11   impressions in answering the question.
12   A.  I don't recall.
13   Q.  (By Ms. Maranzano)  A few down below that there's
14   one that says, "unlawfully accepting a voter and
15   illegally voting."  Can you tell me what that means?
16       MR. SWEETEN:  Same instruction.
17   A.  No.  I would have to -- I don't recall what that
18   is.
19   Q.  (By Ms. Maranzano)  And a few below that,
20   "illegal ballot handling," do you recall what that
21   means?
22       MR. SWEETEN:  Same thing.  You can refer to
23   matters of the public record.  Don't reveal your mental
24   thoughts and impressions about that, other than what's
25   on the public record.

Robert Duncan                                                    June 7, 2012

## 69

1   A. I don't recall specifically what that refers to.

2   Q. (By Ms. Maranzano) Do you see on -- that
3   chart -- am I correct, that chart is labeled "voter
4   fraud investigations"?

5   A. Yes.

6   Q. And on the next page there's a chart that's
7   listed "voter fraud convictions"?

8   A. Yes.

9   Q. And do you see in that paragraph below it says,
10  "Although there have been three instances of alleged
11  illegal voting which may include circumstances prevented
12  by voter photo ID, only one of these has been fully
13  investigated and referred for criminal prosecution." Do
14  you know if that case that's referred to there, that was
15  referred for prosecution, resulted in a conviction?

16      MR. SWEETEN: Yeah. Don't answer the
17  question except for to the extent it's a matter of
18  public record.

19  A. I don't know.

20  Q. (By Ms. Maranzano) Do you remember any details
21  about that case, based on the public record?

22  A. No.

23  Q. Do you remember any details about the other cases
24  that may have been prevented by a voter photo ID based
25  on the public record?

## 70

1      MR. SWEETEN: Same objection; legislative
2  privilege, but you can answer to the extent you can
3  refer to public record.

4   A. I don't know.

5   Q. (By Ms. Maranzano) After this report was issued,
6  were there any bills introduced to prevent voter fraud
7  in the vote by mail process, based on the public record
8  that was introduced?

9      MR. SWEETEN: Well, you're asking -- no.
10  You're asking were there bills --

11     MS. MARANZANO: After the report. Not
12  related to the report.

13     MR. SWEETEN: If you want to ask him if
14  there were bills related to photo identification, I'll
15  let him answer the question. You're asking him to
16  address a problem, is what you've put in -- and I think
17  this that's intruding into legislative purpose. In
18  other words, you're asking as result of this, what is
19  the effect to introduce X. He's not going to answer it
20  as phrased. I will let him answer if chronologically an
21  additional photo ID bill was introduced, matters of the
22  public record, he can refer to. But he's not going to
23  reveal his thoughts and mental impressions, as subtle as
24  you want to be, he's not going to do that.

25  BY MS. MARANZANO:

## 71

1   Q. Okay. No, I've got you. How about I ask it like
2  this. In the 2007 legislative session, were there bills
3  introduced related to the vote by mail process?

4   A. Number one, I didn't introduce any bills.

5   Q. Okay.

6   A. Number two, there may be bills -- the members
7  introduce about 5,000 bills a session. So there may
8  have been bills. I'm not familiar with them,
9  specifically.

10  Q. Do you recall having any hearings on any bills
11  about the vote by mail process in the State Affairs
12  Committee?

13      MR. SWEETEN: You can answer.

14  BY MS. MARANZANO:

15  Q. In the 2007 legislative session?

16  A. As we sit here today, no. If you show me a
17  record, I might refresh my recollection. But if we had,
18  in that committee, several hundred bills and I'm not
19  sure -- when you start talking dates I just can't -- a
20  lot of water has been under the bridge since 2007 so I
21  can't give you a specific answer.

22  Q. How about do you remember any bills related to
23  vote by mail on which the State Affairs Committee heard
24  testimony in either the 2009 or 2011 legislative
25  sessions?

## 72

1      MR. SWEETEN: You can answer as phrased.

2  A. All of these years run together and so I can't
3  give you a specific time frame of when we heard bills,
4  unless you show me the bill.

5   Q. (By Ms. Maranzano) Okay. But sitting here
6  today, and I'm not trying to ask you which session it
7  was introduced, but do you have a recollection of
8  hearings in the State Affairs Committee on vote by mail
9  bills?

10  A. I think we did. But, you know, again, we hear a
11  lot of bills. And so I believe we did have some
12  legislation in regard to vote by mail. I'm not sure if
13  I sponsored it, it was part of an omnibus bill or what.
14  But I can't recall, specifically, the details around
15  that.

16  Q. Okay. Fair enough. Can you look at the page
17  that says Page 28 at the bottom. And there's a
18  subheading that says "conclusion." Under the second
19  paragraph in that section, there's a sentence that
20  starts with 200. It says, "244 of Texas' 254 counties,
21  96 percent have at least one office." If you look at the
22  sentence before, I think it's referring to driver's
23  license offices. Would you agree with that?

24  A. I'm not finding it.

25  Q. I'm sorry?

Robert Duncan                                                    June 7, 2012

---

**73**

1   A. Let me find it.  Oh, it's in the second
2   paragraph.  Yeah, I see.
3   Q. Do you see the sentence now, 200?
4   A. Yes, ma'am.
5   Q. And that's referring to driver's license offices?
6   A. That's what it says.
7   Q. Do you know how many counties currently have
8   driver's license offices in Texas?
9   A. I couldn't tell you.
10  Q. Based on the public record of what occurred in
11  the committee, did the committee determine that the
12  number of driver's license offices in the state was a
13  component that needed to be looked at when analyzing
14  voter ID legislation?
15      MR. SWEETEN:  Don't answer it.  It requests
16  information that would be subject to the legislative
17  privilege.  You can refer to the record for factual
18  matters, but don't reveal your processes or analysis.
19  A. The report speaks for itself on that issue.
20  Q. (By Ms. Maranzano)  And can you look at the
21  paragraph below that.  And the sentence that says,
22  "Opponents of voter ID legislation requiring a photo ID
23  for foreign and elderly voters.  However, as the lack of
24  reports on voter fraud, there are no studies to believe
25  status to support this claim."  Based on the public

---

**74**

1   record, did the committee make any effort to look into
2   whether -- how many minority voters, minority registered
3   voters possessed forms of photo identification?
4       MR. SWEETEN:  Don't answer the question as
5   phrased.  It calls for matters of legislative privilege.
6       MS. MARANZANO:  Mr. Sweeten, can he testify
7   at least as to whether this issue was discussed on the
8   public record?
9       MR. SWEETEN:  I will allow him to answer
10  that question, was the issue discussed on the public
11  record, yes.  Were any steps taken -- your previous
12  question was, were any steps taken to do an analysis is
13  not appropriate.  But, yeah, he can answer that
14  question.
15  BY MS. MARANZANO:
16  Q. Okay.  Let me ask you, were any discussions of
17  that taken -- held on the public record?
18  A. You'll have to look at the public record.  I
19  don't -- that's seven years ago and, you know, I can't
20  remember anything specifically -- or can't remember what
21  specific debates or conversations.  Again you've got --
22  we do a lot of legislation.  And it's not -- that's a
23  long time ago.  The report, in the record of the report,
24  would be the best evidence of what we considered and
25  what the committee conclusions were.

---

**75**

1   Q. When you're having an interim -- when you're
2   creating an interim report like this one, do you have
3   public testimony in front of the State Affairs Committee
4   as with -- as you testified happened on other matters in
5   front of the State Affairs Committee?
6   A. On most issues, yes.
7   Q. Do you recall if that occurred with this report?
8   A. No.  You know, it may -- the public record would
9   have to reveal that.
10  Q. Can you look at the last sentence in that
11  paragraph that we were just talking about which says,
12  "It is unknown whether the current level of voter fraud
13  will decrease, but a voter photo ID law will certainly
14  prevent some fraud.  At the very least it would increase
15  voter confidence."  Can you tell me if there were
16  discussions on the public record that would allow you
17  to -- were there discussions on the public record about
18  those statements?
19  A. You would have to look at the public record.
20  Q. You have no independent recollection?
21  A. I don't.
22  Q. Can you look at the next page for me.  There's a
23  subheading that says "recommendations."  Under 3 A, do
24  you see that second bullet?
25  A. I do.

---

**76**

1   Q. It says, "Issuance of qualifying photo IDs free
2   of charge to any voter requesting, regardless of
3   personal income."  Can you tell me what was the purpose
4   of including that language?
5       MR. SWEETEN:  Don't answer the question if
6   she's asking for your mental thoughts, processes,
7   analyses.
8       MS. MARANZANO:  What about the purpose of
9   the committee, this legislative purpose?
10      MR. SWEETEN:  If you're asking him what is
11  the purpose of the committee.
12      MS. MARANZANO:  For making this
13  recommendation.
14      MR. SWEETEN:  No, he's not going to answer
15  as to the specific recommendation set forth throughout
16  whatever these recommendations are.  That would require
17  him to reveal matters of legislative privilege.  He can
18  refer to the record itself.  But he's not going to
19  answer based on his mental impressions, thoughts,
20  opinions, analysis.  Don't answer except to the extent
21  it's a matter of public record.
22      MS. MARANZANO:  For the record, I disagree.
23  I think that's a question as to the general legislative
24  purpose, which I believe the order allows us to ask.
25      MR. SWEETEN:  Let's pull the order out.

## 77

1      MS. MARANZANO: I'm referring to Page 11.
2      MR. SWEETEN: I'm going to go to the order
3  on general purpose. Let's do that first. The order
4  that I'm reading is dated 5/17/12. And it says, "It is
5  ordered that to the extent such a privilege exists, that
6  privilege does not protect testimony with respect to the
7  general purpose or the purpose of the legislature as a
8  whole in enacting Senate Bill 14 as opposed to the
9  subjective intent of the legislator." So he can answer
10  as to the general purpose of legislation. You're now
11  asking him about, not legislation, but instead you're
12  asking him about something called the Senate Committee
13  on State Affairs interim report to the 80th Legislature.
14  In particular you're asking him about paragraph 3A.2 of
15  Page 29 of that report and what it's purpose was. That
16  is --
17      MS. MARANZANO: No, no, no.
18      MR. SWEETEN: That is not the same thing.
19  He can talk about general purpose of a statute. He's
20  not going to talk about general purpose of different
21  bullet points within that recommendation. That is not
22  contemplated by the order that we just read. Go ahead.
23      MS. MARANZANO: Mr. Sweeten, I wasn't
24  asking -- the way I interpret what you just read is that
25  I'm not allowed to ask about his subjective motivations.

## 78

1  I'm not asking that. I'm asking the committee's purpose
2  for putting this bullet in. And I'm reading from the
3  order that we got on June 5th, Page 11. It says, "With
4  respect to deposition testimony this court has already
5  ordered that foundational privilege questions are
6  proper, as are questions regarding overall legislative
7  purpose, as opposed to an individual legislator's motive
8  with respect to the bill." I'm not asking for his
9  motive. I'm asking for the committee's purpose.
10      MR. SWEETEN: Show me where you just read
11  because there's an important word in there.
12      MS. MARANZANO: F.
13      MR. SWEETEN: F what?
14      MS. MARANZANO: The first sentence under F
15  on Page 11.
16      MR. SWEETEN: "With respect to the
17  deposition testimony this court has already ordered that
18  foundational privilege questions are proper," which
19  we're allowing. You'll agree we're completely allowing.
20      MS. MARANZANO: Yes.
21      MR. SWEETEN: "As are questions regarding
22  overall legislative purpose as opposed to an individual
23  legislator's motive with respect to the bill." This
24  isn't a bill. This is an interim report. It is a
25  sub-subparagraph of an interim report. And you're

## 79

1  asking him what he means within that bullet point. And
2  that is not what the court has said. We will give
3  general purpose. We're not going to give bullet by
4  bullet interpretation of what you meant at this date on
5  this report. That is beyond what the court has ordered.
6  I think that is beyond the scope of the legislative
7  privilege that I am now asserting.
8      MS. MARANZANO: All right. Well, we've got
9  to move on.
10  BY MS. MARANZANO:
11      Q. And I think we are done with this document. So
12  you can put that aside. And I believe before -- when we
13  started looking at this deposition I asked you if you
14  recall the photo ID bill being introduced in 2007 and I
15  think you said no; is that correct?
16      A. That's right. I don't recall a Senate Bill or
17  House Bill or -- in 2007, whether we considered the
18  bill. It seems like we did, but I can't recall
19  specifically that.
20      MS. MARANZANO: Okay. This we can mark as
21  Exhibit 28 because we've previously marked it.
22      (Exhibit No. 28 was previously marked.)
23  BY MS. MARANZANO:
24      Q. I'm showing you what we're marking as deposition
25  Exhibit 28. If you can take a look at that and let me

## 80

1  know if you recognize this, this bill.
2      A. I recognize it as House Bill 218. And it shows
3  on there that it was apparently filed before the end of
4  2007 legislative session, if it was filed. And it
5  appears it was because it was assigned a number, 218.
6      Q. Are you familiar with the provisions of House
7  Bill 218?
8      A. As we sit here today, no.
9      Q. Can you take a look at Section 11 of the bill
10  which is on page -- Section 11, looks like it starts on
11  Page 9.
12      A. Okay.
13      Q. Does it appear that, for the most part, House
14  Bill 218 follows House Bill 1706?
15      MR. SWEETEN: You can refer to the text of
16  the bill, matters of the public record.
17      A. Well, it would take a while to do a side by side
18  analysis.
19      Q. For the most part, just generally.
20      A. They are both bills relating to requiring a voter
21  to present proof of identification.
22      Q. And do you see that House Bill 218 allows for
23  both photo and non-photo identification to be presented?
24      A. If you would point me to where you reach that
25  conclusion.

Robert Duncan                                      June 7, 2012

---

## 81

1  Q. Sure. So on Page 10 there's a subsection B.
2  A. Yes, I see that.
3  Q. Okay. And would you agree that allows for some
4  forms of non-photo identification?
5  A. It states that the following documentation is
6  acceptable of proof of identification under this chapter
7  and then it lists a number of things. And it appears
8  that some of those things do not have a photo ID.
9  Q. Did you or did anybody in your office my a role
10 in the development of House Bill 218?
11 A. Because it's a House Bill, no.
12 Q. I'm sorry. You said no?
13 A. We did not.
14 Q. Did you have communications about House Bill 218?
15 A. With whom?
16 Q. Anybody. First let me just ask if you did?
17 A. Not that I recall -- well, when?
18 Q. At any point.
19 A. Today?
20 Q. Other than at this deposition, have you had
21 communications about House Bill 218, that you recall, as
22 you're sitting here?
23 A. I don't recall any.
24 Q. Are you aware of whether your staff had any
25 communications about House Bill 218?

## 82

1  A. I do not know.
2  Q. If they did, do you think you would know?
3  A. Not necessarily.
4  Q. Did you monitor the consideration of House Bill
5  218 in the House?
6  A. No.
7  Q. Do you recall if House Bill 218 was referred to
8  the State Affairs Committee?
9  A. I don't know if it passed the House. If it did
10 pass the House, you know, whatever the record shows, the
11 record shows. That was in 2007. So that was five years
12 ago.
13          (Exhibit No. 523 was marked.)
14 BY MS. MARANZANO:
15 Q. So I only have one copy of this. I'm showing you
16 what we're marking as deposition Exhibit 523 which is --
17 well, can you tell me what that is?
18 A. The title is Texas Legislature Online History.
19 Q. Can you take a look at that and just let me know
20 if that refreshes your recollection at all as to the
21 procedural history of House Bill 218?
22 A. Well, it's a record of the history. I'm not sure
23 it refreshes my recollection of anything.
24 Q. Fair enough.
25 A. But it appears that, yes, it doesn't refresh my

## 83

1  memory, but it would reflect what happened to the bill.
2  Q. And does it look like the bill passed the House?
3  A. According to this document, it passed to
4  engrossment on 4/23/07.
5  Q. Did you have any communications with anybody
6  about carrying House Bill 218 in the Senate?
7       MR. SWEETEN: You can answer the question as
8  phrased, but don't reveal the substance of any
9  communications.
10 A. I really don't remember. Some people may tell
11 you they're going to carry a bill or whatever. But I
12 don't recall in this particular instance how that came
13 about.
14 Q. (By Ms. Maranzano) As a general matter, how is
15 it usually determined what senator will carry a bill
16 that passes the House?
17 A. There is no -- chairmen are different about how
18 they do that. Some chairmen are very particular and
19 some aren't. And so it just depends on what committee
20 in the House or the Senate the bill goes to.
21 Q. Can you tell me how you do it just as general
22 matter?
23       MR. SWEETEN: I think you're asking for him
24 to reveal his mental impressions and thought process.
25 How would determine -- carries a bill if he did. So

## 84

1  objection; legislative privilege. Instruct not to
2  answer.
3  BY MS. MARANZANO:
4  Q. Did you and Senator Fraser communicate about
5  House Bill 218?
6       MR. SWEETEN: You can answer the question as
7  phrased.
8  A. I'm sure we did.
9  Q. (By Ms. Maranzano) Do you have any recollection
10 of communicating with him?
11 A. No. No.
12 Q. Are you aware of any communications about House
13 Bill 218 that reflect concerns that this bill would have
14 a disproportionate impact on minority voters?
15       MR. SWEETEN: Don't answer the question as
16 phrased. This is more than a general subject matter
17 description. If you want to rephrase it and put less of
18 a -- you know, lead up to the question, then he can
19 answer it if you rephrase it. Right now I'm going to
20 instruct him not to answer that question.
21 BY MS. MARANZANO:
22 Q. Let me try it this way. Did you have any
23 communications about House Bill 218 with groups
24 representing minority voters?
25       MR. SWEETEN: You can answer.

## 85

1     A.  Communications with groups, what do you mean by
2   groups?
3     Q.  (By Ms. Maranzano)  Groups who are representing
4   the interest of minority voters?
5     A.  The record of the committee will reflect those
6   communications.
7     Q.  So apart from the committee, you didn't -- you
8   aren't aware of any other communications?
9     A.  I'm not aware or recall any of those.
10     Q.  Do you recall any communications, apart from
11   testimony in front of the committee, with local elected
12   officials about House Bill 218?
13     A.  Do I recall, I really don't.  When you say "local
14   elected officials," what are you talking about, who are
15   you talking about?
16     Q.  County officials, voter registrars.
17     A.  I don't recall any.  If there are, typically with
18   regard to procedural issues and things like that are
19   necessary in implementing a new voting process, we hear
20   from the committees, the election officials of
21   committees; this causes this issue, this causes this,
22   this causes that.  You need to take into account that.
23   And that would be typically done through the hearing
24   process.  We may have information about that.  But with
25   regard to the general policy consideration, I don't

## 86

1   recall any.
2     Q.  What was the purpose of House Bill 218?
3     A.  To preserve voter integrity or ballot integrity.
4     Q.  Based on the public record, was there any
5   evidence that a problem existed with ballot integrity?
6     MR. SWEETEN:  Objection to the extent that
7   it asks for your mental impressions about any problem
8   that any legislation was attempting to address.  You can
9   refer to the public record as to anything you've heard
10   regarding a problem.  But don't reveal your mental
11   impressions or thoughts about why you worked on a bill,
12   what a bill was meant to address.  You can just discuss
13   what's in the public record.
14     A.  The public record reflects what information the
15   committee heard on House Bill 218 in 2007.  I wouldn't
16   have any independent recollection of any of that.
17     Q.  (By Ms. Maranzano)  Was House Bill 218 -- was
18   part of the purpose of House Bill 218 to prevent
19   non-citizens from voting?
20     A.  No.
21     Q.  Are you familiar with any statements that
22   Representative Betty Brown made on the floor about House
23   Bill 218?
24     A.  No.
25     Q.  Do you recall the Senate's consideration of House

## 87

1   Bill 218?
2     A.  At what point?
3     Q.  Overall.  Let me ask you.  Do you have a
4   recollection of it, first?
5     A.  I have a recollection, generally, of the fact
6   that we had a voter ID bill go through the committee and
7   considered by the Senate.
8     Q.  Was the bill amended in the committee?
9     A.  I don't recall.  The record would have to reflect
10   that.
11     Q.  Can you recall me the witnesses who testified
12   on House Bill 218 were selected?
13     MR. SWEETEN:  Don't answer the question.  It
14   would call for your mental impressions, thoughts,
15   opinions about legislation.
16   BY MS. MARANZANO:
17     Q.  And you're following your counsel's instruction?
18     A.  Yes.
19     Q.  Was House Bill 218 voted out of committee, to the
20   best of your recollection?
21     A.  Yes.
22     Q.  Do you recall if it was voted out of committee on
23   party line?
24     A.  The record would have to reflect the record vote
25   of the members of the Senate and the committee.

## 88

1     Q.  And as you sit here today, do you have any
2   recollection?
3     A.  I would not speculate.
4     Q.  So in 2006, is it fair to say that based on that
5   interim report, the committee made no recollection --
6   made no recommendation on photo ID laws?
7     A.  You're going to have to repeat that.  I'm sorry.
8   I didn't follow it.
9     Q.  In December 2006, we looked at the interim
10   committee report, and is it fair to say the committee
11   made no recommendation as to photo ID?
12     MR. SWEETEN:  You can refer to matters of
13   the public record.
14     A.  I think the committee report is clear as to what
15   it did and didn't do.
16     Q.  (By Ms. Maranzano)  Well, let me ask you this.
17   Is there anything in the public record that you can
18   testify about today that would reflect a change between
19   when you issued the report in December of 2006 and when
20   you voted HB 218 out of committee?
21     A.  I can't answer that because I don't know and
22   haven't looked at it.
23     MR. SWEETEN:  And I'll instruct you as to
24   legislative privilege.  Don't reveal your mental
25   impressions.

Robert Duncan                                                    June 7, 2012

---

89

1    A.  I do not want to run afoul or ignore the
2  legislative privilege that I am asserted in this case.
3    Q.  (By Ms. Maranzano)  Did each -- did HB 218
4  require a two-thirds majority vote of senators to bring
5  that bill to the floor of the Senate?
6    A.  The bill didn't require it.
7    Q.  Did the Senate rules require it?
8    A.  The Senate rules require bills to be brought up
9  in the regular order of business.
10    Q.  And was House Bill 218 brought up in the regular
11  order of business?
12    A.  No.
13    Q.  So in order to bring it up out of order, did it
14  require a two-thirds vote?
15    A.  In 2007, to suspend the rules you had to have a
16  two-thirds vote.
17    Q.  What's the purpose of that requirement, that you
18  needed two-thirds vote to suspend the regular order of
19  business?
20    MR. SWEETEN:  Are you saying in the 2007
21  session, the two-thirds.
22    MS. MARANZANO:  I was asking more generally,
23  actually.
24    MR. SWEETEN:  You can give the general
25  purpose.  Objection; vague.  Because I don't think we're

---

90

1  talking about a specific rule.  But you can give a
2  general purpose to -- if you can understand what she's
3  asking you about.
4    BY MS. MARANZANO:
5    Q.  My question is about the requirement or the
6  tradition in the Senate that when bills go out of order
7  that it requires a two-thirds majority vote.
8    A.  There are 31 members of the Texas Senate.  And
9  there are 31 different general purposes of what that
10  rule is all about.  So I couldn't give you -- I couldn't
11  speak for anybody else.  And so the general purpose is
12  obviously to require two-thirds vote to bring up a bill.
13  But I can't tell you what the -- I don't know of any law
14  reviews that discuss that or -- it has different
15  meanings to different members of the Senate, if you're a
16  rule member or what.  It has different meetings.
17    Q.  Would it be fair to say that it's an effort to
18  get the senators to reach some sort of consensus?
19    MR. SWEETEN:  You can provide and answer as
20  to the general purpose of the bill.  Don't discuss
21  anything further than that or whatever rule she's
22  referring to.
23    A.  Again, I would think that it's -- it has -- to
24  different members it has different general -- there's
25  different interpretations because it is a kind of a

---

91

1  blend of a rule and a tradition.  And so to that end,
2  there's not really a good answer that I can give
3  speaking on behalf of the whole Senate as a general
4  purpose.
5    Q.  Well, to be clear, I'm not interested in your
6  subjective opinion about it.  I'm just interested in
7  your characterization of the legislative purpose.
8    ATTORNEY2:  Objection; asked and answered.
9    BY MS. MARANZANO:
10    Q.  Do you have anything else to add?
11    A.  I probably don't.
12    Q.  Okay.  Are most bills brought to the floor with a
13  two-thirds vote?
14    MR. SWEETEN:  Answer as a general matter.
15    A.  In my experience, yes.  But not all.
16    Q.  (By Ms. Maranzano)  Can you tell me about the
17  ones that went to the floor without a two-thirds vote?
18    A.  Well, over what period of time?  I mean I've been
19  in there 14 years.
20    Q.  Well, how many times -- I'm sorry.  I didn't mean
21  to interrupt your answer.
22    A.  A number of times.
23    Q.  Can you tell me how in the 14 years?
24    A.  No.
25    Q.  More than five?

---

92

1    A.  Sure.
2    Q.  More than ten?
3    A.  Yeah.
4    Q.  More than 15?
5    A.  Yes.
6    Q.  More than 20?
7    A.  Your question is how many times have bills come
8  to the Senate floor with a lack of -- with only 16 votes
9  or without 21 votes.
10    Q.  Uh-huh.
11    A.  Multiple times.  More than you've asked.  I
12  believe more than you have stated.
13    Q.  Okay.  And I think I left off at 20.  Would you
14  say it's around -- can you just give me and approximate
15  number?
16    A.  No, I really can't.  Because I know -- generally
17  I can't.  The 21 vote rule is often debated.  But again,
18  you go back to Bullock, Hobby and other Lieutenant
19  Governors.  Either the rule has been -- there have been
20  special orders or other measures to not apply the rule
21  or that threat has been used.  So it's an interesting
22  part of Texas history.  But it is -- again, there's no
23  specific thing.  It has been done a number of times,
24  though.
25    Q.  Do you know what the partisan makeup of the

Robert Duncan                                                    June 7, 2012

## 93

1  Senate was when the two-thirds rule was suspended under
2  Lieutenant Governor Bullock?
3      A.  It was probably -- I believe -- the Republicans
4  did not have a majority until December of '96.  So I
5  believe -- I don't believe that it was done in '97.  So
6  it would have been -- before that it probably would have
7  been Democrat majority.
8      Q.  Do you know by how much?
9      A.  No.
10     Q.  How about under Lieutenant Governor Hobby?
11     A.  I don't believe the Republicans had a majority
12  under Hobby.
13     Q.  Do you have any idea by what percentage or by
14  what numbers they were in the minority?
15     A.  No.  You would have to look -- it would be easy
16  to determine.
17     Q.  Can you provide the circumstances under which
18  House Bill 218 was voted on by the Senate?
19     A.  No.  Is that the 2007 bill?
20     Q.  Yeah.
21     A.  What was your question?
22     Q.  The circumstances on which it was voted on in the
23  Senate, do you recall anything about that vote?
24     A.  I don't understand the question.  So, no, I
25  can't.

## 94

1      Q.  Okay.  Well, let me ask you this.  Do you recall
2  it being voted on by the Senate?
3      A.  I recall there was a vote.
4      Q.  Who made the decision, if this is part of the
5  public record, to bring this bill to the floor, to a
6  vote of the Senate?
7          MR. SWEETEN:  When you're saying "bill," are
8  we talking about --
9          MS. MARANZANO:  We're talking about House
10  Bill 218.
11         MR. SWEETEN:  To the extent you're not
12  revealing legislative privilege, you can answer it.  But
13  don't reveal matters of privilege, including
14  communications you've had with others or mental
15  impressions.
16     A.  I do not know who made the decision to bring the
17  House Bill in 2007 to a vote.
18     Q.  (By Ms. Maranzano)  Is that usually the
19  Lieutenant Governor's decision?
20     A.  Generally the rules allow the Lieutenant Governor
21  to set the calendar.
22     Q.  Do you know if any members of the Senate were not
23  present when the vote was taken?
24     A.  I don't recall if there were members, you know,
25  either present or on the floor or what.  Members are

## 95

1  often on and off the floor or absent from time to time.
2  There's an excused absence.  There's just people not
3  there.  And so I don't know exactly what the record
4  shows for that day.
5      Q.  And if somebody has an excused absence, votes are
6  still taken; is that correct?
7      A.  Yes, as long as there's a quorum.
8      Q.  Are you aware of any conversations that Senator
9  Uresti had with any members of the Senate about House
10  Bill 218?
11     A.  No.
12     Q.  Were you aware in May of 2007, based on the
13  public record, that there were concerns that House Bill
14  218 would disproportionately impact minority voters?
15         MR. SWEETEN:  You can testify to matters on
16  the public record.  Don't testify as to communications
17  you've had with others or to matter subject to
18  privilege.
19     A.  To the extent those comments were made on either
20  a debate on the Senate floor, which is what I understand
21  the time frame you're talking about now, we're out of
22  committee we're on the floor, is that the public record
23  would reflect those concerns if they were raised.
24     Q.  But in May of 2007, were you aware of those
25  concerns?

## 96

1      A.  If I was on the Senate floor and I heard them on
2  the -- as part of the public record, the public record
3  is the public record.
4      Q.  Based on the public record, were any concerns
5  expressed about taking a vote on House Bill 218 when
6  some members weren't present?
7      A.  The record will reveal that.
8      Q.  Do you have any recollection about this
9  occurring?
10     A.  If I do, it would be subject to the legislative
11  privilege.
12     Q.  I'm just asking you about the public record?
13     A.  The public record is the public record.  And that
14  is -- if those statements were made on the public
15  record, those statements were made on the public record
16  and they speak for themselves.  I'm sure Senator Ellis
17  made a comment or somebody else.  This is what the
18  public record is.
19     Q.  Why are you sure Senator Ellis made a comment?
20     A.  Because he was active in this issue.
21     Q.  And what -- I guess I'm losing you.  You're sure
22  he made a comment because some members weren't present
23  on the floor?
24     A.  No.  On the public record, on the public issue of
25  the debate on the bill.  The issue -- the record will

Robert Duncan                                          June 7, 2012

---

**97**

1    reflect who and what was said.
2        Q.  Do you recall that in was a request made to
3    verify the vote on House Bill 218?
4        A.  No.  But there may have been.
5        Q.  Are you aware that Senator Uresti had called in
6    sick that day?
7            MR. SWEETEN:  Don't reveal matters subject
8    to legislative privilege in answering that question.
9    You can refer to matter of public record.
10       A.  I'll refer to the record.
11       Q.  (By Ms. Maranzano)  What's Senator Uresti's race?
12       A.  Well, I think Senator Uresti is Hispanic.
13       Q.  What part of Texas does he represent?
14       A.  He has a large district.  It is similar to mine
15   in that it -- it abuts the mine.  It's in West Texas,
16   far West Texas, but he also has some urban areas.  And
17   he, at that time, was representing part of El Paso as
18   well.
19       Q.  Had he expressed concerns on the public record
20   about the impact of House Bill 218 on his constituents?
21       A.  Public record will reflect what concerns, if any,
22   he expressed.
23       Q.  Do you recall that House Bill 218 failed to
24   obtain a two-thirds majority vote?
25       A.  It apparently did not pass that session.

---

**98**

1        Q.  Do you know if there were any additional actions
2    taken on House Bill 218 after it failed to obtain the
3    two-thirds majority vote?
4            MR. SWEETEN:  You can answer based on the
5    public record.
6        A.  I don't understand the question.  It's not clear
7    enough to me to respond accurately.
8        Q.  (By Ms. Maranzano)  Was there any additional
9    action taken on House Bill 218 after it failed to obtain
10   a two-thirds majority vote?
11           MR. SWEETEN:  Again, you can refer to
12   matters of the public record in answering the question.
13       A.  I don't recall based on the question.
14           MS. MARANZANO:  This has been previously
15   marked as Exhibit 3.
16           (Exhibit No. 3 was previously marked.)
17   BY MS. MARANZANO:
18       Q.  Senator, I'm showing you what we're marking for
19   the record as deposition Exhibit 3.  And I would like to
20   direct your attention to -- there's a letter that's
21   issued from Lieutenant Governor David Dewhurst.  Do you
22   recall this letter?  Let me state for the record, what
23   I'm showing you is an article from the Texas Weekly.
24       A.  Let me have just a few minutes to read this.
25       Q.  Sure.

---

**99**

1        A.  Okay.
2        Q.  Okay.  Do you see that this includes a letter
3    from the Lieutenant Governor related to House Bill 218?
4        A.  As reported in this media outlet.
5        Q.  And the letter that's printed in this media
6    outlet asserts that the photo identification
7    requirements will prevent voting by persons who are not
8    US citizens, right?
9        A.  Where does it say that?
10           MR. SWEETEN:  Can you reread the question
11   for me, please?
12           (Requested question was read.)
13   BY MS. MARANZANO:
14       Q.  And Senator, below the -- in the second letter,
15   below that topic, "This is a letter from Lieutenant
16   Governor David Dewhurst on voter ID."  In the second
17   paragraph, I just want to read you a sentence that says,
18   "I want people to consider that with 8 to 12 million
19   illegal aliens currently living in the US, the basic
20   American principal of "one person, one vote" is in
21   danger," correct?
22       A.  Well, that's what -- that's what that says.
23       Q.  Right.  So you believe that the Lieutenant
24   Governor's letter is not asserting that photo ID
25   requirements will prevent persons voting who are not US

---

**100**

1    citizens?
2            MR. SWEETEN:  Don't answer the question.
3    Legislative privilege.
4            MS. MARANZANO:  I'm asking him about the
5    letter.
6            MR. SWEETEN:  You can ask him about what
7    this says.  You can't ask him about his beliefs about
8    legislation or about what he thinks about specific
9    legislation.  Those are his thoughts and mental
10   impressions.  If you're asking him if that's what it
11   says, he's free to answer that.
12   BY MS. MARANZANO:
13       Q.  I'm asking if the Lieutenant Governor made that
14   assertion in this letter.
15       A.  I can't speak for the Lieutenant Governor on what
16   he meant or intended or whether or not this is accurate.
17   So I don't really have an opinion on that.
18       Q.  Let me ask you this.  Is there anything in the
19   public record that would support a contention that photo
20   identification requirements prevent persons from voting
21   who are not US citizens?
22           MR. SWEETEN:  Calls for matters of
23   legislative privilege.  You can refer to matters in the
24   public record, but don't reveal your thoughts and mental
25   impressions about any specific legislation.

Robert Duncan                                                    June 7, 2012

## 101

1    A. You would have to refer to the legislative record
2  to --
3    Q. Anything you can add today?
4    A. No, ma'am.
5    Q. Do you see that in this letter -- I'm sorry.  In
6  this article there was a -- there are two letters from
7  the Lieutenant Governor that are printed?  There's a
8  letter and then there's a corrected letter.
9    A. This document which's a media report indicates
10 that.  I don't know about the authenticity of it?
11   Q. You have no recollection of that?
12   A. No, I don't subscribe to the Texas Weekly and did
13 not review this.  So this is the first time I've seen
14 this document.
15   Q. And apart from the letter -- apart from the
16 article, do you recall ever seeing either of these
17 letters from the Lieutenant Governor?
18       MR. SWEETEN:  You can answer.
19   A. No, I don't.  Let me correct, my staff may read
20 this Texas Weekly, but I don't.  I don't recall seeing
21 this letter or -- I'm not even sure I recall hearing
22 about it.  It's been five years ago.
23   Q. (By Ms. Maranzano)  Is a voter registration
24 applicant's citizenship status -- well, does a voter
25 registration applicant af firm their citizenship status

## 102

1  on a voter registration application?
2        MR. SWEETEN:  Under present law?
3        MS. MARANZANO:  Under present law.
4        MR. SWEETEN:  You can answer the question if
5  you know.
6    A. I don't know.  I would have to look at the law.
7    Q. (By Ms. Maranzano)  What ethnic group makes up
8  the largest percentage of the immigrant population in
9  Texas?
10   A. I don't know for a fact.  I think, generally, I
11 believe that the Hispanic growth in Texas is well-known
12 to be flourishing.
13   Q. Based on public record, is there any connection
14 between photo ID bills and the growth of non-citizen
15 population in Texas?
16       MR. SWEETEN:  Don't answer her question.  It
17 calls for matters of legislative privilege.  Instruct
18 not to answer.
19 BY MS. MARANZANO:
20   Q. Have you heard an assertion that photo ID bills
21 are connected to the growth of non-citizen population in
22 Texas?
23       MR. SWEETEN:  You can answer based on
24 matters of the public record.  Don't make a legislative
25 privilege.

## 103

1    A. I don't recall or have any knowledge of that
2  other than if -- I don't even know if there's anything
3  on the public record on that.
4    Q. (By Ms. Maranzano)  Have you heard anyone in the
5  legislature say there's a connection between photo ID
6  bills and the growth of population?  I'm not talking
7  about private communications you may have had.
8        MR. SWEETEN:  You the can discuss matters of
9  the public record.
10   A. You would have to refer to the public record.
11   Q. (By Ms. Maranzano)  How about anyone in the
12 governor's office, made such an assertion?
13       MR. SWEETEN:  Same instruction.  Legislative
14 privilege.  But you can reveal matters of the public
15 record.
16   A. You would have to look -- refer to public record
17 on that issue.
18   Q. (By Ms. Maranzano)  Are you familiar with a
19 decision by the name of Crawford versus Marion County?
20       MR. SWEETEN:  Don't reveal your thoughts or
21 mental impressions about legislation, your analysis or
22 motivation in answering the question.  You can reveal
23 matters of the public record.
24   A. When you say "familiar," I'm not sure what you
25 mean by that.  If that is the Georgia case, I think it

## 104

1  may be referred to in the public record.  If that
2  involves the Georgia voter ID.
3    Q. The Crawford opinion, I believe was referred to
4  in the public record.  It's a Supreme Court decision
5  about a law in Indiana.  Does that refresh your
6  recollection at all?
7    A. Right.  Right.  It does.
8    Q. Have you read that opinion?
9    A. I have not analyzed it.
10   Q. Have you read it?
11       MR. SWEETEN:  You don't have to say if
12 you've read the decision or not.  That would reveal your
13 thoughts, mental impressions or processes and
14 legislative privilege.  Objective; legislative
15 privilege.  You can refer to matters in the public
16 record.
17 BY MS. MARANZANO:
18   Q. I assume you can't answer the question?
19   A. I think the public record would answer the
20 question.
21   Q. Did you or your staff have any communications
22 with officials in Indiana regarding photo ID laws?
23       MR. SWEETEN:  You can answer the question.
24   A. I did not.  I do not know if my staff did or not.
25   Q. (By Ms. Maranzano)  Are you familiar with a photo

## 105

1  identification bill that was introduced in the 2009
2  legislative session?
3      A. You're going to have to be more specific. There
4  are many bills.
5      Q. There were many photo identification bills?
6      A. I believe -- I assume there was. I do not know.
7  I just know that members file bills.
8      Q. All right.
9      A. There's nothing to prevent a member from filing a
10 bill.
11     Q. I was asking, just to be clear, I was asking
12 specifically about the photo identification bills?
13     A. Well, I'm familiar with one bill.
14     Q. Okay. Which bill is that?
15     A. It's the bill that was considered by the Senate
16 in 2009.
17        MS. MARANZANO: Can we mark this as 29?
18        (Exhibit No. 29 was previously marked.)
19 BY MS. MARANZANO:
20     Q. Are you referring to Senate Bill 362, Senator?
21     A. Yes, ma'am.
22     Q. I'm showing you what we're marking as deposition
23 Exhibit 29, previously marked exhibit. And can you look
24 at it and tell me if you recognize this document?
25     A. I assume this is the introduced version of Senate

## 106

1  Bill 362, but I don't know. You have given me -- this
2  doesn't necessarily reflect what -- what this is, other
3  than Senate Bill 362. Was it the original filed
4  version, were there changes. I don't recall what
5  version this is that you're referring to here.
6      Q. Okay. Is there a way, from looking at this bill,
7  that you could determine that?
8      A. No.
9      Q. I can represent to you that it is the engrossed
10 version. And if you will look at Section 10 of the
11 bill, which is on Page 5, do you see that list "forms of
12 identification"?
13     A. Yes.
14     Q. Do you see that Subsection B provides for some
15 forms of identification that don't have photographs on
16 them?
17     A. I believe it does.
18     Q. Do you believe that Senate Bill 362 follows House
19 Bill 218, for the most part?
20     A. I don't know. I haven't analyzed it.
21     Q. Well, just generally?
22        MR. SWEETEN: You can refer to the text of
23 the bill. Don't reveal your impressions.
24     A. I don't know, generally. It appears to me that
25 they're both bills that require -- relate to requiring a

## 107

1  voter to present proof of identification. And it seems
2  like both bills have photo ID or alternatives.
3      Q. Can you look at Section 10, for me? And, in
4  particular, Section 6 -- Subsection 6 of that, it says,
5  "A valid identification card that contains the person's
6  photograph and is issued by an agency or institution of
7  the federal government or an agency institution or
8  political subdivision of this State." Do you believe
9  that would include a State University?
10     A. I'm not sure what you're referring to, quite
11 frankly. So I'm a little slow on reading.
12     Q. Oh, yeah. I'm sorry.
13     A. Six is struck -- Subsection 6 is struck on my
14 bill.
15     Q. Well, I'm looking at the section that --
16     A. So it would be now, 7. I'm sorry, 6. I see.
17 Yeah. It would be U-6. And it refers to a "valid
18 identification card that contains the person's
19 photograph and is issued by an agency of the federal
20 government or an agencies institution or political
21 subdivision of the State." Is that what you're
22 referring?
23     Q. Uh-huh. Would that include identifications
24 issued by a State University?
25        MR. SWEETEN: You can testify based on the

## 108

1  text of the bill.
2      A. An institution of the State would -- may be a
3  little bit vague and ambiguous. But it's not -- one
4  could argue that it means a higher Ed institution.
5      Q. Were you involved in the development of Senate
6  Bill 362?
7        MR. SWEETEN: Objection; vague.
8      A. What do you mean by "development"?
9      Q. (By Ms. Maranzano) Were you involved in the
10 concept of creating this bill?
11     A. No.
12     Q. Were you involved in the drafting of this bill?
13     A. No.
14     Q. Was anybody in your staff?
15     A. I don't think so.
16     Q. Would you know if your staff had been involved in
17 the drafting of this bill?
18     A. Not necessarily. I usually would. From time to
19 time members would ask members of my staff issues on
20 questions about things. So I don't know. But that was
21 not our bill and we weren't sponsoring it. So it's
22 unlikely we were involved to any large degree in
23 developing the bill. Now, there may have been questions
24 that may have been answered. But I don't know what
25 those were.

Robert Duncan                                                          June 7, 2012

## 109

1      Q.  If questions had been asked would they likely
2  have been directed to Jennifer Fagan?
3          MR. SWEETEN:  Objection; calls for
4  speculation.  You can answer.  Objection; vague, too.
5      A.  Or the Committee staff, generally.  Jennifer
6  would direct the question or answer it.
7      Q.  (By Ms. Maranzano)  How many staff work for the
8  committee?
9      A.  I don't recall.  It depends, five or six
10 during -- during a session.
11     Q.  Did you have communications with Senator Fraser
12 about Senate Bill 362?
13         MR. SWEETEN:  You can answer if you had
14 communications.
15     A.  We did.
16     Q.  (By Ms. Maranzano)  You did.  How many?
17     A.  I can't tell you.
18     Q.  Can you give me an approximate number?
19     A.  No.
20     Q.  Can you tell me when those communications
21 occurred?
22     A.  Between the time the bill was filed and between
23 the time it was passed out of the Committee of the
24 Whole.
25     Q.  Any communications before it was filed with

## 110

1  Senator Fraser?
2      A.  Probably.
3      Q.  And would those have been verbal communications
4  or written?
5      A.  Yes, verbal.
6      Q.  Are you aware of the source of the legislative
7  language in Senate Bill 362?
8          MR. SWEETEN:  Don't reveal matters of
9  privilege.
10     A.  I'm not.
11     Q.  (By Ms. Maranzano)  Are you aware of how this
12 list of acceptable forms of identification was arrived
13 at?
14         MR. SWEETEN:  Don't answer.  Objection;
15 legislative privilege.
16 BY MS. MARANZANO:
17     Q.  Was there any discussion on the public record
18 about these forms of identification and whether or not
19 any additional forms of identification should be added
20 to this bill?
21         MR. SWEETEN:  You can answer as phrased.
22     A.  I recall there was an a lot of discussion on the
23 public record about a lot of things.  And I would assume
24 that some of these issues were discussed, but you would
25 have to refer to the record, generally.

## 111

1      Q.  (By Ms. Maranzano)  You can't recall any?
2      A.  Not specifically.
3      Q.  Do you recall whether the legislature considered,
4  based on the public record, adding additional forms of
5  identification based on Senate Bill 362?
6          MR. SWEETEN:  Don't answer.  It calls for
7  mental impression, thoughts about legislation.  It also
8  would implicate other communications with other
9  legislators so don't answer the question as phrased.  If
10 you interpret the word "consider" to mean was it
11 discussed on the public record, that's fair game.  But
12 consideration gets into the privilege.  Instruct not to
13 answer on that basis.  But with my instruction.
14 BY MS. MARANZANO:
15     Q.  Let me ask you this.  Were proposals made on the
16 public record, such as amendments or other proposals to
17 add additional forms of identification to Senate Bill
18 362?
19         MR. SWEETEN:  You can answer as phrased.
20     A.  By "proposed," do you mean amendments.
21     Q.  (By Ms. Maranzano)  Amendments or any other kind
22 of proposals.  I'm not of aware of anything other than
23 amendments, but you may be.
24     A.  The record would reflect that if there were.
25     Q.  And what's your recollection?

## 112

1      A.  You know, I vaguely remember that nobody offered
2  amendments in 2009.  But I may be wrong on that.  The
3  record would have to reflect that in the committee.  Now
4  I don't know about on the floor.  If you're talking
5  about the committee.  But for some reason I recall there
6  were no amendments offered.  But I may be incorrect.
7  The record would reflect that.
8      Q.  And how about on the floor?
9      A.  I don't recall that.
10     Q.  Were there discussions on the public record about
11 how many registered voters did not possess one of the
12 forms of identification listed in Senate Bill 362?
13         MR. SWEETEN:  You can answer.
14     A.  The record will reflect that clearly if there
15 was.  I'm not going to speculate on that.
16     Q.  (By Ms. Maranzano)  What's your recollection, as
17 you sit here today?
18     A.  I don't recall.
19     Q.  You don't recall that happening?
20     A.  Recall what happening?
21     Q.  Discussions about how many registered voters
22 would not possess one of the forms of identification
23 listed in Senate Bill 362?
24     A.  There were a lot of discussions over a period of
25 time that I, you know, can't remember specifically if

Robert Duncan                                                    June 7, 2012

---

**113**

1  there were discussions framed exactly as you have framed
2  it or generally as you have framed it.  I believe there
3  were a number of discussions as the record will reflect
4  regarding issues similar to that, generally.
5      Q.  Were there discussions on the public record about
6  doing an analysis to determine how many voters would
7  possess one of those forms of ID.
8      A.  I don't recall whether there was or not.  The
9  record would have to reflect that.
10     Q.  If Senate Bill 362 had passed, would it have been
11 subject to the requirements of Section 5?
12         MR. SWEETEN:  Don't reveal matters of
13 legislative privilege.  You can answer if you would not
14 be doing that.
15     A.  I believe as we discussed earlier, Texas is a
16 state that is subject to Section 5.
17     Q.  (By Ms. Maranzano)  Is that a "yes" or "no"?
18     A.  Well, if you or subject to Section 5 and it
19 changes the vote procedure, I would assume it would
20 require preclearance.
21     Q.  Did the legislature take the position that after
22 Crawford was covered by Section 5 of the Voting Rights
23 Act, did not meet the analysis of the impact of photo --
24 photo identification laws on minority voters?
25         MR. SWEETEN:  In answering the question,

---

**114**

1  don't reveal matters of legislative privilege.  Also
2  objection to the question as vague.
3      A.  I can't speak for the legislature.
4      Q.  (By Ms. Maranzano)  Was there any position, such
5  as that taken on the public record?
6      A.  I don't know.
7      Q.  What was the purpose of Senate Bill 362?
8          MR. SWEETEN:  You can answer the general
9  purpose.
10     A.  The general purpose is to preserve ballot
11 integrity.
12     Q.  (By Ms. Maranzano)  Was this law designed to
13 correct any specific problem?
14         MR. SWEETEN:  Don't answer the question.  It
15 calls for matters of legislative privilege.  Instruct
16 not to answer.
17 BY MS. MARANZANO:
18     Q.  Was there anything on the public record that
19 would suggest that that law was designed to address any
20 specific problem with regard to the ballot integrity?
21         MR. SWEETEN:  Don't reveal your thoughts and
22 mental impressions.  You can refer to factual matters on
23 the public record in answering the question.  Don't
24 reveal your analysis.
25     A.  You would just have to look at the record to

---

**115**

1  determine that.
2      Q.  (By Ms. Maranzano)  So you have no independent
3  recollection of whether there was discussion of any
4  particular problems that Senate Bill 362 was designed to
5  correct within the realm of voter integrity as you
6  described the purpose?
7      A.  I believe the public record is clear on what was
8  discussed along those lines and that would be the best
9  source, what the public record contains.
10     Q.  But your -- I mean, I'm just trying to
11 understand --
12     A.  Other than my recollection, which would be
13 analysis and mental process.  So what I'm trying to say
14 is simply, that was three years ago.  And the record is
15 created to preserve what was said.  And that would be
16 the best evidence of what was said regarding those
17 things, not my recollection, which is basically a mental
18 impression.
19     Q.  Well, your recollection of the public record is
20 what I'm asking you about?
21     A.  Public record?
22     Q.  Not your impressions of the public record?
23     A.  Well, the public record is the public record,
24 period.  It is the record.
25     Q.  Yes.  But you're being deposed today so I can get

---

**116**

1  your knowledge.  So that's what I'm asking you to
2  explain to me.  Things that happened on the public
3  record.  So let me ask you this.
4          MR. SWEETEN:  I just want to -- he can --
5  and I just want to be clear.  He can say whether he
6  recalls it being addressed in the public record.  So I
7  will let him do that.  Obviously, to the extent you're
8  asking for mental impressions or thought processes about
9  the bill, that's legislative privilege.  But he can say
10 if he recalls.  And I think, for the most part, he says
11 he doesn't recall.  So I just want to make sure my
12 instruction is clear on that point.
13 BY MS. MARANZANO:
14     Q.  Was there -- was any part of the purpose of
15 Senate Bill 362 to prevent non-citizens from voting?
16     A.  No.
17     Q.  Based on the public record, was there any
18 evidence that Senate Bill 362 would be more effective at
19 preventing in person voter impersonation than the
20 current system?
21         MR. SWEETEN:  You're now asking him for his
22 qualitative analysis of what was on the record, which
23 would require him to reveal his mental impression,
24 thoughts that would be subject to the legislative
25 privilege so I'm instructing you not to answer on that

Robert Duncan                                          June 7, 2012

## 117

1  basis.
2  BY MS. MARANZANO:
3      Q.  Was there any factual analysis on the public
4  record that compared Senate Bill 362 to the current
5  system, in terms of the purported goals of the bill?
6          MR. SWEETEN:  You can answer based on the
7  public record if there was factual analysis.
8      A.  I don't -- I don't -- I don't understand the
9  question.  Could you repeat it again?
10     Q.  (By Ms. Maranzano)  Sure.  Was there factual
11 analysis in the public record about Senate Bill 362, the
12 regime that Senate Bill 362 had set up and the current
13 system and each of their -- and the goal of
14 Senate Bill 362 to prevent in person voter
15 impersonation?
16         MR. SWEETEN:  Objection; compound.  Same
17 instruction on legislative privilege.  You can refer to
18 matters of the public record.
19     A.  I think you can refer to the public record.  It
20 would reflect that my memory is a little vague, what
21 you're asking.  But if I understand you correctly, the
22 record would reflect those sorts of things, what was
23 discussed and what was put in the record as far as
24 written testimony, oral testimony, debate between the
25 members and those sorts of things would be covered, I

## 118

1  think, in a very extensive record on this issue.
2      Q.  (By Ms. Maranzano)  And you have no independent
3  recollection, as you sit here today?
4      A.  It would be -- if I have independent recollection
5  it would be recollection that would be subject to my
6  mental processes and judgment as a legislator.  And I
7  would not be accurate -- it would be somewhat
8  speculative on my part to try to go back three years and
9  remember what people said without putting my judgment in
10 there as to what it meant.  The record is very clear
11 about what people said and what the debates were.  And
12 that's why the record was created.  And so that's the
13 best evidence, in my view, of what the legislature did
14 in 2009.
15     Q.  Did you have any communications with legislators
16 who opposed Senate Bill 362?
17         MR. SWEETEN:  You can answer.
18     A.  Yes.
19     Q.  (By Ms. Maranzano)  With whom?
20     A.  Well, Senator Ellis, Senator Lucio, Senator
21 Whitmire, Senator Van de Putte, and probably others.
22     Q.  How many conversations?
23     A.  Senator Gallegos.
24     Q.  Sorry.  Anybody else?
25     A.  You know, probably, but I remember those folks

## 119

1  typically, I communicated with quite a bit.
2      Q.  How many conversations did you have with Senator
3  Ellis about Senate Bill 362?
4      A.  There's no way to tell you how many.
5      Q.  Do you know when they occurred?
6      A.  No.
7      Q.  Can you tell me --
8      A.  During the process.
9      Q.  Can you tell me, generally, what the subject
10 matter of those conversations were?
11     A.  No, I really don't recall, generally.  I mean,
12 Senator Ellis was opposed to the bill and Senator Ellis
13 expressed that opinion several times.
14     Q.  Can you tell me in conversations you had with
15 Senator Lucio about Senate Bill 362?
16     A.  No.
17     Q.  Can you tell me when they occurred?
18     A.  No.
19     Q.  The general nature of those conversations?
20         MR. SWEETEN:  Well, you've already asked him
21 was it about this bill so I think that is the general
22 subject matter.
23         MS. MARANZANO:  You're not going to let him
24 testify to anything more specifically?
25         MR. SWEETEN:  Well, I'm not going to let him

## 120

1  reveal the substance of the communication.  I think he
2  said opponents about the bill.  That would be a
3  privileged log description.
4          MS. MARANZANO:  That seems extremely general
5  to me.
6          MR. SWEETEN:  Well, what do you
7  specifically -- I mean, if you can find a middle ground
8  I will work with you Jennifer.
9          MS. MARANZANO:  It's hard for me to find a
10 middle ground when I don't know what the subject matter
11 is.
12         MR. SWEETEN:  Well, if you can recall the
13 specific communication she's referring to, I will allow
14 you to give a general subject matter description with
15 the opponents.  Does that satisfy you?
16         MS. MARANZANO:  It does, thank you.
17     A.  ID not recall a specific conversation other than
18 what -- there are thousands of bills.  And as chairman
19 of committee, I communicate with members on all of those
20 bills.  And for me to come and try to reconstruct a
21 specific conversation that occurred three years ago
22 would be impossible, to accurately construct it.  And so
23 I can't give you an accurate answer to your question
24 without violating the privilege and without going into
25 mental processes and opinion.

## 121

1    Q. (By Ms. Maranzano)  And would that hold true for
2  each of these members that you've identified?
3    A. I believe it would.
4    Q. Did these members explain to you why they were
5  opposing the bill?
6    MR. SWEETEN:  Objection; compound.
7    A. Common sense would tell you that some more than
8  others, yes.
9    MR. SWEETEN:  Don't reveal anymore than the
10  general subject matter description why they opposed the
11  bill.  You can just answer it.
12  BY MS. MARANZANO:
13    Q. Why do you say some more than others?
14    A. Some were more vocal about their opposition than
15  others.  Some sit closer to me on the floor than others
16  too.  And some members I'm closer to than others.  Just
17  depends on who it is and what's happening on the day.
18    Q. Do you remember if any of them specifically told
19  you why they opposed the bill?
20    MR. SWEETEN:  You can answer "yes" or "no"
21  on that question.  Don't reveal the communication
22  itself.
23    A. Yes.
24    Q. (By Ms. Maranzano)  Which ones?
25    A. I'm sure it would have been Senator Ellis,

## 122

1  Senator Whitmire, Senator Van de Putte, perhaps Senator
2  Lucio.
3    Q. I'm sorry, did you say perhaps?
4    A. Well, not Lucio.  It would be those three.
5  Probably those three.  Because of the committee and
6  other issues.
7    Q. Did you have communications with outside groups
8  about Senate Bill 362?
9    A. Again, to the extent that they appeared before
10  the committee.  But not to any other extent.
11    Q. Did you have communications with the executive
12  branch about Senate Bill 362?
13    A. You know, I don't really recall doing that.  If
14  it was, it might have been some staff member on
15  logistics of when.  But not on any substantive matter.
16    Q. Did you have conversations with or other
17  communications with locally elected officials on Senate
18  Bill 362?
19    A. To the extent they appeared before the committee
20  and gave public testimony or submitted record --
21  testimony or evidence in the record, yes.
22    Q. Anything -- any conversations apart from their
23  testimony?
24    A. Not that I recall.
25    Q. Were concerns raised on the public record about

## 123

1  the impact of Senate Bill 362 on minority voters?
2    A. You would have to refer to the public record.
3    Q. Did the legislature take any steps on the public
4  record to address those concerns?
5    A. The record would reflect that.
6    Q. And you have no independent recollection?
7    A. Not as you have framed the question, no.
8    Q. Well, do you have a different recollection?
9    MR. SWEETEN:  Don't provide thought, mental
10  impressions about the bill or discussions that you've
11  had with other legislators in answering the question.
12    A. The only way I can answer the question accurately
13  is to say that there was discussion on the public record
14  about all of these issues.  And there was testimony
15  given by experts on all of these issues.  And there was
16  testimony given by lay witnesses on all of these issues.
17  And all that is reflected in the record.  And my
18  independent recollection of any of that would be
19  inaccurate.  But if you refer to the record, the record
20  would be an accurate depiction of what was introduced by
21  the committee, debated by the committee and what was
22  before the Committee of the Whole when it made the
23  decision to vote, based on the record.
24    Q. (By Ms. Maranzano)  So my question is, do you
25  have a recollection, based on what happened on the

## 124

1  public record, about whether the legislature took any
2  steps to address the concerns raised about the impact of
3  Senate Bill 362 on minority voters?
4    MR. SWEETEN:  Objection; legislative
5  privilege.  You're asking about what steps they took and
6  that's asking for his mental impressions and thoughts
7  and opinions about the legislation that would be subject
8  to the legislative privilege, as phrased.
9    MS. MARANZANO:  But steps that they took --
10  let me clarify.
11    MR. SWEETEN:  You're asking him to
12  characterize steps they took in the context of
13  information which is clearly an analysis and process
14  question.
15    MS. MARANZANO:  All right.  I got you.
16  BY MS. MARANZANO:
17    Q. Let me ask you this.  Was there anything stated
18  on the public record that a step was being taken where
19  it was publicly stated that this step was being taken to
20  address concerns about the potential impact of Senate
21  Bill 362 on minority voters?
22    MR. SWEETEN:  As narrowed, in referencing
23  the public record, to the extent you can recall, you can
24  answer the question.
25    A. The public record is several thousand page.

Robert Duncan                                                    June 7, 2012

## 125

1    Q. (By Ms. Maranzano) Well, what's your
2  recollection?
3    A. I don't -- I don't have a specific recollection
4  of what was done. I would have to refer to the record.
5    Q. Did you have a role in attempting to secure
6  passage of Senate Bill 362?
7        MR. SWEETEN: Hold on a minute. Object on
8  the basis of legislative privilege. Any role he had to
9  implicate his analysis and thoughts about the bill or
10 communications that he had. To the extent you can refer
11 to matters of the public record, you can answer that
12 question.
13   A. My role was as chairman of the Committee of the
14 Whole, with regard to the process of hearing the bill
15 and presenting it to the members.
16       MR. SWEETEN: Okay. I think we're getting
17 close to a break. That bowl of Captain Crunch I had at
18 5 a.m. is not lasting. So can we get to a point and
19 take a break pretty soon?
20       MS. MARANZANO: Yes. Why don't we just go
21 ahead and do that.
22       MR. SWEETEN: I would like a time check now.
23 Please.
24       MS. MARANZANO: Let's go back on the record.
25 And can we mark this?

## 126

1        (Exhibit No. 524 was marked.)
2  BY MS. MARANZANO:
3    Q. Before the break we were talking about Senate
4  Bill 362. I'm actually going to go back for a moment to
5  House Bill 218. I'm giving you what we're marking as
6  deposition Exhibit 524. If you could take a look at
7  that and tell me if you recognize it.
8    A. It appears to be a record of the Senate Committee
9  on State Affairs, dated April 30, 2007. House Bill 218
10 is the title.
11   Q. Can you look at the page that's Bates labeled at
12 the bottom -- or actually it's Page No. 54 in the
13 record.
14   A. 54 of the transcript.
15   Q. Of the transcript. And the Bates label is Texas
16 00213319. There's a statement made by you on that page.
17 Do you see that?
18   A. Does that appear at line 14.
19   Q. Line 14, exactly. And if you can look down a few
20 lines from that there's a sentence that says, "One thing
21 I think, Senator Fraser laid out a good argument in the
22 beginning and he says that, 'Well, if one voter votes
23 illegally or fraudulently, cancels out the vote of a
24 person who voted legally.'" Does that seem like an
25 accurate representation of something you said, to the

## 127

1  extent you remember?
2    A. Well, again as we discussed earlier I don't
3  remember specific things that were said or what I said.
4  But if that's what the record says I said then I'm sure
5  that's what I said.
6    Q. Has anyone ever told you that they're not going
7  to vote because they're worried about somebody voting
8  illegally and cancelling out their vote?
9        MR. SWEETEN: Don't reveal matters of
10 privilege in answering the question.
11   A. Not specifically.
12   Q. (By Ms. Maranzano) Not -- not specifically. Has
13 anybody ever told you generally?
14   A. Well, generally no. I mean, as far as you hear
15 people discussing, the general public about voter ID and
16 what's wrong with voter ID, people may make statements
17 generally about voter confidence. But I can't recall a
18 specific statement anybody said.
19   Q. And what kinds of statements about voter
20 confidence do you recall?
21       MR. SWEETEN: Don't reveal matters that
22 would be subject to the legislative privilege.
23 Communications with the legislative staff, State
24 agencies, Texas Legislative Council. And don't reveal
25 your thoughts or mental impression.

## 128

1    A. Just generally, what you would read in the
2  newspaper or what you would hear on the radio talk show
3  or what you would hear on a general discussion of the
4  people at meetings and things like that about,
5  generally, voter confidence, voter ID and that sort of
6  thing.
7    Q. Okay. And I'm just trying to understand, what do
8  you mean by "voter confidence and voter ID." What have
9  you heard in those forums that you just listed about the
10 connection between voter confidence and voter ID?
11   A. Generally, what I would recall is that there is a
12 frustration while somebody should not be allowed --
13 should not be required to show and ID to vote when
14 they're shown an ID to do a lot of other things that we
15 all do in this society in this day an age.
16   Q. Have you also heard that, in those same forums,
17 that some of those things we have to show ID for are not
18 legal rights?
19       MR. SWEETEN: You can answer. Don't reveal
20 your mental thoughts and impressions and don't reveal
21 the communications that would be subject to the
22 legislative privilege. You can refer to matters in the
23 public record, which I think you have.
24   A. I don't recall anything specific as to what you
25 described.

Robert Duncan                                                June 7, 2012

---

### 133

1   that.  This statement is what it is.  It is a statement
2   that basically is a form of public debate on the issue.
3   So that's what I recall.  And that is how I can answer
4   that.
5       Q.  Okay.  You're not able to provide any additional
6   answer as to what you meant -- what the word that refers
7   to?  I mean I was just actually just asking for the
8   context?
9       A.  You know, I don't remember making -- this is the
10  record -- I don't recall this specific conversation.
11  I'm not denying that it occurred.  I'm just saying I
12  don't recall the conversation.  So I actually
13  don't understand -- can't -- or don't recall -- I cannot
14  accurately answer what context that's in.
15      Q.  So would it be oppressive if a person was unable
16  to afford an identification and couldn't vote, would
17  that system be oppressive?
18          MR. SWEETEN:  Objection.  Don't answer.
19  Calls for matters subject to the legislative privilege.
20  BY MS. MARANZANO:
21      Q.  Can you look at the next page for me, on Page 57
22  of the public record, the public hearing.  And at the
23  bottom of that page do you see there's a quote by you?
24      A.  Well, I have testimony beginning on line 14.
25      Q.  Yes.  Can you look at where that -- can you look

### 135

1   here today?
2       A.  Not in the record.  Are you talking just about
3   this Senate Committee public hearing or are you talking
4   about 218, generally?
5       Q.  I'm talking about the public record, generally?
6       A.  Okay.
7       Q.  Does that change your answer at all?
8       A.  No.
9       Q.  Okay.  Can you look at Page 99 of the transcript,
10  the Bates label is Texas 00213364.  And there's an
11  exchange -- I'm sorry.  Do you see there's an exchange
12  at the bottom of the page between Senator Van de Putte
13  and Ms. McGeehan.  Can you identify for the record who
14  Ms. McGeehan is?
15      A.  I believe that would be referring to Ann McGeehan
16  who was an employee of the Secretary of State's office.
17  I'm think in the election division.
18      Q.  Was she the director of elections?
19      A.  I think that was generally her title.  It I'm not
20  sure specifically what her title was.
21      Q.  Do you see on line 22, Senator Van de Putte
22  asked, "About how many complaints have you about had
23  voter impersonation?"  And Ms. McGahan responds on line
24  24, "We have not had any."
25      A.  I see that.

### 134

1   at the testimony that's at line 24 and 25 and the top of
2   the one on the next page.  Do you see that it says, "So
3   what this is, this is the least restrictive more to be
4   able to verify voters.  It seems to me."  Based on the
5   public record, do you think House Bill 218 is the least
6   restrictive means to verify voters?
7           MR. SWEETEN:  Objection.  Don't answer the
8   question.  It calls for matters of legislative
9   privilege, including your mental impressions, thoughts,
10  motivations about bills.
11  BY MS. MARANZANO:
12      Q.  Was there discussion on the public record about
13  whether House Bill 218 was the least restrictive means
14  to verify voters?
15          MR. SWEETEN:  You can answer the question.
16      A.  It appears that there was discussion and debate
17  about that and the record will speak for that.
18      Q.  (By Ms. Maranzano)  Was there any discussion on
19  the public record about whether House Bill 218 would
20  continue to be the least restrictive means to verify
21  voters if some of the forms of identification in the
22  bill were removed from it?
23      A.  If there was such a discussion of that it would
24  be in the record.
25      Q.  Do you have any recollection of that, as you sit

### 136

1       Q.  Do you recall that exchange?
2       A.  Not specifically.  But I recall it from reviewing
3   the record here.
4       Q.  Do you recall at any point publicly getting an
5   update on that information sometime between when this
6   happened and the 2011 legislative session?
7           MR. SWEETEN:  You can refer to matters in
8   the public record.
9       A.  I don't recall if we did or not.  If we did it's
10  reflected either in -- or it should be reflected in the
11  committee records post April 30, 2007.
12      Q.  Would that information, if it was publicly made
13  available, have gone to the State Affairs Committee?
14          MR. SWEETEN:  Objection.  Calls for
15  speculation.  Also don't reveal your mental processes or
16  communications.
17      A.  It could have gone to the State Affairs
18  Committee.  It could have gone to members generally.
19  Sometimes post-hearing or once a bill is out of the
20  COMMITTEE people will disseminate things.  I don't know.
21  But I can't tell you outside the record whether the
22  committee followed up or did anymore in that session on
23  that question.
24      Q.  (By Ms. Maranzano)  Okay.  We can put this aside.
25  Before the break we had started talking about Senate

Robert Duncan                                                    June 7, 2012

---

### 137

1   Bill 362. Do you recall that?

2         MS. MARANZANO: Can we have this marked.

3         (Exhibit No. 525 was marked.)

4   BY MS. MARANZANO:

5         Q. Senator, I'm showing you what we're marking for

6   the record as deposition Exhibit 525. It does not have

7   a cover page on this, but do you recognize that this

8   looks to be an excerpt from the Senate rules?

9         MR. SWEETEN: Is this '09 or '11, did you

10  say.

11        MS. MARANZANO: This is '09.

12        MR. SWEETEN: '09, okay.

13        A. Is your question does this appear to be?

14        Q. (By Ms. Maranzano) An excerpt from the Senate

15  rules?

16        A. I assume that it is.

17        Q. Do you recall -- do you recall having a debate on

18  the rules resolution in 2009 in the Senate?

19        A. I do recall there was a debate on this.

20        Q. And can you direct your attention to Section D of

21  Rule 5.11?

22        A. Yes, ma'am.

23        Q. Do you see that there's a provision explicitly

24  for voter identification requirements in Section D of

25  Rule 5.11?

---

### 138

1         A. Uh-huh. Yes, ma'am.

2         Q. Can you tell me what the circumstances were for

3   adopting that rule, that section of the rules?

4         MR. SWEETEN: Done reveal -- don't answer

5   the question as phrased. It will require you to reveal

6   matters subject to legislative privilege. You can

7   answer as to the general purpose of Rule 5.11. I will

8   let him do that.

9   BY MS. MARANZANO:

10        Q. Why don't you tell me about the general purpose

11  of Rule 5.11?

12        A. Well, as I understand the general purpose of Rule

13  5.11 was to be able to take up consider -- a bill of

14  resolution relating to voter identification

15  requirements, within the confines of this rule. And it

16  sets up the process and procedure of doing that.

17        Q. And what was the purpose for making this special

18  carve-out for voter identification requirements?

19        MR. SWEETEN: You can testify to the purpose

20  of rule 5.11 generally.

21        A. Well, generally, the purpose is to allow a bill

22  to be brought up as a special order as opposed to the

23  regular order of business.

24        Q. (By Ms. Maranzano) So what I'm directing your

25  attention to is the Subsection D of that rule. What was

---

### 139

1   the purpose of subsection D?

2         A. The purpose of that subsection is to provide for

3   consideration of voter identification or a bill of

4   resolution relating to voter identification requirements

5   by a Committee of the Whole in setting the time limit.

6         Q. And so -- I'm sorry. Were you done?

7         A. I think so.

8         Q. Do you see that that also allows for a vote by

9   the majority of the members of the Senate?

10        A. That's correct.

11        Q. And so that -- was this in the 2007 Senate rules?

12        A. I think this rule was either added or amended in

13  2009.

14        Q. So you believe it was or was not in the 2007

15  rules?

16        A. Not as 5.11. I don't know what was -- if there

17  was a version of special order bill that was amended by

18  the Senate on -- in January of 2009.

19        Q. Okay. But I'm asking specifically about

20  Subsection D?

21        MR. SWEETEN: You're asking was D in the

22  2007 Senate rules.

23        MS. MARANZANO: Yeah.

24        MR. SWEETEN: You can answer.

25        A. I don't think so.

---

### 140

1         Q. (By Ms. Maranzano) Okay. How about the 2005

2   Senate rules?

3         A. I don't believe it was.

4         Q. Are you aware of any other times when there has

5   been a carve-out for one particular type of legislation

6   written into the Senate rules?

7         MR. SWEETEN: You're talking about in -- in

8   the context of the 5.11. Because I think the question

9   could be very broad. I just want to make sure I

10  understand.

11  BY MS. MARANZANO:

12        Q. Okay. Why don't we focus on 5.11. Was there any

13  other time that you're aware of when there has been an

14  exception written into the rules for Rule 5.11 about one

15  particular type of legislation?

16        A. Not that I recall. Not that I know of.

17        Q. Did Senate Bill 362 pass by more than two-thirds

18  a majority vote?

19        A. I think the record would reflect it passed by a

20  majority, but not a two-thirds majority.

21        Q. Did you have any communication -- well, let me

22  ask you this. Did Senator Williams introduce the

23  resolution to the Senate rules resolution in 2009?

24        A. I believe Senator Williams was the primary author

25  of the rule, of the proposed rule, yes.

## 141

1    Q.  Did you have communications with Senator
2  Williams?
3    A.  Yes.
4    Q.  About the proposed rules?
5    A.  Yes.
6    Q.  How many?
7    A.  I don't know.  Not many.
8    Q.  Prior to his introduction of the resolution?
9    A.  Yes, prior.
10   Q.  Can you give me an approximate number?
11   A.  Not really.  I mean it was -- I really can't.  It
12  would be an approximate guess, so I hate to guess.  We
13  had more than one.
14   Q.  More than five?
15   A.  Probably.
16   Q.  And they were all prior to the introduction of
17  the resolution?
18   A.  No.  Well, I don't know.  Prior to passage.  I'll
19  qualify it that way.
20   Q.  When did you learn that Senator Williams was
21  going to introduce the rules resolution that included
22  this Subsection D for Rule 5.11?
23   A.  Sometime in January of 2009.
24   Q.  Did any other Senate rules get changed from the
25  consideration of voter identification requirements in

## 142

1  2009?
2         MR. SWEETEN:  Could you read the question
3  back, please, madam court reporter.
4         (Requested question was read.)
5         MS. MARANZANO:  And I think what I intended
6  to say was for the identification of voter
7  identification requirements.
8    A.  Would you just rephrase it?
9    Q.  (By Ms. Maranzano)  Were any other Senate rules
10  changed in 2009 solely for -- as is written in 5.11-D,
11  solely for a bill or resolution related to voter
12  identification requirements?
13   A.  I don't know if there were any conforming rules
14  or anything that were changed as a result of this.  I do
15  not know the answer to this question.
16   Q.  Other than conforming rules, did anything change?
17   A.  I don't think so.  But again, I don't know for
18  sure.  I don't recall that there were.  I don't think
19  there were.
20   Q.  Did you take a public position on the rules
21  resolution that Senator Williams introduced?
22   A.  What do you mean?
23   Q.  Presumably, you voted on it, right?
24   A.  I voted for it.
25   Q.  You voted for it?

## 143

1    A.  Yes.  Yes.
2    Q.  Did you have any communications with anybody
3  about changing other rules in 2009 for the consideration
4  of voter identification requirements, other rules other
5  than the 5.11?
6    A.  I don't think so.
7    Q.  And other than Senator Williams, did you have any
8  communications about Subsection D of 5.11 with anybody
9  in 2009?
10   A.  I had conversations with several members of the
11  Senate over that.  During the debate on the floor,
12  during the few days before when it was proposed and
13  voted on.  Just part of what we do in the Senate is
14  there are discussions formal and informal.  Formal would
15  be on the record, informal would be discussions that
16  would be had on the Senate floor.
17   Q.  Who did you have informal communications with?
18   A.  I would assume members of the -- different
19  members.
20   Q.  Can you give me their names?
21   A.  Well, Senator Lucio, Senator Ellis, Senator Van
22  de Putte, Senator Whitmire, probably Senator Fraser,
23  probably Senator Williams, probably Senator Ogden.
24  Probably Carona, Senator Eltife perhaps.  Those are just
25  specific people that are coming to my mind that I would

## 144

1  have had a discussion on the Senate floor about this
2  particular rule.
3    Q.  Do you remember conversations with them or you're
4  just saying if you --
5    A.  I don't remember the context of generally what
6  members of the legislative body do in discussing an
7  issue.
8    Q.  And am I correct that some of the members you
9  listed voted against the rules resolution?
10   A.  That's correct.
11   Q.  Were you conversations -- did your conversations
12  with them include -- include discussing the reasons why
13  they were voting against the rules resolution?
14        MR. SWEETEN:  Don't discuss the specific
15  conversations.  But if you want to -- I think as phrased
16  I'm going to let you answer it.
17   A.  Members discuss their mental processes and
18  thoughts about bills on the Senate floor all the time
19  that may not be on the record.  In other words, it's --
20  as opposed to a formal debate where somebody is holding
21  a mic and debating formally or whether somebody is
22  working on a bill and debating the bill on the Senate
23  floor informally without a debate.  It is part of the
24  mental process sharing of legislators that occurs.  And
25  that would be the type of communication that we were

145

1   having.
2       Q.  (By Ms. Maranzano)  So my question was about
3   whether they expressed why they were opposed to the
4   bill's resolution.
5       A.  I'm sure those that did expressed or gave reasons
6   as to why they were opposed.
7       Q.  Do you recall if Senator Carona gave you reasons
8   about why he was opposed to the rules resolution?
9       A.  Yes.
10      Q.  How many conversations did you have with him?
11      A.  Two or three.
12      Q.  Were all of these conversations that you've
13  referred to, and for the purposes of this question I'm
14  including more than just Senator Carona, were they all
15  verbal?
16      A.  Yes.
17      Q.  Did you have any written communications?
18      A.  No.
19      Q.  Did Senate Bill 362 go to any Senate committees?
20          THE REPORTER:  Go what?
21          MS. MARANZANO:  Was it referred to any
22  Senate committees?
23      A.  I don't believe it was, other than the Committee
24  of the Whole.  I don't believe it went to a specific
25  standing committee.

146

1       Q.  (By Ms. Maranzano)  Is that the -- is that
2   unusual?
3           MR. SWEETEN:  You can answer as the general
4   Senate procedure.
5       A.  That was the procedure that was established by
6   Rule 5.11.
7       Q.  (By Ms. Maranzano)  Rule 5.11 established that it
8   would go straight to the Committee of the Whole?
9       A.  I believe that's what it says.  I'll look at it.
10  I believe that the Senate Rule 5.11 contemplates the
11  bill being referred to by the Senate of the whole.
12      Q.  Would this bill, had it not been referred to the
13  Committee of the Whole, been referred to the State
14  Affairs Committee?  The bill I'm referring to is Senate
15  Bill 362.
16          MR. SWEETEN:  Hold on a minute.  Calls for
17  speculation and calls for him to reveal his thoughts,
18  mental impressions about legislation.  So I'm going to
19  instruct you not to answer based on that.
20  BY MS. MARANZANO:
21      Q.  Did you have any communications with the
22  Lieutenant Governor about the referral of Senate Bill
23  362 straight to the Committee of the Whole?
24      A.  Yes.
25      Q.  How many?

147

1       A.  I can't tell you.  Five or more.
2       Q.  And when were those?
3       A.  From the point of -- it would after the rule was
4   adopted and from the time we had the hearing.
5       Q.  I'm sorry.  The time that the Committee of the
6   Whole held the hearing?
7       A.  Right.  Right.
8       Q.  It was after the rule was adopted you said?
9       A.  Yes.  I may have had some conversations before,
10  generally.  I just don't recall.
11      Q.  What was the purpose of referring the bill
12  directly to the Committee of the Whole?
13          MR. SWEETEN:  Yeah.  Don't answer that
14  question.  That calls for matters that are your mental
15  impressions, thoughts, opinions about legislation,
16  motivations, so don't answer the question.
17  BY MS. MARANZANO:
18      Q.  Were there any conversations on the public record
19  about the referral of this bill straight to the
20  Committee of the Whole?
21          MR. SWEETEN:  You can answer the question as
22  phrased.
23      A.  If they were they're on the record.  I
24  assume there may have been discussions about that during
25  the debate on Rule 5.11.

148

1       Q.  (By Ms. Maranzano)  Do you recall any members
2   expressing concern that this bill was trying to be moved
3   along extremely quickly?
4           MR. SWEETEN:  You can refer to matters of
5   the public record.  Don't reveal matters of legislative
6   privilege.
7       A.  I don't know for sure.  I don't recall -- have
8   independent recall.  That would be reflected in the
9   record.  It's not unusual for that to occur.
10      Q.  (By Ms. Maranzano)  I'm sorry.  For what to --
11  what's not unusual?
12      A.  For someone to complain that the bill is moving
13  too quickly.
14      Q.  I see.  Based on the public record would you say
15  Senate Bill 362 moved fairly quickly through the
16  legislature compared to other bills?
17      A.  No.
18      Q.  Did you have less of an ability to shape Senate
19  Bill 362 since it went straight to the Committee of the
20  Whole and not to State affairs?
21          MR. SWEETEN:  Objection; calls for
22  legislative privilege.  Your qualitative judgment about
23  one committee process as opposed to another.  That's a
24  matter of legislative privilege.  Instruct you not to
25  answer.

Robert Duncan                                                    June 7, 2012

---

149

1       MS. MARANZANO:  Can we get these two
2   exhibits mark?
3       (Exhibit No. 526-527 was marked.)
4   BY MS. MARANZANO:
5       Q.  Do you recognize these?
6       A.  I believe so.
7       Q.  What are these?
8       A.  Well, Exhibit 526 is a letter from Senator Van de
9   Putte me dated March 3, 2009.  Opening a written
10  dialogue concerning the Committee of the Whole hearing
11  and ground rules.  And the -- and 527 is a letter that I
12  wrote responding to her concerns dated March 5, 2009.
13      Q.  And can you look at -- do you recall having this
14  exchange with Senator Van de Putte?
15      A.  I recall that we wrote letters back and forth and
16  also had conversations seeking conversations about these
17  issues.
18      Q.  Can you look at your response for me?
19      A.  Yes, ma'am.
20      Q.  And can you look at No. 1, the first sentence
21  says, "I am not inclined to support further delay in
22  consideration of voter identification legislation."  Can
23  you tell me, based on the public record, had there been
24  a delay in the consideration of voter identification
25  legislation?

---

150

1       MR. SWEETEN:  Yeah.  Don't answer the
2   question.  It calls for you to interpret what you said
3   there.  Legislative privilege.  You can answer as to
4   whether you said that.
5       A.  That's a statement I wrote.  But that's as much
6   as I can testify to.
7       Q.  (By Ms. Maranzano)  Okay.  Can you -- can you
8   look down in that same paragraph where there's a
9   sentence that says, "More than a week's notice of a
10  hearing is much more than the Senate usually provides,"
11  what amount of notice does the Senate usually provide?
12      MR. SWEETEN:  You can answer as a general
13  matter, but I don't want you to interpret statements on
14  this.
15      A.  The rules of the Senate provide posting notices
16  and I believe, you can go with the rules, but I think
17  it's 24 hours or 48 hours to the tag and there's certain
18  periods of times it changes depending on the time of the
19  session.  So the rules of the Senate would be the time
20  limits that committees are required to provide for
21  hearings.  And I would just refer you to those rules
22  that were in effect.
23      Q.  (By Ms. Maranzano)  And is it -- is it your
24  testimony that more than a week's notice would be much
25  more than what the Senate would usually provide?

---

151

1       MR. SWEETEN:  Again, don't refer to the
2   document itself or interpret the words on the page.  If
3   you -- you can answer as a general matter about Senate
4   procedure matters of the public record.
5       A.  Generally a week would be longer than normal
6   bills would -- notice on most bills.
7       Q.  (By Ms. Maranzano)  Are there some bills that you
8   give a longer amount of notice time for?
9       MR. SWEETEN:  You can refer to matters of
10  the public record.
11      A.  Generally, no.  We generally -- we generally set
12  a hearing docket and post it within the required time
13  limits.  Just depends on when it gets down to the
14  Senate.
15      Q.  (By Ms. Maranzano)  Is there any consideration of
16  whether there's significant public interest on a bill?
17      MR. SWEETEN:  Yeah.  Don't reveal that.
18  That would require you to reveal matters that are
19  privileged and instruct you not to answer.
20  BY MS. MARANZANO:
21      Q.  Can you look at that paragraph below the one we
22  were just looking at?  There's a sentence that says,
23  "Additionally, that committee heard extensive testimony
24  last session on a substantially similar voter election
25  bill.  Texas Senate almost spent nearly an entire day on

---

152

1   the Senate floor discussing the importance of this
2   issue."  Does that sentence refer to the debate that
3   occurred on the rules resolution?
4       MR. SWEETEN:  Don't interpret the sentence
5   on the page.  You can answer -- I mean, I don't know
6   that you can answer that.  I think that's legislative
7   privilege.
8       MS. MARANZANO:  So what he meant in this
9   letter --
10      MR. SWEETEN:  He's not going to interpret
11  what he meant when he said it.  That's legislatively
12  privileged.  He can answer questions about the public
13  record, but he's not going interpret the letter.  That
14  would reveal his thoughts, mental impressions about a
15  bill in legislation.
16      MS. MARANZANO:  I'm not sure I see that as
17  interpretation, but more just as what event he was
18  referring to.  But in the interest of --
19      MR. SWEETEN:  Well, I mean, as the court has
20  said, you can ask him about a public statement, he made
21  it, he didn't make it.  The court has not said that you
22  can -- that you can go behind that and ask for reasons,
23  support or information or thought processes behind that
24  statement.  In fact, they've said the contrary.  And so
25  I'm drawing that line.  I think that is an absolutely

## 153

1  correct interpretation of the court's decision on this
2  matter.  That's why I'm not going to allow him to give
3  additional information about this statement or what he's
4  expressed.
5  BY MS. MARANZANO:
6      Q.  Well, let me ask you this, Senator.  That
7  sentence refers to there being discussion about the
8  importance of this issue.  Was the substance of
9  legislation discussed during that discussion, which
10  appears to me is a discussion that happened on the
11  public record?
12      A.  Well, let me answer it this way.  I don't know of
13  any other hearing we had on the public record on the
14  Senate for a day other than the hearing on the public.
15      Q.  And was the substance of Senate Bill --
16      A.  There may have been, but I don't recall.
17      Q.  There may have been what?
18      A.  There may have been other -- I don't recall any
19  other hearing before the Senate that lasted more than a
20  day, other than the one on Rule 5.11.
21      Q.  And was the substance of Senate Bill 362
22  discussed in that debate?
23      A.  The record will clearly reflect what issues were
24  discussed.
25      Q.  And what's your recollection, as you sit here

## 154

1  today?
2      A.  My recollection is, we talked about the issues of
3  voter identification and the issues of the special order
4  rule.  But the record -- you would have to check the
5  record to get a better recollection or better reflection
6  of what was discussed.  There were a lot of things
7  discussed that day.
8      Q.  So your recollection is you talked about voter
9  identification and you don't recall whether or not --
10      A.  I don't recall specifics independently.  The
11  record will reflect that.  That was a long day for me.
12  I had a personal tragedy.
13      Q.  I'm sorry.  Can you look at the next page for me?
14  By the --
15      A.  The next -- my letter of March --
16      Q.  Exactly.  By paragraph 5.  Can you read that?
17      A.  Read it?
18      Q.  Just take a look at it.
19      A.  Yes.
20      Q.  Is that about whether the office of the Attorney
21  General would be available to testify in a legislative
22  proceeding?
23      A.  That's correct.
24      Q.  Are you aware of whether this position -- am I
25  correct that what 5 -- what that paragraph is asserting

## 155

1  is that the office of Attorney General would not testify
2  because should there be litigation that would present a
3  conflict of sorts?
4      A.  Well, I think you just have to read it.
5      Q.  Well, how would you describe it for me?
6      A.  As I wrote it.
7      Q.  Which says, "Given fact that the office of the
8  Attorney General will represent the State of Texas in
9  litigation if any arising out of this legislation, it
10  would be inappropriate to present the Attorney General
11  as a witness in the legislative debate."  Did that
12  position change in any of the legislative debates.  And
13  that's -- that's a public record.  Did the office of
14  Attorney General testify in the 2011 legislative session
15  on voter identification vote?
16      MR. SWEETEN:  That second question, if the
17  AG testified, I'm fine with.  The first one, whether his
18  position changed, I think we --
19  BY MS. MARANZANO:
20      Q.  Okay.  Let's go with the second one.
21      MR. SWEETEN:  Because you amended the
22  question.
23      A.  So to make sure I'm clear, would you restate it?
24      Q.  (By Ms. Maranzano)  Yeah.  Did the office of the
25  Attorney General testify during the debate on SB 14?

## 156

1      A.  There were staff persons from the office of the
2  Attorney General who testified on -- in the public
3  hearing on Senate Bill 362.
4      Q.  On 362?
5      A.  Or whatever it was.
6      Q.  Senate Bill 14?
7      A.  Yeah, I think on 14 as well.
8      Q.  Okay.  And you think they testified in 2009?
9      A.  I think so.
10      Q.  As well?
11      A.  Yeah.
12      Q.  Okay.
13      A.  I'm sorry.  I thought we were on --
14      Q.  We were, but --
15      A.  You've got to be clear with me on what you were
16  talking about.
17      Q.  I'm sorry.
18      A.  It will help me a lot.
19      MR. SWEETEN:  Jennifer, I need to take a
20  2-minute break.
21      (Brief recess.)
22      MS. MARANZANO:  Before we actually go back
23  into the substantive discussion we were having, I wanted
24  to raise an issue with Mr. Sweeten, on the record, about
25  documents that we believe should have been produced

Robert Duncan                                    June 7, 2012

---

### 157

1  yesterday pursuant to the court's order related to --
2  this is from Page 15 of the June 5th order.  The court
3  ordered that y'all produce a constituent lobbyist and
4  interest groups communication on legislative responses.
5  And we believe that the privilege log asserts that there
6  were some constituent communications with Senator
7  Duncan's office that have not been produced.  So I can
8  give you the specific Bates ranges.
9      MR. SWEETEN:  Do you want to -- looks like
10 you've got them all written down.
11     MS. MARANZANO:  I do.
12     MR. SWEETEN:  Do you want to --
13     MS. MARANZANO:  Why don't I read it into the
14 record and then I can send you an e-mail follow-up.
15     MR. SWEETEN:  Yeah.  That would be helpful.
16     MS. MARANZANO:  Okay.
17     MR. SWEETEN:  Let me just say that, in
18 response, that I know that we've obviously -- were in
19 receipt of the court order.  We obviously responded.
20 And I would think you would agree that we sent,
21 certainly over 1,000 constituent -- or documents fitting
22 that description yesterday.  You've been advised --
23     MS. MARANZANO:  I can't represent the
24 number.  I understand that constituent communications
25 were produced.

---

### 158

1      MR. SWEETEN:  So you were given -- let's say
2  this.  You were given a substantial number of
3  constituent communications.  If you're suggesting that
4  you don't think you got some of Senator Duncan's, then
5  all I can do in response to that is to look.  And we
6  believe that we've been in full compliance with the
7  court's order.  But I will certainly look at your list
8  and we'll double-check.
9      MS. MARANZANO:  Right.  And, I mean, that's
10 what I'm asking.  And I think -- because our
11 understanding is we don't have these documents, I am
12 going to need to hold the deposition open.  But, you
13 know, we will --
14     MR. SWEETEN:  If at the next break I can
15 potentially make a phone call and check to see.
16     MS. MARANZANO:  So let me just read for the
17 record that the Bates numbers are Texas 00203510, Texas
18 0020354 -- 3524 through 3527, Texas 00203528 through
19 3529, Texas 00203532, Texas 00203533 through 3539.
20 Texas 00203540 through 3541.  Texas 00203542 through
21 00203544.  Texas 00204706.  Texas 00204707 through 4710.
22 So those are the ones we're missing.  And I can send you
23 e-mail communication following up.
24     MR. SWEETEN:  That actually would be helpful
25 so we can have them all written down and we'll -- I'll

---

### 159

1  look into your suggestion.  But again, I think we fully
2  complied yesterday.  But we'll check that.  We'll check
3  what you're suggesting.
4      MS. MARANZANO:  To be clear, we're looking
5  at the privilege log from May 21st and I believe these
6  documents are explicitly listed as constituent
7  communications.
8  BY MS. MARANZANO:
9      Q.  Okay.  Senator, we were talking about Senate Bill
10 362 before the break.  Can you tell me what your role
11 was during the consideration of Senate Bill 362 when it
12 went before the Committee of the Whole?
13     MR. SWEETEN:  You can refer to your
14 public -- matters of public record.
15     A.  I was appointed to be the chairman of the
16 Committee of the Whole.
17     Q.  (By Ms. Maranzano)  And what are your
18 responsibility when you're chair of the Committee of the
19 Whole?
20     A.  To conduct the hearing.
21     Q.  And can you describe to me what that means?
22     A.  Well, it means setting the parameters for the
23 ground -- the parameters and the ground rules for
24 hearing witnesses and organizing the committee so that
25 it moves in an orderly fashion.  So that -- to work with

---

### 160

1  the members of the committee to determine how we will
2  move through the witnesses expeditiously.  To get
3  consensus on order of witnesses and generally to ensure
4  that there's proper de quorum during the hearing as it's
5  taking place so that there can be the best quality of
6  deliberations possible.
7      Q.  When you say, "work with committee members," when
8  this is a Committee of the Whole, does that mean work
9  with everybody?
10     A.  Right.
11     Q.  Who just thought -- who appointed you to this
12 position?
13     A.  Lieutenant Governor appoints that committee
14 chairman.
15     Q.  Were witnesses invited to testify on the
16 Committee of the Whole for Senate Bill 362?
17     A.  The record reflects proponents and opponents that
18 were invited.
19     Q.  Do you recall what the break down of witnesses
20 was between opponents and proponents?
21     A.  No, the record will reflect that.
22     Q.  What's the -- what's the usual break down between
23 witnesses on either side of the bill?
24     MR. SWEETEN:  Do you mean on the Committee
25 of the Whole?

Robert Duncan

June 7, 2012

## 161

1    BY MS. MARANZANO:

2        Q.  Well, why don't we talk about Committee of the

3    Whole first?

4            MR. SWEETEN:  You can talk about general

5    procedure based on the public record.

6        A.  There is no usual.

7        Q.  (By Ms. Maranzano)  What about in the State

8    Affairs Committee while you've been chair, what's the

9    usual break down of witnesses between supporters and

10   opponents of the bill?

11           MR. SWEETEN:  Same instruction.

12       A.  There is no usual.  Just depends on the bill

13   and -- basically.

14       Q.  (By Ms. Maranzano)  what -- during the Committee

15   of the Whole, who invites the witnesses to testify?

16       A.  The proponents and opponents of the bill.  So any

17   member of the Senate can propose a witness and bring

18   them.  It's not -- there's not any rule about that.  So

19   that's the best way I can answer that.

20       Q.  There's no rule.  Is there a limited time for

21   which people can testify?

22       A.  That's a consensus that we normally try to

23   develop a hearing and our standing committee hearing we

24   have witness limits sometimes.  Sometimes we don't.  And

25   on most public testimony we do have time limits in the

## 162

1    Senate on public testimony.

2        Q.  Do you recall if any groups representing minority

3    voters testified during the 2009 consideration of Senate

4    Bill 362?

5        A.  I recall they did.

6        Q.  Do you recall if concerns were raised about

7    Senate Bill 362's impact on minority voters, either by

8    these groups or by others?

9            MR. SWEETEN:  You can testify to matters on

10   the public record.

11       A.  I think the record will reflect they did.  I

12   don't recall specifically what the objections were, as

13   we sit here today, independently.

14       Q.  (By Ms. Maranzano)  Do you recall who raised

15   those concerns?

16           MR. SWEETEN:  Same instruction.

17       A.  No.  It would be on the record.

18       Q.  (By Ms. Maranzano)  Do you recall if legislators

19   raised those concerns?

20           MR. SWEETEN:  Same instruction.

21       A.  It would be on the record.

22       Q.  (By Ms. Maranzano)  And you have nothing to add

23   to the record in that regard?

24       A.  No.  The record -- I don't have independent --

25   enough independent recollection to give you an accurate

## 163

1    answer.  You would have to rely on the record for that.

2        Q.  Were there any public -- well, let me ask.  Were

3    there any amendments to Senate Bill 362 when it was

4    being considered on the floor that were publicly stated

5    as amendments to respond to the concerns that SB 362

6    would disproportionately impact minority voters?

7        A.  We had talked about this earlier.  The record

8    would have to reflect it.  Independently, I don't recall

9    and for some reason I think we -- there was a consensus

10   not to add amendments, but -- from everybody.  But I

11   can't -- the record would reflect that.

12           (Exhibit No. 528 was marked.)

13   BY MS. MARANZANO:

14       Q.  I'm showing you what we're marking deposition

15   Exhibit 528.  Can you take a look and tell me if you

16   recognize this and I will tell you that it's an excerpt

17   not the full record?

18       A.  Appears to be an excerpt from the Senate journal

19   for the week -- or from the day of March 18, 2009.

20       Q.  And can you look at the second page.  Do you see

21   there's something that says, "statement regarding votes

22   cast on Senate Bill 362."  If you would quickly take a

23   look at that.  Is this something you've seen before?

24       A.  This would be on the third page.

25       Q.  It starts on the second and it goes on to the

## 164

1    third?

2        A.  Okay.  Paragraph 3.

3            MR. SWEETEN:  Are you talking about the

4    statement on the bottom?

5    BY MS. MARANZANO:

6        Q.  The statement regarding both House and Senate

7    Bill 362.  And it starts and it says, "Senator West

8    submitted the following statement," do you have that?

9        A.  No.  Sorry.  I'm a slow reader I guess.  What

10   page is it on?  Third page?

11       Q.  It starts right here.  But actually I'm going to

12   direct your attention to No. 8?

13           MR. SWEETEN:  Starting here, she wants you

14   to read that.

15       A.  Senator West, yeah.  I see that.

16       Q.  (By Ms. Maranzano)  Yeah.  Do you recall this

17   happening?

18       A.  No, I really don't.  It's -- it may have been

19   submitted and not read to the Senate.  It may have just

20   been submitted post-vote.  Sometimes those get done.

21       Q.  Okay.  Can I direct your attention to No. 8 in

22   that -- in that statement.  Do you see that it says, "Of

23   all the opportunities members of the Senate have had to

24   vote on voter identification legislation or Senate

25   process regarding voter identification legislation, no

Robert Duncan                                          June 7, 2012

---

## 165

1  senator who is an ethnic minority has voted in favor of
2  such legislation or the process related to such
3  legislation"?
4      A. I see that.
5      Q. Based on the public record -- let me ask you
6  this. Did you have any public response to the unified
7  opposition of the minority members of the Senate?
8      A. Are you talking about as reflected or a response
9  to Senator West's statement that he placed in the
10 record.
11     Q. I'm asking actually, more generally. Just this
12 statement talked about a unified opposition of minority
13 members of the Senate. And I'm asking if you had any
14 public response to that opposition.
15     A. Did I, as Senator Duncan have any public
16 response? I don't recall that I did.
17     Q. Do you recall the reasons why senators gave for
18 opposing voter ID?
19         MR. SWEETEN: Objection; call for matters
20 subject to legislative privilege. Instruct not the
21 answer.
22 BY MS. MARANZANO:
23     Q. How about if we base it on the public record?
24         MR. SWEETEN: You can testify as to matters
25 of public record.

---

## 166

1      A. Public record reflects their opposition to it.
2      Q. (By Ms. Maranzano) Do you recall if one of the
3  issues that they discussed on the public record was the
4  impact that Senate Bill 362 would have on minority
5  voters?
6      A. The record will reflect that if it was brought
7  up.
8      Q. So do you have no recollection of whether that
9  occurred?
10     A. My independent recollection is not accurate as to
11 exactly what was raised. Those issues generally were
12 discussed during our fairly lengthy debate on several
13 occasions on the issue. But specifically what issues --
14 how those issues were framed and what evidence was
15 brought forward I would have to rely on the record.
16     Q. Okay. So you have a recollection that it came up
17 generally, related to voter identification legislation?
18     A. Correct.
19     Q. And based on the public record, do you have any
20 reason to believe that these senators were not being
21 genuine about their concerns on the impact of the bill?
22         MR. SWEETEN: I'm going to object. Because
23 of the subjective interpretation and the sincerity of
24 these senators would be a matter of legislative
25 privilege. And I'm going to instruct him not to answer

---

## 167

1  on that basis.
2  BY MS. MARANZANO:
3      Q. Are you following your counsel's instruction?
4      A. Yes.
5      Q. Did any supporters of Senate Bill 362 publicly
6  state that if the Senate -- the legislature did not
7  respond to the concerns of minority legislators it might
8  threaten the preclearance of Senate Bill 362?
9      A. "Supporters," meaning?
10     Q. People who voted for it.
11     A. Members of the Senate.
12         MR. SWEETEN: Your question is about public
13 statements.
14         MS. MARANZANO: Uh-huh.
15     A. I don't know if they did or not.
16     Q. (By Ms. Maranzano) You don't recall that?
17     A. Right.
18     Q. Was it true that some legislators and members of
19 the public stayed up all night to testify about Senate
20 Bill 362?
21     A. The hearing lasted throughout the evening hours
22 and concluded in the late morning hours of the following
23 day.
24     Q. Was there any public discussion of what prompted
25 this level of interest in Senate Bill 362?

---

## 168

1      A. You know, I don't recall anything specifically
2  other than what would be on the record.
3      Q. And as you sit here today, you can't --
4      A. Well, I remember there were statements that were
5  made by some people who testified as experts and as
6  laypersons. But I don't -- I can't recall specifically
7  what they said to give you an accurate depiction of it,
8  but the record will reflect that.
9      Q. Well, what do you recall generally, even if you
10 don't recall specifically?
11     A. What I just said.
12     Q. That's it?
13     A. Right.
14     Q. Okay.
15     A. I mean, I recall some loud voices. I recall some
16 passionate testimony. I recall some very
17 straightforward testimony. And, you know, the
18 testimony, I thought, and the debate throughout the day
19 was generally -- we kept things moving. And the debate
20 was on both sides of the issue. And I can't remember
21 generally or specifically -- or specifically what was
22 said by any member of the Senate that day. But it is
23 reflected in the record. That's why we kept the record.
24     Q. Did you have any role when Senate Bill 362 was
25 referred to the House?

Robert Duncan                                                    June 7, 2012

---

169

1    A. No.
2    Q. Did you have any communications with any members
3    of the House about Senate Bill 362?
4    A. Yes.
5    Q. With whom?
6    A. Delwin Jones.
7    Q. Delwin Jones?  Is that what you said?
8    A. Right.
9    Q. Can you tell me in a general way what that
10   communication was about?
11   A. He's a member of the Lubbock delegation.  Yeah, I
12   can remember generally.  But it was just about the bill.
13   Q. Do you -- was it one communication or more than
14   one?
15   A. Just one or two.
16   Q. Was it after the bill had been referred to the
17   House or before?
18   A. It was after.
19   Q. Do you remember what happened to the bill in the
20   House?
21   A. Yes.
22   Q. What happened?
23   A. It didn't pass.
24   Q. Was that because essentially the time ran out?
25        MR. SWEETEN:  Don't reveal matters of

---

170

1    legislative privilege in answering the question.
2    A. Well, the record is fairly clear about what
3    happened on that bill as it went to the House.
4    Q. (By Ms. Maranzano)  And you don't want to add
5    anything to the record?
6    A. I don't think you could add much to that record.
7    Q. Fair enough.  Have you heard of ID verification?
8        MR. SWEETEN:  You can answer as a general
9    matter.  Don't reveal any legislative -- your mental
10   impressions.  That would be subject to the legislative
11   privilege.
12   A. No.  I'll have to say I don't know what you're
13   talking about.
14        MS. MARANZANO:  Can we mark this?
15        (Exhibit No. 529 was marked.)
16   BY MS. MARANZANO:
17   Q. I'm showing you what we're marking as deposition
18   Exhibit 527?  No, 529.  Do you recognize this?
19   A. No, but it's from Jennifer.
20   Q. You testified earlier that Jennifer Fagan is a
21   member of your staff?
22   A. That's correct.
23   Q. Do you know who John Sepehri is?
24   A. John Sepehri?  You'll have to refresh my memory.
25   Q. My recollection is John Sepehri is the general

---

171

1    council for the Secretary of State, or at least was?
2    A. Okay.
3    Q. Does that refresh your recollection as to what
4    this e-mail exchange is about?
5    A. Yes.  I guess -- well, I'm not familiar with this
6    e-mail.  So -- but if he works for the Secretary of
7    State we often, through the State Affairs Committee,
8    communicated with the Secretary of State's office about
9    issues that we had questions about technically.
10   Q. So what is the ID verification process bill that
11   Jennifer refers to in her e-mail?
12   A. I'll have --
13        MR. SWEETEN:  Don't discuss matters of
14   legislative privilege including communications you had
15   with State agencies.
16   BY MS. MARANZANO:
17   Q. But just generally, can you just tell me what --
18   I mean, I'm not -- I'm not interested in what this
19   exchange is about.  I'm just asking you what is the
20   topic on which this says we're not going to file voter
21   identification -- ID verification process bill?
22   A. I don't know.
23   Q. Okay.
24   A. I seriously do not know.
25   Q. Okay.

---

172

1    A. It may have been discussed and I may have said no
2    or we may not have.  I don't know.  I just have no
3    idea what -- this is not ringing a bell with me today.
4    Other than we didn't file it.
5        MS. MARANZANO:  Can we label that?
6        (Exhibit No. 530 was marked.)
7    BY MS. MARANZANO:
8    Q. Senator, I'm showing you what we're labeling as
9    Exhibit 530, for the record.  Can you take a look at
10   this and tell me if you recognize it?
11   A. I would recognize this to be legislation titled
12   Senate Bill 14.
13   Q. If you look at the last page it has signatures on
14   it.
15   A. This appears to be signatures reflecting that it
16   is the enrolled version of the bill signed by the
17   governor.
18   Q. Do you have any knowledge, based on public
19   record, of when Senator Fraser started working on this
20   bill?
21   A. No, I do not.
22   Q. Did you or anyone in your office have
23   conversations with Senator Fraser about the development
24   of what would become Senate Bill 14?
25   A. Probably, at some point in time we did.

Robert Duncan

June 7, 2012

---

### 173

1  Q.  And when was that?
2  A.  I cannot tell you a specific time.  I do not
3  know.
4  Q.  Would that have been you or would that have been
5  your staff who had that communication?
6  A.  If Senator Fraser and I had a conversation it
7  would have been more or less informal.  It would not be
8  unusual for Senator Fraser's office to contact my staff
9  for information or records from the last committee or
10  from hearing or to discuss the issue.  It would not be
11  unusual.
12  Q.  Who on your staff would Senator Fraser have
13  contacted?
14  A.  It would be Jennifer.
15  Q.  When you said "record," -- what is the first
16  thing you said?
17  A.  Well, I mean, this is speculation a little bit.
18  So I'm just saying if somebody wanted a document or
19  something they might call our office and request it.
20  Q.  Do you have any knowledge as to whether Senator
21  Fraser's staff and Ms. Fagan did have any communications
22  about Senate Bill 14?
23  A.  Define what you're talking about communications.
24  Q.  I'm referring very broadly to conversations,
25  e-mails?

---

### 174

1  A.  Yes.
2  Q.  Yes you do have knowledge?
3  A.  Yes.
4  Q.  And did they?
5  A.  The only -- the only communications that I would
6  be aware of would be communications about logistics.
7  They're going to file a bill.  We're going to --
8  MR. SWEETEN:  Don't reveal the substance on
9  it though.
10  BY MS. MARANZANO:
11  Q.  Are you aware of whether there were any
12  substantive communications between your staff and
13  Senator Fraser's staff about Senate Bill 14?
14  A.  I'm not -- I'm not aware of any.
15  Q.  And I believe you said you may have had
16  conversations with Senator Fraser, but you don't recall
17  specifically whether you did or not?
18  A.  Right.
19  Q.  And would your conversations with Senator Fraser
20  have been about the substance of the bill or about the
21  logistics of the bill?
22  A.  Probably both.
23  Q.  And I assume since you said you have no specific
24  recollection you couldn't tell me how many substantive
25  conversations you had with Senator Fraser?

---

### 175

1  A.  No, I couldn't.
2  Q.  Could you give me an approximation?
3  A.  It would be a guess.
4  Q.  Did you have conversations with other legislators
5  about Senate Bill 14?
6  A.  When?
7  Q.  At any time?
8  A.  I assume when you say "Senate Bill 14," it would
9  have to have been from the time we filed it because it
10  didn't have a name then.  I'm just trying to understand
11  the time frames here.
12  Q.  I appreciate that.  Why don't we start and say
13  did you have any conversations with any legislators
14  about what would become Senate Bill 14?
15  A.  No.
16  Q.  Did you have any conversations with legislators
17  about Senate Bill 14?
18  A.  Yes.
19  Q.  With whom?
20  A.  Well, from the time it was introduced until the
21  time it was passed, probably most members of the Texas
22  Senate.
23  Q.  Okay.  And would those have been verbal
24  communications?
25  A.  Yes.

---

### 176

1  Q.  Did you have any --
2  A.  Unless there was -- unless there was some writing
3  between Senator Van de Putte and myself, she was acting
4  as chairman of the caucus.  And as in 2009, I seem to
5  recall she may have sent a similar letter in 2011.  But
6  I don't -- I'm sure you've got that if it's part of the
7  record.
8  Q.  Did you have any conversations with any
9  legislators other than Senator Fraser who we've already
10  talked about, about the development or drafting of
11  Senate Bill 14?
12  MR. SWEETEN:  Objection; vague.  Go ahead
13  and answer it.
14  A.  As far as drafting the original version, no.
15  Q.  (By Ms. Maranzano)  How about drafting later
16  versions?
17  A.  Only to understand what was in the bill, which
18  would be generally what a legislator --
19  MR. SWEETEN:  Don't talk about the
20  conversation.
21  BY MS. MARANZANO:
22  Q.  Who were those conversations with?
23  A.  I don't recall all who would have been involved
24  in that.
25  Q.  Well, can you give me some names of who was

Robert Duncan

June 7, 2012

## 177

1  involved in that?
2      A.  Well, it probably would have been Senator Fraser,
3  might have involved Senator Williams, Senator -- I don't
4  know if it involved Carona or not.  It would have
5  involved Senator Van de Putte, Senator Ellis and others
6  who, as we generally discuss legislative matters coming
7  before the body.
8      Q.  Are the members that you've just named on the
9  State Affairs Committee?
10     A.  Some of them are.
11     Q.  Which ones are not?
12     A.  Well, I think Carona used to be.  I think most of
13  them are.  Maybe I talked to Senator West.  He's not on
14  the committee.
15     Q.  And you said, "to understand what was in the
16  bill."  Is that what you testified to?  Those were your
17  communications?
18     A.  Well, just a listing of the bill and what's in
19  the bill.
20     Q.  That's how you're describing your communications
21  with all of these members?
22     A.  Right.  Right.
23     Q.  And when would those -- when would those
24  communications have occurred?
25     A.  Throughout the period of deliberations on the

## 178

1  bill.
2      Q.  Did you have any communications with the
3  Lieutenant Governor about Senate Bill 14?
4      A.  Yes.
5      Q.  And when was that -- or when were those?
6      A.  Generally, as I've stated, randomly throughout
7  the process of deliberations on the bill.
8      Q.  And what was the general nature of that
9  communication?
10         MR. SWEETEN:  You can give a general subject
11  matter description of the communication.  Do not reveal
12  the subject for communication.
13     A.  Progress on setting the hearing, the process that
14  the senators have discussed with regard to the process
15  for procedures for the hearing, generally that was the
16  primary -- main reason for discussions.
17     Q.  (By Ms. Maranzano)  Did you set the hearing date
18  for the -- for Senate Bill 14?
19     A.  I'll answer this in a way that nobody will
20  object.  I don't remember.
21     Q.  Did you have any conversations with the
22  governor's office about Senate Bill 14?
23         MR. SWEETEN:  You can answer.
24     A.  I don't know if I did or not.
25     Q.  (By Ms. Maranzano)  Does that mean you don't

## 179

1  recall any?
2      A.  I don't remember any.  Not saying I didn't.  I
3  just don't remember any.
4      Q.  Let me ask you this.  Is it common to talk to the
5  governor's office about ongoing legislation?
6      A.  For me --
7          MR. SWEETEN:  Objection; vague and not
8  limited in time and scope, foundation.  But you can go
9  ahead and answer it if you can.  That's fine.
10     A.  The answer is no.  It's not common.
11     Q.  (By Ms. Maranzano)  Can you take a look at Senate
12  Bill 14?  In particular, I would like to direct your
13  attention to Section 14 of the bill.
14     A.  On what page?
15     Q.  It's on Page 9.  Do you see that it lists in that
16  section the forms of identification that are permissible
17  under Senate Bill 14?
18     A.  The section is entitled documentation of proof of
19  identification.
20     Q.  Yep.  Do you see that?
21     A.  Yes.
22     Q.  Can you tell me what the major difference between
23  Senate Bill 14 and Senate Bill 362 are?
24         MR. SWEETEN:  You can answer based on the
25  text of the bill.  Don't give your mental impressions

## 180

1  and thoughts about it.  We'll take a little while so
2  Jennifer can get a bite in.
3      A.  There are numerous differences textually for one
4  reason or another and I can't tell you why.
5          MR. SWEETEN:  Don't provide the reasons why.
6  She's just asking if there is a difference from this to
7  this.
8      A.  There are differences.
9      Q.  (By Ms. Maranzano)  Does Senate Bill 14 allow for
10  any forms of non-photo identification?
11     A.  The provisions that are in Section 14 of the bill
12  do not appear to provide a form of identification other
13  than one that includes a photo ID and I'm assuming a
14  license to carry a concealed hand gun license does.
15  That's in section 14.
16     Q.  If you look at the very beginning of the
17  provision under Section 14, it says Section 63.0101.  Do
18  you see that it actually specifies that the forms of
19  identification listed need to have a photo
20  identification?
21     A.  Line 17 inserts the word photo.
22     Q.  Can you tell me what the purpose was of removing
23  non-photo identification as allowable for voter
24  identification?
25         MR. SWEETEN:  Don't answer the question.  He

Robert Duncan                                                    June 7, 2012

---

### 181

1 can testify about the general purpose of the bill.  He's
2 not going to testify about the specifics of one
3 insertion, deletion, we're not going to parse it that
4 way.  That was issuing the purpose of the court's order.
5 I'm going to instruct him not to answer that question.
6 BY MS. MARANZANO:
7     Q.  Was there anything in the public record that you
8 can refer to related to the purpose of removing
9 non-photo IDs from Senate Bill 14?
10     MR. SWEETEN:  You can testify based upon
11 matters of the public record.  Don't reveal your
12 thoughts, mental impressions in answering the question.
13     A.  The public record has a discussion between
14 members of the Senate and debate on the floor concerning
15 the purpose for the exclusion of non-photo ID methods of
16 identification.
17     Q.  (By Ms. Maranzano)  And what was the purpose of
18 that as stated in the public record?
19     A.  The public record would reflect that.
20     Q.  Well, what's your testimony about it, as you sit
21 here today?
22     A.  The general purpose of the bill is to basically
23 ensure voter ballot integrity.
24     Q.  And removing non-photo identification from the
25 bill is related to ensuring valid integrity?

---

### 182

1     MR. SWEETEN:  He's not going to answer that
2 question.  He's not going to answer the reasons for the
3 insertion or deletions of any bill.  He's answered the
4 general purpose of the bill.  We're not going to have
5 him give his thoughts and general impressions on
6 various -- the reasons and thoughts behind -- or his
7 impressions about the deletion or insertion of a given
8 paragraph.  Legislative privilege.
9 BY MS. MARANZANO:
10     Q.  I'm going to ask you about the public record
11 related to the removal of non-photo ID.  You mentioned
12 ensuring voter integrity, the integrity of the ballot.
13 So based on the public record, what was said about how
14 non-photo IDs are connected to ensuring the integrity of
15 the ballot?
16     MR. SWEETEN:  Misstates the testimony.
17 Objection.  You can answer as to what was said in the
18 public record to the extent you recall.  Do not give
19 reasons behind any changes made.  That's subject to the
20 legislative privilege.  You can answer based on that
21 instruction.
22     A.  I can't -- I do not have independent recollection
23 of exactly what was said.  I would not want to
24 mischaracterize what was said.  And the public record
25 accurately reflects that and I would refer you to the

---

### 183

1 public record.
2     Q.  (By Ms. Maranzano)  You have no independent
3 recollection?
4     A.  Not that would be accurate that I could testify
5 to.
6     Q.  And what about your recollection of the public
7 record as related to the purpose of allowing forms of
8 identification that had expired 60 days before
9 presentation?
10     MR. SWEETEN:  Once again, you can refer to
11 matters of the public record in answering this question.
12 Don't reveal matters of legislative privilege.
13     A.  I couldn't answer that.  I don't have a
14 recollection of the details concerning those
15 discussions.
16     Q.  (By Ms. Maranzano)  Are you aware of the source
17 of the language for Senate Bill 14 or sources of the
18 language?
19     MR. SWEETEN:  You can answer that question
20 "yes" or "no".
21     A.  Yes.
22     Q.  (By Ms. Maranzano)  Was there anything on the
23 public record about the source or sources of the
24 language in Senate Bill 14?
25     A.  I think there may be.  I don't recall

---

### 184

1 specifically.  But I think there were discussions about
2 that on the Senate floor --
3     Q.  Can you tell -- I'm sorry.
4     Q.  Or in the debate.
5     Q.  Can you tell me what those discussions were?
6     A.  Not without seeing the record.
7     Q.  You can't testify to anything, as you sit here
8 today?
9     A.  Again, I don't want to be inaccurate.  And what I
10 recall about what was said as opposed to what was said
11 is not relevant.  The record is the relevant testimony
12 with regard to the issues that you're asking about.
13     Q.  Who was involved in the drafting of Senate Bill
14 14?
15     A.  Senator Fraser.
16     Q.  Anybody else?
17     A.  I have no recollection of who else might have
18 been involved.  It came out of his office.  And to what
19 extent other members or other staff members were
20 involved, I don't know.
21     Q.  Did you have any communications with current or
22 former legislators about Senate Bill 14 -- I'm sorry.
23 Do you have any communications about Senate Bill 14 with
24 current or former legislators who had offered other
25 voter identification bills?

185

1      A. I don't know.
2      Q. You don't know?
3      A. I don't know.
4      Q. Because you don't know --
5      A. Yeah. I don't know what other people have
6  offered. If you could be -- I don't know.
7      Q. Did you have any conversations with
8  Representative Denny about Senate Bill 14?
9      A. No. Well, if I did it would have been in 2005
10 whenever, I think she had -- she had a bill -- or wasn't
11 she on one of those bills that we looked at earlier.
12     Q. I'm sorry. Did you have any communications with
13 her about Senate Bill 14?
14     A. Oh, no, I don't believe so.
15     Q. Did you have any communications with
16 Representative Betty Brown about Senate Bill 14?
17     A. No, I don't know Betty Brown very well.
18     Q. Did you have any communications with
19 representative Leo Berman about Senate Bill 14?
20     A. I don't recall having any with Leo.
21     Q. And did you have any conversations with the staff
22 people of any of those members?
23     A. I don't believe so.
24     Q. Did you have any communications with officials or
25 legislators in the State of Georgia about Senate Bill

186

1  14?
2      A. No.
3      Q. Did you have communications with any officials or
4  legislators in the State of Indiana about Senate Bill
5  14?
6      A. I did not.
7      Q. Did anybody in your office?
8      A. I do not know. Jennifer may have, but I don't
9  know.
10     Q. And how about with Georgia, do you know if
11 anybody in your office had communications?
12     A. I don't know.
13     Q. Did the legislature publicly considered adding
14 additional forms of identification to Senate Bill 14?
15        MR. SWEETEN: Don't answer to the extent it
16 calls for you do reveal legislative privilege. You can
17 testify as to matters on the public record.
18     A. I can't -- the reason I'm having trouble with
19 this is because I can't remember if we offered
20 amendments on Senate Bill 14 on the floor during the
21 Committee of the Whole or during the debate. The record
22 will reveal that. And it may be that someone did, but
23 it would depend on whether or not there were amendment
24 proposals that were offered to Senate Bill 14, either
25 during the Committee of the Whole or during the general

187

1  Senate debate.
2      Q. (By Ms. Maranzano) Okay. We can get to that in
3  a few minutes.
4      A. Okay.
5      Q. But other than that, do you recall any
6  conversations, publicly, about the -- about adding
7  additional forms of identification to Senate Bill 14?
8         MR. SWEETEN: You can testify about matters
9  in the public record.
10     A. The public record probably reflects some
11 discussion about that.
12     Q. (By Ms. Maranzano) Okay. And you have no
13 independent recollection?
14     A. I don't have independent recollection of what was
15 said other than the fact that I believe there was some
16 discussion about that on the public record.
17     Q. Based on the public record, are you aware of any
18 analysis as to how many registered voters possess the
19 required forms of identification in Senate Bill 14?
20        MR. SWEETEN: You can testify about matters
21 on the public record.
22     A. I believe the public record may reflect some
23 estimates of that. But I don't recall exactly what they
24 reflect, the record would show that more accurately.
25     Q. (By Ms. Maranzano) Have you heard of a Spanish

188

1  surname voter registration analysis?
2      A. I believe I have.
3      Q. Are you aware, based on the public record,
4  whether the Secretary of State conducted such an
5  analysis while the legislature was considering Senate
6  Bill 14?
7      A. You would have to go to the record to be accurate
8  about that. I seem to recall some discussion about
9  that, but I don't recall what the conclusion was.
10     Q. Do you recall Senator Williams asking the
11 Secretary of State's office?
12     A. No.
13     Q. Did Legislature -- let me start again. Are you
14 aware, based on the public record, of whether the
15 legislature conducted any analysis to determine whether
16 minority voters would be disproportionately impacted by
17 Senate Bill 14?
18        MR. SWEETEN: You're asking him about
19 legislator's analysis. It calls for speculation. It
20 also calls for him to reveal legislative privilege
21 including your mental impressions, thoughts,
22 motivations, discussions with other members, staff
23 members. And I'm going to instruct him not to answer or
24 that basis. To the extent that there is a discussion on
25 the public record regarding that issue I'll let you

Robert Duncan                                          June 7, 2012

---

189

1    refer to the record, but other than do not answer the
2    question.
3    BY MS. MARANZANO:
4        Q.  Are there any specific conversations on the
5    public record about that?
6        A.  You'll have to look at the record.
7            THE REPORTER:  I'm sorry.  I didn't
8    understand.
9            THE WITNESS:  She'll -- you'll have to look
10   at the record.
11   BY MS. MARANZANO:
12       Q.  Are you aware of any legislators publicly
13   requesting that analysis?
14       A.  As I sit here today, no.  The record may reflect
15   that they did.
16       Q.  If I told you that Senator Fraser's chief of
17   staff testified that there was no analysis of who had
18   some ID for purposes of Senate Bill 14, would you
19   dispute that?
20           MR. SWEETEN:  Objection; assumes facts not
21   in evidence, misstates testimony and also calls for
22   matters subject to the legislative privilege.  Don't
23   answer if it would reveal any matters subject to the
24   privilege.
25       A.  I can't respond to that.

---

190

1        Q.  (By Ms. Maranzano)  Because it's privileged?
2        A.  Because I don't know.
3        Q.  Do you know what a military identification card
4    is?
5        A.  Generally.
6        Q.  What is it?
7        A.  Well, I assume that it's an identification issued
8    to persons who are enlisted in the military.
9        Q.  Do you know how many different forms of
10   identification fall into that category?
11       A.  I don't recall.
12       Q.  Is that something -- when you say "you don't
13   recall," is that something you think you knew when you
14   considered Senate Bill 14?
15           MR. SWEETEN:  And don't answer that.  You're
16   not going to reveal your mental impressions or analysis
17   or thought process.  That's a legislative privilege.
18   Instruct not to answer.
19   BY MS. MARANZANO:
20       Q.  Do you know what a citizenship certificate is?
21       A.  Only generally.
22       Q.  Do you know what steps a person needs to take to
23   obtain a citizenship certificate?
24       A.  Not off the top of my head.
25       Q.  Do you know how much it costs to obtain a

---

191

1    citizenship certificate?
2        A.  Not off the top of my head.
3        Q.  Do you know -- do you know how much it costs to
4    obtain a US passport?
5        A.  Yes.
6        Q.  How much?
7        A.  I think it's $37, but I just bought one so that's
8    why I know.  But I think it's -- by the time you get the
9    picture made and everything like that, it's like $35 to
10   $37.
11       Q.  And do you know what documents you need to
12   provide in order to get one, a US passport?
13       A.  Yes.
14       Q.  Which documents?
15       A.  A birth certificate.
16       Q.  Do you know how long it takes to obtain a US
17   passport?
18       A.  Not generally.
19       Q.  How long did it take you to get yours?
20       A.  I'm speculating.  A month, three weeks to a
21   month.
22       Q.  Is there anything in public record about a change
23   in circumstances between 2009 and 2011 that would have
24   made non-photo identification acceptable in 2009, but
25   not in 2011?

---

192

1            MR. SWEETEN:  Objection; calls for matters
2    subject to the legislative privilege.  You can testify
3    if there was such an explicit statement made in the
4    public record.  But otherwise don't reveal your thought
5    processes.
6        A.  I don't know if there was a statement like that
7    might made or not.
8        Q.  (By Ms. Maranzano)  You have no recollection of
9    that?
10       A.  No.
11       Q.  Was there any statement in the public record
12   about removing from Senate Bill 14 the option to show a
13   state or federal issued identification as is allowed in
14   Senate Bill 362?
15           MR. SWEETEN:  You can testify about matters
16   on the public record.
17       A.  I don't completely understand the question.
18       Q.  (By Ms. Maranzano)  Do you recall when we talked
19   about Senate Bill 362 we read that section --
20       A.  Right.
21       Q.  That allowed for a State or federally issued
22   photo ID.  Was there anything stated on the public
23   record about the purpose of removing those forms of
24   identification from Senate Bill 14, although they had
25   been allowed in Senate Bill 362?

Robert Duncan                                          June 7, 2012

## 193

1          MR. SWEETEN:  Same objection and
2    instruction.
3          A.  That issue may have been discussed on the Senate
4    floor an would be a part of the Senate record.
5          Q.  (By Ms. Maranzano)  You have no independent
6    recollection?
7          A.  Not really.
8          Q.  Any at all?
9          A.  Well, generally a change in the bill, and I
10   assume that a change in the bill was discussed.  I'm
11   going off of memory, but I would assume that in 14 there
12   was a change from 362 and those discussions took place
13   on the Senate floor.  And I remember the -- that Senator
14   Fraser probably laid out those changes on the public
15   record.  That's what I recall.  But I couldn't tell do
16   you specifically what he said.  You would have to go to
17   the record.
18         Q.  Was it Senator Fraser's decision to make those
19   changes?
20         MR. SWEETEN:  Objection.  Requires him to
21   speculate.  Requires him to reveal communications
22   between -- if any, between he and Senator Fraser or any
23   other legislator.  So to the extent it's even passed by
24   legislative privilege don't answer the question.
25   BY MS. MARANZANO:

## 194

1          Q.  I assume you're following your counsel's
2    instruction?
3          A.  Yes, ma'am.
4          Q.  Do you recall the circumstances by which the
5    license to carry a concealed hand gun were included
6    in -- came to be included in Senate Bill 14?
7          MR. SWEETEN:  Don't reveal matters of
8    privilege.
9          A.  No.
10         Q.  (By Ms. Maranzano)  Do you know the racial
11   composition of individuals who possess a license to
12   carry a concealed handgun?
13         A.  No.  No.  I should say it louder.
14         MR. SWEETEN:  An objection to the extent it
15   calls for legislative privilege.
16   BY MS. MARANZANO:
17         Q.  Is it disproportionately white relative to Texas
18   registered voters?
19         MR. SWEETEN:  Objections; asked and
20   answered.  Objection to the extent it calls for your
21   mental impressions about a bill, but you can answer
22   otherwise.
23         A.  I don't know.  If it's on the record, it's on the
24   record.
25         Q.  (By Ms. Maranzano)  Well, are you aware of any

## 195

1    legislator who made a statement on the public record
2    about the racial composition of the license to carry
3    holders?
4          THE REPORTER:  Wait.
5          MS. MARANZANO:  About the racial composition
6    of the license to carry holders.
7          A.  I recall there was a conversation about the -- on
8    the public record about the use of the license to carry
9    as a form of identification.  I do not remember -- I
10   cannot recall independently with accuracy the content of
11   those statements.  That would be reflected in the
12   record.
13         Q.  (By Ms. Maranzano)  And how did the exceptions
14   with individuals with disability come to be included in
15   Senate Bill 14, based on the public record?
16         MR. SWEETEN:  Don't answer to the extent it
17   would require to you to reveal matters of legislative
18   privilege.  To the extent you can refer to matters in
19   the public record, you can do so.
20         A.  There may have been some testimony.  I can't
21   recall specifically.  I think there was concerning that.
22         Q.  (By Ms. Maranzano)  From certain advocates, did
23   you say?
24         A.  Correct.  On the record.  Or some reference to
25   that on the record.

## 196

1          Q.  And was this added?  Was this provisions added to
2    the bill after the testimony from advocates?
3          A.  I don't --
4          MR. SWEETEN:  Hold on a minute.  Hold on a
5    minute.  Can you read the question back, please?
6          (Requested question was read.)
7          MR. SWEETEN:  So you're asking about an
8    amendment, whether it was -- which is a public record,
9    whether it was added after a public record statement.
10   Is that the question?
11         MS. MARANZANO:  Uh-huh.
12         MR. SWEETEN:  Then you can answer as
13   phrased.
14         A.  I don't know.
15         Q.  (By Ms. Maranzano)  Is your recollection that the
16   amendment was a response to the testimony from advocates
17   from the disability community?
18         MR. SWEETEN:  Don't answer the question.  It
19   calls for matters of legislative privilege as to what
20   the response was, if any.
21   BY MS. MARANZANO:
22         Q.  How did the exception for individuals with
23   religious objections to being photographed come to be
24   included in Senate Bill 14?
25         MR. SWEETEN:  Don't answer the question.  It

## 197

1   calls for matters of legislative privilege.  You can
2   testify about the public record, such as an amendment.
3   BY MS. MARANZANO:
4        Q.  Was that part of an amendment?
5        A.  You would have to look at the record.
6        Q.  You have no independent recollection?
7        A.  No.
8        Q.  Is it fair to say that the legislators --
9   legislators modify Senate Bill 14 to respond to concerns
10  raised by disability groups?
11           MR. SWEETEN:  Don't answer the question.
12  Calls for legislative privilege.
13  BY MS. MARANZANO:
14       Q.  Were there any public discussions about the
15  provisions in Senate Bill 14 pertaining to the
16  administration of identification requirement -- that the
17  identification requirement at the polling place?
18           MR. SWEETEN:  You can answer if there's a
19  public statement.
20       A.  I'm not sure that I follow the question enough to
21  give you and answer.  I don't -- so I can't answer the
22  question.
23       Q.  (By Ms. Maranzano)  Were there any public
24  discussions about how at a polling place that Senate
25  Bill 14 would be administered?  In other words, how the

## 198

1   requirements laid out in Senate Bill 14 would come to be
2   administered at a polling place.
3        A.  You would have to refer to the public record.
4        Q.  You have no independent recollection of those
5   discussions?
6            THE REPORTER:  No recollection of what?
7            MS. MARANZANO:  Of those discussions on the
8   public record.
9        A.  I do not have an independent recollection of what
10  was said.  I am only -- you have to refer to the record
11  on that.
12       Q.  (By Ms. Maranzano)  Were there any public
13  discussions about including more specific language in
14  Senate Bill 14 related to what a poll worker would need
15  to do to verify somebody's identity?
16       A.  I don't remember that.  There may have been, but
17  I don't remember it.
18       Q.  Are you familiar with the provision in Senate
19  Bill 14 that allows a person to show a form of
20  identification called an election identification
21  certificate?
22       A.  I think if that's referring to the provision that
23  allows a person to go to the DPS to get an ID for free,
24  if that's the title of that, yes, I've heard of that.
25       Q.  Do you recall anything publicly about how this

## 199

1   form of identification was added to Senate Bill 14?
2            MR. SWEETEN:  Don't reveal matters of
3   legislative privilege.  In fact, court reporter, would
4   you please read that question back.
5            (Requested question was read.)
6            MR. SWEETEN:  Okay.  You can -- because it's
7   got matters of the public record.  Don't reveal
8   legislative privilege, but you can answer as to the
9   public record.  Go ahead.
10       A.  No, I do not know when or how it was added.  I'm
11  about ready for a break.  I don't know about y'all.
12           MR. SWEETEN:  Okay.  Let's take a break.
13           MS. MARANZANO:  Let's take a break.
14           (Brief recess.)
15  BY MS. MARANZANO:
16       Q.  Senator, before the break we were talking about
17  the election identification certificate.  Are you aware,
18  based on the public record, of concerns about potential
19  difficulties in obtaining an election certificate?
20       A.  I'm aware that the issue of the ease or
21  difficulty of retaining a certificate was discussed on
22  the public record.
23       Q.  Do you recall there being concerns voiced on the
24  public record about the distance to drive to those
25  offices?

## 200

1        A.  I would refer to you to public record with regard
2   to the specific discussions concerning specific concerns
3   about that.
4        Q.  You don't have any independent recollection of
5   the various concerns that were raised?
6        A.  Not sufficient to give you and accurate depiction
7   of that or accurate account of it.
8        Q.  During the drafting of Senate Bill 14 or the
9   consideration of Senate Bill 14, was there any publicly
10  spoken about or discussed analysis of the cost for
11  obtaining an election identification certificate?
12           MR. SWEETEN:  Don't reveal matters of
13  privilege.  You can reveal matters of public record.
14       A.  I think anything having to do with drafting would
15  be privileged.  On the public record there was some
16  discussions about the cost and whether or not
17  appropriations would occur to cover those costs.
18       Q.  (By Ms. Maranzano)  And was there discussion on
19  the public record about the steps a voter might have to
20  take to obtain an election identification certificate?
21       A.  There may have been.  I would refer you to the
22  record for an accurate account of that.
23       Q.  And was there any discussion on the public record
24  about the cost that those steps might -- costs that a
25  voter might incur in obtaining an election

Robert Duncan                                                    June 7, 2012

---

201

1   identification certificate?
2       A.  I believe there was some discussion of that.
3       Q.  What discussion was that?
4       A.  You'll have to refer to the record for an
5   accurate account of that.
6       Q.  Do you know what documents are needed to obtain
7   an election certificate?
8           MR. SWEETEN:  As he is sitting here.
9           MS. MARANZANO:  Yes.
10      A.  You would have to refer -- I don't have an
11  independent recollection of that.
12      Q.  (By Ms. Maranzano)  You don't know, as you sit
13  here?
14      A.  No, I don't.  I would have to look it up.
15      Q.  Do you know if there was any discussion on the
16  public record about an analysis conducted regarding
17  individuals who would or would not possess those
18  underlying forms of documentation.
19      A.  I don't know what you mean by "analysis."  I know
20  there was discussion at length about that issue or
21  whether or not -- about the issue of obtaining an
22  alternative ID.  The specifics of that, though, I can't
23  give you accurately from independent recollection and
24  would refer you to the record.
25      Q.  Did the legislature conduct any sort of analysis

---

202

1   in a public way about -- in terms of documents that are
2   needed to obtain election identification certificate in
3   terms of who would have those documents?
4           MR. SWEETEN:  You can testify about matters
5   in the record.  Don't reveal matters of privilege.
6       A.  To the extent there was -- I don't know if it's
7   the word "analysis," but there was a discussion on that
8   in the -- on the Senate -- during the debate on the bill
9   either at the committee level or on the Senate floor or
10  both.
11      Q.  (By Ms. Maranzano)  If the documents needed to
12  obtain an election identification certificate have a
13  cost to them, then would you agree that that is actually
14  charging a voter to vote?
15          MR. SWEETEN:  Objection; don't reveal your
16  thought process, mental impressions, opinions,
17  motivations about the legislation in answering this
18  question.  So unless you can avoid doing that, I'm going
19  to instruct you not to answer the question.
20      A.  An answer to that would require me to invoke my
21  mental impressions and analysis so I would prefer to
22  invoke the legislative privilege.
23      Q.  (By Ms. Maranzano)  Do you know where a person
24  can obtain an election identification certificate?
25      A.  Under the statute, I believe that it is the

---

203

1   Department of Public Safety.
2       Q.  And when -- is it the driver's license offices?
3       A.  I believe it is.
4       Q.  When are those offices usually -- what are the
5   hours of those offices generally?
6       A.  I would have to call and find out.  I would
7   assume from 9:00 to 5:00 during the weekdays.  But there
8   may be -- some offices may have local rules or local
9   opening times that are different.
10      Q.  Does Senate Bill 14 require employees to provide
11  paid leave for somebody to obtain an identification?
12      A.  You'd have to refer to the legislation for that.
13      Q.  Do you have any independent recollection of
14  whether that's included?
15      A.  Not at this time.
16      Q.  Are you aware of any analysis, public analysis
17  conducted to determine if any Hispanic or blacks or any
18  other group are more likely not to have the necessary
19  identification under Senate Bill 14?
20          MR. SWEETEN:  I'm going to instruct you not
21  to answer on the basis of legislative privilege.
22          MS. MARANZANO:  I asked about public
23  analysis.
24          MR. SWEETEN:  If you're talking about public
25  testimony about analysis, boy, I think that's been asked

---

204

1   and answered a number of times, but you can go ahead and
2   you can answer.
3       A.  I would refer you to the record on that.
4       Q.  (By Ms. Maranzano)  No independent recollection?
5       A.  My independent recollection is not include enough
6   information to be accurate to give you testimony with
7   regard to such analysis.  If it occurs on the record I
8   would refer you to the record for an accurate account on
9   that.
10      Q.  Are you familiar with the provisional ballot
11  provisions in Senate Bill 14?
12      A.  If you'll point me to that provision.  Refresh my
13  memory.
14      Q.  Section 17 talks about provisional ballots.
15      A.  Section 17.  I'm sorry.
16      Q.  Starts on Page 11 and goes on to Page 12.
17      A.  Okay.  Section 17.
18      Q.  Uh-huh.
19      A.  I'm generally familiar with Section 17, Senate
20  Bill 14.
21      Q.  Do you think that individuals who vote a
22  provisional ballot, except for some narrow exceptions,
23  need to show the same forms of ID as is required under
24  the bill for voters who cast a regular ballot, in order
25  for their ballot to be counted?

## 205

1    MR. SWEETEN:  You can talk about the text of
2  the bill.  Don't reveal your thoughts and mental
3  impressions about legislation.
4  BY MS. MARANZANO:
5    Q.  Do you recall my question?
6    A.  Vaguely.  If you'll remember -- If you'll
7  rephrase it.
8    Q.  I'm wondering whether -- with, except for some
9  narrow exceptions, it's essentially the same
10  identification requirements for those who cast a
11  provisional ballots, correct?
12    A.  No.
13    Q.  What's the difference?
14    A.  Well, I think B -- Subsection B and C provides
15  affidavits -- an opportunity to present an affidavit --
16    Q.  So you're --
17    THE REPORTER:  I'm sorry.
18    THE WITNESS:  For the reasons stated
19  therein.
20  BY MS. MARANZANO:
21    Q.  So Section B you're referring to is individuals
22  who have a religious objection to being photographed?
23    A.  Right.
24    Q.  And Section C is individuals who do not have
25  identification meeting the requirements because of a

## 206

1  natural disaster that was declared by the President of
2  the United States or the governor which occur no earlier
3  than 45 days before the date the ballot was cast and
4  lead to the destruction of the identification; is that
5  correct?
6    A.  Yes.
7    Q.  And so other than those exceptions individuals
8  who cast a provisional ballot need to show one of the
9  forms required of identification?
10    MR. SWEETEN:  I'm sorry.  Can you read the
11  question back, please?
12    (Requested question was read.)
13    MR. SWEETEN:  You can testify based upon the
14  text of the bill don't reveal your thoughts, mental
15  impression that would be a matter of legislative
16  privilege.  Go ahead and answer it.
17    A.  The provision for that -- for provisional ballots
18  is contained in Section 17 and also discussed in Section
19  18 of the bill.  And those provisions would appear to
20  provide the process for provisional ballot.  What's
21  required in the event a provisional ballot is cast with
22  regard to identification.
23    Q.  (By Ms. Maranzano)  And other than the exceptions
24  that we've discussed, does a voter who casts a
25  provisional ballot need to show one of the required

## 207

1  forms of identification as listed in Senate Bill 14?
2    A.  The Section 65.0541, Subdivision 1, provides that
3  the photo ID would be required or the affidavits
4  required as discussed earlier.
5    Q.  The affidavits for -- that we just discussed with
6  an individual?
7    A.  Correct.
8    Q.  Okay.  Does the voter have to show their
9  identification to a voter registrar, voter who cast a
10  provisional ballot has to show one of the forms of
11  required identification to a voter registrar, correct?
12    A.  I believe there's the provision in the statute.
13    Q.  Is this a voter registrar office in every county?
14    A.  I believe there is.
15    Q.  Are they usually in the county seat?  Are they
16  usually located --
17    A.  That would be normally where they would be.
18    Q.  What's the purpose of Senate Bill 14?
19    MR. SWEETEN:  You can give the general
20  purpose.
21    A.  The general purpose is to in sure ballot
22  integrity.
23    Q.  (By Ms. Maranzano)  Based on the public record,
24  can you tell me the basis of that statement?  Your
25  saying that's the purpose.

## 208

1    MR. SWEETEN:  That calls for matters of
2  legislative privilege.  He can testify to purpose, which
3  he did.  You're asking him now to go to the public
4  record and do an analysis and give you the reasons that
5  are in the public record in support of what he has
6  stated as general purpose.  And to do so would discover
7  his mental impressions and be subject to the mental
8  impressions.  I instruct you not to answer.
9  BY MS. MARANZANO:
10    Q.  Any other purposes of Senate Bill 14?
11    A.  That's the general purpose.
12    Q.  Can you tell me each and every purpose of Senate
13  Bill 14?
14    MR. SWEETEN:  Asked and answered.
15    A.  I've told you the general purpose which is my
16  response to your question.
17    Q.  (By Ms. Maranzano)  So are there any other
18  purposes?
19    A.  There are -- there is a general purpose to the
20  statute, as I stated.  And it's broad enough to include
21  the general purpose, as I stated.
22    Q.  I would like to know each and every purpose of
23  Senate Bill 14?
24    MR. SWEETEN:  He's answered the question.
25  Asked and answered.

## 209

1    MS. MARANZANO:  He hasn't answered that
2    question.
3         MR. SWEETEN:  He's given you the purpose of
4    the bill.  Objection; asked and answered.
5         A.  The purpose of the bill is generally to prevent
6    and preserve -- prevent fraud and observe -- preserve
7    the integrity of the ballot.
8         Q.  (By Ms. Maranzano)  And the reason why I was
9    following up is because you say "generally."  So I'm
10   just trying to make sure I have every purpose of Senate
11   Bill 14?
12        A.  Well, when I say "generally," means the general
13   purpose of the bill.
14        Q.  But are there any other specific purposes of the
15   bill?
16        A.  My testimony involves the general purpose of the
17   bill.  And I stated the general purpose of the bill.
18        Q.  But I am allowed to ask you about the legislative
19   purpose so I think that would include any legislative
20   purpose of Senate Bill 14?
21        A.  Well, just general purpose and legislative
22   purpose are synonymous in this view and that's to
23   prevent voter fraud and protect the integrity of the
24   ballot.
25        Q.  Okay.  That's good.  Can you tell me, based on

## 210

1    the public record, how Senate Bill 14 prevents fraud?
2         MR. SWEETEN:  Hold on a minute.  How it
3    prevents fraud.  No, he's not going to answer that.
4    That's subject to the legislative privilege.
5    BY MS. MARANZANO:
6         Q.  Was there testimony on the public record about --
7         MR. SWEETEN:  Counsel, let's go to the order
8    here.
9         MS. MARANZANO:  Yeah.
10        MR. SWEETEN:  Specifically, we are on
11   Page 16 of 16 of the court's order.  And that provision
12   order says, "Further ordered that questions of
13   depositions shall comply with the terms and restrictions
14   set forth in this order.
15        MS. MARANZANO:  Yes.
16        MR. SWEETEN:  Yesterday, in two depositions
17   held at this building, we had a sitting representative
18   sit and answer these same types of questions until 7:00
19   p.m. in violation of that provision of the court order.
20   We had another witness, Representative Aliseda, who was
21   here until 6:15 p.m. -- no, it was 7:00 because I was
22   waiting for the attorney to come back so we could visit
23   about other matters.
24        Now, we've got an order from the court that
25   explicitly prohibits and requires that deposition

## 211

1    questions will comply with the terms and restrictions of
2    the order.  The court has a succession of four orders
3    carved-out and explicitly told us what the areas of
4    legislative privilege are.  You continue, and I'm not --
5    I'm using you in the broadest sense because you have
6    been polite.  But your office is continuing to ask
7    questions in violation of this order.  And at some point
8    this -- in violation of this order, if this conduct
9    continues we are going to have no other choice but to go
10   to the court and seek relief from them.  Because they
11   have been clear.
12        And this type of questioning, where you
13   continue to ask him matters that are subject to the
14   privilege, is inappropriate.  And is in violation of the
15   court's order.  And I'm going to ask you -- I'm going to
16   ask you here at 3:00 p.m. on the late afternoon after
17   Senator Duncan has sat here since 9:30, I'm going to ask
18   you to rein that in.  Because we are now getting to a
19   point where we have our sitting representatives and
20   senators being -- basically sitting here answering
21   questions that have been prohibited by the court.  And
22   at some point this has to end.
23        MS. MARANZANO:  Well, Mr. Sweeten our
24   position is, absolutely, that we are complying with the
25   court's order and, you know, I have made every effort to

## 212

1    be very clear with the Senator today that I'm asking him
2    questions about the public record.  We've had exchanges
3    and there have been times when I have withdrawn
4    questions.  There's been times when you have withdrawn
5    objections.  So, you know, I think we're both making
6    good faith efforts to comply with the order.
7         And the -- you know, all the attorneys
8    representing the defendant in this matter are doing the
9    same.  And it's absolutely our position that we are
10   complying with this court order.
11        And, you know, my understanding, and
12   obviously I wasn't involved in those depositions
13   yesterday.  My understanding is that part of the reason
14   people were here late was because there were problems
15   with documents that had nothing to do with questions at
16   a deposition.
17        MR. SWEETEN:  Well, I would submit a very
18   different view of things and I have.  I've stated it.
19   I'm simply -- I'm letting you know.  And I'm making this
20   clear on the record, that this has got -- you've got to
21   tamper this down based upon this order, or we're going
22   to seek relief from the court.
23        This is -- yesterday's exercise was in
24   violation of the court order.  And we are starting to
25   get there here.  And I want you to take this very

Robert Duncan                                    June 7, 2012

## 213

1  seriously that we are doing our best.
2      We have put these people through seven hours
3  of depositions. You have taken the limit of time with
4  these individuals. And this -- at some point this has
5  to stop, or this has to be reined in, because we're
6  going to seek redress from the court. With that, I'll
7  let you continue with your examination of Senator
8  Duncan. We'll continue -- continue with this exercise.
9  But please respect the court's order with respect to the
10 legislative privilege. It is very clear.
11     MS. MARANZANO: I am going to continue. But
12 I just want to say, I do not appreciate the suggestion
13 that I am doing anything other than respecting the
14 Court's order.
15 BY MS. MARANZANO:
16     Q. Senator Duncan, was Senate Bill 14 given an
17 emergency designation by the governor?
18     A. I believe that the Governor Perry issued an
19 emergency declaration for legislation related to voter
20 identification.
21     Q. Did you or did anyone in your office have
22 communications about Senate Bill 14's emergency
23 designation?
24     A. With whom?
25     Q. With anybody.

## 214

1      A. Not that I'm aware of.
2      Q. What are the consequences of a bill having this
3  designation, this emergency designation?
4      A. I don't know of any consequences.
5      Q. What does it mean for a bill to be designated as
6  emergency?
7      A. The only thing it means is that the constitution
8  requires that you cannot take up a bill or a resolution
9  of substance prior to the 60th day of a legislative
10 session. Declaring an issue an emergency allows the
11 measure to be taken up and considered before the 60th
12 day.
13     Q. Were there any public statements about why Senate
14 Bill 14 was given this emergency designation?
15     A. The only public statement that I would be aware
16 of would be the proclamation by the governor declaring
17 it an emergency. There may be others by others, but I'm
18 not aware of them.
19     Q. And in the governor's proclamation, did he give
20 any explanation as to why he was declaring it an
21 emergency?
22     A. You know, I don't recall that he really did. I
23 think -- it's in the journal and I don't remember
24 exactly what it said. But I don't believe there was any
25 statement with regard to considerations in the journal.

## 215

1      Whether he made other statements I don't know.
2          (Exhibit No. 531-532 was marked.)
3  BY MS. MARANZANO:
4      Q. Senator, I am showing you what we're marking for
5  the record as deposition Exhibit 531 and 532. Can you
6  take a look at these and tell me if you recognize them?
7      A. I recognize -- I don't know if I've seen 531
8  before. I assume that I've seen 532 because it's
9  addressed to me by Senator Van de Putte.
10     Q. And deposition Exhibit 532, is that a letter from
11 Lieutenant Governor Dewhurst?
12     A. It's a letter from Governor Dewhurst to --
13 Lieutenant Governor Dewhurst to Senator Birdwell.
14     Q. And dated January 20, 2011?
15     A. Correct.
16     Q. Do you recall getting a letter similar to this
17 yourself?
18     A. No. But I may have.
19     Q. Do you see that in -- do you see that it says
20 that, "This Lieutenant Governor's intent to recognize
21 Senator Robert Duncan for a motion to resolve the Senate
22 into a Committee of the Whole to consider Senate Bill
23 14"?
24     A. Yes.
25     Q. And do you see it says that's going to happen on

## 216

1  Monday January 24, 2011?
2      A. Yes.
3      Q. Can you take a look at Exhibit -- deposition
4  Exhibit 532?
5      A. Yes, ma'am.
6      Q. And can you look at the second paragraph for a
7  minute? Do you see that that's referring to a letter
8  from the Lieutenant Governor?
9      A. Okay.
10     Q. Do you see that it states that the Lieutenant
11 Governor circulated a letter on Thursday after most
12 senators had left for the weekend? And it stated that
13 the Senate was going to convene as Committee of the
14 Whole four days later to consider voter ID legislation.
15 Do you see that?
16     A. I see her description.
17     Q. Is that your, based on your recollection, do you
18 believe that that occurred?
19     A. I don't know.
20     Q. You don't have any recollection?
21     A. No. It -- I don't know one way or the other. I
22 don't recall an issue about this. Although, she did
23 raise it in a letter to me.
24     Q. Do you recall receiving this letter?
25     A. Let me read it. I believe -- yeah, I remember

Robert Duncan                                              June 7, 2012

---

217

1   this.  I do.
2       Q.  You do remember it?
3       A.  Yes, ma'am.
4       Q.  Did you respond to it?
5       A.  I assume I did.  I always respond to Senator Van
6   de Putte when I can.  So I don't know if I did it in
7   writing or gave her a phone call.
8       Q.  Do you -- do you recall if you disputed the way
9   she describes the notice that was given in that
10  paragraph that we were just looking at?
11      A.  I don't recall if I did or not.
12      Q.  As you sit here today, you don't recall if this
13  is how the notice was provided to members?
14      A.  No, I don't.  I remember this letter now.  But I
15  don't know how that happened or why it happened or what
16  happened, quite frankly.
17      Q.  Did any opponents of Senate Bill 14 make
18  allegations that minority members of the Senate were
19  being excluded from participation in the debate because
20  they weren't given enough notice?
21          MR. SWEETEN:  You can answer as to matters
22  of the public record.
23      A.  I simply don't remember that specifically.  I
24  know if there's some correspondence to that effect, you
25  know, there's typically -- I think there was.  I think

---

218

1   this letter right here, basically is some protest of the
2   speed in which the bill was moving.  But other than
3   that, I don't recall anything.
4       Q.  And you don't recall whether you had a public
5   response to that?
6       A.  I don't know.  I may have.  I mean, I typically
7   would respond to Senator Van de Putte by phone call or
8   formal letter.  Not only this issue, but other issues as
9   well.
10      Q.  Do you recall that in 2011 there was a similar
11  rule, that's what we discussed in the 2009 session, that
12  allowed for voter identification legislation to be
13  brought to the floor without a two-thirds majority vote?
14      A.  I recall it.  I think Senate Rule 5.11 remained
15  in place.
16      Q.  So Section D of Rule 5.11 would have been the
17  same in 2011 as it was in 2009?
18      A.  I don't believe there were any conceptual changes
19  in it.
20      Q.  Would it refresh your recollection to look at the
21  rule?
22      A.  It would be helpful to look at both the rules.
23  I've got one here.  Well, I've got the original exhibit
24  you previously provided.
25      Q.  I'm going to give you.

---

219

1          (Exhibit No. 533 was marked.)
2   BY MS. MARANZANO:
3       Q.  I'm going to give you what we're marking as
4   deposition Exhibit 533, which I'll represent to you is
5   from the 2011 Senate rules.  And do you see rule 5.11 D
6   on Page 24?
7       A.  Okay.
8       Q.  Do they appear to be the same to you?
9       A.  They appear to be substantially the same, if not
10  identical.
11      Q.  Senator, based on the public record, can you tell
12  me why you were the person who introduced the resolution
13  to bring Senate Bill 14 to the Committee of the Whole?
14          MR. SWEETEN:  Don't answer the question.  It
15  would call for you to reveal matters of legislative
16  privilege, of why it would relate to mental processes
17  about the legislative process.  If there's something
18  expressed specifically on the public record you can
19  refer to.
20  BY MS. MARANZANO:
21      Q.  Let me actually ask you this.  Is there a
22  procedure by which there's a process for who would bring
23  a bill to the floor -- or who would bring a bill to the
24  Committee of the Whole, is that a set procedure in the
25  Senate?

---

220

1       A.  No.
2       Q.  Okay.  Is that a decision that the Lieutenant
3   Governor makes?
4       A.  Yes.
5       Q.  And did you preside over the Committee of the
6   Whole's consideration of Senate Bill 14?
7       A.  Yes.
8       Q.  And that was the same rule, and it contained the
9   same responsibilities as what you testified to in 2009?
10      A.  Yes.
11      Q.  During the debate and the consideration by the
12  Committee of the Whole, did anybody raise public
13  concerns about the impact Senate Bill 14 would have on
14  minority voters?
15      A.  Generally those issues were discussed.  An
16  accurate account would be contained in the record.
17      Q.  And do you recall -- actually we'll get to that
18  in a second.  Never mind.  Have you had occasion to
19  review the Georgia and Indiana voter identification
20  laws?
21          MR. SWEETEN:  Objection; asked and answered.
22  And don't reveal your mental processes when you're
23  evaluating legislation, your motivations that would be
24  subject to legislative privilege.  Instruct not to
25  answer if your answer would reveal that.

Robert Duncan                                          June 7, 2012

---

221

1    A.  The answer is, I have reviewed materials that
2  relate to the Indiana an Georgia laws and those cases.
3  I can't recall if I've actually read the cases verbatim
4  or -- and I know I have not done an analysis of those
5  cases verbatim.
6    Q.  (By Ms. Maranzano)  Is out your belief, as you
7  sit here today, that the Georgia identification law is
8  similar to Senate Bill 14?
9    A.  I can't answer that.
10    MR. SWEETEN:  Okay.  I was going to say if
11  this is going to reveal your legislative processes about
12  Senate Bill 14 don't answer it.  But if you don't -- if
13  it's not.
14    A.  I can't answer it for two reasons.  One, it would
15  require analysis.  And number two is I haven't -- I'm
16  not prepared give you and accurate answer on that.  It
17  would have to be contained -- it would have to be
18  something contained in the record.
19    Q.  (By Ms. Maranzano)  Are you familiar with the
20  Indiana identification law?
21    A.  Generally.
22    MS. MARANZANO:  Can you mark this?  Thank
23  you.
24    (Exhibit No. 534 was marked.)
25  BY MS. MARANZANO:

---

223

1    Q.  Do you recall what those discussions entailed?
2    A.  No.  You would have to refer to the record for an
3  accurate description.
4    Q.  Do you recall introducing any amendments to
5  Senate Bill 14?
6    A.  Do I recall?
7    Q.  Uh-huh.
8    A.  Introducing amendments, I did not introduce
9  amendments that I recall.
10    MS. MARANZANO:  Could we have this marked?
11    (Exhibit No. 535 was marked.)
12  BY MS. MARANZANO:
13    Q.  I'm showing you what we're marking as deposition
14  Exhibit 535.  Can you take a look and tell me if you
15  recognize this?
16    A.  Well, this is apparently a transcription of the
17  hearing on Senate Bill 14, January 26, 2011.
18    Q.  And can you look on that first page by Duncan and
19  take a look at what -- at that paragraph?
20    A.  Yes.  That indicates that I apparently introduced
21  amendment 40.
22    Q.  Does that refresh your recollection?
23    A.  Well, yeah.  Because apparently Senator Davis had
24  an amendment.  And now that I'm looking at this it
25  appears that, according to the record, I was amending

---

222

1    Q.  Senator, I'm showing you what we're marking as
2  deposition Exhibit 534.  Can you take a look at this?
3  Does this appear to be the Indiana voter identification
4  law?
5    A.  The title of this document is Public Law
6  109-2005.  And it appears to be an excerpt from the
7  Indiana code.  I don't know the authenticity of this.  I
8  assume you're representing it to be an authentic version
9  of the law and I have no reason to doubt that.
10    Q.  Can you take a look at Page 2015 for me, please?
11  And I want to direct your attention to the Subsection C,
12  but if you need to look at the preceding page it might
13  give you the context for that.
14    A.  Okay.
15    Q.  Do you see that a voter who cast a provisional
16  ballot is able to execute an affidavit saying they're
17  indigent and their provisional ballot would be counted?
18    A.  Yes.
19    Q.  And they would not have to show the required
20  identification?
21    A.  Yes.
22    Q.  Do you recall public discussions or discussions
23  on public record about this portion of the Indiana code
24  during the debate of Senate Bill 14?
25    A.  I believe there was.

---

224

1  her amendment.
2    Q.  I'm sorry.  You were amending her amendment?
3    A.  I believe that's what this is.
4    Q.  And can you tell me, based on public discussions,
5  why you thought that was a provision that you wanted to
6  add to Senate Bill 14?
7    MR. SWEETEN:  Don't answer the question.  It
8  calls for matters of legislative privilege.  You're
9  asking why in his thought process.
10  BY MS. MARANZANO:
11    Q.  Did you have any discussions on the public record
12  about this amendment?
13    MR. SWEETEN:  You can answer.
14    A.  Yes.
15    Q.  (By Ms. Maranzano)  Do you recall the substance
16  of those discussions?
17    A.  Those discussions were stated in the record.
18    Q.  And is that the record that's right here in front
19  of us?
20    A.  It is.
21    Q.  And do you see that, in that paragraph that we
22  were looking at, you point out that this amendment is
23  very similar to, if not identical to, the provisions of
24  Indiana law?  Do you see that?  And then it says, "and
25  it would be a fail safe privilege for those persons,"

Robert Duncan                                                      June 7, 2012

## 225

1   which I assume you're referring to indigent persons?
2       A.  That's what -- well, I will refer you to the
3   record, if that accurately states what I said, I assume.
4       Q.  Can you tell me what the purpose of this
5   amendment was?
6           MR. SWEETEN:  Don't answer the question.
7   You can give general purpose of legislation.  Don't go
8   into the purpose of the amendment, legislative
9   privilege.
10  BY MS. MARANZANO:
11      Q.  Can you tell me if this provision was included in
12  the final version of Senate Bill 14?
13      A.  According to the record it was adopted, but I
14  don't know -- and I assume that it was in the engrossed
15  version, but I don't know.  You would have to go to the
16  record.
17      Q.  Well, do you want the take a look at Senate Bill
18  14 and tell me if you see it in the bill?
19      A.  In the enrolled and signed version?
20      Q.  Uh-huh.
21      A.  The bill will speak for itself I'm sure, but --
22  and that would have been -- I'm trying to see where that
23  was amended.  But I don't recall that it made it through
24  the House.  But let me look and see.
25      Q.  Let me direct your attention to that paragraph

## 226

1   that we were just looking at.  It points out that this
2   is for individuals who cast a provisional ballot.
3       A.  Right.
4       Q.  So that might help direct your attention to the
5   portion of Senate Bill 14 about provisional ballots.
6       A.  You might remind me of what provision that is.
7       Q.  And you said you don't recall that it did make it
8   through.  Is that what you said?
9       A.  Well, it appears if you're looking at Section
10  60 -- or Section 14 of Senate Bill 14, that -- for
11  amendment No. 40, which was a Senate amendment to Senate
12  Bill did not get in the enrolled version of the bill
13  signed by the governor.
14      Q.  Do you know when this provision was removed from
15  the bill?
16      A.  No, I do not.  You know, you can narrow it down
17  to either in the House or in a conference committee.  I
18  don't think this bill went to a conference committee.
19      Q.  Do you -- did you have any communications with
20  any other legislators about this amendment -- well, this
21  amendment first of all, at all?
22      A.  Not that I recall.
23      Q.  So I take it then, you didn't have any
24  conversations about this amendment getting removed from
25  the bill?

## 227

1       A.  I don't remember any.  But that doesn't -- I
2   could have.  I just don't remember any specific
3   amendments.  When this bill came back over we were in a
4   lot of other different issues.  But I don't remember
5   being told specifically that it came out.  And I just
6   now remembered that we put the amendment on.  So I don't
7   recall being involved at that stage of any decision to
8   remove the amendment.
9       Q.  Did you have any communication with anybody about
10  whether a provision like this, the exemption of for
11  indigency, would increase the chances that Senate Bill
12  14 would be precleared?
13          MR. SWEETEN:  Don't reveal matters of
14  privilege.  I think this asks for more than a general
15  subject matter discussion.  If you -- so I would
16  instruct you not to answer as phrased.  If you want to
17  change the preface of the question, I think we can
18  probably get you and answer that would give you the
19  foundational information you seek.
20  BY MS. MARANZANO:
21      Q.  I think you stated previously you don't recall
22  having conversations about this amendment generally?
23      A.  Well, apparently I did because I put an amendment
24  on the bill.  And as chairman of the committee, I
25  typically work to improve a bill and listen to people.

## 228

1   And so obviously there was some reason to put that on
2   the bill.  The reasons that are there are stated here.
3   What conversations I had with folks, with other members
4   on this particular amendment were probably based upon
5   Indiana law, as stated in the public record.  But my
6   specific conversations with Senator Fraser or others,
7   Senator Davis, I do not recall specifically what they
8   were.  To provide you, especially, to provide you with
9   an accurate account of those conversations.  The
10  statement contained in the record is my conversation
11  with regard to Amendment 40.
12      Q.  Do you recall any of the other amendments that
13  were proposed for Senate Bill 14?
14      A.  If I don't recall my own, I probably don't recall
15  the others.  But I do recall -- at least I don't think
16  there were amendments in 2009, but I do recall, I
17  thought we did some amendments in 2011 and obviously we
18  did.
19          MS. MARANZANO:  Okay.  Let's mark this.  I'm
20  sorry.  Wrong one.  Can you mark this?
21          (Exhibit No. 536 was marked.)
22  BY MS. MARANZANO:
23      Q.  Senator, I'm showing you what we're marking as
24  deposition Exhibit 536.  Do you recognize this?
25      A.  Well, I recognize the title, as apparently it's

## 229

1  an excerpt from the Senate journal for January 26, 2011.
2  Q.  And can you take a look at Page 118, and I'm
3  going to direct your attention to floor Amendment 12.
4  Do you see that that amendment would have prohibited
5  state agencies from charging fees for issuance of any
6  acceptable form of photo identification under Senate
7  Bill 14, or for underlying documentation that would be
8  required to obtain such an ID?
9  A.  I believe the provision -- or the amendment poses
10  a similar concept to what you described.
11  Q.  And do you see below that amendment there's a
12  recorded motion to table and a vote on that motion to
13  table?
14  A.  That's correct.
15  Q.  And you voted, according to the public record, in
16  favor of the motion to table?
17  A.  According to the record, that's how I voted.
18  Q.  Did you take any public position as to how this
19  amendment would have impeded the goals of Senate Bill
20  14?
21  A.  I don't recall if I did or not.
22  Q.  You have no recollection?
23  A.  No.
24  Q.  Can you turn to Page 134, Amendment No. 30?
25  A.  Page what?

## 231

1  A.  That's what Subparagraph 7 states, yes.
2  Q.  And can you look below, I think it goes on to the
3  next page, that there was a motion the table that
4  amendment?
5  A.  Correct.
6  Q.  And you publicly voted in favor of this motion to
7  table; is that correct?
8  A.  That's correct.
9  Q.  Did you take -- did you make any public
10  statements or take a public position about your
11  opposition of this amendment?
12  A.  I don't recall doing so.
13  Q.  Were there any public statements made about
14  concerns that a study, such as the one proposed by this
15  amendment, would actually show there was a disparate
16  impact on minority voters?
17  A.  I'm confident that whenever floor Amendment 30
18  was laid out on the Senate floor that the author and the
19  sponsors of the amendment made certain public statements
20  regarding -- or in support of the amendment.
21  Q.  And my question was about whether public
22  statements were made expressing a concern that to do
23  such a study would show there was a disparate impact?
24  A.  You would have to look at the record to determine
25  whether or not there were public statement on that.  I

## 230

1  Q.  130.  Do you see floor Amendment No. 30?
2  A.  I see that.
3  Q.  Amendment by Senator Ellis as well as Senator
4  Rodriguez and Senator Uresti.  Can you take a look at
5  that amendment?  Do you see that this amendment would
6  have required the secretary of State to conduct a study
7  that would have included information about the number of
8  eligible voters who were prevented from voting because
9  of a lack of possessing an identification?
10  A.  I'll only agree to what it says.  I'm not --
11  you're paraphrasing it.  And I'm not familiar enough
12  after two years, after a year, whatever it is, of the
13  language to agree with your paraphrasing.  But I will
14  agree it is an amendment that requires the Secretary of
15  State to produce an annual report.  And it has specific
16  requirements with seven subsections of requirements for
17  the Secretary of State to either collect data or do
18  analysis and report back to the legislature.
19  Q.  And can you look at Subsection 7, and that
20  actually requires that "the report include an analysis
21  by subgroup of whether the enhanced identification
22  requirements were being accepted to vote, produce a
23  disparate impact on women, the elderly, persons with
24  disabilities, students or persons of racial or ethnic
25  minorities."  Is that correct?

## 232

1  don't recall independently.
2  Q.  Can you look at Page 129 for me?  And
3  specifically at floor Amendment No. 29.  Do you see that
4  amendment it requires driver's license offices to be
5  open until 7:00 p.m. on a weekday during each week and
6  at least four or more hours on two Saturdays of each
7  month?
8  A.  I see that.
9  Q.  Do you see below that there's a motion to table
10  that amendment?
11  A.  Yes.
12  Q.  And you voted in favor of that motion to table?
13  A.  Correct.
14  Q.  And did you take any public position as to how
15  this amendment would have impeded the goals that you
16  described earlier of Senate Bill 14?
17  A.  I don't remember if -- whether I did or not.
18  Probably not.
19  Q.  Did you make any public statements about that?
20  A.  No, I don't think I did.
21  Q.  Do you recall when the Senate passed Senate Bill
22  14?
23  A.  It was probably in January of 2011 as this
24  particular -- well, somewhere near the January 26, 2011
25  proceeding that's reflected in the Senate journal.  But

Robert Duncan                                      June 7, 2012

### 233

1   I don't recall the exact date.
2        Q.  Can you tell me as a general matter, is it
3   unusual for legislation to be introduced, considered and
4   passed within two weeks?
5        A.  Not necessarily.
6        Q.  Has that happened -- how many times has that
7   happened during your time in the Senate?
8        A.  No.  My freshman year I introduced the Boll
9   Weevil.  Actually I introduced it, but I didn't even
10  take it up until the Supreme Court had overruled or had
11  held an existing law unconstitutional until April 30th.
12  And I think we headed out of Senate to the House in two
13  and a half weeks.  So it can be done, if it's necessary,
14  on emergency orders.  On orders that are emergency, they
15  can move fairly quickly depending on the consensus in
16  the bill.  Just depends on all those things.  So
17  generally it's not -- it's -- it's not -- it's -- it
18  happens -- it can and does happen that legislation moves
19  fairly quickly.
20       Q.  I'm sorry.  I missed the piece of legislation you
21  worked on?
22       A.  Boll Weevil.
23            MR. SWEETEN:  Boll Weevil.
24  BY MS. MARANZANO:
25       Q.  Okay.

### 234

1        A.  Actually that's a pretty interesting case.
2        Q.  We'll talk about that off the record.  And you
3   said it depends on the consensus; is that right?
4        A.  Correct.
5        Q.  Is it unusual for a bill that is highly
6   contentious to pass -- to be introduced, considered and
7   passed within two weeks?
8        A.  Depends.
9        Q.  And other than this legislation that yourself
10  mentioned that you worked on, are there other
11  examples -- during the time you've been in the Senate,
12  about how many times have you seen this happen?
13       A.  Couldn't tell you.  Special orders.  Other issues
14  that come up late in the session that need to be
15  addressed.  So, you know, I couldn't.  Just too much to
16  me.  Too long and too much.
17       Q.  Are you familiar with the Conference Committee's
18  consideration as to Senate Bill 14?
19       A.  Remind me who was on the Conference Committee,
20  please?
21       Q.  I would have to look it up.  I'm not sure I had
22  that document in front of me.  It would refresh your
23  recollection if you knew if members of the Conference
24  Committee?
25       A.  Yeah.

### 235

1        Q.  All right.  We'll come back to that.  Did you
2   ever have any discussions -- strike that.  To the best
3   of your knowledge, based on public record, did the
4   legislature take steps to determine whether SB 14 might
5   disproportionately impact minority voters?
6            MR. SWEETEN:  Don't reveal matters of
7   legislative privilege.  If you can answer the question
8   without doing so, you can.  If you cannot, then instruct
9   you not to answer.
10       A.  I can't accurately respond to the question based
11  on independent recollection.  I would refer you to the
12  record.
13       Q.  (By Ms. Maranzano)  Okay.  Was any part of the
14  purpose of Senate Bill 14 to decrease the number of
15  Hispanic voters?
16       A.  No.
17       Q.  Was any part of the purpose of Senate Bill 14 to
18  decrease the number of any other group of minority
19  voters?
20       A.  No.  The purpose is as I've stated.
21       Q.  Was any part of the purpose of Senate Bill 14
22  partisan?
23       A.  No.  The purpose is as I stated.
24       Q.  Did the purpose of photo ID in Texas evolve
25  overtime?

### 236

1        A.  I'm not sure I understand that.  What do you
2   mean?
3        Q.  Did the purpose of the photo ID bills that we
4   talked about in different legislative sessions change?
5        A.  Not that I'm aware of.
6            MR. SWEETEN:  Hold on a second.  I think
7   that you're asking to compare and contrast different
8   bills from different sessions.  I think that the
9   question is vague.  I think it's compound.  I also think
10  that it calls upon him to give you an analysis of how
11  one bill compares with another which would require him
12  to write his mental impressions and would be subject to
13  the legislative privilege.  He will testify -- I think
14  you've asked him all day about the different bills and
15  what he thought the general purpose was.  He has
16  testified to all of that.
17  BY MS. MARANZANO:
18       Q.  Are you aware of any legislators making any
19  statements about illegal aliens voting?
20       A.  No.
21       Q.  Have you ever heard a Texas State legislator who
22  voted in favor of Senate Bill 14 say it would prevent
23  racial or ethnic minorities from voting in Texas?
24       A.  No.
25            MR. SWEETEN:  Don't reveal any

## 237

1  communications you've had with any Senate or staff in
2  answering these questions.
3      A. I've had no such communications is what I'm
4  trying to say. I want to be clear on that.
5      Q. (By Ms. Maranzano) I didn't hear the very last
6  thing you said. You said you've had no such --
7      A. I have not been a party to any such
8  communications or overheard or heard any such
9  communications.
10     Q. Does Senate Bill 14 do anything to address
11 allegations of fraud in the ballot by mail system?
12         MR. SWEETEN: Don't answer the question.
13 Requires you to reveal your mental thought processes and
14 motivations by the voter process.
15         MS. MARANZANO: I'm just asking him about
16 the text of the bill.
17         MR. SWEETEN: You're asking if the text of
18 the bill --
19         MS. MARANZANO: Addresses voter fraud and
20 vote by mail.
21         MR. SWEETEN: You can answer it based upon
22 the text.
23     A. The text of the bill is to achieve the general
24 purpose of the bill, which is to enhance voter -- their
25 ballot box integrity and prevent fraud.

## 238

1      Q. (By Ms. Maranzano) So I'm just asking if
2  anything in the bill, based on the face of the bill,
3  addresses vote by mail voter fraud?
4      A. I've answered the question to the best of my
5  ability.
6      Q. Okay.
7      A. Given -- go ahead. Re-ask the question.
8      Q. I know we talked about that the purpose of Senate
9  Bill 14 is about integrity of the electoral system and
10 voter fraud. And I'm just wondering if the specific
11 area of vote by mail fraud is addressed by Senate Bill
12 14, based on the face of the bill?
13         MR. SWEETEN: But I think your question is
14 asking for him to give you the potential effect of
15 Senate Bill 14 and would therefore, to some extent could
16 reveal his mental processes, opinions and thoughts about
17 the legislation. So to some -- if to that extent I
18 would instruct you not to reveal it if it implements
19 matters of legislative privilege.
20     A. I don't know, sitting here today. I believe that
21 voter -- that mail in ballots is covered under other
22 legislation and not necessarily Senate Bill 14, if my
23 recollection is correct.
24     Q. (By Ms. Maranzano) Do you believe that -- well,
25 strike that. Based on the face of Senate Bill 14, does

## 239

1  it do anything in terms of the goals that you've stated
2  that is not already covered by federal or State law?
3         MR. SWEETEN: Don't answer that. Calls for
4  matters of legislative privilege. Instruct not to
5  answer.
6  BY MS. MARANZANO:
7      Q. Do you know how somebody -- do you know what
8  forms of identification a voter registration applicant
9  in Texas needs to show under the current system to
10 register to vote?
11     A. I know there are -- there are a -- there's a
12 laundry list of items that a voter needs to show. I
13 couldn't recite them specifically for you right now.
14 You would have to show me the statute.
15     Q. Is there anything in the public record about the
16 insufficiency of that current system, in terms of the
17 identification of voter registration an applicant needs
18 to show?
19     A. If there is it would have certainly been stated
20 in the debate of Senate Bill 362 or Senate Bill 14.
21     Q. Can you give me just a minute? I think I'm just
22 about done. I just want to go through my notes real
23 fast.
24     A. Sure.
25         (Brief recess.)

## 240

1  BY MS. MARANZANO:
2      Q. Back on the record. Senator, do you know how
3  many investigated incidents of in person voter fraud
4  have occurred in the state of Texas in the last
5  20 years?
6      A. I don't have a statistic available to me at this
7  time to give you an accurate answer on that.
8      Q. Do you know how many convictions for in person
9  voter fraud have been obtained in the last 20 years in
10 the State of Texas?
11     A. I don't have that information available to me at
12 this time.
13     Q. Do you know if those statistics were part of the
14 public debate on Senate Bill 14?
15     A. If they were, they would be in the record.
16     Q. At any time since the passage of Senate Bill 14,
17 have you come to believe that it was passed with
18 discriminatory purpose?
19     A. No.
20     Q. Have you come to believe it was passed with a --
21 at any time since the passage of Senate Bill 14, have
22 you come to believe that it would have a discriminatory
23 impact on minority voters?
24     A. No.
25     Q. If called to testify at trial, will you testify

Robert Duncan                                           June 7, 2012

## 241

1   that Senate Bill 14 has no discriminatory purpose?
2       A.  Yes.
3       Q.  And will you testify that it has no
4   discriminatory effect?
5       A.  Yes.
6       Q.  Are there any answers that you gave today that
7   now you would like to change?
8       A.  Other than the fact that I forgot that I had
9   offered an amendment.  That's the only one I think.  But
10  I just simply again, don't typically offer those kind of
11  amendments.  But that was corrected and I remember --
12  once you showed it to me I remembered it.  It did
13  refresh my memory.
14      Q.  Is there anything about earlier today you
15  couldn't recall that you are now able to recall?
16      A.  No.  That was the main thing.
17      Q.  Okay.  I'm now going to turn the questioning over
18  to Mr. Brazil.  As I mentioned earlier, we are going to
19  leave this deposition open because we believe there may
20  be some documents that the court has ordered to be
21  produced that have not yet been produced.  So for the
22  moment we're leaving the deposition open?
23      A.  Thank you.
24      MS. MARANZANO:  Thank you.
25

## 242

1              EXAMINATION
2   BY MR. BRAZIL:
3       Q.  Senator, I just have a few questions and I'll do
4   it from here.  So if I don't speak loud enough just ask
5   me to speak up.  Okay?
6       A.  Yes, sir.
7       Q.  I only have about four areas to briefly cover so
8   I'll jump around and if I lose you, just say so.  Fair
9   enough?
10      A.  Yes, sir.
11      Q.  I believe you said earlier this morning that your
12  Senatorial district is 36 counties?
13      A.  46.
14      Q.  I'm sorry?
15      A.  46.
16      Q.  46.  Do all 46 of your counties have DPS offices?
17      A.  I do not know the -- I couldn't accurately give
18  you and answer right now.  I don't know that they all
19  do.  I'm not sure.  I can't tell you today.
20      Q.  I think you saw in the public record that 77 of
21  the 254 counties do not have DPS offices.  Do you recall
22  that?
23      A.  I don't recall those specific numbers.
24      Q.  And you are not sure how many of your counties do
25  or do not have offices?

## 243

1       A.  I haven't -- I haven't looked at that.
2       Q.  Did your office do any independent polling of
3   your constituents on the issue of voter ID?
4       A.  I don't believe.
5       MR. SWEETEN:  Hold on a minute.  Don't
6   answer questions that are subject to the legislative
7   privilege.  So that would -- potentially reveal thought
8   process, mental impressions about legislation.  So don't
9   answer if it would to that.
10  BY MR. BRAZIL:
11      Q.  Well, let me make my question more specific.  Did
12  your office send out any mailers, request any e-mails
13  from your constituents, anything of that sort, in the
14  public domain about voter ID?
15      MR. SWEETEN:  That sounds like a public
16  statement so that would be -- you can go ahead and
17  testify.
18      A.  I don't remember doing that.  We don't typically
19  do those sorts of mailers to our constituent.
20      Q.  (By Mr. Brazil)  Did your staff ever keep records
21  of the telephone calls from your constituents, pro or
22  con, against the voter ID bill?
23      A.  I don't know if they did on that bill.  We've
24  done it before on other bills, but I couldn't tell you
25  whether or not we had a log on that.

## 244

1       Q.  Did you attend any, what we call town meetings,
2   anything of that sort where you specifically discussed
3   the voter ID bill?
4       A.  I'm sure I did.
5       Q.  Do you recall anything specific, any group that
6   you addressed or invited to address?
7       A.  No.  Generally, we have a fairly by-partisan
8   group of people that come to our town hall meetings in
9   these rural counties, even in Lubbock and other areas.
10  So I typically and generally speak about a number of
11  issues that were considered during the legislative
12  session and/or that we are considering or thinking about
13  considering.  And -- but I never have -- I don't recall
14  ever having a specific town hall meeting just dealing
15  with voter ID.  There's a lot of other issues that we
16  generally cover in those types of meetings.
17      Q.  Did you ever -- were you ever invited to speak
18  publicly to a group just on the issue of voter ID?
19      A.  I don't remember if I did.  If I did I didn't do
20  it.
21      Q.  Have you seen any independent studies regarding
22  alleged voter fraud in Texas?
23      MR. SWEETEN:  Don't reveal your thoughts and
24  mental processes regarding legislation.  That would be
25  legislative -- that would be subject to the legislative

245

1    privilege.
2         MR. BRAZIL:  How would that be privileged?
3    Are you contending that somehow he got some secret
4    information or something that's not public?  Some
5    independent study that he received that the public
6    didn't receive?
7         MR. SWEETEN:  What I'm saying is that the
8    Senator's thought process, his motivation, his analysis
9    related to any legislation, would be subject to the
10   legislative privilege.  And I think your question asks
11   him to reveal his analysis about legislation,
12   potentially to divulge conversations that he's had that
13   would be subject to the privilege and therefore, that
14   would be a matter of legislative privilege.  That's what
15   I'm saying.
16   BY MS. MARANZANO:
17        Q.  Well, my question was very specific.  Have you
18   seen any independent studies of alleged voter fraud in
19   Texas?
20        MR. SWEETEN:  You can reveal matters of
21   public record.  Don't reveal matters of privilege.
22        A.  The investigations related to voter fraud or that
23   I have seen are those that are contained in the public
24   record of the Senate on this issue.
25        Q.  (By Mr. Brazil)  Okay.  Do you recall whether or

246

1    not the public record contains any study by an
2    independent agency, such as a university or some entity,
3    that's been hired independent of the legislature on
4    alleged voter fraud?
5         A.  If there is such study that it was included in
6    the record either on Senate Bill 362 or the interim
7    study that we did, or on Senate Bill 14.
8         Q.  I think you've already said you're not aware of
9    the number of prosecutions for illegal voting or voter
10   fraud in Texas over the last ten years.  Is that fair?
11        A.  I couldn't give you the numbers.
12        Q.  Did I here you say that Amendment No. 40, floor
13   Amendment No. 40, did not make it into the final bill
14   that was signed into law?
15        A.  Yes.
16        Q.  Okay.  And did you say that the Senate Bill did
17   or did not go to Conference Committee?
18        A.  It apparently did.  And counsel's asked me about
19   that.  But I'm not -- I don't recall any deliberations
20   in regard to the Conference Committee, other than we had
21   a Conference Committee.  I don't believe I was on the
22   Conference Committee.
23        Q.  Okay.  But somewhere in conference, floor
24   Amendment No. 40 was removed?
25        A.  I don't know that to be a fact.  I know it was

247

1    removed, but I don't know where it was removed.
2         Q.  And you don't know, I assume, who removed it?
3         A.  Correct.
4         Q.  Did you serve on any committees or have you ever
5    served on any committee that specifically investigated
6    alleged voter fraud in Texas?
7         A.  The only -- the interim study that we did in 2006
8    had a charge that reflected that we were to look into
9    and study the voter fraud.  You can look at how it's
10   specifically worded.  That's the only committee that
11   I've worked on or served on where that issue that was
12   taken up, I believe.  I don't think any other committee
13   I've served on has taken that issue.
14        Q.  Have you served on any committee that
15   specifically investigated the effect the voter ID bill
16   would have on any group of the voting population.  For
17   example, the elderly, minorities.  Have you served on
18   any committee that specifically investigated what effect
19   this bill may have on their voting?
20        MR. SWEETEN:  Don't reveal any analysis
21   regarding legislation, nor factual information that you
22   did or did not consider in supporting or opposing a
23   bill.  That would be subject to a legislative privilege.
24        A.  The studies or -- that would relate to your
25   question would be the interim study that was a part of

248

1    the charge for the State Affairs Committee in 2006.
2    Other than that, I don't recall anything.
3         Q.  I think you said earlier that Senate Bill 14 was
4    to -- I'm trying to quote you, "ensure voter and ballot
5    integrity."  Is that correct?
6         A.  I think ballot integrity is more accurate.
7         Q.  Okay.  I have reviewed, I think on the record and
8    many of the depositions that have been taken in this
9    case, Senator.  Can you point to any area of the record
10   going back, you know, five or six years where there's
11   any real substantial evidence statewide voter fraud in
12   Texas?
13        MR. SWEETEN:  Don't reveal -- don't answer
14   the question.  It would require you to reveal matters of
15   legislative privilege.  Straight out of the order that
16   would include what factual information a legislator did
17   or did not consider in supporting or opposing a bill.
18   That's legislatively privileged.
19        A.  I'll follow counsel's advice on this.
20        Q.  (By Mr. Brazil)  Well, I think my question
21   basically was what was in the public domain, the
22   hearings, the record, if we stay in that vein, if we
23   stay in that train of thought, can you -- what in your
24   opinion is the most outstanding evidence that you
25   believe supports this allegation of voter fraud in

249

1  Texas?
2          MR. SWEETEN:  Don't answer the question.
3  That calls for matters of legislative privilege.  You're
4  asking him to weigh the evidence which is part of his
5  analysis in considering legislation.  You're asking for
6  him to say what's the most -- what's the most relevant
7  evidence.  And that is very clearly asking for his
8  mental impressions and thoughts about a bill.  And
9  instruct you not to answer on that basis.
10 BY MS. MARANZANO:
11     Q.  Can you point to anything in the public record
12 that indicates substantial voter fraud in Texas?
13         MR. SWEETEN:  Same instruction.
14         MR. BRAZIL:  I'm sorry?
15         MR. SWEETEN:  Same instruction.
16         MR. BRAZIL:  So you're contending that the
17 privilege covers what's in the public record.  Is that
18 what you're stating?
19         MR. SWEETEN:  I didn't state that.  I
20 said --
21         MR. BRAZIL:  Let me ask him again.
22         MR. SWEETEN:  No, let me finish my
23 statement.  You're asking him what was substantial
24 evidence, which goes to his mental processes.  Now,
25 remember the court said that what factual information a

250

1  legislator did or did not consider in supporting or
2  opposing a bill is part of the legislative privilege.
3  So I'm instructing him that the court order and the
4  legislative privilege covers the question that you're
5  asking.  And I'm instructing him not to answer the
6  question as posed.
7          BY MR. BRAZIL:  Okay.  Well --
8          MR. SWEETEN:  You can -- if you want to ask
9  him was there evidence or an issue came up in the public
10 record, I don't have a problem with it.  When you start
11 asking him what was substantial, how did he weigh it,
12 that goes to his mental processes.  He's not answering
13 that question.
14 BY MR. BRAZIL:
15     Q.  Was there any evidence in the public record, in
16 your opinion, to support the allegation of voter fraud
17 in Texas?
18         MR. SWEETEN:  I think that's -- it's the
19 same for the same reason that question is inferred.  He
20 can refer to evidence in the public record that existed.
21 He's not going to talk about what was more or less
22 important to him.  He can talk about what occurred in
23 the public record.  That is legislatively privileged.
24 Instruction not the answer.
25 BY MR. BRAZIL:

251

1      Q.  What occurred in the public record that supported
2  the allegation of voter fraud?
3          MR. SWEETEN:  It's the same instruction.
4  It's the same question.
5  BY MR. BRAZIL:
6      Q.  Would you agree with me that there's nothing in
7  the public record to support the allegation of voter
8  fraud in Texas?
9          MR. SWEETEN:  Don't answer the question.
10 The question ask for what was your support for a certain
11 issue that calls for matters of the legislative
12 privilege.
13 BY MR. BRAZIL:
14     Q.  Who put on -- or presented evidence in the public
15 record of voter fraud in Texas?
16     A.  The record I think reflects that in 2006 there
17 was evidence in the interim committee.  I do not recall
18 specifically who put on evidence.  I do believe the
19 Attorney General's office did testify in 2009 and also
20 2011 with regard to those issues.  I would refer you to
21 the record for an accurate account of their testimony.
22     Q.  Do you remember how many specific instances of
23 voter fraud they presented?
24     A.  I would refer you to the record for an accurate
25 recollection of that.

252

1      Q.  Did you serve on any committee that specifically
2  investigated what segment of the population would be
3  most affected by this bill?
4          MR. SWEETEN:  Objection.  Calls for matters
5  of legislative privilege.
6  BY MR. BRAZIL:
7      Q.  Did any committee you serve on investigate that
8  publicly?
9      A.  The Senate Committee on State Affairs in 2006
10 carried out its assignment under its charge as stated in
11 the public record.  And I will refer you to that record.
12 The Senate Committee of the Whole in 2009, 2011 I
13 believe, the public record reflects a discussion of
14 those issues.  I'll refer you to the record for those --
15 for the...
16     Q.  There was a lot of discussion and a lot of
17 questions about how this bill progressed and the rules
18 and what rules were changed, et cetera.  If we just look
19 at this legislative session, how many bills were handled
20 in a similar manner to Senate Bill 14?
21         MR. SWEETEN:  Objection; compound.  You can
22 answer based on matters of public record.
23     A.  I don't recall that there were any other
24 committee -- any other bills that were considered by
25 a Committee of the Whole to that extent it would have



---

**253**

1  been different.

2      Q.  (By Mr. Brazil)  What was the urgency of this

3  bill?  What was the emergency?  What precipitated the

4  need for this type of bill and the way was handled?

5      MR. SWEETEN:  Objection; calls for matters

6  of legislative privilege.  Don't answer the question.

7  BY MR. BRAZIL:

8      Q.  Is there anything in the public record that you

9  can point to that would support the urgency or the

10  emergency or the special treatment of this bill?

11     MR. SWEETEN:  Objection.  He's asking you to

12  find evidence that supports something that calls for

13  your mental impressions or thoughts about legislation.

14  Don't answer the question as posed.

15     MR. BRAZIL:  I'll pass the witness.

16     MR. SWEETEN:  I have no questions for the

17  witness.  We'll reserve questions to the time of trial.

18     (Deposition concluded.)

19

20

21

22

23

24

25

---

**254**

1              CHANGES AND SIGNATURE

2          RE:  STATE OF TEXAS VS. HOLDER

3

4  PAGE   LINE   CHANGE           REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**255**

1      I, ROBERT DUNCAN, have read the foregoing

   deposition and hereby affix my signature that same is

2  true and correct, except as noted above.

3

            ROBERT DUNCAN

4  THE STATE OF TEXAS  )

                       )

5  COUNTY OF _____ )

       Before me, _____, on this day

6  personally appeared ROBERT DUNCAN, known to me (or

   proved to me under oath or through

7  (description of identity card or other document) to be

   the person whose name is subscribed to the foregoing

8  instrument and acknowledged to me that they executed the

   same for the purposes and consideration therein

9  expressed.

10      Given under my hand and seal of office this ____

   day of

11         , .

12      NOTARY PUBLIC IN AND FOR

   THE STATE OF

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**256**

1      IN THE UNITED STATES DISTRICT COURT

       FOR THE DISTRICT OF COLUMBIA

2

   STATE OF TEXAS        )

3                        )

                         )

4  VS.                   )  NO. 12-CV-128

                         )  (DST, RMC, RLW)

5                        )

   ERIC H. HOLDER, JR.,  )

6  In his official       )

   Capacity as Attorney  )

7  General of the United  )

   States, ET AL         )

8

   *******************************************

9      CERTIFICATE FROM THE

          ORAL DEPOSITION OF

10            ROBERT DUNCAN

             JUNE 7, 2012

11

   *******************************************

12      I, Janalyn Reeves, a Certified Shorthand Reporter

13  in and for the State of Texas, do hereby certify that

14  the foregoing deposition is a full, true and correct

15  transcript;

16      That the foregoing deposition of ROBERT DUNCAN, the

17  Witness, hereinbefore named was at the time named, taken

18  by me in stenograph on June 7, 2012, the said Witness

19  having been by me first duly cautioned and sworn to tell

20  the truth, the whole truth, and nothing but the truth,

21  and the same were thereafter reduced to typewriting by

22  me or under my direction.  The charge for the completed

23  deposition is $_____ due from Defendant.

24      () That pursuant to the Federal Rules of Civil

25  Procedure, the Witness shall have 30 days after being



## 1

343641 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          *
        Plaintiff,                       *
VS.                                      *
ERIC H. HOLDER, JR., in his              *
official capacity as Attorney            *
General of the United States,            *
        Defendant,                       *
ERIC KENNIE, et al,                      *
        Defendant-Intervenors,           *
TEXAS STATE CONFERENCE OF NAACP          * CASE NO.
BRANCHES, et al,                         * 1:12-CV-00128
        Defendant-Intervenors,           * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS             * THREE-JUDGE COURT
EDUCATION FUND, et al,                   *
        Defendant-Intervenors,           *
TEXAS LEGISLATIVE BLACK CAUCUS,          *
et al,                                   *
        Defendant-Intervenors,           *
VICTORIA RODRIGUEZ, et al                *
        Defendant-Intervenors.           *

TELEPHONIC DEPOSITION OF SENATOR RODNEY ELLIS
VOLUME 1
UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:

Patrick K. Sweeten, Esquire
Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Street, 8th Floor
Austin, Texas  78701

Date            Edith A. Boggs, CSR

6-22-12         HOUSTON, TEXAS

## 2

8    DEPOSITION OF SENATOR RODNEY ELLIS

11   DEPOSITION AND ANSWERS of SENATOR RODNEY ELLIS, taken
12   before Edith A. Boggs, a certified shorthand reporter in
13   Harris County for the State of Texas, taken at the
14   offices of State Senator Rodney Ellis, 440 Louisiana,
15   Suite 575, Houston, Texas, on the 22nd day of June,
16   2012, between the hours of 2:04 p.m. and 5:11 p.m.

## 3

A P P E A R A N C E S

ATTORNEY FOR PLAINTIFF, STATE OF TEXAS:

Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Floor
Austin, Texas  78701
By:  Patrick K. Sweeten, Esquire
(512) 936-1307
patrick.sweeten@oag.state.tx.us

ATTORNEY FOR DEFENDANT, HOLDER, ET AL:

U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC  20530

By:  Jennifer Lynn Maranzano, Esquire
(Present telephonically)
(202) 305-7766
jennifer.maranzano@usdoj.gov

## 4

A P P E A R A N C E S (Continued)

ATTORNEY FOR THE KENNIE INTERVENORS:

Brazil & Dunn, LLP
4201 Cypress Creek Parkway, Suite 530
Houston, Texas  77068

By:  Chad Dunn, Esquire

(281) 580-6310
chad@brazilanddunn.com

ALSO PRESENT:
Mr. David Edmonson
Mr. Brandon Dudley

REPORTED BY:

Ms. Edith A. Boggs

## 5

EXAMINATION INDEX

QUESTIONS BY                          PAGE

Mr. Sweeten                    6


INDEX OF EXHIBITS

NO.   MARKED      DESCRIPTION

1    18      Exhibit 7 - Declaration

2    31      List of Senators who have waived
legislative privilege

3    78      Transcript of excerpt of Committee
of the Whole Senate, Tuesday, January 25, 2011

4    96      Committee of the Whole Senate on
Redistricting, Ethics and Elections, Tuesday, April 13,
1993

5    96      Committee of the Whole Senate on
Redistricting, Ethics and Elections, Tuesday, April 13,
1993, excerpt of Ratliff Personal Privilege/Ellis
Response

6    96      SR 521 Senate Committee Report -
Bill Text

7    112     Senate Journal - Monday, May 9,
2011

## 6

SENATOR RODNEY ELLIS
was called as a witness and, being first duly sworn by
the notary, testified as follows:

EXAMINATION

Q.  (BY MR. SWEETEN)  Mr. Ellis, my name is Patrick
Sweeten.  I'm an attorney with the Texas Attorney
General's Office, and I'm going to be asking you a
series of questions today.

First of all, you've had your deposition taken
before today?

A.  Yes.  That's correct.

Q.  And you're an attorney also?

A.  That's right.

Q.  I assume you've taken depositions?

A.  Well, I've come close.

Q.  Well, let me give you a few ground rules that I'd
like us to follow today to make sure we're
communicating.

First is I'm going to be asking you questions
today.  If at any time you do not understand a question
that I'm asking you, just ask me to rephrase it, and I'm
glad to do that.

Otherwise, if you answer the question, then I'll
assume that you understood the question that was posed
to you.  Is that fair?

## 7

A.  That's fair.

Q.  Okay.  Also, she can't take down nods of the
head, uh-huhs or huh-uhs.  So, we have to answer
verbally.

Another thing is we don't want to talk over each
other because when we read the transcript at a later
time, it will be difficult for us to understand what we
were saying.  So, if you would let me finish my
question, I will endeavor to let you finish your answer,
and then we can have a clean record of this discussion

Also, if any answers that you give today --
you're under oath, obviously, and there are rules with
respect to perjury.  And so, I just want to make sure
you understand that.

This is a legal proceeding.  You're aware of
that, correct?

A.  That's correct.

Q.  Okay.  I want to start with a little bit of
background about you.  First is I'd like to know how
long have you been a Senator?

A.  22 years.

Q.  Okay.  And you started back -- I guess if I do
the math, it would be 1990?

A.  That is correct.

Q.  And I think you -- you're in Senator District 13;

## 8

is that correct?

A.  That's correct.

Q.  And you've at all times served for Senate
District 13 as a Senator?

A.  Yes.

Q.  Your predecessor was -- who was your predecessor?
Craig Washington?

A.  That's correct.

Q.  You've at all times been a Democrat in the
Senate?

A.  That's correct.

Q.  And your district covers -- and we're sitting in
your district today.  We're in your campaign offices.
And it covers a large portion of Houston, correct?

A.  You are in the Senate Office.  And I do take in
downtown and the Medical Center, most of the
universities.

Q.  And can you give me sort of a breakdown of sort
of the ethnic breakdown of your Senate District, sir?

A.  It is predominantly a minority district, African
Americans, Hispanics, Asian Americans and white
population of Houston as well.  About 700,000 people.

Q.  About what is the breakdown, if you can do so, if
you know?

A.  I think it's about 40 percent African American

9

1  and about 30 percent Hispanic and probably about 7, 8
2  percent, maybe close to 10 percent Asian American.
3      Q.   Now, you're represented here today for purposes
4  of this deposition; is that correct?
5      A.   That is correct.
6      Q.   And who is your attorney in this case?
7      A.   Chad Dunn and Jerry Hebert.
8      Q.   And when did you -- when did they start
9  representing you in this case?
10     A.   I don't know exactly when --
11     Q.   Okay.
12     A.   -- but whenever the issue was becoming ripe.
13     Q.   Okay.
14     A.   I'm sure I called them pretty quickly.
15     Q.   Before you contacted counsel, had you had
16  discussions with the Department of Justice in this case?
17     A.   You'd have to check the record to get the exact
18  date but I suspect that I -- I'd have to look at my
19  notes here but I wrote to the Department of Justice, and
20  I suspect I wrote to them -- it would be in the record
21  somewhere -- even before I spoke to them about
22  representing me.  I'd have to check the exact date but I
23  would assume around the time that -- let's see.  My
24  first letter was January 23rd of 2012.
25     Q.   Okay.  You say your first letter, your first

10

1  letter to whom?
2      A.   DOJ.
3      Q.   So, are you saying your first contact with the
4  Department of Justice was January of 2012?
5          MR. DUNN:  Are you talking about photo ID,
6  redistricting or any context?
7          MR. SWEETEN:  That's a good question.
8      Q.   (BY MR. SWEETEN)  First of all, you had
9  involvement in the redistricting litigation?
10     A.   That's correct.
11     Q.   You testified in that litigation?
12     A.   That's correct.
13     Q.   When you did first speak with the Department of
14  Justice about Senate Bill 14 or the issue of voter
15  identification?
16     A.   It would be a shear guess on my part.  It's so
17  easy to check.  So, I suggest you go and check but I
18  deal with the Department of Justice on a regular basis.
19         As it relates to this bill for this past session,
20  according to my notes -- but the letter will be public.
21  The first letter that I see, according to my notes, was
22  January 23rd.  I don't think that I did one before then
23  but I suspect that I wanted them to watch throughout the
24  process on it.
25         So, we just -- and I'd be more than happy to

11

1  check my files and see when the earliest letter is I can
2  find.
3      Q.   And when you wrote them, give me an idea of the
4  subject of the correspondence.
5      A.   I'm concerned about whether or not the
6  legislation would have a disparate impact on people of
7  color in Texas.
8      Q.   When you wrote them -- and you've got a copy of
9  that letter; is that right?
10     A.   I do.
11     Q.   Okay.  When you wrote them, did you express only
12  the issue of disparate impact or did you discuss the
13  issue of whether or not the legislation had a
14  discriminatory purpose?
15     A.   Probably both but the easiest thing to do,
16  obviously, would be go look at it.
17     Q.   Do you have that here?  Can you produce the
18  letter?
19     A.   I don't have it here.
20     Q.   So, your first contact with the Department of
21  Justice in this case regarding Senate Bill 14 or voter
22  identification came in a correspondence in January of
23  2012?
24     A.   Patrick, just because we're on the record, I want
25  to make sure I'm clear on it.  If I called, there may be

12

1  some record of it, I don't know, but I knew that I would
2  end up having to go to the Department of Justice to ask
3  them to pay very close attention to what we do in Texas.
4         So, I'm just suggesting instead of me guessing,
5  understand how the process works, the letter will lay it
6  out pretty clearly but I didn't go review it before this
7  meeting, you know.
8      Q.   Okay.  Well, then let me just make sure I'm
9  clear.  The letter would tell us when you first
10  contacted the Department of Justice regarding voter
11  identification?
12     A.   The letter would tell you the first time I
13  contacted the Department of Justice in writing and it
14  may make reference to if I had ever called.
15     Q.   Okay.
16     A.   I suspect that I may have called them as well but
17  I just wouldn't have a record or recollection of when
18  the first time was when I made contact.
19         I'm sure that shortly after the new
20  administration went in, I went and visited with the
21  Justice Department on a host of issues, as I did with
22  the previous Justice Department under the previous
23  administration.
24     Q.   Who in the Department of Justice have you
25  discussed the issue of voter ID with?

## 13

1     A.  Civil Rights Division.
2     Q.  Who specifically?
3     A.  I don't remember.
4     Q.  Jennifer Maranzano is on the phone.  Have you
5  ever talked to her?
6     A.  I have.
7     Q.  Have you talked to Elizabeth Westfall?
8     A.  I just don't know.
9     Q.  Are there more than one DOJ attorneys you've
10  spoken with?
11     A.  I suspect.  Patrick, I'm willing to bet next week
12  I won't remember your name.
13     Q.  Okay.  After January of 2012, I want to talk
14  about your additional contact with the Department of
15  Justice.  Now, we have a declaration you've provided and
16  it's been filed and, obviously, you discussed that issue
17  with the Department of Justice, correct?
18     A.  That's correct.
19     Q.  Can you give me an idea of the frequency with
20  which you've talked to the attorneys at the Department
21  of Justice from January until the present?
22     A.  I would have no idea.  I would assume that they
23  make keep a record of it.  I don't.  I'd have to go
24  check phone logs but I am someone who relies on the
25  Department of Justice to give us checks and balances.

## 14

1     Q.  Okay.  So, now earlier you said you've been
2  deposed, correct?
3     A.  That's correct.
4     Q.  I want to ask you in what proceedings have you
5  been deposed, sir?
6     A.  I have been deposed with regard to redistricting,
7  probably most instances in which it has come up since
8  I've been in the Senate and back when I was on City
9  Council as well.
10     I think I've been deposed on some issues
11  involving criminal justice matters, you know, people who
12  have been wrongfully convicted.
13     So, I assume your question is when have I been
14  deposed in general every time in my life?
15     Q.  Let's start with how many times, do you know?
16     A.  I have no idea.
17     Q.  Would you say it's over ten, under ten?
18     A.  Probably around about ten.
19     Q.  And you've told me issues related to criminal
20  justice, redistricting.  Any other issues?
21     A.  I'd have to scratch my head and ponder over that
22  for a while.
23     Q.  Okay.  Now, the issues of criminal justice, did
24  you testify in a specific case involving a defendant or
25  was it a civil -- I mean, it, obviously, was a civil

## 15

1  case if it was a deposition.
2     A.  I've been deposed, I think, on the issue of
3  whether or not they ought to pay taxes as a result of
4  legislation I've worked on to give people who have been
5  wrongfully convicted compensation.
6     I think I've been deposed on one case involving
7  somebody was suing The Innocence Project out in New
8  York.
9     Q.  Okay.  And then the redistricting, there was
10  certainly -- there was a recent redistricting case.
11  You've eluded to other redistricting cases that you've
12  been involved in.  Can you tell me approximately when
13  those occurred?
14     A.  This last cycle on the Texas redistricting,
15  congressional redistricting in -- well, Texas
16  reredistricting in either '03 or '05, whenever we did
17  the mid decade redistricting.  I can recall going to
18  federal court and being deposed before that.
19     When I think about it, I've been deposed on a
20  case where somebody was suing the University of Texas
21  Law School Foundation.
22     Q.  Can you tell me about that case?
23     A.  Which one?
24     Q.  The suing of the UT Law School Foundation.  What
25  was the basis of that claim?

## 16

1     A.  That was a professor suing Joe Jamail, saying
2  that he thought that we should -- the Law School
3  Foundation should have funded a second mortgage on his
4  home or either a mortgage on a second home.
5     Q.  And you sued on behalf of -- I mean, you were
6  deposed -- you were a witness on behalf of the UT Law
7  School Foundation; is that correct?
8     A.  I was probably a witness on behalf of Joe Jamail.
9     Q.  Okay.
10     A.  A character witness for him.
11     Q.  Okay.
12     A.  But you would have to go check.  Just go check
13  and see if I was there on behalf of the Foundation or as
14  a character witness for Jamail.
15     Q.  Where do you live?
16     A.  2102 Sunset.
17     Q.  And who lives at your home?  Can you tell me the
18  names of the individual that live at your home?
19     A.  Well, the ones I know about would be my wife,
20  Licia Green, and Maria Hill, Nicole Ellis sometimes,
21  Rodney Leeland Ellis and Alena Ellis on a regular basis.
22     Q.  All right.  And I want to ask about each them as
23  to whether they have -- first, if you can give me their
24  age, and then I'm going to ask you a question about some
25  of their identification is the purpose of this question.

Senator Rodney Ellis - Volume 1                    June 22, 2012

17

1        Licia Green, that's your wife?
2     A. Yes.
3     Q. Does she have a driver's license?
4     A. She does.
5     Q. Maria Hill, how old is she?
6     A. 18.
7     Q. Does she have a driver's license?
8     A. She does.
9     Q. Nicole Ellis?
10    A. 24.
11    Q. And does she have a driver's license?
12    A. She does.
13    Q. Rodney Ellis -- is it junior?
14    A. No.
15    Q. I'm sorry?
16    A. No, he's not a junior.
17    Q. How old is he?
18    A. 13.
19    Q. Okay.
20    A. No driver's license.
21    Q. And he's not registered to vote either?
22    A. Alena is 9.  No driver's license.
23    Q. Neither is she registered to vote?
24    A. No.
25    Q. Okay.  Let's talk about the declaration that you

18

1     filed in this case.
2        MR. SWEETEN:  And I'm going to go ahead and
3     have the court reporter mark this as Ellis Deposition
4     Exhibit 1.
5        (Exhibit 1 marked.)
6     Q. (BY MR. SWEETEN)  Okay.  I'm going to have you
7     look at the official copy.  And can you identify what
8     Ellis Exhibit 1 is for me?
9     A. This is my declaration.
10    Q. And I want to ask you about the process of
11    creating this.  First of all, if you'll look at the very
12    back, this declaration is dated 4-9-12.  So, April 9,
13    2012.  Did you sign this document?
14    A. That is correct.
15    Q. When you signed this document, were you aware it
16    was going to be filed with the Federal Court in the
17    District of Columbia?
18    A. Yes.
19    Q. When were you first contacted about providing a
20    declaration as you have in this case?
21    A. I have no idea.
22    Q. Okay.  I want to ask you who wrote this
23    declaration for you?
24    A. I'm not sure but I assume I worked on it, my
25    staff and I hope that Chad Dunn here.

19

1     Q. Okay.  So, are you indicating that the Department
2     of Justice did not assist you in drafting this
3     declaration?
4     A. That's correct.
5     Q. And when I'm asking you whether they assisted
6     you, I'm asking did they write any of the language
7     within this document?
8     A. Not to my knowledge.
9     Q. Okay.  Did they -- did they coordinate the filing
10    of this document?
11    A. Not to my knowledge.  You know, I know them.  I'm
12    close to them but I'm not that close.
13    Q. Okay.  And it wouldn't -- and, in fact, would it
14    have been an issue for you if the Department of Justice
15    had actually drafted this and sent this to you for your
16    signature?
17    A. If it was correct, it wouldn't have been an
18    issue.  If it was not correct, it would have been an
19    issue.
20    Q. Okay.  But in any event, that's not the case that
21    the --
22    A. It's not the case.
23    Q. Let me finish -- that the Department of Justice
24    did not draft this affidavit and did not send it to you
25    ultimately for your signature; is that correct?

20

1     A. That's correct.
2     Q. Did you discuss the contents of this document
3     before you executed it on April 9th, 2012?
4     A. With who?
5     Q. With the Department of Justice.
6     A. No.
7     Q. Okay.  So, without any discussions with the
8     Department of Justice, without them providing any sort
9     of input whatsoever in this declaration, you signed this
10    declaration; is that correct?
11    A. I may have talked to the Department of Justice.
12    There's a distinction between the Department of Justice
13    writing something for me and me raising concerns with
14    the Justice Department and some of the language and
15    concerns that I raised would end up in a document.
16    Q. But they couldn't have ended up in a document
17    from the Department of Justice if the Department of
18    Justice didn't draft it, right?
19    A. Let me make sure I understand your question.
20    Would you repeat it again?
21    Q. Yes.  In fact, let me just ask it again.
22       You indicated the Department of Justice didn't
23    write this?
24    A. That's correct.
25    Q. You indicated -- and I'm not sure what your

Senator Rodney Ellis - Volume 1                    June 22, 2012

## 21

1  testimony is on this but did you discuss the contents of
2  this affidavit with the Department of Justice prior to
3  executing it?
4      A. Not to my knowledge in terms of details of what
5  is in it but if I had discussions with the Department of
6  Justice about my concerns, whether or not some of the
7  concerns I raised or any questions that the Department
8  of Justice would have asked me would have ended up in
9  this affidavit would be a different issue.
10     Q. So, you're saying the only extent to which
11 anything -- any input from the Department of Justice
12 would have had input into this document would have been
13 if it resulted from a conversation that you had with
14 them and you put it in here; is that correct?
15     A. What I'm saying is from the tone of your
16 question, if you are trying to figure out if the
17 Department of Justice coached me, my answer is no.
18     Q. Okay.
19     A. If your concern is whether or not I went to the
20 Justice Department and asked are these valid concerns,
21 yes.
22     Q. Okay.
23     A. You know, I'm familiar enough with the law to
24 know when something appears incorrect to me. So, I,
25 clearly, went to the Justice Department both verbally

## 22

1  with previous letters that I sent and in person and
2  said, "This is what I think is going on in Texas. I
3  have concerns about this. Is it your understanding of
4  the law that these are legitimate concerns?"
5      Q. But that wasn't in the context of this document,
6  you didn't send them a draft of this document before you
7  signed it?
8      A. No.
9      Q. No one on your staff sent this to the Department
10 of Justice before you signed it?
11     A. Not to my knowledge.
12     Q. Okay. They did not give you input into this
13 specific document as you were drafting it?
14     A. The only input that I would have gotten would
15 have been me asking them are these valid concerns, not
16 them coaching me to say you raise these concerns.
17     Q. Okay. So, the process of drafting this
18 internally then, did a member of your staff draft this
19 or did Mr. Dunn draft this document?
20     A. You know, I don't -- in terms of the actual
21 drafting of it, I don't know if it was a person on my
22 staff or if it was my lawyer, Mr. Dunn.
23     Q. Did you dictate it? Did you write it on a piece
24 of paper to be typed?
25     A. I probably dictated it.

## 23

1      Q. Okay. Do you use audio dictation or do you do --
2      A. I usually just sort of blurt it out.
3      Q. You tell them what you want in it?
4      A. Yeah.
5      Q. And it was put in by someone from your
6  legislative staff; is that right?
7      A. And my lawyer.
8      Q. So, let's look at it. And by the way, when you
9  signed this, you understood that this was going to be
10 filed with the Federal Court in the District of
11 Columbia, correct?
12     A. That's correct.
13     Q. In paragraph 1, it says, "My name is Rodney
14 Ellis. I am a resident of Houston, Texas and registered
15 to vote in Harris County, Texas. I am African
16 American." Who added -- why did you decide to put that
17 you are African American in paragraph 1?
18     A. Well, it's something I'm pretty proud of.
19     Q. Okay.
20     A. I assume that the Court may not be able to guess
21 it. So, I wanted to make sure that they were aware of
22 it.
23     Q. Okay.
24     A. But you would be surprised that oftentimes even
25 when someone is looking at me, if I'm giving a speech, I

## 24

1  might point out I'm African American. It's something
2  I'm proud of.
3      Q. And did you think that that was relevant to the
4  matters that we're discussing today, voter ID?
5      A. I think that the fact that I'm African American
6  and representing an overwhelmingly, maybe 90 percent,
7  close to 90 percent minority district now, I thought
8  that that would be relevant to the Court or anyone
9  reading this document.
10     Q. Okay. Well, let's go ahead and keep going
11 through the document. Here on paragraph 3 -- and
12 paragraph 2 talks about your service on the Texas Senate
13 and the committees on which you've served, correct?
14     A. That's correct.
15     Q. All right. Number 3 says, "In 2005,
16 Representative Mary Denny, who is white, introduced HB
17 1706, a bill to require photo identification for
18 voting." First of all, in that, is House Bill 1706 the
19 first voter identification bill that you are aware of
20 being filed with either the House or the Senate at any
21 time?
22     A. It's the first one that I remember.
23     Q. Okay. Now, who is Mary Denny?
24     A. State Representative.
25     Q. Okay. And where is she out of?

## 25

1    A. Somewhere in Central Texas, I think.
2    Q. Okay. Here you put, "who is white," in the
3  affidavit. Why did you think that was an important
4  point to put in paragraph 3, Senator Ellis?
5    A. I wanted the Court to know when they were reading
6  this that clearly the issue of race was at issue,
7  involved in the voter ID battle in Texas.
8    Q. And we see that several other times. In
9  paragraph 4 you say Betty Brown is white. In paragraph
10  6, you say Troy Fraser is white. Is that the same
11  reason that on each one of these that when you're
12  discussing proponents of the bill that you're saying
13  what their race is, that you think that that's --
14  explain to me why you did that.
15    A. I wanted the Court to know that the leaders in
16  the Legislature who are African American and Hispanic
17  and those who are white were clearly in different camps
18  on this issue, with the hope that it would lead them to
19  ask the question why.
20    Q. Okay. Let me just advance to 2011 then and the
21  vote on Senate Bill 14 in the House of Representatives.
22  Are you aware of whether there were Hispanic or African
23  American Legislators who voted in favor of Senate Bill
24  14?
25    A. If there were, there were none in the Senate but

## 26

1  if there were some in the House, I would suspect that
2  they were the ones who did not represent the interests
3  of those African American or Hispanic voters in their
4  districts.
5    Q. So, if a Latino or African American voted for
6  Senate Bill 14 in either the House or the Senate, you're
7  indicating it's your opinion that they weren't
8  representing their constituents who are black or Latino?
9    A. Yes, just as there were black people who
10  supported the South in the Civil War. Sometimes it's
11  possible for people of different races to be on the
12  wrong side of an issue, in my humble opinion.
13    Q. Okay. So, if anyone voted for Senate Bill 14
14  that is African American or Hispanic, they weren't, in
15  your view, representing their African American or
16  Hispanic constituents?
17    A. In my opinion, that is correct.
18    Q. And that's just what it is, is your opinion,
19  correct?
20    A. Well, it's my opinion based on the data that I
21  have seen and my belief that the voter ID requirements
22  have a disproportionate impact on people of color.
23    Q. Okay.
24    A. On African Americans and Hispanics.
25    Q. Okay. We'll get into that.

## 27

1    A. They have a disproportionate impact on other
2  groups as well but particularly on those groups.
3    Q. Okay. Were you told -- let's go back to the
4  affidavit. Were you told why this affidavit needed to
5  be filed with the District Court?
6    MR. DUNN: Don't get into any discussions
7  you had with me or Mr. Hebert but to the extent you
8  talked to the Department of Justice or somebody who is
9  not your lawyers, you can reveal those.
10    A. My assumption was that I needed to file an
11  affidavit because I wanted my voice to be heard on this
12  important issue. I didn't want to have others speaking
13  for me, particularly the State of Texas.
14    Q. (BY MR. SWEETEN) Okay. All right. Let's go
15  back to paragraph 3. And in that, you're talking about
16  House Bill 1706. Can you tell me about the specific
17  provisions of House Bill 1706 based upon your
18  recollection?
19    A. Well, based on my recollection of the voter ID
20  bill, it started off the first time that a bill was put
21  in, I think in 2005 -- 1706, that's so far back, in
22  2005, you know, I would say that her language that first
23  session was probably -- I'm just guessing. I've have to
24  go back and look at it. I haven't seen it since 2006, I
25  assume. I assume it was not as onerous as the final

## 28

1  bill ended up being. My sense is that this bill has
2  gotten harsher or had more of a disparate impact on
3  minority groups over time.
4    Q. As you're sitting here, can you tell me what
5  forms of photo identification would have been acceptable
6  under 1706?
7    A. I don't remember. I could pull the bill.
8    Q. I think what I'm hearing from your testimony is
9  that the photo identification requirements from 2005 and
10  as they were introduced, you said were more onerous; is
11  that correct?
12    A. Well, yeah, the bill got more onerous over time.
13    Q. Okay.
14    A. Which is just an interesting side point. Usually
15  bills, as you go through the process to gain consensus,
16  you compromise a bit. In the case of this bill, it
17  ended up -- from someone else's perspective, I guess
18  they would say it got stronger. From my perspective, I
19  would say it became more onerous.
20    Q. I understand that you can't testify as to the
21  specifics of the bill as you're sitting here but let me
22  ask you did you pose Senate Bill 1706 as filed in 2005?
23    A. I'm pretty sure I did. I don't think that we had
24  a vote on the Senate floor. According to this
25  affidavit, it was referred to the Senate State Affairs

## 29

1   Committee.  The committee did not hold a hearing on it
2   or vote it out.
3       Q.  But your position, nonetheless, in 2005 was you
4   were not in support of House Bill 1706?
5       A.  I assume that that was one of the reasons why
6   they opted not to have a vote in the committee.  I was
7   sitting on the State Affairs Committee in 2005.
8       Q.  Let's go to paragraph 4.
9       And by the way, any other facts you can tell us
10  about House Bill 1706 that you haven't discussed?
11      A.  Not off the top of my head.  I would have to pull
12  the bill and look at it.
13      Q.  Okay.  Now, you mentioned Mary Denny.  Is there
14  any evidence based on the public record that you have
15  that Ms. Denny had any sort of purposeful discriminatory
16  intent?
17      A.  I know that the bill would have had a disparate
18  impact on people of color.  I'm aware of the movement
19  around the country to try to reduce minority voting
20  strength, in Texas and in other states, and I'm assuming
21  that Mary Denny got the bill from ALEC or some other far
22  right organization.
23      Q.  You don't know that, though?
24      A.  No, I don't.
25      Q.  That's an assumption, you don't have any facts to

## 30

1   support that?
2       A.  No.
3       Q.  Okay.  I guess before we go too much farther into
4   this, I want to discuss the issue of legislative
5   privilege with you.  First of all, you have waived your
6   legislative privilege, is that correct, in this case?
7       A.  I have waived it when I want it waived, which I
8   suspect is more than some of my colleagues have done.
9       Q.  Okay.  Well, is there anything you are reserving
10  your legislative privilege as to the issues that we're
11  discussing today?
12      A.  Depends on what you ask.  So far I haven't used
13  it but if you ask something that I don't care to answer,
14  I'll use it.
15      Q.  Are you going to assert legislative privilege
16  with respect to Senate Bill 14 in any way?
17      A.  Depends on what the question is.
18      Q.  Okay.
19      A.  I don't plan to give you a -- I don't plan to
20  just give you carte blanche on anything you want to ask
21  unless all of my colleagues decide to do that.
22      Q.  So, am I to understand you are in some ways
23  asserting the legislative privilege today?
24      A.  If I think I need it.
25      Q.  Okay.  Can you give me any more guidance as to

## 31

1   when you -- let me ask you this:  Are you going to
2   reveal communications between you and other legislative
3   staff?
4       A.  Depends on which ones you ask for.
5       Q.  Are you going to reveal your communications with
6   other Senators?
7       A.  Depends on which ones you ask for.
8       Q.  Which ones are you going to reveal?
9       A.  I wouldn't know until you ask.
10      Q.  Are you going to assert privilege with respect to
11  your thoughts and impressions of Senate Bill 14?
12      A.  Depends on which ones you ask for.
13      Q.  Okay.  Now, let me also tell you that a number of
14  individuals in this case have asserted legislative
15  privilege with respect to this case.
16      A.  I've heard that.
17      Q.  Okay.
18      A.  Which ones, while you're thinking about it?
19      MR. SWEETEN:  Let's go ahead and mark this
20  as Ellis 2.
21      (Exhibit 2 marked.)
22      Q.  (BY MR. SWEETEN)  All right.  I'm handing you
23  what's been marked as Exhibit 2.  And these are
24  individuals who have waived their legislative privilege.
25  But as I understand it today, Senator Ellis, you are

## 32

1   indicating, certainly for the first time to my
2   knowledge, that you may, in some instances, invoke the
3   legislative privilege as to some questions; is that
4   correct?
5       A.  I'm contemplating that based on looking at your
6   Exhibit 2.  It looks like most of these are members --
7       Q.  I understand these individuals have not asserted
8   legislative privilege, what I've handed you.
9       A.  Okay.  So, I'll have to think about it because it
10  looks like most of these are members who represent
11  predominantly minority districts other than
12  Ms. Harper-Brown.
13      Q.  Do you need to talk with your attorney as to
14  whether you are going to be invoking legislative
15  privilege?
16      MR. DUNN:  I think it's his privilege.  I
17  mean, obviously, if it gets into attorney/client
18  privilege, we may choose to confer and depending on the
19  question, we may choose to confer but I don't think he's
20  committed to invoking privilege.  He's more or less
21  going to waive it but he's reserving the right to do so.
22      A.  I'm a nice guy.  Depends on what you ask.
23      Q.  (BY MR. SWEETEN)  Okay.  So, this is -- and
24  you're indicating that in some instances, you may assert
25  and some instances, you may not; is that correct?

## 33

1      A.  I'm indicating that I'm going to reserve the
2  right based on what you ask me and respectfully, of
3  course, how much of my time you take today.
4      Q.  Okay.
5      A.  I may be in a mood to answer more tomorrow or
6  later on this evening.
7      Q.  Okay.  So, the purpose of me showing you this is
8  to tell you that these individuals have waived.  So, to
9  the extent you, yourself are not asserting legislative
10  privilege, you're free to reveal any communications with
11  these individuals.
12      A.  Okay.
13      Q.  If an individual does not appear on that list,
14  then I don't want -- I'm going to be asking you
15  questions about whether you've had conversations with
16  them but I don't want you to reveal the substance of
17  those communications with them.
18          MR. DUNN:  Well, we object to that.
19          Senator, if you're asked a question and
20  responsive to that is a communication with any other
21  member of the Legislature, you can reveal it, and it
22  will be up to the Court whether it wants to consider it
23  under the privilege.
24          But if your question asks for information,
25  by instructing him not to reveal communications with

## 34

1  other Senators or members, it creates an inaccurate
2  record.
3      Q.  (BY MR. SWEETEN)  Okay.  Well, let me put it this
4  way:  My question, when I'm asking it, is not intended
5  to find the substance of those communications with those
6  who have claimed the legislative privilege.  If your
7  attorney is instructing you to go ahead and provide
8  those, that is not the purpose of my question is to ask
9  that.
10      I do want you to identify the specific
11  individuals with whom you had conversations but not the
12  substance if someone has claimed legislative privilege.
13  Is that -- is what I'm saying clear to you?
14          MR. DUNN:  So, we have the stipulation that
15  none of your questions today are intended to elicit
16  testimony of his communications with members other than
17  those on Exhibit 2, and with that stipulation, he'll
18  only talk about his communications with those on
19  Exhibit 2.
20          MR. SWEETEN:  Well, I want to be clear on
21  that because I do -- I am asking, for example, if he's
22  had a communication with someone, I want him to reveal
23  privilege log stuff, who he had the communication with,
24  when, the means of the communication I may be asking.
25      Q.  (BY MR. SWEETEN)  So, I want you to identify that

## 35

1  a conversation occurred with someone who has asserted
2  legislative privilege.  I do not want you to -- my
3  question should not be interpreted to ask you the
4  substance of those communications with those who have
5  claimed the privilege.  Is that clear?
6      A.  Yes, it's clear.  It's partially why I'm going to
7  reserve the right to exert mine because it sounds like
8  you're saying you want to know about any conversations
9  I've had with anybody on this list --
10      Q.  Yes.
11      A.  -- but you don't want to know -- you don't want
12  me to testify about any conversations I've had with
13  people who are not on this list.
14      Q.  I want you to testify if such a conversation
15  occurred but the legislative privilege is each
16  Legislator's to hold.  And so, I'm not -- the intention
17  of my question is to not invade that privilege.  So,
18  that's what I'm instructing you.
19      A.  Well, why don't we just try and see what happens.
20      Q.  Okay.  That's fine.  And if -- we'll just go
21  question by question, and if you have a question as to
22  whether I'm asking about those types of conversations,
23  will you ask me to clarify if it includes that?
24      A.  I will.
25      Q.  Okay.  All right.  So, let's talk about Mary

## 36

1  Denny.  Do you have any evidence that Ms. Denny, in
2  introducing House Bill 1706, intended the bill to
3  purposely discriminate against racial minorities or
4  anyone else?
5      A.  I would have had very limited, if any, contact
6  with Representative Denny on this bill in 2005 since it
7  was not voted on in Senate Committee or on the Senate
8  floor.
9      Q.  Just so I'm clear, House Bill 1706, it was back
10  in '05 and we've talked about that you don't
11  specifically recall what it provided for, nonetheless,
12  it's your testimony that other than what was in the text
13  of the bill, that there's not any sort of evidence of
14  purposeful discrimination on behalf of Representative
15  Denny in introducing 1706; is that correct?
16          MR. DUNN:  Object to the compound.
17          But you can answer.
18      A.  I'm saying I have no idea.  I never had a
19  conversation with her about this bill.
20      Q.  (BY MR. SWEETEN)  You've never talked with her
21  about the bill.  Is there any evidence whatsoever, other
22  than the text of the bill, that you have that you
23  believe references Ms. Denny having a discriminatory
24  purpose in filing the bill?
25      A.  There's none that I have.

Senator Rodney Ellis - Volume 1                         June 22, 2012

## 37

1   Q.  Okay.  And let's talk then about paragraph 4.  In
2   2007, you say Representative Betty Brown, who is white,
3   introduced another --
4   A.  Which paragraph?
5   Q.  4.
6   A.  Okay.
7   Q.  "In 2007, Representative Betty Brown, who is
8   white, introduced another photo identification bill,
9   House Bill 218."  Did I read that correctly?
10  A.  That's correct.
11  Q.  Do you recall specifically House Bill 218 and its
12  provisions relating to photo identification?
13  A.  I don't know all the details but I assume it was
14  along the same lines of the legislation, maybe not quite
15  as strong or as onerous as the legislation ended up
16  passing in 2011 but it was an early version of the voter
17  ID bill.
18  Q.  That's been five years ago, so, I imagine if I
19  asked you what the specific provisions of the text are,
20  you don't know?
21  A.  No.  What I would generally do to make sure I get
22  them right, particularly in a deposition, would be pull
23  it and look at it.
24  Q.  Okay.  But -- and that's fair but I'm asking you
25  just do you personally know as you're sitting here what

## 38

1   the text of the bill said, the provisions of it?
2   A.  No.
3   Q.  And let me also ask you is there any evidence
4   that you have other than the text of the bill that
5   indicates that House Bill 218 was presented with a
6   discriminatory purpose by Ms. Brown?
7   A.  Nothing that I can -- that I can quantify.
8   Q.  Okay.  There's no evidence -- by the way, have
9   you had communications with Ms. Brown?
10  A.  About her specific bill?
11  Q.  Yes.
12  A.  I don't recall.  Most of my conversations would
13  have been with members of the Senate.
14  Q.  You don't recall any specific conversations you
15  had with Betty Brown?
16  A.  No.
17  Q.  Okay.  You didn't discuss this specific bill with
18  her?
19  A.  No.
20  Q.  Are you aware of any sort of evidence that you
21  believe evidences that Betty Brown had an intention to
22  purposefully discriminate against someone when she filed
23  House Bill 218 other than the text of the bill, which I
24  think you think is discriminatory?
25  A.  Well, the only evidence that I would have in

## 39

1   addition to the text of the bill would be knowing the
2   statistics or the lack of statistics on the number of
3   African Americans and Hispanics in Texas who don't have
4   a driver's license or a government ID.
5   Q.  Okay.  And do you know those statistics?
6   A.  I don't know the exact numbers.  I knew them in
7   debate and probably said it on the floor of the Senate
8   but if you're asking me the exact percentage, I don't
9   know.  I could pull them.
10  But I do know that a higher percentage of African
11  Americans and Hispanics do not have a government ID
12  compared to the number of whites that do.
13  Q.  In three or four answers today now, you've
14  testified about the discriminatory effect of the bill
15  and, obviously, I'm here to find out what your testimony
16  is on this.  This affidavit is centered on the
17  discriminatory purpose of the bill.  Is it a fair
18  characterization for you to say that it is Senator
19  Rodney Ellis' opinion that it is -- that this bill has a
20  discriminatory effect?
21  A.  Yes.
22  Q.  Is it your opinion as you're sitting here that
23  this bill, Senate Bill 14, has a discriminatory purpose?
24  A.  Yes.
25  Q.  Okay.  We're going to talk about why you think

## 40

1   this has a discriminatory purpose.
2   A.  Would you like to do that now?
3   Q.  I will but I'll do it in the order that I think
4   will make sense.
5   A.  Okay.
6   Q.  And then we can talk about your opinions with
7   respect to the discriminatory effect of it.  So, we will
8   get back to that and evidence that you believe shows
9   that.
10  So, as we're going through, you indicate on House
11  Bill 218 the Senate did not pass this bill because
12  proponents of the legislation were unable to garner the
13  support of two-thirds of the Senate, as is most commonly
14  required to pass legislation in the Senate.  So, did
15  House Bill 218 pass the House?
16  A.  Well, for it to have gotten to the Senate, it had
17  to have passed the House.
18  Q.  And did the Senate take this matter -- was it
19  assigned to a committee in the Senate?
20  A.  In order for it to get to the floor, under normal
21  procedures, it would have had to.
22  Q.  Okay.
23  A.  So, in that session, I don't think we did any
24  Committee of the Whole and no tricks were played.
25  Q.  Okay.

41

1     A.  So, I assume it came through the State Affairs
2   Committee or some committee to get to the floor.
3     Q.  And is it your testimony that -- was there an up
4   or down vote on House Bill 218?
5     A.  There was not an up or down vote.  That's what
6   the affidavit says, that the Senate did not pass the
7   bill because proponents of the legislation were unable
8   to garner the support of two-thirds of the Senate, as is
9   the case most commonly required in the Texas Senate.
10    Q.  So, are you indicating that House Bill 218 did
11  not pass due to -- was it the presence of a blocker
12  bill?
13    A.  It didn't pass because they didn't get two-thirds
14  of the vote.  I'm sure you're aware the tradition in the
15  Texas Senate is they have to have two-thirds vote to
16  bring a bill up and they usually use a blocker bill as a
17  way of preserving that tradition of a two-thirds vote.
18  So, I just want to make sure you don't -- I'm sure you
19  know that -- don't confuse the two issues.
20    Q.  Well, we'll talk about the two-thirds rule at a
21  later time but I'm asking you specifically from a
22  procedural standpoint.
23    You indicate here that it didn't garner
24  two-thirds vote from the Senate.  So, does that mean
25  that there was a blocker bill in front of this bill or

43

1   River.  It's a bill that would never pass.
2     Now, if somebody wanted to break the tradition,
3   just go move the blocker bill.  So, it's the tradition
4   that matters.  And the procedure which we normally use
5   to observe the tradition is called having a blocker bill
6   there.
7     Q.  It's a true statement, isn't it, that the Senate,
8   each time it meets, that they decide the rules which
9   they will operate under for each session?
10    A.  Arguably.
11    Q.  How is that not the case?
12    A.  The two-thirds tradition has been observed in the
13  Texas Senate for somewhere in the neighborhood of a
14  hundred years.  As is the case with most traditions, if
15  somebody is not paying attention to the rules, meaning
16  if it's not a controversial bill, maybe you wouldn't
17  observe it if it didn't come up.
18    My read of history is that in the Texas Senate,
19  the two-thirds tradition was broken during the session
20  of 1950 something when you had a bunch of awful stuff,
21  in order to pass a redistricting bill when we were
22  reredistricting in 2003, to pass this voter ID bill in
23  the last session and to pass the budget in the last
24  session.
25    Q.  Let's back up.

42

1   do you know why it would have required two-thirds in
2   this instance?
3     A.  I hope there was a blocker bill but during that
4   session, as it related to this bill -- and most bills,
5   we were recognizing the two-thirds tradition.  A blocker
6   bill sometimes is in the mind of the beholder.
7     Now, I'm not trying to cute but everybody assumed
8   there was a blocker bill in the last legislative session
9   but the budget came up without a two-thirds vote.  I
10  mean, that's inside a baseball, so to speak.
11    So, the assumption is -- you know, they didn't
12  have a two-thirds vote to bring the bill up.
13    Q.  But if there's no blocker bill, would they have
14  needed a two-thirds vote?
15    A.  No.  But, of course, if there had been no blocker
16  bill, no bill would have needed a two-thirds vote.  So,
17  when I say a blocker bill is in the mind of the
18  beholder, somebody could go move the blocker bill.  That
19  rule is based on a tradition, just as it is based on a
20  tradition in the United States Senate.
21    Q.  Are you saying the blocker bill is a tradition?
22    A.  The two-thirds vote is a tradition and the way
23  you normally observe the tradition is with a blocker
24  bill.  You put a bill up that the person who is carrying
25  it will never pass, like naming Red River the Blue

44

1     Do you know whether or not a blocker bill was in
2   place in 2007?
3     A.  I'm assuming there was one.
4     Q.  Okay.
5     A.  Because on most bills that came up, we had a
6   two-thirds vote.
7     Q.  Because if there's no blocker bill, there's no
8   two-thirds -- you don't have to have two-thirds to pass
9   it?
10    A.  That's correct.
11    Q.  You just pass it based on the regular order of
12  business?
13    A.  I'm not trying to argue semantics with you.  What
14  I'm saying is whatever the blocker bill is, you could go
15  past it.
16    Q.  Okay.
17    A.  You could have done that a hundred years ago and
18  there would have been no two-thirds vote.  So, the
19  notion of a blocker is a tradition or concept that was
20  put in place so you would have the so-called two-thirds
21  rule.
22    Q.  You call it a tradition but my question earlier
23  was does the Senate, each time it meets for each
24  legislative session, pass the rules under which it
25  intends to operate for that session?

## 45

1   A.  With a caveat, I'll say yes.
2   Q.  Well, first, is that yes, with a caveat?
3   A.  Possibly.  So, the answer is it's not a clear-cut
4   yes or no answer.  Every session that I've been there,
5   the Texas Senate has adopted essentially the same rules
6   that have always been in place, with the exception of
7   for this voter ID bill, they did a special order to get
8   around it, and we went into a special session on
9   redistricting in 2003.
10   Q.  My question is does each Senate have the
11   opportunity to adopt the rules under which they will
12   operate under before each legislative session?
13   A.  Yes.
14   MR. DUNN:  Objection.  Asked and answered.
15   A.  Yes, with my caveat.
16   Q.  (BY MR. SWEETEN)  If the Senate decides -- if the
17   Senate decides, prior to any legislative session or
18   during any legislative session, that they are going to
19   operate under just a straight majority vote, it is
20   within their power, as a body, to decide to do so?
21   A.  That's correct.
22   Q.  There's nothing illegal whatsoever about that?
23   A.  Nothing illegal about it.
24   Q.  Okay.  In 2007 -- actually, strike that.
25   Let's go to -- so, if I asked you in paragraph 4,

## 46

1   why did House Bill 218 not pass, you are indicating that
2   because of the two-thirds rule of the Senate?
3   A.  That's correct.
4   Q.  But as far as the specifics as to why it didn't
5   pass, whether it was because it was a blocker bill,
6   whether it didn't come up in the -- it was -- it didn't
7   come up in the regular order of business, you can't tell
8   me as you're sitting here other than we think it was
9   blocked by the two-thirds rule?
10   A.  I'm assuming we had a blocker bill.
11   Q.  All right.  So, those -- is there any other
12   evidence that you have that House Bill 218 was passed
13   with the purpose to discriminate other than the text of
14   the bill?
15   MR. DUNN:  It wasn't passed.  So, it
16   misstates the evidence.
17   Q.  (BY MR. SWEETEN)  I guess it passed the House.
18   Okay.  Then let's talk about do you have any evidence
19   whatsoever that House Bill 218 was introduced or passed
20   by the House with the purpose of discriminating other
21   than what the bill says?
22   A.  Yeah.
23   Q.  Okay.  What is it?
24   A.  I knew that it would have a disproportionate
25   impact on African Americans and Hispanics because I knew

## 47

1   then, as I know now, a larger percentage of African
2   Americans and Hispanics do not have a driver's license
3   or some other form of government ID.  That was the case
4   in 2005.  It was the case in 2007, '9, '11 and it's the
5   case today.
6   Q.  Okay.  Well, then let's talk about that.  You
7   said that you knew in 2007 that it would have a
8   disproportionate effect on blacks and Hispanics; is that
9   correct?
10   A.  That's correct.
11   Q.  How did you know that?
12   A.  I know that because my district is overwhelmingly
13   black and Hispanic, and I talk to people who tell me
14   that they don't have a driver's license.
15   I know that we've passed rules to take away
16   driver's licenses if you don't have -- if you have a
17   warrant, if you have a ticket, and most of the people
18   who call my office complaining about not being able to
19   pay their tickets and losing their licenses, I know that
20   most of them that I talk to -- I don't do a running tab
21   but I can oftentimes tell by the voices and the
22   neighborhoods that they live in whether they are African
23   American or Hispanic.
24   Q.  And that's fair.  I think what you're saying,
25   you're saying that you know because the constituents

## 48

1   you've talked to told you that, is that a fair
2   representation of how you know that?
3   A.  I know it because they've told me.  I know
4   because of press accounts about it.  I know because I
5   have looked at data from El Paso County, as an example,
6   that showed some high percentage -- I can't remember the
7   number off the top of my head from the press accounts or
8   report I had somebody pull on it -- a large percentage
9   of people in El Paso County didn't have driver's
10   licenses.  They were suspended because they got a ticket
11   because they passed legislation to balance the budget
12   with exorbitant fees for people who didn't put their
13   seatbelts on.
14   Q.  Let's back up.
15   Let's talk about constituents.  First of all,
16   part of your opinion in 2005 that you felt this would
17   have a disparate impact on minorities is based on what
18   you're saying some of your constituents told you,
19   correct?
20   A.  Correct.
21   Q.  I want to ask what other information in 2005 you
22   had that indicated your belief that this would have a
23   discriminatory effect?
24   A.  My belief was based on calling the Texas
25   Department of Motor Vehicles and asking for a report on

49

1  who didn't have driver's licenses and them not being
2  able to tell me.
3      My belief is based on asking my colleagues in the
4  Senate who were supporting the bill did they know
5  statistics, and oftentimes generally being told that
6  they didn't know, and then asking, "Well, do you care?"
7      So, based on the responses that I got, both in
8  private and asking on the floor, if somebody didn't
9  know, it's a fair assumption that a reasonable person
10  would assume lower income people who get a ticket
11  probably have more of a burden coming up with the funds
12  to pay for it.  If we pass a law that says you lose your
13  license if you don't get it, you probably don't have a
14  driver's license.  And that driver's license would be
15  the most common form of state ID.
16      Q.  Did you look at any data in 2005 that -- let me
17  finish the question -- that would lead you to the conclusion
18  that House Bill, at that time, 1706 would have a
19  discriminatory effect?
20      A.  Yes.
21      Q.  Tell me the data you looked at.
22      A.  I looked at the data that I asked for, and
23  generally what I got was a blank piece of paper.  So,
24  that was my damn data.
25      Q.  So, the absence of data is what lent to your

50

1  conclusion --
2      A.  Yeah.
3      Q.  Hold on.  Let me finish -- that there was a
4  discriminatory effect of House Bill 1706 in 2005; is
5  that right?
6      A.  In my opinion, the absence of data is data.  No
7  report -- let me finish.  No report means either you
8  don't know or you don't care or you do know and you
9  won't share it, and that's what led me to the conclusion
10  that legislation would have a disparate impact on people
11  of color, that included with the history of Texas of
12  being rather ignoble as it relates to the voting rights
13  of people of color.
14      Q.  So, with respect to -- can you tell me about the
15  communications you had -- are you saying with DPS?  What
16  you said was Texas Department of Motor Vehicles.  Is
17  that DPS you're referring to?
18      A.  Yeah, DPS.
19      Q.  Do you know who specifically you talked to or
20  made that request from?
21      A.  I made the request this last session of the
22  author of the bill on the floor, and not only did I make
23  it, several other members asked for it, and we were
24  repeatedly told, "I'm not advised.  Go to the Secretary
25  of State."

51

1      Q.  So, you're talking -- you sort of fast forwarded
2  on me to 2011.  You're saying that in 2011, you did ask
3  the author of the bill -- is that Mr. Fraser?
4      A.  Yes.
5      Q.  You asked Senator Fraser about the data, and
6  you're saying that no data was provided; is that
7  correct?
8      A.  That's correct.
9      Q.  Okay.  Did you specifically yourself or did any
10  member of your staff contact DPS requesting data?
11      A.  Yes.
12      Q.  When?
13      A.  I don't know.
14      Q.  2011 session?
15      A.  Yeah, sure, during the session.  Look, I can't --
16  you know, no more than you can tell me the -- if you
17  ever ran into me walking down the hall, would I remember
18  the exact day but I'm a fairly methodical Legislator.  I
19  haven't lasted 22 years and passed the legislation that
20  I've passed just by the seat of my pants.  I'm pretty
21  good at it.
22      So, any time this issue was coming up in the
23  Texas Senate, as is the case with any vote I'm casting,
24  I will ask what has been the impact in other states if
25  they have done it, can you quantify it, can you give me

52

1  a report, and then show me the data from the appropriate
2  agency here that we have or if we don't have it.
3      Q.  So, in 2011, you asked Senator Fraser on the
4  floor for it?
5      A.  If I didn't ask him on the floor, somebody did.
6      Q.  Did you ask anyone else in 2011 for data related
7  to the potential discriminatory effect of this bill --
8  of Senate Bill 14?  Let's be clear.
9      A.  I'm sure that I asked and had somebody on my staff
10  call the appropriate state department so I could say it
11  on the floor.  And I'm -- you know, I'm speculating but
12  I'm pretty sure that we couldn't get a report, as would
13  probably be the case even now.
14      Q.  What about in 2009, Senate Bill 362, did you --
15  let me finish -- did you make a request or did some
16  member of your staff make a request to the Department of
17  Public Safety regarding data related to discriminatory
18  intent of Senate Bill 362?
19      A.  Okay.  A minute ago you said 369 but on Senate
20  Bill 362, I am assuming because I'm not a computer --
21  Senator Fraser sits next to me on the floor, and if I'm
22  going to engage in a debate, usually I ask my staff to
23  get me the answer before I ask the question.
24      So, I can't remember who on my staff I would have
25  had to do it but I'm sure that I would have asked before

## 53

1  asking the question, or among my colleagues, before
2  suggesting anybody ask the question.
3      Q.  And, again, your testimony is that in 2009, you
4  saw no data, the absence of data is what you're saying
5  you got?
6      A.  Yes.
7      Q.  And that's the data that you've reviewed to show
8  that Senate Bill 362 had no discriminatory intent, the
9  absence of data?
10         MR. DUNN:  Object to the form of the
11  question.  Misstates the testimony.
12         You can answer, if you can.
13     A.  The absence of data to me is the report.  If
14  someone asks for the data and you can't supply the data
15  and you are trying to propose a bill that I think would
16  have a disparate impact on people of color, to me that
17  says you know it's going to have a disparate impact and
18  you just don't care.
19     Q.  (BY MR. SWEETEN)  2007, what -- did your staff
20  make a request in 2007 to the DPS for data regarding the
21  discriminatory effect that that bill may have?
22     A.  In 2007, the bill didn't pass the Senate.  I was
23  on the State Affairs Committee.  You know, you would
24  have to go back and check the transcript.  It would be
25  pretty common -- if you check it, I suspect either I

## 54

1  asked or somebody would have asked in committee if the
2  bill was heard in State Affairs.
3      Q.  You don't know one way or the other as you're
4  sitting here about 2007?
5      A.  No.
6      Q.  So, you don't know if you looked at any data at
7  that time?  Or the absence of data -- you don't know if
8  a request was ever made at that time?
9      A.  Here's my assumption:  Before I argue against
10  somebody's bill or decide on a bill that's important to
11  one of my colleagues that I'm for it or against it, I'm
12  going to know as much as I can.
13         Now, because I do a few things other than Senate
14  Bill -- House Bill 218 and Senate Bill 362, if you are
15  asking me for the record, to go and point to who I
16  asked, when I asked, what the hell they gave me, I have
17  no earthly idea.
18     Q.  Is it a fair statement that in 2005, you did not
19  ask for any data?
20     A.  No, that's not a fair statement.
21     Q.  You asked for data?
22     A.  No, that's not a fair statement.
23     Q.  Okay.
24     A.  Let me finish.
25     Q.  Go ahead.

## 55

1      A.  If I may, respectfully.
2      Q.  Sure.
3      A.  What I'm saying to you, Patrick Sweeten, is that
4  on a major piece of legislation, on most pieces of
5  legislation, if I think it has a chance of passing and I
6  am going to vote on it -- and I haven't missed many
7  votes -- I'm going to know as much as I can to argue my
8  side and I'm going to know as much as I can to argue the
9  other person's side but I don't want to be in a position
10  where you're asking me who did I call in 2005 and who
11  made the call and what did they say and can I quantify
12  it.  I'm just telling you that I think my reputation is
13  one of being a fairly serious Legislator and having a
14  pretty good staff.
15     Q.  Yes, sir.  And what I'm trying to get to, though,
16  is just the facts that support your opinion that this
17  bill had a discriminatory effect.  And I think what I'm
18  hearing you say is that a request was made in 2011,
19  right?
20     A.  That's correct.
21     Q.  To Senator Fraser?
22     A.  That's correct.
23     Q.  There was no data provided to you?
24     A.  That's correct.
25     Q.  That is the data that you had for 2011, or lack

## 56

1  of data?
2      A.  I had that and I also can recall conversations
3  with Legislators in Georgia.  I think I called a couple
4  of members in Indiana or the legislation either had
5  passed -- I think it had passed in Indiana and it had
6  passed in Georgia but it was tied up in courts but I was
7  pretty thorough about calling people around the country
8  to ask, "What do you have?"  I was pretty methodical
9  about, "What do you have?  Can it be quantified?  Am I
10  worried about something based on my instincts or is
11  there something there?"
12     Q.  So, what did you get?
13     A.  The response I got back was, "Heck, yeah, you
14  ought to be worried because, by and large, what they're
15  telling us is that they don't know and they don't care."
16     Q.  So, there was no data given to you from those
17  sources either?
18     A.  No.
19     Q.  You didn't have any data in 2005, 2007, 2009 or
20  2011 other than the lack of data?
21     A.  I prefer to focus primarily on 2011 because my
22  memory serves me a little better from last session than
23  a couple of sessions back.
24     Q.  Okay.
25     A.  But the general response on the floor from

57

1   Senator Fraser was about what we were getting when we
2   would ask for data on our own, "We don't know." He
3   referred everything to the Secretary of State.
4        Then I did a fairly detailed letter, as I recall,
5   which I'm sure you've seen, asking the Secretary of
6   State a lot of those questions.
7        Q. And that was in the 2011 session you made the
8   request to the Secretary of State for information?
9        A. I don't know if I did it during the session or
10  after the session but a pretty detailed -- you know, I'm
11  sure I had a Cracker Jack staffer, probably sitting in
12  here, who did a lot of work on the request.
13       Q. And when you -- did you receive data from the
14  Secretary of State to review related to the
15  discriminatory effect of this bill?
16       A. It was pretty sketchy.
17       Q. Well, what did you receive?
18       A. I'd prefer to pull it for you and let you go
19  through it.
20       Q. Okay. Can you? Let's do that.
21          THE WITNESS: David, you don't have to pull
22  it now but you can send that to him. You know what I'm
23  talking about, right?
24       A. David Edmonson.
25       Q. (BY MR. SWEETEN) Let's pull it now. We're here

58

1   in your office.
2        A. He'll try to find it.
3        Q. And whatever David is going to look for would
4   have been produced in 2011 to you; is that right?
5        A. I think so.
6        Q. Is that after the passage of the bill?
7        A. You know, I don't know.
8        Q. Well, it sounded like you said earlier you wrote
9   them after the passage of the bill.
10       A. I probably did. I'm sure I asked before.
11       Q. Okay.
12       A. And then -- I can just remember sitting with my
13  staff one day and, you know, speculating on why Troy
14  didn't know a lot of this stuff. And I think that's
15  when we came up with the idea -- I don't know what we
16  did. We're going to write the Secretary of State and
17  say give us a breakdown on all of this.
18       Q. So, the reasons that you believe Senate Bill 14
19  has a discriminatory effect is, one, you've talked to
20  your constituents, two, the absence of data that you've
21  attempted to uncover in your investigations, three, the
22  history of discrimination in Texas --
23       A. Against minority voters.
24       Q. -- against minority voters and, four, you
25  indicated there were some press reports, is that right,

59

1   that you've reviewed, something about El Paso? I want
2   to talk about that is why I'm asking.
3          MR. DUNN: And communications with other
4   Legislators from other states.
5        Q. (BY MR. SWEETEN) Okay. Have I got the reasons
6   you believe that this bill has a discriminatory effect
7   on minorities in that grouping of five reasons?
8        A. If I reflect on it, I may think of some others
9   but at least those five.
10       Q. And so, the communications with Senators, you've
11  referenced communications to the floor, are those the
12  communications you're referring to is communications
13  that occurred on the floor of the Senate?
14       A. On the floor and in private conversations.
15       Q. Let's talk about first on the floor. I think
16  you've referenced that you think you asked Senator
17  Fraser on the floor what is the effect, and I think
18  you've testified that he indicated on the floor, he did
19  not know, correct?
20       A. Pull the record. If I didn't ask, one of my
21  colleagues asked. It blurs after a while.
22       Q. Whether you did or someone else, you believe that
23  was asked, you believe the answer was there was no
24  information on that given?
25       A. The answer was, "I don't think so," and someone

60

1   would have said -- I or someone else -- "Well, can you
2   quantify it? Can you give us information? What do you
3   base that on?"
4          "Well, I remember that to the Secretary of
5   State."
6          It was a running joke. And I'm sure you can go
7   back and review the record of my friend and my desk mate
8   about that. It was such a running joke about referring
9   to the Secretary of State, throughout the remainder of
10  the session, when something would come up, we would joke
11  with Troy about maybe we ought to call the Secretary of
12  State.
13       Q. Okay. Communications that you had with Senator
14  Fraser, were those all on the floor, those that would
15  lend support to your belief that this had a
16  discriminatory effect?
17       A. No. Some in private with desk mates. It's a
18  close club.
19       Q. With respect to your communications with
20  Mr. Fraser, I want to ask you are you saying that those
21  occurred while you were on the floor of the -- since
22  you're desk mates, most of the communications you're
23  referring to would have occurred on the floor of the
24  Senate?
25       A. Not all of them. We're good friends. We talk.

61

1     Q. It's not your belief that Senator Fraser knew or
2   thought that this bill would have a discriminatory
3   effect on minorities?
4     A. I think he knew it.
5     Q. And why -- is that based upon the fact that there
6   was a lack of evidence?
7         MR. DUNN: Now, are you asking him to
8   disclose communications now with Senator Fraser?
9         MR. SWEETEN: I'm asking him this is his
10  opinion outside of specific --
11    Q. (BY MR. SWEETEN) Based upon your discussions
12  with Mr. Fraser, is it your characterization that the --
13  and I'm not asking for a specific substance of the
14  communication. I'm asking you what is your opinion
15  about why you think that this bill has a discriminatory
16  effect?
17    A. I think he knew that the bill would have a
18  discriminatory effect. I think he knew it. And I also
19  think he didn't really want to carry the bill.
20    Q. He never -- you're indicating -- wait a minute.
21  Let me ask you that.
22        What makes you think that he never wanted to
23  carry the bill?
24    A. Because he told me.
25    Q. Again, my instruction is I don't want to know

62

1   specific communications you and Senator Fraser have had.
2   He claimed the legislative privilege.
3     A. I'm sorry. I don't mean to interrupt you but you
4   asked.
5     Q. What I instructed you earlier was if you've had a
6   communication, to just identify the communication, that
7   there were communications. I don't want to know the
8   substance of those.
9     A. I had communications with more than one member of
10  the Senate who said -- so, I'm not necessarily talking
11  about one session -- who said they did not want to carry
12  the bill but they drew the bean, they were instructed to
13  do it.
14        MS. MARANZANO: This is Jennifer. I just
15  want to say for the record about the instruction that
16  you're giving Senator Ellis that it's our position that
17  those Legislators who have not affirmatively invoked the
18  legislative privilege have now waived it.
19        MR. SWEETEN: I'm sorry. Senator Fraser has
20  invoked the privilege.
21        MS. MARANZANO: I know but I just want to
22  say that about the larger instruction that you're giving
23  because I believe you handed him a document that has a
24  list of people who have affirmatively waived but our
25  position is that those who have not affirmatively

63

1   invoked the privilege have now waived it.
2         MR. SWEETEN: Well, I mean, fair enough.
3   You've made the record clear as to what your position
4   is.
5     Q. (BY MR. SWEETEN) My instruction -- and it
6   continues to be -- that I don't want you to reveal the
7   specific substance of communications that were not of
8   public record with anybody that's either affirmatively
9   waived the legislative privilege or anyone not on that
10  list.
11        MR. DUNN: And just to be clear, we
12  continuously object to the instruction insofar as it
13  requires the Senator to give an inaccurate account as to
14  his opinions or conversations that we'll attempt to abide
15  by the instruction as is reasonable or possible.
16    Q. (BY MR. SWEETEN) So, we've gone over the reasons
17  you believe this has a discriminatory effect. Now, is
18  it a true statement that you have not reviewed specific
19  data that shows a quantitative breakdown of the impact
20  that Senate Bill 14 may have on racial minorities?
21    A. I have reviewed some -- I have seen reports on
22  the number of African Americans and Hispanics who have
23  lost their driver's licenses, as an example.
24        I don't have specific data on -- I don't know if
25  it's laying around here somewhere. I don't know if I

64

1   have any specific data on the number of African
2   Americans and Hispanics in Texas who have some other
3   form of government ID.
4     Q. What have you seen?
5     A. Well, I've seen reports on that. I don't know
6   specific ones but I'd have to go pull them.
7     Q. Who generated the reports?
8     A. I've seen some press accounts. I don't know the
9   specifics on it. I could go dig around. I know I've
10  asked periodically what can you show me here or in other
11  states that would either give me a comfort level as we
12  were going through the process to vote for this when my
13  colleagues would ask, trying to find some consensus, or
14  ask another side can you give me stuff so I can quantify
15  it so I can go say to them, "This is what you're doing.
16  Do you care?"
17        And so, what I'm saying, I don't know the
18  specifics of it. You can go pull it. You can get on
19  the Internet, Google in and see whatever you can dig up,
20  and most of it is pretty sketchy, I think, the last
21  discussion that I've had on it.
22    Q. So, with respect to any information you've seen
23  that reflects the discriminatory effect of Senate Bill
24  14, you're indicating that you've -- it would be
25  something that you've reviewed on -- through Internet

Senator Rodney Ellis - Volume 1                    June 22, 2012

## 65

1    searches about its potential effect and not any specific
2    data other than what's publicly available?
3        A.  I'm saying it's been all over the board if you go
4    look at the debate.  My folks who were pushing the bill
5    couldn't go in there and come up with a report and say
6    this is not a problem because here's our report that
7    shows everybody has a driver's license, if not, it's
8    easy to get one, and then on the other side, it was
9    difficult for us to go make our case because there was
10   very little data on it.
11       Q.  Have you ever seen data that indicates the
12   percentage of Hispanics or African Americans that would
13   be impacted as a result of the passage of Senate Bill
14   14?
15       A.  I've seen -- I don't know specifics but I've seen
16   data that appears rather speculative, sort of spotty.
17       Q.  Where did you see that data?
18       A.  I've seen it in press accounts.  I've seen
19   whatever my staff could pull together from asking the
20   state agencies, show me one way or the other, and I'm
21   saying to you it's been pretty spotty.
22       Q.  Okay.
23       A.  For this deposition, I didn't go pull some report
24   and put it in front of me to look at.
25       Q.  Can you cite for me as you're sitting here how

## 66

1    many or what percentage of Hispanics, African Americans,
2    Anglos will be impacted as a result of Senate Bill 14?
3        A.  No.
4        Q.  Do you have any opinion as to the percentage
5    of -- based upon any data that you've reviewed, do you
6    have any opinion on what percentage of African Americans
7    or Latinos will be impacted by Senate Bill 14, as
8    opposed to Anglos?
9        A.  No.  I wouldn't want to guess.
10       Q.  Okay.  And, in fact, there's no specific data
11   that you've reviewed that has provided that information?
12       A.  I have been -- I have been told by number
13   crunchers that it will have a disproportionate impact on
14   African Americans and Hispanics, and I've been advised
15   that based on the number of blacks and Hispanics in
16   Texas in particular who have lost their driver's
17   licenses because of fees that we have passed when people
18   get tickets for not having their seatbelts on, that most
19   of those folks who are in the queue to pay these fees to
20   get their licenses back are people of color.
21       Q.  Who told you that?
22       A.  My staff and --
23       Q.  And what did they show you?
24       A.  Press accounts.  I can't remember if I saw a
25   specific report on it.  I'm sure I've asked.  I just

## 67

1    can't remember.
2        Q.  So, you've read press accounts on the alleged
3    discriminatory effect on Senate Bill 14; is that right?
4        A.  On the number of people who have lost their
5    licenses because of fee bills we have passed.
6        Q.  Okay.  So -- and that's not specifically analysis
7    as to Senate Bill 14, you're indicating that you've seen
8    data that indicates people lose their licenses as a
9    result of other legislation at a higher rate that are
10   African American or Latino?
11       A.  Senate Bill 14 zipped out of the Texas Senate so
12   quickly with a majority vote, with so little thought
13   that there was very little data put together about the
14   impact of it because the folks who wanted it passed
15   either didn't know or if they did know, they didn't want
16   somebody to be able to make the case how bad it was or
17   they just didn't care.
18       Q.  Senate Bill 14 didn't really pass that quickly,
19   did it?
20       A.  It passed quick enough.  Faster than what the
21   budget passed.
22       Q.  Well, would you agree that Senate Bill 362 in
23   2009 was textually the same bill?
24       A.  No.  I think it got a little worse.
25       Q.  Okay.

## 68

1        A.  It got a bit more onerous.
2        Q.  Would you agree that there was significant --
3        A.  I'd have to go back and pull the comparison.
4        Q.  Would you agree that there was significant debate
5    in 2009 regarding the issue of voter ID?
6        A.  Yes.
7        Q.  Okay.  Would you agree, in fact, that there were
8    sessions that occurred in excess of 24 hours in the
9    Committee of the Whole in 2009 regarding the issue of
10   voter ID?
11       A.  Yes.
12       Q.  It was -- the issue of voter ID had not only come
13   up in 2005, 2007 and 2009 but then once again it came up
14   and was passed in 2011, right?
15       A.  It was rammed through in 2011.
16       Q.  It was -- Senate Bill 14 was made an emergency
17   item for consideration by the Senate, correct?
18       A.  By the Governor.
19       Q.  The Governor indicated -- or called Senate Bill
20   14 emergency legislation, correct?
21       A.  You said the Senate did it.  No, the Governor did
22   it.
23       Q.  I don't think I said that but that may have been
24   how you interpreted it.
25           So, the Governor declared it emergency

## 69

1  legislation.  It was heard in January of 2011 in the
2  Senate Committee of the Whole proceedings, correct?
3      A.  I think that's right.
4      Q.  Now, the Senate Committee of the Whole is a
5  procedure that is employed that allows -- rather than
6  having a Senate committee of ten individuals sitting on
7  the committee, it allows each member of the Senate to
8  participate in the process, correct?
9      A.  That's correct, among other things.
10     Q.  And among those other things is that it is a more
11 open process --
12     A.  No.
13     Q.  Let me finish -- it is a more process from the
14 standpoint that you have all Senators that sit as a
15 committee rather than having a committee hear it and
16 then pass a bill out for further consideration of the
17 Senate, would you agree with that?
18     A.  No.
19     Q.  You don't believe that because 31 Senators can
20 have input in the committee hearings that that makes it
21 a more open process than if you have a committee with a
22 smaller number of Senators, with many not participating?
23     A.  No, I don't.
24     Q.  And why would that be?
25     A.  Based on my 22-year experience of being in the

## 70

1  Senate, passing 500 bills, if any member of the Senate
2  wants to participate in any committee, they walk in and
3  do it.
4      Based on my experience, if a bill goes through a
5  normal committee process, it generally gets vetted in a
6  lot more detail than you do in Committee of the Whole.
7      In Committee of the Whole, based on my
8  experience, that has generally been the procedure used
9  when you really want to rush something through the
10 process and get it over with and you don't want to run
11 the risk of any parliamentary maneuvers like some point
12 of order on something that is done in the committee
13 before it goes to the Committee of the Whole.
14     If that were not the case, they would take the
15 darn budget through the Committee of the Whole.  I can't
16 think of anything that would be more important for every
17 member to weigh in on than the budget.
18     Q.  Okay.  Let's go back to the affidavit.  Let's
19 talk about paragraph 6.  It says, "On February 17, 2009,
20 Senate Bill 362, a bill that imposed certain photo
21 identification requirements on voters, was referred to
22 the Committee of the Whole Senate.  Senate Bill 362 was
23 authored by Senator Troy Fraser, who is white.  The
24 Senate passed Senate Bill 362 by a simple majority.  The
25 House did not pass this legislation."

## 71

1      Any opinion as to why the House didn't pass the
2  legislation or do you not follow that?
3      A.  Procedurally, I think the way it died that
4  session was because of a procedure called chubbing, so,
5  parliamentary maneuvers to kill it.
6      Q.  Okay.  In 2009, the Committee of the Whole
7  considered the bill, correct?
8      A.  Say it again.
9      Q.  In 2009, in the Senate, the Committee of the
10 Whole considered Senate Bill 362, correct?
11     A.  That's correct.
12     Q.  Would you agree that both sides were able to
13 provide their full position regarding the bill during
14 the some 24 hours plus debate on the Senate floor?
15     A.  No.
16     Q.  Okay.  Would you tell me what is it that you
17 believe wasn't expressed on the public floor that -- or
18 let me just ask another question.
19     Were you restricted in any way from providing
20 your opinion on the floor?
21     A.  The public was.
22     Q.  Do you want to tell me how did that happen?
23     A.  Because if it had gone through a normal committee
24 process where you post a bill, if somebody wanted to tag
25 it, which means delay it, to give someone more time to

## 72

1  get word out to the public so they could get to the
2  Capitol and testify -- showing up to the Capitol, for
3  somebody who doesn't work there, can be a rather heady
4  experience.  It can be a very intimidating process.
5      To come and testify before the Committee of the
6  Whole, when we went through that, it was more like -- it
7  was more of the kind of orchestrated experts from both
8  sides, so-called experts, the party operatives from both
9  sides, as opposed to real folk who might be impacted.
10     Q.  Who specifically didn't get to come testify, in
11 your view, with respect to Senate Bill 362 in 2009?
12     A.  Well, I guess that 30, 40, 50 percent of the
13 people in El Paso County who have a warrant out for them
14 because they owe on tickets, whatever the percentage is
15 here in Harris County but my sense was once the decision
16 was made that the bill would pass by a majority vote
17 with a special order provision, a majority vote instead
18 of the normal two-thirds provision, it was pretty much a
19 fait accompli.
20     The folks in charge knew that they had the votes
21 to pass it.  They had a mandate from their base to pass
22 it.  They had people who were worried about the growing
23 influence of Texas now being a majority minority state.
24 They had a mandate to get it done.  So, a lot of people
25 who would have come didn't come because they kind of

73

1   figured why, in my humble opinion.
2       Q.   So, you're saying there are people in the general
3   population who had such an understanding of the
4   Committee of the Whole proceeding, knew where the votes
5   lay in 2009, and they knew that their voice would not be
6   heard, and so, they didn't come in 2009?
7       A.   I'm saying people in the public wouldn't know
8   what a Committee of the Whole is from whatever the
9   committee is.
10      Q.   So, what prevented people from coming?  Who
11  didn't get to participate in the process, in your view?
12      A.   The fact that it came zooming through the process
13  in Committee of the Whole on February 17th -- usually
14  people -- this is a part-time job.  We meet 140 days
15  every other year.
16         In January and February, you know, it's just
17  gemming up.  When you're more apt to really having
18  people angry, paying attention, excited, happy, pleased,
19  knowing what we do, it's going to be after the press has
20  pretty much really whipped it up or made the case and
21  they know where we are.  For a year and a half, people
22  think we are in Washington instead of in Austin.
23         After we've been there and they've been reading
24  it in the paper, seeing it on TV, hearing it on the
25  radio January, February and March, around about April

74

1   and May, things get a little -- you hear from folks that
2   you didn't know existed is what I'm saying, when you go
3   through what is called the normal process, just in my
4   opinion, based on my experience.
5       Q.   Surely that was alleviated by the fact that the
6   bill didn't pass the House and that voter ID had another
7   two years to make its way to the 82nd Legislature,
8   correct?
9       A.   I don't think there was a lot heard about -- I
10  don't think there was a lot of public input in this
11  bill.  I don't think people got to hear a lot about this
12  bill, as evidenced by when it did pass, the author of
13  the bill was referring all of the questions to the
14  Secretary of State.
15      Q.   On the floor, you're indicating on the floor?
16      A.   Yeah.
17      Q.   Okay.
18      A.   I'm saying, obviously, if he didn't know and
19  you're asking me what the hell do I know, the burden is
20  not on me.  I wasn't the one trying to pass the bill.
21      Q.   But the bill passed by majority in 2009, 362 from
22  the Senate, correct?
23      A.   It certainly was one of those rare bills -- let
24  me finish -- that passed the Texas Senate by a majority
25  vote.

75

1       Q.   And the -- in other words, more Senators voted
2   for the bill than voted against?
3       A.   It was one of those bills where truly the
4   minority was heard, meaning minority in the Senate, not
5   minority in terms of people of color.  It was one of
6   those rare bills -- if you go back and check the record
7   in the history of the Texas Senate, it was one of those
8   rare bills that didn't have a two-thirds vote.
9       Q.   But it certainly wasn't passed by minority, it
10  was passed by majority, wasn't it?
11      A.   It was passed by members of the Senate who do not
12  represent majority minority districts.
13      Q.   It was passed by a majority of Senators.  It
14  passed, did it not, by a majority of Senators?
15      A.   I think I answered that.
16      Q.   Okay.
17      A.   Let me finish.  It was one of those few bills
18  that passed the Texas Senate without a two-thirds vote.
19  It passed by a majority vote.
20         (Short recess.)
21      Q.   (BY MR. SWEETEN)  Okay.  Let me just go back over
22  the issue of legislative privilege because I just want
23  to make sure that we're on the same page and that
24  everything clear.
25         When we were talking earlier -- and I'm just

76

1   going to reiterate it -- that is, that the legislative
2   privilege has been asserted by a number of individuals
3   in this case, and so, to the extent that I'm asking you
4   questions as we go along about any conversations, don't
5   reveal the substance of those communications but you can
6   just reveal whether or not a communication did occur.
7   Okay.  Are you still clear on that instruction?
8       A.   Okay.
9       MR. DUNN:  Just so we understand on that
10  instruction, we're generally okay with that but every
11  once in a while you'll say, "Are those all of the
12  reasons that you have this opinion or that opinion," and
13  he may be thinking of a conversation with a Legislator
14  that may or may not have invoked the privilege, plus,
15  there are a number of Legislators who haven't invoked
16  the privilege and haven't stated one away or the other.
17      MR. SWEETEN:  Okay.  On that issue, what I'm
18  trying to do is just have him reveal whether a
19  communication occurred that is the support of that.
20      Q.   (BY MR. SWEETEN)  And if you can just tell me
21  that rather than tell me the substance of it.
22      MR. SWEETEN:  And then with respect to the
23  prior comment, I think there was one instance where that
24  came up.  I'm going to move to strike that portion of
25  the answer with respect to that issue.

## 77

1    A. If you strike that part -- I don't want to
2  interrupt you but if you ask me a question --
3    Q. (BY MR. SWEETEN)  It's just I'm moving to.  It
4  doesn't mean that I -- I don't have the power --
5    A. Okay.
6    MR. DUNN:  You have preserved your position
7  to remove it.  We oppose the removal of it, and the
8  Court will deal with it.
9    MR. SWEETEN:  Fair enough.
10    A. If you ask me why do I think of something and
11  it's based on a conversation and I say, well, because
12  somebody said it and then you don't want me to say who,
13  I mean, how do I --
14    Q. (BY MR. SWEETEN)  Well, I mean, if there is such
15  a communication, I'd like you to identify who the
16  communication is with but not reveal the specific
17  substance of it.  We'll go -- it will be question by
18  question but if that comes up, then I want you to
19  address that issue and let's discuss it.  Okay?
20  Otherwise --
21    A. So, I can talk about a conversation but not with
22  who?
23    Q. Well, you can --
24    MR. DUNN:  You can talk about with who and
25  when but not the context of it, what was said.

## 78

1    Q. (BY MR. SWEETEN)  Yes, don't say what was said.
2    A. Okay.  I'm sorry.  I thought you all were trying
3  to get to the truth.
4    MR. DUNN:  One of the other lawyers may
5  choose to follow up today and ask you what was said.
6    Q. (BY MR. SWEETEN)  And, of course, in that case,
7  we are asserting legislative privilege on that.  So,
8  we're just having all kinds of fun, Mr. Dunn and I.
9    A. I'm sorry.  I thought you guys were trying to get
10  to the truth.  Put that in the record.
11    Q. We definitely are trying to get to the truth
12  here, and that's why we're going to depose you but just
13  as -- you're an attorney.  So, just as the
14  attorney/client privilege is something that is preserved
15  under law, legislative privilege is also similarly
16  protected by our courts and has been held in this case
17  it is protected.
18    We talked prior to the break about the Committee
19  of the Whole proceeding, and I want to ask you -- I'm
20  going to hand you a copy of -- this is an excerpted copy
21  from the Committee of the Whole proceedings that
22  occurred January 25th, 2011.
23    (Exhibit 3 marked.)
24    Q. (BY MR. SWEETEN)  And we talked about your
25  communications with Senator Fraser --

## 79

1    MR. DUNN:  Just for the record, we've marked
2  this as Exhibit 3?
3    MR. SWEETEN:  Yes, marked as Ellis
4  Exhibit 3.
5    Q. (BY MR. SWEETEN)  Okay.  Have you had a chance to
6  read it?
7    A. Yes.
8    Q. Okay.  Now, this is an excerpted portion of the
9  Committee of the Whole Senate proceedings from Tuesday,
10  January 25th, 2011, correct?
11    A. Uh-huh.
12    Q. Is that yes?
13    A. Yes.
14    Q. And this indicates a discussion that you and
15  Senator Fraser had on the floor of the Senate on
16  January 25th, '11, right?
17    A. Yes.
18    Q. And, in fact, I want to read to you a colloquy
19  between you and Senator Ellis -- I mean, and Senator
20  Fraser.  You indicated, "Are you confident, Senator,
21  that your bill would not have a disparate impact on the
22  elderly, on women, on those that are physically
23  challenged, on racial ethnic minorities?"
24    Senator Fraser says, "I am" --
25    And you said, "Are you confident?"

## 80

1    And Senator Fraser says,  -- "absolutely sure.  I
2  would not have filed the bill if I had thought it -- I
3  want to make sure that every person in the state has a
4  right to vote.  The -- not -- you know, the right that
5  we extend them, they should have that, and I do not
6  believe that in any way we're impacting that and that --
7  that -- you know, I want to make sure that the groups
8  you're talking about, you know, women, minority,
9  elderly, that they all have the right to vote, and I
10  believe my bill does that."
11    And then what did you respond when Senator Fraser
12  said that?
13    A. I was polite, as I am normally.
14    Q. No.  No.  The first question is what did you say
15  in response?
16    A. I said, "Okay.  And I know that's your intent."
17    Q. And so, you said on the Senate floor on
18  January 25th, 2011 that you knew that Senator Fraser's
19  intent was to not impact the groups including women,
20  minority, elderly and preserving their right to vote?
21    A. I did say that but I didn't mean it.
22    Q. Okay.
23    A. It was mere political talk.  Do you ever wake up
24  in the middle of the night and watch C-Span and you hear
25  say the gentleman or the gentlewoman?  They don't mean

---

81

1   it.
2        Q. I just want to be clear that when you told
3   Senator Fraser in the Committee of the Whole proceedings
4   that you didn't believe that his intent was to impact
5   the right of women, minority and elderly to vote that
6   you were not telling the truth?
7        A. She might want to read the record back to you.
8   You got it backwards.
9        Q. All right.
10       A. You meant to say, "Senator Ellis, were you
11  lying?"
12       Yes. I was being polite.
13       Q. Okay. So, you were lying when you said that?
14       A. Yes, I was.
15       Q. Okay.
16       A. I was being polite to hopefully put my colleague
17  at ease and hope that I could get him to vote for the
18  amendment.
19       If you continue to read through it, what I
20  said -- pretty much, I was trying to set him up so that
21  if you agree -- you're saying that was not your intent,
22  and I'm saying, "Okay. That was not your intent. So,
23  why don't you let me add this amendment so we can have
24  the Secretary of State give us a breakdown on all of
25  these factors."

---

82

1        Now, you probably don't go to the rest of that in
2   the record but I offered an amendment, and he objected
3   to it, and it was voted down, simply saying go do a
4   report on it.
5        Q. Is there anywhere else on the transcript of the
6   2011 Committee of the Whole debate that you lied?
7        A. Not that I can think of right away. When I say I
8   lied, I was being polite. It's just like saying would
9   the gentleperson do this, would the gentleman do that.
10       I suspect if you read through the rest of the
11  transcript in there, including my closing comments,
12  you'll hear me say that I think this bill discriminates
13  and either you all don't know or you don't care.
14       Q. Now, is it a foreign concept to you for a
15  Legislator to want to move a bill that they think is
16  important to them through the House or Senate quickly?
17       A. Is it a foreign concept?
18       Q. Yes. I mean, do you -- when you're passing
19  legislation that you think is important to you or to
20  your constituents, do you have any problem with
21  attempting to move quickly under the procedural rules?
22       A. No.
23       Q. Okay. And, in fact, it's a good thing for your
24  legislation to move your legislation quickly so that it
25  gets passed?

---

83

1        A. Particularly all of my good legislation.
2        Q. And so, it is a motivation and goal that you have
3   when you're passing legislation that you feel like is
4   important to you to move it quickly?
5        A. Well, my problem with motivation would be to move
6   it quickly if I think that it's controversial and
7   somebody might come up with some good questions to ask
8   that would put it in jeopardy. If you think you have
9   the votes and think it's controversial, anybody thinks
10  it's controversial, you want to move it as quickly as
11  you can before somebody figures out what bad stuff is in
12  it.
13       Q. When you do it -- and you do it, you move
14  legislation as quickly as you can if it's important to
15  you, correct?
16       A. I can assure you anything I move is vetted,
17  looked at, all the Is are dotted and all the Ts are
18  crossed. I have to essentially bend over backwards if
19  I'm trying to pass something to honor you for your fine
20  work. It will be thoroughly vetted if it has Ellis on
21  it, trust me.
22       Q. And I understand. That's a separate question
23  than the one I asked you. The question I'm asking you
24  is when you have legislation that you've vetted and is
25  important to you, you endeavor to move that legislation

---

84

1   quickly?
2        A. It's been so long since I had a bill move through
3   quickly, I wouldn't know what to do if one passed
4   quickly.
5        Q. And that's why?
6        A. Because usually I carry bills that I have to
7   develop a consensus on.
8        Q. Because your --
9        A. And because I don't want the reputation that I
10  try to move something through when I -- even when I had
11  more votes on my side, that somebody would regret later
12  and then resent me when I'm trying to get them to vote
13  for something else down the road. I carry stuff that
14  might be a bit more ahead of its time.
15       Q. Okay. But when you're moving legislation, you're
16  attempting -- it is a motivation of yours to move it
17  quickly, you've already said that, right?
18       A. No. Usually my motivation is to get the
19  two-thirds. So, mine usually doesn't move too quick.
20       Q. Is there anything wrong with a Legislator
21  attempting to move their bills quickly --
22       A. Depends on the bill.
23       Q. -- to get them passed?
24       A. It depends on the bill and the reason that
25  someone is trying to move it likely. There are people

## 85

1  who try to move stuff quickly because they hide stuff in
2  the bills or there are people who move stuff quickly
3  because they don't know what the hell is in the bill,
4  and there are people who move stuff quickly because they
5  don't really want the public to really realize just how
6  bad a bill may be.
7      Q.  So, are you indicating that you, Senator Ellis,
8  don't try to move your bills quickly?
9      A.  I'm indicating that I, Senator Ellis, cannot move
10 my bills quickly.
11     Q.  And that's been the case all 22 years?
12     A.  Yeah, for the most part.
13     Q.  Okay.
14     A.  I don't carry the -- I generally carry bills that
15 are pretty broad reaching.  I'm not -- I don't go in and
16 try to pass the easy stuff.  So, it takes a while for
17 people to be persuaded or I have to go through
18 compromises to satisfy concerns that they have.
19     Q.  Are you indicating it is not a motivation of
20 yours when introducing legislation to move it through to
21 passage as quickly as possible?
22     A.  I just want to get it passed.  I'm generally not
23 hung up -- as evidenced by -- I'll pass a bill and
24 somebody in the House might sit on it.  Some members
25 would kill that bill.  They would let the bill die.

## 86

1  I'll generally figure out how to get enough credit
2  whether my name is the elite name on it or not.
3  Sometimes I try to put my bills on other people's bills.
4      Q.  Now, it's a true statement, though, that if
5  you -- if your bill does not go as quickly as you can
6  make it go, there is a higher chance that it gets hung
7  up towards the end of the session?
8      A.  For the bad bills.
9      Q.  So, only the bad bills get hung at the end of the
10 session?
11     A.  And my bills.
12     Q.  Okay.  So, you try to avoid that?
13     A.  I'm just saying it's been so long since any of my
14 bills have passed quickly in the process over these
15 22 years, I don't know why but, you know, I'm not one of
16 those who -- you know, sometimes to get a bill passed
17 quickly, you have to vote for so much other bad stuff,
18 it's hard to sleep at night.  I sleep good.
19     Q.  Do you try to move your legislation quickly?
20     A.  I try to move it when it's ready.
21     Q.  Do you move it quickly when it's ready?
22     A.  Rarely.
23     Q.  Do you try to move it quickly when it's ready?
24     A.  No, not really.
25     Q.  Okay.  There's just no desire by you to move your

## 87

1  bills quickly?
2      A.  I gave up on that a long time ago.  I try to
3  avoid high blood pressure.  If you go back and check the
4  record, you will probably find that most of the bills I
5  carry are not coming out early in the session.  Usually
6  watching for stuff with my name on it towards the end.
7      Q.  Now, 2009 and 2011 weren't the only times where
8  the two-thirds rule was not in effect for a Senate Bill
9  that ultimately passed, do you agree with that?
10     A.  That's correct.
11     Q.  Okay.  Would you agree that Senate Bill 800 in
12 the 67th session by Ogg, a redistricting bill, passed
13 without a two-thirds --
14     A.  What year was that?
15     Q.  The 67th session.
16     A.  What year was that?  Was that the year '67?
17     Q.  No.  The 67th session.
18     A.  What year?  I don't remember them in terms of --
19     Q.  We can do the math.  Let's see.
20     A.  I don't think -- I don't even know if I even
21 served with Ogg.  So, it might have been one session.  I
22 just don't do them by 71, 75.  What was the last one?
23     Q.  82nd was 2011.
24     A.  So, you're going back to --
25     Q.  30 years.

## 88

1      A.  I know it will probably surprise you, Patrick,
2  but 30 years ago, I wasn't in the Senate.
3      Q.  I wasn't asking if you were in the Senate.  I'm
4  asking you are you aware that Senate Bill 800 in the
5  67th session by Ogg, a redistricting bill, passed
6  without a two-thirds majority?
7      A.  No.
8      Q.  Okay.  Are you aware that House Bill 1400 -- that
9  there was a redistricting bill that also passed without
10 a two-thirds majority?
11     A.  What year was that?  Or what session?
12     Q.  In the 67th session.  Do you know if a
13 redistricting bill that year passed without a two-thirds
14 majority?
15     A.  No.
16     Q.  Are you familiar with --
17     A.  Was that a regular session or a special session?
18 Does it say?
19     Q.  It says 67th session.
20     A.  I know in 2003, one passed without a two-thirds
21 vote because we broke quorum objecting to not having a
22 two-thirds vote.
23     Q.  Who was the Lieutenant Governor in 2003?
24     A.  David Dewhurst.
25     Q.  Okay.  And what bill are you specifically

89

1    referring to in '03?
2       A.  The reredistricting bill.
3       Q.  Okay.  So, there was a redistricting bill that
4    you're aware of in 2003 that passed, correct, without a
5    two-thirds --
6       A.  That's correct.
7       Q.  What about House Bills, on House Bill days, do
8    those pass often without a two-thirds majority?
9       A.  Not to my knowledge.  Now, I don't know if a
10   budget ever passed without two-thirds majority.
11      Q.  What about in special sessions, is the
12   two-thirds, quote, tradition utilized in special
13   sessions?
14      A.  It is generally.
15      Q.  Is it sometimes not?
16      A.  Yeah, it was -- on major bills, it was not used
17   for the reredistricting session of 2003.  That was a
18   special session.  And as I mentioned earlier, in that
19   segregation for every session in '57, '59.
20      Q.  Okay.  Are you aware that a criminal justice
21   bill, House Bill 1922 in the 67th session --
22      A.  30 years ago.  What did they do?
23      Q.  I'm just asking you are you aware of whether or
24   not it passed with a two-thirds majority?
25      A.  No.  I didn't come in prepared for a history pop

90

1    quiz on the bills that passed in the Texas Legislature.
2       Q.  So, you're not really aware, are you, of how
3    often the two-thirds, quote, tradition has been not
4    employed?
5       A.  I'm aware of when the two-thirds tradition has
6    not been used on major bills.  I am aware on bills to
7    name the Chicken Shack to Radio Shack, insignificant
8    things of that nature.
9       Q.  And what would be called in that --
10      A.  Resolution or some insignificant bill or nobody
11   paying attention.  I know that it has been rare in the
12   Texas Senate that a bill has not passed with a
13   two-thirds vote unless it was part of some back room
14   deal where members were saying to the presiding officer,
15   "Just slide this one out.  We're not going to raise the
16   issue," or it's been an insignificant bill.
17      Q.  Okay.  So, as you're sitting here, within the
18   last 30 years, can you tell me how many times bills have
19   been passed not utilizing the two-thirds majority?
20      A.  I can pull you a report on it or I can tell you
21   where to get one from.
22      Q.  As you're sitting here, can you tell me how many
23   bills fit that category?
24      A.  In terms of major bills that have fit that
25   category --

91

1       Q.  No.  I didn't ask major bills.  I'm asking bills
2    that fit that category.
3       A.  No.  I could refer you to the Secretary of the
4    Senate, not the Secretary of the State.  There's a
5    report that she prepared.  I think I was the one that
6    may have asked her to do it initially.
7       Q.  Do you know if -- by the way, was Lieutenant
8    Governor Bill Hobby a Democrat or a Republican?
9       A.  He was a Democrat.
10      Q.  Do you know if under Lieutenant Governor Hobby if
11   bills were passed without requiring a two-thirds
12   majority?
13      A.  I do.
14      Q.  And were they?
15      A.  There was a bill -- in terms of minor bills, I
16   don't know but on a major bill, I was on his staff, and
17   they had the infamous killer bee incident, which he was
18   trying to change the date of the Texas primary so then
19   Republican candidate for president, John Connally, would
20   have a better shot at winning -- getting the Texas
21   primary out of the way.
22         So, he was going to move the date, and they did
23   that -- they were going to do it by majority vote.  And
24   so, a group of Senators broke the quorum.  And I was on
25   his staff.  And when they did eventually come back, he

92

1    made the decision to let that bill die or they would
2    have had to have a two-thirds vote to do it.
3         In terms of minor bills that came across, I don't
4    know.  There may have been changing Sugar Lake to
5    Kool-Ade Lake or other fairly insignificant bills but in
6    terms of a major bill, since I've been around the Texas
7    Senate as an employee or as a member -- employee in
8    1975 -- to my knowledge, the killer bee incident, moving
9    the date of the Texas primary was the only major bill
10   that passed the Senate without a two-thirds bill under
11   Bill Hobby.
12      Q.  The question is about Bill Hobby.  That's what
13   you said.
14      A.  Yes, Senator Bill Hobby.
15      Q.  Okay.  What about under Lieutenant Governor Bob
16   Bullock -- what party was he in?
17      A.  He was a Democrat.
18      Q.  And are you aware of any legislation that passed
19   under Lieutenant -- let me finish -- Lieutenant Governor
20   Bob Bullock without a two-thirds majority?
21      A.  I am.
22      Q.  Can you tell us what that was?
23      A.  I think -- I'm not sure but I think one of them
24   might have been -- it was some bill that the -- might
25   have been redistricting.  I'm just not sure.  I can't

Senator Rodney Ellis - Volume 1                June 22, 2012

## 93

1  think off the top of my head but it was a bill that
2  Republican members of the Senate wanted passed, agreed
3  to it but didn't want to get heat in their party for
4  voting for it. So, they acquiesced, and it passed by a
5  majority vote.
6      And then I can remember a resolution -- not a
7  bill -- a resolution that I carried to force the
8  election of the settlement of a lawsuit on electing
9  judges in Texas from something less than a countywide
10  district.
11      And I remember I had a resolution coming up which
12  was broad enough so that I could put that language in
13  the resolution, and it was the next one -- resolution on
14  the agenda. So, it would not have been breaking the
15  two-thirds tradition.
16      So, I asked for permission to do it, and the
17  Lieutenant Governor called me in his office and said I
18  had the right but I was going to bust that Senate wide
19  open and I needed to think about more than my issue.
20      And I pouted like a young, impetuous Senator but
21  I backed down but when my Republican colleagues -- or
22  some of my colleagues -- there were a few Democrats that
23  didn't like the bill -- thought I was going to bring the
24  bill up on the floor, they walked or they wouldn't come
25  on the Senate floor.

## 94

1      So, we adjourned without having a quorum that
2  day, and then I negotiated with some of my colleagues,
3  and we came to a conclusion that we would have a vote in
4  Committee of the Whole on my resolution. It was not a
5  bill. I was going to substitute my language into that
6  resolution. So, we did that, and it passed.
7  Q.  So, there was a time that you circumvented the
8  two-thirds, quote, tradition?
9  A.  I don't want to interrupt you. Were you through?
10  Q.  I was.
11  A.  The colloquy that I went through was explained to
12  you. I did not have a bill. It was a resolution.
13  Resolutions do not come -- resolutions come in the
14  regular order.
15      So, there was a resolution coming up relating to
16  election of judges. It might have been a resolution
17  saying we ought to do redistricting, which we hadn't
18  done in 20 years, whatever it said, but the caption was
19  broad enough for me to substitute my language which
20  simply said the Texas Senate agreed the Attorney
21  General's settlement on a redistricting lawsuit
22  involving judicial districts.
23      Parliamentarian and everybody cleared it. In
24  fact, the parliamentarian was the person who told me,
25  "You are a lucky fellow. The next resolution coming up

## 95

1  a day, two days, is your resolution. That's the next
2  one. You have to substitute it. It is germane. You
3  could pass it."
4      But I backed down when my colleagues objected it
5  although I was not circumventing the rules. I was well
6  within the rules.
7  Q.  But you were willing to do, by any means
8  necessary, what you needed to do to pass that
9  legislation you're referring to, which is from 1993,
10  correct?
11  A.  No. There must be some part of what I'm saying
12  that you didn't catch. Resolutions pass by a majority
13  vote on a regular basis. If we want to pass a
14  resolution honoring Nelson Mandela -- a resolution
15  passes by majority vote in the Senate. A bill does not.
16  Q.  Okay.
17  A.  So, I did not have a bill. I had a resolution.
18  Q.  So, resolutions, you're indicating, don't require
19  a two-thirds majority?
20  A.  That's correct.
21  Q.  And haven't?
22  A.  That's correct.
23  Q.  And you passed -- in fact, that was Senate
24  Resolution 521, correct?
25  A.  You're good. How did you know that?

## 96

1  Q.  And Senate Resolution 521, let's talk about that.
2  I'm going to hand you the Committee of the Whole Senate
3  transcript from April 13th, 1993.
4      MR. SWEETEN:  I'll ask the court reporter to
5  mark that.
6      (Exhibit 4 marked.)
7  Q.  (BY MR. SWEETEN)  I want to ask you to indicate
8  what that is, sir.
9  A.  Yes.
10  Q.  And then I also want her to go ahead and mark
11  this, which is the transcript from the Committee of the
12  Whole where you discuss this issue.
13      (Exhibit 5 marked.)
14  A.  Yeah, this is not the judicial one. I think this
15  is -- if I'm reading this correctly, this is not the one
16  that I was making reference to. This is on
17  redistricting.
18  Q.  (BY MR. SWEETEN)  Well, let me give you more
19  information on it. I've got more.
20      MR. SWEETEN:  Can you mark this as Ellis 6.
21      (Exhibit 6 marked.)
22  A.  Yeah, because if this was a -- Sibley moving for
23  adoption. Yeah, because on this, I'm speaking in
24  opposition to it. So, I'm not sure what this is.
25  Q.  (BY MR. SWEETEN)  So, let's start with this: Can

97

1    you identify what Exhibits 4, 5 and 6 are?
2       A.  This is a transcript from a vote on the Committee
3    of the Whole on redistricting, ethics and elections from
4    April of 1993.
5       Q.  And what is Exhibit 5?
6       A.  Committee of the Whole Senate on redistricting,
7    ethics and elections, excerpt from Senator Ratliff's
8    personal privilege speech.
9       Q.  Okay.  And what is Exhibit -- and by the way,
10   what's the date on Exhibit 5?
11      A.  April 13th, 1993.  Let me just read this here and
12   see what it says.
13      Q.  Sure.
14      A.  We didn't keep very good transcripts back then.
15          Okay.  Yeah.  This part --
16      Q.  When you say "this part," which document are you
17   looking at?
18      A.  I'm on Exhibit 5.  This is the discussion about
19   the judicious election matter.
20      Q.  Okay.  And can you tell us is this the same
21   matter referred to -- well, first tell us what is
22   Exhibit 6?
23      A.  It's a committee report from the Senate on
24   Ellis/Carriker bill, Senate Resolution 521.
25      Q.  Okay.  So, is Exhibit 6 what is being referred to

98

1    in Exhibit 5 on the transcript?
2       A.  Let me read it right here.
3       Q.  Okay.  Go ahead.
4       A.  Okay.  Now, if I'm reading this right, so it says
5    here -- and I don't know who did my research.  It says,
6    "I was prepared using the rules of this body to get this
7    item up on the floor of the Texas Senate.  Now, it would
8    have been an instance in which it would have been the
9    third time in the history of Texas that the blocker bill
10   would have been removed" -- I guess the reference is to
11   a major bill -- "and whether or not we had an instance
12   of members of the Senate boycotting the Senate or
13   prepared using the rules of the Senate to move forward.
14   We tracked down the Attorney General of Texas, pulled
15   him out of a meeting with the Vice President of the
16   United States and asked him whether or not an action of
17   the Committee of the Whole would be sufficient for him
18   to move forward with his settlement as he worked up a
19   settlement.  The Attorney General has the right to
20   settle a lawsuit for Texas any day of any week and does
21   not need a formal action or an informal action or a
22   signature or anything from the Texas Senate or the
23   House.  There are ways in which we can come back after a
24   settlement and unsettle it.  And this lawsuit in
25   Louisiana or in Georgia where the Attorney General and

99

1    Governor worked up a settlement, they went from electing
2    judge to appointing judges in Georgia," blah, blah,
3    blah.  So, I think this is it.
4       Q.  And what you were reading from just now was
5    Exhibit 5, correct?
6       A.  Yes.
7       Q.  And what you read from was what you said on the
8    floor of the Senate on April 13th, 1993, correct?
9       A.  Yes.
10      Q.  And what you were talking about at that time was
11   the issue of Senate Resolution 521; is that correct?
12      A.  Appears to be that.
13      Q.  And the issue was a judicial election plan; is
14   that correct?
15      A.  Yes.
16      Q.  And on the floor of the Senate, you said that you
17   were prepared using the rules of this body to get this
18   item up on the floor of the Texas Senate?
19      A.  Yes.
20      Q.  You said, "It would have been an instance in
21   which it would have been the third time in the history
22   of Texas the blocker bill would have been removed, and
23   whether or not we had an instance of members of the
24   Senate boycotting the Senate or not or just a little
25   late getting down the hall, I don't know but I do know

100

1    that I was prepared using the rules of the Senate to
2    move forward."  What did you mean when you said that?
3       A.  That -- what I meant was -- I was making
4    reference to, under this being a resolution, that I was
5    going to get around the blocker bill because it was a
6    resolution.
7          My colleagues, who disagreed with me on the bill,
8    and they were not all Republicans, might I add, my
9    colleagues who disagreed with me on the bill felt like
10   my resolution on this settlement was essentially a bill,
11   and my argument was -- and the parliamentarian agreed
12   with me -- it was not a bill, but instead of blowing up
13   the Senate, what I did was go to the Attorney General
14   and say, "Look, you don't need this anyway.  You settled
15   the lawsuit.  You put in language" -- your Attorney
16   General wouldn't do this, I'm sure -- "you put in
17   language saying that the settlement would only go
18   forward if the Governor, the Speaker, the Lieutenant
19   Governor, the Texas House and the Texas Senate signed
20   off on it."
21          So, then I went to the Attorney General and said,
22   "Will you take a vote from the Committee of the Whole?
23   Because I don't -- I've been advised that I'm within the
24   rules and I can do it but it would blow up this body,"
25   because some of my colleagues felt like you call it a

## 101

1   resolution that you're amending, we think you're
2   amending a resolution with what we consider a bill.  So,
3   I backed down.
4        Q.  You were considering utilizing the Committee of
5   the Whole proceeding?
6        A.  I was a bad, bad boy.
7        Q.  Okay.
8        A.  This is one of the few times in my life that I
9   was going to do something wrong.
10       Q.  But in --
11       A.  But once I saw it -- I'm sorry to interrupt you
12   but you interrupted me -- I backed away from it and
13   decided I would not do it.
14       Q.  Did you say later about the bill that, "I would
15   have been prepared by any means necessary to change the
16   unfair way in which people are elected to the judiciary
17   of Texas"?
18       A.  I would have been prepared until I decided that
19   it meant more to me to protect the institution of the
20   Senate than to get my bill passed -- my resolution
21   passed.
22       Q.  There was a time you were working towards
23   proceeding with a Committee of the Whole proceeding with
24   respect to this issue, however, and you --
25       A.  No, that's what I did do.  So, in other words, a

## 102

1   Committee of the Whole -- it was never voted on by the
2   Senate as a Senate.
3        Let me get through now and then I'll make sure I
4   take your questions.
5        On this one, I think you read it the wrong way.
6   If you try and draw a parallel to voter ID, they can go
7   pass a voter ID in Committee of the Whole and never take
8   it to the floor of the Senate all they want, in
9   Committee of the Whole.
10       But what I did was take a resolution that passed
11   a committee in the House, passed a Calendars Committee
12   in the House, passed the entire House, and then the onus
13   was on me with a bill I cared very deeply about to,
14   within the rules, pass it on the floor of the Senate
15   with the Senate meeting as a Senate, not as a committee.
16       And I was told, "Under the rules, you can do that
17   because it's a resolution but not a bill," by the
18   parliamentarian.  The members could have overruled the
19   parliamentarian.  16 votes could have overruled the
20   chair and the parliamentarian.  That's what controls the
21   body.
22       I was told, "You're going to blow this Senate up.
23   No matter how strongly you feel about integrating the
24   judiciary, you ought to think about this, young
25   Senator," second term there, "You ought to think about

## 103

1   this and decide whether you really want that."
2        So, I backed down.  It was never voted on in the
3   Senate as a Senate.  The Senate adjourned.  The
4   Lieutenant Governor called us in as a Committee of the
5   Whole, and I negotiated this with my Republican
6   colleagues.
7        So, we met as a committee, just like it could
8   have -- if the guy had said you can pass it through the
9   judiciary committee --
10       Q.  You used the Committee of the Whole in 1993?
11       A.  To leave it whole.
12       Q.  You did?
13       A.  For a bill that never went to the Senate.
14       Q.  Did it pass in the Committee of the Whole?
15       A.  It passed in the Committee of the Whole.
16       Q.  What did it pass as?
17       A.  It passed as a resolution in the Committee of the
18   Whole.  It was not a bill, and it never passed the Texas
19   Senate.  And the damn Attorney General didn't need it.
20   He just wanted cover.
21       Q.  And you made the statement at the time that you
22   would have been prepared by any means necessary to
23   change the unfair way in which people are elected to the
24   judiciary of Texas, that's what you said?
25       A.  That was a great quote.  And that other part you

## 104

1   didn't read in there.  You've got to get the feel for it
2   now, Patrick, when you're in there.  I'm waxing
3   eloquently.
4        So, the part I didn't say was but I didn't.  So,
5   you go back and look at the tape.  So, anyway, I'm
6   saying I would have been prepared by any means necessary
7   to do this but I didn't, and why did I not do it,
8   because of my respect for the institution, with only two
9   years under my belt being there.
10       Q.  Can you tell us other instances under -- let's
11   talk about Lieutenant Governor Bullock.  We were talking
12   about him previously.  Can you tell us other instances
13   when the two-thirds, quote, tradition wasn't used?
14       A.  I don't remember the details but when my friends
15   in the Senate were doing their reredistricting in 2003
16   and in the back room, we were arguing about do we really
17   want to disrupt this body and create a tradition where
18   it's two-thirds whenever the hell, whoever is in charge
19   wants it.  We were debating about whether we get rid of
20   it or not.
21       And the presiding officer went and got a report
22   that I had asked the Secretary of the Senate to prepare
23   for me to make my case, and it showed a bunch of mamby
24   pamby votes like the ones I was making reference to on
25   changing the name of some river, nobody cared, nobody

Senator Rodney Ellis - Volume 1                    June 22, 2012

## 105

1   asked.
2       And they said that Bullock passed some bill -- I
3   don't know if it was redistricting or what, and some of
4   my Republican colleagues -- I would have been there.  I
5   got there a minute before Governor Bullock -- said
6   that -- maybe it was Ike Harris.  I don't guess he's --
7   he's using his privilege.  I think it was Ike Harris
8   made the comment --
9       Q.  You can refer to matters of the public record
10  as -- is Mr. Harris a --
11      A.  He's not a Senator.  He was a Senate then.
12      Q.  Well --
13      A.  We'll strike that.
14      A Senator -- how about that -- made the comment
15  that it was something we wanted and we agreed to under
16  the redistricting map but didn't want the heat for it,
17  so, we didn't object to it passing by majority vote.
18      Now, look, I was a baby Senator and, to be honest
19  with you, it would have gone -- I guess it would have
20  been 1991.
21      Q.  Okay.  Under Bullock?
22      A.  Yeah.  So, I assume that the three instances I
23  made reference to here would have been -- I don't know
24  if I asked somebody.  Usually I make somebody research
25  it.  My reference was to major bills.  I would have been

## 106

1   counting segregation forever, maybe that one that was a
2   consensus deal and this being the third time if I had
3   tried to do that.
4       Q.  In addition, there were bills under -- there was
5   a bill you've already referenced under Lieutenant
6   Governor Dewhurst in 2003?
7       A.  That was the controversial one.  That was the one
8   where we did break the quorum, where the quorum was
9   broken.
10      Q.  And the two-thirds rule was not utilized for that
11  bill?
12      A.  Yeah.
13      Q.  And every session, there are bills that pass
14  without a two-thirds majority of the Senate?
15      A.  If so, I'm not aware of it.
16      Q.  Okay.
17      A.  They may -- if so, they must be minor bills.  It
18  would be like every day you're supposed to have 30 kids
19  in the classroom, and if nobody takes the roll -- do you
20  know what I mean?
21      Q.  What's a House amendment strategy?  What does
22  that mean?
23      A.  You mean when I made reference to it earlier?
24      Q.  No.  I'm just asking as a general matter, do you
25  know what a House amendment strategy is?

## 107

1       A.  In what context?  It would depend on what context
2   somebody was using it.
3       Q.  Are you familiar with the concept that a House
4   bill can be added to a Senate Bill or amended to a
5   Senate Bill with the permission of the Senate Bill
6   author and then that doesn't have to pass with a
7   two-thirds vote?
8       A.  I was not aware of it until this last session
9   when they did it with the budget, which was unprecedented.
10  And without calling names because someone may not have
11  waived legislative privilege, there were discussions
12  about that being a very dangerous precedent because,
13  essentially, you take our body to a position of just the
14  majority voting everything.  I'm the one that takes the
15  position come on with it.  My side will get 16 votes
16  before we get 21 but it just would be disruptive.
17      Most of the bills I carried over the years --
18  hate crimes bill, it took me a decade.  Maybe in some
19  ways, it was good it took me a decade because I had to
20  build consensus for it.
21      MR. SWEETEN:  I'm going to object to some of
22  that as nonresponsive.
23      Q.  (BY MR. SWEETEN)  But what I'm asking you is you
24  are familiar with it, you certainly said in the 2011
25  context you're familiar with it with a House member

## 108

1   amending a Senate Bill without requiring a two-thirds
2   majority, right?
3       A.  Are you finished?
4       Q.  I am now.
5       A.  That was the first time I had heard of it.  That
6   is totally different from taking a bill -- taking a bill
7   as an amendment if it is germane and adding it to a
8   House or a Senate Bill but it was certainly
9   unprecedented to take the budget of the second largest
10  state in the country, 15th or 16th largest economy in
11  the world, and amending that to another bill and saying
12  somehow by doing that you avoid a two-thirds tradition.
13      And I think most of my colleagues would say it
14  was unorthodox, unprecedented and something they hope
15  doesn't happen on a regular basis or we're going to reek
16  havoc on the system.
17      Q.  You're not familiar, other than that instance, of
18  that occurring?
19      A.  That's correct.
20      Q.  Okay.  And in that instance, that related to the
21  budget, and you're talking about the 2011 budget, which
22  was passed without a two-thirds majority also?
23      A.  Correct.  Sometimes when you're on beta rules,
24  you essentially have no rules.  That's called chaos in
25  most democracies.

Senator Rodney Ellis - Volume 1                    June 22, 2012

## 109

1    Q.  But it's true that the Senate is able -- first of
2   all, let's talk about it this way:  Senators are elected
3   throughout the Senate.  There are 31 of them.  They're
4   elected to go in and serve their constituents, correct?
5    A.  That's correct.
6    Q.  The Senate is a body.  The 31 individuals within
7   the Senate have the absolute right -- you've already
8   testified -- to set up the rules under which they
9   believe that the Senate should operate under, correct?
10    A.  That's correct.
11    Q.  Okay.  And if they have the votes to do so, they
12   are perfectly capable of either suspending the
13   two-thirds rule for all matters or instituting special
14   order procedures to not require a two-thirds vote,
15   correct?
16    A.  For people who don't care about tradition, that
17   would be correct.
18    Q.  Okay.
19    A.  And to be honest with you, as opposed to a system
20   where it's two-thirds when I want to hide behind it --
21   if I want to say I couldn't pass something, we'll have
22   two-thirds, and if I want to say that I wanted to pass
23   something, we'd do a majority -- you take issues like
24   the gambling bill, which I carry on a regular basis, I
25   could pass that by a majority vote.  How about the ban

## 111

1   State Senator exercised in backing off of his ability
2   under the rules to pass a resolution, not a bill, to
3   keep from disrupting somebody's perception, not reality
4   then, perception of the traditions of the body, they
5   didn't do it.  I did.
6       And down the road in a state that -- whose
7   demographics have rapidly changed, you get some folks
8   who are not as levelheaded as many that we have now, you
9   could really reek havoc on governing the second largest
10   state in the country when you do stuff by any means
11   necessary.
12       MR. SWEETEN:  I'm going to object to the
13   answer as nonresponsive.
14    Q.  (BY MR. SWEETEN)  And I'm going to ask you the
15   following question:  Are you indicating that it is your
16   belief that because 5.11 D of the Senate Rules allowed
17   for voter ID to be considered by a majority that that by
18   itself shows a discriminatory purpose, intent or effect
19   of Senate Bill 14?
20    A.  I think that and other things show discriminatory
21   effect and purpose.
22    Q.  Okay.
23    A.  Would you like to object to that as
24   nonresponsive?
25    Q.  I'll object when I think it's appropriate.

## 110

1   on statewide smoking in public places?  I could pass
2   that by a majority vote.
3       So, I'm one who would argue traditions do matter.
4   In order for a system to work seamlessly, you ought to
5   know what the rules are, they ought to be transparent,
6   same set of rules for everybody but when you pick and
7   choose, I think that leads to -- this is a separate
8   issue but I think that leads to chaos.
9       And what's happening here, particularly on the
10   issue that involves voting, a constitutional right, not
11   a privilege, going back to what this deposition is
12   about, in my humble opinion, when you change the rules
13   to do that, you know, you can read a lot into that.
14    Q.  And you do, you read a lot into that?
15    A.  Most people do.
16    Q.  Okay.  But what you read into -- what you're
17   saying is that because -- is it your opinion as your
18   sitting here that because the Senate, which has an
19   absolute right to do it, allowed for -- under 5.11 D
20   allowed for voter identification to be brought to the
21   floor by majority vote, that that somehow evidences a
22   discriminatory intent or purpose or effect of the bill
23   itself?
24    A.  I think that what it indicates is that, unlike
25   the level of maturity that a 37 year old second term

## 112

1    A.  Okay.
2    Q.  Okay.  I'm going to hand you the next exhibit.
3       (Exhibit 7 marked.)
4    A.  I was reading the prayer.  I can go to the part
5   you highlighted.
6    Q.  (BY MR. SWEETEN)  You can.
7    A.  I want to stick on this part here, "Lord, let
8   them do right."
9    Q.  I think we should as well.
10       All right.  Let's look at the -- and just tell me
11   what this document is.  It looks like it's excerpted
12   from the Senate Journal, Monday, May 9th, 2011.  Did I
13   read that correctly?
14    A.  That's right.
15    Q.  And I'm showing you Page 2084, the excerpted
16   portion from the Senate Journal.  And I want you to look
17   under the heading Conference Committee Report on Senate
18   Bill 14 Adopted.  Do you see that?
19    A.  I do.
20    Q.  Okay.  Now, can you tell us what this reflects
21   regarding Senate Bill 14?
22    A.  This reflects the voting on the bill.
23    Q.  Okay.
24    A.  The conference committee report.
25    Q.  So, this is the final vote of the bill?

113

1    A.  That's correct.
2    Q.  And you vote here, you vote nay, correct?
3    A.  That's correct.
4    Q.  Okay.  And above that are a list of the Senators
5  who voted yea?
6    A.  Uh-huh.
7    Q.  So, my question I'm going to ask you is which of
8  these Senators, in your opinion, voted for Senate Bill
9  14 with a discriminatory purpose?  And I want you to
10  name who those are.
11    A.  Okay.  There are 19 Senators here who voted for
12  it.  They are 19 of my dear friends, people who I care
13  about dearly.
14       If I had served in the Texas Senate during
15  reconstruction or in the battle days when we passed the
16  poll tax, I doubt that I would have singled out any
17  individual member of the Senate even back then and said
18  that they were racist or had ill will towards minority.
19  You just don't do that.  You don't get to where I am in
20  politics by doing that.  I'm not going to do that for
21  you.  I'm not going to do that for the Court or anybody
22  else.
23       But I think that this bill discriminated --
24  discriminates against minorities, and I think that my
25  distinguished colleagues who voted for it knew that they

114

1  were doing the wrong thing.  They wanted to do the wrong
2  thing.  I think most of them know that they are going to
3  be on the wrong side of history.
4       It doesn't mean that they are bad people.  It
5  just means that they are bad on this.
6       You can object to it all the hell you want but
7  I'm not going to single out any of my colleagues but I
8  think they knew what they were doing, they wanted to do
9  it and they did it and history will reflect they are on
10  the wrong side of history.
11    Q.  The question I'm asking is which of these -- let
12  me finish -- voted yea on Senate Bill 14 as reflected
13  here with the purpose of discriminating against racial
14  minorities?
15    A.  I think the best you're going to get out of me --
16  and you can object to it all you want.  That's why I'm a
17  Senator and a lawyer and an American -- I think that
18  this bill discriminates.  I think they know that this
19  bill will discriminate against people of color.  I think
20  they knew what they were doing, all of them who did it,
21  and I think that they wanted to do it.  And I think they
22  will look back one day and tell me that they cast a bad
23  vote.
24    Q.  You think all 19 passed the bill with the purpose
25  of discriminating against racial minorities, all 19?

115

1    A.  I think either they knew it or they should have
2  known it.  So, either it was a willful indifference --
3  but I think that they voted the wrong way, and history
4  will reflect that they voted the wrong way.
5    Q.  I understand you think they voted the wrong way,
6  and I assume that's why you voted nay.  You voted
7  different than they did.
8       So, my question to you is which one of those
9  19 or are you saying all of them passed the bill to
10  purposefully discriminate against racial minorities?
11    A.  I think you've gotten all you're going to get out
12  of me on that subject.
13    Q.  Are you indicating you cannot answer that
14  question?  Are you indicating none of them did?
15       MR. DUNN:  Objection.  Asked and answered.
16    A.  Are you finished?
17    Q.  (BY MR. SWEETEN)  I'm asking -- can you give me
18  an answer?
19    A.  I did.
20    Q.  Okay.  I'm asking you -- are you saying all 19 --
21  let me clarify what you're saying.
22       Are you saying all 19 of these people passed
23  Senate Bill 14 with the purpose of discriminating
24  against racial minorities?
25       MR. DUNN:  Objection.  Asked and answered.

116

1       You can answer.
2    A.  I think you better read the record.  I've said
3  all I'm going to say about it.
4    Q.  (BY MR. SWEETEN)  And I'm asking you to clarify,
5  and I have the right to an answer to my question.
6    A.  And I've got a right to tell you I've said all
7  I'm going to say.
8    Q.  Are you refusing to answer my question?
9    A.  I think I've been crystal clear on the subject.
10    Q.  Is it your testimony that all 19 of these
11  Senators voted for Senate Bill 14 with the purpose of
12  discriminating against racial minorities?
13       MR. DUNN:  Objection.  Asked and answered.
14    A.  I think they knew or they should have known that
15  this bill would have a disparate impact on people of
16  color.
17    Q.  (BY MR. SWEETEN)  So, which of those knew, in
18  your opinion?
19    A.  I think that each one of them either knew or
20  should have known, and that is as far as I'm going to
21  go.
22    Q.  Okay.  So, you're saying that they -- that you
23  can't tell us of the 19 that voted for it who knew and
24  who should have known?
25    A.  I got out of the mind reading business well

## 117

1    before I got elected but I do have common sense, and
2    based on the data that was given, based on the history
3    of Texas discriminating against people of color as it
4    relates to voting, that precious constitutional right,
5    anybody who voted for this bill either knew or should
6    have known that it would have a disparate impact on
7    people of color.
8        Q.  And you can't tell us as you're sitting here
9    which ones knew or which ones should have known, of the
10   yea votes for Senate Bill 14?
11       A.  Well, if I could, I wouldn't tell you.
12       Q.  So, are you refusing to answer my question?
13       A.  I think you got an answer.  I think you got a
14   good answer.  We can keep going back and forth on this
15   record.
16           MR. SWEETEN:  I'm going to object to his
17   answers as nonresponsive on the topic.
18       Q.  (BY MR. SWEETEN)  I guess I'll just ask you one
19   time and then we can move on to something else:  Are you
20   refusing to answer that question?
21       A.  I've said all I'm going to say.
22       Q.  Would you agree that the Committee of the Whole
23   proceeding allows the Senate to have greater
24   deliberation regarding an issue?
25       A.  As I stated earlier, it would depend on the bill

## 118

1    but based on my 22-year experience, instances in which
2    we have gone into Committee of the Whole, we've had less
3    deliberation instead of more.
4        I can remember on a tax bill at one point under
5    Bob Bullock, members, in my judgment, tend to dig in
6    less, find more distractions, not really become an
7    expert on the subject when you go into Committee of the
8    Whole, as would be the case, I guess, if we tried to
9    consider a bill in the Joint Committee between the House
10   and the Senate.  Sometimes the more people you have in
11   the room, the less you really have them focusing in on
12   it, based on my observation.
13       Q.  What amendments did you offer to Senate Bill 14?
14       A.  I think I offered three.  Probably the same -- at
15   least three.  The same three that I offered a couple
16   of -- in the previous session.  I offered one -- let's
17   see here.
18       Q.  Now, you're looking at notes; is that right,
19   Senator Ellis?
20       A.  Yeah.
21       Q.  Can I have -- can I look at your notes?
22           MR. DUNN:  Senator, those notes, were they
23   prepared by attorneys on your staff?
24           THE WITNESS:  Yes.
25           MR. DUNN:  Then we'll invoke attorney/client

## 119

1    privilege on the notes.
2            MR. SWEETEN:  He can't reference during a
3    deposition notes without --
4            THE WITNESS:  Okay.  I submitted --
5            MR. SWEETEN:  Hold on a minute.  I'm having
6    a discussion with counsel on this.
7            He can't reference notes and testify off
8    them without me having a right to review them.
9            THE WITNESS:  Okay.  I won't.
10           MR. DUNN:  He's only using the notes to get
11   bills and dates.  We've invoked attorney/client
12   privilege on the notes.  We'll have to take it up with
13   the Court at this point.
14       A.  Do you want me to answer or leave it alone?
15       Q.  (BY MR. SWEETEN)  You can go ahead and answer the
16   question.
17       A.  Okay.
18       Q.  Do you want her to reread the question?
19       A.  What amendments did I offer?
20       Q.  Yes.  Go ahead.
21       A.  I offered at least three.  One was asking for the
22   Secretary of State or whatever appropriate state
23   entity -- I think it was the Secretary of State -- to do
24   a report on whether or not the bill had a disparate
25   impact -- I think I might have asked for a quarterly

## 120

1    report on what impact it would have on young people, the
2    elderly, racial and ethnic minorities.
3            And just off the top of my head, I can't remember
4    what the other two were.  I did at least three.
5            Probably same day registration.  I probably did
6    something on same day registration.
7            And I may have done something about -- I don't
8    know -- expanding the motor voter thing -- if I didn't
9    do it, I may have given it to somebody else -- expanding
10   the motor voter concept to people who were getting Food
11   Stamps and other forms of assistance.
12       Q.  I want to ask you a few questions about -- first
13   of all, you are registered to vote, I assume, correct?
14       A.  Hope so.
15       Q.  You've already told me you have a driver's
16   license, correct?
17       A.  Yes.
18       Q.  Do you have a license to carry?
19       A.  No.
20       Q.  Do you have a passport?
21       A.  Yes.
22       Q.  Do you have a citizenship certificate?
23       A.  I've never seen it.  Last I checked, I'm a
24   citizen.  I know I was born at Texas State Hospital For
25   Negroes but I don't -- I've never -- if I have it, I

## 121

1  haven't seen it.
2       I remember seeing a big old thing once with my
3  feet on it maybe when I was going to get a passport, and
4  people were laughing at me, if that's what you're
5  talking about.  That may be somewhere in the closet at
6  my mother's house.  You don't have that?  Big old thing,
7  you put your feet on it.
8       MR. DUNN:  I was born in St. Joseph's.
9       A.  Back then, that's what you did at the Houston
10 Hospital for Negroes.
11      MR. DUNN:  Oh, yeah, they did that.
12      A.  My feet were on it.
13      MR. DUNN:  Birth certificate.
14      A.  Yeah.  May have been.  The first time I was going
15 to get my passport, I thought I had to have that, and
16 people laughed at me when I walked in with this big
17 thing.
18      Q.  (BY MR. SWEETEN)  Okay.  I want to ask that also
19 about the voting age members in your household.  Your
20 wife, I assume, has a passport?
21      A.  She does.
22      Q.  The other voting age, if you could just go
23 through their names and whether or not they have a
24 passport.
25      A.  We're fortune enough to be in, you know, a

## 122

1  comfortable household, and all my children have
2  passports.  They have all traveled out of the country.
3       Q.  So, everybody we named earlier has a passport?
4       A.  They all have a passport.  We're not quite the
5  norm for Senate District 13.
6       Q.  Can you tell me as you're sitting here any
7  person's name that is not able to get a -- and who is
8  eligible to vote -- who is not able to receive a free
9  identification as provided for in Senate Bill 14?
10      A.  Well, Eligha Ellis will have a hard time if -- my
11 father, my 91 year old father, if my sister, Melody
12 Ellis, didn't take him to go get one.  He doesn't have a
13 driver's license.  Thank God, we reported him running
14 into people.  So, they took his license where he
15 couldn't pass the test again.  He would be one.
16      I can't think of the names but there are other
17 people in that neighborhood that my dad lives in where
18 my sister is his caregiver.
19      Q.  This is your father.  How old is he?
20      A.  Will be 91 in August.
21      Q.  Are you indicating that your father does not have
22 an identification that would be acceptable under Senate
23 Bill 14?
24      A.  I'm saying that -- no, he has one because he's
25 registered to vote.  If my sister didn't take care of

## 123

1  it, as much as I'm gone, he would be in a bind.
2       Q.  Does he have an identification from the DPS?
3       A.  I don't know what he has but I know he's
4  registered to vote.  Don't turn him in if he doesn't
5  have one.  I don't know.  I haven't seen it.
6       Q.  You're indicating that he is able -- he would be
7  able to vote under Senate Bill 14 as currently written?
8       A.  Well, he voted -- well, I'd have to check and see
9  if he's registered right now or not.  I know he voted
10 for Mr. Obama the last time.
11      Q.  I'm asking would Mr. Ellis, your father -- are
12 you indicating that he would not be able to vote --
13      A.  He would be able as long as --
14      Q.  -- under Senate Bill 14?
15      A.  Under Senate Bill 14, as long as we could find
16 somebody or I had time to go put him in that long line
17 to get one.
18      Q.  Okay.  So, he has --
19      A.  He doesn't drive.
20      A.  He has the means to get to the --
21      A.  He has a son who is a Senator.
22      Q.  -- to get to the DPS office.
23      Let me ask the question again.
24      Are you aware of any specific person that under
25 Senate Bill 14 would not have the requisite ID to vote?

## 124

1       A.  I know of some but I don't know their names.
2       Q.  Okay.
3       A.  The ones whose names I know, either I or I get
4  somebody, I work it out, I take the burden upon myself
5  to work it out for them.
6       Q.  But as you're sitting here, you can't think of
7  any person's name that couldn't get appropriate
8  identification --
9       A.  That's correct, as I'm sitting here.
10      Q.  -- under Senate Bill 14?
11      A.  That's correct, as I'm sitting here, but I could
12 walk outside and find you some if you had time.  A
13 couple under those bridges when I go bike riding.  I
14 don't ask their names.
15      Q.  And you're sure those are registered voters, sir?
16      A.  I'm pretty sure they're not registered to vote.
17      Q.  Again, my question is can you identify any
18 specific person that under Senate Bill 14 would not be
19 able to produce the requisite identification to vote?
20      A.  Couldn't think of a name unless I went out and
21 looked for some.
22      Q.  Okay.  The three amendments you talked about, can
23 you tell us what they were?
24      A.  Thought I did.
25      Q.  Okay.  We've gone on to other things, so, if you

Senator Rodney Ellis - Volume 1                    June 22, 2012

---

125

1   could just tell me.

2        A.   One was doing a periodic report on the impact of

3   this bill, whether it would have disparate impact on

4   people with disabilities, racial and ethnic minorities,

5   students and the elderly.

6        One on same day registration.

7        I cannot remember what the third one was.  It may

8   have had something to do with trying to expand the motor

9   voter concept to people getting public assistance.

10       Q.   Okay.  Were your amendments -- you were able to

11  offer your amendments, correct?

12       A.   I was.

13       Q.   You were able to address the merits of your

14  amendments on -- during the Committee of the Whole

15  proceedings, correct?

16       A.   That's correct.

17       Q.   You weren't in any way precluded from voicing

18  your beliefs about why those amendments should be added,

19  correct?

20       A.   I could talk all I wanted to talk.  Nobody was

21  listening but I was able to talk.

22       Q.   In addition to your amendments, you were able to

23  fully describe your opposition to this bill and did so

24  during the Committee of the Whole proceedings in 2011,

25  correct?

---

126

1        A.   We -- in addition to whatever we said this go

2   round, there was agreement among the body that it is

3   what it is, and we agreed that the record from the

4   previous session would be included so that we wouldn't

5   have to drag on, arguing with one another.

6        Q.   You weren't precluded from articulating your

7   views on Senate Bill 14 or your amendments on Senate

8   Bill 14 in any way?

9        A.   I was not precluded.  In fact, they were nice

10  enough to say, "You can take the record of everything

11  you said the last session and the one before and that's

12  included as well."

13       Q.   Do the rules provide for time limits for debate

14  on amendments?

15       A.   I have -- the rules may provide for it.  I cannot

16  recall anyone ever invoking that in the Senate.  We are

17  a very gentle person like body.  So, we generally don't

18  do that.

19       Q.   Okay.

20       A.   Somebody can talk as long as they want to.

21       Q.   And that certainly wasn't done during the debate

22  on Senate Bill 14?

23       A.   As I said earlier, we met privately in the back

24  room and, you know, it was clear that they were going to

25  pass it by a majority vote, it was what it was, and we

---

127

1   would battle it out in court.

2        And so, on our side, we did as much as we could

3   to be respectful, even some of that language that you

4   were trying to bring back on me when I was trying to be

5   Senatorial like.

6        You know, it was pretty much understood this will

7   fought it out in court and at the Justice Department, so,

8   let's hurry up and get it on over there.

9        Q.   Okay.

10       A.   It was a much more thorough discussion two years

11  earlier.

12       Q.   No one, quote, called the question on your

13  amendments when you were offering them?

14       A.   No, not on mine.  I'm usually pretty quick.  I

15  just cannot remember if they did that on anybody else.

16  We've got a couple of members sometimes that will get a

17  little wound up.

18       Q.   Would you have supported the passage of Senate

19  Bill 14 had your three amendments been accepted?

20       A.   No, I doubt it.  I would have -- there was --

21  there would have been some amendments, if they were

22  taken, where I may have supported it.

23       Q.   Did you also offer an amendment on IDs for

24  college students?  Is that one you missed?

25       A.   I don't know.  I might have.

---

128

1        Q.   You don't recall?

2        A.   My office and I prepared a large number of

3   amendments from talking to people around the country,

4   and we gave them out to other members.  So, I can

5   remember my office working on that.  I don't remember if

6   I did it or we gave it to someone else.  It certainly

7   came up.

8        Q.   Would you have supported the bill had that

9   amendment -- if student IDs would have been added?

10       A.   No.  It would have had to have a heck of a lot

11  more than just student IDs.  Unfortunately, far too few

12  of our minorities in Texas are in school.

13       Q.   Do you conduct surveys or polling within your

14  district to determine how your constituents view

15  different issues?

16       A.   To some limited extent.

17       Q.   What sorts of issues do you poll your

18  constituents about?

19       A.   Well, mainly how they feel about me but I don't

20  spend money -- I don't go out and spend money trying to

21  figure out if somebody is for a smoking ban or for

22  gambling.

23       You know, I think I have a pretty good grasp of

24  what my constituents want, and I try to spend time doing

25  the give and take with them, sometimes thinking that

Senator Rodney Ellis - Volume 1                              June 22, 2012

---

### 129

1 they may have more expertise on the issue than I have
2 and sometimes maybe I have access to more information
3 than they have.  So, we share it.
4      Q.  Okay.  Have you ever polled your constituents
5 about the issue of voter fraud?
6      A.  No.
7      Q.  Are you aware of constituent polling on the issue
8 of voter fraud?
9      A.  I've read about it in the papers, and my
10 colleagues have shared their data with me.
11      Q.  Would you agree that the vast majority of polls
12 that you have seen reflect that the public is in favor
13 of photo identification for voters?
14      A.  I think at one point in the debate on the floor,
15 I made the comment to Senator Fraser that if anybody did
16 any polling in Texas, I bet most people in Texas favored
17 the poll tax when they passed it, and most people --
18 polling indicates they favor a lot of stuff that we
19 don't pass and they don't favor a lot of stuff that we
20 do pass.  And if you could just do it electronically,
21 why are we here?
22      Q.  So, my question, though, is are you aware that
23 the vast majority of polling on this issue shows --
24      A.  I am.
25      Q.  -- public support for it?

---

### 130

1      A.  I am.
2      Q.  Are you also aware that the vast majority -- that
3 the majority of polling on this issue shows that both
4 Latinos and African Americans, a majority of them
5 support a photo identification requirement?
6      A.  I am aware of that.
7      Q.  Are you aware of any poll whatsoever to the
8 contrary?
9      A.  No, but I'm not aware of what questions have been
10 asked.  Oftentimes when people do polls, it depends on
11 how you ask the question.
12      I have been told, I've not seen it, but
13 someone -- I can't remember who but someone did tell me
14 that they wanted to do a push poll that would say do you
15 favor voter ID if you are shown that a disproportionate
16 number of minorities and older people in ethnic groups
17 don't have a government issued ID.
18      I can't remember who but someone told me -- you
19 know, a push poll is not the most scientific form of
20 polling.  So, the point I'm trying to make to you just
21 for the record, of course, as well is that it depends on
22 what you ask.
23      Most people are for, if you poll them, sunny days
24 until everything is dead in the neighborhood, and then
25 they can take a little rain.

---

### 131

1      Q.  Okay.  But my question is are you saying -- and
2 you've already answered the question that the vast
3 majority of polls you're aware of show the public is in
4 favor of it.  Okay.  So, are you saying then that the
5 vast majority of polls, you're quibbling with the
6 methodology in some way?
7      A.  I'm saying the vast majority of polls that I am
8 knowledgeable of were done by people who wanted to get
9 the bill passed and who thought that their side would
10 benefit from the bill passing.
11      Q.  Are you aware of independent polls by news
12 organizations regarding this issue?
13      A.  I have seen polls by news organizations.  And
14 even the news organizations, it depends on how deep down
15 you go in a poll.
16      I'm not being facetious but if you do a poll do
17 most people favor a sunny day or a rainy day, most
18 people favor a sunny day unless they are living in a
19 drought stricken area.  So, it all depends on what you
20 ask but I'm not the one who governs who votes based on
21 polling data.
22      Q.  Well, would you agree that Representatives of the
23 Texas Senate have a duty to represent their constituents
24 and their constituents' wishes?
25      A.  Yeah, when they know what their constituents'

---

### 132

1 actual wishes are.  What I'm saying to you is that if we
2 had government by polling, you know, it depends on what
3 you ask, you could have a whole lot of strange things
4 going on.  I mean, the process -- a lot of it depends on
5 the question.
6      Q.  Okay.  So, just so I'm clear, you're saying you
7 realize the vast majority of polls show that the public
8 is in favor of photo identification requirements, there
9 also seems to be some suggestion by you that you
10 question the methodology of some of the polls.  Is that
11 all accurate so far?
12      A.  That is.  And in addition to it would be I'm
13 saying most people are against cutting funding for
14 schools and most people, if you poll them, are against
15 paying more taxes for schools.  So, I'm saying that when
16 you ask the question do I think most members of the
17 Senate have a duty to reflect the interest of their
18 constituents, we would have total chaos if we just voted
19 on the basis of a poll because polls rarely reflect what
20 our constituents think because polls rarely give them
21 all of the options.
22      And I eluded to that when I made reference to
23 most people in Texas favored the poll tax.  Most people
24 in Texas, when women couldn't vote, thought it was okay
25 for women not to vote.  If you polled in Texas when you

133

1  had to have property to vote, most people figured, yeah
2  the people who have property --
3       Q.  Isn't that supposition on that part as to those
4  three issues, you don't know what polling occurred
5  during those time periods?
6       A.  I read a little bit about it.  It wasn't very
7  scientific but in terms of what the public sentiment was
8  during the poll tax era.
9       Q.  Are you aware of one poll that you can cite for
10  us today that indicates that the public is not in favor
11  of photo identification requirements for voting?
12       A.  No, and I'm not aware of any specific poll that I
13  can cite for you today where they are in favor of it.
14  If you want me to go do a little research --
15       Q.  Then let's clear this up because you already said
16  that the vast majority of polls that you've read or that
17  you've seen show that people are in favor of photo
18  identification requirements.  Are you amending that
19  statement now?
20       A.  No.  I'm just saying when you ask me can I point
21  to one specific poll that indicates the opposite of
22  that, no, I cannot point to a specific poll but based on
23  my recollection, most of the polls I have seen indicate
24  that there is public support for it, and I'm saying to
25  you that they indicate public support based on what was

134

1  asked in the poll.
2       If someone were asked, "Are you for it if you
3  know it will have a disparate impact or it might have a
4  disparate impact on minorities, on the elderly, on the
5  disabled, on people of an ethnic minority, are you still
6  for it," and people don't -- I've seen no polls that go
7  in and put that in it.
8       Q.  Are you indicating that you don't think that
9  those who answer questions about photo identification
10  requirements know or have analyzed potential issues with
11  respect to it like the ones you mentioned?
12       A.  I'm saying that most of the polls that I know
13  about have been fairly cursory.  I doubt that they have
14  said to people, "If you think there's a possibility that
15  a voter ID bill would have a disparate impact on people
16  of color" -- I don't think the people of color who favor
17  voter ID would say, "Oh, that's fine."
18       If you put in the poll, "I think it might have a
19  disparate impact on the elderly," I don't think the
20  elderly who were saying they are for it would say
21  they're for it.
22       Q.  What's so difficult about getting a free
23  identification as allowed for by Senate Bill 14?  Why is
24  that so hard, in your view?
25       A.  Okay.  First of all, in Texas, the lines are

135

1  pretty long to get it.  If you want a driver's license,
2  which is what most people think about -- I'm trying to
3  discard credit cards right now because I would like to
4  sit down and not feel this bulge or think about the debt
5  that I owe.  I want to get rid of some cards.
6       So, most people -- the card that most people want
7  to have would be a driver's license because that's the
8  one that you think you might need for some other reason
9  like driving.
10       When I hear the analogy, well, you've got to have
11  ID to fly, well, you don't.  You've just got to go
12  through a lot of hassle.  I lost my ID not too long ago,
13  and they did let me get on the plane.  I don't think it
14  was who I was.  I just had to go through a lot of
15  changes to get on it but that's not a constitutional
16  right.  So, I'm saying yes, it's difficult.
17       Q.  Travel is not a constitutional right?
18       A.  No.  You better have some money.
19       Q.  Okay.
20       A.  You've got to have some money to go do it.  If
21  you've got no money complex, it's not a constitutional
22  right.
23       Q.  Let me ask you this then:  What's so difficult
24  about going to the DPS -- what are the steps that would
25  be involved in getting a free identification under

136

1  Senate Bill 14?  Just tell us what those would be.
2       A.  Well, I hope we have it accessible now but I got
3  a call from -- we politicians get to go to the VIP room
4  to get our driver's license.
5       Q.  That's not what I was asking you, though.  I'm
6  asking you what is so difficult about a constituent that
7  you have going to get a free identification as provided
8  by Senate Bill 14, if you can answer that question?
9       A.  First of all, you've got to figure out where it
10  is.  It's probably not inside the Loop.  If you go to
11  what I call DPS, what used to be Motor Vehicle, the last
12  discussion I had with somebody about it about a month
13  ago, it was a very important person trying to avoid the
14  lines.  So, there are lines you've got to go through to
15  get there.  You know, it's a real hassle.
16       And if you don't have a car -- I guess if you
17  don't have a driver's license, you've got to worry about
18  driving.  If you don't have a car, you've got to figure
19  out how you get there.  If you're in a city like
20  Houston, it's hell getting a bus anywhere.
21       I guess if you ride bikes like I do, you figure
22  you ride a bike.  You're obese anyway but it's a hassle
23  to do.
24       And I'd be interested to look at how many people
25  have this government issued ID other than a driver's

Senator Rodney Ellis - Volume 1                    June 22, 2012

---

137

1  license.
2        Q.  When you go vote --
3        A.  Let me finish.
4        Q.  Go ahead.
5        A.  Then the hassle with getting a driver's license
6   would be if you got a ticket -- I haven't looked at my
7   stats in Harris County for a while -- I remember asking
8   for the stats on Harris County when I saw this news
9   report about El Paso County some time ago but there was
10  a number of people who have financial difficulties,
11  particularly now.  So, you owe for a ticket and, then
12  you're out.  You're out of luck.  And then you've got to
13  have the insurance.  I mean, it's a requirement if
14  you're going -- if you're going to drive a car, you've
15  got to have -- I can't remember if we passed the thing
16  or not.  Somebody was trying to get a thing passed where
17  you can't get a driver's license if you don't have proof
18  of insurance.
19       Q.  Senator Ellis, I want to make sure we're on the
20  same page.  You understand that Senate Bill 14 provides
21  for a free identification?
22       A.  Uh-huh.
23       Q.  You're not indicating that it requires you to
24  show proof of insurance?
25       A.  No, I'm not.

---

138

1        Q.  So, let's stay with the question.
2        A.  You've got to find.
3        Q.  So, the hard part is finding the DPS office?
4        A.  Finding it, knowing about it.
5        Q.  How are those two separate things, finding it and
6   knowing about it?
7        A.  First of all, if somebody has not had to have
8   this in order to go vote, I doubt that they are going to
9   think about it until they get in there to vote, and then
10  somebody is going to say, "Where is your ID?"
11       So, you really -- I mean, I know -- when you
12  think about the low number of people who vote in Texas
13  anyway, it's not as though people are jumping off the
14  roof to go vote, and when you're trying to get people
15  who have been disenfranchised to participate in the
16  process, another hurdle, another barrier to go through,
17  it presents a problem.
18       Q.  So, the difficulty -- let's stay with the
19  difficulty of getting a free identification under Senate
20  Bill 14.  One, you have to find out where the DPS office
21  is.  What's number two?
22       A.  You've got to figure out a way to get there to
23  get it.
24       Q.  You've got to get to DPS.  Okay.  And then -- and
25  can you give me any other difficulties?  I think you

---

139

1   said standing in some sort of line?
2        A.  I'm assuming that there are lines -- I know
3   people have complained to me about lines to go and get a
4   driver's license.  And I'm assuming if you're going to
5   something that is perceived as a law enforcement entity,
6   there are people in my district who don't have a healthy
7   regard for people who are in uniforms, and they usually
8   don't go out of their way to go to a Department of
9   Public Safety office or some law enforcement type office
10  to go get an ID, not that they're doing anything wrong
11  but I don't think they -- it's just not the kind of
12  place that they look forward to going to visit.
13       Q.  Anything else I missed that would present
14  difficulty for getting a free identification?
15       A.  I'll keep thinking about it.
16       Q.  Okay.  Keep thinking about it.
17       A.  We may think of some others.
18       Q.  Let's do.
19       A.  Let me go get a glass of water.  I might think of
20  some more.
21       Q.  Okay.
22       A.  I won't ask anybody while I'm gone.
23           (Off the record.)
24           (Whereupon at 5:11 p.m. the
25           deposition was adjourned.)

---

140

1        E R R A T A   S H E E T
2
3   Correction              Page    Line
4
5   _____
6
7   _____
8
9   _____
10
11  _____
12
13  _____
14
15  _____
16
17  _____
18
19  _____
20
21  _____
22
23  _____
24
25  _____

## 143

349755 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          *
          Plaintiff,                     *
VS.                                      *
ERIC H. HOLDER, JR., in his             *
official capacity as Attorney           *
General of the United States,           *
          Defendant,                     *
ERIC KENNIE, et al,                      *
          Defendant-Intervenors,         *
TEXAS STATE CONFERENCE OF NAACP         * CASE NO.
BRANCHES, et al,                         * 1:12-CV-00128
          Defendant-Intervenors,        * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS            * THREE-JUDGE COURT
EDUCATION FUND, et al,                   *
          Defendant-Intervenors,         *
TEXAS LEGISLATIVE BLACK CAUCUS,         *
et al,                                   *
          Defendant-Intervenors,         *
VICTORIA RODRIGUEZ, et al                *
          Defendant-Intervenors.         *

TELEPHONIC DEPOSITION OF SENATOR RODNEY ELLIS
VOLUME 2
UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:

Patrick K. Sweeten, Esquire
Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Street, 8th Floor
Austin, Texas  78701

Date          Edith A. Boggs, CSR

6-23-12       HOUSTON, TEXAS

## 144

8   DEPOSITION OF SENATOR RODNEY ELLIS

11  DEPOSITION AND ANSWERS of SENATOR RODNEY ELLIS, taken
12  before Edith A. Boggs, a certified shorthand reporter in
13  Harris County for the State of Texas, taken at the
14  offices of State Senator Rodney Ellis, 440 Louisiana,
15  Suite 575, Houston, Texas, on the 23rd day of June,
16  2012, between the hours of 8:08 a.m. and 10:38 a.m.

## 145

1   A P P E A R A N C E S
2
3
4   ATTORNEY FOR PLAINTIFF, STATE OF TEXAS:
5
    Office of the Attorney General of Texas
6   P.O. Box 12548 (78711-2548)
    209 West 8th Street, 8th Floor
7   Austin, Texas  78701
8   By:  Patrick K. Sweeten, Esquire
9   (512) 936-1307
    patrick.sweeten@oag.state.tx.us
10
11  ATTORNEY FOR DEFENDANT, HOLDER, ET AL:
12
13  U.S. Department of Justice
    950 Pennsylvania Avenue, NW
14  NWB - Room 7202
    Washington, DC  20530
15
    By:  Jennifer Lynn Maranzano, Esquire
16  (Present telephonically)
17  (202) 305-7766
    jennifer.maranzano@usdoj.gov
18
19
20
21
22
23
24
25

## 146

1   A P P E A R A N C E S (Continued)
2
3
4   ATTORNEY FOR THE KENNIE INTERVENORS:
5
    Brazil & Dunn, LLP
6   4201 Cypress Creek Parkway, Suite 530
    Houston, Texas  77068
7
    By:  Chad Dunn, Esquire
8
    (281) 580-6310
9   chad@brazilanddunn.com
10  ALSO PRESENT:
11    Mr. Brandon Dudley
12
13  REPORTED BY:
14    Ms. Edith A. Boggs
15
16
17
18
19
20
21
22
23
24
25

## 147

1                    EXAMINATION INDEX
2
3        QUESTIONS BY                         PAGE
4
         Mr. Sweeten                          148
5
6
7               INDEX OF EXHIBITS
8
      NO.   MARKED        DESCRIPTION
9
         None
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 148

```
1            SENATOR RODNEY ELLIS
2   was called as a witness and, being previously duly sworn
3   by the notary, testified as follows:
4                 EXAMINATION
5      Q.  (BY MR. SWEETEN)  Senator, you understand this is
6   a continuation of your deposition from yesterday, and
7   you understand you're still under oath for this
8   proceeding, sir?
9      A.  I do.
10     Q.  I'm going to move back to Ellis Exhibit 1, which
11  is your declaration, sir.  I'll put that back in front
12  of you.  We left off yesterday, I think, on Page 1.  So,
13  there are a few remaining questions regarding your
14  affidavit that I still have.
15          MR. DUNN:  Did you mean to say Page 2?
16          MR. SWEETEN:  Yes.
17     Q.  (BY MR. SWEETEN)  Page 2.  On 8, you discuss
18  Governor Perry designated Senate Bill 14 as emergency
19  legislation.  Certainly it is within the Governor's
20  power to designate legislation as emergency legislation,
21  correct?
22     A.  That's correct.
23     Q.  If legislation is declared emergency legislation,
24  it's still up to the Senators to determine what they
25  want to do with that legislation.  They fully consider
```

## 149

```
1   it --
2      A.  That's correct.
3      Q.  -- despite that designation, correct?
4      A.  That's correct.
5      Q.  In fact, what are the effects of the Governor
6   declaring an emergency legislation?
7      A.  During the first early period of the session, you
8   could need a four-fifths vote to bring a bill up.  So,
9   that would mean you could bring the bill up out of order
10  by tradition with a two-thirds vote.
11     Q.  Okay.  And I want to ask you -- and certainly
12  that's -- there were other matters that the Governor --
13     A.  It's up to a Governor.
14     Q.  I'm sorry?
15     A.  It's up to a Governor.
16     Q.  Right.  And there were other matters that session
17  that the Governor deemed to be emergency legislation
18  correct, during the 82nd?
19     A.  I assume.  I don't recall.
20     Q.  You then say in paragraph 9 that you offered
21  several amendments, including one that would have
22  required the Secretary of State to produce an annual
23  report analyzing, among other things, whether the
24  requirements imposed by Senate Bill 14 had a
25  disproportionate impact on racial and ethnic minorities.
```

## 150

```
1   So, you attempted to amend the bill to add that for
2   annual reporting to occur after the implementation of
3   Senate Bill 14, correct?
4      A.  That's correct.
5      Q.  And was the amendment that you offered -- by the
6   way, that amendment you offered was not accepted,
7   correct?
8      A.  It did fail.
9      Q.  And had it been added to Senate Bill 14, it would
10  have been perspective, correct?
11     A.  That's correct.
12     Q.  It would not in any way have affected the
13  implementation of the provisions of Senate Bill 14,
14  correct?
15     A.  That's correct.
16     Q.  Okay.  Let's go to Page 3, paragraph 10.  You
17  talk here about an amendment to provide for same day
18  voter registration, an amendment to allow a voter to use
19  his or her unexpired student photo identification from
20  an accredited public Texas university.  With respect to
21  student IDs, are you aware if student IDs reflect
22  whether or not a student -- actually, strike that.
23          Is a student at a public university in the State
24  of Texas necessarily a citizen?
25     A.  A student at a public university does not
```



151

1  necessarily have to be a citizen, nor does a student at
2  a private university have to be a citizen.
3      Q.  So, a student could be issued a student ID and
4  they could be, for example, a resident of Vermont or a
5  nonresident alien, correct?
6      A.  I usually don't refer to humans as aliens but I
7  get your drift.  I do know that a student at a
8  university could have an ID and could be a citizen of
9  another state.
10      I also know that the Supreme Court has ruled that
11  a student's residence is either where they live -- where
12  their parents live or where they go to school.
13      Q.  So, a nonUS citizen could be a student at the
14  University of Texas, for example?
15      A.  I suspect that there are some.
16      Q.  And they could be issued a photo ID?
17      A.  That's correct.
18      Q.  Let's go to paragraph 11.  Here you talk about,
19  "During consideration of Senate Bill 14, Senator Fraser
20  did not acknowledge the extent of the difficulty that
21  some voters might encounter in traveling to a driver's
22  license office to obtain one of the required forms of
23  photo identification."
24      Here you say, "For example, in my district, there
25  are driver's license offices within the 610 Loop, which

152

1  is the inner city portion of Houston."  Did I read that
2  correctly?
3      A.  You did.
4      Q.  Are you aware of the concept of a DPS
5  supercenter, sir?
6      A.  I am.
7      Q.  Are you aware if such a center is slated to be
8  built or being built in Houston?
9      A.  I don't know if one is slated to be built but
10  when I made this statement, I knew that there was not
11  one in my district.
12      Q.  Okay.  But as far as whether or not --
13  perspective plans, you don't know one way or the other?
14      A.  As broke as the State of Texas is, even if
15  someone suggested it, I wouldn't believe them.
16      Q.  You indicate in paragraph 12 -- and I won't read
17  the entire thing but let's look at the last sentence --
18  first, go ahead and read that to yourself, if you would.
19      A.  Okay.
20      Q.  All right.  At the end you say -- the first
21  sentence, you refer to Senators who voiced concerns that
22  SB14 would disproportionately impact minority voters.
23  You say that, "The proponents of the bill turned
24  a deaf ear.  They refused to present to us any research
25  about the effect of the bill on minorities or to engage

153

1  in a discussion with minority legislators about these
2  concerns."
3      Let me ask you are you aware as you're sitting
4  here of any specific research about the effect of Senate
5  Bill 14 on minorities that was not provided to you, in
6  other words, anything that was in existence and not
7  provided to you during the discussions on Senate Bill
8  14?
9      A.  Yes.
10      Q.  Okay.  Can you tell me what that is?
11      A.  You know, there are numerous reports after this
12  debate was over with that people would send in to me or
13  talk about.
14      I made comment yesterday about me calling
15  legislators, some from the floor in Indiana, and that
16  was this -- there was limited discussion on the floor
17  about the Baker/Carter or Carter/Baker report.  Bush
18  just had some footnote about the concern that there
19  could be a disproportionate impact on minority voters.
20  There was some Brennan Center report.  I'm aware of a
21  number of scholarly journals who have done reports on
22  both sides of the issue.
23      Q.  Okay.
24      A.  But that didn't come up during this.
25      Q.  Let me back up on that.

154

1      You're aware of scholarly journals, your
2  testimony is, that either show -- some show and some do
3  not know a disparate impact, is that what your testimony
4  is?
5      A.  That's correct.
6      Q.  And are you indicating that those studies are in
7  the public domain?
8      A.  Yes.
9      Q.  Okay.  And are you indicating -- my question is
10  are you aware of any specific studies that were known to
11  proponents of Senate Bill 14, any research on the
12  disproportionate impact of Senate Bill 14 that were
13  not -- or that were withheld in any way?
14      A.  I don't think the proponents did any research on
15  any disproportionate impact.  They were not discussing
16  whether or not there was any disproportionate impact in
17  specific terms.  It was just blanket comments, "I don't
18  think it will have an impact."
19      Q.  And just to drill down a little more on that, I
20  think what I'm hearing you say is there are studies for
21  or against, that support or do not support your position
22  that are in the public domain, correct?
23      A.  There are studies that support and disagree with
24  my position and their position.
25      Q.  Okay.  Those are in the public domain?

Senator Rodney Ellis - Volume 2                    June 23, 2012

---

155

1          A.  That's correct.
2          Q.  There are no studies of which you're aware that
3    were, quote, suppressed in the floor debate of Senate
4    Bill 14 that you're aware of?
5          A.  To my knowledge, there were no studies based on
6    what impact it would have in Texas.
7          Q.  In fact, that's one of or criticisms that you've
8    leveled is that there were no studies on the impact that
9    the bill would have on racial minorities in Texas,
10   that's what you said yesterday was your criticism?
11         A.  They didn't give me any.
12         Q.  Okay.
13         A.  So, my criticism was they were trying to pass a
14   bill that I felt would have a disproportionate impact
15   and, to the best of my ability, I made my case that it
16   would have a disproportionate impact and, in my
17   judgment, the burden was on them to dispute that because
18   they were advancing the bill that, in my judgment,
19   creates a hindrance, an obstacle to people of color
20   being able to exercise their right to vote.
21         Q.  Let's go back.
22             You indicated that there were studies for or
23   against in the public domain.  You certainly had the
24   full opportunity, would you agree, to voice or produce
25   or append to the record any of those studies that you

---

156

1    chose to do?
2          A.  No, I wouldn't say that I had enough time to do
3    it because I didn't have the resources, nor the full
4    arsenal of the State of Texas.  I didn't have the
5    distinguished Attorney General's Office advising me
6    along the way and pulling together everything that I
7    ought to say to put in the record or to try to keep out
8    of the record.
9              Clearly, the people who were in charge and who
10   considered this a priority and had worked on it for
11   three previous sessions, with the arsenal of the
12   national voter suppression experts and all the other
13   people coming to bear and the full arsenal of the
14   resources of the State of Texas at their disposal, I
15   think that they did have an advantage in the policy
16   making process to make their case.
17         Q.  In no way were you precluded on the Senate floor
18   or during the Committee of the Whole proceedings from
19   offering any sort of research that you felt supported
20   your case other than the time that it would take to find
21   or assemble that research; is that correct?
22         A.  Other than in terms of resources, staff, in the
23   arsenal of state government, second largest state in the
24   country, behind me to make my case, I was not inhibited
25   from being able to make it.

---

157

1          So, it's the sort of like going up against
2    Hercules, with my limited pool of resources, small
3    staff.  I can't imagine what if I could have done if I
4    had folk like you in the AG's office to help make my
5    case.
6          Q.  Okay.  You indicate in your declaration that,
7    "During the Senate floor debate on Senate Bill 14,
8    Senator Fraser repeated answered questions about his own
9    bill by saying that he was not 'advised' or that the
10   Secretary of State could answer the question.  In
11   addition, Senator Fraser responded to questions about
12   the possible impact of this bill on minorities by citing
13   a public opinion poll indicating popular support for
14   voter photo identification requirements."  Did I read
15   that correctly?
16         A.  Yes.  That's number 13.
17         Q.  Okay.  That's paragraph 13, right?
18         A.  That's correct.
19         Q.  Now, Senator Fraser -- let's talk about the
20   second part first because there you reference public
21   opinion poll.  You're indicating that Senator Fraser
22   cited to a public opinion poll in favor of photo
23   identification requirements, correct?
24         A.  Correct.
25         Q.  Were you in any way precluded from offering any

---

158

1    sort of poll results in the event they existed?
2          A.  No, I was not precluded.
3          Q.  Okay.  Did you have any poll results that you
4    offered on the floor?
5          A.  No.  I was not aware of any poll results that
6    argued my side.  My sense of poll results is that, as I
7    said yesterday, it depends on how you ask the question.
8    And you have to have the resources to go and ask the
9    question in a way to make your case.
10             And as an example, if someone had asked the
11   question of voters in my district, "Would you be for a
12   voter identification requirement if it only applied to
13   people showing up to vote, not mail-in ballots, where a
14   good part of the fraud that people have said they can
15   prove exists, would you be for it," or if it said, "Are
16   you for it if you know that a disproportionate number of
17   people of color, African American and Hispanics,
18   probably don't have the government ID," or if you said,
19   "Well, they're going to lose" -- a large percentage of
20   those people don't have driver's licenses, and to get
21   the state ID, they've got to go to the same place where
22   they owe money.  They've got to show up to somebody in a
23   uniform and say, "Can I get this state ID?"
24             You know, there's a lot of things you could have
25   put in there, like the office hours, not one in the

159

1  inner city, they are not open on weekends.  I think the
2  polling data would have been different.  It would have
3  argued for my side, but I didn't have any of that
4  polling data.
5      Q.  And you didn't commission a poll to be conducted?
6      A.  No one gave me any money.  The State of Texas
7  didn't give me any resources to do that polling data,
8  and none of the right wing think tanks that want to
9  suppress minorities votes offered to do that for me.
10     Q.  What about any of the opposite political spectrum
11 think tanks, did you have that?  Any polling of your
12 district from any --
13     A.  To my knowledge, none of the financially deprived
14 civil rights organizations in the country knew of any
15 polling data in that regard.
16     Q.  Okay.  And certainly no polling data for your
17 position was offered in the Committee of the Whole
18 proceeding?
19     A.  Didn't have any and, to my knowledge, none was
20 offered.
21     Q.  Okay.  So, let's go back to the first part of the
22 sentence, which is you indicated that, "Senator Fraser
23 repeatedly answered questions about his own bill by
24 stating he was not 'advised.'"  Now, you're not
25 indicating that him saying "not advised" on the Senate

160

1  floor was evidence of purposeful discrimination, are
2  you?
3      A.  I'm convinced that my colleague and desk mate,
4  Senator Fraser, who was carrying a bill that, in my
5  judgment, he didn't really want to carry but it was his
6  turn to do it, was doing what he needed to do to get
7  through the process.
8      Q.  Okay.  My question, though, is this:  You're not
9  suggesting that by him making the statement on the
10 Senate floor, "I'm not advised," to some questions, that
11 that in and of itself shows evidence of purposeful
12 discrimination?
13     A.  I think it could.
14     Q.  And in what way would saying "not advised" -- how
15 would that possibly show purposeful discrimination, sir?
16     A.  In my judgment, Senator Fraser, who is a bright
17 man and, as I said, a dear friend and somebody I talk to
18 more than anybody on the floor --
19     Q.  Let me just go ahead and caution you before you
20 get into this, remember, I don't want any personal
21 conversations disclosed with Senator Fraser that would
22 be subject to the legislative privilege.  I'll go ahead
23 and give you that caution.
24     A.  If any member on the Senate floor were asked that
25 question, the questions that this Senator was asked

161

1  about a major bill that could impact civil rights
2  issues, knowing how important that is to members on both
3  sides, and they said they were not advised, that would
4  indicate to me that they didn't have a lot of confidence
5  in their position, which is why they would defer that to
6  someone else.
7      Just in a body of 31 and the egos that we have,
8  if you're advancing something, the burden is generally
9  on that person to be the expert on it, to make their
10 case, not to deflect that to someone else.
11     When you do that, that is an indication that
12 either you know something and don't want to say it, you
13 don't feel confident in your position or you really
14 don't like what you're doing.
15     Q.  You would agree, wouldn't you, that is
16 purely your subjective interpretation of the use of the
17 term "not advised," that is Senator Rodney Ellis'
18 opinion?
19     A.  That is the opinion of this Senator based on
20 22 years of passing and killing legislation.
21     Q.  Okay.  And the -- needless to say that what he
22 said on the floor is all a matter of public record,
23 correct?
24     A.  It is.
25     Q.  And certainly the Court will have the opportunity

162

1  to review the public record and make their own
2  interpretation of that issue.  And would you agree that
3  what you're referencing here was all a -- was all what
4  was on the public record, sir, the "not advised"
5  comments?
6      A.  Because you restricted me to what is on the
7  record.  To answer your question, it is.  Obviously, I
8  know things that were not on the record.
9      Q.  Okay.  Well, then in this sentence of the
10 affidavit, you reference statements made on the floor.
11 So, clearly, what you're referencing here, the "not
12 advised" statement is your interpretation based upon
13 what was said on the Senate floor, correct?
14     A.  My quote was, "During the Senate floor debate on
15 Senate Bill 14, Senator Fraser repeatedly answered
16 questions about his own bill by stating that he was not
17 'advised' or that the Secretary of State could answer
18 the question."
19     Now, you could read that as me just making
20 reference to what was said on the floor in public record
21 but when we are debating bills, we debate both on the
22 record and we have side bar comments as well all the
23 time, on the floor, off the floor.
24     Q.  Your affidavit said, "During the Senate floor
25 debate on Senate Bill 14."  Are you indicating that

## 163

1    you're referencing the public record or something that
2    is outside of the public record in that statement,
3    paragraph 13?
4        A.  I'm referencing both.  When members are on the
5    floor debating, everybody doesn't sit there like they
6    are a zombie.  We also have side conversations, which
7    sometimes are more meaningful.  Members probably collect
8    more votes by what is not on the public record than what
9    is not on the public record.  Sometimes you have to go
10   ask a member, "Will you vote for it?"
11       Q.  Nevertheless, your opinion that you've expressed
12   that the use of the term "not advised" shows evidence of
13   purposeful discrimination is your -- as you've
14   testified, whether on or off the public floor, is your
15   subjective opinion based on 22 years as a Senator,
16   correct?
17       A.  Everything that I say or you say is based on a
18   subjective opinion.
19       Q.  It's your impression of the what the term "not
20   advised" means in the context of these discussions,
21   these public discussions on the floor is what you're
22   basing your opinion on, correct?
23       A.  I'm basing it on both, as I said earlier.  I
24   mean, a policy maker doesn't just go into a deep freeze
25   and make a decision or a comment based on what is said

## 164

1    in the record.  You do that in the courtroom, I
2    understand that, but when we are making a decision, not
3    just me but my colleagues as well, you know, you take in
4    the entire spectrum of what's said, in the hall, in
5    committee, in a private meeting, on the phone, in
6    debate.
7        Q.  But what you've said in this affidavit is the
8    term "not advised," and you would agree that that is a
9    term that was used -- that that is something that
10   Senator Fraser said on the public record in the debate?
11       A.  He did say that in the public record.
12       Q.  And your interpretations of that statement made
13   in the public record are that that shows purposeful
14   discrimination on behalf of Senator Fraser?
15       A.  It could.
16       Q.  Again, that's your opinion?
17       A.  That's my opinion.
18       Q.  All right.
19       A.  Everything I say, might I add, is my opinion.
20       Q.  You indicate that you found Senator
21   Fraser's responses to be unsatisfying and not responsive
22   to concerns about the impact of Senate Bill 14 on
23   minority voting rights.
24       Have we talked about -- I mean, I think that's --
25   have we talked about the issue of -- you're saying -- is

## 165

1    there any other factor, any other statement that Senator
2    Fraser made in the public debate that, in your opinion,
3    would show that he was not responsive to concerns about
4    the impact of Senate Bill 14 on minority voting rights
5    other than his use of the term "not advised"?
6        A.  Yeah.
7        Q.  Okay.  What else in the public record would you
8    refer to?
9        A.  Not having -- not being able to quantify or give
10   any data on the impact it would have on minority voting
11   is an indication of it being -- so, not just the
12   comment, "I'm not advised," but when asked, "What can
13   you give us to show that it won't have a disparate
14   impact on minority voting," and when he didn't give
15   anything, to me, that's an indication of being
16   nonresponsive, not just a comment but not giving
17   anything, not making your case that it won't have a
18   disparate impact.
19       Q.  But you, yourself didn't offer any sort of data
20   either with respect to that question?
21       A.  I was not carrying the bill.  What I did was
22   raise the issue what about not having a place to get a
23   license in my district, what about -- whether I did it
24   or other members did it -- what about press accounts
25   that certain counties such a high percentage of

## 166

1    people don't have driver's license.
2        I seem to recall somebody in the debate saying,
3    "You want people to get their -- you want them to go get
4    their state ID that nobody is giving right now and you
5    want them to get it from the folks they owe money to,
6    somebody standing there in a uniform and you want
7    somebody who's license has been suspended to go get this
8    state ID?  Please."  That discussion was held, and it's
9    on the record.
10       Q.  My question was you didn't yourself offer data or
11   studies opposing Senator Fraser's view during the
12   Committee of the Whole debate yourself, correct?
13       A.  I didn't have any data that the State would give
14   me to show the disparate impact.
15       Q.  And in any event, you did not introduce any such
16   evidence?
17       A.  I couldn't introduce what I didn't have.
18       Q.  Okay.  You voted -- on paragraph 15 you say, "I
19   voted against Senate Bill 14 and remain opposed to this
20   legislation in large part because of the effect that I
21   believe it will have on minority voters."  Did I read
22   that correctly?
23       A.  You did.
24       Q.  Now, you said "in large part."  Is it a fair
25   characterization of your opinion -- and you've testified

## 167

1  now for several hours regarding the issue of the
2  purposeful -- what you claim is the purposeful
3  discriminatory element of Senate Bill 14.  Is it a fair
4  characterization of Senator Rodney Ellis' opinion as to
5  why you believe that this Senate Bill 14 purposefully
6  discriminates against minorities, that it is the lack of
7  information on effect is what leads you to that
8  conclusion?
9      A.  Partially.
10     Q.  Okay.  What other factors lead you to the
11  conclusion that Senate Bill 14 purposefully
12  discriminated against racial minorities?
13     A.  The fact that they would not accept amendments on
14  issues like do the research to see what impact it will
15  have.  The fact that they did not include absentee
16  voting, where somebody can mark a ballot for someone
17  when they mail a ballot to them.  The fact that it --
18  that there was a total insensitivity on the part of the
19  proponents of the bill to show data that would indicate
20  that it would not disproportionately impact people of
21  color and the fact that when I made calls to Legislators
22  from the floor in other states during the debate to ask,
23  you know, "In your state, could they give you any
24  empirical data to show that it wouldn't hurt minority
25  voters," and I was told by the Legislators I spoke to,

## 168

1  "Looks like this is a trend going around the country,
2  and they come in with the same argument and very limited
3  information or data to back up what they want to do."
4      MR. DUNN:  Just to make sure our record was
5  clear, you did not want him to mention any private
6  conversations with Legislators as part of that answer?
7      Q.  (BY MR. SWEETEN)  And, again, my goal here is to
8  find out why you think that the bill purposefully
9  discriminated.  You've now listed the reasons that you
10  believe that.  So, I want to make it clear that if
11  you're indicating that there are additional issues that
12  are subject to the legislative privilege, i.e., private
13  conversations with individuals, that you reference the
14  existence of those conversations but you not reveal the
15  substance of those.
16     So, you haven't listed that as one of your
17  factors.  If that is a factor, just so my instruction is
18  clear, that is something I want you to reference without
19  revealing the specific substance.
20     Were there specific conversations that you had
21  off the floor that support your opinion that Senate Bill
22  14 was purposefully discriminating against racial
23  minorities?
24     MR. DUNN:  When you say off the floor, do
25  you mean outside of the public record?

## 169

1      MR. SWEETEN:  Yes, outside of the public
2  record.
3      MR. DUNN:  They could have happened on the
4  floor and just not been in the public record.
5      MR. SWEETEN:  Yes.
6      A.  Yes.
7      Q.  (BY MR. SWEETEN)  And without revealing the
8  specific substance of those conversations, I want you to
9  reference who those conversations were with.
10     A.  Colleagues.
11     Q.  Who specifically?
12     A.  I would -- some with Senator Fraser.
13     Q.  Did you say let's start or --
14     A.  Senator Fraser, conversations I had with him.
15     Q.  And I don't want you to reveal the substance, as
16  we've talked about.
17     Are there any other specific discussions that
18  lead you to believe that this bill purposefully
19  discriminated, other than the other factors that you've
20  listed just now?
21     A.  I'd have to reflect on it.
22     Q.  But right now as you're sitting here, it's a
23  specific conversation you had with Senator Fraser and
24  it's all these other reasons that you've listed that
25  lead you to the belief that this bill purposefully

## 170

1  discriminated, correct?
2      A.  Yes.
3      Q.  There aren't additional factors -- other than the
4  multitude of things you've just listed, there aren't
5  additional factors that lead you to that opinion,
6  correct?
7      A.  There might be some.  I'd have to --
8      Q.  There may be some but as you're sitting here, you
9  can't think of what those are?
10     A.  Not off the top of my head.
11     Q.  So, let's go over -- part of my goal here is to
12  find out -- you're going to testify in Washington, DC.
13  You've been disclosed as a potential witness.  So, part
14  of my goal here is to find out what it is that Senator
15  Rodney Ellis believes.
16     So, we've gone through, have we not,
17  comprehensively, the reasons that you believe that
18  Senate Bill 14 purposefully discriminates against racial
19  minorities, correct?
20     A.  That's correct.
21     Q.  Okay.  Now, one of the factors you've said -- and
22  I want to go through each one.  I think we've talked at
23  some length about why -- about what you felt was the
24  lack of data that was in existence by the proponents of
25  the bill.

171

1      Okay.  Is there anything else about that issue
2   that we haven't discussed other than the fact that -- I
3   think you've testified many times that you asked for
4   specific data and were not provided that data.  Is there
5   anything else?
6      A.  Not that I can think of at this moment.
7      Q.  Okay.  The next thing you said was that
8   proponents of the bill wouldn't -- that certain
9   amendments were not accepted.  I want to know what you
10  have in mind as the specific amendments that you believe
11  show evidence of purposeful discrimination.
12     A.  The fact that they wouldn't accept my amendment
13  that said go and do the research after this is in effect
14  and see what impact it will have on minority voters, and
15  the fact that you wouldn't want to go and do the
16  research even after you have gotten the bill passed to
17  see if the issues I'm raising end up being true or not,
18  to me indicates some discriminatory intent because to me
19  it indicates you think you have something to hide, which
20  is why you don't want to know.
21     Q.  Okay.  What other amendments do you specifically
22  have in mind?
23     A.  I'd have to go through all of the amendments, and
24  I have not -- I didn't go prep myself for this meeting
25  to go through all of the amendments that were offered.

172

1   I know I developed a good number of them, working with
2   my staff, but I'd have to go through that list of them.
3      To the best of my knowledge, we had some pretty
4   good amendments that would show that a reasonable person
5   that did not have the intent to discriminate would have
6   agreed with some of those amendments.
7      You know, same day registration, as an example,
8   if you want to make sure you don't have a
9   disproportionate impact on certain groups of people who
10  may not already be registered to vote and your real
11  intent is to make sure that people who are voting are
12  the right people, you don't have any fraud, considering
13  the low number of people that vote, why wouldn't you go
14  ahead and spend the money to put the apparatus in place
15  to check those things out the same day?
16     I think somebody offered an amendment -- I'm not
17  sure.  I'd have to go back and look -- to come up with
18  some version of a universal state ID that everybody in
19  the State of Texas would have.  I'd have to go back and
20  look at the list but I can remember internal discussions
21  about doing that.
22     There were things one could do if your real
23  intent was to make sure that you didn't have fraud in
24  voting but if your intent was really to discriminate
25  against certain groups that you fear may have clout at

173

1   some point in voting patterns, you would be opposed to
2   those things.
3      Q.  Okay.
4      A.  So, that's what would give me the impression that
5   that was a discriminatory intent.
6      Q.  You've cited now a second amendment, and that one
7   is a universal ID amendment.  Now, can you tell me which
8   Senator offered that amendment, do you recall?
9      A.  I have no idea.  You would have to -- and I would
10  be more than happy -- if you want to come up with the
11  complete list of amendments --
12     Q.  I know I could do that.  I'm asking you what your
13  opinion is on -- I want to ask you about your
14  knowledge is as you're sitting here about that
15  amendment.
16     So, my question is with respect to the universal
17  amendment, you don't know who specifically offered that
18  one?
19     A.  No.
20     Q.  With respect to that amendment, you're saying
21  that you would have been supportive of a universal type
22  of ID system -- photo identification system within the
23  State of Texas?
24     A.  I'm saying that there are things that you could
25  have put in a bill, and if I was confident that all of

174

1   them would stay in the bill, going through the
2   legislative process, the way the game works sometimes,
3   you take anything to get a bill out of a committee or
4   out of one chamber and then take it out of the other
5   chamber or go into a conference committee and I take it
6   out.
7      But yeah, there are ways you could structure --
8   you know, I've heard discussions from around the country
9   or discussions with my colleagues, you know, some people
10  who oppose a notion of a universal ID system -- you
11  know, I can remember conversations with people about it
12  in Mexico, as an example, where they put an inordinate
13  amount of money into the infrastructure of voting, or in
14  Brazil where, to make sure you don't have a
15  disproportionate impact, they give you a ticket and you
16  pay a minor fine if you don't vote.
17     There are things in other countries around the
18  world where people do stuff to make sure the turnout is
19  up, more people have to participate to where you don't
20  have a disproportionate impact but that was not the
21  intent here in Texas.
22     Q.  Is it a fair statement that you would be
23  supportive of a universal photo identification
24  requirement within the State of Texas?
25     A.  I would have to go look at how it's implemented,

175

1  how it's put together but some version of it, I would be
2  for it.
3      Q. Tell me the version you would have been
4  supportive of regarding a universal photo identification
5  from the State of Texas.
6      A. I would have to put you on my staff to go do the
7  research, and then I could tell you what version of it I
8  would be for.
9      Q. So, is it a fair statement that there is a
10  universal type photo identification system that would be
11  statewide that you could support, as far as the details
12  of what that would be, you can't articulate that right
13  now but you would be supportive of such a concept?
14      A. I would have to put some parameters on it,
15  something so that everybody had access, you weren't
16  targeting any groups in terms of gender, race, age,
17  disability and everybody had the ability to participate.
18      You know, that's why I made reference to the
19  notion of same day registration, as an example.  There
20  are things that one could do so that you wouldn't have a
21  disproportionate discriminatory impact on certain
22  groups.
23      Q. And one of those things would be a universal
24  identification system within the State of Texas
25  requiring voters to show a photo identification, and

176

1  that's something you would support if the details were
2  right?
3      A. I'm saying if you had a system where everybody
4  had access, if at birth -- you would have to work out
5  the ramifications of what if you move out of state, when
6  you come back in -- if there were some foul proof way of
7  making sure that you didn't have a disparate impact, a
8  discriminatory impact on any particular group, I would
9  not be bothered, whether based on income -- now, you
10  know, how you work that out in utopia, I don't know, and
11  I would have to put some smart people around me to
12  figure out hot to do that.
13      Q. But from 2005 to 2011, the issue of photo
14  identification requirements were issues that were
15  discussed within the Texas Senate and Texas House,
16  correct?
17      A. That's correct.
18      Q. In that six-year time period, did you at any
19  point offer an amendment or offer legislation regarding
20  this type of universal photo identification system
21  within the State of Texas that would be required to
22  allow individuals to vote?
23      A. No.
24      Q. Did you so -- so, since your -- you would be
25  theoretically in favor of such a concept, did you ever

177

1  put pen to paper and discuss this on the floor of the
2  House or introduce legislation regarding this issue?
3      A. No.  I was not advocating the issue.  That's like
4  asking me if I'm for everybody getting into heaven, am I
5  going to develop a game plan to get them there.
6      Look, I'm a person who carries a lot of bills,
7  gets involved in a lot of issues, but no, I didn't see
8  it as my responsibility to go figure out how to take
9  their bill, which had discriminatory intent, and figure
10  out how to make it work.
11      Q. And you certainly offered no amendments with
12  respect to a universal identification system yourself?
13      A. I offered a bill for same day registration.
14  Obviously, if you're going to have same day
15  registration, that in and of itself implies that you've
16  got to have a system on that day that somebody shows up
17  to the polls, as they do in Iowa, to make sure that the
18  person is valid.
19      So, within the concept of maybe a one or two page
20  amendment, one would have had to flesh out all of the
21  details if it had been accepted and get it in the body
22  of the bill to make sure you could have universal same
23  day registration, which in and of itself implies you've
24  got to have some way of verifying who the person is.
25      Q. Is it against current law for noncitizens to vote

178

1  in the State of Texas?
2      A. I think so.
3      Q. Okay.  Is it against the law for permanent
4  residents who are noncitizens to vote?
5      A. I'd have to go back and check but I don't think
6  it's legal for them to vote.
7      Q. And is that -- by itself, is that discriminatory?
8  Is that a discriminatory law, in your view?
9      A. You need to be a citizen to be able to vote.
10      Q. So, no?
11      A. No.
12      Q. Is evidence of a discriminatory purpose, in
13  your view, to strengthen voting laws to make sure that
14  citizens, rather than noncitizens, are the ones who are
15  voting?
16      A. If there is a way to do that so that you do not
17  have a disparate impact on other groups, I have no
18  problem with that.
19      Q. So, it's not discriminatory, in your view, by
20  itself, to strengthen protections against noncitizens
21  voting, correct?
22      A. It depends on how the bill is crafted.
23      Q. So, that's no to my question?
24      A. That's it depends.
25      Q. So, it is not, in your view, discriminatory by

---

179

1  itself to strengthen protections against noncitizens
2  voting?
3        A.  I don't have a problem with making sure that you
4  do not let people who are not supposed to vote not vote
5  as long as you don't do it in such a way that you
6  discriminate against other people who do have the right
7  to vote.
8        Q.  So, that's a valid concern.  It is a valid
9  concern to make sure that individuals -- to make sure
10  that citizens are the people who are voting and
11  noncitizens are not?
12       A.  Well, that would be your opinion.  I've not seen
13  any evidence in Texas that we have had a problem with
14  people who are not citizens voting.  Most people who are
15  not citizens in this state, unless there's some
16  challenge with them on thinking, the last thing they
17  want to do is come above the surface and be seen in this
18  state.  That's the quickest way to get deported.  I've
19  not seen anybody who has shown me any evidence to prove
20  that.
21       MR. SWEETEN:  I want you to read back my
22  question that I asked prior to Senator Ellis' answer.
23       (Whereupon, the requested testimony was read back
24  as follows:
25       QUESTION:  So, that's a valid concern.  It is a

---

180

1  valid concern to make sure that individuals -- to
2  make sure that citizens are the people who are
3  voting and noncitizens are not?)
4        THE WITNESS:  Okay.  Now I want you to read
5  back my answer to his question.
6        (Whereupon, the requested testimony was read back
7  as follows:
8        ANSWER:  Well, that would be your opinion.  I've
9  not seen any evidence in Texas that we have had a
10  problem with people who are not citizens voting.
11  Most people who are not citizens in this state,
12  unless there's some challenge with them on
13  thinking, the last thing they want to do is come
14  above the surface and be seen in this state.
15  That's the quickest way to get deported.  I've
16  not seen anybody who has shown me any evidence to
17  prove that.)
18       Q.  (BY MR. SWEETEN)  It's a valid concern --
19       MR. DUNN:  Could you ask a complete
20  question?  What is the valid concern?
21       MR. SWEETEN:  I'm finishing the question.
22       MR. DUNN:  Sorry.
23       THE WITNESS:  Don't interrupt him.
24       MR. DUNN:  I noticed.
25       THE WITNESS:  And don't you interrupt me.

---

181

1        MR. SWEETEN:  Nobody has interrupted anybody
2  as far as I can tell.
3        Q.  (BY MR. SWEETEN)  All right.  It's a valid
4  concern to make sure that citizens are voting and
5  noncitizens are not, correct?
6        A.  I have seen no evidence that people in Texas who
7  are not here legally are voting.  And if there is any
8  evidence of it, I would like to see it.
9        I have speculated that if anybody wanted to find
10  any evidence, you ought to look for it with mail-in
11  ballots, not in terms of people showing up to go and
12  vote.
13       Q.  You're answering another question.
14       My question is:  Is it a valid concern to make
15  sure that citizens who are able to vote are the people
16  that are voting, rather than noncitizens?
17       MR. DUNN:  Objection.  Asked and answered.
18       A.  I don't think people who are not in this country
19  legally ought to be able to vote, and I don't think in
20  Texas we have a problem with people who are not here
21  legally voting.  I think our current laws adequately
22  protect us from that.
23       Q.  (BY MR. SWEETEN)  I understand that you think
24  it's not a problem.  My question, though, is do you
25  think it's a valid concern to make sure that those who

---

182

1  are voting are citizens?
2        A.  Hey, I agree with the law.  I agree with the law
3  that says if you're not a citizen of Texas -- of the
4  United States, you ought to not be able to vote in
5  Texas.  I agree with that law.
6        Q.  Do you think voter fraud occurs in the State of
7  Texas?
8        A.  I think if it does occur, it would occur with
9  mail-in ballots, which this bill does not impact.  I do
10  not think it is occurring -- I've not seen it.
11       Q.  You don't believe that voter fraud occurs in the
12  State of Texas?
13       A.  Look, I think there's always a possibility of
14  some kind of fraud, whether it's in voting, whether it's
15  in campaign finance.  I mean, that's why we have laws on
16  the book to keep those things from happening.  I think
17  there are crimes committed all over the place.
18       Q.  So, you do think voter fraud occurs in the State
19  of Texas?
20       A.  I haven't seen any evidence of it but I wouldn't
21  go on a limb to say it has never happened, never could
22  happen.
23       Q.  Do you agree voter fraud is a very difficult
24  crime to detect?
25       A.  No, I don't.

183

1      Q.  And what's the support you have for that opinion?
2      A.  Well, the fact there's so few people in Texas are
3  voting, out of 25 million people, that in and of itself
4  tends to limit the extent to which you have any of it
5  happening, and because I think the proponents of this
6  legislation have spent an inordinate amount of money
7  looking for it and haven't found it yet.
8      Q.  Are you aware of testimony on the floor of the
9  Senate that -- about instances of voter fraud?  Do you
10  recall those?
11      A.  I do.
12      Q.  Do you recall -- have you talked with any sort of
13  law enforcement personnel about how difficult or whether
14  or not voter fraud is a difficult crime to detect?
15      A.  Not recently.
16      Q.  Have you at any point?
17      A.  I did ask around people who were around the
18  Capitol during the last session, some law enforcement
19  people, is it a challenge.
20      Q.  And can you tell me who specifically you talked
21  to?
22      A.  Don't recall.
23      Q.  Okay.  Is it your opinion that voter fraud is not
24  a very difficult crime to detect?
25          MR. DUNN:  Objection.  Asked and answered.

184

1      A.  In my opinion, the State has not proven any major
2  incidence of voter fraud in Texas.
3      Q.  (BY MR. SWEETEN)  But my question is about the
4  difficulty of detection of voter fraud.  Do you have any
5  opinion one way or the other about whether or not it's a
6  difficult crime to detect?
7          MR. DUNN:  Objection.  Asked and answered.
8      A.  I don't know.
9      Q.  (BY MR. SWEETEN)  I'm going to read some language
10  for you, and I want to ask you questions about it.
11          "The electoral system cannot inspire public
12  confidence if no safeguards exist to detect or deter
13  voter fraud or to confirm the identity of a voter."
14  Would you agree with that statement?
15      A.  Say it again.
16      Q.  "The electoral system cannot inspire public
17  confidence if no safeguards exist to detect or deter
18  voter fraud or to confirm the identity of a voter."  You
19  agree with that statement?
20      A.  I think we have adequate safeguards.
21      Q.  But that's not my question.
22          My question is:  Do you agree with the statement
23  that I just read to you?
24      A.  Somewhat.  And the reason I say somewhat is
25  because I think we have adequate safeguards.  I think

185

1  that statement is used by people who want to perpetuate
2  things that will inhibit certain groups of people from
3  voting instead of trying to go after what they consider
4  voter fraud.
5      Q.  Okay.  So, your opinion is yes, that the
6  electoral system can inspire public confidence if no
7  safeguards exist to detect or deter voter fraud but
8  you're just saying that current systems are adequate to
9  do that, is that a fair statement?
10      A.  That's what I said.
11      Q.  Okay.  Do you agree with the following quote:
12  "Citizens should identify themselves as the correct
13  person on the registration list when they vote"?
14      A.  Yes.
15      Q.  Okay.  Do you agree with this statement:  "The
16  perception of possible fraud contributes to low
17  confidence in the voting system"?
18      A.  No.
19      Q.  Let me ask you about this statement.  Do you
20  agree that, "A good ID system could deter, detect or
21  eliminate several potential avenues of fraud, such as
22  multiple voting or voting by individuals using the
23  identities of others, those who are deceased and could
24  enhance confidence"?
25      A.  Read it again.

186

1      Q.  "A good ID system could deter or detect or
2  eliminate several potential avenues of fraud, such as
3  multiple voting or by individuals using the identity of
4  others or those who are deceased and, thus, it can
5  enhance confidence"?
6      A.  Seems a little wishy washy to me.
7      Q.  Okay.
8      A.  I think that statement could also lead to
9  advocating policies that would keep certain groups of
10  people from voting, could be used as a way to keep
11  certain groups of people from voting.
12      Q.  Were you present during the Committee of the
13  Whole proceedings when Tommy Williams' brother testified
14  about -- on the public record about an instance of
15  voting fraud involving Senator Williams' maternal
16  grandfather?
17      A.  I vaguely remember it.
18      Q.  Do you have any reason to dispute that someone
19  voted on Senator Williams' deceased grandfather's voting
20  registration?
21      A.  I really don't know much of the details about his
22  family voting history.
23          MR. DUNN:  Whenever you get a minute, I need
24  to a take a break.
25          (Short recess.)

187

1   Q. (BY MR. SWEETEN)  What did you do to prepare for
2   this deposition?
3   A. I looked at -- I glanced over -- not much.  I
4   glanced over my affidavit, and I asked my staff to pull
5   together whatever I said on the floor and whatever
6   amendments I offered.  Obviously, not too much because I
7   couldn't remember the third amendment.
8   Q. Did you have any discussions with any of the
9   individuals who have been deposed in this case?
10      MR. DUNN:  I'm not sure he would know that.
11   Q. (BY MR. SWEETEN) I can go through it.
12      Did you have any discussions with Representative
13   Anchia prior to this deposition?
14   A. No.  Well, yeah.
15   Q. Regarding the deposition?
16   A. No, not regarding this.
17   Q. Did you discuss the deposition with Senator
18   Uresti?
19   A. No.
20   Q. Did you discuss the deposition with Senator
21   Davis?
22   A. No.
23   Q. Did you discuss any depositions with -- the
24   subject of depositions with any other Senators who have
25   been deposed in this case that you know of?

188

1   A. I don't think so.
2   Q. Did you read deposition transcripts in
3   preparation for this?
4   A. No.  Didn't even read the one that I got last
5   night from what I said yesterday.
6   Q. Did you talk with individuals at the Justice
7   Department prior to this deposition about the
8   deposition?
9   A. No.
10   Q. When is the last conversation you had with
11   individuals at the Justice Department?
12   A. About two minutes ago.
13   Q. Who did you talk to?
14   A. I asked Jennifer how she was doing.
15   Q. How about before the deposition, Senator?
16   A. I haven't had any conversations with Justice
17   about the deposition.  Now, in terms of the last time I
18   spoke to someone from the Justice Department -- this is
19   just mere speculation on my part.  I saw the Attorney
20   General in Houston a month, six weeks ago, not talking
21   about this case, just saying he's doing a good job.  I
22   think I saw him at something in Washington or New York.
23   I did a little wave.  I think I did a little handshake
24   but no -- and I have talked to somebody in Justice about
25   Innocence Project stuff within the last -- I was at some

189

1   symposium in DC six weeks ago, a month ago.  About six
2   weeks ago.  But I cannot -- I don't recall any specific
3   conversations about this issue.
4   Q. Okay.  Now, when we -- let's go back because we
5   were -- I was asking you about the reasons that you
6   believe that this bill purposefully discriminated.  And
7   we talked about accepting amendments, that amendments
8   weren't accepted.  Are there any additional amendments
9   other than what we've talked about that lead you to
10   believe that -- that support your belief that Senate
11   Bill 14 was passed with the purpose of discriminating
12   against racial minorities?
13   A. Yes.
14   Q. Okay.  What are those amendments?
15   A. I'm just speculating because I don't have a list
16   of amendments in front of me, since we're on the record,
17   but I met with a number of the minority -- of the
18   Senators who represent large minority populations in
19   their districts, and I met with my staff, and I met with
20   some of the civil rights groups, Urban -- NAACP, lawyers
21   and other folks, asking, you know, what can we come up
22   with to make a bill that looks like it's going to pass a
23   better bill, to address some of these issues.
24      So, we had a long laundry list of them.  And I
25   can remember my staff sorting amendments out that would

190

1   go to different people.  I don't have the list in front
2   of me, so, I'm just guessing if I were trying to back up
3   to a year and a half ago and figure out -- or a year
4   ago -- you know, what kind of things I would have been
5   discussing.
6      Resources, you know, amendments.  I assume one
7   was offered that you've got to put some resources in
8   here to do this stuff, and there was no interest in
9   doing that.
10      You know, stuff like making sure that whatever ID
11   this is is -- folk can get it easily, you know, put
12   together some system with the bells and whistles so it
13   is easily accessible.
14      Same day stuff.  I'd just have to through a list
15   of them but we had a pretty good list, I think, of them.
16   Q. Let me ask about your amendments first.  Had your
17   amendments been accepted, would you have voted for
18   Senate Bill 14?
19      MR. DUNN:  Objection.  Asked and answered.
20      THE WITNESS:  Say again.
21      MR. DUNN:  I objected that it was asked and
22   answered.
23      But you can answer.
24      THE WITNESS:  You need some coffee there,
25   slurring those words.

191

1    A. I offered three amendments. One had nothing to
2 do with making the current bill better, the one that
3 said do an annual study to see if it has a
4 discriminatory impact on certain groups. So, obviously,
5 if that had been accepted, it wasn't improving the bill,
6 it was just going to see whether or not the concerns
7 that I raised and were not responded to would be
8 answered.
9    The one on same day registration, no, if that had
10 been accepted, I would not have voted for it.
11    The other one on student ID -- if the three that
12 I offered had been accepted, I wouldn't have voted for
13 it.
14    Q. (BY MR. SWEETEN) You would--
15    A. I would not have voted for it.
16    Q. What amendments, as you're sitting here that you
17 have knowledge of, would have made you vote -- or would
18 have motivated you to vote for Senate Bill 14?
19    A. If there had been an amendment to repeal
20 everything below the caption, I would have voted for it.
21    Q. So, any of the amendments that were offered, you
22 wouldn't have supported Senate Bill 14 one way -- in any
23 event?
24    A. I'm not positive. If there had been an amendment
25 to pay to set up the apparatus, to pay for a universal

192

1 statewide identification system with same day
2 registration, there are versions of voter identification
3 that I could support but that was not -- you know, look,
4 it was a given that my colleagues were not going to put
5 up the resources to do that but I can think of --
6 whether an amendment was offered or not, I don't know --
7 from conversations with some people in the House -- if
8 we were going to put in as much in terms of resources
9 that the government of Mexico, as an example, put in,
10 and I can remember a dialogue with adding what Brazil
11 does in terms of a minor ticket, 2 bucks, whatever it
12 is, for people not to vote, to make sure that you really
13 are encouraging voter participation and not having any
14 of those issues.
15    Q. You would support a bill that would require --
16 that would actually fine people for not voting, that's
17 something that you would support?
18    A. That's a concept that -- I've look at some
19 election data around the globe, to be honest with you.
20 That's a concept that I think is worth exploring. There
21 are checks and balances to it as well. Maybe
22 constitutional issues in our constitution that may come
23 up but to respond to the implication, I'm very concerned
24 about the low level of voter participation in Texas,
25 much lower than the national norm.

193

1    Q. And a bill that you would support -- a voter ID
2 bill that you would support would allow for a universal
3 photo identification system in Texas if the details were
4 right, correct?
5    A. I could -- I could -- it would take some effort
6 but I could probably get there.
7    Q. Would that universal ID system include current --
8 use of driver's license by voters or, in Senator Ellis'
9 mind, would it be a new type of a photo identification
10 issue?
11    A. If I were going to do it, it would be a
12 combination. First of all, I would have to make sure
13 that you couldn't take somebody driver's license because
14 they owed a fine or you couldn't keep someone from
15 getting a driver's license because they didn't have
16 insurance but on the other hand -- because a driver's
17 license is probably the most common form of ID, I
18 wouldn't want other people to be in a position that I'm
19 in of having too many credit cards in the wallet and
20 trying to figure out which ones to get rid of, and then
21 you find out they don't take American Express.
22    Q. So, a photo identification bill that you would
23 support would include the use of driver's license, photo
24 identification, in addition to a new type of universal
25 photo identification with a picture ID?

194

1    A. I don't know if I would get hung up on the photo
2 part as much as making sure I could verify that the
3 person is who they say they are. There are a number of
4 things that you could include, like letting someone vote
5 and verifying it later. With low voter participation,
6 I'm very leery of anything that reduces the number of
7 people who legally can vote but don't vote.
8    Q. Would your system that you would advocate
9 regarding some sort of identification system, would it
10 include correspondence sent to a voter by an official
11 state agency? Would that be sufficient, in your view?
12    A. No. It would have to be that and other things.
13 I know that we've got in Houston a large number of
14 rental units and, you know, I have a daughter who is out
15 of the country now, and if she doesn't vote for a cycle
16 and then she comes back and wants to vote, she ends up
17 being purged. Her residence is still my home but she's
18 traveling the world for a year.
19    So, I mean, it would -- it would be that among
20 other things. You would have to throw in same day
21 registration. You know, I could get there. I normally
22 am not in the habit of developing legislation in a
23 deposition or in a courtroom but you could go through a
24 process if what you're trying to do is figure out how to
25 make sure that you don't have the wrong people voting

195

1  but you don't penalize having the right people vote.
2      Q.  Is it a fair statement that you believe there's
3  room for improvement under the current system, it's just
4  a question of what are the details of how that
5  improvement should take place?
6      A.  Improvement in what way?  I think there's room
7  for improvement in terms of increasing voter
8  participation.  I don't think that we have a problem
9  with voter fraud in terms of people showing up to vote.
10      Q.  You don't think that there is any room for
11  improvement under current law for verifying that those
12  voters who show up to the polls who are who they say they
13  are?
14      A.  I think there's always room for improvement in
15  any law.
16      Q.  Including this one, including the current
17  voting?
18      A.  Including the current voting.
19      Q.  All right.  You also said -- when I asked you
20  about the reasons you believe Senate Bill 14
21  purposefully discriminated, you indicated -- and I got
22  this partially down, so, you're going to have to help me
23  with this but I wrote, "not include absentee voting."
24  Do you recall what that specific --
25      A.  I don't know.  Do you know?  Which part are you

196

1  talking about?  Were you reviewing my transcript last
2  night?
3      Q.  Not last night.  You just said it this morning,
4  actually.
5          MR. SWEETEN:  If you could do a search on
6  "absentee voting" from earlier today.
7          (Whereupon, the requested testimony was read back
8          as follows:
9          ANSWER:  The fact that they would not accept
10          amendments on issues like do the research to see
11          what impact it will have.  The fact that they did
12          not include absentee voting, where somebody can
13          mark a ballot for someone when they mail a ballot
14          to them.)
15      Q.  (BY MR. SWEETEN)  So, she just reread the part
16  that said that they did not include absentee voting
17  where someone could mark a ballot.  She's now read that
18  to you.  Do you recall that answer?
19      A.  Yes.
20      Q.  Can you tell me what you meant by that?
21      A.  I meant that they did not apply the photo
22  identification requirement to mail-in ballots.  When you
23  are as old as I am, young man, sometimes the terms
24  change.  So, in the old days, before we had this
25  two-week early voting period, if you were going to be

197

1  out of town, you had to do a mail-in ballot.  Now you
2  can -- the no excuse voting, early voting, whatever we
3  call it, for a two-week or ten-day period but in the old
4  days, we called that absentee ballot.
5          This does not apply to mail-in ballots because,
6  in my judgment, the folks who were pushing the bill know
7  that mail-in ballots tend not to be an area where you
8  have large numbers of African Americans and Hispanics.
9  It takes a little more wealth.  You've got to be a bit
10  more organized.  You've got to have some resources to go
11  mail a ballot to the home of someone, and a lot of them
12  tend to be elderly voters but you won't have as large a
13  number of African Americans and Hispanics in that pool.
14          Well, it didn't apply to this, and I've always
15  thought that if there is some fraud -- not being able to
16  prove it but if there is some fraud, a lot of the cases
17  have been cases where somebody had one of these mail-in
18  ballots, and they go to some grandmother's,
19  grandfather's, older neighbor's home, and they go in
20  there and vote for them and mail it in.
21      Q.  So, part of why you think that Senate Bill 14 had
22  a discriminatory purpose is that it didn't address
23  mail-in balloting?
24      A.  In this sense, I agree with that comment, I would
25  say in this sense, most of those mail-in ballots or a

198

1  disproportionate number of those will be nonminority
2  voters just because of the comment I was making, it
3  takes some resources to organize a campaign.  They tend
4  to be more affluent, when a candidate, whoever, can
5  organize to go pay the money to send that mail-in
6  ballot, have somebody go knock on that door and do a
7  mail-in ballot.
8          And I think that is an area where if some
9  chicanery was going to go on, it could go on but most of
10  those voters are white.  They tend not to be African
11  American and Hispanic voters, and they didn't go and
12  touch that space with the voter ID requirement.
13          They are going after the area where I think
14  minorities would not have a driver's license, have
15  challenges finding the time, resources to go way out
16  somewhere.  If they're working some place, they've got
17  to go after working hours, to find the place to go get
18  this state ID.
19      Q.  So, addressing in-person voting fraud in and of
20  itself without addressing mail-in ballot fraud, to you,
21  shows a discriminatory purpose?
22      A.  It implied to me you are picking and choosing,
23  and you are picking to add barriers in an area where
24  most of the minorities would be impacted the most, as
25  opposed to adding barriers in the area where you don't

199

1   have as many minorities.
2       Q.  Okay.
3       A.  And you could have more -- if there is fraud, you
4   could have more there, just based on my common sense
5   approach to watching the elections.
6       Q.  Another reason you cited that you believe Senate
7   Bill 14 purposefully discriminated was you said that
8   proponents showed some insensitivity to showing data
9   that would indicate the impact of -- or the effect of
10  the bill on racial minorities.  You said that, correct?
11  That was one of your reasons?
12      A.  Yes.
13      Q.  And yesterday we discussed this to some degree.
14  Is there any other -- do you have any other testimony
15  that supports that statement?
16      A.  Any other -- do I want to add anything?
17      Q.  Yes.  Is there anything that you haven't told me
18  in this deposition?  You've told me about the fact that
19  there was a lack of data.  You said that -- your
20  testimony was that you asked for data, it wasn't
21  provided.  Is there any other instance that shows
22  insensitivity to showing data that this bill would not
23  have a discriminatory effect?
24      A.  You asked earlier about what did I do to get
25  prepared.  Before I went to bed about 1:00 a.m., I just

200

1   googled in disparate impact of voter ID laws.  And I had
2   a few other things to do at 1:00 a.m. but a whole
3   laundry list of scholarly reports popped up.
4       Just glancing through them, I'm assuming on both
5   sides, just by googling that in at 1:00 a.m. in the
6   morning.  And, you know, as I said, I saw some kind of
7   going on both sides.  I saw that Carter/Baker thing, the
8   Brennan thing, a whole laundry list of them.
9       I don't know if -- I saw some reference to South
10  Carolina that I hadn't seen before but a whole laundry
11  list of them came up.
12      I think if I had been pushing the bill, I would
13  have felt it was incumbent upon me -- if I'm trying to
14  pass something and I want people to have confidence in
15  me, I'm going to go give them both sides.  I take the
16  position of a good lobbyist.  When you're trying to pass
17  a bill, you're lobbying for it.  I take it as my
18  responsibility to lay out both sides.
19      Q.  Okay.
20      A.  And when all of that popped up, for that not to
21  have -- some of those maybe had been around before the
22  bill passed.  Obviously, you've got advocacy groups on
23  both sides doing work.  I didn't see any polling data
24  but then I went on it sleep about 1:20.  So, I think a
25  lot of that should have come out in that session.

201

1       Q.  And when you say a lot of that, you're saying
2   there's information in the public sphere that you could
3   google that you don't think was presented by proponents
4   of the bill, correct?
5       A.  Proponents as well as opponents.
6       Q.  Okay.  Now, certainly the opponents had that
7   opportunity with respect to Senate Bill 14 or other
8   voter ID bills before the Senate, certainly that
9   opportunity was present to present that publicly
10  available information?
11      A.  To someone outside the sausage making process,
12  that comment is easy to make.  Someone who's been in the
13  process all their life -- you know, about 5,000 bills
14  that are introduced during a 140-day legislative
15  session, the most important bill being the budget.  It's
16  a part-time job.  It's a $600 a month job.
17      On this bill, once the rules were changed,
18  tradition was thrown out the window, and it was passed
19  by a majority vote.
20      In our public as well as private meetings,
21  without naming any members, there's pretty much
22  consensus this is what it is.  We will take everything.
23  We will agree.  Make a motion, everything that was in
24  the record from last session, which nobody would
25  remember, you can put that in but, hey, we have our

202

1   votes, you don't have your votes, you know, I know you
2   all have got to make a record so when it ends up in
3   court, it's going to be there but let's just get this on
4   out of the way so we can agree to disagree and, you
5   know, when it's over with, for the good of the 25
6   million people in the State, we are going to all get
7   along, and we're going to go on and go to the next
8   issue.
9       So, what I'm saying to you is -- one second.
10  What I'm saying to you is to make the comment -- if you
11  on your side or the other side or the distinguished
12  judges that hopefully will be reading all of this, you
13  can't encapsule what goes on in our body, in our process
14  of sausage making just by saying both sides had a chance
15  to put this in.  Sometimes you don't put stuff in when
16  nobody is listening.  You got me?
17      Q.  Well, in 2009, there was an over 24-hour debate
18  of Senate Bill 362.  You indicated that was incorporated
19  into the record in 2011.  That's correct, right?
20      A.  Uh-huh.
21      Q.  Certainly within that time period, as well as the
22  Committee of the Whole proceedings that occurred in 2011
23  regarding Senate Bill 14, there was ample opportunity
24  for opponents of the bill to present evidence that
25  you're referencing that is in the public sphere in

## 203

1    support of or in opposition to Senate Bill 14, would you
2    agree with that?
3        A.  What I'm saying to you is that in the process of
4    making the case on this legislation, there was always
5    the assumption that bright people like you, like the
6    Justice Department that's on the phone, like the lawyers
7    on our side, would have all of the empirical evidence to
8    make the case on what's right, what's wrong, what's out
9    there in the public sphere.
10       I bet if you go search the record, you will find
11   somebody making the comment, "We will agree that you all
12   can put everything in the record from last session and
13   everything else in the world."
14       So, I'm saying in no way did we ever feel, on my
15   side or the State's side -- the State meaning you
16   because my Republican colleagues had the resources of
17   the Attorney General and everybody behind them.
18       "Anything else that you all want to add, any
19   research that you can come up with that makes the case
20   on either side, you can do it."  So, there was no need
21   to go in there and dig up every empirical study on both
22   sides or I didn't feel compelled to go take my campaign
23   money, since I couldn't use the State money, to go do a
24   poll to see whether or not my constituents would be for
25   the bill if they knew A, B, C.  That's just not how it

## 204

1    works, with all due respect, that's what I'm saying.
2        Q.  But I think somewhere within that answer you've
3    indicated that you were afforded the opportunity, to the
4    degree you wanted to put in information from the public
5    sphere that you've referenced that you googled last
6    night, that that opportunity was -- you were availed
7    that opportunity, correct?
8        A.  I was given the opportunity to put everything in
9    I had and, by implication, anything else that comes up.
10       Q.  In addition, during the Senate proceedings,
11   was -- it's a true statement, is it not, that the
12   Baker/Carter Commission report was discussed?
13       A.  It was.
14       Q.  Okay.
15       A.  And most of us were looking at it as we were on
16   the floor.
17       Q.  Okay.  That's a report that had been released, I
18   think, in 2006, correct?
19       A.  Yes.
20       Q.  And you were looking at it on the floor, are you
21   indicating that you looked at it on the floor for the
22   first time in 2011?
23       A.  I'm indicating that I would have looked at it
24   when the bill came up.  It was not -- you know, I think
25   it was cited by an expert that came in from -- a think

## 205

1    tank out of Washington, DC who testified on the bill in
2    2011.
3        And so, he took one phrase out of it where he
4    made some comment to the effect, "President Jimmy Carter
5    was for this but didn't make reference to a footnote."
6    Someone pulled it up during the debate in 2009, where in
7    the Carter/Baker -- Baker/Carter report they said there
8    were legitimate concerns about a disparate impact on
9    African Americans and Hispanics.
10       So, what I'm saying is --
11       Q.  Was that --
12       A.  I'm sorry.  It's not as on this bill -- it's not
13   as though this was the only bill.  The way it works in
14   Texas in particular where you've got 140 days to
15   consider 5,000 bills, it's not as though anybody took
16   all their time and just focused on this one bill.
17   That's why I made reference the other day to the
18   Committee of the Whole.
19       Usually when it's in a committee, members put a
20   lot more time into digging into it, as opposed to all 31
21   of us considering a bill, which is why we normally take
22   the committee route to develop more expertise on a bill.
23       Q.  But the Committee of the Whole is a committee,
24   it's just a committee of all the Senators?
25       A.  Yeah.

## 206

1        Q.  All the Senators have the right to participate in
2    that committee, unlike when you just have certain
3    committees looking at bills?
4        A.  We always have a right by tradition.  And I
5    probably exercised it a little more than most in the
6    last session.  You can use your prerogative to walk into
7    any committee, whether you're on it or not, and
8    participate.
9        There are only 31 of us.  It's the smallest
10   legislative body in the country with 31 of us.  You can
11   go into committee at any time and participate.
12       Q.  And the Committee of the Whole allows for full
13   participation -- it is the matter before the body when
14   you're in the Committee of the Whole, correct?
15       A.  Yes.
16       Q.  It has the focus and attention of the individuals
17   on the Committee of the Whole when a bill is before the
18   Committee of the Whole?
19       A.  As you may recall, I would argue yesterday when
20   it's in the Committee of the Whole, it probably gets
21   less attention than when it is in a committee because
22   when it's in Committee of the Whole and you've got all
23   31 of us in there, there's room for a heck of a lot more
24   distraction.  Were that not the case, they would take
25   the budget and everything else -- they'd take the most

207

1   important bill that we do every session and just do that
2   in Committee of the Whole.
3         Q.  Okay.  We've now gone through what you believe --
4   the reasons that you've cited that you believe Senate
5   Bill 14 purposefully discriminated against racial
6   minorities.  Is there any other factor that you believe
7   supports your view that SB14 purposefully discriminates
8   against racial minorities?
9         A.  As we sit here today, I think that I've given you
10  a pretty good laundry list.  I cannot think of any more
11  right now but if I think of any, I'll let you know in
12  court or I'll pop you an E-mail and tell you before I
13  walk in if that's okay.
14        Q.  Well, let's be clear.  If you have any reasons in
15  support of your belief that Senate Bill 14 purposefully
16  discriminated against racial minorities, I'm asking you
17  now what those reasons are.  And is it your testimony
18  that other than what you've said -- and we've been here
19  now for probably four hours total on the record -- have
20  you cited for me the reasons you believe that Senate
21  Bill 14 purposefully discriminated against racial
22  minorities?
23        MR. DUNN:  Objection.  Asked and answered.
24        A.  How many do you have that I've gone through, just
25  to make sure I've got them all?  Maybe she can read them

208

1   all to me again.  Reasons that this bill is awful and
2   discriminates against minorities, that ought to be in
3   there somewhere.  I think I made a reference to
4   resources.  I hope I have because that is a big part of
5   it.
6         Q.  (BY MR. SWEETEN)  Well, let's talk about those
7   resources.  You think resources of whom are a part of
8   what makes this bill purposefully discriminatory?
9         A.  Resources of the State, first of all.
10        Q.  Okay.
11        A.  Resources in terms of paying to make sure that
12  people who don't have a government issued ID have one in
13  a form in which it is easy to get, it's not obtrusive,
14  you know, it's something small and if you lose it, you
15  can get another one, you don't have to go across town,
16  you don't have to, you know, figure out how you can get
17  it, if not on line -- some people don't have Internet
18  but how you get it, whatever we -- whatever we do, if
19  there's something we really want people to participate
20  in, we find a way to make it accessible and, obviously,
21  that takes some resources to do it.
22        But to say you can go get this new form of ID
23  that most people don't know about, won't know that the
24  law changed, and then to -- if you want to go get this
25  form of ID, you're going to go the DPS office, you don't

209

1   have your license, so, you can't use that, so, you're
2   going to go to the DPS office where you owe money,
3   you're going to walk in and say, "Can I get this state
4   ID?"
5         And then, I guess, those offices close at 5:00,
6   6:00 o'clock, and they are in locations where it's
7   difficult to get there by public transportation.  I
8   guess the system -- we ought to give you a bicycle or
9   something to get out there.  How do you know where they
10  are?  And then the lines that we have.  So, resources in
11  that sense.
12        Q.  Any other reasons that you believe Senate Bill 14
13  had the purpose of discriminating other than what you've
14  testified to now?
15        A.  I'm just going to try to rattle off if I can
16  think of them.  In terms of the resource into it, we
17  don't come up with some fall back provision, like a same
18  day registration in case you show up and don't have the
19  deal, knowing the rules, knowing what they are, the fact
20  that there was ample evidence given that it might have a
21  discriminatory impact in Texas, and the people who were
22  promoting the bill didn't do anything to refute that or
23  try to ameliorate it other than to say, "I don't think."
24        I think that if I were pushing the bill, based on
25  the debate that we had, it would lead a reasonable

210

1   person to believe, you know what, this bill has a
2   discriminatory impact, intent.  He, Senator Ellis, if I
3   was pushing it, knows that and he's willing to live with
4   that.
5         So, to me, as a reasonable person, I think that's
6   enough on the record and the issues that I think I have
7   laid out that would lead a reasonable person, in my
8   opinion, just my opinion, to believe that someone knew
9   the bill had discriminatory impact and they were going
10  to let that happen.
11        Q.  Okay.  And so, as I'm understanding your
12  testimony, you have articulated during the course of
13  this deposition the reasons you believe the bill was
14  purposefully discriminatory, correct?
15        A.  I think I have.
16        Q.  Is there anything else other than what we've
17  discussed at this point?
18        A.  There may be but I just can't think of it off the
19  top of my head.
20        Q.  As you're sitting here now, is there any other
21  reason?
22        A.  Not as I'm sitting here now.
23        Q.  Okay.  I want to follow up on our prior
24  discussion of SR 521 from 1993, just a couple of
25  questions on that.  Was that ultimately passed in the

211

1  Committee of the Whole?
2      A.  Which one is 521?
3      Q.  SR 521.  We're going back to 1993.
4          MR. DUNN:  The judicial election.
5      A.  Senate Resolution 521.
6      Q.  (BY MR. SWEETEN)  Yes, sir.
7      A.  Passed the Senate Committee of the Whole.
8      Q.  And it was by a vote of what?  Do you know if it
9  was 17/13?
10     A.  It was by a majority vote in the Senate Committee
11 of the Whole.  It did not pass the Senate.  It passed a
12 Senate committee.  As you were saying earlier, it was
13 the Senate Committee of the Whole because in order to
14 avoid any of my colleagues feeling as though I
15 circumvented the rules -- which the parliamentarian said
16 I was not circumventing because it was a resolution,
17 Senate Resolution, not SB, not a Senate Bill, just as if
18 it was a resolution commending you on your birthday,
19 those pass by majority vote, not by two-thirds vote.
20     Q.  And SR 521 passed the Committee of the Whole by a
21 vote of 17/13, correct?
22     A.  You would have to show me that.
23     Q.  Okay.
24     A.  It was a majority.
25     Q.  It was a majority vote, not a two-thirds vote is

212

1  my question?
2      A.  That's right.
3      Q.  Okay.  Do you know -- going back to 2011, do you
4  know if when Senate Bill 14 was passed in January of
5  2011 if there was even a blocker bill in place at that
6  time?
7      A.  I think from my affidavit here, I stated that --
8  2011 -- on January 12th -- number 7, "On January 12th,
9  2011, the day after the ceremonial opening day of the
10 82nd session of the Texas Legislature, Senator Fraser
11 introduced Senate Bill 14.  The Senate carried over the
12 rule allowing legislation related to voter
13 identification requirements to be passed by a simple
14 majority vote into the 82nd Legislature."
15     What that is making reference to is that in the
16 previous session, I think it was Tommy who -- Senator
17 Williams who on opening day, when you normally do the
18 ceremonial stuff and everybody is hugging, he came up
19 with a special order to do -- a so-called special order,
20 which would be an exception to the rules, to do two
21 things by a majority vote.  I think it was redistricting
22 and the voter ID bill.
23     And then when -- I think we went into the back
24 room and discussed it and persuaded our colleagues it's
25 bad enough you're going to do voter ID but you're going

213

1  to blow up -- just the perception that the two most
2  important bills, as broke as we are, would be you're
3  trying to rig it in your favor for votes, to
4  disenfranchise minorities and to do redistricting before
5  the census even comes out.
6      So, they went back out and changed that and
7  decided to only change it to do a majority vote on voter
8  ID.  So, on opening day, what Troy was doing was taking
9  that same provision, which was an exception to the
10 rules, which meant they wanted to do two-thirds on
11 everything other than the voter ID bill.
12     Q.  And we've testified that is within the Senate's
13 right to do?
14     A.  It's always within the Senate's right to break
15 tradition, throw all decorum out of the door.
16     Q.  And to change -- the Senate has the absolute
17 right to change the rules, the two-thirds rule to the
18 extent they see fit?
19     A.  No motion is stare decisis in the Senate chamber.
20     Q.  And what you have to have to make those changes
21 is the votes, is a majority vote to do that, right?
22     A.  That's correct.
23     Q.  And they had that?
24     A.  Sure did.
25     Q.  Okay.  But my question I asked it before was

214

1  do you know if when -- on January 25th, 2011 when Senate
2  Bill 14 passed the Committee of the Whole, do you know
3  if a blocker bill was in place at that time?
4      A.  I'm assuming that on the opening day, if he was
5  adopting the rules from the previous session, the rules
6  from the previous session would have given us a blocker
7  bill for anything other than this one bill.
8      Q.  That's not my question.  My question is on
9  January 25th, 2011, was there even a blocker bill in
10 place at that time?
11     A.  I don't know.  You would have to go check the --
12 go check the rules.  And the reason I'm saying that is
13 that our tradition has been for close to 100 years a
14 two-thirds vote, period.
15     Now, you know, there may have been times when
16 there was no blocker bill in previous sessions but the
17 tradition was you would have a two-thirds vote.  The
18 blocker bill was just some procedural maneuver so you
19 could this is why you're having a two-thirds vote but
20 the tradition in Texas Senate was, before the new regime
21 took over, you would have a two-thirds vote.
22     Q.  It's a true statement, isn't it, that if there
23 was not a blocker bill in place that Senate Bill 14
24 would have been the first bill voted on because of the
25 regular order of business?

215

1    A. You could make that argument, and my response
2  would be why did he need to adopt the rules from the
3  previous session so that you were doing this by a
4  special order to the rules, a special order being that
5  you would do the voter ID bill by majority vote.
6    Q. But that's a true statement, isn't it?
7    A. I don't know. You would have to ask them. You
8  know what, I just say just from me reading it, from what
9  Senator Fraser did, I guess his knowledge of the rules
10  would be as weak as your question would imply mine would
11  be, why would he adopt the previous rules and call for a
12  special order if his bill was going to be the first bill
13  anyway unless maybe on their side, some of them were
14  having heartburn about what they were doing as well.
15    Q. Okay. But if there was no blocker bill in place,
16  Senate Bill 14 would have been the first bill voted on
17  based on the regular order of business in 2011?
18    A. The tradition is a two-thirds vote. The notion
19  of a blocker bill was just a way to say this is why you
20  have to have two-thirds vote because whoever was
21  carrying the blocker bill -- if it's something like
22  changing the name of Town Lake to Sugar Lake, whoever
23  was carrying that could always move their bill anyway.
24  So, it was just a way of procedurally saying this is how
25  we maintain our tradition.

216

1    Q. Is it a true statement that when bills come up in
2  the Texas Senate in the regular order of business, they
3  do not require a two-thirds majority vote?
4    A. I'm not trying to belabor the point but I think
5  you do get it. I know you're trying to show some point
6  other than what I'm trying to say.
7    The procedure for implementing our tradition of a
8  two-thirds vote is to go put some bill up there, and the
9  person who is carrying that bill has a gentleperson's
10  agreement to never move their bill. That's how you get
11  the tradition.
12    And it's usually something innocuous that is
13  never going to move anyway, changing the name of
14  something, changing the name of the state.
15    So, that person has that bill as the first order
16  of business. So, we can tell our House colleagues or
17  somebody sitting in the gallery this is why you have to
18  suspend the rules to get a two-thirds vote. So, I hope
19  I'm --
20    Q. But my question was if a bill comes up in the
21  regular order of business, it doesn't require a
22  two-thirds vote, correct?
23    A. That's what they say.
24    Q. Okay. Now, would it -- you were in the 78th
25  Legislature, right?

217

1    A. What year was that? I remember these by years,
2  not by numbers. When you've been there 22 years -- if
3  you ask me how many terms have I been in, I don't count
4  those either.
5    Q. Okay. We can do the arithmetic on that.
6    MR. DUNN: 2003.
7    Q. (BY MR. SWEETEN) So, would it surprise you if in
8  2003 in the 78th Legislature if there were 12 bills that
9  were passed without a two-thirds majority based upon the
10  regular order of business?
11    A. It depends on what the bills are. Do you want to
12  show me what the list of what the bills are?
13    Q. Well, I'm just asking you. The question is would
14  that surprise you?
15    A. It would not surprise me if under the current
16  regime, my colleagues in the Senate, who have had havoc
17  because of pressure from their powers in their party, if
18  there has been a pattern of occasional disregard of
19  Senate traditions as a way of trying to solidify their
20  base to pass things that they want to pass.
21    It would not surprise me if in 2003, as a way of
22  trying to get to reredistricting -- normally you do
23  redistricting in the '01 session or in the 1991 session,
24  1981. It wouldn't surprise me if from the beginning
25  with 31 members, most of whom had families, jobs,

218

1  everything else, would pack up and go to Austin for 600
2  a month for 140 days, where the tradition had been you
3  look out for one another in this process and you obey
4  the traditions, if there was a pattern to prepare for
5  trying to do redistricting again in the middle of the
6  decade, if they didn't resort to all kinds of subterfuge
7  to try to make the case to do reredistricting in 2003.
8  In my judgment, that was one of my lowest points in the
9  history of the Senate.
10    Q. Okay. Would it surprise you to know that under
11  Lieutenant Governor Bullock that in the 72nd
12  Legislature, 1992, that two bills were passed based
13  upon -- without a two-thirds majority based upon
14  adherence to the regular order of business?
15    A. It's certainly possible. It would surprise me if
16  it happened and anybody was concerned about it. I would
17  assume that they were bills where people who were
18  opposed to them had a gentleperson's agreement with the
19  leadership that they wanted to pass, just get them
20  out of here.
21    Q. Would you agree it's a fairly common thing for --
22  based upon adherence to the regular order of business,
23  for Senate bills to be passed without a two-thirds
24  majority?
25    A. I think it's fairly uncommon unless it's an

219

1   insignificant bill.
2       Q.  As you're sitting here, do you know historically
3   how many times the Senate has passed -- within the last
4   50 years, how many times the Senate has passed
5   legislation based upon adherence to the regular order of
6   business without a two-thirds majority?
7       A.  I don't know.  I've looked at a report that the
8   Secretary of State did.
9       Q.  Yesterday when we were discussing your testimony,
10  you made reference to a poll tax.  Do you believe Senate
11  Bill 14 is comparable to a poll tax?
12      A.  I do.
13      Q.  Okay.  You would agree with me, wouldn't you,
14  that a poll tax required -- historically required every
15  person who was casting a ballot to pay in order to cast
16  a ballot, correct?
17      A.  Yes.
18      Q.  Okay.  Now, you would also agree with me,
19  wouldn't you, that there's no requirement in Senate Bill
20  14 that all citizens casting a ballot must pay to do so,
21  correct?
22      A.  That's correct.
23      Q.  You would agree with me that the vast majority of
24  Texans voting, of all racial make-ups, possess a
25  driver's license that would be acceptable under Senate

220

1   Bill 14?
2       A.  No.
3       Q.  You don't agree that the vast majority of the
4   voting public within the State of Texas has a driver's
5   license available to them?
6       A.  I think that there are people who are eligible to
7   vote -- I don't know the numbers but I think there are
8   people who are eligible to vote who have gotten their
9   licenses suspended.  And I made reference to the press
10  accounts from El Paso County, as an example, where a
11  large number of people have gotten their licenses
12  suspended because they owe fines but they would be
13  eligible to vote but cannot vote because they don't have
14  a license.
15      Q.  My question, though, is this:  Do you believe
16  that the majority of Texans who are registered to vote
17  have a driver's license?
18      A.  It might be -- I don't know the number.  It would be
19  at least -- I don't know if it's a majority but I would
20  say a plurality of those who are voting have a driver's
21  license.
22      Q.  And you would agree, wouldn't you, that Senate
23  Bill 14, if you have a driver's license, that that is
24  acceptable identification to vote under the bill?
25      A.  Yeah, I do.

221

1       Q.  So, clearly, those with a driver's license that
2   vote don't pay anything to vote and certainly your
3   analogy to a poll tax is inappropriate with respect to
4   those in possession of a driver's license, wouldn't you
5   agree with that?
6       A.  No, I don't agree with that.  I think that --
7       Q.  How is that not so?
8       A.  Are you finished?
9       Q.  Yes.
10      A.  I think the 12 percent of the people who voted in
11  my last election had -- most of those a driver's license
12  but I think that it's comparable to a poll tax in this
13  sense, you have to have a car or money to get mass
14  transportation or some resources to get to wherever it
15  is they have to go get a driver's license.  They can't
16  do what legislators can do.  We have a private room over
17  there.  When our licenses are expired, we go over there
18  and we don't wait in line.
19      But the people that I represent, particularly the
20  poor ones, they have to have some resources to get to
21  the place, to get in the line.  They have to have some
22  time.
23      So, in my mind, in that sense, yeah, it's
24  comparable to a poll tax if you put in a requirement
25  that everybody who votes has to have a driver's license

222

1   because if you don't have a car, you don't really have a
2   need to get a driver's license.
3       I represent a lot of people who catch the bus.
4   Most of them get the early bus, might I add, to go to
5   work.  They are cleaning these buildings in downtown
6   Houston, or they are riding a bicycle or they are
7   walking or they are hitchhiking.  So, they don't really
8   have a reason to get a driver's license.
9       Q.  Senator Ellis, you're answering another question
10  than the one I asked.
11      The question I'm asking is you've already
12  testified that you believe a plurality of people in the
13  State of Texas who are registered to vote have a
14  driver's license.  The question I'm asking you is those
15  in possession of a driver's license need not under
16  Senate Bill 14 do anything more than show that driver's
17  license when they show up to the polls; is that correct?
18      A.  That's correct.  My reference was to those who
19  don't have a driver's license.
20      Q.  Okay.
21      A.  So, that's the analogy to the poll tax.
22      Q.  So, you would agree with me, wouldn't you, that
23  your suggestion and your analogy to a poll tax is
24  completely inappropriate --
25      A.  No, not at all.

223

1    Q.  I'm not finished.
2    A.  Sorry.
3    Q.  -- with respect to those -- with the plurality of
4    people in the State of Texas who possess a driver's
5    license, as to that group, that's an inappropriate
6    analogy, correct?
7    A.  Are you finished?
8    Q.  I am.
9    A.  My analogy to a poll tax was appropriate because
10   I was making reference to those people in my district
11   who may not have a driver's license because they don't
12   have a car because they catch the bus or they catch a
13   ride or they walk to work.
14       So, if you don't have the resources to have a car
15   or if you are elderly and your driver's license has been
16   taken away from you, you have no reason to go get one.
17   Q.  Okay.
18   A.  And then you have to -- can I finish?
19   Q.  Go ahead.  You can finish.
20   A.  Then you have to figure out where is the DPS
21   office that you don't go to on a regular basis, you
22   don't have a car, you don't plan on buying a car, you
23   have no reason to go get a driver's license, you're not
24   flying on an airplane, you don't need a passport, you're
25   not going out of the country, you know, you're poor or

224

1    you are on disability or something or Social Security,
2    you served in the war and you retired, you don't
3    necessarily -- you may not be homeless, you just may be
4    renting or staying with someone, you have no reason to
5    go get a driver's license, to go through the hassle of
6    waiting in a line or doing the paperwork or practicing
7    for an exam because you don't have a car.
8    Q.  Okay.
9    A.  But you do have a constitutional right to vote.
10   And if the State puts in a restriction that says you
11   have to have a government issued photo ID, you don't
12   have a gun license because you don't have a gun, then I
13   think the analogy to a poll tax is entirely appropriate.
14   Q.  Okay.  Then let's be precise about it.  When
15   you're making an analogy to a poll tax, you are not
16   including those residents in the State of Texas who
17   possess a driver's license, you are referring to those
18   who do not?
19   A.  I'm referring to those who do not have a driver's
20   license and I'm referring to those who do have a
21   driver's license but their driver's license has expired
22   or it has been taken away from them because they don't
23   meet other requirements.
24   Q.  And it's those individuals you're referring to
25   where you are making the analogy to a poll tax, you're

225

1    not referring to the plurality of Texans who have a
2    driver's license, correct?
3    A.  That's fair.
4    Q.  So, with respect to that, the individuals who
5    either do not have a driver's license or who have a
6    suspended driver's license that you're referring to,
7    those individuals are able, under the provisions of
8    Senate Bill 14, to obtain a free identification from the
9    Department of Public Safety, and that's provided for in
10   Senate Bill 14, correct?
11   A.  That's what the bill says.
12   Q.  Okay.
13   A.  That may not be reality but that's what the bill
14   says.
15   Q.  The bill, by its own terms, provides for free
16   identification to be issued from the DPS for any
17   individual that asks for one, correct?
18   A.  The 14th Amendment provides for equal protection
19   under the law but the enforcement of that historically
20   has been a challenge.
21       The Texas constitution has some language to that
22   effect but the implementation of that -- the devil is
23   always in the details.  The challenge for people whose
24   license has been suspended is knowing where to go to get
25   this government issued ID in an environment where they

226

1    feel comfortable.
2        And as I've stated for the record, in my
3    judgment, if someone's license has been suspended, it
4    wouldn't be the wisest thing in the world to go to a DPS
5    office and pass the officer, who you assume has the
6    ability to arrest you because you haven't paid your
7    fines, and say, "I'd like to get a government issued
8    ID."
9        Those offices are open, I assume, until
10   5:00 o'clock, 6:00 o'clock.  Working class people would
11   have to go after hours, and the challenge for working
12   class people would be how do you get there.
13       And the lines -- at least from complaints I've
14   gotten about driver's license -- I don't think many
15   people know about this going to pick up a government
16   issued ID to vote but to get a driver's license, I get a
17   large number of complaints from people about the lines.
18   Q.  Are you -- by the way, do you have any
19   information about the educational efforts by the
20   Secretary of State in the event Senate Bill 14 is
21   implemented?  Do you know what those programs would
22   entail?
23   A.  No.
24   Q.  Okay.
25   A.  It hasn't gone into effect yet.  I know that here

227

1   in Harris County, the voter registrar was doing
2   training, telling election officers that people would
3   have to have ID, and he didn't know that that was not
4   the law.
5         And I contacted the Secretary of State's Office
6   and said, "Would you please let him know that is not the
7   law."
8         So, that indicates to me the plan must be pretty
9   weak in the event the law goes into effect since it was
10  pretty weak before the law went into effect.
11        Q.  Are you aware of any additional legislative
12  programs related to DPS to increase funding for the
13  agency?
14        A.  I don't know any details.  I know that because of
15  the latest -- I know letters went out recently asking
16  the state agencies to do another round of budget cuts,
17  and it would be hard for me to believe that with another
18  record surplus, all the other challenges in terms of
19  issues for state government, that the administration
20  would make it a priority to help get photo IDs to people
21  to vote when classrooms are bulging from classes that
22  have asked for a waiver to the classroom size.
23        Q.  Are you aware currently of specific legislation
24  related to increasing funding of DPS?
25        A.  I have some limited knowledge of it but I'd

228

1   suggest to you, you better hold your breath -- don't
2   hold your breath waiting for it to happen.
3         Q.  Okay.  So, as to the specifics of that funding,
4   do you have any information about that?
5         A.  No.  I'm not Finance Chair any more.  I had a
6   better pulse of that when I had the pen in my hand.
7         Q.  Yesterday you testified that you had some data
8   that you were relying upon regarding what you felt
9   showed discriminatory effect of Senate Bill 14, and
10  remember you asked one of your legislative staffers to
11  go look for that.  Was he able to locate that for you?
12        A.  No.
13        Q.  Okay.
14        A.  But we can get it to you.
15        Q.  Okay.
16        A.  I suggest -- that was a letter that I sent, and
17  that letter that we make reference to in here that I
18  sent to DOJ, that's really what I was thinking about, to
19  see to what extent -- but I assume on Monday, we can get
20  you a copy of that.
21        Q.  Okay.
22        A.  I think we make reference to it in here
23  somewhere, and that's what I was thinking about.  I
24  don't see it in here but I'm thinking of a letter -- I
25  can remember seeing something in the paper and doing a

229

1   follow-up letter to the Justice Department, and that's
2   what I was thinking about that would have some data in
3   it for you.
4         Q.  So, you sent a correspondence to the Justice
5   Department with -- and in your letter, you reference
6   some data?
7         A.  I think so.  Every time I have seen anything in
8   the press that I thought it would be good to consider --
9   since I did ask the Justice Department to weigh in on
10  this issue, every time I think about something, I would
11  send it up.  So, I think I've written them at least
12  twice.
13        Q.  What data did you send?
14        A.  I don't know.
15        Q.  It was from a public press report, though?
16        A.  Yeah, I saw something in the newspaper and that's
17  what triggered -- it may have been something I saw in
18  the paper making reference to somebody's study, and I
19  probably clipped it out or forwarded it in an E-mail and
20  said, "Send another letter to Justice and make sure they
21  are aware of this."
22        Q.  Okay.  And your letter, can you tell me
23  approximately the time frame as to when you sent that?
24        A.  You know, it's just like whether it's the 62nd or
25  the 72nd Legislature --

230

1         Q.  But it's been within this year?
2         A.  Within the last year.  I don't know.  It's been
3   since this issue has been around.  Could have been --
4   look, I've been sending stuff -- I mean, the DOJ,
5   they've been hearing from me since this issue started.
6   I don't know if I sent anything in 2005 since they
7   didn't even hear it in the Senate committee.
8         Q.  Is there any other data that you've -- and we've
9   talked about the lack of data.  Is there any additional
10  data other than that correspondence that you indicate
11  where you reference data that you're aware of related to
12  the number of individuals who will be impacted by Senate
13  Bill 14 that you haven't discussed?
14        A.  I'd just add to the laundry list, you just google
15  in disparate impact of voter ID bills, and you'll see
16  the South Carolina study, and I think somebody has done
17  something in Georgia now, when the issue was working its
18  way through the process, litigated.
19        Q.  And you haven't analyzed those studies?
20        A.  No.
21        Q.  As far as your opinion about those studies,
22  you're not able to offer an opinion with respect to
23  those one way or the other?
24        A.  The Brennan Center I did look at fairly closely
25  some time ago, and that's a group that I work with.  So,

231

1  I'm familiar with them, and I think that one is a good
2  one to look at but there are a number of them out there
3  I wouldn't profess to be an expert on them.  If I had to
4  debate this bill, I would become an expert on them at
5  least for that day.
6        Q.  Okay.
7        A.  And I could have my notes.  I like to be --
8  sharp, young fellow like you, I try to be accurate on
9  stuff, so, I like to have my notes but you don't want me
10 to have any notes here.
11       Q.  Actually, that isn't the case.  What I said is if
12 you are going to testify off notes, I would have
13 the ability to review those.
14       A.  Can I get my iPad?
15       Q.  Hold on a minute.  Your attorney and I discussed
16 this.  And at that point, you indicated you're not going
17 to utilize notes.  So, if that's the case, then I don't
18 have to review them.  If you're going to refer to notes,
19 I do get an opportunity to look at them.
20       MR. DUNN:  Our position is if the notes are
21 prepared by an attorney, you don't get a copy of them
22 but, nevertheless, use all the time you need, we want
23 you to get all your questions answered but most of what
24 we've done in the last hour we've already talked about.
25 So, do we have new areas of inquiry?

232

1        A.  I want to work with you.  I'd be more than happy
2  to --
3        Q.  (BY MR. SWEETEN)  Why don't you just give me a
4  copy of your notes then.
5        A.  If you've got your iPad, I'll just google in
6  disparate impact of voter ID laws.  And for the record,
7  she can put all those in, on both sides.  She can take
8  all those studies on both sides.
9        Q.  And what I want to know is about what you have to
10 testify to, not about what's on google.  I can certainly
11 do that myself.
12       But my question is as far as doing an analysis of
13 those studies that exist in the public domain, that's
14 not something that you've done or you're testifying
15 about here, correct?
16       MR. DUNN:  He just wants to know are you
17 going to show up at trial and analyze a bunch of studies
18 and reports?
19       A.  How much time are you all going to give me at
20 trial?
21       Q.  (BY MR. SWEETEN)  You haven't done that today,
22 though?
23       A.  No.  I spent about 23 minutes on it last night.
24       Q.  Okay.
25       A.  How much time are you guys going to give me in

233

1  court so I can make sure I'm prepared?  I was told I
2  would have about 15 minutes.  With a distinguished panel
3  like this one, I would like to go in there and talk to
4  them for a couple of hours if you all will permit me, in
5  which case, I'll bring my documents.
6        Q.  Senator, I have no doubt that you could talk for
7  a couple of hours but let me -- and I'm getting towards
8  the end.  I hope you understand that was in jest.
9        THE WITNESS:  Is my breakfast out there?
10       MR. SWEETEN:  Let's take a break and let you
11 have that.  And I've got about maybe 15 or 20 minutes.
12       (Short recess.)
13       Q.  (BY MR. SWEETEN)  Now, there's a question I had
14 asked you earlier about the members of your household,
15 and there was one question I needed to ask about each of
16 those.  You and your wife are registered to vote,
17 correct?
18       A.  Yes.
19       Q.  The -- and you've listed the other individuals
20 that live in your household.  Those that are over 18 are
21 all registered to vote; is that correct?
22       A.  Yes.
23       Q.  Now, yesterday I asked you to name any individual
24 who doesn't have an ID that's required by Senate Bill
25 14 -- that doesn't have a -- let me start over.

234

1        I asked you to list the name of one person who is
2  registered to vote and doesn't have an ID required by
3  Senate Bill 14 to vote.  Can you tell me the name of
4  anyone as you're sitting here who fits that description?
5        A.  No.  I can only tell you the names of -- I can
6  only tell you the names of people who are registered to
7  vote, and there are very few of those whose names I
8  know.  That's a common trait for those of us in
9  politics.  We tend to know the ones who vote for us and
10 against us.
11       Ones who are not registered to vote, even if they
12 have a driver's license, I wouldn't know them.  I think
13 that's common for most of my colleagues as well.
14       Q.  You've had constituents, haven't you, Senator,
15 that have told you they support a photo identification
16 requirement?
17       A.  I've had very few but I had some who told me
18 they support it, and I've had some who told me they
19 don't, you know.
20       Q.  Would you agree that it's politically rational
21 for a Senator or Representative to vote for or advocate
22 legislation that their constituents support?
23       A.  No.
24       Q.  Okay.  You don't think that's politically
25 rational?

235

1    A.  No.  And I don't think they do it on a regular
2    basis.  And I'll give you examples.  I carry legislation
3    for a statewide ban on smoking in public places.  I've
4    shown my colleagues data where their constituents
5    support that, and they don't vote for it, or giving the
6    voters an opportunity to vote on casino gambling.
7         It may shock you but it's fairly common for
8    members not to vote on the basis of some news account or
9    some poll that somebody gives them.
10        Now, if they do their own poll where they will
11   ask the question in such a way that they take in all of
12   the ramifications and stuff that may blow up on them --
13   as an example, most of my colleagues know that polling
14   data indicates that the public is very upset about the
15   cuts we made to education, very upset about the alarming
16   increase in classrooms.  I can show you polling data on
17   that but they're not going to go vote to not cut public
18   education because in order to do that, there are other
19   things you have to do.
20        So, I'm just saying that most people who have
21   lasted as long as I have in politics are not just voting
22   on the basis of polling data that somebody gives them
23   because whoever is doing the polling generally asks the
24   question to get the answer that they want to get.
25        Q.  Once Senate Bill 14 passed the Senate, it went

236

1    over to the House for consideration, do you have any
2    personal knowledge as to the House proceedings that
3    occurred with respect to Senate Bill 14?
4         A.  Not really.
5         Q.  You don't have an opinion one way or the other
6    about the procedures employed by the House, correct, in
7    their consideration of Senate Bill 14?
8         A.  The House has always been a mystery to me.
9         Q.  Okay.  And I'll take it then that you don't have
10   an opinion one way or the other about the procedures
11   that the House members utilized to consider Senate Bill
12   14?
13        A.  No.
14        Q.  Okay.  You didn't follow the committee
15   proceedings in the House?
16        A.  I only follow the proceedings in the House on my
17   own bills.
18        Q.  And it's not something that you could testify
19   about one way or the other, correct?
20        A.  No, sir.
21        Q.  Okay.  Now, I you asked yesterday about which
22   Senators you believed voted for Senate Bill 14 in order
23   to purposefully discriminate.  I'm going to ask the same
24   question about House members.  And given the fact that
25   initially you've already indicated that you didn't --

237

1    you're not aware of the House proceedings, I'm just
2    going to ask you of the House members who voted for
3    Senate Bill 14, do you have an opinion one way or the
4    other about which House members voted for Senate Bill 14
5    in order to purposefully discriminate against racial
6    minorities?
7         A.  I do.
8         Q.  Okay.  What is that opinion, sir?
9         A.  My opinion is that the bill has discriminatory
10   intent, that most of them who voted for it knew it or
11   should have known it because there was ample evidence
12   that there was the possibility that the bill would have
13   a disparate impact on African Americans and Hispanics.
14        They work with their colleagues in the House.
15   It's a bigger club but there are 150 people.  We may
16   have philosophical differences but we know one another.
17   And I don't think they would have believed -- the vast
18   majority -- virtually all of the members who represented
19   those minorities constituents would have raised the
20   level of angst and concern if they didn't believe it,
21   which would lead a reasonable person to think there's at
22   least a distinct possibility that this bill would have a
23   disparate impact on certain groups of people.  That
24   leads me to believe that they knew what they were doing,
25   intended to do it, and the fact that they were being

238

1    pushed by their party to vote for it and, if not, there
2    would be consequences in the next election.
3         So, they -- I think they knew that it had
4    discriminatory intent, they felt like they had to do it,
5    and they did it.
6         Q.  So, is it your testimony that every House member
7    and every Senator that voted for Senate Bill 14 either
8    knew that it had a discriminatory effect or should have
9    known that it would have a discriminatory effect?
10        A.  That's correct.
11        Q.  And you don't know as you're sitting here -- do
12   you have an opinion one way or the other which fall into
13   either camp, the knew or should have known camp?
14        A.  I have my -- I could speculate on it but I would
15   decline to do that.
16        Q.  That would be speculation for you to do that,
17   right?
18        A.  It's all my opinion.
19        Q.  And you have seen no data that indicates the
20   number of individuals who do not possess identification
21   under Senate Bill 14, correct?
22        A.  No, that's not correct.
23        Q.  Okay.  What data have you seen?  How many Texans
24   don't have the requisite photo identification under
25   Senate Bill 14, in your opinion?

239

1     A.  I don't have the data in front of me but I saw
2  reports.  So, I'm just guessing it might have been 10,
3  15, 19 percent, somewhere under 20 percent, but I saw
4  data or surveys from other states that you could apply
5  to Texas.
6     Q.  Okay.  So, any data you're referring to would
7  have been from other states, correct?  I'm asking about
8  Texas.  Do you know as you're sitting here or have you
9  seen any data of any sort that quantifies the number of
10  individuals within the State of Texas who do not possess
11  ID that would be acceptable under Senate Bill 14?
12     A.  As I'm sitting here today, I couldn't cite it
13  specifically.  I would have to go back and check my
14  records, check the record of what was said on the floor,
15  ask my staff and people I call.  I can remember calling
16  my political consultant, as an example, and saying,
17  "Hey, have you got any idea in my district, you know,
18  what impact this would have?"
19         And I just cannot remember, sitting here today,
20  the numbers but, I mean, I was told, "Yeah, it's going
21  to have a disparate impact on the folks in your district
22  that it's going to impact."
23     Q.  Who told you that?
24     A.  Well, Dan McClung, my political consultant.
25         (Off the record.)

240

1     A.  Dan McClung, my political consultant.  I called
2  up -- I made a lot of calls.  I called somebody with
3  Labor.  I'm sure I called somebody over at the
4  Democratic party.  I was trying to get numbers on my
5  district, and I called -- I asked -- if it was not Eliot
6  Shapleigh, I called somebody from El Paso.
7     Q.  (BY MR. SWEETEN)  Remember, don't reveal
8  legislative privilege.  Shapleigh, is that the Senator?
9     A.  Yeah.  So, I made calls to a Senator to ask if
10  there were any -- if there was any data from a
11  particular district because of the newspaper account I
12  saw about people whose licenses had been suspended.  And
13  I didn't know if the newspaper -- I can't remember who
14  did the study but it just struck me that this one
15  particular county -- it just seemed like a very high
16  number of people whose licenses had been suspended.  So,
17  I asked the question, "Anything you have that I can use
18  in this debate?"
19     Q.  And did you receive such data?
20     A.  I don't remember.
21     Q.  Okay.
22     A.  It was so quick.  If so, I would have put it in
23  the record.  So, I assume I just used the press account.
24     Q.  Is there any data that you can cite right now
25  about -- let's start with your district -- that would

241

1  show how many individuals in your district do not
2  possess satisfactory photo identification as provided
3  for under Senate Bill 14?
4     A.  I have asked but my staff has not been able to
5  get it.  So, I assume that it does not exist.
6     Q.  Okay.
7     A.  I have asked DPS, and I have asked the Secretary
8  of State.  I assume it's a difficult thing to quantify.
9     Q.  And the same question statewide, you don't
10  know -- specifically as you're sitting here, you have
11  not seen data that indicates what acceptable of the
12  population in the State of Texas does not possess an ID
13  that would be sufficient to qualify under Senate Bill
14  14?
15     A.  I have not but I have asked, and that's also why
16  I have asked for the amendment to be added to the bill
17  and made my nice conciliatory comments to Senator Fraser
18  that you wanted to take out of context, hoping I would
19  get him to vote for it.
20     Q.  That you -- you know.  Never mind.
21     A.  My gratuitous comments that we were going back
22  and forth about the other day when I told you I lied,
23  and you said, "Where else have you lied?"
24         I meant to respond by saying, "You ought to ask
25  my colleagues where else have they lied," but that would

242

1  have been ugly if I had said that.
2     Q.  Any other things on the floor of the Senate that
3  you lied about other than that?
4     A.  No.  I can assure you that lying is not a normal
5  part of my deal.
6     Q.  Okay.  Well, we're getting towards the end.
7     A.  I don't believe it.
8     Q.  Let me check your affidavit again.  On paragraph
9  17 you say, "I, therefore, believe that the proponents
10  of Senate Bill 14 knew that the people most likely not
11  to possess the required photo identification are brown
12  and black."
13         Now, there's not any specific data that you've
14  ever seen that indicates what percentage affected by
15  Senate Bill 14 are racial minorities, correct?
16     A.  Repeat that question.
17         MR. SWEETEN:  Can you read it back?
18         (Whereupon, the requested testimony was read back
19  as follows:
20         QUESTION:  Now, there's not any specific data
21  that you've ever seen that indicates what
22  percentage affected by Senate Bill 14 are racial
23  minorities, correct?)
24     A.  I've not seen any data that gives me specific
25  numbers but I've seen data that indicates that most of

243

1   the people who would fall in that category are
2   minorities.
3       Q.  (BY MR. SWEETEN)  Okay.  That's your -- that's
4   your opinion based upon your 22 years as a Senator and
5   your life experience, correct?
6       A.  The data or the comment?
7       Q.  No.  Your opinion that this will
8   disproportionately impact racial minorities, that's your
9   opinion, right?
10      A.  That's my opinion based on talking to people who
11  conduct elections on a regular basis, do campaigns on a
12  regular basis.
13      Q.  But there's not data that you can say that you've
14  ever seen that supports that position from within the
15  State of Texas?
16      A.  Not within the State of Texas.
17      Q.  Okay.  And --
18      A.  It's not been collected, to my knowledge.
19      Q.  Is it your opinion also that Senate Bill 14 will
20  impact, for example, Asian voters disproportionately?
21  Do you hold that opinion, sir?
22      A.  You know, I don't know.
23      Q.  Okay.
24      A.  I have a sizeable Asian American population but
25  I've not done a detailed analysis on that voting

244

1   pattern.  It's not a high voting community within my
2   district.
3       Q.  Okay.  Do you have an opinion as to the American
4   Indian population, as to whether this bill would
5   disproportionately impact them?
6       A.  I'm just guessing but I'm assuming they have a
7   large number of people who may not have a driver's
8   license.  I've been on a couple of Native American
9   reservations in East Texas but I don't have a large
10  Native American population in my district.  So, I don't
11  know if they have some tribal form of government issued
12  ID or not but I'm just assuming that -- reservations
13  that I have been to, I didn't see a lot of automobiles.
14      Q.  But that would be just guessing, as you said?
15      A.  Guessing, yeah.
16      Q.  Okay.  Well, Senator, we have -- over
17  approximately five hours, we've had a discussion
18  regarding the issues of Senate Bill 14 and your
19  testimony.  Is there anything at this point that you
20  wish to change with respect to your answers that you've
21  provided over the course of the deposition?
22      A.  Upon reflection, I would say that on my
23  affidavit, that I did talk with the DOJ on putting it
24  together, as well as my staff.  You know, I proof most
25  things that I sign and, as much as I can, make sure that

245

1   one is using my words.  So, when you asked the question
2   yesterday about that, I want to make sure I'm clear that
3   I did, on filing this affidavit, work with the DOJ on
4   filing the affidavit.
5       Q.  So, let's talk about that issue.  The Department
6   of Justice worked with you on the production of that
7   affidavit, correct?
8       A.  Uh-huh.
9       Q.  Is that yes?
10      A.  Yes.
11      Q.  And the Department of Justice helped you write
12  it?
13      A.  I'll put it the other way.  I think that I gave
14  the Department of Justice some guidance, as well as my
15  staff, on which parts I thought ought to be included
16  based on what I said in the record.
17      Q.  And the Department of Justice, did they draft the
18  language utilized in your affidavit?
19      A.  I think it's a combination of what I said, what
20  my staff said, what DOJ pulled out of the record saying
21  that I said to me and me adding my input into what I
22  thought --
23      Q.  Okay.
24      A.  -- and what reflected my thoughts.
25      Q.  Who put in here, for example, in 3, "In 2005,

246

1   Representative Mary Denny, who is white" -- who put "who
2   is white" in there?
3       A.  You know, I don't know.
4       Q.  Could have been DOJ?
5       A.  Could have been DOJ.  Could have been me.  I'm
6   pretty sure that I put in there on the first one that
7   I'm African American.
8       Q.  Okay.  Who put in paragraph 4, "In 2007,
9   Representative Betty Brown, who is white," who put that
10  in there?
11      A.  I don't know whether it was my staff, me or DOJ
12  but I know I clearly wanted to let the Court get a sense
13  of the racial and ethnic background of the players in
14  the process.
15      Q.  But you don't know one way or the other who
16  suggested that language?
17      A.  No.
18      Q.  Could have been DOJ?
19      A.  Could have been.
20      Q.  How many drafts were sent back and forth between
21  you and DOJ?
22      A.  You know, I have no earthly idea.
23      Q.  Did the Department of Justice suggest changes to
24  you?
25      A.  I have no earthly idea.

## 247

1      Q.  Was the actual document drafted by the Department
2   of Justice in final form?
3      A.  I don't think so.  I'm sure that they made sure
4   that the page numbers were correct on it.
5      Q.  And they made sure that the -- that what you said
6   is what they wanted to put in?
7      A.  No.  I think that -- you know, as you can tell
8   from the five hours you've spent with me, I tend to be a
9   little colorful and, you know, I'm pretty sure that I
10  can remember either saying to -- on a call with either
11  my staff or with DOJ, my line about most people -- if
12  you did a poll, most people supported the poll tax when
13  it came about.
14     Q.  Okay.
15     A.  I think that's a pretty good analogy in my
16  response to Senator Fraser, and I clearly remember
17  adding that.  So, when I'm in the process of drafting
18  affidavits, as I'm sure when my colleagues on the other
19  side were talking to you on drafting their affidavits,
20  if they drafted any, you know, memory fades as to who
21  suggested what, as long as it's an adequate reflection
22  of the record.
23     Q.  Are there any changes you would make to this
24  affidavit at this time?
25     A.  Yeah.  I'd just have to think about it.  Can I --

## 248

1   I was looking over it last night.  I'd like to --
2      Q.  Is there anything that's inaccurate in the
3   affidavit?
4      A.  Nothing that just hits me.
5      Q.  How long did you and DOJ spend putting this
6   affidavit together?
7      A.  I would have no earthly idea.  It would be like
8   if you asked me next week how much time I spent with a
9   fine lawyer like you, I would just probably say too much
10  but I wouldn't be able to quantify how much.
11     Q.  As long as she got the part about fine lawyer,
12  we'll take it.
13        Senator, have I been -- I've asked you questions
14  over the course of this deposition.  Have I been polite
15  to you?
16     A.  You've been a delight to be with.  You've got a
17  job to do, and I respect that.  Pleasure to get to know
18  you.
19     Q.  You as well.
20        And have you understood the questions that I've
21  asked you, and if you haven't, have you asked me to
22  clarify?
23     A.  I think so.
24     Q.  Okay.  All right.  Okay.
25        MR. SWEETEN:  With that, I'll go ahead

## 249

1   and -- unless DOJ has questions, which may require me to
2   ask you additional questions, I will reserve further
3   questions until the time of trial.
4        MR. DUNN:  Jennifer, are you still with us?
5        MS. MARANZANO:  I am still with you.
6   I don't have questions at this time.
7        MR. DUNN:  And we'll reserve for trial.
8        (Whereupon at 10:38 a.m. the
9        deposition was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 250

1          E R R A T A   S H E E T
2
3   Correction          Page    Line
4
5   _____
6
7   _____
8
9   _____
10
11  _____
12
13  _____
14
15  _____
16
17  _____
18
19  _____
20
21  _____
22
23  _____
24
25

Trey Martinez Fischer                                        June 15, 2012

## 1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,              )
                             )
         Plaintiff,          )
                             )
VS.                          )  CASE NO. 1:12-CV-00128
                             )  (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his  )  Three-Judge Court
official capacity as Attorney)
General of the United States,)
                             )
         Defendant.          )
                             )
ERIC KENNIE, et al.,         )
                             )
         Defendant-Intervenors, )
                             )
TEXAS STATE CONFERENCE OF    )
NAACP BRANCHES, et al.,      )
                             )
         Defendant-Intervenors, )
                             )
TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al.,      )
                             )
         Defendant-Intervenors, )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al.,              )
                             )
         Defendant-Intervenors, )
                             )
VICTORIA RODRIGUEZ, et al.,  )
                             )
         Defendant-Intervenors. )
-----------------------------------------------
              ORAL DEPOSITION OF
              TREY MARTINEZ FISCHER
                 JUNE 15, 2012
-----------------------------------------------
     ORAL DEPOSITION of TREY MARTINEZ FISCHER, produced
```

## 2

1  as a witness at the instance of the Plaintiff, and duly
2  sworn, was taken in the above-styled and numbered cause
3  on the 15th day of June, 2012, from 10:00 a.m. to 3:43
4  p.m., before Jean Thomas Fraunhofer, CSR in and for the
5  State of Texas, reported by machine shorthand, at REGUS,
6  18756 Stone Oak Parkway, Suite 200, San Antonio, Texas
7  78258, pursuant to the Federal Rules of Civil Procedure
8  and the provisions stated on the record or attached
9  hereto.

## 3

```
1              A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4     ADAM ASTON
       Assistant Attorney General
5      ATTORNEY GENERAL OF TEXAS
       P.O. Box 12548
       Austin, Texas 78711
6      Tel: (512) 936-0596
       Email: Adam.aston@oag.state.tx.us
7
   FOR THE DEFENDANT:
8
9     MICHELLE A. McLEOD
       Trial Attorneys
       U.S. DEPARTMENT OF JUSTICE
10     950 Pennsylvania Avenue, NW
       Room 7254 NWB
11     Washington, DC 20005
       Tel: (202) 305-0115
12     Email: Michelle.mcleod@usdoj.gov
13 FOR THE DEFENDANT-INTERVENOR: TEXAS STATE CONFERENCE OF
   NAACP BRANCHES and MEXICAN-AMERICAN LEGISLATIVE CAUCUS
14
15    JOSE GARZA
       LAW OFFICE OF JOSE GARZA
       7414 Robin Rest Drive
16     San Antonio, Texas 78209
       Tel: (210) 392-2856
17     Email: Garzapalm@aol.com
18 FOR THE DEFENDANT-INTERVENOR: THE BRENNAN CENTER FOR
   JUSTICE AT NYU LAW SCHOOL
19
       IAN VANDEWALKER (BY Speakerphone)
20     THE BRENNAN CENTER FOR JUSTICE AT NYU LAW SCHOOL
       161 Avenue of the Americas, Floor 12
21     New York, New York 10013
       Tel: (646) 292-8362
22     Email: Ian.vandewalker@nyu.edu
23
24 ALSO PRESENT: Martin Golando
25
```

## 4

```
1              I N D E X
2
3
   WITNESS                              PAGE
4
   TREY MARTINEZ FISCHER
5     Examination by Mr. Aston            5
      Examination by Mr. Garza          186
6
7  Signature and Changes                192
8  Reporter's Certificate               193
9
10           E X H I B I T S
11 NO.        DESCRIPTION                PAGE
12 Exhibit 1   Waiver List               12
   Exhibit 2   Notice of Deposition        17
13 Exhibit 3   SB14                      45
   Exhibit 4   Election Code 82.003       51
14 Exhibit 5   House Rules               72
   Exhibit 6   House Journal             76
15 Exhibit 7   SB1811                    80
   Exhibit 8   SB1811, Amendment 58         80
16 Exhibit 9   Expert Declaration of Daron R. Shaw 109
   Exhibit 10  House Journal            145
17 Exhibit 11  SB362                    172
18
19
20
21
22
23
24
25
```

## 5

1      TREY MARTINEZ FISCHER,
2   having been first duly sworn, testified as follows:
3               EXAMINATION
4   BY MR. ASTON
5      Q.   Good morning.  My name is Adam Aston, and I
6   represent the State of Texas, the plaintiff in this
7   lawsuit.  Please state and spell your full name for the
8   record.
9      A.   Sure.  My name is Trey Martinez Fischer.
10   That's T-R-E-Y, M-A-R-T-I-N-E-Z, no hyphen, Fischer,
11   F-I-S-C-H-E-R.
12      Q.   Have you ever been deposed before?
13      A.   I have.
14      Q.   How many times?
15      A.   One recently and maybe twice over the last
16   10 years, 15 years.
17      Q.   In what cases did those depositions take place?
18      A.   I was -- I was deposed in the redistricting
19   litigation by the Attorney General's office, and I
20   recall being deposed as a plaintiff in a personal injury
21   lawsuit, and I want to correct that.  That was in the
22   late '80s, early 1990s.
23      Q.   So you are aware of two depositions --
24      A.   Yes.
25      Q.   -- that you recall?

## 6

1      A.   Yes.
2      Q.   And the redistricting deposition, when did that
3   take place?
4      A.   That took place sometime in the summer or early
5   fall of 2011.
6      Q.   And it was by the Texas Attorney General's
7   office?
8      A.   Yes, sir.
9      Q.   Have you been -- Have you been a party to any
10   other lawsuits?
11      A.   I was a -- I was a plaintiff in a landlord and
12   tenant action that was in justice court in the -- in
13   about 1998, 1999 or so.
14      Q.   And the redistricting litigation, were you an
15   intervenor in that suit?
16      A.   Yes, sir.  We were a plaintiff.  I'm sorry.
17   I'm sorry.  I guess I should --
18          MR. GARZA:  So in this case we're
19   intervenors.  In the redistricting case, MALC was the
20   plaintiff.
21          MR. ASTON:  Section II plaintiffs?
22          MR. GARZA:  Section II constitution.
23          THE WITNESS:  I thought you were referring
24   to the District of Columbia lawsuit where we were an
25   intervenor.  No, that lawsuit so we were both.

## 7

1          MR. GARZA:  That's right.  I'm sorry to
2   interrupt then.
3      Q.   (BY MR. ASTON)  That's quite all right.  So to
4   be clear, in the San Antonio lawsuit, you are
5   plaintiffs.  In the District of Columbia lawsuit, you
6   were an intervenor-defendant?
7      A.   That's correct.
8      Q.   You sat for one deposition.  Did it apply to
9   both cases or do you recall which case it occurred in?
10      A.   I was deposed in Section II case for
11   San Antonio, and I think those materials were made
12   available to the DC court.  I don't know if they were
13   used.
14      Q.   Are you taking any medication or suffering from
15   any illness that would affect your ability to provide
16   full and accurate testimony today?
17      A.   I am taking medication.  I don't believe it
18   will impact my ability to answer questions.
19      Q.   Are you aware of anything else that might
20   prevent you from fully or accurately answering the
21   questions?
22      A.   No, sir.
23      Q.   Before we -- Again, I'd like to go over a few
24   ground rules, hopefully make this go as quickly and
25   smoothly as possible.  Please answer audibly so that the

## 8

1   court reporter can hear and record your answers.
2   Nodding and shaking of the head cannot be recorded; do
3   you understand?
4      A.   I do.
5      Q.   If you do not understand my question, you
6   cannot hear my question or if you'd like for me to slow
7   down at any point, please let me know, okay?
8      A.   Okay.
9      Q.   Please wait for me to finish asking your
10   question, and I'll do my best to let you finish
11   answering before I move on to the next question, okay?
12      A.   Okay.
13      Q.   Your lawyer may object to questions.  Even if
14   he objects, you must answer my question unless
15   instructed to do otherwise; do you understand?
16      A.   I do.
17      Q.   Is MALC represented by counsel today?
18      A.   Yes.
19      Q.   Who is MALC's counsel?
20      A.   Jose Garza.
21      Q.   Could you spell his name, please, for me?
22      A.   Jose, J-O-S-E, Garza, G-A-R-Z-A.
23      Q.   Is MALC represented by any other counsel?
24      A.   Yes.
25      Q.   And who's that?

Trey Martinez Fischer                                      June 15, 2012

## 21

1  regarding voter ID legislation?
2      A.  In the capacity as to our Texas roles or out of
3  state or --
4      Q.  Just in general the issue of voter
5  identification.
6      A.  I think that MALC has clearly demonstrated its
7  interest in legislation that could have a impact on --
8  on minority election outcomes, and so this is clearly --
9  as MALC is a member driven organization and as it has a
10  collection of its members, they all have their
11  particular areas of special expertise.  We have a couple
12  of members who are well versed in election law, voter
13  identification law.  We have members who sat on the
14  select committee for this voter identification bill that
15  was passed in 2011, and so there was a lot of robust
16  discussion and advocacy about the need to engage authors
17  of that bill and to see if we could improve the bill or
18  at least point out the significant deficiencies of the
19  legislation.
20      Q.  You mentioned a minute ago that MALC has
21  several members that are particularly experts in voter
22  related matters or election related matters.  Which are
23  those members?
24      A.  I said that there were a few members and the
25  members that come to mind is Representative Anchia who

## 22

1  has worked very hard on this subject matter, served on
2  the elections committee.  I know that Representative
3  Gutierrez was on the select committee that considered
4  this legislation.  I think that Representative Martinez
5  from the valley was very involved in the discussion and
6  debate, and Representative Ana Hernandez Luna from
7  Houston brings a particular perspective having been a
8  first generation US citizen.  Her perspective was very
9  unique and helpful in the debate, and those are the --
10  those are the outliers I think that come to mind.
11      Q.  And those are the members that you were
12  referring to a moment ago.
13      A.  Yes.
14      Q.  Has MALC written any articles on the topic of
15  voter identification?
16      A.  Nothing for publication.  I think that we do
17  have a -- a newsletter that we talk about a variety of
18  topics.  It's a weekly electronic open to anybody who
19  wants to receive it.  I would -- I would guess that we
20  have probably commented on voter identification
21  legislation over the course of time.
22      Q.  The weekly newsletter that you are referring
23  to, is that The Caucus?
24      A.  Yes.
25      Q.  And it's sent out electronically through email

## 23

1  or --
2      A.  Through email.
3      Q.  Has MALC written any academic papers on voter
4  identification?
5      A.  MALC hasn't.  I'm not sure if the individual
6  members have, but MALC has not submitted anything in the
7  organization's name.
8      Q.  Has MALC conducted any seminars on this topic?
9      A.  MALC has not hosted any seminars.  I would
10  imagine members of MALC have probably participated in,
11  you know, panels and discussions at various policy
12  conferences at different times.
13      Q.  Has MALC presented any speakers on this topic?
14      A.  We have had caucus meetings where our voting
15  rights council have addressed the body, addressed the
16  membership about any sort of, you know, voting rights
17  issues.  Voter ID certainly could have been one of them.
18  MALC hasn't had any official convenings or policy
19  conferences where we would be in a position to invite
20  those kinds of speakers.
21      Q.  Has MALC conducted any studies on this topic?
22      A.  Not that I know of other than anything that
23  might be related to litigation in terms of working with
24  different experts, and I'm not -- I'm not saying that we
25  have, but I would -- I would imagine that if we are

## 24

1  doing any studies, they might be related to litigation.
2      Q.  And has MALC taken any surveys on the issue of
3  voter identification?
4      A.  Surveys in what context?  I'm sorry.  I don't
5  understand.
6      Q.  Perhaps public surveys or conducted polls
7  that --
8      A.  Engaging the public, not the membership.
9      Q.  Sure.
10      A.  Okay.  Not that I'm aware of, no.
11          MR. ASTON:  Can we go off the record for
12  just a minute?
13          (Recess from 10:28 a.m. to 10:29 a.m.)
14          MS. McLEOD:  Michelle McLeod of the
15  Department of Justice for defendant Attorney General
16  Eric Holder.
17      Q.  (BY MR. ASTON) Sir, what is your role with the
18  Mexican American Legislative Caucus?
19      A.  I'm the chairman.
20      Q.  And as chairman what are your duties?
21      A.  I preside over the caucus.  I have an executive
22  committee that I work with.  We have a vice-chairman, a
23  treasurer, secretary, legal counsel.  The chairman has
24  always had the discretion to -- to engage the membership
25  on issues of import to Latino community.  Having said

Trey Martinez Fischer                                    June 15, 2012

---

### 25

1  that, the MALC chairman, you know, also serves merely as
2  a facilitator for the membership to have the caucus
3  engage in issues that the members feel are important to
4  the Latino community.  It's a -- I think that from a
5  policy making standpoint, we are a very good sounding
6  board for the pulse of the Latino community because the
7  membership -- to be in the caucus, MALC is one of the
8  few caucuses that actually has some very -- how should I
9  say -- some very rigorous membership requirements, and
10  so as you may know, there are other caucuses in the
11  capitol that a $10 fee will buy you a member.  It's not
12  the case for MALC, so we are very cohesive in the sense
13  that we believe our job is to advocate on behalf of our
14  constituents, and most of our constituents are -- are
15  majority voting age population Latino, and so we believe
16  that we probably represent our constituents, but we are
17  representing their interests.
18        Q.  I believe by count, you mentioned five
19  officers, chair, vice-chair, treasurer, secretary, legal
20  counsel?
21        A.  Yes.  I hope I'm not forgetting anybody, but I
22  think that's it.
23        Q.  Those are the officers of MALC?
24        A.  Yes, sir, the executive committee.
25        Q.  But are there other officers of MALC?

---

### 26

1        A.  No.  And if there are, I'll come back after a
2  break, but that's what I remember.
3        Q.  And especially legal counsel, that is still --
4  that's a member of the legislature.  He serves as legal
5  counsel.  He's not like a staff attorney.
6        A.  No.  That is a presumptively a member lawyer.
7        Q.  How long have you been chairman?
8        A.  Since the 2009 session?
9        Q.  And have you held any previous leadership
10  offices with MALC?
11        A.  Prior to the 2009 session, I was the
12  vice-chairman of MALC.  Prior to that I was the legal
13  counsel and prior to that I was the treasurer.
14        Q.  How long have you been a member of MALC?
15        A.  Since my election into the House, my first
16  session, which was in 2001.
17        Q.  And how long have you been -- you call it the
18  executive counsel or the executive committee?
19        A.  I've been a member of the executive committee
20  since, I believe, the session of 2003, if not 2005.
21  It's been a while.
22        Q.  When was MALC founded?
23        A.  MALC was -- Historically, it has been told that
24  MALC has been an organization that was together since
25  the late '60s.  We have found some records and

---

### 27

1  documentation that showed that it was in existence since
2  1973, and since that's where we find, you know, official
3  paperwork, that's -- that's the time that we -- that we
4  use.  One of the founders of MALC was elected to the
5  Texas House of Representatives in the late 1960s, and he
6  indicates that, you know, MALC was alive and well in the
7  late '60s, although we can't find documents and records
8  that go back that far.
9        Q.  You mentioned a moment ago that MALC is one of
10  the caucuses that in your view has more rigorous
11  membership requirements.  When you say caucus in a Texas
12  House as opposed to a committee or a standing committee
13  or special committee, what is a caucus in the Texas
14  House of Representatives?
15        A.  Well, I think that everybody will have a
16  different view.  I perceive the Mexican American
17  Legislative Caucus to be a body of members that work in
18  some sort of cohesive manner on issues of interest to
19  the caucus, and so in the interest of our caucus, it's
20  looking out for the rights of Mexican Americans and
21  Latinos in specific but in general minority rights.
22        I will say that how that differs from our
23  caucus, I think, if I'm not mistaken, that I might be a
24  member of the sportsmen's caucus and I don't really know
25  what the sportsmen's caucus does, but it sounded cool at

---

### 28

1  the time, and I became a member.  I'm also a member of
2  the Democratic caucus and being a Democrat and my
3  ability to pay my dues makes me a member of that caucus.
4  And the reason why I'm trying to -- when I use the word
5  rigor, I think it's known around the capitol that there
6  are members who would have wished or would desire to be
7  a member of MALC, but they don't meet the eligibility
8  requirements to become members, and so it's -- you know,
9  sometimes we're teased about it because people make us
10  out to be an exclusive caucus, but, really, what makes
11  this caucus work is that, you know, we work -- we work
12  together on many issues.  We don't always agree
13  100 percent, but we always agree to talk it out, and any
14  one member can bring up any idea at any time so long as
15  that member is active and present at the meetings.
16        Q.  That response I think certainly helps frame
17  MALC as a caucus as compared to other caucuses.  Could
18  you explain a bit about how a caucus, whether it's MALC
19  or another one, differs from an official committee
20  membership appointed by the speaker?
21        A.  Sure.  Well, for one, if a standing committee
22  of the House is a committee that's recognized in the
23  rules and it's defined in the rules and the speaker has, you know,
24  is laid out and specified and the speaker has, you know,
25  the discretion in most instances and seniority decides

## 29

1   the other half of the committee, those committees are
2   given a jurisdiction, and they have official oversight
3   over agencies, they are part of the legislative branch,
4   and so I think that's a big distinction between a
5   committee and a caucus.  And a caucus is a body of
6   members that, you know, again, work on issues of similar
7   interest or has a -- you know, lots of commonality with
8   the membership group and members work in achieving
9   objectives that are of mutual interest.
10      Q.  Does MALC have an official mission statement?
11      A.  I'm not sure that we do.  We may.  I've been
12   a -- I've been a member of MALC since my election or my
13   first session in 2001, and I've always known that while
14   I may not have ever seen it in print, I view MALC as not
15   only, you know, the oldest and largest Latino caucus in
16   the United States, that our mission is to advocate on
17   behalf of the minority community in Texas.  And I think
18   every chairman has sort of had that deference to -- to
19   tailor the -- need of the caucus, I guess, depending
20   on what is going on at the -- in the present day, and so
21   I can --
22         You know, if I may, in the early 1970s,
23   MALC had a much different meaning.  MALC was -- was --
24   You know, people have a tendency to say that MALC looks
25   like they are just Hispanics that just happen to be

## 30

1   Democrats, and they are just a democratic group
2   operating as a Hispanic organization.  MALC was created
3   in the 1970s because the democratic majority of the
4   House didn't view the opinions and the voices of the
5   Mexican American representatives the way they wanted to
6   be represented, and so they organized to combat a
7   democratic majority to give themselves a voice and using
8   their leverage as a number of votes to achieve and
9   accomplish their objectives.
10         That's 1970s.  You know, we're now in
11   2012, and the needs are different now.  You know, we --
12   we very much will never lose site of our mission which
13   is to advocate for civil and social justice on behalf of
14   the minority community, but we also recognize that as we
15   grow demographically speaking, that we have a much
16   larger responsibility and obligation to participate in
17   the body politic to either come up with practical
18   solutions to problems or to find ways -- to find ways to
19   deal with that reality that -- that these are issues
20   that Texans are going to have to address that, you know,
21   census after census dictate or indicate that these
22   Texans will be largely minority.
23         And so I think that MALC sees itself now
24   with a very different mission of having to prepare
25   itself and to prepare folks to -- to accept the

## 31

1   demographic changes the State is bringing and be
2   addressed and be prepared to have leadership positions
3   to provide those solutions on behalf of a growing
4   constituency.
5      Q.  To fulfill what MALC views as that role or its
6   role, what were the primary activities -- what were the
7   primary things that they do -- it does to achieve those
8   goals?
9      A.  Well, I think that it's two-fold.  I think that
10   there is an internal -- you know, there's an internal
11   objective which is to be a member driven member service
12   caucus that provides, you know, again, the facilitation
13   of ideas and the flow and exchange of ideas between the
14   membership, our ability to track legislation that we see
15   as things we want to support and things that we want to
16   engage on.  Also, to help members advance their
17   individual legislative agendas.
18         The idea of a caucus is that if the caucus
19   comes together on this issue, then you start off with a
20   block of votes and that's a very good head start in a
21   business where, you know, counting the majority makes
22   the difference on whether your ideas make it out of the
23   House or not.  So that's sort of an internal role, and I
24   think MALC does a very good job keeping its members
25   active and engaged and being supportive of their efforts

## 32

1   to pursue their individual legislative pursuits.
2         Externally, again, I think that there is a
3   recognition that the membership of MALC is all over the
4   State of Texas, and so as a consequence, we find
5   ourselves being an external voice too for advocacy
6   groups, community groups, Hispanic elected officials
7   across the state that come to see us about issues that
8   are important to their region, understanding the
9   different needs and desires of a state as big as Texas
10   that, you know, can elect a Hispanic sheriff in a city
11   as large as Dallas, but at the same time, you know, has
12   a mayor from a border state in Eagle Pass that, you
13   know, happens to be Hispanic as well that have totally
14   different priorities, totally different issues and, you
15   know, MALC sort of tries to serve as that repository of
16   ideas, and -- and I think that over time more and more
17   people outside the capitol have come to MALC for
18   guidance and assistance and advocacy on issues that they
19   feel are important to help.
20      Q.  Let's shift our focus for a minute to election
21   and voting issues and MALC's activities in that regard.
22   ==Does MALC register voters?==
23      ==A.  No.==
24      ==Q.  Does MALC participate or lead in a get out the==
25   ==vote drives or efforts?==

## 33

1    A.  In the name of MALC, no.
2    Q.  Does MALC drive voters to the polls?
3    A.  No.
4    Q.  Does MALC conduct voter education activities?
5    A.  As a matter of -- of forming and shaping public
6    policy, yes.
7    Q.  Now, when you say "public policy," do you mean
8    through legislation or otherwise?
9    A.  Well, I think legislation is one form of policy
10   making, but in -- you know, in terms of being
11   knowledgeable of the subject matter, individual members
12   of MALC participate, you know, in various policy
13   conferences, and those that have the subject matter
14   expertise oftentimes are sought out, you know, for that
15   expertise.  And so, you know, insofar as it relates to
16   that, yes, but in terms of MALC having a division or, a
17   you know, working group or paid staff that engages in
18   that on a regular constant basis, then the answer would
19   be no.
20   Q.  When the members, especially the ones with the
21   particular expertise that we discussed a couple of
22   times, when they go out and do those activities, whether
23   it's in their community or in their district or
24   what-have-you, are they doing those in the name of MALC
25   or in the name of their representative office?

## 34

1    A.  I think that every individual member will have
2    a -- their own individual answer.  I think as far as I'm
3    concerned, I mean, whenever I'm asked to engage the
4    public or participate in various panels or discussion
5    groups or what-have-you, I am mostly introduced as the
6    chairman of the Mexican American Legislative Caucus.
7    Most of my speaking invitations in my roles have been
8    related to fact that I do chair this, Hispanic caucus so
9    oftentimes for me, I think it's very intertwined.
10   Q.  Does MALC have office space?
11   A.  It does.
12   Q.  And where is that located?
13   A.  It is a -- I apologize.  I'm going to sound
14   like I'm from the country, but it's just about a hundred
15   yards west of the capitol.  I refer to it as the west
16   office.  It's at the intersection of Colorado and, I
17   believe, 13th Street.
18   Q.  But it's like -- it's a privately-leased office
19   space?
20   A.  Privately leased office space next to the Price
21   Daniel Building, a place you know well.
22   Q.  Yes, sir, I do.  You've touched on, I believe,
23   earlier that MALC is a membership organization with
24   individual members; is that correct?
25   A.  Yes, sir.

## 35

1    Q.  How many members does MALC have?
2    A.  39.
3    Q.  Does MALC publish a list of the members?
4    A.  We have our website, yes.
5    Q.  What are the criteria for membership?
6    A.  The by-laws are -- probably have the most
7    accurate description, but what comes to mind that you
8    either have to be Hispanic or you have to represent a
9    district that is majority voting age population
10   Hispanic, and so those are the two requirements that I
11   recall.
12   Q.  And it is one or the other, but not both that
13   is required?
14   A.  Only one, yeah.  One or the other, but often
15   many members have both.
16   Q.  Can a former legislator join MALC or remain a
17   member of MALC?
18   A.  No.  However, I don't -- we don't have a bylaw
19   that says that, but it is a organization and a caucus
20   that's for an elected class and there's a dues component
21   to be a member of MALC as well, and so we've never
22   accepted or been asked to accept dues from someone who's
23   not a nonmember or a former member.
24   Q.  And members of the public or other elected
25   officials, for example, state supreme court justices who

## 36

1    happen to be Hispanic, they are not eligible for
2    membership, correct?
3    A.  Correct.  Not a bad idea though.
4    Q.  The 39 members of MALC, is that House and
5    Senate or House only?
6    A.  Just the House.
7    Q.  Does the Senate have a similar organization?
8    A.  I believe there is a Senate Hispanic caucus.
9    Q.  Do you happen to know how many members they
10   have in that caucus?
11   A.  I know the chairman, Senator Carlos Uresti, but
12   I don't know their membership.  Excuse me.  I don't know
13   their entire membership.  I know some of their
14   membership.
15   Q.  Is MALC a partisan organization?
16   A.  We're not.
17   Q.  How many members of MALC are authorized to act
18   or speak on MALC's behalf?
19   A.  I think that any member of MALC is not
20   prohibited from speaking.  The only instance where we
21   have control is when there is a, you know, press release
22   or a news conference, you know, those instances, you
23   know, MALC sends out the press release, you know,
24   conducts it.  Usually it's either going to be an officer
25   of MALC or a subject matter expert, but MALC doesn't

## 37

1   have a rule that that censors or prohibits anyone from
2   speaking.  That's not -- That's not anything that we
3   would do.
4        Q.   But if a press release were to go out or if a
5   press conference was to be called on behalf of MALC, how
6   many members would be authorized to issue that release
7   or call that press conference on behalf of the
8   organization?
9        A.   Well, the MALC staff would always handle the
10  work, so members will never be asked to do that work
11  product, so that's more of a staff driven thing, and I
12  guess the true answer lies in the origin of the news
13  conference.  So if, for instance, we had a member who
14  was, you know, very concerned about, you know, voter
15  identification legislation and wanted to have a press
16  conference to highlight that issue, you know, they would
17  simply, you know, coordinate that with, you know, MALC
18  and MALC staff, and they would be asked and charged to
19  lead that.
20            On the other hand, there have been press
21  conferences that I have arranged.  I have asked people
22  to speak on our behalf, and so there's -- it's not
23  necessarily very formal, but I think that members by
24  their own designation as elected officials have the
25  ability to host and conduct press conferences and really

## 38

1   rarely need the support of MALC.  So it's not something
2   that we focus on as a member service, but, you know, we
3   have a briefing room.  For instance, if somebody wanted
4   to use our briefing room, it just requires them to ask
5   for the use of it.
6        Q.   Suppose we're talking about something very
7   formal like filing a lawsuit or intervening in a
8   lawsuit.  Which members have the authority to do
9   something like that on behalf of MALC?
10       A.   I think that any member of MALC has the ability
11  to raise the issue in terms of, you know, this is
12  something that we should get engaged in or this is
13  something that we should stay away from.  I think that
14  when it rises to the level of spending funds, I think it
15  falls within the realm of the executive committee.  I
16  think when it comes to the discretion of the caucus to
17  engage in these matters, it certainly can come from the
18  chairman as well, and so I think the by-laws, you know,
19  sort of spell out what each officer's duties are.
20            I do know that as chairman that I do have
21  broad discretion, but I also know that the practice of
22  the caucus is for any individual member to be able to
23  raise any individual issue at any time and not be
24  limited because they're non-officers.
25       Q.   But could a non-officer intervene in a lawsuit

## 39

1   or file a lawsuit on MALC's behalf?
2        A.   I don't believe they can.
3        Q.   The five officers that we've discussed a couple
4   of times, the executive committee, are any of those
5   officers currently Republican?
6        A.   No.
7        Q.   Do you know if any of the five current officers
8   are members of the House who voted in favor of Senate
9   Bill 14?
10       A.   If any executive committee member voted in
11  favor of Senate Bill 14?  Bear with me.  I didn't vote
12  for it.  I don't believe Vice-chairman Rodriguez voted
13  for it.  I don't believe that Secretary Martinez voted
14  for it.  I don't believe that Treasurer Gutierrez voted
15  for it, and I'm fairly certain that Counsel Gonzales did
16  not, as in Veronica Gonzales, did not vote for it.
17       Q.   Do you know how many MALC members did vote for
18  Senate Bill 14?
19       A.   Specifically, I don't know.  I want to say
20  anywhere from five to seven members.  I can certainly
21  take a look at the list during the break and come back
22  and answer that.
23       Q.   That would be great.  Did any MALC members
24  oppose MALC's intervention in this suit?
25       A.   Not -- Not in any communication that came to

## 40

1   the MALC staff and myself.
2        Q.   Do you know how many Republicans are currently
3   members of MALC?
4        A.   I don't off the top of my head.  I certainly
5   could look at the membership list and tell you.  I mean,
6   I would sense it's anywhere between four to six or
7   seven, somewhere around there.  It's a small number.
8        Q.   But because the membership list is public on
9   your website, it is available.
10       A.   Absolutely it's available.
11       Q.   How many employees and/or staff does the caucus
12  have?
13       A.   I think it varies from a legislative session to
14  an interim session, so, currently, there are -- there
15  are -- not to be technical, but I'd say there are two
16  and a half members of MALC.  We have one full-time
17  employee.  We have a second full-time employee.  And
18  Marty, you know, appropriates his time between the
19  capitol office and MALC, and so, I mean, in theory he
20  works for MALC as well, but he doesn't exclusively work
21  for MALC.
22       Q.   When you refer to the capitol office, you are
23  referring to your staff?
24       A.   Yes.
25       Q.   Does MALC rely on volunteers?

## 41

1   A.  We don't rely on volunteers.  We have used
2   volunteers.  You know, interns, we have a fellowship
3   program as well.  We've utilized our fellows both at
4   the -- at our designated, you know, home office and,
5   also, in our member offices.
6       Q.  And how many volunteers does MALC have at any
7   one time?  Is that a pretty small number?
8       A.  I think so.  It would be anywhere -- I would
9   imagine we would pick up one to two during a legislative
10  session.  We may even pick up a -- We may even hire an
11  initial staff person during legislative session.  That's
12  sort of the cycle.  We're busier during the legislative
13  session than we are in the interim.
14      Q.  What is MALC's annual budget?
15      A.  I am not quite sure.  We -- Fortunately, we --
16  we have successful fundraising initiatives and the
17  fundraising is able to fund the caucus.  We employ an
18  outside accountant who really handles those matters,
19  and, frankly, it's -- it's so much handled outside that
20  MALC staff has to request checks in order to write them,
21  and so those finances are outsourced.
22      Q.  From whom do you raise money?
23          MR. GARZA:  Objection.  It's not relevant
24  to the issues before this case.  It is harassment of the
25  organization.  We believe that it is a violation of the

## 42

1   organization's First Amendment rights to inquire into
2   its sources of income, and I'm instructing the witness
3   not to answer.
4       Q.  I'm not asking as to individual donors or a
5   donor list.  What I'm wanting to know is do you get
6   government grants?
7           MR. GARZA:  You can answer that question.
8       A.  No, we don't.
9       Q.  Do you accept private donations?
10      A.  We do.
11      Q.  Do you accept donations from corporations?
12      A.  We do.
13      Q.  And from private citizens?
14      A.  Less so, but, yes.  And I might add that MALC
15  files compliance reports with the Texas Ethics
16  Commission, so that information is also accessible on
17  the website.
18      Q.  Do you know how much money you received in
19  those grants in the last year?
20      A.  We didn't receive grants.
21      Q.  How about from the donations?
22      A.  I couldn't tell you, but I know that we
23  annually fundraise, and we've been very successful in
24  our fundraising.
25      Q.  Could you approximate how successful?

## 43

1       A.  I have -- I wouldn't want to speculate, but I
2   will say that, you know, when you look at the cost
3   associated about litigation and so forth, that you have
4   to be raising, you know, a good amount of money to be
5   able to engage the State of Texas.
6       Q.  Do you know about -- Can you approximate what
7   percentage of your annual budget would be devoted to
8   election/voter issues?
9       A.  I don't know if I could tell you that.  I don't
10  believe that we apportion or approximate, you know,
11  based on those issues.  I can tell you that the -- an
12  overwhelming majority of our resources is dedicated to
13  our policy caucus and our public policy issues that we
14  find to be of substantial import, and I think over the
15  course of the 2011 session, two of the subject matters
16  that kept us the busiest was legislative redistricting
17  which impacts voters and voter identification
18  legislation is what we're before right now.
19      Q.  Has MALC made any plans to assist voters with
20  compliance with Senate Bill 14 if it goes into effect?
21      A.  MALC in its official capacity, no.
22      Q.  Has MALC any plans to educate voters as to
23  Senate Bill 14 if it goes into effect?
24      A.  I don't believe MALC's made any plans.  I would
25  imagine through our communications we've articulated,

## 44

1   you know, some of the problems that we believe are
2   associated with this type of legislation and how it
3   could impact elections in our various communities, but
4   we have not done any strategic planning or set out a
5   task list to accomplish things by election date.
6       Q.  Will MALC educate voters about the requirements
7   of Senate Bill 14?
8       A.  It would be my hope that if Senate Bill 14
9   passes, the State of Texas would assume that
10  responsibility.  That's at least what they've reported
11  to do in the legislation, so my hope is that that's
12  being done now.  Having said that, you know, MALC is
13  a -- is a communications piece for -- for Hispanics
14  across the State of Texas, and we certainly believe that
15  we try our best to keep them informed on issues that may
16  have an impact on their lives.
17      Q.  And would MALC help voters either obtain photo
18  identification or the underlying documents necessary to
19  obtain photo identification?
20      A.  I think that as a means of being a disseminator
21  of information, I think so.
22          MR. ASTON:  How about a break before we
23  move on?
24          THE WITNESS:  I'm fine.  I'll follow you.
25          (Recess from 10:59 a.m. to 11:07 a.m.)

## 45

1          (Exhibit 3 marked.)
2     Q.  (BY MR. ASTON) Please take a minute to review
3  what's been marked Exhibit 3.
4     A.  I felt like you are a test proctor.  I didn't
5  want to flip until you told me.
6     Q.  Do you recognize this?
7     A.  It looks like Senate Bill 14.
8     Q.  When was the first time you read this bill?
9     A.  Well, I read a version of this bill when it was
10  introduced.  I read a version of this bill when it was
11  presented on the floor, and I have attempted to keep up
12  with the bill as it may have changed in conference and
13  outside the bounds, and so the final legislation I can't
14  recall spending a lot of time studying it, but I think I
15  saw it develop over the course of time.
16     Q.  And one version or another, you've read it a
17  handful of times.
18     A.  Well, I can't say I read it a handful of times,
19  but I've certainly read it and studied it.
20     Q.  Have you discussed the bill with people at
21  MALC?
22     A.  Not -- Not in any precise detail.  I'm sure
23  we've talked about it.
24          MR. GARZA:  When you say that, Adam, are
25  you talking about the staff or the members?

## 46

1          MR. ASTON:  Both.  But let's do members
2  first.
3     A.  Okay.  Well, clearly, I mean, in the
4  preparation, in the engagement and the debate and the
5  offerings and amendments and all of the legislative
6  tactics, I mean, of course multiple conversations.
7     Q.  Both on the floor and off.
8     A.  On the floor, off, in my sleep, people on this
9  list, people not on the list of the waivers, of course.
10  In terms of the staff, if it was an assignment that was
11  research based or, you know, empirical or find out what
12  other states are doing, absolutely.  In terms of, you
13  know, having a discussion or -- or a -- dissecting the
14  bill with the staff, no.
15     Q.  Does MALC, the caucus -- And maybe I should
16  have asked this earlier.  Do they have weekly meetings,
17  biweekly meetings?  Do they have regular group sessions?
18     A.  MALC meetings are called by the chair.  They --
19  they -- The idea is to have them, you know, on a
20  recurring basis, but it's not a standing meeting, and,
21  again, the reason for that is there is the flexibility
22  that -- that, number one, it's a very busy legislative
23  session.  Number two, members should have the
24  flexibility to have a convening nearby saying that we
25  need to meet for a particular reason.

## 47

1     Q.  Was Senate Bill 14 discussed during any of the
2  MALC members meetings?
3     A.  Well, again, what -- what comes to mind is the
4  specific briefing we had on -- on voting rights that
5  Jose Garza participated in with another lawyer by the
6  name of Joaquin Avila who was available by conference
7  call and that we talked about what we perceived to be
8  some, you know, very discriminatory pieces of
9  legislation in both voter ID and redistricting.  At the
10  time there were, you know, Sanctuary Cities, and so
11  there never in my mind was a meeting that was
12  specifically called, you know, for voter ID and only
13  voter ID, but it certainly came up in the membership
14  meetings.
15     Q.  Have you discussed or debated the bill with
16  people who are outside the legislature?
17     A.  Discussed or debated the bill with people
18  outside the legislature.  I think the easy answer is I
19  certainly have discussed it outside the legislature.
20  Whether I've engaged in any debate, I mean, from a
21  coffee shop debate or a policy conference, likely.
22     Q.  Probably with constituents?
23     A.  No, no.  I mean, I think nothing specific, but
24  I think that I happen to participate in, you know, lots
25  of public appearances and being an invited guest to

## 48

1  speak at different panels and so forth.  So if a topic
2  came up, I knew how to talk about it.
3     Q.  Is MALC familiar with what the different
4  provisions of the final bill do?
5     A.  I would like to think that we are.
6     Q.  Does MALC know what forms of photo ID will be
7  acceptable for voting at the polls?
8     A.  I think that they know among the more, you
9  know, popular, of course.  I was reviewing it this
10  morning and/or just in some of the -- some of the
11  objections that were made in the answers, and there were
12  some things that I didn't -- you know, I didn't realize.
13  I'm mostly familiar with the driver's license, the
14  passport, the concealed gun license.  I didn't think for
15  a minute that a state ID just -- a non-driving state ID
16  would be sufficient just didn't occur to me, but I can
17  understand why it's on the list.
18     Q.  You mean, the personal identification card?
19     A.  Right.
20     Q.  Like a state employees's --
21     A.  Right.
22     Q.  That's what you are referring to, right?
23     A.  Right.
24     Q.  Can we turn to Section 5 on Page 3, please?
25  This section opens with voter identification education.

## 49

1    Is this the section you were referring to a few minutes
2    ago when you said that the legislation requires the
3    state to do some education with the voters?
4        A.   This -- In part, but in the bill analysis,
5    specifically in the fiscal note, there was express
6    language that the State of Texas by and through the
7    Secretary of State would use up to $2 million of HAVA
8    money to educate voters on the changes in voting, and I
9    think it's -- you know, there's a split opinion as to
10   whether that is an appropriate use of HAVA money.  So
11   I'm familiar with that and that sort, of course, takes
12   me to Section 5 that says that the State does have an
13   obligation and responsibility to educate the voters.
14       Q.   Section 14 begins on Page 9, and this is the
15   list of acceptable identification.  Part 1, which begins
16   on Line 18, reads a driver's license, election
17   identification certificate or personal identification
18   card issued to the person by the Department of Public
19   Safety.  Do you know what an election identification
20   certificate is?
21       A.   I don't know.  Unless, of course, this is the
22   new ID that's being proposed.  I've never seen one, and
23   so because it's underlined, it would tell me that that's
24   something new, and so I imagine that that's defined
25   somewhere else in the bill.

## 50

1        Q.   Yes, sir.  Section 20 which begins on Page 13.
2        A.   Okay.
3        Q.   If you'll review that for a minute.
4        A.   I'm very familiar with the evolution of this
5    card.  Very interesting topic.
6        Q.   So MALC is aware of the idea of the election
7    identification certificate being something that a voter
8    can obtain --
9        A.   Yes.
10       Q.   -- free of charge at the DPS offices?
11       A.   I think the free part is in dispute, but I
12   believe they can obtain one, yes.
13       Q.   Do you dispute that the card itself is free or
14   that the things you need to get or to obtain the card
15   would be free?
16       A.   Well, both.  Certainly it could cost a voter to
17   physically prepare themselves to present relevant
18   documentation to qualify for one, but I think that
19   there's been a dispute in the debate of the bill as to
20   the state's method of financing these cards.  Some would
21   argue that it's an intrusion on our Texas Mobility Fund,
22   which would be unconstitutional.  Others would say that
23   that part has been cured.  I don't know if it has, but
24   certainly it's something that's very important to TXDOT
25   and bond covenants and our full faith and credit.

## 51

1        Q.   But does MALC agree that the voter himself or
2    herself who appears at the DPS to obtain one of these
3    cards will not be charged a fee at the time of obtaining
4    that card?
5        A.   I think we can agree that a -- that a person
6    who is seeking a certificate shall not be required to
7    give money to the Department of Public Safety or to
8    receive a certificate.  Yes, we can agree on that.
9        Q.   Is MALC aware of who'll be exempt from showing
10   a photo ID to vote if Senate Bill 14 takes effect?
11       A.   I believe they would know -- MALC would know,
12   its members would know, and those who would look at it,
13   you know, with the -- with the legislative or with the
14   legislation that's -- and supporting documents, I think,
15   they could figure it out yes.
16       Q.   And who'll be exempt?
17       A.   I think -- I'm aware of a narrow religious
18   exception that I know and that will be for those who
19   don't want to be photographed.  That's the one that
20   comes to mind right now.
21       Q.   Are you aware of an exception for those over
22   the age of 65 that would not have to present the photo
23   ID if they wish to vote?
24       A.   I'd have to refresh my memory.
25           (Exhibit 4 marked.)

## 52

1        Q.   Please review the next exhibit.  Have you seen
2    this provision to the election code before?
3        A.   In some form or fashion, yes.
4        Q.   And do you recognize this as a current
5    provision of law --
6        A.   For those who wish to vote by mail, yes.
7        Q.   And this is Election Code, Section 82.003, Age.
8    "A qualified voter is eligible for early voting by mail
9    if the voter is 65 years of age or older on election
10   day."
11       A.   Yes.
12       Q.   Does MALC recognize that this provision would
13   allow anyone who's 65 years or older to vote without a
14   photo ID?
15       A.   I think MALC would recognize that this allows
16   the person who's 65 years of age or older to vote by
17   mail.
18       Q.   Without a photo ID?
19       A.   Well, I'm not -- I can't tell you from the
20   letter of that statute that's the objective.  I
21   think that as I understand it and as I think MALC would
22   understand it that when a person registers to vote,
23   there are some instances where the Secretary of State
24   would require the presentation of some form of ID at one
25   point or another if in fact the driver's license or

## 53

1  other identification didn't match up with their internal
2  record.
3         And so, you know, is it likely that that
4  could have happened to a person who then turns 65 and
5  chooses to vote by mail?  At some point there would have
6  been a presentation of identification.  But I can also
7  see your instance where if someone who turns 65 years of
8  age and decides they just want to vote by mail that they
9  can request a ballot with a paper request and receive
10 the ballot.
11     Q.   And MALC would agree that a mail-in ballot
12 counts just the same as an in-person ballot on election
13 day?
14     A.   I would hope so.
15     Q.   Sir, do you have a Texas driver's license?
16     A.   I do.
17     Q.   How does your name appear on your driver's
18 license?
19     A.   How in print, you mean, or what name appears?
20     Q.   Is it your full name?  Is it your name without
21 a middle initial or how does it appear?
22     A.   It is my legal name on my driver's license.
23     Q.   Trey Martinez name?
24     A.   Ferdinand Frank Fischer, III.
25     Q.   So for the court reporter, how does that

## 54

1  appear?
2      A.   Ferdinand Frank Fischer, III.
3      Q.   What address appears on your driver's license?
4      A.   My home.
5      Q.   Do you have a passport?
6      A.   I do.
7      Q.   How does your name appear on your passport?
8      A.   I believe it says Ferdinand Frank Fischer, III.
9      Q.   Do you have a military photo ID card?
10     A.   No, sir.
11     Q.   Do you have a license to carry a concealed
12 handgun?
13     A.   I believe a recently expired one.
14     Q.   How did your name appear on that license?
15     A.   I believe Ferdinand Frank Fischer, III.
16     Q.   Are you registered to vote in Texas?
17     A.   I am.
18     Q.   How does your name appear on your voter
19 registration card?
20     A.   I believe Ferdinand F. Fischer, III.
21     Q.   Do any of MALC's members lack the photo ID that
22 is required by Senate Bill 14?
23     A.   I don't believe that they lack the ID -- I
24 mean, a form of the acceptable IDs.
25     Q.   MALC cannot identify any member who lacks any

## 55

1  of those forms of ID.
2      A.   Not that I -- No, I cannot.
3      Q.   Do any of MALC's members contend that they will
4  be unable to vote if Senate 14 is precleared and takes
5  effect?
6      A.   No.
7      Q.   So Senate Bill 14 will not deny or abridge any
8  MALC member's right to vote.
9      A.   The individual member, no.
10     Q.   Does MALC represent anyone else in this
11 litigation besides the organization?
12     A.   MALC -- MALC counsel represents the
13 organization.
14     Q.   So MALC represents MALC and no one else in this
15 lawsuit?
16     A.   That is correct.
17     Q.   So then would it be true that MALC has
18 intervened because some of its members strongly oppose
19 Senate Bill 14 rather than because its members lack the
20 photo identification and fear that they will be unable
21 to vote if Senate Bill 14 goes into effect?
22     A.   I think dislike or disapprove or oppose the
23 legislation.  I mean, that is certainly true, but I
24 think that the essence is that members of MALC oppose
25 it because they know it impacts their constituents who

## 56

1  elect them to serve.
2         And so while directly it doesn't infringe
3  on an individual's ability to vote if they possess any
4  of those forms of identification, these members know,
5  particularly those that are in very heavily populated
6  minority communities, that the -- the evidence was a
7  theory and a hunch at the time of the legislation's
8  formation and it's certainly become more and more
9  evidence to the development of the evidence at trial
10 that minorities are more likely to be impacted by this
11 voter identification legislation.
12         So I think in theory when you -- when you
13 are a membership caucus that represents the minority
14 community, then it is very likely that those impacted by
15 this kind of legislation are the very constituents that
16 these members were elected to represent.
17     Q.   How would preclearance of Senate Bill 14 injure
18 MALC as an organization?
19     A.   I think -- I think, again, that if MALC deems
20 itself and views itself as sort of a protector and
21 gatekeeper for advocating on behalf of the Latino
22 community, any time there's any piece of legislation
23 that has an impact on Latinos and minorities, it
24 certainly -- it certainly doesn't settle well with MALC
25 because if there's -- if it's not MALC looking out for

## 57

1   their interests, then, you know, there's not really

2   anyone left.  And so we take those things very seriously

3   for those reasons.  That's what we believe our mission

4   is.

5       Q.  So it is MALC's belief that it is -- how this

6   bill would impact the constituents of the individual

7   members of MALC, that is, the concern that MALC -- that

8   brought MALC into this lawsuit.

9       A.  Could you say that again, please?

10       MR. ASTON:  Actually, could she read that

11   back, please?

12       (Requested portion was read.)

13       A.  I think broader than that, I think that MALC's

14   interest in this bill would be for advocacy on behalf of

15   the Latino community and recognizing that there are

16   Latinos in the State of Texas that aren't currently

17   represented by a MALC member.  So I think much broader

18   than we view this the same way we viewed redistricting,

19   which was the entire state, everybody included, but

20   precisely the -- the Latino -- the Latinos in the state

21   that we wanted to make sure had fair districts and given

22   the opportunity to elect candidates of choice.

23       Q.  So MALC members believe that this bill will

24   affect their ability to be reelected -- will affect

25   their constituents' ability to elect them?

## 58

1       A.  I think MALC feels that -- that the

2   constituents of those members will be impacted, but,

3   again, so will minorities who don't reside within those

4   constituency districts and so the overall policy

5   objection to impacting the minority community, both

6   within members' districts and other parts of the state.

7       Q.  Did MALC provide its members or staff with any

8   written materials on voter ID during the 2011

9   legislative session?

10       A.  Nothing that I recall.  There are instances,

11   however, where members will request, you know,

12   information.  They may have dispatched staff to

13   conduct -- have some sort of research assignment.  We

14   may have notified them of bill alerts.  We may have

15   notified them about making sure they were present on the

16   floor for upcoming debates.  Certainly there had been

17   those forms of communication, but I don't recall a

18   specific briefing document that was created by MALC and

19   distributed, you know, exclusively on voter

20   identification.

21       Q.  Have these materials, unless they're covered by

22   the privilege, been produced to the State?

23       A.  I believe that, you know, MALC having gone

24   through redistricting and being very knowledgeable of

25   our obligations have done the best search that we can

## 59

1   when we presented anything that has been requested to us

2   to present to our lawyers who then presented them for

3   inspection or distribution.

4       Q.  And a privilege log was also produced?

5       A.  I will -- I will rely on your --

6       Q.  To your knowledge, you believe that it was?

7       A.  I don't know, but I wouldn't be surprised if

8   there was one.

9       Q.  Did MALC provide its members or staff with any

10   written materials on voter ID in the 2009 legislative

11   session?

12       A.  That I recall, no.  And, again, I believe it

13   would be -- if that was a discovery request that was

14   presented to us, then we would have conducted our search

15   and presented any documents that were relevant that

16   weren't subject to a privilege or privilege log to our

17   counsel for distribution.

18       Q.  Did MALC provide its members or staff any

19   written materials on voter ID in any previous or prior

20   legislative sessions?

21       A.  Prior to 2009, I wasn't the chair of the

22   caucus.  I certainly was a member of the executive

23   committee.  Again, I don't recall that being the case,

24   but if we did, we would have certainly provided that

25   information if properly requested.

## 60

1       Q.  And would the same go for any materials

2   provided to members during any legislative interim?

3       A.  I believe so with a -- with a lean more

4   towards -- you know, more inactivity in the interim.

5       Q.  Less likely that there's anything out there.

6       A.  Right.

7       Q.  Did MALC meet with any interest groups about

8   Senate Bill 14 prior to or during the 2011 legislative

9   session?

10       A.  Interest groups with regard to voter

11   identification?

12       Q.  Senate Bill 14.

13       A.  Senate Bill 14?  I know that no interest group

14   addressed MALC on Senate Bill 14.  I can't say with

15   certainty that the MALC staff wasn't engaged by an

16   interest group, and what I'm thinking about, I'm

17   thinking about the official instances when someone

18   knocks on our door and says we want to meet with you

19   versus you are in a committee room, you are in the

20   gallery of the capitol, you are in a -- you know, the

21   pit, outside the front door, where, you know, there is

22   just constant communication going on, and so in those

23   instances I think there might be a higher frequency

24   where there could be some engagement in dialogue, but in

25   terms of official requests for visits or communications,

## 65

1    A.  Well, I think the fact that it was a Senate
2  bill, I think MALC had very little influence on
3  controlling the pace of the Senate.  To the extent that
4  it came to the House and found itself behind the local
5  calendar, I would imagine that many members in MALC
6  participated in debates that prevented Senate Bill 362
7  from coming to the floor.
8    Q.  Would those efforts have been at MALC's urging
9  or request?
10    A.  No, not at their request.  But I know -- Again,
11  I believe that MALC is a collection of members, and
12  sometimes I think actions speak louder than words.
13    Q.  Did MALC undertake any efforts in an attempt to
14  defeat Senate Bill 362?
15    A.  I'm sorry?
16    Q.  Did MALC undertake any efforts in an attempt to
17  defeat Senate Bill 362?
18    A.  I don't know that MALC did.  Again, my
19  recollection of the -- of the occurring on the floor --
20  what occurred on the floor, that remaining members of
21  MALC engaged in debate and discussion that -- that, you
22  know, prevented Senate Bill 362 from becoming eligible
23  or becoming considered on the House floor.
24    Q.  Let's shift focus back to Senate Bill 14.
25  Prior to or during the 2011 legislative session, did

## 66

1  MALC take a public position as an organization whether
2  Senate Bill 14 should pass?
3    A.  I don't know if we did.  I think in the event
4  that there was discussion about a upcoming voter
5  identification legislation, I know that if I was asked
6  to comment on behalf of MALC, I would have said that I
7  would be opposed to it.
8    Q.  Would you have said that I represented --
9  Representative Martinez Fischer be opposed to or
10  MALC would be opposed to it or both?
11    A.  It could be both.  Oftentimes, we try to
12  parse -- when there's a request for coverage, is it
13  coming out of the caucus office or is it coming out of
14  my member office, but I can't control what ultimately is
15  written by writers.  You know, oftentimes I've seen my
16  title, you know, used in, you know, whether it's House
17  rep or chairman of MALC.
18    Q.  Was MALC opposed to Senate Bill 14?
19    A.  Yes.
20    Q.  When did MALC take that position?
21    A.  I can't tell you a specific date and time.  I
22  imagine any public statements we made, you know, I think
23  that those statements and those dates of times would
24  obviously be the best evidence.  I think the actions and
25  the deliberations by MALC members from referral of

## 67

1  committee to debate on the floor, I think at all times
2  there was a, you know, pretty large group of MALC
3  members working in opposition to the bill.
4    Q.  If The Caucus published or produced or whatever
5  in your mind The Caucus does when it sends out its
6  email --
7    A.  The Caucus -- The blast.
8    Q.  The Caucus, the newsletter email, not the
9  caucus, the organization.  If The Caucus newsletter
10  spoke out against Senate Bill 14, would that represent
11  MALC's public statement?
12    A.  I think that would represent a form of a public
13  statement, yes.  I don't think that that would be the
14  way or the only way to make a public statement about
15  being in support or in opposition to legislation.
16    Q.  Sure.  There are other ways.
17    A.  Sure.
18    Q.  But MALC would recognize that if it publishes
19  in The Caucus a statement opposing a bill, that should
20  and is construed as a public statement of that position.
21    A.  I certainly believe one could rely on that, of
22  course.
23    Q.  Did MALC undertake any organized efforts to
24  stop the passage of Senate Bill 14?
25    A.  I think in the -- if one could get away with

## 68

1  saying -- using the word organized on the House floor, I
2  mean, it's -- anyone who has experienced it, it's less
3  than that, but I think the record, you know, clearly
4  indicates the -- the very first point of order on the
5  voter identification bill that sent it back to committee
6  was, you know, lodged by a MALC officer.
7    And so I think from -- If the floor debate
8  is the starting point, I think you would find that, I
9  guess, the -- the lead opposition voices to Senate Bill
10  14 were members of MALC.
11    Q.  The point of order, that would be one
12  procedural mechanism by which you could slow down
13  consideration of a bill?
14    A.  Well, sometimes you can permanently defeat a
15  bill, but, yes, in that instance, procedural defect,
16  that would delay passing the bill.
17    Q.  Are there other procedural mechanisms that MALC
18  officers or MALC members used?
19    A.  Well, I think there's obviously the debate --
20  the speaking and debate.  I think there's the ability to
21  change legislation by offering amendments.  I think
22  there's, you know, the leverage and discussions that
23  often take place when you are trying to shape the
24  legislation and that would be at the point it's
25  introduced when it's heard in committee, when it's

## 69

1  passed out of committee, when it's sitting in calendars.
2  I mean, at all points certainly, you know, MALC members
3  were -- if there was a discussion to be had about making
4  the bill acceptable to MALC, MALC members would have
5  participated.  If there was a opportunity to improve the
6  bill with a floor amendment, MALC members participated.
7  If there was a way to tactically, strategically delay or
8  defeat the bill, I would imagine MALC members were
9  involved in that too.
10      Q.  Do you recall whether you were involved in some
11  of those activities?
12      A.  Guilty by association, yes.
13      Q.  I just want to be clear.  I believe a minute
14  ago you said that there were tactics to delay or defeat,
15  and both of those were attempted?
16      A.  Yes.
17      Q.  Not always successfully, but MALC members would
18  have attempted both of those kinds of tactics with
19  respect to Senate Bill 14.
20      A.  MALC members did, yes.
21      Q.  And MALC officers?
22      A.  And MALC officers.
23      Q.  Did MALC as an organization urge its members or
24  its officers to utilize any of those tactics to stop or
25  delay the bills in the past, not Senate Bill 14, but --

## 70

1      A.  Well, I think that MALC from a organizational
2  staff perspective, you know, is probably, you know, more
3  along the lines of an information resource.  I think
4  that once the recommendation actually makes its way into
5  a committee or onto the floor, it really is in a sort of
6  a member only project, and so insofar as MALC had any
7  role in coordinating members, it would have been the
8  things that I referred to, sending you a text message to
9  be on the floor, calling around in your offices to make
10  sure your boss is accessible for a vote, but most of
11  those discussions in terms of, you know, actual floor
12  strategy or parliamentary tactics, those would have been
13  individual discussions with members that would have been
14  member to member.
15      Q.  Would you, MALC, consider these kinds of
16  tactics to be pretty standard in the Texas House?
17      A.  I think the -- I think it's not only standard,
18  I think it's historically significant.  I mean, this is,
19  you know, the -- from the days of Abe Lincoln jumping
20  out of a window to break quorum, I mean, you've heard
21  legendary stories about the use of the rules and
22  parliamentary procedure to empower minority.  In this
23  instance, it's a minority within a minority.
24      Q.  Are you familiar with the term chubbing?
25      A.  Yes.  And I want you to know that I'm on a

## 71

1  1,700 calorie a day diet as a result of that.  I don't
2  like that stigma, but I do know the term.
3      Q.  In the Texas House of Representatives, what
4  does the term chubbing mean?
5      A.  I believe it means a -- an excessive use of the
6  microphone to stall or to delay a bill from passing.
7      Q.  Is there a rule in the House rules regarding
8  chubbing?
9      A.  I don't know that there is.  I think that there
10  are rules about civility and decorum, about speaking
11  over each other.  I think that the -- there's certainly
12  a practice of chubbing and there's certainly a
13  commentary on chubbing itself.  I've never heard of a
14  point of order being called or sustained because a
15  member was speaking excessively.
16      Q.  What is the practice of chubbing?
17      A.  Well, I will represent one time as a junior
18  member that there was a piece of legislation, you know,
19  was controversial, and I watched two senior members and
20  I know one of them was Warren Chisum, and he's very
21  seasoned in the rules, and I remember him just talking
22  at length about a bill that really meant nothing.  But
23  what I didn't know is that while he was spending all
24  this time on the microphone, there were members of the
25  legislature on airplanes coming back to Austin so that

## 72

1  they could participate in the upcoming controversial
2  vote.  So that's approximately been my first exposure to
3  what is known as chubbing, and I imagine that every
4  session has some instance where that occurs.
5      Q.  I don't want to mischaracterize you.  Did you
6  call that excessive talking or --
7      A.  Well, I said -- when you asked me what I
8  thought it meant, I think it's when a member talks
9  excessively.
10      Q.  Is there a time limit that is required to reach
11  that point?
12      A.  You do have -- You do have layout provisions
13  that call for -- for 10-minutes, and you do have
14  specific rules that allow time for pro and con speeches.
15  On the other hand, there are rules that -- that give
16  members privileges that are not bound by time.  So -- So
17  the -- in those instances, the rules did provide for,
18  you know, very express limitations on time.
19          (Exhibit 5 marked.)
20      Q.  Please take a minute to review -- any or all
21  that you wish to review, but what we're going to focus
22  on is Section 14.
23      A.  I've read it.
24      Q.  Do you recognize this as House Rule 6, Section
25  14?

Trey Martinez Fischer                                    June 15, 2012

---

### 73

1    A.   Yes, I do.

2    Q.   And then Subpart 4.

3    A.   Yes.

4    Q.   Which reads, "Any bill or resolution on a local

5    consent and resolutions calendar shall be considered

6    contested.  If the debate exceeds 10 minutes, the chair

7    shall strictly enforce this time limit and automatically

8    withdraw the bill from further consideration if the time

9    limit herein imposed is exceeded."

10    A.   Correct.

11    Q.   Is this the sort of procedure you are talking

12    about when you are talking about chubbing?

13    A.   No.  I mean, I think you could say that that is

14    chubbing, but you could talk for 9 minutes and chub.

15    You could talk for 5 minutes and chub.  I think it's a

16    rather subjective interpretation.  I think if -- if a

17    member has a bill that's voted unanimous out of

18    committee and voted unanimous out of calendars and is

19    about to be voted unanimous out of the floor and all of

20    a sudden a member entertains five, six, seven minutes of

21    unanticipated questions, I think someone can say, well,

22    what is that about?

23         And so I don't think that -- I don't think

24    that if a member chooses to talk 10 minutes on a local

25    bill, that's not necessarily chubbing.  That could just

---

### 74

1    be killing a bill.

2    Q.   Okay.  Whether or not you would describe the

3    provision we just read as chubbing, this is a provision

4    that certainly could be used to move a bill off a

5    calendar?

6    A.   Of course.

7    Q.   And is it routinely used in that fashion?

8    A.   It has been, yes.

9    Q.   And that would be one of the tactics that one

10    could use to delay consideration of a disfavored bill?

11    A.   I think that's -- I think that that is a way

12    that you can defeat a bill in the local calendar.  I

13    guess that's what that bill is for.

14    Q.   Did you engage in chubbing of the House

15    calendar in 2009?

16    A.   I would like to think that I defeated

17    legislation in 2009.  I wouldn't have -- I wouldn't have

18    said that I chubbed on a bill, but I certainly would

19    have said that I killed a bill on the rules.

20    Q.   And how in 2009 did you kill a bill on the

21    rules?

22    A.   I've done it many different ways.  But with

23    regard to Section 6 -- or, excuse me, Rule 6, I have

24    done it by acquiring signatures.  I have done it by

25    getting my colleagues to show with a raising of their

---

### 75

1    hand that there was an objection to a bill, and I've

2    certainly done it by speaking and debating for

3    10 minutes.

4    Q.   And would you have done any or all of those

5    things in 2009?

6    A.   I probably did.

7    Q.   And what would have been the purpose of that

8    exercise?

9    A.   You know, there are many different motivations.

10    I think that passing legislation on the House floor is a

11    full contact sport, and you, you know, it could have been

12    personality driven.  It could have been philosophical on

13    legislation.  Oftentimes, I mean, I think it's --

14    there's a notoriety that every legislative session

15    there's always a meltdown on a particular calendar,

16    and -- you know, so I think every time that happens

17    there's a different motivation.

18    Q.   Does MALC believe that chubbing is a legitimate

19    means to kill a bill?

20    A.   Well, I don't know if MALC believes that, but I

21    think the rules indicates it.  So, you know, again, I

22    mean, just the term chubbing is a term that's not in the

23    rules.  It's a term that, you know, people have given

24    it.  And so -- so I think it's an appropriate use of the

25    rules.  That's why it's there.

---

### 76

1    Q.   Do you recall -- Do you recall in 2011 that

2    there was an amendment to the House rules to limit the

3    practice of chubbing?

4    A.   No.

5         (Exhibit 6 marked.)

6    Q.   Do you recognize this as a portion of the House

7    Journal?

8    A.   Yes, I do.

9    Q.   And this has been marked Exhibit 6.  On the

10    second page is the vote on House Resolution 4.  At the

11    bottom of the page, it says it's Record Vote No. 30, and

12    there are 143 yays, zero nays and one present not

13    voting.

14    A.   Yes.  It looks like I was excused absent that

15    day, but, yes, that is right.

16    Q.   Would MALC recognize that if 143 yays and zero

17    nays were recorded on a vote, one can presume that was

18    uncontroversial?

19    A.   I think so.  You know, very proforma vote

20    certainly.  Sure.

21    Q.   Would there be any way a vote that was 143 to

22    zero was something done for a discriminatory purpose?

23    A.   Sure.  If the body wasn't informed as to what

24    the purpose was at the time, if it was a deliberate

25    attempt to have a discriminatory purpose and conceal it,

## 77

1    sure.
2        Q.   And how would it be concealed?
3        A.   Well, I -- I guess in reading -- the question
4    you asked me, you know, could it be construed that there
5    would be a discriminatory purpose, and I think, yes.   I
6    think that I'm relying on your word that that is a vote
7    on the rules, I guess, or an amendment to the rules.   I
8    didn't see the actual amendment itself, but -- so I
9    guess if I had an idea of what was amended or what that
10   vote was referencing.
11       Q.   Let's talk a bit about a practice of amending a
12   bill onto another bill.   Have you ever amended a piece
13   of legislation onto another bill that was under
14   consideration in the full House?
15       A.   I have amended legislation on the floor of the
16   House.   I don't recall amending legislation with entire
17   pieces of other legislation.   I've made several
18   amendments.
19       Q.   Well, how about with parts of other
20   legislation?
21       A.   Sure.   Absolutely.
22       Q.   And is that a common occurrence in the Texas
23   House?
24       A.   It can be, yes.
25       Q.   What is the vote required to amend the bill

## 78

1    before the full House on second reading?
2        A.   It's a majority vote of those present and
3    voting.
4        Q.   Simple majority of those present and voting.
5        A.   Present and voting, yes.
6        Q.   Is that true for both House bills and Senate
7    bills that are on the floor for second reading debate?
8        A.   Yes.   For amendments, not on passage to
9    engrossment or anything like that.
10       Q.   And if you amended a Senate bill that was under
11   consideration on the House floor, you would only take a
12   majority vote to amend that bill, correct?
13       A.   Yes.
14       Q.   And if that bill ultimately passed in the House
15   and went back over to the Senate, the full Senate would
16   have to either agree with the changes made or they would
17   have to go to conference, correct?
18       A.   Yes.   Or they could -- they could let the bill
19   die.
20       Q.   Do you know if a vote by the Senate to concur
21   or to go to conference is decided by a simple majority
22   of the members present?
23       A.   I'm not as familiar with Senate rules, but that
24   sounds logical.
25       Q.   So would that suggest or indicate that on many

## 79

1    substantive issues, for example, those that were added
2    to bills as amendments, the decision of the Senate could
3    be by simple majority and not by a two-thirds Senate
4    vote?
5        A.   Could you explain that one more time?
6            MR. ASTON:   How about we have her read it
7    back and then I'll try to clarify it?
8            (Requested portion was read.)
9        A.   I'm not quite sure I understand the question.
10   You are referring to bills that are amended -- Senate
11   bills that are amended in the House, correct?
12       Q.   Correct.   Okay.   They go back to the Senate and
13   then on a simple majority vote, they could concur in the
14   changes?
15       A.   Correct.   That could happen.
16       Q.   And so, for example, the Senate could pass a
17   bill that says A, B and C.   It goes to the House and
18   they add D?
19       A.   Sure.
20       Q.   It goes back to the Senate on a simple majority
21   vote, they could pass the bill with A, B, C and D?
22       A.   That's correct.
23       Q.   And so given the nature of the way the things
24   work with amendments back and forth, back and forth
25   during the, you know, fast pace of a legislative session

## 80

1    is it perhaps common that a substantive piece of
2    legislation is passed out of the Senate on that simple
3    majority vote?
4        A.   I think it's possible.   I don't know if I would
5    go so far as to say it is common, but it is certainly
6    possible.   It certainly has happened.
7        Q.   Have you ever amended a Senate bill with a text
8    of a House bill you authored?
9        A.   I believe I have amended Senate bills with
10   amendments.   Some of those could have been portions of
11   legislation that I've authored or it could have been
12   ideas that were newly drawn and drafted and amended on
13   the floor of the House.
14           (Exhibit 7 marked.)
15       Q.   Do you recall Senate Bill 1811 from the 2011
16   session?
17       A.   I don't.   It looks likes this is for
18   unemployment benefits or victims of sexual assault.
19       Q.   Does this amendment look familiar to you?
20       A.   The language of it certainly does, yes.
21       Q.   Where do you recognize it from?
22       A.   I had legislation that dealt with providing
23   unemployment compensation to victims of sexual assault.
24       Q.   Do you think that was House Bill 2755?
25       A.   It could have been, yes.

85

1  those either discussions in terms of having those
2  communications themselves or -- directing us on what
3  would be the best approach to do that.
4      Q.  Onto Senate Bill 14.  Of the offered
5  amendments, was there any of them that if accepted would
6  have caused MALC to support passage of this photo ID
7  bill?
8      A.  I think that that answer runs the risk of -- of
9  bringing up conversations with people that you've asked
10  me not to refer to.
11      Q.  Did you offer any amendments to Senate Bill 14?
12      A.  I did.
13      Q.  How many?
14      A.  Not quite sure.  I know -- I know at least one
15  that I can think of right now.
16      Q.  What was that amendment?
17      A.  I believe it was an amendment that would allow
18  people like you to be able to vote with your AG issued
19  ID, state employees.  I believe that I authored that
20  amendment.  So that -- that's -- that's the one
21  amendment that does come to mind.
22      Q.  Had that amendment passed would that have
23  changed your views on Senate Bill 14 ultimately?
24      A.  I think in that alone, probably not, but I
25  think that there was definitely some goals and

86

1  objectives that were worth working towards that would
2  have made the bill appear to be more inclusive.
3          MR. ASTON:  Could we go off-the-record for
4  a couple of minutes?
5          (Recess from 12:16 p.m. to 12:29 p.m.)
6      Q.  (BY MR. ASTON) When did MALC first hear about
7  this lawsuit?
8      A.  I imagine our awareness was heightened right
9  around the time Texas made its submission because I
10  don't believe that the -- I apologize because, you know,
11  redistricting and voter ID in terms of litigation were
12  right on the backs of each other, so it was around the
13  time there was an exchange of correspondence from the
14  Department of Justice asking for more information and
15  those sorts of things, and so I guess that would have
16  been some time after the bill finally passed and before
17  the declaratory judgment was filed.
18      Q.  When you say "submission," are you referring to
19  the administrative preclearance submission to the
20  Department of Justice filed by the State?
21      A.  Yes.
22      Q.  And the transfer of information, the -- what --
23  you are referring to the times when the Department of
24  Justice asked --
25      A.  For additional information.

87

1      Q.  -- the State of Texas to provide more things
2  for it to review during its consideration of the bill.
3      A.  Correct.
4      Q.  Do you know how MALC first heard about the
5  lawsuit?
6      A.  I imagine if we didn't find it from an
7  independent news source, we probably heard about it from
8  our lawyers.
9      Q.  Did MALC hold a meeting after they heard that
10  the State of Texas had filed this lawsuit?
11      A.  No.  I don't believe that we were in session,
12  and so I think it's fair to say that we probably didn't
13  meet.
14      Q.  Do you know when the lawsuit was field?
15      A.  The day, I don't know off the top of my head,
16  no.
17      Q.  Do you know about when?
18      A.  I imagine it would have been somewhere in the
19  in the late summer to fall of 2011.
20      Q.  Was that the lawsuit you were referring to or
21  the preclearance submission to DOJ?
22      A.  I imagine they were both within a proximity --
23  If I understand the submission having like a 60-day
24  requirement and in this instance there was some request
25  for additional documents.  They may have stretched that

88

1  out a little bit, but at some point there was a
2  declaratory action filed, so I know that -- And, again,
3  I mean, you know, the redistricting litigation itself
4  took place right after Labor Day, so sometimes the
5  litigation and the corresponding dates all run together.
6      Q.  You mentioned there was a 60-day window at DOJ.
7  Do you know how long this bill was pending at DOJ?
8      A.  No.
9      Q.  How long do you think would have been
10  reasonable for DOJ to take to consider this bill?
11      A.  I think as long as the DOJ needed, provided
12  that there's not a hard number of days in Federal law.
13      Q.  So they could delay the State of Texas
14  indefinitely from implementing a pass to sign law?
15      A.  I think there's a reason why Texas is a covered
16  jurisdiction.
17      Q.  So you don't think DOJ should have any deadline
18  as to when they have to give Texas an answer?
19      A.  I think DOJ answers to Congress on that.  So if
20  Congress set a number of days, then that should be the
21  number of days.  If DOJ is charged with preclearance
22  authority for covered jurisdiction, then that's their
23  call.
24      Q.  Has MALC intervened in other lawsuits before?
25      A.  Other than this instant litigation, we

89

1  intervened in the District of Columbia on redistricting.
2  I believe 10 years ago we were a party to a
3  redistricting lawsuit.  I don't know as a plaintiff or
4  an intervenor defendant.  I think at that time the
5  preclearance sought by the State was administrative.  I
6  know MALC had a role.  I just don't know how official or
7  in what capacity that role was.
8      Q.   But your understanding is MALC was involved in
9  the litigation over redistricting?
10     A.   When I came onto the scene in 2001, yes.
11     Q.   About 10 years ago?
12     A.   Yes, sir.
13     Q.   And do you have any recollection or any
14  knowledge of -- since this -- you know, since the
15  decennial census has passed, whether MALC got any
16  involved in any lawsuits that followed?
17     A.   What decennial census?
18     Q.   Whether it was 1990 or 1980.
19     A.   My -- That predates me.  My knowledge of
20  MALC -- By the time I was elected in 2007, at that time
21  my first experience of MALC advocacy was getting
22  involved in a redistricting lawsuit.
23     Q.   So you believe that MALC has been involved in
24  at least three because you are aware of personally at
25  least three?

90

1      A.   I was, yes.  I was aware of three.
2      Q.   MALC intervened in this suit with another
3  party, correct?
4      A.   Yes.
5      Q.   Who is that party?
6      A.   I believe it's the NAACP.
7      Q.   Is that the Texas State Conference of NAACP
8  Branches?
9      A.   Yes.
10     Q.   Did NAACP Branches and MALC meet during the
11  2011 legislative session?  Did the organizations meet?
12     A.   That I know of, no, although we worked
13  together.
14     Q.   Do you know if you worked together in the 2000
15  session with respect to voting issues or voter ID?
16     A.   I don't know that.
17     Q.   Did the two groups meet before intervening in
18  this lawsuit?
19     A.   I think to the extent that counsel for MALC
20  engaged in discussions with the Texas Branches, that's a
21  possibility.  MALC itself did not meet with the Texas
22  Branches of NAACP.
23     Q.   So the members did not.  Your counsel might
24  have.
25     A.   Correct.

91

1      Q.   Has MALC members discussed the claims that you
2  are asserting in this suit with members of the NAACP?
3      A.   I think the answer to that question you would
4  advise me not to answer it because of your objection or
5  your ground rules, I'm sorry, on the waivers.
6      Q.   Have the two groups discussed Senate Bill 14?
7      A.   I think that the answer requires me to violate
8  your housekeeping rule on not disclosing confirmation or
9  discussions involving people that are on the disclosure.
10     Q.   Well, the content -- I don't know want to know
11  what was discussed, but whether there was a meeting.
12     A.   I misunderstood.  Could you tell me the
13  question again, please?
14     Q.   Was there a meeting or a discussion between the
15  two groups?
16     A.   The two groups being MALC --
17     Q.   MALC and NAACP.
18     A.   Oh, I don't believe so.
19     Q.   Has MALC shared any information -- written
20  information with the NAACP group?
21     A.   If we did it's been under -- it's been at the
22  counsel level, our legal counsel level.
23     Q.   And would the same hold true for NAACP sharing
24  group information with MALC?
25     A.   That I wouldn't know, but perhaps, yes.

92

1      Q.   The two groups, do they assert the same claims
2  in this lawsuit?
3      A.   As far as I know they are on the same sets of
4  pleadings and the lawyers represent both entities.
5      Q.   They filed a joint answer, as you've indicated.
6      A.   Every pleading I've seen has been done jointly,
7  yes.
8      Q.   Why did MALC intervene in this lawsuit?
9      A.   Well I, think it's very important, and so --
10  but, you know, for a variety of reasons.  I think that,
11  you know, as I indicated earlier responses, you know,
12  this is sort of pierces the heart and the essence of our
13  caucus.  We are a civil and social justice caucus.  Many
14  people who have served MALC have been in a myriad of
15  battles for advocating on behalf of the minority
16  community, whether it be public education, access to
17  higher education, redistricting, and so I think that
18  there is a -- when you analyze the -- the discussion,
19  debate and the involvement of MALC members taking such a
20  very prominent position in debate and while there was
21  members of MALC who, you know, demonstrated a different
22  view by way of how they voted, there was very little to
23  no advocacy, save and except one or two members that was
24  diabolically in support of Senate Bill 14.  It seemed to
25  me that when you balanced all of the equities, that it

Trey Martinez Fischer                                    June 15, 2012

## 93

1   made perfect sense for MALC to assert itself on behalf
2   of the Latino community and on behalf of our
3   constituents and members.
4       Q.   Any other reason you care to add or would
5   that --
6       A.   You know --
7       Q.   Just don't want to cut you off.
8       A.   You are not cutting me off, but at the expense
9   of giving you a narrative, I mean, there's -- this is --
10  you know, these are very serious issues.  This is not
11  something that MALC wanted to do because we just had an
12  overwhelming amount of resources to combat the State of
13  Texas that has a blank check.  It's very significant,
14  despite the fact that, you know, we have a handful of
15  lawyers, and we're, you know, lodging litigation against
16  the largest law firm in the State of Texas.  Very
17  serious matters when it comes to the voting rights of
18  the Latino community, and, frankly, if MALC didn't
19  assert itself, from the looks of things, very few Latino
20  advocacy groups did.  I think at last check it was MALC
21  and MALDEF involved in this.
22          I think it's important for us to be in the
23  discussion, and, most importantly, the members of MALC
24  were -- you know, were there when all this was
25  occurring, had been privy to the discussions that we can

## 94

1   talk about today and we can't talk about today.  So I
2   think the best evidence and the ability to provide the
3   perspective that nobody else can, only MALC can do that,
4   and so I think that it's -- we have a very appropriate
5   place at the counsel table to present that perspective.
6       Q.   Have you personally spoken with anyone at the
7   Department of Justice about Senate Bill 14?
8       A.   Not -- Well, the answer is yes, I have.  I've
9   been interviewed by the Department of Justice.
10      Q.   When did that occur?
11      A.   The actual date and time, I can't recall.  It
12  was -- It was after redistricting.  It was on or about
13  the time that we engaged as a party or sought a motion
14  to intervene, and the communication was -- was vetted
15  through our lawyer -- through our legal counsel in terms
16  of having the conversation.
17      Q.   You called it an interview.  Did they ask to
18  speak to you in connection with their administrative
19  work or within connection to this lawsuit?
20      A.   I don't know that.  I know that it was a
21  conversation about Senate Bill 14 and what I knew and
22  what I could add to their perspective.
23      Q.   But you don't know if that occurred before or
24  after they denied administrative preclearance.
25      A.   I don't know on recall.  I would imagine that I

## 95

1   can give you a more specific, you know, time frame that
2   might answer that for you, but maybe we can do that on a
3   break if you want that.
4       Q.   Do you know if other members of MALC were
5   similarly interviewed?
6       A.   I believe so, but I don't know.  I spoke to
7   them alone.
8       Q.   It was not a group interview, but you believe
9   that others had the same opportunity?
10      A.   I believe that I was interviewed.  I certainly
11  answered the questions in terms of any other member that
12  may have knowledge of relevant facts or access to
13  information, and so I would suspect that there would
14  have been some follow up on some of the conversations
15  that I had.
16      Q.   Did that interview, conversation take place on
17  one day?
18      A.   Yes, at one phone call.
19      Q.   It was by phone?
20      A.   Yes.
21      Q.   Texas filed this lawsuit on January 24, 2012.
22  Do you know who this lawsuit was filed against?
23      A.   The Attorney General of the United States.
24  January?
25      Q.   I'm sorry.  January 24 of 2012.  Since that

## 96

1   date, has MALC sent any letters or emails to the
2   Department of Justice regarding Senate Bill 14?
3       A.   That I'm aware of, no.  MALC wouldn't have done
4   that.
5       Q.   Since that date has MALC sent any documents to
6   the Department of Justice regarding Senate Bill 14?
7       A.   MALC has not.  You know, again, I'm not trying
8   to qualify, but if MALC did anything with regard to
9   Senate Bill 14 after administrative submission or prior
10  or after to any lawsuit, it would have been done at the
11  behest of our legal counsel, and so I'm not aware of
12  everything that counsel might have directed staff to
13  do or -- but in those instances, if -- if MALC was
14  anticipating litigation, then those decisions were being
15  made by our lawyers.
16      Q.   And as we discussed before, to your knowledge
17  unless those documents are privileged, they would have
18  been turned over?
19      A.   I think that to my knowledge if those documents
20  existed, they were given to our lawyers and I would hope
21  that they would know what to do with them.
22      Q.   Does MALC contend that DOJ is inadequately
23  representing its interests in this case?
24      A.   Does MALC contend that --
25      Q.   DOJ is inadequately representing its interests

### 97

1   in this case.
2          MR. GARZA:  MALC lodges an objection to
3   that question as to Topic No. 2 on the notice of
4   deposition and in which we have stated from the
5   beginning of the deposition that relates to the
6   qualifications of MALC as an intervenor, a decision has
7   been made on intervention.  The court has granted
8   intervention.  MALC has filed legal pleadings through
9   its counsel regarding the issues involved in this
10  intervention, and it's irrelevant to this deposition --
11  the 30(b)(6) deposition.  Having made that objection,
12  you may answer the question to the best of your
13  knowledge.
14      A.   And, I'm sorry.  Mr. Aston, the question again
15  is does MALC feel DOJ is inadequate in representing our
16  interests?
17      Q.   Inadequately representing MALC's interests,
18  yes.
19      A.   I think that MALC and DOJ share similar goals
20  and objectives.  I think that MALC's approach in
21  strategy and perspective is certainly very unique, local
22  and very knowledge based, and what we know and what we
23  anticipate that we will present at trial will be a
24  perspective that no one else other than MALC can present
25  because of our uniqueness and being situated not only as

### 98

1   policymakers that are impacted by these policies, but
2   the policymakers that were involved in the debate and
3   all of the nuances that occur when you're trying to
4   craft, you know, big controversial public policy.
5          So I think that, you know, with due to
6   respect to anybody who's litigating this case, there's
7   sometimes an advantage in terms of capacity and strategy
8   and approach when you know you are inside that brass
9   rail seeing everything happen real-time.
10      Q.   Can MALC think at this time of anything that
11  DOJ has failed to do?
12      A.   I think that if MALC has some inside
13  observations as to what DOJ should do, I imagine that
14  counsel for MALC is in a position to convey those
15  thoughts, and asking me personally as a representative
16  of MALC, I trust that my lawyers are giving me solid
17  reasonable advice and they are advocating and
18  positioning our case in the best way they know how.
19      Q.   If the court denies preclearance of Senate Bill
20  14, will MALC seek attorney fees from the State of
21  Texas?
22      A.   I guess it's a legal question I'll defer to
23  counsel on, and I'll certainly heed their advice.
24      Q.   Does the MALC believe that the United States is
25  incapable of winning this case without MALC's

### 99

1   participation?
2      A.   MALC believes that its involvement in this case
3   provide a very unique perspective, and to the extent
4   that we're able to work cooperatively with the DOJ in
5   presenting that case, it's our intention to do so.
6      Q.   Does MALC contend that they could not have
7   provided that perspective via an amicus submission?
8      A.   I think that, you know, counsel has counseled
9   me in understanding the benefits and the reasons why we
10  want to be present in the courtroom to examine and
11  cross-examination witnesses and present evidence.
12      Q.   How many intervenors in addition to your group,
13  MALC and NAACP, are in this lawsuit?
14      A.   I'd have to rely on the pleadings.  I know I
15  saw MALDEF in there.  I thought I saw a group called The
16  League of Young Voters.  If you want me to look at the
17  pleading.  It seems that there's a group represented by
18  Gerald Hebert.  There's a group represented by John
19  Tanner.  There is the ACLU.  It looks like they're
20  represented.  Counsel for the Texas Legislative Black
21  Caucus, League of Women Voters of Texas, The Justice
22  Seekers, Reverend Johnson, Reverence Wright.  There
23  appears to be a few, you know, other intervenors.  And
24  I'm, you know, Mi Familia Vota, MALDEF, so that's a fair
25  number of intervenors.

### 100

1      Q.   Would you agree that it is more than 20?
2      A.   I'll take your word for it.  I just -- I didn't
3   really examine to know just how many there are, but I
4   see that there are more than MALC.
5      Q.   Does MALC have any contention that that
6   collection of intervenors is not adequately representing
7   MALC's interest in this case?
8      A.   I think MALC, you know, prefers to speak for
9   MALC, and as far as MALC's concern about our
10  involvement, I think one of the reasons I stated
11  previously, I don't have an opinion as to how other
12  groups view their role in the litigation.
13      Q.   Does MALC contend that Senate Bill 14 has the
14  effect of denying or abridging Hispanics and Latinos'
15  right to vote on account of their race, color or
16  membership in a language minority group?
17      A.   I believe it will.
18      Q.   What is the basis for that contention?
19      A.   Well, I think the evidence as I understand it
20  demonstrates that there are anywhere between 600 and
21  700,000 minorities that currently are registered to vote
22  that don't possess a driver's license.  I think that --
23  that the -- a significant -- when you consider election
24  outcomes and you consider election participation rates
25  state-wide, that is a -- that is a large number of

## 101

1  Texans that would have additional hurdles in order to
2  vote.
3       Beyond that, I've struggled trying to
4  understand the basis by which there's even a public
5  policy concern for a need to have a voter identification
6  requirement, and I have yet to understand a proponent of
7  this legislation articulate just exactly what's going on
8  that we have to disenfranchise potentially 6 to 700,000
9  minority in order to achieve some sort of public policy
10  purpose.
11       Q.   Before we move on, would there be anything else
12  you would like to add as far as evidence or facts that
13  you believe demonstrate a discriminatory effect of this
14  lawsuit?
15       A.   Well, I mean, I think that the overwhelming
16  barrier to access -- I mean, it's -- it's more than -- I
17  mean, that you could look at this from multiple points
18  of view.  I mean, you know, compliance with this law
19  would be a tremendous place -- a tremendous burden on
20  access.  It's not just access to the polls, but it's
21  access to DPS to -- to conform to the dictates of the
22  law -- of the proposed law, and so I -- you know, I
23  surmise that you could probably look at this from a
24  number of different ways, and I guess when I -- when I
25  understand what the specific public policy objective --

## 102

1  like what was the -- what was the problem that we were
2  seeking to solve, I mean, I could probably form an
3  opinion, you know, in response to that policy objective.
4       Q.   All right.  Let's review a few of those things.
5       A.   Sure.
6       Q.   You mentioned 600 to 700,000 minorities bought
7  a driver's license.  Do you know where that figure came
8  from?
9       A.   I believe those are -- I've learned of those
10  numbers based on, I guess, the evaluation of discovery
11  material the State has produced in this litigation.
12       Q.   And do you understand that to be 600 to 700,000
13  people with no form of photo ID or who lack a driver's
14  license issued by the State of Texas?
15       A.   I think that to be fair, I think that it's
16  those number of people that are currently registered to
17  vote that are -- that the State of Texas is unable to
18  identify with its records as being people that are in
19  receipt of things like a driver's license, yes.
20       Q.   That would be -- In your understanding that
21  would be people who Texas cannot identify within Texas's
22  own databases which would be the driver's license, the
23  concealed handgun databases?
24       A.   Personal identification card.
25       Q.   Personal identification card.  It's people who

## 103

1  do not have those three forms?
2       A.   I think I imagine that I would -- I would like
3  to think that the State is in the best position to
4  acquire and accumulate data on all of its Texans whether
5  it be at the DMV or the electrician who wants a license
6  to be an electrician.  So whatever data -- And I'm not
7  privy -- I have not seen the data.  I have not analyzed
8  the data.  I have just had discussions with our lawyers
9  in terms of what the data is revealing, and so if there
10  is data that suggests that there's other metrics out
11  there from other State data, then I'm not aware of it.
12       Q.   When we reviewed earlier Section 14 of Senate
13  Bill 14, the list of IDs that are acceptable, a number
14  of those are not State issued, correct?
15       A.   They're Federal issued.  I know of two that I
16  can recall without looking at the bill.
17       Q.   Which two?
18       A.   The passport and the military ID.
19       Q.   If you want to turn to Page 10 of that exhibit,
20  Lines 5 and 6 note "A United States citizenship
21  certificate issued to the person that contains the
22  person's photograph."  Do you know what that is?
23       A.   I don't.  I don't even know if I have one.
24  Where would I get one of those?
25       Q.   But would you agree that the United States and

## 104

1  not Texas would be in the best position to know who has
2  a passport or who has a Federally issued military ID?
3       A.   I think that's fair.
4       Q.   So would you agree that -- that if Texas
5  determines within our own State issued database -- I'm
6  sorry -- within our own State databases as to our State
7  issued IDs, the number of folks without an ID is one
8  thing.  It is not only possible, but likely that that is
9  an over-inclusive number as to the people who lack an ID
10  within Senate Bill 14?
11       A.   I'm not sure I understand that question.
12       Q.   Would you agree -- I'll try to rephrase.  Would
13  you agree that just because someone does not have a
14  State issued photo ID, he or she might well have a
15  Federally issued photo ID that satisfies Senate Bill
16  14's requirements?
17       A.   I think it's possible.  I think it's -- You
18  know, I think it's very -- it's -- it's very
19  problematic, I think.  I don't -- I'm trying to remember
20  what it took for me to obtain my passport, and I don't
21  think I would have had a lot of luck without a birth
22  certificate or driver's license or some sort of
23  identification.
24       Q.   Suppose you are a member of the military and
25  you move around a lot and you have a driver's license

Trey Martinez Fischer                                    June 15, 2012

## 105

1  from your home state, but you're stationed here in
2  Texas.  Would that be the sort of person who might well
3  have the Federally issued ID but not yet have a Texas
4  driver's license who might wish to quickly register to
5  vote?
6      A.  I think an active soldier, yes.  Correct.
7      Q.  Suppose a Texas citizen who lives on the
8  border, would that be the sort of person who might have
9  a passport to cross freely back and forth between Texas
10 and Mexico, but who may not have a driver's license
11 because they live with a family member who does?
12     A.  I'm not a -- I'm not aware of -- I mean, I
13 think that's possible.  I'm not aware of that being a
14 requirement to cross the border and return back.
15     Q.  A passport?
16     A.  Right.  I remember a time in my lifetime you
17 could go over with a birth certificate.
18     Q.  Before we move on again, was there anything
19 else you wanted to add as to MALC's contention of
20 evidence of the allege discriminatory effect of this
21 bill as to Hispanics and Latinos?
22     A.  You know, again, I mean, with the
23 disenfranchising to the degree to which I believe is a
24 very high number if we're looking at 600 to 700,000
25 minorities, you know, I think that the -- the rigors of

## 106

1  the recommendation certainly has an impact in areas
2  where there is not the access to DPS stations to conform
3  with the law or those that do have them, the ability by
4  which they're able to obtain those licenses, you know,
5  whether they work or rely on public transportation or
6  whether they have to travel multiple counties to arrive
7  at a location.  I think that the overarching -- I think
8  when you start to list, you know, what you think is a
9  discriminatory effect, I cannot get past the impact this
10 has on access, and I think that that is one of the
11 bigger ones that I have spent a lot of time thinking
12 about.
13     Q.  Does MALC contend that Senate Bill 14 will have
14 the effect of denying or abridging African-American's
15 right to vote on account of race, color or membership in
16 a language minority group?
17     A.  I think our concern -- While our view is we're
18 the Mexican American Legislative Caucus, oftentimes our
19 viewpoint as a member of a minority group certainly has
20 a lot of commonality with a lot of other minority
21 groups.  So the fact that we're standing together with
22 the Texas Branch of the NAACP tells me that we have a
23 lot in common with this issue.  So if it's yes for MALC,
24 it's going to be yes for the NAACP who represents and
25 advocates on behalf of African Americans.

## 107

1      Q.  And what the evidence would you have for the
2  contention as to African Americans?
3      A.  Well, I think -- I would imagine that some of
4  the barriers that exist to access would also exist -- I
5  mean, to be very candid and frank with you, I was
6  prepared to testified as a representative of MALC, and
7  then we do have members of MALC that are
8  African-American, so I have heard perspectives from
9  people that are on a list that you, you know, have not
10 waived or have asserted privilege.  But I think there
11 have been some very similar dialogue with respect to
12 access and barriers that exist to obtaining documents in
13 order to present themselves for a free ID or the
14 challenges that exist in order to, you know, simply walk
15 into a DPS station and obtain a license, and, frankly,
16 those who have been, you know, voting all their lives
17 that suddenly find themselves having to do things
18 differently for reasons that are, you know, yet to be
19 articulated.
20     Q.  Does MALC contend that Senate Bill 14 will have
21 the effect of denying or abridging Asian Americans'
22 right to vote on account of race, color or membership in
23 a language minority group?
24     A.  I think that MALC would defer the advocates on
25 behalf of the Asian community.  I'm not prepared to

## 108

1  answer that question.
2      Q.  Has MALC conducted any studies or any surveys
3  on the effect of Senate bill 14 on minority voters?
4      A.  MALC has not in MALC's official capacity.
5      Q.  Is MALC familiar with the polls -- the public
6  opinion polls regarding support for voter ID
7  legislation?
8      A.  I know that I have been made aware of polls
9  that speak to that, yes.
10     Q.  Is MALC aware of polls showing that the
11 majority of Texans support a photographic ID requirement
12 to vote regardless of their political affiliation?
13     A.  I'm not aware, but I accept that viewpoint.
14     Q.  Is MALC aware of polls showing that the
15 majority of Texans regardless of their race support a
16 photographic ID requirement to vote?
17     A.  I'm not aware.
18     Q.  And is MALC aware of polls showing that the
19 majority of Texans support a photographic ID requirement
20 to vote regardless of their membership in a language
21 minority?
22     A.  I am not aware.
23         (Exhibit 9 marked.)
24     Q.  Please take as long as you care to to review
25 Exhibit 9, which is the Expert Declaration of Daron R.

## 109

1  Shaw.
2      A.  It appears to be 48 pages.  We may have to come
3  back tomorrow if you really want me to take a look at
4  this.
5      Q.  Again, take as long as you want to review this.
6  I'm going to focus on Page 22 and then Page 28 and the
7  three or four pages after that.
8      A.  I will try to indulge.  This is not my area of
9  expertise here.  Page 22 and what else?
10      Q.  And then 28 through 33.
11      A.  May I write on this?
12      Q.  Certainly.
13      A.  I'll try my best.
14      Q.  On Page 22, the two paragraphs, Mr. Shaw is
15  talking about he's conducted a survey, and he says,
16  "Even if the size of the potentially affected population
17  is quite small, the question remains whether any turnout
18  affect will be disproportionately great among Hispanic
19  voters.  Looking at the general sample, it appears that
20  amongst those who are identified as Hispanic, the
21  possession of some form of ID as defined above is
22  actually the same or higher than the rate among white
23  respondents.  Hispanic respondents didn't have any form
24  of identification necessary for voting either 5 percent
25  of the time unweighted or 6 percent of the time

## 111

1  Do you have any reason to dispute -- Does MALC have any
2  reason to dispute the survey data compiled by Dr. Shaw,
3  any evidence to dispute that data?
4      A.  Well, first, I will say that MALC hasn't made
5  inquiry, and so having said that, these kinds of
6  discussions about looking at empirical evidence and data
7  is what we entrust our legal counsel and experts that we
8  work with to do that.  I'm not an expert.  I'm not even
9  a doctor.  I'm not a statistician.
10          I read polls that say we should fully fund
11  education, and we are at the bottom of the list in the
12  country.  And so I -- I know I -- recognize and
13  understand the importance of surveys and opinions, but
14  I -- I also know, you know, the devil's in the details
15  in the sampling, the time when you poll, the questions
16  you ask, the questions you didn't ask, but with respect
17  to Dr. Shaw, my only opinion is he has an opinion, and
18  if that is opinion is worth any wait, then I hope the
19  State of Texas brings him as a witness to the trial so
20  that our lawyers can cross-examine him.
21      Q.  Do you understand that this portion here was
22  not meant to be an opinion poll?
23      A.  I'm seeing this for the first time, sir.  It's
24  a survey.  It says survey at the top of Table 9.  I
25  don't know if this was done in conjunction with

## 110

1  weighted, the same rate as for white respondents."
2          "Additionally, when looking at the 600
3  person Hispanic surname sample, even fewer respondents
4  indicated not having any of the forms of identification
5  necessary to vote between 2 percent unweighted and
6  3 percent weighted."
7          He goes on to write, "A large part of this
8  positive discrepancy with respect to the ID possession
9  is probably due to varying rates of passport possession.
10  In the unweighted general sample, 45 percent of
11  Hispanics state that they have passports compared to
12  42 percent of white respondents, 46 percent compared
13  with 42 percent in the weighted sample.  Within the
14  Hispanic surname sample, between 53 percent weighted and
15  56 percent unweighted indicated possessing a valid
16  passport."
17          "Additionally, between 21 percent weighted
18  and 22 percent unweighted of Hispanics in the general
19  sample indicated possessing a citizenship certificate
20  with their photograph, 32 percent and 35 percent
21  respectively, in the Hispanic surname sample compared
22  with only 10 percent and 12 percent of whites."
23          We were discussing earlier whether or not
24  it was possible that Hispanics and Latinos might have
25  passports even if they don't have a driver's license.

## 112

1  litigation.  It doesn't have any -- It doesn't have a
2  docket reference number.  I don't know.  I see this
3  filed as a declaration, but I'm not sure this -- as an
4  attachment, if this is done in anticipation of
5  litigation.  Is this something that was done that's just
6  been, you know, made part of the litigation.  But,
7  again, you know, I mean, I think that's why we're in
8  litigation to let the fact witnesses say what the facts
9  are, let the opinion experts give the opinions and let
10  the triers of facts decide what the facts are and how
11  that shapes with the law.
12      Q.  If you are turn to Page 28, please.
13      A.  Sure.
14      Q.  28 through the 33, collect a series of polls,
15  some of them nationally, some done within the State of
16  Texas as to popularity of voter ID legislation.
17          Do you recall seeing any of these polls
18  prior to a few minutes ago?
19      A.  No.  This is the first time I've heard the name
20  Dr. Shaw, and this is the first time I've seen, I'm
21  presuming, Daron, his material.
22      Q.  Well, when you reviewed these or when you
23  reviewed these, these are a collection of polls done by
24  other folks, sources listed at the bottom of each poll.
25  Do you recall seeing any of these before?

## 113

1     A.  No.  I think that -- you know, that I would
2  imagine that if these statistics existed around the time
3  of the debate, I'm sure they were referenced in the
4  debate somewhere.  I'm sure there may have been flyers
5  and talking points and newspaper articles written about
6  them, but in terms of giving it the attention that I'm
7  giving it right now, I'd say that I'm looking at this
8  for the very first time.
9     Q.  On Page 31 is a survey that's conducted in 2009
10  in Texas, and the question is "Do you support or oppose
11  voter ID legislation and would that be strongly or
12  suggest somewhat?"  54 percent strongly support.
13  17 percent somewhat support.  8 percent somewhat oppose.
14  18 percent strongly oppose.  And broken down further,
15  whites strongly support 61, somewhat 17.  Blacks
16  strongly support 58 percent, somewhat support 17.
17  Hispanics strongly support 44 percent, somewhat support
18  15 percent.  Done by party affiliation.  Democrats
19  strongly support 39 percent, somewhat support
20  19 percent.  Independents, 55 percent strongly support
21  and 15 percent somewhat support, and Republicans,
22  70 percent strongly support and 16 percent somewhat
23  support.
24          And then on the next page, 32, there's a
25  more recent study or survey conducted between

## 114

1  February 11 and February 17, 2011, once again, within
2  Texas.  The question was, "Do you agree or disagree with
3  the idea that registered voters should be required to
4  present a government issued photo ID at the polls before
5  they can be allowed to vote?"  75 percent agree,
6  17 percent disagreed, and then broken down, agreed,
7  white, 80 percent, black, 63 percent, Hispanic, 68
8  percent, and as far as party breakdown, 59 percent for
9  Democrats, 70 percent independents, 92 percent
10  Republicans, but there are a number of others here, but
11  would MALC dispute that photo ID laws are widely
12  supported in Texas?
13     A.  Well, MALC would want some clarification to
14  show what those statistics support, you know, and so,
15  again, I'm looking at this for the very first time, and,
16  I mean, if I read a question that says the Texas
17  legislature recently considered legislation stating that
18  people have to provide photo ID, I mean, I could be a
19  respondent and think that's a college ID.  I could be a
20  respondent and think that is a state employee ID.
21          I -- You know, I wonder what the
22  respondents were thinking because they're not told that
23  it's just a Texas driver's license or a passport or a
24  certificate of citizenship to the United States.  And
25  so, I mean, I'd have those questions and I'd want to

## 115

1  know, you know, what the respondents do about that and
2  if that would have changed their opinion.  Again,
3  looking at it for 5 minutes, that's the first thinking
4  that comes to mind, and I think members of MALC would be
5  thinking the same thing.
6          Looking at your example on Page 32 or
7  Dr. Shaw's example on Page 32 about, you know, some
8  people argue that requiring registered voters to present
9  government issued photo IDs at polls reduces voter
10  fraud.  I wonder if the respondents knew that if you
11  combine the elections of 2008 and 2010, 13 million votes
12  were cast, and of those 13 million votes, there were
13  only four allegations of voter fraud presented to the
14  Attorney General, and of those four allegations of voter
15  fraud, there was only one indictment.  So if the
16  respondents knew that, I wonder what they would think
17  about photo ID having an impact on voter fraud that
18  apparently hadn't existed in the 2008 and 2010 election.
19          And so I think a respondent, given that
20  opportunity to weigh that fact or that argument, would
21  say, well, why are we doing this at the risk of 600 to
22  700,000 minorities not being given an opportunity to
23  vote or making it harder for them to vote because they
24  don't possess a form of acceptable identification.
25          So I think, you know, again, I hope

## 116

1  Dr. Shaw can answer that because I think that that's
2  what I'd like our MALC counsel to ask them because I
3  think it's important and relevant and would certainly
4  have an impact on how I would answer a question.
5     Q.  Does MALC believe that elderly voters are more
6  likely than the average voter to lack a form of
7  identification required by Senate Bill 14?
8     A.  I think MALC -- MALC is inclined to believe
9  what data produced by the state is revealing is that 600
10  to 700,000 minorities are registered to vote that lack a
11  driver's license, and I would imagine within that sample
12  of 600 to 700,000 Texans, there would be some seniors in
13  there.  To the extent is there a scientific precise
14  correlation, I can't tell you that.  I would hope
15  that -- I would hope that our MALC lawyers and experts
16  working on behalf of MALC or with MALC or in conjunction
17  with MALC would have some more precise opinions on that.
18     Q.  Does MALC contend that indigent voters are more
19  likely than the average voter to lack a form of
20  identification required by Senate Bill 14?
21     A.  I think that -- I think one could argue that
22  there's a correlation in transient and indigent people
23  not having access to things that people would have who
24  weren't transient and indigent.
25     Q.  Does MALC contend that disabled voters are more

Trey Martinez Fischer                                    June 15, 2012

## 117

1  likely than the average voter to lack a form of
2  education required by Senate Bill 14?
3      A.  Again, I would think that -- that Texans that
4  have limitations due to disabilities are probably not as
5  mobile and can access or endure some of the impediments
6  to conforming to the dictates of the law, particularly
7  if they have to present themselves to DPS locations that
8  aren't in their communities.  Certainly I think that
9  would be a challenge.
10     Q.  Does MALC contend that rural voters are more
11 likely than the average voter to lack a form of
12 identification required by Senate Bill 14?
13     A.  That I think I have more of an opinion of
14 because, as I mentioned to you, MALC is almost
15 state-wide now.  We have members coming in from every
16 pocket of the state, and I know of members whose
17 districts, you know, are larger than many northeastern
18 states, and I've been told directly from some of those
19 members, one of them who's on the list of approved
20 members you can discuss, that talk about the round-trip
21 that would be required of a citizen from one part of
22 west Texas to drive to a DPS facility to get a license
23 or get an identification card to vote.
24         And I think when you ask somebody, you
25 know, I want you to vote, but I want you to make a

## 118

1  200-mile round-trip to go get in compliance with Senate
2  Bill 14, I think that puts an impediment.  Of course it
3  does.
4      Q.  Does MALC contend that young voters are more
5  likely than the average voter to present a lack of
6  identification required by Senate Bill 14?
7      A.  I think, again, to the extent of the
8  demonstrated data that suggests 600 to 700,000
9  minorities could be impacted by this, I would imagine if
10 you sample that with the demographic trajectory of
11 minorities in Texas than being relatively younger than
12 average -- being younger and minority more likely, most
13 likely Latino, I think, yes, they probably could be
14 disproportionately impacted than their peers or those
15 who are not in their demographic area.
16     Q.  What evidence do you have that young voters are
17 less likely than voters who are 30 or 40 or 50 that they
18 don't --
19     A.  I'm sorry.
20     Q.  That they are less likely to currently possess
21 photo IDs.
22     A.  I mean, I'm operating again under the parameter
23 that there are 600 to 700,000 minorities that could be
24 impacted.  I think demography and simple math tells us
25 that when you can look at the course of the last decade

## 119

1  and see that Texas grew by 4 million Texans and
2  89 percent of those Texans were minority and if we know
3  that there is a state data point from our demographer
4  that says minorities and in particular, Latinos, are
5  younger than their Anglo counterparts, I think one needs
6  to do a little bit more work.  But I think on a hunch
7  and gut instinct, that would tell me that there are
8  probably more younger minority Texans that could
9  potentially be minority and fall within that
10 classification of 600 to 700,000 folks that might be
11 impacted.
12         So it's just -- kind of just a hunch of
13 what I know about the State and what I know about its
14 people and what I know about who's, you know, not
15 accounted for in Senate Bill 14.
16         MR. ASTON:  Go off the record for a
17 minute.
18         (Recess from 1:29 p.m. to 1:42 p.m.)
19     Q.  (BY MR. ASTON) Okay.  Does MALC know how many
20 Texas registered voters lack one of the forms of photo
21 ID that is required by Senate Bill 14?  We talked a bit
22 about the 600 to 700,000 number.  Does MALC have any
23 other evidence that might get to this figure?
24     A.  To the six to 700,000?
25     Q.  No.  What is the actual number of Texans

## 120

1  without one of the forms of photo ID.
2      A.  I don't believe I -- In fairness, I don't
3  believer I ever asked that question, but I know that
4  I've not seen anything that would suggest we know what
5  the full and final number is of Texans who lack any of
6  the forms of ID.
7      Q.  Can MALC identify any Texas registered voter
8  who does not have one of the types of photo ID
9  requirements in Senate Bill 14?
10     A.  Well, you know I, was joking with someone the
11 other day, and I represented this guy the other day who
12 has a -- who had a Mississippi violation of the law and
13 one of the consequences was his license was confiscated,
14 so I asked him whether or not he could vote with a valid
15 ID.  Now, I didn't ask him if he had a national birth
16 certificate, but I asked him if he had a passport and he
17 doesn't.  I asked him if he had a concealed handgun
18 license and he doesn't.  And -- And the license he had
19 was taken away from him.  So, you know, I guess, you
20 know, to the extent that I'm doing the arm chair survey,
21 you know, for the State of Texas, I mean, I was -- that
22 could be one.
23     Q.  Do you know any others?
24     A.  Well, I think that those that are similarly
25 situated, but, again, I have not made it my -- my -- I

121

1   have not taken responsibility to find that out, but I
2   think it's just a matter of having a casual conversation
3   from three blocks to the courthouse, I think that there
4   are probably other people that are impacted similarly.
5       Q.   But MALC can't identify by name any of these
6   people.
7       A.   I don't think MALC's attempted to, but if --
8   if -- if the methodology could be that simple, I suppose
9   we could.  And, you know, just to be fair to MALC, I
10  think that, you know, the ultimate burden lies with the
11  State.  We would expect the State to do that and to tell
12  us because -- because we wouldn't pass legislation that
13  would have that kind of impact without doing our due
14  diligence, I wouldn't think.
15      Q.   If the State is not in the best position to
16  determine who has a passport or a military ID or the
17  citizenship certificate, what is the legislature to do
18  with respect to those documents in MALC's eyes?
19      A.   Well, there used to be a time when the State of
20  Texas had the Office of State and Federal Relations
21  where we had a Federal advocate that would run a lot of
22  these traps, and if I'm not mistaken, our current
23  governor said that we had, you know, two Republican
24  United States senators and we had Republicans from
25  corner to corner of the Texas House of Representatives,

122

1   and we could get anything we want at any time
2   essentially.
3       So my sense would be that the State of
4   Texas was really looking for this information from
5   Federal authorities and for some reason cannot seem to
6   convince, persuade or order a court to have a dialogue
7   with Federal agencies that we would get our Federal
8   representatives involved, I would think.
9       And so, you know, I know in the context of
10  redistricting, if you will, I mean, you certainly saw
11  that in the discovery that there was significant
12  involvement from members of United States Congress, if
13  not all of them at some point.  So I -- I would say that
14  if the State of Texas knew how to communicate with
15  members of Congress for redistricting, then you had to
16  do it for voter ID.
17      Q.   In addition to the perhaps gentleman you were
18  speaking of a few minutes ago who had his license
19  confiscated, do you personally know of other Texas
20  registered voters who do not possess one of the forms of
21  photo ID listed in Senate Bill 14?
22      A.   You know, I've been -- I've been corrected that
23  I -- You know, I have a mother who has Parkinson's
24  Disease.  She doesn't drive.  Until very recently, I
25  didn't think she had a driver's license because she

123

1   medically is not able to drive, but lo and behold she
2   does, and I can imagine when it expires, which I think
3   is in the very near future, we have no compelling reason
4   to renew her driver's license because her doctors would
5   probably have a problem with it, number one, and number
6   two, she hasn't driven in two years.  At the age of 73,
7   I don't see her getting a passport any time soon.
8   Certainly hope that she doesn't go out and get a
9   concealed handgun license.  She may mistake me for an
10  intruder one day when I come over to visit.
11      So I worry about her.  I know that I have
12  the manner and means and the resources and the staff and
13  employees that work in my law office that could cover
14  for me so that I can make it my obligation to see that
15  she complies, but I think about people who do this on a
16  bus.  I think about people who do this and have 8 to 5
17  jobs and don't have bosses or have bosses that aren't as
18  flexible as me.  I worry about people who work all week
19  and who are off on Saturdays and Sundays and don't have
20  a open DPS office, and I think in the wake of Homeland
21  Security being what it is, if you cannot board a plane
22  without a driver's license, then I imagine you can't get
23  a passport without a driver's license.  I don't know
24  that, but I -- it's just my speculation.
25      So I worry about people that are situated

124

1   like my mother, and I think that, you know, she's not
2   out of the ordinary.  I think there are many Texans just
3   like her, and I wonder what they're doing, and if it
4   wasn't for me, I would wonder who would help my mother,
5   so I worry about people who don't have that kind of
6   support system.
7       Q.   Does the Federal policy that requires you to
8   present a government issued photo ID when you choose to
9   board an airplane, is that discriminatory?
10      A.   I think that there is a distinction between
11  rights and privileges, and I think that while there may
12  be -- you know, buying a beer is not a constitutional
13  right, you know, I think you have a right to be free,
14  and we all have all these liberties that we're all defining
15  and reminding people that we have, but, you know, I
16  think the right to vote is a very special and unique and
17  when the government tries to impose a duty on a
18  privilege to vote, I see that different from, you know,
19  requiring them to present themselves to board a plane
20  because you don't have to travel by plane to get to
21  places you want to go to these days.
22      Q.   But do you see the two activities as different,
23  voting versus buying a beer or voting versus taking a
24  plane?  But is the requirement that says we want to know
25  who you are via a photo ID before you do these things,

125

1   is it discriminatory in one but not the others?
2        A.   I think when you -- when you make it clear that
3   you are limiting the type and scope of identification
4   that you are willing to accept, I think you start
5   picking winners and losers, yes.
6        Q.   So they are all discriminatory -- Is it your
7   contention that in all three instances it's
8   discriminatory, but it's worse for voting or it's only
9   discriminatory when it's voting?
10       A.   I know that -- I know that the United States
11  Constitution gives me the right to vote, okay?  It also
12  gives me the right to be free, the freedom to get on an
13  airplane if I wanted to and not have to get permission
14  from the government.  I get that.
15            But express rights that I have to vote and
16  participate are democracy, and when the government tells
17  me how I'm going to participate in my democracy, I think
18  it's much different.  And so if the government feels a
19  compelling need or interest or public policy concern
20  that, again, is yet to be articulated, when that is
21  demonstrated to me, I think we are going to adopt a
22  manner and means by which we'll try to accommodate
23  people rather than exclude those.
24            And so the suggestive -- the subjective
25  intent of the authors of sponsors of this bill to limit

126

1   the list of acceptable forms of identification has
2   clearly demonstrated that 600 to 700,000 people are not
3   going to be in the same position they were in -- in the
4   previous election, and I don't think we gave a lot of
5   thought into accommodating those folks.  And I think
6   that there was, you know, potential that you could have
7   had a win-win, but that was never the design and the
8   desire of the author of the bill, and the language
9   speaks for itself.
10       Q.   Does MALC know how many Texas registered voters
11  lack the underlying documents necessary to get a State
12  issued photo ID such as an election identification
13  certificate?
14       A.   We would not.  I'm not aware of MALC making
15  inquiries, no.
16       Q.   So MALC can't identify the Texans by name?
17       A.   No.
18       Q.   They don't know who any of these people are
19  that lack those documents?
20       A.   Well, I think MALC in terms of the
21  organization -- I mean, I think MALC does not know.
22  MALC members have some insights on that perhaps.
23  Perhaps they do.
24       Q.   But you do not?
25       A.   I do not.

127

1        Q.   Would MALC agree that people who have the
2   ability and the means to obtain a photo ID but choose
3   not to would not have this right denied or abridged by
4   Senate Bill 14?
5        A.   I -- I'm not -- I'm not sure that -- that I
6   could say that.
7        Q.   Yes?
8        A.   I guess I could take a defeatist position and
9   let that apathy kick in and say just like what the
10  number of people said last night on the 10 o'clock news
11  here on the ABC affiliate after the basketball game that
12  showed a B role of a line of people standing outside the
13  DPS office for one to two hours who then finally get
14  their turn in line and say, oh, you have the wrong
15  documents, and so they have to leave and come back the
16  next day and sit another one to two hours without a
17  glass of water or a courtesy employee telling them
18  here's what you need, here's what you don't need.  Let
19  me make sure you have everything before you stand in
20  this line.
21            I think somebody could say you know what,
22  you know, this isn't worth it.  I can't do this.  My job
23  won't let me do this.  My children get out of school,
24  and I need to be home for them.  I need to make them
25  dinner.  You know, I think that citizens are going to

128

1   have a number of reasons and even one reason is one more
2   than what they had in the last election.
3            And so, quite frankly, I think that
4   because they don't exercise their ability to conform to
5   the dictates of Senate Bill 14 doesn't mean that they
6   are no longer impacted.  They may be impacted and that
7   apathy speaks for itself, and so it's a -- it's a
8   wonderful news story, if you hadn't seen it.  But we're
9   140 days out from a national election and there are
10  people standing in 100-degree weather trying to get a
11  driver's license.  Can you imagine what the line's going
12  to look like when this -- should this become pretty
13  clear when people have to conform before the November
14  election?  It could be chaos, particularly when a city
15  as large as San Antonio I think has three facilities and
16  the fourth one is in construction and won't be online
17  prior to the election?
18            We're the second largest city in the
19  state, so I wonder what it's like to be in a smaller
20  community.  If that's -- If this is the San Antonio
21  experience, what's it like for people in rural and, you
22  know, communities along the border that -- that don't
23  have this.
24       Q.   Would MALC agree that the requirement that one
25  must register prior to a election day does not deny or

## 129

1  abridge the right to vote?
2      A.  Register to vote?
3      Q.  Yes, sir.
4      A.  The current requirement in Texas to register,
5  we don't have same day registration.
6      Q.  Would MALC agree that that does not deny or
7  abridge one's right to vote?
8      A.  I think it's fair saying that individual
9  members of MALC in this piece of legislation advocated
10  as a means of compromise to provide for same day
11  registration as a way of making the legislation
12  palatable, and it was rejected, so if, you know, maybe
13  there are some members of MALC that would have a
14  different view.  I -- You know, the purpose of me being
15  here is on the bill itself and what it does and not what
16  it could have done, you know.  So I -- You know, I don't
17  dispute the fact that you have to register to vote, but
18  I think that as a general notion the easier we make it
19  for people to vote, the more participation we have in
20  the electoral process.
21      Q.  A few minutes ago before you started looking at
22  the polls in Dr. Shaw's report, you read the bit about
23  passports and citizenship certificates.  Again, it's on
24  Page 22.
25          If it's the case that Hispanics and

## 130

1  Latinos do have passports at a higher rate than an
2  Anglos, would MALC concede that at a minimum that
3  lessens the burden?
4      A.  Not sure that I'm qualified to answer that.  I
5  mean, I think -- I think when, you know, 41 and
6  45 percent of Hispanics say they don't have one, I mean,
7  that's what we need to be concerned about.  You know, if
8  they don't have a passport, then arguably they also
9  don't have a driver's license.  That's -- You know,
10  that's going to be a tough obstacle to overcome without
11  having to go out and get an additional form of
12  identification, but -- so, I mean, I don't think MALC
13  can concede or -- and, frankly, can't even give an
14  accurate dispute to the findings because we don't have
15  the basis, we don't have the sample, the cross tabs, all
16  the things you want to see in a poll.
17          I mean, the top sheets are great to see
18  the numbers, but it's really the methodology that
19  matters, and there's so much that goes into the art of
20  scientific polling and sampling that it's specialized
21  fields, and I'm not the person to opine on -- on what
22  these statistics stand for.
23      Q.  But if it were true that Hispanics and Latinos
24  do in fact have passports, citizenship certificates with
25  photos at a higher rate, might that change your view of

## 131

1  Senate Bill 14?
2      A.  If Latinos -- If it were true that Latinos
3  had -- higher percent of them had passports.
4      Q.  Or the citizenship certificates than Anglos
5  such that there was no disparity as to --
6      A.  With Anglos.
7      Q.  -- the Anglos as to who does not currently
8  possess a photo ID, would that change your mind on
9  Senate Bill 14?
10      A.  I think that that is relevant.  I think it's a
11  important consideration.  I'd like to see those
12  disparities as they exist to college identification
13  cards or state employee photo identification cards.  I
14  mean, I want to be able to weigh that relative to other
15  forms of photo identification that minorities may be in
16  possession of.
17          You know, I'm from San Antonio, and I read
18  a great article here about the -- our public transit
19  system here is, you know, disproportionate.  Our
20  ridership is minority.  If it were true that you had to
21  have a photo ID to ride the bus, I'd wonder -- I'd like
22  to see that statistic measure up to a passport when it
23  came to being eligible to vote.  Public transit is a
24  quasi-governmental entity, and I'd love to see what that
25  number is relative to passports or driver's licenses.

## 132

1      Q.  I'd like to talk next about the purpose behind
2  Senate Bill 14.  Does MALC contend that Senate Bill 14
3  was enacted with a discriminatory purpose?
4      A.  You know, the short answer's yes, I think.
5      Q.  I'm sorry.  Did you see yes?
6      A.  The short answer is yes.
7      Q.  What is the basis for that contention?
8      A.  Understand I find that, you know, the rationale
9  remains elusive.  You know, I was very active in the
10  2011 debate.  I talked to many members, and in my
11  conversations, you know, I -- the different rationales
12  were why we have to have this, and, you know -- and if
13  I'm told that, you know, the purpose of this legislation
14  is to combat voter fraud, you know, I'm reminded by
15  numbers, you know, that I've reviewed directly from the
16  Attorney General that suggests there's not a lot of that
17  going on that -- that Senate Bill 14 would fix.  I'm
18  acutely aware of the discussions and floor proceedings
19  that, you know, we have higher instances voter fraud and
20  inappropriate behavior through the use of mail ballots
21  and poll worker activity.  None of that is addressed in
22  Senate Bill 14.
23          I think that when you start looking at
24  this subject matter from a 10,000-foot view, you see
25  once upon a time the committee on elections, a chairman

133

1   is one of the most outspoken critics of minorities and,
2   in particular, Latin American immigrants.  We chair the
3   elections committee.  We worked very hard in 2007 to
4   make sure that bill came out.  And I apologize.  If no
5   bill came out, I get confused because this is something
6   that I've seen in '07, '09, '11, '05 and at some
7   juncture, and I know that he has some very hardened
8   views about minorities.
9          And you sort of come full circle when you
10  see one of the nicest most personable members of the
11  legislature, Patricia Harless, author of the 2011 voter
12  identification bill, and -- she doesn't have those
13  outward manifestations of how she views or perceives
14  Hispanics and Latin Americans, particularly immigrants
15  but you can look on her website and, you know, she
16  identifies voter identification as a means of
17  immigration policy.  Anybody who thinks voter
18  identification is appropriate immigration policy, I have
19  to ask you what that purpose was.  Is the purpose for
20  voting or is the purpose to curve illegal immigration.
21  The only immigrants that I know of that Texas seems to
22  talk an awful lot about are ones that look like me, and
23  so I wonder what -- again, what the purpose was.
24         And on a final point, I -- you know, I
25  look at the -- You know I appreciated your earlier

134

1   display of knowledge of the House Journal and how it
2   works and your knowledge of the rules, and I think it's
3   also fair to recognize the -- the departures from our
4   legislative procedures that were done to simply
5   facilitate only one bill, which is this bill.  And so if
6   the motive was legitimate and neutral, and we don't
7   intend to impact anybody -- single out anybody because
8   of their race or origin, then we didn't have to do
9   legislative somersaults to pass voter ID.  It should
10  have been able to pass on its own merit or die on its
11  own merit.  That's not the case here.
12         Q.   Was there any other evidence you wanted to
13  discuss as to the purpose of Senate Bill 14?
14         A.   I mean, those seem to be the most visible in my
15  mind.
16         Q.   So that's what MALC relies on to make its claim
17  that there was a discriminatory purpose behind Senate
18  Bill 14, that's the evidence?
19         A.   I think that that is the evidence that seems to
20  be the most weighing on my mind, yes.
21         Q.   You touched a bit on voter fraud as being a
22  purpose articulated -- that was articulated, I assume,
23  on the floor and assume it was articulated in public
24  statements by any number of members who were supporting
25  Senate Bill 148; is that correct?

135

1   A.   Yes.  And I thought I saw a reference to it in
2   Dr. Shaw's own publication.
3   Q.   Does MALC contend that preventing voter fraud
4   was not a purpose of Senate Bill 14?
5   A.   I think that it's not a proven purpose.  I
6   think it may have been a red-herring.  It may have been
7   a talking point.  It may have been sort of a -- you
8   know, a misdirection, but I'm not aware -- I think in
9   the debate it was over and over again to ask the authors
10  and proponents of the bill to articulate to me what
11  exactly is the fraud that we're seeking to eliminate.
12         There were proposals offered by members,
13  and I venture to say they may have been MALC members
14  that said if there's voter fraud going on, throw them in
15  jail.  Let's help you.  Let's make it a felony where
16  there's a substantial sum of years in prison.  Let's do
17  that.  If that's what you want to do, we'll help you do
18  that.  You won't see that.
19         There was acknowledgment by -- You know, I
20  remember a debate between two members of MALC,
21  Representative Aliseda and Representative Anchia, and I
22  debated Representative Aliseda on a newscast.  He said
23  we know there's problems with mail ballots, and we're
24  going to do that next.  Didn't happen.  I mean, if the
25  focus was to attack the fraud, well, the fraud I know

136

1   of, the fraud that's being tracked by the Attorney
2   General, like I said, one indictment out of 13 million
3   votes on voter fraud for voter impersonation.  I have to
4   question what the purpose was.
5   Q.   Earlier you discussed the mail-in ballot fraud,
6   and I think poll worker fraud are two things you
7   mentioned.  Does MALC acknowledge that there is voter
8   fraud in Texas?
9   A.   As a general concept or specific to --
10  Q.   That is happening in Texas and it has happened
11  in the recent past, some of those sorts of fraud that
12  you discussed.
13  A.   Well, yes, and not -- I think that there's a --
14  there is a higher instance of other types of fraud than
15  impersonating a voter, yes.
16  Q.   Do you know how high?
17  A.   I don't.
18  Q.   Would MALC agree that going after mail-in
19  ballot fraud is something the Texas legislature should
20  be doing?
21  A.   I think MALC agrees, and I think the Texas
22  legislature has.  I remember a reform in the early
23  2000's.  I thought at least it was attempted in the
24  House deal with the handling of mail-in ballots and
25  people associated with that.

## 137

1    Q.   Does MALC contend that the Texas legislature
2 intended to harm poor people by passing Senate Bill 14?
3    A.   I don't know if the legislature intended to
4 harm them, but I think the legislature knew that they
5 were excluding them.  If they are someone who would link
6 exclusion to a harm, then, yes, I think they knew that,
7 but I think that -- Again, I mean if the -- if the data
8 point was protecting the integrity of a ballot box and
9 nobody ever getting a real view of what was exactly
10 going on at the ballot box that required an overhaul of
11 our voter identification processes, you know, I'd say
12 that there are some people excluded by it as a result of
13 these policy choices, and that's harmful.  At least it's
14 harmful to the person who no longer has the luxury of
15 voting how they did in the last election.
16    Q.   Does MALC contend that the Texas legislature
17 intended to harm young people by passing Senate Bill 14?
18    A.   I think they intended to exclude.
19    Q.   What's the basis for that contention?
20    A.   Well, again, I'm operating off my notion of
21 demography, the notion that minorities are --
22 particularly Latinos are younger in the state-wide
23 population.  And I am being told that 600 to 700,000
24 minorities don't possess a driver's license, and so I --
25 I think we know we're excluding, and when there was a

## 138

1 sensible alternative to allow people to vote with
2 college identification cards, I think we could have
3 captured many of those folks who were potentially on the
4 list of excluded, and there was a cognizant choice to
5 exclude them by way of a rejection of that amendment.
6    Q.   Do you know if the requirements to obtain a
7 student ID are as rigorous as the requirements to obtain
8 a driver's license or election identification
9 certificate or a passport?
10    A.   I think that the State is in the best and only
11 position to dictate what those requirements be, and so
12 if the State as a matter of policy choice didn't think
13 they were rigorous enough, then we could have changed
14 that.  We would probably do it with rule making.  You
15 know, so Texas went through litigation just to change
16 the form of its driver's license.  I'm certainly very
17 cognizant of the fact that we could do this with college
18 IDs, state employees IDs, hunting licenses, fishing
19 licenses, electrician licenses.  Everything that we
20 licensed, we could make the application requirements
21 more rigorous if we wanted to use those as a list of
22 approved identification cards in order to vote, but that
23 wasn't the case.
24    Q.   Does MALC contend that the Texas legislature
25 intended to harm elderly voters by passing Senate Bill

## 139

1 14?
2    A.   I think that when -- when the proponents of
3 Senate Bill 14 had the choice to vote on amendments that
4 would have excluded seniors from having to meet the
5 requirements of Senate Bill 14, I think they knew they
6 were excluding seniors, and they had the opportunity to
7 give them a hold harmless and --
8    Q.   Give them a what?
9    A.   Hold harmless.  In other words, to exclude
10 senior citizens from the requirements of Senate Bill 14.
11 There was an actual amendment to exempt them, and it was
12 rejected.  I haven't compared the votes, but I'm sure
13 there's a high correlation of people who voted to pass
14 Senate Bill 14, and those very same people are the ones
15 that projected the alternative to exempt the elderly.  I
16 think that we were harming them.  I think we knew that
17 we were going to exclude some of them.  I think it's
18 harmful to the senior who's impacted.
19    Q.   The amendment that did not pass in that regard,
20 what was the age requirement for that; do you recall?
21    A.   I don't, but, you know, there's an amendment.
22 It could be found.  I imagine we're going to define
23 them.  Maybe we may define them very similar to the
24 ability to vote by mail, which is 65 and older.
25    Q.   And so wouldn't you agree that for those who

## 140

1 are 65 and older, Senate Bill 14 would prevent you from
2 voting even if you do not have a photo ID?
3    A.   It would have prevented them from voting at the
4 poll.  Sure, it would have.
5    Q.   But they are still allowed to vote by mail,
6 correct?
7    A.   Sure.  They can vote by mail, but if they want
8 to vote at the polls, they ought to be able to.  I mean,
9 anybody deserves to have it their way.  It's our
10 seniors.
11    Q.   But is it a denial of the right to vote to say
12 that if you choose to vote without a photo ID, you get
13 to stay at home and do it by mail?
14        MR. GARZA:  Objection.  Argumentative and
15 asked and answered.  You can answer.
16    A.   I think that -- I think voters should be
17 afforded the opportunity to vote however they want to,
18 so long as it's provided by law, and by arbitrarily,
19 cutting out one avenue and saying, well, you know, don't
20 fret, you can do it this other way, you know, I think
21 it's a preference.  I think there are people who still
22 don't like voting with computer machines and want to see
23 a tabulated ballot.  I think that -- And bare in mind
24 these seniors that have been voting much longer than you
25 and I have, they like things a certain way.  As I reach

## 141

1  that status, I agree with them, you know.  So I just --
2  I think it's a -- if that was the case, if that was the
3  -- if the fact is you could have voted by mail and not
4  have to show an ID, then why did we deny the opportunity
5  to vote in person without an ID?  What's the harm?
6       Q.   Does MALC contend that the Texas legislature
7  intended to harm rural voters by passing Senate Bill 14?
8       A.   I think during the debate when it was
9  illustrated and laid out that the challenges that rural
10  Texans would experience and endure of having to make
11  themselves available to a DPS office that may not be in
12  their respective county, I think we knew that we were
13  going to be excluding population that would have a undue
14  hardship to receive a -- receive a certificate of
15  voting.  And I don't think that -- that -- I don't think
16  it would be fair to allow anyone to say, well, I didn't
17  know that that was the -- you know, that that was just
18  merely an unintended consequence.
19            I think that on every instance that we've
20  discussed, there was an alternative to provide a more
21  reasonable path, and for not granting them that path, I
22  think the legislature -- those who voted for this Senate
23  Bill 14 made a conscious decision to exclude or limit
24  their ability to participate.
25       Q.   Does MALC contend that the Texas legislature

## 142

1  intended to harm urban voters by passing Senate Bill 14?
2       A.   As I think in the debate when members including
3  members of MALC pointed out the challenges of urban
4  environments, the limitations on the number of DPS
5  facilities within major cities, the limitations of the
6  operating hours to 8 to 5 and open till 6 on Tuesday,
7  but closed on Saturdays and Sundays, and that testimony
8  conflicting with people who don't have a driver's
9  license are presumptively not driving, which means they
10  are riding buses and getting rides, skipping work.
11            I think when you lay out all the
12  challenges to live in a big city and go to DPS only to
13  be met with a two-hour waiting line, like San Antonians
14  did yesterday afternoon, I think when that was
15  articulated and there was no accommodation made to
16  facilitate or provide funding for additional voter
17  stations or having mobile driver's license and voter
18  identification cards to make them more accessible, I
19  think we knew we were excluding people, and I don't
20  think it was by omission.  I think people knew the
21  consequences of their voting rights.
22       Q.   I hear through a number of these answers to
23  these last questions, MALC contends that you can infer
24  discriminatory purpose based on the effect that this
25  bill would have on minority groups and the other groups

## 143

1  that we've discussed recently; is that true?
2            MR. GARZA:  Objection.  Mischaracterizes
3  his testimony.
4       A.   I guess what I'm -- what I'm trying to say is
5  that oftentimes in the legislative arena, we pass pieces
6  of legislation and then there's these consequences that
7  ensue, and you hear more often than not, well, that was
8  just an unintended consequence.  In every subject matter
9  that you presented to me, whether they be rural Texans
10  or urban Texans or senior Texans or young Texans, this
11  debate captured and covered these challenges that were
12  going to be presented if Senate Bill 14 passed, and,
13  more importantly, there were those who felt there were
14  reasonable alternatives and accommodations that could
15  have been made to offset or to dilute, diminish that
16  risk of disenfranchising a voter, and every single time
17  those were rejected on some pretty consistent yays and
18  nays.  The vote patterns were very consistent.
19            And so I can tell you a number of -- or at
20  least a few conversations -- you know, maybe fewer
21  conversations of people who felt one way and their party
22  told them to do it another way, but the fact of the
23  matter is they were made acutely aware of these
24  challenges that could potentially exist, and so a
25  conscious vote to either accept or deny an amendment was

## 144

1  going to come with these consequences that could not be
2  then presented sometime in the future to say, well, we
3  had no idea that we were going to impact seniors.  We
4  had no idea that the challenges in rural Texas were
5  going to be that bad.  We had no concept that you had to
6  wait two hours in a big city just to get inside a DPS
7  office.
8            I think people are very aware of the
9  circumstances because they were very well -- they were
10  articulated very -- you know, very well, and when --
11  when people may be decisions to reject those amendments
12  I think they knew that they were going to -- the result
13  of that policy choice was going to impact people, and I
14  think it's harmful.
15       Q.   How many members of the legislature who are
16  members of a minority group voted for passage of Senate
17  Bill 14?
18       A.   I don't know.  I'm guessing, 7, 10.  I'm -- You
19  know, in that ballpark.  In that ballpark.
20       Q.   But more than five?
21       A.   I'd be guessing, but I -- I think so.
22       Q.   Does MALC know how many amendments that were
23  offered by minority members of the House or the Senate
24  were accepted?
25       A.   I don't know that.  I don't.

## 145

1    Q.   Does MALC know how many of those amendments
2  ultimately ended up in the bill?
3    A.   I don't know that.
4         (Exhibit 10 marked.)
5    Q.   Do you recognize what has been marked
6  Exhibit 10?
7    A.   Portion of the House Journal.
8    Q.   On Page 3, SB14, Adoption of Conference
9  Committee Report.  What is this vote?
10   A.   This is the -- This is the -- the bill as it
11 comes out of conference.  There's a conference committee
12 report that is pretty near the final passage and
13 placement of this bill on governor's desk, so that's
14 what that is.
15   Q.   And if the conference committee report is
16 approved, then that's the version that goes up to the
17 governor, correct?
18   A.   Yes.
19   Q.   Was this the last vote on SB14 in the House?
20   A.   I'm not sure because at some point there was a
21 resolution to go outside the bounds which I think is
22 very rare and unusual, and I don't know if that preceded
23 this conference committee report or if it -- if it came
24 afterwards, but I think that -- that even though it's a
25 separately numbered resolution, it's asking for

## 146

1  permission to exceed the bounds of the conference
2  committee in Senate Bill 14.  I know that happened
3  because it's a -- again, it's something that rarely
4  happens in just regular legislation.
5         I can't tell from the journal, but,
6  obviously, the resolution would have been -- you know,
7  would have been really right before or right after, so
8  it would have been -- to answer your question, it would
9  have been potentially one of the last votes before going
10 to the governor's desk.
11   Q.   And this would have been a vote on the bill in
12 its entirety, not on an amendment or revision?
13   A.   Right.  This is on the conference committee
14 report, yes.
15   Q.   If you would take a few minutes to review the
16 members of the House who voted in support of the bill.
17   A.   Okay.
18   Q.   And please circle the names of all members that
19 MALC contends had a discriminatory purpose in voting for
20 Senate Bill 14.
21   A.   That was a very interesting question.  I think
22 it certainly would require me to know what motivates the
23 inner-workings of my colleagues.  I think that as I said
24 in previous questioning, that there are some members
25 that have voted yay that have some very distinct and

## 147

1  public views that some people would say question, but in
2  terms of, you know, looking someone in the eye and
3  asking them if -- if they're racist or they're intending
4  to discriminate, I can't tell you that I did that, nor
5  would I do that.
6         But I do believe that actions sometimes
7  speak louder than words, and to the extent that there
8  are members who say that voter identification is a means
9  of immigration policy, then I think that that is a --
10 that does not have anything to do with elections.  It
11 has to do about singling people out for who they are.
12 So that being your question, I can say that with respect
13 to one person that I know firsthand that I've seen, you
14 know, make that kind of association.
15   Q.   What number was that?
16   A.   That would be the member that I circled here,
17 the author of Senate Bill 14, Representative Harless.
18   Q.   That's because of what you read on her website.
19   A.   That's because of what I've read on her
20 website.
21   Q.   Anyone else?
22   A.   That is the only member that I have seen with
23 my own eyes make that sort of public comment and be
24 associated with Senate Bill 14.
25   Q.   Do you know how many other states have photo ID

## 148

1  requirements in place at this time?
2    A.   I don't.
3    Q.   Do you know if it's more than five?
4    A.   I don't.
5    Q.   Do you believe Texas is the first to adopt such
6  a requirement?
7    A.   I don't.
8    Q.   So you know there are other states.  You are
9  just not aware of how many?
10   A.   That's correct.
11   Q.   Is MALC aware that the United States Supreme
12 Court upheld Indiana's photo ID law in a case called
13 Crawford versus Marion County Election Board?
14   A.   I'm aware.
15   Q.   Have you read that case?
16   A.   No.
17   Q.   Would MALC agree that if the 10 or 15
18 states are allowed to pass a particular kind of law,
19 that other State's should be allowed to do so as well?
20   A.   I think it would matter to know if those states
21 were a covered jurisdiction under the Voting Rights Act.
22   Q.   So MALC believes that non-covered jurisdictions
23 should be allowed to have laws that covered
24 jurisdictions cannot have?
25   A.   No.  I think that covered jurisdictions are

## 149

1   required to meet their burden pursuant to the Voting
2   Rights Act, and if 10 to 15 covered jurisdictions were
3   to do that, that would be persuasive with MALC.
4        Q.   But you think that non-covered jurisdictions
5   and covered jurisdictions should have different -- not
6   just what they must do to pass muster with the
7   Department of Justice or District Court, but they should
8   have substantive differences as to what laws they could
9   have on their books?
10            MR. GARZA:  Objection as to relevance.
11   You can answer the question?
12        A.   I guess what I'm simply saying is that Texas
13   didn't volunteer to be a covered jurisdiction.  There's
14   a reason for it.  And -- And so long as they are a
15   covered jurisdiction, and there's a Federal act that
16   says covered jurisdictions have to meet certain
17   obligations, then I believe that that's Texas's burden,
18   and -- and so -- so long as that exists -- And, you
19   know, I think whether Texas likes it or not or whether I
20   like it or not is insignificant.  What matters is that
21   it's a covered jurisdiction, and we have a Federal
22   Voting Rights Act.
23        Q.   Is MALC aware of anyone in any of the states
24   that have photo ID laws in place at this time who has
25   been unable to vote because he or she lacks a photo ID?

## 150

1        A.   I know -- I -- I vaguely read an article
2   somewhere about a woman who worked at some capitol in
3   another state that, you know, cleaned the offices of
4   lawmakers and everybody knew her and everybody liked
5   her, and lo and behold, she wouldn't qualify to vote
6   under the rigors of that voter identification law in
7   that state or something to that effect.  And I remember,
8   you know, reading that somewhere in the newspaper.
9   Can't tell you who it is, can't tell you what state it
10   is, but I vaguely recall something like that.
11        Q.   Do you remember when you read that?
12        A.   Probably sometime in the last six months.
13        Q.   Do you remember where you read it?
14        A.   I do a lot of reading online.  I also, you
15   know, take home a lot of reading material mostly
16   generated by staff, and so -- but -- but it would have
17   to have been in a publication, but mostly -- most likely
18   an online publication.
19        Q.   But MALC is not aware of any effort of any
20   particular person who has not been able to vote in the
21   one of those states being --
22        A.   I don't know that we do.  I don't know, and I
23   don't know if now I -- Sorry.  I just wanted to be
24   comprehensive.  I don't want to undersize the point that
25   many members of MALC participate in policy conferences

## 151

1   across the country.  So the extent that they are serving
2   on panels or engaging members in other jurisdictions and
3   that has come up, that is quite possible, but I'm not
4   aware of any.
5        Q.   And you are not aware of any news stories, TV,
6   newspaper, magazine, otherwise in any of the states that
7   articulate that this has become a problem because they
8   enacted the photo ID law?
9        A.   What I know of other states who enacted or
10   attempted to enact the photo ID law has not come
11   without, you know, disagreement or litigation.  There's
12   always been -- As a result of a dispute, I'm not aware
13   of any jurisdiction that's modified their voting and not
14   been challenged, so but other than that, I don't know
15   any state that's repealed their voter identification
16   law.
17        Q.   Do you know of any state that has had a court
18   order then to cease using a photo ID law?
19        A.   I'm not aware.  I don't believe so.  I don't
20   know.
21        Q.   Does MALC recognize that the Supreme Court's
22   decision in Crawford versus Marion County Election Board
23   is binding on the district court here?
24        A.   In Texas?
25            MR. GARZA:  Objection.  Argumentative.

## 152

1   Calls for a legal conclusion.  You may answer.
2        A.   Here as in Texas or here as in this litigation?
3        Q.   Here in this litigation.
4        A.   Yeah.  I think that -- I don't know what the
5   opinion -- I don't know what it says, but I know that
6   our view of the opinion will be interpreted and
7   advocated by MALC's counsel.
8        Q.   Doesn't the Crawford decision that photo ID
9   requirements are nondiscriminatory voting regulations
10   bind the court in this case?
11            MR. GARZA:  Objection.  Argumentative.
12   Calls for legal conclusion, assumes the legislation is
13   identical, which it's not.  You may answer the question.
14        A.   I think that it's our position that our lawyers
15   will counsel us on the applicability of the Supreme
16   Court opinion in our Texas case.
17        Q.   Did MALC consider the Crawford decision when
18   deciding whether to support or oppose Senate Bill 14?
19        A.   I don't believe so.
20        Q.   Did you consider it?
21        A.   I didn't.
22        Q.   Why not?
23        A.   Because what I recall is that MALC had voting
24   rights counsel retained and providing those
25   recommendations from before the 2011 session.  So or

## 153

1  matters, you know, pertaining to voting rights and
2  voting rights litigation, you know, MALC would defer to
3  its counsel.  And so whatever counsel relies on in
4  forming his opinions is certainly, you know, Mr. Garza's
5  and that of our legal team.
6      Q.   Did MALC consider the Crawford decision at all
7  when deciding whether to intervene in this lawsuit?
8      A.   MALC considered the counsel that was presented
9  to us by our lawyers and our responses, you know,
10 indicated by our intervention.
11     Q.   Even if Crawford alone were not sufficient to
12 permit the Texas legislature to adopt a photo ID
13 requirement, don't the federalism concerns raised by the
14 Supreme Court in the northwest Austin case, mandate that
15 Texas is allowed to adopt the same kinds of laws that
16 other states currently have in effect?
17     MR. GARZA:   Objection.  Argumentative.
18 Counsel, file a motion for summary judgment.
19     A.   I'm not quite sure what the Supreme Court in
20 the northwest Austin MUD said or didn't say.
21     Q.   How does MALC define voter fraud?
22     A.   Not quite sure.  I would certainly invite -- I
23 believe this would necessarily include definitions for
24 voting and for fraud, and so the -- anybody who is
25 voting with a fraudulent purpose, I imagine would fall

## 154

1  within the very broad confines of voter fraud.  You
2  know, specifically speaking, I think it's in the eye of
3  the beholder.  I think you hear lots of members from
4  south Texas talk about the politiquera system there
5  where you have a number of individuals who hold
6  themselves out as voting consultants, if you will, and
7  go around and marshal up the vote.  Then you have people
8  in urban areas that talk about the -- the -- the
9  potential for fraud and inappropriateness of voting by
10 mail campaigns, and then you go to some other places in
11 the state where, you know, people are talking about the,
12 you know, very aggressive and assertive election poll
13 workers that have their own particular styles that may
14 conflict with sort of the norms of practices of voting.
15     And so I think if you -- depending on
16 where you come from, I think you have a different, you
17 know, perspective, but I think all three of those
18 things -- I think voting -- you know, impersonating a
19 voter certainly is fraudulent, so I think all of those
20 things could be voter fraud.
21     Q.   So there's a variety of types of voter fraud
22 that you've heard complaints about?
23     A.   I didn't say that I heard complaints about, but
24 I just --
25     Q.   Heard stories about?

## 155

1      A.   You hear like anecdotal, yes, yes.
2      Q.   And MALC agrees that voter fraud should be
3  illegal, correct?  I think you mentioned earlier.
4      A.   All right.  I think that -- I think we ought to
5  have laws in place for people who violate our election
6  laws, yes.
7      Q.   Have you ever witnessed voter fraud?
8      A.   I can't say that I have.  I can't say that I
9  have.
10     Q.   Would you agree that in order to witness
11 in-person voter fraud you would have to be present and
12 know the person who is voting?
13     A.   No.
14     Q.   How else might you discover it?
15     A.   Somebody could tell me.  Somebody could give me
16 a photo from a cell phone, I suppose.
17     Q.   But someone would have had to have been there,
18 not you personally.  I mean, you could hear a story of
19 it, but the person who discovers the fraud would you
20 agree that person has to be there and witness it as it's
21 happening?
22     A.   In some instances -- And I'm trying to think on
23 my feet about, you know, instances where it happens and
24 it's not noticed, you know.
25     Q.   Could you indulge me?

## 156

1      A.   And repeat your question again.
2          (Requested portion was read.)
3      A.   I think not in every instance.  I think you
4  could -- I think you could say you live in one precinct
5  and -- and you vote in that precinct, but, in fact, you
6  live in another precinct and, you know, that alone
7  unwitnessed is a crime.  And the fact that no one
8  witnessed it doesn't mean that it's not a crime.  I
9  think that that on its face is not whether or not it's
10 an enforceable act or whether there's a prosecution.
11     Q.   No.  I think we would agree that that's a
12 crime.  My question is if there was no one there to
13 witness it, would it be discovered?
14     A.   Well, I think you could document that.  Of
15 course, you could.  If -- If you knew that the person
16 was registered to vote at a place that wasn't his or her
17 residency, I certainly think you could discover that.
18 You don't need to be told.  Now, whether you want to
19 expend the resources of the State to go out and do that,
20 that's a policy and budget question, but in terms of you
21 don't need to -- you can conceivably discover that
22 without the aid or assistance of anybody else because
23 the act has been committed, and -- and, you know, an
24 investigation can be conducted, and you could certainly,
25 you know, come up with a violation of the law.

## 157

1    Q.   Would MALC agree that it's easier to discover
2  fraud such as mail-in ballots when someone with the same
3  handwriting mails a stack of them?  Would that be easier
4  to detect after it happens than would be in-person voter
5  fraud potentially?
6    A.   And I hate to say, well, give me 5 minutes to
7  give you a scenario.  I think that that wouldn't be the
8  case, but I think I understand your position -- I mean,
9  your question, and I -- I don't dispute the logic, but I
10  also think that that's not an absolute -- that there are
11  instances where that may not be true.
12    Q.   Does MALC agree that it would be harder to
13  commit in-person voter fraud if each voter who arrives
14  at the polls must show a photo ID?
15    A.   It seems to me that it is pretty hard already,
16  and the -- you know, as I understand it, when you
17  register to vote today you are submitting confidential
18  information as to who you are.  And when there's a
19  match -- you know, everything's okay, when there's
20  something that's not consistent, you are identified.
21  You are asked to present identification at the polls.  I
22  mean, that's a pretty hard clad system now.  I mean, you
23  know, and I think it's supported in the fact that you
24  have very little to none by way of prosecutions in this
25  area of the law.

## 158

1                 You know, I think -- Do you want to expose
2  600 to 700,000 Texans so that you can make a system go
3  from 99.8 percent secure to 99.9 percent secure?  I
4  don't think that's a good policy choice, but that's --
5  the decision has been made by those who back Senate Bill
6  14.  So I think that if you work hard and try hard, you
7  can make anything harder.  Not so sure if it's justified
8  under the current circumstances.
9          MR. ASTON:  Can we go off the record for
10  just a couple minutes?
11          (Recess from 2:49 p.m. to 2:51 p.m.)
12    Q.   (BY MR. ASTON) Does MALC agree that members of
13  the Texas legislature have a duty to represent the
14  interests of their constituents?
15    A.   Of course.
16    Q.   Does fulfilling that duty include proposing,
17  supporting and voting for policies favored by his or her
18  constituents?
19    A.   Sure.
20    Q.   Is it a rational decision for a legislator to
21  vote for bills that are widely supported throughout the
22  state and nation?
23    A.   I think history has demonstrated that sometimes
24  that may not be a good idea.
25    Q.   Isn't fulfilling the wishes of one's

## 159

1  constituents an acceptable purpose behind voting for a
2  piece of legislation?
3    A.   Again, I think it has proper context, yes, but
4  I can think of a number of instances where the popular
5  thing to do wasn't necessarily the right thing to do.
6    Q.   Does MALC have any basis for disputing that a
7  majority of Texans support photo ID requirements?
8    A.   Do we have a basis?
9    Q.   For disputing that a majority of Texans support
10  photo ID requirements.
11    A.   I think that while MALC may not dispute that
12  proposition, I think before MALC can concede that that
13  is the case, MALC would want to make sure that they had
14  access to the same materials that the opinion makers use
15  in forming that opinion to see if it's consistent with
16  our standards and methodologies.
17    Q.   Does MALC have any basis for disputing that a
18  majority of the constituents of every single
19  representative that voted for Senate Bill 14 support
20  photo ID requirements?
21    A.   I would -- I am unaware of that proposition
22  that -- again, make sure I heard you right -- that the
23  majority of the constituents of every single House
24  district is in favor of photo identification
25  requirements.

## 160

1    Q.   The question referred to -- I guess it would be
2  districts represented by someone who supported the bill.
3  So the question is those who voted for the bill, do you
4  have any basis -- does MALC have any basis for disputing
5  that a majority of their constituents support photo ID
6  requirements?
7    A.   Yeah.  I would be -- I don't have a basis,
8  but -- but I have a comparative that -- in some of those
9  instances, and so -- but, again, I think it's really the
10  devil's in the details and how that decision or that
11  statistic was arrived at.  It would be very important to
12  really look at.
13    Q.   We talked a while ago about procedural tactics
14  one might use and indeed legislators do use to slow
15  down, delay or stop a disfavored bill.
16    A.   Or defeat.
17    Q.   Or defeat.  I'd like to talk now for a few
18  minutes about procedures one might use to speed up a
19  bill that he or she supports.  Do the House rules
20  provide a mechanism to waive certain procedural rules to
21  expedite the process on a particular bill?
22    A.   You could suspend all rules.  You can even
23  suspend the Constitution.
24    Q.   And is one example waiving the five-day posting
25  rule for the House?

### 161

1    A.   Routinely, no.

2    Q.   Have you ever had one of your bills set for

3  hearing after the five-day posting rule was suspended?

4    A.   I'm not sure.  I'm not sure.  I mean, it's not

5  an infrequent -- Excuse me.  Yeah, I'm sorry.  It's not

6  an infrequent request that's happened.  I mean, it

7  could.

8    Q.   So that is routine you said.

9    A.   It's not a routine.  It's just not infrequent.

10  I mean, no one would be surprised by it if someone were

11  to make that motion.

12    Q.   So then isn't it fair to say that the House

13  rules can be utilized by members both to expedite a bill

14  they support and to delay or stop a bill they oppose?

15    A.   To a degree, yes, sir.

16    Q.   Do the rules allow for -- Do the rules have

17  mechanisms by which you could do either one of those

18  things?

19    A.   I mean, the rules say that you can have no

20  rules, okay, and so in that instance, it's -- it's the

21  OK Corral on the House floor, I mean, and so -- but I do

22  believe that the -- the rules themselves are in place

23  have a tendency to be designed to work towards the

24  elimination of proposals, not to encourage and foster --

25  not to encourage and foster the way you accelerate and

### 162

1  pass proposals.

2        MR. ASTON:  Can you read that back?

3        (Requested portion was read.)

4    Q.   So what do you mean by that?

5    A.   Well, I mean, if you take a 10,000-foot view of

6  the legislature and we introduce 5,000, 6,000 pieces of

7  legislation every session, we pass 1,000 of them, 1,500,

8  the fact that we have 140 day time limit, we have

9  express rules that prevent activity on the floor of the

10  House within the first 60 days, you are -- literally,

11  it's a race against the clock.

12        And so to the extent that -- that you are

13  trying to advocate and pass your proposals, your

14  measures, you are working against hard deadlines that

15  can defeat a bill, I have rarely seen someone say we

16  need to suspend all the rules so that we can take a bill

17  and pass it now.  I have heard -- I've never witnessed

18  it myself, but I am told, you know, about the days where

19  you could stop the clock before midnight, and it was --

20  it was midnight everywhere else in Texas, but the House

21  floor.  And I'm reminded of days where bills have been

22  introduced -- have been drafted, filed, introduced,

23  passed and sent to the Senate all in one day.  I've

24  heard about these, but these are really kind of the

25  outliers, the tails.

### 163

1        When we start departing from procedure on

2  bills of great import, not just local bills or something

3  that may have a significance in somebody's particular

4  district, when we do it on big controversial bills, I

5  think that that's being done more so for a different

6  reason.  It's to facilitate passage of something that

7  would be difficult to do.

8        And so, you know, you asked me a question

9  earlier about, well, you can -- people pass entire bills

10  as amendments and there are one or two pages, of course

11  they do.  When you want to pass an omnibus rewrite of a

12  code or multi-page, multi-section bill with lots of new

13  language, the body as a matter of practice will put a

14  stop to that because nobody's going to pass something or

15  vote on something that they don't know, you know, what

16  it does.

17        And so, you know, I think that even though

18  the body will often disagree over the direction of

19  policy, we all sort of hold a fidelity to the

20  institution itself and not going to create a practice

21  that -- you know, that can be detrimental to the

22  institution, and I think that's why you see -- you know,

23  people talk about, you know, the institution sometimes

24  being bigger than the two parties that represent it.

25    Q.   So does MALC believe that one use of the rules

### 164

1  to slow things down is legitimate and the other to speed

2  things up is not legitimate?

3    A.   I think that rules that are used to slow down

4  legislation is not a first option.  It's really a last

5  resort.  I think rules used to accelerate -- If you have

6  the ability to use the rules to accelerate legislation,

7  then you probably have the ability to not have any

8  rules, and the fact of the matter is -- I mean, the

9  rules are really not designed -- I think the rules as

10  written when you -- when you read through them, you

11  recognize that they apply to, you know, really protect

12  the minority voice as the way I see it.

13        And -- And so, you know, I think it's fair

14  game -- it's fair game that if you wrote the rules, you

15  know, you ought to be in a best position to follow them.

16  These are rules that were written and passed by the

17  majority.  And so, you know, the reason why people

18  operate under the rules -- I mean, the five-day postings

19  are insignificant, you know.  I think, you know,

20  rewriting an entire calendar rule in hindsight because

21  of a result that prevented a voter ID bill from passing

22  in 2009, I think that's questionable.  That's a

23  questionable procedural day of departure, I think.

24    Q.   Are you referring there to the House resolution

25  that we talked about earlier?

Trey Martinez Fischer                                    June 15, 2012

---

165

1   A.  Yeah, of course.
2   Q.  The one that passed 143 to zero?
3   A.  Absolutely.  I'm very -- I'm intrigued to go
4   play back the videotape to hear the author of the bill
5   say we're going to add a new Section 6 so that we could
6   prevent people from killing the Voter ID Bill.  I think
7   you would have had a different debate.  I don't think --
8   You know, these are rules that we all have to read, and
9   we are all accountable to and we're responsible for our
10  own votes, but, you know, if you -- if you -- if you
11  wanted to take a detailed look at, you know, problems
12  and solutions and the evolution of voter ID passages,
13  you would see that.  There have been accommodations made
14  to facilitate passage based on whatever barrier they ran
15  into in the prior session.  There's at least a couple of
16  examples in that regard.
17  Q.  You mentioned earlier your view that the rules
18  are designed to protect the minority.  In your -- I
19  guess it's 10 years now in the House?
20  A.  12.
21  Q.  12 years now in the House, how many of those
22  years were you in the majority and how many of those
23  years have you been in the minority?
24  A.  I've been in the majority two years and the
25  minority ten.

---

166

1   Q.  Implementation of Senate Bill 14 has been
2   delayed for about a year now.  Can MALC quantify the
3   burdens, financial and otherwise, that this process has
4   placed on the State and the people of Texas?
5   A.  Can we quantify in terms of telling you how
6   much it cost?
7   Q.  Or the financial burden over the last year of
8   preclearance and the other burdens.
9   A.  Sure.  You know, I -- I think it's -- I think
10  that's a fair question.  I think it's also equally fair
11  to sort of measure the fact that it does take two to
12  Tango.  You know, one defendant or defendant-intervenor
13  can control the -- the -- you know, the legal docket
14  system.  You know, from what I remember and what I
15  experienced in redistricting, I think the judges on the
16  panel have something to say about how fast or slow we
17  go, and I've been paying attention to the exchange of
18  information in discovery, and, you know, I can tell you
19  in redistricting, you know, that the state went so far
20  as to blame the litigants for slowing things down.
21  I mean, if things were perfect, there
22  wouldn't be any litigation.  So I think that if -- if
23  the State wanted to facilitate a more efficient means of
24  administering changes to voting patterns and procedures,
25  that they would probably engage in a more robust and

---

167

1   earnest discussion about coming up with practical
2   policies that are appealing to people of all stripes,
3   not just political stripes, but of people of different
4   races and ethnicities.
5        I have had my share of conversations with
6   people that have waived and have not waived that have
7   talked about the fact that, you know, having a primary
8   in May is not as much fun as it is having one in March,
9   and if we only worked a little harder to get a better
10  redistricting map, perhaps we could have a March
11  primary.  I think there's in runoffs that are
12  having regrets right now.  Of course, things could be
13  faster.  It could be easier, but, certainly, it's not
14  because groups like MALC are holding up the train.  I
15  think it -- I think that we both acknowledge that
16  there's a shared responsibility of being where we are
17  today.
18  Q.  You mentioned something about passing policies
19  that are popular --
20  A.  Yeah.
21  Q.  -- among many stripes.  The polls that we
22  looked at from Dr. Shaw's report would suggest --
23  A.  It would tell half the story.
24  Q.  That Voter ID bills are popular, correct?
25  A.  It would say half the story, correct, and I'm

---

168

1   curious to see responses to Dr. Shaw's questions about
2   same day voter registration or being able to vote by
3   internet, being able to, you know, register to vote as
4   you get your driver's license, being able to register to
5   vote as you pay your property taxes.  I'd like to see
6   the responses to questions about making voting easier.
7        As I think that -- You know, just because
8   Dr. Shaw's been so gracious to give us just a few sets
9   of questions doesn't mean that's the only thing Texans
10  are thinking about.  Let's find out what they really
11  think about voting, and let's find out ways to
12  accommodate that.  I can tell you the area I represent,
13  they'd like to see a much longer voting period.  They'd
14  like to see election days on weekends, be able to go to
15  church and go cast their ballot when they walk out,
16  being able to walk out of a college classroom and go to
17  the dining hall and cast a ballot.  I think it would be
18  great if we make those accommodations to make voting
19  more accessible.  I agree with you.
20  Q.  Do you agree that as a covered jurisdiction,
21  Texas is at a tremendous disadvantage when it attempts
22  to enact laws that change voting procedures?
23  A.  I would be the first person to tell you that I
24  wish Texas wasn't a covered jurisdiction.  Again,
25  there's a part of our State's past that nobody's proud

## 169

1  of, and this is a result of trying to rectify in writing
2  a bunch of wrongs.
3         And so to the extent that it places a
4  additional strain on the State of Texas to -- to
5  demonstrate that they are working with clean hands and
6  in good faith, I think that's a distinction Texas earned
7  all by itself as a result of its history.
8     Q.  But would you disagree with the quote that
9  we're still at a disadvantage as opposed to non-covered
10  jurisdictions?
11     A.  As a minority, I don't see that.
12     Q.  You don't see that as a disadvantage is what
13  you are saying?
14     A.  As a minority, no.
15     Q.  We discussed a minute ago, May was when Texas
16  conducted the 2012 primaries for Republicans and
17  Democrats?
18     A.  Right.
19     Q.  Once again, that was about a year after Senate
20  Bill 14 passed and signed, and the photo ID requirement
21  was not used in May, correct?
22     A.  That's correct.
23     Q.  Does MALC acknowledge that this constitutes an
24  irreparable injury to the State of Texas?
25     A.  I think that it's a speculative injury if Texas

## 170

1  were to prevail.
2     Q.  And if Texas does prevail and this law's
3  precleared, would MALC acknowledge that -- what remedy
4  will Texas get for not being able to use it in the May
5  primary?
6     A.  They will get the assurance that their public
7  policy choices don't have the purpose -- discriminatory
8  purpose or effect that some people thought.
9     Q.  But there's nothing to make them whole, is
10  there?
11     A.  Well, it's to -- it's to let Texans know that
12  we've come a long ways since the days of Jim Crow, I
13  think, and that's something that we need to acknowledge
14  if you are right.
15     Q.  And Texas would be irreparably injured a second
16  time in late July when we hold our primary runoffs
17  without Senate Bill 14 in place, correct?
18     A.  I'll think that's speculative again.  I think
19  the only way that can be true is if Texas were to
20  prevail, and since the trial hasn't happened, it's hard
21  for me to give you an opinion.
22     Q.  Are there large numbers of noncitizens on
23  Texas's voter rolls?
24     A.  I don't know that.
25     Q.  Should Texas use its resources to attempt to

## 171

1  remove noncitizens from Texas's voter rolls?
2     A.  I think Texans have a legitimate interest in
3  making sure that their election registration rolls are
4  as accurate as they can be.
5     Q.  Would MALC have supported Senate Bill 14 if it
6  had allowed for non-photo IDs to be used?
7     A.  I think that there was a package of ideas that
8  would have made Senate Bill 14 more of a compromise
9  position that I don't think -- You know, MALC doesn't go
10  into a room and do a straw poll and say we're going to
11  come out and support this.  You know, MALC tries to
12  provide its members and equip them with the best
13  information and the best practice out there.  The
14  individual members go out and represent their districts.
15         And so I think that you could have found
16  several accommodations and still find people who would
17  vote against photo identification.  I think there were
18  those that were working in true belief that they could
19  come up with a measure that would have been acceptable,
20  albeit not ideal, but acceptable, and I think that, you
21  know, a dialogue of looking at certain forms of ID
22  that -- you know, that don't require a photo or not
23  require a photo and not limited to a driver's license
24  may have been appealing.
25     Q.  This morning, if I recall, you said that MALC

## 172

1  opposed Senate Bill 362, is that correct, in 2009?
2     A.  I believe it did, yes.
3     Q.  And didn't that allow for some of the sorts of
4  non-photo IDs?
5     A.  I'd have to look at it.  While you are looking
6  for it, I can tell you that one of the -- one of the
7  bigger discussion points that Representative Anchia was
8  leading was the ability to have the same day voter
9  registration, and -- and I know that members of MALC
10  were in support of that, and I don't think that that was
11  given a -- given any real consideration.
12         (Exhibit 11 marked.)
13     Q.  Please take a few minutes to review this
14  exhibit.  For your information, it's Section 6 and
15  Section 10, the two that I want to discuss.
16     A.  Okay.
17     Q.  Section 6 on Page 3?
18     A.  Yes.
19     Q.  Part B, "On offering to vote, the voter must
20  present to an election officer at the polling place
21  either, one, one form of identification listed in
22  Section 63.0101(a), or, two, two different forms of
23  identification listed in Section 63.0101(b)."
24         If you turn to Section 10 on Page 5,
25  that's where they have amended Section 63.0101.  Section

## 173

1   (a) is a photo identification.  Driver's license or
2   personal identification card, US military identification
3   card, US citizenship certificate, US passport, a license
4   to carry a concealed handgun issued to the person by the
5   Department of Public Safety.
6        Would MALC agree that those are photo IDs
7   that list -- it's quite similar to the one in Senate
8   Bill 14?
9        A.  Correct.
10       Q.  And one of those from that list would entitle
11  one to vote had this bill passed.
12       A.  I see that.
13       Q.  Reading starting on Line 22, Part (b) of the
14  bill.
15       A.  You are still on Page?
16       Q.  Still on Page 6, Line 22.  "The following
17  identification is acceptable as proof of identification
18  under this chapter."  And then we have things like the
19  voter's voter registration certificate or a copy of a
20  currently utility bill, bank statement, government
21  check, paycheck, other government document shows the
22  name and address of the voter, official mail address of
23  the person by name from a governmental entity, certified
24  copy of a birth certificate, original or certified copy
25  of a person's marriage license or divorce decree.

## 174

1   Further on down, a library card, a pilot's license.
2        Would MALC agree that this is a pretty
3   substantial list of non-photo identifications?
4        A.  Much different than Senate Bill 14, yes.
5        Q.  And any two of those would have entitled one to
6   vote had this bill passed?
7        A.  Correct.
8        Q.  And yet MALC still opposed Senate Bill 362.
9        A.  I think that --
10       Q.  Do you recall why that was?
11       A.  Well, I mean, I think it's -- let's put this in
12  proper context.  The fact of the matter is Senate Bill
13  362 never came up for a vote on the floor of the House,
14  and I think you and I have had the very engaging
15  conversation about, you know, policy choices as
16  reflected by statements of voters in journals.  I mean,
17  we don't have one for Senate Bill 362.  I think that
18  until a bill is passed to engrossment and passed on
19  final passage, if they're reading -- everything's being
20  negotiated.
21       And I can tell you that in 2009, some of
22  the areas that were very important to our subject matter
23  experts on voter identification had to deal with same
24  day voter registration, stiffened penalties for those
25  are accused of voter impersonation, making them felonies

## 175

1   and finding ways to make voting more accessible, and so
2   you know, there is the -- there are some of those people
3   who harbor the view that you can't -- that you have to
4   be opposed to legislation because once you lose it in
5   conference, once it's rewritten in conference, once it's
6   finally negotiated -- You know, very much like the
7   budget.  We take a budget vote and then we take a
8   conference committee report on the budget that's much
9   different than the budget we voted on.
10       There are people who think, well, I don't
11  trust the leadership to hold true to these provisions,
12  so I'm going to negotiate myself -- on the conference
13  committee, I'm going to negotiate myself a commitment
14  from the chairman to do different things.  So suffice it
15  to say Senate Bill 362 never made it to a second reading
16  debate, you know, never made it to the floor.  I want to
17  make sure I'm right here.
18       So if it never was eligible for
19  consideration because of the local calendar being in
20  front of, you know -- and some of these decisions were
21  never final, while I may have personally opposed it,
22  MALC may have opposed the notion of disenfranchising
23  voters, I would be -- I'd be -- I'd be devastated if
24  there weren't conversations and communications taking
25  place to try to find a reasonable middle ground or

## 176

1   alternative to find sensible legislation that would have
2   been palatable to many people.  So that's my
3   recollection, but forgive me.  Lots of bills, lots of
4   sessions.  They all sort of run together sometimes.
5        Q.  Are there any circumstances -- Because I guess
6   Senate Bill 362 wouldn't even really truly have been a
7   photo ID requirement with the long list of non-photo
8   IDs.
9        A.  Sure.
10       Q.  Are there any section you could imagine in
11  which a photo ID was required that the MALC could
12  support that bill?
13       A.  You know, I know that the MALC would have been
14  in support of MALC member amendments to do certain
15  things.  We've talked about exclusions for senior
16  citizens.  We've talked about opening the list of photo
17  identifications.  You know, I think the fact of the
18  matter is if we look at the evolution in voter
19  identification legislation, when you compare the 2011
20  version or the 2009 version, you know, you don't need to
21  take a lot of time to -- decide that the 2009 version
22  seems to be a little more accommodating, and for some
23  reason, you know, that bill did not pass.
24       And so, logically, you would think that
25  folks who want to work into a direction to make the bill

---

### 177

1   even more accommodating, if they had that desire to keep
2   it the same, if they didn't want to negotiate any
3   further, but what happened is the bill actually became
4   more restrictive in 2011 and, you know, nothing occurred
5   between the interim of 2009 and the session of 2011 that
6   demonstrated that we need to tighten our grip on voter
7   identification.
8           So, I mean -- So I think that, you know,
9   it's not fair to characterize that no matter the
10  circumstances MALC would never embrace a photo
11  identification requirement.  I think that's not true.  I
12  think people file amendments because they want to make
13  legislation better and then they will look at the end
14  game.  They will look to see what the final bill looks
15  like, what are the commitments and assurances that this
16  bill is not going to be yanked from under our feet when
17  it's in conference and commitments from the authors to
18  say if this bill comes back without this proviso, you
19  will -- you will jump on the grenade and you will not
20  let this bill pass.  Those things happen all the time in
21  the legislative baseball.
22          This is one of the few bodies that still
23  believes in looking someone in the eye, shaking a hand
24  and having a deal, and while we fight like cats and
25  dogs, like Republicans and Democrats, Republicans and

### 178

1   Democrats can look each other in the eye, shake their
2   hand and make a deal, and so I don't want to minimize,
3   you know, that environment.  That certainly exists.
4   But, you know, people will negotiate a bill.  It finally
5   leaves the chamber of the House and Senate Bill 362 just
6   did not have that opportunity.
7       Q.   I didn't want to interrupt you, but you
8   mentioned that nothing happened between the '09 and the
9   2011 sessions.  There was an election in 2010, correct?
10      A.   Certainly.
11      Q.   Do you know what that turnover partisan-wise,
12  Republican and Democrat, was between the '09 session and
13  the Texas House and the 2011 session in the House?
14      A.   I think Republicans won, if that's what you are
15  asking.
16      Q.   Do you know how many seats they gained?
17      A.   20 something.
18      Q.   But is protecting the integrity of the ballot
19  box partisan or is it civic?
20      A.   Again, I think that there was a Republican
21  majority.  You don't need a hundred.  You just need 176,
22  and so, you know -- and with the change in political
23  landscape, you could have passed the same bill,
24  suspended every rule in the book, and, you know, that
25  didn't occur, I mean.

### 179

1           So I'm not persuaded that because there
2   was a landslide election, that voter ID, you know,
3   became tougher.  Voter ID was proposed because there was
4   a problem that needed a cure, and -- and if the voter
5   identification problem worsened in the election of 2010,
6   then maybe there were some Republicans that might be
7   wanting to recount their elections, I mean, because if
8   there's fraud, you know, it happened in the Republican
9   landslide, I don't -- I don't -- I don't buy the notion
10  that because it became more partisan and more Republican
11  that these bills have to get tougher and not be as
12  accommodating or work towards that end.
13      Q.   But aren't there some things in the House that
14  require two-thirds vote?
15      A.   It's just suspending the Constitution.
16      Q.   What about suspending the rules?
17      A.   Majority vote.
18      Q.   With that large turnover, you said might be
19  about 20 seats?
20      A.   I think it went from 76 to 101, I think, or
21  something like that.
22      Q.   But isn't the -- There are certain things in
23  which the threshold between 99 and 101 members matters,
24  correct?
25      A.   In suspending rules, I mean, or having bills

### 180

1   take immediate effect requires a two-thirds vote.  If
2   you want to suspend the rules, you need a majority vote.
3   You want to suspend the Constitution, you need a
4   four-fifths vote.  So when you want to tinker with the
5   Constitution, 30 people control the legislature, but
6   everything else requires a majority vote or two-thirds.
7       Q.   In the House two-thirds would be at 101,
8   correct?
9       A.   It's two-thirds of present and voting, and so
10  assume you have perfect attendance, yes, that's the
11  number.
12      Q.   Is the number 100 or is it 101?
13      A.   I thought it was 101.  It all runs together.  I
14  apologize.
15      Q.   Sir, I definitely want to thank you for your
16  time.  We've had a long day.  I appreciate your patience
17  and your cooperation, and we are almost finished.
18      A.   Well, thank you -- if we're thanking each
19  other, thank you.  I mean, the material is dense.  It's
20  hard to absorb sometimes.  So I gave you the impression
21  that I wasn't being responsive or, you know, giving long
22  answers.  It's only because this is just a lot of
23  information, so thank you for your accommodation.
24      Q.   Certainly.  You've talked throughout the day,
25  and I want to make sure I get the way you characterize

181

1   it -- characterize it accurately.  You were talking
2   about the purpose of the bill.  I believe you said that
3   the rationale remains in your words elusive.  You said
4   that you don't believe there is a lot of in-person voter
5   fraud going on.
6         Are those fair characterizations, A, of
7   what you've said, but, B, of your position?
8       A.  I think the transcript will reflect what I've
9   said, so if I differ with what's in the transcript, I
10  rely on the transcript.  That said, I think in its
11  proper context that the notion of a high level of voter
12  impersonation activity taking place is only reflected in
13  the fact that there are virtually no prosecutions for
14  that other than one that's been referred to the Attorney
15  General's Office.
16      Q.  Does the low number of prosecutions necessarily
17  mean that there's a low amount of voter fraud or could
18  it also just mean that there's a low amount of voter
19  fraud that's been detected to date?
20      A.  I think that when you compare that data point,
21  one actual indicted case of voter fraud, and you say I
22  have time to work on that or I have time to fix a budget
23  that needs $27 billion, I think I know what's more
24  important to the voters I represent.
25         And -- And if it's -- You know, those

182

1   kinds of choices, I think, it's easy.  If it's -- You
2   know, I'm -- I'm bound and determined to pass something
3   that I haven't been able to pass since 2005 and, you
4   know, then I think that's -- I think budget and other
5   important issues aren't really as significant as passing
6   something that you've thought you should have been able
7   to do six years ago.
8       Q.  How much fraud should Texas be required to
9   discover before the legislature is permitted to enact a
10  photo ID requirement that is designed to prevent fraud?
11         MR. GARZA:  Objection.  Argumentative,
12  assumes conclusions that the witness has not testified
13  to.
14      A.  I think that -- I think that when we have
15  140 days to conduct the people's business and our only
16  constitution requirement is to pass the budget, doing
17  things, setting emergency calendar items, that -- that
18  we did in 2011, nothing was more emergent than closing a
19  $27 billion budget shortfall, and so for everyday that
20  we spent working on these types of issues, you know,
21  sometimes when you have a hunch that something's going
22  on and you want to make sure you perfect the
23  legislation, we pass a lot of studies.
24         We empower our Department of Public Safety
25  to conduct investigations.  We have Texas Rangers.  We

183

1   have prosecutors, assistants at the Attorney General's
2   Office that's bill funded.  We have lots of good lawyers
3   out there.  If we needed to really work on our voter
4   fraud to make this a real priority, we could have done
5   the work.  Instead, we passed the bill because someone
6   says, well, you don't know how bad it is if you are not
7   there.
8         I can say that about a lot of things.  I
9   could say that about the people sitting in traffic right
10  behind you.  I can say that about the people who showed
11  up to the health clinic today and found out that they
12  are no longer eligible to receive services.
13         At some point we have to prioritize.  I
14  think the data points on some of these other more
15  important issues are very real and undisputed.  We're
16  enacting voter identification, photo identification
17  because we have the ability to do so, but it doesn't
18  necessarily mean that it rises to the level of import at
19  the exclusion of our priorities, and so I think that we
20  could have done this another way.
21         And I think the State of Texas is well
22  equipped to, you know, find a legitimate means to come
23  up with a very laser like solution to a very specific
24  problem, and, instead, you know, we took a mallet
25  instead of a scalpel and 600 to 700,000 minorities have

184

1   voter registration that doesn't have a driver's license.
2   That's a big concern for me.
3       Q.  But does MALC believe that Texas must tolerate
4   some voter fraud before it could enact a photo ID law?
5       A.  I think that when Texas decides to address the
6   real or perceived allegations of voter fraud, we need to
7   get it right is what I think.  If it means we have to
8   tolerate fraud or if it means we have to put it off a
9   session, if it means we have to study it, if it means we
10  have to put some money into discovering what the real
11  problem is, then we should do it because I think that if
12  someone telling me, well, how many -- you know, how many
13  guilty people on death row are we are going to have to
14  spare their lives so that we can save one who's
15  wrongfully accused?  I don't know if we can make that
16  judgment.  And so I want to be careful when we're
17  trampling on people's constitutional rights, and I want
18  to get it right.  I don't want to pass a bill on a
19  hunch.
20      Q.  So if Texas has to tolerate some fraud before
21  it can enact a photo ID, is that suggesting or isn't
22  that suggesting that Texas can't attempt to prevent
23  voter fraud, rather, it may only attempt to cure it
24  after it becomes a big enough problem?
25         MR. GARZA:  Objection.  Argumentative,

## 185

1  mischaracterizes the witness's testimony.  You can
2  answer.
3          THE WITNESS:  Could you repeat the
4  question, please?
5          (Requested portion was read.)
6      A.  And I think that the only objective evidence to
7  even suggest that there is a voter fraud problem is one
8  indictment out of 13 million votes cast in the 2008 and
9  2010 elections.  I think if somebody came to me and said
10  we needed to pass this because the sky is falling at the
11  ballot box, I think I'd want to know a little bit more,
12  and I wouldn't want to give a knee jerk reaction because
13  one person's been indicted without checking firsthand
14  about the elections officials in every county in the
15  state, without dispatching the resources of the Attorney
16  General's Office to go out into the field and
17  investigate, without dispatching the resources that are
18  strategically placed by the Department of Public Safety
19  to have them monitor these polls, to have our committees
20  and agencies write reports and do legislative findings,
21  conduct hearings and let's take evidence.
22          We do those things all the time to solve
23  Texas's problems.  Voter ID is no different.  Why we
24  have to exercise shortcuts and why we have to do things
25  by augmenting rules and processes knowing that we're

## 186

1  exposing three-quarters of a million Texans?  There's a
2  better way and that's simply what MALC is suggesting and
3  that's why MALC is in the lawsuit.
4      MR. ASTON:  That's all I have.
5      MR. GARZA:  I just have a couple -- just a
6  few questions, Mr. Chairman.
7          EXAMINATION
8  BY MR. GARZA:
9      Q.  We've talked in a speculative way about lots of
10  topics.  Would you agree that voting in one party's
11  primary and voting in the other party's runoff is voter
12  fraud?
13      A.  Sure.
14      Q.  That's illegal in Texas?
15      A.  It is.
16      Q.  Do you know whether that's ever happened?
17      A.  I'm sure it has.  I don't -- I don't --
18      Q.  Would that be something that you could detect
19  without requiring photo ID?
20      A.  Of course.
21      Q.  You could simply look at the records?
22      A.  Absolutely.
23      Q.  Do you know if the Attorney General's Office
24  ever has done -- has ever done an analysis of a
25  crosscheck of people who voted in one primary and

## 187

1  another party's runoff?
2      A.  I don't know that.
3      Q.  Have you ever heard of -- of a race in Houston,
4  Texas for Congress between Gene Green and Ben Reyes?
5  Are you familiar with that?
6      A.  I know both of the individuals.  I know at one
7  point in time they ran against each other.
8      Q.  And you are not aware of whether that
9  circumstance actually occurred in Harris County?
10      A.  That -- That's a little bit before my time.  I
11  know there's -- my Houston colleagues talk about the
12  intensity of Harris County elections.
13      Q.  You are not aware that over 100 people voted in
14  the Republican primary and then the Democratic runoff?
15      A.  Something to that degree.  With precision, I
16  don't know.
17      Q.  And you are not aware that none of those people
18  were prosecuted.
19      A.  Right.  I'm not aware of that.
20      Q.  Okay.  You were asked if it wouldn't be harder
21  to commit voter fraud if you have a photo ID
22  requirement.  If you have a photo ID, would having
23  a photo ID requirement prevent that person from voting?
24      A.  Not if it was -- Not if it was a good ID.
25      Q.  Well, do Texas election officials have any

## 188

1  material in order to examine a fake registration,
2  driver's license, the scanner that they use, for
3  instance, at the airport, the black light that they use
4  at the airport?  Are resources allocated to election
5  officials to purchase those kinds of equipment?
6      A.  There's nothing in 14 that deals with that, and
7  I know that, you know, fiscal note having to be as near
8  zero as possible, I mean that would certainly have cost
9  somebody some money.  That would have been a cost of the
10  bill.
11      Q.  If voter fraud is being committed by a corrupt
12  election official, does it matter if the State of Texas
13  has a photo ID requirement for voters?
14      A.  No.
15      Q.  It's the election official that determines who
16  can vote and who can't vote in Texas.
17      A.  That's correct.  Ultimately, yes.
18      Q.  And just one final question, Mr. Chairman.  You
19  were asked about in the context of how the rules were
20  changed to facilitate photo ID to become law, and there
21  was -- it wasn't asked of you directly, but there was an
22  insinuation that two-thirds rule -- elimination of the
23  two-thirds rule was of no consequence because
24  legislation could be passed in the Senate even under
25  two-thirds rule.  Amended in the House -- And the

## 189

1  assumption was is that it could be amended in the House
2  to include a photo ID voting requirement and then sent
3  back to the Senate in a simple majority could pass this
4  legislation.  What do you think the likelihood of
5  something like that occurring within the rules that are
6  available in the House of Representatives?
7      A.  Well, I mean, I think if someone asked me the
8  question is it possible that that could happen, of
9  course it's possible.  I mean, is it likely?  No.  I
10  mean, it's -- it's less likely for a number of reasons.
11  The House and the Senate always have this ongoing
12  dispute about the interpretation of rules such as the
13  germaneness and two-subject rules and various strict
14  interpretations of captions of bills, and so the House
15  has a very narrow view of germaneness, and so I think
16  that if -- if you had a -- if you had a bill that was
17  voter specific and you were to pass it out of the Senate
18  and make it to the House floor, you could amend it with
19  voter ID, I think that -- I think even if it was
20  possible, I think a series of points of order would have
21  been lodged to dissect every section of that bill.
22           Yeah, I mean, I don't want to be pollyanna
23  about it, but, I mean, we amend all the time.  I mean, I
24  can take a one-page bill and two-page bill and put it on
25  a bill, but when you start amending 10 page, 15 pages of

## 190

1  legislation, even no matter who's sponsoring the
2  legislation, people put the brakes on it because they
3  want to know what they are about to pass and things slow
4  down right away, and so, I mean, sure, all these things
5  could have happened and a super majority could have said
6  we don't care, we're doing it anyway, and provided they
7  can get around the rules, then maybe they can, but it
8  wouldn't be easy.  I think that the odds are that it
9  would have lesser chance of making it back over.
10         MR. GARZA:  Pass the witness.
11         MS. McLEOD:  I don't have any questions,
12  but the department wants to join in the objection made
13  by MALC's counsel, Mr. Garza, regarding the limitation
14  and scope of the chairman's testimony as it relates to
15  what I believe was previously marked as Exhibit 1, but
16  it's the list of legislators that waived legislative
17  privilege, and add for the record, that the court
18  ordered Texas to indicate which legislators were
19  asserting legislative privilege or that privilege would
20  be waived.  Today, Texas has failed to provide that list
21  of legislators in violation of the court's order.
22         Therefore, it is the position of the
23  defendant, Attorney General Eric Holder, that any
24  limitation to the chairman's testimony today relating to
25  conversations with fellow legislators that have not

## 191

1  affirmatively invoked legislative privilege is improper.
2  That's all I have.
3          (Deposition concluded at 3:42 p.m.)

## 192

1          CHANGES AND SIGNATURE
2  RE: STATE OF TEXAS VS. TEXAS STATE CONFERENCE OF NAACP
   BRANCHES, et al
3
PAGE   LINE   CHANGE        REASON
4  _____
_____
5  _____
_____
6  _____
_____
7  _____
_____
8  _____
_____
9  _____
_____
10  _____
_____
11
12   I, TREY MARTINEZ FISCHER, have read the foregoing
    deposition and hereby affix my signature that same is
13  true and correct, except as noted above.
14
    _____
15   TREY MARTINEZ FISCHER, Witness
16  THE STATE OF _____ )
    COUNTY OF _____ )
17
    Before me, _____, on this day
18  personally appeared TREY MARTINEZ FISCHER, known to me
    (or proved to me under oath or through _____)
19  (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
20  instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
    expressed.
21   Given under my hand and seal of office this _____
22  day of _____, _____.
23
24  _____
    Notary Public in and for the State
25  of _____.

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,              )
                             )
        Plaintiff,           )
                             )
VS.                          ) CASE NO. 1:12-CV-00128
                             ) (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his  ) Three-Judge Court
official capacity as Attorney)
General of the United States,)
                             )
        Defendant.           )
                             )
ERIC KENNIE, et al.,         )
                             )
        Defendant-Intervenors, )
                             )
TEXAS STATE CONFERENCE OF    )
NAACP BRANCHES, et al.,      )
                             )
        Defendant-Intervenors, )
                             )
TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al.,      )
                             )
        Defendant-Intervenors, )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al.,              )
                             )
        Defendant-Intervenors, )
                             )
VICTORIA RODRIGUEZ, et al.,  )
                             )
        Defendant-Intervenors. )
-----------------------------------------------
                ORAL DEPOSITION OF
                 MEREDYTH FOWLER
                  JUNE 8, 2012
-----------------------------------------------
    ORAL DEPOSITION of MEREDYTH FOWLER, produced as a

## 2

1   witness at the instance of the Defendant, and duly

2   sworn, was taken in the above-styled and numbered cause

3   on the 8th day of June, 2012, from 9:31 a.m. to 4:35

4   p.m., before Jean Thomas Fraunhofer, CSR in and for the

5   State of Texas, reported by machine shorthand, at the

6   Law Offices of DECHERT LLP, 300 West 6th Street, Suite

7   210, Austin, Texas 78701, pursuant to the Federal Rules

8   of Civil Procedure and the provisions stated on the

9   record or attached hereto.

## 3

1                        A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4      PATRICK K. SWEETEN
       Assistant Attorney General
5      ATTORNEY GENERAL OF TEXAS
       P.O. Box 12548
6      Austin, Texas 78711
       Tel: (512) 936-1307
7      Email: Patrick.sweeten@oag.state.tx.us
8
9   FOR THE DEFENDANT:
10     RISA BERKOWER
       DAN FREEMAN
       Trial Attorneys
11     U.S. DEPARTMENT OF JUSTICE
       950 Pennsylvania Avenue, NW
12     Washington, DC 20005
       Tel: (202) 305-0115
13     Email: Risa.berkower@usdoj.gov
14
   FOR THE DEFENDANT-INTERVENOR:  TEXAS STATE CONFERENCE OF
15   NAACP BRANCHES and THE MEXICAN AMERICAN LEGISLATIVE
     CAUCUS
16
       LINDSEY B. STELCEN
17     AMY L. RUDD
       DECHERT LLP
18     300 West 6th Street, Suite 2010
       Austin, Texas 78701
19     Tel: (512) 394-3000
       Email: Lindsey.stelcen@dechert.com
20
21   FOR SPEAKER STRAUS:
22     MR. THOMAS R. PHILLIPS
       BAKER BOTTS
23     98 San Jacinto Boulevard, Suite 1500
       Austin, Texas 78701
24     Tel: (512) 322-2565
       Email: Tom.phillips@bakerbotts.com
25

## 4

1                        I N D E X
   WITNESS                               PAGE
2
   MEREDYTH FOWLER
3     Examination by Ms. Berkower           6
      Examination by Ms. Stelcen          199
4     Examination by Mr. Sweeten          205
5
   Signature and Changes                  206
6  Reporter's Certificate                 207
7        E X H I B I T S
   NO.        DESCRIPTION              PAGE
8
9  Exhibit US-5    SB14 (previously marked)    165
   Exhibit US-6    OCGA §21-2-417 (previously  130
10                  marked)
   Exhibit US-29   SB362 (previously marked)    75
11 Exhibit US-60   PL109-2005 (Indiana)        134
                    (previously marked)
12 Exhibit US-431     Texas Legislature Online  48
                    Bills Out of Committee
13                  (previously marked)
14 Exhibit US-640   Notice of Deposition        14
   Exhibit US-641   2/9/11 Press Release        44
15 Exhibit US-642   4/28/09 Clear Lake GOP Press 96
                    Release
16 Exhibit US-643   January 2011 Interim Report 109
   Exhibit US-644   SB14                       117
17 Exhibit US-645   3/1/11 Witness List        145
   Exhibit US-646   3/1/11 Select Committee    159
18                  Hearing transcript
                    (Vol. 2 of 2)
19 Exhibit US-647   9/22/11 Email to John Sepehri 182
                    from Meredyth Fowler
20 Exhibit US-648   6/14/11 Email to Andrew     185
                    Bilford, et al from Ashley
21                  Kaden
   Exhibit US-649   9/12/11 Email chain between 187
22                  Ashley Kaden and Andrew
                    Bilford
23 Exhibit US-650     March 2011 Email chain    191
24 Exhibit RODRIGUEZ-36 3/23/11 House Floor Debate 170
                    Transcript (TX00211181-281)
25                  (previously marked)

Meredyth Fowler                                          June 8, 2012

## 29

1    Q.   Do you ever draft legislation?
2    A.   No.
3    Q.   Do you help other people draft legislation?
4    A.   No.
5    Q.   Just as a procedural matter, can the speaker --
6    like among the House rules, can the speaker introduce
7    amendments to a bill?
8         MR. SWEETEN:  You are just asking as a
9    general matter --
10        MS. BERKOWER:  As a general matter --
11        MR. SWEETEN:  -- of parliamentary
12   procedure.
13        MS. BERKOWER:  Exactly.
14        MR. SWEETEN:  She can answer the question.
15   A.   No.
16   Q.   Can he introduce legislation?
17   A.   As a general matter, my understanding is no.
18   Q.   Is there any circumstance in which he could --
19   like, I guess -- and just to be clear, I'm trying to
20   understand if there is a distinction when he's serving
21   as a representative of his district versus as the
22   speaker.  Can he introduce legislation at all if he's
23   not sitting as the speaker presiding?
24   A.   My understanding of the House rules is no, he
25   does not introduce or carry legislation.

## 30

1    Q.   Because he's also the speaker?
2    A.   That's my understanding.
3    Q.   And does the same -- the same understanding
4    applies to amendments?
5    A.   Yes.
6    Q.   Have you ever drafted amendments to a bill?
7    A.   Yes.
8    Q.   So do you work with other legislators to do
9    that?
10   A.   Yes.
11   Q.   Does the speaker just as a matter of procedure,
12   is he allowed to vote on amendments?
13   A.   My understanding is no.
14   Q.   What House district does Speaker Straus
15   represent?
16   A.   121.
17   Q.   Do you know what the demographics of that
18   district are?
19   A.   I do not.
20   Q.   Where is the district located generally?
21   A.   Generally it's in San Antonio.
22   Q.   And I think you sort of got into this a little
23   bit before, but how many staff does the speaker have,
24   just a rough estimate of the number?
25   A.   I think a rough estimate would be around 15.

## 31

1    Q.   And, generally, are people grouped into
2    different areas of responsibility?
3    A.   Yes.
4    Q.   What -- What are those areas?
5    A.   We have communication staff and policy staff.
6    Q.   Can you name the members of the policy staff?
7    A.   Yes.
8    Q.   Who are they?
9    A.   Jesse Ancira, Andrew Blifford, Ashley Kaden,
10   Jennifer Deegan, Zeke Reyna, John Schnautz, Kevin
11   Robnett, Andrea Sheridan, Allison Winney.
12   Q.   And how are people assigned to different
13   issues?  You said you were assigned to certain
14   committees.  What is the division of work in the office?
15        MR. SWEETEN:  If you are asking about
16   how -- the process by which bills are analyzed or
17   legislation is analyzed, she's not going to answer that
18   question.  If they are subject matter areas and it's a
19   general office description, you can answer it that way.
20        MS. BERKOWER:  That's what I was asking,
21   the latter.
22   A.   Can you repeat the question?
23        MS. BERKOWER:  Sure.  I guess I'm just
24   curious how work is divided in your office.  Is that an
25   acceptable question, Patrick?

## 32

1         MR. SWEETEN:  I mean, again, general
2    subject matter or general division of the facts of how
3    the office is organized, but as long as it doesn't
4    reveal legislatively privileged information which would
5    be about how legislation is analyzed, et cetera.
6    A.   Generally speaking, it's divided, I guess, by
7    issue.
8    Q.   Who works on -- Who worked on voter ID in the
9    office?
10        MR. SWEETEN:  You can answer the question
11   as phrased as to who worked on the issue.
12   A.   Anybody else?
13   Q.   Lisa Kaufman.
14   A.   Anybody else?
15   Q.   Denise Davis.
16   A.   Did Jesse Ancira work on the voter ID at all?
17   Q.   Not that I can recall.
18   A.   And to be clear, who is Jesse Ancira and what
19   is his title?
20   Q.   He is now chief of staff.
21   A.   What was he in 2011?
22   Q.   General counsel.
23   A.   Do you report to him ever?
24   Q.   Can you clarify report?
25   A.   Is he your supervisor?

## 33

1    A.   In a sense, yes.
2    Q.   And going back just a step or two, the location
3  of District 121, is the district located primarily
4  within the city or outside the City of San Antonio?
5    A.   I don't know.
6    Q.   Do you ever work on issues that are specific to
7  District 121?
8    A.   I don't recall ever working on that specific
9  issue related to the district.
10   Q.   Are there people in your office who do that?
11   A.   I don't know.
12   Q.   And when you said that you have assisted others
13 with -- with legislative drafting, have you ever
14 provided substantive requests to legislative council?
15       MR. SWEETEN:  Do you mean to Texas
16 legislative council?
17       MS. BERKOWER:  Yes.
18       MR. SWEETEN:  Has she ever requested
19 something from TLC?  You can answer the question as
20 phrased.  I had to think about that a second.
21   A.   Not in my role in the speaker's office.
22   Q.   When you worked for other legislators?
23   A.   Yes.
24   Q.   Did the speaker recently campaign for office?
25   A.   Yes.

## 34

1    Q.   Was that for House District 121?
2    A.   Yes.
3    Q.   When was that election?
4    A.   Last month.
5    Q.   Would that be the May 29th election?
6    A.   Yes.
7    Q.   What was the -- What was the outcome of that
8  election?
9    A.   He won reelection.
10   Q.   Was he -- Did he have an opponent in the
11 primary?
12   A.   He did.
13   Q.   It was a primary, right?
14   A.   Yes.
15   Q.   Was photo ID an issue in his campaign?
16       MR. SWEETEN:  You can talk about matters
17 of public record, campaign speeches, public statements,
18 but don't reveal communications you've had with Speaker
19 Straus, anything that's not public record.
20   A.   I don't know.
21   Q.   So just to be clear, do you know if the speaker
22 ever publicly discussed voter ID as part of his
23 campaign?
24   A.   I don't know.
25   Q.   Can you explain the process by which a

## 35

1  representative becomes the speaker of the House?
2        MR. SWEETEN:  As a general matter, you can
3  answer the question about legislative procedure.
4    A.   He is voted into the position by the other
5  members of the House of Representatives.
6    Q.   And how does that vote just as a general
7  process matter under the House rules?  When and how does
8  that vote take place?
9    A.   If I recall correctly, I believe it's on the
10 first day of the legislative session, and if I recall
11 correctly, it's a secret ballot.
12   Q.   Are there any public speeches made in
13 connection with the election that the different
14 potential speakers make?
15       MR. SWEETEN:  Objection.  Compound.  But
16 you can answer.
17   A.   I don't recall.  I'm trying to think.  I don't
18 recall.
19   Q.   Do you remember who Speaker Straus's opponents
20 in 2011 for Speaker of the House were?
21       MR. SWEETEN:  You can answer.
22   A.   I remember Ken Paxton.
23   Q.   Do you remember any public statements that
24 either Mr. Paxton or Speaker Straus made about the vote
25 for speaker?

## 36

1    A.   I don't.
2    Q.   So do you remember any public statements that
3  Speaker Straus made in connection with his running for
4  Speaker of the House?
5    A.   I don't.
6    Q.   Did you have any involvement with the process
7  by which he became Speaker of the House?  It's a yes or
8  no question.
9        MR. SWEETEN:  You can answer that --
10   A.   No.
11       MR. SWEETEN:  -- as phrased.
12   Q.   When is the last time that you voted?
13   A.   Last month.
14   Q.   Was it in the May 29th election?
15   A.   It was early voting.
16   Q.   For the May 29th election?
17   A.   Yes.
18   Q.   Did you vote in person?
19   A.   Yes.
20   Q.   Do you usually vote in person?
21   A.   Yes.
22   Q.   How far is the -- is your polling place from
23 your house?
24   A.   Six miles.
25   Q.   Was that -- Is it the same distance for an

## 41

1   Q.  When was that convened?
2         MR. SWEETEN:  You can answer.
3   A.  In the 2011 session.
4   Q.  And how are special committees or select
5   committees formed as a general matter?
6         MR. SWEETEN:  I think you are asking for
7   process.
8         MS. BERKOWER:  Yes.
9         MR. SWEETEN:  That would be subject to the
10  legislative privilege.  In other words, she can answer
11  as a general matter who select -- who appoints a select
12  committee, but then if you are asking why --
13        MS. BERKOWER:  I'm not asking --
14        MR. SWEETEN:  I don't think she can reveal
15  legislative privilege.
16        MS. BERKOWER:  I'm not asking why.  I'm
17  asking the general process as a general matter pursuant
18  to House rules how are select committees run.  In if you
19  want, I can specify based on what's in the public record
20  and publicly available rules how are committees formed.
21        MR. SWEETEN:  You can answer that
22  question.
23  A.  I don't know.
24  Q.  Do you know if the speaker is tasked under any
25  rules with that responsibility?

## 42

1   A.  Yes.
2   Q.  Is he tasked under rules with that
3   responsibility?
4   A.  My understanding is yes.
5   Q.  And have you ever been involved with the
6   creation of a select committee?
7         MR. SWEETEN:  You can answer yes or no, if
8   you've ever -- Do you mean has she had discussions or do
9   you mean --
10        MS. BERKOWER:  I just mean, has she ever
11  had any role in the creation of a select committee, just
12  as a yes or no question.
13        MR. SWEETEN:  You can answer yes or no.
14  A.  No.
15  Q.  You said that you have heard of the select
16  committee on to voter identification and voter fraud.
17  Was that -- Did that committee consider a photo ID bill
18  in 2011?
19        MR. SWEETEN:  You can answer.
20  A.  Yes.
21  Q.  Did it consider any other bills to your
22  knowledge?
23  A.  To my recollection, no.
24  Q.  Was it convened for only one legislative
25  session?

## 43

1   A.  I believe so.
2   Q.  Do select committees ever convene for more than
3   one session?
4   A.  I don't know.
5   Q.  Do you know of any that have?
6   A.  I don't know.
7   Q.  Do you know of any other select committees that
8   considered only one bill?
9   A.  I don't --
10  Q.  Are you aware of any communications between
11  your office and other legislators concerning the
12  creation of the select committee?
13        MR. SWEETEN:  You can answer if you are
14  aware of any communications.
15  A.  I am not.
16  Q.  Are you aware of any communications between
17  your office and the lieutenant governor's office
18  concerning the creation of the select committee?
19  A.  I am not.
20  Q.  Are you aware of any communications between
21  your office and the governor's office concerning the
22  creation of the select committee?
23  A.  I am not.
24  Q.  Have you ever heard a reference to the select
25  committee as a "fast track committee"?

## 44

1   A.  No.
2         (Exhibit 641 marked.)
3   Q.  So I have what will be marked as Exhibit 641.
4   Have you seen this document before?
5   A.  It does not look familiar to me.
6   Q.  What is it -- What does did appear to be?
7   A.  To me it appears to be a press release.
8   Q.  Is it from Speaker Straus's office?
9   A.  I don't know.
10  Q.  Okay.  If you look to the bottom, there's a web
11  page where this was printed from.  Do you see that?
12  A.  M-hm.  Yes.
13  Q.  Based on the website address, where does it
14  appear that this press release came from?
15  A.  The website for the Texas House of
16  Representatives.
17  Q.  And does -- the press release at the top of the
18  text, it seems to identify it as coming from Speaker
19  Straus?
20  A.  Yes.
21  Q.  What is the date on the press release?
22  A.  February 9th, 2011.
23  Q.  And turning your attention to -- There's a
24  break in the middle of the page.  Do you see that?
25  A.  Yes.

## 45

1   Q.   Two lines up from the break, do you see what
2   that says?
3   A.   Yes.
4   Q.   What does it say?
5   A.   "The fast track select committee on voter
6   identification and voter fraud."
7   Q.   And what does this press release seem to do as
8   a general matter based on the title and -- I should have
9   said you can read the whole thing if you'd like.   Take a
10  moment since you are not familiar with it.
11  A.   You asked what it appears to do?
12  Q.   Yes.
13       MR. SWEETEN:   You can testify about the
14  document that she's put in front of you, but don't -- as
15  you are doing so, do not reveal any sort of motivations
16  of the legislature with respect to this press release.
17  She can ask you about the document.   As long as you are
18  not revealing privilege, you can answer.
19  A.   Okay.   It appears to announce a list of
20  committees to the public.
21  Q.   For the 2011 legislative session?
22  A.   Yes.
23  Q.   And the select committee on voter
24  identification and voter fraud is listed.   I think it's
25  where we just read from.   It's on the first page before

## 46

1   the break.
2       MR. SWEETEN:   I think it's also here on
3   the second page.
4       MS. BERKOWER:   I'm sorry.   It's No. 38 on
5   the second page too.
6   A.   Yes.
7   Q.   But on the first page, it's identified as a
8   fast track committee; is that accurate?
9   A.   I don't know if I would say identified.
10  Q.   Well, the press release says, "Key facts on
11  committees.   Fast track select committee on voter
12  identification and voter fraud."   Is that accurate?
13  A.   Yes.
14  Q.   So does the pretty release identify the select
15  committee on voter identification and voter fraud as a
16  fast track committee?
17  A.   According to the words on the page, yes.
18  Q.   Okay.   Does the press release identify any
19  other committees as fast track committees?   And take
20  your time to review it, if you'd like.
21  A.   I don't see any other statements to that effect
22  in the document.
23  Q.   Does this press release seem to identify all of
24  the committees that were announced for the 2011
25  legislative session?

## 47

1   A.   Yes.
2   Q.   And in your -- in your memory, can you think of
3   any other committees that you've heard identified as
4   fast track committees in the time you've worked in the
5   legislature?
6       MR. SWEETEN:   In a public setting such as
7   this?
8       MS. BERKOWER:   Yes.
9       MR. SWEETEN:   You can answer.
10  A.   I don't recall.
11  Q.   Okay.   Do you remember any other bills
12  submitted during the 82nd legislature that addressed
13  mail-in voter fraud?
14  A.   I know there were some pieces of legislation I
15  don't recall the bill numbers.
16  Q.   Do you remember what committee they were
17  referred to?
18  A.   I believe House committee on elections.
19  Q.   So they were not referred to the select
20  committee?
21  A.   Not that I recall, but I could be wrong.
22  Q.   I think though we -- you said before that the
23  select committee only considered one bill.   Is that
24  accurate?
25  A.   Only considered in public hearing, one bill,

## 48

1   yes.   To my knowledge, yes.
2   Q.   Do you remember if more than one bill was
3   actually referred to the select committee as well?
4   A.   I think there were more than one referred, but
5   I can't recall specifically.
6   Q.   All right.   I have what's going to be marked --
7   This actually has been used a number of times, but maybe
8   we'll mark it with a new number anyway or 431.   Do you
9   know what this is?
10  A.   Yes.
11  Q.   What is this?
12  A.   It looks like it is a printout from the
13  committee website showing specific legislation referred
14  to that committee.
15  Q.   And how many bills are referred to that
16  committee?
17  A.   From this document, one.
18  Q.   And are we talking about the select committee
19  on voter identification, voter fraud?
20  A.   According to this document, yes.
21  Q.   Do you know who decides what bills are referred
22  to what committee?
23  A.   To my knowledge, it is the parliamentarian, the
24  House parliamentarian.
25  Q.   Are there official criteria by which she

Meredyth Fowler                                     June 8, 2012

## 49

1  decides where things go?
2     A.  I don't know.
3     Q.  Are you familiar with the Federal Voting Rights
4  Act?
5     A.  I'm aware there is a Federal Voting Rights Act.
6     Q.  What is your understanding of the Federal
7  Voting Rights Act?
8     A.  My understanding is that it exists.
9     Q.  Okay.  Do you believe that compliance with the
10 Federal Voting Rights Act is an important consideration
11 for the legislature?
12          MR. SWEETEN:  You are asking for her
13 mental thoughts, impressions.  I think that would be
14 subject to the legislative privilege as to whether she
15 believed it's important, so I'm going to instruct you
16 not to answer the question.
17    Q.  Do you know if the legislature considers the
18 Federal Voting Rights Act when it makes law?
19          MR. SWEETEN:  Same instruction.  You can
20 refer to matters of the public record in answering the
21 question, but do not reveal thought processes, mental
22 impressions, opinions regarding legislation.
23    A.  I'd have to look at the public record.
24    Q.  Based on the public record, do you remember any
25 discussion about the Federal Voting Rights Acts'

## 50

1  requirements?
2     A.  Not specifically.  I believe that the Federal
3  Voting Rights Act was discussed in the public record.  I
4  don't recall specifics.
5     Q.  And I think I asked you as a general matter if
6  you remembered any public discussion about the Federal
7  Voting Rights Act and it seems that you do.  So what --
8  in connection with what bill do you remember public
9  discussion of the Federal Voting Rights Act?
10    A.  About Senate Bill 14.
11    Q.  Do you remember a public discussion of the
12 Federal Voting Rights Act with respect to any other
13 election related bills?
14    A.  Senate Bill 362 in 2009, and I think that's all
15 I can think of.
16    Q.  Okay.  Have you ever given or received any
17 legal advice concerning the Federal Voting Rights Act?
18          MR. SWEETEN:  Don't reveal matters of
19 privilege, but in answering the question, don't give any
20 substance.  She's asking if you've given legal advice.
21 You can answer that yes or no.
22    A.  Can you clarify what you mean by legal advice?
23    Q.  Well, I guess I actually asked sort of a
24 two-part question, and Patrick's right, it is a yes or
25 no question, so I'll break it down and make it clear.

## 51

1  Have you ever given any legal advice concerning the
2  Federal Voting Rights Act as part of your job?
3     A.  Yes.
4     Q.  Have you ever given any policy advice
5  concerning the Federal Voting Rights Act as part of your
6  job?
7     A.  Yes.
8     Q.  And I guess I should have asked you this
9  before, but as a general matter without revealing any
10 specific information you have communicated to your boss,
11 how do you distinguish between legal and policy rights?
12    A.  That's a tough one.  I'm trying to think of a
13 way to describe it.  I guess the -- I don't really know
14 how to describe it.  It's rare, I think, for -- in my
15 mind to give, I guess, legal advice.  I give more policy
16 advice than discussing the effect legislation would have
17 on -- on current situations, current groups.
18          MR. SWEETEN:  If you can't answer without
19 giving the substance of any advice, then don't answer,
20 but if you can answer as a general matter what in your
21 mind is the distinction between policy and --
22          THE WITNESS:  General matter.  I don't
23 know.
24          MR. SWEETEN:  Okay.
25    A.  I don't know.

## 52

1     Q.  Would you categorize -- Would you say you give
2  more than policy advice than legal advice in your mind?
3     A.  Yes.
4     Q.  What's the division roughly percentage-wise?
5     A.  Roughly I would probably say 95 percent policy.
6     Q.  Are you familiar with a Federal law called The
7  Help America Vote Act?
8     A.  Yes, I know it exists.
9     Q.  Do you know any of its terms?
10    A.  I don't recall any specifics.
11    Q.  Do you know if HAVA has identification
12 requirements for voter registration?
13    A.  I don't know.
14    Q.  Were you aware of a Supreme Court decision in
15 2008 in -- concerning the Indiana Voter Identification
16 law called Crawford versus Marion County Board of
17 Elections?
18          MR. SWEETEN:  In answering the question,
19 if it would reveal your analysis, your process in
20 evaluating legislation, do not reveal that.  That would
21 be subject to the legislative privilege including mental
22 thoughts, mental impressions, opinions, motivation about
23 recommendation.  So if you reveal that, then don't
24 answer the question as posed.
25    Q.  I think I just asked a yes or no question.  And

Meredyth Fowler                                          June 8, 2012

---

## 57

1    A.  No.
2    Q.  Do you know people in the Texas legislature or
3  their staff who have?
4    A.  Not specifically.
5    Q.  Has your office ever received any documents
6  from ALEC related to voter ID?
7    A.  Not that I recall.
8    Q.  Did ALEC ever you any technical assistance on
9  voter ID legislation?
10   A.  No.
11   Q.  Are you familiar with the national conference
12  of state legislators?
13   A.  Yes.
14   Q.  Are you a member of that?
15   A.  No.
16   Q.  Have you ever attended any of their meetings?
17   A.  Yes.
18   Q.  When was that?
19   A.  In 2009, if I recall correctly, and 2011, if I
20  recall correctly.
21   Q.  Did any of the meetings that you attended
22  address voter ID issues?
23   A.  I don't recall.
24   Q.  Are there any other groups that focus on policy
25  advice or assistance to legislators that you belong to?

---

## 58

1    A.  No.
2    Q.  Do you know what the current system is under
3  state law for determining how to verify the identity of
4  a voter?
5        MR. SWEETEN:  You can answer as to your
6  understanding of current law.
7    A.  To identify -- Can you repeat it?  I'm sorry.
8    Q.  Sure.  What is the current system under Texas
9  law for determining the identity of a voter?
10   A.  Under current law my understanding is a
11  certain -- they can bring certain documents to the
12  polling place with them.
13   Q.  Do you know what those documents are?
14   A.  Off the top of my head, a voter registration
15  card, a utility bill, a phone bill, a bank statement, a
16  photo ID and that's all I can think of.
17   Q.  So -- And correct me if I'm wrong.  In your
18  understanding of current law is a voter can show a voter
19  registration card or if they don't have the voter
20  registration card, there are a variety of things they
21  could show, some of which you just listed.
22   A.  That's my understanding.
23   Q.  Upon registering, do you know if a county mails
24  a voter registration card to the voter?
25   A.  Yes, that's my understanding.

---

## 59

1    Q.  And under current law, voters are required to
2  obtain a photo ID; is that correct?
3    A.  Yes.
4    Q.  So if a voter lost her voter registration card,
5  she could present ID from a wide-range of IDs like the
6  list you just mentioned?
7    A.  That's my understanding.
8    Q.  And some of those are non-photo ID?
9    A.  Yes.
10   Q.  And the voter could still vote a regular
11  ballot; is that correct?
12   A.  That's my understanding.
13   Q.  Do you know of any evidence in the public
14  record that establishes that the current system for
15  verifying an identity of a voter is not effective?
16       MR. SWEETEN:  I'm going to object to the
17  question.  It calls for matters of legislative
18  privilege.  Don't reveal your thoughts, mental
19  impressions or analysis about a bill.  I think when you
20  are asking her the question, you are asking her to weigh
21  the evidence that you heard --
22       MS. BERKOWER:  Wait.  Patrick, I'm sorry
23  to interrupt you.  If the she can read back the
24  question, I started the question with as part of the
25  public record.

---

## 60

1        MR. SWEETEN:  Understand.  I heard a lot
2  of that yesterday, a lot of prefaces with the public
3  record, but what we can't do is -- She can refer to
4  matters of the public record, but what she won't do is
5  go to the matters of the public record and select an
6  analysis and give a qualitative judgment about what was
7  in the record.  If you want to ask her if something
8  exists, if someone said something the fact of the
9  communication, she can testify, but there won't be any
10  analysis of what was said on the public record, and I
11  think your question did have an analysis portion.
12       MS. BERKOWER:  I think I asked or I
13  intended to ask -- and we could have the court reporter
14  read back the question, but I think I asked just as a
15  matter of public record was there evidence presented
16  that the current system of identifying voters at the
17  polls is ineffective.
18       MR. SWEETEN:  You can testify as to
19  matters of the public record.  I mean, don't weigh the
20  evidence, but you can say if there was testimony about
21  an issue.  Is that clear enough?  I mean, is that fair
22  enough?
23       MS. BERKOWER:  That's fine.  I think that
24  was the call of this particular question.
25   A.  Yes, there was testimony on that issue.

Meredyth Fowler                                          June 8, 2012

## 61

1    Q.   What was that testimony?
2    A.   I don't specifically recall.
3    Q.   Do you remember who provided that testimony?
4    A.   Not specifically.
5    Q.   What was the purpose of -- of requiring a photo
6    ID given the law already in place?
7         MR. SWEETEN:  She can talk about -- I'll
8    let her testify as to her understanding of the general
9    purpose of a bill, but not -- you're having her weigh
10   why this when this is in place, and that is a little
11   beyond -- that would be subject to the legislative
12   privilege.  So with that instruction, I would instruct
13   her not to answer that question as phrased, but I will
14   work with you to try to get at what you're asking.
15   A.   Can you repeat the question?
16   Q.   What was the general purpose of photo ID in
17   Texas?
18   A.   To deter voter fraud.
19   Q.   So in 2005, just because I didn't -- I'm not
20   entirely sure of which person you worked for, can you
21   just tell me which person you worked for in the
22   legislature in 2005?
23   A.   Sure.  Peggy Hamric.
24   Q.   And she's a representative?
25   A.   Yes.  No longer, but she was then.

## 62

1    Q.   Where did she -- What House district did she
2    represent?
3    A.   I don't recall.  She was from Houston.
4    Q.   So like around Houston area?
5    A.   M-hm.  Sorry.  Yes.
6    Q.   Are you familiar with the voter ID bill that
7    was introduced in the House in 2005?
8    A.   I am not.
9    Q.   Did you work on election related issues for
10   Representative Hamric?
11   A.   Not that I recall.
12        MS. BERKOWER:  Okay.  Do you want to take
13   a break?  We've been going for a little while.
14        MR. SWEETEN:  Sure.
15        MS. BERKOWER:  Like 5 minutes?
16        MR. SWEETEN:  Yeah, that sounds good.
17        (Recess from 11:10 a.m. to 11:25 a.m.)
18   Q.   (BY MS. BERKOWER)  So you said that you were
19   not familiar with House Bill 1706 from the 2005
20   legislative session; is that accurate?
21   A.   Yes.
22   Q.   Do you remember if -- even if you didn't work
23   on it yourself, do you remember if you were present
24   during the vote or any of the floor debate on House Bill
25   1706?

## 63

1    A.   I don't recall.
2    Q.   Do you remember hearing any public statements
3    about House Bill 1706?
4    A.   I don't.
5    Q.   Do you have any memories at all connected to
6    House Bill 1706?
7    A.   I have none.
8    Q.   Okay.  Now, in the 2007 legislature, who did
9    you work for?
10   A.   2007?  I believe it was Senator Eltife.
11   Q.   Senator Eltife.  And for your work for Senator
12   Eltife, did you work on any election related bills?
13   A.   I don't recall working on any election related
14   bills.
15   Q.   Was he on -- on a committee that addressed
16   election related bills?
17   A.   Not that I recall.
18   Q.   So did you have any involvement with any
19   election related bills when you worked for him?
20   A.   Not that I recall.
21   Q.   Do you remember hearing -- Do you remember
22   hearing about House Bill 218 in that legislative
23   session?
24   A.   Not that I recall.
25   Q.   Do you know -- And you were present on the

## 64

1    House Bill when the bill -- Sorry.  You were in the
2    Senate then.  Let me think about this for a second.
3         Was Senator Eltife on the state affairs
4    committee by any chance?
5    A.   I don't remember.
6    Q.   Do you remember being present for any hearing
7    in the -- in the Senate state affairs committee on House
8    Bill 218?
9    A.   I don't.
10   Q.   Do you remember any public statements made
11   about House Bill 218?
12   A.   I don't.
13   Q.   As a general matter, were you following voter
14   ID legislation around that time?
15   A.   I don't recall following any voter ID
16   legislation.
17   Q.   When do you first remember starting to follow
18   voter ID legislation?
19        MR. SWEETEN:  If answering it would reveal
20   your thoughts and mental processes, don't answer the
21   question.  But if -- I think the question is vague too
22   as phrased, so I'm going to object to the question
23   itself, but also instruct you not to reveal matters of
24   privilege in answering the question.  You can answer if
25   you want.

Meredyth Fowler                                    June 8, 2012

---

## 65

1    A.   When do I first remember following the issue?
2    February 2009.
3    Q.   Okay.  So is it safe to say you have no memory
4    at all of House Bill 218?
5    A.   It's safe to say that.
6    Q.   Now, I guess one thing I'm curious to know is
7    when you started working on -- for Speaker Straus and
8    you were staffed on the elections committee, did you
9    ever look at prior legislation or familiarize yourself
10   with prior legislation on the general topics for the
11   committees you were staffed on to update yourself on
12   those issues?
13        MR. SWEETEN:  Did she as a general matter
14   review prior bills on committees that she worked on?
15        MS. BERKOWER:  Yes.
16        MR. SWEETEN:  Objection to the question as
17   compound.  You can answer to the extent you are able.
18   A.   Generally speaking, sometimes.
19   Q.   Do you remember ever reviewing House Bill 218
20   or House Bill 1706 for that reason?
21   A.   I do not recall reviewing either of those
22   pieces of legislation.
23   Q.   Okay.  So bringing us up to 2009, are you aware
24   of a photographic voter identification bill that was
25   introduced in the 81st Texas legislature in 2009?

## 66

1         MR. SWEETEN:  You can testify about your
2    awareness of a bill filed.
3    A.   Yes, I was aware.
4    Q.   Who introduced that bill?
5    A.   I don't recall.
6    Q.   Do you remember any public statements about why
7    the bill was introduced?
8    A.   Yes.
9    Q.   What are those statements that you recall?
10   A.   I don't recall specifics, but I know the
11   reasons for introducing the legislation were discussed.
12   Q.   Publicly?
13   A.   Publicly, yes.
14   Q.   And what are the reasons that you remember
15   being publicly discussed?
16   A.   Deterrence of voter fraud.
17   Q.   Was there a particular type of voter fraud that
18   was specified in those public statements?
19        MR. SWEETEN:  She's asking about public
20   statements, so matters of the public record you can
21   answer.
22   A.   Yes.  I recall statements being made about
23   deterring in-person voter fraud.
24   Q.   Do you recall statements about mail-in voter
25   fraud around that -- in connection with that bill?

## 67

1    A.   I do recall discussions.  I don't recall
2    specifics.
3    Q.   Do you remember any public statements
4    concerning noncitizen voting around that time?
5    A.   I recall public statements being made, but I
6    don't remember specifics.
7    Q.   Public statements about noncitizen voting?
8    A.   Yes.
9    Q.   Do you remember who made those statements?
10   A.   I don't recall.
11   Q.   Do you remember where you heard those public
12   statements?
13   A.   In hearings -- In committee hearings.
14   Q.   Were those public statements about noncitizens
15   voting made by our legislators?
16   A.   Yes.
17   Q.   Do you remember which legislators made those
18   public statements?
19   A.   Not specifically.
20   Q.   Do you remember which committee hearing you
21   heard those public statements?
22   A.   The hearing on Senate Bill 362 and on -- and in
23   the hearing on Senate Bill 14.
24   Q.   Okay.  Well, I think I'm just now asking on
25   Senate Bill 362 in 2009.

## 68

1    A.   Okay.
2    Q.   You said there were public statements by
3    legislators at that time concerning noncitizen voting;
4    is that accurate?
5    A.   Yes.
6    Q.   And I think because -- I'm not sure that you
7    were delineating between 2009 and 2011 when I asked you
8    this before.  I'll ask you again.
9    A.   Sorry.
10   Q.   It's okay.  In 2009, do you remember which
11   legislators made public statements about noncitizen
12   voting?
13   A.   I don't recall specifically who did.
14   Q.   But it was during the committee hearings on
15   362?
16   A.   To my recollection, yes.
17   Q.   Okay.  And did you attend those hearings
18   yourself?
19   A.   Yes.
20   Q.   Did you determine all of the hearings on 362?
21   A.   I attended the House hearings and most of the
22   hearings on the Senate floor.
23   Q.   Do you usually follow legislation in the Senate
24   for -- when you think -- Well, let me start that over.
25        Under what circumstances do you follow

Meredyth Fowler                                    June 8, 2012

## 81

1    document confirming birth that is admissible in a court
2    of law and establishes the person's identity?
3        A.  Yes.
4        Q.  Does it include US citizenship papers issued to
5    the person?
6        A.  Yes.
7        Q.  And an original or certified copy of the
8    person's marriage license or divorce decree?
9        A.  Yes.
10       Q.  Court records of the person's adoption, name
11   change or sex change are also allowed; is that correct?
12       A.  Yes.
13       Q.  An identification card issued to the person by
14   a government entity of this state, meaning Texas, or the
15   United States for the purpose of obtaining public
16   benefits including veteran's benefits, Medicaid or
17   Medicare?
18       A.  Yes.
19       Q.  A temporary driving permit issued to the person
20   by DPS?
21       A.  Yes.
22       Q.  A license issued to the person by the Federal
23   Aviation Administration or other authorized agency of
24   the US?
25       A.  Yes.

## 82

1        Q.  A library card containing the person's name
2    issued by a public library in Texas?
3        A.  Yes.
4        Q.  Or a hunting or fishing license issued by the
5    Texas -- I guess it doesn't specify the Texas Department
6    of Parks and Wildlife, but by the Parks and Wildlife
7    Department?
8        A.  Yes.
9        Q.  Okay.  So based on what we went through, it
10   looks like there are approximately 19 categories of
11   known ID that a voter could use as proof of
12   identification; is that accurate?
13       A.  According to this document, yes.
14       Q.  Do you know if a student ID would be permitted
15   under this bill?  And I guess I can direct that question
16   specifically to Line 20 on Page 6 that allows for a
17   photo ID issued by an agency, institution or political
18   subdivision of the state.
19       A.  It doesn't specifically a school ID.
20       Q.  Are some of the universities in Texas
21   institutions of the state?
22       A.  I guess it depends on the definition of
23   institution.
24       Q.  It could -- It could be considered an
25   institution of the state?

## 83

1            MR. SWEETEN:  Don't guess or speculate
2    when answering the question.
3        A.  I don't know.
4        Q.  What state entities would you consider not to
5    be institutions of the state?  Are there any?
6            MR. SWEETEN:  Aren't you kind of asking
7    for her personal impressions now of what the bill is
8    intending --
9            MS. BERKOWER:  I'll actually withdraw that
10   question.
11       Q.  (BY MS. BERKOWER)  You said you attended college
12   and law school here in Texas; is that correct?
13       A.  Yes.
14       Q.  Did you go to a public school or a private
15   college for law school?
16       A.  I went to a public college and a private law
17   school.
18       Q.  And I forget.  What was the name of your public
19   college?
20       A.  It was Southwest Texas.  It's now changed to
21   Texas State.
22       Q.  Texas State?  I guess in your view and not
23   necessarily drawing on your experience as a staff member
24   for Speaker Straus, but your experience as a student,
25   was that -- was Texas State an institution of the state?

## 84

1        A.  It depends on the definition of institution.
2        Q.  Did you get something called in state tuition
3    for attending there?
4        A.  Yes.
5        Q.  Did you have a photo ID issued by that college?
6        A.  Yes.
7        Q.  What was the general legislative purpose of
8    SB362?
9        A.  In general, to deter voter fraud.
10       Q.  Did the legislature hear any public testimony
11   about voter fraud in connection with its consideration
12   of SB362?
13           MR. SWEETEN:  You can testify about
14   matters of the public record.
15       A.  Did they -- Can you repeat that?  Sorry.
16       Q.  Do you mind reading -- I'll do my best to
17   recreate it.  As a matter of public record, did the
18   legislature hear testimony about voter fraud?
19           MR. SWEETEN:  You can testify about
20   matters of the public record.
21       A.  Yes.
22       Q.  And this is in connection with SB362?
23       A.  Yes.
24       Q.  What was that public evidence?
25           MR. SWEETEN:  You can testify about what

## 85

1  was testified to, what was said at a public hearing.
2      A.   I recall hearing testimony.  I don't remember
3  exactly who said it, but there was testimony about
4  in-person voter fraud.
5      Q.   What was the general -- Like do you remember
6  generally what kind of testimony it was, who came, where
7  they were from?  Was it a law enforcement official?
8      A.   I do recall I think it was just a citizen who
9  was a -- volunteered to be a poll watcher who made a
10 statement that they saw one specific person vote more
11 than once and that person had certain tatoos that made
12 them easily recognizable.
13     Q.   Do you know if that incident was ever referred
14 to law enforcement authorities?
15     A.   I don't know.
16     Q.   Do you know if that individual who volunteered
17 as a poll watcher and related that incident was
18 affiliated with any sort of interest group?
19     A.   I don't know.
20     Q.   Do you know if he was affiliated with the King
21 Street Patriots?
22     A.   I don't know.
23     Q.   What other evidence concerning voter fraud was
24 presented on the public record in connection with SB362?
25     A.   I recall -- Again, I don't know the specific

## 86

1  person, but I recall testimony regarding people from
2  across the border -- Texas-Mexico border voting -- being
3  handed a voter registration card that didn't belong to
4  them to go in and vote.
5      Q.   Do you remember who presented that evidence?
6      A.   I don't recall the specific person.
7      Q.   Do you know if that incident as related to the
8  legislature was ever referred to law enforcement
9  authorities?
10     A.   I don't know.
11     Q.   Do you remember if the person who presented
12 that evidence advocated for voter ID as a means of
13 deterring noncitizen voting?
14     A.   I don't recall, no.
15     Q.   Do you remember if any evidence was presented
16 in the public record indicating that SB362 would solve
17 problems relating to in-person voting fraud?
18     A.   I do recall a discussion about that topic.  I
19 don't recall specifically who said it.
20     Q.   Do you remember how -- Do you remember if there
21 was testimony and, if so, what that testimony was about
22 how specifically 362 would solve the problem?
23     A.   I don't recall specifically.
24     Q.   Do you recall whether there was a discussion in
25 the public record about the specific types of IDs that

## 87

1  would be appropriate in a voter identification bill to
2  solve in-person voting -- in-person voter fraud?  Sorry.
3      A.   Yes, that was discussed.
4      Q.   How about in-person voting -- have a problem
5  with in-person voting?  You said you don't remember it
6  was discussed?
7      A.   I do remember it being discussed.
8      Q.   What was said about it on the public record?
9      A.   I don't recall specifics.  I remember that
10 topic being discussed.
11     Q.   Do you remember a debate over -- as part of the
12 public record, do you remember any debate over whether
13 certain types of identification should or shouldn't be
14 included in the bill?
15     A.   Yes.
16     Q.   What was that debate?
17          MR. SWEETEN:  Just matters of the public
18 record.
19     A.   I remember in general just different
20 identification being discussed, and I don't remember
21 specifics.
22     Q.   Do you remember whether it was discussed on the
23 public record as to whether the terms of this particular
24 bill, SB362, would solve problems related to noncitizens
25 voting?

## 88

1      A.   I don't recall.
2      Q.   Do you remember if Speaker Straus voted for or
3  against SB362?
4      A.   As a general matter, the speaker doesn't vote
5  on legislation.
6      Q.   Oh, why not?  Or, I mean, I don't mean to -- I
7  guess I can ask that --
8          MR. SWEETEN:  As a general matter?
9      Q.   -- as a general matter.
10     A.   I don't know if it's part of the House rules or
11 if it's just a policy, but my understanding in the Texas
12 House is that most speakers generally do not vote on
13 legislation.
14     Q.   Are there exceptions to that?
15     A.   Under the House rules, I think if there's a tie
16 in the votes, I think the speaker can vote.  I don't
17 know that he's required to.
18     Q.   Do you remember the speaker voting in the
19 incident of a tie in your time working for him?
20     A.   I don't.
21     Q.   Is the House rule concerning the speaker's
22 ability to vote, is that -- does that mean he actually
23 cannot vote unless there's a tie?
24     A.   I don't know if it's a House rule or if it's
25 just sort of a policy that different speakers have had.

Meredyth Fowler                                              June 8, 2012

---

### 89

1    Q.  Is it Speaker Straus's policy not to vote
2    unless there's a tie?
3         MR. SWEETEN:  Objection.  Calls for
4    speculation.
5         Q.  If you know.
6         A.  I don't know.
7         Q.  So you said that you did follow SB362 when
8    the -- it was in the committee as a whole in the Senate;
9    is that correct?
10        A.  Yes.
11        Q.  Did you attend or listen to any of the debates?
12        A.  Yes.
13        Q.  Did you have any communications with senators
14   about SB362 while the bill was in the Senate without
15   revealing the content of what you discussed?
16        A.  Not that I recall.
17        Q.  Did you have any communications with Senate
18   staff about SB362 while the bill was in the Senate?
19        A.  Yes.
20        Q.  Who did you communicate with?
21        A.  Brian Hebert.  I think that's all I can think
22   of.  He's the only one that I'm recalling right now.
23        Q.  When did you call him?
24        A.  We talked in person on the Senate floor.
25        Q.  Are you allowed to be on the Senate floor?

---

### 90

1         A.  We are.  The speaker's office has a special
2    badge we have to wear to go over there.
3         Q.  Did you have any communications with Janice
4    McCoy about SB362 while the bill was in the Senate?
5         A.  I don't recall.  It's possible.
6         Q.  Did you have any communications with either
7    Mr. Hebert or Ms. McCoy even about SB362 before it was
8    considered by the committee as a whole?
9         A.  With Brian Hebert, yes.
10        Q.  When did you communicate with him about SB362
11   prior to its hearing in the committee as a whole?
12        A.  I don't know a specific date.  My
13   communications with him were ongoing throughout the
14   session.
15        Q.  Was it -- Did you communicate with him about
16   SB362 before it was filed?
17        A.  Not that I recall.
18        Q.  Did you communicate with Janice McCoy about
19   SB362 before it was filed?
20        A.  Not that I recall.
21        Q.  So you said you attended the committee of the
22   whole hearings.  Do you remember did you attend a
23   hearing that occurred around or on March 10, 2009?
24        A.  If that was the date of the committee of the
25   whole, then yes.

---

### 91

1         Q.  Do you remember if Senator Fraser, the bill's
2    sponsor, was asked questions during the hearing you
3    attended?
4         A.  Yes.
5         Q.  Do you remember hearing Senator Fraser ask
6    whether an analysis of the racial composition of voters
7    without a driver's license had been conducted?
8         MR. SWEETEN:  You can refer to matters of
9    the public record.
10        A.  I don't recall.
11        Q.  Do you know if any such analysis was conducted?
12        MR. SWEETEN:  Don't reveal -- Don't answer
13   that question.  That would reveal legislative privilege.
14   Instruct not to answer --
15        MS. BERKOWER:  Okay.
16        MR. SWEETEN:  -- if you know of analysis
17   conducted.
18        MS. BERKOWER:  Just asking her knowledge,
19   not the content of that analysis, if it actually was
20   conducted.  Not asking --
21        MR. SWEETEN:  Yeah.  I think that that
22   goes to her mental processes as to her knowledge of
23   analysis conducted, so I think that's subject to the
24   privilege.
25        Q.  (BY MS. BERKOWER) Okay.  Are you going to

---

### 92

1    follow his instruction?
2         A.  Yes.
3         Q.  So there's more as a general matter and without
4    connection to any legislation, but in your experience
5    working in the legislature, if a bill's sponsor has
6    asked about certain analysis or to conduct certain
7    analysis concerning his or her bill, does the bill
8    sponsor have an obligation to follow up to seek the
9    information?
10        MR. SWEETEN:  Don't answer the question.
11   It calls for speculation and it's irrelevant, and it
12   also could implicate the legislative privilege.
13        MS. BERKOWER:  Yeah.  I guess I'd rephrase
14   the question.  As a matter of legislative procedure or a
15   general matter of legislative process, if -- when bill
16   sponsors are asked to conduct analysis, do they
17   generally conduct that -- the analysis?  Is that an
18   acceptable question?
19        MR. SWEETEN:  I mean, I think that
20   question is compound.  You are asking -- I mean, what
21   possible relevance would it be to have her comment on
22   whether it's appropriate or whether somebody should
23   follow up on a question whether there's not even
24   specificity as to what the legislation is?
25        MS. BERKOWER:  She's worked for a number

Meredyth Fowler                                              June 8, 2012

## 93

1  of different legislators, so they've all sponsored
2  legislation, and I guess I'm asking for her view of the
3  session -- of a request from the floor to conduct
4  analysis about a bill and whether those requests are
5  generally taken seriously and followed up on or if
6  they're not.  I think she would know the answer to that.
7           MR. SWEETEN:  I think you are asking her
8  to reveal her mental impressions, opinions about the
9  legislative process, about legislation.  I mean, I think
10 the question -- and for the other reasons I've
11 expressed, so I object to the question.
12       Q.  (BY MS. BERKOWER) Okay.  I'll move on then.
13 I think this one -- and I know -- I just want to be clear.
14 I'm doing my best to keep these questions within the
15 boundaries of the court's order.
16           Do you know if the Department of Public
17 Safety ever reported to the legislature about the racial
18 analysis of voters who do not have a Texas driver's
19 license?  And I'm asking that because I think based on
20 the court's most recent order, if it doesn't specify
21 which legislator requested it or which it was reported
22 to, the fact of DPS's ability to transmit to the
23 legislature is not privileged.
24           MR. SWEETEN:  Risa, can you restate that
25 question?

## 94

1           MS. BERKOWER:  I will do my best to make
2  it clear.
3           MR. SWEETEN:  Can you tell me where in the
4  order it specifically says that?  Can we pull that out
5  because I want to make sure that my --
6           MS. BERKOWER:  It was this most recent
7  order.
8           MR. SWEETEN:  I've got it.
9           MS. BERKOWER:  Can we go off the record,
10 please?
11           (Recess from 12:05 p.m. to 12:10 p.m.)
12           MS. BERKOWER:  Okay.  So we had a
13 discussion off the record.  Patrick, do you want to
14 explain what you just said?
15           MR. SWEETEN:  Yes.  Risa and I had a very
16 civil discussion off the record involving the court's
17 order, Page 9, and along with Chief Justice Phillips, we
18 have reviewed this, and we were -- we were going to
19 allow the witness to answer this question, but we also
20 had an agreement that to the extent that there's a
21 misinterpretation of the order, that in her answering
22 this, there would not be any sort of waiver or argument
23 with respect to this question.  Is that our agreement?
24           MS. BERKOWER:  That is our agreement.
25           MR. SWEETEN:  Okay.

## 95

1       Q.  (BY MS. BERKOWER) Do you remember the question?
2       A.  Not really.
3       Q.  So I'm going to do my best to recreate it.
4  Okay.  Do you know if the Department of Public Safety
5  ever -- ever conducted an analysis of the racial
6  composition of voters who do not have a Texas driver's
7  license and presented that information to the
8  legislature without revealing who requested it or to
9  whom any specific individual the response was directed?
10      A.  I don't know.
11           MS. BERKOWER:  Okay.
12           MR. SWEETEN:  We're all doing what we're
13 supposed to do.
14           MS. BERKOWER:  All right.  We'll move on
15 then.  So the turning back to --
16           MR. PHILLIPS:  I'm glad I contributed.
17           MS. BERKOWER:  Only a group of lawyers
18 could spend that much time talking to come up with that.
19 Okay.
20      Q.  (BY MS. BERKOWER) So moving back to the House
21 in 2009 -- in April 2009, do you remember if the -- some
22 House members signed a pledge circulated by the
23 Republican Party of Texas concerning voter ID?
24      A.  I don't know.
25           (Exhibit 642 marked.)

## 96

1       Q.  Okay.  We'll mark this as, I guess, 642.  I
2  know it's been marked before, but I don't have the
3  number handy.  Do you know what this document is?
4       A.  It looks like it's a news article.
5       Q.  State press release.  Take a look at the first
6  line of the text and take a minute to review the
7  document.
8       A.  You asked if it was a press release?
9       Q.  Yes.
10      A.  It looks like it is.
11      Q.  Is it a -- Is it a press release from the
12 Republican Party of Texas?
13      A.  It appears to be -- It says Page 4 by the
14 Republican Party of Texas.
15      Q.  Does your review of this document refresh your
16 recollection as to whether a pledge was circulated by
17 the Republican Party of Texas concerning voter ID in
18 2009?
19      A.  No.
20      Q.  No?  Okay.  Well, turning your attention to the
21 middle of the page, now that you've read it, do you know
22 what it is -- just from reading it, do you understand
23 what you read?
24      A.  Yes.
25      Q.  And what do you understand it to be?

## 97

1    MR. SWEETEN:  She's asking for your
2  interpretation of this document.  To the extent that
3  would reveal any matter of legislative privilege, don't
4  answer the question, but if you can testify without
5  revealing that, you can.
6    A.  I understand it to be a press release paid for
7  by the Republican Party of Texas.
8    Q.  About what topic?
9    A.  About voter ID.
10    Q.  The Republican Caucus Members Pledge do Suppor
11  Strong Voter ID Bills.  Is that the title of the
12  document that I just read?
13    A.  That is the title of the document.
14    Q.  Does the document outline principles --
15  statement of principles on voter ID?
16    A.  According to the document, on the statement of
17  principles concerning voter ID legislation.
18    Q.  Are there more principles listed there?
19    A.  According to the document, yes.
20    Q.  Does one of these -- does the first principle
21  require a -- Does the first principle say, "Ensure a
22  valid voter identification is needed to vote"?
23    A.  Yes.
24    Q.  And the second says, "Take effect at the next
25  possible uniform election date"?

## 98

1    A.  Yes.
2    Q.  And the third says, "Be free of any
3  registration requirements such as same day voting
4  registration that dilutes the intent of the bill, which
5  is ensuring fair and accurate elections"?
6    A.  Yes.
7    Q.  And fourth involves "an increase in criminal
8  penalties;" is that correct?
9    A.  Yes.
10    Q.  Do you know if the speaker was asked to sign
11  this pledge by the Republican Party of Texas?
12    MR. SWEETEN:  Don't reveal any
13  communications that the speaker had with any specific
14  members.  If it would be something that does not involve
15  the member or legislative staff and not within the scope
16  of privilege, you can answer the question.
17    A.  I don't know.
18    MS. BERKOWER:  Okay.  And I think to be
19  clear, I asked about the party, not the other
20  legislators.
21    MR. SWEETEN:  There's overlap whether
22  there's party -- you know, if one of these guys is a
23  legislator who's also the head of the party, then I
24  think that's why I made the objection.
25    Q.  Okay.  We reviewed SB362 a little while ago.

## 99

1  Do you remember a review of that?
2    A.  Yes.
3    Q.  You testified that that bill allowed voters to
4  present non-photo ID; is that correct?
5    MR. SWEETEN:  I think she testified about
6  what the text of the bill said on 362.  Is that what
7  you are asking?
8    MS. BERKOWER:  Yes.
9    MR. SWEETEN:  You can't testify about your
10  impressions of what 362 means or its effect, but you can
11  testify about the text of the bill.
12    A.  The text of the bill allowed non-photo ID.
13    Q.  Is the safe to say that the text of 362 does
14  not match up with Item 1 in this pledge?
15    MR. SWEETEN:  Based upon the text of the
16  language of the bill, you can it -- answer the question,
17  but don't give a qualitative judgment as to your
18  opinions about your -- the bill.  So if you can't answer
19  without giving your opinions about it, which would be
20  subject to legislative privilege, my instruction to you
21  would be not to answer the question.
22    A.  I'm going to choose not to answer.
23    Q.  Okay.  I can ask it slightly differently.
24  SB362 permits non-photo ID; is that correct?
25    A.  Yes.

## 100

1    Q.  This pledge demands that only valid photo ID is
2  needed to vote, correct?
3    MR. SWEETEN:  You can testify about the
4  text of the document.
5    A.  The document says, "Ensure a valid photo
6  identification is needed to vote."
7    Q.  Did Speaker Straus ever come out publicly to
8  support SB362?
9    A.  Yes.
10    Q.  Did he in fact publicly support SB362?
11    MR. SWEETEN:  You can testify about public
12  statements that you have knowledge of.
13    A.  Yes.
14    Q.  Did he make any public statements in support of
15  SB362?
16    A.  I'm considering letters we wrote to
17  constituents as public statements.  Is that okay?
18    Q.  Sure.
19    A.  Because we did write -- we had constituents
20  that wrote in on the topic, and he wrote letters back in
21  support.
22    Q.  With regard to the constituent communications
23  your office received about SB362, did you receive
24  communications in support of expressing constituents'
25  support of the bill?

Meredyth Fowler                                                June 8, 2012

---

## 101

1       A.   Yes.
2       Q.   What did those constituents say?
3       A.   I don't recall specifics, but, generally, they
4   supported the concept of a -- of the legislation.
5       Q.   And I guess this is sort of just a basic
6   question.  Do you get constituent -- When you say
7   constituent mail, do you mean only communications from
8   people in House District 121 or people all over the
9   state?
10      A.   All over the state.
11      Q.   Were there any constituents who wrote to the
12  speaker who opposed SB362?
13      A.   I don't recall.
14      Q.   Do you remember any other public statements
15  such as to the media that Speaker Straus made in support
16  SB362?
17      A.   I don't specifically recall.
18      Q.   Do you remember if there was opposition on the
19  public record in the House against SB362?
20      A.   Yes.
21      Q.   Do you remember who opposed the bill on the
22  public record?
23      A.   On the public record, I recall NAACP, LULAC,
24  League of Women Voters, and I know there were individual
25  citizens that testified, but I don't know their names.

---

## 102

1       Q.   Do you remember what their reasons were for the
2   opposition on the public records?
3            MR. SWEETEN:  You can testify about the
4   express reasons on the public record.  Don't reveal
5   what -- I mean, what -- your interpretation of their
6   thoughts, mental impressions.  You can testify about
7   what was on the public record though.  I think that's
8   what she was asking.
9       A.   On the public record I recall statements that
10  voter fraud either doesn't exist or is not a problem, a
11  general dislike of the legislation.
12      Q.   Do you remember if MALDEF testified on the
13  public record in opposition to the bill?
14      A.   I don't recall.
15      Q.   Do you remember if there was any talk as part
16  of the public record on a compromise bill that year?
17      A.   I don't specifically remember.
18      Q.   Do you remember if Todd Smith presented an
19  alternative bill on the public record that he offered as
20  a compromise voter ID bill?
21      A.   I don't recall.
22      Q.   Do you remember if Todd Smith introduced a bill
23  that would have delayed implementation of the voter ID
24  for four years in order to conduct voter education?
25      A.   I don't specifically recall.

---

## 103

1       Q.   Do you remember anything about the bill that
2   Representative Smith introduced concerning voter ID?
3       A.   Specific?  I don't --
4       Q.   Do you remember anything generally about the
5   bill just as it was introduced as part of the public
6   record?
7       A.   No, I don't recall specifics.  I would be
8   guessing.
9       Q.   During this election -- Sorry.  During this
10  legislative session, you were Speaker Straus's liaison
11  to the election committee; is that accurate?
12      A.   Yes.
13      Q.   And you did --
14      A.   Sorry.  Are we still on 2009?
15      Q.   2009.
16      A.   Okay.  Cool.
17      Q.   And you said earlier you did have ongoing
18  communications with Representative Smith and his staff
19  throughout the 2009 legislative session?
20      A.   Yes.
21      Q.   Do you know if Speaker Straus ever publicly
22  came out in support or against Representative Smith's
23  bill?
24      A.   I don't recall.
25      Q.   As a matter of public record, do you know if

---

## 104

1   attempts to draft some sort of compromise on the
2   legislation that session were successful?
3            MR. SWEETEN:  Only if it's a matter of
4   public record can you answer that.
5       A.   I don't remember.
6       Q.   What ultimately happened to SB362 in the House?
7       A.   I don't think it was heard on the House floor.
8   Therefore, it died.
9       Q.   Did something called chubbing happen to Senate
10  Bill 362?
11           MR. SWEETEN:  You can testify as to
12  matters of public record, if you know.
13      A.   Yes.
14      Q.   What is that?
15           MR. SWEETEN:  If you can answer as a
16  matter of general understanding.
17           MS. BERKOWER:  That was the intent of my
18  question.
19      A.   It is a term given to extended debate on
20  legislation.
21      Q.   Is it a technique that some House members might
22  use to delay consideration of the bill?
23           MR. SWEETEN:  Just generally?  You can
24  answer as a general matter.
25      A.   Yes.

## 105

1  Q.  After the end of the is 2009 session -- Well,
2  before we get there, how did the 2009 session end as a
3  matter of public record?
4  A.  I guess the speaker gaveled out.  I don't know.
5  Q.  Would you like to gavel out now?
6  A.  Yes, please.
7  Q.  Okay.  What were the events leading up to his
8  gaveling out; do you remember?
9  MR. SWEETEN:  If it's a matter of public
10  record you can testify, you can.
11  A.  -- I don't remember.
12  Q.  After the -- After he gaveled out at the end of
13  the session, were the House rules changed to prevent
14  chubbing in the future?
15  MR. SWEETEN:  You are asking her about --
16  her opinion about why the House rules would have been
17  changed?  You can ask her if a specific bill was
18  passed -- If there was a specific House bill passed that
19  related to chubbing, I'll allow her to answer if she
20  knows.
21  Q.  Okay.  I can restate the question.  So after
22  the end of the session, and I think this is in line with
23  your objection, Patrick, was there a change in House
24  rules that prevented chubbing?
25  MR. SWEETEN:  You can answer.

## 106

1  A.  I don't know.
2  Q.  Okay.  So do you -- do you know what an interim
3  charge is?
4  A.  Yes.
5  Q.  What is it?
6  A.  It is a suggestion of topics do be studied
7  while we're not in session.
8  Q.  Do you have any role in interim charges issued
9  by the speaker and does the speaker issue the interim
10  charges for the House?
11  A.  He does.
12  Q.  Do you have any role in the interim charges
13  issued to committees that you cover for the speaker?
14  A.  Yes.
15  Q.  What is that role just as a general matter?
16  MR. SWEETEN:  What's her role in the
17  speaker's office as to interim charges?
18  MS. BERKOWER:  No.  I was asking --
19  MR. SWEETEN:  As a committee?
20  MS. BERKOWER:  I can be more specific.
21  That might help.
22  MR. SWEETEN:  Okay.
23  Q.  The -- If the House speaker issues a
24  committee -- Sorry.  If the speaker issues an interim
25  charge that goes to one of the committees that you cover

## 107

1  for him, what is your role with regard to the interim
2  charge?
3  MR. SWEETEN:  You can answer if it won't
4  reveal matters of legislative privilege.
5  A.  I sit in the committee hearings when the topic
6  is discussed.
7  Q.  Do you ever play any other role?  Do you assist
8  them in any way?
9  A.  Do I assist the committee --
10  Q.  Yes.
11  A.  -- with regard to the interim charges?
12  Q.  Yes.
13  A.  Yes.
14  Q.  What do you do?
15  MR. SWEETEN:  Don't reveal matters of
16  privilege.  If you won't be doing, so you can answer the
17  question.
18  A.  I'm going to choose not to answer.
19  MS. BERKOWER:  I guess I'm trying to get
20  at more procedural stuff so, I'm not sure that you would
21  object to all of them, so I'll try to ask a few more
22  specific questions, and if you object to those, we'll
23  move on, and if not, she can answer that.  Is that
24  acceptable, Patrick?
25  MR. SWEETEN:  That's fine.

## 108

1  Q.  Are you involved with -- Do you assist members
2  on -- Well, I'll withdraw that.
3  Does the committee hold hearings during
4  the interim session if they have an interim charge?
5  MR. SWEETEN:  You can answer.
6  A.  If the chair chooses to, yes.
7  Q.  Do you help them organize those hearings?
8  A.  No.
9  Q.  Do you ever reach out to potential witnesses to
10  testify?
11  A.  No.
12  Q.  Do you ever do research to be presented during
13  those hearings?
14  MR. SWEETEN:  Don't reveal matters of
15  privilege as to specific legislation.  I think you can
16  answer that as a general matter.
17  A.  No.
18  MR. SWEETEN:  Okay.
19  Q.  Do you participate in writing any report or
20  recommendation that comes out of the interim charge?
21  A.  No.
22  Q.  Is your role more to observe?
23  A.  Yes.
24  Q.  And to bring a report back on what you see?
25  A.  Yes.

Meredyth Fowler                                          June 8, 2012

---

109

1    Q.   Do you remember if any interim charges were
2    issued during the -- after the 2009 session that related
3    to the elections committee?
4        MR. SWEETEN:  I think that's a matter of
5    public record.  You can go ahead, if you know.
6    A.   Yes.
7    Q.   It is a matter of public record.  Do you know
8    if the elections committee held hearings as a result?
9    A.   They did.
10   Q.   Did they come up with a report at the end of
11   their investigation?
12   A.   If I recall correctly, they did.
13       (Exhibit 643 marked.)
14   Q.   Okay.  We have what we'll mark as Exhibit 643,
15   please.  And I'll represent to you that this is an
16   excerpt of the full report which was pretty long.  Do
17   you recognize this?
18   A.   Yes.
19   Q.   What is it?
20   A.   It is the interim report to the 82nd Texas
21   Legislature from the House Committee on Elections.
22   Q.   When was it presented?
23   A.   It says January 2009 on the document.
24   Q.   And turning to the fourth page of the exhibit,
25   which is -- actually it says Page 26 on it, but I think

---

111

1    A.   Okay.  Okay.
2    Q.   You ready?
3    A.   Yeah, I think so.
4    Q.   So turning to Page 27, does that page describe
5    testimony that was presented to the committee?
6    A.   Yes.
7    Q.   Does it describe testimony presented by Jay
8    Dyer from the Attorney General's Office?
9    A.   Yes.
10   Q.   And does Mr. Dyer explain that there were --
11   does he give some information on the number of referrals
12   and the incidences of alleged illegal voting and the
13   resolution of those cases?
14   A.   Yes.
15   Q.   And he says that the -- Well, how many
16   incidents did he describe?
17       MR. SWEETEN:  You are asking what the
18   document states?
19       MS. BERKOWER:  As recorded in the
20   document, yes.
21       MR. SWEETEN:  Okay.
22   A.   The document says 267 referrals.
23   Q.   Since what date?
24   A.   Since 2002.
25   Q.   And I think I should direct your attention to

---

110

1    it's the fourth page of this exhibit.  It says, "Interim
2    Charge No. 3."  Do you see that?
3    A.   Yes.
4    Q.   What -- What does Interim Charge No. 3 provide?
5    A.   "Examine the prevalence of fraud in Texas
6    elections.  Study new laws in other states regarding
7    voter identification and recommended statutory changes
8    necessary to ensure that only eligible voters can vote
9    in Texas elections."
10   Q.   Do you remember the issuance of that interim
11   charge?
12   A.   Yes.
13   Q.   And do you remember attending hearings related
14   to that interim charge?
15   A.   Yes.
16   Q.   Do you remember receiving this report when it
17   was presented to the legislature at the end of -- or at
18   the start of the 2009 legislative session?
19   A.   Yes.
20   Q.   Turning to Page 27 under testimony -- And did
21   you want -- do you want to take a minute and review the
22   document?  I don't know if you had a chance to do that
23   yet.
24   A.   Sure.
25   Q.   Let me know when you are done.

---

112

1    the paragraph on background.  It indicates the hearing
2    was held on June 14th, 2010.  Is that accurate?
3    A.   Yes.
4    Q.   So Mr. Dyer's testimony seems to being limited
5    to the periods between 2009 and June 14, 2010.  Is that
6    an accurate reflection of this report?
7        MR. SWEETEN:  You can testify about what
8    the document says.  Don't testify about your thoughts,
9    your mental impressions about the bill.
10   A.   The document says since 2002, 267 referrals
11   were received by the Attorney General's Office and the
12   hearing was on June 14, 2010.
13   Q.   Were you present when Mr. Dyer testified?
14   A.   I don't recall.
15   Q.   So the paragraph that mentions the 267
16   referrals of incidents of illegal voting, it goes on to
17   describe the resolution of those cases.  You reviewed
18   that part of the paragraph?
19   A.   Yes.  The document says, "35 of those alleged
20   violations have been resolved with guilty pleas,
21   dismissals or plea agreements, while 12 cases remain
22   active and the remainder of the cases are either still
23   being investigated or the statute of limitations has
24   expired."
25   Q.   Was there any testimony about the total number

Meredyth Fowler                                              June 8, 2012

## 113

1   of people voted between 2002 and June 14, 2010?
2       A.   In this hearing?
3       Q.   Yes, in this hearing.
4       A.   I don't remember.
5       Q.   In the testimony section of this report, do you
6   see anything that indicates the number of voters who
7   voted during that period?
8       A.   I'm not seeing it on this page, unless I'm
9   missing it.
10      Q.   So that this report relates -- the testimony --
11  the answer would be no?
12      A.   As far as what is on this document, I'm not
13  seeing it.
14      Q.   Okay.  And then Mr. Dyer testified further and
15  it's described in the next two paragraphs.  The
16  paragraph after the one you were just reading, can you
17  read the last sentence of that paragraph, please?
18      A.   "To get a complete picture of voter fraud in
19  Texas, further analysis is needed to gather additional
20  information from local election and law enforcement
21  officials."
22      Q.   So without -- Do you know if any such analysis
23  was ever conducted without revealing any particular
24  request by a legislator or any communication back to a
25  particular legislator?

## 114

1       A.   I don't know.
2       Q.   And do you know if the report made a
3   recommendation to the legislature?  I think it's on Page
4   31.
5       A.   According to the document they did.
6       Q.   Would that be in the section entitled
7   Recommendations?
8       A.   Yes.
9       Q.   What did they recommend based on this report?
10      A.   "Based on the report, the elections committee
11  recommends that the legislature adopt legislation
12  requiring voters to show photo identification in order
13  to cast a ballot at the polls.  We ask that free
14  identification cards be issued by either the Department
15  of Public Safety, the local voter registrar's office if
16  the voter is registered in this state, does not already
17  have a driver's license and is receiving the
18  identification cards with the express intent to vote.
19  It is also important that such legislation provide for
20  the education of voters on any changes enacted and that
21  the Secretary of State and counties coordinate their
22  efforts to inform the state's electorate.  This law
23  should take effect January 1, 2012."
24      Q.   At a general matter of your experience in the
25  legislature, when an interim charge -- when a committee

## 115

1   comes back after an interim charge with a
2   recommendation, what do legislators do with that?  How
3   is that received?
4       MR. SWEETEN:  Calls for matters of
5   legislative privilege and compound.
6       Q.   Well, do they have public hearings or any
7   public discussion on the record of the House about the
8   interim charge reports?
9       A.   Sometimes.
10      Q.   Do you know if there was such discussion on the
11  public record about this interim charge report?
12      A.   I don't recall if it was specifically
13  discussed.
14      Q.   Do you know if members who participate in
15  interim charge investigations ever draft legislation
16  simultaneously to their participation in the interim
17  charge investigation?
18      MR. SWEETEN:  I wish -- Sorry.  Can you
19  say that again, Risa?
20      MS. BERKOWER:  Yeah.  It was a question of
21  if she knows whether members who serve on interim charge
22  committees ever draft legislation simultaneously to
23  their work on the interim charge committee.
24      MR. SWEETEN:  You are not asking about a
25  specific bill?  You are just asking generally do they

## 116

1   sometimes do that?
2       MS. BERKOWER:  Yes.
3       MR. SWEETEN:  Okay.  You can answer that
4   question as posed to the extent it doesn't reveal the
5   legislative privilege.
6       A.   I don't know.
7       MS. BERKOWER:  Guys, want to take a lunch
8   break?
9       MR. SWEETEN:  Sure.  That sounds good.
10      (Recess from 12:45 p.m. to 1:31 p.m.)
11      Q.   (BY MS. BERKOWER) Okay.  So I think when we
12  left off at the end of lunch, we were just talking about
13  the state interim report that the elections committee
14  presented to the House in January 2011.  So we'll
15  continue with that period of time.  During the 2011
16  legislative session was a special committee created only
17  to address election related or voter ID related
18  legislation?
19      MR. SWEETEN:  Objection.  Because you are
20  asking the purpose of its creation.  She's already
21  testified that it was a committee.  I think she's
22  testified to the matters that you are asking, except to
23  the extent you are asking for the mental process, that
24  portion.
25      Q.   Then I'll actually withdraw that question.  Was

## 117

1  a photo ID bill addressed in the Senate in 2011?
2      A.  Yes.
3          (Exhibit 644 marked.)
4      Q.  This is exhibit -- We'll just give you a new
5  644, please.  Do you know what this?
6      A.  This is a copy of Senate Bill 14.
7      Q.  And if I represent to you this is Senate Bill
8  14 as filed in the Senate, do you have any reason to --
9  sorry -- as filed in the House, do you have any reason
10 to think that's not actually the case?
11     A.  No.
12     Q.  Take a minute to look at the document.  You've
13 reviewed it?
14     A.  Yes.
15     Q.  So do you recognize it?
16     A.  Yes.
17     Q.  Are you familiar with its provisions?
18     A.  Yes.
19     Q.  Turning your attention to -- it's page --
20 page -- well, really it's 4 and 5 of the document is
21 what we're going to be looking at.  Part G on Page 4 at
22 Line 14.  Sorry.  And then Part H on Page 5 at Line 4.
23 Sorry about that.  Do you see what that section -- what
24 that section says?
25     A.  Yes.

## 118

1      Q.  Does that section appear to carve out an
2  exception for voters presenting photo identification?
3      A.  It says -- document says, "The requirements for
4  identification prescribed by Subsection B do not apply
5  to a voter who, one, presents the voter's voter
6  registration certificate on offering to vote and, two,
7  was 70 years of age or older on January 1, 2012 as
8  indicated by the date of birth on the voter's voter
9  registration certificate."
10     Q.  Does that section seem to create an exemption
11 for voters over age 70 to the identification
12 requirements?
13     A.  Yes.
14     Q.  Do you know if that section was taken out of
15 the final bill?
16     A.  I don't recall.
17     Q.  Turning your attention to Page 8 of the
18 document, Section 63.0101, "Documentation of Proof
19 Identification."  Are you familiar with this section?
20     A.  Yes.
21     Q.  Does this section explain which types of photo
22 ID a voter may present to vote at the polls?
23     A.  Yes.
24     Q.  And does it permit a voter to present a
25 driver's license or a personal identification card

## 119

1  issued by the Department of Public Safety as long as
2  those forms of identification have not expired?
3          MR. SWEETEN:  You can answer about the
4  text of the bill, the question.
5      A.  On the text of the bill, yes.
6      Q.  And it permits a voter -- the text of this bill
7  permits a voter to present a United States military
8  identification card that contains the person's
9  photograph and has not expired; is that correct?
10     A.  Yes.
11     Q.  And it also permits a person -- a voter to
12 present a US citizenship certificate that contains a
13 photograph; is that correct?
14     A.  Yes.
15     Q.  And it permits a US passport issued to the
16 person that has not expired; is that accurate?
17     A.  Yes.
18     Q.  If you remember our discussion on SB362, were
19 there additional types of identification that SB362
20 permitted that this bill does not permit?
21         MR. SWEETEN:  You can answer based on the
22 text of the bill.
23     Q.  And you can refer back to that exhibit if you
24 need to.
25     A.  Yes, yes.

## 120

1      Q.  Did SB362, the text of the bill as you are
2  looking at it also permit a voter to use an ID that had
3  expired?  Actually, I should make that more specific.
4          Did it permit a voter to use a driver's
5  license or personal identification card that had expired
6  for no more than two years?
7      A.  Yes.
8      Q.  Whereas, SB14 has filed -- required an
9  unexpired version of those identifications; is that
10 correct?
11     A.  Yes.
12     Q.  And the same goes for the military
13 identification.  SB362 allowed -- wait a second --
14 allowed identification that had expired, whereas, SB14
15 as filed did not.
16         MR. SWEETEN:  Again, you can answer based
17 on the text of this.
18     A.  Yes.
19     Q.  The same question with regards to passports.
20 Did SB362 as it is before you permit an expired passport
21 within two years, whereas, SB14 does not?  Actually, I'm
22 going to withdraw that question.
23     A.  Okay.
24     Q.  So is it fair to say there are also types of
25 identifications allowed under SB362 as it's before you

**121**

1  that are not included in SB14, the version that's before
2  you?
3        A.  In the version before me, yes, I believe that
4  would be a fair statement.
5        Q.  Do you know if there's any evidence in the
6  public record for SB14 that supported the conclusion
7  that only unexpired ID will prevent voter fraud?
8            MR. SWEETEN:  Objection.  Calls for
9  matters of the legislative privilege.  If you want to
10 ask it another way, more topically general, I won't
11 object to that question.
12       Q.  Did you hear anyone testify on the public
13 record that only unexpired IDs will prevent voter fraud?
14           MR. SWEETEN:  You can answer.
15       A.  I don't recall.
16       Q.  Did anyone present any studies on the public
17 record that showed that only unexpired IDs will prevent
18 voter fraud?
19           MR. SWEETEN:  You can answer.
20       A.  I don't recall that type of testimony.
21       Q.  Do you remember any testimony in the public
22 record that explained why the types of identification
23 permitted in SB362 that are not included in SB14 should
24 not be included in SB14?
25           MR. SWEETEN:  I think you can answer the

**122**

1  question based on the public record.
2        A.  Yes.
3        Q.  What testimony was that?
4        A.  Basically that certain IDs allowed under 362
5  did not require a photo.
6        Q.  Do you remember who testified to that?
7        A.  I don't remember specifically who did.
8        Q.  Do you remember which hearing it was in?
9        A.  I don't recall if it was House or Senate.
10       Q.  Did the person who testified to that provide
11 any reasons why a photo ID is necessary to prevent voter
12 fraud?
13           MR. SWEETEN:  You can answer -- To the
14 extent that reasons were expressed on the record, you
15 can answer the question.
16       A.  Yes.  Reasons were expressed on the record.
17       Q.  What were those reasons?
18       A.  On the record I remember testimony that you
19 need to compare a photo to the person's face standing in
20 front of you who's voting.
21       Q.  And SB14 as filed in the House only permitted
22 unexpired IDs, correct, based on the version you have in
23 front of you?
24       A.  Yes.  On the version in front of me, yes.
25       Q.  How often do you have to renew a Texas driver's

**123**

1  license?
2        A.  If I recall correctly, I could be wrong, I
3  think it's every six years.  I could be wrong.
4        Q.  Is it possible to review your license online?
5        A.  I don't recall.  I don't know.
6        Q.  Do you know if you have to take a new photo
7  every time you renew the license?
8        A.  I don't know.
9        Q.  Well, and to your knowledge someone would go at
10 least six years without having do retake the photo,
11 right?
12       A.  To my knowledge, yes.
13       Q.  Is it possible -- is it possible that someone
14 would look different in a photo taken six years earlier?
15       A.  It's possible.
16       Q.  Do you know if the United States citizenship --
17 a United States citizenship certificate that contains a
18 photo would ever expire?
19       A.  I don't know.
20       Q.  If it didn't expire and it was issued to
21 someone when they were a child, would they still -- is
22 there a chance they would no look like that photograph
23 decades later?
24           MR. SWEETEN:  Objection.  It is compound,
25 calls for speculation.  Please go ahead.

**124**

1        A.  There is a chance.
2        Q.  Do you know how long a United States passport
3  is valid?
4        A.  Off the top of my head, I don't.
5        Q.  Now, with regard to driver's licenses, this is
6  something I should have asked you before, do you know if
7  there's a driver's license office for legislators in the
8  capitol next to the mail room?
9        A.  I don't know.  I don't know.  I don't know if
10 it's still there.
11       Q.  Did it exist at one time?
12       A.  I think it did, but I don't know exactly what
13 type of services they offered.
14       Q.  Did you ever go there yourself?
15       A.  Not that I recall.
16       Q.  Do you know if it's included in the list of
17 driver's license offices on the Department of Public
18 Safety's website?
19       A.  I don't know.
20       Q.  Did you have any communications with Senator
21 Fraser or members of his office as he developed SB14
22 without revealing the contents of any communications you
23 may have had?
24           MR. SWEETEN:  I think it assumes facts in
25 evidence because I don't know that she has testified as

Meredyth Fowler                                              June 8, 2012

## 125

1   to when he developed it, so I think --
2                  MS. BERKOWER:  I'll back up a little.
3                  MR. SWEETEN:  I don't mind asking her
4   conversations.
5          Q.   (BY MS. BERKOWER) So do you know when Senator
6   Fraser developed SB14?
7          A.   I do not.
8          Q.   Did you have any communications with him or his
9   office between the 2009 and 2011 legislative sessions?
10         A.   Not that I can recall.
11         Q.   Do you know if Speaker Straus had any
12   communications without revealing their content between
13   Speaker Straus and Senator Fraser or his office between
14   the 2009 and 2011 legislative sessions?
15         A.   I don't know.
16         Q.   Did you have any communications with the
17   lieutenant governor's office between the 2009 and 2011
18   legislative sessions?
19         A.   Yes.
20         Q.   Without revealing the content of what you
21   discussed, who did you communicate with?
22         A.   Brian Hebert.
23         Q.   What was the general topic of those
24   communications?
25         A.   A lot of them were where to go eat for lunch,

## 126

1   where to go to happy hour.  Probably more unwork related
2   than work related.
3          Q.   What were the work related ones about
4   without -- as a general matter?
5                  MR. SWEETEN:  If you can give a general
6   description, but don't go into the communication.
7          A.   Generally they were about legislation.
8          Q.   Were any of them about voter ID legislation?
9          A.   Yes.
10         Q.   Were any of them about SB14?
11         A.   Yes.
12         Q.   Do you remember when specifically the
13   communications with Brian Hebert were about SB14
14   occurred?
15         A.   On -- Throughout the session.
16         Q.   What about before the session?
17         A.   I don't recall any conversations before
18   session.
19         Q.   And after the session started, did you have
20   communications with Senator Fraser or anyone from his
21   office?
22         A.   Not that I recall.
23         Q.   Do you know if Speaker Straus without revealing
24   any content had any communications with the lieutenant
25   governor's office between -- about SB14 before the start

## 127

1   of the 2011 legislative session?
2                  MR. SWEETEN:  You can answer.
3          A.   I don't know.
4          Q.   Do you know if Speaker Straus had any
5   communications with the lieutenant governor's office
6   about SB14 before the legislative session began without
7   revealing the content?
8          A.   I don't know.
9          Q.   If a photo ID is expired but was validly
10   issued, why doesn't that prove the person is the same
11   person on the ID?
12                  MR. SWEETEN:  Don't answer.  It calls for
13   matters of legislative privilege.  Instruct not to
14   answer.
15         Q.   Are you following that instruction?
16         A.   Yes.
17                  MR. SWEETEN:  You are trying to see if I'm
18   wake, aren't you?
19                  MS. BERKOWER:  That's our strategy.
20   We give you like these beef fajitas and I slip them in.
21         Q.   (BY MS. BERKOWER) Do you know what a military
22   ID is?
23                  MR. SWEETEN:  You can answer.
24         A.   Yes.
25         Q.   What is it?

## 128

1          A.   An ID issued by the military.
2          Q.   How different forms of military ID are there?
3          A.   That I don't know.
4          Q.   Do you know so -- Did you have any
5   communications during the time that you worked on SB14
6   with anyone about which forms of military ID would be
7   acceptable under SB14?
8                  MR. SWEETEN:  I think that would require
9   her to reveal her process and analysis and mental
10   impressions regarding the bill.
11         Q.   I can be more specific and, actually, that
12   might help here.  Did you have any communications with
13   non-legislators or anyone outside the legislature about
14   which forms of military ID SB14 would be unacceptable
15   under SB14?
16         A.   I don't recall any conversations like that.
17         Q.   Do you know what a citizenship certificate is?
18         A.   Yes.
19         Q.   What is it?
20         A.   Essentially a piece of paper stating that the
21   individual is a citizen of the United States.
22         Q.   Have you seen one?
23         A.   I have not.
24         Q.   Do you know how much it cost to obtain one?
25         A.   I do not.

Meredyth Fowler                                          June 8, 2012

## 129

1  Q.  Do you know how much it would cost to get a
2  replacements citizenship certificate?
3  A.  I don't.
4  Q.  Do you know what you would have to do to get a
5  replacement?
6  A.  I don't.
7  Q.  Do you know how long it might take to get a
8  replacement?
9  A.  I do.
10  Q.  Do you know if citizenship certificates always
11  contain a photo?
12  A.  I don't know.
13  Q.  Do you know how much it cost to obtain a US
14  passport?
15  A.  Off the top of my head, I don't.
16  Q.  Do you know what documents you would need to
17  provided to get a passport?
18  A.  I believe when I got mine, I had to provide a
19  birth certificate and Social Security card, I think.
20  Q.  Have you ever -- Are you familiar with the
21  photo ID laws in Indiana and Georgia?
22       MR. SWEETEN:  I'm sorry.  Is she familiar
23  with --
24  Q.  Is she familiar with those laws?
25       MR. SWEETEN:  You can answer except to the

## 130

1  extent it would reveal your mental processes regarding
2  legislation.
3  Q.  It's just a yes or no question.
4  A.  Yes.
5  Q.  Okay.  This has been previously marked as
6  Exhibit 6.  Do you know what this is?
7  A.  This looks like it is the Georgia statutes.
8  Q.  The Georgia photo ID statute?
9  A.  Yes.
10  Q.  Does this -- Turning your attention to the
11  first page of this exhibit, Part A1, does this provision
12  allow a voter to present a Georgia driver's license
13  properly issued by the appropriate state's agency?
14  A.  Yes.
15  Q.  Does the law specify that the ID must be
16  unexpired?
17  A.  This -- On this document, no.
18  Q.  Does this -- Does Part 2 there, the next
19  section, allow a voter to present a valid Georgia voter
20  identification card issued under Code Section 21-2-417.1
21  or other valid identification card issued by a branch,
22  department, agency or entity of the State of Georgia,
23  any other state or the United States authorized by law
24  to issue personal identification so long as it's a photo
25  identification?

## 131

1  A.  Yes.
2  Q.  Based on the version of SB14 that you have in
3  front of you, does SB14 -- does that -- does the text of
4  that bill permit all of those types of identification?
5  A.  Permit all of the types?
6  Q.  Of identification in that Part A2 that we just
7  reviewed in the Georgia law.
8  A.  Does SB14 allow all of these?  According to the
9  version of Senate Bill 14 in front of me, no.
10  Q.  Does this version of Senate Bill 14 allow
11  identification -- a voter to present photo
12  identification issued by a branch, department, agency or
13  entity of the State of Texas other than those issued by
14  DPS as specified?
15  A.  Can you repeat the question?
16  Q.  Yes.  Does SB14 allow a voter to present photo
17  ID issued by any Texas agency other than the Department
18  of Public Safety?
19  A.  No, according to this version.
20  Q.  Does SB14 permit a voter to present
21  identification issued by any other state?
22  A.  In this version of SB14, no.
23  Q.  Does SB14 allow a voter to present as
24  identification a photo ID issued by a branch,
25  department, agency or entity of the United States except

## 132

1  for US military ID, US citizenship certificates and US
2  passports?
3  A.  No.
4  Q.  Turning back to the Georgia law, No. 4, listed
5  under where we were looking before, does the Georgia law
6  allow a voter to present photographic identification
7  issued by employers of the State of Georgia or the US
8  government?
9  A.  Yes.
10  Q.  Does the text of SB14 that you have before you
11  allow that type of identification?
12  A.  Can you repeat the question?
13  Q.  Yes.  The Georgia law, Part 4 there, allows a
14  voter to present identification employee IDs issued by
15  the US government or the State of Georgia.  Does SB14
16  permit a voter to present identification that's an
17  employee identification issued by anybody?
18  A.  In this version of Senate Bill 14, no.
19  Q.  Under Part 6 in the Georgia law, that section
20  permits a voter to present a valid tribal identification
21  card containing a photograph; is that correct?
22  A.  Yes.
23  Q.  Is there a provision for tribal identification
24  in SB14?
25  A.  In the document in front of me, no.

Meredyth Fowler                                          June 8, 2012

---

## 133

1  Q.  Is it fair to say that the Georgia law allows
2  more forms of identification than SB14?
3       MR. SWEETEN:  Based on the text of the
4  bill --
5       MS. BERKOWER:  Yes.
6       MR. SWEETEN:  -- that she's got in front
7  of her?  You can answer that.
8  A.  Based on the text in front of me, yes.
9  Q.  During the public debate of SB14, did anyone
10 that you heard testify raise concerns that SB14 should
11 have adhered more closely to the Georgia law?
12      MR. SWEETEN:  You can answer.  It's a
13 public record.
14 A.  On my own public record, I know that Georgia
15 law was discussed.  I don't know if anyone specifically
16 suggested that Senate Bill 14 should being closer to the
17 Georgia law.
18 Q.  Do you know of any concerns raised by
19 constituents who contacted your office that SB14 should
20 have adhered more closely to the Georgia law?
21 A.  I don't recall.
22 Q.  Do you know if Speaker Straus ever made any
23 public statements that -- to the effect that SB14 was
24 similar to the Georgia law?
25 A.  I don't know.

---

## 134

1  Q.  So I have what was previously marked as
2  Exhibit 60.  Do you know what this is?
3  A.  This looks like it is a copy of the Indiana
4  statutes.
5  Q.  Did you -- Have you read it before?
6  A.  I have not.
7  Q.  Take a minute to look at it now.  Are you
8  ready?
9  A.  Yes.
10 Q.  So looking at Section 1.1C3-5-2-40.5 on the
11 first page of the document -- Did I ask you what this is
12 already?
13 A.  Yes.
14 Q.  Okay.  And you said it was the Indiana voter ID
15 law?
16 A.  I think I said it was the Indiana statute, but
17 it's the Indiana voter ID law.
18 Q.  Okay.  That Section 40.5, Proof of
19 Identification, does that section seem to define the
20 type of identification acceptable for voters to provide
21 at the polls under this law?
22 A.  From the text in front of me, yes.
23 Q.  And does Section 40.5 list four requirements
24 for that identification?
25 A.  Yes.

---

## 135

1  Q.  Are those requirements that the document must
2  contain the name of the individual, photograph of the
3  individual and an expiration date, and the document must
4  have been issued by the United States or the State of
5  Indiana?
6  A.  Yes.
7  Q.  And the expiration date must reveal that the
8  document is either not expired or has not expired -- or
9  expired after the dates of the most recent general
10 election is before the one on which it is presented.
11 A.  From the document in front of me, yes.
12 Q.  So does that mean from -- The face of this does
13 it seem that a voter in Indiana could present an expired
14 ID so long at it hasn't expired before the date of the
15 most recent general election?
16 A.  From the text in front of me, yes.
17 Q.  And this -- since this document -- I'll
18 rephrase that.  Is it fair to say that based on the text
19 in front of you, this -- the Indiana law allows voters
20 to present a wider range of identification than SB14
21 permits based on the text of both bills in front of you?
22 A.  From the text in front of me, yes.
23 Q.  During the time that SB14 was considered by the
24 Texas legislature, are you aware of any discussion on
25 the public record about the differences between SB14 and

---

## 136

1  the Indiana law?
2  A.  I know the Indiana law was discussed.  I don't
3  remember the specifics.
4  Q.  Do you remember if anyone expressed concern on
5  the public record that SB14 should adhere more closely
6  to the Indiana law?
7  A.  Again, I just know it was discussed.  I
8  don't -- I don't remember specifics.
9  Q.  What does the term legislative emergency mean
10 within the Texas legislature?
11      MR. SWEETEN:  You can answer as a general
12 matter what that term means to you to the extent it
13 won't reveal legislative privilege.
14 A.  I don't know.  I've never really thought about
15 it, legislative emergency.  I think it can be used to
16 characterize seemingly important legislation.
17 Q.  When a type of legislation is deemed a
18 legislative emergency, does that mean that the bill --
19 that the legislation on that topic can be considered
20 earlier in the session?
21      MR. SWEETEN:  You can answer as a general
22 matter if you know.
23 A.  As a general matter, it could mean that.
24 Q.  Do you know just as a matter of procedure if
25 there are any constraints on what types of legislation

Meredyth Fowler                                                    June 8, 2012

---

## 137

1   the governor may declare to be a legislative emergency?
2      A.   That I don't know.
3      Q.   Do you know who decides -- I'll rephrase that.
4          So do you know if Speaker Straus had any
5   communications with the governor about legislative
6   emergency prior to the 2011 legislative session?
7          MR. SWEETEN:  Can you read the question
8   back?
9          (Requested portion was read.)
10         MR. SWEETEN:  You can answer.  That's a
11  general enough subject matter.  You can answer the
12  question.
13     A.   I don't know.
14     Q.   Was photographic voter ID declared to be a
15  legislative emergency for the 82nd legislature?
16     A.   To my recollection, yes.
17     Q.   And when did you first learn about the
18  designation?
19     A.   I don't remember the date.
20     Q.   Around when?
21     A.   Around the start of the session, I think.
22     Q.   In your time working in the legislature have
23  you seen any other election law designated as a
24  legislative emergency?
25     A.   No.

---

## 138

1      Q.   During your time working in the legislature,
2   what other types of legislation were designated to be a
3   legislative emergency?
4      A.   I forget the name of the bill, but it was
5   the -- how do I say this tactfully?  I guess the
6   transvaginal thing with abortions.  I'm sorry.  I can't
7   remember the name of the bill because it's been termed
8   so many inappropriate things.  You have to --
9          MR. SWEETEN:  That's descriptive enough.
10  I will stop there.
11         THE WITNESS:  Sorry.
12     Q.   Are you following his advice?
13     A.   There's that one.  What else?  Oh, if I'm
14  recalling correctly, I think maybe Sanctuary Cities was
15  an emergency item last session.  Those are the three
16  that come to mind.  The wand or whatever.
17     Q.   Do you know if there were any elections held in
18  Texas within the first 60 days of the 2011 legislative
19  session?
20     A.   I do not know of any.
21     Q.   Do you know who had input into the decision to
22  designate voter identification as a legislative
23  emergency?
24         MR. SWEETEN:  Don't reveal matters of
25  privilege in answering the question.

---

## 139

1      A.   I don't know.
2      Q.   Did you follow SB14 in the Senate?
3      A.   Yes.
4      Q.   Was SB14 referred to the committee of the whole
5   Senate?
6      A.   Yes.
7      Q.   How many other bills were referred to the
8   committee of the whole Senate during the 2011
9   legislative session?
10     A.   I don't know.
11     Q.   Do you know if any others were?
12         MR. SWEETEN:  Objection.  Asked and
13  answered, but go ahead.
14     A.   I don't recall any others.
15     Q.   Do you know how the committee referral process
16  works in the Senate?
17     A.   I don't.
18     Q.   Did you attend any Senate hearings concerning
19  SB14?
20     A.   Yes.
21     Q.   Do you remember attending a Senate hearing on
22  January 25, 2012?
23     A.   Yes.
24     Q.   Do you recall having any conversation with
25  Senator Williams at that hearing?

---

## 140

1      A.   Yes.
2      Q.   Do you know if there was any discussion on the
3   public record during that hearing about matching the
4   driver's license and voter registration databases?
5      A.   Yes.
6      Q.   What was that evidence?
7          MR. SWEETEN:  You can just talk about
8   matters of the public record.
9      A.   I don't recall specifics.  I know that the
10  topic was discussed.
11     Q.   Do you remember in what context it was
12  discussed?
13     A.   Can you elaborate?
14     Q.   Well, do you remember who was testifying about
15  it?
16     A.   I don't.
17     Q.   Do you remember if it was someone from the
18  Secretary of State's office?
19     A.   That sounds right.
20     Q.   Do you remember if it was a person named Ann
21  McGeehan?
22     A.   I know she testified.
23     Q.   During that hearing?
24     A.   Yes.
25     Q.   And I'm not sure if I got this yet.  Do you

Meredyth Fowler                                          June 8, 2012

## 141

1  remember why the question of matching the driver's
2  license and voter registration databases came up or in
3  what context?
4           MR. SWEETEN:  In what context -- If the
5  context would be on the public record, you can answer
6  that.
7           MS. BERKOWER:  Yes.
8      A.  I believe it came up because the question was
9  asked -- I'm not sure by who -- if they could match
10  registered voters with the driver's license database.
11     Q.  Did the person who testified explain why
12  someone would want to conduct that match, like what the
13  purpose of conducting that match would be?
14     A.  They did.
15     Q.  What was the reason?
16          MR. SWEETEN:  Expressed on the public
17  record, you can testify to if you know.
18     A.  I recall whoever -- I guess, Ann, whoever was
19  testifying, stating that the purpose would be to see how
20  many registered voters have a driver's license.
21     Q.  What -- Did she explain what that would show on
22  the public record?
23     A.  I'm sure she did.
24     Q.  Was it to show or get an estimate of the number
25  of voters who might be impacted by SB14's requirements?

## 142

1           MR. SWEETEN:  If you are asking on matters
2  of public record, you can testify as to that.
3      A.  Can you repeat it?  I'm sorry.
4      Q.  Yeah.  Did she explain on the public record
5  that the purpose of conducting that match would be to
6  show how many voters may not have the identification
7  required by SB14?
8      A.  Yes.
9      Q.  Do you know if that match was in fact
10  conducted?
11     A.  I don't know.
12     Q.  Okay.  Did you ever hear anyone else talk on
13  the public record about the results of such a match?
14     A.  I don't recall hearing anyone talk about the
15  results.
16     Q.  When the bill was back in the House, did you
17  hear anybody say as part of the public record that they
18  would -- that they were interested in the results of
19  such a match?
20     A.  I'm -- I'm -- I don't recall specifically.  It
21  probably was said, but I can't recall specifically.
22     Q.  Maybe I can be a little more specific which
23  would help.
24          During the House debates do you remember
25  anyone expressing on the public record concerns about

## 143

1  the number of voters who may not have requisite
2  identification under SB14?
3      A.  Yes, I remember that coming up.
4      Q.  In that context, do you remember any discussion
5  on the public record about a match that the Secretary of
6  State's office could conduct between the voter
7  registration database and the driver's license
8  databases?
9           MR. SWEETEN:  Just as to the public
10  record?
11     A.  I recall that testimony.
12     Q.  Do you know if the Secretary of State's office
13  ever provided the results of that match to members of
14  the House without specifying who asked for them or who
15  received them?
16          MR. SWEETEN:  I think she's answered that
17  twice now about analysis.  I think I'm going to let her
18  answer a third time, but I don't want to keep beating
19  this drum, but go ahead, you can answer the question.
20     A.  I don't know.
21     Q.  Okay.  Who were the sponsors of SB14 in the
22  House?
23     A.  In the house it was Patricia Harless.
24     Q.  How is it decided just as a general procedural
25  matter who sponsors a bill in the House that comes over

## 144

1  from the Senate?
2      A.  As a general matter, my understanding is a
3  senator has the discretion to ask any House member to
4  carry their piece of legislation.
5      Q.  Does Speaker Straus ever play a role in who
6  ends up sponsoring a bill?
7           MR. SWEETEN:  Objection.  Legislative
8  privilege.  Unless it's a matter of public record --
9  Unless it's a matter of public record, then don't answer
10  his process and his role unless that's in the public
11  record.
12     A.  I'm choosing not to answer.
13     Q.  Okay.  I guess maybe I should have been more
14  clear too.  I'm not as familiar with the House rules as
15  you are, so are there any House rules that provide for
16  the speaker's involvement in the designation of sponsors
17  and bills that come from the Senate?
18     A.  Not that I'm aware of.
19     Q.  Okay.  What committee was the bill sent when it
20  arrived in the House?
21     A.  If I recall correctly, it was sent to the
22  select committee on voter ID and voter fraud.
23     Q.  Right.  Did you following the special committee
24  hearings or select committee hearings?
25     A.  Yes.

Meredyth Fowler                                          June 8, 2012

---

145

1  Q.  Did the select committee hold any hearings?
2  A.  Yes.
3  Q.  Did witnesses provide testimony at those
4  hearings?
5  A.  Yes.
6  Q.  Do you remember who provided testimony?
7  A.  I remember some of the witnesses.
8  Q.  Who do you remember?
9  A.  I remember Skipper Wallace.  I remember there
10  were individual citizens that testified both for and
11  against.  I remember NAACP, LULAC, MALDEF.
12  Q.  I may have an exhibit that can help you.
13  A.  Okay.
14  Q.  Do you remember how many times the select
15  committee held hearings at which testimony was received?
16  A.  If I recall correctly, I think it was one
17  hearing.
18       (Exhibit 645 marked.)
19  Q.  Okay.  This will be Exhibit 645, please.  Do
20  you know what this?
21  A.  This is a printout of the witness list for
22  Senate Bill 14.
23  Q.  Does this help refresh your memory -- Is this
24  for the one hearing that you said the select committee
25  held on SB14?

---

146

1  A.  Yes.
2  Q.  Does this list refresh your memory about who
3  testified?
4  A.  Yes.
5  Q.  Now, you said Skipper Wallace testified.  Who
6  is he?
7  A.  He is I'm -- not sure his title, but he's the
8  government's relations person for -- I think it's the
9  Republican County Chairs Association, if I have that
10  right.
11  Q.  What did he testify about?
12  A.  He testified in support of the legislation.
13  Q.  What were his arguments in support of the
14  legislation?
15  A.  I don't recall specifically.
16  Q.  Do you remember generally what his arguments
17  were?
18  A.  Generally, he just -- he supported the
19  legislation.
20  Q.  Have you ever spoken or met with him?
21  A.  Yes.
22  Q.  When was that?
23  A.  In the 2009 session.  I recall a 2009 session.
24  I don't recall whether or not I met with him in the 2011
25  session.

---

147

1  Q.  What did he say during those meetings?
2       MR. SWEETEN:  He's not a legislator or
3  legislative staff member of a state agency or member of
4  the TLC, right?
5       THE WITNESS:  Right.
6       MR. SWEETEN:  Okay.  So you can answer the
7  question.
8  A.  He expressed support for the legislation.  In
9  2009, he was complaining that Todd Smith was taking too
10  long to get the bill out of committee.  He complained to
11  me a lot about that.  I mean, generally supportive at
12  that time of Senate Bill 362.
13  Q.  In 2009 did you get complaints from other
14  constituents or members of the public that Todd Smith
15  was taking too long to get the bill out of committee?
16  A.  Yes.
17  Q.  About how many of those communications did you
18  get from constituents or members of the public?
19  A.  I don't recall how many.
20  Q.  More than 10?
21  A.  From constituents?
22  Q.  Or from anyone outside the legislature really.
23  A.  More than 10, yes.
24  Q.  More than 20?
25  A.  I don't recall.

---

148

1  Q.  Did you have meetings with other members of the
2  public about SB362 in 2009?
3  A.  Yes.
4  Q.  What were the content of those meetings?
5  A.  Different people or groups would either support
6  or not support the legislation and explain the reasons
7  why.
8  Q.  What were the reasons given for their support
9  of the bill?
10  A.  To deter voter fraud, to ensure election
11  integrity, to make sure that the person voting is who
12  they say they are.
13  Q.  Did anyone raise the issue of noncitizen voting
14  with you during those meetings?
15       MR. SWEETEN:  We're talking about
16  constituent meetings?
17       MS. BERKOWER:  Meetings, yeah.
18  A.  I believe the topic came up, but I don't
19  remember exactly who said it.
20  Q.  Did you meet with who opposed the bill?  And
21  I'll think now we jump back in time a little bit to
22  2009.
23  A.  Who opposed the bill?  Gosh, I had so many
24  meetings in that session.  I think there's a group
25  that's called -- they go by the acronym OWLS, and

Meredyth Fowler                                      June 8, 2012

---

### 149

1  they -- they call themselves objective election
2  watchers, I think.  Actually, wait.  They supported the
3  bill.  You are looking for who I met that opposed it.
4        If I recall correctly, I think I met with
5  the representatives from NAACP, LULAC, MALDEF, League of
6  Women Voters, a representative from the Texas Democratic
7  Party, a group of college kids, but I can't recall what
8  school they were with, that I know I met with.  I
9  remember meeting with the Catholic Diocese.  I think
10 that's the group, and voter ID was one of the topics
11 that they talked about and didn't support it.  That's
12 tall I can think of.
13       Q.  How did people get meetings with you about
14 different legislation?
15       A.  If they have my direct line, they just call me
16 direct.  Otherwise, they'll call the main line in our
17 policy office and they'll transfer them directly to us
18 so we can set up an appointment.
19       Q.  Do you generally meet in person or on the phone
20 for these types of meetings?
21       A.  Generally in person.
22       Q.  Do you ever say no to a meeting?
23       A.  I've never said no.
24       Q.  So turning back to 2011, you said you met with
25 Skipper Wallace in 2011.  What was the content of your

---

### 150

1  meeting in 2011?
2        A.  I can't remember whether or not I met with him
3  in 2011.
4        Q.  Okay.  Well, you said you did remember him
5  testifying though at the select committee hearing?
6        A.  Yes.
7        Q.  What did he say during that hearing?
8        A.  I can't recall specifics.  I know he supported
9  the legislation.  I was very adamant about supporting the
10 legislation.  If I recall correctly, I think he talked
11 about other activities for which one needs an ID,
12 boarding a plane, getting government benefits.  That's
13 pretty much all I can recall.
14       Q.  Have you heard that argument generally in the
15 context of voter identification?
16           MR. SWEETEN:  Don't answer the question.
17       Q.  I guess I could say as part of the public -- as
18 part of the public record, have you heard people advance
19 that argument that you need identification to do things
20 like board a plane or obtain government benefits?
21       A.  Yes.  It's come up in testimony.
22       Q.  Do you have a fundamental right to board a
23 plane?
24       A.  No.
25       Q.  Do you have a fundamental right to obtain

---

### 151

1  public benefits?
2           MR. SWEETEN:  You are asking her as she's
3  sitting here?  I mean to some extent you could be asking
4  her to reveal her thoughts and mental impressions about
5  bills, so if you can separate -- if these questions
6  would require you to do that, do not reveal that
7  information.  To the extent that you can answer as
8  you're sitting here and if not impact those, then you
9  can answer.  Does that make sense?
10       A.  M-hm.
11       Q.  Okay.
12       A.  I've never really thought about it.  Well, the
13 right to government benefits --
14       Q.  I'll withdraw that particular question.  Do you
15 have -- Do you have a fundamental right to vote?
16           MR. SWEETEN:  Same objection.
17       A.  Yes.
18       Q.  Do you have a fundamental right to rent a
19 video?
20           MR. SWEETEN:  Same instruction.
21       A.  No.
22       Q.  Do you -- Do you have a fundamental right to
23 pick up prescriptions at the pharmacy?
24       A.  No.
25           MR. SWEETEN:  Same instruction.

---

### 152

1        Q.  Okay.  Turning back to this list of people who
2  testified at the March 1st, 2011 hearing, do you
3  remember with any specificity what any of these other
4  witnesses testified to rather than just for or against
5  as they're listed on the page?
6        A.  If I recall correctly, I remember testimony, I
7  think, by whoever was representing the King Street
8  Patriots, that they had witnessed someone voting twice
9  or they thought the person looked -- the same person
10 voted twice.  They, I think, had a distinctive feature.
11       Q.  Is that the same person that you mentioned
12 earlier with the tattoos who came in and voted twice or
13 is that a different --
14       A.  That's a different one.
15       Q.  It was a different person?
16       A.  M-hm.
17       Q.  So it was not just a tattoo that they knew that
18 the person had voted twice?
19       A.  I want to say that it was strange hair color,
20 purple or green or something, that caught their eye.
21       Q.  Do you remember if that was Ms. Engelbrecht who
22 testified for this -- the King Street Patriots,
23 Catherine Engelbrecht?
24       A.  I don't recall her name.
25       Q.  Have you met her before?

## 161

1    A.  Yes.
2    Q.  Okay.  To your knowledge did the -- did the
3  Secretary of State's Office ever provide any information
4  to the legislature to determine how many of those
5  690,000 voters were minority voters?
6        MR. SWEETEN:  You're asking about was an
7  analysis provided to the legislature from Ann McGeehan?
8  Is that what you said?
9        MS. BERKOWER:  From the Secretary of
10  State's Office.
11        MR. SWEETEN:  I'm going to object.  It's
12  been asked three other times and don't reveal any
13  substance of the communication, if any, but you can
14  testify the last time though -- you can testify that an
15  analysis was provided.
16    A.  I don't know.
17    Q.  Okay.  Are you aware of any existing document
18  or report in the public record that identifies how many
19  Texas voters are in possession of a concealed handgun
20  license?
21    A.  I don't recall.
22    Q.  Are you aware of any existing document or
23  report in the public record that identifies how many
24  minority voters are in possession of a concealed handgun
25  license?

## 162

1    A.  I don't recall.
2    Q.  Are you aware of any existing document or
3  report that identified -- in the public record that
4  identifies how many Texas voters are in possession of a
5  US military card?
6    A.  I don't recall.
7    Q.  Are you aware of any existing document or
8  report that identifies how many Texas -- Sorry.  I'm
9  going to start that question over.  Sorry.
10        Do you know how many Texas voters are in
11  possession of a US military card?
12    A.  I don't.
13    Q.  Do you know how many minority voters are in
14  possession of a US military card?
15    A.  I don't.
16    Q.  Do you know how many --
17        MR. SWEETEN:  I want to make sure the
18  instruction's clear.  I don't want you to reveal any
19  matters that would be related to your mental
20  impressions, thought processes, investigations regarding
21  the bill as you're answering these, so don't answer if
22  you'd be revealing any legislative privilege that you
23  don't know, but I want to make sure that the
24  legislative privilege instruction is clear.
25        MS. BERKOWER:  To be clear, I'm asking

## 163

1  these questions in part because it would reflect
2  underlying facts that may have been provided rather
3  than --
4        MR. SWEETEN:  I think your first line of
5  questions before you went into do you know may have done
6  that, and this section is now -- could invade the
7  legislative privilege.  I ask you to be mindful of the
8  privilege.
9    Q.  (BY MS. BERKOWER)  Okay.  Do you know how many
10  Texas voters are in possession of a passport?
11        MR. SWEETEN:  Same instruction.
12    A.  I don't.
13    Q.  Do you know how many minorities voters are in
14  possession of a passport?
15        MR. SWEETEN:  The same instruction.  Don't
16  reveal matters of a legislative privilege.
17    A.  I don't know.
18    Q.  Do you know how many Texas voters are in
19  possession of a citizenship certificate with a
20  photograph?
21        MR. SWEETEN:  Same instruction on
22  legislative privilege.
23    A.  I don't know.
24    Q.  Do you know -- I'm not -- Never mind.  Getting
25  back to the list of witnesses who testified on the -- in

## 164

1  the March 1st, 2011 hearing, were there any other
2  witnesses whose testimony you remember with any
3  specificity that we haven't already discussed?
4    A.  No one else comes to mind.
5    Q.  In the time that the legislature has considered
6  voter fraud, do you recall any evidence entered into the
7  public record concerning mail-in ballot fraud?
8    A.  I know the topic has been discussed in
9  hearings, but I don't know particular specifics.
10    Q.  Do you remember anybody testifying that
11  mail-in -- testifying as part of the public record that
12  mail-in ballot fraud is more common than in-person
13  ballot fraud?
14    A.  Yes.
15    Q.  Does SB14 address mail-in ballot fraud?
16    A.  To my recollection it did not.
17    Q.  Did SB362 address mail-in ballot fraud?
18        MR. SWEETEN:  Don't provide your thoughts,
19  mental impressions or analysis about legislative
20  matters, okay?  That means your mental impressions,
21  opinions about legislation, what it would or wouldn't
22  address would be within the legislative privilege.
23        MS. BERKOWER:  Maybe I can rephrase the
24  question.  I think we were looking at SB362 -- a copy of
25  it earlier today, so you have the text of that bill.

Meredyth Fowler                                                    June 8, 2012

---

**165**

1   Based on the text of the exhibit that you had, did that
2   bill address mail-in voter fraud?  Is that acceptable,
3   Patrick?
4            MR. SWEETEN:  From the text that's in
5   front of her, I'll let her look and see if it
6   addresses --
7            A.  We're on 362 now?
8            Q.  362.
9            A.  From the text in front of me, I do not see the
10  language addressing mail-in ballot fraud.
11           MS. BERKOWER:  And I have this exhibit
12  which has been previously marked as Exhibit 5 in another
13  deposition.  Can we have this marked as 5 here, please?
14           MR. SWEETEN:  I thought we already gave
15  her 14.
16           Q.  (BY MS. BERKOWER)  I gave her as filed.  I think
17  if you turn to the last page, you might have a sense of
18  what this is.  Do you know what this is?
19           A.  This looks like the final version of Senate
20  Bill 14 signed by the governor.
21           Q.  If you -- If you can take a minute to review
22  this.  If you could tell me, does the text of that bill
23  address mail-in ballot fraud?
24           A.  The text in front of me, I don't see provisions
25  related to mail-in ballots.

---

**166**

1            Q.  Do you remember if there was any discussion on
2   the public record at the time that these bills -- and
3   I'm referring to SB14 and 362 -- were being debated by
4   the legislation that the bill should address mail-in
5   ballot fraud?
6            MR. SWEETEN:  You can testify as to
7   matters of the public record in answering the question.
8            A.  I believe that topic was discussed.
9            Q.  Who raised that issue, if you remember?
10           A.  I don't recall.
11           Q.  What were the arguments that that person made?
12           MR. SWEETEN:  You can refer to the record,
13  but don't reveal legislative privilege.
14           A.  I'd have to look back at the record.
15           Q.  Do you remember if that argument was to the
16  effect of mail-in ballot fraud is a bigger problem than
17  in-person ballot fraud, so legislation addressing voter
18  fraud should address mail-in ballot fraud just as a
19  matter of what you remember from testimony on the public
20  record?
21           MR. SWEETEN:  Yeah.  Don't reveal your
22  thought processes as you are assessing the public
23  record.  So if that was specifically said as phrased,
24  you can answer, if it was on the public record.  If it's
25  requiring you to reveal matters that are subject to the

---

**167**

1   privilege, don't do that.
2            A.  Can you repeat it?  Sorry.
3            Q.  Sure.  I was asking if -- You said you
4   remembered there was testimony about mail-in ballot
5   fraud and that the bill, I think you said, should
6   address mail-in ballot fraud.  Is that an accurate
7   summary of your testimony?
8            A.  Yes.
9            Q.  With regard to the person who made those
10  arguments on the public record, did they ever argue that
11  the bill should address mail-in ballot fraud because
12  it's a bigger problem than in-person ballot fraud?
13           A.  I don't know specifically if that statement was
14  said.
15           Q.  Was an argument to that effect made on the
16  public record?
17           A.  Yes.
18           Q.  But you don't -- you don't remember who made
19  it?
20           A.  I don't.
21           Q.  Did you receive any constituent correspondence
22  that made that argument against the bill?
23           A.  I don't recall.
24           Q.  Turning back just for a minute to the interim
25  charge -- the interim charge committee report -- I'm

---

**168**

1   sorry.  I know you have lots of documents in front of
2   you at this point.  Can I find it?
3            A.  Yes.
4            Q.  In turning to Page 26 of the document, which
5   listed the interim charge given to the committee, was
6   the committee charge limited only to an investigation of
7   in-person voter fraud?
8            MR. SWEETEN:  You can answer based on
9   what's on the text of the report.
10           A.  The charges says, "Examine the prevalence of
11  fraud in Texas elections."
12           Q.  Does that text specifically specify in-person
13  fraud and not mail-in fraud?
14           A.  As I read it, it does not specify any
15  particular type of fraud.
16           Q.  Right.  And it doesn't exclude any type of
17  fraud?
18           A.  Right.
19           Q.  Turning to the last page, I think, for the
20  Recommendation section, I don't remember which page it
21  is exactly.  It's towards the end.  And based on that
22  text, do you see any recommendation to the legislature
23  to pass a bill that addresses mail-in ballot fraud?
24           MR. SWEETEN:  I'm reading about recusal on
25  my recommendation.  Judge's recusal.

Meredyth Fowler                                          June 8, 2012

---

169

1           MS. BERKOWER:  Okay.
2      A.   Here we go.
3      Q.   Sorry.
4      A.   I found it.  Yeah.  I started reading that too.
5           MS. BERKOWER:  I'm sorry.  I don't where
6  my copy went, so I know it's towards the end.
7           MR. PHILLIPS:  Do you need this copy back?
8      Q.   I only have this one question about it.  It's
9  okay.
10     A.   Can you repeat the question?  I'm sorry.
11     Q.   Yeah.  Based on the text of this
12  recommendation, do you see anything in there that
13  recommends that the legislature pass legislation
14  concerning mail-in ballot fraud?
15     A.   Based on this text, I do not.
16     Q.   Okay.  Were you present for the House floor
17  debates on SB14?
18     A.   Yes.
19     Q.   Were you present when amendments were offered
20  and voted on for the bill?
21     A.   Yes.
22     Q.   Do you remember that the debate --
23     A.   The debate on the bill, yes.
24     Q.   So do you remember that amendments were opposed
25  and debated on and there were a number of amendments?

---

170

1      A.   Yes.
2      Q.   Okay.  So this exhibit -- actually, only have
3  one copy of it, but I'm happy to give it to you because
4  I think I know what we're going to be talking about, and
5  it was previously marked.  Did you make a copy?  It was
6  previously marked in a different deposition, but maybe
7  as Rodriguez Exhibit 36.  So I guess we can mark that
8  again here.
9           So I have Exhibit 36, and, I'm sorry, I
10  only have the one copy.  If you don't mind sharing,
11  Patrick, with her.  Do you know what this is?
12     A.   It looks like a transcript of the floor debate
13  on Senate Bill 14.
14     Q.   What's the date on that?
15     A.   March 23rd, 2011.
16     Q.   Can you turn to Page 38, please?  Does Speaker
17  Straus speak on the record on Page 38?
18     A.   Yes.
19     Q.   Can you review what he said?  Let me know when
20  you are done.  Have you read it?
21     A.   Yes.
22     Q.   Do you see that he made statements concerning
23  the fact that "many minority groups protected under the
24  Voting Rights Act would like to show photo ID to vote"?
25     A.   Yes.

---

171

1      Q.   And he said he had attended a roundtable at
2  which groups raised -- members of minority groups raised
3  that point with him?
4      A.   Yes.
5      Q.   Do you know what roundtable he was referring
6  to?
7      A.   I do not.
8      Q.   Have you ever attended a roundtable event with
9  him?
10     A.   No.
11     Q.   Did you ever hear any reports about that
12  roundtable event?
13     A.   That I can recall.
14     Q.   Turning to Page 89 of the transcript, please.
15  Do you see the speaker spoke on the record on that as
16  recorded in the transcript on Page 89?
17     A.   Yes.
18     Q.   Does it start on the previous page?
19     A.   Yes.
20     Q.   Can you review that -- that part of the record?
21     A.   Yes.
22     Q.   Okay.  Was this exchange with Speaker Straus
23  and was he speaking with Representative Bonnen on the
24  record there?
25           MR. SWEETEN:  You are asking on Pages 88

---

172

1  and 89?
2      A.   Yes.
3      Q.   Yes.
4      A.   Yes.
5      Q.   Were they discussing an amendment that
6  Representative Bonnen had proposed to SB14?
7           MR. SWEETEN:  Don't interpret the words.
8      Q.   Just based on what's in the transcript?
9      A.   Yes.
10     Q.   Was the amendment to eliminate the over 70
11  exemption that we discussed in the certification of SB14
12  as filed in the Senate?
13           MR. SWEETEN:  Are you asking was the
14  subject matter of the discussion the over 70 amendment?
15           MS. BERKOWER:  Yes.
16           MR. SWEETEN:  Okay.
17     A.   I don't see any discussion about what the
18  amendment is.  I just see that.
19     Q.   Well, I think you could go back a page or two
20  and that will help.  You can review the few pages before
21  that.
22     A.   Okay.  Okay.  Yes, now I see it.
23     Q.   So were they discussing an amendment to
24  eliminate the over 70 exemption?
25     A.   According to this document, yes.

Meredyth Fowler                                    June 8, 2012

---

## 173

```
 1        Q.   Okay.  Did Speaker Straus state that he was not
 2   going to support the amendment?
 3             MR. SWEETEN:  Don't reveal matters of
 4   privilege.
 5        Q.   Just as far as that transcript goes.
 6        A.   Can you repeat the question?
 7        Q.   Did Speaker Straus say he would not support the
 8   amendment?
 9        A.   According to this, yes.
10        Q.   Did he give a reason as to why he was not
11   supporting the amendment as reflected in that
12   transcript?
13        A.   Yes.
14        Q.   Was the reason that Texas already allows people
15   over 65 to get mail-in ballots and there's no signatures
16   required -- sorry -- no photo identification for those
17   ballots?
18             MR. SWEETEN:  Don't provide testimony on
19   his reason.  You can testify about what's on the text of
20   the page.
21        A.   According to the text, yes.
22        Q.   Did he also say that voter -- the voter
23   identification bill should be striking a balance between
24   securing each vote but also securing access to the
25   franchise?
```

---

## 174

```
 1        A.   According to the text, yes.
 2        Q.   Do you know if there were any other amendments
 3   to SB14 that Speaker Straus publicly said on the record
 4   he would not support?
 5        A.   I don't recall.
 6        Q.   Do you know if there were any other instances
 7   on the public record where Speaker Straus expressed a
 8   concern to strike a balance between securing each vote,
 9   but also securing access to the franchise?
10             MR. SWEETEN:  You can testify as to the
11   matter of public record.  Don't reveal matters of
12   privilege.
13        A.   I don't recall.
14        Q.   During the legislative debates on SB14, did --
15   were there concerns raised in the public records that
16   the bill would disenfranchise minority voters?
17             MR. SWEETEN:  You can testify if something
18   was expressed on the public record.  Don't interpret
19   what was said on the record to the extent that would
20   reveal your mental impressions and opinions.  You can
21   answer.
22        A.   On the public record, yes.
23        Q.   Did any legislators take action on the public
24   record to prevent the disenfranchisement of minorities
25   as they viewed it by proposing amendments that they
```

---

## 175

```
 1   claimed -- that they testified would prevent the
 2   disenfranchisement of minorities?
 3             MR. SWEETEN:  Objection.  Calls for
 4   legislative privilege.  Instruct not to answer.
 5        Q.   Okay.  Maybe I can rephrase it.  Did any
 6   legislator testify on the public record that an
 7   amendment he proposed would prevent the
 8   disenfranchisement of minorities?
 9             MR. SWEETEN:  You can testify as rephrased
10   as to matters on the public record.
11        A.   That specific statement on that topic, yes.
12        Q.   Do you remember which amendments that testimony
13   referred to?
14        A.   I don't recall the particularly which
15   amendments.
16        Q.   Do you remember if any of those amendments
17   ultimately were included in the final bill?
18        A.   I don't.
19             MR. SWEETEN:  Objection.  Foundation to
20   the question.
21        Q.   What was the general legislative purpose of
22   SB14?
23        A.   To deter voter fraud.
24        Q.   Was any of -- was there any -- Was part of the
25   general legislative purpose of SB14 to prevent
```

---

## 176

```
 1   noncitizens from voting?
 2        A.   No.
 3        Q.   After SB14 was enacted, did you have any
 4   conversations about the bill with other staff members
 5   about the bill for Speaker Straus?  Sorry.
 6        A.   Did I have conversations with other staffers?
 7        Q.   Yes.
 8             MR. SWEETEN:  She's saying after passage.
 9        A.   After passage?
10        Q.   Yeah.
11        A.   I don't recall any specific conversations.
12        Q.   Did you have any communications with Ashley
13   Kaden or Allison Winney after the bill's passage or in
14   passage?  Yeah.
15        A.   Yes.
16        Q.   What were those communications?
17             MR. SWEETEN:  The substance?  Is that what
18   you are asking or in what form?  I'm not sure what
19   you're asking.
20        Q.   Well, let's start with what types of
21   communications were those.
22        A.   Do you mean phone, email, person to person?
23        Q.   Yeah.
24        A.   Email and person to person.
25        Q.   What was the subject matter of those
```

### 197

1     A.  Can you repeat it again?
2     Q.  (BY MS. BERKOWER)  Okay.  Do you know if
3  current law -- under current law procedures exist to
4  verify a person's identify at the polls?
5     A.  I don't know.
6     Q.  At any time since the passage of SB14, have you
7  come to believe it was based with any discriminatory
8  purpose?
9     A.  Repeat it, please.  Sorry.
10     Q.  At any time since the passage of SB14, have you
11  coming to believe it was passed with any discriminatory
12  purpose?
13     A.  No.
14     Q.  At any time since the passage of SB14, have you
15  had come to believe that SB14 will have a retrogressive
16  effect on minority voters?
17         MR. SWEETEN:  You can answer.
18     A.  No.
19     Q.  If you are called to trial, will you testify
20  that SB14 has no discriminatory purpose?
21     A.  Yes.
22     Q.  If you are called to trial, will you testify
23  that SB14 has no discriminatory effect?
24         MR. SWEETEN:  You can answer if you know
25  what you would be called to testify about.  But when you

### 198

1  are saying would she be -- In answering this last
2  question, if it would require you to reveal your
3  thoughts, mental processes related to the bill, then
4  doesn't answer that last question, but if it --
5     A.  Can you ask it again?
6     Q.  If you are called to trial, will you testify
7  that SB14 has no discriminatory effect?
8     A.  Yes.
9     Q.  What's the basis for that?
10         MR. SWEETEN:  In answering the question,
11  if the basis of that would reveal your thoughts, mental
12  impressions about the legislation, then you do not
13  answer that question.
14     A.  I'm going to choose not to answer.
15     Q.  Okay.  We're at the end now.  Do you want to
16  change --
17         MR. SWEETEN:  Okay.  Go ahead.  I thought
18  it was the end.
19     Q.  Well, I was going to say, do you want to change
20  any of the answers you provided today?
21     A.  No.
22     Q.  Is there any information you recall now that
23  you did not recall earlier today?
24     A.  None that comes to mind.
25     Q.  Is there anything additional that you want to

### 199

1  share?
2     A.  No.
3         MS. BERKOWER:  So I'm going pass you now
4  I'm done with my questions.  I'm going to pass you now
5  to Lindsey who has a few questions for you.
6         EXAMINATION
7  BY MS. STELCEN
8     Q.  Don't worry.  This will be very brief.  First,
9  I believe you stated earlier that Steven Schar was the
10  clerk for Representative Smith; is that correct?
11     A.  He was.
12     Q.  He was -- In '09, he was the clerk for the
13  elections committee?
14     A.  Yes.
15     Q.  And in 2011, he was the clerk for the special
16  committee on voter fraud?
17     A.  Yes.
18     Q.  And I think you said earlier that he was
19  responsible for putting together binders for the
20  committee?
21     A.  Yes.
22     Q.  Is that a practice that's done for every
23  committee, binders are put together?
24     A.  Yes.
25     Q.  And what typically is included in a binder for

### 200

1  the committee?
2     A.  The legislation, the bill analysis, the fiscal
3  note and any written testimony or written exhibits that
4  witnesses have distributed to the committee already.
5     Q.  Okay.  And that's all -- that's all witness
6  statements that are produced prior to the committee.  So
7  is it updated throughout, I guess, is my question?  Is
8  the binder updated throughout?
9     A.  Yes.  Normally witnesses will come in and they
10  have copies that's distributed to members.
11     Q.  That's my only question on that.  How long has
12  Speaker Straus been a speaker?
13     A.  Since January 2009.
14     Q.  And how often does he need to be reelected as
15  speaker?
16     A.  To the speakership, every session.
17     Q.  When's the last time that he had to run for the
18  speakership?
19     A.  Last session.
20     Q.  What month is that typically that he runs?
21     A.  It's January.
22     Q.  And does Speaker Straus publicly campaign for
23  the speakership?
24     A.  When you say publicly --
25     Q.  Does he make public statements about why he