

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                )
                               )
          Plaintiff,           )
                               )
VS.                            )
                               )
ERIC H. HOLDER, JR. in his     )
official capacity as Attorney  )
General of the United States,  )
                               )
          Defendant,           )
                               )
ERIC KENNIE, et al,            )
                               )
     Defendant-Intervenors,    )
                               )
TEXAS STATE CONFERENCE OF      )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                )   (RMC-DST-RLW)
                               )   Three-Judge Court
     Defendant-Intervenors,    )
                               )
TEXAS LEAGUE OF YOUNG VOTERS   )
EDUCATION FUND, et al,         )
                               )
     Defendant-Intervenors,    )
                               )
TEXAS LEGISLATIVE BLACK        )
CAUCUS, et al,                 )
                               )
     Defendant-Intervenors,    )
                               )
VICTORIA RODRIGUEZ, et al.,    )
                               )
     Defendant-Intervenors.    )

*********************************************
              ORAL DEPOSITION OF
              SENATOR TROY FRASER
                 MAY 17, 2012
*********************************************

**Page 2**

1     ORAL DEPOSITION OF SENATOR TROY FRASER, produced as
2  a witness at the instance of the Defendant, was duly
3  sworn, was taken in the above-styled and numbered cause
4  on the MAY 17, 2012, from 9:43 a.m. to 6:29 p.m., before
5  Chris Carpenter, CSR, in and for the State of Texas,
6  reported by machine shorthand, at the offices of The
7  United States Attorney's Office, 816 Congress Avenue,
8  Suite 1000, Austin, Texas 78701, pursuant to the Federal
9  Rules of Civil Procedure and the provisions stated on
10  the record or attached hereto.

**Page 3**

               A P P E A R A N C E S
FOR THE PLAINTIFF, STATE OF TEXAS:
     Patrick K. Sweeten
     Matthew Frederick
     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
     Austin, TX 78711-2548
     209 West 14th Street
     8th Floor
     Austin, TX 78701
     (512) 936-1307
     patrick.sweeten@texasattorneygeneral.gov
     matthew.frederick@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:

     Elizabeth S. Westfall
     Bruce Gear
     U.S. DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue, NW
     NWB - Room 7202
     Washington, DC 20530
     (202) 305-7766
     elizabeth.westfall@usdoj.gov
FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
CAUCUS:
     Ezra D. Rosenberg
     DECHERT, LLP
     Suite 500
     902 Carnegie Center
     Princeton, NJ 08540-6531
     (609) 955-3200
     ezra.rosenberg@dechert.com

**Page 4**

FOR THE KENNIE INTERVENORS:

     Chad W. Dunn
     BRAZIL & DUNN, LLP
     4201 Cypress Creek Parkway
     Suite 530
     Houston, TX 77068
     (281) 580-6310
     chad@brazilanddunn.com



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

INDEX

Appearances,.........................................2

SENATOR TROY FRASER
    Examination by Ms. Westfall..................6
    Examination by Mr. Rosenberg...............295

Signature and Changes.............................318

Reporter's Certificate............................320

EXHIBITS

NO. DESCRIPTION                    PAGE MARKED

43   Deposition Notice                    16

44   HB No. 1706                          62

45   Declaration of Carlos Uresti         117

46   Excerpt of proceedings of the Committee of   207
     the Whole Senate on Tuesday, March 10
     2009

47   Senate Journal of the fifth day,             283
     Wednesday, January the 26th

48   Texas Tribune article                        289

49   Excerpt of Senate Record                     311

## 6

1        SENATOR TROY FRASER,
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5            EXAMINATION
6   BY MS. WESTFALL:
7       Q.  Good morning, Senator Fraser.  Could you state
8   and spell your name for the record, please?
9       A.  Troy Fraser, F-r-a-s-e-r.
10      Q.  Have you had your deposition taken before?
11      A.  Not to my knowledge.
12      Q.  Okay.  I'm going to tell you some ground rules
13  so you can understand what will be happening
14  today.  You're here to testify truthfully, accurately
15  and completely.
16          The court reporter here will be preparing
17  a transcript of everything that is said today, so it is
18  important to wait for me to ask you my question before you
19  answer.  And also to make verbal responses to my
20  questions.  In other words, please do not shake your
21  head or say "uh-huh" or "nuh-uh," because you can't see
22  that in the transcript.
23          Please wait for me to finish my question.
24  If you have any questions about my question or don't
25  understand my question, please feel free to ask.

## 7

1        If you would like to take a break for any
2   reason, just let me know, and we can take a break.  We
3   will take breaks probably several times today and also
4   break for lunch.  But if I have a question pending and
5   you would like to take a break, if you could go ahead
6   and answer that question first before we take a break,
7   I'd appreciate it.  Is that clear?
8       A.  Yes.
9       Q.  You understand that you've been sworn in and
10  you're under oath and you may be subject to penalty of
11  perjury for giving false or misleading testimony just
12  like a trial, okay?
13      A.  Yes.
14      Q.  Do you understand these instructions?
15      A.  Yes, I do.
16      Q.  Do you have any questions about these
17  instructions?
18      A.  No.
19      Q.  Are you on any medication today that would have
20  any impact on your ability to testify truthfully at this
21  deposition?
22      A.  No.  I should qualify:  I've had knee surgery a
23  month ago, and at some point, about every five minutes,
24  I will stand up and stretch my leg.  So if I stand up,
25  I'm not leaving.

## 8

1       Q.  Very good.  I will not take offense.  Thank you
2   for letting me know, and I hope you're recovering
3   swiftly.
4           I may use the terms "voter ID" and "photo
5   ID" interchangeably throughout this deposition, and I
6   want you to interpret those terms as broadly as you can
7   to mean a requirement that a voter present a form of
8   identification, whether it has a photo or otherwise,
9   when voting in person, before being permitted to vote
10  with a regular ballot.  Do you understand?
11      A.  Yes.
12      Q.  If I refer to "you," I'm asking you a question
13  about you in your capacity as a member of the Texas
14  State Senate, and not in any other capacity.  Do you
15  understand?
16      A.  Yes.
17      Q.  And if I refer to "you," I also mean to include
18  anyone in your office or acting on your behalf, okay?
19      A.  Could I address my attorney?
20      Q.  Certainly.
21          THE WITNESS:  Why, my staff?
22          MR. SWEETEN:  Yeah.  I think, you know,
23  with respect to that instruction, I think that that
24  could be very difficult for him, if you're asking
25  Senator Fraser something, I mean, it depends on the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1    that Counsel is assisting the witness in reviewing the
2    document.
3        Q.   (By Ms. Westfall)  Does it remain your
4    testimony that you've never seen this document before?
5        A.   (Looking through other pages.)  I have not seen
6    this document.
7        Q.   Thank you.  You need not refer to it right now,
8    but I'm going to ask you some questions about documents
9    that were collected pursuant to US Exhibit 43.
10           Did anyone to your knowledge search in
11   your office for documents and communications related to
12   calculations, reports, audits, estimates, projections,
13   assessments and other analyses of the effect of Senate
14   Bill 14 on minority voters?
15           MR. SWEETEN:  Can you direct him to where
16   you're reading?
17           MS. WESTFALL:  I certainly can.  It's
18   Number 5 in the list of documents.  It's not a paginated
19   document, but Mr. Sweeten could you assist him in
20   looking at Number 5 on this?
21           MR. SWEETEN:  So counsel is asking me to
22   assist him reviewing the document.  Sure.  I can do
23   that.
24           MS. WESTFALL:  Well, if you want me to
25   refer to it, otherwise, I can read, Mr. Sweeten.

## 18

1        Q.   (By Ms. Westfall)  And Number 5 on the next
2    page, sir.
3        A.   Clarify.  You want all through 1 through 5?
4        Q.   No.  Just -- I'm directing your attention to
5    Number 5 in the document.  If you could look at that
6    Number 5, and let me know when you've had a chance to
7    review that.
8        A.   (Witness complies.)
9        Q.   Do you know whether -- you've had a chance to
10   look at Number 5; is that correct, sir?
11       A.   Uh-huh.
12       Q.   Do you know -- is that a "yes"?
13       A.   Yes.
14       Q.   Thank you.  Just so the court reporter can hear
15   you.  Thank you.
16           Do you know whether anyone in your office
17   has searched for documents in response to the documents
18   requested in Number 5 of Exhibit 43?
19           MR. SWEETEN:  She's asking you, do you
20   know if anybody in your office has done a search for
21   these documents?
22       A.   It's my understanding that Janice McCoy did the
23   search for the documents.
24       Q.   (By Ms. Westfall)  Okay.  And did Ms. McCoy, to
25   the best of your recollection, handle all document

## 19

1    searches in response to the documents listed here --
2        A.   Yes.
3        Q.   -- in Exhibit 43?
4           So you don't have any further information
5    about looking for those records, is that your testimony?
6        A.   Yes.
7           MR. SWEETEN:  Were you asking just as to
8    5, when you said "as to this document" --
9           MS. WESTFALL:  No.  I meant --
10          MR. SWEETEN:  -- or are you asking as to
11   any on the list?
12          MS. WESTFALL:  Thank you for the
13   clarification, Mr. Sweeten.
14       Q.   (By Ms. Westfall)  You've testified you've
15   never seen Exhibit 43?
16       A.   No.
17       Q.   Is that correct?
18       A.   Yes.
19       Q.   It -- Exhibit 43 has a list of documents
20   numbered 1 through 12, does it not?
21       A.   Yes.
22       Q.   And to the best of your knowledge, did
23   Ms. McCoy in response to this request for documents
24   search for documents?
25       A.   I have no knowledge that she did.  I think it

## 20

1    was requested of her, but no, I have no knowledge.
2        Q.   Thank you.  And are there any documents related
3    to Senate Bill 14 or previous voter ID bills that you
4    keep in your possession that Ms. McCoy would not have
5    had access to?
6        A.   No.
7        Q.   Can you describe your educational background,
8    please, starting with college?
9        A.   College, three total years of college.  One
10   year of junior college.  And then I attended three other
11   colleges.
12       Q.   Did you eventually get a degree?
13       A.   No.
14       Q.   Did you do any studies after that?
15       A.   In at least one, maybe two occasions, took a
16   course through a university.
17       Q.   Did any of those courses involve election law?
18       A.   No.
19       Q.   Did any of them involve voter ID?
20       A.   No.
21       Q.   How long have you served in the Senate, sir?
22       A.   I was elected in 1996, sworn in January '97.
23       Q.   Before that time, were you a member of the
24   Texas House of Representatives?
25       A.   Yes, I was.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 21

1  Q.  And when did you start that service?
2  A.  I was elected in 1988, and served until '93.
3  Q.  Could you describe the areas within your Senate
4  district currently?
5  A.  Could you clarify?
6  Q.  Certainly.  Just could you describe where your
7  Senate district is?
8  A.  The Senate district is the geographic center of
9  the State of Texas encompassing 21 counties.
10  Q.  And is it Senate District 24?
11  A.  Yes, it is.
12  Q.  What is the total population of your district?
13  A.  The last census, we subdivided the state, and
14  it's approximately 820,000 people.
15  Q.  Could you describe the racial demographics of
16  your district?
17  A.  Racial demographics are in keeping with the
18  rest of the state, probably -- no, probably a pretty
19  good reflection of the percentages within the rest of
20  the state.
21  Q.  Could you tell me approximately how that breaks
22  down, to the best of your knowledge?
23  A.  I'm sorry.  I cannot.
24  Q.  Do you currently serve on any committees in the
25  Senate?

## 22

1  A.  Yes.
2  Q.  What are those committees?
3  A.  The chair of Natural Resources.  I serve on the
4  State Affairs.  I serve on International Relations and
5  something.  I'm sorry.  I'm missing one.
6  Q.  Do you also serve on Nominations?
7  A.  No.
8  Q.  No?
9  A.  No.
10  Q.  My apologies.
11  A.  Well, hold on a second.  I'm sorry, I can't
12  answer that question.  I don't.
13  Q.  That's okay.
14     Is State Affairs committee the sole
15  committee that has considered voter ID bills since
16  you've served in the Senate?
17  A.  Again, I'm not sure I can answer that.  The
18  answer is it has not been the sole committee.
19  Q.  Has the other committee been the Committee of
20  the Whole?
21  A.  Yes.
22  Q.  Are there any other committees you're aware of
23  that have considered voter ID in the Senate since you've
24  served in the Senate?
25  A.  No.

## 23

1  Q.  And putting aside for a moment the photo ID
2  bills that you have sponsored and had involvement in,
3  how many election-related bills have you sponsored, or
4  voter-related bills?
5  A.  Again, I don't have a clear recollection.  I
6  think I probably carried two very minor bills six or
7  eight years ago, but I don't -- I don't have
8  recollection of those.
9  Q.  Do you know generally what they were about?
10  A.  No.
11  Q.  Did they relate to voter registration?
12  A.  No.
13  Q.  Did they relate to voting?
14  A.  If they were a voter bill, they related to
15  voting.
16  Q.  I just wanted to know if they related to
17  campaign finance or some other election-related matter.
18  But to the best of your recollection, they related to
19  voting; is that correct?
20  A.  I don't have a clear recollection, so no, I
21  can't answer that affirmatively.
22  Q.  Do you know whether those bills were enacted?
23  A.  No.
24  Q.  You don't know?
25  A.  No.  I do not know.

## 24

1  Q.  Have you cosponsored any voting bills other
2  than the photo ID bills?
3  A.  I believe the answer is no, not to my
4  knowledge.
5  Q.  What has your primary focus in the legislature
6  been in the Senate?
7  A.  I have chaired, prior to Natural Resources,
8  chaired Business and Commerce and worked on business-
9  related issues.
10  Q.  Could you describe those issues?
11  A.  I heard about 2,000 bills per year for 15
12  years, so it would be a long list of description.
13  Q.  Okay.  Did you have any signature initiatives
14  in that committee?
15  A.  Qualify "signature."
16  Q.  Did you have any area of focus?
17  A.  I focused on the entire committee.
18  Q.  Have you served in any leadership roles in the
19  Senate?
20  A.  We are not divided to leadership positions.
21  There are no leadership positions.
22  Q.  Have you ever served as president pro tem?
23  A.  Yes, I have.
24  Q.  When was that?
25  A.  The -- starting in June of '09 through January



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                    May 17, 2012

---

25

1  of '11.
2      Q.  What did that role entail as president pro tem?
3      A.  It is an honorary position that is rotated by
4  seniority.  It's not mandated, but it is custom that we
5  transfer it by seniority.  And it becomes your term and
6  you serve.  The responsibilities would be entailed that
7  if the Governor and the Lieutenant Governor are out of
8  the state, then you would be the acting governor in
9  their absence.
10     Q.  I see.  What is the role of the Lieutenant
11 Governor in the Senate?
12     A.  The Lieutenant Governor is a state-wide elected
13 official.  He presides over the Senate at the will of
14 the Senate.  He has no constitutional right to serve.
15 He's given his power by rule from the senators.
16     Q.  Is that in the Senate rules?
17     A.  Yes.
18     Q.  Does the Lieutenant Governor vote as a member
19 of the Senate?
20     A.  He is allowed to be a tiebreaker.  He -- yes,
21 he is allowed to vote.
22     Q.  Is that the sole circumstance under which he
23 may vote?
24     A.  No.  He can vote any time he chooses.
25     Q.  Does the Lieutenant Governor set the agenda for

---

26

1  what the Senate hears on the Floor?
2      A.  Yes.
3      Q.  Does the Lieutenant Governor --
4      A.  I'm sorry.  I need to reanswer that
5  question.  The -- the Senate sets the order of their
6  agenda based on an order of business by rule that is
7  established by the senators themselves.  In the absence
8  of a -- following the order of business, the Lieutenant
9  Governor will establish what bills are eligible to be
10 heard that day.
11     Q.  Was -- was it true that the Lieutenant Governor
12 played a role in insuring that Senate Bill 14 would be
13 heard by the Senate when it was?
14     A.  Yes.
15     Q.  And describe the role he played.
16         MR. SWEETEN:  At this point, I'm going to
17 instruct you with respect to the legislative privilege,
18 and I want you to not reveal the thoughts, mental
19 impressions, opinions about legislation, including
20 Senate Bill 14.  Don't reveal the communications that
21 you've had with legislators, with legislative staff,
22 with any state agency, including the Lieutenant
23 Governor's Office, the Governor's Office, or the Texas
24 Legislative Council or constituents.
25     A.  I will assert privilege on that question.

---

27

1      Q.  (By Ms. Westfall)  And outside of any
2  conversations for which your counsel is asserting
3  privilege, as a matter of procedure, did the Lieutenant
4  Governor -- could you describe the role that the
5  Lieutenant Governor played with regard to Senate Bill 14
6  and its placement on the Senate calendar or agenda?
7      A.  I would again assert privilege.
8      Q.  Thank you, sir.  Is the Lieutenant Governor in
9  effect the leader of the Senate?
10     A.  No.
11     Q.  Who is?
12     A.  The senators.
13     Q.  Collectively?
14     A.  Yes.
15     Q.  Are you familiar with an organization called
16 the American Legislative Exchange Council, otherwise
17 known as ALEC?
18     A.  Yes.
19     Q.  Where is that organization based physically, do
20 you know?
21     A.  No.
22     Q.  Is it based in Washington, D.C.?
23     A.  I just answered.  I don't know where it's
24 located.
25     Q.  Thank you.  Do you have any affiliation with

---

28

1  ALEC?
2      A.  Clarify "affiliation."
3      Q.  Are you a member of ALEC?
4      A.  My understanding of ALEC is that there's not a
5  constant membership, that if you choose to attend a
6  conference, part of the registration fee includes your
7  dues for that year.
8      Q.  What is ALEC?  Could you describe it, please?
9      A.  It's an American legislative something
10 exchange.
11     Q.  We'll call it ALEC for the purposes of this
12 deposition to make things easier, sir.
13     A.  Oh.
14     Q.  Could you describe the type of services it
15 provides or what it does generally?
16     A.  They have a conference once a year and enables
17 legislators to get together to intermingle.
18     Q.  Is it for state legislators solely?
19     A.  I believe it is.
20     Q.  How long have you had any dealings -- for how
21 many years have you had membership or attended the
22 conferences or otherwise participated in ALEC events?
23     A.  In 1991, my first dealing with them in 1991, I
24 was chosen as one of their legislators of the year.
25     Q.  How did you get that honor?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

## 29

1     A.  I have no idea.
2     Q.  Do you know if there are other members of the
3  Texas legislature who are members of ALEC?
4     A.  Again, to my knowledge, there is no membership
5  to ALEC.  There's a competing group that is a -- you
6  know, the state pays the membership to a competing
7  group.  To ALEC, the only membership is if someone goes
8  to a conference, part of their conference dues includes,
9  I'm assuming, a membership for that year.  So I don't
10  know who's a member.
11     Q.  Have you attended meetings of ALEC with other
12  members of the Texas legislature?
13     A.  Yes.
14     Q.  Who are those members?
15     A.  I would not -- wouldn't recall who they were.
16     Q.  Was it -- did you attend -- have you attended
17  ALEC meetings with 10 other senators from the Texas
18  Senate?
19     A.  Again, I don't remember who was there.
20     Q.  Are there agendas for the meetings of ALEC?
21     A.  You have general meetings, where you have
22  speakers, and you have breakout meetings that address
23  topics.
24     Q.  And I believe you testified you attend, you
25  have attended ALEC conferences once a year; is that

## 30

1  correct?
2     A.  I didn't say that.
3     Q.  Please tell me how often you attend meetings?
4     A.  Whenever there's a meeting that I want to
5  attend.
6     Q.  So could be once a year, could be less than
7  once a year, could be more than once a year; is that
8  correct?
9     A.  Oh, you're asking how many times a year?
10     Q.  Yes, sir.
11     A.  To my knowledge, I've never attended more than
12  one per year.
13     Q.  Do you generally take notes when you go to
14  those meetings?
15     A.  No.
16     Q.  Do you serve on any task forces or other
17  subcommittees that have been convened by ALEC?
18     A.  To my knowledge, none through ALEC.
19     Q.  Have you ever received any documents, materials
20  or communications from ALEC related to voter ID?
21     A.  No.
22     Q.  Has ALEC ever offered any technical assistance
23  on voter ID?
24     A.  No --
25     MR. SWEETEN:  Hold on a minute.  I just

## 31

1  want to make sure that we're -- with respect to
2  legislative privilege, when she's asking you these
3  questions, I don't want you to reveal thoughts, mental
4  impressions, opinions about legislation, including
5  Senate Bill 14.  And don't reveal communications that
6  you've had with other legislators, legislative staff,
7  state agencies and Texas Legislative Council or
8  constituents.  Okay?
9     THE WITNESS:  All right.
10     MR. SWEETEN:  All right.
11     Q.  (By Ms. Westfall)  Have you ever asked ALEC for
12  assistance with any legislation you've been drafting?
13     MR. SWEETEN:  Any legislation at all?
14     MS. WESTFALL:  Yes.
15     MR. SWEETEN:  I think that would still ask
16  him to reveal thoughts, mental impressions, opinions
17  about legislation, so I don't think you should answer,
18  and I instruct you not to answer that.
19     Q.  (By Ms. Westfall)  Are you following your
20  counsel's advice?
21     A.  Yes.
22     Q.  Have you ever attended -- strike that.
23     Are you a member of the National
24  Conference of State Legislators?
25     A.  To my knowledge, yes.

## 32

1     Q.  Do you attend their meetings?
2     A.  Yes.
3     Q.  Where are their meetings held?
4     A.  Always different cities.
5     Q.  How often do you attend those meetings?
6     A.  Never more than once a year and not every year.
7     Q.  Have you attended any of those -- any meetings
8  other than the National Conference of State Legislators
9  where voter ID has been discussed?
10     A.  How do I answer that?
11     MR. SWEETEN:  I'm going to let you answer
12  to the extent you've attended.  She can ask you about
13  whether you've attended a conference.  And just the
14  subject matter of voter ID, I'm going to let you answer
15  as to just yes or no.
16     A.  The answer is no.
17     Q.  (By Ms. Westfall)  Could you identify your
18  staff members by name and title who work for you?
19     A.  Probably not.
20     Q.  Could you name one of them?
21     A.  Janice McCoy is my chief of staff.
22     Q.  Could you name each and every person on your
23  staff who worked on Senate Bill 14?
24     A.  Janice McCoy.
25     Q.  Was she the sole person?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1    A.  (Witness nods head yes.)
2    Q.  Do you have a schedule in your -- scheduler in
3  your office?
4    A.  Yes.
5    Q.  And what's the name of that scheduler?
6    A.  Terri Mathis.
7    Q.  Did Terri play any role in scheduling any
8  witnesses for hearings related to SB 14?
9    A.  Not to my knowledge.
10   Q.  Did she schedule any meetings with any
11 constituents, groups or other legislators regarding SB
12 14?
13   A.  That's not privileged, is it?
14       MR. SWEETEN:  She's just asking if someone
15 scheduled anything related to you.  You can answer that.
16   A.  The answer would be yes.
17   Q.  (By Ms. Westfall)  And I'm sorry, Terri's last
18 name is?
19   A.  Mathis.
20   Q.  Is she still employed with you today?
21   A.  Yes, she is.
22   Q.  How long has she been employed with you?
23   A.  15 years.
24   Q.  How did she generally schedule meetings with
25 constituents for you?

## 34

1    A.  I feel sure they called and asked for a
2  meeting, and she asked if I wanted to take the meeting,
3  and then they arrange it.
4    Q.  Does she maintain a calendar for you?
5    A.  Yes, she does.
6    Q.  Is that calendar maintained on a computer
7  system or is it a paper calendar?
8    A.  It's a computer.
9    Q.  How often do you communicate with your staff
10 when you're in session?
11   A.  When I'm in session?  Constantly.
12   Q.  Do you use e-mail?
13   A.  No.
14   Q.  No e-mail, personal or business?
15   A.  I have a personal e-mail account that -- and I
16 estimate that I've probably have sent less than 10
17 e-mails in my lifetime.  I don't know how to
18 e-mail.  The answer is I don't know how to e-mail, and
19 when I send one, I have to ask staff how to do it.
20   Q.  Thank you.
21   A.  So I don't e-mail.
22   Q.  Do you have a BlackBerry?
23   A.  No.
24   Q.  How do you communicate with your staff?
25   A.  Yell into the other office.

## 35

1    Q.  How do you communicate with your staff on
2  nonlegislative matters?
3    A.  Clarify, please.
4    Q.  I guess scheduling issues, personnel issues, is
5  there a distinction between how you communicate
6  regarding legislation with your staff and other matters?
7    A.  My staff are generally not involved in
8  nonlegislative.  If I have something that I'm going to
9  do, I will just -- I'll say "Don't arrange something on
10 this day.  Block this day."
11   Q.  How often in session do you communicate with
12 other members of the legislature?
13   A.  In session, constantly.
14   Q.  How do you communicate with other legislators?
15   A.  Open my mouth and words come out.
16   Q.  Face-to-face meetings?
17   A.  Yes.
18   Q.  Chiefly?
19   A.  Well, the answer is a combination of face-to-
20 face, and obviously, there are some phone communication
21 that we touch on.  But we generally more face-to-face
22 because we're around each other constantly.
23   Q.  And do you communicate with the Lieutenant
24 Governor's Office and the Lieutenant Governor?
25   A.  You know, limited.  Once in a while.

## 36

1    Q.  Do you communicate with the Governor's Office?
2    A.  Very limited.
3    Q.  How do you communicate with the Governor's
4  Office?
5    A.  If it's involving a staffer question, probably
6  would be a phone call.  If it's the Governor, you'd have
7  to ask to get on his calendar to see him.
8    Q.  But are these chiefly in-person meetings that
9  you have with the Governor's Office?
10   A.  90 percent of the time.  Occasionally, it will
11 be a phone call.
12   Q.  And does the same hold true for the Lieutenant
13 Governor's Office?
14   A.  Yes.
15   Q.  Turning back to ALEC, can you describe the
16 issues that ALEC has highlighted in the last five years
17 in terms of issue priorities for ALEC?
18   A.  They've highlighted a lot of issues.
19   Q.  Could you name some of them?
20   A.  No.
21   Q.  Could you describe ALEC's key issues and goals?
22   A.  No.
23   Q.  Has ALEC highlighted or provided technical
24 advice on immigration-related issues?
25       MR. SWEETEN:  Don't reveal any sort of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                              May 17, 2012

---

## 37

1   thoughts, mental impressions or opinions about
2   legislation or your process in considering legislation.
3   And then I think that that would include, you know, any
4   sort of discussions that she's asking you for, so I'm
5   going to ask --
6           MS. WESTFALL:  Mr. Sweeten, I have not
7   posed any question about any legislation.  I'm asking
8   about a policy organization and its issues.  I'm going
9   to ask you to withdraw that objection.
10          MR. SWEETEN:  Well, I heard your question
11  to ask technical assistance, which I believe in the way
12  I'm understanding your question would reveal, and you
13  said as to any legislation, so it would potentially
14  reveal any sort of process that he had in formulating
15  legislation.  So I think that that potentially is
16  legislatively privileged what you've asked him.
17      Q.  (By Mr. Westfall)  Let me try another way.
18          Has ALEC highlighted in its work as a
19  policy organization any immigration-related issues?
20      A.  Not to my knowledge.
21      Q.  Has ALEC highlighted any election-related
22  issues?
23      A.  Again, not to my knowledge.
24      Q.  Have you had any communications with ALEC
25  related to the subject matter of photo ID?

## 38

1       A.  No.
2       Q.  Never, not one?
3       A.  Not to my knowledge.  You're clarifying here
4   that is me as an individual Senator.  I have not had
5   communication that I know of.
6       Q.  Have you had any communications with ALEC in
7   any other capacity, other than being a Texas senator?
8       A.  The answer is no.  I'm just saying that --
9           MR. SWEETEN:  We've defined you as --
10      A.  I want to clarify it's me.  I have -- I have
11  not had communication.
12      Q.  (By Ms. Westfall)  Are you aware of whether
13  Ms. McCoy has had any communications?
14      A.  I'm not aware.
15      Q.  Are you employed in the capacity other than
16  serving in the Texas State Senate?
17          MR. SWEETEN:  Is he employed?  I'm sorry.
18      Q.  (By Ms. Westfall)  In another capacity other
19  than being in the Texas Senate?
20      A.  I have no job other than my $600 a month I'm
21  making as a legislator.
22  ==Q.  When you last renewed your driver's license,==
23  ==where did you have to go to do that?==
24  ==A.  Marble Falls, Texas.==
25  ==Q.  How far was that from your home --==

## 39

1   ==A.  I'm sorry.  I renewed my driver's license in==
2   ==Austin, Texas.==
3   ==Q.  Where was that office?==
4   ==A.  North end of town.==
5   ==Q.  How far was that from your office?==
6   ==A.  Probably 25 minutes.==
7   ==Q.  How far was that from your home, to the extent==
8   ==you have a home in Austin?==
9   ==A.  It's an hour and a half from my home.==
10  ==Q.  When did you go there?==
11  ==A.  I'm sorry.  I don't know.==
12  ==Q.  Do you know approximately how many years ago?==
13  ==A.  Three years.==
14  ==Q.  Do you know the hours of operations of that==
15  ==office?==
16  ==A.  No.==
17  ==Q.  What time of day did you go, do you recall?==
18  ==A.  No.==
19  ==Q.  Did you go during business hours, to the best==
20  ==of your recollection?==
21  ==A.  Yes.==
22  ==Q.  How did you get to the driver's license office?==
23  ==A.  I drove myself.==
24  ==Q.  Do you remember waiting in line?==
25  ==A.  Yes.==

## 40

1   ==Q.  How long did you wait?==
2   ==A.  I don't remember.==
3   ==Q.  How would you have gotten to that office if you==
4   ==hadn't had a car?==
5   ==A.  Public transportation in Austin.==
6   ==Q.  Could you remind me again, what office was this==
7   ==that you went to, the driver's license office?==
8   ==A.  I'm sorry.  I don't know the name of the==
9   ==office.==
10  ==Q.  Do you know approximately where it's located or==
11  ==what street it's on?==
12  ==A.  Approximately Burnet Road.==
13  ==Q.  Is it your testimony that there's public==
14  ==transportation to that office?==
15  ==A.  No.  I can't testify that there is public.  You==
16  ==asked me what if, and I don't know for sure that there==
17  ==is.==
18  ==Q.  Thank you for your testimony.  Do you have a==
19  ==copy of your birth certificate?==
20  ==A.  Yes.==
21  ==Q.  If you lost it, do you know how you'd get==
22  ==another one?==
23  ==A.  Yes.==
24  ==Q.  How?==
25  ==A.  To request the town that I was born.==



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 41

1    Q.   Were you born in Texas?
2    A.   Yes.
3    Q.   Do you know how much it would cost?
4    A.   No.
5    Q.   And how would you go about getting a
6    replacement of your birth certificate?
7    A.   Place a phone call to the -- I'm assuming its
8    county clerk and ask for a replacement.
9    Q.   Do you think you could do that by phone, or
10   would you have to go in person?
11   A.   I believe you can do it by phone.
12   Q.   Would there be some cost associated with
13   obtaining that document?
14   A.   I'm not advised.  I don't know.
15   Q.   When -- do you generally vote in elections?
16   A.   Yes.
17   Q.   Do you vote in person or by mail?
18   A.   In person.
19   Q.   When was the last time you voted?
20   A.   Three days ago.
21   Q.   How far is your polling place from your house?
22   A.   15 minutes.
23   Q.   Is that by car?
24   A.   Uh-huh.
25   Q.   Do you ever vote early, early vote, or do you

## 42

1    vote on election day?
2    A.   More often, early.
3    Q.   Do you have any experience outside of your work
4    in the Texas State Senate on any election law-related
5    matters?
6    A.   Please clarify.
7    Q.   Do you have any -- strike that.
8         Do you have any experience related to
9    election administration?
10   A.   Clarify.
11   Q.   Have you ever volunteered as or worked as a
12   poll worker?
13   A.   No.
14   Q.   Have you ever worked as a poll watcher?
15   A.   No.
16   Q.   Have you ever participated in any other
17   capacity in serving any polling location on election day
18   or during early voting?
19   A.   No.
20   Q.   As a voter, have you witnessed any problems in
21   the polls firsthand?
22   A.   Would that not be privileged?
23        MR. SWEETEN:  I think she can ask you if
24   in your personal, in your life, if you've witnessed any
25   what was the problem with the -- with the -- she can ask

## 43

1    you that.  That's -- I'm not asserting privileges to
2    that issue.
3    A.   Ask it again, please.
4         MS. WESTFALL:  Could you read back the
5    question, sir?
6         (Requested portion read back by the court
7    reporter.)
8    A.   Again, I would ask you to narrow that question
9    down.  "Problems" is a very broad word.  Could be
10   parking.
11   Q.   (By Ms. Westfall)  I'm directing attention to
12   within a polling place, have you seen any voters having
13   problems in voting?
14   A.   Yes.
15   Q.   Could you describe the first problem that you
16   saw in a polling place?
17   A.   Someone showing up at the wrong location to
18   vote.
19   Q.   What happened to that individual?
20   A.   They were instructed where to go to -- to vote.
21   Q.   Have you ever witnessed anyone who was not
22   supposed to be in the polling location appearing to
23   vote?
24   A.   Yes.
25   Q.   Tell me about the first time you saw that.

## 44

1    A.   The question I just answered before.  They were
2    in the wrong location, and they were sent to another
3    location.
4    Q.   Have you ever witnessed anyone who was trying
5    to impersonate another voter in a polling place?
6    A.   No.
7    Q.   Have you ever seen -- have you ever witnessed a
8    person who was not a US citizen attempting to vote?
9    A.   No.
10   Q.   Have you ever seen anyone challenging someone's
11   voter eligibility in a polling place?
12   A.   Clarification, again.  First answer I gave, the
13   answer is yes, because they were in the wrong location.
14   Q.   Are you aware that -- that voters may be
15   challenged at the polls as not properly registered to
16   vote or otherwise eligible?
17   A.   Please clarify.
18   Q.   I'll strike that question.
19        Have you ever, when you've been in a
20   polling location, challenged a voter's eligibility to
21   vote?
22   A.   No.
23   Q.   Are you familiar with Section 5 of the Voting
24   Rights Act?
25   A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

45

1    Q.  What is your understanding of Section 5
2  requirements as a general matter?
3    A.  As per the 1965 Voter Rights Act, there were
4  certain states, mostly in the south, that were placed
5  under Section 5.  And placed -- given different
6  requirements than everyone else in the nation.
7    Q.  And I understand that you've testified that
8  you're not a lawyer, but can you tell me, to the best of
9  your ability, what the requirements are of Section 5,
10  sir?
11    A.  Currently, are you asking for currently or in
12  1965?
13    Q.  Currently today.
14    A.  Any election activity that happens in a Section
15  5 state, of which Texas is one, that all data pertaining
16  to that has to be cleared by the Justice Department
17  prior to the election, and there's obviously a cost,
18  administrative cost associated with that.
19    Q.  Is there anything else that you want to testify
20  about your understanding of Section 5 requirements, or
21  that is the sum total?
22    A.  That's it.
23    Q.  Do you believe that compliance with the Voting
24  Rights Act is important?
25        MR. SWEETEN:  Objection.  Relevance.  Go

46

1  ahead and answer.
2    Q.  (By Ms. Westfall)  You may answer.
3    A.  I believe when the Act was passed in '65, it
4  was important.  I believe today the Voting Rights Act
5  has outlived its useful life.
6    Q.  When do you believe -- first of all, what do
7  you mean by that, "outlived its useful life"?
8    A.  Should I?  Privilege on that?
9        MR. SWEETEN:  Well, here's how we'll --
10  let me instruct you as to that.  I don't want you to
11  reveal any sort of thoughts or mental impressions or
12  opinions about legislation or matters in furtherance of
13  the legislative process as it relates to bills.  And I
14  don't want you to reveal communications between you and
15  legislators or legislative staff, state agencies, Texas
16  Legislative Council or constituents.  If you can answer
17  that question without revealing those, then you can go
18  ahead and do so.  And you can at all times --
19    A.  I believe it's outlived its useful life.
20        MR. SWEETEN:  Okay.  You can also just
21  finish.  You can at all times include matters of the
22  public record.  You can discuss matters on the public
23  record, including committee hearings, proceedings,
24  debates, that sort of thing.
25        MS. WESTFALL:  Mr. Sweeten, I'm not asking

47

1  about any legislative act right now.  So I think your
2  instruction is inappropriate.  I would ask you to
3  withdraw it with regard to the question I asked.
4        MR. SWEETEN:  Well, I think he's answered
5  the question.  I think it's important that he not reveal
6  matters that would be legislatively privileged in
7  answering the question.  If he can answer it without
8  doing so, which I think he may have just done, then I'm
9  letting him do so.  So it's just as to matters that
10  could be legislatively privileged.  That's my
11  instruction.
12    Q.  (By Ms. Westfall)  Could you explain what you
13  mean by Section 5 having outlived its useful life?
14    A.  I believe it's outlived its useful life.
15    Q.  Could you explain what you mean by that?
16        MR. SWEETEN:  Same instruction.  Go ahead.
17    A.  I believe it's outlived its useful life.
18    Q.  (By Ms. Westfall)  And that's the sum total of
19  your response to my question?
20    A.  Yes.
21    Q.  When did that occur that it became -- that
22  Section 5 became no longer useful?
23    A.  I wouldn't attach a date to that time.
24    Q.  And what is the basis for your opinion?
25        MR. SWEETEN:  Same instruction.  Go ahead.

48

1    A.  I believe it has outlived its useful life.
2    Q.  (By Ms. Westfall)  Do you have any facts to
3  support that statement that you want to testify about
4  today?
5        MR. SWEETEN:  Same instruction.
6    A.  I believe it has outlived its useful life.
7    Q.  (By Ms. Westfall)  Do you receive any legal
8  advice on election-related legislation to ensure
9  compliance with Section 5?  And I'm just asking about
10  the fact of legal advice.  I'm not asking you to testify
11  about any conversations you've had with your attorneys
12  about Section 5.
13        MR. SWEETEN:  Okay.  And so -- so it's
14  clear.  She's not asking you about the substance of
15  communications.  She's simply asking, do you receive
16  legal advice on that issue?
17    A.  I would claim privilege on that because any
18  advice I'm getting would be involving legislation.
19    Q.  (By Ms. Westfall)  Sir, your counsel has
20  instructed you not to reveal any -- the substance of
21  those conversations, but I'm sure your counsel would not
22  disagree with my assertion that I'm allowed to ask
23  whether you have received advice on compliance with
24  Section 5 of the Voting Rights Act.
25    A.  The answer is yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

49

1    Q.   Thank you.  And from whom?
2    A.   Counsel.
3    Q.   Mr. Sweeten?
4    A.   Not like -- well, Mr. Sweeten, obviously, we
5    have had conversations recently.
6    Q.   Do you have counsel for the -- that you -- that
7    you rely upon within your capacity as a Texas State
8    Senator for advice about Section 5?
9    A.   I do not have specific counsel that I rely on,
10   on Section 5.
11   Q.   Are there any attorneys at all that you relied
12   upon in drafting Senate Bill 14 pertaining to compliance
13   with Section 5?
14        MR. SWEETEN:  Okay.  If you're asking has
15   he communicated and did he have communications with
16   individuals?
17        MS. WESTFALL:  That's not my question,
18   Mr. Sweeten.
19        Court Reporter, would you read back the
20   question?
21        MR. SWEETEN:  Yeah.  Read back the
22   question.
23        (Requested portion read back by the court
24   reporter.)
25   A.   In the drafting of Senate Bill 14.

50

1    Q.   (By Ms. Westfall)  Consideration or anything
2    involving Senate Bill 14, did you -- I'm just asking
3    whether you relied upon the advice of counsel.
4    A.   Yes.
5    Q.   Who was that person?
6    A.   I couldn't give you specific counsel.
7    Q.   Was there an office that person was employed
8    with?  What entity housed the lawyer that you relied
9    upon for advice for Section 5?
10   A.   The counsel for the State of Texas generally is
11   the Attorney General's office.  We do have in-house
12   counsel that drafts legislation, the lawyers there that
13   obviously are involved in the drafting.
14   Q.   Who -- what office is that within --
15   A.   There's two groups in Texas.  One is the Texas
16   Legislative Council.  The second group, I'm sorry, I
17   can't pull up the name of it, but there is a second
18   group that does -- does secondary work.
19   Q.   Is that Engrossing and Enrolling, is it that
20   group?
21   A.   Yes, but that's not what it's called.
22   Q.   If you remember later today, will you tell me?
23   A.   Sure.  Yeah.
24   Q.   Doing my best to figure out the various
25   entities of the Texas State Senate, but I'll have to

51

1    rely upon your help.
2         So it is your testimony that you solely
3    relied upon advice from the Texas Legislative Council
4    for advice pertaining to compliance with Section 5 in
5    regards to Senate Bill 14; is that right?
6    A.   Yes.
7    Q.   Did you rely upon advice from the office of the
8    Attorney General as well in that regard?
9    A.   Yes.
10   Q.   What is Texas's current system for determining
11   how to verify the identity of a voter before section --
12   before SB 14 was enacted?
13   A.   The only requirement Texas has that if you show
14   your -- your voter registration card that is sent by --
15   in the mail to people, and whoever has that card in
16   their possession can walk up and vote.
17   Q.   Has this system failed to prevent voter fraud
18   in your view?
19   A.   No.
20   Q.   Are there any problems you can identify today
21   with the current system in identifying voter fraud?
22        MR. SWEETEN:  When you're answering this
23   question, I don't want you to reveal thoughts, mental
24   impressions or opinions about legislation or in
25   furtherance of the legislative process, or

52

1    communications that you've had among the entities that
2    we've talked about.
3    A.   It has been testified in the hearings on the
4    bill that there's been numerous occasions where a card
5    was either stolen out of a mailbox or given to someone
6    else and that person voted with that card.
7    Q.   (By Ms. Westfall)  Could you tell me when that
8    testimony occurred?
9    A.   When the bill was heard in 2009 and when the
10   bill was heard in 2011.
11   Q.   How many voters did that occur with, to the
12   best of your recollection?
13   A.   I don't recall that number.
14   Q.   Was it more than 10?
15   A.   Yes.
16   Q.   Was it 20?
17   A.   I don't have a number.
18   Q.   Do you know the witness who testified about
19   that activity that you just described?
20   A.   The one witness that comes to mind is Senator
21   Williams' father -- he was deceased and had been voting
22   for multiple elections.  Someone had his card and was
23   taking the card and voting.
24   Q.   Did that result in a conviction of that
25   individual?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 53

1    A.  To my knowledge, no.
2    Q.  Are you aware of any convictions on the basis
3  of -- related to the activity that you described?
4         MR. SWEETEN:  Can you reread the question
5  back?
6         MS. WESTFALL:  Mr. Sweeten, it's a matter
7  of public record, convictions.
8         MR. SWEETEN:  Okay.  I'm -- I didn't ask
9  that.  I'm asking for him to read the question back, if
10  he would, please.
11        MS. WESTFALL:  You may do so, sir.
12        (Requested portion read back by the court
13  reporter.)
14        MR. SWEETEN:  And when you say activity
15  described, he's talking about Williams's testimony on
16  the Senate.  So do you know?  You can answer that
17  question.
18    A.  I'm sorry.  I do not remember.  There has been
19  testimony on that, but I do not remember specific
20  convictions.
21    Q.  (By Ms. Westfall)  So sitting here today,
22  you're unaware, just to -- so I understand your
23  testimony, you're unaware of any convictions related to
24  the fraud that you described, which is stealing
25  someone's voter registration card.  Is that -- am I

## 54

1  correctly stating your testimony?
2    A.  You asked me to list specific ones, and I
3  cannot list specific ones.
4    Q.  Thank you, sir.  Other than that issue that you
5  just flagged as a potential problem under the current
6  law, are you aware of any other problems with the
7  current system for verifying a voter's identity under
8  Texas law?
9         MR. SWEETEN:  Again, don't reveal your
10  thoughts, mental impressions or opinions in furtherance
11  or about legislation.  Don't reveal communications that
12  you've had between legislators, legislative staff, state
13  agencies, Texas Legislative Council or constituents in
14  answering this question.  You can refer to matters in
15  the public record.
16    A.  Texas law is insufficient for making a person
17  identify who they are.
18    Q.  (By Ms. Westfall)  And thank you for your
19  testimony.  And what is the basis for that opinion,
20  other than what you've just testified about, which is
21  testimony regarding stolen voter registration cards?
22        MR. SWEETEN:  Okay.  In answering this
23  question, do not reveal mental impressions, thoughts or
24  opinions about legislation, okay, including Senate Bill
25  14.  And don't reveal communications that you've had

## 55

1  with any of the individuals or entities that we've
2  talked about in answering this question.  You can refer
3  to matters of the public record.
4    A.  In Texas, if someone has in their possession a
5  voter registration card and they go to the proper voting
6  location, they are allowed to vote.
7    Q.  (By Ms. Westfall)  And --
8    A.  Without identifying they are who they say they
9  are.
10    Q.  And it's -- it's your opinion that that creates
11  problems or are there any -- what I'm trying to ask you
12  is whether there are any facts that you haven't already
13  testified to that support your opinion.
14        MR. SWEETEN:  In answering this question,
15  do not reveal thoughts, mental impressions or opinions
16  about legislation or in furtherance of the legislative
17  process.  Okay?  Don't reveal the communications that
18  we've talked about with individuals or entities that
19  are protected under the privilege.
20    A.  It's been testified in testimony that it is
21  possible in Texas for someone to go to and present a
22  voter registration card that is not theirs, and if they
23  are on the list, they're allowed to vote and not asked
24  for identification.
25    Q.  (By Ms. Westfall)  So is it your testimony that

## 56

1  the problem with the current system is the potential for
2  in-person voter fraud, as you just described, is that
3  your testimony?
4         MR. SWEETEN:  In answering this question,
5  do not reveal thoughts, mental impressions, opinions
6  about legislation, including Senate Bill 14, and do not
7  reveal communications that you've had with legislators,
8  legislative staff, Texas Ledge Council, constituents or
9  state agencies.
10    A.  I claim the privilege on this question.
11        MS. WESTFALL:  Mr. Sweeten, it will be
12  possible that you could you shorten, shorthand your
13  objections so we don't have to spend much of the day
14  listening to the same objection over and over, and you
15  could have a shorthand understanding.  Is that something
16  I could ask for you to work out with your client?
17        MR. SWEETEN:  We can do that.  Why don't
18  we -- we can discuss that at a break.
19        MS. WESTFALL:  Okay.
20        MR. SWEETEN:  I know you don't want to
21  hear me sit here and go through this exercise.  At the
22  same time, I think it's important that I will
23  occasionally, you know, interject that.  But let's
24  continue as we are.  We will discuss sort of something
25  we can work out at the break.  Okay?  But I'll work with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 57

1  you.
2          MS. WESTFALL:  I would like --
3          MR. SWEETEN:  I know you don't want to
4  hear me all day.
5          MS. WESTFALL:  I would like to remind you,
6  Senator, that -- and it's going to be very difficult
7  within a complicated deposition with your counsel
8  asserting privilege on your behalf and a lot of
9  interruptions, and we found in the last few days that
10  it's sometimes difficult to remember the question that
11  was posed.  But the way we're going to get through this
12  deposition in as quick a process as possible is if you
13  listen carefully to my question and answer it to the
14  best of your ability, if you decide to listen to the
15  advice of your counsel, taking that into account.  But
16  I'm now going to go back and ask that question again so
17  I can get an answer on the record.
18          Could you read the question back, Court
19  Reporter?
20          (Requested portion read back by the court
21  reporter.)
22          I'll claim privilege.
23      Q.  (By Ms. Westfall)  When was Senate Bill 14
24  signed into law?  To refresh your recollection, was it
25  approximately May 2011?

### 58

1      A.  That sounds correct.
2      Q.  Had there been elections held in Texas since
3  that time?
4      A.  Yes.
5      Q.  Approximately how many?
6      A.  I'm sorry.  I don't have that number.
7      Q.  To your knowledge, has the Secretary of State
8  or any county officials enforced Senate Bill 14 since it
9  was signed into law?
10      A.  No.
11      Q.  Have there been any -- and so you've been
12  operating under the current system before Senate Bill 14
13  is enforced; is that correct?
14      A.  Yes.
15      Q.  And have there been any problems related to
16  in-person voter impersonation, fraud, other problems
17  that you're aware of that occurred between May 2011 and
18  the present?
19      A.  I don't have that information.
20      Q.  So is the answer you're not aware of any
21  problems, sitting here today?
22      A.  My answer is I don't have that information.
23      Q.  When did you first hear any support for
24  enacting photo voter identification requirements in
25  Texas?

### 59

1          MR. SWEETEN:  In answering this question,
2  don't reveal your thoughts, mental impressions, opinions
3  about legislation or in furtherance of the legislative
4  process.  Don't reveal communications between the
5  entities or individuals that we've named.
6      A.  Ask the question again, please.
7          MS. WESTFALL:  Court Reporter, could you
8  read it back?
9          (Requested portion read back by the court
10  reporter.)
11      A.  2007.  No, late 2006.
12      Q.  (By Ms. Westfall)  Could you describe the
13  circumstances under which you heard about interest in
14  them -- in that issue?
15          MR. SWEETEN:  Same instruction.
16      A.  Privilege.
17      Q.  (By Ms. Westfall)  Could you tell me the --
18  could you identify the persons who expressed support for
19  such a law?
20      A.  No.
21      Q.  No, you don't know?
22      A.  Privilege.
23      Q.  I'm sure your counsel will agree that the
24  privilege doesn't extend to identifying the persons who
25  expressed support.

### 60

1      A.  Okay.  The answer is no, I don't have a
2  specific person.
3      Q.  So you don't recall at this time, or you do
4  recall?
5      A.  You're asking for the name of a specific
6  person.  The answer is no, I don't have a specific
7  person.
8      Q.  Was there a group of people who were supporting
9  it?
10      A.  No.
11      Q.  Not that you recall?
12      A.  There was not a group that brought the
13  legislation to me.
14      Q.  So you first heard the support in late 2006.
15  It's your testimony you can't remember individuals.
16  It's your testimony you can't remember any groups.  How
17  did you come to learn about the interest in photo ID?
18      A.  I believe my first contact of looking at it was
19  the Baker-Carter commission report that came out in '05,
20  and I believe I read documentation of that and the
21  recommendation of that group.
22          MR. SWEETEN:  Okay.  She can ask you, and
23  the court will allow her to ask you if you had
24  conversations with someone, who was present in the
25  conversations.  She can ask you the approximate date of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**61**

1  that.  Do not, though, go beyond that and reveal the
2  substance of the communication or -- when she's asking
3  these questions.  I'm just going to instruct you.
4      Q.  (By Ms. Westfall)  Do you know why there was
5  support for photo ID in 2005?
6          MR. SWEETEN:  Don't answer.  Legislative
7  privilege.
8      A.  Privilege.
9      Q.  (By Ms. Westfall)  Are you not asking on the
10 basis of your counsel's advice?
11     A.  Yes.
12     Q.  Was there a time when photo -- voter ID law was
13 first introduced in the Texas legislature?
14     A.  Clarify.
15     Q.  In 2005, was there a bill?
16     A.  To my knowledge, I do not remember a bill in
17 2005.
18     Q.  Was there a bill in the House?
19     A.  Again, I don't remember.
20         MS. WESTFALL:  Could you mark this as
21 US --
22         MS. MARANZANO:  Has it been marked before?
23         MS. WESTFALL:  It hasn't been.  So what's
24 the next number?
25         MS. MARANZANO:  44.

---

**62**

1          MS. WESTFALL:  Could you mark this as U.S.
2  44, please?
3      Q.  (By Ms. Westfall)  You've been handed what's
4  been marked US 44.  Do you recognize this?
5      A.  I recognize it as a bill, but I don't -- has
6  this got a date on it?
7      Q.  I'll give you a moment to take a look.  I don't
8  believe it does have a date.  Oh, it does.
9      A.  The bill is set to have made -- to take effect
10 on September 1, 2009, so it would imply --
11     Q.  Of 2005?
12     A.  It's Senate Bill 362.
13     Q.  Oh, my apologies.
14         MR. SWEETEN:  You've got 362.  She's was
15 trying to get you 1706 here.  So let's change that out.
16         MS. WESTFALL:  Yeah.  Sorry.  So would you
17 mark this Exhibit 44.
18         (Exhibit 44 remarked for identification.)
19     Q.  (By Ms. Westfall)  You've been handed the
20 corrected copy of US 44.  Do you recognize this?
21 Have you had a chance to look at US 44?
22     A.  Yes.
23     Q.  Do you recognize this?
24     A.  Yes.
25     Q.  What is it?

---

**63**

1      A.  It appears to be legislation that was filed,
2  and again, it doesn't have a date on it for the
3  enactment.
4      Q.  Directing your attention to Page 10, which is
5  the last page of US 44.  Do you see a date on that, sir?
6      A.  Okay.  Okay.  Yes.
7      Q.  Does that refresh your recollection as to when
8  this bill was introduced?
9      A.  No.
10     Q.  Did you have any involvement -- and just for
11 the record's purposes, this is House Bill 1706, correct?
12     A.  Yes.
13     Q.  And does it appear that it was introduced in
14 2005?
15     A.  Yes.
16     Q.  Did you have any involvement whatsoever in this
17 bill?
18     A.  No.
19     Q.  Can you hand the witness what's been previously
20 marked as Exhibit 28?
21         MR. SWEETEN:  You can put that other one
22 aside, Senator Fraser.  And let's start with the stack
23 here so we don't lose any of these.
24     Q.  (By Ms. Westfall)  You've been handed what's
25 been previously marked as US 28.  Do you recognize this

---

**64**

1  document?
2          MR. SWEETEN:  Caution the witness to take
3  your time in reviewing the document before you answer
4  any questions on it.
5      Q.  (By Ms. Westfall)  Sir, have you had a chance
6  to look at this Exhibit 28, or do you need some more
7  time?
8      A.  No.  I've looked at it.
9      Q.  Do you recognize it?
10     A.  Yes.
11     Q.  What is it?
12     A.  It was a bill filed in the Texas House of
13 Representatives in 2007.
14     Q.  Do you recall who authored it?
15     A.  I recall because I can read the author's name
16 on the top of the -- the coauthors.
17     Q.  And who authored it?
18     A.  Brown of Kaufman, Berman, Bohac, Riddle, et al.
19     Q.  Did you or your staff play any role in
20 development of House Bill 218?
21     A.  Not to my knowledge.
22     Q.  Are you familiar with the provisions of House
23 Bill 218?
24     A.  Yes.
25     Q.  Could you tell me -- could you describe it,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1  House Bill 218 for me?
2           MR. SWEETEN:  In answering this, don't
3  reveal thoughts, mental impressions or opinions about
4  legislation or in furtherance of the legislative
5  process, or any conversations that we've talked about.
6           MS. WESTFALL:  I would ask you to withdraw
7  that objection.  I'm asking him questions about the
8  bill, which couldn't be more public.  Do you agree,
9  Mr. Sweeten?
10          MR. SWEETEN:  I think -- I'm not sure that
11  the way you just phrased it is what the question asked,
12  but go ahead and you can -- we'll ask the court reporter
13  to read it back.
14          (Requested portion read back by the court
15  reporter.)
16          MR. SWEETEN:  Okay.  He can describe the
17  bill that's in front of him.
18          MS. WESTFALL:  Would you withdraw your
19  objection, Mr. Sweeten?
20          MR. SWEETEN:  If you're asking him to
21  describe the document in front of him, yeah, I'll
22  withdraw the objection.  Go ahead.
23          MS. WESTFALL:  Thank you.
24      Q.  (By Ms. Westfall)  Could you answer the
25  question?

## 66

1       A.  Could you repeat the question?
2       Q.  Certainly.  Could you describe House Bill 218
3  for me?
4       A.  No.
5       Q.  I believe you just testified you were familiar
6  with this bill, did you not?
7       A.  You asked me if I recognized the bill.
8       Q.  Are you unable to describe House Bill 218 for
9  me, sir?
10      A.  This is with a House Bill filed in part of the
11  House.
12      Q.  Can I turn your attention to the part of the
13  bill that may refresh your recollection?  Could you turn
14  your attention to Page 9 of Exhibit 28, House Bill 218?
15  Do you see on Page 9 it lists forms of acceptable
16  documentary proof of ID?
17      A.  What's that number?  I'm sorry.
18      Q.  Certainly.
19          MR. SWEETEN:  She's asking about Page 9,
20  Senator Fraser, I think.
21      A.  I know.  I'm thinking about something else.
22          MR. SWEETEN:  Okay.
23      A.  I'm trying to recall.  It's been a long time
24  ago.
25          What was your question?

## 67

1       Q.  (By Ms. Westfall)  I was directing you to the
2  list of IDs on Page 9.  Are you there?
3       A.  9?
4       Q.  On Page 9, Section 63.
5       A.  Yes.
6       Q.  So just to clarify, you testified earlier that
7  you were unfamiliar with House Bill 1706, is that right,
8  that was introduced in 2005?
9       A.  I didn't say that I was unfamiliar.
10      Q.  Could you clarify your testimony?
11      A.  You asked if I could describe.
12      Q.  Okay.  Are you able to describe any differences
13  between House Bill 1706 enacted in -- or introduced in
14  2005 and the bill that you have before you, Exhibit 28,
15  House Bill 218?  I just want to know if you're able to
16  do so.
17      A.  I am not able to do so.
18      Q.  Thank you.  Were you present at any meetings
19  during the development of House Bill 218?
20      A.  No.
21      Q.  Was any of your staff?
22      A.  I don't know.
23      Q.  Are you aware of any concerns that were raised
24  during the development of House Bill 218 about the
25  impact of House Bill 218 on Hispanic voters?

## 68

1       A.  Privilege.
2           MR. SWEETEN:  Don't -- yeah, that's
3  privileged.
4       Q.  (By Ms. Westfall)  Are you aware of purposes,
5  the purpose or purposes for House Bill 218?  And I'm
6  just looking for a "yes" or "no" answer.  Are you aware
7  of the purposes, and then we'll talk about what they
8  are?
9       A.  When the bill was filed?
10      Q.  Yes.
11      A.  No.
12      Q.  Are you aware of whether part of the purpose of
13  218 was to prevent noncitizens from voting?
14          MR. SWEETEN:  Objection, legislative
15  privilege.
16      A.  Privilege.
17          MS. WESTFALL:  I hand you what's been --
18  well, could you remark this as -- it's previously
19  marked.  Can you just remark this as 3?
20      Q.  (By Ms. Westfall)  I'm handing you what's been
21  previously marked as Exhibit 3.  Have you seen this
22  document before?
23      A.  As the date of this publication -- it says 4-12
24  on the printing.  Is that the date?
25      Q.  I would turn your attention to the top line of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

73

1  did he not?
2      A.  You're representing that this is a letter from
3  him.  I couldn't -- I can't validate that.
4      Q.  Let me ask you directly:  Was part of the
5  purpose of House Bill 218 to prevent noncitizens from
6  voting?
7          MR. SWEETEN:  I'm going to object to
8  legislative privilege.
9      Q.  (By Ms. Westfall)  Mr. Dewhurst -- well, strike
10  that.
11          Who would be the best -- strike that.
12          Would Mr. Dewhurst know about this letter?
13          MR. SWEETEN:  Objection, calls for
14  speculation.
15      Q.  (By Ms. Westfall)  You may answer.
16      A.  Privilege.  I don't know.  I'm not, you know, I
17  don't know.  I -- I don't know about this letter.
18      Q.  Do you think that if the Texas Weekly published
19  an open letter from Lieutenant Governor Dewhurst, and
20  sitting here today, you are unable to answer questions
21  about this, that Mr. Dewhurst would be the best person
22  that we could ask about this letter and the contents
23  thereof?
24      A.  Speculation.
25      Q.  Is there anybody --

---

74

1      A.  I do not -- you're asking me do I know.  I do
2  not know.
3      Q.  Who would know about this letter and about the
4  purposes expressed about House Bill 218?
5      A.  You'll have to ask them.  I do not know.
6      Q.  And by "them," you mean Mr. Dewhurst?
7      A.  Anyone you want to ask would be appropriate.  I
8  don't -- I don't know.
9      Q.  And I believe when I asked you whether
10  preventing US -- non-US citizens from voting was the
11  purpose of House Bill 218 you asserted privilege.  If
12  that is with regard to any private conversations over
13  which your counsel is asserting privilege, could you
14  identify the person with whom you had a conversation
15  about noncitizens voting and House Bill 218?
16      A.  Is that privilege?
17          MR. SWEETEN:  She's asking you and the
18  court will allow them to ask you questions that reveal
19  the name or legislator or staff involved in a
20  communication, the name of a constituent involved in a
21  communication, whether any individuals were privy to the
22  communication, the date on which the communication
23  occurred, or the form or medium of the communication or
24  the nature of general subject matter.
25          So you can identify those sort of

---

75

1  particulars about a contact or conversation.  Do not
2  reveal the specific content of contacts?
3      A.  Ask the question again.
4      Q.  Certainly.  Let me strike the question and ask
5  another one.
6          Did you ever have any conversations with
7  anyone about House Bill 218 and its purpose as it
8  pertained to preventing non-US citizens from voting?
9      A.  No.
10      Q.  Was part of the purpose of House Bill 218 to
11  prevent foreign nationals from applying for and
12  receiving voter registration cards?
13      A.  Privilege.  Privilege.
14      Q.  Did you ever have any conversations about the
15  purpose of House Bill 218 as it pertained to stopping
16  foreign nationals from applying for and receiving voter
17  registration cards?
18          MR. SWEETEN:  Same objection, legislative
19  privilege.
20      A.  Privilege.
21      Q.  (By Ms. Westfall)  Did you have any
22  conversations?  I'm sure your counsel will instruct you
23  that you can answer that question.
24      A.  Privilege.
25          MS. WESTFALL:  Mr. Sweeten.

---

76

1          MR. SWEETEN:  You can identify whether or
2  not you had a conversation with anyone and you can -- if
3  she's asking you the general subject matter, you can
4  answer about the date or time or who was involved in the
5  conversation.  Don't reveal the substance of the
6  conversation or communication.
7      A.  Ask the question again, please.
8      Q.  (By Ms. Westfall)  Senator Fraser, did you ever
9  have any conversations with anyone about House Bill 218
10  and part of its purpose being to prevent foreign
11  nationals from applying for or receiving voter
12  registration cards?
13          MR. SWEETEN:  I'm going --
14      A.  Not to my knowledge.
15          MR. SWEETEN:  And I'm also going to
16  interpose an objection, assumes facts not in
17  evidence.  But go ahead.  You've answered it, so we're
18  on to the next question.
19      Q.  (By Ms. Westfall)  Would, in your view, House
20  Bill 218 stop noncitizens from voting?
21          MR. SWEETEN:  I'm going to object --
22      A.  Privilege.
23          MR. SWEETEN:  -- yeah, as to legislative
24  privilege on that issue.
25      Q.  (By Ms. Westfall)  Would it stop foreign

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

77

1  nationals from receiving voter registration cards?
2         MR. SWEETEN: Same objection. Same
3  instruction. Legislative privilege.
4         A.  Privilege.
5         Q.  (By Ms. Westfall) Don't people indicate their
6  citizenship when they register to vote?
7         MR. SWEETEN: Time frame, are you asking
8  currently now?  Are you asking in 2007?
9         MS. WESTFALL: I'm asking currently now.
10        MR. SWEETEN: Okay.
11        MS. WESTFALL: And then.
12        MR. SWEETEN: Do you understand the
13  question?
14        A.  To my knowledge, no.
15        Q.  (By Ms. Westfall) Do people affirm or indicate
16  their citizenship on voter registration applications in
17  Texas?
18        A.  Clarify "affirm."  Is there a question
19  "asked"?  Is that what you're asking?
20        Q.  I'm asking whether when you apply to register
21  to vote and submit a voter registration form in the
22  state of Texas today, do you swear or affirm or indicate
23  under penalty of perjury that you are a US citizen?
24        A.  To my knowledge, yes, you do.
25        Q.  Thank you for your testimony.

---

78

1         As you sit here today, do you believe that
2  part of the purpose of House Bill 218 was to prevent
3  noncitizens from voting?
4         MR. SWEETEN: Objection, legislative
5  privilege.
6         A.  Privilege.
7         MS. WESTFALL: I'm asking him as he sits
8  here today --
9         A.  Privilege.
10        MS. WESTFALL: -- his opinion, not based
11  upon a legislative act.  Mr. Sweeten, will you
12  reconsider your objection?
13        MR. SWEETEN: Well, I think he wants a
14  break, and so let's -- we'll discuss it at the break.
15        MS. WESTFALL: No.  Can we finish the
16  question?
17        MR. SWEETEN: Okay.  Can you read the
18  question back, please?
19        (Requested portion read back by the court
20  reporter.)
21        MR. SWEETEN: Objection, asked and
22  answered.
23        Q.  (By Ms. Westfall)  You may answer.
24        A.  The purpose of the bill was to protect the
25  integrity of the voting box.

---

79

1         MR. SWEETEN: Okay.  We're going to take a
2  break.
3         MS. WESTFALL: Thank you.  Why don't we
4  take a break for a few minutes and we can get some
5  coffee and come back in a few minutes.
6         (Lunch recess from 11:24 a.m. to
7  12:39 p.m.)
8         Q.  (By Ms. Westfall) Okay.
9         A.  Could I possibly go back and readdress an issue
10  that we had talked about earlier?
11        Q.  Certainly.
12        A.  The -- on Exhibit 28 that you handed me, which
13  is House Bill 218.
14        Q.  Yes.
15        A.  I answered that I was not familiar and had not
16  seen it because I thought this was the filed version
17  that had been filed in the House, and was not the
18  amended -- it was amended on the Floor, engrossed in the
19  House, sent to the Senate, and I picked the bill up.  I
20  had not been following 218 as filed, which I assume it
21  is.  I've since looked at the language and there's an
22  amendment that I recognize in this that was placed, I
23  believe, in the bill that came over.  So I believe my
24  answer to your question you asked, is it 218 as you
25  handed it to me, yes, I am familiar with it because it

---

80

1  was the version that was sent to the House and I picked
2  up as to carry.
3         Q.  Thank you for that.
4         A.  So this -- this -- and I want to correct that.
5         Q.  Thank you for that clarification.  Just to be
6  clear:  Exhibit 28, House Bill Number 218, is that the
7  -- do you believe it is the version that was received in
8  the Senate and engrossed in the House?  Is that your
9  testimony?
10        A.  I do believe this is the engrossed version as
11  amended in the House that came to the Senate and was the
12  bill that I picked up and took to the Floor.
13        Q.  Thank you for that clarification.  I appreciate
14  that.
15        MS. WESTFALL: Before we proceed,
16  Mr. Sweeten, will you, as we discussed during the break,
17  agree -- that we can have an agreement, that you can
18  assert legislative privilege and that will be an
19  objection that reflects objections that you've made more
20  fully previously during this deposition?
21        MR. SWEETEN: Right.  And Counsel will
22  allow me to, in asserting the legislative privilege,
23  that that preserves the full objection that I had been
24  making throughout this deposition.  Okay.  That's fine.
25        MS. WESTFALL: Thank you.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 81

1    Q.  (By Ms. Westfall) Senator, we had been
2    discussing House Bill 218 before the break.  I'd like to
3    refer you to that bill again and ask you whether this
4    bill, House Bill 218, would prevent non-citizens from
5    voting?
6    A.  The --
7         MR. SWEETEN.  I'm going to object based on
8    legislative privilege.  I think that goes to effect.
9         THE WITNESS:  Do you think that's
10   privileged?
11        MR. SWEETEN:  Yeah.  I think it --
12        MS. WESTFALL:  Mr. Sweeten, I'm asking
13   about the effect of the bill, so outside of
14   conversations that you've -- that are -- I'm not asking
15   you to testify about anything -- personal conversations,
16   private things that you're alleging to be privileged, in
17   terms of conversations with other legislators, but to
18   the extent you can just testify about whether you
19   believe the bill on its face.
20   A.  And, again, if you get into belief, what I
21   believed, I would've claim privilege.
22        Q.  (By Ms. Westfall) Okay.  So you -- your
23   testimony is you cannot answer the question about
24   whether HB 218 --
25   A.  I'm saying it is privileged the way you asked

## 82

1    the question.
2         Q.  Okay.  And I'm going to counsel you, just
3    because we're having a back and forth, not to talk over
4    each other because the record will be very difficult to
5    read.  So I will try to wait for you answer, and if you
6    wait for me to interpose my question, I'd be grateful.
7         Let me ask it a different way:  Was HB 218
8    enacted, to the best of your recollection?
9    A.  I'm sorry?
10        Q.  Was it enacted and signed by the Governor in to
11   law?
12   A.  218?
13   Q.  Yes?
14   A.  No.
15        Q.  And if it had been and was precleared by the
16   Justice Department or otherwise approved under Section 5
17   through the courts and was enforced in Texas, is it --
18   do you believe that it would prevent non-citizens from
19   voting?
20        MR. SWEETEN:  I'm going to object to the
21   question as legislatively privileged.  It goes into his
22   beliefs.  I think, to help us, if you want to ask if a
23   specific provision as written in the text that you're
24   seeing would prohibit something, I think that would be
25   fine, but I think you're asking his overall believe, his

## 83

1    mental impressions, about the legislation.  So that's my
2    direction.
3         Q.  (By Ms. Westfall) Directing your attention to
4    Page 9 of Exhibit 28, Section 63.0101, on Page 9; do you
5    see that?
6         MS. WESTFALL:  Let the record reflect
7    witness is reviewing Exhibit 28.
8         Q.  (By Ms. Westfall) Do you see where it lists
9    documentation of proof of identification?
10   A.  Yes.
11        Q.  Would this section of the bill have the effect
12   of preventing non-citizens from voting?
13   A.  No.
14        Q.  Is it true as you understand it, sitting here
15   today, that non-citizens in Texas may obtain a Texas
16   driver's license?
17   A.  Yes.
18        Q.  Are you aware that in 2007, Royal Masset --
19   actually, strike that.
20        Who is Royal Masset?
21        MR. SWEETEN:  You can answer who he is.
22   A.  Royal Masset had been affiliated through party
23   politics off and on through the last ten years.
24        Q.  (By Ms. Westfall) And by party politics, do you
25   mean the Republican party of Texas?

## 84

1    A.  Yes.
2         Q.  Was he the former political director?
3    A.  I don't know.
4         Q.  Are you aware that he said something to the
5    effect of -- in -- that he said in 2007, "They're just
6    basically using sheer racism to pump up their own
7    political points; they're just trying to exploit racism
8    fear of illegal aliens."  Are you familiar with that
9    quote?
10   A.  No.
11        Q.  Are you familiar with that sentiment?
12   A.  No.
13        Q.  You never heard Royal Masset make any
14   indication of that in the public or in the press?
15   A.  No.
16        Q.  What's your reaction to that quote?
17   A.  Privileged.
18        Q.  Could you identify -- did you have a
19   communication that you're referring to in asserting
20   privilege over?
21        MR. SWEETEN:  I think what she's asking
22   you is are you basing the privilege claim on -- on a
23   communication or on the fact that it would reveal
24   thoughts, mental impressions, opinions about
25   legislation?


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1    A.  I think I have to answer this in that the only
2  knowledge I have of this was an assertion made during
3  testimony in 2009.  That's the only time I've ever heard
4  of this issue and had any other knowledge other than it
5  was asserted by a member during testimony.
6    Q.  (By Ms. Westfall) In 2009, your -- could you
7  tell me about the testimony, on the record, that you're
8  referring to?
9    A.  I don't remember the member, but a member of
10  the legislature, and it was a Democrat member, made the
11  assertion that Royal Masset had made this quote.
12    Q.  And what is your reaction to the quote?
13       MR. SWEETEN:  Reaction would be asking for
14  -- objection, legislative privilege.
15    Q.  (By Ms. Westfall) Are you following the advice
16  of counsel?
17    A.  Yes, privilege.
18    Q.  Were there any other bills introduced in the
19  2007 legislative session that you recall related to
20  combatting issues pertaining to undocumented aliens?
21    A.  There was a legislation that was -- I'm sorry,
22  2007?
23    Q.  2007.
24    A.  I have no knowledge that I remember.
25    Q.  And yesterday, your chief of staff, Janice

## 86

1  McCoy, testified in deposition that you advised the
2  Lieutenant Governor's Office that you wanted to sponsor
3  House Bill 218 in the Senate; is that correct?
4    A.  That is correct.
5    Q.  Why did you want to sponsor House Bill 218?
6       MR. SWEETEN:  Objection, calls for
7  legislative privilege.
8    Q.  (By Ms. Westfall) Are you following the advice
9  of counsel?
10    A.  I am.  Privilege.
11    Q.  Is there any conversation that you had with
12  anyone in the Governor's Office concerning your desire
13  to sponsor H Bill -- HB 218?
14       MR. SWEETEN:  Objection.  I think you're
15  -- you're asking the specifics of the conversation.  He
16  can definitely identify whether a conversation occurred
17  with the Governor, but the subject matter is assumed in
18  your question.
19       MR. ROSENBERG:  But the subject, if I may
20  point to the order, we're allowed to get on the record
21  what the subject matter of the conversation was.
22       MS. WESTFALL:  Further, Mr. Sweeten, the
23  witness just confirmed that the testimony of Ms. McCoy,
24  that he indeed made that request to sponsor that
25  legislation.

## 87

1    A.  And did you --
2       MR. SWEETEN:  Hold on.  No, no, no.  No,
3  no, no.  Let me talk.
4       Would -- the subject matter, it was a
5  general subject matter, is what the court's order says.
6  The subject matter does not relate to -- he's not going
7  to identify the specific subject matter.  He can answer
8  the question as to whether or not he had conversations
9  with the Governor's Office.  You can ask about the
10  time.  You can ask about the subject, the general
11  subject matter, but the specifics, I think, are assumed
12  in the question is sort of the issue we're having.
13       MS. WESTFALL:  I'm not going to withdraw
14  my question.  I'm going to try another way.
15    Q.  (By ms. Westfall) Did you have any
16  conversations with anyone in the Lieutenant Governor's
17  Office about sponsoring HB 218 in the Senate?
18       MR. SWEETEN:  I'm going to let you answer
19  that question as phrased.  Do not reveal any additional
20  substance of any conversations other than yes or no.
21    A.  I would first ask for clarification.  You have
22  used Governor in one question and Lieutenant Governor in
23  the other question.  What is the question you're asking?
24    Q.  (By Ms. Westfall) Let's start with the
25  Lieutenant Governor.  Did you have any conversations --

## 88

1  did you or your staff have any conversations with
2  Lieutenant Governor or anyone in his office concerning
3  your sponsorship of HB 218?
4       MR. SWEETEN:  You can answer as phrased,
5  yes or no.
6    A.  Yes.
7    Q.  (By Ms. Westfall) Did you personally
8  participate in that meeting?
9    A.  You're inferring it was a meeting.
10    Q.  Did you personally participate in that
11  communication with the Lieutenant Governor's Office?
12    A.  No.
13    Q.  Did Ms. McCoy?
14    A.  My assumption --
15       MR. SWEETEN:  Answer if you know.
16    A.  My assumption is yes, that she would be the one
17  to do it.
18    Q.  (By Ms. Westfall) Do you know who else was in
19  that part of that communication?  And I'm sure your
20  counsel --
21    A.  No.
22    Q.  Okay.  How many conversations were there about
23  your sponsorship of HB 218 with the Lieutenant
24  Governor's Office?
25    A.  I -- I don't know that because I didn't have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 89

1  one, so.
2    Q.  Do you know approximately when --
3    A.  Zero.  I had zero conversations.
4    Q.  Do you know approximately when this
5  conversation between Ms. McCoy and the Lieutenant
6  Governor's Office occurred?
7    A.  No.
8    Q.  Why did you want to sponsor HB 218?
9    A.  Privilege.
10      MR. SWEETEN:  Objection privilege.
11    Q.  (By Ms. Westfall) Did you have communications
12  with any election officials, either county or state,
13  concerning your sponsorship of HB 218?
14      MR. SWEETEN:  Objection, that's
15  legislatively privileged.
16    A.  Privilege.
17    Q.  (By Ms. Westfall) Yes or no answer for
18  establishing a privilege log.
19      MR. SWEETEN:  Okay.  You can answer if you
20  had a specific conversation with any election official?
21    A.  No.
22    Q.  (By Ms. Westfall) Are you familiar with
23  Secretary of State Roger Williams?
24    A.  Clarify "familiar."
25    Q.  Do you know him?

## 90

1    A.  Yes.
2    Q.  Do you know who he is?
3    A.  Yes.
4    Q.  Are you aware that Secretary of State Roger
5  Williams said something to the effect of he wasn't sure
6  a photo ID would improve turnout?
7    A.  Is the question am I aware that he said that?
8  No.
9    Q.  Are you aware of Secretary of State Roger
10  Williams having that sentiment and believing that in
11  2007?
12      MR. SWEETEN:  Don't reveal any
13  conversations that you had on this issue.
14    A.  No.
15      MR. SWEETEN:  Legislative privilege.
16      MS. WESTFALL:  He just testified he hasn't
17  had any conversations with Secretary of State Williams.
18  I'm not sure what -- this is about whether he's aware.
19      MR. SWEETEN:  Okay.  But if he's aware
20  because he heard from a staffer, because he heard from a
21  legislator or someone else, then that would be
22  privilege.  If he heard from public media sources,
23  public statements, that sort of thing, I think that that
24  would be not be.  So that -- it wasn't clear to me the
25  line you were drawing there.  But if it invaded the

## 91

1  conversations, that needed to be -- we needed to make an
2  objection.
3    Q.  (By Ms. Westfall) Do you think it's important,
4  when you're drafting election-related legislation, to
5  consult with the Secretary of State to obtain the
6  Secretary of State's view on potential legislation?
7      MR. SWEETEN:  Objection, privilege.
8    A.  Privilege.
9    Q.  (By Ms. Westfall) As a general matter?  Not as
10  regarding any particular legislation.  My question
11  stands.  Are you going to claim privilege again?
12    A.  Restate the question, please.
13    Q.  Do you think as a -- as a general matter, it is
14  advisable to consult with the Secretary of State of
15  Texas in crafting election-related legislation?
16      MR. SWEETEN:  I'm going to assert
17  privilege.  Objection, privilege.
18    Q.  (By Ms. Westfall) Are you following his advice?
19    A.  Privilege.
20    Q.  (By Ms. Westfall) Could you -- do you know the
21  party affiliation of Secretary of State Roger Williams?
22      MR. SWEETEN:  You can answer.
23    A.  Today or when he was Secretary of State?
24    Q.  (By Ms. Westfall) In 2007.
25    A.  No.

## 92

1    Q.  Do you know what his party affiliation is
2  today?
3    A.  Yes.
4    Q.  What is it?
5    A.  Republican.
6    Q.  Did you or your office conduct any analyses
7  prior to carrying House Bill 218 in the Senate?
8      MR. SWEETEN:  Objection.
9    A.  Privilege.
10      MR. SWEETEN:  Privilege.
11    Q.  (By Ms. Westfall) Did you have any
12  conversations about conducting any analyses prior to
13  carrying House Bill 218 in the Senate?
14    A.  Privilege.
15    Q.  (By Ms. Westfall) It's a yes or no answer.
16      MS. WESTFALL: Mr. Sweeten?
17      MR. SWEETEN:  Well, in the question,
18  you're asking about conversations about analyses.  So
19  first, I think I'm going to object to the question as
20  vague and unclear as to what that would mean.  Secondly,
21  I think the question assumes -- I think that the
22  question does invade privilege to some degree.  He can
23  reveal conversations he's had if you want to ask him
24  about what specific state agencies, with legislators,
25  we're going to give the facts of the actual



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1  communication.  But when you're asking him, "What
2  conversations you've had in the course of your
3  analysis," I think that is overly broad, I think it's
4  vague, and I think it invades the legislative privilege.
5       MS. WESTFALL:  Could you reread the
6  question, Court Reporter.
7       (The requested portion was read by the
8  court reporter.)
9       MR SWEETEN:  Same objection.
10  Q.  (By Ms. Westfall) Are you following his
11  instruction?
12  A.  Yes.
13  Q.  Yesterday, Ms. McCoy testified that your office
14  did not conduct any analysis of House Bill 218; is that
15  correct?
16       MR. SWEETEN:  I'm sorry, can you reread
17  the question, please?
18       (The requested portion was read by the
19  court reporter.)
20       MR. SWEETEN:  First of all, I'm going to
21  object based upon legislative privilege.
22       You do not have to reveal any analysis
23  that -- that was conducted by or not conducted by your
24  office.  So you don't have to answer that question.
25       Privilege.

94

1       MS. WESTFALL:  Mr. Sweeten, Ms. McCoy has
2  waived the privilege as -- as pertaining to that
3  question and I would ask you reconsider that objection.
4       MR. SWEETEN:  It's Senators Fraser's
5  privilege to assert.  He is asserting the privilege and
6  we are so asserting it.
7       MS. WESTFALL:  She testified about it
8  yesterday.
9       MR. SWEETEN:  Okay.
10       MS. WESTFALL:  And you did not make any
11  effort to claim that that was privilege or otherwise
12  prohibit that examination on that topic today.  It's
13  been waived.
14       MR. SWEETEN:  Well, I'm currently
15  objecting to it based upon legislative privilege.  So I
16  am making an effort today for him not to disclose that
17  matter which would be privileged.  Analysis, it relates
18  to his mental impressions, thoughts, or opinions about
19  legislation.  I'm going to instruct him accordingly.
20  Q.  (By Ms. Westfall) Ms. McCoy is a long-term
21  staff person of yours, isn't she?
22  A.  Yes.
23  Q.  She's been working for you since 1992; isn't
24  that correct?
25  A.  No.

95

1  Q.  How long has she been working for you?
2  A.  I wasn't elected until '97.
3  Q.  My apologies.  How long has she been working
4  for you?
5  A.  I think since 1999.  I think she started two
6  years after I got in the Senate, I believe.
7  Q.  Would you describe her as a trusted advisor?
8       MR. SWEETEN:  You can answer.
9  A.  Yes.
10  Q.  (By Ms. Westfall) She wouldn't tell you
11  anything that was untruthful, would she?
12       MR. SWEETEN:  Objection, argumentative,
13  calls for --
14  Q.  (By Ms. Westfall) You may answer.
15  A.  Is it privilege?  That's a judgment.
16       MR. SWEETEN:  Objection, argumentative.
17  Objection, calls for speculation.  Objection, vague.
18       With that you can answer the question to
19  the extent --
20  A.  I trust her judgment.
21  Q.  (By Ms. Westfall) Thank you.  Ms. McCoy also
22  testified yesterday that you and your office did not
23  conduct an analysis of the impact of HB 218 on minority
24  voters; is that correct?
25       MR. SWEETEN:  Do not discuss the analysis

96

1  that was performed or not performed.
2       So I'm going to object as to legislative
3  privilege?
4  A.  Privilege.
5  Q.  (By Ms. Westfall) Did you conduct any analysis
6  of the impact of HB 218 on minority voters?
7       MR. SWEETEN:  Objection, privilege.
8  Q.  (By Ms. Westfall) Are you following the
9  instruction?
10  A.  Privilege.
11  Q.  Thanks.  And we'll have to be careful because
12  we're going to make a mess of the transcript.  But I
13  realize --
14  A.  All right.  Okay.
15  Q.  (By Ms. Westfall) Okay.  We need to make our
16  records, both of us.
17       Why didn't you -- strike that.
18       Could you describe the procedural history
19  of House Bill 218 after it was introduced in the House?
20       MR. SWEETEN:  By procedural history, you
21  mean how -- how it went through the different committees
22  and legislative process, the public record, it's --
23  Q.  (By Ms. Westfall) Do you -- do you understand
24  the question, Senator Fraser?
25  A.  I do.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                May 17, 2012

---

## 97

1     Q.  Thank you.  Could you answer?

2     A.  I don't have that information.

3     Q.  Do you know whether it was passed in the House?

4     A.  Yes.

5     Q.  And then what happened after that?

6     A.  In the legislative process, when a bill leaves

7 the House, it is delivered to the Senate, and the bill

8 is referred to a committee, and a member can request

9 picking the bill up, or it -- or it is assigned to

10 someone.

11    Q.  And I believe you testified earlier that you

12 had -- there were conversations about your interest in

13 carrying the bill; is that correct?

14    A.  No.  There -- that wasn't the conversation at

15 all.

16    Q.  Go ahead and clarify your testimony.

17    A.  Did you ask me a question?

18    Q.  Do you have an answer to that?  Is the answer

19 no?

20         MR. SWEETEN:  Is -- is -- I think he's

21 asking.

22    A.  There is no question.  You didn't ask a

23 question.

24    Q.  I said, I believe you testified earlier that

25 you had indicated interest in carrying HB 218 in the

---

## 98

1 Senate; is that correct?

2         MR. SWEETEN:  I'm going to object to the

3 extent it misstates any prior testimony.

4    Q.  (By Ms. Westfall)  You may answer.

5    A.  It's -- if you want -- if you want to pull up

6 -- I'll -- testament of what I've said, you can, but the

7 way you're stating the question, no, it is not correct.

8    Q.  How did HB 218 come to be carried by you in

9 the Senate?

10    A.  The conversations --

11         THE WITNESS:  Is that spec -- is

12 conversation within the office?

13         MR. SWEETEN:  If it -- if this relates to

14 conversations you've had with legislators --

15         THE WITNESS:  And/or staff?

16         MR. SWEETEN:  Staff, et cetera, then

17 that's legislatively privileged.

18    A.  Privilege.

19         MR. SWEETEN:  You can reveal basic

20 information about the conversations, date, time, but not

21 the substance of the conversation.

22    Q.  (By Ms. Westfall)  Let's move on.  Did you

23 monitor consideration of HB 218 in the House?

24    A.  No.

25    Q.  Did you learn of any concerns raised about HB

---

## 99

1 218 when it was being considered in the House?

2         MR. SWEETEN:  Objection, privilege.

3 Privilege.

4    Q.  (By Ms. Westfall)  Are you aware of any

5 conversations that were had with anybody involving you

6 or your staff concerning concerns raised about HB 218 in

7 the House?

8         MR. SWEETEN:  You can answer to the extent

9 that you can reveal conversations or people involved in

10 those conversations.  Do not reveal the substance of

11 those conversations.

12    A.  Reread the question, please.

13         (Requested portion was read back by the

14 court reporter.)

15    Q.  Are you -- can you answer the question?

16    A.  No.

17    Q.  I believe you just testified that you carried

18 HB 218 in the Senate, correct?

19    A.  Yes.

20    Q.  Was there a reason for your interest in voter

21 ID?

22         MR. SWEETEN:  Objection, privilege.

23    Q.  (By Ms. Westfall)  Did you have a conversation

24 with anyone about your interest in voter ID in 2007?

25         MR. SWEETEN:  You can answer whether or

---

## 100

1 not you had a conversation.  Don't reveal the contents

2 of the conversation.

3    A.  Ask the question again, please.

4    Q.  (By Ms. Westfall)  Did you have any

5 conversations in 2007 related to your interest in voter

6 ID?

7    A.  I believe that's privileged because of nature

8 of the conversation.

9         MR. SWEETEN:  She can -- she can get a

10 general subject matter.  I do think interest in the bill

11 is getting a little towards general.  But I'm going to

12 let you answer the question as phrased.  So you can

13 answer whether conversations were held.

14    A.  What was the question again?

15    Q.  Were there conversations -- were you involved

16 in conversations regarding your interest in voter ID in

17 2007?

18    A.  Yes.

19    Q.  Who were the other parties to that

20 conversation?

21    A.  Privileged.

22         MR. SWEETEN:  You can testify as to who

23 you had conversations with regarding the issue,

24 regarding the subject matter that she's raised.

25    A.  Janice McCoy.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 101

1    Q.  (By Ms. Westfall) Anyone else?
2    A.  No.
3    Q.  Did you have more than one conversation?
4    A.  Yes.
5    Q.  With -- with Janice McCoy?
6    A.  Yes.
7    Q.  Were these conversations in writing at all?
8    A.  No.
9    Q.  Did an interest in preventing voter
10   impersonation prompt your interest in sponsoring --
11       MR. SWEETEN:  Objection.  Sorry.
12       MS. WESTFALL:  Let me finish my question.
13       MR. SWEETEN:  I'm going to.
14   Q.  (By Ms. Westfall) -- HB 218?
15       MR. SWEETEN:  Objection, privilege.
16   Q.  (By Ms. Westfall) And was HB 218 referred to
17   the State Affairs Committee?
18       MR. SWEETEN:  You can answer.
19   A.  I believe it was.  That, you know, to my
20   knowledge that's where it went.
21   Q.  (By Ms. Westfall) Did the committee hold a
22   hearing on HB 218?
23   A.  Again, to my knowledge, yes, that's normal
24   procedure.
25   Q.  What was your role in the committee in 2007?

## 102

1    Were you a member or were you the chair?
2    A.  A member.
3    Q.  Do you recall the hearing that was held on HB
4    218?
5    A.  I'm sorry, no, not in detail.
6    Q.  And Ms. McCoy testified yesterday that there
7    was a hearing on HB 218.  And it's correct, it's your
8    testimony, that there was one hearing?
9    A.  Again, I just testified, I don't -- I don't
10   remember the hearing, but I'm assuming there was.
11   Q.  Do you recall that -- do you recall the
12   identity of any witnesses at that hearing?
13   A.  No.
14   Q.  Janice McCoy testified yesterday that the
15   Republican party testified at the committee hearing on
16   HB 218; do you believe that to be correct?
17   A.  I -- I can't verify or not verify.
18   Q.  And Ms. McCoy testified yesterday that she made
19   Skipper Wallace aware that the committee was having a
20   hearing on HB 218; do you think that's correct?
21   A.  You're subjective.  You're asking what I think.
22   Q.  I'm asking whether --
23   A.  Privilege.
24   Q.  -- Ms. McCoy's statement is correct about
25   something that happened on the public record, and I'm

## 103

1    sure your counsel will instruct you that it's acceptable
2    as to the identity of witnesses at a hearing.
3        MR. SWEETEN:  Well, I'm -- you -- you can
4    answer this question as phrased.
5    A.  Ask the question again.
6        MS. WESTFALL:  Okay.  Could you repeat
7    that question, Court Reporter?
8        COURT REPORTER:  I'm going to have to go
9    back about two questions.
10       MS. WESTFALL:  You know what, why don't I
11   just save you the trouble.
12   Q.  (By Ms. Westfall)  Ms. McCoy testified that she
13   made Skipper Wallace aware that the committee was having
14   a hearing about HB 218, and that Mr. Wallace testified;
15   is that correct?
16       MR. SWEETEN:  Objection, compound.
17       Go ahead.
18   A.  There's no reason for me to assume that she
19   didn't.
20   Q.  (By Ms. Westfall) Who is Skipper Wallace?
21   A.  He was a county Republican chair from a county
22   in my district.
23   Q.  And what county was that?
24   A.  Lampasas.
25   Q.  Is he still in that position?

## 104

1    A.  Yes.
2    Q.  How long has he held that position?
3    A.  I'm sorry, I don't know.
4    Q.  Do you know why Mr. Wallace has an interest in
5    voter ID?
6        MR. SWEETEN:  Objection, calls for
7    speculation.
8    Q.  (By Ms. Westfall)  You may answer.
9    A.  Privilege.
10       MS. WESTFALL:  I'm not sure that is
11   privilege, Mr. Sweeten.  Could you think about directing
12   your witness to answer the question?
13       MR. SWEETEN:  Well, I mean, the question
14   very clearly calls for speculation.  You're asking why
15   Skipper Wallace believes -- or has an interest in, and
16   so it assumes facts not in evidence, it calls for
17   speculation.
18       With that, you can answer if you're able.
19   A.  I have no idea.
20   Q.  (By Ms. Westfall) Have you ever had
21   conversations about Mr. Wallace with photo ID in 2007?
22       MR. SWEETEN:  Did he have conversation
23   with Mr. Wallace?
24       MS. WESTFALL:  Yes.
25       MR. SWEETEN:  Okay.  You can testify as to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

## 105

1   the facts of the conversation, whether they occurred.
2   But don't reveal the substance.
3        A.  I don't remember conversations with Skipper
4   Wallace.
5        Q.  (By Ms. Westfall) Do you know whether Ms. McCoy
6   had conversations with Mr. Wallace about voter ID?
7        A.  I have no way of knowing.
8        Q.  Do you generally know whether Ms. McCoy has
9   conversations with groups or individuals?
10            MR. SWEETEN:  Objection, vague.
11       Q.  (By Ms. Westfall)  You may answer.
12       A.  I don't always know who she's talking to.
13       Q.  Do you predominantly know who she's talking to?
14       A.  I don't always know --
15            MR. SWEETEN:  Objection, calls for
16   speculation.
17       Q.  (By Ms. Westfall) But listening very carefully
18   to my question, does she mostly let you know when she's
19   meeting with individuals or groups?
20            MR. SWEETEN:  Objection, calls for
21   speculation.
22       Q.  (By Ms. Westfall) You may answer.
23            MR. SWEETEN:  If you -- if you can, answer
24   the question, please.
25       A.  The answer is still the same.  She, you know,

---

## 106

1   she doesn't always tell me who she meets with, and I
2   don't always ask.
3        Q.  (By Ms. Westfall) And you're her direct
4   supervisor; is that right.
5        A.  Yes.
6        Q.  Do you recall, at the hearing on HB 218 before
7   the State Affairs Committee, whether there was any
8   concerns raised about the impact of HB 218 on minority
9   voters?
10            MR. SWEETEN:  At the hearing, you said?
11           MS. WESTFALL:  Right.
12           MR. SWEETEN:  Okay.  No -- no objection.
13   Go ahead.  You can answer.
14       A.  I'm sorry, I do not remember the hearing in
15   2007.
16       Q.  (By Ms. Westfall) Was the bill amended in the
17   State Affairs Committee?
18       A.  I don't remember whether it was or not.
19       Q.  After committee consideration, was it voted out
20   of committee?
21       A.  It had to be voted out of the committee to get
22   to the Floor.
23       Q.  Thank you.  Was it voted out of committee on
24   party lines?
25       A.  Again, I don't -- I don't remember the vote.

---

## 107

1        Q.  Do you remember any member of the Republican
2   party who voted against the bill?
3        A.  No.  I don't remember the vote.
4        Q.  Did you, after Committee voted it out, did you
5   bring it to the Senate Floor?
6        A.  You're -- the answer is no.  I did not bring
7   the bill to the Senate Floor.
8        Q.  Was HB 218 brought to the Senate Floor?
9        A.  It was recognized to be brought forward.
10       Q.  And who recognized it to be brought forward?
11       A.  I don't remember who was in the chair at the
12   time.
13       Q.  Was it Lieutenant Governor Dewhurst?
14       A.  I don't remember who was in the chair at the
15   time.
16       Q.  As a general matter, is the Chair of the Senate
17   would bring a bill, or how would it move from committee
18   to Floor?
19       A.  Whoever is sitting in the chair acting as
20   presiding officer would recognize the member.
21       Q.  Is there a way that it got on to the list of
22   bills to be considered for Floor consideration?
23       A.  When a bill comes out of committee, it is sent
24   to the Floor, and is put in the regular order of
25   business.

---

## 108

1        Q.  Did HB 218 jump the line, so to speak, from the
2   regular order of business, to be heard before other
3   bills that would ordinarily have come before it?
4        A.  I'm going to give an explanation.
5            MR. SWEETEN:  Okay.  You --
6            MS. WESTFALL:  I'm sure it would be
7   helpful to me.
8            MR. SWEETEN:  Well, I mean, you can
9   testify about matters of public record.  Okay?  You can
10   do that.  Don't reveal conversations that you've had
11   surrounding the bill, the substance of those
12   conversations.
13       A.  In 2007, there was a bill put in place that
14   acted as a blocker bill and it was the number one bill
15   on the agenda.  All bills, after that, in order to be
16   brought up, had to jump over that bill in order to be
17   heard.  So every bill heard was heard -- held -- heard
18   out of order.
19       Q.  (By Ms. Westfall) I see.  And was the blocker
20   bill a procedural requirement that required two-thirds
21   of senators to vote in favor of bringing a bill to the
22   Floor?
23       A.  It wasn't a procedural requirement.  It was a
24   Senate rule, an agreement, that that bill was placed
25   there.  And in order to bring up a bill, you had to jump

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 109

1    over the blocker bill.
2       Q.  I see.  And is it an ordinary practice for a
3    blocker bill to be put into place at the beginning of
4    session, in the Texas Senate in your experience?
5       A.  Not ordinary.
6       Q.  How did that arise in 2007?
7          MR. SWEETEN:  You can answer to the extent
8    that this doesn't invade privilege.  You can talk about
9    matters of the public record.
10      A.  In the 2007, the chairman of Administration
11   filed a bill, and that bill remained in place.
12      Q.  (By Ms. Westfall) What was the substance of the
13   bill?  What was the blocker bill?
14      I'm sorry --
15      Q.  Can you describe it?
16      A.  It's usually something having to do with the
17   gardening of the state lawn.  It's...
18      Q.  I see.
19      A.  It was a -- administrative bill.
20      Q.  Did HB 218 require the support of two-thirds
21   Senators to be brought to the Floor for a vote?
22      A.  Yes.
23      Q.  Could you describe the two-thirds procedure,
24   for the record; how does it work?
25         MR. SWEETEN:  As a general matter?

## 110

1          MS. WESTFALL:  As a general matter.
2       A.  As a general matter, if I had a bill that I
3    wanted to get in front of the blocker bill, the Floor
4    would recognize me, let's say you're recognized for a
5    motion on House Bill 218.  I would say, "I now move to
6    suspend all necessary rules to take up and consider
7    Senate Bill 218.
8       Q.  I see --
9       A.  Or House Bill 218.
10      Q.  Sir, how many other sessions are you aware of
11   and served in, in which there has been a blocker bill
12   introduced?
13      A.  Well, I've only been in the Senate since '95 --
14   '97.
15      Q.  That's seems like a long time to me.  Could you
16   tell me how many times a blocker bill has been
17   interposed?
18      A.  During those sessions, at some point in every
19   session, there was a blocker bill that was put in place.
20      Q.  And so the blocker bill requires a two-thirds
21   vote to overcome?
22      A.  Yes.
23      Q.  Were you involved in bringing HB 218 to the
24   Senate Floor for a vote?
25         MR. SWEETEN:  You can reveal matters of

## 111

1    public record.  Don't reveal matters that are
2    legislatively privileged.  Involved could include
3    either.
4       A.  Clarify "involved."
5       Q.  (By Ms. Westfall) Were you're involved,
6    procedurally, in bringing HB 218 to the Senate for a
7    vote in terms of what you just testified to overcoming a
8    blocker bill.
9          MR. SWEETEN:  Same instruction, go ahead.
10      Q.  (By Ms. Westfall) You may answer.
11      A.  My involvement was that it was announced that
12   "Senator Fraser, you are recognized for a motion on
13   House Bill 218."
14      Q.  And I believe you testified earlier you didn't
15   know who was chairing the Senate at that time; is that
16   right?
17      A.  No.
18      Q.  Please proceed and describe the rest of the
19   procedure.
20         MR. SWEETEN:  Again, legislatively
21   privilege.
22         Information, don't provide.  Anything
23   public record, you're free to talk about.
24      A.  When I was recognized, I said, "I now move to
25   suspend all necessary rules to take up and consider

## 112

1    House Bill 218.
2       Q.  (By Ms. Westfall) When that exchange occurred
3    on the Senate Floor, how many Senators were present?
4       A.  Again, I don't know.
5       Q.  Do you recall if anyone was not present?
6       A.  No, I do not recall.
7       Q.  Was Senator Uresti not on the Floor at that
8    time?
9       A.  Again, I don't -- I don't recall.
10      Q.  Are you aware of Senator Uresti's vote on HB
11   218?
12      A.  I believe the record will reflect that Senator
13   Uresti voted not to suspend -- not to suspend.
14      Q.  Does that mean, in lay persons terms and
15   outside of Senate procedure, does that mean he was for
16   or against the bill?
17      A.  It is not a vote for or against.
18      A.  It is a procedural prerequisite to voting on
19   the bill; is it not?
20      A.  I think your question is not correct.  It's
21   neither one.
22      Q.  Well, could you clarify your testimony or
23   explain to us?
24      A.  If you ask the correct question, I'll be glad
25   to.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 113

1   Q.  Is it a vote against considering the bill?
2   A.  It would be a vote against consideration of the
3   bill.
4   Q.  Thank you.  Was there a conversation, that
5   you're aware of, involving the timing of when HB 218 was
6   brought to the Floor?  It's a yes or no.  Was there --
7   was there a conversation?
8   A.  Between me?
9   Q.  I'm going to ask you about your knowledge of
10  the existence of a conversation.
11  A.  Privilege.
12  Q.  The existence.
13      MR. SWEETEN:  It's okay.
14  What she's saying is:  Was there a
15  conversation about that issue?  You can identify if a
16  conversation occurred, with whom it occurred, the date
17  it occurred, if you know.  But don't reveal the
18  substance of it otherwise.
19  A.  I have no knowledge of the conversation.
20  Q.  (By Ms. Westfall) So is it your testimony that
21  you just appeared on the Senate one day and you were
22  recognized?
23      MR. SWEETEN:  Objection.  I think that
24  misstates his testimony.
25      MS. WESTFALL:  You may answer.

## 114

1       MR. SWEETEN:  Argumentative.
2   A.  My testimony is that I was on the Senate Floor
3   and the chair said, "Senator Fraser, you are now
4   recognized for a motion on House Bill 218.
5   Q.  (By Ms. Westfall) How did you react to that;
6   were you surprised?
7       MR. SWEETEN:  Objection.  I think that
8   definitely asks for him to reveal thoughts, mental
9   impressions, opinions about legislation, in furtherance
10  of the legislative process, and therefore is
11  legislatively privileged.
12      MS. WESTFALL:  His human emotion and
13  reaction is part of the legislative process?
14      MR. SWEETEN:  It would be his mental
15  impressions or opinions about legislation.
16  Q.  (By Ms. Westfall) Are you not answering the
17  question?
18  A.  Privilege.
19  Q.  Was a vote held when Senator Uresti was not on
20  the Floor?
21  A.  I'm sorry?
22  Q.  Was this -- was a vote held on HB 218 when
23  Senator Uresti was not on -- on the Floor?
24  A.  The final vote --
25  Q.  I'm not asking you about the first vote.  Was

## 115

1   there a vote when he was not on the Floor?
2   A.  On a bill, there's only one vote.  The vote is
3   the vote that is in the record.  And my only
4   recollection is looking at the vote.  The vote failed to
5   suspend, there wasn't sufficient votes, so I'm assuming
6   that he was on the Floor and voted.
7   Q.  Was there a time in Floor consideration on HB
8   218 when Mr. Uresti did not -- was not on the Floor?
9   A.  I'm sorry, I don't -- I don't know the answer
10  to that.
11  Q.  Was Mr. Uresti sick that day?
12  A.  That would be subjective on my part.  I would
13  say privilege.
14      MR. SWEETEN:  Well --
15  A.  I --
16      MR. SWEETEN:  You -- if you don't know the
17  answer, then that's the answer.  She's asking the fact
18  of whether or not he was sick or not, or whether you
19  knew he was sick or not.  So you can just answer that
20  question.  That's -- we're not claiming
21  privilege as to that question.
22  A.  I don't -- I don't know whether he was sick or
23  not.
24      MR. SWEETEN:  Okay.
25  Q.  (By Ms. Westfall) Was there a verification of

## 116

1   the vote on HB 218 on the Floor?
2   A.  Every vote is a verification.
3   Q.  Were there, in essence, two votes on HB 218;
4   one when Mr. Uresti was not on the Floor, and one when
5   he was on the Floor to verify the vote?
6   A.  I -- I'm sorry, I don't remember.
7   Q.  And just so that we can have a -- in order to
8   facilitate our conversation, as you're an expert in the
9   Texas Senate rules and I'm not, if you could testify
10  about procedure, and grant me some latitude in my
11  questioning, it would make things go along faster.
12  Because I'm -- I -- there's a lot more, many more
13  sessions to cover in today's examination and --
14      MR. SWEETEN:  I'm not sure what you're
15  asking him to do --
16      MS. WESTFALL:  -- I don't want to delay
17  you --
18      MR. SWEETEN:  -- but my instruction to him
19  will be to just answer the question that's posed to him.
20  So that's what --
21      MS. WESTFALL:  Sure.
22      MR. SWEETEN:  -- he's going to do.
23      MS. WESTFALL:  And if we want to play
24  these games, we'll be here for a long, long time,
25  Mr. Sweeten.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1    MR. SWEETEN: It is not -- Counsel --
2    MS. WESTFALL: And I'm going to have that
3 on the record.
4    MR. SWEETEN: It is not a game, I assure
5 you. I mean, I'm not sure if you're asking him to make
6 a speech on issues. He's certainly not going to do
7 that.
8    MS. WESTFALL: No, I --
9    MS. WESTFALL: The way it works is, you ask
10 a question, he gets to answer. He trying to do that.
11   MS. WESTFALL: And I'm asking for
12 assistance as he is an expert in the procedures of Texas
13 State Senate and I am not. To make sure that --
14   MR. SWEETEN: I'm not even sure what the
15 -- what you're even asking him. I mean, he -- he will
16 answer the question that's posed to him. He will do the
17 best he can to answer that, to the extent it's not
18 privileged. He's trying do that, will continue to do
19 that.
20   MS. WESTFALL: Thank you, Mr. Sweeten.
21    Could you mark this as Exhibit 45.
22    (Exhibit 45 marked for identification.)
23   Q. (By Ms. Westfall) You've been handed what's
24 been marked as Exhibit 45. If you can take a look at
25 this document and let me know when you've had a chance

## 118

1 to review.
2    A. (Reading.)
3    Q. You know what, for the time being, Senator,
4 unless you have interest, I'm going to direct your
5 attention to the first page of the numbered paragraphs
6 so you need not read this entire declaration, which is
7 lengthy.
8    Senator, have you seen this declaration
9 before?
10   A. No.
11   Q. Turning your attention to Paragraph 6 and 7,
12 concerning the 2007 legislative session, do you have any
13 different view of the facts that Senator Uresti has set
14 forth in Paragraph 6 and 7?
15   MR. SWEETEN: Okay. To some degree, what
16 is contained in Paragraph 6 or 7 reveals conversations
17 that could have occurred within the Senate. When you're
18 answering her question, make sure that -- that you're
19 not doing -- doing so. And so I'm going to assert a
20 legislative privilege as to that.
21    To the extent you can answer her question
22 without revealing legislative privilege, because I think
23 some of this does not implicate it, that you can feel
24 free to do so.
25   A. Privilege.

## 119

1    Q. (By Ms. Westfall) This declaration pertains to
2 matters that some of which occurred on the Senate Floor,
3 does it not?
4    A. Show me what happened on the Senate Floor.
5    Q. Mr. Uresti appeared on the Senate Floor, on
6 Paragraph 7.
7    A. And I will agree that that happened.
8    Q. And also turning your attention to Paragraph 9,
9 do you have any different recollections than what
10 Senator Uresti has put forth in Paragraph 9?
11   A. The -- no, that is not correct.
12   Q. Could you -- could you indicate what you
13 disagree with in Paragraph 9?
14   A. If a bill passes and the bill is suspended,
15 then you would move to the next step, which would be to
16 hear the bill. There was never a final resolution of
17 the vote to vote to suspend.
18   Q. Was that --
19   A. And the vote was kept open. So what -- the way
20 he's describing it here is -- is partially correct, but
21 not in its entirety.
22   Q. Were you involved in any conversations
23 concerning keeping the vote open on HB 218?
24   A. No.
25   Q. What is Senator Uresti race or ethnicity?

## 120

1    A. I don't know that I've ever asked him. I have
2 an opinion, is that --
3    MR. SWEETEN: You can answer to the extent
4 you know.
5    A. I -- I believe that Senator Uresti is Hispanic.
6    Q. Do you know what part of the state he
7 represents?
8    A. San Antonio.
9    Q. Does he represent a large area of the state
10 bordering the U.S. Mexico border, in part?
11   A. He -- his district touches the Mexico boarder.
12   Q. Did you have any concerns about holding a vote
13 on HB 218 given Senator Uresti illness?
14    MR. SWEETEN: Objection, privilege.
15   Q. (By Ms. Westfall) Are you following your --
16   A. Privilege.
17   Q. Did you have any concerns about holding a vote
18 on HB 218 given the constituency that Senator Uresti
19 represents?
20    MR. SWEETEN: Same objection.
21   A. Privilege.
22   Q. (By Ms. Westfall) Was a request made to verify
23 the vote on 218?
24    MR. SWEETEN: Are you asking on the Floor?
25    If it's public record, you can testify to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

### 121

1   it. If she's asking if there was a request made and it
2   involved internal communications, then that would be
3   privileged.
4       A. The answer is no. There was not a verification
5   of the vote.
6       Q. (By Ms. Westfall) Did House Bill 218, was there
7   a failure to suspend regular order of business with
8   two-thirds of the vote?
9       A. Yes.
10      Q. What -- and could you tell me the purpose of
11  the two-thirds rule that you testified about earlier, as
12  a general matter, and, of course, procedurally?
13      A. Well, that's privilege. There's, you know,
14  everyone has a different opinion.
15          MR. SWEETEN: Privilege.
16      Q. (By Ms. Westfall) Well, I'm -- Mr. Sweeten, I
17  don't think it -- I'm not asking about a particular
18  legislative act, I'm asking about Senator Fraser's deep
19  knowledge of Senate procedures given his long history in
20  the Senate.
21          MR. SWEETEN: Okay.
22          I -- we're going to let you answer as to
23  the general purpose of the rule.
24      A. There is no purpose for the two-thirds rule.
25      Q. (By Ms. Westfall) It's just a rule that's in

---

### 122

1   place for absolutely no reason?
2       A. You're asking me. And my response is there is
3   no...
4       Q. And Ms. McCoy testified yesterday in her
5   deposition the purpose of the rule is to reach general
6   consensus on the bills. Do you agree with her view of
7   the purpose of the two-thirds rule?
8       A. No.
9       Q. How do you -- why do you disagree?
10      A. Privilege.
11      Q. Ms. McCoy also testified that most bills are
12  brought under the two-thirds rule. Do you agree with
13  that testimony?
14          MR. SWEETEN: You can answer.
15      A. I would not agree with the word "most."
16      Q. How would you characterize it?
17      A. Meaning?
18          MS. WESTFALL: Mr. Sweeten, Senator Fraser
19  just refused to answer my question about the purpose,
20  whether the purpose of the two-thirds rule was general
21  consensus on bills. And I believe that was an improper
22  refusal to answer my question. Will you advice your
23  client to answer my question.
24          MR. SWEETEN: I thought he answered.
25          MS. WESTFALL: I said, "Ms. McCoy

---

### 123

1   testified the purpose of the rule is general consensus
2   on the bills," and he said, "privilege" and didn't
3   answer. Would you --
4           MR. SWEETEN: Okay. Well, I mean, the
5   preceding question was, you asked him, well, is there a
6   purpose. And he said there's no purpose. So he's
7   answered what he thinks the purpose is. And now you're
8   coming back with "she says this, is she -- is she
9   right?" I mean, by its own --
10          MS. WESTFALL: It's a different question.
11          MR. SWEETEN: Okay.
12          MS. WESTFALL: About the purpose.
13          MR. SWEETEN: So is the question, "Is
14  Ms. McCoy right about that"? I think he's already
15  answered it, but if you --
16          MS. WESTFALL: He said, "privileged." We
17  can read back the record, Mr. Sweeten.
18          MR. SWEETEN: You can answer that he
19  question.
20      A. Privilege to waive the question when asked.
21          MR. SWEETEN: Okay.
22      Q. (By Ms. Westfall) I'll reask it: Ms. McCoy
23  testified yesterday that the purpose of the two-thirds
24  rule is general consensus on bills. Do you agree with
25  that?

---

### 124

1       A. No.
2       Q. Did the Senate take any further action on House
3   Bill 218?
4           MR. SWEETEN: Don't reveal privilege. You
5   can reveal matters of public record.
6       A. To my knowledge, there was no other action
7   taken on 218 in that session.
8       Q. Were there any conversations about 218 after it
9   failed to pass the Senate?
10      A. Privilege.
11      Q. And that's a yes-no question about whether
12  conversations --
13          MR. SWEETEN: She -- just say if a
14  conversation existed. Don't say what the conversation
15  entailed. So, were there conversations, is her
16  question.
17      A. Yes.
18      Q. (By Ms. Westfall) How many?
19      A. One that I can remember.
20      Q. Were you directly involved or did you hear
21  about the conversation?
22      A. I was directly involved.
23      Q. And who else was in the conversation?
24          MR. SWEETEN: You can identify who was a
25  party to the conversation.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 125

1    A.  I don't remember the specific person.
2    Q.  (By Ms. Westfall) You were in a conversation
3    and you don't know who else was -- I mean, do you have a
4    general sense of whether it was a staff person or was it
5    a legislator?
6    A.  Yes.  I have a general sense.
7    Q.  Was it legislator?
8    A.  No.
9    Q.  Was it a staff person?
10   A.  I believe it was.
11   Q.  Was it a staff person in the Senate?
12         THE WITNESS:  How do I answer this?
13         MR. SWEETEN:  You can answer if -- who --
14   the identity of person to the best of your knowledge.
15   A.  I believe the conversation was with the
16   Lieutenant Governor's Office and I believe it was a
17   staffer.
18   Q.  (By Ms. Westfall) Was it Mr. Hebert?
19   A.  Not likely.
20   Q.  Was it Ms. Rathgeber?
21   A.  Possibly.
22   Q.  Was this in person or by phone?
23         MR. SWEETEN:  You can answer.
24   A.  In person.
25   Q.  (By Ms. Westfall) How soon after the vote on HB

## 126

1    218 did this occur?
2    A.  Not immediately.
3    Q.  A few weeks?
4    A.  A week.
5    Q.  Were there any other conversations, you recall,
6    about HB 218 after it didn't pass in the Senate?
7    A.  No.
8    Q.  Thank you.  Did you talk to -- actually do you
9    recall any conversations with anyone in the Governor's
10   Office after HB 218 failed?
11   A.  You're -- you're -- Governor Governor?
12   Q.  Governor Governor.
13   A.  No.
14   Q.  Do you recall any conversations about HB 218
15   after it failed in the Senate with anyone in the
16   Secretary of State's Office?
17   A.  No.
18   Q.  Or in -- with the Department of Public Safety?
19   A.  No.
20   Q.  Or with anyone, staff person or legislator, in
21   the House?
22   A.  No.
23   Q.  Did you file a photo ID bill in 2009 in the
24   Texas State Senate?
25   A.  Yes.

## 127

1    Q.  Do you remember the bill number?
2    A.  362, SB 362.
3         MS. WESTFALL:  Could you hand the witness
4    29, please.
5    Q.  (By Ms. Westfall) You've been handed what's
6    been previously marked as U.S. 29.  Do you recognize
7    this document?
8         MR. SWEETEN:  I'll tidy this up a little
9    bit here.  Which one do you need?  Are you done with
10   this?
11        Okay, you're asking about 29 right now, is
12   that right?
13        THE WITNESS:  362.
14        MR. SWEETEN:  Exhibit 29 though?
15        MS. WESTFALL:  Yes, yes.
16        MR. SWEETEN:  Okay.  Gotcha.
17        MS. WESTFALL:  They all look alike.
18        MR. SWEETEN:  Yes, they do.
19   Q.  (By Ms. Westfall) And do you recognize this
20   bill?
21   A.  Yes.
22   Q.  And what is it?
23   A.  Senate Bill 362.
24   Q.  This is as filed in the Senate or did this --
25   A.  I believe this is the bill that was -- we

## 128

1    filed.
2    Q.  Did you also file a bill SB 363?
3    A.  Yes.
4    Q.  And could you tell us about that bill and what
5    did it do?
6    A.  My only knowledge of that bill is seeing -- I
7    read in a press release last night of that bill, the
8    bill was filed of what we call a "shell," and to my
9    knowledge, the bill never moved and never had a hearing.
10   Q.  What does "shell" mean?
11   A.  It was a caption for a bill, if needed, to --
12   for a bill to, you know, to address an issue, but it
13   never -- it was never -- to my -- I don't remember
14   having a hearing on the bill.
15   Q.  Was it a placeholder in effect?
16   A.  Yes.
17   Q.  And did SB 362 and SB 363 kind of go hand-in-
18   hand with one another?
19   A.  No.
20   Q.  And why not?
21        MR. SWEETEN:  I'm going object to the
22   extent that calls for matters of his mental impressions,
23   opinions about legislation, and furtherance of the
24   legislative process.
25   Q.  (By Ms. Westfall) SB 363 pertained to voter



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

---

129

1   registration, did it not?
2        A.  I don't remember 363.
3           MS. WESTFALL:  Court Reporter, would you
4   hand him what's been previously marked as Exhibit 36.
5   Thank you, sir.
6        Q.  (By Ms. Westfall) I'm going to hand you what's
7   been previously marked as Exhibit 36.  Do you recognize
8   this document?
9        A.  What was the question?
10       Q.  Do you recognize this document?
11       A.  I recognize it is represented this is Senate
12   Bill 363.
13       Q.  Yes.  And do you see your name is at the top
14   left --
15       A.  I do.
16       Q.  -- as the person who introduced it; is that
17   right?
18           Is this -- does this bill require persons
19   to present documentary proof of citizenship when
20   registering?
21       A.  The bill, if passed, had a provision in it as
22   filed that would provide for proof of citizenship.
23       Q.  And these -- these bills were filed around the
24   same time, SB 362 and SB 363; is that right?
25       A.  It's implied if it's this next number, it

---

130

1   was --
2        Q.  That's what I was thinking too.  Thank you.
3           And turning your attention to Exhibit 29.
4   Can you identify the forms of identification that were
5   allowable in this bill?  And I would like to turn your
6   attention to Page 5, if that will help.
7        A.  And what would you like to know?
8        Q.  Could you just provide a general overview of
9   the -- not each and every one maybe, but just an
10   overview.
11       A.  An expired driver's license, a military ID card
12   that contains a photograph, a United States citizenship
13   certificate that contains a photograph, a license to
14   carry concealed handgun, an identification card that has
15   a persons photograph issued by a federal government
16   agency or a political subdivision of the state, and,
17   looks like, a typical proof of identification as a
18   voter's registration card.
19       Q.  And some other items that do not require a
20   photo; is that correct?
21       A.  That's true.
22       Q.  And the balance of Section 10; is that correct?
23       A.  You said the balance of section?
24       Q.  Well, you were at -- you were at Subsection B
25   -- I'm sorry, of -- Section 63.0101.

---

131

1        A.  The balance from B down.
2        Q.  Right.
3        A.  It lists 11 other pieces of identification.
4        Q.  Thank you.  Were you involved in the
5   development of Senate Bill 362?
6        A.  No.
7        Q.  You filed 362, didn't you?
8        A.  Yes.
9        Q.  Who developed it if you didn't?
10       A.  This is the bill that was passed -- this was
11   the bill that -- 218 that was passed by the House.  We
12   started with the House version that had passed the House
13   the year before.
14       Q.  So you just simply --
15       A.  Picked up.
16       Q.  -- refiled the --
17       A.  Refiled the Bill 218 that came over.  And I
18   want to clarify, that was my understanding.  It might
19   not be exactly word-for-word, but the intention was to
20   file --
21           MR. SWEETEN:  Don't talk about intention,
22   okay?  You're not talking about -- we're not here to
23   talk about our mental impression, opinions about
24   legislation.
25           THE WITNESS:  Okay.

---

132

1        Q.  (By Ms. Westfall) Are you following your
2   counsel's advice --
3        A.  Yes.
4        Q.  -- as to not further testify on the development
5   of the bill?
6        A.  Yes.
7        Q.  Okay.  When did you start developing Senate
8   Bill -- what became Senate Bill 362?
9        A.  I didn't develope 362.
10       Q.  Is your testimony you simply took House Bill
11   218 and filed it the following session?  In essence?
12       A.  In essence.
13       Q.  Did you, just to confirm, is that -- strike
14   that.
15           Did you look at legislation in any other
16   states.
17           MR. SWEETEN:  Don't reveal your thoughts,
18   mental impressions, opinions about legislation or
19   furtherance of the legislative process.  Answer that
20   question if you can reference matters of public record
21   or -- you can discuss public matters.
22           So objection, privilege.
23       A.  Privilege.
24       Q.  (By Ms. Westfall) Just -- and did you look at
25   any models of bills from any interest groups in drafting

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 133

1  Senate Bill 362?
2        MR. SWEETEN:  Same objection.  Objection,
3  privilege.
4        Don't -- don't reveal thoughts, mental
5  impressions, opinions about legislation or in
6  furtherance of the legislative process.
7        A.  Privilege.
8        Q.  (By Ms. Westfall) Did you look to any other
9  sources other than HB 218 in developing and drafting and
10 filing Senate Bill 362?
11       A.  No.
12       MR. SWEETEN:  Same objection.
13       Q.  (By Ms. Westfall) Did you have any
14 communications about Senate Bill 362 with other current
15 or former legislators who'd offered past photo ID bills,
16 before filing the bill?
17       A.  Privilege.
18       MR. SWEETEN:  You can answer as to the
19 fact of a communication, okay?  So you can say if -- if
20 you -- if conversations occurred, but you do not reveal
21 the substance of those.
22       A.  And this the 362 in '09?  Ask the question
23 again.
24       Q.  (By Ms. Westfall) Did you have any
25 communications about Senate Bill 362 with other current

## 134

1  or former legislators who had offered past photo ID
2  bills, or their staff?
3        A.  No.
4        Q.  Did you have any communications with the
5  Lieutenant Governor's Office staff, Governor's Office
6  staff, or anyone in an executive agency about Senate
7  Bill 362 before filing it?
8        MR. SWEETEN:  You can answer.
9        A.  Yes.
10       Q.  (By Ms. Westfall) Could you identify the staff
11 person with whom you had the conversation -- or the
12 person, the individual, with whom you had the
13 conversation?
14       MR. SWEETEN:  You can identify the person.
15       A.  I can't identify the person.  We just gave
16 notice that we were filing the bill to the Lieutenant
17 Governor's Office and --
18       Q.  (By Ms. Westfall) Was there a person in the
19 office to whom you gave that notice?
20       MR. SWEETEN:  You can answer as to the
21 identity of the person.
22       A.  I don't know for sure.  I assume it was Julia
23 Rathgeber.
24       Q.  (By Ms. Westfall) Did you personally make that
25 communication, or did Ms. McCoy on your behalf, or both

## 135

1  of you?
2        A.  I don't know for sure, but I believe it was
3  likely Ms. McCoy.
4        Q.  Was that -- was there one conversation with the
5  Lieutenant Governor's Office about the filing of 362?
6        A.  Yes.  It's all it would be.
7        Q.  Did you have any communications with officials
8  or legislators from other states including but not
9  limited to Georgia and Indiana concerning the drafting
10 of HB 362 before it was filed?
11       A.  No.
12       Q.  Did you have any conversation about Senate Bill
13 362 with any interest groups before it was filed?
14       MR. SWEETEN:  You can answer as to whether
15 or not a conversation occurred.  Do not discuss the
16 substance of the conversation.
17       A.  No.
18       Q.  (By Ms. Westfall) Did you have any
19 communications about Senate Bill 362 with any
20 individuals including constituents in Texas before you
21 filed it?
22       A.  Yes.
23       Q.  And who was the -- who was the person with whom
24 you had the conversation?
25       MR. SWEETEN:  You can reveal who the

## 136

1  conversation was with.  Do not reveal the substance of
2  the conversation.
3        A.  Skipper Wallace.
4        Q.  (By Ms. Westfall) Did you have one conversation
5  with Skipper Wallace?
6        A.  Yes.
7        Q.  Was it you personally, Ms. McCoy, both of you?
8        A.  Me personally.
9        Q.  And how far in advance did you advise
10 Mr. Wallace -- or had this conversation, pardon me,
11 about 326?
12       MR. SWEETEN:  I'm sorry, how far in
13 advance of what?
14       MS. WESTFALL:  Of the filing of the bill.
15       MR. SWEETEN:  Of the filing.
16       You can answer if you know.
17       A.  Fall of '08.
18       Q.  (By Ms. Westfall) Did he come into your office,
19 or where did this conversation take place?
20       A.  I don't remember the specifics.
21       Q.  Was it a phone call?
22       A.  Likely a phone call.  It was not in my office.
23       Q.  Do you regularly have communications with
24 Mr. Wallace?
25       A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                             May 17, 2012

---

## 137

1  Q. About once a week, once a month?
2  A. Once a month.
3  Q. Did you have one conversation with Mr. Wallace
4  about 362 before it was filed?
5  A. Yes.
6  Q. Did you have more than one?
7  A. Not to my knowledge.
8  Q. Did you have any communications with any other
9  constituents or individuals besides Mr. Wallace about
10 362 before it was filed?
11 A. No.
12 Q. I believe you testified earlier about the forms
13 of ID that are listed that are allowable in Senate Bill
14 362. I want to turn your attention to those.
15     Why did you include the forms of allowable
16 photo ID that you included in 362 that you did?
17     MR. SWEETEN: Why did you include those,
18 that's legislatively privileged. Do not provide an
19 answer to that question.
20 A. That's privileged.
21     MR. SWEETEN: That's privileged. Do not
22 answer that question.
23 A. Yes, privileged.
24 Q. (By Ms. Westfall) Let me ask you a question
25 about one of the forms of ID.

---

## 138

1     Do you need a minute?
2  A. No. I'm good.
3     MS. WESTFALL: Okay.
4  Q. (By Ms. Westfall) Turning your attention to
5  Senate Bill 362, do you see where it lists United States
6  military identification cards?
7     MR. SWEETEN: What page? I'll help him.
8     MS. WESTFALL: It's page -- top of Page 6.
9     MR. SWEETEN: Here.
10 Q. (By Ms. Westfall) Could you -- do you see that?
11 A. Uh-huh.
12 Q. Could you describe what types of cards would
13 fall under this category?
14 A. A United States military identification card
15 that contains the person's photograph.
16 Q. Do you have any other information about the
17 types of cards that this would specify?
18 A. It would cover United States military
19 identification cards that contains the person's
20 photograph.
21 Q. Is it -- is it your testimony that -- that the
22 definition of military identification card is -- is
23 clear from the face of the statute?
24 A. It is my testimony that this bill recognizes
25 that a United States military identification card that

---

## 139

1  contains the person's photograph is acceptable.
2  Q. Do you know what federal agency would issue
3  such a card or agencies?
4  A. I do not know that.
5  Q. Was that discussed at all in -- in the drafting
6  or filing process for Senate Bill 362?
7     MR. SWEETEN: Objection, privilege.
8  A. Privilege.
9  Q. (By Ms. Westfall) Turning your attention to a
10 little lower down on the page where it indicates it
11 would include valid ID cards containing a person's
12 photograph from an agency or institution of federal
13 government or agency or institution or political
14 subdivision of the state, do you see that?
15 A. Uh-huh.
16 Q. Would that include student IDs from state
17 colleges and universities to the best of your knowledge?
18 A. I don't know the answer.
19 Q. Did you have any communications with anyone
20 about the forms of ID to included in Senate Bill 362?
21     MR. SWEETEN: You can reveal whether or
22 not a communication occurred. Do not reveal the
23 substance of any such communication?
24 A. No communication.
25 Q. (By Ms. Westfall) You had no communications?

---

## 140

1  I'm sorry, I didn't hear you?
2  A. No communication.
3  Q. Thank you. Do you know who would know the
4  answer to my previous question about when student IDs
5  would be included in the passage of 362 we just
6  described?
7     MR. SWEETEN: I mean, you're asking who
8  might know?
9  A. Anyone that could clarify that if a university
10 -- state university is a political subdivision.
11 Q. Right. Who would -- who -- or for purposes of
12 this statute, is there any -- any person who would --
13 who you can -- sitting here today, who would know the
14 answer to that question?
15 A. There's lot of people.
16 Q. Pardon?
17 A. Almost anyone but me.
18 Q. So can you specify anyone?
19 A. Sure. Someone working for state government
20 could -- could verify that. I could verify that with
21 time, but I can't answer -- answer it right now.
22 Q. Did you analyze or direct anyone to analyze
23 which registered voters did not possess one of the photo
24 IDs identified in Senate Bill 362?
25     MR. SWEETEN: Don't answer.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 141

1         Legislative privilege.

2     A.  Privilege.

3     Q.  (By Ms. Westfall) Did you read any research

4 about voter ID to assist you in drafting Senate Bill

5 362?

6     A.  Privilege.

7         MR. SWEETEN:  Same objection, legislative

8 privilege.

9     Q.  (By Ms. Westfall) Did you conduct or instruct

10 anyone to conduct an analysis of the impact of Senate

11 Bill 362 on minority voters?

12         MR. SWEETEN:  Same objection, privilege.

13     A.  Privilege.

14     Q.  (By Ms. Westfall) If 362 had been passed, would

15 it have been subject to the requirements of Section 5 of

16 the Voting Rights Act?

17     A.  Ask the question again.

18     Q.  If Senate Bill 362 had been passed, would it

19 have been subject to the requirements of Section 5 of

20 the Voting Rights Act?

21     A.  All voting legislation in a Section 5 state is

22 subject to the Voting Rights Act.

23     Q.  So is your answer that yes, it would have been?

24     A.  Yes.

25     Q.  Turning your attention back to Senate Bill 362,

---

### 142

1 I believe you testified earlier that it would allow a

2 voter to present forms of nonphoto ID; is that correct?

3 A long list on Page -- starting on Page 6 and continuing

4 into 7?

5     A.  Yes.

6     Q.  Why did you -- why did you include that

7 provision in the bill?

8         MR. SWEETEN:  Objection, legislative

9 privilege.

10         Do not reveal thoughts, mental

11 impressions, opinions about legislation.

12     A.  Privilege.

13     Q.  What was the purpose -- what is the purpose of

14 the nonphoto ID allowable in Senate Bill 362?

15     A.  Privilege.

16         MS. WESTFALL:  Mr. Sweeten?

17         MR. SWEETEN:  As the court has said, he

18 can provide -- let's read from the Court's Order:

19 "Privilege does not protect testimony with respect to

20 the general purpose or the purpose of a legislature as a

21 whole in enacting Senate Bill 14 as opposed to the

22 subjective intent of the legislator." So, I think he

23 could testify as to the purpose of the bill, and I will

24 allow him testify as to the purpose of the overall bill.

25         MS. WESTFALL:  The purpose of this

---

### 143

1 provision is what I'm asking about, Mr. Sweeten. I'm

2 going to restate my question. You can decide how you

3 want to respond to this order.

4     Q.  (By Ms. Westfall) Could you read back -- well,

5 you know what, it's probably way back. I'll -- just let

6 me redo the question.

7         As to Senate Bill 362, what was the

8 purpose of the provision allowing voters to use nonphoto

9 ID at the polls on election day?

10     A.  To protect the integrity of the ballot box.

11         MR. ROSENBERG:  Could you repeat that

12 back? I didn't hear it.

13         MR. SWEETEN:  "To protect the integrity of

14 the ballot box."

15     Q.  (By Ms. Westfall) Okay. And how would

16 including and allowing those forms of photo ID further

17 that purpose?

18     A.  To protect the integrity of the ballot box.

19     Q.  So is it your testimony that a voter -- it

20 would be acceptable under this bill and would further

21 that purpose to allow voters to present either photo or

22 nonphoto ID; is that correct?

23     A.  I would assert privilege on that.

24         MS. WESTFALL:  I will allow your counsel

25 to confer and then.... Let the record reflect there is a

---

### 144

1 colloquy between the state's counsel right now about the

2 privilege issues.

3         MR. SWEETEN:  Yeah. We're all -- of

4 course there is. We're considering the Court's Order

5 and its application to the facts of the case --

6         MS. WESTFALL:  Very good.

7         MR. SWEETEN:  -- which is not at all

8 times --

9         MS. WESTFALL:  I'm grateful. I'm

10 grateful.

11         MR. SWEETEN:  Good. I'm glad you are.

12 We're certainly going to follow the Court's Order.

13         I'm going to go on ahead and go on the

14 record.

15         The Court has, with respect to this

16 matter, the Court has -- has ordered that Texas will --

17 that the witness can testify as to the general purpose

18 or the purpose of a legislature as a whole, and in this

19 case it says enacting Senate Bill 14.

20         So he can testify about the general

21 purpose. But for you to parse and to take specific

22 provisions out and then ask him each purpose is -- is

23 not, I think, in accordance with what the Court's Order

24 is. We are going to, as he's sitting here, he can

25 testify as to the general purpose of the bill. So we'll

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 145

1  allow that testimony.
2         MS. WESTFALL:  In other words, you're
3  directing him not to answer the last question on the on
4  the basis of privilege?
5         MR. SWEETEN:  Well, can we hear the last
6  question again?
7         MS. WESTFALL:  Can you search for my last
8  question, sir.
9         (Requested portion was read back by the
10 court reporter.)
11        MR. SWEETEN:  You're -- you're asking if
12 it would be acceptable under the bill.  I think you've
13 gone beyond what is the purpose of the bill.  He can
14 testify about the purpose of the bill.  I -- I think
15 you're going beyond what -- what he has to do.  He
16 obviously, you know, the Court has said that he doesn't
17 have to provide his subjective intent of the legislator
18 or other legislators.  He can testify about the purpose
19 of the bill.  He's done so.
20 So I think that's -- we're going instruct
21 as to privilege as to that issue.
22        MS. WESTFALL:  Okay.
23        Q.  (By Ms. Westfall) Did you have any
24 conversations with anyone about allowing nonphoto ID in
25 HB -- SB 362?

## 146

1         MR. SWEETEN:  You can testify as to
2  whether or not you had conversations on that issue.  You
3  can identify with whom the conversation was.
4         A.  Repeat the question.
5         Q.  Did you have conversations with anyone about
6  allowing nonphoto ID in Senate Bill 362?
7         A.  Yes.
8         Q.  Did you personally have a conversation or was
9  it Ms. McCoy on your behalf?
10        A.  I personally had a conversation.
11        Q.  And with whom did you have that conversation?
12        A.  Ms. McCoy.
13        Q.  Did you have that conversation with anyone else
14 other than Ms. McCoy?
15        A.  Yes.
16        Q.  Who else was in the meeting?
17        MR. SWEETEN:  Who was in the meeting is
18 all she's asking, just who was there?
19        A.  Senator Williams.
20        Q.  Was his staff or was he himself in the meeting?
21        A.  Only him.
22        Q.  When did that meeting take place?
23        A.  Prior to the bill coming to the Floor.
24        Q.  Did you have any other meetings you can recall
25 concerning the inclusion of nonphoto ID forms in Senate

## 147

1  Bill 362?
2         A.  Yes.
3         Q.  Who was that conversation with?
4         A.  Lieutenant Governor Dewhurst.
5         Q.  And when did that conversation occur?
6         A.  Prior to the bill coming to the Floor.
7         Q.  And was anyone else in that meeting beside you
8  and Mr. Dewhurst?
9         A.  I don't remember.
10        Q.  Was that in-person conversation?
11        A.  Yes.
12        Q.  Was that in his office or yours?
13        A.  His.
14        Q.  Do you recall any other conversations about
15 including nonphoto ID in Senate Bill 362?
16        A.  No.
17        Q.  Thank you.
18        Were there any -- are you aware of any
19 e-mails or other written communications concerning any
20 of the meetings you just testified about including
21 nonphoto ID in Senate Bill 362?
22        A.  No knowledge of any.
23        Q.  Are you familiar with the concept of Spanish
24 surnamed voter registration?
25        A.  No.

## 148

1         Q.  What was the purpose or purposes of Senate Bill
2  362?
3         A.  To protect the integrity of the ballot box.
4         Q.  Could you describe -- you just testified about
5  conversations between you and Lieutenant Governor
6  Dewhurst concerning nonphoto ID in Senate Bill
7  362.  Could you describe that conversation?
8         A.  Privileged.
9         MR. SWEETEN:  Yeah, don't reveal the
10 substance of the conversation.
11        Q.  (By Ms. Westfall) You just testified that you
12 had conversation with Senator Williams and Ms. McCoy
13 about including nonphoto ID in Senate Bill 362; is that
14 correct?  Could you describe that conversation?
15        A.  Privileged.
16        MR. SWEETEN:  Objection, privilege.
17        Q.  (By Ms. Westfall) So I believe you were
18 testifying about the purposes of Senate Bill 362; is
19 that correct?
20        MR. SWEETEN:  He did answer that question.
21        Q.  (By Ms. Westfall) And I -- and you said it was
22 -- I'm sorry, I -- I was talking about the
23 conversations.  Could you testify about -- strike that.
24        What were the purposes of Senate Bill 362?
25        A.  To preserve the -- the integrity of the ballot



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 149

1  box.
2      Q.  Anything else?
3      A.  No.
4      Q.  Is that the sole purpose of 362?
5      A.  Yes.
6      Q.  Is that why you introduced 362?
7          MR. SWEETEN:  Now, wait a minute.  Now
8  you're asking for his subjective intent of the -- as
9  opposed to the subjective intent of the legislator.  So
10  he's testifying as to purpose, and the Court has very
11  specifically said that this is not his subjective
12  intent.
13          I'm going to instruct you not to answer in
14  accordance with the Court's Order.
15      A.  Privilege.
16          MR. SWEETEN:  Which I hope you recognize
17  as well.
18          MS. WESTFALL:  I certainly do.  I have it
19  right in front of me, Mr. Sweeten.
20          MR. SWEETEN:  Right.  So do I.
21      Q.  (By Ms. Westfall) Did anyone ask you to
22  introduce Senate Bill 362?
23      A.  No.
24      Q.  Did you promise anyone that you would introduce
25  Senate Bill 362.

## 150

1          MR. SWEETEN:  I'm going to object.  I
2  think that you're asking for a specific content of a
3  communication and asking was he -- did he promise
4  someone.  If you want to ask if he had constituent
5  communications --
6          MS. WESTFALL:  We take the position that
7  falls outside the privilege.  That's outside the scope.
8          MR. FREDERICK:  Can we have just a moment
9  to confer.
10          MS. WESTFALL:  Certainly.
11          MR. SWEETEN:  Yeah, I'm going to go ahead
12  and assert privilege on -- on did he promise anyone to
13  -- with respect to the bill.  So I'm going to go ahead
14  and assert privilege as to that issue.
15      Q.  (By Ms. Westfall) Senator, did anything occur
16  between 2007 when HB 218 was introduced in 2009 when
17  Senate Bill 362 was introduced that caused you to
18  conclude there was a continued need for voter ID?
19          MR. SWEETEN:  I'm going to object.  That
20  calls for legislative privilege.
21      A.  Privilege.
22          MS. WESTFALL:  Thanks.  If you can make
23  sure the court reporter can hear you.
24      Q.  (By Ms. Westfall) Are you aware of any
25  in-person voter impersonation that caused you to believe

## 151

1  a voter ID bill was still needed in Texas.
2          MR. SWEETEN:  Objection, privilege.
3      A.  Privilege.
4      Q.  (By Ms. Westfall) You just testified that the
5  purpose of 362 was to preserve the integrity of the
6  ballot box.  What does that mean?
7      A.  To preserve the integrity of the ballot box.
8      Q.  Correct.  Could you explain a bit -- elaborate
9  a bit on that purpose?
10      A.  To preserve the integrity of the ballot box.
11      Q.  Does that mean that -- why does it need
12  preserving?
13      A.  We need to preserve the integrity the ballot
14  box.
15          MR. SWEETEN:  Yeah, I'm going to assert
16  privilege.  He said what he thought the purpose is.  And
17  he's answered the question.
18      Q.  (By Ms. Westfall) Was a there a lack of
19  integrity in the ballot box in 2009?
20          MR. SWEETEN:  I think that's privileged.
21      A.  Privilege.
22      Q.  (By Ms. Westfall) Had you had any conversations
23  with election officials about the integrity the ballot
24  box in 2009?
25          MR. SWEETEN:  You're asking him if he had

## 152

1  conversations about the integrity of the ballot box.  I
2  think we're getting a little more in a subjective -- I
3  mean, we're getting a fairly substantive description in
4  the preface of your question.  I think if you would
5  re-ask it and just ask about whether he's had contact
6  with the election officials, we won't have any objection
7  whatsoever as to that.
8          MS. WESTFALL:  Okay.  I'm going to keep my
9  question on the record and not withdraw it.
10      Q.  (By ms. Westfall) But did you have any
11  conversations with election officials in advance of
12  filing Senate Bill 362?
13      A.  Yes.
14      Q.  Which election officials?
15      A.  Those that testified on the bill in 2007.
16      Q.  And who were those?
17      A.  I don't remember the names.
18      Q.  Were they county officials?
19      A.  Yes.
20      Q.  Did they include any state officials?
21      A.  No.
22      Q.  Did it include Mr. Paul Bettencourt?
23      A.  I can't verify it was Mr. Bettencourt.
24      Q.  Do you recall which counties?
25      A.  I believe it was Houston.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 153

1     Q.  Did you have any conversations with any other
2  election officials outside of those public proceedings
3  in 2007 prior to filing SB 362?
4     A.  No.
5     Q.  What was -- are there any bases or facts that
6  you can identify related to the purpose of SB 362, which
7  you just testified was to preserve the integrity of the
8  ballot box?
9     A.  Privilege.
10         MR. SWEETEN:  Objection, privilege.
11     Q.  (By Ms. Westfall) Can you tell me how 362
12  preserves the integrity of the ballot box?
13         MR. SWEETEN:  Objection, privilege.
14     A.  Privilege.
15     Q.  (By Ms. Westfall) Did you become aware of any
16  convictions on -- for in-person voter impersonation
17  between 2007 and 2009?
18     A.  Rephrase the question.
19     Q.  I'm here to ask you --
20     A.  Not rephrase -- repeat the question, not
21  rephrase.  Repeat.
22     Q.  Okay.  Good.  I liked my question.
23         MR. SWEETEN:  I'm going to object on
24  privilege anyway so go ahead and ask it.
25         MS. WESTFALL:  Well, let's let it be.

## 154

1     A.  Privilege.
2     Q.  (By Ms. Westfall) Very good.
3         How does Senate Bill 362 -- how is it more
4  effective in preventing in-person voter impersonation
5  than -- than current law?
6         MR. SWEETEN:  Objection, privilege.
7     Q.  (By Ms. Westfall) Under current law, voters
8  must verify their identity by bringing their voter
9  registration certificate, correct?
10     A.  Repeat the question, please.
11     Q.  Under current law voters must verify their
12  identity by bringing their voter registration
13  certificate to the polls on election day; is that
14  correct?
15     A.  No.
16     Q.  Tell me how I'm not correct?
17         MR. SWEETEN:  She's asking you under
18  current law, the requirement.
19     A.  There are multiple options of which one of
20  those is to show your voter identification card.
21     Q.  (By Ms. Westfall) So how is Senate Bill 362
22  more effective than current law under which one -- a
23  voter may show a voter registration certificate or other
24  forms of ID --
25         MR. SWEETEN:  Objection --

## 155

1     Q.  (By Ms. Westfall) -- to be verified at the
2  poll.
3         MR. SWEETEN:  Objection, privilege.
4     A.  Privilege.
5     Q.  (By Ms. Westfall) Does Senate Bill 362 address
6  issues of non-citizens voting?
7         MR. SWEETEN:  Objection, privilege.
8     A.  Privilege.
9     Q.  (By Ms. Westfall) Can you identify any
10  non-citizen who has voted in any election in Texas?
11         MR. SWEETEN:  Objection to the extent that
12  this would require you to reveal thoughts, mental
13  impressions, opinions about legislation in furtherance
14  of the legislative process.  However, if it's not under
15  that category or relates to communications you've had,
16  you can answer outside of those.
17     A.  Privilege.
18     Q.  (By Ms. Westfall) Have you ever had any
19  conversations with anyone concerning the identity of any
20  non-citizen who has voted in any election in Texas?
21         MR. SWEETEN:  Don't reveal legislatively
22  privileged information.
23     A.  Privilege.
24     Q.  (By Ms. Westfall) It was concerning
25  conversations, the existence thereof.

## 156

1         MR. SWEETEN:  Okay.  Can you say it again?
2         MS. WESTFALL:  Certainly.
3     Q.  (By Ms. Westfall) Have you ever had a
4  conversation with anyone concerning the identity of any
5  non-citizen who has voted in any Texas election?
6         MR. SWEETEN:  There's a lot of substance
7  in that question as to what the conversation was
8  about.  If you want to narrow that down, I'll let him
9  answer whether conversations occurred and facts about
10  the conversation.
11         MS. WESTFALL:  I don't.  I want that on
12  the record.
13         MR. SWEETEN:  Okay.  On that we'll object.
14         MS. WESTFALL:  On the basis --
15     A.  The question is?  Repeat the question, please.
16     Q.  (By Ms. Westfall) Have you -- can you -- have
17  you had any conversations concerning the identity of any
18  non-citizen who has voted in any election in Texas?
19         MR. SWEETEN:  I've got to object on
20  privilege.
21     Q.  (By Ms. Westfall) Are you following your
22  counsel's advice?
23     A.  Privilege.
24         MR. SWEETEN:  Elizabeth, let me offer that
25  if -- if we've objected to that question, if you're



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 157

1  trying to seek similar information that is not as
2  descriptive as his conversation, we're more than happy
3  to work with you to try to have an answer to the
4  question you're seeking.
5      Q.  (By Ms. Westfall) Have you -- are you aware of
6  any conversations related to non-citizen voting in
7  Texas?
8      MR. SWEETEN:  Yeah, yeah.  I'm going to
9  let you answer that whether or not you had any
10  conversations.
11      A.  I'm not aware of conversations.
12      Q.  (By Ms. Westfall) I'm going to hand you what's
13  been previously marked as or I'm going to have the court
14  reporter hand you what's been previously marked as
15  Exhibit 31.
16      MS. WESTFALL:  Or maybe I can.  Here you
17  go, sir.
18      MR. ROSENBERG:  31?
19      MS. WESTFALL:  Yes.
20      Q.  (By Ms. Westfall) Do you recognize this
21  document?
22      A.  Yes.
23      Q.  And what is it?
24      A.  Press release from my office December 15, 2008.
25      Q.  And do you see it concerns the Senate Bill 362

## 158

1  and 363 about which you just testified today?
2      A.  Yes.
3      Q.  Have you ever heard of any registered voter
4  indicating that the voter was not going to vote because
5  he or she was concerned their vote would be diluted by
6  illegitimate votes?
7      A.  Privilege.
8      MR. SWEETEN:  To the extent, I mean,
9  here's the distinction here:  You don't have to reveal
10  thoughts, mental impressions, or opinions about
11  legislation in furtherance of the legislative process or
12  communications that we've outlined before.  She can ask
13  you about public statements that are made and matters of
14  public record.  And so if it is -- falls in one of the
15  areas of privilege, you don't have to reveal that, if
16  there is.  She can ask you about the public statement
17  though.
18      A.  Privilege.
19      Q.  (By Ms. Westfall) And this press release, when
20  was it dated?
21      A.  December 15, 2008.
22      Q.  Did Ms. McCoy draft it?
23      A.  Yes.
24      Q.  And it, as to Senate Bill 363, it expresses
25  concern about ensuring that only legal citizens can cast

## 159

1  a ballot, does it not?
2      A.  Repeat the question.
3      Q.  Senate Bill 363, well, this press release
4  Exhibit 31, indicates that the purpose of 363 is to
5  ensure that only legal citizens cast a ballot, does it
6  not?
7      A.  Our current laws state that only legal citizens
8  can cast a ballot.
9      Q.  Do you agree with that, that that statement is
10  included and you're quoted in your press release; is
11  that right?
12      A.  The statements is -- our current laws state
13  that only legal citizens can cast a ballot.
14      Q.  And Senate Bill 363, as explained in this press
15  release, would require voter applicants to prove that he
16  or she is a United States citizen by furnishing a birth
17  certificate or a naturalization oath; is that right?
18      MR. SWEETEN:  Are you reading from this?
19      MS. WESTFALL:  I am.  I'm asking him to
20  just confirm that what's in the document is in the
21  document.
22      A.  It's require a voter to prove he or she is a
23  United States citizen by furnishing a birth certificate
24  or, if it's a naturalized citizen, the city, state and
25  year of taking the naturalized oath.

## 160

1      Q.  (By Ms. Westfall) Did you have any concern that
2  Senate Bill 363 would be burdensome to people trying to
3  register to vote?
4      A.  Privilege.
5      MR. SWEETEN:  Don't reveal privileged
6  information.
7      Q.  (By Ms. Westfall) Do you know of any other
8  states that are -- require producing a birth certificate
9  or naturalization oath to register to vote?
10      MR. SWEETEN:  Don't reveal privileged
11  information.
12      A.  Privilege.
13      Q.  (By Ms. Westfall) Are you aware that the state
14  of Arizona requires documents of proof of citizenship to
15  vote?
16      MR. SWEETEN:  Objection, privilege.
17      A.  Privileged.
18      Q.  (By Ms. Westfall) And are you aware that
19  Arizona has been involved in fiercely fought voter
20  rights litigation over that issue for years?
21      MR. SWEETEN:  Objection to the extent it
22  calls for privilege.
23      A.  Privileged.
24      Q.  (By Ms. Westfall) And what did you mean,
25  Senator Fraser, when you said in Paragraph 4, voting is



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**161**

1  one of our most important rights as Americans but it's
2  also a responsibility.
3      A.  I meant that voting is one of our most
4  important rights as Americans but it is also a
5  responsibility.
6      Q.  (By Ms. Westfall) What did you mean by the word
7  "responsibility?"
8      A.  I meant that voting is a one of our most
9  important rights as Americans but it also is a
10 responsibility.
11     Q.  Do you think -- you have to be responsibile to
12 vote, is that what mean?
13     A.  I meant that voting is one of our most
14 important rights as Americans but it also is a
15 responsibility.
16     Q.  I -- it sounds to me I've asked the question
17 three times and is it -- is it your testimony today that
18 you do not have further explanation of the words on the
19 face of this press release and you're not going to
20 answer my question?
21     A.  I believe that voting is one our most important
22 rights as Americans, but it's also a responsibility.
23     Q.  Did you have communications -- are you aware of
24 any communications with legislators or staff who opposed
25 Senate Bill 362?

---

**162**

1      A.  Privilege.
2      Q.  Did you have any communications with
3  legislators who opposed Senate Bill 362 regarding the
4  purpose of Senate Bill 362?
5          MR. SWEETEN:  Objection, privilege.
6      A.  Privilege.
7      Q.  (By Ms. Westfall) Who, besides you, were the
8  main proponents of Senate Bill 362?
9          MR. SWEETEN:  To the extent you can refer
10 the matters of public record?
11     A.  Its co-sponsors.
12         MR. SWEETEN:  Matters that are privilege,
13 you can --
14     A.  Co-sponsors of the bill were Senator Estes,
15 Senator Nelson, Senator Nichols.
16     Q.  (By Ms. Westfall) Was this legislation a
17 priority for other people in the Texas government
18 besides the sponsors of the bill?
19         MR. SWEETEN:  Don't reveal privileged
20 information.
21     A.  Privilege.
22     Q.  (By Ms. Westfall) Was this legislation a
23 priority for Lieutenant Governor?
24     A.  Privilege.
25         MR. SWEETEN:  Objection, privilege.

---

**163**

1      Q.  (By Ms. Westfall) Was this legislation a
2  priority for the Governor?
3          MR. SWEETEN:  Same objection.
4      A.  Privilege.
5      Q.  (By Ms. Westfall) Was Senate Bill 362 a
6  priority for anyone outside the Texas government, such
7  as interest groups, other states, people outside of the
8  state?
9          MR. SWEETEN:  To the extent this would
10 require you to reveal thoughts, mental impressions,
11 opinions about legislation in furtherance of the
12 legislative process, don't answer that.  Or
13 communications with any of the individuals or entities
14 named, then don't answer it.  To the extent it
15 does not do so, you're free to answer.
16     A.  Privilege.
17     Q.  (By Ms. Westfall) Did any groups representing
18 minority voters support Senate Bill 362?
19         MR. SWEETEN:  Same objection, same
20 instruction.
21     A.  Privilege.
22     Q.  (By Ms. Westfall) Did you have any
23 communications with anyone supporting Senate Bill 362?
24         MR. SWEETEN:  You can answer whether or
25 not you've had communications and facts about those

---

**164**

1  communications.  Other than -- but don't reveal the
2  substance.
3      A.  Ask the question again.
4      Q.  (By Ms. Westfall) Did you have any
5  communications with any individuals or groups supporting
6  Senate Bill 362?
7      A.  Yes.
8      Q.  Could you name each and every one of those
9  individuals or groups?
10     A.  Skipper Wallace.
11     Q.  Who else?
12     A.  The only one, Skipper Wallace.
13     Q.  That's the sum total of the supporters you
14 talked to other than legislators and their staff who
15 were supporting the bill; is that correct?
16     A.  Yes.  That was a nod -- that was nod-head yes.
17     Q.  You're getting in the swing of things here in
18 terms of the transcript.  Thank you.
19         Who were the main opponents of Senate Bill
20 362?
21         MR. SWEETEN:  Objection, calls for
22 legislative privilege.
23     A.  Privilege.
24     Q.  Do you know why -- do you know why
25 opponents oppose Senate Bill 362?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

165

1    MR. SWEETEN:  Objection, privilege.
2    A.   Privilege.
3    Q.   (By Ms. Westfall) Did you have any
4    conversations with any bill opponents?
5    A.   Privilege.
6    Q.   Conversations?
7         MR. SWEETEN:  You can testify about the
8    facts of conversations.  Who you talked to, what day,
9    and how long, the duration of them, but don't reveal the
10   substance of the conversation.
11        THE WITNESS:  You said I --
12        MR. SWEETEN:  You can testify as to
13   whether you had conversations with -- with opponents as
14   long as they're not privileged.  I mean, for example, if
15   you talked to a legislator about it, it would be a
16   privilege.  You can talk to -- you can say whether or
17   not you had a conversation with an opponent.  You can
18   list the name of the person on the --
19        THE WITNESS:  But if it's a legislator,
20   would it be privileged?
21        MR. SWEETEN:  You can identify whether or
22   not you had a conversation.  Don't reveal any of the
23   substance whatsoever.
24   A.   I had a -- had a conversation with an -- an
25   opponent.

---

166

1    Q.   (By Ms. Westfall) And what -- who was that
2    opponent?
3    A.   John Whitmire.
4    Q.   When was that conversation?
5    A.   I don't remember.
6    Q.   Did you have conversations -- was that the only
7    bill opponent you had a conversation with about SB 362?
8    A.   Likely that I had more.  I believe I had a
9    conversation with Rodney Ellis, Senator Ellis.
10   Q.   Was Ms. McCoy at either one of those meetings?
11   A.   No.
12   Q.   Was this a one-on-one meeting with the member?
13   A.   Yes.
14   Q.   Did you have any other conversations with any
15   other bill opponents, legislators or staff?
16   A.   I don't remember having a conversation.
17   Q.   Do you recall when you had a conversation with
18   Mr. Whitmire?
19   A.   Whitmire probably was in the fall before Ellis,
20   would probably have been during the session.
21   Q.   Can -- can you describe the general issue, I
22   mean, the general purpose, or the general discussion
23   that you had with Mr. Whitmin?
24   A.   Privilege.
25        MR. SWEETEN:  No, don't -- don't reveal --

---

167

1    A.   Privilege.
2         MR. SWEETEN:  I mean, well, general.  I
3    think you've already done so when you said has he had --
4    has he had conversations with opponents of the bill.  I
5    think he's testified as to the fact of the conversation
6    and he's revealed that he's had discussions with the
7    opponents.
8    Q.   (By Ms. Westfall) And you had one conversation
9    with Senator Whitmire?
10   A.   Likely more than one.
11   Q.   Did, after that, just temporally -- actually,
12   that was before you filed Senate Bill 362; is that
13   right?
14   A.   Yes.
15   Q.   And you also had a conversation with Senator
16   Ellis; is that correct?
17   A.   Yes.
18   Q.   Could you tell me the general nature of that
19   conversation?
20   A.   Privileged.
21   Q.   When was -- did that conversation occur?
22   A.   Likely, after session started.
23   Q.   Was it after you filed the bill?
24   A.   Yes.
25   Q.   Was there any change made to the bill

---

168

1    temporally after that time?
2    A.   No.
3    Q.   I'm -- I'm -- we're going break in one
4    second.  Let me just finish.
5    Did you take any steps with regard to the
6    Senate Bill 362, to try to address any concerns raised
7    by bill opponents?
8    A.   Privilege.
9         MR. SWEETEN:  Objection, privileged.
10        MS. WESTFALL:  Okay.  Why don't we take
11   ten minute break.
12        MR. SWEETEN:  Okay.
13        (Recess from 2:31 to 2:47 p.m.)
14        MS. WESTFALL:  Back on the record.
15   Q.  (By Ms. Westfall) Senator, what was your role in
16   trying to get Senate Bill 362 passed in the Senate?
17        MR. SWEETEN:  Objection, legislative
18   privilege.
19   A.   Privilege.
20   Q.   (By Ms. Westfall)  What procedures did you use
21   to try to ensure that SB 362 would pass the Senate?
22        MR. SWEETEN:  Objection, privilege.
23   A.   Privilege.
24        MS. WESTFALL:  Will you allow him to
25   testify about publicly known procedures?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 169

1    MR. SWEETEN:  I will let him testify --
2    well, I'm not going to let him reveal his thoughts,
3    mental impressions or opinions about legislation or in
4    furtherance of the legislative process.  That's covered.
5    So I'm -- I think the way it's phrased, I can't allow
6    him to answer that, so no, I'm going to object on
7    privilege grounds.
8        Q.   (By Ms. Westfall)  Are there any publicly known
9    and publicly available procedures that you used to get
10   Senate Bill 362 passed through the Senate?
11       MR. SWEETEN:  I think it still -- I think
12   that's implying a purpose, and therefore, is
13   legislatively privileged.  I mean, I think you could ask
14   the general what procedures occurred on a factual basis
15   with respect to the bill.  I don't think that that would
16   -- I would have an objection to that.
17       Q.   (By Ms. Westfall)  Okay.  What procedures were
18   employed to -- in conjunction with consideration of
19   Senate Bill 362 in the Senate?
20       MR. SWEETEN:  I think that's still -- it's
21   still infirm.  I object, privilege.
22       Q.   (By Ms. Westfall)  What was your strategy for
23   getting Senate Bill 362 passed?
24       MR. SWEETEN:  Same objection, privilege.
25       A.   Privilege.

---

### 170

1        Q.   (By Ms. Westfall)  When you introduced Senate
2    Bill 362, did you know how many senators would support
3    it?
4        MR. SWEETEN:  Objection, privilege.
5        A.   Privilege.
6        Q.   (By Ms. Westfall)  Did you try to make any
7    determination about the number of senators who would
8    support Senate Bill 362 prior to bringing it to the
9    Floor?
10       MR. SWEETEN:  Objection, privilege.
11       Q.   (By Ms. Westfall)  Sir, are you relying upon
12   advice of counsel?
13       A.   Privilege.
14       Q.   Thank you.  Did you know how many senators
15   would support 362 prior to your bringing it to the
16   Floor.
17       MR. SWEETEN:  Objection, privilege.
18       A.   Privilege.
19       Q.   (By Ms. Westfall)  Did you have any
20   conversations about how much support 362 had prior to
21   bringing it to the Floor?
22       MR. SWEETEN:  Objection, privilege.
23       MS. WESTFALL:  The existence of
24   conversations?
25       MR. SWEETEN:  He can talk about -- well,

---

### 171

1    let me think, about the privilege of your questioning
2    again.
3        Court reporter, can you reread that
4    question, please?
5        (Requested portion read back by the court
6    reporter.)
7        MR. SWEETEN:  That reveals his thoughts,
8    I'm afraid.  I'm going to object on privilege.
9        If you want to rephrase the preface of the
10   question.  You know, general subject matter is one
11   thing.  That is more than general subject matter.  So if
12   you want to change the question, we may allow him to
13   answer.
14       Q.   (By Ms. Westfall)  Did you have any
15   conversations prior to bringing 362 to the Floor
16   concerning counting votes?
17       MR. SWEETEN:  Okay.  I'm going to let you
18   answer as to if you had conversations about counting
19   votes.
20       A.   Yes.
21       Q.   (By Ms. Westfall)  And who did you have a
22   conversation with?
23       A.   Likely have a conversation with all 31 senators,
24   all 30 other senators.
25       Q.   All 30 senators in the Republican caucus?

---

### 172

1        A.   There's not 30 Republican senators.
2        Q.   Who were those 30 senators?
3        A.   There are 31 members of the Texas Senate; not
4    counting me, there are 30.
5        Q.   So you had a conversation with all the senators
6    about counting votes on 362?
7        A.   I would believe that I had a conversation with
8    every senator.
9        Q.   Do you mean individual conversations?
10       MR. SWEETEN:  You can answer that.
11       A.   Yes.
12       MR. SWEETEN:  Okay.  Let me just make sure
13   that we're clear, though, other than just revealing the
14   fact that the conversation happened, you are not to
15   reveal the substance of those conversations.
16       Q.   (By Ms. Westfall)  Did you have a conversation
17   with each and every individual senator prior to bringing
18   362 to the Floor?
19       A.   To my knowledge, yes, I talked to everyone.
20       Q.   Were these one-on-one conversations?
21       A.   For the most part.
22       Q.   Did Ms. McCoy have any conversations on your
23   behalf with any staff members for senators?
24       MR. SWEETEN:  You can answer if you know
25   about the existence of the conversations.  Don't reveal

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1   the substance.
2       A.  I don't know.
3       Q.  (By Ms. Westfall)  Did you learn as a result of
4   these conversations that you did not have the support of
5   two-thirds of senators for 362?
6           MR. SWEETEN:  Objection.  Calls for
7   matters that are subject to the legislative privilege.
8       A.  Privilege.
9       Q.  (By Ms. Westfall)  During these conversations,
10  did you solicit the view of the members as to whether he
11  or she supported 362?
12          MR. SWEETEN:  I'm going to object.  You're
13  asking for the substance of the conversations.  Don't
14  answer based on legislative privilege.
15      Q.  (By Ms. Westfall)  During these individual
16  conversations, did you discuss support or opposition
17  against 362?
18          MR. SWEETEN:  Same objection.
19      A.  Privilege.
20      Q.  (By Ms. Westfall)  Did you try to persuade any
21  member who was opposed to Senate Bill 362 to vote for
22  it?
23          MR. SWEETEN:  Same objection.
24      A.  Privilege.
25      Q.  (By Ms. Westfall)  I hand you what's been

---

175

1       Q.  (By Ms. Westfall)  And what year were these
2   rules adopted?
3       A.  Just a second.  I'm sorry.  I need to retract
4   the last of -- okay.  I'm sorry.  The answer I gave you
5   was incorrect.  It was not the hearing.  This is the
6   Senate rules that were adopted.
7       Q.  Thank you.
8       A.  January 14th.
9       Q.  Thank you.
10          And was this in 2009?
11      A.  Yes.
12      Q.  Were these rules operable during consideration
13  of Senate Bill 362?
14      A.  Yes.
15      Q.  And turning your attention to Rule 5.11 on Page
16  24 of this document, Exhibit 32, could you direct your
17  attention to that?
18      A.  Page 24?
19      Q.  24, yes.  Could you take a look at Rule 5.11?
20      A.  Uh-huh.
21      Q.  Could you describe this rule?
22      A.  I'm sorry?
23      Q.  Could you describe this rule?
24      A.  Could you be more specific?
25      Q.  Could you describe what this rule provides for

---

174

1   previously marked as Exhibit 32.  Do you recognize this
2   document?
3       A.  Would you like me to read it back to you?
4       Q.  Not the whole entire thing.  I won't do that to
5   you today.  But could you tell me, do you recognize this
6   document?
7       A.  I do recognize this document.
8       Q.  And what is it?
9       A.  I think it is --
10          MR. SWEETEN:  If you don't mind me
11  scooting in here.  I need to be able to see this.  Do
12  you have a copy?
13          MS. WESTFALL:  No, I don't.  We --
14          MR. SWEETEN:  I don't have one either.
15          MS. WESTFALL:  -- lost our others.
16      Q.  (By Ms. Westfall)  Do you recognize what this
17  document is?
18      A.  I do.
19      Q.  What is it?
20      A.  I believe it is the hearing that was held
21  January 14, 2009.
22      Q.  Directing your attention to the first page,
23  does it say "Senate Rules," sir?
24          MR. SWEETEN:  She said the first page.
25      A.  Senate Rules.

---

176

1   based on your knowledge of serving in the Senate for
2   many years?
3       A.  Senate Rule 5.11 refers to special orders.
4       Q.  Could you describe the provision in Section A
5   of Rule 11, 5.11?
6       A.  It says "Any bill, resolution, or other measure
7   may be on any day be made a special order for future
8   time of the session by affirmative vote of two-thirds of
9   the members present."
10      Q.  Turning your attention to Subsection D of Rule
11  5.11, what does that subsection provide for?
12      A.  "Notwithstanding Subsection A of this bill, a
13  bill or resolution relating to voter identification
14  requirements reported favorably from the Committee of
15  the Whole may be set as a special order for a time at
16  least 24 hours after the motion is adopted by a majority
17  of the members of the Senate."
18      Q.  Could you explain the effect of Rule 5.11D?
19      A.  I think it's self-explanatory as I just read
20  it.
21      Q.  So you have no further testimony in answer to
22  my question about the effect?
23      A.  The effect is as it reads, that would be the
24  effect.
25      Q.  What is the purpose of Rule 5.11D as it

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

### 177

1     pertains to voter ID requirements?

2        A.  The purpose is to not --

3        MR. SWEETEN:  Hold on.  Hold on.  I think

4     as it pertains to voter ID requirements, I'm going to

5     object.  I think that that calls for him to reveal

6     matters of legislative privilege.  He's also already

7     answered in previous questioning questions about this

8     rule.

9        MS. WESTFALL:  Are you preventing me from

10    examining the witness about this exhibit, the rules in

11    2009 pertaining to voter ID?

12       MR. SWEETEN:  I'm not prohibiting you from

13    examining about the exhibit.  You can do that.  And you

14    have done that.

15       MS. WESTFALL:  I would direct you also to

16    the Court's Order of today concerning purpose.  And the

17    purpose of a rule governing consideration of voter ID in

18    2009, are you prohibiting me from examining the witness?

19       MR. SWEETEN:  Counsel, you've already

20    asked him very specifically earlier about this rule and

21    what he felt the purpose of it was and what Janice McCoy

22    thought the purpose of it was.  You've already asked

23    this question.

24       MS. WESTFALL:  I can ask a different

25    question.  But I'm going to keep my question on the

---

### 178

1     record.  I'm not withdrawing it.

2        Q.  (By Ms. Westfall)  What was purpose in Rule

3     5.11D of specifying voter ID requirements?

4        MR. SWEETEN:  Okay.  I'm going to let him

5     answer as to your previous question, what is the purpose

6     of that rule.  He can answer that.

7        A.  The purpose of number -- of Subsection C (sic)

8     is to establish a special order, that notwithstanding

9     the section's rule, a bill or resolution relating to the

10    voter identification requirements reported favorably by

11    the committee can be set as a special order.

12       Q.  (By Ms. Westfall)  And are you reading from

13    Subsection D of Rule 5.11?

14       A.  D, yes, I am.

15       Q.  What -- I'm going to ask the question I asked

16    previously, which is what was the purpose of specifying

17    voter ID requirements by name in Rule 5.11D and setting

18    specific procedures for those requirements?

19       A.  It was to specify a special order relating to

20    what is mentioned in Subsection D.

21       Q.  And what was the purpose of that special order?

22       A.  To establish a special order.

23       Q.  Okay.  So what I'm hearing is roundy, roundy

24    circle.  Do you have any further testimony on the

25    subject --

---

### 179

1        MR. SWEETEN:  Objection to the sidebar.

2     Objection to the sidebar.

3        A.  No.

4        Q.  (By Ms. Westfall)  Were there any conversations

5     about establishing Rule 5.11D that you're aware of?

6        A.  Yes.

7        Q.  When did that conversation occur?

8        A.  In the Committee of the Whole meeting with all

9     31 senators.

10       Q.  When was that meeting?

11       A.  Prior to the passage of this.  It was likely

12    the first week of the session.

13       Q.  Is there a Senate rules committee that adopts

14    rules at the beginning of every session?

15       A.  Not a specified rules committee, no.

16       Q.  Does the Committee of the Whole Senate

17    establish its own rules?

18       A.  Yes.

19       Q.  Who is the chair of that committee in 2009?

20       A.  It would have to be John Whitmire, since he's

21    the Dean of the Senate, and he runs the meeting that

22    establishes -- that calls for the vote on the rules.

23       Q.  Did you have any conversations with Senator

24    Williams concerning Rule 5.11D or the concept embodied

25    therein?

---

### 180

1        MR. SWEETEN:  You can answer as to whether

2     a conversation occurred, otherwise it's legislatively

3     privileged.

4        A.  Yes.  There was a conversation.

5        Q.  When did that conversation occur?

6        A.  Immediately prior to this meeting.

7        Q.  I believe you testified this meeting would have

8     been the first week of session in January; is that

9     correct, of 2009?

10       A.  It looks like it was January 14, and the

11    session I think probably started on the 10th, so the

12    first week of the session.

13       Q.  What was your conversation with Senator

14    Williams about?

15       MR. SWEETEN:  Do not reveal, based on

16    legislative privilege.

17       A.  Privilege.

18       Q.  (By Ms. Westfall)  Was anyone else at that

19    meeting?

20       A.  No.

21       Q.  Who requested that meeting, you or Senator

22    Williams?

23       MR. SWEETEN:  Objection.

24       A.  Privileged.

25       MR. SWEETEN:  Yeah, it's privileged.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 181

1    Q.  (By Ms. Westfall)  What was your strategy for
2  gaining two-thirds support of all senators in 2009 to
3  support SB 362?
4         MR. SWEETEN:  Objection, legislative
5  privilege.
6    Q.  (By Ms. Westfall)  Did you request that the
7  two-thirds rule be suspended for Senate Bill 362?
8         MR. SWEETEN:  Objection, legislative
9  privilege.
10    Q.  (By Ms. Westfall)  Do you know of anyone in the
11  Senate or otherwise who requested the two-thirds rule be
12  suspended for consideration of Senate Bill 362?
13         MR. SWEETEN:  Objection, calls for
14  legislative privilege.
15    Q.  (By Ms. Westfall)  Are you aware of any other
16  conversations, other than the one that you just
17  described with Senator Williams, or the meeting of the
18  Committee of the Whole, concerning suspending the
19  two-thirds rule for consideration of Senate Bill 362?
20         MR. SWEETEN:  Is he aware of any
21  conversations about the two-thirds rule?
22         MS. WESTFALL:  Correct.
23         MR. SWEETEN:  Okay.  You can answer as to
24  whether or not there were conversations.  Do not reveal
25  any substance other than that.

### 182

1    A.  This is -- you know, these two are not
2  connected.  This is not a conversation about the
3  two-thirds rule.
4         MR. SWEETEN:  Okay.  Then if you don't --
5  if you're not aware of conversations --
6    A.  There is no conversation about the two-thirds
7  rules.
8    Q.  (By Ms. Westfall)  Was there a conversation
9  about Rule 5.11A, B, C, D or any combination therein
10  that you're aware of?
11    A.  I'm sorry?
12    Q.  Was there a conversation about Rule 5.11 in
13  Exhibit 32 that you're aware of, other than the one that
14  you described between you and Senator Williams?
15    A.  No.
16    Q.  Did you speak to Mr. Dewhurst about Rule 5.11?
17    A.  No.
18    Q.  Or his staff?
19    A.  No.
20    Q.  Do you know whether Janice McCoy spoke to
21  Mr. Dewhurst or his staff about Rule 5.11?
22    A.  I have no idea.
23    Q.  You served in the Senate since 1996; is that
24  right?
25    A.  '97.

### 183

1    Q.  I mean, '97, you started your service.  To the
2  best of your knowledge, have you seen any other rule
3  that was similar to Rule 5.11D during your service in
4  the Texas Senate?
5    A.  You're asking -- ask the question again,
6  please.
7    Q.  Certainly.  During your time in the Senate,
8  since 1997, have you ever seen a rule in the rules that
9  was similar to Rule 5.11D?
10    A.  Yes.
11    Q.  Tell me about each and every time you've seen a
12  rule like that.
13    A.  It would be impossible for me to tell you
14  because every session, there are multiple rule changes
15  in a revision of the rules.  The rules are set by the
16  senators prior to the session, and we change the rules
17  often.
18    Q.  Have you ever seen a subject matter like voter
19  ID requirements listed in Rule 5.11?
20    A.  As a special order?
21    Q.  Yes.
22    A.  Yes.
23    Q.  Tell me each and every time that's happened.
24    A.  I can't, you know, tell you the exact
25  amount.  You asked, had it been done, and I've answered

### 184

1  yes.  I can't give you specifics.
2    Q.  Prior to 2009 when Rule 5.11 was changed to
3  include this carve-out -- to include this provision
4  concerning voter ID requirements in Subsection D, had
5  there been an area of legislation categorically carved
6  out of Rule 5.11 that you're aware of?
7    A.  The answer to your first question is yes, but
8  adding the word "that I'm aware of" would make it a no.
9    Q.  Are you -- do you familiarize yourself with the
10  rules every time a Senate session starts?
11    A.  Ask that again, please.
12    Q.  Do you familiarize yourself with the Senate
13  rules at the beginning of Senate session?
14    A.  Yes.
15    Q.  Could you clarify your testimony that you --
16  that you just gave concerning whether you're aware of
17  any particular time that a subject matter area has been
18  specified in Rule 5.11 during your service in the
19  Senate?
20         MR. SWEETEN:  Objection to the question as
21  vague.
22         Could you ask him, I mean, in another
23  way?  I'm not sure what you're asking to clarify.  I
24  think he's tried to answer your questions.
25    Q.  (By Ms. Westfall)  Could you identify a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

189

1   legislative privilege.
2         MS. WESTFALL: Mr. Frederick, Mr. Sweeten
3   is the one defending this deposition.  You may counsel
4   him but not object on the record.
5         MR. FREDERICK: I thought I had to counsel
6   him a little louder that time.  I apologize.
7         MS. WESTFALL: He wasn't awake?  He wasn't
8   listening to you?  That's between the two of you.
9         MR. SWEETEN: Thanks for all this on the
10  record. (Laughing.)
11  Q.  (By Ms. Westfall)  Were you concerned that Rule
12  5.11D --
13  A.  I believe Mr. Sweeten was talking to me and
14  counseling the witness, and the other lawyer heard the
15  response, and I believe -- I don't believe he was
16  asleep, for the record.
17  Q.  It's very good that you're defending his honor
18  in this deposition.
19        Senator, did you have any concern that
20  Rule 5.11D would make Senate Bill 362 appear very
21  partisan?
22        MR. SWEETEN: Objection.
23  A.  Privilege.
24        MR. SWEETEN: Privilege.
25  Q.  (by Ms. Westfall)  Was there -- was 362 in any

190

1   part designed for partisan purposes?
2         MR. SWEETEN: Objection, privilege.
3   A.  Privilege.
4         MS. WESTFALL: Purpose?
5   A.  Privileged.
6         MR. SWEETEN: You said was it designed for
7   partisan purposes.
8   Q.  (By Ms. Westfall)  Well, did it have any
9   partisan purpose?  Did Senate Bill 362 have any partisan
10  purpose?
11        MR. SWEETEN: He's already answered what
12  he felt the purpose was.  You've asked him repeatedly.
13        MS. WESTFALL: Are you instructing him not
14  to answer?
15        MR. SWEETEN: You're now asking him, did
16  it have a partisan purpose?
17        MS. WESTFALL: Correct.  That's my
18  question.
19        MR. SWEETEN: I think he's already
20  testified to what he thought the purpose was -- all
21  right.
22        If you want to answer her question, you
23  can go ahead and do so.
24  A.  The purpose of Senate Bill 362 was to protect
25  the integrity of the ballot box.

191

1   Q.  (By Ms. Westfall)  Was the purpose of 362 in
2   part for partisan reasons?
3   A.  The purpose of the bill was as I just answered
4   the prior question.
5   Q.  Therefore, is your answer no?
6   A.  The purpose of the bill is what I answered
7   previously.
8         MS. WESTFALL: If I don't get responses
9   from your witness, I'm going to move to compel responses
10  based on nonresponsive, Mr. Sweeney.  You may want to
11  step outside and have a counsel, have a conference with
12  him.
13        MR. SWEETEN: Okay.  He's answered what he
14  thinks the purpose of the bill is.
15        MS. WESTFALL: He hasn't answered my
16  question.
17        MR. SWEETEN: I think he's attempting to
18  do so, and he's tried to tell you what the purpose is.
19  That's what he's done.
20        MS. WESTFALL: We can take it up.  We can
21  take it up.
22        MR. SWEETEN: Okay.  Well, I'll tell you
23  what, we'll talk about it at a break, and --
24        MS. WESTFALL: Okay.
25        MR. SWEETEN: How many more questions are

192

1   you going to have about the purpose of?  Because we keep
2   going over the same thing on 362.  I assume we've got
3   2011 to go to.  Go ahead.
4   Q.  (By Ms. Westfall)  Would Senate Bill 362 have
5   passed the Senate if it had not -- if it were not for
6   Rule 5.11D?
7         MR. SWEETEN: I'm going to object.
8   Legislative privilege.
9   Q.  (By Ms. Westfall)  You following counsel's
10  advice?
11  A.  Privilege.
12  Q.  Did Senate Bill 362 have the support of
13  two-thirds of the Senate?
14        MR. SWEETEN: Same objection.
15  Q.  (By Ms. Westfall)  Just for the court reporter,
16  could you --
17  A.  Privilege.
18  Q.  What was your -- what was the reaction from
19  other senators to the resolution to suspend -- strike
20  that.
21        What was the reaction from other senators
22  to Rule 5.11D?
23  A.  Privilege.
24        MR. SWEETEN: Objection, privilege.
25  Q.  (By Ms. Westfall)  Was there opposition?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                      May 17, 2012

---

193

1      A.   Privilege.
2           MR. SWEETEN:  Don't reveal privileged
3    information.
4      Q.   (By Ms. Westfall)  Was there any consideration
5    of modifications of any other Senate rules in 2009 in
6    addition to Rule 5.11D associated with consideration of
7    Senate Bill 362 or voter identification requirements
8    generally?
9           MR. SWEETEN:  Objection, calls for
10   legislative privilege.
11     A.   Privilege.
12     Q.   (By Ms. Westfall)  Was Senate Bill 362
13   considered by any Senate committees?
14          MR. SWEETEN:  I think that's a matter of
15   public record, so you can --
16     A.   The Committee of the Whole is a Senate
17   committee.
18     Q.   (By Ms. Westfall)  When a bill comes from the
19   house, is it usually referred to a Senate committee
20   other than the Committee of the Whole?
21          MR. SWEETEN:  You can answer about the
22   general procedures.
23     A.   You have the option of doing either.
24     Q.   (By Ms. Westfall)  And what -- how does that
25   break down in terms of percentage in your experience in

---

194

1    the Senate?  In other words, how many go to the
2    Committee of the Whole, and how many go to a committee
3    that's not the Committee of the Whole?
4      A.   I don't have that percentage.
5      Q.   You can't recall sitting here today?
6      A.   No.  I don't have that percentage.
7      Q.   Okay.  How about on 2009 session, how many
8    bills came from the House, originated in the Senate, and
9    went directly to the Committee of the Whole other than
10   362?
11     A.   Well, you've asked an incorrect question.
12     Q.   How many bills that were filed with the Senate
13   in 2009 went -- were assigned directly to the Committee
14   of the Whole that you're aware of?
15     A.   I don't remember.
16     Q.   How many were assigned to other committees in
17   2009?
18     A.   I don't have access to that information,
19   because not every bill is referred.
20     Q.   How many bills were filed in 2009 in the
21   Senate?
22     A.   I don't know the answer to that.
23     Q.   Do you have a ballpark figure?
24     A.   Several thousand.
25     Q.   Of those several thousand, how many went to --

---

195

1    were assigned directly to the Committee of the Whole?
2      A.   I don't have that information.
3      Q.   Janice McCoy yesterday testified it was unusual
4    for a bill to go straight to the Committee of the
5    Whole.  Do you agree with that?
6           MR. SWEETEN:  Assumes facts not in
7    evidence.  You can go ahead and answer to the extent --
8      A.   Unusual is not the correct word.
9      Q.   (By Ms. Westfall)  What words would you use
10   instead of unusual?
11     A.   It is, you know, they are referred to the
12   Committee of the Whole when there's an interest in all
13   senators hearing the activity on the bill.
14     Q.   What was your role during consideration of the
15   Senate Bill 362 before the Committee of the Whole?  What
16   was your role?  Were you presiding?  Were you in the
17   chair?  Were you managing?  What's the correct verb?
18          MR. SWEETEN:  Hold on one second.  To the
19   extent that that asks matters that are subjective to the
20   legislative privilege, do not answer the question.  To
21   the extent that her question calls for information
22   that's a matter of public record, you can answer.
23          MS. WESTFALL:  This was in the Committee
24   of the Whole.  How much more public could it be?
25     A.   I was standing -- sitting at my desk

---

196

1    initially.  I was recognized to lay out the bill, and I
2    stood and stood for 27 hours.  I'm sorry.  Not 27 hours
3    straight, but I -- I answered questions about the bill,
4    and the hearing took 27 hours.
5      Q.   (By Ms. Westfall)  Is it ordinarily the rule of
6    the bill author to be the one to answer questions about
7    the bill when it is considered by the Committee of the
8    Whole?
9      A.   The -- generally, the author of the bill lays
10   out the bill and as a courtesy to other members will
11   answer their questions that they can answer.  But if
12   there's questions asked that someone better could answer
13   it, they say if you will hold that question until the
14   expert witness comes, they will answer your question.
15     Q.   So you answered questions for 27 hours; is that
16   correct?
17     A.   I didn't answer questions for 27 hours, but I
18   was -- the bill was before the committee, and I had to
19   be in the neighborhood.
20     Q.   Why did you -- why was the decision to consider
21   the bill for 27 hours?
22          MR. SWEETEN:  Objection, calls for
23   legislative privilege.
24     A.   Privilege.
25     Q.   (By Ms. Westfall)  Was there an urgency in

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 197

1 considering Senate Bill 362?
2        MR. SWEETEN:  Same objection, privilege.
3        Q.  (By Ms. Westfall)  In your -- I believe you
4 testified earlier that to prepare for this deposition
5 you reviewed the transcripts from 2009 and 2011
6 regarding voter ID; is that right?
7        A.  Uh-huh.  Yes.
8        Q.  Do you remember that you, in 2009, in the
9 Committee of the Whole, made numerous references to the
10 purpose of the bill relating to voter fraud; is that
11 right?
12        A.  No.  I do not agree with that, and if you'd
13 like to reference something, I'd be glad to.
14        Q.  Okay.  We will do that in one moment.  Do you
15 remember also during 2009 hearing, that you mentioned
16 that Indiana's voter ID law had withstood legal
17 challenge and had been upheld by the Supreme Court; is
18 that correct?
19        MR. SWEETEN:  She's asking you matters of
20 public record.  You can answer as to that.
21        A.  Yes.
22        Q.  (By Ms. Westfall)  And do you recall that you
23 were pointing to the Indiana voter ID law as support for
24 Senate Bill 362; is that correct?
25        A.  I was supporting a fact that the Indiana law

## 198

1 had been approved by the US Supreme Court in a 6-3 vote.
2        Q.  And do you also recall that on the Senate floor
3 in the Committee of the Whole proceedings of 362, that
4 you advocated for Senate Bill 362 based in part on the
5 fact that it offered alternatives of two nonphoto IDs;
6 is that right?
7        MR. SWEETEN:  You can testify about
8 matters of the public record.
9        A.  Advocate is not correct.  I explained that the
10 bill, as filed, had those parameters.
11        Q.  (By Ms. Westfall)  And also on the Senate floor
12 during consideration of Senate Bill 362, did you mention
13 that 1.5 percent of registered voters appeared not to
14 have driver's licenses and that you perceived this as a
15 small segment of the voting registered voters; is that
16 correct?
17        A.  I referenced data that had been released and I
18 believe, through the Baker-Carter court that referenced
19 in the states that had passed packed the bill, that 98.5
20 percent of people in those states had a driver's
21 license.
22        Q.  During the Floor debate on the Senate Bill 362,
23 did anyone raise concerns about the impact of the bill
24 on minority voters?
25        MR. SWEETEN:  Since this is a matter of

## 199

1 public record, you can discuss the vote record.
2        A.  Questions were asked and concerns were raised.
3        Q.  (By Ms. Westfall)  And did legislators raise
4 concerns on that topic --
5        MR. SWEETEN:  You're asking in hearings?
6        MS. WESTFALL:  Yes.  I'm confining my
7 questions to the public hearing.
8        A.  Yes.
9        Q.  (By Ms. Westfall)  Who were those legislators?
10        A.  I can't give you specific names, but they were
11 people that were opposed to the bill.
12        Q.  Was there public testimony, members of the
13 public came during the committee consideration of SB
14 362?
15        A.  Yes.
16        Q.  And did some members of the public express
17 concerns about the impact of the bill on minority
18 voters?
19        A.  Yes.
20        Q.  And on the Floor during the committee
21 consideration, what was your response to these concerns?
22        MR. SWEETEN:  Confine your answer to the
23 matters of the public record.
24        A.  I would have to have more of a specific
25 question from a specific member, and they would have to

## 200

1 reference the, you know, the records.  I can't remember
2 that far back.
3        Q.  (By Ms. Westfall)  Do you recall any changes
4 that were made to Senate Bill 362 in response to
5 concerns from any of these concerns that you just
6 testified about, about the bill's impact on minority
7 voters?
8        MR. SWEETEN:  Objection, legislative
9 privilege.
10        A.  Privilege.
11        MS. WESTFALL:  To the extent that the
12 changes were in iterations of the bill, are you still
13 maintaining that objection?
14        MR. SWEETEN:  Yes.  That is a matter of
15 legislative privilege.  You just asked ask him what
16 changes were made in response to statements made by
17 other legislators, so you don't have to answer that.
18        MS. WESTFALL:  Let me put it this way.
19 I'm going to keep my question for purposes of subsequent
20 motions to compel.  But after these concerns were raised
21 on the -- in the Committee of the Whole in 2009, were
22 any changes made to 362?
23        MR. SWEETEN:  Same objection.  Think that
24 calls for his mental impressions process.
25        Q.  (By Ms. Westfall)  Do you recall that there was


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

201

1   a letter signed by all of the racial or ethnic minority
2   members of the Senate expressing opposition to Senate
3   Bill 362?
4       A.  I don't remember.
5       Q.  You don't.  Okay.  I hand you what's been
6   previously marked as Exhibit 33.
7       A.  It's a lot of paper.
8           MR. SWEETEN:  Yes.  And if you need any of
9   these to refer to, let me know, and I'll get them back
10  for you.
11      Q.  (By Ms. Westfall)  Have you had a chance to
12  look at Exhibit 33?
13      A.  Yes.  What are you referencing?
14      Q.  Could you first off tell me what you're looking
15  at?  Could you identify it?
16      A.  It's Senate Journal for the 23rd day of the
17  session, Wednesday, March 18.
18      Q.  And does this -- is this journal pertaining to
19  the Committee of the Whole consideration of Senate Bill
20  362?
21      A.  This is the journal of the regular session.
22      Q.  Okay.  You mean the Floor consideration of the
23  bill?  What do you mean by "regular session"?
24      A.  We go into session every day, and we're gabled
25  into regular session.  And then if -- you know, you have

---

202

1   different sections of the session.  This is the journal
2   of the regular session.  You will see the part about
3   81st legislature regular session, and this was the
4   proceedings on the regular session on the 23rd day.
5       Q.  I see.  Thank you for your testimony on that
6   point.
7           So this was not the Committee of the
8   Whole, in other words?
9       A.  No.
10      Q.  Thank you.
11          Directing your attention to Page 591 of
12  the Senate Journal of the Exhibit 33, could you take a
13  look at that?
14      A.  Yes.
15      Q.  And do you see that in the middle of the page
16  there is a statement regarding votes cast on Senate Bill
17  362 submitted by Senator West?
18      A.  I see a statement submitted by Senator West.
19      Q.  Do you recall seeing this statement before
20  today?
21      A.  No.
22      Q.  You never looked at it until this deposition
23  today; is that right?
24      A.  That wasn't what I said.  I said I don't
25  recall.

---

203

1       Q.  I see.  Looking at the letter today, in your
2   deposition, does it refresh your recollection as to when
3   you first saw this?
4       A.  It refreshes my -- my recollection that
5   something was submitted, but it doesn't, no.
6       Q.  Could you indicate to me your interpretation of
7   what this statement says?
8       A.  Privilege.
9           MR. SWEETEN:  Legislative privilege.
10          MS. WESTFALL:  This is a matter of public
11  record.
12          MR. SWEETEN:  You're asking him to
13  interpret for you.  He can refer to matters of the
14  public record, but you're asking him matters that relate
15  to his thoughts, mental impressions or opinions about
16  legislation or in furtherance of legislation, in this
17  case, Senate Bill 362.
18      A.  Yeah.  362.
19          MR. SWEETEN:  Yes.
20          MS. WESTFALL:  So therefore --
21          MR. SWEETEN:  You can answer to the extent
22  you can -- if you want to discuss matters of public
23  record, but otherwise --
24      A.  I recognize that a statement was submitted.
25      Q.  (By Ms. Westfall)  What does the statement say?

---

204

1       A.  Would you like for me to read the statement to
2   you?
3       Q.  I would not.  I'll represent to you, this is a
4   letter from senators noting that all ethnic and racial
5   minorities voted against Senate Bill 362 and have
6   consistently opposed the voter ID bills.  Am I
7   misrepresenting the statement?
8       A.  You're representing that these people -- the
9   answer is no, your -- your statement is incorrect.
10      Q.  How is it incorrect?
11      A.  Can you restate the statement -- you know, the
12  question?  It's incorrect.
13      Q.  Could you -- do you have anything further to
14  say about why my -- why the summary that I just provided
15  you of this statement is incorrect, or is that the sum
16  total of your testimony on that point?  Do you have
17  further testimony or no?
18          MR. SWEETEN:  I think her question is how
19  was she incorrect?
20          THE WITNESS:  You want me to answer that?
21          MR. SWEETEN:  Well, to the extent it's a
22  matter of the public record, you can say that.  You
23  can't reveal thoughts and impressions.
24      A.  These people are not -- they're not minorities.
25          MR. SWEETEN:  Okay.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

205

1     Q.   (By Ms. Westfall)  Okay.  Do you have any
2   further corrections to my summary of the statement?  Or
3   is that -- is that your testimony?
4     A.   You asked me the question, if they were all the
5   -- you know, all these listed were racial minorities,
6   and they're not.
7     Q.   I believe what I said, and which is why I
8   originally asked you if you would like to summarize your
9   read of the letter so we could move things along, was
10  that the letter was from senators noting that all ethnic
11  and racial minorities had voted against this Senate Bill
12  362 and have consistently opposed voter ID bills, not
13  that the signatories were, but the fact that voter ID
14  bills have been consistently opposed by members of
15  racial and ethnic minorities.  That was the summary that
16  I provided.  Do you agree with that summary?
17    A.   In the Senate.
18    Q.   I'm talking about this statement, not the --
19  whether you agree with the merits.  I'm asking you
20  whether you agree with my summary of the statement,
21  which is why we're at loggerheads.
22    A.   I don't disagree that this was filed and it was
23  their statement.
24    Q.   Thank you.
25         Why do you think these senators felt the

---

206

1   need to submit for the record this statement about
2   racial and ethnic minorities voting against voter ID
3   legislation?
4         MR. SWEETEN:  Objection, legislative
5   privilege.
6     Q.   (By Ms. Westfall)  Are you following the advice
7   of counsel?
8     A.   Privilege.
9     Q.   Did you place any significance on the unified
10  opposition of all minority members of the Senate?  And
11  by "minority," I mean racial and ethnic minorities.
12        MR. SWEETEN:  Objection.
13    A.   Privilege.
14        MR. SWEETEN:  It calls for matters covered
15  by the legislative privilege.
16    Q.   (By Ms. Westfall)  Did you believe that their
17  concerns about the impact of the bill on minority voters
18  were genuine?
19    A.   Privilege.
20        MR. SWEETEN:  Objection, calls for matters
21  that are subject to the legislative privilege.
22    Q.   (By Ms. Westfall)  Do you believe that senators
23  who are opposing the bill and had concerns about the
24  impact of the bill on minority voters were acting in
25  good faith in raising those concerns?

---

207

1     A.   Privilege.
2         MR. SWEETEN:  Objection, privilege.
3     Q.   (By Ms. Westfall)  Was it true that some
4   legislators and members of the public stayed up all
5   night during consideration of Senate Bill 362?
6     A.   Yes.
7     Q.   Why do you think there was such strong
8   opposition to the bill?
9         MR. SWEETEN:  Objection, privilege.
10    A.   Privilege.
11    Q.   (By Ms. Westfall)  During consideration of 362,
12  did you indicate that you had done more research and
13  reading on the bill than you've ever done on any other
14  legislation?
15        MR. SWEETEN:  You're asking on the public
16  record?
17        MS. WESTFALL:  Correct.
18        MR. SWEETEN:  You can answer.
19    Q.   (By Ms. Westfall)  Do you recall saying that?
20    A.   No, I do not recall it.
21    Q.   Okay.
22        MS. WESTFALL:  Could you mark this as 46?
23        (Exhibit 46 marked for identification.)
24    Q.   (By Ms. Westfall)  You've been handed --
25        MS. WESTFALL:  Patrick, we have one for

---

208

1   you.
2         MR. SWEETEN:  Ah, that's great.
3     Q.   (By Ms. Westfall)  You've been handed what's
4   been marked as Exhibit 46.  Have you seen this before?
5     A.   Looks awful small.  This looks like a subset of
6   the transcript.
7     Q.   Yes.  I'll represent to you, and I'm sure your
8   counsel will not disagree, this is an excerpt of
9   proceedings of the Committee of the Whole Senate on
10  Tuesday, March 10, 2009.
11        I'm going to turn your attention to -- I'm
12  going to ask you to turn your attention to what's been
13  marked -- there's various paginations on this exhibit,
14  but 72 in the upper right-hand corner of the page of the
15  transcript, it's Bates Number TX3939.  Do you see that
16  page?
17    A.   Yes.
18    Q.   It's an exchange between you and Senator
19  Watson.
20    A.   Yes.
21    Q.   And do you see that you reference 12 percent of
22  persons in other states without proper photo ID?
23    A.   Show me where I reference that.
24    Q.   Actually, you know what, let's look at the
25  beginning of this exchange on Page 70.  That's the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1    beginning of your statement, Senator Fraser, on Page 70,
2    where you talk about records of numbers of people in the
3    voter registration records who do not have appropriate
4    ID, and you indicate that it's around 800,000 or 12
5    percent.  Do you see that?
6        A.  No.
7            MR. SWEETEN:  I caution the witness to
8    make sure that you're taking the time you need to read.
9        A.  I do not see that.  Show me.
10       Q.  (By Ms. Westfall)  I'm sorry.  Page 70, 71 and
11   72.  You discuss the numbers.
12       A.  What is your question?
13       Q.  So here you're discussing the numbers of people
14   who appear not to have a photo ID, and you're discussing
15   that with Senator Watson; is that correct?
16       A.  Yes.
17       Q.  And you indicate the number roughly 809,000
18   people; is that correct?
19       A.  What about the 809?
20       Q.  I'm just asking whether the record reflects
21   that you refer to about 809,000 people who did not have
22   photo ID in your exchange with Senator Watson.
23       A.  No.
24       Q.  What was it?
25       A.  I didn't say that.

## 210

1        Q.  You -- oh, you said no, you don't see it?
2        A.  I said I did not say that.
3        Q.  Tell me what you said.
4        A.  You want me to read you the transcript?
5        Q.  Certainly.  Tell me what you're talking about
6    so we can be on the same page for the questions.  What
7    did you say?
8        A.  The ones that neither number show up, either a
9    Social Security number or voter ID, 809,000.  That --
10       Q.  Okay.
11       A.  There's 5 million that gave their driver's
12   license.  The others did not use their driver's license.
13       Q.  Correct.  So these are -- these are voter
14   applicants who did not indicate a Social Security number
15   or driver's license?
16       A.  They didn't use their driver's license.
17       Q.  When they -- when they registered to vote; is
18   that correct?
19       A.  Yes.  Because there are other options.
20       Q.  Thank you for clarifying your testimony.
21           But you had an exchange with Senator
22   Watson concerning this number of 800,000 people; is that
23   correct?
24       A.  Yes.
25       Q.  How was that analysis conducted?

## 211

1            MR. SWEETEN:  I'm going to object.  Don't
2    reveal thoughts, mental impressions, opinions about
3    legislation or in furtherance of the legislative
4    process.  If you want to, you can reference matters of
5    the public record in answer to that question, but don't
6    reveal the other based on the legislative privilege
7    objection.
8        Q.  (By Ms. Westfall)  Did you have any
9    conversations, are you aware of any communications with
10   the Secretary of State during consideration of Senate
11   Bill 362, concerning the number of registered voters
12   without a driver's license or Social Security number?
13           MR. SWEETEN:  Objection, compound.
14   Objection, I think you're seeking the substance of
15   conversations.  If you want to ask about whether he's
16   had conversations with the Secretary of State, I think
17   that would be fine.  Under the court's order, I think a
18   general subject matter description would also be fine.
19   But I think the way it's asked, it's compound, multiple;
20   it also has the substance of the conversation in it.  We
21   object.
22           MS. WESTFALL:  Specifically, you're not
23   instructing the witness not to answer because it's a
24   compound question; is that right?
25           MR. SWEETEN:  I think my objection has

## 212

1    been clear, but let me just say that I think I will let
2    him answer questions about whether he had
3    conversations with the Secretary of State.  I'll let him
4    answer about the date, time and a general subject matter
5    description as provided in the court's order.
6        Q.  (By Ms. Westfall)  Senator Fraser, are you
7    aware of any conversations during or before the
8    Committee of the Whole consideration of Senate Bill 362
9    with the Secretary of State's Office?
10           MR. SWEETEN:  You can answer.
11       A.  No.
12       Q.  (By Ms. Westfall)  Did you try to do any
13   analysis of the racial composition or ethnic composition
14   of persons, these 809-approximately-thousand people who
15   did not register to vote with either a Social Security
16   number or driver's license number?
17           MR. SWEETEN:  Objection, legislative
18   privilege.
19       A.  Privilege.
20       Q.  (By Ms. Westfall)  Did Senator Watson raise
21   this as a concern as to the racial composition of these
22   800,000 persons?
23           MR. SWEETEN:  Don't reveal private
24   conversations, but you certainly can bring up matters of
25   public record.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 213

1    Q.  (By Ms. Westfall)  I'll direct you to Page 72,
2    at the bottom of the page, at Line 21.  Did Senator
3    Watson ask about the racial composition of the 800,000
4    persons?
5         A.  I think my answer speaks for itself.
6         Q.  And your answer was that you were not advised
7    and you hadn't done that analysis?
8         A.  I didn't say that.  I said I don't remember if
9    the driver's license had that information, the racial
10   breakdown of the license.
11        Q.  And in response to Senator Watson's questions
12   to whether any statistical analysis had been done
13   regarding potential impact of SB 362 on African-
14   Americans, which is on Page 73, your response was it had
15   been implemented in Indiana and Georgia; is that right?
16        A.  I made reference to the fact that we're going
17   to have someone from Indiana and Georgia, two states
18   that had implemented it, where they would give their
19   testimony and they can give reaction to what happened in
20   their states.
21        Q.  Was there any analysis on the racial
22   composition or ethnic composition of those 800,000
23   voters that was conducted with regard to Texas voters?
24        MR. SWEETEN:  Do not reveal based upon --
25   objection, legislative privilege.  Go ahead.

---

### 214

1         A.  Privilege.
2         Q.  (By Ms. Westfall)  Is there any -- are there
3    any conversations about analysis of the racial
4    composition or ethnic composition of those 800,000
5    voters, that you're aware of?
6         MR. SWEETEN:  Objection, privilege.
7         A.  Privilege.
8         MS. WESTFALL:  The existence of
9    conversations?
10        MR. SWEETEN:  Were there conversations
11   about --
12        MS. WESTFALL:  -- the racial composition
13   or ethnic composition of the 800,000 voter registration
14   applicants referenced in this testimony.
15        MR. SWEETEN:  Okay.  That is way more than
16   a general subject matter description that would be on a
17   privilege log, and so I think that's beyond what we --
18   what I'll let him answer.  I'll work with you, though,
19   if you want to talk about conversations, he will do
20   that.  He'll identify the specifics of the conversation,
21   even a general subject matter description, but that is
22   not a general subject matter description.
23        Q.  (By Ms. Westfall)  Are you aware of any
24   analysis, conversation -- strike that.
25        Are you aware of any conversations of any

---

### 215

1    analysis of the racial or ethnic composition of voters
2    who did not have the forms of allowable ID under Senate
3    Bill 362?
4         MR. SWEETEN:  I think you're -- I think
5    there's subject matter within that question is beyond a
6    general description of subject matter that he would have
7    to provide under a privilege log.  So I'm going to
8    object to the question.
9         Q.  (By Ms. Westfall)  Do you think 800,000 is a
10   small number?
11        MR. SWEETEN:  Don't reveal your thoughts,
12   mental impressions about the legislation.  Objection,
13   legislative privilege.
14        A.  Privilege.
15        Q.  (By Ms. Westfall)  Did these numbers concern
16   you at all?
17        MR. SWEETEN:  Same objection.
18        A.  Privilege.
19        Q.  (By Ms. Westfall)  Do you agree that the key to
20   effective implementation of Senate Bill 362 is adequate
21   poll worker training?
22        MR. SWEETEN:  Same objection, legislative
23   privilege.
24        Q.  (By Ms. Westfall)  Do you recall that in 2009,
25   during the Committee of the Whole consideration of

---

### 216

1    Senate Bill 362, when you were asked about training for
2    poll workers to determine whether an ID was proper, you
3    deferred to the Secretary of State at that time on the
4    public record?
5         MR. SWEETEN:  You can answer to matters of
6    the public record.
7         A.  Yes.  I did refer, yes.
8         Q.  (By Ms. Westfall)  Why didn't Senate Bill 362
9    address more clearly and have more guidance for the
10   Secretary of State concerning poll worker training?
11        MR. SWEETEN:  Same objection, legislative
12   privilege.
13        A.  Privilege.
14        Q.  (By Ms. Westfall)  You're asserting the
15   privilege with regard to that question?
16        A.  (Witness nods head yes.)
17        Q.  You agree that poll worker training is very
18   important, isn't it, in implementing photo ID law?
19        MR. SWEETEN:  Objection, privilege.
20        Q.  (By Ms. Westfall)  As a general policy matter,
21   not with regard to legislation?
22        THE WITNESS:  Isn't that privilege?
23        MR. SWEETEN:  Well, she's now saying -- so
24   logically divorcing this from any pending legislation, I
25   think is what you're doing.  If there were any

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 217

1  consideration of specific legislation, you're asking as
2  a general matter, whether he thinks considerations of
3  poll worker training are important; is that what you're
4  saying?
5         MS. WESTFALL:  My question stands.
6     A.  That's privileged information because I would
7  give my opinion about any legislation.
8         MR. SWEETEN:  Yeah, I think that's --
9  we're going to object to privilege on that.
10        MS. WESTFALL:  Your opinion just --
11 opinions about the necessity of poll worker training is
12 off limits?
13        MR. SWEETEN:  If you're asking him to
14 reveal thoughts, mental impressions or opinions about
15 legislation or in furtherance of the legislative process
16 in doing that, then that is subject to the well-
17 recognized legislative privilege.
18    Q.  (By Ms. Westfall)  I believe you testified
19 earlier that the purpose of 362 was to ensure integrity
20 of the ballot box; is that right?
21    A.  Yes.
22    Q.  Isn't that connected and furthered by how
23 effectively a poll worker can verify a voter's
24 identity?
25        MR. SWEETEN:  Objection, that's

---

### 218

1  legislative privilege.
2     A.  Privilege.
3     Q.  (By Ms. Westfall)  Why didn't you include a
4  provision on poll worker training in Senate Bill 362?
5         MR. SWEETEN:  Same objection, privilege.
6     Q.  (By Ms. Westfall)  Why did you leave it to the
7  Secretary of State?
8         MR. SWEETEN:  Same objection, privilege.
9     Q.  (By Ms. Westfall)  So did 362 pass in the
10 Senate?
11        MR. SWEETEN:  You can answer.
12    A.  Yes.
13    Q.  (By Ms. Westfall)  And was it referred to the
14 House?
15    A.  Yes.
16        MR. SWEETEN:  You can answer.
17    Q.  (By Ms. Westfall)  Did you have any role in
18 furthering the advancement of Senate Bill 362 once it
19 was referred to the House?
20    A.  No.
21    Q.  Did you talk to any members of the House about
22 362 after passage in the Senate?
23        MR. SWEETEN:  You can reveal
24 conversations -- I mean, don't reveal substance of them,
25 but you can reveal whether conversations occurred.

---

### 219

1     A.  Yes, there were conversations.
2     Q.  (By Ms. Westfall)  Was it with members of the
3  House or their staff?
4     A.  Members of the House.
5     Q.  And who are those members?
6     A.  I can't give you specifics.
7     Q.  Who was carrying the bill in the house?
8     A.  Todd Smith.
9     Q.  Did you have conversations with Mr. Smith?
10    A.  Yes.
11    Q.  Did you have more than one?
12    A.  Yes.
13    Q.  Did you have conversations with his staff?
14    A.  No.
15    Q.  Just the two of you?
16    A.  Yes.
17    Q.  How many conversations?
18    A.  More than five.
19    Q.  When did 362 pass in the Senate approximately?
20    A.  January the 20th -- I'm sorry, I don't know.
21    Q.  362, was that March?
22    A.  362?
23    Q.  Yes.
24    A.  Oh, I don't know.  I'm sorry.  I don't know.
25    Q.  Do you know when you had these conversations

---

### 220

1  with Representative Smith about 362?
2     A.  After the bill was sent to the House.
3     Q.  What was the general nature of the
4  conversations with Mr. Smith?
5         MR. SWEETEN:  You can provide a very
6  general subject matter description.
7     A.  Status of the bill.
8     Q.  (By Ms. Westfall)  Did you have any
9  conversations with any other members of the House about
10 362?
11        MR. SWEETEN:  You can reveal
12 the conversation -- whether a conversation occurred.
13    A.  Yes, there were other members.
14    Q.  (By Ms. Westfall)  Where you had individual
15 one-on-one conversations with other members about 362?
16        MR. SWEETEN:  Of the House.
17    Q.  (By Ms. Westfall)  Of the House?
18    A.  Yes.
19    Q.  Who were those members?
20    A.  I can't tell you specifically who they were.
21    Q.  What happened to Senate Bill 362 in the House?
22    A.  It was never voted out.
23    Q.  Did it get assigned to a committee?
24    A.  Yes.
25    Q.  What was the committee?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 225

1  whether you know a fact or whether you know.  So you can
2  answer just as to --
3      A.  No, I do not know.
4      Q.  (By Ms. Westfall)  Is it Hispanics?
5          MR. SWEETEN:  Objection.
6      I just said I didn't know.
7      Q.  (By Ms. Westfall)  I'm trying to refresh your
8  recollection.
9          Was there a time that you introduced a
10 voter ID bill in the 2011 session?  I guess it would be
11 the 82nd session.
12     A.  Yes.
13     Q.  And was that bill called Senate Bill 14?
14     A.  Yes.
15     Q.  Did anyone ask you to introduce this bill?
16         MR. SWEETEN:  Objection, requires him to
17 reveal matters of legislative privilege, so don't
18 answer.
19     Q.  (By Ms. Westfall)  When did you decide to
20 introduce Senate Bill 14?
21     A.  As soon as 362 didn't pass.
22     Q.  So that was 2009 sometime, you started working
23 on it right away?
24     A.  May 31st, 2009.
25     Q.  But when did you file Senate Bill 14?

## 226

1      A.  By law, you cannot file -- you can file one
2  month before.  So in the one month filing period, I
3  filed it prior to session start.
4      Q.  Did you start -- did you start drafting it
5  immediately following the defeat of Senate Bill 362?
6      A.  No.
7      Q.  When did you start drafting or working on
8  concepts for the bill?
9      A.  I did not start drafting.
10     Q.  I understand you didn't draft, but when did you
11 start thinking about what you wanted the bill to look
12 like?
13         MR. SWEETEN:  You're asking him to reveal
14 thoughts, mental impressions, opinions in furtherance of
15 legislation, including Senate Bill 14, so that would be
16 privileged.
17     A.  Privileged.
18     Q.  (By Ms. Westfall)  Did anyone ask you to file
19 Senate Bill 14?
20         MR. SWEETEN:  Same -- I think he's already
21 answered that, but objection, legislative privilege.
22     A.  Privilege.
23     Q.  (By Ms. Westfall)  Did you make any promises to
24 anyone to file Senate Bill 14?
25         MR. SWEETEN:  Same objection, legislative

## 227

1  privilege.
2          MS. WESTFALL:  Did you -- I mean, for the
3  record, I think what you're instructing him not to
4  answer falls outside any conceivably assertible
5  privilege.  I want to just make that known for the
6  record.  We'll brief that later.
7          MR. SWEETEN:  Okay.  Why don't you go
8  ahead and read the question back, and I will consider it
9  again.  If you think I'm way off base, let's hear it
10 again.
11         MS. WESTFALL:  You've made the same
12 objection earlier today, but my question was whether the
13 Senator promised anyone to file Senate Bill 14.
14         MR. SWEETEN:  Okay.  That is a matter --
15 you're asking about a specific communication whether
16 he's promised someone regarding Senate Bill 14.  I think
17 that is privileged.
18     Q.  (By Ms. Westfall)  Did you promise Mr. Skipper
19 Wallace that you would file Senate Bill 14?
20         MR. SWEETEN:  Objection.  I think this has
21 been asked and answered, questions about Skipper
22 Wallace.  If you want to ask him --
23         MS. WESTFALL:  It's Skipper Wallace but
24 we're in a new year.
25         MR. SWEETEN:  And I've heard that name a

## 228

1  lot today, Counsel.  What I want to say is, I -- he can
2  reveal whether or not there's a communication that
3  existed.  He's not going to reveal the substance of the
4  communication.  So you're free to ask him that.
5      Q.  (By Ms. Westfall)  Did you have any
6  conversations with anyone -- strike that.
7          Was Senate Bill 14 given a designation by
8  the Governor or in his office -- Governor -- let me
9  strike that again.
10         Was Senate Bill 14 designated by the
11 Governor to be emergency legislation?
12     A.  Yes.
13     Q.  What are the -- what happens?  Describe what
14 happens when the Governor designates a bill as emergency
15 legislation.
16     A.  The Governor declares it an emergency
17 legislation.
18     Q.  What's the consequences for its consideration
19 in the Texas State Senate?
20     A.  No consequences.
21     Q.  Is it automatically considered within the first
22 60 days of session?
23     A.  No.
24     Q.  There are no consequences to this designation?
25 Is it purposeless; is that your testimony?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

229

1      A.  No.
2      Q.  What is the purpose of designation by the
3    Governor of emergency legislation?
4      A.  You would have to ask the Governor that.
5      Q.  I'm asking as a general -- I'm asking as a
6    general matter, when -- strike that.
7          As a result of the designation of SB 14 as
8    emergency legislation, was it considered within the
9    first 60 days of the Senate session in 2011?
10     A.  She asked me two questions.
11     Q.  Well, you know what --
12         MR. SWEETEN:  Hold on.
13     Q.  -- I'm asking the questions.  If you don't like
14   the questions and you need clarification, you can ask
15   me, as I instructed you at the beginning of this
16   deposition.
17         MR. SWEETEN:  Okay.  Okay.  Let's -- let
18   me -- I want to hear the question read back, please.
19         (Question read back.)
20         MR. SWEETEN:  Objection, legislative
21   privilege.
22         MS. WESTFALL:  Can you further explain
23   your assertion of privilege?  This is a procedural
24   matter and a timing matter and a matter of public
25   record.

230

1          MR. SWEETEN:  He can answer -- the
2    legislative privilege objection relates to matters of
3    nonpublic record.  He is free to answer based upon the
4    public record, if it is as you claim it is.  So he can
5    answer if there are matters of the public record that
6    addresses this, but -- I mean, I'm asserting privilege
7    as to matters not of the public record.
8      Q.  (By Ms. Westfall)  Can you answer the question?
9      A.  Privilege.
10     Q.  When a governor designates legislation as
11   emergency legislation, is it always considered within
12   the first 60 days of the session?
13         MR. SWEETEN:  You can answer as a general
14   matter.
15     A.  No.
16     Q.  (By Ms. Westfall)  Is it sometimes considered
17   within the first 60 days of a session?
18     A.  Yes.
19     Q.  And this designation is done by the Governor;
20   is that right?
21     A.  Yes.
22     Q.  How did Senate Bill 14 come to receive this
23   emergency designation?
24         MR. SWEETEN:  Objection, calls
25   for legislative privilege.  Also calls for speculation.

231

1      Q.  (By Ms. Westfall)  Were there any conversations
2    about the designation of Senate Bill 14 as emergency
3    legislation, that you're aware of?
4          MR. SWEETEN:  The question --
5      A.  No.
6          MR. SWEETEN:  -- is were there any
7    conversations?
8      A.  No.
9          MR. SWEETEN:  Okay.  You answered it.
10   Okay.
11     Q.  (By Ms. Westfall)  There were no conversations
12   you're aware of?
13     A.  No.
14     Q.  Did you request this designation of the
15   Governor's Office?
16     A.  No.
17     Q.  When did you first learn that Senate Bill 14
18   had been designated as emergency legislation?
19         MR. SWEETEN:  You can answer.
20     A.  Read about it in the paper.
21     Q.  (By Ms. Westfall)  Do you know why Senate Bill
22   14 had to be considered within the first 60 days of the
23   legislature in 2011?
24     A.  Privilege.
25         MR. SWEETEN:  Yeah, objection, privilege.

232

1      Q.  (By Ms. Westfall)  Are you aware of any
2    conversations regarding the timing of consideration of
3    Senate Bill 14 in the Senate?
4          MR. SWEETEN:  Objection, that requires him
5    to reveal his mental impressions, opinions about the
6    legislation.
7      A.  Privilege.
8          MR. SWEETEN:  It's legislative privilege.
9      Q.  (By Ms. Westfall)  Do you know what other bills
10   were designated emergency legislation by the Governor in
11   2011?
12         MR. SWEETEN:  You can answer.
13     A.  He had multiple bills that he declared
14   emergency.
15     Q.  (By Ms. Westfall)  Do you recall any of them
16   sitting here today?
17     A.  The sonogram bill.
18     Q.  Any others?
19     A.  No, I'm sorry, I don't.
20     Q.  Was there any urgency, in your mind, about
21   getting this Senate Bill 14 passed quickly, promptly,
22   and expeditiously, in 2011?
23         MR. SWEETEN:  Objection, it requires him
24   to reveal thoughts, mental impressions, opinions about
25   legislation.  It's legislatively privileged.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 233

1    A.   Privilege.
2    Q.   (By Ms. Westfall)  Was there any -- were there
3  immediate elections that were going to be held for which
4  there was a need for the legislation?
5        MR. SWEETEN:  Same objection.  If you want
6  to ask if there were elections, you know, that's
7  different.
8        MS. WESTFALL:  This was previously marked
9  as 5.  Here's a copy.  We have many.
10        (Discussion off the record.)
11    Q.   (By Ms. Westfall)  You've been handed what's
12  been previously marked as Exhibit 5.  Senator, do you
13  recognize this document?
14    A.   I believe this is probably Senate Bill 14, I'm
15  assuming as filed.  The answer is:  No, I do not
16  recognize it, because I'd have to go through it and
17  verify if this is the bill as filed or the engrossed
18  voted version that was --
19    Q.   Sir, if I could refer you to Page 17 of the
20  exhibit, maybe that will clarify for you what version of
21  the bill it is.
22    A.   This is the version that was signed by the
23  Governor.
24    Q.   Thank you.  Is this a copy of the legislation
25  as signed by the Governor that you introduced in 2011

## 234

1  related to voter ID?
2    A.   Yes.  Appears to be.
3    Q.   And turning your attention to Page 9, Section
4  63.0101, do you see it lists Proof of ID?  And could you
5  describe the forms of identification permitted under
6  Senate Bill 14?
7    A.   A driver's license, a US military
8  identification card that contains a person's photograph,
9  a US citizenship certificate that contains a photograph,
10  a passport that's not expired, a concealed-carry handgun
11  license.
12    Q.   Thank you.
13        And does it also provide, on Page 11 at
14  Section 16, for increasing the criminal penalties for
15  persons who impersonate a voter in an attempt to vote as
16  that voter?  Is that right?  At Section 16 of the bill?
17    A.   Yes.
18    Q.   Thank you.
19        Were you involved in the development of
20  Senate Bill 14?
21    A.   Yes.
22    Q.   What was your involvement?
23        MR. SWEETEN:  Don't reveal --
24    A.   Legislative privilege.
25        MR. SWEETEN:  Yeah.  Objection,

## 235

1  legislative privilege.
2    Q.   (By Ms. Westfall)  Can you describe the process
3  by which Senate Bill 14 was developed?
4    A.   Privilege.
5        MR. SWEETEN:  Objection, legislative
6  privilege.
7    Q.   (By Ms. Westfall)  When was Senate Bill 14 --
8  when was it -- when did the development of Senate Bill
9  14 start?
10    A.   May 31st of 2009.
11    Q.   Were you aware of any communications concerning
12  the drafting of the bill?
13    A.   Say it again.  Repeat.
14    Q.   Are you aware of any communications concerning
15  the drafting of the bill?
16        MR. SWEETEN:  I think that's been asked
17  and answered.  Also, I think objection, vague, as far as
18  considerations of drafting the bill.  Or did you say
19  conversations drafting the bill?
20        MS. WESTFALL:  Conversations.
21    Q.   (By Ms. Westfall)  You may answer.
22    A.   Were there conversations?
23    Q.   Yes.
24    A.   Yes.
25    Q.   And was it -- I believe you testified you had a

## 236

1  conversation with Mr. Wallace.  Were there other
2  conversations you were aware of concerning the drafting
3  of Senate Bill 14?
4    A.   With Ms. McCoy.
5    Q.   With Ms. McCoy.  How many conversations did you
6  have with Ms. McCoy?
7    A.   Hundreds.
8    Q.   Hundreds.  Did you have conversations with
9  anyone outside of conversations with your chief of
10  staff, Ms. McCoy?
11    A.   Only in terms of advising people that I was
12  filing the bill.
13    Q.   And who were those people?
14    A.   Skipper Wallace.
15    Q.   Any legislators in the Senate?
16    A.   I don't know specifics.
17    Q.   You don't recall?  Or you can't identify the
18  people?  Or --
19    A.   I can't give you a specific instance, but the
20  bill was talked about in the interim.
21    Q.   I see.  Did you have any conversations with the
22  Lieutenant Governor or his office concerning your
23  intention to file Senate Bill 14?
24    A.   Not that I can recall.
25    Q.   Did you look at past legislation on voter ID in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                          May 17, 2012

---

### 237

1  developing Senate Bill 14?
2         MR. SWEETEN:  Do not reveal your thoughts,
3  mental impressions, opinions about legislation, or
4  matters of furtherance of the legislative process.
5  Objection, legislative privilege.
6     A.  Privilege.
7     Q.  (By Ms. Westfall)  Did you look to other
8  states' photo ID in drafting Senate Bill 14?
9     A.  Privilege.
10        MR. SWEETEN:  Same objection.
11    Q.  (By Ms. Westfall)  Did you look to any models
12  from any interest groups in developing Senate Bill 14?
13        MR. SWEETEN:  Same objection.
14    A.  Privilege.
15    Q.  (By Ms. Westfall)  Did you have any
16  communications about Senate Bill 14 with other current
17  or former legislators who had offered past photo ID
18  bills?
19        MR. SWEETEN:  You can answer as to whether
20  a conversation occurred.
21    A.  No -- I'm sorry, ask that question again.
22    Q.  (By Ms. Westfall)  Did you have any
23  communications about Senate Bill 14 with other current
24  or former legislators who had offered past photo ID
25  bills?

---

### 238

1     A.  Define "legislators".
2     Q.  People who sit in the legislature past or
3  current.
4     A.  Texas legislators?
5     Q.  Correct.
6     A.  No.
7     Q.  How about outside of Texas?
8     A.  Yes.
9     Q.  And could you identify that person or persons?
10    A.  President of the Senate of Illinois -- I mean,
11  Indiana.  The president of the Senate in
12  Georgia.  President of the Senate in Illinois.
13    Q.  Illinois?
14    A.  Actually, the list is probably 40 of the 50
15  state senate presidents.
16    Q.  Was there a conference call, or did you have
17  individual conversations with these folks?
18    A.  I meet four times a year with the senate
19  presidents.
20    Q.  I see.  So there was a meeting with senate
21  presidents.  When was that meeting?
22    A.  We meet four times a year every year.
23    Q.  When was the meeting that you referred to
24  concerning your development of Senate Bill 14?
25    A.  I don't recall.

---

### 239

1     Q.  Where was that meeting?
2     A.  I don't recall.
3     Q.  Could you describe the general nature of that
4  meeting?
5     A.  The senate presidents get together to discuss
6  state issues.
7     Q.  And was there at that meeting a general
8  discussion of interest amongst many states in enacting
9  photo ID laws?
10    A.  Status of legislation involving voter ID in
11  Texas, specific questions.
12    Q.  Was there -- oh, it was a meeting held on that
13  topic solo?
14    A.  No.
15    Q.  I'm sorry.  Could you verify your testimony?
16    A.  There was a question asked about the status of
17  legislation.
18    Q.  And this convening of presidents of state
19  senates, is there an umbrella organization that
20  organized that meeting?
21    A.  Called the Senate Presidents Forum.
22    Q.  I see.  And did -- at that forum, were there
23  discussed other bills pending in other states concerning
24  photo ID?
25    A.  No.

---

### 240

1     Q.  After that meeting, did you make any changes in
2  the draft of Senate Bill 14?
3     A.  Privilege.
4         MR. SWEETEN:  Objection, legislative
5  privilege.
6     Q.  (By Ms. Westfall)  Did you have communications
7  with legislators in Georgia about photo ID as you were
8  drafting Senate Bill 14 or developing it?
9     A.  Yes.
10    Q.  What officials in Georgia?
11    A.  I'm sorry, I need to backtrack on that.  You're
12  asking in the drafting of the bill?
13    Q.  Yes.
14    A.  No.
15    Q.  In the development of the concepts for Senate
16  Bill 14, which I believe you just testified started
17  around May 31st, 2009?
18    A.  Privilege.
19        MR. SWEETEN:  You can identify if you have
20  conversations from May 2009 --
21        MS. WESTFALL:  31st, 2009.
22        MR. SWEETEN:  May 31st, 2009, until the
23  bill was --
24        Q.  With --
25        MR. SWEETEN:  With anyone from Georgia,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

241

1   you can testify about that.
2        A.   No.
3        Q.   (By Ms. Westfall)  Did you have communications
4   with any officials or legislators in Indiana concerning
5   about their photo ID law after May 31st, 2009?
6        A.   Yes.
7        Q.   When did you have that conversation?
8        A.   Four times a year.
9        Q.   Are you referring to the same convening of the
10  senate presidents?
11       A.   Yes.
12       Q.   Were there -- was there any agenda for that
13  meeting that was circulated?
14       A.   Every meeting has an agenda.
15       Q.   Was there an agenda for the meeting you just
16  testified about at which you answered the question about
17  the status of Texas photo ID?
18       A.   Yes.
19       Q.   Who has that agenda?
20       A.   Senate Presidents Forum.
21       Q.   Where is that headquartered?
22       A.   Washington, D.C.
23       Q.   Who's the staff person who you usually deal
24  with at the forum?
25       A.   That I -- I don't deal with anyone.

242

1        Q.   Is there any administrative person who
2   maintains records and organizes the meetings for the
3   forum?
4        A.   Yes.
5        Q.   And who is that person?
6        A.   I don't have that name.
7        Q.   And this meeting that you're testifying about
8   where you talked about Texas photo ID, was this -- did
9   this occur in the year of 2009 or 2010?
10       A.   I don't know.
11       Q.   Did you keep any notes from that meeting --
12       A.   No.
13       Q.   -- yourself?
14       A.   (Witness shakes head no.)
15       Q.   You testified earlier about Exhibit 5, Senate
16  Bill 14, and a number of forms of ID; is that correct?
17  You testified about the particular types of ID that are
18  allowable under Senate Bill 14; is that right?
19       A.   I testified?
20       Q.   You testified in this deposition just minutes
21  ago, don't you remember doing that?
22       A.   I don't --
23       Q.   I just -- I asked you a question about the
24  forms of --
25       A.   And I read the forms that are in the bill.

243

1        Q.   Correct.  That's what I'm referring to when I
2   said you testified.
3            Have you reviewed the photo ID laws in
4   both Indiana and Georgia?
5        A.   Yes.
6            MR. SWEETEN:  Don't reveal your thoughts
7   or mental impressions or opinions about legislation or
8   matters in furtherance of the legislative process when
9   you're answering these questions here.
10       Q.   (By Ms. Westfall)  Do you know whether under
11  Senate Bill 14 there are fewer forms of allowable ID
12  than under Georgia photo ID law?
13       A.   I don't know that.
14       Q.   Do you know whether there are fewer forms of
15  allowable ID in Senate Bill 14 than in the Indiana voter
16  ID law?
17       A.   Don't know that.
18       Q.   Have you reviewed -- I know you testified
19  earlier that you're not an attorney, but have you
20  reviewed those laws or a summary of those laws?
21           MR. SWEETEN:  Objection, that's been asked
22  and answered.  It's legislative privilege.  It goes to
23  his process, thoughts, mental impressions, opinions
24  about legislature or furtherance of legislation.
25           But you are free to refer to matters of

244

1   the public record.
2        Q.   (By Ms. Westfall)  Do you have any answer --
3        A.   Privilege.
4        Q.   Thank you.
5            Have you had any -- did you have any
6   communications in developing or conceptualizing Senate
7   Bill 14 with any groups representing minority voters?
8            MR. SWEETEN:  Objection, legislative
9   privilege.
10       A.   Privilege.
11       Q.   (By Ms. Westfall)  Did you have any
12  communications with any groups representing minority
13  voters in 2009?
14           MR. SWEETEN:  Communications you're
15  asking?
16           MS. WESTFALL:  Correct.
17           MR. SWEETEN:  Okay.  You can ask -- you
18  can answer as to whether a communication occurred or did
19  not occur.
20       A.   Not to my knowledge.
21       Q.   (By Ms. Westfall)  Did you have any such
22  communications with any such groups in 2010?
23       A.   Not to my knowledge.
24       Q.   Did you have any communications about Senate
25  Bill 14 with any officials in the executive branch in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

245

1  Texas?
2       A.  No.
3       Q.  Did you have any communications about Senate
4  Bill 14 with any member of the Lieutenant Governor's
5  Office or the Lieutenant Governor?
6       MR. SWEETEN:  I think that's been asked
7  and answered, but you may answer.
8       Q.  (By Ms. Westfall)  You may answer.  You may
9  answer.
10       MR. SWEETEN:  I'll instruct him as to
11  whether or not he can answer.  I said, "You can answer."
12       A.  And give me the time frame.
13       Q.  (By Ms. Westfall)  2009 or 2010.
14       A.  I don't remember.  Could I add that, if there
15  was a communication, it was advising them that I was
16  filing the bill again?  That would be the extent.
17       MR. SWEETEN:  Okay.
18       MS. WESTFALL:  Thank you.
19       MR. SWEETEN:  And that's fine.  Just don't
20  reveal the specifics of communications you've had.  Her
21  question was:  Was there a communication?  So just limit
22  it to that, but that's general.
23       Q.  (By Ms. Westfall)  Did you or your office or
24  Ms. McCoy exchange drafts of Senate Bill 14 with
25  anybody?

246

1       A.  No.
2       Q.  Did Senate Bill 14 change during the drafting
3  profess before it was filed?
4       A.  Privilege.
5       MR. SWEETEN:  I'm going to object based on
6  legislative privilege.  I think we're getting into the
7  thoughts, mental processes, impressions in furtherance
8  of legislation.
9       Q.  (By Ms. Westfall)  In drafting Senate Bill 14,
10  did you, Ms. McCoy, or anyone associated with the
11  drafting review any reports or studies?
12       A.  Privilege.
13       MR. SWEETEN:  That's -- that's subject to
14  the legislative privilege.  Objection.
15       Q.  (By Ms. Westfall)  When drafting Senate Bill 14
16  or developing the concepts for Senate Bill 14, did you
17  or Ms. McCoy conduct any analysis of how it impacted
18  voters?
19       MR. SWEETEN:  Same objection, privilege.
20       A.  Privilege.
21       Q.  (By Ms. Westfall)  Did you consider including
22  any additional forms of ID in the version of Senate Bill
23  14 that you filed?
24       MR. SWEETEN:  Objection, calls for him to
25  reveal thoughts, mental impressions, opinions about

247

1  legislation.  Legislative privilege.
2       Q.  (By Ms. Westfall)  Are you following the advice
3  of counsel on that?
4       A.  Why don't you ask that again?
5       Q.  Sure.  Did you consider including any
6  additional forms of ID in Senate Bill 14?
7       MR. SWEETEN:  Objection, privilege.
8       A.  Privilege.
9       Q.  (By Ms. Westfall)  In -- was this the least
10  restrictive set of forms of ID that you could include in
11  Senate Bill 14 that would achieve your objective?
12       MR. SWEETEN:  Objection, privilege.
13       A.  Privilege.
14       Q.  (By Ms. Westfall)  Did you consider allowing
15  expired forms of ID as allowable ID?
16       MR. SWEETEN:  Objection, privilege.
17  You're asking about his mental impressions and
18  considerations.
19       A.  Privilege.
20       Q.  (By Ms. Westfall)  Did you consider allowing
21  forms of ID that have expired two years prior to the
22  election rather than 60 days?
23       MR. SWEETEN:  Objection, privilege.
24       A.  Privilege.
25       Q.  (By Ms. Westfall)  If a photo ID is expired but

248

1  was validly issued, doesn't that prove the person is the
2  same person on the ID?
3       A.  Privilege.
4       MR. SWEETEN:  Objection, you're asking
5  about his considerations of the Senate Bill 14.  That
6  would be legislatively privileged.
7       Q.  (By Ms. Westfall)  I'm asking, as a general
8  matter, if a photo ID is expired but was validly issued,
9  doesn't that prove the person is the same person on the
10  ID, notwithstanding that it's expired?
11       MR. SWEETEN:  Objection, argumentative.
12  You can answer.  She's asking not in relation to
13  legislation, she's just asking you as a general matter.
14       A.  Why don't you ask the question again slowly?
15       Q.  (By Ms. Westfall)  Sure.  If a photo ID is
16  expired but was validly issued, why doesn't that prove
17  the person was the same person on the ID?
18       A.  The logic would be that if it's expired, it is
19  not a valid form of identification.
20       Q.  But nevertheless, when you see the person's
21  picture and you see the person next to the picture,
22  notwithstanding that it's expired, you can make a visual
23  -- a poll worker could make a visual check to affirm an
24  individual's identity; isn't that true?
25       A.  I've given my answer to the question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 249

1    Q.   You have no further testimony on that issue?
2    A.   I've given my answer to the question.
3    Q.   How often in Texas do you have to go appear to
4    get your picture retaken for a driver's license?  Do you
5    know?
6    A.   Ask the question again.  How often --
7    Q.   -- do you have to have your picture taken for
8    your driver's license?
9    A.   I'm sorry, I don't know that.
10   Q.   Can you renew your driver's license by mail in
11   Texas in certain circumstances?
12   A.   I don't believe so.  I don't know the answer.
13   Q.   How long are driver's licenses in Texas valid
14   for?
15   A.   I don't know the answer to that.
16   Q.   Did you conduct any analysis as to how many
17   registered voters possess the required forms of ID under
18   Senate Bill 14?
19        MR. SWEETEN:  Objection, legislative
20   privilege.
21   Q.   (By Ms. Westfall)  Did you conduct any analysis
22   to determine if minority voters would be
23   disproportionately less likely to possess the forms of
24   ID required by Senate Bill 14?
25        MR. SWEETEN:  Objection, legislative

## 250

1    privilege.
2    A.   Privilege.
3    Q.   (By Ms. Westfall)  And Janice McCoy yesterday
4    testified that there were no studies at all with any
5    analysis of who has an ID for purposes of Senate Bill
6    14, either public or private.  Do you agree with that
7    testimony?
8         MR. SWEETEN:  Objection, calls for matters
9    that are legislatively privileged.
10   A.   Privilege.
11        MS. WESTFALL:  Ms. McCoy has testified
12   about this matter and waived the privilege.  Are you
13   going to let the witness testify on this?
14        MR. SWEETEN:  He is asserting legislative
15   privilege as to any considerations, analysis related to
16   the bill.
17   Q.   (By Ms. Westfall)  Are you surprised Ms. McCoy
18   had that testimony yesterday?
19        MR. SWEETEN:  Objection.  You're asking
20   the same question in another form.  It calls for matters
21   of legislative privilege.  It's also relevant whether
22   he's surprised.  Don't answer.
23   Q.   (By Ms. Westfall)  Are you following the advice
24   of counsel?
25   A.   Privilege.

## 251

1    Q.   What is a military ID?
2         MR. SWEETEN:  Asked and answered --
3    Q.   (By Ms. Westfall)  Do you know how many --
4         MR. SWEETEN:  -- objection.
5    Q.   (By Ms. Westfall)  Do you know how many --
6         THE WITNESS:  Did you --
7    Q.   (By Ms. Westfall) -- different forms of
8    military ID --
9         MR. SWEETEN:  Yes.
10   Q.   (By Ms. Westfall) -- are accepted --
11        (Reporter cautions everyone not to talk at
12   the same time.)
13        MS. WESTFALL:  Let's break.
14        (Recess 4:29 to 4:46 p.m.)
15   Q.   (By Ms. Westfall)  Okay.  Senator, do you know
16   what a citizenship certificate is?
17   A.   No.
18   Q.   Is it a form of ID in Senate Bill 14?
19   A.   Yes.
20   Q.   Do you have any idea how much it costs to
21   obtain a citizenship certificate?
22   A.   No.
23   Q.   Do you know how much it costs to obtain a U.S.
24   passport?
25   A.   No.

## 252

1    Q.   Do you know what documents you would have to
2    provide to get a U.S. passport?
3    A.   I believe a birth certificate.
4    Q.   And anything else besides a birth certificate?
5    A.   Not to my knowledge.
6    Q.   Do you know how long it takes to obtain a
7    passport?
8    A.   No.
9    Q.   Can you tell me what the purpose was of --
10   well, strike that.
11        I believe you testified earlier that
12   Senate Bill 362 allows for nonphoto ID; is that right?
13   A.   Rephrase -- re-read the question, please.
14   Q.   I believe I -- that you testified earlier that
15   Senate Bill 362 allows for the use of nonphoto ID; is
16   that right?
17   A.   The -- the legislation, as filed, had that
18   provision.
19   Q.   And Senate Bill 14 does not; is that right?
20   A.   That is correct.
21   Q.   And what was the purpose of not including in
22   Senate Bill 14 the option for a voter to show nonphoto
23   ID?
24        MR. SWEETEN:  Objection, you're asking him
25   to reveal thoughts, mental impressions, opinions about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

1   legislation, including Senate Bill 14.
2        A.   Privilege.
3        MS. WESTFALL:  Are you instructing him not
4   to answer?
5        MR. SWEETEN:  I'm instructing him not to
6   answer that specific question as to the differences
7   between the two bills and the why's and wherefore's.  He
8   can answer if you're going to ask him as to what is the
9   purpose of Senate Bill 14.  I will allow him to answer
10  that question.
11       Q.   (By Ms. Westfall) Are you aware of any
12  conversations regarding the non-inclusion of photo ID in
13  Senate Bill 14?
14       MR. SWEETEN:  You're asking about the
15  substance of conversations, and so I think that that
16  would be -- that would be privileged.  He can discuss
17  specifics of whether he had a conversation or general
18  subject matter, but I think that the way you're asking
19  it, I think you're asking for the specific subject
20  matter.
21       A.   Privilege.
22       Q.   (By Ms. Westfall) Who made the decision not to
23  include non-photo forms of ID in Senate Bill 14?
24       MR. SWEETEN:  Objection, legislative
25  privilege.

254

1        A.   Privilege.
2        Q.   (By Ms. Westfall) What changed between 2009 and
3   2011 that made two forms the non-photo ID an acceptable
4   option in 2009 but not in 2011?
5        MR. SWEETEN:  Objection, legislative
6   privilege.
7        Q.   (By Ms. Westfall) In response to a similar
8   question posed to Ms. McCoy yesterday in her deposition,
9   she testified that what happened between 2009 and 2011
10  was that things have worked out well in Indiana and
11  Georgia.  Do you agree with that statement?
12       MR. SWEETEN:  Don't reveal your thoughts,
13  mental impressions or opinions about legislation or
14  between the difference in the 2009 and 2011.  That is
15  legislatively privileged.  Do not answer.
16       A.   Privilege.
17       Q.   (By Ms. Westfall) We talked about this earlier
18  with regard to Senate Bill 362, but under Senate Bill
19  14, who is responsible for verifying the identity of the
20  voter?  Who checks the ID of the voter in Senate Bill
21  14?
22       A.   When they're voting?
23       Q.   Yes.
24       A.   That is determined by the training that is done
25  by the Secretary of State, and I think it would be

255

1   improper for me to speculate what that is.
2        Q.   What are the standards governing how a poll
3   worker administers the -- the photo ID requirement under
4   Senate Bill 14?
5        A.   Those standards are set by the Secretary of
6   State.
7        Q.   And would you agree that those standards are
8   very important for the success and fulfillment of the
9   purpose of Senate Bill 14 you earlier testified about?
10       MR. SWEETEN:  I'm going to object to the
11  extent you're asking for him to reveal thoughts, mental
12  impressions, or opinions about legislation or
13  furtherance of the legislative process.
14       A.   Privilege.
15       Q.   (By Ms. Westfall) There are no standards
16  governing how the ID requirement is administered in
17  Senate Bill 14; isn't that right?
18       MR. SWEETEN:  Objection, privilege.  Are
19  you asking about the text of the bill, Counsel?
20       MS. WESTFALL:  I'm asking about the face
21  of the statute.
22       MR. SWEETEN:  Okay, if you're asking about
23  the face of the statute, he can answer the question.
24       A.   We gave that authority to set that to the
25  Secretary of State.

256

1        Q.   (By Ms. Westfall) So, in other words, it's not
2   -- it's not in the face of the statute; is that correct?
3   Would you agree with that?
4        A.   We -- we did not set to micro-manage.  We said
5   to ask the Secretary of State to determine that.
6        Q.   I want to answer.  I know it's late in the day,
7   but I want you to listen carefully to my question.  Is
8   there anything in Senate Bill 14 that -- that sets the
9   standards for how poll workers are to administer the
10  photo ID requirement in the this -- in this law?
11       A.   No.
12       Q.   Thank you.
13            What was the purpose of removing, and not
14  including from Senate Bill 14, the option for a voter to
15  show a state or federal issued photo ID, as you did
16  include in Senate Bill 362?
17       MR. SWEETEN:  You're asking him to compare
18  and contrast bills from 2009 and 2011 which would
19  necessarily reveal his thoughts, mental impressions, and
20  opinions about legislation or furtherance of the
21  legislative process and is therefore privileged.
22  Objection.
23       A.   Privilege.
24       Q.   (By Ms. Westfall) Are there any circumstances
25  in election administration, problems with the election



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Troy Fraser                                          May 17, 2012

---

257

1   administration, et cetera, between 2009 and 2011, that
2   caused to you make this change?
3        MR. SWEETEN:  I'm going to object, you're
4   asking for his thoughts and mental impressions,
5   privilege.
6        A.   Privilege.
7        Q.   (By Ms. Westfall) How would allowing the use of
8   state or federal issued photo ID prevent the goal in
9   Senate Bill 14 of ensuring election integrity?
10       MR. SWEETEN:  Objection, legislative
11  privilege.
12       A.   Privilege.
13       Q.   (By Ms. Westfall) Are you aware that the
14  Indiana photo ID law allowed for the use of state issued
15  photo ID?
16       MR. SWEETEN:  Objection, you're asking him
17  to reveal his thoughts, mental impressions, opinions
18  about legislation and furtherance of the process;
19  therefore, it would be privilege.
20       Q.   (By Ms. Westfall) What was the purpose of not
21  including in Senate Bill 14 the option for a voter to
22  show a valid employee ID as was included in the Senate
23  Bill 362?
24       MR. SWEETEN:  Objection, you're asking him
25  to compare 2009 to 2011.  He will answer the question of

---

258

1   what is the purpose of Senate Bill 14, but to ask him to
2   compare and contrast provisions that were or were not in
3   those two statutes is asking him to reveal the thoughts,
4   mental impressions, and opinions about the legislation.
5        Q.   (By Ms. Westfall) Is there a provision included
6   in Senate Bill 14 related to an election identification
7   certificate?
8        MR. SWEETEN:  You can answer.
9        A.   Would you restate the question?
10       Q.   (By Ms. Westfall) Certainly.  Is there a
11  provision in Senate Bill 14 that would allow for the use
12  of an election identification certificate for persons
13  who do not have allowable forms of ID under Senate Bill
14  14?
15       A.   SB 14 provides that an elections identification
16  certificate may not be used or accepted as a personal
17  identification certificate.
18       Q.   Did any legislators -- strike that.
19       Did you -- are you aware of any
20  conversations with anyone about concerns about the
21  ability to obtain an election identification
22  certificate?
23       A.   No.
24       Q.   Did anyone express concern about their
25  constituents having difficulty obtaining an election

---

259

1   identification certificate?
2        A.   Not to my knowledge.
3        Q.   Not on the Floor?
4        A.   Again, I -- not to my recollection.
5        Q.   Did you conduct any analysis of the process for
6   obtaining election identification certificate?
7        MR. SWEETEN:  Do not reveal your thoughts,
8   mental impressions, or opinions or -- about legislation
9   or furtherance of the legislation process --
10       A.   Privilege.
11       MR. SWEETEN:  -- legislative privilege.
12       Q.   (By Ms. Westfall) What were the circumstances
13  under which a license to carry a concealed handgun were
14  included in Senate Bill 14?
15       MR. SWEETEN:  Do not answer, it's asking a
16  legislative privilege.
17       A.   Privilege.
18       Q.   (By Ms. Westfall) Do you know the racial
19  composition of license to carry license holders?
20       MR. SWEETEN:  Objection, you're asking for
21  matters covered by the legislative privilege.
22       MS. WESTFALL:  I'm asking him as a matter
23  of general knowledge, not -- not related to a
24  legislative act.
25       MR. SWEETEN:  Okay.  So this is not in

---

260

1   relation to his analysis or review of legislation.
2   You're asking him, now as he sits here, is he aware of
3   this -- of this piece of information.
4        You can answer that question.
5        A.   I'm not aware.
6        Q.   (By Ms. Westfall) Is it -- is the racial
7   composition of license to carry license holders
8   disproportionately white relative to Texas registered
9   voters?
10       A.   I'm not -- I'm not aware of the percentage.
11       Q.   Are you aware of any conversations about the
12  racial composition of licensed to carry holders?
13       A.   No.
14       Q.   How did the exception for individuals with
15  disabilities come to be included in Senate Bill 14?
16       MR. SWEETEN:  Objection, legislative
17  privilege.
18       A.   Privilege.
19       Q.   (By Ms. Westfall) How did the exception for
20  individuals with religious objections to being
21  photographed come in -- come to be included in Senate
22  Bill 14?
23       MR. SWEETEN:  Objection, legislative
24  privilege.
25       Q.   (By Ms. Westfall) Why is it that some changes

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

261

1  in response to some concerns were taken into account and
2  others were not?
3      MR. SWEETEN:  Objection, legislative
4  privilege.
5      Q.  (By Ms. Westfall) The legislature made
6  modifications to Senate Bill 14 for persons with
7  disabilities, is that right, on the face of the bill?
8      MR. SWEETEN:  You can answer.
9      A.  Reread.
10     Q.  (By Ms. Westfall) The legislation made
11 modifications to Senate Bill 14 to accommodate the
12 interests of persons with disabilities; isn't that
13 right?
14     MR. SWEETEN:  Well, now you threw in
15 "accommodate people with disabilities."  I think if you
16 want to ask him a question about the text of the bill,
17 you can you ask him whether it's there or not, but not
18 -- you're starting to get into thoughts, mental
19 impressions, opinions with that question.
20     MS. WESTFALL:  Are you invoking privilege?
21     MR. SWEETEN:  I don't think I objected to
22 the first question, but then the second, the way you
23 worded it, I think you --
24     Q.  (By Ms. Westfall)  Why didn't you answer the
25 first question then, since your counsel is --

262

1      A.  Would you repeat the first question?
2      Q.  The legislature made modifications to Senate
3  Bill 14 for persons with disabilities, did they not?
4      A.  Would you reference the part of the bill that
5  does that?
6      Q.  Certainly.
7          MR. SWEETEN:  Okay.  You're saying "for
8  individuals."  If you're asking him does the text say
9  this, I'm fine with him answering that question, but if
10 you're asking him why was it made, I think that's
11 objectionable, legislative privilege.
12     Q.  (By Ms. Westfall) I refer you to Exhibit 5 at
13 Section 1, Senator.
14         MR. SWEETEN:  This is 5. -- yeah, that's
15 5.
16     Q.  (By Ms. Westfall) Where it indicates --
17     A.  5, Section 1?
18     Q.  Exhibit 5, Senate Bill 14, at -- at Section 1
19 on Page 1.  There is, is there not, an exemption for
20 persons with disabilities that provide certain written
21 documentation from federal agencies; is that correct?
22     A.  Yes.
23     Q.  And this is a provision, wouldn't you agree,
24 that is helpful for certain persons that have
25 disabilities in having an exemption from the bill, isn't

263

1  that correct, on the face of the statute?
2      A.  Yes.
3      Q.  Likewise, turning to your attention to the
4  provisional ballot section of Senate Bill 14 which is on
5  Page 11 at Section 17 of the bill, do you see that?
6  There is a provision related to persons who have
7  religious objections to being photographed; isn't that
8  correct?
9      A.  On Page 11?
10     Q.  On Page 12, sorry.  It starts on Page 11.  Do
11 you see that?
12     A.  Yes.
13     Q.  And -- and this provision indicates that if a
14 person casts a provisional ballot and is eligible to
15 vote in the election but doesn't have ID because a
16 person -- and consequently casts a provisional ballot,
17 that the ballot will be counted if the voter signs an
18 affidavit indicating a religious objection to being
19 photographed, isn't that correct, on the face of the
20 statute?
21     MR. SWEETEN:  You can answer.
22     A.  Yes.
23     Q.  (By Ms. Westfall) And this is a helpful
24 provision for people who have religious beliefs and
25 objections to being photographed; isn't that right?

264

1          THE WITNESS:  She's asking my opinion?
2      MR. SWEETEN:  Yeah.
3      Q.  (By Ms. Westfall)  On the face of the statute.
4      A.  The statute states very clearly what it -- it
5  does.
6      Q.  Did the legislature make any modifications to
7  Senate Bill 14 based on concerns pertaining to racial
8  and ethnic minorities?
9      MR. SWEETEN:  Objection, legislative
10 privilege.
11     A.  Privilege.
12     Q.  Could you -- strike that.
13         During the drafting or legislature's
14 consideration of Senate Bill 14, was there any analysis
15 of the costs or steps that a voter would need to take to
16 obtain an election identification certificate?
17         MR. SWEETEN:  I'm going to object based
18 upon privilege.  You're free to refer to matters of the
19 public record.
20     A.  Privilege.
21     Q.  (By Ms. Westfall) Do you know -- do you know
22 what documents are needed under Senate Bill 14 on the
23 face of the statute to obtain an election identification
24 certificate?  Directing your attention to Section 20 on
25 Page 13.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 265

1      A.   That they -- they must state that they're --
2  the person must sign a certificate for the purpose of
3  satisfying Section 63.001(b) of the election code and
4  does not have another form of identification.
5      Q.   Is it -- is it your recollection that, and
6  based on public record, based on the code, based on the
7  regulations, that the Secretary of State was responsible
8  for identifying the documents needed to obtain an
9  election identification certificate?
10     A.   It says the department may develop -- may
11 cooperate with Secretary of State in developing the form
12 and appearance of an election identification
13 certificate.
14     Q.   So you agree that it's a responsibility of the
15 Secretary of State; is that what the statute says?
16     A.   No.  It says the department may cooperate with
17 the Secretary of State in developing the form and
18 appearance of an election certificate.
19     Q.   Okay.  Thank you.
20          Do you know how much it costs to obtain
21 the documents necessary to get an election
22 identification certificate under Senate Bill 14 and
23 associated regulations?
24     A.   No.
25     Q.   And if the documents needed to get the election

## 266

1  identification certificate are not themselves free, is
2  there a cost associated with obtaining election
3  identification certificates?
4      A.   I don't know.
5      Q.   Where does one obtain an election
6  identification certificate?
7      A.   I don't know.
8      Q.   And when are those offices open?
9      A.   I don't know.
10     Q.   Does one obtain them at the driver's license
11 office in Texas?
12          MR. SWEETEN:  Objection.  He's indicated
13 that he doesn't know the answer, so asked and answered.
14     Q.   (By Ms. Westfall) What was the -- I know we've
15 -- you've testified about the purpose of previous voter
16 ID bills that you've introduced, but what was the
17 purpose, each and every purpose, of Senate Bill 14?
18     A.   The purpose of Senate Bill 14 was to ensure the
19 integrity of the ballot box.
20     Q.   Anything else?
21     A.   No.
22     Q.   Pardon?
23     A.   (Witness shakes head no.)
24     Q.   What is the basis for your assertion that the
25 purpose was to ensure integrity of the ballot box?

## 267

1      A.   Privilege.
2          MR. SWEETEN:  That's -- that's -- now
3  you're asking him, beyond what the purpose is, you're
4  asking him to reveal his thoughts, mental impressions or
5  opinions and his subjective intent in that question.  So
6  he's answered what the purpose is.  I think that you're
7  now going in to matters that are matters protected by
8  the legislative privilege.
9      Q.   (By Ms. Westfall) How would Senate Bill 14
10 ensure integrity of the ballot box?
11          MR. SWEETEN:  Same objection.
12     Q.   For the record, are you asserting privilege?
13     A.   Privilege.
14          MR. SWEETEN:  Objection, privilege.
15     Q.   (By Ms. Westfall) Is there a need in Texas to
16 take measures legislatively to ensure integrity at the
17 ballot box?
18          MR. SWEETEN:  Same objection.
19     A.   Privilege.
20     Q.   Are there any facts, that you're aware of
21 sitting here today, that -- that there's a lack of
22 integrity at the ballot box in Texas?
23          MR. SWEETEN:  Same objection, calls for
24 matters that are covered by the legislative privilege.
25     A.   Privilege.

## 268

1      Q.   (By Ms. Westfall) Yesterday your chief of
2  staff, when asked this question, testified that the
3  purpose of Senate Bill 14 was both election integrity
4  and to prevent in-person voter fraud.  Today, when I
5  asked you the similar question, you did not mention
6  in-person voter fraud.  Is it your testimony that
7  preventing in-person voter fraud is not a purpose of
8  Senate Bill 14, as you sit here today?
9          MR. SWEETEN:  This has been asked, this
10 has been answered.  He has -- he has answered the
11 question, but -- and also objection, assumes facts not
12 in evidence.  Nevertheless, if you want to go ahead and
13 answer, you can.
14     A.   Ask the question again.
15     Q.   (By Ms. Westfall) Is the purpose of Senate Bill
16 14 also to prevent in-person voter fraud and
17 impersonation?
18     A.   The purpose of the bill is to protect the
19 integrity of the ballot box.
20     Q.   (By Mr. Westfall) So is your answer no?
21     A.   The purpose of the bill is to protect the
22 integrity the ballot box.
23          MS. WESTFALL:  Mr. Sweeten, did you have
24 chance during the break to counsel your client about
25 answering the question?  Otherwise, unless it is a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

---

269

1   privileged question, that for which you are asserting
2   privilege, instructing your client not to answer, your
3   client could be -- if we prevail in a motion to compel,
4   could be brought back and asked the same question again.
5   Did you do that, sir?
6        MR. SWEETEN:  Well, I mean, number one,
7   I'm not going tell you what I told my client.  So I'm
8   not going to reveal that.
9        MS. WESTFALL:  Okay, fair point.
10       MR. SWEETEN:  No, no.  But nevertheless,
11  if you can answer that question, just, I mean -- or we
12  can talk about for it second.  But as to what is the
13  purpose of the legislation, I think you've answered what
14  it is, but if you can just answer that second question.
15       Q.  (By Ms. Westfall) Is -- Ms. McCoy testified
16  yesterday that part of the purpose of Senate 14 was
17  to prevent in-person voter fraud.  Is that -- are you --
18  is preventing in-person voter fraud part of the purpose
19  of Senate Bill 14, in your mind?
20       A.  Yes.
21       Q.  Is any part the purpose of Senate Bill 14,
22  private or public, to decrease the number of Hispanic
23  voters?
24            THE WITNESS:  Answer that?
25            MR. SWEETEN:  You can answer what the

---

270

1   purpose of the bill is.
2        A.  No.
3        Q.  (By Ms. Westfall) Are you aware of any
4   conversations about the purpose of Senate Bill 14 being
5   to decrease the number of Hispanic voters?
6        MR. SWEETEN:  Okay, he's not going to
7   answer that question.  You're asking for matters that
8   are covered by the legislative privilege.
9        I'm instructing you not to answer that
10  question.
11       MS. WESTFALL:  Mr. Sweeten, I believe I'm
12  allowed to ask foundational questions about any
13  conversations related to that purpose, pursuant to
14  Paragraph 2 of the order entered today by the Court.  Do
15  you disagree?
16       MR. SWEETEN:  Do you want to cite for me
17  where you -- where you think that that would allow that
18  question?
19       MS. WESTFALL:  The final -- the final
20  sentence of the Order.
21       MR. SWEETEN:  Okay.  Let's go to -- I need
22  Paragraph 1.
23       Actually, Counsel, your -- your question,
24  as I have said on several occasions, and I think we've
25  on most occasions you've been able to move beyond that,

---

271

1   your questions suggests more than a general subject
2   matter of a communication.  You're talking about very
3   specific information in a conversation, which would
4   require him to reveal legislative privilege.  If you
5   want to ask it in another way, you know, that -- that
6   adheres to the Court's Order, which is the nature or
7   general subject matter of the communication, I won't
8   have any objection.  And all day -- let me also say for
9   the record, that all day I have allowed you to ask all
10  of this information about communications.  I think would
11  you agree with that.  And I -- and I -- so I will allow
12  you to do that, but I think the way you phrased that
13  question, it's too specific, it's too -- it's too much
14  into the substance of a potential conversation for him
15  to be able to answer that question.
16       MS. WESTFALL:  Okay.  Well, as to my
17  original question as to whether any part the purpose of
18  Senate Bill 14 was to decrease the number of Hispanic
19  voters, this Order indicates that I'm allowed to examine
20  witnesses as to the purpose, as the witness understands
21  it today, including public information and private
22  information.  So could you make sure that -- or
23  information outside of the public record.  So could --
24  could you make sure that -- that your client is fully
25  answering the question about whether -- and I'll pose it

---

272

1   again, was there any part of the purpose of Senate Bill
2   14 that was to decrease the number the Hispanic voters.
3        MR. SWEETEN:  Okay.  You can -- you can
4   answer that based upon, as she said, based on the public
5   -- or public record or based upon your view of the
6   purpose of the bill, you can tell her what the purpose
7   of Senate Bill 14 was.
8        A.  The purpose of the bill was to preserve the
9   integrity of the ballot box.
10       Q.  (By Ms. Westfall) So in answer to my question,
11  are you answering no, that no part of the purpose of
12  Senate Bill 14 was to decrease the number of Hispanic
13  voters?  Is that your testimony today?
14       MR. SWEETEN:  You can answer that.
15       A.  I'm answering that the purpose of the bill was
16  to preserve the integrity of the ballot box.
17       MS. WESTFALL:  Okay, Mr. Sweeten --
18       MR. SWEETEN:  You can ask -- you can
19  answer the converse of that, as she's asking it:  Was --
20       A.  Ask the question again.
21       Q.  (By Ms. Westfall) Was any part of the purpose
22  of Senate Bill 14 to decrease the number of Hispanic
23  voters?
24       A.  No.
25       Q.  Was any part of the purpose of Senate Bill 14

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



273

1  to decrease the number of any other group of minority
2  voters?
3      A.  No.
4      Q.  Was any part of the purpose of Senate Bill 14
5  to discriminate in any way against any group or groups
6  of minority voters?
7      A.  No.
8      Q.  And I want to -- do you understand that the
9  last three questions that I've asked pertained to the
10 purpose, as you understand it, both from the public
11 record of the consideration of Senate Bill 14 and
12 outside of the public record?  Do you understand that?
13     A.  No.
14     Q.  You don't understand that?
15         MR. SWEETEN:  I -- I think, when you
16 prefaced the question, I told him both.
17         And so I think that -- I mean, she's --
18 she's just asking what is the purpose of the bill based
19 on matters of -- based on your understanding of the bill
20 and based on matters of the public record, both, what is
21 the purpose of the bill.  So in answering --
22         THE WITNESS:  I responded to --
23         MR. SWEETEN:  She's -- she's now answering
24 -- she's now asking you, in those three questions where
25 you said, "no," on all three of those, was that part of

274

1  the -- are you using both your understanding of the bill
2  as well as the matters of the public record in answering
3  the question?
4      A.  Yes.
5      Q.  (By Ms. Westfall) That is correct?
6      A.  Yes.
7      Q.  Thank you.  Was any part of the purpose of
8  Senate Bill 14, either on the public record or outside
9  the public record, for partisan purposes?
10     A.  No.
11     Q.  Was any part of the purpose of Senate Bill 14
12 to depress the participation of registered Democrats in
13 elections?
14     A.  No.
15     Q.  How do you know that?
16         MR. SWEETEN:  Objection, that asks for him
17 to go in to his -- or reveal his thoughts, mental
18 impressions, opinions as well as communications that
19 he's had regarding the issue.
20     Q.  (By Ms. Westfall) Did the purposes of photo ID
21 in Texas from 2005 to 2007 to 2009 to 2011, evolve over
22 time and between legislative sessions?
23         MR. SWEETEN:  I'm going to object.  I
24 think that calls for matters -- you're asking the
25 differences between bills.  I think that calls for

275

1  matters that would reveal his thoughts, mental
2  impressions, opinions about the legislation.  We have,
3  for the record, let you ask as to the purpose of each of
4  those bills and the answer has been consistent on that
5  issue, so --
6         MS. WESTFALL:  I appreciate --
7         MR. SWEETEN:  -- we're not going to let
8  him --
9         MS. WESTFALL:  I appreciate your
10 testimony, but we're here to --
11         MR. SWEETEN:  Elizabeth, I'm trying to
12 make sure the record is clear.  We've got complicated
13 privilege issues, we've got court orders that we're --
14 we're both trying to give the utmost consideration to,
15 and I have at all times done so today.  And I'm trying
16 to make sure that the record here is clear about what
17 we're discussing.
18     A.  Privilege.
19     Q.  (By Ms. Westfall) Was one of the purposes of
20 Senate Bill 14 -- strike that.
21         Was one of the purposes of previous photo
22 bill -- ID bills before Senate Bill 14 to prevent
23 non-citizens from voting?
24         MR. SWEETEN:  I think these questions have
25 been asked and answered all throughout the day.  I think

276

1  he has told you on each singular bill what the purpose
2  of it was.  So if you're now asking him as a whole, as a
3  group, I think the very same question, I'm going allow
4  you to answer it, but we're not going to keep -- we're
5  not going to keep, you know, there's no point in
6  continuing to go back and do this.  You're starting --
7  this is starting to be harassing of this witness.
8         So I'm going let you go ahead and answer
9  her question.  I'm going ask the court reporter could
10 read it back.
11     A.  And I'm going to claim privilege on that
12 question.
13         MR. SWEETEN:  Well, let -- I'm going to
14 have a discussion with -- with him regarding the issue
15 of privilege and we'll --
16         Can you read the question back?
17         (The requested portion was read by the
18 reporter.)
19         MR. SWEETEN:  Okay.  Now, I -- I think I
20 see what the problem is.  You're asking about bills that
21 other people filed.  You're asking about bills that --
22 that were never passed.  You're asking all of these in
23 one loaded question.  And some of this would reveal his
24 mental impressions and thoughts about the bills.  I will
25 let him, as to the legislation that you've already



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

277

1  asked, I will let him answer the -- what the purpose of
2  those bills was.  He -- which he's -- which he's done.
3  And if you want to go through those bills and ask that
4  specific question, I think that -- that we would let him
5  do that.
6          He's also indicated he'd like to discuss,
7  so I think there may be some matters of privilege that
8  he's concerned about and wants to discuss with me, so
9  would ask for a short --
10         MS. WESTFALL:  Would you like a recess?
11         MR. SWEETEN:  Yeah, I'd like a recess.
12         MS. WESTFALL:  Before we you go off the
13  record, I do want to take objection with your accusation
14  that I'm harassing your witness.  I am trying to get
15  through the outline as rapidly as possible.  All the
16  questions are relevant under Arlington Heights,
17  Mr. Sweeten.  And I'm going through the bills, some of
18  the questions repeat from bill to bill, but this is all
19  within the scope of relevance.  And I don't think you
20  have taken objection to any of the relevance of the
21  questions that I have asked.
22         MR. SWEETEN:  Well, I've tried to make it
23  clear that I think we've -- I've -- we've had all day to
24  let you -- let him answer the question of purpose.  And
25  I think for you to continue to go back to the same issue

---

278

1  I think is causing difficulty here.
2          MS. WESTFALL:  Mr. Sweeten, I'm asking
3  about purposes for different bills.  We cannot assume
4  that purpose for each bill is different from year-to-
5  year, and I have a right to examine on different bills
6  and different -- and the purposes.  And now we're on
7  Senate Bill 14, which is the subject of this litigation.
8          MR. SWEETEN:  And he has completely
9  answered what the purpose is of Senate Bill 14.  I mean,
10  ad nauseam he's answered that question.
11         MS. WESTFALL:  Why don't you just take a
12  recess.
13         (Recess from 5:20 to 5:33 p.m.)
14         Q.  (By Ms. Westfall)  So I believe you testified
15  that the purpose of Senate Bill 14 was to restore
16  confidence or electoral integrity or something along
17  those lines; is that right?
18         A.  Restore the integrity of the ballot box or
19  protect the integrity of the ballot box.
20         Q.  Has Texas ever had a photo ID requirement prior
21  to the enactment of Senate Bill 14?
22         A.  No.
23         Q.  What do you mean by "restoring confidence" in
24  the system?
25         A.  Our goal --

---

279

1          MR. SWEETEN:  I'm going to object to the
2  extent you're now going into having him reveal thoughts,
3  mental impressions or opinions about legislation, and
4  that would be subject to legislative privilege.
5          A.  Privilege.
6          MR. SWEETEN:  It also misstates his
7  testimony.
8          Q.  (By Ms. Westfall)  Has anyone ever told you
9  they wouldn't vote because they were concerned that
10  voter fraud would cancel out their vote?
11         MR. SWEETEN:  Don't reveal matters of
12  legislative privilege.
13         A.  Privilege.
14         Q.  (By Ms. Westfall)  Are you aware of any
15  conversations regarding anyone saying they wouldn't vote
16  because they were concerned that voter fraud would
17  cancel out their vote?
18         A.  No.
19         Q.  Would a registered voter, who has voted in
20  previous elections who was refused a regular ballot
21  because of this law, still have confidence in the voting
22  system in Texas?
23         MR. SWEETEN:  Objection, you're asking him
24  to reveal his thoughts, mental impressions or opinions
25  about legislation.  Privilege.

---

280

1          A.  Privilege.
2          Q.  (By Ms. Westfall)  How about a student who has
3  an ID from the University of Texas, and that's the sole
4  ID that he or she has, would that person have a level of
5  confidence in Texas's voting system under this law?
6          MR. SWEETEN:  Objection, legislative
7  privilege.
8          A.  Privilege.
9          Q.  (By Ms. Westfall)  What about the person who
10  has to take time off from work and go to a DPS office,
11  Department of Public Safety office or driver's license
12  office, to get an election identification certificate,
13  would that person have confidence in the system?
14         MR. SWEETEN:  Same objection.
15         A.  Privilege.
16         Q.  (By Ms. Westfall)  What about a person who has
17  to wait to get a copy of a birth certificate or a copy
18  of a court order in order to get ID to vote under Senate
19  Bill 14, would that person have confidence in the
20  system?
21         MR. SWEETEN:  Again, you're asking him to
22  reveal his thoughts or mental impressions about
23  legislation.  Objection, privilege.
24         A.  Privilege.
25         Q.  (By Ms. Westfall)  Did you in any part intend

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 281

1  that SB 14 would be designed to increase voter turnout
2  in the state of Texas?
3       MR. SWEETEN:  The question was, did he
4  what?
5       Q.  (By Ms. Westfall)  Is SB 14 designed or does it
6  have any purpose to increase voter turnout in the state
7  of Texas?
8       A.  The purpose of the bill was to protect the
9  integrity of the ballot box.
10      Q.  So I take it the answer is no?
11      A.  The answer is that we designed the bill to
12  protect the integrity of the ballot box.
13      Q.  And that's the sole reason you testified about
14  today; is that correct?
15      A.  That was our -- yes, that's the reason, yes.
16      Q.  Thank you.
17          During -- do you remember Floor
18  consideration of Senate Bill 14?
19      A.  Floor consideration?
20      Q.  Yes.
21      A.  Do I remember?
22      Q.  Yes.
23      A.  Some month.
24      Q.  Yes.  Did you answer many, many, many questions
25  about the bill by saying you were not advised?  Is that

### 283

1          Janice McCoy testified yesterday that it
2  was her view that "I'm not advised" means "I don't
3  know."  Do you agree with that testimony by Ms. McCoy?
4          MR. SWEETEN:  Same objection to the
5  question.  You can answer to the extent you can.
6      A.  Privilege.
7          (Exhibit 47 marked for identification.)
8      Q.  (By Ms. Westfall)  You've just been handed
9  Exhibit 47.  Do you recognize this document?
10     A.  Appears to be the Senate Journal of the fifth
11 day, Wednesday, January the 26th.
12     Q.  Thank you.  And on this day, did the Senate
13 consider floor amendments to Senate Bill 14?
14     A.  I believe we did the second reading, which
15 would include the amendments.
16     Q.  Thank you.
17         And could I direct your attention to Page
18 119 of this document?
19     A.  Okay.
20     Q.  Turning your attention to Amendment 13, do you
21 recall that Senator Davis introduced an amendment to
22 include a provision in Senate Bill 14 that would allow
23 individuals to use an ID that is unexpired or has
24 expired at some time since the last general election?
25 Do you recall that amendment?

### 282

1  right?  Do you remember that?
2          MR. SWEETEN:  Objection,
3  argumentative.  Objection, vague.  Go ahead.
4      Q.  (By Ms. Westfall)  You may answer.
5          MR. SWEETEN:  You can answer.  It's about
6  the public record.
7      A.  No, I did not answer many, many, many
8  questions.
9      Q.  How about dozens of questions?
10     A.  Probably dozens of questions.
11     Q.  And what did you mean by "I am not advised"?
12         MR. SWEETEN:  I'm going to object.  You're
13 asking what he meant by "I'm not advised," that he said
14 dozens of times.  So how would he possibly -- given the
15 context of that, there's no way he can answer that
16 question.
17     Q.  (By Ms. Westfall)  Do you understand the
18 question?
19     A.  Yes.
20     Q.  What did you mean by "I am not advised"?
21     A.  I'll be glad, if you've give me specific
22 examples of a question, and then I'll tell you, if it
23 applies, why I answered that way.
24     Q.  Okay.  Well, we can go through that maybe at a
25 later time.

### 284

1      A.  Yes.
2      Q.  Are you aware of whether the Indiana photo ID
3  law includes such a provision in its photo ID law?
4      A.  I don't know.
5      Q.  And did you move to table this amendment?
6      A.  Yes.
7      Q.  And why did you move to table this amendment?
8          MR. SWEETEN:  Objection, legislative
9  privilege.
10     Q.  (By Ms. Westfall)  Bear with me.  Could you
11 turn your attention to Page 130 at Floor Amendment
12 Number 30.
13     A.  I don't believe I have 130.
14     Q.  130.
15         MR. SWEETEN:  Page 130, it's up here on
16 the left of the page numbers here.
17         MS. WESTFALL:  Yeah.  You may want to take
18 off the clip.
19         MR. SWEETEN:  Yeah.  There's 130 right
20 there.
21         MS. WESTFALL:  Thank you, Mr. Sweeten.
22     Q.  (By Ms. Westfall)  Directing your attention to
23 Floor Amendment Number 30, do you recall that Senator
24 Ellis introduced an amendment or offered an amendment to
25 Senate Bill 14 that would have required the Secretary of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser          May 17, 2012

---

### 285

1  State to conduct a study that would have included
2  information about the number of eligible voters who are
3  prevented from voting or had to vote provisionally
4  because of a lack of identification and an analysis of
5  this group by race?
6     A.  Is there a question there?
7     Q.  Yes.  Do you recall this amendment?
8     A.  Yes.
9     Q.  Did you vote to table this amendment introduced
10  by Senator Ellis?
11     A.  Yes.
12     Q.  Why would conducting a study have interfered
13  with the purpose that you have described in enacting
14  Senate Bill 14?
15     MR. SWEETEN:  Objection, legislative
16  privilege.
17     A.  Privilege.
18     Q.  (By Ms. Westfall)  Were you concerned that such
19  a study would show that minorities are
20  disproportionately impacted by Senate Bill 14?
21     MR. SWEETEN:  Objection, legislative
22  privilege.
23     A.  Privilege.
24     Q.  (By Ms. Westfall)  Turning your attention to
25  Page 118, turning your attention to Floor Amendment

### 286

1  Number 12 listed on Page 118, do you see that?
2     A.  Okay.
3     Q.  Do you recall that Senator Davis introduced an
4  amendment to prohibit state agencies from charging fees
5  for the issuance of any acceptable form of photo ID
6  under Senate Bill 14 or for the underlying documents
7  that may be required to obtain an acceptable form of ID?
8     A.  Yes.
9     Q.  Did you move to table this amendment?
10     A.  Yes.
11     Q.  How would this amendment have interfered with
12  the stated purpose of enacting Senate Bill 14, which was
13  to ensure integrity of the ballot box?
14     MR. SWEETEN:  Objection, legislative
15  privilege.
16     A.  Privilege.
17     Q.  (By Ms. Westfall)  Why did you vote to table
18  this amendment?
19     MR. SWEETEN:  Objection, legislative
20  privilege.
21     A.  Privilege.
22     Q.  (By Ms. Westfall)  Turning your attention to
23  Page 137.  Are you on Page 137, sir?
24     A.  Uh-huh.
25     Q.  Do you see Floor Amendment Number 40?

### 287

1     A.  Uh-huh.
2     Q.  Did this amendment allow for the counting of
3  provisional ballots of voters who are indigent and
4  unable to obtain ID because of cost?  Do you recall this
5  amendment?
6     A.  I don't believe it is as you described it, no.
7     Q.  How would you describe it?
8     A.  It is as it's laid out.
9     Q.  Are you aware of whether the Indiana photo ID
10  requirement allows for the counting of provisional
11  ballots of someone who is indigent and unable to obtain
12  photo ID because of the cost of that ID?
13     A.  No.
14     Q.  Did you vote to table this amendment?  Sir, is
15  your vote on this amendment recorded in the Senate
16  Journal or no?
17     A.  You're a step ahead of yourself.
18     Q.  Oh?
19     A.  She offered an amendment to the deal, so the
20  motion was to table the amended motion.
21     Q.  And how did you vote on that motion?
22     A.  Voted to table.
23     Q.  Why did you do that?
24     MR. SWEETEN:  Oh.  Objection, legislative
25  privilege.

### 288

1     A.  Privilege.
2     Q.  (By Ms. Westfall)  How would including this
3  provision in Senate Bill 14 have interfered with the
4  accomplishment of the goals of your legislation?
5     MR. SWEETEN:  Same objection, legislative
6  privilege.
7     A.  Privilege.
8     Q.  (By Ms. Westfall)  Turning your attention now
9  to Page 129, turning your attention to Floor Amendment
10  29, do you see that.
11     A.  Uh-huh.
12     Q.  Yes?
13     A.  Yes.
14     Q.  Did Senator Gallegos offer an amendment that
15  would have required driver license offices to be open
16  until 7 p.m. one week day and during four or more hours
17  on at least two Saturdays per month?
18     A.  Yes.
19     Q.  Did you move to table this amendment?
20     A.  Yes.
21     Q.  How would this amendment have harmed the
22  ability of Texas to deter and -- deter and detect a --a
23  voter fraud?
24     MR. SWEETEN:  Objection, legislative
25  privilege.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

289

1    A.   Privilege.
2    Q.   (By Ms. Westfall)  Do you have any concern that
3    individuals who work an hourly wage may have a difficult
4    time in getting to a driver's license office during
5    business hours?
6         MR. SWEETEN:  Objection, legislative
7    privilege.
8    A.   Privilege.
9         MS. WESTFALL:  Can we go off the record
10   for one moment?
11        MR. SWEETEN:  No objection.
12        (Discussion off the record.)
13        (Exhibit 48 marked for identification.)
14        MS. WESTFALL:  Back on the record.
15   Q.   (By Ms. Westfall)  I'm handing you what's been
16   -- oh, go ahead.
17        MR. SWEETEN:  I'm sorry.
18   Q.   (By Ms. Westfall)  I'm handing you what's been
19   marked as US Exhibit 48.  Do you recognize This
20   document?
21   A.   Appears to be from the Texas Tribune.
22   Q.   Have you seen this article before?
23   A.   I read it last night.
24   Q.   Wonderful.  Could you turn your attention to
25   the second page of the document?

---

290

1    A.   Okay.
2    Q.   And do you see at the top of the page that
3    there are some quotations from you, attributed to you,
4    concerning the Justice Department's rejection of Texas
5    voter ID law, as you phrase it?  Do you see that?
6    A.   Yes.
7    Q.   And do you see that you cite a Lighthouse
8    opinion, polling and research poll, in the middle of the
9    page?
10   A.   Yes.
11   Q.   In your view, does public support for Senate
12   Bill 14 have anything to do with its purpose, as you
13   stated and testified today?
14        MR. SWEETEN:  Don't reveal matters of
15   legislative privilege.  You can refer to matters of
16   public records and public statements.
17        MS. WESTFALL:  Mr. Sweeten, this is in the
18   public record.
19        MR. SWEETEN:  What are you specifically
20   asking him?
21        MS. WESTFALL:  Well, my question stands.
22        MR. SWEETEN:  Can you read the question
23   back, please?
24        (Record read back.)
25   Q.   (By Ms. Westfall)  Do you have a question about

---

291

1    the question, sir?
2         MS. WESTFALL:  Or you, Mr. Sweeten?
3         MR. SWEETEN:  Objection, calls for
4    speculation.  You can answer to the extent you know.
5    Q.   (By Ms. Westfall)  Do you know?
6    A.   The question -- repeat the question again.
7         MS. WESTFALL:  Could you repeat the
8    question, court reporter.
9         (Record read back again.)
10        MR. SWEETEN:  Objection, vague.  Go ahead.
11   A.   The purpose of the bill still is to protect the
12   integrity of voting, and public support is certainly --
13   it's good that we have that.
14   Q.   (By Ms. Westfall)  If it was unpopular, would
15   you still have moved forward with Senate Bill 14?
16        MR. SWEETEN:  Objection.  You're now
17   asking about his thoughts, mental impressions or
18   opinions about legislation.  It's legislatively
19   privileged.
20   A.   Privilege.
21   Q.   (By Ms. Westfall)  Are you invoking the
22   privilege?
23   A.   (Witness nods head yes.)  Privilege.
24   Q.   Do you see also in this article that you're
25   quoted as saying, "Polls show that people are less

---

292

1    likely to vote if they believe their ballot will not be
2    fairly counted"?
3    A.   Yes.
4    Q.   Do you think that's a fair representation of
5    something that you've said?
6    A.   It's printed and I also said it on the record.
7    Q.   Can you identify any people who have indicated
8    to you that they were less likely to vote because they
9    believe their ballot will not be fairly counted?
10        MR. SWEETEN:  Don't reveal matters that
11   are privileged in answering the question.
12   A.   Privilege.
13   Q.   (By Ms. Westfall)  What polls were you
14   referring to in that statement, sir?  It's at the -- the
15   sentence that indicates, "Polls show that people are
16   less likely to vote if they believe their ballot will
17   not be fairly counted."  Do you see that?
18   A.   Uh-huh.
19   Q.   Could you tell me what polls you're referring
20   to?
21   A.   That is a quote that was taken from my opening
22   comments in 2009, and so no, I don't have the poll, but
23   it was a poll that I, you know, I had at that time.
24   Q.   So sitting here today, you don't recall the
25   particular poll; is that your testimony?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

### 293

1    A.  No, I do not.
2    Q.  Do you have a legislative ID as a member of the
3    Texas Senate?
4    A.  Yes, I do.
5    Q.  Does it have a photograph on it?
6    A.  Yes, it does.
7    Q.  Does it prove your identity?
8    A.  Yes.
9    Q.  Do other forms of photo ID, in addition to
10   legislative ID that have a picture on it, prove one's
11   identity in addition to the forms of ID listed in Senate
12   Bill 14?
13       MR. SWEETEN:  Objection, vague.
14   A.  If you want to narrow it down, I'll answer the
15   question.
16   Q.  (By Ms. Westfall)  Otherwise, are you refusing
17   to answer my question, sir?
18   A.  No.  I'm asking you to clarify your question.
19   Q.  Are any other photo IDs that we have referred
20   to today, including student IDs, employee IDs, expired
21   state licenses, out-of-state state licenses that have a
22   photograph, do those prove a person's identity?
23   A.  I'll be glad to address those one at a time if
24   you'd like.
25   Q.  We may have time to do that another day.

### 294

1        MR. SWEETEN:  Okay.  And also, while
2    you're answering those, I want to caution you that when
3    you're answering a question, don't reveal thoughts,
4    impressions, matters about legislation when you're
5    answering that question.  It's legislatively privileged
6    if you do that.
7    Q.  (By Ms. Westfall)  At any time since --
8        MS. WESTFALL:  I'm sorry.  Are you done
9    with your instruction?
10       MR. SWEETEN:  I am.
11       MS. WESTFALL:  I was looking down at my
12   paper.
13       MR. SWEETEN:  That's okay.
14       MS. WESTFALL:  Thank you.
15   Q.  (By Ms. Westfall)  At any time since the
16   passage of Senate Bill 14, which -- strike that.
17       When was Senate Bill 14 signed into law
18   approximately?  Was it May 2011?
19   A.  May 2011.
20   Q.  At any time since the passage and signing into
21   law Senate Bill 14, have you come to believe that it was
22   passed with a discriminatory intent?
23   A.  No.
24   Q.  At any time since the passage of Senate Bill
25   14, have you come to believe that Senate Bill 14 will

### 295

1    have a harmful and retrogressive effect on minority
2    voters?
3    A.  No.
4    Q.  If you are called to trial in this action, will
5    you testify that Senate Bill 14 has no discriminatory
6    purpose?
7    A.  Yes.
8    Q.  If called to trial on this action, will you
9    testify that Senate Bill 14 does not have a
10   discriminatory effect upon minority voters?
11   A.  Does not.
12       MS. WESTFALL:  I would like to at this
13   time conclude the questioning of the witness.
14   Obviously we're leaving the deposition open pending
15   resolution of the motion to compel to be filed shortly.
16       I will turn over the questioning to
17   counsel for Defendant Interveners.
18           EXAMINATION
19   BY MR. ROSENBERG:
20   Q.  I will ask your indulgence.  I will try not to
21   go too far over, although we're reserving our right to
22   ask, as is the DOJ, to continue this deposition, if
23   necessary, to bring back the Senator.  I'm Ezra
24   Rosenberg.  I'm going to ask you a few questions right
25   now.

### 296

1        Let me start very briefly with the 5.11,
2    which is in US 32.  Just very quickly, and I don't know
3    if you even have to look at it:  When is a special order
4    needed?
5    A.  I'm having a lot of trouble understanding you.
6    Q.  Okay.  I'm from New Jersey.  I'm going to slow
7    down.  Okay?
8    A.  You need to speak Texan if you're going to
9    talk.
10   Q.  I'll try, y'all.
11       When is a special order needed?  Under
12   what circumstances is a special order needed?
13   A.  There is not a definition of when a special
14   order is needed.
15   Q.  Is one of the times a special order is needed
16   when there's a blockage bill, to get around the blockage
17   bill?
18   A.  No.
19   Q.  Give me one example of when a special order is
20   needed.
21   A.  I don't -- I just said that there's not a --a
22   circumstance where a special order.  There are special
23   orders that are put into the rules.
24   Q.  Give me an example of when a special order is
25   put into the rules.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

297

1     A.  A good example would be the bill we're looking
2  at.
3     Q.  Which says, "Any bill, resolution, or other
4  measure, may on any day be made a special order for a
5  future time of the session by an affirmative vote of
6  two-thirds of the members present," right?
7     A.  Yes.
8     Q.  Did I read that correctly?
9     A.  (Witness nods head yes.)
10    Q.  So that's not an example of a special order
11 being put in the rules, that's -- they talk about a bill
12 being made a special order, correct?
13    A.  Who is "they"?
14    Q.  The Senate, in this rule, talks about any bill
15 may on any day be made a special order, correct?
16    A.  Yes.
17    Q.  All right.  So there are certain times when
18 bills are made special orders, correct?
19    A.  That's what this reads, yes.
20    Q.  And when are those times that bills are made
21 special orders?
22    A.  I couldn't project that without knowing the
23 specific bill and the request of the bill.
24    Q.  Is one of the times that a bill is made a
25 special order when there is a blockage bill?

---

299

1  using -- I'm looking right at 5.11D, that says
2  "Notwithstanding Subsection A of this rule," and
3  Subsection A of this rule is the two-thirds rule,
4  right?  So notwithstanding the two-thirds rule, a bill
5  relating to voter identification requirements may be
6  reported on the basis of a majority rule, a majority
7  vote, correct?  That's what that means?
8     A.  No.
9     Q.  Then tell me what that means.
10    A.  You're asking the questions.
11    Q.  That's right.  I'm asking the questions.  I
12 asked you to tell me what that means.
13    A.  What?
14    Q.  5.11D, what does that mean?
15    A.  It says "Notwithstanding Subsection A of this
16 rule, a bill or resolution relating to the voter
17 identification requirements reported favorably from the
18 Committee of the Whole, shall be set as a special order
19 at a time at least 24 hours after the motion is adopted
20 by the majority of the members of the Senate."
21    Q.  What relationship does 5.11D have to 5.11A?
22    A.  "Notwithstanding A."  It is not subject to A.
23    Q.  Okay, fine.  So voter identification
24 requirements are not subject to 5.11A, correct?
25    A.  Yes.

---

298

1     A.  No.
2     Q.  Okay.  Is -- does a blockage bill have anything
3  to do with special orders?
4     A.  No.
5     Q.  Okay.  The exception in 5.119(d) which carved
6  out from the two-thirds rule voter ID identification
7  requirements bills, right?
8     A.  No.
9     Q.  It did not?
10    A.  No.
11    Q.  Doesn't it say, "Notwithstanding Subsection A
12 of this rule, a bill or resolution relating to voter ID
13 indication requirements reported favorably from the
14 Committee of the Whole Senate may be set as a special
15 order for a time at least 24 hours after the motion is
16 adopted by a majority of the members of the Senate"?  Is
17 that what it says?
18    A.  Yes.
19    Q.  It says, "Notwithstanding the two-thirds rule,"
20 correct?
21    A.  No.
22    Q.  Well, can you tell me --
23    A.  You're making a reference that the two-thirds
24 rule and the blocker bill.
25    Q.  I didn't use "blocker bill."  I said -- I'm

---

300

1     Q.  Okay.  Can you think of any -- can you identify
2  any other category of legislation that is currently not
3  subject to 5.11A?
4     A.  I'm sorry.  I can't -- I don't know the answer
5  to that.
6     Q.  So sitting here today, you cannot identify any
7  other category of legislation, other than voter
8  identification requirements, that are not subject to
9  5.11A; is that right?
10    A.  I can't give you specific answers to a specific
11 bill.
12    Q.  You cannot give me a category of such
13 legislation, correct?
14    A.  You don't go into categories of legislation.
15    Q.  Well, can you name any other types of
16 legislation that are exempt from the requirements of
17 5.11A?
18    A.  It would only be exempt if it was put into the
19 legislation that session, and it would be in that -- in
20 that order until it was taken out the next session.
21    Q.  Can you identify any such examples such as
22 that, other than the voter identification bill?
23    A.  I cannot give you specific examples.
24    Q.  Do you recall -- by the way, the Shoe Horn, is
25 that is a newspaper?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

301

1        A.  I have no idea.
2        Q.  Have you ever heard of anything -- anything in
3    the media called the "Shoe Horn"?
4        A.  No.
5        Q.  Do you recall making a public statement in
6    January 2011, where you said that the number of Texas
7    citizens who would not have photo identification would
8    be very, very small?
9        A.  Made the statement to who?
10       Q.  To the public.
11       A.  No.
12       Q.  Do you believe that the number of Texas
13   citizens who would have photo identification would be
14   very, very -- who would not have photo identification
15   would be very, very small?
16       MR. SWEETEN:  Objection, legislative
17   privilege.
18       Q.  (By Mr. Rosenberg)  Sitting here today, do you
19   believe that the number of Texas citizens who do not
20   have photo identification is very, very small?
21       MR. SWEETEN:  Don't reveal thoughts,
22   mental impressions or opinions about legislation,
23   including Senate Bill 34.
24       A.  Privilege.
25       Q.  (By Mr. Rosenberg)  And I'm not asking you --

---

302

1    I'm asking your present knowledge today, not related to
2    legislation that's pending.  I'm asking you for your
3    present knowledge today as to whether or not you believe
4    that the number of Texas citizens who do not have photo
5    identification is very, very small?
6        MR. SWEETEN:  If you can provide that
7    information without revealing thoughts, mental
8    impressions, opinions about legislation or in
9    furtherance to the legislative process, or not revealing
10   conversations you've had with the multiple agencies or
11   categories of individuals or entities that we've
12   discussed earlier, then you can answer the question.
13       A.  Privilege.
14       Q.  (By Mr. Rosenberg)  Did you have discussions
15   with anyone concerning the differences between SB 14 and
16   SB 362?
17       MR. SWEETEN:  You can answer whether you
18   had discussions with anyone.  You can answer that
19   factual question.  Don't reveal the substance of any
20   conversation.
21       A.  I need more clarification about when you're
22   talking about.
23       Q.  (By Mr. Rosenberg)  At any time -- any time.
24   It would have to be, obviously, at a time when SB 14 was
25   either being formulated or drafted.

---

303

1        A.  Yes.
2        Q.  Okay.  With whom did you have such
3    conversations?
4        A.  Members of the Texas Senate.
5        Q.  With which members of the Texas Senate?
6        A.  Many.
7        Q.  Can you identify -- were these -- and I'd like
8    to focus on conversations that were off the floor and
9    not on the record.
10       A.  Okay.  Then there -- ask the question again.
11       Q.  Sure.  Did you have any discussions that were
12   not on the public record with any Texas legislators
13   concerning differences between SB 14 and SB 362?
14       A.  Yes.
15       Q.  With whom?
16       A.  I had conversations with Senator Van de Putte.
17   I had conversations with Senator Whitmire.
18       Q.  Anyone else?
19       A.  That would probably be it.
20       Q.  Did you have conversations with any
21   constituents concerning differences between SB 362 and
22   SB 14?
23       A.  No.
24       Q.  Did you have conversations with anyone in any
25   executive agency as to differences between SB 362 and SB

---

304

1    14?
2        A.  No.
3        Q.  And when did you have the conversations with
4    Senator Van de Putte?
5        A.  As we were starting, it was after the bill was
6    filed and we were starting session and we were probably
7    within a day or so it being heard.
8        Q.  And what was the substance of that
9    conversation?
10       MR. SWEETEN:  Objection, privilege.
11       Q.  (By Mr. Rosenberg)  And when did you have the
12   conversation with Senator Whitmire?
13       MR. SWEETEN:  You can answer.
14       A.  More than one conversation.  A conversation in
15   the last quarter of the year, and then another -- at
16   least one other conversation in about the time we
17   started session.
18       Q.  (By Mr. Rosenberg)  And what was the substance
19   of that conversation?
20       MR. SWEETEN:  Objection, privilege.
21       Q.  (By Mr. Rosenberg)  Did you have discussions
22   with anyone off the public record concerning the effect
23   of SB 14 on minorities?
24       MR. SWEETEN:  I think the question is
25   you're asking about specific -- the substance of

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 305

1    specific conversations that he's had.  I think -- I
2    don't think he has to reveal that.  That's beyond just a
3    general subject matter description.
4            MR. ROSENBERG:  I really disagree.
5    Q.  (By Mr. Rosenberg)  I'll change it to the
6    effect of, if any, of SB 14 on minorities?
7    A.  Ask the question again, please.
8    Q.  Sure.  Did you have any discussions, not on the
9    public record, as to the effect --
10   A.  I'm sorry.  I don't understand "not in the
11   public record."
12   Q.  Well, meaning, as I think your counsel has
13   advised, that they're taking the position that
14   legislative privilege applies to anything that's not on
15   the public record.  And I think that has been stated
16   over and over again.  So I'm using your counsel's
17   terminology.
18           And my question is:  At any time, did you
19   have discussions with anyone, that was not on the public
20   record, concerning the effect, if any, of SB 14 on
21   minorities?
22   A.  And you're including legislators in session?
23   Q.  No, no.  Off the public record.  During the
24   session, yes, so long as it's not on what your counsel
25   considers the public record.

### 306

1            MR. SWEETEN:  As phrased, I'm going to let
2    you answer whether or not you had such conversations
3    with anyone, whether or not you did.  Don't reveal any
4    substance --
5    A.  I did not have conversations that were not
6    privileged.
7            MR. SWEETEN:  Okay.  And you're not going
8    to reveal any of the substance of any such conversations
9    but you can reveal whether or not you've had a
10   conversation with someone --
11   A.  I just --
12           MR. SWEETEN:  -- on the issue of that.
13   A.  The question before this, I disclosed
14   conversations I had with Van de Putte and --
15           MR. SWEETEN:  Whitmire.
16   A.  -- Whitmire, and I've also said earlier that I
17   had a conversation with Ellis.
18   Q.  (By Mr. Rosenberg)  Right.
19   A.  That sits next to me.  And so I've already
20   testified to those conversations.
21   ==Q.  Well, this is a different question.  My==
22   ==question is specifically:  Conversations not on the==
23   ==public record with anyone concerning the effect, if any,==
24   ==of SB 14 on minorities?==
25   ==A.  And I can't answer that because I'm saying I==

### 307

1    ==have already answered that question of the three that==
2    ==would be included.  So if you're going to qualify your==
3    ==question, anyone other than the three that I have==
4    ==mentioned.==
5    ==Q.  Well, I -- when I first asked you the question==
6    ==which resulted in you giving me the names of Senator Van==
7    ==de Putte and Whitmire, I didn't specify the effect, if==
8    ==any, on minorities.  So now you're telling me that the==
9    ==conversations that you had with Senator Van de Putte,==
10   ==Senator Whitmire, and Senator Ellis had to do with the==
11   ==effect, if any, of SB 14 on minorities; is that correct?==
12   ==A.  I'm saying that it was part of the total==
13   ==conversation.==
14   ==Q.  Other than those conversations, did you have==
15   ==discussions with any other legislators concerning the==
16   ==effect, if any, of SB 14 on minorities?==
17   ==A.  No.==
18   ==Q.  Did you have discussions off the public record==
19   ==with anyone from executive agencies as to the effect, if==
20   ==any, of SB 14 on minorities?==
21   ==A.  No.==
22   ==Q.  Did you have discussions with any constituents==
23   ==or lobbyists or public interest groups as to the effect,==
24   ==if any, of SB 14 on minorities?==
25   ==A.  No.==

### 308

1    ==Q.  Did you have discussions with anyone concerning==
2    ==the effect, if anything, if any, on election results of==
3    ==SB 14?==
4    ==A.  Not to my knowledge.==
5    ==Q.  And that includes discussions with legislators,==
6    ==with anyone from the executive agencies, Governor,==
7    ==Lieutenant Governor, and constituents?==
8    ==A.  Not to my knowledge.==
9    Q.  I'd like you to take a look at United States
10   Exhibit -- Department of Justice Exhibit 46.
11   A.  Which is 46?
12   Q.  Should be in your batch there.  And turn to
13   Page 74, please.  And if you see, there's a quote from
14   you, and I'm going to focus your attention on the last
15   sentence where it says, last two sentences, you're
16   asking, "Have I done that?"  Oh, actually, we should
17   have to give context to this.
18           And I want you to turn a page back to
19   where Senator Watson says, "Well, and I'm looking
20   forward to that.  I'm saying to you, though, with regard
21   to your bill, Senate Bill 362, are you familiar with any
22   data or study that's been done with regard to some sort
23   of statistical analysis concerning the effect of the new
24   requirements of Senate Bill 362 on African-American
25   population, Hispanic, people making less than $35,000 a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                            May 17, 2012

---

309

1    year," et cetera.
2         MR. SWEETEN:  We -- Ezra, we've lost -- we
3    go from Page 74 to 89.
4         A.  We don't --
5         MR. ROSENBERG:  No, no.  Go back to Page
6    73.  I'm sorry.  I was going back a page.
7         MR. SWEETEN:  Okay.  He's going here.
8         MR. ROSENBERG:  Right.  I was trying to
9    give context to this.
10        MR. SWEETEN:  Here, that's what he
11   read.  You can read that.
12        Q.  (By Mr. Rosenberg)  Have you had a chance to
13   read that, Senator?
14        A.  I have.
15        Q.  You see where on Page 74, where you're saying,
16   you're asking, "Have I done that?  The answer is no."
17   The phrase, "The answer is no," does that refer to doing
18   statistical analyses?
19        MR. SWEETEN:  You can -- don't reveal your
20   thoughts, mental impressions, opinions about
21   legislation.  You can reference the public record.
22        A.  The -- the statement speaks for itself.
23        Q.  (By Mr. Rosenberg)  Well, what does it mean?
24        A.  Privilege.
25        Q.  So you're telling me that you won't answer

---

310

1    under privilege the public statement that you made that,
2    quote, "The answer is no," end quote?
3         A.  (Conferring.)
4         MR. ROSENBERG:  Fine.  Let's move on.
5    Look, we don't have all night.  If that's your position,
6    that's --
7         MR. SWEETEN:  Ezra, you're already over.
8         MR. ROSENBERG:  I understand, but it would
9    be a lot easier if I was getting answers.
10        MR. SWEETEN:  I understand.  But I mean,
11   we're sitting here trying to analyze your question as to
12   whether or not we think it invades privilege.  Just give
13   us a second.
14        A.  I think it's clear what I'm saying, and I stand
15   by what I say.
16        Q.  (By Mr. Rosenberg)  Okay.  Let's just move on.
17   Next phrase, "But I am pulling data from
18   the academics that have done that and have delivered
19   back."  Did I read that correctly?
20        A.  Yes.
21        Q.  What data were you referring to?
22        A.  The testimony --
23             Is it all right for me to answer that?
24        MR. SWEETEN:  As to the testimony, yeah.
25        A.  The testimony was about to be delivered from

---

311

1    Indiana and Georgia on their voting results, and it came
2    from data that they had collected and that was about to
3    be delivered.
4         Q.  (By Mr. Rosenberg)  Okay.  And this will be the
5    one and only exhibit that I will mark.
6         (Exhibit 49 marked for identification.)
7         Q.  (By Mr. Rosenberg)  Senator, I'm showing you
8    what's been marked as Exhibit 49, and turning your
9    attention to the page number 48, which is the first page
10   with testimony on it, with discussion.  And the first
11   paragraph -- and I will represent, by the way, that this
12   is an excerpt from a statement by you and I think -- can
13   you verify that from your own memory?
14        A.  Yes.
15        Q.  Okay.  And you're quoting from the Baker-Carter
16   Commission that I think you talked about before.
17        A.  Yes.
18        Q.  And you say, "And regardless of whether one
19   believe that voter impersonation is widespread or
20   relatively rare, it can be no serious dispute that it is
21   a real effect that can be substantial, because in a
22   close election, even a small amount of fraud can make
23   the margin of difference."  Do you see that?
24        A.  Yes.
25        Q.  And is that a statement with which you agree?

---

312

1         A.  That is a statement that I pulled from the
2    Baker and Carter commission.
3         Q.  And did you quote it because you agreed with
4    it?
5         A.  Yes.
6         Q.  And what did you mean then by using the words
7    "can make a difference"?
8         A.  I repeated what they had quoted from their
9    quote.
10        Q.  And what did you understand the phrase "can
11   make a difference" to mean from their quote?
12        A.  I understood it can make a difference.
13        Q.  Do you -- are you -- were you taking it to
14   understand that a person who's not supposed to vote and
15   votes can make a difference in an election?
16        A.  I take it on its face for what it says.
17        Q.  Do you believe that a person who is eligible to
18   vote but can't because he doesn't have a photo ID can
19   make a difference in an election?
20        MR. SWEETEN:  Don't reveal your mental
21   processes in passing a legislation.  It's legislatively
22   privileged.
23        A.  Privilege.
24        Q.  (By Mr. Rosenberg)  Generally speaking, as a
25   matter of general practice, would you want to create a

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 313

1   system that stopped more eligible persons from voting
2   than stopped ineligible persons from voting?
3          MR. SWEETEN:  Do not reveal your thoughts,
4   mental impressions, opinions about legislation,
5   including Senate Bill 14.  Legislatively privileged.  Or
6   any conversations because it's legislatively
7   privileged.  Objection.
8          A.  Privilege.
9          Q.  (By Mr. Rosenberg)  Are you aware, sitting
10  today, here today, of how many Texans don't have photo
11  ID?
12         A.  I do not have the exact number.
13         Q.  Do you have an approximate number?
14         A.  I have only the data that we received during
15  the testimony of the bill.
16         Q.  And what number is that?
17         A.  I don't have a number.
18         Q.  Is it more than 500,000?
19         A.  There's no way to know that.
20         Q.  Is it more than the number of voter
21  impersonations with which you're aware -- of which
22  you're aware?
23         MR. SWEETEN:  I'm going to object to the
24  extent it calls for his mental impressions, opinions
25  about legislation, including Senate Bill 14, or to the

## 314

1   extent that it reveals any conversations he's had with
2   any of the enumerated individuals or agencies we've
3   discussed.
4          MR. ROSENBERG:  But to the extent that
5   it's in the public record and he has knowledge, he can
6   testify, even according to your theories.
7          A.  Please show me in the public record what's been
8   said.
9          Q.  (By Mr. Rosenberg)  Are you aware of assertions
10  on the public record that minorities are less likely to
11  have public identification -- photo identification?
12         A.  Ask the question again, please.
13         Q.  Sure.  Are you aware of assertions on the
14  public record that minorities are less likely to have
15  photo identification?
16         A.  I'm aware that it has been asserted.
17         Q.  Do you disagree with the assertion?
18         A.  I have no basis to know either way.
19         Q.  Okay.  Are you aware of assertions on the
20  public record that minorities are less likely to have
21  access to driver's license facilities in terms of having
22  cars or public transportation?
23         A.  I'm aware that assertions have been made.
24         Q.  Do you doubt the assertions?  Do you question
25  the assertions?

## 315

1          A.  Yes, I do.
2          MR. SWEETEN:  In answering that question,
3   don't reveal your thought processes or discussions with
4   respect to this -- with respect to this legislation;
5   it's legislatively privileged.  You can answer
6   otherwise.
7          Q.  (By Mr. Rosenberg)  Have you answered?
8          A.  Ask the question again.
9          Q.  Sure.  Are you -- do you doubt the -- do you
10  deny the assertion that minorities have less access to
11  driver's license facilities, in terms of having motor
12  vehicles --
13         A.  "Deny" and "doubt" are different words.
14         Q.  Well, I'm going to rephrase the question, and
15  your attorney can object or counsel you.
16         Let me just say again.  Do you deny the
17  assertion that minorities have less access to driver's
18  license facilities in terms of motor vehicles or public
19  transportation?
20         MR. SWEETEN:  Don't reveal your thoughts,
21  your mental impressions, your opinions about legislation
22  or conversations that you've had.  Those are
23  legislatively privileged.
24         A.  Privilege.
25         Q.  (By Mr. Rosenberg)  Are you aware of assertions

## 316

1   that minorities are more likely to be below the poverty
2   line and therefore may have more difficulty for paying for
3   the underlying documents necessary to get photo
4   identifications than nonminorities?
5          A.  Am I aware of the assertion?
6          Q.  Yes.
7          A.  Yes.
8          Q.  Do you deny the assertion?
9          MR. SWEETEN:  Don't reveal matters subject
10  to legislative privilege in answering the question.  If
11  you can answer the question without doing so, you can.
12         A.  Privilege.
13         Q.  (By Mr. Rosenberg)  Do you agree that a person
14  who doesn't have photo identification, doesn't have easy
15  access to driver's license facilities, may have to take
16  time off from work in order to go to the driver's
17  license facilities and doesn't have a spare $22 to pay
18  for underlying documents to get photo identification,
19  may be less likely to vote under SB 14 than people who
20  do have those things?
21         MR. SWEETEN:  Objection, compound.
22  Objection, calls for speculation.  Objection, vague.  In
23  answering that, don't reveal matters, thoughts, mental
24  impressions or opinions about legislation, including
25  Senate Bill 14 or matters communicated to you within --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 317

1  by any legislators, legislative staff, or other
2  enumerated individuals or entities.  If you can answer
3  without doing so, you can attempt to answer his
4  question.
5          A.  Privilege.
6          Q.  (By Mr. Rosenberg)  And my last question:  Just
7  sitting here today, do you have a basis to disagree that
8  minorities will be disproportionately affected by SB
9  14?
10         MR. SWEETEN:  In answering this question,
11  do not reveal matters of legislative privilege,
12  including your thoughts, mental impressions about the
13  legislation, in furtherance of the legislative process,
14  or discussions you've had with legislators, legislative
15  staffs, state agencies, Texas Legislative Council, or
16  constituents.  You can refer to matters of the public
17  record in answering the question.
18         A.  Privilege.
19         MR. ROSENBERG:  Subject to our moving to
20  compel, I'm leaving this open after all the privilege
21  issues and documents are produced, et cetera, I think
22  we're through for the day.
23         MR. SWEETEN:  Okay.  I would like the time
24  total.  I would like the time total appended to the
25  deposition.  And we will reserve questions of Senator

## 318

1      Fraser to the time of trial.
2              (Deposition concluded at 6:30 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 319

1  CHANGES AND SIGNATURE
2      RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 I, SENATOR TROY FRASER, have read the foregoing
21 deposition and hereby affix my signature that same is
22 true and correct, except as noted above.
23
24      _____
25      SENATOR TROY FRASER

## 320

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4      Before me,_____, on this day
5  personally appeared SENATOR TROY FRASER, known to me (or
6  proved to me under oath or through_____
7  (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
9  instrument and acknowledged to me that they executed the
10 same for the purposes and consideration therein
11 expressed.
12      Given under my hand and seal of office
13 this_____day of _____, 2012.
14
15
16      _____
      NOTARY PUBLIC IN AND FOR
17     THE STATE OF _____
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



**1**

346212 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                              *
        Plaintiff,                           *
VS.                                          *
ERIC H. HOLDER, JR., in his                  *
official capacity as Attorney                *
General of the United States,               *
        Defendant,                           *
ERIC KENNIE, et al,                          *
        Defendant-Intervenors,               *
TEXAS STATE CONFERENCE OF NAACP   * CASE NO.
BRANCHES, et al,                  * 1:12-CV-00128
        Defendant-Intervenors,    * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS      * THREE-JUDGE COURT
EDUCATION FUND, et al,                       *
        Defendant-Intervenors,               *
TEXAS LEGISLATIVE BLACK CAUCUS,              *
et al,                                       *
        Defendant-Intervenors,               *
VICTORIA RODRIGUEZ, et al                    *
        Defendant-Intervenors.               *

DEPOSITION OF SENATOR TROY FRASER
VOLUME 2

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
Elizabeth Westfall, Esquire
U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530

Date                    Edith A. Boggs, CSR

6-13-12                 HOUSTON, TEXAS

**2**

DEPOSITION OF SENATOR TROY FRASER

DEPOSITION AND ANSWERS of SENATOR TROY FRASER, taken
before Edith A. Boggs, a certified shorthand reporter in
Harris County for the State of Texas, taken at the
offices of Dechert, LLP, 300 6th Street, Suite 2010,
Austin, Texas, on the 13th day of June, 2012, between
the hours of 1:17 p.m. and 3:49 p.m.

**3**

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF, STATE OF TEXAS:

Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Street, 8th Floor
Austin, Texas  78701
By:  Patrick K. Sweeten, Esquire
and Stacey Napier, Esquire

(512) 936-1307
patrick.sweeten@aog.state.tx.us

ATTORNEY FOR DEFENDANT, HOLDER, ET AL:

U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC  20530
By:  Elizabeth S. Westfall, Esquire
(202) 305-7766
elizabeth.westfall@usdoj.gov

**4**

A P P E A R A N C E S (Continued)

ATTORNEY FOR DEFENDANT-INTERVENOR TEXAS STATE
CONFERENCE OF NAACP BRANCHES AND THE MEXICAN AMERICAN
LEGISLATIVE CAUCUS:

Dechert, LLP
300 6th Street, Suite 2010
Austin, Texas  78701

By:  Lindsey Stelcen, Esquire

(512) 394-3000
lindsey.stelcen@dechert.com

ATTORNEY FOR THE KENNIE INTERVENORS:
Brazil & Dunn, LLP
4201 Cypress Creek Parkway, Suite 530
Houston, Texas 77068
By:  Chad Dunn, Esquire
(281) 580-6310
chad@brazilanddunn.com

REPORTED BY:

Ms. Edith A. Boggs

5

EXAMINATION INDEX

QUESTIONS BY                          PAGE

Ms. Westfall                    6


INDEX OF EXHIBITS

NO.   MARKED      DESCRIPTION

550   12      Notice of Deposition

551   16      Senate Rules adopted by 82nd
Legislature January 19, 2011, Senate Resolution No. 36
552   48      Senate Rules adopted by 81st
Legislature January 14, 2009, Senate Resolution No. 14

553   65      Senate Journal, Fourth Day, Monday,
January 24, 2011
554   85      E-mail dated 1-27-11 from Brenda
Payne

555   91      E-mail dated 1-28-11 from R. L.
Kucera
556   99      E-mail dated 1-21-11 from Mickey
Mathis

557   102     E-mail dated 1-25-11 from Catherine
Engelbrecht
558   107     E-mail dated 1-26-11 from Sonia
Santana

6

1                    SENATOR TROY FRASER
2    was called as a witness and, being first duly sworn by
3    the notary, testified as follows:
4                    EXAMINATION
5        Q.  (BY MS. WESTFALL)  Good afternoon, Senator
6    Fraser.  How are you?
7        A.  Very good.
8        Q.  Good.  Could you state and spell your name again
9    for the record.
10       A.  Senator Troy Fraser.  Last name is F R A S E R.
11       Q.  And you were previously deposed in this matter,
12   right?
13       A.  I was.
14       Q.  Do you remember the ground rules I gave you last
15   time?
16       A.  I do.
17       Q.  And you are appearing to resit for your
18   deposition, as ordered by the Court in this matter on
19   June 5th; is that correct?
20       A.  That's my understanding, yes.
21           MR. SWEETEN:  Just for the record, let me
22   just state that we are here pursuant to the Court's
23   order of June 5th, 2012.
24           In that order, the Court required Senator
25   Fraser to resit for a deposition, to provide nonevasive

7

1    answers to questions regarding the substance and purpose
2    of the two-thirds rule, the effect of a Governor
3    designating a bill as emergency legislation and whether
4    he was aware of any conversations regarding the timing
5    of consideration of Senate Bill 14.
6            He is going to answer questions based upon
7    those issues, as set forth in the Court's order.  He is
8    continuing to assert his legislative privilege as to any
9    matters that would be covered by that.
10           And with that, I'll let you proceed with the
11   examination, Counsel.
12           MS. WESTFALL:  Thank you, Mr. Sweeten.
13       Q.  (BY MS. WESTFALL)  And just to be clear, Senator,
14   are you also aware that the Court ruled that other
15   subjects, such as communications between legislators and
16   constituents, lobbyists and interest groups, public
17   statements and press releases and statements made after
18   Senate Bill 14 was signed into law are not subject to
19   legislative privilege?
20       A.  I would like to be shown that, please.
21           MR. SWEETEN:  Well, I mean, to the extent
22   that the Court's order is limiting as to these three
23   issues, we don't intend -- I mean, our intention is to
24   have him sit for the issues that the Court has ordered
25   him to sit for.  He will answer the questions that the

8

1    Court has provided for, and the Court has not reopened
2    the examination with respect to constituent
3    communication.
4            MS. WESTFALL:  Mr. Sweeten, I provided you
5    with correspondence indicating that we would be
6    examining the Senator on areas related to the order on
7    motions to spell, ECF 167, June 5th, 2012, that related
8    to constituent communications, public statements and
9    press releases and statements made after the signing.
10           This deposition has been ordered by the
11   Court to be reopened.  The Court has ruled that certain
12   issues and areas of examination are not subject to
13   legislative privilege, and I'm going to examine the
14   Senator on those areas, as permitted to do so by the
15   Court's order.
16           MR. SWEETEN:  Okay.  And what I'm telling
17   you is that my interpretation of the Court's order is he
18   is sitting for these three topics and these topics only.
19           If you can show me the support for why you
20   believe that you could extend into the other area, which
21   I understand you to say is constituent communications,
22   then we can have a discussion on that issue.
23           MS. WESTFALL:  Mr. Sweeten, the whole entire
24   order is about areas that are in the Court's ruling
25   subject to legislative privilege and outside of that

## 13

1      And turning in a couple of pages after the
2  numbered paragraphs defining terms, do you see that it
3  lists Documents on the next page?
4      A.  What number?
5      Q.  On the following page.  Unfortunately, these
6  pages are not paginated but after --
7      A.  What number is the sub number?
8      Q.  After paragraph 11 on the following page, sir,
9  where it says Documents, do you see it lists a number of
10 documents, 1, 2, 3?
11     A.  Yes.
12     Q.  Did you under -- did you or your staff undertake
13 a search for these documents?
14     A.  I believe my staff did.  I did not.
15     Q.  Do you know whether it was Ms. McCoy?
16     A.  Ms. McCoy would have been the one.
17     Q.  Do you know where she searched for the documents?
18     A.  In our file in our office.
19     Q.  Do you know what she found in terms of documents?
20 And I'm not asking you for the specific documents but
21 the types of documents she found?
22     A.  I believe every document that had been requested
23 had been released to the Attorney General's Office, and
24 I believe they had some that they felt like were
25 privileged but we have no other documents in our

## 14

1  possession that have not been previously either asked
2  for or released to the Attorney General's Office.
3      Q.  I see.  So, is it your understanding that there
4  were no documents recently produced from your office?
5  Is that right?
6      A.  That is my understanding.
7      Q.  Sir, are you familiar with the Senate procedure
8  which you previously referred to in your prior
9  deposition as the two-thirds procedure?
10     A.  No.
11     Q.  Sir, when a bill in the Senate is favorably
12 reported by a committee, what happens to the bill next?
13         MR. SWEETEN:  And you can answer as a
14 general matter.  I think many of these questions today
15 will be general parliamentary matters, and so, you can
16 answer those questions.
17         Just don't -- if it comes to your thoughts
18 or mental impressions about a specific bill today, then
19 we're going to assert legislative privilege on that but
20 go ahead.
21     A.  I'm sorry.  I'm going to stop you here.  I would
22 like to go back to the previous question and have it
23 read back to me again.
24     Q.  (BY MS. WESTFALL)  Certainly.
25         MS. WESTFALL:  Could you read back the

## 15

1  previous question.
2          (Whereupon, the requested testimony was read back
3  as follows:
4  QUESTION:  Sir, are you familiar with the Senate
5  procedure which you previously referred to in
6  your prior deposition as the two-thirds
7  procedure?)
8      A.  I would like for you to show me where I referred
9  to something as the two-thirds rule -- vote rule.
10     Q.  (BY MS. WESTFALL)  Okay.  Well, I'm going to
11 strike that question for the time being.  We'll go on to
12 the next question.
13     A.  And I am prepared to expand and discuss, because
14 I understand the Court would like that, but the question
15 as you asked it, implying that I had referred to that, I
16 don't remember implying, and I am prepared to expand.
17     Q.  Okay.  And I will ask you many questions
18 generally about what has been referred to in the press
19 and elsewhere as the two-thirds rule or procedure or
20 whatnot.
21         I will ask you the question I just asked earlier,
22 which is, when a bill is favorably reported from a
23 committee, what happens to the bill next?
24     A.  The bill, after it's reported -- first,
25 obviously, you have to have the paperwork that would be

## 16

1  correctly delivered, and that is delivered to the
2  Lieutenant Governor's Office.
3          The Lieutenant Governor, they -- my understanding
4  is they generally preview the bill, and then they will
5  post that on a calendar.
6      Q.  Sir, does that go on the calendar of the regular
7  order of business?
8      A.  We have multiple calendars that -- there are
9  special orders, there are regular orders for second
10 reading, there are regular orders for third reading, and
11 then any other that would be considered served.  There
12 are multiple calendars.
13     Q.  I think instead of talking about this in the
14 abstract, we'll mark this 551.
15         (Exhibit 551 marked.)
16     Q.  (BY MS. WESTFALL)  Sir, you've been hand what's
17 been marked US 551.  Do you recognize this document?
18     A.  I have not examined the document in full but on
19 the surface, on the face, it says Senate Rules adopted
20 by the 82nd legislature, and I'm assuming you're
21 representing that this is that document.
22     Q.  Yes, sir, I will represent to you -- and I'm sure
23 your counsel won't disagree -- that this is a copy of
24 the Senate 2011 Rules in its entirety.
25     A.  Yes.

## 17

1  Q.  Does the Senate consider bills in a particular
2  order?
3  A.  Yes.
4  Q.  What is that order?
5  A.  There are multiple orders that could be created,
6  that if a bill is designated for a special order, it
7  would be designated what special order it would be, and
8  if a bill is designated a special order, it would become
9  the first bill that would be considered on that
10 legislative day.
11     If there's not a special order and you have bills
12 to be considered for a second reading that are eligible,
13 they would be required to be brought up in the order of
14 business in which, you know, they came out of committee.
15 Q.  I'd like to turn your attention to Rule 5.09 on
16 Page 21.
17 A.  21?
18 Q.  On Page 21, Rule 5.09.
19 A.  Okay.
20 Q.  Do you see what that rule is?
21 A.  Order of considering bills and resolutions.
22 Q.  Could you describe your understanding of Rule
23 5.09?
24 A.  5.09 says, "At the conclusion of the morning
25 call, the Senate shall proceed to consider business on

## 18

1  the President's table, which shall be disposed of in the
2  following order."  One would be special orders.  Two
3  would be unfinished business.  Three would be Senate
4  Joint Resolutions.  Four would be Senate Resolutions.
5  Five, Senate Concurrent Resolutions.  Six, Senate bills
6  on third reading.  Seven, Senate bills on second
7  reading.  Eight, House Joint Resolutions.  Nine, House
8  bills on third reading.  Ten, House bills on second
9  reading.  And Eleven, House Concurrent Resolutions.
10 Q.  Is it your understanding that under Rule 5.09
11 that special orders are considered first in terms of
12 order?
13 A.  The rule says it will be disposed in the
14 following order.
15 Q.  And turning your attention to the end of that
16 rule on the notes of rulings, does it indicate that the
17 order of business may be changed by a two-thirds vote of
18 the Senate?  Do you see that?
19 A.  I do see that.
20 Q.  And what does that mean?
21 A.  The -- a 21 vote rule or a vote of two-thirds of
22 the members of the Senate are used any time that you do
23 a suspension of an existing rule.
24     The example would be if there is a printing rule
25 and there's a 48-hour layout, we could suspend the

## 19

1  printing rule with a 21 vote, two-thirds vote.
2      If a bill is coming up -- had been passed on
3  second reading and there's a 24 or 48-hour layout for
4  third reading, the Senate would be allowed -- if the
5  other members would do it, they could suspend that rule
6  with a 21 vote or a two-thirds majority of those present
7  in order to suspend that rule.
8      So, any rule in the Senate where there's an
9  existing rule, you are allowed to suspend that rule.
10 There are literally thousands of suspensions that are
11 done on probably as many as 15 different categories of a
12 suspension.
13     So, when you refer to something as a two-thirds
14 rule, the two-thirds could apply to the posting rule, it
15 could be the printing rule, it could be the layout rule,
16 it could be third reading or it could apply to the
17 regular order of business.
18     And that is my reason for saying there is no such
19 thing as a two-thirds rule.  You have to have a
20 two-thirds majority in Robert's Rules of Order,
21 according to parliamentary procedure, in order to
22 suspend any rule that is established by the Senate,
23 which this is a rule that's been established.  If you
24 want to change the order of that, then you have to
25 suspend the regular order of business in order to take

## 20

1  up and consider a bill.
2  Q.  What is the regular order of business?
3  A.  The regular order of business is the order that
4  it came out of the committee.
5  Q.  Could you refer to a particular rule in the
6  Exhibit 551 that refers to what the regular order of
7  business is?
8  A.  Well, it's -- if you look at the rules, if you
9  have a special order as number one, the first special
10 order that comes out would be number 1, and it would
11 have priority.
12     If there was unfinished business, which means
13 that if you had been carrying a bill and for some reason
14 you suspended that bill and you decided you were going
15 to have a time certain of 11:00 o'clock tomorrow
16 morning, well, at 11:00 o'clock tomorrow morning, it
17 would be -- if there were no special orders, it would
18 be -- would have number 1 preference.
19     So, your order of business is established by
20 Senate Rule 5.09.  If you're not going to go in that
21 order and you're asking members to change that -- and
22 the example I'll give you is that if I had a House
23 resolution that I felt very strongly about but it was a
24 hundred bills down in the order and I was going to have
25 to wait and there were some constituents here that we

Senator Troy Fraser - Volume 2                    June 13, 2012

## 21

1  wanted to honor, I could ask the other members to allow
2  me to suspend the regular order of business to take up
3  and consider House Concurrent Resolution such and such,
4  and that is a common thing that happens often if a
5  member chooses to suspend the regular order of business
6  but the regular order of business, it would allow that
7  it is a majority vote as long as you go in the regular
8  order of business.
9       Q.  I see.  And turning your attention to Rule 5.12
10  on Page 25 --
11      A.  I'm sorry.
12      Q.  Page 25, Rule 5.12.  Do you see at the bottom
13  that describes regular order of business?
14      A.  Uh-huh.
15      Q.  Is this -- could you describe Rule 5.12?
16      A.  I'd be glad to read it to you.  It says, "Bills
17  and resolutions shall be considered on second reading
18  and shall be listed on the daily calendar of bills and
19  resolutions on the President's table for second reading
20  in the order in which the committee reports on them are
21  received by the Senate."
22           They're received, stamped with the time stamp as
23  being received by the Senate coming out of --
24      Q.  Just so I understand that clearly, the committees
25  report favorably bills and whatever order they come in

## 22

1  and they're time stamped on, that is the regular order
2  of business; is that right?
3       A.  That is the regular order of business.  It is my
4  understanding that that's the way they do it.  I'm not
5  there when they come in but they do establish a regular
6  order of business, and my understanding is that if I
7  chair Natural Resources and if I complete a bill and
8  we've got, you know, Senate Bill 300 and we send it over
9  favorably from the committee, they review it, as soon as
10  the paperwork is in order, they time stamp it, and if I
11  am 5th in the regular order of business, it is my right
12  to bring that bill up 5th.
13      Q.  And then you would only need a majority of the
14  Senates to vote in favor of that pursuant to the regular
15  order of business?
16      A.  That is correct.  If I chose to try to jump over
17  everybody and I wanted to come up first, I would have to
18  ask the other members to allow me to get two-thirds
19  majority to do that.
20      Q.  So, I think you just said this but when a bill is
21  considered in the regular order of business, it only
22  requires a majority vote?
23      A.  That's correct.
24      Q.  Are most bills considered in the regular order of
25  business?

## 23

1           MR. SWEETEN:  You can answer as a general
2  matter.
3       A.  There are some bills that are considered in the
4  regular order of business, and there are some bills that
5  are considered out of the regular order of business.
6       Q.  (BY MS. WESTFALL)  Is it fair to say that most
7  are considered out of the regular order of business?
8       A.  It's fair to say that there are more considered
9  out of the regular order of business, not most.
10      Q.  What type of bills or resolutions are considered
11  in the regular order of business?
12      A.  Bills that came in in the regular order.  If they
13  come in the regular order of business and there's not
14  some pressing reason why I or someone else needs to
15  bring our bill up, we operate in the regular order of
16  business, not unlike what the House does.  The House
17  does the same procedure.
18      Q.  If you do that and you proceed on the regular
19  order of business, there is a risk, is there not, that
20  the session may end without the Senate having considered
21  your bill; isn't that right?
22      A.  No.
23      Q.  Why not?
24      A.  Well, there's no limit on the length of time that
25  you can have the session.  I have -- in 2009 on the

## 24

1  photo voter ID bill --
2           MR. SWEETEN:  Don't discuss specific
3  legislation.
4       A.  Okay.  There are bills that have gone -- there's
5  not a time limit on the length of the time that you can
6  go.  So, the answer is no.  Generally, there's
7  sufficient time.
8           The Senate operates on -- you know, we -- I don't
9  know whether you would call it pacing yourself but we
10  take care of business to stay up with the order of -- to
11  take care of sufficient business but --
12      Q.  (BY MS. WESTFALL)  Sir, isn't it true that some
13  bills are reported favorably out of committee and they
14  do not reach the Senate floor for a vote before the
15  session ends?
16      A.  Yes.
17      Q.  When bills are reported favorably from committee
18  I believe you said they go to the Lieutenant Governor's
19  Office and get stamped; is that correct?
20      A.  I'm telling you what I believe is the policy.
21  I've never physically seen that and it has never been
22  explained to me but my understanding is there is a
23  procedure for establishing the regular order of
24  business.
25      Q.  Is that a committee or is it your understanding

Senator Troy Fraser - Volume 2                    June 13, 2012

## 25

1   that that is the Lieutenant Governor in his capacity as
2   the President of the Senate doing that?
3       A.  He and his staff but that also is a power given
4   to that office by the Senate members per the Senate
5   Rules.
6       We allow the --
7       THE WITNESS:  You can tell me if you don't
8   want me to head there.
9       A.  But the House has a Calendars Committee that does
10  this.  The Senate has chosen not to have a Calendars
11  Committee.  We allow the Lieutenant Governor to
12  establish that but if we disagree, through the rules, we
13  have the ability to override.
14      Q.  (BY MS. WESTFALL)  I see.  So, the Lieutenant
15  Governor's Office is in charge of calendaring bills that
16  come out of committee before they go to the floor; is
17  that right?
18      A.  That would be a correct representation.
19      Q.  I believe you testified earlier about bill
20  blockers.  Do you remember that testimony?
21      A.  A blocker bill.
22      Q.  Blocker bills.  I stand corrected.  Can you
23  remind what a blocker bill is?
24      A.  A blocker bill would be if my bill is number 10
25  and somebody has a bill that is number 9, that bill is

## 26

1   blocking my bill from being brought up, and until number
2   9 is brought up, I can't bring up number 10.
3       Q.  My understanding -- and correct me if I'm
4   wrong -- do blocker bills require that even if you're in
5   the regular order of business and your bill is coming up
6   for a vote that you would have to get two-thirds of the
7   Senate to support a suspension of the rules to have your
8   bill considered?
9       A.  Please repeat that question.
10      MS. WESTFALL:  Could you read that back.
11      (Whereupon, the requested testimony was read back
12  as follows:
13      QUESTION:  My understanding -- and correct me if
14  I'm wrong -- do blocker bills require that even
15  if you're in the regular order of business and
16  your bill is coming up for a vote that you would
17  have to get two-thirds of the Senate to support a
18  suspension of the rules to have your bill
19  considered?)
20      A.  No, that is not correct.  If you are following
21  the regular order of business and your bill is scheduled
22  to come up next, it requires a majority vote.
23      Q.  (BY MS. WESTFALL)  I believe you testified
24  earlier that blocker bills are often filed at the
25  beginning of a session.  Do you remember that testimony?

## 27

1       A.  Yes.
2       Q.  And that they are administrative in nature, do
3   you remember that testimony?
4       A.  Yes.
5       Q.  Does the filing of that blocker bill require that
6   all bills must receive support of two-thirds of Senators
7   to suspend -- or to overcome that blocker bill to be
8   heard?
9       A.  What you're actually saying is that you have to
10  come to a resolution of the first bill on the calendar,
11  and if that bill is a bill -- something that the author
12  of the bill does not choose to resolve that and it is
13  sitting and if there's a bill behind it that you choose
14  to break up, you would have to make a motion that I
15  would like to suspend, you know, the regular order of
16  business to take up and consider bill number 2 to jump
17  over bill number 1.
18      Q.  Since you have been serving in the Senate
19  since -- you've served in the Senate since 1997, right?
20      A.  Uh-huh.
21      Q.  Has there always been a blocker bill filed at the
22  beginning of the session in your experience?
23      MR. SWEETEN:  I don't think that's correct.
24      You've served in the Senate since '97?
25      THE WITNESS:  Uh-huh.

## 28

1       MR. DUNN:  Is that a yes?
2       THE WITNESS:  That is a yes.
3       MR. DUNN:  Just for our court reporter.
4       MS. WESTFALL:  Thank you, Mr. Dunn.
5       THE WITNESS:  Are you shocked?
6       MR. SWEETEN:  Go ahead.
7       Q.  (BY MS. WESTFALL)  Since you have served in the
8   Senate, every session has there been a blocker bill
9   filed at the beginning of the session?
10      A.  To my knowledge, there has been a bill filed that
11  would -- that you -- if your bill was behind that bill,
12  you would have to suspend the necessary rules.
13      Q.  So, you can't recall, sitting here today, any
14  legislature that you've served in since you've been in
15  the Senate when there hasn't been such a blocker bill
16  filed?
17      A.  No.
18      MR. SWEETEN:  Was your question regular
19  session or --
20      A.  Again, I'm -- the term blocker bill is a term of
21  art, and there's nothing in the Senate Rules that refers
22  to it, and there's nothing in the Texas Constitution.
23  So, it implies that there is no such thing as a blocker
24  bill.
25      A blocker bill would be something, in my mind,

29

1   that that bill is blocking me bringing up my bill.  So,
2   there is really no such thing as a blocker bill.  It's
3   just if there's a bill in front of mine, it would be
4   blocking me bringing my bill up.
5       Q.  (BY MS. WESTFALL)  Thank you.
6           Is the blocker bill -- what you refer to as the
7   blocker bill, is that what others in the public may
8   refer to as the two-thirds procedure or rule?
9       A.  No.  Now, I probably should -- you know, there is
10  a term of art that people refer to that we're going to
11  suspend the two-thirds rule but there is no such thing
12  as a two-thirds rule.
13          There is a two-thirds majority required to
14  suspend any existing Senate rule.  There's an existing
15  Senate rule that says you have to go in the regular
16  order of business.
17          So, implying that there is a two-thirds rule
18  would imply that that two-thirds rule is the same rule
19  that has to do with a -- the printing rule because you
20  have to have a two-thirds majority, and it's the exact
21  same vote that you have to have to suspend the regular
22  order of business.
23      Q.  Thank you.
24          And is there a particular rule in the Senate
25  Rules that embodies some of what you just testified

30

1   about in terms of the two-thirds required to suspend
2   rules or is it throughout the rules, it refers to
3   two-thirds?
4       A.  And I'm -- I probably should ask you -- it is my
5   belief -- and I'm sorry, I cannot point to it but I
6   believe in the Senate Rules, there is a rule that says
7   that if you want to suspend an existing Senate rule, it
8   would take a two-thirds majority of the Senate to
9   suspend that existing rule.
10      Q.  I'm glad you've turned to that because I'm going
11  to direct your attention now to Rule 5.13 on Page 26,
12  suspension of the regular order of business.
13      A.  Okay.
14      Q.  Do you recognize this rule?
15      A.  Yes.
16      Q.  What does this rule do?
17      A.  This rule says exactly what it says.  "No bill,
18  joint resolution or resolution affecting state policy
19  may be considered out of its regular calendar order
20  unless the regular order is suspended by a vote of
21  two-thirds of the members present."
22      Q.  Is this your understanding of what people refer
23  to as the two-thirds rule, Rule 5.13?
24          MR. SWEETEN:  Objection.  Calls for
25  speculation.  Compound.

31

1           You can answer.
2       A.  This rule says exactly what it is.  It is that if
3   you're going to take something out of the regular order
4   of business, it requires a two-thirds vote, but a
5   two-thirds vote is required on a printing if you're
6   going suspend, on a -- I don't know whether there's 15
7   but there's multiple rules that require a two-thirds
8   vote.
9           So, implying that this particular one is the
10  two-thirds vote, I would say no, that's not the case.
11  This is -- there is a two-thirds vote required to
12  suspend the regular order of business but it would be
13  improper to imply that it only applies to this.
14      Q.  (BY MS. WESTFALL)  I see.  So, is it your
15  testimony that, generally speaking, the Senate requires
16  two-thirds of the Senators to vote in favor of anything,
17  many rules throughout the rules?
18      A.  No.  Every rule, if you do it in the order that
19  you're supposed to, is a majority vote.  If you want to
20  change or get away from the regular rules and not do it
21  in the rules of the Senate, you have to have a vote of
22  two-thirds of the members to suspend that existing
23  Senate rule.
24      Q.  Do you recall in the 2011 session which bills or
25  resolutions were considered under the regular order of

32

1   business?
2           MR. SWEETEN:  You can testify as to matters
3   of the public record.
4       A.  All business in the 2011 session was considered
5   according to the regular order of business.  That is our
6   rule.
7       Q.  (BY MS. WESTFALL)  Which bills or resolutions did
8   not -- only required a majority vote to pass on the
9   merits?
10      A.  Special orders did not require a two-thirds vote.
11  House bill days that we -- generally it's usually
12  allocated -- I believe it's Wednesday and Thursday.  On
13  that day when you bring up House bills, a two-thirds
14  vote is not required on those bills as long as they're
15  done in the regular order of business.  That would be
16  the regular order of business and we bring those up and
17  it would not require a two-thirds vote to suspend the
18  regular order of business because you're doing them in
19  that order.
20      Q.  Sitting here today concerning the 2011 session,
21  can you remember or describe or list all of the bills
22  that were considered in the regular order of business?
23      A.  I'm sorry, I could not list all the bills.
24      Q.  Do you know how many were?
25      A.  I do not know how many.

## 33

1  Q. Was it fewer than 10?
2  A. I'm sorry?
3  Q. Was it fewer than 10?
4  A. I'm sorry, I've said I don't remember the bills
5  or the number of bills.
6  Q. Was it -- my question stands. Was it fewer than
7  10, to the best of your recollection?
8        MR. SWEETEN: Objection. Asked and
9  answered. Objection. Foundation.
10        THE WITNESS: Did you tell me to answer?
11        MR. SWEETEN: You can answer if you can
12  answer the question. I'm not prohibiting you from
13  answering.
14  A. There were -- on the House bills coming over,
15  approximately half of the bills considered in the
16  legislative session come from the House, and if the
17  House bills are considered in regular order, there is
18  not a suspension vote necessary.
19        So, I'm sorry, I can't answer that question. I
20  don't know the number.
21  Q. (BY MS. WESTFALL) Okay. So, your testimony is
22  you do not recall the number of bills in the 2011
23  session that were considered by regular order of
24  business?
25  A. I do not.

## 34

1  Q. And what is a special order?
2  A. A special order, as you've seen in 5.01 -- was
3  that the number?
4  Q. I'll turn your attention to Page 24 at Rule 5.11.
5  A. I'm looking at 5.09. A special order is at the
6  top of the regular order of business. So, if something
7  is specified as a special order, it moves to the top of
8  the list.
9  Q. Turning your attention to Rule 5.11 on Page 24.
10  A. Yes.
11  Q. Do you see that section about special orders?
12  A. Yes.
13  Q. What is a special order?
14  A. 5.11 says, "Any bill, resolution or other measure
15  may on any day be made a special order for a future time
16  of the session by an affirmative vote of two-thirds of
17  the members present."
18  Q. Under what circumstances are bills designated as
19  special orders?
20        MR. SWEETEN: Don't answer that question if
21  it would reveal matters of legislative privilege, your
22  thoughts, mental impressions, motivations regarding any
23  specific legislation.
24        MS. WESTFALL: Mr. Sweeten, this is not
25  about a particular piece of legislation. This is about

## 35

1  the Senator's knowledge of the rules.
2        MR. SWEETEN: You're asking then general
3  information?
4  A. And I'll answer general. What you're referring
5  to here is if a special order had not been designated
6  specifically in the Senate Rules. If the Senate Rules
7  are established and in the Senate Rules themselves, you
8  designate items that would be a special order, that is a
9  majority vote of the Senate to establish that.
10        Once they are in the Senate Rules and the Senate
11  Rules are established and it's been designated that it
12  would only require a majority vote, that would refer
13  back to Rule 5.09, which would put the special order as
14  the number 1 bill on the order of business and would
15  only require a majority vote.
16        If someone wanted to change all other order and
17  make it a special order, they would be suspending the
18  existing rules, the Senate Rules, and it would take a
19  two-thirds vote.
20        But this has no -- this is no different than if
21  someone was in the regular order of business, their bill
22  was number 100 and they wanted to suspend the regular
23  order of business, it would have the same weight.
24  Q. (BY MS. WESTFALL) When do special orders usually
25  arise in the session?

## 36

1  A. Since I've been in the Senate, any time that
2  there was an issue that was a -- either a very large
3  specific issue, difficult issue, it could be and often
4  was given the status of special order.
5  Q. Was that usually --
6  A. I'll add that almost every session since I've
7  been in the Senate, there has been something specified
8  as a special order. And my understanding is, looking at
9  the history of the Senate prior to me getting there when
10  there was Democratic control, they used the special
11  order virtually every session.
12  Q. Would the special orders that you just testified
13  to, would they be set during the session if a Senator
14  made a motion to create a special order or were they
15  usually embodied in the Senate Rules themselves?
16  A. The more logical way to do it would be to embody
17  it in the Senate Rules. And the Senate Rules could
18  either be established at the start of the session or
19  they could be amended at any time during the session.
20        This is a method -- this is a method to do that
21  but if you did that, you had to have a two-thirds -- so,
22  this is a way to establish a special order. I would say
23  it's more likely that it would happen in the Senate
24  Rules themselves as a special order.
25  Q. Do you recall -- other than the special order

## 37

1  regarding voter ID requirements in the 2011 and 2009
2  Rules, do you recall any other special orders that were
3  created in the Senate Rules themselves, to your
4  knowledge?
5       A.  In what year?
6       Q.  Any year in which you've served in the Senate.
7       A.  I'm going to answer you, you know, what I -- I
8  cannot give you specifics but these are issues that I
9  do -- I believe were special orders.
10      Through time, there have been multiple budgets
11 that were put into special order and we voted on.  There
12 have been redistricting plans not only in the current
13 time when the Republicans control but also prior to me
14 getting in the Senate, when the Democrats controlled,
15 that they did special orders for redistricting because
16 they listed that.
17      Prior to me getting to the Senate, when I was in
18 the House, there was a workers' compensation bill that I
19 believe -- my understanding was that it was placed as
20 special order.
21      At that time, there were over two-thirds of the
22 members in the House that were Democrat and about
23 four-fifths of the members in the Senate that were
24 Democrat, with a Democrat speaker and a Democrat
25 Lieutenant Governor, and they placed that as a -- it's

## 38

1  my understanding that they placed that as a special
2  order in the Senate Rules.
3       Q.  And it's your testimony that with regard to
4  budgets, redistricting and worker's comp that there were
5  special specific -- that they were specified as special
6  orders in the Senate Rules themselves; is that right?
7       A.  That's my understanding.
8       Q.  And was it your testimony that any bill could be
9  made a special order with a two-thirds vote of the
10 Senate during session?
11      A.  It is my testimony that there's two different
12 methods to become a special order.  One is that if you
13 amend -- if you either establish it in the Senate Rules
14 that are voted at the start of the session or you do an
15 amendment to the Senate Rules, you can do it that way,
16 or if you want to establish something as a special
17 order, I could move to do a suspension of Rule 5.11 to
18 establish a special order of Senate Bill 6 and if the
19 members chose to establish a special order, they could
20 do that.
21      Q.  How many special orders were there in the 2011
22 session?
23      A.  I don't know.
24      Q.  Were there more than 10?
25      A.  I'm sorry, I don't know.

## 39

1       Q.  To your knowledge, were the Senate Rules in 2011
2  amended at all?
3       A.  Well, yes.  Every session, at the start of the
4  session, the membership goes into caucus, and there will
5  be usually a review of the rules by members of the
6  Senate.
7       They will come back and recommend changes to the
8  Senate Rules.  Those Senate Rules come before the
9  Senate, and there is a -- they're added to the Senate
10 Rules, and then we go to the floor, and we take a vote
11 on the floor.
12      Q.  Does the Lieutenant Governor's Office recommend
13 changes to the rules?  Is he in charge of that?
14      A.  The changes are from the Senators.
15      Q.  But is that done by the whole Senate or by a
16 committee of the Senate or a sub group of the Senate?
17      A.  There is a general sub group that does the review
18 and comes back with recommendations but the vote is by
19 the Senate as a whole.
20      Q.  Who is in that sub group?
21      A.  It would be generally someone who would be
22 appointed by the Dean of the Senate, which is a
23 Democrat.
24      Q.  Is that Mr. Whitmire?
25      A.  Whitmire.

## 40

1       Q.  Who else besides Mr. Whitmire recommends changes
2  to the rules?
3       A.  It's my understanding that any time that
4  happens -- Senate Whitmire is the Dean of the Senate, he
5  runs the meetings, he makes the recommendations.  So,
6  any appointments to people to do a review would come
7  from him.
8       Any member that -- if I had something I wanted to
9  change, I could bring it forward but whoever is doing
10 the review -- I could bring it forward and I could offer
11 an amendment.  If I disagreed with the rules as they're
12 coming out, I could offer to have an amendment when it
13 comes at the floor, and the amendment would be a
14 majority vote.
15      Q.  Who was on the committee in 2011 who recommended
16 the Senate Rules for that session besides Mr. Whitmire?
17      MR. SWEETEN:  You can answer as to matters
18 of public record.
19      THE WITNESS:  Okay.
20      MR. SWEETEN:  And if you don't know --
21      A.  I'm not aware of whether there was a public
22 record on it but I also don't know who they are.  So,
23 the answer is the same.  I don't know whether it was a
24 public record but I also don't remember who they were.
25      Q.  (BY MS. WESTFALL)  What is the general purpose of

## 41

1  having a requirement that two-thirds of the Senators
2  vote in favor of suspending the rules or any of the
3  other things you testified about requiring two-thirds?
4          MR. SWEETEN: He's not --
5          MS. WESTFALL: Mr. Sweeten, that's a
6  general --
7          MR. SWEETEN: He's not answering the
8  question as phrased, period. So, you can rephrase it if
9  you want to ask a general purpose of a rule. He's not
10  answering a question, "As to everything you just said,
11  what's the purpose of it?" Absolutely not.
12          Q. (BY MS. WESTFALL) I'm going to withdraw my
13  question and try again.
14          What is the general purpose of the two-thirds
15  rule?
16          A. You'll have to be more specific because there's
17  no such thing as a two-thirds rule. There is a
18  two-thirds vote required on specific items, and if you'd
19  like to address a specific item, I'll attempt to answer
20  that.
21          MS. WESTFALL: Mr. Sweeten, as you know, the
22  Court has directed that Senator Fraser sit and answer
23  questions about the general purpose of the two-thirds
24  rule.
25          The Senator has testified that two-thirds

## 42

1  applies to a variety of rules, and I am asking him to
2  testify as to the purpose of two-thirds vote being
3  required in a variety of settings, and I ask your
4  indulgence of being permitted to ask this question in
5  order to resolve any conflicts that there may be between
6  your witness and the Court.
7          THE WITNESS: I'd like to answer.
8          MR. SWEETEN: Okay. Let me just -- let me
9  explain my objection, which is when you ask the question
10  as phrased, you basically referenced every bit of
11  testimony that he had just testified to about the Senate
12  Rules. There's no possible he could have answered the
13  question that you phrased.
14          If you're asking about why the two-thirds
15  rule applies in certain circumstances, he can give a
16  general purpose answer as to the reason for that since
17  he's indicated he thinks he can answer your question.
18          Q. (BY MS. WESTFALL) Can you answer my question?
19          A. Okay. I would respectfully address the question
20  that I think the Court has ordered, and I would clarify
21  again that the requirement to have a two-thirds vote is
22  a -- we operate under Robert's Rules of Order.
23          If you look in Robert's Rules of Order, if
24  there's an established rule and you want to suspend that
25  rule, generally, it requires a two-thirds vote of those

## 43

1  present. That's per Robert's Rules of Order.
2          Now, there are exceptions to that. There are
3  times where it requires a four-fifths vote. We have
4  multiple four-fifths votes in the legislature, some of
5  them referring to what you're talking about, which is a
6  regular order of business.
7          So, when you refer to the two-thirds rule, I
8  still say there's not something that is clearly the
9  two-thirds rule.
10          We do have a rule that if you want to take
11  something out of the regular order of business,
12  according to Robert's Rules of Order -- which you said
13  what is the purpose, the purpose is to follow
14  parliamentary procedure as defined by Robert's Rules of
15  Order, which we follow, and those are the rules of the
16  parliamentary procedure that we follow.
17          Q. Why is it necessary to have that rule for the
18  Senate? What is the purpose of the rule?
19          MR. SWEETEN: You can answer as to the
20  general purpose of the rule. I think you have. You
21  don't have to give more than what is the general
22  purpose. That's what the Court has provided.
23          So, if you have additional general purpose
24  information, you can answer but you don't have to give
25  additional.

## 44

1          A. Robert's Rules of Order have been established
2  through -- I'm not -- I don't have how long they've been
3  in existence but a long time, and it was set up in order
4  that you have something where you have to determine the
5  parliamentary procedure of the order of things as they
6  should proceed.
7          I think it is the accepted method of
8  parliamentary procedure and is -- I was taught that at
9  an early age and have known parliamentary procedure for
10  a long time.
11          But under Robert's Rules of Order, unless it's
12  specifically specified, everything is a majority vote,
13  and if there's going to be an exception to that where
14  you're either suspending or you're having a special
15  request, it is elevated to a higher vote.
16          In Congress, they have to have a 60 -- a
17  three-fifths vote in order to proceed.
18          And our Senate Rules, the Robert's Rules of
19  Order, I believe, recommend a two-thirds vote but we
20  also have if a bill is in the regular order of business
21  during the first 60 days of the session, it takes a
22  four-fifths vote.
23          Q. (BY MS. WESTFALL) Turn your attention to Page
24  22, the notes of rulings under Rule 5.09.
25          A. I'm sorry?

Senator Troy Fraser - Volume 2                      June 13, 2012

---

## 45

1    Q.  Under the order of considering bills and
2   resolutions, Rule 5.09, there are notes on Page 22.  And
3   do you see the first note is, "The order of business as
4   set forth above may be changed by a two-thirds vote of
5   the Senate," and it refers to the Senate Journal and
6   1931?
7    A.  Uh-huh.
8    Q.  Does that at all relate to the Robert's Rules
9   you've just testified to or do you not know?
10    A.  I'm sorry, I can't answer that because I wasn't
11   in the Senate in 1931.  I would have loved to have been
12   but I wasn't.
13    Q.  Where do Robert's Rules come from?
14    A.  I'm sorry, I don't know that either.  I know that
15   I was taught Robert's Rules of Order as a 13 year old in
16   school.  So, they've been around at least 50ish years.
17   Past that, I don't know.
18    Q.  So, I understand your testimony is that the
19   Senate follows this two-thirds procedure in many context
20   throughout the rules based on adherence to the Robert's
21   Rules; is that right?
22        MR. SWEETEN:  Objection.  Vague.
23        You can answer.  You can answer as to the
24   general purpose of the rules.
25    A.  It is my belief that we always follow the

---

## 46

1   Robert's Rules of Order if we can but they're also
2   guided by the Senate Rules.
3        And the Senate Rules are if there's a rule of the
4   Senate and it has been established, it will be the
5   presiding rule of the Senate.
6    Q.  (BY MS. WESTFALL)  Why does the Senate generally
7   require the support of two-thirds Senators?  What is the
8   purpose of that rule?
9        MR. SWEETEN:  I think you've asked and
10   answered the question.  If you have more on the general
11   purpose, you can answer.  Otherwise, you don't have to
12   give more than what the general purpose is.
13    A.  The -- any time that a two-thirds vote is
14   required, it's because you are doing a deviation from an
15   established Senate rule.  If you're going to deviate
16   from that, you have to suspend the existing Senate rule
17   in order to move to the rule that you're talking about
18   but it could be on a multiple of issues, and it is not
19   just specific to one particular area.  The two-thirds
20   suspension vote could apply to many, many topics.
21    Q.  (BY MS. WESTFALL)  Thank you for your testimony.
22        Getting back to what is the purpose of the
23   two-thirds rule -- strike that.
24        Your Chief of Staff, Janice McCoy, testified in
25   her deposition that the purpose of this two-thirds vote

---

## 47

1   in a variety of settings, in a variety of reasons, is to
2   get general consensus in the Senate.  That was her
3   belief of the purpose of this rule.  Do you agree with
4   the testimony of Ms. McCoy?
5        MR. SWEETEN:  Objection.  Assumes facts not
6   in evidence.
7        You can answer.
8        I think he's answered as to general purpose.
9   So, I really don't think this is an appropriate question
10   but --
11    A.  I am a Senator.  I'm responsible for my vote.  I
12   vote in accordance to Senate Rules.  Senate Rules
13   require that you have to follow regular order of
14   business.  If you don't do that, then it's required a
15   two-thirds vote to either suspend that rule or suspend
16   others.
17    Q.  (BY MS. WESTFALL)  So, is it your testimony that
18   two-thirds vote is required for various reasons
19   throughout the Senate Rules because you're adhering to
20   that rule?  Is that your testimony?
21        MR. SWEETEN:  Objection.  Asked and
22   answered.  I think he's already provided an answer as to
23   the general purpose.  This has been now asked probably
24   five times.  So, I think he's answered the question.
25    A.  The two-thirds rule applies any time that you are

---

## 48

1   going to have to deviate from an existing rule of the
2   Senate.  There are multiple times and reasons you do
3   that but any time you deviate from the Senate Rules, it
4   would require at least a two-thirds vote to suspend
5   that, and occasionally a four-fifths vote.
6    Q.  (BY MS. WESTFALL)  What is the purpose of
7   requiring two-thirds vote when you are deviating from
8   the regular Senate Rules?
9    A.  The two-thirds rule is -- you know, I
10   believe, is according to Robert's Rules of Order that
11   says that if you have an existing Senate rule that
12   requires a majority vote, if you're going to deviate
13   from that and not stay within that, if you're not going
14   to observe the 48-hour printing rule, if you're not
15   going to observe the 24-hour layout rule and you want to
16   suspend that, it takes a minimum of a two-thirds vote to
17   do that.
18        So, the purpose would be that if you're going to
19   deviate, you have to use that rule to deviate.
20        MS. WESTFALL:  Would you mark this 552.
21        (Exhibit 552 marked.)
22    Q.  (BY MS. WESTFALL)  You've been handed what's been
23   marked US Exhibit 552.  Do you recognize this document?
24    A.  I believe you've handed me something that says on
25   the face Senate Rules adopted 2009, January 14th.  I'm

## 49

1     assuming that everything inside are those rules.  I have
2     not read the document but I'm assuming by you handing it
3     to me that that's what you're representing.
4         Q.  I will represent to you that it is a full,
5     complete, nonexcerpted copy of the 2009 Senate Rules.
6         A.  Okay.
7         Q.  I would like you to turn your attention to Rule
8     5.11 in the 2009 rules and Rule 5.11 in the 2011 rules.
9     And tell me when you have a chance --
10        A.  Both of them?
11        Q.  Yes.
12        A.  Okay.  5.11?
13        Q.  Yes.
14        A.  Okay.
15        Q.  I think it's Page 24 for both sets of rules, if
16    that helps.  Are you there, sir?
17        A.  I'm there.
18        Q.  I believe you testified earlier that Rule 5.11 A
19    means that any bill, resolution, et cetera, may be made
20    a special order for a future time by an affirmative vote
21    of two-thirds members present; is that right?
22            MR. SWEETEN:  Do you mean in his first
23    deposition or do you mean in this one?
24            MS. WESTFALL:  I mean today.
25            MR. SWEETEN:  Objection.  Misstates

## 50

1     testimony.
2             You can answer the question.
3         A.  5.11, as we discussed earlier, says that if
4     you're going to establish a special order after -- that
5     was not established initially in the Senate Rules, that
6     would be a deviation from the Senate Rules and would
7     require a two-thirds vote, as many, many other votes do.
8         Q.  (BY MS. WESTFALL)  And are you referring to Rule
9     5.11 A?
10        A.  Yes.
11        Q.  Is that true for both the 2009 and the 2011
12    rules?
13        A.  Unless I'm missing something, it appears that
14    both of those are exactly the same.
15        Q.  So, your testimony is yes, it applies to both
16    rules?
17        A.  I'm testifying that what I read as what you
18    represent as the rules, that both of those say exactly
19    the same thing.
20        Q.  Turning your attention to Rule 5.11 D for both
21    the 2009 and 2011 rules, could you compare those
22    sections?
23        A.  I'm sorry?
24        Q.  Could you compare 5.11 D in the 2009 rules and
25    2011 rules and tell me if there are any differences?

## 51

1         A.  I do believe it's the same.
2         Q.  What does Rule 5.11 D do?
3         A.  It says, "Notwithstanding Subsection A of this
4     rule, a bill or resolution relating to voter
5     identification requirements reported favorably from the
6     Committee of the Whole Senate may be set as a special
7     order for a time at least 24 hours after the motion is
8     adopted by a majority of the members of the Senate."
9         Q.  Why does it refer to a 24-hour period after being
10    reported from the Committee of the Whole?
11            MR. SWEETEN:  Don't answer the question.
12    You can answer the general purpose of the rule but you
13    don't have to explain the why something was done a
14    certain way or your mental impressions regarding that.
15    Okay?
16        A.  And my answer is going to be that I don't know
17    for sure other than potentially there is a 24-hour
18    layout rule of things moving forward, and I'm assuming
19    that would allow for that 24 hours.
20        Q.  (BY MS. WESTFALL)  What is the 24-hour layout
21    rule?
22            MR. SWEETEN:  You can answer as a general
23    matter of Senate procedure.
24        A.  And I'm sorry, you're getting into an area that
25    I'm -- I will tell you what I believe it to be, that

## 52

1     when a bill is reported from committee, that you have to
2     wait 24 hours layout before that bill could be
3     considered by the Senate.
4         Q.  (BY MS. WESTFALL)  What is the usual rule for how
5     long it takes to go from committee to the floor, the
6     minimum amount of time?
7         A.  I believe the -- the rule that I just stated to
8     you that I believe is the rule applies to all bills.
9         Q.  So, it's a minimum of 24 hours for all bills; is
10    that correct?
11        A.  Yes.
12        Q.  If that's the case for all bills, do you know why
13    it would have had to be included in Rule 5.11 D, that it
14    would have to specify 24 hours?
15        A.  I do not know.
16        Q.  Are there any different rules to --
17            MR. SWEETEN:  Let me -- when you -- pause
18    when you answer and let me make my objection, if it's
19    necessary.
20            THE WITNESS:  Okay.
21            MR. SWEETEN:  Okay.  Go ahead.
22        Q.  (BY MS. WESTFALL)  Do you know whether there's
23    any difference between bills reported out of the
24    Committee of the Whole Senate and other committees as to
25    the minimum amount of time that is required for the

## 53

1  layout of the bill?
2          MR. SWEETEN:  You can answer as a general
3  matter.
4      A.  My answer will have to be I am not for sure but
5  it is my belief that the same rules apply.
6      Q.  (BY MS. WESTFALL)  So, it would be 24 hours for
7  any committee, regardless of whether it's the Committee
8  of the Whole or others?
9      A.  That would be my belief.
10     Q.  Is it your understanding that under some --
11     A.  Excuse me.  I've got to move that.  Sorry.
12     Q.  Do you want to go off the record?  Are you okay?
13     A.  I'm fine.
14     Q.  Is it your understanding that bills considered in
15  the Committee of the Whole could, under some
16  circumstances, be considered immediately by the full
17  Senate?
18          MR. SWEETEN:  You can answer as a general
19  matter.
20     A.  I don't know the answer to that.
21     Q.  (BY MS. WESTFALL)  Is it your understanding that
22  Rule 5.11 D was put into place in the Senate Rules
23  before the Senate went into session in January, 2011?
24          MR. SWEETEN:  You can answer.
25     A.  Would you repeat that?

## 54

1      Q.  (BY MS. WESTFALL)  Let me strike that question.
2  Let me try a more artful question.
3          Is it your understanding that Rule 5.11 D was
4  drafted before the Senate went into session in January,
5  2011?
6      A.  No.
7      Q.  How do you know that?
8          MR. SWEETEN:  Don't reveal matters of
9  privilege in answering the question.  Do you want me to
10  go over what those areas would be?
11          THE WITNESS:  I think I'm fine in answering
12  this one.
13          MR. SWEETEN:  Okay.  Well, don't reveal
14  communications you've had with other Senators, don't
15  reveal communications you've had with leg staff,
16  agencies, TLC, and don't reveal your thoughts and mental
17  impressions when answering the question.  Those would be
18  subject to the legislative privilege.  Go ahead.
19     A.  This bill was an existing Senate rule brought
20  forward.
21     Q.  (BY MS. WESTFALL)  I'm talking about the -- I'm
22  referring you to Rule 5.11 D.
23     A.  Uh-huh.
24     Q.  Is it your testimony that because it was in the
25  2009 rules, it was in place in 2009, so, it carried

## 55

1  forward to 2011; is that right?
2      A.  That is my testimony.
3      Q.  In 2009 or 2008, when was the first time you
4  heard about the possibility of including a provision
5  like Rule 5.11 D in the 2009 rules, without revealing
6  any communications you've had with any other legislator?
7      A.  I'd like to go off the record and have a
8  discussion with counsel.
9          MR. SWEETEN:  We can discuss privilege, yes.
10          THE WITNESS:  I don't think there's a
11  problem with answering it.
12          MR. SWEETEN:  Are you going to have an issue
13  with this?  Because I'm allowed to talk to him about
14  matters relating to privilege.  The rules allow for it.
15          MS. WESTFALL:  Can you direct him on the
16  record whatever your instruction is, Mr. Sweeten.
17          THE WITNESS:  I think I'm okay to answer it.
18          MS. WESTFALL:  I have a question pending,
19  so, I'm reluctant to --
20          MR. SWEETEN:  That's fine but here's what
21  we're going to do:  If she's asking you about
22  communications that occurred that would be subjective to
23  the legislative privilege, do not reveal the substance
24  of the communications.
25          You can reveal whether you had a

## 56

1  conversation or a -- privilege log stuff, like when it
2  happened, who with, but do not reveal the substance of
3  any sort of communication about Rule 5.11.
4      A.  Would you repeat the question?
5          MS. WESTFALL:  Would you read back the
6  question, please.
7          (Whereupon, the requested testimony was read back
8  as follows:
9          QUESTION:  In 2009 or 2008, when was the first
10  time you heard about the possibility of including
11  a provision like Rule 5.11 D in the 2009 rules,
12  without revealing any communications you've had
13  with any other legislator?)
14      A.  The first I knew of this rule is when it was
15  brought forward and voted on by the Senators.
16      Q.  (BY MS. WESTFALL)  Was that in January, 2009?
17      A.  Yes.
18      Q.  You had never heard of any communication about
19  the concept of Rule 5.11 D prior to that time?
20      A.  No.
21      Q.  Was redistricting in 2003 designated as a special
22  order in the rules?
23      A.  I'm sorry, I don't know.  I believe it was but I
24  do not know.
25      Q.  Was redistricting -- was any redistricting bill

## 57

1  that you've ever been involved in, was it considered by
2  the Committee of the Whole?
3       A.  Again, I don't have a recollection.  I don't
4  remember.
5       Q.  Are you aware of any other bill besides voter ID
6  that has been both subject to being set forth as a
7  special order in the rules and considered in the
8  Committee of the Whole?
9       A.  You've asked a very broad question, and I
10 can't -- I can't give you a yes answer on that because I
11 can't say that I know of issues that were both special
12 orders and Committee of the Whole because we have had
13 some of each but I don't know that they were connected.
14 I can't say.
15      Q.  (BY MS. WESTFALL)  Was there any time in the
16 2000 -- prior to the 2009 legislature that you became
17 aware of any discussions whatsoever about amending the
18 Senate Rules for voter ID?
19           MR. SWEETEN:  Objection.  Asked and
20 answered.
21           THE WITNESS:  What did you just say?
22           MR. SWEETEN:  I just said objection.  Asked
23 and answered.
24           THE WITNESS:  That means I've already
25 answered it?

## 58

1            MR. SWEETEN:  That's my objection but you
2  can answer if you can.  I'm objecting to her question as
3  already having been asked and answered.
4       A.  My answer is the same as I just gave, that I have
5  not -- I was not made aware or hadn't discussed it prior
6  to it coming forward in the rules recommendation for a
7  vote.  It was laid out and explained prior to a vote of
8  the Senate, and that's the first I saw of it.
9       Q.  (BY MS. WESTFALL)  In 2007 -- strike that.
10          Was there a time in 2008 when you heard anything
11 about any procedures related to how voter ID would be
12 handled in the Senate in 2009?
13           MR. SWEETEN:  Objection.  Vague.  Objection.
14 Asked and answered.
15           You can answer.
16      A.  No.  The answer is no.
17      Q.  (BY MS. WESTFALL)  You sponsored the voter ID
18 bill in the Senate in 2009; isn't that right?
19      A.  Yes.
20      Q.  That was Senate Bill 362; is that correct?
21      A.  Yes.
22      Q.  Is it your testimony that you were not aware of
23 any conversations prior to the filing of that bill
24 related to how it would be considered procedurally in
25 the Senate in 2009?

## 59

1       A.  No.  You're saying were there -- was I aware of
2  it?  I was not aware of any conversations about how it
3  would be considered, no.
4            MR. SWEETEN:  Same objection to the
5  question.
6       Q.  (BY MS. WESTFALL)  Did you hear any
7  conversations in 2009 or 2010 about how voter ID bills
8  would be handled procedurally in the 2011 legislature?
9            MR. SWEETEN:  Objection.  Vague.  Objection.
10 Compound.
11      A.  I was aware that the rule would be carried -- or
12 would be recommended to be carried forward, not to be
13 removed.  I knew that the rule was in the Senate Rules.
14 And I need to clarify my answer.
15           MR. SWEETEN:  Don't reveal the substance of
16 any communications you've had with anyone.
17      A.  I need to clarify that I was aware that the rule
18 was existing in 2009.  And when the rules were laid out
19 in 2011, I read the rules, and I saw that the rule was
20 still there.  So, that was when I was aware that it
21 would be carried forward, but no, that was the only
22 communication.
23      Q.  (BY MS. WESTFALL)  So, prior to seeing the rules
24 in 2011, you were not aware of any -- not a single
25 conversation prior to that time about carrying forward

## 60

1  the rule from 2009 to 2011?
2            THE WITNESS:  Privileged communication?
3       Q.  (BY MS. WESTFALL)  Without revealing the
4  substance of the communication.
5            MR. SWEETEN:  She's asking did a
6  communication occur but don't answer as to the substance
7  of any communication, just if there was a communication.
8       A.  Yes.  Yes.
9       Q.  (BY MS. WESTFALL)  I'm sorry, we had the --
10      A.  You asked was there a communication, and the
11 answer is yes.
12      Q.  When was the first communication that you had
13 about the procedures for voter ID in 2011?
14      A.  Probably a month from session.
15      Q.  Would that be sometime in December, 2010?
16      A.  Yes.
17      Q.  Were you, yourself a party to that communication?
18      A.  Yes.
19      Q.  Who else was in the conversation?
20           THE WITNESS:  Can I answer that question?
21           MR. SWEETEN:  You can answer as to who was
22 another party to the conversation.  Do not reveal the
23 specifics.
24      A.  Senator Williams.
25      Q.  (BY MS. WESTFALL)  Was anyone else involved in

61

1   that conversation?
2       A.  No.
3       Q.  It was only the two of you?
4       A.  Yes.
5       Q.  Was that an in-person discussion?
6       A.  Yes.
7       Q.  Were your staff people there?
8       A.  I'm sorry.  Just a second.  I need to retract the
9   question about the date.  I will say it was an in-person
10   but it would have been at the start of the session
11   because I don't believe I saw him in December.  So, it
12   would have been in and around the first -- either the
13   day before or a day after the start of session would be
14   that conversation.
15       Q.  And that was the first conversation that you had
16   about procedures --
17       A.  Yes.
18       Q.  -- in regards to Senate Bill 14?
19       A.  Yes.
20       Q.  Did you have any other conversations besides that
21   one with Senator Williams about the procedures for
22   Senate Bill 14?
23       A.  No.
24       Q.  Did you have any conversations with anyone in
25   Mr. Dewhurst's office?

62

1           MR. SWEETEN:  And when you say
2   conversations, just general conversations, are you
3   asking about the timing of the --
4           MS. WESTFALL:  The procedures to be employed
5   for Senate Bill 14.
6           MR. SWEETEN:  Okay.
7       Q.  (BY MS. WESTFALL)  Did you have any conversations
8   with anyone in Mr. Dewhurst's office?
9       A.  And I'm going to qualify your question.  We
10   advised Governor Dewhurst's office --
11           MR. SWEETEN:  Do not tell her what you
12   advised or discussed or the substance of the
13   conversation.  You can tell whether you had a
14   conversation, the existence of the communication only.
15       A.  There was a one-way conversation.
16       Q.  (BY MS. WESTFALL)  Was that conversation between
17   you or your office and Mr. Dewhurst's office about
18   Senate Bill 14 --
19       A.  Yes.
20       Q.  -- prior to the session?
21       A.  Yes.
22       Q.  Was there more than one communication?
23       A.  No.
24       Q.  I believe you testified earlier that you advised
25   the Lieutenant Governor's Office that you were filing;

63

1   is that correct?
2       A.  Yes, that is what I'm referring to.
3       Q.  Was that in November or December, 2010?
4       A.  It was likely the first of December because you
5   can't file a bill until 30 days prior to, and in order
6   to establish that I was going to refile, I'm sure --
7           MR. SWEETEN:  Hold on a minute.  Do not
8   start expressing reasons for why you communicated with
9   him or the substance of that communication.  She's just
10   asking you did a communication occur.
11       A.  Approximately December the 8th of 2008 would have
12   been in that range when it would have happened.
13       Q.  (BY MS. WESTFALL)  Are you talking about 2008 or
14   2010, about 362 or --
15       A.  362 was 2008.  2010 for Senate Bill 14.
16       Q.  Did you advise the Lieutenant Governor's Office
17   approximately the same time in December --
18       A.  I'm sorry, your -- I need to retract that.  You
19   led me down a path I didn't mean to go.
20   I don't remember a communication with them on
21   362.  I do remember a communication on Senate Bill 14.
22       Q.  And that was approximately December 8, 2010; is
23   that right?
24       A.  Yes.  Yes.
25       Q.  And that was the communication between you or

64

1   your office and Mr. Dewhurst's office?
2       A.  Yes.
3       Q.  Related to the filing of Senate Bill 14; is that
4   correct?
5       A.  Yes.
6       Q.  Other than the communication with Senator
7   Williams about procedures for Senate Bill 14 in January
8   and this communication with Mr. Dewhurst, do you recall
9   any other communications with any of the members of the
10   Senate, House, Governor's Office, Lieutenant Governor's
11   Office about the filing of Senate Bill 14?
12       A.  You've asked a very broad question.  Not with the
13   Governor, not with House members but after we started
14   session, there were communication with other Senators
15   that they were aware that I had filed it.
16       Q.  Okay.  But prior to the session starting, there
17   were no other communications besides with Mr. Dewhurst's
18   office and Mr. Williams' office?
19           MR. SWEETEN:  We're talking about the '11
20   session, right?
21           MS. WESTFALL:  Correct.
22       A.  No.
23       Q.  (BY MS. WESTFALL)  May the Governor designate
24   legislation as emergency legislation?
25       A.  May as in does he have the ability?

## 65

1   Q.  Yes.
2   A.  Yes.
3   Q.  What allows the Governor to designate legislation
4   as emergency legislation?
5   A.  The Governor can -- you know, he can declare
6   anything an emergency legislation.
7       MS. WESTFALL:  Could you mark this as 553.
8       (Exhibit 553 marked.)
9   Q.  (BY MS. WESTFALL)  You've been handed what's been
10  marked US Exhibit 553.
11  Could we go off the record?
12  Q.  Certainly.
13      (Short recess.)
14      MS. WESTFALL:  Let's go back on the record.
15  Q.  (BY MS. WESTFALL)  Before the break, you had been
16  handed what's been marked as US 553.  Do you recognize
17  this document?
18  A.  Appears to be the Senate journal for Monday,
19  January 24th, began the session of 1:38 p.m.
20  Q.  This was 2011; is that correct?
21  A.  2011.
22  Q.  Turning your attention to the second page of the
23  document, which is the 54th page of the Senate Journal,
24  do you see down toward the bottom of the page it has a
25  message from the Governor?

## 66

1   A.  Yes.
2   Q.  What does that message indicate?
3   A.  Would you like me to read the message to you?
4   Q.  Or you could summarize it, whatever you'd like.
5   And I'd like to direct your attention to the first such
6   message.
7       MR. SWEETEN:  You can answer based on the
8   text of the document.
9   A.  Would you like me to describe it?
10  Q.  (BY MS. WESTFALL)  Yes, please.
11  A.  It appears that a message from the Governor was
12  read, the following message on January 20th, 2011, "I,
13  Rick Perry, Governor of the State of Texas, do hereby
14  submit the following emergency matter for immediate
15  consideration to the Senate and House of Representatives
16  of the 82nd Legislature, now convened.  Legislation that
17  requires a voter to present proof of identification when
18  voting.  Respectfully submitted, Rick Perry, Governor
19  over the State of Texas, January 20th, 2011."
20  Q.  Thank you.
21  And does that refresh your recollection as to the
22  source of the Governor's power for making emergency
23  designations of bills?
24      MR. SWEETEN:  Objection.  Foundation.  Go
25  ahead.

## 67

1   A.  It doesn't refresh my memory of the power of the
2   Governor.  I'm very aware of the power of the Governor.
3   No, it does not refresh my memory.
4   Q.  (BY MS. WESTFALL)  What is the power of the
5   Governor to designate certain areas of legislation as
6   emergency legislation?
7   A.  I'm going to clarify your question.  You're
8   asking me what power does the Governor have to specify a
9   piece of legislation?
10  The Governor has the -- he takes the authority
11  that he can declare any issue an emergency.  Generally,
12  he does not specify a specific bill, which is what you
13  referred to.
14  So, as you stated the question, that would be
15  incorrect because he generally does not mention or state
16  a specific piece of legislation.  He will specify an
17  issue.
18  Q.  Where does he get that power from?
19      MR. SWEETEN:  You can answer as a general
20  matter.
21  A.  You're asking where does the Governor get that
22  power from?
23  Q.  (BY MS. WESTFALL)  Yes.
24  A.  You're implying that he has a power.  There is no
25  power associated with it because his designation has no

## 68

1   force of power or affect.  So, I would not use the word
2   power.
3   The Governor can declare or submit -- which his
4   wording is very clear here.  He submits the following
5   emergency matter.  He submits it to the Legislature but
6   it has no force of power.
7   Q.  And referring back to his message that you just
8   testified to, do you see that it indicates that he is
9   designating voter ID as an emergency legislation under
10  his powers under the Texas Constitution?
11  A.  Your representation is not correct.  He is not
12  designating.  It very clearly says that, "Pursuant to
13  Section 5 of the Texas Constitution, by this special
14  message, I do submit the following emergency matter for
15  immediate" -- he is submitting it for consideration.
16  There is no power that goes with that that is in any way
17  implied by the Texas Constitution.
18  The Constitution allows him to declare something
19  an emergency but it has no force past that.
20  Q.  Can you explain when he designates an area of
21  legislation as emergency legislation, how does he do it?
22      MR. SWEETEN:  Do you mean -- I'm sorry --
23  Q.  (BY MS. WESTFALL)  As a general matter.
24      MR. SWEETEN:  He's not going to talk about
25  the times or the Governor's motivation in doing that.

## 69

1    That would be subject to privilege and would call for
2    speculation.
3         Are you asking in what means it's done?
4         MS. WESTFALL:  Yes.
5         Q.  (BY MS. WESTFALL)  I'm asking procedurally, how
6    does the Governor --
7         A.  You need to rephrase your question because your
8    question didn't ask that.
9         Q.  I'm going to withdraw my question and ask you,
10   procedurally, how does the Governor submit an area of
11   legislation as an emergency matter?
12        A.  I do not know the procedure that the Governor
13   does.  You know, I know when I read about it but I don't
14   know the procedure of how it's done.
15        Q.  Thank you.
16           When the Governor submits something as an
17   emergency matter to the legislature, what affect does
18   that have?
19           MR. SWEETEN:  You can answer as a general
20   procedural matter.
21        A.  None.
22        Q.  (BY MS. WESTFALL)  You can totally disregard it,
23   as a Senator?
24        A.  When you say "totally disregard," obviously, if
25   the Governor issued it, I noted that it was important to

## 70

1    him but in this case, if he would have really thought it
2    was important, I think they would have picked up the
3    phone and called me.  I read about it in the newspaper.
4         Q.  Are there any procedural consequences of the
5    Governor's designation of a particular area as emergency
6    legislation?
7            MR. SWEETEN:  You can answer as a general
8    matter.
9         A.  There's no consequences of this and, in fact,
10   there are numerous issues that are declared as emergency
11   items that never come before the Legislature.
12        Q.  (BY MS. WESTFALL)  Is it your testimony that it's
13   totally within the Senate's discretion as to how to
14   respond to an emergency designation from the Governor?
15        A.  I would agree with that observation.
16        Q.  So, you would -- strike that.
17           Emergency legislation, as designated by the
18   Governor, is not always considered within the first
19   60 days of session, is that your understanding?
20        A.  No, it is not always considered.
21        Q.  Is it usually considered within the first 60 days
22   of session?
23           MR. SWEETEN:  You can answer as a general
24   matter.
25        A.  It is not always considered, and there's --

## 71

1    occasionally, it is considered but also occasionally, it
2    is not considered in the 60 days.  So, there's not a set
3    pattern of when an issue would be considered.
4         Q.  (BY MS. WESTFALL)  Based on the public record,
5    was there any consequence to the Governor's designation
6    of proof of identification when voting as an emergency
7    legislative matter in 2011?
8            MR. SWEETEN:  Don't --
9            MS. WESTFALL:  As a matter of public record,
10   Mr. Sweeten.
11           MR. SWEETEN:  Still you're asking for his
12   thoughts, mental impressions as to what the consequence
13   of the Governor declaring this an emergency item was.
14        So, if you want to ask him if something was
15   expressed regarding that that he recalls in the public
16   record, that's one thing but you're asking him whether
17   or not -- what the procedural consequences were, and
18   that reveals legislative privilege.
19           I'm going to instruct you, on that basis,
20   not to answer the question.
21        Q.  (BY MS. WESTFALL)  Are you following advice of
22   counsel?
23        A.  I would like the question reasked again.
24           MS. WESTFALL:  Would you reread it, please,
25   Ms. Court Reporter?

## 72

1            (Whereupon, the requested testimony was read back
2    as follows:
3            QUESTION:  Based on the public record, was there
4    any consequence to the Governor's designation of
5    proof of identification when voting as an
6    emergency legislative matter in 2011?)
7            MR. SWEETEN:  If you answer the question, it
8    would reveal legislative privilege unless a specific --
9    something was uttered on the public record.
10        A.  If you'd like to ask me about the first half of
11   the question and not specify about Senate Bill 14, I
12   would be glad to answer, if you would like to repeat the
13   question up to the point that you address Senate Bill
14   14.
15        Q.  (BY MS. WESTFALL)  I'll ask a different question.
16        A.  Are you withdrawing that question?
17        Q.  I'm going to let it be.  I'm going to ask you
18   another question because I think you've asserted
19   privilege or your counsel has directed you to assert
20   privilege.
21        A.  No, I have not done that at all.  The question is
22   still before us.  I'm telling you that the question that
23   you're asking, the majority of the question I'm willing
24   to answer but as you asked it in reference to a specific
25   piece of legislation, which was Senate Bill 14, that

Senator Troy Fraser - Volume 2                           June 13, 2012

---

73

1    would you force me to assert privilege.
2         So, if you will ask me the question on the
3    general matter without it being specific to that issue,
4    I'll be glad to answer your question.
5         Q.  Thank you, sir.
6         Were there any -- strike that.
7         A.  Did you withdraw your last question?
8         Q.  No, it's pending but you've answered it, so,
9    we're on to another --
10        When the Governor designated legislation
11   requiring a voter to present proof of ID when voting in
12   January of 2011, were there any consequences or effects
13   in the Senate on the public record?
14        MR. SWEETEN:  Don't answer.
15        Objection.  Legislative privilege.
16        Q.  (BY MS. WESTFALL)  Senator, are you following the
17   advice of counsel?
18        A.  Privileged.  And I would ask you to reask the
19   question.
20        Q.  Were there any procedural consequences on the
21   record as a result of the Governor's designation of
22   voter ID as an emergency legislative matter --
23        MR. SWEETEN:  Same objection.
24        Q.  (BY MS. WESTFALL)  -- in 2011?
25        MR. SWEETEN:  Same objection on legislative

---

74

1    privilege.
2         A.  If you will ask the first part of the question as
3    a general sense about any emergency legislation and not
4    specify to Senate Bill 14, I'll be glad to answer the
5    question.
6         Q.  (BY MS. WESTFALL)  Are there any procedural
7    consequences when the Governor generally designates
8    legislation as an emergency?
9         MR. SWEETEN:  You can answer the question.
10        A.  No.
11        Q.  (BY MS. WESTFALL)  I believe you testified the
12   Senate can take it or leave it; is that right?
13        A.  Did I say that?
14        Q.  No, but I'm summarizing.
15        A.  I believe you're putting words in my mouth, and I
16   don't believe I said that.  I said there were no
17   consequences.
18        Q.  The Senate may or may not take into consideration
19   the Governor's wishes?
20        A.  The Senate will do their wishes.
21        Q.  As a general matter, when the Governor designates
22   an issue area as emergency legislation, does the Senate
23   consider such legislation within the first 60 days?
24        A.  There is no general rule.  Every issue is
25   considered on its own merit.

---

75

1         Q.  When did you first hear about the Governor
2    designating proof of voter ID in 2011 as emergency
3    legislation?
4         A.  I read about it in the paper.
5         Q.  Are you aware of any communications about the
6    Governor's designation of voter ID as emergency
7    legislation prior to it appearing in the Senate Journal?
8         A.  With who?
9         Q.  With anyone.
10        A.  I'm not aware of any communications.
11        Q.  Are you aware of any conversations or other
12   communications regarding the timing of consideration of
13   Senate Bill 14 by the Senate?
14        A.  No.
15        Q.  Are you aware of any conversations regarding
16   consideration of the Senate Bill 14 by the Committee of
17   the Whole prior to the session starting?
18        A.  Prior to the session starting?
19        Q.  Yes.
20        A.  No.
21        Q.  When did you first learn that the Committee of
22   the Whole would be considering Senate Bill 14?
23        A.  And I believe you asked me that question in the
24   last deposition, and the answer remains the same, is
25   that my recollection is that I was advised by the

---

76

1    Lieutenant Governor's office that I would be recognized
2    on Senate Bill 14 on X date.  It was about two days
3    before that happened.
4         Q.  Is it your testimony that you filed Senate Bill
5    14 before the session started and that you were not
6    aware or party to any communications about how the
7    Senate would consider Senate Bill 14 until you had that
8    conversation or communication with Mr. Dewhurst's
9    office?
10        A.  I'd like the question back.  You've got -- I've
11   got a clarification I've got to make.  I need to hear
12   the question again.
13        MS. WESTFALL:  Could you read it back?
14        (Whereupon, the requested testimony was read back
15   as follows:
16        QUESTION:  Is it your testimony that you filed
17   Senate Bill 14 before the session started and
18   that you were not aware or party to any
19   communications about how the Senate would
20   consider Senate Bill 14 until you had that
21   conversation or communication with Mr. Dewhurst's
22   office?)
23        MR. SWEETEN:  Objection.  Compound.
24        THE WITNESS:  Am I free to answer?
25        MR. SWEETEN:  Yeah, to the extent -- just

---

77

1    don't reveal legislatively privileged matter or the
2    substance of any communication.
3         A. I can't answer your question, and the reason I
4    can't answer your question is the bill that was filed
5    before session started, the one before, was given
6    another number.  I don't recall what that number was but
7    after we got into session -- or about the time we
8    started session, we refiled the exact same bill but they
9    designated a new number on the bill administratively.  I
10   don't know why that happened but we refiled the bill.
11        So, the question, as you asked it, is not
12   correct.  If you'd like to rephrase it and say the bill
13   that I filed, I'll be glad to answer your question.
14        Q. (BY MS. WESTFALL)  Thank you for your testimony.
15        Did you have any communications with anyone about
16   that previous bill prior to the session starting?
17        A. With anyone?
18        Q. With anyone.
19        A. Yes.
20        Q. When was the first conversation that you had in
21   that regard?
22        A. Probably in the summer of 2010.
23        Q. Were you a party to that communication?
24        A. Yes.
25        Q. Who else was a party to that communication?

---

78

1         A. Myself and the person that I was talking to.
2         Q. And who was that individual?
3         A. Skipper Wallace.
4         Q. That was in the summer of 2010?
5         A. It's my recollection it was sometime prior to the
6    start of the session in a three-month period.  I don't
7    remember when it was but it's my recollection that we
8    had a conversation some time prior to the session.
9         Q. Did you only have one conversation with
10   Mr. Wallace?
11        A. I can't answer that because I don't remember.
12        Q. Was anyone else a party it that conversation?
13        A. No.
14        Q. Was that a phone conversation or in-person?
15        A. In-person.
16        Q. Was that in your office?
17        A. No.  It would have likely been at a political
18   event that we were both attending, and it was a passing
19   conversation.
20        Q. Did you have any other conversations with anyone
21   besides Mr. Wallace about the previously numbered voter
22   ID bill that you were going to file in 2010 -- profile
23   in 2010 for the 2011 session?  Sorry.
24        A. Yes.
25        Q. Who else -- strike that.

---

79

1         When was that conversation?
2         A. Summer of 2010.
3         Q. Were you a party to that conversation?
4         A. Yes.
5         Q. Who else was involved in that conversation?
6         A. Myself.
7         Q. Who was the other party?
8         A. The President of the Senate of Indiana.
9         Q. What is the name of that individual?
10        A. Senator David Long.
11        Q. Was that at the meeting of Senate Presidents --
12        A. Yes.
13        Q. -- that you had testified to earlier?
14        A. Yes.
15        Q. Did you have any other conversations with anyone
16   else about the voter ID bill that you were filing?
17        A. I believe I had a conversation with the Senate
18   President from Georgia.
19        Q. Was that at that same meeting?
20        A. Same meeting.
21        Q. Are there any other conversations that you had
22   about the bill -- the voter ID bill that you were filing
23   in 2010 for the 2011 session?
24        A. Yes.
25        Q. Who was that with?

---

80

1         A. With the Senate President of Illinois, John
2    Culbertson, a Democrat.
3         Q. Were there any other conversations about the bill
4    that you were filing related to voter ID not related to
5    that meeting that you had with the Senate Presidents?
6         A. No.
7         Q. Do you receive constituent mail in your Senate
8    office?
9         A. I don't personally but I'm sure there is mail
10   that comes in to the Senate office.
11        Q. How is that mail received?  Do you receive it by
12   E-mail?  Do you receive hard copies of letters?
13        A. I don't know.  I believe that we receive, for
14   sure, postage, and I'm assuming we receive some E-mail
15   communication.  I'm not privy to that because, as I told
16   you, I don't do E-mails.
17        Q. Is there a staff person in your office who
18   handled constituent communication in 2011 for you?
19        A. Janice McCoy.
20        Q. Is she the sole person in your office who handled
21   constituent communication in 2011?
22        A. I don't know the answer to that.
23        MR. SWEETEN:  Okay.  We're going to get into
24   constituent communication, so, let's have a discussion
25   on that.

## 89

1    was restricted to discussion on the floor of the Senate.
2        Q. Did it relate to or concern people without
3    documentation in this country obtaining student IDs?
4        A. No.
5        Q. Had you ever --
6        A. I'm sorry, I need to clarify. To my knowledge, I
7    do not remember a discussion of that type.
8        Q. When did you first hear that there was a concern
9    about undocumented people having student IDs?
10           MR. SWEETEN: Objection to the extent it
11   calls for privilege.
12           A. To my knowledge, I don't remember that issue
13   being brought up other than you showing me this, that
14   someone, it appears, sent in.
15           Q. (BY MS. WESTFALL) Had Ms. McCoy ever raised the
16   issue of undocumented people having student IDs with
17   you?
18           MR. SWEETEN: Don't answer the question.
19           A. Privilege.
20       Q. (BY MS. WESTFALL) Are you following the advice
21   of counsel?
22           MR. SWEETEN: Objection. That calls for
23   privilege.
24           Don't answer the question is my instruction.
25       A. Privilege.

## 90

1        Q. (BY MS. WESTFALL) Had Ms. McCoy ever told you
2    about constituent communication or advocacy groups
3    concerned that undocumented people had student IDs?
4            MR. SWEETEN: Same objection.
5            Don't answer the question. Privileged.
6        A. Privilege.
7        Q. (BY MS. WESTFALL) Do you know whether your
8    office responded to this E-mail from Ms. Payne?
9            MR. SWEETEN: You can answer.
10       A. I do not know.
11       Q. (BY MS. WESTFALL) If Ms. McCoy had received a
12   lot of complaints and a lot of E-mails about the
13   possibility of undocumented people getting student IDs,
14   do you think she would have raised that with you?
15           MR. SWEETEN: Don't answer the question.
16   Legislative privilege.
17       Q. (BY MS. WESTFALL) Can you answer that question?
18           MR. SWEETEN: No. My instruction is do not
19   answer the question.
20       A. Privilege.
21       Q. (BY MS. WESTFALL) Do you know whether E-mails
22   sent from constituents to you are automatically routed
23   to Ms. McCoy's E-mail?
24           MR. SWEETEN: You can answer as a general
25   matter.

## 91

1        A. Yes.
2        Q. (BY MS. WESTFALL) They are, they are sent to her
3    for her response?
4        A. I think my answer is I don't know. My assumption
5    is that it is because there are no E-mails sent directly
6    to me. There are things sent to my Senate office, which
7    in the Senate office, she is the -- she runs the Senate
8    office. So, it wasn't sent directly to me. I have -- I
9    don't have things sent to me personally.
10       Q. Is it your understanding that Ms. McCoy reviews
11   all E-mails that gets sent to your E-mail address? Is
12   that right?
13       A. I didn't say that. I said I believe that they
14   are routed to her, and my assumption is that she does
15   review those.
16           MS. WESTFALL: Could you mark this as 555.
17           (Exhibit 555 marked.)
18       Q. (BY MS. WESTFALL) You've been handed what's been
19   marked as US 555. Have you seen this document before?
20       A. Have I seen this? No.
21       Q. Could you describe the E-mail message that is
22   contained in US 555?
23       A. It appears to come from someone outside of my
24   district that -- I don't even know where Needville,
25   Texas is, and I don't recognize the name of the person.

## 92

1    And he appears to have sent a message to my office.
2        Q. Could you describe the message?
3        A. He says -- he's congratulating me on a wonderful
4    voter ID bill for all legal citizens of Texas.
5        Q. Do you know whether you responded to this E-mail?
6        A. No, I do not.
7        Q. Do you know why this constituent was saying it
8    was helpful for legal citizens of Texas?
9            MR. SWEETEN: Objection. Calls for
10   speculation. Objection. Privileged.
11           Don't reveal your thoughts, mental
12   impressions about why someone would have done something
13   to the extent it would relate to any motivation about --
14           MS. WESTFALL: Mr. Sweeten, I'm asking him
15   about his understanding of why this constituent was
16   writing this E-mail. It's not about anything that's in
17   the Senator's head.
18           MR. SWEETEN: Well, he said he's never seen
19   this before in his life, he doesn't know this guy,
20   doesn't know where he's from, and now you're asking him
21   to interpret why he said something. So, that's first is
22   it's an inappropriate question, but secondly --
23           MS. WESTFALL: But that's not a basis for
24   instructing the witness not to answer.
25           MR. SWEETEN: Well, let's get to that. The

93

1   basis for instructing him not to answer is legislative
2   privilege to the extent that it would require him to
3   reveal any mental thoughts, impressions about why
4   someone would do that.
5           If in answering the question, it would
6   require him to reveal his impressions or thoughts or
7   motivations about the bill, then he can't answer the
8   question as phrased.
9       Q.  (BY MS. WESTFALL)  Do you have any understanding
10  about why this constituent would link voter ID and other
11  immigration bills in his E-mail?
12          MR. SWEETEN:  Same objection.  Same
13  instruction.
14      A.  Privilege.
15      Q.  (BY MS. WESTFALL)  Can you answer it outside of
16  any privileged information or testimony that you might
17  have?
18      A.  I don't know this person.
19      Q.  So, is your answer you don't know why he linked
20  voter ID with illegal immigration?
21          MR. SWEETEN:  Same objection.  Same
22  instruction.
23      Q.  (BY MS. WESTFALL)  Do you not know?
24      A.  Privilege.
25      Q.  Do you know whether other constituents, advocacy

94

1   groups or interest groups also saw that there was a
2   connection between the voter ID bill and immigration
3   bills?
4           MR. SWEETEN:  Same objection.  Instruct you
5   not to answer the question on the basis of legislative
6   privilege.
7       A.  Privilege.
8       Q.  (BY MS. WESTFALL)  Do you have any idea why a
9   constituent like Mr. Kucera would have connected the two
10  issues?
11          MR. SWEETEN:  Same instruction.  Don't
12  answer on the basis of privilege.  Same objection.
13          MS. WESTFALL:  Based on their motivations
14  and intents, not based on the Senator's, Mr. Sweeten.
15          MR. SWEETEN:  Same -- you're asking his
16  opinion as to why someone would do something, which
17  could invade his -- his thoughts and mental impressions
18  about a bill.  It is subject to privilege.  Same
19  instruction.  Same objection.
20          MS. WESTFALL:  Mr. Sweeten, the question is
21  about the motivation of the constituent writing the
22  letter.  It's not about the motivation of the Senator.
23          Will you withdraw your objection?
24          MR. SWEETEN:  No, absolutely not.  I'm -- my
25  objection is appropriate based upon the questions that

95

1   you're asking the Senator.
2           MS. WESTFALL:  I am not asking him to reveal
3   any of his subjective motivations in his advancement of
4   Senate Bill 14.
5           I'm asking about his opinion of why a
6   constituent would put something in an E-mail.
7           Mr. Sweeten, would you reconsider your
8   objection?
9           MR. SWEETEN:  It's the same objection.
10  First, we can go back over the reason that -- you're
11  asking for speculation.  You're also asking for him to
12  reveal his thoughts, mental impressions about why
13  someone would vote for a specific piece of legislation,
14  which implicates the legislative privilege.
15          I will not reconsider it -- I mean, I have
16  considered it again but my objection is appropriate and
17  I'm going to maintain the same objection and
18  instructions.
19      Q.  (BY MS. WESTFALL)  Without -- Senator, without
20  talking about your own motivations in advancing Senate
21  Bill 14, why do you think a constituent would praise
22  your work on voter ID based on behalf of legal citizens
23  of Texas, as opposed to illegal citizens of Texas?  Do
24  you know why he would do that?
25          MR. SWEETEN:  Same objection.  Same

96

1   instruction.  Legislative privilege and vague.  Calls
2   for speculation.
3       A.  Privilege.
4       Q.  (BY MS. WESTFALL)  Can you answer that question
5   about why the constituent would write that?
6       A.  Privilege.
7       Q.  Is your answer you don't know why the constituent
8   would link those two issues?
9           MR. SWEETEN:  Objection.  Asked and
10  answered.  Objection to the question as vague and calls
11  for speculation.  Objection based on the legislative
12  privilege.  Instruct not to answer the question.
13      A.  Privilege.
14      Q.  (BY MS. WESTFALL)  Are you following his counsel?
15      A.  Yes, I am.
16      Q.  Did you receive any other constituent
17  communications that similarly praised you for your work
18  on Senate Bill 14 on behalf of legal citizens of Texas?
19      A.  I don't see communications coming in.
20      Q.  I'm not asking about -- I guess I don't
21  understand your answer.
22          Are you aware of any other constituents who were
23  supportive of your work on voter ID because it was
24  helpful to legal citizens of Texas?
25      A.  Are you asking if people communicated to me?

## 97

1  Q.  Yes.

2  A.  By print?

3  Q.  Are you aware of any communications at all coming
4  into your office -- and I'm sure your counsel will
5  advise you that those are not privileged -- that were
6  supportive of your work on voter ID because it helped
7  legal citizens of Texas?

8  A.  Every time I go to the grocery store, someone
9  still will say something, say, "Good job on Senate Bill
10  14 or the photo ID bill."

11  Q.  Are you aware of many constituents who say this
12  is helpful on the issue of illegal immigration that you
13  passed and worked very hard on Senate Bill 14?

14  A.  People say, you know, it's a good piece of
15  legislation.  They don't go into specifics.

16  Q.  Are you aware of ever having heard any
17  constituent say to you, "Thanks for your work on voter
18  ID.  It helped.  It helps on illegal immigration"?

19  A.  I cannot give you a specific example of where
20  someone said that.

21  Q.  And looking at US 555, is this the first time
22  today sitting here in this deposition that you have
23  received a communication from a constituent -- or, I
24  guess, a resident of Texas, not a constituent, thanking
25  you for your work on voter ID because it helped on

## 98

1  immigration issues?

2  A.  What is US 55?

3  Q.  This exhibit that you're looking at now.

4  MR. SWEETEN:  555.

5  A.  Okay.  What was your question?

6  Q.  (BY MS. WESTFALL)  Is this the first time that
7  you're hearing support for your work on voter ID because
8  it helps on immigration issues, sitting here today?

9  MR. SWEETEN:  From constituents.

10  Q.  (BY MS. WESTFALL)  From constituents.

11  A.  Yes.

12  Q.  You never heard any constituents say this is
13  good, from the standpoint of immigration, until you saw
14  this letter here?

15  A.  My testimony is that I do not recall anyone
16  specifically saying that this was good for immigration
17  issues.

18  Q.  Do you recall whether Mr. Wallace saw there being
19  a connection between Senate Bill 14 and voter ID and
20  fighting illegal immigration?

21  MR. SWEETEN:  Objection.  Calls for
22  speculation but you can testify as to what Mr. Wallace
23  told you.

24  A.  No.  No communication.

25  Q.  (BY MS. WESTFALL)  Do you know whether your

## 99

1  office responded to Mr. Kucera's E-mail?

2  A.  I do not know but suspect we did not.

3  Q.  Do you know whether Ms. McCoy searched for
4  responses to constituent E-mail on voter ID and produced
5  them to your attorneys in this action?

6  A.  Yes.

7  Q.  Did she produce any such responses, to your
8  knowledge?

9  A.  I don't know.  I know that she was attempting --
10  she checked our office.  She told me she was going
11  through it and was going to return everything we had,
12  per the instructions of the Attorney General.

13  Q.  I'm sorry, also the Lieutenant Governor?

14  A.  No.  Attorney General and, I guess, the Justice
15  Department.  The request from the Court had a request,
16  and we complied with the request.

17  Q.  Thank you.

18  MS. WESTFALL:  Would you mark this US 556.

19  (Exhibit 556 marked.)

20  Q.  (BY MS. WESTFALL)  You've been handed what's been
21  marked as US 556.  Do you recognize this document?

22  A.  No.

23  Q.  Do you know a Mickey Mathis?

24  A.  No.

25  Q.  Does this appear to be an E-mail message from

## 100

1  Mickey Mathis to your office on January 21st, 2011?

2  A.  It appears that is.  I believe that's what it
3  says.

4  Q.  Is Brownwood, Texas in your district?

5  A.  Yes, it is.

6  Q.  Could you describe the message that Mr. Mathis
7  conveyed -- pardon me -- Ms. Mathis conveyed?

8  MR. SWEETEN:  You can testify based on the
9  text of the E-mail.

10  A.  "Voter ID, E verify and other anti illegal
11  immigration bills are crucial to this State.  24 percent
12  of the population is on some kind of social program.
13  Schools, communities and our state government are all
14  overdrawn at the bank.  Stop the invasion.  Clean out
15  the welfare rolls.  Verify who is in this state.
16  Washington has stopped deporting.  Texas has to tighten
17  up and toughen up now."

18  Q.  Do you recall whether Ms. McCoy ever showed this
19  E-mail to you?

20  A.  I've never seen this E-mail.

21  Q.  Do you recall whether Ms. McCoy ever described
22  the sentiments expressed in this E-mail to you?

23  MR. SWEETEN:  Objection.  Privilege.
24  Don't answer.  Instruct you not to answer.

25  Q.  (BY MS. WESTFALL)  Are you following the advice

## 101

1   of counsel?

2        A.  Privilege.  Privilege.

3        Q.  Do you know whether you responded to this E-mail?

4        A.  I do not know.

5        Q.  Do you know why Ms. Mathis saw that voter ID, E

6   verify and other illegal immigration bills, as she puts

7   it, were all connected topically?

8            MR. SWEETEN:  Objection.  Calls for

9   speculation.  Objection.  Vague.  Objection.  Calls for

10  matters of legislative privilege.  Instruct not to

11  answer on that basis.

12       Q.  (BY MS. WESTFALL)  To the extent that you can

13  answer without revealing your mental impressions, could

14  you answer the question?

15           MR. SWEETEN:  Same obstruction.

16       A.  If you will reword the question, and it's not

17  privileged, I'll be glad to.

18       Q.  (BY MS. WESTFALL)  Senator, without testifying as

19  to your mental impressions of this E-mail, could you

20  explain why Ms. Mathis is connecting voter ID, E verify

21  and illegal immigration bills topically in her E-mail?

22           MR. SWEETEN:  Objection.  Vague.  Objection.

23  Calls for speculation.  Objection.  Subject to the

24  legislative privilege.

25           Don't reveal your thoughts, mental

## 102

1   impressions, motivations, analysis recording any sort of

2   legislation, including Senate Bill 14.

3            MS. WESTFALL:  Mr. Sweeten, the question

4   itself excludes any mental impressions that the Senator

5   may have in the response.

6            MR. SWEETEN:  To the extent that you would

7   not reveal privilege --

8        A.  I can't answer the question without a -- giving a

9   privilege, I'm sorry, I cannot answer that question.

10           MS. WESTFALL:  Would you mark this as 557.

11           (Exhibit 557 marked.)

12       Q.  (BY MS. WESTFALL)  You've been handed what's been

13  marked US 557.  Do you recognize this document?

14       A.  I'm sorry?

15       Q.  Do you recognize this document?

16       A.  I've never seen it.

17       Q.  Do you know Catherine Engelbrecht?

18       A.  I do not.

19       Q.  You've never heard of her?

20       A.  No.

21       Q.  Do you know who the King Street Patriots are?

22       A.  No.

23       Q.  Do you know who True the Vote is?

24       A.  What?

25       Q.  True the Vote, the organization.

## 103

1        A.  No.

2        Q.  Never heard of it?

3        A.  No.

4        Q.  Did Ms. McCoy tell you anything about the

5   existence of this communication, without revealing any

6   private conversations you've had with Ms. McCoy?

7        A.  No communications with Ms. McCoy on this.

8        Q.  Do you see that it indicates in the second

9   paragraph if you ever have any need of incident reports,

10  Catherine Engelbrecht of King Street Patriots would be

11  willing to provide you with empirical evidence?  Do you

12  see in that E-mail it does, sir?

13       A.  I read that she said that, yes.

14       Q.  Pardon?

15       A.  I read that she said that, yes.

16       Q.  Could you describe the E-mail that she sent to

17  you?

18       A.  I can read you what it says.  "If you ever have

19  need of any of our incident reports to provide the

20  empirical evidence I heard requested so often today,

21  please let me know.  We would be happy to provide you

22  with any of our documentation."

23       Q.  And could you tell me what date on which this

24  E-mail appears to have been sent?

25       A.  Looks like January the 25th.

## 104

1        Q.  Do you know whether there was any response from

2   your office to this E-mail?

3        A.  I do not know.

4        Q.  Do you know whether Ms. Engelbrecht ever sent to

5   you any incident reports she had related to Senate Bill

6   14?

7        A.  I do not.  No, I do not know, and I have no

8   indication that she sent anything.

9        Q.  Are you familiar with an organization called

10  Empower Texans?

11       A.  I have heard of Empower Texans but I'm not

12  familiar with them.

13       Q.  Have you ever had any communications with anyone

14  at Empower Texans?

15       A.  Since I don't know who the group is, I don't know

16  the individuals involved, so, my answer would have to be

17  no.

18       Q.  To the extent you know, do you know what Empower

19  Texans is?

20       A.  No.

21       Q.  Do you know Michael Quinn Sullivan?

22       A.  I know the name.

23       Q.  Who is he?

24       A.  He is a person named Michael Quinn Sullivan.

25       Q.  Do you know whether he represents a group or

## 109

1  some of the amendments will be added to the bill to
2  address issues that critics said would unfairly affect
3  minorities, people with disabilities and the elderly.
4  Those changes, Fraser said, will ensure it passes muster
5  with the Justice Department, although both he and
6  Dewhurst said they believe the bill as passed Tuesday
7  would be approved under the Voting Rights Act."
8      Q.  Thank you.
9      Did you say something to that effect, do you
10 recall?
11     A.  No.  I don't -- there -- I do not remember making
12 this quote to the AUSTIN AMERICAN STATESMAN.
13     Q.  Do you remember saying anything to that effect?
14     A.  I do remember that we were looking at issues,
15 making sure that we had looked at these issues.
16     Q.  Were any amendments passed that would help
17 address what critics said would unfairly affect
18 minorities?
19         MR. SWEETEN:  Objection.  Don't answer on
20 the basis of legislative privilege.
21     Q.  (BY MS. WESTFALL) Can you answer without --
22     A.  Privilege.  If you want to restate the
23 question --
24     Q.  Without revealing any mental impressions,
25 conversations with other Legislators and based on the

## 110

1  public record, are there any amendments that were
2  incorporated into Senate Bill 14 that addressed critics
3  that the bill would hurt minorities voters?
4         MR. SWEETEN:  Objection.  Calls for matters
5  of privilege.  You're still asking for his mental
6  impressions and his assessment.  Even though I realize
7  the preface of the question intends not to do so, it
8  still does so.  Therefore, objection.  Privilege.
9  Instruct not to the answer.
10     A.  Privilege.
11         MS. WESTFALL:  Okay.  No further questions
12 at this time.
13     I'm going to turn it over to Mr. Dunn.
14     Mr. Dunn, would you like to sit here?
15         MR. DUNN:  I'm not going to ask any
16 questions.
17         MR. SWEETEN:  We will reserve questions
18 until the time of trial.
19         (Whereupon at 3:49 p.m. the
20         deposition was concluded.)
21
22
23
24
25

## 111

1              E R R A T A   S H E E T
2
3  Correction                  Page    Line
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24
25

## 112

1      I, SENATOR TROY FRASER, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.
2
3  _____
4      SENATOR TROY FRASER
THE STATE OF _____
5  COUNTY OF _____
6  Before me, _____, on this day personally
appeared SENATOR TROY FRASER, known to me (or proved to
7  me under oath or through _____) (description of
identity card or other document) to be the person whose
8  name is subscribed to the foregoing instrument and
acknowledged to me that they executed the same for the
9  purposes and consideration therein expressed.
10 Given under my hand and seal of office this _____ day
of _____, _____.
11
_____
12 NOTARY PUBLIC IN AND FOR
THE STATE OF _____
13
14
15
16
17
18
19
20
21
22
23
24
25

Tanya Aguilar Garduno                                    June 13, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                  )
                                 )
          Plaintiff,             )
                                 )
VS.                              )
                                 )
ERIC H. HOLDER, JR. in his       )
official capacity as Attorney    )
General of the United States,    )
                                 )
          Defendant,             )
                                 )
ERIC KENNIE, et al,              )
                                 )
     Defendant-Intervenors,      )
                                 )
TEXAS STATE CONFERENCE OF        )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                  )  (RMC-DST-RLW)
                                 )  Three-Judge Court
     Defendant-Intervenors,      )
                                 )
TEXAS LEAGUE OF YOUNG VOTERS     )
EDUCATION FUND, et al,           )
                                 )
     Defendant-Intervenors,      )
                                 )
TEXAS LEGISLATIVE BLACK          )
CAUCUS, et al,                   )
                                 )
     Defendant-Intervenors,      )
                                 )
VICTORIA RODRIGUEZ, et al.,      )
                                 )
     Defendant-Intervenors,      )
*****************************************
            ORAL DEPOSITION OF
         SOUTHWEST WORKERS UNION
            TANYA AGUILAR GARDUNO
               JUNE 13, 2012
*****************************************

## 2

1        ORAL DEPOSITION OF TANYA AGUILAR GARDUNO, produced

2   as a witness at the instance of the Defendant, was duly

3   sworn, was taken in the above-styled and numbered cause

4   on the JUNE 13, 2012, from 9:30 a.m. to 1:08 p.m.,

5   before Chris Carpenter, CSR, in and for the State of

6   Texas, reported by machine shorthand, at the offices of

7   Esquire Deposition Solutions, 9901 IH 10 West, Suite

8   800, San Antonio, TX 78230, pursuant to the Federal

9   Rules of Civil Procedure and the provisions stated on

10  the record or attached hereto.

## 3

 1
 2
 3            A P P E A R A N C E S
 4   FOR THE PLAINTIFF, STATE OF TEXAS:
 5      Reynolds Brissenden
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 6      P.O. Box 12548
        Austin, TX 78711-2548
 7

        209 West 14th Street
 8      8th Floor
        Austin, TX 78701
 9      (512) 936-1307
        reynolds.brissenden@texasattorneygeneral.gov
10
11   FOR THE DEFENDANT, HOLDER, ET AL:
12      Michelle McLeod
        U.S. DEPARTMENT OF JUSTICE
13      950 Pennsylvania Avenue, NW
        NWB - Room 7202
14      Washington, DC 20530
        (202) 305-7766
15      michelle.mcleod@usdoj.gov
16   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
     NAACP:
17
        Donita Judge
18      ADVANCEMENT PROJECT
        1220 I. Street, N.W.
19      Suite 850
        Washington, DC 20005
20      (202) 728-9557
        djudge@advancementproject.org
21
22
23
24
25

## 4

 1                 INDEX
 2   Appearances.......................................3
 3   TANYA AGUILAR GARDUNO
 4      Examination by Mr. Brissenden...............5
 5   Signature and Changes..........................120
 6   Reporter's Certificate.........................122
 7              EXHIBITS
 8   NO. DESCRIPTION                       PAGE MARKED
 9    1   Deposition Notice                15
10    2   Applicants' Motion t Add the Southwest      53
          Workers Union and La Union Del Pueblo
11        Entero As Defendant Intervenors
12    3   Responses to State of Texas' First Set of   83
          Interrogatories to the League of Women
13        Voters of Texas, Justice Seekers
          Southwest Workers Union and La Union Del
14        Pueblo Entero
15    4   E-Mail, Jan. 20, 2011            89
16    5   E-Mail Chain, Feb. 8, 2012       93
17    6   E-Mail, Feb. 8, 2012, and Attachments   101
18    7   MALDEF Form                      106
19    8   MALDEF Explanation of Texas Mandatory      106
          Requirements at the Polls
20
21    9   E-Mail, Sept. 21, 2011           108
22   10   E-Mail, Sept. 21, 2011           112
23   11   E-Mail, July 11, 2011            116
24
25

Tanya Aguilar Garduno                                    June 13, 2012

## 5

1    THE REPORTER:  Will all counsel present
2  please make their announcements.
3    MR. BRISSENDEN:  Reynolds Brissenden for
4  the State of Texas.
5    MS. JUDGE:  Donita Judge, Defendant
6  Intervenors, Texas Legislative Black Caucus.
7    MS. McLEOD:  Michelle McLeod with the
8  Department of Justice for the Defendant, Eric Holder.
9    TANYA AGUILAR GARDUNO,
10  having been first duly sworn to testify the truth, the
11  whole truth, and nothing but the truth, testified as
12  follows:
13    EXAMINATION
14  BY MR. BRISSENDEN:
15    Q.  Could you please state your full legal name?
16    A.  Tanya Aguilar Garduno.
17    Q.  And how would you prefer that I call today, by
18  what name?
19    A.  My first name, Tanya.
20    Q.  Tanya?
21    A.  Yes.
22    Q.  Okay.  Have you ever been deposed before today?
23    A.  No.
24    Q.  All right.  As you can see, the court reporter
25  is here sitting next to you, and he is transcribing

## 6

1  everything that we say here today, and so it will be
2  important that we not talk at the same time, because
3  he'll get mad at us.  Okay?  So before you answer a
4  question, if you could just wait until I'm finished with
5  my question, give your answer, then it will be a lot
6  cleaner.  Okay?
7    A.  Okay.
8    Q.  Also, since the court reporter is transcribing
9  everything that we say, he can't record nods of the
10  head, so it will be important for you to answer "yes" or
11  "no" rather than shaking your head up or down or saying
12  "uh-huh" or "nuh-uh," because it's really hard for the
13  court reporter to record that.  Do you understand?
14    A.  Yes, I do.
15    Q.  All right.  If during the course of the
16  deposition today you don't understand a question that I
17  ask, feel free to let me know.  I'll try my best to
18  rephrase it.  If you answer the question, I assume
19  that you understood the question.  Okay?
20    A.  Okay.
21    Q.  Is there any reason, as you sit here today,
22  that you would not able to understand the questions that
23  I ask of you in terms of:  Are you taking any
24  medications?
25    A.  No.

## 7

1    Q.  Okay.  Does that seem like a strange question?
2    A.  Yes.
3    Q.  Okay.  Well, some witnesses, they are taking
4  medications, and in the past, we've had some issues, not
5  in this case, but in others, where a witness might not
6  be able to understand or remember certain events due to
7  their medications.  So that doesn't like that's going be
8  an issue here today, right?
9    A.  Okay.
10    Q.  All right.  This is a deposition that's a
11  little bit different than a normal deposition.  It's
12  called a 30(b)(6) deposition.  Have you ever heard of
13  that term before?
14    A.  No.
15    Q.  Okay.  And what this deposition is, is -- it's
16  a deposition of the Southwest Workers Union as an
17  organization, and I assume you are a member of the
18  organization?
19    A.  Yes.
20    Q.  And are you employed there?
21    A.  Yes.
22    Q.  What is your position there?
23    A.  Community organizer.
24    Q.  Are you a staff member?
25    A.  Yes.

## 8

1    Q.  And so today, I will be asking you a series of
2  questions at it pertains to Southwest Workers Union
3  organization as a whole.  Do you understand that?
4    A.  Yes.
5    Q.  All right.  And you understand that you have
6  been designated as a representative for Southwest
7  Workers Union to testify here today?
8    A.  Yes.
9    Q.  All right.  Have you done anything to prepare
10  for your deposition today?
11    A.  Talked to my attorney.
12    Q.  All right.  Besides talking with your attorney,
13  have you reviewed any documents?
14    A.  Just the documents my attorneys gave me.
15    Q.  All right.  Did you meet with any staff members
16  in your office?
17    A.  Yes.
18    Q.  And who did you meet with?
19    A.  My director.
20    Q.  And what is his name?
21    A.  Genaro Lopez Rendon.  G-e-n-a-r-o, Lopez,
22  Rendon, R-e-n-d-o-n.
23    Q.  When did you meet with -- is it Genaro?
24    A.  Genaro.
25    Q.  Genaro?  When did meet with him?

Tanya Aguilar Garduno                                                June 13, 2012

## 13

1    Q.  All right.  A deposition transcript would be a
2    document that would contain a number of questions and
3    followed by answers.  Have you reviewed any document
4    like that?
5    A.  No.
6    Q.  What other documents did you review in your
7    meeting with Genaro?
8    A.  I would say that's it.
9    Q.  Did you review any e-mails?
10        MS. JUDGE:  Objection, vague.
11   (By Mr. Brissenden) You know what an e-mail is?
12   A.  I do.
13   Q.  All right.  Then did you review any e-mails?
14   A.  No.
15        MS. JUDGE:  Objection, vague.
16   A.  Yeah.  Just kind of...
17   Q.  (By Mr. Brissenden) Okay.  Let's -- did you --
18   besides the two-hour meeting with Genaro, did you meet
19   with anybody else besides your lawyer?
20   A.  No.
21   Q.  Did you talk with any of the other intervenor
22   groups?
23   A.  No.
24   Q.  Did you tell anybody you were giving your
25   deposition here today?

## 14

1    A.  Yes.
2    Q.  All right.  And who was that?
3    A.  Other staff members.
4    Q.  And who was that?
5    A.  Do you want me to list my whole staff?
6    Q.  Sure.
7    A.  I mean, like, I have to go through the whole
8    list?  Laura, L-a-u-r-a, Muriada, M-u-r-i-a-d-a.  Diana
9    Lopez.  Sandra Garcia.  Joaquin Abrego, A-b-r-e-g-o, and
10   Marco -- what's his last name?  I always forget his last
11   name.  I don't remember his last name right now.  Those
12   staffers that I let know because I wasn't going to be in
13   the office today.
14   Q.  All right.  And you understand that we're here
15   to take your deposition in a case that is pending in the
16   United States District Court in the District of
17   Columbia, that is the State of Texas versus Eric Holder?
18   A.  Yes.
19   Q.  All right.  And you understand that this case
20   involves the Department of Justice's denial of
21   preclearance of Senate Bill 14, the voter ID bill that
22   passed in the Texas Legislature in the 2011 session?
23   A.  Yes.
24   Q.  In terms of Southwest Workers Union's
25   involvement with SB 14, were you the person who has the

## 15

1    most knowledge about Southwest Workers Union's work on
2    that issue?
3    A.  Yes.
4    Q.  Was there anybody else from Southwest Workers
5    Union that was involved with any work that pertained to
6    SB 14?
7    A.  Could you be more specific?
8    Q.  Well, in terms of the passage of SB 14 and the
9    voter ID bill that passed through the legislature, was
10   there anybody else from Southwest Workers Union that had
11   done any work on behalf of Southwest Workers Union
12   either supporting or opposing the bill, either way?
13   A.  No.
14   Q.  Okay.  So in terms of when it came to SB 14,
15   you were the primary person that was involved?
16   A.  Yes.
17        (Exhibit 1 marked for identification.)
18   (By Mr. Brissenden) I'm handing you what's been
19   marked as Exhibit 1, and this is a notice of deposition
20   of Southwest Workers Union.  This is a document that you
21   were talking about just a minute ago?
22   A.  Yes.
23        MS. McLEOD:  Do you have another copy?
24        MR. BRISSENDEN:  Actually, I do.
25   Q.  (By Mr. Brissenden) Directing your attention to

## 16

1    the second page of the deposition notice, you'll see
2    there, there is a list of different topics that we plan
3    to discuss today in the deposition.  Do you see that?
4    A.  Yes.
5    Q.  And are you prepared to talk about each one of
6    these topics that are listed, numbers 1 through 11?
7    A.  Yes.
8    Q.  And you have been designated here today to talk
9    about each one of these topics?
10        MS. JUDGE:  Objection, vague.
11   Q.  (By Mr. Brissenden) You may answer.
12   A.  Yes.
13   Q.  Set that aside for now.
14       What is Southwest Workers Union?
15   A.  It's a community organization.
16   Q.  How long has it existed?
17   A.  This year, 25 years.
18   Q.  How long have you been an employee of Southwest
19   Workers Union?
20   A.  For four years.
21   Q.  And is that a full time or part-time position?
22   A.  From the beginning.
23   Q.  Currently, are you working there full time?
24   A.  Yes.
25   Q.  When you hired on four years ago, was that a

Tanya Aguilar Garduno                                    June 13, 2012

## 17

1   full time or a part-time position?
2       A.   Part time.
3       Q.   And when did you become full time?
4       A.   2010?  Or -- yeah, 2010.  Yes.
5       Q.   Are you currently paid by Southwest Workers
6   Union as a staff member?
7       A.   Yes.
8       Q.   Is that position there an hourly or salary --
9   hourly or a salaried position?
10      A.   It's a salaried position.
11      Q.   When you started working Southwest Workers
12   Union four years ago part time, was that a paid
13   position?
14      A.   It was both, volunteer and paid position.
15      Q.   What do you mean by that?
16      A.   I would volunteer maybe ten hours a week, 15
17   hours a week, and then, you know, got paid -- I think I
18   got paid 20 hours a week.  But I would also volunteer.
19      Q.   You worked part time for 20 hours, but actually
20   volunteered more time than just the 20 hours?
21      A.   Yeah.
22           MS. JUDGE:  Objection, asked and answered.
23      Q.   (By Mr. Brissenden) Is that accurate?
24      A.   Yes.
25      Q.   What is your current title at Southwest Workers

## 18

1   Union?
2           MS. JUDGE:  Objection, asked and answered.
3       Q.   (By Mr. Brissenden) You may answer.
4       A.   Community organizer.
5       Q.   Have you held any other titles at Southwest
6   Workers Union?
7       A.   Volunteer.
8       Q.   Any others?
9       A.   No.
10      Q.   When did you take on the title of community
11   organizer?
12      A.   2010.
13      Q.   Is that around the time you became full time?
14      A.   Yes.
15      Q.   What are your duties or responsibilities as a
16   community organizer?
17      A.   I could go on.  I work with our membership base
18   and beyond at this point, and working in -- around civic
19   engagement issues in the community, educating and doing
20   voter registration, you know, just letting folks know
21   what's up at, you know, at the polls, what they're going
22   to be voting on.  I mean, I run staff meetings.
23           I -- I don't know.  I mean, I water the
24   garden.  I pull weeds.  I put information packets
25   together.  I also work with other organizations with the

## 19

1   networks.  Communications.  I update our website.  I
2   don't know what else I do; I feel like I do a lot.  I
3   work closely with my director, helping him out.  Yeah, I
4   mean, I'm a secretary.  I answer the phones and take
5   messages.  What else?  I mean, yeah.
6       Q.   All right.  So quite a spectrum of work.
7            When it comes to working on issues that
8   Southwest Workers Union is interested in, are those
9   issues assigned to different individuals?
10           MS. JUDGE:  Objection, vague.
11      Q.   (By Mr. Brissenden) Do you understand my
12   question?
13      A.   No.
14      Q.   All right.  If there are issues that Southwest
15   Workers Union is interested in or is following, does
16   Genaro assign those issues to different individuals
17   within the organization?
18      A.   I would say not -- no.
19      Q.   How many members does Southwest Workers Union
20   have?
21      A.   2,500 to 3,000.
22      Q.   And can you describe Southwest Workers Union's
23   membership base?
24      A.   School workers, youth, women, and people of
25   color, low income communities.

## 20

1       Q.   Is the membership base comprised of any other
2   individuals other than what you've just described?
3       A.   As we get older, old folks, elderly, I guess.
4   I mean, that's true a little.
5       Q.   And you've described -- let me back up.
6            First of all, is Southwest Workers Union a
7   community organization?
8       A.   Yes.
9       Q.   All right.  Where is it located?
10      A.   1416 East Commerce, San Antonio, Texas.
11      Q.   I'm sorry.  You said 1413?
12      A.   16.
13      Q.   Commerce?
14      A.   Uh-huh.
15      Q.   Does it have any other locations?
16      A.   No.
17      Q.   Do you work at the 1416 Commerce location?
18      A.   Yes.
19      Q.   What -- if I went to 1416 Commerce, what would
20   I -- what would I see if I drove out?
21           MS. JUDGE:  Speculate -- I'm sorry.
22   Objection, vague.
23      Q.   (By Mr. Brissenden) And what type of
24   building -- is there -- first of all, is there a
25   building there?

Tanya Aguilar Garduno                                    June 13, 2012

## 21

1   A.  Yes.
2   Q.  Can you describe the building for me?
3   A.  It's a two-story building.
4   Q.  Does Southwest Workers Union share that
5   building with anybody else?
6   A.  Yes.
7   Q.  Who else?
8   A.  Centro Por La Justicia.  It's C-e-n-t-r-o,
9   second word, Por, P-o-r, L-a, Justicia, which is Justice
10  in Spanish, J-u-s-t-i-c-i-a.
11  Q.  Any other -- does it share the building with
12  anybody else?
13  A.  No.
14  Q.  What is that organization?
15      MS. JUDGE:  Objection, calls for
16  speculation.
17  Q.  (By Mr. Brissenden) Do you know what they do?
18  A.  Not completely.  Like a finance, I guess.  I'm
19  not sure.  They're like finances.
20  Q.  You're not employed there?
21  A.  No.
22      MS. JUDGE:  Objection, asked and answered.
23  **Q.  (By Mr. Brissenden) What is the mission of**
24  **Southwest Workers Union?**
25  **A.  To empower our community, school workers,**

## 22

1   **youth, women, through social justice.**
2   **Q.  Are the members of Southwest Workers Union**
3   **primarily Latino?**
4   **A.  Yes.**
5   Q.  What percentage of its members are school
6   workers, do you know?
7       MS. JUDGE:  Objection, speculation.
8   A.  I would say like it's 30 percent, to ballpark
9   it.
10  Q.  (By Mr. Brissenden) Sure.  And I'm not asking
11  for exact figures.  I'm just -- a rough -- rough
12  estimates would be fine.
13      Okay.  And in terms of youth, what --
14  approximately what percentage of Southwest Workers
15  Union's members are youth?
16      MS. JUDGE:  Objection, speculation.
17  Q.  (By Mr. Brissenden) You may answer.
18  A.  I mean, 20 percent.
19  Q.  And women?
20      MS. JUDGE:  Objection, speculation.
21  A.  Almost the whole organization.
22  Q.  (By Mr. Brissenden) Low income.  Do you know
23  what percentage --
24      MS. JUDGE:  Objection, speculation.
25  Q.  (By Mr. Brissenden) -- would fall in that

## 23

1   category?
2       MS. JUDGE:  I'm sorry.  I thought you were
3   finished.
4   A.  I would say all of them.
5   Q.  (By Mr. Brissenden) And in terms of elderly,
6   what percentage of Southwest Workers Union would fall
7   into the elderly category?
8       MS. JUDGE:  Objection, speculation.
9   A.  I don't feel like I can answer that.  I don't
10  -- like, I think that's something new for our
11  organization.  I think there's a lot of -- there's a lot
12  of old folks.  There's a -- I mean, maybe 20 percent, 30
13  percent, something.
14  Q.  (By Mr. Brissenden) And the other group of
15  members you said that Southwest Workers Union represents
16  are people of color?
17  A.  Uh-huh.
18  Q.  And can you be more specific?
19  A.  I mean, you've ask it before.
20      MS. JUDGE:  Objection, speculation.
21  A.  The Latino community.  We have African American
22  members.
23  Q.  (By Mr. Brissenden) Any other?
24  A.  It's largely comprised of.
25  Q.  Do you know what percentage of members of

## 24

1   Southwest Workers Union are Latino?
2       MS. JUDGE:  Objection, speculation.
3   Objection, asked and answered.
4   Q.  (By Mr. Brissenden) You may answer.
5   A.  80, 90, 95 percent, something like that.
6   Q.  And do you know what percentage would be
7   African American?
8       MS. JUDGE:  Objection, speculation.
9   Objection, asked and answered.
10  Q.  (By Mr. Brissenden) Do you know?
11  A.  10 percent.
12      MS. JUDGE:  Do you mind if we take a
13  break?  I'd just have a minute with my client?  Would
14  that -- just a minute, please.
15      MR. BRISSENDEN:  Sure.
16      (Recess from 10:04 a.m. to 10:05 a.m.)
17      MR. BRISSENDEN:  Ready to proceed?
18      THE WITNESS:  Yes.
19  Q.  (By Mr. Brissenden) I believe you testified
20  earlier that you are a member of Southwest Workers
21  Union?  Is that correct?
22  A.  Yes.
23  Q.  And you're a staff member, correct?
24  A.  Yes.
25      MS. JUDGE:  Objection, asked --

Tanya Aguilar Garduno                                              June 13, 2012

## 41

1   this particular meeting that your witness has just
2   described, and I'm simply asking:  As a result of that
3   meeting, did you come back to your office at Southwest
4   Workers Union and take any steps that related to voter
5   ID legislation?
6        A.   Could you repeat the question?
7             MR. BRISSENDEN:  Can you read the question
8   back?
9             (Requested portion was read back by the
10   court reporter.)
11        A.   Yes.
12        Q.   (By Mr. Brissenden) And what steps did you
13   take?
14        A.   Well, I talked to my staff about what was said
15   at the meeting, and we talked about, you know, this
16   bill, and at that point, we had just said that we were
17   going to be watching it and seeing where it went.
18             THE WITNESS:  Can we take a break?
19             MR. BRISSENDEN:  Certainly.
20             (Recess from 10:37 a.m. to 10:45 a.m.)
21        Q.   (By Mr. Brissenden) All right.  We're back on
22   the record after having taken a short break.
23             Are you ready to proceed?
24        A.   Yes.
25        Q.   Before the break, we talked about Southwest

## 42

1   Workers Union, who its members are, and we talked a
2   little bit about the 2011 legislative session.  I want
3   to talk to you about the voter ID legislation and in
4   particular SB 14.
5             Are you familiar with Senate Bill 14?
6        A.   Yes.
7        Q.   And are you familiar with the forms of
8   identification that it allows?
9        A.   Yes.
10        Q.   As you sit here today, do you know whether any
11   of the Southwest Workers Union's members lack the forms
12   of photo ID that are identified in Senate Bill 14?
13        A.   Yes.
14        Q.   Have you undertaken any analysis to make that
15   determination?
16        A.   Could you be more specific?
17        Q.   Well, you've indicated that you do know whether
18   any of the members of Southwest Workers Union lack the
19   forms of photo ID.  Have you undertaken an analysis to
20   make in that determination?
21        A.   What do you mean, analysis?
22        Q.   Have you done to anything to determine whether
23   or not your members have those forms of ID or not?
24        A.   I wouldn't say analysis.  I would say people
25   called me, they called me on the phone.  People called

## 43

1   me.  I didn't analyze the phone calls, and I'm not --
2   I'm not really clear on what you're asking me.
3        Q.   Well, you've testified that you do know whether
4   or not Southwest Workers Union members lack the forms of
5   ID that are specified in SB 14, and so my follow-up
6   question is:  What efforts did you or what steps did you
7   take to make that determination?
8             MS. JUDGE:  I think -- objection.  I think
9   you're mischaracterizing what my client has basically
10   said.
11             You're free to answer, but I'm going to
12   object.
13        A.   I guess -- sorry.  Membership, and, you know,
14   community members called me and told me that they were
15   concerned about this particular policy because they
16   themselves didn't have a photo ID and/or knew of other
17   people that didn't.
18        Q.   (By Mr. Brissenden) Did you keep a log of the
19   people who called your office?
20        A.   Somewhat.  Sometimes people just call randomly
21   because they know the organization and just tell us
22   stuff, so...
23        Q.   And when people call, did you write down their
24   names?
25        A.   Some of them I did.

## 44

1        Q.   Okay.  And approximately how many called?
2        A.   When?
3             MS. JUDGE:  Objection, vague.
4        A.   Yeah.
5        Q.   (By Mr. Brissenden) Well, you just made mention
6   that people would call your office, and I'm asking you
7   in terms of numbers, approximately how many people
8   called your office?
9             MS. JUDGE:  Objection, vague.
10        A.   Can you rephrase the question?  Or not
11   rephrase, but repeat it?
12             MR. BRISSENDEN:  Can you read back the
13   question?
14             (Requested portion was read back by the
15   court reporter.)
16        A.   It could be anywhere from 20 to 30, approximate
17   on the numbers.  But they didn't always talk to me.
18        Q.   (By Mr. Brissenden) Do you know they would
19   have spoken with, other than yourself?
20        A.   Staff members.
21        Q.   Specifically, do you know who -- what other
22   staff members would have spoken with your members who
23   called in about -- with concerns about the legislation?
24        A.   I don't know.  Whoever picked up the phone.
25        Q.   Besides receiving the 20 to 30 phone calls that

Tanya Aguilar Garduno                                    June 13, 2012

## 45

1  you just mentioned, did Southwest Workers Union do
2  anything else to make a determination of whether or not
3  its members would be affected by SB 14?
4          MS. JUDGE:  Objection, vague.
5       A.  We read just reports, and we also followed
6  reports on, I guess, basically who would be affected by
7  this bill that different people were putting out at the
8  time.
9       Q.  (By Mr. Brissenden) Anything else?
10      A.  Not that I can think of.
11      Q.  How many reports did you review?
12      A.  I don't know.
13      Q.  And who were the authors of the report, the
14 reports?
15      A.  I don't know.
16      Q.  These were not reports that Southwest Workers
17 Union prepared?
18      A.  That's correct.
19      Q.  Were there any reports that addressed or
20 analyzed SB 14 as to Southwest Workers Union members
21 specifically?
22      A.  That we produced?
23      Q.  Well, my question is:  In terms of any reports,
24 were there any reports that you saw that pertained
25 specifically to the 2500 members of Southwest Workers

## 46

1  Union?
2       A.  No.
3       Q.  Do you still have those reports?
4       A.  Some of them.
5       Q.  Approximately how many do you have?
6       A.  I don't know.
7       Q.  Do you remember, as a part of this case,
8  receiving or seeing a -- what's called a request for
9  production of documents to Southwest Workers Union in
10 this case?
11      A.  Yes, I do.
12      Q.  And did you review the document that had the
13 list or categories of documents that were requested?
14      A.  Yes, I did.
15      Q.  Did you assist in preparing responses and
16 gathering documents to produce in response to that
17 request?
18      A.  Yes.
19      Q.  And as part of responding to that request and
20 gathering documents, were these reports part of your
21 efforts to respond to the request?
22      A.  Yes.
23      Q.  Did you turn those documents over to your
24 lawyers?
25      A.  Yes.

## 47

1       Q.  Do you know whether they have been produced as
2  part of this litigation?
3       A.  I don't know.
4       Q.  Can you identify any member of Southwest
5  Workers Union who does not have one of the forms of
6  photo ID that's required by Senate Bill 14?
7       A.  Yes.
8       Q.  And who are the members that you know of?
9       A.  I don't remember her first name but, Senora
10 Lopez.
11      Q.  And how do you know Ms. Lopez?
12      A.  Ms. Lopez has been a lifelong member of the
13 organization.  She has been there longer than I have.
14      Q.  Is she an employee of the organization?
15      A.  No.
16      Q.  And do you know whether or not Ms. Lopez has a
17 driver's license?
18      A.  She does not.
19      Q.  Do you know if she has a state-issued personal
20 identification card?
21      A.  To my knowledge, she does not.
22      Q.  Have you taken any steps to determine whether
23 or not she does?
24      A.  I mean, she talked to me and other members
25 about it.

## 48

1       Q.  And did she tell you that she did not have a
2  state-issued personal ID?
3       A.  Yes.
4       Q.  Do you know whether Ms. Lopez has a passport?
5       A.  I do not.
6       Q.  Any other members that you have talked to other
7  than Ms. Lopez?
8       A.  Yes.
9       Q.  And besides Ms. Lopez, what other members that
10 you're aware of do not have one of the forms of photo ID
11 that's required by SB 14?
12         (Witness and Ms. Judge conferring.)
13         MS. JUDGE:  I'm going to object on
14 attorney-client privilege, and I'm going to instruct my
15 client not to respond.
16      Q.  (By Mr. Brissenden) I'm not asking you for
17 communications you've had with your -- with your
18 attorney.  Do you understand that?
19      A.  Yes.
20      Q.  All right.  So we're talking about
21 communications you've had with individuals who are
22 members of Southwest Workers Union, and you've
23 identified Ms. Lopez.  Are there any other members that
24 you've spoken with who've indicated they don't have any
25 of the forms of ID that are identified under Senate

Tanya Aguilar Garduno                                    June 13, 2012

---

**49**

1    Bill 14?
2             MS. JUDGE:  I'm going to object on
3    attorney-client privilege.  I'm going to ask that you
4    not respond.  I'm going to instruct you not to respond
5    to that, if you've had conversations.
6             A.  Under the advice of my counsel, I'm not going
7    to respond.
8             Q.  (By Mr. Brissenden) Do you have knowledge about
9    people you've spoken with, members you've spoken with at
10   Southwest Workers Union about SB 14?
11            A.  Could you repeat the question?
12            Q.  Yeah.  Do you have -- do you have knowledge
13   about the people you have spoken with?  You've already
14   identified Ms. Lopez.  Do you have personal knowledge
15   about other individuals you've spoken with?
16            A.  Yes.
17            Q.  All right.  So and have you spoken to those
18   people, those individuals directly?
19            MS. JUDGE:  I'm going to object on
20   attorney-client privilege.
21            MR. BRISSENDEN:  Well, I'm not asking
22   about communications she's had with her attorney.
23            MS. JUDGE:  But I can understand --
24            MR. BRISSENDEN:  I'm asking about
25   communications she's had with Ms. Lopez and others who

---

**50**

1    are members.
2             MS. JUDGE:  I understand that, but there
3    are reasons why there is attorney-client privilege
4    attached to that.  And at this point, I'm going to
5    instruct her not to answer.  If you would like to go
6    further and, you know, deal with it in the court, then
7    we can do it.  But at this point, sir, I'm going to ask
8    that she not respond to that, and there are reasons
9    behind us asking that.
10            MR. BRISSENDEN:  There is no grounds for
11   it.
12            MS. JUDGE:  Well, then if there's no
13   grounds for it, then you'll probably be able to get the
14   response in court then.  But at this point, I'm going to
15   instruct her not to answer that.
16            MR. BRISSENDEN:  Well, I think it's bad
17   faith grounds and it's an obstruction.
18            MS. JUDGE:  Well, it's not -- it's not an
19   obstruction, and I'm just going to protect my client.
20            MR. BRISSENDEN:  It's a fair question, and
21   she's already -- she's already disclosed Ms. Lopez.
22   There is no --
23            Q.  (By Mr. Brissenden) Are any of the community
24   members that you have spoken with attorneys?
25            A.  Not to my knowledge.

---

**51**

1             Q.  And none of them are representing you as
2    attorneys in this case?
3             A.  No.
4             Q.  And none of your attorneys were the source of
5    knowledge, your personal knowledge in terms of these
6    communications with these members, right?
7             A.  That's correct.
8             MR. BRISSENDEN:  Would you like to
9    reconsider your assertion of attorney-client privilege?
10            MS. JUDGE:  I would like to -- what I
11   would like to do is make sure that my client not have to
12   respond to people who do not want to be -- who do not
13   want to be a part of this.  And so therefore, therefore,
14   I am asking again to my client, I am going to instruct
15   her not to respond in terms of anything else -- and this
16   is attorney-client privilege.  And, in fact, you think
17   it's obstructionist, then, please, by all means, put it
18   in the court -- let's put it in the record.  But at this
19   point, I'm not going to withdraw it.
20            MR. BRISSENDEN:  Well, there is no grounds
21   for it to be attorney-client privilege, as the witness
22   has clearly described the foundation testimony, and it
23   is, I believe, just purely obstructionist.
24            Q.  (By Mr. Brissenden)  You understand I'm trying
25   to ask you some of these questions in hopes of not

---

**52**

1    having you come back and sit for a second deposition?
2             A.  I understand.
3             Q.  And you understand I'm not trying to drag in
4    other people as a part of this case?
5             A.  I don't understand that.
6             Q.  Do you understand I'm not interested in
7    dragging poor Ms. Lopez and make her a part of this
8    case?
9             A.  I don't understand that.
10            Q.  All right.  You've identified Ms. Lopez.  Any
11   other individuals who you've spoken with about whether
12   or not they have identifications listed under Senate
13   Bill 14?
14            A.  I have spoken to other people about it.
15            Q.  How many?
16            A.  I'd say a handful.
17            Q.  So when you say a handful, I assume you mean
18   three, four, five other individuals?
19            A.  Yes.
20            Q.  Those other individuals have indicated to you
21   they don't have the requisite forms of identification
22   under Senate Bill 14?
23            A.  Yes.
24            Q.  Have you taken any steps to verify one way or
25   another whether they do have the requisite forms of ID?

Tanya Aguilar Garduno                                          June 13, 2012

---

## 53

1    A.   No.  It's not the role of my organization or
2    myself.
3        Q.   Does Southwest Workers Union represent anyone
4    else as a part of this litigation, other than the 2500
5    members it represents?
6        A.   No.
7        Q.   Do you have a driver's license?
8        A.   Yes.
9            (Exhibit 2 marked for identification.)
10       Q.   (By Mr. Brissenden) All right.  The court
11   reporter has handed you what's been marked as Deposition
12   Exhibit 2.  Do you recognize that document?
13       A.   Yes.
14       Q.   And what is this document?
15       A.   It's the Intervenors document.
16       Q.   And do you see a title there on the first page?
17       A.   Yes.
18       Q.   All right.  And this is titled, "Applicants'
19   Motion to Add Southwest Workers Union and La Unión Del
20   Pueblo Entero as Defendant Intervenors"?
21       A.   Yes.
22       Q.   I know I pronounced that horribly.  I
23   apologize.
24            What is the acronym for La Unión --
25       A.   La Union Del Pueblo Entero, LUPE.

## 54

1        Q.   (By Mr. Brissenden) LUPE?  Are you familiar
2    with the LUPE organization?
3        A.   Yes.
4        Q.   Do LUPE and Southwest Workers Union have
5    similar interests in regards to voter ID legislation?
6            MS. JUDGE:  Objection, calls for
7    speculation.
8        Q.   (By Mr. Brissenden) Do you know?
9        A.   I would -- I would say yes.
10       Q.   It's LUPE located here in -- do they have an
11   office here in San Antonio?
12       A.   Not to my knowledge.
13       Q.   Do you know whether members of your
14   organization, Southwest Workers Union, are members of
15   LUPE?
16       A.   I don't know.
17       Q.   All right.  Directing your attention to the
18   second page of Exhibit 2, I represent to you this was a
19   document that was filed as a part of the pleadings in
20   this case.  And on the second page, the first paragraph
21   describes Southwest Workers Union, and it states,
22   "Southwest Workers Union is a San Antonio-based
23   organization representing approximately 2,500 low-income
24   workers, including migrant farm workers, domestic
25   workers, and public school workers.  Most of its

## 55

1    membership is Latino.  SWU's aim is to build multi-
2    generational grassroots power to create sustainable
3    change for social, economic, and environmental justice
4    and to build the movement for dignity and justice."  Did
5    I read that correctly?
6        A.   Yes.
7        Q.   In terms of South -- the statement "SWU's aim
8    is to build multi-generational grassroots power to
9    create sustainable change for social, economic, and
10   environmental justice and to build the movement for
11   dignity and justice," does that accurately reflect the
12   mission of SWU?
13       A.   Yes.
14       Q.   The paragraph goes on to state, "They
15   accomplish this through hands-on civic engagement work."
16   Do you see that?
17       A.   Yes.
18       Q.   Is that true?
19       A.   Yes.
20       Q.   And the sentence goes on to state, "Primarily
21   in the Latino community, including voter education and
22   voter registration work."  Do you see that statement?
23       A.   I do see that statement.
24       Q.   Did I read that correctly?
25       A.   Yes.

## 56

1        Q.   Is that true?
2        A.   This is true.
3        Q.   All right.  What type of voter education work
4    does Southwest Workers Union engage in?
5        A.   We teach people about what's going to be on the
6    ballots.  We block walk.
7        Q.   I'm sorry?
8        A.   We block walk.  You know, to tell people what's
9    on the ballot.  Do voter registration.  We let people
10   know what they're going to be facing at the polls, which
11   precincts they're in, when early voting is, when
12   election day is.  I mean, yeah.  I mean, yeah.  I mean,
13   candidate accountability forums or informative forums.
14   You know, people want to know who's on the forum, like,
15   who's going to be on the ballot and what they're
16   about.  We do information sessions.  I mean, yeah.
17       Q.   Anything else?
18       A.   And we let people know about precinct changes,
19   if there's been any.
20       Q.   Do you discuss different issues with voters?
21       A.   Around what?  I mean, yes.
22       Q.   In terms of voter registration work, what work
23   does SWU do?
24       A.   We register voters, or assist in voter
25   registration with our members and just within the

Tanya Aguilar Garduno                                    June 13, 2012

---

**57**

1   community, anybody.
2       Q.   So you help voters in the Latino community
3   register to vote?
4       A.   Yes.
5       Q.   On election day, does SWU engage in any voter
6   education or work in connection with the election?
7       A.   Which election?
8       Q.   On a typical -- just generally speaking on an
9   election day.
10      A.   Sometimes.
11      Q.   All right.  For example, a few weeks ago, we
12  had the May primary.  Did anybody from your organization
13  work at any polls?
14      A.   A member of our organization?
15      Q.   Yes.
16      A.   I'm sure they did.
17      Q.   Did they assist individuals, voters in getting
18  to the polls?
19      A.   I'm not sure.
20      Q.   Have you ever heard of anybody from your
21  organization helping to get voters to the polls?
22      A.   Yes.
23      Q.   The paragraph on Page 2, Paragraph 1, the last
24  sentence states, or goes on to state, "More recently, it
25  has used its scarce resources to educate its members and

---

**58**

1   members of the Latino community on the new voter photo
2   identification law."  Do you see that statement?
3       A.   I do see that statement.
4       Q.   And did I read that correctly?
5       A.   Yes.
6       Q.   Is it true?
7       A.   Yes.
8       Q.   What resources has Southwest Workers Union used
9   to educate its members on SB 14?
10      A.   Mainly around community meetings, letting folks
11  know what SB 14 is, and then just through our elections,
12  you know, the upcoming elections, and doing phone
13  banking, just letting folks know that they don't need a
14  Texas ID to actually go vote, that they can still use
15  their voter registration card, because there was a lot
16  of confusion.
17      Q.   Was there some confusion -- you're referring to
18  the May primary?
19      A.   Yeah.  And then -- yeah, yeah.
20      Q.   And so were -- was -- was there some effort to
21  educate voters, for this last May primary, in terms of
22  whether or not those voters would need a photo ID?  Is
23  that what you're referring to?
24      A.   Not the May primary.  During the San Antonio
25  city elections.

---

**59**

1       Q.   Okay.
2       A.   There was a bond election.
3       Q.   And when was that election held?
4       A.   The 12th or 14th.  12th was the last day of
5   early voting, and the 14th was election day.
6       Q.   On which day?
7       A.   May.  The month, May.
8       Q.   May 14th?
9       A.   Yeah.
10      Q.   Has the voter education included educating
11  members about SB 14 in terms of, if the law is
12  precleared or approved and enacted, what forms of voter
13  ID will be required?
14      A.   Yeah.
15      Q.   The statement there on Page 2, the first
16  paragraph, the last sentence, makes reference to scarce
17  resources.  Do you see that?  What resources have been
18  used to educate voters about SB 14?
19      A.   Staff time.
20      Q.   Anything else?
21      A.   Telephone.  Use of space.  I mean, anything you
22  can think of around the building; you know, food,
23  drinks, electricity.
24      Q.   Anything else?
25      A.   I guess like just printing, production of

---

**60**

1   information.
2       Q.   Anything else?
3       A.   Not that I can think of.
4       Q.   Okay.  How much of your time has been spent on
5   educating voters about SB 14?
6       A.   Throughout what time period?
7       Q.   Let's say from -- since the beginning of the
8   year.
9       A.   In terms of what, hours?
10      Q.   Generally speaking, yes.
11          MS. JUDGE:  Objection, vague.
12      A.   Yeah.  Could you be more specific?
13      Q.   (By Mr. Brissenden) Sure.  Can you give me idea
14  how much time, of your time has been spent on educating
15  voters on SB 14?
16      A.   I'd say like April and May, was probably -- I
17  mean, you know, I would say dedicated.  How many hours?
18  I got to think.  I don't know.  It was like, did a lot
19  of phone banking.  I don't know how many hours.  I can't
20  say how many hours.  But we did do a lot of phone
21  banking to let folks know, that, one, to remind them to
22  go vote and that an ID was not necessary to vote.  I
23  can't -- I don't remember.  I don't know.
24      Q.   You mentioned printing information and printing
25  materials.  Over the past six months, did Southwest

Tanya Aguilar Garduno                                                June 13, 2012

---

**61**

1  Workers Union prepare any printed materials in
2  connection with or relating to SB 14?
3      A.   We didn't produce anything.  We just made
4  copies of what other people had, just to have one, you
5  know, solid thing that we could give people.
6      Q.   All right.  And what was copied from -- that
7  you had received from other people?
8      A.   We used stuff from the Advancement Project, and
9  some folks wanted to see the actual bill, so we printed
10  those out for people to have.  And we also printed out
11  some documents from MALDEF that they forwarded to us
12  and from Southwest Voters.
13      Q.   Any other documents?
14      A.   Just ballot information.
15      Q.   Anything else?
16      A.   And just the dates for voting.
17      Q.   Okay.  Any other documents that you remember?
18      A.   Not that I can remember right now.
19      Q.   The documents from the Advancement Project,
20  what were those documents about; do you remember?
21      A.   I mean, they're the documents that I -- that
22  they forwarded to me around SB 14, just like fact sheets
23  and...
24      Q.   Do you remember what they said?
25      A.   They just went in depth about the bill, more

---

**62**

1  details.
2      Q.   Did they provide a summary of what the
3  provisions of the bill were?
4      A.   I believe so, yeah.
5      Q.   Do you still have copies of those documents
6  from the Advancement Project?
7      A.   Yeah.  We gave them to y'all.
8      Q.   How about the documents from MALDEF; do you
9  still have those documents?
10      A.   I do, and I gave those to you as well.
11      Q.   And how about from Southwestern Voters?
12      A.   I do, and I gave them to you all.
13      Q.   Has Southwest Workers Union hosted any speakers
14  about voter ID legislation?
15          MS. JUDGE:  Objection, vague.
16      I'm sorry, could you repeat the question?
17      Q.   (By Mr. Brissenden) Has Southwest Workers Union
18  hosted any speakers?  Have they had any speakers come in
19  and speak about voter ID legislation?
20      A.   To whom?
21      Q.   To its members.
22      A.   During what time frame?
23      Q.   The past six months.
24      A.   No.  I don't know, actually, no.
25      Q.   Is there somebody in the organization who would

---

**63**

1  know?
2      A.   Me.
3      Q.   So as you sit here today, do you know?
4      A.   I don't.  The last -- no.
5      Q.   Any -- let's go beyond six months.  Any -- make
6  it broader than the past six months.  Can you remember
7  any speaker coming in and speaking to members of
8  Southwest Workers Union regarding voter ID legislation?
9          MS. JUDGE:  Objection, vague.
10      A.   Not to my knowledge.
11      Q.   (By Mr. Brissenden) Did Southwest Workers Union
12  meet with any Texas legislators during the 2011
13  legislative session regarding SB 14?
14      A.   Yes.
15      Q.   And who -- who did it meet with?
16      A.   I can't remember all of them, but Leticia Van
17  de Putte was one of them.  Bobby Cruz.  Joaquin Castro.
18  Is it Trey Fischer Martinez.  I think -- I mean, at that
19  point, we had tried to meet with most of the law makers
20  in San Antonio, if not their aides, just kind of let
21  them know where we're at with most of the -- you know,
22  anything that we're working at that point.  Just because
23  we're limited resources, we can't continuously go to
24  Austin, you know, and we don't have resources to do
25  that.

---

**64**

1      Q.   How many times did anyone from Southwest
2  Workers Union go to Austin to talk about SB 14?
3      A.   I don't know.
4      Q.   Did you ever go to Austin?
5      A.   Yes.
6      Q.   How many times?
7      A.   I don't know.
8      Q.   Who is the state representative for the
9  district in which Southwest Workers Union is located?
10      A.   I don't -- I don't know.
11      Q.   The same question as to the State Senator.  Do
12  you know?
13      A.   It should be Leticia Van de Putte.
14      Q.   And Senator Van de Putte is one of the
15  individuals that Southwest Workers Union met with, with
16  regards to SB 14?
17      A.   Uh-huh.
18      Q.   How many times did you meet with the Senator?
19      A.   Probably once.
20      Q.   Were you present?
21      A.   Yeah.
22      Q.   And where was the meeting?
23      A.   In her office.
24      Q.   Where?
25      A.   In Austin.

Tanya Aguilar Garduno                                    June 13, 2012

## 65

1   Q.   Do you remember when?
2   A.   I don't.
3   Q.   And what was discussed?
4   A.   Several things.
5   Q.   And what were those things?
6        MS. JUDGE:  Objection, vague.  It calls --
7   A.   How the weather was.  How we're doing.
8   Q.   (By Mr. Brissenden) Let's narrow it down to
9   Senate Bill 14.  Was there discussion about Senate Bill
10  14?
11  A.   Yes.
12  Q.   And what was discussed?
13  A.   Whether or not it was going to pass.  Where she
14  was at on the issue.  Where we were at on the issue.
15  Q.   Anything else with regards to Senate Bill 14?
16  A.   That's it, that I can remember.
17  Q.   And what did you tell the Senator in terms of
18  where Southwest Workers Union was on the issue?
19  A.   That we were opposed.
20  Q.   Did you say why or explain why?
21  A.   I don't remember specifically what was said,
22  but I do remember that the Senator had the same
23  sentiment that we did.  She just understood that it was
24  not a good -- a good thing for the state.
25  Q.   And so when you left the meeting, it was your

## 66

1   understanding that Senator Van de Putte would be voting
2   against the bill?
3   A.   That's how I left feeling.
4   Q.   Did you provide the senator with any materials?
5   A.   My business card and just let her know that we
6   would try to make the hearing.  I don't remember,
7   actually.  I'm sure we gave her something, but I don't
8   remember.
9   Q.   Did you attend the Senate hearing?
10  A.   I did not get to.
11  Q.   Did anybody from Southwest Workers Union attend
12  the hearing?
13  A.   Not to my knowledge.
14  Q.   How about other hearings, committee hearings,
15  hearings on the House side; did Southwest Workers Union,
16  any representative attend those hearings?
17  A.   Yes.
18  Q.   Which hearings?
19  A.   Some of the committee hearings.
20  Q.   Do you remember which ones?
21  A.   I don't.
22  Q.   Did anyone from Southwest Workers Union testify
23  during the hearings?
24  A.   No.  There was -- no.
25  Q.   Did anybody testify at the hearing on behalf of

## 67

1   Southwest Workers Union, more generally?
2   A.   Maybe.
3   Q.   Who would that have been?
4   A.   Possibly the folks from Southwest Voters or
5   from MALDEF.
6   Q.   Do you know of any Southwest Workers Union
7   member who personally appeared at the hearings to
8   testify?
9   A.   Not to my knowledge.
10  Q.   On that day when you met with Senator Van de
11  Putte, did you meet with any other senators?
12  A.   I don't remember.
13  Q.   When did you first learn about this lawsuit?
14  A.   Could you be more specific?
15  Q.   Sure.  We're here to take your deposition and
16  ask you some questions about the case of the State of
17  Texas versus Eric Holder.  Southwestern Workers Union
18  has intervened as a party in this case, and so my
19  question is:  At what point did Southwest Workers Union
20  first learn about this lawsuit?
21  A.   I don't recall.  Sometime last year.
22  Q.   Who made -- who at Southwest Workers Union made
23  the decision to intervene in this case?
24  A.   The director.
25  Q.   That would have been Genaro Rendon?

## 68

1   A.   Yes.
2   Q.   He was the director at the time?
3   A.   He is the director.
4   Q.   Do you know when he decided to intervene in the
5   case?
6   A.   I don't remember the exact date.
7        MS. JUDGE:  Objection, calls for
8   speculation.
9   Q.   (By Mr. Brissenden) Why did Southwest Workers
10  Union intervene in this case?
11  A.   Because we felt it was discriminatory.
12  Q.   And what do you mean by that?
13  A.   We felt that it would affect our members, and
14  that just overall for the state, it was not a good -- a
15  good thing for voters.
16  Q.   And I understand Southwest Workers Union was
17  opposed to SB 14, correct?
18  A.   Yes.
19  Q.   And you went and spoke with several
20  legislators, including Senator Van de Putte, in
21  opposition to the bill during the session, but in terms
22  of intervening in this lawsuit, why has Southwest
23  Workers Union intervened in the case?
24       (Witness and Ms. Judge conferring.)
25  A.   Yeah.  I mean, we just feel that it's going to

Tanya Aguilar Garduno                                    June 13, 2012

---

## 73

1  Q.  Besides meeting with senators and
2  representatives of the Texas Legislature that you've
3  indicated you met with previously and then some law
4  makers in San Antonio, did you -- and I'm saying you in
5  general, Southwest Workers Union do anything else to
6  oppose SB 14 during the 2011 legislative session?
7  A.  I mean, we participated in actions with other
8  organizations.
9  Q.  Okay.  And what actions are you referring to?
10  A.  Of the numerous marches on the Hill.  I mean,
11  that's -- I can just say that there's a lot of things
12  happening in Austin during the session.
13  Q.  Okay.  So you attended -- Southwest Workers
14  Union participated in marches on Capitol Hill?
15  A.  Yes.
16  Q.  Anything else?
17  A.  Not that I can remember.
18  Q.  Were those marches, did those relate
19  specifically to SB 14?
20  A.  I don't remember.  There's so many.
21  Q.  Did Southwest Workers Union meet with any lobby
22  organizations?
23  A.  I don't know.  I don't know which ones are
24  lobbying organizations or not, you know.
25  Q.  Has Southwest Workers Union, to your knowledge,

## 74

1  ever intervened in a lawsuit before?
2  A.  Not to my knowledge.
3  Q.  After the bill passed through the Senate, do
4  you understand that there was an administrative
5  preclearance process?
6  A.  Yes.
7  Q.  And that administrative process was handled by
8  the Department of Justice.  Do you understand that?
9  A.  I do.
10  Q.  Did you ever speak with anyone at the
11  Department of Justice about SB 14?
12  A.  No.
13  Q.  Did any member of Southwest Workers Union
14  communicate with the Department of Justice about SB 14?
15  MS. JUDGE:  Objection, vague.
16  Q.  (By Mr. Brissenden) Well, let me clarify
17  that.  Did any employee or staff member of Southwest
18  Workers Union communicate with the Department of Justice
19  about SB 14?
20  MS. JUDGE:  Objection, vague.
21  A.  Not to my knowledge.
22  Q.  (By Mr. Brissenden) Did anyone from Southwest
23  Workers Union send any letters or e-mails to the
24  Department of Justice regarding SB 14?
25  A.  Not to my knowledge.

## 75

1  Q.  Do you know whether any member of Southwest
2  Workers Union sent any letters or e-mails to the
3  Department of Justice regarding SB 14?
4  MS. JUDGE:  Objection, vague.
5  A.  I don't know.
6  Q.  (By Mr. Brissenden) Does Southwest Workers
7  Union contend that Senate Bill 14 will have the effect
8  of denying minorities the right to vote?
9  A.  Yes.
10  Q.  And does it contend that SB 14 will affect all
11  minority groups or just some minority groups?
12  A.  All.
13  Q.  And what is the basis for that contention?
14  A.  Well, as I stated before, we received and
15  reviewed documents and reports from other organizations,
16  and we have also received phone calls from membership on
17  this, and we feel that it's discriminatory against
18  minority voters in the state.
19  Q.  Okay.  Now, those -- when you say reports, are
20  those the reports that -- that you made reference to
21  just a few minutes ago?
22  MS. JUDGE:  Objection, asked and answered.
23  Q.  (By Mr. Brissenden) Or are these different
24  reports?
25  A.  They are the same.

## 76

1  Q.  All right.  And which organizations did you
2  receive those reports from?
3  MS. JUDGE:  Objection, asked and answered.
4  A.  I don't remember all of them.
5  Q.  (By Mr. Brissenden) Did Southwest Workers Union
6  undertake any of its own investigation to determine what
7  effect SB 14 would have on minority voters here in the
8  state of Texas?
9  MS. JUDGE:  Objection, asked and answered.
10  A.  No.
11  Q.  (By Mr. Brissenden) Has Southwest Workers Union
12  conducted any surveys concerning the effects of SB 14
13  other on its members?
14  MS. JUDGE:  Objection,
15  mischaracterization.
16  A.  Could you be more specific around the word
17  survey?
18  Q.  (By Mr. Brissenden) Do you understand what a
19  survey is?
20  A.  Not in your question.
21  Q.  All right.  When I say survey, I'm asking like
22  a questionnaire.  Did Southwest Workers Union send out
23  any questionnaires or conduct any surveys concerning the
24  effect of SB 14 on its members?
25  A.  No.

## 77

1    Q.  In terms of the reports that you received from
2    other organizations, did any of those reports that you
3    reviewed include reports showing poll results indicating
4    support for voter ID legislation?
5    A.  Could you repeat the question?
6    Q.  In the reports that you reviewed, you've been
7    discussing, made reference to a few minutes ago that you
8    received from organizations, did any of those reports
9    have poll results showing support for voter ID
10   legislation?
11        MS. JUDGE:  Objection, vague.
12   A.  I don't really understand the question.
13   Q.  (By Mr. Brissenden) Do you know what a poll is?
14   A.  I do know what a poll is but --
15   Q.  Okay.  So I'm asking you:  In those reports,
16   did they -- did any of those reports include poll
17   results showing support for voter ID legislation?
18   A.  I don't remember.
19   Q.  Have you seen any poll results showing that the
20   majority of Texans support the photo ID requirement as
21   laid out in SB 14?
22   A.  I have not.
23   Q.  Are you aware of a poll result showing the
24   majority of Texans support photo ID requirement to vote
25   regardless of race?

## 78

1    A.  Could you repeat that?
2    Q.  Sure.  Are you aware of poll results showing
3    that the majority of Texans support the photo ID
4    requirement to vote regardless of race?
5    A.  Not to my knowledge.
6    Q.  Do you believe that indigent voters are more
7    likely than average voters to lack a form of the
8    required photo IDs under SB 14?
9    A.  Could you define indigent?
10   Q.  Poor.
11   A.  Do I -- could you repeat it?
12   Q.  Do you believe that poor voters are more likely
13   than the average voter to lack a form of ID required by
14   SB 14?
15        MS. JUDGE:  Objection, calls for
16   speculation.
17   Q.  (By Mr. Brissenden) You may answer.
18   A.  I don't know.
19   Q.  Do you believe that rural voters are more
20   likely than the average voter to lack a form of ID
21   required by SB 14?
22   A.  I don't know.
23   Q.  That's not something you've considered?
24   A.  I've considered it or do I know it?
25   Q.  Whether you've considered that.

## 79

1    A.  I'm confused by your question.
2    Q.  Okay.  We'll move on.
3        Do you -- and when I say you, I'm
4    referring to Southwest Workers Union.  Do you contend
5    that SB 14 was passed with a discriminatory purpose?
6    A.  Yes.
7        MS. JUDGE:  Objection --
8    A.  Yes.
9    Q.  (By Mr. Brissenden) And what is the basis for
10   Southwest Workers Union's contention that SB 14 was
11   passed with a discriminatory purpose?
12        MS. JUDGE:  Objection, calls for legal
13   conclusion.
14   A.  Well, as I stated before, we feel that it's
15   going to affect our membership and, you know, voters in
16   the state of Texas.
17   Q.  (By Mr. Brissenden) All right.  And I
18   understand you're talking about effect that bill will
19   have, but I'm talking about purpose, discriminatory
20   purpose.
21   A.  Could you explain that?
22        MS. JUDGE:  Objection, calls for a legal
23   conclusion.
24   Q.  (By Mr. Brissenden) In terms of purpose, do you
25   know whether or not there was any -- first of all, do

## 80

1    you know what -- in your opinion, what is the purpose of
2    SB 14?
3        MS. JUDGE:  Objection, vague.
4    A.  I don't understand your question.
5    Q.  (By Mr. Brissenden) What is your understanding
6    as to what the purpose of SB 14 is?
7    A.  My understanding of it?
8    Q.  Yes.
9    A.  To prevent voter fraud.
10   Q.  Do you know --
11        (Witness and Ms. Judge conferring.)
12        MR. BRISSENDEN:  Let the record reflect
13   that counsel is speaking with the witness during the
14   questioning, and I'd request that the sidebars stop.
15   Q.  (By Mr. Brissenden) Do you know how many Texas
16   registered voters lack one of the forms of ID that are
17   required under SB 14?
18   A.  I do not.
19   Q.  Can you identify any Texas registered voter who
20   does not have one of the types of photo IDs that are
21   required?
22        MS. JUDGE:  Objection, asked and answered.
23        MR. BRISSENDEN:  I don't believe I've
24   asked this question.
25   Q.  (By Mr. Brissenden) Do you understand my

Tanya Aguilar Garduno                                    June 13, 2012

---

## 81

1  question?
2      A.  Could you repeat the question?
3      Q.  Sure.
4          Can you identify any Texas registered
5  voter who does not have one of the types of photo ID
6  that's required under SB 14?
7          MS. JUDGE:  Objection, asked and answered.
8      Q.  (By Mr. Brissenden) You may answer.
9      A.  Yes.
10     Q.  And who are those individuals that are Texas
11  registered voters who you believe don't have the types
12  of required photo ID under SB 14?
13     A.  I think we already spoke about her earlier
14  today.
15     Q.  Oh, okay.  Was that Ms. --
16     A.  Senora Lopez.
17     Q.  Ms. Lopez?
18     A.  Yes, sir.
19     Q.  Do you know if she's a registered voter?
20     A.  Yes.
21     Q.  Any others?
22     A.  Yes.
23     Q.  And who are those individuals?
24     A.  I mean, community members.
25     Q.  And who are those individuals?

---

## 82

1          MS. JUDGE:  Objection, asked and answered
2  previously.
3      Q.  (By Mr. Brissenden) You may answer.
4      A.  They are community members within the state of
5  Texas that we know.
6      Q.  And who are those individuals?
7          MS. JUDGE:  Objection, asked and answered.
8      A.  I don't want to name them because I don't think
9  they want to be part of -- well, I know they don't want
10  to be named in this or be a part of it.
11     Q.  (By Mr. Brissenden) How many individuals are
12  you aware of?
13     A.  Could you repeat the question?
14     Q.  How many individuals are you aware of that you
15  can identify -- again, I understand you don't want to
16  disclose their names -- that are Texas registered voters
17  who do not have the requisite forms of ID under SB 14?
18     A.  I said earlier, a handful.
19     Q.  Do you know if those individuals are all
20  currently registered to vote?
21     A.  I don't know.
22         MS. JUDGE:  We've been going at this for a
23  while.
24         MR. BRISSENDEN:  Sure.  Why don't we take
25  a short break.

---

## 83

1          (Recess from 11:57 p.m. to 12:10 p.m.)
2      Q.  (By Mr. Brissenden) We're back on the record
3  after having taken a short break.  Are you ready to
4  proceed?
5      A.  Yes.
6      Q.  All right.
7          MR. BRISSENDEN:  Let's go ahead and have
8  this exhibit marked.
9          (Exhibit 3 marked for identification.)
10     Q.  (By Mr. Brissenden) The court reporter has just
11  handed you what's been marked as Exhibit 3.  Do you
12  recognize this document?
13     A.  Yes.
14     Q.  Have you seen this document before today?
15     A.  Yes.
16     Q.  Did you assist in preparing Responses to the
17  State of Texas's First Set of Interrogatories?
18     A.  No.
19     Q.  Do you know who from Southwest did prepare or
20  assist in preparing the answers?
21         MS. JUDGE:  Objection, vague.
22         Do you mind if we go off the record for a
23  minute?  I think she's confused.
24         THE WITNESS:  Yeah.
25         MR. BRISSENDEN:  Okay.

---

## 84

1          (Witness and Ms. Judge conferring.)
2      A.  Okay.  Yeah.  I'm sorry, I was confused.
3      Q.  (By Mr. Brissenden) So you understand that
4  you've seen this document before today?
5      A.  Uh-huh.
6      Q.  And the State of Texas had asked -- or sent
7  some written questions to Southwest Workers Union and
8  asked them to provide responses?
9      A.  Yes.
10     Q.  Did you assist in preparing those responses?
11     A.  Yes.
12     Q.  Did anybody else from Southwest?
13     A.  No.
14     Q.  Directing your attention to Page 5 of the
15  exhibit.
16     A.  Uh-huh.
17     Q.  Do you see your name listed there on Page 5?
18     A.  Yes, and it's actually misspelled.
19     Q.  And your name is listed there along with
20  Mr. Rendon?
21     A.  Yes.
22     Q.  And Laura Muriada?
23     A.  Muriada.
24     Q.  And were there any other individuals, other
25  than yourself and Genaro or Laura, that participated in

Tanya Aguilar Garduno                                June 13, 2012

## 85

1  any form of discussions, communications relating to
2  SB 14, that you're aware of?
3     A.   No.
4     Q.   Interrogatory Number 2 on that same page,
5  Page 5, asks Southwestern to identify all analysis,
6  investigation, studies, reviews, assessments, and/or
7  reports done, commissioned, received, or reviewed, or
8  considered in connection with SB 14.  Do you see that
9  interrogatory?
10    A.   Number 2?
11    Q.   Yes.
12    A.   Yes, I see this.
13    Q.   And do you see the statement, the answer that
14 was provided there in Paragraph 2, which states,
15 "Southwest Workers Union further responds that it
16 received and reviewed various studies and reports
17 showing the disparate impact of SB 14 that are no longer
18 in SWU's possession or control."  Do you see that?
19    A.   I do see that.
20    Q.   Are those the reports that you had made
21 reference to earlier today?
22    A.   Yes.
23    Q.   And to your knowledge, those have been turned
24 over and produced in this case?
25    A.   Yes.

## 86

1     Q.   Do you know why the statement there says that
2  they are no longer SWU's possession or control?
3     A.   I'm not sure what you're asking.
4     Q.   Do you see the statement there at the end that
5  states that those reports are no longer in SWU's
6  possession or control?
7     A.   I do see that statement.
8     Q.   But you've indicated that those were turned
9  over and produced in this case, correct?
10    A.   Yes.
11    Q.   Do you know why that statement is in there
12 suggesting that SWU no longer has that document or those
13 reports?
14    A.   I don't know.
15    Q.   And then directing your attention to Page 6 of
16 the exhibit on Interrogatory Number 4, which asks,
17 "State the name and address of each of your members who,
18 A, is registered to vote in Texas, and B, does not have
19 one or more of the forms of identification listed in
20 Texas Election Code Section 63.0101."  Do you see that
21 interrogatory?
22    A.   I do see that Number 4.
23    Q.   And do you see the answer below that indicates
24 that, "Intervenors currently do not possess any
25 information responsive to this interrogatory, but

## 87

1  reserve the right to supplement this response."  Do you
2  see that answer?
3     A.   I do see that.
4     Q.   Is that accurate, to the best of your
5  knowledge?
6     A.   To the best of my knowledge, yes.
7     Q.   The trial in this case is scheduled for about
8  three and a half weeks.  Are you aware of any efforts by
9  Southwestern Workers Union to develop or create
10 information that would be responsive to Interrogatory
11 Number 4?
12    A.   Not to my knowledge.
13    Q.   So you see the date of the interrogatory
14 answers is on May 3rd, 2012?
15    A.   I do see that.
16    Q.   So as you sit here today, it's now June 13th,
17 is that answer still correct today, to the best of your
18 knowledge?
19         (Witness and Ms. Judge conferring.)
20         MR. BRISSENDEN:  Let the record reflect
21 witness is conferring with counsel.
22    A.   Could you repeat the question?
23    Q.   (By Mr. Brissenden) Do you see the date there,
24 it's dated May 3rd in the interrogatory?
25    A.   Yes, I do.

## 88

1     Q.   Okay.  And it's now June -- today is June 13th.
2         Between the time that this answer was
3  given on May 3rd, are you aware of any new information
4  between now and May 3rd that would somehow make that
5  answer incorrect?
6     A.   I mean, I believe we gave you Senora Lopez's
7  information.
8     Q.   Are you referring to a document?
9     A.   I am not referring to a document.  I'm
10 referring to earlier I talked to you about Mrs. Lopez as
11 one of our members.
12    Q.   Okay.
13    A.   And so, yes.  So that's somebody that I've
14 mentioned.
15    Q.   All right.  Are you aware of any other
16 information that would change the answer to
17 Interrogatory Number 4?
18    A.   Am I aware of -- can you repeat the question?
19    Q.   Are you aware of any other information --
20         MS. JUDGE:  I'm going to object.  Object,
21 asked and answered earlier.
22    Q.   (By Mr. Brissenden) Other than Ms. Lopez, are
23 you aware of any other information that would change
24 your answer to Interrogatory Number 4?
25    A.   No.

Tanya Aguilar Garduno                                        June 13, 2012

---

## 101

1    Workers Union assisted MALDEF in their request for help
2    finding people who would be affected by the new voter ID
3    law?
4            MS. JUDGE:  I think you can answer that.
5        A.  Okay.  Assisted how?
6        Q.  (By Mr. Brissenden) In any way.
7        A.  We distributed this information from MALDEF to
8    community and community members.
9        Q.  And when you say this information, you're
10   referring to the attachments?
11       A.  I am referring to the attachments.
12           (Exhibit 6 marked for identification.)
13       Q.  (By Mr. Brissenden) The court reporter has
14   handed you what has been marked as Deposition
15   Exhibit 6.  And again, I represent to you that this was
16   an e-mail that was part of the production from you all
17   in this case.  Do you recognize this document?
18       A.  Yes.
19       Q.  All right.  And just for the sake of saving
20   some time here, in looking at Exhibit 6 and the e-mail
21   that is in that exhibit and comparing it to the e-mail
22   that is in Exhibit 5, do you see that the e-mail that is
23   in Exhibit 6 also contains the same e-mail from Mike
24   Seifert?
25       A.  Yes.

---

## 102

1        Q.  All right.  And directing your attention to the
2    bottom of the first page of Exhibit 6, do you see the
3    document that is reflected there with the heading
4    MALDEF?
5        A.  I do.
6        Q.  All right.  And in that document, it states,
7    "MALDEF is committed to protecting your right to vote.
8    The following form will help us identify individuals
9    that may be affected by a new law requiring strict photo
10   ID requirements to vote at the polls."  Did I read that
11   correctly?
12       A.  Yes, you did.
13       Q.  And below that heading on the bottom of Page 6
14   and at the top of Page 7, the form goes on to ask for
15   information.  Do you see that?
16       A.  I do see that.
17       Q.  And was that the document that was attached to
18   Mike's -- Michael e-mail that you just made reference to?
19       A.  That was one of the attachments.
20       Q.  And the form goes on to ask individuals whether
21   they are registered to vote in Texas.  Do you see that?
22       A.  I do.
23       Q.  And if no, would they like assistance in
24   registering.  Do you see that?
25       A.  Yes.

---

## 103

1        Q.  And then the form goes on to ask, "Which forms
2    of identification do you currently possess?  Mark all
3    that apply."  Do you see that one?
4        A.  I do.
5        Q.  And then the form goes on to ask over a list of
6    various forms of identification.  Do you see that?
7        A.  I do.
8        Q.  Are those the forms of identification that are
9    provided for under SB 14?
10       A.  Are you asking me if SB provides
11   identification?
12       Q.  I'm asking you if those are the various forms
13   of identification that are required under SB 14?
14       A.  Yeah.
15       Q.  All right.  And then at the bottom, the
16   document form goes on to state, "A MALDEF representative
17   will contact you if you are an affected individual to
18   ensure your rights are protected.  All of the provided
19   information will be held confidentially.  Thank you for
20   your time and participation in this questionnaire."  Did
21   I read that correctly?
22       A.  Yes, you did.
23       Q.  And then at the very bottom it states, "Please
24   return a complete form to Luis Figueroa at," and then it
25   provides Luis's e-mail.  Do you see that?

---

## 104

1        A.  I do.
2        Q.  And does Luis work at MALDEF?
3        A.  To my knowledge, yes.
4        Q.  When you forwarded this document to members of
5    your organization, did you receive feedback?
6            MS. JUDGE:  Objection.  You know,
7    foundation.  I am not sure that that foundation was laid
8    in terms of what my client did or do not do specifically
9    with regards to this e-mail.
10           MR. BRISSENDEN:  I believe she testified
11   just a few minutes ago that she forwarded these
12   documents on, sent these documents to members?
13       A.  Well, we printed them out for distribution.
14       Q.  (By Mr. Brissenden) All right.  And when you
15   distributed them to members, did you get feedback?
16       A.  Yeah.
17       Q.  All right.  And what did you do with those
18   responses once you received them?
19       A.  Could you be more specific about what feedback
20   means?
21       Q.  Sure.  Did you receive the form that's shown on
22   Exhibit 6?  Did you receive those back in completed form
23   after you sent them out?
24       A.  Oh, no, that I did not.  That should have been
25   gone -- I mean, if they filled it out and gave it to

Tanya Aguilar Garduno                                    June 13, 2012

---

## 105

1  anybody, it should have been sent to MALDEF.
2  Q.  Did anybody, to your knowledge, at Southwest
3  Workers Union receive these forms back that were
4  completed?
5  A.  To my organization?
6  Q.  Yes.
7  A.  No, not to my knowledge.
8  Q.  As you sit here today, do you know whether or
9  not any members of Southwestern Workers Union sent this
10 completed form to Luis Figueroa at MALDEF?
11 A.  Not to my knowledge.
12         MS. JUDGE:  Objection, calls for
13 speculation.
14 A.  I don't know.
15 Q.  (By Mr. Brissenden) Did any of your members
16 contact you and say they had sent this form to MALDEF?
17 A.  No.  They don't remember -- no.  Actually, I
18 don't remember, yeah.
19 Q.  When you printed out the forms and distributed
20 them to your members, what did you tell your members to
21 do with the form?
22 A.  I told them to read it, and I told them if --
23 to fill it out if it pertained to them, and if not, to
24 pass it along to other people, and get in touch with
25 MALDEF, that they would be able to assist.

---

## 106

1  Q.  And do you know whether any of the members
2  followed your instructions?
3         MS. JUDGE:  Objection, asked and answered.
4  A.  I don't know.
5         (Exhibit 7 marked for identification.)
6  Q.  (By Mr. Brissenden) The court reporter has just
7  handed you what's been marked as Exhibit 7.
8  A.  Uh-huh.
9  Q.  And this is another document that was produced
10 as part of the litigation in this case.  Does this
11 questionnaire form look to be the same document or
12 similar as to what we were just discussing, Exhibit 6?
13 A.  It looks familiar.
14         (Exhibit 8 marked for identification.)
15 Q.  (By Mr. Brissenden) The court reporter has
16 handed you Exhibit 8.  Do you recognize this document?
17 A.  I do.
18 Q.  And what is this document?
19 A.  This document is from MALDEF, and it talks
20 about the ID requirements at the polls.
21 Q.  And does it provide a summary of the provisions
22 of the photo ID law?
23 A.  Yes.
24 Q.  And was this Exhibit 8 the second attachment to
25 Michael's e-mail that's referred to in Exhibit 5 and 6?

---

## 107

1  A.  I don't remember.  I don't remember.  And
2  actually, I don't know.
3  Q.  As you sit here today, it may have but not have
4  been?
5  A.  Yes.
6  Q.  Do you know whether or not you distributed
7  Exhibit 8 to members of Southwest Workers Union?
8  A.  I mean, I believe we did.
9  Q.  Are there any individuals members of Southwest
10 Workers Union who have appeared as intervenors in this
11 case?
12 A.  Not to my knowledge.
13 Q.  You're aware that there have been a number of
14 individuals who have intervened in the case?
15 A.  I am not aware.
16 Q.  All right.  So do you know whether Peter
17 Johnson, an Intervenor in this case, whether he is a
18 member of Southwest Workers Union?
19 A.  I don't know.
20 Q.  Ronald Wright?
21 A.  I don't know.
22 Q.  Anna Burns?
23 A.  I don't know.
24 Q.  Nicole Rodriguez?
25 A.  I don't know.

---

## 108

1  Q.  Victoria Rodriguez?
2  A.  I don't know.
3  Q.  Brianna Williams?
4  A.  I don't know.
5  Q.  Felicia Johnson?
6  A.  I don't know.
7  Q.  Dominic Munday?
8  A.  I don't know.
9         (Exhibit 9 marked for identification.)
10 Q.  (By Mr. Brissenden) The court reporter has
11 handed you what's been marked as Exhibit 9.  Do you
12 recognize Exhibit 9?
13 A.  I do.
14 Q.  And what is Exhibit 9?
15 A.  It's an e-mail.
16 Q.  And is this an e-mail that was sent to you on
17 September 21st, 2011?
18 A.  Yes.
19 Q.  And do you see that the e-mail was sent to you
20 from Sam Patton of The League of Young Voters Education
21 Fund?
22 A.  I do.
23 Q.  And it states, "Subject:  48 hours to reject
24 voter ID.  Dear Tanya:  The Texas student voters are
25 under attack and they need your help.  We have just 48

Tanya Aguilar Garduno                                      June 13, 2012

---

### 109

1  hours to tell the Department of Justice that we see the
2  Texas voter ID bill for what it is; an attempt to divide
3  our generation and cut us out of the 2012 elections.  As
4  an organization dedicated to protecting young voters, we
5  are asking the Department of Justice to reject the law
6  based on the fact that it deliberately disenfranchises
7  young voters."  Did I read that correctly?
8       A.  Yes.
9       Q.  And do you agree with the statements in that
10  e-mail?
11          MS. JUDGE:  Objection,
12  irrelevant.  Relevance here.  Relevance.
13       Q.  (By Mr. Brissenden) You may answer.
14       A.  Are you asking me if I personally agree with
15  the statement?
16       Q.  Yes.
17       A.  My personal opinion?
18       Q.  And on behalf of Southwestern Workers Union,
19  yes.
20       A.  Yes.  We feel it's discriminatory.
21       Q.  The e-mail goes on to state that or instructs,
22  "Stand with the students of Texas by telling the DOJ to
23  reject SB 14."  Do you see that line?
24       A.  I don't see it.
25       Q.  I'm sorry.  In the middle in bold.

---

### 110

1       A.  Oh, yes.  I'm sorry.
2       Q.  Do you see that?
3       A.  Yes.
4       Q.  And did I read that correctly?
5       A.  Yes.
6       Q.  The e-mail then goes on to state, in the -- I'm
7  directing your attention to the last paragraph.  "We
8  must show them that we stand united against youth voter
9  suppression.  We have a very short window -- two more
10  days -- to pressure the Department of Justice to deny
11  preclearance of SB 14 and stop this assault on student
12  voters.  Your letter could change the course of the 2012
13  elections."  Did I read that correctly?
14       A.  Yes, you did.
15       Q.  And do you agree with the statements contained
16  therein?
17       A.  Yes.
18       Q.  Did you join in League of Young Voters' efforts
19  to, as they say, quote, pressure the Department of
20  Justice to deny preclearance of SB 14?
21       A.  Are you asking if I personally did or did my
22  organization join with The League of Young Voters?
23          MS. JUDGE:  Yes.  Objection, compound
24  question.
25       Q.  (By Mr. Brissenden) All right.  Well, then

---

### 111

1  we'll start with whether Southwest Workers Union --
2       A.  Did Southwest Workers Union do what?
3       Q.  Join in The League of Young Voters' efforts to,
4  as they describe, pressure the Department of Justice to
5  deny preclearance of SB 14?
6          MS. JUDGE:  Objection, vague.
7       A.  I'm not very clear on what you're exactly
8  asking me.
9       Q.  (By Mr. Brissenden) All right.  Let me clear it
10  up for you then.  In terms of responding to this e-mail,
11  did you do what Mr. Patton was asking you to do?
12       A.  So you're asking me if we sent to a letter to
13  the DOJ?
14       Q.  That's right.  He's asking did you -- he's
15  asking to -- requesting you to contact the Department of
16  Justice with regards to SB 14.  Did you do that?
17          MS. JUDGE:  Objection, vague.  And we're
18  trying to figure out:  Are you asking on behalf of the
19  students here, or, you know, because as you know, we
20  have certainly disclosed that our clients did sign on to
21  a letter, a comment letter to the Department of Justice,
22  but it wasn't through the students here.  So we just
23  want to be clear that she's responding to the correct
24  questions you're asking.
25       Q.  (By Mr. Brissenden) Okay.  And I'm just simply

---

### 112

1  asking at this point, in response to Exhibit 9, did you
2  respond to what Sam Patton's -- what Sam Patton was
3  requesting you to do in this e-mail?
4       A.  To write a letter after this e-mail was sent?
5       Q.  Is that what your understanding of the e-mail
6  is?
7       A.  The last statement says, "Your letter could
8  change the course of the 2012 elections," that is my
9  understanding.
10       Q.  And did you do that?
11       A.  Did I personally do that?
12       Q.  Yes.
13       A.  No.
14       Q.  Do you know if anyone from Southwest Workers
15  Union sent or communicated with the Department of
16  Justice about SB 14 in response to Sam's e-mail?
17       A.  No.
18          (Exhibit 10 marked for identification.)
19       Q.  (By Mr. Brissenden) The court reporter has
20  handed you what's been marked Exhibit 10.  Do you
21  recognize Exhibit 10?
22       A.  Yes.
23       Q.  What is Exhibit 10?
24       A.  It's an e-mail.
25       Q.  And was it sent from you?

Tanya Aguilar Garduno                                        June 13, 2012

## 113

1    A.   From my personal e-mail.
2    Q.   And does your name appear there at the top of
3    the e-mail?
4    A.   Yes.
5    Q.   And was that e-mail sent on September 21st,
6    2011?
7    A.   Yes.
8    Q.   And was that sent on the same day that you
9    received the e-mail from Sam Patton that's reflected in
10   Exhibit 9?
11   A.   Yes.
12   Q.   And do you see the subject heading, it says,
13   "Do not preclear SB 14"?
14   A.   I do see that.
15   Q.   And you sent that e-mail to Chris Herren,
16   correct?
17   A.   Yes.
18   Q.   And Chris Herren is an attorney at the
19   Department of Justice, correct?
20   A.   As far as my knowledge goes, yes.
21   Q.   And Chris was involved with the administrative
22   preclearance process of SB 14 at the Department of
23   Justice, correct?
24   A.   I believe so, yes.
25   Q.   How is it that you had Chris's e-mail address

## 114

1    at the Department of Justice?
2    A.   I'm guessing I got it from this other e-mail,
3    from The League of Young Voters.  I forgot, I guess.
4    Q.   And you're referring to Exhibit 9?
5    A.   Yes, I am.  It's a lot of e-mails.  I get
6    confused and forget.
7    Q.   Is there anything in Exhibit 9 that indicates
8    you should send the e-mail directly to Chris?
9    A.   I mean, I don't know.  It could have been
10   something to click on in there, but I don't know which
11   one it is or what was it in there.
12   Q.   Okay.  But in any event, you did send this
13   e-mail to Chris?
14   A.   Yes.
15   Q.   And on the subject heading, "Do not preclear
16   SB 14," correct?
17   A.   Yes.
18   Q.   And in the e-mail -- first of all, could you
19   read the substance of the e-mail?
20   A.   What's inside the e-mail?
21   Q.   Yes.
22   A.   It says, "The right to vote is the bedrock of
23   our democracy, and SB 14 takes the power to vote --" "of
24   the vote out of the hands of Texas students.  Please
25   deny preclearance of SB 14 and stand for the future of

## 115

1    the Texas electorate."
2    Q.   And below that, then, is your name, correct?
3    A.   That is my name.
4    Q.   In comparing Exhibit 10 to Exhibit 9, do you
5    see there the time stamps that are reflected on the two
6    e-mails?
7    A.   I do.
8    Q.   Would you agree with me that in looking at the
9    two e-mails, that you sent the e-mail roughly about an
10   hour after receiving the e-mail from Sam Patton?
11       MS. JUDGE:  I'm going to object,
12   certainly, to the point that it's an unfair
13   characterization in terms of, this was sent on behalf of
14   Southwest Workers Union.  Let the record note that this
15   was sent from a private e-mail account.
16   Q.   (By Mr. Brissenden) You may answer.
17   A.   Yes.  It was within an hour, roughly.
18   Q.   When Sam Patton sent the e-mail that's
19   reflected in Exhibit 9, do you see there that the e-mail
20   was sent to your e-mail address at Southwestunion.org?
21   A.   Yes.
22   Q.   And in the e-mail that's reflected in Exhibit
23   10, you sent the e-mail but did not use your work e-mail
24   from Southwest Workers Union, correct?
25   A.   That is correct.

## 116

1    Q.   And instead, you have simply listed your, I
2    assume, personal e-mail address; is that correct?
3    A.   That is correct.
4    Q.   All right.  Is there anything in there, in
5    Exhibit 10, that indicates that at the time that you
6    sent this that you were employed at Southwestern Workers
7    Union at the time?
8    A.   I don't understand your question.
9    Q.   Is there anything in the e-mail that would have
10   indicated to Chris that you were an employee of
11   Southwestern Workers Union?
12   A.   No.
13   Q.   Did you send any more communications to Chris
14   other than this e-mail?
15   A.   I don't remember.
16   Q.   Did you have any more communications with
17   anyone at the Department of Justice regarding SB 14?
18   A.   I don't remember.
19   Q.   Did you hear back from Chris after this e-mail
20   was sent?
21   A.   I don't remember.
22   Q.   Did you hear back from anybody from the
23   Department of Justice after you sent this e-mail?
24   A.   I don't remember.
25       (Exhibit 11 marked for identification.)

## 117

1    Q.  (By Mr. Brissenden) The court reporter has
2    handed you what's been marked Exhibit 11.  Do you
3    recognize this exhibit?
4    A.  I do.
5    Q.  What is Exhibit 11?
6    A.  It's an e-mail I sent to staff at my
7    organization.
8    Q.  To other members -- or staff at Southwest
9    Workers Union?
10   A.  Yes.
11   Q.  And you sent this e-mail on July 11th of 2011?
12   A.  Yes.
13   Q.  And do you see on the subject heading, "Voter
14   ID Law Texas."  Is that correct?
15   A.  That is correct.
16   Q.  And you state, "Hey, folks.  I know I have
17   talked to some folks about this, but I thought I'd ask
18   again:  Do you know someone or somebodies that will be
19   affected by the new voter ID law that passed this year?
20   They must NOT--" in all caps -- "have a state-issued ID
21   and vote using ONLY --" all caps -- "a voter
22   registration card.  If you do know someone or somebodies
23   like this, please put them in connection with myself."
24   Did I read that correctly?
25   A.  Yes.

## 118

1    Q.  And this was in July of 2011, correct?
2    A.  Yes.
3    Q.  And this -- was this a follow-up to the prior
4    e-mail we discussed referencing the MALDEF
5    questionnaire?
6    A.  I don't know.
7    Q.  Do you know if anybody responded to you in this
8    e-mail?
9    A.  I don't remember.  If they did, I'm sure I
10   would have produced it in the stuff that you asked us
11   for.
12   Q.  As you sit here today, do you know of anybody
13   in particular that -- a member, a nonmember, who
14   contacted you as a result of this e-mail?
15   A.  I don't know.  I don't remember.
16   Q.  You'd agree that in this e-mail, you're asking
17   for other staff members to let you know if they know of
18   someone or somebody who would be affected by the new
19   voter ID law, correct?
20   A.  That's what my e-mail says.
21   Q.  And as you sit here today, do you know whether
22   any of the other staff members gave you the names of
23   anyone?
24   A.  I mean -- I don't remember last year, last
25   summer.

## 119

1         MS. JUDGE:  About how much longer do you
2    think we'll go?
3         MR. BRISSENDEN:  I think I'll pass the
4    witness at this time.
5         MS. JUDGE:  Okay.  Well, we'd like the
6    opportunity to review -- or passing in terms of me.  I
7    don't have a redirect.  But we would like the
8    opportunity to review and sign the transcript and make
9    any corrections.
10        MS. McLEOD:  I have no questions.
11        MR. BRISSENDEN:  Thank you for your time
12   today.
13        (Signature reserved.)
14        (Deposition concluded at 1:08 p.m.)
15
16
17
18
19
20
21
22
23
24
25

## 120

1    CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3    PAGE LINE CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   I, TANYA AGUILAR GARDUNO, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24        _____
25        TANYA AGUILAR GARDUNO



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                        )
                                       )
        Plaintiff,                     )
                                       )
VS.                                    )
                                       )
ERIC H. HOLDER, JR. in his             )
official capacity as Attorney          )
General of the United States,          )
                                       )
        Defendant,                     )
                                       )
ERIC KENNIE, et al,                    )
                                       )
    Defendant-Intervenors,             )
                                       )
TEXAS STATE CONFERENCE OF              )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                        )  (RMC-DST-RLW)
                                       )  Three-Judge Court
    Defendant-Intervenors,             )
                                       )
TEXAS LEAGUE OF YOUNG VOTERS           )
EDUCATION FUND, et al,                 )
                                       )
    Defendant-Intervenors,             )
                                       )
TEXAS LEGISLATIVE BLACK                )
CAUCUS, et al,                         )
                                       )
    Defendant-Intervenors,             )
                                       )
VICTORIA RODRIGUEZ, et al.,            )
                                       )
    Defendant-Intervenors.             )

****************************************
ORAL DEPOSITION OF
REPRESENTATIVE MAY HELEN GIDDINGS
JUNE 6, 20112
****************************************

**2**

1        ORAL DEPOSITION OF REPRESENTATIVE MAY HELEN
2    GIDDINGS, produced as a witness at the instance of the
3    Defendant, was duly sworn, was taken in the above-styled
4    and numbered cause on the JUNE 6, 20112, from 9:43 a.m.
5    to 12:59 p.m., before Chris Carpenter, CSR, in and for
6    the State of Texas, reported by machine shorthand, at
7    the offices of Attorney General for the State of Texas,
8    209 West 14th Street, 1st Floor Conference Room, Austin,
9    TX 78701 Austin, Texas 78701, pursuant to the Federal
10   Rules of Civil Procedure and the provisions stated on
11   the record or attached hereto.

**3**

 1
 2
 3                    A P P E A R A N C E S
 4   FOR THE PLAINTIFF, STATE OF TEXAS:
 5       Matthew Frederick
         Stacey Napier
 6       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         P.O. Box 12548
 7       Austin, TX 78711-2548
 8       209 West 14th Street
         8th Floor
 9       Austin, TX 78701
         (512) 936-1307
10       matthew.frederick@texasattorneygeneral.gov
11
         FOR THE DEFENDANT, HOLDER, ET AL:
12
         Angela Miller
13       Jennifer Maranzano
         U.S. DEPARTMENT OF JUSTICE
14       950 Pennsylvania Avenue, NW
         NWB - Room 7202
15       Washington, DC 20530
         (202) 305-7766
16       angela.miller5@usdoj.gov
17   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
     NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
18   CAUCUS:
19       John K. Tanner
         (for Ezra D. Rosenberg)
20       DECHERT, LLP
         Suite 500
21       902 Carnegie Center
         Princeton, NJ 08540-6531
22       (609) 955-3200
         john.k.tanner@gmail.com
23       ezra.rosenberg@dechert.com
24
25

**4**

 1                     INDEX
 2   Appearances.......................................3
 3   REPRESENTATIVE MAY HELEN GIDDINGS
 4       Examination by Mr. Frederick..............5
         Examination by Mr. Tanner................98
 5       Examination by Ms. Miller...............108
 6   Signature and Changes.........................112
 7   Reporter's Certificate........................114
 8                    EXHIBITS
 9   NO. DESCRIPTION                    PAGE MARKED
10   1    Amended Notice of Deposition        13
11   2    Photos of Members of the Texas Legislative   17
          Black Caucus
12
13   3    Motion For Leave To Intervene As         33
          Defendants
14
15
16
17
18
19
20
21
22
23
24
25

May Helen Giddings                                            June 6, 2012

---

**5**

1              REPRESENTATIVE MAY HELEN GIDDINGS,
2      having been first duly sworn to testify the truth, the
3      whole truth, and nothing but the truth, testified as
4      follows:
5                      EXAMINATION
6      BY MR. FREDERICK.
7          Q.   Good morning, Representative Giddings.
8          A.   Good morning.
9          Q.   Please state your full name for the record.
10         A.   May Helen Giddings.
11         Q.   Thank you.  My name is Matt Frederick.  I
12     represent the State of Texas in the lawsuit styled Texas
13     versus Holder.  Have you ever been deposed before?
14         A.   I can't remember.  I think I was many years
15     ago.
16         Q.   Okay.  Well, I'll go over some ground rules in
17     a minute just to reacquaint you.
18         A.   Okay.
19         Q.   Are you suffering from any illness today that
20     will affect your ability to answer my questions
21     accurately?
22         A.   No.
23         Q.   Are you taking any medication that might affect
24     your ability to provide accurate answers to my
25     questions?

---

**6**

1          A.   No.
2          Q.   Are you aware of anything else that might
3      prevent you from accurately answering my questions
4      today?
5          A.   No.
6          Q.   Okay.  A couple of ground rules.  One, maybe
7      the most important, is to just answer audibly so that
8      the court reporter can take down what we're saying.  So
9      instead of nodding your head, he would prefer that you
10     say "yes" or "no."
11         A.   Uh-huh.  Yes.
12         Q.   And if you don't understand any question that I
13     ask, please tell me, and I will happy to rephrase it.
14     Okay?
15         A.   That's fine.
16         Q.   Thanks.  And please wait until I finish a
17     question to start answering just so we're not talking
18     over each other, and I will also to do my best not to
19     ask a question while you're still answering.  Okay?
20         A.   Fine.
21         Q.   Okay.  Are you represented by counsel today?
22         A.   I am not.  I am here representing the Texas
23     Legislative Black Caucus, and the Black Caucus has
24     counsel.  I personally do not.
25         Q.   Okay.  And who is the Legislative Black

---

**7**

1      Caucus's counsel?
2          A.   John Tanner.
3          Q.   And you understand that you have been
4      designated to provide testimony on behalf of the Texas
5      Legislative Black Caucus today?
6          A.   Yes.
7          Q.   So I will try and be clear if I'm referring to
8      you personally or to the Caucus, but my -- unless I
9      otherwise indicate, my questions will be directed toward
10     the Caucus as a whole.
11         A.   Yes.
12         Q.   Thanks.  What did you do to get ready for your
13     deposition today?
14         A.   I reviewed the Senate Bill 14.  I did a little
15     search, a little research surrounding the bill as it was
16     on the Floor, and I had a brief conversation with the --
17     with the Black Caucus's general counsel.
18         Q.   Who is the Legislative Black Caucus's general
19     counsel?
20         A.   Or -- the Caucus is represented by John Tanner,
21     so general counsel is probably the wrong word, just
22     counsel, I suppose.
23         Q.   How long did that meeting with Mr. Tanner last
24     about?
25         A.   Well, we had dinner, and we talked about this

---

**8**

1      among other things, so it lasted probably an hour or so
2      last evening.  And then we had about a 20-minute
3      breakfast this morning, some of which I spent talking
4      about the Celtics game.
5          Q.   What research did you do specifically to
6      prepare for this deposition?
7          A.   I took a look at the amendments that members of
8      the Texas Legislative Black Caucus had proposed during
9      the debate.  I took a look at Senate Bill 4 -- Senate
10     Bill 14.  And I looked at the House research
11     organization piece.  Pardon me.  I looked at the letter
12     from -- that the Department of Justice sent to the
13     State, briefly this morning.  And I looked at -- I don't
14     know what you call it, the notice of intention to take
15     oral deposition of -- I looked at that.
16         Q.   All right.
17         A.   Additionally, I recalled that some of the
18     conversations and so forth that had happened with my
19     office regarding this particular legislation, and I
20     tried to find an e-mail as it related to that.
21         Q.   What was the e-mail that you tried to find?
22         A.   Well, it was an e-mail from Riley Simmons, who
23     back in December of 2011, I believe it was, was very,
24     very concerned about the chilling effect that this bill
25     would have on voter turnout, particularly for elderly

May Helen Giddings                                              June 6, 2012

---

**9**

1   African Americans and for students.  And Mr. Simmons
2   called our office and asked if we could make available
3   the Department of Public Safety coming out on site,
4   doing on-site registrations for the elderly so that they
5   would not have to go down to the Department of Public
6   Safety and stand in line for a very long time.  Many of
7   them might not be able to do that.
8             And also, because we had some colleges,
9   that there was some concern about students there who
10  might not have a driver's license because they might not
11  drive, and their student ID could not be used.  And
12  therefore, they might be absent what was required under
13  Senate Bill 14 to be able to vote.
14      Q.  Did you find that e-mail?
15      A.  I found our response to Mr. Simmons.  I did not
16  find his e-mail.  I did find our response to him.  And
17  our response to him said our having worked with the
18  Department of Public Safety, the Department of Public
19  Safety said to us that they would come out and offer
20  education and guidance to the citizens that were bussed
21  into a particular site, but they were unable to set up
22  on-site registration.
23      Q.  Do you know if that e-mail has been or the --
24  or Mr. Simmons -- I'm sorry.  Is it Mr. or Mrs. Simmons?
25      A.  It's Mr. Simmons.  Riley Simmons.

---

**10**

1       Q.  Do you know if Mr. Simmons e-mail has been
2   produced in this litigation?
3       A.  I don't know that it has.  I just -- I just
4   recall that very, very vividly because, you know, I said
5   to Mr. Simmons, this -- this issue has not finally been
6   decided just yet.  But there was a lot of confusion, or
7   I should say concern in the community and believing
8   that, in fact, everything had been cleared and this
9   legislation was, in fact, in place.  And so, you know, I
10  was trying to tell him I wasn't sure that we were, you
11  know, quite where he was yet and let the process play
12  out.  So I don't know is the answer to that question.
13      Q.  You mentioned a letter from the Department of
14  Justice to the State.  Was that the March 12th letter
15  where the department objected to Senate Bill 14?
16      A.  Yes.
17      Q.  Okay.  Great.
18      A.  I saw it for the first time last night, and I
19  reviewed it for the first time for a few minutes this
20  morning, and a lot of legalese there so I don't know how
21  much I know about that.
22      Q.  And it looks like you've brought some documents
23  with you today.  Can you tell me what those documents
24  are?
25      A.  Senate Bill 14.  The House research organ --

---

**11**

1   organization report, and that's -- and the documents
2   that we've already talked about.
3       Q.  Okay.
4       A.  That's -- oh, some amendments that were filed
5   by members of the legislative -- Texas Legislative Black
6   Caucus.
7       Q.  Do you have copy of the e-mail we were
8   discussing with Mr. Simmons?
9       A.  Yes, I do.
10      Q.  Okay.  Do you mind if I looked at that e-mail?
11      A.  No, sure don't.  (Handed to counsel.)
12      Q.  Thanks.
13          Did you talk to anyone else about your
14  deposition today besides Mr. Tanner?
15      A.  Well, yes, just in passing, but no details.  My
16  staff knows I'm here to do a deposition on -- on voter
17  ID, you know, I -- but in terms of what I
18  might -- my testimony is or whatever, no, I -- I can't
19  think of anyone that I talked to about it.
20          I mean, we've had a conversation with
21  Mr. Tanner, with the chair of the Legislative Black
22  Caucus some time ago, I think before I was asked to
23  provide whatever testimony I could provide, and
24  certainly probably the director of the Texas Legislative
25  Black Caucus was on that conversation and maybe other

---

**12**

1   members.  I don't know.  It was the chair, to the best
2   of my memory, some weeks ago calling a meeting, a
3   telephone meeting.
4       Q.  Do you know how you were designated to testify
5   on behalf of the Legislative Black Caucus?
6       A.  No, I do not.  I'll be perfectly honest with
7   you and tell you that we have members in the legislature
8   that are experts on various issues and --
9       Q.  Are you an expert --
10      A.  No.
11      Q.  -- on SB 14?
12      A.  No.
13      Q.  Okay.  Is there any member of the Legislative
14  Black Caucus who is an expert on SB 14 to your
15  knowledge?
16      A.  Well, to my knowledge, and now, you know, this
17  is my personal opinion.
18      Q.  Sure.
19      A.  And I'm here speaking on behalf of the Caucus,
20  but the person I think who sat on the committee was
21  Mr. Veasey, I believe, and so because he sits on that
22  committee and he knows what transpired, I would say, but
23  it's my understanding, and I could be wrong, that he has
24  presented himself as somebody who has an issue.
25      Q.  Right.

May Helen Giddings                                                June 6, 2012

---

33

1    just don't think I can speak to that at all or
2    adequately.
3        Q.  Well, let me show --
4        A.  I guess it's a little bit legal to me in terms
5    of joining the League of Women Voters or Justice
6    Seekers, per se, rather than, you know, the Caucus
7    acting on it and what was in the best interest of the
8    people that they represent.
9        Q.  I understand.  And let me -- I'll show you
10   something that I think will maybe explain a little bit
11   what I mean when I say that.
12       A.  All right.
13       Q.  I understand that's probably confusing.
14           MR. FREDERICK:  Will you please mark this
15   as 3?
16           (Exhibit 3 marked for identification.)
17       Q.  (By Mr. Frederick)  I'm handing you what has
18   been marked as Deposition Exhibit 3.  Are you
19   familiar with this document?
20       A.  Personally -- well, this is kind of hard to
21   answer on behalf of the Caucus because it does require a
22   personal -- I'm not familiar with this document, no.
23       Q.  Just for the record, can you identify what this
24   document says it is?
25       A.  It says it's a Motion For Leave To Intervene As

---

34

1    Defendants.
2        Q.  And in the first sentence, right under the
3    title, you see it says "Texas Legislative Black Caucus";
4    is that right?
5            MR. TANNER:  I'm going to object to this
6    on a number of grounds:  The attorney-client privilege,
7    work document and relevance.  We are going down -- we've
8    spent a fair amount of time going down a road that has,
9    as far as I can discern, nothing to do with the legal --
10   the factual issues involved in this case.  And so I'll
11   -- unless I get some explanation, I'll instruct the
12   witness not to answer the question.
13           MR. FREDERICK:  On what basis, relevance?
14           MR. TANNER:  Attorney-client privilege and
15   work product.
16           MR. FREDERICK:  Well --
17           MR. TANNER:  This is a brief, a motion and
18   a memorandum in support.  It's a legal document.
19           MR. FREDERICK:  Okay.
20           MR. TANNER:  And it has to do with an
21   issue separate from the issue of this case.
22           MR. FREDERICK:  Okay.  Well, let me ask
23   the question again.  I'll move quickly through it.  All
24   I'm intending to ask about is just what the document is
25   and what it says.  So I'm not asking for any attorney-

---

35

1    client conversation or work product.  I mean, this has
2    been filed in the lawsuit.
3            MR. TANNER:  Well, the document speaks for
4    itself, and it's a legal brief, and this is a
5    nonattorney factual witness.
6            MR. FREDERICK:  I understand, and I'm just
7    asking her to confirm what the document says.
8            MR. TANNER:  And I will also note for the
9    record that she said she's not familiar with it, and
10   we're burning up time here going over it.
11           MR. FREDERICK:  I understand.
12       Q.  (By Mr. Frederick)  Let me just ask one
13   question.  In this document that's been marked as
14   Exhibit 3, it's titled, "A motion For Leave To Intervene
15   As Defendants."  Is it -- does this document list the
16   Legislative Black Caucus, the League of Women Voters,
17   the Justice Seekers, Reverend Peter Johnson, Reverend
18   Ronald Wright and Donald Wright?
19           MR. TANNER:  I'll object.  The document
20   speaks for itself.
21       Q.  (By Mr. Frederick)  You may answer.  You may
22   answer.
23       A.  The -- what you just read is what the document
24   said.  And that's a little bit confusing for a
25   nonlawyer, when counsel objects and the opposition is --

---

36

1    where is the judge here to tell me I have to answer or
2    not.
3        Q.  Sure.  And I should have made that clear at the
4    beginning.  Generally, the way depositions work, you
5    know, your counsel is free to object on the record, and
6    unless he instructs you not to answer, even if he
7    objects, generally, you just answer.
8        A.  Oh, okay.
9        Q.  But if you're not to answer, he will instruct
10   you.
11       A.  Oh, okay.  Good.  Great.  Now I know the answer
12   to that.
13           MR. TANNER:  Thank you, Matt.
14       Q.  (By Mr. Frederick)  Okay, well, let's move on
15   to a different area.  Did you speak with anyone at the
16   Department of Justice about Senate Bill 14?
17       A.  No, I have not.
18       Q.  Are you aware whether the Caucus spoke with the
19   Department of Justice about SB 14?
20           MR. TANNER:  The Caucus is an
21   organization.  Just to clarify the form of the question.
22       A.  The Caucus, as an organization, I don't have
23   direct knowledge.
24       Q.  (By Mr. Frederick)  To your knowledge, did --
25   have any of the members of the Caucus spoken with the

May Helen Giddings                                              June 6, 2012

---

## 37

1 Department of Justice about SB 14?
2      A.   To my knowledge.  I might -- I would not know
3 whether or not individual members did.  There are two --
4 and I want to make sure that I'm clear here.  I want to
5 make sure that -- I'm trying to keep two things
6 separated.  We were very concerned about -- about
7 redistricting.  We very concerned about SB 14.  And I do
8 know that we had some conversations, not as a group, the
9 organization, but to the best of my knowledge, that
10 conversation that we had would have been with
11 redistricting.  I'm not -- there were two things going
12 on, both of them with the Department of Justice, and I
13 think that what I'm aware of was probably having to do
14 with redistricting.
15      Q.   I understand.  Thank you.
16            Did the Caucus send any letters or e-mails
17 to the Department of Justice about SB 14?
18      A.   It's the same answer because on -- on either
19 redistricting -- and I'm going to guess, you know, my
20 best -- to the best of my memory, that correspondence,
21 at least while we were in session, had to do with
22 redistricting, rather than SB 14.
23            Now, you know, after the session, the
24 Caucus as an organization has a chairman that very often
25 speaks for us, and with our permission, but I'm not -- I

---

## 38

1 may not be aware of all contact, if any, that might have
2 been made, but between the redistricting and SB 14, and
3 I believe it was mostly redistricting, I think there has
4 been communication.
5      Q.   Does the Caucus contend that Senate Bill 14, if
6 enacted or if it takes effect, will deny or abridge
7 African American Texans' right to vote?
8            MR. TANNER:  Excuse me.  I'm going to
9 object to the form of the question which calls for a
10 legal conclusion, and I think, as to this, and I presume
11 you're going to get into the purpose too.  You can break
12 it down into elements.
13            MR. FREDERICK:  Sure.
14            MR. TANNER:  And it will be -- and we can
15 move along.
16            MR. FREDERICK:  Okay.
17      Q.   (By Mr. Frederick)  And that question was
18 stated in more legal terms.  So I'll -- I'll try and
19 make it more clear.
20            First, do you understand -- do you
21 understand what I mean when I say "denying or abridging
22 the right to vote"?
23      A.   Yes.
24      Q.   Does the Caucus contend that Senate Bill 14, if
25 put into effect, would deny or abridge African American

---

## 39

1 Texans' right to vote?
2            MR. TANNER:  Again, I'm going to object to
3 the form.  The legal terms have precise legal meaning,
4 which may not be the same as the lay meaning of the
5 terms, and I think that there's some plain language ways
6 that would be easier for the witness to answer.
7      Q.   (By Mr. Frederick)  Do you understand the
8 question as I've stated it?
9      A.   Let me -- can I play it back to you in my own
10 language?
11      Q.   Of course, yes.
12      A.   Is the question, does the Caucus believe that
13 the African American vote is going to be suppressed
14 because of Senate Bill 14?
15      Q.   Well, that's fair.  Does the Caucus believe
16 that the African American vote will be suppressed by
17 Senate Bill 14?
18      A.   The Caucus does.
19      Q.   Earlier you mentioned a retrogressive effect.
20      A.   Uh-huh.
21      Q.   Does the Caucus believe that Senate Bill 14
22 would have a retrogressive effect on African American
23 voters?
24            MR. TANNER:  Would you like to rephrase
25 that?  Plain language.  Again, I object to the form.

---

## 40

1      Q.   (By Mr. Frederick)  Okay.  If you can answer
2 the question, please do.
3      A.   If you're asking me if it has the potential of
4 lowering the vote, percentage-wise or otherwise, of
5 African Americans, that's the concern that the
6 Legislative Black Caucus does have.
7      Q.   So your testimony, just so I'm clear and we can
8 move on, is that the Caucus believes that Senate Bill
9 14, if enacted or put into effect, would suppress
10 African American votes and -- well, is that accurate?
11      A.   I think it's -- it's pretty accurate,
12 Mr. Frederick, because from all the -- from our town
13 hall meetings and so forth, when these particularly
14 elderly people and very young people come up, they tell
15 us in many cases they do not possess the document that
16 they are going to need to go and vote.  And so that's
17 how we have come up with -- with our belief that it is
18 going to lower voter turnout.
19            And people who are voting today, because
20 of the variety of documents that they can use to vote,
21 will not be able to do it tomorrow because -- or if this
22 bill is enacted, because some of the documents that are
23 used today they won't be able to use in the future.
24      Q.   So the Caucus believes that SB 14, if put into
25 effect, will lower African American turnout?

May Helen Giddings                                        June 6, 2012

## 41

1     A.  Yes.  Yes.
2     Q.  Are there any other negative effects that the
3  Caucus believes SB 14 would have if put into effect?
4     A.  To the best of my knowledge, it would be that,
5  you know, while we're trying to get as many people to
6  have a voice in government and feel a part of
7  government, and they do that by voting, and these people
8  no longer be able to vote, that would be the major
9  reason that I believe that the Caucus would have for its
10  position.
11     Q.  So you said that belief of the Caucus is
12  based on town hall meetings where individuals have
13  stated that they don't have the required documents under
14  SB 14; is that right?
15          MR. TANNER:  I believe that was part of
16  the witness's previous answer.  She also referenced
17  other materials that had been provided to the members of
18  the Caucus in which we discussed earlier.
19     Q.  (By Mr. Frederick)  Okay.  Well --
20     A.  Repeat, please.
21     Q.  Sure.  A moment ago you mentioned that that
22  belief, the Caucus's belief about the effect of SB 14,
23  was based at least in part on town hall meetings where
24  individuals had said that they lacked the required ID.
25     A.  Uh-huh.

## 42

1     Q.  Is that right?
2     A.  Well, that, in part, but then again, you know,
3  we speak to advocacy groups, so it's just not from a
4  town hall meeting.  It's from advocacy groups.  I mean,
5  this bill caused a real major stir in the African
6  American community.  And because of the history of
7  African Americans, it was very frightening that
8  something has been fought for so long and so hard
9  might -- might now be in danger.
10          So we, basically, if there's something
11  really good happening, we hear from our constituents.
12  If there's really something bad happening, we hear from
13  our constituents.  And we heard a lot from constituents
14  on -- on this particular issue.  And again, the very
15  young, the very old, the people in the rural areas, and
16  interestingly enough, a lot of married women.
17          I remember a town hall meeting in Dallas
18  that I did with several other state reps, and it -- it
19  was a little bit of surprise to me that married women
20  were standing up and saying, "Well, you know, my voter
21  ID says this and my driver's license says that," and
22  based on that, their question was, "How is this going to
23  be reconciled?  Am I going to be able to vote?"  And
24  so --
25     Q.  Did the Caucus conduct any studies on the

## 43

1  effect of SB 14 on African American voters?
2     A.  Not to my knowledge.
3     Q.  Other than -- well, I'll just ask it this way,
4  and hopefully, this will be clear:  Has the Caucus
5  conducted any -- any formal surveys on the effect of SB
6  14 on African American voters?
7     A.  Not formal surveys, no.
8     Q.  But -- but members of the Caucus have spoken to
9  individuals who are concerned about the potential
10  effects; is that accurate?
11     A.  Many, many individuals, especially, you know,
12  in our individual meetings, our phone calls, town hall
13  meetings, that kind of thing.  Electronic town hall
14  meetings where, you know, you get thousands of people.
15     Q.  So, and the purpose of this is just to figure
16  out what the basis for the contention is about the
17  effect, and you've mentioned town hall meetings,
18  advocacy groups that provided material, and constituent
19  communications about the potential effect of SB 14.  Is
20  there anything -- anything else that the Caucus's belief
21  about the potential effect of SB 14 is based on?
22     A.  I don't think we can leave out history.
23     Q.  History.
24     A.  That's I think a major part of this.  And I
25  think, secondarily, you know, when we pass bills,

## 44

1  generally speaking, I think the Caucus believes that
2  we're trying to move to a higher level and improve, make
3  an improvement that makes us a better -- a better state
4  and so forth.
5          And I -- I know that the Caucus did -- did
6  look at some information that indicated to them that
7  there really hadn't been a lot of evidence of widespread
8  misuse of the ballot with people being misidentified, so
9  to speak.
10          We -- we certainly realize that we don't
11  want people who are not eligible to vote, illegal voters
12  voting, and we didn't see and we haven't been presented
13  with a lot of evidence that that is the case.
14     Q.  Has -- has the Caucus -- you mentioned
15  widespread misuse, are you referring to voter
16  impersonation?
17     A.  Uh-huh.  Yes.
18     Q.  Was there any evidence that -- of any voter
19  impersonation in Texas?
20          MR. TANNER:  Are you talking about the
21  consideration of the period for the consideration of
22  this bill?
23          MR. FREDERICK:  Correct.  And let me
24  broaden that a little bit.
25     Q.  (By Mr. Frederick)  During the -- during the

May Helen Giddings                                    June 6, 2012

## 45

1    consideration of this bill or any other voter ID bill,
2    has there been any evidence of any voter impersonation
3    in Texas?
4         A.   Well, I'm trying to remember the debate, and I
5    won't say that I can remember it precisely, but I think
6    the conclusion was that we're -- while there might have
7    been some cases of voter fraud that, by and large, it
8    did not appear that those cases were based on somebody
9    impersonating somebody.  Which is, you know, I think
10   largely what this bill tries to fix, is making sure that
11   the person that, you know, presents themselves as a
12   certain person is that person.
13        So in the debate, that was one of the key
14   questions that members of the Caucus and other members
15   continued to ask, do we believe based on whatever
16   evidence we have that this has been occurring, that this
17   is a big problem in Texas?  And I don't believe that I
18   recall a lot of evidence in that regard.  You know, if I
19   -- I would say that in a state with 26, almost 26
20   million people, and I don't know how many of those are
21   voters off the top of my head, but you know, I would
22   think that you would be talking about something, you
23   know, in -- you would be talking about some pretty large
24   numbers for that to be an issue.
25        Q.   Does the Caucus contend that there is no

## 46

1    in-person voter fraud in Texas?
2         A.   I don't know that that's the Caucus's
3    contention.  But I will say this.  I will say it is the
4    Caucus's belief that with fraudulent votes, this is not
5    an area where we have evidence as a state, based on the
6    debates on the Floor, that we have a lot of
7    activity.  Now, is that zero?  No.  I'm not saying it's
8    zero.
9         But I'm saying from the debate on the
10   Floor, and I'm sure that the persons who came with this
11   bill were armed with the best evidence that they could
12   get so as to convince their colleagues that this was the
13   right thing to do.  And obviously, they were able to
14   convince a number of people that this was the right
15   thing to do.  But it wasn't based, from my recollection,
16   that our knowing that, oh, yeah, a couple of hundred
17   people did this in the last year and here's who they
18   were and here's what they did.  That didn't happen.
19        There's, you know, yes, there -- from now
20   until the end of the time, end of time, I would suspect
21   that there's going to be some attempt at voter fraud.
22   But the Caucus belief was that this bill doesn't get at
23   that.  This bill is basically about impersonation and
24   doesn't get to the issues that may be out there.
25        Q.   When you say "the issues that may be out

## 47

1    there," would that include mail-in ballot fraud?
2         A.   I think that there have been allegations over
3    the years that there have been some mail-in ballots
4    where there was fraud, where there was suspected fraud.
5         Q.   But it's not the Caucus's contention that there
6    is no such thing as in-person voter fraud or voter
7    impersonation; is that right?
8         A.   No, not -- it's not a zero game.
9         Q.   Does the Caucus contend that Senate Bill 14
10   will prevent Latino Texans from voting or lower Latino
11   turnout?
12        A.   I think the Caucus is concerned that this bill
13   would prevent a lot of people from voting, including --
14   the people that I'm talking about at the town hall
15   meeting that I went to in Cedar Springs with a couple of
16   other state reps happen to be primarily Anglo, and it
17   was the Anglo women who stood up and said that they
18   weren't going to be able to vote either.  You know,
19   because their drivers license said this and their voter
20   ID said that.  And so they had a question.
21        So anytime anybody is going to be denied the
22   right to vote, we're concerned about that.  But the
23   primary concern of the -- I think of the Texas
24   Legislative Black Caucus in taking whatever action it
25   took, was to two speak to -- speak for those people that

## 48

1    we represent, because that's what they expect us to do,
2    to come here and to voice their concerns and their
3    issues.  So the chairperson would be the person to speak
4    to that, I guess, absolutely, but in my case, speaking
5    for the Caucus and being in those meetings, our concerns
6    were everybody overall, but certainly African
7    Americans.
8         And you know, there's a college in my
9    district that's a small historically Black college.
10   Many of those students don't have government ID because
11   they don't have, you know, they don't have a driver's
12   license.  They don't travel out of the country so, you
13   know, they don't have a passport.  Their student ID
14   won't help them.  So it's a major concern.  How do these
15   students -- I mean, what are they going to -- it was a
16   major concern that this created another barrier, and if
17   you don't call it a barrier, at least you have to say
18   that for some people there's at least another step that
19   you have to take in order to vote.
20        And our thing is about removing barriers
21   as best we can.  And at the same time, I don't want
22   anybody to vote who shouldn't be voting.  But I also
23   don't want anybody who should be voting to have to climb
24   some mountain that they shouldn't have to climb.
25        Q.   What colleges in your district?

May Helen Giddings                                    June 6, 2012

---

## 49

1    A.  Paul Quinn.
2    Q.  Paul Quinn.
3    A.  Also the University of North Texas -- the
4  University of Texas -- the University of North Texas at
5  Dallas is in my district as well as Cedar Valley
6  College, as well as North Haven -- Northbrook.  Oh,
7  they're going to kill me.  I'll have to tell you before
8  I leave.
9    Q.  Okay.
10    A.  And North -- I have to remember the rest of the
11  North.  But I'm very fortunate in that I have at least
12  four colleges in the -- in the area that I
13  represent.  You know, two privates and two
14  publics.  Northwood.
15    Q.  Northwood?
16    A.  Northwood Institute.
17    Q.  Did you hear -- did you or the Caucus hear from
18  students at all of the colleges in your districts about
19  concerns about ID?
20    A.  I don't know that I -- I know that I heard from
21  -- I know that the Caucus heard from Paul Quinn and
22  Cedar Valley.  I don't know -- I think the University of
23  North Texas at Dallas is a little bit different kind of
24  a university in that, for the most part, you don't have
25  -- we don't have the 18 and 19-year-olds there, you

## 50

1  know.  It's older, more mature people.  And I did not
2  hear from those people regarding this.  And
3  specifically, I don't recall that I specifically heard
4  from Northwood.
5    Q.  To the extent that students expressed concern
6  about IDs, did that tend to be younger 18 and 19-year-
7  old students?
8    A.  It did tend to be younger ones.
9    Q.  Does the Caucus believe that Senate Bill 14
10  would prevent indigent Texans from voting?
11    A.  Well, yes, in that they are now required in
12  many cases to take an additional step that they didn't
13  have to take before.  If you didn't have a government
14  ID, currently, there are a number of ways you could
15  establish your identity.  And with that taken away, many
16  of them are going to have to go the Department of Public
17  Safety and get this alternative identification.  And the
18  Department of Public Safety in the state of Texas is --
19  those folks are already -- I don't want to say
20  understaffed, that would get me in trouble since I'm on
21  appropriations but --
22    Q.  Overworked maybe?
23    A.  But let me just say that the Department of
24  Public Safety gets a few complaints about having long
25  lines, having long waiting periods and that kind of

## 51

1  thing, which is why many of the churches -- I just
2  happened to have the conversation -- correspondence with
3  Riley Simmons, but many of the African American churches
4  in the area that I represent and other members represent
5  were concerned about the very elderly who might not have
6  this card, having to stand in that line, and how
7  discouraging that was going to be.  It isn't always --
8  it isn't always the easiest thing for the elderly to get
9  out to vote to begin with, and anything that makes it a
10  little bit harder, it has a negative effect.
11        MR. FREDERICK:  Do you all mind if we take
12  a quick break?
13        MR. TANNER:  I was just about to suggest
14  that.
15        (Recess from 11:03 to 11:20 a.m.)
16    Q.  (By Mr. Frederick)  Representative, are you
17  familiar with the polls regarding Texans' support for
18  voter ID legislation?
19    A.  No, I'm not.
20    Q.  Does the Caucus believe that elderly voters are
21  more likely than average to lack one of the IDs required
22  by SB 14?
23    A.  We particularly believe that elderly African
24  Americans are -- are more likely.
25    Q.  Why is it -- what's the basis of that belief

## 52

1  that elderly African Americans would be more likely to
2  lack ID?
3    A.  Well, I think they -- they have, if you're
4  elderly and you're poor, you have perhaps fewer
5  transactions where these -- where certain documents are
6  required.  I guess a lot of times with banks, for
7  instance, if you have banking relationships, certain
8  kind of photo IDs and so forth, are required to
9  establish those banking relationships.  But
10  particularly, I think the elderly, I think more African
11  Americans who are elderly than the general elderly
12  population.
13    Q.  And among elderly people, this -- is that
14  belief based on the understanding that more elderly
15  African Americans would be poor than other elderly
16  persons?
17    A.  I don't know that that's the case, but -- that
18  that's the case for the belief, but if you're asking me
19  if I believe that, the answer is yes.  But I'm speaking
20  here for the Caucus.  I passed legislation to that
21  effect.
22    Q.  Does the Caucus believe that poor or indigent
23  voters are more likely than average to lack a form of ID
24  required by SB 14?
25    A.  I'm sorry.  I was taking a drink of water and

May Helen Giddings                                      June 6, 2012

---

53

1    the bottle made a noise, so I didn't hear the whole
2    thing.
3        Q.  Of course.  Does the Caucus believe that poor
4    or indigent voters are more likely than average to lack
5    a form of ID required by SB 14?
6        A.  Okay.  That sounds like the same question that
7    I just answered.  Do we believe that elderly African
8    Americans are more likely to not be in possession of
9    photo ID?
10       Q.  Well, this one is:  Does the Caucus believe
11   that poor or indigent voters, regardless of age, would
12   be less likely to have the ID required by SB 14?
13       A.  Gee, you know what?  I -- I'm not sure that the
14   Caucus really has a position on that.
15       Q.  Does the Caucus contend that disabled voters
16   are less likely than average to have the identification
17   required by SB 14?
18           MR. TANNER:  If I could interject with an
19   objection as to the form.  I think we're, again, we're
20   getting back to the level of formality in the Caucus and
21   how much the Caucus is an institution, an unstructured
22   institution, takes positions that are separate from the
23   legal aspect of the position, and whether they take
24   positions as a group or have taken.  I think the witness
25   has been very forthcoming in terms of providing the

---

54

1    general information about the sense of the Caucus, and
2    I'm sure will continue to do so.  But again, we're
3    presuming a level of formality and structure that has
4    not been established by the questions so far.
5            MR. FREDERICK:  Okay.  Well, I mean, the
6    basis of these questions is that the Caucus as a group
7    has intervened and answered in this lawsuit, so that's
8    -- that's the only basis for my questions directed at
9    the Caucus.  And I would contend that's a sufficient
10   basis, because the Caucus has actually appeared in the
11   lawsuit.  So, I mean, that's the only way that I know
12   how to answer the question -- or to phrase these
13   questions.
14           MR. TANNER:  All right.  Well, I was just
15   adding that caveat to it.
16           MR. FREDERICK:  Okay.
17           MR. TANNER:  And to clarify the nature of
18   -- I understand the limitations on how you can ask
19   questions and how the witness can respond.
20       Q.  (By Mr. Frederick)  Let me reask the question.
21           Does the Caucus contend that disabled
22   voters are less likely than average to possess the
23   identification required by SB 14?
24       A.  I'm not sure that the Caucus has taken a
25   position on that.

---

55

1        Q.  Does the Caucus contend that rural voters are
2    less likely than average to possess the ID required by
3    SB 14?
4        A.  Speaking for the Caucus, the Caucus is -- has
5    been very concerned about African American voters in
6    rural areas and that voter turnout and the fact that we
7    need to do what we can to make sure that those people
8    are -- have an opportunity to be engaged.  I think I
9    would have to -- I would have to leave it there.
10           So, yeah, we do -- we have some concern
11   about rural voters, and particularly those -- those
12   rural voters who happen to be African American.
13   Because, for the most part, African American legislators
14   that can be accessed easily by African American
15   constituents are folks in large cities.  In the rural
16   areas, we -- there is a, you know, a -- some
17   representation in some of the rural areas but not that
18   much.  And so, yeah, there is -- there is a real concern
19   about the African Americans and their ability to vote in
20   rural areas.
21           And a lot of that has to do with, I know
22   you -- we just coming back to history.  There are places
23   in the state that history reflects that it has not been
24   very good for African Americans who want to vote.  And
25   those areas are -- I don't want to say largely rural,

---

56

1    but certainly in rural areas, there's been a problem
2    historically.
3        Q.  Does the Caucus believe that an African
4    American voter in a rural area would be less likely than
5    other voters, say Anglo or Hispanic voters, in the same
6    area to have an ID required by SB 14?
7        A.  I'm not sure that they -- they have taken --
8    I'm not sure that the Caucus has taken a position on
9    that.
10       Q.  Okay.  Are you aware or is the Caucus aware of
11   any evidence that an African American in a rural area
12   would be less likely than a Hispanic or Anglo voter in
13   the same area to have the required ID under SB 14?
14       A.  I don't think the Caucus has any facts, factual
15   evidence on that.  They may have more anecdotal kind of
16   information.
17       Q.  Are you aware of any specific anecdotal
18   information about whether African Americans in rural
19   areas would have the ID required by SB 14?
20       A.  Not directly, no, not directly.  Just again, I
21   mean, you're asking for -- I mean, I can't -- is it out
22   there?  Yes.  Can I pinpoint it to a person and a
23   place?  I can't.  But anecdotally, I will say yes, it's
24   that kind of feeling exists, that kind of thought
25   pattern exists.

May Helen Giddings                                          June 6, 2012

---

## 57

1    Q.   Can you identify kind of how or by whom that
2    thought has been expressed to the Caucus, anecdotally or
3    otherwise?
4    A.   Well, I think would it have come through some
5    of our discussions about how to better engage African
6    Americans in some of the rural areas, particularly, I
7    would say in some of the East Texas areas where the
8    voter turnout doesn't seem to be, you know, what it
9    could be, what the potential is.  And I think that whole
10   thought pattern of the rurals not -- of the rurals being
11   less likely to possess this has to do with perhaps
12   occupations even, you know, largely agricultural in a
13   lot of cases and so forth, and maybe less likely to have
14   some of these pieces of -- some of these IDs.
15   Q.   But you're not aware of specific --
16   A.   No, I'm not.
17   Q.   -- information?
18   A.   No, I'm not.
19   Q.   Does the Caucus believe that poor or indigent
20   voters are less likely to be able to obtain one of the
21   IDs required by SB 14?
22   A.   Less likely from the standpoint of their being
23   able to go and get the transportation to a site where
24   they can get a free ID.  And also taking into
25   consideration that with the Department of Public Safety,

## 58

1    I'm pretty sure we don't have a Department of Public
2    Safety in every one of our counties in this state.  I
3    could be wrong about that, but you know, just trying to
4    recall as best I can.
5          I mean, if you were to ask just people in
6    general whether or not we need more DPS sites, I think
7    the answer to that would be -- would be yes.  But
8    certainly if you don't have an automobile and you don't
9    have transportation and the only place you can go and
10   get this ID is 35 or 40 miles away, I think the
11   likelihood of you being -- some people being up to doing
12   that is not that great.
13   Q.   And would the burden that that would place on a
14   voter, the problem of transportation, access to a DPS,
15   would that be any different for an African American
16   voter or a Hispanic voter or an Anglo voter?
17   A.   Well, yes, Mr. Frederick, because we do have
18   national statistics as well as state statistics that
19   really show that African American wealth is nowhere near
20   that of Anglo wealth.  And so what that transforms into
21   is that they may, you know, a lot of these people may
22   not even have automobiles to be able to, you know, live
23   in a rural area or some place and be able to have a car
24   to go 40 miles if they need to, to get to a site where
25   they can do it.

## 59

1    So I think in a general broad sense kind
2    of way because we know where wealth is and where it
3    isn't, it would seem to me that -- or would seem to us
4    that African Americans would be more at a disadvantage.
5    Q.   Is there anything -- is there anything besides
6    the disparity in wealth --
7    A.   Uh-huh.
8    Q.   -- that would put African Americans at a
9    disadvantage related to getting one of the required
10   forms of ID under SB 14?
11   A.   Well, I don't think.  I'm not -- I'm going to
12   speak, you know, the Caucus and as a member of the
13   Caucus, I'm going to speak as an individual, but one of
14   the things that I've worked with a lot with African
15   Americans, older and in rural areas, is that many of
16   them -- I won't say many, but I'm going to say a number
17   of them who have come to our offices that we work with
18   never had birth certificates, because they were
19   delivered by midwives.  And those midwives somehow or
20   another -- I mean, I'm talking about a lot of years ago,
21   didn't make it to wherever they needed to make it to, to
22   register, so I can't tell you -- we've had to counsel
23   and work with and direct a number of elderly people who
24   did not have birth certificates, so and had to get what
25   is called a "delayed birth certificate," so I think, you

## 60

1    know, just kind of based on that, the same thing
2    follows.
3    Q.   And in your experience with what you were just
4    talking about, is it your understanding that people who
5    might have been birthed with a midwife and might not
6    have a birth certificate, are those people more likely
7    to be African American?
8    A.   Well, what I can say is that the folks that we
9    have been asked to work with from our office have all
10   been African Americans.  I mean, it's -- you know, and
11   you have to go back and try to help them try to figure
12   out how to research the census, how to get something
13   from their church, how to get a Bible, you know, how to
14   get an insurance policy, how to do -- you know, because
15   the documentation apparently doesn't exist for these
16   people.  And I don't know how they got that way, except
17   that most of them that have contacted us have said that
18   they were delivered by a midwife, and I dare say, in
19   some cases, nobody at all, just family delivered.
20         So when we speak about the elderly, I
21   think we have to take those kinds of things into
22   consideration, and I think it's a whole separate set of
23   issues from the very young.  So I think the elderly are
24   disproportionately affected if they're African
25   Americans.  The young are disproportionately affected.

May Helen Giddings                                              June 6, 2012

## 61

1  That's -- that was my position.  I hope the Caucus is
2  okay with that.
3      Q.  Are you aware of any studies or statistics that
4  show that the people who would lack a birth certificate
5  or have a midwife birth would be disproportionately
6  African American?
7      A.  I think in the old days that's true.  I -- you
8  know, and that's why I say the elderly, because I think
9  we have a whole new -- another game now.  I mean, the
10 whole midwife thing is popular across the board, and
11 it's pretty much regulated, and folks have to do what
12 they have to do.  And those kind of regulations did not
13 exist back in those days.  And in rural areas, you might
14 not have been even close to any doctors.  You might have
15 been miles away from a doctor.
16     Q.  Do you have a sense based on your experience
17 with that issue of how -- where the age cutoff is for
18 people who would have that kind of problem?
19     A.  Well, I think they're -- quite frankly, I think
20 they're pretty old.  You know, I mean, we're not talking
21 about folks in their fifties.  We may not even be
22 talking about people, you know, up to 65.  I mean, we
23 may be talking about, you know, the -- well, the people
24 that we've -- that we've helped, they have been in their
25 sixties, because many of them, quite frankly, are trying

## 62

1  to go over to the -- where you apply for Social
2  Security, and didn't have proper documentation to apply
3  for Social Security.  So, you know, that -- that would
4  say you were -- you were, you know, sixty-ish, I would
5  say.
6      Q.  Does the Caucus contend that voters in the
7  rural areas would be less likely than urban or suburban
8  voters to be able to get one of the IDs required by SB
9  14?
10     A.  I think the answer to that would be yes, you
11 know, basically, due to the availability of a DPS
12 site.  DPS sites are more available in urban areas, I
13 think, or I know.
14     Q.  Does the Caucus contend that with respect to
15 availability of DPS sites and transportation to get ID,
16 does the Caucus contend that African Americans would
17 be -- rural African Americans would be affected
18 differently than Anglo or Hispanic rural residents?
19     A.  I suspect that Hispanics would be affected as
20 well.  And again, I want to -- you know, the Caucus is
21 concerned about everybody in the state.  But the Caucus
22 has a primary concern for African Americans.  And so,
23 generally, as loose as our organization is in terms of
24 having, you know, structure that says this, this and
25 this, we're concerned about everybody, but we're -- but

## 63

1  we exist to make sure that African Americans have equal
2  opportunities in this state.  And, but at the same time,
3  we understand that African Americans cannot advance
4  while, you know, everybody else that's disadvantaged is
5  standing still.  So everybody has to move together.
6          But you know, we -- our agenda really is
7  one that is African Americans.  But we do believe, I
8  think I can say on behalf of the Caucus, that we believe
9  that Hispanics are going to be disproportionately
10 adversely affected by Senate Bill 14 as will African
11 Americans.
12     Q.  Since we've been talking about this, I think
13 we've identified a couple of factors that would be I
14 think you said an extra step that would be required to
15 get an ID, and I think one of those was you might have
16 to just go to the DPS; is that right?
17     A.  Uh-huh.
18     Q.  And then one -- another might be you might not
19 have a birth certificate or whatever documentation; is
20 that right?
21     A.  Uh-huh.  Yes.
22     Q.  Another might be if you had to pay money to
23 get, you know, either a driver's license or a birth
24 certificate, that would be an extra step; is that right?
25     A.  Yes.

## 64

1      Q.  And are there any other -- are there any other
2  specific burdens that the Caucus contends SB 14 would
3  have on people?
4      A.  Gee, other than the things that -- that we have
5  -- that I have articulated, for us, having to take an
6  extra step and not being able to take that extra step is
7  huge.
8      Q.  Uh-huh.
9      A.  And it's a reason to be concerned, because we
10 want people to -- we want people who are eligible to
11 vote, to vote.  And it's been such a long difficult ride
12 for African Americans.  I mean, when people have died
13 because they simply wanted to vote, it takes years to
14 turn around that kind of thinking and to get people to
15 understanding, you know, that, yeah, it's okay now.  And
16 then you -- so just the mere fact that you're putting in
17 another step that says you've got to have this -- this
18 is the only thing that you can use, it requires a whole
19 new education.
20          Particularly for the elderly, and you
21 know, I don't know that our state is going to be willing
22 to do what is necessary to educate these people.  I
23 mean, we need some TV -- if this were to go into effect,
24 we need some TV PSAs and all kinds of education to make
25 this -- to get anywhere near a good result.  And I just

May Helen Giddings                                    June 6, 2012

## 65

1  don't think you can get a good result by asking people
2  to make -- make this -- to take this -- this extra step
3  in terms of being able to identify themselves as being
4  eligible to vote.
5       Q.  So if you, hypothetically, if you had an
6  African American voter and an Anglo voter who were, you
7  know, lived in the same place, had the same
8  socioeconomic status, would there be any extra burden or
9  any other steps that the African American individual
10  would have to take to comply with SB 14?
11       A.  I think you would -- I would have to answer
12  that by, you know, we've got to take into consideration
13  all the things -- did you say economically?  Tell me --
14  give me your question again.
15       Q.  Of course.  Of course.  If we had, let's say
16  hypothetically, we've got an Anglo voter, an African
17  American voter, say they're the same age, live in the
18  same place, same neighborhood, and they have the same
19  you know, socioeconomic status.
20       A.  Uh-huh.
21       Q.  Is there anything, any extra burden or step
22  that the African American voter would have to go through
23  under SB 14 as opposed to the Anglo voter?
24       A.  Well, even though I'm older than you, that
25  aside, you and I would be dealing with the same set of

## 66

1  circumstances.  We wouldn't have to do anything
2  differently.  The only difference would be that I have a
3  history of not being able to vote.  And unfortunately,
4  we can't leave that baggage behind.  And so do I have to
5  take another step?  A step more than you would have to
6  take?  No.
7          But I come -- I mean, the only reason we
8  have the Voter Rights Act is because of the history of
9  voting in our state, and we can't minimize that.  So you
10  and I would be similarly situated.  You know, you
11  wouldn't have -- I wouldn't have to do anything more
12  than you would do, because you know, it would just be a
13  -- the same, the effort would be the same.  But I think
14  that we -- we really cannot minimize the historical
15  piece of this and how we got here and why we're even
16  grappling with this.
17       Q.  And I understand that.  I guess what -- and
18  this is what I'm trying to figure out.  It's just I
19  think a piece of all of this.
20       A.  Yeah.
21       Q.  And it's the effect that just the specific
22  requirements of SB 14 will have on -- on voters, and
23  it's what I'm trying to get at is whether -- is whether
24  SB 14, because of the history that you've been talking
25  about, just in terms of availability of ID or ability to

## 67

1  vote, whether that history would have any effect or
2  impose any burden on an African American voter who, you
3  know, is not indigent, is not in a rural area, you know,
4  doesn't have any of the kind -- you know, is not
5  elderly, who doesn't have any of, you know, the burdens
6  that we've been talking about, is it -- I'm just trying
7  to understand how the history would play into the burden
8  on a specific voter.
9       A.  How the history would play into the burden on
10  -- we're all creatures of our circumstances, our
11  experiences, our backgrounds, and I guess that's one of
12  those things that is not easily articulated, but it is
13  something that has to be contended with and taken into
14  consideration.
15          And for African Americans, we know that it
16  is very real to be able to get the voting participation
17  rate up among African Americans to where the voter
18  participation rate is across the board.  And so we have
19  to look at all of these things, I think, that may have a
20  chilling effect.  And I think adding this extra step
21  really does -- really does do that, and it's at least
22  real for those people who have to -- who have to deal
23  with it.
24          I mean, in the case of two people -- two
25  groups who are similarly situated, middle income, this

## 68

1  and that and the other thing, so they got a car, can get
2  to the driver's license -- to the Department of Public
3  Safety, to get the -- what -- their driver's license or
4  whatever they need, they've got a birth certificate,
5  this and that.  You know, that's -- that's pretty even,
6  but that's not necessarily most of the world.
7       Q.  Uh-huh.
8       A.  That's really not most of the world.  I mean,
9  you've got such a high unemployment rate, you know, for
10  African American youth, for instance.  And if you've got
11  a choice between, you know, going to try to find
12  yourself a job and going to try to get this document,
13  which one are you going to do?
14          I mean, yeah, there are all kinds of
15  barriers that come in those kinds of circumstances that
16  are not easily articulated, but I think the fact that
17  we're doing what we're doing brings all of that into
18  consideration.  Because yeah, there are a lot of
19  barriers for people, not for you and I.  But one of the
20  things that I try to do in the legislature is -- and I'm
21  on record as saying this many times from the mic, "We
22  ought not to be making laws for people who sit in this
23  chamber, because we're privileged.  We're privileged."
24          And so what we're talking about is dealing
25  with those people who are not as privileged as we

May Helen Giddings                                      June 6, 2012

---

**69**

1   are.  I mean, you and I are on the same level, but
2   unfortunately that doesn't exist for everybody.  And I
3   think we believe that this is -- this is an extra step,
4   and any additional step will have a negative effect on
5   African Americans if it's one that requires additional
6   resources in terms of financial resources to get to the
7   DPS.  If you had to buy a birth certificate, which might
8   require another visit to city hall.  Or if you don't
9   live -- if you were born someplace other than the city
10  in which you live, that's a whole another set of
11  circumstances.  If you're from Texas, it's dealing with
12  Austin.  If you're from outside of the state, it's
13  dealing with some other capital.  And so there are a lot
14  of additional things that go into making what seems like
15  one easy step.
16       Q.   But to the extent that -- to the extent that
17  any voter, you know, say they have a driver's license
18  that's current --
19       A.   Uh-huh.
20       Q.   -- SB 14 wouldn't impose a different burden on
21  a voter if he or she happened to be African American,
22  Anglo or Hispanic or Asian American, if they actually
23  had a driver's license; is that right?
24       A.   Yes, that's right.  And that's why I brought my
25  notes so I could just be sure what the bill says.  So

---

**70**

1   these are -- you know, got that section of the bill, you
2   know, printed, but you know.  No, I mean, to the -- to
3   just -- well, I thought I had that so I could just move
4   right in there and see it.  But no, I mean, if you've
5   got that, that documentation, then it's -- it's no
6   different.
7        Q.   Well, let me ask you some questions about who
8   has documentation.  And by the way, I don't mean to stop
9   you, if you're still looking for something.
10       A.   No, no, I found it.  I was just looking at what
11  we can use now, you know, all these -- a sufficient
12  amount of -- I would think, of pieces of identification
13  versus just a driver's license, just the military ID,
14  citizenship certificate, U.S. passport.
15            And I will tell you that I was -- well,
16  anyway.  Yeah.  So, I mean, a lot of people don't have a
17  passport.  If they don't travel out of the country, they
18  might not have a passport.  Some of them haven't been to
19  the military.  I don't know where they would get the
20  U.S. citizenship certificate.  So they're pretty much
21  going to be dealing with, if they haven't been to the
22  military, they're going to be dealing with a driver's
23  license or a concealed handgun license.
24       Q.   Can you tell me, I notice you're referring to a
25  document, what document is that?

---

**71**

1        A.   It's just our House Research Organization.
2        Q.   Oh, it's the HRO report on SB 14?
3        A.   Yeah, that goes with SB 14.
4        Q.   Okay.
5        A.   Just made it easy for me to look up.
6        Q.   Of course.
7        A.   So I would know what I was talking about.
8        Q.   Does the Caucus know how many Texas registered
9   voters lack one of the IDs required by SB 14?
10       A.   We do not.
11       Q.   Can -- can you, speaking for the Caucus,
12  identify any Texas registered voter who does not have
13  one of the IDs required by SB 14?
14       A.   Can we identify them?
15       Q.   Uh-huh.
16       A.   I can't give you the names right now, but we --
17  I have been in some -- had some meetings where people
18  stood up and said they didn't.
19       Q.   You don't know what their names are?
20       A.   No.
21       Q.   Do you know if their names were ever recorded
22  or written down anywhere?
23       A.   Possibly.  I'm not -- I'm going to say no,
24  because you know, basically, these -- these were
25  meetings where we were trying to say, "Well, we got to

---

**72**

1   figure out a way to fix that probably before the bill
2   was done," and whatever, but was completed.
3        Q.   Did the Caucus -- and forgive me if I've asked
4   you this already, did the Caucus conduct any study of
5   photo ID possession by Texas voters?
6        A.   Not that I'm aware of.
7        Q.   To your knowledge, is the Caucus -- does it
8   know, say, the levels of photo ID possession by various
9   groups of voters in Texas, and what I mean is, does the
10  Caucus know the percentage of African American
11  registered voters in Texas who have one of the required
12  IDs under SB 14?
13       A.   Factually, we don't.  I can tell you that I
14  think that the Caucus believes that African Americans
15  are less likely to have had a concealed weapon permit.
16       Q.   Uh-huh.
17       A.   Which is one of the documents that would be
18  acceptable.  I -- that would be something that would be
19  easy to get, but I suspect -- or it might not, but I can
20  tell you that on that one particular document, the
21  Caucus certainly anecdotally believes that there would
22  be far fewer African Americans who would possess that
23  document.
24       Q.   Does the Caucus have a specific belief about,
25  you know, the different levels of possession of any

May Helen Giddings                                          June 6, 2012

---

**73**

1  other of the documents listed in SB 14?
2  A.  I -- I don't believe so.
3      MR. TANNER:  Just -- never mind.
4  A.  I don't believe so.
5  Q.  (By Mr. Frederick)  All right.
6  A.  I -- you know, I don't -- you know, the
7  driver's license or the passport, again, you would have
8  to deal with anecdotal.  We don't have any statistics.
9  I mean, I would suspect that the passport would be one.
10 I mean, if you're not traveling internationally, I don't
11 quite know what else you do with passports.  So I don't
12 know" I guess is the real answer.
13     Q.  We've been talking about it, so I'll just ask
14 you:  Do you have -- do you have a driver's license, a
15 current Texas driver's license?
16     A.  I do.
17     Q.  Are there -- are there other members of your
18 household who are voting age?
19     A.  Yes.  And Mr. Frederick, so we don't have to go
20 down that line, again, everybody in my family has
21 whatever kind of ID is his.  But I think I just said,
22 and I'm going to say that again, that we should not be
23 the model for this.  I mean, we've got to think about
24 people who are in other circumstances.  So I wasn't
25 supposed to be speaking personally, but I was supposed

---

**74**

1  to be speaking for the Caucus, but yeah, I mean -- I
2  mean, yes, we all have birth certificates, almost all of
3  us have passports, but then we're talking about people
4  in different circumstances.  I just said that you and I,
5  other than age, we're probably very similarly situated.
6  That is not the case overall.
7      Q.  And while we're on the subject, and I'll move
8  on in just a moment, but what are -- if you just remind
9  me what the specifics circumstances are that would put
10 someone in a different situation than maybe you or I are
11 in?
12     A.  I think, you know, beyond the control of
13 people, if they're elderly, born in a rural area where
14 there might not be doctors and what have you, and where
15 there might not be easy access in terms of where they're
16 -- where their birth need to be registered, you and I
17 probably travel internationally a great deal, and so,
18 yeah, I would have a passport because I travel a lot.
19 So that would -- that would differentiate us.
20     We are -- or in my case, I'm a driver, so,
21 you know, I have a DPS -- I have a driver's
22 license.  But we're talking about -- I talked a lot
23 about the elderly and the very young, African American
24 elderly and very young, which is an area that I know an
25 awful lot about.

---

**75**

1      We both probably have birth certificates.
2  I do.
3      And I think we -- we cannot -- we cannot
4  discount the fact that the whole socioeconomic deal has
5  an impact on people.  It has a -- depending where you
6  are in that, you may not be -- you might not have easy
7  access to some of these documents.
8      So, and then -- I mean, it just probably
9  needs somebody else to talk about this, but even when
10 you talk about, you know, the concealed handgun permits
11 unfortunately in Texas and throughout this country, for
12 that -- for that matter, I mean, we've got so many young
13 men who have been somehow or another caught up in the
14 criminal justice system, some rightly, some wrongly,
15 we've seen by the exonerations.  And so all of those
16 things impact who has a concealed weapon permit and who
17 doesn't.  So there are lots of factors out there that
18 would cause some people to be more likely to have these
19 documents that are acceptable as identification at the
20 voting booth that just don't come to the surface
21 immediately.  There's a real difference.
22     Q.  Well, I want to move on and don't have a whole
23 lot more, and I'd like to move on now.  We've been
24 talking a lot I think about effect and how this bill
25 might affect the people.  I want to move briefly to the

---

**76**

1  purpose of the bill.
2      Does the Caucus contend that preventing
3  in-person voter fraud is not the purpose of Senate Bill
4  14?
5      MR. TANNER:  I'm going to object to the
6  form of the question and that it calls for a legal
7  conclusion.  You know, purpose is a complex legal
8  question that involves a lot of specific factors, and we
9  can go through those one by one if you like.  But I'd
10 like to stay away from legal conclusions.  You know,
11 those are reflected in documents filed by the court.
12     MR. FREDERICK:  Let me --
13     MR. TANNER:  And will be reflected in
14 additional documents filed by the court by various
15 parties.
16     MR. FREDERICK:  Fair enough.
17     Q.  (By Mr. Frederick) Let me just -- let me just
18 ask you before I move on:  Do you understand -- do you
19 understand my question about the purpose of SB 14, or do
20 you need me to rephrase?
21     A.  Would you rephrase?
22     MR. TANNER:  Yeah.  I think that in terms
23 of form of a question about the purpose of the
24 legislative act would need to be open to the possibility
25 that there are multiple purposes held by multiple

May Helen Giddings                                                    June 6, 2012

---

## 77

1   legislators in terms of what actually is going on.  I
2   think the Court would be able to take judicial notice of
3   that.  And so we can go among the -- well, I don't want
4   to phrase your questions for you.
5         MR. FREDERICK:  Let me rephrase.  I think
6   I can avoid the legal confusion.
7         Q.  (By Mr. Frederick)  Does the Caucus contend
8   that the Texas legislature did not actually pass SB 14
9   in order to prevent in-person voter fraud?
10        MR. TANNER:  I think you've just
11  rephrased, but it has the same problem as to the
12  form.  And the possibility, again, of multiple forms of,
13  you know, that -- the witness would be in a position to
14  answer whether that was a stated purpose of it or
15  whether she heard on the Floor or elsewhere statements
16  of legislators to that effect.
17        Q.  If I were to ask you what the purpose of a
18  bill, a piece of legislation was, what would you -- what
19  is your understanding of purpose, i.e., legislative
20  purpose, if you have one?
21        A.  Well, the purpose usually comes from the person
22  who is bringing the bill and saying "We're doing this
23  because of that, and this is what we're trying to
24  accomplish."
25        Q.  Was there -- are you aware or is the Caucus

---

## 78

1   aware of a stated purpose for Senate Bill 14?
2         A.  Yes.  I would have to -- to look at the House
3   research.  But obviously, the stated purpose was not --
4   it was to -- the stated purpose was to prevent voter
5   fraud, voter impersonation, loosely, generally, I'll say
6   was the stated purpose.
7         Q.  Does the Caucus contend that there was any
8   other purpose behind SB 14, stated or unstated?
9         A.  I would have to say that the Caucus does not
10  believe that this bill does anything to prevent voter
11  impersonation, nothing.
12        Q.  I understand that and I appreciate that.  I
13  guess I'm asking a slightly different question.  Whether
14  or not -- well, understanding that the Caucus may
15  believe that it may not accomplish the stated purpose --
16        A.  Uh-huh.
17        Q.  -- does the Caucus contend that there was any
18  other purpose behind SB 14, whether it was stated or
19  unstated?
20        A.  I think the Caucus's position would be that
21  they have questions about what the purpose was.
22        Q.  Does the Caucus contend that there was any
23  other specific purpose behind SB 14?
24        MR. TANNER:  I -- again, I'm going to
25  object to the form.  I've been trying to give

---

## 79

1   leeway.  And there are many purposes the many members of
2   the legislature have, and ultimately, you know, you do
3   get down to certain factors as for a legal sense of
4   whether they're a purpose, and I think the form of the
5   question needs to be clearer as to that.
6         MR. FREDERICK:  I think the -- I think the
7   questions have been clear, because the witness has been
8   able to answer.  So I think that -- I don't think that
9   there's a problem with the form of the questions.  I
10  believe that the witness has understood them and is
11  perfectly capable of answering them, as far as she
12  understands, so I would like to reask the question.
13        MR. TANNER:  As far as she understands in
14  terms of the position of the Caucus.
15        MR. FREDERICK:  Exactly.
16        Q.  And let me be clear.  I'm not asking for any
17  legal conclusions.  I'm just asking for what does the
18  Caucus believe?
19        A.  Uh-huh.
20        Q.  And that's it.  So let's see if I can remember
21  my last question.
22        Does the Caucus contend that there are
23  any -- that there's any other specific purpose other
24  than preventing in-person voter fraud behind SB 14?
25        A.  Well, I know I answered that before in another

---

## 80

1   way, and Mr. Frederick, that's the only way that I can
2   answer that.  The Caucus didn't say, "Hey, this is the
3   real deal or that's the real deal."  What the Caucus
4   said is this bill doesn't do what we've been told it's
5   supposed to do, what the purpose is.  It doesn't do
6   anything to improve that situation.
7         So I cannot tell you, you know, I cannot
8   tell you more than that.  But other than the fact that
9   this doesn't -- this is not going to do anything to --
10  and do we even have a problem in the state with people
11  impersonating someone else and voting for someone else?
12  Those are the kinds of discussions that the Caucus has
13  had, to the best of my knowledge.
14        Q.  I understand that.  I appreciate that.  So is
15  it your testimony then that the Caucus doesn't contend
16  that there's a different unstated purpose other than
17  preventing in-person voter fraud behind SB 14?
18        A.  I can't say that --
19        MR. TANNER:  Again, is the form.  You're
20  presuming that there is one purpose among of legislature
21  with a lot of people who are as, as we've already
22  discussed, individuals --
23        MR. FREDERICK:  Uh-huh.
24        MR. TANNER:  -- who -- and the whole
25  notion that there's one purpose in a legislative act is

## 81

1    --
2          MR. FREDERICK:  I understand.  I think
3    this has been addressed by the Court as a legal issue in
4    a lot of orders and filings.
5          Q.  (By Mr. Frederick)  I want to be clear to you,
6    Representative Giddings, I am -- I do not intend to
7    presume that there is a single purpose.  In fact, what
8    I'm trying -- I'm just asking you whether the Caucus
9    contends that there were other specific purposes.  So I
10   think my question presumes that there may not be a
11   single purpose.
12         So what I'm asking is:  Can -- does the
13   Caucus contend that there is another specific purpose
14   besides preventing in-person voter fraud behind SB 14?
15         A.  That there is another specific purpose?
16         Q.  Yeah.
17         A.  I'm not sure that I can speak for the Caucus on
18   that issue other than to -- to go back to what I said; I
19   mean to say, this bill is not going to do anything for
20   this situation.  So I can't say that -- I can't speak
21   for the Caucus on the other part.  All I can speak to
22   is, at this point, is just what I said, that the bill
23   doesn't seem to accomplish the stated purpose.
24         Q.  And does that lead the Caucus to believe that
25   there is another purpose behind the bill?

## 82

1          A.  Well, I won't say for the Caucus, but it always
2    leads people to ask questions.  If the purpose is this
3    and it doesn't accomplish that, then there's always a
4    question of what does it do?  And that's not with just
5    this bill, that's with every -- you know, every bill or
6    many bills.  So I am not sure, you know, how to answer
7    that, rather than we took it from the opposite end, it
8    doesn't do that, but here's what it is going to do on
9    the other side.
10         Q.  Has any legislator made any statement that
11   you're aware of that there was another purpose other
12   than preventing in-person voter fraud behind SB 14?
13         A.  Has any other legislator?  I -- now, this --
14   I'm testifying for the Caucus, for the entity, for the
15   organization, and whether the -- whether or not the
16   organization has any information along those lines, I'm
17   not aware.
18         Q.  Does the Caucus contend that the Texas
19   legislature intended to harm African American voters by
20   passing SB 14?
21         MR. TANNER:  That's the same objection.
22         Q.  (By Mr. Frederick)  You can answer.
23         A.  I think what the -- what the Texas legislative
24   Black Caucus did is forget about -- well, I think what
25   the Texas Legislative Black Caucus did is look at

## 83

1    results, what will the result of this be?  That's where
2    they hung their hat.
3          Q.  So would it be fair to say then that the Caucus
4    does not actually contend that the legislature
5    intentionally acted to harm African American voters by
6    passing SB 14?
7          MR. TANNER:  We're going to object to the
8    form of the question in that it calls for a legal
9    conclusion for the grounds I've stated before.  The
10   contentions of the Caucus are stated in the papers that
11   are filed thus far, and we're happy to answer factual
12   questions about -- you asked about the activity on the
13   Floor.  And given the nature of the issues in the case,
14   it would be more appropriate, a more appropriate form of
15   the question to ask whether the passage of the bill
16   satisfied the Caucus, that it was entirely free of any
17   racial or discriminatory purpose or effect.
18         MR. FREDERICK:  John, with respect, I'm
19   going to object on the record.  I would ask you not to
20   coach the witness.  I believe I understand you need to
21   object, but -- and I appreciate your thoughts on the
22   questions, but I believe that we're getting pretty close
23   to a line.  So I would respectfully request that I just
24   be allowed to ask the witness questions.  You may
25   certainly object, but I would ask that the witness be

## 84

1    permitted to answer subject to your objection.
2          MR. TANNER:  I'm certainly not trying to
3    coach the witnesses, and now it's getting into legal
4    discussion or legal language in terms of talking to you
5    about it.  And the witness has been very forthcoming in
6    answering the questions, and I'm sure we'll continue to
7    be so.
8          Q.  (By Mr. Frederick)  Does the Caucus contend
9    that SB 14 was passed with a racially discriminatory
10   purpose?
11         A.  I guess if you're not a member of the
12   legislature, this is very hard to understand.  We pass
13   lots of legislation, you know, on occasion, that we
14   think is going to do this.  And we pass it, and we try
15   to pass it for the purpose of doing that, but sometimes
16   the effect is something else.
17         I'm personally involved in one of those
18   cases right now which went before a committee that I
19   chaired.  We passed the legislation to do this.  It's
20   not racially anything to do with this.  But now we're
21   finding out that the legislation really -- the effect of
22   the legislation is really this.  And so sometimes you
23   deal more with the effect than you do with the purpose,
24   and so that's what we've dealt with here is the effect
25   of this legislation, and what it does, what it might do,

May Helen Giddings                                                June 6, 2012

## 85

1   what we believe that it will do in terms of African
2   Americans.
3         So that's not uncommon, not just with the
4   bill, but with lots of bills.  I mean, you know, there's
5   a purpose and then there's, you know, what is the -- you
6   know, what is the result of that.  And so lots of times
7   we don't concentrate so much on -- we concentrate on
8   what's going to happen if this bill gets passed.
9         Q.  Sure.
10        A.  And that's where we came down.  What's going to
11  happen, you know, on African American -- to -- to just
12  people in general and particularly African Americans if
13  the bill gets passed, that's -- that's sort of where
14  we've come down.
15        And as a legislator, this is probably too
16  much information, you do your best not to try to get
17  into -- it's hard to get into the heads and hearts of
18  people who are trying the pass legislation, but I think
19  -- I think it's fair game when you start to talk about
20  what's the result of this.  What's going to happen as a
21  result of this piece of legislation being passed?
22        Q.  I appreciate that.  That's -- I mean, that's
23  very helpful, and it kind of -- it helps me phrase the
24  question:  What -- I mean, I guess what I'm trying to
25  get at is:  Does the Caucus contend that any member of

## 87

1   voters, some of the people that we represent.  We looked
2   at it that way.  And also, we had lots of -- lots of
3   communication with lots of people who believed that it
4   was going to have a negative effect on being able to --
5   to get voters out.
6         Q.  And I -- you understand the difference between
7   purpose and effect, right?
8         A.  Not in a legal sense, I don't.
9         Q.  No, no.  And I'm not asking a legal sense.
10  Based on your previous answers, I believe you testified
11  that, you know, sometimes when you pass legislation,
12  there's a purpose, and then it might have an effect that
13  you didn't think it would have.
14        A.  Uh-huh.
15        Q.  So I mean in that sense --
16        A.  Uh-huh.
17        Q.  -- you understand the difference between the
18  purpose of a bill and its effect?
19        A.  Uh-huh.
20        Q.  Is that right?
21        A.  (Witness nods head yes.)
22        Q.  And all -- and so what I'm -- my question is:
23  In that sense, does -- is it the Caucus's position that
24  there was a racially discriminatory purpose for the
25  passage of SB 14?

## 86

1   the Texas legislature who supported SB 14 did so in
2   order to, you know, have the kind of negative effects on
3   African Americans that the Caucus believes the
4   legislation may have?
5         MR. TANNER:  I think the witness has
6   already answered that question by her statement that
7   that's not the focus of -- of her approach.  And again,
8   the legal contentions the Caucus has set forth in the
9   documents and the witness is trying provide as much
10  information as she can about the actual experience of
11  the -- of the legislature.
12        Q.  (By Mr. Frederick)  Do you remember the
13  question?
14        A.  Yes.  And Mr. Frederick, my answer is going to
15  be the same, because, you know, I'm very -- very sincere
16  about that.  I mean, there are lots of times when you
17  just -- you have to -- you have to look at the results
18  of something, and not the purpose, and I can't get into
19  another legislator's head, and they can't get into
20  mine.  I've passed pieces of legislation that I thought
21  the purpose was this, and the result was that.
22        And so it's -- it's the same, it's the
23  same with this.  I mean, that's how I personally looked
24  at it, and I think that's how the Caucus looked at it
25  is, you know, what effect will this have on some of our

## 88

1         MR. TANNER:  That --
2         A.  If there was a what?
3         Q.  Racially discriminatory purpose?
4         A.  Is it the Caucus's contention?
5         Q.  Correct.
6         A.  I -- I'm not -- I can't answer that any other
7   way than -- than I've answered it and not because of
8   this, but just because that's the way in a lot of cases
9   we measure legislation.  I'm dealing right now with the
10  lease purchase that came through my committee.  The
11  intention was to help some people over there who had
12  gotten in bad situations and never got deeds.  The
13  effect was we pretty much closed down lease purchases in
14  the state of Texas.  So the effect was we pretty much
15  closed down lease purchases in the state of Texas.  So
16  that was the effect, wasn't my bill, somebody else's,
17  that was the effect of that legislation.
18        And so that's what we -- that's basically
19  what I try to deal with is effect.  You know, what's the
20  real effect?  The purpose might be this, but when you
21  put it all together, this is what the effect is going to
22  be.
23        Q.  The lease purchase bill that you mentioned, I
24  mean, despite its effect, you can say that the purpose
25  was something else and it had this different effect,

May Helen Giddings                                      June 6, 2012

## 93

1   Q. -- would the Caucus still contend that SB 14
2 would have a negative effect on African American turnout
3 on voting participation?
4     MR. TANNER: Or has the Caucus taken a
5 position to that?
6   A. Well, I was -- I was going to say there,
7 Mr. Frederick, that if I'm speaking here for the Caucus,
8 I can't answer that question. Because number one, we've
9 never believed that, and therefore, we've never had any
10 discussion that would lead us to be able to answer the
11 question that you've -- that you've just asked, because
12 we've never believed that to be the case as a Caucus.
13     On a personal basis, I would still have to
14 wonder about the effects, the historical effects on
15 African American turnout. There's no way that that can
16 ever be discounted. It's just like people going to the
17 museum. For many, many years, people of color didn't
18 get to go to the museum. Now they can go to the
19 museum. Do they go in the numbers that they should?
20 No, they don't.
21     And so there's -- at this point, I don't
22 know when the time will come when we can say, you know,
23 people being killed because they wanted to vote is not
24 affecting what's happening to voting today. But -- but
25 the Caucus never addressed that, because the Caucus

## 94

1 never believed that to be -- to be the case. That would
2 be interesting to see.
3   Q. But it's possible, isn't it? I mean, I'm not
4 all at all trying to discount the effect of history on
5 voting.
6   A. Uh-huh.
7   Q. But it's possible, isn't it, that history could
8 have an effect on its own even if it turned out that SB
9 14 didn't require anybody to go get a new ID?
10     MR. TANNER: I believe that the witness
11 already has testified that that's not something that the
12 Caucus has taken a position on.
13   Q. (By Mr. Frederick) Can you answer the
14 question?
15   A. Well, if I'm answering -- and I'm here, you
16 know, for the Caucus and to talk about our proceedings
17 and the things that we did. It's not something that we
18 could -- that I could answer. But I do really want to
19 understand the question you just posed.
20   Q. Sure. We've talked a lot about the history,
21 and you know, as I understand it, the -- your testimony
22 has been that the history of discrimination and violence
23 associated with voting --
24   A. Uh-huh.
25   Q. -- specifically toward African Americans in

## 95

1 Texas, has an effect on how many African American people
2 vote; is that accurate?
3   A. I think that's right.
4   Q. And so it seems to me, based on that testimony,
5 that even -- you know, even if SB 14 didn't exist, that
6 history might have some effect on African American
7 turnout, African American voting; is that right?
8   A. I think that that history has an effect today,
9 if that's what you're asking me. Does that history have
10 an effect today? Yes. You know, are we getting -- is
11 it getting better? Yes, it is. Will this cause us to
12 make a turn and go back the other way? Quite possibly.
13   Q. And what I'm trying to get at is: What is --
14 I'm just trying to figure out, if I can, what it is that
15 SB 14 would add to the history? What additional burden
16 or deterrent, or whatever the word would be, what that
17 would add to the history?
18     MR. TANNER: I've got to object. This has
19 been asked many times, and the witness has talked about
20 this in response to many questions. And I -- it's been
21 asked and answered over and over again. You keep trying
22 -- you know, the --
23     MR. FREDERICK: I mean, I think the
24 objection is on the record. I respectfully disagree
25 that the specific question has been asked or answered.

## 96

1   Q. (By Mr. Frederick) So can you answer the
2 question? Do I need to have it read again?
3   A. Yes, would you?
4   Q. Of course.
5     MR. FREDERICK: Could you please read the
6 last question?
7     (The requested portion was read back by
8 the court reporter.)
9   A. What it would add to the history? I don't know
10 that it's going to add to the history, but what it's
11 going to do is make it more difficult for some people,
12 as I just talked about, people who don't have birth
13 certificates, people who don't have a driver's license,
14 who may not have a car to get to. So it creates an
15 additional step that has to be taken, and that
16 additional step for some people is not simple or easy.
17 They have to do some things to take that additional
18 step, some of which they may want to do, and they may
19 not be able to do.
20     But we -- we really want to make it easy
21 for people who are eligible to vote, to vote. We really
22 want people to think that government is by the people,
23 for the people and of the people. And they are the
24 people, and they ought to be able to vote. And so we
25 want more people who are eligible and legal voters to

May Helen Giddings                                          June 6, 2012

## 97

1   vote in this process.  Not people who want -- we don't
2   want to step back from that.  I mean, it's against
3   everything I think that we believe in as a country, as a
4   state, as a people.  And if we're not accomplishing --
5   if we're not seeing the result, if it's not -- if it's
6   not solving a problem -- and in our opinion, it's not
7   solving a problem, it's causing a problem.  Why are we
8   doing it?
9        Q.   Okay.  I appreciate that.
10            So last question:  So what it would add,
11   then, just to sum it up, it just adds that people might
12   have to go get an ID that they don't have; is that
13   right?
14        A.   And going to get that might require them some
15   financial resources.  It might require that they may not
16   be able to do it at all.  And so then, if they can't do
17   it at all, it would deny them the right to vote, which
18   is something that we certainly would not want to
19   happen.  But we might set up a scenario where for some
20   people, at least in the near future, they may be able to
21   correct it if given some time, but they may not be able
22   to vote at all because they don't have the required
23   documents for whatever reason.
24        Q.   Thank you.
25        A.   Thank you.

## 98

1             MR. FREDERICK:  I will reserve further
2    questions until the time of trial.
3             MR. TANNER:  I've just got a few
4    questions.
5                  EXAMINATION
6    BY MR. TANNER:
7         Q.   Representative Giddings?
8         A.   Yes.
9         Q.   The voter ID measure has been before the
10   legislature several times during your -- a voter -- one
11   voter ID bill or another has been before the legislature
12   several times during your tenure; is that correct?
13        A.   Yes.
14        Q.   Okay.  During any of those periods, to the best
15   of your knowledge, and the best of the Caucus's
16   knowledge, did the State ever produce examples of voter
17   impersonation fraud that would be prevented by
18   possession of a voter ID?
19        A.   Not that I'm aware of.
20        Q.   Okay.  During that time, did the State or the
21   people who were pushing the -- supporting the bill, get
22   any state agency or other authority to provide a study
23   of the number of Black voters who would be affected by
24   the law?
25        A.   I'm not aware of that study.

## 99

1         Q.   Or the number of Latinos who would be affected
2    by any of the laws?
3         A.   You know, this is taxing my memory, because we
4    did this in '9 and '11, I think, but I don't recall --
5         Q.   Okay.
6         A.   -- such a study.
7         Q.   On the Floor of the legislature and in the
8    discussions among legislators, you testified that there
9    was a stated purpose --
10        A.   Yes.
11        Q.   -- to prevent ID, and that no one produced
12   examples of voter impersonation.  On the Floor of the
13   legislation, did -- on the Floor of the Legislature,
14   excuse me, did members of the Black Caucus and others
15   voice concerns such as you have voiced today, about the
16   discriminatory impact on minority voters by such a
17   requirement as -- by such a requirement?
18        A.   There was a great deal of discussion as it
19   relates to the effect of this legislation.
20        Q.   And were advocacy groups also presenting to
21   members of the legislature various studies and
22   statistics about the impact of the bill?
23        A.   Well, I can't speak to studies and statistics
24   specifically, but I can say that advocacy groups were
25   coming in and saying this is going to be the effect, and

## 100

1    I'm sure some of those had studies and what not, but I
2    can't specifically recall the studies myself.
3         Q.   In the course of your tenure in the
4    legislature, has the history of discrimination against
5    minority voters in Texas been discussed frequently?
6         A.   Absolutely.
7         Q.   And particularly, the history of discrimination
8    in the area of voting --
9         A.   Yes.
10        Q.   -- has that been discussed in the legislature?
11        A.   Yes, it has.
12        Q.   Has it been discussed many times over the
13   years?
14        A.   It has been discussed many times over the
15   years.
16        Q.   How about the social and economic disparities;
17   any social and economic disparities that may exist
18   between minority voters and Anglo voters, you mentioned
19   earlier, the great disparity in wealth.  Has that been
20   discussed before the legislature many times?
21        A.   Absolutely.  Health disparities, disparities in
22   the insurance -- in insureds, the disparities exist out
23   there, and we discuss those frequently.
24        Q.   In this last iteration of the voter ID bill
25   that was passed, SB 14, did the legislature -- well,

## 101

1   backing up a step.
2           Does the legislature normally have a
3   two-thirds rule on consideration of legislation?
4       A.  In the Senate.
5       Q.  In the Senate?
6       A.  Yes.
7       Q.  Okay.  And did, in this instance, the Senate
8   abandon the two-thirds requirement for the voter -- for
9   SB 14?
10      A.  That is my understanding.  I'm more familiar
11  with, you know, what went on in the House, but it is my
12  understanding.
13      Q.  Okay.  And the House, is there a practice in
14  the Texas legislature called "chubbing"?
15      A.  Yes.
16      Q.  Could you explain briefly, for those not
17  familiar with the Texas legislature, what chubbing is?
18      A.  Well, chubbing is a practice that members have
19  when they find something so very objectionable that they
20  just keep talking and talking and talking,
21  and they try to talk -- talk the bill into the death
22  chamber, I guess.
23      Q.  Is it fair to characterize that as similar to a
24  filibuster?
25      A.  Yes, it is.  Very much so.

## 102

1       Q.  In the instance of the passage of SB 14, the
2   voter ID bill in this instance, did the legislature take
3   steps to prevent chubbing?  To the best of your
4   recollection?
5       A.  You know, I'm -- I'm going to have to say that
6   I don't really remember.  I believe that is the case,
7   but I cannot say definitively.  I know that there were
8   bills, maybe, I don't remember specifically what bill it
9   might have affected.
10      Q.  Are you an officer of the Caucus?
11      A.  I am.
12      Q.  What office?
13      A.  Secretary.
14      Q.  Now, you've testified some about the structure
15  or lack of structure of the Caucus, of the independence
16  of the members, of the small budget, and Mr. Frederick
17  has elicited information about the absence of studies
18  conducted by the Caucus on any issues.
19      A.  Uh-huh.
20      Q.  About how many, if you can give any sort of
21  ballpark, communications do you have with constituents
22  and advocates and others about the circumstances of the
23  Black community in Texas?
24      A.  Okay.  I got lost.  I'm somewhere.  I'm
25  sorry.  Repeat that.

## 103

1       Q.  All right.  In addressing the circumstances or
2   in terms of your knowledge of the circumstances of the
3   minority community in Texas, about how many
4   communications per year do you have meetings, town
5   halls, telephone calls, e-mails, other letters, other
6   communications, do you get a year that describe the
7   circumstances of the Black community in Texas?
8       A.  Oh, I mean, there's no way I could count
9   those.  I mean, it's just too numerous to count.  If
10  you're asking me how many telephone calls I get talking
11  about whether it's voter ID, whether it's redistricting,
12  whether it's health care disparities, whether it's
13  educational disparities, if you're asking me how many of
14  those I get, there's no way I could count those.  I
15  mean, it's just a continuous flow of communication.
16      Q.  And that is -- has that been the case for you
17  and other members of the Caucus for many years?
18      A.  For many years, yes.
19      Q.  And on various issues you receive statistics
20  and studies from state agencies and other sources?
21      A.  Yes.
22      Q.  In terms -- if this goes through, if SB 14
23  becomes effective as law, will that change the burdens
24  on you as a member of the legislature or as a leader in
25  your community, in terms of responding to requests from

## 104

1   constituents and others?
2       A.  Well, I --
3           MR. FREDERICK:  Object to the form of the
4   question.
5       Q.  (By Mr. Tanner)  If SB 14 goes through, will
6   there be any change in the number of requests for
7   information, such as you mentioned that you go through,
8   help a lot of people get replacement or delayed birth
9   certificates, I think you called it?
10      A.  Right.  Yes.  There's no question that there's
11  going to be a greater need for voter education, just
12  based on the number of questions that we're getting
13  right now.  It can -- you know, it can only go up when
14  this is actually -- if it's actually implemented.  So it
15  is going to be an increase in the number of people
16  that -- that we communicate and the number of
17  communications and trying to help people, who are having
18  difficulty, walk through how they can eliminate whatever
19  problems they're having in access of the documents that
20  they need.
21      Q.  In response to questions from Mr. Frederick, I
22  believe in terms of the voter registration, voter
23  education activities of the Caucus and its members, you
24  indicated, I believe, if I'm characterizing this
25  correctly, that those issues are not separated out, but

May Helen Giddings                                                      June 6, 2012

## 105

1  they come up, tend to come up whenever you've have town
2  halls and the summit that you mentioned?
3      A.  Right.  Yes.
4      Q.  Are there a large number of issues, or how many
5  issues do members of the Caucus have to deal with that
6  are of concern, of particular concern to the minority
7  communities in the state?
8      A.  Oh, wow.  There are just so many issues,
9  because in a lot of cases, you know, we're trying to
10  look at, as I said, eliminate disparities, whether they
11  are -- whether they be in education and the number of
12  students of color who are not achieving at the level
13  they should be.  That's a whole big conversation.
14  Health care is a -- is a big conversation.
15          There are just any number of issues that
16  are before us.  In addition to that, you know, we've got
17  House members who are going to file some 4,000-plus
18  bills, and you know, what do you do with all of those
19  bills?  So we have a full plate.
20      Q.  You have a full plate, and then there are only
21  24 hours in the day; is that correct?
22      A.  Right.  Yes.
23      Q.  So if you are, as you've testified, spending
24  additional time on voter education and other activities,
25  for any new voter ID requirement, what effect would that

## 106

1  have, if any, on your ability to address other concerns
2  of minority voters?
3      A.  Well, if we take some time away from our
4  other -- other issues that are on our plate and -- and
5  we will definitely have to spend some time, a lot of
6  time on education and on assisting our voters here, it's
7  -- it's definitely going to take time away from some of
8  the other issues that we have to -- we have to deal
9  with.  This -- this issue is a big concern in my
10  district, and so it's going to take some time deal with
11  it.
12      Q.  And getting a delayed birth certificate, I
13  think you mentioned that people have to go back to
14  census records; is that correct?
15      A.  There are several things that you can do.  As I
16  remember it, you can go get some census records.  You
17  can go to your church and get a record that's over 15
18  years old, I think.  You can go to your insurance
19  company and get records that are over 15 years old.  You
20  can get your oldest living relative to swear that you
21  were born in this time and place and whatever.  So
22  it's -- it's a big -- it's a big process that people
23  have -- have had to go through.
24      Q.  Have you had to deal with those processes with
25  people who have come from other states?

## 107

1      A.  Well --
2      Q.  Texas attracts a lot of people from other
3  states, I know.
4      A.  All of the people that we've dealt with have
5  been people who are -- who reported that they were born
6  in Texas, as far as I know.  Because, of course, I don't
7  do all the work in my office.  I just kind of get a
8  briefing on what's going on, but some of these things,
9  you know, I do get personally involved in.
10      Q.  Well, that appears, I think it's a fairly
11  characterization, or is it, that this is a fairly
12  complex process that individuals, the average individual
13  would need some assistance in accomplishing.
14      A.  Oh --
15      Q.  Is that --
16      A.  Yes.  I think -- I think people definitely need
17  assistance, and even with the assistance in my office,
18  sometimes it's taken us, the person thought forever to
19  assist them, because we can't do it.  All we can help
20  them do is to follow the guidelines that are set forth
21  by the Bureau of Vital Statistics.
22      Q.  It seems like forever to the person.  Are we
23  talking days, weeks, months, years?
24      A.  I'm talking in some cases months.  I can
25  remember one that actually took months.

## 108

1      Q.  And if a judgment were to come down in this
2  case, say, two months before the election, and if the
3  demand for assistance from your office were to increase,
4  and thus, the demand on other offices increases, would
5  you expect those delays to increase, and the time that
6  it takes to get responses to increase as well?
7      A.  From vital statistics and getting the delayed
8  birth certificates?  You know, I don't know, really,
9  what that demand would be, but just -- just in general,
10  there are going to be some people, if something -- if
11  people have two months advance notice before they have
12  to produce these documents to vote, in my opinion,
13  you're going to be -- a lot people, for various and
14  sundry kinds of reasons, are simply not going to be able
15  to vote in that election.
16          MR. TANNER:  I don't have any further
17  questions at this time.
18          MS. MILLER:  Could I ask a question?  I'm
19  sorry.  I originally said we weren't going to ask any
20  questions.
21          EXAMINATION
22  BY MS. MILLER:
23      Q.  I should be quick.  I just want to clarify,
24  Representative Giddings, early on in the deposition, we
25  were talking about the materials you reviewed to prepare

Larry Gonzales                                                    May 31, 2012

---

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS        )
                      )
                      )
VS.                   )  NO. 12-CV-128
                      )  (DST, RMC, RLW)
                      )
ERIC H. HOLDER, JR.,  )
In his official       )
Capacity as Attorney  )
General of the United )
States                )

**************************************************
    ORAL DEPOSITION OF LARRY GONZALES
**************************************************

ANSWERS AND DEPOSITION OF LARRY GONZALES, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 31st day of May, 2012, between the hours of 9:30
a.m. and 5:16 p.m., in the offices of the US Attorney,
816 Congress, Austin, Texas, pursuant to the agreement
of counsel for the respective parties as hereinafter set
forth.

---

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
OFFICE OF THE ATTORNEY GENERAL:
  By:  MR. JOHN W. McKENZIE, III
  209 West 14th Street
  Austin, Texas  78701
  PH: (512) 936-6432

FOR THE DEFENDANT:
DEPARTMENT OF JUSTICE
  By:  MR. BRUCE GEAR
  - and -
  MS. RISA BERKOWER
  - and -
  MR. SPENCER R. FISHER
  950 Pennsylvania Avenue, NW
  Room 7161 NWB
  Washington, DC  20530
  PH: (202) 305-0185

FOR THE INTEVENORS:
BRAZIL & DUNN
  By:  MR. SCOTT BRAZIL
  4201 Fm 1960 West
  Suite 550
  Houston, Texas  77068
  Ph: (281) 580-6310

FOR THE INTEVENORS:
ADVANCEMENT PROJECT
  By:  MS. DONITA JUDGE
  1220 L. Street, NW
  Suite 850
  Washington, DC  20005
  Ph: (202) 728-9557

---

## 3

INDEX

                                          PAGE
Appearances..............................   2

LARRY GONZALES
  Examination by Mr. Gear .................   5
  Examination by Mr. Brazil ..............  237

Signature and Changes ...................  249
Reporter's Certificate ..................  251

---

## 4

| NO. | EXHIBITS DESCRIPTION | PAGE |
|-----|---------------------|------|
| 5   | SB 14               | 155  |
| 28  | HB 218              | 105  |
| 29  | SB 362              | 99   |
| 44  | HB 1706             | 67   |
| 102 | Online History      | 105  |
| 106 | SB 362              | 100  |
| 220 | Notice of Deposition | 14  |
| 221 | Post Session Report | 170  |
| 222 | House Journal       | 183  |
| 223 | Online History      | 192  |
| 224 | Letter              | 205  |

Larry Gonzales                                              May 31, 2012

---

**5**

1        LARRY GONZALES,
     having being first duly sworn, testified as follows:
2            EXAMINATION
     BY MR. GEAR:
3       Q.  Good morning, Representative Gonzales.
4       A.  Morning.
5       Q.  This is the deposition for Representative Larry
6    Gonzales in the matter of Texas V Holder, USDC for DC
7    docket No. 1:11-CV-128.  Again, good morning.  And could
8    you state your full name and spell your name for the
9    record?
10      A.  Sure.  Larry Dean Gonzales.
11      Q.  My name is Bruce Gear.  I'm with the Department
12   of Justice and I represent the defendant in this case,
13   Eric Holder, the Attorney General.
14          MR. GEAR:  I just say to everyone else could
15   you introduce yourself for the record.
16          MS. BERKOWER:  Risa Berkower for the
17   Attorney General, Eric Holder.
18          MR. FISHER:  Spencer Fisher for the Attorney
19   General.
20          MS. JUDGE:  Donita Judge for the
21   Intervenors.
22          MR. BRAZIL:  Scott Brazil for the Kennie
23   Intervenors.
24          MR. McKENZIE:  John McKenzie for the State
25   of Texas and the witness.

**6**

1       Q.  (By Mr. Gear)  Now, this is the opportunity for
2    me to ask you questions and for you to give full and
3    complete answers.  And do you understand that you've
4    been sworn in under oath under penalty and perjury and
5    that this is kind of like a trial setting where
6    everything you say must be truthful and you must try to
7    give complete and full answers.  Do you understand that?
8       A.  Yes.
9       Q.  Okay.  And so let me -- let me go through a
10   couple of ground rules with you.  Again, I'm going to be
11   asking you some questions and you are going to be
12   answering.  But while I'm asking you the questions, give
13   me an opportunity to complete my question and I will
14   give you an opportunity to complete your full answer.
15   If at any time you don't understand the question that
16   I'm asking you, you can always let me know that and I
17   will try to rephrase it for you so that you understand
18   completely.  Do you understand that?
19      A.  Yes.
20      Q.  All right.  Now, it's important for you to say
21   "yes" or "no" or give a complete answer.  You can't nod
22   your head because the court reporter is taking
23   information and she won't be able to capture the nod of
24   the head "yes" or "no".  Do you understand that?  So you
25   have to give a verbally answer?

**7**

1       A.  Yes.
2       Q.  Okay.  So is there any reason today that you
3    cannot testify completely and truthfully?
4       A.  No.
5       Q.  Are you taking any type of medication or drugs
6    that would interfere with your ability to understand and
7    testify completely and truthfully today?
8       A.  No.
9       Q.  This is an important one, if at any point you
10   want to take a break, you know, we may be in the middle
11   of a question and answer.  And so what I would ask is
12   that if I've posed a question and you're in the middle
13   of answering that, that you complete your answer and
14   then I will give you an opportunity to take a break.
15   And that's also true if you -- if you need to speak with
16   your attorney at any time.  If you're in the middle of
17   an answer, please complete your answer.  Let me know
18   that you would like to speak to your attorney and I will
19   give you that opportunity.  Do you understand that?
20      A.  Yes.
21      Q.  Now, there's a couple of terms that we're going
22   to be using throughout the day.  One is voter ID and
23   photo ID.  And we're going to be using that
24   interchangeably throughout the day during this
25   deposition.  And I want you to interpret those terms as

**8**

1    broadly as you can, to mean a requirement that a voter
2    present a form of identification, whether it has a photo
3    or otherwise, when voting in person before being
4    permitted to vote with a regular ballot.  Do you
5    understand that term?
6       A.  Yes.
7       Q.  Okay.  When I refer to you, I'm asking you
8    questions about your capacity as a member of the House
9    of Representatives.  Do you understand that?
10      A.  Yes.
11      Q.  Okay.  And when I'm also referring to you, I am
12   going to be referring to anyone in your office acting on
13   your behalf.  Do you understand that?  And before your
14   attorney objects to this, I'm going to be -- I'm going
15   to try my best to make it very clear when I'm referring
16   to just you and when I'm referring to you and your
17   staff.  Do you understand that?
18          MR. McKENZIE:  I'm just going to lodge the
19   objection for the record that to the extent there's
20   ambiguity, he's going to interpret "you" to mean
21   himself.  And in the question, if it's obvious, "when
22   did you last vote."  But other questions might be more
23   ambiguous.  But with that objection, go ahead and
24   answer.
25   BY MR. GEAR:

Larry Gonzales                                                      May 31, 2012

## 17

1      A. My chief of staff did.
2      Q. Can you tell me the types of communications or
3  documents that you found related to No. 1?
4          MR. McKENZIE:  I'm just going to interpose a
5  brief objection.  When you say "type," don't go into
6  content if it reveals personal thoughts, opinion,
7  motivations of legislatures.  But if you want to talk
8  about "type" in terms of e-mails, letters, what type of
9  document, you're free to answer the question.
10 BY MR. GEAR:
11     Q. I'm going to ask you to identify what documents
12 were found by your chief of staff?
13     A. I didn't review that book, other than one
14 pass-through, a while ago.
15     Q. And when you refer to "that book," what do you
16 mean?
17     A. Chris had put together a book for me and gave it
18 to me.  And I did a cursory, literally, flip through and
19 just put it aside.
20     Q. Did it break out the communications or documents
21 by number or was it just simply a book with -- with
22 documents that were found by your chief of staff?
23     A. Just a book with documents.
24     Q. Okay.  And I guess, for the record, were those
25 documents in the book in response to the amended notice

## 18

1  of deposition?
2      A. Yes.
3      Q. Okay.  About how many documents would you say
4  were in the book?
5      A. Less than ten.
6      Q. I want to turn your attention to No. 5 on the
7  next page.  And if you could read that quickly for me?
8      A. I'm done.
9      Q. And this relates to any calculations, reports
10 audits, estimates, assessments or other analysis of the
11 effect that SB 14 will impose upon minority voters.  Did
12 you produce or your chief of staff produce any documents
13 related to No. 5?
14     A. Not anything official from anybody.  Not like a
15 report or numbers that came from any place at all.
16 We -- what we talked about was the 605,000 number from
17 the Texas Secretary of State.  Chris and I talked about
18 that number.
19     Q. And when you say "Chris," who are you referring
20 to?
21     A. Sanchez, chief of staff.
22     Q. So let's just talk about that 605,000 number for
23 just a second.  That was testimony from the Secretary of
24 State's office that was given during the legislative
25 debate on SB 14?

## 19

1      A. Yes.
2      Q. And you were present during that testimony?
3      A. Yes.
4      Q. And as I understand it, the Secretary of State
5  testified that there were approximately 605,000
6  registered voters in Texas that may not possess one of
7  the allowable forms of ID under the -- under SB 14?
8      A. That's my understanding of testimony, yes.
9      Q. That 605,000 was 605,000 or more according to the
10 Secretary of State?
11     A. I don't know that to be true.
12     Q. Okay.  Did you have an occasion after that
13 testimony to learn that the 605,000 may actually be more
14 than 605,000?
15     A. No.
16         MR. McKENZIE:  I'm going to object to
17 legislative privilege to the extent it asks you to
18 express your personal opinions, thoughts, impressions.
19         THE WITNESS:  Okay.
20 BY MR. GEAR:
21     Q. Okay.  So what I'm asking you is, are you aware
22 of any communication after the Secretary of State's
23 testimony that would have identified that this 605,000
24 voters in the State of Texas who may not have the
25 allowable forms of ID under SB 14, are you aware that

## 20

1  this number actually may be higher?
2      A. No.
3      Q. All right.  I want to turn your attention to No.
4  6.  "All documents and communications between you, your
5  office and members of the public, private organizations
6  and governmental entities related to SB 14 or SB 362,
7  the 81st Legislature, HB 218, the 80th Legislature, or
8  HB 1706, the 79th Legislature."  Did you or your chief
9  of staff find any documents responsive to No. 6?
10     A. I'm not familiar with that.
11     Q. You're not familiar with whether or not --
12     A. I don't know if he -- well, I was not in office
13 for one, two, three of those bills.
14     Q. Okay.  So let me -- let me break this down for
15 you, then, so the record is clear.  Did you find any
16 documents in response to -- and when I say documents,
17 documents or communication in response to SB 14 or --
18 let's start there, SB 14?
19     A. Yes.
20     Q. And did you find any documents, and "you" meaning
21 you or your chief of staff or anyone else in your
22 office, find any documents or communications related to
23 SB 362 which is from the 81st Legislature?
24     A. No.
25     Q. Did you or anyone within your office find any

Larry Gonzales                                                    May 31, 2012

## 25

1    Q.  Do you realize that you hold the ability to
2  assert your privilege or not to assert your privilege?
3    A.  Yes.
4    Q.  And are you continuing to assert your privilege,
5  legislative privilege over -- over this deposition
6  today?
7    A.  Yes.
8    Q.  And are you willing to waive your privilege at
9  any point during our questioning during the deposition
10  today?
11    A.  No.
12    Q.  Where were you born and raised?
13    A.  I was born in Houston, Texas.  And I was raised
14  in Alvin, Texas.
15    Q.  And can you describe your educational background
16  for me?
17    A.  Sure.  Public school, community college, the
18  University of Texas at Austin for an undergraduate
19  degree.  And then Texas State University for a Master's
20  degree, which I'm three hours -- or nine hours short.
21    Q.  What was your undergraduate degree in?
22    A.  Government.
23    Q.  And what's your -- what's the focus of your
24  Master's degree?
25    A.  Public administration.

## 26

1    Q.  Are you currently a member of any community
2  organizations or groups?
3    A.  Yes.
4    Q.  Which community organizations or groups?
5    A.  The Round Rock Chamber of Commerce, the Texas
6  State Advisory Counsel, probably a PTA or two I'm sure
7  from parents night.  I think I'm still on the rolls for
8  El AMISTAD Club.
9      REPORTER:  The what?
10      WITNESS:  El AMISTAD, A-M-I-S-T-A-D.
11  BY MR. GEAR:
12    Q.  And what is that?
13    A.  A civic organization in Round Rock.  And that's
14  all I can think of right now.
15    Q.  Are you a member of the Mexican Legislative
16  Exchange Counsel?
17    A.  Mexican American.
18    Q.  Let me do that again.  I'm sorry.  Are you a
19  member of the American Legislative Exchange Counsel?
20    A.  I've never like paid or gone.  I don't know if
21  we're automatically a part of it.  But I have never made
22  an effort to join or send them dues or attend a meeting.
23    Q.  So you have never participated in any of their
24  conferences or meetings?
25    A.  No.

## 27

1    Q.  Have you ever had any communications of any kind
2  with this organization?
3    A.  No.
4    Q.  Have you ever introduced any bill language in the
5  House related to voter identification from this
6  organization?
7    A.  No.  And just to be clear, I have the name right,
8  we're talking about ALEC, right, A-L-E-C?
9    Q.  Yes.
10    A.  No.
11    Q.  Did you communicate with ALEC at any time during
12  the legislative debate pertaining to SB 14?
13    A.  No.
14    Q.  Are you a member of the Hispanic Republican
15  Conference?
16    A.  Yes.
17    Q.  When did you join?
18    A.  At the beginning of session, I guess.
19    Q.  So and -- is that -- would it be accurate to say
20  that's when the organization was actually created?
21    A.  Yes.
22    Q.  And who was the founder or who is the founder of
23  that organization?
24    A.  Aaron Pena.
25    Q.  And do you know what the Mission statement of

## 28

1  this organization is?
2    A.  I don't.
3    Q.  Why did you join?
4    A.  I joined because there were six of us who wanted
5  to show some solidarity as Hispanic Republicans.
6    Q.  And can you name the six that are original
7  founders of the membership?
8    A.  Aaron Pena, Jose Aliseda, Raul Torres, John
9  Garza, Dee Margo and myself.
10    Q.  And all six, are they Republicans?
11    A.  Yes.
12    Q.  All six, did they vote in support of SB 14?
13    A.  I don't know for sure, but -- I don't know for
14  sure.
15    Q.  As -- as an organization, Hispanic Republican
16  Conference, did you have discussions regarding SB 14?
17      MR. McKENZIE:  I'm going to object to the
18  extent it calls for communications among legislators
19  that are not public record that reflect individual
20  motive or purpose.  You may answer as to general purpose
21  and to the public record.
22  BY MR. GEAR:
23    Q.  And just to be clear, I'm asking you in -- in
24  reference to your membership in an organization, the
25  Hispanic Republican Conference.  I'm asking you in

Larry Gonzales                                                    May 31, 2012

## 29

1  reference to that, did you have discussions specific to
2  SB 14?
3       MR. McKENZIE:  Same instruction.  You can
4  answer if you had discussions.  The content of the
5  discussions would be privileged, actually.
6       A.  Of course.  At some point, yes, but I can't
7  recall for sure.  I wasn't very active in that group.
8       Q.  (By Mr. Gear)  Well, let's try to make this a
9  little clearer for the record.  You said, "at some
10 point," do you recall when this conversation took place?
11      A.  Oh, no.
12      Q.  Do you recall -- do you recall where this
13 conversation took place?
14      A.  No.
15      Q.  Do you recall who was present during this
16 conversation?
17      A.  No.
18      Q.  Well, it would have been members of the Hispanic
19 Republican Conference, correct, that were present?
20      A.  I didn't go but to, maybe one or two meetings.
21      Q.  So during those one or two meetings, did you
22 discuss voter ID issues at both?
23      A.  No.
24      Q.  At one of them, then, as -- as I understand your
25 testimony?

## 30

1       A.  One was organizational.  That was the set up,
2  organizational.  And the other one -- I don't know what
3  we were talking about at that deal.  I didn't stay very
4  long.
5       Q.  Let me just -- tell me if I misunderstood your
6  testimony.  You testified that as a member of the
7  Hispanic Republican Conference, you engaged in a
8  communication regarding voter ID related to SB 14.  Is
9  that accurate?
10      A.  I don't specifically recall sitting down and
11 having a discussion on Senate Bill 14.
12      Q.  Do you recall having this discussion with any of
13 the members that you testified here to today?
14      A.  Not in the context of HRC.  See I'm thinking HRC,
15 like the group, the entity.  Is that what you're asking
16 about?
17      Q.  Yes.
18      A.  Okay.  As a group -- as a group we discussed
19 it -- not as a group, as individuals we discussed it on
20 the day it was on the House floor.
21      Q.  And that was during the public legislative
22 debate?
23      A.  That's correct.
24      Q.  And so during that public debate, can you tell me
25 did you meet with Representative Pena?  And so we're

## 31

1  clear, can you tell me when this individual meeting
2  occurred?
3       A.  During the debate.
4       Q.  And which debate are we talking about, what date,
5  if you remember?
6       A.  It would be the second reading debate.  Whatever
7  second reading was.  Whatever the day that was.  The day
8  of the House journal entry.
9       Q.  Would it be in March of 2011?
10      A.  I don't know the day of the House entry, whatever
11 that day is.
12      Q.  2011?
13      A.  2011, yeah.
14      Q.  Okay.  Can you tell me who else, if anyone else
15 was present during your individual meeting with
16 Representative Pena?
17      A.  Nobody.
18      Q.  And can you tell me what the substance of the
19 that conversation was?
20      MR. McKENZIE:  Objection to the extent it
21 calls for legislative communications that aren't public
22 or purpose that are private and not public.  You may
23 answer as a general purpose.
24 BY MR. GEAR:
25      Q.  You can answer.

## 32

1       A.  It was just me and Aaron.  What was your question
2  again?
3       Q.  The question was the substance of the
4  conversation that you had with Representative Pena?
5       MR. McKENZIE:  You may answer as it
6  references matters of public record, but if it is not
7  matter of public record, I would instruct you not to
8  answer or if it reflects general legislative purpose.
9  BY MR. GEAR:
10      Q.  Are you refusing to answer the question?
11      A.  I'm not going to answer that one.
12      Q.  Are you following the advice of your counsel?
13      A.  Yes.
14      Q.  Let me ask you, the discussion which you've
15 identified as related to SB 14, did you use that -- part
16 of that private discussion to present any public
17 information during the debate?
18      A.  No.
19      Q.  So as I understand it, your conversation with
20 Representative Pena was not advanced publicly in any of
21 the debate that took place on the floor?
22      A.  If I understand, "advance publicly," what does
23 that mean?
24      Q.  "Advance publicly," as did you speak about a
25 subject related to SB 14 and did you talk about that

Larry Gonzales                                        May 31, 2012

## 33

1  subject on the mic, publicly on the floor?
2      A. Yes.
3      Q. Okay. So when you went to the mic and you spoke
4  publicly, what was the subject matter of your
5  discussion?
6      A. When, timing, when, if we were going to -- same
7  thing.
8      Q. You're -- you're providing testimony. I'm trying
9  to understand what you know?
10     A. Right.
11     Q. So if you could give me some detail on what
12 you're talking about that would be helpful?
13     A. Well, the substance of it, I think I'm not going
14 to say anything on the substance.
15     Q. Well, again, you're at -- as I understand it you,
16 went to the microphone and you -- you spoke on the mic,
17 on the floor which is part of the public record?
18     A. Right.
19     Q. So I'm asking you, what did you say when you went
20 to the mic?
21     A. Oh, I don't know. It's in the journals that I
22 don't have on me. But it's that journal from the pages
23 we discussed earlier.
24     Q. Okay.
25     A. That's what I said.

## 34

1      Q. We'll get to that, but you said it was about
2  timing and when and I'm trying to understand your
3  testimony. What do you mean by that?
4      A. Well, that -- it's a long debate. And that I
5  would -- I would tell -- or ask the questions of
6  Representative Harless, the public questions that I
7  would ask it much later in the day.
8      Q. So the questions that you asked of Representative
9  Harless, that was a subject that you discussed with
10 Representative Pena?
11     A. No.
12     Q. Well, again, I'm trying to understand your
13 testimony. And forgive me if I'm asking. You had an
14 individual meeting with Representative Pena on the
15 floor, correct?
16     A. Yes.
17     Q. You then went to the mic and you spoke on the
18 record and you indicated that the subject matter was the
19 timing or when, correct?
20     A. Uh-huh.
21     Q. The timing or when for what?
22         MR. McKENZIE: I'm just going to object.
23 You can say what you said on the public record. The
24 private conversations you had with Aaron Pena are, from
25 what I understand, you're asserting legislative

## 35

1  privilege over that. So to the extent you're speaking
2  about what you said on the mic. You can talk generally
3  about what you remember about what you said on the mic.
4  But the private conversations are privileged.
5      A. It's all House journal.
6      Q. (By Mr. Gear) Okay. But I'm -- I'm just asking
7  you generally, when you said "the timing for when and
8  what". I'm just trying to understand what that means.
9  And then I -- then we can move on. But if you tell me
10 what the timing for "when" means, we can move on?
11     A. Thought I already answered that. It's the
12 questions that were asked on the mic publicly, that's
13 what I was -- that's what I asked Patricia Harless.
14     Q. Okay.
15     A. And as I stated previously, I was going to ask
16 those questions much later in the day.
17     Q. Okay. So was that a choreographed presentation
18 on the microphone?
19         MR. McKENZIE: Objection to the extent it
20 calls for private communications with you and a
21 legislator. You may answer to the extent it reflects
22 the public record.
23     A. I'll take that right.
24         THE REPORTER: Say that again.
25         THE WITNESS: Oh, I'll invoke that right.

## 36

1  BY MR. GEAR:
2      Q. Are you following the advice of your counsel and
3  refusing to answer the question?
4      A. Yes.
5      Q. You also indicated that you had a meeting with
6  Mr. Aliseda on the floor; is that correct?
7      A. Yes.
8      Q. And can you tell me when that meeting took place?
9      A. The date that the second reading of the bill was.
10     Q. Around the same time you spoke to Representative
11 Pena?
12     A. Yes.
13     Q. And would that also be true for Representative
14 Torres -- is it Garza?
15     A. Garza.
16     Q. And -- and what was the last name again? Is it
17 Marango?
18     A. Margo.
19     Q. Margo. Thank you. Did you have a meeting with
20 each of these individuals prior to taking the microphone
21 on the date that the legislative debate took place?
22     A. Not all of them.
23     Q. Okay. So which ones did you not meet with on
24 that day?
25     A. Dee Margo.

Larry Gonzales                                            May 31, 2012

## 37

1    Q. And Dee Margo is a representative?
2    A. He is.
3    Q. And can you tell me when you met with Dee Margo?
4    A. Well, I didn't. The question you asked me is
5    which one of these I did not meet with. Isn't that what
6    you asked me?
7    Q. Yes, but did you meet with Dee Margo regarding SB
8    14?
9    A. No.
10   Q. Okay. Thank you. Did the Texas Conservative
11   Coalition as an organization have any communication with
12   any House member regarding voter identification?
13       MR. McKENZIE: Objection, it may call for
14   speculation. Go ahead.
15   A. I don't recall seeing anything.
16   Q. (By Mr. Gear) Are you a member of the Mexican
17   American Legislative Caucus?
18   A. Yes.
19   Q. When did you join that organization?
20   A. At the very beginning of session.
21   Q. And do you know, is there a Mission statement for
22   the Mexican American Legislative Caucus?
23   A. I'm not aware.
24   Q. Do you know if they addressed, publicly, issues
25   regarding to voter ID?

## 38

1    A. I'm not aware.
2    Q. Do you hold a position in the Mexican American
3    Legislative Caucus?
4    A. No.
5    Q. Did the Mexican American Legislative Caucus have
6    any communication with any House members regarding voter
7    identification?
8        MR. McKENZIE: Objection to the extent it
9    calls for private communications that are not public
10   among legislatures. You may answer as to public record
11   and legislative purpose.
12   A. I'm not aware.
13   Q. (By Mr. Gear) Well, let's talk about publicly
14   first. Did they issue any public report or
15   communication regarding voter ID?
16   A. I'm not aware.
17   Q. Did you engage or -- excuse me. Did the Mexican
18   American Legislative Caucus engage in any private
19   communications regarding voter ID?
20   A. I'm not aware.
21   Q. You indicated that you were elected in 2010?
22   A. Yes, sir.
23   Q. And during 2010, can you tell me what your
24   campaign issues were?
25   A. Oh, man. Public education, higher education.

## 39

1    property rights were the big ones. Second amendment
2    rights, transportation, we talk about voter ID. I'm not
3    sure what else. I'm not sure what else. I was trying
4    to visualize my website.
5    Q. Sure.
6    A. I can't remember what else is on there.
7    Q. So let's focus on voter ID. That was a campaign
8    issue in 2010?
9    A. Uh-huh.
10   Q. Can you tell me the position you took on voter
11   ID?
12   A. Yes, that I was -- would be supportive.
13   Q. Why were you supportive of voter ID in 2010?
14       MR. McKENZIE: Objection to the extent it
15   calls for legislative privilege.
16       MR. GEAR: He's not a member of the House in
17   2010. So I'm asking him during his campaign, why did he
18   take the position to support voter ID. I don't know
19   where that would be privileged.
20       MR. McKENZIE: It's still -- with respect,
21   it still could reflect his private deliberations prior
22   to thought. But you may answer as to anything that's in
23   your campaign, anything that's public. But to the
24   extent it doesn't reflect your thoughts before the bill,
25   then you're open to answer that, too.

## 40

1    BY MR. GEAR:
2    Q. Again, I'm focusing solely on your campaign in
3    2010. And your position that you are a supporter of
4    SB 14 or voter ID, more specifically. Can you tell me
5    why you took the position to support voter ID?
6    A. As stated on my website.
7    Q. Okay.
8    A. Yeah. Which is public record. The -- it was
9    protect the integrity of the elections process and to
10   instill confidence in the voters.
11   Q. And that's your current website, correct?
12   A. I haven't seen it in a while, but...
13   Q. So moving away from your website, I want to know
14   personally as an individual why you made the
15   determination to support voter ID?
16       MR. McKENZIE: Same instructions, answer to
17   the extent it doesn't reflect your thoughts as a
18   legislator.
19   BY MR. GEAR:
20   Q. And again this is before you became a legislator?
21   A. Uh-huh. It's on the website.
22   Q. I'm not asking you about your website. I'm
23   asking about your personal opinion, your personal
24   decision to support voter ID?
25       MR. McKENZIE: I'm going to object on

Larry Gonzales                                          May 31, 2012

## 41

1    relevance.  Go ahead.
2        A.  It's -- it's clearly in writing on the website.
3    You're asking me to -- or it was.  I haven't seen the
4    website in a while.  I haven't looked at it in a while.
5        Q.  (By Mr. Gear) Did you as an individual conduct
6    any analysis to determine the impact of voter ID prior
7    to becoming a legislator?
8        A.  No.
9        Q.  Did you engage in any communications regarding
10   voter ID prior to becoming a legislator that helped
11   determine your position on voter ID?
12       A.  No.
13       Q.  Did you communicate with community members
14   regarding voter ID prior to becoming a legislator?
15       A.  No -- yeah, yeah.
16       Q.  And when did those communications take place?
17       A.  No idea.
18       Q.  Was it in terms of your campaign?
19       A.  Campaign.
20       Q.  Can you tell me what the general concerns were
21   regarding voter ID that you heard from community
22   members?
23       A.  Oh, different people expressed all kinds of
24   different reasons.  I mean, there's just -- everybody
25   has their opinion.  We heard -- we heard from a lot of

## 42

1    people different issues.
2        Q.  Did you hear people express support for voter ID?
3        A.  Yes.
4        Q.  Did you hear people express concern or opposition
5    to voter ID?
6        A.  Yes.
7        Q.  Did you have an occasion the speak with
8    legislators prior to becoming a legislator yourself
9    regarding the issues of voter ID?
10       A.  No.
11       Q.  Okay.  And can you tell me what formed the basis,
12   beyond the communication that you had with individuals
13   in the community, that formed the basis of your opinion
14   on voter ID?
15       A.  That my constituents --
16       Q.  Well, you don't have constituents at that point,
17   correct?  You're campaigning.
18       A.  That the citizens, that my community weren't --
19   weren't supportive -- I mean, were supportive.
20       Q.  Some of the concerns that you heard, did any of
21   them also include that this would have a --
22   disproportionate impact on minority voters from
23   community members?
24       A.  No.
25       Q.  So you didn't hear anyone express concern about

## 43

1    the impact or the effect of voter ID on minority voters?
2        A.  I don't know any specific time or -- I mean, I
3    just don't recall.
4        Q.  And so specifically, what did people tell you
5    regarding voter ID?
6        A.  Just -- I don't -- you know, that they were
7    supportive.  That if you -- they wanted people who voted
8    to produce an ID.  That's what they wanted.
9        Q.  And as I understand it, not all people told you
10   that they were supportive of voter ID; is that correct?
11       A.  That's correct.
12       Q.  And so the people that -- that told you that they
13   were not supportive of voter ID, what were their
14   concerns or what did they express to you?
15       A.  Oh, let me think.  Some of my guys -- some of the
16   guys there -- some of the community members, I can't --
17   I can't quote them.  I can't possibly put it in words
18   what, you know, specifically what they were saying.
19       Q.  So you remember what the supporters were saying
20   but you don't remember what the concerns were?
21       A.  Yeah.  The concerns -- very, very few where I
22   live.  We heard concerns on a lot of other issues not
23   related to voter ID.
24       Q.  And I want to focus solely on voter ID right now?
25       A.  Right.  I can't recall.

## 44

1        Q.  Was there any discussion about what problems --
2    what specific problems voter ID was intended to address?
3        A.  Most conversation was just -- kind of the quote I
4    use over and over again was "prove who you are," just
5    show an ID that you are who you say you are.  That's
6    just what we heard, that's what the people said during
7    the campaign.
8        Q.  Did community members also express concern about
9    undocumented non-citizens or illegal aliens voting?
10       A.  No.  No.
11       Q.  And you said "where you live."  Where
12   specifically do you live?
13       A.  I live in Williamson County.
14       Q.  Williamson County.
15       A.  Right.
16       Q.  And can you tell me what the demographics of
17   Williamson County are?
18       A.  No.
19       Q.  In terms of Black or Hispanic?
20       A.  No.
21       Q.  Can you tell me what the percentage specifically
22   of Hispanic population is?
23       A.  No.
24       Q.  In Williamson County?
25       A.  No.

Larry Gonzales                                                    May 31, 2012

## 45

1   Q.  Have you ever attempted to determine that?
2   A.  No.
3   Q.  My understanding is -- strike that.  When
4   speaking with the people who expressed concern against
5   voter ID, did they express any specific problem that
6   voter ID may cause?
7   A.  Not that I recall.
8   Q.  My understanding that you -- is that you are
9   currently campaigning in House District 52?
10  A.  I'm up for reelection.
11  Q.  Does that mean you're campaigning?  I don't want
12  to put words in your mouth so tell me how you would
13  describe it?
14  A.  Oh, I mean, I'm on the ballot, but I'm up for
15  reelection.  Campaigning, we sent out a mail piece.
16  But, you know.
17  Q.  You're running for reelection?
18  A.  We're running for reelection.
19  Q.  But you're unopposed?
20  A.  I'm unopposed.
21  Q.  Okay.
22  A.  Well, I have a Libertarian, but there's not a
23  Democrat.  So we're not unopposed.
24  Q.  Thanks for the clarification.
25  A.  Sure.

## 46

1   Q.  Let me ask you a question about your history of
2   participation in government outside of your elected
3   office.  Can you tell me a little bit about that?
4   A.  Sure.  I've been employed -- you're asking about
5   government, right?
6   Q.  Yes.
7   A.  Okay.  Sure.  I've been employed by the House.
8   I've been employed by the Senate.  I've been employed by
9   the Attorney General's office.  I've been employed by
10  Texas State University system.  And Texas State.
11  Q.  You indicated that you were appointed by the
12  House.  So does that mean that you were appointed by
13  specific House members?
14  A.  I'm not appointed.  I worked -- I work with the
15  House.
16  Q.  Okay.  You were hired?
17  A.  Yes.
18  Q.  By members of the House.  Okay.  Can you tell me
19  which members of the House you were hired by?
20  A.  Sure.  I'll start in -- with Pitts, that's Jim
21  Pitts.  And by Kevin Brady.
22  Q.  If you can give me the time frame?
23  A.  Okay.  So '93 is Jim Pitts.  '95 is Kevin Brady.
24  '97 Wayne Christian.  '99 is Rick Perry.  2001 is John
25  Cornyn, 2003 is Robert Talton, 2005 is John Otto, 2007

## 47

1   is John Otto, 2009 --
2   Q.  So you said '05 through '07 is John Otto?
3   A.  Yes.  Yes.  2009 is the Texas State University
4   System and then elected 2011.
5   Q.  Okay.  So let me break that out.  John Cornyn, is
6   he with the House of Representatives?
7   A.  No.  He was, at that time, serving as our Texas
8   Attorney General.
9   Q.  Okay.  So let me just focus primarily right now
10  on the House.  Can you -- can you go through again who
11  hired you in the House solely?
12  A.  Oh, okay.  So 1993 Jim Pitts.  1995 Kevin Brady,
13  1997 Wayne Christian, 2005 John Otto, 2007 John Otto and
14  in the interim of '93 was Huey McCoulskey.  I forgot
15  about Huey.  Huey McCoulskey.
16  Q.  Okay.  So let's just start with, I believe you
17  said Jim Pitts was the first House member that hired
18  you, correct?
19  A.  Let's back up.  Let's go to -- I forgot Tim Von
20  Dohlen.  I was an intern, so there might be paperwork
21  for Tim Von Dohlen.  I'm not certain.  But Tim never
22  paid me.  Tim Von Dohlen.  That would be '92.
23  Q.  And Tim was a Representative?
24  A.  Yes.  Yes.  Tim Von Dohlen in '92.
25  Q.  So as I understand it you've been in the House as

## 48

1   a senior staff member?
2   A.  Yes.  Well, all of it from intern, you know, all
3   the way up to chief of staff.
4   Q.  Okay.  And as we talk about each one I would like
5   you to try to identify what your title or position was
6   during that time period?
7   A.  Okay.
8   Q.  But let's start with 1992, which you said was
9   Tim?
10  A.  Von Dohlen.
11  Q.  Von Dohlen.
12  A.  Uh-huh.
13  Q.  Tim Von Dohlen was a Representative.  Is still
14  in the House now?
15  A.  He is not.
16  Q.  He is not.  Okay.  And as an employee of Tim Von
17  Dohlen, can you tell me what your position or title was?
18  A.  Intern.
19  Q.  And as an intern for Tim Von Dohlen, can you tell
20  me what your responsibilities generally were?
21  A.  Case work.
22  Q.  And when you say "case work," do you mean
23  research?  How are you defining that?
24  A.  Case work is when a constituent calls and they
25  have a question, they have a question about child

Larry Gonzales                                          May 31, 2012

## 49

1   support or maybe Medicaid, State services.  And as an
2   intern we take those phone calls and problem solve for
3   them.
4      Q.  As an intern for Tim Von Dohlen, did you deal
5   with any issues related to voter ID?
6      A.  No.
7      Q.  And that would have been in 1992?
8      A.  1992, correct.
9      Q.  And did you field any calls, did you take any
10  calls regarding voter ID?
11     A.  No.
12     Q.  Did you take any calls regarding voter fraud?
13     A.  No.
14     Q.  Let's go to 1993 which did -- did Huey --
15     A.  McCoulskey.
16     Q.  Or Jim Pitts come first?
17     A.  Huey McCoulskey.
18     Q.  And Huey McCoulskey was a Representative in the
19  House?
20     A.  Yes.
21     Q.  What was the title or position that you held for
22  Huey McCoulskey?
23     A.  Two.  I was an intern as well.
24     Q.  Okay.
25     A.  And then I worked in the district office.  I

## 50

1   can't tell you my title.  If I'm -- I'm district office
2   director, maybe something like that.
3      Q.  So your answer would suggest that you worked in
4   two different locations --
5      A.  That is correct.
6      Q.  For Jim McCoulskey?
7      A.  Huey.  Yes.
8      Q.  And so can you tell me which locations you worked
9   at?
10     A.  Sure.  So at the beginning of '93 I was in Huey's
11  capital office as an intern.  And then after the session
12  '93, when it was over, I went back to work for Huey.
13  And between that time is when I worked for Jim Pitts in
14  '93.  So it was Huey McCoulskey beginning of '93.  I
15  finished the session with Jim Pitts in '93 and went back
16  to work for Huey McCoulskey in '93.
17     Q.  So in '93 while you're in the capital office for
18  Representative McCoulskey, can you tell me what your
19  responsibilities were.  I believe you're an intern?
20     A.  Open mail.
21     Q.  Did you open my mail related to voter ID?
22     A.  No.
23     Q.  Did you open any mail related to voter fraud
24  issues?
25     A.  No.

## 51

1      Q.  And so then -- and also in 1993 you worked for --
2   let me back up.  You also said you were in his other
3   office, correct?
4      A.  Correct.
5      Q.  And same questions.  Did you have any
6   responsibilities related to voter ID?
7      A.  No.
8      Q.  Did you have any responsibilities related to
9   voter fraud of any kind?
10     A.  No.
11     Q.  All right.  And so also in 1993 you worked for
12  Jim Pitts, Representative Pitts.  And can you tell me
13  what your title or position was in 1993?
14     A.  Same thing.  I mean, you got to check the
15  paperwork for exact titles.  Because I don't know what
16  his exact title -- what my exact title was.  But it was
17  the same thing.  Like, intern.  Same job.
18     Q.  When you say "same job," do you mean case work or
19  do you mean opening mail?
20     A.  Opening mail.
21     Q.  Opening mail.  Okay and in 1993 with Jim Pitts
22  did you deal with any issues related to voter ID?
23     A.  No.
24     Q.  Did you deal with any issues related to voter
25  fraud?

## 52

1      A.  No.
2      Q.  Were those issues that you were even aware of in
3   1993?
4      A.  No.
5      Q.  So I believe the next Representative that you
6   worked for, and correct me if I'm wrong, is Kevin Brady?
7      A.  Yes.
8      Q.  In 1995?
9      A.  Yes.
10     Q.  And in 1995 can you tell me what your
11  responsibilities were for Representative Brady?
12     A.  Administrative aid.  So mail, case work,
13  assigning the interns, file folders.  This is
14  pre-computers.  So we were, you know, manually filing
15  them.  Kind of made sure the interns had jobs.
16     Q.  That sounds like a promotion.
17     A.  It was.
18     Q.  In any event in 1995 did your responsibilities
19  conclude -- include anything dealing with voter ID?
20     A.  No.
21     Q.  Did your responsibilities include anything
22  dealing with issues of voter fraud of any kind?
23     A.  No.
24     Q.  All right.  So from 1995 you then, looks like you
25  took a little time off and you came back and worked for,

Larry Gonzales                                                      May 31, 2012

## 53

1   is it Wayne Christian?
2       A.  Yes.
3       Q.  And Wayne Christian is also a representative?
4       A.  Yes.
5       Q.  And that time period would have been 1997, if
6   I'm -- if I'm correct?
7       A.  Yes.
8       Q.  And in 1997 what title or position did you hold?
9       A.  Legislative aid.
10      Q.  And tell me, if you can, what the
11  responsibilities were for a legislative aid?
12      A.  Making sure the committee book for the committees
13  he was serving, making sure the committee books had the
14  right bills in them and that we had the analysis in
15  them, everything was together for him.  And then
16  managed, you know -- at this point the administrative
17  assistant, any interns and making sure that the case
18  work was done, you know, and the letters were being
19  written and things were getting filed correctly.
20      Q.  So you were dealing with his constituents in
21  terms of letter writing?
22      A.  Not really anymore.  I was kind of making sure
23  that what came in had an answer going out.  But I wasn't
24  involved with like the -- the copy writing at this stage
25  anymore.  That was the administrative assistant's job.

## 54

1       Q.  Okay.  So in 1997 while working for Wayne
2   Christian were you aware of issues related to voter
3   fraud?
4       A.  No.
5       Q.  Was that a topic of discussion in 1997, if you
6   remember?
7       A.  I don't recall that it was.
8       Q.  Okay.  Were you aware of any issues related to
9   voter ID in 1997?
10      A.  No.
11      Q.  So from -- and I should follow it up with, did
12  you work on any issues related to voter ID?
13      A.  No.
14      Q.  And did you work on any issues related to voter
15  fraud?
16      A.  No.
17      Q.  And so from 1997 you then went to, if I am
18  correct, Jim Pitts in 2005?
19      A.  No.  1999 would be Rick Perry.
20      Q.  1999.  But Rick Perry was not a representative in
21  1999?
22      A.  No.  That's right.
23      Q.  He would have been Lieutenant Governor?
24      A.  That's correct.
25      Q.  Okay.  So let's -- let's skip over Rick Perry for

## 55

1   a second --
2       A.  Okay.
3       Q.  And focus on Jim Pitts in 2005.
4       A.  2005 would be John Otto.
5       Q.  You're correct.  Thank you.  Let's focus on
6   Representative Otto in 2005.  Can you tell me what title
7   you held as -- as an employee for Representative Otto?
8       A.  Legislative aid.  When you ask me title, you'll
9   have to check the personnel action request.  Because
10  I -- I don't know if that says legislative assistant, if
11  it says legislative director.  The titles for each
12  member are kind of vague here in Texas.  The members
13  kind of put a title on there.  So when I say that, you
14  know, there's -- there's four recognized titles in the
15  handbook.
16      Q.  What are the four recognized titles?
17      A.  Oh, gosh.  It was clerk, intern, administrative
18  aid and legislative aid.
19      Q.  Okay.
20      A.  Those are like, the four.  So people put, you
21  know, on the actual paperwork other stuff.  So when I
22  tell you legislative aid that's what I did, I mean,
23  legislative aid.
24      Q.  And so in 2005 under Representative Otto, can you
25  tell me, generally, what your responsibilities were?

## 56

1       A.  Yeah.  His legislative package, his bills -- his
2   bills, ones that he was carrying, dominated almost all
3   of my time.
4       Q.  Okay.  And so as a legislative aid did you -- did
5   you conduct analysis, research on a particular bill?
6       A.  Yes.
7       Q.  Okay.  And did Jim Otto address any issues of
8   voter ID in 2005?
9       A.  John Otto, no.
10      Q.  I'm sorry.  John Otto.  I'll get that right.
11  I'll just call him Representative Otto for now.
12      A.  That'll work, too.
13      Q.  Did any of your responsibilities include issues
14  of voter ID in 2005?
15      A.  No.
16      Q.  Did any of your responsibilities include issues
17  related to voter fraud in 2005?
18      A.  No.
19      Q.  Were you aware of issues related to voter ID in
20  2005?
21      A.  At this time, 2005, I don't think a bill had been
22  filed in 2005.  I'm not certain when I saw that first
23  one.  But I can't remember if that was '05 or '07.  I
24  don't remember.
25      Q.  So as you sit here today, is it your testimony

Larry Gonzales                                              May 31, 2012

## 57

1  that you are not -- you were not aware of issues related
2  to voter ID?
3       A.  Right.  Right.
4       Q.  In 2005?
5       A.  Right.
6       Q.  And you were not aware of issues related to voter
7  fraud in 2005?
8       A.  Right.
9       Q.  Okay.  And so you worked for Representative
10  Otto --
11      A.  That's right.
12      Q.  From 2005 to 2007 or was there a break in there
13  somewhere?
14      A.  That one was consecutive.  So it would have been
15  the whole time.
16      Q.  Okay.  At any time during the period that you
17  worked for Representative Otto did your responsibilities
18  include issues related to voter ID?
19      A.  No.
20      Q.  At any time during the period in which you worked
21  for Representative Otto did your responsibilities
22  include issues related to voter fraud?
23      A.  No.
24      Q.  Did you receive any calls or communications
25  regarding voter ID while you were a legislative aid for

## 58

1  Representative Otto?
2       A.  Not that I recall.
3       Q.  And did you receive any communications or phone
4  calls while you were a legislative aid for
5  Representative Otto that addressed the issue of voter
6  fraud?
7       A.  Not that I recall.
8       Q.  Okay.  And so I want to take you back.  Was --
9  was there anybody else that you worked for as a
10  legislative aid or any other -- of the other titles that
11  you described in the House after 2007?
12      A.  No.  No.  Because then it was Texas State so I
13  got elected.
14      Q.  Okay.  So your period would have been from 1992
15  to 2007 you worked for various representatives in the
16  House?
17      A.  That is accurate.
18      Q.  All right.  So let me take you back for a second
19  to your campaign in 2010.  Do you know what -- do you
20  know what the people you communicated with wanted to see
21  regarding the issue of voter ID?  Wanted to see happen I
22  should say?
23      A.  A picture -- photo picture when you voted.
24      Q.  And do you -- at any time during that time that
25  you were campaigning, and I'm talking about 2010, did

## 59

1  you do any independent research to determine the effects
2  of voter -- photo ID?
3       A.  No.
4       Q.  On minorities?
5       A.  No.
6       Q.  Did you do any independent research at all or
7  engage in any communications that would have supported
8  your position on -- that helped to support your position
9  on photo ID?
10      A.  No.
11      Q.  And so now, let me move forward to your actual
12  position as a representative in District 52.  Why don't
13  you know the demographics of your district?
14      A.  I don't see my district like that.
15      Q.  You don't think it's important to know the
16  demographics, the people in your district?
17      A.  I think it's important to know the issues that
18  are facing my district.
19      Q.  Well, obviously during your campaign in 2010, you
20  campaigned, correct?
21      A.  Uh-huh.
22      Q.  You went out and -- into your community?
23      A.  Yes.
24      Q.  And did you go to the various areas, cities
25  within your, now District 52?

## 60

1       A.  Yes.
2       Q.  And that's contained completely within Williamson
3  County?
4       A.  Yes.
5       Q.  And there are various cities within District 52?
6       A.  Yes.
7       Q.  Can you identify the cities that -- that are
8  currently within District 52?
9       A.  Currently or at the time of the election?
10      Q.  At the time of the election.  I understand there
11  was a redistricting process.
12      A.  Right.  Round Rock, Georgetown, Hutto, Taylor,
13  Coupland, C-O-U-P.  Coupland, parts of Austin, and parts
14  of two different municipal utility districts, or as we
15  say MUDS.
16      Q.  Okay.  And I just want to ask you, specifically,
17  you spent time in Taylor during your campaign?
18      A.  Yes.
19      Q.  Could you describe for me the demographics of --
20  of Taylor as far as Black, Hispanic?
21      A.  No.
22      Q.  So who did you speak to when you went to Taylor.
23  Did you speak to Anglos?
24      A.  A lot of folks.
25         MR. McKENZIE:  I'm also going to object.

Larry Gonzales                                                  May 31, 2012

## 61

1  When you see someone, you don't always know what,
2  exactly, the demographics of the folks you're seeing
3  are.  But you may answer.
4  BY MR. GEAR:
5      Q.  Okay.
6      A.  Don't know.
7      Q.  So as you sit here today, is it your testimony
8  that you have never attempted to determine the
9  demographics of the District 52 which you are currently
10  a House member in, correct?
11      A.  Yeah.  I don't know the racial demographics of
12  District 52.
13      Q.  Okay.  And on your own representative website,
14  are the demographics posted on that website?
15      A.  I don't know.
16      Q.  You've never attempted to look to see if
17  demographics are posted on your website for House
18  member?
19      A.  I don't know -- oh, the House member?
20      Q.  Yes.
21      A.  House member or campaign member?
22      Q.  As a House member?
23      A.  Oh, I don't know if it's there.  Probably is, I
24  guess.
25      Q.  Who do you view as your main base of electoral

## 62

1  support?
2          MR. McKENZIE:  Objection; vague.
3  BY MR. GEAR:
4      Q.  Well, when you were campaigning in 2010 --
5      A.  Uh-huh.
6      Q.  For District 52, did you have an opponent?
7      A.  Yes.
8      Q.  And who was that opponent?
9      A.  Diana Maldonado.
10      Q.  And that's a Hispanic surname.  Am I accurate to
11  say that she is Hispanic?
12          MR. McKENZIE:  Objection; calls for
13  speculation.
14  BY MR. GEAR:
15      Q.  Well, did you meet this candidate?
16      A.  Oh.  Yeah.  Yeah.
17      Q.  And is this candidate a Spanish Speaker?
18      A.  I think she speaks Spanish.
19      Q.  Okay.
20      A.  I've never heard her speak Spanish, but I think
21  she speaks Spanish.
22      Q.  Okay.  So I'm going to ask you again, is it fair
23  to say that this candidate that you were running against
24  in 2010 was also Hispanic?
25          MR. McKENZIE:  Objection.  Same objection.

## 63

1  Speculation.  Go ahead.
2  BY MR. GEAR:
3      Q.  Are you Hispanic?
4      A.  Yes.
5      Q.  Okay.  And did you have an occasion to look at
6  her website while campaigning against her?
7      A.  Oh, yeah.
8      Q.  And did that indicate at all whether or not she
9  was Hispanic?
10      A.  I don't know.
11      Q.  Was she a -- a member of any Hispanic membership
12  groups?
13      A.  I don't know.
14      Q.  Were you a member of any Hispanic membership
15  groups during the -- during 2010 campaign?
16      A.  El Amistad Club.  And I say that because they
17  list me officially, but I haven't been there in years.
18  But it's my understanding that they list me on their
19  Secretary State filings, whatever they do, that I appear
20  there.  But it's been years since I've gone there.
21      Q.  Do you have any support from the Hispanic
22  community, did you have any support during your
23  candidacy in 2010?
24      A.  Yes.
25      Q.  Did you have an occasion to look at the vote

## 64

1  results during the campaign or after the campaign in
2  2010?
3      A.  Which -- which campaign?
4      Q.  I'm talking about your 2010 campaign where you
5  first ran for district 52.
6      A.  There were three campaigns in 2010.
7      Q.  You were involved in three campaigns in 2010?
8      A.  Yes.
9      Q.  You ran for three different positions?
10      A.  No.
11      Q.  Elected positions in 2010?
12      A.  No.
13      Q.  So help me understand what you mean by three
14  campaigns?
15      A.  Sure.  There's a campaign for the Republican
16  nomination.
17      Q.  Okay.
18      A.  There was a campaign for the runoff.
19      Q.  Okay.
20      A.  And there was a campaign to be the elected
21  official in November.  So three campaigns.
22      Q.  So -- so Republican nomination --
23      A.  Runoff.
24      Q.  Runoff.  General election?
25      A.  Correct.

## 65

```
 1      Q.  So during the Republican nomination, did you have
 2   a chance to look at how the -- the precincts in House
 3   District 52 broke out and what type of support you were
 4   receiving?
 5      A.  Yes.
 6      Q.  And did you attempt to do an analysis
 7   based on Spanish surname to determine if the Hispanic
 8   community or Spanish surname community in this case, was
 9   supporting you during to your campaign.
10      A.  Yes.
11      Q.  And what did you find?
12      A.  A lot of support by the Hispanic community.
13      Q.  And when you say "a lot of support," what does
14   that mean?
15      A.  Numbers were -- were big.  A lot of support.  You
16   want a number?
17      Q.  Well, generally, I've been trying to understand
18   your testimony on not knowing the constituents, the
19   demographics of your constituents in House District 52.
20   But during the campaign you've testified that you looked
21   at -- at the data precinct by precinct and you did a
22   surname analysis to determine what Spanish surname
23   constituents, at least, were supporting you.  And so I
24   was attempting to find out if you could tell me based on
25   the precinct data now, how that would break out in terms
```

## 66

```
 1   of the cities in House District 52?
 2      A.  I didn't do the surname search.  I didn't do the
 3   research.  It was sent to me, although we didn't ask for
 4   it.  It was sent to my office and we looked at it.  So
 5   as to how it was done, I don't know.  As to methodology,
 6   I don't know.  As to the metrics --
 7      Q.  You don't know.
 8      A.  No.  I didn't do that.
 9      Q.  Okay.
10      A.  I didn't do that part of it.  So I can't speak to
11   the methodology.
12      Q.  Did you look to see if the majority of the
13   Hispanic precincts supported you during your campaign?
14   And I'm talking about both the Republican, the --
15   through to the general election.  The Republican
16   nomination to the general election?
17      A.  Can you define for me Hispanic precinct?
18      Q.  Sure.  A majority Spanish surname precinct?
19      A.  I don't know that information.
20      Q.  Have you had -- ever had an occasion to
21   review voter ID bills that were presented prior to SB
22   14?
23      A.  Not that I recall.  There was one voter ID bill,
24   but I don't know if it was '07 or '09.  I can't remember
25   the year.  There was another one, but it was not my --
```

## 67

```
 1   it wasn't in my scope.  Like, I wasn't working on that.
 2   There was -- there was one out there that I recall.  I
 3   couldn't tell you who did it or what year it was.  But
 4   it wasn't like, within my scope of like, my job
 5   description to -- to follow that particular bill.  But
 6   there was one out there, I think filed previously in a
 7   different session.
 8      Q.  Okay.
 9      A.  That I recall.
10          MR. GEAR:  This has been previously marked
11   as Exhibit 44, so I want to follow that same number.
12          MR. McKENZIE:  Do you have a copy?
13          MR. GEAR:  Say that again.
14          MR. McKENZIE:  Do you have a copy?
15          MR. GEAR:  Yes, I do.
16          MR. McKENZIE:  Okay.
17          (Exhibit No. 44 was marked.)
18   BY MR. GEAR:
19      Q.  Okay.  Now, I want to give you a chance to look
20   at this and then ask you a few questions about it.
21      A.  Okay.  Okay.  I think I get it.
22      Q.  Have you seen this before?
23      A.  It is not familiar to me at all.
24      Q.  Can you identify what it is?
25      A.  This is House Bill 1706.  Authors are listed
```

## 68

```
 1   there.  I couldn't tell you that I recall seeing this in
 2   any kind of capacity, really.
 3      Q.  And can you tell me who the authors are on this?
 4      A.  Well, I can tell you who the authors listed are.
 5      Q.  Sure.
 6      A.  There's Denny -- that's Mary Denny, that would be
 7   Jim Pitts, it would be Beverly Woolley, Joe Dixon,
 8   Dwayne Bohac and then the et al refers to other members
 9   who may have signed on.
10      Q.  And is this the same Representative Pitts that
11   you worked for between 2005 and 2007?
12      A.  No.  Jim Pitts was in 1993.
13      Q.  And that's where my mistake was.  There was a Jim
14   Pitts --
15      A.  And a John Otto.
16      Q.  John --
17      A.  That is correct.
18      Q.  Otto.  Okay.  Did you have occasion to review
19   this during or prior to the legislative debates for SB
20   14?
21      A.  No.
22      Q.  I just want to direct your attention to page --
23   it would be -- it would be Page 4, Section 63.0101?
24      A.  Okay.
25      Q.  Documentation of proof of identification?
```

Larry Gonzales                                          May 31, 2012

---

### 69

1    A. Uh-huh.

2    Q. And do you understand this -- this Exhibit 44 to

3  be the voter ID bill that was introduced in 2005?

4    A. No, I wouldn't.

5       MR. McKENZIE:  Objection.

6    A. I wouldn't know that.

7    Q. (By Mr. Gear) Well, again, take some time to

8  review it.  I would like to ask you some questions about

9  it.  And I would like you to try to familiarize yourself

10  with it.

11    A. Okay.

12    Q. Can you tell me what this is now?

13    A. It is a bill to be entitled An Act Relating to

14  Requiring a Voter to Present Proof of Identification.

15    Q. And, you know, again, directing your attention to

16  Section 63.0101 --

17    A. Uh-huh.

18    Q. Documentation of proof of identification.

19    A. Uh-huh.

20    Q. Can you describe for me what the allowable forms

21  of identification were in HB No. 1706?

22    A. Okay. Line 19 says a driver's license or

23  personal identification card issued by DPS or, I guess

24  an ID card, if it's not a driver's license issued by

25  DPS, and has some expiration dates.  On line 25 it talks

---

### 70

1  about a United States military identification card with

2  the person's photograph.  On page -- on my Page 5, line

3  2 it talks about a valid employee identification card

4  that contains a person's photograph and is issued by an

5  employer.  Ordinary course of business.  My Page 5, line

6  7 talks about a US citizenship certificate that has a

7  photograph.  Same page, my page line -- Page 9, line 9

8  talks about passport.  Page 10 is a student

9  identification card issued by an institution of higher

10  education that contains a person's photograph.  Line 14

11  appears to be a CHL, concealed handgun license, issued

12  by DPS, Department of Public Safety.  Line 16 is an ID

13  card issued by a State agency of the State that has a

14  photograph.  Line 18 is an ID card, the person's

15  photograph that's issued by the county election's

16  administrator or county clerk.  And 21 says there's

17  more.

18    So 23 says -- oh, I guess that's current

19  language.  Yeah, that's not underlined, so line 23, 24,

20  25 are current language.  And that lists utility bill,

21  government bill, paycheck, other government documents

22  In 26 they added official mail addressed to the person

23  by name from a governmental entity.  Wait a minute.

24    Q. I asked you a few questions before about voter

25  fraud.  You testified that between 1992 to 2007 you were

---

### 71

1  not aware of any issues of voter fraud; is that correct?

2    A. Yeah.  It wasn't in my scope of responsibility.

3    Q. Okay.  And does that mean you were not aware of

4  issues of voter fraud between 1992 and 1997?

5    A. Yeah.  Not from a legislative, I mean, not from a

6  legislative -- I'm a staffer, read legislation, it

7  wasn't -- it wasn't -- I wasn't aware of that at all.

8    Q. Okay.  And you also testified that between 1992

9  and 19 -- 2007 you were not aware of issues related to a

10  voter ID.  Is that also correct?

11    A. Right.

12    Q. Okay.  So do you understand or have you become

13  aware, at some point, regarding the issues of voter

14  fraud?

15    A. Yes.

16    Q. And can you tell me, how would you define voter

17  fraud?

18    A. I would define voter fraud as somebody who --

19  well, there's different definitions.  Let's see here.

20    Q. And when you say "there's different definitions,"

21  you're talking about the Texas -- Texas election code?

22    A. I wasn't going to quote statute.  I was just

23  going to, you know --

24    Q. Fair enough.

25    A. Yeah.  I mean, it's an illegal vote that's being

---

### 72

1  cast is how I would define it.

2    Q. When you say "an illegal vote that's being cast,"

3  what do you mean?

4    A. There are -- maybe somebody votes and represents

5  to be somebody they aren't.  Maybe somebody has a

6  mail-in ballot that they shouldn't legally have.  Fills

7  out a mail-in ballot they shouldn't legally be filling

8  out.

9    Q. Anything else?

10    A. If we sat here long enough.  But no.

11    Q. How would you identify or define voter

12  impersonation?

13    A. I guess it would be representing yourself to be

14  somebody other than yourself.  Representing yourself --

15  yeah.  Representing yourself to be somebody other than

16  yourself.

17    Q. So generally, as I understand your testimony, you

18  identified by mail ballot fraud?

19    A. Uh-huh.

20    Q. And voter impersonation or voting at the polling

21  place types of fraud, correct?

22    A. Yes.

23    Q. And is that your understanding of voter fraud in

24  general?

25    A. Yes.

Larry Gonzales
May 31, 2012

## 73

1  Q.  Turning your attention back to Exhibit 44,
2  section 63.0101.
3  A.  Okay.
4  Q.  Section 3, which would be, I believe Page 5?
5  A.  My Page 5.  Yes.
6  Q.  In your opinion, would allowing a valid employee
7  identification card that contains the person's
8  photograph and is issued by an employer of the person in
9  the ordinary course of the employer's business be an
10  effective method of preventing voter fraud as you
11  identified it?
12  A.  No.
13  Q.  Why not?
14  A.  Because you're asking an election judge to know
15  that that is a valid source of ID, to recognize that
16  that is valid or not valid.
17  Q.  Does an election judge have an ability -- a
18  greater ability to identify whether a driver's license
19  is valid versus an employee card?
20  A.  Yes.
21  Q.  And how do you know this?
22  A.  Consistency of documentation.
23  Q.  So does it make any difference if the ID card,
24  for instance, expired within a two-year period or a
25  60-day period, does that make any difference to you?

## 74

1  A.  No.
2  Q.  Would that make it any easier or harder for an
3  election judge to identify a invalid card, for instance?
4  A.  Yeah, harder.
5  Q.  Harder in what -- what capacity?
6  A.  Harder in that a four-year old card versus a --
7  you know, a four-year old picture versus a two-month old
8  picture might be more difficult for someone to identify.
9  Q.  Well, that may be the case anyway, because how
10  often do Texas residents have to renew their driver's
11  license?
12  A.  Every four years, I guess.
13  Q.  So someone could actually come in to a polling
14  place with a four-year old picture and still have a
15  valid card; is that correct?
16  A.  You said card, you mean driver's license?
17  Q.  Driver's license ID card, State issued ID card.
18  A.  Yes.
19  Q.  Can you renew your driver's license on line?
20  A.  Yes.
21  Q.  Is that something you're allowed to do?  And when
22  you renew on line, do you take a new photo?
23  A.  You take a new photo every other renewal, I
24  think.
25  Q.  So in essence, someone could still possess a

## 75

1  valid driver's license or State issued ID with an
2  eight-year old photo?
3  A.  I don't know the exact years.  But you do have to
4  get -- but you do have to get a new picture done.  You
5  have to get a new picture done in Texas even on line.
6  Actually --
7  Q.  I'm sorry.
8  A.  You have to go -- it's on line once.  But I think
9  the next time you have to go get your picture redone.
10  Q.  So as I understand your testimony, driver's
11  licenses in Texas last -- are valid for four years?
12  A.  Yes.
13  Q.  And if you renew on line, then you would use the
14  old photograph that was taken previously for your
15  renewed license, correct?
16  A.  I think it's one time.
17  Q.  And that -- that renewed license would be valid
18  for another four years?
19  A.  That is correct.
20  Q.  So again, it's -- it's possible and likely then,
21  that an individual who renewed on line could vote at a
22  polling place with a valid driver's license or State
23  issued ID that has an eight-year old picture?
24  A.  That's correct.
25  Q.  Why don't we take a quick break?

## 76

1  A.  Sure.
2  (Brief recess.)
3  BY MR. GEAR:
4  Q.  Okay.  Back on the record.  I just want to return
5  your attention to Exhibit 44.  We had a chance to look
6  at this.  The -- you've identified who the authors of
7  this bill are and you also see that this is listed as
8  House Bill No. 1706.  And do you understand that to be
9  the House Bill that was introduced in 2005?
10  A.  I -- I couldn't tell you the year, but if you say
11  2005, okay.
12  Q.  Okay.  Would you be surprised if that was the
13  House Bill introduced in 2005?
14  A.  It -- no, it was sometime in there.
15  Q.  And the categories of ID that we've been going
16  through, do you understand those to be described as the
17  allowable forms of ID under House Bill 1706?
18  A.  Yes.
19  Q.  Okay.  My understanding is that you also worked
20  for Lieutenant Governor Perry at the time, in 1999?
21  A.  Yes.
22  Q.  And can you tell me what your responsibilities
23  were for Lieutenant Governor Perry?
24  A.  Read and write an analysis for any bill that was
25  in government code.

Larry Gonzales                                                        May 31, 2012

## 77

1    Q. Can you give me a little bit more on that?  "Any
2   bill that was in government code," does that include
3   voter ID, does that include election law, I should say?
4    A. Government code.  So if this were to, say amend
5   the government code, then that's something I would have
6   read.
7    Q. Did you have an occasion to read or write any --
8   any government code related to election law?
9    A. No, not that I remember at all.
10    Q. Okay.  And along that line of questioning, did
11   you have an occasion to read or write any government
12   code related to voter fraud?
13    A. No, not that I remember at all.
14    Q. And as a staff member for Governor Perry, what
15   position or title did you hold?
16    A. I don't know what the paperwork says, but we were
17   referred to as research assistant, maybe, something like
18   that.
19    Q. And as a research assistant specifically, were
20   you ever given the responsibility to research issues
21   related to voter fraud?
22    A. No.
23    Q. Were you ever given responsibility to research
24   issues related to voter ID?
25    A. No.

## 78

1    Q. Was voter ID ever a topic of discussion in
2   Lieutenant Governor Perry's office during the time that
3   you were employed by him?
4    A. Not that I would be aware of.
5    Q. Was voter fraud ever a discussion in Lieutenant
6   Governor Perry's office during the time that you were
7   employed?
8    A. No.
9    Q. And I believe that was in 1999.
10    A. 1999.  Not that I'm aware of at all.
11    Q. And you were employed in his office from 1995
12   until?
13    A. January of '99 until June of '99.
14    Q. Okay.
15    A. Maybe July 1.  I don't know.
16    Q. So as I understand your testimony, you were --
17   during your employ with Governor Perry you were never
18   involved in any writing or analysis of, either voter ID
19   or voter fraud; is that correct?
20    A. That's correct.
21    Q. Okay.  You also indicated that you were an
22   employee in the Attorney General's office?
23    A. Yes, sir.
24    Q. And that was under which Attorney General?
25    A. John Cornyn.

## 79

1    Q. Cornyn?
2    A. C-O-R-N-Y-N.
3    Q. And what time period was that?
4    A. This would be February-ish of '01 through
5   December of '01.
6    Q. And what responsibilities did you have in the
7   AG's office?
8    A. It was broken down the same way.  So I had --
9   like Perry's office was by topic.
10    Q. Okay.
11    A. So I had transportation and I don't remember any
12   other topic, but there at the end of session I was asked
13   to look at loan repayment programs.
14    Q. Okay.  And so there's something I don't
15   understand.
16    A. Okay.
17    Q. You said Perry's office was my topic.  I don't
18   think -- I'm not really sure what that means?
19    A. Well, I mean like, as in Perry's office, the
20   General Cornyn had the staffers broken down by policy
21   area.
22    Q. Okay.
23    A. So when I worked for General Cornyn, my policy
24   area was transportation.  And then toward the end of
25   session they asked me to help with -- like, a law

## 80

1   school loan repayment program.
2    Q. So while in the Attorney General's office, did
3   you ever have any responsibilities related to voter
4   fraud?
5    A. No.
6    Q. Did you ever have any responsibilities related to
7   either the research analysis of voter ID?
8    A. No, sir.
9    Q. Do you -- do you or were you aware of the issue
10   of either -- let's start with voter fraud.  Were you
11   aware of the issue of voter fraud being discussed in the
12   Attorney General's office in 2001?
13    A. No, sir.
14    Q. And that would not have been your area of -- that
15   would not have been your policy area, correct?
16    A. Correct.
17    Q. Are you aware of anyone that had a policy area in
18   2001 that -- that dealt with the issue of voter fraud in
19   the Attorney General's office?
20    A. No, sir.
21    Q. Are you aware of anyone that had a policy issue
22   in 2001 that dealt with the issue of voter ID?
23    A. No, sir.
24    Q. Okay.  So again, let me take you back to your
25   campaigns in 2010.  And when I say "campaigns," I mean

Larry Gonzales                                          May 31, 2012

---

## 81

1   from the beginning to the end.
2       A. Okay.
3       Q. Is that clear?
4       A. That is clear.
5       Q. Okay. And so as we've gone through our -- your
6   testimony today, you've indicated that between 1992 and
7   2007 you -- you had no knowledge or you were not aware
8   of issues related to voter fraud; is that correct?
9       A. Yeah.
10      Q. And as we went through our testimony today, you
11  indicated that between 1992 and 2007 you had no
12  knowledge of issues related to voter ID; is that
13  correct?
14      A. That's correct.
15      Q. Okay. And so you then entered into your campaign
16  for House District 52 in 2010. And that's what,
17  three -- approximately a three-year period between the
18  times that you worked for these various individuals you
19  testified about -- to the point where you determined
20  that you were going to run for House District 52?
21      A. Yes.
22      Q. And I -- I'd like to know, as you sit here today,
23  what information did you become aware of that -- that
24  first identified the issue of voter fraud for you and
25  voter fraud as you've defined it on the record?

---

## 82

1           MR. McKENZIE: May I ask a clarifying
2   question.
3           MR. GEAR: Sure.
4           MR. McKENZIE: Are you talking about him as
5   candidate or him as a legislator.
6           MR. GEAR: I'm talking to him about as -- as
7   a candidate.
8           MR. McKENZIE: Okay.
9           MR. GEAR: Between 2007 and 2010 -- let
10  me -- let me strike that. Let me make it very simple.
11          MR. McKENZIE: Okay.
12  BY MR. GEAR:
13      Q. When did you first take a position on voter ID?
14      A. Probably 2009.
15      Q. So prior to 2009 were you -- were you aware of
16  voter fraud issues at all in the State of Texas?
17      A. Cursory, what you see on the news stuff. But it
18  wasn't something that I was, you know, engulfed in. You
19  see it, but wasn't working on it.
20      Q. So other than the news, did you undertake any
21  independent research analysis that would have helped to
22  form the basis of your position on voter fraud?
23      A. No.
24      Q. Did you engage in any specific types of
25  communication with anyone in the State of Texas that

---

## 83

1   would have helped to form your basis and position on
2   voter fraud?
3       A. We're asking '07 through '09. Is that what we're
4   talking about?
5       Q. '07 through '09.
6       A. No.
7       Q. And let me ask the same questions about voter ID.
8   Did you engage in any independent research or analysis
9   that would have helped to form your basis on the issue
10  of voter ID between 2007 and 2009?
11      A. No.
12      Q. Did you engage in any communications with anyone
13  in the State of Texas that would have helped to form the
14  basis of your opinion on voter ID between 2007 an 2009?
15      A. No.
16      Q. All right. And so is it fair to say between 1992
17  to 2009 you were unaware of issues related to both voter
18  fraud and voter ID?
19          MR. McKENZIE: I'm going to object as
20  slightly mischaracterizing his testimony. But you may
21  answer.
22  BY MR. GEAR:
23      Q. If I'm mischaracterizing it, you clarify it for
24  the record?
25      A. Okay. As I said earlier cursory knowledge, like

---

## 84

1   what you see on the news. It wasn't an area. So what
2   you're saying is not true. I was aware, but just like
3   anybody else would be aware.
4       Q. Okay.
5       A. It wasn't in like -- like a capacity of research.
6   It was just what you hear.
7       Q. Fair enough. And you did say that you -- you
8   heard, like anyone else, issues on the news. So let's
9   focus on the issues on the news. Do you recall what
10  issues you heard between this time period, and I
11  assume you're talking about 2007 to 2009, that came up
12  regarding voter fraud on the news?
13      A. All right. You know, information that there
14  would be illegal votes cast in person, mail-in --
15  mail-in ballots, in person and mail-in ballots are it.
16      Q. So let's talk about in person voter
17  impersonation. That's what you're talking about?
18      A. Yes.
19      Q. Okay. And -- and when we're talking about in
20  person voter impersonation, we're talking about the way
21  you defined it here on the record, correct?
22      A. Uh-huh.
23      Q. Can you tell me, specifically what you heard
24  regarding in person voter impersonation between 2007 and
25  2009?

Larry Gonzales                                          May 31, 2012

## 85

1    A.  Specifically no.  I mean, it's just general
2    knowledge.  It's what you hear.  I can't tell you
3    specifically what was said.
4    Q.  Between 2007 and 2009 are you aware of any
5    investigations, specific investigations related to voter
6    fraud?  And we're talking about voter impersonation.
7    A.  Yeah.  I can't tell you when or where or a court
8    case.  Just a general knowledge that was a concern that
9    people had.
10   Q.  Well, let's focus on the "yes."  What was it that
11   you heard regarding voter impersonation between that
12   time period?  Do you know any details?
13   A.  No.  That there's a concern that people were
14   showing up and they weren't who they say they were.
15   Q.  So let's see if we can put substance to the
16   concern that other people are saying or that you
17   yourself had?
18   A.  Just what I was seeing, hearing.
19   Q.  Okay.  Do you know what county this
20   investigation, as you described, it took place in?
21   A.  No.
22   Q.  Do you know the actual year that this
23   investigation that you described took place?
24   A.  No.
25   Q.  Do you know what any of the details regarding

## 87

1    A.  No.
2    Q.  Okay.  You also talked about by mail balloting.
3    Again, are you describing that as a general source of
4    information from the news?
5    A.  Yes.
6    Q.  And same questions.  Are you aware of any
7    specific investigations that resulted in what you heard
8    on the news?
9    A.  No.
10   Q.  And are you aware of any specific prosecutions
11   that took place regarding the by mail ballot voting that
12   you heard on the news?
13   A.  No.
14   Q.  And are you aware of any convictions that took
15   place as a result of what you heard on the news?
16   A.  No.
17   Q.  So other than the general information, you
18   can't -- as you sit here the day, can you provided any
19   specific detail on any of these news broadcasts that you
20   heard?
21   A.  No.
22   Q.  Okay.  Do you -- do you speak Spanish?
23   A.  No.
24   Q.  Have you ever learned Spanish?
25   A.  Yes.

## 86

1    that investigation may be?
2    A.  No.
3    Q.  Do you know if that investigation resulted in
4    prosecution?
5    A.  No.
6    Q.  Do you know if that investigation resulted in a
7    criminal conviction?
8    A.  No.
9    Q.  Do you know if that investigation dealt
10   specifically with voter impersonation?
11   A.  Investigation?
12   Q.  Well, you described it on the record as an
13   investigation that you were aware of.  I'm just trying
14   to understand what it is that you know.  So if -- if I'm
15   mischaracterizing your testimony, you can correct it?
16   A.  Yeah, I would like to because I don't know.  And
17   I said earlier I couldn't tell you a specific court
18   case.  So to use the word investigation, I don't think
19   is what I was talking about.  I said, generally
20   speaking, you hear things about things that are going
21   on.  Your questioning is very specific to an
22   investigation that I wouldn't have knowledge of.
23   Q.  Okay.  Fair enough.  And would you have knowledge
24   of it -- a conviction that was the result of what you
25   heard on the news?

## 88

1    Q.  Okay.  Is it -- is it by choice that you don't
2    speak Spanish or you no longer -- you no longer speak
3    it?
4    A.  I learned it because UT told me I had to learn
5    it.
6    Q.  Okay.  Do your parents speak Spanish?
7    A.  Yes.
8    Q.  Do you ever speak Spanish or did you ever speak
9    Spanish during the time you were campaigning in 2010?
10   A.  No.
11   Q.  Do you believe that -- my understanding is that
12   in the State of Texas there's been some push to pass
13   English only legislation.  Do you agree with that
14   legislation?
15   MR. McKENZIE:  I'm going to object to the
16   extent it reflects your thoughts as a legislator.  You
17   may talk about your candidacy or public record or
18   anything like that.
19   A.  That's privileged.  I take privilege.
20   Q.  So we're talking about prior to you becoming a
21   legislator.  And I want to focus solely on 2010 and
22   before?
23   A.  Okay.
24   Q.  Between -- now that we've described it, between
25   2009 and 2010, are you aware of any specific instances

Larry Gonzales                                                May 31, 2012

## 89

1  of voter fraud that helped to form your basis on voter
2  ID?
3      A.  No, not a specific case or docket number or court
4  number.
5      Q.  Investigation, prosecution?
6      A.  No.
7      Q.  Conviction?
8      A.  No.
9      Q.  So in 2010, you indicated that your campaign
10  supported voter ID.  And we've walked through, during
11  this deposition, your understanding, your awareness of
12  both voter ID and voter fraud.  Can you tell me, for the
13  record, what you are basing your position on, and this
14  is prior to becoming a legislator, what you're basing
15  your position on in supporting voter ID?
16      A.  To build the confidence of an electorate who felt
17  that there is and to instill integrity into the system
18  that my voters felt were being compromised.
19      Q.  You said, "to build confidence in a system."  Did
20  you have any communication that would support that there
21  was a lack of confidence in the election system because
22  of voter fraud?
23      A.  If I can correct you?
24      Q.  Sure.
25      A.  I said it was integrity of the system and it was

## 90

1  the confidence of the people.
2      Q.  So the integrity of the system.  Did you have
3  any -- and information or communication that would
4  support that there was a concern about the integrity of
5  the system?
6      A.  The people in House District 52 said they were
7  concerned about it.
8      Q.  And in House District 52, which is Williamson
9  County, correct?
10      A.  Yes.
11      Q.  Are you aware of any investigations, actual
12  investigations related to voter fraud?
13      A.  No.
14      Q.  Are you aware of any actual convictions related
15  to voter fraud?
16      A.  No.
17      Q.  Are you aware of any actual investigations
18  related to voter fraud?
19      A.  No.
20      Q.  Are you aware of any actual allegations related
21  to voter fraud?
22      A.  No.
23      Q.  And so do you believe that there was a basis of
24  concern when you were a candidate hearing individuals
25  speak about voter fraud even though you didn't have

## 91

1  any -- any actual source of information?  Do you believe
2  that there was an actual basis for this voter fraud?
3          MR. McKENZIE:  Can I ask a clarifying
4  question real quick?
5          MR. GEAR:  Sure.
6          MR. McKENZIE:  We're talking about at the
7  time as a candidate and not as a legislator.
8          MR. GEAR:  Yes.  We are.
9          MR. McKENZIE:  Okay.
10      A.  They expressed a concern for that and I told them
11  I would help them.
12      Q.  (By Mr. Gear) I'm asking what you believed as a
13  candidate in 2010, did you -- did you believe that voter
14  fraud was a problem in House District 52?
15      A.  I've never known it to be in House District 52 --
16  a problem in House District 52.
17      Q.  Do you believe that voter fraud was a problem in
18  the State of Texas?
19      A.  Could have been.  I don't -- I don't know that we
20  discussed any kind of case or court number or docket
21  number.  But, you know, enough people expressed concern
22  about it to me.  And I told them that we would work on
23  it.
24      Q.  And what did you tell them that you would work
25  on?

## 92

1      A.  That we'd support a piece of legislation that had
2  a voter ID requirement to vote.
3      Q.  Did your -- did your views of minority voters
4  play any role in taking a position on supporting voter
5  ID?
6      A.  No.
7      Q.  Did you -- so other than general fairs expressed
8  in the public adds, and as you described it, by news,
9  you're often unaware of any actual investigations,
10  convictions, prosecutions, allegations of voter fraud?
11          MR. McKENZIE:  Again as a candidate,
12  correct?
13          MR. GEAR:  Yes.
14      A.  No.
15      Q.  (By Mr. Gear) Once you became a House member in
16  House District 52, did you undertake any process of
17  determining if voter fraud was a problem in the State of
18  Texas?
19          MR. McKENZIE:  I'm going to object on the
20  grounds of privilege about what his process is --
21          MR. GEAR:  I'm not tying -- I'm sorry.  I'm
22  sorry.  I'm not tying this into legislation.
23  BY MR. GEAR:
24      Q.  We've -- we've talked about voter fraud for some
25  time on -- in your deposition and I want to understand

Larry Gonzales                                          May 31, 2012

## 93

1    what it is that you actually know.  We don't have to tie
2    it to legislation.  So again, I just want to be clear on
3    that.  Do you understand or did you take any steps to
4    understand whether or not voter fraud is actually a
5    problem in the State of Texas?
6          MR. McKENZIE:  Can we go off the record?  I
7    don't want to take your record time.
8          MR. GEAR:  Sure.
9          (Discussion off the record.)
10   BY MR. GEAR:
11         Q.  Now, specifically I asked once you became a
12   representative for House District 52, did you or your
13   staff undertake any effort to determine if voter fraud
14   was a real problem in the State of Texas?
15         A.  I'm going to invoke privilege there because you
16   just said as a member.  So I'm invoking that privilege.
17         Q.  The question is, did you undertake any effort to
18   determine if voter fraud was a problem.  That's a yes or
19   no question?
20         A.  I'm going to invoke that privilege if you're
21   talking about as a member because that's what you say
22   that's how you phrased the question was as a member.
23         Q.  I'm not asking you about the substance.  I'm
24   asking about did you as a member of House District 52 --
25   have you or your staff conduct any analysis of the issue

## 94

1    of voter fraud and whether or not it was a problem in
2    the State of Texas?
3          A.  My work as a member, I'm going to the claim
4    privilege.
5          Q.  Are you refusing to answer based on the advice of
6    your counsel?
7          A.  I'm refusing to answer based on that's privileged
8    work as a member.
9          Q.  Do you know of any studies or analysis on the
10   issue of voter fraud that are not privileged and that
11   would be public?
12         A.  Not off the top of my head.  I couldn't give you
13   any kind of cite or source or anything like that.
14         Q.  Well, in -- this is the time for me to understand
15   what you know.  So I would like you the take your time
16   with that answer.  And let me ask that again and see if
17   we can get a clear answer?
18         A.  Okay.
19         Q.  Do you know of any studies or analysis related to
20   voter fraud in the State of Texas that would be part of
21   a public record?
22         A.  I couldn't tell you of one.  I can't cite for you
23   anything that I've read.
24         Q.  Have you reviewed any part of the public record,
25   studies or analysis that relate to voter fraud?

## 95

1          A.  Not to my recollection at all.
2          Q.  Okay.  Now, we've gone through a series of
3    different employers.  We did the House, we did the
4    Attorney General's office.  Is there any other
5    employment that -- that you described for me on the
6    record?  I believe there is.
7          A.  Oh, Texas State University System.
8          Q.  Thank you?
9          A.  There you go.
10         Q.  Can you tell me what that employment involved?
11         A.  Sure.  The title was assistant vice chancellor
12   for government relations.
13         Q.  And was that part of the university?
14         A.  It's the university system.  So the university
15   system is comprised of eight colleges an universities.
16         Q.  Okay.  And just briefly, would your
17   responsibilities in the position with Texas State, would
18   that have involved any issues of voter fraud?
19         A.  No.
20         Q.  Would that have involved any issues of voter ID?
21         A.  No, sir.
22         Q.  In your experience with the university system are
23   you familiar with student IDs?
24         A.  Yes.
25         Q.  And do you have an opinion as to whether or not

## 96

1    student IDs would be an appropriate form of
2    identification based on your experience at -- at -- in
3    the university system in voting in the State of Texas?
4          A.  Not in that capacity, no.
5          Q.  Well, do you understand process for students to
6    obtain student IDs?
7          A.  I don't know that it's consistent so I would say
8    no.
9          Q.  You -- well, let me put it in -- let me put
10   into context.  Do you understand that SB 14 allows for
11   military IDs?
12         A.  Yes.
13         Q.  Can you describe for me what a military ID is?
14         A.  A State issued identification card with the
15   personnel photo on it, military personnel photo on it.
16         Q.  Are college IDs, are they State issued IDs?
17         A.  Depends on what college they go to.
18         Q.  Okay.  A military card, do you know what's on the
19   front of it?
20         A.  Photo, branch of service, rank.  Those are the
21   only three I can name off the top of my head.
22         Q.  Were you in the military by any chance?
23         A.  I currently serve in the Guard.
24         Q.  You currently serve in the Guard and you have a
25   military ID?

Larry Gonzales                                              May 31, 2012

---

## 97

1   A. I do.
2   Q. Do you understand that there are multiple forms
3   of military ID?
4   A. No.
5   Q. There's only one form of military ID?
6   A. No. The question was, do I understand that. I
7   don't understand that.
8   Q. So as a member of the Guard, are there different
9   forms of military ID for the Guard?
10  A. From each other?
11  Q. Yes.
12  A. I don't know. The IDs I've seen of my fellow
13  Guard members look just like mine.
14  Q. Have you seen IDs of different branches such as
15  Army, Navy, Marines?
16  A. No.
17  Q. Did you ever undertake an effort to determine if
18  military IDs are consistent across the board?
19  A. No.
20  Q. Did you consider that during the legislative
21  debates on SB 14?
22  A. No.
23  MR. McKENZIE: Objection.
24  BY MR. GEAR:
25  Q. Was that topic of public debate during SB 14?

---

## 98

1   A. No.
2   Q. Military IDs?
3   A. Yeah. I think. Yeah. Yeah.
4   Q. And what was that topic of debate, what was the
5   substance discussion?
6   A. Wow. I don't recall on the floor quotes or in
7   the record what people said. I can't recall for you
8   verbatim type of stuff. One of the exceptions being
9   discussed was a military ID. That's generally what
10  we're talking about. But I can't tell you specifically
11  what the arguments. I don't remember that.
12  Q. What's your position on -- on military ID and
13  voting in the State of Texas?
14  MR. McKENZIE: I would object to the extent
15  it reveals privileged thoughts or communications.
16  A. And I'll take -- I'll invoke that.
17  Q. As a -- as a member of the Guard, do you believe
18  it's appropriate for a member of the military to be
19  allowed to present photo ID and vote?
20  MR. McKENZIE: Again, that's the same
21  objection as he's currently serving in the Guard as he
22  was a legislator. You may answer.
23  BY MR. GEAR:
24  Q. Are you refusing to answer the question based on
25  the advice of your counsel?

---

## 99

1   A. Yes, I am.
2   (Exhibit No. 29 marked.)
3   BY MR. GEAR:
4   Q. I'm showing you what's been marked as Exhibit No.
5   29. I just like you to take a look -- second and then
6   we'll talk about it.
7   A. Okay.
8   Q. What is this?
9   A. Okay.
10  Q. Have you had an opportunity to review Exhibit 29?
11  A. I'm just now, like, sir.
12  Q. Okay. Can you tell me what this is?
13  A. It is a Senate Bill to be entitled An Act
14  Requiring a Voter to Present Proof of Identification.
15  Q. Okay. And it's titled Senate Bill No. 362?
16  A. Uh-huh.
17  Q. And can you tell me who the authors of this bill
18  were?
19  A. The authors appear to be Fraser, Estes, Nelson,
20  and Nickels.
21  Q. And do you know when this bill was offered?
22  A. I -- I don't. Is it the companion to -- no, I
23  guess I don't.
24  Q. Okay. Let me see if I can give you something to
25  help refresh your recollection?

---

## 100

1   (Exhibit No. 106 was marked.)
2   BY MR. GEAR:
3   Q. I'm showing you what's been previously marked in
4   other depositions as Exhibit 106. Do you see up in the
5   left-hand corner that this addresses SB 362.
6   A. Yes.
7   Q. And it's part of the legislative session -- 81st
8   legislative session?
9   A. Yes.
10  Q. And again, it indicates that the -- who the
11  authors are up in the --
12  A. Yes. Authors and co-authors.
13  Q. And is that consistent with the --
14  A. The bill doesn't say who the co-authors are, but
15  the same four names.
16  Q. Okay. And so does this help you understand what
17  you're actually looking at in front of you?
18  A. Yes.
19  Q. Okay. And so can you describe what you're
20  looking at for the record?
21  A. A bill to be entitled An Act Relating to
22  Requiring a Voter to Present Proof of Identification.
23  Q. And do you understand that this is the voter ID
24  bill that was offered in 2009 as SB 362?
25  A. I would have to take your word on it. I didn't

Larry Gonzales                                          May 31, 2012

## 101

1  recognize it when you gave it to me.
2      Q.  Well, are you familiar with Exhibit 106 which is
3  the Texas Legislature online history?
4      A.  No.  Not until you just gave it to me.
5      Q.  Okay.  You've -- you've never went online to look
6  at the online history of a bill?
7      A.  Online history of a bill?  Yes.
8      Q.  Okay.  And is it similar to what you're looking
9  at here?
10     A.  Depending on the website, yeah.
11     Q.  Okay.  Do you have any reason to believe that
12  what you're looking at is not SB 362 --
13     A.  No. No.
14     Q.  Which is offered in 2009?
15     A.  No.
16     Q.  Okay.  So just -- just briefly, turning your
17  attention back to Exhibit 29?
18     A.  Okay.
19     Q.  I'd like you to turn to Section 63.0101, which is
20  Page 5?
21     A.  Okay.
22     Q.  Do you see that?
23     A.  I do.  Line 19 I have.
24     Q.  And that deals with documentation and proof of
25  identifications.

## 103

1  or personal identification card issued to the person by
2  the Department of Public Safety that has not expired or
3  that has expired no earlier than two years before the
4  date of presentation.  Do you see that?
5      A.  Yes.
6      Q.  And then turning the page to Page 6, SB 362 would
7  have allowed a United States military identification
8  card that contains the person's photograph?
9      A.  Yes.
10     Q.  Okay.  Section 3, it would have allowed United
11  States citizenship certificate issued to the person that
12  contains a person's photograph.  Do you see that?
13     A.  Yes.
14     Q.  Section 4, United States passport issued to the
15  person.  Do you see that?
16     A.  Yes, sir.
17     Q.  Section 5, license to carry a concealed hand gun
18  issue to the person by the Department of Public Safety.
19  Do you see that?
20     A.  Yes.
21     Q.  Or as we described before a valid identification
22  card that contains the person's photograph and issued by
23  an agency or institution of the federal government.  Do
24  you see that?
25     A.  Yes.

## 102

1      A.  Yes.
2      Q.  And just going through this briefly.
3      A.  Uh-huh.
4      Q.  Do you understand that SB 362 would have allowed
5  a valid identification card that contains a person's
6  photograph and issued by an agency or institution of the
7  federal government or an agency, institution or
8  political subdivision of the State?
9      A.  I don't see that.  What line are you on?
10     Q.  That would be Page 6.
11     A.  Okay.
12     Q.  I believe it's Section 6.
13         MR. McKENZIE:  Line 14.
14         MR. GEAR:  Line 14.  Thank you.
15         THE WITNESS:  Line 14.  My line 14 is
16  crossed out.
17         MR. McKENZIE:  It's just below it.  Line 16.
18         THE WITNESS:  Oh, so 16.  Okay.
19  BY THE WITNESS:
20     A.  A valid identification card that contains the
21  person's photograph and is issued by agency or
22  institution of federal government or agency and
23  institution or political subdivision of the State.
24     Q.  Okay.  And turning back to Page 5, Section A1
25  that SB 362 would have also allowed a driver's license

## 104

1      Q.  An agency, institutional political subdivision of
2  the State, you also see that?
3      A.  Yes.
4      Q.  An then it also goes on say that the
5  following documentation is acceptable as proof of
6  identification under this chapter.  And that would be
7  Section B on line 22.  Do you see that?
8      A.  Yes.
9      Q.  And on Page 6, Section 1, the voters -- voter
10  registration certificate or -- and it lists a number of
11  other allowable forms of identification.  Do you see
12  that?
13     A.  Uh-huh.
14     Q.  And do you understand this to be the allowable
15  forms of identification under SB 362?
16     A.  Yes.
17     Q.  And that bill was -- was offered as a photo --
18  photo identification bill?
19     A.  I'll take your word for that.
20     Q.  During your time as a legislature -- legislator
21  did you ever engage in any discussions regarding SB 362
22  or HB -- HB 1706, which was a 2005 bill marked as
23  Exhibit 44?
24         MR. McKENZIE:  You can answer whether there
25  was a discussion or not.  Substance of discussions is

Larry Gonzales                                                May 31, 2012

---

## 105

1  totally privileged it's not public.  So you can say yes
2  or no as to whether a discussion took place.
3      A.  Never had a discussion on Senate Bill 362.
4      Q.  Did you have a discussion on HB 1706?
5      A.  No, sir.
6          (Exhibit No. 28 was marked.)
7  BY MR. GEAR:
8      Q.  I'm showing you what's been marked as Exhibit 28
9  and asking you to take some time to take a look at it
10 and then we'll talk about it?
11     A.  Okay.
12         (Exhibit No. 102 was marked.)
13 BY MR. GEAR:
14     Q.  Have you had some time to look at that?
15     A.  I've had some time.  I'm not finished.  Okay.
16     Q.  Have you seen this document before?
17     A.  No, sir.
18     Q.  Showing you what's been marked as Exhibit
19 No. 102?
20     A.  Okay.
21     Q.  And for the record, this is the Texas Legislature
22 online history for HB 218 which is dated the last
23 section of the bill is dated 5/16/2007.  Do you see
24 that?
25     A.  Last section.  5/16/2007, yes.

---

## 107

1  proof of identification, do you see that?
2      A.  Not yet.  Okay.
3      Q.  Similar to SB 362 and HB 1706, this also goes
4  through a list of allowable forms of ID.  Do you see
5  that?
6      A.  Yes.
7      Q.  And similar to the bills which I've -- I've just
8  discussed this allows for a driver's license or a State
9  issued ID by the -- by DPS?  If you look at Section 1 --
10 or line 17 on Page 9.
11     A.  Yes.
12     Q.  And it allows for the presentation of a driver's
13 license or State ID that has expired no earlier than
14 two years before the date of presentation.  Do you see
15 that?
16     A.  Yes.
17     Q.  It also allows for a United States military
18 identification card?  Line 23, Section 2 that contains a
19 person's photograph.
20     A.  Is that a question?
21     Q.  Yes.
22     A.  What was the question?
23     Q.  Does it also allow for a United States military
24 identification card that contains a person's photograph?
25     A.  Yes.

---

## 106

1          MR. McKENZIE:  Counsel, do you have a copy.
2          MR. GEAR:  I am so sorry.
3          MR. McKENZIE:  Thank you.
4  BY MR. GEAR:
5      Q.  And this is for the 80th Legislature?
6      A.  Yes.
7      Q.  Okay.  And do you see who the authors are on this
8  bill?
9      A.  Yes.
10     Q.  Can you tell me who the authors are?
11     A.  The authors are Betty Brown, Bereman, Bohac and
12 Riddle.  And the co-authors are Aycock, Christian,
13 Darby, Harless, Harper-Brown, King, Laubenberg,
14 Mesillas, Miller, Paxton, Taylor, and Zedler.
15     Q.  All right.  So I gave you Exhibit 102 because I
16 wanted -- wanted to see if that would help put
17 Exhibit 28 into context.  Do you understand Exhibit 28,
18 which is House Bill 218, to be a bill authored by Betty
19 Brown and others during the 80th Legislature?
20     A.  Yes.
21     Q.  And do you understand House Bill No. 218 to be a
22 bill related to voter ID?
23     A.  Yes.
24     Q.  And again, turning your attention to, let's see,
25 I believe it's Page -- Page 9, 63.0101 documentation of

---

## 108

1      Q.  All right.  And as far as military identification
2  cards, do you know if non-citizens are issued military
3  ID cards, can be issued military ID cards?
4      A.  I don't know.
5      Q.  In your service in the Guard, are you aware of
6  any non-citizens who are serving for the United States
7  military?
8      A.  No.
9      Q.  Do you know if you have to be a citizen to serve
10 in the United States military?
11     A.  I don't.
12     Q.  Turning your attention back to Exhibit 28,
13 Section 3 on Page 9, it allows for valid employee
14 identification card that contains the person's
15 photograph and is issued by the employer of the person
16 in the ordinary course of the employer's business.  Do
17 you see that?
18     A.  Yes.
19     Q.  Section 4, line 5 on Page 10, it indicates that
20 United States citizenship should -- citizenship
21 certificate issued to the person that contains a
22 person's photograph, do you see that?
23     A.  Yes.
24     Q.  Section 5 on Page 10, United States passport
25 issue to the person, do you see that?

## 109

1    A. Yes.
2    Q. A student identification card issued by a public
3  or private institution of higher education, located in
4  the United States that contains the person's photograph.
5  Do you see that?
6    A. Yes.
7    Q. Section 7, license to carry a concealed handgun
8  issued to the person by the Department of Public Safety.
9  Do you see that?
10   A. Yes.
11   Q. Do you have any idea how many individuals in the
12  State of Texas carry a concealed handgun license?
13   A. No.
14   Q. Do you have any idea if the number of Hispanics
15  who can carry a concealed handgun license in the State
16  of Texas?
17   A. No.
18   Q. Do you have any idea the number of
19  African-American that carry a concealed handgun license
20  in the State of Texas?
21   A. No.
22   Q. During the legislative debate on SB 14, was the
23  issue of concealed handgun licenses debated?
24      MR. McKENZIE: Objection. Public stuff you
25  can talk about.

## 110

1  BY MR. GEAR:
2    Q. Well, let's start with the public record. Was
3  the issue of concealed handguns debated during the
4  legislative debate on SB 14?
5    A. Yeah, I'm -- I'm going to say it was. I don't
6  recall specifically what we were talking about. But
7  I -- it had to be if we're going through the list.
8    Q. What does a concealed handgun license look like.
9  Actually, let me -- strike that. Do you have a
10  concealed handgun license?
11   A. Yes.
12   Q. Do you know if there is a -- do you know,
13  generally, what a concealed handgun license looks like?
14   A. Yes.
15   Q. Can you describe it for me?
16   A. It has my photograph on it. Texas -- it says
17  Texas concealed handgun license on there. It has all
18  the markings of a -- of a State issue with a -- the
19  paper of the stock, the seal, all that kind of stuff,
20  not a hologram, but like a full stamp on it. Issued by
21  the State of Texas. I couldn't tell you much else past
22  that.
23   Q. Do you know if a concealed handgun license for a
24  police officer is different than a concealed handgun
25  license for a representative of the House?

## 111

1    A. I don't know that.
2    Q. Do you know if a concealed handgun license for
3  someone in the military, such as yourself, is different
4  from a can sealed handgun license from a representative
5  of the House?
6    A. I don't know that.
7    Q. Do you know if there is any consistency in what a
8  concealed handgun license looks like in the State of
9  Texas. Is there any inconsistency that you're aware of?
10   A. I'm not aware of any inconsistencies in CHL's.
11   Q. Okay. But you're not aware of whether or not the
12  concealed handgun license for a police officer may be
13  different than the concealed handgun license that you
14  have?
15   A. Yeah, I don't know.
16   Q. Section 8 deals with valid identification cards
17  that contains the person's photograph and it's issued by
18  an agency or institution of the federal government. Do
19  you see that?
20   A. Uh-huh.
21   Q. And Section B is an agency institution or
22  political subdivision of the State. Do you see that?
23   A. Yes.
24   Q. And then it goes on to say the following -- in
25  Section B, line 20, the following documentation is

## 112

1  acceptable as a proof of identification under this
2  chapter. Do you see that?
3    A. Yes.
4    Q. And it allows, for instance, official mail
5  addressed to the person by name from a governmental
6  entity, correct?
7    A. Yes.
8    Q. A certified copy of the birth certificate or
9  other documentation confirming birth that is admissible
10  in the court of law and establishes a person's identity.
11  Do you see that?
12   A. Yes.
13   Q. And the United States citizenship papers issued
14  to the person. Do you see that?
15   A. Yes.
16   Q. And that citizenship paper does not need to
17  contain a photograph. Are you aware of that?
18   A. I have no idea.
19   Q. Okay. But it does not say with photograph; is
20  that correct?
21   A. Oh --
22   Q. I'm talking about --
23   A. The actual language?
24   Q. Yes, the actual language.
25   A. It does not say that.

Larry Gonzales                                                May 31, 2012

## 113

1    Q.  Okay.  And just turning your attention back to
2    line 7, Page 10, license to carry a concealed handgun.
3    In the State of Texas can non-citizens obtain concealed
4    hand guns?
5    A.  I don't know.
6    Q.  Have you ever explored that issue?
7    A.  No.
8    Q.  And again, do you understand this to be the
9    allowable form of identification in HB No. 218 that was
10   authored by Representative Brown and others?
11   A.  In the form that it is in front of me, yes.
12   Q.  And you've also looked at Exhibit 102 I
13   believe -- I believe it's 106 -- is that HB 218.
14       MR. McKENZIE:  This is 106 right here.
15       MR. GEAR:  106?  That's 102.  You're right.
16   BY MR. GEAR:
17   Q.  So have you looked at Exhibit 102 and does that
18   confirm for you that this is HB 218?
19   A.  Yes.
20   Q.  Okay.  Have you ever had an occasion to -- go
21   ahead.  If you would like to talk to your attorney.
22   A.  Yeah.  I'd like to.
23       MR. McKENZIE:  Can we break take a break off
24   the record?
25       MR. GEAR:  Sure.  Let's go off the record.

## 115

1        MR. McKENZIE:  You can answer, yes.
2        THE WITNESS:  I was making sure you had it
3    in front of you.  I was waiting for you.
4        MR. McKENZIE:  Oh, okay.
5    A.  Relating to requiring a voter to present proof of
6    identification.
7    Q.  Anything else?
8    A.  In requiring a voter to present proof of
9    identification.
10   Q.  And the question was anything else that you're
11   aware of?
12   A.  No.
13   Q.  Okay.  We've also gone through what's been marked
14   as Exhibit No. 28.  Do you see that?
15   A.  Yes.
16   Q.  And Exhibit 28 is HB 218, which was authored by
17   Betty Brown, I believe.  Can you tell me what the
18   purpose of HB 218 was?
19   A.  Relating to requiring a voter to present proof of
20   identification.
21   Q.  And you're just simply reading from the title of
22   the bill or from the language in the bill?
23   A.  Yes.
24   Q.  Okay.  Are you aware of any other purpose?
25   A.  I'm not aware.

## 114

1    (Brief recess.)
2    BY MR. GEAR:
3    Q.  Let's go back on the record.  I want to take you
4    back to 2010 when you were campaigning for House
5    District 52.  Did you seek out the opinion of the
6    minority community in District 52 regarding the issue of
7    voter ID?
8        MR. McKENZIE:  I'm going to object on vague
9    about minority community.  But go ahead and answer.
10   BY MR. GEAR:
11   Q.  Well, let me clarify before you answer that.
12   Minority community meaning the Hispanic and Black
13   community?
14   A.  Okay, visiting with them, forums, events, things
15   like that.
16   Q.  Specifically the -- the question is, did you seek
17   out the opinion of the minority community, as I've now
18   defined it for you, in House District 52 regarding the
19   issue of voter ID?
20   A.  No.
21   Q.  We've gone through a series of bills during your
22   deposition, one of which is HB -- HB 1706, which has
23   been marked as Exhibit 44, which you had a chance to
24   review.  Can you tell me what the purpose of HB 1706 is?
25   You can answer.

## 116

1    Q.  And we've also gone through SB 362.  Do you see
2    that exhibit?
3    A.  Yes.
4    Q.  And that Exhibit is Exhibit No. -- can you
5    tell -- State that for the record.  29, correct?
6    A.  Correct.
7    Q.  And you had a chance to review that.  Can you
8    tell me what the purpose of SB 362 was?
9    A.  To require a voter to present proof of
10   identification.
11   Q.  And again, you're reading from the language of
12   SB 362, correct?
13   A.  That's correct.
14   Q.  All right.  Now, again, prior to being elected to
15   House District 52, I'd like to ask you if you were aware
16   of any concerns in House District 62 or -- or anywhere
17   in Texas for that matter, of non-citizens or illegal
18   aliens voting in elections in the State of Texas?
19   A.  Not specifically.  Generally speaking, news what
20   you hear on TV kind of stuff.
21   Q.  So you described in your deposition previously
22   that you heard general information and voter fraud in
23   the news.  Would that be consistent with what you're
24   testifying to now?
25   A.  Yes.

Larry Gonzales                                              May 31, 2012

---

117

1    Q.  Regarding undocumented citizen -- non-citizens or
2  illegal aliens voting?
3    A.  Yes.
4    Q.  You testified a little bit about the location of
5  your office.  I believe you said one was the capital
6  office location?
7    A.  Right.  Yes.
8    Q.  And can you tell me what the address of the
9  capital office location is?
10   A.  1401 North Congress, maybe, in Austin.  State
11  capital, so 14 -- I think it's 1401 North Congress.
12   Q.  Okay.  And that's in Austin?
13   A.  Yes.  Austin.
14   Q.  And you indicated there was another location.
15  Can you identify that location for the record?
16   A.  Oh, my office.
17   Q.  Yes, sir.
18   A.  Okay.  We have an office in Round Rock.
19   Q.  Focusing on your office in Austin, can you
20  identify your staff that are employed in that office?
21   A.  Chris Sanchez, Courtney Forsell and Sara -- I
22  don't know Sara's last name.  Hidalman or Hinalman or
23  something.  I don't know.  She's part-time.
24   Q.  Okay.  So if I refer to her as Sara you would
25  know who I'm speaking about?

---

118

1    A.  Yes.
2    Q.  Okay.  And you identified Chris Sanchez as your
3  chief of staff?
4    A.  Yes.
5    Q.  And as your chief of staff chat responsibilities
6  does Chris Sanchez have?
7    A.  My legislative package, the bills that I author
8  reviewing the calendar for the next day, like when they
9  put the calendar for what's coming up the next day,
10  greet people when they come in an take their literature
11  and visit with them about whatever they're going to
12  visit with me about.  And just generally knowing the
13  legislative issues that are in front of us, I mean, just
14  big picture stuff.  That's his responsibility.  So if I
15  come in and ask him what's on this, you know, he should
16  know that.
17   Q.  Okay.  During the legislative debate for SB 14,
18  did you direct any of your staff to research the issue
19  of voter fraud?
20       MR. McKENZIE:  I'm going to object on the
21  basis of legislative privilege those the extent it's not
22  public.  If it's public or general purpose you can
23  answer.
24   A.  I'll take that privilege.
25   Q.  (By Mr. Gear) And are you following advice of

---

119

1  your Counsel and refusing to answer my question?
2    A.  Yes.
3    Q.  Did you publish any research analysis or analysis
4  related to voter fraud as a result of research done in
5  your office?
6    A.  I'll invoke that as well.
7       MR. McKENZIE:  It's published.
8  BY MR. GEAR:
9    Q.  I'm asking did you publish public record?
10   A.  No.
11   Q.  Do you know of any research conducted on voter
12  fraud regarding SB 14?
13       MR. McKENZIE:  Objection.  You may answer to
14  the extent there's public record on that.
15   A.  I'll kind of go back to the previous question.
16  You said published, like a report.  What are you asking
17  me again.
18   Q.  Let me be clear.  That's a fair question.
19  Published or part of the public record during the
20  legislative debate on SB 14.
21   A.  We sent out like an e-mail update that we did
22  every week.  So probably in -- in one, two of the
23  updates, maybe.  But that was just generally -- here's
24  where we are.
25   Q.  Let's talk about the e-mail update for a second.

---

120

1  You said "we sent out."  Who is we?
2    A.  The office, my office.
3    Q.  And are you referring to both of your offices or
4  one office in particular?
5    A.  The Round Rock office didn't exist during
6  session.
7    Q.  Okay.  Thank you for that clarification.  So the
8  Austin office -- office sent out an e-mail and that
9  e-mail included issues on voter ID.  Is that accurate?
10   A.  I wouldn't say that the Austin office did it.  I
11  would say that the Larry Gonzales campaign did it.  It
12  wasn't State computers.  It wasn't State times.  It
13  wasn't like official, like it was in the capacity as a
14  State rep.
15   Q.  Can you tell me when the e-mail was sent out?
16   A.  I have no idea.
17   Q.  Can you tell me the purpose of the e-mail?
18   A.  To let people know what's gone on with all the
19  different areas we'd been talking about during session.
20   Q.  Was this during the 2011 session?
21   A.  Yes.
22   Q.  And was it sent out to your constituents?
23   A.  Yes.
24   Q.  Okay.  And you hesitated for a second.  Was it
25  second out to an audience broader than your constituents

Larry Gonzales                                          May 31, 2012

## 121

1  in House District 52?
2      A.  Yes.
3      Q.  And who did the e-mail include, what individuals?
4  Let's start by that.
5      A.  Whoever signs up for it.  I couldn't tell you who
6  signed up for it.
7      Q.  What is that process?
8      A.  They go to the website and sign up for the
9  newsletter.
10     Q.  And the website that you're referring to is that
11  a website specific to the -- your elected position or is
12  that a website specific to Larry Gonzales campaigning?
13     A.  It's through the campaign website.
14     Q.  Okay.  So it's a privately owned website by you?
15     A.  Right.  Well, the campaign.
16     Q.  Thank you for the clarification.  Okay.  And so
17  you said e-mails.  Was there more than one e-mail?  Was
18  there one e-mail?
19     A.  I said -- I said e-mails just to cover -- cover
20  the basis because I can think of one, but I can't -- I
21  don't know if there's anymore.  So I said e-mails just
22  in case there was two.  But I couldn't tell you how many
23  there were.
24     Q.  Okay.  And so when you mentioned the e-mail that
25  was sent out we were talking about voter fraud, correct?

## 122

1      A.  Voter ID.
2      Q.  Okay.  So the e-mail that went out is -- is
3  related to voter ID and SB 14?  And again the time
4  frame --
5      A.  Yeah.
6      Q.  That I'm talking about is 2011.
7      A.  Yeah.  I don't know specifically reference SB 14
8  or if it was like bigger picture than that.  I can't
9  recall.
10     Q.  Okay.  With that can you tell me what the
11  substance of that e-mail was?
12     A.  Where we were in the process.
13     Q.  And where were you in the process at the time?
14     A.  I don't recall.  Those updates just tell
15  people -- as of today, here's where we are.
16     Q.  But it discussed voter ID, correct?
17     A.  Yes.
18     Q.  What topics did it discuss related to voter ID?
19     A.  Where we were in the process.  I just remember
20  the heading.
21     Q.  What did the heading say?
22     A.  It was talking about where we are today.  Like
23  the committee process or if it was on the floor, that
24  kind of update.
25     Q.  And when you say "the process," what are you

## 123

1  referring to?
2      A.  The process that you'll see if you look at the
3  legislature online reports that you have given me.
4      Q.  And you're referring to Exhibit 102?
5      A.  Yeah.  For this case, 102.  If you look at this
6  exhibit it walks you through the process of legislation.
7  So the updates would just take whatever day that was and
8  let people know where we were in the process.
9      Q.  Okay.  Did you state a position in that e-mail to
10  your constituent or the broader audience?
11     A.  I can't recall what those e-mails said.
12     Q.  And you can't recall the date?
13     A.  No.
14     Q.  You also mentioned Courtney Forsell.  Can you
15  tell me what her title or position is?
16     A.  Courtney's title is legislative aid.
17     Q.  And what responsibilities does Courtney have in
18  your office?
19     A.  Courtney answers the phones.  Courtney works on
20  case work that we defined earlier.  And during session
21  Courtney was responsible for my committee books.  The
22  books that -- for the specific committees that I served
23  on.  She prepared those for me.
24     Q.  Did any of her responsibilities include voter ID?
25     A.  No.

## 124

1      Q.  Did any of her responsibilities include issues
2  related to voter fraud?
3      A.  Well, I say that.  If there was a case work where
4  someone called.
5      Q.  When you say "case work," what do you mean?
6      A.  Well, we defined that already.  Someone calls in
7  the office and has questions.
8      Q.  Okay.  I just wanted to make sure that we were on
9  the same subject matter when we're talking about case
10  work.  Are you aware of any calls or case work that came
11  in regarding the issue of voter ID or voter fraud?
12         MR. McKENZIE:  I'm going to object.
13     A.  I take privilege on that one.
14     Q.  (By Mr. Gear)  When you searched the documents and
15  in response to Exhibit 220, the deposition notice, did
16  you produce any documents related to case work?
17     A.  I don't know.
18     Q.  There was one other employee that you mentioned,
19  Sara.  And you didn't known her last name, specifically.
20  Can you tell -- I believe you said she was an intern?
21     A.  Uh-huh.
22     Q.  And can you tell me what her responsibilities
23  are?
24     A.  She answers the phone and gets whichever staffer
25  she needs.

Larry Gonzales                                                      May 31, 2012

---

**129**

1    A.  I think we do.  I think it's the one we use on
2    the floor.
3    Q.  Do you have a work issued laptop?
4    A.  I think so.
5    Q.  Do you know if Mr. Sanchez searched the work
6    issued laptop for documents related to voter ID?
7    A.  I don't know.
8    Q.  Would he have access to that?
9    A.  Yes.
10   Q.  Did you personally search the work issued laptop
11   for documents related to voter ID?
12   A.  No.
13   Q.  Do you ever use your personal e-mail for work
14   purposes?
15   A.  Not really.  You mean for like with my staff.  I
16   guess, can you explain?
17   Q.  With your staff or the legislatures, executive
18   office, anyone related to the Texas government?
19   A.  Oh, yeah.  I get a lot of friends who are members
20   and, you know, we communicate all kinds of stuff.
21   Q.  And it's your testimony today that you did not
22   search your personal e-mail to determine if you had any
23   documents relevant to our document request for photo ID?
24   A.  That's correct.
25   Q.  And why didn't you search your personal e-mail?

---

**131**

1    Q.  Do you ever text message while you're on the
2    floor to your staff?
3    A.  Oh, I'm sure we to that.
4    Q.  And have you -- are you aware of any text
5    message that were related to SB 14 that you sent to your
6    staff?
7    A.  Not aware at all.
8    Q.  Do you have any off side storage facilities that
9    you send overflow papers or papers for any reason?
10   A.  No.  Personally, yes for my business, yes.  But
11   not for legislative.
12   Q.  And what business do you currently own?
13   A.  Oh, I have a company called Lazarus Graphics.
14   Q.  And in Lazarus Graphics, do you -- is there --
15   have you had occasion to print anything related to voter
16   ID?
17   A.  No.
18   Q.  Do you print on behalf of other candidates?
19   A.  Yes.
20   Q.  Have you used your business to print on your own
21   behalf regarding your own campaigns?
22   A.  My campaign, yes.
23   Q.  And is it your testimony that -- that either
24   yourself or other candidates have not used your business
25   for the purpose of printing communications that are --

---

**130**

1    A.  Not used for that purpose.
2    Q.  And again, let me understand, is it your
3    testimony that you receive documents or text, e-mails
4    from your staff on your personal phone?
5    A.  Yeah.
6    Q.  And did you receive e-mails from your staff or
7    texts from your staff during the legislative debate for
8    SB 14?
9    A.  I wouldn't have any idea.
10   Q.  Well, let's explore that for a second.  Do you
11   e-mail while you're on the floor?
12   A.  No, not really.
13   Q.  How do you communicate with your staff while
14   you're on the floor?
15   A.  Phone.
16   Q.  Do you use your personal phone or do you use a
17   phone --
18   A.  House phone.
19   Q.  Okay.  So in -- on the floor there's a House
20   phone you can use for those purposes?
21   A.  That's correct.
22   Q.  Do you have e-mail while you or on the floor to
23   your staff?
24   A.  No, I can't think of hardly any reason why we did
25   that.

---

**132**

1    are first responsive to the notice of deposition and
2    related to voter ID?
3    A.  I'm sorry.  I didn't understand that at all.
4    Q.  Okay.  That's fair.
5    A.  I didn't know what you were talking about.
6    Q.  It was just kind of -- kind of long and
7    on-running.  But are you testifying here today or is it
8    your position today that there -- that other candidates
9    who have used your business, your graphics business,
10   have not asked you or an employee of your business to
11   print documents, communications that are related to
12   voter ID?
13   A.  I don't know how to claim a legislative privilege
14   there, but I would if I can because they are, in fact,
15   legislators.  And --
16   Q.  But they're using your private business.
17   A.  I'm a legislator and they're legislators.  That's
18   a communication that I'm going to claim.
19   ==Q.  I'm asking you, based on your private business,==
20   ==have other legislators used your business to print==
21   ==communications that are relevant -- I'm sorry.  Relevant==
22   ==is not a good word.  That are related to voter ID?==
23   ==A.  I'm going to claim legislative privilege.==
24   ==          MR. McKENZIE:  You can -- you can answer for==
25   ==whether or not a document was printed.  But going into==

## 133

1  the contents of the document or why it was printed or
2  anything else is where we go on privilege.
3       THE WITNESS:  Well, there's also the who.
4       MR. McKENZIE:  The who is something you can
5  talk about.  It's not privileged.
6       THE WITNESS:  If they're a legislator?
7       MR. McKENZIE:  If they're a legislator you
8  can still say who you talked to.  Just can't say what
9  they said.
10      A.  Yes.
11      Q.  (By Mr. Gear)  Do you remember the date?
12      A.  Oh, no.
13      Q.  Do you remember who?
14      A.  No.
15      Q.  Who you published these documents for you printed
16  these documents for?
17      A.  Not off the top of my head.
18      Q.  It was another legislator?
19      A.  Yes.
20      Q.  It was during the legislative debate for SB 14?
21      A.  No.
22      Q.  Was it related to a voter ID bill prior to SB 14?
23      A.  No.
24      Q.  Was it related to a voter ID legislation?
25      A.  No.

## 134

1      Q.  Was it related to voter ID?
2      A.  No.
3      Q.  Was it related to voter fraud?
4      A.  Yes.
5      Q.  Okay.  What was the subject matter of the
6  communication that you printed?
7       MR. McKENZIE:  I'm going to object on the
8  basis of privilege.  It goes into what was communicated.
9       MR. GEAR:  Wait a minute.  If I understand
10 his testimony correctly it was not related to SB 14.
11 BY MR. GEAR:
12     Q.  But the printing job that you completed on behalf
13 of another legislator; is that correct?
14     A.  Yes.
15     Q.  So this would have occurred before you were
16 actually a legislator in House District 52?
17     A.  Not exclusively.
18     Q.  You've got to help me understand that, now.  I
19 asked for a time period.  I asked you when.  I asked you
20 who.  Is it your testimony that -- that the printing --
21 strike that.  When did the printing occur?  Did it occur
22 when you were an elected official or did it occur before
23 you were an elected official?
24     A.  That question -- they're not mutually exclusive.
25     Q.  Well, were you an elected official at the time

## 135

1  that you were asked to print documentation that was
2  related to voter I did or voter fraud as you say?
3      A.  Yes.
4      Q.  You were --
5      A.  Yes.
6      Q.  You were an elected official?
7      A.  Yes.  Yes.
8      Q.  You were elected in 2010?
9      A.  That's correct.
10     Q.  So now you remember when you actually completed
11 the printing job?
12     A.  Oh, I have no idea when it was completed.
13     Q.  So is it your testimony that the printing job was
14 done subsequent to 2010?  Was it done in 2010?
15     A.  Yes.  Well, I mean, it was ongoing.  I mean, it's
16 not like there's a job you have and you have to be done
17 with it.  It was prior to being elected.  It was after
18 being elected.
19     Q.  So that's the issue.  It was an ongoing print
20 job.  Is that -- is that your testimony?
21     A.  I mean, or jobs, yeah.
22     Q.  So in 2010 prior to being -- being an elected
23 official in House District 52, were you asked to print
24 any communications related to voter fraud?
25     A.  Yes.

## 136

1      Q.  So focusing exclusively on the time period in
2  2010 before you became an elected official, what was the
3  subject matter of that print job?
4      A.  Voter fraud.
5      Q.  What was the subject matter?  Beyond just voter
6  fraud, what did it discuss?  What was the topic?
7      A.  I don't write copy.  It was voter fraud.
8      Q.  Did you produce the -- the print job, the
9  communication in response to the notice of deposition?
10     A.  No, I don't think so.
11     Q.  Did the notice of deposition ask for public
12 communication?
13     A.  Yeah.
14     Q.  Are you claiming legislative privilege on any
15 documents that are related to voter fraud prior to you
16 becoming a legislator?
17     A.  Yeah.
18     Q.  On what basis?
19     A.  It goes into my thought process, reasoning.
20     Q.  But you're not a legislator.
21     A.  Oh, but it's -- it affects decisions as a
22 legislator.
23      MR. GEAR:  Counsel, I'd ask that those
24 documents be produced to the Attorney General.  I don't
25 believe that they're covered under legislative

Larry Gonzales                                                    May 31, 2012

## 137

1  privilege.  It was prior to Representative Gonzales
2  becoming a legislator in the House.  I would ask that
3  those documents be produced.
4       MR. McKENZIE:  Okay.  I will check with the
5  representative and see whether or not we have those in
6  our custody.  And if we do have those in our custody,
7  we'll get them to you fast.  And if we don't, I'll ask
8  when we can get them if he still has a copy of them.
9       MR. GEAR:  Thank you.
10  BY MR. GEAR:
11       Q.  I believe I asked you before, are you a member of
12  the Texas Conservative Coalition?
13       A.  You didn't.  And I think that I am.
14       Q.  When did you become a member of the Texas
15  Conservative Coalition?
16       A.  Well, they accept you upon your election before
17  swearing in.  But you write your check, your dues, I
18  think once you're elected.  I think I wrote the check
19  once you're elected.  But you're officially part of the
20  caucus before you're sworn in.
21       Q.  And can you tell me, does the Texas Conservative
22  Coalition have a Mission statement?
23       A.  I have no idea.
24       Q.  And has the Texas Conservative Coalition
25  addressed the issue of voter ID?

## 138

1       A.  I would assume so, but I wouldn't have any idea
2  what that is.
3       Q.  Have they publish any communication related to
4  voter ID?
5       A.  I wouldn't have any idea.
6       Q.  Does the Texas Conservative Coalition issue or
7  distribute floor reports to the House?
8       A.  The Texas Conservative Coalition Research
9  Institute does, but not the Texas Conservative
10  Coalition.
11       Q.  And is that affiliated with the Texas
12  Conservative Coalition?
13       A.  Yes.
14       Q.  And as a member of the Texas Conservative
15  Coalition, have you have reviewed any House -- any
16  research reports related to voter ID that were
17  distributed by the Texas Conservative --
18       A.  I have no idea.
19       Q.  Coalition?
20       MR. McKENZIE:  I'll object to the extent it
21  was during your time as a legislator and might reflect
22  your personal opinions, thoughts, and mental
23  impressions.
24       MR. GEAR:  I'm just simply asking if he's
25  reviewed any documents related to photo -- voter ID that

## 139

1  were issued by the Texas Conservative Coalition.  I
2  think it's a "yes" or "no" answer?
3       A.  I'll take the privilege.
4       Q.  (By Mr. Gear) Are you refusing to answer that
5  question based on advice of your counsel?
6       A.  Yes.
7       Q.  And are you -- you're refusing to answer that
8  question?
9       A.  Yes.
10       Q.  Okay.  Are you aware of the existence of any
11  reports by the Texas Conservative Coalition that address
12  the issue of photo ID?
13       A.  I have no idea.
14       Q.  Have you reviewed any reports issued by the Texas
15  Conservative Coalition that relate to SB 14?
16       A.  Not that I recall.
17       Q.  Do you believe that compliance with the federal
18  voting rights act is an important consideration in the
19  law making process?
20       A.  Yes.
21       Q.  Have you yourself reviewed the provisions of the
22  Texas election code?
23       A.  As per what section?
24       Q.  The Texas election code.  Specifically as it
25  relates to voter fraud.

## 140

1       MR. McKENZIE:  I'm going to object on the
2  grounds of privilege to the extent in played a part in
3  your deliberations to vote.
4       A.  I'll take that privilege.
5       Q.  (By Mr. Gear) You're refusing to answer that
6  question based on the advice of your counsel?
7       A.  Yes, that's right.
8       Q.  Under the current Texas State law, what forms of
9  identification be -- can be presented at the polling
10  place by a voter?
11       A.  Oh, you've got your voter card, driver's license,
12  I think you can do like public utility bills, things
13  like that.  Water bill, electric bill, power bill,
14  something like that.  And that's all I can speak to.
15       Q.  Under the current law do you know what the
16  penalties are for voter fraud?
17       A.  No.
18       Q.  Have you ever researched that issue?
19       A.  No.
20       Q.  Has anyone in your staff, in your office ever
21  researched that issue?
22       MR. McKENZIE:  I'm going to object on the
23  grounds of privilege that it reflects your
24  deliberations.
25       A.  I'll take that.

Larry Gonzales                                           May 31, 2012

---

### 141

1   Q.  (By Mr. Gear) Are you aware that voter fraud
2   under the current law carries a possible jail sentence?
3           MR. McKENZIE:  Same objection.
4   A.  Take that privilege.
5   Q.  (By Mr. Gear) Do you have an opinion as to
6   whether or not a potential penalty of -- of prison and
7   fine acts as a deterrent when it comes to voter fraud?
8           MR. McKENZIE:  Same objection.
9   A.  I'll take that privilege.
10  Q.  (By Mr. Gear) Are you refusing to answer that
11  question based on the advice of your counsel?
12  A.  Yes.
13  Q.  Do you know under the current law what the
14  penalty is for a non-citizen to register to vote?
15          MR. McKENZIE:  Same objection.
16  A.  I'll take that.
17  Q.  (By Mr. Gear) What is it that you're taking?
18  A.  The legislative privilege.
19  Q.  And are you refusing to answer that question
20  based on the advice of your counsel?
21  A.  Yes.
22          MR. McKENZIE:  I've been saying same
23  objection a lot.  Let me clarify, for the record.  To
24  the extent it reflects your deliberations and it's not
25  public record, don't answer it.  Or if it's public

---

### 142

1   record you may answer it.
2   BY MR. GEAR:
3   Q.  Does voting as a non-citizen carry any additional
4   penalties under the Texas election code?
5           MR. McKENZIE:  It's the same objection.
6   A.  I'll take the same privilege, legislative
7   privilege.
8   Q.  (By Mr. Gear) Do you know if -- if a non-citizen
9   has the ability to obtain a driver's license in the
10  State of Texas?
11          MR. McKENZIE:  Same objection.
12  A.  I'll take the same legislative privilege.
13          MR. GEAR:  I -- Counsel, I'm wondering how
14  his knowledge of the Texas election code and its affect
15  on non-citizens draws a legislative privilege objection.
16          MR. McKENZIE:  Well, to the extent it is
17  considered information of that type.  And to be fair, I
18  don't know what the witness knows so I don't know if it
19  does reflect it or not, but to the extent it does
20  reflect it.  His knowledge today may or may not have
21  been acquired during a legislative session and it may be
22  something he considered when he was voting.  So I object
23  to that extent.  To the extent he didn't require it in
24  that process or it doesn't affect his acts as a
25  legislator, then he's free to answer.  And I have to --

---

### 143

1   I have to let the witness make that call because I don't
2   know what the witness knows.
3   BY MR. GEAR:
4   Q.  Are you refusing to answer my question based on
5   advice of your counsel?
6   A.  Yes.  Yes.
7   Q.  Can you obtain a Texas State ID if you're a
8   non-citizen?
9           MR. McKENZIE:  Same objection.
10  A.  I'll take that legislative privilege.
11          MR. BRAZIL:  What was the last thing you
12  said?
13  A.  Invoking that legislative privilege.  Sorry.
14  Q.  (By Mr. Gear) So let me ask, do you know if a
15  non-citizen can obtain a Texas driver's license in the
16  State of Texas?  And I don't believe that "do you know"
17  questions are subject to a legislative privilege
18  objection?
19          MR. McKENZIE:  I understand.  And it's our
20  position that his knowledge if acquired as part of the
21  legislative process and part of his research on deciding
22  whether or not to vote on a bill is where he got this
23  information, then that would be privileged.  But if it's
24  not from that source and he just happens to know it and
25  it's not something part of the legislative process then

---

### 144

1   he can answer.
2   BY MR. GEAR:
3   Q.  All right.  And are you refusing to answer that
4   question based on the advice of your counsel?
5   A.  Yes.
6   Q.  And that was a yes?
7   A.  Yes, sir.
8   Q.  Does having a State issued ID or do you know if
9   having a State issued ID or a State issued -- in the
10  form of a State issued driver's license or ID card --
11  strike that question.  Are you a registered voter in
12  Williamson County?
13  A.  Yes.
14  Q.  When is the last time you voted?
15  A.  May the 15th of 2011.
16  Q.  Did you vote in person or by mail?
17  A.  In person.
18  Q.  And how far is your polling place away from your
19  home?
20  A.  My polling place is a little over a mile.  I did
21  not vote at my polling place, though.
22  Q.  What did -- I'm sorry.  I may not have heard the
23  first part of your answer.  Did you vote in person or
24  did you vote by mail?
25  A.  In person.

Larry Gonzales                                                    May 31, 2012

## 145

1    Q.  Okay.  Can you tell me where you vote?
2    A.  I vote at Chisholm Trail Middle school.
3    Q.  And --
4    A.  Actually this year it was different.  I voted at
5    Precinct 38 votes at Restoration Covenant church.
6    Q.  And can you tell me why you did not vote at your
7    regular polling place?
8    A.  Because I voted early.
9    Q.  Okay.  So early voting would be a different
10   location?
11   A.  Yes.
12   Q.  Okay.  And how did you get there?
13   A.  I drove.
14   Q.  To the polling place?
15   A.  I drove.
16   Q.  Okay.  And do you have a valid driver's license?
17   A.  Yes.
18   Q.  Where did you go to get your driver's license,
19   your valid driver's license?
20   A.  I -- I don't recall.  I don't recall.
21   Q.  Did you have to go to DPS?
22   A.  Yes.  Yes.  DPS.
23   Q.  Do you know how any DPS offices there are if
24   Williamson County?
25   A.  I -- I don't know the answer to that.

## 147

1    A.  Because I work downtown.
2    Q.  Okay.  Do you know what the cost of renewing your
3    driver's license was?
4    A.  No.
5    Q.  For a person who does not have a valid driver's
6    license or State issued ID, do you know what
7    documentation they would be required to bring to a DPS
8    is office to get a driver's license or State issued ID?
9    A.  No.
10   Q.  Do you know what the cost, the underlying cost
11   for those documents may be?
12   A.  No.
13   Q.  When you went to renew your driver's license, did
14   you -- did you have to stand in a line to do it?
15   A.  Yes.
16   Q.  How long did it take from entering the door to --
17   to the time you actually had card in hand?
18   A.  No idea.
19   Q.  Was it more than an hour?
20   A.  No idea.
21   Q.  How long was the line that you had to stand in?
22   A.  No idea.
23   Q.  What's the process for renewing your license?
24   And I mean specifically when you get to DPS, what's the
25   process that you have to go through?

## 146

1    Q.  Do you know what the operational hours are of the
2    DPS offices in Williamson County?
3    A.  No.
4    Q.  Do you know if the DPS offices in Williamson
5    County are full services offices?
6    A.  I don't know.  I want to clarify.  When you ask
7    me where, the end decision is I don't know if it was at
8    one location or the other.  So I don't -- I can't
9    remember if I was at the 183 location or the downtown
10   Austin location.
11   Q.  And just so we're clear for the record, when you
12   say "where," you're talking about voting?
13   A.  No.  The -- getting the certificate, the DPS
14   certificate -- DPS driver's license.  You asked me where
15   did I get it and it's one of those two locations.
16   Q.  Okay?
17   A.  Neither of which is in Williamson County.
18   Q.  I thought I previously asked you do you know the
19   locations of the DPS offices and I understand your
20   answer now because you said neither of them are in
21   Williamson County.  So is there a reason why you
22   obtained your driver's license in the location other
23   than Williamson County?
24   A.  Yes.
25   Q.  And what is that reason?

## 148

1    A.  I cannot recall what I did.
2    Q.  Fair enough.  Okay.  Do you know if any DPS
3    offices are being closed in the State of Texas due to
4    the lack of funding?
5    A.  No idea.
6    Q.  Was the lack of funding for DPS offices discussed
7    publicly during the legislative debate on SB 14?
8    A.  Not that I recall hearing that particular
9    discussion.  I don't have any recollection of that -- of
10   that dialogue at all.
11   Q.  Was there any discussion during the public
12   legislative debate regarding the burden that SB 14 may
13   place on minority voters?
14   A.  Yes.
15   Q.  And specifically regarding the distances to DPS
16   offices?
17   A.  Yes.  Yes.  Yes.
18   Q.  Can you tell me what that discussion was?  And
19   we're talking about the public debate?
20   A.  All I remember is Pete Gallego saying that it was
21   going to be far, that in his district it's -- it's a
22   long drive.
23   Q.  And that was Pete Gallego, Representative
24   Gallego?
25   A.  Yes.

Larry Gonzales                                                    May 31, 2012

---

149

1  Q.  And do you recall any public debate regarding
2  some constituents that may be required to travel as far
3  as 100 miles to renew or to obtain a driver's license?
4  A.  I couldn't tell you what number Pete used.  I
5  don't remember.  I just remember it was far.
6  Q.  Do you have an opinion as to whether or not
7  requiring individual to travel a far distance place as
8  burden on them when it comes to voting?
9  MR. McKENZIE:  I'm going to object to the
10  extent you developed an opinion during your time as a
11  legislator.  If you have an opinion separate and apart
12  from that time you're free to answer.
13  A.  I'll take that legislative privilege.
14  Q.  (By Mr. Gear) Well, I'm asking you your opinion.
15  And I want to be clear that you're not just asserting
16  legislative privilege without considering and breaking
17  out your knowledge based on public debate and your
18  knowledge based on private debates that may have --
19  private discussions that may have taken place during the
20  legislative debate on SB 14.  So I'm asking you to focus
21  on your knowledge, your personal knowledge.  Do you have
22  an opinion as to whether or not requiring someone to
23  travel a substantial distance to obtain a driver's
24  license or a State issued ID imposes a burden on -- when
25  required to vote?

---

150

1  MR. McKENZIE:  Just make a quick objection.
2  If -- if that opinion is not publish and was weighed by
3  you in your decision to vote then I'm going to instruct
4  you not to answer.  If that opinion was not a factor in
5  your decision to vote then you may answer.
6  A.  I'll invoke the legislative privilege.
7  Q.  (By Mr. Gear) Are you refusing to answer my
8  question on the basis of advice from your counsel?
9  A.  Yes.
10  Q.  Do you currently possess a certified copy of your
11  birth certificate?
12  A.  I -- I don't know.  I don't know.
13  Q.  Do you know what you would have to go through to
14  obtain a certified copy of a birth certificate in the
15  State of Texas?
16  A.  No.
17  Q.  Do you know what the cost of obtaining a
18  certified birth certificate is in the State of Texas?
19  A.  No.
20  Q.  Do you know where you would have to go to obtain
21  a certified copy of your birth certificate in the State
22  of Texas?
23  A.  I think you can go to Department of Health and
24  Human Services.  You know what, I do have one because I
25  had to go get one.

---

151

1  Q.  And when did you have to go get one?
2  A.  Within a year and a half or so.
3  Q.  And do you recall -- do you recall what the cost
4  of obtaining that birth certificate was?
5  A.  No.
6  Q.  Do you recall what underlying documents you
7  needed to obtain a certified birth certificate?
8  A.  I was trying to think of that while you were
9  asking the question.  I have no idea why I was there
10  now.
11  Q.  And when you say "you have no idea why you were
12  there," you mean no idea what you took?
13  A.  I did -- I don't know why I was asking for it.  I
14  don't know the reason why I was asking for my birth
15  certificate.
16  Q.  And that's a little different than the question
17  which I asked which is, do you know what documentation
18  you had to bring in order to obtain a certified copy of
19  your birth certificate?
20  A.  Oh, I don't remember what I gave the clerk.
21  Q.  As you sit here today, you don't remember what
22  underlying documentation you needed to present to obtain
23  a copy of a certified birth certificate?
24  A.  Correct.
25  Q.  Do you know if every county in the State of Texas

---

152

1  has a DPS office or an office where you can obtain a
2  driver's license or a State issued identification card?
3  A.  I am not aware.
4  Q.  Do you know, or are you aware of counties which
5  do not have a DPS is office?
6  A.  Not aware.
7  Q.  Was the discussion, and I'm talking about a
8  public discussion, was there public discussion expressed
9  during the legislative debates on SB 14 that addressed
10  the issue of DPS offices and where they were located?
11  A.  There was a conversation.  To the extent of what
12  that was I -- I don't recall.
13  Q.  Would I be accurate to say that the public
14  discussion during the legislative debate on SB 14
15  identified our counties that did not have a DPS is
16  office?
17  A.  Not that I can remember.
18  Q.  So as you sit here today, it's your testimony
19  that you're not aware of any counties in the State of
20  Texas that do not have a DPS office or an office where
21  you can -- where you go to obtain a driver's license or
22  a State issued ID?
23  A.  No.  I have no idea.
24  Q.  Are you concerned that if SB 14 were implemented
25  do you believe that that would cause a burden -- strike

Larry Gonzales                                                          May 31, 2012

---

### 153

1   that.  If, in fact, there are counties that do not have
2   a driver's license office or a DPS is office, are you
3   concerned that would impose a burden on individuals who
4   would be required to obtain allowable forms of ID under
5   SB 14 if they had to travel long distances to get there?
6       A.  Well, I'll take that privilege.
7           MR. McKENZIE:  You already testified, as far
8   as I remember, that you didn't know that before.  So
9   it's not an opinion you would have developed on the part
10  of the legislation.
11      A.  I don't -- I don't -- can you ask me the question
12  again so I can make sure I understand it.
13          MR. GEAR:  Can you read that back?
14          (Requested question was read.)
15          MR. McKENZIE:  Relevance objection.  You may
16  answer.
17      A.  No.
18      Q.  (By Mr. Gear) You're not concerned?
19      A.  No.
20      Q.  Were you an author or co-author of SB 14?
21      A.  I don't recall, but it's easy to find out.
22      Q.  Well, were you involved in the drafting of SB 14?
23      A.  No.
24      Q.  Were you involved in any communications regarding
25  SB 14?

---

### 154

1       A.  No, sir.
2       Q.  As you sit here today, you don't know if you were
3   an author or co-author of SB 14?
4       A.  No, but I could look it up for you.
5       Q.  We'll to that.  I'm just trying to understand
6   what you know.  So what is the process, generally, for
7   determining who will sponsor or cosponsor a bill in the
8   House?
9       A.  Anybody can sponsor anything.  Anybody can put
10  their name on a draft and file it.  So anybody can
11  author whatever they want to author.
12      Q.  What about cosponsor, is there -- is there any
13  process in place for determining who will cosponsor a
14  bill?
15      A.  Well, cosponsor as a House member assumes it
16  comes from the Senate itself, which is different from
17  co-authoring.
18      Q.  Uh-huh.
19      A.  So cosponsor, to your question, when it comes
20  over from the Senate there is a sheet in the chief
21  clerk's office that you can sign up as co-op -- I mean,
22  cosponsor.
23      Q.  So as I understand it there's a sheet in the
24  Senate where you can sign up as a cosponsor?
25      A.  When the Senate Bill comes to the House you go to

---

### 155

1   the House chief clerk's office and you can sign up as a
2   cosponsor.
3       Q.  Okay.  And did you sign up as a cosponsor for
4   SB 14?
5       A.  That's what I'm not sure about, but I would be
6   happy to check.  I just don't recall.
7       Q.  I think that was previously marked as Exhibit 5?
8           (Exhibit No. 5 was marked.)
9       A.  Okay.
10      Q.  So I've handed you what's been marked as Exhibit
11  No. 5.  What is that?
12      A.  This is Senate Bill No. 14.
13      Q.  And so the question I had for you was were you a
14  co-author of Senate Bill No. 14?
15      A.  Well, you would be a cosponsor of Senate Bill if
16  you're in the House.
17      Q.  I stand corrected.
18      A.  A cosponsor.  I need to look it up.  I can look
19  it up for you.  I don't know.  Can you give me a minute
20  to look it up and then I could answer your question?
21      Q.  I don't mean to be difficult.
22      A.  I can look it up if you want me to.  I'm not
23  trying to not answer it.  I don't know.
24      Q.  Okay.  That's fair.  And I apologize.  I just
25  didn't have it in front of me.

---

### 156

1       A.  That's it.  That's it.
2       Q.  Okay.  I'm just going to show you this document.
3   It's been previously introduced as Exhibit No. 8 in
4   other depositions.  And does that help refresh your
5   recollection?
6       A.  Yes.  Yes.
7       Q.  And the answer is, yes, you were a cosponsor of
8   SB 14?
9       A.  That is a cosponsor of SB 14, yes.
10      Q.  And can you identify who the author of SB 14 was?
11      A.  The author of Senate Bill 14 is Fraser, Birdwell,
12  Corona, Dual, Duncan, Eltife, Estes, Harris, Haber,
13  Huffman, Jackson, Nelson, Nichols, Ogden, Patrick,
14  Seliger, Shapiro, Wentworth and Williams.
15      Q.  And SB 14 was passed in the Senate and then came
16  to the House?
17      A.  Yes.
18      Q.  Can you tell me when it came to the House?
19      A.  When it came to the House or when it came to the
20  House Committee?  When it came to the House floor?  What
21  are you asking?
22      Q.  And let's just be clear.  What is the process
23  for -- what was the process for SB 14 when it passed the
24  Senate?
25      A.  It is received by the House.  It is assign -- it

## 157

1    is read aloud.  It is assigned to committee.  The
2    committee, if passes goes to a calendar committee, if
3    passes comes to the floor with a lot of variables in
4    between depending on what happened.
5        Q.  Is that what happened with SB 14?
6        A.  Let me check.  I'm sure it did.
7        Q.  Okay.  And let me turn your attention back to the
8    actual bill which has been marked as Exhibit No. 5.
9        A.  Okay.
10       Q.  Can you tell me what the allowable forms of ID
11   are under SB 14?
12       A.  Okay.  In this version of Senate Bill 14 a
13   driver's license, election identification certificate,
14   personal identification card issued from Department of
15   Public Safety that hasn't expired or that expired no
16   earlier than 60 days before the date of presentation, a
17   United States military identification card with a
18   photograph on it that has not expired or that expired no
19   earlier than 60 days before the date of presentation, a
20   United States citizen certificate with a photograph of
21   the person.  A passport that has not expired or that
22   expired no earlier than 60 days before date of
23   presentation.  Concealed handgun license issued by
24   public safety that has not expired or that expired no
25   earlier than 60 days before date of presentation.  I

## 158

1    think this -- that's it.
2        Q.  Now, previously during your deposition we went
3    through HB 1706 which was sponsored by Representative
4    Denny and others.  We went through HB 218 and we went
5    through SB 362.  Would you agree that the allowable
6    forms of ID in SB 14 are different than the allowable
7    forms of ID in the bills that I just referenced?
8        A.  Hold on let me check.  Well, let me look at them.
9    They all have a driver's license, they have a personal
10   identification card.
11       Q.  But is it accurate to say that the driver's
12   license in SB 14 has an expiration date of no more than
13   60 days and the driver's license in all of the other
14   referenced ID bills has an expiration date to be
15   presented no more than two years?
16       A.  Yes.
17       Q.  And do you have an opinion as to -- strike that.
18   I think that's been asked and answered actually.  Do you
19   see any -- any other differences as we're describing
20   this for the record, between SB 14 and the other bills
21   that I've referenced?
22       A.  The United States military ID in Senate Bill 14
23   has an expiration date.  I don't see it in 1706, 218 or
24   362 -- let's see, citizenship certificate date is that
25   on all of them.  It's on that one.

## 159

1        Q.  Well, let me ask a specific question to help you
2    out.  Does SB 14 allow for identification for a student
3    identification card issued by public or private
4    institution of higher education that contains the
5    person's photograph?
6        A.  It does not.
7        Q.  Do you know why -- what the basis of the change
8    was between the 2007, 2009 and HB -- HB 12 -- SB 14?
9    I'm sorry.
10           MR. McKENZIE:  I didn't mean to talk over
11   you.  I'm going to object to the extent that it reveals
12   private communications that are not public or to the
13   extent it reveals personal reflections that are not
14   public and factored into your decision to vote.  If it
15   reflects public record or a general legislative purpose
16   you may answer.
17   BY MR. GEAR:
18       Q.  The question is what's the basis of the change
19   from the previous voter ID legislation and SB 14?
20           MR. McKENZIE:  Same objection.
21       A.  I don't know.  I'll answer.  I don't know because
22   I wasn't a member for any of that.  I'm not familiar
23   with these three.  This is the one that I'm familiar
24   with.  So I can't speak to any changes that were made
25   for this purpose.

## 160

1        Q.  Was there public debate regarding the removal or
2    the decision not to include student identification cards
3    issued by public or private institution in SB 14 that
4    you can recall?
5        A.  Yes.
6        Q.  And what was the subject matter or the substance
7    of that public debate?
8        A.  I don't know who was talking, but I remember the
9    conversation was that it would be difficult for an
10   election judge to recognize a valid student ID because
11   there were so many different forms.  That's what --
12   that's the discussion I remember on the floor.
13       Q.  Are you aware of any personal -- are you
14   personally aware of any voter impersonation allegations
15   by students who have used student identification?
16           MR. McKENZIE:  I'm going to object to the
17   extent that you acquired that knowledge in furtherance
18   of your duties of the Legislature.  You may answer it to
19   the extent you didn't acquire knowledge that way or it's
20   a matter of public record.
21       A.  I don't have any knowledge.
22       Q.  (By Mr. Gear) Are you aware of any convictions of
23   students whose have falsely used a student
24   identification?
25           MR. McKENZIE:  Same objection.

Larry Gonzales                                                    May 31, 2012

---

## 161

1    A. I don't know.
2    Q. (By Mr. Gear) Are you aware of any allegations
3    what so never the State of Texas of students who have
4    falsely used a student identification card?
5    A. I don't have any knowledge.
6    Q. Do you see that SB 14 also does not include a
7    valid employee identification card?
8    A. Yes, that's correct.
9    Q. Do you know what the basis of the change from the
10   previous voter ID legislation to SB 14, do you know the
11   basis of that change?
12           MR. McKENZIE:  Legislative privilege
13   objection.  Subject, you may answer.
14   A. I can't speak to any reason for change.
15   Q. (By Mr. Gear) In your opinion, would you -- would
16   allowing an employee ID that contains photograph be an
17   effective method of presenting voter fraud?
18           MR. McKENZIE:  If you developed an opinion
19   and factored it in your decision to vote, I would say
20   it's privileged.  If not then you may answer.
21   A. I am going to say privilege on that one.
22   Q. (By Mr. Gear) Are you refusing to answer my
23   question based on the advice of your counsel?
24   A. Yes.
25   Q. Are you aware of any allegations in the State of

---

## 163

1    A. The last page.  Yes.
2    Q. And you see that that page has been signed?
3    A. Yes.
4    Q. And that page has been signed by Governor Rick
5    Perry?
6    A. Uh-huh.  I do.
7    Q. So does that indicate that this is the version
8    that's been passed?
9    A. Yes.
10   Q. Do you have a photo ID with you here today?
11   A. No, sir.
12   Q. Why not?
13   A. I didn't bring anything with me.
14   Q. Is it true that if an individual did not bring a
15   photo ID to the polling place, if SB 14 was adopted,
16   that they would not be allowed to vote regular ballot?
17   A. Regular ballot, yes.
18   Q. Do you have an opinion as to whether that places
19   a burden on a legitimate voter when attempting to cast a
20   ballot in the State of Texas?
21           MR. McKENZIE:  Same objection.  If you
22   gathered that opinion before the vote and used it and it
23   factored into your vote, then it's privileged.  If you
24   got it separate and apart from your legislature you can
25   answer.

---

## 162

1    Texas where an individual has used a voter -- an
2    employee identification card to impersonate someone else
3    at the polling place?
4            MR. McKENZIE:  Same objection.
5    A. Legislative privilege on that.
6    Q. (By Mr. Gear) Are you aware of any investigations
7    by any entity in the State of Texas that involved an
8    individual who used a employee identification card to
9    impersonate someone else at a polling place?
10           MR. McKENZIE:  Again, if the awareness of
11   these investigations factored into your duty as a
12   legislator, I instruct you not to answer.  Otherwise,
13   you may answer if it's public record or general
14   legislative purpose.
15   A. I'll claim legislative privilege.
16   Q. (By Mr. Gear) And you see that SB 14 also does
17   not include Section B or the information acceptable
18   regarding acceptable proof of identification under --
19   strike that.  That made no sense.  You see that SB 14
20   does not include official mail addressed to a person by
21   name from a governmental entity?
22   A. This version of Senate Bill 14 does not.
23   Q. And so let's be clear for the record, when you're
24   talking about this version of Senate Bill 14, do you see
25   the last page of SB 14?

---

## 164

1    A. Legislative privilege.
2    Q. (By Mr. Gear)  Are you refusing to answer my
3    question base on the advice of counsel?
4    A. Yes.
5    Q. Was photograph -- was the voter ID declared an --
6    a legislative emergency?
7    A. Yes.
8    Q. Do you know why voter ID was declared a
9    legislative emergency?
10           MR. McKENZIE:  Again you can answer this to
11   public record.  Prior conversations are privileged.
12   A. Legislative privilege.
13   Q. (By Mr. Gear)  Are you refusing to answer my
14   question based on the advice of your counsel?
15   A. Yes.
16   Q. Do you know who was responsible for declaring
17   voter ID to be a legislative emergency?
18   A. The governor.
19   Q. Were you part of any communication concerning the
20   issue of declaring voter ID as a legislative emergency?
21   A. No, sir.
22   Q. Was your staff present during any communications
23   regarding declaring voter ID as a legislative emergency?
24   A. No, sir.
25   Q. Are you aware of any communications that have

Larry Gonzales                                                                  May 31, 2012

---

165

1   been obtained in your office by either you or your staff
2   that relates to declaring voter ID as a legislative
3   emergency?
4       A. No, sir.
5       Q. Was there any election set the occur 60 days
6   before SB 14 was considered by the Legislature?
7       A. Sixty days before the Senate Bill was brought up?
8       Q. Yes.
9       A. Let's see the date. It was brought up on January
10  12th. So 60 days, November 12th. Is that what you're
11  asking?
12      Q. Was there any election that was 60 days before SB
13  14 was brought up by the Senate?
14      A. Close. I'm not sure if it's exactly 60. It may
15  be 65 or 70.
16      Q. So as you sit here today, you're not sure?
17      A. I'm not sure. It's close.
18      Q. Why was SB 14 declared an emergency?
19          MR. McKENZIE: Again, you may answer as a
20  matter of a public record. Otherwise, private
21  communications legislative privilege.
22      A. Legislative privilege. I'll take that.
23      Q. (By Mr. Gear) What was the purpose of Senate Bill
24  14?
25          MR. McKENZIE: Again, you may answer if its

---

166

1   public record, your own personal purpose. If it is not
2   communicated publicly, it's privileged.
3       A. Relating to requirements to vote, including
4   presenting proof of identification.
5       Q. (By Mr. Gear) Are you reading from an exhibit?
6       A. Yes. I don't know if this is an exhibit. Does
7   it have a number on it?
8       Q. It does not?
9       A. I didn't know.
10      Q. Just note for the record that the witness was
11  reading from the Texas Legislature online history 82nd
12  legislative session dated May 27, 2011. Do you have any
13  independent knowledge of why SB 14 was declared
14  legislative emergency?
15          MR. McKENZIE: Again, you can answer as a
16  matter of public record.
17      A. Legislative privilege.
18      Q. (By Mr. Gear) Do you have any independent
19  knowledge as to why -- what the purpose of SB 14 was?
20          MR. McKENZIE: Same objection.
21      A. Legislative privilege.
22      Q. (By Mr. Gear) Does SB 14 address the issue of
23  voter impersonation?
24      A. Yes.
25      Q. And we talked about voter impersonation on the

---

167

1   record already and you defined that, correct?
2       A. Yes.
3       Q. Other than voter impersonation, does it address
4   any other type of voter fraud?
5       A. It does not.
6       Q. Are you familiar with the House Research
7   Organization?
8       A. Yes.
9       Q. And can you tell me does the House Research
10  Organization have a membership?
11      A. Yes, it does.
12      Q. How are members selected?
13      A. I don't know. I think they're appointed, but I
14  don't know how you get on an HRO.
15      Q. Are you a member of the House Research
16  Organization?
17      A. No.
18      Q. Do you know what the appointment process?
19      A. I do not.
20      Q. Can you explain the purpose of the House Research
21  Organization?
22      A. They provide background on the legislation that
23  we're going to consider on the House floor.
24      Q. And do they do that for every bill or select
25  bills?

---

168

1       A. Select bills.
2       Q. Did they do this for SB 14 during the 2011
3   session?
4       A. I don't recall.
5       Q. Do you recall reviewing any reports or analysis
6   from the House Research Organization in 2011?
7       A. I don't recall.
8       Q. Does the House Research Organization set policy
9   for the House?
10      A. No.
11      Q. But they do conduct research; is that correct?
12      A. Yes.
13      Q. Do they take testimony? We're talking generally,
14  at this point about --
15      A. They call the author -- well, actually what they
16  do is they call people who have an interest in the bill
17  and ask them what their, you know, concerns are, what
18  their, you know, pro, con, so they'll call different
19  people to ask different opinions that we as members can
20  see supporters say and opponents say.
21      Q. Do House members rely on the information or the
22  reports that are provided by the House Research
23  Organization?
24      A. I can't speak to other members at all, what they
25  think of that.

Larry Gonzales                                                    May 31, 2012

---

### 169

1  Q. Do you rely on information that's provided by the
2  House Research Organization?
3  A. I read it. I don't rely on it.
4  Q. Is there a standard that the House Research
5  Organization has to follow when conducting research on a
6  select bill?
7  A. I'm not familiar with their process.
8  Q. Do you -- House members -- would you generally
9  find reports issued by the House Research Organization
10  reliable?
11  A. Yeah. Yeah. Rather, I believe that is what they
12  were told by the people they called. Yes. And I
13  believe that they reflect that accurately from what they
14  were told, yes. But I don't rely on them.
15  Q. Is it accurate to say that the House Research
16  Organization provides impartial information on
17  legislation and issues before the Texas Legislature?
18  A. To the degree that they're just reporting what
19  they heard from the other people.
20  Q. What, if any regulation or guidelines, and I
21  believe you testified to this, are they required to
22  follow when conducting and analysis of a bill?
23  A. I do not know their process.
24  Q. Does the HRO, or the House Research Organization,
25  publish or distribute their findings of its analysis?

---

### 170

1  A. Yes.
2  Q. And generally is the House Research Organization
3  analysis distributed to House members?
4  A. Yes.
5  Q. And how would that be distributed?
6  A. Distributed on our desk the day we vote and also
7  online, always available online.
8  Q. And are those called the daily floor reports, the
9  ones that are distributed on your desk?
10  A. They have a blue cover. I don't know what it's
11  called.
12  Q. Let's see, I think this would be 221 if I'm
13  correct.
14       (Exhibit No. 221 was marked.)
15  BY MR. GEAR:
16  Q. I handed you what's been marked as Exhibit 221.
17  Take your time and we're going to talk about it.
18  A. Okay.
19  Q. Can you identify this? What is this?
20  A. This is a post session report from the House
21  Research Organization on the major issues. And Page 55
22  and 56 have been photocopied, requiring voters to
23  present photo ID.
24  Q. Okay. And you see that this is dealing
25  specifically with SB 14 in the left-hand corner?

---

### 171

1  A. Left-hand corner?
2  Q. Page 55, left-hand corner.
3  A. Yes.
4  Q. And what does that say?
5  A. Requiring voters to present photo ID, Senate Bill
6  14 by Fraser, generally effective January 1, 2012.
7  Q. And it's your testimony, as I understand it, that
8  the House Research Organization calls individuals to
9  understand what the issues are related to a particular
10  bill?
11  A. Yes.
12  Q. Okay. And do you see on Page 55 where it says,
13  "supporters said"?
14  A. Yes, sir.
15  Q. Indicating that SB 14 would strengthen the
16  election process. Do you agree with that position?
17       MR. McKENZIE: I'm going to object to the
18  extent it reflects your personal opinions and you
19  factored into your vote. To the extent you didn't, you
20  may answer.
21  A. I -- I'll take the legislative privilege on that.
22  Q. (By Mr. Gear) Do you have a personal opinion as
23  to whether or not SB 14 would strengthen the election
24  process?
25       MR. McKENZIE: Same objection to the extent

---

### 172

1  you have one. If it's not the same as the one you
2  considered when you voted on the bill. You may answer
3  if you don't have any separate.
4  A. Legislative privilege.
5  Q. (By Mr. Gear) And was it your testimony that you
6  don't rely on information produced by the House Research
7  Organization?
8  A. To make my decision, that's correct.
9  Q. But it was your testimony that you believe that
10  the information that's produced by the House Research
11  Organization is reliable?
12  A. It's reflective of what they were told.
13  Q. Also directing your attention to Page 55,
14  "supporters said the bill would deter voter fraud." Do
15  you see that?
16  A. Yes.
17  Q. Do you have a position as to whether or not SB 14
18  would deter voter fraud?
19       MR. McKENZIE: Same objection. Object on
20  legislative privilege grounds. To the extent you have
21  an opinion different from the one you considered in
22  voting or didn't have an opinion when you voted on the
23  subject you may answer. Otherwise I'm going to instruct
24  you not to answer on legislative privilege grounds.
25  A. Okay. Legislative privilege on that question.

Larry Gonzales                                                    May 31, 2012

---

173

1    Q. (By Mr. Gear)  Are you refusing to answer my
2  question based on advice of counsel?
3    A. Yes.
4    Q. Do you see where it says keep in eligible voters
5  from voting?
6    A. Yes.
7    Q. Do you recall if there was public debate
8  regarding that particular issue?
9    A. Yeah.  During the debate on the floor.
10    Q. Do you recall that ineligible voters also
11  included undocumented citizens or illegal aliens?
12    A. I don't remember that part of the conversation.
13    Q. Do you know if SB 14 was passed, in part, to
14  prevent undocumented citizens or illegal aliens from
15  voting?
16        MR. McKENZIE:  Again, you may answer as a
17  matter of public record.  If it reflects private
18  conversations with legislators and factored into your
19  vote, I will instruct you not to answer.
20    A. Legislative privilege.
21    Q. (By Mr. Gear)  Are you refusing to answer my
22  questions based on the advice of your counsel?
23    A. Yes.
24    Q. Do you have an opinion as to whether SB 14 was
25  passed, in part, to prevent undocumented non-citizens or

---

174

1  illegal aliens from voting?
2        MR. McKENZIE:  Again, to the extent you
3  developed that opinion as part of your duties as a
4  legislator and its not public, I instruct you not to
5  answer.  You may answer as a general legislative purpose
6  and matter of the public record.
7    A. Legislative privilege.
8    Q. (By Mr. Gear) Do you see where it said -- where
9  it says SB 14 would promote a higher turnout, also on
10  Page 55?
11    A. Yes.
12    Q. Do you have an opinion as to whether or not SB 14
13  would promote a higher turnout?
14        MR. McKENZIE:  Same objection on legislative
15  privilege grounds.
16    A. I'll claim legislative privilege.
17    Q. (By Mr. Gear) And you're refusing to answer that
18  question on the advice of your counsel?
19    A. That's correct.
20    Q. Was there any public debate during the
21  legislative process for SB 14 regarding SB 14 promoting
22  a higher turnout?
23    A. I don't recall going into that conversation.  Not
24  that I recall.
25    Q. Do you see where it says, also in that same

---

175

1  paragraph, that increasing the criminal penalties for
2  voter fraud would help ensure the integrity of
3  elections?
4    A. Yes.
5    Q. Was there any public debate regarding increasing
6  the voter fraud to ensure the public integrity of
7  elections?
8    A. As per the criminal penalty?
9    Q. Yes.
10    A. I don't recall.  I don't remember.
11    Q. Do you think that increasing criminal penalties
12  would ensure the integrity of elections?
13        MR. McKENZIE:  Objection to the extent it
14  reflects an opinion you developed prior to voting.  If
15  it factored into your voting, if it doesn't meet those
16  requirements and you have an opinion, you may answer
17    A. I will claim legislative privilege.
18        MR. GEAR:  So just so we're clear for the
19  record, I'm asking him about the purpose of SB 14.
20        MR. McKENZIE:  Right.
21        MR. GEAR:  And are you advising him that he
22  should not answer based on legislative privilege?
23        MR. McKENZIE:  Only if it's a -- reflects
24  private, unspoken, individual purposes and motivations
25  to vote.  To the extent it's in the public record and he

---

176

1  can recall that there's something to say about that,
2  then he is free to answer.
3        MR. GEAR:  And I'm being very clear and I
4  don't believe that that's what the court ordered.  So I
5  want to put on the record and I've been asking over and
6  over again if he's following the advice of counsel and
7  he has said over and over again that he is.  I'm going
8  to continue to ask the questions, you know.  We may have
9  to take this up with the Court.
10        MR. McKENZIE:  I understand.  But I was
11  going to ask, I mean, it's our position that we are
12  complying with the court's order, as we understand it.
13  The way I understand the court's order is that general
14  legislative purpose you're allowed to speak about and
15  public record you're -- you're allowed to speak about.
16  And there's no privilege protecting those two items.
17  When it comes to private opinions and private purposes,
18  then it is protected, as far as I understand.  But if
19  you have a court opinion with you right now, I'll be
20  happy to look over it.
21        MR. GEAR:  Can we go off the record?
22        (Discussion off the record.)
23  BY MR. GEAR:
24    Q. So we had a brief conversation off the record
25  regarding legislative privilege.  And I'm going to try

## 177

1  to rephrase some of these questions so that we can try
2  to understand what you know about these particular --
3  about SB 14.  So was the purpose of SB 14 in part to
4  prevent undocumented non-citizens or illegal aliens from
5  voting?
6          MR. McKENZIE:  And I'll just ask a
7  clarifying question.  You mean general legislative
8  purpose when you say SB 14, correct?
9          MR. GEAR:  Yes.
10         MR. McKENZIE:  Okay.  You may answer.
11  A.  I don't know.
12  Q.  (By Mr. Gear) Was the general legislative purpose
13  of SB 14, in part, to promote a higher -- to promote a
14  higher turnout?
15  A.  I don't know.
16  Q.  Was the general legislative purpose of SB 14
17  adopted, in part, or passed, in part, to restore and
18  enhance the public confidence in elections?
19  A.  I am not aware.
20  Q.  Do you have an opinion as to whether or not
21  increasing criminal penalties for voter fraud would
22  ensure the integrity of elections?
23         MR. McKENZIE:  Again, if you have an opinion
24  that's private, do not disclose.  I'll object on
25  privilege grounds or if it factored into your duties as

## 178

1  a legislator.  If you have an opinion separate and apart
2  from that, you may answer.
3  A.  Going to claim legislative privilege on that.
4  Q.  (By Mr. Gear) Have you heard any public debate
5  regarding voter fraud driving honestly -- honest
6  citizens out of the Democratic process?
7  A.  Yes, they did discuss that on the House floor.
8  Q.  Do you know what the basis of that discussion is?
9  A.  No.
10  Q.  What was the general legislative purpose of SB
11  14, each and every purpose that you're aware of?
12  A.  To address the requirements to vote, including
13  presenting proof of identification.
14  Q.  And are you reading from an exhibit?
15  A.  Yes.
16  Q.  And which Exhibit are you reading from, sir?
17  A.  Five.
18  Q.  And five is which Exhibit?
19  A.  That is the signed version of Senate Bill 14.
20  Q.  And you said that there was some public debate
21  about the concern that voter fraud was driving honest
22  citizens out of the Democratic process; is that correct?
23  A.  Yes.
24  Q.  And can you tell me when that conversation took
25  place?

## 179

1  A.  During the floor debate.
2  Q.  Can you tell me what the substance of that
3  conversation was during the floor debate?
4  A.  That there might be people who felt that voter
5  fraud kept them from voting.
6  Q.  Was there any specific allegation that was
7  presented during the floor debate?
8  A.  I don't recall.
9  Q.  Was there any specific investigation --
10  information of investigations that was presented during
11  the floor debate?
12  A.  I don't recall.
13  Q.  Was there any specific information of convictions
14  that was presented during the floor debate, and I'm
15  referencing voter fraud?
16  A.  I don't recall.
17  Q.  Was there any specific allegation of voter fraud
18  that would support that honest citizens were being
19  driven out of the Democratic process that was presented
20  during the legislative debate on SB 14?
21  A.  I think they talked about it.  But I couldn't
22  tell you who or in what context.  I just remember it was
23  going on.
24  Q.  You see -- and again, I'm going to refer you back
25  to the House Research Organization focus report.  Do you

## 180

1  see where it says on Page 55 that "every day
2  circumstances require citizens to present a photo ID."
3  Do you see that at the bottom of Page 55?
4  A.  Bottom right or bottom left?
5  Q.  Bottom right.
6  A.  Yes.
7  Q.  What does that mean?
8  A.  When I read that, I take it to mean that you in
9  your course of business, everyday kind of activities
10  that you have to use -- or have to show a photo ID.
11  Q.  Do you believe this voting is a fundamental
12  right?
13  A.  Yes.
14  Q.  Do you believe that cashing a check is a
15  fundamental right?
16         MR. McKENZIE:  Objection; relevance.  You
17  may answer.
18  A.  I don't even know what the question means.
19  Q.  (By Mr. Gear) Do you believe that travelling on
20  an airplane is a fundamental right?
21         MR. McKENZIE:  Same objection.
22  A.  Yeah.  I don't know what that means.
23         MR. McKENZIE:  You can answer.
24  A.  I don't know what it means.
25  Q.  (By Mr. Gear) Do you have a position regarding

Larry Gonzales                                          May 31, 2012

## 181

1    this statement that was made by supporters of SB 14 that
2    every day circumstances require citizens to present
3    photo ID?
4            MR. McKENZIE:  Object if he developed this
5    position in the course of your duties as a legislator.
6    To the extent you did not develop that opinion in that
7    course, you may answer the question.
8        A.  Can you repeat the question?
9        Q.  (By Mr. Gear) Can you read it back?
10           (Requested question was read.)
11   BY MR. GEAR:
12       Q.  And I would include, including air travel and
13   cashing a check.  Do you have a position on that?
14       A.  I am going to claim legislative privilege on
15   that.
16       Q.  Do you usually carry a photo ID with you?
17       A.  Yes.
18       Q.  But you didn't bring one with you today?
19       A.  No.
20       Q.  And why not?
21       A.  Just didn't bring one.
22       Q.  Do you have an opinion as to whether or not if SB
23   14 is adopted and an individual who just didn't bring a
24   photo ID would be allowed to vote on a regular ballot?
25       A.  Can you ask that again, please?

## 182

1        Q.  A person who didn't bring a photo ID to the
2    polling place and did not have any other forms of
3    allowable identification under the SB 14, would they be
4    allowed to vote a regular ballot?
5        A.  No.
6        Q.  Do you have an opinion as to whether or not
7    stricter identification requirements under SB 14 impose
8    an unreasonable burden on voters?
9            MR. McKENZIE:  If you have a position that
10   you developed during the course of your duties as a
11   legislator and it factored into your vote, I'll instruct
12   you not to answer if it's not public.  If it's public or
13   you developed an opinion outside the legislator, you may
14   answer.
15       A.  Invoke legislative privilege.
16       Q.  (By Mr. Gear) Are you refusing to answer that
17   question on the basis of advice from your counsel?
18       A.  Yes.
19       Q.  During the legislative debate on SB 14, are you
20   aware of discussions on the floor where the issue of
21   stricter identification requirements related to SB 14
22   creating an unreasonable burden on voters?
23       A.  Yes.
24       Q.  Did you respond publicly on the floor to the
25   concerns expressed?

## 183

1        A.  My record in the House journal would reflect
2    that.  I don't have that with me.
3            (Exhibit No. 222 was marked.)
4    BY MR. GEAR:
5        Q.  Can you read my question back?  I'm handing you
6    what's been marked as Exhibit 222.
7        A.  Okay.
8        Q.  Can you identify that for the record?  What is
9    that?
10       A.  This is the House journal from the 82nd regular
11   session of Legislature from Wednesday March 23, 2011.
12       Q.  Now, you've referenced during your deposition
13   several times that the House journal would reflect your
14   testimony on the -- on the House floor; is that correct?
15       A.  That is correct.
16       Q.  And this is the Wednesday March 23, 2011 House
17   journal.  Is this the -- the journal that you were
18   referencing?
19       A.  Yes, sir.
20       Q.  Okay.  So the question that I asked you
21   previously and --
22           (Requested question was read.)
23       A.  Which concerns were you asking me about?
24       Q.  We were talking about the stricter identification
25   requirements would impose an unreasonable burden on

## 184

1    voters.  And you recalled hearing that debate.  And I
2    asked did you respond to those concerns?
3        A.  My questions were as to the word
4    "disenfranchised."  You're using a different word there.
5    What word are you using?
6        Q.  I'm using burden.
7        A.  I spoke to the disenfranchised -- the
8    disenfranchisement of others.
9        Q.  Okay.  Do you have an opinion as to whether or
10   not stricter identification requirements under SB 14
11   would impose an unreasonable burden on voters?
12           MR. McKENZIE:  Same objection.  If you
13   developed the opinion in the course of your duties as a
14   legislator and it's the same today and it's not public,
15   I instruct you not to answer.  If you have an opinion
16   that you developed prior to being in the legislature or
17   has already been publicly stated, you may answer.
18       A.  I'll claim legislative privilege.
19       Q.  (By Mr. Gear) Are you refusing to answer that
20   question on the advice of counsel?
21       A.  Yes.
22       Q.  I just refer your attention back to the House
23   organization focus report.
24       A.  Okay.
25       Q.  Did you ever review the Crawford vs. Marion

Larry Gonzales                                        May 31, 2012

---

### 185

1   County election board decision?
2       A.  No.
3       Q.  Do you know what that is?
4       A.  No.
5       Q.  Are you aware of whether or not SB 14 was based
6   on any other voter ID legislation?
7       A.  I claim legislative privilege on that.
8       Q.  Do you know if SB 14 was based on any other voter
9   ID legislation?
10      A.  Legislative privilege on that, I would like to
11  claim.
12          MR. McKENZIE:  You can answer to the extent
13  it's in the public record if you know it's in the public
14  record.  But if all you know about is in private stuff
15  or private communications in the Legislature, then don't
16  answer.
17      A.  Legislative privilege.
18      Q.  (By Mr. Gear)  Is it your testimony that you don't
19  know it's in the public record -- if there's any
20  testimony in the public record?
21      A.  Yes.
22          MR. GEAR:  I think we need to go off the
23  record and move upstairs.
24          (Discussion off the record.)
25  BY MR. GEAR:

---

### 186

1       Q.  Back on the record.  During your deposition
2   testimony you testified that voting as a fundamental
3   right.  Do you remember that?
4       A.  Yes.
5       Q.  Do you leave it's a right that should be
6   protected by the voting rights acts?
7       A.  Yes.
8       Q.  We also had a discussion on the record about
9   showing ID in everyday life activities.  Do you recall
10  that discussion?
11      A.  Yes.
12      Q.  And do you believe that showing and ID to board a
13  plane or showing and ID to cash a check should be
14  something that's protected by the Voting Rights Act?
15      A.  Yeah.  Voting Rights Act?
16      Q.  That's right.
17      A.  I don't see what that would mean, cashing a check
18  in a voting rights act?
19      Q.  Do you believe -- let me rephrase that so that
20  there's no ambiguity to it.  Do you believe that cashing
21  a check or showing an ID to board a plane is a
22  constitutional right?
23      A.  Constitutional right?
24          MR. McKENZIE:  Objection to the extent it
25  calls for a legal conclusion.  But you may answer it.

---

### 187

1       A.  I don't really know what that -- what you're
2   asking about a constitutional right.
3       Q.  (By Mr. Gear)  Do you understand what I'm
4   referencing when I talk about the Constitution?
5       A.  Yes.
6       Q.  And for your purposes we can talk about the State
7   of Texas, they have a constitution, correct?
8       A.  Yes.
9       Q.  And is showing an ID to board a plane covered
10  under the State of Texas Constitution?
11      A.  I wouldn't know.
12      Q.  Do you have a right to board a plane?
13      A.  I don't know.  I don't know.  If it's a private
14  business, no.
15      Q.  It's not a trick question.
16      A.  I don't understand your question.  I don't
17  understand the question.
18      Q.  Okay.  The question was do you have a right to
19  board a plane?
20      A.  I -- I don't know.
21      Q.  Okay.  During the legislative debate for SB 14,
22  do you recall public discussion regarding the
23  implementation of SB 14 would create an obstacle for
24  minority voters?
25      A.  Yes.

---

### 188

1       Q.  And can you tell me what the substance of that
2   discussion was?
3       A.  That it's an obstacle for minority voters.
4       Q.  Obstacle in what ways?
5       A.  I don't recall.  It was a very long conversation.
6   I don't recall the specifics of a 14-hour debate.
7       Q.  Do you recall distance being discussed?
8       A.  Yes.
9       Q.  And that was described as an obstacle?
10      A.  Yes.  But not as per minority that you're asking
11  about, I don't think.  I don't know that that link was
12  made.  I don't recall that link being made.
13      Q.  Well, and I'm specifically asking you regarding
14  minority voters.  Was there concern expressed during the
15  legislative debate for SB 14 that would create an
16  obstacle for minority voters?
17      A.  Not that I recall.  The obstacle that I remember
18  was regionally.  It was regional argument that it was
19  too far.  That's what I recall from the floor.  It was a
20  regional argument.
21      Q.  Do you have a position whether or not the
22  implementation of SB 14 would create an obstacle for
23  minority voters in terms of distance?
24          MR. McKENZIE:  Object on the grounds of
25  legislative privilege.  If you developed the opinion in

Larry Gonzales                                                    May 31, 2012

---

189

1  the course of deliberating your vote on that bill.  If
2  you have an opinion separate and apart from that, then
3  please, answer the question.
4      A.  Legislative privilege.
5      Q.  (By Mr. Gear) Are you refusing to answer my
6  question base on the advice of counsel?
7      A.  Yes.
8      Q.  We also talked during your deposition about DPS
9  offices and I asked you the question whether or not you
10 had any knowledge of counties that do not have a DPS
11 office.  Do you recall that?
12     A.  I do.
13     Q.  Do you recall what your answer was?
14     A.  That I don't have any knowledge of DPS offices,
15 essentially.
16     Q.  Do you recall any public debate regarding DPS
17 offices during the legislative debate on SB 14?
18     A.  Just that Pete Gallegos said it would be a far
19 distance to travel.
20     Q.  I direct your attention to Exhibit 221 Page 56,
21 top right-hand corner.  There's no DPS office in 77 of
22 Texas's 54 counties.  Do you see that?
23     A.  Yes.
24     Q.  Do you recall that being part of the public
25 legislative debate on SB 14?

---

190

1      A.  No.  I don't remember.
2      Q.  Do you recall the second sentence here, "the bill
3  also would give election workers too much power and pave
4  the way for discrimination."  Do you recall that being
5  part of the public legislative debate?
6      A.  I don't remember that being discussed.
7      Q.  Do you recall during the legislative debate that
8  there was concern that SB 14, if adopted, would suppress
9  the rights of eligible voters?
10     A.  Yes.  I remember -- I remember that.
11     Q.  What did supporters of SB 14 say in response to
12 that concern?
13     A.  I don't recall what the supporters were saying.
14 I just remember the conversation was that it would --
15 and I can't tell you who was saying it.  But they were
16 testifying that it would be.  But I can't -- I don't
17 recall the dialogue back and forth.
18     Q.  You are a supporter of SB 14?
19     A.  I voted for SB 14, yes.
20     Q.  Did you express publicly any response to the
21 concern that SB 14 would suppress voting among eligible
22 voters?
23     A.  My public testimony in the House journal had to
24 do with disenfranchisement.
25     Q.  So the answer the that is, no?

---

191

1      A.  That is correct answer.
2      Q.  Let's talk about your testimony.  And I'm
3  referring you to what's been marked as Exhibit No. 9,
4  the House journal?
5      A.  I've got Exhibit 222.
6      Q.  Okay.  Okay.  For this deposition it is marked as
7  Exhibit No. 222.  Do you see where you provide testimony
8  there?
9      A.  I did earlier.  Let me get back to it.  But I
10 did.  Yes.
11     Q.  Can you tell me what page that's on, please?
12     A.  It starts on Page 1036.
13     Q.  This discussion that you've referenced several
14 times in your deposition occurred on March 23, 2011?
15     A.  Yes.
16     Q.  And that was during the 82nd Legislature regular
17 session?
18     A.  Yes.
19     Q.  And the discussion that you referred to occurred
20 between yourself and Representative Harless?
21     A.  Correct.
22     Q.  And Representative Harless is a cosponsor of the
23 bill?
24     A.  I believe she would be listed as the sponsor.
25 But I would have to look at that thing you gave me.

---

192

1      Q.  So she sponsored the bill in the House?
2      A.  I don't know.  I have to look at that sheet.
3      Q.  Take your time.
4          MR. McKENZIE:  I wouldn't have any of the
5  originals.
6      A.  I don't have any -- what I have is for the
7  previous sessions.
8          MR. GEAR:  Why don't we go ahead and mark
9  this as an exhibit if we refer to the referencing it.
10         (Exhibit No. 223 was marked.)
11 BY MR. GEAR:
12     Q.  So I'm showing you what's been marked as
13 Exhibit 223.  And again, this is a document that we've
14 referenced in your deposition.  Can you identify it
15 again, for the record?
16     A.  Yes.  This is the Texas Legislature online
17 history of Senate Bill 14.
18     Q.  And the question that just before you is, was
19 Representative Harless a sponsor or cosponsor of Senate
20 Bill 14?
21     A.  She is a sponsor.
22     Q.  Can you identify any actions taken by
23 Representative Harless to ensure that ethnic minorities
24 were not disenfranchised by SB 14?
25     A.  To the extent that I asked her in public record,

Larry Gonzales                                    May 31, 2012

---

193

1   I asked her from the House floor.
2       Q.  What did you ask her from the House floor?
3       A.  I asked her, is it your intention for this bill
4   to disenfranchise ethnic minority voters.
5       Q.  And her response?
6       A.  No, sir.
7       Q.  And my question to you was, can you identify any
8   actions taken by Representative Harless to ensure that
9   SB 14 did not disenfranchise ethnic minorities?
10      A.  There's nothing in the record that indicates
11  that.
12      Q.  Are you aware of any private communications with
13  Representative Harless that would support that she took
14  some action to ensure that ethnic minorities were not
15  disenfranchised by SB 14?
16          MR. McKENZIE:  I'm going to object on
17  legislative privilege grounds.
18      A.  I'll claim legislative privilege on that
19  question.
20      Q.  (By Mr. Gear)  Are you aware of any
21  communications, including documents on the public
22  record, that would support that SB 14 did not
23  disenfranchise ethnic minorities?
24      A.  No.
25      Q.  Is there any report or analysis that was

---

194

1   presented during the public debate on SB 14 that
2   supports the position that SB 14 will not disenfranchise
3   ethnic minorities?
4       A.  Not that I recall.  I don't remember.
5       Q.  As you sit here today, you -- do you know of any?
6       A.  That this bill would disenfranchise voters, is
7   that what you're asking?
8       Q.  Specifically I asked is there any report or
9   analysis that was presented during the public debate on
10  SB 14 that supports the position that SB 14 will not
11  disenfranchise ethnic minorities?
12      A.  I don't recall.
13      Q.  And my question following up your answer was, as
14  you sit here today, are you aware of any analysis or
15  report that supports that position?
16          ATTORNEY2:  I'm going to object to the
17  extent you received a report in private prior to voting
18  for a bill.  But if you know of anything after
19  legislative or before your time as a legislator that
20  reflects that, you may answer the question.
21  BY MR. GEAR:
22      Q.  Just so the record is clear, I asked you during
23  the public debate?
24      A.  Okay.  I don't recall.
25      Q.  Are you aware of any private communications?  And

---

195

1   again, I'm referring to communications off the public
2   record that support the position that SB 14 will not
3   disenfranchise ethnic minorities?
4           MR. McKENZIE:  I'm going to object to the
5   extent it reflects legislator communications.  You may
6   answer as to non-legislator communications to the extent
7   there are any.
8       A.  I'm claim the legislative privilege.
9       Q.  (By Mr. Gear) What, if any, actions did you take
10  to ensure that SB 14 would not disenfranchise ethnic
11  minority voters?
12          MR. McKENZIE:  I'm going to object to the
13  extent it's not public record.  But answer to the extent
14  it's public record.
15      A.  I asked Patricia Harless these questions that are
16  in the House journal.
17      Q.  Is that the only public action that you took to
18  ensure that SB 14 would not disenfranchise minority
19  voters?
20      A.  As I recall, yes.
21      Q.  Have you ever heard a legislator who voted in
22  favor of SB 14 explain that voter ID would prevent any
23  minority voter from voting?
24          MR. McKENZIE:  I'm going to object on
25  legislative privilege grounds, to the extent if reflects

---

196

1   private and non-public communications.  You may answer
2   if its public.
3   BY MR. GEAR:
4       Q.  Let's start with the public record.
5       A.  I don't have any knowledge of that.
6       Q.  And so is the answer, no?
7       A.  I don't have any knowledge of that.
8       Q.  You referenced during your deposition that there
9   was some discussion about the timing of when you would
10  speak on the record.  Do you recall that?
11      A.  Yes.
12      Q.  And when you talk about the timing of what would
13  be said is -- is this what -- is this exhibit and the
14  testimony that you gave, does that -- is that related to
15  the timing of when you would make this statement?
16          MR. McKENZIE:  I'm going to object to the
17  extent it deals with issues that are private
18  communications between other legislators and your
19  personal deliberations on when to reveal this
20  information.  But you may answer it to the extent it
21  that's matter of public record.
22      A.  Legislative privilege on that, I'll claim.
23      Q.  (By Mr. Gear)  Did you have any discussions with
24  any legislators about what you would say on the record
25  to Representative Harless?

Larry Gonzales                                          May 31, 2012

---

197

1          MR. McKENZIE:  Again, I'm going to object to
2    the extent you didn't actually say anything on the
3    record.
4          A.  Legislative privilege.
5          Q.  (By Mr. Gear) Are you following the advice based
6    on the advice of counsel not to answer this question?
7          A.  Yes.
8          Q.  Were the -- did you prepare in advance for the
9    questions that you asked Representative Harless on the
10   record?  It's a yes or no answer?
11         A.  Or I can claim legislative privilege on that one,
12   as well.
13         Q.  Well, the question is before you.
14         A.  Can you repeat the question?
15         MR. GEAR:  Can you read it back?
16         (Requested question was read.)
17         MR. McKENZIE:  I think you can answer to the
18   extent it says what you did to prepare or anything else
19   to that effect it would probably be privileged.  But the
20   mere fact that you prepared, I think you can answer the
21   question.
22         A.  As you'll see in the video, it clearly shows that
23   I'm reading these questions that I have written out
24   prior to getting to the microphone.
25         Q.  (By Mr. Gear) Is the answer to that, yes?

---

198

1          A.  Yes.
2          Q.  When did you prepare the questions that you asked
3    Representative Harless on the record on March 23, 2011?
4          A.  Oh, gosh.  Toward the very end of the day.
5          Q.  You're referencing March 23rd?
6          A.  Oh, yeah.  Well, March 23rd, yes.
7          Q.  Was the preparation of the questions that you
8    asked Representative Harless on the record on March 23rd
9    the subject of any communications with any other
10   legislators?
11         MR. McKENZIE:  I'm going to the object on
12   privileged grounds to the extent that those
13   communications are not public.
14         A.  Legislative privilege on that.
15         Q.  (By Mr. Gear) And the question is, what is the
16   subject of any communications with any other
17   legislatures.  I'm not asking you about the substance of
18   it?
19         MR. McKENZIE:  I'm still going to object.
20   It's a fine line between subject and substance.
21   BY MR. GEAR:
22         Q.  Are you refusing to answer that question based on
23   advice of your counsel?
24         A.  Legislative privilege, yes.
25         Q.  Who was present, if anyone else, while you

---

199

1    prepared the questions that you asked Representative
2    Harless on the record on March 23, 2011?  The question
3    is, who was present?
4          A.  Nobody.
5          Q.  Where did you prepare these questions?
6          A.  At my desk.
7          Q.  In your Austin office?
8          A.  No.
9          Q.  On the floor?
10         A.  Yes.
11         Q.  Were there other legislators in the -- on the
12   floor at the time you prepared these questions?
13         A.  It was during debate, so yes.
14         Q.  Did you receive assistance from any other --
15   other legislators?
16         A.  No.
17         MR. McKENZIE:  I was going to object the
18   word "assistance," would reveal communications by the
19   legislators.
20   BY MR. GEAR:
21         Q.  Were the -- in preparation for the questions for
22   Representative Harless, did you receive any -- was it
23   the subject of any e-mails or text messages?
24         MR. McKENZIE:  I'm going to object on the
25   same grounds.

---

200

1          A.  Legislative privilege, I'll claim on that one.
2          Q.  (By Mr. Gear) Are there any e-mails or text
3    messages that exist regarding communications in
4    preparation for the questions that you asked
5    Representative Harless on March 23, 2011?
6          A.  I don't know.
7          Q.  Did you send any e-mails or text messages in
8    preparation for the questions that you asked
9    Representative Harless on March 23, 2011?
10         MR. McKENZIE:  I'm going to object to the
11   extent that his communications were to other legislators
12   in a private, not disclosed.  But to the extent there
13   weren't other legislatures in the work process, you may
14   answer.  Assuming there were any communications.
15   BY MR. GEAR:
16         Q.  And I want to be clear that all of these
17   questions that I'm asking are based -- privilege log
18   questions.  Who, what, when, where.  And that there's a
19   ruling that's pending by the Court and we have a right
20   to create a privilege log during this deposition of the
21   who, what, when and where.  And that's what I'm asking
22   right now.  And so the question is before you, are you
23   refusing to answer that question based on the advice of
24   your counsel?
25         A.  Yes.

## 201

1        MR. McKENZIE:  Can I have you read it back
2  to me real quick?
3        MR. GEAR:  Sure.
4        (Requested question was read.)
5        MR. McKENZIE:  My concern is that the
6  subject of that question contains -- the subject of that
7  question contains a lot of the subject matter that may
8  have been communicated.  So that's why I lodged the
9  objection.  I'm afraid it might reveal more than a
10  privilege log would reveal and possibly risk disclosure.
11  So that's why I'm lodging the objection.  I'll allow the
12  same objection to the extent it's to other legislatures.
13  I instruct you not to answer if it was public, or to
14  non-legislators you may answer.
15    A.  Claim legislative privilege.
16    Q.  (By Mr. Gear) And you're refusing to answer that
17  question on the advice of your counsel?
18    A.  Yes.
19    Q.  During the public debate on SB 14, were you aware
20  of the concern expressed by opponents that minority
21  voters were less likely to possess the allowable forms
22  of ID required pursuant to SB 14?
23    A.  Yes, I remember that part.
24    Q.  And do you recall what the supporters of SB 14,
25  how they responded so that concern?

## 202

1    A.  No, I don't.
2    Q.  Do you believe -- do you have an opinion that
3  minority voters in the State of Texas are less likely to
4  have the allowable form of ID under SB 14?
5        MR. McKENZIE:  Object to the extent you
6  developed that opinion in the course of your
7  deliberations on SB 14 and prior to voting.  To the
8  extent you have an opinion prior to that, you may
9  answer.
10    A.  I claim legislative privilege.
11    Q.  (By Mr. Gear) I want to ask you to you have a
12  personal opinion?
13        MR. McKENZIE:  Same objection to the extent
14  the opinion was developed in the course of your
15  legislative duties.
16    A.  I'll tell you legislative privilege.
17    Q.  (By Mr. Gear) Well, as a member of the minority
18  community, and I believe you identified on the record
19  that you were Hispanic, do you have an opinion as to
20  whether or not minority voters are less likely to have
21  the allowable forms of ID under SB 14?
22    A.  I'll claim legislative privilege.
23    Q.  Are you refusing to answer that question on the
24  basis of -- on the advice of your counsel?
25    A.  Yes, sir.

## 203

1        MR. GEAR:  And again, for the record, I
2  don't believe it's a privilege -- a legislative
3  privilege if he has an opinion.  As to the substance of
4  any opinion that he has.  I just don't believe that
5  that's a legislative privilege.  But I understand your
6  instruction.  And I understand that he's following your
7  instructions.
8        MR. McKENZIE:  In that case, the mere
9  existence of an opinion, you can answer if you have an
10  opinion, yay or nay.  The substance of that opinion, I
11  would instruct you not to answer.
12  BY MR. GEAR:
13    Q.  And just so we're clear on the record, again, I
14  ask you, a member of the minority community, and I
15  believe you identified yourself as Hispanic on the
16  record.  Do you have an opinion as to whether or not
17  minority voters are less likely to possess the allowable
18  forms of ID that are required under SB 14?
19        MR. McKENZIE:  Sorry.  The objection I think
20  is proper because you're asking him if he has an
21  opinion.  And then the following piece of it is that
22  minority voters are less likely to have IDs, so that
23  would reveal the subject of his opinion whether or not
24  he believed that to be a true fact.  If he developed
25  that in the course of deliberating on his vote, I would

## 204

1  object privilege.  If the question was merely does he
2  have an opinion on who among the minority community has
3  an ID, I think you can answer that, what the rates of it
4  are.
5  BY MR. GEAR:
6    Q.  Who is Ann McGeehan?
7        REPORTER:  Who?
8        MR. GEAR:  Ann McGeehan, M-C-G-E-E-H-A-N.
9    A.  I don't know who that is, or don't recall who she
10  is.
11    Q.  (By Mr. Gear) Was she with the Secretary of
12  State's office?
13    A.  I have no idea.
14    Q.  Do you recall the Secretary of State's office
15  providing testimony during the legislative debate for SB
16  14?
17    A.  No.
18    Q.  I believe you testified previously that you were
19  aware that there was testimony that over 600,000 voters
20  in the State of Texas may lack the State issued driver's
21  license or ID required under SB 14; is that right?
22    A.  That's what I've read.
23    Q.  And where did you read that?
24    A.  The Austin American-Statesman.
25    Q.  Do you have an opinion on this issue?

Larry Gonzales                                              May 31, 2012

---

## 205

1  A. Yes.
2  Q. What is your opinion on this issue?
3  MR. McKENZIE: Objection to the extent you
4  developed it as part of your deliberations as a
5  legislator. If you developed it independently, you may
6  answer.
7  A. Yeah. On -- I forget the question, again.
8  MR. McKENZIE: What is the substance of the
9  opinion about the 600,000 voters approximately who may
10  lack a photo ID.
11  A. The fact that I read it in the Statesman and it
12  was a follow-up questions. I can't remember.
13  Q. (By Mr. Gear) I'm asking you what your opinion on
14  that is?
15  A. Oh, that, I will claim legislative privilege on.
16  (Exhibit No. 224 was marked.)
17  BY MR. GEAR:
18  Q. Before we go to Exhibit 224, do you have an
19  opinion as to whether minority voters are less likely to
20  have proper ID under SB 14?
21  MR. McKENZIE: To the extent you developed
22  that during the course of deliberating on your vote, I
23  instruct you not to answer. If it's public or you
24  developed it after the voting of SB 14, you may answer
25  the question.

---

## 206

1  BY MR. GEAR:
2  Q. And that's a "yes" or "no" answer.
3  A. Well, I'm talking about -- I'm talking about the
4  disenfranchised.
5  Q. Wait a second? You're looking at Exhibit --
6  A. 224.
7  Q. 224. I'm asking you specifically -- and I'm not
8  asking about that exhibit?
9  MR. McKENZIE: Whether or not -- whether or
10  not he has an opinion?
11  BY MR. GEAR:
12  Q. I'm asking if you have an opinion. And I'm sorry
13  if that was confusing.
14  A. Yeah. If I have an opinion whether minorities
15  are disenfranchised?
16  Q. No. Are less likely to possess the required ID
17  under SB 14?
18  A. I don't have an opinion.
19  Q. Are you concerned if -- if the concerns that were
20  expressed by the opponents of SB 14 are accurate, are
21  you concerned that that would have a disproportionate
22  affect on minority voters in the State of Texas?
23  MR. McKENZIE: I'll object to the extent you
24  developed a concern in the course of your voting or
25  deliberations to vote. If you have a concern that was

---

## 207

1  developed after the fact, you may answer the question.
2  A. My concerns are in the House journal with my
3  conversations with Patricia Harless.
4  Q. (By Mr. Gear) And specifically, what concerns do
5  you express there?
6  A. I don't. I asked questions. I asked her if it
7  was her intention for the bill to disenfranchise ethnic
8  minority voters. And then I asked if there was anybody
9  who joint authored or co-authored the bill, if it was
10  their intention to disenfranchise the minority voters.
11  Q. Are you aware of any public communications or
12  analysis of documents which would support that, either
13  co-authors or co sponsors or authors or anyone that was
14  related to -- involved in drafting SB 14, are you aware
15  of any steps that they took to ensure that SB 14 would
16  not disenfranchise ethnic minority voters?
17  A. The purpose of asking the questions was to -- was
18  to find that exact point. And that's why I asked --
19  that's why I asked the questions.
20  Q. And other than asking the questions and getting
21  and answer, did you take any personal steps to determine
22  if SB 14 would disenfranchise ethnic minority voters?
23  A. No.
24  Q. Turning your attention to what's been marked as
25  Exhibit 224, do you see this?

---

## 208

1  A. Yes.
2  Q. Can you tell me what this is?
3  A. This is a letter to me from Boyd L. Ritchey from
4  the chairman of the Texas Democratic party.
5  Q. You earlier referenced a TV interview that you
6  gave regarding voter ID issues. Do you recall that?
7  A. Yes.
8  Q. And would that be the YNN Capital Tonight
9  interview that aired on October 24th?
10  A. I don't know the date of the airing. But it was
11  the YNN interview.
12  Q. And do you see the statement attributed to you in
13  this October 21, 2011 letter from Boyd Ritchey?
14  A. Quote, "What the Democrats aren't taking into
15  consideration is, the numbers they saw do not include
16  all seven forms of identification. It only includes a
17  few of them. We feel confident that once all forms are
18  included, no one will be disenfranchised and people will
19  have access to the poles. And remember it's about voter
20  integrity in the first place."
21  Q. When you say, "we feel confident," who are you
22  referencing?
23  A. In this particular context, the body, the House,
24  the body.
25  Q. Did the entire body of the House feel confident,

Larry Gonzales                                                    May 31, 2012

## 209

1   based on your knowledge, that SB 14 would not
2   disenfranchise ethnic minority voters?
3       A. I would say there was -- well, you don't have a
4   vote total on this. I would say there were, as
5   indicated by their "I" votes that those that voted "I".
6   But this doesn't have the floor. This is just the
7   committee votes.
8       Q. Well, is it fair to say that not all members of
9   the House voted in favor of SB 14?
10      A. That's correct.
11      Q. Do you know how many Hispanic legislators voted
12  in favor of SB 14?
13      A. Not without having it in front of me. But I
14  would say there were six.
15      Q. You're looking at the online legislative history?
16      A. Correct.
17      Q. And the you're saying that does not reflect the
18  votes?
19      A. It does not reflect the votes. It does not.
20  That is just committee votes.
21      Q. Would you agree that a majority of the House
22  members that were Hispanics did not support and vote in
23  favor of SB 14?
24      A. Yes.
25      Q. Are there any African-American House members?

## 210

1       A. Yes.
2       Q. How many African-American House members voted in
3   favor of SB 14?
4       A. I would have to see the vote totals to know.
5       Q. Are you aware of any that voted in favor of SB
6   14?
7       A. Yes.
8       Q. Do you know who that is?
9       A. I'm pretty sure it was Stephanie Carter.
10      Q. Are you aware of anyone else, other than
11  Stephanie Carter, that is an African-American and House
12  member that voted in favor of SB 14?
13      A. I think James white did, African-American from
14  East Texas but I would have to look at the vote totals.
15      Q. Do you know how many African-American House
16  members there are?
17      A. No.
18      Q. Now, I would just like to ask you again, you
19  reference here that no one will be disenfranchised and
20  people will have access to the poles. Did you take any
21  public steps, anything on the public record during the
22  legislative debates for SB 14, which would support your
23  position that no one would be disenfranchised by SB 14?
24      A. Just the questions I asked of Ms. Harless.
25      Q. Okay. And other than that, you took no other

## 211

1   steps?
2       A. That is correct.
3       Q. Are you aware of anyone regarding -- during the
4   legislative debates for SB 14, who researched this issue
5   or conducted analysis of this issue that supports
6   that -- that no one would be disenfranchised under the
7   provisions of SB 14?
8           MR. McKENZIE: May I ask a clarifying
9   question?
10          MR. GEAR: Sure.
11          MR. McKENZIE: Is that confined to public
12  record or is that --
13          MR. GEAR: The public record.
14      A. I don't know about the public record, other than
15  what's in the bill and the questions that were asked
16  here.
17      Q. (By Mr. Gear) Did you ever publicly inquire,
18  other than your statement here to Representative
19  Harless, to anyone -- other legislator whether or not
20  SB 14 would disenfranchise ethnic minority voters?
21      A. Not that I recall.
22      Q. You referenced seven forms of identification --
23  let me put that into proper context. What the Democrats
24  aren't taking into consideration is, the numbers they
25  saw do not include all seven forms of identification.

## 212

1   What seven forms of identification were you referencing?
2       A. The ones listed in Senate Bill 14. In Section --
3   Section 14 of the bill, which is section 63.0101 of
4   Senate Bill 14. So driver's license, military ID card,
5   citizenship certificate, passport, CHL, driver's
6   license, and State issued ID card and military ID,
7   citizenship certificate, passport, CHL, and I'm counting
8   six.
9           MR. GEAR: Go off the record.
10          (Discussion off the record.)
11  BY MR. GEAR:
12      Q. Were you done?
13      A. Yes.
14      Q. Why did you say in this statement that this is
15  about voter integrity. This is not a purpose of SB 14
16  that you listed earlier; is that right?
17      A. Yeah. It was the integrity of the system, I
18  believe, is what I said. The integrity of the system.
19      Q. Are there other purposes to SB 14 that you're
20  aware of?
21      A. Integrity of the system...
22      Q. As you sit here the day, are you aware of any
23  other purposes of SB 14?
24      A. No. No. It was voter confidence, integrity of
25  the system.

Larry Gonzales                                          May 31, 2012

## 213

1  Q.  Are you aware of the number of minority voters,
2  and when I say "minority voters" I'm referencing Black
3  and Hispanic, who lack a driver's licenses in the State
4  of Texas?
5  A.  No.
6  Q.  Are you aware of minority voters, Black and
7  Hispanic, who lack a State issued identification card
8  from the Department of Public Safety?
9  A.  I read -- I read something that broke those
10  numbers down.  But I can't tell you what I was reading.
11  Q.  Is it fair to say that number of minority voters,
12  Black and Hispanic, that lack allowable driver's license
13  or identification card is higher than Anglos?
14  MR. McKENZIE:  Object to the extent you
15  gathered knowledge like that during legislative process.
16  But if you have never gathered knowledge, you may
17  answer.
18  BY MR. GEAR:
19  Q.  And you're testifying to --
20  A.  I have no idea.
21  Q.  Okay.  Do you know how many minority voters,
22  Black or Hispanic, are in possession of concealed
23  handgun licenses?
24  A.  I don't know that.
25  Q.  Are you aware of any existing communications that

## 214

1  identify how many Texas voters are in possession of a US
2  military card?
3  A.  I don't know that.
4  Q.  Do you know how many minorities, Black or
5  Hispanic, are in possession of a US military card?
6  A.  I don't know that.
7  Q.  Are you aware of any communications -- public
8  communications during the legislative debate on SB 14
9  that would identify how many Texas voters are in
10  possession of a passport?
11  A.  I don't recall that part of the debate.
12  Q.  Are you aware of any existing communication or report
13  that identifies how many Texas voters are in possession
14  of a citizenship certificate with a photo?
15  A.  I'm not.
16  Q.  Citizenship certificates can also be issued
17  without a photo.  Do you know that?
18  A.  No.
19  Q.  Is that "no, they cannot," or "no, you're not
20  aware"?
21  A.  No.  I'm not aware.  Sorry.
22  Q.  Identify any communication that you're aware of
23  that supports your position that no voter will be
24  disenfranchised under SB 14.
25  MR. McKENZIE:  Object to the extent the

## 215

1  communications are private or communications that were
2  had during the legislative process.  But if they are
3  public and not part of the legislative process, you may
4  answer.
5  A.  Just what the -- just what the quote is there.
6  I've already Stated.
7  Q.  (By Mr. Gear) Can you testify to any
8  communication that supports your opinion that no voter
9  will be disenfranchised under SB 14?
10  MR. McKENZIE:  Same objection.
11  A.  Legislative privilege on that.
12  Q.  (By Mr. Gear) And that's -- that's any
13  communication that that would be public or private?
14  A.  Legislative privilege on that.
15  Q.  I don't believe you can assert legislative
16  privilege on public communications.
17  A.  Well, divide the questions up.  What are you
18  asking me?
19  Q.  Are you aware of any communications, public
20  communications that would support your position that SB
21  14 would not disenfranchise ethnic minority voters?
22  A.  Only what's in the record that I asked
23  Representative Harless.
24  Q.  Are you aware of any private communications that
25  exist that support your position that SB 14 would not

## 216

1  disenfranchise ethnic minority voters?
2  A.  And that's the legislative privilege.
3  Q.  Do you believe that SB 14 is color blind?
4  A.  Yes.
5  Q.  What's the basis for your statement?
6  A.  That it doesn't address color.
7  Q.  Well, you heard expressed -- concerns expressed
8  by opponents of the bill that SB 14 would have a
9  disproportionate impact on minority voters.  Do you
10  recall testifying to that?
11  A.  I recall that they said it, yes.
12  Q.  Okay.  Do you have a concern as to whether or not
13  SB 14 would disproportionately impact minority voters?
14  MR. McKENZIE:  I'm going to object to the
15  extent you developed a concern or opinion during the
16  course of your legislative deliberations.  Any opinions
17  independent of that, you may answer the question.
18  A.  As per my interview, I don't think that they will
19  be.
20  Q.  (By Mr. Gear) And do you have any public
21  communication that supports your position that ethnic
22  minorities voters will not be disenfranchised if SB 14
23  is implemented?
24  A.  No.
25  Q.  Can you tell me each and every basis that your --

Larry Gonzales                                          May 31, 2012

---

217

1   that your position that ethnic minorities will not be
2   disenfranchised by SB 14 is based upon?
3          ATTORNEY2:  Objection; vague.  And objection
4   to the extent the communications are not public and
5   legislative communications.  But subject to those
6   qualifications if they are public communications, you
7   may answer.
8      A.  I'm sorry.  Can you ask the question again for
9   me?
10     Q.  (By Mr. Gear) We can strike that question.  All
11  right.  Let me try to wrap this up.  Let me turn your
12  attention to the March 23, 2011 regular session floor
13  debate that you've referenced throughout your
14  deposition.  Could you turn to Page 1016?
15     A.  Okay.  I'm ready.
16     Q.  I direct your attention to amendment No. 55.  Do
17  you see that?
18     A.  I do.
19     Q.  What does this amendment address?
20     A.  The use of voter registration certificate
21  following certain elections.
22     Q.  And what does that reference?
23     A.  Provisional votes.
24     Q.  Do you believe that if amendment No. 55 was
25  adopted that it would have mitigated the impact to

---

218

1   minority voters in reference to SB 14?
2          MR. McKENZIE:  To the extent you have a
3   belief that you developed prior to voting on SB 14 or
4   voting on this amendment, to the extent you could vote
5   on the amendment, I would instruct you not to answer.
6   To the extent you never had an opinion and you developed
7   one after the fact, you may answer the question.
8      A.  I never had an opinion on registration
9   certificate problems.
10     Q.  (By Mr. Gear) If you were aware that SB 14 had a
11  disproportionate impact on minority voters, would you
12  want to remedy that?
13     A.  Yes.
14     Q.  Do you think that amendment No. 55 would have
15  mitigated the impact on minority voters if adopted?
16     A.  I don't know.
17     Q.  Does this amendment, and I'm referring to
18  amendment No. 55, allow the Secretary of State to keep
19  track of provisional ballots by race?
20     A.  Yeah.  It says, "Secretary of State shall
21  determine whether, through out the State, majority of
22  persons who are required to cast provisional ballot were
23  members of a racial or ethnic minority."  So that's what
24  that does.
25     Q.  So again, the question that I had posed to you

---

219

1   is, would this amendment, if adopted, have mitigated the
2   impact on minority voters and I'm referencing SB 14?
3      A.  I don't know.
4      Q.  Let me turn your attention to amendment No. 54 on
5   Page 1015.  Do you see that?
6      A.  Yes.
7      Q.  Can you tell me what this amendment is?
8      A.  Sure.  "The Secretary of State is keeping
9   demographic information relating to eligible voters who
10  are prevented from voting as a result of failure to make
11  requirements for being accepted to vote, and the
12  eligible voters who are required to file provisional
13  ballots as a result of the requirements being accept to
14  vote that include the number of provisional ballots that
15  were not counted."  And then it gives them -- looks like
16  rulemaking authority in Section B.
17     Q.  And this is an amendment that was offered to
18  SB 14?
19     A.  Yes.
20     Q.  And how did you vote on this amendment?
21     A.  I don't know.  Well, the motion was to table and
22  I voted to table.
23     Q.  Why did you vote to table this amendment?
24         MR. McKENZIE:  I'm going to instruct you not
25  to answer to the extent the reasons why you vote and the

---

220

1   way you vote are not public.
2      A.  Legislative privilege.
3      Q.  (By Mr. Gear) Would this amendment allow the
4   Secretary of State to keep tract of provisional ballots
5   cast due to the lack of ID on the basis of race?
6      A.  Let's see here.  I don't see -- and help me on
7   the basis of race -- anywhere in amendment No. 54.  Am I
8   missing that?  It does not say race in amendment 54.
9   And based on my reading, I would say no.
10     Q.  Well, what this does say is that the -- this
11  deals with the Secretary of State recordkeeping,
12  correct?
13     A.  Yes.
14     Q.  And it allows the Secretary of State to keep
15  records showing for the State in each county and each
16  election precinct demographic information related to.
17  Do you see that?
18     A.  Yes.
19     Q.  The eligible voters who were prevented from
20  voting as a result of failing to meet the requirements
21  for being accepted to vote.  Do you see that?
22     A.  Yes.
23     Q.  It also allows the Secretary of State to keep
24  records related to the eligible voters who were required
25  to file provisional ballots as a result -- as a result

Larry Gonzales                                              May 31, 2012

---

221

1   of the requirements for being accepted to vote that
2   include the number of those provisional ballots that
3   were not counted.  Do you see that?
4       A.  Yes.
5       Q.  And Section B says, "the Secretary of State may
6   adopt rules to implement this section, including rules
7   requiring other State agencies and authorities holding
8   elections to record information relevant to the record
9   required by this section."  Do you see that?
10      A.  Yes.
11      Q.  And you voted against that, correct?
12      A.  I voted for the motion to table.
13      Q.  I want to direct your attention to amendment
14  No. 50 which is on Page 1009.
15      A.  Okay.
16      Q.  Can you tell me what this is, the amendment?
17      A.  Amendment by Raymond regarding travel
18  reimbursement program.  It's says "Department of Public
19  Safety shall establish and operate a travel
20  reimbursement program which -- under which individuals
21  whose earnings are not more than 100 percent of the
22  income standard established by applicable federal
23  poverty guidelines, may submit an application for
24  reimbursement to the Department to recover the expenses
25  incurred by the individual travelling to and from the

---

222

1   Department office to obtain a photo identification for
2   purposes of voting."
3       Q.  Do you believe that if this amendment was adopted
4   it would have mitigated the impact to minority voters in
5   reference to SB 14?
6       A.  I don't know if that would have mitigated the
7   minority -- I forget the verb you used.
8       Q.  The impact.
9       A.  Impact.  Impact.
10      Q.  To minority voters who -- in reference to SB 14.
11      A.  I don't know if this would have done that.
12      Q.  I direct your attention to Page 1010, and
13  Representative Raymond's discussion with Representative
14  Phillips.  Representative Raymond indicates rights.  So
15  we've got four million people I would call poor.  I
16  mean, this would be someone who earns, if your an
17  individual, someone who earned $10,800 a year.  If
18  you're a family of two, it would be $14,000 a year.
19  Families earned $10,000 -- families of three, $18,000 a
20  year.  Do you see that?
21      A.  I'm going to reread this real quickly.  Let me
22  read it real quickly.  Yes.
23      Q.  Do you agree with Representative Raymond's
24  position that there are four million Texans who fall
25  below the poverty line or who were considered poor in

---

223

1   the State of Texas?
2       A.  I have no idea if that number is right or not.
3       Q.  Do you have any knowledge of the number of
4   Texans -- Texans who fall below the poverty line in the
5   State of Texas?
6       A.  I do not.
7       Q.  Ir -- if that number was correct, that there are
8   four million Texans who fall below the poverty line, do
9   you believe that the amendment that was offered by
10  Representative Raymond would have mitigated the impact
11  to those poor voters?
12      A.  I don't know if it does that.
13      Q.  Did you make any effort to find out?
14      A.  No.
15      Q.  Why not?
16          MR. McKENZIE:  Object on the basis of
17  legislative privilege, the deliberations during session
18  and if they're public, you may answer.  If they're not I
19  would instruct, you not to answer.
20      A.  Legislative privilege.
21      Q.  (By Mr. Gear) Are you refusing to answer that
22  question based on advice of your counsel?
23      A.  Yes.
24      Q.  Why wouldn't this -- do you have an opinion as to
25  whether or not this amendment would benefit or help poor

---

224

1   voters to obtain allowable forms of ID under SB 14?
2       A.  I don't have -- can you ask me again real
3   quickly?
4          MR. GEAR:  Can you read that back?
5          (Requested question was read.)
6          MR. McKENZIE:  You may answer "yes" or "no."
7   But not the substance, if it's not public, your opinion.
8       A.  I don't think this does what -- I think the
9   answer is no, but I keep forgetting the question.
10      Q.  (By Mr. Gear) Do you need her to read it back?
11      A.  Yes.
12          MR. GEAR:  Could you read it back again
13  please?
14          (Requested question was read.)
15          MR. McKENZIE:  Same objection.
16  BY MR. GEAR:
17      Q.  Do you have an answer?
18      A.  I don't have an opinion.
19      Q.  Turn your attention to amendment No. 35 on Page
20  991.  Do you see that?
21      A.  Not yet.  Okay.
22      Q.  Can you tell me what this amendment is?
23      A.  I don't see an amendment.  I just see a statement
24  of legislative intent.  Am I missing something?  There's
25  not an amendment here.

Larry Gonzales                                                    May 31, 2012

---

### 225

1   Q.  Page 991?
2   A.  Right.
3   Q.  Amendment No. 35?
4   A.  Oh, that one line.  Okay.  Sorry, I missed that.
5   Now that I see the amendment, can you ask me the
6   question again?
7   Q.  What is this amendment?
8   A.  I don't know.  I would have to go back and pull
9   Section 203 and 14 F and 4 of the Voting Rights Act.
10  Q.  Do you see that it references Section 203 and 4F
11  of the Voting Rights Act?
12  A.  203 and 14 F4, yes.
13  Q.  And do you know what Section 203 and 14 F 4 are
14  under the Voting Rights Act?
15  A.  I do not.
16  Q.  If I was to tell you that Section 203 of the
17  Voting Rights Act applies to the Spanish language
18  provisions of the Voting Rights Act, would you agree
19  that it would be necessary in implementing SB 14 to also
20  allow Spanish language provisions?
21  A.  I don't know.  I would need you to sit down with
22  me and show me those sections.
23  Q.  If Section 203 indicated that all election
24  related material needed to be translated into both
25  English and Spanish, do you believe that that's a good

---

### 227

1   the advice of your counsel?
2   A.  That's correct.
3   Q.  Turn to amendment No. 34 which is on Page 987.
4   A.  Okay.
5   Q.  Do you see that?
6   A.  I do.
7   Q.  And can you tell me what amendment No. 34
8   addresses?
9   A.  Section 5, Section 203 and Section 4 F 4 of the
10  Voting Rights Act.
11  Q.  Do you see the public debate between
12  Representative Harless and Representative Raymond where
13  Representative Raymond asks, "do you believe that
14  there's discrimination in the voting place?"  Do you see
15  that?
16  A.  What page do you have there?
17  Q.  Page 897 -- or 987.  I'm sorry.
18  A.  Yes.  I'm sorry.  Yes.  At the top.
19  Q.  And I'll ask you that question, do you believe
20  that there is discrimination in the voting places in
21  Texas?
22  A.  No.
23  Q.  So I'm clear, you do not believe that
24  discrimination occurs at the voting place in -- places
25  in the State of Texas?

---

### 226

1   thing under SB 14?
2       MR. McKENZIE:  I'll object as vague.  But go
3   ahead and answers it.
4   A.  I don't know that I can.  I don't know if that
5   represents what Senator Raymond is trying to address.
6   Q.  Well, what do you think he's trying to address
7   here?
8   A.  I don't know.
9   Q.  How did you vote on this amendment?
10  A.  Okay.  Here we go.  The motion was to table and I
11  voted to table.
12  Q.  And this amendment addresses the Voting Rights
13  Act, correct?
14  A.  Yes.
15  Q.  And you already testified that you believed that
16  the Voting Rights Act should apply to SB 14?
17  A.  Yes.
18  Q.  Why did you vote to table this amendment?
19  A.  Because --
20      MR. McKENZIE:  I'm going to object on
21  legislative privilege grounds to the extent your
22  reasoning is not public.  To the extent it's public, you
23  may answer the question.
24  A.  I'll claim legislative privilege on that.
25  Q.  (By Mr. Gear) And you're not answering that on

---

### 228

1   A.  Correct.
2   Q.  And how did you vote on that amendment?
3   A.  Let's see here.  The motion was to table and I
4   voted to table the amendment.
5   Q.  Turn your attention to Page 979, Exhibit No. --
6   amendment No. 23.  Do you see that amendment?
7   A.  Yes, sir.
8   Q.  Can you tell me what this amendment addresses?
9   A.  This amendment addresses a student ID card issued
10  by a public or private high school or institution of
11  higher education that contains the person's photograph.
12  Q.  What's the purpose of this amendment?
13  A.  I would have to read it in context from
14  subdivision 5, because you're inserting it as a stand
15  alone.  But I don't have the language in front of it.  I
16  don't know what it's purpose is.
17  Q.  Is that language contained without the floor
18  debate of March 23rd?
19  A.  Is the language contained?
20  Q.  Well, you're referencing that you don't have the
21  language.  You would need to see the language.
22  A.  Right.  You just pull up the language on the
23  computer and look at it.
24  Q.  So as you sit here today, you don't know what
25  amendment No. 23 -- what the purpose of amendment No. 23

Larry Gonzales                                                    May 31, 2012

---

229

1  is?
2       A.  No.  It's just out of context for me.
3       Q.  Amendment No. 23 addresses the student
4   identification card issued by a public or private high
5   school or institution of higher education that contains
6   the person's photograph, correct?
7       A.  Yes.
8       Q.  How did you vote on that amendment?
9       A.  The motion was to table and I voted yes, to
10  table.
11      Q.  Do you believe that if this amendment was adopted
12  it would have reduced the impact to minority voters in
13  reference to SB 14?
14          MR. McKENZIE:  I'm going to object that it
15  assumes facts not in evidence about the impact on
16  minority voters, but you may answer the question.
17      A.  I don't know that it does or it doesn't.
18      Q.  (By Mr. Gear)  Turn your attention to Exhibit --
19  amendment No. 15 on Page 969.
20      A.  Okay.  I'm ready.
21      Q.  Do you see that amendment?
22      A.  Yes.
23      Q.  Can you tell me what this amendment does?
24      A.  Talking about fees prohibited for certain forms
25  of identification documentation.

---

230

1       Q.  And what's the purpose of this amendment?
2       A.  It's saying that an agency, institution or
3   political subdivision of the State may not charge any
4   fee for the issuance of any document that may be used as
5   proof or identification under this chapter or to obtain
6   a document that may be used as proof or identification
7   under this chapter.
8       Q.  So this addresses the underlying documentation
9   required to obtain the allowable forms of identification
10  under SB 14, correct?
11      A.  Yes.
12      Q.  Would you agree that the underlying documentation
13  required to obtain an allowable form of ID under SB 14
14  are not free?
15      A.  I don't know about each of the -- well, there's
16  six or seven of them.
17      Q.  You're saying there are six or seven underlying
18  documents that you could use to obtain the allowable
19  form of identification?
20      A.  Right.
21      Q.  Can you identify which six or seven you're
22  referencing?
23          MR. McKENZIE:  Counsel, I think he's
24  confused about underlying documentation versus the ID
25  itself.

---

231

1          MR. GEAR:  Okay.  Then let me clarify.  I
2   think you're probably right.
3          MR. McKENZIE:  Okay.
4   BY MR. GEAR:
5       Q.  When I'm talking about underlying documentation
6   to obtain a driver's license, can you simply go to a DPS
7   office without any documentation and ask and obtain a
8   Texas driver's license?
9       A.  Without any documentation?
10      Q.  Correct.
11      A.  I don't know.
12      Q.  Well, when you went to renew your driver's
13  license did you need to bring underlying documentation
14  to obtain a renewed driver's license?
15      A.  I don't remember what I brought with me.  I don't
16  know if I have to or not.  I can't remember.
17      Q.  So do you know if obtaining a birth
18  certificate -- a certified birth certificate in the
19  State of Texas is free?
20      A.  I don't think it is.
21      Q.  Do you know what the cost of a birth certificate
22  is?
23      A.  No.
24      Q.  If I or some other voters lost their social
25  security card, is there a cost for renewing or obtaining

---

232

1   a new copy of a social security card?
2       A.  No idea.
3       Q.  Have you ever lost your social security card?
4       A.  No.
5       Q.  Do you know what you need to do to obtain a new
6   copy of a social security card?
7       A.  No.
8       Q.  Do you know if there's any cost associated with
9   obtaining a copy of a social security card?
10      A.  I don't know.
11      Q.  Do you know if there's any cost for obtaining the
12  underlying documentation required to obtain an allowable
13  form of ID under SB 14?
14      A.  Underlying document, just so that I'm clear,
15  you're talking about the birth certificate?  You're
16  talking about something you have to give to somebody to
17  get an ID.  Is that what you're talking about?
18      Q.  I tried to start this conversation off by giving
19  you a hypothetical.  If you, Mr. Voter went into a
20  polling place and you had no identification, no
21  credentials and no paperwork, could you simply obtain a
22  driver's license from the State of Texas, a DPS office?
23      A.  I don't know the criteria to get a driver's
24  license from DPS.  I don't know what you have to give
25  them to get a driver's license.

## 233

1  Q. Okay. How did you vote on this amendment No. 15?
2  A. The motion was to table and I voted to table the
3  amendment.
4  Q. Well, if you had to give some form of
5  documentation to obtain a Texas driver's license, but
6  you lost that and you had to renew it, would the cost
7  for a driver's license be free?
8  A. I guess what you're asking me, is there a cost
9  to -- the stuff you have to give them, right, to get
10  your driver's license?
11  Q. That's correct.
12  A. I don't know if there's a cost for that or not.
13  Q. Is there a cost for a driver's license?
14  A. Yes.
15  Q. Is there a cost for a State issued ID card in the
16  State of Texas?
17  A. Don't know.
18  Q. I think we can take a quick break and I can wrap
19  up my portion of this?
20  (Brief recess.)
21  BY MR. GEAR:
22  Q. Back on the record. Are there any provisions in
23  SB 14, and I'm referring to Exhibit 5 which reference
24  free -- or election identification certificates. And I
25  direct your attention to Page 13.

## 234

1  A. Yes.
2  Q. Do you see that?
3  A. Yes.
4  Q. And it says the department shall issue an
5  election identification certificate to a person who
6  states that the person is obtaining the certificate for
7  the purposes of satisfying section 63.001 B. Do you see
8  that?
9  A. Yes.
10  Q. And does election code -- and does not have
11  another form of identification described by section
12  63.0101 election code. Do you see that?
13  A. Yes.
14  Q. Do you know if there's a requirement to present
15  identification if you do not have to obtain an election
16  identification certificate if you do not have one of the
17  allowable forms of ID under SB 14?
18  A. I'm sorry. I didn't follow that.
19  Q. What, if any, documentation do you need to
20  present to obtain an election identification certificate
21  under SB 14?
22  A. I'm not seeing one. Unless I'm missing it, I'm
23  not seeing what you have to give to them to get an
24  election identification certificate. It talks about if
25  the person states that they are getting that certificate

## 235

1  for the purposes of code. I don't see that they have to
2  give them -- unless I'm just reading that wrong.
3  Q. You were a cosponsor of SB 14, correct?
4  A. Yes.
5  Q. Was there public debate during the discussion of
6  SB 14 regarding what would be required to be presented
7  to obtain an election certificate, election
8  identification certificate?
9  A. I don't recall any conversation about election
10  identification certificate.
11  Q. I'll direct your attention to Page 14-F. The
12  department may require each applicant for an original or
13  renewal election identification certificate to furnish
14  to the department the information required by section
15  521.142. Do you see that?
16  A. Yes.
17  Q. Do you know what's required under Section
18  521.142?
19  A. I don't.
20  Q. Would that suggest that a person who is -- who
21  walks in to obtain a certificate would have to present
22  identification?
23  A. It's saying that the Department may require,
24  doesn't have to, it may require each applicant for an
25  original or renewal application certificate to furnish

## 236

1  the Department. So not required, but they may require
2  it.
3  Q. Would you agree if the underlying documents cost
4  money that the election certificate would not be free?
5  A. I don't -- if they cost money?
6  Q. That's correct.
7  A. Yes. Yes. Well, might. It says may. It didn't
8  say shall. It says may. So it may. Doesn't say that
9  it will.
10  Q. So a person who has to obtain the underlying
11  documentation to obtain an election certificate and pays
12  money to do that, would you then agree that the election
13  certificate is not free?
14  A. If -- I mean, if they -- if they require it,
15  right. Because it doesn't say that they are making them
16  give that. Am I reading that correctly?
17  Q. You tell me. You're the author of the bill, the
18  cosponsor of the bill.
19  A. I don't know.
20  Q. Do you want to change any of your answers that
21  you provided here today?
22  A. I don't think so.
23  Q. Is there any information that you recall now that
24  you didn't recall earlier during your deposition
25  testimony?

Larry Gonzales                                          May 31, 2012

## 237

1      A.  No, I don't think so.
2      Q.  Is there anything additional that you would want
3  to share regarding SB 14?
4      A.  No.
5      Q.  Well, I have no additional questions today.  And
6  I thank you for your time and patience during this
7  deposition.  And I'm going to hold this deposition open
8  based on the pending decision by the Court.  So you may
9  be called back to provide additional testimony.  Do you
10 understand that?
11     A.  Yes.
12     Q.  And I'm going to turn it over to my other
13 colleagues.
14         MR. BRAZIL:  Good afternoon.  I'm going
15 to -- if you have trouble hearing me just ask me to
16 speak up.
17         THE WITNESS:  Okay.
18             EXAMINATION
19 BY MR. BRAZIL:
20     Q.  Good afternoon.  I'm going to jump around if I
21 could to speed up the process and I will try not to
22 repeat any of the questions that have already been
23 asked.  And I'll try to make my questions very specific.
24 Have you ever served on a committee or subcommittee that
25 has investigated in person voter fraud?

## 238

1      A.  No, sir.
2      Q.  Have you ever served on a committee or
3  subcommittee that's ever investigated mail in fraud,
4  meaning voter registration or mail in ballots where
5  there's some allegation of fraud.  Have you ever served
6  on a committee or subcommittee?
7      A.  No, sir.
8      Q.  Have you ever personally observed in person voter
9  fraud?
10     A.  No, sir.
11     Q.  Have you ever served on any kind of committee or
12 any type of organization that has investigated
13 allegations of mail in ballot fraud?
14     A.  No, sir.
15     Q.  Now, we talked about earlier, you did, about the
16 DPS offices?
17     A.  Yes, sir.
18     Q.  Just in general.  And I think you said you did
19 not know how many counties did not have DPS offices,
20 correct?
21     A.  Correct.
22     Q.  If we -- if we believe the information that came
23 from the -- let's see what it's called, Texas -- let's
24 see here.  Texas House Research Organization.
25         MR. McKENZIE:  Exhibit No.

## 239

1         MR. BRAZIL:  221.
2  BY MR. BRAZIL:
3      Q.  If we believe their information, approximately
4  30 percent of the 254 counties in Texas do not have DPS
5  offices.  Do you agree with that?
6      A.  Yes.
7      Q.  Do you have any idea how many people live in
8  those 77 counties?
9      A.  No idea.
10     Q.  Do you have any idea how many African-Americans
11 live in those 77 counties?
12     A.  No idea.
13     Q.  Do you have any idea how many Asians?
14     A.  I have no idea.
15     Q.  Do you have any idea how many Latinos live in
16 those 77 counties?
17     A.  I have no idea.
18     Q.  Have you seen any other studies, investigation or
19 research from any organization or entity that talks
20 about those 77 counties?
21         MR. McKENZIE:  To the extent you've seen it
22 as part of your deliberations I would object on
23 privileged grounds.  But to the extent you've seen it
24 outside of that, you're free to answer.
25     A.  Just here.

## 240

1      Q.  (By Mr. Brazil)  Just this information,
2  Exhibit 22?
3      A.  Yes.
4      Q.  Okay.  Are you aware of any independent studies
5  of alleged voter fraud in Texas?
6      A.  Individual studies, no, sir.
7      Q.  Independent studies?
8      A.  Independent, no, sir.
9      Q.  Are you aware of any independent studies of
10 alleged voter intimidation in Texas?
11     A.  No, sir.
12     Q.  Did you request any independent information on
13 alleged voter fraud in Texas before you cosponsored SB
14 14?
15         MR. McKENZIE:  I would object on privileged
16 grounds as to what he requested unless it's public
17 record in which case.  You may answer.
18     A.  I guess I'll claim legislative privilege on that.
19     Q.  (By Mr. Brazil)  Okay.  Were you provided any
20 independent research or information from any
21 organization or entity before you cosponsored SB 14,
22 that had anything to do be with allegations of voter
23 fraud?
24     A.  Not that I recall seeing.
25     Q.  Do you agree that SB 14 addresses only the

Larry Gonzales                                                    May 31, 2012

241

1    allegations of in person voter fraud?
2         A.  Yes.
3         Q.  Do you agree that it does not address the
4    allegations of mail in voter fraud?
5         A.  Yes.
6         Q.  Are you aware of any voter -- in person voter
7    fraud in Texas?  Do you have any personal knowledge of
8    one instance of someone voting for someone else in
9    person?
10        A.  No.
11        Q.  Okay.  Would you agree with me that based on all
12   your testimony today and everything that you've seen,
13   that this allegation or these allegations of in person
14   voter fraud is really a myth, would you agree with me?
15        A.  No.
16        Q.  Well, if you have no information and we've never
17   seen it before and we haven't seen any study show
18   there's any in person fraud in Texas, why do you not
19   disagree that it's just a myth?
20            MR. McKENZIE:  I don't think he's testified
21   there's no studies out there ever.  I think he's
22   testified that none were provided to him and that's to
23   the extent of his testimony.
24            BY MR. BRAZIL:  So is that instruction not
25   to answer or is that an objection?

242

1            MR. McKENZIE:  It's an objection.
2    BY MR. BRAZIL:
3         Q.  You may still answer.
4         A.  Legislative privilege.
5            MR. McKENZIE:  You can answer.
6         A.  Repeat the question for me.
7         Q.  (By Mr. Brazil)  Based on your testimony today
8    and based on the fact that we really haven't seen
9    anything that proves that there's no in person voter
10   fraud in Texas and based on your testimony the last few
11   hours, why do you disagree that this allegation of in
12   person voter fraud is not just a myth?
13            MR. McKENZIE:  Object to facts not in
14   evidence.  You may answer.
15        A.  Anecdotal conversations, people talk.
16        Q.  (By Mr. Brazil)  And conversations with whom?
17        A.  Oh, lots of people.
18        Q.  Can you give me the name of one person who has
19   told you that they personally observed voter fraud in
20   Texas?
21            MR. McKENZIE:  Object to private legislative
22   communication, but otherwise you can answer.
23        A.  Yeah.  Legislative privilege on that.
24        Q.  (By Mr. Brazil)  Do you have anything in your
25   office, whether it be an e-mail or a letter or an

243

1    affidavit from anyone who hesitated to you as a
2    representative, that they personally observed voter --
3    in person voter fraud in Texas?
4            MR. McKENZIE:  Object to state legislative
5    provided that information.  But if it's not a State
6    legislator, you may go ahead and answer.
7         A.  Not to my knowledge.
8         Q.  (By Mr. Brazil)  Have you been to any, sometimes
9    we call them town meetings, in your district where you
10   have specifically discussed this allegation of in person
11   voter fraud in Texas?
12        A.  I think it came up at like a forum.  I couldn't
13   recall the specifics or anything.  There was a forum
14   at -- oh, where were we, where somebody was asking a
15   question.  But I couldn't tell you a whole lot more than
16   that.  And we were talking about, in context, of in
17   person fraud and voter ID.  But I can't remember what
18   they were asking.
19        Q.  Did you do anything before you cosponsored SB 14
20   to determine what the reaction would be from your
21   constituents in your district?
22            MR. McKENZIE:  I'm going to object on
23   legislative privilege grounds.  I think we're still
24   covering legislative communications.  To the extent it
25   doesn't play into your thoughts, one way communication

244

1    to you, you may answer it.
2         A.  Yeah.  People in the district were asking me to
3    vote yes on this bill.
4         Q.  (By Mr. Brazil)  Okay.  But that really wasn't my
5    question.  My question was did you send out a mailer
6    saying, "please respond to this.  What's your idea about
7    this?"  Did you send out a blast e-mail saying, "please
8    respond to your thoughts on voter fraud," things of that
9    nature.  Did you do anything like this to your
10   constituents?
11        A.  No.
12        Q.  Can you provide us today, under oath, any facts
13   to support the allegation of voter fraud in Texas?
14            ATTORNEY2:  Objection; vague.  You may
15   answer.
16        A.  No, sir.
17        Q.  (By Mr. Brazil)  Do you believe that, or do you
18   have an opinion as to what was wrong with all of the
19   laws in effect before SB 14 that dealt with registering
20   to vote and voting that somehow needed to be corrected
21   by SB 14?
22            MR. McKENZIE:  I'm going to object to the
23   extent your opinion was developed in the course of your
24   deliberations with the legislator.  To the extent you
25   have an opinion apart from that after you passed the

Larry Gonzales                                        May 31, 2012

## 245

1  legislator.  You can answer the question.
2     A.  Sorry I forgot the question.
3     Q.  (By Mr. Brazil)  Sure.  What was defective with
4  all these other laws?  We have federal laws, as you
5  know, that cover voting registration and voting.  We
6  have State laws that cover registration and voting,
7  right?  Do you agree with that?  Is that a yes.  She
8  can't take down uh-huh.
9     A.  Yes.  I'm sorry.
10    Q.  What was defective in any of those laws that
11 needed to be corrected in your opinion by SB 14?
12    A.  I don't know if it was corrected in as much as it
13 was added to.
14    Q.  Okay.  What did SB 14 add to, whether it be HAVA
15 or any other voting legislation, what did it add?
16    A.  Can you explain HAVA?
17    Q.  No, I cannot.  Not with the amount of time we
18 have left here today.  What, in your opinion, did it add
19 to these other laws?  Whether it be one law, federal
20 law, State law, what did SB 14 add?
21    A.  The people of House District 52 asked me to
22 support it so I'm going to support it.
23    Q.  What specifically did it add to any other laws
24 that you believe is necessary to correct this allegation
25 of voter fraud?

## 246

1     A.  I think it put into place a process that would
2  protect the integrity of that system and the confidence
3  the voters have in the system based on what they told me
4  during the campaign.
5     Q.  Basically it sounds good.
6        MR. McKENZIE:  Objection.  You're
7  mischaracterizing the testimony.  You may answer.
8     A.  I don't know.
9     Q.  (By Mr. Brazil)  You don't know?
10    A.  I mean, they asked me to be supportive.
11    Q.  Okay.  Would you agree with me that there's
12 absolutely no independent Texas data to support the
13 allegation of voter fraud?
14       MR. McKENZIE:  Objection; speculation.  You
15 may answer.
16    A.  No.  I would not agree.
17    Q.  (By Mr. Brazil)  Can you give me any example of
18 independent Texas data to support the allegation of
19 voter fraud in Texas?
20    A.  I don't have any.
21    Q.  Okay.  Would you agree with me that all of the
22 information that you had before you cosponsored SB 14
23 regarding alleged voter fraud was hearsay?
24    A.  Anecdotal.
25    Q.  What's the difference between that and hearsay?

## 247

1     A.  I'm not an attorney.  I used the word anecdotal.
2     Q.  Okay.  Did I understand your testimony that the
3  first time you ever considered voter fraud to be an
4  issue was 2009?
5     A.  No.  What we were talking about earlier was in
6  the context of what have you heard.  My testimony was in
7  the context of what anybody hears on the news or
8  whatever else that's always been out there.  That's
9  what you see and you learn about and you hear about.
10 Into that we drilled down into it as a matter of policy.
11 For the first time we ever looked at that in that way
12 was about that time frame, yeah, for the campaign.
13    Q.  Just a couple other questions and I'm finished.
14 Do you know what a provisional ballot is?
15    A.  Yes.
16    Q.  And you tell us your definition of a provisional
17 ballot?
18    A.  Oh, man.  My understanding is that if you don't
19 have the election judge who you walked up to doesn't
20 feel that you have the right or necessary information
21 that they need to authenticate your vote that they put
22 you in a provisional ballot category.
23    Q.  And do you know when or if the provisional
24 ballots are counted?
25    A.  The only thing I know is in the event of a

## 248

1  contest provisional ballots are counted.  I can't tell
2  you that's the only time they're counted.  But in a
3  contest they're counted.
4     Q.  Can you provide any example of any election in
5  the last 50 years that's been changed by voter fraud?
6     A.  No, sir.
7     Q.  Thank you.  That's all I have.  I appreciate it.
8  Thank you.
9        MR. GEAR:  With that we'll conclude with
10 that -- do you have any questions?
11       THE WITNESS:  No.  I'm good.
12       MR. GEAR:  We'll conclude your deposition
13 for now, but we'll hold it open for a later date.
14       THE WITNESS:  Thank you.



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                      )
                                     )
            Plaintiff,               )
                                     )
VS.                                  )
                                     )
ERIC H. HOLDER, JR. in his           )
official capacity as Attorney        )
General of the United States,        )
                                     )
            Defendant,               )
                                     )
ERIC KENNIE, et al,                  )
                                     )
      Defendant-Intervenors,         )
                                     )
TEXAS STATE CONFERENCE OF            )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                      )   (RMC-DST-RLW)
                                     )   Three-Judge Court
      Defendant-Intervenors,         )
                                     )
TEXAS LEAGUE OF YOUNG VOTERS         )
EDUCATION FUND, et al,               )
                                     )
      Defendant-Intervenors,         )
                                     )
TEXAS LEGISLATIVE BLACK              )
CAUCUS, et al,                       )
                                     )
      Defendant-Intervenors,         )
                                     )
VICTORIA RODRIGUEZ, et al.,          )
                                     )
      Defendant-Intervenors.         )
*******************************************
            ORAL DEPOSITION OF
          STATE OF TEXAS 30(b)(6)
                LEE GUYETTE
               JUNE 19, 2012
*******************************************

**2**

1      ORAL DEPOSITION OF LEE GUYETTE, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the JUNE 19, 2012, from 3:13 p.m. to 6:09 p.m.,
5   before Chris Carpenter, CSR, in and for the State of
6   Texas, reported by machine shorthand, at the Offices of
7   the Texas Attorney General, 209 West 14th Street, 6th
8   Floor, Austin, TX 78701, pursuant to the Federal Rules
9   of Civil Procedure and the provisions stated on the
10   record or attached hereto.

**3**

1
2
3               A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS:
5     Patrick K. Sweeten
      Reynolds Brissenden
6     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
      P.O. Box 12548
7     Austin, TX  78711-2548
8     209 West 14th Street
      8th Floor
9     Austin, TX  78701
      (512) 936-1307
10    patrick.sweeten@texasattorneygeneral.gov
11
    FOR THE DEFENDANT, HOLDER, ET AL:
12
      Daniel Freeman
13    Victor Williamson
      U.S. DEPARTMENT OF JUSTICE
14    950 Pennsylvania Avenue, NW
      NWB - Room 7202
15    Washington, DC  20530
      (202) 305-7766
16    daniel.freeman@usdoj.gov
17
18
19
20
21
22
23
24
25

**4**

1               INDEX
2   Appearances..........................................2
3   Stipulations pages attached after Page...........93
4   LEE GUYETTE
5     Examination by Mr. Freeman................5
      Examination by MR. Sweeten................85
6     Further Examination by Mr. Freeman........87
      Further Examination by Mr. Sweeten........89
7
8   Signature and Changes............................90
9   Reporter's Certificate...........................92
10              EXHIBITS
11  NO. DESCRIPTION                    PAGE MARKED
12
    971  E-mail string, January 25-27, 2011       22
13
    972  E-mail string, January 27 thru February 1,  28
         2011
14  973  E-mail string, November 15-16, 2011      45
15  974  E-mail string, November 7 thru December 9,  47
         2011
16
    975  E-mail string, January 25, 2011          49
17
    976  Mendoza E-mail, January 25, 2011 1:03 p.m.  60
18
    977  Mendoza E-mail, January 25, 2011 3:35 p.m.  63
19
20
21
22
23
24
25

5

```
 1              LEE GUYETTE,
 2  having been first duly sworn to testify the truth, the
 3  whole truth, and nothing but the truth, testified as
 4  follows:
 5              EXAMINATION
 6  BY MR. FREEMAN:
 7      Q.  Sir, could you state your name for the record.
 8      A.  Lee Guyette.
 9      Q.  And how do you spell your last name?
10      A.  G-u-y-e-t-t-e.
11      Q.  Okay.  Thank you.
12          My name is Dan Freeman, and I'm here on
13  behalf of the defendant in this matter, Eric H. Holder,
14  Jr.  To my right is my colleague, who can introduce
15  himself.
16          MR. WILLIAMSON:  I'm Victor Williamson.
17          MR. FREEMAN:  And if your counsel can
18  introduce themselves for the record as well.
19          MR. SWEETEN:  Patrick Sweeten on behalf of
20  the State of Texas and on behalf of the witness, Lee
21  Guyette.
22          MR. BRISSENDEN:  Reynolds Brissenden on
23  behalf of the State of Texas and the witness,
24  Mr. Guyette.
25          MR. SWEETEN:  Dan, maybe for the record, I
```

6

```
 1  want to go ahead and talk about where we are.
 2          MR. FREEMAN:  Sure.
 3          MR. SWEETEN:  We are presenting
 4  Mr. Guyette today for Topic 8, which is, has been
 5  required by the court pursuant to an order yesterday.
 6          At that time, the court required us to
 7  have Mr. Guyette sit -- or a corporate representative
 8  sit for Topic 8, which is any and all of registered
 9  voters who possess Texas driver's license or personal
10  identification card, conducted between January 1st, 2005
11  and May 27th, 2011, including but not limited to
12  analysis conducted in February or March of 2011 by the
13  DPS and the Elections Division of the Secretary of
14  State.  Mr. Guyette is being presented here on very
15  short notice, based upon the provisions of the court
16  order.
17          In addition, prior to the deposition --
18  and I think it was about an hour and a half prior to, I
19  provided Mr. Freeman some documents.  The court had
20  required us to provide documents that Mr. Guyette had
21  relied upon.  We made at that time -- we've asserted and
22  continue to assert an attorney-client privilege with --
23  or an attorney-client privilege with respect to a number
24  of these documents, which contain information from
25  Ms. McGeehan.  However, we interpreted the court's order
```

7

```
 1  to require us to provide that information, and
 2  therefore, we are not in any way waiving our argument
 3  with respect to the attorney-client privilege, but
 4  instead to comply with the court's order of yesterday.
 5          With that, you can proceed.
 6          MR. FREEMAN:  Okay.  Thank you.
 7      Q.  (By Mr. Freeman)  And Mr. Guyette, just so you
 8  know, you're aware that this is a deposition in the
 9  matter of Texas v. Holder, preclearance litigation in
10  the District of Columbia?
11      A.  Yes, sir.
12      Q.  Okay.  Have you ever been deposed before?
13      A.  No, I have not.
14      Q.  Okay.  So a deposition functions as a question
15  and answer.  I get to ask the questions, you give the
16  answers.  There's a court reporter to my left,
17  Mr. Carpenter, and he will write down everything that is
18  said in the room.  However, in order to get a good
19  record, you need to articulate your answers rather than
20  gesturing, because that can't be recorded by the court
21  reporter.  Do you understand?
22      A.  I understand.
23      Q.  Okay.  The purpose of the deposition is to
24  obtain your full and complete answers, so I need you to
25  provide as full of an answer as you can on the basis of
```

8

```
 1  your knowledge in response to my questions.  Do you
 2  understand?
 3      A.  I understand.
 4      Q.  I may not always be clear.  This is
 5  particularly the case, as I have received documents
 6  relatively recently, and as you can tell, I'm reading
 7  from a computer rather than having worked things out
 8  completely in advance, so I'll have to apologize if my
 9  questions aren't clear.
10          If you don't understand at all, please ask
11  me to restate the question or reframe the question.  I'm
12  happy to do so.  It's much more important that you
13  provide accurate testimony in response to my questions
14  rather than leave some kind of uncertainty.  Do you
15  understand?
16      A.  I understand.
17      Q.  Okay.  If you need a break, tell me, and we'll
18  finish the question and see about a break.  Is that all
19  right?
20      A.  Yes.
21      Q.  Okay.  If you need any water, coffee or
22  anything, please grab water between questions and not
23  during.  And I don't mean just drinking from the bottle
24  of water in front of you.  That's fine.  If you want the
25  extra bottle of water at the end the table, finish the
```

LEE GUYETTE                                          JUNE 19, 2012

## 9

1   question first.
2         If you want to talk to your attorney,
3   again, that's fine.  But similarly, if there is a
4   question pending or you're in the middle of an answer,
5   please finish that up first, okay?
6         A.  I understand.
7         Q.  Sometimes you may remember things later in the
8   day, based on a question I ask or an answer you give.
9   If that happens, please let me know what's in your mind,
10  and we'll add it to the record.  Will you do that?
11        A.  I will.
12        Q.  Okay.  I'll give you a chance to do that at the
13  end as well.  Okay?
14        A.  Yes, sir.
15        Q.  Okay.  Sometimes, after we've been talking for
16  a while, you may realize that a prior answer was not
17  entirely accurate.  If you realize that, will you let me
18  know, so that you can correct the record?
19        A.  I will.
20        Q.  Okay.  Sometimes while you're answering, you
21  may think of a document that would help you remember or
22  help you answer more accurately.  If you do, please let
23  me know.  We may have that document here, and if not, we
24  may be able to get it to help you.  Okay?
25        A.  I understand.

## 10

1         Q.  Are you on medication or drugs of any kind that
2   might make it difficult for you to understand and answer
3   questions?
4         A.  No.
5         Q.  And these are just routine questions.  Don't
6   take offense.
7         A.  No.  Okay.
8         Q.  Have you had anything alcoholic to drink in the
9   last eight hours?
10        A.  No.
11        Q.  Are you at all sick today?
12        A.  No.
13        Q.  Are you currently under a doctor's care for any
14  illness that would limit your ability to answer
15  questions?
16        A.  No.
17        Q.  Is there any reason you can think of why you
18  will not be able to answer my questions fully and
19  accurately?
20        A.  No.
21        Q.  The last thing:  I want to remind you that you
22  are under oath, and you're subject to federal penalties
23  for giving false or misleading testimony, so it's
24  important that you answer my questions truthfully,
25  accurately and completely.  Do you understand?

## 11

1         A.  I understand.
2         Q.  Okay.  Also, it's very important that we not
3   speak over each other.
4         A.  I just did.  Yeah, I got you.
5         Q.  It makes it very hard for the court reporter to
6   make a good record.  So I'll try and wait for you to
7   finish answering before asking you a question, if you
8   could try to wait for me to finish asking the question
9   before answering, it will make life easier for everyone.
10        A.  I understand.
11        Q.  Great.  Good.
12             Do you understand that you are testifying
13  on behalf of the State of Texas and not in your
14  individual capacity today?
15        A.  Yes.
16        Q.  What is your position?
17        A.  Project manager.
18        Q.  Okay.  And is that within the Office of the
19  Secretary of State?
20        A.  Yes.
21        Q.  Is that within the IT division specifically?
22        A.  Yes.
23        Q.  Okay.  How long have you held that position?
24        A.  Three years.
25        Q.  And how long have you been at the Office of the

## 12

1   Secretary of State?
2         A.  The same three years.
3         Q.  Okay.  As project manager, do you supervise any
4   other individuals?
5         A.  Yes.
6         Q.  How many individuals?
7         A.  Seven individuals.
8         Q.  Okay.  And are you responsible for any
9   particular area of the information technology systems of
10  the Office of the Secretary of State?
11        A.  Yes.  Software development for the voter
12  registration database.
13        Q.  Is that also known as the TEAM database?
14        A.  Yes.
15        Q.  And can you tell me what the TEAM database
16  stands for?
17        A.  Texas Elections Administration Management.
18        Q.  Okay.  The last witness I asked that was not
19  totally sure.  Now we know.  Thank you.
20             And do you work on any other databases
21  besides TEAM?
22        A.  Yes.
23        Q.  What other databases?
24        A.  There is a system called PPRI, which tracks
25  funding, and a system known as ENR, which is election

LEE GUYETTE                                                    JUNE 19, 2012

## 13

1   night returns.
2       Q.  Okay.  Anything else?
3       A.  No.
4       Q.  Okay.  Thank you.
5           What is your educational background?
6       A.  A bachelor's in electrical engineering, a
7   master's in electrical engineering with computer
8   science.
9       Q.  Okay.  Do you have any certifications with
10  regard to databases or programing in any way?
11      A.  I have certifications, not in databases, but in
12  project management.
13      Q.  And what are those certifications?
14      A.  PMP, as well as -- I'll leave it at PMP.
15      Q.  Okay.  And what does PMP stand for?
16      A.  Project Management Professional.
17      Q.  Okay.  And who provides that certification?
18      A.  It's provided by PMP.  The name is the same as
19  the certification.
20      Q.  Okay.  That's the organization?
21      A.  Yes.
22      Q.  Okay.  And prior to coming work for the Office
23  of the Secretary of State, where were you employed?
24      A.  Previously employed at Dell Computer.
25      Q.  Okay.  For how long?

## 14

1       A.  Ten years.
2       Q.  And were you a project manager as well?
3       A.  Project managers at some time, but also senior
4   manager.
5       Q.  Okay.  And prior to Dell, where were you
6   employed?
7       A.  Compaq Computer, now HP.
8       Q.  And how long were you at Compaq?
9       A.  Five years.
10      Q.  And were you also a project manager or a senior
11  manager?
12      A.  Yes, software management.
13      Q.  And prior to Compaq, where were you?
14      A.  Department of Defense for three years.
15      Q.  Okay.
16      A.  Software development.
17      Q.  Okay.  Was that out near D.C.?
18      A.  That was actually in California.
19      Q.  Even better.
20      A.  Yeah.
21      Q.  And prior to DoD, where were you?
22      A.  General Dynamics for five years.
23      Q.  Okay.
24      A.  Software development.
25      Q.  Okay.  And I think we've gone far enough back.

## 15

1       A.  That's pretty far.
2       Q.  That's fine.
3           When did you first learn that you would be
4   testifying on behalf of the State?
5       A.  This morning.
6       Q.  If you could take a look at this.  This has
7   previously been marked as U.S. Exhibit 830.  Just take a
8   moment to look it over.
9           (Witness reviewing document.)
10      Q.  You can hold on to it.
11      A.  Okay.
12      Q.  Have you seen that document before?
13      A.  I don't recall seeing this specific document.
14      Q.  Have you seen any portion of the document, any
15  of the text previously?
16      A.  Well, I don't -- I don't know.  I've seen
17  similar text in everywhere from paper to potentially
18  e-mail.  I can't say if any piece of this is a stand
19  out.
20      Q.  Okay.  Could you turn to the last two pages.
21      A.  Yes.
22      Q.  And do you see a list of topics, 1 through 12,
23  listed here?
24      A.  Yes.
25      Q.  Have you seen Topic 8 before?  And maybe take a

## 16

1   look at it.
2       A.  Yes.
3       Q.  And are you prepared to testify on behalf of
4   the State of Texas concerning Topic 8?
5       A.  Yes.
6       Q.  Okay.  Could you read, just for the record,
7   what Topic 8 is?
8       A.  "Any and all analysis of registered voters who
9   possess a Texas driver's license or a personal
10  identification card, conducted between January 1st, 2005
11  and May 27th, 2011, including, but not limited to
12  analysis conducted in February or March 2011 by the
13  Department of Public Safety and the Elections Division
14  of the Secretary of State."
15      Q.  Okay.  What did you do to prepare for this
16  deposition?
17      A.  Went back and reviewed some e-mails --
18      Q.  Okay.
19      A.  -- which I believe were part of the package you
20  received this afternoon.  I went and contacted some key
21  purchase events.  Keith Ingram, who is director of
22  elections, Karen Richards, who used to head the voter
23  registration TEAM for elections, and John Mendoza, who
24  was a key analyst for the topic we're going to discuss.
25      Q.  Anything else?

## 17

1    A.   Looked at some old programming that was done
2  and tried to research -- I researched if there's any
3  programing or software appropriate prior to January of
4  2011.
5    Q.   You said you previously produced some e-mails.
6  Did you produce to your attorneys a full set of e-mails
7  to review?
8    A.   Yes.  It's the same e-mails that have been
9  previously provided to OAG.
10   Q.   Okay.  And was Mr. Ingram in the Office of the
11 Secretary of State at the time that you -- or at the
12 time that the analysis at issue occurred?
13   A.   No.
14   Q.   What did you discuss with Mr. Ingram?
15   A.   Questions about what to expect potentially this
16 afternoon, as well as if he was aware, through a
17 disclosure to legislation of the January results, the
18 January 2011 results.
19   Q.   And was he aware of any disclosure?
20   A.   He is not aware of any disclosure.
21   Q.   Did Mr. Ingram provide you with any
22 instructions?
23   A.   No.
24   Q.   Did you discuss anything else?
25   A.   No.

## 18

1    Q.   And you also stated that you spoke with Karen
2  Richards?
3    A.   Correct.
4    Q.   And you said she was the head of the voter
5  registration team at the time?
6    A.   Yes.
7    Q.   Is that in January of 2011?
8    A.   Yes.
9    Q.   And what is her current position?
10   A.   She currently holds a position with a third
11 party, VOTEC, V-O-T-E-C.
12   Q.   So she's in the private is sector now?
13   A.   In the private sector, right.
14   Q.   What were her responsibilities as head of the
15 voter registration team?
16   A.   She would provide IT groups, such as myself,
17 direction on needed analysis and other TEAM development
18 work.
19   Q.   So she's the business side of the TEAM
20 database?
21   A.   Yes.
22   Q.   Okay.  And what subjects did you discuss with
23 Ms. Richards?
24   A.   Key focus was on whether or not this
25 information, the January 2011 results were disclosed

## 19

1  legislation, and that was the primary discussion.
2    Q.   Any secondary discussion?
3    A.   I did ask if she remembered the January 2011
4  analysis.
5    Q.   Did she?
6    A.   Parts.
7    Q.   And did she recall if the January 2011 analysis
8  had been disclosed to any legislator?
9    A.   She was not aware of any disclosure.
10   Q.   And then you said that you spoke to John
11 Mendoza, correct?
12   A.   Yes.
13   Q.   And you described him as an analyst, correct?
14   A.   Developer analyst, yes.
15   Q.   Does he still hold that position?
16   A.   Yes.
17   Q.   And are you his superior?
18   A.   Yes.
19   Q.   And what did you discuss with Mr. Mendoza?
20   A.   We reviewed some of the old programs and
21 discussed some of the analysis that took place in
22 January of 2011.
23   Q.   And so does the code still exist from the
24 January 2011 map?
25   A.   I saw some of the software code, but portions

## 20

1  may be missing.
2    Q.   Okay.
3         MR. FREEMAN:  Mr. Sweeten, if we were to
4  want copies of that code, do we need to make separate --
5  a separate request, or will you just provide it?
6         MR. SWEETEN:  I don't know anything about
7  what it would involve.  Let me speak to him at the
8  break, and I may be informed.
9         MR. SWEETEN:  That's fine.
10   Q.   (By Mr. Freeman) And other than Mr. Ingram,
11 Ms. Richards and Mr. Mendoza, did you meet anyone else
12 or talk with anyone else?
13   A.   No.
14   Q.   Did you meet with your attorney?
15   A.   Excuse me.  Yes.
16   Q.   I'm not going to ask what you talked you about,
17 but I will ask:  When did you meet with them?
18   A.   Started at noon today.
19   Q.   And who did you meet with specifically?
20   A.   The two gentlemen that are here right now.
21   Q.   Anyone else?
22   A.   No.
23   Q.   Where did you meet?
24   A.   Right above this conference room.
25   Q.   Okay.  Did you bring any other documents with

## 21

1  you here today?
2      A.  I brought a copy of an e-mail that you received
3  this afternoon.
4      Q.  So beyond the documents that you reviewed and
5  produced through your attorney?
6      A.  No, no other documents.
7      Q.  Okay.  And you didn't speak with anyone else
8  about the deposition?
9      A.  My boss, to make sure he was aware I'd be here
10  this afternoon.
11      Q.  And who is your boss?
12      A.  Well, the gentleman you had a deposition
13  earlier today with, Scott Brandt.
14      Q.  Okay.  And did he provide you with any
15  instructions?
16      A.  No.
17      Q.  Did he say that I'm terrifying?
18      A.  No comment.
19      Q.  I will withdraw the question.
20      A.  (Laughing.)
21      Q.  All right.  Mr. Guyette, did the Office of the
22  Secretary of State receive any requests to perform
23  analysis of registered voters who possess a Texas
24  driver's license or a personal identification card
25  between January 1st of 2005 and May 27th, 2011?

## 22

1      A.  I can speak for what I received, a request from
2  the Elections Division to produce results in January
3  2011.
4      Q.  Are you aware of any requests having been made
5  prior to January 2011 for a similar analysis?
6      A.  I'm not aware of any.
7      Q.  Are you aware of any similar analysis having
8  been conducted to prior to January of 2011?
9      A.  I am not aware of any.
10      Q.  Okay.  Specifically when in January 2011 was a
11  request for such analysis received?
12      A.  Would it be possible to access some of the
13  e-mails you have?
14      Q.  Sure.  Of course.
15      MR. FREEMAN:  This document will be marked
16  as U.S. Exhibit 971.
17      (U.S. Exhibit 971 marked for
18  identification.)
19      MR. FREEMAN:  That's your copy.  That copy
20  is for your counsel.
21      Q.  (By Mr. Freeman) If you could just take a
22  moment and just look that over, and it will refresh your
23  recollection.
24      A.  (Witness reviewing document.) So the time frame
25  was on or about January 25th, 2011.

## 23

1      Q.  And does this document say that -- pardon me.
2      Did you send an e-mail at 1:03 p.m. on
3  January 25th of 2011, saying that you had conducted
4  analysis and spent two and a half hours on this request?
5      A.  Yes.  It's -- on January 25th, it's the totals
6  that came up on short notice, which leads me to believe
7  that's when the analysis took place, on or about January
8  25th.
9      Q.  Okay.  Do you recall if you started working on
10  the analysis immediately after you received the request?
11      A.  I don't recall.
12      Q.  And who gave you the request?
13      A.  The request, as dictated, you know, through the
14  chain, typically came from either Ann McGeehan or Karen
15  Richards.
16      Q.  Do you recall in this instance whether you had
17  received the request from Ann, from Ms. Richards or from
18  another individual?
19      A.  For the initial request, I do not recall.
20      Q.  Okay.  Do you know where the request itself
21  originated, who made the request to the Division of
22  Elections or the Office of the Secretary of State?
23      A.  This specific request I do not recall, but
24  traditionally, all requests come through in business
25  partner, which would be Ann and Karen.

## 24

1      Q.  Okay.  But you're not -- you don't know whether
2  it came from the legislature or from an individual
3  legislator, et cetera?
4      A.  I do not recall, but typically, legislators
5  don't contact IT directly to perform such functions.
6      Q.  Fair enough.  And just for the record, did the
7  State of Texas conduct any analysis in response to that
8  request?
9      A.  Yes.
10      Q.  How many separate rounds of analysis did the
11  State of Texas conduct?
12      A.  During this January time period?
13      Q.  Yes.
14      A.  Roughly six.  Six that I'm aware of.
15      Q.  Okay.  Are you aware -- just so we can narrow
16  the time frame --
17      A.  Sure.
18      Q.  -- for the rest of the conversation, are you
19  aware of any other requests for analysis after this
20  approximately January 25 request, but before May 27th
21  2011?
22      A.  I'm not aware of any others.
23      Q.  And are you aware of any other analysis, after
24  these approximately six rounds of analysis, around
25  January 25th and before May 27th?

LEE GUYETTE                                                      JUNE 19, 2012

---

**25**

1    A.   I'm not aware of any other analysis or efforts.
2    Q.   Great.  So we can talk about a narrow window.
3         Who performed the actual analysis in
4    response to the request?
5    A.   That would be John Mendoza.
6    Q.   And did you supervise that analysis?
7    A.   Yes.
8    Q.   What instructions did you give to Mr. Mendoza?
9    A.   Instructions were given by Ann McGeehan and
10   Karen Richards.  Our response was to follow those
11   instructions down to the letter.
12        Q.   Okay.  So you were simply passing things along
13   to the programmer?
14   A.   Yes.
15   Q.   Okay.  Normally, do you pass along such
16   instructions with the same quote, unquote, "to the
17   letter" sort of mentality or instruction?
18        MR. SWEETEN:  Objection, vague.  Go ahead.
19   A.   Okay.  It really just depends on the case.
20   Q.   (By Mr. Freeman) Okay.
21   A.   In this condition, it was very clear what Ann
22   and Karen were asking for.
23   Q.   How did they make it clear that they were
24   asking for that precise type of analysis?
25   A.   They dictated the data to be used and they

---

**26**

1    dictated the matching criteria.
2    Q.   Is Ms. Richards familiar -- to the extent of
3    your knowledge, is she familiar with the technical
4    contents of the TEAM database?
5    A.   More than enough to be able to make this
6    request.
7    Q.   Okay.  And is Ms. McGeehan familiar with the
8    technical contents of the TEAM database to the level
9    necessary to make a specific request of this nature?
10        MR. SWEETEN:  Objection, calls for
11   speculation.
12        Q.   (By Mr. Freeman) And to the extent of your
13   knowledge?
14   A.   To the extent of my knowledge, yes.
15   Q.   Okay.  And I'll just clarify that your counsel
16   may make objections at various points.  Unless he
17   instructs you not to answer affirmatively, you can go
18   ahead and answer.  But I'll remind you and he'll remind
19   you, et cetera.
20        MR. SWEETEN:  Yeah.
21   Q.   (By Mr. Freeman) Did the Department of Public
22   Safety or its employees provide any input concerning
23   this analysis?
24   A.   No.  Excuse me.  No.
25   Q.   And did the Office of the Attorney General

---

**27**

1    provide any input with regard to the analysis?
2    A.   Not that I'm aware of.
3    Q.   Did the Department of Public Safety receive any
4    copies of this analysis?
5    A.   I do not know.
6    Q.   Did the Office of the Attorney General receive
7    any copies of this analysis at this time?
8    A.   I do not know.
9    Q.   How long was Karen Richards in her position as
10   the head of the voter registration team; do you know?
11   A.   Long before I arrived, so I don't know.
12   Q.   And when did she leave again?
13   A.   2011.  I can't recall a specific month.
14   Q.   Are you aware of whether David Falk, F-a-l-k,
15   was involved in this analysis?
16   A.   I don't recall, but I'm going to say I don't --
17   I don't know.  I do not recall working with David on
18   this.
19   Q.   Okay.  Do you know if Todd Giberson was
20   involved with this in any capacity?
21   A.   I'm not familiar with Todd.
22   Q.   Do you know if Joshua Zahn, Z-a-h-n, was
23   involved in any capacity?
24   A.   Are these OAG employees?
25   Q.   I'll represent to you that they are employees

---

**28**

1    of the Office of the Attorney General, yes.
2    A.   I don't recall any other employees being
3    involved in this activity.
4    Q.   Okay.  And so it was just you, Mr. Mendoza,
5    Ms. Richards, and Ms. McGeehan?
6    A.   Yes.
7    Q.   Okay.  Do you recall when you completed the
8    project, all six rounds of analysis?
9    A.   There's a chance there's another e-mail I'd
10   like to take a look at that has the summary.
11        MR. FREEMAN:  We'll mark this as U.S.
12   Exhibit 972.
13        (U.S. Exhibit 972 marked for
14   identification.)
15   A.   I see that on February 1st, Ann had the results
16   that she needed and was going to communicate it.
17   Q.   (By Mr. Freeman) And if you look a little bit
18   further down, did Karen Richards transmit statistics
19   from six queries on January 27th?
20   A.   Yes.
21   Q.   Okay.  So, was that the extent of the analysis,
22   six queries?
23   A.   To the best of my knowledge, these were the
24   final results of the queries.
25   Q.   Okay.  Who else, besides Ann McGeehan and Karen

LEE GUYETTE                                                    JUNE 19, 2012

---

29

1  Richards, received copies of this analysis?
2      A.   I see the intent of the e-mail, but I don't
3  know if it went beyond the group that you mentioned.
4      Q.   Who is Coby?
5      A.   That would be Deputy Secretary Coby Shorter,
6  Secretary of State.
7      Q.   And the top of this e-mail, does Ms. McGeehan
8  state that she has attached a draft summary that she
9  will send to Coby and John so that they can distribute
10  to legislative folk?
11     A.   That's correct.  And to clarify, the John that
12  she's referencing is likely the John Sepehri, who was
13  general counsel.
14     Q.   Okay.  And to the extent of your knowledge, did
15  this distribution end with Coby and John?
16     A.   To be honest with you, I don't even know if it
17  went to Coby and John.  This is the extent of my
18  knowledge.
19     Q.   Okay.  All I can ask you for is the extent of
20  your knowledge.
21     A.   That's...
22     Q.   Now, if you can look back real quickly at
23  Exhibit 491.  Do you see on Wednesday, January 26th, at
24  just before 4:00 p.m., Karen Richards sent out an e-mail
25  saying that some queries had already been done, some

---

30

1  queries needed to be done?  Is that correct?
2      A.   So, 491.  I'm not sure -- I've got 971, 972,
3  970.
4      Q.   I'm sorry.  I meant 971.
5      A.   Okay.
6      Q.   You can see the page that is marked 44399.
7      A.   Okay.
8      Q.   And do you see that there are queries listed as
9  having been done and queries listed as needing to be
10  done?
11     A.   Yes, I do.
12     Q.   Is this the format in which you received
13  instructions from Ms. Richards concerning the analysis
14  that was needed?
15     A.   I believe there was probably some instruction
16  prior to that, judging from John's earlier response on
17  January 25th.  I also believe that Karen's additional
18  instruction, for your reference, of January 26th, lines
19  up with the summary of the six queries that were
20  provided.
21     Q.   But in terms of the manner in which
22  Ms. Richards provided instructions to you, is this how
23  she essentially defined the scope of the project, these
24  types of bullet points?
25     A.   These types, but I would also say that it

---

31

1  wasn't unusual for us to have telephone conversations to
2  enforce and into more detail on instructions.
3      Q.   Okay.  Do you recall receiving several
4  different sets of instructions as to how the run the
5  queries that resulted in the total of six queries, or
6  were all six given at once?
7      A.   Judging from -- and I'm going by the e-mail
8  that we both share -- it looks like there was some,
9  maybe not iteration of queries, but there were some
10  iteration on thought on what the queries should be.
11     Q.   Okay.
12     A.   So, you could tell that it slowly evolved,
13  through this e-mail chain, what the target queries and
14  matching criteria are; even some discussion about the
15  age that should be used.
16     Q.   So if you start at the bottom, the January 25th
17  e-mail, that matches was a county code, last name, first
18  name, date of birth match, correct?
19     A.   So, I'm sorry.  Which document are you
20  referring to?
21     Q.   Still 4 -- excuse me -- 971, the last page.
22     A.   Okay.
23     Q.   That it says county code, last name, first
24  name, date of birth, correct?
25     A.   Last name, first name, date of birth, and

---

32

1  county, that's correct.
2      Q.   Okay.  And further up in the e-mail when
3  Ms. Richards is describing queries needed to be done,
4  she lists the same query, but she strikes out first
5  name, correct?  And this is on 44399.
6      A.   That's correct.
7      Q.   So that would provide a less accurate -- sorry,
8  strike that.
9      A.   It would provide a different set of data.
10     Q.   It would provide a different set of data.  And
11  it would provide a greater set of matches if you
12  eliminate one of the match criteria?
13     A.   I believe you have the results that show that
14  in 972.  For example, in 972, you have a query 5 --
15  excuse me.  You have query 3 that removes the first
16  name, and the other query you were comparing against --
17  last name, first name, date of birth and county -- is
18  query 1, last name, first name, date of birth.  So you
19  -- you're asking for a comparison between query 1 and
20  query 3, and I think you'll have your results there.
21     Q.   What I'm asking is:  As a general matter, if
22  you have a match that requires matching on four
23  different criteria, and then you eliminate one of those
24  criteria, so that you only need to match on three of the
25  four criteria, you will have a greater number of

LEE GUYETTE                                                        JUNE 19, 2012

## 33

1   matches, assuming that at least one of the no match is
2   as a result of the no match on the eliminated criteria?
3           MR. SWEETEN:  Objection, calls for
4   speculation.  Objection, assumes facts not in
5   evidence.  And I think you're now asking him to make a
6   qualitative judgment based upon the matching criteria.
7   I think that's beyond the scope of the topic.
8           With all those objections, you can answer
9   the question as best as you can.
10      A.  I think it's possible to leave it to the
11  numbers that you were provided, which have last name,
12  date of birth, the same county.  The only difference
13  between 1 and 3, is 1 has a first name and query 3 does
14  not.
15      Q.  (By Mr. Freeman) Okay.  I guess what I'm trying
16  to get at is:  By eliminating first name, the number of
17  matches went up from one to three, correct?
18      A.  That is correct.
19      Q.  Okay.  Did anyone ever tell you the purpose of
20  eliminating first name?
21      A.  No.
22      Q.  It was just an instruction?
23      A.  It was an instruction.
24      Q.  Okay.  And were you ever told that these
25  queries were emergencies?

## 34

1       A.  I would draw the conclusion that yes, given
2   that subject line of the e-mail chain is, "Emergency,
3   Special Query."
4       Q.  And then in an e-mail from Karen Richards to
5   Ann McGeehan, did Ms. Richards say she had talked to
6   Mr. Mendoza and impressed the urgency of the queries?
7       A.  Is that also part of -- part of Line 971?
8       Q.  It is.
9       A.  I know you know the answer, but if you could
10  help direct me to what page it.
11      Q.  On 44399. I'm sorry.  It's not a quiz.  It's
12  Wednesday.
13      A.  Yes.  Karen states on Wednesday, January 26th,
14  that she spoke to John on the phone and impressed the
15  urgency.
16      Q.  Okay.  Now, the e-mail chain on 4 -- I keep
17  saying 4. -- 972.  If you look at Ms. Richards's e-mail
18  of January 27 -- we've previously discussed this -- but
19  she provides matching criteria and results for six
20  queries, correct?
21      A.  Yes, that's correct.
22      Q.  And she bases it on the total voters in the
23  state of 12,657,834 on the top of Page 2?
24      A.  That is correct.
25      Q.  And for each query, does she first eliminate a

## 35

1   number of voters who will have a TDL ID number in their
2   TEAM record?
3       A.  That is correct, with the exception of query 2,
4   4, and 6, where she also eliminates individuals 70 years
5   or older.
6       Q.  Okay.  Thank you for that clarification.
7           And then are the remaining individuals
8   then matched to DPS records based on the set of named
9   criteria?
10      A.  That is correct.
11      Q.  And do the total unmatched records range
12  between approximately 504,000 and 845,000?
13      A.  That is correct.
14      Q.  Okay.  And I know that we discussed this a
15  little bit when we were discussing who you met with
16  previously.  But does the middle e-mail indicate that
17  Ms. McGeehan is typing up a summary of that data?
18      A.  That is correct, it does.
19      Q.  And does she state that she's typing up the
20  summary to provide the summary to legislative staff?
21      A.  That is correct.  Ann states, "I am typing up a
22  summary of this comparison to provide to legislative
23  staff."
24      Q.  And I know that you testified to this, a
25  variation on this earlier, but what legislative staff

## 36

1   received that summary?
2       A.  I am not aware of any legislative staff that
3   received this summary.
4       Q.  Okay.  Now, the top e-mail, does the top e-mail
5   state this Ms. McGeehan had talked to John Sepehri
6   concerning the summary?
7       A.  I think she -- I believe that the first John
8   she's referring to is John Mendoza.
9       Q.  Oh.
10      A.  I believe the second John she's referring to,
11  in the section, is John Sepehri.
12      Q.  Thank you for the clarification.
13          Does she state that she has attached a
14  draft summary that she plans to send to Coby and John?
15      A.  Yes, she does.
16      Q.  If you turn to the third page, is that a
17  summary of the queries?
18      A.  Yes, it is.
19      Q.  Okay.  If you can please review in it total,
20  and then I'll ask you a couple of questions.
21      A.  (Witness reviewing document.) All right.  I'm
22  ready.
23      Q.  Does the summary explain only two queries?
24      A.  It explains query 3 and 5.  And let me
25  verify.  It may do 1 as well.  The first paragraph after

LEE GUYETTE                                             JUNE 19, 2012

---

## 37

1    the discussion does reference the number 2,814,965,
2    which is in query number 1.  The second paragraph --
3        Q.   Just a quick clarification.  Isn't the
4    2,814,965 number the total number of voters who did not
5    list a Texas driver's license or a Texas ID number on
6    their voter registration application, so it's present in
7    query 1, 3, and 5, all the queries where the universe of
8    total voters was not filtered out to eliminate voters
9    age 70 and older?
10       A.   That is right.
11       Q.   Okay.
12       A.   The second paragraph -- the second paragraph --
13   can you give me a couple of minutes to review this?
14   Of course.  Yes.  Yes.
15       A.   I know I can't write on this.  Can I borrow a
16   pen?
17       Q.   You can if you'd like.  If you find it helpful,
18   you can write on it.
19       A.   (Reviewing document and taking notes.)
20            Okay.  All right.  Reviewing Ann's
21   summary, it appears that the first query she references
22   is last name, first name, date of birth and same county.
23       Q.   And that's query 1, correct?
24       A.   And that corresponds to query 1.  The second
25   portion with the second query was last name, date of

---

## 38

1    birth, and same county.  And that's query 3.  So she
2    references two of the six queries.
3        Q.   And am I correct that her summary states that
4    the office performed two queries to obtain the estimated
5    range of voters who had not been issued a TDL ID
6    number?  She does not say three or six, correct?
7        A.   She does state, "We performed two queries to
8    obtain the estimated range of voters."
9        Q.   And she does not reference any other analysis
10   performed beyond query 1 and query 3, correct?
11       A.   I agree.
12       Q.   Do you know why she did that, to the extent of
13   your knowledge?
14       A.   I do not know.
15       Q.   Okay.  Did you receive any instruction to run
16   any queries other than the six queries listed here?
17       A.   I don't recall any other queries.
18       Q.   Do you know if Mr. Mendoza received any
19   instruction to run any queries other than the six
20   queries listed here?
21       A.   I'm not aware of any additional queries.
22       Q.   Okay.  If you had received such an instruction,
23   is it your normal procedure to run those queries if you
24   were instructed to do so?
25       A.   Yes.

---

## 39

1        Q.   Okay.  And with regard to this specific summary
2    document, are you aware of anyone who received it beyond
3    the recipients of the e-mail that has been marked
4    Exhibit 972?
5        A.   I'm not aware of anyone outside the recipients
6    of 972.
7        Q.   But it's possible, correct?
8            MR. SWEETEN:  Objection, relevance.  Don't
9    guess or speculate.
10       A.   I do not know.
11       Q.   (By Mr. Freeman)  Okay.  Do you know if anyone
12   provided an instruction not to send this information to
13   the legislature?
14       A.   I have seen no such instruction.
15       Q.   Okay.  Besides the documents that you provided
16   today, what records of the analysis still exist?
17       A.   We previously discussed that we do have some
18   old code.
19       Q.   Okay.
20       A.   We may be able to access.  I'm not aware of any
21   other documents outside of what's been provided.  Now, I
22   will say that I'm sure the e-mail stack you've received
23   over the last few weeks.  But I'm not aware of any of
24   the relative documents in there.
25       Q.   All I can ask is what you know.

---

## 40

1        A.   Yeah.  Thank you.
2        Q.   I don't know if anyone fully knows what's in
3    e-mail stack that we've received in the last few weeks.
4            Okay.  I apologize, again, that some of my
5    questions may dart back and forth because, as you
6    know, we received these documents recently.  I'm going
7    to try and keep it in some sort of a coherent narrative.
8            We talked about communications.  I'd like
9    to speak a little bit about the content of the matches,
10   the technical content.
11           What database or databases were you using
12   as the universe of data on the DPS side of this match?
13       A.   For the DPS, we used -- once a year, DPS
14   distribution, that data is typically used to develop
15   jury pools.
16       Q.   Okay.
17       A.   The data we used here is from October 2010.
18       Q.   And is that known as the annual jury wheel
19   process?
20       A.   Yes, sir.
21       Q.   And is it produced in October every year?
22       A.   It's -- I don't know.
23       Q.   Okay.  Is it typically produced in October?
24       A.   Typically produced every year around October.
25       Q.   Okay.  On or about October?

LEE GUYETTE                                              JUNE 19, 2012

## 41

1    A.   Yes, sir.  Thank you.
2    Q.   Sure.  And that's a production from the
3    driver's license database?
4    A.   Yes.
5    Q.   Did you use any match to the license to carry
6    database?
7    A.   I'm not aware of any matches with the license
8    to carry database.
9    Q.   Okay.  Are you aware of what fields are
10   provided to the Office of the Secretary of State as part
11   the annual jury wheel process?
12   A.   I'm aware of some of the basic fields which are
13   included in the matching criteria.
14   Q.   Okay.  If you go back to Ms. McGeehan's draft
15   summary, the last page of Exhibit 972, do you see that
16   she says -- do you see if she says, "Our copy of the DPS
17   database contains only those data field relevant for
18   voter registration:  TDL number, the last name, first
19   name, middle name, name suffix, date of birth, date
20   created, last modified, and transaction type"?
21   A.   I do see that.
22   Q.   Do you additionally have county data?
23   A.   I don't know.  Oh, can I retract that?
24   Q.   Of course.
25   A.   I believe, yes, the county data is included.

## 42

1    Q.   So there are additional fields beyond what was
2    listed Ms. McGeehan's letter, correct?
3    A.   I state that since county was used as one of
4    the matching criteria.
5    Q.   Are you aware of what other criteria you have
6    from DPS?
7    A.   I don't know additional criteria came from DPS
8    in the jury file.
9    Q.   Do you know if -- if you have data concerning
10   whether the driver's license is expired?
11           MR. SWEETEN:  You're asking had.  You're
12   talking about the January analysis?
13           MR. FREEMAN:  I'm asking about the data
14   that he had available to him to perform the January
15   analysis.
16           MR. SWEETEN:  All right.
17   A.   I don't know if it includes expiration dates.
18   Q.   (By Mr. Freeman)  Okay.  Do you know if you had
19   a field indicating whether a driver's license had been
20   suspended?
21   A.   I do not know.
22   Q.   Do you know if you had a field indicating
23   whether the individual at issue did not have a Texas
24   driver's license?
25   A.   And we're speaking about the DPS data?

## 43

1    Q.   We are.
2    A.   I'd rather not speculate, but I don't know if
3    it had a non -- a nonTDL.
4    Q.   Okay.  Are you aware of whether the driver's
5    license database contains out-the-state drivers who
6    receive tickets in the state of Texas?
7    A.   I do not know.
8    Q.   Okay.  Are you aware of whether the driver's
9    license data produced to the Office of the Secretary of
10   State indicates whether an individual is deceased?
11   A.   I do not know.
12   Q.   Do you know how many cases were in the driver's
13   license data that you received overall?
14   A.   How many --
15   Q.   Individual records.
16   A.   I don't have record of that with me.
17   Q.   Okay.  And you don't know?
18   A.   I do not know.
19   Q.   Okay.  Prior to matching the voter registration
20   data to the driver's license database, did you drop any
21   records from the driver license database?
22   A.   I understand that there was some filtering on
23   the side of DPS.  For example, felons gets filtered.  So
24   there is filtering done, not by myself and my team, but
25   I'm not aware of any other filtering we did to the DPS

## 44

1    database.
2    Q.   So as part of the jury wheel process, data is
3    filtered on the DPS side prior to providing it to SOS,
4    correct?
5    A.   That is correct.
6    Q.   And other than the felons, what other filters
7    are you aware of that are applied to the jury wheel
8    data?
9    A.   I'd be speculating.
10   Q.   Okay.  I'm only asking what you're aware of.
11           Do you know DPS filters for felons, what
12   criteria they use?
13           MR. SWEETEN:  Objection, outside the
14   scope.
15           MR. FREEMAN:  Mr. Sweeten, I'm asking
16   about the data that he used to perform the match, and I
17   think we're well within the scope.
18           MR. SWEETEN:  That's not what you asked.
19   You said, "Do you know how DPS filters," and that's a
20   present tense.  We're here talking about the analysis
21   from January of 2011.  So, if you want to ask about
22   whether he knew that about that data, then that's a fair
23   question, and I'll allow him to answer that.
24           MR. FREEMAN:  All right.
25           MR. SWEETEN:  I think if you're asking

LEE GUYETTE                                                    JUNE 19, 2012

---

## 45

1  general, sort of procedure, I think --
2      MR. FREEMAN:  I'm happy to change the
3  tense of my question.
4      MR. SWEETEN:  But in any event, I think
5  his answer was no.
6      THE WITNESS:  No.
7      MR. FREEMAN:  Okay.  That's solves the
8  problem.
9      MR. SWEETEN:  It does.  It solves a lot of
10  problems between us.
11      Q.  (By Mr. Freeman) Did you, prior to running the
12  match, search for any duplicates within the DL side of
13  the database?
14      A.  Not that I'm aware of.
15      Q.  Okay.
16      MR. SWEETEN:  Can we have a restroom break
17  if we're at a good spot?
18      MR. FREEMAN:  Yeah.  Fine.
19      (Recess from 4:19 p.m to 4:34 p.m.)
20      MR. FREEMAN:  If you could mark this
21  document as Exhibit 973.
22      (U.S. Exhibit 973 marked for
23  identification.)
24      Q.  (By Mr. Freeman) Now, I'm not going to ask you
25  any questions about the actual time frame of this

## 46

1  e-mail, because it's outside the scope of this
2  deposition.  What I am going to ask about is whether you
3  similarly loaded additional records into the jury wheel
4  data before performing this match, the match at issue in
5  January?
6      MR. SWEETEN:  Dan, what you're trying to
7  do is, you're asking, did he do something similar to
8  what this e-mail, which is outside the scope, was.
9      I don't mind if you want to ask him about
10  the analysis of January, but I think that your question,
11  it relates to something, you know, that occurred at a
12  later time than what he's here on Topic 8 to testify
13  to.  So if you want to ask him about what he did with
14  the jury wheel, I have no issue with that, but he's not
15  going to compare something that may have happened later
16  that's outside the scope of the topic.
17      MR. FREEMAN:  All I was trying to do is
18  use this to refresh his recollection about the
19  possibility, and so if you want me to not use it as a
20  framework try to and help him, that's fine.
21      MR. SWEETEN:  Well, he's seen it.  I mean,
22  I would prefer if you'd just ask him if he did
23  something, the analysis, whatever.
24      MR. FREEMAN:  That's fine.
25      Q.  (By Mr. Freeman) Did you load any additional

## 47

1  records into the jury wheel data prior to performing the
2  match in January 2011?
3      A.  I'm not aware of any additional records that
4  were added.
5      Q.  Okay.  What is test data?
6      A.  Where do you reference test data?
7      (U.S. Exhibit 974 marked for
8  identification.)
9      MR. FREEMAN:  Okay.  I'm going to mark
10  this as U.S. Exhibit 974.  And I am putting it in front
11  of the witness only for the purposes of refreshing the
12  witness's recollection with regarding to a particular
13  term and not with regard to anything that happened in
14  November of 2011.
15      Q.  (By Mr. Freeman) So if you could look at
16  Page 3.
17      A.  I got a question.  I can't share this with
18  counsel?
19      Q.  Oh, he has a copy.
20      MR. SWEETEN:  He gave it to me, yeah.
21      I mean, again, Dan, we're going outside
22  the scope here.  You're showing him an e-mail from
23  November 29th, 2011, it appears.  The scope of the
24  deposition is any analysis performed prior to May 27th.
25  He is here to answer questions about an analysis that I

## 48

1  think you've quizzed him on in January of 2011.
2      If you want to ask him about test data
3  with respect to the analysis in January, I think that's
4  appropriate, and I'll let that go on.  But I don't --
5  you know, we're not going to get in beyond the scope of
6  Topic 8.
7      MR. FREEMAN:  And I will ask no questions
8  with regard to this match.  I'm only trying to refresh
9  the witness's recollection with regard to a concept, and
10  then apply that concept to the match.  So I don't think
11  we should have any problems.
12      Q.  (By Mr. Freeman) Do you understand?
13      A.  I understand.
14      Q.  Okay.
15      With regards to the January 2011 -- or the
16  October 2010 --
17      Q.  Data.
18      A.  -- data, I don't recall if test data was
19  removed or remained.  That's a DPS term.
20      Q.  Okay.  Prior to the match, did you filter the
21  DPS data to eliminate expired drivers' licenses?
22      A.  For purposes of January 2011, I don't recall
23  doing that.
24      Q.  Okay.  Did you filter for suspended drivers'
25  licenses?

LEE GUYETTE                                              JUNE 19, 2012

---

**49**

1      A.   I don't recall that additional filtering.
2           MR. FREEMAN:  I'll mark this as
3    Exhibit 975.
4           (U.S. Exhibit 975 marked for
5    identification.)
6      Q.   (By Mr. Freeman) Take a moment to review it.
7      A.   (Witness reviewing document.)
8      Q.   Have you seen that e-mail before?
9      A.   No, I have not.
10     Q.   At the time that you performed the analysis or
11   supervised the analysis in January of 2011, were you
12   aware of any effect that suspension of a license would
13   have on an individual's ability to vote under the
14   legislation that was then being considered?
15     A.   No, I was not.
16     Q.   Did you filter out for individuals who did not
17   have a Texas driver's license or a Texas ID but were in
18   the driver's license database?
19     A.   I don't recall filtering for those, for the
20   driver's license.  You said no driver's license?
21     Q.   No Texas ID card, but were in the database.
22     A.   I don't recall any of that filtering.
23     Q.   Did you filter out individuals who were marked
24   in the Texas driver's license database as being
25   deceased?

---

**50**

1      A.   See, I don't recall that additional filtering,
2    if any, were used upon the DPS database.
3      Q.   Okay.  Did you ask for any additional fields
4    for the driver's license database related to deceased
5    individuals, individuals with suspended licenses, or
6    individuals with no ID?
7      A.   I don't recall any additional fields being
8    asked beyond what's provided in the October 2010
9    database.
10     Q.   Okay.  Did you filter out any individuals with
11   invalid social security numbers?
12     A.   I don't recall ever filtering out based on
13   social security number.
14     Q.   And the last one these:  Did you filter out any
15   individuals based on an invalid county code?
16     A.   I do not recall filtering based on an invalid
17   county code.
18     Q.   Okay.  So let's move over to the social --
19   excuse me -- the Secretary of State's Office side of the
20   data match.  What database or databases did you start as
21   the starting universe of data on the Secretary of
22   State's side?
23     A.   I don't recall the specific period of the
24   database, but traditionally, we'll run from production,
25   which is the latest live database.

---

**51**

1      Q.   Okay.  So that's part of the TEAM database?
2      A.   Yes.
3      Q.   And is that sort of a snapshot?
4      A.   Every time you run a query, you'll get new
5    data, the latest data.
6      Q.   Okay.  Do you know what date the data
7    extraction was that was used for the matches here?
8      A.   It would be speculation, but -- and I'll leave
9    it at that.
10     Q.   Was it on or about January 25th?
11     A.   Yes.
12     Q.   Okay.  Was the same data extraction used for
13   all six queries?
14     A.   Judging from the results, I would say no.
15     Q.   Isn't it the case that the total number of
16   voters in the state in each of the six queries is the
17   same?
18     A.   The key that I'm triggering off of is voters
19   with no TDL ID number varies.
20     Q.   Doesn't it vary only based on whether a filter
21   was run for individuals 70 and over?
22     A.   No.
23     Q.   Pardon me?
24     A.   No.  For example, query 1 result is different
25   than query 3 for no TDL number.

---

**52**

1           MR. FREEMAN:  And for the record, the
2    witness is pointing to Page 2 of Exhibit U.S. 972.  And
3    for the record, the witness is quite right.
4      Q.   (By Mr. Freeman) Okay.  If you can turn back to
5    Exhibit 971.  Do you see the first e-mail from
6    Mr. Mendoza to Ms. Richards?  Do you see the postscript
7    to that e-mail?
8      A.   "I went ahead and added the VR numbers, but as
9    you mentioned, it is a moving target.  These two have
10   slightly different VR numbers."
11     Q.   So is it the case that there were slightly
12   different data extractions for the six runs?
13     A.   I would speculate that that would be the case,
14   but I'm not -- I can't swear to it.
15     Q.   Okay.  But logically, based on your experience,
16   if Mr. Mendoza said that it was a moving target and that
17   totals were slightly different for each query, would
18   that lead you to conclude the most likely outcome is
19   that there were slightly different data extractions for
20   each of these queries?
21     A.   Which is very typical of -- which is very
22   typical of running queries on a live database.
23     Q.   Okay.  Thank you.  And thank you for working
24   through that with me.  These documents are all new to me
25   as well.

LEE GUYETTE                                                    JUNE 19, 2012

## 53

1          Are you aware of what tables within the
2    TEAM database were used for this match?
3          A.   I don't recall the specific tables that were
4    used.
5          Q.   Do you know what fields were used in the match
6    process?
7          A.   At a minimum, it would be the fields that are
8    dictated in the match.  I'm not aware of additional
9    fields that were used.
10          Q.   So that would be TDL ID number, correct?
11          A.   For the initial one, yes, that's correct.  For
12    the initial filtering, that is correct.
13          Q.   Okay.  And then in total, among the six
14    queries, the additional fields would be last name, first
15    name, date of birth, county, age, which is likely
16    derived from date of birth?
17          A.   That's correct.
18          Q.   And that's all?
19          A.   That is correct.
20          Q.   Okay.  Did you receive any instruction to run
21    the queries on a frozen extract of the database so that
22    they would be based on the same total number of voters?
23          A.   I don't recall such instruction.
24          Q.   Did you consider running the queries on a
25    frozen database?

## 54

1          A.   I do not recall.
2          Q.   Okay.  And were any cases dropped from the SOS
3    side of the analysis prior to the match, other than the
4    filter for individuals with a TDL or ID number?
5          A.   The only other criteria is must be an active or
6    a suspense voter.
7          Q.   So individuals who are in the live check
8    status were not part of the match?
9          A.   Give me a minute.  I do not recall, but I see
10    some reference on Exhibit 971 where the analyst did not
11    find any live check match records.
12          Q.   Okay.  So the alternative to active and
13    suspense is an individual in a live check status?
14          A.   Possibly cancelled.
15          Q.   Okay.  And what is your understanding of what
16    live check status means?
17          A.   Live check status is the part of the process
18    where we're confirming the information on the
19    individual.
20          Q.   Okay.  And what is a cancelled voter?
21          A.   A cancelled voter is a voter that can no longer
22    vote.
23          Q.   And so is that someone who was once an active
24    voter but is no longer on the rolls?
25          A.   I think that might be a fair question to ask

## 55

1    the Elections Division.
2          Q.   I'm asking for your understanding.
3               MR. SWEETEN:  Don't guess or speculate.
4          A.   Okay.  I'm not going to guess.
5          Q.   (By Mr. Freeman)  Okay.  Are they in a separate
6    cancelled voter table within the database?
7          A.   I do not know.
8          Q.   Is there a cancelled voter field?
9          A.   I do not know.
10          Q.   Within the database, how do you identify a
11    cancelled voter?
12               MR. SWEETEN:  Are we talking about his
13    analysis in January of 2011?
14               MR. FREEMAN:  I'm trying to understand how
15    he excluded cancelled voters from the analysis.
16          A.   I would need to review the code --
17          Q.   (By Mr. Freeman)  Okay.
18          A.   -- again.  Keep in mind that there's tens of
19    thousands of fields in this database, so for me to talk
20    about individual fields --
21          Q.   That's fine.
22          A.   -- I'd have to go investigate.
23          Q.   I understand your argument.
24               But cancelled voters were not included in
25    your analysis, correct?

## 56

1          A.   That's correct.
2          Q.   Okay.  Did you search for duplicates within the
3    database prior to performing the match?
4          A.   I don't recall searching for duplicates.
5          Q.   And again, within the SOS side of things, did
6    you filter for any particular criteria prior to
7    performing the match, other than the TDL ID number being
8    present?
9          A.   I do not recall any other filtering.
10          Q.   Okay.  I'm just going to run through real
11    quickly and say no, then we can move on.
12               Did you filter for test data?
13          A.   On the SOS --
14          Q.   Yes.
15          A.   -- database?  I don't recall any test data.
16          Q.   Did you filter to see whether "test" was the
17    entry in any fields prior to performing the match, such
18    as a first name being test or a last name being test?
19          A.   I don't believe we filtered on test.
20          Q.   Did you include suspense voters in your match?
21          A.   Yes.
22          Q.   In terms of the removal of individuals who
23    provided a driver's license or a Texas ID number at the
24    time of registration, did you consider this a form of
25    matching, or did you consider this simply a filter?

LEE GUYETTE                                          JUNE 19, 2012

---

**57**

1    A.  I'm trying to -- maybe you could help
2  distinguish the difference between the two.
3    Q.  Sure.  Did you consider, when performing the
4  match, that an individual who had listed a Texas
5  driver's license or a Texas ID number was an individual
6  who had a valid current Texas driver's license?
7    A.  I'll have to review the code to determine.
8    Q.  Are you aware of whether the presence of a
9  Texas driver's license number within the TEAM database
10  is an indication of whether the driver's license is
11  current and valid?
12    A.  I'm not aware if that's a pure indication if
13  it's a current valid driver's license.
14    Q.  Is the presence of a Texas driver's license
15  number in the TEAM database an indication of whether
16  that driver's license actually matches the individual?
17    A.  I'm not aware if that's strong indicator that
18  that matches the individual.
19    Q.  Are you aware of whether the presence of a
20  Texas driver's license number in the TEAM database is an
21  indication of whether that driver's license has been
22  revoked?
23    A.  I would have no indication.
24    Q.  Okay.  This was simply a filter that you were
25  instructed to impose, correct?

---

**58**

1    A.  That's correct.
2    Q.  Okay.  A couple more of these easy filter
3  questions for you.  Did you filter out individuals who
4  are marked in the TEAM database as being deceased?
5    A.  I do not recall removing deceased.
6    Q.  Is there an indicator in the TEAM database of
7  whether individuals are deceased?
8    A.  For the sake of this exercise, I'm not aware if
9  that was used.  We have -- so I'm not aware if deceased
10  records were considered in this.
11    Q.  Okay.  Is there an indicator, however, in the
12  TEAM database of whether individuals are deceased?
13    A.  Yes.
14    Q.  How is that determined?
15    MR. SWEETEN:  That's outside the scope.
16  I'm going to object to the question as outside the
17  scope.  You're asking how a field is populated, the
18  determination that goes in to it.  That was subject to a
19  30(b)(6) motion -- I mean deposition.  We've also -- I
20  mean, this isn't a discovery deposition.  He's here for
21  Topic 8, so I think you're outside the scope of that
22  question.
23    MR. FREEMAN:  Are you instructing him not
24  to answer?
25    MR. SWEETEN:  I mean, you can answer this

---

**59**

1  question if you know, but, I mean, we're getting far
2  afield, Counsel, I think, so, I'm going to maintain my
3  objection, obviously.
4    A.  I'd prefer to review the material before
5  answering that question.
6    Q.  (By Mr. Freeman) You're not aware?
7    A.  I'm not aware.
8    Q.  Again, solving me and Mr. Sweeten's problems.
9    A.  Yeah.
10    Q.  Was there any filter for invalid social
11  security numbers?
12    A.  I'm not aware of any social security number
13  filtering.
14    Q.  Any filter for individuals with an unrealistic
15  age?
16    A.  I'm not aware of any filtering for unrealistic
17  age.
18    Q.  Any filter for an invalid county code?
19    A.  I'm not aware of any filters for invalid county
20  codes.
21    Q.  Any other filters?
22    A.  I'm not aware of any other filters.
23    Q.  Okay.  Great.
24         So just very quickly, if we can proceed
25  through the six matches.  There were six, correct?

---

**60**

1    A.  That is correct.
2    MR. FREEMAN:  Mark this as U.S. 976.
3    (U.S. Exhibit 976 marked for
4  identification.)
5    Q.  (By Mr. Freeman) Is this an e-mail conveying
6  the query 1 results?
7    A.  The criteria looks appropriate, but I'd have to
8  check the numbers to verify that's it an exact match of
9  query 1 in the summary.
10    Q.  Okay.  But you've seen this e-mail before,
11  correct?
12    A.  To be honest, I've seen the e-mail, but I
13  haven't seen the attachment.
14    Q.  Okay.  You're cc'd on this e-mail, right?
15    A.  That is correct.
16    Q.  And you normally read e-mails that you receive
17  from Mr. Mendoza?
18    A.  Yes, I do.
19    Q.  Okay.  And according to the -- strike that.
20         Just to understand the process of the
21  match, the first step was to remove the individuals who
22  have a Texas driver's license or ID, and that is
23  indicated in Columns C and D of the attached
24  spreadsheet, correct?
25    A.  To be honest, I'd have to go back and look at

## 61

1   the numbers, because both CD and EF all say without TDL
2   ID. So let me make sure I fully understand what these
3   numbers represent.
4       Q.   If you look at the last page of Exhibit 976, do
5   you see Totals?
6       A.   I do see Totals.
7       Q.   And am I correct that these totals, if you add
8   up Column C and Column D, that you get 2,814,965?
9       A.   That's correct.
10      Q.   And is that the number of voters with no TDL or
11  ID, both active and suspense and listed in query 1?
12      A.   That does match query 1.
13      Q.   Okay. If you add the second, E and F totals,
14  am I correct that you'd get 1,970,252?
15      A.   That's correct, which matches query 1.
16      Q.   And that's the number who do match. So am I
17  correct that this spreadsheet does not provide the total
18  number of voters that do not match a DPS record?
19      A.   This spreadsheet does not, but -- are you doing
20  the same math I'm doing right now?
21      Q.   I'm just waiting for you to do it.
22      A.   With this information, that is correct.
23      Q.   Okay. So if I were to -- or you were to
24  subtract the total of Column CD -- pardon me -- the
25  total of Column EF from the total of Column CD, you

## 62

1   would get the numbers of voters who neither have a TDL
2   ID number in their TEAM entry nor were matched to a DPS
3   record under query 1, correct?
4       A.   That is correct.
5       Q.   Okay. I am proud of both of us for still
6   having arithmetic skills in this age of omnipresent
7   calculators.
8            Now, you did not, in performing this
9   match, also assess whether an individual was reported in
10  the TEAM database as having a Spanish surname, correct?
11      A.   I don't recall doing anything with Spanish
12  surnames.
13      Q.   Are Spanish surname analyses easy to do,
14  perform when using the TEAM database?
15      A.   They weren't part of this January effort.
16      Q.   Sure. But is it just a matter of filtering for
17  one field, a match or a no match, essentially, to that
18  field?
19      A.   I'd have to go back and do some investigation,
20  but parts of -- I don't know --
21      Q.   Okay.
22      A.   -- is the answer.
23      Q.   But no one asked you to perform that analysis,
24  so you didn't?
25      A.   No. No.

## 63

1       Q.   And you wouldn't ever perform that analysis on
2   your own, you would just have -- you would have to be
3   asked to do it by someone on the business side?
4       A.   That's correct.
5       Q.   And is that true with all six of the queries?
6       A.   That is correct.
7       Q.   Okay. Are you aware of whether anyone received
8   this attachment other than Ms. Richards and yourself?
9       A.   Potentially, but I see the e-mail was forwarded
10  from Mrs. Richards to Ann McGeehan.
11      Q.   And that's --
12      A.   The second.
13      Q.   -- the second to the last e-mail in Exhibit --
14      A.   971.
15      Q.   -- 971?
16      A.   So that's all the information I have on that.
17      Q.   Okay.
18           MR. FREEMAN:   Mark this as U.S.
19  Exhibit 977.
20           (U.S. Exhibit 977 marked for
21  identification.)
22      Q.   (By Mr. Freeman) Have you seen this e-mail
23  before?
24      A.   Yes.
25      Q.   What is this e-mail?

## 64

1       A.   This e-mail is similar to the previous exhibit,
2   except revision is made to query the voters that are 70
3   -- younger than 70 years of age.
4       Q.   Okay.
5       A.   So it's an e-mail.
6       Q.   And did you take a look at what the totals were
7   again for Column CD and Columns EF?
8       A.   I just looked at CD.
9       Q.   And was the total for Column C and D, which are
10  the without TDL ID columns, is that 2,096,789?
11      A.   It is.
12      Q.   And is that actually the total for query 6,
13  which does not match for same county?
14      A.   And let me -- let me check the second number to
15  make sure that is -- I'd have to go back over with you,
16  because the first number appears to match query 6.
17      Q.   But the second number doesn't match any of the
18  queries, correct?
19      A.   That is correct.
20      Q.   Okay. But it appears that this is simply a
21  filter of query 1, but the -- sorry, strike that. Let
22  me try and get that out making a little bit of sense.
23           From the e-mail chain, does it appear that
24  the only change that Mr. Mendoza made from the first
25  query is to eliminate the voters that are 70 years of

LEE GUYETTE                                          JUNE 19, 2012

## 65

1  age or older?
2      A.   Based solely what's in the e-mail --
3      Q.   Okay.
4      A.   -- I agree.
5      Q.   And that would be query 2, correct?
6      A.   I do not know if this was run as -- it's -- the
7  criteria -- the criteria appears -- to be honest, I'm
8  not sure if this is query 2.
9      Q.   Okay.  The criteria appear to match query 2,
10 correct?
11     A.   Based strictly on this e-mail chain.
12     Q.   Okay.  And the time of this e-mail is 3:35 p.m.
13 on January 25th?
14     A.   That is correct.
15     Q.   And that's only two and a half hours after the
16 query 1 e-mail that we previously discussed was sent,
17 correct?
18     A.   That is correct.
19     Q.   Okay.  So it's possible that some of the totals
20 in Exhibit 972, on the second page, are not quite right,
21 or that this spreadsheet is not quite right?
22     A.   I'd have to review why there's a difference
23 between the spreadsheet and the final numbers.
24     Q.   But there's some kind of discrepancy?
25     A.   There is a discrepancy in the numbers with the

## 66

1  two e-mails that have been provided.
2      Q.   Okay.  And you're not certain of the basis for
3  that discrepancy?
4      A.   Not without investigating further.
5      Q.   Okay.  At this time?
6      A.   At this time.
7      Q.   Great.  Were you given a reason why a filter
8  should be performed to take out the voters 70 years of
9  age or older, or simply instructed to do so?
10     A.   Instructed to do so.
11     Q.   Okay.  Just to clean up the record, because I
12 should have asked this before.  Are the numbers for the
13 totals of C and -- Column C and Column D on Exhibit 977,
14 do they approximately equal the number of voters without
15 a Texas driver's license number or Texas ID number in
16 the TEAM database once you exempt individuals 70 or
17 older?
18     A.   That is correct.
19     Q.   Okay.
20     A.   Keeping in mind that it's active and suspense
21 voters.
22     Q.   But query 2, query 4, and query 6 all have
23 approximately 297 -- excuse me -- 2,097,000 individuals
24 who are under the age of 70 and lack a TDL or ID number?
25     A.   That's what the results are indicating.

## 67

1      Q.   Okay.  And Columns E and F appear to be the
2  result of a number of voters that matched a DPS record
3  in one of the under 70 queries, although it doesn't
4  quite match any of the three such totals found for
5  queries 2, 4, and 6 in Exhibit 972?
6      A.   That is true.
7      Q.   Okay.  And just to clear up for the record, the
8  six queries, because I don't think we ever read them
9  in.  The first query was last name, first name, date of
10 birth, and same county, correct, for matching criteria?
11     A.   That is correct.
12     Q.   The second is the same as the first, but
13 exempts individuals 70 and older, correct?
14     A.   That is correct.
15     Q.   The third is last name, date of birth, and same
16 county?
17     A.   Correct.
18     Q.   The fourth is the same as that, but exempts
19 individuals 70 and older?
20     A.   Correct.
21     Q.   The fifth is the last name, first name, and
22 date of birth?
23     A.   Correct.
24     Q.   And the sixth is the same as the fifth but
25 exempting individuals 70 and older?

## 68

1      A.   Correct.
2      Q.   Okay.  When running these queries, did you only
3  take out individuals on the TEAM side if there was a
4  unique one-to-one match on the DL side?  Does that make
5  sense?
6      A.   You could try repeating the question.
7      Q.   Sure.  What I mean by unique matches, if there
8  are several John Smiths born on June 1st, 1950, in the
9  both the voter registration database and the DPS
10 database, would you have considered them all to be
11 matched?
12          MR. SWEETEN:  According to the analysis?
13     Q.   (By Mr. Freeman) When running these queries?
14 For example, in query 5, last name, first name, date of
15 birth.
16     A.   I'd have to go back and review the code to make
17 sure that would match unique and not multiple matches.
18     Q.   So you're not sure at this time?
19     A.   I'm not sure at this time.
20     Q.   Okay.  And if there were several John Smiths
21 born on June 1st, 1950 in the voter registration
22 database and only one John Smith born on June 1st, 1950
23 in the driver's license database, do you know if the
24 code would have considered all those June 1st, 1950 John
25 Smiths in the voter registration side to be matched?

LEE GUYETTE                                                JUNE 19, 2012

## 69

1  A.  I'm not sure.  I'd have to review the code.
2  Q.  Okay.
3  A.  For those scenarios.
4  Q.  Okay.  What is fuzzy matching?
5  A.  I can tell you what fuzzy matching is, but I
6  don't believe we did, or I don't recall doing any fuzzy
7  matching in this exercise.
8  Q.  Well, you skipped to the second question and
9  avoided the name for the first.  That's fine.
10      So just to clarify, there was no form of
11 fuzzy matching whatsoever with regard to the last name
12 or date of birth?
13 A.  No, there wasn't fuzzy matching.
14 Q.  And was there any kind of substitution matching
15 for a space or a hyphen in the last name field?
16 A.  I don't recall any special handling of unique
17 characters.
18 Q.  Okay.  So for example, if the voter
19 registration database had someone with the last name
20 Sandoval-Martinez, and the driver's license database had
21 Sandoval space Martinez, would that be a no match or
22 would that be a match?
23 A.  I'd rather hold off and look at the code and
24 give you an answer.
25 Q.  Okay.  So you don't know at this time?

## 70

1  A.  I do not know at this time.
2  Q.  If you don't know, you don't know.
3      Did you use strict case matching?
4  A.  I do not know at this time.
5  Q.  Are there any sorts of rules to the TEAM
6  database that requires that the first letter of a last
7  name or first name entry be capitalized and that the
8  remaining letters being lower case?
9  MR. SWEETEN:  I think we're outside the
10 scope here, so I would object, outside the scope.
11 Q.  (By Mr. Freeman) You can answer.
12 A.  I'm going to follow counsel.
13 Q.  But as long as counsel doesn't instruct you not
14 to answer --
15 A.  Okay.
16 Q.  -- to the extent that you have knowledge, you
17 do need to answer.
18 A.  Okay.  I do not know.
19 Q.  Okay.  That's fine.  The only reason I'm asking
20 the question is to try and understand the nature of the
21 match and work around your lack of knowledge concerning
22 case matching.  I'm trying to eliminate the problem.
23     Was there any special rule for treating
24 individuals who were listed with January 1st as their
25 birth date?

## 71

1  A.  I don't recall any special scenarios.  No, I'm
2  not aware of any special handling of January 1st birth
3  dates.
4  Q.  Okay.  Was the output of the query the
5  spreadsheet, the type of spreadsheet that was attached
6  to Mr. Mendoza's January 25th e-mails?
7  A.  I'd have to go back and verify the attachment
8  you shared, but that's -- that's one potential output.
9  Q.  What are the other potential outputs?
10 A.  It could be a -- I'd be speculating, but
11 potentially, it could be an Oracle output --
12 Q.  Okay.
13 A.  -- and converted to the spreadsheet.
14 Q.  Okay.  And that's based on the systems that the
15 SOS has?
16 A.  Yes.
17 Q.  Great.  Was it possible that the output
18 actually produced the names or records for all
19 nonmatched individuals?  Do you know if it did?
20 A.  No, I do not know if it did.
21 Q.  So you're not aware at all of the format of the
22 output?
23 A.  No, I am not.
24 Q.  And were you instructed to filter or categorize
25 the data at all based on SSVR?

## 72

1  A.  SSVR?
2  Q.  The Spanish surname voter registration.
3  A.  No, no such instruction.
4  Q.  And were you instructed or did you -- I'll ask
5  one at a time.  I'm sorry.  Were you instructed to
6  filter or categorize by ethnicity collected by DPS?
7  A.  No, it was not asked.
8  Q.  And did you filter by ethnicity collected by
9  DPS?
10 A.  No, we did not filter.
11 Q.  Or categorize?
12 A.  Or categorize.
13 Q.  Thank you.  That was my question, not your
14 answer that was at fault.
15     MR. FREEMAN:  Okay.  We'll take a brief
16 recess, just to go off the record, and then we can
17 probably wrap this up pretty quickly.
18     (Recess from 5:28 p.m. to 5:49 p.m.)
19     MR. FREEMAN:  Back on the record after a
20 medium-length break.  I appreciate everyone's patience
21 Q.  (By Mr. Freeman) Mr. Guyette, were you and
22 your counsel able to discuss obtaining the old code
23 during the break?  You had said previously you might --
24     MR. SWEETEN:  We did not, and if you want
25 us to do that, I mean, I don't know what's involved, but

LEE GUYETTE                                          JUNE 19, 2012

---

### 73

1  we can do it after your questioning.
2        MR. FREEMAN:  That's fine.
3        Q.  (By Mr. Freeman) Are you aware of whether there
4  was any follow-up communication with Senator Williams
5  after the question that he asked, either conveying or
6  not conveying the data?
7        A.  I have no idea.  I'm not aware.
8        Q.  Have you ever conducted analysis concerning the
9  Spanish surname component of the TEAM database?
10       A.  In this January?
11       Q.  In general.
12       A.  So can you repeat that question?  I want to
13  make sure --
14       Q.  Have you ever conducted any analysis breaking
15  out into categories those voters with Spanish surname
16  and those who do not have a Spanish surname?
17       MR. SWEETEN:  If you can confine your
18  answer to the 2005 to May 27th, 2011 time frame that's
19  in Topic 8.  I'm going to instruct you to confine your
20  answer to that time period.
21       A.  I'm not aware of any analysis during that time
22  frame.
23       Q.  (By Mr. Freeman) But have you ever personally
24  conducted, for any purpose -- that's fine, during that
25  time frame your counsel has instructed you.  But have

---

### 74

1  you ever conducted any analysis related to Spanish
2  surname code or voters with Spanish surnames?
3        A.  I'm not aware of any related during this time
4  period.
5        Q.  What do you mean by related?
6        A.  There may have been some analysis done, but I
7  have to go back and do a lot of digging and find out
8  what it was.
9        Q.  You don't recall personally --
10       A.  I don't recall anything, no.
11       Q.  Are you aware that during her deposition in
12  this case, Ann McGeehan testified that such analysis was
13  routinely performed in your office?
14       A.  I wasn't aware of Ann's testimony.
15       Q.  Okay.
16       A.  And there are reports, and I can get you that
17  information.  But with regards to voter ID, I'm not
18  aware --
19       Q.  Okay.
20       A.  -- of anything that was --
21       Q.  Is there another individual in your office who
22  generally does analysis related to Spanish surname to
23  voters?
24       A.  There -- it would be limited to a very small
25  number of individuals that would.

---

### 75

1        Q.  Who are those individuals?
2        A.  Primarily John Mendoza, the gentleman that has
3  been on some of these e-mails, that would have knowledge
4  of that.
5        Q.  And he did -- he did these queries here, right,
6  that we've been discussing today?
7        A.  That is correct.
8        Q.  Okay.  Was the purpose of this match ever
9  explained to you?
10       A.  Primarily just focusing on the guidance I've
11  got from Elections.  Didn't ask why.
12       Q.  They just said, we need you to run the
13  following data?
14       A.  Yeah, the following matches and data.  There
15  may be some reference -- I think there was some
16  reference in the e-mails to content.  But our focus was
17  on the direction given by the Elections Division.
18       Q.  Is it your ordinary practice not to ask the
19  purpose of a particular data request?
20       A.  It depends on the case.
21       Q.  If you ask the purpose of the data request,
22  aren't you better able to suggest particular ways for
23  the analysis to be run?
24       A.  It was pretty clear cut, the directions we were
25  given in this case.  In many cases, we don't have that

---

### 76

1  clear guidance.  So we do have to ask and work with the
2  business partner.
3        Q.  So you don't know what the purpose of this
4  match was?  Sorry, strike that.
5        A.  Yeah.
6        Q.  What was the purpose of this match?
7        A.  The purpose of the match is -- was -- it would
8  be speculation on what they were going for on this --
9  the purpose of the match.
10       Q.  What is your understanding of the purpose of
11  this match, to the extent that you have one?
12       MR. SWEETEN:  Objection, asked and
13  answered.
14       Q.  (By Mr. Freeman) You can answer.
15       A.  Okay.  The purpose was the number of voters
16  without TDL number, and then which ones matched and
17  didn't match or how many matched or didn't match the DPS
18  record.  We get numerous asks for queries.
19       Q.  Do you feel that that match was achieved?
20       A.  That seems like speculation to me.  I mean, I
21  believe --
22       MR. SWEETEN:  Objection, vague.  You can
23  answer.
24       A.  I believe that we built the queries to get the
25  results for what was being asked.

LEE GUYETTE                                          JUNE 19, 2012

---

**77**

1    Q.   (By Mr. Freeman) And do you think that those
2    queries provided the results that you were asked to
3    provide?
4    A.   I believe they do.
5    Q.   Are there any shortcomings of which you're
6    aware?
7            MR. SWEETEN:  Objection, foundation.
8    Objection, calls for speculation.
9    Q.   (By Mr. Freeman) You can answer.
10   A.   I think it would be --
11           MR. SWEETEN:  Objection, outside the
12   scope.  Go ahead, you can answer.  You can answer.
13   A.   Okay.  I'd like to go back and research the
14   spreadsheet discrepancy that you mentioned.
15   Q.   (By Mr. Freeman) Uh-huh.
16   A.   And go back and become more familiar with the
17   code to make sure that, to answer some of the scenarios
18   you built.  But I'm not aware of any other outstanding
19   issues.
20   Q.   Okay.  Did any problems come up while the code
21   was being built or while you were conducting the
22   analysis?
23   A.   I'm not aware of any problems.
24   Q.   Anything related to any compatibility between
25   the fields in the driver's license database and fields

---

**78**

1    in the TEAM database?
2    A.   I'm not aware of any problems.
3    Q.   Any problems related to corruption of the data
4    or ability to read the data?
5    A.   No, I'm not aware of any problems.
6    Q.   And on the DL side was data that you had
7    routinely used for jury wheel purposes, correct?
8    A.   That is correct.
9    Q.   Are you confident that the match between the
10   data on both sides was accurate?
11   A.   Per the guidance given by the business
12   division, I believe that the matches met the criteria.
13   Q.   Are you confident, per the criteria given by
14   the business side, that the match was complete?
15   A.   That the match was complete?
16           MR. SWEETEN:  Objection, asked and
17   answered.  Objection, foundation.  You can answer.
18   A.   Can you elaborate on that?
19   Q.   (By Mr. Freeman) Sure.  Are you confident that
20   the match found all of the matching driver's license
21   records pursuant to the criteria that you were given?
22   A.   To the best of my knowledge, I believe it fit
23   the criteria that was given.
24   Q.   Okay.  Do you believe that the match is
25   misleading in any way?

---

**79**

1            MR. SWEETEN:  Objection, vague.
2            THE WITNESS: I can still answer, though?
3            MR. SWEETEN:  Yeah.  And objection to
4    form.  Go ahead.
5            THE WITNESS: Okay.
6            MR. SWEETEN:  Objection to foundation.  Go
7    ahead.
8    A.   I'm sorry.  Repeat the question one more time.
9    Q.   (By Mr. Freeman) Do you believe that the match
10   is misleading in any way?
11           MR. SWEETEN:  Same objection.
12   A.   With regards to the criteria that was provided,
13   I believe we met the criteria.
14   Q.   (By Mr. Freeman) Did you have sufficient
15   confidence in the match such that you were willing to
16   have it shared with the rest of the Office of the
17   Secretary of State?
18   A.   That wasn't my judgment to make.  This
19   information was provided to Elections Division to make
20   that judgment.
21   Q.   Okay.  Did you have sufficient confidence in
22   the match such that you were willing to share it with
23   Ms. McGeehan?
24   A.   Yes.
25   Q.   And the decision after that point was up to

---

**80**

1    her?
2    A.   That is correct.
3    Q.   Or her supervisors?
4    A.   That is correct.
5    Q.   But you wouldn't have had any qualms about it
6    being shared beyond the division, correct?
7    A.   Beyond the IT division or beyond Elections?
8    Q.   I'm sorry.  Beyond Elections.
9            MR. SWEETEN:  Objection, relevance.
10   A.   For the data that was produced and the criteria
11   that we fulfilled, I didn't have an objection with it.
12   Q.   (By Mr. Freeman) Okay.  Is this type of match
13   similar to the match that is performed in the live check
14   process, to the extent of your knowledge?
15           MR. SWEETEN:  Objection, vague.
16   A.   I'd have to revisit the live check process to
17   be able to answer that.
18   Q.   (By Mr. Freeman) Is there any other type of
19   matching that goes on between the TEAM database and
20   external databases, to the extent of your knowledge?
21           MR. SWEETEN:  Are you talking about within
22   the time period of Topic 8?
23           MR. FREEMAN:  Sure.  Let's talk about
24   within the time period of Topic 8.  That's fine.
25   A.   There are possible matches.  There's matches to

LEE GUYETTE                                                    JUNE 19, 2012

---

81

1  verify address of postal office, make sure of correct
2  format.  I'd have to do some more investigation to find
3  out if there's any other matches that are performed
4  generally throughout the ongoing time.
5       Q.  (By Mr. Freeman) And you rely on that -- that
6  postal match, you use that moving forward after the
7  match has been run?
8       A.  No.  Once the match is run, you have your
9  results.
10      Q.  Okay.
11      A.  So, no, it's not done in addition to this
12  match.
13      Q.  Yes.  No, that -- that postal match you were
14  talking about, the Office of the Secretary of State uses
15  the results of that for some purpose, correct?
16      A.  There are -- there is quite a few matches.
17  There's deceased matching.  There's postal match.
18  There's several matches that are pretty much outside the
19  scope of this, but that is done.
20      Q.  But they occur?
21      A.  They do occur.
22      Q.  Have you written code for any of those matches?
23      A.  I have personally not written any code for
24  those matches.
25      Q.  Has Mr. Mendoza?

---

82

1       A.  I'd have to investigate and see if Mr. Mendoza
2  or other developers have written code for those
3  different matches.
4       Q.  Are you aware of any other instance when you
5  performed work that was in response to a legislator's
6  query and that work was not released to the legislator?
7       A.  I personally -- I don't know.  I'm personally
8  not aware, but I don't always see what goes on to
9  legislators.
10      Q.  But you're not aware of any other instance when
11  that has happened, correct?
12          MR. SWEETEN:  Objection, foundation.
13      A.  I'm not aware.
14      Q.  (By Mr. Freeman) Okay.  As a general matter, is
15  the Office of the Secretary of State responsive to
16  legislative queries?
17          MR. SWEETEN:  Objection, relevance.
18  Objection, outside the scope of Topic 8.
19      Q.  (By Mr. Freeman) To the extent of your
20  knowledge, you can answer.
21      A.  To the best of my knowledge, we -- IT provides
22  expedient answers to requests.
23      Q.  From the legislature?
24      A.  From the legislature.
25      Q.  Is the Office of the Secretary of State relying

---

83

1  on the legislature for appropriations?
2       A.  That's outside my scope.
3       Q.  Do you know?
4          MR. SWEETEN:  Objection, calls for
5  speculation.
6       A.  I'm speculating on how much finance.
7       Q.  (By Mr. Freeman) Okay.  We don't want you to
8  speculate.  That's fine.
9          Are you aware of whether Secretary of
10  State Andrade stated that matches between DPS and SOS
11  data are misleading?
12          MR. SWEETEN:  Objection, outside the scope
13  of Topic 8.  We are way outside now of the January
14  analysis of 2011.  And that statement that you made is
15  outside the scope of the topic as well.  It's not -- I
16  think what you're quoting, I don't even think you could
17  find that quote within the time frame of Topic 8.  So
18  now you're really outside the scope, Dan, and so I'm --
19  you're asking him something that is not related to what
20  he's here to testify about.  It's just simply not
21  related.  So I'm going to ask you to withdraw the
22  question.
23          MR. FREEMAN:  The basis that I believe
24  it's related is that to the extent that criticisms were
25  levied of matches between DPS and SOS data, it's

---

84

1  relevant to this January match as to whether this match
2  was in any way misleading.
3          MR. SWEETEN:  You can ask him if he thinks
4  -- I mean, that is so far outside the topic number.  I
5  mean, come on, Dan, really.  That is tangentially, at
6  best, relevant to this topic area.  This is outside the
7  scope.  You're using this for a purpose for which it
8  wasn't noticed.  We've put him up on short notice.  It's
9  not fair of you to ask this witness this question.  He
10  can talk about the January 2011 analysis.
11          MR. FREEMAN:  You know, I think -- that's
12  fine.  I'll withdraw the question.
13      Q.  (By Mr. Freeman) Okay.  At this point, are
14  there any answers that you wish to change?
15      A.  I can't think of any.  Can I solicit counsel
16  for recommendations?  No phone-a-friend?
17      Q.  No.  I actually had to tell -- I had previously
18  said in a deposition in this case, there is no
19  phone-a-friend in a deposition.  And that was Speaker of
20  the House Joe Straus.  So don't worry about it.  If
21  there's nothing you wish to change, there is nothing you
22  wish to change.
23          Is there any information that you didn't
24  recall previously that you now recall?
25      A.  No.

LEE GUYETTE                                                    JUNE 19, 2012

## 85

1   Q.  Okay.  And is there anything you would like to
2   add so that we can understand your answers more
3   clearly?
4           MR. SWEETEN:  Objection, vague.  Go ahead.
5       A.  Not at this time.  Do I have the ability to
6   answer or respond later?
7           MR. SWEETEN:  Yeah.  We can talk later
8   about that.
9           MR. FREEMAN:  I mean, so we are going to
10  object to the State of Texas's failure to produce a
11  witness with knowledge of the -- of the fate of this
12  analysis, what became of it after it was actually
13  conducted.  We are also -- we also believe that the
14  documents produced today do not relate to the provision
15  of legal advice by Ms. McGeehan, and therefore should
16  have been previously produced, and therefore, given that
17  they were not produced prior to Ms. McGeehan's
18  deposition, that we have been prejudiced and may seek
19  leave of the court for some form of limited further
20  relief.
21          And with that, I pass the witness.
22              EXAMINATION
23  BY MR. SWEETEN:
24      Q.  Okay.  Let me ask you a few questions.  We're
25  here to talk today about any analyses that were

## 86

1   performed from 2005 to 2011.  Is that your
2   understanding?
3       A.  Sorry.  That's correct.
4       Q.  All right.  And the cut-off date is May 27,
5   2011, right?
6       A.  Right.
7       Q.  How many analyses were performed from 2005 to
8   2011, to your knowledge, related to the DPS and voter
9   registration database?
10      A.  These six queries.
11      Q.  Okay.  And when those six queries --
12  approximately what date did you run those six queries?
13      A.  January 25th, 26th.
14      Q.  Are you aware of any other analysis during that
15  time whatsoever between the DPS and voter registration
16  database?
17      A.  I'm am not.
18      Q.  Okay.  Have you -- in preparing for this
19  deposition, you talked to several members of the
20  Secretary of State's Office?
21      A.  That's correct.
22      Q.  And in visiting with those individuals from the
23  Secretary of State, have you seen any indication
24  whatsoever that the results of this analysis were
25  provided to any member of the legislature?

## 87

1       A.  I have not.
2       Q.  Okay.  Are you familiar with Ms. McGeehan's
3   testimony indicating that she did not provide this to
4   Tommy Williams, to Senator Williams?
5       A.  I am.
6       Q.  And have you seen anything to dispute that?
7       A.  I have not.
8       Q.  Okay.  Did you run a Spanish surname review of
9   this analysis in January of 2011?
10      A.  Did not, no.
11          MR. FREEMAN:  Objection, asked and
12  answered.
13          MR. SWEETEN:  All right.  I have no
14  further questions.  Thank you.
15          MR. FREEMAN:  I just one quick clarifying
16  question, just to be clear on Mr. Sweeten's question.
17          FURTHER EXAMINATION
18  BY MR. FREEMAN:
19      Q.  When he asked whether you were aware of any
20  matches between DPS and SOS, was your answer limited to
21  with regard to voter ID, or you were testifying that
22  you're not aware of any other circumstances in which
23  data from the Department of Public Safety has been
24  matched to data in the TEAM database?
25          MR. SWEETEN:  During the time period.

## 88

1       Q.  (By Mr. Freeman) During the time period.
2       A.  I'm not aware of any -- during that time period
3   of any data matches done during that period.
4       Q.  Between data from those two sources?
5       A.  I mean, I'm not aware -- between those two
6   sources between -- from the 2005 to the May 2011 time
7   period.
8       Q.  Okay.  But you are aware of matches between the
9   TEAM database and other data sources outside the office
10  of the Secretary of State, just not DPS, correct?
11      A.  Is it possible for me to talk to counsel, or
12  no?
13      Q.  Unfortunately, it's not.
14      A.  DPS is a source to validate information on
15  voters, so there's -- there's an ongoing matching that's
16  done for that for a live check.
17      Q.  Okay.
18      A.  For example.
19      Q.  So, for example, during a live check process,
20  data is routinely matched from DPS sources to the SOS
21  databases, correct?
22      A.  It's a copy of the DPS database at TEAM.
23      Q.  Okay.  So that's done every day when there's a
24  new voter registration application --
25      A.  That's correct.

LEE GUYETTE                                                    JUNE 19, 2012

## 89

1    Q.  -- that comes in?
2    A.  Right.
3         MR. FREEMAN:  I pass the witness.
4              FURTHER EXAMINATION
5    BY MR. SWEETEN:
6    Q.  All right.  The topic that we're here on was
7    any and all analysis of registered voters who possess a
8    Texas driver's license or personal identification card
9    between January 1st, 2005 and May 27, 2011.  Okay?  Do
10   you understand that?
11   A.  Yes.
12   Q.  Other than January 2011, are you aware of any
13   such analysis having been performed?
14   A.  Not analysis.
15   Q.  Okay.
16   A.  No.
17        MR. SWEETEN:  I have no further questions.
18        MR. FREEMAN:  Nor do I.
19        Thank you so much for your testimony.
20        THE WITNESS:  Thank you.
21        (Signature reserved.)
22        (Deposition concluded at 6:09 p.m.)
23
24
25

## 91

1    THE STATE OF _____)
2    COUNTY OF_____)
3
4         Before me,_____, on this day
5    personally appeared LEE GUYETTE, known to me (or proved
6    to me under oath or through_____
7    (description of identity card or other document) to be
8    the person whose name is subscribed to the foregoing
9    instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein
11   expressed.
12        Given under my hand and seal of office
13   this_____day of _____, 2012.
14
15
16        _____
          NOTARY PUBLIC IN AND FOR
17        THE STATE OF _____
18
19
20
21
22
23
24
25

## 90

1    CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3    PAGE  LINE  CHANGE       REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20        I, LEE GUYETTE, have read the foregoing deposition
21   and hereby affix my signature that same is true and
22   correct, except as noted above.
23
24        _____
25              LEE GUYETTE

## 92

1         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2    STATE OF TEXAS,           )
3         Plaintiff,           )
4    VS.                       )
5    ERIC H. HOLDER, JR. in his  )
     official capacity as Attorney )
6    General of the United States, )
7         Defendant,           )
8    ERIC KENNIE, et al,        )
9         Defendant-Intervenors,  )
10   TEXAS STATE CONFERENCE OF   )  CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,            )  (RMC-DST-RLW)
                                )  Three-Judge Court
12        Defendant-Intervenors,  )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al,      )
14        Defendant-Intervenors,  )
15   TEXAS LEGISLATIVE BLACK     )
     CAUCUS, et al,             )
16        Defendant-Intervenors,  )
17   VICTORIA RODRIGUEZ, et al., )
18        Defendant-Intervenors,  )
19              REPORTER'S CERTIFICATION
20           DEPOSITION OF LEE GUYETTE
               JUNE 19, 2012
21   I, Chris Carpenter, Certified Shorthand Reporter in
22   and for the State of Texas, hereby certify to the
23   following:
24        That the witness, LEE GUYETTE, was duly sworn by the
25