**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
    Plaintiff,                 )
                               )
V.                                 )
                               )
ERIC H. HOLDER, JR.,               )
in his official capacity           )
as Attorney General of             )
the United States,                 )
    Defendant.                 )
                               )
ERIC KENNIE, et al.,               )
    Defendant-Intervenors,     )
                               )
TEXAS STATE CONFERENCE             )   CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al.,         )   (RMC-DST-RLW)
    Defendant-Intervenors,     )   Three-Judge Court
                               )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, et al.,     )
    Defendant-Intervenors,     )
                               )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
    Defendant-Intervenors,     )
                               )
VICTORIA RODRIGUEZ, et al.,        )
    Defendant-Intervenors.     )

---

ORAL DEPOSITION OF
REPRESENTATIVE PATRICIA HARLESS
May 15, 2012

---

ORAL DEPOSITION OF REPRESENTATIVE PATRICIA HARLESS,
produced as a witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause on the
15th day May, 2012, from 9:42 a.m. to 7:11 p.m., before Amy C.
Kofron, CSR in and for the State of Texas, reported by machine
shorthand, at the offices of the United States Attorney, 816
Congress Avenue, Austin, Texas, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record or
attached hereto.

**2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
  Mr. Patrick Sweeten
  Mr. Matthew H. Frederick
  OFFICE OF THE ATTORNEY GENERAL OF TEXAS
  P.O. Box 12548
  Austin, Texas 78711-2548

FOR THE DEFENDANT:
  Mr. Daniel J. Freeman
  Ms. Elizabeth S. Westfall
  Ms. Risa Berkower
  Ms. Jennifer Maranzano
  Mr. Bruce Gear
  U.S. DEPARTMENT OF JUSTICE
  950 Pennsylvania Avenue NW
  NWB Room 7203
  Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS
STATE CONFERENCE OF NAACP BRANCHES AND
MEXICAN AMERICAN LEGAL CAUCUS:
  Mr. Ezra Rosenberg
  DECHERT, L.L.P.
  902 Carnegie Center
  Suite 500
  Princeton, New Jersey 08540-6531

FOR THE DEFENDANT-INTERVENOR, KENNIE:
  Mr. Chad Dunn
  BRAZIL & DUNN, L.L.P.
  4201 Cypress Creek Parkway
  Suite 530
  Houston, Texas 77068

**3**

INDEX

Appearances. . . . . . . .                          2
REPRESENTATIVE PATRICIA HARLESS
  Examination by Mr. Freeman. . .          5
  Examination by Mr. Rosenberg. . .       274
Signature and Changes. . . .                      292
Reporter's Certificate. . .                       294

EXHIBITS

NO.  DESCRIPTION                           PAGE

(Exhibits 1-10 referred to were marked in previous depositions)

11  Deposition Notice                       13
12  Press Release                           35
13  Texas Legislature Bills by Committee    37
14  Population and Voter Data               82
15  Population and Voter Data               89
16  Press Release                          102
17  House Journal                          115
18  House Debate Transcript Vol. I         116
19  "Making the Case for Photo IDs at the polls"   133
20  Houston Chronicle NewsRoom             142
21  May 9, 2012 letter                     155
22  Caucus Members Pledge Press Release    177
23  Plaintiff's Interrogatory Responses    218

**4**

24  House Debate Transcript Vol. II        246
25  Recognized Tribes List                 255
26  House Committee Transcript Vol. III    267
27  Texas Response to Motion to Compel     268

5

```
 1              REPRESENTATIVE PATRICIA HARLESS,
 2    having been first duly sworn, testified as follows:
 3                        EXAMINATION
 4    BY MR. FREEMAN:
 5        Q.   This is the deposition of Representative Patricia
 6    Harless in the matter of Texas V. Holder, U.S. District Court
 7    for the District of Columbia, Docket No. 1:11-CV-128.
 8             My name is Dan Freeman, and I'm here on behalf of
 9    Attorney General Eric Holder.  And with me are my colleagues,
10    Elizabeth Westfall, Risa Berkower, Jennifer Maranzano and Bruce
11    Gear, who you've already met, as well as attorneys for the
12    defendant intervenors, who you've also met, so I won't introduce
13    them again.
14             Could you spell your name for the record.
15        A.   It's Patricia, P-a-t-r-i-c-i-a, Harless,
16    H-a-r-l-e-s-s.
17        Q.   Thank you.  Have you ever been deposed before,
18    Representative?
19        A.   I have.
20        Q.   And when was that?
21        A.   I can't remember.  20 years ago maybe, 10 years ago.
22        Q.   Okay.  So let me just give you a few ground rules.
23    I'm sure that your attorneys have spoken to you already.  But a
24    deposition functions in the form of questions and answers.  So
25    it's necessary for you to speak rather than gesture in order to
```

6

```
 1    answer so that the court reporter can get everything down.  Do
 2    you understand?
 3        A.   Yes.
 4        Q.   And the purpose of the deposition is to secure your
 5    testimony and your complete version of the facts relevant to
 6    this case.  And so I will need your full and complete answers to
 7    the questions that I ask.  Do you understand?
 8        A.   Yes.
 9        Q.   I may not always be clear when I ask my questions.
10    And so if you don't understand, please ask me to restate the
11    question so that you're able to answer completely.  Do you
12    understand?
13        A.   Yes.
14        Q.   And I think we just had someone come onto to the
15    phone, so --
16             MR. ROSENBERG:  Well, we'll enter our appearances --
17             MR. FREEMAN:  Okay.
18             MR. ROSENBERG:  -- formally, I guess, at some point.
19             MR. FREEMAN:  All right.
20        Q.   If you need a break, please let me know, and we'll
21    finish the question that's pending, and then we'll see about a
22    break.  Is that acceptable?
23        A.   Yes.
24        Q.   And if you need to get up for additional water or
25    coffee or something, we should do that between questions, no
```

7

```
 1    while a question is pending.  Is that all right?
 2        A.   Yes.
 3        Q.   Okay.  If you want to talk to your attorney, that's
 4    fine.  But if there's a question pending or if you're in the
 5    middle of an answer, if you could finish that up first, that
 6    would be great.  Is that okay?
 7        A.   Yes.
 8        Q.   Okay.  At various points your attorney may object to
 9    what I ask.  Many of these objections will be resolved
10    by the Court at a later time.  We have some disagreements
11    regarding the law that is applicable to this case, and so none
12    of us will be offended.  But unless your attorney specifically
13    directs you not to answer, you need to please respond to my
14    question.  Is that all right?
15        A.   Yes.
16        Q.   Sometimes your attorney may instruct you not to rely
17    on certain information when you're answering a question.  If you
18    follow that instruction, please answer by preceding your answer
19    by saying, "based on the instruction" or "in reliance on my
20    attorney's instruction."  This will help it be clear for the
21    record that you are relying on that instruction and possibly
22    providing a partial answer.  If you follow that instruction and
23    as a result cannot answer at all, please do say, "I cannot
24    answer based on my attorney's instruction."  Is that all right?
25        A.   Yes.
```

8

```
 1             MR. ROSENBERG:  And, Dan, before you begin then --
 2             MR. FREEMAN:  Sure.
 3             MR. ROSENBERG:  -- we did not put our appearances on
 4    the record.
 5             Ezra Rosenberg from Dechert on behalf of the Texas
 6    State Conference of NAACP Branches and the Mexican American
 7    Legislative Caucus.
 8             MR. DUNN:  Chad Dunn on behalf of the defendant,
 9    Kennie Intervenors.
10             MR. ROSENBERG:  And we have someone on the line.  Amy?
11             MS. PEDERSON:  Amy Pederson for the Rodriguez
12    intervenors.
13             MR. ROSENBERG:  Okay.  Thanks.
14             MR. FREEMAN:  And that's P-e-d-e-r-s-o-n.
15             THE REPORTER:  Thank you.
16        Q.   Now, I believe that your attorney agrees that you hold
17    any legislative privilege personally.  Therefore, with regard to
18    your own statements or actions or those of your staff, you may
19    choose to waive that privilege in order to share the truth with
20    the Court, with the public, and with your constituents.  For
21    example, during the redistricting litigation, numerous
22    legislators chose to provide full testimony.  Sometimes --
23    does -- do you understand that?
24        A.   Yes.
25        Q.   Sometimes you may remember things later in the day.
```

Patricia Harless                                                    May 15, 2012

---

21

1        During your involvement on policy matters as a
2    business owner, did you ever make any requests for materials
3    under the Texas Open Records Act?
4        A.   Not that I recall.
5        Q.   Did you have to interact with government regulation
6    and regulators as a small business owner?
7        A.   Yes.
8        Q.   And did you expect those government agencies to
9    communicate with you fully, openly and honestly?
10       A.   Yes.
11       Q.   When did you last renew your driver's license?
12       A.   Well, about six years ago, I think.  I think it's up
13   for renewal this year, so we renew every six years.
14       Q.   Okay.  And where did you have to go for that?
15       A.   I did it by mail.
16       Q.   And when was the last time you had to do it in person?
17       A.   I can't recall.
18       Q.   When are you allowed to renew a Texas driver's license
19   by mail?
20       A.   You can renew your Texas driver's license, if I
21   remember correctly, for the first renewal after six years.
22   They're good for six years.  The first renewal, if you haven't
23   had any citations or speeding tickets or issues on your driver's
24   license, you can renew by mail.  After 12 -- after the second
25   renewal, you have to go in, in person.

---

22

1        Q.   Do you have to submit a new photograph when you renew
2    by mail?
3        A.   No.
4        Q.   Okay.  Do you know where the closest driver's license
5    office is to your house?
6        A.   I do.
7        Q.   And how far is that from your house?
8        A.   It's probably about 7 to 10 miles.
9        Q.   And do you know what hours it's open?
10       A.   No, I don't.
11       Q.   And how long would it take you to get there?
12       A.   Depending on traffic, maybe 15 to 20 to 30 minutes.
13       Q.   And do you remember last time you went how long you
14   had to wait in line?
15       A.   When my son turned 16, about 45 minutes.
16       Q.   Okay.  And when your son turned 16, do you know what
17   time of day you went with him?
18       A.   We went two different times, one to take a test and
19   then one to get his temporary -- his temporary then to take the
20   test.  Maybe an hour to do the driving test.
21       Q.   Do you know what time of day you went, though?
22       A.   After school.
23       Q.   So --
24       A.   After 2:30 or 3:00.
25       Q.   If you hadn't been going with him, would you have

---

23

1    normally been at work?
2        A.   Yes.
3        Q.   If you didn't have a car, would you be able to get to
4    that driver's license office from your House?
5        A.   I don't know if the bus runs there.  I can't tell you
6    for sure.
7        Q.   Okay.  If there weren't a bus, how long would it take
8    you to get there?
9        A.   In my car?
10       Q.   Without a car.
11       A.   I can't even speculate.
12       Q.   Okay.  If you had to walk, do you know how long it
13   would take?
14       A.   No.
15       Q.   Do you know how much it would cost to take a cab from
16   your House to the driver's license office?
17       A.   No.
18       Q.   Okay.  Do you know what documents you brought with you
19   when you went with your son to help him get his driver's
20   license?
21       A.   I can't remember.
22       Q.   Do you know if some driver's license offices are
23   currently closed because of funding issues?
24       A.   I think the record testimony in committee is that
25   there are some.

---

24

1        Q.   Are some currently using reduced hours?
2        A.   There may have been testimony on that.  I can't recall
3    specifically.
4        Q.   Okay.  Do you know -- is there a driver's license
5    office in every county in Texas?
6        A.   I think the testimony was that there is not.
7        Q.   Okay.  Do you have a copy of your birth certificate?
8        A.   I do.
9        Q.   And does the name on the birth certificate match your
10   current name on your driver's license?
11       A.   No.
12       Q.   Do you know where you'd get a copy if you lost your
13   birth certificate?
14       A.   I do what my constituents do and call my office.
15       Q.   Okay.  How much would it cost to get a new copy of
16   your birth certificate?
17       A.   I couldn't tell you.  I've got -- I've got a certified
18   copy I've had since I was a kid.
19       Q.   Okay.  Do you know how long it takes to get a new copy
20   of a birth certificate?
21       A.   I don't.
22       Q.   Do you have a copy of the order that legally changed
23   your name?
24       A.   I don't know if I do.
25       Q.   Do you know where you would get a copy?

---

Patricia Harless                                                    May 15, 2012

---

**25**

1   A.  The order that -- no, I don't.
2   Q.  I guess after you got married?
3   A.  Yeah.
4   Q.  Do you know how much a copy would cost?
5   A.  I don't.
6   Q.  Do you know how long it would take to get a copy?
7   A.  I don't.
8   Q.  How would you go about finding out where to get a copy
9   of that document?
10  A.  I'd call my office.
11  Q.  Okay.  You probably get a lot of phone calls, don't
12  you?
13  A.  We do, a lot.
14  Q.  And the next question is going to kind of sound a
15  little silly, but I don't drive a car.
16      How much is gas going for in Harris County right now?
17  A.  I filled up yesterday.  I think I paid 3.79 a gallon.
18  Q.  When is the last time you voted?
19  A.  I voted last week.
20  Q.  And how far is your polling place from your home?
21  A.  I had to go to two different polling places.  I voted
22  in a MUD election and in an EDS election.
23  Q.  And just for the record, a MUD is a municipal utility
24  district?
25  A.  Yes.

**26**

1   Q.  And an EDS is?
2   A.  Is emergency -- or ESD, emergency service district.
3   Q.  Okay.  And those had different polling places?
4   A.  Yes.
5   Q.  And how far was the MUD polling place?
6   A.  The MUD is our subdivision MUD, so it was probably a
7   quarter of a mile.  The EDS was at the fire department, so it
8   was probably five or six miles, but they had -- they had a
9   number of locations open.
10  Q.  Okay.  And so those are much closer than the driver's
11  license office; is that correct?
12  A.  Yes.
13  Q.  And where do you vote for presidential elections?  How
14  far is that from your house?
15  A.  Well, in Harris County, we have early voting.
16  Q.  Okay.
17  A.  And I typically vote early voting, and that is at a
18  church --
19  Q.  Uh-huh.
20  A.  -- and it's probably 7 to 10 miles from my house.
21  Q.  Okay.  If you were to vote on election day --
22  A.  It's in --
23  Q.  -- do you know where you would vote?
24  A.  It's in my subdivision at an elementary school that's
25  probably a mile or two away.

**27**

1   Q.  Okay.  So that's much closer than the driver's license
2   office as well, correct?
3   A.  Well, not early voting.
4   Q.  But the election day precinct is much closer, correct?
5   A.  If I voted on election day.  I don't.
6   Q.  Okay.
7   A.  I'm scared I might be sick and miss it.
8   Q.  I understand.  We're often very busy on election day
9   as well.  Although in DC, our vote doesn't count quite as much.
10      Okay.  What ID are you carrying on you today?
11  A.  I have my driver's license, my concealed handgun
12  license, my voter registration card.
13  Q.  And which ones of those have your photo on them?
14  A.  My driver's license and my concealed handgun license.
15  Q.  Okay.  And which of those establish your citizenship?
16  A.  I would say my driver's license.
17  Q.  Does it indicate on your driver's license that you're
18  a United States citizen?
19  A.  No.
20  Q.  And so how does that document establish your
21  citizenship?
22  A.  I think you have to answer a question that you're a
23  citizen or provide some type of citizenship paper to get a
24  driver's license.
25  Q.  So if someone is a Green Card holder who is a legal

**28**

1   resident of Texas and in line to become a citizen, can they not
2   get a Texas driver's license?
3   A.  I'm not sure.
4   Q.  Okay.  And if someone's here on a work visa, can they
5   not get a Texas driver's license?
6   A.  I'm not sure.  I don't know the procedures.
7   Q.  Okay.  Do you have a passport on you?
8   A.  No.
9   Q.  Do you have a military ID?
10  A.  No.  Now --
11  Q.  Is --
12  A.  -- I need to clarify that.  You mean on me?
13  Q.  Yes.
14  A.  Okay.
15  Q.  Those are coming.
16  A.  Okay.  I just --
17  Q.  And do you have a passport?
18  A.  I do.
19  Q.  Do you have a military ID?
20  A.  I don't.
21  Q.  Does anyone in your family have a military ID?
22  A.  Oh, my goodness, I have no clue.
23  Q.  Immediate family.
24  A.  I have six brothers, two sisters, 37 nieces and
25  nephews and 42 great nieces and nephews all in Harris County.

Patricia Harless                                                May 15, 2012

---

### 29

1    have no clue.

2        Q.   You must have amazing picnics.

3             What other types of ID are produced by the State of

4    Texas?

5        A.   Identification card, a driver's license --

6        Q.   Uh-huh.

7        A.   -- concealed handgun are all provided by DPS.

8        Q.   Anything else by the state or its agencies?

9        A.   I don't know that.

10       Q.   Do state colleges produce identification cards?

11       A.   I'd assume some do.  The one my son went to had -- he

12   had an ID, student ID card.

13       Q.   And do employers -- when the state is an employer,

14   does it produce identification cards?

15       A.   I don't know what their procedures are.

16       Q.   Do you have any kind of legislator ID?

17       A.   I do.

18       Q.   Does it have your photo on it?

19       A.   It does.

20       Q.   Does that legislator identification card establish

21   your identity?

22       A.   I guess it could.

23       Q.   Okay.

24       A.   It hadn't got me out of tickets.

25       Q.   I hope not.

---

### 30

1        A.   Yeah, I know.

2        Q.   Where do you get your information about elections?

3        A.   What do you mean?

4        Q.   In terms of news, information about issues.

5        A.   You mean on polling places or the date?

6        Q.   I mean in terms of the candidates, the issues, the

7    polling.

8             MR. SWEETEN:  You're asking as a general matter?

9             MR. FREEMAN:  As a general matter, yes.

10            MR. SWEETEN:  Okay.  All right.

11       A.   We get massive amounts of mail during the election

12   season.  I typically try to look at a sample ballot and do some

13   research on the candidates --

14       Q.   Okay.

15       A.   -- just for my own information to see who I'm going to

16   vote for.

17       Q.   And how do you do that research?

18       A.   I go to their web site if they have one, look at their

19   web sites and read what their values are, what they say their

20   values are.

21       Q.   And what newspapers or web sites do you read other

22   than candidates' web sites?

23       A.   Just the Houston Chronicle.

24       Q.   Okay.  What news channels do you watch?

25       A.   None.

---

### 31

1        Q.   And do you listen to any talk radio?

2        A.   No.

3        Q.   And do you receive any e-mail newsletters or repeated

4    e-mails from any organization or individual?

5        A.   Our republican clubs that I'm members of send out

6    massive amounts of information.  I typically delete most of

7    them.

8        Q.   And what republican clubs are you a member of?

9        A.   Northwest Forest Republican Women in Harris County and

10   Texas Tea Republican Women, Cy-Fair Republican Women.

11       Q.   What was the last one?

12       A.   Cy-Fair Republican Women.

13       Q.   What is Cy-Fair?

14       A.   Cy-Fair is northwest area in Harris County.

15       Q.   Oh, okay.  Thank you.

16            Representative Harless, what committees do you

17   currently sit on?

18       A.   I sit on State Affairs, on Licensing and -- LAP,

19   Licensing and Administrative Procedures, Redistricting.  I

20   sit -- I sit on the Select Committee For Human Trafficking, and

21   I served on the Select Committee For Voter -- I don't -- I don't

22   know the technical name.

23       Q.   Was it the Select Committee on Voter Identification

24   and Voter Fraud?

25       A.   Yes.

---

### 32

1        Q.   Okay.  What is a select committee?

2        A.   A select committee is a committee issued to study a

3    specific item.

4        Q.   And who decides to establish a select committee within

5    the legislature?

6        A.   Our information comes from the speaker's office.

7        Q.   So can the speaker decide to establish a select

8    committee on any issue?

9        A.   I would assume he could.

10       Q.   Does anyone else participate in that decision-making

11   process, to your knowledge?

12       A.   I wouldn't know.

13       Q.   Okay.  Who picked the name of the Select Committee on

14   Voter Identification and Voter Fraud?

15       A.   I don't know.

16       Q.   Are you aware of any other select committees related

17   to voting or elections, first in the current legislature?

18       A.   Not other than this committee.

19       Q.   Any in past legislatures?

20       A.   I don't know.  I've only been there three sessions.

21       Q.   Okay.  But you said that you were involved, to some

22   extent, as a small business owner; is that correct?

23       A.   Yes.

24       Q.   But were you not following issues related to election

25   law?

---



Patricia Harless                                                May 15, 2012

---

33

1    A.   As a small business person, prior to being elected,

2    no.

3    Q.   Okay.  Are you aware of any other select committees

4    that relate directly to a standing committee in the way that the

5    Select Committee on Voter Identification and Voter Fraud relates

6    to elections?

7    A.   I think we've had committees, yes.

8    Q.   Could you provide any examples?

9    A.   We had a select committee on emergency appropriation.

10   We had a select committee on state sovereignty.  I think there

11   was a select committee on government efficiency, which are all

12   under other jurisdictions of other committees.

13   Q.   And what is the purpose of establishing a select

14   committee in those circumstances?

15   A.   In my opinion, it's to bring more attention and a

16   larger venue to an issue.

17   Q.   Is the Select Committee on Voter Identification and

18   Voter Fraud larger than the election committee?

19   A.   You mean as far as members?

20   Q.   As far as the number of members, yes.

21   A.   I don't know that.

22   Q.   What did you mean by a larger venue?

23   A.   It's a select issue --

24   Q.   Uh-huh.

25   A.   -- so you don't have to share the stage with other

---

34

1    issues, and it brings in more participation, in my -- my view, a

2    larger group to participate.  It's a single issue, so it's open

3    more to the public, and testimony is not limited.

4    Q.   Okay.  By saying that testimony is not limited, do you

5    mean that there are not limitations on the amount of time that

6    individuals can testify under the House rules?

7    A.   No.

8    Q.   What do you mean by that?

9    A.   I mean that in the regular committee process on agenda

10   when we have legislation that's there for a hearing --

11   Q.   Uh-huh.

12   A.   -- there may be five, ten, twenty pieces of

13   legislation.  So the committee kind of establishes a time frame

14   in how long they'll give each of these issues in order to get

15   through the agenda.  And on the select committee, it is the sole

16   purpose to hear that information as broad and as wide with as

17   much participation as possible.

18   Q.   Do select committees overlap in the time that they

19   meet with other committees that members of the committee may be

20   on?

21   A.   It's possible.  I can't tell you for sure if we did or

22   if they do, but it's possible.

23   Q.   Okay.  Was the Select Committee on Voter

24   Identification and Voter Fraud a "fast-track" committee?

25   A.   I can't answer that.

---

35

1    MR. FREEMAN:  If I can mark this as U.S. Exhibit 12.

2    (Exhibit No. 12 marked)

3    Q.   I guess that copy is for you.  Could you take a look

4    at this document?  Have you seen this document before?

5    A.   Not that I recall.

6    Q.   Do you see on the second-to-last line of the first

7    page where it says "fast track"?

8    A.   I see that.

9    Q.   Do you have any idea what that means?

10   A.   I know that the voter ID legislation was an emergency

11   item for the governor's office.

12   Q.   Were there other emergency items for the governor's

13   office?

14   A.   Yes.

15   Q.   Were those assigned to fast-track select committees?

16   A.   I don't recall.

17   Q.   Were there any other fast-track select committees in

18   the 82nd legislature in 2011?

19   A.   I can't answer 100 percent sure, but I think that the

20   state sovereignty committee was a select committee.  The

21   government reform committee was a select committee for

22   government for the governor's emergency items.  I think there

23   were more than just this that were the governor's emergency

24   items that had select committees.

25   Q.   But if you look on this document below "Fast Track

---

36

1    Select Committee on Voter Identification and Voter Fraud," do

2    you see "Select Committee on State Sovereignty"?

3    A.   I do.

4    Q.   Is that designated a fast-track committee?

5    A.   It doesn't -- it doesn't say that in this document.

6    Q.   Are you aware of any other fast-track committees

7    having been established in the sessions of the legislature in

8    which you served?

9    A.   I can't answer that.  I didn't write this, so I can't

10   answer that.

11   Q.   But are you aware of any other committees being

12   designated as fast-track committees?

13   A.   I don't know for sure.

14   Q.   Okay.  So you're not aware?

15   A.   I'm not aware.

16   Q.   Thank you.

17   A.   No.  I can't say I'm not -- I don't recall.

18   Q.   Okay.  How many bills did the Select Committee on

19   Voter Identification and Voter Fraud consider?

20   A.   We had a hearing on just the one.

21   Q.   Okay.  Are there any other examples of committees of

22   which you are aware that heard only one bill?

23   A.   I don't know.

24   Q.   So you're not aware of any other examples of a

25   committee that has heard only one bill?

---

Patricia Harless                                      May 15, 2012

---

37

1    A.  I don't know if there were any other committees that
2    only heard one bill.  There's like 30-plus committees, and I
3    have my hands full with my committee.
4        Q.  No.  I understand.  I'm just asking:  To your
5    knowledge, you don't --
6        A.  Not to my knowledge.
7        Q.  -- you're not aware of any other?
8        A.  I don't remember.
9        Q.  Okay.  Thank you.
10           Were there any bills submitted in the 82nd legislature
11   to address mail-in voter fraud?
12       A.  Any committees?
13       Q.  Any bills submitted?
14       A.  Yes, I think there were.
15       Q.  Were those referred to the Select Committee on Voter
16   Identification and Voter Fraud?
17       A.  If they were, we did not hear them.
18       Q.  Okay.
19       A.  I'm not sure where they referred them, but we did not
20   have a hearing on them.
21       Q.  If I can just -- we can just clean this up real
22   quickly, if I can have this marked U.S. Exhibit 13.
23           (Exhibit No. 13 marked)
24           MR. SWEETEN:  That last one was 12?
25           MR. FREEMAN:  Yes.

---

38

1        Q.  Have you seen this document before?
2        A.  No, I haven't seen it in this form.
3        Q.  Do you recognize it, though?
4        A.  Yes.
5        Q.  And does this document indicate the number of bills
6    that were heard by the Select Committee on Voter Identification
7    and Voter Fraud?
8        A.  Bills by committee.  Seems to be.
9        Q.  And how many bills were heard by the select committee?
10       A.  One.
11       Q.  Okay.  So is it the case that any of the bills that
12   were submitted related to mail-in voter fraud were not submitted
13   to the select committee; is that correct?
14       A.  You know, I'm not familiar with how the system
15   searches that.  If you are and you're saying that, then I
16   understand, but I don't know.  Is this a search on all the bills
17   that were referred to that committee, or --
18       Q.  Well --
19       A.  -- is it just a search on the bills that were heard in
20   that committee?
21       Q.  If you can see, the report indicates that it is the
22   82nd legislature regular session.
23       A.  Right.
24       Q.  And the number of bills by committee.  Do you see
25   where it indicates one?

---

39

1        A.  It says, "Number of bills: 1."
2            And it says, "Bills Out of Committee: (1)."
3        Q.  But if you look at the top of the page, it states,
4    "Texas Legislature" --
5        A.  Right.
6        Q.  -- "Bills By Committee."
7        A.  Right.
8        Q.  Does -- do you understand that that would mean?
9        A.  I guess this document is saying there was only one
10   bill referred, from what --
11       Q.  Okay.
12       A.  -- what you're saying.
13       Q.  And you don't have any recollection of hearing or
14   addressing any other bill in the select committee?
15       A.  No, we did not.
16       Q.  Okay.  Why would a bill related to the -- to mail-in
17   voter fraud not be referred to the select committee?
18           MR. SWEETEN:  Hold on one second.  I just want to
19   provide you a admonitory instruction you're going to hear
20   several times today.  I don't want you to reveal in answering
21   questions for Mr. Freeman any thoughts, mental impressions or
22   opinions about legislation, including S.B. 14.  I don't want you
23   to reveal any communications with legislators, legislative
24   staff, state agencies, including the governor's office or
25   lieutenant governor, any communications with Texas Legislative

---

40

1    Council or constituents.  You are free to include matters of
2    public record, including committee hearings, House floor
3    proceedings, debates or those proceedings.
4            MR. FREEMAN:  And I will just -- just note for
5    the record that you are, in fact, free to reveal your own
6    communications and mental impressions.  It is your privilege to
7    assert or to waive.
8            MR. SWEETEN:  Counsel, first of all, I'm going
9    to -- I'm her attorney.
10           MR. FREEMAN:  I recognize that.
11           MR. SWEETEN:  I will do the instructing as to
12   what -- and I'm communicating with my client, and she is
13   asserting the privilege.  This is the second time now that
14   you've told her that.  I'll give her the legal advice, and she
15   has indicated that she will assert the privilege.  So my
16   marching orders is I will provide her with the framework for how
17   to assert that privilege.
18           MR. FREEMAN:  Okay.
19           MR. SWEETEN:  So I would ask you to not continue
20   with that line.
21           MR. FREEMAN:  Okay.  Well, Counsel, at this
22   point, she has not verbally asserted the privilege in this
23   deposition, although she is, of course, free to if she chooses
24   to.
25           MR. SWEETEN:  We have done so in a court filing,

---

Patricia Harless                                          May 15, 2012

---

**41**

1   and she is asserting that privilege.

2          MR. FREEMAN:  I believe there was a question

3   pending.  Is it possible to get it read back?

4          THE REPORTER:  Yeah.  Sure.  Yeah, I can read it

5   back.

6          Question:  "Okay.  Why would a bill related to

7   the -- to mail-in voter fraud not be referred to the select

8   committee?"

9          MR. SWEETEN:  With that instruction, go ahead and

10   answer.

11   A.  I don't know.

12   Q.  Who makes the decisions concerning to which committee

13   each bill is referred?

14   A.  I'm -- I don't know that.

15   Q.  How many bills did you submit in the 82nd legislature?

16   A.  I can't answer.

17   Q.  Do you have a rough number?

18   A.  I think it was less than 35.

19   Q.  Okay.  And were you ever concerned regarding what

20   committee each of those bills would be referred to?

21   A.  On advice from my counsel, I can't answer that.

22   Q.  And does the name -- does the particular committee to

23   which a bill is referred affect its likelihood of being passed

24   out of committee and out of the House and becoming law?

25   A.  I don't know that.

---

**42**

1   Q.  So if a particular committee is busy with one issue,

2   is it more or less likely that it would address other bills that

3   may be referred to it?

4   A.  I don't know that.

5   Q.  Why was the Select Committee on Voter Identification

6   and Voter Fraud convened?

7          MR. SWEETEN:  Don't reveal thoughts, mental

8   impressions or opinions about the legislation, including

9   communications that we've outlined.

10   A.  I can't answer that.

11   Q.  Thank you.  Why are you asserting legislative

12   privilege here today?

13   A.  On advice from my counsel, protected conversations.

14   Q.  Did you ask to be included on the Select Committee on

15   Voter Identification and Voter Fraud?

16   A.  I can't remember.

17   Q.  Did you discuss your assignments before they were

18   formally made?

19          MR. SWEETEN:  Don't reveal any communications that

20   you've had with other legislators, legislative staff, state

21   agencies, Texas Legislative Council or constituents.  Those are

22   legislative privileges.

23   A.  That would be a conversation that I had with another

24   member.

25   Q.  When did that conversation occur?

---

**43**

1   A.  I can't -- I can't remember.

2   Q.  Do you recall, did it occur in person?

3   A.  I don't know.

4   Q.  Did you ever send an e-mail regarding the assignment

5   to that committee?

6   A.  Not that I recall.

7   Q.  Did you submit preferences for committees prior to the

8   committee assignments being made?

9   A.  I think that's privileged communication.

10   Q.  What legislation would that relate directly to?

11          MR. SWEETEN:  I'm sorry.  The question again?

12   Can you -- can you say it again?

13   Q.  Did you submit preferences regarding your choices for

14   committees?

15          MR. SWEETEN:  I think you're asking her to reveal

16   communications she's had with other legislators, legislative

17   staff, state agencies, Texas Legislative Council or constituents

18   as to pending legislation.

19   Q.  At the time that the -- strike that.

20          Did you ever discuss committee assignments with

21   Speaker Straus?

22          MR. SWEETEN:  Don't reveal any communications

23   that you've had regarding pending legislation.

24   A.  I can't answer that for a privileged conversation.

25   Q.  Did you ever have communications regarding committee

---

**44**

1   assignments with Chairman Bonnen?

2          MR. SWEETEN:  You can say -- you can reveal

3   whether or not you've had a conversation with Representative

4   Bonnen.  You cannot -- I'm instructing you not to reveal the

5   substance of that conversation.

6   A.  Not that I recall.

7   Q.  Did you have any conversation concerning committee

8   assignments with Senator Fraser?

9   A.  Not that I recall.

10   Q.  What committees did you serve on in your past

11   sessions?

12   A.  2009, I served on State Affairs, Workforce and

13   Technology.  I can't remember the other committee.  There was

14   another one.  And 2007, I served on Transportation, County

15   Affairs, and Rules and Resolutions.

16   Q.  Okay.

17   A.  Redistricting was the other one in 2009.

18   Q.  Okay.  Did you ever -- so you never served on the

19   Elections committee?

20   A.  No.

21   Q.  Did you ever assert that you wished to serve on the

22   Elections committee?

23          MR. SWEETEN:  Don't reveal any communications

24   that you've had with other legislators, legislative staff, state

25   agencies, Texas Legislative Council or constituents.  If it's a

---

Patricia Harless                                              May 15, 2012

45

1    matter of public record, you can answer the question.
2        A.  Not that I recall.
3        Q.  Okay.  Have you ever sponsored or cosponsored
4    legislation related to open government?
5        A.  I think I probably have.
6        Q.  Okay.  And what was that?
7        A.  Whew.  I filed a bill on the Systems Benefit Fund to
8    stop state agencies from diversions of funds, and I can't
9    remember the specifics of the others.
10       Q.  And why did you submit a bill related to open
11   government?
12       A.  Well, this one was specifically diversions of the
13   funds.
14       Q.  Okay.  And why was that issue important to you?
15       A.  Because the money that is taxed should go to that
16   specific purpose.
17       Q.  Okay.  Before this last term, did you ever sponsor any
18   election-related bills?
19       A.  I filed a bill pertaining to election costs in my
20   school district in 2009.
21       Q.  Okay.  Anything in 2007?
22       A.  I may have filed that same bill in 2007.
23       Q.  And in 2011, did you file that same bill?
24       A.  I possibly could have.  I can't recall for sure.
25       Q.  Did you file anything related to elections in 2011

46

1    other than the school election funding bill and bills related to
2    photographic voter ID?
3        A.  Not that I recall.
4        Q.  Okay.  Why were you more interested in
5    election-related matters in the 82nd legislature?
6            MR. SWEETEN:  I'm going to caution the witness to
7    not reveal thoughts, mental impressions or opinions about
8    legislation, including Senate Bill 14, or communications
9    surrounding that.  You're free to include matters of public
10   record.
11       A.  I think testimony on the floor was that it was a bill
12   that was important to my district.
13       Q.  Okay.  How do you usually communicate with your
14   legislative colleagues?
15       A.  One-on-one.
16       Q.  Okay.  So in person on the floor?
17       A.  Yes.
18       Q.  Do you ever send e-mails between legislators?
19       A.  I think that's privileged.
20           MR. SWEETEN:  I'm going to let you testify as to
21   the means of communication, in other words, if you've talked to
22   them, if you've sent e-mails.  But as far as the substance of
23   that, you're right, that is privileged.  So you can just say if
24   you've e-mailed.  You can answer that question.
25       A.  I would bet I probably have e-mailed, but I could not

47

1    guarantee that I do.  I know it's usually face-to-face.
2        Q.  And if I can -- if I can jump back real quickly.  Can
3    I ask you -- you earlier testified that you were -- that you had
4    an increased interest in matters related to elections because
5    photographic voter ID was important to your district.  Is that
6    correct?
7        A.  That was my testimony on the floor --
8        Q.  Okay.
9        A.  -- and in the committee.
10       Q.  Why was it important to your district?
11           MR. SWEETEN:  You can provide an answer to the
12   extent that you're relying upon matters of public record,
13   including committee hearings, floor debates, but do not reveal
14   thoughts, mental impressions or opinions about the legislation
15   relating to Senate Bill 14.
16           THE WITNESS:  As in --
17           MR. SWEETEN:  Tell him --
18           MR. FREEMAN:  There's a question pending.
19       A.  As in -- as in my points that I spoke about in
20   committee and on the floor, it was important to protect the
21   integrity of the election process.
22       Q.  Did any constituents ever volunteer information to you
23   related to this issue and the importance of it?
24           MR. SWEETEN:  I think you're asking at this point
25   about a communication between a constituent and Representative

48

1    Harless.  I believe that that's within the scope of the
2    legislative privilege.
3            So my instruction to you will be not to answer that
4    question.
5        A.  On advice from my counsel, I can't answer that
6    question because it's privileged conversation.
7        Q.  Thank you.  So back to communications with legislative
8    colleagues.  Sorry to be back and forth like that.  Do you
9    ever communicate with your legislative colleagues via text
10   messaging?
11       A.  Yes.
12       Q.  Do you do that from your office, between offices?
13   When you're in your office, would you use your phone to
14   text-message other colleagues?
15       A.  Possibly to see if they're in their office.
16       Q.  And do you use your phone for texting on the floor?
17       A.  Yes.
18       Q.  And when you e-mail with your legislative colleagues,
19   do you use your official House account?
20       A.  Yes --
21       Q.  Do you --
22       A.  -- both.
23       Q.  You use your personal account as well?
24       A.  Could possibly.
25       Q.  Is your personal account subject to disclosure under

Patricia Harless                      May 15, 2012

## 53

1   Q. How are they kept?

2   A. The computer documents?

3   Q. We can start with that.

4   A. I think House administration has a policy that

5 documents are saved and purged after 30 days. I'm not sure of

6 the procedures in the office on paper documents.

7   Q. Are e-mails purged after 30 days, or is -- is that all

8 electronic documents?

9   A. House administration has a policy. I'm not specific

10 of it. I just know that there's a 30-day window.

11   Q. Okay. And do you save files on your X drive?

12   A. I don't know what their procedures are.

13   Q. But when you're saving a file, if you were working in

14 a -- in a Word document, where would you save it?

15   A. If I hit the save button, and I don't know where it

16 puts it.

17   Q. Okay. Is that -- does Mr. Beuck find the documents

18 for you?

19   A. Yes, he does.

20   Q. Okay. Are you familiar with the term "X drive"?

21   A. I've heard them say that before.

22   Q. Are you familiar with the term "Y drive"?

23   A. I've heard them say that before as well.

24   Q. Are you familiar with the distinction?

25   A. No.

## 54

1   Q. Okay. If you had a personal document that you were

2 working on, on your office computer because you're there for the

3 whole session, where would you save it; do you know?

4   A. I'd have hit the save button, and wherever it puts it.

5 I'm sorry.

6   Q. That's fine. That's fine.

7   A. I would love to give you more information, but I gripe

8 about the computer, so --

9   Q. Okay. Do you know -- just to be certain, do you

10 know if files, electronic files, are saved separately for

11 different pieces of legislation?

12   A. I don't know what their procedure is.

13   Q. But you don't move them around?

14   A. I don't.

15   Q. Okay. Do you have -- related to paper documents,

16 where are those kept in your office?

17   A. I don't set up the procedures of how they organize the

18 office, but I know we have several lateral files.

19   Q. Okay. And do you have any kind of procedure related

20 to how long those files are kept?

21   A. I don't.

22   Q. Do you have any procedure for how they are -- how they

23 are arranged?

24   A. I don't.

25   Q. Okay.

## 55

1   A. I'm a delegator. Sorry.

2   Q. That's fine. Do you ever archive your e-mail?

3   A. I don't.

4   Q. Does anyone else archive your e-mail for you?

5   A. I think there has been -- I think they may have in the

6 past. I don't know for sure.

7   Q. Okay. Do you believe that compliance with the Texas

8 Constitution is an important consideration in the law-making

9 process?

10   A. Compliance with the Texas Constitution is an important

11 process --

12   Q. Important consideration in the law-making process?

13   A. Yes.

14   Q. How do you ensure, when you're submitting a bill or

15 voting on a bill, that the bill complies with the Texas

16 Constitution?

17   A. I --

18   MR. SWEETEN: Hold on a second. I want you to make

19 sure that you're not revealing thoughts, mental impressions or

20 opinions about specific legislation. If he's asking you as a

21 general matter or if it's something that relates to something

22 that you've said publicly, you can answer that, but not as to

23 specific legislation. Okay?

24   A. As a general matter, I rely on Leg Council.

25   Q. Okay. Anyone else?

## 56

1   A. No.

2   Q. And so does Leg Council submit a determination as to

3 whether a given bill -- an opinion as to whether it complies

4 with the Texas Constitution?

5   A. I'm not aware of their procedures.

6   Q. Do you know if anyone else provides a formal opinion

7 as to whether a bill complies with the Texas Constitution?

8   A. I'm not aware of if there are any.

9   Q. So would it be fair to say that your process is to

10 rely solely on Leg Council with regard to the question of

11 whether a given bill relies -- or complies with the Texas

12 Constitution?

13   A. That would be my impression, yes.

14   Q. Okay. Do you believe that compliance with federal law

15 is an important consideration in the law-making process?

16   MR. SWEETEN: Same instruction.

17   A. I assume that the agencies do that.

18   Q. But in term --

19   A. Leg Council.

20   Q. Okay. And how do you ensure that -- that there is

21 compliance with federal law when you're drafting a bill?

22   A. I rely on Leg Council.

23   Q. And how do you ensure that you're complying

24 with -- with federal law when you're voting on a bill?

25   A. I rely on Leg Council's draft.

Patricia Harless                                              May 15, 2012

---

**57**

1    Q.   Okay.  Leg Council's draft, what do you mean by that?

2    A.   The -- drafting the legislation.

3    Q.   Okay.  Do you believe with -- that compliance with the

4    federal Voting Rights Act is an important consideration in the

5    law-making process?

6    A.   Yes.

7    Q.   Prior to passage, did you understand that S.B. 14

8    would be subject to preclearance under Section 5 of the Voting

9    Rights Act?

10   A.   The record on the floor was that I did.

11   Q.   I'm asking about your personal understanding, not

12   the record on the floor.

13        MR. SWEETEN:  And don't reveal your thoughts,

14   mental impressions or opinions about legislation, including

15   specifically Senate Bill 14.  You can rely on matters of the

16   public record as you have.  Go ahead.

17   A.   On the floor, I stated that.

18   Q.   Okay.  How did you act on this consideration, this

19   issue, when you were drafting S.B. 14?

20   A.   How did I act?

21   Q.   Yeah.

22        MR. SWEETEN:  He's -- the question is -- and I

23   want to make sure that you are not revealing any mental

24   impressions or opinions about legislation.  Okay?  That also

25   includes all these -- all the communications that we've

---

**58**

1    outlined, constituents, state agencies, legislators, legislative

2    staff or the Texas Legislative Council.

3    Q.   Do you need me to rephrase?

4    A.   Please.

5    Q.   Okay.  What actions did you take or changes did you

6    make in consideration of the fact that S.B. 14 would have to be

7    submitted for preclearance under Section 5 of the Voting Rights

8    Act?

9        MR. SWEETEN:  Don't answer that question except

10   to the extent that it's a matter of public record.  It's

11   legislatively privileged.

12   A.   On advice from my attorney, I'm not answering that

13   question.

14   Q.   Thank you.  And what -- when you were voting on S.B.

15   14, how did you take into account the Voting Rights Act

16   compliance of the bill?

17        MR. SWEETEN:  Same instruction.

18   A.   Can you explain what you're asking?

19   Q.   When you were voting on the bill, in what way did you

20   consider whether the bill complied with the federal Voting

21   Rights Act?

22        MR. SWEETEN:  Same instruction.  Don't reveal

23   mental impressions, opinions about legislation.

24   A.   On advice from my counsel, I can't answer that.

25   Q.   Okay.  Thank you.  Now, you've said that you relied on

---

**59**

1    Leg Council with regard to whether S.B. 14 relied -- complied

2    with the federal Voting Rights Act.  Is there a written document

3    setting out Leg Council's opinion with regard to Voting Rights

4    Act compliance?

5    A.   I'm not aware.

6    Q.   And so was it solely Leg Council's drafting of the

7    bill that you were relying on?

8        MR. SWEETEN:  Objection, assumes facts not in

9    evidence.  Also assumes -- also, you're asking her to reveal

10   mental impressions, opinions about legislation, including Senate

11   Bill 14.

12   A.   On advice from my counsel, I can't answer that.

13   Q.   Okay.  Was there any other formal opinion that you

14   received or read or reviewed as to whether S.B. 14 complied with

15   the Federal Voting Rights Act?

16        MR. SWEETEN:  Don't reveal your mental

17   impressions, opinions about legislation or your thoughts about

18   the legislation.  Okay?  You can answer to the extent that --

19   that you can refer to the public record on this issue.

20   Otherwise, don't answer.

21        MR. FREEMAN:  Mr. Sweeten, this is a privileged

22   log type of question.  I'm asking you about the existence of the

23   document.

24        MR. SWEETEN:  Okay.  And let me explain that to

25   her.

---

**60**

1        MR. FREEMAN:  Sure.

2        MR. SWEETEN:  During the course of today's

3    deposition, there may be moments where he's attempting to

4    establish if it -- the existence of a specific type of document.

5    There's a line there, however.  We're not going to disclose;

6    we're going to just --

7        THE WITNESS:  An existence of the --

8        MR. SWEETEN:  Yeah.  Just let me tell you.  There

9    is a line there that we're not going to disclose the substance

10   of what's in that document, but he can ask questions about, for

11   example, if a document exists or the date of a document.

12   However, do not reveal what's contained in the document.  So

13   with that instruction, if you can answer that, then go ahead and

14   do so.

15   A.   Can you ask your question again.

16   Q.   Sure.

17        MR. FREEMAN:  If we could have the court reporter read

18   it back.

19        THE REPORTER:  Sure.  Question: "Okay.  Was there any

20   other formal opinion that you received or read or reviewed as to

21   whether S.B. 14 complied with the federal Voting Rights Act?"

22   A.   My testimony on the floor was that we looked at the

23   legislation drafted from Georgia and Indiana and drafted and

24   filed our legislation along those lines.

25   Q.   I'll repeat my question.  Was there any formal opinion

---

61

1   with regard to S.B. 14 that you read or reviewed in drafting or
2   voting on the bill with regard to its compliance with the
3   federal Voting Rights Act?
4        A.  I can't answer that.
5        Q.  So are you not aware of any such opinion issued by TLC
6   or anyone else?
7        A.  TLC is?
8        Q.  The Legislative Council.
9        A.  I can't recall.  I don't remember.
10       Q.  Now, the Legislative Council, their job is to draft
11  bills based on the substantive suggestions of legislators or
12  legislative staff; is that correct?
13       A.  That is my understanding.
14       Q.  And so if a legislator asks for a substantive change
15  to be in a bill, TLC will include it in that bill; is that
16  correct?
17       A.  That's privileged, and our discussion is privileged
18  with Leg Council.
19       Q.  So I think in terms of objections about privilege, I'm
20  going to ask that your counsel make those objections.  Because
21  unless you are submitting -- even assuming that there is an
22  attorney/client privilege with Legislative Council, which the
23  United States does not -- or the attorney general does not
24  believe there is, the only privileged communications are going
25  to be confidential communications.  I'm asking about the

62

1   function of the -- the legislative agency.
2            So I'm asking if Legislative Council were to
3   receive an instruction from a legislator to include a particular
4   substantive provision in a bill, would it be within the role of
5   Legislative Council to reject that request?
6        A.  I don't know how other members do their relationship
7   with Leg Council.
8        Q.  Okay.  In your experience as a legislator, has Leg
9   Council ever rejected a substantive request that you've asked
10  for legislation that you've submitted to them for drafting?
11       A.  I can't recall that they -- that we've asked a
12  substantive change.
13       Q.  Well, for example, if you submitted something to Leg
14  Council saying I would like you to draft legislation that will
15  decrease the gasoline tax in Texas by a penny per gallon, would
16  they draft that legislation for you, or would they -- would
17  they, in some cases, say, no, we can't do that?
18       A.  They would draft the legislation.  I don't know if
19  they would say no.
20       Q.  Have they ever said no?
21       A.  Not that I recall, but I don't have the one-on-one
22  communications with Leg Council.
23       Q.  So how does the fact that Leg Council drafted a bill
24  based on these substantive requests of legislators or staff
25  indicate that the bill complies with the Texas Constitution?

63

1            MR. SWEETEN:  As a general matter, you're asking?
2            MR. FREEMAN:  As a general matter.
3        A.  I'm not sure what their procedures are.  I know the
4   legislature relies on their legal interpretation and following
5   all federal and state statutes prior to drafting.
6        Q.  How is their legal interpretation a part of the draft
7   bill that you received from them after submitting a substantive
8   request?
9        A.  I don't know what their procedures are.  I know that
10  we request legislation based on accomplishing a goal, and I
11  don't know what their procedures are after that.
12       Q.  And if a legislator were to submit a request to Leg
13  Council for a bill that would raise the voting age in Texas to
14  25, is it your understanding that Leg Council would say to that
15  legislator, no, I will not do that?
16       A.  You're asking me to speculate on what their
17  conversation is with another member.  I can't do that.  I don't
18  know.
19       Q.  I'm just trying to understand how the agency works.
20       A.  Yeah.
21       Q.  I don't want you to speculate.  So if you don't know
22  how the agency works --
23       A.  I don't.
24       Q.  Okay.  So what is the basis for your reliance on the
25  fact that Leg Council drafted a bill for the fact that it would

64

1   comply with the Texas Constitution?
2            MR. SWEETEN:  As a general matter?
3            MR. FREEMAN:  As a general matter.
4        A.  As a general matter, they're the agency that has the
5   sole responsibility of making sure the legislation is drafted
6   properly, correctly and meets all the standards.
7        Q.  Okay.
8        A.  That's my opinion of what their role.
9        Q.  Okay.  And if I could just shift that over.  What is
10  the basis for your reliance on the fact that Leg Council drafted
11  a bill for the fact that it complies with Section 5 of the
12  Voting Rights Act?
13       A.  It's my reliance that they draft all legislation that
14  comply with federal and state rules and laws.
15       Q.  Has Leg Council ever drafted a bill that did not
16  comply with the Voting Rights Act?
17       A.  I don't know.
18       Q.  Has the United States Supreme Court ever found that a
19  Texas redistricting violated Section 5 of the Voting Rights Act?
20            MR. SWEETEN:  If you know.
21       Q.  If you know.
22       A.  I don't know.
23       Q.  Are you aware of whether any Texas redistricting has
24  ever been struck down by the Texas -- by the United States
25  Supreme Court?

Patricia Harless                                                    May 15, 2012

---

**69**

1          (Recess from 11:18 a.m. to 11:20 a.m.)
2          MR. SWEETEN:  Yesterday there -- at the tail end,
3   Mr. Rosenberg's question was about -- was to Mr. Beuck, and at
4   that time, as an -- as an attorney and someone who has spoken
5   with Representative Harless, he asserted the attorney/client
6   privilege.  Obviously, that is hers as a potential client to
7   waive.  So with respect to -- at this point, we're going to
8   allow her to answer that question, and we're not -- we obviously
9   are still maintaining our assertion of legislative privilege.
10         MR. FREEMAN:  Uh-huh.
11         MR. SWEETEN:  But as to the questioning regarding
12  attorney/client privilege, Representative Harless is not going
13  to stand by that privilege.  So she will --
14         MR. FREEMAN:  Okay.
15         MR. SWEETEN:  -- answer your question.
16         MR. FREEMAN:  Okay.
17    A.   I've had a conversation with my chief of staff on
18  privilege.
19    Q.   Okay.  And what was the substance of that
20  conversation?
21    A.   The affidavit that we submitted in the privilege.
22    Q.   And did you discuss whether you would agree to that
23  affidavit?
24    A.   Yes.
25    Q.   And did you ever discuss considerations against

**70**

1   agreeing to assert legislative privilege in this case?
2     A.   No.  Can you ask that again so that I understand
3   completely what you're asking?
4     Q.   Sure.  Did you ever discuss reasons why you might not
5   want to discuss -- or might not want to agree to assert the
6   legislative privilege in this case?
7          MR. SWEETEN:  Okay.  Let me also say that
8   obviously any conversation that you had, if Mr. Beuck was
9   present with me or with any of the members the attorney
10  general's office, is a privileged conversation.  Do not reveal
11  any matters discussed within those conversations.
12    A.   The only conversation Colby and I had was about
13  signing the affidavit on privileged motions.
14    Q.   And was the idea to assert legislative privilege in
15  this case, did that originate in your office?
16    A.   I --
17         MR. SWEETEN:  Do not reveal any conversations
18  that you've had with attorneys for the attorney general's
19  office.  If answering that question would do so, do not answer
20  the question.
21    A.   I can't answer that question because it would reveal
22  private conversations.
23    Q.   I understand.  Have you ever asserted legislative
24  privilege in any other matter?
25    A.   Not that I recall.

**71**

1     Q.   Do you have copies of the affidavit?  Sorry.  Strike
2   that.
3          Did you -- sorry.  Strike that as well.
4          Did you ever have discussions with other legislators
5   concerning their decision not to assert legislative privilege in
6   the redistricting litigation?
7     A.   No.
8     Q.   Did you ever have conversations with other legislators
9   concerning their decision to testify in the redistricting
10  litigation?
11    A.   Not that I know of.
12    Q.   Did you ever have discussions with other legislators
13  concerning their testimony in the redistricting litigation?
14    A.   Not that I remember.
15    Q.   Are you aware of any other instances where legislators
16  have asserted the legislative privilege in litigation with the
17  federal government?
18    A.   I wouldn't have a way of knowing that.
19    Q.   So you're not aware of any other instances?
20    A.   Not -- I would have no way of knowing that.
21    Q.   Okay.  Let's turn to a different subject.
22         When were you first elected?
23    A.   2006, sworn in 2007.
24    Q.   Did you have a primary?
25    A.   I did.

**72**

1     Q.   Was it an open seat?
2     A.   Yes.
3     Q.   And who was your opponent in the primary?
4     A.   Judge John Devine.
5     Q.   Is he still a sitting judge?
6     A.   No.
7     Q.   Was he a sitting judge at the time?
8     A.   No.
9     A.   He was a former judge?
10    A.   Yes.
11    Q.   And how did you distinguish yourself from your
12  opponent in that election?
13    A.   As the community activist and a long-time resident of
14  the district.
15    Q.   Did you campaign on any particular issues?
16    A.   I'm sure we did --
17    Q.   Do you --
18    A.   -- the same ones.
19    Q.   Do you recall what those issues were?
20    A.   Not exactly, but my stance has always been
21  probusiness, limited government, personal responsibility.
22    Q.   Okay.  Do you consider Devine to be conservative?
23    A.   He considers himself to be conservative.  He's running
24  for U.S. Supreme Court judge against David Medina, so --
25    Q.   You mean Texas Supreme Court?

---

Patricia Harless                                              May 15, 2012

### 77

1    A.  Uh-huh.
2    Q.  And was it a close race?
3    A.  No.
4    Q.  Do you know how many points you won by?
5    A.  No.
6    Q.  Do you know how many points you won by in 2006?
7    A.  2006, in my primary, it was really close in the
8    general.  It was 60, in the 60s.
9    Q.  Okay.
10   A.  In 2008, I think it was in the 60s again.
11   Q.  Congratulations.
12   A.  I got eight points above McCain, which meant that I
13   reached out to my district.
14   Q.  And sorry.  Just to jump back to 2006 real quickly.
15       Do you know what the turnout was in the general
16   election?
17   A.  In the general, I can't say exactly.  I think it was
18   anywhere from 7 to 12,000.
19   Q.  And do you know in 2008 what the turnout was?
20   A.  I -- it was more --
21   Q.  Okay.
22   A.  -- but I don't know how much more.
23   Q.  And do you remember what issues you campaigned on in
24   2008?
25   A.  The same issues in 2006.

### 78

1    Q.  So you don't recall specifically whether you
2    campaigned on election issues or voter ID?
3    A.  No, not specifically, but it's possible on integrity
4    of the election.
5    Q.  Okay.  And in 2010, did you have a primary?
6    A.  No.
7    Q.  And did you have a general election opponent?
8    A.  Yes.
9    Q.  And who was that?
10   A.  Casey McKinney.
11   Q.  And do you remember what issues you campaigned on in
12   2010?
13   A.  Education, business, limited government, some
14   immigration issues and community issues.
15   Q.  And what immigrations issues did you campaign on?
16   A.  From the literature, providing -- I'm trying to
17   remember how to phrase it -- providing verification when
18   employers hire employees.
19   Q.  Okay.  Different from the I-9 process?
20   A.  Yes, through the E-Verify.
21   Q.  Okay.  But that's also a federal program, correct?
22   A.  Right.
23   Q.  Okay.  Did -- and do you recall if you campaigned on
24   voter ID as an issue?
25   A.  I think -- I think we did.  I think we talked about

### 79

1    the integrity of the election process in photo voter ID.
2    Q.  Okay.  And do you remember what the turnout was like
3    in 2010?
4    A.  I don't.
5    Q.  Do you know if it was different at all from 2008?
6    A.  I think it was about the same.
7    Q.  As 2008?
8    A.  Yeah.  Maybe a little less.  I can't remember.
9    Q.  So it was higher than 2006; is that correct?
10   A.  I would be guessing.
11   Q.  Okay.
12   A.  I could have checked that if I'd have known, but --
13   Q.  It's all right.
14   A.  I have it in a file on my desk.
15   Q.  It's all right.
16       I'm going to actually ask and see if we can find --
17   this might be one of those circumstances where documents can
18   refresh your recollection, and I'm going to try and remember it,
19   and we'll come back to it -- it will be a little bit out of
20   order.
21   A.  Okay.
22   Q.  Do you remember, did you vote in favor of S.B. 1
23   budget measure?
24   A.  This session?
25   Q.  I believe it was this session, yes.

### 80

1    A.  I think I did.  I can't remember.
2    Q.  You don't recall?
3    A.  I don't.
4    Q.  Okay.
5    A.  I may have voted against it.  There was one bill I
6    voted against most of the members on, and I don't remember if
7    that was it.
8    Q.  Do you recall why you voted against a bill that most
9    of the -- do you mean most of the republican members or most of
10   the members of the House as a whole?
11   A.  Most --
12   MR. SWEETEN:  And I don't want you to reveal your
13   thoughts, mental impression or opinions about legislation or why
14   you specifically voted for something.  I don't want you to
15   reveal that unless it's a matter of public record, something
16   expressed publicly.
17   A.  I think I publicly went to the microphone and said I
18   was disappointed in the funding cuts in education.
19   Q.  Okay.  And so that was a -- so that was the -- that
20   was a republican sponsored bill, correct?
21   A.  Yes, I think so.
22   Q.  Where do you fall in the political spectrum within the
23   republican delegation to the Texas House?
24   A.  You mean as number?
25   Q.  Well, if -- to the far, far right or towards the

Patricia Harless                                    May 15, 2012

---

81

```
 1   middle?
 2       A.  I consider myself an independent.
 3       Q.  Okay.
 4       A.  And my record reflects that.
 5       Q.  Okay.  Do you have a primary coming up?
 6       A.  No.
 7       Q.  Glad we didn't keep you away from that.  That might
 8   have been hard.  So I'm glad this wasn't a problem.
 9   Congratulations on that.
10       A.  Thank you.  Thank you.
11       Q.  How would you describe your current district, the one
12   from which you were elected in -- in 2010?
13       A.  What do you mean by describe it, the -- the
14   boundaries?
15       Q.  The constituents.  So in terms of the work they do,
16   socioeconomic class, ethnicity.
17       A.  My boundaries are very diverse.  I live in
18   unincorporated Harris County --
19       Q.  Okay.
20       A.  -- which has no city rules or regulation.  The area is
21   1.5 million people, and if it were a city, it would be the fifth
22   largest city in the United States without any type of city
23   government, which is the reason I have a lot of constituent
24   inquiries, because I'm their first level.
25       Q.  Is there no county government?
```

---

82

```
 1       A.  There's county commissioners, but typically the
 2   constituents come to me to get response from county government.
 3       Q.  Okay.
 4       A.  It's very economically diverse.  One of my school
 5   districts, I represent Spring, is at close to 70 percent free
 6   and reduced lunches.  Cy-Fair is becoming more economically
 7   diversed and probably approaching 50 percent free or reduced
 8   lunches.  I have a broad mix of people from bus riders that
 9   don't buy cars to people that have several cars.
10       Q.  And are you aware of the -- the racial make-up of your
11   district?
12       A.  Not specifically.  I would say it's probably over
13   50 percent Caucasian.
14           MR. FREEMAN:  We can mark this as U.S. 14.
15           (Exhibit No. 14 marked)
16       Q.  Have you ever seen this document before or a document
17   similar to it?
18       A.  Similar to it, yes, sir.
19       Q.  And if you can go to District 126.  And if you can
20   look at the percent BH column under population and the total.
21       A.  Uh-huh.
22       Q.  Do you see what percentage population for your
23   district?
24       A.  Am I reading it in the right column of 51.2?
25       Q.  Yes.
```

---

83

```
 1       A.  Okay.
 2       Q.  So does that indicate that this is combined
 3   majority --
 4       A.  Black and Hispanic.
 5       Q.  -- minority?
 6           So that's in your current district, correct?
 7       A.  When you say current, this is --
 8       Q.  The district from which you were elected in the -- in
 9   2010.
10       A.  Well, this is the 2010 census numbers --
11       Q.  Yes.
12       A.  -- so I was elected in a district that reflected
13   different numbers.
14       Q.  But in 2010, that was the district from which you were
15   elected, correct?
16       A.  I disagree with that because of the fact that these
17   are 2010 census numbers, which we didn't get until January of
18   2011.  And so the district I was elected in and voted for,
19   though these were certified after 2010, this was not the numbers
20   I was relying on.
21       Q.  Are you -- not in terms of reliance, but are you aware
22   of what date the census reflects the population on?
23       A.  They started, I want to say, in May.
24       Q.  Are you aware that the census reflects April 1st,
25   2010?
```

---

84

```
 1       A.  No.
 2       Q.  Okay.  But it's the 2010 census, correct?
 3       A.  Yes.  I know we got the information in 2011.
 4       Q.  Okay.  So as of the 2010 election, is it your
 5   understanding, after seeing this document, that the district
 6   from which you were elected is -- the population is majority
 7   either black or Hispanic?
 8       A.  Yes.
 9       Q.  Okay.
10       A.  From this document.
11       Q.  Yes.
12           And do you see on the top right-hand corner where the
13   document is produced from?
14       A.  Top right-hand, Texas Legislative Council.
15       Q.  Okay.  Thank you.  Were the demographics of your
16   district trending over the last decade?
17       A.  Yes.
18       Q.  And in what way were they trending?
19       A.  I think more minority population.
20       Q.  Okay.  Now, you said before that you were on
21   Redistricting; is that correct?
22       A.  Yes.
23       Q.  And what was your involvement in the map that was
24   passed by the legislature last spring?
25           MR. SWEETEN:  Hold on a second.  I think the
```

---

Patricia Harless                                              May 15, 2012

---

89

1    that legislation that was passed.  Do you understand that
2    distinction?
3         A.   THE WITNESS:  Yes.
4              MR. SWEETEN:  Okay.  And with that, you can go
5    ahead and answer his question.
6         A.   The district passed during session, the San Antonio
7    district and my previous district and now the court ordered
8    district were all fine with me.
9         Q.   But how would you describe the new district in terms
10   of --
11        A.   It --
12        Q.   -- differences from the old district?
13        A.   It has different boundaries.  It goes further north.
14   I think that there -- it's probably more -- more houses, more
15   developments, less industry.
16        Q.   Okay.  Is there any difference in the demographics in
17   terms of the racial communities?
18        A.   To be honest, to be absolutely honest, I have never
19   looked at that.
20        Q.   Okay.  Let's take a look.
21             MR. FREEMAN:  If we can mark this as U.S. 15.
22             (Exhibit No. 15 marked)
23        Q.   And can you tell me, for District 126, is it still a
24   majority minority district?
25        A.   From the Leg Council sheet that you have given me --

---

90

1         Q.   Uh-huh.
2         A.   -- on the House Plan 283, it shows that the percentage
3    BH is 45.1, and my district that I ran in, in 2010 was 51.2.  So
4    that would make me 6.1 percent less minority than in the
5    previous district I ran in.
6         Q.   Did you ask to eliminate the majority minority status
7    of your district?
8         A.   No.
9              MR. SWEETEN:  Objection.  Don't reveal any -- any
10   mental impressions or communications that you had regarding any
11   sort of bill.
12             THE WITNESS:  Okay.
13             MR. SWEETEN:  And give me time to make my
14   objections.
15             THE WITNESS:  I'm sorry.
16        Q.   And would eliminating the majority minority status of
17   your district make it easier for you to run for reelection?
18             MR. SWEETEN:  You're asking about the bill that
19   was passed, and so I'm going to instruct her not to answer the
20   question based on because it would reveal thoughts, mental
21   impressions, opinions about legislation.
22             MR. FREEMAN:  Mr. Sweeten, I would say that's
23   outside the scope of the bill and reflects the general issue of
24   whether it would be easier for Representative Harless to run for
25   reelection in a majority Anglo district or a majority minority

---

91

1    district.
2              MR. SWEETEN:  Is your question following passage?
3              MR. FREEMAN:  My question is related to the
4    demographics of greater than 50 percent or lesser than
5    50 percent.
6              MR. SWEETEN:  I'm going to object, calls for
7    speculation.  I'm going to let her answer that question about
8    after passage of the bill because I don't think that you're
9    asking her to reveal mental impressions about the passage of the
10   bill; you're asking her as it stands now --
11             MR. FREEMAN:  Yes.
12             MR. SWEETEN:  -- how she would view that issue.
13        Q.   Based on your political knowledge of Harris County,
14   your own election.
15             MR. SWEETEN:  Objection, calls for speculation.
16        Go ahead.
17        A.   I was happy with my old district.  I'm happy with my
18   new district.  I didn't care.
19        Q.   Okay.  Are you a member of a group called the Texas
20   Tea Republicans?
21        A.   Texas Tea Republican Womens Club.
22        Q.   Oh, okay.  I don't think we need to show the exhibit.
23   What is your involvement with that group?
24        A.   I pay dues to them annually.
25        Q.   Are you involved in leadership at all?

---

92

1         A.   No.
2         Q.   Do you attend meetings?
3         A.   Rarely.  Maybe --
4         Q.   Do --
5         A.   -- once a year.
6         Q.   Do they send materials to you?
7         A.   They send e-mails out as a distribution, and I'm on
8    that list as a member.
9         Q.   Do they discuss particular issues?
10             MR. SWEETEN:  Don't reveal communications you've
11   had with -- with constituents.  If it's a mass mailing and is of
12   a public nature, I'll let you discuss that.
13        A.   They send out e-mails.
14        Q.   Okay.  At the meetings you've attended, does this --
15   has this group had a substantial number of minority individuals
16   attending, black or Hispanic?
17        A.   I -- I don't -- I can't recall.  I would say probably
18   no.
19        Q.   Okay.
20        A.   I've attended maybe one meeting in a year.
21        Q.   Okay.  And have they sent out any communications
22   regarding voter ID?
23        A.   They send out communications every day that I usually
24   delete.
25        Q.   Okay.

---

Patricia Harless                                          May 15, 2012

---

**93**

1    A.  They don't like me, and I don't like them.

2    Q.  Sorry to hear that.

3    A.  Sorry.

4         MR. SWEETEN:  Just answer the question.

5    Q.  Are you a member of the American Legislative Exchange

6    Council?

7    A.  I am.

8    Q.  And what is your participation in the American

9    Legislative Exchange Council?

10   A.  I've attended a couple of their conventions.  I think

11   the speaker appointed me to a task force on cable ready, but I

12   can't --

13   Q.  Does the speaker -- you mean Speaker Straus?

14   A.  Yes.

15   Q.  Okay.  And so Speaker Straus is also involved in the

16   American Legislative Exchange Council?

17   A.  I don't know if he is or isn't.

18   Q.  Okay.  Have you ever introduced bill language that was

19   provided by the American Legislative Exchange Council?

20   A.  No.

21        THE WITNESS:  Sorry.

22   Q.  That's fine.

23        MR. SWEETEN:  That's okay.  Don't reveal

24   communications you've had with constituents.  Okay?  Don't

25   reveal the substance of communications.

---

**94**

1         MR. FREEMAN:  And, Mr. Sweeten, are you

2    considering the American Legislative Exchange Council to be a

3    constituent?

4         MR. SWEETEN:  To be honest with you, Mr. Freeman,

5    I am not familiar with the American Legislative Exchange, but as

6    you know, we -- we've defined constituents as those who live in

7    the State of Texas, so --

8         MR. FREEMAN:  It's an organization also known as

9    ALEC that is based outside of the State of Texas.

10        MR. SWEETEN:  I don't -- I think under our

11   interpretation of what a constituent is, if you're asking if it

12   originated -- information originated outside of the State of

13   Texas, not from a Texas citizen, then -- then that's -- I don't

14   think that that's covered under where we're asserting our

15   privilege.

16        MR. FREEMAN:  Okay.  But I'm asking about -- the

17   representative's already answered no, so this is --

18        MR. SWEETEN:  Okay.  All right.

19        MR. FREEMAN:  -- largely a moot point.

20        MR. SWEETEN:  Well, I'm glad we had that debate.

21        MR. FREEMAN:  Yes.  Good.  But we're setting

22   ground rules for things in the future.  That's important.

23   Q.  Okay.  If we can move on -- we're going to move on to

24   S.B. 14 itself.  What were the purposes of S.B. 14?

25        MR. SWEETEN:  Okay.  I'm going to -- I'm going to

---

**95**

1    instruct you at this time not to answer based upon the fact that

2    that would invade legislative privilege, including

3    communications with legislators, legislative staff, state

4    agencies, Texas Legislative Council, constituents, as well as it

5    would reveal your mental impressions regarding Senate Bill 14.

6    That's my instruction.  You can answer based upon the public

7    record.

8    A.  If I recall in testimony on the floor, I stated the

9    purpose was to protect the integrity of the election process and

10   to deter and detect fraud.

11   Q.  Were there any other purposes?

12        MR. SWEETEN:  Same instruction.  Same objection.

13   A.  Those are the ones that I recall that I mentioned on

14   the floor.

15   Q.  And so any other purposes -- am I correct that you

16   would not be stating any other purposes based on the instruction

17   received from counsel?

18   A.  I can't recall anything else.  I can't remember what

19   all I discussed on the House floor.

20   Q.  Okay.  Was the purpose of S.B. 14, in part, to

21   decrease the number of Hispanic voters?

22        MR. SWEETEN:  I'm going to object to the

23   question.  The matter invades the legislative privilege, and --

24   and I'm going to instruct Representative Harless not to answer

25   that question because it reveals thoughts, mental impressions

---

**96**

1    and opinions about legislation.  Also reveals communications

2    that she may have had with the parties that I've already listed.

3    A.  And my testimony on the House floor that I believe

4    that the legislation would increase participation for all

5    Texans.

6    Q.  Was the purpose, in part, to decrease the number of

7    African-American voters?

8    A.  My --

9         MR. SWEETEN:  Object -- hold on.  I'm going to object

10   to the question based upon the legislative privilege.  I'm going

11   to instruct Representative Harless not to answer because it

12   would invade her mental impressions, thoughts about pending

13   legislation, about past legislation and would implicate

14   communications that she's had with other legislators and other

15   legislative staff as well as the other groups that I've

16   previously mentioned.

17        You can answer based upon the public record.

18   A.  My testimony on the House floor was that I felt the

19   bill would increase participation with -- for all Texans.

20   Q.  And I guess if I can clarify my question beyond your

21   personal belief but the purpose of the legislation as a whole as

22   understood by any other legislators, was the purpose of the

23   bill, in part, to decrease the number of any group of minority

24   voters?

25        MR. SWEETEN:  I'm going to instruct

---

97

1   Representative Harless not to answer that question.  You're
2   asking her to reveal thoughts, mental impressions about
3   legislation.  You're also asking her to reveal communications
4   between state agencies, legislators, legislative staff, Texas
5   Legislative Council and constituents.
6         And so I'm going to instruct you not to answer that
7   question based on that.  You can refer to public matters such as
8   the public floor debates as to the issue.
9      A.   My testimony on the floor was that this legislation
10  was to protect the integrity of the election process.
11     Q.   And are you asserting legislative privilege with
12  regard to any other purpose maintained by yourself or any other
13  individual for this legislation?
14        MR. SWEETEN:  My instruction to you is to do so
15  unless it -- you can refer to matters of the public -- from
16  public debate, public hearings or committee hearings.
17        MR. FREEMAN:  Mr. Sweeten, this is her privilege
18  to hold or waive, and so I would ask that you instruct her that
19  she can but not that she must withhold this information.
20        MR. SWEETEN:  She's already asserted the
21  legislative privilege.  We're asserting it throughout this
22  deposition.  This is an area that implicates legislative
23  privilege.  This is a protected privilege that this court has
24  recognized and we are going to -- and I'm instructing her as to
25  the boundaries of that privilege.

98

1         MR. FREEMAN:  Okay.
2      A.   I agree with my counsel that I will invoke privilege,
3   but I'm happy to discuss from my memory what my conversations
4   were on the floor that I recall.
5      Q.   On the floor.
6      A.   And in committee.
7      Q.   Okay.
8      A.   When I say on the floor, I mean from -- from
9   the -- from the front and back mike, public record.
10     Q.   Was the purpose of S.B. 14, in part, to discriminate
11  in any way against any group or groups of minority voters?
12        MR. SWEETEN:  I'm going to instruct you about the
13  legislative privilege and that specifically legislative
14  privilege covers mental impressions, opinions about legislation.
15  It also allows you not to reveal communications between
16  legislators, legislative staffers, state agencies, constituents
17  or the Legislative Council.  That privilege is recognized by
18  this court, and you -- and I'm instructing you accordingly.  You
19  can answer based upon matters of public record.
20     A.   Can I hear the question one more time?
21        MR. SWEETEN:  Yeah, she can read it.
22     Q.   The court reporter can read it back.
23        THE REPORTER:  Question: "Was the purpose of S.B.
24  14, in part, to discriminate in any way against any group or
25  groups of minority voters?"

99

1      A.   The purpose of the --
2         MR. SWEETEN:  Same objection.
3      A.   The purpose of --
4         MR. SWEETEN:  Same instruction.
5      A.   The purpose of the legislation, as I stated on the
6   floor during the debate, was to protect the integrity of the
7   election process.
8      Q.   And if you can confirm that you are refusing to answer
9   questions about nonpublic purposes of S.B. 14 on the basis of
10  your assertion of the state legislative privilege --
11     A.   I confirm that.
12     Q.   -- and that it is your assertion and not the assertion
13  of the Office of the Texas Attorney General?
14     A.   It is my assertion.
15     Q.   Okay.  How do you know that the purpose of S.B. 14 is
16  limited to nondiscriminatory reasons?
17        MR. SWEETEN:  I'm going to again instruct you not to
18  answer that question based upon the fact that it would reveal
19  mental impressions about legislation.  It also would reveal
20  communications you've had with the various categories that I've
21  enumerated:  Legislators, legislative staff, state agencies,
22  constituents or Texas Legislative Council.  All of those are
23  covered by the legislative privilege.  This court has found that
24  there is -- that a legislative -- that legislative privilege
25  does exist, and I'm instructing you as to the boundaries of that

100

1   privilege.  So you can go ahead and answer with that -- you can
2   answer with respect to matters of the public record.
3         THE WITNESS:  Could you repeat the question,
4   please.
5         THE REPORTER:  Question: "Okay.  How do you know that
6   the purpose of S.B. 14 is limited to nondiscriminatory reasons?"
7      A.   I --
8         MR. SWEETEN:  Same instruction.
9      A.   I don't recall the debate on that specific question.
10     Q.   Is it your testimony that you do not recall the debate
11  with regard to potential discriminatory purposes or
12  discriminatory effects of S.B. 14?
13        MR. SWEETEN:  You can confine your answer to
14  matters of the public record.
15     A.   I stated on the floor that I felt that S.B. 14 would
16  increase participation for all Texans.
17     Q.   And what was the basis for your understanding that it
18  would increase the participation for all Texans?
19        MR. SWEETEN:  Don't reveal your thoughts, mental
20  impressions or opinions about legislation.  You can answer to
21  the extent that you've made a public statement with respect to
22  that.  Otherwise, the legislative privilege would cover
23  this -- this information that he's seeking.
24     A.   From public testimony in committee that I repeated on
25  the House floor, I believe that it would increase participation

Patricia Harless                                           May 15, 2012

101

1  because people will be -- would be more confident that their
2  vote is counted and --
3      Q.  We'll turn to that later.  But if we can first -- if I
4  can first ask, what is Texas' current system for determining how
5  to verify the identity of a voter?
6      A.  The current system --
7      Q.  Uh-huh.
8      A.  -- for --
9      Q.  With -- S.B. 14 is currently not being implemented
10 because of this litigation.  So without S.B. 14 in place, what
11 is the current system to identify -- to verify the identity of a
12 voter when they show up to vote at the polls?
13     A.  If I remember correctly, testimony during committee
14 was voters show up with a voter registration certificate --
15     Q.  Uh-huh.
16     A.  -- or a driver's license, and they're checked against
17 the current data voter registration -- the voter registration
18 database.
19     Q.  Okay.  On the day that Governor Perry signed S.B. 14,
20 which I believe was May 27th, 2011, correct?
21     A.  (Laughter.)
22     Q.  Okay.  On the day that Governor Perry signed S.B. 14,
23 did you state, quote, "We must do all we can to guarantee our
24 elections are conducted fairly and without fraud.  This bill
25 takes a significant step to ensure the integrity of the ballot

102

1  box by providing a means to detect and deter in-person voter
2  fraud"?
3      A.  If you have a statement that I said that.
4          MR. FREEMAN:  If we could mark this U.S. 16.
5          (Exhibit No. 16 marked)
6      Q.  Do you recognize this press release?
7          MR. SWEETEN:  I caution the witness to take your
8  time to review it before answering the question.
9      Q.  Please do.
10     A.  Well, it's kind of printed over.  Is this a press
11 release from me or from Governor Perry's office?
12     Q.  If you look at the top left.
13     A.  Oh, okay.
14     Q.  And your quote begins at the bottom of Page 1.
15         MR. SWEETEN:  So just so I'm clear, this is a
16 press release from Governor Perry's office, Dan?
17         MR. FREEMAN:  That's correct.
18     A.  It shows that that is a quote from me.
19     Q.  And what did you mean in that statement by "in-person
20 voter fraud"?
21         MR. SWEETEN:  You can testify about the -- the
22 statement that you made, if you indeed made that statement, but
23 I don't want you to go back and reveal thoughts and mental
24 impressions or opinions about legislation.  You can talk about
25 that specific -- about public statements about that issue.

103

1      A.  My statement says, "We must do all we can to guarantee
2  our elections are conducted fairly and without fraud.  This bill
3  takes a significant step to ensure the integrity of the ballot
4  box by providing means to deter and detect in-person voter
5  fraud."
6      Q.  What do you mean by the term "in-person voter fraud"?
7      A.  From the testimony on the House floor, the purpose of
8  the photo voter ID is to verify the person showing up to vote is
9  who they say they are.
10     Q.  So what is the act that you are trying to prevent by
11 S.B. 14?
12         MR. SWEETEN:  Okay.  That -- and he's asking you
13 now a question that would require you to reveal thoughts, mental
14 impressions, opinions about legislation, okay, or potentially
15 communications with constituents, legislators, staff, TLC or
16 state agencies.  So to the extent he's asking you to do that, my
17 instruction to you is that that is a matter covered by the
18 legislative privilege.  To the extent that you can refer to
19 public debate about the issue or public statements, you can
20 answer.
21         MR. FREEMAN:  Let me see if I can rephrase my
22 question to avoid the objection.
23     Q.  How would you define the term used in this press
24 release, the act that you are detecting and deterring, which is
25 in-person voter fraud?  How would you define the term that you

104

1  used?
2      A.  The debate on the floor was the act to deter and
3  detect is by having a person that shows up to vote in person
4  show a photo ID showing that they are who they say they are.
5      Q.  But without S.B. 14, what is the in-person voter
6  fraud?
7      A.  Excuse me?
8      Q.  What is in-person voter fraud?
9          MR. SWEETEN:  I don't want you to reveal
10 thoughts, mental impressions or opinions about the legislation.
11 He can ask you about that specific statement that -- that you
12 made, if you made that.  But don't go into the process of
13 making -- of how the legislation came to be, your thoughts as
14 the legislation proceeded or communications that you've had with
15 the individuals I've outlined earlier.
16     A.  I don't recall public testimony specifically about
17 that question.
18     Q.  About the definition of in-person voter fraud?
19     A.  I don't recall it.  I'm not saying it didn't exist.  I
20 don't remember it.
21     Q.  Do you personally have a working definition, an
22 understanding of what in-person voter fraud is?
23     A.  Say that one more time?
24     Q.  Do you have -- oh, sorry.  We can have the court
25 reporter read it.

Patricia Harless                                          May 15, 2012

---

105

1     THE REPORTER: Question: "Do you personally have a
2   working definition, an understanding of what in-person voter
3   fraud is?"
4         MR. SWEETEN: Just same instruction. Don't
5   reveal any mental impressions, opinions about the legislation,
6   but you can -- if you want to give him your current
7   understanding -- I think is what he's asking you -- of what
8   voter -- in-person voter fraud means, I don't think that
9   that's -- to the extent you're not doing -- you're not providing
10  that information, you can go ahead and do so.
11    A.   There was testimony in committee --
12    Q.   Uh-huh.
13    A.   -- that people stated someone had used an ID of a
14  person that was deceased and went and voted with that person's
15  ID. That was the testimony of impersonation of a voter.
16    Q.   Okay. So if -- allow me to -- I'll provide a working
17  definition so we can use that moving forward that -- can we
18  accept that in-person voter fraud is the act of showing up at a
19  polling place with someone else's ID in order to falsify your
20  identity and vote for that other person? Does that work?
21    A.   Yes.
22    Q.   Okay. What would a voter need to do under the
23  existing law, pre-S.B. 14, to commit in-person voter fraud?
24    A.   Show up to vote with someone else's voter registration
25  card.

---

106

1     Q.   How would they obtain someone else's voter
2   registration card?
3     A.   I have no idea.
4     Q.   Would they have to steal it, for example?
5     A.   I don't know.
6     Q.   What is the punishment under current law for
7   committing in-person voter fraud?
8     A.   Prior to --
9     Q.   Prior to S.B. 14.
10    A.   I don't know exactly. It was -- we increased it to a
11  second degree -- I think it was a third degree. I can't
12  remember exactly.
13    Q.   So it was a felony; is that correct?
14    A.   I -- I think it was.
15    Q.   Okay. And in-person voter fraud would change one
16  vote; is that correct?
17    A.   Excuse me?
18    Q.   An act of in-person voter fraud would change one vote
19  is that correct?
20        MR. SWEETEN: Under existing statute or --
21        MR. FREEMAN: Under the -- under the existing
22  statute, as the term is defined.
23    A.   Yes.
24    Q.   And that would be a felony; is that correct?
25    A.   I think.

---

107

1     Q.   Okay.
2     A.   I'm not sure. I can't remember. I know we
3   increased it to a second degree and a state jail felony, but I
4   don't remember what it was prior to.
5     Q.   Are you aware of any specific incidents of in-person
6   voter fraud in your district, Texas House District 126, in the
7   last 20 years?
8         MR. SWEETEN: Hold on a second. When you're
9   answering this question, I don't want you to reveal thoughts,
10  mental impressions or opinions about legislation.
11    THE WITNESS: Right.
12        MR. SWEETEN: I also don't want you to reveal
13  communications you've had with constituents or state agencies,
14  other legislators or staff.
15    A.   I was going to say that's privileged conversation with
16  constituents.
17    Q.   Okay. But in the public record, is it correct that
18  there are no statements in the public record before the
19  committee or before the floor concerning -- that set out
20  incidents of in-person voter fraud in Texas House District 126?
21    A.   I cannot say that for sure. There were people that
22  were testifying.
23    Q.   Okay. And have you, in any public statements,
24  articulated any incidents of in-person voter fraud that occurred
25  in Texas House District 126 in the last 20 years?

---

108

1     A.   I don't think I have made any public statements of
2   that.
3     Q.   Are you aware of any specific incidents of in-person
4   voter fraud in Harris County in the last 20 years?
5     A.   There was testimony that -- in committee that there
6   were cases referred to the Secretary of State and some
7   prosecuted in Harris County.
8     Q.   For in-person voter fraud?
9     A.   If I remember correctly.
10    Q.   Did Paul Bettencourt give that testimony?
11    A.   I don't remember him giving testimony --
12    Q.   Okay.
13    A.   -- during our committee. I'm not saying he didn't,
14  but I don't remember him.
15    Q.   Are you aware of how many convictions the attorney
16  general has secured for in-person voter fraud in the last 20
17  years in the State of Texas?
18        MR. SWEETEN: In answering that question, don't
19  reveal thoughts, mental impressions, opinions about legislation,
20  including Senate Bill 14, or communications with legislators,
21  legislative staff, state agencies, Legislative Council or
22  constituents.
23        MR. FREEMAN: Mr. Sweeten, I believe convictions
24  are a matter of public record.
25        MR. SWEETEN: You can -- you can confine your

---

Patricia Harless                                                     May 15, 2012

109

1   testimony to matters of public record.
2       A.  I remember in committee there were testimony of
3   numbers, but I can't tell you what they were.
4       Q.  Was it less than five?
5       A.  I could not tell you for sure.
6       Q.  Okay.  In the last 20 years, are you aware of any
7   convictions of noncitizens for in-person voter fraud?
8           MR. SWEETEN:  Same instruction.
9       A.  I don't recall that in testimony.
10      Q.  Okay.  Are you aware of whether Attorney General
11  Abbott has dedicated substantial resources over the last decade
12  to investigating allegations of voter fraud, in-person voter
13  fraud?
14          MR. SWEETEN:  In answering that question, don't
15  reveal thoughts, mental impressions, opinions about legislation.
16  Don't reveal communications with legislators, legislative staff,
17  state agencies, Texas Legislative Council, constituents or your
18  lawyers.
19          THE WITNESS: Could you please repeat the
20  question.
21          THE REPORTER: Question: "Okay.  Are you aware of
22  whether Attorney General Abbott has dedicated substantial
23  resources over the last decade to investigating allegations of
24  voter fraud, in-person voter fraud? "
25      A.  I don't --

110

1           MR. SWEETEN:  Same instruction.
2       A.  I don't recall testimony of that.
3       Q.  Okay.  What is the drinking age in Texas?
4       A.  21.
5           MR. SWEETEN:  You can answer.
6           MR. FREEMAN:  Thanks.
7           THE WITNESS: I'm getting better about waiting,
8   though.  My arm's sore.  I'm teasing.
9       Q.  Have individuals ever created counterfeit photographic
10  identification cards in Texas?
11      A.  Repeat that, please.
12      Q.  I'm happy to.  Have individuals ever created
13  counterfeit photographic identification cards in Texas?
14      A.  I'm not aware of any public testimony of that.
15      Q.  Are you aware, in your personal experience outside the
16  legislature, in terms of any source of information you may have,
17  of whether individuals in Texas have ever created counterfeit
18  photographic identification cards?
19          MR. SWEETEN:  Same instruction that I've given.
20      A.  I agree.  That's privileged conversations with
21  constituents and staff.
22      Q.  And you have no information outside the legislative
23  process concerning the production of counterfeit photographic
24  identification cards in Texas?
25          MR. SWEETEN:  Same instruction.

111

1       A.  Not that I recall in the legislative sense.
2       Q.  Are you aware of any incidents of minors or
3   individuals who are underneath the age of 21 creating or using
4   false IDs in order to obtain alcohol?
5           MR. SWEETEN:  Same instruction.
6       A.  There was testimony in committee that is
7   possible.
8       Q.  How many convictions have been obtained in the last 20
9   years concerning the use of false IDs either to -- either to
10  obtain alcohol or for any other purpose?
11          MR. SWEETEN:  Same instruction.
12      A.  I have no clue.
13      Q.  Do you know how many investigated incidents there have
14  been?
15      A.  On alcohol?
16      Q.  Using fake IDs to obtain alcohol, fake photo IDs to
17  obtain alcohol or for any other purpose.
18          MR. SWEETEN:  Same instruction.
19      A.  There may have been testimony.  I don't recall it.
20      Q.  Would it be fair to say that there are more
21  convictions for using fake IDs, photo IDs, to obtain alcohol in
22  the State of Texas than there are for in-person voter fraud?
23          MR. SWEETEN:  Objection, calls for speculation.
24  In addition, I object and instruct her, as I have, regarding the
25  specific privilege.

112

1           But you can go ahead and answer with that instruction.
2       A.  I have no way of knowing that.  I don't recall any
3   testimony on that.
4       Q.  What are the security features of a Texas driver's
5   license?
6       A.  They have a scan -- a scan bar on the back.  I think
7   they're made with holographic material.  I know there's a number
8   of them, but I don't know them all off the top of my head.
9       Q.  Do they have anything that appears if you shine a
10  black light on them?
11          MR. SWEETEN:  Same -- I'm going to make the same
12  objection just to the extent that this could reveal
13  communications in the legislative process between state
14  agencies.  Don't reveal that.  If it's a matter of public
15  record, then you can -- and not part of the legislative process,
16  you can answer.
17      A.  Well, outside of the legislature, when I travel on a
18  plane, I have noticed them shining something on my driver's
19  license.  I don't know what that is and what purpose that is.
20      Q.  Does S.B. 14 provide funding for polling places to
21  have those similar lights, like they use when you're traveling
22  on a plane, to test the validity of Texas driver's licenses?
23          MR. SWEETEN:  You're asking about Senate Bill 14
24  as passed?
25          MR. FREEMAN:  Yes.

113

1      MR. SWEETEN:  Does it contain that?
2      MR. FREEMAN:  Yes.
3      A.   There was a fiscal note that was several pages with a
4    lot of breakdown from departments on what the fiscal expense
5    they expected the legislation to add up to, and I'm not sure
6    exactly what all the specifics were that went to drafting that
7    fiscal note.
8      Q.   Are you aware of whether S.B. 14 provides financing
9    for handheld computers to scan the back of the driver's license?
10     A.   I'm -- I don't know.
11     Q.   Do you recall any debate in the House concerning the
12   fiscal note attached to S.B. 14?
13     A.   I do.
14     Q.   And do you recall whether all of the funding for S.B.
15   14 would be provided using federal funds available under the
16   Help America Vote Act?
17     A.   If I recall the testimony correctly, there was
18   discussion that part of the funding could be applied for --
19     Q.   Uh-huh.
20     A.   -- through the Help America Vote Act.
21     Q.   And was -- were there discussions as to whether that
22   funding would be available -- would be used only for voter
23   education?
24     MR. SWEETEN:  You're talking about public
25   hearing --

114

1      MR. FREEMAN:  Public hearing testimony, yes.
2      MR. SWEETEN:  You can answer.
3      A.   I'm not sure what the -- I don't remember what the
4    testimony was of what specifically that money would be used for,
5    but that we could apply for half of funding to help offset the
6    cost of the fiscal note part of process.
7      Q.   We're going to probably just jump back to that later
8    when I'll find something to refresh your recollection on that
9    during a break --
10     A.   Okay.
11     Q.   -- rather than stop now.
12     A.   Okay.
13     Q.   When there are a greater number of one crime being
14   committed than another, in your opinion, what crime should be
15   given the greater priority in terms of the legislature's
16   attention?
17     MR. SWEETEN:  Okay.  To the extent that this
18   question is asking you to reveal thoughts, mental impressions,
19   opinions about legislation, do not reveal those.  Do not also --
20   also, do not reveal any communications you've had with state
21   agencies, legislators, staff members, constituents or the Texas
22   Legislative Council.  You can refer to matters of the public
23   record or matters that aren't implicated by that legislative
24   privilege.
25     A.   I don't know that that was ever discussed in the

115

1    debate of photo voter ID.  I don't remember.
2      Q.   I'm just asking as a general -- as a general
3    principle, your opinion.
4      MR. SWEETEN:  Same instruction.
5      Q.   Okay.  Are you not able to offer an opinion because of
6    the advice of counsel?
7      A.   Yes.
8      Q.   Okay.
9      A.   Because it relies on my thought process.
10     Q.   Did you ever state in the House that you were not
11   advised as to how often in-person voter fraud occurs?
12     A.   I could have possibly stated that.  It was a 12-hour
13   debate.
14     Q.   I thought you said 11.
15     A.   11, 12.  The second time.
16     Q.   Okay.
17     A.   The first time it was four hours.
18     MR. FREEMAN:  If we could mark this as, I
19   believe, U.S. Exhibit 17.
20     (Exhibit No. 17 marked)
21     Q.   My apologies for making you re-live all those hours.
22     A.   It's part of it.
23     Q.   If you could turn to Page 910.  And if you could just
24   read beginning with, "And how does -- describe how voter
25   impersonation works," Representative Anchia's statement.

116

1      MR. SWEETEN:  Dan, where are you in the --
2      THE WITNESS:  Right here (indicating).
3      MR. FREEMAN:  910.
4      MR. SWEETEN:  Thank you.
5      A.   And your question was?
6      Q.   My question was:  Did you state on the House floor
7    that you were not advised how often in-person voter fraud or
8    voter impersonation occurs?
9      A.   That's what the transcript said, so, yes.
10     Q.   Okay.  And is it correct that you stated on the House
11   floor that you'd heard testimony in committee, quote, suggesting
12   that in-person voter fraud occurred?  It's not in that
13   transcript; it was from a different day.  But do you recall
14   that?
15     A.   I don't recall that.
16     MR. FREEMAN:  If we could -- I apologize.  This
17   is much larger.  But if we could mark this as U.S. 18.  Sorry.
18     (Exhibit No. 18 marked)
19     MR. FREEMAN:  I don't have copies for everyone.
20   This is pretty big.
21     Q.   And this is -- if you could look to Page 96, right in
22   the middle of page, starting with Representative Veasey's
23   question, beginning, "Ms. Harless, why on earth."  Could you
24   read for the record beginning with Representative Veasey's
25   question?

Patricia Harless                                                May 15, 2012

117

1    A.  What line is that?
2    Q.  It is Line 8.
3    A.  No?  Or 96?  Page 6?
4    Q.  On Page 96.
5    A.  Okay.
6    A.  Beginning --
7    A.  Line 8.
8    Q.  -- Line 8, Mr. Veasey.
9    A.  "Ms. Harless, why on earth would anyone go into a
10   polling place and lie and say that they are not who they are and
11   sign a form that could put them in jail with a second degree
12   felony to cast one ballot?  Help me understand the process here.
13   Help me understand why that would be."
14       "We heard testimony in committee of people suggesting
15   that that occurred."
16   Q.  Okay.  Are there any other incidents in which you have
17   presented legislation based on the suggestion of a problem
18   rather than evidence of a problem?
19       MR. SWEETEN:  I'm going to instruct you to not
20   reveal thoughts, mental impressions, opinions about legislation.
21   Do not reveal communications you've had with legislators,
22   legislative staff, state agencies, Texas Legislative Council or
23   constituents.  You can reveal matters of public record,
24   including committee meetings, House floor proceeding or debates.
25   You can answer the question.

118

1    A.  From the transcript --
2    Q.  Uh-huh.
3    A.  -- this is at the end of the debate.
4    Q.  It's the end of Volume I of III.
5    A.  Okay.  So I don't know at what part of the process
6    this is.
7    Q.  Uh-huh.
8    A.  But we heard testimony in committee of people saying
9    that voter impersonation happens.
10   Q.  Did they provide evidence in the form of convictions?
11       MR. SWEETEN:  You're saying in the committee?
12       MR. FREEMAN:  In the committee.
13       MR. SWEETEN:  Yeah.  Go ahead and answer.
14   A.  I know that there was information in the committee
15   presented from the AG's office, the Secretary of State of the
16   number of complaints referred --
17   Q.  Uh-huh.
18   A.  -- and the number of convictions, but I cannot recall
19   the specific number of convictions from the testimony in the
20   committee.
21   Q.  Do you recall if they were numerous?
22   A.  I know they were more than one.
23   Q.  Are you certain that they were more than one?
24   A.  I am -- and make sure we're asking the same thing --
25   Q.  Uh-huh.

119

1    A.  -- I'm answering the same thing.
2    Q.  Convictions for in-person voter fraud.
3    A.  I don't know specifically what the convictions were,
4    but it was -- I can't say specifically it was in-person voter
5    fraud.  I know they talked about convictions.
6    Q.  Okay.  And just so you know, could you look at the
7    date on that transcript?
8    A.  March 23rd, 2011.
9    Q.  Was that after the committee hearings had occurred?
10   A.  Yes.
11   Q.  Okay.  So that was after you'd received all the
12   evidence that you had received in public proceedings; is that
13   correct?
14   A.  Yes.
15   Q.  And on that date, on March 23rd, you stated that there
16   was the suggestion that in-person voter fraud had occurred; is
17   that correct?
18   A.  That's what it says here.  I can't recall the exact
19   testimony.
20   Q.  And I'll let you know that that's a  transcript that
21   was provided by your counsel to the United States.
22   A.  Right.  But if you notice, in these transcripts,
23   there's a lot of times that it's difficult to hear or understand
24   because of the microphone issues.
25   Q.  But you were at the front mike; isn't that correct?

120

1    A.  I was.
2    Q.  And the front mike, it's easier to hear;
3    isn't -- isn't that correct?
4    A.  You read the transcript.  How many times did they say,
5    "Could you repeat yourself"?
6    Q.  But no one asked you to repeat yourself there, did
7    they?
8    A.  No, they didn't.
9    Q.  Representative Harless, how many incidents of mail-in
10   ballot fraud have occurred in the State of Texas in the last 20
11   years?
12       MR. SWEETEN:  Okay.  In answering this question,
13   I don't want you to reveal thoughts, mental impressions or
14   opinions about the legislation.  Also, do not reveal
15   communications with legislators, legislative staff, state
16   agencies, Texas Legislative Council or constituents, as all of
17   those matters are legislatively privileged.  To the extent you
18   can answer that question based upon the public record, you -- I
19   will allow you to do so.
20   A.  I don't recall testimony on mail-in ballot in
21   committee.
22   Q.  Have you heard outside of the context of committee but
23   outside of the context in which your counsel has instructed you
24   not to answer anything about mail-in ballot fraud?
25       MR. SWEETEN:  Same instruction.

Patricia Harless                                          May 15, 2012

---

121

1    A.  That would be privileged communication between
2    constituents.
3    Q.  Okay.  And so are you aware of whether mail-in ballot
4    fraud has been prosecuted more than in-person ballot fraud?
5        MR. SWEETEN:  Same instruction.
6    A.  It was not part of the committee testimony that I
7    recall.
8    Q.  Okay.  When you were asked in the House about mail-in
9    ballot fraud, did you state, "This bill is only interested in
10   one type of potential fraud, in-person voter fraud"?
11   A.  I don't recall the exact words, but --
12   Q.  Let me see if we can refresh your recollection.  It
13   might be easier --
14   A.  Yeah.
15   Q.  -- if you could take a look at Exhibit 17 on Page 914.
16   It's the third line on Page 914.
17   A.  "This bill is only interested in one type of potential
18   fraud, in-person voting fraud."
19   Q.  Why did you -- why did you limit the bill in this way?
20       MR. SWEETEN:  Don't answer to the extent that
21   your answer would reveal thoughts, mental impressions, opinions
22   about legislation.  Don't reveal communications to the -- to the
23   legislators, legislative staff, state agencies, Texas Leg
24   Council or constituents.
25   A.  My testimony on the committee was this bill was

---

122

1    specifically about in-person, protecting the integrity of the
2    ballot box by verifying you are who you say you are when you
3    show up to vote in person.
4    Q.  But it wasn't about protecting the integrity of the
5    ballot box from -- from mail-in ballot fraud?
6    A.  My testimony --
7        MR. SWEETEN:  Same instruction.
8    A.  -- was only about in-person.  This bill was about
9    in-person voting.
10   Q.  And why did you limit it that way?
11       MR. SWEETEN:  Same instruction.
12   A.  That is privileged.
13   Q.  Okay.  And why would you focus on a bill that
14   addressed a problem such as in-person ballot fraud that occurs
15   rarely, far more rarely than any issues concerning mail-in
16   ballot fraud?
17       MR. SWEETEN:  I'm going to object based upon the
18   legislative privilege and instruct you not to reveal thoughts,
19   mental impressions, opinions about legislation or reveal
20   communications between you and legislators, legislative staff,
21   state agencies, Texas Legislative Council or constituents.
22   A.  This bill was about in-person voting and only
23   in-person voting.
24   Q.  And any other reason is protected by privilege; is
25   that your -- is that your testimony?

---

123

1    A.  Yes.
2        MR. SWEETEN:  Same instruction.
3        MR. FREEMAN:  Okay.  I just want to get that on
4    the record without -- okay.
5    Q.  Now, are you familiar with your campaign web site?
6    A.  Vaguely.
7    Q.  And are you aware of whether you -- whether you list
8    important issues facing Texans?
9    A.  I think I have an issue drop box.
10   Q.  And this has already been entered as U.S. Exhibit 7.
11   And do you see where you list immigration reform?
12   A.  I do.
13   Q.  And do you see under immigration reform where you list
14   require Texans -- a Texas photo ID to vote?
15   A.  I see that.
16   Q.  Why is requiring Texas photo ID to vote listed under
17   immigration reform?
18       MR. SWEETEN:  I'm going to instruct you to not
19   answer based upon -- and reveal thoughts, mental impressions,
20   opinions about legislation.  Don't reveal communications that
21   we've already discussed.  Because this is a -- on a web site,
22   you can answer this specific question, but you cannot -- I
23   instruct you not to reveal the information about the bill or
24   legislation, why it's passed.
25   A.  My consultant does my web site, and I don't know why

---

124

1    he put -- put it under immigration reform.
2    Q.  Who is your consultant?
3    A.  Spencer Newman.
4    Q.  And do you see any connection between requiring Texans
5    to show a photo ID to vote and immigration reform?
6        MR. SWEETEN:  Same instruction.  Objection.
7    A.  If I would have designed this, I would have probably
8    put it under other.
9    Q.  So you don't see a connection; is that correct?
10   A.  It's on my --
11       MR. SWEETEN:  Same instruction.
12   A.  -- web site under immigration reform.
13   Q.  Are you aware of any documented cases of noncitizens
14   committing in-person ballot fraud in Texas?
15       MR. SWEETEN:  Don't reveal thoughts, mental
16   impressions or opinions about legislation.  Don't reveal
17   conversations that you've had with legislators, legislative
18   staff, state agencies, Texas Legislative Council or constituents
19   as those matters are legislatively privileged.  If you can
20   answer the question without doing so, you are free to do so.
21   A.  I don't recall that in testimony in committee.
22   Q.  Okay.  And any further information would be covered by
23   privilege?
24   A.  Yes.
25   Q.  Okay.  Are you aware of any documented cases of

Patricia Harless                                                    May 15, 2012

125

1   undocumented immigrants --
2                MR. SWEETEN:  Same --
3        Q.  -- voting in Texas elections?
4        A.  I don't --
5                MR. SWEETEN:  Same objection.  Same instruction.
6        A.  I don't recall any testimony of that in committee.
7        Q.  Is it necessary to prove citizenship to obtain a Texas
8   license to carry a concealed handgun?
9                MR. SWEETEN:  Same instruction.  Well, answer if
10  you know.
11       A.  I don't know that I know that.
12       Q.  Okay.
13       A.  I applied for my handgun, but I don't remember the
14  questions.
15       Q.  And we already discussed a driver's license?
16       A.  Right.
17       Q.  Are you aware of whether it's necessary to prove
18  citizenship to obtain a Texas identification card, a
19  non-driver's identification?
20               MR. SWEETEN:  Same instruction.  Same objection.
21  You can answer.
22       A.  I don't know for sure.  It seems like there was
23  testimony in committee on other bills about that, but I don't
24  know specifically what the requirements are.
25       Q.  Okay.  Are you aware of whether it's necessary to

126

1   prove citizenship in order to obtain a U.S. military
2   identification card?
3        A.  I'm not aware.
4        Q.  Are you aware of whether it's necessary to prove
5   citizenship to obtain a state or federal ID card related to
6   employment?
7                MR. SWEETEN:  Same instruction regarding
8   legislative privilege.
9        A.  I'm not aware.
10       Q.  Okay.  What ethic group makes up the majority of
11  immigrants in Texas?
12               MR. SWEETEN:  Same instruction.  Same objection.
13  You can answer.
14       A.  I couldn't tell you for sure.
15       Q.  Is it possible that it is Hispanics?
16       A.  It's possible.
17       Q.  But you're not certain?
18       A.  I'm not exactly certain.
19       Q.  Okay.  Are you aware of any other legislators or
20  staff, including the lieutenant governor, making any public
21  statements about illegal aliens voting?
22       A.  I'm not aware of their statements, if they've made
23  them or not.
24       Q.  Are you aware of any other legislators or staff,
25  including the lieutenant governor, making any nonpublic

127

1   statements about noncitizens voting?
2                MR. SWEETEN:  I'm going to -- I'm going to object
3   based upon the legislative privilege.  Don't reveal thoughts,
4   mental impressions or opinions about legislation nor
5   communications between legislators, state agencies, including
6   the lieutenant governor's office or governor's office,
7   legislative staff, Texas Legislative Council or constituents.
8        A.  I don't recall any nonpublic statements.
9        Q.  And is that based on the assertion of privilege?
10       A.  Yes.
11       Q.  Okay.  Are you aware of the claims that S.B. 14
12  attempted to exploit fears of illegal immigrants voting?
13               MR. SWEETEN:  Same instruction.
14       A.  I don't recall that testimony on the floor or in
15  committee.
16       Q.  And if you could be clear that any other statements,
17  you will not be providing them on the basis of privilege?
18       A.  If it's conversations about the legislation with
19  constituents --
20       Q.  Okay.
21       A.  -- staff, Leg Council, then you are correct.
22       Q.  You learned Mr. Sweeten's list.
23       A.  I'm trying.  It's -- it's tough for a blonde female,
24  but I'm working on it.
25       Q.  With all due respect, the blonde females who are

128

1   working with me on this team --
2        A.  This blonde female.
3        Q.  -- they are outstanding lawyers and I'm sure that you
4   are an outstanding legislator.
5        A.  I'm not an attorney.
6        Q.  If I can just ask that when you are withholding
7   testimony on the basis of privilege that you do state it for the
8   record.  It's just easier moving forward for all parties.
9        A.  Yes, sir.
10       Q.  Okay.  Now, you've described in public the purpose of
11  S.B. 14 as restoring public confidence in the election system;
12  is that correct?
13       A.  Yes.
14       Q.  And have you used the word "restoring"?
15               MR. SWEETEN:  You're asking her in public
16  statements?
17               MR. FREEMAN:  In public statements, yes.
18       A.  I would say yes.
19       Q.  Okay.  Can you tell me why you used the word "restore"
20  in public statements?
21       A.  I can't tell you why.
22       Q.  Was there a time previously when Texans had -- had
23  confidence in the election system and lost that confidence?
24       A.  I think that would be privileged based on
25  conversations with constituents.

Patricia Harless

May 15, 2012

129

```
1    Q.   Has Texas ever had a photo ID requirement in the past?
2    A.   Not that I'm aware of, not in the public testimony.
3    Q.   Has Texas ever had other restrictions on voting that
4    would coincide with a time when Texans had confidence in their
5    elections?
6    A.   I'm not exactly sure what you're asking.
7    Q.   Well, you testified that there was a time in the past
8    when Texans had confidence in their elections, and in the past
9    they did not have a photo ID requirement.   Was there some other
10   limitation on voting that coincided, was at the same time, as
11   that public confidence in the voting?
12            MR. SWEETEN:  Same instruction on legislative
13   privilege.  Go ahead and answer.
14   A.   I don't know that I can answer that.  I don't know
15   that I understand what you're asking.
16   Q.   Did Texans have more confidence in their elections
17   when elections were limited on the basis of race?
18            MR. SWEETEN:  Same instruction.
19   A.   Testimony on the floor was that in the last election
20   cycle we had a House member that won her recount by three votes
21   and an election with a representative from Houston that won his
22   election by eight votes and that it was important that every
23   person that goes to vote in person knows that their vote is
24   going to count.
25            MR. FREEMAN:  I'll object to that testimony as
```

130

```
1    nonresponsive.
2    Q.   And just so that it's clear, what is your personal
3    view on the issue of whether there was a time in the past that
4    Texans had more confidence in their elections?
5            MR. SWEETEN:  I'm going to object to the extent
6    the question calls for her to provide matters that are
7    legislatively privileged.  Don't reveal thoughts, mental
8    impressions, opinions about legislation.  Don't reveal
9    communications with legislators, legislative staff, state
10   agencies, Texas Legislative Council or constituents.
11   A.   My testimony on the floor was that asking a person to
12   verify who they say they are increases the confidence that every
13   vote counts.
14   Q.   And my question was with regard to the past time when
15   Texans had confidence without a voter -- photo voter ID
16   requirement, what your personal opinion as to why they had
17   confidence but no longer have it.
18            MR. SWEETEN:  Same objection.  Same instruction.
19   A.   I hate to say the same thing over and over, but the
20   purpose of the bill was to increase participation by allowing
21   people to know that their vote counts when they show up to vote
22   in person by verifying you are who you say you are.  That
23   increases public confidence, in my opinion, from the testimony
24   on the floor by the results of the Georgia increase in
25   participation.
```

131

```
1    Q.   We'll get to those later.  If I can just ask one last
2    time as an attempt --
3    A.   I think that --
4    Q.   Based on the use of the word "restore" -- and I'm not
5    trying to be argumentative.  I just want to know why you said
6    restore, which would imply that at some time in the past there
7    was voter confidence and then that voter confidence was lost.
8    And so I want to know what your opinion is not with regard to
9    your constituents, but what your opinion is with regard to when
10   there was confidence and why that confidence was lost such that
11   you would now need a new photo ID requirement to restore that
12   confidence.
13            MR. SWEETEN:  Objection, asked and answered.
14   Objection, compound.  Also, she's already testified she doesn't
15   know why she used the word "restore."  I think she -- that --
16   that's already been -- but go ahead.  You can answer, I guess,
17   again.
18   A.   I thought I had answered, and I absolutely agree with
19   my counsel that I don't know why I used that, but I think I've
20   answered the question that you've asked.
21            MR. FREEMAN:  Mr. Sweeten has offered excellent
22   testimony today.
23   Q.   Have you ever had an individual registered voter tell
24   you that they did not vote because they were concerned about
25   voter fraud cancelling out their vote?
```

132

```
1    A.   Privilege.
2            MR. SWEETEN:  Okay.  Don't reveal -- I'm going to
3    object based on legislative privilege.  Don't reveal matters
4    that we've already discussed.
5            THE WITNESS:  I need to go to the bathroom.
6            MR. SWEETEN:  Okay.  We can take a break.
7            MR. FREEMAN:  Okay.  Let's take a break.
8    Actually, you know what, it is -- it's a quarter to 1:00.  Let's
9    take lunch.
10           MR. SWEETEN:  Okay.
11           (Recess from 12:45 p.m. to 2:12 p.m.)
12   Q.   We are back from the lunch break and a discussion of
13   legislative privilege.  And before the break, we had been
14   discussing public confidence.
15           And I'm not sure if I asked this question before the
16   break, but I wanted to know:  Have you ever had an individual
17   registered voter tell you that they did not vote because they
18   were concerned about voter fraud cancelling out their vote?
19           MR. SWEETEN:  Don't reveal thoughts, mental
20   impressions, opinions about legislation, including Senate Bill
21   14.  Don't reveal discussions you've had with constituents.
22   A.   I believe by answering that I will -- I will reveal
23   personal conversations with constituents.
24   Q.   Okay.  Have you ever had an individual registered
25   voter who is a member of a racial minority group or ethnic
```

Patricia Harless                                                          May 15, 2012

---

**133**

1   minority group or language minority group tell you that you did
2   not -- that they did not vote because they were concerned about
3   voter fraud cancelling out their vote?
4           MR. SWEETEN:  Same instruction.
5       A.  My same answer, that will reveal personal
6   conversations.
7       Q.  Okay.  Do you remember writing an op-ed in the Houston
8   Chronicle back in November?
9       A.  I do.
10      Q.  And this has already been marked as an exhibit.  Okay.
11  It has not.
12          MR. FREEMAN:  If we could have this marked as U.S.
13  Exhibit 19.
14          (Exhibit No. 19 marked)
15      Q.  Do you recognize that document?
16      A.  I do.
17      Q.  Is that your November 11th op-ed -- excuse
18  me -- November 14th?
19      A.  It's the op-ed I wrote.  I don't know what date -- I
20  don't remember the date that the Chronicle published it, but,
21  yes.
22      Q.  Is that the Houston Chronicle?
23      A.  Yes.  Sorry.
24      Q.  And have you ever published any other op-eds?
25      A.  I don't think so.  I was surprised about this one too.

---

**134**

1       Q.  Okay.  And in that op-ed, did you state that,
2   "Statistics from Indiana and Georgia show that ID requirements
3   work well and do not suppress turnout, as opponents claim"?
4       A.  "Statistics from Indiana and Georgia show that ID
5   requirements work well and do not suppress turnout, as opponents
6   often claim."  That's what it said.
7       Q.  Did you then claim that voter ID would, in fact,
8   increase turnout?
9       A.  It says, "All along our goal with photo ID has been to
10  restore integrity in the election process, which will increase
11  turnout."
12      Q.  And did you state during debate that there had been
13  document evidence that in two states that have passed this more
14  restrictive photo ID that voter turnout increases?  Do you
15  recall making that statement in debate, not in the op-ed?
16      A.  In debate, I said that the testimony during committee
17  was that they had increased participation in elections from what
18  I remember.
19      Q.  If you could take a look at Exhibit 17, which was the
20  Day 38 transcript on Page 912.
21      A.  Is that the little one or --
22      Q.  It's the little one, yes.
23          On Page 912 -- oh, I'm sorry.  It's on 913.  It's the
24  first sentence on 913.  Oh, no, it's not.  You know what, let's
25  just stick to your public -- to the statement in the op-ed.

---

**135**

1       Are you aware of what the voter ID requirements are in
2   Georgia?
3       A.  Vaguely.  I mean, I don't know if I can quote exactly
4   from memory, but from carrying the legislation and testimony, I
5   remember some of it.
6       Q.  Could you tell me what you remember?
7       A.  I know they allow tribal IDs, tribal cards.  I know --
8   I think that they don't have a provision for absentee ballot.  I
9   think they don't have a -- or provisional ballot.  I don't think
10  they have a provision that allows exemption for indigent,
11  religious.  I think they have state and federal
12  government-issued ID.  And I can't remember all the specifics,
13  but those are the things off the top of my head.
14      Q.  Okay.  So the things that you were saying they do have
15  or they don't have, those are differences from S.B. 14, correct?
16      A.  Right.
17      Q.  And so the Georgia one is different from S.B. 14 --
18      A.  Right.
19      Q.  -- in several ways?
20          Do you know what the prior ID requirements were in
21  Georgia before they passed their new photo ID requirement?
22      A.  I don't remember.
23      Q.  So do -- same question with Indiana:  Do you know what
24  the requirements are in Indiana?
25      A.  Indiana, I know that they had -- I don't know.  I

---

**136**

1   think that they had a provisional ballot of a couple days, two
2   days, maybe.  I think that they did allow a religious exemption
3   for being photographed, and I think they allowed an indigent
4   provision.  I think their ID requirements were one of the
5   specific ID requirements, something along those lines.  I don't
6   think they were spelled out the same as in Texas and Georgia.
7       Q.  And so that was also different from S.B. 14?
8       A.  Yes.
9       Q.  And do you know what the ID requirement was in Indiana
10  before the law that you're discussing?
11      A.  I don't remember.
12      Q.  Now, with regard to increased turnout, the statistics
13  from Indiana and Georgia that you've cited in the op-ed, what
14  elections were those?
15      A.  I can't recall exactly, but I know in committee
16  testimony in -- the Secretary of State from Georgia was our
17  expert that we brought in, and he testified that in 2008, they
18  had a significant increase, but in the elections since 2008,
19  they had an increase in participation in election turnout in
20  person, and the increase was more so for the minority vote.
21      Q.  And that's in Georgia?
22      A.  Yes.
23      Q.  And are you aware of who the candidates were for the
24  presidential election in 2008?
25      A.  I do, yes, sir.

---

Patricia Harless                                              May 15, 2012

## 137

1   Q.   And who were they?

2   A.   President Obama and Senator McCain.

3   Q.   And are you aware of whether there were any voter

4   registration efforts in the minority community in Georgia prior

5   to the 2008 election?

6        MR. SWEETEN:  I want to go ahead and just

7   instruct you not to reveal thoughts, mental impressions or

8   opinions about legislation.  To the extent that you have this

9   information based on a public record, you can feel free to

10  provide that.

11  A.   From reading the newspaper, I saw that there were

12  voter drives, but I don't know specifically where they were.

13  Q.   And can you think of any reason why there might be

14  higher turnout in 2008 unrelated to voter ID among minority

15  population in Georgia than in prior elections?

16  A.   I think in --

17       MR. SWEETEN:  Same instruction.

18  A.   I think the testimony in committee was, yes,

19  there -- there was a higher turnout in 2008 and in committee

20  there were testimony from members of the committee and the

21  public that said, well, that was probably attributed to the

22  presidential race.

23  Q.   Uh-huh.

24  A.   But the Secretary of Georgia's testimony followed up

25  saying that, yes, they had had increased participation in other

## 138

1   election since.  And I can't tell you the number, but Georgia

2   has a lot of elections.

3   Q.   Okay.  But there would be newly registered minority

4   voters because of the presidential race, wouldn't there be?

5   A.   I don't know.

6   Q.   And with regard to Indiana, because you also cited

7   Indiana in your op-ed, do you know what elections you're

8   referring to there?

9   A.   The testimony was -- I think it was written, and he

10  referenced -- he referenced a couple of elections, two or three,

11  but I can't tell you which ones.

12  Q.   And so you're not aware of who the candidates were?

13  A.   No.

14  Q.   And you're not aware of general population trends in

15  either Georgia or Indiana that would account for changes in the

16  number of votes?

17  A.   No.

18  Q.   And you're not aware of any changes with regard to

19  registration rates in Indiana?

20  A.   Not that I recall.

21  Q.   And you're not aware of any voter registration efforts

22  in Indiana?

23  A.   Not that I recall.

24  Q.   And you're not aware of any get-out-the-vote efforts

25  in Indiana and the elections at issue?

## 139

1   A.   Not that I recall in testimony.

2   Q.   And you're not aware of any get-out-the-vote efforts

3   in Georgia in the elections at issue?

4   A.   Not that I recall.

5   Q.   Are you aware of any national trends concerning voter

6   registration in states other than Georgia and Indiana in those

7   same elections?

8   A.   You know, I'm sure I've read articles on it.  I just

9   can't grasp the information right now.

10  Q.   And are you aware of any national trends concerning

11  turnout in those same elections?

12  A.   No.

13  Q.   So you stated that you'd gotten information from the

14  Secretary of State of Indiana and the Secretary of State of

15  Georgia.  Did you get information from any academic studies?

16       MR. SWEETEN:  Hold on a second.  Just make sure

17  you're not revealing mental impressions, opinions about the

18  legislation or discussions you've had with legislators,

19  legislative staff, state agencies, Leg Council or constituents

20  in answering that question.

21  A.   Your statement was that I got information from them.

22  The information we got was through testimony.

23  Q.   Okay.  But in preparing this op-ed that I have here,

24  you stated that the statistics from Indiana and Georgia show

25  that ID requirements work.  And so I'm wondering, with regard to

## 140

1   statistics, did you get information in the form of any studies?

2       MR. SWEETEN:  Same instruction on legislative

3   privilege.

4   A.   The testimony in committee, they gave us the specific

5   breakdown of the number of voters in the elections, and that was

6   what I was relying on.

7   Q.   And so you were not relying on any academic studies at

8   all?

9       MR. SWEETEN:  Same instruction.

10  A.   I was relying on the testimony in committee.

11  Q.   Okay.  Was there any testimony given in committee by

12  other individuals who stated that voter ID was likely to

13  decrease turnout?

14  A.   I can't recall specifically, but there was a full

15  range of people testifying on the bill.

16  Q.   Did anyone from the Brennan Center for Justice

17  testify?

18  A.   I can't recall specifically if they testified, but I

19  know there was discussion about the Brennan Justice and the

20  report that they had done.  I don't know if there was someone

21  from that group that actually testified or if it was brought up

22  by a committee member.

23  Q.   And why did you not rely on that report in terms of

24  its projections of turnout or the effect of the bill?

25       MR. SWEETEN:  To the extent that he's asking you

Patricia Harless                                                    May 15, 2012

---

141

1   to reveal your thoughts, mental impressions or opinions about
2   the legislation, don't reveal those or any communications.
3       A.   I believe by answering that, that would reveal private
4   conversations.
5       Q.   And why did you not rely on any academic studies
6   concerning the effect of turnout --
7       A.   Again, by answering that, that's private
8   conversations.
9       Q.   Okay.
10      A.   Other than what was discussed publicly.
11      Q.   Now, previously, we discussed how the number of voters
12  who turned out in each of your elections has differed in the
13  three times that you've run.  That's correct, right?
14      A.   I think that's what we kind of said, yeah.  You were
15  going to get the numbers, I thought.
16      Q.   And I neglected to do that during lunch, for which I
17  apologize, and I will try to get it during our next break.  We
18  didn't take a long lunch.
19           And can I ask, what factors do you think were
20  responsible for the different levels of turnout in each of your
21  own elections?
22      A.   Well, I'm not exactly sure that there were that big of
23  differences.  I think there probably was but I'm not sure so
24  until I see what elections they were and what the difference was
25  it would be hard to speculate on that.

---

142

1       Q.   Okay.  We'll try and get those numbers in a moment.
2       A.   Thank you.
3       Q.   Now, you also stated to the Houston Chronicle in a
4   different article do you recall stating we will increase turnout
5   for all voters because it protects our integrity of the election
6   it makes you know that your vote counts?  Do you recall making
7   that statement?
8       A.   I don't recall that, but I do recall a few interviews
9   and being somewhat disappointed in how they paraphrased what I
10  said.  I don't know if that was the specific article.
11      Q.   Well, let's see.  This should be U.S. Exhibit 20.  And
12  let's see if this is one of those instances.  Hopefully it won't
13  be.
14           (Exhibit No. 20 marked)
15      A.   If it's Gary Scharrer, probably -- yeah.
16      Q.   Do you see right above "Full GOP support" where it has
17  a quote?
18      A.   Yes.
19      Q.   Is that an accurate statement, to your knowledge?
20      A.   Let me finish reading.
21      Q.   Sure.
22           MR. SWEETEN:  Were you asking is that an accurate
23  quote, Dan?
24           MR. FREEMAN:  Yes.
25      A.   Yeah.  I'm -- I don't -- this doesn't sound like

---

143

1   something I would say.
2       Q.   Okay.  Is it your understanding that S.B. 14 will let
3   voters know that their vote counts?
4           MR. SWEETEN:  Don't reveal your mental
5   impressions, thoughts or opinions about the legislation itself.
6   You can --  also don't reveal communications that you've had as
7   outlined before.  But you can go ahead and answer that question.
8       A.   My testimony was that participation will likely
9   increase or -- I believe that it will increase because
10  of the increased confidence in the election process.
11      Q.   Do you believe it is necessary to let individuals know
12  that their vote counts?
13           MR. SWEETEN:  Same instruction as to the
14  legislative privilege.  Go ahead.
15      A.   I think my testimony on the floor was that it's
16  important -- it's important for everyone to know that one
17  person, one vote, and that when you show up to cast your vote
18  that your vote matters.
19      Q.   Okay.
20      A.   That it counts.
21      Q.   Is any individual's vote not counted under current law
22  when they show up at the polls with their voter registration
23  certificate?
24      A.   I wouldn't be able to answer that.  I don't work in
25  the registrar's office.

---

144

1       Q.   But if an individual shows up -- if S.B. 14 becomes
2   law and an individual shows up at the polls with their voter
3   registration certificate, but they lack a photo ID, isn't it the
4   case that their vote will not be counted if they don't have the
5   other necessary ID?
6       A.   The testimony on the floor was that if they show up
7   and don't have a photo ID, if S.B. 14 is implemented, that they
8   can cast a provisional ballot, have six days to go back to the
9   registrar and provide the documentation needed, and their vote
10  would be counted.
11      Q.   But if they don't have that documentation, they don't
12  own that documentation, their vote will not be counted?  That
13  professional ballot will be thrown away.  Isn't that the case?
14           MR. SWEETEN:  Same instruction on legislative
15  privilege.  Go ahead and answer.
16      A.   I'm not sure of the procedures that happen after they
17  cast their provisional ballot.
18      Q.   But if they have six days to show up and show an ID,
19  if they don't arrive and show an ID, are you aware of what
20  happens to the provisional ballot and whether it is counted?
21      A.   I think the testimony on the floor was if they don't
22  show up within the six days with the proper information that
23  that is considered a provisional ballot as the standards are
24  already in place with the Secretary of State and the registrar's
25  office.

---

Patricia Harless                                    May 15, 2012

145

1     Q.   Okay.  And I think we have the figures from your
2  general elections.  If I can represent from the Secretary of
3  State's office that in 2006 there were 27,962 votes cast in your
4  general election, 27,962.  In 2008 there were 55,131 votes cast
5  in your general election.  And in 2010 there were 37,472 votes
6  cast.  And that's from the Texas Secretary of State's web site.
7     A.   And that was in District 126?
8     Q.   In District 126, in your race.  And you had a healthy
9  percentage each time.
10    A.   Okay.
11    Q.   So can I ask, stepping back, what are the factors that
12  you believe were responsible for the different levels of turnout
13  in each one of those elections?
14         MR. SWEETEN:  Objection, calls for speculation.
15    Q.   To the extent that you have political knowledge of
16  your own district and were able to win that district?
17         MR. SWEETEN:  Same objection.
18    A.   I don't know how to answer that without going into the
19  process of our campaign.
20    Q.   I don't believe that the process of your campaign is
21  privileged in this matter, and your counsel has not asserted a
22  privilege over that.  So I would ask, to the extent necessary to
23  answer the question, but no more than necessary, I would ask
24  what factors you thought were responsible for the number of
25  votes essentially doubling from 2006 to 2008 and then dropping

146

1  by approximately 18,000 between 2008 and 2010, but that 2010
2  level being significantly higher than 2006?
3     A.   In my experience in the campaigns --
4         MR. SWEETEN:  Hold on.  Objection, calls for
5  speculation, but go ahead.
6     A.   In my experience in the campaigns, presidential
7  election always has a larger percentage of participation.
8     Q.   Okay.
9     A.   And that was 2008.
10    Q.   What about 2010?
11    A.   That is a governor's race.
12    Q.   Okay.
13    A.   And that also has an increase in participation.
14    Q.   Wasn't there a governor's race in 2006?
15    A.   Yes, possibly, but I don't know who was -- I don't
16  know who was fighting for the governor's race then.
17    Q.   So it's possible that -- well, wasn't Governor Perry
18  elected in 2006?
19    A.   Yes, he was.
20    Q.   But it's possible that if the governor's race were
21  more contested in 2006 -- or excuse me -- in 2010 than it was in
22  2006 that more people would turn out?
23         MR. SWEETEN:  Objection, speculation.
24    Q.   Based on your knowledge of Texas politics, as a member
25  of the Texas House of Representatives.

147

1     A.   Okay.  Of running a campaign?
2     Q.   Yes, absolutely.
3     A.   2010 I know there were a lot of local races --
4     Q.   Uh-huh.
5     A.   -- that were more contested than in the past.
6     Q.   Uh-huh.
7     A.   And there was a lot of participation in pushing
8  getting out the vote.
9     Q.   Okay.
10    A.   I know my campaign we did several mail pieces to get
11  out the vote and calling our supporters, saying, you need to
12  show up and vote.
13    Q.   Is it possible that those same types of local
14  contested local races and get-out-the-vote efforts occurred in
15  Georgia?
16    A.   I can't speak for Georgia.
17    Q.   But is it possible that those occurred in Indiana as
18  well?
19    A.   I can't speak for Indiana.  I can speak for District
20  126.
21    Q.   Sure.  And in District 126 you saw between
22  non-presidential years a significant increase from 2006 to 2010
23  is that correct, in terms of turnout?
24    A.   From what you have here, 17,000 out of 20,000.
25    Q.   That's almost doubling; isn't that right?

148

1     A.   How much is the population growth from 2006 to 2010?
2         MR. SWEETEN:  Let me make sure the numbers.
3  27,000 is what I heard him say is the '06.
4     Q.   So that's another 10,000.  Thank you for the
5  correction.
6     A.   Another 10,000.
7     Q.   Another 10,000 voters?
8     A.   I can't answer those questions because I don't know
9  what the population of District 126 was in 2006 and what it was
10  in 2008 and what it was in 2010.
11    Q.   But the number -- the turnout rose by approximately 35
12  percent or so?
13    A.   I don't know.
14    Q.   And there was no change in the voter identification
15  law between 2006 and 2010, correct?
16    A.   Not that I know of.
17    Q.   And so there were other factors that were responsible
18  for that increase in turnout, correct?
19         MR. SWEETEN:  Objection, calls for speculation.
20  Go ahead and answer, if you can.
21    A.   I don't know.
22    Q.   I mean, as a matter of logic, if it wasn't photo ID,
23  it had to be something else, correct?
24    A.   I don't know how to answer that.
25    Q.   Okay.  Let's move on.  Does S.B. 14 address any other

Patricia Harless                                                May 15, 2012

149

1    problems other than what we've discussed?

2         MR. SWEETEN:  I'm going to go ahead and instruct

3    you, based on the legislative privilege, do not reveal thoughts,

4    mental impressions, opinions about Senate Bill 14.  Don't reveal

5    communications you've had with any of the areas that we've

6    already gone over.  If you can, go ahead and answer.

7         Q.  Allow me to rephrase.  Is the purpose of S.B. 14 to

8    address any other problems than the ones we have discussed?

9         MR. SWEETEN:  Hold on one second.  Okay.  Are you

10   asking about the purpose of the bill or are you asking about the

11   individual purpose of the legislators who passed the bill or

12   their thought process or mental impression?

13        MR. FREEMAN:  I am asking about the purpose of

14   the bill.

15        MR. SWEETEN:  The purpose of the bill as written,

16   as passed, Senate Bill 14.

17        MR. FREEMAN:  As written and passed, stated and

18   unstated purpose, in any context.

19        MR. SWEETEN:  I'm going to let you answer, to the

20   extent you know.

21        A.  I've answered this before.  The purpose of the bill

22   was to increase participation by protecting the integrity of the

23   election process.

24        Q.  I will note that your counsel has not objected and has

25   not instructed you to limit your testimony to the public record.

150

1    And, therefore, I would ask, is the purpose of the bill, as you

2    understand, from both public and non-public sources, legislators

3    and all other sources from which legislators derive the purpose

4    of a bill, limited to only those purposes that we have

5    previously discussed?

6         A.  I can only speak to my purpose.

7         Q.  Okay.

8         A.  And that was to protect the integrity of the election

9    process, as I stated a number of times on the floor.

10        Q.  Okay.  Nothing else than we've discussed?

11        A.  There's pages of testimony.

12        Q.  Okay.  I just want to make sure we're closing off.

13        A.  I answer all those questions here.

14        Q.  Do you know of any other purpose held by any other

15   legislator that may be construed as the purpose of the bill?

16        MR. SWEETEN:  Hold on a second.  I'm going to

17   object.  That calls for speculation.  I'm also going to object.

18   You're asking her to reveal thoughts, mental impressions,

19   opinions, discussions with other legislators, legislative staff.

20   Those are covered by the legislative privilege.  I'm going to

21   reassert the objection to that issue.

22        A.  I couldn't answer that anyway.  I don't know what

23   their thought processes are -- is.

24        Q.  Let's move on then.  Do you know how many registered

25   voters in Texas lack a driver's license, state ID card, or

151

1    license to carry?

2         A.  I know in committee there was testimony of a number

3    presented by Ann McGeehan but I -- when I asked her more

4    questions on, could that number be accurate, could there be name

5    issues, could that number of people have one of the other forms

6    of identification, she says yes.  So I -- I just know the number

7    that was -- she presented.

8         Q.  Do you recall ever telling the Dallas Morning News

9    that you assumed that the population without a necessary ID

10   would be very, very small?

11        A.  I think, yes.  Could be possible.

12        Q.  Okay.  Did you ever try to find out what that number

13   was beyond your conversation with Ms. McGeehan?

14        MR. SWEETEN:  I'm going to instruct you at this

15   point that, based upon legislative privilege, don't reveal

16   thoughts, impression or opinions or discussion you had with

17   legislators, state agencies, legislative staff, Texas

18   Legislative Council or constituents.

19        A.  The discussion -- we had that discussion in committee

20   and we tried to get to those numbers, and there was never a real

21   good answer from the Secretary of State's office.

22        Q.  Okay.  I'm going to ask a series of privilege log

23   questions, if that's all right.  Did you have a conversation

24   with the Department of Public Safety concerning the number of --

25   or concerning the number of registered voters who lacked a Texas

152

1    photo ID?

2         MR. SWEETEN:  I'm going to let you answer that

3    question.  It's a yes or no question.

4         A.  During committee hearing, yes.

5         Q.  Did you ever reach out via telephone, e-mail, anything

6    like that, outside the context of committee hearing, to try and

7    get an answer to that question, given that you said you did not

8    receive a definite answer from Ms. McGehan?

9         A.  I think during the committee we asked specifically for

10   some information from TXDOT, and they were to provide that

11   information in the future.  And I don't know if they did.  I

12   can't recall.

13        Q.  Is TXDOT the Texas Department of Transportation?

14        A.  Yes.  I'm sorry.

15        Q.  Is the Department of Public Safety somehow related to

16   TXDOT?

17        A.  Yes.

18        Q.  What is the relationship between the two?

19        A.  At the time it was a division under TXDOT.

20        Q.  Are they separate now?

21        A.  No.  I think they're still probably -- I think they

22   are.  I don't know TXDOT changes.

23        Q.  So just so I understand, you asked the Department of

24   Public Safety or TXDOT for information concerning the number of

25   registered voters who lacked photo ID, but you're not sure

Patricia Harless                                                May 15, 2012

---

**153**

1  whether you received it?

2    A.  I don't know that we specifically asked the way you

3  did.

4    Q.  Okay.

5    A.  It was during committee, and I don't remember the

6  specific question that we asked her.  But I know that it was

7  something that she said she would have to follow up on.

8    Q.  And did you make sure that she followed up?

9    A.  I don't know that I did.  I think my staff might have.

10  I am not sure.  It wasn't necessarily a question I was looking

11  for.

12    Q.  Are you -- strike that.

13    Who do you believe will make up the group of

14  individuals whose lack the necessary photo ID, the driver's

15  license, state ID card or license to carry?  What is your

16  understanding based on everything you've learned?

17    MR. SWEETEN:  Don't reveal thoughts,

18  mental impressions about legislation.  Don't reveal

19  communications you've had with state agencies, legislative

20  staff, legislators, Texas Leg Council or constituents in

21  answering this question.

22    A.  My testimony in committee and on the floor in the

23  debate was that I think there is a very, very small universe of

24  people that won't have one of the approved forms of ID.  And if

25  there are any, we provided for a free ID card.

---

**154**

1    Q.  Is that the election identification certificate?

2    A.  Right, a free election identification certificate.

3    Q.  We'll discuss more about that later.  Can I just ask,

4  do you think that the individuals who lack the ID will be more

5  likely to be poor?

6    MR. SWEETEN:  Same objection.  Don't reveal any

7  sort of thoughts, mental impressions, opinions about legislation

8  or conversations you've had with state agencies, staff,

9  legislators, Leg Council or constituents.

10    A.  The testimony that I stated on the floor a number of

11  times was that I think that it will be a small universe and they

12  have access to a free election certificate card.

13    Q.  If I can just look back real quickly.  You said a

14  moment ago that following up with DPS on the number of

15  registered voters without acceptable ID was not something you

16  were interested in.  Why not?

17    MR. SWEETEN:  I'm going to object.  I think that

18  asks for her to reveal thoughts, mental impressions, opinions

19  about legislation.

20    You can testify as to whether or not you had

21  follow-up conversation with DPS; however, I don't want you to

22  testify about communications with state agencies such as DPS

23    A.  I don't know that I had follow-up conversations with

24  them, but a lot of that I rely on my staff to do.

25    Q.  Okay.  Do you believe that the individuals who lack --

---

**155**

1  who are registered voters who lack a Texas driver's license,

2  state ID card, or license to carry will be more likely to be

3  members of racial minority groups?

4    MR. SWEETEN:  Same instruction on legislative

5  privilege.  Don't reveal your mental impressions or opinions

6  about legislation or communications that we've discussed.

7    A.  And my answer is the same as it has been.  I feel like

8  that the people that do not have one of the approved forms of ID

9  will be a very small universe and we have provided for a free

10  election certificate card for those.

11    Q.  Are you aware that the State of Texas recently

12  informed the attorney general that there are 795,955 individuals

13  in the State of Texas who are registered voters and lack a Texas

14  driver's license or photo ID?

15    MR. SWEETEN:  Objection.  I think that misstates

16  -- I'm going to object.  I think that assumes facts not in

17  evidence.

18    MR. FREEMAN:  Well, I will get that into

19  evidence.  If we can have this marked U.S. 21.

20    (Exhibit No. 21 marked)

21    Q.  Take a moment to read this letter.  And so just to

22  clarify, do you now understand that the recent comparison

23  conducted by the State of Texas between the registered voter

24  database to its driver's license database indicated that 795,955

25  registered voters lack a Texas driver's license?

---

**156**

1    A.  That's what this says.

2    Q.  Do you consider that number to be very, very small?

3    A.  I consider that number in relation to we don't know

4  that they have a citizenship paper with an ID, a CSL, a

5  passport.  They may have one of the other approved forms of

6  identification.

7    Q.  But you don't know whether any of them do either; is

8  that correct?

9    A.  I don't know that for a fact.

10    Q.  Do you think it's likely that individuals who don't

11  have a driver's license will have a passport, given what those

12  two documents are needed for?

13    MR. SWEETEN:  Objection, calls for speculation.

14  You can answer.

15    Q.  Based on your life experience?

16    MR. SWEETEN:  Don't reveal thoughts, mental

17  impressions, opinions about legislation or any communications

18  that you've had with legislators, legislative staff, state

19  agencies, constituents or Leg Council.

20    A.  I would not be surprised to learn that people without

21  a driver's license may have a passport.

22    Q.  Significant numbers of people?

23    A.  I can't answer that.

24    MR. SWEETEN:  Objection, calls for speculation.

25  Same instruction.

### 157

1    Q.  Have you ever seen a U.S. citizenship certificate?
2    A.  Not that I recall.
3    Q.  Do you know if all of them have photographs on them?
4    A.  Not that I recall.
5    Q.  Could you take another look at Exhibit No. 20, the
6    article from May 17th from the Houston Chronicle.  Do you see in
7    there where you told the Chronicle that you did not believe the
8    bill would disenfranchise minority voters?
9    A.  Where is that at?  I'm trying to skim, but my eyes are
10   getting foggy.
11   Q.  It says, "Representative Patricia Harless, republican
12   of Spring, House author of the voter ID bill dismissed
13   assertions that the bill would disenfranchise minority voters."
14   Do you see that?
15   A.  I think that is the reporter reading into an interview
16   what he wants.
17   Q.  Do you believe that the bill will disenfranchise
18   minority voters?
19          MR. SWEETEN:  I'm going to instruct you as to
20   legislative privilege.  Don't reveal thoughts, mental
21   impressions, opinions about legislation or conversations you had
22   with any of the individuals or entities that we named.  Without
23   revealing that, you can answer that question.
24   A.  I believe that by answering that question it would
25   reveal private conversations with constituents and other

### 158

1    legislators.
2    Q.  So just to be clear, you're asserting legislative
3    privilege with regard to your understanding of whether the
4    effect of S.B. 14 will be to disenfranchise some minority
5    voters; is that correct?
6    A.  I am asserting privilege from answering the question
7    that a reporter is summarizing, without a quote, of what his
8    feelings are about my statement.
9          MR. SWEETEN:  I think he's referring to --
10         THE WITNESS:  I think he's referring to that.
11   Q.  I'm happy to step away from the op-ed and just say --
12         THE WITNESS:  I think that's what he's --
13   Q.  Without with regard to the article there, do you now
14   believe that S.B. 14 will not disenfranchise minority voters?
15         MR. SWEETEN:  Don't reveal the matters of the --
16   A.  I can't answer that without revealing private
17   conversations.
18   Q.  Okay.  So I just wanted to be clear that you are
19   asserting legislative privilege with regard to that question.
20   It is now clear.
21   A.  Yes.
22   Q.  Do you believe that any valid registered voters will
23   show up to vote if S.B. 14 is implemented and will be turned
24   away -- excuse me -- will have to vote a provisional ballot
25   because they lack the necessary ID?

### 159

1    A.  I can't speculate on what will happen.
2    Q.  Do you know if there are any minority voters who lack
3    the necessary ID and don't own cars needed to get to a driver's
4    license office?
5    A.  I don't know of any.
6    Q.  Do you know if there are any minority voters who
7    currently lack the necessary ID and work during the hours when
8    driver's license offices are open?
9          MR. SWEETEN:  Again, I'm instructing you about
10   legislative privilege.  Don't reveal thoughts, mental
11   impressions or opinions about legislation or discussion you've
12   had with individuals that we discussed earlier.
13   A.  I don't know of any.
14   Q.  Now, you described the election identification
15   certificate under S.B. 14 as a free ID, right?
16   A.  Free election voter certificate.
17   Q.  But free?
18   A.  Yes.
19   Q.  Okay.  Do you know what documents are needed in order
20   to get the election identification certificate under S.B. 14?
21         MR. SWEETEN:  Representative Harless, you can
22   answer this question, but don't reveal thoughts, mental
23   impressions or opinions about legislation or conversations that
24   you've had with the individuals or entities we've discussed
25   earlier.

### 160

1    A.  I know there was discussion in committee and on the
2    floor, but I can't tell you the specific requirements to get an
3    ID or a driver's license off the top of my head, without going
4    back and refreshing my memory.
5    Q.  Okay.  And we discussed earlier that you didn't know
6    how much it cost to get a new copy of a birth certificate or a
7    name change certificate.  Do you know if those cost money,
8    though?
9    A.  I don't recall.
10   Q.  If an ID requires documents that you have to pay for,
11   then you can't get the ID without paying money, correct?  If I
12   have to buy a document to get the free document, then the free
13   document -- I still have to spend money before I get the free
14   document, correct?
15         MR. SWEETEN:  Objection, argumentative.  Also
16   instruct as to legislative privilege.  But go ahead.  You can
17   answer.
18   A.  I have to say I agree with my attorney.  I can't
19   speculate on any of that.  I know that we provided for people
20   that do not have one of the approved forms of identification to
21   get a free election certificate card.
22   Q.  Okay.  Where can a voter obtain the election
23   identification certificate?
24   A.  I think --
25         MR. SWEETEN:  Same instruction on leg privilege.

Patricia Harless                                                    May 15, 2012

---

161

1   You can go ahead and answer -- legislative privilege.  Go ahead.
2       A.   I think the debate on the floor was that that would be
3   provided by DPS and they would provide the standards upon what
4   is required to get a free ID card.
5       Q.   But do you know where you get the ID card?
6       A.   From I think the DPS.  If I remember correctly, the
7   DPS office.
8       Q.   And do you know if those offices are -- strike that.
9            Does S.B. 14 require employers to provide paid leave
10  in order for an individual to go get an EIC?
11           MR. SWEETEN:  Same instruction on leg privilege.
12  You can go ahead and answer.
13      A.   I don't remember any -- I don't remember that as being
14  part of the bill.
15      Q.   And is it possible that some individuals in Texas live
16  at least 50 miles from a driver's license office?
17      A.   I think there was --
18           MR. SWEETEN:  Okay.  Hold on.  I'm going to
19  instruct you as to leg privilege.  Don't reveal mental thoughts,
20  impressions, opinions about legislation.  Also don't reveal
21  conversations you've had with any of the individuals or entities
22  we've discussed.
23      A.   I think there was testimony or debate on the floor
24  that that was possible.  I don't know that for a fact.
25      Q.   How much would the gas cost to drive 100 miles

---

162

1   roundtrip?
2       A.   I sell cars for a living.  It could cost as much as $5
3   or --
4       Q.   100 miles?
5       A.   If you have an electric car, it doesn't cost you
6   anything.
7       Q.   How much would it cost you, in your car, to drive 100
8   miles?
9       A.   I'd have to guess.
10      Q.   Approximately?
11      A.   100 miles?  Probably $20, $25.
12      Q.   Okay.  Now, if you could take another look at your
13  op-ed real quickly from November of 2011.  You stated in that
14  op-ed that S.B. 14 contains a reasonable exception for indigent
15  voters in addition to the election identification certificate;
16  is that correct?
17      A.   Where are you reading that at, just to save me from
18  reading everything again.
19      Q.   It's the bottom of the second full paragraph.  "The
20  bill also provides."  Last sentence.
21      A.   On the first page?
22      Q.   First page, yes.
23      A.   My last paragraph said, "The provisions will ensure."
24      Q.   The second full paragraph, last sentence.
25      A.   Okay.

---

163

1       Q.   Beginning with, "The bill also provides."
2       A.   Okay.
3       Q.   Do you agree that you stated that, "The bill also
4   provides reasonable exceptions to the photo ID requirement for
5   indigent voters"?
6       A.   Yes.
7       Q.   And that's in addition to the photo election ID for
8   registered voters who request an ID, correct, as you stated it
9   in your op-ed?
10      A.   It says, "indigent and disabled voters and allows
11  individuals not carrying a photo ID to vote provisionally, as
12  long as they provide verification of their identity within six
13  days of the election."
14      Q.   What is this exception for indigent voters?
15      A.   From the legislation?
16      Q.   Uh-huh.
17      A.   I can't remember exactly.
18      Q.   Did that exception remain in the bill as it was
19  signed, or was that only a part of an earlier version of the
20  bill?
21      A.   I can't remember.
22           MR. SWEETEN:  Same instruction on leg privilege.
23  Go ahead and answer.
24      A.   I can't remember.
25      Q.   Isn't is the case that that exception was removed

---

164

1   during the amendment process?
2       A.   It could be possible.  I don't remember.
3       Q.   During the debate, do you recall stating that --
4   sorry.  Strike that.
5            Did you consider it to be an important issue whether
6   minority voters were more likely to lack the necessary ID needed
7   to vote pursuant to S.B. 14?
8            MR. SWEETEN:  Don't reveal thoughts, mental
9   impressions, opinions about the legislation, discussions you've
10  had with leg staff, legislators, state agencies, Leg Council or
11  constituents.
12      A.   I think my testimony on the floor was that I felt that
13  everyone -- it would increase participation and protect the
14  integrity, and if citizens of Texas did not have the approved
15  forms of ID, they were able and eligible to get a voter
16  certificate card.
17      Q.   But it's certainly harder to go get that voter
18  identification card, even if it's free, than to just go to a
19  polling place and vote, isn't it?
20           MR. SWEETEN:  Same instruction as to legislative
21  privilege.
22      A.   I don't believe I can answer that.
23      Q.   I mean, it would be more trouble for you to go seven
24  miles from your house to a driver's license office than
25  three-quarters of a mile to a polling place, isn't it?

---

Patricia Harless                                              May 15, 2012

---

165

1    A.  Not for the right to vote.

2    Q.  But it's more trouble?

3    A.  It's a sacrifice I'm willing to make to vote.

4    Q.  Are you aware of what turnout rates are statewide in

5  Texas among registered voters?

6    A.  I can't tell you off the top of my head, no.

7    Q.  Are you aware of whether Texas is a high turnout or

8  low turnout state as percentage, relative to other states in the

9  United States?

10   A.  No, I can't answer that.

11   Q.  Would it surprise you to learn that it is one of the

12  five lowest turnout states in the United States?

13   A.  No reaction to that.

14   Q.  Do you think that it is important to make it as easy

15  as possible for voters to be able to exercise the franchise

16  rather than making it harder for them to do so?

17      MR. SWEETEN:  Same instruction on leg privilege.

18   A.  And I believe by answering that it would reveal

19  private conversations.

20   Q.  Do you believe that if African-American or Hispanic

21  voters lacked the required ID at a greater rate than Anglos, the

22  photo ID bill would still be worth enacting?

23      MR. SWEETEN:  I'm going to object to the

24  question.  It calls for matters that are legislatively

25  privileged, including requiring her to reveal thoughts, mental

---

166

1  impressions or opinions about legislation or communications

2  between she, other legislators, legislative staff, state

3  agencies, Leg Council or constituents.

4      To the extent you can provide information that

5  does not reveal that information, you can go ahead and answer.

6    A.  My debate on the floor and my testimony was that I

7  think it will increase participation for all Texans.

8    Q.  I'm going to object to that as nonresponsive and ask

9  one more time, is it your belief that if African-American or

10  Hispanic voters lacked the needed ID at a greater rate than

11  Anglos, that the photo ID bill will still be worth enacting?

12      MR. SWEETEN:  Same instruction as to legislative

13  privilege.  Also objection, asked and answered.

14   A.  I agree.

15   Q.  Your counsel did not instruct you not to answer.  And

16  so if you're not answering on the basis of privilege, please

17  state that for the record.

18   A.  I'm not answering on the basis of privilege.

19   Q.  Okay.

20   A.  Because I felt like I answered it.

21   Q.  Okay.  Is it your belief that if African-American or

22  Hispanic voters lacked the required voter ID at a rate greater

23  than that of Anglos that this bill would still meet what you

24  described, I believe, as the important criterion of compliance

25  with the Voting Rights Act?

---

167

1      MR. SWEETEN:  I'm going to instruct you again as

2  to the legislative privilege.  Don't reveal thoughts, mental

3  impressions, opinions about the legislation.  Don't reveal

4  communications you've had with legislators, legislative staff,

5  state agencies, Leg Council and constituents.

6    A.  And I'm not going to answer that, based on privilege.

7    Q.  What do you believe is the purpose of the Voting

8  Rights Act?

9    A.  Excuse me?

10   Q.  What do you believe is the purpose of the Voting

11  Rights Act?

12      MR. SWEETEN:  I'm going to object to the extent

13  that that calls for her to reveal thoughts, mental impressions,

14  opinions about legislation or communications she's had with any

15  of the entities or individuals that we've discussed.

16      MR. FREEMAN:  Mr. Sweeten.

17      MR. SWEETEN:  To the extent you can answer that

18  question, I'll let you go ahead and do so.

19      MR. FREEMAN:  Mr. Sweeten, I'm going to ask what

20  legislative act my question refers to, as I've asked her for

21  general understanding of the purpose of the Federal Voting

22  Rights Act.

23      MR. SWEETEN:  First, with respect to any

24  considerations that she had with Senate Bill 14, she's had

25  conversations with individuals or state agencies, et cetera,

---

168

1  where those could have been revealed, I'm instructing her that

2  if those communications occurred do not reveal that information.

3      Also to the extent that that question asks her to

4  reveal thoughts, mental impressions or opinions about

5  legislation, that would be legislatively privileged.  To the

6  extent she can answer outside of that, the privilege area, then

7  I'm going to let her do so.

8      MR. FREEMAN:  Mr. Sweeten, I'm going to ask you

9  to withdraw your objection on the basis that my question had

10  absolutely nothing to do with S.B. 14 and solely asked

11  Representative Harless' understanding of the purpose of the

12  Federal Voting Rights Act of 1965.

13      MR. SWEETEN:  If it has nothing to do with

14  legislative privilege, i.e., any of those communications that

15  we've discussed, she can answer that.  If she's had discussions

16  with legislators, state agencies, staff, counsel, constituents

17  about this issue, she does not have to reveal that.  She can

18  answer outside of that.  If you believe that your question

19  doesn't invade any of those and she also agrees it doesn't

20  invade those communications, I'm going to let her answer that.

21  That's my instruction.

22      MR. FREEMAN:  Mr. Sweeten, I am going to ask you

23  to withdraw your objection on the basis that Texas did not enact

24  the Federal Voting Rights Act of 1965 and that this question has

25  absolutely nothing to do with this state legislative privilege.

Patricia Harless                                                                                May 15, 2012

---

169

1    Now, you've asserted this privilege over and over and over
2    again, but there has to be a line, and this is that line.
3    Please withdraw your objection.
4           MR. SWEETEN:  Mr. Freeman, I understand what
5    you're suggesting.  But you nor I have a full understanding of
6    communications that she's had with the specific individuals that
7    would be privileged.  Okay?  If any part of your question
8    invades communications that she's had or reveals thoughts,
9    mental impressions or opinions about legislation, then that
10   would be privileged.  To the extent it does not, I am allowing
11   her to answer that question.  So I will not withdraw my
12   objection.  I will instruct her as I have.
13          Go ahead.  You can answer.
14          MR. FREEMAN:  Representative Harless -- why don't
15   we have the court reporter read back the question, just so you
16   have it clear.
17          THE REPORTER:  Question: "What do you believe is
18   the purpose of the Voting Rights Act?"
19      A.  I learned about the Voting Rights Act in 8th grade.
20   And I know it was done in 1965.  And I know there's Section 2
21   and Section 5.  And we're here on Section 5, part of the Voting
22   Rights Act.  And most of my discussions about the Voting Rights
23   Act and education process came after I started doing work on
24   S.B. 14, which I would assume that that would fall under
25   privilege.

---

170

1      Q.  Do you believe that the Voting Rights Act is necessary
2    in 2012?
3      A.  I'm not sure how to answer that.
4      Q.  Do you believe that the Voting Rights Act enforces
5    important principles in 2012?
6      A.  I don't know how to answer that.
7      Q.  I would ask for a yes or no answer as to whether the
8    Voting Rights Act enforces principles to the extent that you
9    understand the principles that the Federal Voting Rights Act of
10   1965 enforces?
11     A.  In 2012?
12     Q.  In 2012.
13          MR. SWEETEN:  You're asking her for her opinion
14   about the Voting Rights Act?  Am I clear on that?
15          MR. FREEMAN:  That's correct.
16          MR. SWEETEN:  I'm going to object to relevance as
17   to that question.  I think also it has been asked and answered.
18   She's attempted to answer that.  And she does not have to answer
19   a yes or no.  She can say she doesn't know.
20     A.  And that's what I've answered.  I don't know what the
21   relevance is in 2012.
22     Q.  Okay.  Did you participate in Texas' submission of
23   S.B. 14 for administrative preclearance, including responses to
24   requests for more information?
25          MR. SWEETEN:  Hold on a minute.  When -- can you

---

171

1    clarify the question by participate, what you're specifically
2    asking.
3          MR. FREEMAN:  Sure.
4      Q.  First, did you provide any -- well, first off, did you
5    understand the question?
6      A.  I am not sure I did.
7      Q.  Okay.  Did you provide any information to the
8    Department of Justice during preclearance process?
9      A.  I did a phone interview.
10     Q.  And did you provide any additional information to the
11   State of Texas as part of the preclearance process?
12     A.  My staff may have.
13     Q.  You did not personally?
14     A.  All my files were in Austin and my staff may have
15   provided.
16     Q.  Okay.  Did you participate in the decision to sue the
17   attorney general and initiate this case?
18     A.  I was never asked.
19     Q.  Okay.  Did you participate in the drafting of the
20   complaint in this case and the allegations that are at issue in
21   this case?
22     A.  Our staff -- my staff --
23          MR. SWEETEN:  Hold on a minute.  I am going to
24   object as to the attorney/client privilege.  Our office
25   represents Representative Harless.  So any communication that

---

172

1    we've had with Representative Harless would be privileged under
2    the attorney/client privilege.
3      Q.  Did you provide any non-confidential information as
4    part of participating in the drafting of the complaint in this
5    matter?
6      A.  I cannot tell you what my office did.
7      Q.  Okay. But you did not personally.
8      A.  No.
9      Q.  And you're not aware of what your office did?
10     A.  No.
11     Q.  Okay.  That solves the question.  Are you familiar
12   with the Federal Help America Vote Act of 2002, or HAVA?
13     A.  From the debate on the floor and in committee.
14     Q.  Are you familiar with the voter identification
15   requirements of HAVA?
16     A.  I can't say off the top of my head I am, no.  I'm sure
17   at some point I knew that, but --
18     Q.  Are you aware of HAVA's requirements allowing the use
19   of non-photographic ID in order to identify a voter who has
20   previously registered to vote via mail?
21     A.  I don't know that I'm aware of that.
22     Q.  Okay.  If the Federal Help America Vote Act provided
23   for non-photographic ID in order to establish the identity of a
24   voter, do you think that that would be sufficient for Texas'
25   purposes as well?

---

Patricia Harless                                     May 15, 2012

173

1    A.  I think the testimony on the floor was that a photo ID
2    helps verify you are who you say you are.
3         MR. SWEETEN:  I will object to that as
4    nonresponsive and ask another time.
5         Q.  Do you believe that if the Federal Help America Vote
6    Act allows non-photo ID, two forms of non-photo ID to establish
7    identity, that that should be sufficient for Texas as well?
8         MR. SWEETEN:  Don't reveal your thoughts, mental
9    impressions or opinions about the legislation, Senate Bill 14 or
10   communications you've had with any of the entities we've listed.
11   Go ahead and answer.
12       A.  That's privileged.
13        MR. FREEMAN:  Why don't we take a five minute
14   break so that we don't have any similar problems to last time.
15            (Recess from to 3:17 p.m. to 3:33 p.m.)
16       Q.  If we can turn to before you became a member of the
17   Texas Legislature very quickly.  At any point prior to being
18   sworn in as a member of the Texas legislature, did you hear of
19   any photographic voter identification bill or issue as a
20   political issue in Texas?
21       A.  I can't recall that I did.
22       Q.  Okay.
23       A.  It could be possible, but I can't recall.
24       Q.  Are you aware of a photographic voter identification
25   bill that was introduced during your first term, in 2007?

174

1    A.  Yes.
2    Q.  Was any particular bill subject to serious
3    consideration?
4    A.  I don't remember.
5    Q.  Was a bill passed out of the House?
6    A.  I don't recall.  It seems like there's been stories
7    that it did, but I don't recall.
8    Q.  So is this an issue that, in 2007, would it be fair to
9    say, that you were not greatly involved in?
10   A.  Yes.
11   Q.  Okay.  And just to make sure, did you make any public
12   statements about that bill in 2007, of which you're aware?
13   A.  Not that I know of.
14   Q.  Do you know if you voted in favor of the bill?
15   A.  I don't even know if it made it to the floor.  I can't
16   remember.
17   Q.  Okay.  That's fine.  In 2009, are you aware of a
18   photographic voter identification bill that was introduced?
19   This was in your second term, 81st Texas Legislature?
20   A.  Right.  I know there was a voter ID bill, but I don't
21   know the specifics of it.
22   Q.  Do you know when the bill was introduced in the House?
23   A.  No.
24   Q.  Do you know who introduced it?
25   A.  I think there were more than one.

175

1    Q.  Do you know who introduced the bill that had passed
2    from the Senate?
3    A.  Senator Fraser.
4    Q.  But do you know who introduced it in the House?
5    A.  No.
6    Q.  Okay.  What was your involvement with that bill?
7    A.  Just watching it as it proceeded.
8    Q.  Did you offer any amendments?
9         MR. SWEETEN:  You can confine your testimony to
10   matters of the public record.
11   A.  I don't recall if it ever made it to the House floor
12   in 2011 or 2009.
13   Q.  Are you aware of the basic provisions of that bill?
14   A.  I know it was different than the bill that we passed
15   this session.
16   Q.  And are you aware of what any of those differences
17   were?
18        MR. SWEETEN:  Are you asking about the bill
19   introduced in 2009 as to what was passed in 2011 and the
20   differences between those?  Which duration?  I want to make sure
21   that I'm clear.
22   Q.  I think I'll ask if the witness understands.  Do you
23   understand what my question was?
24   A.  Partially.  If I recall correctly, which no
25   guarantees, there were more than one voter ID bill filed in the

176

1    2009 session by multiple members of the Texas House.
2    Q.  Do you recall what the differences were between the
3    bill that was passed from the Senate in 2009 and was introduced
4    in the Texas House and the bill that was passed from the Senate
5    in 2011 and what was introduced in the Texas House?
6    A.  That's where I think the confusion is coming from,
7    because I don't think the bill that was passed in the Senate in
8    2009 actually made it to the House floor.  I think it went to
9    committee.  And I don't think it got out of committee.  And I
10   did not serve on that committee.  So I wouldn't have known the
11   provisions of the bill and if it was the same bill and how many
12   bills were filed.
13   Q.  Isn't it the case that S.B. 362 was passed out of
14   committee but was chubbed on the floor?
15   A.  I don't recall that.
16   Q.  Okay.
17        THE REPORTER:  I'm not familiar with that term,
18   chubbed.
19        MR. FREEMAN:  Chubbed, c-h-u-b-b-e-d.
20        THE REPORTER:  Thank you.
21        MR. FREEMAN:  It's a term of art that I only
22   recently learned myself.
23   Q.  Did you make any public statements concerning S.B.
24   362, the photographic voter identification bill that passed the
25   Senate in 2009?

177

1    A.   Not that I recall.
2    Q.   Did you send any e-mails concerning that bill?
3    A.   Not that I recall.
4    Q.   During the 81st Legislature, 2009, did you sign a
5    pledge circulated by the Republican Party of Texas concerning
6    voter ID?
7    A.   Probably.  I can't say for sure, but it is possible.
8    Q.   Do you recall what the principles in that pledge were?
9         MR. SWEETEN:  I assume this is a public record?
10        THE WITNESS:  I don't know.
11        MR. FREEMAN:  If this could be marked as U.S.
12   Exhibit 22.
13             (Exhibit No. 22 marked)
14        MR. SWEETEN:  Dan, is this from a web site of
15   some kind?  Clear Lake GOP it says.
16        MR. FREEMAN:  That is correct.  It is a copy of a
17   Republican Party of Texas press release.
18        MR. SWEETEN:  Okay.
19        THE WITNESS:  I don't see my name on it.  Do you?
20   Q.   If you look at Page 2, in between Hancock and
21   Harper-Brown.  It's double sided.
22   A.   Oh.  Sorry.  Yes.
23   Q.   And what were the principles that were in that pledge
24   concerning voter ID?
25   A.   From this press release posted on Clear Lake GOP, it

178

1    says, "Ensure a valid photo ID is needed to vote.  Take effect
2    at the next possible uniform election date.  Be free of any
3    registration requirements such as same day voter registration
4    that dilutes the intent of the bill, which is ensuring fair and
5    accurate elections.  Increase criminal penalties for voter fraud
6    and registration."
7    Q.   Okay.  Are you aware of whether Attorney General
8    Abbott has dedicated substantial resources over the last decade
9    to investigating allegations of voter fraud, in-person voter
10   fraud?  And you agreed to those principles, correct?
11   A.   Looks like that.
12   Q.   How would allowing same-day registration dilute the
13   intent of a photographic voter ID bill?
14        MR. SWEETEN:  Okay.  Don't reveal any thoughts or
15   mental impressions or opinions about legislation or
16   communications that you've had with legislators, legislative
17   staff, state agencies, Legislative Council or constituents.
18        MR. FREEMAN:  I'm asking the representative to
19   explain a public statement.
20        MR. SWEETEN:  If that's the question, then you
21   can go ahead and have her explain the public statement.
22   A.   I'm not sure, in the context of this.  Our bill did
23   not address same-day registration, the bill that I was involved
24   in.
25   Q.   Do you believe that including a provision allowing

179

1    same-day registration based on possession of the documents
2    needed to vote under S.B. 14 would have diluted the intent of
3    S.B. 14?
4         MR. SWEETEN:  Same objection as to legislative
5    privilege.  Don't reveal your mental impressions or thoughts
6    about that legislation or communications that we've outlined
7    previously.
8         THE WITNESS:  May I have the question repeated.
9         THE REPORTER:  Question: "Do you believe that
10   including a provision allowing same-day registration based on
11   possession of the documents needed to vote under S.B. 14 would
12   have diluted the intent of S.B. 14?"
13        MR. SWEETEN:  Same objection.
14   A.   It was not a provision of the bill, so I can't
15   speculate on that.
16   Q.   What does it mean to dilute the intent of a bill?
17   A.   To dilute?
18   Q.   Dilute the intent.
19   A.   From this?  Are you taking that statement from here?
20   Q.   I am.
21   A.   I have no clue what they meant by that.
22   Q.   Why did you sign this pledge?
23   A.   I can't answer.
24   Q.   You don't recall?
25   A.   I don't.

180

1    Q.   Do you recall who urged you to sign the pledge?
2    A.   I don't.
3    Q.   Do you recall whether you spoke with Eric Opiela
4    concerning this pledge?
5    A.   I am pretty positive I did not.
6    Q.   Do you know who Eric Opiela is?
7    A.   I've seen his name.  I don't ever recall having a
8    conversation, whether on the phone or in person, with him.
9    Q.   Was Eric Opiela the chairman of the Republican Party
10   of Texas in 2009?
11   A.   I don't know.
12   Q.   Do you have any documents concerning any
13   communications regarding this pledge?
14   A.   Not that I know of.
15   Q.   Okay.  When was the last time that you were asked to
16   prove your citizenship?
17   A.   When I got a passport, maybe.
18   Q.   Do you remember any time before that?
19   A.   Since I just got a new passport about seven years ago,
20   I don't remember since then.  I don't know.  Maybe when I got my
21   concealed handgun license in '96.
22   Q.   Okay.  So once in the last seven years, maybe twice in
23   the last 16 years or so.  To your knowledge, what documents
24   prove that an individual is a U.S. citizen?
25   A.   For me it would be my birth certificate.

Patricia Harless                                                    May 15, 2012

---

185

1    submitted for the 82nd Legislature related to photographic voter
2    identification?
3        A.  It was a bill that was prefiled because it's got a low
4    number.  Is it photographic or is it --
5            MR. SWEETEN:  Just take your time.  You can
6    review it.
7        A.  I think this was the bill that was similar to the bill
8    filed in -- yeah, driver's license.  Yeah.  It's a photographic
9    identification bill, yes.
10       Q.  Why did you take a more prominent position on this
11   issue in the 82nd Legislature?
12           MR. SWEETEN:  Don't reveal any communications
13   that you've had with other legislators, staff, state agencies,
14   constituents or Texas Legislative Council, and don't reveal
15   thoughts, mental impressions or opinions about legislation.  To
16   the extent you're not doing so, you can answer that question.
17       A.  Well, it's difficult to answer that without revealing
18   communications with constituents, but I will say it's an issue
19   that was important to my district.
20       Q.  Did you have any communications in 2010, prior to
21   filing this bill, concerning photographic voter ID with
22   constituents?
23       A.  That's privileged.
24           MR. SWEETEN:  I'm going to object to legislative
25   privilege.

---

186

1        Q.  I'm going to ask not in favor or opposed, so I'm not
2    going to ask the position, but I want to ask as a matter of
3    subject matter whether you had any such conversations.  And I
4    think that --
5            MR. SWEETEN:  You can answer that question.  You
6    can identify as to the subject matter that he's saying.  You can
7    identify whether you had constituent communications and the form
8    and the approximate date, if you're able to.
9        A.  Yes.
10       Q.  Did you have -- did you speak with anyone from ALEC,
11   the American Legislative Exchange Council?
12       A.  No.
13       Q.  Did you speak with anyone from the King Street
14   Patriots?
15       A.  No.
16       Q.  Did you speak with anyone from any other Tea Party
17   groups?
18       A.  No.
19       Q.  Did you speak with Catherine Engelbrecht?
20       A.  Prior to this legislation?
21       Q.  Yes.
22       A.  No.
23       Q.  Did you speak with her after this legislation?
24       A.  That's privileged.
25       Q.  As a matter -- not as a matter of whether she

---

187

1    supported or opposed the legislation, but just about voter ID.
2            MR. SWEETEN:  You can testify about whether or
3    not you had contact and with whom the contact was with.  Don't
4    go into the subject matter of it.
5        A.  I had contact with her after the committee hearing
6    on --
7        Q.  Do you remember the approximate date?
8        A.  No.
9        Q.  But the hearing was -- do you remember which
10   particular committee hearing?
11       A.  The committee hearing where this legislation went
12   through.
13       Q.  Okay.  And this was S.B. 14?
14       A.  Yes.
15       Q.  So March 2011?
16       A.  Yes.
17       Q.  Okay.  Did you have any conversations with Paul
18   Bettencourt?
19       A.  No.
20       Q.  Did you have any conversations with any experts,
21   political scientists, concerning photographic voter ID before
22   filing this bill?
23       A.  I would have to say probably no.
24       Q.  Okay.  Did you have any conversations with any
25   experts, including political scientists, at any time after you

---

188

1    filed this bill concerning photographic voter ID?
2        A.  I have concerns that those are privileged.  But we
3    were doing due diligence in the legislation, so I am probably
4    sure there were some conversations with experts.
5        Q.  Just to jump back real quickly to Ms. Engelbrecht, how
6    many times did you speak with her?
7        A.  Maybe once or twice.
8        Q.  Was it on the phone?
9        A.  She came by the office after the committee hearing.
10       Q.  Okay.  And how long was the conversation?
11       A.  Ten minutes.
12       Q.  Okay.  Did you have any conversations -- excuse me.
13   Who are the experts who you had conversations with?
14       A.  I can't recall.  I don't know for sure that I did.
15       Q.  Did you ever speak with an individual named Hans von
16   Spakovsky?
17       A.  No, I didn't.
18       Q.  Are you aware of any conversations that occurred with
19   Mr. Von Spakovsky?
20       A.  I think my chief of staff may have, but I don't know
21   for sure.
22       Q.  Okay.  That's fine.  Did you ever have any
23   conversations with George Hammerline?
24       A.  Yes.
25       Q.  When did that occur?

---

Patricia Harless                                           May 15, 2012

189

1       A.   Probably after -- probably after they announced that I
2   would be carrying the bill in the House.
3       Q.   And who is George Hammerline?
4       A.   He's someone who works for one of the government
5   agencies in Harris County.  I can't tell you which one.  He used
6   to work with Paul Bettencourt before Bettencourt left office.
7       Q.   Okay.  Did you speak with him in person?
8       A.   He came by the office.
9       Q.   About how long was the conversation or conversations?
10      A.   Longer than I wanted.  Maybe five, ten minutes.
11      Q.   Okay.  Did you ever have any conversations with any
12  minority groups concerning photographic voter ID?
13      A.   I can't tell you for sure, but I know that after it
14  was announced that we would carry the legislation, there were a
15  number of groups that came back to visit about --
16      Q.   Do you recall any of the names of those groups?
17      A.   It seems like League of Women Voters was probably one,
18  but I can't recall all of them.  And I didn't meet with them.
19      Q.   Who did?
20      A.   I would -- I don't know if one of the interns did,
21  Julie or Colby.  I'm not sure.
22      Q.   Did you make any changes to either your proposed bill,
23  H.B. 112 or S.B. 14 as a result of concerns expressed by these
24  groups?
25           MR. SWEETEN:  Hold on a minute.  Don't reveal any

190

1   thoughts, mental impressions or opinions about legislation or
2   conversations or the substance of conversations with any
3   legislator, staff, state agency, TLC or constituents.
4       A.   That is privileged.
5       Q.   Okay.  Who drafted the bill that you have in front of
6   you, H.B. 112?
7       A.   Leg Council.
8       Q.   What input did you provide?
9            MR. SWEETEN:  Don't talk about the specific
10  substance of any input or communications you've had with TLC.
11      A.   None.
12      Q.   Who else provided input concerning the substance of
13  the bill?
14           MR. SWEETEN:  Again, I think that you're asking
15  her to provide mental impressions, opinions about legislation or
16  conversations that she's had with the individuals or entities
17  named.  So I'm going to instruct you not to answer based on
18  legislative privilege.
19      Q.   If you can indicate if you're not answering on the
20  basis of privilege, that would be great.
21      A.   Not answering based on privilege.
22      Q.   Okay.  Thank you.  Are you aware of whether the
23  speaker provided input concerning the substance of H.B. 112?
24           MR. SWEETEN:  Same objection, same instruction.
25      A.   Privileged.

191

1       Q.   Any of the speaker's staff?
2            MR. SWEETEN:  Same instruction, same objection.
3       A.   Privileged.
4       Q.   Lt. Governor Dewhurst?
5            MR. SWEETEN:  Same instruction, same objection.
6       A.   Privileged.
7       Q.   Any of Lt. Governor Dewhurst's staff?
8            MR. SWEETEN:  Same objection, same instruction.
9       A.   Privileged.
10      Q.   Senator Fraser?
11           MR. SWEETEN:  Same objection, same instruction.
12      A.   Privileged.
13      Q.   Senate Fraser's staff?
14           MR. SWEETEN:  Same objection.
15      A.   Privileged.
16      Q.   Governor Perry?
17           MR. SWEETEN:  Same objection and instruction.
18      A.   Privileged.
19      Q.   Governor Perry's staff?
20           MR. SWEETEN:  Same objection and instruction.
21      Q.   Lobbyists?
22           MR. SWEETEN:  Same objection and instruction.
23           THE WITNESS:  May I have a minute?
24           MR. SWEETEN:  Sure.
25           THE WITNESS:  Thank you.

192

1            (Brief off-record discussion)
2            MR. FREEMAN:  I believe this is when you say
3   "privileged".
4       A.   Privileged.
5       Q.   Thank you.  While you were drafting H.B. 112, did you
6   speak with the Department of Public Safety?
7            MR. SWEETEN:  You can testify about the fact of
8   communication.  You can't testify about the substance.  It's
9   legislatively privileged.
10      A.   I didn't draft House Bill 112.
11      Q.   While your staff were drafting House Bill 112, are you
12  aware of whether they spoke with the Department of Public
13  Safety?
14      A.   To clarify that as well, my staff doesn't draft the
15  bill.  We present to Leg Council information, and they draft the
16  bill.
17      Q.   So let me clarify based on that.  Thank you.  While
18  your staff were providing the substance of the bill to Leg
19  Council for drafting purposes, while the drafting process was
20  ongoing --
21      A.   Sorry.
22      Q.   -- did they -- accuracy is what we do.
23      A.   I don't want to get down the road with this and --
24      Q.   While your staff was providing information to Leg
25  Council and Leg Council was drafting H.B. 112, did you or anyone

Patricia Harless                                          May 15, 2012

---

193

1  in your staff speak with the Secretary of State's office?
2          MR. SWEETEN:  You can testify about the fact of
3  communication.
4      A.  I did not.  I can't answer whether my staff did.
5      Q.  Did you conduct or did you instruct anyone to conduct
6  an analysis of the impact that H.B. 112 would have on minority
7  voters?
8          MR. SWEETEN:  Don't answer that.  That's
9  privileged.  Reveals thoughts, mental impressions about
10  legislation.
11     A.  Privileged.
12     Q.  Why not?
13         MR. SWEETEN:  Same objection and instruction.
14     A.  Privileged.
15     Q.  Now, you've testified that your staff provided
16  instructions to Legislative Council concerning the substance of
17  the bill, but who made decisions concerning what components
18  would go into the bill?
19     A.  Into?
20     Q.  Into H.B. 112?
21         MR. SWEETEN:  That's the same instruction as the
22  legislative privilege and objection based on that.  You can
23  answer to the extent it doesn't reveal legislatively privileged
24  information.
25     A.  I am not sure.  I think it's a companion.  It's

---

194

1  similar to the bill that was filed the previous session.
2      Q.  Did you provide any instructions specifically to your
3  staff concerning what should and should not appear in H.B. 112?
4          MR. SWEETEN:  Don't reveal communications between
5  yourself and legislative staff.  It's legislatively privileged.
6          MR. FREEMAN:  I'm going to try and frame this in
7  a way that we can just have this be a subject matter question,
8  Mr. Sweeten.
9          MR. SWEETEN:  Sure.  I'm fine with that.
10     Q.  Were there any communications between you and your
11  stuff on the subject of what should and should not be included
12  in H.B. 112?
13         MR. SWEETEN:  You can answer that.
14     A.  No.
15     Q.  Okay.  Was H.B. 112 ever referred to the Select
16  Committee on Voter Identification and Voter Fraud?
17     A.  I can't remember.
18     Q.  Isn't it the case that we earlier determined that the
19  only bill referred to --
20     A.  I think that's what you said from that sheet.  I could
21  look up the bill number and see where it went, where it was
22  referred to, but I can't remember where it was referred to.
23     Q.  Are all bills referred to some committee after they're
24  filed?
25     A.  I'm not sure of the procedure, if all bills are.

---

195

1  Under typical legislative sessions, bills are referred to
2  committee.  But close to the end of the session there may be 10
3  to 20,000 bills filed and there may not be time to refer them to
4  committee.
5      Q.  But an early bill, a prefiled bill like H.B. 112, that
6  would be referred to some committee, right?
7      A.  It's my understanding it should be.
8      Q.  And so insofar as only one bill was referred to the
9  Select Committee on Voter Identification and Voter Fraud, that
10  was the bill that was going to move in terms of any voter ID
11  bill that was filed in the last session, right?
12     A.  I think that it would be easy to make that point.
13     Q.  Okay.
14     A.  I can't guarantee that, but I think that would make
15  sense.
16     Q.  Okay.  What were the basic provisions of H.B. 112?  Do
17  you know?
18     A.  Voter education, acceptable identification outside of
19  a polling place, an election officer at a polling place, either
20  one form of identification listed on section.  So it looks like
21  it's got the approved forms of IDs that we talked about and
22  maybe some additional forms.
23     Q.  Okay.  Can we -- can you take a quick look at Section
24  6(b) and tell me whether this allows an individual to present
25  either one form of ID listed in one list or two forms from

---

196

1  another list?
2      A.  It does.
3      Q.  Can you take a look at Section 11.
4      A.  Just one second.  I got to take my contacts out,
5  because I can't look anymore.
6      Q.  Do you want us to go off?
7      A.  No.  It will be fine.  They're disposable, but after
8  awhile they blur.  Section 11?
9      Q.  Yes.  And if you can look at Section 11(a).
10     A.  This is the bill?
11     Q.  I'm sorry.  It's actually Section 10.  Its on Page 5,
12  where it says, "Documentation of Proof of Identification"?
13     A.  Yes.  This is the --
14     Q.  What are the forms of photo identification that are
15  acceptable under your bill?
16     A.  Under which section?
17     Q.  It's going to be Section 10, which modifies section
18  63.0101 of the Election Code, begins, "The following
19  documentation is an acceptable form of photo identification."
20  Bottom of Page 5.
21     A.  Expired or expired no earlier than two years before
22  the date of presentation.
23     Q.  And is that a driver's license or a Texas
24  identification card?
25     A.  It says issued to a person by DPS, so, yes.

---

Patricia Harless                                           May 15, 2012

197

1       Q.   Okay.
2       A.   United States military ID card that contains the
3   person's photograph.
4       Q.   Uh-huh.
5       A.   United States citizen certificate issued to person
6   that contains the person's photograph.  License to carry
7   concealed handgun issued by the Department of Public Safety.
8       Q.   Does it allow passport?
9       A.   Valid ID card that contains persons issued by federal
10  government.  Agency, institution, political subdivision of the
11  state.
12      Q.   And Representative Harless, did you skip Subsection 4.
13  Do you see where it says United States passport?
14      A.   Yes, but that's not underlined or crossed out so --
15      Q.   But it is in the list, isn't it?
16      A.   Yes.
17      Q.   So those are all forms of photographic identification?
18      A.   Uh-huh.
19      Q.   And the bill also allowed two forms of
20  non-photographic identification, correct?
21      A.   Yes.
22      Q.   And what are the forms of non-photographic
23  identification, if you can just -- well, I'll list them quickly.
24  Did it allow voter registration certificate?
25      A.   Uh-huh.

198

1       Q.   Official mail addressed to the person by name from a
2   government entity?
3       A.   Yes.
4       Q.   Certified copy of a birth certificate?
5       A.   Yes.
6       Q.   Citizenship papers without a photograph?
7       A.   Yes.  It doesn't say without.  It says citizenship
8   papers.
9       Q.   Okay.  An original or certified copy of a marriage
10  license or divorce decree?
11      A.   Yes.
12      Q.   Court records of adoption, name change, or sex change?
13      A.   Yes.
14      Q.   An identification card issued by a government entity
15  of the state or the United States for the purpose of obtaining
16  benefits?
17      A.   Yes.
18      Q.   A temporary driving permit?
19      A.   Yes.
20      Q.   Pilot's license?
21      A.   Yes.
22      Q.   A library card?
23      A.   Yes.
24      Q.   A hunting or fishing license?
25      A.   Yes.

199

1       Q.   Okay.  Did this conform, H.B. 112, to the pledge that
2   you made in 2009?
3       A.   Probably not.
4       Q.   Why the difference?
5       A.   What is the difference --
6           MR. SWEETEN:  Well, hold on.  I want to make sure
7   that you're clear.  Don't reveal thoughts, mental impressions or
8   opinions about legislation.  I don't want you to reveal
9   communications.  You're free to include matters of public
10  record, but I caution you on that privilege issue.
11      A.   The question again.
12      Q.   Why the difference between the bill you introduced
13  that allows non-photo ID and the pledge that you made in 2009
14  concerning an identification bill that would only allow photo
15  ID?
16          MR. SWEETEN:  I can't interpret that question
17  other than to ask for her to reveal her mental impressions or
18  opinions about legislation.  I think that is squarely within the
19  order regarding this privilege.  So I'm going to globally
20  instruct her not to answer that question.
21      A.   Privileged.
22      Q.   Thank you.  Why did you introduce a bill that allowed
23  non-photo ID in terms of a photo ID bill?
24          MR. SWEETEN:  Same objection.  Instruction not to
25  answer.

200

1       Q.   Are you not answering on the basis of privilege?
2           MR. SWEETEN:  Let me finish.  It would reveal
3   your mental impressions, opinions about legislation.
4       A.   Privileged.
5       Q.   Okay.  Is it your understanding that a driver's
6   license or Texas identification card that is expired provides
7   proof of the identity of the individual who holds it?
8           MR. SWEETEN:  Are you asking her as a factual
9   matter?
10          MR. FREEMAN:  Yes.
11          MR. SWEETEN:  You can answer just as to what you
12  know.
13      A.   An ID or a driver's license issued by the Department
14  that's expired provide ID of that person, who they are.
15      Q.   Okay.
16      A.   I think in our legislation we put a provision --
17          MR. SWEETEN:  Let's go ahead and just answer the
18  question he's asked.  Okay?
19      A.   Yes.
20      Q.   Okay.  Does the identification card cease to prove the
21  identity of the person after six months after it's expired?
22      A.   No.
23      Q.   Does it cease to prove the identity of the person two
24  years after it's expired?
25      A.   No.

201

1    Q.   Are you aware of how the Department of Public Safety
2  maintains records about driver's license expiration?
3    A.   No.
4    Q.   Are you aware of whether they maintain only a notation
5  that it's less than two years expired or more than two years
6  expired?
7    A.   I'm not aware.
8    Q.   Okay.  Does a valid identification card that contains
9  a person's photograph and is issued by an agency or institution
10 of the federal government establish an individual's identity?
11   A.   It could possibly.
12   Q.   How about a valid identification card that contains
13 the person's photograph and is issued by an agency, institution
14 or political subdivision of the State of Texas?
15   A.   It could.
16   Q.   In what ways could it not?
17   A.   You know, I just have no way of knowing what checks
18 and balances that that political subdivision goes through
19 issuing an ID.  I may can go up and say, "I'm John Smith," and
20 you issue me an ID.
21   Q.   Why did you include valid identification cards issued
22 by political subdivisions of the state in H.B. 112?
23       MR. SWEETEN:  I'm going to object.  I think that
24 asks for legislatively privileged information, asks her to
25 reveal thoughts, mental impressions, opinions about legislation.

202

1  why she included something or did not include something, was
2  covered by that.
3    A.   Privileged.
4    Q.   And why did you say that a valid identification card
5  issued by an agency or institution with the federal government
6  could establish an identity but not always establish an
7  individual's identity?
8        MR. SWEETEN:  Same objection.
9    A.   The question one more time?  Are you saying --
10   Q.   I'm not saying why, but I'm asking -- you previously
11 testified that a valid identification card that contains the
12 person's photograph and is issued by an agency or institution of
13 the federal government could establish an individual's identity.
14 And I'm asking why only could.  Why are you qualifying that
15 statement?
16       MR. SWEETEN:  I think she's answered that.
17       MR. FREEMAN: I said that with regard to the
18 state.  I didn't say that with regard -- with state subdivision,
19 not with regard to the fed government.
20       MR. SWEETEN: You can answer as to that.
21   A.   So we're talking specifically about the federal
22 government?
23   Q.   Yes.
24   A.   I'm not sure how they issue their IDs.
25   Q.   Okay.  And just for the record, why did you include

203

1  valid identification cards issued by agencies or institutions of
2  the federal government in H.B. 112?
3    A.   Privileged.
4        MR. SWEETEN:  Objection, calls for legislatively
5  privileged information, asks her to reveal thoughts, mental
6  impressions or opinions about legislation.
7        MR. FREEMAN: I would ask that you wait for your
8  counsel to finish just so the record is clean.
9    A.   I should.  I'm just trying to speed it up.  Sorry.
10 I'm old and tired.
11   Q.   Now, you previously testified that you don't know what
12 a citizenship certificate looks like; is that correct?
13   A.   I don't know that I do.
14   Q.   Okay.
15   A.   I may have seen one, but I can't recall.
16   Q.   And can I ask, so you included among the list of photo
17 ID in H.B. 112 the United States citizenship certificate issued
18 to the person that contains the person's photograph.  And on the
19 non-photo list you included just a United States -- or United
20 States citizenship papers issued to the person.  From that, can
21 it be inferred that sometimes citizenship papers have a photo on
22 them and sometimes they do not?
23       MR. SWEETEN:  Don't reveal thoughts, mental
24 impressions or opinions about legislation.  Okay.
25   A.   Privileged.

204

1    Q.   I'm just asking for your knowledge and the logical
2  inference that can be made from a bill that you publicly
3  submitted for consideration in the Texas Legislature.
4        MR. SWEETEN:  But you can't do that by asking her
5  legislatively privileged information.  You're asking her about
6  her mental impressions, opinions about why something was or
7  wasn't included, what can be inferred based upon the inclusion
8  or non-inclusion of certain information.  I think you're asking
9  for privileged information.
10   Q.   To the extent that you lack knowledge of the answer to
11 that question, whether it sometimes has a photo and sometimes
12 does not, that's a fine answer as well.
13   A.   I don't know if there are certificates without photos.
14 I don't know.
15   Q.   Okay.  Why would H.B. 112 solve any problems related
16 to in-person voter fraud in comparison to current Texas law?
17       MR. FREEMAN: I'm going to object.  I think
18 you're asking her for her mental impressions, opinions about
19 legislation.  I think that falls squarely within the legislative
20 privilege.
21   A.   Privileged.
22   Q.   Did you make any public statements concerning H.B.
23 112?
24   A.   Not that I remember.  Could possibly, but.
25   Q.   You don't recall?

Patricia Harless                                          May 15, 2012

## 205

1    A.  No.

2    Q.  Do you recall if it was ever mentioned in your

3    constituent newsletter?

4    A.  Possibly as the bills that I filed.

5    Q.  Anything more than just a list of the bills that you

6    filed?

7    A.  I don't know.  We do those weekly during session.

8    Q.  Okay.  Do you keep all of your constituent newsletters

9    maintained in a file somewhere?

10   A.  I don't.

11   Q.  Do you know if your staff does?

12   A.  I don't know if they do.

13   Q.  Would you like to take a break or can we keep going?

14   A.  Keep going until my --

15         MR. SWEETEN:  She's got that 4:40.

16   Q.  20 minutes.  Sounds good.

17   A.  It's 20 or 30.

18         MR. ROSENBERG:  What happens at 4:40?

19         MR. SWEETEN:  She has a phone call that will take

20   15 minutes.  It's physician related.

21   Q.  What were the basic provisions of S.B. 14?  And if

22   you'd like, I'm happy to give you a copy of U.S. Exhibit 5.

23   A.  Photo ID from prescribed list, including driver's

24   license, ID card, concealed handgun, citizenship paper with a

25   photo on it, U.S. military ID.  It also provided for extensive

## 206

1    training or training.  I shouldn't say -- training on the new

2    requirements under S.B. 14.  It provides for a free election ID

3    certificate, voter certificate.  It provides for, off the top of

4    my head, a provisional ballot, that notice be placed outside of

5    the polling place, provision that the names that are similar be

6    accepted, rights to cast provisional ballot, requirements for

7    identification prescribed by Subsection B, that they do not

8    apply to a person who is disabled and presents the voter

9    registration certificate containing the indication described in

10   Section 15.01, and increased penalties for attempting to vote

11   with someone else's ID and actually voting.

12   Q.  Isn't it the case that S.B. 14 limited the use of

13   expired driver's license or personal identification cards to

14   those that are expired up to 60 days as opposed to two years in

15   your bill?

16   A.  I think that's correct in S.B. 14, up to 60 days.

17   Q.  Why the difference?

18         MR. SWEETEN:  I'm going to object.  That calls

19   for legislatively privileged information.

20   A.  It's privileged.

21   Q.  And isn't it correct that S.B. 14 limits the use of

22   passports to those that are expired up to 60 days?

23   A.  That is correct.

24   Q.  And isn't it the case that H.B. 112 put no limitation

25   concerning expiration on U.S. passports?  It's on Page 6 of

## 207

1    Exhibit 4.

2    A.  Expired or that expired no later than two years before

3    the date.

4    Q.  But with regard to passports?

5    A.  Passports wasn't a new section in the bill.

6    Q.  But there was no modification to exclude passports

7    that were expired by more than 60 days, correct?

8    A.  Right.

9    Q.  Okay.  Why did S.B. 14 exclude passports that were

10   expired by more than 60 days?

11         MR. SWEETEN:  Don't reveal thoughts, mental

12   impressions or opinions about the legislative process or

13   discussions you've had with legislators, legislation staff,

14   state agencies, TLC or constituents.  Refer to matters of the

15   public record.

16   A.  Privileged.

17   Q.  Okay.  Were you involved in the drafting process for

18   S.B. 14?

19   A.  No.

20         MR. SWEETEN:  I think that's been asked and

21   answered.

22   Q.  Did anyone in the media ask you questions concerning

23   changes between H.B. 112 and S.B. 14?

24   A.  Could possibly.  I don't recall.

25   Q.  Okay.  Why did you shift your support in four months

## 208

1    from a bill that allowed individuals to establish their identity

2    via non-photographic ID to a bill that required individuals to

3    present one of a few articulated forms of photo ID?

4          MR. SWEETEN:  I'm going to object based on

5    legislative privilege.  You're asking her to reveal thoughts,

6    mental impressions, opinions about legislation and also

7    communications she's had.  So I'm going to instruct her not to

8    answer based on that.

9    A.  It was privileged.

10   Q.  Are you aware of any records that are maintained of

11   driver's licenses that are expired more than 60 days but less

12   than two years?

13   A.  I'm not. You asked that earlier.  I'm not aware.

14   Q.  I'm sorry.

15   A.  It's okay.

16   Q.  Are you aware of what forms of ID are permissible

17   under the Georgia photo ID law?  And I'm happy to put them in

18   front of you if that makes it easier.

19   A.  We talked about it earlier.

20   Q.  This is U.S. Exhibit 6.  Just, if you can look through

21   now that you've just recently looked at S.B. 14 and tell me

22   what's in the Georgia law and not in S.B. 14?

23   A.  And not?  A card issued by the branch, department,

24   agency or identity of the State of Georgia or other state or of

25   the United States authorized by law to issue personal

Patricia Harless                                            May 15, 2012

209

1   identification and provide such identification, a valid U.S.
2   passport, which I assume that means not expired, a valid
3   employee identification card, obtained photograph of elector
4   issued by a branch and department agency or entity of the United
5   States Government, the state or any county, municipal board,
6   authority or other entity of the State.  It says a valid
7   military ID.  So that's not an expired.  And a valid tribal ID
8   card.
9       Q.   And doesn't it also not have an expiration limitation
10  on driver's licenses in Subsection 1?
11      A.   I'm not sure.  I guess you're reading this.  It was my
12  understanding that Georgia's was two -- or not past the last
13  election cycle, but I don't recall.
14      Q.   Just to clarify my question.  Does it say that -- does
15  it limit use of Georgia driver's licenses to those that are
16  unexpired or less than 60 days expired?
17      A.   I don't think it's specific here, unless you see it
18  and I don't.  It says a Georgia driver's license which was
19  properly issued by the appropriate state agency.  The difference
20  between that and the ID card and the passport, it says valid.  I
21  don't know what they're reading into the difference of that is.
22      Q.   Okay.  So would it be fair to say that several of
23  these are different from S.B. 14?  Nearly all of them?
24      A.   I wouldn't use the word different, but they're
25  similar.

210

1       Q.   Okay.  Well, the driver's license provision doesn't
2   limit the use of expired IDs, correct?
3       A.   It says a Georgia driver's license which was issued,
4   and the difference between the other one says a valid Georgia
5   voter identification card issued or a valid U.S. passport.  I'm
6   not sure what they are meaning by valid.
7       Q.   Okay.
8       A.   Does that mean current?  I don't know.  Why wouldn't
9   they say current?  I just can't answer.
10      Q.   Okay.  But an employee identification card issued by a
11  state --
12      A.   That is different.
13      Q.   It's easier if you don't talk over me.
14      A.   Sorry.
15      Q.   No problem.  And a tribal identification card is not
16  included in S.B. 14, correct?
17      A.   That is different.
18      Q.   Okay.  When Representative Veasey asked you on the
19  floor of the Texas House, "Why should we pass such a stringent
20  bill and stringent law based on rumor and innuendo," isn't it
21  the case what you responded, "S.B. 14 is similar to the case,
22  the legislation that was passed in Indiana, that was upheld by
23  the U.S. Constitution, is similar to the bill that was filed in
24  Georgia that was approved by the Department of Justice"?  Isn't
25  that correct?

211

1       A.   You're reading it, so I assume that it is.
2       Q.   If you'd like me to -- it's on Page 97 of that
3   transcript right in front of you, which is Exhibit?
4       A.   11.  I don't have it.
5       Q.   It is Exhibit 18.  Look at Page 97, onto Page 98.
6       A.   "Similar to the case, the legislation that was passed
7   in Indiana, upheld by the U.S. Constitution" -- should have been
8   Supreme Court.  "It is similar to the bill that was filed in
9   Georgia that was approved by the Department of Justice."  Yes.
10      Q.   Now, you've testified earlier that these bills had a
11  variety of differences, correct?
12      A.   Was that my word?  I can't remember.
13      Q.   Not verbatim, but you just testified that there were a
14  number of differences in terms of the acceptable ID in Georgia
15  versus S.B. 14, correct?
16      A.   I think you were asking me specifically, and I said --
17  when you read the statement, I said that's different and the
18  tribal ID was different.  The others are similar.
19      Q.   Do you still maintain the position that you
20  articulated on the floor, that the reason for passing the bill
21  was that the legislation was similar to what was passed in
22  Indiana and what was passed in Georgia?
23      A.   My testimony on the floor and during the debate was
24  that it was similar.
25      Q.   And do you still maintain that position today?

212

1       A.   I still support what I said on the floor.
2       Q.   How is the legality of S.B. 14 responsive to
3   Representative Veasey's question concerning the need for the
4   law?
5       A.   The legality?
6       Q.   So Representative Veasey asked -- let me rephrase.
7           Representative Veasey asked, "Why should we pass such
8   a stringent bill and stringent law based on rumor and innuendo?"
9   He is asking what is the need for this bill.  And then you
10  responded, S.B. 14 is similar to the legislation in Indiana and
11  in Georgia, Indiana, having been, you asserted, upheld by the
12  U.S. Constitution and Georgia being approved by the Department
13  of Justice.  So that was talking about how those bills were
14  considered legal.  How was your response that S.B. 14 was legal
15  responsive to Representative Veasey's question about why the
16  legislation was needed?
17      A.   All I can tell you is what I said here.
18      Q.   But why did you respond to a question about the need
19  for the bill with an answer saying that the bill would not
20  violate the U.S. Constitution?
21      A.   I can't remember exactly at what point this was, but I
22  think this was about the debate on an amendment and I was
23  responding to the amendment.
24          MR. FREEMAN: I'm going to object to that as
25  nonresponsive and ask you to review the transcript a little bit

Patricia Harless                                           May 15, 2012

---

**213**

1  further back if that provides some context and assistance for
2  you to be able to answer the question.
3      A.  It was in regard to his provision that would gut the
4  bill, is what my testimony is.  And then he continued with his
5  questioning that had nothing to do with his amendment, and I
6  went back to the purpose of his amendment, which the purpose of
7  the bill was that it was similar to Indiana and the U.S.
8  Constitution, and his amendment was trying to gut the provision
9  of the bill.  And I don't know how to answer that any other way.
10         MR. FREEMAN: I'm going to object to that as
11  nonresponsive as well, but we'll move on.
12         THE WITNESS: Can we take a break?
13         MR. FREEMAN: Sure.
14         (Recess from 4:36 p.m. to 5:01 p.m.)
15      Q.  Other than modeling bills on Indiana and Georgia, what
16  did you do to ensure that S.B. 14 was constitutional?
17         MR. SWEETEN: I think to some extent that the
18  question is asking her to reveal thoughts, mental impressions,
19  opinions about the legislation or conversations she's had with
20  legislator's staff, state agencies, Leg Council or constituents.
21  So I think that you're asking about the process and how she came
22  up with the bill.  I think that's squarely within the
23  legislative privilege.
24      A.  Privileged.
25      Q.  Did you make any public statements concerning your

---

**214**

1  efforts to ensure that S.B. 14 was constitutional?
2      A.  I don't know if I made public statements about that or
3  not.
4      Q.  Did you make any public statements or statements on
5  the record concerning your efforts to ensure that S.B. 14 would
6  comply with the Voting Rights Act?
7      A.  I don't know if I made statements on that or not.  I
8  recall making statements that I felt comfortable that it would
9  comply with Section 5 of the Voting Rights Act.
10      Q.  And what was the basis for your comfort?
11      A.  The statements that I said were that we had filed
12  legislation that were similar to Georgia, that had been pre-
13  cleared in Indiana, that had been upheld by the U.S.
14  Constitution, and I think I remember continuing by saying that
15  protected the integrity of the election process, it helped deter
16  and detect in-person voter fraud, and we provided for -- we
17  provided for provisional ballots and free voter certificate
18  card.
19      Q.  And did you take into account the differences between
20  S.B. 14 and the Georgia photo ID bill?
21         MR. SWEETEN: Are you asking her in her public
22  statements or you're asking her did she take it into account in
23  her process?
24         MR. FREEMAN: I'm asking with regard to the
25  public statements that she made, did those public statements

---

**215**

1  take it into account.
2         MR. SWEETEN: Okay.
3      A.  The public statements were that the legislation was
4  drafted similar to those states.  I never said on record that it
5  was identical or the exact same piece of legislation, that it
6  was similar.
7      Q.  And that's -- just so I'm clear, was it your belief
8  that none of these -- strike that.
9         Sitting here today, can you identify any purpose for
10  the change from H.B. 112 to HB-14 as to the use of non-photo ID
11  what the purpose for that change was?
12         MR. SWEETEN: You're asking her thoughts, mental
13  impressions or opinions about the legislation, the differences
14  between that legislation.  It could also implicate
15  communications she's had.  I believe that's legislatively
16  privileged.
17      A.  It was clearly privileged communications.
18      Q.  What does the term legislative emergency mean within
19  the Texas Legislature?
20      A.  You would have to ask the governor that.  I don't know
21  how to define that.
22      Q.  What does a legislative emergency effectively mean
23  within the legislature?  What is the effect of the declaration
24  of legislative emergency?
25      A.  It's my understand that the governor can call issues

---

**216**

1  that are emergency, that are heard during the first part of the
2  legislative session, a priority.
3      Q.  And if something is not declared a priority, it cannot
4  be heard in the beginning of the legislative session; is that
5  correct?
6      A.  There's certain days that it cannot be heard, until
7  committees are organized.
8      Q.  Are there any substantive constraints on what the
9  governor may declare to be a legislative emergency?
10      A.  Not to my knowledge.  I don't know.
11      Q.  Was photographic voter ID declared to be a legislative
12  emergency?
13      A.  I think the photo voter ID was.
14      Q.  Who was responsible for declaring photographic photo
15  ID to be a legislative emergency?
16      A.  The governor.  It's my understanding that only the
17  governor can call an emergency.
18      Q.  Are you aware of any conversations that occurred with
19  the governor concerning what bills would be declared legislative
20  emergencies?
21         MR. SWEETEN: I think if you're asking about the
22  fact of the conversation, if you would just -- I think you're
23  asking subject matter.  We talked about this.  We talked about
24  trying to get through this issue together, and I'll work with
25  you.  I think you've put too much substance into the

Patricia Harless                                                May 15, 2012

217

1    conversation.  If you want to ask about communications she's
2    aware of, I'm comfortable with that.
3              MR. FREEMAN:  I'll rephrase.
4         Q.  Are you aware of any conversations concerning the
5    declaration of legislative emergencies for the 2011 legislative
6    session?
7         A.  I am not aware of any conversations prior to them
8    being declared emergency.
9         Q.  So you didn't participate in any of those
10   conversations?
11        A.  I did not.
12        Q.  Okay.  Do you have any documents relating to the
13   declaration of voter ID as a legislative emergency?
14        A.  Not that I'm aware of.  I'm sure that we were sent
15   something from the governor's office, but I can't tell you for
16   sure I saw it or I have it.
17        Q.  Okay.  So nothing outside the actual declaration
18   itself?
19        A.  Right.
20        Q.  Okay.  Was an election set to occur during the first
21   60 days of the legislative session, to your knowledge?
22        A.  An election?
23        Q.  Uh-huh.
24        A.  In the State of Texas?
25        Q.  Uh-huh.

218

1         A.  I don't know, but I would bet there's some type of
2    municipal or some type of election across Texas.  I don't know
3    though.
4         Q.  Was there a uniform election date -- maybe that's the
5    right term -- set to occur during the first 60 days of the
6    legislative session?
7         A.  If I remember correctly, the uniform election dates
8    are either in May or November, and they're for school board
9    elections or city municipal elections.  So my guess would be no,
10   because May is past 60 days.
11        Q.  Are you aware of any other reason why photographic
12   voter ID was declared to be a legislative emergency?
13        A.  I am not aware.
14        Q.  Okay.  Did you have any role in the development of
15   S.B. 14 before it was submitted for consideration in the Senate?
16        A.  No.
17        Q.  Did your staff?
18        A.  No.  Now, you're asking specifically about S.B. 14,
19   correct?
20        Q.  I am.
21        A.  Because I think we filed a bill in the House that was
22   similar to S.B. 14, if not a duplicate.
23        Q.  If I can put in front of you and mark as Government
24   Exhibit, U.S. Exhibit 23.
25              (Exhibit No. 23 marked)

219

1         Q.  And if you can turn to Page 5.  Now, as you can see on
2    Page 5, this is an indication from the State of Texas in
3    response to questions posed by the attorney general.
4         A.  Uh-huh.
5         Q.  And the State of Texas has indicated that Mr. Beuck
6    assisted with the drafting, development and passage of S.B. 14
7    in the Texas House of Representatives.  Are you aware of any
8    assistance that Mr. Beuck provided concerning the drafting of
9    S.B. 14?
10        A.  I have no idea.
11        Q.  Are you aware of any assistance he provided in the
12   development of S.B. 14?
13        A.  I have no idea.
14        Q.  Did you provide him with any instructions as to the
15   substance of what you wished to be included in S.B. 14?
16              MR. SWEETEN:  I think we're getting into
17   communication that she may have had with Mr. Beuck, her
18   legislative assistant.  I think that if you're asking did she
19   talk with Mr. Beuck, I'll let her answer with respect to that.
20   But as far as what she talked to him about or the specific
21   matters, including Senate Bill 14, I think that those would be
22   privileged, the substance of those.
23        A.  I'm sure we've had conversations about drafting a
24   photo voter ID.
25              MR. SWEETEN:  Don't reveal the substance of

220

1    conversations.  You can reveal the existence of conversations.
2         A.  I would bet that we had conversations.
3         Q.  Are you Mr. Beuck's direct supervisor?
4         A.  Yes.  I can hire and fire him, if that's what you're
5    asking.
6         Q.  Does Mr. Beuck take direction from any other
7    individuals with regard to his work in the Texas Legislature?
8         A.  Not while employed by me.
9         Q.  Does he take any direction from Lt. Governor Dewhurst,
10   his former employer?
11        A.  No.  I have to answer -- I have to assume he doesn't
12   because if he does then he doesn't have a job with me.
13        Q.  Okay.  And I don't mean to imply that he does.
14        A.  Yeah.  Be careful, because we may be having a talk
15   about this tomorrow.
16        Q.  I'm just trying to understand --
17        A.  I --
18        Q.  -- why Mr. Beuck was listed as having assisted with
19   the development of S.B. 14 if you provided no instruction or
20   gave no input with regard to the bill and you are the person who
21   is his immediate supervisor.  I guess if you could explain, to
22   the extent of your knowledge and inside the confines of any
23   instruction your counsel may give, this statement.
24              MR. SWEETEN:  One, I think your question would
25   ask for conversations that she had with Mr. Beuck, who is her

Patricia Harless                                          May 15, 2012

221

1  assistant, and that would be under the umbrella of what we
2  believe is covered by the legislative privilege. Two, I think to
3  some degree your question would ask for thoughts, mental
4  impressions or opinions about legislation or her thoughts about
5  that, and so I think that that's legislatively privileged.
6      A.  You know, we have discussions about legislation I want
7  filed.
8      Q.  Okay.  But you didn't file S.B. 14, correct?
9      A.  I filed -- I am pretty sure I filed a companion bill
10 to S.B. 14.
11     Q.  That was identical in substance to S.B. 14?
12     A.  I think it was.  I can't remember exactly.
13     Q.  And did you provide substantive direction with regard
14 to that companion bill?
15     A.  No.
16     Q.  When was S.B. 14 filed in the Senate; do you know?
17     A.  I don't.
18     Q.  We can refresh your recollection.  This is U.S.
19 Exhibit 8.
20     A.  It says received by the Secretary of State.  That
21 doesn't make sense to me.  Filed 1/12 of 2011.
22     Q.  Does that say the Secretary of the Senate?
23     A.  Yes.  I'm sorry.
24     Q.  So January 12th?
25     A.  Yes.

222

1      Q.  And when did S.B. 14 pass out of the Senate?
2      A.  Testimony taken, record vote, reported favorably.  So
3  it was reported favorably without amendments.  I'm not exactly
4  sure because their procedures are different than ours.
5      Q.  Was it -- on Page 6 does it note that it was reported
6  engrossed from the Senate on January 26?  Do you see that?  The
7  last one that says S before it starts saying H?
8      A.  Yes.  It says reported engross, January 26.
9      Q.  And when was the bill referred to the Select Committee
10 on Voter Identification and Voter Fraud?
11     A.  2/11.
12     Q.  So February 11th?
13     A.  Yeah.  It was read in the House on the 11th and
14 referred to the committee on the 11th.
15     Q.  How were you chosen as the House sponsor?
16     A.  I don't know.
17     Q.  Did you ever ask Senator Fraser or speak to Senator
18 Fraser about it?
19     A.  I would say that's privileged.
20         MR. FREEMAN: Unless your attorney asserts
21 privilege, I'll ask you to answer.
22         THE WITNESS:  Wake up.
23         MR. SWEETEN:  Actually, with respect to any
24 conversation she had with Senator Fraser, that's legislatively
25 privileged.

223

1         MR. FREEMAN:  You're a good student.
2         MR. SWEETEN:  She's only heard it, what, 200
3  times today?  Sorry.  I was communicating with Matt over here.
4      Q.  Did you ever have a conversation with Speaker Straus
5  on the general subject of House sponsorship of S.B. 14?
6         MR. SWEETEN:  You can answer the question as
7  phrased.
8      A.  Yes.
9      Q.  When did that discussion occur?
10     A.  Probably after he was elected Speaker, before
11 committee assignments came out.
12     Q.  How long did you speak for?
13     A.  Oh, when he and I spoke?  Usually five minutes, two
14 minutes.
15     Q.  Who else was present?
16     A.  I don't think anyone was.
17     Q.  Who initiated the conversation?
18     A.  I did.
19     Q.  Was that the only conversation that you had on that
20 subject?
21     A.  Pertaining to photo voter ID?
22     Q.  And sponsorship in the House.
23     A.  We may have had one more.
24     Q.  Did you ever have any conversations with Chairman
25 Bonnen on the same subject?

224

1         MR. SWEETEN:  Again, you can answer as to whether
2  a conversation occurred.  Don't reveal any of the contents.
3      A.  No.
4      Q.  Were any of these conversations documented in
5  memoranda or e-mail?
6      A.  No, not that I know of.
7      Q.  Okay.  When did you find out that you would be the
8  House sponsor of S.B. 14?
9      A.  When Chairman Bonnen issued a press release and sent
10 it out through House administration, and I got the press
11 release.
12     Q.  He didn't speak to you first?
13     A.  No.  The dynamics in the House are different.
14         MR. SWEETEN:  Okay.  Just answer his question.
15     Q.  Based on the history of the bill that you have in
16 front of you, how long did the bill take to pass out of the
17 select committee to the floor of the House?
18     A.  It was referred to the select committee on 2/11 and
19 scheduled for a committee hearing on 3/1.  Testimony was taken
20 on 3/1, was left pending on 3/1, and it was voted out with a
21 committee substitute on 3/7 and recorded favorably on 3/7.
22     Q.  So it was only in committee for a week; is that
23 correct?
24     A.  From the date it was referred was 2/11 to 3/7.  So
25 that was a month.

225

1    Q.   But from the first hearing to the final hearing, it
2    was just a week; is that correct?
3    A.   From the date that it was heard for public comment on
4    3/1 to voted out on 3/7, six days.
5    Q.   Just to loop back real quickly, why did you go to
6    Speaker Straus to talk to him about sponsorship of S.B. 14 in
7    the House?
8        MR. SWEETEN:   I think your question would require
9    her to reveal thoughts, mental impressions, opinions about
10   legislation, legislative process, and would require her to
11   reveal communications with Speaker Straus, and, therefore, I'm
12   going to object as legislatively privileged.
13   A.   Privileged.
14   Q.   Okay.  Did you have any additional conversations with
15   Senator Fraser concerning S.B. 14 on the general subject?
16   A.   Prior to it getting referred to the House in the press
17   release?
18   Q.   Yes.
19   A.   I don't recall if I did.
20   Q.   Did you have any conversations with Senator Fraser on
21   the subject of S.B. 14 after it was referred to the House?
22   A.   I don't think I had any conversations with him prior
23   to Dennis Bonnen doing his press release that I would carry it.
24   Q.   Did you have any conversations with Senator Fraser
25   after Chairman Bonnen's press release?

226

1    A.   I could have.  I don't remember specifically.
2    Q.   So you don't recall any specific conversations with
3    Senator Fraser even after you were carrying his bill?
4    A.   Yes.  We -- after we started moving the bill forward.
5    Q.   Okay.
6    A.   We had conversations, but not -- I don't recall
7    anything from the -- from before we had the hearing to the time
8    it got to the floor.  After we had the hearing, I'm sure we had
9    conversations.
10   Q.   Okay.  When did those conversations occur?
11   A.   You know, I don't remember.
12   Q.   Do you remember approximately how many there were?
13   A.   I know I went to his office and visited with him once
14   and maybe visited with his staff one other time.
15   Q.   Okay.  When you visited with him, was anyone else
16   present?
17   A.   I know my chief of staff and his chief of staff were
18   there.
19   Q.   Is his chief of staff Janice McCoy?
20   A.   Yes.  I think that's her title.
21   Q.   Okay.  And when you met with his staff, who was
22   present?
23   A.   Janice and Colby.
24   Q.   So just the three of you?
25   A.   Yes.

227

1    Q.   Okay.  Did you ever e-mail with Senator Fraser or his
2    staff?
3    A.   I don't recall e-mailing Senator Fraser at all and I
4    don't recall e-mailing Janice.  May have, but I don't recall it.
5    Q.   Okay.  Did you ever instruct Mr. Beuck to e-mail
6    Janice?
7    A.   I don't recall instructing him to e-mail her.
8    Q.   Uh-huh.
9    A.   But I know that he probably did e-mail her during the
10   course of the legislation moving.
11   Q.   Okay.  Was the period of time between when S.B. 14 was
12   first addressed in a public hearing and when it was passed out
13   of committee shorter than usual for a major bill like this?
14   A.   Actually, I don't think it is.
15   Q.   Okay.  What does it mean for a bill to be placed on the
16   emergency calendar?
17       MR. SWEETEN:   I think that's been asked and
18   answered, but go ahead.
19   A.   I don't know what the rules are.
20   Q.   Okay.  You haven't served on the rules committee?
21   A.   Served on Rules and Resolutions, but --
22   Q.   I'm sorry.  Calendars committee?
23   A.   No, I have not.
24   Q.   Okay.  So you're not aware of the distinction between
25   the emergency calendar and any other calendar?

228

1    A.   I'm not.  I probably should be.  I'm not.
2    Q.   Does the Calendar committee control who puts bills on
3    the emergency calendar?
4    A.   I am not aware.  I'm not advised.
5    Q.   Okay.  Were any changes introduced to S.B. 14 in the
6    conference committee that had not been in the version of the
7    bill passed by either House?
8        MR. SWEETEN:   You mean the House or the Senate?
9    Q.   Either House of the Texas Legislature.
10   A.   Yes.  I know from the floor we had a resolution on the
11   changes in the Conference committee.
12   Q.   And what were those changes?
13   A.   There were several.  We defined the voter certificate
14   election card.  We took out an amendment on the -- we deleted
15   some of the amendments.  I can't remember all of them.  I had an
16   outside-of-the-bounds resolution.
17   Q.   And what does an outside-of-the-bounds resolution
18   mean?
19   A.   It means that when something is different that was in
20   the House version or the Senate version that hadn't been in
21   either, it has -- you have to have a vote on allowing the
22   membership to do that.
23   Q.   How often does that happen?
24   A.   During the last few days of session, when we're doing
25   conference committee reports, it happens more often than

Patricia Harless                                                    May 15, 2012

---

229

1   probably we would like.
2       Q.   And why was the exemption based on religious beliefs
3   added back in in conference?
4            MR. SWEETEN:  Hold on a minute.  You're asking
5   her, I believe, to reveal thoughts, mental impressions or
6   opinions about legislation.  I think the "why" question does
7   that.  It also could require her to reveal communication.  So I
8   think that is within the confines of what is legislatively
9   privileged.  Instruct her accordingly.
10      A.   If I could remember, I would probably say it was
11  privileged.
12      Q.   So you didn't make any public statements regarding
13  that, of which you're aware?
14      A.   Not that I'm aware.  There could have been when we did
15  the outside-of-the-bounds resolution.  I don't know.
16      Q.   And do you recall what changes were included
17  concerning the election identification certificate in the
18  out-of-the-bounds resolution?
19      A.   There was a clarification to make sure the discussion
20  was -- during the debate Representative Anchia raised a concern
21  that the free ID card would draw funds out of the Texas Mobility
22  Fund.  So the out-of-the-bounds resolution and the change was to
23  clarify that it would be election certificate voter card -- I
24  forget the proper name -- and that it would not draw from the
25  Texas Mobility Fund.

---

230

1       Q.   Are you aware of the date on which the governor signed
2   S.B. 14?
3       A.   I bet it's in here.
4       Q.   Feel free to refresh your recollection.
5       A.   Signed by the governor on 5/27.
6       Q.   To your knowledge has the Secretary of State enforced
7   any part of S.B. 14 concerning photographic voter ID?
8       A.   To my knowledge, they have not.
9       Q.   Are you aware of any local election official who has
10  enforced any part of the photographic voter ID requirements of
11  S.B. 14?
12      A.   To my recollection, no.
13      Q.   Okay.  Have you heard of any reports of confusion
14  concerning voter ID requirements leading up to the upcoming
15  primary in a couple weeks?
16      A.   I have seen a press release issued by a senator in
17  Harris County instructing the Secretary of State to make sure
18  that there is not confusion.
19      Q.   Who is that senator?
20      A.   I think it was senator Rodney Ellis from Harris
21  County, I think.
22      Q.   And are you aware of the reason why Senator Ellis
23  issued that press release?
24      A.   No.
25      Q.   Okay.  Who were the main opponents of S.B. 14.

---

231

1       A.   People?
2       Q.   Individuals.
3            MR. SWEETEN:  I just want to make sure that
4   you're not revealing communication with other legislators,
5   legislation staff, state agencies, Legislative Council,
6   constituents.  And don't reveal thoughts, mental impressions,
7   opinions about the legislation.  To the extent you can answer
8   that question without doing so, you can answer.
9       A.   I think from the committee testimony and the debate on
10  the floor, probably the most vocal in opposition to the
11  legislation, if I remember correctly -- I know Anchia, Rafael
12  Anchia.  I know Mark Veasey.  I remember a number of times with
13  back-and-forth debate with Represent Richard Raymond.  I think
14  there were some -- I know Yvonne Davis offered a couple of
15  amendments, one which I took.  Representative Donna Dukes
16  offered a couple amendments, and I think we adopted one of her
17  amendments, I think.
18      Q.   Are you aware of any outside groups who were opposed
19  to S.B. 14?
20           MR. SWEETEN:  Again, don't reveal communications
21  with other legislators, with legislative staff, state agencies,
22  Texas Leg Council or constituents in answering this question.
23      A.   Other than the people that testified in committee
24  against it, those are the only ones.
25      Q.   And who were those?

---

232

1       A.   MALDEF testified.  I think LULAC testified.  I think
2   there were some individuals representing different minority
3   groups that testified.
4       Q.   Were there any minority groups that testified in favor
5   of the bill?
6       A.   There were some minorities that testified in favor of
7   the bill.  I don't know what groups they were associated with.
8       Q.   Can you, sitting here today, identify any minority
9   groups that testified in favor of the bill in committee
10  hearings?
11      A.   I can't recall specifically what groups they were
12  with.
13      Q.   Did it concern you at all that all the major minority
14  groups were opposed to S.B. 14?
15           MR. SWEETEN:  Don't reveal your thoughts, mental
16  impressions or opinions about the legislation or communications
17  with the groups that we've discussed.
18      A.   Okay.  I don't know that I can define all the minority
19  groups, but if I were to, it was probably privileged
20  communication.
21      Q.   I'm not asking for any communication between different
22  legislators.  I'm asking with regard to major groups that you've
23  named.  And based on your inability to name groups that were in
24  favor of the bill representing minority voters, did it concern
25  you that the major groups all lined up against the bill?

Patricia Harless                                              May 15, 2012

233

1          MR. SWEETEN:  When you're asking about her
2   concern, you're asking her to reveal her thoughts, her mental
3   impressions and her opinions about legislation.  I think that
4   directly asks that.  So I think that's squarely within the
5   legislation privilege.  I'm going to instruct you not to answer.
6          A.  Privileged.
7          Q.  Okay.  Did you at any time learn of any election
8   officials who were opposed to S.B. 14?
9          A.  I can't recall if any testified in committee against
10  it.  That's not to say there were or weren't.  I just can't
11  remember.
12         Q.  Okay.  Are you aware of any constituents who testified
13  against S.B. 14?
14         A.  That is possible, but I can't remember.
15         Q.  Did any one of your constituents, without prompting
16  from your office, reach out to your office to offer their
17  opposition to S.B. 14?
18         MR. SWEETEN:  With respect to the substance of
19  conversations between constituents and Representative Harless'
20  office, I believe that would be a matter that is legislatively
21  privileged and would fall within one of the communication areas
22  that I've been objecting to today.  Don't reveal the substance
23  of any communications with constituents.
24         THE WITNESS:  I don't understand.  Do I answer the
25  question?

234

1          MR. SWEETEN:  If you can't answer that question
2   without revealing the substance of conversations between you and
3   constituents, then you can't answer the question and tell him
4   so.
5          A.  Okay.  It's privileged.
6          Q.  Okay.  And did you take any steps to address the
7   concerns expressed in the hearings or elsewhere by minority
8   groups?
9          A.  I think the testimony on the floor was that we
10  provided for the approved forms of identification.  If someone
11  did not have one of the approved forms, we would provide them
12  with free identification card in order to vote.  And the bill
13  was drafted with funds set aside for education and an
14  opportunity for, as we have now, ballot by mail if you're a
15  senior or disabled.  We put in all the safeguards.
16         MR. FREEMAN:  Going to object to that as
17  nonresponsive, and I guess I'll rearticulate.
18         Q.  Can you identify today any changes that were made to
19  S.B. 14 in response to concerns articulated by minority groups
20  during the hearings held by the Select Committee on Voter
21  Identification and Voter Fraud?
22         Mr. SWEETEN:  Other than matters of public
23  record, including committee hearings or House proceedings, your
24  question is asking her to reveal thoughts, mental impressions,
25  opinions about the legislation or communications between

235

1   constituents, legislators, legislative staff, state agencies or
2   Texas Legislative Council.  I will instruct you to only answer
3   to the extent you are not revealing matters that are subject to
4   the privilege.
5          A.  It's privileged.
6          Q.  Okay.  Were you ever concerned that failing to address
7   the concerns of minority voters and the groups representing
8   minority voters might have an impact on preclearance of S.B. 14
9   under Section 5 of the Voting Rights Act?
10         MR. SWEETEN:  You're asking her to reveal her
11  thoughts, mental impressions or opinions about the legislation,
12  therefore, it's legislatively privileged.
13         A.  My testimony on the floor was that I felt that we had
14  met the constitutional standards laid out in Georgia's
15  legislation with -- providing the ability to deter and detect
16  fraud, providing for a free ID card, a disabled exemption,
17  religious exemption.  We met all the tests.
18         Q.  Okay.
19         A.  To meet Section 5.
20         Q.  Why did you think there was such strong opposition to
21  S.B. 14?
22         MR. SWEETEN:  I think that question asks her to
23  reveal thoughts, mental impressions, opinions about legislation
24  Senate Bill 14, and it also could ask her to reveal
25  communications among the groups or individuals that we've

236

1   listed, and is therefore legislatively privileged.
2          Q.  Is your response that any response would be
3   privileged?
4          A.  Yes.
5          Q.  Okay.  Did you ever make any public statements about
6   the opposition to the bill that you recall?
7          MR. SWEETEN:  You can answer.
8          A.  Possibly.  There may be.
9          Q.  Do you have your op-ed in front of you?
10         A.  I do, somewhere.
11         Q.  I believe that's it.  Did you ever refer to the claims
12  made by opponents of photo ID as spurious?
13         A.  If it's in here, I guess I did.
14         Q.  It's on the bottom of the first page, last sentence of
15  the first page.  And this is Exhibit No. 19.
16         A.  Yes.  And then I proceeded by quoting Justice Stevens'
17  opinion that includes, "Burdens arising from life's" -- I can't
18  read it.  It's typed over.
19         Q.  Would it be "vagaries"?
20         A.  Yeah -- "however, are neither so serious or frequent
21  as to raise questions about the constitutionality of the photo
22  voter ID."
23         Q.  Are you aware of what the legal test is under
24  Section 5 of the Voting Rights Act?
25         A.  I don't recall it.

Patricia Harless                                                    May 15, 2012

### 237

1    Q.   Are you aware of whether Crawford V. Marion County
2   Board of Elections was a case under the Voting Rights Act?
3    A.   That's the Georgia?
4    Q.   No.  That's the Indiana.
5    A.   Indiana?  No, that was not subject to preclearance.
6    Q.   And are you aware of whether that case addressed
7   whether the photo ID legislation would have a disparate impact
8   on minority voters, a greater impact on minority voters than on
9   Anglo voters?
10    A.   I don't remember the specifics of the case.  I have
11   read it, but I don't remember.
12    Q.   How would you define spurious?
13    A.   I couldn't define that.  And I'd like to take complete
14   authorship of this, but my staff pretty much wrote a lot of
15   this.  And I'm sorry.
16    Q.   Were all of the arguments made against photo ID
17   requirements just concerning the constitutionality of the photo
18   ID requirement?
19          MR. SWEETEN:  Are you asking about arguments made
20   at the hearing or are you --
21          MR. FREEMAN:  We can start with public.
22    Q.   Say that one more time.
23    Q.   Were all of the arguments made against photo ID
24   arguments that photo ID would be unconstitutional?
25          MR. SWEETEN:  He's asking about public, so I'm

### 238

1   not going to make an instruction.
2    A.   I don't recall.
3    Q.   Did anyone argue that it was simply not necessary?
4          MR. SWEETEN:  This is still as to public?
5          MR. FREEMAN:  In public.
6    A.   I'm sure there were witnesses that said that it wasn't
7   necessary.
8    Q.   And did Crawford V. Marion County Board of Elections
9   address whether photo ID was good policy?
10    A.   I don't recall that in Indiana's testimony.
11    Q.   Does the Supreme Court ordinarily pass on whether a
12   law is good policy?
13    A.   I don't know what the Supreme Court does.
14    Q.   Okay.  Did you ever discuss whether S.B. 14 might
15   impact minority voters more than it impacted Anglo voters with
16   anyone?
17          MR. SWEETEN:  I'm going to object.  I think
18   you're asking for information that relates to mental impressions
19   or communications between legislators, legislative staff, Texas
20   Legislative Council or constituents.  To the extent it does so,
21   I'm going to instruct you not to answer based on legislative
22   privilege.
23    A.   It's privileged.
24    Q.   Did you ever have any discussions of disproportionate
25   impact on the public record?

### 239

1    A.   On the public record, I felt like -- I remember
2   testifying that I felt that it would affect all Texans equally.
3    Q.   Were you concerned that S.B. 14 might
4   disproportionately and negatively impact minority voters?
5          MR. SWEETEN:  I think you're asking for her to
6   reveal thoughts, mental impressions, or opinions about
7   legislation, particularly Senate Bill 14, which is privileged.
8   Don't answer the question.
9    A.   Privileged.
10    Q.   Did you seek any advice on whether S.B. 14 complied
11   with Section 5 of the Voting Rights Act?
12          MR. SWEETEN:  Same objection.
13    A.   That's privileged.
14    Q.   What was your strategy to ensure that S.B. 14 was
15   passed on the House floor?
16          MR. SWEETEN:  Same objection.  Don't answer the
17   question.  It's legislatively privileged.
18    A.   It's privileged.
19    Q.   How did you prevent chubbing?
20          MR. SWEETEN:  Good lord.  Chubbing?
21          MR. FREEMAN:  Chubbing.
22          MR. SWEETEN:  That sounds like it would ask her to
23   reveal mental impressions, opinions about legislation.  So I'm
24   going to object as legislatively privileged.
25    A.   There was never any debate about chubbing on the

### 240

1   floor.
2          MR. FREEMAN:  Mr. Sweeten, after this deposition
3   we can have a discussion about what chubbing is.  That's fine.
4          MR. SWEETEN:  I'd like to know what chubbing is.
5          THE WITNESS:  I know what chubbing is.
6    Q.   How did you prepare for the floor debate?
7          MR. SWEETEN:  To the extent that that question
8   would require you to reveal communications between legislators,
9   legislation staff, state agencies, Texas Legislative Council,
10   constituents or would reveal your thoughts, mental impressions
11   or opinions about the legislation, don't answer the question.
12    A.   It would do all of those.
13    Q.   Did you have any discussions with any individuals on
14   the general subject of the floor debate prior to the floor
15   debate?
16          MR. SWEETEN:  I'm going to let you answer to
17   whether or not you had discussions and the names of the
18   individuals.  Do not reveal the substance of the communication.
19    A.   I had discussions with members of the House that were
20   going to help me with the floor debate.  Discussions with my
21   staff.  I'm trying to remember if there were anyone else.
22   Possibly discussions with Janice.  Possibly discussions with an
23   employee with the Lt. Governor's office.
24    Q.   And who was that?
25    A.   Brian Herbert.

Patricia Harless                                                      May 15, 2012

```
                                        245
 1      A.  I think on occasion, when a member has gone to the
 2   back mike, if I remember correctly and said, please let the
 3   remarks be recorded in the journal, the speaker has said, it's
 4   already been done.  So I don't know what the distinction is.
 5      Q.  But not everything will automatically show up in the
 6   House journal, correct?
 7      A.  Yes.  That's a true statement.
 8      Q.  Good enough.  Can you turn to Amendment 15 on Page 969
 9   and take a look at that amendment.
10      A.  Amendment 15?
11      Q.  That's correct.  When Amendment 15 was offered -- well,
12   first, can you explain what the purpose of Amendment 15 was, to
13   the extent of your understanding?
14          MR. SWEETEN:  I'm going to let you discuss it to
15   the extent it appears on public record or you can refer to
16   hearings or committees.  He's asking about purpose though
17   potentially invades your impressions, to reveal thoughts, mental
18   impressions, opinions about the legislation, including that
19   amendment offered on Senate Bill 14.  Also could implicate
20   communications that you've had.  Therefore, I want you to be --
21   to answer to the extent it does not invade legislative
22   privilege.
23      A.  I'm not sure what this was about.
24      Q.  Well, can you explain the substance, what it would do?
25      A.  It says fees prohibited for certain forms of
```

```
                                        246
 1   identification documents, and it references the election code
 2   strikes.  So I'm not sure exactly what this amendment did except
 3   for it's saying you can't charge any fees for identification
 4   documents.
 5      Q.  And isn't it the case that Amendment 15 would have
 6   prohibited fees needed -- fees to obtain a document that may be
 7   used as proof of identification under S.B. 14?  Isn't that
 8   correct?
 9      A.  I'm not sure.  The way it reads, it says for certain
10   forms of identification.  I don't know if they're the same forms
11   that are required to get a driver's license or ID or different
12   forms or -- I can't answer it.
13      Q.  Why did you move to table this amendment?
14          MR. SWEETEN:  Don't answer that.  It would
15   require you to reveal your thoughts, mental impressions,
16   opinions about the legislation.
17      A.  It's privileged, unless it's in the record.
18      Q.  During the debate, do you recall saying that the bill
19   was about voter ID, not issuing documents for free ID?  And I
20   can put in front of you what we're going to mark as U.S. Exhibit
21   24.
22          (Exhibit No. 24 marked)
23      Q.  This is Volume II of the full transcript.  And if you
24   look to Page 12.  And perhaps if you could take a look at
25   Representative Martinez's statement, you can get a better sense
```

```
                                        247
 1   of the bill as well, the amendment.
 2      A.  That's what I said.
 3      Q.  And now that you've read Representative Martinez's
 4   statement, can you tell me what the amendment would have done?
 5      A.  It -- his statement talks about, he doesn't know where
 6   his birth certificate is.  It's probably at his mom's house.  If
 7   he had to get a certified copy of his birth certificate he would
 8   have to go down to the vital statics and pay $22 in order to get
 9   that.
10      Q.  And so essentially, isn't it the case that this
11   amendment would make it free to get the documents that you need
12   to get the free ID?  Is that correct?
13      A.  I don't know that the people that would -- this bill
14   was about providing integrity in the election process and
15   protecting the election process.
16          MR. SWEETEN:  You want to confine your answers to
17   the matters of the public record.  I don't want you to go into
18   reveal thoughts, mental impressions or opinions about the
19   legislation.  So there's a line here.  Clearly, you can discuss
20   the public record.  You can discuss his questions to the extent
21   they appear in the House journal, but I don't want you to go
22   into your mental impressions, opinions about the legislature.
23      A.  And I'll stay with my statement that I said on the
24   record that the bill was about photo ID and not issuing
25   documents for free IDs.
```

```
                                        248
 1      Q.  But didn't you earlier say that it was important that
 2   an election identification certificate be available for free in
 3   order for this not to have a negative impact on any Texans,
 4   including minority Texans?
 5      A.  I don't know if I said it was important.  I said one
 6   of the provisions was a free voter certificate card for people
 7   that didn't have one of the approved forms of devices --
 8   devices?  -- of IDs.
 9      Q.  Okay.  And so I guess I'll ask again, if that was one
10   of the elements of S.B. 14 that helped make it legal, that that
11   ID be available for free, for that to be a free ID, doesn't it
12   need to be free to get the documents that you need to get the
13   free ID, as a matter of logic?
14      A.  I think that's privileged.
15          MR. SWEETEN:  Yeah.  Don't reveal your thoughts,
16   mental impressions, opinions about the legislation.  Okay?
17      Q.  Okay.  I'll simply ask for the record one more time,
18   why did you move to table Amendment 15?
19          MR. SWEETEN:  Same objection.  Refer to matters of
20   public record, that it's legislatively privileged.
21      A.  I said, "Members, I'd like to move to table this
22   motion.  This bill is about voter ID and not about issuing free
23   IDs, not about issuing documents for free IDs."
24      Q.  If you could please turn to Page 979 and Amendment No.
25   23 and take a look at that amendment real quickly.
```

Patricia Harless                                                May 15, 2012

---

249

1    A.   979?
2    Q.   979 of the House journal, which is again Exhibit No --
3    A.   9.
4    Q.   Yes, 9.
5    A.   Amendment number?
6    Q.   23, offered by Representative Dutton?
7    A.   It's an amendment to allow for student identification
8    cards by public, private high school or institution of
9    education.
10   Q.   Do you recall telling Bloomberg News -- I believe I
11   showed you the article earlier -- that you wanted a form of
12   identification that was easily recognized by poll workers at the
13   election site?
14   A.   I haven't seen the article, but I remember that
15   statement.
16   Q.   You do remember making that statement?
17   A.   I don't know who I made that statement to, but I've
18   made that statement before.
19   Q.   It's Exhibit 10.  I believe you should have it in
20   front of you, if you want to take a look and refresh your
21   recollection.
22   A.   I've got 11, 4, 12, 7, 6.  Do you know about where it's
23   at?  Where it says "Election Integrity, Harless, Republican
24   State Rep, said concerns of constituents about 'the integrity of
25   elections' rather than possible partisan advantage explains why

---

250

1    she sponsored the voter ID measure last year.  The law reduces
2    the possibility of fraud, she said.  Lawmakers excluded student
3    IDs because 'we wanted a form of identification that was easily
4    recognized by poll workers at the election site.'"
5    Q.   So that's a correct statement?
6    A.   Yes.  That's what it says there.
7    Q.   Bloomberg does a better job of quoting than the
8    Houston Chronicle?
9    A.   I don't know.  I recognize saying that statement
10   before.
11   Q.   Okay.
12   A.   Whether it was in this record or that.
13   Q.   Okay.  Didn't you previously testify that your polling
14   place is at a school?
15   A.   At my current home?
16   Q.   Uh-huh.
17   A.   Yes.
18   Q.   So isn't it likely that there wouldn't be more than
19   one or two, a few different high school IDs at any given polling
20   place?
21   A.   I couldn't even speculate on that.
22   Q.   Okay.  Are you aware of how many forms of
23   identification are issued by the United States military?
24   A.   I'm not sure what your question is.
25   Q.   Are you aware of how many forms of identification, how

---

251

1    many different IDs are issued by the United States military?
2    A.   In the record we talked about the military ID.  And if
3    I remember correctly, when asked about that, my response was the
4    military identification is a card issued by one of the branches
5    of the service.  Other than that, I don't know.
6    Q.   Are you aware of whether they issue identification
7    cards to contractors?
8    A.   I'm not aware of any of that.
9    Q.   Are you aware of whether they issue identification
10   cards to family members of active military soldiers?
11   A.   I am not aware of any of that.
12   Q.   Are you aware of whether they issue identification
13   cards to veterans?
14   A.   The active branches of the military?
15   Q.   Or the Veterans Administration?
16   A.   I am aware that the Veterans Administration issues
17   IDs.
18   Q.   And are you aware of whether the military issues ID
19   cards to reservists?
20   A.   I don't know.
21   Q.   Did you assess, when you were working on S.B. 14, how
22   many ID cards were issued by the United States military?
23   MR. SWEETEN:  Don't reveal thoughts, mental
24   impressions, opinions about the legislation.  Don't reveal
25   communications between legislators, legislative staff, state

---

252

1    agencies, Leg Council or constituents.
2    A.   That's privileged.
3    Q.   Do you believe that poll workers will be able to
4    easily recognize military IDs?
5    A.   I think that they are a standardized form.
6    Q.   What is the basis for that belief?
7    A.   If it's issued by one of the branches of the military.
8    If they're a Marine, they have a Marine card.
9    Q.   Have you ever seen a military ID?
10   A.   I think I probably have.
11   Q.   Could you tell me what it looks like.
12   A.   I can't off the top of my head.
13   Q.   Why does S.B. 14 allow military identification and not
14   college identification as a permissible form of ID?
15   MR. SWEETEN: Objection, calls for matters of
16   legislative privilege and asks her to reveal thoughts, mental
17   impressions, opinions or communications she's had with the
18   entities or individuals I've previously named.
19   A.   That's privileged.
20   MR. SWEETEN:  Instruct her not to answer.
21   Q.   Are you aware of the demographics of the college
22   population in the State of Texas?
23   A.   I am not.
24   Q.   Are you aware of whether the population in the State
25   of Texas that is currently attending college is a higher

---

253

1    percentage minority than the population of the state as a whole?
2         A.  I'm not.
3         Q.  Okay.  If you can turn to Amendment No. 30, which is
4    on Page 984, onto 985.  And Amendment 30 added a valid
5    identification card that contains the person's photograph and is
6    issued by a tribal organization to the list of acceptable IDs,
7    correct?
8         A.  Yes.
9         Q.  And you didn't oppose this amendment, correct?
10        A.  Um, we had --
11             MR. SWEETEN:  Just reveal it as to matters of
12   public record.  Don't reveal your thoughts or mental impressions
13   or opinions.  So oppose could be -- if it's a public matter, you
14   can discuss it.   If it's a mental impression or opinion about
15   the legislation, do not.
16        A.  We had considerable amount of debate on the floor or
17   dialogue on the floor about this.  Representative Gonzalez
18   offered the amendment, if I remember correctly.  Then she pulled
19   it down, went to seek counsel with other members, came back with
20   the other members, offered the amendment back.  And we discussed
21   that, in her opinion, all tribal cards were issued by an agency
22   of the federal government.
23        Q.  Uh-huh.
24        A.  And we had a discussion -- I don't remember the
25   specifics of it, but it was on the record -- that if she could

254

1    provide me with the information that she was quoting from then I
2    would keep this amendment in the legislation.
3         Q.  Uh-huh.
4         A.  But if she could not provide that, we would not keep
5    it.  We would accept it based on her response that she had this
6    information.
7         Q.  And so is it your statement, then, that it came out in
8    the conference committee because she did not provide that
9    information?
10             MR. SWEETEN:  Same instruction.
11        A.  That's privileged conversation.
12        Q.  You told the Texas Tribune that these IDs do not have
13   a single standardized form; is that correct?
14        A.  If that's what it says I did.
15        Q.  And what was the basis for that statement?
16        A.  That would be privileged conversation.
17        Q.  Are you asserting that the --
18        A.  I'm sorry.  I'm not allowed to do that.
19             MR. SWEETEN:  Go ahead.  You can ask your
20   question again.
21        Q.  What was the basis for your statement to the Texas
22   Tribune that tribal ID do not have a single standardized form?
23             MR. SWEETEN:  You can discuss a public statement,
24   but you can't at the same time reveal thoughts, mental
25   impressions or opinions about the legislation.  So I think that

255

1    would be legislatively privileged.  Public matter, though, you
2    can answer questions about the statement, but don't reveal the
3    privileged information.
4         A.  The statement was based on privileged information from
5    conversations with colleagues.
6         Q.  Okay.  What about enhanced tribal IDs issued by the
7    federal government?  Aren't these in a single standardized form?
8         A.  If I remember correctly, that was the term that she
9    used during her presentation of the amendment.
10        Q.  Uh-huh.
11        A.  And could not confirm -- or there was never any proof
12   in the record that she knew that those were the types of IDs
13   that were presented in Texas.
14        Q.  Do you know how many state or federally recognized
15   tribes there are in Texas?
16        A.  I know we discussed that on the floor.  I can't
17   remember.  I remember the debate being about 5,000 tribal
18   members in Texas, but I don't know how many select tribes.
19        Q.  If I can just get -- this is U.S. 25.  And if you can
20   just take a look under Texas and see if you can refresh your
21   recollection.
22             (Exhibit No. 25 marked)
23        A.  I don't recall ever seeing this document at any time
24   during the debate.
25        Q.  Sure.

256

1         A.  But on this document it says there are three tribes in
2    Texas.
3         Q.  And so there would only be three forms of ID that we
4    are talking about, right?
5         A.  There are three tribes in Texas.  I don't know if they
6    offer different IDs for different members of the tribe.  I don't
7    know.
8         Q.  So, again, why does S.B. 14 permit military ID but not
9    tribal ID?
10             MR. SWEETEN:  Don't reveal thoughts, mental
11   impressions or opinions about the legislation.
12        A.  Privileged.
13        Q.  Okay.  If we can move on to Amendment 34, which is
14   House Journal Page 987.  Take a quick look.
15        A.  Okay.
16        Q.  Have you taken a look?
17        A.  Amendment 34 would have rendered the act unenforceable
18   if it did not comply with Section 5, Sectin 203 or Section
19   4(f)(4) of the Voting Rights Act, correct.
20        A.  Yes.
21        Q.  Now, you earlier stated that the Texas Legislature
22   considered, as part of its process, why -- whether a law
23   complies with federal law and federal Voting Rights Act,
24   correct?
25        A.  Say that one more time.

Patricia Harless                                                    May 15, 2012

257

1    Q.   You earlier testified that as part of the legislative
2    process you would consider whether a law complied with federal
3    law and the federal Voting Rights Act, correct?
4         MR. SWEETEN:  Objection.  I'm not sure that
5    accurately characterizes the specific testimony.
6    A.   And I agree.  I don't remember specifically what I
7    said.
8    Q.   Earlier in the deposition you said that during the
9    drafting process you depended on the Texas Legislative Council
10   to ensure that laws complied with federal law and the federal
11   Voting Rights Act.
12   A.   I agree I said something similar to that, yes.
13   Q.   But -- and on Page 988 near the top, your third
14   statement, you said, "As I said before, this is a federal issue
15   to be decided by the federal courts.  This isn't for us in the
16   Texas Legislature to discuss right now."
17   A.   That was taking a statement out of context from the
18   record.
19   Q.   I'm asking you if you made that statement.  And if
20   you'd like, I can ask you if you'd like to explain that
21   statement in context.
22        MR. SWEETEN:  Let's just answer the question he's
23   asking.  I think he's asking did you make that statement.
24   Q.   Did you make that statement?
25   A.   Yes.

258

1    Q.   Would you like to provide context -- could you provide
2    context for that statement?
3         MR. SWEETEN:  I'm going to instruct her not to
4    reveal thoughts, mental impressions or opinions about the
5    legislation.  She can refer to matters of the public record.
6    A.   I think during the debate it was discussed that the
7    legislation is drafted to comply with the Voting Rights Act.
8    Q.   But you stated that this was not an issue for the
9    Texas Legislature, it was an issue for the federal courts,
10   correct?
11   A.   The debate that he wanted to have in the record --
12        MR. SWEETEN: Just answer his question.  Did you
13   state that?
14   A.   Yes, I stated that.
15   Q.   I'll ask you, since your counsel did not object or
16   provide an objection to stop your testimony, I would ask you to
17   complete the statement that you were making.
18   A.   In this debate that we were having, I wanted to
19   debate the need for the Voting Rights Act.  And I told him I
20   don't think this is the place to debate that.
21   Q.   Okay.  Why did you vote against this amendment?
22        MR. SWEETEN:  Don't answer the question.  It
23   would reveal thoughts, mental impressions, opinions about the
24   legislation and is legislatively privileged.
25   A.   Privileged.

259

1    Q.   If we can turn to Amendment No. 35 is which is on Page
2    991.  And that only states that Section 203 and 14(f)(4), which
3    probably should be 4(f)(4) of the Voting Rights Act should be
4    applied to this section; is that correct?
5    A.   That's what it says.
6    Q.   Are you aware of what Section 203 and Section 4(f)(4)
7    of the Voting Rights Act do?
8    A.   Not off the top of my head.
9    Q.   Can I represent to you that those are the language
10   minority provisions of the Voting Rights Act that require
11   certain documents to be translated into languages spoken by U.S.
12   citizens within the state?
13   A.   Okay.
14   Q.   What was your understanding of the effect of this
15   amendment to apply those two provisions to the bill?
16        MR. SWEETEN:  That would ask her to reveal
17   thoughts, mental impressions, opinions about the legislation.
18   That would be legislatively privileged for her to provide that
19   answer.
20   A.   And it's privileged, and I wasn't involved in that
21   discussion.
22   Q.   Why did you vote against the amendment?
23        MR. SWEETEN:  Don't answer.
24   A.   It's privileged.
25   Q.   Do you believe that materials that must be printed

260

1    under S.B. 14 should be printed only in English?
2         MR. SWEETEN:  The question is does she currently
3    believe that or did she believe it at the time of the passage?
4    Q.   Let's say currently.
5    A.   Okay.  I carried a bill last session that said that
6    the Secretary of State must do the translation because now, in
7    Harris County, we translate in English, Spanish, Vietnamese and
8    Mandarin.  And other counties are required, since the census, to
9    print their ballots in additional language.  So I would say that
10   your statement that you're making or asserting that I believe is
11   not true.
12   Q.   It was a question.
13   A.   Yeah.
14   Q.   So the answer is no?
15        MR. SWEETEN:  Dan, I need to go to the bathroom,
16   so I'll be back.  We can take a very short break.
17        MR. FREEMAN:  Yeah.  I'm almost done.
18        (Recess from 7:04 p.m. to 7:06 p.m.)
19   Q.   With regard to the language requirements that you just
20   discussed in Harris County, are you aware that Section 203 of
21   the Federal Voting Rights Act requires Harris County to print
22   those materials in those languages?
23   A.   I think that you said that earlier.
24   Q.   And so, let me just reiterate my question.  Why did
25   you then vote against an amendment that would simply articulate

Patricia Harless
May 15, 2012

261

1   that Section 203 applies to S.B. 14?
2         MR. SWEETEN:  To not reveal thoughts, mental
3   impressions, opinions about legislation, why you voted for
4   something.  Don't reveal communications that you've had.  Those
5   are legislatively privileged.
6      A.   Privileged.
7      Q.   Okay.  Let's move to Amendment 50, Page 1009 on to
8   1010.  If you can take a quick look through it.  Okay.  So
9   Amendment 50 would have simply reimbursed the costs for poor
10  individuals to travel to obtain ID, correct?
11     A.   Yes.
12     Q.   Why did you vote against this amendment?
13        MR. SWEETEN:  Objection.  It would require her to
14  reveal thoughts, mental impressions, opinions about legislation
15  and would therefore be legislatively privileged.
16     A.   Privileged.
17     Q.   Isn't is the case that the majority of the individuals
18  who live below the poverty line in Texas are members of racial
19  or language minority groups?
20     A.   I don't know that I know that for sure.
21     Q.   Do you know whether members of racial or language
22  minority groups are more likely to live below the federal
23  poverty line in Texas than Anglos?
24        MR. SWEETEN:  Objection, asked and answered.
25     A.   I don't know that I know what the breakdown is.

262

1      Q.   Okay.  Let's move to Amendment 54 on Page 1015.  We
2   can take a quick look.
3      A.   I'm sorry.  I didn't know you were waiting on me.
4      Q.   No worries.  So Amendment 54 would require the
5   Secretary of State to determine who is prevented from voting and
6   who filed provisional ballots that were eventually not counted
7   because the individual did not later show up to provide the
8   necessary ID and would require the Secretary of State to record
9   that by demographics, correct?
10     A.   Yes, that's what you said.
11     Q.   Why did you move to table this amendment?
12        MR. SWEETEN:  Objection.  It would ask her to
13  reveal thoughts, mental impressions, opinions about legislation
14  and it is therefore legislatively privileged.
15     A.   It's privileged.
16     Q.   Would it concern you if members of racial or language
17  minority groups were disproportionately likely to show up at the
18  polling place lacking the necessary ID and then later not return
19  to show ID to have their provisional ballot counted and, thus,
20  not have their ballot counted at all?
21        MR. SWEETEN:  Are you asking her would it concern
22  her now?
23        MR. FREEMAN:  Yes.
24     A.   Could you rephrase the question.
25     Q.   Sure.  Would it concern you if members of racial

263

1   minority groups or language minority groups were
2   disproportionately -- or a larger share of the group of people
3   who voted by provisional ballot, because they didn't have the
4   necessary ID under S.B. 14 and then did not return, for whatever
5   reason, with the necessary ID in the time frame that S.B. 14
6   allows, and thus, as a result, that that group of people didn't
7   have their ballots counted?
8      A.   You want me to answer a hypothetical.  We have no
9   evidence that that's going to happen.
10     Q.   But if it did happen, would it concern you?
11     A.   I'm --
12        MR. SWEETEN:  Objection, calls for speculation,
13  assuming facts not in evidence.
14     A.   I can't answer a hypothetical.
15     Q.   Okay.  Let's move on to Amendment 55, which is on Page
16  1016.  Take a quick look.
17     A.   1016.  Okay.
18     Q.   Amendment 55.  Under Amendment 55, the Secretary of
19  State is required to determine whether the majority of voters
20  casting provisional ballots because they lacked photo IDs were
21  members of minority groups, and, if so, if that were the case,
22  would then allow the use of voter registration certificates,
23  correct?
24     A.   That's what it says.
25     Q.   Why did you vote against this amendment?

264

1         MR. SWEETEN:  Objection.  It would ask her to
2   reveal her thoughts, mental impressions, opinions about
3   legislation and, therefore, falls under the legislative
4   privilege.
5      A.   Privileged.
6      Q.   Now, you said on the record -- and it's on Page 1018
7   -- in response to arguments in favor of this amendment that in
8   Crawford V. Marion County Board of Elections that The Court
9   ruled that the requirement to produce photo ID imposes only a
10  limited burden on the voter and justifies by the State's
11  interest in restoring confidence in elections and deferring
12  fraud, correct?
13     A.   Where you are reading that?
14     Q.   On Page 1018.  Top of the page.
15     A.   I did.  That's what the record reflects.
16     Q.   And I know we discussed this a little bit earlier, but
17  are you aware of the nature of the legal dispute in Crawford?
18     A.   It was not exactly off the top of my head.  I've
19  reviewed the case.  It was the case on the voter ID for Indiana.
20     Q.   It was constitutionally, correct?
21     A.   I guess.  I can't remember.
22     Q.   But it wasn't discrimination on the basis of race,
23  right?
24     A.   I can't answer that.  I don't know.
25     Q.   If I can represent to you that it was not --

Patricia Harless                                          May 15, 2012

---

265

1     A.  Okay.

2     Q.  -- discrimination on the basis of race.

3     A.  I trust you.

4     Q.  I appreciate that.  We've spent a lot of time

5  together.

6         How was your response concerning Crawford responsive

7  to concerns about racial discrimination?

8         MR. SWEETEN:  You're asking her to interpret

9  matters that were part of the legislative record.  I'll let her

10  refer to the record in answering that question.  But I think to

11  some extent you're asking her to reveal thoughts, mental

12  impressions, opinions about the legislation.  So to the extent

13  you can refer to public documents, feel free to do so.

14  Otherwise, do not reveal those.  They are subject to the

15  legislative privilege.

16     A.  The record is talking about if -- it says in here that

17  I'm not a big fan of talk radio.  I don't listen to it, and I

18  don't believe everything they say.  So that goes to mention what

19  we talked about earlier.  It talks about the decision.  And

20  they're asking me questions, and I'm answering the questions.  I

21  don't recall.

22         MR. FREEMAN:  I'll object to that as

23  nonresponsive.

24     Q.  But I'll assume the remaining answer to my question

25  would be privileged; is that correct?

---

266

1     A.  Yes, sir.

2     Q.  Okay.  Last one.  Amendment No. 58 on Page 1021, if

3  you could take a quick look.

4     A.  Is this the amendment?

5     Q.  Amendment 58.  It's on Page 1021.  Strike Section 25

6  and substitute a new Section 25.  Do you see that?

7     A.  Okay.  Yes.

8     Q.  And so Amendment 58 essentially required a study by

9  county and according to ethnicity of access to photo ID along

10  with a analysis of potential impact on voter turnout, correct?

11     A.  That's what it says.

12     Q.  Why did you move to table that amendment?

13         MR. SWEETEN:  Don't answer.  The question would

14  ask you to reveal thoughts, mental impressions, opinions about

15  legislation.  Therefore, it's subject to the legislative

16  privilege.

17     A.  I would say it's privileged if there's no more record

18  than this.

19     Q.  Do you recall Representative Anchia asserting that

20  such a study should have been conducted prior to consideration

21  of this bill?

22     A.  I don't recall that specifically.  It doesn't mean it

23  didn't happen.

24     Q.  If I can just quickly put this in front of you.  This

25  should be U.S. 26.  If you can turn very quickly to Page 62

---

267

1  through 64.  Just skim through.

2         (Exhibit No. 26 marked)

3     A.  And this is from the floor or --

4     Q.  This is a transcript of the March 23rd floor debate.

5  This is Volume III.  This is Day 40.

6     A.  How far do you want me to read through?

7     Q.  Until you move to table.

8     A.  Okay.

9     Q.  Which I believe is Page 64.

10         MR. SWEETEN:  You've gone past it, I think.

11     A.  It goes to Lamar Davis after that.  Do you have Volume

12  II or Volume III?

13         MR. SWEETEN:  III.

14     A.  And 63 is talking about studies and 64 is taking about

15  statics.  And then it seems that Yvonne Davis and Anchia have a

16  back-and-forth dialogue to 65, 66.

17     Q.  You move to table on Page 69.  Do you see that?

18     A.  Do I need to know what all this is?

19     Q.  If you can just skim through and see -- do you say

20  anything prior to simply moving to table?

21     A.  I'm on 71 and still don't see where I move to table.

22     Q.  It's the top of 69.  Will you accept my representation

23  that --

24         MR. SWEETEN:  She's found it.

25     Q.  Do you move to table without responding to any of

---

268

1  Representative Anchia's statements?

2     A.  That's what it shows.

3     Q.  Why did you move to table without responding to any of

4  Representative Anchia's statements?

5         MR. SWEETEN:  I'm going to object.  The question

6  calls for her to reveal thoughts, mental impressions, opinions

7  about the legislation.  She can answer to the extent that the

8  public record reveals information responsive.  Otherwise, I'm

9  going to instruct her not to answer on the basis of legislative

10  privilege.

11     A.  It's privileged.

12     Q.  Okay.  And do you believe that such information was

13  not necessary to support the bill concerning the effect of the

14  bill in terms of possession of ID based on race?

15         MR. SWEETEN:  Same objection.

16     A.  Privileged.

17     Q.  We are done with amendments.  If you can mark this as

18  U.S. 27.

19         (Exhibit No. 27 marked)

20     Q.  This is a declaration that you signed with regard to

21  an assertion of privilege in this case.  Can you take a quick

22  look.  Are you familiar with that document?

23     A.  Yes, sir.

24     Q.  Did you meet with the Office of the Texas Attorney

25  General prior to receiving a copy of this document?

---

269

1    A.  No.
2    Q.  Who wrote this document?
3    A.  I received it from my chief of staff.
4    Q.  Did you write this document?
5    A.  I never asked him --
6    Q.  Are you aware of whether he wrote this document?
7    A.  I don't know.  We discussed the issues that should go
8    into the document, but --
9    Q.  Did your chief of staff draft this document?
10   A.  I didn't ask him.
11   Q.  But did you have a conversation about this document
12   with your chief of staff before you received the document?
13   A.  Yes.
14   Q.  And did you have a conversation with the Office of the
15   Texas Attorney General before you received this document?
16   A.  No.
17   Q.  Are you aware of any supporter of the bill who is not
18   asserting attorney/client privilege, legislative privilege, and
19   any other privilege available under state or federal law to
20   protect from disclosures in this case?
21          MR. SWEETEN:  When you're answering that
22   question, don't reveal any communications that you've had with
23   our office or meetings or other discussions.
24   A.  I'm not aware.
25   Q.  Has anything changed since you signed this

270

1    declaration?  Do you stand by everything in the declaration
2    today?
3          MR. SWEETEN:  Take your time to the extent you
4    need to answer his question.
5    A.  Yes.
6    Q.  The next two questions I'm going to ask concern
7    conversations that didn't happen on the House floor.  I'm
8    curious about what gets said in members' offices at lunch,
9    fundraisers, etcetera.  Have you ever heard a legislator in
10   those contexts in any other who voted in favor of S.B. 14 state
11   that a photo ID requirement would prevent any registered voter
12   from voting?
13          MR. SWEETEN:  The question -- the scope of the
14   question is very broad.  I'm not clear as to what -- are you
15   talking at matters prior to the passage of it, or can you be
16   specific as to what you're asking.  It will help me in knowing
17   whether to assert privileges to the question.
18   Q.  I'm asking in any circumstance, private circumstance,
19   so off the floor, have you ever heard any legislator who voted
20   in favor of S.B. 14 state that S.B. 14 would, in effect, prevent
21   any registered voter from voting?
22          MR. SWEETEN:  I'm going to instruct you not to
23   answer.  He has not limited the question.  To the extent this
24   question could reveal communications with legislators,
25   legislation staff, state agencies, Texas Legislative Council or

271

1    constituents, that would be legislatively privileged.
2    A.  That's privileged.
3    Q.  And have you ever heard a legislator who voted in
4    favor of S.B. 14 explain that voter ID would prevent any
5    minority registered voter from voting?
6          MR. SWEETEN:  Same instruction.
7    A.  Privileged.
8    Q.  Now, distinctly with regard to the purpose of the
9    bill, do you believe that S.B. 14 has no purpose to reduce the
10   number of Hispanic voters who will be able to vote in elections
11   in Texas?
12          MR. SWEETEN:  This question has been asked and
13   answered.  I think -- and we've had a discussion at lunch
14   regarding purpose and questions about that.  I will let her
15   discuss what she believes the purpose of the bill is.  We will
16   allow that.  She will not be able to talk about what other
17   people think, what other legislators' opinions are, but I will
18   allow her to testify as to the purpose of the bill.
19   Q.  In the context -- I am asking in the context of all
20   the aspects of the legislative process that led up to passage of
21   the bill, with regard to the purpose of the bill in its
22   complete, all provisions, do you believe that S.B. 14 has no
23   purpose to reduce the number of Hispanic registered voters who
24   will be able to vote in elections in Texas?
25          MR. SWEETEN:  I think the way you've asked this

272

1    question, you're asking her to reveal matters up until the time
2    of the passage of the bill that could include thoughts, mental
3    impressions, discussions, communications with other legislators.
4    I think your question as directly -- would require
5    her to give information that is legislatively privileged.  So
6    I'm going to instruct her accordingly.
7          MR. FREEMAN:  Mr. Sweeten, can I ask, based on
8    your understanding of the privilege, as you're asserting this
9    privilege, do you believe there's a way to phrase this question
10   that I can ask with regard to the purpose of the bill and with
11   whether a particular purpose was a purpose of the bill that
12   would ask for purpose but not intent, because you've agreed, I
13   believe, that purpose is a permissible inquiry.
14          MR. SWEETEN:  We're attempting to accommodate you
15   based upon the letter that we received earlier today and our
16   discussions.  We also are very cognizant of her legislative
17   privilege.  Again, I can allow her to testify about what she
18   believes the purpose -- what the purpose of the bill.  She can
19   testify to that.  We'll let her do that.
20          MR. FREEMAN:  Okay.
21   A.  As I've answered earlier and as I stated on the floor
22   a number of times and in committee, the purpose of S.B. 14 was
23   to increase and improve the integrity of the election process.
24   Q.  And I'm asking whether there was any secondary
25   subsidiary purpose behind the bill in any aspect that was

273

1   motivating the bill, not just on your part, but on the part of
2   the legislators advancing the bill.
3        A.   I can't answer for anyone other than myself.  The
4   purpose of S.B. 14, as I've stated over and over, was to improve
5   the integrity of the election process.
6        Q.   Let's wrap this up then.  Are there any answers you
7   wish to change from what you said earlier?
8        A.   Heck, I can't even remember past the last five
9   questions.  I'm stuck in the amendments.
10        Q.   It's been a long day.  I appreciate your time.  Any
11   information that you didn't recall before that you now recall?
12        A.   No, sir.
13        Q.   Anything you'd like to add so we can understand your
14   questions more clearly?
15             MR. SWEETEN:  Let me take one minute with her.
16             (Brief off-record discussion)
17             THE WITNESS:  The only thing that I might want to
18   add is that I had met with the AG's office and there was
19   discussion about --
20             MR. SWEETEN:  Don't talk about what it was about.
21   You met with the AG's Office.
22             THE WITNESS:  We met with the AG's office prior
23   to signing this affidavit.
24        Q.   Prior to signing?
25        A.   Uh-huh.

274

1        Q.   But did you meet with the AG's office prior to
2   receiving a copy of the draft?
3        A.   I don't know that I did.
4        Q.   Okay.
5        A.   I can't remember.
6             MR. FREEMAN:  Okay.  I appreciate the correction.
7   Thank you.  And thank you for your testimony.  I want to state
8   that the deposition is left open pending decisions on the, I
9   believe as Mr. Sweeten said, 300 assertions of privilege as well
10   as over various documents and other testimony, and I now pass
11   the witness to Mr. Rosenberg.
12             THE WITNESS:  Thank you.
13             EXAMINATION
14   BY MR. ROSENBERG:
15        Q.   I'm obviously not going to repeat everything that
16   Mr. Freeman did.  Just a few questions, Representative Harless.
17   And thanks for your patience during the day.  Can we show
18   Representative Harless U.S. 19.  Is that the op-ed piece?  And
19   looking at the first paragraph, the last sentence actually says
20   -- second paragraph -- the first paragraph is one sentence, "Yet
21   as the U.S. Department of Justice reviews the law for
22   preclearance under the Voting Rights Act, a barrage of
23   inaccurate attacks has been levied against our election
24   integrity bill that must be corrected."  Do you see that?
25        A.   Yes, sir.

275

1        Q.   What did you mean by a barrage of inaccurate attacks?
2             MR. SWEETEN:  You can reference the public
3   statement made.  Don't reference your mental impressions about
4   the passage of Senate Bill 14.
5             MR. ROSENBERG:  Mr. Sweeten, let me respond to
6   that because I respectfully request that you withdraw that
7   objection.  We're dealing with a public statement that
8   Ms. Harless made.  If it happens to have been based on
9   privileged information, then I would submit that she's waived
10   that privileged information.  We have the right to inquire as to
11   the entire basis.
12             MR. SWEETEN:  I'm going to let her discuss
13   matters of the public record, including this statement.  She
14   hasn't waived and she hasn't revealed her thoughts, mental
15   impressions or opinions about the legislation that preceded
16   this.  She's made this statement.  She can answer questions
17   about the statement.  I will allow that to occur.
18        Q.   My question remains, what do you mean by a barrage of
19   inaccurate attacks?
20        A.   As we debated in the record, there were some
21   inaccuracies in information that was being repeated.  And I
22   can't name specifically.
23        Q.   Can you name any one?
24        A.   Not off the top of my head.
25        Q.   Can you name who was making these inaccurate attacks?

276

1        A.   No.
2        Q.   Turn your attention to the second page, the paragraph
3   that's going to be a little hard to read because it's
4   overwritten, but I'll try to read it and you tell me if I'm
5   accurate.  "While an ID requirement may place a burden on
6   voters;" do you see that?
7        A.   Yes, sir.
8        Q.   And then you go on to quote from Justice Stevens.  Do
9   you see that?
10        A.   Yes, sir.
11        Q.   What do you mean by burden?
12        A.   I honestly can't tell you what emotions I was going
13   through at the time I wrote this.
14        Q.   Well, let me ask you this.
15        A.   And what had prompted up to it.
16        Q.   Do you think it's a burden -- did you think it was a
17   burden on voters who did not have a photo ID to get a photo ID?
18        A.   I think the record that I've talked about over and
19   over a number of times is that we provided for those that do not
20   have one of the approved forms of ID to have an opportunity to
21   get a free ID, and that's no more cumbersome in the record
22   than the act of voting.
23        Q.   Well, if someone has a photo ID and someone does not
24   have a photo ID, you would admit that there is at least some
25   burden on the fact that the person who does not have a photo ID

277

1  to go and get a photo ID; is that correct?
2        MR. SWEETEN:  You can answer in the context of
3  the public statement.  Don't reveal privileged information.
4        MR. ROSENBERG:  Again, I disagree with that,
5  Mr. Sweeten, and would ask you to withdraw that objection in the
6  context of a statement that Representative Harless made in
7  public.
8        MR. SWEETEN:  If you're asking her about the
9  public statement, I've again said that she can answer questions
10  about that.
11        MR. ROSENBERG:  I'm asking her what she meant by
12  something she wrote in public.
13    A.  I can't tell you what every word that I wrote meant at
14  the time that I wrote it, which was November the 14th of 2011.
15    Q.  I understand that.  That's why I'm only asking about
16  one word, burden.
17    A.  I don't know what you want me to answer.  I'm not sure
18  what you're asking.
19    Q.  Let me ask it again.
20    Q.  Do you want me to define what burden means?
21    Q.  In the context of how you were using it in this
22  article, yes.
23    A.  Well, I'm not -- I said while an ID requirement may
24  place a burden.  It may.  I don't know that it will.
25    Q.  What kind of burden were you talking about?

278

1    A.  That someone shows a photo ID when they vote.
2    Q.  How about if someone has to go and get a photo ID if
3  they don't already have one?  Would that be a burden?
4    A.  I don't know that that's what I was referring to at
5  the time that I wrote this.
6    Q.  Well, if someone had to go to a motor vehicle facility
7  to get either a driver's license or a voter identification,
8  would that be a burden that someone who already had a driver's
9  license or a voter identification would not have?
10    A.  I don't think that's what I was discussing in this
11  statement.
12    Q.  Would you agree that would be a burden, though?
13    A.  No, I don't.
14    Q.  Well, what if someone had to drive 100 miles to the
15  motor vehicle facility as opposed to someone who already had a
16  driver's license or a photo identification?  Would you agree
17  that that would be more of a burden on the person who had to
18  drive the 100 miles than the person who did not have to drive
19  the 100 miles?
20    A.  I don't think that that's part of the debate or the
21  record and it's -- you know, what one person may think is a
22  burden I may not think is a burden.
23    Q.  Is it your testimony that there was nothing in the
24  public record about the burden on people who had to travel to --
25  long distances to motor vehicle facilities?

279

1    A.  That's not what I said.  I think there was members
2  that talked about that people had to travel to motor vehicle
3  divisions, but we don't know if there are actually any of those
4  people that don't already have one of the approved forms of ID
5  or that aren't already eligible to vote by ballot by mail
6  whether they're senior or disabled.  So I can't speculate on if
7  that person actually exists.
8    Q.  Was there also discussion in the public record during
9  the debate in S.B. 14 that people who were minorities were more
10  likely to be further away from motor vehicle facilities than
11  non-minorities?
12    A.  I don't recall that discussion.  It could be possible.
13  But if you don't live close to a DPS station, you don't live
14  close to it whether you're Caucasian or a minority.
15    Q.  Was there any discussion in the public record as to
16  whether or not minorities would be less likely to have
17  transportation to get to motor vehicle facilities than
18  non-minorities?
19    A.  I don't recall the exact testimony.
20    Q.  Would you agree that someone who did not have motor
21  vehicle transportation or public transportation to get to a
22  motor vehicle facility and who did not have a driver's license
23  would have more of a burden on that person than someone who
24  already did have a driver's license?
25        MR. SWEETEN:  Objection, asked and answered, but

280

1  go ahead.
2        MR. ROSENBERG:  Not quite, but go ahead.
3    A.  I don't know that that person doesn't already have one
4  of the other approved forms of ID.  I don't know that they have
5  to get the free ID.
6    Q.  Let's assume that that person has none of the other
7  IDs.
8    A.  I'm not going to assume.  I'm not going to assume that
9  some person may exist out there.
10    Q.  Is it your testimony that there is no one who does not
11  have any of the photo IDs under S.B. 14?
12    A.  I've never said that in testimony.
13    Q.  Was there any analysis or study done to see how many
14  individuals did not have the requisite photo ID during the
15  consideration of S.B. 14?
16        MR. SWEETEN:  Do not reveal thoughts, mental
17  impressions, opinions about legislation or communications that
18  you've had with legislators, legislative staff, state agencies,
19  Texas Leg Council or constituents.  You can refer to the public
20  record.
21    A.  That's privileged.
22    Q.  Do you agree that there are people who do not have a
23  birth certificate in Texas?
24    A.  That's not part of the record.
25    Q.  Do you think that's an important consideration in

Patricia Harless                                                          May 15, 2012

281

1   terms of whether or not there are people who might be burdened
2   by the requirements of S.B. 14?
3           MR. SWEETEN:  Objection.  You're calling for
4   matters that are subject to the legislative privilege, which
5   includes her thoughts, mental impressions about the bill.  If
6   you can answer based upon the public record, feel free to do so.
7       A.  Privileged.
8       Q.  Would you consider that a burden if someone did not
9   have a birth certificate, did not have a driver's license, did
10  not have any of the photo identification requirements under S.B.
11  14?
12      A.  I don't recall that being discussed in the record.
13      Q.  Would you consider that a burden?
14      A.  I'm not going to answer that for privilege.
15      Q.  Would you consider that a burden today?
16      A.  Excuse me?
17      Q.  Would you today, sitting here today -- I'm not asking
18  prior to S.B. 14.  Sitting here today, would you consider that a
19  burden?
20      A.  Consider?
21      Q.  Consider a person who does not have any of the photo
22  identifications under S.B. 14 and who did not have a birth
23  certificate in order to get one of the photo identifications
24  under S.B. 14, would you consider that person more burdened than
25  someone who already had a photo ID?

282

1       A.  I can't answer that because I don't know that the
2   birth certificate is the only form of ID that we discussed that
3   you are required to have to get an ID.  I don't know what the
4   specific identification.
5       Q.  Well, if a person had none of the identification that
6   are listed under S.B. 14 that would allow that person to get a
7   driver's license or voter identification, would you consider
8   that, sitting here today, more of a burden on that person than
9   the person who already has the photo ID?
10      A.  I'm not going to speculate on if some person that
11  meets all that criteria actually exists in Texas.  I'm not going
12  to speculate on it.
13      Q.  Have you looked to see or done any kind of analysis as
14  to whether or not such a person exists in the State of Texas?
15          MR. SWEETEN:  Do not reveal your thoughts, mental
16  impressions, opinions about legislation or efforts, including
17  communications with legislators, legislative staff, state
18  agencies, Texas Leg Council or constituents considering this
19  bill.
20      A.  By answering that, I'd waive privilege, and I can't do
21  that.
22      Q.  Do you know how much it costs to get a birth
23  certificate?
24      A.  I think we talked today about it.  And somewhere in
25  the record somebody made mention of, I think $22, I think.

283

1       Q.  You think that it would be -- if a person needed to
2   get a birth certificate in order to get the requisite photo
3   identification under S.B. 14, paying $22 would be an additional
4   burden on that person not imposed on people who already have the
5   photo ID?
6           MR. SWEETEN:  You're asking her questions about
7   Senate Bill 14.  You're asking her to reveal mental impressions,
8   opinions about the legislation.  That is squarely within the
9   legislative privilege.  That's what you're asking.  Objection.
10      A.  I can't answer that.
11      Q.  Sitting here today, do you consider that more of a
12  burden, someone who had to pay $22 for a birth certificate in
13  order to meet the requirements of S.B. 14?
14      A.  I can't speculate if that's a burden for that person.
15  I don't know why they need the birth certificate.  I don't know
16  if that's their only form of ID.  I can't speculate on that.
17      Q.  Do you think $22 is an insignificant sum?
18      A.  I guess if I needed a birth certificate to get a job,
19  I would not think it is.  I don't know.
20      Q.  What's a Calendar committee or Calendars committee?
21      A.  It's the committee that bills go to in order to get
22  set on the calendar for the floor.
23      Q.  And how long typically do bills sit in the Calendars
24  committee awaiting placement on the calendar?
25      A.  I don't serve on that committee and I don't know if

284

1   there's any specific time frame.
2       Q.  Can you give me a range?
3       A.  I can tell you I've had bills in Calendars for up to
4   two or three months.  I've had bills die in calendars.  I don't
5   know how they operate and what the priority is.
6       Q.  Do you know how long it took S.B. 14 from the time the
7   committee report was received by the Calendars committee to the
8   time it was placed in the calendar the first time?
9       A.  I don't remember.  I saw something, but I don't
10  remember.
11      Q.  If I suggested it was under two hours, would that be
12  right?
13      A.  I couldn't answer that.  I don't know.
14      Q.  Does it sound wrong?
15      A.  I don't know.
16      Q.  Do you recall what happened after S.B. 14 was placed
17  on the calendar the first time?
18      A.  The very first time?
19      Q.  The very first time.
20      A.  When we got to the floor debate?
21      Q.  Right.
22      A.  We started the floor debate, and then there was a
23  point of order called and it was upheld.
24      Q.  And it was because there was a material error in the
25  bill?

285

1    A.  I don't recall exactly.  I remember what the error
2    was, but I don't know if it was in the bill or in the summary,
3    the bill analysis.  I don't know which one it was.
4    Q.  There's a reference to business days as opposed to
5    calendar days?
6    A.  Exactly.
7    Q.  And what happened as a result of that?  Point of order
8    was sustained.  What does that mean?
9         MR. SWEETEN:  We're talking about the process of
10   Senate Bill 14.  I want to remind her -- I don't want you to
11   discuss mental impressions, opinions about legislation.  You can
12   talk about matters of public record.  If that's what we're
13   doing, you can provide that.
14        MR. ROSENBERG:  And just for the record, Mr.
15   Sweeten, is it your position that testimony as to the regularity
16   or irregularity of the procedure used in S.B. 14 is privileged?
17        MR. SWEETEN:  It depends on the way you ask it.
18   And let's be very clear.  When you asked about the calendar
19   committee or, you know, how common it is, I've let her answer
20   those questions.  Let's not pretend that I've shut that down.
21   That hasn't happened.
22        MR. ROSENBERG:  I haven't pretended anything.
23        MR. SWEETEN:  Okay.  So you can ask her questions
24   about procedure, about how it works generally.  When it comes to
25   Senate Bill 14 and her considerations of that legislation,

286

1    that's where I'm asserting privilege.  I'm not -- we'll leave it
2    at that.
3         MR. ROSENBERG:  Can we have the question read
4    back.
5         THE REPORTER:  Question: "And what happened as a
6    result of that?  Point of order was sustained.  What does that
7    mean?
8    Q.  We were at the point of order business day, calendar
9    day.
10   A.  They called the point of order from the record.  The
11   parliamentarian ruled on the point of order, that it was -- I
12   don't know the proper term -- is a valid point of order, and the
13   bill was -- I think I remember it being re-referred to
14   committee.
15   Q.  Right.  And after it was re-referred to committee went
16   back to the Calendars committee, right?
17   A.  After it goes to committee -- the procedure is after a
18   bill goes to committee, is voted out of committee, then it goes
19   to Calendars to be voted out of Calendar.
20   Q.  And do you recall how long it sat in Calendars
21   committee the second time?
22   A.  I don't.
23   Q.  If I suggested 12 minutes, would that be about right?
24   A.  I have no clue.
25   Q.  Can you -- that's pretty short, though; would you

287

1    agree?
2    A.  I don't know.  I mean, as a member, we don't
3    necessarily know when our bills get to Calendars.  So I don't
4    know what the time frame is.
5    Q.  Would you agree that a total of -- let's assume around
6    80 minutes the first time it sat in the Calendar committee and
7    the second time it sat in the Calendars committee is unusually
8    short for a bill of this importance?
9    A.  I can't answer that.  I don't know.  I don't know.  I
10   don't serve on that committee.  I don't know how long it usually
11   takes them to get the paperwork and if there was a delay in the
12   paperwork and after they get it how long.  I don't know the
13   procedures of how that committee operates.
14   Q.  And I assume, then, you can't name any other bill that
15   sat in the committee that short?
16   A.  I can't.  I don't know.
17   Q.  Were you a legislator in 2009?
18   A.  I was.
19   Q.  And this is really for Mr. Sweeten's edification.  Why
20   don't you tell him what chubbing is.
21   A.  Chubbing is when members take a bill to the -- it's
22   filibuster, in essence, in the Texas House.
23   Q.  And do you recall something called a chub-a-thon?
24   A.  I remember I had legislation that died because of
25   chubbing.

288

1    Q.  And when was that?
2    A.  That was in 2009.
3    Q.  And that was on H.B. 112?
4    A.  No.
5    Q.  What was it?
6    A.  I think the chubbing, if I remember correctly, wasn't
7    pertaining to the voter ID legislation.  The chubbing was on our
8    local and consent calendar.  And local and consent calendar, the
9    procedures typically are the member lays out the bill and it's a
10   local issue.  It's voted without debate.  And they use the rules
11   to talk each of those local and consent bills to where it bumped
12   the general calendar to the next day.
13   Q.  Are you aware of when the use of the local and consent
14   -- is it local consent calendar -- was used by a minority to
15   block a previous photo ID bill.
16   A.  That was when the chubbing, but I'm not sure -- I
17   don't know.  I'm not exactly sure why the chubbing -- I can't
18   remember exactly.  I don't remember the voter ID bill getting on
19   the calendar.  Was it?  You must know.
20   Q.  I can't answer questions.  I can only ask them.
21   Sorry.
22   A.  Yeah.  I don't remember.  I remember the chubbing on
23   the local calendar.  I knew that it was to stall, to get -- so
24   we wouldn't get to the general calendar.  But I don't know why.
25   Q.  You don't recall if it was specifically used in

Patricia Harless                                              May 15, 2012

289

1   opposition to a photo ID bill?
2       A.   No.  I don't know.  I seem to vaguely remember
3   conversation about that, but it was conversation.
4       Q.   Do you know what the two-thirds rule is?
5       A.   In the Senate?
6       Q.   Yes.  Are you familiar with that?
7       A.   A little.
8       Q.   And what little?
9       A.   I'm just a little familiar of the debate by Dan
10  Patrick and other members of the Senate about the value of the
11  two-thirds and not.
12      Q.   Was there a change in the two-thirds rule?
13      A.   In the Senate on this?
14      Q.   Yes.
15      A.   It seemed like, if I remember correctly, that the
16  members of the Senate voted to suspend the two-thirds for this
17  one piece of legislation, but I can't say that for sure.
18      Q.   And the one piece of legislation was photo ID bill?
19      A.   I think it was S.B. 14.
20      Q.   Just a couple of tie-up points.  You testified I think
21  that there were conversations that you had with Catherine
22  Engelbrecht?
23      A.   I heard Catherine's name.
24      Q.   Right.  And I think you testified that there were
25  conversations you had with Catherine Engelbrecht concerning the

290

1   photo ID bill; is that correct, without going into what the
2   substance was?
3       A.   I think the conversation was after the bill was heard
4   in committee she visited my office.
5       Q.   Right.  I don't think you were asked and just to tie
6   it up, can you tell me what you and she talked about?
7            MR. SWEETEN:  I'm going to object.  It calls for
8   matters that are legislatively privileged or communication
9   specifically.
10      Q.   And similarly, I think you were asked about
11  conversations with George Hammerline.
12      A.   Yes.
13      Q.   Concerning S.B. 14, correct?
14      A.   After the bill was heard in committee, George stopped
15  by the office.
16           MR. SWEETEN:  Don't reveal communications or the
17  substance of them.  You can talk about the existence of the
18  communication.
19      Q.   And now I will ask you something that your attorney
20  will tell you you can't talk about.  What were the substance of
21  the conversation or conversations that you had with
22  Mr. Hammerline concerning the photo ID bill?
23           MR. SWEETEN:  Objection.  That's subject to the
24  legislative privilege.
25      A.   And that's privileged communications with

291

1   constituents.
2       Q.   Are you aware of any information contrary to the
3   positions that you took on the floor concerning the impact of
4   S.B. 14 on minorities that has not been made public?
5            MR. SWEETEN:  Do not reveal any thoughts, mental
6   impressions, opinions about the legislation or communication
7   with legislators, legislative staff, state agencies, Texas Leg
8   Council or constituents.
9       A.   My opinions would be privileged.
10           MR. ROSENBERG:  Thank you very much.  Told you
11  I'd be quick.
12           MR. SWEETEN:  Let me make a statement on the
13  record.  We have gone seven hours with Representative Harless
14  and she has sat here and we've answered a tremendous number of
15  questions posed by Mr. Freeman and Mr. Rosenberg.  So the
16  gratuitous remark about objections, yes, but there were many
17  objectionable questions asked of Representative Harless.
18           MR. ROSENBERG:  And just so my record is kept
19  open, I'd like to keep my record open for the same reasons that
20  Mr. Freeman stated.  Thank you very much.
21           (Deposition concluded at 7:11 p.m.)
22
23
24
25

292

1                    CHANGES AND SIGNATURE
2
3   WITNESS NAME_____ DATE OF DEPOSITION_____
4   PAGE LINE   CHANGE        REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS, | ) |
|    Plaintiff | ) |
| | ) |
| VS. | ) |
| | ) |
| ERIC H. HOLDER, JR., | ) |
| Attorney General of the | ) |
| United States of America, | ) |
|    Defendant | ) |
| | ) |
| ERIC KENNIE, et al, | ) |
|    Defendant-Intervenors, | ) |
| | ) |
| TEXAS STATE CONFERENCE OF | ) CASE NO. 1:12-cv-00128 |
| NAACP BRANCHES, et al, | ) RMC-DST-RLW |
|    Defendant-Intervenors, | ) Three-Judge Cost |
| | ) |
| TEXAS LEAGUE OF YOUNG | ) |
| VOTERS EDUCATION FUND, et | ) |
| al, | ) |
|    Defendant-Intervenors, | ) |
| | ) |
| TEXAS LEGISLATIVE BLACK | ) |
| CAUCUS, et al, | ) |
|    Defendant-Intervenors, | ) |
| | ) |
| VICTORIA RODRIGUEZ, et | ) |
| al, | ) |
|    Defendant-Intervenors. | ) |

**********************************************************

ORAL DEPOSITION OF
REPRESENTATIVE PATRICIA HARLESS
VOLUME 2
JUNE 13, 2012

**********************************************************

Ken Owen & Associates, L.P.

Page 297

1    ORAL EXAMINATION OF REPRESENTATIVE PATRICIA HARLESS,

2    produced as a witness at the instance of for the

3    DEFENDANT-INTERVENORS TEXAS NAACP and MALC, and duly

4    sworn, was taken in the above-styled and numbered cause

5    on the 13th of JUNE, 2012 from 10:04 a.m. to 11:08 a.m.,

6    before MELISSA PARKHILL, CSR, in and for the State of

7    Texas, reported by computer-assisted machine shorthand at

8    209 W. 14th Street, First Floor Conference Room, Austin,

9    Travis County, Texas, pursuant to the Federal Rules of

10   Civil Procedure and the provisions stated on the record

11   or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 299

1                    INDEX

2                              PAGE

3    Appearances.................................. 298

4

REPRESENTATIVE PATRICIA HARLESS - VOLUME 2

5        Examination by Mr. Rosenberg.............. 301

         Examination by Mr. Freeman............... 316

6        Examination by Mr. Sweeten............... 346

         Examination by Mr. Freeman............... 347

7

8    Signature and Changes........................ 350

9

     Reporter's Certificate........................ 352

10

11

12

13

                     EXHIBITS

14

     NO. DESCRIPTION                    PAGE

15

     790 11-21-11 Harless and Beuck e-mails......... 299

16

     791 11-28-11 Beuck e-mail to Harless........... 299

17

     792 2-8-09 Krannig e-mail to Harless........... 299

18

     793 3-21-11 Harless and Beethe e-mails......... 299

19

     794 3-13-12 Harless and Nehiley e-mails........ 299

20

     795 3-13-12 Harless and Courtney e-mails....... 299

21

22        (Exhibits 790 - 795 premarked.)

23

24

25

Page 298

1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Patrick K. Sweeten, Assistant Attorney General
         OFFICE OF THE ATTORNEY GENERAL
5        Special Litigation Division
         P.O. Box 12548
6        209 W. 14th Street
         Austin, Texas 78711
7        (512) 475-4330
         patrick.sweeten@texasattorneygeneral.gov
8
9
10   FOR THE DEFENDANT:
11       Daniel Freeman, Esq.
         (Appearing Telephonically)
12       UNITED STATES DEPARTMENT OF JUSTICE
         Voting Section, Civil Rights Division
13       950 Pennsylvania Avenue NW
         NWB Room 7259
14       Washington, D.C. 20530
         (202) 514-4609
15       daniel.freeman@usdoj.gov
16
17
     FOR THE DEFENDANT INTERVENORS, NAACP:
18
         Ezra D. Rosenberg, Esq.
19       (Appearing Telephonically)
              -and-
20       Lindsey Stelcen, Attorney at Law
         DECHERT, LLP
21       902 Carnagie Center, Suite 500
         Princeton, New Jersey 08540
22       (609) 955-3200
         ezra.rosenberg@dechert.com
23       lindsey.stelcen@dechert.com
24
25

Page 300

1        MR. ROSENBERG:  Is the witness sworn in?

2        MR. SWEETEN:  Well, I want to -- I want to

3    make the announcement also just for the record to discuss

4    the contours of the deposition.  This is Patrick Sweeten

5    on behalf of State of Texas and on behalf of the witness,

6    Representative Harless.  We are here pursuant to the

7    Court's order of 6-8-2012 where they re-opened the

8    deposition of Harless.  It is not to exceed one hour.

9    It's limited to questions about contacts with

10   constituents and other members of the public.

11       We will allow Representative Harless to

12   sit in conformance with the Court's order and answer

13   questions in conformance with the Court's order today.

14   She continues to assert the legislative privileges as

15   well as to any sort of privileged communication.

16       And with that, you guys can take over.  I

17   want a hard stop -- I want a time check hard stop at one

18   hour of record time.

19       MR. ROSENBERG:  Is the witness sworn in?

20       COURT REPORTER:  No, she's not.  Give me

21   one moment, please.

22       REPRESENTATIVE PATRICIA HARLESS,

23   having been first duly sworn, testified as follows:

24

25

Ken Owen & Associates, L.P.

## Page 301

```
 1           CONTINUED EXAMINATION
 2  BY MR. ROSENBERG:
 3      Q.  Representative Harless, this is Ezra Rosenberg.
 4  We met at your last deposition.  And I'm not going to
 5  repeat any of the guidelines because I assume you
 6  remember them.  Is that correct?
 7      A.  Yes, sir.
 8      Q.  Okay.  Did you have a chance to review the
 9  transcript of your deposition prior to today?
10      A.  I've skimmed it.
11      Q.  Okay.  The first question I have,
12  Representative Harless, did you have any conversations or
13  communications with constituents concerning specific
14  incidents of in-person voter fraud in your district that
15  occurred over the last 20 years?
16      A.  I can't recall any specific conversations.
17      Q.  Do you recall any general conversations?
18      A.  I know in working the polls during early
19  voting, a number of times I had constituents come up and
20  talk about photo voter identifications at the polls and
21  the need to have people verify they are who they say they
22  are when they vote in person.
23      Q.  At your deposition you were asked this
24  question:  And it's on page 107 line 5:  "Are you aware
25  of any specific incidents of in-person voter fraud in
```

## Page 302

```
 1  your district, Texas House District 126, in the last
 2  20 years.
 3           And then there was an objection by Mr. Sweeten.
 4           And you answered, "I was going to say that's
 5  privileged conversation with constituents."
 6  Do you remember that testimony?
 7           MR. SWEETEN:  Ezra, just for the record,
 8  I'm putting the transcript that you're reading from in
 9  front of her so she can have the context of it.
10           MR. ROSENBERG:  Okay.  Great.
11      A.  I see it in the deposition, yes, sir.
12      Q.  And can you tell me what you were referring to
13  when you said, "I was going to say that's privileged
14  conversation with constituents"?
15      A.  What it says.  I was going to say that was
16  privileged.
17      Q.  But were you aware of any specific incidents of
18  in-person voter fraud that was told to you in
19  conversations with constituents?
20      A.  I can't recall specific conversations with
21  constituents.
22      Q.  Okay.  Are you aware of any conversations and
23  communications with constituents that you had concerning
24  convictions the attorney general has secured for
25  in-person voter fraud over the last 20 years?
```

## Page 303

```
 1      A.  I can't recall any specific conversations, no.
 2      Q.  Are you aware of any conversations or
 3  communications that you had with constituents concerning
 4  whether individuals in Texas ever created counterfeit
 5  photographic identification cards?
 6      A.  I don't recall that specifically.
 7      Q.  Do you recall any general conversations?
 8      A.  It may have.  I've had a number of
 9  conversations with constituents.  Typically, I'm
10  listening and not talking.  But I can't remember exactly
11  all the details of those conversations.
12      Q.  Do you recall any details of the conversations?
13      A.  No, sir.
14      Q.  All right.  Are you -- Do you recall any
15  conversations or communications that you had with any
16  constituents concerning minors or individuals under the
17  age of 21 creating or using false identifications in
18  order to obtain alcohol?
19      A.  Not that I recall.
20      Q.  Do you recall any conversations or
21  communications that you had with constituents concerning
22  mail in ballot fraud?
23           COURT REPORTER:  Mail?
24           MR. SWEETEN:  Mail in ballot fraud.
25      A.  Not that I recall.  Those conversations could
```

## Page 304

```
 1  have existed.  But I can't remember specifically or
 2  generally.
 3      Q.  Are you -- Do you recall any conversations or
 4  communications with constituents that you had concerning
 5  documented cases of non-citizens committing in-person
 6  ballot fraud in Texas?
 7      A.  I don't recall any.
 8      Q.  Do you recall having any conversations or
 9  communications with constituents concerning the
10  relationship of S.B. 14 with fears of illegal immigrants
11  voting?
12           COURT REPORTER:  I'm sorry.  Sir, at the
13  end of every one of your questions, I'm having a little
14  bit of difficulty understanding the words.  I don't know
15  exactly why that is.  But it --
16           MR. ROSENBERG:  Let me repeat that.
17      Q.  And I guess my first question, Representative
18  Harless, have you been able to understand my
19  questions?
20      A.  I understand.  There's -- there's a delay,
21  like, a second where maybe a syllable of a word doesn't
22  come across like almost on a cell phone.  But I've
23  understood what you're asking.
24      Q.  Okay.  I will try to slow down despite
25  Mr. Sweeten's threat of a cut off.
```

Ken Owen & Associates, L.P.

Page 305

1    Representative Harless, do you recall any
2    conversation or communication that you've had with
3    constituents concerning a relationship between S.B. 14
4    and fears of illegal immigrant voting?
5        A.  I do not recall any.
6        Q.  Representative Harless, have you ever had an
7    individual registered voter tell you that they did not
8    vote because they were concerned about voter fraud
9    cancelling out their votes?
10       A.  I don't recall a conversation of that.
11       Q.  All right.  I'd like you to turn your attention
12   to page 132 of the transcript of your deposition --
13       A.  Yes, sir.
14       Q.  -- line 16 where you were asked, "Have you ever
15   had an individual registered voter tell you that they did
16   not vote because they were concerned about voter fraud
17   cancelling out their vote."  Do you see that?
18       A.  Yes, sir.
19       Q.  And then on line 22 after Mr. Sweeten's
20   objection, you said, "I believe by answering that I will
21   -- I will reveal personal conversations with
22   constituents."  Do you see that?
23       A.  Yes, sir.
24       Q.  Can you tell me what you meant by your answer?
25       A.  I just meant that if that conversation took

Page 306

1    place, it was considered privileged at that time.
2        Q.  But you don't recall ever having any such
3    conversation?
4        A.  No, not that I recall; no.
5        Q.  And do you ever recall having -- In my
6    questions I've used the phrase "conversations" or
7    "communications."  And to be clear by communications,
8    meant all kinds of communications, oral or written.  Do
9    you understand that?
10       A.  I understand that.
11           And I also understand that constituents may
12   write into the office and get a response.  But I'm -- I
13   mean, those may be hundreds a week during session.  So I
14   just don't know those --
15       Q.  Okay.
16       A.  -- or remember those off the top of my head.
17       Q.  Representative Harless, have you ever had an
18   individual registered voter, who is a member of a racial
19   minority group or ethnic minority group or language
20   minority group, tell you that they did not vote because
21   they were concerned about voter fraud cancelling out
22   their vote?
23       A.  I don't recall having a conversation like that.
24       Q.  Do you recall any conversation or
25   communications with any constituents concerning your

Page 307

1    taking a more prominent position on photographic I.D. in
2    the Legislature?
3        A.  There may have been e-mail communications when
4    we sent out information to constituents.  But I don't
5    remember those.
6        Q.  I'd like you to turn your attention to page 185
7    of the transcript.
8        A.  1815?
9        Q.  185.
10       A.  185?
11       Q.  Yeah.
12       A.  Yes, sir.
13       Q.  And the question was asked on line 10:  "Why did
14   you take a more prominent position on this issue in the
15   82nd Legislature."  And this issue meant photographic
16   identification.  Do you see that?
17       A.  Yes, sir.
18       Q.  And then there's an objection by Mr. Sweeten.
19   And you answered, "Well, it's difficult to answer that
20   without revealing communications with constituents, but I
21   will say it's an issue that was important to my
22   district."  Do you see that?
23       A.  Yes, sir.
24       Q.  Do you see that?
25       A.  Yes, sir.

Page 308

1        Q.  Can you explain to me what you meant by your
2    answer?
3            MR. SWEETEN:  Well, I think -- The
4    question is phrased, Ezra -- I'm fine with you asking her
5    about constituent communications about the issue.  But
6    when you look back at the question, which is why did you
7    take a more prominent position, she's not going to reveal
8    that answer as to why she took a more prominent position.
9    That would be privileged.
10           She can -- I'll let her discuss any
11   communication she had as referenced in her answer because
12   I think that's what the Court --
13           MR. ROSENBERG:  That's all I'm looking
14   for, Pat.  And specifically, I'm focusing on her answer
15   that it's difficult to answer that without revealing
16   communications with constituents.
17       Q.  Which communication with constituents were you
18   concerned about revealing?
19           MR. SWEETEN:  Well, I mean, if the
20   question is what constituents did you speak with about
21   your position on -- in the 82nd Legislature, I'm fine
22   with that.  I'm still kind of bothered by the fact that
23   you're asking her why did you take it because it relates
24   back to a question that's clearly objectionable under the
25   order.  So, Ezra, I think we can get through this.  I'm

Ken Owen & Associates, L.P.

## Page 309

1   just uncomfortable having her answer in relation to the
2   question why.  So if you want to ask -- Go ahead.
3        MR. ROSENBERG:  Well, I understand what
4   you're saying.
5        Q.   Let me focus on this:  And when you referred to
6   your concern about revealing conversations with
7   constituents, which constituents were you concerned
8   about?
9        A.   Conversations that I've had with constituents,
10  as I've mentioned earlier, at early voting places where
11  they said protecting the integrity of the election
12  process by verifying that you are who you say you was was
13  important to them.  And I can't tell you specific
14  constituents.  And but I know that I've had those
15  conversations during early voting and working election
16  polls.
17       Q.   And you can't remember the names of any of
18  those constituents; is that right?
19       A.   Not off the top of my head.
20       Q.   And other than those conversations, were there
21  any other constituents with whom you had conversations
22  concerning your position on photographic I.D.?
23       A.   It's an issue that's important to my district.
24  I hear about it often.
25       Q.   And I understand that.  And I'm asking if you

## Page 310

1   identify any other constituents other than those with
2   whom you had conversations in a polling place?
3        A.   Not that I can recall.
4        Q.   Did you have any communications in 2010 prior
5   to filing S.B. 14 concerning photographic voter I.D.
6   other than those conversations that you described?
7        A.   Possible.
8        Q.   Do you recall any specific ones?
9        A.   No, I don't.
10       Q.   At your deposition do you recall testifying
11  about conversations that you had with Catherine
12  Engelbrecht?
13       A.   Yes.
14       Q.   And can you -- I think you testified that the
15  conversation occurred around March, 2011; is that
16  correct?
17       A.   I -- I testified that it happened after -- it
18  was announced that I would carry the legislation in the
19  first committee meeting, which I guess was around March
20       Q.   And how long did that conversation last?
21       A.   I don't know exactly.  But I would say less
22  than ten minutes.
23       Q.   And the conversation occurred in your office?
24       A.   Yes, sir.
25       Q.   And can you tell me the substance of the

## Page 311

1   conversation?
2        A.   She came to the office to let me know that she
3   was available if I had any questions or needed any
4   assistance.
5        Q.   And what else was said during the conversation?
6        A.   I -- I don't know exactly.  But it was
7   basically for your stopping by and letting me know that
8   you're available.  I appreciate it.  And it was just a
9   basic kind of introduction meeting.
10       Q.   Now, who is Catherine Engelbrecht?
11       A.   She is a lady who is part of the King Street
12  Patriots --
13       Q.   And --
14       A.   -- or I think that's who's she's associated
15  with.
16       Q.   And who are the King Street Patriots?
17       A.   You know, I don't -- I don't know them
18  personally.  I think they're -- I think originally they
19  started as a Tea Party group.  But I'm not exactly sure.
20       Q.   Prior to that conversation that you had with
21  Ms. Engelbrecht, have you ever discussed voter
22  identification with her?
23       A.   Not that I recall.  I only remember seeing her
24  one other time prior to that.
25       Q.   And after that conversation with

## Page 312

1   Ms. Engelbrecht, did you have any other conversations
2   with her concerning voter identification?
3        A.   You know, I don't know for sure.  During
4   session, people wander the halls, and we pass them in the
5   halls and say hi, how are you doing.  That could be
6   possible.  But not -- not that I recall.
7        Q.   Did Ms. Engelbrecht subsequently provide any
8   help to you in relation to S.B. 14?
9        A.   I don't think she did to me.  She may have
10  visited with my staff.  But I don't remember anything
11  specific.
12       Q.   And when you say, she may have visited with
13  your staff, do you know whether she visited with your
14  staff?
15       A.   I don't know.
16       Q.   Do you know whether she spoke with any other
17  legislators?
18       A.   I don't know that.
19       Q.   Do you know whether she provided any assistance
20  to any legislator concerning S.B. 14?
21       A.   No, I don't.
22       Q.   At your deposition I think you also mentioned
23  conversations that you had with George Hammerline.  Do
24  you recall that?
25       A.   Yes, sir.

Ken Owen & Associates, L.P.

Page 313

1  Q.  Do you know who is George Hammerline?
2      A.  He's someone who works for one of the county
3  agencies.  I'm not sure if it's the clerk or the voter
4  registrar or which agency, but he works for Harris
5  County.
6      Q.  And when were your conversations with him
7  concerning S.B. 14?
8      A.  He stopped by the office after -- I don't know
9  if it was after the committee or after it was announced
10 that I would carry the legislation and said he was
11 available to help if I needed any.
12     Q.  And what was your response?
13     A.  Thank you.  I appreciate it.  I'll keep your
14 card.  And if I need any help, we'll contact you.
15     Q.  And what kind of help did you understand that
16 he was offering?
17     A.  I had no clue.
18     Q.  Did you ask him what kind of help he was
19 offering?
20     A.  No, sir.
21     Q.  Did you have any other conversations with
22 Mr. Hammerline, other than that conversation concerning
23 voter registration?
24     A.  I could have.  But I don't know specifically.
25     Q.  Do you know whether Mr. Hammerline did, in

Page 314

1  fact, provide any assistance to any of the Texas
2  legislators, including yourself, concerning the passage
3  of S.B. 14?
4          MR. SWEETEN:  I think that goes beyond
5  communications.  But I mean, if you're asking her if she
6  knew of communications Hammerline has had with anybody
7  else, you can absolutely answer that question.
8      A.  Not that I know of.  He may have.  But I don't
9  know.
10     Q.  Did you have any communications with any
11 lobbyists concerning S.B. 14?
12     A.  They may have stopped by the office.  I can't
13 recall specifically.  I don't -- I didn't seek any out.
14 But as with any piece of legislation, once the author is
15 announced or the bill starts moving, people just stop by
16 the office during the legislative session and want to
17 give their assistance.  And I usually try to thank them
18 and continue on doing my due diligence.
19     Q.  But do you remember specifically any lobbyist
20 with whom you or your staff communicated concerning S.B.
21 14?
22     A.  On myself, not that I recall.  The staff have
23 lots of meetings when I'm not there.
24     Q.  Were you made aware of any meetings that your
25 staff had with a lobbyist?

Page 315

1      A.  Not that I recall.
2      Q.  Does your office maintain any documentation of
3  meetings that you or your staff have with lobbyists?
4      A.  I'm not sure of the documentation my staff
5  maintains.
6      Q.  Do you know whether any documentation
7  concerning meetings with you and your staff with
8  lobbyists has been produced in this litigation?
9      A.  I don't -- I don't know exactly what all has
10 been produced.  I know we produced a lot of stuff.  But I
11 can't recall it.
12     Q.  Did any of your constituents without prompting
13 from your office reach out to your office to offer their
14 assistance with S.B. 14?
15     A.  I don't know that.
16     Q.  Did you have any conversations with
17 constituents who opposed S.B. 14?
18     A.  You mean, communication or conversations?
19     Q.  Well, let's start with conversations.
20     A.  Not that I recall.
21     Q.  Did you have any communications with
22 constituents that opposed S.B. 14?
23     A.  I know that during the legislative session in
24 the interim, we send out an e-mail newsletter to kind of
25 update our constituents on things that we're working on

Page 316

1  and legislative issues and status of legislation.  And,
2  you know, when we send that out, we always get feedback,
3  which is the purpose of the communication.  And there may
4  have been some constituent feedback after we sent out
5  newsletters.
6          MR. ROSENBERG:  Okay.  Representative
7  Harless, thank you for your time.  I'm going to turn
8  the questioning over to Mr. Freeman.
9          THE WITNESS:  Okay.  Thank you.
10         MR. ROSENBERG:  Thank you.
11 Dan, you may be on mute.
12         MR. FREEMAN:  Hello, can you hear me?
13         MR. ROSENBERG:  Yes.
14         MR. FREEMAN:  Okay.  Sorry about that.
15             EXAMINATION
16 BY MR. FREEMAN:
17     Q.  Good morning, Representative.
18     A.  Hi; how are you.
19     Q.  I'm all right.  Sorry that I'm not able to be
20 there in person today.  Although, it is nice to be home
21 once in a while.
22     A.  I bet.  I bet you're glad to be home.
23     Q.  I've almost achieved gold status on American
24 Airlines now.
25     A.  Good for you.

Ken Owen & Associates, L.P.

---

Page 317

1    Q.  Yeah.  So I just have a few additional
2  questions.
3        First of all, were there any particular groups
4  that you were aware of that were vocal in advocating for
5  voter I.D.?
6    A.  I'm sure there were.
7    Q.  You know -- Pardon me?
8    A.  I'm sure there were.
9    Q.  Do you recall any particular names of groups?
10    A.  The only one that I recall would be the Texas
11  Federation of Republican Women.
12    Q.  You had previously mentioned the King Street
13  Patriots.  Do you know if they were vocal about voter
14  I.D.?
15    A.  Probably.  But I don't know for sure that I
16  knew that.
17    Q.  Well, their leader did come to visit you,
18  didn't she?
19    A.  Yes, she did.
20    Q.  And so it would be fair to say that they were
21  reaching out to you on the issue; is that correct?
22    A.  Well, not necessarily.  Because I don't know
23  that I knew she was a leader of the King Street Patriots,
24  and I don't know that I knew what her role was, Catherine
25  Engelbrecht.

---

Page 318

1    Q.  When she visited with you, did she explain her
2  relationship to the King Street Patriots?
3    A.  No, I don't think she did.
4    Q.  And you had said before that she offered some
5  kind of assistance.  Did she specify what type of
6  assistance she could make available?
7    A.  Not that I recall.
8    Q.  Okay.  One more quick follow up on one of
9  Mr. Rosenberg's questions, he had spoken to you about
10  whether constituents had spoken to you about specific
11  incidents of in-person voter fraud in your district,
12  House District 126.  Were there any conversations that
13  you had with constituents about specific evidence of
14  incidents of in-person voter fraud?
15    A.  Not that I recall.
16    Q.  Did they ever tell you a particular date when
17  in-person voter fraud had occurred?
18    A.  A particular what?
19    Q.  A particular date or a particular election.
20    A.  Not that I recall.
21    Q.  Okay.  Did they ever tell you a particular
22  polling place where in-person voter fraud had occurred?
23    A.  Not that I recall.
24    Q.  Okay.  Thank you.
25        Ms. Stelcen from Dechert has a few documents

---

Page 319

1  with her that were produced alongside the Court's ruling
2  about the application of legislative privilege to
3  constituent communications.  And I'd like to just have
4  her put just a few of those in front of you so we could
5  talk through them.
6    A.  Okay.
7    Q.  Now, first, I believe Lindsey has a document
8  marked as Exhibit 790 --
9        MS. STELCEN:  Correct.
10    Q.  -- which should have a Bates number on the top
11  TX_00007063.
12        MR. FREEMAN:  Lindsey, could you please
13  put that in front of the witness?
14        MS. STELCEN:  (Tenders documents.)  Okay.
15    Q.  Representative, what is this document?
16    A.  It looks like maybe an e-mail.
17    Q.  And is it an e-mail from you to Mr. Beuck?
18    A.  It looks like it.
19    Q.  When is the e-mail dated?
20    A.  November 21st, 2011.
21    Q.  And if you could, take a moment to look at the
22  text of the e-mail.  Did you say that you would be making
23  two speeches in the next week?
24    A.  I -- I -- I don't know.  I don't see two
25  speeches.  It says, I appreciate you forwarding me the

---

Page 320

1  information but you know I'm expected to give a speech
2  outline on both redistricting and photo voter I.D. by
3  Wednesday, right.
4    Q.  And it says later, I have lots of good info on
5  both.  I just need them in one piece of paper for my two
6  speeches next week.
7    A.  Oh, okay.  I see that.
8    Q.  When were those speeches?  Were they the
9  following week?  Do you recall them?
10    A.  I have no clue.
11    Q.  Do you recall where you gave those speeches?
12  This would be around Thanksgiving last fall.
13    A.  No.
14    Q.  Do you recall who the audiences were?
15    A.  No, sir.
16    Q.  Do you recall if there were any Hispanic voters
17  in attendance?
18    A.  No, sir.
19        MR. FREEMAN:  Okay.  Lindsey, if you could
20  put the document labeled U.S. Exhibit 791 in front of the
21  witness.
22        MS. STELCEN:  (Tenders documents.)  Okay.
23    Q.  Representative, what is this document?
24        MR. SWEETEN:  I caution the witness to
25  review it before answering the question to the extent you

---

Ken Owen & Associates, L.P.

Page 321

1  need to.
2      A.  Just one second.  Can I look through it?
3      Q.  Of course, you can.
4      A.  It looks like an e-mail from Colby to me on
5  speech follow up with details.
6      Q.  And is it dated November 28, 2011?
7      A.  Yes, sir.
8      Q.  So that's the week after the prior e-mail,
9  correct?
10     A.  Yes, sir.
11     Q.  Can you turn to the last page, which should be
12  marked TX_00007052?
13     A.  Yes, sir.
14     Q.  Thank you.  If you look at the second or third
15  to last line, did you write that the information for
16  speeches is to friendly groups?
17     A.  That's what it says.
18     Q.  And do you recall who you would have referred
19  to as friendly groups?
20         MR. SWEETEN:  Wait a minute.  Hold on a
21  minute.  You're asking her to interpret the words, Dan,
22  what she meant?
23         MR. FREEMAN:  I'm trying to see if this
24  can refresh her recollection about who she was speaking
25  to.

Page 322

1          MR. SWEETEN:  Well, she can testify about
2  whether or not this statement is there.  But she's not
3  going to give -- she's not going to give information in
4  support of or interpreting the words, you know, that are
5  on this page.
6          So I'm going to caution you.  I don't want
7  you to -- You don't have to reveal your thoughts and
8  mental impressions to the extent that they would relate
9  to legislation, including Senate Bill 14, in answering
10  this question.
11         MR. FREEMAN:  Mr. Sweeten, I think we can
12  both agree that this e-mail does not address a
13  legislative act.  Rather it addresses a single act and,
14  therefore, definition of a friendly group is not
15  protected by the privilege.  I'm going to re-ask my
16  question, and I'll ask you not to object on that basis.
17  So let me rephrase my question.
18     Q.  Representative, on the second or third last
19  line did you write to Mr. Beuck, "This info is for
20  speeches to friendly groups"?
21     A.  That's what it says, yes, sir.
22     Q.  And who -- Does that help refresh your
23  recollection as to who you would be speaking to?
24     A.  No.
25     Q.  And who would you typically define as a

Page 323

1  friendly group when you were doing a public speech?
2          MR. SWEETEN:  Well, you can answer that to
3  the extent you're not revealing your thoughts and mental
4  impressions about legislation.  So you can answer if it
5  won't do that.
6      A.  I -- if I -- off the top of my head -- And I
7  don't know specifics.  But off the top of my head, a
8  friendly group, I would think, would be a Republican
9  group.  And we try to keep partisan out of it.  So but I
10  don't know if that's what I was referring to.
11     Q.  Are there any other particular groups that you
12  give speeches to that you would refer to as friendly
13  groups?
14     A.  Groups that have my family in it.
15     Q.  I thought you said your family are all of your
16  business competitors, Representative?
17     A.  They are.  They're still friendly.
18     Q.  I'm glad to hear it.
19     A.  They're constituents, too.
20     Q.  Okay.  Then do you recall if you used bullet
21  points in your speeches?
22     A.  Excuse me?
23     Q.  Do you recall if you used bullet points
24  provided by Mr. Beuck in your speeches?
25     A.  I -- I -- I'm sure I used some.

Page 324

1      Q.  Okay.  Now, on the same page do you see where
2  you wrote, "Our bill needs both the constitutional test
3  of Indiana and preclearance of Georgia"?
4      A.  Yes.
5      Q.  And so you were aware that the Supreme Court
6  decisions concerning Indiana was addressing a
7  constitutional test, correct?
8          MR. SWEETEN:  Don't answer the question if
9  you would require you to reveal thoughts or mental
10  impressions about legislation.  If it would require you
11  to do so, do not answer the question.
12     A.  What is the question again?
13         MR. FREEMAN:  Could the court reporter
14  please read it back?
15         COURT REPORTER:  Yes.
16         (Whereupon requested testimony read back.)
17         MR. SWEETEN:  Same instruction.
18     A.  I -- I guess.  I don't know.
19     Q.  And you were aware that your preclearance
20  addressing Georgia concerns the Voting Rights Act; am I
21  correct?
22         MR. SWEETEN:  The same objection, if it
23  would require you to reveal your thoughts and mental
24  impressions about legislation, including Senate Bill 14,
25  don't answer.

Ken Owen & Associates, L.P.

Page 325

1    A.  Yes, I am aware of that.
2    Q.  Okay.  Now, let's turn to the substance, which
3  is back on the first page of this exhibit.  If you look
4  to the third bullet on the first page, does the e-mail
5  from Mr. Beuck state that in-person voter fraud may not
6  be evident until after the election has occurred?
7    A.  Yes.
8    Q.  Does this statement logically imply that
9  in-person voter fraud may be evident after the election
10  occurred?
11         MR. SWEETEN:  I'm going to object.  To the
12  extent it would require you to reveal your thoughts and
13  mental impressions about legislation, don't answer the
14  question.
15    A.  Well, I think the statement says that, in fact,
16  in-person voter fraud may not be evident until after the
17  election has occurred.  The statement says what it says.
18    Q.  Are you aware of any cases of in-person voter
19  fraud that were detected only after an election had
20  occurred?
21         MR. SWEETEN:  Do not reveal your thoughts
22  or mental impressions about legislation in answering his
23  question.  Anything you considered your motivations about
24  the bill do not provide them in answering this question.
25    A.  I don't recall specifics.

Page 326

1    Q.  Okay.  Have you ever signed a poll book when
2  you voted in Texas?
3    A.  I don't know what it's called.  But when I show
4  up to vote, I give them my voter registration and usually
5  have to sign something.
6    Q.  Okay.
7    A.  Is it a poll book, I don't know.
8    Q.  Are you aware of any cases set out in the
9  public record concerning this case in which signature in
10  a poll book has been found not to match a signature on
11  file and thus proving the case of in-person voter fraud?
12         MR. SWEETEN:  Same instruction, don't
13  reveal your thought processes about legislation in
14  answering this question.
15    A.  I don't recall specifically.
16    Q.  Okay.  If you can keep looking at that same
17  bullet point, did Mr. Beuck also write, "Over the last
18  couple of legislative sessions we heard from many
19  witnesses who testified that voter registration cards had
20  been stolen and false votes cast in those person's names
21  most of whom were decreased"?
22    A.  That's what he wrote.
23    Q.  Who were the witnesses that he's referring to?
24    A.  I -- I don't know specifically.  I know that --
25         MR. SWEETEN:  Objection, legislative

Page 327

1  privilege.
2         MR. FREEMAN:  Mr. Sweeten, it was a
3  question about the public record and hearings in the
4  House.
5         MR. SWEETEN:  Okay.  You can testify as to
6  matters of the public record.  But don't reveal your
7  thoughts or mental impressions about legislation.  Go
8  ahead.
9    A.  I don't know specifically.  I know that over
10  the last few sessions, all the hearings -- committee
11  hearings and the floor is recorded and available to watch
12  at any time.  The one specifically that I remember is
13  Senator Williams' brother in the Senate side testifying
14  of that happening.  But that's the only one I recall
15  specifically.
16    Q.  When were those voter registration card stolen?
17    A.  I don't know.
18    Q.  Did Senator Williams' brother explain when or
19  how the voter registration card had been stolen?
20         MR. SWEETEN:  You can refer to matters of
21  public record.
22    A.  I don't recall that.
23         COURT REPORTER:  I'm sorry?
24         MR. SWEETEN:  You can refer to matters of
25  the public record.

Page 328

1         Go ahead, Representative.
2    A.  I don't recall that.
3    Q.  Do you recall any testimony about where these
4  voter registration cards had been stolen from?
5    A.  No, sir.
6    Q.  Do you know why voter registration cards had
7  been printed for individuals who were dead?
8         MR. SWEETEN:  Refer to matters of public
9  record only in answering the question.
10    A.  I don't.
11    Q.  Are you aware as a matter of law whose
12  responsibility it is to remove dead voters from the
13  voting roles?
14    A.  I don't know that I know specifically.  But I
15  think that it's the voter registrar's responsibility.
16    Q.  Does Texas law already mandate that --
17    A.  I'm sorry.  I lost you at mandate.
18         Hello; hello?
19         MR. ROSENBERG:  I think he must have
20  gotten cut off.  It's 11:42 just in case you're keeping
21  track, Patrick.  But let's see what time he gets back on.
22         MR. SWEETEN:  Okay.
23         MR. ROSENBERG:  I'll shoot him an e-mail.
24         There he is.  Dan, we lost you for a
25  second.

Ken Owen & Associates, L.P.

Page 329

1    MR. FREEMAN:  Yeah, my connection cut out.
2  I apologize for that.  I apologize for wasting everyone's
3  time for a moment there.  Are we ready to go back?
4    MR. SWEETEN:  Yeah.  We stopped the clock
5  at 36 minutes.  So we'll go back on now.  Okay?
6    MR. FREEMAN:  Thank you for that.  I
7  appreciate the courtesy.
8    Q.  Representative, my prior question I think was
9  lost because of a phone difficulty on my end, which was
10 whether Texas law prior to S.B. 14 already mandated the
11 removal of dead voters from the voting roles?
12   A.  I'm not familiar.
13   Q.  Do you know if federal law already mandates
14 list maintenance be conducted at a state level?
15   A.  I'm not aware.
16   Q.  And you can name no one, other than Senator
17 Williams' brother, who testified concerning the theft of
18 a voter registration card; is that correct?
19   A.  That's the only person I remember from a number
20 of years of committee hearings.
21   Q.  Okay.  Thank you for your testimony.
22   Now, in the sixth bullet do you see where
23 Mr. Beuck quotes from Crawford v. Marion County for
24 election?
25   A.  I see the sixth bullet and I see -- What part

Page 330

1  specifically?
2    Q.  Well, in April of 2008, the U.S. Supreme Court
3  upheld Indiana's photo I.D. law six-to-three in Crawford
4  vs. Marion.
5    A.  Yes.
6    Q.  In fact, wasn't that decision only addressing
7  Indiana's law?
8    MR. SWEETEN:  Yeah, don't reveal your
9  thoughts and mental impressions about the law if it would
10 relate to what you considered with respect to this bill;
11 okay, don't reveal those.  That's legislatively
12 privileged.
13   Also, Dan, is this a correspondence
14 between -- is this a constituent correspondence that
15 we're looking at?
16   MR. FREEMAN:  This was withheld on the
17 basis that it is a speech that would be given to
18 constituents, I believe.  We didn't receive this until a
19 few days ago.  But I think this is fairly within the
20 scope of the deposition.
21   MR. SWEETEN:  Well, I mean, the scope of
22 the deposition is really limited to constituent
23 communications.  I'll let you continue on this document
24 because I hear what you're saying.  But if on any further
25 documents, if we can go back to constituent

Page 331

1  communications.
2    MR. FREEMAN:  I will assure you that all
3  further documents are direct correspondence between the
4  Representative and --
5    MR. SWEETEN:  Okay.  And I'm letting this
6  examination continue based on your representation that we
7  withheld it based on the fact that it's a constituent
8  communication.
9    So go ahead, Representative Harless, you
10 can answer his question.
11   A.  I'm not sure what the question was.
12   Q.  I'm happy to rephrase it.
13   Am I correct that the document states that the
14 decision in Crawford v. Marion County for election in
15 this document -- that the decision addressed all photo
16 I.D. requirements but that the words "photo I.D.
17 requirements" are in brackets?
18   A.  You know, I -- I see that.  I will --
19   MR. SWEETEN:  Don't give the whys.  We're
20 not giving why you did something.  If you can, answer
21 that question as phrased as to what's on the document.
22   A.  I see that you say that.
23   Q.  Am I correct that I didn't say that but
24 Mr. Beuck wrote "photo I.D. requirements" but it is in
25 brackets; is that correct?

Page 332

1    A.  Yes.
2    Q.  And are you aware of whether the actual
3  decision language of Crawford vs. Marion County where
4  those brackets appear simply named the Indiana photo I.D.
5  law?
6    A.  I'm not aware of that.
7    MR. SWEETEN:  Privileged clearly.
8    Q.  And do you see where Mr. Beuck wrote that
9  Justice Stevens's opinion also noted that for the few
10 voters without I.D., the burden of obtaining one does not
11 qualify as a substantial burden on the right to vote?
12   A.  I see where he wrote that.
13   Q.  And are you aware of whether Justice Stevens's
14 was talking about factual scenarios beyond Indiana?
15   MR. SWEETEN:  No.  We're not going to
16 interpret a decision to the extent that it would require
17 you to reveal your thoughts or mental impressions about
18 legislation.  So if in answering the question it would do
19 that, do not answer the question.
20   A.  I -- I have no clue what you're talking about.
21   Q.  Okay.  Texas is a bigger state than Indiana,
22 correct?
23   A.  Yes.
24   Q.  And Texas has higher overall poverty rates than
25 Indiana, correct?

Ken Owen & Associates, L.P.

## Page 333

1  A.  I don't know that for sure.
2  Q.  Okay.  Are you aware of whether Justice Stevens
3  preceded the language that's quoted here by saying he was
4  referring to most voters who need I.D., not all voters
5  that need I.D.?
6      MR. SWEETEN:  Same instruction on
7  privilege.  But you can answer.
8      A.  I'm not aware of what he was -- what he was
9  saying.
10  Q.  Okay.  If you look under bill details, do you
11  see the third bullet where it states that S.B. 14
12  contains an exception for indigent voters?
13  A.  Yes.
14  Q.  Does S.B. 14, in fact, contain an exception for
15  indigent voters?
16  A.  I can't recall specifically what all was in
17  there.
18  Q.  Do you know if the Indiana law contained an
19  exception for indigent voters?
20  A.  I don't recall.
21  Q.  Wasn't that exception taken out during the
22  legislative process prior to S.B. 14 being signed into
23  law?
24      MR. SWEETEN:  Objection, foundation.
25  A.  I don't recall.

## Page 334

1  Q.  Okay.  For the last set of questions on this
2  document, if you could turn to the second page.  Do you
3  see the heading for S.B. 14 Timeline?
4  A.  Yes.
5  Q.  You can go down to October 5.  Is it correct
6  that the document states that the S.O.S. does not have
7  information requested by the Department of Justice
8  concerning the race of voters?
9  A.  Do you want me to read what it says?
10  Q.  I'm just asking whether the document states
11  that.
12      MR. SWEETEN:  He's just asking if it says
13  what it says.
14  A.  Yes.
15  Q.  Okay.  When Ann McGeehan, the Texas director of
16  elections, appeared before the select committee on voter
17  identification in voter fraud, did you ask her publicly
18  for any such data?
19  A.  I may have.  I don't recall specifically.  We
20  asked her for several things.  I just don't know
21  specifically what it was.
22  Q.  And are you aware whether the Legislature as a
23  whole received data concerning the racial composition of
24  the group that lacked the necessary I.D. during the
25  legislative process?

## Page 335

1      MR. SWEETEN:  No, we're not answering that
2  question.  Okay.  We're not answering the question that
3  you're posing, which is not part of what the Court has
4  ordered her to sit on.
5      Now, I've let you have some latitude on
6  this document.  But -- but we're not getting into that
7  information.  This is a limited, very narrow purpose
8  deposition about constituent communications.  We are way
9  far afield here, Dan.
10      MR. FREEMAN:  All right.  That's fine.
11  Lindsey, could you put Document 792 in
12  front of the Representative?
13      MS. STELCEN:  (Tenders document.)  Okay.
14  Q.  Representative, what is this document?
15  A.  It looks like an e-mail dated February 6th,
16  2009 to a number of legislators.
17  Q.  Are you the first listed recipient?
18  A.  On this document, yes.
19  Q.  Okay.  Are you aware of whether Ms. Krannig
20  resides in your district?
21  A.  I'm not aware.
22  Q.  Okay.  Am I correct that Mr. Krannig wrote to
23  you, quote, "Letting these illegals come into our country
24  and register under several names and then vote is not
25  doing your job"?

## Page 336

1  A.  I read that she wrote that.
2  Q.  Did you receive any other communications,
3  either verbal or communicated by e-mail similarly
4  alleging that undocumented immigrants are voting in
5  Texas?
6  A.  Not that I recall.
7  Q.  Did you receive any substantive proof that
8  undocumented immigrants are voting in Texas from your
9  constituents?
10      MR. SWEETEN:  Okay.  To the extent that
11  he's asking you if constituent communications occurred,
12  you can answer that.
13      I mean, the proof has a value element to
14  it, Dan, whether she thought it was proof.  So I don't
15  want to get into proof.  If you want to phrase it another
16  way --
17      MR. FREEMAN:  Yeah, I'll rephrase.
18      MR. SWEETEN:  Okay.
19  Q.  Did you receive in any other communications
20  from constituents providing evidence or specific facts
21  related to incidents of undocumented immigrants voting in
22  person illegally?
23  A.  Not that I remember.
24  Q.  Did you receive any other accusations
25  concerning that?

ken@kenowen.com * www.kenowen.com
800.829.6936 * 512.472.0880

Ken Owen & Associates, L.P.

## Page 337

1   MR. SWEETEN:  If it's a constituent
2   communication, you can answer.
3       A.  I can't remember.
4       Q.  Okay.  If you turn to the next page of the same
5   document.  Is this a responsive e-mail from you to
6   Ms. Krannig?
7       A.  It looks that way.
8       Q.  And did your response in any way try to
9   dissuade Mr. Krannig from her belief that undocumented
10  immigrants are registering and voting?
11      A.  It's just a blanket thank you for your letter.
12  We appreciate hearing from you.
13      Q.  In fact, you wrote that you would support an
14  honest and secure voter I.D. in the next session; is that
15  correct?
16      A.  "Securing integrity in the election system is
17  very important to me, and this session I will support
18  legislation establishing honest and secure voter I.D."
19      Q.  And so you were in some respects confirming
20  Ms. Krannig's suspicions; is that correct?
21      MR. SWEETEN:  You just testify as to what
22  you responded to.
23      A.  I responded that I would support legislation
24  establishing honest and secure voter I.D.
25      Q.  And so by saying that, you were saying that

## Page 338

1   honest and secure voter I.D. was necessary because of the
2   cases of illegal voting that Ms. Krannig was alleging; is
3   that correct?
4       A.  I think you're putting words in my mouth.  I
5   said, "I will support legislation establishing honest and
6   secure voter I.D."  That's --
7       Q.  Why would you tell Ms. Krannig that you were
8   supporting legislation concerning honest and secure voter
9   I.D. after Ms. Krannig's allegations were put to you
10  concerning undocumented immigrants voting?
11      MR. SWEETEN:  Don't answer the question.
12  Legislative privilege.
13      A.  Privilege.
14      MR. FREEMAN:  Okay.  Lindsey, if you can
15  put Exhibit 793 in front of the witness?
16      MS. STELCEN:  (Tenders document.)  Okay.
17      Q.  Take a moment to look at it, please.
18          Representative, what is this document?
19      A.  It looks like the top one is a response from
20  our office to a constituent.
21      Q.  And is the second page an e-mail from a
22  constituent to you?
23      A.  Yes, the bottom of the first and the top of the
24  second.
25      Q.  Thank you.

## Page 339

1       When is this constituent's e-mail dated?
2       A.  His is dated Sunday, March 20th, 2011.
3       Q.  And so that is right around the time that the
4   vote and the debate was happening in the House concerning
5   S.B. 14; is that correct?
6       A.  I guess close to it, yes.
7       Q.  If you look at the second page, did Mr. Beethe
8   state that he would like it to be harder to vote?
9       A.  Yes.
10      Q.  Did Mr. Beethe favor requiring proof that taxes
11  have been paid prior to voting?
12      A.  He says, "Registration 30 days before election,
13  I.D., proof that your taxes are paid.  I could go on."
14      Q.  Is requiring proof that taxes had been paid
15  prior to voting similar in some respects to a poll tax?
16      MR. SWEETEN:  Yeah.  Don't answer the
17  question.  He's asking you to interpret it, and it
18  relates to a legislative privilege.
19      A.  I don't know what he means by his statement.
20      MR. SWEETEN:  My instruction is please
21  don't answer the question.
22      Q.  Representative, what is a poll tax?
23      MR. SWEETEN:  You can answer, I mean, not
24  in relation to legislation if you know the answer as a
25  general matter, and it doesn't relate to your thoughts.

## Page 340

1       A.  You know, I don't know specifically.  It was a
2   tax that was charged prior to the Voting Rights Act.
3       Q.  Is it -- Representative, is the poll tax a tax
4   that had to be paid prior to being allowed to vote?
5       A.  I don't remember exactly.
6       Q.  Have other individuals who supported voter I.D.
7   also told you that they wished to make voting more
8   difficult as a general matter?
9       A.  I -- I don't recall.  I don't know.
10      Q.  And with regard to this particular e-mail, did
11  you in any way disagree with Mr. Beethe when you
12  responded to him concerning his beef that voting should
13  be more difficult?
14      A.  "I appreciate your sharing your support for
15  this proposal.  I believe strong voter I.D. legislation
16  is essential to our state to have honest and accurate
17  elections.  I fully support S.B. 14's requirements."  It
18  looks like our general response.
19      Q.  Okay.  So you didn't -- you didn't tell him
20  that you weren't in favor of making voting more
21  difficult, did you?
22      MR. SWEETEN:  You can answer based on the
23  text.
24      A.  It's a general response that we sent.
25      Q.  But isn't this response different than the

Ken Owen & Associates, L.P.

**Page 341**

1  response you sent to Mr. Krannig, which is set out in
2  Exhibit 792?
3      A.  I don't know exactly what the differences are.
4  But the language is pretty much the same.
5      Q.  I'll ask you to compare the two exhibits.  They
6  should both be in front of you.  And I'll ask is your
7  response in both e-mails different?
8      A.  Yes.
9      Q.  Okay.  Thank you.
10         MR. FREEMAN:  Lindsey, if you could put
11  Exhibit 794 in front of the witness?
12         MS. STELCEN:  794?
13         MR. FREEMAN:  Yes, please.
14         MS. STELCEN:  (Tenders document.)  Okay.
15      Q.  Representative, you can take a moment to review
16  the document.
17         Representative, what is this document?
18      A.  It's an e-mail from me -- or from our office to
19  a constituent.
20      Q.  And is your response to the constituent
21  different from the response on the prior two exhibits?
22      A.  Yes.
23      Q.  Okay.  And if you could look towards the
24  bottom, did Ms. Nehiley state that nothing should serve
25  to disenfranchise those who are without means to jump

**Page 342**

1  extra hurdles to vote?
2      A.  Her words were, "Nothing should serve to
3  disenfranchise those who are without means to jump extra
4  hurdles to vote."
5      Q.  Did you receive numerous communications along
6  these lines?
7      A.  I don't have any clue how many we received.
8      Q.  Do you know if you received communications
9  along these lines from constituents with Spanish
10  surnames?
11      A.  I don't know.
12      Q.  Okay.  In response to this, did you claim that
13  ballot access should have at least the same degree of
14  integrity as boarding a plane or cashing a check?
15      A.  My words were, "As the bipartisan commission on
16  the federal election reform concluded, ballot access
17  should have at least the same degree of integrity as
18  boarding a plane or cashing a check, both of which
19  require photo I.D."
20      Q.  So, yes?
21      A.  Yes.
22      Q.  Are you certain, though, that boarding a plane
23  and cashing a check requires a photo I.D.?
24      A.  I'm not certain.
25      Q.  Is it possible to board a plane without one of

**Page 343**

1  the types of photo I.D.s named in S.B. 14?
2      A.  I think that there are -- I think testimony in
3  committee was that it is possible if you jump some
4  hurdles.  But I don't recall exactly what that was.
5      Q.  Okay.  And when is the last time you cashed a
6  check?
7      A.  Last week.
8      Q.  And did you deposit that check at an A.T.M.?
9      A.  No.  I went to the bank and cashed a check.
10      Q.  Did you have to show a photo I.D.?
11      A.  I did.
12      Q.  Have you ever cashed a check at an A.T.M.?
13      A.  No.  I didn't even know you could do that.
14         MR. FREEMAN:  Okay.  Last exhibit and
15  we're almost out of time.  So if you could have
16  Exhibit 795 put in front of the witness.
17         MS. STELCEN:  (Tenders document.)  Okay.
18      Q.  Representative, what is this document?
19      A.  It looks like a constituent e-mail.
20      Q.  And is it addressed to you?
21      A.  It is.  It is in a response from us to a
22  constituent.
23      Q.  Okay.  When is this dated?
24      A.  March 13, 2012.
25      Q.  And, again, is this different from the

**Page 344**

1  responses you gave in Exhibit 792, 793 and 794?
2      A.  They look different.
3      Q.  Okay.  Does Ms. Courtney state that she
4  believes that in-person voter fraud is a fabricated
5  problem?
6      A.  "I think this is a fabricated problem that
7  keeps our elected officials from working on the economy
8  and jobs."
9      Q.  And she had previously said that she is not
10  convinced that there is fraud in our elections; is that
11  correct?
12      A.  "I am not convinced there is fraud in our
13  elections (except the time the Supreme Court gave the
14  election to George Bush."
15      Q.  That would merit passing Senate Bill 14,
16  correct?
17      A.  That's what she says.
18      Q.  Okay.  Do you receive numerous communications
19  stating that constituents did not believe that there was
20  fraud in elections that would merit passing S.B. 14?
21      A.  I have responded before, I don't know how many
22  we received.  I know that the majority of the
23  constituent's e-mails we get are after we send a
24  newsletter stating what's going on in the Legislature,
25  what's going on with legislation.  That's what prompts

Ken Owen & Associates, L.P.

Page 345

1  them to send responses.  And it's feedback.
2     Q.  Okay.  But you don't know whether you've
3  received numerous communications along these lines?
4     A.  I receive numerous communications from
5  constituents all the time.  I don't know what they're
6  about.
7     Q.  Okay.  And in your response to Ms. Courtney's
8  e-mail, did you set out any individual cases of confirmed
9  voter fraud?
10        MR. SWEETEN:  You can review your response
11  to answer the question.
12     A.  It's kind of the same language that we've used,
13  maybe not the exact same words, but the same language
14  about integrity of the election process.  Under current
15  law, we don't have the tools.  The Secretary of State, as
16  well as other law enforcement agencies, testified about
17  past and current voter fraud that has been prosecuted.
18  Though there are more cases of voter fraud than are
19  prosecuted, even one fraudulent vote can cost an
20  election.
21     Q.  And, Representative Harless, can you confirm
22  the existence of more than one successful prosecution in
23  the state of Texas concerning in-person voter fraud?
24        MR. SWEETEN:  You can testify about
25  matters of public law.  Don't reveal privileged matters.

Page 346

1     A.  There was testimony in committee about the
2  numbers and how many have been prosecuted.  I can't tell
3  recall if it was -- if it were one or 1,000.  I don't
4  recall.
5        MR. FREEMAN:  Okay.  I think that's all
6  that I have, Representative.  I appreciate you coming
7  back and finishing up the testimony here.  And I
8  definitely appreciate your time.
9     Q.  Just a quick roll out question, do you have any
10  changes you'd like to make to your testimony today?
11     A.  No, I don't think so.
12     Q.  Anything that you recall now that you didn't
13  recall earlier in your deposition?
14     A.  No, sir.
15        MR. FREEMAN:  Okay.  Well, I thank you so
16  much.
17        I pass the witness.  Mr. Sweeten, do you
18  have any questions on your end?
19        EXAMINATION
20  BY MR. SWEETEN:
21     Q.  Yeah.  I've got one question.
22        Did your office -- In having these constituent
23  communications, did your office have more than one
24  general response that it utilized?
25     A.  In what?

Page 347

1     Q.  We've gone over several of these letters.  Did
2  your office use more than one type of general response to
3  these voter I.D. questions?
4     A.  Yes.
5        MR. SWEETEN:  Okay.  I have nothing else.
6  Thank you.
7        MR. FREEMAN:  We have follow-up questions.
8        MR. ROSENBERG:  We're out of time.  Go
9  ahead.
10        EXAMINATION
11  BY MR. FREEMAN:
12     Q.  Okay.  My quick follow-up question is,
13  Representative, how did you decide which responses to
14  give to which particular constituent?
15        MR. SWEETEN:  Yeah.  She's not going to
16  give her mental processes about how she responded.  She
17  can talk about the facts or why she responded a certain
18  way.  She can't answer as to the communication itself,
19  though.
20        MR. FREEMAN:  Mr. Sweeten, it's not a
21  question about a legislative act or the fact that it is a
22  legislator's mental process does not necessarily connect
23  it to privilege.  I believe that this is a question about
24  her mental processes concerning political communications
25  to constituents.

Page 348

1        MR. SWEETEN:  Well, I think there is
2  potentially some overlap.
3        So I'll just instruct her that if you're
4  going to give matters of legislative privilege if it
5  would reveal your thoughts about the bill, then don't do
6  that.  But if in answering the question you're not going
7  to, then you can.
8     A.  From looking at the e-mails that you have
9  presented as exhibits, they were from the time frame of
10  2009 to 2012, and different staff members' names are on
11  them.  So different staff actually draft the response and
12  send it to the constituent.  You know, whether the
13  language is different because of a different staff person
14  or the time frame -- more knowledge, the longer we're --
15  you know, I serve in the legislature, I can't say for
16  certain.  But I know that -- I know that the language is
17  different.  But the time frame is also extremely
18  different from 2009 to 2012.
19        MR. SWEETEN:  Okay.
20     Q.  Representative, aren't Exhibit 794 and 795
21  dated within just a couple of days of each other?
22     A.  They were; they were.
23     Q.  In fact, the same day?
24     A.  I don't know.  One was March 13th when we
25  responded; March 13th.  But the constituent e-mail was

Ken Owen & Associates, L.P.

Page 349

1 March 12th and March 12th.
2       MR. FREEMAN:  Okay.  Thank you.  That's
3 all that I have.
4       Mr. Rosenberg, did you have any further
5 questions?
6       MR. ROSENBERG:  No, I didn't.
7       And I join in thanking Representative
8 Harless for your time.  And thank you, Pat.
9       MR. SWEETEN:  Thank you.
10      (Deposition Ended at 11:08 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 350

1       CHANGES AND SIGNATURE
2 NAME OF WITNESS:  REPRESENTATIVE HARLESS, VOLUME 2
3 DATE OF DEPOSITION:  JUNE 13, 2012
4 PAGE    LINE    CHANGE        REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 351

1       I, REPRESENTATIVE PATRICIA HARLESS, have read the
2 foregoing deposition and hereby affix my signature that
3 same is true and correct, except as noted above.
4
5
6
7 _____
8       REPRESENTATIVE PATRICIA HARLESS
9
10
11 THE STATE OF _____)
12 COUNTY OF _____)
13
       Before me, _____, on this
14 day personally appeared REPRESENTATIVE PATRICIA HARLESS,
   known to me (or proved to me under oath or through
15 _____) (description of identity
   card or other document) to be the person whose name is
16 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
17 consideration therein expressed.
       Given under my hand and seal of office this
18 _____ day of _____, _____.
19
20
   _____
21       NOTARY PUBLIC IN AND FOR
         THE STATE OF _____
22       COMMISSION EXPIRES: _____
23 _____ No Changes Made    _____ Amendment Sheet(s) Attached
24       State of Texas v. Eric H. Holder, et al
25

Page 352

1       IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2
3 STATE OF TEXAS,        )
       Plaintiff        )
4                        )
   VS.                   )
5                        )
   ERIC H. HOLDER, JR.,  )
6 Attorney General of the    )
   United States of America,  )
7       Defendant        )
                         )
8 ERIC KENNIE, et al,    )
       Defendant-Intervenors, )
9                        )
   TEXAS STATE CONFERENCE    )  Case No. 1:12-cv-00128
10 OF NAACP BRANCHES, et al,  )  RMC-DST-RLW
       Defendant-Intervenors, )  Three-Judge Court
11                       )
   TEXAS LEAGUE OF YOUNG VOTERS)
12 EDUCATION FUND, et al,    )
       Defendant-Intervenors, )
13                       )
   TEXAS LEGISLATIVE BLACK    )
14 CAUCUS, et al,        )
       Defendant-Intervenors, )
15                       )
   VICTORIA RODRIGUEZ, et al, )
16       Defendant-Intervenors. )
17
18       REPORTER'S CERTIFICATION
     DEPOSITION OF REPRESENTATIVE PATRICIA HARLESS
19             VOLUME 2
               JUNE 13, 2012
20
21       I, MELISSA PARKHILL, Certified Shorthand Reporter in
22 and for the State of Texas, hereby certify to the
23 following:
24       That the witness, REPRESENTATIVE PATRICIA HARLESS,
25 was duly sworn by the officer and that the transcript of

## 1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS        )
                      )
                      )
VS.                   )  NO. 12-CV-128
                      )  (DST, RMC, RLW)
                      )
ERIC H. HOLDER, JR.,  )
ET AL                 )
********************************************
      ORAL DEPOSITION OF BRIAN HEBERT
********************************************
     ANSWERS AND DEPOSITION OF BRIAN HEBERT, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 29th day of May, 2012, between the hours of 9:30
a.m. and 7:06 p.m. in the offices of United States
Department of Justice, 816 Congress, Third Floor,
Austin, Texas, pursuant to the agreement of counsel for
the respective parties as hereinafter set forth.
```

## 3

                        INDEX

                                    PAGE
Appearances................................   2

BRIAN HEBERT
   Examination by Ms. Westfall .............. 6
   Examination by Mr. Dunn ..................  343

Signature and Changes ........................ 370
Reporter's Certificate ........................  372

## 2

           A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
ATTORNEY GENERAL'S OFFICE
By:  MR. PATRICK K. SWEETEN
     209 West 14th Street
     Austin, Texas 78701
     PH: (512) 936-1307

FOR THE DEFENDANT:
U.S. DEPARTMENT OF JUSTICE
By:  MS. ELIZABETH S. WESTFALL
     950 Pennsylvania Avenue, NW
     NWB Room 7202
     Washington, DC 20530
     PH: (202) 305-7766

FOR THE INTEVENORS:
BRAZIL & DUNN, LLP
By:  MR. CHAD W. DUNN
     4201 Cypress Creek Parkway
     Suite 530
     Houston, Texas 77068
     PH: (281) 580-6310

     - and -

DECHERT, LLP
By:  MR.EZRA D. ROSENBERG
     902 Carnegie Center
     Suite 500
     Princeton, New Jersey  08540-6531
     PH: (609) 955-3200

ALSO PRESENT:
     Reynolds Brissenden
     Jennifer Maranzano
     Michelle A. McLeod

## 4

                EXHIBITS
NO.     DESCRIPTION              PAGE

3   Texas Weekly Article.............   163
5   SB 14........................      252
28  HB 218......... ..............     129
29  SB 362.......................      184
44  HB 1706......................      117
70  Texas Conservative Round Table 40
71  Privilege Log................      43
72  Notice of Deposition.............  51
73  Senate Rules...............        56
74  Legislature Online History        126
75  Legislature Online History        154
76  Dallas News Article    212
77  Senate Rules     215
78  Letter from Dewhurst to Birdwell 239
79  Emergency Call     243
80  Letter from Van de Putte to Duncan 247
81  SB 14........................      249
82  Indiana Code......................     311
83  Dewhurst Statement Regarding Voter ID
                                       319
84  Voter ID Bill Signing Draft........  323
85  Talking Points....................   325
86  Standard Review....................   327

BRIAN HEBERT                                    MAY 29, 2012

## 5

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 88 | Letter from Dewhurst to Beck. | 336 |
| 89 | Voter ID Overview.................... | 339 |
| 90 | Email from Battle to Ancira | 341 |

## 7

1  understand?
2     A.  Yes.
3     Q.  I will try to ask you clear questions, but if you
4  don't understand a question, please let me know?
5     A.  Okay.
6     Q.  If you wish to stop and take a break, please let
7  me know and we'll try to accommodate you, but I ask if
8  there is a question pending that you go ahead and answer
9  that question before you take a break.  Okay?
10    A.  Okay.
11    Q.  You understand that you're under oath today and
12  you may be subject to penalty of perjury for giving
13  false or misleading testimony?
14    A.  Yes.
15    Q.  Do you understand these instructions?
16    A.  Yes.
17    Q.  Do you have any questions about these
18  instructions?
19    A.  No.
20    Q.  Are you on any medication today that would affect
21  your ability to testify truthfully?
22    A.  No.
23    Q.  Is there any reason you can't testify truthfully
24  or accurately today?
25    A.  No.

## 6

1               BRIAN HEBERT,
   having being first duly sworn, testified as follows:
2               EXAMINATION
   BY MS. WESTFALL:
3     Q.  Good morning, Mr. Hebert, how are you?
4     A.  Well, thanks.
5     Q.  Could you please state and spell your name for
6  the record?
7     A.  Bryan Hebert.  B-R-Y-A-N, H-E-B-E-R-T.
8     Q.  Have you had your deposition taken before?
9     A.  No.
10    Q.  I'm going to explain some ground rules for you so
11  you'll understand how the day will go.  You've just been
12  sworn in by the court reporter and you're here to
13  testify truthfully, accurately, and completely.  Do you
14  understand?
15    A.  Yes.
16    Q.  The court reporter will prepare a transcript of
17  everything that is said today.  So you must wait for me
18  to ask my question before you respond so the transcript
19  is readable.  Do you understand?
20    A.  Yes.
21    Q.  By the away, I forgot to introduce myself.  I'm
22  Elizabeth Westfall.  I represent the US Attorney Genera
23  in this action.
24       Please, wait for me to finish my question before
25  you answer and I will try to do the same.  Do you

## 8

1     Q.  So during the deposition, I may use the terms
2  voter ID and photo ID interchangeably.  I want you to
3  interpret them as broadly as possible to mean a
4  requirement that a voter present a form of
5  identification, whether it has a photo on it or not when
6  voting in person before being permitted to vote by
7  regular ballot.  Do you understand?
8     A.  Yes.
9     Q.  I may refer to Lieutenant Governor Dewhurst,
10  Mr. Dewhurst or the Lieutenant Governor's office and I
11  would like you to construe all those as broadly as
12  possible to refer to Lieutenant Governor's office.  Do
13  you understand?
14    A.  Yes.
15    Q.  When I refer to the term minority voters, I mean
16  voters you are not white or not Anglo.  Do you
17  understand?
18    A.  Yes.
19    Q.  Are you represented by council today?
20    A.  Yes.
21    Q.  Who is your council?
22    A.  Attorney General's Office, Reynolds & Patrick.
23    Q.  Great.  And if I could ask that you just keep
24  your voice up so that everyone in the room can hear what
25  you are saying.

BRIAN HEBERT                                                    MAY 29, 2012

## 9

1   A.  Sure.
2   Q.  Thank you.  Have you testified in court before?
3   A.  No.  Other than a traffic offense.
4   Q.  Hope it turned out well for you.
5       Have you ever been involved in a case where the
6   State of Texas was a plaintiff or defendant?
7   A.  No.
8   Q.  What did you do to prepare for today's
9   deposition?
10  A.  I had a meeting with my council.  We met briefly
11  this morning.  That was it.
12  Q.  Other than your attorneys, did you speak to
13  anyone about your deposition today?
14  A.  Except to say I'm being deposed, no.
15  Q.  And who did you say I'm being deposed?
16  A.  My wife, a few friends, former workers,
17  coworkers.
18  Q.  Did you speak to Governor Dewhurst?
19  A.  No.
20  Q.  Did you speak to Ms. Rathgeber?
21  A.  No.
22  Q.  Did you speak to Blaine Brunson?
23  A.  No.
24  Q.  Who are the former colleagues who you spoke to
25  about your deposition?

## 10

1   A.  Doug Davis, Karina Davis.  Those are probably the
2   only ones.
3   Q.  And could you describe your conversation with
4   Ms. Davis?
5   A.  It was -- actually saw her in the lobby going
6   into meet with my council and said, oh, you're here,
7   too.  And that was it.
8   Q.  That was the sum total of the conversation?
9   A.  That's right.
10  Q.  Did you talk about the substance of what you
11  intended to testify about?
12  A.  No.
13  Q.  Did you bring any notes or documents with you
14  here today?
15  A.  No.
16  Q.  And are the papers over there in front of
17  Mr. Sweeten, are those Mr. Sweeten's or yours?
18  A.  Mr. Sweeten's.
19  Q.  When is the last time you voted?
20  A.  In the primary, early voting just a couple weeks
21  ago.
22  Q.  Do you usually vote by early voting or in person
23  on election day?
24  A.  I would say I usually vote election day.
25  Q.  And how far is your polling place from your

## 11

1   residence?
2   A.  It is a mile.
3   Q.  How do you get there?
4   A.  I walk sometimes and I drive sometimes.
5   Q.  How long does it take to walk?
6   A.  10 minutes, 5 minutes.
7   Q.  How long does it take to drive?
8   A.  Less.  I mean, I would usually stop on the way
9   back from work so I'm not really timing it from my
10  residence.
11  Q.  Have you ever, while you've been voting in a
12  polling location, witnessed anyone trying to impersonate
13  another voter?
14  A.  No.
15  Q.  Have you ever witnessed a noncitizen voting?
16  A.  Not that I know of.
17  Q.  Have you personally ever challenged a voter's
18  eligibility to vote?
19  A.  No.
20  Q.  Could you tell me your educational background,
21  please, starting with college.
22  A.  I graduated from Louisiana State University with
23  a degree in political science.  Went to law school at
24  Washington University in Saint Louis.  Graduated from
25  with a JD.

## 12

1   Q.  What year did you graduate from law school?
2   A.  1998.
3   Q.  Are you licensed to practice law?
4   A.  Yes.
5   Q.  In which states are you admitted to the bar?
6   A.  Texas.
7   Q.  Any other states?
8   A.  No.
9   Q.  Do you list an employer with your bar membership?
10  A.  Yes.
11  Q.  And who is that employer?
12  A.  Today it is myself.
13  Q.  Since you graduated from law school in 1998,
14  could you tell me every single job that you've held in
15  chronological order?
16  A.  My first job was with the Texas Legislative
17  Council, which is a non partisan drafting legal agency
18  here at the capital.  I worked there for 8 years and
19  then took a position with Lieutenant Governor, David
20  Dewhurst, and I was with him for 5 years.  And then this
21  January I left to do political consulting.
22  Q.  Could you describe the Legislative Council?
23  A.  Sure.  It's 200 people total.  Research document
24  production and legal, maybe it's 400, the legal division
25  is about 50 attorneys, at least it was when I was there.

BRIAN HEBERT                                                    MAY 29, 2012

## 13

1   And they're basically the sort of law firm for the
2   Legislature.  So any drafting request for bills, any
3   legal advice, constitutional advice, procedural advice,
4   the Legislative Council exists to help the legislatures
5   pass bills and serve their constituents.  They're non
6   partisan so it's Republican/Democrat Committee
7   legislator, Governor, Lieutenant Governor in some cases.
8   Yeah.
9       Q.  And what years were you there specifically at the
10  council?
11      A.  I would have been there from '98 to I guess '05.
12      Q.  Does the council serve --
13      A.  Sorry.  It would have been '07.
14      Q.  My apologies.
15      A.  Sorry.
16      Q.  I broke my own rule already.  You described the
17  council as serving as a law firm for the Legislature; is
18  that right?
19      A.  That's how most people think of it, yes.
20      Q.  Does the council serve any other role other than
21  a law firm.  For example, does it provide strategic
22  advice?
23      A.  I would say, no, except to the extent, you know,
24  they would help members navigate bills through the
25  legislative process.  So, you know, I would say that

## 14

1   providing strategic advice in the sense of you should do
2   this is not something that council does.  It's not their
3   role.
4       Q.  Does it provide policy assistance to
5   legislatures?
6       A.  Again, other than sort of laying out the options
7   that a legislator might have or doing research on what
8   other states do, no.
9       Q.  Are there staff members who are not lawyers who
10  work for the council?
11      A.  Yes.  Because they are different departments
12  within Legislative Council.  So there's a legal
13  division, research division, document production
14  division, human resources and maybe one more.
15      Q.  What does the research division do?
16      A.  Whatever legislators request.  So please tell me
17  what the 50 states do on this issue or what is the
18  history of Texas action on this given issue.
19      Q.  So people in the research division are not
20  lawyers; is that correct?
21      A.  I believe none of them are lawyers.  Maybe there
22  are now, but I don't think so.  Certainly not a
23  requirement is my memory.
24      Q.  Are you aware of persons in the research
25  department who provided advice to legislators about

## 15

1   voter ID?
2       A.  I'm not aware.
3       Q.  You don't know a single person?  You couldn't
4   name anyone?
5       A.  The only person I know that still works there is
6   Carey Eskridge and I don't know that he worked on this
7   issue or not.
8       Q.  When you were working for the Lieutenant
9   Governor, did you work with anyone in the research
10  division of the Legislative Council on voter ID?
11      A.  No.
12      Q.  Does the council have a governing body?
13      A.  Yes.
14      Q.  What's the role of the governing body?
15      A.  As I understand it, it's sort of like a Committee
16  of the legislators and they approve hiring of the
17  director.  Maybe budget issues.  That's all I know.
18      Q.  Do you know who sits on the governing body?
19      A.  I don't know the current makeup of it, no.
20      Q.  Does the Lieutenant Governor always play a role
21  in the governing body?
22      A.  Yes, I believe so.
23      Q.  Do you know what Mr. Dewhurst responsibilities
24  are in that capacity?
25      A.  I'm not aware.

## 16

1       Q.  And who would know?
2       A.  Maybe our general counsel.  Our meaning
3   Lieutenant Governor Dewhurst general counsel.
4       Q.  Who is that person?
5       A.  Frank Battle.
6       Q.  So I believe you were testifying it's
7   nonpartisan; is that correct?
8       A.  Correct.
9       Q.  Do staff people serve -- is there -- strike that.
10          Is there a majority and minority staff?
11      A.  No.
12      Q.  So does staff serve both sides of the isle so to
13  speak?
14      A.  Correct.
15      Q.  When a staff person drafts a bill, is he or she
16  also responsible for drafting amendments to the bill?
17          MR. SWEETEN:  Objection.  I think it's --
18  the question is vague and general.  I'm going to let you
19  answer that question.  Go ahead.
20      A.  Typically the same person who drafted the bill
21  would draft the amendments because they're most familiar
22  with that legislation.  On a very large bill it wouldn't
23  be uncommon to have other people draft amendments and
24  then further complicate it, everyday during session
25  they've got a few Legislative Council attorneys that sit

BRIAN HEBERT                                      MAY 29, 2012

---

17

1   on the House floor and so, sort of, last second
2   amendments may have been drafted by someone not involved
3   through out the process.
4       Q.  (By MS. WESTFALL)  Do you know with regard to
5   Senate Bill 14 the name of the person at the legislative
6   council whole was involved in drafting?
7       A.  My memory is that there are two attorneys that
8   were primarily in charge of election laws and this bill.
9   Jennifer Jackson and David Hanna.
10      Q.  Did those persons also draft the amendments to
11  Senate Bill 14?
12      A.  I don't know.
13      Q.  But based on your testimony that you just
14  provided, is it your inference that they would have
15  drafted the amendments?
16          MR. SWEETEN:  Objection, calls for
17  speculation.  Go ahead.
18      A.  I think they probably would have.
19      Q.  (By MS. WESTFALL)  Was there any concern or, I
20  guess, is there any concern about maintaining
21  confidentiality when you have someone in the Legislative
22  Council drafting the bill and you have bill opponents
23  who are drafting amendments?
24          MR. SWEETEN:  You're asking as a general
25  matter?

---

18

1           MS. WESTFALL:  Yes.
2           MR. SWEETEN:  You an answer as a general
3   matter.
4       A.  I can say from my own experience as an attorney,
5   yeah, the training of a legislative council attorney is
6   something that we spent a lot of time on was, you know,
7   sort of, building these walls that each bill has its on
8   clients, yeah.
9       Q.  So in other words, you did not share information
10  with the bill sponsor about amendments you were
11  drafting.  Is that your testimony?
12          MR. SWEETEN:  Objection.  I think assumes
13  facts not in evidence.  I'm not even clear on the
14  question.  So objection vague.  You can answer to the
15  extent you can.
16      A.  Could you repeat the -- I'm also unclear what
17  you're asking.
18      Q.  (By MS. WESTFALL)  Could you read back the
19  question?
20          (Requested question was read.)
21      A.  Right.  To the extent I was writing an amendment
22  or assisting with an amendment, I probably communicated
23  with the bill sponsor.  I don't recall ever passing
24  messages back and forth between unless, again, it's
25  possible there was some general communications about the

---

19

1   bill with Legislative Council and the sponsor.
2       Q.  I see.  So it's your testimony that you -- there
3   weren't necessarily any strict walls between
4   communications you had with legislatures who wanted
5   amendments to be drafted, versus the legislator who
6   sponsored the bill; is that right?
7           MR. SWEETEN:  Objection, vague.
8       A.  Yeah, again.  I'm not clear exactly what you're
9   getting at.
10      Q.  (By MS. WESTFALL)  Let me try again.
11      A.  Sure.
12      Q.  I believe you just testified that sometimes you
13  would share information with a bill sponsor about
14  amendments that were being contemplated; is that
15  correct?
16      A.  Sure.
17      Q.  You testified that the council has a legal
18  division; is that right?
19      A.  Yes.
20      Q.  Could you tell me what the legal division does as
21  opposed to the other sections of the council?
22      A.  During session the legal division spends the bulk
23  of their time drafting bills and amendments and
24  assisting with, sort of, procedural questions.
25      Q.  And when they're not in session, what does the

---

20

1   legal division do?
2       A.  They have an ongoing code -- provision project
3   where they take sort of old and antiquated statutes and
4   modernize them, do intern legal research projects.
5       Q.  Are there any other responsibilities the legal
6   division has that you haven't already testified about?
7           MR. SWEETEN:  Again, as a general matter not
8   a specific Legislature you can answer.
9       A.  Sure.  They may do other things now.  I know when
10  I was there that was the primary interim activity.
11      Q.  (By MS. WESTFALL)  When you were employed with
12  the council, what were your responsibilities?
13      A.  I was a Legislative Counsel, C-O-U-N-S-E-L, and I
14  did all the things I just described, drafted bills and
15  amendments and provided legal advice and assisted with
16  the interim code projects and random special intern
17  research projects.
18      Q.  Did you work on any legislation related to photo
19  ID when you were in the council?
20      A.  I don't believe so.  I don't think I did.  And I
21  say I don't believe so because we would draft hundreds
22  and hundreds of bills and amendments when I was there
23  8 years.  I don't think I did election law or much of it
24  when I was there, not as a drafter.
25      Q.  Did you have an active bar license when you were

BRIAN HEBERT                                          MAY 29, 2012

---

### 21

1    with the council?

2    A.  Yes.  I'm sorry.  There may have been a window at

3    the very, very beginning where my bar results came in

4    November, but I started in October or something, but

5    generally speaking, yes.

6    Q.  Could you describe -- and did you provide legal

7    advice while you were employed with the council?

8    A.  Yes.

9    Q.  Could you describe that legal advice?

10   MR. SWEETEN:  I'm going object as to

11   attorney/client privilege.  As council for the TLC don't

12   disclose any specific legal advice that you provided

13   within that job.

14   Q.  (By MS. WESTFALL) And to clarify, I'm not asking

15   you for the legal advice.  I'm asking you to describe

16   the nature of the advice that you provided, not the

17   specifics.

18   A.  Sure.

19   MR. SWEETEN:  If you can answer it without

20   revealing the substance of the communications as a

21   general matter, you can answer it.  But if you're

22   required to provide substantive information, do not

23   answer the question.

24   A.  Sure.  I mean, it would typically be in relation

25   to a piece of legislation is this constitutional, does

---

### 23

1    MR. SWEETEN:  Don't reveal the substance of

2    any communication.  Are you asking him as a general

3    matter?  But don't reveal any specific communications

4    regarding any sort of bill with any legislators.

5    A.  I'm not sure what you mean by agreement.

6    Q.  (By MS. WESTFALL)  An agreement to provide

7    services, legal services?

8    A.  I mean, that's the way that the Legislative

9    Council operates is the staff of attorneys -- and I'm

10   sure there is some statutory language that I'm

11   forgetting that says the Legislative Counsel exists to

12   provide legal and other advice to legislatures.

13   Q.  So is it your testimony that the statute is the

14   sole source of the agreement between the council and

15   legislators as to the provision of legal services?

16   A.  I would say that's not my testimony.  There is

17   probably some statutory authority is all I'm saying.

18   Q.  But are you aware of any other agreements either

19   oral or written about the provision of legal services

20   between the council and the legislators?

21   A.  I guess I'm not aware.

22   Q.  Does the counsel provided advice on whether --

23   strike that.

24   Are you aware of the counsel having provided

25   advice to any legislator on whether a bill complies with

---

### 22

1    this conflict with common law or some other statutory

2    precedent or anything else.  Again, it would usually be

3    tailored to what is this bill and is it okay.

4    Q.  And you would provide that advice in response to

5    what kind of inquiry?

6    A.  Usually a phone call or a meeting with a staffer

7    or a legislator.

8    Q.  Did you provide any advice in that regard

9    pertaining to Section 5 of the Voting Rights Act?

10   A.  As a Legislative Council Attorney?

11   Q.  Yes?

12   MR. SWEETEN:  You can answer that question

13   yes or no.  Just don't provide the substance of any

14   communication.

15   A.  Not that I recall.

16   Q.  What was your title at the council?

17   A.  Legislative Counsel and then they would have one,

18   two, three, four.  So Legislative Counsel one is where

19   you start.  I think I may have been Legislative Counsel

20   three when I left.

21   Q.  Were you -- did you ever have the title of policy

22   analyst at the council?

23   A.  No.

24   Q.  Did you have any agreement with the legislatures

25   or staff to whom you provided legal advice?

---

### 24

1    Section 5 of the Voting Rights Act?

2    A.  I'm not aware.

3    Q.  Did you handle election laws while you were

4    employed with you counsel?

5    MR. SWEETEN:  Objection, asked and answered

6    A.  No.

7    Q.  (By MS. WESTFALL)  Are you aware of who did at

8    the council handle election laws?

9    A.  I think I said Jennifer Jackson and David Hanna.

10   Q.  Was that while you were employed at the council

11   or subsequent to that time or both?

12   A.  Both.  Jennifer started after I did so there may

13   have been -- I forget who else may have been doing

14   election law while I was there?

15   Q.  Did you ever have any conversations with

16   Ms. Jackson or Mr. Hanna concerning Section 5 of the

17   Voting Rights Act?

18   MR. SWEETEN:  You're asking while he was at

19   Texas Legislative Council.

20   MS. WESTFALL:  Yes.

21   A.  Not that I recall.

22   BY MS. WESTFALL:

23   Q.  Was there a time when you became employed by

24   Mr. Dewhurst?

25   A.  Yes.

BRIAN HEBERT                                                    MAY 29, 2012

## 25

1    Q.  And in what capacity were you first employed with
2    Mr. Dewhurst?
3    A.  My initial title was council for public policy.
4    And then after one session I became deputy general
5    counsel.
6    Q.  What year did you start working for him as
7    council for public policy?
8    A.  '07, January '07.
9    Q.  How did your relationship with Mr. Dewhurst
10   arise?
11           MR. SWEETEN:  Objection, vague.  Go ahead.
12   A.  While at Legislative Council, I drafted a fair
13   number of bills related to school finance.  I worked
14   closely with his staff.  So I built a relationship with
15   staff and they had an opening and let me know.
16   Q.  When in 2007 did you start working for
17   Mr. Dewhurst?
18   A.  January I believe.
19   Q.  Who did you report to at that time?
20   A.  Julia Rathgeber was the policy director.
21   Q.  Could you describe the structure of
22   Mr. Dewhurst's office when you started working for him
23   in 2007?
24   A.  Governor Dewhurst, chief of staff, policy
25   director, there was a budget director and then a dozen

## 26

1    or more staff, policy staff and a general counsel.
2    Q.  And how large was the office in whole?
3    A.  30, 35 people, something like that.
4    Q.  Were you hired to handle a particular issue area?
5    A.  No.  I mean, I'll say that the way -- within the
6    structured question, each staff member would be in
7    charge of certain committees or in some cases issues.
8    In my case, I had two or three committees that I was in
9    charge of which encompassed a whole range of issues.
10   Q.  Could you identify those committees?
11   A.  Sure.  The Senate State Affairs Committee, the
12   Senate Jurors Prudence Committee, there may have been
13   one more.  Every one, sort of, got involved in the
14   budget process.  So to a lesser extent the finance
15   Committee.
16   Q.  When you were heard by Mr. Dewhurst, did you have
17   anyone -- did you have any conversations with anyone in
18   his office concerning the fact that you would be
19   handling voter ID as an issue?
20   A.  I don't remember it being specifically discussed,
21   except that I would be handling some election issues.
22   Q.  Did you have any familiarity or background with
23   election issues before you started working for
24   Mr. Dewhurst?
25   A.  As a lawyer, yes.  And at Legislative Council

## 27

1    part of my responsibility included general government
2    issues which occasionally flavored into election stuff,
3    but not really conduct of elections, more sort of the
4    big picture stuff.
5    Q.  Would you describe yourself as coming to the job
6    with Mr. Dewhurst as not having a lot of familiarity
7    with election law?
8    A.  I would not describe it that way.  I had also
9    been a lawyer and political science major and law school
10   graduate so to the extent I was familiar with it.
11   Q.  Did you familiarity with State election code at
12   that time?
13   A.  I was familiar with it, yes.
14   Q.  Did you understand code as it pertained to voter
15   registration and election day procedures?
16           MR. SWEETEN:  Objection vague.  Go ahead you
17   can answer.
18   A.  Sure.  And certainly meeting with the Secretary
19   of State's office that familiarity increased.
20   Q.  (By MS. WESTFALL)  When did you meet with the
21   Secretary of State's office?
22   A.  As part of my role with Governor Dewhurst I was,
23   sort of, the point person with that office for the
24   5 years there.
25   Q.  Guess I'm directing your attention to the time

## 28

1    before you started working for Mr. Dewhurst, did you
2    have any contact with the Secretary of State's office?
3    A.  Not that I recall.
4    Q.  Did you have any background in federal election
5    laws, other than law school, of course?
6    A.  Right.  No.
7    Q.  When you became council for public policy, did
8    you have a written job description?
9    A.  I think no, not that I recall.
10   Q.  With regard to your responsibilities for the
11   State Affairs Committee, could you describe those
12   responsibilities?
13   A.  Sure.  Attending Committee meetings, working with
14   the staff and Senators on those committees, reporting
15   back to the Lieutenant Governor's office on what
16   billings were proceeding or substance of those bills.
17   Q.  He did not sit on the Committee, correct?
18   A.  Correct.
19   Q.  You would simply go to the meetings and report
20   back as to what happened; is that right?
21   A.  Correct.
22   Q.  Could you identify every person in Mr. Dewhurst's
23   office who handled the issue of voter ID from when you
24   were hired in 2007 until you stopped working for
25   Mr. Dewhurst?

BRIAN HEBERT                                                    MAY 29, 2012

## 29

1    A. Myself. That's it. I conferred occasionally
2    with our general counsel, Frank Battle. And when you
3    say handled voter ID, I mean, you know, the chief of
4    staff and the policy director would have been aware of
5    that bill just like they were aware of every bill coming
6    through the Senate. But I wouldn't characterize it as
7    handling voter ID.
8    Q. So you mean you handled the substance of the bill
9    for Mr. Dewhurst; is that right?
10        MR. SWEETEN: Okay. Just -- I want to make
11   clear that with respect to your thoughts and mental
12   impressions with respect to the bill that passed, we're
13   getting into areas, I don't think we're there yet, but
14   that could be covered by legislative privilege and
15   therefore you can discuss if you had a communication,
16   you can answer general matters, but don't reveal
17   specific thoughts and mental impressions with respect to
18   a specific bill as to voter ID. But with that, you can
19   go ahead and answer the question.
20        A. I think I handled the bulk of election
21   legislation or at least the analysis and the processing
22   of it. And that would include voter ID.
23   Q. (By MS. WESTFALL) Was there anything else or was
24   it a general category of activity that you had
25   associated with handling election legislation besides

## 30

1    analysis and sort of processing of drafts?
2    A. No.
3    Q. Did you have a press person on staff who issued
4    press releases regarding voter ID for Mr. Dewhurst?
5    A. Yes.
6    Q. Who was that person?
7    A. It would have been several people over the 5 year
8    period. Mike Walz, W-A-L-Z, I think is the still
9    current press secretary. Then Mike Wintemute and Rich
10   Parsons were communications guys when I first started.
11   Q. Could you generally describe the role of the
12   chief of staff with regard to voter ID while you were in
13   office?
14        MR. SWEETEN: You can answer. Now, she's
15   asked about specifically about voter ID. So don't
16   reveal in your answer thoughts, mental impressions or
17   conversations you've had with anybody. If you can
18   answer a question without doing so you can go ahead and
19   do it.
20        A. All right. I think from my perspective and I
21   don't know all that he did, I mean, I would report back
22   to status updates like I would with any legislation.
23   Q. (By MS. WESTFALL) And with regard to -- so are
24   you referring to Ms. Rathgeber?
25   A. You asked about the chief of staff which would be

## 31

1    then -- let's see now Blaine Brunson and before that Rob
2    Johnson.
3    Q. Okay. So with regard to Mr. Brunson, what was
4    his role pertaining to voter ID.
5        MR. SWEETEN: Same objection. I'm also
6    going to instruct with respect to communications you've
7    had internally with Lieutenant Governor's office, you
8    being an attorney that those are potentially protected
9    by the attorney/client privilege. We's discussed
10   already the legislative privilege. So to the extent you
11   can answer these questions without revealing matters
12   that are privileged, then you can do so. Okay.
13   A. So the question.
14   Q. What did Mr. Brunson generally do with regard to
15   voter ID? What were his responsibilities.
16   A. I don't know because he didn't tell me all his
17   responsibilities, but what I saw him do as I just
18   mentioned; received status updates and shepherd
19   Lieutenant Governor's policies.
20   Q. As a council for public policy, did you solely
21   report to Ms. Rathgeber?
22   A. I directly reported to her, but the chief of
23   staff obviously was my supervisor as well.
24   Q. How long did you serve as a council for public
25   policy?

## 32

1    A. My title changed after my first session there.
2    So it would have been '08 or '09. I honestly can't
3    remember when that switch happened.
4    Q. And with regard to Mr. Brunson, was his role for
5    voter ID different from his role with regard to other
6    legislation?
7        MR. SWEETEN: In answering this question,
8    don't reveal thoughts, mental impressions or opinions
9    about legislation or in furtherance of the legislative
10   process including Senate Bill 14.
11   A. I don't think it was different.
12   Q. (By MS. WESTFALL) So I'm sorry. You said after
13   you had served as a council for public policy, there was
14   a time when you changed your job titles; is that right?
15   A. Correct. I was promoted to deputy general
16   counsel.
17   Q. And when did that occur?
18   A. Again, I think it must have been '08 or '09. It
19   was after the first session I was there which began in
20   January '07.
21   Q. When you were council for public policy, did you
22   have an attorney client relationship with the Lieutenant
23   Governor, yourself?
24   A. Yes.
25   Q. What was the basis of that relationship?

BRIAN HEBERT                                           MAY 29, 2012

## 33

1    A.  He employed me as an attorney.
2    Q.  Did you have any written or oral agreement?
3    A.  No, not that I'm aware.
4    Q.  Were you serving as his attorney with regard to
5    all aspects of your employment as council for public
6    policy?
7    A.  I'm not sure what you mean.
8    Q.  I mean, were there certain responsibilities for
9    which you were providing him legal advice and serving as
10   his attorney in certain parts of your job where you were
11   not functioning as an attorney for the Lieutenant
12   Governor?
13   A.  I guess it's possible.  But, again, to the extent
14   I was communicating with him, they were almost always
15   generally speaking, have been some legal analysis.  So
16   that's why I was there as an attorney.
17   Q.  So in other words there was no differentiation of
18   your rolls?
19   A.  Certainly no formal differentiation.
20   Q.  And sitting here today, you can't think of any
21   role in which you were not serving as an attorney for
22   Mr. Dewhurst as council for public policy?
23   A.  I can't think of any, no.
24   Q.  Did your -- strike that.
25        Did you consider yourself as having an attorney

## 34

1    client relationship with members of the Legislature and
2    their staff?
3    A.  Members -- you mean, House and Senate members and
4    their staffs?
5    Q.  Yes.  Other members of the --
6    A.  Probably not.  Probably not.
7    Q.  Could you describe your responsibilities as
8    deputy general counsel?
9    A.  Very, very similar as council for public policy.
10   Just with a new title and a bigger paycheck.
11   Q.  Can you think of any ways, other than the things
12   you've just described, more pay, in which they differed?
13   A.  No, not really.  I will say, at this point I
14   began taking a larger role in Open Records request.
15   Q.  Did your Committee assignments change at all or
16   did they remain the same?
17   A.  They remained the same.
18   Q.  How long did you serve as deputy general counsel
19   for Mr. Dewhurst?
20   A.  Until I left.  So that would have been about
21   3 years.
22   Q.  And did you the have the same attorney
23   relationship with Lieutenant Governor during that period
24   of time as deputy general counsel as you did as a
25   counsel for public policy?

## 35

1    A.  Yes.
2    Q.  In no way, shape, or form it differed; is that
3    correct?
4    A.  I think that's correct.
5    Q.  Did you provide any strategic advice to
6    Mr. Dewhurst?
7        MR. SWEETEN:  I'm going to object to the
8    question as vague.  Also don't reveal the substance of
9    any communications you've had with Mr. Dewhurst or
10   members of that office.
11   A.  I mean, over 5 years the vast majority, at least
12   what I would remember of anything that could be called
13   strategic advice would have been sort of legal strategy
14   or legislative procedural strategy.
15   Q.  (By MS. WESTFALL)  Is it your testimony you never
16   provided any political strategic advice to Mr. Dewhurst,
17   ever?
18       MR. SWEETEN:  Objection to the question as
19   vague.  Also objection to the extent you're asking him
20   to reveal the specific substance of communications he's
21   had with Lieutenant Governor Dewhurst or other members
22   of Lieutenant Governor's office.  If you can answer
23   without revealing the substance of those communications
24   you can do so.  Otherwise I instruct you not to answer.
25       MS. WESTFALL:  I'm going to object to your

## 36

1    objection.  I'm asking him about his roles and
2    responsibilities.  I'm not asking him about the content
3    of those discussions.  I would ask you to withdraw that
4    objection, Mr. Sweeten.
5        MR. SWEETEN:  I think I've already allowed
6    you to ask him questions about the general subject
7    matter of the role.  And I'm also allowing him to answer
8    this to the extent it doesn't require him to reveal
9    communications between he and the Lieutenant Governor or
10   Lieutenant Governor's staff.  So I will not withdraw the
11   objection.
12       MS. WESTFALL:  I'm asking about the
13   existence of strategic discussions and not the content.
14   Do you understand the question?
15   A.  I do.
16   BY MS. WESTFALL:
17   Q.  Can you answer the question?
18       MR. SWEETEN:  Objection, vague, same
19   instruction.  You can answer it to the extent you can.
20   A.  I think I'll just repeat what I said.  You asked
21   about political strategy.  I think to the extent of my
22   discussions with him and staff would have been legal and
23   procedural.
24   Q.  So there's -- you never gave him strategic advice
25   that wasn't legal; is that right.

BRIAN HEBERT                                                    MAY 29, 2012

## 45

1   Q. Do you recall what that news article was about?
2   A. No.
3   Q. Do you see again that it list Bryan Herbert,
4   Senator, Author, and Bryan Herbert as recipient?
5   A. Yes.
6   Q. Do you know to whom you were sending this e-mail?
7   A. I don't know.
8   Q. Could you tell me who Daniel Hodge is?
9   A. He is, I think, currently the first assistant to
10  the Texas Attorney General.
11  Q. Who is Jerry Bonay?
12  A. The name is not ringing a bell.
13  Q. Turning your attention to Page 437 of this
14  document, three entries down at Texas 34472, do you see
15  that?
16  A. Yes.
17  Q. And do you see that it list the sender author of
18  that document as Jerry Bonay and that you were the
19  recipient?
20  A. Yes.
21  Q. Does that refresh your recollection as to who
22  Mr. Bonay is?
23  A. It's -- my guess is that he would be an election
24  official from Indiana, but I'm not sure of that.
25  Q. From the description of the e-mail does that

## 46

1   refresh your recollection as to what this document is?
2   A. No.
3   Q. Could you tell me who Jennifer Fagan is?
4   A. She still is, I think, either general counsel or
5   director of the Senate State Affairs Committee.
6   Q. Who does she report to?
7   A. Senate or the Robert Duncan.
8   Q. Is she Committee staff person or is she personal
9   staff for Mr. Duncan?
10  A. I think maybe both actually.
11  Q. Who is David Duran?
12  A. He is a budget analyst for Lieutenant Governor
13  Dewhurst.
14  Q. Who is John Opperman?
15  A. Budget and policy analyst for Lieutenant Governor
16  Dewhurst.
17  Q. And who is John Green?
18  A. Budget analyst for Lieutenant Governor Dewhurst.
19  Q. Are you familiar with the roles and
20  responsibilities of the Lieutenant Governor under the
21  Senate rules?
22  A. Generally familiar, yes.
23  Q. Is it true that Mr. Dewhurst has no authority to
24  set the legislative agenda for the Senate under the
25  Senate rules?

## 47

1   A. When you -- what do you mean when you say set the
2   agenda?
3   Q. He doesn't present an agenda and then the Senate
4   must execute it pursuant to his authority; is that
5   right?
6   A. I think that's right.
7   Q. Was -- strike that.
8       Was Mr. Dewhurst a member of the State Affairs
9   Committee in 2007?
10  A. The Lieutenant Governor does not serve on
11  committees so no.
12  Q. So he was not a member of that Committee at any
13  time, correct?
14  A. Correct.
15  Q. Could you describe Mr. Dewhurst's authorities or
16  roles pursuant to the Senate rules in the State Affairs
17  Committee?
18      MR. SWEETEN:  As a general matter.
19  Q. (By MS. WESTFALL)  As a general matter.
20  A. He appoints the members of that Committee and
21  then extent to which any bills from any Committee are
22  considered on the Senate floor that's because they're
23  recognized for that purpose by the Lieutenant Governor.
24  Q. Can he call a Committee hearing for the State
25  Affairs Committee?

## 48

1   A. The State Affairs committee, no.
2   Q. Can he -- when the committee is acting as a
3   committee as a whole call a hearing for that committee?
4   A. I'm actually forgetting now whether it was
5   Lieutenant Governor or motion from a Senator to convene
6   the committee.
7   Q. Are you familiar with the American Legislative
8   Exchange Council?
9   A. I'm aware of them, yes.
10  Q. What is it?
11  A. I think it's a policy group.  That's all I know.
12  Q. Do you know where it's based?
13  A. No.
14  Q. Do you have any affiliation with ALEC, yourself?
15  A. No.
16  Q. Do you know whether Mr. Dewhurst was or is a
17  member of ALEC?
18  A. I don't know.
19  Q. Have you ever received any documents from ALEC
20  related to voter ID?
21  A. No.
22  Q. Are you familiar with the National Conference of
23  State Legislatures?
24  A. Yes.
25  Q. What is that entity?

BRIAN HEBERT                                           MAY 29, 2012

---

## 53

1  when you left the employment of Mr. Dewhurst to your
2  home?
3      A.  No.
4      Q.  Did you take anything from the office related to
5  photo ID?
6      A.  No.
7      Q.  Does Mr. Dewhurst maintain more than one office?
8      A.  I think he has a business office and his capital
9  office.
10     Q.  Is the capital office for both the roles and
11 responsibilities that he has with the legislator and his
12 roles and responsibilities as a member of the executive
13 branch?
14     A.  I think, yes.
15     Q.  So one office total; is that right?
16     A.  As far as I know.
17     Q.  Does he not have separate staff for executive
18 responsibilities versus responsibilities in the Texas
19 State Senate?
20     A.  There's one capital staff.
21     Q.  Is there a person in Mr. Dewhurst's office who
22 maintains records?
23     A.  Yes.
24     Q.  Who is that person?
25     A.  Well, I take that back.  Well, let me clarify, I

## 54

1  should say.  Each member of the staff is responsible for
2  holding on to documents they think might be required for
3  archival purposes or open records purposes.  And then
4  the general counsel and when I was there deputy general
5  counsel would compile those documents as necessary to
6  respond to the open records request.
7      Q.  I see.  And with regard to the photo ID bills
8  that you were involved in, was there anticipation of
9  Section 5 submissions or litigation that prompted you to
10 retain those records?
11         MR. SWEETEN:  Objection, vague.  Objection,
12 I think it calls for him to reveal mental impressions
13 that he may have had with respect to the legislative
14 process.  To the extent you're not providing
15 information, you can answer the question.
16     A.  Yes.  We held onto records assuming people might
17 want to see them.
18     Q.  (By MS. WESTFALL)  Did you hold onto and retain
19 records related to photo ID legislation in a broader
20 sense than you might otherwise have done pursuant to the
21 Texas Open Records request?
22         MR. SWEETEN:  Objection vague, objection
23 calls for speculation.  But go ahead and answer.
24     A.  No.  I think I would treat it like any other
25 bill.

## 55

1      Q.  (By MS. WESTFALL)  Which is simply saving
2  documents that you thought could be subject to the open
3  records request; is that right?
4      A.  I think that's fair.
5      Q.  But you took no special precautions or retention
6  of documents given that it was election related
7  legislation; is that right?
8      A.  I think that's right.
9      Q.  What is the retention policy for Mr. Dewhurst's
10 office?
11     A.  There is a schedule set in the administrative
12 code for all legislative and executive agencies and I
13 think for most items for Lieutenant Governor it's keep
14 everything and send it to the State archives and for
15 some other things it's 2 years.
16     Q.  Are you generally familiar with the Senate rules
17 in effect in the from sessions from 2005 to 2011?
18     A.  Yes.
19     Q.  Are you generally familiar with the Texas State
20 Constitution?
21     A.  Yes.
22     Q.  Could you describe in general terms the
23 differences between the Lieutenant Governor's executive
24 and legislative functions broadly?
25         MR. SWEETEN:  Objection, vague.  Go ahead.

## 56

1      A.  He's elected statewide which would be an
2  executive feature.  He presides over the Legislature --
3  the Senate which would be a legislative feature.  There
4  are some things about filling his vacancy and things
5  which would make it more executive than legislative.
6      Q.  Can you describe off the top of your head any
7  other roles that he has in Senate besides presiding over
8  the Senate?
9      A.  He appoints committees, he issues interim charges
10 for study by the Senate, he participate as a voting
11 senator would in the case of a tie or in the Committee
12 as a whole in the Senate.  That's all.  That's all I can
13 remember.
14     Q.  What are questions of order?
15         MR. SWEETEN:  As a general matter you're
16 asking what is a question of order, you can answer.
17     Q.  (By MS. WESTFALL)  Do you understand the
18 question?
19     A.  Yes.  I mean, I guess I'm not sure.  I'm not
20 familiar if it's a term of art question of order.
21     Q.  Could you mark this?
22         (Exhibit No. 73 was marked.)
23     Q.  (By MS. WESTFALL)  You've been handed what's been
24 marked as US 73.  Do you recognize this document.
25     A.  It's the rules of the Texas Senate.

BRIAN HEBERT                                          MAY 29, 2012

---

## 57

1    Q. And I will represent to you that this is an
2    excerpt of the rules. It only contains certain rules
3    and not all of the rules because it is otherwise a very
4    voluminous document.
5    A. It is.
6    Q. Turn your attention to past the table of contents
7    to Page 1 of the Senate rules. Do you see that?
8    A. Yes.
9    Q. And first of all, before we get there, could you
10   tell me what year these rules applied to?
11   A. First page says 2011.
12   Q. Thank you. And turning your attention back to
13   Page 1.
14   A. Okay.
15   Q. Do you see rule 1.01?
16   A. Yes.
17   Q. And the first sentence refers to, does it not,
18   that the Lieutenant Governor is present in the Senate
19   and decides all questions of order subject to appeal by
20   another member. Do you see that sentence?
21   A. Yes.
22   Q. Could you tell me what that means in your words?
23   A. I suppose my interpretation would be if a member
24   of the Senate raises any sort of objection in the form
25   of a point of order, that a ruling on that point of

---

## 58

1    order would be made by the Lieutenant Governor.
2    Q. Turning your attention to page 28, rule 5.15,
3    called ruling by president. Do you see that?
4    A. Yes.
5    Q. And could you describe for me your understanding
6    of this rule?
7    A. Again, if there's a point of order raised by a
8    member of the Senate, the Lieutenant Governor would rule
9    on that point of order. That ruling may be appealed to
10   the entire Senate for a vote to overrule or uphold that
11   ruling.
12   Q. Turning your attention to page 46, at rule 6.18,
13   Lieutenant Governor to give casting vote. Do you see
14   that rule?
15   A. Yes.
16   Q. Does this rule suggest that the Lieutenant
17   Governor may vote on anything or only when there is a
18   tie?
19   A. This rule says that if there is a tie Lieutenant
20   Governor shall give the casting vote.
21   Q. And otherwise is the Lieutenant Governor
22   prohibited from voting?
23   A. If there is a Committee as a whole I believe that
24   also allows the Lieutenant Governor to participate in
25   debate and vote.

---

## 59

1    Q. And in a Committee of the whole may he vote on
2    anything before the Committee or only certain types of
3    bills or resolutions or?
4    A. My understanding is the Committee of the whole is
5    only convened to consider a particular item.
6    Q. I see. So as a general matter under rule 6.18,
7    it's only when there is a tie he may vote; is that
8    right?
9    MR. SWEETEN: Objection vague. Misstates
10   prior testimony. Go ahead and answer it.
11   A. 6.18 says he shall vote if there is a tie.
12   Q. (By MS. WESTFALL) Do you remember in your
13   employment with Mr. Dewhurst how many times he voted
14   when there was a tie?
15   A. I'm not sure I recall that ever happening.
16   Q. Can he ever vote on final passage of a bill if
17   there is not a tie?
18   A. Not that I'm aware.
19   Q. And I believe you testified earlier that he may
20   refer assigned bills to the Committee; is that right?
21   A. I believe technically bills are assigned to
22   Committee through the Secretary of State -- secretary of
23   the Senate or parliamentarians office.
24   Q. I will refer you to page 51, rule 7.06, referral
25   bills. Do you see that?

---

## 60

1    A. Yes.
2    Q. Could you tell me what that rule means?
3    A. That means the Lieutenant Governor shall refer
4    each bill to the proper Committee.
5    Q. Turning your attention to the next page, page 69,
6    rule 7.23, do you see that rule, signing bills?
7    A. Yes.
8    Q. Is that -- is your understanding of this rule
9    that it's -- it's somewhat of a ceremonial function, the
10   signing?
11   A. I think that's fair, yes.
12   Q. He doesn't have any discretion whether he can or
13   can't sign those bills or joint resolutions; isn't that
14   right?
15   A. I'm not aware.
16   Q. Are you aware of any time during your employment
17   with Mr. Dewhurst that his refused to sign
18   legislation -- a bill or a joint resolution that had
19   been enacted by the Legislature?
20   A. I'm not aware.
21   Q. Turning your attention to the next page, page 78,
22   do you see rule 11.01?
23   A. Yes.
24   Q. And it indicates that the president of the Senate
25   appoints committees and standing subcommittees; is that

BRIAN HEBERT                                                    MAY 29, 2012

## 61

1    right?
2        A.  Correct.
3        Q.  Turning your attention to the next page on 79,
4    rule 11.03, do you see the president, in other words the
5    Lieutenant Governor may appoint special committees and
6    standing committees?
7        A.  Yes.
8        Q.  Including subcommittees and the Committee of the
9    whole senate; is that right?
10       A.  Yes.
11       Q.  And on the next page, page 80, at rule 11.04, do
12   you see it indicates the president shall designate the
13   chair and vice chairs of each standing committee and
14   subcommittee?
15       A.  Yes.
16       Q.  And on page 91, at rule 12.01, do you see that
17   conference committees of the Senate are selected and
18   appointed by the Lieutenant Governor; is that correct?
19       A.  Yes.
20       Q.  And then on Page 98, at rules 13.02 and 13.03, do
21   you see that the Lieutenant Governor with regard to
22   Committee of the whole Senate may debate and vote on
23   questions?
24       A.  Yes.
25       Q.  Do you have any idea why the president is allowed

## 62

1    to debate and vote on all questions of the Committee of
2    the whole Senate?
3        A.  I don't know.
4        Q.  What's the purpose of the that rule?
5        A.  I don't know.
6        Q.  During your employment with the Lieutenant
7    Governor, how many times was a Committee of the whole
8    Senate convened.
9        A.  I would say a few times.
10       Q.  Can you remember the first time it happened?
11       A.  I know it was done on voter ID twice and it seems
12   like there may been another time, but I can't remember
13   the circumstances.
14       Q.  For voter ID twice, do you mean in 2011 and 2009?
15       A.  That's my memory, yes.
16       Q.  And sitting here today, you can't remember
17   another time when the Committee of the whole was
18   convened; is that correct?
19       A.  I can't be certain.
20       Q.  You can't be certain that you can't remember or
21   that it didn't happen?
22       A.  I'm not certain that it did not happen other
23   times.
24       Q.  Well, it certainly was unusual, was it not?
25           MR. SWEETEN:  Objection, vague.  You can

## 63

1    answer.
2        A.  I think the Committee of the whole is less usual
3    than the regular meeting of the Senate for sure.
4        Q.  (By MS. WESTFALL)  Do you have a general
5    understanding of why the purpose of the convening of the
6    Committee of the whole Senate?
7            MR. SWEETEN:  Objection, asked and answered.
8        A.  I think generally speaking a Committee of the
9    whole is convened to consider an issue.  The
10   circumstances probably vary.
11       Q.  (By MS. WESTFALL)  Well, I believe you just
12   testified that the Committee of the whole was convened
13   to consider two voter ID bills, correct?
14       A.  I remember those two, I remember, yes.
15       Q.  And did that occur in order to allow the
16   Lieutenant Governor to have the right to debate and vote
17   on these questions?
18           MR. SWEETEN:  Don't reveal the thoughts,
19   mental impressions, or opinions about the legislation or
20   the furtherance of the legislation process and don't
21   reveal any communications you had between the Lieutenant
22   Governor, legislators, legislative staff, state agency,
23   or Texas Council in answering this question.
24       A.  I don't know why it was convened as a Committee
25   of the whole.

## 64

1        Q.  (By MS. WESTFALL)  Is your response -- are you
2    responding based in part on asserting privilege today
3    based on your counsel's advice?
4        A.  I think the short answer is I don't know and so I
5    don't have to get to the question of whether there's a
6    privilege that attaches.
7        Q.  Does forming a Committee of the whole Senate
8    allow more expeditious consideration of legislation?
9            MR. SWEETEN:  As a general matter,
10   Elizabeth?
11           MS. WESTFALL:  Yes.
12           MR. SWEETEN:  You can answer.
13       A.  Yes.
14   BY MS. WESTFALL:
15       Q.  How does that work?
16       A.  Typically you would have a bill that goes to a
17   Committee and then to the full Senate for a vote.  And
18   the Committee of the whole allows all the Senators to
19   hear testimony and vote.  I believe straight to final
20   passage from the Senate.
21       Q.  Are there two votes?  One in the Committee of the
22   whole and one final passage or is it one vote to the
23   best of your knowledge?
24       A.  I cannot recall.  If they're back to back
25   votes -- I mean, if they're two votes they're probably

BRIAN HEBERT                                          MAY 29, 2012

## 65

1   very close together.
2        Q.  I see.  And they can just be held sequentially?
3        A.  They may require suspension of the rules to do
4   that.  I can't remember frankly.  If it's one or two.
5             MR. SWEETEN:  Elizabeth, I think we've been
6   going over an hour.  Do you want to take a break pretty
7   soon.  And also is there any way we can move?  It's
8   getting warm in here.
9             MS. WESTFALL:  Yes.  Mr. Sweeten, I fully
10  agree with your assessment on the temperature in the
11  room.
12            MR. SWEETEN:  We've agreed on something.
13            MS. WESTFALL:  And we can have that on the
14  record even.  Could I please ask two more questions and
15  we will investigate a more comfortable room for this
16  deposition to move to.
17            MR. SWEETEN:  Sure, absolutely.
18  BY MS. WESTFALL:
19       Q.  Could you describe for me the differences that
20  Mr. Dewhurst would play if a bill were considered by a
21  State Affairs Committee as opposed to the Committee of
22  the whole as a general matter?
23            MR. SWEETEN:  You can answer as a general
24  matter.
25       A.  Yeah.  I think a bill in the State Affairs

## 66

1   Committee the Lieutenant Governor would not have a
2   direct role in the way he would in a committee of the
3   whole where he gets to participate and vote.
4        Q.  Are there any other differences you're aware of?
5        A.  No.
6        Q.  Are you aware of any communications concerning
7   consideration of photo ID legislation by the Committee
8   of the whole and as it pertained to Section 5 of the
9   Voting Rights Act?
10            MR. SWEETEN:  Objection to the question as
11  compound.  I think if you're asking him as matters of
12  public record, he can answer that question.  If you're
13  asking him, you know, information that would reveal
14  communications that he's had with the individuals or
15  entities that we've enumerated then that would be
16  legislative and privileged, but then I'll go ahead and
17  let him answer.
18       A.  If you could repeat the question.
19       Q.  (By MS. WESTFALL)  Certainly.  Are you aware of
20  any communications concerning consideration of photo ID
21  legislation by the Committee of the whole and as it
22  pertained to Section 5 of the Voting Rights Act?
23       A.  No.
24       Q.  And are you asserting privilege in your response
25  or is that simply based on your memory?

## 67

1        A.  Again, I think it's just based on my memory.  I'm
2   not sure how the Committee of the whole would
3   communicate, frankly.
4        Q.  I'm just -- let me rephrase the question.  Are
5   you aware of any communications concerning having photo
6   ID considered by the Committee of the whole?
7        A.  No.
8        Q.  As it related to Section 5 in the Voting Rights
9   Act?
10       A.  No.
11            MR. SWEETEN:  Same objection.
12       Q.  (By MS. WESTFALL)  What is the Lieutenant
13  Governor's role when the Senate is considering a bill on
14  the floor?
15       A.  He recognizes senator to bring up a bill, he
16  answers questions, points of order, questions of order,
17  and helps the bill proceed administratively through the
18  process.
19       Q.  Does he manage the bill or is the bill sponsor
20  the one who is managing the floor debate?
21       A.  His role is only procedural.  So managing would
22  just be recognizing senators to ask questions.
23       Q.  And turning back to Exhibit US 73, I asked you a
24  number of questions about a number of rules and the
25  senate rules related to the Lieutenant Governor's

## 68

1   powers, are you aware of any other powers in the senate
2   rules that were applicable in 2011 that we haven't
3   already discussed and referred to and to which you
4   answered questions?
5        A.  I'm not aware of any.
6        Q.  So in other words, what you've testified about
7   any rules that I've identified in the senate rules are
8   the sum total of the Lieutenant Governor's powers and
9   responsibilities in the senate in 2011; is that your
10  understanding?
11       A.  Yeah.  I mean, generally speaking I'm looking at
12  it now, if there's some matter that's open to
13  interpretation or the rules are silent then other
14  parliamentary precedent can be used.  But other than
15  that I think the senate rules are the sum of his
16  authority.
17       Q.  And the rules to which you answer questions and
18  which we identified in the record in your deposition
19  today, are those the sum total of the rules that define
20  the Lieutenant Governor's powers in the 2011 session, to
21  if best of your knowledge sitting other day?
22            MR. SWEETEN:  Objection, asked and answered
23       A.  I would say -- I mean, the universe of his powers
24  presiding over the senate.  The Lieutenant Governor has
25  got other constitutional powers and authority that would

BRIAN HEBERT                                          MAY 29, 2012

---

## 69

1  be outside of these senate rules.

2     Q.  Okay.  But can you think of any rules that we

3  haven't discussed today in your deposition that pertain

4  to the Lieutenant Governor's powers?

5     MR. SWEETEN:  You're asking about --

6     MS. WESTFALL:  In the Senate rules.

7     MR. SWEETEN:  In the Senate rules.

8     A.  No.

9     Q.  (By MS. WESTFALL)  Thank you.  Why don't we take

10  a break?

11     (Brief recess.)

12  BY MS. WESTFALL:

13     Q.  The Lieutenant Governor can't ever introduce

14  legislation in his own name; is that right?

15     A.  That is correct.

16     Q.  Could you describe his powers concerning the

17  development of legislation?

18     A.  I think he issues interim charges so directing

19  committees of the senate to study certain issues.

20  Again, he recognizes Senators on the floor so in that

21  sense he decides the agenda for the session.

22     Q.  With regard to interim charges, is there a rule

23  in the senate rules that authorizes him to do that and

24  requires the senate to follow those charges?

25     A.  I'm not aware if those are constitutional rules

---

## 70

1  authority.

2     Q.  Does his office develop legislation for other

3  members to introduce?

4     A.  I think --

5     MR. SWEETEN:  Don't reveal specific thoughts

6  or impressions about pending legislation or matters

7  related to the legislative process in answering the

8  question.  You can answer as a general matter.

9     A.  Generally, the Lieutenant Governor like any

10  elected official would layout their priorities before

11  any session or during any session and to the extent

12  those bills are picked up and sponsored by senators.

13  There's a connection there.

14     Q.  Does he ordinarily set forth a legislative agenda

15  in particular legislative language for bills that would

16  go along with that agenda?

17     A.  I'm not sure --

18     MR. SWEETEN:  Don't reveal legislatively

19  privileged information, but you can answer.

20     A.  I'm not sure if it's typical, but I think there

21  are probably times when, you know, he suggests

22  particular language.

23     Q.  When do you remember that having occurred?

24     MR. SWEETEN:  At this point, I don't want

25  you to reveal any communications with respect to -- that

---

## 71

1  would reveal mental impressions or opinions about

2  legislative or in furtherance of the legislative process

3  or any communications surrounding those.  So to the

4  extent you can answer this question without doing so,

5  you can answer.

6     A.  I guess I can't recall examples that would not

7  include my personal communications.

8     Q.  (By MS. WESTFALL)  So you're asserting privilege

9  with regard to that answer?

10     A.  I think, yes.  Yes.

11     Q.  And Mr. Dewhurst role with regard to introduction

12  of bills is limited to what you just testified to and

13  advocating with legislatures to introduce his

14  legislation; is that correct?

15     MR. SWEETEN:  Objection asked and answered.

16     A.  I think certainly, you know, he is an advocate

17  for his own priorities.

18     Q.  In addition to the ability to introduce

19  legislation, are there any other powers that members of

20  the senate have that the Lieutenant Governor does not

21  have?

22     A.  I mean a senator can introduce a bill, the

23  Lieutenant Governor then refers it to the Committee and

24  recognizes it on the floor if it makes it out of

25  Committee and then recognizes them again if there's a

---

## 72

1  change in the House and the conference Committee report

2  to be considered as well as appointing conference

3  Committee members.

4     Q.  But turning back to my question, are there other

5  powers that members of the senate have in addition to

6  introducing bills, that you can think of sitting here

7  today that the Lieutenant Governor does not have?

8     A.  The voting Committee.  That's probably it from a

9  legislative procedural standpoint.

10     Q.  While you were employed with Mr. Dewhurst, did

11  you assist in developing legislation?

12     A.  Yes.

13     Q.  Can you describe that process generally?

14     MR. SWEETEN:  In answering this question, I

15  don't want you to reveal thoughts, mental impressions,

16  or opinions about legislation or in furtherance of the

17  legislation process.  Just asking as a general matter to

18  the extent you can answer that without revealing

19  attorney/client privilege or legislative privilege or

20  the deliberative process privilege, you can go ahead and

21  do so.

22     A.  I think generally as a staffer, we would be made

23  aware of an issue either because Lieutenant Governor

24  informed us it was a priority or because the

25  constituents were talking about it or because it was

BRIAN HEBERT                                              MAY 29, 2012

---

73

1  raised in one of these interim Committee hearings or
2  otherwise just reading the newspaper what's a problem
3  and what's not.  So from any number of sources, the
4  staff would decide this is something, you know, we
5  should support or help with and then so my role as a
6  staffer -- as an attorney on the staff would be to
7  sometimes to draft language since I had some experience
8  from that from a former job, to provide legal advice
9  about what's possible and not possible.  And just
10  generally talk procedurally about how to make that
11  happen.
12      Q.  Could you describe the breakdown given your
13  experience in the council as to when you would,
14  yourself, draft the bill and whether it -- when you
15  would refer it to the council to draft it, kind of in a
16  percentage way?
17      A.  Most of the time I did not request legislation.
18  It was not my job to provide particular language
19  typically.  So I guess the answer is, sort of,
20  emergency, last second, we need this language now
21  situations is when I was most likely to assist in
22  drafting.
23      Q.  How often did that occur in your employment with
24  the Lieutenant Governor?
25          MR. SWEETEN:  You can answer as a general

---

74

1  matter.  Don't reveal matters of privilege.
2      A.  It would happen -- it was not unusual, but,
3  again, there would be lots and lots of preparation
4  leading up to the floor debate.  I guess floor debate is
5  what I would typically be called upon to help with a
6  last minute amendment.
7      Q.  (By MS. WESTFALL)  But did you do primary
8  drafting of legislation for Mr. Dewhurst?
9      A.  As a general matter, no.
10      Q.  You never drafted any bills to be filed for
11  Mr. Dewhurst?
12      A.  I didn't say that.  I said as a general matter,
13  my role was not to draft all the bills even in my
14  subject area.  I'm sure I drafted some drafts of
15  legislation.
16      Q.  How many bills were you the primary drafter for
17  during your employment with Mr. Dewhurst?
18      A.  Gosh, I don't know.  Not that many.
19      Q.  A handful?
20      A.  A dozen or less.
21      Q.  And how, as a general matter, do you interact
22  with the council in drafting and creating legislation?
23          MR. SWEETEN:  Objection, vague.
24      A.  I think the formal process is you get on the
25  council website, there's a form you fill out about we

---

75

1  want this bill to do that and here's what, you know,
2  additional details and then they'll open up a file on
3  their end and then communicate as necessary to get
4  details.
5      Q.  Did you oversee research for the legislation?
6          MR. SWEETEN:  Any legislation?
7          MS. WESTFALL:  Any legislation.
8      A.  When you say oversee research?
9          MR. SWEETEN:  Objection, vague.  Go ahead.
10  BY MS. WESTFALL:
11      Q.  Let me withdraw that question and ask it a
12  different way.
13          Were you responsible for tasking anyone or
14  conducting yourself, any research, to support the bill
15  drafting process?
16          MR. SWEETEN:  Objection, vague.  You can
17  answer it.
18      A.  I can only speak for -- I did research on bills,
19  but I was not supervising anyone else's research.
20      Q.  Did you do any research for any voter ID bill
21  while you were employed with the Lieutenant Governor?
22          MR. SWEETEN:  You can answer as to whether
23  or not you did research on a bill.
24      A.  Yes.
25      Q.  (By MS. WESTFALL)  Did you do research for voter

---

76

1  ID in 2010?
2      A.  I can not recall.  I'm assuming I probably did
3  since the bill came up in the session before.  But
4  depending on when in 2010, and I can't remember when the
5  legislation was filed or discussed.
6      Q.  Did you develop or contribute to the Lieutenant
7  Governor's legislative agenda for any of the years for
8  which you were employed with the Lieutenant Governor?
9      A.  Yes.
10      Q.  And which years was that?
11          MR. SWEETEN:  Don't reveal specifics as to
12  what you did.  She's asking you the year.  You can
13  answer.
14      A.  Sure.
15      Q.  (By MS. WESTFALL)  Do you understand the
16  question?
17      A.  Yes.  And I think probably most or all staff
18  contributed in some way each year.  So in my case
19  probably the whole time I was there I had some input
20  into that.
21      Q.  How many legislative priorities would the
22  Lieutenant Governor typically have?
23          MR. SWEETEN:  Okay.  Don't reveal
24  communications that you had with the Lieutenant Governor
25  in answering this, members of his staff.  Don't reveal

BRIAN HEBERT                                          MAY 29, 2012

---

## 77

1  matters that are legislatively privileged or matters
2  covered by the deliberative process in answering the
3  question.
4      A. I can't -- I can't recall any given number or any
5  given session or year, but my guess is tenish. I really
6  don't know.
7      Q. (By MS. WESTFALL) Did that remain stable
8  throughout your employment with the Lieutenant Governor
9  or did the number change from year to year?
10         MR. SWEETEN: Same objection and
11 instruction. Go ahead.
12     A. I don't recall. I'm guessing it changed.
13     Q. (By MS. WESTFALL) Did it get larger or smaller
14 over time?
15     A. I don't recall.
16     Q. Besides drafting bills and trying to get
17 legislatures to introduce them, how did you otherwise
18 ensure that Mr. Dewhurst's agenda was carried out?
19         MR. SWEETEN: I'm going to instruct you with
20 respect to the legislative privilege, don't reveal
21 thoughts, mental impressions, opinions about legislation
22 or matters in further of the legislative process. Don't
23 reveal any communications you had with legislators,
24 legislative staff, State agencies, Texas Legislative
25 Council. Also don't reveal matters that are subject to

---

## 78

1  the deliberative process or the attorney/client
2  privilege.
3          MS. WESTFALL: Mr. Sweeten, I'm not asking
4  about any particular legislative acts. This is wholly
5  outside of your objections. I ask that you withdraw
6  with this line of questions.
7          MR. SWEETEN: Why don't read the question
8  back.
9          MS. WESTFALL: Court reporter, could you
10 read that back?
11         (Requested question was read.)
12         MR. SWEETEN: Same objection, same
13 instruction. You can answer to the extent you're not
14 revealing matters of privilege drop develop.
15     A. Generally, on issues within my areas, coverage, I
16 would, again, update our staff on procedurally where the
17 bills were. I was available as a resource to answer
18 questions. Usually legal questions for our staff and
19 for the Texas Senate.
20 BY MS. WESTFALL:
21     Q. As deputy general counsel for the Lieutenant
22 Governor, did you have staff underneath you?
23     A. No.
24     Q. Who reported to you?
25     A. No.

---

## 79

1      Q. Did you work with legislatures and their staff in
2  furthering the Lieutenant Governor's agenda?
3          MR. SWEETEN: Objection, vague. You can
4  answer yes or no if you worked with -- if you worked
5  with.
6      A. Yes.
7      Q. (By MS. WESTFALL) Which legislatures did you
8  most often work with?
9      A. Members of the Texas Senate.
10     Q. Could you identify particular senators?
11     A. Sure.
12         MR. SWEETEN: While you're answering, you
13 can answer, you can identify the fact that a
14 communication occurred. Approximate date, the means,
15 but do not reveal the substance of the conversation or
16 what it was about.
17         MS. WESTFALL: Mr. Sweeten, I would ask that
18 you identify the legislative act over which you are
19 asserting privilege because there is none. I'm asking
20 hit about procedure.
21         MR. SWEETEN: Well --
22         MS. WESTFALL: And his job description and
23 what he did generally. There is no legislation.
24         MR. SWEETEN: I've let him answer a lot
25 about his job description so we've done that. Now, to

---

## 80

1  the extent you're asking him with whom he dealt I'm
2  saying don't reveal the substance of the conversation.
3          MS. WESTFALL: We're not discussing a bill.
4          MR. SWEETEN: Okay. Well, to the extent we
5  are, to the extent your answer would be revealing
6  information about a specific bill, then I think that is
7  covered. He can provide the information you're
8  requesting to -- as long as he's not revealing the
9  substance of those communication.
10         MS. WESTFALL: Mr. Sweeten, if he's
11 answering a question about a particular bill that's a
12 different question than I have imposed.
13         MR. SWEETEN: If her question is limited,
14 you can answer as a general matter the individuals with
15 whom you had communication. I think that's your
16 question. Go ahead.
17     A. So the legislators that I most often communicated
18 with, Senator Duncan, Senator Williams, Senator Eltife,
19 Senator Huffman, Senator Seliger, I would say that's
20 probably who I communicated with the most.
21 BY MS. WESTFALL:
22     Q. And with regard to the Governors -- I mean
23 Lieutenant Governor's role with regard to the State
24 Affairs Committee, would it be the same set of senators
25 or a different set of senators?

BRIAN HEBERT                                                MAY 29, 2012

---

## 81

1   A.  I think most of those senators serve or served on
2   State Affairs Committee.
3   Q.  Did you communicate directly with legislators or
4   with their staff?
5   A.  Both.
6   Q.  Who more often, legislators or staff?
7   A.  Staff.
8   Q.  Did you communicate with the Governor Perry's
9   staff about Lieutenant Governor's responsibilities on
10  State Affairs Committee?
11  A.  I'm not sure if I communicated with Governor's
12  staff specific to State affairs matters.  I think I
13  probably did.  I think the Governor has a staff member
14  assigned to most major committees so I'm sure there were
15  communications about bills.
16  Q.  But sitting here today you can't recall
17  communications between Governor Perry's staff and you
18  regarding State Affairs matters?
19  A.  I would say, yes, there were communications.
20  Q.  Was it about photo ID?
21      MR. SWEETEN:  Don't reveal the substance of
22  the specific communication.  You can reveal the general
23  subject matter.
24      MS. WESTFALL:  Mr. Sweeten, that is a
25  general subject matter that you list throughout your

---

## 82

1   privilege log so I would ask that you let him answer the
2   question.
3       MR. SWEETEN:  And I'm letting him.
4   A.  There are communications about election bills
5   including photo ID.
6   BY MS. WESTFALL:
7   Q.  About how many did you have regarding photo ID?
8   A.  I probably didn't have many communications
9   outside the weekly Committee hearings and even then no:
10  every week about elections and even then not every time
11  about voter ID.  So I would say no more than a handful.
12  Q.  And just to clarify your testimony, you had no
13  more than a handful of conversations with Governor
14  Perry's staff about photo ID; is that correct?
15  A.  I think that's correct.
16  Q.  And were those communications chiefly in the 2009
17  through 2011 period of time?
18  A.  Yes.
19  Q.  How did you communicate with Governor Perry's
20  staff?
21  A.  In person, at Committee hearings.
22  Q.  Did you have any written communications with
23  Governor Perry's staff?
24  A.  Not that I recall.
25  Q.  Did you have any e-mail?

---

## 83

1   A.  I may have, but I don't recall any specific
2   e-mails.
3   Q.  And who was the person in Governor Perry's office
4   with whom you communicated?
5   A.  The elections person was Michael Scofield and it
6   seems like there was a woman's name whom I'm forgetting
7   when I first started in '07.
8   Q.  As part of your roles and responsibilities, did
9   you advice Lieutenant Governor when he should exercise
10  his discretion to cast a vote?
11      MR. SWEETEN:  You're asking about the
12  substance of communication that he had with Lieutenant
13  Governor Dewhurst.  I think that that's clearly under
14  the attorney/client privilege in the legislative
15  privilege as well as the deliberative process privilege.
16      MS. WESTFALL:  I'm not asking about the
17  substance of the communication.  I'm asking about
18  whether he advised as part of his job responsibilities.
19  It's not a substance of a communication.  It doesn't
20  pertain to a legislative act.  It's wholly outside of
21  anything which you could reasonably assert privilege.
22      MR. SWEETEN:  I'm going to let him answer as
23  to whether or not he advised as to who framed it.  Go
24  ahead.
25      MS. WESTFALL:  Thank you.

---

## 84

1   A.  As to whether he can vote?
2   BY MS. WESTFALL:
3   Q.  Whether he should exercise his discretion to vote
4   on anything?
5   A.  No.
6   Q.  Did you play any role in Mr. Dewhurst's committee
7   appointments when he made committee appointments?
8       MR. SWEETEN:  Objection.  Vague and don't
9   reveal the substance of any particular communication.
10  A.  I think probably the chief of staff and policy
11  director would ask and if the rest of the staff had
12  recommendations about particular senators that would be
13  a particularly good fit for committees.
14  Q.  (By MS. WESTFALL)  Did you provided input as par
15  of that process?
16  A.  Yes.
17  Q.  Did you provide input with regard to State
18  affairs?
19  A.  No.
20  Q.  Did you provide any input with regard to
21  Committee assignments in the House?
22  A.  No.
23  Q.  Did you advise the Lieutenant Governor on how to
24  assign bills to committees?
25      MR. SWEETEN:  Same instructions, don't

BRIAN HEBERT                                              MAY 29, 2012

---

## 85

1    reveal the substance of communications.  Give a general
2    subject matter description.  Go ahead.
3         A.  Generally, I think the only time that staff would
4    be asked is if it was a close call about, you know, the
5    subject of this bill could be State affairs or finance.
6    So sort of deciding which Committee is a better fit for
7    the substance of the bill.
8         Q.  (By MS. WESTFALL)  Who in Mr. Dewhurst's office
9    advised him on committee assignments -- I mean, pardon
10   me, on assigning bills to committees?
11        A.  I think --
12            MR. SWEETEN:  Same objection and
13   instruction.
14        A.  I think Julia Rathgeber was primarily charged
15   with referring bills to committee.  And then I'm sure
16   any number of senior staff would have had some input.
17        Q.  (By MS. WESTFALL)  Did someone advise or are you
18   aware of any communications that Mr. Dewhurst had with
19   staff person concerning assigns SB 14 to the Committee
20   of the whole?
21            MR. SWEETEN:  I think she's asking you there
22   to reveal the substance of a communication.
23            MS. WESTFALL:  No.  I'm asking about the
24   existence of a communication.  We can read question
25   back, Mr. Sweeten.

---

## 86

1            MR. SWEETEN:  Well, you're saying to advise
2    as to Senate Bill 14.  I think there was even more in
3    there about the substance of the communication.  Don't
4    reveal the substance of communication that you had as
5    that matter is legislatively privileged, part of the
6    deliberative process privilege and subject to the
7    attorney/client privilege.  You can answer questions
8    about if you had a communication on a given date, the
9    means of the communication, who was present.  That's
10   all.
11        A.  So the question is am I aware of whether or not
12   Governor Dewhurst communicated with staff prior to
13   referring the bill to the Committee of the whole.
14        Q.  (By MS. WESTFALL)  Correct.
15        A.  I think, yes.
16        Q.  And did Ms. Rathgeber have any involvement in
17   those discussions?  Was she -- strike that.
18            Was she a party to the communications which you
19   just testified to?
20        A.  I don't know.
21        Q.  Was Mr. Brunson a party to the communication?
22        A.  I don't know.
23        Q.  Were you a party to the communication?
24        A.  No.
25        Q.  When did that communication take place?

---

## 87

1         A.  I don't know.
2         Q.  You just testified that you believe you are aware
3    of a communication concerning a referral of SB 14 to the
4    Committee of the whole, correct?
5         A.  I guess what I'm saying is a bill that was -- any
6    high profile bill there would have been some discussion
7    about in this case to go to the Committee of the whole.
8    I assume there would have been a discussion.  I'm not
9    aware of any particular times or dates or parties to
10   that discussion.
11        Q.  And who do you think would know about the
12   existence of that communication?
13            MR. SWEETEN:  Objection, calls for
14   speculation.  You can answer.
15        A.  I'm guessing the chief of staff and the policy
16   director.
17        Q.  (By MS. WESTFALL)  Ms. Rathgeber and Mr. Brunson?
18        A.  Correct.
19        Q.  And Mr. Dewhurst himself, correct?
20        A.  Probably, yes.
21        Q.  And if Ms. Ratgeber and Mr. Brunson don't recall
22   this communication or discussion Mr. Dewhurst would be
23   the one to ask about it; is that right?
24            MR. SWEETEN:  Objection calls, for
25   speculation, assumes facts not in evidence.  You can

---

## 88

1    answer.
2         A.  That's who I would ask.
3         Q.  (By MS. WESTFALL)  Do chairs of committees make
4    request to have bills sent to their committee?
5         A.  Yes.
6         Q.  How often does that happen?
7         A.  I don't know.
8         Q.  Do you know with regard to Senate Bill 14 whether
9    the chair of the State Affairs Committee ask that it be
10   referred to his committee?
11        A.  I don't know.
12        Q.  Do you play any role in assisting the Lieutenant
13   Governor in the appointment of conferees to conference
14   committee?
15        A.  Yes.
16        Q.  Did you play such as role with regard to Senate
17   Bill 14?
18            MR. SWEETEN:  Objection, that calls for
19   legislatively privileged information.  Would ask him to
20   reveal thoughts, mental impressions, conversations and
21   furtherance of the legislative process regarding Senate
22   Bill 14.  Don't answer.
23            MS. WESTFALL:  I don't think it does.  I
24   want you to state on the record how this has anything to
25   do with the substance.  This has to do with what role,

BRIAN HEBERT                                      MAY 29, 2012

## 89

1   who was playing with regard to certain legislative acts.
2           MR. SWEETEN:  You asked the specific nature
3   -- in your question, you're asking about the subject
4   matter of the communication and it also presupposes that
5   that occurred.  So I think you're beyond asking general
6   information about a communication.  You're asking about
7   the specifics of the communication.
8           MS. WESTFALL:  Mr. Sweeten, it is a matter
9   of public record that conferees were appointed to the
10  conference committee with regard to SB 14, is it not?
11  I'm asking whether he played any role in that.  I'm not
12  asking about any communications.  I'm not asking what
13  the role was.  I'm asking was he involved in that
14  decision.  What is objectionable about those questions?
15          MR. SWEETEN:  Well, I mean, think you're
16  starting to seek -- you're drilling down into specific
17  mental impressions on how the bill took its course and
18  the involvement that his office had.  And I think once
19  you're walking down that path, then you're starting to
20  get into matters that are matters of privilege.  I think
21  the way it's phrased that it's objectionable.
22          MS. WESTFALL:  Just to be clear, you're
23  taking the position that the identify of staff people
24  involved in decisions, which is clearly a foundational
25  issue and not going to the communication itself, is

## 90

1   privileged?  Is that what you're asserting today?
2           MR. SWEETEN:  First of all, I'm not subject
3   to your examination, but let me tell you what I am
4   telling you.
5           MS. WESTFALL:  It's important to have this
6   on the record, Mr. Sweeten.
7           MR. SWEETEN:  It's fine.  Le's have a clear
8   record.  Let me say what I'm going to say.  The court
9   has very clearly said that whether or not communications
10  occurred is a matter that you can ask him.  The dates,
11  the means of communications, the parties involved,
12  that's all stuff that I'm going to let you ask him.
13  When you start to get into -- and as a precursor to the
14  question, you start talking about the substance and you
15  presuppose what was discussed, then I think you're
16  starting to get into matters that are legislatively
17  privileged and are covered by that.  So, I mean, I'm
18  happy to work with you if your question is, did he have
19  a communication?  We'll let him answer that question.
20  If you're asking about specific information that
21  occurred in the conversation, then I think we're getting
22  to a point where you are trying to discover his mental
23  impressions, thoughts, or impressions about pending
24  legislation.  You even said Senate Bill 14.  So I'm
25  going to let him, you know, answer to the extent that

## 91

1   we're not revealing the substance of the conversation.
2   What I think you're starting to ask him about specific
3   conversations.  That's my point.  So if you want to
4   rephrase -- if you could read the question back that
5   she's asked, we'll look at it in that light, but I want
6   to be clear on what I'm instructing him.
7   BY MS. WESTFALL:
8       Q.  I'm going try it a different way.
9           Were you a party to any communications concerning
10  Lieutenant Governor's appointment of conferees to the
11  conference committee to consider SB 14?
12          MR. SWEETEN:  I'm going to let you answer as
13  to that general subject matter and description.  You can
14  answer that question.
15      A.  Yes.
16      Q.  (By MS. WESTFALL)  Who else was involved in that
17  communication?
18      A.  Julia Rathgeber.
19      Q.  Was anyone else involved in that conversation?
20      A.  Not that I recall.
21      Q.  Were any staff people for legislators involved in
22  that conversation?
23      A.  Not that I recall.
24      Q.  Was that one conversation?
25      A.  Probably.

## 92

1       Q.  Are you aware of any conversations that the
2   Lieutenant Governor had with anyone in the House
3   concerning the appointment of conferees --
4       A.  No.
5       Q.  -- to that Committee?
6           Does the Lieutenant Governor engage in public
7   relations or media?
8           MR. SWEETEN:  Objection, vague.  You can --
9       Q.  (By MS. WESTFALL)  Press releases?
10      A.  Yes.  He issued -- his staff issues press
11  release.
12      Q.  And who was the person who handled that with
13  regard to SB 14?
14      A.  I think Mike Walz.
15      Q.  Was there anyone else besides Mr. Walz?
16      A.  Not that I'm aware.
17      Q.  Does the Lieutenant Governor, as part of his
18  responsibilities, communicate with interest group
19  outside of the legislature?
20      A.  I think he address various groups and
21  conventions, yes.
22      Q.  And who is the staff person who organizes those
23  discussions?
24      A.  I don't know.
25      Q.  Are you aware of any such communications that he

BRIAN HEBERT                                              MAY 29, 2012

## 93

1    had with interest groups regarding photo ID?
2        A.  No.
3        Q.  Are you familiar with Section 5 of the Voting
4    Rights Act?
5        A.  Yes.
6        Q.  What is your understanding of Section 5's
7    requirements?
8        A.  Broadly that a certain class of states have to
9    seek preclearance from the federal government before
10   implementing changes to election laws.
11       Q.  Is there anything else you can just generally
12   tell me about your understanding of Section 5 or is that
13   it in terms -- from your legal perspective?
14       A.  More general than that?
15       Q.  Well, I mean --
16       A.  It largely applies to -- I mean, the most common
17   examples would be redistricting and matters relating to
18   eligibility for voting.
19       Q.  And Section 5, regardless of anyone's personal
20   views of Section 5, it remains the law of the land,
21   right?
22       A.  Yes.
23       Q.  And the Legislature must comply with all federal
24   laws including Section 5, correct?
25           MR. SWEETEN:  Objection, you're asking for a

## 94

1    legal opinion, legal inference.  You can answer.
2            MS. WESTFALL:  He testified he has a law
3    degree.
4        A.  I think, yes, is the answer.
5    BY MS. WESTFALL:
6        Q.  And you drafted a lot of election laws while
7    employed with the council and the Lieutenant Governor;
8    is that right?
9        A.  I would not say I drafted a lot.  I drafted some.
10       Q.  Were you only involved in the drafting of photo
11   ID, in terms of election laws or others?
12       A.  Others.
13       Q.  Could you --
14       A.  Election laws bills went through the State
15   Affairs Committee generally.  And so I read and reviewed
16   and waited on a dozen at least over the 5 years.
17       Q.  Could you generally provide me a sense of the
18   categories of bills that you were involved in the
19   drafting or consideration of that went through State
20   affairs?
21           MR. SWEETEN:  While at Leg. Council or while
22   at the Governor's office.
23           MS. WESTFALL:  While at the Governor's
24   office.
25           MR. SWEETEN:  Lieutenant Governor's office.

## 95

1        A.  The ones which I provided drafting assistance?
2
3    BY MS. WESTFALL:
4        Q.  Or had any general advisory assistance or bills
5    that went through State affairs while you were employed
6    with the Lieutenant Governor?
7        A.  There's just a very broad range.  Everything in
8    the election code so from polling place locations to
9    cleanup and technical changes, to the code to make it
10   easier to understand, voter ID obviously.  Election
11   dates, most recent -- I just passed a bill last session
12   changing primary dates to comply with federal law.  I
13   think it was just a very broad spectrum.
14       Q.  What is your understanding of the scope of the
15   applicability of Section 5 to the laws that you just
16   described and listed?  Does it cover some of those laws?
17   All of those laws?
18           MR. SWEETEN:  Objection, compound.
19   Objection vague.  Objection calls for speculation.
20   Objection asked for a legal opinion.  You can answer to
21   the extent you have and answer to that question.
22       A.  I think without having the election code in front
23   of me, I would just say that some of the laws that went
24   through State affairs were probably subject, if they
25   passed, to Section 5 voting rights.

## 96

1        Q.  (By MS. WESTFALL)  Is it your understanding that
2    Section 5 applies to a broader range of bills than
3    redistricting?
4        A.  Yes.
5            MR. SWEETEN:  Same objection.  Go ahead.
6        A.  Yes.
7        Q.  (By MS. WESTFALL)  And with regard to the
8    billings that are subject to Section 5, could you
9    describe as a general matter steps that the Legislature
10   takes during development, introduction or passage to
11   increase the likelihood that the bill will be pre
12   cleared under Section 5?
13           MR. SWEETEN:  I'm going to object based upon
14   the legislative privilege.  You're asking for specific
15   thoughts, mental impressions, about pending legislation.
16   And I think that those matters are potentially
17   legislatively privileged because you're asking what they
18   generally do.
19           MS. WESTFALL:  Are you instructing him not
20   to answer, period.
21           MR. SWEETEN:  Well, I mean -- your
22   question -- if you're asking what the legislator has
23   done with respect to bills that impact the election
24   code, then I think you're asking about specific bills
25   that have been before the legislator -- legislature, so

BRIAN HEBERT                                          MAY 29, 2012

### 97

1  therefore I think those would be -- you're asking for
2  his thoughts and mental impressions about pending
3  legislation.  Also the question is compound.  So those
4  are my objections.
5  BY MS. WESTFALL:
6      Q.  Can you answer my question, Mr. Hebert?
7      A.  So does the legislature take special steps in
8  bills that might be subject to Voting Rights Act.
9      Q.  As a general matter, not with regard to any
10 particular legislative act or bill?
11     A.  I guess, I would say any legislator who's
12 concerned about passage of their bill would take steps
13 that they and their staff thought necessary.  And then
14 during the open testimony in any given committee you
15 would probably hear a lot of testimony about sides about
16 the relevance and applicability of the Voting Rights
17 Act.
18     Q.  And can you point to any particular steps that
19 might be taken to ensure that it would be pre cleared?
20     A.  They would probably consult council.  They would
21 probably listen to public testimony.  They would
22 probably confer with the Secretary of State's office.
23     Q.  And is --
24     A.  And the Attorney General's office.
25     Q.  And is it your experience that in order to ensure

### 98

1  that there would be no retrogressive adverse effect on
2  minority voters, that there would be any factual
3  analysis conducted of such a bill?
4      MR. SWEETEN:  Okay.  My instruction to you
5  is don't reveal any matters related to a specific bill
6  including thoughts, mental impressions, or the process.
7  You can answer as a general matter her question
8  without -- but not as to a specific piece of
9  legislation.
10     A.  Yes.  I think the legislature considers
11 surrounding facts when passes legislation.
12     Q.  (By MS. WESTFALL)  And do they look into whether
13 an election law might have a retrogressive or adverse
14 impact on the minority voters?
15     MR. SWEETEN:  Objection to the form.
16 Objection compound.  Objection calls for speculation.
17 You can answer as a general matter, but not as to a
18 specific legislation.
19     A.  As a general matter they would consider all
20 surrounding facts when given specific legislation.
21     Q.  (By MS. WESTFALL)  But listen carefully to my
22 question.  My question is, whether they would analyze
23 the impact on minority voters.  Can you answer that
24 question?
25     MR. SWEETEN:  Don't answer as to a specific

### 99

1  bill.  Do not reveal mental impressions, thoughts, or
2  opinions as to specific legislation.  Also, I'm going to
3  object compound, calls for speculation and vague.
4      A.  So the question is, does the legislature consider
5  impact on minority voters during the past election laws?
6      Q.  (By MS. WESTFALL)  In order to ensure that it
7  would be pre cleared through Section 5?
8      A.  I think the answer is probably, yes.
9      Q.  Can you think of any particular instances where
10 that was done?
11     MR. SWEETEN:  Don't reveal matters related
12 to specific legislation.  Those are legislatively
13 privileged.  To the extent you can answer, generally,
14 the question without revealing matters of legislative
15 privilege or deliberative process privilege or
16 communications impacting those, then you can do so.
17     A.  Any bills that affecting polling locations,
18 eligibility to vote would have undergone some of that
19 analysis.
20     Q.  (By MS. WESTFALL)  Was such analysis, you know,
21 in your experience shepherding through, analyzing
22 reviewing, monitoring, election laws, was that type of
23 analysis usually done as a matter of course to ensure
24 preclearance for Section 5?
25     MR. SWEETEN:  Objection, multiple.

### 100

1  Objection, calls for speculation.  Objection, vague, and
2  objection to the extent you're seeking to find out
3  information about a specific piece of legislation.  To
4  the extent that it does not do so or invade the
5  deliberative process or legislative process you can
6  answer the question.
7      A.  Could you repeat the question?
8      Q.  (By MS. WESTFALL)  Certainly.  As a matter of
9  course when election laws were considered being
10 developed, et cetera, would you -- actually strike that.
11     Why don't you read back the question because now
12 I forget my question.
13     (Requested question was read.)
14     MR. SWEETEN:  Same objection and
15 instruction.
16     A.  I think yes.
17     Q.  (By MS. WESTFALL)  And with regard -- with regard
18 to election bills, did you -- did the legislature
19 typically take steps to ensure that the law would not be
20 seen as having a discriminatory purpose, for the
21 purposes of ensuring preclearance under Section 5, of
22 the Voting Rights Act?
23     MR. SWEETEN:  Same objection and
24 instructions.
25     A.  I don't think any legislator -- I think every

BRIAN HEBERT                                          MAY 29, 2012

---

## 101

1    legislator would be concerned about clarifying that
2    there is no discriminatory purpose in the legislation.
3         Q.  (By MS. WESTFALL)  And would steps be taken to
4    ensure on the public record and otherwise there would be
5    a legitimate bona fide nondiscriminatory reason for
6    election bills?
7              MR. SWEETEN:  Same objection, same
8    instruction.
9         A.  I guess, I don't know.  I mean, I assume every
10   piece of legislation has a purpose and that legislators
11   are not choosing a discriminatory purpose?
12        Q.  (By MS. WESTFALL)  And is it your testimony that
13   they bear Section 5 in mind when they are enacting
14   election bills to ensure that there's no discriminatory
15   purpose?
16             MR. SWEETEN:  That calls for speculation.
17   And I'm also going to object to the extent she's asking
18   about any specific piece of legislation that you've had
19   experience with.  You don't answer the question with
20   respect to specific legislation.  To the extent you can
21   answer the question as a general matter without
22   discussing mental impressions or reveal any thought
23   processes regarding legislation, you can do that.
24        A.  I don't think I know the intent of legislators on
25   that.

---

## 102

1         Q.  (By MS. WESTFALL)  Is there any particular role
2    that the Lieutenant Governor plays in ensuring the
3    likelihood that an election bill will be pre cleared
4    under Section 5?
5              MR. SWEETEN:  Same objection, same
6    instruction.
7         A.  I mean, on all legislation that passed through
8    the Senate, I think the Lieutenant Governor's staff was
9    available as a resource to any senator who wanted it.
10        Q.  (By MS. WESTFALL)  I guess, my question is
11   whether the Lieutenant Governor plays any role in
12   ensuring that as election bills pass through the
13   legislator that they will be pre cleared under Section
14   5?
15             MR. SWEETEN:  Same objection, same
16   instruction.
17        A.  I don't think there's a formal role.
18        Q.  (By MS. WESTFALL)  Is there an informal role?
19        A.  Again, his staff was available on this or any
20   other legislation to senators and staff who wanted
21   opinions.
22        Q.  Is that different from any other types of
23   legislation that is not election related?  That is not
24   subject to Section 5?
25        A.  It's the same, I think, for all types of

---

## 103

1    legislation.
2         Q.  So is it your testimony that they're basically no
3    steps taken to ensure that election bills will be pre
4    cleared pursuant to Section 5?
5              MR. SWEETEN:  Objection compound.  Objection
6    misstates facts and also I'm going to instruct don't
7    reveal specific matters related to specific legislation
8    in answering the question.
9         A.  That's not my testimony.  My testimony is that a
10   legislator has their purpose for filing legislation.
11   They have a staff and the resources at the capital to
12   perfect that legislation.  One of those resources is the
13   staff of the Lieutenant Governor.
14        Q.  Okay.  Turning back to my question, I just want
15   to make sure that I clearly understand your testimony.
16   I'm asking about election bills which are subject to
17   Section 5 and then there's a universe of other bills
18   that are not subject to Section 5.  Does the Lieutenant
19   Governor take any steps to ensure that election bills
20   that are subject to Section 5 will be pre cleared?
21             MR. SWEETEN:  Same objection, asked and
22   answered also.
23        Q.  (By MS. WESTFALL)  Or no?
24        A.  I think the answer is, election bills that go
25   through State Affairs Committee or any other committee

---

## 104

1    that might be subject to the Voting Rights Act.  The
2    staff on those committees and the staff of the
3    Lieutenant Governor to the extent we recognize issues or
4    problems would raise those issues or problems.
5         Q.  What do you mean by issues and problems?
6         A.  If we fear that a bill might not pass
7    preclearance.
8         Q.  Then the staff would raise that with the members?
9    I'm not sure I understand your testimony?
10             MR. SWEETEN:  Objection.  I'm going to
11   object to the question.  You're asking compound
12   questions about a review of the entire election code and
13   his experience with the election code.  I think the way
14   the question is phrased is confusing.  I also am
15   instructing him with respect to the legislative
16   privilege, don't reveal matters that relate to specific
17   pieces of legislation.  With that instruction, you can
18   answer.
19        A.  I guess the way it would typically work.  Let's
20   say, it's a bill changing up polling location.  If I or
21   any other staffer recognize that that bill needed
22   amendments or changes or improvements to ensure its
23   compliance with federal law, the staff would probably
24   suggest that to the senator or their staff.
25        Q.  (By MS. WESTFALL)  And are you aware of any

BRIAN HEBERT                                          MAY 29, 2012

---

## 105

1  communications between staff and a member or the
2  Lieutenant Governor or the Governor's office or the
3  Secretary of State, in which any staff person raised
4  concerns about SB 14 and it's ability to be pre cleared
5  under Section 5 of the Voting Right Act?
6       MR. SWEETEN:  Objection.  Don't answer the
7  question.  It asks you to repeat communications that are
8  legislatively privileged.  Also privileged by the
9  deliberative process privilege and potential
10  attorney/client privilege.
11       Q.  (By MS. WESTFALL)  I'm asking you about the
12  existence of communications.
13       MR. SWEETEN:  You've asked more than that.
14  If you want to ask him about a specific communication
15  that's fine, but you've laced this question with
16  specific subject matter and that's why it's
17  objectionable.  I'll work with you to try to, you know,
18  figure out how he can answer your question about the
19  general substance, but you've gone beyond that in your
20  question.
21       Q.  (By MS. WESTFALL)  Can you answer my question?
22       A.  The question is were there communications that
23  I'm aware of related to --
24       Q.  Any concerns about SB 14 not being able to be pre
25  cleared under Section 5 of the Voting Rights Act?

---

## 106

1       MR. SWEETEN:  Same objection, same
2  instruction.
3       A.  I guess I'm not -- I'm comfortable saying I'm
4  aware of communications regarding the ability of the
5  bill to be pre cleared or not.  I'm not sure concerned
6  is the right word.
7       Q.  (By MS. WESTFALL)  How many such conversations
8  are you aware of?
9       A.  I think the passage of any piece of legislation
10  is an ongoing deal from four session through three
11  session.  So I can't give you a number of conversations
12  about the Voting Rights Act during the last session.  It
13  would be lots probably.
14       Q.  Were you a party to such conversations?
15       A.  Yes.
16       Q.  Were these conversations that occurred before the
17  signing of the bill in May 2011?
18       A.  Yes.
19       Q.  Were any steps taken subsequent to those
20  conversations in the substance of the bill?
21       MR. SWEETEN:  Don't answer that question.
22  You don't have to answer that.  That's legislatively
23  privileged.  You're asking about mental impressions,
24  thoughts about pending legislation.  Don't answer it.
25       Q.  (By MS. WESTFALL)  Could you tell me Texas's

---

## 107

1  current system for determining how to verify the
2  identity of a voter at the polls on election day?
3       A.  I believe a voter can show up with a voter
4  registration card or some alternate forms of ID with
5  government issued paperwork with their name on it.  So
6  an electric bill or something like that.
7       Q.  Turning back to the conversations you just
8  testified about, who was involved in these conversations
9  about -- not concerns, but it's not fears.  You used
10  another word that SB 14?
11       MR. ROSENBERG:  Ability was the word.
12  BY MS. WESTFALL:
13       Q.  Ability was the word.  About the ability of SB 14
14  to be pre cleared under Section 5?  It's a foundational
15  question.
16       MR. SWEETEN:  You can answer as to who was
17  involved in the conversation.
18       MR. ROSENBERG:  Conversations, I think was
19  his testimony.
20       A.  I would say probably staff from almost every
21  single office in the Senate.
22  BY MS. WESTFALL:
23       Q.  Outside of?
24       A.  And then maybe even a couple House offices.
25       Q.  Outside of opponents of the bill, persons who

---

## 108

1  voted against the bill, could you identify particular?
2       A.  So who -- in those who supported the legislation,
3  who in that group did I talk to about Voting Rights Act?
4       Q.  Correct.  As it pertained to SB 14?
5       A.  I would probably need to see a list of senators,
6  but probably every single one.  Them or their staff.  I
7  mean, it could have ranged from, you know, indefinite
8  analysis to nothing.
9       Q.  Did you speak with anyone outside the Legislature
10  about similar concerns?
11       A.  Yes.
12       Q.  Could you tell me who those people were?
13       A.  It wasn't concerns.  It was discussion of the
14  Voting Rights Act and it's applicability to election
15  laws.  I think, probably the people over the course of
16  the sessions that were involved in the public testimony.
17       Q.  Only the public testimony?
18       A.  I mean, aside from just -- yeah.  Public
19  testimony.  I mean.
20       Q.  Did you talk to anyone from the Governor's office
21  on this topic?
22       A.  As I mentioned earlier, I think I probably talked
23  with their staffer who was in charge of the State
24  Affairs Committee.
25       Q.  Mr. Scofield?

BRIAN HEBERT                                    MAY 29, 2012

## 109

1    A. I think that's probably right.

2    Q. And you talked to him about the applicability or

3  how it would all play out?  SB 14 in the Section 5 of

4  the Voting Rights Act?

5         MR. SWEETEN:  Objection.  You're asking for

6  more information about the thoughts, mental impressions

7  about legislation Senate Bill 14 and I think you're

8  moving into matters that are legislatively privileged.

9  You can identify whether he had a conversation with

10  whom, when, who was there, but we're not going to get

11  into the specifics of the conversation.

12    Q. (By MS. WESTFALL)  Can you answer the question?

13    A. I had limited interaction with the Governor's

14  office.

15    Q. Was there anyone in your office, in the

16  Lieutenant Governor's office who had more extensive

17  communications with the Governor's office about voter

18  ID?

19    A. I'm not aware.

20    Q. Would it have been Mr. Brunson?

21         MR. SWEETEN:  Objection.  You're --

22  objection, vague.  Objection assumes facts not in

23  evidence.  Objection calls for speculation.  Go ahead

24  and answer if you can.

25    A. I don't know.  I mean, I'm guessing the policy

## 110

1  director and the chief of the staff are most likely.

2    Q. (By MS. WESTFALL)  Getting back to Texas's

3  current system for determining how to verify the

4  identify of voter, when someone registers to vote, the

5  county election official mails the person a voter

6  registration card; is that the current procedure?

7    A. I believe yes.

8    Q. Therefore, if you have that card in your

9  possession and go to the polls on election day you get

10  to vote a regular ballot?

11    A. I believe that's right.

12    Q. Do you know what happens if a voter lost her

13  voter registration card or forgets to bring it to the

14  polls on election day?

15    A. I believe they can cast a provisional ballot.

16    Q. Is it possible that if the voter has some sort of

17  other form of ID that that would be a sufficient

18  substitute under current?

19    A. Yes.  I'm sorry.  Yes.  Sorry.  If they don't

20  have their registration card.  I thought you were asking

21  if they didn't have any.

22    Q. And are you aware of whether the other forms of

23  currently supplemental ID include non photo ID?

24    A. I believe they do.

25    Q. Do you know what the forms of ID are off the top

## 111

1  of your head?

2    A. Again, I think it's government issued paperwork.

3  So your electric bill, you're -- some other

4  communications with the government.

5    Q. And is your impression that it's a number of

6  forms of ID that would suffice; is that correct?

7    A. Correct.

8    Q. And if you don't have any of those IDs from that

9  large range or a voter registration card, then what

10  happens to a voter?

11    A. Then you cast a provisional ballot.

12    Q. And is that -- how is it determined whether that

13  provisional ballot will be counted?

14    A. I believe that the person has a certain period of

15  time to return with sufficient ID to prove that they're

16  an eligible voter.

17    Q. Are you certain that's current law or is it

18  simply that the county election official compares or

19  verifies from the registration records that the voter is

20  eligible and then counts the ballot.  Do you believe

21  it's that system?

22    A. That might be correct.

23    Q. Is the current system for identifying voters of

24  the polls inadequate in any way?

25         MR. SWEETEN:  Objection.  In answering this

## 112

1  question, you're not -- under legislative privilege, you

2  are not to reveal your thoughts, mental impressions,

3  opinions about legislation or in furtherance of the

4  legislation process including as to Senate Bill 14.

5  Also, don't reveal communications you've had with any

6  members of the staff, with any legislators in the

7  furtherance of this specific bill.

8         MS. WESTFALL:  Mr. Sweeten, I'm asking his

9  view as he sits here today.  I'm not asking about any

10  legislative act.  I would ask that you withdraw that

11  objection.

12         MR. SWEETEN:  To the extent that you can

13  answer the question without revealing that information.

14  I'm going to the let you do so.

15    A. So my question is, is the current system of

16  identification sufficient?

17  BY MS. WESTFALL:

18    Q. Inadequate in any way?

19    A. Is it inadequate in any way?  I think given the

20  amount of attention being paid to this, there's

21  certainly people concerned about its efficiency.

22    Q. I'm asking about your view as someone who's

23  drafted a lot of elections bills, who's served for Leg.

24  Council, who's served for the Lieutenant Governor, in

25  your view is the current system inadequate?

BRIAN HEBERT                                          MAY 29, 2012

---

## 113

1    MR. SWEETEN:  In answering this question,
2    don't reveal your thoughts, mental impressions, or
3    analysis regarding specifically Senate Bill 14.  You can
4    answer as you're sitting here today as long as your
5    answer does not reveal those communications.
6         A.  I think it's inadequate to the extent it's
7    subject to fraud.
8         Q.  (By MS. WESTFALL)  What is your basis for that
9    opinion?
10        MR. SWEETEN:  Do not reveal matters that you
11   learned with respect to -- that are covered by the
12   legislative privilege, the deliberative process
13   privilege or attorney/client privilege in answering that
14   question.
15        A.  I think like any system, any system is
16   susceptible to fraud.  So why do I think the election
17   system is potentially susceptible, because it's a system
18   made up of human beings.
19        Q.  (By MS. WESTFALL)  So is it your testimony that
20   it is the potential for fraud that makes it inadequate?
21        MR. SWEETEN:  Same objection and
22   instruction.  Don't reveal your past mental impressions
23   or considerations regarding the bill.  To the extent you
24   can answer without do so, you can.
25        A.  I think that's -- the potential is certainly part

---

## 114

1    of it.  And then there are cases of election fraud in
2    Texas in the past.
3         Q.  (By MS. WESTFALL)  And to be clear, the current
4    system for voting -- for identifying voters at the
5    polls, we're only talking about fraud as it pertains to
6    in voter impersonation; is that correct?
7         A.  Repeat the question.
8         Q.  I'm sorry.  Let me withdraw that question and ask
9    another one.
10        The only voter fraud that is potentially at issue
11   when we're talking about voters appearing at the polls
12   on election days, in person voter impersonation; is that
13   correct?
14        MR. SWEETEN:  Objection, vague.  Also
15   objection, don't reveal any matters that were subject to
16   the legislative privilege that I've outlined before or
17   the deliberative process privilege or the
18   attorney/client communication.
19        A.  I suppose there are other types of fraud you
20   could commit regarding the electronic storage of the
21   votes or on election day I would say the in-person fraud
22   is probably the biggest threat.
23        Q.  (By MS. WESTFALL)  And certainly photo ID laws
24   would address only in-person voter impersonation,
25   correct?

---

## 115

1    MR. SWEETEN:  Objection.  Voter ID laws, you
2    haven't defined what that is.
3         MS. WESTFALL:  Actually I have.
4         MR. SWEETEN:  Tell me what it is.
5         MS. WESTFALL:  I had an instruction in the
6    beginning.
7         MR. SWEETEN:  Well, let's talk about what
8    that is then because I'm not sure if you're talking
9    about a specific Senate Bill, another iterations of
10   legislation.  He's not going discuss his thoughts,
11   mental impressions about a specific bill.  You're asking
12   him as he sits here and these are matters that don't
13   invade his thought process or that are matters of the
14   deliberative process or attorney/client communications
15   that I'm going to let him answer as he's sitting here.
16   But also objection, vague as to the question.
17        A.  So what was the question?
18        Q.  (By MS. WESTFALL)  When did you first hear any
19   support for enacting photo ID requirement in Texas?
20        MR. SWEETEN:  Don't reveal matters of
21   legislative privilege.  You can answer.
22        A.  I don't recall.
23        Q.  (By MS. WESTFALL)  Was it 2005?
24        A.  It's possible.  It may have been before that.
25        Q.  Was it prompted by Indiana's enactment of photo

---

## 116

1    ID law in that State?
2         MR. SWEETEN:  Objection.  You're asking for
3    him to reveal his thoughts and mental impressions,
4    opinions about specific legislation.  If you are asking
5    him about that, then don't do that.
6         MS. WESTFALL:  I'm asking him about Indiana
7    photo ID.  That's not anything that could be covered by
8    legislative privilege in this case, Mr. Sweeten.
9         MR. SWEETEN:  I'm not even clear on what
10   your question is.  Did he first hear of the Indiana
11   bill, is that the same time that he heard something --
12   he's already testified that he didn't know about when he
13   heard it.  It doesn't make sense.  So objection, vague.
14   Objection, calls for speculation.  Go ahead and ask your
15   question again.
16   BY MS. WESTFALL:
17        Q.  Do you know why there was support for photo ID in
18   Texas?
19        MR. SWEETEN:  Objection, calls for
20   speculation.  Do not reveal your thoughts, mental
21   impressions or opinions about legislation in furtherance
22   of the legislative process including any specific bill
23   in answering this question.  Do not reveal
24   attorney/client communications that you've had with
25   anybody at the Lieutenant Governor's office and do not

BRIAN HEBERT                                          MAY 29, 2012

## 117

1   reveal matters that are subject to the deliberative
2   process privilege.  If you can answer that question
3   without doing so, you can do so.
4         A.  I imagine different people have different
5   motivations for supporting that law.
6         Q.  (By Ms. WESTFALL)  Okay.  Well that doesn't
7   really answer my question, but we'll move on.
8             MR. SWEETEN:  Objection to the side bar.
9   Argumentative.
10        Q.  (By Ms. WESTFALL)  Could you mark this as US 44?
11  You've been handed what's been -- oh.  You know my
12  apologies.  We need to remark this exhibit.  Could you
13  give that back to the court reporter.  We previously
14  used this exhibit.  Could you mark it as US 44?
15            (Exhibit No. 44 was marked.)
16        Q.  (By Ms. WESTFALL)  My apologies.  You've been
17  handed what's been previously marked as US 44.  Do you
18  recognize this?
19        A.  I don't think so.  It's a voter ID bill.  I don't
20  know what session it's from.
21        Q.  Have you seen this before?
22        A.  I may have.  I don't know what session it's from.
23        Q.  Okay.  Turning your attention to the last page,
24  Page 10 of Exhibit 44.  It list the proposed effective
25  date, do you see that?

## 118

1         A.  Uh-huh.
2         Q.  Does that refresh your recollection as to what
3   session this was introduced in?
4         A.  Yes.
5         Q.  And what session was that?
6         A.  That would have been the 2005 session probably.
7         Q.  Okay.  And do you see who was sponsoring this
8   bill?  Or authoring this bill, pardon me?
9         A.  Yes.
10        Q.  Who was that?
11        A.  Representatives Denny, Pitts, Bohac and probably
12  a lot more.
13        Q.  Have you read this bill before sitting here
14  today?
15        A.  I probably reviewed it.  I'm not sure when or how
16  many times.
17        Q.  Could you just take a look at US 44 and let me
18  know when you've had a chance to review it?  In
19  particular, I would direct you to Page 4, at section
20  63.0101.
21        A.  Okay.
22        Q.  Just let me know when you've had chance to look
23  at those pages in that section.
24        A.  Okay.
25        Q.  Okay.  So are you familiar with the forms of

## 119

1   allowable ID under SB 14?
2         A.  Yes.
3         Q.  Do you know them off the top of your head?
4         A.  It is several forms of government issued ID:
5   Driver's license, military ID, concealed handgun
6   license, immigration status papers that include photo
7   ID.  I think there was one or two more.
8         Q.  And you've had a chance to review the forms of
9   allowable ID under House Bill 1706?
10        A.  Yes.
11        Q.  Could you compare those list and tell me what's
12  included in HB 1706 that was not included in Senate Bill
13  14?
14            MR. SWEETEN:  You can answer as to a factual
15  matter.  I don't want you to give the basis for or I
16  don't want you to provide mental impressions regarding
17  the differences between these other than what's revealed
18  on the bill itself.
19        A.  All right.  Looks like HB 1706 includes employee
20  ID cards, student ID cards and county issued ID cards
21  in addition to the ones I stated earlier.
22        Q.  (By Ms. WESTFALL)  And also does it not include
23  non photo ID?
24        A.  Yes.  Section B.  Yes.
25        Q.  I'm sure you're better at reading these bills

## 120

1   than I am.
2         A.  I used to write a lot of them.  Yes.  One off the
3   first list or two off the second, I think.
4         Q.  Turning your attention back to the photo ID's, do
5   you see that the driver's license allowable in the HB
6   1706 allowed for driver's license that had expired no
7   earlier than 2 years before the date of presentation?
8         A.  Yes.
9         Q.  Do you know why that time period was selected for
10  HB 1706?
11            MR. SWEETEN:  Don't answer the question.
12  Legislative privilege.  Objection.
13        Q.  (By Ms. WESTFALL)  Are you following your
14  counsel's advice?
15        A.  Yes.
16        Q.  Do you see it list military ID cards at Section
17  2 --
18        A.  Yes.
19        Q.  -- under A?  Can you describe the different types
20  of cards that that form of ID would encompass?
21            MR. SWEETEN:  You can answer.
22        A.  I assume any of the branches of the United States
23  military that issues a photo ID would follow that
24  description.
25        Q.  Do you know how many forms of different ID's that

BRIAN HEBERT                                    MAY 29, 2012

## 121

1  would be?
2      A. I don't have that number now.
3      Q. Would it be more than a dozen, fewer than a
4  dozen?
5      A. I don't know.
6      Q. As to any of the forms of ID listed in BB 1706,
7  do you know the intent of the bill's authors including
8  that form of ID in HB 1706?
9          MR. SWEETEN: Objection. You're asking for
10 matters that are subject to the legislative privilege.
11         MS. WESTFALL: I'm asking about the purpose
12 and intent which is permissible.
13         MR. SWEETEN: He can provide what he
14 believes is the legislative purpose of a bill.
15         MS. WESTFALL: And you're not allowing him
16 to answer the legislative purpose of why a particular ID
17 was listed in a particular bill?  Is that your
18 instruction to your client?
19         MR. SWEETEN: What I'm telling you is he can
20 provide an answer as to the general purpose of the bill.
21 He cannot provide, pursuant the court's order.  He does
22 not have to provide the subjective intent of any
23 specific legislator with respect to that bill.  So you
24 can ask him about what the purpose of the bill is, he
25 can answer that.  Otherwise, it is subject to the

## 122

1  legislative privilege.
2          MS. WESTFALL: To be clear, you're not
3  allowing him to answer any questions about the purpose
4  of individual ID's included in this bill; is that right?
5          MR. SWEETEN: I will let him testify as to
6  what his understanding of the legislative purpose of a
7  specific bill is.
8          MS. WESTFALL: The overall bill; is that
9  right, because I'll change the question.  I just want to
10 be clear of your objection.
11         MR. SWEETEN: Yeah.  I think that's what the
12 court has said is you can ask as to the legislative
13 purpose of a bill.
14 BY MS. WESTFALL:
15     Q. What is your understanding of the legislative
16 purpose of HB 1706?
17     A. I was not in Lieutenant Governor's office at the
18 time, but my guess is they wanted to --
19         MR. SWEETEN: Don't guess.  Just answer the
20 question she's posed.
21     A. I don't know the purpose is the answer.
22     Q. (By MS. WESTFALL) Do you know whether anyone in
23 the Lieutenant Governor's office was involved in the
24 development of drafting of HB 1706?
25         MR. SWEETEN: Objection, calls for

## 123

1  speculation.  Also don't reveal any specific
2  communications you've had related to HB 1706.
3          MS. WESTFALL: I said do you know.  It's not
4  calling for speculation.  You may answer.
5      A. I don't know.
6  BY MS. WESTFALL:
7      Q. Are you aware of any communications related to
8  the drafting of the element of HB 1706 outside of the
9  Lieutenant Governor's office?
10     A. No.
11     Q. Are you aware of the source of legislative
12 language of HB 1706?
13         MR. SWEETEN: Don't reveal specific mental
14 impressions, thoughts about specific legislation
15 including the process by which the legislation came
16 through.  So I'm going to instruct you not to answer, if
17 your answer would reveal that.
18     A. I don't know.
19     Q. (By MS. WESTFALL) Do you know anyone in the
20 Lieutenant Governor's office who would have knowledge or
21 testimony about the purpose of HB 1706?
22         MR. SWEETEN: Objection, asked and answered.
23     A. No.
24     Q. (By MS. WESTFALL) Would the Lieutenant Governor
25 himself know the purpose of HB 1706?

## 124

1          MR. SWEETEN: Objection, asked and answered.
2      A. I don't know.
3      Q. (By MS. WESTFALL) Are you aware of the source of
4  any of the legislative language of HB 1706?
5          MR. SWEETEN: Objection, asked and answered
6  also.
7      A. No.
8      Q. (By MS. WESTFALL) Are you familiar with the
9  Indiana photo ID law?
10         MR. SWEETEN: You can answer that question.
11     A. Yes.
12     Q. (By MS. WESTFALL) Did you review that law?
13     A. Yes.
14     Q. When did you review that law?
15         MR. SWEETEN: Don't reveal your mental
16 thoughts and impressions about specific pending
17 legislation, okay?  In answering this question.
18     A. I think I probably would have reviewed it
19 certainly in '07 when I started with the Lieutenant
20 Governor.
21     Q. (By MS. WESTFALL) Would you describe the Indiana
22 ID photo law as similar or dissimilar to HB 1706?
23         MR. SWEETEN: Don't answer that.  It
24 requires you to reveal mental thoughts -- mental
25 impression, thoughts, opinions about specific

BRIAN HEBERT                                      MAY 29, 2012

## 125

1  legislation.  Don't answer it.
2      Q.  (By MS. WESTFALL)  Based on the face of the
3  statutes, the Indiana photo ID law and HB 1706, and
4  based on your knowledge as a lawyer and with your
5  experience in election law, would you describe those --
6  that bill and the Indiana law as similar or dissimilar?
7      MR. SWEETEN:  Objection, ask for a legal
8  conclusion.  Objection, also you can -- I'll let you
9  answer, but don't reveal any thoughts, mental
10  impressions about any pending legislation.  She's asked
11  you on the face of it and you can answer.  Go ahead.
12      A.  On the face of this bill and what I remember of
13  the Indiana law, they're similar.
14      Q.  (By MS. WESTFALL)  Can you describe, generally,
15  the legislator's consideration of HB 1706 after it was
16  filed?
17      MR. SWEETEN:  Objection.  Don't answer
18  except as to the matter it's public record.  Don't
19  reveal thoughts or mental impressions about the
20  legislation, the process by which it went through.  You
21  can answer as to public record.
22      A.  I don't remember.
23      Q.  (By MS. WESTFALL)  After the House -- did the
24  House pass HB 1706?
25      A.  I don't remember.

## 126

1      Q.  Could you mark this as US 74?
2          (Exhibit No. 74 was marked.)
3      Q.  (By MS. WESTFALL)  I'm handing you what's been
4  marked as US 74.  Do you recognize this document?
5      MR. SWEETEN:  Caution the witness to review
6  the document before answering questions about it.
7      A.  Looks like a legislative history of HB 1706.
8      Q.  (By MS. WESTFALL)  Could you take a moment to
9  review this and let me know when you've had a chance to
10  look at it?
11      A.  Okay.
12      Q.  Does this document refresh your recollection as
13  to whether the House passed HB 1706?
14      A.  It looks like it passed.
15      Q.  And when it went to the senate, what committee
16  was it referred to?
17      A.  Looks like it was referred to State Affairs.
18      Q.  Would that have been the ordinary jurisdiction --
19  committee that would have jurisdiction over election
20  laws in the Senate?
21      A.  It's fair to say that those election laws goes to
22  State Affairs Committee.
23      Q.  What happened to HB 1706 after it was referred to
24  the State Affairs Committee?
25      MR. SWEETEN:  You can answer as to the

## 127

1  matters of public record.
2      A.  I don't know.  It didn't pass.  But it was also
3  May.
4      Q.  (By MS. WESTFALL)  In other words, it was late in
5  the session?
6      A.  Correct.
7      Q.  Why was it referred to the State Affairs
8  Committee and not the Committee of the whole?
9      MR. SWEETEN:  Don't answer that.  Ask for
10  matters that are subject to legislative privilege.
11      A.  I don't know.
12      Q.  (By MS. WESTFALL)  Are you following the advice
13  of your council?
14      MR. SWEETEN:  I'm instructing you not to
15  answer that question.  It asks for matters of
16  legislative privilege.
17      A.  Yes.
18      Q.  (By MS. WESTFALL)  Do you know whether the
19  Lieutenant Governor took a public position on HB 1706?
20      A.  I don't remember.
21      Q.  Did you say you didn't remember?
22      A.  I don't remember if he did or did not.
23      Q.  Do you notice whether the Lieutenant Governor or
24  anyone in his office had any communications with anyone
25  about HB 1706?

## 128

1      MR. SWEETEN:  You can testify as to whether
2  or not you know of any communications.
3      A.  I don't know of any.
4      Q.  (By MS. WESTFALL)  Are you aware of any analysis
5  conducted by the Lieutenant Governor's office prior
6  to -- actually, strike that.
7      Are you aware of any analysis conducted by the
8  Lieutenant Governor's office related to HB 1706?
9      MR. SWEETEN:  Don't answer that.  It asks
10  for matters that are subject to legislative privilege,
11  the deliberative process privilege, and the
12  attorney/client privilege.
13      Q.  (By MS. WESTFALL)  Are you following the advice
14  of your counsel?
15      A.  Yes.
16      Q.  Are you aware of any attempt to determine who
17  among registered voters did not possess the forms of ID
18  required or allowed by HB 1706?
19      MR. SWEETEN:  Objection, calls for matters
20  that are legislatively privileged.  Instruct not to
21  answer.
22      Q.  (By MS. WESTFALL)  Are you following your
23  counsel's advice?
24      A.  I am.
25      Q.  Sitting here today, what is your opinion of HB

BRIAN HEBERT                                           MAY 29, 2012

---

**129**

1706?

2      MR. SWEETEN: Don't answer to the extent
3 that that question ask you to reveal your mental
4 thoughts, impressions, about the legislation. So don't
5 provide that if it does that.
6      A. Seems like an attempt to ensure the integrity of
7 the elections.
8      Q. (By MS. WESTFALL) I'm sorry?
9      A. Seems like an attempt to ensure the integrity of
10 the elections and require photo ID.
11      Q. Had this bill, HB 1706, been elected into law,
12 would it have accomplished that purpose in your view?
13      MR. SWEETEN: Objection. She's asking for
14 matters that are subject to the legislative privileges,
15 instruct not to answer.
16      Q. (By MS. WESTFALL) Are you following the advice
17 of your counsel?
18      A. I am.
19      Q. Was there a photo ID bill introduced in the next
20 legislative session in 2007?
21      A. I believe there was.
22      Q. Do you remember that bill number?
23      A. I don't. A lot of bill numbers.
24      Q. Could you mark this as US 28?
25      (Exhibit No. 28 was marked.)

---

**130**

1      Q. (By MS. WESTFALL) You've been handed what's been
2 previously marked as US Exhibit 28. Do you recognize
3 this document?
4      A. It's a photo ID bill from the '07 session.
5      Q. Who authored the bill?
6      A. Representatives Brown, Berman, Bohac, Riddle and
7 others.
8      Q. Are you familiar with the provisions of HB 218?
9      A. Yeah.
10      Q. Could you compare HB 218 with HB 1706 and tell me
11 if there are any major difference that strike you?
12      MR. SWEETEN: In answering the question, I
13 don't want you to reveal any thoughts, mental
14 impressions or opinions about those two bills or
15 legislation that occurred -- that you would have
16 developed in the furtherance of the legislative process.
17 She's asking you to compare the text of two bills right
18 now. I'm not objecting to that specific question.
19      Q. (By MS. WESTFALL) Thank you.
20      A. Looks like the HB 218 has some exceptions for --
21 or a place for military and military widows or widowers
22 to indicate they are that status on their registration
23 form. And for the registration form to include a notice
24 on there whether or not it is a disabled veteran or
25 military widow or widower.

---

**131**

1      Q. Okay. Sir, I would like you to limit your
2 discussion of the differences to the forms of allowable
3 ID at section 63.0101 at Page 9. So you need not
4 compare the whole bill. But could you tell me the
5 differences in allowable forms of ID between HB 1706 and
6 HB 218?
7      A. Looks like 218 requires a Texas license and any
8 license from Texas or other states. Looks like 218 does
9 not allow State agency ID cards or county issued ID
10 cards. Oh, wait, take that back. It does. Generally
11 similar.
12      Q. So it your testimony that HB 218 now limits it
13 to Texas driver's licenses and eliminated the use of
14 county issued forms of ID; is that correct?
15      A. I think that's right.
16      Q. Pardon me. County election office issued ID; is
17 that correct?
18      A. That's correct.
19      Q. Otherwise, the forms of allowable ID are similar
20 to HB 1706?
21      A. I think that's right.
22      Q. But is it fair to say that it's a narrowing of
23 the allowable forms of ID; is that correct?
24      A. Yes.
25      Q. As to the photo ID; is that correct?

---

**132**

1      A. Correct.
2      Q. And HB 218 as with HB 1706 still allows the use
3 of non photo ID; is that correct?
4      A. Correct.
5      Q. And turning your attention to the forms of
6 allowable photo ID, is it your view that student IDs
7 issued by a state institution are still permissible
8 forms of photo ID under HB 218, though they're not
9 expressly identified as such?
10      A. Well, in 218 --
11      Q. 218.
12      A. In par in six says, a student ID card that
13 contains their photograph is acceptable.
14      Q. Thank you. Did you or anyone in the Lieutenant
15 Governor's office play any role in the development of
16 218?
17      MR. SWEETEN: Objection. I don't want you
18 to discuss any matters that are subject to the
19 legislative privilege, which could include thoughts or
20 mental impressions opinions about legislative or could
21 also reveal communications of legislators, legislative
22 staff, State agencies, Texas Legislative Council, those
23 are all matters of legislative privilege so do not
24 reveal any specifics with respect to that. They're
25 privileged.

BRIAN HEBERT                                        MAY 29, 2012

## 133

1     A.  The question is did Lieutenant Governor or staff
2  play a role in the development of HB 218?
3     Q.  (By MS. WESTFALL)  Yes.
4        MR. SWEETEN:  I'm going to instruct you not
5  to answer if it would reveal matters that are subject to
6  the privilege.
7     A.  The answer is don't recall.
8     Q.  (By MS. WESTFALL)  So you're not asserting
9  privilege with regard to that answer?
10    A.  Correct.
11    Q.  Were you present at any meetings during the
12  development or drafting of HB 218?
13       MR. SWEETEN:  Same objection, same
14  instruction.
15    A.  I don't recall.
16    Q.  (By MS. WESTFALL)  Are you aware of who in
17  particular was involved in the drafting of HB 218?
18    A.  No.
19    Q.  Are you aware of any concerns raised during the
20  development, drafting or consideration of HB 218 about
21  the impact of the bill on Hispanic voters?
22       MR. SWEETEN:  That calls for matters that
23  are subject to the legislative privilege, the
24  deliberative process privilege, as well as potentially
25  attorney/client privileged information, so don't answer

## 134

1  the question.
2     Q.  (By MS. WESTFALL)  Are you following advice of
3  counsel?
4     A.  I am.
5     Q.  Are you aware of any concerns raised during the
6  development or drafting of HB 218 about the impact of
7  bill on Black voter?
8        MR. SWEETEN:  Same objection, same
9  instruction.
10    Q.  (By MS. WESTFALL)  Are you following the advice
11  of council?
12    A.  I am.
13    Q.  Are you aware of any analysis conducted to
14  determine the impact of HB 218 on racial or ethnic
15  minority voters?
16       MR. SWEETEN:  Objection, legislative
17  privilege.  My instruction is to not answer the
18  question.
19    Q.  (By MS. WESTFALL)  Are you following the advice
20  of council?
21    A.  I am.
22    Q.  Did you monitor consideration of HB 218 in the
23  House?
24       MR. SWEETEN:  Objection.  I think that calls
25  for matters subject to the legislative privilege.

## 135

1     Q.  (By MS. WESTFALL)  Are you going to answer the
2  question or follow the advice of council?
3     A.  Follow the advice.
4     Q.  Did you learn or become aware of any concerns
5  raised about HB 218?
6        MR. SWEETEN:  Same objection, legislative
7  privilege, same instruction, don't answer the question.
8     Q.  (By MS. WESTFALL)  Are you following advice of
9  council?
10    A.  I am.
11    Q.  If there's a bill in the House that gets passed
12  and then referred to the senate, how is it determined
13  who sponsors the House in the senate as a general
14  matter?
15       MR. SWEETEN:  I'm going to object to the
16  question.  I think you're asking for matters that are
17  subject to the legislative privilege.
18       MS. WESTFALL:  You are not going to allow
19  him to answer generally?
20       MR. SWEETEN:  Let me hear the question
21  again.  Madam, court reporter, will you please read it
22  back?
23       (Requested question was read.)
24       MR. SWEETEN:  You can answer as a general
25  matter.  Don't reveal matters subject to legislative

## 136

1  privilege.  So go ahead.
2     A.  I think generally there's communications between
3  House sponsors and senators, people who share priorities
4  sponsor each other's bills.
5     Q.  (By MS. WESTFALL)  So generally speaking, is the
6  Lieutenant Governor not a party to those communications?
7        MR. SWEETEN:  Objection, I mean, that's
8  vague.  It also ask about his particular role in
9  legislation.  That is subject to the legislative
10  privilege.
11       MS. WESTFALL:  I'm not referring to any
12  particular legislative act.  I'm asking about general
13  procedures.  Will you let your witness answer that
14  question?
15       MR. SWEETEN:  You're asking about general --
16  can you read the question back again.
17       (Requested question was read.)
18  BY MS. WESTFALL:
19    Q.  To those conversations, I think, about who
20  will -- who in the Senate will sponsor a House Bill?
21       MR. SWEETEN:  Objection to the question.
22  Objection form, objection vague.  Objection, it's
23  compound.  You can answer as a general matter to that
24  question.  Do not refer to any specific legislation in
25  answering that.  In particular, Senate Bill 14 or these

BRIAN HEBERT                                                MAY 29, 2012

---

## 137

1  bills she's showing you.  Okay.
2      A.  I think generally the Lieutenant Governor is not
3  involved in who sponsors what.
4      Q.  (By MS. WESTFALL)  Does he become involved if he
5  has particular interest in a bill and who will be the
6  senate sponsor of a House bill?
7          MR. SWEETEN:  Same objection, same
8  instruction.
9      A.  I don't know.
10     Q.  (By MS. WESTFALL)  So Janice McCoy has testified
11  in this litigation.  Did you review her transcript in
12  advance of this deposition today?
13     A.  No.
14     Q.  So she testified that she had one or two dozen
15  conversations with the Lieutenant Governor's office
16  about HB 218, including the person who staffed State
17  Affairs for the Lieutenant Governor.  Was that you?
18          MR. SWEETEN:  Objection to the form of the
19  question.
20     A.  In '07 --
21          MR. SWEETEN:  Objection, calls for facts not
22  in evidence.  Go ahead.
23     A.  -- probably yes.  I should say there's several
24  people that staff State affairs although my guess is I
25  would have been one of those people.

---

## 138

1      Q.  (By MS. WESTFALL)  Who were the other people in
2  2007 that were staffing State affairs besides you?
3      A.  State affairs is a large-- insurance bills would
4  have been Karen Barret and health related bills would
5  have been Jamie Dudensten.  And my memory is during this
6  session, myself and general counsel Frank Battle
7  probably would have split the elections bills.  There
8  may have been others.
9      Q.  And Ms. McCoy and Senator Fraser when they
10  testified in this matter also testified that they met
11  with the Lieutenant Governor's office and indicated that
12  Senator Fraser wanted to sponsor HB 218.  Is that your
13  recollection as well?
14          MR. SWEETEN:  Objection, assumes facts not
15  in evidence.  You can answer to the extent you know.
16     A.  I don't know.  I don't remember.
17     Q.  (By MS. WESTFALL)  Are you aware of any meeting
18  that occurred between Senator Fraser or Janice McCoy or
19  with the Lieutenant Governor concerning sponsorship of
20  HB 218 in the Senate?
21     A.  I don't recall.
22     Q.  You don't recall?
23     A.  I don't recall a meeting.
24     Q.  Were you aware of Senator Fraser's interest in
25  sponsoring HB 218 in the Senate?

---

## 139

1          MR. SWEETEN:  Don't reveal matters that are
2  subject to communications that you've had with
3  legislators or legislative staff.  So if it would
4  reveal a communication you had with his office or one of his
5  staffers, don't reveal that information.
6      A.  I think I was aware when he filed it or shortly
7  before, possibly, but I can't remember.
8          MR. SWEETEN:  You can testify as to matters
9  of public record.  We need a bathroom break.
10     (Brief recess.)
11  BY MS. WESTFALL:
12     Q.  We're back on the record.  Before the break we
13  were discussing HB 218 and talking about Janice McCoy's
14  testimony about this bill, do you remember that?
15     A.  I do.
16     Q.  Ms. McCoy testified in her deposition in this
17  case that she had never had any discussions with anyone
18  in the Lieutenant Governor's office about the impact of
19  HB 218 on minority voters.  To your knowledge, is that
20  accurate?
21          MR. SWEETEN:  Don't reveal in answering the
22  question legislative privilege would cover
23  communications that you've had with legislative staff,
24  don't reveal any substance of any communications that
25  you've had with staff as that is a matter covered by

---

## 140

1  legislative privilege.
2      Q.  (By MS. WESTFALL)  Can you answer the question?
3          MR. SWEETEN:  You can testify if you had a
4  conversation with Janice McCoy.  Don't testify about the
5  substance of it.  The way it's currently phrased,
6  they're asking you the substance of the conversation.
7  Therefore, I'm instructing you not to answer it as
8  phrased.
9      Q.  (By MS. WESTFALL)  Are you following your
10  counsel's advice?
11     A.  Yes.
12     Q.  Are you aware of any discussions that occurred
13  about the impact of HB 218 on minority voters?
14          MR. SWEETEN:  Again, in the question she's
15  asking you the substance of the conversations.  The
16  question is problematic from that standpoint.  I'll
17  allow you to answer as to any conversations you've had,
18  who those conversations were with, including whether you
19  had a discussion with Janice McCoy.  However, as the
20  question is phrased, I believe the question is calling
21  for you the reveal the substance of communications and
22  therefore I'm instructing you not to answer the
23  question.
24     Q.  (By MS. WESTFALL)  Are you following your
25  counsel's advice?

BRIAN HEBERT                                           MAY 29, 2012

## 141

1        A.  Yes.
2        Q.  The question was not about -- just to clarify,
3   for the witness, the question was not about
4   conversations with Janice McCoy.  Are you aware of any
5   discussions about the impact of HB 218 on minority
6   voters?
7            MR. SWEETEN:  You can reveal if you're aware
8   of any specific discussions regarding that subject
9   matter, but do not reveal anything beyond that.
10       A.  I don't recall.
11       Q.  (By MS. WESTFALL)  Are you aware of any
12  communications with election officials concerning HB
13  218?
14           MR. SWEETEN:  You can answer as phrased.
15       A.  I don't recall.
16       Q.  (By MS. WESTFALL)  Are you aware of a statemen
17  by Secretary of State, Roger Williams, that he wasn't
18  sure if a photo ID bill would improve turn out?
19           MR. SWEETEN:  You can answer, if you are
20  aware.
21       A.  I don't recall that statement.
22       Q.  (By MS. WESTFALL)  Do you know the party
23  affiliation of Secretary Williams?
24       A.  I believe he's Republican.
25           THE REPORTER:  Can you speak up.

## 142

1        A.  I believe he's Republican.
2        Q.  (By MS. WESTFALL)  What were the purposes of the
3   bills authors in introducing HB 218?
4            MR. SWEETEN:  Don't reveal the subjective
5   intent of any specific person.  You can -- you can as
6   the court has indicated, you can provide your
7   understanding of the purpose of the bill itself was, but
8   don't speculate as to subjective intent.  You don't have
9   to do that and that's privileged.
10           MS. WESTFALL:  I'm not asking about
11  subjective intent.  Just to be clear.  My question was
12  limited to the purpose of HB 218.
13           MR. SWEETEN:  You can answer as to the
14  purpose of 218 as phrased.
15       A.  If you're asking why they filed it?
16       Q.  (By MS. WESTFALL)  Yes.
17       A.  I don't know.  Presumably to improve the
18  integrity of the election process in Texas.
19       Q.  How do you know that?
20           MR. SWEETEN:  Don't reveal the conversations
21  that you've had.  Those would be legislatively
22  privileged.  You can answer as to the purpose of the
23  bill, I think you have, but you don't have to give all
24  the conversations you've had or the discussions mental
25  impressions that occurred as that bill was considered.

## 143

1   Don't answer if it would reveal that information.
2        A.  Just seems a natural purpose to file this sort of
3   legislation.
4        Q.  (By MS. WESTFALL)  You mean, to your mind -- in
5   your mind HB 218 would improve the integrity of the
6   election process?  Is that your testimony?
7        A.  That wasn't your question, I don't think.  I
8   thought your question was, why do I think they did it.
9   I don't know why they did it.  My guess is because it
10  would improve integrity of the elections.
11       Q.  And then what is basis of your supposition that
12  that was the purpose in introducing HB 218?
13           MR. SWEETEN:  In answering that question
14  don't reveal conversations you had that would be subject
15  to the legislative privilege or thoughts, mental
16  impressions about that specific legislation.  If you can
17  answer without doing so, you can do so.
18       A.  I mean, there's been lots of election bills and
19  voter ID bills filed.  And I would say it's fair to say
20  that in those cases for those similar bills that was the
21  purpose.
22       Q.  (By MS. WESTFALL)  Were there any other purposes
23  that you're aware of underlying the filing of HB 218?
24       A.  I'm not aware.
25       Q.  Are you aware of any evidence that there was a

## 144

1   problem with the integrity of elections at the time HB
2   218 was filed?
3            MR. SWEETEN:  The question as phrased ask
4   you to reveal information, mental impressions, thoughts,
5   about specific legislation.  In answer to the question,
6   don't do that.  You can reveal matters that are on the
7   public record, but do not reveal the substance of
8   conversations and don't reveal mental impressions.
9   Those would be subject to the legislative privilege.  So
10  objection.
11       A.  I don't recall public discussion of the purpose
12  of this.
13       Q.  (By MS. WESTFALL)  Are you following the advice
14  of council as to any other purposes you're aware of or
15  basis of problems?
16           MR. SWEETEN:  That wasn't your question.
17  Your question was different than that.  If you want to
18  ask him what the purpose of the bill was, you can ask
19  him that.
20       Q.  (By MS. WESTFALL)  Is your response as to
21  evidence supporting need for the problem based on
22  private information for which you are asserting
23  privilege?
24           MR. SWEETEN:  That is privileged, I would so
25  instruct you not to reveal mental impressions about the

BRIAN HEBERT                                                    MAY 29, 2012

---

## 145

1  legislation or conversations that you've had with
2  anyone, any legislators, legislative staff or the other
3  enumerated individuals or entities.
4      A.  The short answer is I just don't recall.
5      Q.  (By MS. WESTFALL)  Was HB 218 in part designed to
6  prevent noncitizens from voting?
7          MR. SWEETEN:  Don't answer that.  You can
8  answer as to the specific purpose of the legislation.
9  She's now asking you about the design and the intent of
10  the subjective intent of individuals.  So you can answer
11  as to the purpose of the legislation, the court has said
12  that you can and so I will allow that.  But I'm not --
13  but legislative privilege covers mental impression,
14  thoughts, about the bill in conversations related to the
15  bill.
16      Q.  (By MS. WESTFALL)  Do you have any testimony in
17  response to my question?
18      A.  I think the answer is I don't know.
19      Q.  Are you following the advice of your council not
20  to provide testimony?
21          MR. SWEETEN:  And the correct question is,
22  are you saying that you don't know at all or are you
23  saying I don't know based upon the instruction.
24      A.  I'm saying I don't know at all.
25      Q.  (By MS. WESTFALL)  Was the purpose of HB 218 in

---

## 146

1  part to prevent noncitizens from voting?
2          MR. SWEETEN:  You can answer as to the
3  purpose of 218.
4      A.  It seems to me.  I'm not sure how that's
5  different from the last question.  I don't know the
6  purpose.  I don't know why these members filed this
7  bill.
8      Q.  (By MS. WESTFALL)  Are you aware of
9  representative Betty Brown, who was the sponsor of 218
10  stating on the House floor that it was designed to keep
11  illegal aliens, noncitizens and otherwise people not
12  qualified from voting?
13      A.  I don't recall that.
14      Q.  How do you determine what is legislative purpose
15  of a bill?
16      A.  I mean, when you say legislative purpose I think
17  of the indent of the author.  Sometimes that is spelled
18  out in the bill in the four corners of the document,
19  what is the intent and other times it's from the floor
20  statement.  Other times it's in their head and I don't
21  have access to that.
22      Q.  How do you figure out the intent when a bill is
23  enacted?  How do you figure out the purpose of the bill
24  besides what you've just testified to?
25          MR. SWEETEN:  Okay.  Again, the court has

---

## 147

1  said that you do not have to testify based upon the
2  legislative privilege about the subjective intent of
3  individuals who passed a bill.  You can testify about
4  the purpose of the legislation.  When you're answering
5  this question, don't reveal matters that are subject to
6  legislative privilege, including the deliberations,
7  conversations, or mental impressions you may have had
8  when this particular bill was moving forward.  So you
9  can answer to the extent you can.
10      A.  So how does one determine the purpose of the law
11  after it has passed Legislature.
12      Q.  (By MS. WESTFALL)  Where does one look to
13  determine and ascertain and derive purpose?
14      A.  To the extent that the purpose is relevant to the
15  law, then I imagine a court would look at that and some
16  courts would give weight to things like history and
17  public comments and other courts would dismiss the
18  importance of legislative history entirely.
19      Q.  I believe you just testified that you saw
20  protecting the integrity of elections and preventing
21  noncitizens from voting was the same purpose; is that
22  correct?
23      A.  I'm sorry.  Could you repeat?
24      Q.  I may have misunderstood you or misheard you.
25  But did you testify that ensuring integrity elections

---

## 148

1  and preventing noncitizens from voting are one and the
2  same?
3      A.  I don't think I mentioned noncitizens.  I
4  mentioned that ensuring the integrity of the election
5  system and instilling confidence in that system and the
6  voting public's perception.
7      Q.  Okay.  Do you believe that HB 218 would prevent
8  noncitizens from voting?
9          MR. SWEETEN:  Don't provide an answer to
10  that.  That calls for matters that are legislatively
11  privileged.
12      Q.  (By MS. WESTFALL)  Based on the face of the
13  statute?
14      A.  I think I don't know.
15          MR. SWEETEN:  You're asking his mental
16  impressions about a specific bill that is covered by the
17  legislative privilege.  He can answer as to what he
18  thinks the legislative purpose is.  He won't answer as
19  to subjective intent or his own personal mental
20  impressions about the bill.  It's legislatively
21  privileged.  Objection.
22      Q.  (By MS. WESTFALL)  can you answer the question?
23      A.  The question is, will this bill prevent
24  noncitizens from voting?
25      Q.  Correct.

BRIAN HEBERT                                                    MAY 29, 2012

## 149

1      A.  I think to the extent it's designed to prevent
2  ineligible voters from voting and noncitizens or
3  ineligible voters, it probably will have that effect.
4      Q.  Is it your understanding that a person's -- a
5  voter applicant's citizenship is determined by county
6  election officials when a person submits a voter
7  registration application?
8      MR. SWEETEN:  As it currently stands?  The
9  current law or are you talking about under a new bill.
10     MS. WESTFALL:  Under any law.
11     MR. SWEETEN:  Under current law, you're
12 asking the question?
13 BY MS. WESTFALL:
14     Q.  Do you understand the question?
15     A.  I think, yes.  I think my understanding is you're
16 registered to vote in a county.  That county registrar
17 determines whether you're eligible and if you are
18 submits that information to the Secretary of State.
19     Q.  And as part of the voter registration
20 application, does an applicant indicate whether he or
21 she is a US citizen?
22     MR. SWEETEN:  You can answer.
23     A.  I'm pretty sure, yes, but I don't have a
24 registration card in front of me.
25     Q.  (By MS. WESTFALL)  And does photo ID legislation

## 150

1  including HB 218, help to prevent persons who are not US
2  citizens from casting a ballot?
3      MR. SWEETEN:  When you're answering this
4  question don't reveal your mental processes thoughts,
5  communications, with other people regarding specific
6  legislation.  To the extent that you can answer not
7  based upon that information, you can do so.
8      A.  Again, I think, my guess, is this bill would
9  prevent some number of ineligible voters from voting and
10 to the extent that noncitizens are not eligible, then
11 they would be prevented from voting.
12     Q.  (By MS. WESTFALL)  Can you elaborate on that and
13 how that would work?
14     MR. SWEETEN:  Again, don't reveal matters
15 that are subject to the legislator privilege in
16 answering this question.
17     Q.  (By MS. WESTFALL)  Under the face of this
18 statute?
19     A.  On the face of House Bill 218, if you do not have
20 proper identification and you do not fall into one of
21 these exceptions, then you are not eligible to vote.  So
22 to the extent you are a citizen or a noncitizen and fit
23 that description, you would not be eligible to vote.
24     Q.  Do you know under current law whether noncitizens
25 can obtain driver's licenses in the State of Texas?

## 151

1      A.  I believe that they can.
2      Q.  Do you know whether noncitizens in the State of
3  Texas can obtain a concealed handgun license?
4      A.  I'm actually not sure of that.
5      Q.  Do you know whether in the State of Texas a
6  noncitizen can obtain a military ID?
7      A.  I'm not sure of that either.
8      Q.  So if -- suppose a noncitizen submitted a voter
9  registration application and falsely indicated that he
10 or she was a US citizen and was added to the voter rolls
11 as a citizen, and then appeared at the polls on election
12 day with a driver's license that indicated his or her
13 identify, visually you could match the person and was
14 able to vote.  Would that -- would that scenario be
15 prevented by HB 218 or similar photo ID legislation?
16     MR. SWEETEN:  In answering this question,
17 don't reveal your thoughts, mental impressions, or
18 opinions, about legislation or information you learned
19 from conversations with legislative staff members,
20 legislators, State agencies, Texas Legislative Council.
21 You can answer to the extent you're not revealing that
22 information.
23     A.  So the question is, a noncitizen has registered
24 to vote and has a photo ID, does this bill stop that
25 person from voting?

## 152

1      Q.  (By MS. WESTFALL)  Correct.
2      A.  I guess I'm not clear.  Maybe there's some types
3  of ID under this bill that would have an indication of
4  whether the person was a citizen or not a citizen, which
5  presumably would be discovered by the poll worker.
6      Q.  Could you turn your attention again to HB 218 and
7  look at the list of photo IDs?  I believe it begins on
8  Page 9, of section 63.0101?
9      A.  Yeah.
10     Q.  Could you identify one of the documentary -- one
11 of the photo IDs that would indicate a person's
12 citizenship?
13     A.  Again, I think outside the bounds of this
14 document, it may be that, you know, the Department of
15 Public Safety has guidelines for what a driver's license
16 looks like or that the United States Military has
17 guidelines for what a military ID looks like and those
18 guidelines might include some designation for citizen
19 versus noncitizen.  Same as perhaps any of these.
20     Q.  Is your testimony today that you are uncertain of
21 whether the IDs indicate a person's citizenship status?
22     MR. SWEETEN:  You can answer the question,
23 but don't do it based upon matters that you learned
24 prior to the bill's passage, including the conversations
25 we've talked about.  Don't reveal your thoughts and

BRIAN HEBERT                                              MAY 29, 2012

## 153

1  mental impressions, but you can answer if you're not
2  doing that.
3        A.  Right.  In the case of some of these I am unsure.
4        Q.  (By MS. WESTFALL)  Which ones are you unsure of?
5  Could you just identify those for the record?
6        A.  Out of the list starting on Page 9?
7        Q.  Yes.
8        A.  Military identification I'm not sure.  Employer
9  identification cards, it would depend on the employer
10  perhaps.  Student identification cards perhaps.  Again,
11  I'm unclear about concealed handgun licenses and number
12  eight is broad enough to include some card that has a
13  citizenship designation.  That's any ID card issued by
14  the federal government or State government and then
15  subsection B official mail addressed to the person or
16  governmental entity that seems like it.
17        Q.  What is the most commonly held form of
18  identification on this list, of photo IDs?
19              MR. SWEETEN:  You can answer the question,
20  but as you're doing so don't reveal the thoughts, mental
21  impressions, about specific legislation or information
22  you have learned from conversations between legislatures
23  because that would be legislatively privileged.  But you
24  can answer the question to the extent you're not doing
25  that.

## 154

1        A.  So on House Bill 218, what is the most common
2  form of photo ID?
3        Q.  (By MS. WESTFALL)  Yes.
4        A.  I don't know that.  I would guess a driver's
5  license, but number eight seems broad enough that any ID
6  from a federal or state institution.  I don't know.
7        Q.  And it was your testimony earlier that you were
8  uncertain whether driver's license indicates US
9  citizenship; is that right?
10        A.  That's correct.  I don't believe it does, but I'm
11  not a 100 percent sure.
12        Q.  After the House -- maybe you testified about this
13  earlier.  Oh, no.  After the House passed HB 218, was it
14  considered by the senate?
15              MR. SWEETEN:  You can answer as matters of
16  public record.
17        A.  I don't recall.
18        Q.  (By MS. WESTFALL)  Could you mark this as 75?
19              (Exhibit No. 75 was marked.)
20        Q.  (By MS. WESTFALL)  You've been handed what's
21  marked US 75.  Do you recognize this document?
22        A.  Yes.
23        Q.  What is it?
24        A.  It's the legislative history of HB 218.
25        Q.  Have you reviewed this before today?

## 155

1        A.  I may have a long time ago, but not so that I can
2  remember it.
3        Q.  Can you take a look at US 75 and let me know
4  whether based on this document it refreshes your memory
5  as to whether HB 218 was referred to the State Affairs
6  Committee?
7        A.  It was.
8        Q.  About the Lieutenant Governor made that committee
9  assignment, correct?
10        A.  Presumably, yes.
11        Q.  Did the committee hold a hearing on HB 218?
12        A.  Yes.
13        Q.  And under the -- I believe, you testified under
14  the senate rules of Lieutenant Governor is who the --
15  does not serve on the committee of State Affairs; is
16  that right?
17        A.  Correct.
18        Q.  And therefore he cannot order, convene committee
19  hearings or call witnesses; is that right?
20        A.  Correct.
21        Q.  Do you know who testified at that hearing?
22        A.  I do not recall.
23        Q.  And you were handling State Affairs that year; is
24  that correct?
25        A.  Correct.

## 156

1        Q.  Do you know whether the bill was amended in
2  committee?
3        A.  I don't recall that either.
4        Q.  And after committee consideration, was it voted
5  out of committee?
6        A.  Yes.  This indicates that it was.
7        Q.  Was it voted out on party lines?
8        A.  I don't recall that either.
9        Q.  Did HB 218 require the support of two-thirds of
10  the senators to bring it to the floor for a vote?
11        A.  In '07, I believe those were the senate rules,
12  yes.
13        Q.  And why was that quantum of senators required?
14        A.  That is a long standing rule that applies to all
15  bills in the senate.  Two-thirds of the senate must
16  agree to take items out of order and there's typically a
17  place holder bill at the top of the calendar.
18        Q.  What is the purpose of that rule?
19              MR. SWEETEN:  You can answer.
20        A.  I don't know the purpose.  I think most people
21  would say it encourages some level of conciliation or
22  cooperation.
23        Q.  (By MS. WESTFALL)  What was the partisan
24  composition of the Senate in 2007, do you recall?
25        A.  I don't recall.  Maybe -- I would guess 21/10,

BRIAN HEBERT                                    MAY 29, 2012

---

### 157

1  but I don't know for sure.
2      Q.  And if all democrats were present on the floor to
3  vote against the bill, could they block legislation
4  subject to the two-thirds rule?
5      A.  In 2007?
6      Q.  2007?
7      A.  Yeah.  It would take 11 votes.  And so if it was
8  21 to 10, then, no, the democrats would not be able to
9  stop it or the opposition would not be able to stop it.
10     Q.  Do you believe there were 11 democrats?
11         MR. SWEETEN:  Objection, asked and answered.
12     Q.  (By MS. WESTFALL)  Did the Lieutenant Governor
13  attempt to bring 218 -- pardon me.  HB 218 to the Senate
14  floor for a vote?
15         MR. SWEETEN:  You can answer the question.
16  But in doing so don't reveal communications you've had
17  with other members of the Lieutenant Governor's staff or
18  mental impressions regarding this specific bill, but you
19  ask answer if you know.
20     A.  I don't recall.  I'm trying to remember looking
21  at this.
22     Q.  (By MS. WESTFALL)  Do you know any of the
23  circumstances under which Lieutenant Governor brought HB
24  218 to the Senate floor?
25         MR. SWEETEN:  Objection vague.  Also

---

### 158

1  objection, I'm going to instruct you not to reveal
2  matters of legislative privilege including conversations
3  between legislators, between Lieutenant Governor, staff
4  members, other individuals.
5      A.  I don't recall.
6      Q.  (By MS. WESTFALL)  Are you following the
7  instruction of council and asserting privilege over some
8  your testimony or is it your testimony fully that you
9  don't recall anything about this?
10     A.  My testimony is, that I do not recall whether the
11  Lieutenant Governor what he did in the process of
12  bringing this or not bringing this to the Senate floor.
13     Q.  Were you present in any meetings or a party to
14  any conversations that the Lieutenant Governor held
15  concerning the timing of the vote of HB 218 on the
16  Senate floor?
17
18         MR. SWEETEN:  I'll let you answer as too
19  whether or not -- you can answer.
20     A.  I don't recall anything like that.
21     Q.  (By MS. WESTFALL)  Are you aware of any
22  conversation between the Senator or any member of the
23  Senate the day before the vote?  Or the day of vote
24  in the Senate?
25         MR. SWEETEN:  You can answer whether or not

---

### 159

1  you are aware of the conversation.
2      A.  I dont' think so, no.
3      Q.  (By MS. WESTFALL)  Do you know -- strike that.
4      When the Lieutenant Governor called a vote to
5  bring HB 218 to the Senate for a vote, how many Senators
6  were present on the Senate floor?
7      A.  I do not recall.
8      Q.  Do you recall whether anyone was not present?
9      A.  When the vote was called?  No.
10     Q.  Are you aware of whether Lieutenant Governor was
11  aware at the time of the Senate vote on HB 218 of the
12  concerns that HB 218 would disproportionately harm
13  minority voters?
14         MR. SWEETEN:  Okay.  I'm going to object
15  based upon legislative privilege and also based upon
16  speculation.  I'm going to instruct you not to reveal
17  information that you may have learned from any
18  conversations with the Lieutenant Governor, with any
19  legislators, with any legislative staff, state agencies,
20  Texas Legislative Council.  So that's my instruction to
21  you.  Don't answer the question as posed.
22     A.  I'm not aware of such information.
23     Q.  (By MS. WESTFALL)  Are you asserting privilege
24  over some of your testimony based upon council's advice?
25         MR. SWEETEN:  I'm instructing you that what

---

### 160

1  she's asking you would require you to reveal privilege.
2  So my instruction would be to not answer the question.
3      Q.  (By MS. WESTFALL)  Are you following your
4  counsel's advice?
5      A.  Yes.
6      Q.  Where were you working, physically, in the
7  capital day of the vote for HB 218 on the Senate
8  floor?
9      A.  I don't remember.  I most certainly was not on
10  the Senate floor.  It would have been my first session.
11  So I probably was in my office, which is in the basement
12  two floors below.
13     Q.  Are you aware that the vote on HB 218 was held
14  when not all members were present on the floor?
15     A.  I don't know.
16     Q.  Can you recall during your time working for the
17  Lieutenant Governor of any time when a vote was held,
18  intentionally scheduled to be brought to the floor when
19  a member of the Senate was sick and had called in sick
20  that day?
21         MR. SWEETEN:  You can answer to the extent
22  you're not being asked to reveal matters of legislative
23  privilege.
24     A.  I'm not aware of such circumstance.
25     Q.  (By MS. WESTFALL)  Do you know that there was a

BRIAN HEBERT                                          MAY 29, 2012

## 165

1     A. I'm not aware of any specifics other than it came
2  out after the vote we discussed earlier.
3     Q. Did you, yourself, have any part in drafting
4  this?
5     A. No.  I should say it's possible I reviewed, you
6  know, some of the statistics and things in here, but I
7  did not draft this letter.
8     Q. Would the press person in Mr. Dewhurst's office
9  likely have drafted this?
10        MR. SWEETEN:  Objection, calls for
11  speculation.
12     A. I really don't know.
13     Q. (By MS. WESTFALL)  So you handled photo ID for
14  the Lieutenant Governor, correct?
15     A. I handled the legal and procedural analysis of
16  it, yes.
17     Q. And you testified and identified a press person
18  earlier; is that correct?
19     A. Correct.
20     Q. And the press person in your office, did he
21  usually write all of the substance for all of his press
22  releases or did he rely upon the subject matter experts
23  within the office to assist him with content?
24     A. Well, in this case it would have been a different
25  press person.  In '07, again, it would be typical to

## 166

1  have a draft to the extent there were things like
2  statics or procedural history, those things would have
3  been run by a staff person.  But it's also not uncommon
4  for Lieutenant Governor to write his own opinions and
5  then have those crafted into a press release format.
6     Q. Do you think in this instance Lieutenant Governor
7  wrote this letter himself because you handled photo ID
8  and you don't recall having drafted this?
9        MR. SWEETEN:  Objection, calls for
10  speculation.
11     A. Again, I would never have -- I think it's safe to
12  say that I would never have drafted a press release.
13  I'm not sure if this is a press release or something he
14  sent directly to the Senate or something else.  It's
15  addressed to Senate colleagues and it's signed David
16  Dewhurst.  That would be an unusual formate for a press
17  release I would think.
18     Q. (By MS. WESTFALL)  Do you think that was a leaked
19  letter that Mr. Dewhurst wrote?
20        MR. SWEETEN:  Objection, calls for
21  speculation.  He's already said his doesn't know.
22     Q. (By MS. WESTFALL)  Can you see that in the draft
23  letter referred to that was later corrected that's
24  referred to on Page 1, that it says in the second
25  paragraph, HB 218 requires voters to present a driver's

## 167

1  license or some other common form of ID at the election
2  polls to prove who they say they are, US citizens.  Do
3  you see that sentence?
4     A. I do see that sentence.
5     Q. Can you explain how HB 218 would ensure that
6  people prove they are US citizens at the polls?
7        MR. SWEETEN:  Don't reveal your thoughts,
8  your mental impressions, about legislation or in
9  furtherance of the legislative process including Senate
10  Bill 14.  Do not reveal conversations you had with
11  Lieutenant Governor Dewhurst.  Do not reveal
12  conversations you've had with legislators, legislative
13  staff, state agencies, or Texas Legislative Council.
14     A. Right.  Just looking, again, at the face of the
15  bill and as we discussed earlier, I think the intent is
16  to ensure that eligible voters vote and you have to be a
17  US citizen to vote and so I assume that's what this
18  sentence is getting at.
19     Q. (By MS. WESTFALL)  I believe you testified
20  earlier that you were not certain of whether the forms
21  of photo ID required by HB 218, in fact, proved that the
22  voter was a citizen; is that right?
23     A. That's what I said, yeah.
24     Q. So is there any way that you can reconcile your
25  understanding of what the forms of photo ID require and

## 168

1  show and prove, versus what you just testified your
2  belief is in terms of the purpose and effect of House
3  Bill 218?
4        MR. SWEETEN:  Objection to the question as
5  vague.  Objection also to the extent that the question
6  requires or asks you to reveal your thoughts, mental
7  impressions, or opinions about legislation.  Okay.
8  Don't reveal communications that you've had with respect
9  to the issue.  If you can answer it without doing --
10  without providing matters that are subject to
11  legislative privilege or to the attorney/client
12  privilege, then you can do so.
13     A. I would just say that, I mean, I think this bill
14  would make it more likely that eligible voters only are
15  voting and citizens are the only eligible voters, then
16  it would have -- it would be reflected in what this
17  letter says.
18     Q. (By MS. WESTFALL)  And what I'm trying to
19  understand is, can you explain further how you believe
20  HB 218 would further that purpose?
21        MR. SWEETEN:  Same objection.  Same
22  instructions.
23     A. By requiring additional forms of identification,
24  you are attempting to ensure and, again, not system is
25  perfect.  You are attempting to insure that only

BRIAN HEBERT                                          MAY 29, 2012

---

169

1    eligible voters can vote.  And I think the more -- in my
2    opinion, the more secure you try to make these
3    elections, the less tempted someone who wants to
4    fraudulently vote is -- the less tempted they are to
5    vote or the less able they are to vote.
6        Q.  But you nevertheless testified earlier that a
7    person's citizenship status is determined at the voter
8    registration stage; is that correct?
9        MR. SWEETEN:  You can testify about matters
10   of fact, she asked you that earlier.  You do not testify
11   about your mental impressions, communications that you
12   had, or thoughts and impressions about a specific piece
13   of legislation.  That is legislatively privileged.  So
14   I'm going to instruct you accordingly.  You can answer
15   to the extent you are not revealing matters of
16   privilege.
17       A.  I also think it's useful to point out that it not
18   just be noncitizens who would be presumably prohibited
19   from voting.  It would be anyone trying to
20   fraudulently -- me trying to vote in a different county,
21   me trying to vote in an election in which I'm not
22   eligible to participate.  So I think the idea here, and
23   my opinion here is, you are putting up some standards
24   and if a fraudulent person wants to try to vote
25   fraudulently, they are going to have to get through

---

170

1    several hurdles or, you know, yes, you have to check a
2    box saying that you're a citizen and then turn that into
3    your County.
4        As the current law stands, that would be enough
5    for you to vote fraudulently.  If you put in Mickey
6    Mouse, and this was an example, I think, if you wrote
7    Mickey Mouse, yes, I'm a citizen and you get that ID
8    card, that voter registration card, you could vote.
9    This would require you also to get some sort of photo ID
10   with Mickey Mouse on it, which is, again, not a fool
11   proof system and does not prevent every ineligible voter
12   from voting, but I think it raises the bar somewhat of
13   the security of the election.
14       Q.  (By MS. WESTFALL)  Well, likewise, a voter
15   registration card that has the individuals name and
16   address indicating he or she is a voter, also
17   indicates -- proves identity under the current system;
18   isn't that correct?
19       MR. SWEETEN:  Are you asking about current
20   law?
21       MS. WESTFALL:  Yes, I'm asking about current
22   law.  Do you understand the question.
23       A.  Yes.  A voter registration card is a form of
24   identity under the current system and then this bill
25   apparently thinks that's not secure enough.

---

171

1    BY MS. WESTFALL:
2        Q.  So would HB 218 prevent the following scenario:
3    Noncitizen lies on voter registration application,
4    county official adds that person to the rolls.  That
5    person has a driver's license or another form of photo
6    ID that does not indicate citizenship.  That person goes
7    to the polls, presents the photo ID and votes a regular
8    ballot.  Would HB 218 stop that?
9        MR. SWEETEN:  Again --
10       Q.  (By MS. WESTFALL)  On the basis of the public
11   record, the face of the statute?
12       MR. SWEETEN:  Okay.  You can answer with
13   that qualification.
14       A.  Based on this statute, someone who committed, I
15   think those two or three levels of fraud, potentially
16   could vote and again I think that is a much smaller
17   class of potential fraud than the existing system which
18   is you just have to do first thing, get your card and
19   show up and vote.
20       Q.  (By MS. WESTFALL)  Does HB 218 solely stop
21   in-person voter impersonation?
22       MR. SWEETEN:  When you're answering this
23   question don't --
24       Q.  (By MS. WESTFALL)  Based on the face of the
25   statute?

---

172

1        MR. SWEETEN:  You can answer based on the
2    face of the statute.
3        A.  I think no bill, including this statute, is able
4    to stop every type of fraud in every type of
5    circumstance.
6        Q.  (By MS. WESTFALL)  So in answer to my question,
7    yes, it is solely designed to stop in-person
8    impersonation?
9        MR. SWEETEN:  Objection, misstates his
10   testimony.
11       A.  Yeah.  And I think potentially there are other, y
12   ou know, intents here.  I'm just not aware.  I mean, you
13   could argue that this decreases the incidents of
14   fraudulent voter registration.  If people know that they
15   will now have to show an ID when they show up to vote,
16   they may never bother to file a fake registration card
17   in the first place.  So the side effect of this could be
18   fewer fraudulent registrations in addition to fewer
19   fraudulent in-person attempts to vote.
20       Q.  (By MS. WESTFALL)  Do you think it would deter
21   fraudulent registration even though the IDs, the photo
22   IDs, required in HB 218 do not require a person to be a
23   US citizen to obtain those IDs; is that your testimony?
24       MR. SWEETEN:  Don't reveal your thoughts--
25       MS. WESTFALL:  Based on the face of the

## 173

1    statue --
2         MR. SWEETEN:  -- without legislation.
3    A.  Based on this bill, I don't -- I could read it
4    more closely.  I don't get the intent that it's
5    noncitizens that the bill is worried about.  They're
6    worried about in eligible voters which may be US
7    citizens or Texas citizens, but still in eligible to
8    vote.  I could request a, you know, registration for my
9    roommate.  We may both be citizens, I still can't go
10   vote in his name.
11        Q.  (By MS. WESTFALL)  Isn't eligibility to vote
12   determined at the voter registration stage and not at
13   the point of presenting yourself to vote on election
14   day?
15        MR. SWEETEN:  You're saying under current
16   law?
17        MS. WESTFALL:  Under current law.
18        MR. SWEETEN:  You can answer.
19   A.  The eligibility question is, yes, do I have
20   sufficient -- I still have to when I'm going to vote
21   either show the required proof of registration or some
22   other form of identification, answer whether I'm still
23   living at the same address.  I mean, there's still some
24   interaction with the poll worker there.
25        Q.  That is --

## 174

1         MR. SWEETEN:  We're going to take a break
2    after this question, but go ahead.
3         Q.  (By MS. WESTFALL)  What you just testified about,
4    is it not, is proving who you say you are at the polls
5    on election day; is that correct?
6    A.  I'm sorry.
7         Q.  Proving your identity on election day, those are
8    the --
9         MR. SWEETEN:  Objection.
10        Q.  (By MS. WESTFALL)  That's the scope of the issue
11   that you just defined?
12        MR. SWEETEN:  Objection to the question as
13   vague.
14   A.  I'm not clear what you're asking.  I'm sorry.
15        Q.  (By MS. WESTFALL)  Is there a difference between
16   voter registration and proving your identity at the
17   polls on election day?
18        MR. SWEETEN:  When you're answering that
19   question, don't reveal matters of legislative privilege.
20        MS. WESTFALL:  Based on current law.  Based
21   on the current face of the statute.
22   A.  Under current law those are different processes.
23   BY MS. WESTFALL:
24        Q.  And HB 218 is designed to -- or it does require
25   proof of identification at the polls on election day; is

## 175

1    that right?
2         MR. SWEETEN:  Are you asking about the face
3    of the statute?
4         MS. WESTFALL:  I'm asking about the face of
5    the statute.
6         MR. SWEETEN:  Okay.
7    A.  The bill on its face requires a voter to prevent
8    certain forms -- one of certain forms of acceptable ID.
9    BY MS. WESTFALL:
10        Q.  And HB 218 does not govern or change current law
11   pertaining to how a voter registers to vote; is that
12   correct?
13   A.  Give me a second to double-check.
14        MR. SWEETEN:  You can answer based upon the
15   statute, the face of the statute.
16   A.  In the provisions that state what happens if a
17   voter only has a registration certificate, but in terms
18   of actually getting a voter on the rolls and becoming a
19   registered voter, apparently no.
20        Q.  (By MS. WESTFALL)  Thank you.
21        MR. SWEETEN:  Okay.  We're going to take a
22   quick break.  I don't mean a big long.
23        MS. WESTFALL:  Sure.
24        (Brief recess.)
25   BY MS. WESTFALL:

## 176

1         Q.  We're back on the record.
2         Turning your attention back to Exhibit 3, are you
3    aware that a corrected letter was released after initial
4    letter was released referred to in Exhibit 3?
5    A.  Yes.
6         Q.  How soon was it released?
7    A.  I don't know.
8         Q.  Do you know why it was released?
9    A.  No.
10        Q.  Do you know changes that were made to the letter
11   between the draft that was released and the corrected
12   draft?
13   A.  I don't recall.
14        Q.  Did the Lieutenant Governor at some point come to
15   the conclusion that photo ID would not prevent
16   noncitizen voting?
17        MR. SWEETEN:  Don't answer the question as
18   phrased.  It would require you to reveal matters that
19   are subject to the legislative privilege and potentially
20   attorney/client privilege.
21        Q.  (By MS. WESTFALL)  You going to follow your
22   counsel's instruction?
23   A.  Yes.
24        Q.  Are you aware of any discussions about noncitizen
25   voting that occurred in 2007 involving your office?

BRIAN HEBERT                                          MAY 29, 2012

---

## 177

1    MR. SWEETEN:  You can answer whether or not
2    there was a discussion.
3    A.  2007 session were noncitizens ever discussed in
4    the context of voter ID?
5    Q.  (By MS. WESTFALL)  Correct.
6    A.  I'm not sure.
7    Q.  Is there a connection between the photo ID bill
8    HB 218, and the growth of noncitizen population in
9    Texas?
10   MR. SWEETEN:  Don't answer the question.  It
11   calls for matters that are subject to the legislative
12   privilege.
13   Q.  (By MS. WESTFALL)  Are you going to follow your
14   counsel's instruction?
15   A.  Yes.
16   Q.  Have you ever heard of such an assertion before?
17   A.  Heard an assertion that voter ID is tied to
18   growth, I don't guess I have, no.
19   MR. SWEETEN:  And when you're answering --
20   Q.  (By MS. WESTFALL)  Did you say you have not?
21   MR. SWEETEN:  He said he has not.  But just
22   so we're clear, don't reveal communications that are
23   nonpublic.  You can reveal a matter of a public
24   communication, but I think your answer is no.
25   Q.  (By MS. WESTFALL)  Are you aware of any public

## 178

1    statements about tying photo ID to noncitizen voting?
2    MR. SWEETEN:  You can answer.
3    A.  No.  I think that's the same question I was
4    answering before.
5    Q.  (By MS. WESTFALL)  Have you heard anyone in
6    either the Governor's office or the Lieutenant
7    Governor's office make any statement connecting photo ID
8    with noncitizen voting?
9    MR. SWEETEN:  Has you ever heard -- can you
10   restate that again because I don't know if we're talking
11   about a public statement as phrased or if you're talking
12   about communications.
13   (Requested question was read.)
14   MR. SWEETEN:  Don't reveal communications
15   you've had with members of the Lieutenant Governor's
16   staff.  Those would be attorney/client privileged.
17   Don't reveal matters of legislative privilege to the
18   extent that you can answer based upon the public record
19   or public statement, you can go ahead and do so.
20   A.  So did anyone in the Governor's or Lieutenant
21   Governor's office publicly or privately mention
22   noncitizens and photo ID; is that the question?
23   Q.  (By MS. WESTFALL)  Yes.
24   MR. SWEETEN:  And my instruction is don't
25   reveal any nonpublic statements with respect to that.

## 179

1    A.  I cannot remember specific references.
2    Q.  (By MS. WESTFALL)  Can you remember any
3    references?
4    MR. SWEETEN:  Same instruction.
5    A.  Right.  I mean, again, I think to the extent I'm
6    aware of noncitizens it was in the context of a
7    discussion about ineligible voters and noncitizens would
8    be part of a class of eligible voters.
9    Q.  (By MS. WESTFALL)  And beyond the testimony that
10   you gave earlier today, is there anything in addition
11   that you remember on that topic in terms of
12   conversations?
13   MR. SWEETEN:  Don't reveal communication
14   that you've had with legislatures, legislative staff,
15   Lieutenant Governor, State agencies, Texas Legislative
16   Council.
17   A.  No.
18   Q.  (By MS. WESTFALL)  Are you familiar with the
19   Crawford supreme court decision?
20   A.  Yes.
21   Q.  Did you read it when it was issued in 2008?
22   A.  Almost certainly.
23   Q.  Did you at that time believe that it impacted the
24   ability of States to craft photo ID laws?
25   MR. SWEETEN:  Don't provide your mental

## 180

1    impressions at the time.  Those are matters of
2    legislative privilege.  You don't have to reveal those.
3    Q.  (By MS. WESTFALL)  Can you answer or can you not
4    answer?
5    MR. SWEETEN:  My instruction about
6    legislative privilege applies.
7    A.  Yeah.  I think, I don't have an answer based on
8    privilege.
9    Q.  (By MS. WESTFALL)  Did you believe that the
10   Crawford decision impacted the ability of states covered
11   by Section 5 of the Voting Rights Act to obtain
12   preclearance under Section 5?
13   MR. SWEETEN:  Don't answer the question.
14   That requires you to reveal matters that are subject to
15   the legislative privilege.
16   MS. WESTFALL:  Are you instructing him not
17   to answer at all.
18   MR. SWEETEN:  I am.  Unless, except to the
19   extent that you can refer to matters of the public
20   record.
21   BY MS. WESTFALL:
22   Q.  Are you following your counsel's advice?
23   A.  Yes.
24   Q.  Are you aware of any communications between the
25   Lieutenant Governor's office and officials in Indiana

BRIAN HEBERT                                                    MAY 29, 2012

## 181

1  regarding this photo ID law?
2          MR. SWEETEN:  You can answer whether or not
3  you're aware of communication.
4      A.  Between Lieutenant Governor's office and Indiana,
5  I believe that in the '09 and '11 sessions public
6  testimony was given by representatives from Indiana.
7      Q.  (By MS. WESTFALL)  And is that -- those the
8  only communications you can testify about today?
9      A.  Yes.
10     Q.  Are you asserting privilege over other
11 communications that you had with -- you're aware of
12 between Lieutenant Governor's office and Indiana
13 election officials?
14     A.  Yes.
15     Q.  Are you aware of any communications between
16 Lieutenant Governor's office and Indiana officials
17 regarding the Crawford decision?
18     A.  No.
19     Q.  Are you aware of any written communications
20 between the Lieutenant Governor's office and Indiana
21 officials regarding its photo ID law or the Crawford
22 decision?
23         MR. SWEETEN:  You can answer if you're aware
24 of such communications.
25     A.  I believe, yes.

## 182

1      Q.  (By MS. WESTFALL)  What communication are you
2  aware of?
3          MR. SWEETEN:  Don't reveal the substance of
4  the communication.
5      Q.  (By MS. WESTFALL)  When did it occur?
6          MR. SWEETEN:  You can answer.
7      A.  I think it would have been just prior to their
8  public testimony.
9      Q.  (By MS. WESTFALL)  Who was the communication
10 between?
11         MR. SWEETEN:  You can answer.
12     A.  Again, I think -- I think it would have been
13 between the person who went up to publically testify in
14 each case.
15     Q.  (By MS. WESTFALL)  How do you know about this
16 communication?
17     A.  My memory is that I was included on
18 correspondence leading up to that testimony.
19     Q.  And so this correspondence that you were copied
20 on involving Indiana officials before the testimony on
21 the 2009 bill?
22     A.  I think that's right.  Yes.
23     Q.  Who in the legislature was communicating with the
24 Indiana officials?
25         MR. SWEETEN:  You can answer if you know the

## 183

1  person that was communicating.
2      A.  My memory is that it would have been Senator
3  Fraser and his staff arranging for witnesses for their
4  bill.
5      Q.  (By MS. WESTFALL)  Are you aware of any other
6  such communications with Indiana officials?
7      A.  No.
8      Q.  Are you aware of any communications between the
9  Lieutenant Governor's office and the officials in
10 Indiana regarding the burden imposed upon Indiana voters
11 by the photo ID law?
12         MR. SWEETEN:  Objection.  You're asking the
13 substance of the communication.  If you want to ask
14 about whether communications occurred that's fine, but
15 this is loaded with information about what the
16 conversations pertained to, so I'm going to instruct you
17 as phrased not to answer the question.
18     Q.  (By MS. WESTFALL)  Are you following the advice
19 of council.
20     A.  Yes.
21     Q.  Was a photo ID bill filed in the Senate in 2009?
22         MR. SWEETEN:  You can answer.
23     A.  Yes.
24         MS. WESTFALL:  Mr. Sweeten, are you going to
25 be instructing him yes, no, yes, no for every question

## 184

1  moving forward?  Is that how it's going to go?  Does he
2  need that level of advice because it's going to burn up
3  a lot of time and kind of interrupt the flow.
4          MR. SWEETEN:  Well, I'm not trying to
5  interrupt the flow.  I'm trying to be clear on --
6  because we're asserting privilege on many of these
7  questions that you know that I have been asserting
8  privilege to and you keep bringing up.  So I will try to
9  rein that in, but I want to make it clear that you keep
10 treading into areas that you well know that I've been
11 asserting privilege on.  And so to the extent you keep
12 doing that, I'm going to have to continue to impose this
13 objection.  But with that, you can go ahead and answer.
14 BY MS. WESTFALL:
15     Q.  So, yes, a photo ID bill was filed in the Senate
16 in 2009?
17     A.  I believe, yes.
18     Q.  Do you recall the number?
19     A.  No.
20     Q.  Could you mark this US 29?
21         (Exhibit No. 29 was marked.)
22     Q.  (By MS. WESTFALL)  You've been handed what's been
23 previously marked as US 29, do you recognize this
24 document?
25     A.  It's Senate Bill 362 from the 2009 session.

BRIAN HEBERT                                      MAY 29, 2012

## 185

1    Q.  Who authored this bill?
2    A.  Senators Fraser, Estes, Nelson, and Nichols.
3    Q.  Could you please review this bill, particularly
4    the forms of allowable ID and let me know when you've
5    had a chance to do so.
6    A.  Okay.
7    Q.  What forms of ID are allowable under Senate Bill
8    362.
9           MR. SWEETEN:  You're asking on the Texas
10   statute.
11          MS. WESTFALL:  On the Texas statute.
12          MR. SWEETEN:  I'll let you answer.
13   A.  On Section 630101 it lists a driver's license or
14   ID card issued by DPS, military ID citizenship
15   certificate with a photograph, passport, concealed
16   handgun license, photo ID issued by the federal
17   government or a State entity.  And then there's a list
18   of non-photo IDs.
19   BY MS. WESTFALL:
20   Q.  Can you compare Senate Bill 362 with House Bill
21   218 and let me know whether there are changes in the
22   forms of allowable ID based on the Texas bill?
23          MR. SWEETEN:  That's fine.  I'm going to
24   allow him to compare the text of the bill, but as far as
25   whys or mental impressions about those differences, he

## 186

1    won't answer those questions.  As those matters are
2    legislatively privileged.
3    A.  It looks like 362 does not include employee
4    identification card as a photo?
5    Q.  (By MS. WESTFALL)  Yes.  Anything else?
6    A.  I'm looking.  Looks like they're otherwise the
7    same.
8    Q.  Do you recall earlier you testified that student
9    IDs were included in HB 218; is that right?
10   A.  Yes.
11   Q.  Does it appear that they -- in Senate Bill 362
12   they are not expressly provided for?
13   A.  I do not see it on the list.
14   Q.  Would you construe valid ID cards issued by
15   agency institution or local subdivision of the State,
16   any of the that language to include State college and
17   university issued IDs or no?
18   A.  In looking at the face of the bill, an agency
19   institution or subdivision of the state, arguably could
20   include state universities.
21   Q.  I believe you testified that Senate Bill 326 also
22   includes the use of two forms of non-photo ID; is this
23   right?
24   A.  Yes.  Subsection B.
25   Q.  Was photo ID a part of the Lieutenant Governor's

## 187

1    legislative agenda for 2009?
2           MR. SWEETEN:  You can reveal matters that
3    are public or on the public record as to his legislative
4    agenda.  Don't reveal conversations you've had with the
5    other enumerated individuals or entities we talked
6    about.
7    A.  I don't recall if it was part of some sort of
8    public pronouncement of his priorities.
9    Q.  (By MS. WESTFALL)  And you handled his State
10   Affairs Committee issues in 2009; is that correct?
11   A.  Correct.
12   Q.  And you testified earlier that subject matter
13   experts within the office who handled issues would
14   contribute to the Lieutenant Governor's agenda; did you
15   not?
16   A.  Yes.  We would be asked are those some of the
17   things that we should be talking about this session.
18   Q.  Do you recall having recommended or -- strike
19   that.
20      Do you recall any conversations about inclusion
21   of photo ID in the Lieutenant Governor's agenda for
22   2009?
23          MR. SWEETEN:  Don't reveal any conversations
24   that you had with the Lieutenant Governor or the
25   legislatures.

## 188

1    A.  I don't recall.
2    Q.  (By MS. WESTFALL)  Are you -- is this based on --
3    in part on advice of council?
4    A.  Yes.
5    Q.  Were you or anyone in the Lieutenant Governor's
6    office involved in the development or drafting of Senate
7    Bill 362?
8           MR. SWEETEN:  Objection.  The question is
9    vague.  As you're answering the question be mindful that
10   the legislative privilege prohibits you -- or the scope
11   of the privilege does not require you to reveal
12   thoughts, mental impressions, about a bill or
13   conversations you had with respect to that.  So you can
14   answer the question to the extent you're not revealing
15   matters of legislative privilege.
16   A.  So the question was, was the Lieutenant
17   Governor's staff involved in the drafting of Senate Bill
18   326.
19   Q.  (By MS. WESTFALL)  Or the development?
20          MR. SWEETEN:  Objection compound.  Same
21   instruction.
22   A.  Yes.
23   Q.  (By MS. WESTFALL)  Who was involved in the
24   development or drafting of Senate Bill 362?
25          MR. SWEETEN:  Objection, compound.

BRIAN HEBERT                                        MAY 29, 2012

## 189

1      A.  Myself.
2      Q.  (By MS. WESTFALL)  Can you think of anyone else
3  or was it solely you?
4      A.  I'm the only one I know for sure.  Me is the only
5  answer I can say yes.  It's possible other people were.
6      Q.  Can you identify the time -- strike that.
7          Was there -- were there any conversations about
8  the development or drafting of the Senate Bill 362?
9          MR. SWEETEN:  Objection, compound.  You can
10  answer whether or not a communication -- such
11  communication occurred.  Do not reveal the substance of
12  any communications.
13      A.  Yes.
14      Q.  (By MS. WESTFALL)  When did the first
15  conversation occur?
16      A.  I don't recall the first conversation.
17      Q.  Did it occur sometime shortly after House Bill
18  218 failed to pass?
19      A.  I don't recall.
20      Q.  Who else was involved in that conversation?
21          MR. SWEETEN:  You can answer.
22      A.  I'm sure I would have talked about this generally
23  with our policy director and chief of staff so Julia
24  Rathgeber, Blaine Brunson.
25      Q.  (By MS. WESTFALL)  Do you recall what year it

## 191

1  involved at some point, in some draft or amendment, but
2  I'm not sure.
3      Q.  Was Senator Fraser's staff involved in the
4  drafting of Senate Bill 362?
5      A.  Yes.
6          MR. SWEETEN:  Objection, vague.
7      Q.  (By MS. WESTFALL)  Was that Janice McCoy?
8      A.  Yes.
9      Q.  Were any other staff or Senators involved in the
10  drafting of Senate Bill 362?
11          MR. SWEETEN:  You can answer if they were
12  involved in the drafting.  Don't reveal the specific
13  communications you had.
14      A.  It could be that possibly Ginger Fagan is a
15  lawyer I trust, but is also someone from the State
16  Affairs Committee.
17      Q.  Anyone else?
18      A.  I can't recall names.  Again, I'm sure I
19  discussed this with lots of people around the capital,
20  but I don't have a list.
21      Q.  Senator --
22      A.  Sorry.  If your question is development of the
23  draft, I think that's probably the list.
24      Q.  Thank you for your testimony.
25          Senator Fraser testified that in essence, he

## 190

1  occurred in?
2      A.  It was supposed to be '09 session it probably
3  would have been '08.
4      Q.  Do you think it was in the second half of the
5  year?
6      A.  I don't recall.  I can't remember.  There may
7  have been an interim charge in the '07, '08 year that
8  addressed these issues that may have come up in that
9  context.
10      Q.  Were you primarily responsible for developing
11  Senate bill 362?
12          MR. SWEETEN:  In answering that question
13  don't reveal your thoughts, mental processes, your
14  conversations that you've had with individuals in
15  answering that question.  I'm also going to object to
16  the question as vague.
17      A.  No.  I was not primarily responsible for
18  developing the draft the bill.
19      Q.  (By MS. WESTFALL)  Was the Legislative Council
20  also involved in drafting the bill?
21      A.  I don't recall.  Usually there would be a number
22  or letter at the bottom here if it was a formal
23  council -- was it a council draft.  I don't know what
24  version this was.  It could be that -- I'm almost
25  certain that Legislative Council would have been

## 192

1  testified in a deposition in this case.  In essence he
2  took House Bill 218 and filed it in the following
3  session more or less the same.  Do you agree with that
4  assessment?
5      A.  Do I agree that 218 is essentially the same as
6  Senate Bill -- House Bill 218 is the same as Senate Bill
7  362?
8      Q.  Yes, that's part of the question.  Based on the
9  face of the statute?
10          MR. SWEETEN:  You can answers.
11      A.  Looking at them now there are some similarities.
12  And it looks like, I mean, starting with the very first
13  page there are also some differences.  I mean, but
14  they're substantially similar I suppose.  They're both
15  proof of identification.
16      Q.  And is it true that Senator Fraser was the one
17  who re-crafted the bill or would you say that you played
18  more of a role?
19          MR. SWEETEN:  Objection to the term
20  re-crafted, vague.  Are you talking about the text --
21  who filed the -- I mean, you can answer as to that if
22  you know.
23      A.  I cannot recall how much specific input I had on
24  this draft of this bill.
25      Q.  (By MS. WESTFALL)  On this bill?

BRIAN HEBERT                                                    MAY 29, 2012

---

### 193

1    A.  Correct.

2    Q.  362?  But it essentially was developed and

3    created by yourself, Ms. McCoy, and Ms. Fagan; is that

4    correct?

5    A.  I think I would say it was developed.

6         MR. SWEETEN:  Hold on a minute.  The term

7    developed -- do not answer a question as to the mental

8    impression, thoughts that occurred with respect to the

9    legislative the conversations that you've had with these

10   individuals.  So to the extent that she's asking you

11   whether conversations occurred you can answer.  To the

12   extent she's asking about whether someone did a draft

13   you can answer, but don't talk about the matters that be

14   covered by legislative privilege.

15   Q.  (By MS. WESTFALL)  Can you answer my question?

16   A.  I'll exercise my privilege.

17   Q.  Other than House Bill 218, are you aware of any

18   other sources of legislative language or -- I guess

19   legislative language that provided the basis of Senate

20   Bill 362?

21        MR. SWEETEN:  In answering the question

22   don't reveal thoughts, mental impressions, or opinions

23   about legislation or furtherance of the legislative

24   process.  You can answer to the extent that you can do

25   so without revealing.

---

### 194

1    A.  I don't recall and/or don't know the source of

2    all the language in 362.

3    Q.  (By MS. WESTFALL)  Are you aware of any

4    conversations concerning any other additional forms of

5    ID that were contemplated with regard to Senate Bill

6    362?

7         MR. SWEETEN:  You can answer whether or not

8    a communication occurred.

9    A.  Yes, communications occurred about forms of ID.

10   Q.  (By MS. WESTFALL)  How many such conversations

11   occurred?

12        MR. SWEETEN:  You can answer.

13   A.  I think it was an ongoing part of the bill.

14   Several.

15   Q.  (By MS. WESTFALL)  Were they between you and

16   Ms. Fagan and Ms. McCoy?

17   A.  Probably.

18   Q.  Are you aware of any conversations involving

19   Mr. Dewhurst on that topic?

20        MR. SWEETEN:  You can reveal whether a

21   conversation occurred.  Don't reveal the substance of

22   the conversation.

23   A.  So 2009 was Governor Dewhurst involved in any

24   discussions about the forms of identification?

25   Q.  (By MS. WESTFALL)  Correct.

---

### 195

1    A.  I don't recall.

2    Q.  Would anyone else know the answer to that

3    question?

4         MR. SWEETEN:  Objection, calls for

5    speculation.

6    Q.  (By MS. WESTFALL)  You may answer it?

7    A.  As I said before, the chief of staff and the

8    policy director would possibly have had -- I didn't have

9    that conversation.

10   Q.  And Mr. Dewhurst himself would certainly know

11   whether he was involved in those conversations, would he

12   not?

13   A.  I don't know.  I guess.

14   Q.  Are you aware of any conversations concerning the

15   analysis of the impact of Senate bill 362 on minority

16   voters?

17        MR. SWEETEN:  Don't answer the question.

18   The question -- the preface of the question asks for the

19   particular subject matter.  So as phrased I'm going to

20   object that it calls for matters that are subject to

21   legislative privilege and instruct not to answer.

22   Q.  (By MS. WESTFALL)  Are you going to follow the

23   advice of council?

24   A.  Yes.

25   Q.  If Senate Bill 362 had been passed, which it

---

### 196

1    wasn't, correct?

2    A.  Correct.

3    Q.  It would have been subject to the requirements of

4    Section 5, right?

5    A.  Correct.

6    Q.  Are you aware of any conversations involving

7    staff being directed not to conduct analysis of the

8    impact of Senate Bill 362 on minority voters?

9         MR. SWEETEN:  Don't answer the question.

10   The question assumes the subject matter and it's calling

11   for matters that are subject to the legislative

12   privilege.  You can reveal if you had conversations

13   about general subject matter and with whom the

14   conversations occurred and approximately when and the

15   means.

16   Q.  (By MS. WESTFALL)  Do you have any testimony?

17        MR. SWEETEN:  But as phrased she's asking

18   for the subject matter of the conversations, so my

19   instruction would be not to answer the question as

20   phrased.

21   Q.  (By MS. WESTFALL)  Based on advice of council --

22   A.  Correct.

23   Q.  -- you are asserting your privilege?

24   Okay.  Are you familiar with the concept of

25   Spanish surname voter registration?

BRIAN HEBERT                                                          MAY 29, 2012

## 197

1    MR. SWEETEN:  If answering the question
2    would require you to reveal your thoughts, mental
3    impressions, opinions, about legislation or discussions
4    you've had about legislation, the legislators, Governor
5    Dewhurst, with other members of the Lieutenant
6    Governor's office, legislative staff, State agencies or
7    Texas Legislative Council.  Do not reveal those as those
8    are legislatively privileged.
9        A.  I'm just generally aware of it from redistricting
10   conversations and other matters.
11       Q.  (By MS. WESTFALL)  Did you hear about any
12   conversations related to an analysis of whether Spanish
13   surname voter registrations were more or less likely to
14   have the necessary photo ID under Senate Bill 362?
15           MR. SWEETEN:  Don't answer the question.  It
16   calls for matters that are subject to legislative
17   privilege.  If Council wants to rephrase it as to
18   conversations that are not in that particular, I will
19   allow him to answer.
20       Q.  (By MS. WESTFALL)  Are you following the advice
21   of council?
22       A.  Yes.
23       Q.  Are you aware of any conversations related to
24   Spanish surname voter registration and Senate Bill 362?
25           MR. SWEETEN:  I'll let you answer the

## 198

1    question as phrased.  Don't reveal the substance of the
2    conversation.
3        A.  I don't recall.
4        Q.  (By MS. WESTFALL)  Were you in touch with Janice
5    McCoy on a near daily basis during consideration of
6    Senate Bill 362?
7        A.  Probably.
8        Q.  Outside of the communications between Lieutenant
9    Governor's office and Senate Fraser's office that you
10   just testified to, to which Jennifer Fagan may have been
11   a party, are you aware of any other communications
12   regarding the development with drafting Senate Bill 362?
13           MR. SWEETEN:  Objection, as vague, compound,
14   assumes facts not in evidence.
15       Q.  (By MS. WESTFALL)  You may answer.
16       A.  Yeah.
17           MR. SWEETEN:  Don't reveal the substance of
18   conversations, those would be matters of legislative
19   privilege.  If she's asking you about conversations you
20   can answer it to the extent you can.
21       A.  I don't have any firsthand knowledge of what
22   other people were talking about.
23       Q.  (By MS. WESTFALL)  I wasn't asking about the
24   substance of the communication.  I was asking about your
25   knowledge of the existence of the communication and then

## 199

1    your council made an objection which created a different
2    question that is different from what I just asked.  So
3    I'm going to re-ask the question if it's okay.
4        Outside of communications between the Lieutenant
5    Governor's office and Senator Fraser's office, are you
6    aware of the existence of any other communication's
7    regarding the development or drafting of Senate Bill
8    362?
9            MR. SWEETEN:  Objection, compound.  You can
10   answer.
11       A.  I'm not aware of it.
12       Q.  (By MS. WESTFALL)  In your opinion, based on your
13   experience handling election law bills and drafting,
14   being a lawyer as you testified earlier today, sitting
15   here today after Crawford, do you believe that States
16   covered by Section 5 of the Voting Rights Act need not
17   conduct an analysis of the impact of photo voter ID laws
18   on minority voters.
19           MR. SWEETEN:  You're asking him to reveal
20   his thoughts, mental impressions, opinions, about
21   legislation.  I'm going to instruct you not to answer.
22   That matter is subject to legislative privilege.
23       Q.  (By MS. WESTFALL)  Are you going to follow the
24   advice of council?
25       A.  Yes.

## 200

1        Q.  What was the purpose or purposes of Senate Bill
2    362?
3        A.  This bill, like the ones that you've shown me
4    before, are intended to improve the integrity of the
5    election system in Texas and instill confidence in the
6    electoral.
7        Q.  So improve integrity of the elections and the
8    second one was instill confidence?
9        A.  Correct.
10       Q.  Anything else?
11       A.  Again, any -- I suppose any given sponsor of a
12   bill and amendment could have a different purpose or
13   intent.
14       Q.  But those are your understandings of the purposes
15   sitting here today; is that correct?
16       A.  Yes.
17       Q.  Senator Fraser testified in deposition in this
18   case that before he filed Senate Bill 362 he gave notice
19   to the Lieutenant Governor; is that accurate?
20       A.  He gave notice --
21       Q.  That he was going to file; is that correct?
22       A.  I don't recall.
23       Q.  Are you aware of such communication?
24           MR. SWEETEN:  Objection, asked and answered
25       A.  No.

BRIAN HEBERT                                            MAY 29, 2012

## 201

1    Q. (By MS. WESTFALL)  Senator Fraser also testified
2    at deposition that he had an in-person meeting with
3    Mr. Dewhurst in his office regarding allowing non-photo
4    ID in Senate Bill 362.  Are you aware of that meeting?
5           MR. SWEETEN:  Objection, assumes facts not
6    in evidence.  You can answer.
7    A. I don't recall a meeting.  I guess I'm not aware
8    of a meeting.
9    Q. (By MS. WESTFALL)  And you were the person who
10   was developing and drafting the bill as you testified
11   to, correct?
12          MR. SWEETEN:  Objection to the form.
13   Objection, compound.  You can answer.
14   A. I was a person.
15   Q. (By MS. WESTFALL)  Was Senate Bill 362, was it's
16   purpose to in terms of improving the integrity of
17   elections, did that relate to in-person voter
18   impersonation?
19          MR. SWEETEN:  You can testify as to the
20   purpose of the legislation.  Other than that, don't
21   reveal matters that are subject to legislative privilege
22   including your thoughts, mental impressions, about
23   legislation.
24   A. Again, looking at the draft, certainly whether or
25   not a person has an acceptable ID when they show up to

## 202

1    vote is part of that bill.
2    Q. (By MS. WESTFALL)  And that would be targeted
3    towards in-person voter impersonation, correct?
4           MR. SWEETEN:  Objection, asked and answered.
5    Objection, to the extent it asks him to reveal matters
6    that are subject to legislative privilege which includes
7    mental impressions or opinions about the conversation.
8    Q. (By MS. WESTFALL)  Based on the face of this
9    statute?
10   A. Right.  It says a voter when offering to vote
11   presents documentation, et cetera, et cetera, so, yes.
12   Q. And to clarify your testimony, Senate Bill 362
13   was targeted towards ensuring that in-person voter
14   impersonation would not occur; is that right?
15          MR. SWEETEN:  Objection, asked and answered.
16   Objection, to the extent that you're asking him to go
17   beyond the purpose.  He's expressed what the purpose is.
18   You're asking matters that are subject to legislative
19   privilege.
20   A. Again, the document on its face in-person voter
21   fraud is part of what it appears to be designed to
22   combat.
23   Q. (By MS. WESTFALL)  How would Senate Bill 362
24   preserve the integrity of elections in any other way
25   than deterring in-person voter impersonation?

## 203

1           MR. SWEETEN:  Don't reveal.
2
3    Q. (By MS. WESTFALL)  Based on the face of the
4    statute?
5           MR. SWEETEN:  Okay.  I'm going to let you
6    answer based upon the text of the statute.  When
7    answering, do not reveal your thoughts, mental
8    impressions about legislation or furtherance of the
9    legislation process or communications that you've had
10   that I've already previously enumerated, okay?
11   A. The Bill 362 adds a level of security to the
12   voting process and presumably a level of security makes
13   people feel more secure.
14   Q. (By MS. WESTFALL)  Okay.  But in terms of the
15   type of harm that it's targeting, based on the face of
16   the statute, it's not mail inverter fraud of mail in
17   ballots; is that right?
18          MR. SWEETEN:  You can limit your answer to
19   what is on the text of the statute.  Do not reveal your
20   mental impressions or thoughts about legislation in
21   doing so.
22   A. Right.  This bill in front of me does not address
23   mail in ballots.  Without me looking at it one more
24   time.
25   Q. (By MS. WESTFALL)  And it does not address fraud

## 204

1    that might occur at the voter registration stage; is
2    that correct?
3           MR. SWEETEN:  Same instruction.  Same
4    objection.
5    A. This Bill 362 does not directly address, doesn't
6    appear to.
7    Q. (By MS. WESTFALL)  What is the basis for your
8    testimony that you believe it would deter people from
9    fraudulently registering to vote?
10          MR. SWEETEN:  In answering the question,
11   don't reveal your thoughts, your mental impressions,
12   your opinions about the legislation.  I've let you
13   answer as to the purpose of it.  I think that that can
14   be answered, but don't reveal your thoughts, mental
15   impressions, or communications that we've discussed
16   earlier.
17   A. So the question is what is -- how does 362 --
18   Q. (By MS. WESTFALL)  Deter --
19   A. -- deter fraudulent conduct?
20   Q. I believe you testified earlier today that you
21   were of the view that one of the purposes of HB 218
22   would be to deter fraudulent voter registration; is that
23   correct?
24   A. I believe so.
25   Q. And would you testify that with regard to SB 362

BRIAN HEBERT                                          MAY 29, 2012

---

## 205

1    that it would likewise deter fraudulent voter
2    registration?
3         MR. SWEETEN:  Same objection and
4    instruction.
5         A.  Sure.  Just looking at the draft, I think it has
6    that potential.
7         Q.  (By MS. WESTFALL)  What's the basis for you
8    saying that based on the statute?
9         MR. SWEETEN:  You can testify --
10        Q.  (By MS. WESTFALL)  And the structure of the
11   election code?
12        MR. SWEETEN:  You can testify as to the
13   specific text of the Bill.  Do not reveal your thoughts,
14   mental impressions, or opinions about legislation that
15   is legislatively privileged.  You've asserted your
16   privilege and that would be beyond the bounds of that
17   privilege.
18        A.  So what is the question.
19        Q.  (By MS. WESTFALL)  I was just asking based on
20   your understanding of the election code and Senate Bill
21   362, how Senate Bill 362 would deter fraudulent voter
22   registration?
23        MR. SWEETEN:  Same instruction as to
24   legislative privilege, objection.
25        A.  I just think generally this Bill appears to deter

## 207

1    system more secure?
2         MR. SWEETEN:  Same objection, same
3    instruction.
4         Q.  (By MS. WESTFALL)  Do you have any testimony?
5         A.  No.
6         Q.  Are you aware of any conversations about two
7    forms of non-photo ID making the system more secure?
8         A.  Two forms of --
9         A.  Non-photo ID.
10        A.  -- non-photo ID making it more secure?
11        Q.  Yes?
12        A.  More secure than what.
13        Q.  The status quo?
14        MR. SWEETEN:  You can testify as to a
15   general description of subject matter of a conversation,
16   whether conversations occurred.  Don't reveal any
17   substance of communications.
18        A.  Yes.
19        Q.  (By MS. WESTFALL)  When did that conversation
20   occur?
21        A.  I think it would have been simultaneous with the
22   development of this draft, this bill.
23        Q.  Is this the conversation you already testified to
24   previously?
25        A.  Maybe?  Which conversation?

## 206

1    fraudulent activity and if it requires a person to
2    commit several forms of fraud, maybe that makes it less
3    likely that a fraud will occur.
4         Q.  (By MS. WESTFALL)  Do you have any further
5    testimony or explanation as to the basis of your
6    conclusion?
7         A.  No.
8         Q.  That Senate Bill 362 would deter fraudulent voter
9    registration, other than what you just testified to?
10        A.  No.
11        Q.  And I believe that you testified that Senate Bill
12   362 would make the system more secure; is that correct?
13        MR. SWEETEN:  Don't -- I object based on
14   legislative privilege.  Don't reveal your thoughts,
15   mental impressions, opinions about the legislation.
16   It's legislatively privileged.  Or the communications
17   that you had with the enumerated entities or individuals
18   we've been discussing.
19        Q.  (By MS. WESTFALL)  Do you have any testimony in
20   response to my question?
21        A.  No.
22        Q.  Are you following your counsel's advice on
23   privilege?
24        A.  Yes.
25        Q.  Would showing two forms of non-photo ID make the

## 208

1         Q.  Without discussing the subject matter it's hard
2    for me to refer to previous testimony that you've given,
3    but when did this conversation occur?
4         A.  It would have been, again, probably 2008, 2009.
5         Q.  Were you a party to the conversation?
6         A.  I was party to conversations, yes.
7         Q.  And who else was a party to the conversation?
8         A.  Probably Janice McCoy, possibly Julia Rathgeber,
9    possibly Senator Fraser.
10        Q.  Was Mr. Dewhurst a party to any of these
11   conversations?
12        A.  Not that I recall.
13        Q.  How many conversations did you have involving the
14   use of non-photo ID?
15        MR. SWEETEN:  You can answer.
16        A.  In 2009.  Some, I think -- some.
17        Q.  (By MS. WESTFALL)  Were these conversations in
18   person?
19        A.  I think, probably, yes.
20        Q.  Were any of these in writing?
21        A.  Not that I recall.
22        Q.  Was there any e-mail on this topic in 2008 or '9?
23        A.  There might have been, but I don't recall.
24        Q.  Would it have been between you and Ms. McCoy?
25        A.  Probably.

BRIAN HEBERT                                          MAY 29, 2012

---

### 209

1   Q. Do you recall any communications with legislators
2   who opposed Senate Bill 362?
3   A. In 2009 on Senate Bill 362? I can't recall.
4   Q. Would you have been at those meetings had the
5   been held since you were the staff person who handled
6   the bill?
7         MR. SWEETEN: Objection, calls for
8   speculation.
9   A. I don't know if I would have been at every
10  meeting.
11  Q. (By MS. WESTFALL) Would you have generally have
12  had a sense in your role as a deputy general counsel for
13  the Lieutenant Governor -- when you handled the bill,
14  would you generally know about meetings with opponents,
15  with supporter, et cetera, to inform you of how to craft
16  the bill to respond to those concerns of supporters?
17        MR. SWEETEN: Objection, the question is
18  vague. Objection, form.
19  A. I can't say that I was aware of every meeting
20  about Senate Bill 362.
21  Q. (By MS. WESTFALL) Do you think you were aware of
22  most of the meetings --
23        MR. SWEETEN: Objection, alls for
24  speculation.
25  Q. (By MS. WESTFALL) -- that Lieutenant Governor had

---

### 211

1         MR. SWEETEN: Hold on a minute. When you're
2   answering the question don't reveal communications you
3   had with Senators or legislators or legislative staff.
4   So to the extent you can refer to matters of the public
5   record, do not reveal those matters, you can do to so.
6   A. My memory from the Committee hearing is that
7   Senator Van de Putte, Senator West, Senator Gallegos,
8   Senator Watson, opposed the bill and there may have been
9   others.
10  Q. (By MS. WESTFALL) Can you identify based on your
11  review of Senate Bill 362, any parts of the bill that
12  were changed in response to those concerns by the bills
13  opponents?
14        MR. SWEETEN: That question asks you to
15  reveal matters that are legislatively privileged,
16  specifically it requires you to reveal thoughts, mental
17  impressions about legislation. It also would ask you to
18  reveal communications between legislatures, legislative
19  staff, State agencies, Texas Leg. Council, so you can
20  answer as to matters of the public record, but do not
21  answer to the extent that it would invade legislative
22  privilege.
23  A. Right. I don't recall from the public record if
24  there were amendments or specific debate that resulted
25  in changes.

---

### 210

1   regarding that subject?
2         MR. SWEETEN: Objection, calls for
3   speculation.
4   A. I don't know.
5   Q. (By MS. WESTFALL) Was it your impression that
6   you were kept in the dark as you were drafting Senate
7   Bill 362 about communications about the very topic
8   that -- and very bill that you were drafting?
9         MR. SWEETEN: Objection, speculation.
10  Objection, argumentative. Go ahead.
11  Q. (By MS. WESTFALL) You may answer.
12  A. Again, I was a person working on the draft.
13  Q. I believe your testimony earlier was that you
14  were -- the Lieutenant Governor's office you were the
15  central person, the main person?
16  A. Correct. And he's not a sponsor.
17  Q. He's not a sponsor, but you were the one handling
18  it for the Lieutenant Governor's office, right?
19  A. Correct.
20  Q. Who were the main opponents to Senate Bill 362?
21  A. I would have to go back and look at the record of
22  the hearing.
23  Q. Can you not think of any opponents to the bill
24  right now, either within the legislature or outside?
25  A. Sure. Senator --

---

### 212

1   Q. (By MS. WESTFALL) And are you following the
2   advice of council in part in that answer?
3   A. Yes.
4   Q. Did the Lieutenant Governor's office play a role
5   in attempting to secure passage of Senate Bill 362 in
6   the Senate?
7         MR. SWEETEN: Objection, that calls for
8   legislatively privileged unless it's asking for matters
9   on the public record which you can answer.
10  A. Did Lieutenant Governor attempt to secure passage
11  of SB 362?
12  Q. (By MS. WESTFALL) Yes.
13        MR. SWEETEN: Don't reveal matters of
14  privilege.
15  Q. (By MS. WESTFALL) Do you have any testimony in
16  response?
17  A. No.
18  Q. Are you relying upon your counsel's advice?
19  A. Yes.
20  Q. Could you mark this as US 76?
21        (Exhibit No. 76 was marked.)
22  Q. (By MS. WESTFALL) I'm handing you what has been
23  marked as US 76. Do you recognize this document?
24        MR. SWEETEN: Do I have a copy of that?
25  A. Looks like a Dallas morning news article about

BRIAN HEBERT                                    MAY 29, 2012

## 213

1   photo ID, early in session.
2       Q.  (By MS. WESTFALL)  Have you seen this document
3   before?
4       A.  I may have read it, but I don't recall.
5       Q.  Can you take a look at it, just a few paragraphs
6   in where it quotes the Lieutenant Governor?
7       A.  Okay.
8       Q.  Have you had a chance to review it?
9       A.  Uh-huh.
10      Q.  Could you describe what this article is
11  concerning?
12      A.  It's beginning of session and it talks about how
13  voter ID might cause some disagreement in the Senate.
14      Q.  And it refers to the so-called two-thirds rule;
15  is that right?
16      A.  Yes.
17      Q.  Can you describe the controversy surrounding the
18  two-thirds rule in 2009?
19          MR. SWEETEN:  You can describe matters of
20  public record, don't reveal any communications that
21  you've had with legislatures or legislative staff or
22  reveal your thoughts, mental impressions, opinions about
23  legislation in answering.
24      A.  Right.  I mean, I think, looking at the article
25  some bills come to the floor or maybe most bills come to

## 214

1   the Senate floor, again, if only -- only if two-thirds
2   of the Senate agrees to consider those bills.  And so
3   there's a disagreement about whether that rule should
4   apply to debate over voter ID.
5       Q.  (By MS. WESTFALL)  And do you see that Lieutenant
6   Governor Dewhurst is quoted as saying, I don't think the
7   two-thirds rule is going to change.  Do you see that?
8       A.  I see that.
9       Q.  Do you think he said that?
10          MR. SWEETEN:  Objection, calls for
11  speculation.
12      A.  It's in quotes.  I don't recall him saying that.
13      Q.  (By MS. WESTFALL)  Do you believe he expressed
14  that sentiment that it wasn't going to change as to this
15  day in 2009?
16          MR. SWEETEN:  Objection, speculation.
17      A.  Yeah.  I don't know.  That's what the article
18  says.
19      Q.  (By MS. WESTFALL)  Would Mr. Dewhurst be the best
20  person to ask that question of?
21      A.  Or the reporter.
22      Q.  Are you familiar with the 2009 Senate rules?
23      A.  Generally.
24      Q.  Do you remember that -- actually.  Hang on.
25  Could you mark this as 77?

## 215

1           (Exhibit No. 77 was marked.)
2       Q.  (By MS. WESTFALL)  You've been handed what's been
3   marked as US 77.  Do you recognize this document?
4       A.  Yes.
5       Q.  And what is it?
6       A.  Appears to be a copy of rule 5.11 from the Senate
7   rules in 2009.
8       Q.  Are you familiar with this rule?
9       A.  Generally.
10      Q.  Do you know the circumstances under which this
11  rule was adopted in 2009?
12          MR. SWEETEN:  Don't answer any matters that
13  would impede legislative privilege.  That would be
14  thoughts, mental impressions about legislation, that
15  would be discussions that you've had with Senators,
16  legislative staff, Lieutenant Governor Dewhurst.
17      A.  The question is, am I aware --
18      Q.  (By MS. WESTFALL)  Are you aware of the
19  circumstances under which rule 5.11 was adopted in 2009?
20      A.  I think I'll assert privilege.
21      Q.  I'm sorry.  You're asserting privilege with
22  regard to?
23          MR. SWEETEN:  The circumstances on which --
24  as to the question and I instructed him so.
25      Q.  (By MS. WESTFALL)  What was the purpose of

## 216

1   exempting voter ID requirements in rule 5.11?
2           MR. SWEETEN:  I'm going to object to the
3   question.  I think you're asking now about specific
4   thoughts, mental impressions, opinions about legislation
5   and/or communications between legislatures, legislative
6   staff.
7           MS. WESTFALL:  I'm asking about the purpose
8   of the Senate rule.  My question stands.
9           MR. SWEETEN:  But the court's ruling related
10  to the purpose of the specific voter ID legislation not
11  as to specific Senate rules and his understanding of the
12  purpose of that.
13          MS. WESTFALL:  Is it your view that
14  questions concerning the purpose of Senate rules or
15  other legislation, other than voter ID is something upon
16  which you can assert privilege and instruct a witness
17  not to answer questions in a deposition.
18          MR. SWEETEN:  When you're asking him
19  questions about why was this rule 5.11 adopted by the
20  Senate, you're asking for his subjective impressions as
21  to why this bill was included.  Therefore, you were
22  asking matters that are subject to legislative
23  privilege.  You're also asking matters that could
24  require him to reveal communications he's had with
25  legislatures or legislative staff.  So I think that's

BRIAN HEBERT                                          MAY 29, 2012

## 217

1   squarely within the area of privilege.
2           MS. WESTFALL:  I'm not asking about his
3   subjective intent.  None of the questions I am asking
4   today go to suggesting intent, they go to purpose.  What
5   was the purpose of the Senate in adopting rule 5.11?
6           MR. SWEETEN:  Okay.  I'll let you answer
7   just as to the purpose of 5.11.  You can answer that
8   question.
9       A.  When you say purpose you're not asking the
10  intent, you're asking what does this do.
11  BY MS. WESTFALL:
12      Q.  Sure.  Yes.  What does this do?
13      A.  Rule 5.11 from 2009 appears to say that a bill
14  can be considered on the affirmative vote of two-thirds
15  of the members, except that voter identification bill
16  considered by the Committee of the whole can be set to
17  special order 24 hours -- 24 hours notice.
18      Q.  So is the effect of this rule based on the face
19  of the rule, not based on any privileged conversations
20  you had; is that it carves out an exemption for voter ID
21  in 2009?
22          MR. SWEETEN:  I'll let you answer as to the
23  text.
24      A.  5.11 has a general rule and says, notwithstanding
25  the general rule there are other criteria for voter

## 218

1   identification, bills or resolutions.
2       Q.  (By MS. WESTFALL)  And what is that criteria for
3   voter identification resolutions set forth in 5.11?
4       A.  That a bill of resolution reported favorably from
5   the Committee of the whole may be set as a special order
6   with 24 hours notice.
7       Q.  Are you aware of any communications involving the
8   Lieutenant Governor pertaining to rule 5.11 in the 2009
9   rules?
10          MR. SWEETEN:  You can answer if you're aware
11  of any communication.
12      A.  Yes.
13      Q.  (By MS. WESTFALL)  When did that communication
14  occur?
15      A.  January.  I don't know.  It would have been 2008
16  or 2009.
17      Q.  Are you aware of more than one communication on
18  this topic?
19      A.  Yes.
20      Q.  When was the first one that you're aware of, when
21  did that take place?
22      A.  Again, it would have been right before -- right
23  at the beginning of session.  So 2008 or January 2009.
24      Q.  Who was a party to that communication?
25      A.  I remember it was discussed generally, I mean,

## 219

1   when these rules were adopted.  It would have been
2   senior staff in my office.  Again, Blaine Brunson and
3   Julia Rathgeber likely.  But I don't have memory of
4   specific conversations about this.
5       Q.  Was it after the rule was adopted or before the
6   rule was adopted?
7       A.  I don't recall.
8       Q.  Was it an in person meeting or an e-mail
9   communication or phone call?
10      A.  I think probably in person discussions.
11      Q.  Were you talking about the ramifications of rule
12  5.11 or development of the rules?
13          MR. SWEETEN:  The question is asking you to
14  reveal the specific subject matter.  Don't do that.
15  That impacts the attorney/client privilege as well as
16  the legislative privilege.  So you can answer it.  I've
17  let you as to who was involved, when, how long, but
18  don't reveal the subject.
19      Q.  (By MS. WESTFALL)  Are you following the advice
20  of council?
21      A.  Yes.
22      Q.  Was Mr. Dewhurst, himself, involved in this
23  communication?
24      A.  Not that I recall.
25      Q.  It was solely staff?

## 220

1       A.  That's my memory, yes.
2       Q.  And there was more than one communication; is
3   that correct?
4       A.  Probably.
5       Q.  Do you believe there was a conversation in the
6   end of 2008 regarding the two-thirds rule and voter ID?
7       A.  A conversation before session started in '09
8   about the two-thirds rule.
9       Q.  Correct.
10      A.  Do I believe it?
11      Q.  Do you recall?
12      A.  Oh, I don't recall it.  Again, no, it's possible
13  that it was discussed, but I really can't recall whether
14  it was reacting to this or before this.
15      Q.  When did you first hear about photo ID and the
16  two-thirds rule?
17      A.  I think within generally, it would have been late
18  2008, early 2009 is my guess.  I don't remember a
19  specific date of when I heard about it.
20      Q.  Did you have any conversations with anyone
21  outside of the Lieutenant Governor's office about the
22  two-thirds rule and voter ID before the rule was
23  adopted?
24      A.  I don't think so.  I don't recall.
25      Q.  Did you have any discussions with Janice McCoy or

BRIAN HEBERT                                          MAY 29, 2012

## 221

1  this topic?
2      A. I don't recall.
3      Q. Did you have any discussions with anyone in
4  Governor Perry's office about this topic?
5      A. Probably not. But I don't recall for sure.
6      Q. Based upon your experience working for the
7  Lieutenant Governor, how many times has the two-thirds
8  rule been suspended as a matter of public record?
9      MR. SWEETEN: You can answer.
10     A. There was a -- I remember there being debate on
11 the Senate floor about how often this happens and it
12 seemed like under Lieutenant Governor Dewhurst it
13 perhaps had happened once or twice. But then
14 historically it happened more than that.
15     Q. (By MS. WESTFALL) And what were the occasions
16 you're aware of, the two-thirds rule has been suspended?
17     A. I'm not aware of specific examples. I just
18 remember discussion of it has happened before.
19     Q. Janice McCoy testified in deposition she was
20 unaware of any other bills except voter ID being
21 exempted from the two-thirds rule. Do you believe that
22 testimony is accurate?
23     A. I guess, I believe she's not aware. I'm not sure
24 that's right or not. It seems like there may have
25 been -- in my memory, there may have been one special

## 222

1  session, but again, I can't remember the specific
2  examples. Just that there were examples.
3      Q. Did it pertain to the directing?
4      A. Maybe.
5      Q. Would Senate Bill 362 have passed the Senate if
6  the Senate had not adopted rule 5.11 in the 2009 Senate
7  rules?
8      MR. SWEETEN: Objection. When you're
9  answering the question, don't reveal thoughts or mental
10 impressions or opinions about legislation or furtherance
11 of the legislative process.
12     A. I don't know. I don't know whether it would have
13 passed or not.
14     Q. (By MS. WESTFALL) You have no idea?
15     A. I have no idea.
16     Q. Was it -- was the bill passed on party lines,
17 Senate Bill 14?
18     A. I believe that it was.
19     Q. So sitting here today you have no understanding
20 of whether the bill would have or would not have --
21 whether -- I'm sorry. Strike that.
22     Sitting here today you no idea of whether Senate
23 Bill 362 would have passed if it had been subject to a
24 two-thirds rule in 2009?
25     MR. SWEETEN: Yeah. She's asking for

## 223

1  matters that are subject to the legislative privilege.
2  She ask you to reveal thoughts or mental impressions
3  about legislation, legislative process so I'm going to
4  instruct you don't reveal those to the extent you can
5  refer to matters that are public record you're free to
6  do so.
7      A. I'm not aware of public statements by Senators
8  about whether they were willing to vote for or against
9  the bill. But, again, in the legislative process the
10 bill goes through different iterations and for any
11 number of reasons a member can change their vote so --
12 and they do change their votes. I don't know the answer
13 about whether it could have passed.
14     Q. (By MS. WESTFALL) Did Senate Bill 362 ultimately
15 pass the Senate?
16     A. Yes.
17     Q. Did it pass by two-thirds?
18     A. I don't recall. I believe it was majority.
19     Q. Are you aware of any other communications related
20 to consideration of modifying any other Senate rules in
21 addition to rule 5.11, with regard to voter ID bills?
22     MR. SWEETEN: She's asking you to reveal
23 communications that may have occurred between
24 legislatures and legislative staff, State agencies,
25 Texas Leg. Council, as well as to reveal your thoughts

## 224

1  and mental impressions, opinions about legislation. To
2  the extent you're asserting the legislative privilege
3  that question that asks for matters of the legislative
4  privilege so my instruction would be not to answer the
5  question.
6      Q. (By MS. WESTFALL) Are you going to follow your
7  counsel's advice?
8      A. Yes.
9      Q. Was Senate Bill 362 considered by any Senate
10 committees?
11     MR. SWEETEN: You can answer as a matter of
12 public record.
13     A. I believe it was considered by the Committee of
14 the whole.
15     Q. (By MS. WESTFALL) And ordinarily it would have
16 been sent to State affairs; is that right?
17     A. I don't know that. But given that other election
18 bills were generally referred there, then probably.
19     Q. Janice McCoy testified in her deposition it was
20 unusual for a bill to go straight to the Committee of
21 the whole, do you agree with that assessment?
22     A. Most bills do not go to Committee of the whole.
23     Q. What was the purpose of the assignment of Senate
24 Bill 362 to the Committee of the whole?
25     MR. SWEETEN: In that question she's asking

BRIAN HEBERT                                        MAY 29, 2012

---

225

1  you to reveal thoughts, mental impressions, opinions
2  about legislation or further answer of the legislative
3  process as well as communications.  Therefore, that
4  would be a matter that is subject to the legislative
5  privilege?
6       Q.  (By MS. WESTFALL)  Are you asserting privilege
7  and not answering the question?
8       A.  Yes.
9       Q.  What was Lieutenant Governor's role, generally,
10  during Senate Bill 362, as Committee of the whole?
11       MR. SWEETEN:  In that -- to he extent that
12  she's asking you to reveal thoughts, mental impressions,
13  opinions about legislation or furtherance of the
14  legislative process including communications you had
15  with Lieutenant Governor Dewhurst, legislatures,
16  legislative staff, state agencies, Texas Legislative
17  Council, so don't reveal those.  To the extent you can
18  refer to matters of the public record you're free to do
19  so.
20       A.  I believe the Senate rules provide that he can
21  participate and vote like any Senator and my memory is
22  that he was on the Senate floor and I don't recall if he
23  had questions for witnesses or not.  I believe he did
24  cast a vote on the bill.
25       Q.  (By MS. WESTFALL)  On 362 before the Committee of

---

226

1  the whole; is that right?
2       A.  I believe that's right.
3       Q.  Did he vote in favor of the bill?
4       A.  I believe he did.
5       Q.  During the floor debate on Senate Bill 362, do
6  you recall any concerns about the impact of the bill on
7  minority voters on the public record?
8       MR. SWEETEN:  If she's asking you what was
9  expressed on the public record you're free to answer.
10  Don't reveal matters of legislative privilege.  Go
11  ahead.
12       A.  I do recall discussion during the public debate
13  of 326 about the impact on voters, yes.
14       Q.  (By MS. WESTFALL)  On minority voters?
15       A.  All voters, including minority voters.
16       Q.  And who expressed those concerns?
17       A.  My memory is that most of the witnesses had
18  something to say about it.
19       Q.  What was the response to those concerns?
20       MR. SWEETEN:  Again, you can reveal matters
21  on the public record, but don't reveal matters that are
22  subject to the legislative privilege.
23       A.  I don't recall particular responses.  I'm
24  assuming you mean from the Senators themselves.  I don't
25  recall.

---

227

1       Q.  (By MS. WESTFALL)  Was there any response from
2  Lieutenant Governor to these concerns?
3       MR. SWEETEN:  Same objection, same
4  instruction.
5       A.  I don't recall if he had questions of witnesses
6  or not.
7       Q.  (By MS. WESTFALL)  Are you asserting privilege
8  over your response in part?
9       MR. SWEETEN:  Well, I mean, I thought you
10  were asking matters of the public record.
11       MS. WESTFALL:  I am.  I thought you made an
12  objection.
13       MR. SWEETEN:  Well, I mean, I instructed and
14  I'll continue to do so.  You can refer to matters on the
15  public record to the extent that it's asking for
16  something else other than legislative privilege that
17  would my instruction.
18       A.  I don't remember any public input.  I don't
19  remember specific public questions or input from
20  Lieutenant Governor or anyone else on the floor about
21  the testimony from the witnesses.  I know there was.  I
22  just don't remember particular specifics.
23       Q.  (By MS. WESTFALL)  Based on the bill history of
24  Senate Bill 362, were there any changes in the
25  iterations of the bill, either from when it was filed,

---

228

1  went through the drafting process that were made in
2  response to concerns about the impact of the bill on
3  minority matters?
4       MR. SWEETEN:  You're asking him to reveal
5  thoughts, mental impressions, or opinions about
6  legislation or furtherance of the legislative process as
7  well as protected communications.  So I'm asserting --
8  I'm objecting based upon legislative privilege.
9       Q.  (By MS. WESTFALL)  Do you recall that there was a
10  letter from Senators expressing concern that ethnic and
11  racial minority members of the Senate were unified in
12  their opposition to Senate bill 362?
13       MR. SWEETEN:  Is this a matter of public
14  record.
15       MS. WESTFALL:  Yes.
16       A.  Yes.
17  BY MS. WESTFALL:
18       Q.  You recall that letter?
19       A.  I believe so, yes.
20       Q.  Do you recall any conversations in response to
21  that letter?
22       MR. SWEETEN:  Don't reveal matters of
23  legislative privilege including discussions you have had
24  with staffers, legislators, Lieutenant Governor, et
25  cetera.  You are free to refer to the matters of the

BRIAN HEBERT                                                    MAY 29, 2012

---

## 229

1    public record.

2        A.  Right.  I don't recall the specific public

3    response to that letter from Lieutenant Governor

4    Dewhurst or anyone else.

5        Q.  So you're talking about public record, public

6    response.  Are you aware of any conversations about that

7    letter?

8            MR. SWEETEN:  You can answer if you're aware

9    of conversations.

10       A.  Right.  I cannot recall.

11       Q.  (By MS. WESTFALL)  Was it true that some

12   legislatures and members of the public stayed up all

13   night during consideration of Senate Bill 362?

14       A.  I did.  We did.

15       Q.  And many people did?

16       A.  My recollection is the Senate chamber was --

17   certainly the Senators did.  Yes, there was some public

18   testimony.

19       Q.  Why do you think there was such strong opposition

20   to Senate bill 362?

21           MR. SWEETEN:  Don't answer.  That would

22   require you to reveal thoughts mental impressions

23   opinions about legislation.  It's a matter that is

24   subject to legislative privilege.

25       A.  Right.

---

## 230

1        Q.  (By MS. WESTFALL)  Are you asserting privilege?

2        A.  Yes.

3        Q.  Are you aware of any amendments to Senate Bill

4    362 that were -- which had the purpose of addressing the

5    concerns of minority legislatures or minority voters?

6            MR. SWEETEN:  As phrased, the question

7    requires you to reveal thoughts, mental impressions,

8    opinions about legislation or furtherance of the

9    legislative process subject to legislative privilege.  I

10   instruct you not to answer.

11       Q.  (By MS. WESTFALL)  Are you following the advice

12   of council?

13       A.  Yes.

14       Q.  Did Senate Bill 326 pass the Senate?

15           MR. SWEETEN:  You can answer.

16       A.  Yes.

17       Q.  (By MS. WESTFALL)  Did it get referred to the

18   House?

19       A.  I believe it did.

20       Q.  Did you play any role in Senate Bill 362 once it

21   went to the House?

22           MR. SWEETEN:  Objection, vague.

23       Q.  (By MS. WESTFALL)  You may answer.

24       A.  I think in a similar way that I was available for

25   questions.  I was available as a resource.  Certainly

---

## 231

1    from a procedural standpoint.

2        Q.  Did you any conversations with House members or

3    their staff concerning Senate Bill 362 when it was

4    referred to the House?

5            MR. SWEETEN:  You can answer whether you had

6    any conversations.

7        A.  I may have had conversations.

8        Q.  (By MS. WESTFALL)  With whom?

9        A.  House staff.

10       Q.  And who specifically?

11       A.  I can't remember the names of staff.

12       Q.  Did you talk to Speaker Strauss's staff?

13       A.  Probably.

14       Q.  Did you talk to Meredith Fowler?

15       A.  Probably.

16       Q.  Was she the main person handling photo ID issues

17   for the Speaker in 2009?

18       A.  I don't know if she was the primary person.  She

19   was a person that I talked to.

20       Q.  What was her role?

21       A.  I believe she's a lawyer in the Speaker's office.

22       Q.  Is she still employed with the Speaker or is she

23   no longer employed with the Speaker?

24           MR. SWEETEN:  You can answer.

25       A.  I think she's still employed.

---

## 232

1        Q.  (By MS. WESTFALL)  How many conversations did you

2    have with Ms. Fowler?

3        A.  Probably a few, more than a handful, but not a

4    lot.

5        Q.  Did you have conversations with any other staff

6    person in the House regarding Senate Bill 362?

7        A.  Perhaps the staff in the bill sponsor's office.

8        Q.  Was that -- so what happened to Senate Bill 362

9    in the House?

10       A.  I cannot recall.  It did not pass.

11       Q.  Do you know why?

12           MR. SWEETEN:  Objection.  She's asking

13   you -- to the extent she's asking you for communications

14   you've had with individuals or thoughts, mental

15   impressions, or opinions about legislation.

16       A.  I don't know why.

17           MR. SWEETEN:  Therefore privileged.

18       Q.  (By MS. WESTFALL)  Was a photo ID bill introduced

19   in the Senate in 2011?

20           MR. SWEETEN:  You can answer.

21       A.  Yes.

22       Q.  (By MS. WESTFALL)  Was it Senate Bill 214?

23       A.  Yes.

24       Q.  Did Senator Fraser introduce that?

25       A.  Yes.

BRIAN HEBERT                                                    MAY 29, 2012

## 233

1    Q.  Senator Fraser testified in deposition in this
2    case he started working on the bill on May 31, 2009.  Do
3    you believe that sounds accurate?
4    A.  I believe that sounds like Senator Fraser.
5    Q.  In other words, it's accurate?
6    A.  Sure.
7    Q.  Did the Lieutenant Governor or anyone in his
8    office have any conversations prior to May 31, 2009
9    about Senate Bill 14?
10    A.  So did we discuss that Bill 14 before the end of
11    2009 session?
12    Q.  Correct.
13    A.  I don't recall.  I mean, as a practical matter it
14    wouldn't have even had a number.
15    Q.  I'll rephrase it to say, did you conceptually
16    discuss filing a photo ID bill in the 2011 session prior
17    to May 31, 2009?
18    A.  I can't recall.
19    Q.  Did the Lieutenant Governor promise anyone he
20    would file -- or push -- not file, push photo ID in
21    legislation 2011?
22        MR. SWEETEN:  The question potentially calls
23    for matters that are -- calls for information that would
24    be protected by the legislative privilege including
25    conversations you had with the Lieutenant Governor,

## 234

1    legislative staff, legislators, or it also could require
2    you to reveal thoughts or mental impressions about the
3    bill.  So to the extent that she's asking for matters of
4    legislative question do not answer the question.
5        MS. WESTFALL:  Is it your position that
6    promises to advance legislation falls within legislative
7    privilege?
8        MR. SWEETEN:  You're asking about a
9    conversation that Lieutenant --
10        MS. WESTFALL:  Promises to advance
11    legislation.  Are you saying that falls within the
12    privilege?  Is that your position?
13        MR. SWEETEN:  Well, I mean I think what you
14    are asking for is the substance of communications that
15    Lieutenant Governor Dewhurst may or may not have had
16    with someone.  If you want to ask specifically about
17    whether he had a conversation with someone about the
18    bill that's a general subject matter, I think promises
19    that relates to, you know, is probably a little beyond
20    what you're allowed to ask for.
21    Q.  So you're asserting privilege over promises,
22    Mr. Sweeten?  I'm not sure you've take then position.
23        MR. SWEETEN:  You know what.  I'm going to
24    let him answer as to promises.  You can answer that
25    question.

## 235

1    A.  I don't recall any promise.
2    BY MS. WESTFALL:
3    Q.  Are you asserting any privileges in responding to
4    that question?
5        MR. SWEETEN:  I haven't instructed him as to
6    privilege.
7    A.  I just don't recall.
8    Q.  (By MS. WESTFALL)  Was Senate Bill 14
9    considered -- strike that.
10        Was Senate Bill 14 designated by the Governor to
11    be emergency legislation?
12    A.  Yes.  Well, the issue of voter identification was
13    an issue that was deemed to be an emergency issue.
14    Q.  How did voter ID come to receive that emergency
15    designation?
16        MR. SWEETEN:  Objection.  You're asking for
17    thoughts, mental impressions, or opinions about
18    legislation.  You can testify about matters in the
19    public record.
20    A.  I don't recall the Governor's statement about why
21    he added the emergency items that he did to the
22    emergency call.
23    Q.  (By MS. WESTFALL)  Are you asserting legislative
24    privilege over gubernatorial acts as the Governor is not
25    able to introduce legislation?  Is that your position?

## 236

1        MR. SWEETEN:  Well, what I'm saying is, if
2    you're asking him questions about communications he's
3    had with the State agency including the Governors
4    office, legislatures, legislative staff, and you're
5    asking him to reveal that information, then that would
6    be subject to legislative privilege.  I also said he can
7    testify about matters in the public record so to the
8    extent it involves privilege don't answer it.  If you
9    can answer without providing information that would be
10    privileged then you can do so.
11    A.  The short answer is, I don't know why he added
12    the items he did to the list of emergency items.
13    Q.  (By MS. WESTFALL)  Are you aware of any
14    communications on that topic?
15    A.  No.
16    Q.  Are you aware of whether the Lieutenant Governor
17    requested this designation of the Governor's office?
18    A.  Not aware.
19    Q.  Are you aware of any conversations about that
20    topic between the Lieutenant Governor's office and the
21    Governor's office related to the emergency designation
22    of voter ID?
23    A.  I'm not aware.
24    Q.  Who would know the answer to that question?
25        MR. SWEETEN:  Objection calls for

BRIAN HEBERT                                                    MAY 29, 2012

---

## 237

1   speculation.
2       Q.  (By MS. WESTFALL)  Would Lieutenant Governor
3   Dewhurst?
4       A.  If they existed he might.
5       Q.  What were the consequences of this emergency
6   designation of voter ID?
7       A.  Generally speaking, an emergency item -- an item
8   designated as an emergency by the Governor is exempted
9   from some of the normal procedural time lines and so you
10  can introduce it sooner and consider it sooner and pass
11  it sooner to address the emergency.
12      Q.  What was the emergency?
13          MR. SWEETEN:  The question would ask you to
14  reveal matters that are subject to legislative privilege
15  or conversations that would be subject to legislative
16  privilege, so don't answer to the extent you would have
17  to do so.  You can refer to matters of the public
18  record.
19      A.  I'm not aware of the grounds for the items that
20  he listed, the emergency items.
21      Q.  (By MS. WESTFALL)  Are you aware of any
22  conversations about the emergency nature of the need for
23  voter ID in the State of Texas in 2011?
24          MR. SWEETEN:  Objection, asked and answered.
25      Q.  (By MS. WESTFALL)  You may answer.

## 238

1       A.  I'm not aware.
2       Q.  Did you have any communications with Senator
3   Fraser's staff about the emergency designation?
4           MR. SWEETEN:  Objection, asked and answered.
5   You can answer.
6       A.  I'm sure I had conversations just in terms of how
7   it affected the timeline for introducing the bill and
8   passing it.
9           MR. SWEETEN:  But don't reveal substance of
10  the communication.  You can reveal whether a
11  communication occurred.
12  BY MS. WESTFALL:
13      Q.  Would those conversations have been with
14  Ms. McCoy?
15      A.  Yes.
16      Q.  And do you believe anyone else was involved in
17  those communications besides Ms. McCoy?
18      A.  I don't recall.
19      Q.  Is there anything in the public record related to
20  the need or urgency or emergency nature of voter ID in
21  2011, that you're aware of?
22      A.  What in the public record was evidence of an
23  emergency?  I don't recall now.
24      Q.  Are you familiar with the public record related
25  to SB 14?

## 239

1       A.  At committee hearing or in the newspapers, in the
2   State, nationally or when you say public record, what is
3   it that you're referring to?
4       Q.  The public and legislative record related to SB
5   14.
6       A.  So the debate between Senators and the Senate?  I
7   don't recall if there was specific discussion or debate
8   on the Senate floor about whether it was an emergency or
9   not or why it might have been an emergency?
10      Q.  And I was just -- I would ask you again, were you
11  as the person who was involved in the issue for
12  Lieutenant Governor, did you familiarity with the public
13  record and legislative history of Senate Bill 14, as a
14  general matter?
15      A.  Sure.
16      Q.  Could you mark this as US 78?
17          (Exhibit No. 78 was marked.)
18      Q.  (By MS. WESTFALL)  You've been handed what's been
19  marked US 78.  Have you seen that document before?
20      A.  Yes.
21      Q.  What is it?
22      A.  It is a letter from Lieutenant Governor Dewhurst,
23  in this case to Senator Birdwell, but I think it went to
24  the whole Senate saying that he intends to recognize
25  Senator Duncan to bring the Senate into a Committee of

## 240

1   the whole to consider Senate Bill 14.  And so appoints
2   Senator Duncan to chair that Committee.
3       Q.  Why did Senator Duncan make a motion to resolving
4   the Senate to a Committee of the whole?
5           MR. SWEETEN:  Objection.  Calls for matters
6   of legislative privilege.  Don't answer the question.
7       Q.  (By MS. WESTFALL)  Are you following the advice
8   of council?
9       A.  Yes.
10      Q.  Could Lieutenant Governor, himself, not make this
11  motion to resolve the Senate to a Committee of the
12  whole?  It's a procedural question.
13      A.  Procedurally under the senate rules I don't
14  believe the Lieutenant Governor can make that motion.
15      Q.  And that is why Senator Duncan or any Senator
16  could have made this motion; is that correct?
17      A.  I think that's right.
18      Q.  And as chair of Committee of the whole, what
19  powers did Senator Duncan have under the rules?
20          MR. SWEETEN:  She's asking you a matter of
21  public record and procedure.  So you can answer it.
22      A.  Right.  My memory is that under the rules of
23  precedent and Senate procedure that you would have
24  similar role as when he was chairing his own State
25  Affairs Committee.  He would preside procedurally

BRIAN HEBERT                                          MAY 29, 2012

## 241

1   recognizing members and so forth to debate.
2        Q.  (By MS. WESTFALL)  Who was the chair of the State
3   Affairs Committee in 2011?
4        A.  Senator Duncan.
5        Q.  And this also -- this letter from Mr. Dewhurst
6   also refers to a draft resolution concerning procedures,
7   do you see that?
8        A.  Yes.
9        Q.  And do you know whether the draft -- strike that.
10       What did the draft resolution regarding
11  procedures indicate, if you know?
12           MR. SWEETEN:  You can testify if that's a
13  matter of the public record.
14       A.  I believe it just outlined who would preside, the
15  general timing of the day, how amendments would be
16  handled, how witnesses would be handled, just procedural
17  nuts and bolts.
18       Q.  (By MS. WESTFALL)  Were those procedures adopted
19  and incorporated into the Senate journal?
20       A.  I don't recall.
21       Q.  Have those procedures been produced to us,
22  Mr. Sweeten, as part of this litigation?
23           MR. SWEETEN:  I'm not sure even what you're
24  specifically talking about.  If they're procedures that
25  are a matter of the public record -- can you tell me a

## 242

1   little more about what you're asking for.
2            MS. WESTFALL:  The procedures set forth in
3   the letter of January 20th, 2011, from David Dewhurst to
4   Senator Birdwell referred to in the exhibit we were just
5   discussing.
6            MR. SWEETEN:  Are we talking about 13 rule
7   13--
8            MS. WESTFALL:  The procedures for the
9   Committee of the whole.  Do we have those?  Have they
10  produced to us in this litigation, Mr. Sweeten?
11           MR. SWEETEN:  I mean, is this something that
12  is part of the record?
13           MS. WESTFALL:  That's what I'm examining the
14  witness on and he's uncertain.  And --
15           MR. SWEETEN:  Okay.  Well, as you're asking
16  me this --
17           MS. WESTFALL:  He's surprised that there's
18  a privilege you can assert over procedures related to
19  the process of the Committee of the whole.
20           MR. SWEETEN:  Nor am I trying to take that
21  position.  I mean, one way or the other I'm not even --
22  you know, you're asking me, did we produce something --
23           MS. WESTFALL:  Yes.
24           MR. SWEETEN:  I mean, that first presupposes
25  that we were provided something or that someone had a

## 243

1   duty to provide something.  I mean, there's several
2   layers of analysis we must do before we're going to be
3   able to answer that question, but if you're asking if --
4   where we can start is, I can ask my folks back at the
5   office if such a thing exists.  Whether we have it in
6   our production and we'll take it from there.  I'm glad
7   to do that.
8            MS. WESTFALL:  Thank you.
9   BY MS. WESTFALL:
10       Q.  Do you know whether the procedures proposed in
11  this letter were adopted by the Senate?
12       A.  I don't recall.
13       Q.  Do you know anything about procedures or could
14  you describe them?
15       A.  My memory, again, is that there's a president of
16  Senate going into the Committee of the whole.  My guess
17  is that they were just parallel to what had been done
18  before, but I don't recall.
19       Q.  Thank you for your testimony.
20       Could you mark this as US 79?
21           (Exhibit No. 79.)
22       Q.  (By MS. WESTFALL)  You've been handed what's been
23  marked as US 79.  Do you recognize this document?
24       A.  It is a press release from Lieutenant Governor's
25  Dewhurst office regarding Governor Perry's emergency

## 244

1   call.
2        Q.  Have you seen it before today?
3        A.  I probably read it when it came out.
4        Q.  And do you see that it's dated January 20, 2010?
5        A.  Yes.
6        Q.  Do you think that's an error and it should be
7   2011?
8        A.  Yeah, probably.
9        Q.  Do you see in the last paragraph it reads, Texans
10  have fought and died for the principal of one person,
11  one vote?
12       A.  Yes.
13       Q.  Can you explain what is meant by the need to
14  uphold the principal of one person, one vote?
15           MR. SWEETEN:  You can answer the question to
16  the extent it doesn't ask you to reveal communications
17  you had with Lieutenant Governor Dewhurst, legislatures
18  legislative staff, or that it doesn't require you to
19  reveal thoughts, mental impressions, opinions about the
20  legislative session.  You can answer to the extent you
21  are not providing information that is within that
22  privilege.
23       A.  I think it just means what it says.  One person
24  one vote, as a tenant of voting in the United States and
25  I don't know what else asking.

BRIAN HEBERT                                          MAY 29, 2012

## 245

1    Q. (By MS. WESTFALL) Was there any threat to the
2    principal of one person, one vote that voter ID was
3    intended to remedy?
4          MR. SWEETEN: You're asking him to reveal
5    thoughts, mental impressions, opinions about furtherance
6    of the legislation process and/or conversations that
7    we've discussed previously. So to that extent I'm going
8    to the object based on legislative privilege.
9    Q. (By MS. WESTFALL) You following your counsel's
10   advice?
11   A. Yes.
12   Q. Do you see it also states in that paragraph that
13   there's a need to uphold the integrity of elections?
14   A. Yes.
15   Q. What was the basis for that statement?
16         MR. SWEETEN: Same objection. The question
17   asks you to reveal thoughts, mental impressions,
18   opinions, about legislation or furtherance of the
19   legislative process or communications. So don't answer
20   to the extent that you would have to do so in answering
21   that question. You can answer it based on the public
22   record matters that are not subject to legislative
23   privilege, you can do so.
24   A. Right. I mean, it means what it says on its
25   face. I mean, during the debate of the bill on the

## 246

1    Senate floor there was a lot of discussion about
2    ensuring the integrity of the elections.
3    Q. (By MS. WESTFALL) But what was the need to
4    ensure? Was there a threat to the integrity of
5    elections that this bill was intended to address?
6          MR. SWEETEN: Same objection. You're asking
7    him about the intent of the bill and what it was
8    intended to address that impacts matters of legislative.
9    Therefore, I'm instructing him not the answer to the
10   extent it would reveal matters of legislative privilege.
11   Q. (By MS. WESTFALL) Are you following the advice
12   of council?
13   A. Yes.
14         MR. SWEETEN: You can reveal matters of the
15   public record.
16   Q. (By MS. WESTFALL) Do you have any testimony
17   related to the public record on any threats to the
18   integrity of the elections that necessitated the need
19   for voter ID?
20   A. My memory is just that, you know, the debate
21   among Senators was that there were threats. There was
22   election fraud that existed and this was a tool to
23   combat that.
24   Q. Do you have any specific information about fraud
25   that was referenced in the public record that was

## 247

1    intended to be remedied by Senate Bill 14?
2    A. Again, from the public record, I recall evidence
3    and discussion of the types of fraud that were being
4    committed in Texas and other states, I don't have those
5    specific numbers on my fingertips.
6    Q. And was notice to Senators of the convening of
7    the Committee of the whole upheld within four days
8    notice from the time Senators were notified to when the
9    Committee was convened, do you recall that?
10   A. I don't recall the number of days.
11   Q. Bear with me one minute. Could you mark this.
12         (Exhibit No. 80 was marked.)
13   Q. (By MS. WESTFALL) You've been handed what's been
14   marked US 80. Do you recognize this document?
15   A. It appears to be a letter from Senator Van
16   DePutte to Senator Duncan.
17   Q. Have you seen this before?
18   A. I believe, yes, when it came out I saw it.
19   Q. Do you see that it issues a complaint about short
20   notice on convening of the Committee of the whole
21   executed by the Lieutenant Governor, on Page 1 of this
22   document?
23   A. The second paragraph, yes.
24   Q. Were you aware at the time of the relatively
25   short notice that the convening of the Committee of the

## 248

1    whole?
2          MR. SWEETEN: Objection, asked and answered
3    He's already said.
4    Q. (By MS. WESTFALL) You may answer.
5    A. Again, I don't recall specific discussions about
6    this.
7    Q. Are you aware that the notice was given to
8    Senators by slipping a note under the door after hours
9    on Thursday night before the Committee was convened?
10   A. I don't know that it was to use the letter's
11   language literally slipped under most office doors.
12   Q. Was the notice provided after hours on Thursday
13   of the convening of the Committee of the whole the next
14   week?
15   A. I don't know what time it was delivered to each
16   Senator.
17   Q. Was it delivered on Thursday before the convening
18   on Monday?
19         MR. SWEETEN: Objection, asked and answered
20   A. Yeah. Again, probably, but I'm not sure of the
21   exact time.
22   Q. (By MS. WESTFALL) Are you aware of any
23   conversations about perceived exclusion of members of
24   the Senate representing minority voters from the debate
25   on Senate Bill 14?

BRIAN HEBERT                                                MAY 29, 2012

---

## 249

1        MR. SWEETEN:  You can answer the question.
2   Don't reveal matters subject to legislative privilege
3   including communications.  You can answer to the extent
4   you're not doing so.
5        A.  I think there was some, again, in the public
6   debate on the bill I think some Senators made some more
7   statements.
8        Q.  (By MS. WESTFALL)  And who would know exactly
9   when the Lieutenant Governor gave notice to all members
10  of the convening of the Committee of the whole?
11       A.  I don't know who would have hand delivered the
12  letter.
13       Q.  The Lieutenant Governor, himself, would know,
14  correct?
15       A.  He probably did not hand deliver the letter
16  personally.
17       Q.  He probably did not hand deliver it, but he
18  directed the letter to be sent to the Senators, correct?
19       A.  Yes, presumably.
20       Q.  Could you mark this.
21            (Exhibit No. 81 was marked.)
22       Q.  (By MS. WESTFALL)  Can you show the witness.
23            MR. SWEETEN:  Guess you better get one over
24  to me.
25            MS. WESTFALL:  I won't answer that question.

---

## 250

1            MR. SWEETEN:  Objection.
2        Q.  (By MS. WESTFALL)  You've been handed what's been
3   marked as US 81.  Do you recognize this document.
4        A.  It is some version of Senate Bill 14.
5        Q.  If you look at the notation at the bottom of the
6   exhibit, does that indicate that this is the version of
7   the bill as filed?
8        A.  It doesn't indicate that.  I would need to see --
9   the file version will have a stamp from the Clerk's
10  office.  I don't know if this is the final version or
11  what.
12       Q.  Can you look at the last page of Exhibit 81 and
13  you see there's -- this is certainly not the engrossed
14  version of the bill, correct?
15       A.  Correct.
16       Q.  Are you familiar with the provisions of Senate
17  Bill 14?
18       A.  Yes.
19       Q.  Could you describe the differences between Senate
20  Bill 362, about which you testified extensively and
21  Senate Bill 14?
22            MR. SWEETEN:  If you're asking him about the
23  differences on the text he can do so, but if you're
24  asking him about his thoughts, opinions about the
25  legislation, then, I would object to that.

---

## 251

1            MS. WESTFALL:  Mr. Sweeten, I'm going to ask
2   him a series of questions about the text of the bill.  I
3   am not intending to invade the privilege that you have
4   been asserting to that.
5            MR. SWEETEN:  Then I don't object at this
6   time.
7            MS. WESTFALL:  Very good.  Very good.
8        A.  There's a difference of the forms of
9   identification that are acceptable.
10  BY MS. WESTFALL:
11       Q.  Could you describe those?
12       A.  Sure.  Senate bill 362 has a slightly longer list
13  of photo IDs that are acceptable and it allowed
14  non-photo ID at the polling place and Senate Bill 14
15  requires photo ID.  And Senate 14 implements a longer
16  explanation and procedure for people who are exempted
17  from the photo ID requirement.  Those seem to be the
18  major differences.
19       Q.  And many previous iterations of the bill before
20  Senate Bill 14 was final.  It allowed use of a driver's
21  license that had not expired more than 2 years before,
22  correct?  And Senate Bill 14 reduced that time to
23  60 days; is that correct?
24       A.  I would have to look at the final version of the
25  draft.  Senate Bill 14 in front of me it just says a not

---

## 252

1   expired driver license.  And I can't remember the final
2   number from the final draft.
3        Q.  Could you mark this as US Exhibit 5, please?
4            (US Exhibit No. 5 was marked.)
5        Q.  (By MS. WESTFALL)  You've been handed what's been
6   previously marked as US Exhibit 5.  Do you recognize
7   this document?
8        A.  Yes, this is the SB 14.
9        Q.  Yes.  And is this the version that was engrossed?
10       A.  Yes, this appears to be that version.
11       Q.  Turning your attention to Page 9, where it list
12  the form of ID.  Do you see that?
13       A.  Uh-huh.
14       Q.  And do you see that with regard to driver's
15  licenses that they expire no earlier than 60 days before
16  presentation; is that correct?
17       A.  Yes.
18       Q.  Would you characterize this on the face of the
19  Senate Bill 326 and Senate Bill 14 as having major
20  changes between the two bills?
21       A.  There are changes between the two bills, yes.
22       Q.  And was it a significant change, in your view, to
23  have removed non-photo ID as a form of ID?  Just on the
24  face of the bills?
25            MR. SWEETEN:  You're asking for his opinions

BRIAN HEBERT                                          MAY 29, 2012

## 253

1    about legislation.  You know, I don't have a problem if
2    you ask him a period of the text, but I think if you're
3    asking him these major changes and certainly qualitative
4    issues then I think that you're getting into legislative
5    privilege.
6            MS. WESTFALL:  As he's sitting today he
7    can't testify based on his expertise of drafting, based
8    on his expertise of election law?  How does that relate
9    to a legislative --
10           MR. SWEETEN:  Okay.  If that's your question
11   and you're not asking him to discuss matters for
12   example, information he heard from communication or his
13   mental impressions that he had, you know, as these bills
14   were proceeding, then he can answer as he's sitting here
15   today, if that's your question.
16   BY MS. WESTFALL:
17       Q.  Sitting here today, is it a significant change
18   between Senate Bill 362 an Senate Bill 14 in terms of
19   the forms ID allowable?
20       A.  Yes.
21       Q.  And is that in part because Senate Bill 14 no
22   longer allows the use of non-photo ID; is that correct?
23       A.  Yeah.  I think that's the significant difference.
24       Q.  Are there any other significant differences other
25   than that?

## 254

1        A.  I think the SB 14's addition of expansion of the
2    ways in which provisional ballots can be counted for
3    those people who don't have ID is also significant.
4        Q.  And how is that based on the face of the bill?
5        A.  I think under 362 the provisional ballot system
6    stayed essentially the same.  And then SB 14 the
7    provisional ballot system is expanded to clarify which
8    persons -- to include a class of people who can still
9    cast a ballot even without photo ID.  And I'm looking
10   for that now.
11           Also, SB 14 creates a new election identification
12   certificate.
13       Q.  Are there any other major differences that you're
14   aware of between the two bills?
15       A.  Glancing at the math I think those are the big
16   ones.
17       Q.  Thank you for your testimony.
18           Were you involved in developing Senate Bill 14?
19           MR. SWEETEN:  Objection, to the form.
20   Objection, vague.  Also don't reveal information that's
21   subject to the legislative privileges including your
22   thoughts or opinions or your communications with
23   individuals.  Those are subject to legislative
24   privileges.  Also, don't reveal attorney/client
25   privileges between you and other members of the

## 255

1    Lieutenant Governor's staff.
2        A.  Yes, I was involved with Senate Bill 14.
3        Q.  (By MS. WESTFALL)  Were you involved in the
4    drafting analysis of Senate Bill 14?
5
6            MR. SWEETEN:  Objection, compound.  Also,
7    don't reveal your thoughts and mental impressions or
8    communications regarding this bill.
9        A.  Yes.
10       Q.  (By MS. WESTFALL)  Were you involved in the
11   drafting of Senate Bill 14?
12       A.  Yes.
13       Q.  Were you involved in analysis of Senate Bill 14?
14       A.  Yes.
15       Q.  When did you start drafting Senate Bill 14?
16       A.  I don't recall when I first started drafting it.
17   To the extent -- I don't remember when I first
18   contributed to the draft.
19       Q.  Do you remember when anyone first started
20   drafting Senate Bill 14?
21       A.  No.  I don't remember the particular date.
22       Q.  Was it after SB 362 failed?
23       A.  Probably.
24       Q.  Shortly after?
25       A.  My memory is that was not shortly after, but just

## 256

1    sometime after when the next session was rolling around
2    is when you would introduce legislation.
3        Q.  Was the drafting of Senate Bill 14 started in
4    earnest after the November 2010 elections?
5            MR. SWEETEN:  Objection, asked and answered.
6        A.  I don't know when exactly.
7        Q.  (By MS. WESTFALL)  When did -- when did your role
8    in drafting Senate Bill 14 start?
9        A.  My role had been for several years at that point.
10   So I don't -- I don't know that there was a time at
11   which we sat and drafted this thing and, you know, had
12   it filed.  So again, it was a process, not a day when we
13   sat down and rolled up our sleeve.
14       Q.  Do you recall when your involvement in that
15   process, you just described, started with regard to this
16   particular bill?
17       A.  I don't remember particulars or start date.
18       Q.  Who would know when that process started in your
19   office?
20           MR. SWEETEN:  Objection, calls for
21   speculation.
22       Q.  (By MS. WESTFALL)  You may answer.
23       A.  I think you would have to ask the sponsor of the
24   bill when they started it.
25       Q.  And when you started working on the drafting of

BRIAN HEBERT                                          MAY 29, 2012

---

**257**

1   Senate Bill 14, whenever that occurred, were there any
2   source that you consulted with?
3       MR. SWEETEN:  That calls for matters that
4   are subject to the legislative privileges.  Don't reveal
5   thoughts, mental impressions, opinions about legislation
6   or furtherance of the legislation process that includes
7   your thought processes.  That is subject to legislative
8   privilege, objection.  Instruct not to answer.
9       Q.  (By MS. WESTFALL)  Are you following the advice
10  of your council?
11      A.  Yes.
12      Q.  Did you look at any models from any interest
13  group?
14      MR. SWEETEN:  Same objection.
15      Q.  (By MS. WESTFALL)  Are you following the advice
16  of your council?
17      A.  Yes.
18      Q.  So it's your -- okay.
19          Did you look at any other States photo ID's laws
20  in drafting Senate Bill 14?
21      MR. SWEETEN:  Once again, you're asking for
22  his mental impressions, his thought processes regarding
23  the legislation.  That is subject to the legislative
24  privilege.
25      MS. WESTFALL:  Are you instructing him not

---

**258**

1   to answer?
2       MR. SWEETEN:  I am.  Unless you can
3   answer -- hold on one second.  Unless you can answer
4   without revealing matters that are subject to the
5   legislative privilege.
6       A.  There may have been discussion and testimony
7   about other states.  Otherwise, I would assert the
8   privilege.
9   BY MS. WESTFALL:
10      Q.  Who else besides you was involved in drafting
11  Senate Bill 14?
12      A.  I believe Janice McCoy and Legislative Council
13  attorneys.  Probably Jennifer Jackson is all I know for
14  sure.
15      Q.  Jennifer Jackson was with the State Affairs
16  Committee?
17      A.  No.  She was -- Jennifer Jackson was the
18  legislative council attorney.
19      Q.  Thank you.
20          Anybody else you can think of involved in the
21  drafting?
22      A.  Again, there may have been amendments offered or
23  the floor that were drafted by other people, I don't
24  know.
25      Q.  But just as to the body of the bill that was

---

**259**

1   introduced, have you listed everybody who was involved
2   in drafting?
3       A.  I think so.
4       Q.  Did you have any communications about SB 14 with
5   any current or former legislatures or staff who had
6   offered or introduced past photo ID bills?
7       A.  Did I communicate with members or staff from '09
8   or '07 about the '11 bill.
9       Q.  Or '05?
10      A.  I don't think so.
11      MR. SWEETEN:  Elizabeth, can we get to a
12  point of a break pretty quickly here.
13      MR. WESTFALL:  Sure.  Why don't we break
14  now.
15      MR. SWEETEN:  Sounds good.
16      (Brief recess.)
17  BY MS. WESTFALL:
18      Q.  Let's go back on the record.  I want to turn your
19  attention back to Exhibit 78, the letter from
20  Mr. Dewhurst to Senator Birdwell.  Could you look at
21  maybe a copy of your counsel's?  Do you see at the
22  bottom it says DD colon E G?
23      A.  Yes.
24      Q.  Is the DD, David Dewhurst?
25      A.  I don't know.

---

**260**

1       Q.  And who is the EG, do you know whose initials
2   those are, who would have been copied on this letter?
3       A.  I don't know that those -- I don't know what
4   those letters mean.
5       Q.  Do you know anyone who's first name --
6       A.  There's also a David Duran at the Governor's
7   office.  That's probably not his initials, but the point
8   being I don't know.
9       Q.  Who is Elaine Gonzales?
10      A.  She the -- I don't know her title.  Office
11  manager assistant to Governor Dewhurst, et cetera.
12      Q.  Thank you.
13      MR. SWEETEN:  By the way, Elizabeth I want
14  to go ahead on the record and tell you that we have
15  produced what you asked earlier about the draft
16  resolution outlining the procedures of the Committee as
17  a whole.  On Page 60 of the Senate journal dated 1/24/11
18  and that has been produced I'm told.
19      MS. WESTFALL:  Fantastic.  Thank you.
20      MR. SWEETEN:  That seemed very helpful to
21  you.
22      MR. ROSENBERG:  Have we decided is that
23  going to happen tomorrow or not, do we know?  I'm just
24  trying to tell my other people.
25      (Discussion off the record.)

BRIAN HEBERT                                              MAY 29, 2012

---

261

BY MS. WESTFALL:

1   BY MS. WESTFALL:
2   Q. So we will go back on the record.
3      Are you aware of any communications with any of
4   firms or any legislatures from any other States about S
5   B 14?
6   A. Yes.
7      MR. SWEETEN: You can answer if you're aware
8   of.
9   A. Yes.
10  Q. (By Ms. Westfall) And who are those individuals?
11  A. About SB 14?
12  Q. Yes.
13  A. There would have been communications with
14  individual and elections official and I forget his name.
15  I believe he testified in the hearing. That's all I
16  know for sure.
17  Q. Did you have any communications with any official
18  in Georgia?
19  A. That's what I'm trying to remember. I cannot
20  recall for sure.
21  Q. How many conversations did you have with
22  officials in Indiana? Or how many communications are
23  you aware of with officials in Indiana?
24  A. There would have been a handful. And again, I
25  only had one or two conversations, communications. I

---

262

1   shouldn't say conversation.
2   Q. Was anyone else involved in those communications?
3   A. I believe Janus McCoy lined up that witness or
4   the hearing.
5   Q. Were the communications regarding the hearing?
6   A. I don't know everything they talked about, but
7   anything they I'm aware of it was about the hear.
8   Q. You were a party to these conversations; is that
9   right?
10  A. Yes.
11  Q. And can you tell me the general nature of the
12  communications?
13  A. Before the hearing it was, can you come down and
14  share your experience in Indiana. And then the day of
15  the hearing it was more sort of pleasantries, welcome to
16  Texas, if you need something, explaining procedurally
17  how the Senate works and so forth.
18  Q. Did you have any other communications with those
19  officials?
20  A. Not that I recall.
21  Q. Did you have any communications about SB 14 with
22  any interest group?
23  A. Other than there were people that testified in
24  the original hearing. I can't remember specific group.
25  Q. Do you remember whether you had communications or

---

263

1   anyone in your office had communications with any group
2   representing minority voters?
3      MR. SWEETEN: Hold on a minute. You can
4   answer as to the subject matter as phrased. Whether you
5   mad communications that's fine.
6   A. I'm trying to keep straight SB 146789 there are
7   groups that made their opinions on voter identification
8   in general for and against. I would say I probably had
9   indirect communications, meaning some sort of
10  constituent letter or e-mail or conversation in a
11  meeting. I'm sure that happened with group from both
12  sides, including minority workers case.
13  Q. Do you recall any with regard to Senate Bill 14
14  in particular?
15  A. I believe in the public testimony there were
16  testimony from MALDEF and NAACP and maybe LULAC
17  Q. Were there any meetings involving anyone from
18  Lieutenant Governor's office with any of those group
19  related to SB 14?
20  A. I would say we didn't have meetings with interest
21  group.
22  Q. Pardon?
23  A. We didn't have meetings with interest group as
24  you described them. We met with anyone who wanted to
25  have a meet?

---

264

1   Q. Did you or the Lieutenant Governor exchange
2   drafts with Senate Bill 14 with anybody?
3      MR. SWEETEN: Objection, compound.
4   A. Drafts of Senate Bill 14 I would have only
5   exchanged with Lieutenant Governor's staff and the
6   people I mentioned so far, the staff I mentioned so far.
7   Q. (By MS. WESTFALL) That is Ms. McCoy?
8   A. Correct.
9   Q. Ms. Jackson?
10  A. Correct.
11  Q. Anybody else?
12  A. Not that I recall.
13  Q. In drafting Senate Bill 14 did the Lieutenant
14  Governor or anyone in his office review any reports or
15  studies?
16     MR. SWEETEN: I'm going to object based upon
17  legislator privilege. You're asking for mental
18  impressions, thought processes related to pending
19  legislation and that is a matter that is subject to
20  legislative privilege as well as the deliberative
21  process privilege.
22  Q. (By Ms. Westfall) Do you have any testimony in
23  response to my question?
24  A. I'll assert the privilege.
25  Q. Did you consider including any forms of

BRIAN HEBERT                                          MAY 29, 2012

---

265

1    additional ID in Senate Bill 14?
2              MR. SWEETEN:  Same objection.  Do not reveal
3    any thoughts, communications or privileged
4    communications as we went over in legislative privilege.
5        A.  In the Senate Committee there was discussion of
6    previous drafts there was discussion of potential
7    amendments there was a lot of discussion.
8        Q.  (By MS. WESTFALL) And other than that, you're
9    asserting privilege in response to that answer?
10       A.  Correct.
11       Q.  Are you aware of any analysis that was conducted
12   regarding how many registered voters possessed the
13   required forms of ID under S B 14?
14             MR. SWEETEN:  Don't reveal thoughts, mental
15   impressions, or opinions about legislative for further
16   answer of the legislative process and don't reveal
17   communications.  You can refer to matters in the public
18   matter with respect to this question.
19       A.  Again, there was discussion in the public hearing
20   about the impact it would have on vote something
21   general, particular communities specifically regarding
22   internal communications.  I'll assert the privilege.
23       Q.  (By MS. WESTFALL)  Thank you.  Are you aware of
24   any analysis to determine if minority voters would be
25   disproportionately less likely to possess the additional

---

266

1    forms or ID allowed under SB 14?
2              MR. SWEETEN:  Same objection.  The question
3    asks you to reveal thoughts, mental impression, opinions
4    about legislations, rules, the potential communications
5    with State Agencies, State Legislative Staff,
6    Legislators, Legislative Council, therefore it'd be
7    legislatively privileged.  It also invades deliberative
8    process of privilege, therefore I'm instructing you not
9    to answer.
10       A.  Again, to the extent -- my answer would involve
11   internal communications.  I would assert the privilege.
12   But again in public -- in the testimony publicly, there
13   was a discussion I recall about how this would impact --
14   I mean, what percentages of different communities might
15   have or not have the identification.  And I believe that
16   was from the Secretary of State's office and from
17   Senators.
18             MS. WESTFALL:  What is the final -- what is
19   the decision that you're asserting with regard to
20   deliberative process privilege with regard to these
21   communications?
22             MR. SWEETEN:  Well, first of all, I am
23   honestly relying upon the legislative privilege.
24   However with respect to their deliberations with respect
25   to Senate Bill 14, I'm referring to that.  Those would

---

267

1    be subject to the privilege.
2              MS. WESTFALL:  Those are deliberations.  But
3    what was the decision since Lieutenant Governor Dewhurst
4    did not ultimately vote on Senate Bill 14; is that
5    correct?  So what is the decision that you are asserting
6    deliberative process over?
7              MR. SWEETEN:  As to decisions with respect
8    to any procedural aspect of the bill, the decisions that
9    they reviewed, that the processes were formulated -- so
10   it would be as to their actions with respect to the bill
11   --
12             MS. WESTFALL:  So that's --
13             MR. SWEETEN:  In addition to the legislative
14   privilege.
15             MS. WESTFALL:  I understand you're asserting
16   legislative privilege.  I'm going to ask you to withdraw
17   deliberative process privilege because I'm not -- unless
18   there's something else that you need to add on this
19   topic -- I'm not understanding what the decision is that
20   relates to these communications since the Lieutenant
21   Governor did not vote on this legislation he was
22   actively involved.
23             MR. SWEETEN:  He was also involved in the
24   Committee-of-the-Whole hearing.  It reflects the give
25   and take of the consultative process, which is something

---

268

1    that the court has recognized as being subject to the
2    deliberative process privilege.
3              MS. WESTFALL:  It's certainly deliberative,
4    but the court certainly had concerns about the
5    privileged logs produced previously and their failure to
6    identify the decision at issue.  So I would ask you to
7    identify on the record what the decision is or to
8    withdraw your privilege instruction based on
9    deliberative process.
10             MR. SWEETEN:  I think I have been clear.
11   We're talking about the Committee-of-the-Whole -- of the
12   whole process with respect to decisions about that
13   process, with respect to his role in that process, with
14   respect his role -- any role that he had with the Senate
15   Bill 14 legislation.  I think that that all -- those all
16   would be matters that are covered in addition to the
17   fact that I'm asserting legislative privilege.
18             MS. WESTFALL:  I understand the assertion of
19   legislative privilege.  We have plenty of testimony from
20   this witness that -- and it's clear from the face of the
21   Senate rules that the Lieutenant Governor is not able to
22   introduce legislation.  What I'm examining this witness
23   on right now is about his participation in drafting
24   Senate Bill 14 so I do not believe that deliberative
25   process privilege is an appropriate privilege to be

BRIAN HEBERT                                          MAY 29, 2012

## 269

1  interposing with regard to these questions.  I ask you
2  withdraw that privilege.  If you want to assert
3  legislative privilege, go ahead and do so, but not
4  deliberative process.
5       MR. SWEETEN:  I've made my objections.
6       Q.  (BY MS. WESTFALL)  Ms. McCoy testified in
7  deposition in this case that there were no studies at
8  all about the analysis of who has and ID the for
9  purposes of Senate Bill 14, either public or private
10  studies.
11      A.  Studies of -- I'm sorry, Texas?
12      MR. SWEETEN:  Let her ask her question.
13      Q.  Ms. McCoy testified in deposition in this case
14  that there are no studies at all about any analysis of
15  who has and ID for purposes of Senate Bill 14, you know,
16  either public or private studies.  Do you agree with her
17  testimony?
18      MR. SWEETEN:  In answering the question
19  don't reveal your thoughts, mental processes, opinions
20  about legislation or in furtherance of the legislative
21  process that would be legislatively privileged.  Don't
22  reveal the communications that we previously outlined in
23  answering the question.  So to the extent you can answer
24  it without revealing those, you can go ahead and do so.
25  Otherwise objection privileged.

## 270

1       A.  The question is, are there studies about Texas
2  voters?
3       Q.  (By MS. WESTFALL) Correct.
4       A.  Okay.  I think that's correct.  I don't remember
5  for sure.
6       Q.  Do you know what a citizenship certificate is?
7       A.  My understanding was that it's -- it's just that,
8  it's a certificate issued for various states of presence
9  in that state.
10      Q.  Do you know how much it costs to obtain one?
11      A.  I don't recall.
12      Q.  Do you know how much it would cost if you had one
13  and you need to replace it?
14      A.  I don't recall.
15      Q.  Do you know how long it would take to get a
16  replacement citizenship certificate?
17      A.  I don't recall.
18      Q.  Do you know how much it cost to obtain a U.S.
19  passport?
20      A.  I don't know exactly.
21      Q.  Do you know approximately?
22      A.  I think it's about -- there's a different price
23  for expedited versus regular.  I want to say it's
24  $60-something for the regular and then $100 for an
25  expedited-ish.

## 271

1       Q.  Do you know what documents you need to have to
2  get a U.S. Passport?
3       A.  I don't know the full list.  I know birth
4  certificate, driver's license, those sorts of documents.
5  I don't know the full list.
6       Q.  Do you know how long it takes to get a U.S.
7  passport?
8       A.  I don't recall.
9       Q.  Do you recall any conversations about not
10  including the non-photo forms of ID in Senate Bill 14 as
11  was permitted under Senate Bill 362?
12      MR. SWEETEN:  You can reveal whether or not
13  a conversation occurred on general subject matter, but
14  don't reveal the substance of the specific conversation.
15      A.  Yeah.  I don't recall specific conversations.
16  But I think we discussed the forms of ID.
17      Q.  (BY MS. WESTFALL)  What was the purpose of
18  excluding non-photo forms of ID as allowable in Senate
19  Bill 14?
20      MR. SWEETEN:  Don't reveal your thoughts,
21  mental impressions, or opinions about legislation or
22  furtherance of the legislative process, or
23  communications to legislative privilege.
24      A.  I'll assert privilege.
25      Q.  You'll assert privilege.  Are there any changes

## 272

1  that occurred in the state of election administration in
2  Texas or otherwise between 2009 and 2011 that made these
3  forms of identification unacceptable and not proving
4  one's identity under Senate Bill 14?
5       MR. SWEETEN:  The question asks you to
6  reveal mental impressions, opinions, and furtherance of
7  the legislation.  Therefore -- and also potentially
8  conversations that are privileged -- and therefore I'm
9  asserting legislative privilege.  I instruct you not to
10  answer.
11      Q.  (BY MS. WESTFALL)  Are you following the advice
12  of council?
13      A.  Yes.
14      Q.  Can you -- do you know anything about the
15  circumstances under which the license to carry a
16  concealed handgun was included as a form of photo ID in
17  Senate Bill 14?
18      MR. SWEETEN:  Same objection.  Instruct you
19  not to answer except for as to matters on the public
20  record.
21      Q.  (BY MS. WESTFALL)  Are you following advice of
22  council?
23      A.  Yes.
24      Q.  Do you know why Senate Bill 14 or what the
25  purpose was in not including Student IDs in the bill?

BRIAN HEBERT                                                    MAY 29, 2012

---

273

1          MR. SWEETEN:  You can answer questions per
2   the court order about the general purpose of Senate Bill
3   14.  However don't reveal thoughts, mental impressions
4   that would be subject to the legislative privilege or
5   the subjective intent of the legislator.
6          A.  I believe -- my memory is there may have been
7   some public debate about that issue during the Committee
8   hearing, but I don't remember the exact nature of it.
9          Q.  (By MS. WESTFALL)  Are you aware of any
10  conversations about the removal of Student IDs an
11  allowable form of ID from Senate Bill 14 and it's impact
12  on students at historically black colleges in Texas?
13         MR. SWEETEN:  Objection.  You're asking him
14  to reveal thoughts, mental impressions, or opinions,
15  about legislation or conversations that he had with
16  legislators, legislative staff, state agencies, or Texas
17  Legislative Council.  As such, the question that you're
18  asking imposed is subject to the legislative privilege.
19  If you want to ask a more general and have a general
20  topical subject matter description, you know, I'll let
21  him answer that as I have all day.  But as to the way
22  you've asked that question you're asking for very
23  specific conversation.
24         Q.  (By MS. WESTFALL)  Are you following the advice
25  of council?

---

274

1          A.  Yes.
2          Q.  Are you aware of any conversations, public or
3   private, concerning voter ID bills and historically
4   black colleges in Texas?
5          MR. SWEETEN:  I think we are a little beyond
6   general subject matter, but I'll let him answer if he's
7   aware of such conversations.
8          A.  I'm not aware.
9          Q.  How did the exception for individuals with
10  disabilities come to be included in Senate Bill 14?
11         MR. SWEETEN:  That's a matter subject to
12  legislative privilege and I instruct you not to answer.
13         Q.  (By Ms. Westfall) Are you following the advice of
14  council?
15         A.  Yes.
16         Q.  Could you describe, on the basis of the face of
17  the statute, the provisions in the bill pertaining to
18  the administration of the ID requirements at the polls
19  and how poll workers would determine whether the ID was
20  sufficient?
21         MR. SWEETEN:  The question -- since the
22  question is confined to the texts of the bill, you can
23  answer.
24         A.  Section 6 of the bill, at the bottom of Page 3,
25  looks like it requires training standards for election

---

275

1   workers to include provisions on acceptance and handling
2   of identification.
3          Q.  (By MS. WESTFALL)  Does the bill essentially
4   leave it to the Secretary of State to call and get
5   regulations on this -- not regulations, but guidelines?
6          A.  I believe the amended section of law here are
7   standards adopted by the Secretary of State.
8          Q.  Do you think the key to success of this bill,
9   Senate Bill 14, is the administration of the polls and
10  for poll workers to understand how they determine a
11  voter's identity?
12         MR. SWEETEN:  Her question is asking you to
13  reveal thoughts, mental impressions, and opinions and
14  legislation, therefore it's matter subject to the
15  legislator privilege.
16         Q.  (By MS. WESTFALL)  Are you following the advice
17  of council?
18         A.  Yes.
19         Q.  Can you describe the provisions in Senate Bill
20  14, based on the face of the bill, concerning the
21  Election Identification Certificate?
22         A.  The Election Identification Certificate on Page
23  13 requires, I believe it's DPS, Department of Public
24  Safety, to issue these cards to persons if they are a
25  registered voter in the State and eligible for

---

276

1   registration.  It provides they cannot collect a fee for
2   that certificate, or for a duplicate certificate, or any
3   replacement.  It says it can only be used for election
4   purposes and not for as a personal identification
5   certificate.  It provides election officers have to
6   accept that election ID as a valid form of
7   identification proof.  It says the election ID should be
8   similar to but distinguishable from the Driver's
9   License.  It requires provision of certain documents or
10  information to get the ID.  It allows the department to
11  decide when those certificates or identification cards
12  expire, except that once you reach 70 years of age, it
13  doesn't expire.
14         Q.  Was this provision related to election
15  identification certificates in the bill as filed first?
16         A.  My memory is that it was not filed.
17         MS. WESTFALL:  Let the record reflect the
18  witness is turning to Exhibit 81 or looking for
19  Exhibit 81.
20         MR. SWEETEN:  Caution the witness to review
21  Exhibit 81, the prior version of the bill.
22         MS. WESTFALL:  It's actually the filed
23  version of the bill.
24         THE WITNESS:  Election Identification
25  Certificate was not in the filed version.

BRIAN HEBERT                                          MAY 29, 2012

---

277

1   Q. At what stage in the process, based on the public
2   record did it become included in SB 14?
3   A. I don't have all of the different versions in
4   front of me and I can't remember if it was before it
5   passed the Senate or in conference Committee or in the
6   House maybe. Sometime after being filed.
7   Q. Thank you. Were you involved in the drafting of
8   this particular provision yourself?
9   A. Yes.
10  Q. Was the Election Identification Certificate in
11  previous photo ID bills and prior legislative sessions?
12  A. I don't think so.
13  Q. How did you develop this language in SB 14?
14          MR. SWEETEN: Objection. You're asking him
15  to reveal his thoughts, mental impressions, opinions
16  about legislation, legislative process and so subject to
17  legislative privilege.
18          MS. WESTFALL: Instruct him not to answer?
19          MR. SWEETEN: Instruct him not to answer.
20  Q. (BY MS. WESTFALL) Are you following your
21  counsel's advice?
22  A. Yes.
23  Q. Are you aware of any conversations about the
24  Election Identification Certificate to which you or
25  anyone in the Lieutenant Governor's office was a party

---

278

1   during the drafting process for Senate Bill 14?
2          MR. SWEETEN: You can answer.
3   A. Yes.
4   Q. (BY MS. WESTFALL) When was the first
5   conversation you're aware of?
6   A. Again, it would have been sometime after the
7   filing of the bill. Perhaps even after -- again I can't
8   remember without seeing each stage of the draft, I
9   recall exactly when it would have been.
10  Q. Who was a part of the communication?
11  A. Again, it would have been myself and probably
12  Janus McCoy, perhaps Senator Fraser. That's all I can
13  recall for sure.
14  Q. Was the Lieutenant Governor involved in any
15  conversations about the Election Identification
16  Certificate?
17  A. I don't believe so.
18  Q. How many conversations did you have with
19  Ms. McCoy?
20  A. About Identification Certificate?
21  Q. Yes?
22  A. Probably a handful.
23  Q. Did you have any e-mail communications with her?
24  A. Perhaps, but I don't recall specifically.
25  Q. Where you aware of any conversations concerning

---

279

1   the difficulty or steps necessary to take to obtain an
2   election certificate?
3   A. I'm sorry. Could you repeat that?
4   Q. Certainly. Certainly. Are you aware of any
5   communications or conversations concerning difficulty in
6   obtaining an Election Identification Certificate that
7   occurred during that drafting and consideration of SB
8   14?
9          MR. SWEETEN: I think this does more than
10  ask for a general subject matter topic, but you can go
11  ahead and answer the question as posed.
12  A. I don't recall specific conversations about it
13  being difficult to obtain one of these certificates.
14  Q. (BY MS. WESTFALL) Are you aware of any testimony
15  or public statements about difficulty of obtaining an
16  Election Identification Certificate?
17  A. I don't recall any.
18  Q. Are you aware of any analysis of the cost or
19  steps that a voter would need to take to obtain an
20  Election Identification Certificate?
21  A. Yeah --
22          MR. SWEETEN: In answering that questions it
23  would require you to reveal thoughts, mental
24  impressions, opinions about legislation, or
25  communications that are subject to the legislative

---

280

1   privilege. Therefore I instruct you not to answer the
2   question on the basis of legislative privilege.
3   Q. (BY MS. WESTFALL) Are you following council's
4   advice?
5   A. Yes.
6   Q. What documents are needed to obtain an Election
7   Identification Certificate under SB 14?
8   A. Looks like Subsection F allows the department to
9   require applicants to furnish information required by
10  and it refers to another section. So I think it's the
11  same sorts of documents required to get a Driver's
12  License.
13  Q. Do you know how much it costs to obtain those
14  underlying documents as you sit here today?
15  A. I don't recall.
16  Q. If an individual lacks those documents, is it
17  possible to get an Election Identification Certificate
18  without paying the cost for the underlying documents?
19          MR. SWEETEN: You're asking based upon the
20  text as written?
21          MS. WESTFALL: Yes.
22          MR. SWEETEN: And his current knowledge?
23          MS. WESTFALL: Yes.
24  A. I would have to see a list under 521142 that's
25  referenced here.

BRIAN HEBERT                                         MAY 29, 2012

---

281

1   Q. (BY MS. WESTFALL) If the documents needed for
2   the underlying forms of identification are not
3   themselves free, there's a cost to voting for those who
4   lack the necessary documents, is there not?
5   A. There's a cost to obtain the Certificate if this
6   is the only way, yes. There are also provisional ballot
7   provisions that allow you to vote without the proper --
8   Q. Right. And under those provisions under the face
9   of the statute, if you use a provisional ballot, your
10  ballot won't be counted unless you produce and supply an
11  appear before the County Election Official with a
12  necessary form of ID, correct?
13  A. Let me check. Looks like Page 6 there, if you
14  are disabled, that's an exception. But generally I
15  think you're right.
16  Q. Thank you. Do you know where a voter can obtain
17  an Election Identification Certificate?
18  A. It says the department may issue so I assume the
19  same place as you would get personal identification
20  certificates for a Driver's License.
21  Q. And that would be under the Department of Public
22  Safety?
23  A. Correct.
24  Q. That would be Driver's License offices; is that
25  right?

---

282

1   A. Correct. It looks like it's silent as the
2   different types of places.
3   Q. Do you know the hours of operation of those
4   offices, generally speaking?
5       MR. SWEETEN: Objection compound.
6   A. Of all driver's license offices in the State of
7   Texas?
8       MR. SWEETEN: And when you're providing this
9   answer, just don't reveal mental impressions, thoughts
10  or communications that occurred in formulating the bill.
11      THE WITNESS: Sure.
12      MS. WESTFALL: This is information about
13  hours of operation. How is this possibly something that
14  over which you could assert privilege? This is like
15  probably on a website, Patrick.
16      MR. SWEETEN: If it relates back to
17  information that he learned and would reveal his mental
18  impression, thoughts, or communications that incurred in
19  the time then that potentially is privileged. Again he
20  can answer as he is sitting here if he knows so I will
21  let him do that.
22  Q. (BY MS. WESTFALL) Do you know?
23  A. I believe the hours vary depending on the
24  location of the office.
25  Q. Does SB 14 require employers to provide paid

---

283

1   leave to -- for the time it takes to obtain an
2   identification?
3   A. I don't believe it does.
4   Q. Do you know whether some individuals and voters
5   in Texas live at least 50 miles from the Driver's
6   License office?
7       MR. SWEETEN: You can answer, if you know
8   while you're sitting here.
9   A. Yeah, I mean, as I sit today I don't know that
10  for sure.
11  Q. Do you know whether any group of minorities are
12  less likely than other groups to have the necessary
13  forms of ID under SB 14?
14      MR. SWEETEN: Objection to the extent that
15  the question calls for you to reveal thoughts, or mental
16  impressions, opinions about legislations, discussions
17  you had with legislators, legislative staff, state
18  agencies, Texas Legislative Council. Those matters
19  would be subject to the legislative privilege so do not
20  reveal those. You can refer to matters in the public
21  record.
22  A. So the question is: Are some minority groups
23  less likely to have photo identification than other
24  group? I don't know.
25  Q. (By MS. WESTFALL) Are you aware of any

---

284

1   conversations with the Department of Public Safety
2   during the drafting of SB 14 related to Election
3   Identification Certificates?
4       MR. SWEETEN: You can reveal whether or not
5   you're aware of such conversations. Do not reveal the
6   substance of those conversations.
7   A. I am not aware of conversations with the
8   Department of Public Safety.
9   Q. (By MS. WESTFALL) During any time during the
10  consideration of SB 14; is that right?
11  A. About Election Identification Certificates?
12  Correct.
13  Q. Yes. Thank you. And when did you last renew
14  your Driver's License?
15  A. I don't know. A year or two ago.
16  Q. Did you go in person?
17  A. Yes.
18  Q. What were the hours of operation of that office?
19  A. My memory is they were standard 8:00 to 5:00,
20  9:00 to 5:00 hours, but I can't recall for sure.
21  Q. How far that office from your home?
22  A. It was -- well, about 8 miles.
23  Q. Did you wait in a line to renew Driver's License?
24  A. No.
25  Q. Did you drive to get there?

BRIAN HEBERT                                           MAY 29, 2012

---

285

1    A. I walked from my office where I worked.
2    Q. Do you have a copy of your birth certificate?
3    A. Did I?
4    Q. Do you?
5    A. Yes.
6    Q. If you lost it, do you know how you would replace
7    it?
8    A. I'm not 100% sure.  I imagine I would contact the
9    State of birth.
10   Q. We talked a little bit about this, but could you
11   provide an overview based on the statute of the
12   provisional ballot provisions?
13        MR. SWEETEN:  You're asking him based upon
14   the text of the statute?
15        MS. WESTFALL:  Right.
16        MR. SWEETEN:  Of SB 14?
17        MS. WESTFALL:  Yeah.
18   A. So if you show up to vote -- and this is on Page
19   4 of the final -- never mind.  Wrong copy.  Looking at
20   the bill engrossed version as initially adopted, if a
21   voter shows up and does not have the required
22   identification he'd be accepted provisional voting at
23   which point the election officer shall inform them of
24   the right to cast a provisional ballot, provide them
25   written information listing the requirements for ID

---

286

1    procedures for presenting that ID, and a map showing
2    them where the identification must be presented.  And
3    then it says those provisions do not apply to a voter
4    who is disabled and prevents their Voter Registration
5    Certificate.
6    Q. So with the exception of that exception, if you
7    vote provisionally and you do not, within 6 days,
8    provide a form of the ID, your provisional ballot is not
9    counted; is that right?
10   A. I believe that's correct.
11   Q. Can you describe each and every purpose of Senate
12   Bill 14?
13        MR. SWEETEN:  You can answer the question,
14   provide the general purpose of the bill.
15   A. When you say purpose, you don't mean intent.  You
16   mean, what does the bill do on its face?
17   Q. (By Ms. Montgomery) Yes.  Well, purpose, you
18   know, per the court's order either public or private,
19   the purpose of the bill, any purpose?
20   A. So SB 14, again, looking at the statute --
21   Q. But this is not limited to looking at the
22   statute.  This is any purpose.  And I'm sure Mr. Sweeten
23   will let you testify.  Any purpose of the bill, public
24   or private, that you're aware of, pursuant to the order
25   of, I believe it was May 17th.

---

287

1    A. Sure.  Again, the general purpose of voter
2    identification and election reform bills would be to
3    ensure --
4    Q. I'm directing your attention to Senate Bill 14.
5    I'm sorry to interrupt you but I just want to make sure
6    the question is understood.
7    A. Sure.  As I stated earlier, to ensure the
8    integrity of the elections and instill confidence among
9    voters, certainly a purpose.  This particular bill also
10   has the purpose of making sure that voters are informed.
11   And making sure that poll workers are trained.
12   Q. Anything else?
13   A. I'm sure there are others.  But that seems to me
14   to be the main purposes.
15   Q. In terms of the basis and information and behind
16   why SB 14 furthers the integrity of elections; is there
17   anything other than the testimony you provided earlier
18   about that purpose with regard to an earlier iteration
19   of the bill that you would like to testify about today,
20   with regard to Senate bill 14?
21   A. I don't understand the question.  Can you read
22   that back, please?
23   Q. All right.  It's late in the day.  Let me
24   withdraw that question.
25        You testified earlier about how a previous Photo

---

288

1    ID Bill furthered the integrity of elections.  Do you
2    remember that testimony?
3    A. Yes.
4    Q. Does all that testimony apply to why Senate Bill
5    14 furthers the integrity of elections?
6    A. I believe, yes.
7    Q. Is there anything else that you want to testify
8    about as to why Senate Bill 14 promotes integrity of
9    elections?
10   A. I don't think so.
11   Q. You also testified earlier that a previous
12   iteration Photo ID Bill instilled confidence in voters,
13   did you not?
14   A. I believe that's right.
15   Q. Could you explain how SB 14 instills confidence
16   in voters?
17        MR. SWEETEN:  He's testified as to the
18   purpose of the bill.  You're now asking him why is the
19   purpose of the bill correct.  I think what you're asking
20   him to do is to reveal his thoughts, mental impressions,
21   or opinions with respect to the specific bill and I
22   think what you're asking him is subject to the
23   legislative privilege.  I will allow him to testify as
24   he has about the purpose of Senate Bill 14.  But I think
25   your questions beyond that are covered by the

BRIAN HEBERT                                                    MAY 29, 2012

---

289

1    legislative privilege.
2         A. I mean, I think -- again, there was testimony in
3    Committee that the bill was designed to do the things
4    that I just mentioned:  Increase the security of the
5    elections which has the impact of increasing the
6    integrity of those elections.
7         Q. (By MS. WESTFALL)  Is there any facts, analysis,
8    or information that you can testify about today that
9    would indicate that Texas voters have confidence in
10   their elections?
11        MR. SWEETEN:  Objection.  You're asking him
12   matters that would require him to reveal his mental
13   impressions, his opinions about legislation, or
14   furtherance of the legislative process and/or
15   communications that we've outlined previously.
16   Therefore this matter is legislatively privileged.  And
17   I object to the question on that basis.  You can answer
18   based upon matters of the public record.
19        A. I don't recall what evidence is in the public
20   record.
21        Q. (By MS. WESTFALL)  Thank you.  And are you --
22        A. I'm asserting privilege otherwise.
23        Q. Thank you.  Was any part of the purpose of SB 14
24   to decrease the number of Hispanic voters?
25        MR. SWEETEN:  You can testify about the

---

290

1    purpose of the bill.
2         A. Looking at the bill, the purpose is not to
3    decrease voting by any particular group, except the
4    group of ineligible voters.
5         Q. (By Ms. Montgomery)  But not based solely on the
6    face of the bill -- I'm talking about the public and
7    private purposes.  I'm -- the court has allowed inquiry
8    as to the public and private purposes of bills pursuant
9    to its May 17th order.  So not limiting your answer to
10   the face of the bill, was any part of the purpose of
11   Senate Bill 14 to decrease the number of Hispanic
12   voters?
13        MR. SWEETEN:  You can answer.  The court has
14   said that it is -- that to the extent such as privilege
15   the privilege does not protect testimony with respect to
16   the general purpose or the purpose of a Legislature as a
17   whole in enacting Senate Bill 14 as opposed to the
18   subjective intent of the Legislature.  Therefore you can
19   answer based upon what the court has said you can
20   testify to about the purpose.
21        A. I'm not aware of any legislative purpose to
22   decrease Hispanic voters turnout.
23        Q. (By MS. WESTFALL)  Was any part of the purpose of
24   Senate Bill 14 to decrease the number of any other group
25   of minority voters?

---

291

1         A. I'm not aware of any legislative incentive to
2    decrease turnout among any group of voters.
3         Q. Was any part of purpose of Senate Bill 14 to
4    discriminate in any way against any group or groups of
5    minority voters?
6         A. I'm not aware of any legislative intent to
7    discriminate against any group of voters.
8         Q. Was any part of the purpose of Senate Bill 14 for
9    partisan purposes?
10        A. Partisan?  You mean Republican versus democrat?
11        Q. Correct.
12        A. I'm not aware of any legislative intent based on
13   partisanship.
14        Q. And I believe you testified earlier that part of
15   the purpose of Senate Bill 14 was to inform voters and
16   train poll workers.  Are both of those items with regard
17   to the requirements of Senate Bill 14?
18        A. Yes.
19        Q. Did the purpose of photo ID in Texas evolve over
20   time and change in any way from one session to the other
21   in your view?
22        MR. SWEETEN:  I'm going to object.  That
23   calls for him to reveal matters that are subject to the
24   legislative privilege including his thoughts, mental
25   impressions, opinions about legislation or in

---

292

1    furtherance of the legislative process.
2         MS. WESTFALL:  I'm asking his opinion about
3    purposes which I'm allowed to examine on.  So I'm not
4    certain I'm asking his analytical ability of discussing
5    purpose to purpose to purpose which he's testified about
6    today.  So I'm not certain why you would be directing
7    him not to answer my question, Mr. Sweeten.
8         MR. SWEETEN:  Well, just to be clear.  He's
9    answered the question on the general purpose of the
10   bill.  He's answered the question on the general purpose
11   of the other statutes that -- presented in front of him.
12   So to the extent that you're asking him that, I will let
13   him answer the question as to purpose.  So you can go
14   ahead and answer with that instruction.
15        A. I would say generally the purpose has been the
16   same.  I mean, given that there are different sponsors,
17   again, when you say purpose, I hear intent.  And I don't
18   know the intent of any given sponsor, or voter, on the
19   supporter of this bill.
20        Q. (By MS. WESTFALL)  Yes.  I'm not asking about the
21   intent.
22        A. Right.
23        MR. SWEETEN:  Let him finish if you would.
24   He's not finished with his answer.  You can finish.
25        A. So, yes.  Generally speaking, the purpose as you

BRIAN HEBERT                                           MAY 29, 2012

---

293

1   mean it of each of these versions of the bill has
2   remained similar.
3       Q.  (BY MS. WESTFALL)  And is it true that the
4   Lieutenant Governor has consistently indicated that one
5   of his purposes was to prevent non-citizens from voting?
6       MR. SWEETEN:  Don't reveal matters or
7   discussions that you've had with the Lieutenant Governor
8   that would invade the attorney/client privilege.  Also
9   that would be subject to the legislative privilege.  You
10  can testify as to matters of the public record and
11  public statements.
12      A.  Right.  I'm not aware of any statements that
13  indicate that was his intent.
14      Q.  (BY MS. WESTFALL)  Okay.  Well, remember you
15  testified about U.S. Exhibit 3 concerning a letter in
16  the Texas Weekly that related to the purpose of photo
17  ID --
18      A.  Right.
19      Q.  In preventing non-citizens from voting.  Does
20  that refresh your recollection as to one of the
21  Lieutenant's Governor's intents and purposes in
22  promoting the issue of voter ID?
23      MR. SWEETEN:  He's not going to testify
24  about someone's subjective intent.  He can testify about
25  whether or not something was -- a statement was made on

---

294

1   the public record.  But what you're asking him to do is
2   to reopen communications that he may have had with
3   Lieutenant Governor Dewhurst which would be both
4   protected by the attorney/client privilege as well as
5   the legislative privilege.
6       MS. WESTFALL:  I'm asking about an article
7   that was published in the Texas Weekly so it seems to me
8   to be fairly public.
9       MR. SWEETEN:  You're asking about intent of
10  the statement.  And the intent of the statement, again,
11  is a legislative privilege as well as the
12  attorney/client privilege.  He can testify about whether
13  or not a statement was made, but he's not going to
14  testify about the subjective intent which is something
15  specifically prohibited in the court.
16      A.  I believe your earlier question was the purpose
17  of Lieutenant Governor Dewhurst to prevent non-citizen's
18  from voting.
19      Q.  (BY MS. WESTFALL)  Yes.
20      A.  And I said no.  The Texas Weekly article to which
21  you referred appears to have two versions of the letter.
22  And I can't remember which one was deemed to be the
23  official statement and which was a draft or not.  The
24  short answer, again, is:  I'm not aware of that being
25  the purpose for Lieutenant Governor to support the bill,

---

295

1   given public statements.
2       Q.  Was any purpose of any Photo ID Bill to increase
3   voter turnout?
4       MR. SWEETEN:  Objection.  Asked and
5   answered.  He's provided the purpose of each of the
6   bills.  You can answer as to the general purpose of the
7   legislation.
8       A.  Again, I would say that, yes, I'm more confident
9   in electorate that turns out in greater numbers.
10      Q.  (BY MS. WESTFALL)  So are you amending your
11  response to my question about each and every purpose of
12  Senate Bill 14 to include -- one of the purposes was to
13  increase voter turnout?
14      MR. SWEETEN:  Objection argumentative.  You
15  can answer.
16      A.  My understanding was that you are asking me to
17  clarify and give more detail about an existing answer.
18  So my answer is the purpose of the bill -- one of the
19  purposes, the one that I would identify was to insure
20  the integrity of the elections and instill confidence in
21  the voting public.  Whether that results in an increased
22  turnout might be ineffective and maybe it's the purpose
23  of it depending on how you characterize it.
24      Q.  (BY MS. WESTFALL)  Is it your testimony here
25  today that one of the purposes was to increase turnout?

---

296

1       MR. SWEETEN:  Objection.  Asked and
2   answered.
3       A.  I would repeat it's -- whether it's characterized
4   as an effective legislation, or a purpose, or an intent,
5   I'm not sure.  But I think it's a possibility.
6       Q.  (BY MS. WESTFALL)  Are you aware of any incidents
7   of in-person voter impersonations in the State of Texas
8   in the last 20 years?
9       MR. SWEETEN:  Hold on.  When you're
10  answering the question don't reveal thoughts, mental
11  impressions, opinions about legislation, including
12  discussions or conversations you had with legislatures,
13  legislative staff, State Agencies, Texas Legislative
14  Council.  You can answer it based upon matters of the
15  public record or as you're sitting here right now the
16  question is what are you aware of.  And it doesn't
17  invade those privileges then you can answer that
18  question.
19      A.  I don't recall how much of the public testimony
20  -- and are we talking about SB 14 now?
21      Q.  (BY MS. WESTFALL)  Yes.
22      A.  I don't recall how much of the public testimony
23  of SB 14 involved examples of in-person voter fraud.
24      Q.  I'm sorry.  You don't recall any public
25  testimonies ever?

BRIAN HEBERT                                              MAY 29, 2012

## 297

1    A.  I don't recall whether the public testimony
2    included examples of in-person voter fraud.
3    Q.  How many incidences of mail-in voter fraud have
4    occurred in Texas in the last 20 years?
5         MR. SWEETEN:  In answering this question
6    don't reveal matters that are subject to the legislative
7    privileges I have outlined today.
8    A.  Right.  I don't know that number.
9    Q.  (By MS. WESTFALL)  Have you heard of any voters
10   who did not participate in an election because they were
11   concerned that voter fraud would cancel out their vote?
12        MR. SWEETEN:  Same objection, same
13   instructions.  You can answer as to matters of the
14   public record, but don't reveal matters subject to the
15   legislative privilege.
16   A.  Again, I don't recall all of the public provide
17   testimony specifically.
18   Q.  (By MS. WESTFALL)  Do you think Senate Bill 14,
19   if ultimately able to be implemented, will result in
20   increased turnout in Texas?
21        MR. SWEETEN:  When you're answering the
22   question don't reveal matters that are subject to the
23   legislative privileges.  You can answer if your answer
24   will not reveal those matters.
25   A.  I don't know what will happen.

## 298

1    Q.  (By MS. WESTFALL)  Did the Lieutenant Governor
2    play any role in developing the strategy to insure that
3    Senate Bill 14 would be passed?
4         MR. SWEETEN:  Objection.  You're asking him
5    to reveal thoughts, mental impressions, conversations he
6    may have had with Lieutenant Governor Dewhurst as well
7    as his -- any specific roles he may have had or
8    discussions with legislators.  So to the extent that
9    what she's asking calls upon matters that are subject to
10   legislative privilege, I would instruct you not to
11   answer the question.  You can answer based upon the
12   public record or matters of -- that are public as to
13   those matters.
14   A.  I'll assert the privilege.
15   Q.  (By MS. WESTFALL)  Are you aware of any
16   conversations surrounding how to prevent what happened
17   in 2009 with voter ID from happening again in 2011?
18        MR. SWEETEN:  I'm going to instruct you on
19   the legislative privilege, don't reveal communications
20   that you've had regarding this bill.
21   A.  Could you clarify what you mean?
22        MR. SWEETEN:  Sorry.  With the individuals
23   that I've already outlined previously.
24   Q.  (By MS. WESTFALL)  You testified earlier that
25   voter ID failed in 2009, right?

## 299

1    A.  Right.
2    Q.  Are you aware of any conversations about that
3    failure in 2009 and how to avoid such failure in 2011?
4         MR. SWEETEN:  You're asking about the
5    specific substance of the communication.  You're asking
6    matters that would require him to reveal matters that
7    are subject to the legislative privilege.  Accordingly,
8    I'm going to instruct him not to answer.  Also you
9    potentially are asking questions that may relate to the
10   attorney/client privilege or that deliberative process
11   privilege.
12   Q.  (By MS. WESTFALL)  Do you have any testimony?
13   A.  No.  I'll assert the privilege.
14   Q.  Is it true that the Lieutenant Governor reserves
15   low bill numbers for priority bills?
16        MR. SWEETEN:  You can testify about matters
17   in the public record general procedure.
18   A.  I believe that's right.
19   Q.  (By MS. WESTFALL)  And did Lieutenant Governor
20   not have any involvement in SB 14 until Senator Fraser
21   filed it in 2011 -- 2010, sorry.
22        Mr. Sweeten:  Objection to the question as
23   vague.
24   A.  I don't know if he did.
25   Q.  (By MS. WESTFALL)  If you learned that

## 300

1    Ms. Rathgeber just testified to that effect, would it
2    surprise you?
3    A.  That she testified to the effect?
4    Q.  That she testified that the Lieutenant Governor
5    had no involvement in SB 14 until Senator Fraser filed
6    it in November 2010?
7         MR. SWEETEN:  Objection asked and answered.
8    A.  Does it surprise me?
9    Q.  (By MS. WESTFALL)  Does it sound accurate?
10        MR. SWEETEN:  Same objection asked and
11   answered.
12   A.  I'm not aware of any such meetings or
13   involvement.
14   Q.  (By MS. WESTFALL)  Are you aware that the
15   Lieutenant Governor asked Senator Fraser to re-file his
16   bill in order to have a lower number?
17        MR. SWEETEN:  Don't reveal communications
18   that are subject to legislative privilege.  She's just
19   asking a very specific question about a conversation
20   that would require you to do so.  I'll instruct you not
21   to answer.  I would advice council that he can answer
22   about a specific conversation as long as it does not
23   reveal the subject matter of the communication which you
24   are doing so in your question.
25   Q.  (By MS. WESTFALL)  Do you have any testimony?

BRIAN HEBERT                                                      MAY 29, 2012

## 301

1      A.  No.
2      Q.  Are you asserting the privilege based on advice
3  of council?
4      A.  Yes.
5      Q.  Are you aware of the Senate 2011 rules?
6      A.  Generally, yes.
7      Q.  And did those rules similar to the 2009 rules
8  include Rule 5.11 concerning special orders and Voter ID
9  Legislation?
10     A.  My memory is that they did, but I can't be
11 certain.
12     Q.  Was SB 14 considered by any Senate Committees?
13     A.  I believe it was considered by the
14 Committee-of-the-Whole.
15     Q.  What role did the Lieutenant Governor play in
16 consideration of Senate Bill 14 by the
17 Committee-of-the-Whole?
18         MR. SWEETEN:  You can testify as to matters
19 of the public record.  Don't reveal matters that are
20 subject to the privilege or the to attorney/client
21 privilege, including conversations you had with
22 Lieutenant Governor Dewhurst.
23     A.  My memory from the Committee was that Lieutenant
24 Governor Dewhurst sat among the Senators and I can't
25 recall if he asked questions of the witnesses or not.  I

## 302

1  believe he voted in favor of the bill.
2      Q.  (By Ms. Montgomery) Did you play any role during
3  the Committee's consideration of Senate Bill 14?
4          MR. SWEETEN:  Objection to the question as
5  vague.  You can answer to the extent you understand it.
6      A.  I was also in the Committee on the floor
7  available as I sometimes was for questions from any
8  Senator.
9      Q.  (By MS. WESTFALL)  Were you charged with advising
10 the Lieutenant Governor, providing him with information
11 if Senators had inquiries of Lieutenant Governor about
12 the bill?
13     A.  I mean, my job was to be general counsel for the
14 Lieutenant Governor.  So I acted like I would have on
15 any other work day, I suppose.
16     Q.  During the floor debate on Senate Bill 14, did
17 anyone raise concerns about the bill's impact on
18 minority voters?
19     A.  My memory is that the public testimony did
20 include testimony about that.
21     Q.  Who made -- who raised those concerns?
22     A.  My memory is that concerns were raised by some
23 Senators in opposition to the bill, and perhaps from
24 some of the invited, and public testimony.
25     Q.  Were any changes made to Senate Bill 14 as a

## 303

1  result of those concerns being aired?
2          MR. SWEETEN:  Don't reveal thoughts, mental
3  impressions, or opinions about legislator or
4  communications that you've had with Lieutenant Governor
5  Dewhurst, with legislators, legislative staff, State
6  Agencies, Texas Legislative Council.  You can answer to
7  the extent that you can reveal matters that are not
8  privileged or that are matters of the public record.
9      A.  Looking at the file version of the bill -- the
10 final version of the bill, there are several changes
11 that were made.
12     Q.  (By MS. WESTFALL)  What were those?
13     A.  As we discussed earlier the Election
14 Identification Certificate, the forms of ID acceptable,
15 provisional ballot process.  There may be others I'm
16 forgetting.  I can looking back through if you'd like.
17     Q.  And are these changes that were made from when it
18 was filed to when it was passed?
19     A.  The ones I just described, yes.
20     Q.  And do any of those respond specifically to the
21 concerns raised by legislators and others about the
22 impact of the bill on minority voters?
23         MR. SWEETEN:  Again, don't reveal your
24 mental impressions, your opinions about legislation, or
25 the furtherance of the legislative process, or

## 304

1  communications that I've outlined previously.  To the
2  extent you can refer to matters of the public record,
3  you can do so.
4      A.  My memory is that minutes were successfully added
5  on the floor -- I mean, in the Committee to -- I don't
6  remember for sure, by Senator Hinojosa and Senator Lucio
7  who had earlier expressed concerns generally about the
8  impact of the bill.  And I believe they were both
9  successful in adding amendments.
10     Q.  (By Ms. Montgomery) Do you remember what the
11 substance of those amendments were?
12     A.  I believe Senator Hinojosa was added to related
13 to the Concealed Handgun License as an acceptable form
14 of ID.  And I believe Senator Lucio dealt with whether
15 expired licenses could be used or not.  The length of
16 time at which a license could be expired and still be
17 acceptable as proof of ID.
18     Q.  And how do those amendments mitigate the impact
19 of the bill on minority voters?
20         MR. SWEETEN:  On that question don't reveal
21 any mental impressions, opinions, about legislation, or
22 furtherance of the legislative process, or other matters
23 that were subject to the conversations we discussed
24 previously.  To the extent you can refer to matter of
25 the public record, you can do so.

BRIAN HEBERT                                              MAY 29, 2012

## 305

1    A. I think from what I remember in their testimony
2    their purpose in introducing those amendments was to
3    increase the acceptable forms of ID. Presumably that
4    would have an impact on all voters including minority
5    voters.
6         Q. (By MS. WESTFALL) What does it mean when a
7    legislator says on the Senate floor, I am not advised?
8              MR. SWEETEN: Objection. Calls for
9    speculation. You can answer to the extent you know.
10        A. I think it depends on who is saying it and the
11   context.
12        Q. (By MS. WESTFALL) When Senator Fraser said, "I
13   am not advised", dozens and dozens of times
14   during consideration of SB 14, how did you interpret
15   that statement?
16             MR. SWEETEN: Objection calls for
17   speculation. Objection compound. You can answer.
18        A. The way I take it, hearing it now, is that he
19   didn't know for sure. But I don't know.
20        Q. (By MS. WESTFALL) Is it part of the Bill
21   Sponsor's role as the author of Senate Bill 14 to field
22   questions from other Senators on the floor during the
23   debate?
24        A. It's typical for a Bill Sponsor to take
25   questions.

## 306

1         Q. Would you say it's typical or atypical to say, "I
2    am not advised", as many times as Senator Fraser did
3    during the debate of SB 14?
4              MR. SWEETEN: Let me interpose an objection.
5    Objection calls for speculation. You can answer to the
6    extent you know, based on public record.
7         A. I would it's atypical for a debate to last that
8    long. And so if he said I'm not advised more often it
9    might be -- in part it's because the debate was so long.
10        Q. (By MS. WESTFALL) How long was the debate of SB
11   14?
12        A. I don't recall exactly. Hours and hours.
13        Q. So you think it was routine for a Bill Sponsor to
14   have that response to so many questions based on the
15   length of the testimony -- I mean based on the length of
16   the consideration; is that your testimony?
17             MR. SWEETEN: Objection. Calls for
18   speculation. Objection. Vague. You can answer.
19        A. I would say it's probably not typical of a
20   Senator. But I honestly, I'm not sure it's typical of
21   Senator Fraser or not.
22        Q. (By MS. WESTFALL) Do you believe that Senator
23   Fraser in fact did not know the answer to all those
24   questions?
25             MR. SWEETEN: Objection. Calls for

## 307

1    speculation. You can answer to the extent that -- you
2    can answer.
3         A. I don't know.
4         Q. (By MS. WESTFALL) Is it possible that he knew
5    the answer to some of those questions but didn't want to
6    state the answers on the Senate floor?
7              MR. SWEETEN: The same objection. Calls for
8    gross speculation but go ahead.
9         A. Is it possible that he knew the answer to some of
10   the questions he said he was unadvised on. Again,
11   anything is possible but I certainly don't know.
12        Q. (By MS. WESTFALL) Some minority legislators who
13   listen to the repeated assertion of, "I am not advised",
14   might have felt that the lack of substantive response
15   about the impact of SB 14 on minority voters might be --
16   might be viewed as a lack of concern for those issues.
17   Did you have that feeling as you watched the debate?
18             MR. SWEETEN: Objection. Relevance.
19   Objection, to the extent you're asking him about
20   communications he may have had with anybody, don't
21   reveal those. You can answer the question, though to
22   the extent she's asking you questions that are public
23   record. So, go ahead.
24        A. So the question is: In my opinion, did Senator's
25   Fraser's handling of the debate in saying, "I am not

## 308

1    advised", that was the word you used --
2         Q. (By MS. WESTFALL) Callous.
3         A. Callous. Before you said -- That it was not --
4    you phrased it differently.
5         Q. That it was not -- I'm not sure what the question
6    was. But it was showing a lack of regard for those
7    issues.
8         A. I did not and I don't interpret it as a lack of
9    regard for any particular population.
10        Q. Are you aware of any communications concerning a
11   less restrictive means of achieving the same purpose of
12   SB 14 than what is set forth in SB 14?
13             MR. SWEETEN: Okay. I'm going to instruct
14   you as to legislative privilege and specifically I'm
15   going to instruct you, don't reveal thoughts, mental
16   impressions, or opinions about legislation or in
17   furtherance of the legislative process. Don't reveal
18   communications you've had with Lieutenant Governor Dewhurst,
19   members of the Lieutenant Governor's office,
20   legislators, legislative staff, State Agencies, or Texas
21   Legislative Council in answering the question.
22        A. Okay, I -- could you explain what you mean by
23   less restrictive?
24        Q. (By MS. WESTFALL) Are you aware of any
25   communications about whether there could be more

BRIAN HEBERT                                                    MAY 29, 2012

---

### 309

1  expansive set of allowable forms of ID in SB 14 and
2  still accomplish the same purpose of the legislature in
3  enacting SB 14?
4       MR. SWEETEN:  You're asking him about
5  specific conversations and the substance of specific
6  conversations.  I think those are subject to legislative
7  privilege.  I'm going to instruct you not to answer on
8  that basis.  If council wants to rephrase it without all
9  the substance of the conversation in it I will allow him
10 to answer the question as to who was involved, when the
11 conversation was, who were the parties, et cetera.
12      Q.  (By MS. WESTFALL)  My question stands.  Do you
13 have any testimony in response?
14      A.  I'll assert privilege.
15      Q.  Are you familiar with the Georgia Photo ID Law?
16      A.  Generally, yes.
17      Q.  Did you review it at the time when you were
18 involved in drafting Photo ID Laws?
19      MR. SWEETEN:  I think the question asks him
20 to reveal thoughts, his mental impressions, and opinions
21 in the process by which legislative -- Senate Bill 14 or
22 legislative acts, including Senate Bill 14, was passed.
23 You don't have to reveal your thought process with
24 respect to that.  That's subject to the legislative
25 privilege.

---

### 310

1       Q.  (By MS. WESTFALL)  Are you aware that the Georgia
2  Photo ID Law allows for the use of photo ID issued by
3  any entity of the United States, Georgia, or another
4  State entity?
5       MR. SWEETEN:  You can answer whether you're
6  aware.
7       Q.  (By MS. WESTFALL)  Based on the -- just based on
8  the face of the law?
9       A.  That sounds right to me.
10      Q.  And are you aware that the Georgia ID allows for
11 the use of valid employee cards?
12      A.  That sounds right.
13      Q.  Are you aware that the Georgia ID Law allows for
14 expired IDs to be used that are photo in nature?
15      A.  I don't know that.  I don't recall that.
16      Q.  Is it fair to say that there are differences
17 between the Georgia Photo ID Law and SB 14?
18      A.  From what I remember, yes.
19      Q.  Is it fair to say that SB 14 provides for a more
20 restrictive and narrower set of forms of allowable photo
21 ID than does the Georgia Law?
22      MR. SWEETEN:  You can answer based upon the
23 text of the bills as they exist.
24      A.  My memory is that there are fewer forms of
25 acceptable ID in Texas than in Georgia.

---

### 311

1       Q.  (By MS. WESTFALL)  And does the same hold true
2  with regard to the Indiana Photo ID Law?
3       A.  I would have to review the Indiana Law.
4       Q.  Could you mark this as U.S. 16?
5           (Exhibit No. 82 was marked.)
6       Q.  (By MS. WESTFALL)  Would you mark it as 82,
7  please?  I'm handing you what's been marked as U.S. 82
8  do you recognize this document?
9       A.  That looks like Indiana's Motor ID Law.
10      Q.  Can you take a look at the first page of the
11 document where it list allowable forms of ID and defines
12 proof of identification.  Do you see that?
13      A.  Uh-huh.  Yes.
14      Q.  And does it allow for use of photo ID issued by
15 the United States or the State of Indiana?
16      A.  Yes.
17      Q.  And is that different from SB 14?
18      A.  Yes.
19      Q.  Is it fair to say that SB 14 is more restrictive
20 than the Indiana Photo ID Law, on its face?
21      A.  There are probably fewer acceptable
22 identifications under the SB 14 Law.
23      Q.  Are you familiar with the amendments that were
24 offered to SB 14 on the Senate floor?
25      A.  Generally.

---

### 312

1       Q.  Are you aware of an amendment introduced by
2  Senator Davis that would have allowed the use of ID that
3  is either unexpired or has expired sometime since the
4  past election?
5       A.  I don't recall that one specifically.
6       Q.  Did the Lieutenant Governor vote on any of the
7  amendments to SB 14?
8       A.  I don't recall that either.
9       Q.  Did you play any role in advising the Lieutenant
10 Governor about any of the amendments that were offered
11 to SB 14?
12      MR. SWEETEN:  You can answer, but don't
13 reveal the substance of the conversation.
14      A.  Certainly not for all of them.  It's possible I
15 gave them some input on some of them.
16      Q.  (By MS. WESTFALL)  Do you recall which ones?
17      A.  No.
18      Q.  Are you aware of any amendments that would have
19 mitigated the impact of Senate Bill 14 on minority
20 voters as you sit here today?
21      MR. SWEETEN:  Objection.  I think you are
22 going into his mental processes, his mental impressions
23 about legislation or furtherance of the legislative
24 process.  If you want to ask as to the text of the bill,
25 sitting here he can answer that, but otherwise I think

BRIAN HEBERT                                          MAY 29, 2012

---

### 313

1   that's legislative privilege.
2       Q.  (By MS. WESTFALL)  Do you have an answer?
3       A.  So the question is, please?
4       Q.  Are you aware of any amendments that would have
5   mitigated the impact of Senate Bill 14 on minority
6   voters?
7       A.  My memory is --
8           MR. SWEETEN:  Same objection and
9   instruction.
10      A.  My memory is from the debate that some amendments
11  were offered and the author maybe said that that was the
12  intended effect.  But I'm not sure which of those were
13  adopted or if that was an actual effect.
14      Q.  (By MS. WESTFALL)  I see.  When did the Senate
15  pass Senate Bill 14?
16      A.  I don't remember the date.  It would have been in
17  January of 2011.
18      Q.  Was it -- was it approximately 2 weeks from the
19  date of filing of the bill or receipt of the bill and
20  the Senate until when it was passed by the Senate in
21  January 2011; is that about right?
22      A.  That sounds about right.
23      Q.  Is that kind of unusual for a bill to be received
24  by the Senate and passed within two weeks?
25      A.  It's not unusual for an emergency bill.

### 314

1       Q.  I see.  And how many emergency bills are you
2   aware of based on your experience working for the
3   Lieutenant Governor?
4       A.  I think there were six or eight last session.
5   There are at least a few every session.
6       Q.  Were they all passed in the Senate within
7   two weeks in January?
8       A.  I don't know.
9       Q.  Do you know of any others that were passed within
10  two weeks in January?
11      A.  I don't recall examples.
12      Q.  Did the Lieutenant Governor play any role in
13  conferring with or having any discussions with Senators
14  about amendments?
15          MR. SWEETEN:  Objection.  I think you're
16  asking him to reveal conversations that he may have had
17  with Lieutenant Governor Dewhurst, that he or Lieutenant
18  Governor Lieutenant Dewhurst may have had the
19  legislators, legislative staff, State Agencies, Texas
20  Ledge Council, or to reveal thoughts, mental
21  impressions, or opinions about the legislation.  You can
22  answer as to matters that are of public record.
23      A.  I'm not aware of any public conferring between
24  Lieutenant Governor and senators.  And I'll assert
25  privilege as to any private conversation.

### 315

1       Q.  (By MS. WESTFALL)  Are you aware of any
2   conversations between Lieutenant Governor or staff
3   related to any amendments offered by opponents of the
4   bill?
5           MR. SWEETEN:  You can answer.
6       A.  Communications between opponents of the bill and
7   Lieutenant Governor staff.  So did I have those
8   conversations or did someone on our staff?  I think
9   there were conversations on the floor during the debate.
10      Q.  (By MS. WESTFALL)  Any other conversations that
11  did not occur in the debate?
12      A.  I don't recall.  I'm not sure.
13      Q.  Did you have -- did you monitor Senate Bill 14
14  once it was passed to the Senate and went to the House?
15      A.  Yes.
16      Q.  Could you describe your monitoring of Senate Bill
17  14 once it went to the House?
18          MR. SWEETEN:  You can answer, but in doing
19  so don't reveal communications you've had with
20  Lieutenant Governor with Legislators, Legislative Staff,
21  State Agencies, Texas Legislative Council.
22      A.  The bulk of my activity was charting the progress
23  of the bill, being -- again, as I mentioned earlier,
24  being available as a resource for anyone including House
25  and staff, House members and their staffs on the lawyer

### 316

1   or staffer from the Senate.
2       Q.  (By MS. WESTFALL)  Did the Lieutenant Governor
3   play any role in the Conference Committee's
4   consideration of Senate Bill 14?
5           MR. SWEETEN:  You can testify as to matters
6   of public record.  Don't reveal communications that
7   would be subject to legislative privilege.
8       A.  Yeah.  I'm not aware of any sort of public
9   pronouncements of his role with members of the
10  committee.
11      Q.  He appointed the conferees; did he not?
12      A.  Yeah.  To clarify.  Beyond appointing them.  But
13  I think your questions was the process of that
14  Committee.
15      Q.  Did -- are you familiar with the changes to SB 14
16  that occurred during conference?
17      A.  I would -- I would -- I don't recall.  Is the
18  short answer.  I would need to look at different
19  versions to be sure.
20      Q.  And was the Election Identification Certificate
21  Provision inserted into the bill in conference?
22      A.  It's possible.
23      Q.  Are you aware of whether that provision and
24  perhaps others outside of the versions of SB 14 passed
25  in the House and Senate were put into the bill in

BRIAN HEBERT                                        MAY 29, 2012

## 317

```
 1   conference?
 2       A.  I can't be sure about the timing of it.
 3       Q.  Are you aware that during the conference
 4   Committee, the committee removed a provision from the
 5   bill that would have required voter education targeted
 6   at low income and minority voters?
 7       A.  I don't recall that.
 8       Q.  Are you aware of any conversations involving
 9   Lieutenant Governor on whether SB 14 might
10   disproportionately impact minority voters?
11           MR. SWEETEN:  I'm going to object based upon
12   legislative privilege.  Don't reveal, in answering the
13   questions she's asking, reveal substance of
14   communications that Mr. Dewhurst may have had with
15   others.  Don't reveal those.  Those are subject to the
16   attorney/client privilege or the legislative privilege.
17       A.  I'm not aware of any public discussions like that
18   and I'll assert privilege on other internal
19   communications.
20       Q.  (By MS. WESTFALL) Are you aware of any
21   communications that the Lieutenant Governor had about an
22   obligation to adhere to Section 5 of the Voting Rights
23   Act with regard to Senate Bill 14?
24           MR. SWEETEN:  Don't reveal matters that are
25   subject to the attorney/client privilege or matters of
```

## 318

```
 1   legislative privilege.  You can reveal public testimony
 2   on the issue.
 3       A.  I don't recall all of his public statements and
 4   I'll assert privilege as to internal communications.
 5       Q.  (By MS. WESTFALL) Have you ever heard of any
 6   Texas State Legislator who voted in favor of SB 14,
 7   saying that it would prevent racial or ethnic minorities
 8   from voting in Texas?
 9           MR. SWEETEN:  Did you say testimony,
10   Elizabeth?  Can you read the question?
11       Q.  (By MS. WESTFALL) Have you ever heard any Texas
12   State Legislator who voted in favor of Senate Bill 14
13   say that it would prevent racial or ethnic minorities
14   from voting Texas?
15           MR. SWEETEN:  Don't reveal communications
16   that you've had with Legislators, Legislative Staff,
17   other productive communications, but you can answer to
18   the extent you can refer to matters of the public
19   record.
20       A.  I think, again, during the open testimony
21   there were, you know, there were probably members of the
22   Senate who asserted that that would be the impact.  But
23   that's, I think, as close as a yes as I can get.
24       Q.  (By MS. WESTFALL) I was asking whether any Texas
25   State Legislator voted in favor?
```

## 319

```
 1       A.  Voted for.  Sorry.
 2           MR. SWEETEN:  Don't reveal communications of
 3   Legislators.  Don't reveal matters of the public record.
 4       A.  Right.  Again, from the public testimony my
 5   memory is that there were general discussions about the
 6   impact of the bill and that included opponents and
 7   proponents.
 8           MS. WESTFALL:  Thank you.  Could you mark
 9   this as Exhibit 83.
10           (Exhibit No. 83 was marked.)
11       Q.  (By MS. WESTFALL) I'm handing you what's been
12   marked as U.S. 83; do you recognize this exhibit?
13       A.  It looks like a press release from Lieutenant
14   Governor David Dewhurst.
15       Q.  Can you review it and let me know when you've had
16   a chance to take a look at it?
17       A.  It looks like it was a late January press release
18   saying that he's glad that it passed the Senate.
19       Q.  And can you see that it indicates increasing
20   public confidence in our election process by insuring
21   only U.S. citizens who are legally eligible vote in
22   Texas.  Do you see that statement?
23       A.  Yes.
24       Q.  How does Senate Bill 14 promote that?
25           MR. SWEETEN:  You're asking him to reveal
```

## 320

```
 1   matters that are subject to the legislative privilege.
 2   Do not reveal those matters.  You can reveal matters
 3   that are based on the public record.
 4       A.  As I said before, I think, to the extent that SB
 5   14 is designed to increase the integrity of the election
 6   process and discourage ineligible voters from
 7   fraudulently voting, that the statement would reflect
 8   that purpose.
 9       Q.  (By MS. WESTFALL) Notwithstanding all of the
10   testimony that you gave earlier today about how voter
11   registration is when you say you're a citizen and voting
12   and Photo ID Laws stop in-person voter impersonation; is
13   that right?
14           MR. SWEETEN:  Objection to the question as
15   argumentative, vague.  Also, don't reveal matters of
16   legislative privilege in answering the question.
17       A.  I think what I said earlier was that making
18   elections more secure would have the general effect of
19   deterring all sorts of voter fraud.
20       Q.  (By MS. WESTFALL) Do you believe
21   Senator Dewhurst -- not Senator -- strike that.
22           Do you believe Mr. Dewhurst approved this press
23   release before it was released?
24           MR. SWEETEN:  Objection.  Calls for
25   speculation.  You can answer it if you know.
```

BRIAN HEBERT                                                    MAY 29, 2012

## 321

1  A. I don't know.

2  Q. (By MS. WESTFALL) Do press releases go out under

3  his name that he doesn't approve of?

4  A. I don't know.

5  Q. Who would know?

6  A. I imagine Mike Walz would know, the press

7  secretary.

8  Q. And certainly Mr. Dewhurst would know, right?

9  A. He might.

10  Q. He might know whether he said this or not?

11  A. I don't know how many press releases go out and

12  whether he signs off on some, or all, or none of them.

13  MR. SWEETEN: How are we doing on time?

14  MS. WESTFALL: We're getting there.

15  MR. SWEETEN: I'm asking the court reporter

16  for time total.

17  COURT REPORTER: It is 6 hours and 27

18  minutes.

19  MS. WESTFALL: And I would ask that given

20  number of objections that Mr. Dunn be permitted to have

21  some time. I'm close to completing my examination for

22  the time being, of course, leaving this deposition open,

23  but given number of objections, and privilege

24  assertions, and discussions between council on this

25  subject I would ask your indulgence in allowing Mr. Dunn

## 322

1  to have a few moments once I am finished with the exam.

2  MR. SWEETEN: Well, I mean the Federal Rules

3  allow for 7 hours. You have spent much of this

4  deposition asking him about questions that are very,

5  very, clearly implicating legislative privilege. We

6  have court orders on this subject. You're asking

7  questions that are -- that the court is already very

8  clearly indicated are matters of privilege. You have

9  spent much of your questioning doing that today. So I

10  understand that I have objected but I have had to object

11  because you have gone way beyond the scope of what is

12  permissible with respect to our assertion of this

13  privilege and you have done it repeatedly. So my

14  response to that is, we'll let Mr. Dunn question the

15  witness but as far as your implication that this

16  deposition has gone on this long as a result of me. I

17  absolutely reject that proposition.

18  MS. WESTFALL: Well, I wasn't suggesting

19  that. I was saying council had been having, we have

20  been having extensive discussions about privilege. I

21  have asked repeated questions about communications,

22  which are permissible. I have asked repeated questions

23  about purpose, which are permissible. We had a

24  disagreement about the scope and application of the

25  orders that have been ordered in this case. We have

## 323

1  pending motions to compel on legislative privilege that

2  have not yet been ruled upon. There are open questions

3  on these issues an it has taken the time for the two of

4  us to discuss them on the record.

5  MR. SWEETEN: It has been very clear what my

6  position was going to be with respect to legislator

7  privilege. We've articulated it over and over again

8  within filings with the court. You understand what my

9  position is on this and you have repeatedly asked

10  questions that invade the legislative privilege and

11  invade the other privileges we have discussed today.

12  Nevertheless there is no point sitting here and debating

13  it. I will let you continue your questioning. When Mr.

14  Dunn has questions, we will take that matter up then.

15  MR. DUNN: And just -- this will probably

16  help. I will have very little to no questions.

17  MR. SWEETEN: Okay. Yeah. That helps.

18  MR. DUNN: I didn't want to interrupt what

19  was an awesome oration by both sides.

20  MS. WESTFALL: Could you please mark this as

21  84?

22  (Exhibit No. 84 was marked.)

23  Q. (By MS. WESTFALL) You've been handed what's been

24  marked U.S. 84. Do you recognize this document?

25  A. It talking points for a speech.

## 324

1  Q. Did you draft those?

2  A. No.

3  Q. Who drafted this?

4  A. I don't know.

5  Q. Do you see that it is dated May 27, when the bill

6  was signed?

7  A. Well, there's another date above that. But yes.

8  Q. You're right. It looks like there are two dates.

9  Could you read for the record those two dates?

10  A. One says 5/26/11 and the other one says May 27

11  2011.

12  Q. Did LRT refer to an individual's initials or

13  something else?

14  A. I don't know.

15  Q. Do you see on the second page, it indicates a

16  talking point that generations of Americans have fought

17  and died for the principal of one U.S. citizen, one

18  vote. Do you see that?

19  A. Yes.

20  Q. And does this document suggest to you that part

21  of Mr. Dewhurst's support for the bill was that it is

22  protecting the right of U.S. citizens to vote. Is that

23  how you would interpret this bullet?

24  MR. SWEETEN: When you're answering the

25  question don't reveal communications you've had with

BRIAN HEBERT                                          MAY 29, 2012

## 325

```
 1    Lieutenant Governor Dewhurst.  Those are privileged
 2    under legislative privilege and attorney/client
 3    privilege.  You can answer to the extent that you are
 4    not revealing matters of privilege.
 5         A.  I don't know is the short answer.  I don't know
 6    if this is the -- the speech he gave.  I don't know if
 7    he wrote this draft.  So I don't know if it's an
 8    accurate reflection of his purpose, or intent, or
 9    anything else.
10         Q.  (By MS. WESTFALL)  Who would know?
11         A.  I suppose whoever wrote it.
12         Q.  And Mr. Dewhurst would also know; is that right?
13         A.  Perhaps.  Again that's possible.  I don't know if
14    this is his speech or interview that he gave or if it
15    was just something prepared for his possible use.
16         Q.  Thank you.
17              MS. WESTFALL:  Could you mark this as 85?
18              (Exhibit No. 85 was marked.)
19         Q.  (By MS. WESTFALL)  You've been handed what's been
20    marked as U.S. 85; do you recognize this document?
21         A.  Yes.
22         Q.  What is it?
23         A.  It's talking points on voter ID.
24         Q.  And how to you recognize this document?
25         A.  I wrote it.
```

## 326

```
 1         Q.  Do you see where, in the first bullet, it refers
 2    to fraudulent registration applicants or applications?
 3         A.  Yes.
 4         Q.  And was this -- were these talking points by the
 5    way in support of SB 14?
 6         A.  I don't recall if they were generally about voter
 7    ID or if they were for a particular bill.  I mean, it
 8    says 82 R, but I don't know if it was for -- the timing
 9    of it compared to the legislation.
10         Q.  But 82 R referred to?
11         A.  82nd regular session?
12         Q.  And that was 2011 was it not?
13         A.  Correct.
14         Q.  And could you explain why one talking point in
15    support of photo ID related to fraudulent registration
16    applicants and listed as an example application
17    submitted by non-citizens?
18              MR. SWEETEN:  Don't reveal matters subject
19    to the legislative privilege.
20         So the question is why are these examples used?
21         Q.  (By MS. WESTFALL)  Yes.
22         A.  They're examples of fraudulent registration
23    applications.
24         Q.  And how does that support the case for photo ID?
25              MR. SWEETEN:  Same objection.
```

## 327

```
 1         A.  Right.  I mean, on its face it says over 6,000
 2    applications were rejected.  That seems to me to
 3    implicate the security of the elections.
 4         Q.  (By MS. WESTFALL)  How does Photo ID Law --
 5    requiring photo ID at the polls on election day, stop
 6    fraudulent registration applications?
 7              MR. SWEETEN:  Don't reveal matters of
 8    legislative privilege.  You can answer.
 9         A.  I think as I said earlier today, it's additional
10    levels of security make the elections more secure and
11    that if an election is more secure, I think fraudulent
12    voting is less likely, including fraudulent registration
13    applications.
14              By MS. WESTFALL:  Could you mark this as 86?
15              (Exhibit No. 86 was marked.)
16         Q.  (By MS. WESTFALL)  You have each been
17    handed what's been marked as U.S --
18              MR. SWEETEN:  Can I have a copy?
19              MS. WESTFALL:  Sure.  I don't know.
20              MR. SWEETEN:  I'll just look on.  That's
21    fine.
22         Q.  (By MS. WESTFALL)  Thank you.  You've been handed
23    what's been marked U.S. 86.  Do you recognize this
24    document?
25         A.  It's an overview of the process overview by the
```

## 328

```
 1    Justice Department.
 2         Q.  And how are you familiar with this document?
 3         A.  It looks like something I drafted but I'll have
 4    to double-check.
 5         Q.  Let me know when you've had a chance to review?
 6         A.  Okay.
 7         Q.  Did you draft this document?
 8         A.  I think so.
 9         Q.  Do you know when you drafted this document?
10         A.  I can't be sure if it was 2009 or 2011.  Well, it
11    says, Georgia is the only Section 5 State with the Photo
12    ID requirement.  So I'm guessing that might have been
13    '07 or '09.  I can't remember when Indiana's law went
14    into effect or any of the other states.
15         Q.  And you see that it indicates you wrote about
16    retrogressive effect in this document?
17         A.  Where are we at?  Is there a retrogressive
18    effect?  Yes.
19         Q.  By the way, to whom was this document circulated?
20         A.  I can't recall.
21         Q.  Was it internal to the Lieutenant Governor's
22    office or was it to other Senate staff?
23         A.  I can't recall.
24         Q.  What was -- what did you do with this document
25    after you drafted it?
```

BRIAN HEBERT                                                    MAY 29, 2012

## 329

1    A.  It was almost certainly for use in my office.  I
2  just can't remember if it was also distributed to other
3  people or not and by whom.
4    Q.  Did you have any conversations or discussions
5  with anyone about retrogressive effect after you
6  circulated this document, within your office?
7    MR. SWEETEN:  Don't reveal communications
8  you had with anyone within your office.  Attorney/client
9  privilege.
10    Q.  (By MS. WESTFALL)  Well, to the extent there's
11  any attorney/client privilege it seems to have been
12  ordered to have been produced in this litigation.  So
13  it's been produced.
14    MR. SWEETEN:  He doesn't have to reveal
15  communications that he's had with anyone in his office
16  That's subject to the attorney/client privilege.  You
17  can ask about the document.  I'm freely allowing you to
18  ask about the document.
19    MS. WESTFALL:  I'm asking about
20  conversations about the document.
21    MR. SWEETEN:  You can answer whether
22  conversations occurred.
23    MS. WESTFALL:  And this is not about
24  legislative privilege.  This is a different privilege,
25  Mr. Sweeten.  This has now been produced in litigation

## 330

1  I can examine the witness on this document.
2    MR. SWEETEN:  You can examine him based upon
3  the document.  That doesn't allow you to go into any
4  communications he's had within the realm of the
5  attorney/client communication with individuals in his
6  office.
7    MS. WESTFALL:  I disagree with your view of
8  attorney/client privilege and what I can examine the
9  witness on.
10    MR. SWEETEN:  So is it your position then
11  that in light of this document you can ask any question
12  about the attorney/client privilege, because I reject
13  that.
14    MS. WESTFALL:  I can ask him about what
15  happened with this document and conversations about this
16  document.
17    MR. SWEETEN:  You can ask him what happened
18  with this document, if he had conversations about the
19  document, I'm not objecting to that.  But he is not
20  going to reveal the specifics of his communication
21  surrounding the document.
22    MS. WESTFALL:  In other words you're only
23  going to let me examine him about the existence of
24  communications and foundational questions; is that what
25  you're saying.

## 331

1    MR. SWEETEN:  You can ask about the
2  existence of them you can ask about this document to the
3  extent that whatever you want to ask.
4    Q.  (By MS. WESTFALL)  Did you have any conversations
5  with anyone in your office about this document after you
6  circulated it?
7    MR. SWEETEN:  You can answer.
8    A.  Probably.
9    Q.  (By MS. WESTFALL) Did you have a conversation
10  with Mr. Dewhurst about this document after you
11  circulated it?
12    A.  I don't recall.
13    Q.  Did you have conversation with Ms. Rathgeber, or
14  Mr. Brunson about this document, or Mr. Battle?
15    A.  Probably all of them.
16    Q.  Were any steps taken as a result of your
17  circulation of this document?
18    A.  I don't know that it requires steps.  It looks
19  like it's a summary of State of preclearance, in
20  general, and this one opinion, legal review, in
21  particular.
22    Q.  Were there any efforts after you circulated this
23  document to determine whether SB 14 or 362, whatever
24  bill was at issue when you circulated this memo, whether
25  that bill would have an impact on Hispanic and Black

## 332

1  voters disproportionately?
2    A.  I don't recall any -- I don't recall from the
3  public record whether evidence to that effect was
4  introduced or not.
5    Q.  But we're now dealing with a different privilege.
6  I'm asking you a different set of questions.  Your
7  council is letting you be examined -- I realize it's
8  late in the day -- based on a different set of
9  privileges.  I'm asking whether any -- not based on the
10  public record -- were any steps taken after you
11  circulated this memo concerning retrogressive effect and
12  the legal standard, were any steps taken in response to
13  the circulation of this memo?
14    A.  I'm not aware of specific steps.  Again, there
15  was -- I'm not aware of specific steps.
16    Q.  And you see underneath retrogressive effect, you
17  indicate the issue of less retrogressive alternatives,
18  do you see that section?
19    A.  Right.
20    Q.  Did you have any conversations about that topic
21  with anyone in your office after your circulated this
22  memo?
23    A.  Probably the same list that I gave earlier.
24    Q.  Ms. Rathgeber, Mr. Brunson?
25    A.  Mr. Battle.

BRIAN HEBERT                                           MAY 29, 2012

## 333

1   Q. Anyone else?
2   A. In my office, no.
3   Q. And are you aware of any less retrogressive
4   alternatives that were pursued after you circulated this
5   memo?
6       MR. SWEETEN: Don't reveal matters that are
7   subject to the legislative privilege. In other words,
8   if you had communications with Legislators, Legislative
9   Staff, State agencies, Texas Ledge Council, in answering
10  that question.
11      A. Again, without knowing the timing I can't be
12  sure. The bills, as I've reviewed them today, have a
13  sort of spectrum of alternatives. Some, to use your
14  word, less restrictive than others. But I can't be sure
15  without knowing when this was produced.
16      Q. (By MS. WESTFALL) Are you aware, at any time,
17  during consideration of any of the bills to which you've
18  testified today that there were considerations of less
19  retrogressive alternatives, based on the legal standard
20  you set forth in this memo?
21      MR. SWEETEN: In answering the question
22  don't reveal matters of legislative privilege, don't
23  reveal discussions she's asking you as to this memo.
24      A. The question is: Was there consideration of --
25      Q. (By MS. WESTFALL) Less retrogressive

## 334

1   alternatives?
2   A. I think there were consideration of lots of
3   things, I suppose, yes.
4   Q. What were those alternatives?
5   A. I don't recall specifically.
6   Q. Do you see underneath, you list Mitigating
7   Effects. Do you see that?
8   A. Uh-huh.
9   Q. By the way, before I ask a question about that.
10  Do you see the number indicated at the top right-hand
11  corner? 552.111?
12  A. It looks -- I see a number. It looks like it
13  might be 557.
14  Q. You may be right. Does this indicate to you --
15  do you have any indication of an internal number that
16  would help you to remember when you wrote this document?
17  A. No.
18  Q. Okay. Do you see where you write about
19  mitigating effects in this document?
20  A. I do.
21  Q. Did you have conversations about mitigating
22  effects with the same persons in your office you
23  testified to earlier?
24  A. I probably discussed each of those things with
25  Mr. Brunson, Ms. Rathgeber, and Mr. Battle since it was

## 335

1   essentially a summary of that one opinion, is what it
2   appears to be.
3   Q. And do you see here you list education efforts
4   targeted among minority communities?
5   A. Yes.
6   Q. And I believe we just testified about an
7   amendment offered to provide voter education to minority
8   communities that was not adopted by the Senate; is that
9   correct?
10  A. Yes, you did mention that.
11  Q. So ultimately Senate Bill 14 does not include
12  such education efforts that are targeted to minority
13  communities. Is that correct?
14  A. I don't recall that it does.
15  Q. And does Senate Bill 14 include any program
16  designed to provide photo ID's in isolated or
17  impoverished areas?
18  A. Does it include those?
19  Q. In the bill, as passed?
20  A. I don't think it does.
21  Q. And are there any other programs that were
22  designed to minimize the impact of the bill on minority
23  voters included in Senate Bill 14 as passed?
24      MR. SWEETEN: In answering the question
25  don't reveal matters that are subject to legislative

## 336

1   privilege. That includes thoughts, mental impressions,
2   opinions about legislation or in furtherance of the
3   legislative process, including communications with
4   legislators or legislative staff. Okay?
5   A. I think the voter education provision and the
6   free education -- I mean, Election ID Certificate
7   arguably are designed to minimize the impact of minority
8   voters.
9   Q. (By MS. WESTFALL) Thank you. And anything else
10  in Senate Bill 14?
11  A. I'm not sure. I'd have to review it.
12  Q. Thank you.
13      MS. WESTFALL: Could you mark this as 87.
14      (Exhibit No. 87 was marked.)
15  Q. (By MS. WESTFALL) I've handed you what's been
16  marked as U.S. 87. Do you recognize this document?
17  A. No. It looks like it's a letter to Governor
18  Perry, Lieutenant Governor Dewhurst.
19  Q. Okay.
20      MS. WESTFALL: Can you mark this as 88,
21  please?
22      (Exhibit No. 88 was marked.)
23  Q. (By MS. WESTFALL) You've been handed what's been
24  marked as U.S. 88; do you recognize this document?
25  A. It looks like it's a letter to Mr. Beck from

BRIAN HEBERT                                              MAY 29, 2012

---

## 337

1    Lieutenant Governor Dewhurst.
2        Q.  Is Mr. Beck presumably a constituent?
3        A.  He lives in Texas so, yes.
4        Q.  And who drafts responses to constituent mail in
5    Mr. Dewhurst's office?
6        A.  It depends.  Sometimes it's the staff.  Sometimes
7    it's the press office.  Sometimes it's a combination.
8        Q.  Do you see in the second paragraph where it says,
9    Voter ID will help stamp out voter fraud and increase
10   public confidence in our election process by insuring
11   that only U.S. citizens who are legally eligible vote in
12   Texas elections?
13       A.  I see that.
14       Q.  Do you see that this letter is dated February 8,
15   2011?
16       A.  Yes.
17       Q.  So it was right after the Senate passed Senate
18   Bill 14; is that right?
19       A.  Uh-huh.  Yes.
20       Q.  Can you explain why Mr. Dewhurst would assert
21   that it would -- voter ID would help ensure that only
22   U.S. citizens are voting in Texas elections?
23           MR. SWEETEN:  Objection.  Calls for
24   speculation.  Also asks him to reveal thoughts, mental
25   impressions, opinions about legislation.  Also requires

---

## 338

1    him to reveal communications with Lieutenant Governor
2    Dewhurst.  If you can answer the question without
3    revealing matters of legislative privilege or matters of
4    related to the attorney/client confidentiality then you
5    can answer the question.
6        A.  I guess I would refer to my earlier answers to
7    similar questions.  The bill -- the purpose of the bill
8    is to ensure that elections are secure.  That includes,
9    meaning that -- the meaning that voters are eligible to
10   vote and if you're not a U.S. citizen then you're not
11   eligible to vote.  So that's the connection.
12       Q.  (By MS. WESTFALL)  And Remember when I asked you
13   about the purposes of Senate Bill 14 and you said ensure
14   election integrity, increase voter confidence, do you
15   remember that?
16       A.  Huh-uh.
17       Q.  And do you remember when I asked you whether the
18   -- one of the purposes advanced by Mr. Dewhurst was to
19   prevent non-citizens from voting in elections and you
20   responded, no; do you remember that?
21       A.  I think I said, no, except to the extent it ties
22   into making sure all voters are eligible.
23       Q.  Does this letter, Exhibit 88, cause you in any
24   way to modify your testimony about Mr. Dewhurst's
25   purpose in advancing Senate Bill 14?

---

## 339

1        A.  No.
2        Q.  Was one of Mr. Dewhurst's purposes in advancing
3    and promoting Senate Bill 14 to prevent non-citizens
4    from voting?
5            MR. SWEETEN:  Objection.  You're asking for
6    him to glean the subjective intent of Lieutenant
7    Governor Dewhurst and that is a matter that is outside
8    of what -- of the purpose question that you've been
9    asking so I'm going to object to him answering that
10   question based upon the court's order.
11       Q.  (By MS. WESTFALL)  Are you following the advice
12   of council?
13       A.  Yes.
14       Q.  Who is Jesse Ancira?
15       A.  Ancira.
16       Q.  Ancira.
17       A.  I believe he is general counsel for Speaker Joe
18   Strauss.
19       Q.  Does he handle voter ID for Speaker Strauss?
20       A.  I don't know his exact role on that issue.
21           MS. WESTFALL:  Could you mark this as 89?
22           (Exhibit No. 89 was marked.)
23       Q.  (By MS. WESTFALL)  You have been handed what's
24   marked as U.S. 89; do you recognize this document?
25       A.  Looks like an overview of voter ID issues, like a

---

## 340

1    sort of talking points.
2        Q.  Did you draft this?
3        A.  I think I did.
4        Q.  Do you see at the bottom where it says, likely
5    questions from opponents?
6        A.  Yes.
7        Q.  Do you see it doesn't include anything about
8    concerns about impact of minority voters?
9        A.  I'm sorry, repeat.
10       Q.  It doesn't include any questions about, what's
11   the impact on minority voters.
12       A.  That is not one of the three questions.
13       Q.  Right.  Is there a reason --
14       A.  Other than -- I'm sorry.
15       Q.  Pardon?
16       A.  Other than perhaps the last one, what about
17   people who do not have access to photo ID?
18       Q.  Is there a reason why you didn't have any concern
19   or list a likely question from opponents related to
20   minority voters?
21           MR. SWEETEN:  You're asking for him to
22   reveal his thoughts and mental impressions when he is
23   formulating this document.  That is matter of
24   legislative privilege and I'm asserting that objection.
25   It also is matter potentially that impacts the

BRIAN HEBERT                                                    MAY 29, 2012

## 345

1    Q.  Were you able to locate 85 for me?
2    A.  Yes.
3    Q.  Now, if I understand your earlier testimony you
4    prepared and drafted Exhibit 85?
5    A.  I believe that is correct.
6    Q.  I would like that go through a few of these
7    statements.  The first one we can skip the first one.
8    I'm interested in the second one.  "Fraudulent
9    registration applications are rampant."  Do you see that
10   sentence?
11   A.  Yes.
12   Q.  And there's a parenthetical after that?
13   A.  Correct.
14   Q.  Where did you get that information?
15       MR. SWEETEN:  In answering the question I
16   don't want you to reveal thoughts or mental impressions
17   about legislation or conversations that you had with
18   legislators or legislative staff.  Those would be
19   subject to the legislative privilege.
20   A.  Sure.  It says they made national news.  I think
21   they're from various newspaper accounts at the time.
22   Q.  (By MR. DUNN)  Well, you think or you know.
23   A.  I don't know how else I would have gotten them.
24   Q.  All right.  Did you get that information from
25   officers in Harris County?

## 346

1    A.  I can't recall.
2        MR. SWEETEN:  Same objection with respect to
3    your mental impressions about the legislative process.
4    Don't reveal those in communications that would be
5    protected as we've discussed.  But you can answer based
6    on matters of the public record or based on the document
7    itself.
8    A.  I can't recall.  I'm pretty sure it was from the
9    news.
10   Q.  (By MR. DUNN)  You're pretty sure you got it from
11   a news source; is that true?
12   A.  Correct.
13   Q.  Now, I assume that somebody employed for the
14   Lieutenant Governor you had the ability to call local
15   officials an discuss facts and circumstances with them?
16   A.  I suppose that's true.
17   Q.  All right.  Did you contact anybody with the
18   Harris County Voter Registration Office to confirm any
19   of this information?
20   A.  I don't recall and I don't -- again, without
21   knowing the date of it it's possible that Harris County
22   officials I think were involved in the testimony in '07
23   or '09.  I can't remember if it was one or both of those
24   years.
25   Q.  So you might have drawn this conclusion,

## 347

1    Paragraph 2 of Exhibit 85, from testimony Harris County
2    Officials gave.  Is that right?  Is that what I'm
3    hearing you say?
4    A.  It's possible.
5    Q.  Alright.  As you sit here today, if I can sort of
6    boil down what I think you said, you either got this
7    from Harris County Officials, or the news, or you simply
8    just don't recall; is that right?
9    A.  I think I said I probably got it from the news
10   but it's possible I got it from those other sources or
11   some other source.
12   Q.  Are you aware of a lawsuit settled by Harris
13   County in the lead up to the 2010 election related to
14   how they handled voter registration applications?
15   A.  No.
16   Q.  Are you aware that Harris County ultimately
17   entered into a consent decree where -- that
18   significantly scaled back the number of applications
19   that were rejected?
20   A.  No.
21   Q.  Are you aware that Harris County rejected nearly
22   68,000 voter registration applications in the lead up to
23   the 2008 election?
24   A.  I'm not familiar with that number.
25   Q.  With respect to the allegation here that's 6,000

## 348

1    applications by non-citizens where rejected by Harris
2    County from 2004 to 2007, is your testimony the same
3    that you either got that from the news, from Harris
4    County Officials, or that you don't remember?
5    A.  I do not remember the exact source of those
6    numbers.  Again, I think I probably got them from news
7    accounts.
8    Q.  So if the facts and circumstances demonstrate
9    that the 6,000 applications rejected were rejected
10   because people simply didn't check whether they were a
11   citizen, you don't know one way or the other?
12   A.  I'm not familiar it.
13   Q.  Is it possible people submit applications and
14   forget to check that they are a citizen.  They actually
15   are citizens; is that true?
16       MR. SWEETEN:  Objection.  Calls for
17   speculation.  You can answer.
18   A.  I don't know if it's true.  I know it's possible.
19   Q.  (By MR. DUNN)  You don't know much about voter
20   registration in terms of the laws and how voter
21   registration applications are actually processed in an
22   office.  Is that something you have some expertise in?
23   A.  I've never done it.  I'm generally familiar with
24   it.
25   Q.  You're familiar with the statutes?

BRIAN HEBERT                                              MAY 29, 2012

## 349

1    A. Correct.

2    Q. Okay. But have you ever been involved in either

3    administering or working in an office that process

4    applications?

5    A. No.

6    Q. Now, I notice under your threat of, Fraud is

7    Real, talking point here in Exhibit 85 that the only

8    example given here that has an explanation is the Harris

9    County. Let me rephrase that. The only one of these

10   evidences of the threat of fraud that gives an actual

11   example is the Harris County example; would you agree?

12   A. Well, there -- it says Acorn in 2008, the team

13   system in general. I mean, I'm not sure when you say an

14   example. It just says 6,000 applications by

15   non-citizens rejected in Harris County and then there

16   are two other examples after that. I don't think it

17   directly involved Harris County.

18   Q. What was it about the 2008 Acorn and 2010 Houston

19   vote registration situations that, quote, made them

20   scandals that made national news?

21   A. The fact that they were widely reported and were

22   relatively recent to what I assume was the time of the

23   production of this memo that made them relevant.

24   Q. Do you remember any details about them?

25   A. The 2008 A corn and 2010 Houston votes?

## 350

1    Q. Yes, sir.

2    A. My memory is that there were, I mean, I remember

3    a particular story where, again, the news account was

4    someone registered in the name of Mickey Mouse, or Troy

5    Aikman, or clearly fictional people. There were other

6    larger examples.

7    Q. And it's your recollection that those fictional

8    registrants actually got on the rolls in Harris County

9    Texas?

10   A. I don't recall.

11   Q. Do you recall that, if not the name of the

12   publication, the types of publications that reported

13   these events?

14   A. I believe it was a major state newspapers.

15   Q. Like the Houston Chronicle or Dallas Morning

16   News.

17   A. Correct.

18   Q. Not in other words organizations that have more

19   of a political bend?

20   A. It was probably all of those. It wasn't one type

21   of information in my memory.

22   Q. Let me ask it from this angle. The media

23   accounts that you relied upon in preparing Exhibit 85,

24   are these AP Member Papers?

25   A. I don't recall every source I used. But

## 351

1    certainly AP Papers were part of that.

2    Q. Now, the next line says, Texas Election

3    Administration Management System is improving. And how

4    so; how was it improving?

5    A. My memory is that the Texas Election

6    Administration and Management System was designed to do

7    sort of, eventually real-time update the State voter

8    rolls based on submissions of whether data -- whether

9    voters are alive or dead or eligible or not. And that

10   there were some initial technical problems but other

11   problems in keeping that accurate. But that I recall

12   Secretary of State testimony that it was getting better.

13   Q. But it was continuing to have accuracy problems

14   according to your statement in Exhibit 85; is that true?

15   A. I think there were still in eligible voters

16   listed on the team system in my memory.

17   Q. From where did you gather that information?

18   A. I think from Secretary of State testimony and

19   Committee.

20   Q. And so how was it that Senate Bill 14 has either

21   proposed or ultimately passed was going to resolve the

22   team accuracy problems?

23   MR. SWEETEN: I'm going the object. I think

24   you're asking for matters that are subject to the

25   legislative privilege, including his opinions, his

## 352

1    thoughts, mental impressions about Senate Bill 14. So

2    I'm going to object on that basis. You can answer based

3    upon the public record.

4    A. It looks like the heading of No. 1 is, The Threat

5    of Fraud is Real. And these look like examples of

6    throats of fraud which is one ground that the Supreme

7    Court has said is justifies voter ID laws in general.

8    Q. (By MR. DUNN) Is it your opinion that Senate

9    Bill 14 will improve the accuracy problems with the team

10   system?

11   MR. SWEETEN: Same objection. Don't reveal

12   matters that are subject to the legislative privilege

13   including communications with State Agencies,

14   communications we've outlined previously. Don't reveal

15   matters, thoughts, or impressions about the bill. So to

16   the extent you can answer, based upon the public record,

17   you're free to do so.

18   A. I don't think that SB 14 or Voter ID Law will

19   improve team but it will at least as we stated before it

20   will have the general purpose of improving the integrity

21   of the elections. Which if the team system is

22   inaccurate and there are in eligible voters, I think

23   those in eligible voters are probably less likely to

24   cast a vote.

25   Q. (By MR. DUNN) Well, assuming that the team

BRIAN HEBERT                                              MAY 29, 2012

## 353

1   system is inaccurate, there's sort of -- it appears to
2   me to be at least two possible solutions.  One was the
3   -- I suppose your argument, adoption SB 14.  Another
4   would be to actually address the team system and
5   implement reforms in that system.  Would you agree?
6       MR. SWEETEN:  Don't reveal thoughts and
7   mental impressions about the bill.  Those are subject to
8   the legislative privilege.  You can answer to the
9   extent, you can refer to matters of public record.  But
10  don't reveal matters that are subject to the legislative
11  privilege.
12      A.  Right.  I think if you wanted to improve the team
13  system you -- there's lots of ways you could to that.
14      Q.  (By Ms. Montgomery)  Lots of ways that you could
15  improve the team system independent from what SB 14 did
16  is that true?
17      A.  True.
18      Q.  Is it true that the overarching concern that you
19  express in Exhibit 85 under Threat of Fraud is Real
20  section is the inaccuracy -- is generally the inaccuracy
21  of the State's voter registration databases; is that the
22  overarching concern expressed here?
23      A.  Let me take a look.  Looks like registration
24  fraud, inaccurate rolls, and inadequate ability to catch
25  in-person fraud are the three general umbrellas of fraud

## 354

1   listed there.
2       Q.  Your first bullet is Inaccurate Registration
3   Rolls.  Your second bullet is Registration Problems in
4   Harris County.  Your third bullet is the Team System,
5   which is the registration database, having accuracy
6   problems; is that right?  Those are the first three
7   bullets?
8       A.  Right.
9       Q.  And then the fourth one is, we have this
10  inadequate system to catch in-person voter fraud; is
11  that correct?
12      A.  That's what I said, yeah.
13      Q.  Okay.  Now if you would go with me -- is this --
14  before we do that.  On Exhibit 85, is this all of 85?
15      A.  I don't recall for sure.  I think it is.
16      Q.  And to whom did you deliver 85?
17      A.  I don't recall, as I stated earlier.  Probably my
18  staff and I don't recall who else might have received
19  it.
20      Q.  Who was your staff?
21      A.  The people mentioned earlier.  Blaine Brunson and
22  Julie Rathgeber, our Chief of Staff and Policy Director,
23  and possibly Frank Battle, our general counsel.
24      Q.  Would anybody have participated in drafting the
25  document?

## 355

1       A.  I can't recall if that was meant to be a summary
2   of the Supreme Court opinion or if that was intended to
3   be some sort of -- serve some other purpose.
4       Q.  Were there any earlier drafts to Exhibit 85 other
5   than the one that we have here before us?
6       A.  I don't recall.
7       Q.  Do you recall at what point -- strike that.
8           At the top of Exhibit 85, at the sort of title it
9   says, 82 R.  I assume that's 82nd regular session?
10      A.  Correct.
11      Q.  Can you recall whether that was prepared prior to
12  the beginning of session, or in the middle of it, or
13  after the end?
14      A.  Not at the end.  Well, probably not at the end.
15  I don't recall when otherwise.
16      Q.  So other than not being at the end, you can't
17  otherwise nail down when Exhibit 85 was prepared by you?
18      A.  Correct.
19      Q.  Now, go with me to Exhibit 86.
20      A.  Okay.
21      Q.  I know I'm probably going to ask a question or
22  two that you were already asked, but I couldn't hear and
23  I didn't want to interrupt during that part of the
24  review, but why was 86 drafted?
25      A.  Why was it drafted?

## 356

1       Q.  Yes, sir.
2       A.  My memory is, it's intended to give an overview
3   of the preclearance process and overview of a memo
4   issued by the Department of Justice.
5       Q.  There was -- I didn't quite understand that.
6   There was a memo issued by the Department of Justice
7   that you were summarizing?
8       A.  Here in the middle Standard Legal Review it says
9   the 2005 Department of Justice Legal Review of the
10  Georgia law that refers to a memo by the Department of
11  Justice.
12      Q.  Alright.  And how did you obtain that memorandum?
13      A.  It's publicly available.
14      Q.  Other than the memoranda, did you obtain anything
15  else in order to prepare Exhibit 86?
16      A.  I don't recall.
17      Q.  Did anybody else help you participate in the
18  drafting of 86?
19      A.  It's possible our general counsel Frank Battle
20  looked at it.
21      Q.  Were there any other earlier drafts of 86?
22      A.  I don't recall.
23      Q.  Now, if you need to take a minute to review it, I
24  would like you to do so.  Tell me if there's anything in
25  86 that, as of today, that you disagree with or you

BRIAN HEBERT                                              MAY 29, 2012

---

357

1    think you got incorrect in this memo.
2        A.  Georgia is not the only State with photo ID
3    requirement anymore.  I would have to review the Georgia
4    memo again to be sure that each of these summarizing
5    points about the content of the memo are correct, but
6    I'll assume they are.
7        Q.  Well, you were preparing this to be relied upon,
8    I'm sure, by at least the Lieutenant Governor if not
9    other members of the Legislature, is that true?
10       A.  I can't recall who it was for, who the intended
11   audience was for.
12       Q.  Well, you would agree that you were somewhat
13   careful in the preparation of Exhibit 86?
14       A.  I hope so.
15       Q.  All right.  Now, if you go with me to the
16   underlying section; Is there a Retrogressive Effect, do
17   you see that?
18       A.  Yes.
19       Q.  And the first question is:  Did Texas produce or
20   consider any evidence regarding whether Hispanics or
21   Blacks are less likely to possess or obtain a photo ID.
22   Did I read that correctly?
23       A.  Correct.
24       Q.  What's the answer to that question?
25           MR. SWEETEN:  You can answer the question to

---

358

1    the extent that you are not revealing information that's
2    subject to the legislative privilege and concluding
3    communications with legislatures, legislative staff,
4    State Agencies.  Also do not reveal your thoughts,
5    mental impressions, or opinions about legislation,
6    including Senate Bill 14.  You can refer to matters of
7    the public record in answering the question or the
8    specific memo itself.
9        A.  My memory is that that was discussed in the
10   public hearing, probably in each of the years that we
11   discussed today.  And I'll assert privilege as to
12   internal communications.
13       Q.  (By MR. DUNN)  All right.  Well, I just want to
14   focus on, without prejudice to our argument on
15   privilege.  My questions are just going to focus on what
16   you know that's in the public record.  All right?
17       A.  Okay.
18       Q.  What information do you have that's in the public
19   record that Texas produced or considered regarding
20   whether Hispanics or Blacks are less likely to possess
21   or obtain a photo ID?
22       A.  I believe there was testimony from Texas
23   Department of Transportation and from the Secretary of
24   State.  And I know evidence from other states was also
25   discussed.

---

359

1        Q.  Do you remember if there was any analysis
2    actually performed on whether or not Hispanics or
3    African Americans were less likely to possess a photo
4    ID?
5            MR. SWEETEN:  You're asking as to matters of
6    public record?
7            MR. DUNN:  Yes, that's all.
8        A.  And you're talking about for Texas, Hispanics and
9    Blacks or for --
10       Q.  (By MR. DUNN) For Texas Hispanics and Blacks.
11       A.  I don't recall whether that was introduced into
12   the testimony or not.
13       Q.  You can't think of any examples of such report as
14   you sit here today?
15       A.  I think that's -- that were introduced into
16   public testimony, I think that's right.
17       Q.  The next question is, how did the minority
18   members of the legislature vote on the proposed changes
19   in the law?  Again, constricting your answer to the
20   public record, what's the answer to that question with
21   respect to Senate Bill 14?
22       A.  I'd have to review it to be sure.  But I think
23   minority members voted against the law.
24       Q.  Can we agree that nearly all of them, if not all
25   of them voted against the law in both the House and the

---

360

1    Senate?
2        A.  The House, I'm less comfortable saying so but
3    yes.
4        Q.  The next section, Is there a less retrogressive
5    alternative.  And the first question is:  Are non-photo
6    documents, birth certificate, social security cards, et
7    cetera, proven to be unreliable or lack security?  Is
8    there evidence of that forgery or fraud.  Did I read
9    that correctly?
10       A.  Correct, yes.
11       Q.  How does Senate Bill 4 measure up to that
12   question, using only the public record?
13           MR. SWEETEN:  You can answer based upon the
14   public record.  Otherwise object, legislative privilege.
15       A.  Senate Bill 14 does not include non-photo
16   documents except in some cases.  Again, I think there
17   was a disability exception that you could present just a
18   voter registration card without a photo.
19       Q.  (By MR. DUNN) Did you -- is there any record or
20   evidence in the public record about birth certificates
21   proven to be unreliable or lack security?
22       A.  I think my memory is there was general discussion
23   about non-photo IDs being inherently unreliable because
24   you could never be certain that the person holding a
25   paper document was the actual person eligible to vote.

## 361

1  Q.  From whom was that testimony given?
2  A.  I think it was lots of people.  My sense is that
3  it was stated as a matter of fact.
4  Q.  Did that testimony in your view prove that a
5  birth certificate was unreliable or lacked security?
6  MR. SWEETEN:  You're asking him to reveal
7  his thoughts an mental impressions about legislation in
8  consideration of evidence and you're asking his -- what
9  you're asking is a matter that is legislatively
10  privileged.  Again he can refer to what he heard on the
11  public record and he can refer specifically to the
12  document.  But as to his thought processes and mental
13  impressions or communications that I have previously
14  asserted, I'm going to instruct you not to answer based
15  upon that.
16  A.  I guess I would answer that this doesn't say, are
17  birth certificates unreliable?  It says, are any
18  non-photo documents unreliable or do they lack security
19  i.e. Are they more open to fraud or forgery?  And so I
20  guess as I sit here today that the answer would be yes.
21  Q.  (By MR. DUNN) So it's your opinion that the
22  public record testimony or other supports for this bill
23  demonstrated or to use the word in the memorandum
24  Exhibit 86, prove then that birth certificates and
25  social security cards were unreliable or lacked security

## 362

1  measures.  Is that true?
2  A.  I would have to review the records.  I would say
3  it speaks for itself probably.
4  Q.  Now, the next question, is there evidence that
5  criminal penalties are sufficient to deter voter fraud;
6  did I read this correctly?
7  A.  Yes.
8  Q.  What is the answer to that question with respect
9  to Senate Bill 14, using only the public record?
10  MR. SWEETEN:  Don't reveal matters of
11  legislative privilege.  You can answer.
12  A.  My memory of the -- I don't recall from the
13  public record.
14  Q.  (By Ms. Montgomery)  The next question is:  Are
15  there additional forms of photo ID that can be accepted
16  for voting?  Did I read that correctly?
17  A.  Yes.
18  Q.  What is the answer to that question using only
19  the public record for Senate Bill 14?
20  A.  The -- it is not every type of photo ID that is
21  acceptable under SB 14.
22  Q.  So with regard to the questions here under Is
23  there a less retrogressive alternative, you can't
24  provide testimony today whether Senate Bill 14 presents
25  the least retrogressive alternative or not is that true?

## 363

1  MR. SWEETEN:  Again, in answering that
2  question, I don't want you to reveal thoughts, mental
3  impressions, or opinions about legislation or
4  communications that we've outlined previously.  Those
5  are subject to the legislative privilege.
6  A.  I can't recall what, or if any, public testimony
7  touched on those items.
8  Q.  (By MR. DUNN) Well, in asking just your opinion
9  based upon the public record, was there a less
10  retrogressive alternative to address the concerns, if
11  there were any on voter fraud, other than Senate Bill
12  14?
13  MR. SWEETEN:  Do you understand the
14  question?  He's confining it to matters of the public
15  record.  Don't reveal internal thought processes,
16  discussions.  You can answer as to the public record.
17  A.  Right.  I guess it depends on what we mean by
18  alternative.  Is it less retrogressive alternative to
19  the bill or a less retrogressive alternative that's
20  still insures secure elections.  So I guess my short
21  answer is, I don't know.
22  Q.  (By MR. DUNN) What did you mean here in Exhibit
23  86 when you used the term less retrogressive
24  alternative?
25  A.  Well, I think this is intended to be a summary of

## 364

1  the 2005 DOJ opinion -- staff opinion.
2  Q.  So in trying to summarize the DOJ staff opinion
3  as it related to Georgia, is it your testimony you
4  weren't able to understand what a less retrogressive
5  alternative meant to the DOJ?
6  A.  And to the DOJ reviewing the Georgia law it
7  probably meant a less retrogressive alternative than
8  that implemented by law.
9  Q.  And is it your opinion based upon the public
10  record and your research of the Georgia law and Senate
11  Bill 14 that Texas's Senate Bill 14 is less
12  retrogressive than the Georgia law?
13  MR. SWEETEN:  Objection you're asking for
14  his mental impressions about legislation particularly
15  Senate Bill 14.  That is a matter of legislative
16  privilege.
17  A.  The question is:  Is the SB 14, in my opinion,
18  less retrogressive than --
19  Q.  (By MR. DUNN) The Georgia law?
20  MR. SWEETEN:  Don't reveal thoughts, mental
21  impressions regarding the legislation or communications
22  you've had with legislators of the other enumerated
23  groups I've been talking about today.
24  A.  Sure.  I would have to review the Georgia law to
25  be sure.

BRIAN HEBERT                                              MAY 29, 2012

---

365

1    Q. (By MR. DUNN) Now, the next section says, Does
2    the new law include mitigating effects? The first
3    sentence is, Are photo IDs free of charge and widely
4    available? Is that true under Senate Bill 14?
5    A. I believe it is, yes.
6        MR. SWEETEN: Same objection.
7    Q. (By MR. DUNN) What information do you have from
8    the public record that the free ID's that can be
9    obtained from DPS are widely available?
10   A. I recall testimony about the number of DPS
11   offices and other locations to obtain the photo IDs.
12   Q. Did you recall that from the public record that
13   there were a number of locations in the State that were
14   hundreds of miles from the local DPS office?
15   A. I don't recall the number of miles.
16   Q. Do you recall any testimony or evidence that some
17   DPS offices even in urban locations though close in
18   proximity to citizens have extraordinary wait times?
19   A. I do recall a discussion about wait times at
20   offices and I think it was in the context of pending
21   litigation -- I mean, pending legislation designed to
22   address those areas that were having long wait times.
23   Q. What do you recall and those wait times?
24   A. That some people had to wait a long time.
25   Q. Do you remember what locations that occurred at?

---

366

1    A. I think my memory is that Houston was mentioned.
2    But I don't remember what other locations.
3    Q. Do you remember which location in Houston?
4    A. No.
5    Q. Do you remember any information in the public
6    record on whether or not there were locations at the DPS
7    offices with long wait times and where those offices
8    were in relation to minority population centers?
9    A. My memory is that it was opponents of the bill
10   arguing that, as you said, minority populations would be
11   adversely impacted by that.
12   Q. Did you see any evidence in the public record to
13   contest that allegation made by minority representatives
14   or Senators?
15   A. I believe the questions were directed to a
16   Department of Transportation official and I don't recall
17   her exact responses.
18   Q. In terms of posing these question that you posed
19   in Exhibit 86, did you undertake any effort to answer
20   these questions as they applied to Senate Bill 14?
21       MR. SWEETEN: In answering his question
22   don't reveal mental impressions, opinions about
23   legislation or communications that you had with the
24   individuals we've enumerated previously. You can answer
25   as to matters of the public record.

---

367

1    A. Right. I don't recall any -- I don't think I
2    publicly addressed these.
3    Q. (By MR. DUNN) Do you know -- well, let me ask it
4    this way. Did you direct anybody to go about answering
5    these questions in Exhibit 86 as they applied to Senate
6    Bill 14?
7    A. In public or internally?
8    Q. Anywhere. Not asking the result of the review,
9    just asking if you're aware -- well, not aware, if you
10   assigned anybody the project of answering these
11   questions in Exhibit 86 as they applied to Senate Bill
12   14?
13   A. I'll assert the privilege earlier mentioned.
14   Q. Do you know whether there was any review by any
15   party starting publicly as to the questions that you
16   pose in Exhibit 86 as to Senate Bill 14?
17       MR. SWEETEN: Caution you on legislative
18   privilege. Don't reveal communications or your thoughts
19   or mental processes regarding legislation.
20   A. Right. I'll assert legislative privilege.
21   Q. Where are we on time?
22       THE REPORTER: He's been on the record
23   28 minutes.
24       MR. DUNN: I probably have five to seven
25   more minutes.

---

368

1        Now, skipping down to the, How does the law
2    compare to laws of other states, is it more or less
3    restrictive than the identification laws in other
4    states? Did you conduct an analysis to answer that
5    question?
6        MR. SWEETEN: Don't reveal your thoughts,
7    mental processes, impressions about legislation in
8    answering the question or communications that you've had
9    with legislators, staff, State Agencies, Texas Ledge
10   Council.
11   Q. (By MR. DUNN) And again, I'm going to withdraw
12   that question and ask it this way: Relying on only the
13   public record, which is the statute as passed, Senate
14   Bill 14, the evidence that you're aware of in the public
15   record supporting it and the laws as passed in other
16   states is clearly available to anyone, did you develop
17   an opinion on whether or not Senate Bill 14 is more or
18   less restrictive than identification laws in other
19   states?
20   A. I don't recall. I recall a general discussion in
21   the Committee and how this law compares to Georgia. And
22   again, without knowing the timing it's -- I can't recall
23   if it was Georgia, Indiana, Mississippi, Louisiana,
24   other states involved or if it was limited to Georgia.
25   Q. Now, moving to the last paragraph in the last

BRIAN HEBERT                                        MAY 29, 2012



369

1 section under Conclusion, last sentence of the first
2 paragraph, Without inclusion of these three options,
3 other forms of IDs fail-safe, non-photo ID options, it
4 seems doubtful the DOJ staff will recommend preclearance
5 of the Photo ID Law.  You drafted that sentence?
6    A.  I think so, yes.
7    Q.  I think I'm just about finished.
8        In your preparations of Exhibits 86, 85 and 89,
9 did you undertake any analysis as to what types of data
10 the State collects on voters in terms of race and ID
11 availability?
12        MR. SWEETEN:  In answering that question,
13 don't reveal your thoughts, mental impressions regarding
14 -- or opinions about legislation or furtherance of the
15 legislative process nor communications that we've
16 outlined previously.  If you can't answer it without
17 doing that then do not do so.  Otherwise you can refer
18 to the matters of the public record.
19    A.  I'll assert privilege.
20    Q.  (By Mr. Dunn)  Alright.  I think subject to the
21 court's rulings, I'm finished.
22        MR. SWEETEN:  Reserve questions to the time
23 of trial.
24        (Deposition concluded.)
25

371

1        I, BRIAN HEBERT, have read the foregoing
2 deposition and hereby affix my signature that same is
  true and correct, except as noted above.
3
              BRIAN HEBERT
4 THE STATE OF TEXAS  )
                     )
5 COUNTY OF _____)
6        Before me, _____, on this day
  personally appeared BRIAN HEBERT, known to me (or proved
7 to me under oath or through
  (description of identity card or other document) to be
8 the person whose name is subscribed to the foregoing
  instrument and acknowledged to me that they executed the
9 same for the purposes and consideration therein
  expressed.
10       Given under my hand and seal of office this ____
  day of        , .
11
12             NOTARY PUBLIC IN AND FOR
                THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25

370

1              CHANGES AND SIGNATURE
2          RE: STATE OF TEXAS VS. HOLDER
3
4    PAGE  LINE   CHANGE        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

372

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2
  STATE OF TEXAS      )
3                     )
                      )
4 VS.                 )  NO. 12-CV-128
                      )  (DST, RMC, RLW)
5                     )
  ERIC H. HOLDER, JR.,  )
6 ET AL               )
7 ********************************************
             CERTIFICATE FROM THE
8            ORAL DEPOSITION OF
             BRIAN HEBERT
9 ********************************************
10       I, Janalyn Reeves, a Certified Shorthand Reporter
  in and for the State of Texas, do hereby certify that
11 the foregoing deposition is a full, true and correct
  transcript;
12
13   That the foregoing deposition of BRIAN HEBERT, the
14 Witness, hereinbefore named was at the time named, taken
15 by me in stenograph on May 29, 2012, the said Witness
16 having been by me first duly cautioned and sworn to tell
17 the truth, the whole truth, and nothing but the truth,
18 and the same were thereafter reduced to typewriting by
19 me or under my direction.  The charge for the completed
20 deposition is $_____ due from Defendant.
21   () That pursuant to the Federal Rules of Civil
22 Procedure, the Witness shall have 30 days after being
23 notified by certified mail, return receipt requested, by
24 the deposition officer that the original deposition
25 transcript is available in her office for review and

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
            Plaintiff,             )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
            Defendant,             )
                                   )
ERIC KENNIE, et al,                )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS STATE CONFERENCE OF          )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )  (RMC-DST-RLW)
                                   )  Three-Judge Court
     Defendant-Intervenors,        )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
     Defendant-Intervenors,        )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
     Defendant-Intervenors.        )

************************************************
              ORAL DEPOSITION OF
              BRIAN KEITH INGRAM
                 JUNE 5, 2012
************************************************

## 2

1        ORAL DEPOSITION OF BRIAN KEITH INGRAM, produced as
2    a witness at the instance of the Defendant, was duly
3    sworn, was taken in the above-styled and numbered cause
4    on the JUNE 5, 2012, from 9:36 a.m. to 5:25 p.m., before
5    Chris Carpenter, CSR, in and for the State of Texas,
6    reported by machine shorthand, at the offices of The
7    United States Attorney's Office, 816 Congress Avenue,
8    Suite 1000, Austin, Texas 78701, pursuant to the Federal
9    Rules of Civil Procedure and the provisions stated on
10   the record or attached hereto.

## 3

1
2
3                      A P P E A R A N C E S
4    FOR THE PLAINTIFF, STATE OF TEXAS:
5        Patrick K. Sweeten
         John McKenzie
6        Jay Dyer
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
7        P.O. Box 12548
         Austin, TX 78711-2548
8
         209 West 14th Street
9        8th Floor
         Austin, TX 78701
10       (512) 936-1307
         patrick.sweeten@texasattorneygeneral.gov
11
12   FOR THE DEFENDANT, HOLDER, ET AL:
13       Bruce Gear
         Jennifer Maranzano
14       U.S. DEPARTMENT OF JUSTICE
         950 Pennsylvania Avenue, NW
15       NWB - Room 7202
         Washington, DC 20530
16       (202) 305-7766
         bruce.gear@usdoj.gov
17       jennifer.maranzano@usdoj.gov
18   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
     NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
19   CAUCUS:
20       Ian Vandewalker (by telephone)
         Myrna Perez (by telephone)
21       THE BRENNAN CENTER FOR JUSTICE
         AT NYU LAW SCHOOL
22       161 Avenue of the Americas, Floor 12
         New York, NY 10013-1205
23       (646) 292-8362
         ian.vandewalker@nyu.edu
24       myrna.perez@nyu.edu
25

## 4

1                    INDEX
2    Appearances.......................................3
3    BRIAN KEITH INGRAM
4        Examination by Mr. Gear...................5
         Examination by Mr. Vandewalker..........231
5        Further Examination by Mr. Gear.........263
         Further Examination by Mr. Vandewalker..266
6        Examination by Mr. Sweeten..............274
7    Signature and Changes.........................276
8    Reporter's Certificate........................278
9              EXHIBITS
10   NO. DESCRIPTION                    PAGE MARKED
11    5   SB No. 14                     126
12    28  HB No. 218                    111
13    44  HB No. 1706                   163
14    101 Texas Legislature Online History, HB 1706   107
15    552 Notice of Deposition             36
16    553 E-Mail, June 5, 2012             28
17    554 E-Mails and Attachments, TX_00148056 thru   94
         TX_00148170
18
19    555 Group of Documents Pertaining to Angelina   96
         County Investigation
20    556 SB No. 362                    162
21    557 Election Irregularities Reported During   215
         the May 9, 2009 General Election
22
23    558 Affidavit of Keith Ingram        240
24    559 Plaintiff's Supplemental Objections and    263
         Responses to Defendant's First Set of
         Interrogatories
25

## 5

1       THE REPORTER:  This is the deposition of
2   Keith Ingram, taken in the case of the State of Texas,
3   versus Eric Holder, et al., in the United States
4   District Court for the District of Columbia, Case Number
5   1:12-CV-00128.  Today's date is June 5, 2012, and we're
6   on the record at 9:36 a.m.
7       Will the counsel please make your
8   announcements and then I will swear in the witness.
9       MR. GEAR:  My name is Bruce Gear.  I'm
10  with the Department of Justice, and I represent Eric
11  Holder, the Attorney General for the United States.
12      MS. MARANZANO:  Jennifer Maranzano, also
13  representing Defendant Attorney General Eric Holder.
14      MR. SWEETEN:  I'm Patrick Sweeten.  I'm
15  with the Texas Attorney General's Office, and I
16  represent the State of Texas and the witness, Keith
17  Ingram.
18      MR. MCKENZIE:  John McKenzie, also with
19  the Texas Attorney General's Office, and I represent the
20  State of Texas and the witness.
21      MR. DYER:  And also Jay Dyer.  I'm with
22  the Texas Attorney General's Office.  I'm here on behalf
23  of the State of Texas and the witness.
24      EXAMINATION
25  BY MR. GEAR:

## 7

1   This is Ian Vandewalker for Defendant Intervenors, Texas
2   NAACP and Mexican American Legislative Caucus.  I also
3   have here in the room with me Myrna Perez for the same
4   party.
5       MR. GEAR:  Thank you.
6       BRIAN KEITH INGRAM,
7   having been first duly sworn to testify the truth, the
8   whole truth, and nothing but the truth, testified as
9   follows:
10      EXAMINATION
11  BY MR. GEAR:
12      Q.  All right.  And so let's reverse that just a
13  little bit.  And I asked you the question did you
14  understand that you've been sworn in under oath, under
15  penalty of perjury and that this is similar to giving
16  testimony at a trial.  Do you understand that?
17      A.  I do indeed, yes.
18      Q.  Okay.  And now you have, in fact, been sworn
19  in.
20      A.  Now I have in fact, yes.
21      Q.  So going back to the ground rules, I'm going to
22  be asking you questions.  I'd just ask that you give me
23  an opportunity to complete the question that I ask, and
24  I will do the same for you, give you an opportunity to
25  complete your answer as completely and fully as

## 6

1       Q.  Mr. Ingram, can you state and spell your name
2   for the record?
3       A.  My name is Brian Keith Ingram.  B-R-I-A-N,
4   K-E-I-T-H, I-N-G-R-A-M.
5       Q.  And you understand that you've been sworn in
6   under oath and may be subject to penalty of perjury for
7   giving false or misleading testimony?
8       A.  Yes.
9       Q.  And that providing testimony is similar to
10  providing testimony in a trial?
11      A.  Absolutely.
12      Q.  Do you understand that?
13      A.  (Witness nods head yes.)
14      Q.  Okay.  I just want to start off with a couple
15  of ground rules.  I'm going to be asking you questions,
16  and you're going to be responding.  So during the course
17  of the deposition, I just ask that you give me --
18      THE REPORTER:  I need to swear in the
19  witness.
20      (Witness sworn.)
21      THE REPORTER:  Anybody on the phone want
22  to make announcements?
23      MR. GEAR:  Do you want to introduce
24  yourself on the phone?
25      MR. VANDEWALKER:  Yes, sir.  Thank you.

## 8

1   possible.  Do you understand that?
2       A.  I do.
3       Q.  It's also important that when you respond, you
4   respond verbally.  You can't shake your head "yes" or
5   "no" because that cannot be recorded.  Okay?
6       A.  I understand.
7       Q.  It's important that you let me finish the
8   sentence that I'm speaking and then I will allow you to
9   do the same, and that just goes along with listening and
10  answering.  Do you understand that?
11      A.  I do.
12      MR. VANDEWALKER:  I apologize.  I'm sorry
13  to interrupt, but I wonder if maybe the phone could be
14  placed closer to the people that are speaking.  We're
15  having a little trouble hearing on the phone.
16      MR. GEAR:  Okay.  Let's see if we can do
17  that.
18      Q.  (By Mr. Gear)  As the gentleman on the phone
19  pointed out, I tend to be very soft-spoken, and so it's
20  important for us to both speak loudly and clearly enough
21  so that it can be recorded by the court reporter.  Do
22  you understand?
23      A.  I do.
24      Q.  Okay.  Is there any reason that you cannot
25  testify today completely and truthfully?

BRIAN KEITH INGRAM                                        June 5, 2012

## 17

1   January 12th letter before there was a lawsuit filed.
2       Q.   And that was during the submission process?
3       A.   It was.
4       Q.   And when you say "you" --
5       A.   I mean Jennifer.
6       Q.   Maranzano?
7       A.   Right.  I wasn't going to try the last name.
8       Q.   All right.  And in the first time you met with
9   your attorneys, I believe you said in April or March of
10  2012, who else was present, if anyone?
11      A.   In the room that day would have been Patrick, I
12  believe Brooke was there, Paup, and --
13      Q.   I'm sorry.  What was the last name?
14      A.   Paup.  P-A-U-P.  Matt Frederick, Reynolds
15  Brissenden, and I think that's it.
16           MR. GEAR:  I don't want to ask him about
17  any substance of the conversation.
18           MR. SWEETEN:  Okay.  Great.
19      Q.   (By Mr. Gear)  Who is Brooke Paup?
20      A.   Lawyer in the Attorney General's Office.
21      Q.   And Reynolds Brissenden?
22      A.   Same, lawyer in the Attorney General's Office.
23      Q.   And did you review any documents at that time?
24      A.   I did not.
25      Q.   Moving forward to the next meeting with your

## 18

1   attorneys in preparation of this deposition, when did
2   that occur?
3       A.   Yesterday.
4       Q.   Where did that occur?
5       A.   7th floor of the Price Daniel, Sr. Building.
6       Q.   You said "Price Daniel"?
7       A.   (Witness nods head yes.)
8       Q.   Who, if anyone, was present then?
9       A.   Yesterday we had John McKenzie, Patrick Sweeten
10  and Jay Dyer were present, and Adam somebody was on the
11  phone.
12      Q.   You don't know Adam's last name?
13      A.   I do not.
14      Q.   Do you know who Adam is?
15      A.   A lawyer in Chicago, New York.  Not Texas.
16      Q.   And you indicated John?
17      A.   McKenzie.
18      Q.   McKenzie.
19           Were there any nonlawyers present?
20      A.   There were not.
21      Q.   Any of your staff?
22      A.   No.
23      Q.   Did you review any documents during that
24  deposition preparation?
25      A.   I did not.

## 19

1       Q.   Other than your lawyers, did you speak to
2   anyone else regarding this deposition today?
3       A.   Just generally telling people where I was going
4   to be and that I would be mostly unavailable.
5       Q.   Do you -- are you aware that others have been
6   deposed regarding this case?
7       A.   Yes.
8       Q.   Are you aware that Ann McGeehan has been
9   deposed regarding this case?
10      A.   I am aware of that, yes.
11      Q.   Did you review Ann McGeehan's deposition
12  testimony?
13      A.   I did not.
14      Q.   Did you speak to Ann McGeehan regarding her
15  deposition testimony?
16      A.   I did not.
17      Q.   Did you speak to anyone -- did you speak to
18  anyone regarding Ann McGeehan's testimony?
19      A.   You know, in general terms --
20           MR. SWEETEN:  Hold on a minute.  Don't
21  reveal any attorney-client privilege information, any
22  discussions that you or me or any other attorneys with
23  you may have had.  Other than that, you can answer.
24      Q.   (By Mr. Gear)  Anyone other than your lawyers?
25      A.   No.

## 20

1       Q.   Did you speak to any of the other deponents in
2   this case?
3       A.   I talked to Michael Scofield before his
4   deposition, and he said it was coming Friday when I saw
5   him last week.  And I talked to Julie Rathgeber in the
6   Lieutenant Governor's office.  She called me on another
7   matter and said she had been deposed.  Didn't talk about
8   the substance of it at all.  Those are the only two that
9   I know of.  If more than that have been deposed that
10  I've talked to, I don't know.
11      Q.   And you said you spoke to Mr. Scofield.  When
12  did you meet with Mr. Scofield?
13      A.   I had lunch with him a week and a half ago.
14      Q.   And that was before he provided his deposition
15  testimony?
16      A.   It was.
17      Q.   Did you talk about the depositions?
18      A.   Did not.
19      Q.   Did you meet with anyone else regarding
20  preparation for this deposition?
21      A.   No.  I did talk to the manager of my voter
22  registration department just to make sure in my head I
23  had the right general figures.
24      Q.   So the manager of your voter registration
25  department --

BRIAN KEITH INGRAM                                    June 5, 2012

## 21

1    A.   That's right.
2    Q.   -- who is that?
3    A.   Betsy Schonhoff.  S-C-H-O-N-H-O-F-F.
4    Q.   And is Betsy Schonhoff an attorney within the
5    Secretary of State's Office?
6    A.   She is not.
7    Q.   Can you tell me when you met with or spoke with
8    Betsy Schonhoff?
9    A.   I talked to her about 15 minutes yesterday
10   afternoon.
11   Q.   And you indicated that you wanted to make sure
12   you had your figures correct.  What figures are you
13   referencing?
14   A.   Well, specifically, I was talking to her about
15   the fact that, you know, in the official list of
16   registered voters for this May 29th primary that we just
17   had, that I had a recollection of having 13,065,000
18   registered voters of which a little better than 1 1/2
19   million were on suspense, and so I just wanted to make
20   sure that my recollection of those numbers was correct.
21   Q.   So when you say "on suspense," you're talking
22   about suspended voters?
23   A.   Right.
24   Q.   Okay.  And so what was the figure that you just
25   stated?

## 22

1    A.   That as of April the 30th, whenever they ran
2    the list of -- official list of registered voters for
3    the primary, we had just over 13 million registered in
4    the state, of which about 1 1/2 million, 1.543 or
5    something like that, were on suspense.  And that 1 1/2
6    million figure for suspense is fairly consistent over
7    time.  2008 cycle, there was 1.898.  In the 2010 cycle,
8    there was a little more, 1,898,300.  But anyway, that's
9    --
10   Q.   So 1.5 million is the average?
11   A.   It's consistent.  A little down.
12   Q.   And why were you concerned about those numbers?
13   A.   Just wanted to make sure that if it came up, I
14   had good information in my head.
15   Q.   Okay.  And you're familiar with SB 14?
16   A.   I'm generally familiar with SB 14.
17   Q.   And is it fair to that suspended voters would
18   not be allowed to vote pursuant to SB 14?
19   A.   That is not correct.
20   Q.   Okay.  What is correct?
21   A.   If a voter shows up to vote and they show the
22   proper ID, they can vote.
23   Q.   Okay.
24   A.   That's the one way to get out of suspense is to
25   vote.

## 23

1    Q.   Are -- do suspended voters, are their licenses
2    seized?
3    A.   No.
4    Q.   And I'm not -- this is --
5    A.   No, no.
6    Q.   -- your chance for me to understand.
7    A.   No.  It doesn't have anything to do with
8    that.  That's -- I'm just surprised.
9    Q.   Okay.  And so what does suspended voting have
10   to do with?
11   A.   A voter goes in suspense whenever there's an
12   indication to the voter registrar of their county that
13   that voter no longer lives at the address they provided
14   when they registered to vote.  So the way it works is in
15   the fall of odd-numbered years, there is a date, a
16   cut-off date at the end of November.  All voters who are
17   registered by that date get a card that's a voter
18   registration card.
19   Q.   Uh-huh.
20   A.   And that piece of mail, that card, is
21   nonforwardable.  So if it bounces back to the voter
22   registrar, the voter registrar then sends a piece of
23   forwardable mail to that address that says, "Have you
24   changed your address?"  The voter will have 30 days to
25   update their address information with the voter

## 24

1    registrar or let them know that they have moved out of
2    county.  If they don't do either one, they will stay in
3    suspense for the next two general elections.  So roughly
4    36 months.  And after the second general election, at
5    which they don't show up and vote, they're cancelled.
6    Q.   And is there a process that a suspended voter
7    would have to go through in order to vote on an election
8    date?
9    A.   Show up and vote.
10   Q.   Okay.
11   A.   They can either bring an expired voter
12   registration card, or they can bring any of the other
13   forms of ID that are in 63.0101, pre-Senate Bill 14.
14   Q.   And that's under the current law?
15   A.   Right.
16   Q.   And would that change under SB 14?
17   A.   The categories of documents that are allowable
18   has ID change.
19   Q.   Okay.
20   A.   63.0101 lists changes, yes.
21        MR. SWEETEN:  I need to take a quick
22   break.  I've got a breaking very small family emergency
23   that I can address with a phone call.
24        MR. GEAR:  Sure.  Go off the record.
25        (Recess from 10:03 to 10:05 a.m.)

BRIAN KEITH INGRAM                                        June 5, 2012

---

## 25

1        MR. GEAR:  Okay.  So we were talking about
2   suspended voters, and can you read the last question
3   back?
4              (Requested portion was read back by the
5        court reporter.)
6        Q.  (By Mr. Gear) And I believe that was your
7   answer.  And what did you mean by that?
8        A.  I mean that the list of allowable forms of
9   identification changed in SB 14.
10        Q.  All right.  So when dealing with a suspended
11   voter that comes to the polling place, what must they
12   show in order to vote?
13        A.  When?
14        Q.  When they come to the polling place.
15        A.  I understand --
16        Q.  When SB 14 -- if SB 14 is implemented?
17        A.  If SB 14 is implemented, they would have to
18   show one of the forms of ID in Election Code 63.0101.
19        Q.  And all of those are photo ID?
20        A.  Yes.
21        Q.  And they can no longer show their election
22   certificate?
23        A.  No, they could.
24        Q.  They could?
25        A.  Sure.

## 26

1        Q.  Could they only show the certificate?
2        A.  No.
3        Q.  And again, this is my opportunity to understand
4   what you know, and so some questions that I ask you may
5   seem obvious, but I just want to know what you know.  Do
6   you understand?
7        A.  I do.
8        Q.  Okay.  And you indicated that you gained the
9   knowledge about suspended voters from Betsy, and I can't
10   remember the last name.
11        A.  Schonhoff.
12        Q.  Schonhoff.  Did you discuss anything else with
13   Betty Schonhoff?
14        A.  I did not.
15        Q.  All right.  And I see that you brought some
16   documents today?
17        A.  I did.  I received an e-mail this morning that
18   I believe to be responsive to the duces tecum.
19        Q.  Okay.  And is that something I can take a look
20   at?
21        A.  (Handed document to counsel.)
22        MR. GEAR:  Have you seen this already?
23        MR. SWEETEN:  I have.
24        MR. GEAR:  Okay.
25        Q.  (By Mr. Gear) And this is from the Secretary of

## 27

1   State?
2        A.  Forwarded it to me, yes.
3        Q.  And it's dated June 5th, 2012, correct?
4        A.  Yes.
5        Q.  Okay.  And as I've skimmed this, I understand
6   that it addresses La Salle County?
7        A.  Yes, that's my understanding.
8        Q.  And why did you believe this was responsive to
9   the subpoena?
10        A.  I believe that the subpoena has on it anything
11   that relates to complaints of voter fraud, and this is
12   what appears, on its face, to be a complaint about voter
13   fraud in a La Salle County recently.  It's not on our
14   official complaint form yet.
15        Q.  Okay.  And it indicates that the complaint that
16   you're referring to may cover 20 -- 20 percent, 25
17   percent of the registered voters?
18        A.  Whatever Mr. Barrientos says.
19        Q.  And who is Barrientos?
20        A.  I do not know who he is.
21        Q.  And you're referring to -- and let's do this so
22   it's a little clearer on the record.
23        A.  Sure.
24        Q.  Do you need this document?  Do you mind if I
25   mark it as an exhibit?

## 28

1        A.  No, you're welcome to it.
2        Q.  Okay.
3        MR. GEAR:  Why don't we mark this as
4   Exhibit 553.
5              (Exhibit 553 marked for identification.)
6        MR. SWEETEN:  And Bruce, just at a break
7   or at lunch or whatever, we probably want to make copies
8   of that.
9        MR. GEAR:  Copies.  That's fine.  And of
10   course I don't have copies right now.
11        MR. SWEETEN:  Of course, and I don't
12   either, and so, yeah, we'll work it out.
13        MR. GEAR:  Okay.
14        Q.  (By Mr. Gear) So now that this is a little
15   clearer on the record, I'm showing you what's been
16   marked as Exhibit 553, which is a document that you
17   brought with you today; is that correct?
18        A.  It is.
19        Q.  Okay.  And this is from the Secretary of State
20   to -- to you, correct?
21        A.  That is right.
22        Q.  And the date is June 5th, 2012?
23        A.  It is.
24        Q.  All right.  And this document references La
25   Salle County, and it's from an individual named Rene --

BRIAN KEITH INGRAM                                          June 5, 2012

---

### 29

1    can you pronounce the last name for me?
2       A.   Barrientos.
3       Q.   Barrientos.  And I asked you previously, do you
4    know who Rene Barrientos is?
5       A.   I do not.
6       Q.   You do not.  Did you receive this complaint
7    from Mr. Barrientos directly, or did it come to you in
8    some other form?
9       A.   It came to me indirectly.  It was made to the
10   Secretary.  She forwarded it to me.
11      Q.   Okay.  And do you know -- the date reflected
12   here is June 4th, 2012.  Is that when it was made to the
13   Secretary?
14      A.   I --
15      Q.   Do not know?
16      A.   -- assume it's correct.
17      Q.   Okay.  And again, it's dated June 4th, 2012,
18   from Mr. Barrientos.  And it starts off, "Dear Secretary
19   of State."  And again, it references La Salle County.
20   Do you see that?
21      A.   Yes.
22      Q.   And it also indicates that La Salle County has
23   approximately 7,000 residents and approximately 3,900
24   registered voters.  Do you see that?
25      A.   Uh-huh.

---

### 30

1       Q.   All right.  "This county has a fairly young
2    population that would otherwise be ineligible to vote,
3    as they are not of voting age." Do you see that?
4       A.   Yes.
5       Q.   "Some county officials have estimated that 900
6    to 1,000 of those registered voters --" "those
7    registered to vote in La Salle do not reside in the
8    county and would not be eligible to vote."  Do you see
9    that?
10      A.   I see that's what he says.
11      Q.   Okay.  "Confirmation of their residence is
12   unavailable due to the inability to verify their
13   residence as required in obtaining a driver's license."
14   Is that correct?
15      A.   Again, that's what he says.
16      Q.   Okay.  And when you say that's what he says,
17   that -- that's what's indicated in the complaint by
18   Mr. Barrientos?
19      A.   That is right.
20      Q.   All right.  And you have not done any
21   independent research of this particular complaint?
22      A.   I have not.
23      Q.   Okay.  Mr. Barrientos indicates that, "These
24   nonresidents actually have a higher voting percentage
25   than the actual voter resident population."  Do you see

---

### 31

1    that?
2       A.   I see it.
3       Q.   Okay.  And that's what Mr. Barrientos says in
4    his complaint?
5       A.   Right.
6       Q.   And his complaint indicates -- or addresses the
7    issue of non-U.S. citizens registering and voting.  Do
8    you see that?  And that would be at the bottom of the
9    first page of this document.
10      A.   Right.  That's listed as the first of several
11   examples, apparently.
12      Q.   Okay.  And again, you have not had an
13   opportunity to independently verify any of the
14   allegations in, in this complaint?
15      A.   I have not.
16      Q.   And would this be a formal complaint or an
17   informal complaint for the purposes of the Secretary of
18   State's Office?
19      A.   This is an informal complaint.
20      Q.   Is there a particular process that
21   Mr. Barrientos would have to go through to file a formal
22   complaint with the Secretary of State's Office?
23      A.   We generally ask people who make informal
24   complaints to fill out our formal complaint form and
25   provide any evidence that they've got along with that

---

### 32

1    form.
2       Q.   And I see this is dated -- the e-mail to you is
3    dated June 5th, 2012.  Is it fair to say you have not
4    had a chance to communicate with Mr. Barrientos?
5       A.   That is fair.
6       Q.   Okay.  So what type of voter fraud is being
7    referenced in Exhibit 553?
8       A.   Well, like you said, noncitizens, multiple
9    registration of individuals and being registered in
10   different counties, convicted felons on probation not
11   eligible to vote that are registered and did vote.
12   Something about a local justice of the peace whose
13   husband was a candidate for sheriff, knowingly
14   registered nonresident oil field workers to support her
15   husband, and that they did, in fact, vote as she
16   requested.  Allegations that ballots were shredded
17   during the vote count, and countless examples remaining.
18      Q.   Do any of those allegations include voter
19   impersonation?
20      A.   I don't think so, but it's hard to say.
21      Q.   And based on your review, you don't see --
22      A.   Well, it's hard to say because I'm not sure
23   exactly what he's getting at with these without more
24   information.  Some of these, especially the multiple
25   registration and the non-U.S. citizens, could be voter

BRIAN KEITH INGRAM                                    June 5, 2012

## 33

1  impersonation, but I just don't have enough information
2  on this.
3      Q.   But in your review of Exhibit 553, there's no
4  direct mention of voter impersonation?
5      A.   Not voter impersonation, no.
6      Q.   There's no direct mention of individuals voting
7  at a polling place who represent -- who are not who they
8  say they are?
9      A.   That's true.  Not directly, except for he talks
10  about ineligible voters falsely misrepresenting
11  residents or citizenship and requiring voter eligibility
12  and ID as a way to stop that.
13      Q.   And you can be a nonresident and vote
14  illegally, but you can still be who you say you are; is
15  that correct?
16      A.   You can.
17      Q.   And you can be a noncitizen and vote illegally,
18  but still be who you say you are, correct?
19      A.   You can.
20      Q.   And those individuals could also be registered
21  or improperly registered, based on clerical error.  Is
22  that fair to say, generally?
23      A.   Yeah, it's the qualifier that I don't like.
24  What do you mean, clerical error?
25      Q.   Clerical error, an error made by the local

## 34

1  election official.  I mean, I'm not trying to testify
2  for you, so...
3      A.   Well, I just don't understand the question.  I
4  mean, people can be falsely registered, yes.
5      Q.   Okay.  And again, that false registration can
6  be based on no fault of their own, generally?
7      A.   It takes an act of volition to apply to
8  register to vote.
9      Q.   Okay.  And so my question is, is:  Are you
10  aware of errors made in registration by any local
11  officials?
12      A.   Yes.
13      Q.   Okay.  So what's -- what's the next step in the
14  process for Exhibit 553?  What would you do?
15      A.   Well, what I did do, I refer it to my legal
16  department for further action.
17      Q.   All right.  And so, we may come back to this,
18  but and the further action would be to request a formal
19  complaint by Mr. Barrientos, and that would be a formal
20  written complaint?
21      A.   Right.
22      Q.   And what happens if he does not return a formal
23  written complaint?
24      A.   Well, I don't know.  I mean, we could either
25  refer it to the OAG like this, or we could send

## 35

1  Mr. Barrientos a letter saying, "Sorry, you didn't give
2  us enough info."
3      Q.   All right.
4      A.   That would be for my lawyers decide.
5      Q.   And so your response suggests that, that you
6  have an option whether to refer or not to refer?
7      A.   Right.
8      Q.   And who makes that decision?
9      A.   Well, ultimately, I do.
10      Q.   Have you received complaints in your office
11  that were received informally that you have determined
12  not to refer?
13      A.   Yes.
14      Q.   And is there a format or a basis in which you
15  make that determination?  Is there a process by which
16  you would make such a determination?
17      A.   Well, you know, basically, you refer them if
18  you think there's enough there to refer.
19      Q.   And what, if any, independent research or
20  investigation do you do when you receive informal
21  complaints?
22      A.   We don't do any investigation in our office.
23      Q.   Okay.
24      A.   We look at the face of the complaint and refer
25  it if it, on its face, alleges sufficient facts.

## 36

1      Q.   So you look at the facts of -- of any
2  particular complaint?
3      A.   Yes.
4      Q.   Okay.
5          (Exhibit 552 marked for identification.)
6      Q.   (By Mr. Gear) Okay.  These go out of order, but
7  I'm going to show you what's been marked as Exhibit 552
8  and give you a chance to take a look at that.
9      A.   (Viewing documents.) Yes.
10      Q.   You previously referred to your subpoena.  Were
11  you referring to your notice of deposition?
12      A.   I am.
13      Q.   Okay.  And specifically to Attachment A?
14      A.   Yes.
15      Q.   And the request for documents, which I believe
16  is on Page 5 of your notice?
17      A.   Right.
18      Q.   All right.  And did -- what, if anything, did
19  you or anyone in your office do to respond to the
20  attachment, request for documents?
21      A.   Well, I reviewed the request to determine
22  whether or not these documents have been previously
23  provided or not, and they have been.
24      Q.   And how did you determine that they have been
25  provided?

BRIAN KEITH INGRAM                                    June 5, 2012

## 37

1    A.   Because everything that we have with regard to
2    SB 14 was assembled and turned over.
3    Q.   And so let's break that down a little bit.
4         When you say everything that we have, how
5    were those documents maintained within your office?  And
6    we're talking about the Election Division?
7    A.   That's right.  We had a substantial public
8    information request from a AP reporter, Suzanne Gamboa.
9    Q.   Okay.
10   A.   Earlier this year, late last year, and so we
11   gathered up everything responsive to that public
12   information request, and it was gathered at the time
13   that we received the litigation hold on this case.
14   Q.   So other than turning over to the Department of
15   Justice the documents responsive to the public
16   information request, did you go beyond and search for
17   any additional documents that may be responsive?
18   A.   No.  We did submit forms and a couple of
19   manuals for preclearance Friday, so you all should have
20   those.  And those are recently-created forms.  And then
21   this e-mail that I received this morning was responsive,
22   I thought, to Number 14.  We also had a spreadsheet that
23   we gave -- I don't know when it was, a couple of months
24   ago, a month and a half ago -- related to all the voter
25   fraud complaints that we have received over the last

## 38

1    while.
2         MR. GEAR:  Can we go off record for one
3    second?
4         (Brief discussion off the record.)
5         MR. GEAR:  All right.  Back on the record.
6    Q.   (By Mr. Gear) Can you tell me when you produced
7    the spreadsheet for voter fraud complaints?
8    A.   I don't know.
9    Q.   Can you tell me what the date range of that
10   spreadsheet is?
11   A.   I don't remember.
12        MR. GEAR:  And Patrick, do you know if we
13   received that?
14        MR. SWEETEN:  I don't.  I can talk to him
15   at a break, and we'll figure that out as well.  I have
16   talked to John, and I don't think he knows either.
17        MR. GEAR:  Because I've reviewed our
18   records, and I don't believe that I've seen anything
19   like that.  Is there any way that we can get a copy of
20   it before this deposition is over?
21        MR. SWEETEN:  Well, let me look into what
22   it is, and if we've asserted a privilege on it, and let
23   me get to the bottom of it at a break.  And I'll talk to
24   Keith.  That's where I'll start.
25        MR. GEAR:  Okay.

## 39

1    Q.   (By Mr. Gear) So just so I understand a little
2    bit more about this spreadsheet, you testified here
3    today that it deals with voter fraud, and it's a list of
4    voter fraud complaints that have been generated in the
5    Secretary of State's Office?
6    A.   No.  That is not correct.
7    Q.   Okay.  Well, you tell me.
8    A.   It is a list of voter fraud, voter
9    impersonation complaints that we've received at the
10   Secretary of State's Office.
11   Q.   And when you say received, can you give me a
12   little bit more detail?  How did you receive these?
13   A.   All kinds of ways:  Over the phone, e-mail,
14   letters.
15        MR. VANDEWALKER:  I'm sorry to interrupt
16   again.  For the people on the phone, it seemed to have
17   moved away from the mics or something.  People's voices
18   are fading out a little bit.  If I could just remind
19   everyone to speak into the phone.
20        MR. GEAR:  We'll do that.  Thank you.
21        MR. VANDEWALKER:  Thank you.
22   Q.   (By Mr. Gear) So as I understand your
23   testimony, the spreadsheet includes voter fraud
24   complaints that have been received by the Secretary of
25   State's Office by phone, correct?

## 40

1    A.   Right.
2    Q.   E-mail?
3    A.   Right.
4    Q.   Letters?
5    A.   Yes.
6    Q.   Any other way that complaints would be received
7    by the Secretary of State's Office?
8    A.   I can't think of any.
9    Q.   I asked you earlier how you maintained files
10   within the Secretary of State's Office, or within the
11   Elections Division, and you referenced that files were
12   produced in -- that had been gathered by public
13   information requests.  And I want to go back to that
14   question of how you maintained the files in your
15   office.  Do you maintain electronic files?
16   A.   Yes.
17   Q.   Can you describe that a little bit for the
18   record, how they are maintained?
19   A.   Well, they're maintained on shared network
20   drives under categories.  I'm not sure I understand the
21   question.
22   Q.   You indicated that they're maintained under
23   shared network drives under categories.  How are the
24   categories divided on the shared network drive?
25   A.   I have no idea.  I mean...

## 41

1    Q.  Well, let me narrow that down to voter ID
2    legislation or voter ID issues.  Is there a category
3    that would identify voter ID specifically?
4        A.  One of the things that we did in response to
5    the public information request from Suzanne Gamboa is
6    segregate all of the electronic documents into an SB 14
7    folder.
8        Q.  Okay.  So as I understand your testimony, in
9    the Election Divisions office, all of the electronic
10   files that deal with SB 14 have been segregated into a
11   particular electronic file?
12       A.  That's right.
13       Q.  All right.  What about earlier voter ID
14   legislation; has that also been segregated?
15       A.  When I said SB 14, I mean voter ID generally.
16       Q.  Okay.  And that would include legislation from
17   2005 to 2011?
18       A.  It includes whatever it includes.  Photo ID was
19   the...
20       Q.  And when you -- when you -- and I'm saying
21   "you" in reference to you or anyone else within your
22   office at this time.  When you produced documents
23   responsive to the notice of deposition, did you also
24   produce documents related to any legislation prior to
25   2011 that dealt with voter ID legislation?

## 42

1        A.  Yes.
2        Q.  Okay.  I turn your attention to -- I think it's
3    Exhibit Number 552 --
4        A.  Right.
5        Q.  -- which is your notice of deposition, and turn
6    your attention to Paragraph 5.  "All documents and
7    communications, including but not limited to those among
8    and between the Office of the Secretary of State, the
9    Division of Elections, members of the Texas Legislature,
10   the Texas Legislative Council, and other Texas state
11   executive offices and agencies."  Do you see that one?
12       A.  I do.
13       Q.  Did you produce documents responsive to
14   Paragraph 5?
15       A.  I believe so, yes.
16       Q.  And so it's your testimony here today that you
17   produced documents responsive to all of the paragraphs
18   included within the notice of deposition documents?
19       A.  Yes.
20       Q.  Okay.  I just want to go back briefly to the --
21   your testimony about the spreadsheet regarding voter
22   fraud that was -- that was produced.  Who -- who do
23   complaints usually come from in terms of voter fraud?
24       A.  There's not a usual.
25       Q.  Can you give me a description of generally,

## 43

1    then, who would make a voter fraud complaint to the
2    Secretary of State's Office?
3        A.  Generally, anybody that feels like fraud has
4    been committed and cares enough about it, reports it.
5        Q.  So that would include voters?
6        A.  It does include voters.
7        Q.  Candidates?
8        A.  Yes.
9        Q.  Would you ever receive a referral for any
10   reason directly from the Attorney General's Office?
11       A.  No.
12       Q.  Election officials, local election officials?
13       A.  Yes.  And maybe -- we might have -- sometimes
14   people go the OAG first, and the OAG redirects them to
15   us to do the evidence assembly.  So if that's considered
16   getting a complaint from the OAG, that probably has
17   happened a few times.
18       Q.  Okay.  So let's just talk about for a minute.
19           If the OAG redirects a complaint to you,
20   what do they generally ask you to do?
21       A.  They like for us to have complaints sent to
22   them on our form after we've assembled the evidence.
23       Q.  Okay.  When you talk about evidence, what are
24   you referring to?
25       A.  I'm talking about a list of witnesses, whatever

## 44

1    documentary evidence there is to support the
2    allegations, they want us to do that bit first and then
3    refer to it them.
4        Q.  Okay.  And is that generally what you do for
5    all complaints when possible?
6        A.  It is.
7        Q.  And when you talk about evidence, are you
8    referring an election-related evidence?
9        A.  Evidence supporting the allegations of fraud as
10   the complainant sees it.
11       Q.  Okay.  And that would deal with voter
12   registration information, documentation that's specific
13   to any particular election?  Would that be accurate,
14   generally?
15       A.  It includes whatever the complainant believes
16   to be necessary for their complaint.  So yes, it can be
17   any number of things.
18       Q.  Okay.  And we talked about documents in the
19   Elections Division.  Can you tell me:  Is there a
20   retention policy in your office?
21       A.  There is.
22       Q.  And what is that policy?
23       A.  It's written.  A lot of pages, a lot of words.
24       Q.  And what is your retention policy?
25       A.  Well, it's different for different documents.

## 49

1    A.  I don't know.

2    Q.  Who would know what's maintained within the

3 electronic file pertaining to SB 14?

4    A.  I don't know.

5    Q.  Is there a particular person that's responsible

6 for maintaining that file?

7    A.  Well, yes.  There's a lady in my office who's

8 got a -- you know, a list of stuff.

9    Q.  Okay.  And so let's flesh that out a little

10 bit.  There's a lady in your office.  Who is the lady?

11    A.  Jennifer Templeton.

12    Q.  And what are -- what are Jennifer Templeton's

13 responsibilities?

14    A.  Well, applicable to this, it's her

15 responsibility to gather information and keep public

16 information requests in order and on track.

17    Q.  And you testified to stuff, and I'm just trying

18 to put that into context.

19    A.  Well, I haven't -- I haven't looked at her

20 list, so I don't know how detailed the description is

21 of, of the items.  It's -- she got a list of everything

22 that we've turned over to the OAG in connection with

23 this litigation.  But what I think is that's it's a real

24 high-level list.

25    Q.  And when you say high level, what do you mean?

## 50

1    A.  I mean, you know, three banker boxes of

2 documents.

3    Q.  Okay.

4    A.  So, I don't think it's of much help is my

5 point.

6    Q.  Has the list itself been turned over to the

7 OAG?

8    A.  No.

9    Q.  But that list would identify everything that

10 has been turned over and everything that's within the

11 electronic file pertaining to SB 14?

12    A.  In a very general way.

13    Q.  Did you review Ann McGeehan's files pertaining

14 to SB 14?

15    A.  I don't know.

16    Q.  Would Ann McGeehan's files, notes, speeches,

17 whatever exists be contained within the electronic file

18 that you've been testifying here today?

19    A.  Yeah.  It would be in the electronic and paper

20 files.  We gathered everything.

21    Q.  And so did you review Ann McGeehan's files

22 pertaining to SB 14 when you began in January of 2012?

23    MR. SWEETEN:  Objection, asked and

24 answered.

25    A.  Yeah.

## 51

1    Q.  (By Mr. Gear) I don't believe I asked that one,

2 but you can answer.

3    A.  I don't know.  I mean, it's a hard question to

4 answer, because Ann McGeehan didn't have files.  You

5 know, that's -- that's not a category that exists.

6 There are files that contain Ann McGeehan's work in

7 them, and I have looked at some of those, sure.

8    Q.  Okay.

9    A.  It is in response to the Suzanne Gamboa PIR, we

10 were trying to go through them and assert objections.

11    Q.  So you said, if I understand your testimony

12 correctly, she did not have a file that exists on a

13 electronic drive, but she had -- she had work that

14 existed on the electronic drive, correct?

15    A.  That's the best of my ability to describe it,

16 yes.

17    Q.  And are you familiar with the work that she

18 produced pertaining to SB 14?

19    A.  Am I familiar with all of it?  I don't know.

20    Q.  But you've reviewed --

21    A.  Some.

22    Q.  -- some of that work?

23    A.  (Witness nods head yes.)

24    Q.  In addition to the electronic files, are there

25 paper files maintained within your office pertaining to

## 52

1 SB 14 or voter ID legislation generally?

2    A.  Yes.

3    Q.  And were those searched in response to the

4 notice of deposition?

5    A.  No.

6    Q.  Do you know -- do you know or do you have

7 knowledge as to whether the paper files contained any

8 different documentation other than the -- beyond the

9 electronic file?

10    A.  I have no idea.

11    Q.  I'm going to change the focus for a second to

12 your educational background.  Can you tell me a little

13 bit about your educational background?

14    A.  I graduated Permian Basin Christian School with

15 a high school diploma in 1985.  I graduated Texas A&M

16 University with a BA in political science in 1989.

17 Graduated UT Law with a JD in 1993.

18    Q.  All right.  And I just need to slow down a

19 little bit.  So we can skip past high school.  You

20 graduated.  Congratulations.  Let's go to 1999.

21    A.  But in high school, I was the top 20 percent of

22 my class.  You don't want to just pass right over that.

23    Q.  And that is important.

24    A.  I wasn't in the top 20 present.  I was the top

25 20 present.  It was a small school.

BRIAN KEITH INGRAM                                        June 5, 2012

## 53

1   Q.  So in 1999, you said you graduated from
2   undergrad, correct?
3   A.  1989.
4   Q.  1989 you graduated from undergrad.  And did I
5   -- did I hear University of Texas?
6   A.  That's law school.
7   Q.  Law school.  So the undergrad was --
8   A.  Texas A&M.
9   Q.  Texas A&M.  Okay.  And then UT law school was
10  in?
11  A.  1993.
12  Q.  '93.  And do you have an active law license?
13  A.  I do.
14  Q.  And which states do you have an active law
15  license in?
16  A.  Texas and Arkansas.
17  Q.  Okay.  Well, let's just talk about your work
18  history, if we -- if we can.  Did you come to practice
19  law at any particular time?
20  A.  I did.
21  Q.  And tell me just a little bit about your law
22  practice.
23  A.  Sure.  September of '93 to February of '96, I
24  was at a firm in McAllen, Texas named Atlas and Hall,
25  LLP.  And I was a litigation associate, but did a little

## 54

1   bit of a lot of stuff.
2   Q.  Okay.  Beyond 1996?
3   A.  In February 1996, I came to Austin to work in a
4   litigation boutique.  At the time, it was Maroney,
5   Crowley, Bankston, Richardson & Hull, LLP, where I was
6   also a litigation associate.  But instead of doing as
7   many different things as I was doing in McAllen, now I
8   had focused primarily on product liability litigation,
9   breast implants, medical malpractice and general
10  insurance defense, mainly of Sears and Jefferson
11  Insurance.
12  Q.  And you did that from '96 to --
13  A.  The guys that I came to work for in '96, we
14  stayed together until 2006.  It was different firms.  We
15  merged with Locke, Purnell, Rain & Harrell.  Locke,
16  Purnell merged with Liddell, Sapp, Zivley, Hill &
17  LaBoon.  And then it merged with Liddell, Sapp, Zivley,
18  Hill & LaBoon, and then we left again to form our own
19  litigation boutique.
20  Q.  And you left again in 2006 or you left --
21  A.  No.  We left in April of 2000, and then had our
22  own firm until March of 2006, when I went to Arkansas.
23  Q.  So between 1996 to 2006, you were a lawyer with
24  Maroney or some capacity of Maroney.  Is that fair to
25  say?

## 55

1   A.  That's fair.
2   Q.  Okay.  And so in 2006, you indicated you left
3   and went to Arkansas?
4   A.  I did.
5   Q.  And where did you go when you went to Arkansas?
6   A.  I went to a firm called Kutak Rock in Little
7   Rock, Arkansas.  They're an Omaha-based national firm.
8   Q.  And how long did you stay there?
9   A.  About a year.
10  Q.  2006 to 2007?
11  A.  Yes.
12  Q.  And after that?
13  A.  I had my own firm for a year, January of '07 to
14  January of '08; figured self-employed in Austin was
15  better than Kutak Rock in Little Rock.
16  Q.  Was that -- was that in Arkansas as well, or
17  was that back here?
18  A.  No, it was here in Austin.
19  Q.  Austin.  And after 2008?
20  A.  January of 2008, I went to work for the
21  Governor of Texas.
22  Q.  And how long did you work for the Governor?
23  A.  Four years.
24  Q.  So that would have been what, 2008 to 2012?
25  A.  '12, yes.

## 56

1   Q.  All right.  So let's just go back briefly to
2   1993 to 1996, where you worked for -- I believe you said
3   Atlas and Hall?
4   A.  Yes.
5   Q.  And during that time period, did you do
6   anything related to election law?
7   A.  No.
8   Q.  And then the next period would have been 1996
9   to 2006.  You want make a correction?
10  A.  Yeah.  I'm not sure is a better answer to that
11  question.  I did do some work for a lawyer named Travis
12  Hiester, and he had a whole lot of school districts that
13  he did work for, so it is completely possible that I did
14  some election law question for him on a memo.  But I
15  don't remember anything specifically about it.
16      And when I was in law school, my first
17  summer, I clerked at Bickerstaff, Heath, Smiley, and
18  there was a huge election law case involving Applewhite
19  Dam, a San Antonio voter initiative.  It was a big
20  constitutional mess.
21  Q.  So let's go back to your internship briefly.
22  Bickerstaff, Heath & Riley I believe you said?
23  A.  Smiley.
24  Q.  Smiley.  Smiley.  And you -- you spoke a little
25  bit about what the issue was that you've referred to a

## 57

1  constitutional mess.  Can you tell me a little bit more
2  about the particular case that you were working on?
3       A.  Well, I'm not sure exactly what all the
4  parameters were, but the question was whether or not the
5  issue put before the voters on an initiative was
6  constitutionally allowable for voters to decide in an
7  initiative process.
8       Q.  And do you know what the issue was that was
9  before voters?
10      A.  Applewhite Dam, a water project.
11      Q.  So that had nothing do with voter ID?
12      A.  No.
13      Q.  Is that correct?
14      A.  Definitely not.
15      Q.  Okay.  All right.  So going back from moving
16  forward, as it was, to 1993, 1996, I believe I asked if
17  you had any responsibilities dealing with voter ID or
18  election law, and --
19      A.  Definitely not.
20      Q.  No.  Okay.  So in 1996 to 2006, when you were
21  working in some capacity with Maroney, did you deal with
22  election law at all during that time period?
23      A.  I don't think so.  Not that I recall.
24      Q.  And in 2006 to 2007, when you were at Kutak
25  Rock, I believe, did you deal with anything related to

## 58

1  election law or voter ID legislation?
2       A.  Did not.
3       Q.  And that was in Arkansas, if I recall
4  correctly.
5       A.  It was.
6       Q.  Okay.  So then in 2007 to 2008, you came back
7  to your own firm in Austin.  Did you deal with anything
8  related to election law or voter ID?
9       A.  Did not.
10      Q.  No.  All right.  And now we're to 2008 to 2012
11  where you worked for the Governor, correct?
12      A.  Right.
13      Q.  And that would have been Governor Rick Perry at
14  the time?
15      A.  Yes.
16      Q.  And when you came in to Governor Perry's
17  Office, what was your title or what was your title?
18      A.  Appointments Manager.
19      Q.  And did you continue to hold that title as
20  Appointments Manager through -- through the time that
21  you worked for the Governor?
22      A.  I did.
23      Q.  Okay.  And what were your responsibilities as
24  an Appointments Manager?
25      A.  To assist the Governor in making gubernatorial

## 59

1  appointments.
2       Q.  Did you have any other responsibilities?
3       A.  Yes.  You know, a variety of other things.
4       Q.  Tell me what those are.
5       A.  Well, since I was a lawyer and I was in the
6  Appointments Office, I did legal work for the division
7  with the -- you know, in consultation of the general
8  counsel's office.  But I was the lawyer on the side of
9  the division.
10      Q.  Okay.  And I want to make sure I understand
11  that testimony.  You did legal work for the division.
12  And you're talking about within Governor Perry's Office?
13      A.  Right, within the Appointments Division inside
14  of Governor Perry's Office.
15      Q.  Okay.  And what did that legal work involve?
16      A.  Mainly statutory interpretation.
17      Q.  Of which provisions or what provisions?
18      A.  Well, anything that comes up in Appointments,
19  from water law, river authorities to election code.
20      Q.  Okay.  And would your work have involved
21  anything dealing with voter ID legislation?
22      A.  No.  I was on a team that did bill analysis for
23  the Governor, you know, with his Policy Office.  And so
24  one of the groups that I was in, was in legal, and that
25  would have dealt with voter ID legislation.  But I don't

## 60

1  have any specific recall of a bill coming up.
2       Q.  Okay.  And just so I understand your testimony
3  there, you were on a team that did bill analysis?
4       A.  Right.
5       Q.  Who was -- who else was on that team?
6       A.  Well, it varied, depending on which category we
7  were in.  My role on the team is that if any
8  appointments issue comes up in a bill, to be the
9  Appointments person to talk about whether or not, you
10  know, a good idea, a bad idea, it needs to be tweaked or
11  whatever.  So my role as not wholistic.  My role was
12  limited.
13      Q.  And again, so I understand what you're talking
14  about, when you talk about Appointments issues, how
15  would Appointments issues be related to election law,
16  for instance?
17      A.  Well, it wouldn't necessarily be related to
18  election law, but it would be related to a whole bunch
19  of other kinds of laws.  They always -- the Legislature
20  always thinks it's a good idea to appointment more
21  boards and commissions.
22      Q.  Okay.  Was Michael Schofield on the team that
23  you were referencing?
24      A.  He was in some of the groups that I was in.
25      Q.  And specifically, do you have any -- any memory

## 61

1  of analyzing any voter ID legislation?
2      A.  I do not.
3      Q.  Were you involved in any communications
4  regarding voter ID legislation while you were in the
5  Governor's Office?
6      A.  No.
7      Q.  Are you aware of any existing analysis or
8  reports regarding voter ID legislation that you may have
9  reviewed while you were in the Governor's Office?
10     A.  No.  I didn't review anything.
11     Q.  So you said you didn't review anything, but you
12  said -- you also testified that you were involved in a
13  team that conducted bill analysis?
14     A.  That's right.
15     Q.  And my understanding is, is you may have been
16  involved in the analysis of voter ID legislation?
17     A.  Right.
18     Q.  But you don't recall reviewing anything related
19  to that?
20     A.  Bill analysis doesn't mean that everybody in
21  the room reviews things.
22     Q.  Okay.
23     A.  One person reviews and reports.  Everybody else
24  has questions, so I didn't -- I didn't have any of my
25  own bills.

## 62

1      Q.  Okay.
2      A.  So I didn't review anything.
3      Q.  So help me to understand what it is that you
4  would have done, what your responsibilities on the team
5  would have been.
6          MR. SWEETEN:  You can answer that as a
7  general matter.
8      A.  And generally speaking, my role was to provide
9  input with regard to Appointments issues that come up in
10  the bills.
11     Q.  (By Mr. Gear) Were you present during any
12  communications while in the Governor's Office where
13  voter ID legislation was the subject matter?
14     A.  No.
15     Q.  Have you ever worked as an election judge or an
16  election worker in any elections in the state of Texas?
17     A.  I have not.
18     Q.  And so my understanding is, is that you are the
19  Director of Elections within the Secretary of State's
20  Office?
21     A.  That's correct.
22     Q.  All right.  And you began that January 5th,
23  2012?
24     A.  I did.
25     Q.  So prior to January 5th, 2012, other than your

## 63

1  limited role in the Governor's Office working on a team
2  that may have reviewed voter ID legislation and a memo
3  that you may have prepared some time back during your
4  law practice, did you have any other responsibilities or
5  involvement in voter ID legislation prior to becoming
6  the Director of Elections?
7      A.  None.
8      Q.  And I guess I should ask, just to make sure I'm
9  clear:  Were you involved in any groups prior to
10  becoming the Director of Elections that -- that
11  supported or promoted voter ID legislation?
12     A.  No.  I don't know what you mean.
13     Q.  Any groups, any outside groups, groups outside
14  of the government?
15     A.  Advocacy kind of groups?
16     Q.  Yes.
17     A.  No.
18     Q.  Are you a member of any groups outside of the
19  government?  Political groups?
20     A.  I'm a member of my church.
21     Q.  That's a group.
22     A.  Yeah, that's a group.  I don't know of any
23  other groups that I would be a member of.  I'm a member
24  of the Texas Bar Association, the Arkansas Bar
25  Association.  I'm a member of -- I'm no longer a member

## 64

1  of any other Young Lawyer group.  That's by the
2  wayside.  But, you know, I don't know.  Nothing advocacy
3  oriented.
4      Q.  Are you a member of any -- any political
5  organizations, other than the organizations that you've
6  mentioned?
7      A.  No.
8      Q.  Do you sit on any committees of any kind?
9      A.  No.  In the Governor's Office, one of the
10  things that I did was, I was his designee on the Texas
11  Access to Justice Commission, but I resigned that when I
12  came over to the Secretary of State's Office.
13     Q.  Texas Access to Justice, can you tell me what
14  that is?
15     A.  It is a group that was formed by the Supreme
16  Court, where the Supreme Court, in its order, invited
17  the Governor to have a designee present at the
18  meetings.  And the purpose of the Texas Access to
19  Justice Commission is to make sure that indigent persons
20  in the state of Texas have access to civil legal
21  services.
22         MR. SWEETEN:  Bruce, I've got an answer to
23  your question on the SOS information.
24         MR. GEAR:  Okay.
25         MR. SWEETEN:  We can do that at a break,

BRIAN KEITH INGRAM                                    June 5, 2012

---

## 65

1    or I can just tell you now.
2         MR. GEAR:  We can go off the record for a
3    second.
4         MR. SWEETEN:  All right.
5         (Brief discussion off the record at
6    11:01 a.m.)
7         MR. SWEETEN:  I let Bruce, at the break,
8    know that we had produced a spreadsheet from the
9    Secretary of State, and I gave him the Bates numbers.
10        MR. GEAR:  And I appreciate that.  Thank
11   you.
12            My watch says 12:00 o'clock.  Do you need
13   a break at all?
14        THE REPORTER:  Yeah, I would like a break.
15   It's 11:00 o'clock, though.
16        MR. GEAR:  Why don't we take a ten-minute
17   break.
18        (Recess from 11:02 a.m. to 11:13 a.m.)
19    Q.  (By Mr. Gear)  So we moved through your long
20   and illustrious history, work history, and so now we've
21   gotten to the point where you are employed with the
22   Secretary of State's Office.  And so why don't we start
23   off by talking about how you came to be employed by the
24   Secretary of State?
25    A.  I had an -- obviously, the Deputy Secretary of

---

## 66

1    State, Coby Shorter, used to be in the Appointments
2    Office.  He was the Deputy Secretary.  He was the Deputy
3    Director of Appointments.  And whenever I came, he had
4    just left, so I was at his desk in the Appointments
5    Office.  And over the years I got to know Coby.  I would
6    go to the senior staff meetings sometimes, and he was up
7    there, and you know, you just get to know people.
8             And after this last legislative session,
9    you start the process of thinking about what comes
10   next.  You can't do appointments for the Governor
11   forever, and you have to go back to the work at some
12   point.  So talked to my director about, you know,
13   keeping our ear to the ground and kind of putting
14   feelers out, you know, for anything that might be coming
15   up.
16            And got a weird phone call from John
17   Sepehri.  It was weird.  John Sepehri, I had known for a
18   while.  He's general counsel in the Secretary of State's
19   Office for the last few years.  And so I had known him
20   in that capacity, and we had lunch a few times.  And you
21   know, we were friends.  And he calls and he says -- just
22   asking random questions, election law experience, not
23   much.  A little bit as it pertains to judicial
24   appointments, but not much.  And "Ever worked" -- "Ever
25   been to party conventions?"  "

---

## 67

1    No, never have."  You know.  Just
2    strange -- "John, what's this about?"
3             "Can't tell you right now."
4             Okay.  And so then another weird phone
5    call about a week later, "Have you ever met the
6    Secretary?"
7             "No."
8             "Why don't you come over and meet the
9    Secretary?"
10            "Okay.  Love to."
11            So we dropped by and met the Secretary,
12   you know, just coming by to see John and he happened to
13   be over there by her, and we just happened to be --
14   anyway, it was all very strange, cloak and dagger, and I
15   don't know what the deal was.
16            But at some point, I had a conversation
17   with Coby Shorter who says that Ann McGeehan was
18   retiring, and that he had thought of me as a possibility
19   to replace her and wanted to know if I was interested.
20   And I said "yes."  He had already talked to Teresa, my
21   boss, so they'd already --
22    Q.  So was there a formal interviewing process?
23    A.  There was.  I had a formal interview with Coby,
24   I don't know sometime after that.
25    Q.  Okay.  So had you ever attended any party

---

## 68

1    conventions?
2    A.  No.  No.  I did the Williamson County
3    convention for the Republicans in '08, just because I'd
4    never had done any of that stuff before.  So at precinct
5    convention level, I became the precinct convention
6    chairman of the three of us that were meeting, one of
7    which was my wife.  And we nominated ourselves to be
8    delegates to the Williamson County convention, and we
9    went.  That was quite an entertaining process.  You
10   would not believe the amount of energy spent in debating
11   whether or not the 17th Amendment should stay on the
12   platform or not.  It was interesting.  So that was the
13   only time.
14    Q.  And the 17th Amendment would --
15    A.  Direct election of senators, yeah.  That was a
16   hot issue at the Williamson County Republican
17   convention.
18    Q.  And so as we've established already, you -- you
19   became employed with the Secretary of State's Office on
20   January 5th, 2012?
21    A.  Yes.
22    Q.  And did you come in as the Director of
23   Elections?
24    A.  I did.
25    Q.  And because I don't know, can you tell me what

BRIAN KEITH INGRAM                                    June 5, 2012

## 69

1  the -- what the structure of the Secretary of State's
2  Office is, particularly as it pertains to election laws?
3      A.   Well, we have the Secretary and the Deputy
4  Secretary.  And then under the Deputy Secretary, we've
5  got several division directors, one of which is the
6  Elections, so that's me.  And then I've got managers,
7  four of them that are in my division that management
8  different teams.
9      Q.   So let's talk about the managers, and I believe
10 you said there were four of them.  Can you tell me who
11 they are and what they manage?
12     A.   Sure.  There's Louri O'Leary, who is the
13 administration manager, so she -- all the administrative
14 stuff in the office.  She's not really an office
15 manager.  We don't have an office manager, but all of
16 the administrative support staff kind of things, she's
17 in charge of, as well as other duties as assigned,
18 including the ordering of voter registration application
19 cards, which has turned into a pretty complicated
20 process.
21         She has within her group kind of a
22 subgroup of administration.  It's called "special
23 projects."  And it's managed by Leticia Salazar, and she
24 is in charge of doing the training video for volunteer
25 deputy registrars for election workers.  She's in charge

## 70

1  of organizing the seminar and making sure that all the
2  materials are, you know, that we've got an organized
3  process for putting the seminar together in August.  As
4  well as she's the Elections Division interface with the
5  voter education campaigns that the Secretary's engaged
6  in, you know, any kind of graphic design, website stuff,
7  that's all special projects.
8      Q.   And that's a subgroup under Louri O'Leary?
9      A.   Under administration, that's right.
10     Q.   Okay.
11     A.   So she's kind of -- she's a manager, but she's
12 a submanager under Louri.
13         And then we've got the Legal Division and
14 the director of it is -- the manager of it is Elizabeth
15 Winn.  She has been in the Secretary of State's Office
16 for about 20 years.
17     Q.   So she's the institutional knowledge in the
18 office.
19     A.   She's invaluable.  Smart, pleasant, hard
20 worker.  Invaluable.  And she's got several lawyers
21 working for her as well as two support people.
22     Q.   Okay.
23     A.   We're about to have two more lawyers start
24 three days from now, two days from now.
25         Then we've got the voter registration

## 71

1  team, Betsy Schonhoff is the manager of it.  And they
2  manage the team database and interface with the counties
3  on any questions the counties have with regard to the
4  team voter registration database.  Betsy's job is to
5  make sure that her ladies that she's got in her division
6  are being productive, as well as interfacing with the IT
7  pat of the Secretary of State's Office, which is in a
8  different division.  So she's got one of the IT groups
9  is devoted to voter registration so she interfaces with
10 them, and she's the face of the Secretary of State's
11 Office with the counties.
12     Q.   And when you mean "the face," or when you say
13 "the face," do you mean the point person?
14     A.   She's the point person.  If the counties have
15 an issue, they get in touch with Betsy, and Betsy
16 distributes it out to whoever needs to work on it.
17         And then we've got the Electronic Funds
18 Management portion of the office.  Dan Glotzer is the
19 one in charge of it.  And they are in charge of passing
20 out money.
21     Q.   So if SB 14 was implemented, would -- did you
22 say Dan Glotzer?
23     A.   Glotzer.
24     Q.   Glotzer.  The funding for SB 14, would it come
25 through the Electronic Funds division?

## 72

1      A.   No.  I don't think that there any funding with
2  SB 14 except for the education component, and it would
3  come through Electronic Funds Management.  It would come
4  through HAVA.
5      Q.   HAVA.
6      A.   Yes.  HAVA grant.
7      Q.   So your testimony is it would not come
8  through --
9      A.   Just that piece.
10     Q.   Okay.
11     A.   The voter education piece.
12     Q.   Okay.
13     A.   Any other costs associated with SB 14
14 implementation would be absorbed by the regular budget.
15     Q.   Okay.  All right.  I think I understand
16 that.  So as the Director of Elections, were you hired
17 to -- as a lawyer for the Secretary of State?  You have
18 a law degree.  Do you -- were you hired to practice law?
19     A.   They feel that it's important.  Ann McGeehan
20 was a lawyer.  They feel like it's important to have a
21 lawyer in this position, because there's a whole lot of
22 legal interpretation that has to go on necessarily with
23 the election code and the rule making.
24     Q.   Do your job -- does your job title or does your
25 job responsibilities include providing legal advice?

BRIAN KEITH INGRAM                                    June 5, 2012

## 73

1  A. Yes.
2  Q. And generally, what type of legal advice would
3  you provide in your position?
4  A. I would give legal advice to our communications
5  manager, if -- if he wants to do a certain thing in the
6  voter education campaign as to whether or not that thing
7  would be covered by the HAVA criteria. You know what I
8  mean? So just advise him about the extent of HAVA
9  funding for voter education campaigns. That -- you
10  know, that's just an example, but there are things like
11  that where the executive part of the Secretary of
12  State's Office needs a legal opinion from the Elections
13  Division and that would be my job.
14  Q. So would it be the Legal Division that takes
15  the primary responsibility of giving such legal advice?
16  A. Well, me, I'm the decision-maker. I generally
17  get input from my lawyers.
18  Q. Do you provide legal advice to the Secretary of
19  State?
20  A. Yes. Not often.
21  Q. Were you hired for that purpose?
22  A. It's one of the reasons, yes.
23  Q. So, generally, I understand that testimony.
24  Can you tell me what your other responsibilities would
25  be as the Director of Elections?

## 74

1  A. Well, you know, you have to manage the
2  division, so that means making sure that everybody is
3  playing well together and being productive, and if
4  there's a problem, address it. I mean, all the things
5  that are related to human resources, you know, stuff,
6  and prioritizing the work that needs to be done and
7  giving assignments to managers and checking in with them
8  on their progress. And you know, finding out if there's
9  any hurdles that need to be overcome and how much work
10  it's going to be overcome those hurdles. And making
11  sure that the executive is appropriately apprised of
12  anything that might come up that they might get asked
13  about, you know. It's just normal stuff.
14  Q. Okay. And it's fair to say that you would --
15  you would coordinate with the managers that are
16  underneath you in the elections division?
17  A. That is correct.
18  Q. So at -- in your responsibilities, were you
19  involved in any communications with anyone in any state
20  agency regarding the drafting of language for voter ID
21  legislation?
22  A. No.
23  Q. And let me be more specific on that question.
24  Since you were hired January 5th, 2012, were you
25  involved in any communications with anyone regarding the

## 75

1  drafting or proposal of language for SB 14?
2  A. No.
3  Q. Did your -- or does your responsibility or did
4  you ever communicate with any legislature, legislator,
5  their staff or the Lieutenant Governor or his staff
6  regarding voter ID legislation?
7  A. No.
8  Q. And again, let me be more specific. Did you
9  ever communicate with any of those parties regarding SB
10  14?
11  A. No. I talked to the Lieutenant Governor and
12  his staff a lot about redistricting but not about SB
13  14.
14  Q. And generally, what -- even though that is a
15  different matter, generally, what would your discussion
16  regarding redistricting have to do with?
17  A. He was --
18  MR. SWEETEN: Hold on a minute. You can
19  give general subject matter description.
20  THE WITNESS: Right.
21  A. You know, generally about the timing of the
22  primary election and whether or not we were actually
23  ever going to have a primary election and when that
24  might be.
25  Q. Okay.

## 76

1  A. It was a much discussed topic.
2  Q. And when did that meeting take place?
3  A. I -- I didn't have a meeting with the
4  Lieutenant Governor. I had conversations with him on
5  the phone and his people, and it would have all been
6  January, whenever we were having court hearings in San
7  Antonio.
8  Q. Of 2012?
9  A. Right.
10  Q. Can you tell me generally what, if any,
11  involvement of the department of the Secretary of State
12  have in drafting language regarding election laws
13  proposed language?
14  A. We are a resource for the legislature to use if
15  they have any questions about proposed bill language and
16  its impact.
17  Q. And when you say "a resource," what does that
18  involve?
19  A. It means we're ready to answer whatever
20  questions they have about election bills.
21  Q. What resources do you use or does your office
22  use to prepare the answers for, generally, for those
23  types of questions?
24  A. I don't know. I mean, I haven't been through a
25  session yet.

BRIAN KEITH INGRAM                                    June 5, 2012

---

## 77

1    Q.   So your testimony is, is you have never had to
2    do that in your capacity as elections director?
3    A.   Not yet.  That's right.
4    Q.   Did you have any substantive input regarding SB
5    14?
6    A.   No.
7    Q.   Did you have any substantive input regarding
8    any of the voter -- voter ID legislation prior to SB 14?
9    A.   I did not.
10   Q.   Did you have any input at all with anyone
11   regarding the language of SB 14?
12   A.   No.
13   Q.   Were you aware that voter ID legislation was
14   controversial?
15   A.   Yes.
16   Q.   And how did you gain that awareness?
17   A.   Watching the session on the computer.
18   Q.   And when you talk about the session, you're
19   talking about the public hearings, the --
20   A.   Floor debates.
21   Q.   In both the House and the Senate?
22   A.   I don't know.  You know, whenever I wasn't
23   doing anything else.
24   Q.   And what was it that you understood to be
25   controversial about SB 14?

---

## 78

1    A.   Well, I understood that one side felt it to be
2    a suppression of the vote, and the other side felt it to
3    be necessary to protect the integrity of the vote.
4    Q.   And do you have an opinion as to that
5    controversy?
6    A.   I have always believed that voter ID is a very
7    small step.  You know, there's a balancing act that you
8    have to take.  I talked to the -- one of the directors,
9    the elections for the Philippines, and they do
10   fingerprints, they do photos, they do a whole background
11   check, anybody that registers to vote.  They have a
12   public hearing, you know, and anybody can object to that
13   person being admitted to register to vote.  So, you
14   know, they're trying real hard to make sure that the
15   integrity of their voter rolls is maintained.  Right?
16   And the integrity of the vote.
17        So that on their official list of
18   registered voters, they have a thumbprint and a picture,
19   along with the name and address.  And the person who
20   votes has to show a photo ID.  And if there's any
21   discrepancy between the photos, and the election judge
22   is worried about it, they have to give a thumbprint, and
23   then they can vote.  So it's -- you know, obviously,
24   that's an extreme one way.
25        And then you've got the possibility of

---

## 79

1    anybody showing up on election day and voting with no
2    controls whatsoever.  With nothing.  No list of
3    registered voters.  No voter registration.  Just vote.
4    So that's the other extreme.
5        I think that voter ID is a necessary step
6    to deal with some portions of possible voter fraud.
7    It's a small thing on the scale of possible things, and
8    it would deal with a great deal of impersonation fraud.
9    That's my opinion.
10   Q.   So what is the purpose of SB 14?
11   A.   I don't know what the legislative purpose of SB
12   14 is.  Colloquially, the purpose of SB 14 is to make
13   sure that a person who shows up to vote is who they say
14   they are.
15   Q.   So voter impersonation as it's defined in
16   elections -- Texas --
17   A.   The other secondary aspect is whenever you have
18   to get a driver's license or a Texas ID, the Real ID Act
19   means that you're a citizen so it would have the
20   indirect benefit, as it were, of making sure that more
21   noncitizens are not voting.
22   Q.   So it's your understanding that at least in
23   part, the purpose of SB 14 is to prevent noncitizens
24   from voting?
25   A.   Right.

---

## 80

1    Q.   And do you -- you indicated that you watched
2    some of the legislative debate.  Did you hear that
3    argument being made on the Floor during those debates
4    that SB 14 was, in part, to prevent noncitizens from
5    voting?
6    A.   I don't remember hearing that specifically,
7    no.  I probably did but -- if it was part of the debate.
8    Q.   So where did you -- where did you gain your
9    knowledge regarding preventing noncitizens from voting?
10   Where did you come to understand that?
11   A.   That is just, you know, I've always been very
12   interested in politics in the news, and it's just
13   something that I've absorbed from the conversation over
14   the years.
15   Q.   For instance, were you aware that the
16   Lieutenant Governor has repeatedly stated that SB 14, in
17   part, was to prevent noncitizens from voting?
18   A.   I did not know that he had said that.
19   Q.   Are you aware of any legislators making the
20   statement that SB 14 was, in part, to prevent
21   noncitizens from voting?
22   A.   I don't know.  I mean, probably.  Senator
23   Fraser probably would, but I don't have any specific
24   recall of him saying that.
25   Q.   Did you have any communications with Senator

BRIAN KEITH INGRAM                                              June 5, 2012

## 81

1    Fraser regarding the noncitizen aspect of SB 14?
2       A.   Absolutely not.
3       Q.   Did you have any communications with anyone --
4    let me narrow that, with any legislators regarding
5    noncitizens voting and SB 14?
6       A.   No.
7       Q.   Did you have any communications with the
8    Secretary of State regarding noncitizen voting?
9       A.   No.
10      Q.   And SB 14?
11      A.   No.
12      Q.   What about the Lieutenant Governor?
13      A.   No.
14      Q.   Anyone in the Governor's office?
15      A.   No.
16      Q.   But you understood that to be at least, in
17   part, part of the debate regarding SB 14?
18      A.   I believe that's an indirect benefit of the law
19   is it's worded, yes.
20      Q.   And you said that this was a small necessary
21   step to prevent voter fraud; is that accurate?
22      A.   That is correct.
23      Q.   Okay.  So let's talk about voter fraud for a
24   second, and when we say "voter fraud," how are you
25   defining that?

## 82

1       A.   Well, specifically, I'm talking about voter
2    impersonation.
3       Q.   Okay.  Anything else?
4       A.   Well, I mean, there's all kinds of voter fraud
5    that, you know, that can be anything.  But, you know,
6    voter ID is going to specifically deal with
7    impersonation.
8       Q.   And --
9       A.   Voting more than one time.
10      Q.   I'm sorry.  When you say "impersonation," you
11   mean voter impersonation at the polls?
12      A.   Correct.
13      Q.   Okay.  And SB 14 does not deal with any other
14   type of voter fraud?
15      A.   I don't know if it does or not.  I know that
16   primarily, you know, you want to make sure that the
17   people who are registered to vote are eligible to vote
18   and that they are who they say they are when they show
19   up.
20      Q.   Okay.
21      A.   And I think that SB 14 will help with both of
22   those things.
23      Q.   Okay.  So we talked a little bit about what
24   the -- what the Secretary of State's Office or the
25   election division does when it receives complaints of

## 83

1    voter fraud.  Remember that testimony?
2       A.   Uh-huh.
3       Q.   Okay.  And so I just want to make sure that I
4    understand the -- the realm of voter fraud as it's
5    received by the Secretary of State's Office.  You
6    testified that that could be received from the voter?
7       A.   Correct.
8       Q.   From a candidate?
9       A.   Yes.
10      Q.   From a local election official?
11      A.   Yes.
12      Q.   And there are others who can -- who can provide
13   complaints of voter fraud to the Secretary of State's
14   Office, correct?
15      A.   Correct.
16      Q.   And as you testified, it's anyone who is
17   concerned about voter fraud can provide a complaint to
18   the Secretary of State's Office?
19      A.   Right.  Anybody that feels like they have
20   witnessed something that shouldn't be happening that
21   cares enough to report it.
22      Q.   Okay.  And is it -- is it accurate to say,
23   based on your testimony, that once a complaint is
24   received, you would ask the complainant to complete a
25   formal complaint?

## 84

1       A.   Correct, if they haven't already.
2       Q.   All right.  And are those complaints sworn or
3    unsworn?  You know what I mean by that?
4       A.   I do.  And I don't know off the top of my
5    head.  I would have to look at the form.  The form is on
6    our website.  I don't think it's sworn, but I don't know
7    for sure.
8       Q.   And once you receive a complaint, and "you"
9    being you and your office.
10      A.   Right.
11      Q.   Once you receive a complaint, you would refer
12   that to the OAG's Office?
13      A.   No.
14      Q.   Okay.  Tell me what you would do.
15      A.   I would refer it to our Legal Division inside
16   of the Elections Division, and they would evaluate the
17   complaint and determine whether or not it merits
18   referral or not.
19      Q.   Okay.  When you say "evaluate the complaint,"
20   we've -- you've provided some testimony already as to
21   the fact that the Secretary of State's Office does not
22   do its own independent investigation?
23      A.   That's right.
24      Q.   So when you say "evaluate," what do you mean by
25   that?

## 85

1    A.   You know, I don't want to -- I haven't ever
2  been a lawyer in the Elections Division --
3    Q.   Okay.
4    A.   -- under Elizabeth, so I'm not sure exactly
5  what all they do.  All I see is the report from them
6  about whether or not they think it merits referral and
7  why, or doesn't merit referral, and so I can infer some
8  of the process they go through.
9    Q.   Who makes the decision as to whether or not a
10 complaint merits referral?
11   A.   I do.
12   Q.   Okay.  And so is there something you're basing
13 that on?  You've testified before you look at the facts.
14   A.   Right.  And do the facts, as alleged,
15 constitute a crime?  You know, the election worker was
16 rude to me, not a crime.
17   Q.   Okay.
18   A.   Right?  So if that's all that's been alleged,
19 we send it back to the voter and say thank you for your
20 concern.  We'll try to address that in our training
21 materials, and you know, hopefully, you won't be
22 mistreated next time you go vote.  So you understand
23 what I'm saying?
24        But if it's -- if it's a voter
25 impersonation, which is -- what, a state jail felony,

## 86

1  then if that's what's been alleged, we refer it to the
2  OAG.  If it's a Class C misdemeanor or no crime, it
3  doesn't get a referral.  The OAG has -- they've got too
4  many cases to work on to do Class Cs.
5    Q.   Okay.  And so we've -- you've testified to
6  this, generally, but the types of voter fraud complaints
7  that would be received by the Secretary of State's
8  Office, can you give me a little bit more detail on
9  that?
10   A.   It's -- it runs the gamut.
11   Q.   And generally, can you identify what "the
12 gamut" is?
13   A.   Generally is everything.
14   Q.   Okay.  So we're talking about misconduct by
15 election officials.  Are we also talking about by mail
16 ballot fraud?
17   A.   (Witness nods head yes.)  Improper assistance
18 at the polling place.  I mean, you just -- it's
19 everything.
20   Q.   Okay.  And everything that's referred to the
21 Secretary of State's Office or to the election division
22 does not turn out to be a crime; is that correct?
23   A.   That is correct.
24   Q.   Okay.  And so you also indicated that you had a
25 spreadsheet that you've produced and which has been

## 87

1  identified by Patrick.  Can you tell me generally how
2  many complaints were indicated on that spreadsheet?
3    A.   I don't recall.
4    Q.   All right.  Can you give me a general number?
5    A.   I don't -- I would be speculating.  I don't
6  remember.
7    Q.   Okay.  And I think we'll come back to this.
8  I'll see if I can pull that and put it in front of you.
9    A.   Sure.
10   Q.   So there's a spreadsheet, but let me ask a
11 larger question:  How are the complaints of voter fraud
12 maintained within the Secretary of State's Office?
13   A.   I don't know for sure all the ways.  I know
14 that if we've got it in hard copy, we've got a file room
15 where the hard copies are kept.  I don't know for how
16 long they're kept.  We also have soft copies, and I
17 don't know if we've got all of them in soft copy or not,
18 and I don't know how long they're kept.
19   Q.   And when you say "soft copies," I think
20 electronically, but are you talking about by disk, by --
21   A.   I'm talking about PDFs on the network drives.
22 Canned PDFs.
23   Q.   Okay.  And can you tell me how long this
24 referral process has been in place with the OAG's
25 Office?

## 88

1    A.   I have no idea.
2    Q.   Okay.  That's generally because you came in
3  2012?
4    A.   Exactly.
5    Q.   All right.  Do you know how far back the
6  referrals go on either the hard copies or the PDF
7  versions on electronically?
8    A.   I don't.
9    Q.   All right.
10   A.   I would imagine that they go back as far as our
11 retention policy requires them to go back, but I don't
12 know.
13   Q.   Okay.  And who prepared the spreadsheet that
14 was produced in response to -- or to your attorneys?
15   A.   Jennifer Templeton.
16   Q.   And who is Jennifer Templeton?
17   A.   She's my assistant.
18   Q.   And why did she create this spreadsheet?
19   A.   We were asked by them.
20   Q.   By the OAG's Office?
21   A.   (Witness nods head yes.)
22   Q.   Do you recall on that spreadsheet how many
23 cases of voter impersonation you identified?
24   A.   I don't.
25   Q.   Did you identify any cases of voter

## 89

1  impersonation on the spreadsheet?
2      A.  I believe so.
3      Q.  More than one, less than five?
4      A.  I don't know.
5      Q.  So other than Jennifer Templeton -- or strike
6  that.
7          Is it Jennifer Templeton who maintains
8  the -- the files related to voter fraud?  Is there
9  anyone else that would maintain those files?
10     A.  No.  I mean, it's Louri's group that would --
11 so I guess, ultimately, Louri O'Leary is in charge of
12 it.
13     Q.  And Louri O'Leary, again, is in administration?
14     A.  Correct.
15     Q.  And would it be Louri O'Leary that ultimately
16 makes the referral, or is that something that you
17 specifically would do the referral to the OAG's Office?
18     A.  I do it.
19     Q.  Okay.  In the -- within the Elections Division,
20 are the voter fraud files broken down by subject matter?
21     A.  I don't know.  They're categorized in the
22 spreadsheet by subject matter.
23     Q.  And that would have been something that
24 Jennifer Templeton did?
25     A.  And whoever did it before her.

## 90

1      Q.  Okay.  So I didn't understand your testimony
2  to -- to indicate that there was an existing
3  spreadsheet.  Is that what you're testifying to today?
4      A.  Yes.
5      Q.  Okay.  And so she updated the spreadsheet?
6      A.  She keeps it updated, yes.
7      Q.  Okay.  And do you know who would have worked on
8  the spreadsheet prior to Jennifer Templeton?
9      A.  I don't.
10     Q.  Do you know if there was -- do you know if the
11 Secretary of State's Office provided testimony during
12 the public legislative debates regarding SB 14?
13     A.  I assume they did.
14     Q.  All right.  Do you know if the information from
15 the spreadsheet was used during the testimony during the
16 public debates?
17     A.  I don't know.  Probably.
18     Q.  Do you know who, if anyone, testified out of
19 the Secretary of State's Office during the legislative
20 debates?
21     A.  I don't.
22     Q.  Is it fair to say Ann McGeehan testified?
23     A.  Probably.
24     Q.  And other than Ann McGeehan, it's your
25 testimony you're not aware of who, if anyone else,

## 91

1  testified out of the Secretary of State's Office?
2      A.  I don't.
3      Q.  Do you know how many -- do you have any
4  knowledge of how many cases of voter fraud have been
5  referred to the Texas AG's Office from the Secretary of
6  State's Office?
7      A.  I don't know.
8      Q.  Do you have a general number?
9      A.  I don't.
10     Q.  Would the spreadsheet be reflective of the
11 number of complaints both received by the Secretary of
12 State's Office and referred to the OAG's Office?
13     A.  I believe so.
14     Q.  Would they -- would the spreadsheet also be
15 reflective of the number of voter impersonation cases
16 that the Secretary of State's Office has referred to the
17 OAG's Office?
18     A.  I believe so.
19     Q.  Do you have any specific knowledge of voter
20 impersonation cases that have been referred to the OAG's
21 Office?
22     A.  I don't.  I believe the Medrano case that came
23 out of the 2010 election involved voter impersonation,
24 but I'm not at all aware of the specifics.  I think
25 there was two complaints that were referred to the

## 92

1  OAG.  One of those has been tried to conviction in
2  Rockwall County earlier this year.
3      Q.  Okay.  So you said -- the Medrano --
4      A.  Right.
5      Q.  -- complaint.  Tell me what that complaint
6  involved.
7      A.  I don't know.
8      Q.  Did it involve voter impersonation?
9      A.  I believe so.  It's several species of voter
10 fraud, and I'm not sure exactly what the OAG ended up
11 prosecuting.  It's -- I would have to go look at that
12 case.
13     Q.  And that's M-A-D-R-A-N-O?
14     A.  M-E-D-R-A-N-O.  And it involved a justice of
15 the peace race in Dallas County.
16     Q.  So that was in Dallas County in 2010?
17     A.  Yes.  And I don't know if it was the primary or
18 the general.  I think it was the Democratic primary.
19     Q.  And who is Medrano?
20     A.  The justice of the peace had several family
21 members who came in that were involved in whatever went
22 on.
23     Q.  So several family members.  You indicated that
24 this -- strike that.
25         So was this a referral from the Secretary

BRIAN KEITH INGRAM                                    June 5, 2012

---

## 101

1   everything.
2        Q.  And "everything" meaning?
3        A.  Everything.
4        Q.  From voter fraud to --
5        A.  Everything.  "The county didn't tell me where
6   my polling place was.  I want to lodge a complaint."
7        Q.  Okay.  And so in that gamut of complaints, have
8   you identified any that deal with voter impersonation?
9        A.  I haven't done any work with regard to that
10  list of complaints at all.
11       Q.  Okay.  Has anyone within your office done any
12  work with regard to that list of complaints?
13       A.  I don't know.  I think they might be waiting
14  for the new lawyers to spring in on them.
15       Q.  Let's focus on May 29th for a second.  Would
16  that be the usual gamut of complaints that are received
17  after an election?
18       A.  During an election, yes.
19       Q.  And you made a distinguishing point.  Are these
20  complaints generally received prior to, during or after
21  elections?
22       A.  You know, all three.  The preponderance of them
23  come during and after, but you can definitely have
24  complaints beforehand.
25       Q.  Okay.  And are you aware of any complaints that

## 102

1   are specific to voter impersonation during, before or
2   after the May 29th election?
3        A.  I'm not.  And it could be that the Yvonne Ramon
4   call came in on the May 29th election.  I'm pretty sure
5   it was May 12th, but --
6        Q.  Okay.
7        A.  -- I want to leave myself some wiggle room
8   there.  It could have been May 29th.
9        Q.  Okay.  So you're not sure as you sit here?
10       A.  Not totally sure.  It's been kind of a blur
11  lately.
12       Q.  So in your capacity as Director of Elections,
13  can you identify any documented cases of noncitizens
14  voting?
15       A.  Uhm...
16       Q.  And just so I'm clear, cases that have been
17  referred to the OAG's Office?
18       A.  I don't know if we've got any cases referred to
19  the OAG for noncitizens.
20       Q.  And referring to the spreadsheet which you've
21  testified about, if there were cases that were referred
22  to the OAG's Office regarding noncitizens, would that be
23  reflected in that spreadsheet?
24       A.  Ought to be.
25       Q.  Are you aware of any cases involving

## 103

1   noncitizens that were not referred to the OAG's Office?
2        A.  Well, we've got this one from Mr. Barrientos
3   this morning that hasn't been referred to the OAG's
4   Office.
5        Q.  Okay.  So other than the Barrientos case which,
6   again, you received on June 5th, 2012, and is marked as
7   Exhibit 553, are you aware of any other cases?
8        A.  Well, and again, we've got a whole bunch of
9   complaints that have to be worked with regard to the two
10  recent elections that we've had so there could be some
11  in there.  I don't know.
12       Q.  Okay.  And you're referring to the May 12th and
13  May 29th elections?
14       A.  Right.
15       Q.  So other than Exhibit 553, May 12th and May
16  29th, are you aware of any other cases that have not
17  been referred to the OAG's Office that deal with
18  noncitizen voting?
19       A.  No.
20       Q.  The answer was "no"?
21       A.  No.
22       Q.  I'm sorry.  You were covering up your mouth.
23       A.  Sorry.
24       Q.  So I believe I asked you this question.  You
25  were hired January 5th of 2012.  Were you involved in

## 104

1   any capacity with reviewing voter ID legislation?
2            MR. SWEETEN:  Objection, asked and
3   answered.
4        A.  Not reviewing voter ID legislation, no.
5        Q.  (By Mr. Gear)  Okay.  So let me just understand
6   for the record then.  Regarding SB 14, what if any
7   responsibilities have you had as the director of
8   election?
9        A.  Since I have been at the Secretary of State's
10  Office, I had to submit supplemental information to the
11  Justice Department regarding voter ID submission.  I had
12  to have a conference on the phone with DOJ lawyers
13  regarding that submission.  I have had to answer
14  numerous press questions regarding SB 14 submission
15  litigation implementation.  I have had to deal with
16  legislative calls from senators and representatives
17  regarding SB 14 implementation.
18            I have had to answer discovery in this
19  case, the Holder versus -- or Texas versus Holder case.
20  I've had to testify at a hearing over the phone in the
21  Texas versus Holder case, and I've had to prepare forms
22  for the implementation of SB 14 and submit those to the
23  DOJ for preclearance.  I've had to revise our election
24  worker training manual and submit it to the DOJ for
25  preclearance.  And I don't know what else.

BRIAN KEITH INGRAM                                    June 5, 2012

## 105

1    Q.  Okay.  I'm not going to go through and
2  summarize all of that, but is it fair to say that you
3  have been involved in the Section 5 submission process
4  and responding to press questions and assisting with
5  responding to questions related to this lawsuit, Texas
6  V. Holder?
7    A.  Right.
8    Q.  And again, so I understand your testimony, is
9  there any aspect of SB 14 that you were involved with
10  prior -- prior to the SB 14 being signed by the
11  Governor?
12    A.  No.
13        MR. SWEETEN:  Objection, asked and
14  answered.
15    Q.  (By Mr. Gear)  Were you involved in any aspect
16  in -- strike that.
17        Have you ever reviewed any prior voter ID
18  legislation?
19    A.  I don't think so.  Not that I recall.
20    Q.  Are you aware that there was prior voter ID
21  legislation prior to SB 14?
22    A.  I am.
23    Q.  During any aspect of considering SB 14, did you
24  have an occasion to review any of the prior legislation?
25    A.  No.

## 106

1    Q.  Do you have any knowledge of what the prior
2  legislation or the language of the prior legislation?
3    A.  No.
4    Q.  And so I just want to be clear before we move
5  on.  If I was to tell you that there was legislation in
6  2005, is it fair to say that you have not reviewed that
7  legislation?
8    A.  I have not.
9    Q.  Okay.  Is it fair to say that you didn't engage
10  in communication with any of the legislators regarding
11  the voter ID legislation in 2005?
12    A.  I did not.
13    Q.  Okay.  And when I say "engaged in
14  communication," I'm referring to communication that may
15  have occurred while you were working for the Secretary
16  of State's Office from 2012 forward.
17    A.  I don't understand that at all.
18    Q.  Okay.  Well, let me break that down, and that
19  was a little convoluted.  I'm just trying to narrow this
20  down and understand if you've engaged in any
21  communications with anyone regarding prior voter ID
22  legislation since you've been the Director of Elections.
23    A.  No.
24    Q.  Do you know what the purpose -- well, strike
25  that.

## 107

1        If I was to tell you that the voter ID
2  legislation from 2005 was HB 1706, would you know that?
3    A.  If you say that's the number, that's the
4  number.  I can look it up.
5    Q.  Well --
6    A.  I have no -- before you say that number, I
7  didn't know it existed.
8    Q.  Okay.  You have no independent knowledge of
9  that?
10    A.  I do not.
11        (Exhibit 101 marked for identification)
12    Q.  I'm just going to show you what's been
13  previously marked as Exhibit 101 in prior
14  depositions.  Just have you take a look at that.
15    A.  (Witness reviewing document.)
16    Q.  And let me know when you've had a chance to
17  look at it.
18    A.  Okay.
19    Q.  Does this refresh your recollection as to the
20  title of voter ID legislation in 2005?
21    A.  I didn't have a recollection to be refreshed.
22    Q.  Okay.  And can you tell me what this is,
23  Exhibit 101?
24    A.  It looks like an Online Legislative History
25  form.

## 108

1    Q.  Okay.  And it refers to HB 1706?
2    A.  That's what it says.
3    Q.  And you've seen these type of online history
4  before?
5    A.  I have.
6    Q.  All right.  And so would you have any reason to
7  believe that there was not voter ID legislation
8  introduced in 2005 by looking at Exhibit 101, would you
9  agree with what it says?
10        MR. SWEETEN:  Objection, foundation.
11    A.  I -- I don't know.  I mean, it says
12  "identification cards."  That could be voter ID, I
13  guess.  I don't know.  I didn't -- I'm not disputing
14  it.  I just --
15    Q.  (By Mr. Gear)  You don't know?
16    A.  I don't know.
17    Q.  Does this refresh your recollection as to
18  whether or not you ever reviewed any voter ID
19  legislation from 2005?
20        MR. SWEETEN:  Objection, asked and
21  answered.  Go ahead.
22    A.  I did not.
23    Q.  (By Mr. Gear)  Okay.  Do you see that Exhibit
24  101 refers to HB 1706?
25    A.  I do.

BRIAN KEITH INGRAM                                          June 5, 2012

---

## 121

1  got one then, and I don't think I've had to renew since
2  then.
3     Q.  And when you were in Arkansas, did you have an
4  Arkansas driver's license?
5     A.  I did.
6     Q.  So what did you have to do to obtain a Texas
7  driver's license, if that's what you actually have at
8  this point?
9     A.  I don't know what I had to do.
10    Q.  Okay.  Do you have a Texas driver's license?
11    A.  I do, and I have renewed it once.
12    Q.  All right.  And did you do it online or did you
13 do in person?
14    A.  In person?
15    Q.  All right.  And you're a resident of which
16 county?
17    A.  At the time I got my driver's license renewed
18 and when I got my driver's license, I was a resident of
19 Travis County.
20    Q.  Of Travis County.  And does Travis County have
21 a driver's license office?
22    A.  Yes.
23    Q.  All right.  And how far was that office from
24 your home at the time?
25    A.  I don't know.

---

## 122

1     Q.  All right.  But you lived in Travis County when
2  you renewed it?
3     A.  I did.
4     Q.  Okay.  And what city in Travis County did you
5  live in?
6     A.  Austin.
7     Q.  Austin.  And you don't know how far from your
8  home to the driver's license office, how far you would
9  have had to travel?
10    A.  No.
11    Q.  Do you remember what underlying documentation
12 you needed to produce?
13    A.  No.
14    Q.  Can a temporary driver's license be used to
15 vote if SB 14 was implemented?
16    A.  I think not, because in order to be eligible to
17 vote, you have to be a citizen, and a temporary driver's
18 license that's marked temporary is proof that someone is
19 not a citizen.  And so I think if somebody showed up and
20 they were registered to vote and they had a temporary
21 driver's license, they would probably vote provisionally
22 if they said that they have since been naturalized as a
23 citizen, and then they would have the six-day cure
24 period to go to the voter registrar and present the
25 citizenship papers?

---

## 123

1     Q.  Can a citizen have a temporary driver's
2  license?
3     A.  Well, not that's marked temporary.  Whenever
4  you get a new picture with a -- you have a paper license
5  for a period of time, but it's not a temporary license,
6  it's a permanent license that just is in a temporary
7  form.  Do you know what I mean?
8     Q.  I think I do.  So, at one time another, we were
9  all 18 or 17 and getting our driver's license.  When you
10 first obtained your driver's license, is that a
11 temporary?  I can't remember that far back.
12    A.  I don't know.  I mean, I remember having a
13 learner's permit for about a year and then having a
14 driver's license.
15    Q.  Okay.  So, yeah, and I just don't remember that
16 far back.
17    A.  Well, my teenagers have all recently gone
18 through this process, and it's basically the same.
19    Q.  Okay.  So let's talk about it in terms of your
20 teenagers going through the process.  When they go in
21 to, to obtain a driver's license, what did they have to
22 go through?
23    A.  They have to -- my daughter just did it.  She
24 had to round up -- she had to prove that she had had
25 drivers' education, right, so she had gone through the

---

## 124

1  class work, and so we had that paperwork.  She had her
2  social security card to prove her citizenship, and she
3  had to come up with money, and she had to pass a test,
4  then she had to pass a driver's test.
5     Q.  Does having a Social Security card prove
6  citizenship?
7     A.  Yes.
8     Q.  Can noncitizens have a social security card?
9     A.  Not legally.
10    Q.  Under SB 14, if it was implemented, why
11 wouldn't a voter be allowed to show a social security
12 card?
13    A.  It doesn't have a photo on it.  It's not part
14 of a list of IDs required.  And I would imagine that a
15 resident alien would be able to get a social security
16 card of some sort.  I don't know what they have.
17 That's -- because they are here legally, they work and
18 they get taxes out.
19    Q.  So what forms of ID allowed in SB 14 can
20 noncitizens obtain; do you know?
21    A.  Do you have the list of acceptable IDs?
22    Q.  Under SB 14?
23    A.  Under SB 14?
24    Q.  I do.  I'm going to show you what's been
25 previously marked as Exhibit Number 5 in prior

BRIAN KEITH INGRAM                                    June 5, 2012

## 125

1   depositions.  Take some time, and then we can talk about
2   it.
3       A.   (Reviewing document.) All right.  So some
4   noncitizens can have a driver's license.  Legal aliens
5   and ones who are here on a temporary visa, they've got a
6   temporary that's named "Temporary."
7       Q.   And just -- I'm sorry, I didn't mean to cut you
8   off.  But just so the record is clear, you're looking at
9   Exhibit Number 5, and can you identify what Exhibit
10  Number 5 is?
11      A.   Exhibit Number 5 appears to be a copy of
12  SB 14.  I assume it was the enrolled version that was
13  eventually signed by the Governor.
14      Q.   And if you look at the last page, do you see
15  that it is, if, fact, signed by Governor Rick Perry?
16      A.   Okay.
17      Q.   So, then this would be the enrolled version as
18  you testified?
19      A.   Right.
20      Q.   Okay.  And so you were referring to a
21  particular section in Exhibit Number 5.  Can you tell me
22  what you're referring to?
23      A.   I'm referring to Section 14.  It's on Page 9 of
24  the bill.
25      Q.   Okay.

## 126

1       A.   And it amends Section 63.0101 of the Election
2   Code.
3       Q.   Okay.  And so the question that was pending
4   before you was:  What forms of allowable ID under SB 14
5   can noncitizens obtain?  Did you need something?
6       A.   The back, Page 10 is not here.
7            MR. SWEETEN:  I've got a copy.  We've got
8   to switch out.
9            MR. GEAR:  Why don't I do this, just so
10  we're -- we're good on this.  I'm going to give you --
11  I'm going to remark an exhibit as Exhibit 5.
12           Mr. Court Reporter, can I do that?
13           THE COURT REPORTER:  Sure.
14           (Exhibit 5 marked for identification.)
15           MR. GEAR:  And take back the one that I
16  gave you, and cross out the exhibit number on there.
17      Q.   (By Mr. Gear) And so now you're referring to
18  page number 10?
19      A.   Well, 9 and 10 is where 63.0101's list of IDs
20  is located.
21      Q.   Okay.  So, and the Exhibit Number 5 that you
22  now have in front of you contains Page 9 and 10?
23      A.   Yes.
24      Q.   Good.  So, do you remember the question?
25      A.   I do.

## 127

1       Q.   Okay.
2       A.   Which one of these forms of ID can a noncitizen
3   obtain?
4       Q.   Yes.
5       A.   That's the question.
6       Q.   Yes.
7       A.   So a noncitizen legal alien can get a driver's
8   license; a noncitizen temporary visa person can get a
9   temporary driver's license that's marked "Temporary."  I
10  believe that noncitizens can be in the military and thus
11  would be able to have a military identification card.
12      Q.   Anything else?
13      A.   I would imagine that noncitizens can get a
14  license to carry a concealed handgun.  I don't know for
15  sure, but I don't think there's citizenship requirement
16  there.
17      Q.   Does a concealed handgun license indicate
18  whether you're a citizen or a noncitizen?
19      A.   I don't believe it does.
20      Q.   And if I was a voter and I came to the polls on
21  election day, I could present, under SB 14, my concealed
22  handgun license and vote?
23      A.   You could.
24      Q.   And if I was a voter on election day under
25  SB 14, if it was implemented, I would present a military

## 128

1   ID card and vote?
2       A.   Yes, if it's got a photograph and it hasn't
3   being expired earlier than 60 days before the date of
4   presentation.
5       Q.   And are you aware of whether or not military ID
6   cards indicate citizenship or noncitizenship?
7       A.   They do not.
8       Q.   If I was a voter and I showed up at the polls
9   with a temporary driver's license, I could vote?
10      A.   No, you could not.
11      Q.   Okay.  And specifically, we're referring to if
12  SB 14 was implemented.
13      A.   Correct.
14      Q.   And why would I not be able to vote?
15      A.   Because the license, if it's got "Temporary" on
16  it, either because it's vertical and it says -- I don't
17  remember what they said, but they don't them that way
18  anymore -- but anyway, if it says "Temporary" at the
19  top, then it's got a term "coterminous" with the visa
20  that's supposed to be used for staying in the country,
21  then that's evidence that you're not a citizen, on its
22  face.
23      Q.   Okay.  How does showing an ID ensure that a
24  person is eligible to vote?
25      A.   It doesn't.

BRIAN KEITH INGRAM                                    June 5, 2012

---

**129**

1   Q.  Does that ensure that a person is any more
2   eligible to vote if they were to show a student ID?
3   A.  Well, if you're talking about a driver's
4   license, you know, illegal aliens are not able to get
5   drivers' licenses.  So, that is what we talked about
6   before, an indirect effect of SB 14, to eliminate
7   noncitizens, illegal aliens, as well as the temporary
8   residents from voting.
9   Q.  Let's focus for a second on the temporary
10  driver's license.  Do you know what that looks like, a
11  temporary driver's license?
12  A.  I have not seen a picture of that, no.
13  Q.  And you talked about your -- your kids going
14  through the process.  Did any of them have a temporary
15  driver's license?
16  A.  Not the kind of temporary license that I'm
17  talking about.  You're talking about a paper license
18  that you get while you wait for the picture one.  That
19  is a permanent license, it's just a temporary form of
20  it.
21  Q.  Okay.  And I understand that.  So as you sit
22  here today, you couldn't testify as to the actual
23  writing on a temporary driver's license?
24  A.  No.  But that part of our process for
25  implementing SB 14 is, we've got a version of the

---

**130**

1   handbook for election workers at the DOJ now.  That's
2   going to have to be revised with pictures of the
3   temporary licenses so that the election workers are
4   aware of what these are and what they mean.  So we've
5   got some more work to do on that handbook.
6   Q.  So ultimately, it's the election worker or the
7   election judge that would have to decide if an ID that's
8   being shown on election day is valid or not?
9   A.  That's right, which is exactly the way it is
10  now.
11  Q.  I think before the break, we ended with
12  Exhibit 28, which is HB 218, which is right here?
13  A.  Yes.
14  Q.  And I was asking you your knowledge of HB 218.
15  And forgive me if I asked this question, but what's the
16  purpose of HB 218?
17          MR. SWEETEN:  Objection, asked and
18  answered.
19  Q.  (By Mr. Gear) Do you remember that?
20  A.  To amend the election code in some respects.
21  Q.  And what does it mean to amend the election
22  code in some respects?
23  A.  Well, it means that there is 12 pages of bill
24  language, with some strikes-outs and some underlines,
25  indicating that pieces of the election code are being

---

**131**

1   added to and struck out.  We've got a piece of
2   13.122(a).  We've got a piece of 1501.001(a) of the
3   election code.  We've got 32.11 of the election code.
4   32.111.  32.114.  We've got 62.016 of the election
5   code.  63.001 of the election code.  63.006(a) of the
6   election code has been modified.  63.007(a) of the
7   election code has been modified.  Section 63.008(a) of
8   the election code has been modified.  63.0101 of the
9   election code is amended.  63.011(a) of the election
10  code is being amended.  Section 521.422 of the
11  Transportation Code is being amended.  And I think
12  that's it.
13  Q.  Do you have any idea why there was a need to
14  amend any of the codes within Exhibit 28, specifically
15  HB 218, in 2007?
16          MR. SWEETEN:  Objection, asked and
17  answered.  Objection, calls for speculation and lack of
18  foundation.  Go ahead.
19  Q.  (By Mr. Gear) Well, again, I asked if you have
20  any -- do you have any understanding as to why there was
21  a need to amend HB -- or the voter ID legislation?  I'm
22  sorry.  Strike that.
23          Do you have any idea why there was a need
24  to amend election laws in 2007?
25          MR. SWEETEN:  Same objection.

---

**132**

1   A.  Well, I don't know the need to amend election
2   laws in 2007.  I imagine that Representative Brown of
3   Kaufman, Representative Burman, Representative Bohac and
4   Representative Riddle felt that these changes need to be
5   made.
6   Q.  (By Mr. Gear) And do you, as the Elections
7   Director, have any personal knowledge or knowledge as to
8   why there was a need to make changes to the election
9   code in 2007?
10          MR. SWEETEN:  Objection, asked and
11  answered.  Objection, calls for speculation.  Objection,
12  foundation.
13  A.  I don't know.  I mean, I don't know what all
14  happened to election code in 2007.  I don't know what
15  was needed and what wasn't.
16  Q.  (By Mr. Gear) Do you have any knowledge as to
17  whether or not HB 218, in part, was designed to prevent
18  noncitizens from voting?
19  A.  I do not.
20          MR. SWEETEN:  Objection, asked and
21  answered.
22  Q.  (By Mr. Gear) Do you have any knowledge of any
23  voter fraud that occurred in 2007?
24  A.  If it's on our spreadsheet.
25  Q.  Other than what may be contained in the

BRIAN KEITH INGRAM                                          June 5, 2012

## 137

```
 1   intricacies of those debates or those bills' contents.
 2       Q.  (By Mr. Gear) Okay.  And so when you became the
 3   Director of Elections in 2012, was consideration of any
 4   of the voter ID legislation that we have just now talked
 5   about part of your job duties?
 6       A.  No.  I wouldn't -- I wouldn't imagine so.  At
 7   that point, we've got a bill.  We've got a bill that's
 8   been passed by the legislature and signed by the
 9   Governor.  It's been submitted for preclearance to the
10   Department of Justice.  That's the bill that we needed
11   to be familiar with and that needed to be prepared to
12   implement.
13       Q.  Okay.  So do you know what the -- do you
14   understand that the legislation that was introduced in
15   2009 was SB 362?
16       A.  No.
17       Q.  And if I was to tell you it was SB 362, have
18   you ever reviewed SB 362?
19       A.  Not that I recall.
20       Q.  Do you know what the purpose of SB 362 was?
21       A.  No idea.
22       Q.  And I believe you testified that you reviewed
23   or you viewed the legislative debates on your computer
24   at work?
25       A.  That's right.
```

## 138

```
 1       Q.  Do you recall --
 2           MR. SWEETEN:  You're talking about the
 3   '11, or are we talking about '09?
 4           THE WITNESS:  '9 and '11.
 5           MR. SWEETEN:  Okay.  Thank you.
 6       Q.  (By Mr. Gear) Regarding '9, 2009, do you recall
 7   -- do you recall any of the debate dealing with
 8   preventing noncitizens from voting?
 9       A.  No.
10       Q.  Do you recall any concerns expressed regarding
11   the impact of the 2009 voter ID legislation to -- on
12   minority voters?
13       A.  No, not specifically.
14       Q.  When you say "not specifically," what do you
15   mean?
16       A.  I know that generally the concern of the
17   opponents of the legislation, in all of these years, has
18   been that minority voters would be adversely affected.
19       Q.  So as the Director of Elections -- am I saying
20   that right?  Director of Elections or Election Director?
21       A.  It doesn't matter.
22       Q.  It doesn't matter.  Okay.  So as the Director
23   of Elections, are you aware of any analysis regarding
24   any voter ID legislation that, that studies the impact
25   of vote ID on minority voters?
```

## 139

```
 1       A.  I have not.
 2       Q.  You have not reviewed it?
 3       A.  Not reviewed it.  Not aware of it.  Don't know
 4   about it.
 5       Q.  Are you aware of any study or analysis that
 6   considers the burden of voter ID on minority voters?
 7       A.  I'm not aware of any such thing.
 8       Q.  And you haven't reviewed any such analysis?
 9       A.  No.
10       Q.  As the Director of Elections, are you aware of
11   whether or not the Secretary of State's Office have
12   conducted an analysis or created a report regarding the
13   impact of SB 14 on minority voters?
14       A.  I think the only thing that would come close to
15   that was the exercise that I went through from my letter
16   in January of this year.
17       Q.  And the letter that you're referencing is
18   during the submission process?
19       A.  Yes.
20       Q.  And that's the letter to the Department of
21   Justice?
22       A.  It is.
23       Q.  And going back to the 2009 legislation, are you
24   aware of the purpose of the 2009 legislation related to
25   voter ID?
```

## 140

```
 1           MR. SWEETEN:  Objection, asked and
 2   answered, but go ahead.
 3       A.  No.
 4       Q.  (By Mr. Gear) So other than SB 14, which
 5   addresses the issue of voter ID, were you involved in
 6   any review of any other voter ID legislation?
 7       A.  No.
 8       Q.  Other than voter ID legislation which we have
 9   now talked about, HB 1706, HB 218, SB 362, are you aware
10   of any other voter ID legislation other than SB 14?
11       A.  No.
12       Q.  And just so that the record is clear, were you
13   involved in any communication regarding any other voter
14   ID legislation, other than SB 14?
15       A.  No.
16       Q.  From your position as the Elections Director
17   for the Secretary of State's Office, have you reviewed
18   any analysis or reports related to SB 14?
19       A.  Well, I don't know.  I have looked at the
20   letter from Ann McGeehan to the Department of Justice
21   September 7th.
22       Q.  Uh-huh.
23       A.  That had analysis in it, I guess.  I have
24   looked at the October 4th letter from Ann McGeehan to
25   the Department of Justice.  That also had some analysis,
```

BRIAN KEITH INGRAM                                          June 5, 2012

## 141

1   that had the spreadsheets that were mentioned in the
2   September 7th letter that had the actual spreadsheets
3   attached to the October 4th letter.  So I don't know, I
4   mean.  And then obviously, the exercise that we're going
5   through since I've been in the office.
6        Q.   And you're referring to your letter to the
7   Department of Justice?
8        A.   Yes.
9        Q.   Are you aware of any internal analysis or
10  reports that study the impact of SB 14 on minority
11  voters?
12            MR. SWEETEN:  You can answer the question;
13  just make sure you're not revealing matters of attorney-
14  client privilege.
15       A.   I don't know what you mean.  Any internal
16  analysis that we've done --
17       Q.   (By Mr. Gear) Nonpublic record.
18       A.   Well, there's not anything separate from what's
19  been disclosed to the Department of Justice, no.
20       Q.   Okay.
21       A.   That was --
22       Q.   Okay.  So I believe we've already marked SB 14
23  as an exhibit?
24       A.   Yes.
25            MR. GEAR:  Could we go off the record for

## 142

1   a second?
2            MR. SWEETEN:  Sure.
3            (Recess at 1:49 p.m. to 1:50 p.m.)
4        Q.   (By Mr. Gear) All right.  And I believe we
5   previously marked SB 14 as Exhibit 5?
6        A.   Yes, we did.
7        Q.   And if you look through the stack of exhibits
8   there, you have that in front of you now?
9        A.   I do.
10       Q.   Can you identify what the allowable forms of ID
11  are under SB 14?
12            MR. GEAR:  Do you have a copy of that,
13  Patrick?
14            MR. SWEETEN:  Oh, I do.  Yeah.  Thank
15  you.  I've got other one.  I've been in enough of these,
16  Bruce.  I've got the old copies from you guys.
17       Q.   (By Mr. Gear) And specifically I'm referring to
18  Page 9, I believe, Section 63.0101.  And the question
19  is:  What are the allowable forms of ID?
20       A.   Yes.  63.0101 it amended to add an election
21  identification certificate that's issued by the
22  Department of Public Safety, in addition to what was
23  already there, a driver's license or a personal
24  identification card.  And the caveat is that instead of,
25  the old law was a driver's license or ID card, whether

## 143

1   it's expired or not.  The new law is a driver's license,
2   election identification certificate, personal ID card
3   that has not expired or expired no earlier than 60 days
4   before the date of presentation.  So there's a little
5   bit -- you couldn't show up with any old driver's
6   license, you had to have a fairly current one.
7        Q.   Is that it?
8        A.   And they added election identification
9   certificate, which is a new form of ID that's free to
10  the public who asks for it.  And then you could -- they
11  added a U.S. military identification card containing a
12  person's photograph, as long as it hadn't expired more
13  within the 60 days before the election, or more than 60
14  days before the election.  They added a United States
15  citizenship certificate that contains a photograph.
16  They changed the passport requirement to say that it had
17  to expired -- to have expired no longer than 60 days
18  before the election, and they added a license to carry a
19  concealed handgun, as long as it hadn't expired 60 days
20  before the date of the presentation.
21       Q.   And before we get into the substance of SB 14,
22  were you aware that SB 14 was designated as an emergency
23  item during the 2011 legislative session?
24       A.   I don't know if I remember that or not.  I
25  guess.

## 144

1        Q.   When you reviewed for -- the notice of
2   deposition for documents, did you produce anything
3   responsive to communications from the Secretary of
4   State's Office regarding the designation of SB 14 -- or
5   voter ID as an emergency legislation?
6        A.   Anything that we had, we would have turned over
7   to the OAG.  I would -- you know, the Secretary of
8   State, as far as I know, is not involved in the
9   declaration of emergency legislation.  That's not
10  something we do.
11       Q.   When you say it's not something that we do
12  referring to the Secretary of State's Office, would they
13  ever be involved in providing advice on the designation
14  of emergency items or legislation?
15       A.   I don't know.
16       Q.   Have you ever done that in your capacity as the
17  Director of Elections?
18       A.   I have not had the benefit of going through a
19  session yet, so no.
20       Q.   So was anyone in the Secretary of State's
21  Office, including yourself, involved in the development
22  of SB 14?
23       A.   I don't know.
24       Q.   Who would know that?
25       A.   Ann McGeehan.

BRIAN KEITH INGRAM                                    June 5, 2012

## 145

1    Q.   Were you or anyone in the Secretary of State's
2    Office involved in any communications between the
3    Secretary of State and Senator Fraser's office during
4    the drafting of SB 14?
5    A.   I don't know.
6    Q.   And who would know that?
7    A.   I don't know.  Ann McGeehan, probably.  I don't
8    think that we would be involved in the drafting process
9    or the development process.  That's not what we do.
10   We're a resource witness when they've got bills filed
11   but Ann would know.
12   Q.   Were you or anyone in the Secretary of State's
13   Office involved as a resource during the development or
14   drafting of SB 14?
15        MR. SWEETEN:  Objection, asked and
16   answered.
17   A.   I don't know.
18   Q.   (By Mr. Gear) Well, you know that there was
19   testimony given by the Secretary of State's Office
20   during the legislative debates, correct?
21   A.   I believe there was, yes.
22   Q.   And you know that Ann McGeehan provided
23   testimony during SB 14?
24   A.   I would assume she would be the one.
25   Q.   And she provided testimony as a resource

## 146

1    witness?
2    A.   Yes.
3    Q.   So is it fair to say that your testimony that
4    you don't know if the Secretary of State's Office or any
5    of the staff within the office provided guidance as
6    resource witnesses, is it fair to say that that's not
7    entirely true when you say "I don't know"?
8    A.   No, it's entirely true, because you were asking
9    about the resource during the development and drafting
10   of the bill, and I don't have any idea what happened
11   during the development and drafting of the bill.  I
12   don't -- I know what happened after the bill was drafted
13   and developed as it's going through the legislative
14   process, and I only know that in general terms.  So no,
15   it was entirely accurate.
16   Q.   What was the purpose of SB 14?
17   A.   Well, as I mentioned before --
18        MR. SWEETEN:  Hold on a second.
19        Objection, asked and answered.  And are
20   you asking him his personal opinion about SB 14?
21   Q.   (By Mr. Gear) As the Director of Elections,
22   what's your understanding of the purpose?
23   A.   It's my understanding that SB 14 is --
24        MR. SWEETEN:  Objection, relevance.  Go
25   ahead.

## 147

1    A.   Is an attempt to improve the integrity of the
2    election process.  In general terms, that's what I think
3    it's designed to do.
4    Q.   (By Mr. Gear) And in part, was it designed to
5    prevent noncitizens from voting?
6    A.   That's part of improving the integrity of the
7    voting process, to make sure that -- you know, to the
8    extent we can, that eligible voters are -- the people
9    eligible to vote, vote.
10   Q.   And I understand your testimony to this point,
11   but let me be clear.  Did you attend any of the
12   legislative debate for 2011?
13   A.   I did not.
14   Q.   Did you provide any testimony during the
15   legislative debate for 2011?
16   A.   No.  I have to clarify.
17   Q.   Okay.
18   A.   I did go to a confirmation hearing when Judge
19   Elsa Alcala was up for appointment -- or up for
20   confirmation, so I did attend the legislative hearing.
21   And so if you're referring to any legislative hearing, I
22   did attend.  And I did attend a few sessions of the
23   House, specifically when the Governor gave the State of
24   the State and when Wallace Jefferson gave his State of
25   the Judiciary speech.  So, if you're talking about

## 148

1    SB 14, that's what I understood your question to be in
2    regard to, and the answer is no.
3    Q.   Thank you.  And generally, do you have
4    knowledge of the positions taken by the supporters and
5    opponents of SB 14?
6    A.   In general terms.
7    Q.   Do you recall any of the debate centering on
8    preventing noncitizens from voting?  And I'm referring
9    to SB 14.
10   A.   Yeah.  You know, I don't have any specific
11   recall of the terms of the debate.  You know, I don't
12   know.  I know that that was part of the discussion.  I
13   don't know who was discussing it or what specifically
14   was said about it.  You know, I understand that to have
15   been part of the discussion.  I have a recall of, you
16   know, that.
17   Q.   Who, if anyone, do you know engaged -- that
18   engaged in the debate about noncitizens voting?
19   A.   I don't know.  I don't know.
20   Q.   You previously testified that Senator Fraser
21   may have engaged in that discussion, correct?
22   A.   He might have, and I might have heard Trey
23   Martinez Fischer with the opposing viewpoint.
24   Q.   Okay.  And what was the opposing viewpoint?
25   A.   That whenever you're -- it's whenever you're

BRIAN KEITH INGRAM                                      June 5, 2012

## 149

1  preventing noncitizens from voting, you're having an
2  adverse impact on people who are citizens.
3      Q.  Do you agree with that opinion?
4      A.  I do not.  That's my personal opinion.
5      Q.  Do you have an opinion as to whether or not
6  SB 14 would have an adverse impact on citizens?
7      A.  It would not.
8      Q.  And what are you basing that on?
9      A.  Well, it's like I said before, SB 14 is an
10  incremental step toward increased voter integrity, that
11  appears to me to be a reasonable incremental step.  And
12  yes, there is a small amount of marginal cost, but it is
13  worth it in order to further enhance the integrity of
14  the election process.
15      Q.  Okay.  You said two different things there, so
16  I want to break that out.  First, you indicated that it
17  was an incremental step.  That would suggest, at least,
18  that there are other steps to be considered.  Have you
19  been involved in any communications which would indicate
20  that SB 14 had an incremental step?
21      A.  No.  No.  You are misunderstanding what I'm
22  saying.
23      Q.  Okay.
24      A.  I'm saying that it is an incremental step
25  toward increasing the integrity of the process.  I am

## 150

1  not in any way suggesting that it is an increment as
2  part of some greater whole.  I am saying that I talked
3  to one of the directors of the elections in the
4  Philippines, and I know about a much more stringent
5  voter ID process that they have.  And I am not in any
6  way suggesting, advocating, promoting at all that that's
7  where we're headed.  I'm saying that that's one extreme,
8  all right?  An extreme that I don't think anybody in
9  this country wants to get to, and I don't think we have
10  to, because I think we've got good citizens, right?
11        So don't hear me saying that we're on a
12  road, right?  No, not even a little bit.
13      Q.  Okay.  And again, this is my opportunity to
14  understand what you know and it's your opportunity to
15  testify to it.  So, I wasn't suggesting one way or the
16  other what you were saying.  I was trying to understand
17  what you were saying.  Do you understand?
18      A.  I understand, and I appreciate the opportunity
19  to clarify.
20      Q.  Okay.  You also indicated that this has a
21  marginal cost.  What do you mean by that?
22      A.  Well, there are some people in this state who
23  do not have an ID, and they will have to get one if they
24  want to vote.
25      Q.  Okay.  And in your position as the Elections

## 151

1  Director for the Secretary of State, do you have an idea
2  of the actual number of people that may not possess an
3  allowable form of identification under SB 14?
4      A.  I do not know.
5      Q.  During the admissions process -- submissions
6  process, did you attempt to make that determination?
7      A.  We attempted to narrow it down.
8      Q.  And what did you narrow it down to?
9      A.  Well, we narrowed it down in the fall to
10  605,000 that we couldn't prove had an ID, we narrowed it
11  down to 795,000 that we couldn't prove had an ID in
12  January of this year.
13      Q.  And that was 795,000-plus voters that may not
14  have an allowable form of ID under SB 14?
15      A.  It was right around 795,000 that may not have
16  an acceptable form of ID.
17      Q.  And do you understand that number to be more or
18  less as you sit here today?  Higher or lower?
19        MR. SWEETEN:  Objection.  Don't reveal any
20  communications you've had with your attorneys in this
21  matter, the Attorney General's Office.
22      A.  The number is substantially less than 795,000.
23      Q.  (By Mr. Gear) Okay.  And what are you basing
24  that on?
25      A.  Because that 795,000 doesn't include anybody

## 152

1  that's got one of the other forms of ID besides a
2  driver's license or ID card.  It doesn't include anyone
3  that has a driver's license or ID card that we failed to
4  match.  So, in the match criteria, I think I outlined in
5  my letter the problems with matching two different
6  databases that are not meant to go together.
7      Q.  Okay.  And turning your attention back to
8  SB 14, and I believe that was Page 9, Section
9  63.0101.  Under that section, one form of allowable ID I
10  is driver's license.
11      A.  That's right.
12      Q.  Do you see that?  Do you know how many Texans
13  in the -- well, how many voters in the state of Texas do
14  not have a driver's license?
15      A.  I have no idea.
16      Q.  Are you aware of any analysis from the
17  Secretary of State's Office that attempts to determine
18  how many voters in the state of Texas did not have a
19  driver's license?
20      A.  We did two separate matching exercises, and it
21  included driver's license and IDs, so I don't know if
22  we've done a separate determination for a driver's
23  license only.  That's the reason I said I don't know.
24      Q.  And that was the 600,000 or the 795,000 that
25  you're referring to?

BRIAN KEITH INGRAM                                          June 5, 2012

---

### 153

1     A.   Correct.
2     Q.   Do you know how many voters in the state of
3  Texas have military IDs?
4     A.   I do not.
5     Q.   Has the Secretary of State's Office attempted
6  to conduct an analysis or research into the number of
7  registered voters who possess military IDs?
8     A.   As far as I know we haven't, but I don't know.
9     Q.   Who would know that beyond yourself?
10    A.   Ann McGeehan.
11    Q.   And now you've -- you've testified that you
12  were involved in the submissions process, correct?
13    A.   I was.
14    Q.   And during the submissions process, did you
15  attempt to determine how many voters in the state of
16  Texas had United States military identification?
17    A.   I don't know.  I was involved at the tail end
18  of it.  Not that I was involved in.  That's the reason
19  you would you have to ask Ann McGeehan about what
20  happened in the fall.
21    Q.   Well, and again, I'm trying to limit this to
22  your time period in the office.
23    A.   Right.
24    Q.   Did you or anyone in your office, at the time
25  you were the Director of Elections, attempt to determine

---

### 154

1  how many voters in the state of Texas possessed a
2  military ID card?
3     A.   And the answer to that question is no.
4     Q.   Okay.  Turning your attention to Page 10 in
5  SB 14, it indicates United States citizenship
6  certificate issued to the person that contains a
7  person's photograph.  Do you see that?
8     A.   Yes.
9     Q.   Okay.  Do you know how many voters in the state
10  of Texas possess a United States citizenship certificate
11  that's issued to the person that contains a photograph?
12    A.   No idea.
13    Q.   Did you or anyone within the Secretary of
14  State's Office during your time period as the Director
15  of Elections attempt to determine how many voters in the
16  state of Texas possess a United States citizenship
17  certificate issued to a person that contains a
18  photograph?
19    A.   We did not.
20    Q.   Are you aware of any reports or analyses that
21  were conducted by Ann McGeehan or staff under her that
22  attempted to determine how many voters in the state of
23  Texas possess the United States citizenship certificate
24  issued to a person that contains the person's
25  photograph?

---

### 155

1     A.   I don't know of any such analysis.
2     Q.   SB 14 also allows -- and I'm referring page
3  10 -- a license to carry a concealed handgun issued to
4  the person by the Department of Public Safety that has
5  not expired or that expired no earlier than 60 days
6  before the date of presentation.  Do you see that?
7     A.   I do?
8     Q.   During your time period as Director of
9  Elections, and that would be from January 2012 forward,
10  have you or anyone in your office attempted to determine
11  how many voters in the state of Texas possess a
12  concealed handgun license?
13    A.   Have not.
14    Q.   And are you aware of any report or analyses
15  that, during Ann McGeehan's time period as the Director
16  of Elections, which indicate how many voters in the
17  state of Texas possess a license to carry a concealed
18  handgun?
19    A.   I'm not aware of any.
20    Q.   So is it fair to say that you're not aware of
21  any studies or analysis, either during Ann McGeehan's
22  time period or during yours, that would indicate how
23  many voters in the state of Texas actually possess one
24  of the allowable forms of ID under SB 14?
25    A.   I lost you.

---

### 156

1        MR. GEAR:  All right.  Let me see if I can
2  have you read that back.  Let me try that again.
3     Q.   (By Mr. Gear) Is it fair to say that based on
4  your testimony here today that you're not aware of any
5  reports or analysis that have been conducted by the
6  Secretary of State's Office, either during Ann
7  McGeehan's time period or during your time period as the
8  Director of Elections, that would show or indicate how
9  many voters in the state of Texas possess one of the
10  allowable forms of ID under SB 14?
11    A.   You know, I think we've tried it twice with the
12  information that we've got available to us, and so we've
13  limited it to less than 795,000, but we don't know how
14  much less, and we can't get it any less than that, as
15  far as I know.
16    Q.   Okay.  And so the 795,000 is the -- is
17  basically no match list, the list of voters that do not
18  have allowable form of ID under SB 14?  Is that your
19  understanding?
20    A.   That is not -- that is not what that 795,000
21  represents.
22    Q.   Tell me what it represents.
23    A.   It represents the number of people that we
24  can't prove have an ID.  Some portion of those have an
25  ID.  Is it a hundred or 500,000?  Don't know.

## 157

1    Q.  Okay.  So we -- we went through a discussion on
2  the record about the Secretary of State's -- the
3  Secretary of State and/or his staff's effort to make a
4  determination as to what voters, if any, in the state of
5  Texas, possess the other forms of allowable forms of ID
6  under SB 14.  Do you recall that discussion on the
7  record?
8    A.  Indeed.
9    Q.  And my question to you previously was:  As you
10  sit here today, can you testify -- strike that.
11    Are you -- are you aware of any reports or
12  analysis that were either generated during Ann
13  McGeehan's time period or during yours, that would show
14  how many voters in the state of Texas have any of the
15  other forms of allowable forms of ID under SB 14?  And
16  I'm referring to military ID.  I'm referring to handgun
17  licenses.  I'm referring to citizenship certificates.
18  Are you aware of any reports or analysis that show that?
19    A.  No.
20    Q.  Okay.  Are you aware of whether or not the
21  Secretary of State took a public position on SB 14?
22    A.  We don't -- that's not what we do.
23    Q.  Okay.  So based on that testimony, is it fair
24  to say that the Secretary of State did not take a public
25  position on any of the voter ID legislation?

## 158

1    A.  I believe not.  If we did, that would be
2  extremely out of the ordinary.
3    Q.  And did you take a position on -- a public
4  position on SB 14?
5    A.  Have not.
6    MR. GEAR:  This might be a good place to
7  just take a very quick break.
8    MR. SWEETEN:  Okay.
9    MR. GEAR:  Five minutes.
10    MR. SWEETEN:  Sounds good.
11    (Recess from 2:14 p.m. to 2:21 p.m.)
12    Q.  (By Mr. Gear)  So we've been talking about SB
13  14.  In your capacity as the Director of Elections, are
14  you aware of any attempt by the Secretary of State's
15  Office to determine the impact of SB 14 on minority
16  voters?
17    MR. SWEETEN:  Objection, asked and
18  answered.  Go ahead.
19    A.  Other than the exercise that we went through
20  earlier this year in connection with the submission
21  process, I don't know of any.
22    Q.  (By Mr. Gear)  Okay.  Are you aware of any
23  reports or analysis that were generated by the Secretary
24  of State's Office during Ann McGeehan's time period that
25  would have studied the impact of SB 14 on minority

## 159

1  voters?
2    A.  I don't believe that there was any such
3  analysis.
4    Q.  So what is a military ID?
5    A.  A military ID is a laminated plastic card with
6  a picture on it that says you're a member of the
7  military.
8    Q.  Okay.  And do you know how many forms of
9  military ID there are?
10    A.  I have no idea.  I know my son's got one for
11  the Army reserve, and other than that, I don't know
12  anything about them.
13    Q.  And do you know if civilians have military IDs?
14    A.  I do not.
15    Q.  Contractors?
16    A.  I don't know.
17    Q.  Do you know if all military ID is -- are the
18  same in the formatting?
19    A.  I don't know.
20    Q.  Do you know why it was determined that military
21  ID would be acceptable under SB 14?
22    A.  No.
23    Q.  And I think you've seen a military ID because
24  your son has one, correct?
25    A.  I have.

## 160

1    Q.  What is a citizenship certificate?
2    A.  I don't know.
3    Q.  Have you ever seen one?
4    A.  Not that I know of.  I have a friend that I
5  used to practice law with who became a naturalized
6  citizen several years ago, and I might have seen his
7  certificate.  I don't know.
8    Q.  Do you know how much it cost to obtain a
9  citizenship certificate?
10    A.  I do not.
11    Q.  So you wouldn't know how much it would cost to
12  replace a citizenship certificate?
13    A.  I do not.
14    Q.  Do you know what you have to provide, the
15  underlying documentation that you would have to provide
16  to obtain citizenship certificate?
17    A.  No.
18    Q.  Do you know how long it would take or it might
19  take to obtain a citizenship certificate?
20    A.  No.
21    Q.  Do you know how much it costs to obtain a US
22  passport?
23    A.  I -- yes.  I -- but I don't remember.  My
24  daughter got one a couple of years ago, and we paid for
25  it to be expedited, and I just don't remember.

BRIAN KEITH INGRAM                                          June 5, 2012

---

## 169

1   at the job that was extremely broad, and so we were
2   working through the process of hold the material,
3   collecting the material, finding how much it would cost
4   to gather up all the material and check it for
5   duplicates, all the stuff you do when you're evaluating
6   a public information request.  That work was going on
7   when I arrived.
8           Since I have worked in the Governor's
9   office and was familiar with public information requests
10  in that role and had familiarity with gathering
11  information, evaluating information, asserting
12  objections to the Attorney General's Office, I was
13  immediately tagged to assist our general counsel in that
14  process.  So in that role, I looked in quite a bit of
15  these documents to generally categorize them.
16      Q.   And the documents were ultimately produced to
17  Ms. Gamboa?
18      A.   No.  They were not.
19      Q.   Do you know why not?
20      A.   She never paid the cost deposit, and she never
21  renewed her request.
22      Q.   Are you aware of any analysis that was
23  conducted by the Secretary of State's Office or the
24  Secretary of State and/or any of her staff that was the
25  request of a senator or House member?

## 170

1           MR. SWEETEN:  Objection, asked and
2   answered.
3       Q.   (By Mr. Gear)  As it relates to SB 14?
4       A.   Right.  I don't have anything specific in
5   mind.  I don't know of anything that they did or didn't
6   do in response to a House member's request.  I know that
7   generally when we get requests, we do our best to
8   fulfill those requests.
9           MR. SWEETEN:  Just answer his question,
10  the question that's he's posing.
11      A.   Sure, sure.
12      Q.   (By Mr. Gear)  How would allowing a -- how
13  would allowing a nonphoto ID prevent the goal of SB 14?
14      A.   Well, if we're talking about enhancing the
15  integrity of the voting process, photo IDs are more
16  reliable to determine the identity of the voter.
17      Q.   Okay.  So how would allowing a student ID
18  prevent the goal of SB 14?
19      A.   I don't know for sure, but I would imagine that
20  student IDs come in many shapes, forms and sizes and
21  would be easy to fabricate.
22      Q.   And it's fair to say that military IDs come in
23  many different forms?
24      A.   Probably.  I don't know if they come in as many
25  forms as student IDs.

## 171

1       Q.   But as you sit here today, you don't know how
2   many different forms of military ID there may be?
3       A.   No, I do not.
4       Q.   How would it allowing an employer -- employee
5   ID or employer's ID prevent the goals of SB 14?
6       A.   Same thing.
7       Q.   Which is?
8       A.   That it would be susceptible to fabrication.
9       Q.   Even if it had a photo of the individual --
10      A.   Sure.
11      Q.   -- who was presenting it?
12      A.   Absolutely.
13      Q.   Are driver's licenses susceptible to
14  fabrication?
15      A.   Yes, they are.  But when you fabricate a
16  driver's license, you would have to really, really,
17  really work at it.
18      Q.   Couldn't that be true for some of the student
19  IDs or --
20      A.   No.
21      Q.   -- or employee IDs?
22      A.   That would be easy.  That would be easy.  I
23  could have made my own employee ID for my law firm, and
24  it could look like whatever I wanted it to look like.
25  It could say whatever I wanted it to say.

## 172

1       Q.   Well, for instance, SB 362 allowed for IDs that
2   were issued by federal agencies.  Do you believe that
3   those would be easy to fabricate?
4       A.   I do not know.
5       Q.   Do you know what the circumstances were by
6   which the license to carry a concealed handgun were
7   included into SB 14?
8       A.   I do not.
9       Q.   Do you know the racial composition or the
10  racial breakdown of individuals who carry a concealed
11  handgun license is in the state of Texas?
12      A.   I do not.
13      Q.   What, if any, tools would a poll worker have to
14  determine if a driver's license that was presented on
15  election day was valid or not?
16      A.   Well, I don't know for sure what any random
17  election worker would have, but part of the training
18  would be general familiarity with what a driver's
19  license looks like.  And specifically, what we're doing
20  to add to the training materials with regard to SB 14 is
21  the distinction between a temporary driver's license and
22  a regular driver's license, so they'll have pictures of
23  all three.
24      Q.   And I'm sorry, temporary driver's license,
25  regular driver's license, and what was the third

---

173

1    driver's license?
2        A.   Well, there's two kinds of temporary licenses.
3        Q.   Okay.
4        A.   There's the kind that they used to have that
5    apparently there was a lawsuit to disallow that was
6    vertical that had temporary resident on it, and now it
7    says something else on a horizontal license like
8    everybody else has.
9        Q.   But is it fair to say that if someone went
10   through the process of fabricating, and this is a
11   general question, fabricating a driver's license, that
12   the poll workers at the polling place would not have any
13   specific tools other than the training guide to
14   determine if it was valid or invalid?
15       A.   Right.  I mean, I don't know what other
16   knowledge a poll worker brings to the table whenever
17   they come up, but they would have their general
18   awareness of the world and what driver's licenses look
19   like.
20       Q.   So, ultimately, it would be up to the poll
21   worker to determine if a license was valid or invalid?
22       A.   Just like it is today.
23       Q.   Do you know why student IDs were not allowed
24   under SB 14?
25       A.   I do not.

---

174

1            MR. SWEETEN:  Objection, calls for
2    speculation.  Go ahead.
3        A.   I do not.
4        Q.   (By Mr. Gear)  Do you have any concerns as the
5    Director of Elections that the failure to include the
6    IDs that we've talked about, student IDs, employee IDs,
7    would have a disproportionate impact on minority voters?
8        A.   No.
9        Q.   And why not?
10       A.   Well, why would they?
11       Q.   You tell me.
12       A.   I'm not aware of any information to indicate
13   that that would have a disproportionate impact on
14   minorities.  No.
15       Q.   Well, is it true that as the law is today,
16   election laws are today, that a poll worker does not
17   have to verify a voter's identity by looking at a photo
18   ID?
19       A.   They don't have to but they can.
20       Q.   Sure.  But a voter can present a nonphoto ID at
21   the polls today.
22       A.   When a voter presents to vote, they can do one
23   of several things.
24       Q.   Okay.
25       A.   They show their voter registration card.  It's

---

175

1    yellow this time.  They can present it.  If the names
2    match, the election clerk will ask them, "Are you still
3    at this address?"
4            They say "Yes."
5            Perfect voter.  You can go vote.  Right?
6        Q.   Uh-huh.
7        A.   You could you show up and you don't have your
8    voter registration certificate.  So you've got to come
9    up with one of the other forms of acceptable
10   identification under 63.0101.  Right?  So it could be a
11   birth certificate.  It could be a student ID.  It could
12   be a utility bill.  It could be a bank statement.  It
13   could be a pay stub.  It could be other government
14   document.  It could be a letter from a government
15   agency.  Right?
16       Q.   And those would have to have a specific set of
17   identifying information on it?
18       A.   Exactly.  So that's my point.  So when somebody
19   comes in with one of these other forms of
20   identification, whether it's a driver's license or
21   whether it's anything else besides the yellow card, the
22   election worker has to make a judgment in that moment.
23   They've got discretion.  Is this the same?  Right?
24       Q.   Okay.
25       A.   I -- My name is Brian Keith Ingram.  I go by

---

176

1    Keith.  Right?
2        Q.   Correct.
3        A.   So some of my stuff has Keith Ingram on it.
4        Q.   Okay.
5        A.   Right?  Some of my stuff has Keith Ingram from
6    my address in Austin.  Some of my stuff has Keith Ingram
7    from my address in Williamson County.  Right?
8        Q.   Uh-huh.
9        A.   So I show up and I present them a document that
10   says "Keith Ingram" from my address in Austin, and I'm
11   in Williamson County, they have to determine whether or
12   not that's me.  They've got the discretion to do so.
13       Q.   Right.
14       A.   And they've got complete discretion to say that
15   Keith Ingram from Austin is not the same as Brian Keith
16   Ingram that's registered to vote in Williamson County.
17       Q.   Okay.
18       A.   And if I say I am, then I get to vote
19   provisionally.  And they will take my provisional
20   ballot, and the ballot board will determine whether or
21   not that's a valid vote or not.
22       Q.   Okay.
23       A.   I think my chances are not good at that point.
24       Q.   Okay.
25       A.   Right?  So that's the way it works now.  Under

BRIAN KEITH INGRAM                                          June 5, 2012

## 177

1   this new law, the same amount of discretion, you're
2   going have to show them something, and the same
3   discretionary process is going to work.  Right?
4           We have a rule, 81.71, that we've adopted
5   to talk about similar names so that under my specific
6   example, Keith Ingram and Brian Keith Ingram would
7   probably be considered substantially similar names.
8   Right?  Even though they're different, all I would have
9   to do is fill out an affidavit that says Keith Ingram
10  and Brian Keith Ingram are the same person; they're me.
11  And then I go vote.  And my vote counts.  It's good.
12          If they determine that my name is not
13  substantially similar, right, then I will have to vote
14  provisionally.  The beauty of SB 14 is that I then have
15  six days to come talk to the voter registrar and prove
16  that I really am the same person.  So now then I get an
17  opportunity to fix the problem.
18          Under current law, I do not get that
19  opportunity.  So you have the same amount of discretion
20  on the part of the poll workers without any opportunity
21  to backstop it.  You see the difference?
22  Q.  I do.  You said something that was interesting,
23  and I just wanted to understand it.  Once a voter votes
24  provisionally and it goes to the board --
25  A.  Right.

## 178

1   Q.  -- what was the name of the board again?
2   A.  Ballot board.
3   Q.  The ballot board.  You indicated that my
4   chances are not good at that time.
5   A.  That's right.
6   Q.  Does that mean that the provisional
7   ballot be counted is not good at that time?
8   A.  Right.  Under my example with a different
9   address and a different name, my odds are not good at
10  going to the ballot board of having my vote count.  So I
11  will probably get a rejection notice.
12  Q.  Is it fair to say that in the state of Texas,
13  provisional ballots are more likely not to be counted
14  than counted?
15  A.  I don't know.
16  Q.  Have you ever looked at any studies or analysis
17  which would show the percentages of provisional ballots
18  that have counted in the state of Texas?
19  A.  I have not.
20  Q.  And you also talked about the six days that --
21  that an individual would have time sensitive -- that an
22  individual would have once they've cast a provisional
23  ballot to bring an allowable form of identification back
24  to the election board --
25  A.  Right.

## 179

1   Q.  -- to have their vote counted, right?
2   A.  Right.
3   Q.  But as you sit here today, if a voter came to
4   the polls and they did not have an allowable form of
5   identification, can you say how long it would actually
6   take for a voter to, for instance, get a birth
7   certificate?
8   A.  I don't know, but a birth certificate I don't
9   think would be acceptable under Senate Bill 14.
10  Q.  Okay.  And do you -- could you say how long it
11  would take for an individual to get a driver's license
12  under the scenario that you just talked about?
13  A.  I don't know.
14  Q.  Okay.  And when I talked about the birth
15  certificate, that's in fact one of the underlying
16  documentation that an individual could present --
17  A.  Right.
18  Q.  -- to obtain a driver's license?
19  A.  You know, I don't know how long it takes.
20  Right?  I know how long it has taken me, and I go right
21  down to the health department and get a birth
22  certificate in a matter of a couple of hours.  Right?
23  And then you would have to go to the DPS and wait
24  another couple of hours and get a temporary with your
25  picture that you could go to the voter registrar with.

## 180

1   Q.  Okay.  So just so I understand your testimony,
2   you said you could get a birth certificate within a
3   couple of hours?
4   A.  Sure.  I have recently for my daughter.
5   Q.  Okay.  And do you recall what the cost for a
6   birth certificate was?
7   A.  I don't remember.  $10, $5, not much.
8   Q.  But it was not free.
9   A.  Not free.
10  Q.  And so would you agree that the underlying
11  documents required to get an allowable form of
12  identification under SB 14 are not free?
13  A.  If they had to be bought, they're not free.
14  Q.  Okay.  And if the person didn't have any of the
15  underlying documentation, they would have to go about
16  whatever process was necessary to get the underlying
17  documentation before they could even get a driver's
18  license in the state of Texas?
19  A.  Sure.
20  Q.  Under the current law, as it is today, what can
21  a voter -- a poll worker look at to determine if the
22  voter that's before them is actually who they say they
23  are?  And that's a very broad question, I know.  I'm
24  just trying to understand, under the current law, what
25  can a poll worker consider when Mr. Voter comes into the

BRIAN KEITH INGRAM                                      June 5, 2012

---

181

1  door to determine if they're really who they say they
2  are?
3       A.   Well, they can look at any of the acceptable
4  forms of identification under 63.0101.
5       Q.   And that includes both photo and nonphoto?
6       A.   Yes.
7       Q.   And we talked a little bit about what the
8  identifying factors are for the nonphoto, and that
9  includes an address, correct?
10      A.   Right.
11      Q.   What if anything else does it include?
12      A.   The name.
13      Q.   The name.  All right.  And so if the name and
14 the address match the voter registration rolls, then
15 that person would be allowed to vote a regular ballot.
16      A.   If they're on the list of registered voters,
17 yes.
18      Q.   Okay.  And if -- if I was married and I changed
19 my last name so my maiden name was different but my
20 address was correct, that person most likely would be
21 allowed to vote a provisional ballot?
22      A.   I don't know.
23      Q.   That's based on the discretion of the poll
24 worker?
25      A.   It is.

---

182

1       Q.   Okay.  So under SB 14, the consideration of the
2  poll worker would be different if it was implemented,
3  correct?
4       A.   Different?  It would be different if someone
5  came with a voter registration card.  Right?  If someone
6  comes with a voter registration card now, there is no
7  other thing the election worker has to think about.
8       Q.   What would happen then?
9       A.   They vote.  So if SB 14 is implemented and you
10 show up with a voter registration card, now then you're
11 going to have to have something else.
12      Q.   Okay.
13      A.   Right?  So your something else could take the
14 place of the voter registration card.  It doesn't -- you
15 don't have to have a voter registration card.  I'm just
16 saying that persons who show up with that now get to
17 vote.  If persons who show up with one, if SB 14 is in
18 place, have to have another form of ID.
19      Q.   So my other form of ID is a utility bill.
20      A.   Not going to work under SB 14.
21      Q.   You have to have a photo ID?
22      A.   That's right.  It's on the list.
23      Q.   So both a -- the voter registration card and a
24 photo ID, and that is one of the allowable forms of
25 voter ID under SB 14, correct?

---

183

1       A.   Yeah.  I don't believe you have to have a voter
2  registration card.  You only have to have a photo ID and
3  --
4       Q.   If I only have a voter registration card under
5  SB 14, I would have to have some other form of ID, and
6  that would have to be a photo ID; is that right?
7       A.   That's right, on the list, and that would
8  include a free election identity certificate.
9       Q.   Under SB 14, does a poll worker also look at
10 the address on the ID?
11      A.   Sure.
12      Q.   And if the address didn't match the voter
13 registration roll, and we're talking about if SB 14 was
14 implemented, what would happen?
15      A.   They would ask, "Do you still live at the
16 address on the voter registration roll?"
17      Q.   Okay.  And so, hypothetically, if I was a
18 voter, I came in, I showed you my voter ID --
19      A.   The names match.
20      Q.   -- the names match, but I had moved recently
21 within the same county or within the same precinct, what
22 would happen?
23      A.   Well --
24      Q.   What should happen, I guess?
25      A.   What should happen is that you should be

---

184

1  allowed to vote probably.  If you've moved into a
2  different precinct, it depends on when you moved.  You
3  know, if you moved within the recent time period before,
4  you know, you didn't have time to reregister in your new
5  address, then you could vote a limited ballot that's
6  common to both precincts.
7       Q.   And that hypothetical, moving, not changing
8  your address, that's something that commonly happens in
9  the state of Texas?
10      A.   People move a lot.  Yes.
11      Q.   How did the exception for individuals with
12 disabilities come to be included in SB 14?
13      A.   I don't know.
14      Q.   Do you know who made that decision?
15      A.   I do not.
16      Q.   Do you know what the purpose of that provision
17 was?
18      A.   No.
19      Q.   Do you know if it was in response to any
20 particular concerns expressed by either supporters or
21 opponents of SB 14?
22      A.   I don't know.
23      Q.   Do you know how the exception for individuals
24 with religious objections came to be included in SB 14?
25      A.   I do not.

BRIAN KEITH INGRAM                                    June 5, 2012

---

### 185

1    Q.   Do you know what the purpose of that provision
2    was?
3    A.   Other than what it is.
4    Q.   All right.  And I -- I think I know what you
5    mean, but I just want to make sure that your testimony
6    is clear.  What do you mean by that?
7    A.   A provision for religious conscience, I mean,
8    is what it seems to be.
9    Q.   Do you know if that was included to address any
10   specific concerns?
11   A.   I do not.
12   Q.   Are you aware of any communications about that?
13   A.   I am not.
14   Q.   Are you aware that the legislature made
15   modifications to SB 14 for persons with disabilities?
16   A.   I know what the bill looks like today.
17   Q.   And that includes allowances for persons with
18   disabilities?
19   A.   That's right.
20   Q.   It includes allowances for persons with
21   religious objections?
22   A.   It does.
23   Q.   Did the legislature make modifications to SB 14
24   based on concerns pertaining to racial and ethnic
25   minorities?

---

### 186

1         MR. SWEETEN:  Objection, calls for
2    speculation.  Go ahead.
3    A.   I don't know.
4    Q.   (By Mr. Gear)  Is it included anywhere within
5    the bill?
6    A.   I don't know.
7    Q.   Are you aware of amendments that were offered
8    during the legislative debate on SB 14 that would have
9    addressed concerns pertaining to racial and ethnic
10   minorities?
11   A.   Not specifically, no.
12   Q.   When you say "not specifically, what do you
13   mean?
14   A.   I mean, I know there was a lot of amendments
15   offered.  I don't know what they were or what effect
16   they were supposed to have.
17   Q.   Well, do you know that there was an amendment
18   offered to allow tribal identification, for instance?
19   A.   No.  I did know that.
20   Q.   Do you know that there was an amendment offered
21   which would have -- that would have required the
22   Secretary of State to track voting based on race?
23   A.   No.
24   Q.   Do you know any of the specific amendments that
25   were offered during the legislative debates on SB 14?

---

### 187

1    A.   No.
2    Q.   And just to round that off, do you know of any
3    specific debates that were offered during the
4    legislative debates on SB 14 that addressed the concerns
5    of minorities?
6    A.   I do not.
7    Q.   Can you describe the provisions in the bill
8    that pertain to administration of ID at the polling
9    place?
10   A.   What do you mean?
11   Q.   Is there anything in SB 14 that pertains
12   specifically to the administration of the ID requirement
13   at the polling places, at the polls on election day?
14   A.   Yes.
15   Q.   Can you describe that for me?
16   A.   Well, I don't know exactly what your question
17   is.
18   Q.   Well, let's start with a yes.  What are you
19   referring to in SB 14?
20   A.   Well, there's several things that relate to
21   polling places and presentation of ID in the polling
22   place.  There's the whole idea that you have to have a
23   notice posted about what IDs are required.  Then -- so
24   that's 15.05.  You got to prescribe the wording of the
25   section that before voting, you have to provide to

---

### 188

1    applicants who register to vote whether they wish to
2    receive an exemption on the basis of disability, you've
3    got to provide them the forms so that they could with
4    their voter registration application ask for an
5    exemption based on disability.  So then there would have
6    to be a certificate issued to that voter if they did get
7    their disability exemption.
8         The Secretary of State and voter registrar
9    of each county is required to maintain a website
10   providing notice of the identification requirements for
11   voting prescribed by Section 63 -- or Chapter 63.  So we
12   have prescribed that notice, that notice has been
13   disseminated, and as far as I know, it's on the county
14   websites now.  We're supposed to, when this bill is
15   implemented, conduct a state-wide effort to educate
16   voters regarding the identification requirements.
17        There was an RFP put out.  That RFP was
18   eventually let to Burson Marsteller, that campaign is
19   ongoing.
20   Q.   And the other part of that was, did I hear you
21   say "let"?
22   A.   Let.
23   Q.   Let.  Okay.
24   A.   You know, there was request for proposal.
25   There were bids.  There was evaluation of those bids.

## 189

1   Q.   Okay.

2   A.   The winning bidder.

3        And that was a voter education campaign

4   regarding photo ID.  Now, that campaign is ongoing right

5   now, and it is not about voter ID, because we don't have

6   preclearance on this bill.  But the money is in place.

7   The spots are bought for both the primary and the

8   general election.  And it's easy to change the content

9   back to what was proposed.

10        We're going to have to train the election

11   workers about the photo ID.  We've started that

12   process.  I mean, we haven't started training them.  We

13   started the process of the manual.  Y'all have got a

14   draft in your view now.  We're working on the

15   Powerpoint video combo.

16   Q.   That's the training video?

17   A.   Training video.

18   Q.   Okay.

19   A.   We're not going to reshoot the video.  We're

20   just going to add some Powerpoint slides between what

21   already exists.  We got to post the notice of acceptable

22   identification outside the polling places.  And the

23   voter must present to an election officer at the polling

24   place one form of ID described in Section 63.0101.

25        The document required -- on presentation

## 190

1   of the document, the election officer is going to

2   determine whether the voter's name is on the list of

3   registered voters.  And when they're making that

4   determination, they're supposed to use the standards

5   adopted by the Secretary of State.  And we've got that

6   rule adopted, 81.71, about whether or not the voter's

7   name on the documentation they provide is substantially

8   similar to but does not match exactly with the name on

9   the voter registration list.

10   Q.   Uh-huh.

11   A.   So they've got to match the names.  If they

12   don't match exactly, you know, that's close, we've

13   got four criteria in our rule.  I don't remember them

14   all off the top of my head.  But, you know, if it's a

15   last name middle name combo that you only have one or

16   the other, that's one of the similar names.  If it's a

17   commonly accepted abbreviation of one of the names, so

18   Beto for Alberto.  If there's a middle initial that's

19   there or not there -- I mean, we've got several

20   descriptions of what they should consider to be

21   substantially similar names -- they'll provide them an

22   affidavit.  They'll provide the voter an affidavit

23   stating that the voter is the same person and that voter

24   will be allowed to vote.

25   Q.   Would you agree that the success of SB 14

## 191

1   depends on the administration of this bill at the

2   polling places?

3   A.   This success of any election law depends upon

4   the administration of the election law at the polling

5   place and at the voter registrar's office before the

6   polling place.

7   Q.   And that's also true for SB 14?

8   A.   That is true for every single election law ever

9   adopted.

10   Q.   Could you describe the election identification

11   certificate provision of SB 14?

12   A.   I don't know much about it.  That's a DPS

13   question.  I just know that they have had to come up

14   with an election identification certificate that is good

15   for voting but not good for anything else, and I don't

16   know any of the particulars on it.

17   Q.   Do you know how that particular part of SB 14

18   was developed?

19   A.   I don't.

20   Q.   Do you know what if any role the Secretary of

21   State's Office or the Secretary of State and/or her

22   staff would have played in the development of the

23   election identification certificate?

24   A.   I do not.

25   Q.   Do you know if there's any studies, reports or

## 192

1   analysis within the Secretary of State's Office which

2   address the issue of election identification

3   certificates?

4   A.   I don't know of any.

5   Q.   When producing documents in response to the

6   document request for the notice of deposition, are you

7   aware of any documents that were produced that address

8   the issue of election identification certificates?

9   A.   I'm not specifically aware of such things.  If

10   we had them, they were produced.

11   Q.   Do you know what, if anything, the election

12   identification certificate modeled on or upon?

13   A.   I do not.

14   Q.   Do you know what, if any, concerns were

15   expressed regarding -- do you know why this

16   particular -- how this provision arose or what concerns

17   were expressed, if any, about election identification

18   certificates?

19        MR. SWEETEN:  Objection, speculation.

20   A.   I do not know.

21   Q.   (By Mr. Gear)  Are you aware of any concerns

22   that the election identification certificates would be

23   difficult for Texans to obtain?  And Texans, I mean

24   voters in the State of Texas.

25        MR. SWEETEN:  Can you read that back,

BRIAN KEITH INGRAM                                          June 5, 2012

## 193

1  please?

2          (Requested portion read back by the court

3  reporter.)

4      A.  I know what Mr. Perez wrote in his letter to

5  me.

6      Q.  (By Mr. Gear)  Okay.  So -- and that was Perez?

7      A.  Right.

8      Q.  And Mr. Perez wrote you a letter when?

9      A.  Whenever SB 14 was being presented for

10 preclearance.

11         MR. SWEETEN:  Hold on a second.  Who is

12 Mr. Perez?

13         MR. GEAR:  Mr. Perez -- well

14     Q.  (By Mr. Gear)  Who is Mr. Perez?  Let's start

15 off with that.

16         MR. SWEETEN:  Is he with DOJ?

17         THE WITNESS:  I'm not sure -- yeah, he's

18 with DOJ.  I think he's one of the big bosses.

19         MR. SWEETEN:  Okay.  That's fine.  I just

20 wanted to make sure.

21     Q.  (By Mr. Gear)  And just so we're being clear,

22 you received a letter from the Department of Justice

23 that was signed by Mr. Perez?

24     A.  Right.

25     Q.  Okay.  And so go on.  Were you done with your

## 194

1  answer?

2      A.  And in that letter he expressed concern about

3  the ability of voters to get an election identification

4  certificate.  That's the extent of my knowledge.

5      Q.  Okay.  So as you sit here today, is it your

6  testimony that you weren't aware of any concerns

7  expressed along those lines during the legislative

8  debate for SB 14?

9          MR. SWEETEN:  Objection, asked and

10 answered.  Go ahead.

11     A.  No, sir.

12     Q.  (By Mr. Gear)  Do you have an opinion as to the

13 concern that was expressed by Mr. Perez?

14     A.  I do not.

15     Q.  Do you know if every county has a driver's

16 license office?

17     A.  I know what Mr. Perez said.

18     Q.  And what did Mr. Perez say?

19     A.  He said that, what was it, 81 counties didn't.

20     Q.  Have you attempted to independently confirm

21 that statement?

22     A.  I have not.

23     Q.  Do you know if, in fact, there are counties

24 that do not have driver's license offices?

25     A.  I don't.

## 195

1      Q.  Is that a concern of yours?

2      A.  Texas is a very large state.

3          MR. SWEETEN:  Objection, relevance.  Go

4  ahead.

5      A.  Texas is a very large state, wide-open empty

6  spaces in it.

7      Q.  (By Mr. Gear)  Are you aware of any concerns

8  expressed during the legislative debate regarding the

9  distance that may need to be traveled by persons who

10 would be required to obtain one of the allowable forms of

11 ID under SB 14?

12     A.  I know Mr. Perez's letter.

13     Q.  Okay.  And independent of Mr. Perez's letter,

14 are you aware of any legislative debate that addressed

15 that matter?

16     A.  I am not.

17     Q.  Would it be fair to say that there are voters

18 in the state of Texas who may not have allowable form of

19 ID that may need to travel a distance of more than 50

20 miles to obtain it?

21     A.  I don't know.

22     Q.  Have you attempted to make a determination as

23 to the distance voters who do not have a form of

24 allowable ID under SB 14 would have to travel to obtain

25 an allowable form of ID?

## 196

1      A.  I don't.

2      Q.  You did not make an effort to determine that?

3      A.  No.

4      Q.  Do you know if public transportation is

5  available to all offices, driver's license offices in

6  the State of Texas?

7      A.  I don't know one way or the other.

8      Q.  Have you made any determination, you or anyone

9  within your office made a determination as to whether or

10 not public transportation was available to all driver's

11 license offices?

12     A.  No, we have not.

13     Q.  Have you attempted to make any determination,

14 and "you" meaning you or anyone within your office

15 attempted to make a determination as to the burden SB 14

16 would place upon minority voters in obtaining an

17 allowable form of ID under SB 14?

18     A.  No.

19     Q.  Are you aware of any study or analysis that

20 would address that issue, the issue of burden to

21 minority voters, and I'm speaking specifically of the

22 Secretary of State's Office or anyone, any staff within

23 the office, are you aware of an existing analysis or

24 study?

25     A.  I am not.

BRIAN KEITH INGRAM                                          June 5, 2012

## 197

1    Q.   Are you aware of any analysis, report, study
2    within the Secretary of State's Office which attempted
3    to determine the underlying cost of documents necessary
4    to obtain allowable forms of ID under SB 14?
5    A.   No, sir.
6    Q.   Are you aware of what underlying documents are
7    needed to obtain an election identification certificate
8    under SB 14?
9    A.   I'm not.  I assume it's the Real ID
10   requirements, whatever those are.
11   Q.   But as you sit here today, you don't know what
12   the Real ID requirements are?
13   A.   I don't have a list in my head, no, sir.
14   Q.   If documents needed for allowable ID under SB
15   14 themselves are not free, would you agree that the IDs
16   required for SB 14 are also -- would also not be free?
17   A.   No, sir.
18   Q.   And why not?
19   A.   Because chances are, people have those
20   documents already and they don't need to buy them.
21   Q.   Well, let's do a hypothetical.  And this is in
22   general terms.  If I was a long-time voter in the state
23   of Texas, and SB 14 was implemented, and I made a
24   determination that I did not have any of the allowable
25   forms of ID under SB 14, and I also did not have any of

## 198

1    the underlying documentation, would you agree that for
2    me to obtain the underlying documentation, it would --
3    there would be a cost?
4    MR. SWEETEN:  Objection, assumes facts not
5    in evidence.  You can answer the question.
6    A.   I would imagine that it would cost something.
7    Sure.
8    Q.   (By Mr. Gear)  And not only just in terms of
9    money, but in terms of time to obtain the underlying
10   documentation?
11   A.   Probably.
12   Q.   Would you agree with that?
13   A.   If there's a voter that doesn't have either a
14   form of identification or the underlying documents
15   required to get such identification.
16   Q.   And so moving forward with that hypothetical,
17   you agree that there would be a cost to obtaining the
18   underlying documentation, so would you also agree that
19   by the time I got to the point where I could afford an
20   allowable form of identification under SB 14, I have
21   expended both time and money to do that?
22   A.   No.
23   MR. SWEETEN:  Same instruction.
24   Q.   (By Mr. Gear)  And again, this is a
25   hypothetical.

## 199

1    A.   No.  I -- I disagree with that.
2    Q.   Well, what part of it do you disagree with?
3    A.   Well, I disagree with the conclusion.  If
4    someone wants to vote, they realize that voter ID is in
5    place, that they do not have an acceptable form of ID
6    under 63.0101, then they will have to go to their
7    important papers drawer, see if they've got a birth
8    certificate or whatever else is required to obtain such
9    an ID.  And if they don't have one, then they'll have to
10   order one.  That will entail a cost, and it will entail
11   a little bit of time.
12   Once they've got their underlying
13   information --
14   Q.   Uh-huh.
15   A.   -- they can go down to the DPS and get their
16   free election identification certificate.  So how much
17   time is expended, how much money is expended, I don't
18   have any idea.  It probably will not be very much.  And
19   if someone is interested in voting, and presumably, in
20   your hypothetical, you've got a long-time voter who is
21   probably interested in voting, then they're probably
22   willing to bear that cost, and that's the cost that I
23   was talking about when I said that voter ID does have a
24   little bit of cost associated with it.
25   But you know, probably, when you're

## 200

1    talking about trade-offs, it's worth it for the benefit
2    that it gets in enhancing the integrity of the electoral
3    process.  See, there's a cost, there's no doubt there's
4    a cost, but there's also a benefit.
5    Q.   And the benefit as we're describing it in the
6    hypothetical would be voting?
7    A.   Voting, and knowing who the voters are and that
8    they're eligible to vote.
9    Q.   Is there any study or analysis that you have
10   reviewed from the Secretary of State's Office that would
11   show that the cost to poor voters was considered during
12   the implementation of SB 14?
13   MR. SWEETEN:  Objection, asked and
14   answered.  Go ahead.
15   A.   I don't -- I don't know of any such study.
16   Q.   Okay.  And you have not reviewed any such
17   study?
18   A.   I have not.
19   Q.   Do you know where you would obtain an election
20   identification certificate?
21   A.   I don't know.  It's my understanding that you
22   get them at the DPS office, but I don't know.
23   Q.   Do you know the hours of office for the various
24   DPS offices in the state of Texas?
25   A.   I have no idea.

BRIAN KEITH INGRAM                                      June 5, 2012

## 201

1      Q.   Excuse me.  Would you agree that there are
2  different office hours, that there are different days of
3  the week that are actually open in various DPS offices?
4      A.   I do not know.
5      Q.   Okay.  Would you agree that there are full DPS
6  offices and DPS offices that only provide partial
7  services?
8      A.   I don't know.
9      Q.   Have you ever attempted to determine that?
10      A.   I have not.
11      Q.   Any concern that for someone who has a very
12  little income, the little bit of cost might mean that he
13  or she cannot participate in the election --
14          MR. SWEETEN:  Objection.
15      Q.   (By Mr. Gear)  -- and I'm talking about voting
16  in the state of Texas?
17          MR. SWEETEN:  Just the question is vague,
18  and objection, relevance, but go ahead, you can answer
19      A.   It has been my experience that people come up
20  with money for what they want to come up with money
21  for.  Period.
22      Q.   (By Mr. Gear)  Okay.  Would you agree that
23  voting is a right?
24      A.   Yes.
25      Q.   Would you agree that that right may be affected

## 202

1  if a -- for instance, a poor voter didn't have the
2  little bit of cost that you referenced in your testimony
3  if SB 14 was implemented?
4          MR. SWEETEN:  Objection, assumes facts not
5  in evidence.
6      A.   Yeah.  I don't know.
7      Q.   (By Mr. Gear)  Are you aware of whether or not
8  any purpose of SB 14 was for partisan purposes?
9          MR. SWEETEN:  Objection, asked and
10  answered.
11      A.   I have no idea what -- I don't know.
12      Q.   (By Mr. Gear)  Was SB 14 designed to address
13  any particular problem?
14          MR. SWEETEN:  Objection, asked and
15  answered.  Objection, calls for speculation.
16      A.   I don't know if it was intended to address any
17  particular problem.  In my experience at the Secretary
18  of State's office, there are several problems that could
19  be addressed by SB 14, yes.
20      Q.   And what are those problems?
21      A.   Well, voter impersonation.
22      Q.   Anything else?
23      A.   Noncitizens voting.
24      Q.   Anything else?
25      A.   I can't think of anything else, but those are

## 203

1  the enhancements to the election process's integrity
2  that I think are important.
3      Q.   So other than your testimony today, and I
4  certainly understand that, are you aware of any other
5  evidence that -- that may exist that shows that either
6  voter impersonation or noncitizens voting at the polling
7  place actually exists?
8          MR. SWEETEN:  Objection, asked and
9  answered.  Go ahead.
10      A.   The thing is that voter impersonation under our
11  current system would be almost impossible to detect
12  outside of serendipity.  So saying that we're not aware
13  of cases of voter impersonation is not particularly
14  useful.  How would we know?  We would know if a precinct
15  worker is checking in a voter with a certificate with
16  the name of a person that they know and they know that
17  ain't them.  Right?  Serendipity is the only way we
18  would know about voter impersonation right now.
19          And the opportunity for voter
20  impersonation is quite large, both active fraud cases as
21  well as opportunity cases.  There was a case not too
22  long ago where -- was it earlier this year, where a
23  woman had an interest in elections.  She was either the
24  candidate for city council or advocated strongly for the
25  candidate, and she had her son, who was a junior, take

## 204

1  her dad -- his dad's voter card and go vote his dad's
2  card.  So when dad showed up to vote, it had already
3  been voted.
4          So voter impersonation happens.  We don't
5  know how often it happens, because we can't know how
6  often it happens, because we don't check.
7      Q.   (By Mr. Gear)  Now, you referenced a case that
8  you believe happened this year.  Can you give me some
9  detail about it?
10      A.   I just gave you all the details I know.  It was
11  in the newspaper.
12      Q.   Are you sure that it was this year?
13      A.   I'm pretty sure it was this year.
14      Q.   And do you know the name of that voter --
15      A.   I do not.
16      Q.   -- that you referenced?  Do you know the name
17  of the son that you referenced?
18      A.   (Witness shakes head no.)
19      Q.   Do you know the name of the person that they
20  supposedly impersonated?
21      A.   It was daddy, her husband.
22      Q.   And do you know when that newspaper article
23  came out?
24      A.   Within the last month.
25      Q.   Was that -- was that incidence of voter

BRIAN KEITH INGRAM                                    June 5, 2012

## 205

1  impersonation referred to the Secretary of State's
2  Office?
3      A.   I don't know.  It could have been.  It could
4  have been in that list of complaints that we haven't
5  worked yet.
6      Q.   So is it fair to say there's been no formal
7  investigation by the Attorney General's Office?
8      A.   Not as far as I know.  I think the local law
9  enforcement, local DA was looking into it according to
10  the newspaper.
11      Q.   And other than newspaper articles, are you
12  aware of any other allegations related to that -- to
13  that allegation or that complaint?
14      A.   I don't think so, no.
15      Q.   You testified that the only way that there
16  would be any evidence of voter impersonation was if the
17  poll worker knew the person that was presenting the card
18  as not being the person who they say they are, is that
19  --
20      A.   Right.  They either know the name on the card
21  or they know the person and they know they are not the
22  same person.
23      Q.   Wouldn't you agree that there are other ways to
24  determine if voter impersonation was occurring?
25      A.   You tell me what they are.

## 206

1      Q.   Well, I'm not actually here to testimony.
2      A.   Because I can't think of any.  How else would
3  anybody know?  If you show up with the yellow card to
4  vote -- if I show up with the yellow card to vote and it
5  says "Mary Jane Smith," probably, the election worker
6  would be suspicious because I don't look like Mary Jane,
7  right?
8      Q.   Uh-huh.  Hypothetically.
9      A.   If I get my wife to take "Mary Jane Smith,"
10  then we got something:  This fellow who might have been
11  voting several cards down there in Hidalgo County.
12      Q.   You don't know who identified him, if anyone,
13  to -- that he was committing voter impersonation --
14      A.   That's right.
15      Q.   -- if that's, in fact, what he was committing?
16      A.   And the reason that he was even suspicious is
17  because poll workers thought they had seen him before.
18      Q.   A voter, for instance, could identify someone,
19  and according to your testimony, that that happens, that
20  voters can identify individuals who they believe are
21  committing voter fraud.  Is that fair to say?
22      A.   Right.  But how would you know?  How would the
23  voter know?  The voter wouldn't know what name they were
24  presenting when they -- I could show up to vote at the
25  polling place, and I could see my friend Bob, and I

## 207

1  could say, "Hey, Bob, what's up?"  Right?  And Bob could
2  be giving his name to the registrar as "John."  Right?
3  And he could be voting John's card.  I wouldn't know
4  that.  I know Bob, but I don't know what name he's
5  voting under.
6      Q.   But it still doesn't eliminate the possibility
7  that --
8      A.   Serendipity could happen.
9      Q.   -- that during that scenario that you have just
10  testified to, that that voter would realize something
11  was not right and say something about it.
12      A.   They could.  That's what I'm talking about:
13  serendipity.
14      Q.   Okay.
15      A.   A few isolated instances where something
16  happened to catch somebody who was committing voter
17  fraud.
18      Q.   And there are poll watchers in the polling
19  place, correct, at times?
20      A.   That's true.  That's right.
21      Q.   There are federal observers in the polling
22  place at times?
23      A.   Yes, there are.
24      Q.   There are candidates who, as you've testified
25  before, have introduced at least allegations of voter

## 208

1  fraud in the past; is that accurate?  And I'm talking
2  about voter fraud in general.
3      A.   Uh-huh.  Candidates have made allegations of
4  voter fraud on the part of their opponents, yes.
5      Q.   Sure.  So there's any number of individuals who
6  can identify alleged cases of voter fraud, if I
7  understand your testimony.
8      A.   Voter fraud, yes.  Voter impersonation, very
9  difficult to detect.
10      Q.   But each and every one of the individuals that
11  we've just talked about here today would have the
12  ability to identify voter impersonation if -- if they
13  believed it occurred; is that correct?
14      A.   They would not.  That is my point.  They would
15  not.  If I'm a poll watcher for a candidate, and I'm
16  standing there observing, and I see somebody come in and
17  present a yellow card, there is no way for me to know
18  what name is on that card, what name they have in their
19  back pocket in the driver's license, and whether they're
20  the same or not.
21      Q.   Well, having done election coverages for a
22  long, long time, is it accurate to say that poll
23  watchers at times, not always, but at times have copies
24  of the voter registration rolls?
25      A.   I don't know.

BRIAN KEITH INGRAM                                      June 5, 2012

## 209

1      Q.   Have you ever observed an election -- have you
2  ever been inside the polling place to actually observe
3  an election as it goes on?
4      A.   No.  I mean, I've been to vote.
5      Q.   Okay.  So other than voting and leaving --
6      A.   But if they had an official list of registered
7  voters, that wouldn't help them.
8      Q.   Well --
9      A.   Do you understand that it wouldn't help them?
10     Q.   Is it also true, and I may know the answer or
11 your response to this, but is it also true that during
12 elections, poll workers often call out who is the name
13 of that voter and compare it to the voter registration
14 roll that they have?
15     A.   Sure.
16     Q.   You know that to be true?
17     A.   Absolutely.
18     Q.   Okay.  And is it also true that poll watchers
19 have the ability to challenge voters within the polling
20 place?
21     A.   I don't know.
22     Q.   One of election laws in the state of Texas, if
23 I, Mr. Poll Watcher, don't believe that a person is who
24 they say they are, do I have the authority under
25 election law to challenge that voter?

## 210

1      A.   I don't think so.  I mean, I'd have to look at
2  the election code and to make sure, but --
3      Q.   Is it fair to say as you sit here today, you're
4  not aware of what the election law provides regarding
5  the ability of poll workers to challenge -- I'm sorry,
6  poll watchers to challenge voters in the polling place?
7      A.   No.  I know they can challenge the assistants.
8  I don't know if they can challenge a voter.  That's a
9  good question.  I'd have to look.  But they would have
10 to have some idea that that voter is not who they are
11 presenting themselves to be.  That's the piece that is
12 missing.  That is the piece that voter ID supplements.
13     Q.   And as the law is today, what are the penalties
14 for voter impersonation?
15     A.   Voter impersonation right now I think is a
16 state jail felony.  Under SB 14, it goes up to a second-
17 degree felony.
18     Q.   So is it two to ten years?
19     A.   I don't know what the penalty is for state jail
20 felonies.
21     Q.   But that would include jail time and the
22 possibility of a fine, correct?
23     A.   Absolutely.
24     Q.   All right.  Any reason to believe that criminal
25 penalties aren't sufficient to deter voter

## 211

1  impersonation?
2      A.   I don't know.  Anytime a potential criminal is
3  evaluating conduct like that, they have to do a risk-
4  benefit analysis, don't they?
5      Q.   Well, that's an interesting statement.  When
6  you say "risk-benefit analysis," what do you mean?
7      A.   I mean the risk of getting caught and suffering
8  the punishment versus the benefit of getting to cast an
9  extra vote.
10     Q.   Would you agree that voter impersonation in the
11 state of Texas, if it occurs, is rare?
12     A.   I don't know.
13     Q.   Have you ever heard about voters who did not
14 vote because they were concerned that voter fraud would
15 cancel out their vote?
16     A.   Well, Mr. Barrientos makes allusion to that in
17 his e-mail this morning.
18     Q.   And you're referring to Exhibit Number 553?
19     A.   Yes.
20     Q.   And so where does he make that reference?
21     A.   "Someone complained that requiring voter
22 eligibility or identification is voter intimidation, but
23 the underlying rationale remains that voter fraud or
24 abuse taints the democratic election process, dilutes
25 the true vote, and should not be ignored due to

## 212

1  political correctness."
2      Q.   Okay.  And so my question was:  Ever hear about
3  a voter who did not vote because they were concerned
4  that voter fraud would cancel out their vote?
5      A.   No.
6           MR. SWEETEN:  Objection, asked and
7  answered.
8      Q.   (By Mr. Gear)  And your answer was "no"?
9      A.   The answer is I haven't heard of any specific
10 voter that hasn't voted.  I have heard from a general
11 lot of voters who think their vote doesn't count.
12     Q.   Do you have any knowledge as to whether SB 14,
13 if implemented, would increase voter turnout?
14     A.   I do not know.
15     Q.   Has the Secretary of State's Office or more
16 correctly, has the Secretary of State or any of his
17 staff conducted any analysis which would support that
18 voter turnout could increase if SB 14 was implemented?
19     A.   I don't believe we've done any such analysis.
20     Q.   I want to change your focus briefly on -- on
21 the absentee ballots, and I just want to know, what must
22 a voter do to vote an absentee ballot in the state of
23 Texas?
24     A.   Currently?
25     Q.   Currently.

BRIAN KEITH INGRAM                                    June 5, 2012

---

**213**

1    A.   They have to apply for the ballot by mail, have
2    to receive it, fill it out and return it in time.
3    Q.   And in Texas, as I remember it, absentee ballot
4    voting is called "early voting by mail"?
5    A.   Absentee ballot by mail.
6    Q.   Is there such a thing as an emergency absentee
7    ballot?
8    A.   I don't know.  I haven't heard of such a
9    creature.
10   Q.   Let me put it in a different way.  If I did not
11   know that I was going to be out of town, and it was 15
12   days before the election, is there any way that I could
13   obtain an absentee ballot?
14   A.   I don't know what the deadline is.  I think
15   that the deadline is later than that, so yes.
16   Q.   So when you say "later than that," is there --
17   A.   Closer to the election than 15 days.
18   Q.   So there's a deadline for when I can actually
19   request an absentee ballot?
20   A.   Yes.
21   Q.   And do you know what that deadline is?
22   A.   I don't off the top of my head.  It was
23   different for this year's election because of the
24   redistricting.
25   Q.   Is it 60 days before an election?

---

**214**

1    A.   No.  It has to be within 60 days that you apply
2    for a ballot by mail.
3    Q.   And we're talking about the absentee ballot
4    application?
5    A.   That's right.
6    Q.   And if I fail to apply for an absentee ballot
7    by using the application within that 60-day period, can
8    I obtain an absentee ballot?
9    A.   No.
10   Q.   So going back to my original question, if I
11   missed that application deadline --
12   A.   Right.
13   Q.   -- the 60-day deadline, is there any way for me
14   to obtain an absentee ballot?
15   A.   There's not a 60-day deadline.
16   Q.   Okay.
17   A.   The application for ballot by mail, you can't
18   apply for it earlier than 60 days before the election.
19   Q.   Earlier than 60 days.
20   A.   Right.
21   Q.   So any time within that 60 --
22   A.   60 to the election, but I think it's a few days
23   before the election is when the deadline is.  I just
24   don't remember off the top of my head.
25   Q.   Okay.  That was my misunderstanding.  I thank

---

**215**

1    you for that testimony.
2         Is there such a thing as a permanent
3    absentee ballot?
4    A.   No.
5    Q.   So would a voter be required to apply for an
6    absentee ballot prior to each election?
7    A.   Yes.
8    Q.   Okay.  And when I say "apply," they would have
9    to fill out the absentee ballot application and submit
10   it within whatever the deadline is?
11   A.   Right.
12        MR. GEAR:  Let's take a break.
13        (Recess from 3:38 p.m to 3:50 p.m.)
14        MR. GEAR:  So we're back on the record.
15        (Exhibit 557 marked for identification.)
16   Q.   (By Mr. Gear) I wanted to hand you what's
17   marked as Exhibit 557, and give you an opportunity to
18   look at that, and then we can talk about it.
19   A.   (Reviewing documents.)  Okay.
20   Q.   All right.  And so you've testified a number
21   times about a spreadsheet that was generated from the
22   Secretary of State's Office that addressed referrals to
23   the Attorney General's Office.  Can you identify what
24   Exhibit 557 is?
25   A.   Exhibit 557 is what appears to be a list of

---

**216**

1    complaints that were received, some of which were
2    referred to the OAG.
3    Q.   Received by the Secretary of State's Office?
4    A.   I'm assuming.  What this is, is, there was --
5    say we have war room taking calls on election day?
6    Q.   Uh-huh.
7    A.   This was the May election in 2009, so I don't
8    know what was on the ballot, but that's generally a
9    local election day.
10   Q.   And is this the spreadsheet that you were
11   referring to?
12   A.   It is not.
13        MR. GEAR:  So Patrick, just for the
14   record, I'd like to see if -- he's testified that he's
15   produced the spreadsheet.  I'd like to see if we can get
16   that spreadsheet produced to us.
17        MR. SWEETEN:  Okay.
18        MR. GEAR:  And I'll follow up with a
19   letter, if that's what you would like me to do.
20        MR. SWEETEN:  Okay.  Well, just for the
21   record, I'll say that this was the spreadsheet that I --
22   I asked my folks in the office if there was a
23   spreadsheet produced.  I mean, these are the Bates
24   labels that we said we had.  Is that right, Bruce?
25        MR. GEAR:  You did say that.

## 217

1    MR. SWEETEN:  I don't see Bates labels on
2  this copy.
3    MR. GEAR:  There's one at the top.  It
4  looks like it's cut off.
5    MR. SWEETEN:  Okay.
6    MR. GEAR:  TX 000 -- I don't know the
7  rest.  I think it's 18125.
8    MR. SWEETEN:  Okay.  But we'll look to see
9  if there's another spreadsheet.  Yeah, if you'll just
10  send me a letter on that specifically about that, and
11  we'll run it --
12    MR. GEAR:  Okay.  I'll do that -- I'll do
13  that this week.
14    Q.  (By Mr. Gear) And so, just so I'm clear, the
15  exhibit that I've handed you, 557, does that -- is
16  something that would have been produced by the Secretary
17  of State's Office?
18    A.  Yes.  This is -- this is what we take the
19  complaints on during the day, during election day, you
20  know, and so I would imagine.  I wasn't there in 2009.
21  But we do something similar now.  So I think that it's
22  the same thing.
23    Q.  And do you do this type of exhibit for each
24  election?  I note that this has "May 9th, 2009 General
25  Election" on it.

## 218

1    A.  I don't know what happens to these after
2  election day.  I don't know if they're kept.  I don't
3  know where this one came from.  I don't know.  I don't
4  know.
5    Q.  Do you know if you have produced any additional
6  exhibits or documents that are similar to Exhibit 557
7  regarding other elections?
8    A.  I don't know.
9    Q.  Okay.
10    MR. GEAR:  I'll put within my request a
11  request for production regarding any other -- for lack
12  of better word -- spreadsheets that deal with specific
13  elections that are similar to Exhibit 557.
14    Q.  (By Mr. Gear) Does Exhibit 557 refresh your
15  recollection as to whether or not there were any
16  allegations or complaints referred to the Secretary --
17  to the Attorney General's Office regarding noncitizens
18  voting?
19    A.  No.  This -- this doesn't have anything to do
20  with that.
21    Q.  Does this Exhibit 557, which is the May 9,
22  2009, general election, have any indication that any
23  voter impersonation cases were referred to the Attorney
24  General's Office?
25    A.  No.

## 219

1    Q.  Okay.  So before the break, we left off, we
2  were talking about absentee ballots.  Can you tell me
3  every reason under the Texas Election Code that a voter
4  would be allowed to request an absentee ballot?
5    A.  I don't know if I know every reason.  I know
6  that over 65 can request an absentee ballot.  Over the
7  age of 65, persons can request one.  The disabled
8  persons can.  And you can if you are going to be out of
9  the county during the entire voter -- early voting
10  period and election day.  I don't know if that's the
11  universe of options, but I know those three.
12    Q.  Okay.  Those would be the main reasons, as you
13  understand them?
14    A.  Very much so.
15    Q.  Okay.  So, you can vote -- you can request and
16  then vote an absentee ballot if you are sick or
17  disabled; is that right?
18    A.  That's right.
19    Q.  What additional steps, if any, must a disabled
20  voter take to qualify for an absentee ballot?
21    A.  I don't think there's any additional steps that
22  they have to take.
23    Q.  They can simply complete the application and
24  request an absentee ballot?
25    A.  Fill it out and send it back.

## 220

1    Q.  Is there any proof required to show that
2  they're actually disabled or sick at the time the
3  absentee ballot has been requested?
4    A.  I don't believe so.
5    Q.  If a disabled voter requires an absentee
6  ballot -- or I'm sorry.  Strike that.
7      If a disabled voter requires assistance
8  while voting an absentee ballot, what must they do to
9  comply with election law in the State of Texas?
10    A.  There is instructions with their absentee
11  ballot about the assistance that can be provided and who
12  can provide it and what assistance can be provided, and
13  all of that's in the form, so I don't want to quote from
14  -- by memory.
15    Q.  Do you know what the person providing
16  assistance must do to comply with election law?
17    A.  It depends on what they do, but generally,
18  they're going to have to identify themselves and sign a
19  statement that they didn't vote for the person.
20    Q.  Is that a sworn statement?
21    A.  I think so, yeah.
22    Q.  What happens if the voter, the disabled voter
23  fails to follow these procedures?
24    A.  Well, if they don't follow the correct
25  procedure, generally, the result is that the vote is not

BRIAN KEITH INGRAM                                          June 5, 2012

---

221

1   counted.  Usually what happens is, the county clerk will
2   receive the absentee ballot, notice a defect of some
3   sort, contact the voter, and get the defect remedied.
4        So, while it's still in that receipt
5   process, there's an opportunity to remedy defects.  It
6   depends on what the defect is, of course.  But once it
7   has gone to the ballot board, then, you know, you can't
8   change anything.
9        Q.  The defect cannot be remedied.
10       A.  Right.
11       Q.  Would be a disabled voter or the person
12  providing assistance be subject to criminal penalties if
13  they fail to follow the procedures?  And that's
14  generally.
15       A.  I don't know.  It depend on what happens.  It
16  depends on the defect.  I don't think for most defects,
17  most mistakes, there's criminal penalties.  There's
18  criminal penalties for fraud.
19       Q.  Also, based on your testimony, you can
20  provide -- you can vote an absentee ballot if you're 65
21  years or older on election day; is that right?
22       A.  That's right.
23       Q.  What must a voter who is 65 years or older
24  do to obtain an absentee ballot?
25       A.  Apply for it.

---

222

1        Q.  Is there any additional requirement to show
2   that the voter is actually 65 years old?
3        A.  I don't believe so.
4        Q.  So as you sit here today, you're not aware of
5   any additional steps that a 65 year or older voter must
6   take to apply for and vote an absentee ballot?
7        A.  No.  Their date of birth is in the voter
8   registration database.  There's a few voters that
9   don't.  I think we got about 25,000 in Dallas that
10  don't, so it's out of 1.9 million voters.  So we know.
11       Q.  Okay.  So do you know why -- or do you know the
12  reason why SB 14 only exempts voters 70 years or older?
13       A.  I do not.
14       Q.  Are you aware of any communication from the
15  Secretary of State's Office to any entity within the
16  state of Texas that -- that analyzes the reason why 70
17  old or older voters are exempted under SB 14?
18       A.  I'm not aware of any such.
19       Q.  Is it fair to say that under SB 14, the
20  exemption for 70 year or older voters is only for the
21  election certificate?
22       A.  I don't know.
23       Q.  Would a 70 year old or older voter be required
24  to show photo ID pursuant to SB 14?  And I just note for
25  the record that you are reviewing SB 14.

---

223

1        A.  Right.  The bill is what it is.  So I don't
2   know.  It says what it says.
3        Q.  And what does the bill say?
4        A.  I'm looking.
5        Q.  Take your time.
6        A.  (Reviewing document.)  Okay.  It says that
7   Transportation Code 521(a) regarding election
8   identification certificate, that it doesn't expire once
9   it's issued to a person 70 years of age or older.
10       Q.  So an individual who is 70 years of age or
11  older would be exempt from SB 14; is that fair to say?
12       A.  Well, I don't know.  That's not what this
13  says.  It says that the election identification
14  certificate doesn't expire for that person.
15       Q.  What would the 70 year or older voter be
16  required to show if they went to the polls and voted on
17  election day and SB 14 was implemented and in place?
18       A.  I don't see anything in this bill that exempts
19  them from showing ID, so presumably, the difference is
20  that they're -- they would never be with election
21  identification certificate that had expired more than 60
22  days before the election.
23       Q.  So your understanding is, is that -- and
24  correct me if I'm wrong -- that, that they would have to
25  show both an election certificate and a photo ID?

---

224

1        A.  No.  That's not what I said.
2        Q.  Okay.  And I said correct me if I was wrong.
3        A.  Right.  And so what it is, is they would just
4   have a form of ID that wouldn't be subject to the
5   expiration provisions of 63.101.
6        Q.  Does an election certificate have a photo?
7        A.  Yes.
8        Q.  Do you know what the purpose of the 70 years or
9   older exemption was?
10       MR. SWEETEN:  Objection, calls for
11  speculation.
12       A.  I do not.
13       Q.  (By Mr. Gear) Do you know why 65 years or older
14  was not considered under SB 14?
15       A.  I do not.
16       Q.  I don't know if you testified to this, but is
17  it also true that a person who is confined in jail and
18  not convicted of a felony could vote an absentee
19  ballot?  For instance, hypothetically, someone went to
20  the jail for driving without a valid driver's license,
21  which I believe would be a misdemeanor in most cases.
22  They are waiting their pending court date.  Would that
23  individual be allowed to vote an absentee ballot?
24       A.  I don't know.
25       Q.  Is it fair to say that the majority of the

BRIAN KEITH INGRAM                                          June 5, 2012

---

## 225

1   types of allegations or complaints that you both receive
2   and refer to the Texas Attorney General's Office would
3   be based on absentee ballot fraud?
4        A.   Are you asking if the majority of the
5   complaints that we receive and refer have to do with
6   absentee ballots?
7        Q.   Yes.
8        A.   I don't think that's a fair characterization,
9   no.
10       Q.   Okay.  Would it be fair to say that the
11  majority of the complaints that you receive and refer
12  deal with anything -- issues other than voter
13  impersonation?
14       A.   Yes.
15       Q.   Okay.  And would you say that there is a -- or
16  what percentage of those would you say would deal with
17  absentee ballot fraud?
18       A.   I don't know.
19       Q.   Would you -- does the Election Division track
20  absentee ballot voting by race of voters?
21       A.   We don't track any voting by race of voters.
22       Q.   Are you aware if the majority of convictions
23  relating to voter fraud have to deal with absentee
24  ballots?
25       A.   I don't know.

---

## 226

1        Q.   Would the types of referrals or complaints that
2   you've made to the Attorney General's Office be
3   reflected in the spreadsheet that you've you testified
4   here today?
5        A.   Yes.
6        Q.   And to be fair, we don't have that spreadsheet
7   in front of us.
8        A.   Right.
9        Q.   Do you have any knowledge as to whether or not
10  whites or Anglos, as it's referred to in the state of
11  Texas, tend to use the absentee ballot process more than
12  minorities?
13       A.   I do not know.
14       Q.   Do you have any knowledge as to the percentage,
15  in any given election, of Blacks or Hispanics who use
16  the absentee ballot process?
17       A.   We don't track voters by race.
18       Q.   Have you seen an increase in vote by mail in
19  Texas over the -- I'm trying to put that in a time frame
20  for you.
21       A.   Right.
22       Q.   Strike that question.
23            Does absentee ballot voting or voting by
24  mail differ from early voting?
25       A.   Yes, I assume by early voting you mean early

---

## 227

1   voting in person.
2        Q.   And how does it differ?
3        A.   One is by mail and one is in person.
4        Q.   What does the voter need to do to early vote?
5        A.   Show up at polling place and present either a
6   voter registration card or another acceptable form of ID
7   on a 63.0101 list.
8        Q.   And we talked about the basis for voting
9   absentee ballot.  There is any reason that a voter has
10  to provide to vote early vote, or in other words, show
11  up at the polls and vote early?  Is there reason that's
12  required?
13       A.   Not even, any -- any reason or no reason.
14       Q.   Are you aware of any analysis or studies that
15  would indicate which process, either early voting or
16  absentee ballot voting, Texans tend to use more during
17  elections?
18            MR. SWEETEN:  Can you read that back to
19  me, please?
20            (Requested portion was read back by the
21  court reporter.)
22       A.   We do not have any analysis of that.  This
23  election that we just had May 29th, will be the first
24  election under a new law, 18.068.  The second 18.068.
25  There's two of them.  And it will require counties to

---

## 228

1   provide to the Secretary of State voting history for
2   everybody.  In the past, voting history has been
3   submitted voluntarily.  Some counties did, some counties
4   didn't.  So this is the first election that we will have
5   where within 30 days, we'll have voting history for all
6   counties, assuming that they comply.  And the voting
7   history will delineate early vote, early vote absentee
8   ballot by mail, UOCAVA, or election day voting.
9        Q.   Okay.  And so you said there have been two
10  versions of 18.068, correct?
11       A.   There is, in the election code right now, two
12  18.068s.
13       Q.   And this past election is the first time that
14  local election officials would have to track the voting
15  history?
16       A.   No.  That's the first time they have to report
17  voting history to us.
18       Q.   And you said that that would delineate what?
19       A.   It will delineate who voted and the means by
20  which they voted.
21       Q.   In other words, it will identify early voting
22  by mail voting, in-person voting on election day?
23       A.   In-person early voting.  And I think they'll
24  break out the overseas military voters separately.
25       Q.   Okay.

BRIAN KEITH INGRAM                                    June 5, 2012

## 237

1  was spent on voter education relevant to SB 14 for the
2  primary since it was not precleared?
3      A.  Right.  But money was spent on a voter
4  education campaign minus SB 14.
5      Q.  So the 3 million dollar figure that you just
6  mentioned, is that specific to voter education regarding
7  SB 14?
8      A.  That was what it was originally intended for,
9  but SB 14 has not been precleared, and we cannot educate
10 the public with regard to its requirements yet.
11     Q.  So that money is being spent on things that
12 have nothing to do with SB 14?
13     A.  It's being spent on what it was designed to be
14 spent for, which is a voter education campaign.
15     Q.  Do you have a figure that is how much money is
16 going be spent on the voter education requirements
17 specific to photo ID that are required by SB 14?
18     A.  I do not.
19     Q.  Is it true you that it will be a number less
20 than 3 million?
21     A.  Well, there is less than 3 million left in the
22 budget for the voter education campaign.  As soon as
23 voter ID is precleared, the entire emphasis of the
24 remaining campaign is going to be on photo ID.
25     Q.  Okay.  So you don't know at this point how much

## 238

1  that's going to be, because it's -- if I understand what
2  you just said correctly, it's just going to be how much
3  is left over after you've spent things on other voter
4  education activities?
5      A.  It depends upon when voter ID is precleared,
6  that's correct.
7      Q.  How do you know you'll have enough money left
8  over after you're doing whatever you're doing right now?
9      A.  I don't know what you mean by enough.
10     Q.  Well, it sounds like you don't know how much
11 you're going to have when SB 14 is precleared, if it is
12 precleared, and there are certain -- I mean, SB 14
13 requires that Secretary of State educate voters about
14 the photo ID requirements.  What if there is too small
15 an amount?  Is that possible?  Is there's too small an
16 amount to adequately educate voters about the photo ID
17 requirement?
18     A.  I don't know.  I'm not a communications expert.
19     Q.  Is Communications solely responsible for
20 implementing the plan to educate voters about photo ID?
21     A.  I don't know.  But when you're talking about
22 communication strategy for communicating with the public
23 and whether or not it's effective, I think you would
24 require somebody besides a lawyer in the Elections
25 Division.

## 239

1      Q.  Of the funds that are going to be used to
2  educate voters about the photo requirement under SB 14,
3  what proportion of those funds will be federal funds?
4      A.  I don't know.  I believe all of them.
5      Q.  And will those funds be HAVA funds?
6      A.  Yes, indeed.
7      Q.  Okay.  Has the Secretary of State's Office
8  confirmed with the Election Assistance Commission that
9  HAVA funds can be used to pay for SB 14's voter
10 education plans?
11     A.  We believe it falls within the grant, yes.
12     Q.  Does the Election Assistance Commission believe
13 that?
14     A.  I don't know.
15     Q.  Have you made any efforts to find out?
16     A.  I haven't, no.
17     Q.  Are you aware of anyone in the Secretary of
18 State's Office trying to find that out?
19     A.  Probably Dan Glotzer.
20     Q.  Have you ever asked Dan Glotzer if he found
21 that out?
22     A.  I have not.
23     Q.  Does the plan to educate voters about the photo
24 ID requirement under SB 14 include efforts that will
25 continue after the 2012 election?

## 240

1      A.  I don't know.
2      Q.  Have you seen the plan to educate voters about
3  the photo requirement under SB 14?
4      A.  I don't know.  I don't think so.
5      Q.  Is there a plan to educate voters about the
6  photo ID requirement under SB 14?
7      A.  Well, I don't know what you mean by a plan.
8  There's a communication strategy that's in place, that
9  time has been purchased.  I mean, everything's been
10 reserved, and the plan for communication is in place.
11 The content is subject to change.
12     Q.  So a communication strategy is in place, and
13 that means that ad time has been bought?
14     A.  Well, it's been reserved.  I said all this in
15 my affidavit to the court about the August 15th date.
16     Q.  Okay.  Let's take a look at that.  If I could
17 ask Mr. Gear to -- I believe you've got copies of
18 Mr. Ingram's affidavit there from March 23rd.  Well,
19 filed on March 23rd.
20         MR. GEAR:  I do.  I'm going to mark that
21 as Exhibit Number -- I'll mark it as MALC
22 Exhibit 558.  Are you doing your separate numbering?
23         MR. SWEETEN:  No, that's fine.  Thank you.
24         (Exhibit 558 marked for identification.)
25     Q.  (By Mr. Vandewalker)  Mr. Ingram, when you get a

## 249

1 requirement under SB 14?
2     A.  We have created an app, both for Android and
3 for iPhones, and the content on that app can change to
4 voter ID whenever we get precleared.
5     Q.  What other ways have the Special Projects Team
6 made efforts to reach minority voters with the voter
7 education plan about photo ID requirements?
8     A.  I don't know of anything specific that I can
9 recall as we sit here today.  There's a strong social
10 media component, and it's multi-layered.  I don't know
11 what they all are.
12     Q.  Would you know if they were doing things other
13 than relying on social media?  I mean, you said they
14 give you reports about what they are doing.  Are those
15 the kinds of things that are in those reports?
16     A.  No, they don't give me specific reports about
17 what radio spots they're running where and what TVs
18 they're running where.  I mean, I don't know those kind
19 of details.  That's not -- would be a Rich question.
20         Do you understand what I'm saying?  The
21 question about Spanish markets and African American
22 markets and how those are being targeted with specific
23 ads, I would never get in the middle of that level of
24 detail.  That would not be productive.
25     Q.  And have you directed your staff to engage

## 250

1 those things, even though you're not keeping track of
2 the what they are doing?
3     A.  As I told you before, I don't have to direct
4 them that; they are well aware of their obligations
5 in that regard.
6     Q.  Does the -- or will the education plan to
7 educate voters about photo ID requirements make use of
8 newspapers?
9     A.  I don't know.  Probably, but it would be a
10 small component, I bet.
11     Q.  Do you know if any newspaper ads have been
12 designed yet?
13     A.  I do not.
14     Q.  Does the education plan to educate voters about
15 photo ID under SB 14 make use of television advertising?
16     A.  Yes.
17     Q.  Do you know if TV advertisements have been
18 designed or produced yet?
19     A.  I do not know the status of those.  I
20 anticipate that they are in some level of production,
21 because the goal is to have a plan in place ready to go
22 by August the 15th or August 31st, in case this gets
23 precleared, so I don't know how long the front end is on
24 that, but they'll be ready.
25     Q.  So you expect that those will be ready by

## 251

1 August 15th, but you don't actually know what their
2 progress is?
3     A.  That's right.
4     Q.  And do you know if any of those TV ads are
5 going to be in Spanish?
6     A.  I don't know.  I know in the first round, they
7 were.
8     Q.  Do you know if the plan will make use of radio
9 ads?
10     A.  I assume that it will.  The first phase did.
11     Q.  And do you know if any of those will be in
12 Spanish?
13     A.  I imagine they will be, yes.
14     Q.  Okay.  If we could go back your affidavit,
15 which has been marked as MALC Exhibit 558.
16     A.  Yes, I have it.
17     Q.  If I could just direct you to Paragraph 7.  You
18 say there that, "In order to have a basic education
19 program, the Secretary of State's Office would need a
20 final decision by August 15th," and then you contrast
21 that with a complete program, which would need a
22 decision by no later than July 6th.  I wonder if you
23 could tell me:  What's the difference between a basic
24 program and a complete program?
25     A.  I cannot.  That would be a Rich Parsons

## 252

1 question.
2     Q.  Could you turn to the next page and tell me:
3 Did you sign this affidavit?
4     A.  I did.
5     Q.  And so when you signed this affidavit, did you
6 understand what Paragraph 7 meant?
7     A.  I understand that it's what Rich told me.
8     Q.  Now, you also state here that -- I'm sorry.  As
9 I said before, you say that you would need a final
10 decision by August 15th in order to have even the basic
11 education program.  If I were to represent to you that
12 the court has predicted yet it won't make a decision
13 until August 31st, does that mean the Secretary of State
14 will not be able to have even a basic education program?
15     A.  It means that we're going to get it done.
16     Q.  Will the program be less well developed than
17 whatever this basic education program that's
18 contemplated in your affidavit is?
19     A.  I'm sure it will be the same as the August
20 15th, just with less time to have an impact.
21     Q.  So what is does it mean that it will have less
22 time to have an impact?
23     A.  It will be 16 more days down the road toward
24 election.
25     Q.  Will it reach fewer voters?

BRIAN KEITH INGRAM                                      June 5, 2012

---

## 253

1      A.  I don't know.  I assume so.  But that's, again,
2   a Rich question.
3      Q.  Who bears the primary responsibility for
4   informing election workers or poll workers about changes
5   to state election law, like the new photo ID
6   requirements in SB 14?
7      A.  The Secretary of State's Elections Division.
8      Q.  And what's the Election Division's plan for
9   training poll workers on the voter ID requirements of
10  SB 14?
11     A.  Well, we've got several things that we're
12  planning to do.  We've got forms that we've prepared
13  that we submitted for preclearance.  We've got a manual
14  that we have begun to draft, that we've also submitted
15  for preclearance, that's going require a little
16  modification, and we've got a video that we have used in
17  the past for educating poll workers, and we're going to
18  add PowerPoint content to that video in time for an
19  August 15th roll-out.
20     Q.  And how do poll workers see that content?  Do
21  you send it to the county supervisors and they give it
22  to the actual workers, or how does that work?
23     A.  That's generally the way it works.  The
24  election administrators or county clerks, whoever is in
25  charge of the elections at the local level, is

## 254

1   responsible for making sure their poll workers go
2   through training before they work.
3      Q.  Now, you said an August 15th roll-out.  If
4   there isn't a decision on preclearance of SB 14, how
5   will that change your plan?
6      A.  It will not.  It will just mean that it rolls
7   out August 31st.
8      Q.  And is it -- so that's the kind of thing that
9   you are able to change to conform to SB 14 and roll out
10  with a day's notice?
11     A.  Certainly not.  These are changes that are
12  being worked on right now.
13     Q.  So the training materials, if I understand you
14  correctly, are not completed now but are in the process
15  of being completed?
16     A.  That is correct.
17     Q.  Have you seen those training materials?
18     A.  I have seen the manual, the draft that's in
19  front of the DOJ right now.  I had input into the
20  drafting.  I have not seen any of the PowerPoint
21  presentations' splices into the video yet.  I've talked
22  to Lettie about some of the content that we're going to
23  need to put in that.  She's got a copy of the manual so
24  she can transfer content from the manual to those
25  slides.  But she has been otherwise engaged with the

## 255

1   election night returns process for these two last
2   elections, or this last election that we've had.  So she
3   now has breathing space within which to do this work.
4      Q.  And how do you think getting those training
5   materials out, you know, the difference between August
6   15th and August 31st, two weeks or a little more, how
7   will that two weeks make a difference in election worker
8   training?
9      A.  It won't make a difference directly in election
10  worker training.  It will make a difference in educating
11  the county employees.
12         We've got a seminar where county employees
13  are going -- election workers, tax assessors, collectors
14  voter registrars, are going to be in town August the
15  20th and the few days thereafter, and it would be ideal
16  to roll this out with them at that time, while we've got
17  7- or 800 of them present, that would be great if we
18  could do that, and that way, they would have personal
19  interaction with us before they start training their
20  poll workers.  Unfortunately, if it's August 31st, we're
21  not going to have the opportunity to demonstrate this to
22  those county officials.
23     Q.  So then how will you inform county officials
24  about the photo ID requirement?
25     A.  Well, the way we generally communicate with

## 256

1   county officials is by e-mail.
2      Q.  So you'll just send out an e-mail sometime
3   after the preclearance decision saying what to do about
4   photo ID; is that correct?
5      A.  That's right, and where the training materials
6   are located on our website, and, you know, that we have
7   copies available, if they need them, in CD form or DVD
8   form.  I mean, we'll run the full gamut of communication
9   at that point, but it will start with an e-mail that
10  says, we've been precleared and we got training
11  materials, here they are.
12     Q.  Will the training materials include samples of
13  the acceptable forms of ID under SB 14?
14     A.  That's the modification that I want to make, so
15  it will have representative samples.  I'm intending for
16  it to have that, yes.
17     Q.  Will it include a sample of a voter
18  registration certification showing that the voter is
19  disabled?
20     A.  I don't know if we'll have a mock-up of that at
21  the time.  I don't know that form exists yet.  That's --
22  I don't know.
23     Q.  And how do you plan to determine whether
24  election workers understand the requirements of SB 14 to
25  show photo ID?

BRIAN KEITH INGRAM                                            June 5, 2012

## 261

1   voters?
2       A.   Yes.
3       Q.   When?
4       A.   I don't know for sure, but I would imagine just
5   about every election.
6       Q.   Do you know of any examples?
7       A.   Well, this exhibit that we just had from the
8   May 9th general election, the very first one, "Worker
9   was rude and blamed the voter."
10      Q.   And can you think of any other examples?
11      A.   You know, you get some of that, you know, the
12  two elections that I've sat in the room listening to
13  them answer the phone calls, as far as I can tell, both
14  elections had some amount of that.
15      Q.   Okay.   But I'm just asking if you happen to
16  remember the specific facts of any cases that you can
17  tell me now.
18      A.   The second one on the list on Exhibit 557,
19  "Police chief's brother was driving down a," quote,
20  "Hispanic," close quote, "part of town in a police car
21  with a large dog in back of car on election day.
22  Council members alleges that this activity prevented
23  Hispanic turnout, with only five Hispanic voters
24  voting."
25           I got a complaint -- I got a complaint --

## 262

1   oh, stink, I don't remember when -- that it was -- it
2   was -- let me think.   The complaint was that somebody's
3   dog assistant -- assistant -- you know, they were
4   disabled visually and they had a dog helping them, that
5   that, the presence of that dog scared a voter off.
6       Q.   Okay.   But that's not an example of an election
7   worker intimidating or harassing.
8       A.   Right.   But the allegation was that the
9   election worker should have kept the dog outside the
10  polling place so that other voters could vote.
11      Q.   I see.   What does your office do when you get
12  allegations of poll workers intimidating voters?
13           MR. SWEETEN:   Objection, compound.   Go
14  ahead.   You can give a general.
15      A.   So we call the county elections administrator
16  and let him know about the complaint and what precinct
17  it was and the nature of the complaint, and then we --
18  if we can, if we've got a number, follow up with the
19  voter and say that we have told the person who is in
20  charge of that worker.
21           MR. GEAR:   Would you mind if we take a
22  very quick break?
23           MR. VANDEWALKER:   Yes.   That's fine with
24  me.
25           MR. GEAR:   Okay.   And actually, I have a

## 263

1   question that we can do on or off the record.
2           I've found an additional document, and I
3   just want to follow up.   I believe he's been testifying
4   to it all day.
5           MR. SWEETEN:   Are we talking about the
6   spreadsheet?
7           MR. GEAR:   We're talking about the
8   spreadsheet.   I believe this is the spreadsheet.   Would
9   you mind if I put it on the record?
10          MR. SWEETEN:   That's fine.   How much time
11  do we have?   And I'll work with you on that.
12          MR. GEAR:   Okay.
13          (Recess from 5:06 p.m. to 5:08 p.m.)
14          (Exhibit 559 marked for identification.)
15              FURTHER EXAMINATION
16  BY MR. GEAR:
17      Q.   We've discussed off the record, and Patrick has
18  indulged me to allow to introduce an additional exhibit,
19  and so I've showed you what's been marked as Exhibit 559
20  and I'd just ask you to identify that for the record.
21      A.   This appears to be the data from the
22  spreadsheet that I've been talking about today.
23      Q.   Okay.   And the data that you've been talking
24  about, the spreadsheet pertained to voter fraud,
25  correct?

## 264

1       A.   Yes, complaints of voter fraud.
2       Q.   Okay.   And I asked you two questions as a
3   follow-up, one was:   Did the spreadsheet that you
4   produced identify noncitizens' voting?
5       A.   Well, I don't think that that's one of the
6   allegations on here.
7       Q.   So the answer would be no?
8       A.   No.   You know, I don't know what illegal voting
9   is in the first one.   Votes being cast illegally in the
10  second one, I don't know.   And, obviously, we don't
11  investigate these ourselves, so we don't -- you know,
12  what we have is an allegation.
13      Q.   And so you don't know the -- whether or not
14  these were investigated or the outcome of these?
15      A.   Do not.   I know that this one is illegal voting
16  and voter impersonation.   This one is illegal voting and
17  voter impersonation.   So illegal voting, to me, could
18  mean any number of things.
19      Q.   Okay.
20      A.   Including -- including noncitizen voting.
21      Q.   But you don't know as you sit here today?
22      A.   Do not.
23      Q.   And I note that in 2009 -- or 2008, there's an
24  allegation of voter impersonation; is that accurate?
25      A.   That is correct.

BRIAN KEITH INGRAM                                    June 5, 2012

---

265

1    Q.  And that's the -- you were referring to Moreno?
2    A.  No, I was referring to Medrano.
3    Q.  Medrano, okay.  So this -- this would be a
4    different allegation?
5    A.  Yes.
6    Q.  And you don't know the outcome of it -- of it
7    as you sit here today?
8    A.  I do not.
9    Q.  And I also note in 2009, there is an allegation
10   of voter impersonation.  Do you see that?
11   A.  I do.
12   Q.  And as you sit here today, do you know the
13   outcome of that allegation?
14   A.  I do not.
15   Q.  And from my brief review of Exhibit 559, I
16   don't see that there are any other allegations, specific
17   allegations of voter impersonation?
18   A.  The other one, the Medrano case, is the bottom
19   one on Page 2, and it doesn't specifically say voter
20   impersonation in that summary.
21   Q.  And as we sit here today, do you know the
22   outcome of that specific allegation?
23   A.  That we've got one conviction and another trial
24   pending is, I think, the current status.
25   Q.  And it's a conviction of -- do you know what

---

266

1    the conviction is of?  And I believe you testified to
2    that before.
3    A.  I don't know the specifics of the conviction,
4    but I don't think it was voter impersonation.
5    Q.  Okay.
6            MR. GEAR:  I have no further questions,
7    and thank you, Patrick.
8            MR. SWEETEN:  Sure.
9            Mr. Vandewalker, you can proceed.
10           MR. VANDEWALKER:  Thank you.
11               FURTHER EXAMINATION
12   BY MR. VANDEWALKER:
13   Q.  I just want to -- we were talking about cases
14   where election workers have harassed or intimidated
15   voters.  What does the Division of Elections do to
16   prevent that from occurring in the future?
17   A.  Well, I don't know.  We talk to the election
18   administrators and the county officials to make sure
19   that if they've had a problem with an election worker,
20   that that election worker doesn't get hired again.
21   Q.  I see.  And you've mentioned a few times the
22   ability to cast a provisional ballot under SB 14.  If
23   SB 14 is implemented, will poll workers be given a
24   script showing them how to inform voters of the right to
25   cast a provisional ballot where they don't have

---

267

1    acceptable ID?
2    A.  We've got a form, that will go with the
3    provisional ballot, that talks about what they can do to
4    correct their problem, and the counties are supposed to
5    attach a map to that form.  That form was submitted to
6    DOJ Friday.
7    Q.  And how do you ensure that the election workers
8    comply with that procedure?
9    A.  Well, you know, the Secretary of State's Office
10   don't have any enforcement power.
11   Q.  Does the Secretary of State's Office have a
12   plan to ensure adequate staffing in the six days
13   following election day to allow voters who voted
14   provisional ballots to return with ID?
15   A.  That would be up to the counties to make sure
16   that their staffing patterns are in place for that.
17   Q.  So the Secretary of State won't engage in any
18   oversight of the counties on that issue?
19   A.  We can educate and we can suggest.  That's what
20   we do.
21   Q.  Will the Secretary of State have a procedure
22   for answering questions from election workers during
23   early voting?
24   A.  Yes.
25   Q.  And what is that procedure?

---

268

1    A.  We answer the phones.
2    Q.  So do you have to hire extra workers to have
3    enough people there to answer the phones?
4    A.  So far, in the two elections that I've been a
5    part of, we have not.  I anticipate that prior to this
6    general election, there will be increased volume, and we
7    have pulled in workers temporarily from other divisions
8    in the Secretary of State's Office.  And so, you know,
9    that's a plan that's been used in the past, and I think
10   it would be easy to do again if necessary.
11   Q.  And the same is true for election day voting,
12   or is there a different plan?
13   A.  No, that would be the same.
14   Q.  One of the forms of ID that you've mentioned as
15   being acceptable under SB 14 is the Election
16   Identification Certificate, or EIC.  Do you know why DPS
17   requires an application for an EIC to include the
18   applicant's fingerprints?
19   A.  I do not.
20   Q.  Have voters previously been required to submit
21   their fingerprints in order to identify themselves?
22   A.  I don't know.
23   Q.  Do all of the other forms of ID that are
24   acceptable under SB 14 require applicants to submit
25   their fingerprints?

State of Texas v. Eric H. Holder, Jr., et al.                    1:11-CV-00128
Gloria Johnson-Lawson                                            4/17/2012

---

## 1

```
               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

      STATE OF TEXAS,                    )
                                         )
           Plaintiff,                    )
                                         )
      VS.                                )
                                         )  CASE NO:  1:11-CV-00128
      ERIC H. HOLDER, JR., IN            )  RMC-DST-RLW
      HIS OFFICIAL CAPACITY AS           )
      ATTORNEY GENERAL OF THE            )
      UNITED STATES,                     )
                                         )
           Defendant,                    )
                                         )
      ERIC KENNIE, ET AL.,               )
                                         )
           Defendant-Intervenors,        )
                                         )
      TEXAS STATE CONFERENCE OF          )
      NAACP BRANCHES, ET AL.,            )
                                         )
           Defendant-Intervenors,        )
                                         )
      TEXAS LEAGUE OF YOUNG              )
      VOTERS EDUCATION FUND, ET          )
      AL.,                               )
                                         )
           Defendant-Intervenors,        )
                                         )
      TEXAS LEGISLATIVE BLACK            )
      CAUCUS, ET AL.,                    )
                                         )
           Defendant-Intervenors,        )
                                         )
      VICTORIA RODRIGUEZ, ET             )
      AL.,                               )
                                         )
           Defendant-Intervenors.        )
```

---

## 2

```
 1   ****************************************************

 2                   ORAL DEPOSITION OF

 3               CHERRY L. JOHNSON-LAWSON

 4                    APRIL 17, 2012

 5   ****************************************************

 6       ORAL DEPOSITION OF CHERRY L. JOHNSON-LAWSON, produced

 7   as a witness at the instance of the Defendant Intervenors

 8   Texas State Conference of NAACP Branches and the Mexican

 9   American Legislative Caucus of the Texas House of

10   Representatives, and duly sworn, was taken in the

11   above-styled and numbered cause on Tuesday, April 17,

12   2012, from 3:20 p.m. to 4:47 p.m., via telephone, before

13   Tamara K. Chapman, CSR in and for the State of Texas,

14   reported by machine shorthand, at the State House, 209

15   West 14th Street, Ground Floor, Austin, Texas, pursuant to

16   the Federal Rules of Civil Procedure and the provisions

17   stated on the record or attached hereto.

18

19

20

21

22

23

24

25
```

---

## 3

```
 1

 2                    A P P E A R A N C E S

 3   FOR THE PLAINTIFF STATE OF TEXAS:
         Mr. Patrick Sweeten
 4       Mr. Reynolds Brissenden
         ATTORNEY GENERAL OF TEXAS
 5       Civil Medicaid Fraud Division
         300 W. 15th Street
 6       Austin, Texas
         patrick.sweeten@oag.state.tx.us
 7       reynolds.brissenden@oag.state.tx.us
 8
 9   FOR TEXAS NAACP STATE CONFERENCE AND THE MEXICAN AMERICAN
     LEGISLATIVE CAUCUS:
10       Ms. Myrna Pérez (telephonically)
         BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
11       161 Avenue of the Americas, 12th Floor
         New York, New York  10013
12       myrna.perez@nyu.edu
13
14   FOR THE DEFENDANT ERIC H. HOLDER, JR., IN HIS OFFICIAL
     CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
15       Ms. Elizabeth S. Westfall (telephonically)
         Mr. Daniel J. Freeman (telephonically)
16       U.S. DEPARTMENT OF JUSTICE
         Voting Section, Civil Rights Division
17       950 Pennsylvania Ave. NW, NWB Room 7202
         Washington, DC 20530
18       elizabeth.westfall@usdoj.gov
         daniel.freeman@usdoj.gov
19
20
21   FOR DEFENDANT INTERVENORS TEXAS STATE CONFERENCE OF NAACP
     BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE CAUCUS OF
     THE TEXAS HOUSE OF REPRESENTATIVES:
22       Mr. Ezra D. Rosenberg (telephonically)
         DECHERT, LLP
23       902 Carnegie Center, Suite 500
         Princeton, New Jersey  08540-6531
24       ezra.rosenberg@dechert.com
25
```

---

## 4

```
 1   FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND:
         Mr. Gregory K. Johnson (telephonically)
 2       FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
         801 17th Street NW,
 3       Washington, DC 20006
         gregory.johnson@friedfrank.com
 4
 5   FOR THE DEPARTMENT OF PUBLIC SAFETY:
 6       Ms. Kathleen T. Murphy
         TEXAS DEPARTMENT OF PUBLIC SAFETY
 7       Office of General Counsel
         5805 N. Lamar Boulevard
 8       Austin, Texas  78773
         kathleen.murphy@txdps.state.tx.us
 9
10
11   FOR VICTOR RODRIGUEZ, NICOLE RODRIGUEZ, SOUTHWEST VOTER
     REGISTRATION EDUCATION PROJECT, MI FAMILIA VOTA EDUCATION
     FUND:
12       Ms. Nina Perales
         MALDEF
13       110 Broadway, Suite 300
         San Antonio, Texas  78205
14       nperales@maldef.org
15
16   ALSO PRESENT:
17       Ms. Laura Fleming, Paralegal (Dechert, LLP)
18       Mr. Russell Weaver (telephonically) - Social
         Scientist
19
20
21
22
23
24
25
```

---

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

## 29

1    Q. (BY MR. ROSENBERG)  Okay.  What is CHI
2  Identification, do you know?
3    A. The criminal history file.
4    Q. And is that a file that is -- has been kept in
5  the LTC database as far as you know?
6    A. I'm sorry.  I don't understand the question.
7    Q. Sure.
8      Is that a file that has been included in the LTC
9  database for as long as you know?
10    A. The CHL entry ID, it points to crime records file
11  for the applicant.
12    Q. And are those crime record files for the
13  applicant included in the LTC database?
14    A. Their responses are included in the database
15  concerning -- to determine eligibility for the applicant.
16    Q. And do those -- those do -- are the responses as
17  included in the database set forth in specific fields?
18    A. Yes.
19    Q. And looking at under column definitions, the one
20  that begins CH Entry ID, and then CH Journal ID and so on,
21  are those fields in the LTC database with which you're
22  familiar?
23    A. Yes.
24    Q. Turning to the next page, and if you see, there
25  is a column for CHF (sic) -- CHI Race?

## 30

1    A. Yes.
2    Q. And it says, Race is imported from criminal
3  history import file.
4      Do you see that?
5    A. Yes.
6    Q. And is it -- are there values assigned to that
7  field of CHI Race?
8    A. Explain your question.
9    Q. Sure.
10      Are there required values --
11      Well, let me ask you:
12      Do you know what a value is in connection with
13  fields in an L- -- in a database like the LTC database?
14    A. I -- I'd like to know what you define it as.
15    Q. Okay.  Well, I want to know -- actually, I'd like
16  to know if you have a definition.  We're going to use your
17  definition, if I like it.  If not, I'll use mine.
18    A. A value can be -- a value can be a number, it can
19  be a character.  That's the way I would define it.
20    Q. Sure, sure.
21    A. I'm not understanding what your -- what you want
22  to know.
23    Q. Well, I'm just really just trying to understand all of
24  this.
25      So, for example, if you look a few -- just one

## 31

1  block up where it says, Sex, M male, F female, M and F are
2  values, right?
3    A. Correct.
4    Q. Okay.  Are there values for the CHI Race field?
5    A. Yes.
6    Q. And where could I find those values?
7    A. It would correspond with the table that is right
8  under it that indicates the race, which is a shared --
9  there's only one -- one def- -- definition table in the
10  system that is about race.
11    Q. Okay.  Underneath the race block there is a CHI
12  Ethnicity field.
13      Do you see that?
14    A. Yes.
15    Q. Are you familiar with that field?
16    A. No.
17    Q. Have you ever seen it before?
18    A. No.
19    Q. And going to the field underneath it that says
20  Ethnicity, ethnicity codes are follows:  1 Hispanic, 2
21  non-Hispanic, have you ever seen that before?
22    A. No.
23    Q. Do you know whether or not the LTC contains data
24  relating to ethnicity as described in these two fields on
25  this page of the document?

## 32

1    A. Not at all.
2    Q. Are you surprised to see that?
3    A. I'm neither --
4      MR. SWEETEN:  Objection to the form.
5      Go ahead.  And -- go ahead.  You can answer
6  the question.
7    A. I'm -- I'm surprised at this whole process so
8  I'm -- I guess yes.
9    Q. (BY MR. ROSENBERG)  I'd like to take -- turn your
10  attention to a few chapters ahead of that, which is
11  Chapter 97, XCVII.
12    A. Okay.
13    Q. Which -- which is the CHB Identification.
14      Do you see that?
15    A. Say it one more time, please, Ezra.
16    Q. Sure, sure.  It's Roman Numeral XCVII.
17    A. Okay.  XCVII?
18    Q. Yes.  It's 97.
19    A. You're going to have to give me a minute.
20    Q. Sure.
21      (Witness reviews document.)
22    A. CHB Identification?
23    Q. (BY MR. ROSENBERG)  That's right.
24    A. Okay.
25    Q. Have you -- have you ever heard of that table?

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Johnson-Lawson                           4/17/2012

---

**41**

1  Q. But specifically if I were looking for
2  information as to whether a person was a citizen, can you
3  point me in the direction of any tables that I should look
4  to?
5      A. The specific tables?
6  Q. Yeah.
7      A. No. I can tell you it's there. I can tell you
8  the applicant indicated whether they were a U.S. citizen
9  or not. Beyond that, I cannot tell you exactly where it
10 sits in the data model. I can't tell you exactly what
11 table it's in. That would have to be another individual
12 with that expertise.
13 Q. Who would that individual be?
14     A. It would be a member of our information
15 technology team at the Department of Public Safety.
16 Q. And is there any specific individual who would be
17 someone that would most likely have that information?
18     A. I would have to refer to Kathleen, who would have
19 to reach out and find out what expert. I can just tell
20 you that based -- if you look at the application and the
21 information requested, the person has to indicate if
22 they're a U.S. citizen or not. You have to be a
23 U.S. citizen to qualify for a concealed handgun license in
24 the State of Texas.
25 Q. Who is Kathleen?

**42**

1      A. Kathleen is our DPS attorney who is sitting here
2  at the table.
3  Q. And what's Kathleen's last name?
4      MS. MURPHY: Murphy.
5  Q. (BY MR. ROSENBERG) If you don't know, that's
6  fine.
7      A. Murphy.
8      MR. SWEETEN: Murphy, she said.
9  Q. (BY MR. ROSENBERG) Murphy?
10     A. I was allowing her to answer.
11 Q. She's not under oath.
12     A. Sorry.
13 Q. Is there information in the LTC database, other
14 than the self-reporting information, when somebody asks
15 whether they're a citizen or not, that would allow one to
16 determine whether someone in this database is a citizen?
17     A. The application is provided by the state.
18 Part of that is that they are answering and affirming that
19 they are being honest to everything that is on that
20 application.
21     They are also authorizing us to confirm that the
22 information that they are providing is accurate and
23 qualifies them for a license for a concealed handgun in
24 the State of Texas. The remainder of that process is to
25 confirm that everything that they have answered is honest

**43**

1  and that everything allows them by law and by rule to
2  carry a concealed handgun. Anything in the system is just
3  for that purpose, to confirm or to disqualify the
4  individual based on the laws of Texas.
5  Q. Right. And is there any other -- any other field
6  in the database that would provide information as to
7  whether someone is a citizen other than the specific
8  direct report answer of the applicant?
9      A. The confirming that what the applicant has told
10 us is true would be the only other data, which you have
11 here, which is confirming that what they have reported to
12 us is validated by the supporting systems that own that
13 information.
14 Q. And what -- what fields contain that data?
15     A. If they give me a driver's license, that the
16 information on the driver's license matches the
17 information that they indicated.
18 Q. Is there information in the LTC database that
19 includes information as to whether a license has expired?
20     A. Yes.
21 Q. And where is that information?
22     A. In one of the primary tables associated to that
23 license.
24 Q. And which one of the primary tables would that
25 be?

**44**

1      A. I don't know the exact table.
2  Q. Who would know that?
3      A. The information technology person that Kathleen
4  is able to provide.
5  Q. Is there information in the LTC database as to
6  licenses that have been revoked or withdrawn or
7  surrendered?
8      A. Yes.
9  Q. And where would that information be found?
10     A. It would be in the primary tables.
11 Q. And can you point me to any of the primary tables
12 where that information would be?
13     A. There would be multiple, and, no, I cannot point
14 you to the specific table.
15 Q. Can you give me an example of any of those
16 tables?
17     A. It would tell me that the specific record is
18 active or inactive, if it -- and the reason that it is
19 active or inactive.
20 Q. And, again, can you point me to a table that
21 shows me that?
22     A. It would be multiple tables in the primary pool
23 of tables.
24 Q. Can you tell me what tables are in the primary
25 pool of tables?

---

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Johnson-Lawson                    4/17/2012

---

## 45

1  A. The specific tables, all -- they are just those
2  tables that deal with the specific record, and it's a
3  grouping of tables that would be able to tell me through
4  the user interface what I -- actually looking at the
5  record.
6  Q. Do any of these tables have names?
7  A. I do not know the names of those tables. They
8  would be in this document. I would need time to look
9  through this document or bring in a member of our
10 information technology team to be able to speak to that.
11 But I have not -- this is the first time that I have seen
12 this document.
13         MR. ROSENBERG: Let's take about a
14 five-minute break.
15         (Break.)
16 Q. (BY MR. ROSENBERG) Ms. Johnson, if I wanted to
17 identify those people in the LTC database who currently
18 held valid licenses, what fields would I look at?
19 A. I don't know. Active -- active -- active
20 license.
21 Q. Right.
22 A. Now, an active license means they are current in
23 the database.
24 Q. And so what fields would I look at if I wanted to
25 find out who had an active license?

## 46

1  A. I don't know.
2  Q. Who -- who would know that?
3  A. Information technology.
4         MR. ROSENBERG: I don't have any further
5  questions at this point.
6         EXAMINATION
7  BY MS. WESTFALL:
8  Q. Ms. Johnson, this is Elizabeth Westfall. I
9  represent defendant, Eric Holder. I just have a few
10 additional questions for you.
11 A. Yes, ma'am.
12 Q. Turn your attention to the exhibit marked
13 Intervenor's No. 8 --
14 A. Yes, ma'am.
15 Q. -- the design document. Do you have that in
16 front of you?
17         MR. SWEETEN: That's the big one, Elizabeth?
18         MS. WESTFALL: Yes.
19         MR. SWEETEN: The -- okay. The database
20 design document. Okay. We're talking about the big one.
21 A. Okay. Because that one says it's 7.
22 Q. (BY MS. WESTFALL) Okay. My -- my apologies.
23 I'm confused on the numbers. Okay. So Exhibit No. 7?
24 A. Yes, ma'am.
25 Q. Is this the most current version of this

## 47

1  document?
2  A. Yes, ma'am.
3  Q. Are there any changes planned to be made to this
4  document?
5  A. No, ma'am.
6  Q. Were you involved in production of the database
7  to the Department of Justice --
8         MR. SWEETEN: Objection; asked and answered.
9  Q. (BY MS. WESTFALL) -- in this litigation?
10        MR. SWEETEN: Asked and answered already.
11        But go ahead, you can answer it again.
12 Q. Can you say that one more time?
13 Q. (BY MS. WESTFALL) Do you know that a copy of
14 the -- of the LTC database was produced to the United
15 States in this litigation?
16 A. Yes, ma'am.
17 Q. Were you involved in the production of the
18 database to the United States in this litigation?
19 A. No, ma'am.
20 Q. Do you have any idea why it would have been
21 produced to us without fields named over the information?
22 A. Everything that you have here is exactly what you
23 requested.
24 Q. How do you know that?
25 A. These are -- this is the complete design. It

## 48

1  gives you the label, what the type of field is and what
2  the information is that resides in that field.
3  Q. Are you referring to Intervenor's Exhibit No. 7
4  or something else?
5  A. The Intervenor's No. 7 is the current document
6  that we have describing this database. Everything that
7  you have in here is exactly what was requested.
8  Q. Thank you for your testimony.
9        What I was referring to is whether you were --
10 and I believe you just testified you were not involved in
11 producing a copy of the database to the United States as
12 part of this litigation, correct?
13 A. Correct. That's not the second --
14        MR. SWEETEN: Just answer her question.
15 Q. (BY MS. WESTFALL) So I was wondering whether you
16 knew why the database produced to us did not have titles
17 for the fields.
18        MR. SWEETEN: Objection; calls for
19 speculation.
20        Go ahead and answer.
21 Q. (BY MS. WESTFALL) You may answer.
22 A. Having gone through this document and answering
23 your questions, everything that is described in this
24 document is accurate, it's what you asked for and it
25 describes the fields in the system.

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Johnson-Lawson                              4/17/2012

---

49

1    Q.  And does our testimony -- does that answer refer
2    to Intervenor's Exhibit No. 7?
3        A.  From -- this is the latest manual, this is what
4    I've gone through, yes, it does.
5        Q.  Thank you for your testimony.
6            And I believe you just testified that you did not
7    know the fields you would have to gather to identify
8    persons with active concealed handgun licenses; is that
9    correct?
10       A.  There is multiple tables.  So, yes, that is
11   correct.
12       Q.  Would you tell me what you know about the field
13   called "License Application Status"?
14       A.  That is whether it is active or inactive in the
15   database.
16       Q.  Could you describe that field for me a bit more?
17       A.  I would need to see the specific field, what its
18   type is, what it -- what it has.  There are multiple
19   fields that make up a -- what a user would see from a
20   computer.
21       Q.  If I could refer you again to Intervenor's
22   Exhibit No. 7 on Page XII-2 with -- pardon me -- XII-2,
23   which is approximately Page 54 of the document.  I'll give
24   you a chance to get there.  But there is a box on the left
25   that says "License Application Status."

---

50

1        A.  Yes, ma'am.
2        Q.  Would this field, if it was produced to the
3    United States, enable us to identify persons who currently
4    have active licenses?
5        A.  Yes.
6        Q.  Thank you.
7            I'd also like to ask you to describe the "License
8    Return Type" field, if you are familiar with that field.
9        A.  Where do you see -- is that on this same page?
10       Q.  It is not.  I would ask you to turn your
11   attention to Page XXXVII-2, which is on approximately
12   Page 138 of this Intervenor's Exhibit No. 7.
13       A.  Okay.  Can you -- that's a lot of num-- a lot
14   of letters.  Can you say that again, please?  X --
15       Q.  Certainly.  I'm sorry.  It's XXX --
16       A.  So three X's.
17       Q.  -- VII-2, and it's about Page 138.
18       A.  Okay.  So XXXII- ---
19       Q.  VII.  So it's XXXVII.
20       A.  Yeah, I'm almost there.
21       Q.  All right.  It's hard --
22       A.  I know.  Page numbers would be better, right?
23       Q.  Would they.
24       A.  Okay.  So I'm on XXXVII-2, did you say?
25       Q.  2.

---

51

1        A.  Okay.
2        Q.  Are you on that page?
3        A.  Yes.  If you give me one second.
4        Q.  Sure.
5        A.  Okay.  And which col-- which name -- which
6    column are you interested in?
7        Q.  I -- I would like you to describe, if you can,
8    the "License Return Type," which is at the top of the page
9    and what that -- what that shows.
10       A.  This indicates where the license -- why it was
11   returned, whether it was because we couldn't deliver it to
12   the applicant, so it was returned by the mail, or whether
13   it was returned through other means which are listed --
14   listed here.  So it was surrendered, confiscated due to
15   a -- it was returned because there was incorrect
16   information printed on it.  There are multiple reasons why
17   a license would be returned to the department.
18       Q.  Okay.  Thank you.
19           So it would not be necessary to have this field
20   if -- if we had the field regarding the license
21   application status; is that correct?
22       A.  I'm not --
23       Q.  In order to determine who -- who currently holds
24   an active license?
25       A.  That is not for me to determine.  That is beyond

---

52

1    my expertise as -- I don't know what you -- what you're
2    trying to get, so -- I can tell you what the fields are.
3        Q.  Okay.  Well, to rephrase, I'm trying to determine
4    what fields you would need in order to determine who has
5    an unexpired license to carry a concealed handgun.
6        A.  The first field we went through, active or
7    inactive.
8        Q.  Okay.  Give me one second.
9            How often is the database updated?
10       A.  Explain what you mean by "how often is the
11   database is updated."
12       Q.  Is it a live database, is it -- is data put -- is
13   information and application information put -- put into it
14   on a periodic basis?
15       A.  It depends on the information come in.
16   There's -- it's constantly changing.
17       Q.  So, in other words, you would describe it as a
18   live database?
19       A.  Yes, ma'am.
20       Q.  Do you know what percentage of applicants get
21   rejected?
22       A.  No, ma'am.
23       Q.  Do you know what percentage are unexpired license
24   holders in the database?
25       A.  No, ma'am.

---

Reported By:  Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424