

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,      )

      Plaintiff,    )

VS.       )

ERIC H. HOLDER, JR. in his )
official capacity as Attorney )
General of the United States, )

      Defendant,    )

ERIC KENNIE, et al,    )

      Defendant-Intervenors, )

TEXAS STATE CONFERENCE OF    )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,    )   (RMC-DST-RLW)
            )   Three-Judge Court

      Defendant-Intervenors, )

TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al,    )

      Defendant-Intervenors, )

TEXAS LEGISLATIVE BLACK    )
CAUCUS, et al,    )

      Defendant-Intervenors, )

VICTORIA RODRIGUEZ, et al., )

      Defendant-Intervenors. )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
STATE OF TEXAS 30(b)(6)
DENNIS LEOPOLD
JUNE 19, 2012
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**2**

1     ORAL DEPOSITION OF DENNIS LEOPOLD, produced as a

2  witness at the instance of the Defendant, was duly

3  sworn, was taken in the above-styled and numbered cause

4  on the JUNE 19, 2012, from 10:58 a.m. to 11:30 a.m.,

5  before Chris Carpenter, CSR, in and for the State of

6  Texas, reported by machine shorthand, at the Offices of

7  the Texas Attorney General, 209 West 14th Street, 6th

8  Floor, Austin, TX 78701, pursuant to the Federal Rules

9  of Civil Procedure and the provisions stated on the

10  record or attached hereto.

**3**

1           A P P E A R A N C E S
2
3   FOR THE PLAINTIFF, STATE OF TEXAS, AND THE WITNESS:
     Reynolds Brissenden
     Patrick K. Sweeten
4   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
5   Austin, TX 78711-2548
6   209 West 14th Street
     8th Floor
7   Austin, TX 78701
     (512) 936-1307
8   patrick.sweeten@texasattorneygeneral.gov
     reynolds.brissenden@texasattorneygeneral.gov
9
10   FOR THE DEPARTMENT OF PUBLIC SAFETY AND THE WITNESS:
11   Kathleen T. Murphy
     OFFICE OF GENERAL COUNSEL
12   4805 N. Lamar
     Austin, TX 78773
13   (512) 424-2420
     kathleen.murphy@txdps.tx.us
14
15   FOR THE DEFENDANT, HOLDER, ET AL:
16   Daniel Freeman
     Victor Williamson
17   U.S. DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue, NW
18   NWB - Room 7202
     Washington, DC 20530
19   (202) 305-7766
     daniel.freeman@usdoj.gov
20
21
22
23
24
25

**4**

              INDEX

Appearances.......................................3

DENNIS LEOPOLD
    Examination by Mr. Freeman................5

Signature and Changes...........................28

Reporter's Certificate..........................30

## 5

1              DENNIS LEOPOLD,
2    having been first duly sworn to testify the truth, the
3    whole truth, and nothing but the truth, testified as
4    follows:
5              EXAMINATION
6    BY MR. FREEMAN:
7         Q.  Mr. Leopold, could you state your name for the
8    record.
9         A.  Dennis Leopold.
10             MR. BRISSENDEN:  Dan, just for the record,
11   the State of Texas is presenting Mr. Leopold for Topic
12   Number 9 of the Attorney General's Notice of Rule
13   30(b)(6) deposition here today.  And more specifically,
14   in terms of Topic 9, he is designated to discuss with
15   you all the license to carry database.
16             MR. FREEMAN:  Okay.
17        Q.  (By MR. FREEMAN) Mr. Leopold, my name is Dan
18   Freeman, and I'm here on behalf of the Attorney General,
19   Eric Holder, who is the defendant in this case.
20        A.  Okay.
21        Q.  And with me is my colleague, Victor Williamson,
22   who also represents the Attorney General.
23        A.  Okay.
24        Q.  And if your counsel just wants to, you know,
25   state his name for the record.

## 6

1              MR. BRISSENDEN:  Reynolds Brissenden, the
2    State of Texas, and the witness, Mr. Leopold.
3              MS. MURPHY:  Kathleen Murphy from the
4    General Counsel of the Department of Public Safety.
5         Q.  (By MR. FREEMAN) Okay.  Mr. Leopold, have you
6    ever been deposed before?
7         A.  No, sir.
8         Q.  Okay.  So a deposition functions as a question
9    and answer.  I ask the questions and you get to answer.
10   And the court reporter needs to be able to get it all
11   down, so I'll need you to articulate rather than gesture
12   or nod.  Do you understand?
13        A.  Yes.
14        Q.  And it's important that we don't talk over each
15   other.  So, if you can, please wait until the end of my
16   question before you answer, and I'll wait until the end
17   your answer before I ask another question.  Is that
18   okay?
19        A.  Fair enough.
20        Q.  Okay.  And the purpose of your testimony is to
21   obtain your full and complete answers.  So to the extent
22   that you have knowledge, if you can provide that full
23   knowledge in response to a question.  Do you understand?
24        A.  Yes.
25        Q.  Okay.  I may not always be clear.  If you don't

## 7

1    understand my question, please ask me to restate it.
2    It's important that you understand the question so you
3    can answer it correctly.  Does that make sense?
4         A.  Yes.
5         Q.  Okay.  If you need a break, let me know, and
6    we'll finish the question, and we'll see about a break.
7    This should not go long enough that you should really
8    need a break.  But if you need a break for any reason,
9    just let me know.
10        A.  Okay.  Thanks.
11        Q.  If you need to get up for another bottle of
12   water or coffee or something else, please do so between
13   questions, but not while a question is pending.  Okay?
14        A.  Yes.
15        Q.  If you want to talk to your attorney, either of
16   your attorneys, that's fine, but if there's a question
17   pending and you're in the middle of an answer, please
18   finish that up first, and then you can talk to your
19   attorney.  Okay?
20        A.  Okay.
21        Q.  Sometimes you may remember things later down
22   the road, another question or another answer reminds you
23   of something that would have been relevant earlier.  If
24   that happens, let me know while it's on your mind, and
25   we'll add it to the record.  Will you do that?

## 8

1         A.  Yes.
2         Q.  Okay.  Sometimes after we have been talking for
3    a while, you may realize that a prior answer was not
4    entirely accurate.  If you realize that, will you let me
5    know so that we can correct the record?
6         A.  Yes.
7         Q.  Great.  Sometimes while you're answering, you
8    may think of a document that would help you remember or
9    help you answer more accurately.  If you do, will you
10   let me know?
11        A.  Yes.
12        Q.  We have a few documents here, and if not, we
13   may be able to get something if you need it.  Okay?
14        A.  Okay.
15        Q.  Are you on any medication or drugs of any kind
16   that would make it difficult for you understand or
17   answer questions?
18        A.  No.
19        Q.  And these are routine questions, please
20   understand.
21        A.  I understand.  I understand.
22        Q.  Have you had anything alcoholic to drink in the
23   last eight hours?
24        A.  No.
25        Q.  Are you at all sick today?

## 9

1    A.  No.

2    Q.  Are you currently under a doctor's care for any

3  illness that would impede your ability to answer

4  questions?

5    A.  No.

6    Q.  Is there any reason you can think of why you

7  will not be able to answer my questions fully and

8  accurately?

9    A.  No, sir.

10    Q.  The last thing:  I want to remind you that you

11  are under oath and subject to federal penalties for

12  giving false or misleading testimony, so it's important

13  to answer my questions truthfully, accurately, and

14  completely.  Do you understand?

15    A.  Yes.

16    Q.  Do you have any questions so far?

17    A.  No, sir.

18    Q.  Okay.  Do you understand that you are

19  testifying on behalf of the State of Texas and not in

20  your individual capacity today?

21    A.  Yes.

22    Q.  Okay.  What is your position?

23    A.  I'm a resource manager at the Department of

24  Public Safety, information technology department.

25    Q.  And what is a resource manager?

## 10

1    A.  I have a team.  In this case, basically, we

2  support the LTC application.

3    Q.  And are you the highest-ranking person specific

4  to LTC?

5    A.  From the IT side, yes.

6    Q.  Okay.  Do you work on databases other than the

7  LTC?

8    A.  Yes.  My team has several other applications

9  that we support other than LTC.

10    Q.  And are they few enough that you can name them?

11    A.  There is.  We have the Narcotics database, an

12  application that we support.  We have several small

13  applications, internal applications that there too many

14  to quote off today.

15    Q.  I understand.

16    A.  But it's basically, I have a team of 15

17  members.

18    Q.  Okay.

19    A.  And we support several applications.

20    Q.  All IT staff?

21    A.  Yes.

22    Q.  Okay.

23    A.  All IT staff.

24    Q.  Okay.  Although I'm curious what the Narcotics

25  database is, it's not relevant.

## 11

1    A.  It's a pharmaceutical tracking system is what

2  it is.

3    Q.  Okay.

4    A.  We track all the pharmacy entries.

5    Q.  Okay.

6    A.  As far as prescriptions.

7    Q.  Thank you.

8        How long have you held your position?

9    A.  I've been a manager for two years.

10    Q.  Okay.  What's your educational background?

11    A.  I have a high school degree with about 50 hours

12  of college education.

13    Q.  Okay.  Where did you go to the college?

14    A.  I went San Jacinto Junior College in Houston.

15    Q.  Okay.  And what's your employment background?

16    A.  My employment background:  I've been eight

17  years with the Department of Public Safety.  Prior to

18  that, I did some contracting work for ONEOK, which is a

19  gas and oil company, and I was employed full time

20  with -- at that time, it was called Southern Union Gas

21  for two years.  Prior to that, I was with a private

22  company for 25 years.

23    Q.  What was that private company?

24    A.  It was called CheckFree.  They're out of

25  Atlanta, Georgia.

## 12

1    Q.  And what do they do?

2    A.  They basically -- for online bill payments.  We

3  supported online bill payments for several large banks.

4    Q.  And were you employed by CheckFree in an IT

5  capacity?

6    A.  Yes.

7    Q.  In a managerial capacity?

8    A.  Several positions over 25 years, yes.

9    Q.  And when you moved to Southern Union -- South

10  Union Gas?

11    A.  Southern Union.

12    Q.  Southern Union.

13    A.  Which is now called Texas Gas Services.

14    Q.  Okay.  Was that also in an IT capacity?

15    A.  Yes.

16    Q.  Managerial?

17    A.  No.

18    Q.  And when you moved over to ONEOK, was that also

19  in an IT capacity?

20    A.  Well, ONEOK bought out, basically, Southern

21  Union Gas, and it was all IT related.

22    Q.  Okay.  And so you started at DPS in

23  approximately 2004?

24    A.  Correct.

25    Q.  And what was your first position at DPS?

DENNIS LEOPOLD                                          June 19, 2012

## 13

1   A.   Developer.
2   Q.   And how long have you been a developer for?
3   A.   Probably about six years.
4   Q.   What databases did you work on as a developer?
5   A.   Those were mainframe databases, DB2 mainframe
6   databases.
7   Q.   DB2?
8   A.   Yes.
9   Q.   And for a relative civilian, what is a DB2
10  database?
11  A.   A DB2 database is -- it's a database that -- I
12  forget what DB2 stands for, what it's called.  IBM calls
13  it their DB2 product.  It's a database that -- it's a
14  relationship that uses the SQL queries to access data.
15  Q.   And where were the subjects of those databases?
16  A.   Crime records I worked on initially.  We
17  converted it from an old, old system to a new system
18  onto the mainframe.
19  Q.   Okay.  And you said that was for two years?
20  A.   That was for -- when I first got here.  For six
21  years, I was a developer.
22  Q.   Oh, six years you were a developer?
23  A.   Yes.  And two years in the managerial position.
24  Q.   Okay.  Sorry.  Thank you for clarifying.
25  A.   Sure.

## 14

1   Q.   And you were working just on crime records for
2   those first six years?
3   A.   Correct.
4   Q.   Okay.  Once you became a manager, have you, for
5   two years, been the manager for the license to carry
6   database?
7   A.   Yes.
8   Q.   Okay.  When did you first learn that you would
9   be testifying on behalf of the State?
10  A.   I guess approximately a month ago.  I may have
11  to defer.  But I don't exactly recall the date.
12  Q.   Okay.
13  A.   It was about a month ago, I think.
14  Q.   I'll represent to you that this has been
15  previously marked as U.S. Exhibit 830.  (Handed to
16  witness.)  If you could take a moment to review the
17  document.
18  A.   (Witness reviewing document.)
19  Q.   Have you seen that document before?
20  A.   No, sir.
21  Q.   Okay.  If you could take a look at the last two
22  pages, do you see a list of topics there?
23  A.   Uh-huh.
24  Q.   And I know that your counsel has previously
25  represented that you are here to testify concerning

## 15

1   Topic 9, but I just want, for the record, to ask:  Are
2   you prepared to testify about that topic?
3   A.   Yes, sir.
4   Q.   And can you, for the record, read that topic?
5   A.   "The process, manner, and method of compiling,
6   cleaning, and filtering data from the Department of
7   Public Safety's driver's license and license to carry
8   databases and producing such data to the Attorney
9   General and Defendant Intervenors in this litigation."
10  Q.   Thank you.
11  A.   You're welcome.
12  Q.   What did you do to prepare for this deposition?
13  A.   We did meet in a prep course with the OAG.
14  Q.   Okay.  And did you meet with anyone else?
15  A.   No.
16  Q.   And when you met with the Office of the
17  Attorney General, who was present?
18  A.   Patrick Sweeten and Kathleen.
19  Q.   Okay.  Did you review any documents prior to
20  the deposition?
21  A.   Actually, not Patrick.  I'm sorry.  Reynolds.
22  I got the two confused.  I'm sorry.
23  Q.   Did you review any documents prior to the
24  deposition?
25  A.   No.

## 16

1   Q.   Okay.  Did you bring any documents with you
2   here today?
3   A.   No.
4   Q.   Okay.  Did you speak to anyone else about the
5   deposition today?
6   A.   Just Patrick briefly, before he came in and
7   took me up here.
8   Q.   Okay.
9   A.   One correction, if I could, make.
10  Q.   Of course.
11  A.   When I said a couple of months ago about being
12  here, Kathleen had sent us an e-mail to our managers
13  that there's a possibility --
14       MR. BRISSENDEN:  I would instruct you not
15  to discuss the substance of communications you've had
16  with your attorney.
17       THE WITNESS:  Okay.  Thanks.
18  Q.   (By MR. FREEMAN) Can you walk me through what
19  steps you went through in order to produce the license
20  to carry database, the Department of Justice?
21  A.   Yes.  We sent a data dictionary which lists all
22  of the databases and the fields contained within each
23  database and the definitions of the values in each field
24  in the databases.  Then we were instructed to extract
25  specific data from those databases, which we then had a

DENNIS LEOPOLD                                                    June 19, 2012

---

## 17

1   developer develop a query from the databases to extract
2   that information.  That information was then put on to a
3   flash drive, was verified by the technical lead, and
4   also the developer, that we had pulled and extracted all
5   of the data, and that basically we populated the fields
6   that they had requested.
7        Q.   Now, you said that you were instructed to
8   provide certain fields.
9        A.   Uh-huh.
10       Q.   Who did you receive those instructions from?
11       A.   They came from Kathleen, and I don't know if it
12   came from DOJ or the OAG.  I'm not sure of that.
13       Q.   Okay.  And the developer query, was that a
14  program designed to export data into a new table?
15       A.   No.  Into a file, a delimited file.
16       Q.   Okay.  Was this a comma delimited file?
17       A.   No.  It was pipe delimited.  Fixed length
18  fields.
19       Q.   Is the license to carry database contained in a
20  single table or linked tables?
21       A.   110 tables.
22       Q.   110 different tables.  Okay.
23            Do you recall -- oh, sorry.  Just to take
24  a step back.  Who -- who developed the query?
25       A.   Who developed the query?  One of my developers.

---

## 18

1        Q.   Do you recall which developer that was?
2        A.   Hannah Lee.
3        Q.   And did Ms. Lee transfer the pipe delimited
4   file on to a flash drive?
5        A.   It was transferred to a file, and then I had
6   one of my other developers just copy it flash drives.
7        Q.   Okay.  And you said that the file was verified
8   by both the developer and the technical lead, correct?
9        A.   They both reviewed it.
10       Q.   Okay.  So Ms. Lee was the developer?
11       A.   Yes.
12       Q.   Who was the technical lead?
13       A.   Robert Jett.
14       Q.   Robert Jett.
15       A.   J-e-t-t.
16       Q.   Do you recall what the dates of the database
17  productions were?
18       A.   There were several, and without that
19  documentation in front of me, I really don't recall
20  specific dates.
21       Q.   Were the dates of the data extraction the same
22  date as the production?
23       A.   I'm sorry.  Could you repeat that, please?
24       Q.   Were the dates of the data extraction the same
25  date as the production?

---

## 19

1        A.   Yes.  We ran it against the current files.
2        Q.   Okay.
3        A.   The date that we were requested to extract the
4   data, it was extracted from the database as is at the
5   time we extracted it.
6        Q.   Okay.  And approximately how much lead time was
7   there between the deadline on your end to provide the
8   data to the Department of Justice and --
9        A.   Well, there were several -- I'm sorry.  I'm
10  sorry.  I thought you were through.  I apologize.
11       Q.   -- and the actual extraction from the live
12  database?
13       A.   Well, there were several requests.  I think
14  most of the time, it's like 24 hour.
15       Q.   Okay.  So about the same.
16            And is the license to carry database
17  updated with both additions and subtractions on an
18  essentially live basis?
19       A.   Mostly additions and updates.
20       Q.   Okay.
21       A.   Deletions are based upon archive.  The business
22  has some archives, periods of time.
23       Q.   Okay.
24       A.   So that's done programmatically, but we -- I
25  don't know exactly what the archive period is.

---

## 20

1        Q.   Okay.  So people will come in, and when an
2   application goes in, they go into the database?
3        A.   Correct.
4        Q.   And the business side folks will periodically
5   do a removal of some records into the archive?
6            MR. BRISSENDEN:  Objection, form.
7        A.   I can't speak to that.  That's a business
8   process that I really don't know.
9        Q.   (By MR. FREEMAN) Okay.  Are you aware of
10  whether there is software that's written for the purpose
11  of extracting certain records to be archived?
12       A.   I'm not aware of any, no.
13       Q.   Okay.  Are you aware of whether any such
14  extraction has occurred between March 1st of 2012 and
15  the present?
16       A.   No, I'm not aware of any.
17       Q.   Do you recall what tables you used in
18  populating the fields that you had requested -- or that
19  had been requested of you to be populated?
20       A.   Without that document in front of me, no, I
21  can't recall.
22       Q.   And is this a document that you received that
23  provided you instructions on how to perform this task?
24       A.   Correct.  We received the data that needed to
25  be extracted.  They did specify the tables that the data

DENNIS LEOPOLD                                          June 19, 2012

---

## 21

1   should come from.
2       Q.   Where did that document come from?
3       A.   For the data they wanted extracted?
4       Q.   Uh-huh.
5       A.   Or where they got the data from?
6       Q.   Where did the document listing the data that
7   you needed to extract come from?
8       A.   It came through Kathleen.
9       Q.   Okay.  And do you recall how the requests
10  differed between the multiple requests?
11      A.   Yes.  There was an initial request and then
12  additional fields were requested at a later date.
13      Q.   And when the additional fields were requested,
14  was that a -- strike that.  If I could rephrase this.
15           When the additional fields were requested,
16  did you run a fresh extraction from the license to carry
17  database?
18      A.   Yes.
19      Q.   Okay.  Do you recall, approximately, the dates
20  for those productions?
21      A.   There was several files.  No, I can't.
22      Q.   Okay.
23      A.   Without looking at our log files, which I don't
24  have here today.
25      Q.   Okay.  Are you aware of how many individual

---

## 23

1   to carry database, did you search for duplicates of any
2   kind?
3       A.   No.
4       Q.   Other than adding additional fields to the
5   production, were there any changes in procedure for --
6   between the various productions?
7       A.   I'm not sure what you mean by procedures.
8       Q.   Were there any changes to the algorithm for --
9   extra program for extracting data from the license to
10  carry database other than adding additional fields?
11      A.   No.
12      Q.   Okay.  Are you aware of whether there was any
13  difference in the procedures used to produce data to the
14  Department of Justice and the procedures used to produce
15  data to the Defendant Intervenors in this case?
16      A.   From my understanding to the Intervenors, there
17  was some editing of the file, basically, to not display
18  PPI information.
19      Q.   And PPI, can you define that term?
20      A.   Such as social security number or any numbers
21  that would be associated with a specific person that
22  should be kept private.
23      Q.   What does PPI stand for?
24      A.   Personal -- I knew you were going to ask me
25  that.  We use a lot of acronyms.  Personal -- I don't

---

## 22

1   records are contained in the license to carry database?
2       A.   I don't know that number.
3       Q.   Okay.  Are you aware of whether there were
4   individual cases dropped from the production as part of
5   taking the license to carry database and putting it into
6   this pipe delimited delineated file?
7       A.   No.
8       Q.   Were there any -- sorry.  Strike that.  What
9            You referenced log files previously.  What
10  is a log file?
11      A.   Log files are requests that we receive from the
12  different departments.  We basically, when we receive a
13  request, we put it in log and who it was assigned to.
14  It's my way of monitoring who is doing what on my team,
15  basically.
16      Q.   Okay.  So it's sort of an internal assignment
17  sheet of some kind?
18      A.   Right.
19      Q.   Got it.  Are there any entries in the license
20  to carry database that are test entries?
21           MR. BRISSENDEN:  Objection, vague.
22      A.   Not that I'm aware of.
23      Q.   (By MR. FREEMAN) To the extent that you
24  understand it.  Okay.  Thank you.
25           As part of the production of the license

---

## 24

1   remember all of it.
2       Q.   It's okay.  In this particular case, do you
3   recall whether you eliminated anything other than social
4   security numbers?
5       A.   From my understanding was that the file went to
6   the DOJ.  Nothing was eliminated other than the social
7   security number.
8       Q.   Is it your understanding that the social
9   security number was eliminated?
10      A.   From -- from any fields other than the social
11  security number field.
12      Q.   Is it your understanding that the social
13  security number field was in some way altered for the
14  production to the Department of Justice?
15      A.   No.
16      Q.   Just the Intervenors?
17      A.   Just the Intervenors.
18      Q.   Okay.  I just wanted to clarify that.
19      A.   Yes.  Right.
20      Q.   Because I think you misstated it earlier, and
21  I'm just trying to help you out.
22      A.   Right.
23      Q.   What steps did you go through in order to
24  eliminate the nine digit social security number from the
25  production to the Intervenors?

DENNIS LEOPOLD                                                              June 19, 2012

---

25

1    A.   To the Intervenors?  Basically the file we
2    created that -- that was supplied, we truncated to the
3    last four digits and created a file with only the last
4    four digits in the social security number.
5    Q.   Where in the process did that occur?  Was it
6    the same -- I'm sorry.  I just asked that.
7    A.   When the extract file was performed, we created
8    a file with all nine digits and all those requested
9    fields.
10   Q.   Uh-huh.
11   A.   When we were requested to supply only the last
12   four digits, we took that very same file and truncated
13   it, and that's what we put on the flash drive.
14   Q.   Okay.  So it was the same draw from the license
15   to carry database?
16   A.   Correct.  Right.
17   Q.   Thank you.
18       What type of verification did Ms. Lee and
19   Mr. Jett perform after the data had been put on the
20   flash drive?
21   A.   They verified that -- we ran an extract query
22   to count nothing but a count to count all of the number
23   of records that we should have extracted, then we
24   verified, looking at the flash -- or the file, before we
25   put it to the flash drive, that the number matched.

---

26

1    They also just did sort of periodic checks to make sure
2    that fields were populated.
3    Q.   Okay.  And was any subsequent quality control
4    performed by the Office of the Attorney General, to the
5    extent of your knowledge?
6    A.   I'm not aware of that.
7    Q.   Are you aware of any nonroutine or irregular
8    batches of additions that have been made to the database
9    since March 1st?
10       MR. BRISSENDEN:  Objection, form.
11   Objection, vague.
12   A.   No.
13   Q.   (By MR. FREEMAN) Are you aware of any irregular
14   or nonroutine deletions from the database since
15   March 1st?
16   A.   No.
17       MR. BRISSENDEN:  Objection, vague.
18       MR. FREEMAN:  Okay.  I just need to take a
19   moment with my co-counsel to talk through something for
20   a couple of minutes, and then we can probably wrap up in
21   just a few minutes.
22       THE WITNESS:  Okay.
23       MR. FREEMAN:  So we'll just go off the
24   record.
25       (Recess from 11:25 a.m. to 11:29 a.m.)

---

27

1        MR. FREEMAN:  Back on the record.
2    Q.   (By MR. FREEMAN) And I just need to ask:  Are
3    there any answers you wish to change?
4    A.   No, sir.
5    Q.   Any information you didn't recall that you now
6    recall?
7    A.   No, sir.
8    Q.   And anything you would like to add so we can
9    understand your answers more fully?
10   A.   No, sir.
11       MR. FREEMAN:  Okay.  I want to thank you
12   for your testimony, and everything was quick and clean.
13   I appreciate it.
14       THE WITNESS:  Thank you.
15       (Signature reserved.)
16       (Deposition concluded at 11:30 a.m.)
17
18
19
20
21
22
23
24
25

---

28

1    CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3    PAGE  LINE  CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   I, DENNIS LEOPOLD, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24       _____
25       DENNIS LEOPOLD

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez   4/17/2012

---

**1**

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,               )
                              )
     Plaintiff,               )
                              )
VS.                           )
                              ) CASE NO:  1:11-CV-00128
ERIC H. HOLDER, JR., IN       ) RMC-DST-RLW
HIS OFFICIAL CAPACITY AS      )
ATTORNEY GENERAL OF THE       )
UNITED STATES,                )
                              )
     Defendant,               )
                              )
ERIC KENNIE, ET AL.,          )
                              )
     Defendant-Intervenors,   )
                              )
TEXAS STATE CONFERENCE OF     )
NAACP BRANCHES, ET AL.,       )
                              )
     Defendant-Intervenors,   )
                              )
TEXAS LEAGUE OF YOUNG         )
VOTERS EDUCATION FUND, ET     )
AL.,                          )
                              )
     Defendant-Intervenors,   )
                              )
TEXAS LEGISLATIVE BLACK       )
CAUCUS, ET AL.,               )
                              )
     Defendant-Intervenors,   )
                              )
VICTORIA RODRIGUEZ, ET        )
AL.,                          )
                              )
     Defendant-Intervenors.   )
```

---

**2**

```
1    *********************************************
2              ORAL DEPOSITION OF
3              GLORIA MARTINEZ
4              APRIL 17, 2012
5    *********************************************
6        ORAL DEPOSITION OF GLORIA MARTINEZ, produced as a
7    witness at the instance of the Defendant Intervenors Texas
8    State Conference of NAACP Branches and the Mexican
9    American Legislative Caucus of the Texas House of
10   Representatives, and duly sworn, was taken in the
11   above-styled and numbered cause on Tuesday, April 17,
12   2012, from 1:24 p.m. to 2:57 p.m., via telephone, before
13   Tamara K. Chapman, CSR in and for the State of Texas,
14   reported by machine shorthand, at the State House, 209
15   West 14th Street, Ground Floor, Austin, Texas, pursuant to
16   the Federal Rules of Civil Procedure and the provisions
17   stated on the record or attached hereto.
18
19
20
21
22
23
24
25
```

---

**3**

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF STATE OF TEXAS:
       Mr. Patrick Sweeten
4      Mr. Reynolds Brissenden
       ATTORNEY GENERAL OF TEXAS
5      Civil Medicaid Fraud Division
       300 W. 15th Street
6      Austin, Texas
       patrick.sweeten@oag.state.tx.us
7      reynolds.brissenden@oag.state.tx.us
8
9    FOR TEXAS NAACP STATE CONFERENCE AND THE MEXICAN AMERICAN
     LEGISLATIVE CAUCUS:
10     Ms. Myrna Pérez (telephonically)
       BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
11     161 Avenue of the Americas, 12th Floor
       New York, New York  10013
12     myrna.perez@nyu.edu
13
14   FOR THE DEFENDANT ERIC H. HOLDER, JR., IN HIS OFFICIAL
     CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
15     Ms. Elizabeth S. Westfall (telephonically)
       Mr. Daniel J. Freeman (telephonically)
16     U.S. DEPARTMENT OF JUSTICE
       Voting Section, Civil Rights Division
17     950 Pennsylvania Ave. NW, NWB Room 7202
       Washington, DC 20530
18     elizabeth.westfall@usdoj.gov
       daniel.freeman@usdoj.gov
19
20
21   FOR DEFENDANT INTERVENORS TEXAS STATE CONFERENCE OF NAACP
     BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE CAUCUS OF
     THE TEXAS HOUSE OF REPRESENTATIVES:
22     Mr. Ezra D. Rosenberg (telephonically)
       DECHERT, LLP
23     902 Carnegie Center, Suite 500
       Princeton, New Jersey  08540-6531
24     ezra.rosenberg@dechert.com
25
```

---

**4**

```
1    FOR DEFENDANT INTERVENORS TEXAS STATE CONFERENCE OF NAACP
     BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE CAUCUS OF
2    THE TEXAS HOUSE OF REPRESENTATIVES (CONTINUED):
3      Ms. Lindsey Stelcen
       DECHERT, LLP
4      300 West 6th Street, Suite 2010
       Austin, Texas  78701
5      lindsey.stelcen@dechert.com
6
       Mr. Robert Kengle (telephonically)
7      Mr. Mark Posner (telephonically)
       LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER THE LAW
8      1401 New York Avenue, N.W., Suite 400
       Washington, D.C.  20005
9      bkengle@lawyerscommittee.org
       mposner@lawyerscommittee.org
10
11
     FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND:
12     Mr. Gregory K. Johnson (telephonically)
       FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
13     801 17th Street NW,
       Washington, DC 20006
14     gregory.johnson@friedfrank.com
15
16   FOR THE DEPARTMENT OF PUBLIC SAFETY:
       Ms. Kathleen T. Murphy
17     TEXAS DEPARTMENT OF PUBLIC SAFETY
       Office of General Counsel
18     5805 N. Lamar Boulevard
       Austin, Texas  78773
19     kathleen.murphy@txdps.state.tx.us
20
21   FOR VICTOR RODRIGUEZ, NICOLE RODRIGUEZ, SOUTHWEST VOTER
     REGISTRATION EDUCATION PROJECT, MI FAMILIA VOTA EDUCATION
22   FUND:
       Ms. Nina Perales
23     MALDEF
       110 Broadway, Suite 300
24     San Antonio, Texas  78205
       nperales@maldef.org
25
```

---

Reported By: Tamara K. Chapman

Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez                                4/17/2012

## 9

1   Q. And how long have you been in that position?
2   A. Approximately six years.
3   Q. And before that, what position did you have?
4   A. I did not work at the Secretary of State's office
5   before that.
6   Q. Okay. Where did you work before that?
7   A. I was without work for approximately four months.
8   Q. And before that?
9   A. I worked for about five years at the Wake Forest
10  University Baptist Medical Center in North Carolina.
11  Q. Winston-Salem, right?
12  A. Yes.
13  Q. And can you tell me what the duties of the
14  Program Specialist I are?
15  A. It's basically customer service. We answer
16  questions from the general public regarding voter
17  registration, and we help the county voter registrars or
18  county clerks or elections administrators with their
19  questions on the use of the T.E.A.M. program that stands
20  for Texas Election Administration Management.
21  Q. And in the course of your duties, have you become
22  familiar with the voter registration database maintained
23  by the Secretary of State?
24  A. I've become familiar with the data that's entered
25  into the database.

## 10

1   Q. And when you answered my question that way, are
2   you differentiating your familiar -- familiarity of the
3   data that's entered from being familiar with the database
4   as a whole?
5   A. Correct.
6   Q. Do you have a familiar -- familiarity with the
7   database as a whole?
8   A. That's difficult for me to answer. I know about
9   the information that users input and that data gets stored
10  in the database. But I don't work with the database.
11  Q. Are you familiar with the fields of the voter
12  registration database?
13  A. I'm familiar with the fields in T.E.A.M., yes.
14  Q. And when you corrected me and said "fields in
15  T.E.A.M.," is there a difference between what you called
16  T.E.A.M. and the voter registration database?
17  A. I'm not familiar with what's in the actual
18  database. I don't know about the background workings of
19  it. I know about the user interface and entering the
20  information there.
21  Q. I'd like to show you what's been marked as
22  Intervenor's Exhibit No. 1, which is
23  "Defendant-Intervenor's Notice of Deposition of the State
24  of Texas Regarding Texas's Database System."
25  Is that --

## 11

1   MR. ROSENBERG: Can someone give the --
2   A. She did.
3   MR. SWEETEN: Lindsey did.
4   MR. ROSENBERG: Okay. Thank you.
5   Q. (BY MR. ROSENBERG) Have you seen this document
6   before?
7   A. Yes.
8   Q. And turning your attention to Roman Numeral III
9   on Page 4, which says: Information contained in the
10  T.E.A.M. voter registration database.
11  I'd like to go through each of those. First of
12  all, I think you've already testified that you're familiar
13  with the information contained in the T.E.A.M. voter
14  registration database; is that correct?
15  A. I suppose if you're calling it a T.E.A.M.
16  database, but I would just call it a T.E.A.M. interface.
17  Q. Okay. Then I -- I think you're going to have to
18  educate me when you say -- when, again, you differentiate
19  between the T.E.A.M. interface as opposed to the T.E.A.M.
20  voter registration database.
21  A. Sure.
22  T.E.A.M. interface is the program that the users
23  go into to enter voter registration information. The
24  T.E.A.M. database is where that information is stored.
25  Q. So you're familiar with the T.E.A.M. interface,

## 12

1   but not with the T.E.A.M. database?
2   A. Correct.
3   Q. Okay. Let's go down each of these subparts,
4   then. No. 1: The table/fields contained in the T.E.A.M.
5   database, and the contents of those tables and fields.
6   Are you the person at the Secretary of State's
7   office to answer questions concerning those?
8   MR. SWEETEN: Are -- you're asking her if
9   she's the best person equipped? Are -- I mean, we're
10  putting her up as a corporate representative on these
11  copies. So I think those are -- those are potentially
12  different things. She's a corporate representative.
13  She's here to answer questions about those seven topics.
14  MR. ROSENBERG: I'll rephrase my question.
15  Q. (BY MR. ROSENBERG) Are you familiar with
16  table/fields contained in the T.E.A.M. database and the
17  contents of those tables and fields?
18  A. I am familiar with the fields contained in
19  T.E.A.M. and the contents of the fields. I don't know
20  about all the tables in the background. I know that there
21  are tables in T.E.A.M., I don't know what tables you are
22  referring to.
23  Q. No. 2: How the T.E.A.M. database tracks voters
24  who move or whose voter registration otherwise changes.
25  Are you familiar with that?

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez                                        4/17/2012

---

## 17

1    other individuals in the T.E.A.M. database?
2       A. In it?  No.  I would say no.
3       Q. I'd like to return for a second here to the jury
4    wheel information.  How do you -- are you able to put that
5    information into your -- into the T.E.A.M. database
6    without creating a lot of duplications?
7       A. There is a process to eliminate duplicates.
8       Q. And what is -- what is that process?
9       A. There's a matching process.  Well -- it takes
10   into account the file of voters for that county.  So we do
11   it county by county.  And it takes into account the DPS
12   file for people belonging to that county.  And we also do
13   check with a file that we receive from the Texas Bureau of
14   Vital Statistics to eliminate deaths, people that have
15   passed away.
16          When we -- and part of the process, we compare
17   the names from the DPS file to the names in the voter
18   registration file.  And those that are a strong match, we
19   will eliminate the DPS record, let's say, from the wheel,
20   keeping only one , the voter registration record and
21   therefore eliminating those duplicates.
22      Q. And what -- what criteria do you use to determine
23   whether something's a strong match?
24      A. A strong match is a match on -- let's me see.
25   I'm not completely familiar with that.  I can tell you as

## 18

1    much as I remember --
2       Q. Sure.
3       A. -- but I'm not 100 percent on it.
4          MR. SWEETEN:  Okay.  We don't want you to
5    guess.  Just give the information that you're -- that's
6    responsive to the question, that you know of.
7       A. I know that there is a set of three or four
8    matching criteria.  What exactly they are, I can't
9    remember them right now.
10      Q. (BY MR. ROSENBERG)  Who at the Secretary of State
11   would have that knowledge?
12      A. Probably somebody in IT, in our IT department.
13      Q. And is that -- are those criteria in written
14   form, as far as you know?
15      A. I believe there is a document in there.  However,
16   I don't know where it's located.
17      Q. Does the T.E.A.M. database track whether people
18   voted or not?
19      A. It can track that, yes.
20      Q. When you say "it can track that," is that data
21   gathered?
22      A. It is dependent upon user entry.  So if the user
23   enters voting history, then the voting history is there to
24   be tracked.
25      Q. And when you say "the user," to whom are you

## 19

1    referring?
2       A. Anybody that enters voting history.  It could be
3    the county clerk's office.  It could be the election
4    administrator's office.  It could be the voter's
5    registrar's office, depending upon the county.
6       Q. Is there a standard practice or procedure within
7    the Secretary of State in terms of inputting information
8    as to whether people voted?
9       A. Yes.
10      Q. And is that standard procedure in written form?
11      A. That's a little difficult to answer.  Do we have
12   the step-by-step written out somewhere?
13      Q. Yes.
14      A. I believe we do have -- like we send out an
15   e-mail periodically to all counties reminding them of the
16   processes.  So that's the written form that I'm familiar
17   with.
18      Q. Is there a specific field in the database that
19   captures whether or not -- a field or fields that capture
20   whether or not a person voted?
21      A. Yes.
22      Q. And what is that field called?
23      A. The screen -- there are two screens where a user
24   can enter voting history.  One screen is called record
25   voting activity.  The other screen is called record poll

## 20

1    book activity.  And both allow the user to search for a
2    particular voter number or voter name, determine that it's
3    the right voter that they want to enter voting history
4    for, making sure that they choose the correct election,
5    whether it's early voting or election date, the date for
6    early voting and the polling place, and then they enter if
7    the ballot was accepted.
8       Q. Does the T.E.A.M. database also then track the
9    mode of voting?  And by that I mean in person, early
10   voting, absentee voting, provisional ballot, things like
11   that.
12      A. It does have a place for each of those to be
13   entered into, yes.
14      Q. And is there any special term or terminology to
15   describe those fields?
16      A. Yes.
17      Q. And what are they?
18      A. For provisional ballots, there is a screen
19   specifically called provisional voting.  There is a screen
20   for absentee ballots.  It's a composite of -- well, it's a
21   series of four screens.
22          For regular absentee ballot, you have the
23   absentee ballot request.  You've got the absentee ballot
24   sent screen.  You've got the absentee ballot received
25   screen and the absentee ballot voted screen.

---

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez                                          4/17/2012

---

### 21

1       There is an intermediary step in between the
2   absentee ballot request and the absentee ballot sent.
3   Technical issue that we had to put in, I don't know why.
4   But we have a step in there where we also are able to put
5   in a code of absentee ballot printed, and then it
6   automatically assigns absentee ballots sent to -- to the
7   particular voter.  So that's absentee ballot.
8       The federal postcard applications follow all
9   those same screens except for the very first one.  On
10  federal postcard application, we skip the absentee ballot
11  requested because the federal postcard application itself
12  is the request.
13      Q.  And -- I'm sorry, go ahead.
14      A.  I think that was all of them.
15      Q.  How about provisional ballots?
16      A.  There is a screen.  Like I said, it's called
17  provisional voting.  And it is in there so that the -- the
18  user can track that there was a provisional ballot
19  entered.  Uh-huh.
20      Q.  And -- I'm sorry.  Are you finished?
21      A.  Yes.
22      Q.  Is there also a field for early voting?
23      A.  Early voting, that would be the absentee ballot
24  mailed steps, because those fall into the category of
25  early voting.

### 22

1       Now, if you want early voting in person --
2       A.  Yes.
3       A.  -- those are the first two screens I was talking
4   about, the record voting activity and the record poll book
5   activity, where you can choose the mode of early voting.
6       Q.  Are there -- does the T.E.A.M. database capture
7   information as to which precinct a voter is assigned to?
8       A.  It is assigned to the voter record.  It does
9   capture that information.
10      Q.  And is there a specific term or terminology to
11  describe that field?
12      A.  That information is assigned to each voter
13  according to their residence address.  The residential
14  addresses are kept in the part of T.E.A.M., the online
15  T.E.A.M. program that's called street index.
16      And we also have a parcel index.  And that's for
17  residence addresses that just have a concise description,
18  it doesn't follow the regular rules of a parsed address,
19  like 783 Main Street.  Well, there are some addresses that
20  are just five miles west of Mile Marker 28, et cetera.
21      So both of those indexes, both of those indices,
22  are where the user will assign a certain range of
23  addresses to belong to a certain precinct and to belong to
24  certain jurisdictions.  Whatever residential address or
25  parcel address falls in what has been entered in the

### 23

1   in- -- index, that -- that voter will get assigned that
2   precinct and jurisdictions.
3       Q.  By the way, is -- does the Secretary of State
4   maintain an archive of past snapshots of what the database
5   looked like?
6       A.  I don't believe so.  I really don't know what the
7   databases hold.
8       Q.  Who would know that?
9       A.  Probably somebody in IT.
10      Q.  Do you know any names of any individual?
11      A.  Probably Scott Brandt would be the one to direct
12  you to the right person.
13      Q.  And what's Scott Brandt's title?
14      A.  Well, all I know, he's the head of IT.
15      Q.  I got it.
16      A.  I don't know his title.  Sorry.
17      Q.  Is there a field that indicates the date that a
18  person registered to vote?
19      A.  Yes.
20      Q.  And would it be possible to use that field to get
21  a snapshot by pulling everything from X date?
22      A.  I don't know what kind of a snapshot you're
23  asking about.
24      Q.  Of-- of voters who are registered at -- on that
25  day--

### 24

1       A.  We have public information request method, and we
2   can certainly request a list of people who registered
3   between certain dates.
4       Q.  Do you have an understanding of how much
5   compliance there is at the local level with entering data
6   into these fields concerning how people have voted, the
7   mode they voted?  Is that something where you have a
8   hundred percent compliance or something less?
9       A.  That -- that's hard to tell, because we're not
10  present at each of the counties looking at what -- how
11  people are voting, how many people are voting.  We depend
12  on the county users to give us that information.  So I
13  couldn't compare it.
14      Do I know that ten people went to vote at County
15  A and the county is actually telling me ten people voted?
16  I don't know.
17      Q.  Do you have any understanding of how many fields
18  there are in the T.E.A.M. database?
19      A.  I couldn't number them for you.  Every screen is
20  different.  There's many fields.
21      Q.  Can you give me an estimate in terms of are we
22  dealing with more than a hundred or less than a hundred?
23      A.  I'm sure there's more than a hundred.
24      Q.  Are we dealing with more than 200?
25      A.  I couldn't tell you.

---

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Gloria Martinez                              4/17/2012

---

## 25

1    Q. Okay. So it's somewhat upwards of 100, as far as
2    you know?
3    A. As far as I can estimate.
4        MR. ROSENBERG: Let's have marked, Lindsey,
5    what was exhibit -- it was going to be, I think,
6    Exhibit 1. But let's call this Intervenor's Exhibit --
7        MS. STELCEN: This is going to be 5.
8        MR. ROSENBERG: For the court- -- yeah, we
9    can go to 5, I think, at this point.
10       MS. STELCEN: Yeah.
11       MR. ROSENBERG: And it's the voter record
12   layout.
13       MS. STELCEN: Yes, I have it. I'm putting
14   it in front of the witness right now.
15       MR. ROSENBERG: Great.
16       (Intervenor Exhibit 5 was marked.)
17       Q. (BY MR. ROSENBERG) Ms. Martinez, looking at
18   what's been marked as Intervenor's No. Exhibit 5, have you
19   ever seen that document?
20       A. Yes.
21       Q. And can you tell me -- can you identify for the
22   record, explain what this document is?
23       A. This voter record layout of company's PI
24   requests, or that is, public information request, to let
25   the requester know what they're getting in their file.

## 26

1    Q. And have you seen this specific voter record
2    layout that's before you?
3    A. It looks the same as the ones we use every time
4    we give out a public information request.
5    Q. Were you involved in -- in any of the databases
6    that were provided to the United States or the defendant
7    intervenors in this action?
8    A. I was not.
9    Q. Going through this list here, under field name,
10   do you see that?
11   A. Uh-huh, yes.
12   Q. I'd like you just to tell me what each of these
13   fields mean, starting with the one that says Voter County
14   ID.
15   A. Voter County ID. That's a number that is
16   assigned to each county. Should be a three-digit number
17   as far as I'm familiar with.
18   **Q. And how about juror ID?**
19   **A. Jury ID must be the -- no. Unless I can actually**
20   **see the data that it's -- that it is being assigned to, I**
21   **couldn't tell you for sure.**
22   **Here the field length says three. I think juror**
23   **IDs are longer than three digits, but it says three.**
24   **Q. So was your initial thought that this has to do**
25   **with the jury wheel?**

## 27

1    **A. No. I -- I didn't even think that it had to do**
2    **anything with the jury wheel. But now that I see juror**
3    **ID, it must have some juror information in there.**
4    Q. How about VUID?
5    A. That's the voter unique identif- --
6    identification number. That's a ten-digit number.
7    Q. And last name is I assume the last name of the
8    registrant?
9    A. Or whoever record it belongs to, yes, uh-huh.
10   Q. Because it might not be a registrant.
11   A. If it's not a registered voter then, that's
12   right, it would be whoever the jury ID belongs to.
13   Q. Does the database include records as to people
14   who applied for a registration but have not been granted
15   registrations?
16   A. Those that are waiting?
17   Q. Or rejected.
18   A. Or rejected.
19   I couldn't tell. I can't -- I use T.E.A.M., and
20   I don't have a way to call up rejected records, so I don't
21   know.
22   Q. SSN is Social Security number; is that correct?
23   A. Yes.
24   **Q. Now, do you know what percentage of -- of names**
25   **in the database have Social Security numbers?**

## 28

1    **A. I don't. I have no idea.**
2    **Q. Do you know how long Social Security numbers have**
3    **been collected in the database?**
4    **A. I don't know when they started to be required.**
5    **No, I don't know.**
6    Q. Gender code is -- can you explain what that is?
7    A. That's always a -- optional. Male, female or
8    unspecified. But it's optional.
9    Q. And is the information self-reporting or filled
10   out by an official?
11   A. Self-reported.
12   Q. Official ID number. What is that?
13   A. Good question. I don't know what that official
14   ID number is. Different counties used to have their own
15   legacy number but we call that a legacy number. What
16   official ID number is referring to, I don't know.
17   Q. Date of birth is, I assume, date of birth of the
18   person about whom there's information?
19   A. And self-reported, yes.
20   Q. Voter status code, what is that?
21   A. That is a Code A for Active, S for Suspense, C
22   for Canceled. I believe FPCAs have an FPCA code.
23   Q. I'm sorry, you believe that who?
24   A. Yeah. FPCAs, federal postcard applicants --
25   Q. Yeah.

---

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez                                 4/17/2012

---

### 29

1   A.  They have a status of FPCA.  Yeah.  And, of
2   course, it can go to canceled, so...
3       Q.  When -- A -- it would be A for active means what?
4       A.  It means that the last time the voter registrar
5   sent a voter certificate to the address that they've got
6   for the voter, the card did not come back as undelivered
7   or undeliverable.  So the voter registrar has to assume
8   that it reached the voter and, therefore, that the mailing
9   address, whatever they have for the voter, is correct.
10      Q.  And S for suspense, what does that mean?
11      A.  It means that the last time the voter registrar
12  sent a voter certificate to the mailing address they have,
13  it got returned as undeliverable, and a notice of address
14  confirmation is sent to the only address that the voter
15  registrar has.  That notice of address confirmation is
16  eligible to be forwarded by mail, whereas the voter
17  certificate is not supposed to be forwarded by the post
18  office.
19      So once that notice of address confirmation
20  reaches the voter, we are hoping that the voter will
21  respond by giving the voter registrar their new mailing
22  address.  But until that time or until they go vote and
23  give their new address at that time, until that time they
24  remain in suspension for about two federal election
25  cycles.

### 30

1       Q.  And then after two federal election cycles, what
2   happens?
3       A.  If there's been no voting activity on behalf of
4   the voter and the voter has not given the voter registrar
5   their new address, after two federal election cycles, the
6   suspense record is canceled.
7       Q.  So the S becomes a C?
8       A.  Correct.
9       Q.  And canceled includes anyone who is in suspense
10  who did not respond within the -- by two federal election
11  cycles.  Is there anyone else under C?
12      A.  Yes.  Sometimes people request on their own to be
13  canceled.  Sometimes people register in another county
14  and, therefore, the record in their previous county will
15  be automatically canceled.  Sometimes a voter moves
16  outside of the State of Texas and registers in another
17  state.  That state will give us notification, and then
18  their Texas record will be canceled.
19      There can also be reasons for new felonies that
20  the voter reg- -- that the voters don't deny or don't
21  respond to our request for finding out if they really, you
22  know, were charged with a felony.  And if there's no
23  response in those 30 days or if they did get charged with
24  a felony, then they're canceled.
25      Records get canceled due to -- a deceased person,

### 31

1   you know, can get their record canceled.
2       Q.  And -- and are there fields that relate to these
3   cancellations in the T.E.A.M. database, meaning fields
4   relating to felonies, fields relating to deceased?
5       A.  There are reasons that the users should be
6   selecting.  If they select the correct reasons, then, yes,
7   they can track the various reasons that a record -- that
8   records were canceled in their county.  For which the
9   records were canceled in their county, yeah.
10      Q.  Hold on one second.
11      A.  Sure.
12      Q.  Can you explain to me what the FPCA designation
13  does?  And -- and -- or actually, first tell me what the
14  code is for.
15      A.  Federal postcard applications.  We assign a
16  source code of 90 to that.  I don't know --
17      Q.  Ninety?  The number 90?
18      A.  9-0.  I don't know why we assigned it a 90.  I
19  don't know.  But it has a source code of 90.  It gets
20  processed, we fill in the necessary information that we
21  get in the federal -- well, the users will enter that
22  information into the federal postcard application screen.
23  And it will automatically get assigned the source code of
24  90 because it is a federal postcard application, because
25  they use the screen for federal postcard application.

### 32

1       Anything else?
2       Q.  Are you familiar with a code L in the voter
3   status code database?  Voter status code field?
4       A.  L.  I don't know if the background ever has an L.
5   I don't know.
6       Q.  How about a code -- well, Code S -- a Code V as
7   in Victor?
8       A.  No.  No.  Not currently.  There's no code that
9   says V for voter in the status, no.
10      Q.  All right.  Going down this list, the last one
11  here says Spanish surname FG.
12      Can you tell me what that field is?
13      A.  Spanish surname flag.
14      Q.  Okay.
15      A.  There is a box, I guess, that can be check marked
16  when -- when we're requesting public information -- when
17  we're going through the steps for requesting public
18  information report, and one of them says Spanish surname
19  flag.
20      And if they check mark that box, if the user, one
21  of us or the user check marks that box, then whatever
22  information is getting drawn out, if that record's surname
23  happens to fit the criteria from the Census Bureau as
24  being a Spanish surname or Hispanic surname, then it has
25  the flag of S for Spanish surname.

---

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez                                 4/17/2012

## 41

1  represent defendant, Eric Holder, in this litigation.  I'm
2  going to ask you a few additional questions about the
3  T.E.A.M. database.
4      A.  Very well.
5      Q.  First of all, were you -- did you have any
6  involvement in producing the copies or extracts of the
7  T.E.A.M. voter registration database of the United States
8  as part of this lawsuit?
9      A.  No.
10     Q.  And are you aware that before this lawsuit was
11 filed, the State of Texas asked the Department of Justice
12 to preclear its photo ID law through an administrative
13 process under the Voting Rights Act?
14     A.  I was made aware of it, yes.
15         (Sotto voce conversation.)
16     Q.  (BY MS. WESTFALL)  Are you -- so you are aware
17 that there was an administrative process before this
18 lawsuit; is that correct?
19     A.  I don't know what you mean by "administrative
20 process," but I know that the SB14 bill has to go through
21 preclearance.
22     Q.  And did you have any involvement in respon- -- in
23 participating in that administrative process to seek
24 preclearance of Texas' photo ID law?
25     A.  No.

## 42

1      Q.  Ms. Martinez?
2      A.  Yes.
3      Q.  Did -- did you -- did you hear that question?
4      A.  Yes.  I responded that I was not involved in that
5  piece of preclearance and the information gathering.
6      Q.  Thank you.
7         Are there certain counties in Texas -- actually,
8  are there -- strike that.
9         Are there 39 counties in Texas that do not -- are
10 not directly linked with the T.E.A.M. database?
11     A.  Correct.
12     Q.  How do those 39 counties input their information
13 into the T.E.A.M. database?
14     A.  They upload their files on a daily basis to the
15 Secretary of State's office.
16     Q.  Do you know whether there is a database
17 dictionary for the T.E.A.M. database?
18     A.  No.  Not that I'm aware of, no.
19     Q.  Is there a manual for the database?
20     A.  Not that I'm aware of.  A manual, no.
21     Q.  How do you know how to operate the database?
22     A.  I don't operate the database.  I use the T.E.A.M.
23 online interface program.
24     Q.  Who does operate the database?
25     A.  I suppose -- well, I really don't know about the

## 43

1  word "operate," but IT is the only one --
2      Q.  Who maintains the database?
3      A.  Depends on what you mean by "maintain."  The
4  users, the county users that enter voter information keep
5  inputting information into the database that --
6      Q.  Who in your office maintains the T.E.A.M.
7  database, in your perspective?
8              MR. SWEETEN:  Objection; asked and answered.
9  Go ahead.
10     Q.  (BY MS. WESTFALL)  You may answer.
11             MR. SWEETEN:  You can answer, if you know.
12     A.  The only one I can think of is IT.
13     Q.  (BY MS. WESTFALL)  And who is the person in
14 charge of that department?
15     A.  Scott Brandt.
16     Q.  To your knowledge, does he have any manual or
17 instructions on how to -- how to maintain or operate the
18 T.E.A.M. database?
19             MR. SWEETEN:  Objection; asked and answered.
20 You may answer.
21     Q.  (BY MS. WESTFALL)  You may answer.
22     A.  Not that I know of.
23     Q.  If the Secretary of State wanted to change a
24 field name in the T.E.A.M. database, who would implement
25 that change?

## 44

1      A.  The request would be made by the elections
2  division, the -- it would be carried out by the IT
3  department.
4      Q.  And how is information gathered and put into the
5  database from voters?
6      A.  The voters fill out the voter application.  The
7  online users use the T.E.A.M. online information to enter
8  in that information.  The off-line counties enter it into
9  whatever platform they use in their counties.  They create
10 the file that then gets uploaded to Secretary of State's
11 office.
12     Q.  And -- and your role, again, is to interface
13 with -- with the users which are counties; is that
14 correct?
15     A.  Correct.
16     Q.  Okay.  Turning your attention back to an exhibit
17 that's previously been marked Intervenor No. 5.
18     A.  Yes.
19     Q.  It's entitled "Voter Record Layout."  Could you
20 refer -- refer to that exhibit, please.
21     A.  I've got it in front of me.
22     Q.  I believe you testified earlier that you weren't
23 quite certain of what the first field on the left meant,
24 "voter county ID"; is that correct?
25     A.  Correct.

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Gloria Martinez                                           4/17/2012

## 45

1    Q.  Directing your attention all the way over to the
2  right of that field, do you see where it says "Internal
3  database key" under "Comments"?
4    A.  Correct.
5    Q.  Does that refresh your recollection at all of
6  what this field means?
7    A.  I could answer better if I had the actual
8  information that it's referring to.  The only thing I know
9  is that the voter county ID number is three digits long.
10  But here the field length is ten.  I don't know why, then.
11  I don't know.
12    Q.  Well, if I represent to you that the database
13  that the United States has received from your office has
14  voter county ID that generally has the field length of
15  seven or eight numbers, does that refresh your
16  recollection?
17    A.  No.  No.
18    Q.  Would it refresh your recollection if I told you
19  that the first digit is always one?
20    A.  No, not at all.  I have no clue.
21    Q.  Do you know who in your office would be able to
22  tell us what this field name refers to?
23    A.  The personal that created it.  Someone in IT.
24    Q.  Who do you think created this document?
25    A.  I think that it's from your first -- from the

## 46

1  first information that was gathered and given to y'all for
2  preclearance.  And as far as I know, it was only the
3  people in IT that were asked to gather the information.
4    Q.  Okay.  Well, turning your attention again to
5  Exhibit No. 5, do you see on the upper right-hand side
6  there is a date of 3/28/2012?
7    A.  Yes.
8    Q.  Does that cause you to any other conclusion
9  about when this document was generated and the office that
10  generated it?
11      MR. SWEETEN:  Objection; calls for
12  speculation.
13    Q.  (BY MS. WESTFALL)  You may answer.
14    A.  Yes, I don't know what it would have been created
15  for.
16    Q.  But does it make you reconsider your conclusion
17  that this was created during a preclearance period, given
18  the date on this document?
19      MR. SWEETEN:  Objection; asked and answered.
20  Objection; calls for speculation.
21    Q.  (BY MS. WESTFALL)  You may answer.
22    A.  Was I wrong in thinking that --
23      MR. SWEETEN:  Just answer her question.
24  She's asked you her question.  If you can answer it...
25    A.  I don't know what this document was created for.

## 47

1    Q.  (BY MS. WESTFALL)  Okay.  Thank you.
2      So do you see under the column entitled "Field
3  Name," it says "Juror ID"?
4    A.  Yes.
5    Q.  Could you testify -- or could you tell me,
6  please, what that field indicates?
7    A.  I can tell you what it appears to be, to me.
8    Q.  Okay.  Please do so.
9    A.  It appears to be juror ID.  Could it be
10  jurisdiction ID?  Yes.  I don't know what that field name
11  really means.  I wasn't the one that created the file, so
12  I don't know what --
13    Q.  I'm going to turn your attention again to the
14  left-hand side, you know, corresponding to juror ID where
15  it says "County Number."  Do you see that?
16    A.  Tell me again, on the line where juror ID is?
17    Q.  Right.  If you just follow it all the way over to
18  the right under "Comments," do you see it says "County
19  Number."
20    A.  County number.
21    Q.  I'm sorry.  Did you say yes?
22    A.  Yes, I see where it says "County Number."
23    Q.  Does that refresh your recollection as to what
24  this field is?
25    A.  I can only guess at it.

## 48

1    Q.  And what -- what is your guess?
2    A.  That it does not mean juror ID but, rather,
3  jurisdiction ID.
4    Q.  Okay.  And who do you think would know for sure
5  what this field name means?
6    A.  Whoever created the document.
7    Q.  Okay.  And then underneath, it says "VUID."
8  Is that correct?
9    A.  Yes.
10    Q.  And could you tell me what that field means?
11    A.  It stands for voter unique identification.
12    Q.  How is that number assigned?
13    A.  How is that number signed?
14    Q.  Assigned.
15    A.  Assigned.  The T.E.A.M. program automatically
16  assigns voter unique identification number, ten-digit
17  number, to each record that it processes.
18    Q.  And that is assigned at the state level in the
19  state T.E.A.M. database and not at the county level; is
20  that correct?
21    A.  That is correct.
22    Q.  Okay.  Then going down the list down to official
23  ID number.  I believe that you earlier testified that you
24  didn't know what that field means; is that correct?
25    A.  That is correct.

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Gloria Martinez                                    4/17/2012

## 49

1    Q. If I told you that in the document in the
2  database that we received that field length is usually
3  eight numbers, would that refresh your recollection in any
4  way?
5    A. I can guess as to what that means.
6    Q. Tell me what you think it means.
7    A. I think it stands for the legacy number or the
8  old voter number that used to be assigned by each
9  individual county to a voter.
10   Q. I see. And do counties still assign an
11 individual number to a voter today?
12   A. Some do.
13   Q. And by "legacy," do you mean the county numbers
14 before there was a T.E.A.M. statewide voter registration
15 database?
16   A. That is correct.
17   Q. When did the database come into existence?
18   A. January of 2007.
19   Q. I'm sorry. The statewide did?
20   A. When we started to implement the T.E.A.M. program
21 is January 2007.
22   Q. Did you not have -- did Texas not have a
23 statewide voter registration database prior to
24 January 2007?
25   A. They did have one. It just wasn't through

## 50

1  T.E.A.M.
2    Q. I see. What was that database called?
3    A. I -- hum. I don't know if they named the
4  databases something different. The program that the voter
5  registrars used was different. I know the initials to
6  that.
7    Q. So turning back to the -- the official ID number,
8  are those numbers not unique because the counties
9  individually create them?
10   A. That was the reason for creating the VUID number,
11 correct, because -- because there could be duplication of
12 numbers from one county to the next.
13   Q. And are the official ID numbers, those were
14 numbers that might have been in use even before there was
15 a statewide voter registration database T.E.A.M. -- called
16 T.E.A.M. or a different database; is that correct?
17   A. Could they have been? It's possible. I don't
18 know.
19   Q. And under that field "Voter Status Code," the
20 database that's been produced to the United States, I'll
21 represent to you, includes a code of Z.
22   A. Okay.
23   Q. Do you know what that would stand for?
24   A. I'd -- I'd have to look back in my notes. If
25 you've got that information, then...

## 51

1    I'd have to go back to my office and find out,
2  but...
3    Q. Would there be documents that you could look at
4  to determine what that code means in your office?
5    A. I could compare it to other public information
6  requests that were given, and I could make that
7  determination then.
8    Q. If I told you that the majority of records have a
9  voter status code of V, does that change your answer in
10 any way?
11   A. I'd -- I'd still be guessing as to what the V
12 meant.
13   Q. Okay. Turning your attention to the Spanish
14 surname field about which you testified to earlier.
15   A. Yes.
16   Q. Could you tell me how -- could you describe again
17 how that field works?
18   A. To the best of my knowledge, the surname that a
19 voter record has is compared against the list of surnames
20 that the Census Bureau -- I don't know what year -- that
21 the Census Bureau has declared as being a Hispanic surname
22 or a Spanish surname. And if it matches that list, then
23 it is coded as yes, as being a Spanish surname.
24   Q. I see. And is this sort of matching process and
25 identification of Spanish surname voters done at the

## 52

1  Secretary of State's level rather than the county?
2    A. Correct.
3    Q. And this is not in any way -- it does not in any
4  way relate to anything a voter puts on a voter
5  registration application; is that correct?
6    A. Aside from just self-reporting their surname,
7  correct.
8    Q. Thank you.
9    And who in your office would be the one who would
10 have the most knowledge about the Spanish surname field?
11   A. IT.
12   Q. And who in IT? Is there a particular individual?
13   A. I'd have to say that Scott Brandt would be best
14 to direct you to that particular person.
15   Q. Have you seen any manuals or publications that
16 describe this matching process or describe the Spanish
17 surname database?
18   A. I have not.
19   Q. Okay. One moment.
20   A. Uh-huh.
21   Q. How do you know that the Spanish surname list
22 comes from the census?
23   A. I believe it's anecdotal information. This is
24 the information that I was given by my supervisor in the
25 past. It was just in talking. That's all.

State of Texas v. Eric H. Holder, Jr., et al.                    1:11-CV-00128
Germaine Mary Martinez                                          4/17/2012



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                     )
                                    )
     Plaintiff,                     )
                                    )
VS.                                 )
                                    ) CASE NO:  1:11-CV-00128
ERIC H. HOLDER, JR., IN             ) RMC-DST-RLW
HIS OFFICIAL CAPACITY AS            )
ATTORNEY GENERAL OF THE             )
UNITED STATES,                      )
                                    )
     Defendant,                     )
                                    )
ERIC KENNIE, ET AL.,                )
                                    )
     Defendant-Intervenors,         )
                                    )
TEXAS STATE CONFERENCE OF           )
NAACP BRANCHES, ET AL.,             )
                                    )
     Defendant-Intervenors,         )
                                    )
TEXAS LEAGUE OF YOUNG               )
VOTERS EDUCATION FUND, ET           )
AL.,                                )
                                    )
     Defendant-Intervenors,         )
                                    )
TEXAS LEGISLATIVE BLACK             )
CAUCUS, ET AL.,                     )
                                    )
     Defendant-Intervenors,         )
                                    )
VICTORIA RODRIGUEZ, ET              )
AL.,                                )
                                    )
     Defendant-Intervenors.         )

**2**

1    ***************************************************
2             ORAL DEPOSITION OF
3            GERMAINE MARY MARTINEZ
4                APRIL 17, 2012
5    ***************************************************
6        ORAL DEPOSITION OF GERMAINE MARY MARTINEZ, produced
7    as a witness at the instance of the Defendant Intervenors
8    Texas State Conference of NAACP Branches and the Mexican
9    American Legislative Caucus of the Texas House of
10   Representatives, and duly sworn, was taken in the
11   above-styled and numbered cause on Tuesday, April 17,
12   2012, from 9:29 a.m. to 11:14 a.m., via telephone, before
13   Tamara K. Chapman, CSR in and for the State of Texas,
14   reported by machine shorthand, at the State House, 209
15   West 14th Street, Ground Floor, Austin, Texas, pursuant to
16   the Federal Rules of Civil Procedure and the provisions
17   stated on the record or attached hereto.
18
19
20
21
22
23
24
25

**3**

1
2                A P P E A R A N C E S
3    FOR THE PLAINTIFF STATE OF TEXAS:
         Mr. Patrick Sweeten
4        Mr. Reynolds Brissenden
         ATTORNEY GENERAL OF TEXAS
5        Civil Medicaid Fraud Division
         300 W. 15th Street
6        Austin, Texas
         patrick.sweeten@oag.state.tx.us
7        reynolds.brissenden@oag.state.tx.us
8
9    FOR TEXAS NAACP STATE CONFERENCE AND THE MEXICAN AMERICAN
     LEGISLATIVE CAUCUS:
10       Ms. Myrna Pérez (telephonically)
         BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
11       161 Avenue of the Americas, 12th Floor
         New York, New York  10013
12       myrna.perez@nyu.edu
13
14   FOR THE DEFENDANT ERIC H. HOLDER, JR., IN HIS OFFICIAL
     CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES:
15       Ms. Elizabeth S. Westfall (telephonically)
         Mr. Daniel J. Freeman (telephonically)
16       U.S. DEPARTMENT OF JUSTICE
         Voting Section, Civil Rights Division
17       950 Pennsylvania Ave. NW, NWB Room 7202
         Washington, DC 20530
18       elizabeth.westfall@usdoj.gov
         daniel.freeman@usdoj.gov
19
20
21   FOR DEFENDANT INTERVENORS TEXAS STATE CONFERENCE OF NAACP
     BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE CAUCUS OF
     THE TEXAS HOUSE OF REPRESENTATIVES:
22       Mr. Ezra D. Rosenberg (telephonically)
         DECHERT, LLP
23       902 Carnegie Center, Suite 500
         Princeton, New Jersey  08540-6531
24       ezra.rosenberg@dechert.com
25

**4**

1    FOR DEFENDANT INTERVENORS TEXAS STATE CONFERENCE OF NAACP
     BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE CAUCUS OF
2    THE TEXAS HOUSE OF REPRESENTATIVES (CONTINUED):
         Ms. Lindsey Stelcen
3        DECHERT, LLP
         300 West 6th Street, Suite 2010
4        Austin, Texas  78701
         lindsey.stelcen@dechert.com
5
6
         Mr. Robert Kengle (telephonically)
7        Mr. Mark Posner (telephonically)
         LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER THE LAW
8        1401 New York Avenue, N.W., Suite 400
         Washington, D.C.  20005
9        bkengle@lawyerscommittee.org
         mposner@lawyerscommittee.org
10
11
12   FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND:
         Mr. Gregory K. Johnson (telephonically)
13       FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
         801 17th Street NW,
14       Washington, DC 20006
         gregory.johnson@friedfrank.com
15
16   FOR THE DEPARTMENT OF PUBLIC SAFETY:
         Kathleen T. Murphy
17       TEXAS DEPARTMENT OF PUBLIC SAFETY
         Office of General Counsel
18       5805 N. Lamar Boulevard
         Austin, Texas  78773
19       kathleen.murphy@txdps.state.tx.us
20
21   FOR VICTOR RODRIGUEZ, NICOLE RODRIGUEZ, SOUTHWEST VOTER
     REGISTRATION EDUCATION PROJECT, MI FAMILIA VOTA EDUCATION
22   FUND:
         Ms. Nina Perales
23       MALDEF
         110 Broadway, Suite 300
24       San Antonio, Texas  78205
         nperales@maldef.org
25

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Germaine Mary Martinez                            4/17/2012

---

## 37

1  Alien Registration Number.  Is that also dealing with the
2  hazardous material endorsement or is that something else?
3       A.  It actually deals with the hazardous material
4  endorsement as well as if the individual presents the
5  document to us for proof of their lawful presence or proof
6  of their identity, that alien registration number is also
7  inputted into the system.
8       Q.  And, again, you would agree that that Field
9  No. 256 also relates to citizenship?
10      A.  I don't know that I would agree to that, but...
11      Q.  Well, do you have an understanding of what "alien
12  registration number" means?
13      A.  Yes, sir.
14      Q.  And what's that?
15      A.  It's the registration number that INS, or DHS
16  now, provides to an individual that has been lawfully
17  present in the U.S.
18      Q.  And would that relate to the issue of whether or
19  not that individual is a citizen or not?
20          MR. SWEETEN:  Objection to the question.
21  It's vague.  Asked and answered.  It's also outside the
22  scope.
23      Q.  (BY MR. ROSENBERG)  You may answer as your
24  attorney has not directed you not to answer.
25      A.  I could see your point.  I understand your point

## 38

1  that it could relate to the citizenship.
2       Q.  And, again, if that information is there as an
3  applicant who in another part of the system has an
4  indication of -- a different indication as to citizenship,
5  is there anything in this system that tries to reconcile
6  those two pieces of information?
7           MR. SWEETEN:  Again, asked and answered.
8  You can go ahead and answer if you --
9           MR. ROSENBERG:  Actually, I have not asked
10  that question.
11      A.  No, there is no -- no, there is no reconciliation
12  between the two.
13      Q.  (BY MR. ROSENBERG)  And turning to Field No. 265
14  which says:  INS Eligible.
15          And the description is:  Whether or not the
16  applicant meets the eligibility requirements for
17  immigration status.
18          First, do you agree that that field relates
19  to citizenship?
20          MR. SWEETEN:  Objection to the form.  You're
21  asking her if she thinks that "INS eligible" means the
22  same as "INS citizenship"?  How is that anywhere within
23  the scope of the topic?  She's here to talk about a
24  database.  She's here to talk about what's in it.  And
25  you're asking her to interpret how something is similar.

## 39

1  That's your argument to make if you want to make it, but
2  not through this witness.  So I'm going to object to that,
3  argumentative and it's outside the scope of this topic.
4           MR. ROSENBERG:  I'm asking her for her
5  understanding of the description here which says:  Whether
6  or not the applicant meets the eligibility requirements
7  for immigration status.
8       Q.  (BY MR. ROSENBERG)  That's my question.
9           MR. SWEETEN:  You can answer if you have an
10  answer to that question.
11      A.  I'm sorry.  Can you repeat it one more time.
12          MR. SWEETEN:  We could have the court
13  reporter read it back.
14          (Discussion off the record.)
15      Q.  (BY MR. ROSENBERG)  Field No. 265 where it says,
16  "Whether or not the applicant meets the eligibility
17  requirements for immigration status," can you explain to
18  me what your understanding of that field is?
19          MR. SWEETEN:  Same objection.
20      A.  Again, it's based on the hazardous application
21  that the individual is applying for their hazardous
22  material endorsement.
23      Q.  (BY MR. ROSENBERG)  And looking at Field No. 642,
24  which is on Page 138 which is entitled:  U.S. Citizen Born
25  Abroad.

## 40

1           Do you have an understanding of what the
2  purpose of that field is?
3       A.  Other than the fact that it's dealing with their
4  hazardous material endorsement and the federal government
5  requires that on there, no.  I mean, that's -- it's part
6  of that application.
7           MR. ROSENBERG:  Lindsey, could you have
8  marked, and actually I think, Patrick, or, Reynolds, you
9  have --
10          MS. STELCEN:  Is it your e-mail from this
11  morning?
12          MR. ROSENBERG:  Yeah.
13          (Intervenor Exhibit 4 was marked.)
14          MS. STELCEN:  This will be marked as
15  Exhibit 4.
16          THE WITNESS:  Okay.
17      Q.  (BY MR. ROSENBERG)  Before you take a look at
18  that, one last question in the area we were just
19  discussing.  Field No. 26 dealing with citizenship, is
20  that information asked of every applicant whether they're
21  applying for a driver's license or hazardous material or
22  occupational license or anything?
23      A.  Yes, sir.
24      Q.  Okay.  I'd like to show you a document that we
25  went over this morning that's now Exhibit 4, am I correct?

---

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Germaine Mary Martinez                                    4/17/2012

---

45

1      A.  Okay.  My definition of valid would be one that
2  is not expired and is not suspended, canceled, revoked,
3  denied or taken away for some reason.  So those, by that
4  definition, we would have a card status that would tell us
5  whether or not the license, what the status is based on --
6  for the expiration date.  We have a record status that
7  would tell us whether or not the person was eligible or
8  suspended for some reason.  And we also could look at
9  administrative statuses and card -- another type of card
10 status that would tell us if there is something else going
11 on with that record.
12     Q.  So, for example, turning your attention to Field
13 No. 37.
14     A.  Yes, sir.
15     Q.  Which is Surrendered.  Would that be an
16 indication of whether or not that person holds a valid
17 license?
18     A.  No, sir, not necessarily.  No.
19     Q.  What does that field describe, then?
20     A.  That's the field when an individual comes in and
21 surrenders their license to us from another state, we
22 input that state information and that card number into
23 that field.  It's maintained on the database so it's not
24 an indication that something didn't happen after that.
25     Q.  Thank you.

---

46

1          How about Field No. 113 through 123, do those
2  relate to whether or not a person has a valid license?
3      A.  113 through 115?
4      Q.  Through 123.
5      A.  Through 123.
6          They do, but there is -- the easier way of doing
7  that is to look at the actual card status that says
8  whether or not he's eligible or not eligible.
9      Q.  And where would we find that?
10     A.  I'd have to look through the data dictionary.  I
11 don't know the number off the top of my head.
12     Q.  Let me just try one off the top of my head.  340?
13     A.  Yes, that's the -- I'm sorry.  I was saying card
14 status.  It's a License Status.
15     Q.  And that -- is that the field that you think
16 would be the field that would best provide information as
17 to whether a person has a valid license?
18     A.  That's one of the fields, yes, sir.
19     Q.  Okay.  And I think you also mentioned that there
20 was something called a record status?
21     A.  This is what I was referring to as the record
22 status is the License Status.  And then there is the
23 actual -- it may actually be called an issuance status.
24     Q.  306.  Would you look at that, please?
25     A.  Yes, sir.  That's what I was referring to as far

---

47

1  as if he's expired or if he's active.
2      Q.  Now, Field 135 which says License Confiscated,
3  with a question mark.  Is that data also captured within
4  fields 306 and 340?  Or is that separate data?
5      A.  No, that's separate data.
6      Q.  And if a person's license is confiscated, would
7  you then consider that person not to have a valid license?
8      A.  Not until the enforcement action was taken effect
9  on him.  The confiscation is dealing with your
10 administrative license revocation, your ALR.  And so it's
11 just an indicator for that particular enforcement action.
12     Q.  And similarly on page -- next page, License
13 Surrendered, 143, is this the same sort of surrender as
14 you talked about before or is this a different sort of
15 surrender?
16     A.  This should be a different sort of surrender
17 based on if the individual chooses to give up his ID card
18 or his driver's license for some reason.
19     Q.  And if a person gives up his ID card or his
20 driver's license, do you consider that person to be
21 holding a valid license?
22     A.  No, sir.
23     Q.  And Field No. 171, which is Enforcement Action
24 Type, does that field relate to field -- either of the
25 status fields you talked about earlier?

---

48

1      A.  It's a little more complicated than that because
2  you're dealing with multiple information.  This is just
3  one of the fields in the enforcement action that tells you
4  what type of action we're taking.  Depending on the dates
5  of that action and where it is in the process would
6  determine the license status of not eligible or eligible.
7      Q.  So the information there would be captured under
8  License Status in a summary form?
9      A.  No.  The information here is just based on that
10 particular enforcement action and where it falls under the
11 statute.  If it's under a revocation or a
12 disqualification.  Based on the dates of that enforcement
13 action when it began and what the current date is, when it
14 ends, what the status is of that enforcement action going
15 through the process would then determine what the record
16 status, the license status is of the entire license.
17     Q.  And that would get into Field 340, then?
18     A.  Let me look at 340.  Yes, sir.
19     Q.  And by the way, going back to -- maybe we can use
20 340 as an example.  Yeah.
21         340 has five values, correct?
22     A.  Yes, sir.
23     Q.  And are values entered in that field for
24 everyone?
25     A.  Yes, sir.

---

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Germaine Mary Martinez                          4/17/2012

---

### 49

1  Q.  Whenever we have fields that have more than one
2  values, is it the practice of DLS to always enter a value
3  in that field as opposed to leaving some of the fields
4  blank?
5  A.  Yes, sir.  It's a hierarchy.
6  Q.  Meaning -- I'm not sure I understand your answer.
7  When you say it's a hierarchy, what do you mean?
8  A.  That if we find that the person's reported
9  deceased, that takes precedence over any other status.  So
10  we have the statuses listed in a hierarchy to tell us
11  which one takes precedence over the other one.
12  Q.  What is the hierarchy?
13  A.  This is, again, without any notes or
14  documentation that I have, but I believe that Reported
15  Deceased is first as far as that's the -- going, I guess,
16  from top to bottom in my way of thinking -- is Reported
17  Deceased, Not Eligible.  And these two have actually been
18  combined, the two -- the NOT and the NEN.  The NEN is no
19  longer there.  It's just a Not Eligible.  Then there is
20  Not Eligible CDL, Eligible Non-CDL, and then there is
21  Licensed.
22  Q.  And going back to Field 23 dealing with Race, if
23  nothing is filled out in Race, does -- is that just left
24  blank in the database or is a field always filled in?
25  MR. SWEETEN:  Ezra, what number did you say?

---

### 50

1  I didn't hear.
2  MR. ROSENBERG:  23.
3  MR. SWEETEN:  23.  Okay.  We're back to 23.
4  MR. ROSENBERG:  Yeah.
5  MR. SWEETEN:  Go ahead.  You can answer.
6  A.  If we're doing an actual issuance of a license or
7  identification card and it's a required field, we do have
8  what we call on-license records in the system, and they
9  are established based on the fact that a person -- that a
10  court convicts somebody of something and we don't have a
11  record of them on the system, so many times we don't know
12  what their race was.
13  Q.  (BY MR. ROSENBERG)  But in terms of Field 23, my
14  question is, is that field ever left blank?
15  A.  For a driver's license or identification card,
16  no.
17  Q.  And but for what other -- in what other
18  circumstances would that field be left blank?
19  A.  It could be left blank if we establish an
20  on-license record where we don't know what the
21  individual's race is.
22  Q.  Can you give me an example of an on-license
23  record?
24  A.  An individual that has never applied for and
25  obtained a driver's license or identification card in

---

### 51

1  Texas obtains a DWI conviction in Texas.  The court
2  reports that to us and we establish an on-license record
3  so we can take suspension action to withdraw his driving
4  privileges in Texas.
5  Q.  Just so I understand this, the DLS database will
6  include people who are not applicants for a license under
7  a certain circumstances?
8  A.  Yes, sir.
9  Q.  And one example is an out-of-state driver who
10  gets stopped for some sort of infraction such as DWI?
11  A.  Yes, sir.
12  Q.  Are there other examples where people who are not
13  applicants for licenses are in the database?
14  A.  The only other example that we have is we have
15  what's called a parent-taught application where parents
16  apply for a parent-taught package and a record is
17  established in the system for that child at that time to
18  show that we mailed the parent-taught information to them.
19  Q.  And getting back to the example of an
20  out-of-state driver -- or I should say getting back to the
21  example of somebody who has an out-of-state license who is
22  stopped for a DWI, what -- if I wanted to identify who
23  those people were, is there a field that I would look at?
24  A.  We determine -- the basic way we determine is
25  that we don't have a driver's license or an ID card

---

### 52

1  assigned to that individual.
2  Q.  Right.  But that person is still in the system?
3  A.  Yes.
4  Q.  But not with a driver's license or an ID card,
5  but there might be people like that who are Texas
6  citizens?
7  A.  Sure.
8  Q.  So, again, if I wanted to identify them, is there
9  a way of identifying them in the system?
10  A.  No, we don't distinguish why we establish the
11  on-license record.
12  Q.  If I wanted to pull up Texas citizens who are in
13  the system but who don't have a driver's license, could
14  that be done?
15  A.  No, sir.
16  Q.  Give me a second, please.
17  Ms. Martinez, getting back to the various
18  statuses and just so I have it straight.  Record Status, I
19  think you testified, is the same as License Status.  Which
20  field is card status?
21  A.  So -- let me go back and look.  Hold on.
22  Q.  Sure.
23  (Witness reviews document.)
24  Q.  (BY MR. ROSENBERG)  Just to help speed things up,
25  is there -- Issuance Status and Card Status, are they the

---

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Germaine Mary Martinez                          4/17/2012

## 53

1  same thing?
2      A.  No.  The two statuses that I was referring to was
3  the issuance status where it's showing he's eligible or
4  licensed and then status dealing with whether he's expired
5  or not expired.  And occasionally I get the terms mixed up
6  as far as what they're called.  So those are the two
7  fields that I was referring to.
8      Q.  And one of them was 340, which is the eligibility
9  status, right?
10     A.  The License Status, yes.
11     Q.  And which -- the other is expired or not expired,
12  which is the card status and where would we find that?
13     A.  That was actually the DL Issuance Status, 306.
14     Q.  Okay.  And I think you also discussed or
15  mentioned something called administrative status.  Is that
16  different from card status?
17     A.  Yes.  The administrative status is different than
18  that.
19     Q.  What is that and where can we find that?
20     A.  I don't know what the number is in here.  But an
21  administrative status deals with certain actions that we
22  may take against the individual just based on
23  administrative functions.
24     Q.  And can you give me an example?
25     A.  For example -- and let me find the field before

## 54

1  I --
2      Q.  Sure.
3      A.  -- say something that's not right.
4          (Witness reviews document.)
5      Q.  (BY MR. ROSENBERG)  If it will speed things up,
6  because we're going to be taking a break around ten
7  minutes or so and you'd rather look at it over the break,
8  that would be fine.
9      A.  Okay.
10     Q.  Let me ask about another status which is in 374,
11  Permit Status.  Can you explain what that is?
12     A.  You said it was 74?
13     Q.  374.
14     A.  374.
15         This is dealing with information that we may
16  obtain from another state through the PDPS system or
17  through the commercial driver's license information
18  system.  Many states maintain separate records for their
19  permits, especially for commercial drivers, and these
20  would be the statuses of those permits.  We don't maintain
21  that on our system.
22     Q.  Field 249, which is Deceased Certificate Number.
23     A.  Okay.
24     Q.  Does that relate to -- field relate at all to the
25  RPD in the License Status field, 340?

## 55

1      A.  It does in the way that when we receive that
2  information, we will change the status of the individual's
3  license to reported deceased.
4      Q.  I also want to clarify something we discussed a
5  few moments ago.  If there was a Texan who was unlicensed
6  and gets stopped for a DWI, that person is entered into
7  the system as unlicensed?
8      A.  Yes, sir.
9      Q.  But, again, if I wanted to find out -- if I
10  wanted to pull those people from your system, is there a
11  way that we could pull those people?
12     A.  We don't make any distinguish if the individual's
13  a Texan or not.  So, no, you cannot pull that to know that
14  they are just Texans.
15     Q.  But if I wanted to pull all unlicensed DWI people
16  from your system, could I do that?
17     A.  Yes, sir.
18     Q.  And how would I do that?
19     A.  It would be a query, a SQL query against the
20  database to pull those particular records.
21     Q.  What kind of query?
22     A.  It's a SQL query.
23     Q.  Oh, SQL query.  Okay.
24         I'd like you to take a look, if you would, at
25  Field No. 32.

## 56

1      A.  Yes, sir.
2      Q.  And could you tell me what that field is?
3      A.  It's the Homebound field.  It's an indicator that
4  we place on a record when we are issuing a homebound
5  identification card.  It's used so that our image capture
6  system knows that we don't have fingerprints for that
7  individual since they're homebound.
8      Q.  And how is the determination is made whether the
9  person is homebound?
10     A.  When we actually have to go to their home in
11  order to do the issuance transaction form.
12     Q.  And is the information in the system as to
13  whether a person is homebound updated?
14     A.  It would be updated the next time they're issued,
15  yes.
16     Q.  Is it updated in both directions if the person is
17  in the system as homebound and then is determined not to
18  be homebound or if the person in the system is not
19  homebound and is later determined to be homebound, does
20  the data turned both directions?
21     A.  Only when we actually go to their house would it
22  be updated that they're homebound.  And then only when
23  they actually applied for a license in the office would it
24  be changed back to not homebound.
25     Q.  I'd like to take a look at 264, please.  And can

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Germaine Mary Martinez                              4/17/2012

---

### 61

1    A. Only when they return to be issued.

2    Q. And otherwise, it would not be updated?

3    A. Correct.

4    Q. And how does DPS collect citizenship information

5    from people who did not provide their citizenship when

6    they provided their license, when they obtained their

7    license?

8    A. We require documentation of their citizenship,

9    such as a -- a U.S. birth certificate or a U.S. passport.

10   Q. At what time?

11   A. When they come back into the office and apply for

12   a new license or ID card.

13   Q. Does the renewal form ask the question -- the

14   citizenship question?

15   A. Yes, it does.

16   Q. We talked about No. 265, Field No. 265. Could

17   you take a look at that for a second?

18   A. Okay. I'm there.

19   Q. How does the DPS determine whether the applicant

20   is eligible for an INS status?

21   A. It says this is --

22        MR. SWEETEN: Hold on a minute. How does

23   the DPS determine whether someone is -- I'm sorry?

24        MR. ROSENBERG: Has met the eligibility

25   requirements for immigration status as set forth in the

---

### 62

1    description.

2         MR. SWEETEN: Are you asking how the data --

3    what's in the database? Are you asking how these

4    determinations are made amongst individuals filling out

5    information? I think once again -- you know, I'm going to

6    go ahead, Ezra, and I'm going to interpose an objection.

7    What we're doing here -- what you're doing here is you're

8    asking her questions about -- you were -- you were going

9    into the area of DPS policy. She is here to talk about

10   the DLS database. That's what she's here for. That's

11   what these topics cover. It also -- I understand it talks

12   about the information in the database. We're not here to

13   talk about DPS policy or things that are extraneous to

14   that.

15        MR. ROSENBERG: No, I'm not. I'm talking

16   about how the information is gathered. And specifically

17   all I'm asking is how the determination is made to have a

18   yes or a no value assigned to Field 265.

19        MR. SWEETEN: Okay. As phrased, you can go

20   ahead and answer the question if you know the answer to

21   it.

22   A. This -- this particular field is dealing with the

23   hazardous material endorsement. So, again, it's a

24   self-reported field. We leave it up to TSA to verify that

25   information.

---

### 63

1    Q. (BY MR. ROSENBERG) I'm sorry. I didn't hear the

2    end of that answer.

3    A. It's up to TSA what they do with the information

4    on the hazmat application.

5    Q. And going back to the issue of when Hispanic was

6    added to the database. If a person was initially entered

7    into the database who is Hispanic but was not assigned a

8    Hispanic value because it wasn't there, how is that

9    individual identified as Hispanic subsequently after the

10   field was added, the value was added?

11   A. Whenever they get issued again, if at that point

12   they wish to change their designation, it can be

13   changed during the issuance process.

14   Q. Does the renewal form ask for that information?

15   A. No.

16   Q. Turning back to field No. 340.

17   A. Okay. I'm there.

18   Q. Going through each of those values, can you

19   explain what each of those values means? "LIC, licensed"?

20   A. "LIC, licensed" means that they actually have a

21   license that is valid.

22        The term "eligible" means that they're eligible

23   to obtain one.

24        The -- the "not eligible due to ACD" and the

25   "NEN, not eligible due to non-ACD" is actually one status

---

### 64

1    now of not, which means you're not eligible to -- to

2    obtain any type of license.

3         And then, of course, the "reported deceased" is

4    reported deceased.

5    Q. I'm sorry. The difference between "NOT" and

6    "NEN," I'm not sure if I understood the difference.

7    A. So to verify -- to clarify, I mean, that these

8    statuses are the statuses that are used -- that are listed

9    here are the ones it used in our transmissions between

10   Texas and other states through the AMVA interfaces that we

11   have. AMVA no longer has the NEN, N-E-N, status. They

12   did away with it.

13   Q. Okay. We talked before the break about the

14   homebound field. Could you tell me who determines what

15   the value is that's placed in the homebound field? And by

16   that, I mean, is it self-referencing?

17   A. It's determined by the examiner that goes to the

18   home to issue the documents, the license or identification

19   card, to the homebound individual. So when --

20   Q. So the individual would typically inform DPS that

21   he or she is homebound?

22   A. Yes. They -- they contact and schedule an

23   appointment for one of our employees to go to their home.

24   Q. And are there standards that apply as to the

25   determination of whether someone is listed as homebound?

---

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424

State of Texas v. Eric H. Holder, Jr., et al.    1:11-CV-00128
Germaine Mary Martinez                           4/17/2012

## 73

1  record.
2      Q.  So, in other words, the person ID number could
3  refer to -- could be linked to a person who has a driver's
4  license and other forms of ID that are maintained in the
5  driver's license database; is that correct?
6      A.  Yes, ma'am.
7      Q.  And underneath "DL Number," there is "Address
8  Line No. 1," is there not?
9      A.  Yes.
10     Q.  And what does that field represent?
11     A.  It's a field that we can populate in their
12  address.
13     Q.  Is that a mailing address or a home address?
14     A.  It's not specified here, so I don't know which
15  field it was referencing.
16     Q.  If the field that is in the possession of the
17  United States lists Address Line 1, how you would we know
18  what address that referred to?
19     A.  We'd have to determine who did the -- asked for
20  the information and what -- and information they asked
21  for.
22     Q.  So I believe you testified earlier that you
23  provided certain information or extracts and answered
24  certain -- certain questions posed by you and your
25  supervisor, Mr. Gomez; is that correct?

## 74

1      A.  Yes.
2      Q.  Would he be the one who would know what these
3  fields mean?
4      A.  I can't answer to what he would know.  I -- I
5  don't know.
6      Q.  Turning your attention to "Address Line 2" below,
7  do you know what that field refers to?
8      A.  It's a continuation of the Address Line 1.  If
9  individual has an address that is longer than allowed in
10  Address Line 1, it can be continued in address Line 2.
11     Q.  And this, likewise, continues for fields "City"
12  and "State" and "ZIP code"; is that correct?
13     A.  That's correct.
14     Q.  That would all be linked to the same address; is
15  that right?
16     A.  Yes.
17     Q.  And do you see "County Code" underneath "ZIP
18  Code"?
19     A.  Yes.
20     Q.  What does that refer to?
21     A.  It's the code that's been assigned to the county
22  and the State of Texas.
23     Q.  Do you know whether a list of county codes has
24  been produced to the United States?
25     A.  I do not know if it's been produced to the United

## 75

1  States, no.
2      Q.  Do you know who would know?
3      A.  No, I don't know.
4      Q.  And do you see underneath "County Code" it lists
5  "Country"?
6      A.  Yes, ma'am.
7      Q.  And what does that refer to?
8      A.  That would be the country of where the
9  individual -- well, to be honest with you, I don't know
10 which country field that they picked up, because we --
11     Q.  Wouldn't this only include people from the U.S.?
12     A.  I don't know what the parameters were for the
13 query.
14     Q.  One moment.  I'm just looking at my notes.
15         So based on this list, if you look at
16 U.S. Exhibit No. 1, would -- would an evaluation of these
17 fields indicate to you who has an unexpired driver's
18 license in Texas?
19     A.  No, it would not.
20     Q.  What additional fields would you need to be able
21 to answer that question?
22     A.  And the question was for an unexpired driver's
23 license?
24     Q.  Correct.
25     A.  I would need --

## 76

1      Q.  Unexpired, yes, ma'am.
2      A.  I would need the expiration date of the license.
3      Q.  And what field would that be?
4      A.  Driver's license expiration date.
5      Q.  Would you need any other fields besides that
6  field?
7      A.  No.
8      Q.  What about card status?
9      A.  No, that's not tied to the expiration date.
10     Q.  What does card status represent?
11     A.  The card status represents other action that is
12 taken against a person's card that's not necessarily a
13 revocation or suspension.
14     Q.  What about the field of issuance status?
15     A.  The issuance status details whether or not the
16 license is active within or outside of the expiration
17 date -- or renewal period, I'm sorry.  If it's active
18 inside or outside the renewal period or if it's expired
19 inside or outside of two years.
20     Q.  Looking again at U.S. Exhibit No. 1, would this
21 indicate who has a current personal ID card in Texas?
22     A.  No, it would not.
23     Q.  What information or fields would you need to be
24 able to determine that universe of individuals?
25     A.  I would need to have the ID number.

State of Texas v. Eric H. Holder, Jr., et al.   1:11-CV-00128
Germaine Mary Martinez                          4/17/2012

## 77

1    Q.  And could you -- could you clarify, do you mean
2  you would need the personal ID number field?
3        A.  No, I need the identification card number field.
4        Q.  Would you need any other fields to determine who
5  has a personal identification card that's current?
6        A.  What do you mean by "current" again?
7        Q.  One that is not expired?
8        A.  Then I would need the expiration date of that
9  identification card.
10       Q.  Are there any other fields besides those two
11 fields that -- that you would need to determine what --
12 who has a personal identification card that's not expired?
13       A.  No.
14       Q.  Thank you.
15           I believe you testified earlier about duplicate
16 entries in the database; is that correct?
17       A.  I believe so.
18       Q.  And you testified that -- that sometimes one
19 individual has more than one ID; is that correct?
20       A.  Not that they have more than one ID, but they
21 could have a driver's license and an identification card.
22       Q.  Thank you for that correction.
23           And I believe you testified that you did not know
24 the number or you could not estimate the total number of
25 unique driver's license holders in the database; is that

## 78

1  correct?
2        A.  That's correct.
3        Q.  Do you know who in your office would know the
4  answer to that question?
5        A.  No.
6        Q.  And how long have you worked in that office,
7  ma'am?
8        A.  For over 22 years.
9        Q.  Have you ever seen a document during your 22-year
10 employment that indicates the number of unique license
11 holders in the database?
12       A.  Yes.  Well --
13       Q.  Could you tell me what documents?
14           MR. SWEETEN:  Elizabeth, she's -- I don't
15 think she's finished answering the question.  She's
16 thinking about the answer.
17           MS. WESTFALL:  My apologies.
18       A.  No, there's not a document that -- that does
19 that.
20       Q.  (BY MS. WESTFALL)  Is there a query that could be
21 run in the database to make that determination?
22       A.  It's possible to run -- run a query, yes.
23       Q.  Could you do that?
24       A.  No, I could not.
25       Q.  Who could do that?

## 79

1        A.  A programmer.
2        Q.  What department is that in your office?
3        A.  That's our IT division.
4        Q.  Thank you.
5            How in the database is it reflected if you have
6  an expired driver's license?
7        A.  It's reflected based on the expiration date of
8  the license, would show a date that's passed.  And then
9  the -- the issuance status, which would be expired more
10 than two years, expired less than two years.
11       Q.  Do you ever purge records from the driver's
12 license database?
13           MR. SWEETEN:  Objection; outside the scope.
14       Q.  (BY MS. WESTFALL)  You may answer.
15       A.  At this point, we don't.
16       Q.  Was there a point when you did in the past?
17           MR. SWEETEN:  Objection; outside the scope.
18           Go ahead.
19       Q.  (BY MS. WESTFALL)  You may answer.
20       A.  Yes, there was.
21       Q.  When -- and when -- when did that stop?  When did
22 that practice end?
23           MR. SWEETEN:  Same objection.
24       Q.  (BY MS. WESTFALL)  You may answer.
25       A.  When we moved to the new system in April of 2009.

## 80

1        Q.  Could you tell me how it is reflected in the
2  database if you have a suspended driver's license?
3        A.  That goes back to the field of issuance status
4  that I -- let me look up which -- the actual name of the
5  field.
6            MR. SWEETEN:  Elizabeth, she's looking it up
7  in the data dictionary, just to let you know what's going
8  on.
9            MS. WESTFALL:  Thank you.
10           MR. SWEETEN:  Sure.
11       A.  It would go back to the Field 340.
12       Q.  (BY MS. WESTFALL)  Thank you.
13           How often is the database updated?
14       A.  Can you clarify under what part you're asking
15 about?
16       Q.  It's -- in other words, is it a live database, or
17 is it periodically updated?
18       A.  It's -- we have both realtime updates and batch
19 updates that are done.
20       Q.  How often do the batch updates occur?
21       A.  Nightly.
22       Q.  What are the batch updates?
23       A.  I don't have an exact listing of them.
24       Q.  Could you generally describe what you know about
25 batch updates?

Reported By: Tamara K. Chapman
Huseby - 7000 North Mopac Expressway, 2nd Floor, Austin, Texas 78731   512-687-0424



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
        Defendant,                 )
                                   )
ERIC KENNIE, et al,                )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS STATE CONFERENCE OF          )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )  (RMC-DST-RLW)
                                   )  Three-Judge Court
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
        Defendant-Intervenors.     )

**********************************************
            ORAL DEPOSITION OF
               JANICE McCOY
               MAY 16, 2012
**********************************************

**3**

A P P E A R A N C E S
FOR THE PLAINTIFF, STATE OF TEXAS:
    Matthew Frederick
    Patrick K. Sweeten
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, TX 78711-2548
    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 936-1307
    matthew.frederick@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:
    Jennifer Maranzano
    Elizabeth S. Westfall
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    (202) 305-7766
    jennifer.maranzano@usdoj.gov
    elizabeth.westfall@usdoj.gov
FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
CAUCUS:
    Ezra D. Rosenberg
    DECHERT, LLP
    Suite 500
    902 Carnegie Center
    Princeton, NJ 08540-6531
    (609) 955-3200
    ezra.rosenberg@dechert.com

**2**

ORAL DEPOSITION OF JANICE McCOY, produced as a
witness at the instance of the Defendant, was duly
sworn, was taken in the above-styled and numbered cause
on the MAY 16, 2012, from 9:39 a.m. to 6:24 p.m., before
Chris Carpenter, CSR, in and for the State of Texas,
reported by machine shorthand, at the offices of The
United States Attorney's Office, 816 Congress Avenue,
Suite 1000, Austin, Texas 78701, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on
the record or attached hereto.

**4**

FOR THE KENNIE INTERVENORS:
    Chad W. Dunn
    BRAZIL & DUNN, LLP
    4201 Cypress Creek Parkway
    Suite 530
    Houston, TX 77068
    (281) 580-6310
    chad@brazilanddunn.com

## 5

INDEX

1
2   Appearances...........................2
3   JANICE McCOY
4       Examination by Ms. Maranzano..............7
        Examination by Mr. Dunn...................227
5
    Signature and Changes......................286
6
    Reporter's Certificate.........................288
7
                EXHIBITS
8
    NO. DESCRIPTION                PAGE MARKED
9
10  28  HB No. 218, Filed 2007              41

11  29  SB No. 362                         79

12  30  Notice of Deposition               14

13  31  Press Release From the Office of State   97
        Senator Troy Fraser
14  32  Senate Rules Adopted by the 81st   119
        Legislature, Jan. 14, 2009
15
16  33  Senate Journal, March 18, 2009     132

17  34  Transcript, March 10, 2009, Committee of   134
        the Whole Senate
18  36  SB No. 363                         139
19  37  Declaration of Janice McCoy, March 30,   161
        2012
20
21  38  Senate Rules Adopted by 82nd Legislature   196

22  39  Transcript, Jan. 25, 2011, Committee of   204
        the Whole Senate
23  40  Transcript, Jan. 26, 2011, Committee of   206
        the Whole Senate
24
25  41  Transcript  Excerpt: Senate Bill 14, Jan.   208
        26, 2011

## 6

1   42  Transcript  Excerpt: Senate Bill 14, Jan.   213
        26, 2011, CD 1, Section II

## 7

1            JANICE McCOY,
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5            EXAMINATION
6   BY MS. MARANZANO:
7       Q.   Good morning.
8       A.   Good morning.
9       Q.   My name is Jennifer Maranzano.  I'm
10  representing the Defendant, Eric Holder, in this matter.
11           Can you please state your full name for
12  the record?
13      A.   Janice Steffes McCoy.
14           MS. MARANZANO:  And can we have everybody
15  go around and identify themselves, please?
16           MR. ROSENBERG:  Ezra Rosenberg from
17  Dechert LLP on behalf of the Texas State Conference of
18  NAACP Branches and MALC.
19           MR. DUNN:  Chad Dunn on behalf of the
20  Kennie Intervenors.
21           MR. ROSENBERG:  And let me see if we're
22  having a telephone guest today.
23           MR. FREDERICK:  Matthew Frederick for the
24  State of Texas.
25           MS. MARANZANO:  Let's just continue while

## 8

1   they are doing that.
2       Q.   (By Ms. Maranzano) Ms. McCoy, have you ever
3   been known by any other names?
4       A.   My maiden name is Janice Steffes.
5       Q.   Have you ever been deposed before?
6       A.   No.
7       Q.   Let me go over some ground rules with you.  You
8   have been placed under oath today, so it's important to
9   testify truthfully, accurately, and completely.
10           The court reporter is taking down a
11  transcript of everything that we say, and so it's
12  important to answer my questions verbally, not with
13  shaking your head or nodding.  It's important for you to
14  wait until I finish a question before you answer.  We
15  shouldn't talk over each other, and that way, the record
16  will be clear.  If you wish to stop and take a break at
17  any point, go ahead and let me know, and I will do my
18  best to accommodate you.
19           From time to time, your attorney may make
20  an objection to a question that I ask.  He is doing this
21  for the record, and unless he instructs you not to
22  answer, you can go ahead and answer my question.  If he
23  counsels you to answer only to the extent that
24  information is not privileged, I'd ask you to clarify
25  whether you're not answering based on that ground, so

JANICE MCCOY                                                    MAY 16, 2012

---

25

1     A.  In 1998, when I worked for the Republican Party
2  of Texas, I was also, in addition to being coalitions
3  director, they asked me to help their primary
4  administrator with some of her job.
5     Q.  And what was that job?
6     A.  To help coordinate the county chairs and get
7  them the information they needed to run their election,
8  the primary election, and then get that information back
9  so it could get certified by the chairman of the
10  Republican Party.
11     Q.  Have you ever worked at a polling place on
12  election day?
13     A.  Yes, ma'am.
14     Q.  In what capacity?
15     A.  Election judge.
16     Q.  And can you describe for me what an election
17  judge does?
18     A.  The election judge helps run the primary in
19  terms of getting the ballots in the ballot box to the
20  polling location, ensuring that the voters are voting in
21  the correct location and that they're eligible to vote
22  at that location, and then when the polls close, getting
23  the ballots back to the county.
24     Q.  Have you ever witnessed any problems at a
25  polling place while you were serving as election judge?

---

26

1     A.  No, ma'am.
2     MR. FREDERICK:  Objection, vague.
3     THE WITNESS:  Sorry?
4     MR. FREDERICK:  It's okay.  You can
5  answer.
6     A.  No.
7     Q.  (By Ms. Maranzano) Did you ever witness anyone
8  trying to impersonate another voter while you were
9  serving as election judge at a polling place?
10     A.  No.
11     Q.  Can you describe all of your current
12  responsibilities as chief of staff for Senator Fraser to
13  me, please.
14     A.  I'm responsible for managing the office in
15  terms of just Senate paperwork, time sheets, travel
16  vouchers, general day-to-day business of making sure the
17  Senate office runs.  I'm responsible for overseeing and
18  directing six staff people, in terms of giving them
19  advice about issues that they see or are dealing with in
20  their roles working for the Senator.  I handle the
21  Senator's media relations, and I continue to work policy
22  and legislative issues for the Senator.
23     Q.  Do you assist with drafting legislation?
24     A.  Yes, ma'am.
25     Q.  In what capacity?  What role do you play in

---

27

1  drafting legislation?
2     A.  There's several ways you can draft
3  legislation.  Once an idea is -- once it's determined
4  that the Senator wants to carry legislation, we
5  typically make a request to either the Texas Legislative
6  Council or Senate Engrossing and Enrolling and we just
7  send them -- or the Texas Legislative Council with just,
8  you know, general two, three lines, this is what we'd
9  like to see the law do, and then they draft it.  And
10  during session, occasionally we will draft -- I will
11  draft amendments to various legislation, if they're in
12  order to facilitate movement.
13     Q.  If a Senator -- if the Senator has proposed
14  legislation, do you work on trying to ensure that
15  legislation gets passed?
16     A.  Yes.
17     Q.  Can you describe that process for me?
18     MR. FREDERICK:  I'll object, and to the
19  extent that it calls for communications that you might
20  have had with legislators, staff, state agencies, the
21  TLC, or constituents about pending legislation, I'll
22  instruct you not to answer on the basis of privilege.
23  But to the extent you can answer without relying on
24  that, you're free to answer the question.
25     Q.  (By Ms. Maranzano) And I'm asking you right now

---

28

1  in a general sense what your role is in that capacity.
2     A.  In a general sense, once a piece of legislation
3  has been drafted by whomever drafted it, as staff, we
4  get the bill filed with the calendar clerk, and then it
5  goes through a general process that every bill goes
6  through, and once it gets referred to a committee, we
7  make the bill hearing request.  Along with the bill
8  hearing request, we will do a bill analysis, or provide
9  information to the committee so that they can have a
10  bill analysis prepared.  Once the bill is set for a
11  hearing, we will help the Senator with talking points.
12     If the bill makes it out of committee, we
13  will -- in the Senate, we have what's called an intent
14  calendar, so it's my job to -- once when we're ready to
15  move something on the Floor, we will notify the intent
16  calendar, essentially, and we will do talk -- and once
17  we're going to be recognized on the Floor, we'll do
18  talking points for the Floor.  And then if it passes the
19  Senate, we will provide that information to -- the same
20  sort of talking points and data that we have to whoever
21  will pick up the bill in the House.
22     Q.  What is a bill analysis?  I think you mentioned
23  that in regards to the committee portion of the bill.
24     A.  The Senate rules require that every bill have
25  an analysis attached to it.  The committees are

JANICE MCCOY                                           MAY 16, 2012

---

**29**

1  responsible for -- in the Senate, the committees are
2  responsible for putting that bill analysis together.
3  The Senate Research Center helps with that; it's an arm
4  of the Senate, and it basically provides a general
5  description of the bill, and then it will provide a
6  section-by-section analysis.
7     Q.  Do you have -- do you personally have
8  communications with other legislators?
9     A.  Yes.
10     Q.  Regularly about legislation?
11     A.  I mean, regularly is an interesting term.
12  During session?
13     Q.  Uh-huh.
14     A.  Yes.  During the interim, no.
15     Q.  Are your communications with other legislators
16  usually related to bills that Senator Fraser is
17  sponsoring or authoring?
18     A.  Yes.
19     Q.  What else would communications with other
20  legislators be about?
21     A.  Potentially, it could be about that
22  legislator's legislation, if I have a question about it.
23     Q.  Okay.
24     A.  I don't --
25     Q.  About how many times -- during the legislative

---

**30**

1  session, about how many times in a given week would you
2  talk to another legislator?  Not Senator Fraser, a
3  different legislator.
4     A.  I talk to other legislators pretty much every
5  day during session.
6     Q.  Do you communicate with the Executive Branch
7  about legislation?
8     A.  Yes.
9     Q.  About how frequently during a legislative
10  session do you communicate with the Executive Branch?
11     A.  Infrequently.  It depends on the bill.  I mean,
12  if it's something that is changing the way an agency
13  does business, it could be every day.  If it's a bill
14  that doesn't do that, then maybe never.  I mean...
15     Q.  About how frequently do you communicate with
16  the Governor's Office about legislation?
17     A.  Two, three times a session.
18     Q.  About how frequently do you communicate with
19  the Lieutenant Governor's Office about legislation?
20     A.  Every day.  During session.  I'm sorry.
21     Q.  Yeah.  When we were talking about your
22  responsibilities as chief of staff, did you say
23  communicating with constituents was one of your
24  responsibilities?
25     A.  I might not have said it, but it would be, yes.

---

**31**

1     Q.  Is communicating with interest groups or
2  advocacy groups one of your responsibilities?
3     A.  Yes.
4     Q.  And you said that you had a role in drafting
5  legislation.  Do you have a role in researching issues
6  that might be related to legislation?
7     A.  Yes.
8     Q.  When Senator Fraser is taking a vote on a bill,
9  what's your role in regards to that legislation?  Do you
10  make a recommendation to him?
11     A.  Yes, ma'am.  We do.
12     Q.  You do.  Does that role change if the Senator
13  is the sponsor of a bill?
14     A.  No.
15     Q.  Can you tell me, I think you said the Senator
16  has six staff people?
17     A.  Well, I'm seven.  Yeah.
18     Q.  Can you tell me their names and their titles?
19     A.  We have three people working in the district.
20  They're all called district coordinators.  Mel Ferguson,
21  Blake Woodall, Ralph Gauer, G-a-u-e-r.  And then
22  currently in Austin, in addition to myself, we have
23  three people, and Terri Mathis is scheduler.  Will
24  McAdams, policy analyst.  I think that's his title,
25  legislative analyst, policy analyst, something like

---

**32**

1  that.  And then Whitney Smith-Nelson, administrative
2  assistant.
3     Q.  Do the staff people in the district office have
4  any role in legislative efforts the Senator makes?
5     A.  No.
6     Q.  Does your office have a records retention
7  policy?
8     A.  No.
9     Q.  None?
10     A.  Our specific office does not have a records
11  retention policy.
12     Q.  When you say "our specific office," you mean
13  Senator Fraser's office?
14     A.  Yes, ma'am.
15     Q.  Do you retain records?
16     A.  No, not --
17     Q.  What prompted you to save certain files from
18  2009 voter ID?
19     A.  I knew that the Senator would want to try again
20  in 2011.
21     Q.  How often do you communicate with Senator
22  Fraser?
23     A.  During the interim?  Two or three times a week.
24     Q.  I'm sorry.  During the interim, can you
25  describe what you mean by that?

JANICE MCCOY                                               MAY 16, 2012

## 33

1   A.   The Texas legislature is in regular session for
2   140 days in odd-numbered years.  The rest of the time,
3   it's called the interim.  And that's the period we're in
4   right now, and I speak with him two or three times a
5   week during the interim.
6        Q.   And by what means do you communicate with him,
7   usually, during the interim?
8        A.   Phone.
9        Q.   Just phone?
10       A.   (Witness nods head yes.)
11       Q.   And do you speak on the phone, or do you text
12   message each other?
13       A.   Both.
14       Q.   Is that on the Senator's personal phone or an
15   official government phone?
16       A.   Personal phone.
17       Q.   Is that on your personal phone or an official
18   government phone?
19       A.   Both, depending on what time of day it is.
20       Q.   Do you save those messages on your phone?
21       A.   No.
22       Q.   Not at all, or not for any length of time at
23   all?
24       A.   I don't save anything.
25       Q.   Do you delete them, meaning, if they're not on

## 34

1   your phone now, is that because they weren't archived in
2   some manner or --
3        A.   Right.  I delete them.
4        Q.   Okay.  So other than the phone during the
5   interim, do you communicate with the Senator in any
6   other ways?
7        A.   I will, if I'm writing a speech or if he needs
8   some information, I fax things to his home.  But other
9   than that, I do not communicate with him in any other
10   way.
11       Q.   When you're in the legislative session --
12       A.   Yes, ma'am.
13       Q.   -- how often do you communicate with the
14   Senator?
15       A.   Every day.
16       Q.   And how do you usually communicate with him?
17       A.   Verbally.
18       Q.   Do you and the Senator ever exchange e-mails?
19       A.   I have sent him e-mail.  He does not respond.
20       Q.   Do you send e-mail to his personal account or
21   to a government account?
22       A.   Personal.
23       Q.   During the time that you worked for Senator
24   Fraser, how many election-related bills has the Senator
25   authored?

## 35

1   A.   I don't know.
2        Q.   Can you give me an estimate?
3        A.   The Senator typically does not author election-
4   related legislation.  He sponsors it.  So typically, I
5   would say, because of his seat on State Affairs, House
6   members will ask him to pick up their election bills,
7   and it could be 10 or 15 a session.  That's not to say
8   that he hasn't authored election related, other than,
9   obviously, voter ID, I just -- I don't -- I don't know.
10       Q.   So as you sit here, you can't think of other
11   election-related bills that Senator Fraser has authored
12   other than voter ID bills?
13       A.   That's correct.
14       Q.   And he has sponsored about 10 to 15 election-
15   related bills in those legislative sessions that you
16   worked in?
17       A.   That's a good guess.
18       Q.   During the time that you've worked for Senator
19   Fraser, how many immigration-related bills has Senator
20   Fraser authored?
21       A.   I don't know.
22       Q.   Can you give me an approximation?
23       A.   My guess would be none.
24       Q.   How about how many immigration-related bills
25   has Senator Fraser sponsored or co-sponsored?

## 36

1   A.   Again, my guess would be none, but I don't
2   know.
3        Q.   Are you familiar with Section 5 of the Voting
4   Rights Act?
5        A.   I know what it is.
6        Q.   What's your understanding of the requirements
7   of Section 5?
8        A.   My understanding is that Section 5 of the
9   Voting Rights Act requires the Department of Justice to
10   review election-related legislation for nine specific
11   states and a few other entities, and to ensure that
12   those election changes don't discriminate against
13   minorities.
14       Q.   Did you think it was important to save your
15   voter ID files because of Section 5 of the Voting Rights
16   Act?
17       A.   No.
18       Q.   How does the Legislature ensure that an
19   election-related change complies with Section 5 of the
20   Voting Rights Act?
21           MR. FREDERICK:  Let me interpose an
22   objection.  To the extent that the question seeks
23   information that reflects thoughts or mental impressions
24   about pending legislation or privileged communications
25   I'll instruct you not to answer.  I think that the

JANICE MCCOY                                                    MAY 16, 2012

## 37

1   question is more general.  And to the extent it doesn't
2   call for privileged information or communications, you
3   may answer the question.
4          A.   Can you ask the question again?
5          Q.   (By Ms. Maranzano)  Yes.  How does the Texas
6   Legislature ensure that an election-related change to
7   the law complies with Section 5 of the Voting Rights
8   Act?
9          A.   I don't know.
10         Q.   Do you believe that compliance with the Voting
11  Rights Act is important?
12              MR. FREDERICK:  Object to relevance.
13         Q.   (By Ms. Maranzano)  You can answer.
14         A.   No.
15         Q.   Why not?
16         A.   I don't believe it's fair that nine states --
17  personally don't believe it's fair that nine states are
18  singled out in 2012.
19         Q.   To your knowledge, does Senator Fraser believe
20  that compliance with the Voting Rights Act is important?
21         A.   I don't speak to the Senator's beliefs.
22         Q.   In regards to your files on voter ID, did
23  anybody instruct you not to save those files?
24         A.   No.
25         Q.   Did anybody instruct you to delete your text

## 38

1   messages?
2          A.   No.
3          Q.   Can you tell me, describe for me, the current
4   system in Texas by which a voter's identity is verified
5   at the polls?
6          A.   Under current law, the voter who does not show
7   up with a voter registration card -- well, under current
8   law, if a voter shows up with a voter registration card
9   and they're on the rolls, gets to vote.  That's all they
10  need is the card.  If you don't have a card, under
11  current law, you can show several different forms of
12  ID:  Photo, one photo, with several options, or two
13  nonphoto.
14         Q.   Are you aware of any problems with the system?
15              MR. FREDERICK:  Objection, vague, but you
16  may answer.
17         A.   I think that the system works mostly, but it's
18  open to fraud.
19         Q.   (By Ms. Maranzano)  Why do you say that?
20         A.   Because the voter registration card doesn't
21  necessarily have to be the person who is standing there
22  with it.
23         Q.   Are you aware of instances of voter fraud?
24         A.   No, ma'am.
25         Q.   Are you aware of any instances of voter fraud?

## 39

1          A.   I think in -- are we talking about in-person
2   voter fraud or voter fraud?
3          Q.   Well, let's talk generally first.
4          A.   I mean, I think, yes, there are instances of
5   voter fraud in that we know that there is some being
6   prosecuted.  Particularly, mail-in ballots are probably
7   the worst offenders, where we actually have the tools to
8   catch fraud.  In-person voter fraud, I'm not personally
9   aware of any.
10         Q.   When you said earlier that this -- the current
11  system, I think you said, it left -- it left open the
12  possibility of in-person voter fraud?  Is that a correct
13  summary of your testimony?
14         A.   Yes, ma'am.
15         Q.   What would somebody need to do to commit
16  in-person voter fraud under the current system?
17              MR. FREDERICK:  Objection to the extent it
18  calls for speculation, but you may answer, if you can.
19         Q.   (By Ms. Maranzano)  What did you mean by it
20  leaves open the possibility?
21         A.   You could register yourself five times, five
22  different names, go vote five times.  You could steal
23  someone's voter registration card and go vote.  You
24  could, you know, borrow.  Like, I don't have time to
25  vote, you go vote for me.  Someone could go vote twice

## 40

1          Q.   Are you familiar with the voter registration
2   application in Texas?
3          A.   Generally.
4          Q.   Does somebody have to make certain attestations
5   on that voter registration application?
6          A.   Yes, ma'am.
7          Q.   And what are those?
8          A.   I think that you are who you say you are, and
9   you live where you say you live, but I don't know for
10  sure.
11         Q.   Does somebody have to swear that they are a
12  citizen on the voter registration application?
13         A.   I think so.
14         Q.   When was SB 14 signed into law?
15         A.   Around the end of May 2011.
16         Q.   Have there been elections since the time that
17  SB 14 was signed into law?
18         A.   Yes, ma'am.
19         Q.   Was SB 14 enforced in those elections?
20         A.   No, ma'am.
21         Q.   Are you aware of any in-person voter fraud that
22  occurred in any of those elections?
23         A.   No, ma'am.
24         Q.   I believe you testified earlier that there was
25  a photo ID bill introduced in 2007; is that correct?

JANICE MCCOY                                           MAY 16, 2012

---

**41**

1    A.  Yes, ma'am.
2         MS. MARANZANO:  Can I get that marked?
3    We can do 28.
4         (Exhibit 28 marked for identification.)
5    Q.  (By Ms. Maranzano) Can you take a look at that
6    exhibit that has been marked for the record as
7    Deposition Exhibit 28?
8    A.  (Viewing document.)
9    Q.  Do you recognize this?
10   A.  Yes, ma'am.
11   Q.  What is it?
12   A.  It looks like the filed version of House Bill
13   218 from 2007.
14   Q.  Can you tell me what forms of identification
15   were permitted under House Bill -- is this House Bill
16   218?
17   A.  Yes, ma'am.
18   Q.  Can you tell me what forms of identification
19   this bill would have permitted?
20        MR. FREDERICK:  And take your time.  If
21   you need a minute to review.
22   A.  Oh, no, I just to find it.  Under Section 11 of
23   the bill --
24   Q.  (By Ms. Maranzano) Uh-huh.
25   A.  -- it shows eight different forms of photo ID

---

**42**

1    that were acceptable:  Driver's license, ID card,
2    military card, employee ID card, citizen's certificate
3    that has a photo, passport, student ID card, concealed
4    handgun license, or a valid ID card issued by a
5    government institution, federal or local.
6         And then if you didn't have photo ID, the
7    bill would allow two forms.  Well, I thought it was two,
8    but I don't see that in here.  The bill would allow for
9    some forms of nonphoto ID, which is also in Section 11:
10   Utility bills, bank statements, official mail, birth
11   certificate, citizenship papers, marriage license,
12   divorce decree, court records.
13   Q.  So under HB 218, am I correct that a voter
14   could show either a form of photo identification or
15   forms of nonphoto identification?
16   A.  Yes, ma'am.
17   Q.  Does nonphoto verification verify a voter's
18   identity?
19   A.  Most of the time, yes.
20   Q.  Is there something about the forms of nonphoto
21   identification in HB 218 that you think verifies an
22   identity in a more secure fashion than a voter
23   registration card?
24        MR. FREDERICK:  Object to the extent that
25   this seeks information of thoughts or mental impressions

---

**43**

1    about pending legislation or requires information that
2    would reflect communications with legislators, staff,
3    state agencies, the Texas Legislative Council,
4    constituents, I'll instruct you not to answer on the
5    basis of privilege.  If you are able to answer without
6    relying on privileged matters, you may do so.
7    A.  Can you ask the question again?
8    Q.  (By Ms. Maranzano) Yeah.  My question is:  Do
9    you think HB 218 would have made an improvement on the
10   current system that you described to me, where a voter
11   shows their voter registration card or other forms of ID
12   when they show up to vote?
13        MR. FREDERICK:  Same objection and
14   objection.  But you may answer if you can.
15   Q.  (By Ms. Maranzano) Do you have an answer to
16   that, ma'am?  Thinking?
17   A.  Yeah.  My personal opinion is no.
18   Q.  What's Senator Fraser's opinion on that?
19        MR. FREDERICK:  Object to the extent it
20   calls for a legislator's thoughts and mental impressions
21   about pending legislation, and I'll instruct you not to
22   answer that question.
23   A.  I choose not to answer.
24   Q.  (By Ms. Maranzano) Would HB 218 prevent a voter
25   from voting multiple times?

---

**44**

1         MR. FREDERICK:  I'll make the same
2    objection.  To the extent it calls for privileged
3    information, thoughts or mental impressions or
4    privileged communications.  But to the extent you can
5    answer without relying on privileged matters, you may do
6    so.
7    A.  I have no answer.
8    Q.  (By Ms. Maranzano) Have you no answer because
9    of the instruction?
10   A.  Yes, ma'am.
11   Q.  Okay.  What was the purpose of including two
12   forms of photo identification at HB 1218?
13        MR. FREDERICK:  Objection to the extent it
14   seeks thoughts or mental impressions you or Senator
15   Fraser may have had about pending legislation or
16   communications that are privileged.  To the extent that
17   you can answer without relying on privileged matters,
18   you may answer the question.
19   Q.  (By Ms. Maranzano) And for the record, this is
20   about the legitimate purpose of part of this bill.
21   A.  I think you are better off asking
22   Representative Betty Brown.
23   Q.  Betty Brown.  Did the Senator bring HB 218 to
24   the Senate Floor?
25   A.  He did.

JANICE MCCOY                                    MAY 16, 2012

45

1    Q.   And did you have a role in that?
2    A.   I did.
3    Q.   Do you know what the purpose of including two
4    forms of nonphoto ID in HB 218 was?
5         MR. FREDERICK:  I'll make the same
6    objection.
7         But I think she's just asking just a
8    yes-or-no question, so you may answer whether or not you
9    know.
10   A.   I was not part of how House Bill developed in
11   the House.  My personal belief is that they included two
12   forms of voter ID in order to get the necessary votes to
13   move it out of the House.
14   Q.   Okay.
15        MS. MARANZANO:  And just to clarify the
16   record, it's my understanding that Mr. Sweeten has
17   actually alerted the court that you all are going to
18   allow witnesses to answer questions about legislative
19   purpose.  I missed the e-mail, but that's my
20   understanding of what has happened, so...
21        MR. FREDERICK:  No.  Consistent, I think,
22   with what we have tried to convey yesterday and today,
23   we will permit testimony about legislative purpose to
24   the extent that is available from nonprivileged sources.
25        MS. MARANZANO:  Okay.  This might be

46

1    something that we discuss with the court later.
2    Q.   (By Ms. Maranzano) Did Senator Fraser have any
3    role in the development of HB 218?
4    A.   No.
5    Q.   Did the Senator take a public position on HB
6    218?
7    A.   Yes.
8    Q.   What position was that?
9    A.   In favor.
10   Q.   Did you play any role with regard to advising
11   the Senator on that position?
12   A.   Yes.
13   Q.   Did you recommend that he support the bill?
14   A.   Yes.
15   Q.   And what was that recommendation based upon?
16        MR. FREDERICK:  Object to the extent the
17   question calls for thoughts and mental impressions about
18   pending legislation or asks for the substance of
19   communications of legislators' staff, state agencies,
20   TLC and constituents, I will instruct you not to
21   answer.  If you can answer without relying on that
22   material, you may do so.
23   A.   I cannot answer.
24   Q.   (By Ms. Maranzano) Okay.  And just so we have a
25   clear record, you cannot answer because of the privilege

47

1    being asserted?
2    A.   Yes.
3    Q.   Did you have any conversations with
4    constituents about HB 218?
5    A.   Yes.
6    Q.   How many?
7    A.   How many conversations or how many
8    constituents?  Sorry.
9    Q.   That's an important distinction.  Let's start
10   with how many constituents.
11   A.   Verbally, I probably spoke to five to ten
12   constituents.
13   Q.   Did you speak to any of these constituents on
14   multiple occasions?
15   A.   Yes.
16   Q.   About how many did you speak to on multiple
17   occasions?
18   A.   How many constituents?
19   Q.   Uh-huh.
20   A.   One.
21   Q.   And was this a conversation on the phone?  In
22   person?  In another means?
23   A.   Most of the time, the conversations with this
24   one constituent were in person.
25   Q.   Have -- I'm sorry.

48

1    A.   Otherwise, I might have spoken to him once or
2    twice on the phone.
3    Q.   Was anybody else party to the conversations
4    that occurred in person?
5    A.   The Senator may or may not have been part of
6    the conversations.  I don't remember 2007 very well.
7    Q.   Does the Senator meet with any constituent who
8    comes to his office if he's in the office?
9    A.   If the Senator is in the office, in a meeting
10   or on the phone, he will visit with constituents.
11   Q.   Do you recall if he met with anybody, any
12   constituent about HB 218?
13   A.   The same constituents that I met with on
14   several occasions, I think the Senator met with.
15   Q.   Who was this constituent?
16   A.   Skipper Wallace.
17   Q.   Why was he particularly interested in HB 218?
18        MR. FREDERICK:  Object to the extent that
19   calls for the substance of communications with a
20   constituent or a legislator or staff for the thoughts
21   and mental impressions about pending legislation; I
22   instruct you not to answer.
23   A.   I can't answer because of privilege.
24   Q.   (By Ms. Maranzano) Did these conversations all
25   take place in the Senator's office?

JANICE MCCOY                                                    MAY 16, 2012

---

**49**

1    A.  I don't remember, but probably, yes.  By
2  "office," you mean our general office because I have a
3  -- so there's three rooms, so in that space?
4    Q.  In Senator Fraser's office complex --
5    A.  Yes.  Okay.  Right.
6    Q.  -- in the Capitol.
7    A.  Okay.
8    Q.  Okay.  Thank you for clarifying that.
9        Did either you or the Senator ask
10  Mr. Wallace to comment, to speak about HB 218?
11    A.  No.  Are we still talking about 2007?
12    Q.  We're still talking about 2007 right now.
13    A.  Thank you.  No.
14    Q.  We'll get to the other bills at some point.
15        What was the nature of your conversation
16  with Mr. Wallace?
17        MR. FREDERICK:  I'll object and instruct
18  you not to answer to the extent that you would reveal
19  the substance of the conversation.  You may testify as
20  to the general subject matter only, and to the extent
21  you can do that, you may answer.  Otherwise, I instruct
22  you not to answer the question.
23    Q.  (By Ms. Maranzano) And are you going to --
24    A.  I'm going to assert privilege.
25    Q.  All right.

---

**51**

1  conversations or e-mails or other written
2  communications?
3    A.  I would assume in 2007, most of our
4  conversations were verbal, either on the phone or in
5  person.
6    Q.  Did Senator Fraser have any communications with
7  the Executive Branch about HB 218?
8    A.  I don't know.
9    Q.  Did you communicate with any interest groups or
10  lobbyists about HB 218?
11    A.  I don't remember.
12    Q.  Did you communicate with any election officials
13  about HB 218?
14    A.  Election officials outside of the Secretary of
15  State's Office?
16    Q.  Yes, that's right.  NonExecutive Branch
17  election officials.
18    A.  Yes.
19    Q.  Who did you communicate with?
20    A.  Well, Skipper as County Chair.  I think that I
21  also spoke with the Republican Party of Texas.
22    Q.  How many times did you speak with the
23  Republican Party of Texas?
24    A.  Probably once.
25    Q.  Who from the Republican Party of Texas did you

---

**50**

1        MS. MARANZANO:  So that I'm clear,
2  Mr. Frederick, is your position that unsolicited
3  conversations with constituents are also covered by
4  privilege?
5        MR. FREDERICK:  Yes.
6    Q.  (By Ms. Maranzano) Did you or Senator Fraser
7  communicate with any members of the Executive Branch
8  about HB 218?
9    A.  I don't remember.  I'm sorry.  I'm probably
10  sure that I talked to Ann McGeehan in the Secretary of
11  State's Office.  Other than that, I don't remember.
12    Q.  What did you talk to Ann McGeehan about?
13        MR. FREDERICK:  I'll object again, and
14  instruct you not to answer to the extent it requires you
15  to disclose the substance of your conversation with
16  Ms. McGeehan about pending or proposed legislation.  To
17  the extent you can answer by giving the general subject
18  matter, you may do so.
19    A.  Generally, I'm sure you've heard Ann.  Ann was
20  responsible for the Elections Division.  Generally, we
21  spoke of how they would implement the bill.
22    Q.  (By Ms. Maranzano) About how many times did you
23  speak with Ms. McGeehan?
24    A.  I don't remember.
25    Q.  Do you remember whether those were

---

**52**

1  speak with?
2    A.  I don't know.
3    Q.  Was that an in-person conversation or a
4  conversation by phone, e-mail?
5    A.  Most likely, it was by phone.
6    Q.  And when was that?
7    A.  It was sometime in May, April May of 2009.
8  2007.  I'm sorry.
9    Q.  Anyone else a party to that conversation?
10    A.  No.
11    Q.  Did the Republican Party of Texas also speak to
12  Senator Fraser about HB 218?
13    A.  No.
14    Q.  And how do you know that?
15    A.  Because the Senator doesn't speak to the
16  Republican Party of Texas.  I do.
17    Q.  What was the nature of your conversation with
18  the Republican Party of Texas?
19    A.  I might have been asking about witnesses and
20  testifying and just generally about the bill.
21    Q.  When you say witnesses and testifying, are you
22  talking about for --
23    A.  For the State Affairs Committee.
24    Q.  Did you talk to the Republican Party of Texas
25  about the substance of HB 218?

JANICE MCCOY                                          MAY 16, 2012

---

53

1    A.  I don't remember.  I don't think so, but I
2    don't remember.
3    Q.  Did you have any communications or -- well, let
4    me:  Are there any other election officials that you
5    spoke with about HB 218?
6    A.  Not that I know of.
7    Q.  Did you have any conversations with any groups
8    representing minority voters about HB 218?
9    A.  I don't remember.
10   Q.  Did you have any conversations with the
11   Lieutenant Governor's Office about HB 218?
12   A.  Yes.
13   Q.  How many?
14   A.  I don't remember.  A dozen, two dozen.
15   Q.  Who did you have those conversations with?
16   A.  His executive staff, Julia Rathgeber.  I'm
17   trying to remember if Blaine Brunson was chief of staff
18   then or not.  I can't remember if Blaine was or not.
19   And then whoever staffed State Affairs for Lieutenant
20   Governor, and I don't know who was at the time, either.
21   Q.  Did you say his executive staff?  Is that what
22   you said initially?
23   A.  Yeah.
24   Q.  Does he have --
25   A.  Well -- go ahead.

---

54

1    Q.  I was going to ask:  Does he have an executive
2    staff that's distinguishable from legislative staff?
3    A.  No.  I said executive staff because there's
4    like three or four people that sit upstairs with him.  I
5    just classified them that way.
6    Q.  Okay.  So you believe that you spoke with Julia
7    Rathgeber potentially?
8    A.  It's Rathgeber.
9    Q.  And you said Blain Brunson possibly?
10   A.  If he was chief of staff in 2007, then, yes.
11   Q.  And potentially whoever was staffing his State
12   Affairs issues?
13   A.  Uh-huh.
14   Q.  And when were these conversations?
15   A.  I would have to look at the record of when the
16   bill made it to the Senate.  April, May time frame of
17   2007.
18   Q.  Were these conversations in person, over the
19   phone, e-mail?  How did you communicate with the
20   Lieutenant Governor's Office?
21   A.  Primarily in person.
22   Q.  Were they in the Capitol offices?
23   A.  Yes.
24   Q.  What was the nature of your conversations with
25   Lieutenant Governor's staff?

---

55

1        MR. FREDERICK:  I'll give you the same
2    instruction.  I instruct you not to answer to the extent
3    that it would reveal thoughts and mental impressions
4    about pending legislation or the substance of
5    conversations between you and Senator Fraser or members
6    of the Lieutenant Governor's staff or the Lieutenant
7    Governor.  But to the extent you can identify the
8    subject matter without revealing the substance of the
9    conversations, you may answer the question.
10   Q.  (By Ms. Maranzano) Can you answer?
11   A.  I'm trying to decide if I can.
12   Q.  Okay.
13   A.  We generally spoke about the process of moving
14   the bill in the Senate.
15   Q.  Did you have any discussions with anyone in the
16   Lieutenant Governor's Office about the impact of HB 218
17   on minority voters?
18   A.  No.
19   Q.  Did you have conversations with anybody about
20   the impact of HB 218 on minority voters?
21   A.  I don't remember.
22   Q.  Do you keep any record of meetings that you
23   have?
24   A.  No.
25   Q.  None?

---

56

1    A.  Not from 2007.
2    Q.  How about from 2009?
3    A.  No.
4    Q.  How about from 2011?
5    A.  There might be some stuff on my calendar from
6    2011.
7    Q.  Do you keep any record of meetings or
8    conversations the Senator has?
9    A.  No.
10   Q.  Does the Senator keep such a record?
11   A.  Of meetings that he's had in the past, only to
12   the extent that his calendar is stored electronically,
13   and if that meeting made it to the calendar.
14   Q.  Who keeps that calendar in your office?  Does
15   the Senator keep his own calendar?
16   A.  The scheduler.
17   Q.  Did you turn that calendar over to counsel?
18   A.  No, I didn't.  I'm sorry.
19   Q.  Do you believe that's responsive to the
20   requests that were propounded on your office?
21   A.  I suppose not.
22   Q.  You don't believe that was?
23   A.  Well, I mean, I guess if -- I didn't search the
24   calendar.  So then the answer is no, it was not
25   responsive.

JANICE MCCOY                                                    MAY 16, 2012

## 57

1  Q.  Am I understanding that you didn't turn -- you
2  didn't search it because it was --
3  A.  I forgot to search it.  And so now that you've
4  brought it up, it's not responsive, and I can search for
5  it.
6  Q.  Okay.  Yeah.  I think we're going to ask you to
7  make that search and turn it over to counsel.
8  MR. FREDERICK:  And just for the record,
9  I'll object to the request.
10  MS. MARANZANO:  On what grounds?
11  MR. FREDERICK:  On the grounds that it's
12  privileged and not relevant and not reasonably
13  calculated to lead to discovery of relevant evidence.
14  MS. MARANZANO:  Okay.  But I'm asking her
15  to turn it over to you.  I mean, you can still do a
16  privilege review.
17  MR. FREDERICK:  Fair enough.  Fair enough.
18  That's fine.  I understand.
19  MS. MARANZANO:  Okay.  For the record, our
20  position is who the Senator met with on the dates is not
21  actually privileged.  The substance, we understand
22  you're asserting privilege over.  But we would ask that,
23  at the very least, she'd turn that information over to
24  you.
25  MR. FREDERICK:  And we understand.

## 58

1  MS. MARANZANO:  Yeah.
2  Q.  (By Ms. Maranzano) Did Senator -- yes.
3  A.  Just so we can be clear, the Senator meets with
4  people unexpectedly, and it doesn't make it to his
5  calendar.
6  Q.  Okay.
7  A.  So there may have been meetings that have took
8  place that will not reflected on his calendar.
9  Q.  Okay.  And are there any documents that reflect
10  those meetings?
11  A.  Again, the meetings that just took place
12  unexpectedly, no, ma'am.
13  Q.  Okay.  Did you review any studies that would be
14  related to HB 218?
15  A.  No.
16  Q.  Did anyone in your office?
17  A.  No.
18  Q.  Did the Senator -- did you or the Senator make
19  any attempt to determine who among registered voters did
20  not possess one of the forms of identification listed in
21  HB 218?
22  A.  No.
23  Q.  Why not?
24  MR. FREDERICK:  Object to the extent it
25  calls for thoughts, mental impressions, or

## 59

1  communications between you and the Senator or you and
2  the Senator and the legislative staff, state agencies,
3  TLC, and constituents.  If you can answer without
4  revealing privileged matters, you may do so.
5  A.  Generally, when you pick up a bill from the
6  other chamber, you assume most of the work was done in
7  the other chamber.
8  Q.  (By Ms. Maranzano) Did you feel you had any
9  obligation to analyze the bill prior to recommending to
10  your boss that he take a position on it?
11  MR. FREDERICK:  I think I'll make the same
12  instruction:  Don't reveal thoughts, mental impressions,
13  or communications that are privileged.  But if you can
14  answer without doing, so you may answer the question.
15  A.  I did review the bill prior to making a
16  recommendation.
17  Q.  (By Ms. Maranzano) And did you feel that you
18  needed to do anything in addition to reviewing the bill
19  prior to making a recommendation to the Senator?
20  A.  No.
21  Q.  Were you aware that if this bill had been
22  passed, it would have been subject to Section 5 of the
23  Voting Rights Act?
24  A.  Yes.
25  Q.  And did you believe that includes any

## 60

1  obligation to take any additional steps before
2  recommending a position to Senator Fraser?
3  A.  No.
4  Q.  Are you aware of whether the House analyzed the
5  impact of HB 218?
6  A.  I'm not aware.
7  Q.  Do you know whether there was any attempt in
8  the House to analyze whether HB 218 would have a
9  disproportionate impact on minority voters?
10  A.  I'm not aware.
11  Q.  Who would know that information?
12  A.  The House author.
13  Q.  And that was?
14  A.  Representative Betty Brown.
15  Q.  What was the purpose of HB 218?
16  MR. FREDERICK:  Object on grounds of
17  privilege.  To the extent the question calls for
18  thoughts or mental impressions of you, Senator Fraser,
19  or communications that you or the Senator have had with
20  other legislators, staff, agencies, TLC, or
21  constituents, I instruct you not to answer.  But to the
22  extent that you are able to identify the purpose of the
23  bill without relying on privileged matters, you are free
24  to answer the question.
25  A.  I think the record from the State Affairs

JANICE MCCOY                                                    MAY 16, 2012

### 61

1  Committee hearing on House Bill 218 will show that the
2  Senator said the intent was to stop in-person voter
3  fraud.
4       Q.   (By Ms. Maranzano) And how does this bill stop
5  in-person voter fraud?
6            MR. FREDERICK:  Object to the extent it
7  calls for speculation and object to the extent it calls
8  for thoughts, mental impressions, or privileged
9  communications.  But to the extent you can answer
10 without relying on privileged matters, you may do so.
11      A.   What was the question?
12      Q.   (By Ms. Maranzano) How does HB 218 solve
13 in-person -- help with in-person voter fraud?  Is
14 that what -- what did you say the purpose of the bill
15 is?  Why don't you repeat that?
16      A.   If you look at the record from the State
17 Affairs Committee hearing, the Senator said that the
18 intent of a voter ID bill was to stop in-person voter
19 fraud.
20      Q.   And so my question is:  How does this bill do
21 that?
22           MR. FREDERICK:  Same instruction.
23      A.   I'll assert privilege.
24      Q.   (By Ms. Maranzano) Is that the only purpose of
25 HB 218?

### 62

1            MR. FREDERICK:  Same objection and
2  instruction.  Don't reveal thoughts, mental impressions
3  or communications with legislative staff, agencies, TLC
4  or constituents.  If you are able to answer without
5  doing so, you may.
6       A.   Again, according to the record, if you look at
7  what Senator Fraser said in the State Affairs Committee
8  hearing, his only intent is to stop in-person voter
9  fraud.
10      Q.   (By Ms. Maranzano) Can you describe to me the
11 procedural history of after HB 218 was introduced, what
12 happened?
13           MR. FREDERICK:  I'll object on grounds of
14 vagueness, but you can answer if you can.
15      A.   I cannot --
16      Q.   (By Ms. Maranzano) I'm looking for a general
17 summary of what happened with the bill.
18      A.   I mean, the House process is the House
19 process.  The bill gets filed, gets sent to committee,
20 gets voted out of committee, it goes to calendars, goes
21 the Floor, gets passed.  In the Senate, it gets -- comes
22 to over to the Senate, then just like every bill,
23 Lieutenant Governor reviews it, refers it to a
24 committee, committee chairman decides to give it a
25 hearing or not, and the bill has a hearing in committee,

### 63

1  and the bill gets voted out of committee, and Senator
2  places the bill on the intent calendar.
3       Q.   Can I stop for a second.
4       A.   Uh-huh.
5       Q.   I'm asking you particularly about HB 218, not
6  about a general description.
7       A.   House Bill 218 was voted out of the House, and
8  I can't speak to how it got out of the House.  You need
9  to go back and talk to Betty Brown about that.  House
10 Bill 218 showed up in the Senate, was read, Lieutenant
11 Governor referred it to the Senate State Affairs
12 Committee.  The Senate State Affairs Committee had the
13 bill.  Senator Fraser notified the Senate State Affairs
14 Committee that he wanted to sponsor HB 218 and requested
15 a hearing.  The bill was set for a hearing by the
16 Chairman of Senate State Affairs.  The bill had a
17 hearing.  I don't remember if this bill sat in State
18 Affairs or if it was voted out the same day it was
19 heard.  You'd have to look at the record.  But the bill
20 was voted out of committee.
21           And Senator Fraser decided to move forward
22 with the bill, and so he notified, via the intent
23 calendar notification process, the other senators that
24 he wanted to hear the bill, and we had the bill in
25 Intent for quite a while.

### 64

1  This particular bill, we tried to move one
2  day, when we thought we had the necessary votes, and we
3  were not successful, and the bill died.
4       Q.   Okay.  So I'm going to ask you a couple of
5  questions about that process as you've described it.
6       I believe that you testified that the
7  Lieutenant Governor reviews a bill, after it gets voted
8  out of the House, and than refers it to committee?
9       A.   Yes, ma'am.
10      Q.   Does every bill that gets voted out of the
11 House get referred to some Senate committee?
12      A.   Yes, ma'am.
13      Q.   And does the Lieutenant Governor solely -- is
14 that decision of which committee to refer it to solely
15 that of the Lieutenant Governor's?
16      A.   Based on the current Senate rules, yes.
17      Q.   And you mean the 2011 rules?
18      A.   2007, but even now in 2011, yes, ma'am.
19      Q.   Okay.  And you said that the Senator, Senator
20 Fraser notified the committee on State Affairs that he
21 wanted to sponsor this bill?
22      A.   Yes, ma'am.
23      Q.   Why did he do that?
24           MR. FREDERICK:  Well, object to the extent
25 it calls for the Senator's thoughts, mental impressions,

JANICE MCCOY                                    MAY 16, 2012

## 65

1  or any communications that you had with him, and I will
2  instruct you not to answer.
3      A.  I'll assert privilege.
4          MR. FREDERICK:  Okay.
5          Jennifer, sometime soon, if we could take
6  a quick break.
7          MS. MARANZANO:  Yeah, just give me a
8  couple of minutes.
9          MR. FREDERICK:  Sure.  Sure.
10     Q.  (By Ms. Maranzano) And you said the committee
11 held hearings on HB 218?  The Committee on State Affairs
12 held hearings on HB 218?
13     A.  Held a hearing.  I don't think they had
14 multiple.  I think they had one.
15     Q.  Who invited the witnesses to testify at that
16 committee hearing?
17         MR. FREDERICK:  I'm going to object to
18 that, and to the extent it calls for communications that
19 any legislator had or that you or Senator Fraser had
20 with legislators, staff, agencies, TLC, constituents, or
21 potential witnesses, I'll instruct you not to answer.
22 To the extent you can answer without revealing the
23 substance of conversations, you can do so.
24     A.  I don't remember that there was an invited
25 panel.  It was just the process of laying out a bill by

## 66

1  the Senator and then the public testifying.
2          I earlier said that I think I talked to
3  the Republican Party of Texas about coming and
4  testifying, so I may have called a few people that I
5  thought would be helpful to the passage of the bill
6  besides the Republican Party of Texas.  I'm not sure.
7  And then the one constituent that we talked to quite a
8  bit about this bill.  Other than that, I don't think
9  there was invited to testimony.
10     Q.  (By Ms. Maranzano) So the one constituent was
11 Skipper Wallace?
12     A.  Yes.
13     Q.  And are you saying that you may have invited
14 him to testify as well?
15     A.  I think I didn't invite him to testify.  I
16 think I was more making sure he knew that the bill had
17 been scheduled for hearing.
18     Q.  Do you remember about how many members of the
19 public testified at that hearing?
20     A.  I do not.
21     Q.  Can you approximate?
22     A.  I cannot.  It's in the record, however.
23     Q.  Okay.  Did anybody raise any concerns about 218
24 during this committee hearing?
25     A.  My recollection is yes.

## 67

1      Q.  What were those concerns?
2      A.  I cannot -- I cannot speak to what they
3  actually said.
4      Q.  Did anybody raise any concerns about the impact
5  HB 218 might have on minority voters?
6          MR. FREDERICK:  Well, object and instruct
7  you not answer to the extent that the question calls for
8  communications that you had or Senator Fraser had with
9  legislators or legislative staff, agencies, TLC, or
10 constituents.  But to the extent you can answer without
11 revealing.
12     A.  I mean, the record is there.  The hearing was
13 videotaped.  I think that you could watch it.  I don't
14 remember specifically.
15     Q.  (By Ms. Maranzano) Okay.  Did the bill change
16 at all in committee?
17     A.  I don't think so, but -- yeah, I don't think
18 so.  I don't remember.  I mean, we might have made minor
19 tweaks, but I don't think so.
20     Q.  Okay.
21         MS. MARANZANO:  Let's take a five-minute
22 break.
23         (Recess from 11:11 a.m. to 11:32 a.m.)
24     Q.  (By Ms. Maranzano) Ms. McCoy, before the break,
25 we were talking about HB 218.  Who brought HB 218 to the

## 68

1  Floor of the Senate?
2      A.  Senator Fraser.
3      Q.  Did anyone ask the Senator to bring it to the
4  Floor?
5          MR. FREDERICK:  Object to the extent that
6  calls for communications with other legislative staff
7  in this case the legislators or staff members that's not on
8  the public record, I will instruct you not to answer.
9  If you can answer without revealing that, you may
10 answer.
11     A.  I'll assert privilege.
12     Q.  (By Ms. Maranzano) Why was Senator Fraser
13 playing a leadership role in HB 218?
14         MR. FREDERICK:  I'll object to the extent
15 that calls for thoughts or mental impressions of Senator
16 Fraser about HB 218 or communications with other
17 legislators, staff, or state agencies.  If you can
18 answer without revealing subjective mental impressions
19 or you may do so.
20     A.  I'll assert privilege.
21     Q.  (By Ms. Maranzano) When HB 218 was brought at
22 the time Floor of the Senate, what was your role?
23     A.  My role with House Bill 218 at that point was
24 to help the Senator with his talking points, and that's
25 it.

JANICE MCCOY                                        MAY 16, 2012

## 69

1  Q.  Did you draft his talking points?
2  A.  Yes.
3  Q.  Did you save those talking points?
4  A.  Yes.
5  Q.  Do you still have them?
6  A.  Yes.
7  Q.  Were those turned over to your counsel?
8  A.  Yes.
9  Q.  Did you do any research prior to drafting those
10 talking points?
11 A.  I read the bill book that Representative Brown
12 provided to us.
13 Q.  And what does the bill book include?
14 A.  I don't remember what the bill book included
15 specifically.  Typically, a bill book has copies of the
16 legislation, copies of the bill analysis, copies of the
17 fiscal note, and occasionally, supporting documents.
18 This bill book had all of those things.  I do not
19 remember what those supporting documents were.
20 Q.  Did you do any additional research other than
21 read the bill book?
22 A.  No.
23 Q.  Why not?
24    MR. FREDERICK:  I'll object.  I believe
25 that question calls for your mental impressions about

## 70

1  pending legislation.  I'll instruct not to answer.
2  Q.  (By Ms. Maranzano)  Are you going to follow your
3  counsel's instruction not to answer the question?
4  A.  Yes, ma'am.
5  Q.  Okay.  When HB 218 was brought to the Floor of
6  the Senate, did -- or did HB 218 require the support of
7  two-thirds of the senators to bring bill to the Floor
8  for a vote?
9  A.  Yes.
10 Q.  When Senator Fraser brought HB 218 to the
11 Floor, how many senators were present at that time?
12 A.  I don't recall exactly.  Either 29 or 30.
13 Q.  I believe you testified earlier that the
14 Senator brought the bill to the Floor when he -- he
15 tried to move this bill on a day when you thought it
16 would pass?
17 A.  Yes, ma'am.
18 Q.  What did you mean by that?
19 A.  We knew that a particular Senator was absent.
20 Q.  Which Senator was absent?
21 A.  Senator Uresti.
22 Q.  Why was Senator Uresti absent?
23 A.  If you look at the record from that day, I
24 think he was excused because he was sick.
25 Q.  Did you know Senator Uresti's position on HB

## 71

1  218?
2     MR. FREDERICK:  I'll object to the extent
3  it calls for thoughts or mental impressions of any
4  legislators or staff of pending legislation or
5  communications with other legislators of Senator Fraser
6  or staff.  But if you can answer without revealing
7  privileged matters, you may do so.
8  A.  After the bill moved, Senator Uresti voted no.
9  Q.  Can you --
10 A.  So I did not know how he was going to vote
11 prior to the bill moving.  After he voted, he voted
12 no.  After we voted, he voted no.
13 Q.  Well, why did you bring the bill to the Floor
14 when he was absent?
15    MR. FREDERICK:  Object to the extent the
16 question calls for thoughts and mental impressions about
17 pending legislation or communications indications that
18 are privileged.  I instruct you not to answer.  If you
19 can answer without revealing privileged matters, you may
20 do so.
21 A.  I'll assert privilege.
22 Q.  (By Ms. Maranzano)  Do you think it's important
23 to give every Senator a chance to weigh in on a bill
24 like HB 218?
25    MR. FREDERICK:  I'll object as

## 72

1  argumentative, but you may answer if you can.
2  Q.  (By Ms. Maranzano)  Are you able to answer that,
3  Ms. McCoy?
4  A.  No.
5  Q.  No, you're not able to answer or --
6  A.  I'm sorry.
7  Q.  -- no, you don't think it's important to --
8  A.  No, I don't think it's important that every
9  Senator vote on every specific piece of legislation,
10 including House Bill 218.
11 Q.  Do you know Senator's Uresti's ethnicity?
12 A.  Yes.
13 Q.  What ethnicity is he?
14 A.  He's Hispanic.
15 Q.  Do you know anything about the district that he
16 represents?
17 A.  Not specifically.
18 Q.  Do you know if he made any comments about
19 HB 218 and the impact it would have on his constituents?
20 A.  I do not know.
21 Q.  Would that impact your thoughts on whether it
22 was important to give him an opportunity to vote on
23 HB 218?
24    MR. FREDERICK:  Objection, calls for
25 speculation.

JANICE MCCOY                                                    MAY 16, 2012

73

1    Q.  (By Ms. Maranzano) You can ahead and answer.
2    A.  I'm sorry.  You need to ask the question
3    again.  I don't know what you're asking me.
4    Q.  I'm asking if you thought that Senator Uresti
5    believed that HB 218 would impact his constituents,
6    would you think it was important that he be given an
7    opportunity to take a vote on that bill?
8    MR. FREDERICK:  Same objection.  You can
9    answer.
10   A.  I think, again, generally, every bill impacts
11   every Senators' constituents.  And generally, Senators
12   should on the Floor to vote, but not -- we don't have a
13   31 -- we don't always 31 Senators on the Floor to vote.
14   And so with Senator Uresti, I can't speak to Senator
15   Uresti's constituents what they think is important or
16   not important for him to vote on.
17   Q.  (By Ms. Maranzano) But am I understanding you
18   correctly that your position is, you don't think every
19   Senator needs to vote on every bill, including HB 218?
20   A.  That's correct.
21   Q.  And did you say that the bill -- well, after
22   the first vote was taken on HB 218, was there
23   verification of the vote that was taken?
24   A.  I think that's what it's called, yes.  I think
25   of we -- they voted again.  I don't know if it was a

74

1    verification or if they just chose to vote again.  I'm
2    not really sure how that worked.  But there was a second
3    vote.
4    Q.  And did you say Senator Uresti arrived for that
5    vote?
6    A.  He did.
7    Q.  And what happened to HB 218?
8    A.  It failed to suspend the regular order of
9    business rule.
10   Q.  Was that because it did not have a two-thirds
11   majority --
12   A.  That's correct.
13   Q.  Two-thirds majority support?
14   A.  That's correct.
15   Q.  What is the purpose of the two-thirds rule?
16   A.  There is not a rule that's the two-thirds
17   rule.  The rule is the regular order of business rule,
18   and that rule says that as a bill comes out of the
19   calendar, it's placed on the regular order of business,
20   and you're supposed to vote in that order.  So there is
21   no two-thirds rule.
22   Q.  So to vote on a bill out of order, does that
23   require two-thirds majority support?
24   A.  You have to suspend the regular order of
25   business rule, and that requires a two-thirds vote of

75

1    the members present.
2    Q.  What do you think the purpose of that
3    requirement is?
4    A.  I can't speak to the purpose.  It's just the
5    way the Senate has done business.
6    Q.  But as somebody who has worked there since
7    1992, do you have any thoughts on what you think the
8    purpose of that is?
9    A.  General consensus on bills.
10   Q.  Are most bills brought to the Floor by getting
11   two-thirds majority support?
12   A.  Yes.
13   Q.  After HB 218 failed to get two-thirds majority
14   support, did anything further happen to that bill?
15   A.  No.
16   Q.  Who were the main supporters of HB 218?
17   MR. FREDERICK:  I'll object to the extent
18   that it calls for communications that you or Senator
19   Fraser might have had with legislators, staff, agencies,
20   or constituents or thoughts and mental impressions.  But
21   if you can answer without that, I think you're free to
22   answer.
23   A.  Well, I think the record will show, if you look
24   at the vote in the Senate, you're talking about who the
25   supporters were in the Senate; Republican Senators

76

1    supported it, Democrat Senators did not.
2    Q.  (By Ms. Maranzano) How about, were there any --
3    would you consider anybody from the Executive Branch to
4    be a main supporter of HB 218?
5    MR. FREDERICK:  Same objection.  To the
6    extent it calls for communications between you or
7    Senator Fraser and a member the Executive Branch or
8    their thoughts or mental impressions, I instruct you not
9    to answer.  If you can answer without revealing that,
10   you can answer.
11   A.  I'll assert purchase.
12   Q.  (By Ms. Maranzano) Was there any outside groups
13   or advocacy groups that you would consider to be in the
14   group of the main supporters of HB 218?
15   MR. FREDERICK:  Again, I'll instruct you
16   not to answer and object on privilege, to the extent
17   that it would require you to reveal the substance of any
18   conversation.  But to the extent it's just seeking
19   identity, then you may identify.
20   A.  I honestly don't remember who testified for and
21   against the bill.  Republican Party, I think, was for
22   it.
23   Q.  (By Ms. Maranzano) And did you say -- you said
24   most of the legislators who supported the bill were in
25   the Republican Party?

## 77

1    A.  Yes, ma'am.

2    Q.  Do you believe any part of the purpose of

3  HB 218 was partisan?

4        MR. FREDERICK:  I'll object and assert

5  privilege to the extent that the question seeks thoughts

6  or mental impressions about pending legislation or the

7  substance of communications with legislators, staff,

8  agencies, TLC, or constituents.  But, I mean, to the

9  extent that you can identify -- to the extent you're

10  able to identify a purpose without relying on those

11  matters, you're free to answer the question.

12    A.  I think the purpose of the bill, from Senator

13  Fraser and our office's perspective, was to stop

14  in-person voter fraud.  It wasn't partisan.

15    Q.  (By Ms. Maranzano) Who were the main opponents

16  to HB 218?

17    A.  I don't remember.

18    Q.  You don't remember any of them?

19    A.  I don't.

20    Q.  Do you believe that HB 218 would have had a

21  discriminatory impact on minority voters?

22        MR. FREDERICK:  I'll object to the extent

23  it calls for your thoughts and mental impressions about

24  pending legislation and communications, and based on

25  that, I will instruct you not to answer the question.

## 78

1    A.  I'll assert privilege.

2    Q.  (By Ms. Maranzano) Are you familiar with

3  Section 2 of the Voting Rights Act?

4    A.  No.

5    Q.  Not at all?

6    A.  Not at all.

7    Q.  Would it surprise you if I told you that

8  Section 2 includes an antidiscrimination provision that

9  applies to all 50 states?

10    A.  I don't know anything about Section 2, so...

11    Q.  So you've never made any effort to ensure that

12  legislation you worked on complied with Section 2 of the

13  Voting Rights Act?

14        MR. FREDERICK:  Objection, argumentative.

15  Objection, assumes facts not in evidence.

16    A.  I don't know anything about Section 2.

17    Q.  (By Ms. Maranzano) Do you think a federal law

18  is required to make sure a piece of legislation doesn't

19  discriminate against minorities?

20    A.  No.

21    Q.  Do you make any attempts to make sure that

22  legislation you work on doesn't discriminate against

23  minorities?

24        MR. FREDERICK:  I object, to the extent it

25  calls for you to reveal thoughts, mental impressions, or

## 79

1  communications relating to specific legislation.  To the

2  extent you can answer without relying on privileged

3  matters, you may do so.

4    A.  I assert privilege.

5    Q.  (By Ms. Maranzano) Was Senator Fraser involved

6  in a photo identification bill in 2009?

7    A.  Yes, ma'am.

8        (Exhibit 29 marked for identification.)

9    Q.  (By Ms. Maranzano) Ms. McCoy, I'm showing you

10  what has been marked as Deposition Exhibit 29.  Do you

11  recognize this?

12    A.  Yes, ma'am.

13    Q.  And what is this?

14    A.  I think it's the filed version of Senate Bill

15  362.

16    Q.  Can you take a look at it and tell me what

17  forms of identification would be allowed in this bill?

18    A.  Section 10 of the bill shows six different

19  forms of photo ID that would be acceptable, including a

20  driver's license or ID card, a military card, a citizen

21  certificate that has a photograph, a passport, a

22  concealed handgun license, and a valid ID card from a

23  federal or local government, or two forms of nonphoto

24  ID, including registration cards, utility bills,

25  official mail, birth certificates, marriage license or

## 80

1  divorce decrees, court records.

2    Q.  Is -- I think I didn't ask you this question.

3  Is this the bill that Senator Fraser introduced in 2009?

4    A.  I think I said it was the filed version, yes,

5  ma'am.

6    Q.  Okay.

7    A.  I don't know that to be exact, but based on the

8  title of the bill, it looks like it's the filed version.

9    Q.  Okay.  And this bill would allow for a voter to

10  show one form of photo identification or two forms of

11  nonphoto identification?

12    A.  That's correct.

13    Q.  I believe you testified earlier that two forms

14  of nonphoto identification would verify a voter's

15  identity in both instances?

16    A.  Uh-huh.

17    Q.  What are the instances --

18        MR. DUNN:  Was that a yes?

19        THE WITNESS:  Yes.

20    Q.  (By Ms. Maranzano) What are the instances that

21  a nonphoto ID would not verify a voter's identity?

22        MR. FREDERICK:  Objection to the extent it

23  calls for speculation, but you can answer.

24    A.  Again, if someone is trying to cheat the

25  system, they can -- nonphoto IDs can be reproduced and

81

1   manipulated.
2      Q.   (By Ms. Maranzano) Can photo IDs be reproduced
3   and manipulated?
4           MR. FREDERICK:  Objection to the extent it
5   calls for speculation, but you can answer if you know
6      A.   Some can.
7      Q.   (By Ms. Maranzano) Can you tell me what your
8   involvement was in the development of SB 362?
9      A.   Senate Bill 362 as filed was the legislation
10  that the House sent to us from House Bill 218.  So
11  Exhibit 28 is not the bill the Senate was debating,
12  because this is the filed version.  So after the House
13  manipulated it a while, this is the language they sent
14  us.  So we refiled the bill that had passed the House
15  from 2007.  We refiled it in 2009.
16     Q.   Why did Senator Fraser decide to file the bill
17  in the Senate in 2009?
18          MR. FREDERICK:  Object.  That question
19  seeks thoughts or mental impressions of Senator Fraser.
20  I'll instruct you not to answer on the basis of
21  privilege.
22     A.   I'll assert privilege.
23     Q.   (By Ms. Maranzano) So you filed -- I'm sorry.
24  Senator Fraser filed a bill that was -- that had been
25  previously filed in the House; is that correct?  And SB

82

1   362 was a version of a previously-filed bill in the
2   House?
3      A.   Senate Bill 362 was the version of House Bill
4   218 that the House sent us, the engrossed version of
5   House Bill 218 from 2007.
6      Q.   Okay.  And you did not make any changes to the
7   bill prior to filing SB 362?
8      A.   I think Senate Bill 362, as filed, was exactly
9   the language that was House Bill 218 as it came out of
10  the Senate committee on State Affairs.
11     Q.   Did you do any -- we've talked a little bit
12  about what you did in relation to House Bill 218.  Did
13  you take any additional steps, in terms of developing or
14  working on SB 362, with regards to any research you did,
15  any studies you looked at?
16     A.   Yes, ma'am.
17     Q.   And what did you do?
18          MR. FREDERICK:  I'll object to the extent
19  this calls for you to reveal thoughts or mental
20  impressions, any communications with legislators, staff,
21  agencies, TLC, or constituents, I instruct you not to
22  reveal the substance of those communications or your
23  thoughts or mental impressions.  If you can answer
24  without revealing those matters, you may do so.
25     A.   I gathered more poll data.  I gathered more

83

1   research reports, and compiled that information for the
2   Senator.
3      Q.   (By Ms. Maranzano) What poll data did you
4   gather?
5           MR. FREDERICK:  Object.  That calls for
6   you to reveal your thoughts or mental impressions.  I
7   will instruct you not to answer on the basis of
8   privilege.
9      Q.   (By Ms. Maranzano) Are you following your
10  counsel's instruction not to answer that question?
11     A.   Yes, ma'am.
12     Q.   What research reports did you gather?
13          MR. FREDERICK:  Object on the basis that
14  calls for thoughts or mental impressions.  I'm going to
15  instruct you not to answer on the basis of privilege.
16     A.   I'll assert privilege, yes, ma'am.
17     Q.   (By Ms. Maranzano) All right.  Why did you
18  decide to look at poll data when you were doing research
19  on this question?
20          MR. FREDERICK:  I object.  That answer
21  calls for your thoughts or mental impression on pending
22  legislation.  I instruct you not to answer on the basis
23  of privilege.
24     A.   I'll assert privilege.
25     Q.   (By Ms. Maranzano) Did the Senator cite any of

84

1   the poll data or reports that you had gathered on the
2   public record?
3      A.   Yes.
4      Q.   Which polls or reports did he cite?
5      A.   In 2009, he cited Rasmussen Poll on the
6   record.  He cited the Carter-Baker Commission report on
7   the record.  And I don't know that I can recall more
8   than those two on the record.
9      Q.   Were there any polls that you had found in
10  doing your research that the Senator did not cite on the
11  public record?
12          MR. FREDERICK:  I object on the basis that
13  that calls for your thoughts or mental impression,
14  communications.  I instruct you not to answer on the
15  basis of privilege, except to the extent that you can
16  answer yes or no if there are such reports.
17     A.   No.
18     Q.   (By Ms. Maranzano) Were there any studies that
19  you had found or other research you had found that the
20  Senator did not cite on the public record?
21          MR. FREDERICK:  Same objection, same
22  instruction.  You may answer yes or no.
23     A.   Yes.
24     Q.   (By Ms. Maranzano) And what were those?
25          MR. FREDERICK:  I object on the basis that

JANICE MCCOY                                    MAY 16, 2012

---

85

1   seeks thoughts or mental impressions and communications
2   that are privileged.  I instruct you not to answer on
3   the basis of privilege.
4         A.  But I can answer because I don't remember the
5   names of those reports.
6         Q.  (By Ms. Maranzano) Do you remember how many
7   there were?
8         A.  Four or five.  Three, four, five, something
9   like that.
10        Q.  Do you remember what they were about?
11        A.  Voter identification.
12        Q.  Anything more specific than voter
13   identification?
14        MR. FREDERICK:  I'll object.  That seeks
15   thoughts and mental impressions, communications.  I
16   object and instruct you not to answer on the basis of
17   privilege.
18        A.  I'll assert privilege.
19        Q.  (By Ms. Maranzano) When you were working on SB
20   362, did you study any other state's identification
21   requirements?
22        MR. FREDERICK:  I'll object to the extent
23   that calls for your thoughts or mental impressions or
24   communications with legislators, staff, agencies, TLC,
25   or constituents, instruct you not to answer on the basis

---

86

1   of privilege.  However, if you can answer without
2   revealing privileged matters, you may do so.
3         A.  On the record, Senator Fraser said that he had
4   looked at how Indiana was working.
5         Q.  (By Ms. Maranzano) Did you look at any
6   information or study information from any interest
7   groups in relation to SB 362?
8         MR. FREDERICK:  I'll make the same
9   objection that this question calls for thoughts or
10  mental impressions about pending legislation and your
11  investigative process.  I instruct you not to answer on
12  the basis of privilege, except to the extent you can
13  answer without revealing privileged matters, you may do
14  so.
15        A.  I don't remember.
16        Q.  (By Ms. Maranzano) Did you have any
17  communications about SB 362 with other legislators?
18        A.  Yes.
19        Q.  Which ones?
20        MR. FREDERICK:  I'll just issue a
21  cautionary instruction.  I don't think that this
22  question is seeking the content of those communications,
23  so I instruct you not to reveal the content, but
24  you may identify people with whom you spoke.
25        A.  Can we just on the record say that I was four

---

87

1   months pregnant with twins when we were debating Senate
2   Bill 362, so I don't remember a lot.
3         I probably spoke to a dozen Senators about
4   Senate Bill 362.  And as the bill moved through the
5   Senate, Senator Williams, Senator Ellis, Senator West,
6   Senator Duncan, Senator Van de Putte, Senator Whitmire.
7   2009, Senator Huffman, was she in the Senate?  Senator
8   Harris.  Generally, I mean, a lot of senators I --
9         Q.  (By Ms. Maranzano) Uh-huh.  So is it fair to
10  say that you spoke to senators who -- those senators who
11  voted for and against SB 362?
12        A.  Yes, ma'am.
13        Q.  Did you speak to the Lieutenant Governor's
14  Office about SB 362?
15        A.  Yes, ma'am.
16        Q.  How many times?
17        A.  I mean, I probably spoke to them every day as
18  the bill was being scheduled for hearing and being
19  heard, and then probably not at all until the House was
20  done with it, and it was moving back over, and then
21  again every day until we voted on it again.
22        Q.  Can you tell me, generally, what those
23  conversations, the nature of those conversations?
24        MR. FREDERICK:  I'll object to the extent
25  it asks you to reveal the substance or content of those

---

88

1   conversations, which are subject to privilege.  However,
2   to the extent you're able to identify a general subject
3   matter, you may answer.
4         A.  We generally spoke about the legislative
5   process and we generally spoke about the bill itself.
6         Q.  (By Ms. Maranzano) The legislative process, do
7   you mean how the bill would get passed?
8         MR. FREDERICK:  I'll object to the extent
9   that seeks the content of privileged communications and
10  instruct you not to answer.
11        A.  I'll assert privilege.
12        Q.  (By Ms. Maranzano) Were those conversations by
13  phone or in person?
14        A.  I spoke to Lieutenant Governor's Office.  I
15  generally spoke to them in person.
16        Q.  Is there anybody from the Lieutenant Governor's
17  Office who you spoke to who you haven't already
18  testified about?
19        A.  In 2009?
20        Q.  Uh-huh.
21        A.  I would add Bryan Hebert to the list.
22        Q.  And who is Bryan Hebert?
23        A.  He was Lieutenant Governor's primary staff
24  person for State Affairs in 2009.
25        Q.  Do you know when Bryan Hebert started working

JANICE MCCOY                                          MAY 16, 2012

---

**89**

1  for the Lieutenant Governor?
2      A.   No, ma'am.
3      Q.   He was not the Lieutenant Governor's staff
4  person on voter ID issues in 2007?
5      A.   I don't remember.  He might have been.
6      Q.   Was he the Lieutenant Governor's staff person
7  on voter ID issues in 2011?
8      A.   Yes, ma'am.
9      Q.   Did you have communications with officials from
10  other states about SB 362?
11      A.   Yes, ma'am.
12      Q.   And who was that?
13      A.   When I was looking to get witnesses to testify,
14  I spoke to somebody in Indiana.  I don't recall who.  I
15  think from the Secretary of State's Office.  And they
16  were not able to come.  And then I spoke with someone in
17  Georgia.  And I don't remember his name, although it's
18  in the record, because he did come testify.
19      Q.   Did anyone ask you to contact these
20  individuals?
21          MR. FREDERICK:  Object that the question
22  asks you to reveal the substance of communications with
23  legislators, staff or agencies or constituents.  To the
24  extent that you can answer without revealing those
25  privileged conversations, you may do so.

---

**90**

1      A.   Senator Fraser.
2      Q.   (By Ms. Maranzano) Why did you think, or why
3  did the Senator think that individuals from Georgia or
4  Indiana would be helpful in terms of the testimony about
5  SB 362?
6          MR. FREDERICK:  I object, based that that
7  seeks thoughts or mental impressions of Senator Fraser
8  and communications between Senator Fraser and his
9  staff.  I instruct you not to answer on the basis of
10  privilege.
11      A.   I'll assert privilege.
12      Q.   (By Ms. Maranzano) Do you remember either of
13  these individuals' names who you talked to in Indiana
14  and Georgia?
15      A.   No.
16      Q.   Did anyone from Indiana come and testify during
17  the hearings on SB 362?
18      A.   No.
19      Q.   Did anyone from Georgia come testify?
20      A.   Yes, ma'am.  He was very nice.  I just can't
21  remember his name.
22      Q.   Did you have communications about SB 362 with
23  any interest groups?
24      A.   I don't remember.
25      Q.   Did you have communications about SB 362 with

---

**91**

1  any groups representing minority voters?
2      A.   I don't remember.
3      Q.   Is there anything that would help you remember
4  whether you had any communications about SB 362 with any
5  interest groups?
6      A.   No.
7      Q.   Did you consider adding any additional forms of
8  identification to SB 362?
9          MR. FREDERICK:  Object.  That question
10  seeks thoughts or mental impressions about pending
11  legislation.  I instruct you not to answer on the basis
12  of legislative privilege.
13      A.   I'll assert privilege.
14      Q.   (By Ms. Maranzano) Can you look at Exhibit 29
15  and Exhibit 28, I believe, HB 218 and SB 362, and look
16  at forms of ID that are allowed in each bill.
17      A.   (Viewing documents.)
18      Q.   What was the purpose of excluding from 362 the
19  student ID as a form of allowable identification even
20  though it was allowed in HB 218?
21          MR. FREDERICK:  I object to the extent
22  this question seeks your thoughts or mental impressions
23  about pending legislation or thoughts of any other
24  legislator, including Senator Fraser or their staff or
25  to the extent it requires communications with

---

**92**

1  legislators, staff, agencies, TLC, and constituents, I
2  instruct you not to answer on the basis of legislative
3  privilege.  To the extent you are able to identify the
4  purpose of any part of the bill without relying on those
5  privileged matters, you may do so.
6      A.   Again, this version of House Bill 218 is not
7  the version that came to the Senate.  I think that the
8  student ID was pulled out by the House, not by the
9  Senate.
10      Q.   (By Ms. Maranzano) I believe that the bill that
11  I have introduced as evidence was actually the bill that
12  was engrossed.  Does that seem correct to you?
13      A.   It does not.
14      Q.   Okay.
15      A.   I'd have --
16      Q.   And you think that the student ID was pulled
17  out of SB 362 in the House?
18          MR. FREDERICK:  I just object to the
19  extent it mischaracterizes the testimony, but you can
20  answer.
21      Q.   (By Ms. Maranzano) Okay.  Can you describe to
22  me what you --
23      A.   My understanding --
24      Q.   Uh-huh.
25      A.   My recollection, Senate Bill 362 should be the

## 93

1 engrossed version of House Bill 218. So I what I see in
2 front of me with House Bill 218 is not the bill that the
3 Senate debated. So I don't know what this version is
4 without -- it's saying that it's the engrossed version.
5 I think it's the filed version.
6 Q. Okay. Well. Let me ask you this: Did SB 362
7 allow, as a form of acceptable identification, student
8 identifications?
9 A. No, ma'am.
10 Q. What was the purpose of excluding that from the
11 bill?
12 MR. FREDERICK: I object to the extent
13 this seeks thoughts or mental impressions from you,
14 Senator Fraser, or other legislators or staff or to the
15 extent it requires you to reveal the substance of
16 communications with legislators, staff, state agencies,
17 TLC, and constituents, I instruct you not to answer on
18 the basis of privilege. However, to the extent that you
19 are able to identify the purpose of that portion of the
20 bill without relying on those privileged matters, you
21 can do so.
22 A. I'll assert privilege.
23 Q. (By Ms. Maranzano) Did you ever look or do any
24 research into who among registered voters would be most
25 likely to have a student identification card?

## 94

1 MR. FREDERICK: Object. The question
2 calls for your thoughts, mental impressions about
3 pending legislation. I instruct you not to reveal --
4 not to reveal the substance of your efforts. However,
5 to the extent that you can answer whether you did or
6 not, you may answer.
7 A. Ask the question again.
8 MS. MARANZANO: Can you read back the
9 question.
10 (The requested portion read back by the
11 court reporter.)
12 A. No.
13 Q. (By Ms. Maranzano) Why not?
14 MR. FREDERICK: I'll object on the ground
15 that that calls for your subjective mental impressions
16 and thoughts about pending legislation and instruct you
17 not to answer on the basis of privilege.
18 A. I'll assert privilege.
19 Q. (By Ms. Maranzano) Did you have any
20 communications with anyone about the forms of
21 identification, what forms of identification to include
22 in SB 362?
23 A. No, ma'am.
24 Q. Did you do any analysis to determine who among
25 registered voters possessed the forms of identification

## 95

1 included in SB 362?
2 MR. FREDERICK: I'll object to the
3 question on the ground that it seeks thoughts and mental
4 impressions and investigative efforts related to pending
5 legislation, and instruct you not to answer to the
6 extent that it would disclose the substance or -- the
7 substance or nature of the process you engaged in.
8 However, you may answer to the extent that you can do so
9 without revealing those matters.
10 A. I'm sorry. I'm having some brain fatigue. You
11 have to read the question again.
12 MS. MARANZANO: Can you read the question?
13 (The requested portion was read back by
14 the court reporter.)
15 A. No.
16 Q. (By Ms. Maranzano) Were you ever instructed not
17 to look at who among registered voters possessed one of
18 the forms of identification included in SB 362?
19 MR. FREDERICK: I object on the grounds
20 that that seeks communications between legislators,
21 staff, and state agencies. I instruct you not to answer
22 on the basis of privilege.
23 A. I'll assert privilege.
24 Q. (By Ms. Maranzano) If SB 362 had passed the
25 Texas Legislature, would it have been subject to the

## 96

1 requirements of Section 5?
2 A. Yes.
3 Q. Are you familiar with the concept of a Spanish
4 surname voter registration match?
5 A. No.
6 Q. Have you ever heard of a Spanish surname
7 analysis being conducted on a voter registration list?
8 A. No.
9 Q. Have you ever heard of a Spanish surname list
10 that's put together by the U.S. Census?
11 A. No.
12 Q. What's the purpose of SB 362?
13 MR. FREDERICK: I'll object to the extent
14 that the question calls for thoughts or mental
15 impressions about pending legislation, or to the extent
16 it seeks the substance of communications from
17 legislators, staff, state agencies, TLC, and
18 constituents. To the extent, however, that you can
19 identify the purpose of the bill without relying on
20 privileged matters, you may do so.
21 A. Senator Fraser's stated purpose on the record
22 about Senate Bill 362 is to prevent in-person voter
23 fraud.
24 Q. (By Ms. Maranzano) Any other purposes?
25 A. No, ma'am.

## 101

1    Q.   (By Ms. Maranzano) Okay.  So to the extent that
2    you --
3         A.   Would you like to ask the question again?
4         Q.   Yes.  I'm interested in what -- the sentence
5    that starts with, "Instead, I want to ensure that
6    illegal aliens, noncitizens, and people otherwise not
7    qualified, do not dilute the legitimate votes cast by
8    citizens, said Fraser."  What does that mean?
9         A.   I think it means that he wants to ensure that
10   the person who shows up at the polls is the person who
11   is supposed to be voting under that name.
12        Q.   Was a part of the purpose of SB 262 related to
13   illegal aliens voting?
14        MR. FREDERICK:  Let me just interpose a
15   objection to the extent that seeks thoughts, mental
16   process, or privileged communications that would be
17   privileged, and I would instruct you not to answer.  But
18   to the extent that you can identify the purpose or
19   whether that's a purpose, you may answer.
20        A.   The purpose of Senate Bill 362 was to stop
21   in-person voter fraud, and that would entail anybody not
22   voting legally, including illegal aliens who are not
23   allowed to vote.
24        Q.   (By Ms. Maranzano) So if a noncitizen votes,
25   you define in-person voter fraud to include a noncitizen

## 102

1    voting as themselves?  Am I understanding you correctly?
2         A.   Because they're committing fraud, yes, ma'am.
3         Q.   Okay.  So when you said the purpose of SB 362
4    was to deter in-person voter fraud, you also are
5    including in that category deterring noncitizens from
6    voting in elections; is that correct?
7         MR. FREDERICK:  I'll just object to the
8    extent it mischaracterizes the testimony.  But to the
9    extent we're talking about the purpose of the bill, you
10   may answer the question.
11        A.   The purpose of the bill was to ensure that
12   citizens, registered -- were voting -- were not
13   committing fraud.  There was no in-person voter fraud.
14   So whatever that constitutes, this bill was trying to
15   prevent.
16        Q.   (By Ms. Maranzano) Okay.  So what I'm asking
17   you now is:  What do you believe that that constitutes?
18   As somebody who was the chief of staff for the author of
19   the bill, what do you think that constitutes?
20        MR. FREDERICK:  I will object, based on
21   privilege, the extent that this seeks a subjective
22   motivation, a subjective thought or a mental impression
23   somehow incorporated in the text of the bill.  And I
24   would instruct you not to answer on the basis of
25   privilege.  To the extent that sitting here today, you

## 103

1    can explain your understanding of the terms at issue
2    that would not be privileged, then you may answer.
3         A.   I don't know that I understand your question.
4         Q.   (By Ms. Maranzano) Okay.  What I'm trying to do
5    is, you have testified earlier today that the purpose of
6    both SB 362 and HB 218 was to detect in-person voter
7    impersonation.  And I want to be clear for the record as
8    to how you define that term, the term in-person voter
9    impersonation.
10        A.   Someone who is not authorized to vote by our
11   constitution who is voting in person.  Someone who is
12   cheating the system by voting under a different name.
13   Someone who is cheating the system by voting more than
14   once in an election.
15        Q.   So is part of the purpose of SB 362 to prevent
16   noncitizens from voting?
17        MR. FREDERICK:  Same objection.  But you
18   can answer subject to my previous instruction.
19        A.   Okay.  Can we back up?  Because I just reread
20   this press release.
21        Q.   (By Ms. Maranzano) Uh-huh.
22        A.   Senator Fraser filed two bills in 2008 -- 2008,
23   Senate Bill 362 and Senate Bill 363?
24        Q.   Uh-huh.
25        A.   Senate Bill 363 was talking about -- more about

## 104

1    the illegal immigrant issue.  Senate Bill 362 was about
2    in-person voter fraud.  This quote probably relates more
3    to Senate Bill 363 than it does to Senate Bill 362.  So,
4    I mean, we have to read the whole press release in
5    context.
6         Q.   Uh-huh.
7         A.   I mean, but in-person voter fraud is someone
8    showing up who's not supposed to be there, who is not a
9    citizen of our country, who has someone else's ID, who
10   has falsified voter records and is voting fraudulently,
11   and that's what Senate Bill 362 was trying to do.
12        Q.   Okay.  So how does Senate Bill 362 deter
13   noncitizens from voting?
14        MR. FREDERICK:  I object to the extent it
15   calls for speculation.  You may answer if you can.
16        A.   By requiring someone to show ID, if they're not
17   a legal citizen, they wouldn't have that ID,
18   necessarily, and then they wouldn't be able to vote.
19        Q.   (By Ms. Maranzano) Do you know how many forms
20   of ID listed in SB 362 a noncitizen is able to obtain?
21        A.   I do not.
22        Q.   Did you look into that when you were working on
23   SB 362?
24        MR. FREDERICK:  I object to the extent it
25   calls for mental impressions, thought process,

## 105

1   privileged communications.  But subject to that
2   instruction, if you can answer without revealing that,
3   you may answer.
4         A.   No.
5         Q.   (By Ms. Maranzano) No, you didn't look into it?
6         A.   I did not.
7         Q.   Do you think that would be an important issue
8   to look into, if part of the goal of the bill is to
9   prevent noncitizens from voting?
10        A.   The goal of the bill was to prevent in-person
11  voter fraud.
12        Q.   Okay.  I thought you testified earlier that
13  that included anyone who was not legally permitted to
14  vote.  Is that not correct?
15        A.   The goal of Senate Bill 362 was to prevent
16  in-person voter fraud.  Whether it was by legal citizens
17  or illegal citizens, we were trying to create a tool to
18  prevent in-person voter fraud.
19        Q.   Okay.  And to be clear, you did not look into
20  whether noncitizens could obtain the forms of
21  identification required by SB 362?
22        A.   I did not.
23             MR. FREDERICK:  If we can take a break
24  soon.
25             MS. MARANZANO:  Do you want to go like

## 106

1   another 15 minutes and break for lunch?  That's fine.
2             MR. FREDERICK:  Sure.
3             MR. DUNN:  But then we'll have to do the
4   hearing.
5             MR. ROSENBERG:  Yeah, that would fit in
6   with the hearing.
7             MS. MARANZANO:  Okay.
8         Q.   (By Ms. Maranzano) Did the Senator consider any
9   alternative legislative measures that would have
10  accomplished the goal of deterring in-person voter
11  impersonation.
12             MR. FREDERICK:  Object on the ground that
13  it seeks thoughts, mental impressions, and privileged
14  communications, and I instruct you not to answer the
15  question based on privilege.
16        A.   I'll assert privilege.
17        Q.   (By Ms. Maranzano) Did the Senator make any
18  promises to anyone concerning alternative legislative
19  measures that would have accomplished the goal of
20  deterring in-person voter impersonation?
21             MR. FREDERICK:  I'll object to the extent
22  that calls for thoughts, mental impressions, or
23  communications with other legislators or legislative
24  staff members, other privileged communications.  To the
25  extent you can answer without revealing privileged

## 107

1   communications, you may do so.
2         A.   I'll assert privilege.
3         Q.   (By Ms. Maranzano) Ms. McCoy, is it your
4   position that promises that the Senator makes about
5   legislation are covered by the privilege, the
6   legislative privilege?
7             MR. FREDERICK:  Yes, to the extent -- I
8   mean, I guess promises, I'm not entirely clear on what a
9   promise would entail, but I think to the extent that it
10  would include a discussion with another legislator or
11  discussions between legislative staff members about
12  pending legislation.  I mean, I think promise could be
13  construed to include ordinary legislative discussions
14  and, you know, policy discussions and compromises.  I
15  think that kind of thing is an integral part of the
16  legislative process in determining votes to get
17  legislation passed.
18             MS. MARANZANO:  Is it also your position
19  that promises to constituents or groups would be covered
20  by the privilege?
21             MR. FREDERICK:  It's my understanding that
22  a promise to somebody outside the Legislature, I think,
23  would not fall under the privilege.
24             MS. MARANZANO:  That's my understanding,
25  too.

## 108

1             MR. FREDERICK:  Yeah.  Yeah.  And I think
2   to the extent it's not an -- to the extent it's a
3   nonconfidential or an external communication, I think
4   that's not what I intend to object to.
5             MS. MARANZANO:  Okay.
6         Q.   (By Ms. Maranzano) Ms. McCoy let me rephrase
7   that question.  Did the Senator make any promises to
8   constituents or outside groups related to SB 362?
9         A.   In what way?
10        Q.   Did the Senator make any promises to bring a
11  bill to the Senate Floor that would require photo
12  identification in 2009?
13        A.   The Senator committed, after the legislation
14  failed in 2007, to constituents that he would try again.
15        Q.   Which constituents did he commit to?
16        A.   Skipper Wallace.
17        Q.   Can you tell me who Skipper Wallace is?
18        A.   He's a constituent from Lampasas.
19        Q.   Why is he so interested in photo identification
20  bills?
21             MR. FREDERICK:  I'll object to the extent
22  that calls for privileged communications between Senator
23  Fraser, Ms. McCoy, and privileged communications between
24  either and Mr. Wallace, and as well as to the extent it
25  calls for thought process, mental impressions.  If you

JANICE MCCOY                                                    MAY 16, 2012

---

**109**

1   can answer without revealing thoughts or privileged
2   communications, you can do so.  Otherwise, I instruct
3   you not to answer on the basis of privilege.
4       A.   I mean, Skipper has been a long-time election
5   worker and judge, and I think he just advocates for
6   election law change.
7       Q.   (By Ms. Maranzano) He's an election worker and
8   judge.  What is his profession, if you know?
9       A.   He's a businessman.
10      Q.   So he is a volunteer election judge, and what
11  was the first thing you said?
12      A.   Election worker, election judge.
13      Q.   Does he have any role in the government
14  structure of the county?
15      A.   Skipper, I think, used to be city manager in
16  Lampasas, I think.
17      Q.   Does he have any role with a political party?
18  Any political party?
19      A.   Yes.
20      Q.   Which one?
21      A.   Republican.
22      Q.   And what's his role?
23      A.   He's Chair of the Lampasas Republican Party.
24      Q.   Ms. McCoy, you testified earlier that there was
25  no partisan purpose to SB 362.  So now that you've

---

**110**

1   testified that the Senator made a promise to a person
2   who was affiliated with a political party, the Chair of
3   a political party, do you wish to change your testimony
4   from earlier today?
5       A.   No, ma'am.
6       Q.   Did your office have any communications about
7   the purpose of SB 362?
8       MR. FREDERICK:  Object as vague, also
9   object on grounds of privilege to the extent it calls
10  for the substance of confidential communications, and
11  instruct you not to answer.  To the extent you can
12  answer without revealing confidential communications,
13  you may.
14      A.   I'm going to assert privilege.
15      Q.   (By Ms. Maranzano) Did your office have any
16  communications in response to a -- did you -- did your
17  office ever get a Texas public records request regarding
18  SB 362?
19      A.   We have received public information requests
20  about voter ID.  I do not recall if they were in post
21  2009 session or post 2011.  Probably both.
22      Q.   Has Senator Fraser had any meetings with
23  constituents where the purpose of 362 was discussed?
24      MR. FREDERICK:  I'll object to the extent
25  it calls for the content of communications, privileged

---

**111**

1   communications between Senator Fraser and
2   constituents.  To the extent you can answer without
3   revealing the substance of those conversations, you may
4   do so.
5       A.   The Senator has met with constituents about
6   voter ID.
7       Q.   (By Ms. Maranzano) How many times?
8       A.   The Senator mentions voter ID when he speaks
9   and when he gets invited to go speak to different
10  chambers and groups.  Pretty much every time he speaks
11  to a group like that, he'll mention it.  And in office,
12  half dozen.
13      Q.   Would you say that voter ID was one of the
14  Senator's key legislative accomplishments?
15      MR. FREDERICK:  I'll object to the extent
16  to calls for mental impressions or thoughts.  However,
17  to the extent you can answer, based on -- to the extent
18  you can answer without relying on privileged
19  information, you can do so.
20      A.   Yes.
21      Q.   (By Ms. Maranzano) Who besides Senator Fraser
22  were the main proponents of SB 362?
23      A.   Other members?
24      Q.   Well, presumably.  Well, why don't we start
25  with:  Were there any members who voted for the bill who

---

**112**

1   were strong proponents of it?
2       MR. FREDERICK:  I'll just interpose, I
3   don't think that this question is asking for the
4   substance of communications, so I would admonish you no
5   to reveal the substance of any privileged communications
6   in answering, but I think that you can do that.
7       A.   I mean, I think that all the members that
8   signed on as co-authors would consider themselves strong
9   proponents of the bill.
10      Q.   (By Ms. Maranzano) Were there others in the
11  Texas government who were strong proponents of SB 362?
12      MR. FREDERICK:  Same instruction.
13      A.   I don't think so.  I don't know.
14      Q.   (By Ms. Maranzano) Was 362 a priority for the
15  Governor?
16      MR. FREDERICK:  I'll object on the same
17  grounds.  To the extent it seeks thoughts, mental
18  impressions of the Governor or communications between
19  Senator Fraser's office and the Governor, I will
20  instruct you not to answer.  I mean, if you know.
21      A.   I don't know the Governor's priorities from
22  2009.
23      Q.   (By Ms. Maranzano) Was SB 362 a priority for
24  the Lieutenant Governor?
25      MR. FREDERICK:  The same instruction.  To

## 113

1  the extent it seeks thoughts or mental impressions of
2  the Lieutenant Governor or confidential communications
3  between Senator Fraser's office and the Lieutenant
4  Governor's Office, I would instruct you not to answer.
5  If you're able to answer, you may do so.
6      A.  I don't know -- I don't know the Lieutenant
7  Governor's priorities from 2009.
8      Q.  (By Ms. Maranzano) Was SB 36 a priority for
9  anyone outside of the Texas government?
10        MR. FREDERICK:  I'll object as vague, but
11  you can answer if you know.
12     A.  I don't.  I don't know.
13     Q.  (By Ms. Maranzano) How often did you say that
14  you talked to Lieutenant Governor's Office during the
15  consideration of SB 362?
16     A.  I probably talked to them every day while we
17  were scheduling the bill and during the hearing.
18     Q.  And you have no idea whether it was priority
19  for their office?
20        MR. FREDERICK:  Object, argumentative.
21     Q.  (By Ms. Maranzano) You can answer.
22     A.  That process was about six days long, so to
23  talk to them for six days.  But again, I don't speak for
24  the Lieutenant Governor, so I don't know his priorities.
25     Q.  Were there any groups that represented minority

## 114

1  voters who supported SB 362?
2         MR. FREDERICK:  I'll just object to the
3  extent this calls for the substance of confidential
4  communications between any constituents and Senator
5  Fraser's office, I would instruct you not to answer.
6  But to the extent that you can answer without revealing
7  the substance of any conversation, you can do so.
8      A.  I don't know.
9      Q.  (By Ms. Maranzano) Ms. McCoy, who would know
10  the Lieutenant Governor's priorities?
11        MR. FREDERICK:  Object as vague and calls
12  for speculation.  You can answer if you know.
13     A.  The Lieutenant Governor and his staff.
14     Q.  (By Ms. Maranzano) Who on his staff?
15        MR. FREDERICK:  Same objection.
16     A.  His chief of staff, Blaine Brunson.
17     Q.  (By Ms. Maranzano) Who were the main opponents
18  to SB 362?
19     A.  I don't recall.
20     Q.  Do you recall having communications with
21  constituents who opposed SB 362?
22     A.  No.
23     Q.  Do you recall having -- do you recall having
24  communications with outside groups that opposed SB 362?
25        MR. FREDERICK:  I'll object to the extent

## 115

1  it seeks the substance of any privileged communication
2  between a constituent and Senator Fraser's office, but
3  to the extent it doesn't require you to reveal the
4  substance, you may answer the question.
5      A.  I don't recall.
6      Q.  (By Ms. Maranzano) Do you recall that there was
7  opposition to SB 362?
8      A.  Yes, ma'am.
9      Q.  What was the basis of that opposition?
10        MR. FREDERICK:  I'll object to the extent
11  it calls for speculation.  Also object to the extent it
12  seeks the substance of any privileged communications
13  between other legislators and staff or constituents and
14  Senator Fraser and Ms. McCoy.  To the extent that you
15  know independent of privileged sources or you don't have
16  to reveal any, you may answer.
17     A.  I think if you look at the record, that the
18  people that testified against Senate Bill 362 believed
19  that it would disenfranchise voters.
20     Q.  (By Ms. Maranzano) What do you think about that
21  testimony?
22        MR. FREDERICK:  I'll object to the extent
23  it calls for thoughts or mental impressions about
24  pending legislation.  I also object to relevance.
25     A.  I'll assert privilege.

## 116

1  Can I do that?
2         MR. FREDERICK:  Yeah.
3      Q.  (By Ms. Maranzano) Did the Senator take any
4  steps with regard to SB 362 to address any of these
5  concerns that were raised by opponents to SB 362?
6         MR. FREDERICK:  Objection, vague.
7  Objection, seeks thoughts and mental impressions of the
8  Senator.  It also seeks the substance of confidential
9  communications and privileged communications with the
10  Senator.  To the extent that you can answer without
11  revealing the substance of confidential communications
12  or the Senator's thought process or the thought
13  processes of you or any other legislator, you may do so.
14     A.  I don't think we amended the bill, so the
15  answer would be no.
16     Q.  (By Ms. Maranzano) Just to be clear, you don't
17  think you amended the bill at all throughout the entire
18  Senate process?
19     A.  I don't think we did.  Maybe on the margins,
20  but -- so, we did not take any action to make changes
21  either direction.
22     Q.  Is there a reason you didn't take any action to
23  respond to the concern of opponents?
24        MR. FREDERICK:  Objection, it seeks
25  thoughts and mental impressions.  I instruct you not to

JANICE MCCOY                                          MAY 16, 2012

## 117

1    answer on the basis of privilege.
2        A.  I'll assert privilege.
3        Q.  (By Ms. Maranzano) Did anybody raise any
4    concerns that SB 362 would disenfranchise minority
5    voters?
6            MR. FREDERICK:  I'll object to the extent
7    it calls for privileged communications between
8    constituents, legislators, staff, and you or Senator
9    Fraser.  To the extent you can answer without relying on
10   privileged communications, you may do so.
11       A.  And on the record, during the debate, several
12   members testified that way, and then we had witnesses
13   that testified in the same manner.
14       Q.  (By Ms. Maranzano) And do you recall what the
15   basis of their testimony was?
16       A.  No, ma'am.
17       Q.  Did you take any steps to determine whether
18   SB 362 would disenfranchise minority voters?
19           MR. FREDERICK:  Object to the extent it
20   seeks thought process -- thought processes and mental
21   impressions and confidential communications with
22   legislators and legislative staff.  I would instruct you
23   not to answer that question on the basis of privilege.
24       A.  I'll assert privilege.
25           MS. MARANZANO:  I think that I'm a point

## 118

1    where it might make sense to stop for lunch.  And maybe
2    we can start back up after the call to the court?  Does
3    that make sense?
4            MR. SWEETEN:  That's fine.
5            With respect to letting Janice go, I'm
6    going to let her go for a while.  Let's probably have
7    you come back at two o'clock.  I mean, I don't think she
8    needs to be here before 2:00 for any reason.
9            MS. MARANZANO:  Yeah, I think that's
10   right.
11           MR. DUNN:  That's fine.  The only thing
12   I'll add is that I invoked the rule, and under the
13   Federal Rules of Procedure you're not to talk to anybody
14   about your testimony other than your lawyers.
15           THE WITNESS:  That's fine.
16           (Lunch recess from 12:46 p.m. to
17   2:15 p.m.)
18           MS. MARANZANO:  Let's go back on the
19   record.
20       Q.  (By Ms. Maranzano) Before the break, we were
21   talking about SB 362, and I'd like to continue talking
22   about SB 362.
23           Ms. McCoy, what was your role in trying to
24   get SB 362 passed?
25       A.  My role in trying to get 362 passed was to

## 119

1    navigate the legislative process for the Senator in
2    terms of the behind-the-scenes staff work that takes
3    place.
4        Q.  And can you describe that to me?
5        A.  Filing the bill.  Filing the bill and
6    requesting hearings, prepping talking points.
7        Q.  Did you have any role in determining how
8    different senators would vote on SB 362?
9        A.  No.
10       Q.  Did Senator Fraser have any idea of how many
11   senators would support SB 362 when he introduced it?
12           MR. FREDERICK:  Object.  The question
13   calls for thought process and mental impressions of
14   Senator Fraser.  It may also call for communications
15   with legislators and staff that are privileged.  I would
16   instruct you not to answer on the basis of privilege.
17       A.  I'll assert privilege.
18           (Exhibit 32 marked for identification.)
19       Q.  (By Ms. Maranzano) Okay.  Can you take a look
20   at what we've marked as Deposition Exhibit 32?  In
21   particular, can you look at Rule 5.11, which is on Page
22   24.  Do you see Provision D under 5.11?
23       A.  Yes.
24       Q.  When was that provision added to the rules?
25       A.  January 14th, 2009.

## 120

1        Q.  And how was -- was there a resolution to
2    specifically add Subsection D to Rule 5.11?
3        A.  Yes.
4        Q.  Who introduced that resolution?
5        A.  Senator Williams.
6        Q.  Did Senator Fraser ask Senator Williams to
7    exempt voter ID requirements from the two-thirds Rule?
8            MR. FREDERICK:  I object on the grounds
9    that it seeks confidential communications related to
10   pending legislation, and I'm going to instruct you not
11   to answer on the basis of privilege.
12       A.  I'll assert privilege.
13       Q.  (By Ms. Maranzano) How was the resolution
14   brought up in the Senate to add Subsection D to 5.11?
15       A.  I don't remember.
16       Q.  During the time that you have worked for
17   Senator Fraser, have you ever seen another category of
18   legislation exempted from the two-thirds rule?
19           MR. FREDERICK:  I'll object just on -- to
20   the extent that it mischaracterizes the testimony in the
21   record, but you can answer.
22       A.  I don't recall the Committee of the Whole
23   meeting, except for 2009 and 2011, since I've worked for
24   Senator Fraser.
25       Q.  (By Ms. Maranzano) So am I understanding you

JANICE MCCOY                                           MAY 16, 2012

## 121

1 correctly that there has not been, to the best of your
2 recollection, another category of legislation that's
3 been written into the rules as exempted from the
4 two-thirds vote requirement under Rule 5.11?
5           MR. FREDERICK:  The same objection, but
6 you can answer.
7      A.   Can you repeat the question?
8      Q.   (By Ms. Maranzano) I just want to make sure I
9 understood the answer that you gave, because you
10 mentioned the Committee of the Whole.  But am I
11 understanding you correctly that it's your recollection,
12 as you sit here, that during the time you worked for
13 Senator Fraser, there has not been another category of
14 legislation carved out of Rule 5.11 as voter
15 identification requirements are carved out in
16 Subsection D in the 2009 rules?
17      A.   Yes.
18      Q.   Okay.  What was the purpose of carving out the
19 voter ID identification requirement from the two-thirds
20 rule?
21      A.   I don't know.
22      Q.   Did the Senator have any concerns about
23 exempting SB 362 from the requirement that legislation
24 get two-thirds support in the Senate?
25           MR. FREDERICK:  Object on the grounds that

## 122

1 it seeks the thought process and mental impressions of
2 Senator Fraser about pending legislation, and I instruct
3 you not to answer on the basis of privilege.
4      A.   I'm going to assert privilege.
5      Q.   (By Ms. Maranzano) Did the Senator have any
6 concerns that by exempting legislation from the
7 two-thirds rule requirement, it would appear to be a
8 very partisan-supported piece of legislation?
9           MR. FREDERICK:  I object on the grounds
10 that it seeks the mental impressions and thought
11 processes of Senator Fraser on pending legislation.  I
12 instruct you not to answer on grounds of privilege.
13      A.   I'll assert privilege.
14      Q.   (By Ms. Maranzano) If SB 362 had not been
15 exempt from the two-thirds rule requirement, would it
16 have passed the Senate?
17           MR. FREDERICK:  Object to the extent it
18 calls for speculation.
19      A.   I don't know.
20      Q.   (By Ms. Maranzano) Well, SB 362 was voted on,
21 did two-thirds of the members support it?
22      A.   No.
23      Q.   Did you have any communications with Senator
24 Williams about the resolution that led to Subsection D
25 of Rule 5.11 in the 2009 rules?

## 123

1           MR. FREDERICK:  I object to the question
2 to the extent it calls for the substance of confidential
3 communications between Ms. McCoy and Senator Williams
4 so it's subject to legislative privilege.  I'm going to
5 instruct you not to answer on that basis.
6      Q.   (By Ms. Maranzano) Are you following your
7 counsel's instruction not to answer that question?
8      A.   I never spoke to Senator Williams about this
9 resolution.
10      Q.   Did you speak to anybody at Senator Williams's
11 office about this resolution?
12      A.   No.
13      Q.   Did you speak to anybody in the Lieutenant
14 Governor's Office about the resolution that led to the
15 suspension of the two-thirds rule?
16      A.   No.
17      Q.   Did you speak to anybody in the Governor's
18 Office?
19      A.   No.
20      Q.   What was the reaction from senators on the --
21 well, let me ask you this first:  Are you familiar with
22 the testimony that occurred when Senator Williams
23 introduced the resolution to suspend the two-thirds
24 rule?
25      A.   No.

## 124

1      Q.   Can you also take a look at Rule 16.07?  It's
2 on Page 106 and 107.
3      A.   Which rule did you want me to look at?
4      Q.   16 -- hold on.
5      A.   07?
6      Q.   16.07.
7      A.   Okay.
8      Q.   Actually, you know what; let's do 16.06 and 07,
9 which relate to matters regarding -- 16.06 is matters
10 requiring a vote of two-thirds of the members present,
11 and 16.07 is Matters of Requiring Vote of Majority
12 Members of the Senate.  Were these rules also impacted
13 by Senator Williams's resolution?
14      A.   I don't know.
15      Q.   Can you look at Section 7, Subsection 7 of Rule
16 16.07, matters -- and 16.07, again, is Matters Requiring
17 Vote of Majority of Members of the Senate.  And
18 Subsection 7 says, "Set voter identification requirement
19 bills for special order."  Does that refresh your
20 recollection as to whether that was something that was
21 impacted by Senator Williams's resolution?
22      A.   I never read Senator Williams's resolution, so
23 I would assume yes, it was in there.
24      Q.   So these changes in the rules directly impacted
25 SB 362, did they not?

JANICE MCCOY                                              MAY 16, 2012

---

125

1     A.   Yes.
2     Q.   So you never read Senator Williams's
3  resolution, but are you familiar with the impact that
4  his resolution on the rules?
5     A.   Yes.
6     Q.   Did Senator Fraser have any concerns about
7  suspending the two-thirds rule for SB 362?
8          MR. FREDERICK:  I object on the grounds
9  that it seeks the mental impressions and thought
10  processes of Senator Fraser as well as privileged
11  communications of the staff, and I instruct you not to
12  answer on the basis of privilege.
13     A.   I'll assert privilege.
14     Q.   (By Ms. Maranzano) Were there any other changes
15  in the rules in 2009 from previous Senate rules that --
16     A.   I don't recall.  I'm sorry.  I thought you were
17  done.  I'm sorry.
18     Q.   No, it was just a pause.
19          That were related only to voter
20  identification requirements?
21     A.   I don't recall.
22     Q.   Was there any consideration of changing any
23  other Senate rules in 2009 to ensure that SB 362 would
24  get passed in the Senate?
25          MR. FREDERICK:  I object to the extent the

---

126

1  question calls for thought process, mental impressions
2  of legislators and for confidential communications,
3  privileged communications among legislators and
4  staff.  I would instruct you not to answer on the basis
5  of privilege, except to the extent there is something
6  nonprivileged you can point to answer.
7     A.   I don't know.
8     Q.   (By Ms. Maranzano) Was SB 362 considered by any
9  Senate committees?
10     A.   Senate committee on the whole.
11     Q.   Is that the only one?
12     A.   Yes, ma'am.
13     Q.   Is it unusual for a bill to go straight to
14  Senate Committee of the Whole?
15     A.   Yes.
16     Q.   Have you seen that happen with other
17  legislation during the time you have worked for Senator
18  Fraser?
19     A.   I don't recall it happening since I've worked
20  for Senator Fraser.
21     Q.   What was your role during the Floor
22  consideration of SB 362?
23     A.   I sat with Senator Fraser as he laid out the
24  bill, and when he asked me to produce documentation, I
25  would give it to him.

---

127

1     Q.   What kind of documentation did you have with
2  you?
3          MR. FREDERICK:  I object on the ground
4  that it seeks thought process and mental impressions
5  that may reflect confidential communications.  I would
6  instruct you not to answer on the basis of privilege.
7     A.   I will answer, because I will tell you the same
8  things that we've talked about earlier:  The poll data,
9  the studies, the Carter-Baker Commission report.  Just
10  those two.
11          MS. MARANZANO:  I'm going to ask, if it's
12  possible, Mr. Frederick, can you shorten your objections
13  just so that we can --
14          MR. FREDERICK:  Yeah.
15          MS. MARANZANO:  I mean, you know, since
16  it's the same objection, that will maybe save us some
17  time.
18          MR. FREDERICK:  Absolutely.
19          MS. MARANZANO:  Thank you.
20          MR. FREDERICK:  If y'all are willing to --
21  you know, to stipulate that when I make a shorter
22  objection, it covers all the matters, I am happy to
23  shorten it.
24          MS. MARANZANO:  Great.  Thank you.
25          MR. FREDERICK:  Can I propose "Objection,

---

128

1  legislative privilege"?
2          MS. MARANZANO:  That's sounds --
3          MR. FREDERICK:  Is that good enough?
4          MS. MARANZANO:  That's great.  And you
5  will understand what he means overall.
6          THE WITNESS:  And then I may not forget
7  your question.
8          MR. FREDERICK:  Yeah.  Thanks.
9          MS. MARANZANO:  Okay.  Terrific.
10     Q.   (By Ms. Maranzano) During the Floor debate on
11  SB 362, did anyone raise concerns about the impact that
12  the bill might have on minority voters?
13     A.   Yes.
14     Q.   What concerns were those?
15     A.   I can't speak to specific concerns.
16     Q.   Who raised those concerns?
17     A.   Democrats and the senators.
18     Q.   Were they minority senators?
19     A.   Some of them were.
20     Q.   Do you know if they were senators who
21  represented minority voters?
22     A.   Yes.
23     Q.   What was the Senator's response to these
24  concerns?
25     A.   His response was that he disagreed.

JANICE MCCOY                                    MAY 16, 2012

---

**129**

1    Q.   What was that disagreement based upon?

2         MR. FREDERICK:  Object on legislative

3    privilege, but matters in the public record you may

4    address.

5    A.   He referenced election data in both Georgia and

6    Indiana that showed that their voter ID laws did not

7    impact minority voters on the record.

8    Q.   (By Ms. Maranzano) What was that election data?

9    A.   Data from Indiana and Georgia's elections that

10   were held after they voted -- after they had a voter ID

11   law, that showed that the turnout increased.

12   Q.   So the data you referenced was about turnout?

13   A.   Yes, ma'am.

14   Q.   Was it solely about turnout?

15   A.   Yes, ma'am.

16   Q.   And was it about turnout of minority voters in

17   particular?

18   A.   All voters.

19   Q.   All voters?

20   A.   By I think the data he showed did have

21   minority -- I think the data he referenced in his

22   testimony did show that minority voters increased as

23   well.

24   Q.   And what years were those studies run?

25   A.   I don't remember.

---

**130**

1    Q.   Do you know if he looked into whether other

2    issues might have had any impact on that turnout?

3         MR. FREDERICK:  Objection, legislative

4    privilege.  To the extent there's material on the

5    record, you may answer.

6    A.   I'll assert privilege.

7    Q.   (By Ms. Maranzano) Did any of those studies

8    record any information about voter registration rates in

9    Indiana and Georgia?

10   A.   The data -- I'm sorry.  The data that I

11   mentioned was not a study.  It's actual voter turnout

12   from those states' Secretaries of State.  So I want to

13   be real clear that they're not studies.  We're talking

14   about actual turnout.

15   Q.   Okay.  I got you.  So did the Senator do any

16   research to determine whether voter registration rates

17   changed in those states during the years in which there

18   was an increase in voter turnout?

19        MR. FREDERICK:  Objection, legislative

20   privilege.  Instruct you not to answer.

21   A.   I'll assert privilege.

22   Q.   (By Ms. Maranzano) Did the Senator do any

23   research to determine whether there were any close

24   elections during those years?

25        MR. FREDERICK:  Objection, legislative

---

**131**

1    privilege.  Instruct you not to answer.

2    A.   Assert privilege.

3    Q.   (By Ms. Maranzano) Did the Senator do any

4    research to determine whether there were any high

5    profile elections during those years?

6         MR. FREDERICK:  Objection, legislative

7    privilege.  Instruct you not to answer.

8    A.   I assert privilege.

9    Q.   (By Ms. Maranzano) Did the Senator do any

10   additional research about turnout and Georgia and

11   Indiana?

12        MR. FREDERICK:  Objection, legislative

13   privilege.  Instruct you not to answer.

14   A.   Assert privilege.

15   Q.   (By Ms. Maranzano) Did SB 362 change at all in

16   response to the concerns that were raised on the Senate

17   Floor?

18        MR. FREDERICK:  Objection, legislative

19   privilege, to the extent it calls for actual thought

20   process, but I think to the extent there's anything on

21   the record, you're free to testify about that.

22   A.   So I went and looked over at the break, while

23   y'all were having your conference, about the process,

24   because I don't recall, didn't recall, and Senate Bill

25   362, there was a committee substitute in committee.  But

---

**132**

1    I don't think it changed on the Floor after the Floor

2    debate.

3    Q.   (By Ms. Maranzano) What were the changes that

4    occurred in committee?

5    A.   I didn't -- I don't recall, and I didn't have

6    time to review it.

7    Q.   I just want to go back to finish what you were

8    talking about earlier, and just make sure.  You said the

9    Senator disagreed with the opposition that was brought

10   up on the Floor, and then we talked about turnout.

11   A.   Uh-huh.

12   Q.   Were there any other bases from the Senator's

13   disagreement with the concerns that were raised on the

14   Floor?

15        MR. FREDERICK:  Object on the legislative

16   privilege only to the extent those bases were not

17   disclosed.  But if there's anything else on the record,

18   you're free to address it.

19   A.   I don't remember if he had any other arguments.

20        (Exhibit 33 marked for identification.)

21   Q.   (By Ms. Maranzano) Okay.  Ms. McCoy, I'm

22   showing you what we're marking for the record as

23   Deposition Exhibit 33, and it's Bates labeled U.S.

24   00005599 through U.S. 00005615.  And I'd like to turn

25   your attention to Page 5607 at the bottom and 5608.

---

137

1  available that the witnesses are going to lay out.
2  You're asking have I done that?  The answer is no."  Do
3  you see all that?
4      A.  Uh-huh.
5      Q.  Do you recall this testimony?
6      A.  Not specifically, but...
7      Q.  Did Senator Fraser ever do any research on how
8  SB 362 would impact minority voters?
9          MR. FREDERICK:  Objection, legislative
10  privilege.  Instruct you not to answer.
11      Q.  (By Ms. Maranzano) Was there any testimony
12  presented during the debate of SB 362 by Senator Fraser
13  about any analysis related to the impact that the bill
14  would have on minority voters?
15      A.  I think the only testimony that Senator Fraser
16  might have talked about, in terms of voter turnout,
17  minority or not, was the election results from Indiana
18  and Georgia.
19      Q.  Did SB 362 pass the Senate?
20      A.  Yes.
21      Q.  Did Senator Fraser have any role with regard to
22  SB 362 once it was referred to the House?
23      A.  No.
24      Q.  Did you have any role?
25      A.  I met with Representative Todd Smith once.

---

138

1      Q.  Anybody else?
2      A.  No.
3      Q.  What was your meeting with Representative Smith
4  about?
5          MR. FREDERICK:  Object, legislative
6  privilege to the extent it seeks the substance of the
7  communications, but you are free to describe general
8  subject matter of the meeting, if you can.
9      A.  Senate Bill 14.  I mean, specifically the
10  provisions in Senate Bill 14.
11      Q.  (By Ms. Maranzano) And did Representative Smith
12  carry Senate Bill -- oh, wait.  Did you say Senate Bill
13  14?
14      A.  Oh, I'm sorry.  Senate Bill 362.  I'm sorry.
15      Q.  Did Representative Smith carry Senate Bill 362
16  in the House?
17      A.  Yes.
18      Q.  And did the bill pass the House?
19      A.  No.
20      Q.  Why not?
21      A.  It ran out of time.
22      Q.  Was it essentially filibustered in the House?
23      A.  I don't really remember how that worked, but I
24  think it -- yes.  No.  That's the wrong term.  The
25  calendar was filibustered.

---

139

1      Q.  Okay.  All right.  Thank you for the
2  distinction.
3      A.  Yeah.  I don't -- yeah.
4      Q.  You testified earlier about Senate Bill 363.
5  Do you recall that --
6      A.  Yes, ma'am.
7      Q.  -- when we read the news article?
8          Can we have this marked as Exhibit 36?
9          (Exhibit 36 marked for identification.)
10      Q.  (By Ms. Maranzano) Does this appear to be a
11  copy of Senate Bill 363 that you referred to earlier?
12      A.  Yes, ma'am.
13      Q.  What are the general requirements of this
14  legislation in regard to voter registration applicants?
15      A.  Honestly, without reading it again, I can't
16  tell you.
17      Q.  Would it sound correct to you if I said that
18  this requires voter registration applicants to prove
19  citizenship?
20          MR. FREDERICK:  And take your time to read
21  it, if you need to.
22      A.  (Viewing documents.)  Yes.
23      Q.  (By Ms. Maranzano) What was the purpose of
24  Senate Bill 363?
25          MR. FREDERICK:  I object to legislative

---

140

1  privilege to the extent that it seeks mental
2  impressions, thought process, or confidential
3  communications, but to the extent that the question just
4  seeks the purpose of the bill, then you may answer, if
5  you know.
6      A.  I don't remember.
7      Q.  (By Ms. Maranzano) Was this filed at the same
8  time as Senate Bill 362?
9      A.  Yes, ma'am.
10      Q.  Were they filed -- would you say these bills
11  were filed in conjunction with each other?
12      A.  Yes, ma'am.
13      Q.  Why would it be necessary for a voter
14  registration applicant to prove their citizenship?
15          MR. FREDERICK:  Objection, calls for
16  speculation.
17      A.  I don't remember this bill.
18      Q.  (By Ms. Maranzano) Did you work on this bill,
19  Ms. McCoy?
20      A.  Not since it was filed in November of 2008.
21      Q.  Do you recall that press release that we looked
22  at earlier today?
23      A.  Yes, ma'am.
24      Q.  And did it mention Senate Bill 363?
25      A.  Yes, ma'am.

JANICE MCCOY                                        MAY 16, 2012

---

## 141

1      Q.   And didn't you testify that you had written
2  that press release?
3      A.   Yes, ma'am.
4      Q.   Are you aware of any evidence that noncitizens
5  register to vote?
6          MR. FREDERICK:  I'll object, legislative
7  privilege, to the extent this seeks your thought
8  process, mental impressions or those of Senator Fraser
9  related to this pending legislation.  To the extent you
10 can answer just based on general knowledge, if you can,
11 you're free to do so?
12      A.   I don't know.
13      Q.   (By Ms. Maranzano) You don't know of any
14 evidence?
15      A.   I do not.
16      Q.   Did you look into any such evidence when you
17 were working on Senate Bill 363?
18          MR. FREDERICK:  Objection, legislative
19 privilege.  Instruct you not to answer.
20      A.   I don't recall.
21      Q.   (By Ms. Maranzano) Are you familiar with a
22 federal law called the Help America Vote Act?
23      A.   Yes.
24      Q.   Does HAVA, the Help America Vote Act, implement
25 certain identification requirements for voter

---

## 142

1  registration applicants?
2      A.   Yes.
3      Q.   Is there any reason to think that those forms
4  of identification wouldn't be sufficient?
5          MR. FREDERICK:  Objection, calls for
6  speculation.  You can answer if you can.
7      A.   Well, my understanding is, HAVA requires your
8  driver's license or your social security card number.
9  Those are the photo -- those are the IDs.
10      Q.   And if a person does not list those forms of
11 identification on their voter registration application,
12 are you familiar with any additional requirements?
13      A.   When they go to vote the first time, they're
14 supposed to show some form of ID.
15      Q.   And do you know what forms of ID are acceptable
16 HAVA?
17      A.   I do not.
18      Q.   Do you know if it's only photo identification?
19      A.   I think it's more than that, but I don't know
20 specifically.
21      Q.   Did you look into the requirements of HAVA when
22 you were working on any voter identification bills?
23          MR. FREDERICK:  Object, legislative
24 privilege.  Instruct you not to answer.
25      A.   I'll assert privilege.

---

## 143

1      Q.   (By Ms. Maranzano) Do you know what ethnic
2  group makes up the largest percentage of the noncitizen
3  population in Texas?
4      A.   The noncitizen --
5      Q.   Uh-huh.
6      A.   -- population in Texas?  No.
7      Q.   How long have you lived in Texas?
8      A.   My whole life.
9      Q.   And you have no idea what ethic group makes up
10 the largest -- percentage of the noncitizen population?
11      A.   Do you want me to guess?
12          MR. FREDERICK:  Objection, argumentative.
13      Q.   (By Ms. Maranzano) You can make an educated
14 guess.
15      A.   Hispanic.
16      Q.   And what's your educated guess based on?  Your
17 time in Texas?
18      A.   We're close to Mexico.
19      Q.   Okay.  Let's talk about Senate Bill 14.  When
20 did Senator Fraser introduce Senate Bill 14?
21      A.   In November of 2010, Senator Fraser filed a
22 piece of legislation -- and I don't recall the bill
23 number -- that was essentially Senate Bill 14.  When
24 session started, we refiled that legislation as Senate
25 Bill 14, so it was right January of 2011.

---

## 144

1      Q.   Would it sound correct to you if I say:  Did he
2  introduce a bill that's called Senate Bill 178?
3      A.   That's it.  Yes, ma'am.
4      Q.   And that was the one that was introduced prior
5  to the session beginning?
6      A.   Yes, ma'am.
7      Q.   Was that the same as Senate Bill 14 as it was
8  introduced?
9      A.   No, ma'am.
10      Q.   What were the changes?
11      A.   There was a provision added to Senate Bill 14
12 to exempt certain elderly people from the provisions of
13 voter ID.
14      Q.   And how did that get added?
15          MR. FREDERICK:  Object, legislative
16 privilege.  If you can answer without revealing
17 confidential communications or thought processes, you
18 may.
19      A.   I'll assert privilege.
20      Q.   (By Ms. Maranzano) Did anyone ask Senator
21 Fraser to introduce Senate Bill 14?
22          MR. FREDERICK:  Object, legislative
23 privilege.  Instruct you not to answer.
24      A.   I'll assert privilege.
25      Q.   (By Ms. Maranzano) Did Senator Fraser ever make

JANICE MCCOY                                                      MAY 16, 2012

## 145

1  any public commitments to introduce Senate Bill 14 after
2  Senate Bill 362 did not get enacted?
3      A.  Probably, but I can't definitively say.
4      Q.  Was Senate Bill 14 given a designation by
5  Governor Perry as emergency legislation?
6      A.  Governor Perry designated photo ID as an
7  emergency.  I don't think that order specifically said
8  that bill number.
9      Q.  What does it mean to be designated emergency
10  legislation?
11      A.  According to the constitution, the Legislature
12  can't do anything substantive for 60 days unless the
13  Governor says it's an emergency.
14      Q.  How did photo ID come to be included in the
15  Governor's designation?
16      A.  I don't know.  I'll just tell you.  I mean...
17      Q.  Did you have any conversations with anyone in
18  the Governor's Office about the emergency designation?
19      A.  No.
20      Q.  Did the Senator?
21      A.  I don't know.
22      Q.  Why would photo ID requirements need to be
23  considered within the first 60 days of the legislative
24  session?
25          MR. FREDERICK:  Objection, calls for

## 146

1  speculation.  You can answer if you know.
2      A.  I don't know.
3      Q.  (By Ms. Maranzano) Were there any elections
4  scheduled within the first 60 days of 2011, of the 2011
5  legislative session?
6      A.  I don't think so, but I can't speak to every
7  election that local governments or...
8      Q.  What other categories of -- what other topics
9  were given emergency designation in 2011?
10      A.  I don't remember.
11      Q.  Does legislation automatically get considered
12  within the first 60 days if it's designated as emergency
13  legislation?
14      A.  No.
15      Q.  Who makes the decision whether or not the
16  legislation will be heard within the first 60 days?
17      A.  My guess is leadership, Lieutenant Governor or
18  the Speaker.  They set the calendars.
19      Q.  Did you have any conversations with anybody in
20  the Lieutenant Governor's Office about SB 14 getting
21  heard within the first 60 days of the 2011 legislative
22  session?
23          MR. FREDERICK:  Object, legislative
24  privilege.
25      A.  Yes.

## 147

1          MR. FREDERICK:  I think that's calls
2  for --
3          THE WITNESS:  Sorry.
4          MR. FREDERICK:  Just let me finish my
5  objection, please.
6          THE WITNESS:  Okay.
7      Q.  (By Ms. Maranzano) Who in the Lieutenant
8  Governor's Office did you have a conversation with?
9      A.  Julia Rathgeber and Blaine Brunson.
10      Q.  How many conversations did you have with them?
11      A.  Probably two on that issue.
12      Q.  How many conversations did you have with the
13  Lieutenant Governor's Office about SB 14?
14      A.  I probably spoke to them once or twice a day
15  during the whole process until voter ID left the Senate.
16      Q.  And is there anybody, other than the people
17  that you've already testified to from the Lieutenant
18  Governor's Office, who you were communicating with?
19      A.  In the Lieutenant Governor's Office?
20      Q.  Uh-huh.
21      A.  No.
22      Q.  So am I correct that it was Julia Rathgeber,
23  Blaine Brunson and Bryan Hebert?
24      A.  Uh-huh.
25          (Brief discussion held off the record.)

## 148

1      Q.  (By Ms. Maranzano) Okay.  Ms. McCoy, I'm
2  showing you what we've marked as Deposition Exhibit 5
3  for the record.  Do you recognize what this is?
4      A.  It's the enrolled version of Senate Bill 14.
5      Q.  And can you look at Section 14 of the bill and
6  tell me what forms of identification are permitted under
7  Senate Bill 14?
8      A.  A driver's license, an election ID certificate,
9  an ID card by DPS, a military ID card, a citizens
10  certificate, a passport, and a license to carry a
11  concealed handgun.
12      Q.  What is a military identification card?
13      A.  My understanding is it's a card issued by the
14  Department of Defense.
15      Q.  Is it your understanding that only the
16  Department of Defense issues military IDs that would be
17  acceptable under SB 14?
18      A.  Yes.
19      Q.  And what's that understanding based on?
20          MR. FREDERICK:  We'll object on
21  legislative privilege, only to the extent it would
22  require you to disclose confidential communications or
23  thought process.  If it's based on something outside of
24  that, then you're free to answer.
25      A.  I'll assert privilege.

JANICE MCCOY                                                MAY 16, 2012

## 149

1     Q.  (By Ms. Maranzano) Have you ever seen a
2   military ID card?
3     A.  No.
4     Q.  Do you know if veterans ID -- a veterans
5   identification is an acceptable form of military
6   identification under SB 14?
7     A.  I don't believe that it is.
8     Q.  And what is that based on?
9     A.  The Department of Veterans Affairs is not a
10  military.  It's an executive branch agency.
11    Q.  Do you know if any Department of Homeland
12  Security identifications would be considered acceptable
13  under SB 14?
14    A.  Again, I would say no.
15    Q.  And what is that based on?
16    A.  That they're not also not military.  They're
17  not under the Department of Defense.
18    Q.  What is a citizenship certificate?
19    A.  My understanding is when someone becomes a
20  citizen of the United States, they are issued a
21  certificate showing that they are now a citizen.
22    Q.  Do you know how much it costs to get a
23  citizenship certificate?
24    A.  No.
25    Q.  Do you know how much is costs to get a United

## 150

1   States passport?
2     A.  No.
3     Q.  Did you look into the cost of obtaining these
4   IDs when you were working on SB 14?
5     A.  No.
6     Q.  Can you look at Page 11, Section 16 of the
7   bill?  Does SB 14 increase criminal penalties for a
8   person who impersonates a voter?
9     A.  Yes.
10    Q.  Were you involved in the drafting of SB 14?
11    A.  Yes.
12    Q.  What involvement did you have?
13    A.  I presented options to Senator Fraser, and when
14  he determined what he wanted included in the bill, I had
15  it drafted by Senate Engrossing and Enrolling.
16    Q.  Who is Senate Engrossing and Enrolling?
17    A.  It's an administrative arm of the Senate that
18  works on -- it's a group of lawyers that help us with
19  bill drafts and amendments.
20    Q.  What options did you present to Senator Fraser?
21    MR. FREDERICK:  Objection, legislative
22  privilege.  Instruct you not to answer.
23    A.  I'll assert privilege.
24    Q.  (By Ms. Maranzano) Does Senate Engrossing and
25  Enrolling -- did you say that was a committee?

## 151

1     A.  No, ma'am.  It's an administrative arm of the
2   Senate.
3     Q.  Do they provide legal advice about whether a
4   law complies with federal law?
5     A.  No.
6     Q.  Are they connected at all to the Texas
7   Legislative Council?
8     A.  No.
9     Q.  How are those two bodies different?
10    A.  The Texas Legislative Council -- well, Senate
11  Engrossing and Enrolling is strictly a body that's
12  designed to assist the senators, but they do the same
13  essential work.  They work just for the Senate.
14    MS. MARANZANO:  Mr. Frederick, have you
15  produced any documents from the Engrossing and Enrolling
16  branch that Ms. McCoy is testifying about?
17    MR. FREDERICK:  I am not aware at this
18  time whether or not we have.
19    MS. MARANZANO:  Have you reached out to
20  them in terms of the document requests that were
21  propounded on the State of Texas?
22    MR. FREDERICK:  I'm not aware that we
23  have.
24    MS. MARANZANO:  It sounds to me like they
25  might have relevant documents, so I'd request that you

## 152

1   all do that.
2     Q.  (By Ms. Maranzano) Did you also work with the
3   TLC, Ms. McCoy, in developing SB 14?
4     A.  Yes.
5     Q.  And what was the TLC's role?
6     A.  I'm trying to remember if we did substitutes or
7   amendments.  But they assisted me with either a
8   substitute or potential amendments.  And then at the
9   end, they also assisted me with the conference committee
10  reports.
11    Q.  When you say -- all right.  So the substitute,
12  can you tell me what the substitute was?
13    A.  I don't remember how we moved this bill through
14  the process.  I don't remember if we had a substitute.
15  I don't remember if we had amendments.  So once we filed
16  the bill with the E & E draft, I used the Legislative
17  Council, as we moved forward, with whatever drafting
18  needs I had.  But I don't remember what those drafting
19  needs are -- were.
20    Q.  So just so I'm clear, what -- how do you
21  distinguish between the drafting E & E does versus the
22  drafting that Texas Legislative Council does?  Is it the
23  process that the bill is in, or is there another
24  distinction?
25    A.  Senate Engrossing and Enrolling moves a lot

JANICE MCCOY                                              MAY 16, 2012

## 153

1    faster, so when we need quick drafts, we tend to use
2    them.  Legislative Council is a little bit slower, but
3    they review all of the sections of the code to make sure
4    that we're -- if something needs to get changed for
5    compliance -- not -- compliance is not the right word,
6    but settle up reasons, they'll say, "Hey, if you're
7    amending this section of code, you need to address this
8    section, too."  And so sometimes we go through Leg
9    Council, even though we know it's going slower, to make
10   sure that we've hit every part of the code or statute
11   that we need to.
12       Q.   And does Leg Council also look at how
13   legislation interacts with federal law?
14       A.   I don't know.
15       Q.   So did you go through the Engrossing and
16   Enrolling with the initial draft of SB 14 because you
17   were on an expedited -- because you were -- it was
18   because the bill was given emergency designation?
19       A.   No.  We used Engrossing and Enrolling in
20   November because we wanted to get the bill filed as
21   close to the first day of filing as we could.
22       Q.   And why was that?
23       A.   The Senator just wanted to.
24       Q.   Were there multiple drafts of SB 14 prior to it
25   being introduced?

## 154

1        A.   Yes.
2        Q.   And would E & E, Engrossing and Enrolling, be
3    the -- would they be the holders of those drafts?
4        A.   No.
5        Q.   Who would?
6        A.   Me.
7        Q.   And did you keep them?
8        A.   Yes.
9        Q.   And did you turn them over to your counsel?
10       A.   Yes.
11       Q.   Did Senate Engrossing and Enrolling draft
12   SB 362 as well?
13       A.   Yes.
14       Q.   Did they draft HB 218 as well?
15       A.   Oh, I'm sorry.  No, no, no.  I'm sorry.  I got
16   confused.  Senate Bill 362 in 2009 was drafted by
17   Legislative Council.
18       Q.   And why was that one drafted by Legislative
19   Council?
20       A.   Because it was -- I think what I filed as
21   Senate Bill 362 was the Senate Committee report of House
22   Bill 218.  So that's all I asked them to do, was, like
23   would you just make this document ready to file, and
24   they did.
25       Q.   Who from -- if I say E & E, can we agree that

## 155

1    that's this Engrossing and Enrolling?
2        A.   Yes, ma'am.  That's how we call them.
3        Q.   Okay.  Who from E & E did you work with on
4    Senate Bill 14?
5        A.   Mardi, M-a-r-d-i, Alexander was my contact.
6        Q.   Anybody else?
7        A.   She was head of E & E.  I think she assigned it
8    to a lawyer, but she's who I dealt with.
9        Q.   How did you communicate with Ms. Alexander?
10       A.   E-mail.
11       Q.   Did you save those e-mails?
12       A.   If I printed out the e-mail, I saved it.  If it
13   was not printed out, then it was not saved.
14       Q.   And would those be in your files if you printed
15   out the e-mails?
16       A.   Yes, ma'am.
17       Q.   And that's the files that we talked about
18   earlier that you kept of SB 362 and SB 14?
19       A.   Yes, ma'am.
20       Q.   Do you know about how many e-mails you
21   exchanged Ms. Alexander?
22       A.   Three or four.
23       Q.   For the whole process of drafting SB 14?
24       A.   Yes, ma'am.
25       Q.   Was there anything you looked at, when you were

## 156

1    developing SB 14, that you haven't already testified to,
2    when we were talking about other bills?
3            MR. FREDERICK:  Object, legislative
4    privilege.  Instruct you not to answer.
5        A.   I'll assert privilege.
6        Q.   (By Ms. Maranzano) Did you have any
7    communications about SB 14 with other legislators?
8        A.   Yes.
9        Q.   Which legislators?
10       A.   Throughout the process?
11       Q.   Uh-huh.
12       A.   I would say probably 90 percent of the
13   senators.  Representative Harless.
14       Q.   Anyone else?
15       A.   I'm trying to think.  That's -- I mean, those
16   are the ones I can remember.  House members.  Other
17   House members potentially, but it was probably more of
18   size than substantive.
19       Q.   Did you have communications with any
20   individuals from the Governor's Office about SB 14?
21       A.   Yes.
22       Q.   And who was that?
23       A.   Michael Scofield.
24       Q.   When was that?
25       A.   Throughout the legislative session.

JANICE MCCOY                                              MAY 16, 2012

## 157

1   Q.   Were those communications verbal or written?
2   A.   Verbal.
3   Q.   By phone or in person?
4   A.   Both.
5   Q.   Was Senator Fraser involved in those
6   communications?
7   A.   Yes.
8   Q.   In none of them?
9   A.   No.
10  Q.   What was the nature of those communications?
11       MR. FREDERICK:  I'll object, legislative
12  privilege.  Instruct you not to answer.
13  A.   I'll assert.
14  Q.   (By Ms. Maranzano) Did you have communications
15  about SB 14 with any interest groups or lobbyists?
16  A.   Yes.
17  Q.   What groups?
18  A.   I talked to AARP a couple of times.  I'm pretty
19  sure the Disability Coalition, although I'm not sure
20  that's how they're known, came in a time or two, and
21  that group out of Houston, the Patriots or the -- I
22  can't think of what their name is.
23  Q.   Does the King Street Patriots sound correct?
24  A.   Yes, ma'am.  The King Street Patriots.  I think
25  they came in once.  Other than that, I can't think of

## 159

1   Q.   What was the nature of those conversations?
2       MR. FREDERICK:  Object on legislative
3   privilege and instruct you not to answer.
4   A.   I'll assert.
5   Q.   (By Ms. Maranzano) Can you tell me the general
6   nature of your conversation with Mr. Bettencourt in
7   terms of a --
8   A.   I generally am having a hard -- I think -- I
9   know I talked to him.
10  Q.   Uh-huh.
11  A.   And generally, I'm -- I honestly don't recall
12  that he was helpful to me.  I don't really remember.  We
13  generally talked about Senate Bill 14.
14  Q.   How about the general nature of your
15  conversation with the King Street Patriots?
16       MR. FREDERICK:  To the extent it's a
17  general subject matter, I'll permit you to answer.
18       THE WITNESS:  Right.  Okay.
19  A.   I think generally, they came in to talk about
20  their history of monitoring elections in Harris County.
21  Q.   (By Ms. Maranzano) Did they bring up any
22  in-person voter impersonation?
23       MR. FREDERICK:  Object, legislative
24  privilege and instruct you not to answer.
25  A.   I'll assert.

## 158

1   any particular interest group that came in.
2   Q.   Did you have any communications with a group by
3   the name of American Legislative Exchange Council, or
4   ALEC, about SB 14?
5   A.   I did not.
6   Q.   Did the Senator?
7   A.   Not to my recollection.
8   Q.   Did you have any communications with an
9   individual by the name of Catherine Engelbrecht about SB
10  14?
11  A.   I did not, but I think she testified.  Did she
12  testify in the Senate?  I can't remember.  I'm sorry.
13  Q.   Did you have any communications with an
14  individual by the name of Paul Bettencourt about SB 14?
15  A.   Yes.
16  Q.   How many?
17  A.   Maybe two.
18  Q.   And do you remember when -- when were those
19  communications?
20  A.   I do not recall.
21  Q.   Were they in person or by phone?
22  A.   By phone.
23  Q.   Were you and he the only parties to those
24  conversations?
25  A.   As far as I know, yes.

## 160

1   Q.   (By Ms. Maranzano) Did you say there was a
2   disability group that came in, disability advocate?
3   A.   I don't -- I think that the disability
4   lobbyists, interest group came in as we were in
5   conference committee to talk to me about the language
6   that was added -- that was amended by the House.
7   Q.   And what was that amendment?
8   A.   It was the Section 1 of the bill.
9   Q.   And were they concerned about that?
10      MR. FREDERICK:  Objection, legislative
11  privilege.  Instruct you not to answer.
12  Q.   (By Ms. Maranzano) Did you have any
13  communications about SB 14 with an individual by the
14  name of Hans von Spakovsky?
15  A.   No.
16  Q.   Did you have any communications with any local
17  election officials about SB 14?
18  A.   I don't recall.
19  Q.   Did you have any communications with the Texas
20  Republican Party about SB 14?
21  A.   I don't think so, but I don't recall.
22  Q.   Did Senator Fraser exchange drafts of SB 14
23  with anyone other than Engrossing and Enrolling or TLC?
24      MR. FREDERICK:  We'll object on
25  legislative privilege to the extent that it seeks the

## 165

1  privilege, the work product immunity.
2          MS. MARANZANO:  Okay.  I mean, our
3  position is she signed a sworn declaration that this is
4  complete and accurate information.
5          MR. FREDERICK:  I would disagree.
6          MS. MARANZANO:  True and correct.
7          MR. FREDERICK:  Yes, that I would agree
8  to.
9          MS. MARANZANO:  And so our position is
10  that we should be able to question her about what she
11  did to make sure it was true and correct and what she
12  meant, you know, by listing these as the individuals who
13  are responsive to the request.  It's about the three.
14          The question remains about the three
15  co-sponsors and joint -- and the -- about Representative
16  Aliseda, Representative Gonzalez, Representative Pena,
17  and why those three individuals are listed in response
18  to Interrogatory Number 1 and why the other co-sponsors
19  are not listed.  So let's just, you know, be clear.  Are
20  you going to instruct her not to answer that question?
21          MR. FREDERICK:  No.  I'll permit her to
22  respond subject to my objection.
23      Q.  (By Ms. Maranzano) So the question is about why
24  Representative Pena, Gonzalez and Aliseda are listed
25  here, and the description provided for them is that they

## 166

1  were co-sponsors and joint sponsors.  But my
2  understanding is that there a number of other co-
3  sponsors and joint sponsors who are not listed here.
4      A.  And those names were provided by Representative
5  Harless's Office as people that were instrumental in
6  specifically drafting, proposing, and developing Senate
7  Bill 14.  My assumption, when I signed this, was that
8  the other members that supported the legislation didn't
9  draft, propose, develop, or analyze the bill.  They
10  supported it, but they didn't do those fours things.
11  And so that's, I think, probably how these members got
12  on the list and not every member.
13      **Q.  And was the person who provided these names to**
14  **you, Mr. Beuck?**
15      **A.  Yes.**
16      **Q.  And do you see that on Page 5, Mr. Beuck is,**
17  **is also listed?**
18      **A.  Yes, ma'am.**
19      **Q.  Would it surprise you to learn that**
20  **Representative Harless testified yesterday that**
21  **Mr. Beuck was not instrumental in drafting, developing,**
22  **and passing SB 14?**
23          **MR. FREDERICK:  Object, mischaracterizes**
24  **the testimony and assumes facts not in evidence.**
25      **Q.  (By Ms. Maranzano) Would you like to me to read**

## 167

1  **you testimony from yesterday?**
2      **A.  Sure.**
3      **Q.  The question was:  "And the State of Texas has**
4  **indicated that Mr. Beuck assisted with the drafting,**
5  **development, and passage of SB 14 in the Texas House of**
6  **Representatives.  Are you aware of any assistance that**
7  **Mr. Beuck provided concerning the drafting of SB 14?"**
8          **Representative Harless said, "I have no**
9  **idea."**
10          **"Were you aware of any assistance he**
11  **provided in the development of SB 14?"**
12          **Representative Harless said, "I have no**
13  **idea."**
14          **MR. FREDERICK:  Can I get page and line**
15  **cite for that?**
16          **MS. MARANZANO:  Yes.  That is, of the**
17  **dirty transcript, at Page 201, Line -- I think I started**
18  **reading -- I read Line 12 through Line 20.  And that's**
19  **of the transcript that we were sent last night, not the**
20  **final.**
21          **MR. FREDERICK:  Thank you.**
22      **Q.  (By Ms. Maranzano) Would that surprise you**
23  **Ms. McCoy?**
24      **A.  That she didn't remember?**
25      **Q.  That she has no idea if Mr. Beuck was involved**

## 168

1  **in the development, drafting, and passing of SB 14?**
2      **A.  Yes.**
3      Q.  Can you look at -- below Mr. Beuck's name on
4  the interrogatories, Bryan Hebert and Julia Rathgeber?
5      A.  Uh-huh.
6      Q.  Can you tell me what Mr. Hebert's role was in
7  the drafting of SB 14?
8          MR. FREDERICK:  Object on the grounds of
9  legislative privilege.  To the extent you can answer
10  without revealing -- no, I'm going to object.  I'm going
11  to object to that on legislative privilege and instruct
12  you not to answer.
13      A.  I'll assert privilege.
14      Q.  (By Ms. Maranzano) Can you tell me what
15  Mr. Hebert's role was in analyzing SB 14?
16          MR. FREDERICK:  Object, legislative
17  privilege.  Instruct you not to answer.
18      A.  I'll assert privilege.
19      Q.  (By Ms. Maranzano) Can you tell me what
20  Ms. Rathgeber's role was in assisting with the
21  development of SB 14?
22          MR. FREDERICK:  Objection, legislative
23  privilege.  Instruct you not to answer.
24      A.  I'll assert privilege.
25      Q.  (By Ms. Maranzano) And at the bottom of Page 5,

JANICE MCCOY                                                    MAY 16, 2012

---

### 169

1  the top of Page 6, do you see Mr. Battle is listed as
2  somebody who assisted with the analysis of legal
3  questions relating to SB 14.  Can you tell me what legal
4  questions Mr. Battle analyzed?
5          MR. FREDERICK:  Objection, legislative
6  privilege.  Instruct you not to answer.
7      A.  I'll assert privilege.
8          MS. MARANZANO:  And is that even on what
9  issues he was looking at Mr. Frederick, what legal
10  issues he --
11          MR. FREDERICK:  Yeah, that reflects the
12  thought process in mental impressions.
13      Q.  (By Ms. Maranzano) And below Mr. Battle,
14  Mr. Brunson is listed as involved in the development of
15  SB 14.  Can you tell me what his role was in the
16  development of SB 14?
17          MR. FREDERICK:  Objection, legislative
18  privilege.  Instruct you not to answer.
19      A.  I'll assert privilege.
20      Q.  (By Ms. Maranzano) Can you turn to Page 7, and
21  there's two individuals who are listed as staff members
22  for Senator Tommy Williams, both Amanda Montague and
23  Ryan Larue.  Can you tell me why these two staffers are
24  listed here, but Senator Williams is not?
25          MR. FREDERICK:  Again, this whole line of

---

### 170

1  questioning I object to.  I object to that question on
2  the grounds of work product immunity.
3      Q.  (By Ms. Maranzano) Why don't we do this,
4  Ms. McCoy.  Can you just look through the list and tell
5  me, as you sit here today, if this looks like a true and
6  correct list of individuals involved in the drafting,
7  development -- drafting, proposing, development or
8  analysis of SB 14?
9          MR. FREDERICK:  May I also note for the
10  record that the State -- I mean, as reflected in the
11  exhibit, the State made numerous objections to the
12  request, including overbreadth, undue burden.
13          But you may answer to the extent you can.
14      A.  I think that potentially you could have listed
15  every elected official and every legislator in this
16  document.  But I think this list is pretty complete,
17  given that Senate Bill 14 and how it was developed.
18      Q.  (By Ms. Maranzano) Every -- every legislator in
19  the Texas Senate could be listed as being involved in
20  the drafting, development --
21      A.  Or analysis.
22      Q.  -- or analysis?
23      A.  They all had a thought.  They all had talked
24  about it.  And if you wanted to just...
25      Q.  Did you consider listing every legislator in

---

### 171

1  response to Interrogatory Number 1?
2      A.  No.
3      Q.  Why not?
4          MR. FREDERICK:  I object.  It's attorney
5  work product.  I instruct you not to answer that
6  question.
7      Q.  (By Ms. Maranzano) Are you following your
8  counsel's advice not to answer?
9      A.  Yes.
10      Q.  In drafting SB 14, did you or the Senator
11  review any studies or reports or analysis that you
12  haven't already testified about today?
13          MR. FREDERICK:  You may testify to the
14  fact of yes or no whether you did.
15      A.  Yes.
16      Q.  (By Ms. Maranzano) What were those?
17          MR. FREDERICK:  Objection, legislative
18  privilege.  Instruct you not to answer.
19      Q.  (By Ms. Maranzano) How many --
20      A.  Well, except that in the record, we referenced
21  more recent polls, more recent public opinion polls.
22  Those types of things weren't -- and they're in the
23  record, so I'll tell you that they were there.
24      Q.  Were there any polls or reports or studies or
25  analysis that you reviewed that are not in the public

---

### 172

1  record?
2          MR. FREDERICK:  Again, I'll instruct you
3  that you may answer to the question posed, which is a
4  yes-or-no question.
5      A.  Yes.
6      Q.  (By Ms. Maranzano) And for the record, what
7  were those?
8          MR. FREDERICK:  Objection, legislative
9  privilege.  Instruct you not to answer.
10      A.  I'll assert privilege.
11      Q.  (By Ms. Maranzano) How many were there?
12          MR. FREDERICK:  You know what; I'm going
13  to object to that on legislative privilege and instruct
14  you not to answer as well.  That goes to thought
15  processes and mental impressions.
16      A.  I'll assert privilege.
17      Q.  (By Ms. Maranzano) Who were the authors or who
18  conducted these reports or studies?
19          MR. FREDERICK:  Objection, legislative
20  privilege.  Instruct you not to answer except to the
21  extent that the question includes matters that are on
22  the public record.
23      A.  The one in particular that's on the record is
24  the one led by Lighthouse.
25      Q.  (By Ms. Maranzano) Ms. McCoy, did you consider

JANICE MCCOY                                                    MAY 16, 2012

## 173

1  including any additional forms of identification in
2  SB 14?
3      MR. FREDERICK:  Objection, legislative
4  privilege.  Instruct you not to answer the question.
5      A.  I'll assert privilege.
6      Q.  (By Ms. Maranzano) Did you consider including
7  identification forms that had expired?
8      MR. FREDERICK:  Objection, legislative
9  privilege.  Instruct you not to answer.
10     A.  Except that -- the answer is yes, and there's
11 an amendment where we -- the original bill required it
12 to be valid and the amendment allowed expired photo IDs
13 to be used.
14     Q.  (By Ms. Maranzano) And under SB 14, are you
15 allowed to use identification that has expired for a
16 length of time that is greater than 60 days?
17     A.  No.
18     Q.  So you're referring to the amendment that
19 allowed for identification, certain forms of
20 identification in SB 14 to be expired for 60 days --
21     A.  Yes, ma'am.
22     Q.  -- prior to the presentation?  Thank you.
23         What was the purpose of excluding from
24 SB 14 the option that a voter could present two forms of
25 nonphoto ID?

## 174

1      MR. FREDERICK:  Objection, legislative
2  privilege.  Instruct you not to answer.
3      Q.  (By Ms. Maranzano) What changed between 2009
4  and 2011 that would impact what forms of voter -- what
5  forms of identification would verify a voter's identity?
6      MR. FREDERICK:  I object on legislative
7  privilege.  To the extent there are matters in the
8  record that you can identify, you're free to do so, but
9  don't go beyond that.
10     A.  On the record, Senator Fraser said he thought
11 the additional two years from 2009 to 2011 provided us
12 the opportunity to see that the states that had voter ID
13 were not -- that it was working.
14     Q.  (By Ms. Maranzano) What do you mean by that?
15     A.  That people were still voting, that turnout was
16 still fine, that there hadn't been any voter had come
17 forward that had been unable to vote.
18     Q.  And are you referring to anything other than
19 what we already talked about with the Senator having
20 presented the actual turnout rates from Georgia and
21 Indiana?
22     A.  No.
23     Q.  And so I believe we discussed that the Senator
24 didn't do any -- whether the Senator did any additional
25 research other than looking at the turnout rates?

## 175

1      A.  That's correct.
2      Q.  Okay.  Ms. McCoy, how often does a driver's
3  license photo need to be renewed?
4      A.  I don't know.
5      Q.  Do you know how often a driver's license needs
6  to be renewed?
7      A.  Six years.
8      Q.  Did you think it was an important consideration
9  to look into whether -- how recent a photo would be on
10 one of the forms of identification that you were
11 requiring under SB 14?
12     MR. FREDERICK:  Objection, legislative
13 privilege.  Instruct you not to answer.
14     A.  I'll assert.
15     Q.  (By Ms. Maranzano) Pursuant to SB 14, who will
16 be verifying the voter's identity when they -- well, who
17 looks at the --
18     A.  The election worker.
19     Q.  And how would they do that?
20     MR. FREDERICK:  Objection to the extent it
21 calls for speculation.  If you know, you can answer.
22     A.  I think the legislation is designed for the
23 Secretary of State to write rules to implement that
24 provision.
25     Q.  (By Ms. Maranzano) Do you know if there's going

## 176

1  to be additional training given to poll workers on that
2  topic?
3      A.  I think under Senate Bill 14, the Secretary of
4  State is instructed to provide additional training.
5      Q.  Did you discuss any of these regulations with
6  the Secretary of State's Office?
7      MR. FREDERICK:  I'll object on legislative
8  privilege.  To the extent it calls for communications
9  between you, Senator Fraser, and the Secretary of
10 State's Office about SB 14 or any other pending
11 legislation.
12     A.  I'll assert privilege.
13     MS. MARANZANO:  And just for the record to
14 be clear, are you asserting privilege over the fact of
15 whether or not she had a conversation with the Secretary
16 of State's Office?
17     MR. FREDERICK:  I did not intend to, so if
18 you want to reask the question, I'm not intending to
19 prevent you from discovering that.
20     Q.  (By Ms. Maranzano) Did you have conversations
21 with the Secretary of State's Office about SB 14?
22     A.  Yes.
23     Q.  How many?
24     A.  Five or six.
25     Q.  And when were those?

177

```
 1        A.   After the bill was filed, but prior to it being
 2   heard in committee.
 3        Q.   Were those conversations in writing or verbal?
 4        A.   Verbal.
 5        Q.   Was anybody else a party to those
 6   conversations?
 7        A.   Yes.
 8        Q.   And who was that?
 9        A.   Bryan Hebert.
10        Q.   Anyone else?
11        A.   I'm trying to think.  It all runs together.
12   Ryan Larue, I think, was in on one of those meetings.
13   Amanda Montague, I think, was in on one of those
14   meetings.
15        Q.   Anyone else?
16        A.   I don't think so.
17        Q.   And were those meetings about how SB 14 would
18   be implemented?
19             MR. FREDERICK:  I want to just caution the
20   witness, the question asked, you may answer, but please
21   don't reveal the substance of any communication.
22             THE WITNESS:  Right.
23        A.   Yes.
24        Q.   (By Ms. Maranzano) And what were the nature of
25   those conversations?
```

179

```
 1        Q.   (By Ms. Maranzano)  What was the purpose of
 2   removing from SB 14 the option for voters to show a
 3   valid employee ID?
 4             MR. FREDERICK:  Objection, legislative
 5   privilege.  Instruct you not to answer.
 6        Q.   (By Ms. Maranzano)  Did any legislators express
 7   concern to Senator Fraser that the election
 8   identification certificate pursuant to SB 14 would be
 9   difficult for their constituents to obtain?
10             MR. FREDERICK:  I'll object on legislative
11   privilege.  However, to the extent issues were
12   raised on the Floor in committee, you may testify about
13   that.
14        A.   I don't recall.  Yeah.  That was added by the
15   conference committee, and so I -- the debate on the bill
16   at that point, I don't think anybody raised it on the
17   Floor.
18        Q.   (By Ms. Maranzano)  Prior to the addition of
19   the election identification certificate, was there a
20   provision that allowed for a different sort of
21   pre-identification in SB 14?
22        A.   Yes.
23        Q.   And was that a form of identification that
24   needed to be obtained at driver's license offices?
25        A.   Yes, ma'am.
```

178

```
 1             MR. FREDERICK:  Object on the basis of
 2   legislative privilege.  Instruct you not to answer.
 3        A.   I'll assert privilege.
 4        Q.   (By Ms. Maranzano) Ms. McCoy, wouldn't it be
 5   fair to say that the standards by which a poll worker is
 6   going to verifying the identity of a voter is pretty
 7   central to the purpose of SB 14?
 8             MR. FREDERICK:  Objection.  Objection,
 9   calls for speculation.  Objection to the extent it calls
10   for thoughts and mental impressions about SB 14.  I
11   object on the basis of legislative privilege and
12   instruct you not to answer.
13        A.   I'll assert privilege.
14             MS. MARANZANO:  Let's take a break.
15             (Recess from 3:46 p.m. to 3:56 p.m.)
16             MS. MARANZANO:  Back on the record.
17        Q.   (By Ms. Maranzano)  Ms. McCoy, you testified
18   earlier that under SB 362, a voter could show a state or
19   a federal-issued photo ID; is that correct?
20        A.   Yes, ma'am.
21        Q.   What was the purpose of removing that form of
22   photo identification from the required forms of ID
23   allowed under SB 14?
24             MR. FREDERICK:  Objection, legislative
25   privilege.  Instruct you not to answer.
```

180

```
 1        Q.   And does the election identification
 2   certificate also need to be obtained at driver's license
 3   offices?
 4        A.   Yes, ma'am.
 5        Q.   Did anybody testify on the Floor about the
 6   distance their constituents would need to travel to get
 7   to a driver's license office?
 8        A.   Yes, ma'am.
 9        Q.   Did anybody testify on the Floor about the lack
10   of public transportation options available to driver's
11   license offices?
12        A.   I don't specifically remember that point being
13   raised, but I'm sure it was.
14        Q.   Did anybody testify on the Floor about the wait
15   times at driver's license offices?
16        A.   Yes.
17        Q.   Did anybody testify on the Floor about the cost
18   of obtaining the required underlying documentation to
19   obtain the identification that needed to be issued free
20   of charge under SB 14?
21        A.   I don't specifically recall, but I assume yes.
22        Q.   What was the Senator's response to these
23   concerns that were raised on the Floor?
24             MR. FREDERICK:  I'll just object,
25   legislative privilege, only to the extent the question
```

JANICE MCCOY                                          MAY 16, 2012

---

181

1   could be construed to ask for confidential privileged
2   communications, but anything on the Floor, you may
3   testify about.
4       A.   I don't remember how he responded to those
5   particular complaints on the Floor specifically.
6       Q.   (By Ms. Maranzano)  Did he conduct any
7   analyses, or did you conduct any analysis at his request
8   on any of these issues?
9           MR. FREDERICK:  Objection, legislative
10  privilege.  Instruct you not to answer.
11      A.   I'll assert.
12      Q.   (By Ms. Maranzano)  You'll assert the
13  privilege?
14      A.   Yes, ma'am.
15      Q.   What were the circumstances by which the
16  license to carry a concealed handgun were included in SB
17  14?
18          MR. FREDERICK:  Object on the grounds of
19  legislative privilege, to the extent it seeks thoughts,
20  mental impressions or confidential communications among
21  legislators or staff or agencies.  To the extent you can
22  answer without revealing any of that, you may.
23      A.   It was added as an amendment by Senator
24  Hinojosa.
25      Q.   Do you know the racial composition of license

---

182

1   to carry license holders?
2       A.   No.
3       Q.   Is it disproportionately white relative to
4   Texas registered voters?
5       A.   I do not know.
6       Q.   Are you aware of whether any staff or
7   legislator investigated the racial composition of
8   license to carry holders?
9           MR. FREDERICK:  I'll object only to the
10  extent that it seeks the substance or nature of the
11  investigations, whether or not you were aware, you may
12  answer.
13      A.   I am not aware.
14      Q.   (By Ms. Maranzano)  Was there any discussion
15  expressing concern that this form of identification
16  might disproportionately favor white voters?
17          MR. FREDERICK:  Object on the grounds of
18  legislative privilege, to the extent there was
19  discussion on the Floor and committee on the record, you
20  may answer.
21      Q.   (By Ms. Maranzano)  Are you asserting
22  privilege?
23      A.   Well, Senator Hinojosa offered the amendment,
24  so I think -- I don't -- I can't speak to his research
25  on the bill or on his amendment.

---

183

1       Q.   Was there any discussion expressing concern
2   that this form of ID might disproportionately favor
3   white voters?
4           MR. FREDERICK:  Same objection,
5   legislative privilege, only to the extent it seeks
6   confidential communications, but to the extent that
7   there were.
8       A.   Not that I know of.
9       Q.   (By Ms. Maranzano)  How did the exception for
10  individuals with disabilities come to be included in SB
11  14?
12          MR. FREDERICK:  Object on legislative
13  privilege, only to the extent it seeks confidential
14  communications and thought processing and mental
15  impressions.  To the extent it seeks information about
16  the legislative process or testimony, you may answer.
17      A.   Senator Patrick offered an amendment, and
18  Senator Fraser accepted it.
19      Q.   (By Ms. Maranzano)  What was the purpose of
20  this provision?
21          MR. FREDERICK:  Object to the legislative
22  privilege.  I instruct you not to answer.
23      A.   I think that -- Senator Patrick
24  probably on the record said why he wanted to include
25  it.  I don't recall what he said.

---

184

1       Q.   (By Ms. Maranzano)  Was this amendment in
2   response to concerns by any particular groups or
3   constituencies?
4           MR. FREDERICK:  Object on the basis of
5   legislative privilege.  To the extent there's -- you
6   have any nonprivileged basis to answer, you may.
7       A.   I think that -- well, again, I don't want to
8   speak for Senator Patrick because I -- I don't want to
9   speak for Senator Patrick.  But there was an individual
10  that testified on the Floor during the Senate committee
11  debate that was fairly moving, and I think Senator
12  Patrick wanted to do something to help him.
13      Q.   (By Ms. Maranzano)  What was the general nature
14  of that testimony?
15      A.   I don't know.  I didn't listen to it.
16      Q.   Was there any testimony on the Floor related to
17  difficulties other individuals might have obtaining
18  identification?
19      A.   I don't know.  I didn't listen to the
20  testimony.
21      Q.   What -- what was your -- your role during the
22  Floor consideration of SB 14?
23          MR. FREDERICK:  I would just caution you
24  not to reveal any confidential communications or mental
25  impressions or thought process, but as to your -- the

JANICE MCCOY                                          MAY 16, 2012

---

185

1    process, you may answer.
2         A.  It was the same as what we had testified
3    earlier, I think, on the Senate bill 362, and I sat next
4    to the Senator and helped him with his debate and
5    providing him information that he asked me to provide
6    him during the debate.
7         Q.  (By Ms. Maranzano)  So you were on the Floor
8    with him during the debate?
9         A.  During the Committee of the Whole, yes, ma'am.
10        Q.  And when you say this individual testified with
11   moving testimony that potentially led Senator Patrick to
12   include this exemption, was that during the Committee of
13   the Whole?
14        A.  Yes, ma'am.
15        Q.  How did the exception for individuals with
16   religious objections to being photographed come to be
17   included in SB 14?
18             MR. FREDERICK:  I'll object only to the
19   extent that it seeks confidential communications,
20   thought processes or mental impressions.  But to the
21   extent it seeks the process or public discussion, you
22   may answer.
23        A.  I'll assert privilege.  I don't -- yeah.
24             MR. FREDERICK:  I mean, just -- I want to
25   be clear with you.  I'm not instructing her not to

---

186

1    answer about when it was introduced or how it became
2    part of the bill.  And so I think if you want to probe
3    that further, I'm not objecting to that part.
4             MS. MARANZANO:  Okay.
5         Q.  (By Ms. Maranzano)  Was that provision added in
6    response to any particular concern, Ms. McCoy?
7             MR. FREDERICK:  I'll just -- only to the
8    extent it seeks mental impressions, communications, but
9    if there's testimony, Floor testimony, and if you know,
10   you may answer.
11        A.  There was not Floor testimony on that issue.
12        Q.  (By Ms. Maranzano)  During the drafting of the
13   legislator's consideration of SB 14, was there analysis
14   of the cost that a voter would need to take -- the cost
15   or the steps the voter would need to take to obtain an
16   election identification certificate?
17             MR. FREDERICK:  Objection, legislative
18   privilege.  Instruct you not to answer.
19        A.  I'll assert privilege.
20        Q.  (By Ms. Maranzano)  What documents are needed
21   to obtain an election identification certificate?
22        A.  I don't know.
23        Q.  Was that something that you -- I'm sorry.  You
24   can finish your answer.
25        A.  I used to know, but I don't know now.

---

187

1         Q.  Was that something that you looked into while
2    developing SB 14?
3         A.  Yes, ma'am.
4         Q.  And were the costs, in particular, something
5    that you looked into while developing SB 14?
6             MR. FREDERICK:  Object on the grounds of
7    legislative privilege.  Instruct you not to answer.
8         A.  I'll assert privilege.
9         Q.  (By Ms. Maranzano)  If there are costs to
10   obtaining underlying documentation for the election
11   identification certificate, is it fair to say the
12   election identification certificate is not actually
13   free?
14             MR. FREDERICK:  Object to the form of the
15   question.  Object, it calls for speculation.  And object
16   to relevance.  If you -- if you have an opinion, you may
17   answer.
18        Q.  (By Ms. Maranzano)  Do you have an opinion?
19        A.  I do not.
20        Q.  You have no opinion on that?
21        A.  I don't know which documents are required to
22   get an ID at this point.  I don't remember.  And so I
23   don't recall why people wouldn't or would not have
24   them.  So my opinion, I mean, I'd have to go back and
25   kind of look.

---

188

1         Q.  If -- if you were to determine that there were
2    costs to obtaining those underlying documentations for
3    an individual who did not have them --
4         A.  Right.
5         Q.  -- would you say it would be fair to
6    characterize the election identification certificate as
7    free?
8             MR. FREDERICK:  Objection to the form of
9    the question.  You can answer if you can.
10        A.  I suppose not.
11        Q.  (By Ms. Maranzano)  Do you know when driver's
12   license offices are open in Texas?
13        A.  I do not.
14        Q.  Does SB 14 require employers to provide paid
15   leave to obtain an ID?
16        A.  No.
17        Q.  Do some individuals in Texas live at least 50
18   miles from a driver's license office?
19        A.  I think there was testimony to that effect,
20   yes.
21        Q.  How much does gas cost in Texas?
22        A.  Texas is a big state.  It varies.  I think in
23   Austin right now it's 3.55 a gallon.
24        Q.  So how much would it cost for somebody to drive
25   a hundred miles round trip?

JANICE MCCOY                                      MAY 16, 2012

## 189

1        MR. FREDERICK:  Objection, calls for
2  speculation.
3        A.   Depends on their car, how they drive.
4        Q.   (By Ms. Maranzano)  Do you know whether any
5  racial or ethnic group is more likely than not have the
6  necessary ID to obtain the election identification
7  certificate?
8        MR. FREDERICK:  I'll object only to the
9  time extent that this can be construed to seek
10  information related to the development of SB
11  14.  Insofar as you can answer based on your knowledge
12  sitting here today, you may answer.
13        A.   Can you repeat the question?
14        Q.   (By Ms. Maranzano)  Is there any racial or
15  ethnic group that is more likely to not possess the
16  underlying documentation needed to obtain election
17  identification certificate?
18        A.   I do not know.
19        Q.   Is that something that you ever looked into
20  during the development of SB 14?
21        MR. FREDERICK:  Objection, legislative
22  privilege.  I instruct you not to answer.
23        A.   I'll assert privilege.
24        Q.   (By Ms. Maranzano)  Did you ever look into or
25  analyze who among registered voters would be -- might

## 190

1  not have the forms of identification included in SB 14?
2        MR. FREDERICK:  Objection, legislative
3  privilege.  I instruct you not to answer, except to the
4  extent you can do so based on nonconfidential matters or
5  nonprivileged matters.
6        A.   The specific question again was?
7        Q.   (By Ms. Maranzano)  Did you ever research or
8  analyze who among registered voters in Texas would be
9  more likely or less likely to have the required forms of
10  identification under SB 14?
11        A.   No.
12        Q.   No, you never looked into that?
13        A.   That is correct.
14        Q.   Why not?
15        MR. FREDERICK:  Objection, legislative
16  privilege.  Instruct you not to answer.
17        A.   I'll assert privilege.
18        Q.   (By Ms. Maranzano)  Would you agree that that
19  might be a relevant inquiry pursuant to Section 5?
20        MR. FREDERICK:  Objection, calls for
21  speculation.  Objection, calls for a legal opinion.  You
22  can answer if you can.
23        A.   As I testified earlier, I didn't really
24  consider Section 5 when I was helping the Senator
25  develop this bill.

## 191

1        Q.   (By Ms. Maranzano)  Did the Senator seek legal
2  advice from anybody about to ensure that Senate Bill 14
3  would comply with Section 5?
4        MR. FREDERICK:  I'm going to object on the
5  grounds that it seeks information within the attorney-
6  client privilege.  I think the fact that he might have
7  sought some legal would not itself be privileged, but
8  the question -- the question entails the substance of
9  the advice that he may or may not have sought, so I
10  object on that ground.
11        MS. MARANZANO:  And you're instructing
12  Ms. McCoy not to answer?
13        MR. FREDERICK:  Yes.  Yes.
14        Q.   (By Ms. Maranzano)  Are you going to follow
15  your counsel's advice?
16        A.   Yes, ma'am.
17        Q.   Was the passage of SB 14 a priority for Senator
18  Fraser?
19        MR. FREDERICK:  I'll object on legislative
20  privilege and instruct you not to answer as to the
21  extent it calls for confidential communications, but to
22  the extent it's in a public statement or testimony, you
23  can answer.
24        A.   I think the answer is he consistently told his
25  constituents that he thought voter ID needed to be

## 192

1  passed.
2        Q.   (By Ms. Maranzano)  Did his constituents ask
3  for him to pass some sort of voter ID law?
4        MR. FREDERICK:  We'll object to the extent
5  that seeks -- to the extent it seeks the substance of
6  any particular constituent communication.  If you can
7  answer based on nonconfidential communications from
8  constituents, you may answer.
9        A.   I assert the privilege.
10        Q.   (By Ms. Maranzano)  Was passage of SB 14 a
11  priority for Governor Perry?
12        A.   He declared it an emergency.  I can't speak
13  further than that.
14        Q.   Was passage of the SB 14 a priority for any
15  interest groups that you're aware of?
16        A.   Not that I'm aware of, no.
17        Q.   What was the purpose of SB 14?
18        MR. FREDERICK:  I'm just going to give a
19  cautionary instruction.  You may testify about the
20  purpose of SB 14 to the extent you know.  I would only
21  caution you not to reveal the substance of the
22  confidential communications between yourself and the
23  legislature or any legislative thought process or mental
24  impressions.  But as to the purpose of the bill, you may
25  testify.

## 193

1    A.   Senator Fraser consistently said on the record
2    that his purpose was to stop in-person voter fraud.
3    Q.   (By Ms. Maranzano)  Were there any additional
4    purposes to SB 14?
5    A.   Election integrity.
6    Q.   What does that mean?
7    A.   It means -- it means that elections are valid
8    and true and there isn't fraud.
9    Q.   Any other purposes?
10   A.   (Witness shakes head no.)  No.  I'm sorry.
11   Q.   Thank you.  Were there any purposes of SB 14
12   that were not stated on the public record?
13         MR. FREDERICK:  Object, legislative
14   privilege.  Instruct you not to answer.
15   Q.   (By Ms. Maranzano)  Are you following your
16   counsel's advice?
17   A.   I am.
18   Q.   Was any part of the purpose of SB 14 to
19   decrease the number of Hispanic voters?
20         MR. FREDERICK:  Object, legislative
21   privilege.  Instruct you not to answer.
22   A.   I'll assert privilege.
23   Q.   (By Ms. Maranzano)  Was any part of the purpose
24   of SB 14 to decrease the number of any group of minority
25   voters?

## 194

1          MR. FREDERICK:  Objection, legislative
2    privilege.  I'll instruct you not to answer.
3    A.   I'll assert.
4    Q.   (By Ms. Maranzano)  Was any part of the purpose
5    of SB 14 to discriminate in any way against any group of
6    minority voters?
7          MR. FREDERICK:  Objection, legislative
8    privilege.  Instruct you not to answer.
9    A.   Assert the privilege.
10   Q.   (By Ms. Maranzano)  Was any part of the purpose
11   of SB 14 for partisan purposes?
12         MR. FREDERICK:  Objection, legislative
13   privilege.  I'll instruct you not to answer.
14   A.   Assert the privilege.
15   Q.   (By Ms. Maranzano)  Did the purpose of photo ID
16   in Texas evolve over time in legislative sessions?
17         MR. FREDERICK:  Object on the basis of
18   legislative privilege.  Instruct you not to answer
19   unless you can do so based on public statements or
20   testimony.
21   A.   Senator Fraser's stated purpose has always been
22   to be prevent in-person voter fraud across the sessions.
23   Q.   (By Ms. Maranzano)  Have you ever heard of a
24   voter who decides not to vote on election day because
25   they're worried their vote will be diluted by a

## 195

1    nonlegitimate voter?
2    A.   No.
3    Q.   Who are the main opponents of SB 14?
4    A.   I think the Senate Democrats, Democrat
5    members.  I think the Texas Democratic party.
6    Q.   Did any minority members of the Senate support
7    SB 14?
8          MR. FREDERICK:  Object on legislative
9    privilege, only to the extent that support or opposition
10   was expressed confidentially by a legislator or staff
11   member to you.
12   A.   No minority senator voted for the bill.
13   Q.   (By Ms. Maranzano)  Did any groups representing
14   minority voters support SB 14?
15         MR. FREDERICK:  Same cautionary
16   instruction.  You may answer to the extent that you know
17   from public statements or the legislative record, but
18   caution you not to reveal any privileged matter
19   communicated to you by a constituent.
20   A.   I don't know.
21   Q.   (By Ms. Maranzano)  Did the Senator consider
22   any alternative legislative measures that would have
23   deterred voter fraud?
24         MR. FREDERICK:  Objection, legislative
25   privilege, and instruct you not to answer.

## 196

1    A.   I'll assert.
2    Q.   (By Ms. Maranzano)   What was the Senator's
3    strategy to ensure that Senate Bill 14 was passed?
4          MR. FREDERICK:  Objection, legislative
5    privilege.  Instruct you not to answer.
6    A.   I'll assert.
7          (Exhibit 38 marked for identification.)
8    Q.   (By Ms. Maranzano)  Ms. McCoy, I'm showing you
9    what we marked as Deposition Exhibit 38.  Do you
10   recognize what this -- what this is?
11   A.   Yes.
12   Q.   What is it?
13   A.   It's the Senate Rules Adopted by the 82nd
14   Legislature.
15   Q.   And this, what I've given you is actually the
16   table of contents and some portion of the rules.  It's
17   not the entire set of Senate rules.  Can you look at the
18   table of contents and tell me what procedural rules are
19   implicated by the consideration of SB 14, what
20   procedural rules were applied to SB 14's consideration?
21         MR. FREDERICK:  Objection, vague.  You can
22   answer if you can.
23   A.   I'm not sure.
24   Q.   (By Ms. Maranzano)  Oh, you know what, that
25   looks like it's highlighted.

JANICE MCCOY                                           MAY 16, 2012

## 197

1      A.  It is highlighted.  Is that the one you want?

2      MS. MARANZANO:  Why don't we mark a clear

3  one for the record.

4      MR. FREDERICK:  Here, that one's got a

5  mark on it.  I've got a clean one right here.

6      MS. MARANZANO:  Thank you.

7      MR. FREDERICK:  Here's your highlighted

8  one.

9      (Clean copy Exhibit 38 exchanged for

10  highlighted copy originally marked.)

11      A.  I don't --

12      Q.  (By Ms. Maranzano)  If you look -- let's look

13  at Rule 5.11.

14      A.  Yes, ma'am.

15      Q.  Subsection D of 5.11.  Is that the same

16  provision that we talked about earlier that was included

17  in the 2009 rules that carves out voter identification

18  requirements from the two-thirds rule?

19      A.  Yes, ma'am.

20      Q.  And can you look at Rule 16 for me?

21      You can scratch looking at Rule 16.

22      THE REPORTER:  I'm sorry.  I didn't get

23  that.

24      MS. MARANZANO:  I said she could scratch

25  reviewing Rule 16.

## 198

1      Q.  (By Ms. Maranzano)  Can you look at Rule 12.03

2  about conference committees?

3      A.  Yes, ma'am.

4      Q.  And do you see that Section 4 states -- well,

5  can you read Section 4 for me and tell me what your

6  understanding of that subsection of the rule is?

7      A.  "Add text on any matter which is not included

8  in either the House or Senate version of the bill or

9  resolution."

10      Q.  What's your understanding of what this rule

11  does?

12      A.  That rule says that when a bill is in

13  conference committee, they -- the conference committee

14  should not consider including provisions that weren't in

15  either of the House or Senate passed versions.

16      Q.  How many times have you seen that section of

17  the rule disregarded while you've worked for Senator

18  Fraser?

19      A.  Probably happens 20 to 30 times a session.

20      Q.  What type of bills does that happen on?

21      A.  All types.

22      Q.  Was SB 14 considered by any -- you know what,

23  scratch that.  I think we've talked about that already.

24      What did you do to ensure that Senator

25  Fraser was prepared for Floor consideration of SB 14?

## 199

1      MR. FREDERICK:  Object based on

2  legislative privilege, to the extent it calls for

3  substance of any communication or your thought process

4  or Senator Fraser's thought process.  However, to the

5  extent you can answer without revealing that, you may

6  describe your preparation.

7      A.  Typically, when we do floor prep for Senate

8  Bill 14 or any bill, we put together a bill book, which

9  includes the bill, the bill analysis, the fiscal notes,

10  any supporting documentation and talking points.  And

11  that's what I did for Senate Bill 14.

12      Q.  (By Ms. Maranzano)  And do you write the

13  talking points?

14      A.  Yes.  Or -- not for every bill.  I did for

15  Senate Bill 14.

16      Q.  And is the bill analysis what we've previously

17  discussed, a section-by-section analysis of the bill?

18      A.  Yes, ma'am.

19      Q.  And do you write that?

20      A.  No, ma'am.

21      Q.  Who does?

22      A.  Those are prepared through the committee

23  process, and I think the Senate Research Center prepares

24  those.

25      Q.  Are you familiar with this Floor testimony on

## 200

1  SB 14?

2      A.  Generally.

3      Q.  And I believe you testified earlier you were

4  with the Senator, correct?

5      A.  For some of it.  I don't -- I think I got up

6  and left for part of it.  Actually, I know I got up and

7  left for part of it.

8      Q.  During the Floor consideration of SB 14, did

9  Senator Fraser answer any questions about SB 14 by

10  saying he was not advised?

11      A.  Can we be clear when we're talking about Floor

12  consideration, Committee of the Whole consideration

13  or Floor?  Specifically when we talk about the Floor,

14  it's when they're actually in session on the Floor.  The

15  Committee of the Whole meets on the senate Floor, just

16  because there's no other place for them to meet.

17      So during the Committee of the Whole

18  debate, there were times that Senator Fraser said "I'm

19  not advised."

20      Q.  What does that mean, "I'm not advised"?

21      MR. FREDERICK:  Object, based on

22  legislative privilege, only to the extent it asks for

23  Senator Fraser's thought process or mental impressions

24  To the extent you can answer from your own personal

25  knowledge of what "I'm not advised" means, you may.

JANICE MCCOY                                                          MAY 16, 2012

201

1       A.  Typically, when a senator says that, it means
2    they don't know.
3       Q.  (By Ms. Maranzano)  About how many questions
4    did he answer by saying "I'm not advised"?
5       A.  I don't know.
6       Q.  Can you approximate?
7       A.  No.
8       Q.  Would you say it was hundreds?
9       A.  I don't remember.
10      Q.  Isn't it part of the Senator's role as author
11   of the bill to answer questions about the bill?
12              MR. FREDERICK:  Objection, argumentative.
13   You may answer.
14      A.  The Senator offered his colleagues that he
15   didn't know the answer to some questions and that
16   resource and expert witnesses were going to testify
17   later during the committee, and those questions would be
18   better addressed to those resource expert witnesses.
19      Q.  (By Ms. Maranzano)  Did anyone instruct Senator
20   Fraser not to answer substantive questions about SB 14
21   during the Committee of the Whole?
22              MR. FREDERICK:  Objection, legislative
23   privilege.  Instruct you not to answer.
24      A.  I'll assert privilege.
25      Q.  (By Ms. Maranzano)  During -- during the

202

1    Committee of the Whole's consideration of SB 14, did
2    anyone raise concerns about the impact of SB 14 on
3    minority voters?
4       A.  Yes.
5       Q.  What was the Senator's response?
6       A.  I don't remember.
7       Q.  You don't recall how he responded?
8       A.  (Witness shakes head no.)
9       Q.  Did numerous senators raise concerns about the
10   impact of SB 14 on minority voters?
11              MR. FREDERICK:  Objection, legislative
12   privilege, only to the extent it calls for confidential
13   communications.  Anything on the committee or on the
14   Floor, you may testify about.
15      A.  I think that 10 of the 12 Democrat senators
16   testified against the bill during the Committee of the
17   Whole.  May have been 9.  May have been 11.  It wasn't
18   all 12.
19      Q.  (By Ms. Maranzano)  But my question was about
20   testimony related to concerns about the impact of SB 14
21   on minority voters.  It not about --
22      A.  I don't recall what they said.  I know that
23   many senators testified against the bill, but I can't
24   recall what each of them said.  So I cannot answer that
25   question.

203

1       Q.  Was that testimony that you would consider to
2    be important?
3              MR. FREDERICK:  Objection, vague.  You may
4    answer.
5       A.  To some people, yes.
6       Q.  (By Ms. Maranzano)  How about to you?
7       A.  No.
8       Q.  Why not?
9       A.  I just work for the Senator.  I don't --
10      Q.  Well, part of your job in working for the
11   Senator is giving him advice on this bill, is it not?
12      A.  Yes.
13      Q.  And so the impact of this bill on minority
14   voters is a relevant consideration, is it not?
15      A.  Yes.
16      Q.  So I'm just wondering why that wasn't an
17   important testimony to you.
18              MR. FREDERICK:  Object to the extent it
19   mischaracterizes the testimony, but you may answer if
20   you can.
21      A.  I think that the position that the Senator had
22   relative to this bill wasn't going to change because of
23   testimony we heard in January of 2011, because we heard
24   the same testimony in January of 2009, and we heard the
25   same testimony in May of '07.

204

1              So the testimony is important to the
2    people that were giving it, mainly, I think, because
3    they were trying to put it on the record for you guys,
4    but it wasn't going to change my recommendations to the
5    Senator on how to proceed with this legislation.
6       Q.  (By Ms. Maranzano)  Did you take any actions
7    with regard to Senate Bill 14 in response to those
8    concerns?
9              MR. FREDERICK:  Objection, legislative
10   privilege.  Instruct you not to answer.
11      A.  I'll assert privilege.
12              (Exhibit 39 marked for identification.)
13      Q.  (By Ms. Maranzano)  I'm showing you what we've
14   marked for the record as Deposition Exhibit 39.  Can you
15   turn to the label at the bottom, Texas 00000098, and
16   look at the portion of the print?
17              Well, let me ask you first, do you
18   recognize this document, or can you tell me what this
19   document is?
20      A.  I've never seen this document, but it is a
21   transcript of the Committee of the Whole from Tuesday,
22   January 25, 2011.
23      Q.  Can you look at the transcript Page 168.  And
24   do you see that there's a question posed by Senator West
25   as to whether the forms of identification that are

JANICE MCCOY                                             MAY 16, 2012

## 205

1   listed in the bill are the least restrictive options in
2   order to achieve the goal of avoiding what you have said
3   is voter identification fraud?
4       A.   Uh-huh.  Yes.
5       Q.   And can you look at Senator Fraser's answer to
6   that?
7       A.   (Witness complies.)
8       Q.   Is that a topic that you looked into prior to
9   introducing Senate Bill 14 of whether this was the least
10  restrictive way to achieve the Senator's goal?
11          MR. FREDERICK:  Objection, legislative
12  privilege.  Instruct you not to answer.
13      A.   I'll assert privilege.
14      Q.   (By Ms. Maranzano)  Can you tell me anything
15  about that topic based on the comments that were made in
16  public during the Committee of the Whole, Ms. McCoy?
17          MR. FREDERICK:  Object to the form, but
18  you may answer.
19      A.   Well, I can speak to what Senator Fraser said.
20  The Secretary of State had provided us information,
21  which he referenced here, showing that people -- 91
22  percent of voters registered with their driver's license
23  under HAVA.
24      Q.   (By Ms. Maranzano)  90 percent of the -- of
25  voter registration applicants registered with their

## 206

1   driver's license number?
2       A.   Under the HAVA requirement.
3       Q.   And do you know when HAVA started requiring
4   people to write down their driver's license number?
5       A.   Texas passed its version of HAVA in 2005, so I
6   would assume it took a while to make sure -- it started
7   probably that fall of 2005 or 2006.  Sometimes we start
8   things in January of the next year.
9       Q.   And did anybody ever -- or did you or the
10  Senator ever conduct any analysis of who those 10
11  percent, approximately 10 percent of registered voters
12  without driver's license numbers might be and whether or
13  not they might have any other forms of identification?
14          MR. FREDERICK:  Objection, legislative
15  privilege, and instruct you not to answer.
16      A.   I'll assert privilege.
17      Q.   (By Ms. Maranzano)  Okay.  I'm going to have
18  this marked.
19          (Exhibit 40 marked for identification.)
20      Q.   (By Ms. Maranzano)  I'm showing you what we are
21  marking as Deposition Exhibit 40, which is a transcript
22  of another transcript of the Committee of the Whole from
23  Tuesday, January 26, 2011.
24          Can you look at the second page of this
25  document that's labeled on the transcript as Page 189 at

## 207

1   the top?  Actually, the quote starts -- I'm sorry.  The
2   quote starts on Page 188 from Senator Fraser.  If you
3   can just take a look at that.
4           Does that appear to be saying that there
5   are very small differences between Texas's bill and
6   Indiana and Georgia's bill?
7       A.   That does what it seems to be saying.
8       Q.   Are you familiar with the Indiana and Georgia
9   photo identification requirement?
10      A.   No.
11      Q.   Didn't you testify earlier that you had looked
12  at those two states when you were developing SB 14 362?
13      A.   We looked at voter turnout from those two
14  states.  I never looked at the legislation.
15      Q.   So, Ms. McCoy, you've never looked at either
16  Indiana or Georgia's photo identification requirements?
17      A.   I might have printed out a copy of Indiana's,
18  and I might have seen a table that included the
19  different IDs that allowed under every state's photo ID
20  law, but I've never looked at Indiana or Georgia's
21  legislation in depth, no.
22      Q.   So do you have any position on whether the
23  Indiana and Georgia identification requirements are
24  similar to SB 14?
25      A.   I do not have a position, no.

## 208

1           (Exhibit 41 marked for identification.)
2       Q.   (By Ms. Maranzano)  Okay.  I'm showing you what
3   we've marked as Deposition Exhibit --
4           MR. FREDERICK:  Do you have one for me?
5           MS. MARANZANO:  Sorry.  I only have one
6   copy.
7           MS. WESTFALL:  Can you look on with the
8   witness?
9           MR. FREDERICK:  Oh, yeah, yeah, I'll look
10  at this one.
11      Q.   (By Ms. Maranzano)  Ms. McCoy, this is a
12  transcript from July 26, 2011.  The Committee of the
13  Whole's consideration of SB 14.  I'm going to direct you
14  to certain pages, but I want to say at the beginning,
15  this transcript has two sets of pagination.  On the
16  left-hand side, it says "CD Number" and "Section
17  Number," and then it also has a page.  So I will give
18  you both of those, because it has -- the pagination
19  restarts with every CD and section number.
20      A.   Okay.  But I want to clarify this isn't from
21  the Committee of the Whole.  This is from when the
22  Senate was actually in session as the Senate.
23      Q.   Okay.  Thank you for that clarification.
24      A.   You're welcome.
25      Q.   Can you turn to Page 34 on CD 1, Section 1?

JANICE MCCOY                                        MAY 16, 2012

## 209

1    A.  Hold on.  Okay.

2         Q.   Were you on the Floor with the Senator during

3    -- during the Floor consideration on January 26th of SB

4    14?

5         A.  Yes, but --

6         Q.  Yes, but?

7         A.  Can I just clarify?

8         Q.  Yes, please.

9         A.  During the Committee of the Whole, I could

10   actually be inside the rail right next to the Senator.

11   When the Senate was in full session, I had to be outside

12   the rail away from the Senator's desk.

13        Q.  Okay.  Did you communicate with the Senator

14   during that time?

15        A.  As much as you can if they turn around and look

16   at you.

17        Q.  You didn't -- you didn't communicate by a

18   Blackberry or cell phone?

19        A.  No, ma'am.

20        Q.  Okay.  Can you take a look at on Page 34, where

21   it starts with the testimonies by Davis?  Can you just

22   take a look at that?

23        A.  I think I'm on the wrong page.

24             MR. FREDERICK:  I think you're on Section

25   2.  Got Section 1.

## 210

1         A.  Okay.

2             MR. FREDERICK:  Yeah.

3         A.  Okay.

4         Q.  (By Ms. Maranzano)  Can you just take look at

5    that amendment which starts with Davis?  And then the

6    action that's taken on that amendment is lower on the

7    page.  Do you recall this amendment being offered?

8             MR. FREDERICK:  Just to clarify, is

9    this -- is it Floor Amendment 12 we're talking about?

10             MS. MARANZANO:  Yes.  I think that's

11   right.

12        A.  I don't recall, because I'm not seeing the text

13   of the amendment.

14        Q.  (By Ms. Maranzano)  Uh-huh.

15        A.  So I don't -- I don't recall.

16        Q.  Do you recall that Senator Davis introduced an

17   amendment to prohibit state agencies from charging fees

18   for the issuance of any acceptable ID under SB 14?

19        A.  Not really, no.

20        Q.  Do you recall that Senator Fraser moved to

21   table that amendment?

22        A.  I mean, I can see that he did.  I don't recall

23   this particular part of the debate.

24        Q.  Did you have any role in recommending to him

25   how to handle amendments to SB 14?

## 211

1             MR. FREDERICK:  Well, you may answer the

2    question whether or not you had a role.

3         A.  Yes.

4         Q.  (By Ms. Maranzano)  What was your role?

5             MR. FREDERICK:  I'll object to legislative

6    privilege, to the extent it seeks confidential

7    communications, thought processes or mental

8    impressions.  But to the extent you can describe your

9    role without going into that, then you may answer the

10   question.

11        A.  I provided him with some thoughts on

12   what he could say if certain amendments that we thought

13   were going to be introduced were introduced.

14        Q.  (By Ms. Maranzano)  And did you provide him

15   with a recommendation on how to vote on certain

16   amendments?

17             MR. FREDERICK:  Just caution you, I mean,

18   you can answer the question as phrased, whether or not

19   you offered a recommendation.

20        A.  I did not.

21        Q.  (By Ms. Maranzano)  Why -- well, how would this

22   amendment introduced by Senator Davis have interfered

23   with the Senator's goals of deterring voter fraud?

24             MR. FREDERICK:  Object on legislative

25   privilege.

## 212

1         Q.  (By Ms. Maranzano)  Ms. McCoy, as you're

2    sitting here today, are you aware of any ways in which

3    not charging for the acceptable forms of identification

4    under SB 14 would interfere with the goal of deterring

5    in-person voter impersonation?

6         A.  No.

7         Q.  Can you turn to what's labeled as CD-1, Section

8    2, Page 28 through 30?

9         A.  (Witness complies.)

10        Q.  You see that this testimony is related to an

11   amendment proposed by Senator Ellis that would have

12   required the Secretary of State to conduct a study

13   including information about the number of eligible

14   voters who are prevented from voting or have to vote

15   provisionally because they lacked an ID?

16        A.  Yes.

17        Q.  And do you recall that amendment being offered?

18        A.  Yes, ma'am.

19        Q.  Did you provide a recommendation to Senator

20   Fraser as to how to handle that amendment?

21             MR. FREDERICK:  I'll caution.  You can

22   answer the question as phrased, as long as you don't

23   reveal the substance of any confidential communication.

24        A.  No.

25        Q.  (By Ms. Maranzano)  Did Senator Fraser move to

## 213

1  table that amendment?
2      A.  Yes.
3      Q.  And how would conducting a study about who was
4  impacted by SB 14 have interfered with the Senator's
5  goals of deterring in-person voter impersonation?
6          MR. FREDERICK:  Objection, legislative
7  privilege.  Instruct you not to answer.
8      A.  I'll assert privilege.
9      Q.  (By Ms. Maranzano)  Was Senator Fraser
10  concerned that such a study would show that minorities
11  are disproportionately impacted by Senate Bill 14?
12          MR. FREDERICK:  Objection, legislative
13  privilege.  Instruct you not to answer.
14      A.  I'll assert privilege.
15      Q.  (By Ms. Maranzano)  Can I have you turn to --
16  I'm going to actually get out another exhibit.
17          (Exhibit 42 marked for identification.)
18      Q.  (By Ms. Maranzano)  I'm showing you what we're
19  marking as Deposition Exhibit 42.  If you could look at
20  the side of the page that has 28 at the top.  Actually,
21  I'm sorry.  It starts on the bottom of 27.  There's an
22  amendment presented by Senator Gallegos that goes to the
23  top.
24          Do you see that Senator Gallegos offered
25  an amendment that would have required driver's license

## 214

1  offices to be open until 7 p.m. on one weekend and
2  during four or more hours on at least two Saturdays per
3  month?
4      A.  Yes.
5      Q.  Did you provide a recommendation to Senator
6  Fraser as to how to vote on this bill -- on this
7  amendment?
8          MR. FREDERICK:  I just caution.  You may
9  answer the question as phrased.  I advise you not to
10  reveal the substance of any communication.
11      A.  No.
12      Q.  (By Ms. Maranzano)  Did Senator Fraser move to
13  table this amendment?
14      A.  Yes.
15      Q.  How would keeping driver's license offices open
16  longer interfere with deterring in-person voter
17  impersonation?
18          MR. FREDERICK:  Objection, legislative
19  privilege.  I instruct you not to answer.
20      A.  I'll assert privilege.
21      Q.  (By Ms. Maranzano)  Did Senator Fraser have any
22  concern that any individuals who work at hourly wage may
23  have a difficult time making it to a driver's license
24  office while it's open?
25          MR. FREDERICK:  Objection, legislative

## 215

1  privilege.  I'll instruct you not to answer.
2      A.  I'll assert privilege.
3      Q.  (By Ms. Maranzano)  Did Senator Fraser
4  acknowledge on the Floor that a person needed to work to
5  make sure that a driver's license office was open?
6      A.  Can you repeat that question?
7      Q.  Do you recall the Senator acknowledging on
8  the -- during the consideration of SB 14, that people
9  needed to work to make sure that a driver's license
10  office was open?
11      A.  I do not recall.
12      Q.  Were there any other amendments that you
13  haven't testified about that were offered that would
14  have mitigated the impact of SB 14 on minority voters?
15          MR. FREDERICK:  Objection, assumes facts
16  not in evidence.  Also object on legislative
17  privilege.  Instruct you not to answer.
18      A.  I'll assert privilege.
19      Q.  (By Ms. Maranzano)  Based on the public record,
20  are there any amendments that we haven't discussed that
21  you believe would have mitigated the impact of SB 14 on
22  minority voters?
23          MR. FREDERICK:  Objection, assumes facts
24  not in evidence.  You -- otherwise, you may answer if
25  you can.

## 216

1      A.  I don't recall every amendment offered.
2      Q.  (By Ms. Maranzano)  Do you recall any amendment
3  that you believe would have mitigated the impact of SB
4  14 on minority voters?
5          MR. FREDERICK:  Again, object, assumes
6  facts not in evidence.  You may answer.
7      A.  I don't know how to answer, because I don't
8  know that Senator Fraser or I think the bill impacted
9  minority voters negatively.  So the amendment -- I don't
10  know that the -- the answer then is no, because I don't
11  know that they would have added to what we already
12  believe the bill did.
13      Q.  (By Ms. Maranzano)  When did the Senate pass SB
14  14 and refer it to the House?
15      A.  It was either January 26th or 27th when we
16  passed it to engrossment.  I don't recall exactly which
17  day that occurred.
18      Q.  Is it unusual for the Senate to pass
19  legislation within the first two weeks of a session?
20      A.  Yes.
21      Q.  Has that ever happened before during the time
22  that you've worked for Senator Fraser?
23      A.  I don't recall.
24      Q.  Did the Senator have any role with regard to SB
25  14 once it was referred to the House?

JANICE MCCOY                                                    MAY 16, 2012

---

### 217

1    MR. FREDERICK:  Object only to the extent
2  it seeks privileged matters as to the fact, whether or
3  not he had a role.  You may answer.
4    A.  Yes.
5    Q.  (By Ms. Maranzano)  What role was that?
6    MR. FREDERICK:  And I'll object on the
7  basis of legislative privilege and instruct you not to
8  answer to the extent that your answer would reveal
9  his -- the Senator's or your thought process, mental
10  impressions or disclose the substance of any privileged
11  conversation.  But to the extent you can describe his
12  role without divulging that, you may answer.
13    A.  It was limited in that once Representative
14  Harless was determined to be the House sponsor, we
15  provided her the information that we had that she could
16  move forward.
17    Q.  (By Ms. Maranzano)  Was the Senator concerned
18  about any of the changes to SB 14 that occurred in the
19  House?
20    MR. FREDERICK:  Objection, legislative
21  privilege.  Instruct you not to answer.
22    A.  I'll assert privilege.
23    Q.  (By Ms. Maranzano)  Was the Senator on the
24  conference committee?
25    A.  Yes.

---

### 218

1    Q.  Did the conference committee change the
2  structure of the identification card that was required
3  to be issued free of charge?
4    A.  Yes.
5    Q.  Did they insert a new provision into the bill
6  on that topic?
7    A.  Yes.
8    Q.  Is that unusual?
9    MR. FREDERICK:  Objection, vague.  You may
10  answer.
11    A.  As I testified earlier, the conference
12  committees, 20, 30 times during a session, we'd go
13  outside the bounds.
14    Q.  (By Ms. Maranzano)  What was the purpose of the
15  conference committee removing the provision of SB 14
16  that would have allowed a tribal identification to be
17  used by a voter?
18    MR. FREDERICK:  Objection, legislative
19  privilege.  Instruct you not to answer.
20    A.  I'll assert privilege.
21    Q.  (By Ms. Maranzano)  What was the purpose of the
22  conference committee removing a provision that would
23  require the voter education that was required in SB 14
24  be targeted at low income and minority voters?
25    MR. FREDERICK:  Objection, legislative

---

### 219

1  privilege.  Instruct you not to answer.
2    A.  I'll assert privilege.
3    Q.  (By Ms. Maranzano)  What was the purpose of the
4  conference committee removing the provision of SB 14
5  that would have exempted from the photo ID requirement
6  individuals whose ID had been stolen and who certified
7  that in an affidavit?
8    MR. FREDERICK:  Objection, legislative
9  privilege.  Instruct you not to answer.
10    A.  I'll assert privilege.
11    Q.  (By Ms. Maranzano)  Did the Senator ever
12  discuss whether SB 14 might disproportionately impact
13  minority voters?
14    MR. FREDERICK:  I'm sorry, Jennifer.  You
15  said did the Senate ever discuss --
16    MS. MARANZANO:  Senator.  I'm sorry.
17    Q.  (By Ms. Maranzano)  Did Senator Fraser ever
18  discuss whether SB 14 might disproportionately impact
19  minorities voters?
20    MR. FREDERICK:  Objection, legislative
21  privilege, and instruct you not to answer, except to the
22  extent that you recall public statements or statements
23  on the Floor in the committee.
24    A.  He had discussions in the Committee of the
25  Whole and on the Floor with other members about their

---

### 220

1  impressions of the bill that it would impact minority
2  voters.
3    Q.  Did he have discussions about this topic that
4  are not included in the public record?
5    MR. FREDERICK:  I'll object, vague, object
6  to form, and object on the legislative privilege, to the
7  extent that it seeks the substance of any nonpublic
8  conversation.  To the extent you were aware of it, the
9  fact of the conversation, you may testify to.
10    A.  I can't speak to the Senator's private
11  conversations.  I wasn't privy to them.
12    Q.  (By Ms. Maranzano)  Are you aware of any
13  legislators making any statements about illegal alien
14  voting?
15    A.  Yes.
16    Q.  Who was that?
17    A.  I just know it happened.  I don't remember who
18  said it.
19    Q.  What was the statement?
20    A.  I don't know the specifics of it.  I remember
21  reading about it in the newspaper, but I don't remember
22  who said it.
23    Q.  When -- when did you read about the statement?
24    A.  I want to say there was something in 2009, but
25  I'm not -- I don't recall.

JANICE MCCOY                                          MAY 16, 2012

## 221

1  Q.  What newspaper was that in?
2  A.  I do not recall.
3  Q.  What was the general subject of the statement?
4  A.  I don't recall.  Generally, I remember hearing
5  that somebody said something in a committee hearing on
6  public record, but that's the extent of what I know.
7  Q.  Somebody said something in a committee meeting,
8  that somebody being one of the legislators?
9  A.  Yes.  I'm sorry.
10  Q.  Okay.  Thank you.  Have you ever heard any
11  Texas state legislator who voted in favor of SB 14 say
12  that it would prevent a legitimately registered voter
13  from voting in Texas?
14       MR. FREDERICK:  I object on privilege, to
15  the extent it calls for confidential privileged
16  communications, but other than that, you may answer.
17  A.  That specific statement, no.  That general
18  idea, yes.
19  Q.  (By Ms. Maranzano)  Who said that?
20  A.  The general thought that a legitimate voter
21  might not be able to vote was generally said by the
22  Democrat senators who testified against the bill.
23  Q.  Okay.  I'm sorry.  My question is any
24  legislator who voted in favor of SB 14 saying that?
25  A.  Then the answer is no.  I'm sorry.

## 223

1  who they say they are, U.S. citizens"?
2  A.  Yes.
3  Q.  Was that part of the purpose of House Bill 218?
4  A.  No.
5  Q.  Any reason that the Lieutenant Governor would
6  assert that that is the purpose of House Bill 218?
7       MR. FREDERICK:  Objection, calls for
8  speculation.  You can answer.
9  A.  I can't speak to what Lieutenant Governor wrote
10  in 2007.
11  Q.  (By Ms. Maranzano)  Ms. McCoy, at any time
12  since the passage of Senate Bill 14, have you come to
13  believe that it was passed with any discriminatory
14  purpose?
15       MR. FREDERICK:  I'll object on the basis
16  of legislative privilege.  I mean, to the extent -- and
17  I'll object to the extent that the question seeks your
18  thought processes, based on information gathered during
19  consideration of SB 14.  And otherwise, you can answer
20  if you won't reveal that.
21       MS. MARANZANO:  My question is, post
22  enactment, did she come to believe it was passed with
23  discriminatory purpose?
24  A.  No.
25  Q.  (By Ms. Maranzano)  At any time since the

## 222

1  Q.  Have you ever heard any Texas state legislator
2  who voted in favor of SB 14 say that it would prevent
3  racial or ethnic minorities from voting in Texas?
4  A.  No.
5  Q.  Are you familiar with a public letter from the
6  Lieutenant Governor in 2007 about photo ID requirements?
7  A.  No.
8  Q.  This has been previously marked as -- as
9  Exhibit 3.  This has been previously marked as
10  Deposition Exhibit 3.  Have you seen this before,
11  Ms. McCoy?  I'm sorry.  I'm showing you what has been
12  marked as Deposition Exhibit 3, previously marked.  And
13  if you can tell me if you've seen it before.
14  A.  I don't specifically remember reading this, but
15  I'm sure I did.
16  Q.  Do you see that there's a sentence that 8 to 12
17  million illegal aliens currently living in the U.S. --
18  wait, I'm sorry.  Let me find the exact sentence.
19       Can you look at the second paragraph?  Do
20  you see that -- do you see that that sentence says that
21  "Yesterday, Senator Troy Fraser brought up in the Senate
22  consideration of House Bill 218 by Representative Betty
23  Brown, which simply requires voters to present a
24  driver's license or some other common form of
25  identification at the election polls to prove they are

## 224

1  passage of SB 14, have you come to believe that SB 14
2  will have a discriminatory effect on minority voters?
3       MR. FREDERICK:  Same objection, but you
4  can answer.
5  A.  No.
6  Q.  (By Ms. Maranzano)  Ms. McCoy, can you give me
7  about two minutes?  I'm just about done.
8  A.  Sure.
9  Q.  We'll go off the record for about two minutes.
10  A.  Yeah.  Uh-huh.
11       (Recess from 5:03 to 5:11 p.m.)
12  Q.  (By Ms. Maranzano)  Ms. McCoy, do you know what
13  percentage of Senator Fraser's district was made up of
14  Latinos?
15  A.  No.
16  Q.  You testified earlier that minority legislators
17  made statement on the Floor to -- statements on the
18  Floor for the benefit of I believe you said, "of you."
19  Did you mean the Department of Justice?
20  A.  I meant -- yes, yes.
21  Q.  What's the basis of that statement?
22  A.  Personal opinion.
23  Q.  What's your personal opinion based on?
24  A.  Their opposition to the bill and the fact that
25  they thought maybe y'all could help kill it.

## 225

1     Q.   Did any of them say anything like that to you?
2          MR. FREDERICK:  Object, based on
3     legislative privilege, to the extent there was any
4     confidential communication between a specific legislator
5     and you or Senator Fraser, I'll instruct you not to
6     answer.  Otherwise, to the extent you can answer, you
7     may.
8     Q.   (By Ms. Maranzano)  Can you answer this
9     question?
10    A.   I cannot.
11    Q.   Ms. McCoy, if you're called to testify at
12    trial, will you testify that SB 14 has no discriminatory
13    purpose?
14    A.   Yes.
15    Q.   If you're called to testify at trial, will you
16    testify that SB 14 has no discriminatory effect?
17    A.   Yes.
18         MS. MARANZANO:  Well, to be clear for
19    Mr. Frederick, it's our position that if she's taking
20    that position, we have a right to explore the basis of
21    that under our motion to compel.
22         MR. FREDERICK:  I'm sorry.  Just so I'm
23    clear, to explore what?
24         MS. MARANZANO:  To explore the -- I mean,
25    there's a number of questions that are related to that,

## 227

1     taking it out at some point.  I don't recall really when
2     that came out just because I was kind of hurriedly
3     looking through the versions.  And I think the House did
4     send it to us with it in and we had taken out.
5     Q.   Thank you for that clarification.
6     A.   You're welcome.
7     Q.   Anything else?
8     A.   That's -- that's it.
9     Q.   Any -- I'm sorry.
10    A.   So that was the only thing that I wasn't sure
11    about when I answered earlier.
12    Q.   Is there any information that you didn't recall
13    earlier that you now recall?
14    A.   No.
15         MS. MARANZANO:  Well, as I said, we're
16    leaving this deposition open, and I will now hand it
17    over to Chad.
18         EXAMINATION
19    BY MR. DUNN:
20    Q.   Good afternoon.
21    A.   Hi.
22    Q.   Hi.  My name is Chad Dunn.  I don't think we've
23    ever met before, have we?
24    A.   I don't think so.
25    Q.   All right.  Well, I know you've been here for

## 226

1     that y'all have not permitted her to answer.  So we
2     would reserve our right -- we're going to leave this
3     deposition open.  I'd like to say that for the record.
4     And you know, we believe that we have a right to ask her
5     and get answers on a number of questions that you've
6     instructed her not to answer, if she's taking the
7     position that she will offer these opinions if she's
8     called to testify at trial.
9          MR. DUNN:  Intervenors join.
10         MR. FREDERICK:  Okay.  I understand.
11    Q.   (By Ms. Maranzano)  Ms. McCoy, are there any
12    answers that you've provided today that you now wish to
13    change?
14    A.   Yes.
15    Q.   What's that?
16    A.   When we took our break.
17    Q.   Uh-huh.
18    A.   I went back and tried to look at the record of
19    when things passed or didn't pass.
20    Q.   Uh-huh.
21    A.   And I didn't have a lot of time, because there
22    was someone in my office on an unrelated issue for most
23    of the hour.  But you -- the Senate did remove the
24    provision on student ID's, not the House.  I think I had
25    testified that the House removed it, but we ended up

## 228

1     quite a while today, so I'm not going to, you know, try
2     to waste your time.  I've got a few issues that I want
3     to ask you about.  And I'm going to jump around a little
4     bit, all right?  I'm going to do my best to not ask you
5     anything that's already been asked.
6     A.   Okay.
7     Q.   But in order to get done with you as soon as I
8     can, I may end up having to overlap just a little bit,
9     and for that I apologize.  All right.
10    I'm going to start a little bit with some
11    of your earlier testimony.  As I understand it, you used
12    to be an election judge; is that true?
13    A.   One election I served as election judge.
14    Q.   Which election was that?
15    A.   Maybe 2000.  I don't really recall.  It's been
16    a while.
17    Q.   Was that in Travis County?
18    A.   Yes, sir.
19    Q.   And were you appointed as the actual election
20    judge, or you served as a volunteer?
21    A.   I was not precinct chair.
22    Q.   Okay.
23    A.   I -- they called and asked me, it was a
24    November election, the local party called and said we
25    need a Republican, because they had -- they wanted a

JANICE MCCOY                                    MAY 16, 2012

## 229

1  Democrat and a Republican.  And I lived in the precinct,
2  and they asked me to do it, and I said yes.  I don't
3  know if they had to actually turn my name in or not.
4       Q.   Okay.  And I'm not trying to quarrel with you,
5  but it sounds more like you were an election observer or
6  a poll watcher than an election judge.
7       A.   No, sir.  I was an election -- or the assistant
8  election -- I don't think I was the election judge.  I
9  was the assistant election judge.  I mean, I actually
10 had the title.
11      Q.   Okay.  And what were your responsibilities there
12 at the polling location?
13      A.   I was -- what was it?  I was -- I -- served as
14 the election judge, assistant election judge.  So I
15 monitored the election.  If there were any issues that
16 came up, I was there to resolve them.  There were not.
17 And then at the end of the night, I do remember taking
18 the box.  They used -- they used to take the boxes to --
19      Q.   Central tabulation?
20      A.   Yeah.  Well, you know where Palmer Event
21 Center -- there used to be a building next to Palmer
22 Event Center, but they tore it down.  Whatever that
23 building was, I took the box there and had to turn it in
24 official.  And then by election code, you have to keep
25 the documents for two years.  And so I was the custodian

## 231

1  Republican party official.
2       Q.   Was it the chairman?
3       A.   I don't recall.
4       Q.   I assume that you vote in most elections?
5       A.   Yes, sir.
6       Q.   Do you vote in both nonpartisan and partisan
7  elections?
8       A.   Yes, sir.
9       Q.   And you're going to hate me for asking this,
10 but it's important for several questions, what year were
11 you born?
12      A.   1969.
13      Q.   All right.  I tried to do it as gingerly as I
14 could.
15      A.   I'm not embarrassed.
16      Q.   So I assume since you turned 18 and since then,
17 you have more or less consistently voted?
18      A.   Yes, sir.
19      Q.   Whenever you have voted in Texas, have you ever
20 observed activity that made you concerned it would be
21 voter fraud?
22      A.   No, sir.
23      Q.   Have you ever voted in an election and observed
24 discriminatory behavior by an election clerk?
25      A.   No, sir.

## 230

1  of the documents for that precinct for two years.
2       Q.   All right.  Were you actually assigned the
3  responsibility of enrolling voters as they came in?
4       A.   I did not sit there and check the voters.
5  That, the election workers did that.
6       Q.   And did you do that during early vote or
7  election day or both?
8       A.   It was only on election day.
9       Q.   Do you remember the precinct?
10      A.   No.  The precinct number, no, sir.
11      Q.   Do you remember the actual location?
12      A.   There was a church just at 45th and Medical
13 Parkway.
14      Q.   While there, did you observe any activity that
15 you were concerned might be election fraud?
16      A.   No.
17      Q.   Have you served in an election judge or
18 election official capacity any other time than we just
19 spoke about?
20      A.   No.
21      Q.   Now, you said somebody called you and asked you
22 to do this.  Do you remember who that was?
23      A.   No, sir.
24      Q.   Was it a party official or a county official?
25      A.   I think it was a party official.  Travis County

## 232

1       Q.   I think you also testified that you've lived in
2  Texas your whole life; is that true?
3       A.   Yes, sir.
4       Q.   Have you, during that time, ever witnessed an
5  act of discrimination against a minority citizen in
6  Texas?
7            MR. FREDERICK:  Object as vague.  Object
8  to relevance.  But you can answer.
9       A.   Yeah.  I don't -- I don't know that I can
10 answer that question because it's vague.  I mean --
11      Q.   (By Mr. Dunn)  Well, I'll do -- I'll see if I
12 can do better.  All right?
13      A.   Okay.
14      Q.   Have you ever seen a government official deny a
15 benefit or service to a minority citizen?
16      A.   No, sir.
17      Q.   Have you ever seen another citizen in Texas
18 treat a minority citizen with some degree of disrespect?
19      A.   Another citizen?
20      Q.   Yes, ma'am.
21      A.   So one citizen treating somebody else with
22 disrespect?  Yes, sir.
23      Q.   And was that an Anglo to an African-American or
24 an Anglo to a Latino or something different?
25      A.   I think in all instances I have seen people

JANICE MCCOY                                    MAY 16, 2012

## 233

1    treat people poorly, whether it's minority on minority
2    or Anglo on minority or minority on Anglo, I've seen it
3    all.  And I've lived 43 years, you see a lot of
4    disrespect.
5        Q.   So, in your opinion, there's not a higher
6    degree of discrimination amongst the citizenry between
7    Anglos and minority population in Texas anyway?
8        A.   In my opinion, that's correct.
9        Q.   Have you always lived in Austin?
10   A.   No, sir.
11       Q.   Where else have you lived in the state?
12   A.   Houston, in College Station, Bryan/College
13   Station when I was at A&M.
14       Q.   You went to school at A&M?
15   A.   Yes, sir.
16       Q.   Where did you grow up?
17   A.   Houston.
18       Q.   So is it fair to say that you've more or less
19   split your life in-between Houston and Travis County?
20   A.   Yes, sir.
21       Q.   Now, I'm going to move to a different topic, so
22   I'm trying not to lose you here.  But you were asked a
23   number of questions about the various photo voter ID
24   bills over the last several sessions about documents
25   prepared as part of the legislative process.  Okay.

## 234

1    That's where I'm going now.
2        A.   Yes, sir.
3        Q.   And you were asked some questions about bill
4    analysis that were prepared.  And I want to focus on SB
5    14 for a minute.  The bill analysis prepared for SB 14
6    was created by whom?
7        A.   The bill analysis that was created by Senate
8    Bill 14 as it came out of Senate, as it was filed, as it
9    came out of Senate committee as it was passed,
10   engrossed, was prepared by Senate Research Center,
11   essentially, via the Senate administrative process.
12       The House, when it made it over there,
13   their processes developed their own bill analysis for
14   use.  I don't really recall -- I don't know who does
15   theirs.
16       Q.   All right.
17       A.   They probably base it on ours, but they do
18   their own.
19       Q.   And I want to focus on the Senate report
20   first.  The Senate report was prepared by Senate
21   Research, if I understood your answer right.
22       A.   That's -- yes.
23       Q.   Okay.  And I want to make sure we're being very
24   specific about that.
25       A.   Right.

## 235

1        Q.   Was it completely created by and put out by
2    Senate Research, or did it include language provided by
3    you or somebody in your office?
4        A.   Senator Fraser, through me, provides language
5    to the committee chair and their staff, and in this
6    case, Senator Duncan chaired Senate State Affairs.  They
7    then take that information and submit it to Senate
8    Research Center.  I don't know for sure if they used my
9    language verbatim.  Sometimes they do.  Sometimes they
10   don't.  And on this instance, I do not recall if they
11   used any of my language verbatim.
12       Q.   And so just to be clear in our record, do you
13   recall whether or not the language your office submitted
14   to Senator Duncan's staff was changed at all when it was
15   submitted by Senator Duncan's staff to Senate research?
16       A.   I do not recall.
17       Q.   Who was it with Senator Duncan's staff you
18   would have coordinated on the research analysis?
19       A.   Jennifer Fagan.
20       Q.   Was any convincing or cajoling necessary to
21   convince Senator Duncan's staff to support this bill?
22           MR. FREDERICK:  Object, legislative
23   privilege.  Instruct you not to answer.
24   A.   I'll assert privilege.
25       Q.   (By Mr. Dunn)  With respect to the -- in

## 236

1    addition to the bill analysis, a fiscal note was also
2    prepared; is that true?
3        A.   Yes, sir.
4        Q.   And was that prepared by the Legislative Budget
5    Board?
6        A.   Yes, sir.
7        Q.   Can you recall if, and I'm not asking for the
8    numbers, but from the various sessions you've been asked
9    about photo ID bills today, can you recall if there were
10   any changes to the fiscal note of the bill in its
11   various iterations?
12       A.   I don't recall what the fiscal note was in
13   2007.  I think in 2009 the number stayed somewhere in
14   the 2 to 4 million dollar range.
15       Q.   Do you remember who the analyst at LBB was on
16   these bills?
17       A.   I did not know the analyst at LBB.
18       Q.   Did you ever communicate with the analyst at
19   LBB?
20       A.   No, sir.
21       Q.   Did you ever provide LBB any estimates as to
22   your belief as to the fiscal impact of the bill?
23       A.   No, sir.
24       Q.   Did you ever do or conduct any research as to
25   what the fiscal impact of the bill would be?

JANICE MCCOY                                        MAY 16, 2012

---

### 237

1      MR. FREDERICK:  Object, based on
2  legislative privilege.  Instruct you not to answer to
3  the extent it reveals the substance of any research.  I
4  instruct you not to answer.
5      A.  I'll assert privilege.
6      Q.  (By Mr. Dunn)  Stepping way from this bill for
7  a minute, is it generally important that a bill in the
8  legislature not have a fiscal impact or have a minimal
9  fiscal impact in order to pass?
10     MR. FREDERICK:  Object, vagueness, but you
11  can answer.
12     MR. DUNN:  I'll strike the question and
13  rephrase.  How about that?
14     Q.  (By Mr. Dunn)  Is it -- bills with a large
15  fiscal impact, do they typically get defeated or fail?
16     A.  They take longer to pass.
17     Q.  And they -- and because the bill involves a
18  larger fiscal impact, that means the state has to divert
19  financial resources to the bill's tenants; is that true,
20  if it were to pass?
21     A.  No.
22     Q.  Well, I assume that in all these years that
23  you've worked for Senator Fraser and perhaps others, you
24  have prepared a lot of bills and received a lot of
25  fiscal impacts on bills; is that true?

---

### 238

1      A.  Yes, sir.
2      Q.  Is it not typically bad news when you received
3  a fiscal impact statement from LBB that puts money on
4  the cost of a bill?
5      MR. FREDERICK:  Object to vagueness.  You
6  can answer.
7      A.  Well, I think I need you to ask the question
8  better.  I don't -- can you ask the question again?
9      Q.  (By Mr. Dunn)  Uh-huh.  Is it more difficult to
10  pass a piece of legislation when it has a fiscal impact
11  statement from LBB that costs a considerable amount
12  of money?
13     A.  Not always, but the majority of the time, yes,
14  you'd rather have a zero fiscal note than not.  Or have
15  a low fiscal note than not.
16     Q.  And just so our court, which may not understand
17  the process here in Texas, our budget here in the state
18  is prepared either by the House Appropriations Committee
19  or the Senate Finance Committee in alternating sessions;
20  is that true?
21     A.  That's true.
22     Q.  And so if a member wants to pass a bill that
23  has a fiscal impact, they typically have to go to either
24  the Appropriations or Finance Committee and work out an
25  arrangement to pay for the bill; is that also true?

---

### 239

1      A.  Yes.
2      Q.  All right.  What efforts were made -- is it
3  true then that Senate Bill 14 had a fiscal impact
4  according to the LBB?
5      A.  Yes.
6      Q.  What steps were taken to make sure the funding
7  would be available for the bill?
8      A.  In 2007, no, I'm sorry.  I get my years -- in
9  2009 -- well, let's back up.
10     So when a bill has a fiscal impact, you
11  need a Finance Committee member to propose an amendment
12  to the budget or a rider or some sort of mechanism to
13  get that included, a contingency rider, sometimes.  In
14  2007, I want to say that -- I can't remember if I did
15  one of those or not.  In 2009, I'm sorry.  Sorry.
16  2009.  In 2007, I don't -- I didn't do anything with the
17  budget of the bill.  I don't remember that.
18     In 2009, I think I prepared a contingency
19  rider, and I think we asked another senator who was on
20  the committee to move that forward, who was a supporter
21  of the bill.
22     In 2011, I don't recall that I did any
23  work on trying to -- on behalf of Senator Fraser in
24  trying to get money in the budget.
25     Q.  Is the short answer with respect to Senate Bill

---

### 240

1  14, in 2011, you can't recall what, if anything, you did
2  to get the bill funded?
3      A.  I don't recall that I did anything to get the
4  bill funded --
5      Q.  All right.
6      A.  -- on behalf of Senator Fraser.
7      Q.  Senator Fraser has served on the Finance
8  Committee before, has he not?
9      A.  Yes, he has.
10     Q.  When did that service stop?
11     A.  I don't recall.  2005 or 2007.
12     Q.  Do you recall the senator you approached in
13  2009 to hold the contingency rider on the committee?
14     A.  I do not.
15     Q.  Do you know who carried it in 2011?
16     A.  I do not.
17     Q.  Just for our record, which -- was the
18  appropriation bill in '11 out of the house or out of the
19  Senate?  Or do you remember?
20     A.  I don't remember.
21     Q.  I don't either so I was hoping you did.
22     A.  I try to forget.
23     Q.  All right.  As part of the fiscal analysis for
24  the bill, did you participate in trying to determine
25  what it would cost to fully fund antifraud technologies

JANICE MCCOY                                    MAY 16, 2012

## 241

1  in voting locations?
2          MR. FREDERICK:  I'm going to object on the
3  basis of privilege, to the extent it calls for the
4  substance of any communications or your thought process,
5  mental impressions, but the question as phrased, you may
6  answer it as long as you don't reveal those matters.
7          A.  Senator Fraser and I didn't do any work on
8  developing what the fiscal note looked like or what the
9  agency said it would cost them or not cost them.  So we
10  did nothing on the fiscal impact.
11          Q.  (By Mr. Dunn)  All right.  Fair enough.  So
12  I'll ask this question:  Did you, though, in working on
13  the bill, in any session, come to learn of various
14  technologies that have been developed or being developed
15  that can be used in polling locations to stop voter
16  fraud?
17          MR. FREDERICK:  Object to legislative
18  privilege.  Instruct you not to answer.
19          A.  I'll assert privilege.
20          Q.  (By Mr. Dunn)  With respect to Senate Bill 14,
21  do you know which legislator or which legislator's staff
22  was the point person for the fiscal impact of the bill,
23  if it wasn't you?
24          A.  I mean --
25          MR. FREDERICK:  If you know.

## 242

1          A.  When a bill moves to the legislative process,
2  the committee staff in the committee is responsible for
3  asking LBB for a fiscal note.  LBB then asks the
4  different agencies that are impacted how much it will
5  cost.  That comes back, gets attached to the bill, and
6  we move forward.
7          I mean, I don't -- I mean, I think -- I
8  mean, I don't know that I can be responsive to your
9  question, because I don't know that any legislative
10  staff directed anybody to provide that type -- those
11  numbers.  It's just that's what happened.  That's what
12  we got back from legislative budget board.
13          Q.  (By Mr. Dunn)  Let me try a different way of
14  phrasing the question.  Do you know and can you name for
15  us any staffer that was involved in formulating the
16  fiscal impact of this bill or coordinating with LBB?
17          A.  No.
18          Q.  Okay.  As I understand your description earlier
19  of your job responsibilities, you principally handle the
20  Capitol office for Senator Fraser and his legislative
21  priorities; is that true?
22          A.  Yes.
23          Q.  Do you have any district office
24  responsibilities?
25          A.  Only insomuch as I oversee the same

## 243

1  administrative functions for those three employees, and
2  they call me and bounce things off me about meetings or
3  issues or case work that they're working on.
4          Q.  Do you go out into the district?
5          A.  I have.  I haven't done it in the last couple
6  of years.
7          Q.  Senator Fraser's district is, gross
8  generalization, but more or less northwest of the Austin
9  area; is that true?
10          A.  He would categorize it as the Hill Country from
11  Kerr County to Abilene, from Belton to Menard.
12          Q.  All right.
13          A.  Junction.
14          Q.  Where are his district offices?
15          A.  Abilene, Belton and Marble Falls.
16          Q.  Is there an area in the district that has a
17  high degree of African-American, Latino or Asian
18  population?
19          A.  I would assume Bell County probably has our
20  largest minority population because it's our largest
21  county.
22          Q.  How would you describe that minority?  I mean,
23  is it Latino, African-American mixed?
24          A.  African-American.
25          Q.  I think you were asked earlier if you knew the

## 244

1  percentage of Latinos you have in your district.  I
2  think you said you didn't know; is that true?
3          A.  That's true.
4          Q.  Do you have an estimate?
5          A.  No, sir.
6          Q.  Do you have an estimate for the number of
7  African-Americans in your district?
8          A.  No, sir.
9          Q.  Do you have an estimate for the number of
10  Asians in your district?
11          A.  No, sir.
12          Q.  You've been with Senator Fraser for 10 years.
13  Did I hear that right?
14          A.  Since 1998.
15          Q.  '98.  All right.  So about 14 years?
16          A.  Yes, sir.
17          Q.  In the 14 years, what activities have you taken
18  or Senator Fraser taken to support the minority
19  community in his district?  Any bills, business,
20  meetings, or legislative business undertaken for those
21  groups?
22          MR. FREDERICK:  I'll object on legislative
23  privilege, only to the extent that your answer would
24  require you to reveal thought process, mental
25  impressions or confidential communications related to

JANICE MCCOY                                    MAY 16, 2012

---

245

1   pending legislation.  To the extent you can answer
2   without revealing that, you may answer.
3        A.   Senator Fraser votes and promotes and works
4   with every constituent equally.
5        Q.   (By Mr. Dunn)  And I appreciate that.  I'm just
6   trying to find out, can you name for us some bills or
7   meetings or sort of administrative lobbying he's done on
8   of behalf of the minority constituents in his district?
9        A.   No.
10       Q.   Now, with regard to your district
11  responsibilities, do you ever go out and take the place
12  of the Senator at an event or speak to group because
13  he's unavailable?
14       A.   I have in the past.  I have not done it in
15  about three years.
16       Q.   What sort of events would you go speak to?
17       A.   They weren't necessarily speaking events where
18  it was a public forum.  They typically would just be
19  meetings with various constituency groups that wanted to
20  express concerns or opinions to our office.
21       Q.   Are there -- if I understand the testimony
22  earlier, there's sort of a schedule kept by your office
23  of where the Senator goes and does.  It doesn't have
24  everything, but it has some things; is that right?
25       A.   Yes, sir.

---

246

1        Q.   Would it also include the events that you
2   attended or another staff attended on his behalf?
3        A.   No, sir.
4        Q.   Those would be kept on the staffer's private
5   calendar?
6        A.   That's correct.
7        Q.   Can you recall ever have gone to an event in
8   place of Senator Fraser and speaking with a group of
9   African-Americans or Latinos?
10       A.   I've gone to events where African-Americans and
11  Latinos were present but nothing specific to those
12  groups.
13       Q.   Not a group or event where they made up the
14  predominant population in the attendees?
15       A.   That's correct.  I have not.
16       Q.   Have you attended any public meetings in
17  Senator Fraser's district as it relates to photo ID?
18       A.   I've attended meetings with the Senator where
19  he has -- speaking to a group where he brings up the
20  topic of photo ID in terms of the legislation that he
21  passed or didn't pass, given whatever year it was, but
22  nothing specific for the meeting specifically about
23  voter ID.
24       Q.   In other words, you didn't go to any rallies or
25  events put together by certain political groups who were

---

247

1   pushing photo ID?
2        A.   No, sir.
3        Q.   It would just come up as a part of more general
4   political discussion?
5        A.   Yes, sir.
6        Q.   My question earlier was limited to events in
7   the district.  Now I'm going to ask you about anywhere.
8   Have you been to such events?
9        A.   No, sir.
10       Q.   When is it that photo ID became something you
11  started working on in your office?
12       A.   The spring of 2007.
13       Q.   What caused that project to develop?
14            MR. FREDERICK:  Object, based on
15  legislative privilege.  To the extent you can answer
16  without revealing communications with the Senator,
17  legislators, constituents, or thoughts or mental
18  impression, you can answer.
19       A.   When the Senator agreed to be the House sponsor
20  to House Bill 218.
21       Q.   (By Mr. Dunn)  Prior to agreeing to be the
22  sponsor of House Bill 218, you hadn't researched,
23  drafted bill language or otherwise worked on the photo
24  ID issue?
25            MR. FREDERICK:  Objection, legislative

---

248

1   privilege.  Instruct you not to answer.
2        A.   I'll assert privilege.
3        Q.   (By Mr. Dunn)  The impetus to your office
4   beginning to deal with photo ID, did it have anything to
5   do with a specific event or events actually involving
6   voter impersonation?
7            MR. FREDERICK:  Object on the basis of
8   legislative privilege.  Instruct you not to answer.
9        A.   I'll assert privilege.
10       Q.   (By Mr. Dunn)  Why is it that Senator Fraser,
11  after having been asked in 2007 to carry House Bill 218
12  why is it that he continued to hold the issue and push
13  it in future sessions?
14            MR. FREDERICK:  Object on the basis of
15  legislative privilege.  To the extent that it -- that
16  the question calls for subjective mental impressions,
17  thought process or confidential communications, I
18  instruct you not to answer.  If you can answer based on
19  nonprivileged matters including public statements or
20  core testimony, you can do so.
21       A.   I think I can say that Senator Fraser has said
22  consistently, public record or public meetings, that he
23  believes that the issue of in-person voter fraud and
24  protecting the integrity of our elections was important,
25  and he wanted to continue to fight.

JANICE MCCOY                                    MAY 16, 2012

---

249

1      Q.  (By Mr. Dunn)  And he came to that conclusion
2   sometime in or around the spring of 2007 when he was
3   asked to support House Bill 218?
4          MR. FREDERICK:  Objection to the extent it
5   mischaracterizes the prior testimony.  Also object on
6   legislative privilege.  I instruct you not to answer.
7      A.  I'll assert privilege.
8      Q.  (By Mr. Dunn)  Is it true that Senator Fraser's
9   issue in the photo ID matter -- strike that.
10         Senator Fraser's interest in the photo ID
11   matter did not develop until he was approached by a
12   member of the House?
13         MR. FREDERICK:  Objection, legislative
14   privilege.  Instruct you not to answer.
15     A.  I'll assert privilege.
16     Q.  (By Mr. Dunn)  You were asked some testimony
17   about Section 5 of the Voting Rights Act.  I'm just
18   telling you that to sort of get you to where I'm going
19   now.
20     A.  Yes, sir.
21     Q.  All right.  And you mentioned something that
22   nine states and some territories are subject to Section
23   5.  Did I hear you correctly?
24     A.  That was my comment.  Yes, sir.
25     Q.  Do you know how it is that those nine states

---

250

1   and territories were made subject to Section 5?
2      A.  My understanding is that it was part of -- back
3   when LBJ was president, but that's as much I could speak
4   to.
5      Q.  In other words, you don't know if there was a
6   formula or some kind of basis used to select the areas
7   subject to Section 5, you're not familiar with it?
8      A.  That's correct.
9      Q.  Are you aware that Section 5 was applied to
10   certain areas because of the history of discrimination?
11     A.  It's my understanding that that was the
12   intent.  Yes, sir.
13     Q.  And do you deny that there's a history of
14   discrimination in Texas?
15     A.  No, sir.
16     Q.  When is it that you think, if you do, that the
17   discrimination in Texas stopped?
18     A.  I don't recall there being discrimination
19   in my life -- well, in my adult lifetime.
20     Q.  So sometime in your adolescence is when that
21   problem was solved in your view?
22         MR. FREDERICK:  Objection, to the extent
23   misstates the testimony.  You can answer.
24         MR. DUNN:  I'll rephrase.
25     Q.  (By Mr. Dunn)  When in your view was racial

---

251

1   discrimination in Texas resolved?
2      A.  I don't know.
3      Q.  Okay.  But in any event, in your opinion, we're
4   at the point now where federal laws are not required to
5   protect minority citizens in Texas?
6          MR. FREDERICK:  You may answer to the
7   extent that --
8      A.  My personal opinion is federal law is not
9   necessary to protect minority voters in Texas.
10     Q.  (By Mr. Dunn)  But you believe that minority
11   citizens have an equal opportunity to vote as Anglos or
12   anyone else?
13     A.  That they do?
14     Q.  Yes, ma'am.
15     A.  Yes, sir.
16     Q.  Okay.  That is -- that sort of belief, the
17   belief that everybody that's an American citizen has an
18   equal vote is also part of the law in the constitution,
19   the federal constitution; is that true?
20     A.  Yes, sir.
21     Q.  All right.  So when you draft legislation,
22   whether it's on elections or anything else for the
23   Senator, do you keep that concern in mind to make sure
24   you're complying with that provision of the
25   constitution?

---

252

1      A.  I --
2          MR. FREDERICK:  Object on the basis of
3   legislative privilege, and instruct you not to answer.
4      A.  I'll assert privilege.
5      Q.  (By Mr. Dunn)  Do you believe that -- this
6   is -- I'm going to make sure I'm clear about this.  If
7   you're confused, ask me.  But do you believe that
8   government, whether it's state or federal, is capable of
9   disenfranchising a citizen?  I beg your pardon?
10     A.  I'm sorry.  I'm just thinking in my head.
11     Q.  Oh.
12     A.  What do you mean by "disenfranchising"?
13     Q.  Well, let's say the federal government passed a
14   law that said that people with blue eyes can't vote any
15   longer.
16     A.  So we're specifically talking about elections?
17     Q.  Yes.  Uh-huh.  Such a law would disenfranchise
18   voters.  Would you agree?
19     A.  If you had blue eyes, yes, sir.
20     Q.  All right.  You and I share that trait.  That's
21   why I picked that one.
22     A.  Maybe we shouldn't be voting.
23     Q.  Well, we probably -- well, I won't even say.
24         All right.  With respect to -- there have
25   been laws over the years that have caused voters to be

## 253

1   disenfranchised; would you agree?
2       A.   Previous, yes.
3       Q.   For example, requiring a voter to pay a poll
4   tax.  Would you agree that resulted in disenfranchise?
5       A.   Yes.
6       Q.   Laws that require voters to take a literacy
7   test.  Would you agree that was disenfranchising?
8       A.   Yes.
9       Q.   Do you believe that government can make voting
10  so onerous that it becomes a disenfranchisement?
11          MR. FREDERICK:  Object as vague, but if
12  you have an opinion, you can answer it.
13      A.   I don't believe the government would do that.
14      Q.   Fine.  But if it did, it could become
15  disenfranchising?
16      A.   I think the government could do a lot of things
17  that are bad and does.
18      Q.   So is it your opinion that Senate Bill 14 as
19  passed has no effect on the difficulty in voting in
20  Texas?
21          MR. FREDERICK:  I'll object only to the
22  extent that the question seeks your mental impressions,
23  thought processes related to the development of SB 14
24  and any confidential communications.  As you sit here
25  today, you may answer based on personal knowledge or

## 254

1   opinion.
2       A.   I do not believe Senate Bill 14 disenfranchises
3   voters.
4       Q.   (By Mr. Dunn)  All right.  And that's fair
5   enough, but that's a slightly different answer to a
6   different question.
7           I'm asking:  Do you believe that Senate
8   Bill 14 puts some burden on voting that wasn't there
9   before?
10          MR. FREDERICK:  Same objection and
11  instruction.
12      A.   I'll assert privilege.
13          THE WITNESS:  Can I?  Is that what --
14          MR. FREDERICK:  No.  Let me repeat it just
15  so I'm clear to you.
16          THE WITNESS:  Okay.
17          MR. FREDERICK:  I object based on
18  legislative privilege, only to the extent the question
19  seeks your thoughts or Senator Fraser's thoughts or
20  mental impressions about SB 14 during the process of
21  development and passage or any confidential
22  communications --
23      A.   Okay.
24          MR. FREDERICK:  -- related to it.  To the
25  extent that you have a personal opinion or personal

## 255

1   knowledge, as you sit here today, not based on that, you
2   may answer.
3       A.   So the question is?
4       Q.   (By Mr. Dunn)  The question is, what is your
5   opinion as to whether or not Senate Bill 14 places some
6   burden on voting?
7       A.   I don't believe it imposes an additional burden
8   on voting that makes it hard for anybody to vote.
9       Q.   And so I just want to make sure I understand.
10  You don't think that there's any burden, or you think
11  that the burden is insignificant?
12      A.   I think the burden is insignificant.
13      Q.   All right.  And so whereas a burden that would
14  come from a poll tax or a literacy test is some degree
15  higher -- well, let me just strike that.
16          Where do you draw the line between the
17  burden of a poll tax, for example, and the burden
18  created by the photo ID requirement?
19          MR. FREDERICK:  Object as vague.
20      A.   I don't know that I personally believe that the
21  burden of having a photo ID is a burden or having a
22  photo ID is a burden.
23      Q.   (By Mr. Dunn)  I see.  All right.  Well, have
24  you worked on -- you staffed State Affairs for some
25  period of time I think you said, right?

## 256

1       A.   Yes, sir.
2       Q.   And State Affairs in the Senate is where most
3   election bills go through unless --
4       A.   Yes.
5       Q.   -- there's a special rule set up?
6       A.   Yes, sir.
7       Q.   All right.  In this case, Senate Bill 14 didn't
8   go through State Affairs because the Committee of the
9   Whole was created; is that true?
10      A.   That's true.
11      Q.   But typically, the committee with senators who
12  have the background and knowledge about election matters
13  are in State Affairs?
14      A.   Yes, sir.
15      Q.   There have been a number of bills that have
16  been passed by the state legislature in the last several
17  sessions that relate to election laws; is that true?
18      A.   Yes, sir.
19      Q.   There have also been a number that relate to
20  voter registration; is that true?
21      A.   Yes, sir.
22      Q.   Are you familiar with bills that have created
23  new requirements for deputy voter registrars in Texas?
24      A.   Not specifically, no.
25      Q.   All right.  Are you familiar with any bills

JANICE MCCOY                                              MAY 16, 2012

---

### 257

1  that create additional burdens in order to become
2  registered to vote in Texas?
3      A.  I don't recall that we passed anything about
4  registering to vote since HAVA or that doesn't comply
5  with HAVA.
6      Q.  So if things have been passed since then, you
7  just don't recall it?
8      A.  That's correct.
9      Q.  Now, could you see a scenario where the -- and
10  I'm using your language, the insignificant burden of SB
11  14 added on to a burden of voter registration, added on
12  to a burden of deputy registrars, could add up to
13  disenfranchisement in time?
14          MR. FREDERICK:  Objection, calls for
15  speculation.  You can answer if you can.
16      A.  I don't know what the changes were to voter
17  registration and deputies, so I cannot answer the
18  question.
19      Q.  (By Mr. Dunn)  But you would agree that if we
20  take stacks of hairs and we continue to stack the hairs,
21  sooner or later we'll get to the thickness of a quarter?
22          MR. FREDERICK:  Objection, vague.  You can
23  answer if you can.
24      A.  I don't believe that Senate Bill 14 was passed
25  in a vacuum, and I think we recognized what the rest of

---

### 258

1  the election code did when we passed it.
2      Q.  (By Mr. Dunn)  So it's your testimony then that
3  whatever burden, if there is one on Senate Bill 14, does
4  not add into other burdens if there are in state law to
5  the right to vote?
6          MR. FREDERICK:  Object to the extent it
7  mischaracterizes prior testimony, but you can answer.
8      A.  I don't know that I said there were other
9  burdens.  So, I mean.
10      Q.  All right.  What burdens are there, if any, to
11  the voting in Texas?
12      A.  I don't believe there are any burdens currently
13  to voting in Texas.
14      Q.  Are you familiar with new regulations adopted
15  by the Department of Public Safety relating to documents
16  required to be presented in order to get an ID or
17  driver's license?
18      A.  I have recently read news clips saying they did
19  that.  Yes, sir.
20      Q.  These are new regulations that came out May the
21  1st; is that true?
22      A.  I don't know the date, but recent, yes, sir.
23      Q.  Very recently?
24      A.  Yes, sir.
25      Q.  DPS also adopted some new regulations shortly

---

### 259

1  in advance of the last legislative session, did they
2  not, with respect to information that had to be provided
3  to get a driver's license or ID?
4      A.  I think that's correct.  Yes.
5      Q.  So is it your opinion that as DPS continues to
6  add requirements to getting a driver's license or an ID,
7  that doesn't create a burden, even ever so slight, to
8  voting?
9      A.  Well, Senate Bill 14 provides with other forms
10  of ID, so you could use one of those forms, those five
11  other forms, four other forms, to vote if you didn't
12  want to get a driver's license.
13      Q.  So if the state, whether it be through the
14  legislature, the agency makes it extremely difficult to
15  get a driver's license, that's not a burden, in your
16  view, because there are other IDs that can be obtained?
17  Do I have that right?
18          MR. FREDERICK:  Object to the extent it
19  misstates prior testimony.  You can answer.
20      A.  I don't -- can you say that, can you repeat
21  your question?
22          MR. DUNN:  Sure.  Would you mind reading
23  that one?
24          (Requested portion read back by the court
25  reporter.)

---

### 260

1          MR. FREDERICK:  Object, again, as
2  vague.  Object to the extent it mischaracterizes the
3  prior testimony.  And object, it calls for speculation.
4  But you can answer.
5          (Cell phone buzzes.)
6      Q.  (By Mr. Dunn)  Do you need to deal with that?
7      A.  I need to just turn it off.
8      Q.  I know you have twins.  If you need to get it.
9      A.  No.  My husband has them.
10          I don't know that what we -- what DPS has
11  done is created a burden in terms of getting a driver's
12  license.  And I believe that Senate Bill 14 provided
13  with other mechanisms if you didn't want to use a
14  driver's license as a photo ID to vote.
15      Q.  All right.  Well, did you or anybody in your
16  office have any coordination with DPS and its adoption
17  of regulations relating to obtaining a driver's license
18  or ID?
19      A.  No.
20      Q.  Are you aware of any impediments to DPS through
21  its rule-making authority to create other requirements
22  for folks to bring in order to obtain one of these state
23  IDs?
24      A.  No.
25      Q.  So then it would be true that even under the

261

1  current sort of situation and regulation in which we're
2  judging Senate Bill 14, that could easily change should
3  DPS decide to alter its regulations?
4       MR. FREDERICK:  Objection, calls for
5  speculation, but you can answer.
6       A.  I don't think I can answer the question.  I
7  can't speculate what DPS will or won't do.
8       Q.  (By Mr. Dunn)  I don't think I was asking you
9  to speculate.
10      A.  Okay.
11      Q.  I guess all I was asking is since DPS
12  regulations are as fluid as DPS wants to create rules,
13  you would agree with me the effect of Senate Bill 14
14  will change as those requirements change?
15      A.  I disagree because DPS has to operate within
16  statute, and if statute is clear, then DPS rules can't
17  go beyond that.
18      Q.  Was there anything in Senate Bill 14 that
19  authorized DPS to require documentation of 30-day
20  residency in order to get a voter ID or a driver's
21  license?
22      A.  No, sir.
23      Q.  So do you know what their statutory authority
24  was for doing that?
25      A.  No, sir.

262

1       Q.  If there was statutory authority, it would have
2  had to come from someplace other than Senate Bill 14?
3       A.  That's correct.
4       Q.  All right.  Now, I'd like to ask you a little
5  bit about the 21-vote rule.  And I understand that you
6  say it's not a rule, so I'm not trying to put the word
7  "rule."  How do you want to refer to it, the 21-vote
8  tradition?
9       A.  We can call it a rule if you'd prefer, if that
10  makes it easier for you.
11      Q.  All right.  A bill or measure in the Senate in
12  order to pass out of the body under typical rules and
13  traditions requires 21 votes, if all 31 senators are
14  present?
15      A.  It requires -- yes, sir, if all 31 senators are
16  present.  Yes, sir.
17      Q.  All right.  And if there's some number below 31
18  senators, then two-thirds of the number who are present
19  is required, so long as there's a quorum; is that true?
20      A.  Yes, sir.
21      Q.  What measures can you recall in your 14 or so
22  years of experience have been passed out of the Senate
23  without complying with the two-thirds tradition?
24      A.  Besides photo ID, I don't know of any.
25      Q.  Now, you gave some testimony earlier -- well,

263

1  strike that.
2       The 31 senators who are in the Senate are
3  the only people eligible to vote in the Senate.  Seems
4  like a silly question, but that's true; is that right?
5       A.  That's true.
6       Q.  All right.  So you either have to convince the
7  requisite number of those senators to support your
8  measure or you have to somehow change the electorate; is
9  that true?
10      A.  Change the electorate.  I don't understand.
11      Q.  These 31 senators.  You either got to convince
12  --
13      A.  Right.
14      Q.  -- two-thirds or a majority, whatever you
15  need --
16      A.  Right.
17      Q.  -- or you got to beat a senator or two in an
18  election?
19      A.  That's correct.
20      Q.  As I understand earlier forms of photo ID,
21  because there wasn't the two-thirds vote in the Senate,
22  the maneuver then was to have the vote when one senator
23  who opposed the bill was missing; is that true?
24      A.  Yes.
25      Q.  And that happened on at least one occasion when

264

1  Senator Uresti was not around?
2       A.  In terms of voter ID, yes.
3       Q.  And it was senators, I'm not asking you to
4  identify whom, but it was senators who came up with this
5  maneuver of trying to get a bill through when there
6  wasn't two-thirds of the -- when you didn't have a
7  senator present.
8       MR. FREDERICK:  I'll object on legislative
9  privilege.  Instruct you not to answer it.
10      MR. DUNN:  Okay.  And I'm not talking
11  about Senate Bill 14.  I'm talking about process in
12  general in the Senate.  So is it your -- is it your
13  instruction to her, she can't talk about the two-thirds
14  rule in general?
15      MR. FREDERICK:  No.  That's not my
16  instruction to her.
17      MR. DUNN:  Oh, okay.  All right.  I just
18  didn't want to keep asking the same question.
19      MR. FREDERICK:  No, no, I hear you.
20      Q.  (By Mr. Dunn)  All right.  So -- let me just
21  start over.
22      Your experience there in the Senate is
23  that senators occasionally will wait for an opponent
24  senator to not be in the chamber in order to push a
25  bill?

## 265

1    A.  Yes, sir.

2    Q.  All right.  And the hope then is to get the

3  bill passed and get two-thirds while this other senator

4  is out of the room?

5    A.  Yes, sir.

6    Q.  And sometimes it might take a couple of

7  senators out of the room; is that true?

8    A.  Yes.

9    Q.  There's a tradition in the Senate, though, on

10  big and large and hot button measures that senators ask

11  the chair that a bill not come up when they have to be

12  away from the Senate; is that true?

13        MR. FREDERICK:  Objection, vague.  You may

14  answer.

15    A.  It has been done, to my knowledge, yes.

16    Q.  (By Mr. Dunn)  And now here's where I'll get

17  his objection.  All right.

18        Do you know if Senator Uresti asked

19  whoever was in the Lieutenant Governor's chair, don't

20  bring up this bill while I'm out of the chamber?

21        MR. FREDERICK:  I'll object on legislative

22  privilege, to the extent it calls for a confidential

23  communication from a legislator or staff, or -- yeah,

24  but to the extent it's in the public record or the

25  Senate, you may answer.

## 266

1    A.  I don't know Senator Uresti's discussions with

2  Governor Dewhurst's office.

3    Q.  (By Mr. Dunn)  Now, senators who have it in

4  their intent when they pass a bill, to try to get the

5  bill passed without another member present, that senator

6  could also have the intent to conduct elections in Texas

7  where certain members can't participate?

8        MR. FREDERICK:  Objection, calls for

9  speculation.

10    A.  I disagree.

11    Q.  (By Mr. Dunn)  Have you ever done any research

12  or been presented any data as to whether or not there's

13  racially polarized voting in Texas?

14        MR. FREDERICK:  I'll object, legislative

15  privilege, to the extent that you have performed any

16  such research in connection with pending legislation.

17  I'm instructing you not to answer on the basis of

18  legislative privilege.

19    A.  I'll assert privilege.

20        MR. DUNN:  So even sitting -- not talking

21  about Senate Bill 14, just in general, are you familiar

22  with whether or not there's racially polarized voting in

23  Texas, you're instructing her not to answer on that?

24        MR. FREDERICK:  No.

25        MR. DUNN:  Okay.

## 267

1        MR. FREDERICK:  If you're asking her, in

2  general, is she aware of whether or not there's racially

3  polarized voting, that's different.  If you're asking

4  her whether she's performed research in her role as the

5  senate staffer, that I would object to.

6        MR. DUNN:  I see.

7    Q.  (By Mr. Dunn)  Are you aware of whether or not

8  there's racially polarized voting in Texas?

9    A.  I am not aware.

10    Q.  Do you know what racially polarized voting is?

11    A.  Not necessarily.

12    Q.  Have you ever worked on campaign staff?

13    A.  No.  I'm sorry.  When I first got out of

14  college, I worked for a political consultant, but we had

15  several campaigns, and I never actually staffed a

16  campaign.

17    Q.  Do you play any role in Senator Fraser's

18  reelection campaign?

19    A.  I do Senator Fraser's campaign books.  Senator

20  Fraser hasn't had a campaign for several years.  So I

21  have helped him develop press releases saying he's

22  running for reelection, but that's the extent of it.

23    Q.  All right.  When you say his books, are you

24  talking about the Ethics Commission reports?

25    A.  Yes, sir.

## 268

1    Q.  All right.  But you don't actually direct

2  political strategy for him?

3    A.  No, sir.

4    Q.  Do you do that for any other candidate?

5    A.  No, sir.

6    Q.  Did you have any involvement in redistricting

7  this last election cycle?

8    A.  No, sir.

9    Q.  Did you make any recommendations to

10  redistricting members or their staff as it related to

11  the makeup or the shape of Senator Fraser's district?

12        MR. FREDERICK:  I'll object on privilege,

13  only to the extent that your answer would reveal

14  confidential communications or thought processes, the

15  fact of whether or not you did.  You may answer.

16    A.  Yes.

17    Q.  (By Mr. Dunn)  Who was it that you spoke with

18  about Senator Fraser's district?

19    A.  Senator Seliger.

20    Q.  He was the chairman of the redistricting effort

21  in the Senate; is that true?

22    A.  Yes, sir.

23    Q.  Anyone else?

24    A.  His asides, probably other staff, legislative

25  staff, other senators, members, staffs.

JANICE MCCOY                                           MAY 16, 2012

---

**269**

1  Q.  What was the characteristic of the changes
2  Senator Fraser wanted to his district?
3       MR. FREDERICK:  Objection, legislative
4  privilege.  I'm instructing you not to answer.
5       A.  I'll assert privilege.
6       Q.  (By Mr. Dunn)  All right.  Earlier we asked, I
7  asked you about discrimination in Texas.  Are you aware
8  of any courts in Texas finding that legislative acts
9  have a discriminatory effect or purpose?
10      A.  Not specifically, no.
11      Q.  Are you aware that in this most recent
12  redistricting cycle, a panel of judges in San Antonio
13  unanimously found that parts of the redistricting plan
14  in Texas either had a discriminatory effect or purpose?
15          MR. FREDERICK:  Object to the extent it
16  assumes facts not in evidence.
17      A.  I didn't follow.
18      Q.  (By Mr. Dunn)  You didn't follow?
19      A.  No, sir.
20      Q.  Did you follow the United States Supreme Court
21  opinion in 2003 where a majority of that court found
22  that Texas legislature had been racially discriminatory
23  in redistricting?
24      A.  No, sir.
25      Q.  At least with respect to the legislators that

---

**270**

1  passed Senate Bill 14, the vast majority of them were
2  the same ones that passed the legislative redistricting
3  in both 2003 and the most recent set; is that true?
4      A.  I'm sorry.  I don't know the votes of
5  redistricting in 2003.  The votes of the redistricting
6  bill in 2011, I think only two senators voted against
7  it, and those two senators also voted against voter ID.
8          MR. DUNN:  All right.  So I object to the
9  responsiveness.
10      Q.  (By Mr. Dunn)  I guess all I'm asking, though,
11  is that the senators that voted in support of
12  redistricting in 2011 were the same body of senators
13  that voted on Senate Bill 14?
14          MR. FREDERICK:  Object to the extent it
15  assumes facts not evidence, but you can answer if you
16  know.
17      A.  Yes.
18      Q.  Is it also true that the champions, so to
19  speak, the people who were pushing the redistricting
20  effort in the Senate, were also the same senators that
21  were pushing Senate Bill 14?
22          MR. FREDERICK:  Objection, assumes facts
23  not in evidence.  Object, vague.  You can answer if you
24  can.
25      A.  I really honestly didn't work on redistricting.

---

**271**

1  Q.  (By Mr. Dunn)  All right.  I'm going to move to
2  a new topic.  You spoke with Ann McGeehan about Senate
3  Bill 14, if I recall?
4      A.  Yes, sir.
5      Q.  And she was -- she left the Secretary of
6  State's office, what, in January of this year; is that
7  true?
8      A.  She left sometime this -- in the last couple of
9  months.  I don't know exactly when.
10      Q.  Have you had -- and the person that replaced
11  her is a gentleman named Ingram; is that right?
12      A.  Keith Ingram.  Yes, sir.
13      Q.  Keith Ingram.  Have you spoken with him at all
14  about Senate Bill 14's implementation?
15      A.  About Senate Bill 14's implementation.  I
16  talked -- I don't recall.  I know I think I've talked to
17  him.  I don't know if it's specifically about Senate
18  Bill 14.
19      Q.  Turning back to Ms. McGeehan, did she testify
20  in either the House or the Senate committee as a whole
21  on Senate Bill 14?
22      A.  She testified on Senate Bill 14, yes, in the
23  Senate.  Yes, sir.
24      Q.  Did she testify in favor or opposition to it?
25      A.  She testified on as a resource witness.

---

**272**

1  Q.  In other words, she didn't express an opinion
2  on behalf of the Secretary of State as to whether or not
3  Senate Bill 14 was a good idea?
4      A.  Not that I recall.
5      Q.  Was there any effort by you to encourage
6  Ms. McGeehan to get behind the bill in her testimony?
7          MR. FREDERICK:  Objection, legislative
8  privilege.  I would instruct you not to answer.
9      A.  I'll assert privilege.
10      Q.  (By Mr. Dunn)  In your -- I'm going to do
11  several questions.  He's going to object, and you're
12  going to answer, but I just want to get these out here.
13          In your conversations with Ms. McGeehan,
14  did you ask her to provide you data on election returns
15  and how they might be impacted by the photo ID
16  requirement?
17          MR. FREDERICK:  Objection, legislative
18  privilege.  I'll instruct you not to answer.
19      A.  I'll assert.
20      Q.  (By Mr. Dunn)  Did you provide Ms. McGeehan any
21  data or research that you had performed on the effect of
22  the photo ID requirement on turnout?
23          MR. FREDERICK:  Objection, legislative
24  privilege.  I'll instruct you not to answer.
25      A.  I'll assert.

JANICE MCCOY                                              MAY 16, 2012

---

273

1    Q.   (By Mr. Dunn)  Did you request at any time that
2    the Secretary of State's office prepare research or
3    analysis on whether or not the photo ID requirement
4    would have a disparate impact on minority citizens?
5         MR. FREDERICK:  Objection, legislative
6    privilege.  Instruct you not to answer.
7    A.   I'll assert.
8    Q.   (By Mr. Dunn)  Are you aware -- this one ought
9    to get past the bully here.
10        Are you aware that the Secretary of
11   State's office has data and computer staff that might be
12   capable of performing an analysis about the impact of a
13   particular legislation on minority citizens?
14   A.   I've seen the data that they prepared for the
15   Department of Justice, so yes, I know that now.
16   Q.   You know that they are capable of doing that?
17   A.   Yes, sir.
18   Q.   The data, though, that's been prepared for the
19   Department of Justice, all that came about after Senate
20   Bill 14 had been passed by legislature and signed by the
21   Governor, true?
22   A.   True.
23   Q.   Other than the resource of the Secretary of
24   State's office, are you familiar with any other
25   organization that you had sort of access to that could

---

274

1    have performed an analysis, what I would call an
2    analytical analysis of whether or not Senate Bill 14
3    would have disparate impact on minorities?
4         MR. FREDERICK:  I'll object on the basis
5    of legislative privilege, only to the extent that it
6    seeks thought process or mental impressions during the
7    development and passage of SB 14, to the extent it --
8    he's asking you as you sit here today, are you aware.
9    Q.   Let me fix the question.
10        What resources other than Secretary of
11   State did you have to consult about doing data type
12   analysis on the effect of SB 14 on minorities?
13        MR. FREDERICK:  I'm sorry.  Could you
14   read -- read the question back, sir?
15        (Requested portion read back by the court
16   reporter.)
17        MR. FREDERICK:  I'm going to object on
18   legislative privilege.  I think that gets into thoughts
19   and mental impressions.  I'll instruct you not to
20   answer.
21   A.   I'll assert.
22        MR. DUNN:  All right.  And I just want to
23   make sure.  So she's not allowed to tell me what
24   agencies or groups could have performed this analysis
25   that she's aware of?

---

275

1         MR. FREDERICK:  To the extent you're
2    asking her during -- during the development and passage
3    of SB 14, what she thought at the time was available to
4    her to perform specific subject matter, subject matter
5    specific analysis, yes, I believe that's a thought,
6    mental impression, that's protected by legislative
7    privilege.
8    Q.   (By Mr. Dunn)  Is it your opinion that this
9    bill will not have the effect of discouraging even one
10   voter?
11        MR. FREDERICK:  That's -- cautionary
12   instruction, I mean, I think as phrased, to the extent
13   the question seeks your opinion, as you sit here, you
14   may answer.
15   A.   My opinion is that it will not impact one voter
16   negatively.
17   Q.   (By Mr. Dunn)  All right.  If you could go with
18   me to US-31.  Right here on the top.
19   A.   Oh, yes.
20   Q.   I'd like to go with you to the last paragraph,
21   and if I remember your testimony from earlier, you at
22   least prepared the initial draft of 31; is that true?
23   A.   Yes, sir.
24   Q.   All right.  The first sentence of --
25   A.   The first phrase.

---

276

1    Q.   And I told you the last paragraph.  I really
2    meant the next to the last one that begins with "voting
3    is"?
4    A.   Okay.
5    Q.   The sentence reads:  "Voting is one of our most
6    important rights as Americans, but it is also a
7    responsibility."  Do you see that?
8    A.   Yes, sir.
9    Q.   In my reading, I don't understand, and I don't
10   think it's defined in the writing here what it was meant
11   be responsibility.  Is there a sentence that informs
12   what that phrase, "but it is also a responsibility," in
13   this document?
14   A.   No, sir.
15   Q.   All right.  So what is it that you meant, at
16   least when you drafted this, about voting is a
17   responsibility?  I mean, why was that in here?
18        MR. FREDERICK:  I object on the basis of
19   legislative privilege, to the extent that it seeks a
20   thought or mental impression about pending legislation
21   that goes -- that -- underlying a public statement.  So
22   I -- as phrased, I would instruct you not to answer the
23   question.
24   A.   I'll assert.
25   Q.   (By Mr. Dunn)  Do you believe that members who

JANICE MCCOY                                          MAY 16, 2012

## 277

1   don't have a significant population of minority citizens
2   in their district still have to take care to make sure
3   the minority citizens elsewhere in the state are
4   protected under the law?
5      A.  Yes.
6      Q.  In other words, if there's a member that -- and
7   I know this doesn't happen, but if there's a member that
8   just represented 100 percent African-Americans, would it
9   be fair for that member to just ignore the needs of
10  Anglos and Latinos?
11     A.  No.
12     Q.  So when you prepare legislation or help Senator
13  Fraser with legislation, do you consider it one of your
14  responsibilities to make certain that that legislation
15  doesn't have a disparate impact on minority citizens or
16  majority citizens?
17     MR. FREDERICK:  Objection, legislative
18  process.  Instruct you not to answer.
19     A.  I'll assert.
20     Q.  (By Mr. Dunn)  Is there any -- have there ever
21  been situations where you've been working on bills where
22  you believe there was a conflict in your duties under
23  the state constitution and the federal constitution?
24     MR. FREDERICK:  Objection, legislative
25  process privilege.  Legislative privilege.  Instruct you

## 278

1   not to answer.
2      A.  I'll assert.
3      Q.  (By Mr. Dunn)  Do you believe that federal law
4   is supreme to state law?
5      MR. FREDERICK:  Objection, relevance.
6   Objection, vague.  I would also object on the basis of
7   legislative privilege, to the extent it's asking for
8   what she believes in her role as a role in the Senate.
9   If he's asking for your opinion or belief as you sit
10  here today, not based on confidential matters, you can
11  answer if you can.
12     A.  I do -- I believe that the state -- that the
13  federal government is not superior to the states.
14     Q.  (By Mr. Dunn)  All right.  And that's not what
15  I thought my question was.
16     A.  Okay.
17     Q.  So, but I may have done a bad job of wording
18  it.
19     Really what I'm asking is, to the degree
20  there's conflict between federal law and state law,
21  which one controls, if one does?
22     MR. FREDERICK:  Objection, asks for legal
23  opinion.
24     A.  I don't think I can answer that question.
25     Q.  (By Mr. Dunn)  Well, as you helped Senator

## 279

1   Fraser prepare legislation, do you have to consider how
2   that legislation will interact with federal law?
3      A.  In some cases, yes.
4      Q.  And do you think the state is authorized to
5   pass statutes that conflict with the federal law?
6      MR. FREDERICK:  Objection, relevance.
7   Objection, legislative privilege, to the extent it seeks
8   her opinion with respect to specific legislation.  To
9   the extent it just asks for your opinion, you can answer
10  if you can.
11     A.  I don't think I have an opinion.
12     Q.  (By Mr. Dunn)  All right.  I'm going to switch
13  gears on you now and go to the ID requirements
14  themselves.  You were asked some questions about
15  nonphoto IDs?
16     A.  Yes, sir.
17     Q.  And as I understand your testimony, without
18  going through it all, but under current state law, a
19  voter can arrive at the polling location without a photo
20  ID and rely on some nonphoto IDs; is that right?
21     A.  That's my understanding, yes.
22     Q.  And some of those things are like utility
23  bills, for example?
24     A.  Yes.
25     Q.  Do you have an opinion as to whether or not a

## 280

1   nonphoto ID is as effective as a photo ID in
2   discouraging voter fraud?
3      MR. FREDERICK:  Just caution to the extent
4   it asks for your opinion as you sit here today, based on
5   nonprivileged matters, you can answer if you have an
6   opinion.
7      A.  My opinion is the photo ID is a better
8   mechanism to prevent fraud.
9      Q.  (By Mr. Dunn)  Now, do you believe that photo
10  identification can be sort of manufactured?
11     MR. FREDERICK:  Objection, vague.  I'll
12  caution you to the extent you can answer based on
13  personal opinion, not based on privileged information,
14  you may answer if you have an opinion.
15     Q.  (By Mr. Dunn)  Have you ever heard of a fake
16  ID?
17     A.  When I was in college, yes, sir.
18     Q.  All right.  People had fake driver's license?
19     A.  A lot of people had fake driver's licenses,
20  yes, sir.
21     Q.  And they would use them to go into bars and
22  convince the bartender they were 21 and get an alcoholic
23  beverage; is that right?
24     A.  Yes, sir.  Back when we are younger, yes, sir.
25     Q.  You don't think people fake IDs any longer?

JANICE MCCOY                                                  MAY 16, 2012

---

### 281

1          A.  I think it's a lot harder to fake IDs these
2     days.
3          Q.  What do you think makes it harder about faking
4     IDs today?
5          A.  I think that the provisions of real ID -- the
6     federal provisions of real IDs that Texas has enacted to
7     make driver's licenses harder to fake make it harder.
8          Q.  Like, for example, a driver's license now have
9     like a black light insignia; is that right?
10          A.  Yes, sir.
11          Q.  And there's other things that when you put the
12     ID in a certain type of viewing device, you can see
13     whether it's genuine; is that true?
14          A.  That's my understanding.  Yes, sir.
15          Q.  And you see these devices at the airport, you
16     know, occasionally at the bank; is that right?
17          A.  I haven't seen them at a bank but --
18          Q.  You've seen them at the airport?
19          A.  I don't know that I've seen them at an
20     airport.  I haven't flown in over three years.
21          Q.  With twins?
22          A.  Yes, sir.
23          Q.  All right.  Well, was there ever any discussion
24     about funding technology of polling locations that would
25     allow the staff to determine whether or not a particular

---

### 282

1     photo ID was genuine?
2          MR. FREDERICK:  Objection, legislative
3     privilege.  To the extent you can answer based on
4     discussions on the Floor or any public statements or
5     testimony, you may do so.
6          A.  I don't recall any public discussions about
7     that --
8          Q.  (By Mr. Dunn)  Was there any --
9          A.  -- issue.
10          Q.  Do you recall any private discussions without
11     giving me the details?
12          MR. FREDERICK:  Objection, legislative
13     privilege.  Instruct you not to answer that.
14          MR. DUNN:  She doesn't even have to admit
15     whether the discussion happened.
16          MR. FREDERICK:  I think with the lead up,
17     I believe that the question implies the substance of a
18     conversation.  I'm not trying to prevent you from asking
19     if a conversation ever took place, generally, but I
20     think the subject matter was drawn too specifically to
21     lead up.
22          Q.  (By Mr. Dunn)  Are you aware of any
23     conversations in the consideration of Senate Bill 14
24     relating to technology at the polling location to
25     determine the genuineness of a photo ID?

---

### 283

1          A.  No.
2          Q.  Do you know why not?
3          A.  Why people didn't have discussions about that
4     issue?  No, sir.
5          Q.  Now, would you agree that nonphoto ID, if you
6     required a number of them, might be accurate to confirm
7     the identity of a voter?
8          MR. FREDERICK:  Objection, calls for
9     speculation.  Objection, vague.  But you may answer.
10          A.  Nonphoto ID, a number of nonphoto ID could
11     confirm the identity of someone, yes.
12          Q.  (By Mr. Dunn)  Do you know why that wasn't
13     included in the bill?
14          MR. FREDERICK:  Objection, legislative
15     privilege.  Instruct you not to answer.
16          A.  I'll assert privilege.
17          Q.  (By Mr. Dunn)  Did you have any senators come
18     to you and tell you or in your presence that they were
19     voting against this bill but they really supported it?
20          MR. FREDERICK:  Objection, legislative
21     privilege.  To the extent that calls for communication
22     between a senator and you, that would be privileged, and
23     I instruct you not to reveal it.
24          A.  I'll assert.
25          Q.  (By Mr. Dunn)  When was the last time you

---

### 284

1     renewed your driver's license?  Ballpark.  You don't
2     need to look it up.
3          A.  I don't know.
4          Q.  Oh, okay.  Has it been a while?
5          A.  It's been -- yeah.  I think I'm due next year.
6          Q.  All right.
7          A.  So five or six years.
8          Q.  Do you use the private DPS office here
9     available to Capitol staff members?
10          A.  I think I do it online.
11          Q.  Okay.  Each time you do it, you do it online?
12          A.  The last time I renewed online.  I think I
13     renewed when I got married in 2006, or I went in 2006,
14     because I had to actually show my marriage -- my new
15     Social Security card.  And since then, I've done it
16     online if I had to do it.  I guess, probably, I haven't
17     had to do it since 2006.
18          Q.  Are you aware of there being a DPS office
19     available for Capitol employees and state employees?
20          A.  If you're speaking of the office at 15th and
21     Congress, I thought that was open to the public.
22          Q.  All right.  Are you aware of an office that is
23     open to the public but is not advertised to the public
24     for DPS driver's license?
25          A.  I didn't know that it wasn't advertised.



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          )
                                         )
        Plaintiff,                       )
                                         )
VS.                                      )
                                         )
ERIC H. HOLDER, JR. in his               )
official capacity as Attorney            )
General of the United States,            )
                                         )
        Defendant,                       )
                                         )
ERIC KENNIE, et al,                      )
                                         )
        Defendant-Intervenors,           )
                                         )
TEXAS STATE CONFERENCE OF                )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                          )  (RMC-DST-RLW)
                                         )  Three-Judge Court
        Defendant-Intervenors,           )
                                         )
TEXAS LEAGUE OF YOUNG VOTERS             )
EDUCATION FUND, et al.,                  )
                                         )
        Defendant-Intervenors,           )
                                         )
TEXAS LEGISLATIVE BLACK                  )
CAUCUS, et al.,                          )
                                         )
        Defendant-Intervenors,           )
                                         )
VICTORIA RODRIGUEZ, et al.,              )
                                         )
        Defendant-Intervenors.           )

*****************************************
            ORAL DEPOSITION OF
               ANN McGEEHAN
               MAY 31, 2012
*****************************************

**2**

1       ORAL DEPOSITION OF ANN McGEEHAN, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the MAY 31, 2012, from 9:45 a.m. to 6:50 p.m., before
5   Chris Carpenter, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the offices of
7   DECHERT, LLP, 300 W. 6th Street, Suite 2010, Austin,
8   Texas 78701, pursuant to the Federal Rules of Civil
9   Procedure and the provisions stated on the record or
10  attached hereto.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1
2
3                A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS:
5       Adam Mortara
        BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
6       Courthouse Place
        54 West Hubbard Street, Suite 300
7       Chicago, IL 60654
        (312) 494-4469
8       adam.mortara@bartlit-beck.com
9       Jay Dyre
        ATTORNEY GENERAL OF THE STATE OF TEXAS
10      209 West 14th Street
        8th Floor
11      Austin, TX 78701
        (512) 936-1307
12      anne.wilson@texasattorneygeneral.gov
13
    FOR THE DEFENDANT, HOLDER, ET AL:
14
        Elizabeth S. Westfall
15      Daniel Freeman
        Maria Rios
16      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
17      NWB - Room 7202
        Washington, DC 20530
18      (202) 305-7766
        elizabeth.westfall@usdoj.gov
19
    FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
20  NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
    CAUCUS:
21
        Ezra D. Rosenberg
22      DECHERT, LLP
        Suite 500
23      902 Carnegie Center
        Princeton, NJ 08540-6531
24      (609) 955-3200
        ezra.rosenberg@dechert.com
25

**4**

1   FOR THE MALDEF INTERVENORS:
2       Nina Perales
        Janine Lopez
3       Luis Figueroa
        MALDEF
4       110 Broadway Street, Suite 300
        San Antonio, TX 78205
5       (210) 224-5476
        nperales@maldef.org
6
    FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND
7   INTERVENORS:
8       Adam M. Harris
        Brian Chen (law clerk)
9       FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
        One New York Plaza
10      New York, New York 10004
        (212) 859-8953
11      adam.harris@friedfrank.com
12  Also present:
13      Juan Carlos Ibarra, The Advancment Project
14
15
16
17
18
19
20
21
22
23
24
25

## 5

1  Appearances.........................................3
2  ANN McGEEHAN
3     Examination by Ms. Westfall................7
       Examination by Ms. Perales................211
4
   Signature and Changes..........................297
5
   Reporter's Certificate...........................299
6
         U.S. EXHIBITS
7
   NO. DESCRIPTION                    PAGE MARKED
8
   280  Revised Privilege Log, May 11, 2012      34
9
   281  Supplemented Privilege Log, May 21, 2012  38
10
   282  Amended Notice of Deposition             62
11
   283  House Committee on Elections Subcommittee  88
12      on Verification Voters, March 17, 2005
13  284  Excerpt of Transcript of Senate Committee  116
        on State Affairs, April 30, 2007 (House
14      Bill 218 Public Hearing)
15  285  Texas Legislature Online History, SB 362  134
16  286  Houston Chronicle Article:  Voter ID Fight  145
        Appears Certain In Texas
17
    287  Transcript Excerpt of Senate Committee of  164
18      the Whole, Jan. 25, 2011
19  288  Excerpt of Transcript of Select Committee  184
        on Voter Identification, March 1, 2011
20
         INTERVENOR RODRIGUEZ EXHIBITS
21
    R-1  Election Line Weekly Article, Dec 15, 2011  212
22
    R-2  Transcript Excerpt of Committee on        228
23      Elections Meeting, 6/14/10
24  R-3  SOS Andrade Memo, March 6, 2009           247
25  R-4  SOS Andrade Letter, July 25, 2011         252

## 6

1  R-5   Senator Ellis Letter, Oct. 27, 2011      259
2  R-6   Senate Journal, March 18, 2009           264
3  R-7   E-Mail Chain, Sept. 15, 2011             266
4  R-8   McGeehan Letter, Sept. 7, 2011           268
5  R-9   McGeehan Letter, Oct. 4, 2011            272
6  R-10  McGeehan Letter, Oct. 27, 2011           274
7  R-11  SOS Letter, Jan. 6, 2012                 279
8  R-12  SOS Letter, Jan. 12, 2012                279
9  R-13  HAVA Request For Proposal Number 12111   288
10 R-14  Eligibility for Election Identification  291
          Certificate

## 7

1           ANN McGEEHAN,
2  having been first duly sworn to testify the truth, the
3  whole truth, and nothing but the truth, testified as
4  follows:
5           EXAMINATION
6  BY MS. WESTFALL:
7     Q.  Good morning, Ms. McGeehan.  How are you?
8     A.  Good.
9     Q.  Could you state and spell your name for the
10 record, please?
11    A.  Ann McGeehan, A-n-n, M-c-G-e-e-h-a-n.
12    Q.  Thank you.  My name is Elizabeth Westfall.  I
13 represent the Attorney General in this action.
14         I'm going to allow others around the table
15 to introduce themselves.
16         MR. FREEMAN:  Dan Freeman on behalf of the
17 Attorney General.
18         MS. RIOS:  Maria H. Rios on behalf of the
19 Attorney General.
20         MS. PERALES:  Nina Perales with MALDEF.
21         MS. LOPEZ:  Janine Lopez with MALDEF.
22         MR. FIGUEROA:  Luis Figueroa with MALDEF.
23         MR. HARRIS:  I'm Adam Harris with Fried,
24 Frank, Harris, Shiver & Jacobson, LLP, on behalf of
25 Defendant Intervenor Texas League of Young Voter

## 8

1  Education Fund, and with me is law clerk Brian Chen.
2          MR. IBARRA:  Juan Carlos Ibarra with the
3  Advancement Project.
4          MR. DYER:  I'm Jay Dyer with the State of
5  Texas.
6          MR. MORTARA:  Adam Mortara for the State
7  of Texas and the witness.
8      Q.  (By Ms. Westfall) Ms. McGeehan, have you had
9  your deposition taken before?
10     A.  Yes.
11     Q.  So I'm going to go through some ground rules
12 just in case you have forgotten the grounds rules for
13 having your deposition taken.
14     A.  Okay.
15     Q.  You're here to testify today truthfully,
16 accurately, and completely.  The court reporter will
17 prepare a transcript of everything that is said today,
18 so you must listen for me to ask my question and wait
19 for me to ask my question before you give your answer.
20 Okay?
21     A.  Uh-huh.
22     Q.  And because there is a transcription of this
23 deposition, please don't say "uh-huh," "nuh-uh" or shake
24 your head.
25     A.  Yes.

## 13

1  questions about a privilege log, Mr. Mortara.
2         MR. MORTARA:  Yes.  I am instructing the
3  witness not to answer the question.
4      Q.  (By Ms. Westfall) Other than your attorneys,
5  did you speak with anyone about your deposition today?
6      A.  Only to inform my current employers that I'd be
7  out.
8      Q.  Did you bring any notes or documents with you
9  today?
10     A.  No.
11     Q.  Can you tell me where you went to college?
12     A.  University of Texas at Austin.
13     Q.  What year did you graduate?
14     A.  '86.
15     Q.  And did you get any education after that time?
16     A.  I went to law school and graduated in August of
17  '88, U.T. law School.
18     Q.  Thank you.  Are you licensed to practice law?
19     A.  Yes.
20     Q.  Where are you licensed?
21     A.  Texas.  Only Texas.
22     Q.  Could you tell me your first job out of law
23  school?
24     A.  I worked for a solo practitioner attorney in
25  Houston, Ernest Ortiz, for about a year.

## 14

1      Q.  Did you find employment after that time?
2      A.  Yes.  I went from there to the Secretary of
3  State's Office in September of '89.
4      Q.  When you were working for that practitioner,
5  did you do any election law?
6      A.  No.
7      Q.  And what was your first position with the
8  Elections Division?
9      A.  I was a staff attorney.
10     Q.  What year did you have that -- did you start
11  that position?
12     A.  September of 1989.
13     Q.  What were your responsibilities in that
14  position?
15     A.  We provided legal advice to election officials
16  across the state.  There's a toll free number.  We
17  provided advice via phone, letter.  We prepared
18  submissions to the Justice Department, presented at
19  conferences to educate Election officials.
20     Q.  What was your role in preparing submissions to
21  the Justice Department?
22     A.  As a staff attorney, I would do the initial
23  draft, and then it would go up for review.  I didn't
24  sign those.
25     Q.  When is the last time you voted?

## 15

1      A.  The May 12th city election.
2      Q.  Did you vote in person?
3      A.  Yes.
4      Q.  How far is your polling place from your house?
5      A.  Maybe a mile.
6      Q.  Do you usually vote in person?
7      A.  Yes.
8      Q.  Have you ever witnessed anyone try to
9  impersonate another voter while you have been voting?
10     A.  No.
11     Q.  Have you ever witnessed a noncitizen voting
12  while you've been voting?
13     A.  Not that I'm aware of.
14     Q.  Have you ever challenged a voter's eligibility
15  to vote?
16     A.  No.
17     Q.  Is there a time when you were promoted in the
18  Elections Division after you had the staff attorney
19  position?
20     A.  Yes.
21     Q.  When was that?
22     A.  In July of 1991, I was promoted to director of
23  the Legal section.
24     Q.  Could you describe your responsibilities in
25  that capacity?

## 16

1      A.  I managed the attorneys, which there were
2  between, you know, five and seven attorneys there.  And
3  was, you know, in charge of the submissions, most of the
4  written correspondence that came out of the Legal
5  Division or the Elections Division itself.  I was
6  responsible for testifying at legislative committees,
7  assisting with any litigation, things of that nature.
8      Q.  Were you ultimately responsible for all
9  submissions that were submitted pursuant to Section 5 of
10  the Voting Rights Act?
11     A.  Not as the legal director, because those were
12  signed by the director of the Elections Division.  But
13  we prepared them to -- you know, for his signature.
14     Q.  But you didn't -- you weren't responsible for
15  certain types of submissions; is that right?  You were
16  responsible for all submissions?
17     A.  Right.
18     Q.  Could you describe your particular specific
19  role as legal director as it pertained to submissions
20  under Section 5?
21     A.  Well, it was my responsibility to ensure that
22  we had a process set up to identify all the bills that
23  would require submission, to assign them, and then make
24  sure they were done timely.
25     Q.  Did you have any other responsibilities in

Ann McGeehan                                          May 31, 2012

---

**17**

1  addition to testifying in Section 5 submissions in your
2  role as legal director?
3      A.   Yeah.  I mean, the Legal section provided legal
4  advice to all divisions, so, you know, distributing
5  election funds.  The division distributed state funds.
6  Then later on, we distributed federal funds.  Voter
7  registration issues.  Primary finance issues.  Basically
8  providing legal advice for all the different divisions
9  within the sections within the Elections Division.
10     Q.   And what are the other sections within the
11 Elections Division?
12     A.   They were voter registration, special projects,
13 which I guess would include voter education, election
14 night returns, canvassing, election administration,
15 designing forms, election inspectors, sending out
16 election inspectors to the field, and then the election
17 funds management section, which is sending out state
18 funds to local election officials.
19     Q.   And what percentage of your time as legal
20 director, while you were legal director, was spent on
21 Section 5 submissions?
22     A.   Well, you know, it totally followed the pattern
23 of legislation, so in an odd-numbered year, the summer
24 months, would be heavy, and it usually would, you know,
25 dribble into the fall as well.

---

**19**

1  our director of election administration another quarter
2  of the time.  Something like that.
3      Q.   Who was the election director at that time?
4      A.   Tom Harrison.
5      Q.   Did you, in that capacity as legal director,
6  also development legislative priorities for the
7  Division?
8      A.   No.  Now, depending on the Secretary of State
9  in office, sometimes certain Secretaries would ask for
10 ideas, more from a policy point of view, and then the
11 Secretary would vet that.  That would be sort of one
12 approach.  Then also, the chair of the House Elections
13 Committee would also contact us sometimes and say do you
14 all have any clean-up legislation that you recommend?
15 Anything we can do to make things work better.  And so
16 we would also develop the list of clean-up legislation.
17 But as the legal director, that was channeled more
18 through Tom Harrison, the director then.
19     Q.   Thank you.
20          Was there a time that you were promoted
21 from legal director to another position in the Division?
22     A.   Yes.  In September of 1995, I was promoted to
23 director of the Elections Division.
24     Q.   Could you describe, generally, those
25 responsibilities?

---

**18**

1      Q.   Did you assist, as legal director, in
2  developing election bills in state legislature?
3      A.   I wouldn't say we assisted, you know, because
4  we are not a legislative body.  But we would serve as a
5  resource, so if questions came up.  Generally, someone
6  from our office would attend every House Elections
7  Committee meeting as a resource, and then also for any
8  election-related bills that would come up in Senate
9  State Affairs, we would usually have a witness there to
10 be available as a resource.
11     Q.   What was your role with regard to those
12 activities?
13     A.   My role would be to make sure that we had
14 somebody, either myself or somebody else, at one of
15 those hearings.
16     Q.   Was it often you --
17     A.   Yes.
18     Q.   -- who attended?  How often would you attend as
19 opposed to a staff person?
20     A.   Well, now, I was only legal director for -- I
21 was legal director from 1991 to 1995, so -- and it was
22 1991 after the legislative session, so it was just two
23 legislative sessions, '93 and '95.  And so in that time,
24 it was maybe me half of the time, our director of
25 elections maybe another quarter of the time, and then

---

**20**

1      A.   Those responsibilities were, you know,
2  basically being in charge of the entire division and
3  making sure that all of the sections that I mentioned
4  before were, you know, operating as they should.
5          The big change, I guess, is that I had
6  more direct contact with our executive staff, with the
7  Secretary directly and Assistant Secretary general
8  counsel.
9      Q.   Who did you report to directly in that
10 position?
11     A.   There would be changes through different
12 administrations.  Every administration has a different
13 style.  Generally, I would report to the Secretary and
14 the Assistant Secretary.
15     Q.   How many staff people did you have under you?
16     A.   Between, you know, through the years, probably
17 between 30 and 38.
18     Q.   And did your role include preparing submissions
19 under Section 5 of the Voting Rights Act?
20     A.   Yes.  I mean, I oversaw that process.  Again,
21 they originated through the Legal Division, but
22 ultimately, they came through me, and I would read them
23 and sign them.
24     Q.   Did you review every single one that was
25 submitted to the Justice Department?

Ann McGeehan                                                          May 31, 2012

## 21

1    A.  If I signed it, I did.  I was out on maternity
2    leave a couple of times, things like that.  But overall,
3    most of them, I did.
4    Q.  Could you describe your other responsibilities,
5    besides advising the Division, supervising staff,
6    reviewing Section 5 submissions, as Election Division
7    director.
8    A.  I monitored legislation closely.  You know, I
9    had various folks tracking bills and writing up bill
10   analyses.  I would read those.  Again, I was sort of the
11   point of contact for legislative matters, as far as
12   being a witness at committee hearings.
13             I would be the point of contact on any
14   election-related litigation.  I work closely with our
15   Legal Division to prepare memoranda to counties
16   instructing on new laws, and then also was responsible
17   for coordinating any -- for instance, if a law passed
18   that gave the Secretary of State new duties or we had to
19   adopt a rule, I would be in charge of kind of
20   coordinating that effort.
21   Q.  Thank you.  So you develop legislative
22   priorities for the Election Division?
23   A.  No.  I mean -- you know, as I said before, we
24   didn't -- we're not a legislative body, so if we were
25   asked, we would provide a list of clean-up legislation.

## 22

1    If the Secretary of State asked for advice on possible
2    policy, which didn't happen very much, but then we could
3    give the Secretary of State ideas on policy changes.
4    Q.  Was the Secretary of State the entity that
5    promoted an affirmative legislative agenda regarding
6    election bills with the Legislature?
7    A.  Yes, but that depended on the Secretary and
8    whether they wanted to or not.
9    Q.  Would you support the Secretary of State in
10   creating that legislative agenda if did it occur?
11   A.  If they asked for our advice.
12   Q.  But otherwise, is it your testimony today that
13   the Election Division did not have an affirmative
14   legislative agenda?
15   A.  Correct.  We don't.
16   Q.  And by clean-up legislation, you mean sort of
17   technical corrections --
18   A.  Yes.
19   Q.  -- to the election code are the types of things
20   you would provide --
21   A.  Right.
22   Q.  -- to the Legislature; is that correct?
23   A.  Correct.  Correct.
24   Q.  Thank you.  When it did occur that the
25   Secretary of State asked the Elections Division for

## 23

1    guidance or thoughts on policy, did you consult with any
2    other offices or branches of the Executive Branch in
3    developing policy thoughts on election law?
4    A.  The Legislature didn't usually the contact us
5    directly on policy issues.
6    Q.  But if the Secretary of State was developing a
7    legislative agenda and sought your input, would you, in
8    turn, for example, seek suggestion or guidance from the
9    Governor's Office?
10   A.  No.
11   Q.  Or would you seek any suggestion or guidance
12   from the Lieutenant Governor's office?
13   A.  No.
14   Q.  Were there times when any of the technical
15   corrections that the Elections Division wanted to
16   advance with the Legislature would conflict with
17   legislation that the Secretary of State wanted to
18   advance?
19   A.  No.
20   Q.  Were the interests usually aligned?
21   A.  It was very -- and it hasn't happened
22   recently.  It was fairly rare for a Secretary of State
23   to be, sort of, proactive on the policy side.
24   Q.  When did that last happen?
25   A.  I think it was Tony Garza in -- which was -- he

## 24

1    left in '97.
2    Q.  And in your role as a director of the Elections
3    Division, were you ever called to testify before the
4    State Legislature?
5    A.  Yes.
6    Q.  Were you called as a resource witness?
7    A.  Yes.
8    Q.  Were you always called as a resource witness?
9    A.  Yes.
10   Q.  Did you ever come to the testify for or against
11   any legislation while you served?
12   A.  No.  I always checked the "Resource Only" box.
13   Q.  What committees did you testify before in the
14   State Legislature?
15   A.  The House Elections Committee, Senate State
16   Affairs, and then occasionally another committee, like
17   the House Committee on Veterans Affairs.  There may have
18   been another Senate committee, but that would be the
19   exception to the rule.
20   Q.  Was it ordinary, in your experience, for either
21   the House Elections Committee or the Senate State
22   Affairs Committee to, to not seek the Division's advice
23   or thoughts or input on election bills, or would they
24   ordinarily seek the advice of the Elections Division on
25   bills?

## 29

1    I think I had the attorney-client privilege.  As
2    director of the Elections Division, my legal advice to
3    the Secretary and the Executive Division would be
4    considered privileged.
5       Q.   And who exactly were your clients?  You said
6    the Secretary of State, and anyone else?
7       A.   Secretary of State, Deputy Secretary of State
8    or assistant.  That title has changed through the years,
9    but the number two person.  General counsel.  That's
10   sort of the general folks in our Executive Division.
11      Q.   And did this relationship cover all --
12      A.   Communications director, I guess, too.  Sorry.
13      Q.   The communications director was also a client?
14      A.   I would -- I would think that -- sometimes they
15   would all be together in a meeting, so I would think
16   they would -- my conversations would be privileged as
17   well.
18      Q.   Were you an attorney -- or did you have that
19   relationship in all aspects of your employment and
20   interactions with the Secretary of State, Deputy
21   Secretary of State, general counsel, or were there
22   certain aspects of your relationship and
23   responsibilities for those individuals that were not
24   attorney-client protected communications, in your view?
25      A.   Sometimes, it's to hard to draw that line, but

## 30

1    obviously, a lot of what I did was administrative as
2    well, so...
3       Q.   And how did you differentiate between the times
4    when you were providing attorney-client advice to those
5    individuals and when you were not, in your mind?
6       A.   I don't know that I actually made a conscious
7    decision at the time, you know.
8       Q.   Did you have an attorney-client relationship
9    with state legislators?
10      A.   I don't think so.
11      Q.   Did you --
12      A.   I'm not a litigation attorney, so...
13      Q.   Did you have an attorney-client relationship
14   with county election officials?
15      A.   No.
16      Q.   Did you have an attorney-client relationship
17   with the Department of Public Safety?
18      A.   No.
19      Q.   Did you have an attorney-client relationship
20   with the Governor's office?
21      A.   I don't think so.
22      Q.   You have an attorney-client relationship with
23   the Lieutenant Governor's Office?
24      A.   No.
25      Q.   Is there a time when you stopped working for

## 31

1    the Elections Division?
2       A.   Yes.
3       Q.   When was that?
4       A.   That was in November of 2011, last November.
5       Q.   What prompted that decision?
6       A.   I was offered another job at the Texas County
7    District Retirement System.
8       Q.   Did you play any role in selecting your
9    successor as the head of the Division?
10      A.   No.
11      Q.   And what is your title now at the retirement
12   system?
13      A.   I'm Assistant General Counsel.
14      Q.   Is that a state agency?
15      A.   They're not a state agency.  They're a
16   governmental body created by the State Legislature.  I'm
17   still figuring out what rules they fall under.
18      Q.   What are your responsibilities as assistant
19   general counsel?
20      A.   I'm responsible for providing general legal
21   advice on, really, all matters affecting the system,
22   including administration of the benefits, open records
23   issues, open meetings issues, personnel issues, getting
24   into federal tax issues, because we're very much
25   regulated by the Internal Revenue Code.

## 32

1       Q.   How many staff do you have?
2       A.   I don't oversee any staff.
3       Q.   Who do you report to?
4       A.   I report to Tom Harrison, who is the general
5    counsel there.
6       Q.   And why did you take this position?
7       A.   It was -- it was a good opportunity.  Tom
8    Harrison contacted me.  He is looking to retire, and he
9    contacted me and it would be -- it was a real good fit,
10   so it was a good opportunity.
11      Q.   Do you remain in contact with the Elections
12   Division?
13      A.   Occasionally.  I sent them a note, to a few
14   folks to wish them well on Tuesday, but nothing major.
15      Q.   Are you -- who in touch -- who are you in touch
16   with at the Division still?
17      A.   I occasionally talk to Elizabeth Winn, who's
18   the legal director, not very much.  Melanie Best, who's
19   a staff attorney.  Melanie Best, B-e-s-t.  Dan Glotzer.
20   I speak with the secretary from time to time, Hope
21   Andrade, and then several folks -- that -- that's
22   probably about it.
23      Q.   Are you asserting any privileges today?
24      A.   I am asserting privileges on any legal advice I
25   may have given the Secretary or the Secretary executive

## 41

1   Q.   Could you take a look at this entry and let me
2   know when you've read the description.
3   A.   (Reading documents.) Okay.  I've looked at it.
4   Q.   Do you recall which legislators made this
5   request?
6   MR. MORTARA:  Just one second.  You may
7   answer that question if the legislator's name appears on
8   this list that I am handing you of legislators that have
9   waived legislative privilege.  And you may not answer
10  that question if the legislator's name does not appear
11  on that list.  And the basis is legislative privilege.
12  A.   And your question was who --
13  MR. MORTARA:  Actually, withdrawn.  You
14  may answer that question.  You may answer that question
15  You may answer that question irrespective of the
16  legislator.  And I withdraw the objection.  I'm sorry,
17  Ms. McGeehan.
18  THE WITNESS:  Okay.
19  A.   My recollection is that -- and your question is
20  what?  I'm sorry.
21  Q.   (By Mr. Sells) Which legislator requested
22  advice referenced in this entry?
23  A.   Okay.  My recollection was that this came out
24  of a question that was asked during the Senate hearing
25  on Senate Bill 14, and I think it was Senator Williams.

## 42

1   It might have been Senator Fraser.  But one of the two
2   of them asked the question.
3   Q.   Thank you.
4   MS. WESTFALL:  Mr. Mortara, what is that
5   document that you handed the witness?
6   MR. MORTARA:  If you want to mark it, we
7   can.  It is our best efforts to assemble a list of
8   legislators that have waived privilege.
9   MS. WESTFALL:  Okay.  No, I don't want to
10  mark it.
11  MR. MORTARA:  For the purposes of giving
12  Ms. McGeehan a guide, when you ask questions did a --
13  for instance, if you ask a question, did a legislator
14  ask you how many voters lacked identification, she can
15  answer that question with respect to some and not
16  others, and this is our best effort to get that
17  information into an easy way, versus me repeating a long
18  objection.  So for purposes of the record, I'll just
19  read the list into the record and take one minute.
20  Alvarado, Anchia, Chisum, Davis, Dukes,
21  Dutton, Eiland, Ellis, Gallego, Harper-Brown, Hartnett,
22  Hinojosa, Hochberg, Lucio, Martinez, Martinez-Fischer,
23  Naishtat, Strama, Turner, Van de Putte, Veasey, Vo,
24  Walle, West, Zaffirini.
25  MS. WESTFALL:  Is your understanding

## 43

1   that these individuals have waived?  Have they invoked
2   privilege?  What are you asserting this list is?
3   MR. MORTARA:  Waived.  These are the
4   individuals that have waived privilege.
5   MS. WESTFALL:  And is it your position
6   that you need not affirmatively invoke privilege with
7   regard to legislative privilege?
8   MR. MORTARA:  It is the legislator's
9   privilege to waive; and therefore, if the State of Texas
10  is not aware that the legislator has waived privilege,
11  then Ms. McGeehan cannot waive it for the legislator,
12  and I will instruct her not to answer.
13  If counsel, anybody, has information that
14  another legislator has waived privilege and can produce
15  that in writing, we can add that legislator's name to
16  the list.  We, by no means, necessarily think the list
17  is exhaustive with respect to all legislators' intent.
18  This is what we could confirm in writing.
19  MS. WESTFALL:  All right.  We'll discuss
20  that at a break, Mr. Mortara.
21  Q.   (By Ms. Westfall) Ms. McGeehan, are you
22  familiar with Section 5 of the Voting Rights Act?
23  A.   Yes.
24  Q.   What is your understanding of Section 5's
25  requirements?

## 44

1   A.   That any change impacting voting needs to be
2   precleared by the Justice Department or precleared by
3   the District Court in Columbia before it can be
4   implemented in Texas.
5   Q.   What is your understanding of the legal
6   requirement involved in preclearance?  What's the
7   standard?
8   A.   That the state has to show that it's not going
9   to have a disparate impact on minority voters.
10  Q.   Is there any other requirement under Section 5?
11  A.   I believe also that there was no intent to
12  discriminate against minority voters.
13  Q.   Could you tell me what type of voting changes
14  Section 5 applies to?
15  A.   Just everything.
16  Q.   It certainly applies to more voting changes
17  than just redistricting; isn't that right?
18  A.   Yes.
19  Q.   And does the analysis of legislative purpose or
20  intent differ based on the type of voting change, or is
21  it the same legal standard that applies to all voting
22  changes?
23  A.   I think it's the same legal standard for all
24  changes.
25  Q.   And you testified earlier, when we were talking

Ann McGeehan                                                   May 31, 2012

## 45

1  about your job history, that you prepared submissions
2  and reviewed submissions that were sent to the U.S.
3  Department of Justice; is that right?
4      A.  Yes.
5      Q.  How many were you involved in, approximately,
6  during the course of your employment with the Division?
7      A.  Hundreds and hundreds, you know.  There's --
8  usually, we would submit at least a hundred bills a
9  session, so... You know, so how many sessions, you
10  know.  So probably about a thousand.
11     Q.  What types of information, as a general matter,
12  did you submit with preclearance submissions?
13     A.  What general subjects?
14     Q.  What types of information did you submit in
15  support of your submission, as a general matter?
16     A.  As a general matter, we would write up a
17  description of the bill.  We followed the Code of
18  Federal Regulations, pretty well tried to track, you
19  know, the required elements of the submission, tried to
20  be responsive to that, and would generally supply, try
21  a supply at least two minority contacts that could be
22  contacted on the change.
23     Q.  Anything else as a general matter?
24     A.  As a general matter, no.
25     Q.  Were you ever involved with a Section 5

## 46

1  submission that drew a request from the Attorney General
2  for more information?
3      A.  Yes.
4      Q.  How many times did that happen?
5      A.  Maybe ten.
6      Q.  What types of voting changes were involved?
7      A.  There were some questions regarding to creation
8  of district courts in the '90s.  When we implemented the
9  National Voter Registration Act, we got, I think, an
10  additional information request on certain issues.
11  Redistricting would usually generate that.  And then
12  recently, there was a water -- or I think it was a water
13  district bill that generated an additional information
14  request.
15     Q.  And could you speak generally as to what
16  actions you would take upon receipt of a request for
17  more information from the Justice Department?
18         MR. MORTARA:  Ms. McGeehan, you can answer
19  the question generally, but remember, in some instances,
20  you may have been acting within the scope of your role
21  as an attorney.  And so I admonish you to observe that
22  there's an attorney-client privilege where you believe
23  one to exist.
24     Q.  (By Ms. Westfall) Okay.  And certainly, I'm not
25  seeking any information that would touch upon attorney-

## 47

1  client communications.
2      A.  Well, my role would be to coordinate the
3  response, review it, and generally we would need to
4  contact the sponsor to get some of the additional
5  detail.
6      Q.  Were you ever involved in a Section 5
7  submission that drew an objection from the Justice
8  Department?
9      A.  Yes.
10     Q.  Which ones were those?
11     A.  In the '90s, there was an objection on the
12  national -- our implementation of the National Voter
13  Registration Act.  It was later withdrawn.  But there
14  was an objection regarding having agency staff check the
15  citizenship status of applicants before they could
16  register.  There was a -- I believe it was a water
17  district bill that got an objection maybe in 2007.
18  There may have been a couple of others.
19     Q.  With regard to the NVRA registration issue you
20  just described, when that submission drew an objection,
21  what actions did you take following that objection, or
22  what additional information did you supply to the
23  Justice Department, if any?
24     A.  After the objection?
25     Q.  Yes.

## 48

1      A.  I believe that the Secretary wrote a letter at
2  that point.  And I honestly don't recall the details of
3  that.  I may have been involved in that.  That may be
4  privileged, I don't know, but...
5      Q.  Are you familiar with the term Spanish surname
6  analysis?
7      A.  Yes.
8      Q.  Could you define that for us.
9      A.  The Elections Division, I think, since the mid
10  '80s, had used a list of Spanish surnames that we've
11  obtained from the Census Department, and we run that
12  against the list of -- statewide list of registered
13  voters to identify Hispanic voters or voters with
14  Hispanic surnames.
15     Q.  And are you familiar the omission comission
16  corrective aspect of that analysis?
17     A.  I don't understand what you mean by that.
18     Q.  Is there any corrective analysis goes along
19  with the Spanish surname analysis that you could testify
20  about today?
21     A.  I still don't understand what you're asking.
22     Q.  Is there anything that accounts for someone who
23  would -- false positives -- someone, for example, who
24  would -- who would not be of Hispanic origin who married
25  -- a woman who married someone who had a Hispanic last

Ann McGeehan                                                        May 31, 2012

## 49

1    name, and actually that individual, that woman, for
2    example, is not herself Hispanic?  Would there be
3    anything that would correct for falsely counting her as
4    someone of Hispanic origin, notwithstanding that she
5    wasn't Hispanic, that is involved in Spanish surname
6    analysis?
7        A.   That the Secretary of State's Office uses --
8        Q.   Yes.
9        A.   -- in addition to the Spanish surname?  No.  I
10   mean, we use -- my recollection is, that we used the
11   Spanish surname list due to an agreement with the
12   Justice Department, that was entered into the mid '80s,
13   regarding sending out notice of Constitutional
14   amendment.  So we are following the practice that's
15   precleared.
16       Q.   I see.  How many times have you used a Spanish
17   surname analysis in conjunction with -- or how many
18   times did you in conjunction with submitting a voting
19   change for preclearance?
20       A.   We routinely used it to -- in describing the
21   geographic area that was impacted, we would usually send
22   voter registration data, including a breakdown of
23   Hispanic surname as well.
24       Q.   So if you had a hundred bills a session, how
25   many would involve Spanish surname analysis?

## 50

1        A.   Generally, only those bills that affected
2    discreet portions of the state, we would provide that
3    analysis on.  But if it was a bill of statewide
4    applicability, just a change in a law that affects
5    everybody, we generally didn't supply any specific data
6    on voter registration statistics.
7        Q.   So you can never remember, sitting here today,
8    a time, with a statewide change, where you did a Spanish
9    surname analysis?
10       A.   Redistricting is kind of a whole different
11   animal, so not talking about redistricting, but just
12   sort of a -- you know, like the bill I mentioned earlier
13   to change the time period when the early ballot board
14   could meet, we would submit that, and we would not
15   provide any detailed analysis about the number of
16   registered voters in the state or the number of Spanish
17   surname voters.
18       Q.   I see.  But you just testified that it was
19   routine that you use this analysis, correct?
20       A.   Yeah, but depending on the submission.  So if
21   it's a -- I mean, probably half the bills that go up are
22   a creation of a special district that comprise only a
23   portion of the state.  That would be the kind of bill
24   that we would include voter registration detail.
25       Q.   I see.  But there's nothing that would prevent

## 51

1    you from doing it for statewide changes, is there?
2        A.   No.
3        Q.   Because you do it all the time, right?
4        A.   Right.  It's public information.
5        Q.   And did you use it to comply with -- with state
6    law for the staffing of precincts, for example?  Did you
7    do Spanish surname with regard to staffing of precincts
8    with --
9        A.   We did.
10       Q.   -- Spanish-speaking poll workers?
11       A.   Yes.  We started to do that in maybe 2003, '4,
12   something around -- around that time, whereas basically,
13   just to help the county election officials identify
14   those precincts that would need Spanish-speaking poll
15   workers.  We went ahead and shared the results of our
16   Spanish surname list to help them identify precincts.
17       Q.   Outside of Section 5, does the state also use
18   Spanish surname analysis for other purposes?
19       A.   You know, the primary purpose was for purposes
20   of sending out the written notice for the constitutional
21   amendment election.  We did start to using it to help
22   the counties identify Spanish surnames.  It's available
23   as a request, when someone requests information.  So if
24   somebody wants a copy of the voter registration
25   database, they can request it with the Spanish surname

## 52

1    flag.  I don't recall, at this point, any other time
2    that the Secretary of State used that data for Spanish
3    surname.
4        Q.   Was it at all used for redistricting to advise
5    a Hispanic legislator that they would be able to be
6    elected in a new district?
7            MR. MORTARA:  Ms. McGeehan, you can answer
8    that question with respect to the --
9            Ms. Westfall, the problem I have with this
10   question is, it incorporates within the question the
11   positive advice that he would get elected or she would
12   get elected.  And then the additional problem is, we
13   have waivers here for voter ID purposes, and I'm not
14   sure we have waivers for other purposes.
15           And so I think the general question, did
16   you ever give advice to a legislator about the
17   likelihood of a Hispanic legislator getting elected is a
18   yes or a no, because that's subject matter privilege
19   log.  Beyond that, I think I'd have to assert
20   legislative privilege for everyone, because I'm not
21   aware of waivers that go beyond voter ID.  Do you --
22           MS. WESTFALL:  Okay.  You have a different
23   conception of how legislative privilege works, because
24   you're saying it has to be waived rather than invoked,
25   so we are looking at privilege differently.

53

1     MR. MORTARA: Okay.
2     MS. WESTFALL: Secondly, you're
3  anticipating a question I haven't asked, because I
4  haven't asked the identity of any particular Hispanic
5  legislator. I'm asking her as a general matter. So I'm
6  not understanding your objection.
7     MR. MORTARA: Because your question
8  incorporates the positive, which is, did you tell a
9  Hispanic legislator he or she would could get elected,
10  which is the positive, which would never appear on a
11  privilege log. What would appear on a privilege log is
12  the subject of communication about election prospects.
13     MS. WESTFALL: I'm not invading any
14  privilege. I'm not following why, since there's no
15  identity or no -- there's no individual. This is a
16  general question that I'm posing, and I object to your
17  instructing the witness to answer yes or no.
18     MR. MORTARA: I'm not instructing her.
19  I'm saying you cannot answer the question the way it's
20  been posed.
21     Q.   (By Ms. Westfall) Is the Spanish surname
22  analysis conducted within the Division, or is it
23  conducted by a central data office?
24     A.   It is conducted within -- not in the Elections
25  Division, but in the IT department, information

54

1  technology department, of the Secretary of State's
2  Office.
3     Q.   What was your experience with the accuracy of
4  surname analysis?
5     A.   It was pretty mixed. We would get a lot of
6  complaints from people who felt that -- again, the main
7  purpose of it was sending out the notices for
8  constitutional amendment elections. So sometimes folks
9  would receive one of those and they didn't speak Spanish
10  and they got mad, or sometimes they did speak Spanish
11  and they got mad, because they didn't want to be
12  profiled. So yes, we had some concerns that it may not
13  be a hundred percent reliable. But that was our --
14  those were basically the rules that we played by, as
15  were precleared by the Justice Department.
16     Q.   And was that -- concerns by constituents who
17  erroneously received materials in Spanish or vice versa,
18  was that the sum total of your concerns about the
19  accuracy of the analysis?
20     A.   Well, in that it represented that some people
21  may be identified that don't speak Spanish or people who
22  do speak Spanish are not included in that list, so it's
23  not a perfect list of identifying Spanish-speaking
24  voters.
25     Q.   How many complaints, sitting here today, are

55

1  you aware of with regard to what you just testified to?
2     A.   We would get many complaints. Maybe 50 or more
3  after a mail-out.
4     Q.   What --
5     A.   Some of them were people complaining because
6  they didn't think the state should be sending out mail-
7  outs in Spanish. So just lots of different complaints.
8     Q.   Okay. But just focusing on issues pertaining
9  to the accuracy of the Spanish surname analysis, what --
10  could you give a kind of a percentage of how many
11  complaints you would get when you sent out one of these
12  mailings that related to accuracy of the analysis?
13     A.   You know, it's hard to answer that, because
14  most of the complaints we got were sort of emotional
15  reactions, so I don't know that they were -- really,
16  those complaints weren't centered so much on the
17  accuracy of the data.
18     Q.   So it's your testimony that there were not
19  complaints about the accuracy of the data, and that
20  there were -- these were emotional responses related to
21  a different issue?
22     A.   I think the only complaints we ever got, and I
23  don't know that we got them in writing, but sometimes we
24  could would get feedback from county election officials
25  that felt that the lists were not necessarily reflective

56

1  of Spanish-speaking communities, so that if they had to
2  appoint a number of polling place officials, that they
3  would express that didn't necessarily represent the
4  community, and that that might not be the best way of
5  identifying where to appoint Spanish-speaking clerks.
6     Q.   So other than what you've just testified to, is
7  there -- is there any other facts that you can testify
8  to about concerns with the accuracy of the analysis, or
9  was it kind of anecdotal complaints?
10     A.   Yeah. I mean, we -- those were the complaints
11  we got. Let's put it that way.
12     Q.   And based on your experience in the Division,
13  you don't have any fundamental concerns about the
14  accuracy of the analysis; is that right?
15     A.   Well, we're not data specialists. I mean, we
16  are implementers, and we follow the law. So that's what
17  we did. It really...
18     Q.   Based on your administration experience, did
19  you believe it was, on the whole, accurate?
20     A.   It was my thought that it was probably the best
21  way we had of identifying Spanish-speaking folks, but I
22  knew it wasn't perfect.
23     Q.   Thank you. And I believe you testified earlier
24  that as part of your responsibilities when you were at
25  the Division, you worked with legislators and staff to

## 57

1   provide them with advice pertaining to election laws,
2   right?
3       A.   Uh-huh, yes.
4       Q.   Did you serve as a resource to the Legislature
5   in the development of election bills, other than what
6   you have testified to earlier?
7       A.   Not so much in the development of the bill, but
8   after the bill was filed and if it was going to be heard
9   in a committee, that's where we would generally step in
10  and offer advice.
11      Q.   When it was heard in committee, what types of
12  information did the Division provide to either the
13  committee or individual legislators?
14      A.   Usually, it was just an explanation of how it
15  worked within the framework of existing election law.
16      Q.   Would you describe that as technical advice?
17      A.   For the most part, technical advice.
18      Q.   Was there any other advice you provided besides
19  technical advice?
20      A.   No.  I mean, generally we did not provide
21  policy advice.  That was not what we would do.
22      Q.   But besides technical advice as to how a bill
23  would work relative to the election law, did you talk
24  about -- or did you provide advice on how it could be --
25  how it would actually be implemented if enacted?

## 58

1       A.   Yes.  They would ask us questions like that.
2       Q.   Are there any other categories of advice,
3   besides how a bill would be, how a law -- a bill, if
4   enacted, would be implemented and how it sort of fit in
5   the election code that you would provide to committees
6   or legislators?
7       A.   Sometimes they might ask for data, and we would
8   supply data, you know, Hispanic surname voters or other
9   information that we might collect at the Secretary of
10  State's Office.  You know, kinds of voting systems used,
11  things like that.  So we also would provide just raw
12  data that we had.
13      Q.   Anything else you can think of sitting here
14  today?
15      A.   I think that -- that covers it.
16      Q.   And with regard to bills subject to Section 5,
17  does the Legislature, in your experience, take any
18  special steps, as a general matter, to ensure that an
19  election bill will be precleared by the Justice
20  Department or by a court?
21           MR. MORTARA:  You can answer if you know,
22  and if the -- you can answer if you know and if
23  answering would not disclose the content of any
24  communications with any legislator that is not on that
25  list.  Do you understand?

## 59

1           THE WITNESS:  Uh-huh.
2           MS. WESTFALL:  I'm asking her as a general
3   matter, not as pertaining to any particular legislator,
4   Mr. Mortara.
5       A.   My experience that is most legislators
6   understand the mandate of Section 5 and keep that in
7   mind when they propose legislation, and know that's part
8   the process.
9       Q.   (By Ms. Westfall) How do you know that?
10      A.   Well, for -- I mean, for the time I worked
11  there, the Secretary of State's Office routinely
12  contacted sponsors, after a bill passed, seeking
13  assistance in locating minority contacts.  So for one
14  thing, for 20-plus years, our office has always
15  solicited that information, so...
16      Q.   Outside of the minority contact issue, would
17  legislators generally do anything in crafting their
18  legislation to ensure that it would meet the two legal
19  prongs that you just testified about earlier pertaining
20  to Section 5?
21           MR. MORTARA:  Objection, foundation.
22           THE WITNESS:  Sorry, you're objecting?
23           MR. MORTARA:  You may answer the
24  question.
25           THE WITNESS:  Oh, okay.

## 60

1       A.   I mean, I don't -- I don't really know what the
2   legislative process is.  I mean, I presume they're aware
3   of the law.  I don't know what the detailed -- we didn't
4   work on drafting bills.
5       Q.   (By Ms. Westfall) Do you know whether, as a
6   general matter, legislators would conduct any factual
7   analysis to ensure that there would not be retrogressive
8   effect on minority voters when they were drafting bills?
9       A.   I don't know.
10      Q.   Do you know whether legislators would take any
11  steps to ensure that there was no discriminatory purpose
12  in crafting election laws?
13      A.   I don't know.
14      Q.   And with regard to voting changes subject to
15  Section 5 that are administrative in nature, did the
16  Division take any steps, as a general matter, to ensure
17  that rules, regulations, other procedures that the
18  Division created would comply with Section 5?
19      A.   Yes.  I mean, yeah.
20      Q.   Can you describe what procedures you would take
21  to accomplish that?
22      A.   I don't know that we had any procedures per se,
23  but I think it -- you know, we worked intimately with
24  Section 5, and so that would be part of our analysis,
25  and anything we did -- anything relating to voting, that

## 61

1   would be in our minds.  But I don't know -- we didn't
2   have a checklist per se.
3      Q.  But would you make sure that if you were
4   putting out a rule, would you think "I want to make sure
5   this is not going to have a retrogressive effect because
6   I'm going to have problems"?  Would you foresee the
7   Section 5 process, in other words?
8      A.  Yes, and how it would impact all voters.  I
9   mean, that was always a part of what the Elections
10   Division is charged to do per statute.  So yes, we would
11   keep that in mind if we were -- anything we did,
12   creating a form or issuing a directive or adopting a
13   rule.
14      Q.  Can you think of a time when you did any
15   factual analysis of any rule or regulation or anything
16   administratively you did to ensure that it would not run
17   into problems with Section 5?
18      A.  Factual analysis meaning doing some sort of
19   investigation?
20      Q.  Yes.
21      A.  No, we didn't -- we didn't have resources for
22   that sort of thing.
23      Q.  And did you take any steps to ensure within the
24   Division that your rules and regulations were not
25   adopted or promulgated with a discriminatory purpose?

## 62

1      A.  I mean, we were -- I have to think how to
2   answer that question, because it's kind of like obeying
3   the law.  And so it was -- I think it -- it was inherent
4   as part of our responsibilities to make sure that
5   anything we did was fair to all voters, including
6   complying with Section 5 of the Voting Rights Act.
7      MR. MORTARA:  Ms. Westfall, we've been
8   going for over an hour.  I don't need a break.  But if
9   Chris or Ms. McGeehan need a break, I just wanted to
10   advise Ms. McGeehan that she doesn't have to wait for
11   you to call a break if she wants one.
12      MS. WESTFALL:  Certainly.  No.  I advised
13   Ms. McGeehan if she needs a break.  Do you need a break,
14   Ms. McGeehan?
15      THE WITNESS:  Actually, I would like a
16   break.
17      MS. WESTFALL:  Go ahead and take a break.
18   We're at a good point.
19      THE WITNESS:  Thank you.
20      (Recess from 10:54 a.m. to 11:18 a.m.)
21      (Exhibit 282 marked for identification.)
22      Q.  (By Ms. Westfall)  You've been handed what's
23   marked as U.S. 282.  Have you seen this document before?
24      A.  I don't think I've seen this one.  I think I
25   saw the original notice of deposition.

## 63

1      Q.  Great.  And this is the notice of your
2   deposition for today; is that right?
3      A.  Yes.
4      Q.  Turning your attention to the list of documents
5   on -- at Attachment A, three pages in, do you see that?
6      A.  Yes.
7      Q.  Did you undertake a search for documents
8   responsive to these list of documents today?
9      A.  I did, but all of these documents would be at
10   the Secretary of State's Office.  So --
11      Q.  Did you take any documents with you related to
12   the voter ID or photo ID when you left --
13      A.  No.
14      Q.  -- the employment of the Election Division?
15      A.  I did not.
16      Q.  I'm sorry.  I just want to make sure that we're
17   not talking over each other.
18      A.  Sorry.
19      Q.  You anticipated my long question.  Thank you.
20      So did you have any work-related
21   communications on your home computer?
22      A.  No.
23      Q.  Or in your home office files?
24      A.  No.
25      Q.  And you did not take any files when you left

## 64

1   the Division; is that right?
2      A.  I did not.
3      Q.  Did you do any -- conduct any work on your
4   personal e-mail?
5      A.  No.
6      Q.  So you have not searched for these documents;
7   is that correct, because this --
8      A.  I don't have custody of them.
9      Q.  They belong to your former employer; is that
10   right?
11      A.  Yes.  That's right.
12      Q.  Okay.  All right.
13      MS. WESTFALL:  Mr. Mortara, are you aware
14   of whether the documents listed in the schedule have you
15   been produced?
16      MR. MORTARA:  No.  I am not personally
17   aware.  I have no reason to believe that they have not,
18   and if you need a break, I can confer with
19   Mr. Sweeten or send an e-mail to the team and get you
20   that confirmation e-mail.
21      MS. WESTFALL:  Thank you.
22      MR. MORTARA:  I have no reason to believe
23   that they have not.
24      MS. WESTFALL:  Thank you.
25      Q.  (By Ms. Westfall)  Ms. McGeehan, have you

---

65

1  attended professional conferences at which photo ID was
2  discussed?
3       A.  Yes.
4       Q.  Which ones?
5       A.  Well, the -- the Secretary of State conference
6  for election officials, we routinely discuss new
7  legislation, so Senate Bill 14 was discussed at that
8  2011 conference.  It may have been discussed in past
9  conferences when we do a recap of legislation just to
10  simply say that it did not pass.  But in 2011, it was on
11  the agenda.
12       Q.  Where was that conference held?
13       A.  It was held in Austin at the Renaissance Hotel
14  by the Arboretum.
15       Q.  Did you speak at that conference?
16       A.  Yes.
17       Q.  What month in 2011?
18       A.  It was either July or August.  I don't remember
19  right now.  It was a summer conference.
20       Q.  And was this a statewide meeting or a
21  nationwide meeting of secretaries of state?
22       A.  This was a statewide meeting of county election
23  officials in Texas.
24       Q.  Did you prepare written remarks for that
25  meeting?

---

66

1       A.  I usually would do an outline of my comments.
2       Q.  Did you retain a copy of those remarks?
3       A.  I do not have it.  It might be on the computer
4  at SOS.
5       Q.  Thank you.  Have you ever presented remarks at
6  a conference, at any other conference at which you spoke
7  about photo ID or voter ID?
8       A.  Again, just to get back, this was one of the
9  initial points is, you know, photo ID -- I mean, photo
10  ID clearly relates to Senate Bill 14, because photo ID
11  is not required under current law.  But current law
12  requires some form of ID.  Some people use the term
13  "voter ID," which may not mean photo ID.  So, routinely,
14  at our Secretary of State's seminars, we would discuss
15  the law which requires some form of voter identification
16  in order to vote.
17       Q.  I see.  Between the period of 2005 and when you
18  left the Division, did you speak about photo ID laws,
19  either proposed or enacted, at any conferences, other
20  than the one you just testified to?
21       A.  We probably discussed it in 2009 as part of the
22  recap.  At a seminar that occurs after a legislative
23  session, we do a legislative summary.  So I'm sure we
24  probably mentioned it and the fact that it did not
25  pass.  But it wouldn't have been a lengthy discussion.

---

67

1       Q.  Did you prepare written remarks for that?
2       A.  Probably had an outline for '07.
3       MS. WESTFALL:  And, Mr. Mortara, I would
4  ask that to the extent those documents are responsive to
5  our document request, which I believe they are, we would
6  request that they be produced if they have not already
7  been produced.
8       MR. MORTARA:  I think that they have, but
9  if you want to follow up with correspondence to confirm,
10  we will.
11       MS. WESTFALL:  Thank you.
12       Q.  (By Ms. Westfall)  Have you ever had any
13  conversations with any county election official in Texas
14  in which that individual indicated a need for photo ID?
15       A.  Yes.
16       Q.  Which official?
17       A.  Joy Streeter in Comal County.  There may have
18  been other ones, but that's one that comes to mind.
19  There may have been -- there may have been other county
20  officials as well, but --
21       Q.  And when did Ms. Streeter talk to you?
22       A.  It was probably -- well, it was at the
23  legislature before a hearing or during a hearing,
24  something like that, a conversation when we were both
25  getting ready to testify at a hearing.

---

68

1       Q.  Do you recall what year that was?
2       A.  I don't remember if it was '09 or 2011.  I
3  don't really remember which one, but it was one of
4  those.
5       Q.  Can you describe the substance of the
6  conversation?
7       A.  No.  It was a passing remark, and I usually
8  don't engage in policy discussions with folks, so...
9       Q.  Did she indicate any basis for her support for
10  photo ID?
11       A.  No.  Like I said, I didn't really engage in the
12  conversation, and it was really a comment she made.
13       Q.  How long was the conversation?
14       A.  It was very short.
15       Q.  Did she simply express support for photo ID?
16       A.  Yes.
17       Q.  Did she give you any indication of why she
18  supported photo ID?
19       A.  I don't really remember, to be honest with
20  you.  I don't remember the details of the conversation.
21       Q.  And sitting here today, do you remember any
22  other similar conversations with county election
23  officials about a need for photo ID other than
24  Ms. Streeter?
25       A.  There may have been similar kind of comments

Ann McGeehan                                                    May 31, 2012

## 69

1   made by officials, but again, we would tend to steer
2   away from any sort of perceived partisan-type issues.
3       Q.   But I'm not asking about whether you responded
4   or agreed or disagreed.  I'm asking about the existence
5   of your knowledge of support from county officials?
6       A.   And what I'm saying is there may have been
7   other officials that made similar comments.  I don't
8   really remember them, because we would generally try not
9   to have those kind of conversations.
10      Q.   Thank you for your testimony.
11           What is the system under state law for
12  determining how to verify the identity of a voter?
13      A.   And I'm going to ask to clarify.  Verify the
14  identity of a voter presenting themselves at the polling
15  place and not talking about as registering to vote?
16      Q.   Let's start with at the polling place.
17      A.   The current law is that a voter is required to
18  show their certificate, their voter registration
19  certificate, or if they don't have a voter registration
20  certificate, then they can present another form of ID.
21  And there's a fairly long list.  And because I don't do
22  this every day anymore, I don't really have it off the
23  top of my head anymore, so...
24      Q.   What happens if a voter doesn't have either the
25  voter registration card or one of those forms of ID at

## 70

1   the polls on election day?
2       A.   Then they -- they're given the opportunity to
3   vote a provisional ballot.
4       Q.   Does the voter need --
5       A.   I believe.  I'm pretty sure that's right.  And
6   that's -- you see, that's the problem; I haven't been
7   doing this for six months, but I'm fairly certain --
8   yes, that's case.  If a voter does not have any form of
9   ID, then they're given the opportunity to vote a
10  provisional ballot.
11      Q.   Does the voter need to take any additional
12  steps to ensure the provisional ballot will be counted?
13      A.   There's really not much the voter can do,
14  actually, because if they don't have ID, even though
15  they're given the opportunity to vote a provisional
16  ballot, it will not be counted, because they didn't
17  provide any identification at the polls.
18      Q.   Are you certain that it's not the case under
19  state law that election officials will consult the
20  records to determine whether to count the provisional
21  ballot, and if the signature on the provisional ballot
22  envelope matches the registration record, that that
23  provisional ballot will be counted?
24      A.   That's not what the law says.
25      Q.   Tell me what --

## 71

1       A.   They can do a search like that to find evidence
2   if a voter is registered to vote.  But if they have not
3   presented a form of ID, then they're allowed to count
4   that ballot.  There's no way to cure that under current
5   law.
6       Q.   I see.  And of the forms of ID that are
7   acceptable at the polls today, do many of them include
8   nonphoto IDs?
9       A.   Yes.
10      Q.   And are they kind of similar to the forms of
11  photo ID that are acceptable and listed under the Help
12  America Vote Act, i.e., utility bills, government
13  correspondence, et cetera?  Is it a large wide range?
14      A.   Yeah.  I think it's about 11 or 12 items.
15      Q.   And when you register to vote, the county
16  election official will mail you a copy of your voter
17  registration card under current law; is that correct?
18      A.   Yes.
19      Q.   And if the voter doesn't have a voter
20  registration card at the polls on election day and
21  presents one of these forms of ID from a wide range of
22  forms of ID, that voter may vote a regular ballot; is
23  that right?
24      A.   That's right.
25      Q.   Are you aware of any reports of a voter

## 72

1   registration card being stolen in the mail from a voter?
2       A.   Reports or information reported to the
3   Secretary of State's office?
4       Q.   Let's -- I would say reports, generally, have
5   you ever heard about that?
6       A.   There may -- I mean, I may have heard something
7   like that said at a hearing.  I don't believe we have
8   it -- that when I was at the Secretary of State's
9   office, we had anybody file anything with our office
10  indicating that.
11      Q.   So you've never investigated any of those
12  claims, to your knowledge, while employed with the
13  Division?
14      A.   Well, actually, I take that back.  I think we
15  did have a -- I think we did have an allegation, a
16  written complaint that voter registration certificates
17  were stolen.
18      Q.   Who made that complaint?
19      A.   I don't remember, but I believe we referred it
20  to the Attorney General for investigation.
21      Q.   When was that complaint made?
22      A.   In the last four years.  I don't remember
23  exactly.
24      Q.   Did it pertain to one card or more than one
25  card?

### 73

1      A.  It was several cards.
2      Q.  A handful of cards?
3      A.  It was a bunch of cards.  It was a bunch of
4   voter registration certificates.  I don't remember all
5   the details, but --
6      Q.  Do you know whether any prosecutions arose from
7   that?
8      A.  I don't know.
9      Q.  And where were those cards alleged to have been
10  stolen?
11     A.  I think they were stolen out of someone's car
12  or -- I don't remember all the details.  I think it was
13  in relation to a primary.  It may have been the --
14  either the 2008 primary or the 2010 primary.  And to be
15  honest, my memory is fuzzy on that.
16     Q.  Is it possible that you're referring to voter
17  registration applications and not cards?
18     A.  No, these were certificates.  These were voter
19  registration certificates.
20     Q.  That were -- had been in the custody of a
21  county election official; is that right?
22     A.  I don't remember the line of custody, but yeah,
23  I -- initially, they came out of a county office, and I
24  don't really remember -- I don't remember the details.
25     Q.  Did you yourself have any involvement in the

### 74

1   development of the current system for identifying a
2   voter at the polls on election day under the Texas
3   election code?
4      A.  The -- I think the only role that I may have
5   played is in, when the Help America Vote Act passed,
6   was -- you know, advising the legislature on how to
7   integrate that federal law into the Texas state law,
8   including what a voter has to present at the polls, if
9   it is a voter that the state has not been able to
10  confirm their voter -- their driver's license number or
11  Social Security number under HAVA.
12     Q.  I see.  And how long has the current system for
13  identifying voters at the poll been in place in Texas?
14     A.  My recollection is that in either 1997 or 1999,
15  one of those sessions, the legislature passed the
16  requirement to affirmatively require some form of ID,
17  this list that we talked about.  Prior to that time, a
18  voter didn't have to show anything.  That was in either
19  '97 or '99.  In 2003, the legislature passed -- I
20  believe it was 2003, the legislature passed a bill to
21  implement HAVA, which I don't think really changed that
22  list.
23         It may be more in Secretary of State rules
24  and procedures where the interaction between confirming
25  a voter's identity on the voter registration process and

### 75

1   how that impacts the voter registration list, that may
2   not be in the law, per se, that may be more through
3   directives issued by the Secretary of State.
4      Q.  I see.  And to your knowledge, was the Help
5   America Vote Act and its set of IDs contained therein,
6   was that in part based on the list under -- that existed
7   under Texas law at the time?
8      A.  Did Congress base their list?
9      Q.  (Nodding head yes.)
10     A.  I don't know.
11     Q.  Is the current system for identifying a voter
12  at the polls effective in identifying voters in your
13  opinion?
14     A.  Effective in terms of?
15     Q.  Does it do the job?  Does it, in fact, ensure
16  identification of voters at the polls?
17     A.  That's a difficult question for me to
18  answer.  I mean, we -- we advise county officials on the
19  rules to follow.  We don't do any investigation, or
20  Secretary of State's Office doesn't do any investigation
21  to double-check that.
22     Q.  To your knowledge, is it -- is the current
23  system not effective, and does it fail to identify
24  voters at the polls?
25     A.  You know, as -- when I was a state employee,

### 76

1   it's my duty to implement the law.  It's not my duty to
2   make policy judgments on what's good and what's not
3   good.
4      Q.  But you worked for the Election Division, did
5   you not?
6      A.  Yes.
7      Q.  And you received complaints or information
8   about the effectiveness of systems --
9      A.  We would routinely --
10     Q.  -- because you administered the law, correct?
11     A.  Right.  I guess the deal is, we routinely
12  received complaints from both sides.  It's always a
13  balance between access to the ballot and making sure the
14  election process is secure and maintaining integrity.
15  So it's always that battle.  And so we hear from folks
16  on both edges of those issues.  And so, generally, we
17  don't get into those.  Generally, what we look at is are
18  the laws being followed as the legislature has passed
19  them as they have been precleared by the Justice
20  Department.
21     Q.  I understand.
22     A.  It's not our role to judge.
23     Q.  I understand.  I'm not asking you to take a
24  policy position based on your past position with the
25  Election Division.

## 77

1           Let me ask you another question:  Do you
2   have any facts or information that you could testify
3   today that would indicate that the current system has
4   failed in any instance to identify a voter at the polls?
5           A.   We've been asked that question in legislative
6   committee meetings and we've provided data.  You know, I
7   don't have the numbers at my fingertips on that.
8           Q.   Okay.  And we will talk about your testimony a
9   little bit later today.  I understand your testimony
10  before the hearings in the Senate and the House, and
11  otherwise.  But outside of that testimony, is there any
12  other set of facts or information that you can provide
13  to us today about how the current system has failed to
14  identify voter at the polls on election day?
15          A.   No.  I don't think so.
16          Q.   Do you recall that in 2000, you were quoted in
17  the Dallas morning news?
18          A.   In 2000?
19          Q.   In 2000.  To the effect -- and we can use an
20  exhibit if that would help to refresh your
21  recollection -- that in the polling place you have a lot
22  of measures in place to protect the integrity of the
23  ballot but voting at home has none of those safeguards.
24  Do you remember that?
25          A.   Yes, I do.

## 78

1           Q.   What did you mean when you said there are a lot
2   of measures in place in a polling place to protect the
3   integrity of a ballot?  What measures?
4           A.   Well, it's a public setting, and you've got,
5   you know, representatives of the government essentially
6   administering the voting process.  And you may have poll
7   watchers present and other voters present, and state law
8   controls, as opposed to a voter voting by mail in the
9   privacy of his or her home, and you don't have those
10  safeguards.
11          Q.   And how do those safeguards you've just
12  described and testified to protect the integrity of the
13  ballot in the polling place?
14          A.   Well, I mean, the intent of those laws is to
15  make sure that only, you know, eligible voters vote,
16  that they vote one ballot, and that, also, that their
17  rights are protected.  So I guess that's how.
18          Q.   Thank you.
19               How are those safeguards absent when
20  you're voting from home?
21          A.   There's nobody from the -- the entity holding
22  the election is not present.  You don't have any
23  representatives of that entity.  And so there have been
24  occasions where voters can be targeted, especially
25  elderly voters, where, you know, there are attempts to

## 79

1   manipulate their vote.
2           Q.   Are you aware of any issues or concerns about
3   fraud that have arisen from mail-in ballot procedures in
4   the state of Texas?
5           A.   Yes.  And in 2003, the legislature passed a
6   fairly significant bill to try to address some of those
7   issues where, you know, more signatures are required for
8   anybody who assists the voter, requests a ballot, and
9   you have to put their name and address and sign it.  And
10  I believe the AG has prosecuted some of those that where
11  those signatures were not provided.
12               And I don't know that any legislation was
13  enacted in 2011.  I think there was a report issued
14  after the 2009 session on the issue of mail -- mail-in
15  voting and concerns about mail-in voting.
16          Q.   Since the legislature enacted that law in 2003,
17  are you aware of convictions for voter fraud based on
18  the mail-in votes?
19          A.   Yes.  I believe there have been several through
20  the Attorney General's Office.
21          Q.   Do you know the number?
22          A.   I don't know the number.
23          Q.   And who would know that?
24          A.   I think the -- someone in the Attorney
25  General's Office would have that data.

## 80

1           Q.   When did you first hear any support for
2   enacting a photo ID law in the state of Texas?
3           MR. MORTARA:  Ms. McGeehan, although the
4   question doesn't call for it, it's broad enough to cover
5   communications you may have had with legislators that
6   are not on this list, and I just admonish you in that
7   regard.
8               And, Ms. Westfall, totally happy at
9   this point for that to be a standing instruction,
10  because your question is really not in that area anyway,
11  if you're okay with that?
12          MS. WESTFALL:  A standing objection?
13          MR. MORTARA:  My point is:  Your question,
14  as broad as it is, would include a communication between
15  Ms. McGeehan and, for instance, Senator Tommy Williams
16  where Tommy Williams --
17          MS. WESTFALL:  My question was when.  It's
18  a date question.
19          MR. MORTARA:  Oh, I'm sorry.  I thought
20  you said something else.
21          MS. WESTFALL:  When, when -- no.  Listen
22  to my question.
23          MR. MORTARA:  Okay.  Well, let's go
24  ahead with when.
25          MS. WESTFALL:  Let's read back the

## 81

1  question.

2        MR. MORTARA:  When is fine.

3        MS. WESTFALL:  When is fine.

4    Q.  (By Ms. Westfall)  When did you first hear

5  about any support for enacting photo ID with voter

6  identification requirement in Texas?

7    A.  I think -- I mean, I don't know that I can give

8  you a date certain.  I am thinking it began to be

9  discussed in kind of around the same type as HAVA.

10  There was a Carter Baker report that talked about it,

11  and I don't know if that was maybe 2003, 2004, around

12  that time frame.

13    Q.  How did you learn about it?

14    A.  I really don't remember.  It may have been

15  through that Carter Barker report.

16    Q.  Do you know who was supporting photo ID in the

17  State of Texas?

18    A.  Lots of people supported it.  So --

19    Q.  Where was it stemming from?

20        MR. MORTARA:  Objection to foundation.

21    Q.  (By Ms. Westfall)  You may answer.

22    A.  I mean, just generally, it was more of a

23  Republican issue, I guess, Republican party issue.

24    Q.  Do you think that photo ID is motivated in part

25  by partisan concerns?

## 82

1        MR. MORTARA:  Objection, form of the

2  question.

3    Q.  (By Ms. Westfall)  You may answer.

4    A.  That may be part of it.  It seems to enter into

5  just about everything else.  So --

6    Q.  Was there a time when you were employed in the

7  Election Division that the Division first became

8  involved in the issue of photo ID legislation?

9    A.  I'm sure when the bill -- when a bill was

10  introduced, we would have been involved as far as having

11  to analyze the bill and possibly testify.

12    Q.  Do you recall what year that was?

13    A.  No.

14    Q.  And how were you -- what -- strike that.

15        Are you familiar with House Bill 1706 from

16  2005, introduced by Representative Denny?

17    A.  I don't remember it right now.  I mean, I might

18  be able to refresh my memory.

19    Q.  Why don't we do that.

20        MS. WESTFALL:  Could you mark this --

21  actually, this has been previously marked, Chris, as --

22  Court Reporter, as Exhibit 44.  Could you mark that for

23  the witness.

24    Q.  (By Ms. Westfall)  You've been handed what's

25  been previously been marked as U.S. 44.  Could you take

## 83

1  a look at this document and let me know if you recognize

2  it?

3    A.  You know, I don't really remember it too well,

4  but I'm sure at one point I -- you know.  This is 2005?

5    Q.  Turning your attention to the last page of this

6  exhibit on Page 10.

7    A.  Uh-huh.

8    Q.  If you look at Section 13, that might refresh

9  your recollection.

10    A.  Yeah.  Okay.  Okay.

11    Q.  Do you remember having any involvement with

12  this legislation at all?

13    A.  Not really.

14    Q.  Do you recall whether the Secretary of State or

15  Election Division took any public position on HB 1706?

16    A.  The Secretary of State -- well, I'm trying to

17  remember if -- who was Secretary of State in 2005.  The

18  Secretary of State may have taken a position on this

19  issue.  The Elections Division did not.

20    Q.  Do you know what the Secretary of State's

21  position on 1706 was?

22    A.  Let me just think.  Who was Secretary of State

23  in 2005?  Actually, I don't think anybody did, not in

24  2005.  Sorry.  I don't think there was any public

25  position.

## 84

1    Q.  Are you aware of whether the Division was

2  involved in the development of drafting of HB 1706?

3    A.  I don't think we were.

4    Q.  Are you aware of the source of the legislative

5  language for 1706?

6    A.  No.

7    Q.  Are you aware of whether the Division provided

8  any facts or information to any House or Senate

9  committee related to the HB 1706?

10    A.  I don't have any memory of that.

11    Q.  Turn your attention to the section of the

12  legislation of HB 1706 at Page 4.  Do you see where it

13  lists Section 63.0101, Documentation of Proof of

14  Identification?

15    A.  Yes.

16    Q.  Could you take a look at the forms of ID and

17  let me know when you've had a chance to review them?

18    A.  (Witness complies.)  Yes.  I've reviewed it

19  now.

20    Q.  Thank you.  And HB 1706 includes both photo ID

21  and nonphoto ID; is that correct?

22    A.  Yes.

23    Q.  And also includes photo ID cards issued by

24  county elections administrators or clerks; is that

25  correct?

## 93

1  or overall eligibility.
2         There are processes in place once a voter
3  is registered so, you know, to keep the rolls clean, so
4  where there are checks against felons and, you know,
5  mental incapacity, you know, abstracts.  And then
6  there's our routine, you know, mass mail renewal voter
7  registration certificate that helps finding issues if
8  someone has moved and are no longer eligible.
9         But the upfront process of registering to
10  vote, you know, the process is the county reviews the
11  application, makes sure all the boxes are filled in.
12    Q.  And the applicant -- not to interrupt you.
13    A.  Yeah.
14    Q.  My apologies.  But the applicant signs under
15  penalty of law --
16    A.  Right.  That's correct.
17    Q.  -- that they're affirming certain
18  information --
19    A.  The information.
20    Q.  -- about their eligibility; is that correct?
21    A.  Yes, that's correct.
22    Q.  So that's one rule in place; is that right?
23  And that's codified under Texas law?
24    A.  Yes.
25    Q.  Thank you.  I'm sorry for interrupting.  Go

## 94

1  ahead.
2    A.  The application doesn't come to the state
3  first.  It goes to the county voter registrar.  The
4  county voter registrar reviews it first, makes sure the
5  address they're providing is in the county.  So in that
6  sense, they look at the address, but they don't confirm
7  whether somebody actually lives there or not.
8    Q.  They make sure that it's an address that
9  exists?
10    A.  That exists in their county.  If it's in
11  another county, they send it to another county.
12         And then it goes to the state for the
13  state to verify the identification number that's been
14  provided.  So, you know, anyway, so that's the process
15  of becoming registered.
16         And then after the fact, there are some
17  routine checks to make sure that the rolls remain clean,
18  so they're checked against, you know, database of
19  deceased persons, felons.
20         And on the U.S. citizenship issue, if a
21  person claims they're not eligible for jury service
22  because they're not citizens, then that should trigger a
23  process where they are sent a letter requesting them to
24  confirm that they are, in fact -- actually, they have to
25  show proof of citizenship at that point, and that's one

## 95

1  way to keep -- to have a check on citizenship.
2    Q.  Great.  Thank you.
3         Could you describe the rules in place to
4  determine whether a voter who requests an absentee
5  ballot or mail-in ballot is a registered eligible voter?
6    A.  The basic rules are that they -- the voter has
7  to submit a written request.  They have to state a valid
8  reason for voting by mail.  And there are only
9  four.  The early voting clerk reviews that, and the only
10  thing they can really verify is if they state they're
11  over 65, they can check the voter registration rolls,
12  but they can't verify if they're disabled or if they're
13  out of the county.  You know, the other eligibility
14  criteria is if you're in jail but otherwise eligible to
15  vote.
16    Q.  So, in other words, a voter submits a form
17  swearing that he or she is registered and that there is
18  a reason --
19    A.  Right.
20    Q.  -- to submit the mail-in ballot?
21    A.  (Witness nods head yes.)
22    Q.  Are there any other checks in place for
23  verifying that voter who is seeking an absentee ballot?
24    A.  Not at that point.
25    Q.  Are there any other checks at any other points?

## 96

1    A.  When -- when the ballot comes back in and when
2  the early voting ballot board reviews the ballot, they
3  basically review it again, making sure it's a valid
4  reason.  They might check the date of birth.  They
5  compare signatures on the application to the actual
6  voted ballot.  And that's about it.  If they were
7  required to sign a statement of residence, that would
8  have to be included, and they would have to check for
9  that.
10    Q.  Thank you.  Do you recall whether a photo ID
11  bill was introduced in the 2007 session?
12    A.  I think it probably was.
13    Q.  Do you know the number?
14    A.  No.
15    Q.  And by the way, before we get to 2007, do you
16  know what happened -- did any photo ID bill pass in the
17  legislature in 2005?
18    A.  No.
19    Q.  Do you know why?
20    A.  I don't remember.  I don't really have a very
21  good memory of that 2005 session on that issue.
22    Q.  I'm going to hand you what's been previously
23  marked as Exhibit 28.
24         You've been handed what's been marked,
25  previously marked as Exhibit 28.  Do you recognize this

Ann McGeehan                                              May 31, 2012

---

### 101

1   A.  No.

2   Q.  Do you know whether he held that belief?

3   A.  I -- I don't know if he held that belief.  I

4   don't remember that, him saying that.

5   Q.  Do you agree with that sentiment?

6   A.  Whether requiring voter ID would increase voter

7   turnout?

8   Q.  Will not increase voter turnout?

9   A.  The statement is requiring voter ID will not

10  increase voter turnout?

11  Q.  Correct.

12  A.  I don't know that I would agree with that.

13  Q.  Do you think it will increase voter turnout?

14  A.  I don't know that anyone knows what increases

15  voter turnout.  And a lot of bills that were designed to

16  increase voter turnout have not.  So I don't know that

17  it's -- I don't know that I agree with that statement.

18  Q.  Is it your testimony that you can't predict

19  whether it will increase voter turnout?

20  A.  That's true.  I couldn't predict whether it

21  would increase voter turnout.

22  Q.  Did you or the Division play any role in the

23  development of drafting of HB 218?

24  A.  No.  I don't believe we did.

25  Q.  Did anyone in the legislature or legislative

---

### 102

1   counsel contact the Elections Division concerning HB

2   218?

3   A.  Did anybody in the legislation or where else?

4   Q.  Legislative counsel, the TLC.

5   A.  Probably.

6   Q.  Do you remember that happening?

7   A.  I don't know if it was for this year or another

8   year, but they would contact us on a bill like -- like

9   this, that's making a lot of changes to the election

10  code.

11  Q.  I guess I'm trying to figure out with just --

12  just with regard -- turning your attention just with

13  regard to HB 218, do you recall such communications?

14  A.  I don't specifically recall them, but that

15  doesn't mean they didn't happen.

16  Q.  Do you think it would have, based on your

17  experience at the Division, it would have been likely

18  that either the legislature, a member of committee staff

19  and/or the Legislative Counsel would have contacted the

20  Elections Division about --

21  A.  Yes.  I think that would be likely.

22  Q.  And I believe you just testified that they

23  ordinarily would when there were changes to the code as

24  significant, expansive, substantial, as the ones

25  contained in this HB 218; is that correct?

---

### 103

1   A.  Yes.

2   Q.  Do you recall whether the -- whether the

3   Division provided any information to the legislature

4   concerning HB 218?

5   A.  Information as in data or?

6   Q.  Data, factual analysis, any information broadly

7   defined.

8   A.  We -- we probably testified as a resource on

9   the bill.  I don't recall any other data being exchanged

10  in 2007.

11  Q.  Do you recall any requests for information?

12  A.  Well, I take that back.  The House Elections

13  Committee may have asked for data in 2007 related to

14  some of these -- some of the issues related to voter

15  registration.

16  Q.  And by that you mean specifically?

17  A.  Well, and I'm -- again, I am confusing the

18  sessions.  I don't really remember if it was 2007 or

19  2009, but the House Elections -- House Elections

20  Committee, at least one or both of those sessions, asked

21  questions regarding the number of registered voters, who

22  registers with driver's license, who registers with

23  Social Security number, and I believe these were

24  questions that were asked at organizational meeting of

25  the House Elections Committee.

---

### 104

1   Q.  Was that in the public record in the hearing?

2   A.  Yes.

3   Q.  Did any staff ask you separately for that

4   information, or was it simply confined to the public

5   record?

6       MR. MORTARA:  Ms. McGeehan, if the

7   specific information is part of the question, which I'm

8   not clear it is.

9       Is the question any information or the

10  specific set of information that Ms. McGeehan just

11  discussed?  Ms. Westfall, I need you to clarify the

12  question.

13      MS. WESTFALL:  Could you repeat back the

14  question?

15      MR. MORTARA:  The question just said any

16  information.

17      MS. WESTFALL:  Could you repeat back the

18  question?

19      (Requested portion read back by the court

20  reporter.)

21  Q.  (By Ms. Westfall)  I was referring back to

22  information about the number of registered voters who

23  registered with a driver's license or Social Security

24  number.

25      MR. MORTARA:  You may not answer that

## 105

1  question with respect to any legislator not on this list
2  or their staff.  You may answer it with respect to these
3  legislators.
4        A.   Right.  What I'm remembering are questions that
5  Representative Anchia asked at the hearing, but again, I
6  am a little bit fuzzy on whether that was '07 or '09.
7  And it's possible one of his staff members called back
8  to clarify.  I don't think so.  I think the requests
9  were coming directly from Representative Anchia.
10       Q.   Do you recall any -- was Representative Anchia
11 opposed to HB 218?
12       A.   Yes.
13       Q.   Aware you aware of any other requests from any
14 other members who were opposed to HB 218 for requests
15 for information?
16            MR. MORTARA:  Again, you may answer with
17 respect to the legislators on this list and not others.
18            MS. WESTFALL:  Are you taking the position
19 that the Attorney General is representing bill opponents
20 who are not on that list?
21            MR. MORTARA:  No.
22            MS. WESTFALL:  Because that seems to be
23 contrary to the position that's been taken in this
24 litigation previously.
25            MR. MORTARA:  The position the State is

## 107

1  those people.  She is instead someone who may have had
2  conversations with legislators, and she cannot waive a
3  legislator's privilege for that legislator.  That's why
4  she may only answer with respect to the list of names I
5  put in front of her.
6            MS. WESTFALL:  Okay.  We can discuss this
7  further in a break.
8        Q.   (By Ms. Westfall)  Other than
9  Representative Anchia -- first of all, are you following
10 the advice of counsel on this privilege issue?
11       A.   I'm trying to.  Yes.
12       Q.   Are there any other representatives besides
13 Representative Anchia who contacted the Division about
14 or had any communications with the Division about HB
15 218?
16            MR. MORTARA:  You may answer that question
17 completely without any limitation whatsoever.
18       A.   In 2007?
19       Q.   (By Ms. Westfall)  Yes.
20       A.   2007 session.  I really don't recall anyone
21 other than representative Anchia requesting specific
22 data on House Bill 218.
23       Q.   Did you have any other communications, or are
24 you aware of any communications between the Division and
25 anyone else in the government outside of the legislature

## 106

1  taking is that Ms. McGeehan may not inadvertently or
2  intentionally breach a legislator's privilege, unless
3  that legislator has affirmatively waived the privilege.
4  And since Ms. McGeehan does not hold the privilege, she
5  cannot act to break the privilege.  And therefore, she
6  may only answer, not with respect to whether something
7  opposed the bill or supported the bill, but with respect
8  to whether that legislator has affirmatively waived
9  privilege with respect to voter ID issues.  That list is
10 in front of her, and she answer with respect to
11 representatives on that list.
12            MS. WESTFALL:  I just want to represent on
13 the record that your cocounsel early in this litigation
14 indicated that the office of the Texas Attorney General
15 does not represent bill opponents and that we could
16 freely contact bill opponents.  So, therefore, which is
17 -- which is related to this very issue, and I take
18 strong issue with your assertion that only individuals
19 on this list are folks that she can testify.  There
20 are other legislators who are bill opponents.
21            MR. MORTARA:  I don't think there's any
22 inconsistency here, Elizabeth.  You may freely contact
23 any legislator you want, who oppose the bill, and ask
24 them if they're willing to waive their privilege.
25 Absolutely, go right ahead.  Ms. McGeehan is not one of

## 108

1  concerning HB 218?
2        A.   In state government but not in the state
3  legislature --
4        Q.   Correct.
5        A.   -- about 218?  I don't recall any.
6        Q.   Do you recall any communications with the
7  Governor's office?
8        A.   No.
9        Q.   Do you recall any conversations with the
10 Lieutenant Governor's office?
11       A.   No.
12       Q.   Did the Division receive any request to conduct
13 any analysis of HB 218?
14       A.   We didn't receive any requests to analyze.
15       Q.   Did you nevertheless conduct any analysis?
16       A.   Yes.  It's our standard procedure to analyze
17 any election-related bill, and we -- well, attorneys
18 will do a bill analysis so that we can be prepared if
19 that bill is heard in committee.
20       Q.   Can you describe that bill analysis procedure?
21       A.   It's usually assigned to an attorney to do a
22 bill analysis, you know, kind of summarize the bill.  It
23 goes to the legal director to review.  Then it goes to
24 me.  Or it would go to me.  And then sometimes, you
25 know, depending on our general counsel, sometimes they

## 109

1  would want to see those.  Sometimes not.
2      Q.  Can you tell me, generally, what factors the
3  analysis considers?
4      A.  Fiscal impact is a standard, because every
5  state agency has to analyze the bill as a fiscal
6  impact.  We would analyze it whether it required
7  submission preclearance, effective date -- those are the
8  some of the standard things.  But, you know, the heart
9  of it was really just a summary of what the bill did.
10     Q.  With regard to preclearance, does the analysis
11 generally include any indication of steps that should be
12 taken to ensure that the increase of likelihood of the
13 bill would be precleared if enacted?
14     A.  No.  It's really intended to identify,
15 basically, that's the beginning of our list to determine
16 what needs to get precleared.
17     Q.  Did the Division receive any requests to
18 determine who among registered voters did not possess
19 the required forms of ID?
20     A.  Did the bill possess?
21     Q.  Did the Division receive any requests to
22 determine who among registered voters did not have the
23 form of ID?
24         MR. MORTARA:  Ms. McGeehan, you may not --
25 you may -- you may not answer that question with respec

## 110

1  to legislators that do not appear on this list or their
2  staff.  You may answer the question with respect to the
3  legislators that do appear on this list or their staff
4  or anyone else that is not the Lieutenant Governor or
5  Governor or legislators that appear not on this list.
6         And Ms. Westfall, for clarification,
7  my problem is that you've included more in there than
8  just what would be on the privilege log.
9         MS. WESTFALL:  I understand.  I'm making
10 my record.  You are too.
11     Q.  (By Ms. Westfall)  You may answer.  Are you
12 following the advice of counsel?
13     A.  Oh, no.  I'm trying to think of what the answer
14 is.  I think that in -- as best as I can remember, I
15 believe it was only Representative Anchia that requested
16 that kind of information.
17     Q.  Does any -- any of your answer, in part, are
18 you asserting privilege over any information and not
19 providing it to us in this deposition?
20         MR. MORTARA:  I'm instructing you not to
21 answer with respect to legislators that do not appear on
22 this list or Lieutenant Governor or the Governor.
23     A.  Okay.
24     Q.  (By Ms. Westfall)  Mr. Anchia is on that list,
25 is he not?

## 111

1      A.  Yeah.  So he's waived.
2      Q.  I want to know whether you are asserting
3  privilege over any part of your answer pursuant to your
4  counsel's advice?
5         MR. MORTARA:  Ms. Westfall, the problem I
6  have is Ms. McGeehan does not assert privilege.  I'm
7  giving her instructions to maintain legislative
8  privilege.  So she doesn't assert privilege, because
9  she's not the holder.
10        MS. WESTFALL:  I understand.
11        MR. MORTARA:  So I have a problem with
12 your question in that it implies that Ms. McGeehan gets
13 to decide, which she does not.
14        MS. WESTFALL:  I certainly -- I understand
15 your position on that.  You've made it clear for the
16 record.  What I want to know is -- what I'm trying to
17 elicit from her is whether there's any reason for us to
18 consider to moving to compel a response further if there
19 is any privileged material to which we are not entitled
20 to examine the witness during this deposition.
21        MR. MORTARA:  Yes.  And I have instructed
22 her not to answer your question, this particular
23 question, with respect to legislators that do not appear
24 on the list in front of her, the Lieutenant Governor or
25 the Governor.  And along as she follows my

## 112

1  instruction --
2         MS. WESTFALL:  Including the Lieutenant
3  Governor and Governor?
4         MR. MORTARA:  Yes.
5         MS. WESTFALL:  Is that what you just
6  said?
7         MR. MORTARA:  Yes.  As far as I know --
8         MS. WESTFALL:  I don't think the Governor
9  is a legislator.
10        MR. MORTARA:  -- he's maintained a
11 privilege with the Governor that would be deliberative
12 process if he communicates with the Secretary of State.
13 That's the Governor's deliberative process .
14        MS. WESTFALL:  So this a new privilege
15 that's being asserted in this litigation -- I mean in
16 this deposition?
17        MR. MORTARA:  Isn't this the one that we
18 just filed briefs on like last night?
19        MS. WESTFALL:  We just -- I examined the
20 witness this morning about privileges that she's
21 asserting.  Are you now asserting deliberative process?
22        MR. MORTARA:  Yeah, this is the Governor's
23 privilege, deliberative process, not hers.  I'm not
24 asserting her deliberative process privilege.  The
25 Governor has a deliberative process privilege.  If,

## 113

1   hypothetically, the Governor were to ask somebody at the
2   Secretary of State's Office, "Tell me how to do A, B and
3   C," that is within the Governor's deliberative process
4   privilege, as I understand it's being litigated right
5   now.  If Mr. Freeman wants to correct me, he can, but I
6   believe that is within that -- and again, I agree with
7   what Mr. Freeman just whispered:  The actual facts, the
8   actual information is not privileged.  As the example I
9   used when we were off the record earlier, lawyer sends
10  the client e-mail, "We have a problem."  Attached to the
11  e-mail is a document.  The document is not privileged;
12  it is factual.  It must be produced.  But the underlying
13  communication is privileged.  That's the position the
14  State's taking and will continue to take it unless, off
15  the record, Mr. Freeman wants to tell me that's not the
16  current subject of motions that are subjudiciary on the
17  Governor's deliberative process privilege.
18        MS. WESTFALL:  No, you can direct the
19  questions to me.  I'm aware of the briefing on this
20  case.
21        MR. MORTARA:  Okay.
22        MS. WESTFALL:  I'm the lead counsel so --
23  we're briefing it.
24        Q.  (By Ms. Westfall)  Are you aware, Ms. McGeehan,
25  of any attempt to determine the impact of HB 218 on

## 114

1   minority voters?
2         A.  I'm not aware.
3         Q.  Are you aware of any communication about the
4   impact of HB 218 on minority voters?
5         A.  I'm sorry?
6         Q.  Are you aware of any communications?  My first
7   question was about attempts, and you said no.  My second
8   question is about communications, about the impact of HB
9   218 on minority voters.
10        A.  There was probably testimony at the hearing on
11  that point.
12        Q.  Outside of that testimony, are you aware of any
13  other communications concerning the impact of HB 218 or
14  minority voters?
15        A.  Not that I recall.
16        Q.  In advance of the 2007 legislative session, did
17  the Division or the Secretary of State develop
18  legislative priorities for the session?
19        A.  I'm certain we developed a list of cleanup
20  legislation like, you know, we usually do.
21        Q.  Were you involved in the development of that
22  agenda?
23        A.  Yes.
24        Q.  Did the priorities include photo ID?
25        A.  No.

## 115

1         Q.  And why did it not?
2         A.  We consider that a policy issue that we would
3   not be making recommendations on.
4         Q.  And I believe you testified earlier that HB
5   1706 allowed a form of photo ID by county election
6   officials and HB 218 does not; is that correct?
7         A.  I'm sure that's right.  I just -- I don't see
8   that in here.  So I agree that it does not appear to
9   authorize that.
10        Q.  Do you know why it wasn't included as a form of
11  ID in HB 218?
12        A.  No.
13        Q.  Are you aware of any communications regarding
14  the exclusion of this form of photo ID from HB 218?
15        A.  No.
16        Q.  Are you aware of any communications between the
17  legislature and county election officials regarding HB
18  218?
19        A.  No.
20        Q.  Did the legislature hold hearings on HB 218?
21        A.  I'm pretty sure they did.
22        Q.  And were you invited to testify?
23        A.  I'm sure I was.
24        Q.  Did you accept this invitation?
25        A.  I'm you sure I did, yeah.

## 116

1         Q.  In what capacity did you testify?
2         A.  As a resource witness.
3         MR. MORTARA:  Ms. Westfall, we've hit
4   another over-an-hour period.  I don't know if you want
5   to do lunch, or Ms. McGeehan wants to do lunch, but I
6   know Chris probably needs a break.
7         MS. WESTFALL:  Certainly.  We will do
8   lunch.  Well, you know what, why don't we get through a
9   little bit more.  Can you wait ten more minutes more?
10  Get through the hearing so we can finish up this line.
11        Could you mark this as 284?
12        (Exhibit 284 marked for identification.)
13        Q.  (By Ms. Westfall)  You've been handed what's
14  been marked 284.  Do you recognize this document?
15        A.  Yes.
16        Q.  What is it?
17        A.  It is a transcript of the Senate State Affairs
18  Committee hearing on April 30th.
19        Q.  Directing your attention -- and this, for the
20  record, is an excerpt of the hearing transcript focusing
21  on your remarks at that hearing.  I'm sure your counsel
22  won't disagree with that representation.
23        If I could turn your attention to Page 99
24  of this transcript, and it is Bates stamped
25  TX_00213364.  Do you see that?

## 117

1     A.   Yes.
2     Q.   That's where the exchange begins between you
3  and Senator Van de Putte.  Do you see that?
4     A.   Yes.
5     Q.   And I believe you testified in response to
6  questions from Senator Van de Putte that in the past
7  four years, the Division had not received any complaints
8  about voter impersonation; is that correct?
9     A.   Let me take a second to read it here.
10    Q.   Certainly.  Certainly.
11    A.   (Witness reading.)  Okay.  Yes.  That's -- I
12  reviewed my testimony with Senator Van de Putte.
13    Q.   And you did -- and you testified that the
14  Division had not received any complaints about voter
15  impersonation in the previous four years --
16    A.   Yes.
17    Q.   -- prior to your testimony; is that right?
18    A.   That's correct.
19    Q.   Apart from this testimony at the hearing, did
20  you or the Division provide anyone with additional
21  information about complaints of voter impersonation?
22    A.   I don't think so.
23    Q.   And do you see that on the next page, Page 101
24  of this exhibit, that you had an exchange with Senator
25  Lucio?

## 118

1     A.   Yes.
2     Q.   Do you see that in response to a question from
3  Senator Lucio, that there's no law that holds election
4  judges accountable for failing -- that there is no law
5  holding election judges accountable for failing to
6  report voter impersonation?  Do you see that?
7     A.   Let me just take a second to read that.
8     Q.   On Page 101.
9     A.   (Witness reading.)  Yes, I see that.
10    Q.   Do you have any facts or information for
11  believing that the fact that there is no such law
12  accounts for the absence of complaints of voter
13  impersonation that the Election Division has received?
14    A.   Complaints from election judges, you mean?
15    Q.   The fact that there's no law holding election
16  judges accountable for not reporting voter
17  impersonation?
18    A.   And whether that -- the lack of that -- not
19  having that law, whether that impacts on?
20    Q.   The number of reported allegations of in-person
21  voter impersonation that the Division has received?
22    A.   I -- I don't think that would have much of an
23  impact.
24    Q.   Turning your attention to Page 104 of Exhibit
25  284, do you see that you had an exchange with Senator

## 119

1  Ellis?
2     A.   Yes.  I'm going to just read that here real
3  quickly.
4     Q.   Certainly.  Let me know when you've had a
5  chance to take a look at it.
6     A.   (Witness reading.)  Okay.  I've read that.
7     Q.   Do you see that Senator Ellis asked you whether
8  the Division had any discussions about policy
9  initiatives to find voter fraud?  Right?
10    A.   Yes.
11    Q.   And in response you indicated that your office
12  for the past couple of years had been focusing on
13  implementation of HAVA; is that correct?
14    A.   That's correct.
15    Q.   Is it fair to say that voter impersonation was
16  not the focus of the Division in 2007?
17    A.   Yes.
18    Q.   And the Division had not made research on voter
19  impersonation a priority that year?
20    A.   Right.
21    Q.   And the Division, as a general matter, has
22  limited resources, correct?
23    A.   Yes.
24    Q.   And why had the Division decided not to devote
25  resources towards the issue of voter impersonation in

## 120

1  2007?
2     A.   We hadn't been directed to.  It was no law
3  requiring us to study it, or we were trying to comply
4  with the laws on the books.
5     Q.   Was it also because it wasn't much of a
6  problem?
7     A.   I couldn't say that.
8     Q.   Do you have any facts to indicate anything to
9  the contrary?
10        MR. MORTARA:  Objection, form.
11    Q.   (By Ms. Westfall)  You may answer.
12    A.   I don't have any facts on that.
13        MS. WESTFALL:  Thank you.  Okay.  Let's
14  take a break now.  I think it's a good breaking point.
15        (Lunch recess from 12:36 to 1:36 p.m.)
16    Q.   (By Mr. Westfall)  Before the break, we were
17  discussing HB 218.  Were you aware of whether any of the
18  supporters of HB 218 argued that the bill would prevent
19  noncitizens from voting?
20    A.   I don't recall that.
21    Q.   Do you recall hearing that Representative
22  Brown, Betty Brown stated on the House Floor that the
23  bill was designed to keep illegal aliens, noncitizens,
24  and other people otherwise not qualified from voting?
25    A.   I don't recall that.

## 121

1    Q.   Are you aware that Lieutenant Governor Dewhurst
2    argued in 2007 that photo ID laws would prevent
3    noncitizens from voting?
4    A.   No.
5    Q.   And based on your knowledge of the election
6    code, would to HB 218, if enacted, prevent noncitizens
7    from voting?
8    A.   You know, only if they couldn't present the
9    forms of ID that are required.
10   Q.   In other words, it wouldn't -- to your
11   knowledge, it would not prevent noncitizens from voting?
12   A.   Well, unless a noncitizen was unable to obtain
13   one of these forms of ID.
14   Q.   But that would not be particularized to having
15   the status of being a noncitizen; is that correct?  That
16   would be related to whether they had ID, allowable ID in
17   HB 218?
18   A.   Right.  That was my point.  If, as being a
19   noncitizen, they were unable to obtain one of kinds
20   forms of ID.
21   Q.   Thank you.
22        Are you aware of whether a noncitizen can
23   obtain a Texas driver's license?
24   A.   My understanding is that a person has to have
25   legal residence in the state, so a noncitizen who is

## 122

1    here legally could get a driver's license is my
2    understanding.
3    Q.   And is it your understanding that a noncitizen
4    could obtain a concealed handgun license?
5    A.   I don't know.
6    Q.   Could a noncitizen obtain a military ID?
7    A.   I don't think so, but I don't know the answer
8    to that.
9    Q.   If a noncitizen became registered to vote, a
10   photo ID requirement for voting would not prevent that
11   person from voting; is that right?
12   A.   Well, again, I think it would relate to what ID
13   was required, and if a noncitizen was unable to obtain
14   one of the forms of ID, then that, I guess, would
15   prevent them from voting.
16   Q.   And assuming they were able to obtain one of
17   those forms of ID, a photo ID would not prevent that
18   individual from voting; is that right?
19   A.   That's right, if they had one of the permitted
20   forms of ID.
21   Q.   There has been deposition testimony in this
22   case that enacting photo ID law requiring voters to
23   present photo ID at the polls would deter ineligible
24   voters from attempting to register to vote.  Do you have
25   any facts or information that would support that

## 123

1    statement?
2    A.   No.
3    Q.   Would you agree that if the prevention of
4    noncitizen voting was a purpose of HB 218, that, in
5    fact, HB 218 would not be serving that purpose?
6         MR. MORTARA:  Objection, calls for
7    speculation.
8    Q.   (By Ms. Westfall) You may answer.
9    A.   The question is, if the purpose of 218 was to
10   prevent noncitizens from voting?
11   Q.   Would HB 218, in fact, serve that purpose?
12   A.   To the extent that a noncitizen was unable to
13   obtain one of the forms of ID, then it would help
14   accomplish that purpose.
15   Q.   And not to any other extent; is that right?
16   A.   To my understanding, uh-huh.
17   Q.   Would you say that there is not a nexus between
18   photo ID requirements imposed at the polls on election
19   day and preventing noncitizens from voting on the basis
20   of their citizenship status?
21   A.   I don't recall there being -- at least the
22   hearings that I was present at, I don't recall there
23   being a lot of testimony on that.  Whether, you know,
24   the overall concept of having tighter requirements at
25   the polls, whether that would discourage voter fraud

## 124

1    overall, you know, that's possible.  I don't know.
2    Q.   Do you have any facts to support that
3    supposition?
4    A.   Which supposition?
5    Q.   The one that you just testified to, that
6    stricter --
7    A.   Having more stricter?  No.
8    Q.   Are you familiar with the Crawford decision
9    issued by the U.S. Supreme Court in 2008?
10   A.   Yes.
11   Q.   Did you review that decision when it was
12   issued?
13   A.   I did.  It was a while ago, but I did read it.
14   Q.   Was it in 2008 when it was issued?
15   A.   Yes.
16   Q.   Do you believe it impacted the ability of
17   states to craft photo ID laws?
18   A.   Impacted how?  As far as constricted or --
19   Q.   Do you think it had any ability or any effect
20   on the ability of states to craft and enact photo ID
21   laws?
22   A.   I would say yes.
23   Q.   How?
24   A.   I think that it -- by ruling that there were no
25   federal constitutional issues, that sort of freed up

## 125

1  that as an argument at the state level.
2      Q.  Do you believe it impacted the ability of
3  states covered by Section 5 of the Voting Rights Acts to
4  obtain preclearance of a photo ID law?
5      A.  I think it probably has some bearing, but the
6  state, you know, still has to obtain Section 5
7  preclearance.  It's not -- you still need to go through
8  the process, even though the Crawford case was decided.
9      Q.  What is your understanding of the bearing that
10 it has on Section 5?
11     A.  Well, I don't know that it has a direct impact
12 on the Section 5 process.
13     Q.  When you were at the Elections Division in
14 2008, when the opinion was issued, did your change your
15 procedures at all, with regard to Section 5 submissions,
16 as a result of the Crawford decision?
17     A.  No.
18     Q.  After Crawford, do you believe that states
19 covered by Section 5 of the Voting Rights Act need not
20 conduct any analysis of the impact of photo ID laws on
21 minority voters?
22     A.  No.
23     Q.  And why do you say that?
24     A.  I don't think the Crawford case spoke to
25 Section 5 issues.

## 126

1      Q.  Did you ever communicate that view to the State
2  Legislature?
3      A.  No.
4          MR. MORTARA:  Again, you may answer the
5  question with respect to public hearings.
6      A.  Publicly, yes, I have not.
7          MR. MORTARA:  And with respect to the
8  legislators on this list, but not with respect to
9  legislators not on this list.
10         MS. WESTFALL:  I was examining the witness
11 about facts and information she provided in the Election
12 Division.  Are you still objecting --
13         MR. MORTARA:  Yes.
14         MS. WESTFALL:  -- to that question?
15         MR. MORTARA:  Yes.
16     Q.  (By Ms. Westfall) Was there a photo ID bill
17 introduced in the Senate in 2009?
18     A.  Yes.
19     Q.  Do you remember the bill number?
20     A.  No.
21     Q.  I'm going to hand you what's been previously
22 marked as U.S. Exhibit 29.
23         You have been handed what's been
24 previously marked U.S. Exhibit 29.  Do you recognize
25 this exhibit?

## 127

1      A.  Yes.
2      Q.  What is it?
3      A.  Senate Bill 362 from 2009.
4      Q.  Do you know who it was introduced by?
5      A.  Senator Fraser, I believe.
6      Q.  Could you describe the -- could you describe
7  the forms of ID that are allowable under Senate Bill
8  362?  And I would direct your attention to Page 5 of
9  Exhibit 29.
10     A.  Okay.  Okay.  It permitted one form of
11 identification, as listed in 63.0101A, and 0101A was
12 photo identification including driver's license,
13 military identification card, U.S. citizenship
14 certificate, passport, license to carry a concealed
15 handgun, and also a valid identification card that
16 contains a person's photograph and is issued by an
17 agency of the federal government or of the state
18 government.
19         And then also permitted, as proof of
20 identity, two forms of nonphoto ID, I think, and that
21 would include the voter registration certificate,
22 official mail from a governmental entity with the
23 person's address, a certified copy of birth
24 certificate, U.S. citizenship papers, a certified copy
25 of a person's marriage or divorce decree, court records

## 128

1  of a person's adoption, name change or sex change,
2  identification card issued to a person by the state or
3  the United States for obtaining public benefits,
4  including veterans' benefits, Medicaid or Medicare, a
5  temporary driving permit, pilot's license, library card,
6  or a hunting or fishing license.
7      Q.  Thank you.  And to your knowledge, does this
8  include student IDs in the list of acceptable photo IDs?
9  Drawing your attention to cards issued by agencies or
10 institutions or political subdivisions of the state.
11     A.  Is that under the second list?
12     Q.  It's under the first.
13     A.  The first list?
14     Q.  Uh-huh.
15     A.  Yeah, I think that would probably include it,
16 from a public university.
17     Q.  And in comparing Exhibit 28, HB 218, with
18 Senate Bill 362, does it appear that for the most part,
19 the two bills are relatively similar in terms of
20 allowable ID?
21     A.  Yes.
22     Q.  Did the Secretary of State or Elections
23 Division take a public position on Senate Bill 362?
24     A.  No.
25     Q.  Were you or the Division involved in the

---

129

1 development or drafting of Senate Bill 362?
2      A.   Not as it was filed.
3      Q.   After it was filed, were you involved?
4      A.   Yes.
5      Q.   So why did you say not as it was filed?  What
6  did you mean?
7      A.   Nobody -- this was not -- before it was filed,
8  nobody asked us to review it or comment on it on
9  anything.
10      Q.   Thank you for your testimony.
11           Was there a time after it was filed that
12  the Division was asked to provide any assistance or
13  guidance with Senate Bill 362?
14      A.   This may be covered by the legislative
15  privilege.
16           MR. MORTARA:  You can answer with respect
17  to legislators on the list and not with respect to
18  others.  That's a standing instruction.  If you can
19  state that, when you're answering the question, that
20  will make things move faster and allow Ms. Westfall to
21  get through her questions, but otherwise, I can --
22      A.   I guess the communication that I had -- well,
23  there were some communications that were at public
24  committee meetings, and any other communications that I
25  might have had, I probably can't testify to.

---

130

1      Q.   So you're asserting privilege over those other
2  communications; is that correct?
3      A.   Yes.
4      Q.   Could you tell me what information you provided
5  in response to those inquiries, what factual information
6  you provided?
7           MR. MORTARA:  Ms. McGeehan, what
8  Ms. Westfall is getting at is, without disclosing
9  anything else about the communication, you can testify
10  about what information the Secretary of State had about
11  Senate Bill 362.  You cannot testify as to whom you
12  communicated that information, and if that person's name
13  is not on this list.  Do you understand?
14           THE WITNESS:  Uh-huh, right.
15           MR. MORTARA:  So you can testify as to
16  what information the Secretary of State or you or the
17  Elections Division had on Senate Bill 362.
18      A.   During the session, our office provided
19  information concerning, again, sort of, technical
20  information on how to make certain processes work within
21  the election code and how if other sections needed to be
22  amended in order to make this law work.
23      Q.   (By Ms. Westfall) Was that kind of conforming
24  technical amendments?
25      A.   Yes.

---

131

1      Q.   Is that how you would describe them?  And could
2  you tell me what particular sections of the code you
3  provided information on, from a subject matter-wise, not
4  the particulars.
5      A.   I think it was generally provisions in
6  Chapter 64 concerning what a voter presents and
7  technical changes on, you know, a voter who doesn't have
8  a certificate and what they have to present and issues
9  like that.  I'm thinking it was mostly Chapter 64-type
10  issues.
11      Q.   That related to the forms of ID or provisional
12  ballots or --
13      A.   To how ID relates to qualifying a voter.  So
14  Chapter 64 talks about accepting a voter for voting and
15  we provided some information on how to, you know,
16  integrate this new requirement into those existing
17  requirements.
18      Q.   Is there any other information that you
19  supplied concerning Senate Bill 362?
20           MR. MORTARA:  And again, with my prior
21  instruction.
22           THE WITNESS:  Uh-huh.
23      A.   There were again, you know, public hearings.
24  Representative Anchia may have asked for additional --
25  for data in 2009.  I think he did.  And I think that's

---

132

1  about it.
2      Q.   (By Ms. Westfall)  When did you provide this
3  information to the Senate?  At what point in the
4  legislative process?
5      A.   Which -- which information?
6      Q.   The technical information that you just
7  testified about.
8      A.   That was later in the session, like maybe
9  April.
10      Q.   Was that after --
11      A.   After it had passed the Senate and it was in
12  the House.
13      Q.   Were there any exchanges of documents between
14  you and the -- between the Division and the Senate
15  pertaining to those technical corrections or technical
16  advice or information?
17      A.   No, I don't think so.
18      Q.   How did you communicate that information you
19  just testified about?
20      A.   We met.
21      Q.   How many people were at that meeting?
22      A.   I think four.
23      Q.   Was Legislative Council at that meeting, the
24  Texas Legislative Council?
25      A.   No, I don't -- I don't think so.  I don't

## 137

1  outside of the hearing process, about Senate Bill 362?
2      A.  I don't think so.
3      Q.  And besides the meeting that you had with
4  Ms. McCoy, Senator Fraser, Ms. Winn, before March 10th,
5  2009, and this subsequent meeting that you had, was it
6  with the same people?
7      A.  No.
8      Q.  Who was it with?  I'm talking about the meeting
9  in April.
10     A.  That was with -- on the -- that was after it
11  passed the Senate, and it was with Chairman Smith's
12  staff that was in charge of this bill.  His first name
13  is -- Travis Richmond is his name.  It's Travis
14  Richmond, me, John Sepehri.  Steven Schar may have been
15  there.  I don't remember that well.  And Elizabeth Winn
16  might have been there.  I don't remember if she was
17  there or not.  And that was the conversation where we
18  may have brought in Leg Council.
19     Q.  Were there any other meetings that you had with
20  any other legislators or their staff about Senate Bill
21  362?
22     A.  I don't think so.
23     Q.  And getting back to my previous question:  Did
24  any of --
25     A.  Well, let me think.  No, there weren't.

## 138

1      Q.  Did any of the bill's opponents contact you or
2  anyone in the Division about Senate Bill 362?
3      A.  I don't remember it, if they did.
4      Q.  Did the Division receive any request to conduct
5  any analysis of Senate Bill 362, other than what you
6  have already testified to?
7          MR. MORTARA:  You may answer that question
8  with respect to the legislators on this list, not with
9  respect to other legislators.
10     A.  Representative Anchia, I believe, asked similar
11  questions in 2009 that he asked in 2007, and so we
12  provided that data to him and to the whole House
13  Elections Committee.
14     Q.  (By Ms. Westfall) What did Representative
15  Anchia ask for?
16     A.  He asked for, you know, voter registration
17  numbers.  He asked for the number of voters that
18  registered with driver's license and registered to social
19  security number.  He asked for information about the
20  number of referrals we had made to the Attorney
21  General's Office for election code for criminal
22  violations.  He may have asked -- well, there may have
23  been one or two other questions on there, but that was
24  the big part of it, I think.
25     Q.  Did he make that request in writing?

## 139

1      A.  No.
2      Q.  Did you respond in writing?
3      A.  Yes, I think we did.
4      Q.  And in response to my question about whether
5  any of the bill's opponents have contacted the Division
6  about Senate Bill 362, you have just testified, did you
7  not, that Representative Anchia made a request, and your
8  counsel advised you not to testify to the extent any of
9  the information was privileged, were you asserting
10  privilege in that response in part?
11         MR. MORTARA:  Ms. Westfall, I think my
12  instruction speaks for itself.
13         Again, Ms. McGeehan, it's not your
14  privilege to assert.  My instruction to you is:  Don't
15  answer the question with respect to legislators that do
16  not appear on this list.
17     A.  I think I answered the question.
18     Q.  (By Ms. Westfall) Okay.  Did the Division --
19  other than what you have just testified to in terms of
20  Representative Anchia, did the Division receive any
21  request to determine who among registers voters did not
22  possess the forms of allowable ID under Senate Bill 362?
23         MR. MORTARA:  The same instruction:  Only
24  with respect to these legislators and not others.
25     Q.  (By Ms. Westfall) Can you answer?

## 140

1      A.  Well, none of these legislators, other than
2  Representative Anchia, asked for that information.
3      Q.  Are you aware of any attempt to determine the
4  impact of Senate Bill 362 on minority voters?
5          MR. MORTARA:  You may answer that
6  question, if you can, with respect to communications you
7  had with these legislators, public hearings, but not
8  with respect to nonpublic communications you had with
9  legislators that are not on this list, the Governor's
10  Office or the Lieutenant Governor's Office.
11         MS. WESTFALL:  I would request that you
12  withdraw that objection.  My question was:  Are you
13  aware of any attempt to determine the impact of Senate
14  Bill 362 on minority voters.  I did not ask about
15  communications.
16         MR. MORTARA:  You can answer the question
17  yes or no.  I think the witness has already testified
18  that she --
19     A.  I mean, at the hearing, there were witnesses on
20  both sides on that point.  So, I mean, that's what I'm
21  aware of.  When it was heard on the Senate Floor, I
22  believe there were witnesses that testified to that.
23     Q.  (By Ms. Westfall) Are you aware of -- when you
24  say there were witnesses on both sides, you're saying
25  there were bill supporters who attempted to determine

Ann McGeehan                                          May 31, 2012

## 141

1   the impact of Senate Bill 362 on minority voters, or is
2   it limited to bill opponents?
3       A.  I don't know if all the witnesses stated that
4   they were opposed to it, but in particular, I'm trying
5   to remember the name of the -- generally, I think they
6   were affiliated with the bill's opponents.
7       Q.  Thank you.  In advance of the 2009 legislative
8   session, did the Division or the Secretary of State
9   develop legislative priorities for the session.
10      A.  For 2009?
11      Q.  Yes.
12      Q.  Yes.
13      Q.  Were you involved in the development of that
14  agenda?
15      A.  Yes.
16      Q.  Did the priorities include photo ID?
17      A.  No.
18      Q.  And why didn't they?
19      A.  Because we only prepare recommendations on
20  technical issues, not policy issues.
21      Q.  Do you know which committee Senate Bill 362 was
22  referred to when it was filed in the Senate?
23      A.  I think it was heard by Committee of the Whole.
24      Q.  And what is your understanding of why that
25  referral occurred?

## 142

1       A.  To be honest, I forget.  I know there was a
2   reason.  I don't really remember exactly what it was.
3       Q.  Would Senate Bill 362 ordinarily have been
4   handled by State Affairs?
5       A.  Yes, probably.
6       Q.  And who is in charge in the Senate of referring
7   bills to particular committees?
8       A.  Well, I believe the Lieutenant Governor.
9       Q.  Do you know whether Senate Bill 362 was
10  referred to the Committee of the Whole in order to
11  ensure that it would receive expedited consideration by
12  the Senate?
13              MR. MORTARA:  Objection, foundation.
14      Q.  (By Ms. Westfall) You may answer.
15      A.  I really don't remember what the precise reason
16  was in '09.
17      Q.  Did it strike you as unusual that it had been
18  referred to the Committee of the Whole at the time?
19      A.  It was unusual.
20      Q.  Do you know whether the Lieutenant Governor has
21  any additional powers in the Committee of the Whole that
22  he doesn't have when the bill is in another -- being
23  heard before another committee?
24      A.  I'm really not an expert on the legislative
25  process, so I don't want -- I would be guessing.

## 143

1       Q.  Do you know whether the Lieutenant Governor
2   referred Senate Bill 36 to the Committee of the Whole so
3   that he could play a more active role in managing the
4   bill in committee?
5       A.  I don't know.
6               MS. WESTFALL:  Bear with me for one
7   minute.  Can we take a short break?
8               MR. MORTARA:  Sure.
9               MS. WESTFALL:  Thank you.  Let's go off
10  the record for one sec.
11             (Recess in place from 2:08 to 2:09 p.m.)
12      Q.  (By Ms. Westfall) Do you know whether the
13  Committee of the Whole held a hearing on Senate Bill
14  362?
15      A.  When?
16      Q.  Whether it did hold a hearing?
17      A.  Yes, they did.
18      Q.  Did you give testimony at that hearing?
19      A.  No.
20      Q.  Do you know whether the hearing occurred around
21  March 10th, 2009?
22      A.  That sounds right.
23      Q.  Are you aware -- did you read the transcript or
24  hear any reports about that hearing, from any of your
25  colleagues or otherwise?

## 144

1       A.  I watched portions of it.
2       Q.  Are you aware that during the hearing, the
3   bill's sponsor, Senator Fraser, was asked whether an
4   analysis of the racial -- analysis of voters without a
5   driver's license had been conducted?
6       A.  I don't remember that.
7       Q.  Following the hearing in March 2009, did the
8   Division submit any analysis of the racial composition
9   of voters who don't have a Texas driver's license to any
10  members of the Legislature or the Lieutenant Governor's
11  Office?
12      A.  No.
13      Q.  Did it surprise you that -- strike that.
14              At any time after the hearing, did the
15  Division conduct or attempt to conduct an analysis of
16  the racial composition of voters who do not have a Texas
17  driver's license?
18      A.  No.
19      Q.  Was Senate Bill 362 enacted by the Legislature?
20      A.  No.
21      Q.  What happened to it?
22      A.  It passed the Senate.  It did not get out of
23  the House, as I recall.
24      Q.  In 2010, did the House Elections Committee hold
25  a hearing about voter ID in the interim session?

Ann McGeehan                                                    May 31, 2012

## 145

1   A.  I know they held -- in 2010?  They probably
2   did.  I don't remember exactly, to be honest with you.
3       Q.  Did Representative Smith chair that hearing?
4       A.  I believe so.  Yeah, I'm starting to remember
5   it a little bit.
6       Q.  Did you testify at that panel?
7       A.  I probably did, yeah.
8       Q.  Did you testify that the Division had referred
9   24 election code cases for possible prosecution in the
10  past two years?  Does that sound familiar?
11      A.  That sounds familiar.
12      Q.  And that was as of 2010; is that correct?
13      A.  If they had asked for that information, I would
14  have pulled what we had, and that sounds about right.
15      Q.  And of those 24, did you testify that two had
16  involved voter impersonation allegations?
17      A.  You know, I don't have a super clear memory of
18  it, but that sounds about right.
19          MS. WESTFALL:  Could you mark this?
20          (Exhibit 286 marked for identification.)
21      Q.  (By Ms. Westfall) You've been handed what's
22  been marked U.S. 286.  Do you recognize this document?
23      A.  Yes.  It appears to be an article from the
24  Houston Chronicle.
25      Q.  And if you see at the bottom of Exhibit 286, it

## 146

1   refers to your testimony before that panel.  Do you see
2   that?
3       A.  Yes.
4       Q.  Could you take a look at that and let me know
5   when you've read the sentences?
6       A.  Yes, I have finished reading it.
7       Q.  And does it indicate that you had referred 24
8   election code cases for possible prosecution in the past
9   two years as of the date of this testimony; is that
10  right?
11      A.  Yes.
12      Q.  And that two had involved voter impersonation
13  allegations; is that correct?
14      A.  Right.
15      Q.  And that more than 20 million votes had been
16  cast in Texas general elections since 2002; is that
17  right?
18      A.  That's what it says.
19      Q.  Is this article accurate about what you
20  testified to before the panel?
21      A.  It probably is.  I just -- I don't remember,
22  you know, everything I testified to on that.  But I have
23  no reason to think it's not -- not an accurate summary.
24      Q.  In 2010, did you have any other information
25  about voter impersonation allegations that you conveyed

## 147

1   to law makers outside of this hearing?
2       A.  No.
3       Q.  Were these two allegations the sum total of
4   voter impersonation you were aware of in 2010?
5       A.  I believe so.
6       Q.  Are you aware of whether either of those two
7   voters you testified about in 2010 were ultimately
8   convicted of voter impersonation?
9       A.  I don't know.
10      Q.  Who would know?
11      A.  The Attorney General's Office.
12      Q.  Before the 2011 session, were there any other
13  photo ID bills, in addition to the ones to which you
14  have testified about today, that you're familiar with?
15      A.  No, I don't think so.
16      Q.  Did you have any involvement in any other
17  drafting, development, or analysis of any other photo ID
18  bills that were introduced in either the House or Senate
19  before 2011 that you haven't already testified about?
20      A.  I don't think so.
21      Q.  Was a voter ID bill introduced in the Senate in
22  2011?
23      A.  Yes.
24      Q.  Was it Senate Bill 14?
25      A.  Yes.

## 148

1       Q.  Did Senator Fraser introduce it?
2       A.  Yes.
3       Q.  He testified in deposition in this case that he
4   started to work on Senate Bill 14 on May 31st, 2009.
5   Was there a time that you learned about Senate Bill 14
6   being developed?
7       A.  No.  I mean, not -- I learned of it when it was
8   filed.
9       Q.  So you did not see a draft of Senate Bill 14
10  before it was filed?
11      A.  No.
12      Q.  Are you aware of whether the Division provided
13  any comments on Senate Bill 14 on drafts before it was
14  filed?
15          MR. MORTARA:  Ms. McGeehan, you may answer
16  that question with respect to public comments, with
17  respect to communications with legislators on this list,
18  but not with respect to Senator Fraser or any legislator
19  that is not on this list, the Governor Lieutenant or
20  Governor.
21          THE WITNESS:  Whether there were or were
22  not?
23          MR. MORTARA:  You can answer that question
24  whether or not with respect to these people.
25          THE WITNESS:  These folks, yeah.

## 149

1    A.   Then I guess I can only say that there were no
2    conversations with these folks.
3    Q.   (By Ms. Westfall)  Thank you.
4         As to legislators not on that list, how
5    many conversations about Senate Bill 14, before it was
6    filed, are you aware of?
7         MR. MORTARA:  You can answer that
8    question.
9    A.   Before Senate Bill 14 was filed?  I'm not aware
10   of any.
11   Q.   (By Ms. Westfall)  Are you aware of any written
12   communications about Senate Bill 14 between the Division
13   and anyone in the Legislature before it was filed?
14   A.   No.
15   Q.   Did the Division receive any requests for any
16   information related to photo ID before Senate Bill 14
17   was filed?
18   A.   I don't think so.
19   Q.   Did the Division independently conduct any
20   research related to photo ID before Senate Bill 14 was
21   filed?
22   A.   No.
23   Q.   You have been handed what's been previously
24   marked as United States 81.  Do you recognize this
25   document?

## 150

1    A.   Yes.
2    Q.   What is it?
3    A.   It's Senate Bill 14.
4    Q.   Are you familiar with the provisions of Senate
5    Bill 14 as -- and is this -- strike that.
6         Is this the version that was filed, do you
7    know, as opposed to engrossed?
8    A.   Right.  It looks like the one that was filed.
9    Q.   Could you review the forms of identification
10   provided in the bill, Senate Bill 14 as filed, and let
11   me know when you've had chances to do so?  I will direct
12   your attention to Page 8.
13        MR. MORTARA:  Ms. Westfall, I wrote the
14   number down wrong.  What is it?
15        MS. WESTFALL:  It's 81, previously marked.
16        MR. MORTARA:  Thank you.
17   A.   Okay.  It requires photo identification
18   including -- which includes a driver's license or a
19   personal ID card issued by DPS, that has not expired; a
20   U.S. military identification card that contains the
21   person's photograph and has not expired; a United States
22   citizenship certificate that contains the person's
23   photograph, or a United States passport that has not
24   expired.
25   Q.   (By Ms. Westfall)  And could you compare how

## 151

1    this compares to Senate Bill 14 as filed with the forms
2    of allowable ID under Senate Bill 32?
3    A.   Senate Bill 14 requires photo ID, whereas the
4    prior versions permitted photo ID or two forms of
5    nonphoto ID.
6    Q.   And would you describe that as a significant
7    change in the legislation between 362 and 14?
8    A.   Yes.
9    Q.   Do you know why Senate Bill 14 didn't allow for
10   use of nonphoto IDs?
11   A.   No.
12   Q.   Do you know why Senate Bill 14 only allows for
13   the use of unexpired IDs?
14   A.   No.
15   Q.   Do you know why the forms of ID have been
16   significantly reduced between Senate Bill 362 and Senate
17   Bill 14 as filed?
18   A.   No.
19   Q.   Are you aware of any forms of ID that the
20   Legislature or the bill's sponsor considered including
21   in Senate Bill 14 that were not included?
22        MR. MORTARA:  Ms. McGeehan, you can answer
23   that question yes or no.  It's fine.
24        I'm sorry for interrupting, Ms. Westfall.
25   A.   No.

## 152

1    Q.   (By Ms. Westfall)  Are you aware of whether the
2    Legislature considered allowing expired forms of ID?
3    A.   I'm not aware.
4    Q.   Are you aware of whether the Legislature
5    considered allowing forms of ID that had been expired
6    two years prior to the election?
7    A.   I'm not aware.
8    Q.   Are you aware of any communications with anyone
9    in the Legislature about the use of expired forms of
10   photo ID?
11   A.   No.
12   Q.   If a photo ID is expired but was validly
13   issued, why doesn't that prove or doesn't that prove
14   that the person is the same person on the ID, in your
15   view?
16   A.   Could you restate that question?
17   Q.   Certainly.  That was -- it's after lunch.
18        If a photo ID is expired but was validly
19   issued, does that prove the person is the same person
20   who appears on the ID?
21   A.   Yes.
22   Q.   How often do you have to go to get your
23   pictures taken in Texas for your driver's license?
24   A.   It could be as little as every six years --
25   well, the driver's licenses expire in six years.  I

## 153

1  think if you have good record, it can be extended
2  another six years.
3      Q.   Is it possible also to renew your driver's
4  license by mail in Texas?
5      A.   You can do that once, I think, and then you
6  have to go in person the next time.
7      Q.   And so how long would that be?
8      A.   I think the maximum would be 12 years.
9      Q.   Under Senate Bill 14 as filed, how many forms
10 of military ID would be acceptable?
11     A.   Just a military identification card.
12     Q.   What does that consist of?
13     A.   It needs to be a current identification card
14 issued by the U.S. military to somebody who is in --
15 who's in the military.
16     Q.   Would that include active duty?  Inactive
17 duty?  Family members of military?
18     A.   I don't think it includes --
19     Q.   Retirees, et cetera?
20     A.   You know, it's been a little while since I
21 looked at this, and, you know, we were in process -- the
22 Secretary of State's Office was in the process of trying
23 to educate, you know, and develop training.  I don't
24 think it included family members, and I think it had to
25 include somebody who was a current member of the

## 154

1  military.
2      Q.   How do you have that?  What's the basis of your
3  understanding?
4      A.   Well, you know, there were a lot of questions
5  that came up regarding veterans, veteran ID cards, and
6  I'm not sure what decision ultimately the Secretary of
7  State's Office came down with on that, as far as whether
8  that would be included or not.
9      Q.   Does this bill provide the Secretary of State
10 with rule making authority?
11     A.   I know we had to develop the training
12 materials.  Yeah, it does have -- there is some rule
13 making authority in here.
14     Q.   And does that rule making authority enable you
15 to define the term military ID, or is it with regard to
16 other portions of the bill?
17     A.   I believe it was in regard the other portions
18 of the bill.
19     Q.   So how would military ID be defined?
20     A.   Well, I mean, that's -- that's the point.  When
21 we would -- when the Secretary of State would be
22 developing the training instructions, we would have to
23 figure out a way how to explain that.  But that occurred
24 after -- or, you know, that was occurring as I was
25 leaving.

## 155

1      Q.   I see.  In November 2011; is that correct?
2      A.   Right.
3      Q.   Did you have any communications with anyone in
4  the Legislature about which forms of military ID this
5  provision would encompass?
6      A.   I guess to the extent they're not on this
7  list, it would be privileged.
8           MR. MORTARA:  I think the way Ms. Westfall
9  has framed the question, you can answer.  It's privilege
10 log-type material, so you can answer, with respect to
11 all legislators, yes or no.
12          THE WITNESS:  Okay.
13     A.   Yes.
14     Q.   (By Ms. Westfall) When did that communication
15 occur?
16     A.   It occurred after I made a statement at a
17 seminar when asked about what constitutes U.S. military
18 identification cards.
19     Q.   Was that after the signing of the bill in May
20 of 2011?
21     A.   Yes.
22     Q.   You didn't have any communications about what
23 would constitute a military ID before the bill was
24 signed; is that right?
25     A.   Correct.

## 156

1      Q.   What is a citizenship certificate?
2      A.   My understanding, that's something a court
3  would issue to someone who had obtained citizenship
4  status.  But again, you know, when I left, it was sort
5  of still early days in developing how these items would
6  be described and explained.
7      Q.   Did you have any communications with anyone in
8  the Legislature about defining that term or
9  understanding what that meant before the bill was signed
10 in May of 2011?
11     A.   No.
12     Q.   Do you know how much it costs to obtain a
13 citizenship certificate?
14     A.   No.
15     Q.   Do you know how much it costs to get a
16 replacement certificate?
17     A.   No.
18     Q.   Do you know how long it takes to get a
19 replacement certificate?
20     A.   A replacement U.S. citizenship certificate?
21     Q.   Correct.  I'm using the shorthand.  Thank you.
22     A.   Yeah.  Yeah.  No, I don't.
23     Q.   Do you know how much it costs to obtain a U.S.
24 passport?
25     A.   I got one a couple of years ago, and I think it

Ann McGeehan                                                    May 31, 2012

## 157

1  was about 80 dollars.
2      Q.  Do you know what documents you have to provide
3  to get one?
4      A.  Generally.
5      Q.  Could you tell me what they are?
6      A.  Proof of your birth, I think.  I'm not an
7  expert on it.  I got one myself a couple of years ago.
8      Q.  Are you familiar with the Georgia and Indiana
9  photo ID laws?
10     A.  Not really.
11     Q.  Have you ever reviewed those statutes?
12     A.  No.
13     Q.  Did you see any, read any, or hear any summary
14  of those laws?
15     A.  I have probably read about those laws.
16     Q.  Are you aware of whether Senate Bill 14 and the
17  Georgia photo ID law are similar or dissimilar?
18     A.  I'm not aware.
19     Q.  Did you have any communications with anyone in
20  the Legislature or the Lieutenant Governor's Office
21  about the Georgia photo ID law?
22     A.  No.
23         MR. MORTARA:  You can answer that question
24  with respect to everyone.
25         THE WITNESS:  Okay.

## 158

1      Q.  (By Ms. Westfall) Are you aware of any
2  communications or discussions within the Legislature
3  about advancing a photo ID bill that adhered more
4  closely to the Georgia law than Senate Bill 14 as filed?
5         MR. MORTARA:  You can answer that with
6  respect to public communications with the legislators or
7  this list.
8      A.  I did not have a conversation with any of these
9  legislators on that issue.
10     Q.  (By Ms. Westfall) Are you aware that the
11  Georgia photo ID law allows for the use of expired IDs?
12     A.  No.
13     Q.  Are you aware that the Georgia photo ID law
14  allows the use of valid employee cards --
15     A.  No.
16     Q.  -- issued by a state or federal agency?
17     A.  No.
18     Q.  Are you aware that the Georgia photo ID law
19  allows for the use of photo ID issued by any entity of
20  the United States or Georgia or another state entity?
21     A.  No.
22     Q.  And are you familiar with the Indiana photo ID
23  law?
24     A.  No.
25     Q.  Are you aware of any discussion within the

## 159

1  legislator about advancing a photo ID law that was
2  modeled on Indiana's law?
3         MR. MORTARA:  You may answer the question
4  with respect to the legislators on the list and not
5  others.
6      A.  I'm not aware of any conversation with these
7  legislators.
8      Q.  (By Ms. Westfall) Do you know what the term
9  "legislative emergency" means within the Texas
10  Legislature?
11     A.  I don't know the definition.
12     Q.  Could you tell me generally what it means?
13     A.  I think it is -- again, I'm sort of guessing,
14  but I believe it's when the Governor declares that an
15  emergency exists that requires prompt legislative
16  action.
17     Q.  Was photo voter ID declared to be an
18  legislative emergency?
19     A.  I believe it was.
20     Q.  And when did you first learn about this?
21     A.  When it was reported in the media.
22     Q.  Did the Secretary of State or Election Division
23  request this designation?
24     A.  No.
25     Q.  And did the legislative emergency -- was it

## 160

1  declared sometime in January 2011?
2      A.  That sounds right.
3      Q.  Did your office receive any notice of this
4  declaration before it occurred?
5      A.  No.
6      Q.  Do you know why Governor Perry designated voter
7  ID as a legislative emergency?
8      A.  No.
9      Q.  Are you aware of any election law having been
10  designated as an emergency prior to photo ID in January
11  of 2011?
12     A.  No.
13     Q.  Do you know what the consequences are
14  legislatively when a bill is declared an emergency --
15     A.  No, I don't.
16     Q.  Must the Legislature consider the issue within
17  the first 60 days of session?
18     A.  I don't know.  That might be the case, but I
19  don't know the rules.
20     Q.  Do you know why Senate Bill 14 needed to be
21  considered in the first 60 days of the Legislature?
22     A.  No.  I mean, I can assume it's because it was
23  declared an emergency, but I'm not familiar with those
24  rules.
25     Q.  But do you know why there was urgency in

161

1   considering photo ID --
2       A.   No.
3       Q.   -- in 2011?  Can you identify, as you're
4   sitting here -- well, actually, can you identify
5   anything related to the administration of elections in
6   the state of Texas that would have necessitated the
7   Legislature to consider voter ID within the first 60
8   days of the session in 2011?
9       A.   I don't know of any.
10      Q.   And you were, at the time, the director of the
11  Elections Division, correct?
12      A.   Uh-huh, yes.
13      Q.   So you would probably be the best person to
14  know if there was any emergency related to the
15  administration of elections that would have prompted
16  that; is that right?
17      A.   Well, you know, that's the Governor's role.
18  That's not the Elections Division's role.  So I can't
19  speak for what was in the Governor's mind.
20      Q.   Certainly.  But you would know what would be
21  happening, in terms of voting and elections in the state
22  of Texas in 2011 in January; would you not?
23      A.   To the extent that I ever would be, but I'm
24  just saying that as far as the role of declaring or
25  determining what's an emergency for legislative

162

1   purposes, that's not a role the Elections Division has
2   any -- we don't have a role that.
3       Q.   Certainly.  And maybe I'm not being clear in my
4   question.  I'm asking whether you would be the best
5   person to know, as of January 2011, whether there was
6   any situation related to the administration of elections
7   that would have required emergency action on photo ID?
8       A.   No, I wouldn't say that.  I mean, I think the
9   state law puts that authority with the Governor to make
10  those determinations.
11      Q.   And you think the Governor is the person who
12  knows the most about election administration in the
13  state?
14      A.   State law says he's the person with the power
15  to make those determinations.
16      Q.   As to emergency designations?
17      A.   Correct.
18      Q.   Is that your testimony?
19      A.   Yes.
20      Q.   But I'm asking whether -- who is the person
21  with knowledge, the most knowledge of the administration
22  of elections in the state of Texas in the government?
23  Would that be the Elections Division?
24      A.   As far as what the rules are, that would be --
25  yes, that would be probably the Elections Division in

163

1   the Secretary of State's Office.  As to what's happening
2   outside, not necessarily.
3       Q.   Thank you.
4           Do you know how Governor Perry made this
5   decision to declare it an legislative emergency?
6       A.   No.
7       Q.   Was Senate Bill 14 referred to the Committee of
8   the Whole Senate?
9       A.   Yes.
10      Q.   Do you know why it was referred to the
11  Committee of the Whole?
12      A.   I think it was for similar reasons as '07, but
13  I don't know for sure.
14      Q.   Did you mean '09?
15      A.   I'm sorry.  '09.  Yes.  '09.
16      Q.   And do you know what those reasons were?
17      A.   No.
18      Q.   In other words, your testimony is that it
19  followed the same procedural course that it did in 2009?
20      A.   That's my testimony, that it followed the
21  same course as '09, and was heard by Committee of the
22  Whole.  I don't know why.
23      Q.   Did you testify before the Committee of the
24  Whole Senate on January 25th, 2011?
25      A.   Yes.  That sounds right.

164

1       Q.   Did you appear as a resource witness?
2       A.   Yes.
3           MS. WESTFALL:  Could you mark this as 287.
4           (Exhibit 287 marked for identification.)
5       Q.   (By Ms. Westfall) You have been handed what's
6   been marked as U.S. Exhibit 287.  Do you recognize this?
7       A.   Yes.
8       Q.   What is it?
9       A.   It appears to be a transcript of at least some
10  of my testimony during the Senate hearing for Senate
11  Bill 14.
12      Q.   And I will represent to you that this is an
13  excerpt of the transcript from the Committee of the
14  Whole Senate on January 25th, 2011, that contains your
15  remarks.  And if you could take a look at the exhibit
16  and let me know when you've had a chance to review the
17  questions and answers to which you were responding, and
18  I'll direct you to a page in one moment.
19      A.   Okay.  (Reading documents.)  Okay.
20      Q.   Turning your attention to Page 444 of the
21  transcript, which is Texas 00000800, do you see that
22  questions were posed from Senator Wendy Davis?
23      A.   Yes.
24      Q.   And she was asking you, was she not, questions
25  related to persons who filled out a voter registration

## 165

1  application who indicated neither a driver's license
2  number nor a social security number; is that correct?
3      A.  Right.
4      Q.  Do you recall the analysis that you conducted
5  in that regard?
6      A.  I think she was asking for a percentage of
7  people, I don't think I had that, a percent figure with
8  me at the time, so I gave her the raw numbers.
9      Q.  Do you recall that you had analyzed the numbers
10  after enactment of the Help America Vote Act, and
11  applicants were required to supply either a driver's
12  license number or a social security number, and
13  analysis of persons who supplied neither.  Is that the
14  analysis that you conducted?
15      A.  Yes.  It looks -- yes.  I answered that, since
16  January 1st, 2006 through December 31st, 2010, 2.3
17  million -- oh, no.  2.3 million provided driver's
18  license number.  As far as the number that didn't fill
19  out either one -- well, you know, there's a couple of
20  questions in here because we had -- you know, we,
21  obviously, had data before 2006 as well.  And so even
22  before it was required, people voluntarily provided
23  driver's license numbers.
24      Q.  Right.  And the analysis that you just
25  described concerning persons between January 1st, 2006

## 166

1  and 2011 who had not supplied either a driver's license
2  or a social security number when they registered?
3      A.  Uh-huh.
4      Q.  Who asked you to conduct that analysis?
5      A.  I think that was information that we had
6  previously supplied to Representative Anchia, and so I
7  think we were updating it for the 2011 session.
8      Q.  Could you indicate your testimony as to what
9  your analysis found in terms of the numbers of persons
10  who had registered without either of those numbers?  And
11  I would direct your attention to Page 445 of the
12  excerpt, Texas 00000801, the top of the page.
13      A.  Oh, okay.  Sorry, I almost missed it.
14          So, it looks like I responded that since
15  2006, the number of people that provided neither one was
16  34,506.
17      Q.  And had Representative Anchia asked you to
18  update this analysis after Senate Bill 14 was filed, or
19  did you do it on your own?
20      A.  I think we did that on our own.
21      Q.  And why did you do it?
22      A.  We expected we would get asked.
23      Q.  When did you conduct that analysis?
24      A.  Shortly before the Senate hearing.
25      Q.  So you simply updated the numbers after the

## 167

1  bill was filed in January and before the hearing; is
2  that correct?
3      A.  Yeah.  I think, sort of, to be prepared for
4  this hearing, we updated those numbers.
5      Q.  Did you have any conversations with anyone in
6  the Legislature, other than Representative Anchia, about
7  this analysis?
8      A.  No.
9      Q.  And can you explain why you focused on the date
10  range of January 1st, 2006 and December 31st, 2010.
11      A.  Because prior to that time, they weren't -- it
12  was not required, so that was sort of a useful
13  statistic.  Since it had been required, this was the
14  number of folks that weren't able to provide IT.
15      Q.  Did you also, as part of that analysis, review
16  the entire state voter file to determine which voters
17  had a social security number -- or who had
18  voluntarily provided a social security number?
19      A.  Right.  Yes.
20      Q.  And which voters had voluntarily provided a
21  driver's license number?
22      A.  We did.
23      Q.  When did you conduct that analysis?
24      A.  I believe we did it in 2009 pursuant -- or
25  2007, or maybe both, pursuant to Representative Anchia's

## 168

1  request, and then we updated that in preparation of this
2  2011 hearing.
3      Q.  Did you likewise conduct that analysis in
4  January 2011?
5      A.  Yes.
6      Q.  And what number did you find, based on that
7  analysis, of persons who had not supplied either a
8  social security number or a driver's license number?
9      A.  The number was 690,887.
10      Q.  And I believe you just testified that, that
11  before January 1st, 2006, voter applicants could
12  voluntarily supply that information.
13      A.  Right.
14      Q.  So what is the implication of the fact that
15  voters were only supplying that information voluntarily,
16  in terms of the numbers of people who are indicated not
17  to have those forms of ID in the voter file?
18      A.  It would mean that there could be people who
19  were registered to vote before 2006 that didn't provide
20  a driver's license number or a social security number,
21  but might, in fact, have them.
22      Q.  And as of the date of this hearing, January
23  25th, 2011, is the sum total of all the analyses that
24  the Division had undertaken to determine which voters in
25  the state's voter registration database did not have a

Ann McGeehan                                            May 31, 2012

## 169

1   form of photo ID allowable under Senate Bill 14 or its
2   predecessors, is that what you testified to?
3       A.  Yes.
4       Q.  You hadn't conducted any other analysis?
5       A.  Correct.
6       Q.  Is that correct?
7       A.  Yes.
8       Q.  Is there any analysis that you did not publicly
9   disclose that you had conducted?
10      A.  No.
11      Q.  On the day of the Senate hearing on Senate Bill
12  14, did Senator Williams ask you to conduct additional
13  analysis of which registered voters did not have
14  driver's license?  And I would refer you to your
15  testimony at Page 446.
16      A.  Yes.
17      Q.  What did he ask you to investigate or analyze?
18      A.  I thought he publicly asked us a question, but
19  here on Page 446, I am sort of repeating what he asked.
20  And I believe he asked us to see if we could do any
21  analysis to get -- to look at these numbers a little
22  more closely and compare them against the driver's
23  license database to see if we could get a better handle
24  on the number of voters that didn't have driver's
25  licenses or personal ID numbers.

## 170

1       Q.  Was that the first time that Senator Williams
2   had asked you to do that?
3       A.  Yes.
4       Q.  Had anyone asked you to do that type of match
5   before January 25th, 2011?
6           MR. MORTARA:  You may not answer that
7   question with respect to nonpublic requests made by
8   legislators not on the list.
9       Q.  (By Ms. Westfall)  Do you have any testimony?
10      A.  Nobody on this list asked us to do that before
11  this hearing.
12      Q.  Turning your attention to Page 489, of your
13  remarks before the Senate.  Tell me when you're there.
14      A.  Okay.  I'm there.
15      Q.  Do you see Senator Williams asks some
16  questions, halfway through the page?
17      A.  Okay.
18      Q.  And is he asking you, or making reference to
19  having talked earlier with you about cross-referencing
20  driver's license and voter registration?  Do you see
21  that on to the next page?
22      A.  Yeah.  He asked how it was coming along.
23      Q.  And he had just asked you earlier in the day?
24      A.  Yes.
25      Q.  Is that right?

## 171

1       A.  Right.
2       Q.  And so he wanted a status report hours later?
3       A.  Right.
4       Q.  Is that correct?
5       A.  Yes.
6       Q.  And he indicates there he only asked you today;
7   is that right?
8       A.  Right.
9       Q.  So he's referring to conversations he had with
10  you that day?
11      A.  Correct.
12      Q.  And in response, you indicated that you were
13  having difficulty with matching, is that correct, and
14  there were some IT issues?
15      A.  Yes.
16      Q.  What were the difficulties you were having in
17  conducting that match?
18      A.  Well, I think we needed to develop what the
19  matching criteria was going to be and just comparing the
20  data.  I mean, we had go through our IT department to,
21  you know, set that up.  So at this point in time, I
22  really had no idea how long that was going to take.
23      Q.  I see.  So in terms of matching criteria, what
24  do you mean?
25      A.  To -- you know, to determine what data fields

## 172

1   to match on between the voter database and the driver
2   database.  And, you know, would it be on first name,
3   last name, middle name, date of birth, county, address,
4   you know, would be the exact criteria.
5       Q.  And prior to January 25th, 2011, had you given
6   any thought to how you would do that matching criteria?
7       A.  No.
8       Q.  Other than the matching criteria, you said
9   there were other IT issues involved; is that right?
10      A.  Right.
11      Q.  Could you describe those?
12      A.  Well, and I'm not a technical person, but, you
13  know, the format -- the data is in different formats, so
14  comparing the SOS data with the DPS data, sometimes
15  there are issues on making sure we can match up the
16  data.  Again, that's not my area of expertise.
17      Q.  And were you foreseeing that being a problem?
18      A.  It usually is a problem, so...
19      Q.  And had you had any communications or meetings
20  with the Department of Public Safety, prior to January
21  2011, about conducting that type of match?
22      A.  No.
23      Q.  Had you had any meetings with DPS about
24  matching criteria?
25      A.  Not on -- the only time we had -- we have met

Ann McGeehan

May 31, 2012

## 173

1   with DPS on matching criteria for purposes of HAVA and
2   verifying driver's license numbers for HAVA purposes.
3       Q.   But for purposes of determining who in your
4   voter registration database has driver's licenses, you
5   had not?
6       A.   We had not done that.
7       Q.   And had you not as of January 25th, 2011 --
8       A.   Correct.
9       Q.   -- because you just had received that request
10  from Senator Williams that day; is that right?
11      A.   That's right.
12      Q.   Was there a time, after January 25th, 2011,
13  that you provided Senator Williams, or any other
14  legislator or the Lieutenant Governor, with information,
15  factual analysis related to matching of the voter
16  registration and driver's license database?
17          MR. MORTARA:   You may answer that
18  question.
19      A.   No.
20      Q.   (By Ms. Westfall) Do you recall that during
21  this hearing, the Senate hearing, you also had a
22  colloquy with Senator Davis about whether the Secretary
23  of State gathers demographic information about voters by
24  race, gender, disability, and age?
25      A.   I vaguely remember that.

## 174

1       Q.   And I'll direct your attention to Page 460, if
2   you could take a look at your testimony and let me know
3   when you've had an opportunity to review it.
4       A.   (Reading documents.) Okay.
5       Q.   How did you respond to Senator Davis's inquiry
6   about whether the Secretary of State gathers demographic
7   information about voters by race, gender, disability,
8   and age?
9       A.   I explained what data we had, which is gender.
10  That used to be a required field on the voter
11  registration application.  So we have some information
12  on gender, but I guess I said since 1995, it was
13  optional, so it's not complete.  And on age, obviously,
14  we have that data, because that's required, birth date
15  is required.  And then on ethnicity, I explained that we
16  didn't collect any information regarding race, and that
17  the only tool we had was the Hispanic surname list to
18  identify voters with Hispanic surnames.
19      Q.   And did Senator Davis further ask you how the
20  Secretary of State would be able to respond to questions
21  about whether Senate Bill 14 disproportionately impacts
22  minority voters?  Directing your attention to Page 461.
23  Do you see that?
24      A.   Yes.
25      Q.   And what was your response?

## 175

1       A.   I explained what current process was and what
2   information we had access to, and that if the
3   Legislature wanted to establish a process, that we could
4   collect it, we'd have to change the voter registration
5   application to collect that data.
6       Q.   And your testimony, in short, was that you were
7   able to do Spanish surname analysis; is that correct?
8       A.   Correct.
9       Q.   And that that was the sum total of what you
10  were currently able to do?
11      A.   Right.
12      Q.   Was there any other method of identifying the
13  race of a voter in the Texas voter database that you did
14  not testify about in the Senate hearing on January 25th,
15  2011?
16      A.   No.
17      Q.   And do you recall that at the conclusion of
18  Senator Davis's colloquy with you, she opined that
19  information about the impact of Senate Bill 14 on
20  minority voters was important for review under Section
21  5, correct?
22      A.   Yes.
23      Q.   Subsequent to this hearing, did the Division
24  undertake any analysis of the impact of Senate Bill 14
25  on minority voters?

## 176

1       A.   Pursuant to a request from the Justice
2   Department, we did.
3       Q.   Prior to that time?
4       A.   Prior to that time, we did not.
5       Q.   And why was -- when was that response to the
6   Justice Department?
7       A.   I think we submitted the bill in maybe the
8   middle of June or the end of June.
9       Q.   Was it July?
10      A.   That sounds right.
11      Q.   And when did you submit information about the
12  impact on minority voters to the Justice Department, to
13  the best of your recollection?
14      A.   Probably August or September.
15      Q.   And when was the bill signed into law?  Was it
16  May 2011?
17      A.   I don't really remember.  It probably was.  I
18  don't remember exactly.  Oh, it might be on that list
19  of --
20      Q.   I'm going to hand you what's been previously
21  marked as Exhibit 8.  You've been handed what's been
22  previously marked as U.S. Exhibit 8.  Do you recognize
23  this document?
24      A.   Yes.
25      Q.   What is it?

## 177

1    A.  It looks like the bill history on Senate
2    Bill 14.
3    Q.  Does this refresh your recollection -- or could
4    you refer to U.S. Exhibit 8 to refresh your recollection
5    as to when Senate Bill 14 was --
6    A.  I think I can, if I can read it right.  Yes.
7    Okay.  It was signed by the Governor on May 27th.
8    Q.  Why did the Division not undertake an analysis
9    of the racial impact of Senate Bill 14 prior to
10   receiving a request from the Justice Department, when
11   Ms. Davis had requested this information of you in
12   January 2011?
13   A.  She requested how could we -- I mean, her
14   question, I thought, was looking into the future, how
15   would we be able to analyze the impact on voters if we
16   didn't collect data on race at the time of voter
17   registration, and I explained that that would require a
18   legislative change, and nobody changed the law to
19   accomplish that.
20   Q.  So was it your feeling that you could not
21   conduct that analysis absent a change in state law?
22   A.  We generally don't conduct -- the Secretary
23   State's Office does not usually conduct investigations
24   or, sort of, analyses of that sort, as a general rule.
25   Q.  But state legislators had requested that

## 178

1    information of your office, had they not, Representative
2    Anchia and Senator Davis; is that correct?
3    A.  We responded to every request they made.
4    Nobody asked for that particular data of racial
5    breakdowns of voters who didn't have driver's licenses
6    or personal identification cards.
7    Q.  Is it your testimony Ms. Davis was not seeking
8    that information?
9    A.  That's not how I understood her question and
10   that's not how I answered her question.
11   Q.  Okay.
12   A.  She never followed up.
13   Q.  I see.  But you testified earlier that you had
14   involvement in hundreds and hundreds of Section 5
15   submissions, correct?
16   A.  Yes.
17   Q.  So did you that believe you would ultimately,
18   if the law was enacted and signed by the Governor, need
19   as part of the Section 5 process to provide that
20   information to the Justice Department?
21   A.  We didn't include in it our initial submission,
22   so I guess we didn't feel like it was required.
23   Q.  And why not?
24   A.  I think we provided, sort of, the standard
25   information in our initial submission regarding number

## 179

1    of registered voters, and I don't think we felt like we
2    possessed the information as to how -- how many voters
3    really didn't have the forms of ID and how to break them
4    down by race.
5    Q.  Are you familiar with the amendments offered in
6    the Senate during consideration of Senate Bill 14?
7    A.  Somewhat.
8    MS. WESTFALL:  Could you mark this as 47.
9    Q.  (By Ms. Westfall) You have been handed what's
10   been previously marked as Exhibit 47.  Do you recognize
11   this document?
12   A.  Yes.  Senate Journal from January 26th.
13   Q.  Turning your attention to Page 130 of this
14   document, do you see it references an amendment offered
15   by Senator Ellis?
16   A.  Yes.
17   Q.  Did Senator Ellis introduce an amendment that
18   would have required the Secretary of State to conduct a
19   study that would have included information about the
20   number of eligible voters who were from prevented from
21   voting or had to vote provisionally because of lack of
22   ID and an analysis of those voters based on race?
23   A.  Okay.  That's what this says.
24   Q.  Did the Division -- are you aware of this
25   amendment?

## 180

1    A.  I don't remember this amendment.  It was
2    probably offered during deliberation.  I don't think it
3    got approved.  Maybe it did.
4    Q.  Turning your attention to the bottom of
5    Page 130, do you see that it indicates --
6    A.  It was tabled.
7    Q.  -- it was tabled?
8    A.  Okay.
9    Q.  And does that mean it was not approved; is that
10   right?
11   A.  That's my understanding.
12   Q.  Did the Division take a position on this
13   amendment?
14   A.  No.
15   Q.  Were you involved in any communications
16   regarding this amendment?
17   A.  No.
18   Q.  Do you know why this amendment was tabled?
19   A.  No.
20   Q.  Are you aware of any concerns or communications
21   that such a study, as required by the Floor Amendment
22   Number 30, would show that minorities are
23   disproportionately impacted by Senate Bill 14?
24   A.  We never saw this.  I think this was just
25   offered during the Floor debate, so it never --

Ann McGeehan                                              May 31, 2012

## 181

1    Q.   Uh-huh.  Okay.
2    A.   So I'm not familiar with it.
3    Q.   Fair enough.  Thank you for your testimony.
4         I believe you testified earlier that you
5    conducted Spanish surname analysis as a matter of
6    course; is that right?
7    A.   Right.
8    Q.   Is there a reason why the Division did not
9    conduct such an analysis, Spanish surname analysis of
10   the voters without driver's licenses between January
11   2011 and the time you provided it to the Justice
12   Department in the fall of '11?
13   A.   Well, I mean, one reason is nobody asked us to.
14   Q.   Are there any other reasons?
15   A.   We don't -- you know, as a general policy,
16   Elections Division does not generally use that list for
17   any purpose other than sending out that notice.  It's
18   not something we use to qualify voters or -- and then as
19   we discussed earlier this morning, we send it out to
20   county officials for purposes of helping them place
21   Spanish-speaking poll workers, but...
22   Q.   Is it your testimony that in 2011, not a single
23   bill opponent ever asked you for that information?
24   A.   I don't recall any of these people --
25        MR. MORTARA:  Yeah, just this list.

## 182

1    A.   Yeah.  I don't recall any of these legislators
2    asking for that information.
3    Q.   (By Ms. Westfall) Are you aware of any
4    communications regarding Senate Bill 14 and Spanish
5    surname analysis?
6         MR. MORTARA:  You can answer that question
7    with respect to everyone in the world.
8    A.   During session or --
9    Q.   (By Ms. Westfall) In 2011.  Before the bill --
10   strike that.
11        Do you recall any such communications
12   involving Senate Bill 14 and Spanish surname analysis
13   between January 1st, 2011 and when the bill was signed
14   in May 2011?
15   A.   No.
16        MS. WESTFALL:  Sure.  Let's take a break.
17        (Recess from 3:02 to 3:27 p.m.)
18   Q.   (By Ms. Westfall)  When did the Senate pass
19   Senate Bill 14?
20   A.   I don't remember.  It's probably on this list.
21   Q.   You can refer back to Exhibit 8.
22   A.   It looks like was January 26th; is that right?
23   Q.   Was it passed within about two weeks of having
24   been filed in the Senate?
25   A.   Yeah.  And it was filed on January 12th, and it

## 183

1    passed on January 26th.
2    Q.   Is it fairly unusual to pass a bill in two
3    weeks in January at the beginning of a session?
4    A.   I don't really know, to be honest.
5    Q.   Do you recall other bills that were passed that
6    early in the Senate in January?
7    A.   I don't recall any, but I don't track them all
8    either.
9    Q.   Can you recall any other election bill other
10   than Senate Bill 14 that was part of a Governor's
11   emergency call?
12   A.   I believe there were several issues in that
13   emergency call.
14   Q.   But I'm referring you to -- do you recall any
15   emergency call that included another election bill in
16   previous sessions?
17   A.   No.
18   Q.   Did you testify before the House select
19   committee on voter identification and voter fraud on
20   Senate Bill 14?
21   A.   Yes.
22   Q.   Did you testify on March 2, 2011?
23   A.   I don't remember the date.  I don't see it on
24   here.  I guess it was probably a different bill.  It was
25   probably maybe the House -- well, I don't remember.

## 184

1    Q.   After the Senate passed Senate Bill 14, did it
2    go to the house?
3    A.   Yes.
4         MS. WESTFALL:  Could you please mark this
5    as 288?
6         (Exhibit 288 marked for identification.)
7    Q.   (By Ms. Westfall)  Do you recognize this
8    document?
9    A.   Yes.  It appears to be a transcript of
10   testimony before the Select Committee on Voter
11   Identification and Voter ID fraud on March 1st.
12   Q.   And I'll represent to you that this is an
13   excerpt of the transcript pertaining to your remarks --
14   A.   Okay.
15   Q.   -- at that hearing.
16   A.   Okay.
17   Q.   Did you appear as a resource witness?
18   A.   Yes.
19   Q.   And turning your attention to Page 290 of the
20   testimony.  Are you there?
21   A.   Yes.
22   Q.   Do you see that there's a question from an
23   unidentified representative as to whether you've done a
24   match to determine whether folks in the drivers -- in
25   the voter registration database have driver's licenses?

Ann McGeehan                                                    May 31, 2012

## 185

1    A.   Let me take just a quick second to read.
2    Q.   Certainly.
3    A.   (Witness reading.)  Okay.  Sorry.
4    Q.   Sure.  No, that's okay.
5         Did you testify in response to the
6    question about whether a match had been done with the
7    voter registration database and the DPS driver's license
8    database to determine who did not have driver's
9    licenses?
10   A.   Yes.
11   Q.   And what was your response to that question?
12   A.   My response was that we were looking into that
13   at the time, so on March 1st, we were still working on
14   trying to make that comparison.
15   Q.   And you had -- you testified earlier that you
16   had been asked by Senator Williams on January 25th,
17   2001, to engage in that match and comparison; is that
18   correct?
19   A.   That's correct.
20   Q.   And can you describe the process that you
21   undertook in January to attempt to conduct that match?
22   A.   We -- we were looking at what would be the
23   matching criteria, you know, how tight of a match would
24   it be, and those sorts of issues.
25   Q.   And as of March 1st, that process was still

## 186

1    pending, and you haven't been able to determine the
2    universe of voters without driver's licenses; is that
3    correct?
4    A.   Correct.
5    Q.   And why the delay in conducting the match?
6    A.   I think we were looking for sort of, you know,
7    guidance on what matching criteria to use.
8    Q.   Who were you seeking that guidance from?
9    A.   Probably from our executive -- from executive
10   management within Secretary of State's Office.
11   Q.   And who would that be specifically?
12   A.   That would be our deputy secretary and our
13   general counsel.
14   Q.   Is it your testimony that they weren't
15   providing you with the guidance that you needed to
16   conduct the match?
17   A.   I think we were sort of, you know, looking for
18   the -- for them to say yes, okay, this is fine, let's
19   release it.
20   Q.   I see.  So you had conducted the analysis, but
21   you hadn't released it; is that correct?
22   A.   We hadn't sort of had it approved or, you know,
23   okayed to release outside the office.
24   Q.   Who in particular did not let you release that
25   information?

## 187

1    A.   Well, I don't know that we were prohibited, it
2    was -- but it would be up to -- it would be up to the
3    executive management to be the ones to release something
4    like that.
5    Q.   And who by name is that person or persons?
6    A.   That would be Coby Shorter, who was -- who is
7    the deputy, and John Sepehri, who's the general counsel.
8    Q.   When did you, from your perspective, complete
9    this matching analysis, what date?
10   A.   I don't really remember exactly when.
11   Q.   Was it in the month of February?
12   A.   It could have been February or March, but I
13   don't remember exactly.
14   Q.   Was it before or after this hearing on March
15   1st?
16   A.   I don't remember.
17   Q.   Were you -- does your testimony here on March
18   1st on Page 290 refresh your recollection as to when you
19   completed the match?
20   A.   I can't really tell if we had completed it here
21   or not.
22   Q.   It's conceivable that you had done the match in
23   February, but it was not authorized to be released at
24   that time; is that right?
25   A.   Right.  And when I say "authorized to be

## 188

1    released," you know, I don't know if our executive
2    management had a chance to review it, if they felt
3    confident about it.
4    Q.   Was there concerns about the accuracy of the
5    match?
6    A.   I think so.  I think they wanted to make sure
7    that anything we released was accurate.
8    Q.   Was there any concern about the number of
9    voters who were unmatched and releasing that information
10   to the public?
11   A.   Not that I'm aware of.
12   Q.   Was the number that was in that analysis about
13   800,000 people that were unmatched?
14   A.   I don't really remember.  I was thinking it was
15   around 700,000, but I don't have a clear memory of that.
16   Q.   Was there any concern you're aware of that
17   releasing that number in February of 2007 could
18   potentially jeopardize enactment of the bill?
19   A.   Not that I'm aware of.
20   Q.   Do you know whether anyone directed executive
21   management not to release that information?
22   A.   Not that I'm aware of.
23   Q.   Do you know whether that match and those
24   numbers changed significantly from February 2011 to the
25   time that you released that information to the Justice

189

1    Department in the fall of 2011?
2        A.   I don't think they did.
3        Q.   And to your knowledge, did you learn after the
4    match was conducted in February or March, 2011, of any
5    errors that caused there to be a change in the analysis?
6        A.   Between March --
7        Q.   And whenever -- you testified -- I believe you
8    testified that this match was probably conducted in
9    February or March 2011; is that right?
10       A.   Right.
11       Q.   And did you become aware, subsequent to that
12   time, of any errors in the analysis or the matching
13   process, or was it basically final as of that date,
14   although not released?
15       A.   I don't think we changed it much from what we
16   did.  I mean, I think there were some judgments as to
17   which criteria to use, and I don't think we changed that
18   much from when we did pull it to send to the Justice
19   Department.
20       Q.   Did you at any time between the time that you
21   did that match -- and you believe it was February or
22   March of 2011?
23       A.   That sounds about right.
24       Q.   Did you conduct a Spanish surname analysis on
25   that information, those unmatched voters?

190

1        A.   Not during the session.  We did that after we
2    provided it to the Justice Department.
3        Q.   Did you have any reason to believe based on the
4    universe of voters you had identified, the 700,000
5    voters, that they would be disproportionately minority
6    voters?
7        A.   No.
8        Q.   Who was aware of the fact that that analysis
9    had occurred in February or March 2011 besides you in
10   your office?
11       A.   In my office within the Secretary of State's
12   Office?
13       Q.   Yes.
14       A.   It would have been me and our voter
15   registration director, who is in the Elections Division,
16   and then in our IT department, one of the programmers,
17   and his supervisor, and our IT director, and then the
18   Deputy Secretary of State and the general counsel.
19       Q.   Did you at any time provide that analysis from
20   February or March of 2011 to anyone in the legislature?
21            MR. MORTARA:  You may answer that question
22   only with respect to the legislators listed on the
23   sheet.
24            MS. WESTFALL:  Wait a minute.  It's
25   providing factual information to the legislature --

191

1            MR. MORTARA:  Specifically about the
2    Court's order, Elizabeth.  The Court's order says the
3    information is not privileged.  The analysis exists.
4    What I understand the Court's order to mean is that we
5    must produce it to you if it exists, not that we have to
6    tell you with whom it was shared.  That is exactly what
7    the last two sentences of that order means.  We disagree
8    about that.
9            Don't answer the question except with
10   respect to these legislators.
11       A.   We didn't release it to any of those
12   legislators.
13       Q.   (By Ms. Westfall)  Would it have been
14   relatively easy to do a Spanish surname analysis on that
15   list of 700,000 voters in February and March of 2011?
16       A.   Yes.  I mean, I say that.  Our IT department
17   might not agree with that.
18       Q.   Fair point.  Did you or the Division play any
19   role in the consideration by the Conference Committee of
20   Senate Bill 14?
21       A.   No, not in the Conference Committee.
22       Q.   Are you aware of any changes made to provisions
23   of Senate Bill 14 in Conference Committee that involved
24   voter education?
25       A.   I don't recall that.  It may be the case, but I

192

1    didn't remember that changing in Conference Committee.
2        Q.   Was there a provision removed in conference
3    that would have targeted voter ed -- voter education,
4    pardon me, to low-income and minority voters?
5        A.   I don't remember that.  That may have been -- I
6    mean, I don't dispute it.  I don't have a clear memory
7    of that.
8        Q.   Do you have any reason to believe that voters
9    without allowable forms of ID under Senate Bill 14 are
10   disproportionately low-income or minor voters?
11       A.   I do not.
12       Q.   Did the -- strike that.
13            Did the Division provide any data or
14   information to any member of the Conference Committee
15   about voter education to low-income voters?
16       A.   No.
17       Q.   Was the Conference Committee report adopted by
18   both chambers?
19       A.   Yes.
20       Q.   I'm going to hand you what has been -- whoops,
21   sorry.  You've been handed what's been previously marked
22   as U.S. 5.  Do you recognize this?
23       A.   Yes.
24       Q.   What is it?
25       A.   This is the signed enrolled version of Senate

## 193

1   Bill 14.
2       Q.   Turning your attention to the list of allowable
3   IDs, do you see that at Page 9?
4       A.   Yes.
5       Q.   Could you take a look at the allowable forms of
6   ID and let me know when you've had a chance to do so?
7       A.   Yes.
8       Q.   Can you describe for me the forms of ID that
9   are different in the engrossed version of the bill,
10  Exhibit 5, than in the filed bill?
11      A.   I believe that the difference is that a new
12  form of ID was authorized and it created an election
13  identification certificate that would be issued by the
14  Department of Public Safety.  I think that's the only
15  change.  And maybe the expiration date.  I don't know if
16  that's the same as in the original bill as to when -- I
17  don't remember.  I think that's the main change.
18      Q.   Do you know whether the license to carry a
19  concealed handgun was added as an allowable form of ID?
20      A.   Yeah.  But I thought that got added in the
21  Senate, but maybe not.
22      Q.   Do you know the circumstances by which the
23  license to carry a concealed handgun were included in
24  Senate Bill 14?
25      A.   No.

## 194

1       Q.   Do you know the racial composition of persons
2   who hold those licenses?
3       A.   No.
4       Q.   Have you had any conversations or
5   communications about holders of those licenses might be
6   disproportionately White?
7            MR. MORTARA:  Ms. McGeehan, you may answer
8   that question with respect to everybody in the entire
9   world except legislators, Lieutenant Governor and his
10  staff, Governor and his staff, legislative staff not
11  appearing on this list.
12      A.   I have not heard any conversations on that with
13  any of these legislators or any other people other than
14  the legislators not on the list or the Governor's office
15  or Lieutenant Governor.
16      Q.   (By Ms. Westfall)  Do you know why Senate Bill
17  14, as engrossed, did not allow the use of student IDs?
18      A.   No.
19      Q.   Were student IDs allowed as an allowable form
20  of ID in previous iterations of photo ID in Texas?
21      A.   I believe that we saw it in the 2009 bill.
22      Q.   Do you know what had changed between 2009 and
23  2011 that caused the legislature to remove that
24  provision?
25      A.   I don't know.

## 195

1       Q.   Have you -- were you aware of any concern that
2   failure to include these forms of ID, notwithstanding
3   their inclusion in previous bills, could
4   disproportionately impact minority voters?
5       A.   Not including student IDs?  No.
6       Q.   Any concern that it might create an appearance
7   that the law was enacted with a discriminatory purpose
8   to remove that form of ID from the bill?
9       A.   No.
10      Q.   Are you aware of any analysis to determine the
11  effect of excluding student IDs as a form of allowable
12  ID under Senate Bill 14?
13           MR. MORTARA:  Again, Ms. McGeehan, for all
14  these questions, are you aware, but please keep in mind
15  not to give testimony about legislators, Governor's
16  office, Lieutenant Governor's office, not appearing on
17  the list.
18      A.   I'm not aware of any communications with these
19  legislators, general public, not making any comments as
20  to the other legislators that haven't waived their
21  privilege, and the Governor's office and Lieutenant
22  Governor's office on student IDs in any studies.
23      Q.   (By Ms. Westfall)  Do you know why tribal ID
24  was not included as an allowable form of ID in Senate
25  Bill 14?

## 196

1       A.   No.
2       Q.   Was it in the -- is it in the Georgia photo ID
3   of law that tribal ID --
4       A.   I don't know.  I don't know.
5       Q.   How did the exception for persons with
6   disabilities come to be included in Senate Bill 14?
7            MR. MORTARA:  Objection, foundation.
8       Q.   (By Ms. Westfall)  You may answer.
9       A.   I'm not sure if I remember all the -- you know,
10  all the iterations of that.
11      Q.   I'll turn your attention --
12      A.   Okay.
13      Q.   -- to the first page of the Act, if you want to
14  review it, and let me know when you've had a chance to
15  take a look at it.
16      A.   (Witness reading.)  Right.  Yeah.  This is how
17  it ended up, but I couldn't really explain how this got
18  here.
19      Q.   What was the purpose of this provision?
20      A.   I believe it was to exempt persons with
21  disabilities from the requirement of presenting a photo
22  ID, and they would have to make application with the
23  voter registrar to prove that up and obtain the
24  exemption.
25      Q.   Was this provision in the filed bill?

Ann McGeehan                                                          May 31, 2012

## 197

1    A.   I don't think so.

2    Q.   And at whose request was this provision added?

3    A.   I don't know -- or I don't remember.

4    Q.   Can you describe the provisions of Senate Bill

5    14 as engrossed pertaining to administration of the ID

6    requirement at the polls?

7    A.   Explain how it would be administered at the

8    polls?

9    Q.   As required by the bill.

10    A.   The new requirement bill?

11    Q.   Yes.

12    A.   It would -- I believe, as best I can remember,

13    and of course, this is somewhat qualified, because the

14    Secretary of State is probably still in the process of

15    you know, fully developing some of these processes, but

16    essentially, all voters who voted in person who had not

17    received the disability exemption and who were not over

18    the age of 70, I think as of the date of this bill,

19    would be required to present one of these forms of photo

20    identification.

21         If they didn't, then they could vote a

22    provisional ballot, and they would have a certain amount

23    of time to go back to the voter registrar's office and

24    present after -- after they voted, they could go to the

25    voter registrar's office and present one of these forms

## 198

1    of ID later, within five days or something like that.

2         There were -- I believe there was also two

3    sort of exemptions for voters that had a religious

4    objection.  I may have to refresh my memory on this.

5    Q.   Certainly.

6    A.   (Witness reading) Okay.  Yeah.  They could --

7    they -- they -- they would vote a provisional ballot and

8    then if they came in I believe after the election and

9    executed an affidavit stating that they had either a

10    religious objection to being photographed or that they

11    had, you know, been a victim of a natural disaster, and

12    because of that natural disaster, they didn't have any

13    identification.

14    Q.   So when you talk about administration of the ID

15    requirement at the polls, are you talking about the --

16    what the Secretary of State and Election Division

17    promulgated in terms of rules and procedures, or are you

18    talking about the bill itself?

19    A.   Just then I was, I guess, talking about the

20    basic requirement.  The bill also requires the Secretary

21    of State to do training of poll workers, training of

22    voters.  I think we had to develop rules on -- to give

23    guidance to poll workers on how to accept voters

24    regarding how similar the name on the photo ID has to be

25    to the name on the list of registered voters.

## 199

1    Q.   Do you know why Senate Bill 14 did not provide

2    more specificity about how poll workers should determine

3    whether a voter had presented an ID that proved their

4    identity?

5    A.   No.

6    Q.   Do you think the bill should have provided more

7    specificity in that regard?

8    A.   Well, I guess from the Secretary of State's

9    point of view, it would have been nice if they had done

10    that.  It would have been one less thing that the

11    Secretary of State's Office had to do.

12    Q.   And do you believe that it's a very important

13    part of the bill to determine -- to instruct poll

14    workers as to how to administer this ID requirement at

15    the polls?

16    A.   Yes.

17    Q.   Because if they don't understand how to

18    determine someone's identity, it could be misapplied and

19    disenfranchise a voter; isn't that right?

20    A.   Yes.

21    Q.   I believe you testified about the provisional

22    ballot requirements.  In essence, the provisional ballot

23    requirements do not provide much in the way of

24    mitigation of the photo ID requirements; isn't that

25    right?

## 200

1    A.   Well, you know, I think that's kind of an

2    opinion question.  Some folks would argue there's more

3    protection, because you can come back in and fix it.

4    Whereas under current law, you can't do that.

5    Q.   Can you point me to a particular part of the

6    election code that require -- that says that provisional

7    ballots under current law will not be counted if you

8    don't have any of those wide range of forms of ID?

9    A.   I believe it's in an administrative rule that

10    the Secretary of State's Office adopted and precleared,

11    where it sets out the rules for processing provisional

12    ballots according to the various voting systems.

13    Q.   Under -- but nonetheless, under the current

14    law, you can present a very broad range of IDs compared

15    to the IDs that are allowable under Senate Bill 14;

16    isn't that right?

17    A.   Yes.  Senate Bill 14 only permits photo IDs.

18    Q.   Right.

19    A.   And current law does not.

20    Q.   Right.  And in terms of the provisional ballot

21    provision of Senate Bill 14, unless you can cast a

22    provisional ballot, but if you don't have that

23    appropriate form of photo ID and return within six days

24    to present it to the office, your provisional ballot

25    will not be counted, except unless very limited

Ann McGeehan                                                  May 31, 2012

## 201

1  circumstances; is that right?
2      A.   That's right.
3      Q.   And is it your understanding under the bill
4  that you must return in person within six days to prove
5  your identity in order to ensure that your provisional
6  ballot will be counted?
7      A.   That's my understanding.
8      Q.   Is that within the bill, or is that pursuant to
9  an administrative regulation or rule?
10     A.   That was my understanding as of the time I left
11 the Secretary of State's Office.  They may have further
12 provided guidance on that.  I'm not aware if they have.
13     Q.   Does Senate Bill 14 include a provision for
14 voter education?
15     A.   Yes.
16     Q.   Could you describe the voter education
17 provisions, generally speaking, in the bill?
18     A.   I think it's in Section 5 of the bill that says
19 the Secretary of State -- anyway, it sets up several
20 mandates for Secretary of State and county officials
21 that specifically requires the Secretary of State to
22 conduct a statewide effort to educate voters regarding
23 the identification requirements.
24     Q.   And so the education requirements advise voters
25 of the need or will advise if this law is precleared of

## 202

1  the need to get ID, but it doesn't in any way reduce any
2  burden that a voter might need to undergo to get an
3  election identification certificate or a form of
4  allowable ID; isn't that right?
5      A.   Right.  This is purely an educational effort.
6      Q.   Did you have any concerns that without
7  guidance, poll workers might inconsistently administer
8  the photo ID law?
9      A.   Sure.  I mean, that's a danger with all
10 election laws.  So --
11     Q.   And were you concerned that inconsistent
12 administration of photo ID requirements might fall
13 disproportionately on minority voters?
14     A.   I had no -- I did not have that as a specific
15 concern.
16     Q.   In deposition testimony in this case, there
17 have been a number of purposes that witnesses have
18 talked about in terms of the purpose of SB-14, and I'm
19 going to ask you a few questions about purposes of the
20 bill.  Some witnesses have testified, and I believe that
21 this was in the submission letter along with the
22 preclearance submission for SB-14, which you signed,
23 that it would promote election integrity.  Do you
24 remember that --
25     A.   Uh-huh.

## 203

1      Q.   -- purpose?
2      A.   Yes.
3      Q.   Are you aware of any voters in the state of
4  Texas who did not vote because they were concerned that
5  voter fraud would cancel out or dilute their vote?
6      A.   I don't know that for a fact.
7      Q.   Would a registered voter who had voted in
8  previous elections but did not have a form of photo ID
9  and who could not vote by regular ballot experience a
10 loss of confidence in the election system under SB-14?
11     A.   Can you repeat that?
12     Q.   Certainly.  It was a confusing questioning.
13 It's late in the day.  I will withdraw that question.
14          Is it possible that if a registered voter
15 did not have a form of photo ID, and he appeared at the
16 polls to vote and had to vote by provisional ballot,
17 that he might lose confidence in the election system?
18     A.   It's possible.
19     Q.   Are you familiar with any academic studies
20 concerning who has the necessary or allowable forms of
21 photo ID under this law?
22     A.   Under Senate Bill 14?
23     Q.   Yes.
24     A.   No.
25     Q.   Are you aware of any academic studies

## 204

1  concerning who has allowable forms of ID, photo ID,
2  under the Georgia photo ID law or the Indiana photo ID
3  law?
4      A.   No.
5      Q.   Is one of the purposes of Senate Bill 14
6  deterring ineligible voters from registering to vote?
7      A.   I think it could be, because I know that one of
8  the -- you know, one of the stated goals was to overall
9  bring confidence in the system and perceptions of
10 integrity in the system so, to that extent, it could
11 prevent that from occurring.
12     Q.   Do you agree that that purpose would be served
13 by SB-14?
14     A.   For regarding registering to vote or just
15 overall confidence?
16     Q.   Overall confidence.
17     A.   Yes.  I think that --
18     Q.   What is the basis of your belief?
19     A.   As I started to say earlier, I think all
20 election laws is kind of a balance between access to the
21 polls and keeping the election secure and maintaining
22 integrity.  And so to the extent that people feel like
23 there are not enough safeguards, if you tighten it up a
24 little bit, as long as you're not impacting access, and
25 that's the legislative process, they're always sort of

Ann McGeehan                                          May 31, 2012

## 205

1   adjusting those rules.
2       Q.   And are you aware of groups or people who do
3   not -- who feel that there are not enough safeguards in
4   proving one's identity at the polls on election day
5   besides the sponsors of the bill?
6       A.   You mean under current law, meaning before
7   Senate Bill 14?
8       Q.   Correct.
9       A.   Yes.
10      Q.   Who are those people?
11      A.   I think they're many members of the
12  legislature.
13      Q.   Outside of the legislature, who believes that
14  we do not have enough safeguards in proving voter's
15  identity at the polls on election day in the state of
16  Texas?
17      A.   I think there are fair numbers of folks who
18  believe that, and we get -- we would receive e-mails and
19  letters from people that, you know, felt the rules
20  should be tighter.
21      Q.   Are you aware of any academic studies,
22  generally, about who has access to photo ID?
23      A.   Not really.  We may have cited to one or two in
24  that original submission letter, but I'm not personally
25  aware of those studies.

## 206

1       Q.   Do you know whether you need to be a U.S.
2   citizen to obtain a license to carry a concealed weapon
3   in Texas?
4       A.   I don't know.
5       Q.   Can you describe the election identification
6   certificate provision of Senate Bill 14?
7       A.   It requires DPS to develop a new form of -- to
8   develop an election identification certificate that
9   could be issued to persons that didn't have -- that were
10  registered voters or who -- either they were registered
11  or they were eligible to be registered, and they
12  submitted registration right there at the DPS office.
13          And it has to be free.  And it can only be
14  used for purposes of voting.  Can't be used like a
15  regular personal identification certificate issued by
16  DPS.
17      Q.   Was the Division involved in developing this
18  provision at all?
19      A.   No.
20      Q.   Did you do any analysis of this provision?
21      A.   No.
22      Q.   Did you do any drafting of this provision?
23      A.   No.
24      Q.   Are you aware of any communications between the
25  Division and anyone related to this provision?

## 207

1           MR. MORTARA:  Ms. McGeehan, my earlier
2   instruction remains.  You can answer.
3       A.   You mean before it was put in the bill --
4       Q.   (By Ms. Westfall)  I mean at all --
5       A.   -- or after the bill?
6       Q.   -- at any time?
7       A.   We were not aware of it until it -- until after
8   the Conference Committee.  After the Conference
9   Committee, we began to work with DPS to figure out a way
10  to start to implement it.
11      Q.   Can you describe that?
12      A.   We had several meetings to kind of work through
13  the requirements.  DPS, I think they sent us a prototype
14  of what it would look like, what they were preparing.
15  Again, that was kind of ongoing as I left, so I didn't
16  see the end of that.
17      Q.   As you sit here today, can you list for me
18  every single purpose that you can think of for the
19  enactment of Senate Bill 14?
20      A.   Every single purpose?
21      Q.   Yes.
22      A.   I think it was the stated purposes were to
23  increase confidence in the election process, curb
24  election fraud.  Those are the main ones I can think of.
25      Q.   As to curbing fraud, the only fraud it could

## 208

1   conceivably address is in-person voter impersonation; is
2   that correct?
3       A.   I think that's the main fraud.  You know, the
4   legislature may have had other reasons, but I don't
5   know, but those are the ones I recall being discussed.
6       Q.   But as to fraud, in-person voter impersonation
7   is the only fraud that this bill could conceivably
8   address.  Is that your testimony?
9       A.   I would need to think through that.  I mean,
10  maybe there are other frauds that showing a photo ID may
11  mitigate against.
12      Q.   Sitting here today, can you identify any other
13  fraud besides in-person voter impersonation?
14      A.   I can't think of anything else right now.
15      Q.   All right.  Can you think of any other facts or
16  information about how -- that you haven't already
17  testified about today, as to how Senate Bill 14 would
18  increase voter confidence?
19      A.   I think if people trust the system, they're
20  more likely to participate in it.  And if they sense
21  that ineligible people are voting, they may be less
22  likely to participate.  So --
23      Q.   Are there any facts to support that thesis that
24  you can tell us about today or testify about today?
25      A.   I guess that's just my perception.

## 209

1    Q.   And you -- I believe you testified that those
2    are the two stated reasons for Senate Bill 14?
3    A.   That I recall.  That I recall.
4    Q.   Are there any unstated purpose of Senate Bill
5    14 that you can identify today?
6    A.   No.
7         MR. MORTARA:  And remember my earlier
8    instructions.
9    A.   No.  Not to the extent that anybody on this
10   list has mentioned any.
11   Q.   Are you aware of any unstated purposes, the
12   existence of unstated purposes --
13   A.   No.
14   Q.   -- for Senate Bill 14?
15   A.   No.
16   Q.   Was any part of the purpose of Senate Bill 14
17   to decrease the number of Hispanic voters participating
18   in elections in Texas?
19   A.   I don't think so.
20   Q.   Was any part of the purpose of Senate Bill 14
21   to decrease the number of any other groups of minority
22   voters participating in elections?
23   A.   I don't think so.
24   Q.   Was any part of the purpose of Senate Bill 14
25   for partisan purposes?

## 210

1    A.   There may have been partisan purposes, because
2    there usually is in everything.
3    Q.   Do you have any --
4    A.   I don't know any facts.
5    Q.   Do you have any facts to support that?
6    A.   No.
7    Q.   Did the purpose of photo ID in Texas, the
8    legislative purpose, evolve over time and between
9    sessions?
10   A.   Not that I'm aware of.
11   Q.   Was the -- was photo ID advanced to turn on
12   citizen voting during one session and then that was less
13   emphasized during subsequent sessions of the
14   legislature?
15   A.   Not that I recall.
16   Q.   At any time since the passage -- since the
17   enactment of SB-14, have you come to believe it was
18   passed with a discriminatory purpose?
19   A.   No.
20   Q.   At any time since the passage of Senate Bill
21   14, have you come to believe that Senate Bill 14 will
22   have a retrogressive effect on minority voters?
23   A.   No.
24   Q.   If called to trial, will you testify that
25   Senate Bill 14 has no discriminatory purpose?

## 211

1    A.   Yes.
2    Q.   And if called to trial, will you testify that
3    Senate Bill 14 has no discriminatory effect?
4    A.   Yes, based on the information I know.
5         MS. WESTFALL:  I will take a quick break
6    and then I'll pass you over to my cocounsel.
7         THE WITNESS:  Okay.
8         (Recess from  4:09 to 4:25 p.m.)
9    Q.   (By Ms. Westfall)  Ms. McGeehan, do you agree
10   that Hispanic surnamed voters are less likely to have
11   the forms of allowable photo ID under SB 14?
12   A.   No.  I mean, I don't have any reason to say
13   that.
14        MS. WESTFALL:  Okay.  Thank you.  I have
15   no other questions at this time.  We're going to keep
16   the deposition open pending resolution of some of our
17   disputes about privilege.
18        Thank you for your time.
19        THE WITNESS:  Thank you.
20        EXAMINATION
21   BY MS. PERALES:
22   Q.   Good afternoon, Ms. McGeehan.
23   A.   Hello.
24   Q.   My name is Nina Perales, and I represent the
25   Rodriguez Defendant Intervenors in this case.  All of

## 212

1    the instructions and advice that Ms. Westfall gave you
2    will continue between you and I; is that all right?
3    A.   Yes.
4    Q.   Is it also okay if I use the term "Latino" and
5    "Hispanic" interchangeably?
6    A.   Yes.
7    Q.   Thank you.
8         MS. PERALES:  I'd like to start by marking
9    the news article.  Now, does anybody know how we're
10   doing the marking?  Is it just whichever party is
11   marking it, so I can mark this as 1?
12        MR. MORTARA:  That's fine.
13        MS. PERALES:  I'd like to mark this
14   Rodriguez 1.
15        (Rodriguez 1 marked for identification.)
16        (Discussion off the record.)
17   Q.   Ms. McGeehan, I'm handing you what has been
18   marked Rodriguez 1, and I will represent to you it's an
19   article from Election Line Weekly from December 15.  And
20   I believe this in the time period shortly after you
21   announced that you would be moving on from the Secretary
22   of State's Office?
23   A.   Yes.
24   Q.   Did you ever see this article?
25   A.   I did, yeah.

## 213

1  Q.  It's a wonderful article.
2  A.  It is.
3  Q.  I wanted to put it in the record because I
4  think everything in it is true.
5  A.  Thank you.
6  Q.  And I wanted the record to reflect your
7  outstanding service to Secretary of State's Office for
8  many, many years.
9  A.  Well, thank you.  Appreciate that.
10  Q.  Ms. Westfall went over your background, which
11  this article does an excellent job of summarizing your
12  background and your education, and so I don't think we
13  need to go over any more because you've covered that
14  very well.
15      MR. MORTARA:  I'd like to put in the
16  record that the State of Texas whole-heartedly agrees
17  with everything that Ms. Perales just said.
18      THE WITNESS:  Well, thank you.  Can we end
19  right now?
20      MS. PERALES:  Would be a great way to end,
21  but I do have a few more questions.
22      THE WITNESS:  Okay.
23  Q.  (By Ms. Perales)  You testified earlier you are
24  the Assistant General Counsel at the Texas county and
25  District Retirement System.  And you described this as

## 214

1  sort of a quasi-governmental entity; is that right?
2  A.  Well, it is a governmental body per
3  statute.  But it -- we receive no state funds, so we're
4  not a state agency.  We don't get an appropriation.
5  Q.  So would it be correct to say, then, that you
6  no longer are employed by the State of Texas?
7  A.  That's correct.
8  Q.  I wanted to talk with you a little bit about
9  the benchmark system that we have right now for voter
10  ID.  I think you went over most of this with
11  Ms. Westfall with respect to the current requirement to
12  show either the voter certificate or photo ID or
13  nonphoto ID, correct?
14  A.  I think we did.
15  Q.  Can you just walk me carefully through what
16  happens if a voter presents themselves for voting at the
17  polls on election day and has none of the described
18  forms of identification?  Is it correct to say that that
19  voter could vote a provisional ballot on that day?
20  A.  Yes.
21  Q.  And then what would the voter have to do
22  subsequent in order to have that ballot counted?  Would
23  the voter come back and cure, or is there a signature
24  verification that goes on back at the county to make
25  sure that ballot could be counted?

## 215

1  A.  Under current law?
2  Q.  Under current law?
3  A.  Under current law, if a voter provided no ID
4  when they voted provisionally, there is no way to cure
5  that.  The ballot may not be counted.
6  Q.  And under what circumstances would it be
7  counted?
8  A.  If a voter voted a provisional ballot for
9  another reason, for instance, they might not be on the
10  list of registered voters or they vote in the wrong
11  precinct, something like that, then there may be ways
12  where, you know, there may have been some sort of
13  administrative mistake and their name just never made it
14  to the list of registered voters.  In that, the voter
15  registrar may be able to find that out by looking at DPS
16  records or other records.  And in that event, then the
17  ballot could be counted if the county voter registrar
18  can confirm that they were registered in the right
19  precinct.
20  Q.  Would under those circumstances, would the
21  voter have shown ID then?
22  A.  Yes.
23  Q.  So is it your testimony that if the voter shows
24  no form of acceptable ID under current law, and votes a
25  provisional ballot, there is not a mechanism to allow

## 216

1  that ballot to be counted either through a signature
2  verification at the county or later presentation of ID?
3  A.  That's right.
4  Q.  Thank you.
5      I wanted to ask you some questions about
6  U.S. citizens and some of the types of voter ID that are
7  described in SB 14.  Our conversation is going to be a
8  little bit disjointed because I'm bouncing around and
9  going in-between some of the questions I have for you
10  now.
11  A.  Okay.
12  Q.  You mentioned that you are aware that non-U.S.
13  citizen legal residents can receive a Texas driver's
14  license, correct?
15  A.  Yes.
16  Q.  All right.  And that would also be true for a
17  Texas identification card from DPS?
18  A.  Yes.
19  Q.  All right.  And you would agree with me that
20  legal permanent resident immigrants can serve in the
21  U.S. military, don't you?
22  A.  I believe that's correct.
23  Q.  And thus, they would have a military ID,
24  correct?
25  A.  Correct.

217

1   Q. All right. Did the Secretary of State's Office
2   generate any information or conduct any analysis during
3   the pendency of SB 14 on whether non-U.S. citizens could
4   obtain the forms of ID set out in SB 14?
5   A. No.
6   Q. You know a lot about the driver's license, how
7   long it's valid for, and many other things. So I'm
8   curious why the Secretary of State's Office would not
9   have made even an inquiry into whether or not
10  non-citizens could obtain the types of ID in SB 14. Can
11  you help me understand that?
12  A. I mean, we didn't -- we didn't have a reason to
13  necessarily. I mean, it was still pending legislation.
14  I don't know that we would have had the information to
15  make that kind of an analysis anyway.
16  Q. Couldn't you have looked up the --
17  A. Oh, I'm sorry. As far as who's -- if
18  non-citizens, yeah.
19  Q. So, for example, Texas law sets out the
20  requirements for obtaining a concealed handgun license.
21  Did your office make any inquiry into whether
22  non-citizens could obtain a concealed handgun license?
23  A. We did not.
24  Q. I'm going to ask you a question now about a
25  citizenship certificate. Do you know what that document

218

1   is?
2   A. I think I have seen one. I'm not very familiar
3   with them. No.
4   Q. Are you aware that they can be issued by the
5   citizenship and immigration service as opposed to a
6   federal court?
7   A. I probably knew that at one point, but I'm not
8   very familiar with that process.
9   Q. Did your office undertake any examination of
10  the nature of a citizenship certificate or how you get
11  it or what it looks like during the pendency of SB 14?
12  A. Not during Senate Bill 14.
13  Q. Did your office make any inquiry with respect
14  to citizenship certificates during the pendency of prior
15  bills?
16  A. I believe we did look into that, and it was
17  either 2007 or 2009, I think, based on a legislator's
18  questions to us.
19  Q. Now, with respect to SB 14, which requires a
20  photo, did your office make any examination whether a
21  citizenship certificate has a photo on it?
22  A. For SB 14?
23  Q. Yeah.
24  A. No.
25  Q. Are you aware that a U.S. certificate of

219

1   citizenship does not have a photo on it?
2   A. No.
3   Q. Do you know whether a U.S. certificate of
4   citizenship is different from a naturalization
5   certificate?
6   A. I think they're -- I believe there are
7   differences, but I -- I think we looked -- like I said,
8   we looked into it a little bit in either '07 or '09 on
9   some of those issues. I don't think we did any analysis
10  on that in 2011 for purposes of the Senate Bill 14.
11  Q. So when you -- when your office was preparing
12  the bill analysis for SB 14, then would it be correct to
13  say that in the preparation of that bill analysis, your
14  office did not, for example, look into whether the
15  stated acceptable documents had photographs in them or
16  how readily obtainable they were?
17  A. We did not.
18  Q. You'd -- you mentioned earlier several times
19  that your office is concerned with sort of technical
20  matters of the law and particularly implementation. Did
21  your bill analysis of SB 14 undertake an examination of
22  how SB 14 might be implemented from the perspective of
23  individual voters being able to use any of the stated
24  forms of ID as acceptable photo ID?
25  A. No.

220

1   Q. I'd like to go back to your testimony in 2005,
2   and I will give it to you --
3   A. Okay.
4   Q. -- so that you can refresh your recollection,
5   and that is Exhibit U.S. 283. Do you have --
6   A. I think I have it.
7   Q. -- U.S. 283? You might not have the right
8   pages then. I wanted to direct you to pages --oh, yes,
9   103 and 104. It's the very end maybe.
10  A. Oh, okay.
11  Q. I also thought that maybe all the pages weren't
12  there.
13  A. Oh, okay.
14  Q. Okay. In 103 and 104, you're talking about --
15  you're clearing something up about HAVA.
16  A. Right.
17  Q. And you mentioned earlier in your testimony
18  that the requirement to present identification at the
19  time of first voting for a voter who registered by mail
20  would disappear at some point, and you used the word
21  "disappear" here in your testimony. And I wanted to
22  make sure I understood, because you also mentioned that
23  you only used this requirement for a couple of years.
24  Is this requirement that you described in HAVA to
25  provide ID at the time of first voting, is that still in

Ann McGeehan                                                    May 31, 2012

## 225

1    Q.  Are you familiar with any facts around Chairman
2  Smith's efforts to get a bill passed in the House, some
3  of his proposals?
4    A.  I'm probably familiar with some of them.  I
5  think he was trying to hear as many suggestions, hearing
6  from lots of different folks on.
7    Q.  Do you remember whether Chairman Smith rolled
8  out a proposed substitute at any point?
9    A.  I'm sure he did.  I don't remember them all,
10  but --
11    Q.  Do you remember a proposal by Chairman Smith
12  that would increase funding for voter education and
13  voter registration as part of the voter ID bill?
14    A.  I don't remember that.  I -- it may have been
15  in there, but I have forgotten that.
16    Q.  Now, at this point in 2009, there is some talk
17  about potential disparate impact of the voter ID as it
18  was being proposed at that time.  And you had some
19  conversations with Ms. Westfall about Spanish surname
20  registered voters, and I want to put that aside for
21  now.
22         And I want to ask whether the Secretary of
23  State generated any information or analysis on whether
24  there were classes of persons who might have less access
25  to the ID required by the bill, whether that be groups

## 226

1  of people based on age, either youth or age, an older
2  age, or income or race.  Do you remember making any
3  inquiry, your office making any inquiry or generating
4  any information like that?
5    A.  I don't recall us doing that.
6    Q.  So, for example, with respect to accepting
7  student IDs as voter ID, do you recall whether your
8  office looked into whether accepting student IDs might
9  ameliorate students and young people, in general,
10  otherwise not having access to acceptable ID?
11    A.  I don't remember doing any research on that.
12    Q.  Okay.  And the same with elderly people that
13  might live in nursing homes, did your office ever look
14  into or make any analysis or generate any information on
15  their access to ID?
16    A.  I don't think so.
17    Q.  In 2009, did you have any internal
18  conversations at the Secretary of State's Office about
19  assessing potential disparate impact on the basis of
20  race of the voter ID bill that was being proposed at
21  that time?
22         MR. MORTARA:  Ms. McGeehan, the question
23  is unobjectionable, but I remind you on the attorney-
24  client privilege within the Secretary of State's Office,
25  to the extent that anything you did is protected by

## 227

1  that; you should self-police the attorney-client
2  privilege.
3    Q.  (By Ms. Perales)  So as long as it wasn't a
4  conversation with the four people that you mentioned
5  earlier, the Secretary, who might not have been Hope
6  Andrade in 2009.
7    A.  I think it was, she was.
8    Q.  So put aside the Secretary, Deputy Secretary,
9  communications and general counsel, I'd like to know
10  about your conversations or your communications with
11  e-mail, conversations inside the Secretary of State's
12  Office about potential disparate impact on the basis of
13  race or whether you needed to look into that?
14    A.  I don't recall any.
15    Q.  At this point, by 2009, you are getting
16  questions during hearings about potential racial impact
17  though; isn't that correct?
18    A.  I don't know that I received that question.
19    Q.  But were you present in hearings where this
20  issue was starting to be discussed --
21    A.  Yes.
22    Q.  -- by other witnesses, by members of the
23  legislature --
24    A.  Yes.
25    Q.  -- including Ralph Anchia?

## 228

1    A.  Yes.
2    Q.  But do you not recall any conversations inside
3  the Secretary of State's Office that are not privileged,
4  sort of peer to peer.
5    A.  Uh-huh.
6    Q.  Involving looking into potential racial
7  disparate impact?
8    A.  No.
9    Q.  I'd like to go to 2010 in the interim.
10         MS. PERALES:  Okay.  Here's a question for
11  United States.  We have the transcript of the interim
12  Elections Committee meeting in June of 2010.  Do you
13  happen to know the number for that exhibit so we can
14  refer to it?
15         MS. WESTFALL:  We didn't use that exhibit.
16         MS. PERALES:  You didn't use that exhibit?
17  I'd like to mark this Rodriguez 2, please.
18         (Rodriguez 2 marked for identification.)
19    Q.  (By Ms. Perales)  I'm handing you what has been
20  marked Rodriguez 2.  Happy to say we're already in 2010.
21    A.  Good.
22    Q.  If you would turn with me to Pages 36 and 37.
23  Starts near the top with "Good morning, I'm Ann
24  McGeehan."
25    A.  Okay.

Ann McGeehan                                              May 31, 2012

## 229

1    Q.  So we've got you at the beginning of your
2    testimony.
3    A.  Okay.
4    Q.  At the second paragraph, you talk about a 50
5    state chart survey, and you say it's in your packet.
6    A.  Right.
7    Q.  Do you know whether -- I mean, is this -- do
8    you know whether this was ever disclosed by the state in
9    discovery in this case?
10   A.  I don't know.
11          MR. MORTARA:  You know better than to ask
12   me.
13          MS. PERALES:  I'm not going to ask you.
14   I'll stick with the answer I got from the witness, and
15   I'll follow up later.
16   Q.  (By Ms. Perales)  And that was all I was going
17   to ask you about 2010.
18   A.  Okay.
19   Q.  Let's go to U.S. Exhibit 288.  It's a House
20   hearing transcript.  Thank you.
21   A.  Okay.  March 1st, 2011.
22   Q.  Correct.  And turn with me to Page 313, if you
23   may.  It starts -- there's a back and forth going on
24   here.  And I'd like to have you read it from 310, Page
25   310, just to get a better of sense of what's going on

## 230

1    there.
2    A.  Okay.
3    Q.  On Page 310, near towards the bottom of the
4    page, Representative Anchia starts to talk to you about
5    what he called a "vote saving affidavit approach," and
6    I'd like you to read through your comments on 313 just
7    to yourself.
8    A.  Okay.  (Witness reading.)  Okay.  So through
9    313?
10   Q.  Yes.
11          And so what you're basically talking about
12   here, would it be correct to say then is what we would
13   call a "bypass affidavit," or an affidavit in which the
14   person swears to their identity and is then permitted to
15   vote in lieu of providing photo ID; is that correct?
16   A.  Right.
17   Q.  And you say "We could" -- "We could look at."
18   On Page 13, you say "We could look at what some of the
19   other states have done."  And you mentioned Michigan.
20   Representative Anchia mentions Ohio.  You say you might
21   have heard Florida.  I'm curious whether you ever --
22   your office ever looked into that, whether or not an
23   affidavit could serve as a way to allow someone to vote
24   who lacked ID?
25   A.  We did in 2009 a little bit, but I think that's

## 231

1    covered under this privilege.
2    Q.  Okay.  So I think I can ask you about
3    information that you have generated as opposed to
4    communications.
5          MR. MORTARA:  You can ask about -- she can
6    you about information that you generated.
7    A.  Uh-huh.
8          MR. MORTARA:  She cannot ask about to whom
9    you communicated it, because that would be revealing a
10   communication.  But she can ask what information you
11   generated.
12   A.  Okay.
13   Q.  (By Ms. Perales)  I will ask about the
14   information that you generated.
15   A.  Okay.
16   Q.  Can you describe for me the information that
17   you generated when you looked into this question?
18   A.  I think that in 2009, the question came up
19   about essentially this, like some sort of bypass
20   affidavit that could be used.  And we were asked to look
21   at Michigan -- or I don't remember if we were directed
22   or we had to look that up and find out which states had
23   that, but we did look at that -- an affidavit process
24   that a person who didn't have an ID could use.
25   Q.  And what type of -- in what form did the

## 232

1    information -- in what form did you embody the
2    information?  Did you create a memo, or did you write
3    any of this down?
4    A.  I -- I know I contacted Michigan, and I
5    contacted Florida, and I think I got -- either they told
6    me their law.  I looked it up online.  I -- and that's
7    what I did.
8    Q.  Okay.  And did you write -- make any notes
9    about the information that you were learning, or did you
10   prepare an e-mail?
11   A.  I don't remember if I put it in an e-mail or if
12   it was in a phone conversation.  I don't remember.  And
13   I think by the time we got the information, the need for
14   the information had sort of -- wasn't as -- people
15   weren't asking about it as much as they were.
16   Q.  Once you gathered the information, did you form
17   a conclusion that a bypass affidavit would lead to voter
18   fraud?
19   A.  What I -- what I obtained from the information
20   I got from Michigan and Florida was that they thought it
21   was a pretty good process.  Although, I think I've read
22   that Michigan is trying to change that law now.  So --
23   Q.  You mentioned this was in 2009.
24   A.  Yes.
25   Q.  So at the time that you gathered the

Ann McGeehan                                              May 31, 2012

## 233

1  information, you understood that those states felt
2  positively about their affidavit bypass.  Did you gather
3  any information suggesting that the affidavit bypass
4  would increase voter fraud?
5       A.  We didn't really do much with it.  I mean, we
6  basically found out what -- what their process was.  We
7  didn't do any further analysis on it.
8       Q.  And you learned that they felt good about their
9  process?
10      A.  I know that the Florida director felt positive
11  about the process, and I don't know if he came to
12  testify or there was -- at some point, there was a
13  discussion that he might come and testify in one of the
14  hearings.
15      Q.  And did you learn any information at that time
16  that the bypass affidavit process would lead to
17  increased voter fraud?
18      A.  No.
19      Q.  Could you go in the same transcript to Page
20  285?  The transcript that we're holding here.
21      A.  Okay.
22      Q.  Oh, let me ask you one last question.  Since
23  your testimony that we were just talking about was in
24  2011, did you make any further investigation of bypass
25  affidavit in 2011 after being asked about it in the

## 234

1  legislature, in the hearing?
2       A.  No.
3       Q.  Is there any particular reason you did not
4  generate more information about affidavit bypass in 2011
5  after being asked about it in the hearing?
6       A.  I guess the impression I got was it was sort of
7  an idea that was suggested at the hearing but that I
8  don't know that any -- I didn't think anyone directly
9  asked us to look into it or give them any information on
10  it.
11      Q.  On Page 285, you are talking about the fiscal
12  note for SB 14.  And going from Page 284 to 285, is it
13  correct that you testified in a hearing that your fiscal
14  note assumes training and voter education for one
15  election cycle; is that correct?
16      A.  Yes.  For the 2012 cycle.
17      Q.  And so the fiscal note did not contemplate any
18  further voter education or training in terms of how much
19  money it was describing?
20      A.  Right.
21      Q.  I have a question about this, the HAVA funds
22  being used for voter education on SB 14, and it's later
23  in my outline, but I figure we could just get to it now.
24      A.  Okay.
25      Q.  I understand that Secretary of State Andrade

## 235

1  wrote a letter to Senator Ellis, I believe, saying that
2  she had received assurances from the U.S. Election
3  Assistance Commission that HAVA funds could be used for
4  voter education on SB 14.  Do you recall that?
5       A.  Yes.
6       Q.  And did you make similar assurances when you
7  testified in the legislature that the EAC HAVA funds
8  could cover voter education for SB 14?
9       A.  I probably did, and I don't know if that was
10  before the letter -- before Secretary Andrade wrote hat
11  letter or not.
12      Q.  Did you have any direct communications with the
13  EAC, the Election Assistance Commission on this topic?
14      A.  I did.
15      Q.  Can you tell me about that, those
16  communications?
17      A.  I spoke with Tom Wilke, who was the director of
18  the Election Assistance Commission, and asked him that
19  question.  And -- over the phone.  And he answered.  And
20  he pointed me in the direction of I think an opinion
21  they had written for the state of Indiana.  I think it
22  was Indiana.  He called me back a day or two later,
23  after the letter from Secretary Andrade had gone out and
24  said he wasn't authorized to give that advice over the
25  phone.  So --

## 236

1       Q.  Did you ever receive a letter or any
2  correspondence in writing from Mr. Wilke or anybody else
3  at the EAC on the topic?
4       A.  Yes.  I think he actually ended up sending a
5  letter saying that they would have to direct that to
6  their general counsel, or something along those lines.
7       Q.  Do you know whether they ever did direct that
8  question to their general counsel?
9       A.  I don't know.  I don't think we ever got -- I
10  don't think we ever received a letter from their general
11  counsel on that, that I recall.
12      Q.  So sitting here today, do you know the answer
13  to the question, whether HAVA funds could be used for
14  voter education for SB 14?
15      A.  It was my understanding that they could and
16  that they had been used for voter education in other
17  states.
18      Q.  But with respect to the prospective use of HAVA
19  funds, given that you have nothing in writing from the
20  EAC, and Mr. Wilke essentially verbally retracted what
21  he had told you before, saying he was not authorized --
22      A.  Well, he just said he couldn't say one way or
23  the other.  But I mean, even if we hadn't had that
24  conversation, there were opinions on the EAC website
25  that authorized other states to use their HAVA funds to

237

1   educate on voter ID.
2       Q.   So would it be fair to say then that you feel
3   confident today that EAC HAVA funds could be used for
4   voter education on SB 14?
5       A.   Yes.
6       Q.   We talked earlier that in 2009, your office did
7   not make an inquiry into the impact of the proposed
8   voter ID law at that time on special classes of persons
9   such as the very young or the very old.  I'm wondering
10  whether you looked into those questions during the 2005
11  session or the 2007 session, what efforts your office
12  may have made to generate information about the impact
13  of voter ID on special classes of persons?
14      A.   We did not do any analysis like that in 2005 or
15  2007.
16      Q.   Did you have any conversations internally that
17  were not privileged, within the Secretary of State's
18  Office in 2005 or 2007, about generating information or
19  inquiring or doing an analysis into the potential impact
20  of a voter ID law on special classes of persons?
21      A.   No.
22      Q.   So, for example, nobody -- none of the staff
23  attorneys came up to you and said, "We got another voter
24  ID bill on the horizon.  I think our bill analysis ought
25  to include the potential impact on certain groups of

238

1   people"?
2       A.   No.
3       Q.   You testified earlier that in February or March
4   of 2011, your office undertook an effort to try to match
5   registered voters without ID with your Spanish surname
6   registered voters; is that correct?
7       A.   Yes.  Wait, no, I'm sorry.  We -- not with
8   Spanish surname.
9       Q.   Okay.
10      A.   In February or March, we tried to do the
11  comparison of drivers that didn't have driver's license
12  on file with the DPS database to see if we could find
13  additional voters, how many voters didn't have driver's
14  license or ID identification number.
15      Q.   Okay.  I understand.  So the Spanish surname
16  registered voter part was not a part of the picture yet
17  at that time?
18      A.   That's correct.
19      Q.   And that was the analysis that you created and
20  then waited for approval from your executive committee
21  to be able to release that information?
22      A.   Right.
23      Q.   Okay.  And at what point did you receive that
24  approval and were able to release that analysis?
25      A.   We didn't -- we -- I didn't get any instruction

239

1   to release that during session.  And so I guess -- and I
2   guess nobody was breaking down the door to ask for it,
3   so it just kind of sat there for a while.
4       Q.   All right.  And did you then release it in
5   response to a request by DOJ?
6       A.   Yes.
7       Q.   And would you use -- I think you said earlier
8   that it was essentially the same analysis?
9       A.   I believe it was, as far as the process that we
10  used to pull the data in the February, March time frame
11  was pretty much what we did in August or September,
12  whenever we pulled it for the Justice Department.
13      Q.   I see.  So you used the same methodology but
14  you did the poll as of a later date?
15      A.   Yes.
16      Q.   Now, the Secretary of State routinely
17  provides -- you testified earlier on this, routinely
18  provides data on Spanish surnamed registered voters;
19  that's correct?
20      A.   Yes.
21      Q.   And I'm certainly familiar with that.  We've
22  been one of those groups that requested the information
23  and received it.
24      A.   Okay.
25      Q.   So I'm familiar with that a little bit.  Isn't

240

1   it true that following a general election, the Secretary
2   of State typically updates its Spanish surnamed
3   registered voter data, or do you do that live?
4       A.   We -- we do it more frequently now with the
5   statewide system.  It used to be that we did it at
6   designated times of the year.  But with Team, you can do
7   it, you know, I think you can do it pretty much whenever
8   you want to.  It's easier, I think.
9       Q.   And the Secretary of State does post the
10  information about Spanish surnamed registered voters on
11  its website, correct?
12      A.   I don't know if we do or not.
13      Q.   When you put in your election returns, do you
14  recall whether you ever put in Spanish surnamed
15  registered voters?
16      A.   I don't think so.  No, I don't think we do.
17      Q.   Okay.  So would you say that you update your
18  information on Spanish surnamed registered voters
19  statewide at least twice a year?
20      A.   Well, I -- actually, I think anybody can -- can
21  request a copy of the, you know, the file of registered
22  voters and can request to have the flag.  So, I mean,
23  it's available any day somebody asks for it.  I think
24  for sort of having the data ready if we get a press call
25  or something like that, we do it; I think we do it once

241

1   a month.
2       Q.   All right.  So because you have Spanish surname
3   registered voters readily available for your total voter
4   roll, I'm curious why once you did your analysis in
5   February and March of 2011, attempting to identify
6   registered voters who did not have a DPS ID, why at that
7   point you didn't simply run the flags and look?  Because
8   you already had the data for your statewide voter role.
9   All you needed was to run the data for the persons you
10  had identified as not having a DPS ID.  Why didn't you
11  do it?
12      A.   I guess nobody thought to do it.
13      Q.   Were you ever instructed not to do it?
14      A.   No.
15      Q.   Okay.  Did it ever occur to you to do it, and
16  this is a different question whether anybody asked you
17  to do it?
18      A.   It really didn't.  I mean, you know, during a
19  legislative session, it's just very busy, so it did not
20  occur to me to do it.  So I can only speak for myself.
21      Q.   Okay.  But you had been through the '09
22  session.
23      A.   Yes.
24      Q.   And at this point you're in the '11 session.
25      A.   Right.

242

1       Q.   And you're sitting through these legislative
2   hearings on voter ID.  And at every hearing, you're
3   hearing witnesses say this is going to have a disparate
4   racial impact; isn't that correct?
5       A.   Yes.  At least by members of the legislature,
6   nobody else.
7       Q.   And witnesses as well; isn't that correct?
8       A.   In some hearings.
9       Q.   Tell me the ways in which the Secretary of
10  State's Office would receive allegations of election
11  fraud.
12      A.   We could get them via e-mail, phone calls,
13  written correspondence.
14      Q.   And what do you know about the office or the
15  special investigation unit that was set up by the
16  Attorney General's Office to look into voter fraud?
17      A.   What do I know about it?  I -- at some point in
18  the -- you know, the -- maybe around 2005 or '06, I know
19  that they got more staff, so they were, you know, more
20  -- had more resources to investigate election fraud.  So
21  we -- around that time, you know, it was decided that we
22  would just send any credible allegation of election
23  fraud, whether it was for electioneering or, you know,
24  intimidating a voter, whatever it might be, we would
25  send it over.

243

1       Q.   And so you began to forward complaints about
2   voter fraud to the special investigation unit of the
3   AG's office around 2005 or 2006?
4       A.   Oh, no.  We always had made referrals based on
5   criminal -- allegations of criminal violations.  In the
6   early 2000s, we did not send over electioneering
7   violations or misdemeanors, things like that, because
8   they didn't have the staff.  And they said, you know,
9   please, we can't investigate.  So, but they got more
10  staff, and we were directed to just send over any
11  credible allegations of fraud.
12      Q.   And how would you determine that an allegation
13  was credible?  What was your criteria for deciding
14  whether something was worth sending on to the AG's
15  Office?
16      A.   Generally, they would have to provide some sort
17  of specific facts.  They couldn't just say, you know,
18  "We think this election is crooked.  Investigate."  They
19  would have to provide something specific.  Not
20  necessarily provide any proof, but state something and
21  there -- and it would be required to be in writing.  We
22  wouldn't take something over the phone.
23      Q.   Would you require something to be notarized?
24      A.   No.
25      Q.   Would you require it to be signed if it came in

244

1   by e-mail and it was credible?
2       A.   No.
3       Q.   All right.  What was your understanding of what
4   the special investigation unit of AG's office would do
5   with these allegations?
6       A.   I -- I know they had investigators that would
7   investigate.  And then I guess at a certain point, they
8   would turn it over to prosecutors.  But we didn't --
9   once we sent it over, we didn't really have any regular
10  communication on that.
11      Q.   I saw that in one of your hearing testimony
12  transcripts that you testified that you were unaware of
13  the ultimate disposition --
14      A.   Correct.
15      Q.   -- of some of these complaints.
16      A.   Right.  We didn't -- we wouldn't necessarily
17  know if they were going to prosecute someone or not.
18      Q.   Did there ever come a time when your office
19  decided to check back in on some of these allegations
20  that had been made and find out from the special
21  investigation unit what had happened to these
22  complaints?
23      A.   I think we had discussed a process to kind of
24  have sort of regular updates, but it -- we never really
25  got very far with that.

## 245

1    Q.  So today, do you have any more information
2    about the disposition of these complaints than you did
3    when you were testifying in the legislature?
4    A.  No.
5    Q.  Do you know whether documenting election fraud
6    became a higher priority at some point for the special
7    investigation unit at the AG's office?
8    A.  I don't know.  I mean, like -- I know that they
9    got more resources so they dedicated more folks to
10   it.  That's about all I know on that.
11          MS. PERALES:  Can we have Exhibit U.S.
12   284?
13   Q.  (By Ms. Perales)  Do you have Exhibit U.S. 284?
14   A.  Here it is.
15   Q.  Okay.  Oh, it's very small.  Do you have Page
16   99 in there?  If not, I'll give you the bigger
17   transcript.
18   A.  Okay.  Yes.  I have Page 99.
19   Q.  Okay.  So down at the bottom, Senator
20   Van de Putte asks you, "How many complaints have you had
21   about voter impersonation?"  Is it correct that you
22   testified, "We have not had any"?
23   A.  Yes.
24   Q.  Okay.  And then let's go to June 14,
25   2010.  This is Rodriguez --

## 246

1    A.  2?
2    Q.  It's Rodriguez 2.  Thank you.  Can you turn to
3    Page 46?
4    A.  Yes.
5    Q.  Okey-dokey.  Oops.  You're talking on Page 46.
6    If you can look back to Page 45, you start talking about
7    -- you start giving your answer.  And is it correct to
8    say that on June 14, 2010, in the paragraph near the
9    bottom, you say, of the 24 referrals that you made to
10   the Attorney General, at least two of them involve
11   allegations of voter impersonation.
12   A.  I'm sorry.  On what page?
13   Q.  46.
14   A.  46.
15   Q.  It's in the second full paragraph.
16   A.  Okay.  Yeah.  I see that now.
17   Q.  You testified you've made 24 referrals over the
18   past two years, and you said "two of them," and then you
19   said, "at least two of them involve allegations of voter
20   impersonation."
21   A.  Uh-huh.  Yes.
22   Q.  And that was your testimony?
23   A.  Yes.
24   Q.  Was it two or was it more than two?
25   A.  I said it was two.  Maybe in my head I thought

## 247

1    -- I don't know.  I don't remember now what they all
2    were, but -- let me see what the exact question they
3    asked me.
4          Well, that's what I said.  Maybe -- I
5    don't know.  Maybe some of the referrals may have sort
6    of some general allegations, and it's possible once the
7    AG does their investigation, they may uncover other
8    violations.  But probably just on the face of it, two of
9    them clearly involve that as an allegation.  And I think
10   we provided copies of all this to the committee too.
11   Q.  Do you know if the state produced those
12   documents in discovery?
13   A.  I don't know.
14   Q.  I'm going to give you one more document.  This
15   is the March 6th memo.
16          (Rodriguez 3 marked for identification.)
17   Q.  (By Ms. Perales)  Ms. McGeehan, the court
18   reporter has handed you what has been marked Rodriguez
19   Deposition Exhibit 3.  Do you recognize this as a memo
20   from Secretary of State Hope Andrade to members of the
21   House Committee on Elections dated March 6, 2009?
22   A.  Yes.
23   Q.  Okay.  I'd like you to turn with me to Page 2,
24   where there's a section about complaints received
25   concerning election-related crimes (vote fraud).  Do you

## 248

1    see this?
2    A.  Yes.
3    Q.  By the way, did you write this document?
4    A.  I -- yes, I think I did.  I'm sure other people
5    helped, but I think I was the primary author.
6    Q.  Okay.  Do you recall anyone ever making
7    suggestions that you change the document from one draft
8    to the other?
9    A.  I'm sure that I -- most likely, I wrote the
10   initial draft, and then it was sent to the executive
11   department for review, and they probably did make
12   changes.
13   Q.  Okay.  So in this paragraph about -- on Page 2,
14   let's see, somewhere in here you say you have received
15   -- okay.  It's a dense paragraph, but maybe about a
16   third of the way in.
17   A.  Yeah.  I can't believe we provided it this way,
18   but maybe we did.  It looks kind of like -- anyway.
19   Q.  It says, "Of those complaints, of the written
20   complaints received, several alleged multiple instances
21   of voter impersonation complaints clearly involve
22   allegations of voter impersonation."
23          And here the word "several" is used.  And
24   the time frame, I believe, is since September 1, 2007.
25   So that would be about a year and a half between 2007

249

1  and 2009.  I'm having a hard time meshing that number
2  several with your other testimony in -- well, in 2005,
3  you had received no complaints, and then in 2010, you
4  said you received two complaint between 2009 and 2010.
5       A.  Well, is the difference that they're talking
6  about complaints here and in the other, it's talking
7  about referrals to the AG.
8       Q.  I see.  I see.  So that helps me with my next
9  question.  Do you recall whether you ever forwarded to
10  the Attorney General's Office for investigation any
11  complaints that arose from the City of Taft?
12      A.  Well, I guess we did.  This is dated March of
13  2009.  City of Taft, City of Progreso, and something in
14  Harris County.
15      Q.  But you were mentioning to me before that not
16  all of the complaints go on to the Attorney's General's
17  Office.  They have to be sufficiently specific to be
18  investigated.
19      A.  Right.
20      Q.  Do you recall whether any of the complaints
21  from Taft, Progreso or Harris County were sufficiently
22  detailed or even gave enough information that they could
23  be investigated?
24      A.  I think those were.  I mean, I believe we did
25  make referrals to the AG on those.  You know, it could

250

1  be -- well, I don't know.
2       Q.  Do you remember attaching copies or putting
3  together with this memo copies of the complaints?
4  Because it says in the next couple of sentences, "Copies
5  of all written complaints are enclosed."  Do you
6  remember other things being with this memo such as
7  copies of the complaints?
8       A.  I think there were.  Yes.
9       Q.  Do you know if that was ever produced by the
10  state in discovery?
11      A.  I don't know.
12      Q.  On the next page, the third page, the very top,
13  in all caps, is --
14      A.  This is not a final.  I don't know where this
15  came from, but yeah, this does -- I know this did not go
16  out to the committee like that.  I can just tell you
17  that for sure.
18      Q.  I don't know.  Maybe the executive office made
19  changes after you wrote a beautiful draft.  I can't say
20  either.  But did I want to ask you about the paragraph
21  at the top.  "Question for Ann," it says.  "Do these
22  figures in the attachments I reviewed reflect all
23  instances of complaints the office received for all
24  elections since September 27, whether primary, local or
25  otherwise?"  Do you know where that question came from?

251

1       A.  That probably came from John Sepehri, who was
2  the general counsel.
3       Q.  And do you ever remember providing an answer to
4  that question?
5       A.  I'm sure I did provide an answer.
6       Q.  Okay.  Do you remember what the answer was?
7       A.  I think it did.  I mean, I think it did,
8  because I think that's the question that Representative
9  Anchia asked us, so... And it would have included all.
10  We wouldn't have --
11      Q.  Do you remember whether the complaints from
12  Taft and Progreso were related to local elections?
13      A.  Progreso was related to local elections.  I
14  think it was school district and city.  Taft, I don't
15  really remember what that was.
16      Q.  Okay.  So would it be fair to say then that
17  John is asking you here, the general counsel for the
18  Secretary of State, asking you here to make sure you put
19  in everything you had?
20      A.  Yes.
21          THE COURT REPORTER:  Is it okay if we take
22  a short break?
23          MS. PERALES:  Yes.
24          (Recess from 5:27 to 5:36 p.m.)
25          MS. PERALES:  I marked Rodriguez 4.  Did I

252

1  give it to you?
2           THE WITNESS:  No.
3           MS. PERALES:  I did not.  Can you please
4  mark this.
5           (Rodriguez Exhibit 4 marked for
6  identification.)
7       Q.  (By Ms. Perales) Ms. McGeehan, I'm handing what
8  has been marked Rodriguez 4.  Do you recognize this
9  document?
10      A.  Yes.
11      Q.  And what is the document?
12      A.  It is the State submission of Senate Bill 14,
13  the letter submission.  I guess we -- okay.  It's the
14  whole submission.
15      Q.  I hope it is.
16      A.  Yeah.
17      Q.  Okay.  If you wouldn't mind turning with me to
18  Page 10, paragraph N as is "Nancy."  You state here,
19  "The Act does not have the intent and will not have the
20  affect the diluting voting strength of any racial or
21  linguistic minority."  And you also state that the Act
22  will not affect members at any racial or linguistic
23  minority differently from the way the general public is
24  affected."  Do you see that language?
25      A.  Yes.

## 253

1    Q.   Can you give me the factual basis that you had
2    for making that statement?
3    A.   That was the opinion of the office based on the
4    information we had, and there's a discussion beneath
5    that paragraph or further discussion in N that sets out
6    a legal analysis of that.
7    Q.   I see it.  Putting aside the legal analysis,
8    are you able to identify any specific facts that formed
9    the basis of your statement in the first paragraph of
10   Section N?
11   A.   Well, essentially, this is a standard clause
12   that we put in most of our submissions.  This may have
13   been tweaked a little bit on this one, but we almost
14   always have this sentence in every submission.  So
15   unless we have specific information that there is a
16   discriminatory intent or a discriminatory impact, we
17   will put this -- these statements in the submission.
18   Q.   I understand, and I have seen this type of
19   statement before in other submissions.  I understand
20   it's something of a boilerplate.
21   A.   Yes.
22   Q.   But here, I need an answer directly to my
23   question whether you had any facts supporting the
24   statements in the first paragraph of N at the time of
25   the submission.

## 254

1    A.   I had no facts that showed that the Act would
2    have -- that the Act would affect members of a racial or
3    linguistic minority differently from the way the general
4    public was affected.
5    Q.   Did you have any facts that the Act would not
6    affect members of any racial or linguistic minority
7    differently?
8    A.   No.
9    Q.   Did you have any fact showing that the Act did
10   not have the intent of diluting the voting strength of
11   any racial or linguistic minority?
12   A.   No, I did not have any fact, factual
13   information that the Act had the intent of diluting the
14   voting strength of any racial or linguistic minority.
15   Q.   Would it be correct to say that you didn't have
16   any facts one way or the other with respect to the
17   effect of Senate Bill 14 on racial and linguistic
18   minorities?
19   A.   Yes.  I think that's fair.
20   Q.   You signed the submission; is that correct?
21   A.   Yes.
22   Q.   Did you prepare it?
23   A.   It was -- the initial draft was by one of the
24   attorneys in the Division, and then it went through
25   Elizabeth.  I looked at it.  It went to John Sepehri,

## 255

1    and John may have sent it to some other folks.
2    Q.   And then eventually, it made its way back to
3    you?
4    A.   Yes.
5    Q.   All right.  And do you always read it through
6    and make sure it's all you before you sign it and send
7    it off?
8    A.   Well, I mean, it wasn't all me, but I felt
9    comfortable signing it.
10   Q.   Why did you put Larry Gonzalez and Aaron Pena
11   as contacts in the -- I guess you'd call it the second
12   to last page.  It actually looks like there's three
13   contacts:  Aaron Pena, Larry Gonzales, and Jose
14   Aliseda.  Why did you put those three people?
15   A.   Actually, John Sepehri made that decision as to
16   which -- as to who he would list as the minority
17   contacts.
18   Q.   I see.  So this is typically racial minority
19   persons?
20   A.   Yes.
21   Q.   Are there any African Americans on this list?
22   A.   No.
23   Q.   Do you know of any African Americans who were
24   -- who spoke or testified on the bill?
25   A.   For the bill?

## 256

1    Q.   For or against.
2    A.   For or against.  I don't recall any African
3    American legislators testifying for the bill.
4    Q.   Do you remember some in opposition?
5    A.   Yes.
6    Q.   Okay.  And with respect to Latinos, because
7    these three guys are Latinos; is that right?
8    A.   Yes.
9    A.   They were all for the bill?
10   A.   I know that Representative Pena and
11   Representative Jose were.  I don't know about Gonzales,
12   Representative Gonzales.  I guess he was.  He was a
13   co-sponsor, so...
14   Q.   Yes, he was a co-sponsor, so we're assuming he
15   voted for the bill he co-sponsored?
16   A.   Yes.
17   Q.   And so these three names that you chose to give
18   to DOJ, these three Latinos did not oppose the bill; is
19   that correct?
20   A.   That's my understanding.
21   Q.   Okay.  So the decision was made by the general
22   counsel to put three Latinos, no African Americans, and
23   only people who supported the bill?
24   A.   Yes.  And generally, that's what we do is, put
25   down the names of people that are supportive of the

## 257

1    bill.
2        Q.  Did you have any communications with
3    legislators or anyone in the Office of the Lieutenant
4    Governor during the period of time that this submission
5    was being prepared and following passage of SB 14?
6        MR. MORTARA:  I'm sorry.  Can you read
7    back the question, Chris?  I just have make sure I have
8    no privilege instruction.
9        (Requested portion was read back by the
10   court reporter.)
11       MR. MORTARA:  You can answer that question
12   yes or no.
13       A.  I did not.
14       Q.  (By Ms. Perales) Do you know whether anybody in
15   your office had the communications with anybody in the
16   Legislature or the Lieutenant Governor's Office during
17   the preparation of this submission and following passage
18   of SB 14?
19       A.  I'm not aware of any.
20       Q.  Okay.  Would that answer be same with respect
21   to with some of the subsequent correspondence that you
22   had DOJ?
23       A.  Regarding if there were any conversation with
24   the Lieutenant Governor's Office or the Legislature?
25       Q.  Correct.

## 258

1        A.  That's correct.  I'm not aware of any
2    communications.
3        Q.  All right.  So while all this significant
4    amount of back and forth is going on between you and the
5    Department of Justice, and you're trying to provide more
6    information in response to their requests for more
7    information, who did you turn to, to navigate through
8    this if not anybody in the Legislature or the Lieutenant
9    Governor's Office?
10       A.  I think our -- from my perspective, we were
11   more in contact with the AG's Office, and that's
12   probably privileged, at that point, with the Attorney
13   General's Office --
14       Q.  Uh-huh.
15       A.  -- on how to respond to Justice Department.
16       Q.  Well, you weren't the client of the Attorney
17   General.
18       MR. MORTARA:  No, but the Attorney General
19   represents the State, and the Attorney General is the
20   lawyer for the entire state, including the Secretary of
21   State when they ask for legal advice from the Attorney
22   General's Office, so it's privileged.
23       Q.  (By Ms. Perales) So you asked the Attorney
24   General's Office for legal advice?
25       A.  Yes.

## 259

1        Q.  Was there -- did you have communications with
2    the Attorney General's Office that was not a request for
3    legal advice?
4        A.  No.  I think -- I think it would be considered
5    legal advice as far as getting the Act precleared.
6        Q.  Uh-huh.  Would you send factual information to
7    the Attorney General's Office from time to time during
8    the course of the back and forth with DOJ on the
9    Section 5 submission?
10       MR. MORTARA:  You can answer that question
11   yes or no, Ms. McGeehan.
12       A.  Yes.
13       Q.  (By Ms. Perales) Do you know whether that
14   factual information was produced in discovery?
15       A.  I don't know what was produced in discovery.
16       Q.  I'm sorry I keep asking that question.
17       A.  That's okay.  Okay.  Yeah.
18       Q.  But I have to get it on the record.  I don't
19   mean to be a pest about that.  Okay.
20       MS. PERALES:  I'd like mark this Rodriguez
21   5, please.
22       (Rodriguez Exhibit 5 marked for
23   identification.)
24       Q.  (By Ms. Perales) Do you recognize the first
25   page of this document as a letter from Senator Ellis to

## 260

1    you dated October 27th, 2011.
2        A.  Yeah.  I need to refresh my memory on
3    this.  (Reading document.) okay.  I have looked at it.
4        Q.  Do you recognize the first document, that's the
5    first page, printed double-sided, as a letter to you
6    from Senator Ellis?
7        A.  Yes.
8        Q.  Do you recognize the second document as an
9    attachment to that letter which is a letter from state
10   demographer Lloyd Potter?
11       A.  Yes.
12       Q.  I'm going to ask you a couple of questions
13   about this.  Were you involved in the meeting between
14   the Secretary of State's Office and Dr. Potter, the
15   state demographer, about the methodology for deriving
16   the number of registered voters in Texas by race and
17   Spanish surname that might lack ID?
18       A.  Yes.
19       Q.  Okay.  And is it correct to say, then, that in
20   this meeting with Dr. Potter, you discussed your
21   methodology for coming up with this number, and he
22   discussed his ideas?
23       A.  Yes.
24       Q.  Did Dr. Potter make any suggestions about the
25   methodology that should be used?

Ann McGeehan                                                    May 31, 2012

## 261

1    A.   As best as I can remember the meeting,
2  Dr. Potter, you know, ran through a couple possible ways
3  that they might be able to do the analysis.  And I think
4  when he heard of the information that DPS had -- and I
5  think in the meantime -- okay.  We had already gotten
6  the request from DOJ asking -- I'm just trying to get
7  the time line straight in my head.
8         Okay.  So we had already had received the
9  Justice -- so the Justice Department had probably
10  already asked us to be looking at the -- or comparing
11  the DPS race data.  So we were starting to analyze what
12  we could do with that.  And I think once we shared that
13  with Dr. Potter, I think he decided that might be more
14  fruitful than the kinds of analysis that he could do
15  with the census information and things like that.
16    Q.   Did Dr. Potter make any suggestions or offer
17  something he thought you all should be doing that you
18  decided not to do?
19    A.   I don't remember that.
20    Q.   When you had your conversation with Dr. Potter,
21  was it only about race, or was it also about trying to
22  look at Spanish surname?
23    A.   I think it also was about race.  Spanish
24  surname or -- could you restate your question, please?
25    Q.   Well, I understand from your previous testimony

## 262

1  that when you were looking at trying to identify Spanish
2  surnamed registered voters who might lack ID --
3    A.   Uh-huh.
4    Q.   -- that you were comparing your registered
5  voters with DPS and looking at their Spanish surnamed
6  people; is that right?  Or you were just looking at all
7  the Spanish surnamed flagged people in your database,
8  and the ones you could not find in DPS?
9    A.   Well, and I remember we didn't -- we didn't do
10  any analysis of DPS data -- and I'm just trying to build
11  a timeline here.  We sent the Justice Department the
12  data on the voters that we could identify that didn't
13  have a driver's license.  The Justice Department came
14  back and said, oh, but we know that DPS has information
15  on the driver's race.  Can you run that information
16  against your voter information?  And that request, I
17  think, came in around the same time as this letter from
18  the demographer, or the request from Senator Ellis.  And
19  I'm not sure how DPS -- how they identified race in
20  their data.
21    Q.   Uh-huh.  Okay.  So with respect to Spanish
22  surname, you could always have run -- once you figured
23  out who was in the voter database who you couldn't find
24  in DPS, which is possibly a list of people who lack
25  voter ID, you could always have looked at that group of

## 263

1  people for what percentage of them were Spanish
2  surnamed; you didn't need to look at DPS's race data to
3  figure that out?  In fact, they weren't even in the DPS
4  database, correct?
5    A.   Well, and we sent that to the Justice
6  Department in September.  We did that --
7    Q.   With the Spanish surname information?
8    A.   Yes.
9    Q.   Okay.  And so this is -- these letters that
10  we're looking at in Rodriguez 5 have more to do with an
11  attempt to figure out the race of the people who might
12  not have ID?
13    A.   Yes.
14    Q.   So at this point, you've got the Spanish
15  surname figured out.
16    A.   We've got the Spanish surname data figured out.
17    Q.   Okay.
18    A.   Right, and then the Justice Department asked us
19  to, sort of, see if we could further analyze the voter
20  data by comparing it to the DPS data with the --
21  whatever racial classifications they had.
22    Q.   And at that time, were you looking at Hispanic
23  as a racial classification, or had you stopped looking
24  at Hispanics?
25    A.   Well, DPS had that as a -- as a category, so we

## 264

1  looked at it.  Now, that was on -- that was just
2  beginning, and I left the agency before that analysis
3  had concluded.
4    Q.   Okay.
5         MS. PERALES:  Can we look at the March 18,
6  '09 House Journal.  I would like to mark this as
7  Rodriguez 6.
8         (Rodriguez Exhibit 6 marked for
9  identification.)
10    Q.   (By Ms. Perales) The court reporter has handed
11  you what has been marked Rodriguez 6.  And do you
12  recognize this as the Senate Journal from March 18,
13  2009?
14    A.   Yes.
15    Q.   Turn with me to Page 591 if you would, which is
16  tail end of a letter that actually begins on the first
17  page, from Deputy Secretary of State Colby Shorter, III
18    A.   Yes.  And it's really Coby, not Colby.
19    Q.   Coby.
20    A.   Coby.  His real name.
21    Q.   So this is a letter from Mr. Shorter, and he --
22  you have previously described the position of Deputy
23  Secretary of State as somebody in the executive office;
24  is that right?
25    A.   They're basically number two.

Ann McGeehan                                        May 31, 2012

## 265

1    Q.   The number two, right below Hope Andrade; is
2  that right?
3    A.   That's right.
4    Q.   If you would turn with me to Page 591, there is
5  a question on that page:  "Does the Secretary of State
6  track the racial status of registered voters?  If not,
7  how will the state prove that Senate Bill 362 does not
8  have an adverse impact on the minority voters when the
9  state submits the bill for preclearance."  Do you see
10  that question?
11    A.   Yes.
12    Q.   And is it correct, if you look at the second
13  paragraph, every submission to the U.S. Department of
14  Justice?  Do you see that second paragraph there?
15    A.   Yes?
16    Q.   The third sentence, do you see where it says,
17  "A similar effort to obtain such demographics may be
18  required for a voter identification bill."  Do you see
19  that there?
20    A.   Yes, I do.
21    Q.   So would it be fair to say, then, that the
22  number two person at the Secretary of State's Office, in
23  March of 2009, was informing the Legislature that an
24  effort would have to be made when attempting to preclear
25  a voter ID bill to identify the demographics of

## 266

1  registered voters?
2    A.   Yeah.  He said it may be required.  He offered
3  it, but...
4    Q.   Okay.  So would it be fair to say, then, and
5  your office knew, in 2009, that having to get
6  demographics on registered voters might be a part of the
7  preclearance process for showing that a voter ID bill
8  complied with Section 5?
9    A.   Yes, I mean, Deputy Shorter's answer mentioned
10  that, so...
11    Q.   Okay.
12      MS. PERALES:  I'd like to mark this,
13  please.
14      (Rodriguez Exhibit 7 marked for
15  identification.)
16    Q.   (By Ms. Perales) The court reporter has handed
17  you what has been marked Rodriguez Deposition
18  Exhibit 7.  And do you recognize this as some e-mail
19  communication between yourself and a staffer for Senator
20  Van de Putte?
21    A.   Yes.
22    Q.   And is it fair to say that in your September
23  15th e-mail, 2011, to Amber Hausenfluck, you are
24  discussing the possibility that DOJ will ask for racial
25  breakdowns of data regarding which voters do not have a

## 267

1  Texas driver's license or ID?
2    A.   Yes.  That's what I said.
3    Q.   How did you know that it was possible that the
4  U.S. DOJ would ask for that, if the letter asking for it
5  didn't come in until September 23rd?
6    A.   Well, Amber -- Amber's original question to me,
7  or she's referencing -- she is referencing a request
8  from Senator Gallegos's office, I think.  Well, I don't
9  really know who Debbie is.  But in any event, I mean,
10  what we did -- I think it started out at Senator
11  Gallegos's office, they asked a question about, you
12  know, the number the voters that didn't have driver's
13  license or personal ID numbers issued by DPS, and I
14  think we had just sent that to Justice Department.
15    Q.   Uh-huh.
16    A.   And so it was public information, and I sent it
17  to Senator Gallegos's office.  He must have sent it to
18  Senator Van de Putte's office.  And I think once it was
19  out there, then the question was, have you broken this
20  down by Hispanic surname.  So once other people were
21  asking the question, it seemed natural that DOJ might
22  ask that question, so...
23    Q.   Is it your testimony that it did not occur you
24  to you that DOJ would ask for breakdowns by Spanish
25  surname before it was suggested to you by the staffer in

## 268

1  an e-mail?
2    A.   I don't think it did.  I don't think they
3  specifically asked for it when they asked for the data.
4    Q.   DOJ, you mean?
5    A.   DOJ.
6    Q.   Okay.  I understand.  DOJ didn't ask for the
7  data until they asked for it --
8    A.   Right.
9    Q.   -- around September 23rd.  But is it your
10  testimony that it did not occur to you that the Justice
11  Department would ask for that kind of information prior
12  to September 14th, when it was suggested by a Senate
13  staffer?
14    A.   I don't remember it -- I mean, it seems obvious
15  now, but I don't recall it coming to me or asking our IT
16  department to do it.
17    Q.   And so you don't recall it occurring to you?
18    A.   No.
19    Q.   Okay.
20      MS. PERALES:  Mark this Rodriguez 8.
21      (Rodriguez Exhibit 8 marked for
22  identification.)
23    Q.   (By Ms. Perales) The court reporter has handed
24  you what has been marked Deposition Exhibit Rodriguez
25  8.  Do you recognize this as a September 7, 2011 letter

## 277

1    objection, do you remember the objection letter talking
2    about the fact you had provided them information on
3    Spanish surname voter registration for the --
4          A.   The letter from the Justice Department?
5          Q.   Yes.  Do you remember the Justice Department
6    letter of objection referring to Spanish surname
7    registered voter data?
8          A.   No, I don't remember that part of the letter.
9          Q.   Okay.  But if it did, it would have come from
10   the Secretary of State, right?
11         A.   Yes.
12         Q.   Now, redistricting, which you called another
13   animal, is one in which also prepared Section 5
14   submissions, correct?
15         A.   Yes.  Sometimes, unless it went straight to
16   court or something.
17         Q.   And when you prepared submissions,
18   administrative submissions for redistricting, you
19   routinely provide Spanish surname registered voter data
20   for the state and for individual districts, correct?
21         A.   Yes.  Yes.
22         Q.   And, in fact, you are the source of Spanish
23   surname registered voter data for the Texas Legislative
24   Council when they build their redistricting database;
25   yes?

## 278

1          A.   Yes.
2          Q.   And their GIS system?
3          A.   Yes.  That's my understanding.
4          Q.   You were very careful earlier in your testimony
5    when you talked about Spanish surname registered voters
6    and some of the complaints that you had received, to
7    talk about Spanish speaking.  And I appreciated your
8    carefulness in this, because you talked about people who
9    complained to your office because they had received
10   mailers in Spanish; is that right?
11         A.   Right.
12         Q.   And they would tell you, "I'm not Spanish
13   speaking," correct?
14         A.   Right.
15         Q.   Okay.  Is it possible to be Hispanic and not
16   Spanish speaking?
17         A.   Yes.
18         Q.   So it could have been that you correctly
19   identified this person as a Spanish surnamed person and
20   even an Hispanic person, but they didn't speak Spanish?
21         A.   Yes, that could happen.
22         Q.   Okay.  And so speaking Spanish is not the same
23   as being Hispanic, is it?
24         A.   No.
25         Q.   And, in fact, nonHispanic people speak Spanish,

## 279

1    too.
2          A.   Right.  Right.
3          Q.   Mr. Mortara aside.
4               MR. MORTARA:  But his wife does speak
5    Spanish and is, as far as Mr. Mortara knows, not
6    Hispanic.
7          Q.   (By Ms. Perales)  Have you seen any study on the
8    accuracy of your identification of Spanish surnamed
9    registered voters with respect to being able to identify
10   Hispanic voters in Texas?
11         A.   No.
12         Q.   Okay.
13              MS. PERALES:  Please mark these two.
14              (Rodriguez Exhibits 11 and 12 marked for
15   identification.)
16         Q.   (By Ms. Perales)  If you wouldn't mind looking
17   at Rodriguez Deposition Exhibits 11 and 12 for me.
18         A.   Okay.
19         Q.   I want to ask you about the January 6th letter
20   first.  Do you recognize this as another letter to the
21   Department of Justice?
22         A.   Yes.
23         Q.   Okay.
24         A.   Well, it's not signed, but...
25         Q.   That's right.  And if you wouldn't mind

## 280

1    checking and seeing that the January 12th letter is
2    signed by Keith Ingram.
3          A.   Yes.
4          Q.   Okay.  And did Keith Ingram become director of
5    Elections after you left or before you left?
6          A.   After I left.
7          Q.   And what happened to Elizabeth Winn?
8          A.   She was acting director for a while, and then
9    when Keith was named or came on board, she went back to
10   her duties as director of the Legal section.
11         Q.   Who took your place when you left?
12         A.   Well, Elizabeth basically would wore two hats.
13   I think she acting director of the Division and also
14   director of the Legal section.
15         Q.   What is her title now?
16         A.   I believe it's Director of Legal section.
17         Q.   Okay.
18         A.   But, I mean, maybe it's changed, but that's
19   what it was before I left.
20         Q.   All right.  So from what I can figure out --
21   well, first of all, let me ask you:  Did you draft the
22   January 6th letter that we're looking after here before
23   you left?
24         A.   I don't think so, but I will look at it.  I did
25   not write this letter.

Ann McGeehan                                          May 31, 2012

---

## 281

1     Q.   It doesn't sound like you, but I had to ask.
2          Let me point you to the language on Page 2
3     of the letter you're holding from January 6th.  There
4     are some bullet points, and I want you to look at bullet
5     point 5.  Look at bullet point 5 that starts with, "Use
6     of Hispanic surname."
7     A.   Okay.
8     Q.   When you were at the Secretary of State's
9     Office, did you ever write or offer the opinion that use
10    of the Hispanic surname is an unreliable methodology for
11    the purpose of this exercise, which we can understand is
12    identifying Hispanics?
13    A.   No.  And I think we -- had I offered this
14    earlier with Ms. Westfall, also, that's it -- you know,
15    we know it's not a perfect process, but, you know, it
16    was our belief at the time that it was -- it was
17    probably the only available tool we had to try and
18    identify Spanish surname voters, Hispanic voters.  And
19    furthermore, it was also pursuant to an agreement with
20    the Justice Department as sort of an authorized way to
21    identify Hispanic voters.
22    Q.   And the courts accept it as such in
23    redistricting litigation, don't they?
24    A.   Yes.
25    Q.   Okay.  And now if you look with me in the

---

## 282

1     January 12th letter, which looks a lot like the January
2     6th letter, if you go to the fifth bullet point again on
3     Page 2, you'll see it says, "Hispanic surname analysis
4     is an imprecise substitute for accurate racial data."
5          Do you have any idea why the language was
6     changed from "unreliable" to "imprecise"?
7     A.   I don't know.
8     Q.   Did you work on editing any form of this
9     letter --
10    A.   No.
11    Q.   -- before you left?
12    A.   No.
13    Q.   Are you familiar with -- are you familiar with
14    any incident in which an individual presented, for
15    voting, the voter certificate of a different individual
16    in order to impersonate that voter?
17    A.   I think there was a case in Houston where
18    somebody, I think a son, showed his deceased father's
19    certificate or something along those lines.
20    Q.   Other than the incident that you heard of
21    involving a son presenting a certificate of his father,
22    are you aware of any other incidents in which one
23    individual used the voter certificate of a person in
24    order to vote?
25    A.   I can't recall any right now, except for the

---

## 283

1     fact that I have reviewed, you know, some of these
2     documents where I stated that we made referrals to the
3     AG maybe twice on voter impersonation, and that may have
4     been based on somebody like another person's analysis of
5     all the complaints.
6     Q.   So you don't know of a specific incident, other
7     than the one in Harris County involving the son using
8     his father's voter certificate?  Because you can
9     impersonate a voter with other documents, under the
10    current law, besides the voter certificate; yes?
11    A.   Right.
12    Q.   Okay.  So with respect only to the use of the
13    voter certificate, is it correct to say, then, that you
14    were only aware of one incident that you heard of where
15    a son used the voter certificate of his father to vote?
16    A.   Well, I think it would be fair to say that
17    that's a specific fact scenario that I specifically
18    remember.  But I also feel comfortable saying that we
19    had some -- you know, at least two complaints where that
20    was an allegation.  I don't remember the underlying
21    facts under those allegations.
22    Q.   So what -- do you remember those two cases
23    solving allegations of the use of a voter certificate?
24    A.   I don't remember precisely.  And voter
25    impersonation, I mean, that's not really an offense

---

## 284

1     under the Election Code.  So, when we were asked to
2     analyze that, we'd have to sort of look at the
3     complaints and say, well, does that fit under this
4     category, which was sort of a category that's not really
5     defined.  We know what it means, but...
6     Q.   I understand.  But what you're saying is that
7     with specific reference to one person using another
8     person's voter certificate, that exact document, you can
9     recall one specific incident involving a son voting with
10    his deceased father's certificate and that you recall
11    other voter impersonation compliant, two other, in which
12    the certificate might or might not have been involved?
13    A.   Yes.
14    Q.   And can you think of a valid reason to remove
15    the voter certificate from the list of acceptable ID for
16    voting?
17    A.   You know, I can only speculate that the
18    Legislature felt it was important to have a photo ID, so
19    since the certificate doesn't have a photo, they didn't
20    feel like that was strong enough.
21    Q.   Okay.  I understand.  And for so many years, you
22    had to defer to the policy decisions of the
23    Legislature.  But I want to ask you whether you, based
24    on your 20-plus years in the Secretary of State's Office
25    and your familiarity with one very specific incident

Ann McGeehan                                          May 31, 2012

---

## 285

1   involving the improper use of a voter certificate by a
2   son to vote for his deceased father, whether you can
3   think of a valid reason, based in reality, and I'll be
4   more specific here, to prevent voter fraud by removing
5   the voter certificate from the list of acceptable ID for
6   voting?
7        A.  You know, as director of Elections, you know,
8   my duty was to implement the law, and, you know, it's
9   not my duty to second guess the law.  And so for
10  photo ID, the stated intent was that this is going to,
11  you know, strengthen our voter laws.  It's going to, you
12  know, increase confidence in the process because there's
13  going to be an affirmative identification at the polls.
14       So in that sense, the certificate alone
15  probably doesn't meet that goal.  You know, I'm not the
16  Legislature, so, you know, so I guess that's my answer,
17  if you let me get away with that.
18       Q.  (By Ms. Perales) I won't.  I have to object as
19  nonresponsive, because I'm asking for your opinion, and
20  maybe the first and last time I'll ask.  I mean, I have
21  to ask you for your opinion.  And you spent many, many
22  years in the Office.  If there's anybody in the state of
23  Texas who is an expert on the operation of elections and
24  all things surrounding elections, including the
25  acceptance of voters for voting, it's you.

---

## 286

1        A.  My opinion is, I think both sides of the issue
2   are a little exaggerated and overstated and the truth is
3   probably somewhere in the middle.
4        Q.  And so with respect to your opinions
5   specifically on the removal of the voter certificate
6   from the list of ID that should be presented for voting,
7   can you think of a reason, based in reality, to remove
8   the voter certificate from the list of ID in order to
9   prevent voter fraud?
10       A.  Well, I mean, as a practical matter, what we
11  hear from election officials is most voters don't
12  present it anyway.
13       Q.  So is there a reason to remove it, in your
14  opinion?
15       A.  I mean, it's hard to examine that without
16  knowing that -- if the mandate is photo ID, then there's
17  a reason to remove it.
18       Q.  All right.  But putting aside SB 14, our
19  current law, which we have a voter ID law in Texas,
20  includes the voter certificate as a form of ID for
21  voting, and you testified you can think of one very
22  specific incident in which a son used his father's voter
23  certificate after his father passed away to vote in his
24  place.  Knowing everything you do about Texas election
25  administration, and this one very specific incident and

---

## 287

1   two other possible incidents where you don't know
2   whether the certificate was involved --
3        A.  Right.
4        Q.  -- what is your opinion or do you have -- well,
5   I'm not going to ask the other opinion, because you'll
6   tell me you don't.  But in your opinion, is there a
7   valid reason, based in reality, to remove the voter
8   certificate from the list of acceptable ID in order to
9   prevent fraud?
10       MR. MORTARA:  Objection, asked and
11  answered.
12       Q.  (By Ms. Perales) It's a yes or no question, and
13  so I need a yes or no answer.
14       A.  Yes.  I think there would be a reason if the
15  stated goal is to increase confidence in the process and
16  to ensure the public that people aren't voting
17  fraudulently, whether it really happened in reality or
18  not aside, but if the thought is we want to promote
19  confidence in the process and the rules in the system,
20  then, yes, I think that some folks might feel more
21  confident about voting if they knew that only these
22  governmental photo IDs are allowed at the polling place
23       Q.  Have you had received any complaints from
24  voters who said they lacked confidence in the system
25  because the voter certificate could be used for voter

---

## 288

1   identification?
2        A.  No.
3        MS. PERALES:  These are my last questions,
4   the Dechert folder.
5        (Rodriguez Exhibit 13 marked for
6   identification.)
7        Q.  (By Ms. Perales) You have been handed what the
8   court reporter has marked Rodriguez Deposition Exhibit
9   13.  I'm going to ask my last questions of you regarding
10  the Public Education Plan under HAVA.
11       A.  Okay.
12       Q.  Did you, when you were at the Secretary of
13  State's Office, work on the current Public Education
14  Plan?
15       A.  I gave some feedback on this RFP, but I was not
16  the primary author or driver of it.
17       Q.  Was the Public Education Plan developed
18  in-house at the Secretary of State?
19       A.  The request for a proposal was.
20       Q.  Okay.  And when you say request for a proposal,
21  you mean Rodriguez Deposition Exhibit 13, yes?
22       A.  Yes.
23       Q.  Okay.  And what's the difference between the
24  RFP and the Public Education Plan under Senate Bill 14,
25  because I noticed you made a distinction, so I wasn't

289

1    sure.
2        A.  Well, I mean, the RFP is -- basically, it's
3    asking for proposals to help the Secretary of State
4    develop a statewide voter education program.  So the
5    actual voter education program is going to be different
6    than this.  This is just sort of setting out, sort of,
7    the minimum requirements that the office wanted to see
8    in responses.
9        Q.  Okay.  And so the responses to the request for
10   proposal would be, in essence, this is how it should
11   look, the Public Education Plan should look?
12       A.  I don't think we had a preconceived notion as
13   to how it would look.  I mean, we had certain
14   requirements we wanted see them meet, but I think they
15   were also looking for creative solutions as to how to
16   get the word out and educate voters.
17       Q.  Okay.  You were still at the Secretary of State
18   when the deadline arrived for responses --
19       A.  Yes.
20       Q.  -- to the RFP; yes?
21       A.  Yes.
22       Q.  How many proposals did the Secretary of State
23   receive in response to this RFP?
24       A.  I don't know.  I mean, I helped, or at some
25   point, I reviewed this document, but I did not see any

290

1    of the responses that came in.
2        Q.  So would you be able to answer any questions
3    regarding whether the proposals that the Secretary of
4    State received included plans designed to target African
5    Americans or Hispanic communities?
6        A.  I couldn't answer any of those questions.
7        Q.  Do you know whether a proposal has been
8    selected as a result of this RFP?
9        A.  I think it has, because I noticed on the
10   website that the Secretary had sort of picked off a new
11   kind of an education tour, and I presume that's part of
12   this.  But I don't know for sure.
13       Q.  Okay.  Do you know whether any legislators
14   encouraged the Secretary of State's Office to select a
15   particular proposal or contractor?
16       A.  I don't know.
17           MR. MORTARA:  Well --
18           MS. PERALES:  It's not legislative.
19           MR. MORTARA:  Yeah.  Sorry.
20       A.  No, I don't know.
21       Q.  (By Ms. Perales)  Okay.  I'm going off that
22   topic now.
23           Do you know anything about the substance
24   of the proposal that was selected?
25       A.  No.

291

1        Q.  There are some BIC regulations, the Texas
2    Administrative Code 37 15.181 through .185.  Does this
3    sound familiar to you?
4        A.  Yeah, maybe, on the procurement process or --
5        Q.  I'm looking now.
6        A.  Okay.
7        Q.  With respect to the proposal that was selected,
8    which we think there's been a proposal selected, who at
9    the Secretary of State's Office would be most
10   knowledgeable about the contents of the proposals and
11   the proposal that was ultimately selected?
12       A.  Probably the communications director.
13       Q.  Okay.  Eligibility for Election Identification
14   Certificate.  We have to let the court reporter mark it.
15           (Rodriguez Exhibit 14 marked for
16   identification.)
17       Q.  (By Ms. Perales)  The court reporter has handed
18   you what has been marked Rodriguez Depo Exhibit 14.
19   It's selections from the Texas Administrative Code on
20   Eligibility For Election Identification
21   Certificate.  Did you work on these regulations?
22       A.  These are the DPS's regulations it looks like?
23       Q.  Yes, having to do with this new election
24   identification certificate under SB 14.
25       A.  I may have seen a draft of these.

292

1        Q.  Do you know which agency did the first draft?
2        A.  DPS.
3        Q.  Okay.  So you might have seen a draft of this
4    somewhere along the line?
5        A.  Yeah.  I think they were asking for some
6    feedback.
7        Q.  Do you remember providing any feedback?
8        A.  I believe we did.
9        Q.  Do you remember when all of this occurred?
10       A.  Well, I don't -- I know that -- I think it was
11   in September or maybe October, that we met with DPS to
12   discuss these rules.  I don't know that I ever saw what
13   they actually proposed in the register.
14       Q.  Uh-huh.
15       A.  So it says it was effective December 13th, so
16   they probably proposed it sometime in October, but
17   that's what I know.
18       Q.  Do you know the source of the suggestion
19   involving fingerprints?  Did that come from the
20   Secretary of State?
21       A.  No, that did not come from the Secretary of
22   State.  I'm trying to find that, where that is.
23       Q.  I know.  I am, too.  But it's in here
24   somewhere.
25       A.  Yeah.

Ann McGeehan                                    May 31, 2012

## 293

1    Q.   Do you remember adding items to this long list
2  of supporting identification under 15.182?  And do you
3  remember in your comments from the Secretary of State's
4  Office adding additional documents that you thought
5  should be used in order to support the application for
6  an election identification card?
7    A.   No.  I think they were following their -- the
8  process for obtaining an personal identification number,
9  as I recall.
10   Q.   Okay.  I found the fingerprints.  It's in
11 15.183.  The applicant must provide fingerprints in
12 order to get an election identification card.  You don't
13 remember that coming from the Secretary of State?
14   A.   No.
15   Q.   Do you remember having any conversations about
16 that requirement?
17   A.   Yes.
18   Q.   And tell me what those conversations were.
19       THE WITNESS:  Is there any privilege on
20 this?
21   Q.   Who is the conversations with?  Was it DPS?
22   A.   It was DPS.  Okay.
23       MR. MORTARA:  I mean, you and DPS may
24 share a conversation, but, for instance also included
25 OAG on legal advice, that would be privileged.  DPS

## 294

1  would have the same lawyer.  If you and DPS were just
2  having conversations about what to do with respect to
3  these regulations, and you don't think you were giving
4  legal advice, you can answer.
5        MS. PERALES:  She doesn't have an
6  attorney- client relationship with DPS.
7        MR. MORTARA:  That will be common interest
8  between her and DPS Lawyers.  So, for instance, they can
9  have a common legal interest and coordinate, just like
10 you get to talk to the Justice Department.  You have a
11 common interest, and that's -- I don't get to discover
12 what you're saying to the Justice Department.
13       So if it was legal advice that you and DPS
14 lawyers were coordinating on, you can't answer.  If it's
15 not legal advice, you can answer.
16   Q.   (By Ms. Perales) Well, let me first ask you
17 then who you had the communication with at DPS regarding
18 the fingerprints?
19   A.   It was DPS general counsel, and kind of their
20 government relations person.  I don't know what her
21 title is exactly.  I think the director or the assistant
22 director of the driver's license department.  And one or
23 two other people from DPS.  And I think John Sepehri was
24 present and Elizabeth Winn was present.
25       MR. MORTARA:  And just further

## 295

1  clarification.  If these conversations were not
2  ultimately for the purpose of you rendering shared legal
3  advice between DPS and yourself to your client, the
4  Secretary of State or the executive body thereof, you
5  may answer.  If it's part of that process, you may not,
6  about the substance of this communication.
7    Q.   (By Ms. Perales) So was the substance of the
8  communication to DPS for the purpose of giving legal
9  advice to your executive office and your boss, the
10 Secretary of State?
11   A.   I think it was for the purpose of giving some
12 legal advice to DPS.
13       MR. MORTARA:  I think you can't answer
14 that.
15       THE WITNESS:  Can or cannot?
16       MR. MORTARA:  Cannot.
17   Q.   (By Ms. Perales) If you just said it was a
18 stupid idea, I think that counts.
19   A.   As legal advice?
20   Q.   Not legal advice.  As not legal advice.
21       MR. MORTARA:  Things can be stupid because
22 they are not legal.
23       MS. PERALES:  That's true.  Very true.
24 Okay.
25       I'd like to take a one-minute break.

## 296

1        (Recess from 6:45 p.m. to 6:48 p.m.)
2        MS. PERALES:  So we are back on the
3  record.
4        All right.  I reserve the remainder my
5  questions for the time of trial.  I pass the witness to
6  Mr. Mortara.
7        MR. MORTARA:  No questions.
8        MS. PERALES:  That's it.  The deposition
9  is concluded.
10       (Signature reserved.)
11       (Deposition concluded at 6:50 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

     STATE OF TEXAS          )
                             )
                             )
     VS.                     )  NO. 12-CV-128
                             )  (DST, RMC, RLW)
                             )
     ERIC H. HOLDER, JR.,    )
     In his official         )
     Capacity as Attorney    )
     General of the United   )
     States, ET AL           )

     ***************************************************
     ORAL DEPOSITION OF MAJOR FORREST MITCHELL
     ***************************************************
         ANSWERS AND DEPOSITION OF MAJOR FORREST MITCHELL, a
     witness called by the United States taken before Janalyn
     Reeves, Certified Shorthand Reporter for the State of
     Texas, on the 15th day of June, 2012, between the hours
     of 9:30 a.m. and 5:46 p.m., in the offices the United
     States Department of Justice, 816 Congress Street, Suite
     1000, Austin, Texas, pursuant to the agreement of
     counsel for the respective parties as hereinafter set
     forth.
```

**Page 3**

                        INDEX

                                     PAGE
Appearances                     2
MAJOR FORREST MITCHELL
   Examination by Mr. Gear Maranzano ....    5
   Clarifying Examination by Mr. Rosenberg    146
   Further Examination by Mr. Gear.......    147
   Examination by Mr. Rosenberg..........    210
   Examination by Mr. Sweeten............    215
   Further Examination by Mr. Gear.......    225
   Further Examination by Mr. Rosenberg..    238

Signature and Changes           245
Reporter's Certificate          247

**Page 2**

```
                A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    OFFICE OF THE ATTORNEY GENERAL:
    By:  MR. PATRICK SWEETEN
         - and -
         MR. REYNOLDS BRISSENDEN
    209 West 14th Street
    Austin, Texas  78701
    PH: (512) 936-6432

FOR THE DEFENDANT:
    DEPARTMENT OF JUSTICE
    By:  MR. BRUCE GEAR
         - and -
         MR. VICTOR WILLIAMSON
    950 Pennsylvania Avenue, NW
    Room 7161 NWB
    Washington, DC  20530
    PH: (202) 305-0185

FOR THE INTEVENORS:
    DECHERT, LLP
    By:  MR. EZRA ROSENBERG
    902 Carnegie Center
    Suite 500
    Princeton, New Jersey 08540
    Ph: (609)) 955-3259
```

**Page 4**

                    EXHIBITS
NO.      DESCRIPTION              PAGE
580   Notice of Deposition          16
581   Letter              20
582   Objections and to Notice      27
583   Election Code Prosecution      59
584   Press Release          98
585   Spreadsheet           99
586   Press Release         108
587   Press Release         109
588   Press Release         115
589   Press Release         120
590   Press Release         128
591   Report              177
592   Article         177
593   Article         196
594   Resource Witness Testimony     204
595   Document              205

Major Forrest Mitchell                               June 15, 2012

---

**5**

1   MAJOR FORREST MITCHELL,
2   having being first duly sworn, testified as follows:
3   EXAMINATION
4   BY MR. GEAR:
5   Q.  This is the deposition of Major Forrest Mitchell
6   in the matter of Texas V Holder, US DC for DC docket No
7   1:11 CV 128.  Good morning, Major Mitchell.
8   A.  Good morning.
9   Q.  Could you state your name and spell your name for
10  the record?
11  A.  My name is Forrest Mitchell, F-O-R-R-E-S-T,
12  M-I-T-C-H-E-L-L.
13  Q.  My name is Bruce Gear.  I'm with the Department
14  of Justice.  I represent Eric Holder who is the United
15  States Attorney General.  And could everybody else
16  introduce themselves?
17  MR. SWEETEN:  Patrick Sweeten with the Texas
18  Attorney General's office on the behalf of the State of
19  Texas and on behalf of the witness, Forrest Mitchell.
20  MR. BRISSENDEN:  Reynolds Brissenden for the
21  State of Texas and the witness.
22  MR. ROSENBERG:  Ezra Rosenberg from
23  Dechert LLP representing the Legislative Conference of
24  NAACP branches and the Mexican American legislative
25  caucus.

---

**6**

1   MR. WILLIAMSON:  Victor Williamson from the
2   US Department of Justice.
3   BY MR. GEAR:
4   Q.  Now, you've been sworn in under oath.  You
5   understand that you've been sworn in?
6   A.  Yes, sir.
7   Q.  That you are under oath.  That you're here today
8   to provide testimony and that you're expected to testify
9   completely and as fully as possible.  You understand
10  that?
11  A.  Yes, sir, I do.
12  Q.  Okay.  So I just want to start off with a couple
13  of ground rules so that we understand exactly what we're
14  doing.  I'm going to be asking you questions.  You're
15  going to be providing the answers and so it's very
16  important that during the course of the deposition you
17  allow me to get out my question and then I will allow
18  you to get out your answer completely and fully.  And at
19  anytime during this deposition if you believe you recall
20  something or you stated something in accurately, let me
21  know and I'll allow do you correct that on the record.
22  Do you understand?
23  A.  Yes, sir.
24  Q.  Okay.  You know, so it's important that you allow
25  me to finish my questions and I'll allow you to finish

---

**7**

1   your answers.  It's important to answer verbally because
2   a nonverbal answer is hard to catch on a record and the
3   court reporter needs to hear your response.  Do you
4   understand that?
5   A.  Yes, sir.
6   Q.  Okay.  So -- which may happen during this
7   deposition if I ask you a question you don't understand,
8   then, you know, don't hesitate to ask me to repeat it or
9   don't hesitate to ask me to try to restate it so that
10  you can understand it.  This is my opportunity to
11  understand what you know.  So I'm going to be asking a
12  lot of questions, none of them are intended to be
13  personal.  It's intended to get to exactly that, what do
14  you know.  Do you understand that?
15  A.  Yes, sir.
16  Q.  All right.  Is there any reason you think you may
17  not be able to answer completely and truthfully today?
18  A.  No, sir.
19  Q.  Are you taking any type of drugs or medication
20  that may affect your ability to understand the questions
21  that I ask or provide answers today?
22  A.  No, sir.
23  Q.  At any point during this deposition, if you would
24  like to take a break, just what I would ask you to do is
25  work through the question that's before you, complete

---

**8**

1   that, let me know that you need to take a break and then
2   I'll allow you do to that.  Is that understandable?
3   A.  Yes, sir.
4   Q.  Okay.  And what may happen during the course of
5   this deposition, there may be objections, there may be
6   discussions between the attorneys.  I just ask that if
7   there's a question before you that you answer that
8   question unless you're directed otherwise by your
9   attorney.  Do you understand that?
10  A.  Yes, sir.
11  Q.  Okay.  Now, during the course of this deposition,
12  we're going to be talking about voter ID, photo ID.  And
13  I would ask that you consider those terms
14  interchangeably throughout this deposition.  I want you
15  to interpret those terms broadly, to mean that the
16  requirement that a voter present a form of
17  identification, whether it has a photo or otherwise,
18  when voting in person before being permitted to vote
19  with a regular ballot.  Do you understand that?
20  A.  Yes, sir.
21  Q.  If I refer to you, I'm asking you a question
22  about you as a member of the special investigations unit
23  of the law enforcement division of the office of the
24  Texas Attorney General's office.  Do you understand
25  that?

Major Forrest Mitchell                                    June 15, 2012

## 9

1    A. Yes, sir.
2    Q. Okay. If I refer to you, I'm also including any
3  staff that you may supervise, but before your attorney
4  objects to this because we've gone down this road
5  before, I am going to do my best during the course of
6  this deposition to identify when I'm referring to you in
7  your capacity in the special investigations unit or when
8  I'm broadening that definition to include others that
9  may be underneath you or within your office. Do you
10  understand that?
11    A. Yes, sir.
12    Q. Okay. If I say the Texas Attorney General, I
13  mean the Attorney General Greg Abbott. Do you
14  understand that?
15    A. Yes, sir.
16    Q. All right. And we may, as we get into this
17  deposition, we may be talking about the special
18  investigations unit or the office of the attorney
19  general I may use those interchangeably. So would you
20  mind if I use the term SIU for the special
21  investigations unit at times and would you understand
22  that?
23    A. That would be fine, sir. Yes, I will.
24    Q. Okay. So do you understand everything that we've
25  talked about so far?

## 10

1    A. Yes, sir, I do.
2    Q. All right. And are you represented by counsel
3  today?
4    A. Yes, sir.
5    Q. And who is your counsel?
6    A. Patrick Sweeny and -- I'm sorry.
7    MR. BRISSENDEN: Reynolds.
8    A. Reynolds.
9    Q. Have you ever been deposed before?
10    A. No, sir. This is the first time.
11    Q. Have you ever provided testimony at trial?
12    A. Yes, sir.
13    Q. And I know you're an investigator and you
14  probably have provided quite a bit of testimony. But
15  generally, talk to me and tell me about what type of
16  testimony you provided in the past?
17    A. Well, for the first year -- first eight years
18  with the Texas Attorney General's office I worked in the
19  prosecutor assistance division. And one of my charges
20  was to investigate capital murder cases which occurred
21  in the State of Texas. And so I would testify about my
22  investigative work on those kinds of cases.
23    Q. And those dealt specifically with capital murder
24  cases?
25    A. Yes, sir. During that time I also worked other

## 11

1  types of cases including public integrity cases, fraud
2  cases, other index crimes and I would testify in
3  criminal proceedings about whatever investigative work
4  that I had done on those cases.
5    Q. And you said, "during your first eight years"?
6    A. Correct.
7    Q. How long have you been with the office of the
8  attorney general?
9    A. In September I will have been there 15 years.
10    Q. 15 years. Okay. So after your first eight
11  years, where did you go?
12    A. I became the lieutenant of the special
13  investigations unit.
14    Q. And that was what time period?
15    A. In 2005.
16    Q. And the title you just told me you became the?
17    A. I became the lieutenant.
18    Q. Lieutenant. And was that the lead investigator?
19    A. No. It was a supervisory position.
20    Q. Supervisor. Okay. So let's focus on 2005. We
21  were still talking about the types of testimony you may
22  have provided. So from 2005 forward, have you been
23  involved in trials where you provided testimony under
24  oath?
25    A. I haven't really testified much up until 2010.

## 12

1    Q. 2010. Okay. And in 2010 can you tell me a
2  little bit about that testimony?
3    A. Yes, sir. I was one of the investigators who
4  assisted on the YFZ case, which occurred out in
5  Schleicher County.
6    Q. YFZ?
7    A. YFZ.
8    Q. Is that short for something else?
9    A. Yearning for Zion.
10    Q. Yearning for Zion, okay. And tell me a little
11  bit about that case?
12    A. That was a case involving men who had married
13  under age women and had fathered children with those
14  under age women. And had married multiple women in
15  Schleicher County.
16    Q. And so as I understand your testimony, that did
17  not involve election code violations?
18    A. No, sir.
19    Q. Something completely different?
20    A. Yes, sir.
21    Q. Have you testified on any matters that involved
22  election code violations?
23    A. No, sir.
24    Q. So other than the YFZ in 2010, have you provided
25  any other testimony at trial, 2005 forward?

## 21

1    Q.  You indicated that you sent an e-mail saying yes,
2    no, yes, no in response to the notice of depositions and
3    I don't want do you get into privileged communication
4    with your counsel.  But was that e-mail sent to your
5    counsel?
6    A.  Yes, sir.
7    Q.  And when was that e-mail sent?
8    A.  Sometime last week.
9    Q.  And who was it sent to?
10   A.  John McKenzie.
11   Q.  Turning your attention to Page 2, last full
12   paragraph where it indicates, "Mr. Mitchell will produce
13   the -- to the Department of Justice convictions and
14   indictments for voter fraud for the time period
15   identified in Exhibit A to Mr. Mitchell's notice by
16   6:00 p.m. on June 8, 2012."  It also goes on to say
17   that, "Mr. Mitchell will produce another spread sheet,
18   redacted of personal identifying information, for the
19   309 voter fraud investigations that he maintains in the
20   ordinary course of duties."  Do you see that?
21   A.  Yes, sir.
22   Q.  It also indicates that, "we continue to assert
23   our objections as to the production of over 10,000 pages
24   of largely irrelevant documents and maintain our belief
25   that a request calling for such as production far

## 22

1    exceeds the scope of discovery."  Do you see that?
2    A.  Yes, sir.
3    Q.  Now, when you talk about "10,000 pages of
4    irrelevant documents," can you give me an idea of what
5    you're actually referring to?
6    A.  Case files.
7    Q.  And those are case files that regard the spread
8    sheets that you've provided to the defendant, Eric
9    Holder, in this case?
10   A.  Yes, sir.
11   Q.  And those case files include conviction records,
12   if any?
13   A.  Correct.
14   Q.  They include testimony, if any?
15   A.  I do not believe the case files would include
16   testimony.
17   Q.  Okay.  Why don't we do it this way.  Generally
18   what would the case files include?
19   A.  The case file would generally contain a referral
20   document from an outside agency.
21   Q.  Okay.
22   A.  Such as the Secretary of State's office, a local
23   district attorney's office or county attorney's office.
24   Q.  Which would initiate the action in the attorney
25   general's office?

## 23

1    A.  Correct.
2    Q.  Okay.  What else would it include?
3    A.  It also could include affidavits from
4    complainants --
5    Q.  Okay.
6    A.  Who forwarded that information to whatever
7    referral agency.  It may contain documents such as voter
8    registration records or mail-in ballot applications or
9    poll place combination forms.
10   Q.  And those documents would have come from the?
11   A.  Referring agency.
12   Q.  Referring agency.  Okay.  Anything else that
13   would be in the files, generally?
14   A.  In the entire case file would be investigative
15   work product, such as interviews of witnesses.
16   Q.  Notes?
17   A.  Notes.  Suspect interviews, audio recordings,
18   personal identifying information of witnesses or
19   suspects contacted, additional election records
20   obtained.  And each one will generally contain an open
21   case form and a closed case form, along with any sorts
22   of court pleadings such as, indictments or information
23   or the final disposition of the case.
24   Q.  Okay.  And do you agree with what's stated here
25   that these would be irrelevant; in particular,

## 24

1    irrelevant to understanding your spread sheet?
2         MR. SWEETEN:  That's communication that we
3    provided to you on behalf of the witness.  He's not
4    going to comment on what he thinks of the words on the
5    page.
6         MR. GEAR:  Well, I'm asking you --
7         MR. SWEETEN:  That's a legal term.
8    "Relevance" is a legal term.  We're his legal counsel.
9    We represent Mr. -- Major Mitchell.  And we provided to
10   you what our belief is and his position is.  That
11   continues to be his position for you to ask him to
12   characterize your legal interpretation of his words would
13   invade the attorney/client privilege and frankly, is
14   irrelevant.  We're representing him in this case.  So I
15   object to the question.
16   BY MR. GEAR:
17   Q.  You can answer.
18   A.  Can you repeat that, sir.
19   Q.  Can you read back?
20        (Requested question was read.)
21        MR. SWEETEN:  Objection; calls for a legal
22   conclusion.  Objection; relevance.  You can go ahead and
23   answer.
24   A.  There are many documents in these case files that
25   don't deal with SB 14 at all.

## 25

1  Q.  But they deal with the issue of -- in this case
2  referring to your spread sheet, which we'll get to
3  later, refer to the issue of voter fraud?
4  A.  In the broad sense, yes.
5  Q.  Well, they're from the referring agency, correct?
6  A.  Correct.
7  Q.  And they're regarding election code violations?
8  A.  Correct.
9  Q.  And in that, when you say, "the broad sense,"
10  they're referring to election code violations referred
11  from a particular agency?
12  A.  Correct.
13  Q.  To the attorney general's office?
14  A.  Yes, sir.
15  Q.  And did you complete your answer?  I'm sorry.
16  A.  I apologize.
17  Q.  You were answering and I interrupted you, I
18  think.  So were you able to complete your answer on
19  that?
20  A.  The large volume of documents deals with all of
21  the election code referrals that this office has
22  received over the years.
23  Q.  Okay.  And am I understanding correctly that
24  there's also and off-site location where files are
25  maintained?

## 26

1  A.  Multiple.
2  Q.  Okay.  And did you search those off-site
3  locations in response to the notice of deposition?
4  A.  Electronically.
5  Q.  So they are both electronic files and paper
6  files.  Is that your testimony?
7  A.  Yes, sir.  If I could clarify?
8  Q.  Sure, please.
9  A.  We have a case management system and what we did
10  was try to determine the location of the closed case
11  files, all of the election code case files which are
12  maintained off-site.
13  Q.  So it's the closed case files that are maintained
14  off-site?
15  A.  Yes, sir.  If I could clarify that as well?
16  Q.  Please.
17  A.  Due to the large volume of documents, some open
18  case files require that we store them off-site as well.
19  Q.  So they're both open and closed files?  And would
20  all those -- would the information in those files be
21  maintained both by paper and electronically?
22  A.  Only a small portion is maintained
23  electronically.
24  Q.  Okay.  And so my original question was, did you
25  search those files in response to the notice of

## 27

1  deposition, you indicated electronically, correct?
2  A.  Correct.
3  Q.  So am I -- is it fair to say that you did not
4  search the paper files to determine if there were any
5  responsive documents?
6  A.  I did not search paper files.
7  Q.  Okay.  And I want to be clear on this when I'm
8  saying "you," I mean you or anyone else within your
9  office?
10  A.  Correct.
11  (Exhibit No. 582 was marked.)
12  BY MR. GEAR:
13  Q.  Okay.  I'm showing you what's been marked as
14  Exhibit 582.  I'll give you a chance to take a look at
15  that.  Have you had a chance to look at Exhibit 582?
16  A.  Yes, sir.
17  Q.  And have you seen that exhibit before?
18  A.  Yes, sir.
19  Q.  Did you assist in preparing the answers on
20  Exhibit 582?
21  A.  Can you explain, "prepare"?
22  Q.  Did you provide any input on Exhibit 582?
23  MR. SWEETEN:  Don't reveal anything you said
24  to us, not one word.  You can just say if you've had any
25  effort in drafting that or not and this's all -- that's

## 28

1  all we're going to give them.
2  A.  I did not provide any effort in drafting this
3  document.
4  Q.  (By Mr. Gear)  Okay.  And that -- okay.  Your
5  counsel referred to a document that would provide a
6  clearer understanding of what you did to respond to the
7  notice of deposition.  Would that be the document
8  that --
9  MR. SWEETEN:  Feel free to review the
10  document to the extent you need to.
11  BY MR. GEAR:
12  Q.  I mean, if your testimony is that you didn't
13  provide any assistance or input into the drafting of
14  that particular document, I understand that and we can
15  move on.  Is that your testimony?
16  MR. SWEETEN:  No.  What I said earlier is I
17  think it would be fair if you're going to ask him about
18  the categories of documents that you show him the
19  official responses that we submitted to you a week ago.
20  And so he's -- now that he has that in front of him, I'm
21  going to advise him to review it to the extent he needs
22  to in order to answer your question.
23  A.  I apologize, again.  Can you restate your
24  question one more time?
25  Q.  Well, let me actually ask you a different

## 33

1   update it to the mainframe.  And then would they be sent
2   to the off-site location?
3       A.  Just the status is updated in mainframe.
4       Q.  Okay.
5       A.  All the documentary files are placed in a box or
6   boxes.  And prepared for long-term storage.
7       Q.  And long-term storage is as we talked about at
8   off-site locations?
9       A.  We keep them in our division for a short period
10  of time.
11      Q.  Is there a determination that certain time period
12  that you keep them there?
13      A.  I don't really know what that is.
14      Q.  And after that short period of time what happens?
15      A.  They're sent to, I believe a warehouse.
16      Q.  And so you indicated there were multiple
17  locations.  Can you tell me how many different locations
18  there are off-site?
19      A.  I do not know how many warehouses we have for the
20  State records system.
21      Q.  Okay.
22      A.  We do have a couple of cases that have large
23  volumes of documentary evidence or records.  And we have
24  those stored in off-site location.  That would be just
25  one location.

## 34

1       Q.  And what's the name of that location, if you
2   know?
3       A.  I don't really know the name of it.
4       Q.  Is it here in Austin?
5       A.  Yes, sir, it is.
6       Q.  Okay.  Let me change the subject for a minute and
7   talk about your background.  Could you tell me what your
8   educational background is?
9       A.  I graduated from Southwest Texas State University
10  in 1997 with a bachelor's degree in criminal justice and
11  a minor in sociology.  And then I have attended graduate
12  level courses at the University of Virginia at the FBI
13  academy and then also through Sam Houston State
14  University in Huntsville Texas for the leadership
15  command college.
16      Q.  So the graduate level courses, what was the
17  subject matter of the study?
18      A.  I attended the 233rd FBI national academy in
19  Quantico, VA in 2008.  And while you're attending the
20  academy, you can take graduate level classes through
21  University of Virginia.  I took courses in
22  organizational communication.  I took courses in
23  intelligence, in law enforcement, organizational change,
24  ethics and integrity in law enforcement and forensics
25  for supervisor?

## 35

1       Q.  Okay.  So as I understand your testimony, you
2   have an undergraduate degree in criminal justice?
3       A.  Yes, sir.
4       Q.  And do you currently hold a master's in any
5   field?
6       A.  No, sir.
7       Q.  Okay.  Any other education generally?
8       A.  Well, yes, sir.  I attended basic peace officer
9   academy in 1993 through the San Antonio College in
10  San Antonio, Texas.  And then over the course of my
11  20 years of public service, I have taken many
12  investigative courses.
13      Q.  Continuing education?
14      A.  Yes, sir.
15      Q.  I understand that.  So you do not hold a law
16  license, correct?
17      A.  No, sir, I do not.
18      Q.  Are there any privileges that you're asserting
19  today?
20          MR. SWEETEN:  I'll assert the privileges as
21  they may come up.  It depends on what you ask him.  If
22  you ask him about his doctor/patient relationship, we'll
23  assert the privilege there.  With respect to -- he's
24  going to assert as to any attorney/client privilege.
25  There also may be occasion wherein the event it comes

## 36

1   up, the law investigatory privilege.  And that's a
2   privilege that would -- if in the event he were asked to
3   reveal a law enforcement investigatory technique, that
4   we would assert as to that.  Otherwise, it will depend
5   on the questions that are asked.  Thus far, he hasn't
6   asserted any privilege other than the discussions he's
7   had with us.
8   BY MR. GEAR:
9       Q.  I promise you I won't ask you about your
10  doctor/client privilege?
11          MR. SWEETEN:  That was sort of in gest.
12          MR. GEAR:  I know.
13  BY MR. GEAR:
14      Q.  Are you a member of any organizations?
15      A.  Currently I'm a member of the FBI national
16  academy graduate.
17      Q.  Anything else?
18      A.  No, sir.
19      Q.  Have you ever heard of the Austin Area Chapter
20  Association of Certified Fraud Examiners?
21      A.  Yes, sir, I have.
22      Q.  Is that an organization with a membership?
23      A.  Yes, sir.
24      Q.  Are you a member of that organization?
25      A.  No, sir.

## 37

```
 1     Q.  Have you ever presented for that organization,
 2  provided any speeches, information related to what you
 3  do in the office of the Attorney General?
 4     A.  Yes, sir.
 5     Q.  Okay.  Do you know how often you do presentations
 6  in front of this organization?
 7     A.  I believe I've done two presentations for the
 8  Austin chapter.
 9     Q.  And do you recall when those presentations were?
10     A.  They were a few years ago.
11     Q.  General time period?
12     A.  I would say between 2006 and maybe 2010.
13     Q.  And you indicated that that particular
14  organization, The Association of Certified Fraud
15  Examiners, has a membership?
16     A.  Yes, sir.
17     Q.  Okay.  And have you ever been a member?
18     A.  I don't believe -- no, I have not.
19     Q.  All right.  Any other -- let's talk a little bit
20  about your work experience.  So you indicated that
21  you're currently with the SIU division.  Can we walk
22  that back a little bit and tell me about your work
23  experience?
24     A.  Well, if I could clarify, I now also supervise
25  the fugitive apprehension unit or the sex apprehension
```

## 38

```
 1  unit as well.  Those are the two units that I'm
 2  responsible for supervising, SIU and the fugitive
 3  apprehension unit.
 4     Q.  And just briefly, for the fugitive apprehension
 5  unit, when did you become a supervisor?
 6     A.  May 1st.
 7     Q.  Does that have anything to do with election code
 8  violations?
 9     A.  No, sir.
10     Q.  Okay.  So turning your attention back to the SIU,
11  when did you become a supervisor there?
12     A.  In 2005.
13     Q.  And prior to 2005, were you in the office of the
14  Attorney General?
15     A.  Yes, I was.
16     Q.  And can you tell me a little bit about what you
17  did prior to 2005?
18     A.  I was hired with the Texas Attorney General's
19  office the Fall of 1997.  I was an investigator assigned
20  to the prosecutor assistance division in special
21  investigations for -- I'm sorry.  From 1997 to 2003, I
22  worked in that division.  As I stated previously, a good
23  portion of that was working on capital murder
24  investigations throughout the state.  We also did other
25  types of investigations at the request of local district
```

## 39

```
 1  county attorneys.  These could be any kind of case from
 2  an aggravated robbery to a public integrity
 3  investigation.
 4     Q.  When you say, "public integrity," what are you
 5  referring to?
 6     A.  This -- a typical case would involve a local
 7  official who could be in law enforcement or an elected
 8  official or an appointed official who engages in any
 9  kind of criminal misconduct associated with their office
10  or while in office.
11     Q.  So you were with -- you were with this particular
12  division from 1997 to 2003, correct?
13     A.  With an exception of about two and a half weeks.
14  I left the office of the Attorney General and went to
15  the Texas Department of Insurance for about two and a
16  half weeks.
17     Q.  And the Texas Department of Insurance has nothing
18  to do with election code violations?
19     A.  That's correct.
20     Q.  All right.  And so let's just focus on the 1997
21  to 2003.
22     A.  Okay.
23     Q.  Did you -- did you ever have an occasion during
24  that time period to work on election code violation
25  referrals, allegations?
```

## 40

```
 1     A.  One.
 2     Q.  One.  Can you tell me about that?
 3     A.  There was -- and I can't give you the date.  But
 4  it was when I came on as a new investigator, there was
 5  an allegation of election misconduct in the handling of
 6  ballot boxes in Liberty County.
 7     Q.  Do you recall who was the alleged wrong doer in
 8  that case?
 9     A.  No, sir, I don't.
10     Q.  Do you recall any specifics about the
11  investigation?
12     A.  No, sir.  By the time I got the case the statute
13  of limitations expired.
14     Q.  And the overall allegation was, could you say
15  that again?
16     A.  I believe the handling of the ballot boxes.
17     Q.  Was that misconduct by an official?
18     A.  I don't remember.
19     Q.  Is it fair to say that -- that the one case that
20  you dealt with between 1997 and 2003 did not deal with
21  voter impersonation?
22     A.  Yes, sir, that's fair.
23     Q.  So between 2003 to 2005, what responsibilities
24  did you have within the attorney general's office?
25     A.  I was assigned as a long-term case investigator.
```

## 41

1    Q. And tell me what the responsibilities are and
2  what division you were in?
3    A. In 2003, all of the investigators with the office
4  of the Attorney General merged into the criminal
5  investigations division. Previously we had been
6  assigned to specific divisions that handled specific
7  types of cases. The prosecutor assistance division did
8  any type of case that a local district or county
9  attorney needed assistance on or had been recused in.
10 And so again, I could work any type of case. And there
11 were other divisions that had like financial crimes,
12 they had investigators as well. And the cyber crimes
13 was another particular unit. In 2003 all of the
14 investigators were merged into one division focusing the
15 same in units of specialization.
16    Q. Okay. So I think I understand that. So between
17 2003 and 2005, did you ever have an occasion to work on
18 an election code violation case?
19    A. In mid-2005 I did when I became the lieutenant.
20    Q. And when you say, "when you became the
21 lieutenant," were you part of the SIU at this time?
22    A. Yes, sir.
23    Q. So between 2003, 2005 until you became the
24 lieutenant in the SIU, you did not work on any election
25 code violation cases?

## 42

1    A. That's correct.
2    Q. Okay. So let's move forward then, regarding --
3  actually, I would like to back up. I'm sorry. You were
4  talking about the records that are maintained in your
5  office. Do the electronic records contain scans of
6  every hard copy document in storage?
7    A. No, sir.
8    Q. They do not. Moving forward to 2005 when you
9  became the lieutenant in the SIU, how did you become the
10 lieutenant for that particular position?
11    A. I believe we submitted our names for
12 consideration and the supervisor of the division
13 reviewed memos and our personnel files and then made a
14 selection.
15    Q. And who did you submit your -- did you say letter
16 of recommendation? I'm sorry.
17    A. I'm sorry. We submitted our names for
18 consideration and we submitted those to David Boatright.
19    Q. David Boatright. And who is David Boatright?
20    A. He was the division chief at the time and was
21 later my Major.
22    Q. And he was the division chief for the SIU?
23    A. For the entire criminal investigations division.
24    Q. And obviously you were selected?
25    A. Yes, sir.

## 43

1    Q. So when you were selected, was that automatically
2  a supervisory position?
3    A. Yes, sir.
4    Q. And I believe you said you held the rank of
5  lieutenant?
6    A. Yes, sir. If I could clarify?
7    Q. Please.
8    A. It was an investigator supervisor. Because we're
9  so small, I still had to work some cases.
10    Q. So in 2005 you became the investigative
11 supervisor. Can you tell me how many people you
12 supervised, if any?
13    A. I think it was a small group of maybe -- it
14 varied over the years. But anywhere between 8 and 12.
15    Q. And we're talking about 2005 at this point?
16    A. Yes, sir.
17    Q. Between 8 and 12. Can you tell me generally what
18 the responsibility of the -- were they all
19 investigators?
20    A. Yes, sir.
21    Q. Of the investigators you supervised, what was
22 their responsibility?
23    A. What was their responsibility or mine?
24    Q. What was their responsibility?
25    A. To conduct investigations that were referred to

## 44

1    our office.
2    Q. And am I accurate to say that the SIU does not
3  only deal with election code violations, it deals with a
4  broad variety of different violations?
5    A. That would be accurate. We deal with a wide
6  variety of criminal investigations.
7    Q. And generally, can you tell me the types of
8  investigations that the SIU deals with?
9    A. Public integrity, election violations, white
10 color crimes such as fraud. And are you talking 2005 or
11 all the way to present, now?
12    Q. Let's start off in 2005, just so we're clear.
13 When you started off in 2005, what was the
14 responsibility of the SIU?
15    A. I would say fraud, election fraud, public
16 integrity and whatever type of case needed additional
17 investigative assistance. An example, around that time
18 there were many death penalty cases that were under
19 review for consideration of mental retardation. So some
20 of our investigators had to go back and examine those
21 cases to determine whether or not there was evidence of
22 mental retardation.
23    Q. Okay. So you started off as a lieutenant. Can
24 you tell me how -- the time periods of which you gained
25 your promotion to a different rank?

## 45

1   A. I was promoted to captain of the special
2   investigations unit in, I believe the Fall of 2007.
3       Q. And you just recently became a major?
4       A. Yes, sir.
5       Q. In 2012?
6       A. Yes, sir.
7       Q. And I believe, off the record you said May of
8   2012?
9       A. Yes, sir, May of 2012.
10      Q. Now, does the increase in rank does that give you
11  any additional responsibility?
12      A. Yes, sir.
13      Q. It does.  Okay.  So as a lieutenant in the SIU,
14  can you tell me what your identified responsibilities
15  were?
16      A. Was to supervise the daily and weekly
17  investigative activity of the investigators in my unit.
18  That would include reviewing case reports, and providing
19  them assistance or guidance as needed.  In many cases, I
20  would also actually accompany the investigators out into
21  the field if they needed additional manpower.
22      Q. Would you sign off on the case reports?  Was that
23  part of your responsibility?
24      A. Either I would or my captain at the time.
25      Q. Who was your captain at the time?

## 46

1   A. In 2005 it would be Greg Lucus.
2       Q. Is he still there with you now?
3       A. Yes.
4       Q. Still a captain?
5       A. Yes.  He is not a part of the special
6   investigations unit, however.
7       Q. From 2005 to the present, has the size of the
8   investigators underneath you changed?
9       A. Substantially.
10      Q. Okay.  And so I understand in 2005 there were
11  between 10 to 12.  Can you tell me how the growth has
12  occurred within your office?
13      A. Well, I believe it was in 2008, the money
14  laundering unit was absorbed into the special
15  investigations unit.  And that area of responsibility
16  was added.
17      Q. How many investigators came along with that?
18      A. I would say about eight or nine.
19      Q. Any other units that have been absorbed into the
20  SIU?
21      A. Also the -- what we call the criminal litigation
22  unit, which would be the group of investigators who
23  assist prosecutors in the prosecution of cases.  That's
24  about six.
25      Q. About six.  Any other units?

## 47

1   A. I have a group that is assigned to the joint
2   terrorism task force.  And that has a ranged between two
3   and three employees.
4       Q. So is that it?  Are there any other units?
5       A. Well, in May of 2012, I also was added to the --
6   the fugitive apprehension was added to my
7   responsibility.
8       Q. And they were absorbed into the SIU?
9       A. No, sir, it's a separate group, but it's about 24
10  or 25 employees.
11      Q. Okay.  Do their responsibilities cross over?
12      A. No, sir, they do not.
13      Q. Okay.  So if my calculations are correct, there
14  are approximately 30 investigators underneath you from
15  the various units that have been absorbed?
16      A. I think it would be a more accurate statement to
17  say between -- I think there's 40 commissioned state
18  police officers in special investigations unit and about
19  24 in the fugitive apprehension unit.
20      Q. So 40 in SIU?
21      A. Correct.
22      Q. And you said "commissioned police officers," what
23  does that mean?
24      A. Investigators who are commissioned through the
25  State law enforcement.

## 48

1   Q. And they all carry badges?
2       A. Yes, sir.
3       Q. They are police officers?
4       A. Yes, sir.
5       Q. Okay.  And you indicated that there was a captain
6   underneath you.  Did you say Greg Russ?
7       A. I'm sorry.  His name -- he is not part of my
8   unit.  But he was my captain back in 2005.
9       Q. Okay.  Do you have -- I'm trying to understand
10  the structure.  I know you've got 40 commissioned police
11  officers, investigators that work underneath you and
12  that you supervise.  Is there another structure?  Are
13  there other managers within your unit?
14      A. Yes, sir there are.
15      Q. Okay.
16      A. There are two captains.
17      Q. Two captains.
18      A. One for the special investigations unit and one
19  for the sex offender apprehension unit, fugitive unit.
20      Q. And the name of the captain that's in the SIU
21  unit?
22      A. Would be Daniel Guajardo.
23      Q. And Daniel reports directly to you?
24      A. That is correct, sir.
25      Q. What about the other captain?

Major Forrest Mitchell                                    June 15, 2012

---

**49**

1    A. He reports to me as well.  And his name is Bruce
2    Cook.
3       Q. Does Bruce Cook's responsibilities cross over
4    into the SIU unit?
5       A. No, sir.
6       Q. Okay.  So as I understand the structure of the
7    SIU, you are the lead investigator, the supervisor.
8    There's one captain, Daniel?
9       A. Guajardo.
10      Q. Guajardo.  And then there are 40 police officers,
11   investigators that are underneath you, correct?
12      A. Yes, sir.
13      Q. Okay.  And do you have general staff that
14   assists, supports -- support staff?
15      A. Yes, we do.
16      Q. And generally how large is your support staff?
17      A. I believe we have four auditors.
18      Q. What does that mean, "auditors"?
19      A. These are, in some cases they're CFEs or CPAs who
20   assist in the investigation we conduct.  They're
21   noncommissioned personnel.
22      Q. CPA's?
23      A. Certified public accountants.
24      Q. Accountants.  They would be assisting with
25   white-collar crimes?

---

**50**

1    A. Correct.
2       Q. Okay.  Do you have any other support staff that
3    would actually go out into the field?  And I'm just
4    speaking specifically about the election code violations
5    to assist with investigations?
6       A. No.  Civilians wouldn't go in the field.
7       Q. Okay.  What are the names of the auditors?
8       A. Kyle Swihart, Roxanne Mendoza, Rebeka Rutland,
9    Kim Holderread.
10      Q. And would any of the individuals that you just
11   mentioned, would they be involved in election code
12   violations?
13      A. The only way they would be involved in election
14   code violations is if we were conducting an
15   investigation of campaign finance violations or the
16   improper use of government monies for political
17   purposes.
18      Q. Have you had those types of investigations within
19   your office?
20      A. Yes, sir.
21      Q. All right.  And can you tell me how many of those
22   types of investigations you've conducted within your
23   office?
24      A. I would -- to give you a firm number I would have
25   the review my spread sheet.  But if I were to hazard a

---

**51**

1    guess it would be half a dozen or so.
2       Q. One more time focusing on your promotion, what is
3    the process of moving from lieutenant to major?  What is
4    the process that you had to go through for your
5    promotions?
6       A. We generally prepare a memo involving our core
7    competencies in the identified areas for the position.
8    And this could be a two to three page memorandum, along
9    with a resume.  And then there is a board review.
10      Q. Okay.  And after each board review, you're told
11   of the determination, if you've been promoted.  Would
12   that be fair to say?
13      A. Yes, sir.  You are scored by the board and then
14   you're advised of the promotion.
15      Q. Okay.  And so you indicated previously that there
16   are additional responsibilities that are added with each
17   promotion.  So as a major, is there any other
18   responsibilities that we haven't discussed here?  I
19   mean, I understand the structure of your office.  I
20   understand that there have been units that have been
21   added to your office.  Is there anything else that is
22   of -- that I should know about the structure or your
23   responsibilities?
24      A. Since I've been promoted to major, I think one of
25   the more substantial responsibilities is now budget, is

---

**52**

1    dealing with budgets and hiring.
2       Q. And when you say budgets, generally what do you
3    mean by that?
4       A. Both general revenue funding and then grants that
5    we may have through the attorney general's office.
6       Q. Okay.  So again, I understand the structure of
7    your office now, but what is the special investigations
8    unit?  What are the specific responsibilities of that
9    unit?
10      A. Currently there is an election team, a fraud
11   team, a public integrity team, a human trafficking team,
12   a financial investigations team, a money laundering team
13   and a prosecution assistance team.  There is also a
14   group of auditors who assist those different teams and a
15   group of analysts who assist those teams.
16      Q. And what are the responsibilities of the
17   analysts?
18      A. The analysts would assist investigators in
19   obtaining contact information regarding witnesses.
20      Q. Do they help maintain the files?
21      A. No.
22      Q. Is it the investigator's responsibility to
23   maintain the individual file?
24      A. Yes, until it's finally done.
25      Q. Okay.  And then at that point it would go to

## 53

1  Sherry, if I understand correctly?

2     A. Yes, sir it would.

3     Q. Okay. What else do the analysts do? You said

4  they assist with contact information?

5     A. They would help prepare any kind of charts, if

6  there were any kind of charts developed. They would

7  search criminal history information.

8     Q. And they're civilians, correct?

9     A. Yes, sir, that's correct.

10     Q. All right. And so out of all these teams that

11  you have described, which ones would deal with election

12  code violations?

13     A. Just the elections team.

14     Q. So you have an elections team and a fraud team.

15  Does the fraud team deal with election code violations?

16     A. If I could clarify?

17     Q. Sure.

18     A. It depends on the volume of cases that we have or

19  the volume of work required for any of the

20  investigations.

21     Q. Okay.

22     A. I would have a public integrity investigator

23  assist the elections team or I could have a human

24  trafficker investigator assist so long as it's not

25  prohibited by their grants or anything like that.

## 54

1     Q. Okay.

2     A. So there have been some investigations which have

3  required more investigators than what are currently

4  assigned to the elections team.

5     Q. So as I understand it, the area of concentration

6  for the elections team is election code violations?

7     A. Correct.

8     Q. But other teams can assist when necessary or

9  individuals from those teams?

10     A. Yes, sir.

11     Q. How many individuals do you have working on the

12  elections team?

13     A. I think there are three right now.

14     Q. Three. And who are those individuals?

15     A. It would be Stormy Jackson, Wayne Rubio and

16  Jeanette. I'm sorry. Oh, gosh.

17     Q. Take your time. That's a lot of people you

18  supervise.

19     A. It's Jeanette, I can't remember her -- I'm sorry.

20  Jeanette -- Josephine Smith.

21     Q. And did any of these individuals, Jackson, Rubio

22  or Smith, assist you in searching documents for the

23  notice of deposition?

24     A. No. The only instruction I gave them was to get

25  their investigative files in order.

## 55

1     Q. And that's both paper and electronic?

2     A. I just said investigative case files.

3     Q. Okay. And what does that mean?

4     A. It would mean their actual paper files.

5     Q. Okay. That would not include the electronic

6  files -- strike that. Do they maintain electronic

7  files?

8     A. Through our case reporting system.

9     Q. When was the special investigations unit formed?

10     A. I believe in June of 2005.

11     Q. And how was it formed?

12     A. I don't know.

13     Q. Why was it formed?

14     A. I don't really know.

15     Q. Was it in response to any particular concerns

16  that you're aware of?

17     A. I don't know.

18     Q. Was it the subject of a grant?

19     A. At some point in time, SIU has had, and still

20  does today, have investigators who are grant funded

21  positions.

22     Q. Where would those grants come from?

23     A. I don't know much about the grants reporting back

24  in 2005, but I do know that the grants that we currently

25  have are typically through the governor's office.

## 56

1     Q. Do you know the amount of the grants that have

2  come from the governor's office?

3     A. In total or the ones we currently -- the ones we

4  currently have.

5     Q. Are you aware of the grant coming from the

6  governor's office in 2005?

7     A. Yes, I'm somewhat aware of it.

8     Q. What was the amount of that grant?

9     A. I would say it's in excess of probably a million

10  dollars.

11     Q. A million dollars. And when you say "in total,"

12  do you mean that there have been a series of grants from

13  the governor's office?

14     A. Yes. Because we also have grants that are

15  through the -- for instance, an example would be the

16  HIDTA task forces.

17     Q. HIDTA stands for?

18     A. High intensity drug trafficking area.

19     Q. Okay.

20     A. So we have grants through there.

21     Q. Okay. So let me see if I can ask this in a way

22  that it makes sense. In total, how much in the form of

23  grants from the governor have been dedicated to the SIU

24  division?

25     A. I don't think I have that answer.

Major Forrest Mitchell                                                June 15, 2012

---

57

1     Q.  In total, how much in grants from the governor's
2     office have been dedicated to dealing with the issue of
3     election code violation?
4         A.  It would only be a portion of the grants that we
5     receive.
6         Q.  Okay.  And can you give me a general total as to
7     what we're talking about?
8         A.  Well, in -- if I could.  In 2005, I think we did
9     get a Burns Grant from the governor's office.  And
10    that's the grant I think that was in excess of a million
11    dollars.
12        Q.  Okay.
13        A.  Out of that grant the OAG hired a number of
14    investigators.  A portion of which served in the special
15    investigations unit.
16        Q.  Now, when these grants are issued, is there an
17    indication of the purpose or the reason for the grants?
18        A.  Yes.
19        Q.  Okay.  And so you talked about the Burns Grant in
20    2005.  What was the reason for the Burns Grant?
21        A.  To conduct criminal investigations.  I believe,
22    if my memory is correct, it was for money laundering,
23    sex offender apprehension, cyber crimes, public
24    integrity and election code violations and white-collar
25    crimes.

---

58

1         Q.  So it was not just election code.  It was a
2     series of different responsibilities that the SIU had at
3     the time.
4         A.  I'm sorry.  Could you restate that one more time?
5         Q.  Sure.  The grant that was in excess of a million
6     dollars was -- was that for the SIU unit or was that for
7     the OAG's office in general, and it was disbursed
8     amongst the various units?
9         A.  It was a grant for the entire criminal
10    investigations division and it was disbursed between the
11    various units.
12        Q.  Okay.  Can you tell me, either specifically or
13    generally, how much money has been dedicated to election
14    code violations in the State of Texas at this point?
15    And I'm talking about the SIU unit.
16        A.  I really don't have that number.
17        Q.  You give me a general ball park?
18        A.  I believe we only had that grant for one or
19    two years.
20        Q.  Okay.
21        A.  And I want to say that -- my memory is that about
22    $90,000 of that grant was used for the investigation and
23    prosecution of election code offenses.
24        Q.  And you're talking about the 2005 grant?
25        A.  Yes, sir.

---

59

1              (Exhibit No. 583 was marked.)
2     BY MR. GEAR:
3         Q.  I'm showing you what's been marked as Exhibit 583
4     and I'll give you a chance to take a look at that.
5         A.  Okay, sir.
6         Q.  Okay.  Have you seen this document before, sir?
7         A.  No, sir.
8         Q.  Okay.  Can you tell me what it?
9         A.  It is titled election code -- election code
10    resolve prosecutions by the office of the Attorney
11    General.
12        Q.  Okay.  And can you tell me what this is in
13    reference to?
14        A.  It indicates the number of cases, criminal
15    investigation division case hours, criminal prosecution
16    division case hours, criminal investigation division
17    cost, criminal prosecutions division cost and then a
18    combined cost.
19        Q.  And have you prepare add similar form in
20    functions of your duties?
21        A.  No, sir.
22        Q.  This indicates -- and if you look at the bottom
23    right-hand corner, it indicates January 25, 2011.  Do
24    you see that?
25        A.  Yes, sir.

---

60

1         Q.  And it says, "as of January 25, 2011?"
2         A.  Yes, sir.
3         Q.  So as of January 25, 2011 it indicates that -- up
4     at the top, "resolved prosecutions."  Do you see that?
5         A.  Yes, sir.
6         Q.  And it says, "number of cases."  Do you see that?
7         A.  Yes, sir.
8         Q.  And what's that number of cases?
9         A.  62.
10        Q.  And would that be accurate as of January 25,
11    2011?
12        A.  I believe that would be representative of that
13    time.
14        Q.  It says, "criminal investigation division case
15    hours."  And do you see the number there?
16        A.  Yes, sir.
17        Q.  And how many number -- what is that number?
18        A.  10,649.
19        Q.  Do you believe that that would be accurate
20    representation?
21        A.  I don't know if that number deals with just those
22    specific prosecutions or if it's actually larger.
23        Q.  And when you say, "specific prosecutions," you're
24    talking about if it just deals with election code
25    violations?

## 61

1    A. Yes, sir.

2    Q. Okay. So it could be more or it could be less,

3 if I understand your testimony?

4    A. Correct.

5    Q. Do you know who prepared -- who prepared this

6 form?

7    A. I don't know who prepared the form.

8    Q. Do you know who would be responsible for

9 preparing this form?

10    A. I believe it would be our budget or accounting

11 division.

12    Q. Okay. And if I understood your testimony, you

13 are now in charge of budgeting aspects?

14    A. No, sir, not completely. We have a budget and

15 accounting division and I would work with them on

16 various issues.

17    Q. Does that have a supervisor?

18    A. Budget has a supervisor and I think accounting

19 has a supervisor as well.

20    Q. And who would that supervisor be for budgeting,

21 first?

22    A. I've met a lot of new people in the last month

23 and a half. I don't know who's in charge of the budget

24 right now.

25    Q. Okay. And the other division that you --

## 62

1    A. The other would be accounting division.

2    Q. And do you know who the supervisor for accounting

3 is?

4    A. I believe that's Greg Herbert.

5    Q. Greg Herbert. Okay. All right. So essentially

6 this goes through -- and again, the title of this

7 document is election code resolve prosecutions. And it

8 goes through number of cases, the number of hours,

9 criminal prosecution division case hours. Why would

10 that be distinguished between investigation division

11 case hours and prosecution division case hours?

12    A. I believe internally within the OAG they have

13 divided budgets.

14    Q. Okay. And so who would be the supervisor of the

15 budget division in 2011, if you know?

16    A. I don't know.

17    Q. It says, "combined CID, CPD hours." Do you know

18 what that stands for?

19    A. Combined CID and CPD hours I believe would

20 represent a total of the hours worked by the criminal

21 investigations division or the criminal prosecutions

22 division.

23    Q. Okay. And that number is 16,952?

24    A. Yes, sir.

25    Q. And then its goes on to indicate, "criminal

## 63

1 investigation division costs." Do you see that?

2    A. Yes, sir.

3    Q. And what is that cost?

4    A. $792,217.

5    Q. Okay. And then, the next line is, "criminal

6 prosecution division cost." Do you see that?

7    A. Yes, sir.

8    Q. All right. And do you see what the number is?

9    A. $483,258.

10    Q. And the combined cost of both?

11    A. $1.275475.

12    Q. All right. And then in -- at the bottom of this

13 sheet it indicates, "statistics on this sheet relate to

14 election code prosecutions during the Abbott

15 Administration as of January 21, 2010," correct?

16    A. Yes, sir. That's what it says.

17    Q. Okay. And so it also includes a total direct

18 expense such as travel, court cost and other case fees

19 Do you see that?

20    A. Yes, sir.

21    Q. All right. Any reason to dispute the numbers

22 that are indicated on this exhibit?

23    A. No, sir.

24    Q. All right. Do you know how much has been

25 expended for election code violation prosecutions from

## 64

1 January of 2010 to the present?

2    A. No, sir, I do not.

3    Q. So what is the purpose of the, I believe you

4 said, "election team," what is the purpose of the

5 election team?

6    A. The elections team responsibility would be to

7 conduct criminal allegations of election code offenses.

8 These are typically referred by the Secretary of State,

9 local, district county attorneys, local elections

10 administrators or local law enforcement.

11    Q. Okay. And I believe I asked you this before, but

12 let me make it more specific to the elections team. Was

13 the elections team formed in response to any concerns

14 that you're aware of?

15    A. It's my understanding that since 1985 the office

16 of the Attorney General has had jurisdiction in election

17 code offenses or concurrent jurisdiction. So the office

18 of the Attorney General conducts those kinds of

19 investigations.

20    Q. And do you have knowledge of election code

21 prosecutions, investigations going back to 1985?

22    A. No, sir, I do not.

23    Q. Would those records be maintained somewhere?

24    A. I don't know what the records retention is for

25 those.

## 65

1    Q.  How far back does your knowledge extend?
2    A.  I would say it goes back to, I think, 2002.
3    Q.  Are you aware of any voter impersonation
4    investigations, prosecutions, that occurred prior to
5    2002?
6    A.  No, sir.
7    Q.  You talked a little bit about the jurisdiction of
8    the SIU.  What jurisdiction does the special
9    investigations unit have in the State of Texas?
10   A.  Do you mean specifically towards elections or in
11   the broader sense?
12   Q.  Elections.
13   A.  Chapter 273 of the Texas Elections Code discusses
14   the investigations of election code violations.  If you
15   have a single jurisdictional election, the jurisdiction
16   may rest with the local district or county attorney.  If
17   you have multi-jurisdictional elections, then the
18   jurisdiction may rest with the Texas Attorney General's
19   office.  Chapter 273 authorizes the Texas Attorney
20   General's office to conduct investigations and
21   prosecutions of either type, working in conjunction with
22   local DAs or law enforcement.
23   Q.  So when you say, "it authorizes them," does that
24   mean they have direct jurisdiction?
25   A.  Yes, I believe the statutory language says they

## 66

1    have concurrent jurisdiction.
2    Q.  Are they authorized to take the lead on any of
3    these particular investigations, prosecutions?
4    A.  I believe that in the case of
5    multi-jurisdictional elections, the answer would be yes.
6    Q.  All right.  And I believe you've answered this in
7    a general way.  Does the SIU prosecute the cases that it
8    investigates?
9    A.  Oh, no, sir.
10   Q.  So let's talk about that structure a little bit.
11   Your unit, the SIU, conducts the investigations.  How
12   does it then, shift to the prosecution stage?
13   A.  At the completion of our investigation, we would
14   prepare an investigative packet with statements,
15   reports, supporting documentation, it could be recorded
16   interviews, those kinds of things.  And that would be
17   presented to the local district attorney, county
18   attorney or to the criminal prosecutions division.
19   Q.  And did you produce these election investigation
20   packets to your attorney, to your attorney in this case?
21   A.  In the scope of this?
22   Q.  Yes.
23   A.  No.
24   Q.  All right.  And you said something in your
25   answer, and I want to kind of flesh that out a little

## 67

1    bit.  The investigations packet would be then, turned
2    over to -- can you go through those again for me?
3    A.  It would be either the criminal prosecutions
4    division, or a local district or county attorney.
5    Q.  Okay.  And so the criminal prosecutions division
6    is within the office of the Attorney General, correct?
7    A.  Yes, sir.
8    Q.  Okay.  And they would be the ones that would be
9    primarily responsible for prosecutions within your
10   office, the OAG's office?
11   A.  Unless it was the joint prosecution with the
12   local DA.
13   Q.  Okay.  And is there a supervisor in the criminal
14   prosecutions division?
15   A.  Yes, sir.
16   Q.  And do you know who that is?
17   A.  Adrian McFarland.
18   Q.  And how long -- is that a he or she?
19   A.  It's a she.
20   Q.  And do you know how long Ms. McFarland has been
21   the director of that -- of the criminal prosecution
22   division?
23   A.  I don't know.
24   Q.  So other than providing the investigations
25   packet, are there communications regarding -- that

## 68

1    you're -- the SIU would engage in regarding the contents
2    of the investigations package?  I'm talking about with
3    the criminal prosecutions division.  How does the
4    package get delivered?  I mean, is there -- is it simply
5    the package is prepared and passed off and that's the
6    end of your role?  Do you understand what I'm trying to
7    ask you?
8    A.  Yes, sir.
9    Q.  Okay.
10   A.  And I would have to say it depends.  Over the
11   years it has changed.  And it does not end our role.
12   Frequently, the prosecutors identify additional
13   witnesses they want interviewed or additional documents
14   they want obtained.  And so they might ask the
15   investigators to do additional work.
16   Q.  So is it fair to say the investigator would stay
17   with the case through the prosecution, the process of
18   prosecution to assist when necessary?
19   A.  Ideally, yes.
20   Q.  Are the investigators called to testify at
21   all in these election code violation prosecutions?
22   A.  Yes, sir.
23   Q.  Have you ever been called to testify during any
24   of the election code prosecutions?
25   A.  I have been subpoenaed, however, never had to

## 69

1  testify.
2      Q.  How often has that happened, subpoenaed?
3      A.  I would say once or twice -- I would say twice.
4      Q.  Do you recall the specific case?
5      A.  It would be the State of Texas versus Anita
6  Baeza.
7      Q.  BI?
8      A.  B-A-E-Z-A.
9      Q.  Okay.
10     A.  There was another case that was -- I don't
11 remember the defendant's name, but it was out of Hidalgo
12 County and was prosecuted in Brooks County?
13     Q.  Do you remember the time period on that one?
14     A.  I would say it was probably a case we
15 investigated in 2008 or 2009.  I was summons down
16 probably about 2010.
17     MR. GEAR:  We've been going for a while.  Do
18 you guys want to take a break?
19     THE WITNESS:  Yes, please.
20     MR. GEAR:  Let's take a little short break.
21 Ten minutes.
22     MR. SWEETEN:  That's fine.
23     (Brief recess.)
24 BY MR. GEAR:
25     Q.  Back on the record.  We talked a little bit about

## 70

1  what the -- actually we talked a lot about what the SIU
2  does, what their responsibilities are.  I just wanted to
3  circle back to get a clear understanding, the SIU
4  conducts criminal investigations?
5      A.  For the most part, yes.
6      Q.  And let's narrow that even more and talk about
7  election code violations.  Are those always criminal
8  investigations?
9      MR. SWEETEN:  That he conducted?
10 BY MR. GEAR:
11     Q.  The SIU that you conduct as a supervisor?
12     A.  I would say the vast majority are criminal.
13     Q.  And when you say, "vast majority," the other
14 portion of it, when would that cross over, or why would
15 that cross over into the civil realm?
16     A.  Can I give you an example?
17     Q.  Please.
18     A.  We were referred a criminal case from the
19 Secretary of State's office from Waller County and it
20 involved allegations of voters not being allowed to vote
21 in an election.  I think it was the 2006 general
22 election.  And there's a particular university there
23 named Prairie View University, Prairie View A&M
24 University.  And there were allegations that the
25 elections department did not process their voter

## 71

1  registration applications.  And consequently, when the
2  voters went to the polls, they weren't allowed to vote.
3  So our office worked on the investigation of the
4  potential criminal misconduct for unlawfully rejecting
5  voters.  But we also assisted the Department of Justice,
6  I think it was a civil rights division, in the analysis
7  of the data regarding the voter registration and what --
8  why voters weren't processed properly and what were the
9  reasons.  So many were -- because the address wasn't
10 complete, so many didn't provide necessary -- so we did
11 a statistical analysis during that investigation, which
12 was then used, I believe civilly in action by the
13 Department of Justice against Waller County.
14     Q.  So your overall responsibilities in SIU have also
15 involved both communications and in conjunction with
16 working with the Department of Justice?
17     A.  Occasionally, yes.
18     Q.  So for the vast majority of the criminal
19 investigations, what is the standard that these cases
20 would ultimately have to be prosecuted by?  Is it beyond
21 a reasonable doubt?
22     A.  Yes, sir.
23     Q.  Okay.  So it's also fair to say that just because
24 you receive a referral does not mean that that person is
25 guilty of what the allegation is.  There's an

## 72

1  investigation and until proven guilty, it's simply a
2  referral?
3      A.  That's correct.
4      Q.  Okay.  And so we spoke a little bit about fraud
5  in the State of Texas.  So I would like to define that a
6  little bit more.  How do you define voter fraud?
7      MR. SWEETEN:  Do -- let me make sure I'm
8  clear.  Do you mean how does the SIU?  Because that was
9  in your definition.
10     MR. GEAR:  Yes.  Yes.
11     MR. SWEETEN:  Okay.
12     A.  We would define it as a violation of election
13 code offenses or other penal code offenses associated
14 with elections.
15     Q.  (By Mr. Gear)  And there are two chapters that
16 deal with election code violations, if I'm correct or
17 multiple?
18     A.  Oh, no.  Yeah, there's multiple chapters that
19 deal with violations.
20     Q.  Okay.  Let me try my hand at this.  Chapter 68
21 deals with what type of election code violations?
22     A.  I don't think chapter 68 deals with election code
23 violations.  64 deals with some.
24     Q.  64?
25     A.  63, 84, 86, 253, and I know there are others.

Major Forrest Mitchell                           June 15, 2012

---

73

1     Q.  And I'm not going to ask you to identify and
2  define each of these chapters.  Which of these chapters
3  deals with voter impersonation?
4     A.  That would be the -- it could potentially be the
5  voter registration.  And that would be in, I believe
6  Chapter 13.  And then also, it could also be during the
7  early voting which is covered in 86 or 84.  And it also
8  could be during a poll place violation which is, I think
9  in 64.
10    Q.  You said 86 or 84?
11    A.  Yes, sir.  I'm not sure I know -- I'm not sure I
12  remember perfectly.
13    Q.  Okay.
14    A.  If I could just say that we have different
15  categories.  We have early voting.  We have -- which
16  early voting also includes mail-in ballot.  And then, we
17  also have poll place violations.
18    Q.  And poll place violations would be chapter 64, if
19  I understood you correctly?
20    A.  Some of the early voting can also involve poll
21  place violations.  But I think predominantly 64 is poll
22  place.
23    Q.  Okay.  So early voting involves both by mail and
24  poll place?
25    A.  Yes, sir.

---

74

1     Q.  Okay.  And I threw out the term "voter
2  impersonation."  What is voter impersonation?  How do
3  you define that?
4     A.  Voter impersonation is either someone who is not
5  registered to vote or has -- is registered to vote and
6  has already voted and using somebody else's voters
7  registration certificate to vote again.
8     Q.  When you say, "not register to vote," what do you
9  mean by that?
10    A.  This could be a person who has not gone through
11  the process of registering to vote, but is using
12  somebody else's certificate to vote.
13    Q.  So the underlying premise, for lack of better
14  words, is they are using somebody else's identity to
15  cast a ballot?
16    A.  Correct.
17    Q.  Now, are you familiar at all with SB 14?
18    A.  Some of it.
19    Q.  Were you involved in any communications during
20  the legislative debates on SB 14?
21    A.  No, I wasn't involved in the communication.
22    Q.  Okay.  And let me be more specific on that.  Were
23  you involved in, for instance, communicating with the
24  governor's office regarding voter ID during the
25  legislative debates on SB 14?

---

75

1     A.  No, sir.
2     Q.  All right.  And again, were you involved in any
3  communication with any of the State agencies regarding
4  SB 14 during the legislative debates?
5     A.  No, sir.
6     Q.  And so how did you become familiar with SB 14?
7     A.  One of our responsibilities at the attorney
8  general's office is to review, you know, statutes.
9     Q.  Okay.
10    A.  So obviously, as kind of a criminal investigator
11  with -- that's charged with the responsibility of
12  looking at election laws, I looked at that one.
13    Q.  And so when you say, "review statutes," can you
14  tell me what you mean.  And specifically in terms of
15  voter ID legislation or SB 14, what would -- what would
16  your responsibility be in that respect?
17    A.  Just reviewing the proposed statutes.
18    Q.  Do you provide an analysis?  Do you provide a
19  summary of the -- of your review of SB 14?
20    A.  No.  I do not.
21    Q.  So help me understand.  Other than it being a
22  provision that deals with election code, what other
23  reasons would you have to look at it?
24    A.  And this is more broad.  In some cases we are
25  asked to do a bill analysis and assess a fiscal impact.

---

76

1     Q.  Were you asked to do a bill analysis for SB 14?
2     A.  No, sir.
3     Q.  Was anyone within your office asked to do a bill
4  analysis?
5     A.  I don't know.
6     Q.  Is that something that you would generally do
7  for -- let me narrow this down so it's easier.  Would
8  that be something that your office has done in the past
9  for voter ID legislation?
10    A.  I don't know if we have been asked to do that.
11    Q.  Who would be the entity that would make that
12  request?
13    A.  I believe it would come from our governmental
14  relations division.
15    Q.  And where is that division located within the
16  structure of the government?
17    A.  I mean, it would be within the intergovernmental
18  relations division within the office of the attorney
19  general.
20    Q.  Okay.  And so tell me a little bit about that
21  particular division, what do they do?
22    A.  They deal with other branches of State
23  government.
24    Q.  Specifically as it relates to voter ID
25  legislation, what would they -- what would their

## 77

1   responsibilities be?
2       A.  They would serve as a liaison, I believe, between
3   the legislative branch and the office of the attorney
4   general.  But I don't know their specific -- their
5   specific duties.
6       Q.  So the intergovernmental division?
7       A.  Intergovernmental relations division.
8       Q.  Relations division.  Did you have any
9   communications with that division regarding SB 14?
10      A.  I don't believe so.
11      Q.  And when I say, "you," I mean anyone within the
12  SIU.  Are you aware of anyone who had communications
13  with the intergovernmental division?
14      A.  Like I said, I would like to make a
15  clarification.
16      Q.  Sure.
17      A.  I think I may have been asked to provide my
18  spread sheets, at some point in time.
19      Q.  And who asked you to provide the spread sheets?
20      A.  I don't remember if it was my division chief or
21  someone within the intergovernmental relations division.
22      Q.  Did you provide the spread sheets?
23      A.  Yes, sir.
24      Q.  When did you provide the spread sheets?
25      A.  I routinely update those on about a monthly

## 78

1   basis.  So I just provided them as requested.
2       Q.  Okay.  So help me understand.  You said, "you
3   provide them as requested."  You testified that you
4   recall being asked to provide your spread sheets,
5   correct?
6       A.  Uh-huh.
7       Q.  Were you asked to provide them on a monthly
8   basis?
9       A.  I generally am asked almost on a monthly basis to
10  provide these.  It could be for a public information
11  request.  It could be a specific legislative request
12  or...
13      Q.  Do you track who makes a request for your spread
14  sheets?
15      A.  I don't.  I -- public information request would
16  be tracked through our public information officer.
17      Q.  What about request from legislatures?
18      A.  Do I track that?
19      Q.  Do you track that?  "You," being you or your
20  office staff in your office?
21      A.  Well, I would believe that the intergovernmental
22  relations division would track it.
23      Q.  Do you track from your office, SIU, how many
24  times you produce the spread sheet?
25      A.  No.

## 79

1       Q.  Are you aware of any legislators that the spread
2   sheet had been provided to?
3       A.  Yes.
4       Q.  All right.  And who was your spread sheet
5   provided to?
6       MR. SWEETEN:  Okay.  Here we're getting into
7   a potential area of privilege.  I think the court's
8   order has said the transmission of information is fine,
9   but as to the identity of a legislator it -- he wouldn't
10  reveal that.  So I think that would be subject to the
11  court's order on privilege.
12      MR. GEAR:  And that's not my understanding
13  of the court's order.  I think we've been asking,
14  generally through all these depositions the who, what,
15  when, where.  It's the substance of that communication
16  that may be privileged.
17      MR. SWEETEN:  Yeah.
18      MR. GEAR:  Is my understanding.
19      MR. SWEETEN:  But I think there's a separate
20  issue on -- and Risa and I discussed this yesterday.  I
21  believe it is on Page 7 of the court's order.  That
22  would prevent -- let me see if I can find that.  Let me
23  go off the record.
24      MR. GEAR:  Go ahead.
25      (Discussion off the record.)

## 80

1   BY MR. GEAR:
2       Q.  So off the record we had a brief discussion of
3   privilege.  There's been a determination that the
4   individual who requested the spread sheet from you has
5   waived that privilege.  So let me go back to the
6   question.  What was the name of the legislator that
7   requested the spread sheet?
8       A.  First let me say that I don't communicate
9   directly with them at all.  They communicate through our
10  intergovernmental relations division.
11      Q.  Okay.
12      A.  I was advised that Representative, I think his
13  name is Raphael Anchia, requested the spread sheet.
14      Q.  Did you receive that request by e-mail?  How does
15  that request come to you?
16      A.  I don't specifically recall exactly how that one
17  request came in.  It could have been through e-mail.  It
18  could have been on the phone.  I could have been
19  directed by my division chief.  Most times it's either
20  on the phone or by e-mail.
21      Q.  Do you recall when that request was made?
22      A.  He's requested my spread sheets multiple times so
23  I don't know.
24      Q.  Well, let's kind of break that down.  Can you
25  give me a general time period for when he's requested

### 81

1   your spread sheets?
2       A.  He's requested updates on election
3   investigations.  I think dating back to like 2006 and
4   2007, all the way to the present.
5       Q.  Did you ever have any direct contact or
6   communication with Representative Anchia?
7       A.  No, sir.
8       Q.  Did anyone within your office have any direct
9   contact or communication with Representative Anchia
10  regarding the spread sheets?
11      A.  I don't know.
12      Q.  How would you produce those spread sheets to
13  Representative Anchia?
14      A.  I would send them electronically, via e-mail.  In
15  a PDF format.
16      Q.  Did you search your electronic files for any
17  e-mails dealing with your communications or dealing with
18  the production of the spread sheets that were given to
19  Representative Anchia?
20      A.  Yes, sir.
21      Q.  Did you find those?
22      A.  I found some.
23      Q.  And did you produce those to your attorney?
24      A.  Yes.
25      Q.  And are you aware of whether or not your office,

### 82

1   the SIU, or the attorney general's office for that
2   matter, had any communications with Representative
3   Anchia regarding SB 14?
4       A.  I did not have any communication with
5   Representative Anchia and I do not believe that anybody
6   in the special investigations unit had any
7   communications with Representative Anchia.
8       Q.  Are you aware of any communications with the
9   OAG's office with Representative Anchia?
10      A.  Yes, I am aware of communications between the two
11  offices.
12      Q.  Regarding SB 14?
13          MR. SWEETEN:  Don't speculate.  If you don't
14  know.
15      A.  I don't know for sure.
16      Q.  (By Mr. Gear) Do you know when that communication
17  took place?  Was it during the legislative session,
18  2011?
19      A.  Yes, sir, I believe so.
20      Q.  Do you know who initiated that communication?
21      A.  No, sir.
22      Q.  Do you know who that communication was with out
23  of the OAG's office?
24      A.  Again, it would be someone in our
25  intergovernmental relations division.  And potentially

### 83

1   also our public information division.
2       Q.  Are you aware of any communication with
3   Representative Anchia regarding any voter ID
4   legislation?  And I'm talking about from the SIU
5   division.
6       A.  Can you say that one more time?
7       Q.  Are you aware of any communication from the SIU
8   division, and of the -- from either you or any of your
9   staff to Representative Anchia regarding any of the
10  voter ID legislation?
11      A.  We don't communicate with the representatives.
12      Q.  So the answer to that is no?
13      A.  No.
14      Q.  Are you aware of any communications from the
15  intergovernmental -- is it special division?
16      A.  Intergovernmental relations division.
17      Q.  Relations division with Representative Anchia
18  regarding any of the voter ID legislation?
19          MR. SWEETEN:  Objection; asked and answered
20  Go ahead.
21  BY MR. GEAR:
22      Q.  You can answer.
23      A.  I don't know.
24      Q.  Was that it?
25      A.  Yeah.  I don't know.

### 84

1       Q.  Okay.  Can you tell me what version of the spread
2   sheet was produced to Representative Anchia?
3       A.  The most current at the time.  As I said, I
4   update it monthly or as new referrals come in or as we
5   obtain new indictments new or judgments and sentences, I
6   update them at that time.
7       Q.  And when you say, "at the time," I'm trying to
8   get an idea of the time frame you're talking about here.
9   It was during the 2011 legislative session?
10      A.  I'm sorry.  What 2000 what.
11      Q.  '11 I believe you said?
12      A.  Yes, sir.  2011.
13      Q.  Okay.  And you said there were also periods prior
14  to that.  I think you said 2006, 2007, that you provided
15  him, "you," being your spread sheet has been provided to
16  Representative Anchia?
17      A.  If I could clarify?
18      Q.  Please do.
19      A.  Back in 2006 and 2007 it wasn't -- it wasn't a
20  spread sheet.  It was just a little summary of where we
21  got our referrals from.
22      Q.  Okay.  Did you produce that to your attorneys?
23      A.  Yes, sir.
24      Q.  Any other representatives or senators that you're
25  aware of that received a copy of the spread sheet?

## 85

1    A. Not that I recall.
2    Q. So I was asking you about voter impersonation.
3  And I believe you said that was -- one of which was at
4  the poles.  And it was under Chapter 64.  Chapter 64,
5  does it cover more than just voter impersonation?
6    A. Yes, sir.
7    Q. Can you give me a general idea of the types of
8  violations covered under chapter 64?
9    A. 64 contains the illegal voting statute, which
10 there are four different types of illegal voting in the
11 State of Texas.
12        THE REPORTER:  Are you saying legal or
13 illegal?
14    A. Illegal, sorry.  Chapter 64 contains the four
15 different types of illegal voting.  It also contains
16 other provisions such as unlawful assistance and
17 prohibited conduct in polling places, such as
18 electioneering, lawyering, I believe candidate in a
19 polling place.
20    Q. When you say, "illegal voting," can you identify
21 that a little bit more?
22    A. Yes, sir.  There are different elements to
23 illegal voting.
24    Q. Okay.
25    A. One form of illegal voting is voter

## 86

1  impersonation.
2    Q. Okay.
3    A. Another form of illegal voting is a person who
4  votes more than once in an election.  Another type is a
5  person who is ineligible for election.  And the final
6  type is a person who marks a ballot contrary to the
7  instructions of the voter.
8    Q. So based on your familiarity with SB 14, what
9  type of violation would be covered under SB 14, the
10 provisions of SB 14?
11    A. The voter impersonation.
12    Q. Anything else?
13    A. I think that would be it.
14    Q. Has the Texas Attorney General made investigating
15 voter fraud one of his top priorities?
16    A. It is one of the -- on of our investigative
17 functions in our office.
18    Q. And the question was, is it a priority within
19 your office?
20    A. As much as any other priority.  And we have
21 multiple priorities.
22    Q. So is your answer, yes, it is one of the AG's
23 priorities?
24    A. I would say yes.
25        MR. SWEETEN:  Objection; asked and answered.

## 87

1  BY MR. GEAR:
2    Q. Can you tell me how long it's been one of the
3  priorities of the Texas Attorney General?
4    A. That, I don't know.
5    Q. Investigating election code violations, is it one
6  of the primary responsibilities of the special
7  investigation unit?
8    A. It's one of the investigative responsibilities of
9  the special investigations unit.
10    Q. But it would be the primary responsibility of the
11 elections team?
12    A. Correct.
13    Q. I want to change your focus about the referral
14 process and how that actually comes into the attorney
15 general's office.  Is there a provision of the Texas
16 election code that allows -- that sets out the process
17 for referrals?
18    A. Yes, sir, there are.
19    Q. And can you tell me generally what those are?
20    A. There's -- it's found in two places in the Texas
21 election code.  One indicates a direct referral from the
22 elections administrator themselves.  If they have reason
23 to believe that a voter has committed illegal voting.
24    Q. Okay.
25    A. The second is found in chapter 273 of the

## 88

1  election code, which talks about the investigations of
2  election code violations.  And it indicates that the
3  Secretary of State may refer a case to our office.  It
4  indicates that two voters themselves who file an
5  affidavit, sworn affidavit, can refer to our office.
6  And also local district attorneys and county attorneys
7  can file it with our office.
8    Q. So let me just kind of summarize that, if I can.
9  So there are referrals that come from the Secretary of
10 State's office?
11    A. That's correct.
12    Q. There are referrals that come from citizens and
13 local election officials?
14    A. Yes.
15    Q. There are referrals that come from law
16 enforcement agencies?
17    A. Yes.
18    Q. Including local DA's or local prosecutors?
19    A. Yes, sir.
20    Q. Are -- SIU, are they limited to election codes in
21 the State of Texas?  Do they investigate outside of the
22 state?
23    A. Oh, no, sir.
24    Q. So other than what we've just summarized about
25 how referrals come in, are there any other ways that

## 89

1  referrals could be received by the OAG's office?
2  A.  No, sir.
3  Q.  And who in the OAG's office is in charge of
4  receiving and maintaining election code violation
5  referrals?
6  A.  It depends on the source of the referral.
7  Q.  So there are various sources that you've
8  testified to?
9  A.  Correct.
10  Q.  So is there a different person responsible for
11  each source of referral?
12  A.  Yes, sir.  If it comes from the Secretary of
13  State's office, it currently goes to the director of law
14  enforcement.  If it comes from a local DA or prosecutor,
15  it would generally go to the criminal prosecutions
16  division.  If it comes from a direct referral from law
17  enforcement agency, it could come to the director of law
18  enforcement or it could come in to our peace officer
19  liaison.
20  Q.  Do you supervise all of these various entities?
21  A.  No.
22  Q.  Would you know when a referral has come into the
23  OAG's office?  Is there a way for you to keep track of
24  the various forms of referrals?
25  A.  Yes, sir.

## 90

1  Q.  And how do you do that?
2  A.  Through the spread sheet.
3  Q.  Okay.  And so who actually maintains that spread
4  sheet?
5  A.  I do.
6  Q.  So in order to maintain that spread sheet, if it
7  comes in, for instance through the director of law
8  enforcement, how would you actually know it came into
9  the office?
10  A.  He provides it to me.
11  Q.  Okay.  And so that's what I was trying to get at.
12  So there are various entities or sources that it would
13  come to.  They provide you with an electronic version of
14  the referral or do they provide you with paper copy or
15  both?
16  A.  I would say sometimes both.  They definitely
17  provide me with a written copy.
18  Q.  And is there a specific process in your office
19  for making sure you're provided with copies of the
20  referrals that come in?
21  A.  Yes, sir.
22  Q.  And what is that process?
23  A.  We have an internal computer system which is
24  called Webpass, which tracts referrals.
25  Q.  Webpass?

## 91

1  A.  Yes, sir, W-E-B-P-A-S-S.
2  Q.  Is there a specific program that you use to
3  maintain the spread sheet?
4  A.  I maintain the spread sheet through Excel.
5  Q.  Excel.  Does anyone else, or is anyone else
6  responsible within your office that maintains the spread
7  sheet?
8  A.  No, I'm the one who maintains the spread sheet.
9  Q.  And you've been doing that since 2005?
10  A.  No.  I want to say 2007, 2008, somewhere around
11  there.
12  Q.  So when you talked about Representative Anchia
13  back in 2006, that wouldn't have been the spread sheet
14  in the version that you're currently maintaining?
15  A.  That's correct.
16  Q.  And I believe you indicated -- I believe you
17  indicated that it was a summary.  And can you describe
18  what that summary would have looked like?
19  A.  Yes, sir.  It was a -- I believe it was a
20  WordPerfect document.  And it would identify the county
21  of the offense, the referral source, and then the
22  allegation.
23  Q.  At some point, was your spread sheet updated to
24  include violations from 2002?
25  A.  Yes.

## 92

1  Q.  And when did that happen?
2  A.  I would say the spread sheet, the information we
3  obtained on the 2002 cases, was probably around 2005.
4  Q.  I'm not sure I understand your testimony now,
5  because you said in 2000 -- 2006 when there was
6  communication with Representative Anchia there was no
7  spread sheet in the current form, correct?
8  A.  Correct.
9  Q.  And so that would have been in the form of a
10  WordPerfect summary of referrals that have come into the
11  OAG's office.  Is that fair to say?
12  A.  Yes, sir.
13  Q.  Okay.  And so you believe that -- now you're
14  saying that in 2005, the spread sheet would have been
15  updated?
16  A.  If I could clarify.
17  Q.  Please.
18  A.  I found -- or obtained the information in 2005
19  about the 2002 cases, but it was for a different
20  purpose.
21  Q.  And what was that purpose?
22  A.  It was to identify the geographical regions in
23  Texas that had election code violations.
24  Q.  And when you say you, "found or obtained the
25  information," what do you mean by that?

## 93

1    A. I queried our mainframe system to determine the
2    election cases that we had on file.
3    Q. And why were you trying to determine the
4    geographical area of violations?
5    A. To conduct -- to do a geographic analysis to
6    determine where we would conduct training.
7    Q. Okay. And we'll get into the training a little
8    bit later.
9    A. Yes, sir.
10   Q. So I think I understand the process by which
11   referrals come into your office. They come into
12   different sections depending on the source of the
13   referral, correct?
14   A. Yes, sir.
15   Q. Is there a specific individual that conducts the
16   intake of these referrals? Does that make sense?
17   A. There are different people conducting the intake,
18   depending on where the referral source is.
19   Q. And you've testified to that already, correct?
20   A. When it comes -- when it's identified as an
21   election violation referral, it comes to me and then I
22   conduct an intake.
23   Q. And what is your intake process?
24   A. I obtain and review the referral packet and I
25   identify the county of the offense, the election

## 94

1    involved, the referral source and the nature of the
2    allegation.
3    Q. And you also update your spread sheet, as I
4    understand it?
5    A. That's correct.
6    Q. Do referrals -- are they automatically given a
7    complaint number or a tracking number?
8    A. They are given -- yes, they are given what we
9    call a call for service number.
10   Q. And at that point, are they considered an
11   official investigation or is that just simply to track
12   the file as it moves through the system?
13   A. It's to track the file.
14   Q. Are there -- is it -- or has it occurred within
15   your office where a referral has become a call for
16   service number, but it didn't actually generate into an
17   official investigation?
18   A. Yes, sir.
19   Q. Who makes the actual decision to investigate or
20   not to investigate?
21   A. It's a multi-person decision.
22   Q. Help me understand it.
23   A. Okay. The division chief or the major is
24   required to approve it.
25   Q. Is that you?

## 95

1    A. That would be me now. The captain, the
2    lieutenant, and then the director of law enforcement as
3    well.
4    Q. So does that occur during a meeting or is there
5    e-mail communication that's passed between the
6    individuals you just testified about? How is that
7    decision actually made?
8    A. It's generally meetings.
9    Q. Okay. And so is that a weekly meeting, monthly
10   meeting, how do these meetings occur?
11   A. Generally as referrals come in.
12   Q. Okay. Do you wait until you have a certain
13   number of referrals or is it each referral?
14   A. It's generally each referral.
15   Q. All right. And so during this meeting what is
16   actually discussed regarding the referral?
17   A. The first thing that's discussed and evaluated is
18   what -- what kind of offenses are they. We have a
19   practice that some of the referrals that we get are
20   class C misdemeanors.
21   Q. Okay.
22   A. And those are fine-only offenses. And all
23   election cases are labor intensive and so we generally
24   discuss the fact that this is a class C misdemeanor and
25   so we don't investigate those.

## 96

1    Q. And who would investigate the class C
2    misdemeanors, if anyone?
3    A. The local jurisdictions like sheriff's
4    departments, police departments, local county attorneys.
5    Q. So is there a determination made at that meeting
6    whether or not to refer it back to the referring source?
7    A. Right. If we determine that it's a class C
8    misdemeanor then we will say we do not have the
9    resources to investigate this. Suggest contacting your
10   county attorney or local law enforcement officials.
11   Q. Does your spread sheet indicate which ones are
12   referred back or whether there was a determination not
13   to investigate?
14   A. No, sir.
15   Q. Do you keep a separate tracking system of what
16   has been closed, essentially in your office and referred
17   back to the referring source?
18   A. Webpass may have that indication in it.
19   Q. Did you produce that information to your
20   attorney?
21   A. No, I did not.
22   Q. So as I understand it, Webpass would indicate the
23   determination on how that case would be handled within
24   the OAG's office or the SIU's office; is that correct?
25   A. If we advised that we were not going to

## 97

1  investigate a class C misdemeanor, yes.
2      Q.  Okay.  Once it's referred back, is there any
3  additional tracking down by your office?
4      A.  No, sir.
5      Q.  Does the Texas OAG's office ever initiate its own
6  investigations of alleged election code violations?
7      A.  No, sir.
8      Q.  It's 100 percent referral based?
9      A.  It is referral driven.
10     Q.  Are the referrals in the Texas OAG's office or
11  the SIU maintained by subject matter or category?
12     A.  No, sir.
13     Q.  Are they maintained by county or by agency
14  referring agency?
15     A.  We generally maintain them by county and whether
16  or not there's SOS referrals or whether or not they're
17  other referrals.
18     Q.  Is it possible to search within your mainframe
19  database to determine the exact number of referrals from
20  the SOS, for instance?
21     A.  Yes, sir.
22     Q.  And then it -- if I understood you correctly, the
23  other search would be for others.  And is it possible to
24  determine the other source for referrals?
25     A.  Yes, sir.

## 98

1      Q.  Okay.
2      A.  If I could clarify?
3      Q.  Please.
4      A.  The ability to search all of the election
5  violations will require like a -- it will just
6  categorize it as an election violation and I will have
7  to go through manually and determine whether or not it
8  was an SOS or a other referral.
9      Q.  So it would require manual search?
10     A.  Right.
11     Q.  Okay.
12         (Exhibit No. 584 was marked.)
13  BY MR. GEAR:
14     Q.  I've shown you what has been marked as
15  Exhibit 584.  Take your time and take a look at this.
16     A.  Yes, sir.
17     Q.  So first of all, I want to see if -- have you
18  reviewed these types of documents before?
19     A.  These types of documents, but not specifically
20  this document.
21     Q.  Okay.  And what is this?
22     A.  This is a -- I would call this a press release.
23     Q.  And it comes directly out of the attorney
24  general's office?
25     A.  That's correct.

## 99

1      Q.  All right.  And when I say the attorney general,
2  I mean Greg Abbott in 2005?
3      A.  Yes, sir.
4      Q.  Okay.  And do you see the date on this, Friday
5  June 3, 2005?
6      A.  Yes, sir.
7      Q.  All right.  This indicates -- actually let me do
8  something else just to make this go a little smoother.
9  You've testified routinely about the existence of a
10  spread sheet, correct?
11     A.  Yes, sir.
12     Q.  All right.  Let me mark this, please.
13         (Exhibit No. 585 was marked.)
14  BY MR. GEAR:
15     Q.  I'm showing you what's been marked as
16  Exhibit 585.  And I just asked you to take a look at
17  that and identify it for the record, please.
18         MR. SWEETEN:  Bruce, can I get a copy of
19  that?
20         MR. GEAR:  I do not have an extra copy of
21  that.  I don't not, sorry.  I can make a copy if you
22  want to do that.
23         MR. SWEETEN:  Let's just do it at the break.
24  BY MR. GEAR:
25     Q.  Is this the spread sheet that you've been

## 100

1  referring to?  And to be fair, this may be a series of
2  spread sheets and I'm just trying to understand what
3  exactly they are.
4      A.  If you could just give me a moment.
5      Q.  Sure.
6      A.  Yes, sir.  They appear to be the spread sheet
7  I've been referencing.
8      Q.  Okay.  Now, are all of these maintained by you,
9  created by you?
10     A.  Yes, sir.
11     Q.  And this would be a version that was if I'm
12  correct, and correct me if I'm wrong, that was printed
13  in 2012.  Do you see the date on the bottom of the
14  spread sheet?
15     A.  Yes, sir.
16     Q.  And to be accurate, it was March 12th of 2012?
17     A.  Yes, sir.
18     Q.  And there's also another version here that was
19  printed on March 9th of 2012.  And it would be the
20  election code referrals to the office of the attorney
21  general August 2002 to the present.  Do you see that
22  particular version they I'm talking about?
23     A.  Yes, sir.
24     Q.  And would these have been printed by you?
25     A.  They would be electronically published by me.

Major Forrest Mitchell                                    June 15, 2012

101

1       Q.  Okay.  And when you say, "electronically
2    published," do you publish these spread sheets on any
3    particular system?  Do you make them publicly available?
4       A.  If I could explain?
5       Q.  Sure.
6       A.  I maintain an Excel spread sheet that has three
7    different books.  One book is specifically for
8    referrals.  One book is specifically for prosecution
9    resolved.  And one book is for charges pending.  And
10   then I publish to a PDF any one of those three books or
11   a combination of all three or all three.
12      Q.  And when you say, "publish to a PDF," where does
13   that go?
14      A.  It could go to somebody in our open records
15   division who has requested a copy.  It could go to our
16   intergovernmental relations division.
17      Q.  So if a news agency wanted a copy of your spread
18   sheets, then that would be published and released to the
19   news agency?
20      A.  Yes, sir.
21      Q.  Okay.  When news -- have news agencies made
22   request for your spread sheets in the past?
23      A.  Yes, sir.
24      Q.  And other than the spread sheet, do you provide
25   them with any additional information?

102

1       A.  No, sir.
2       Q.  So it's generally the spread sheet that is
3    publicly released when requested?
4       A.  Yeah.  If I could clarify.
5       Q.  Please.
6       A.  Unless they specifically asked for another
7    document, such as a charging instrument or indictment or
8    judgments or sentence.
9       Q.  And those --
10      A.  In some cases they do ask for those as well as
11   the spread sheets.
12      Q.  Okay.  All right.  So now you have your spread
13   sheet in front of you that you've identified.  And let
14   me actually clarify something.  You said there were
15   three different versions of the spread sheet or three
16   different books:  The referrals, the prosecutions and
17   pending.  Can you identify for me, are there three
18   different versions here or three different books or is
19   this all from one of these versions of the spread sheets
20   that you have testified?
21      A.  This is one spread sheet which contains three
22   books.
23      Q.  Okay.  And so looking at the spread sheet, it
24   starts with TX 000056816.  Could you -- I'm trying to
25   get you to identify the books for me that are contained

103

1    within the spread sheet?
2       A.  Referral TX 0056816, contains the charges pending
3    resolution.
4       Q.  And how far does that -- how many pages is that?
5       A.  It's two-pages, sir.
6       Q.  Okay.  So the next of spread sheet would be
7    TX 0056818.  And that indicates election code referrals
8    to the office of the attorney general, prosecutions
9    resolved.  Is that accurate?
10      A.  My Bates stamp is cut off on that.  But this
11   document contains the prosecutions resolved.
12      Q.  And how many pages is that?
13      A.  Contains five pages, sir.
14      Q.  Okay.  And then the -- there's another spread
15   sheet that indicates on -- starts with TX 0056823.  It
16   indicates on the top, election code referrals to the
17   office of the attorney general, August 2002 to the
18   present.  Do you see that one?
19      A.  Yes, sir.
20      Q.  And which one would this represent?
21      A.  This one represents the referrals.
22      Q.  And so I see that this is 2002 to 2012.  Is that
23   accurate?
24      A.  Yes, sir.
25      Q.  So during the 2011 session, this would not have

104

1    been the spread sheet that was provided to
2    Representative Anchia?
3       A.  Yes, that would be incorrect.
4       Q.  That would be incorrect?
5       A.  I'm sorry.  This would not be the spread sheet
6    that was provided to Representative Anchia.
7       Q.  It would have only included the 2011 referrals?
8       A.  Up to the most current, at the time of the
9    request.
10      Q.  And I believe I asked you and I'm sorry if I did,
11   do you recall when you provided him a copy -- there were
12   multiple occasions, but in 2011, do you recall the time
13   period you provided to him these spread sheets?
14      A.  It may have preceded the legislative session and
15   it would have -- but we can provide him continuous
16   updates.  So he made multiple request.
17      Q.  And you said, "it may have preceded the
18   legislative session."  Could it have been during the
19   legislative session?
20      A.  Yes, sir.
21      Q.  Okay.  All right.  Do you know if he got a copy
22   of the March 12, 2012 version?
23      A.  I don't know.
24      Q.  You don't know.  Okay.  So turning your attention
25   back to Exhibit 584, I believe, which is the press

## 105

1 release from Attorney General Greg Abbott.  It indicates
2 on here that the attorney general's office announced the
3 first indictments for alleged voter fraud in Texas.
4 Would 2005 be the -- be the time period in which the
5 first indictments were issued from regarding voter
6 fraud?
7     A. I don't know that.
8     Q. Okay.  And 2005 would have been when you came on
9 board for the SIU?
10    A. That's correct.
11    Q. Do you know how these press releases are created,
12 how they're generated?
13        MR. SWEETEN:  Objection; calls for
14 speculation.
15 BY MR. GEAR:
16    Q. Go ahead.  Do you know how?
17    A. No, not really.
18    Q. Okay.  Are you involved in the information that's
19 contained within this particular press release?
20    A. No.
21    Q. Would you ever be asked for information prior to
22 the release of these particular press releases?
23    A. Occasionally, yes.
24    Q. So the information that these -- that at least
25 the 2005 press release is addressing, is election code

## 106

1 violations, correct?
2     A. Yes, sir, it is.
3     Q. And would you have provided information regarding
4 these election code violations?
5     A. Not for this press release.
6     Q. Okay.  So the first violation that's referenced
7 in here is the Hardeman County, Precinct 1, Commissioner
8 Johnny Akers, do you see that?
9     A. Yes, sir, I do.
10    Q. All right.  And looking at Exhibit 585, which is
11 your spread sheet, do you see that referenced in --
12 within your spread sheet?
13    A. Yes, sir, I do.
14    Q. And specifically turning your attention to
15 TX 0056818, is that the page that you're looking at?
16    A. Again, the Bates stamp is cut off on this one.
17 But it is Page 1 of the prosecutions resolved.
18    Q. All right.  And can you tell me what happened
19 with the -- what were the facts of the Johnny Akers
20 case?
21    A. He was -- the allegation is that he was handling
22 mail-in ballots during the course of the election.  And
23 he was charged with six counts of possession of official
24 ballot or carrier envelope of another.  And then he
25 plead guilty to one count of possession of an official

## 107

1 ballot or carrier envelope of another.
2     Q. And that's indicated in the press release as
3 well, Exhibit 584?
4     A. In the press release it does not indicate that he
5 has plead guilty.  It only indicates that he has been
6 charged with possession of a mail-in ballot.
7     Q. And just so that we clarify this as we move
8 along, would this have been chapter 64 or would it have
9 been a different chapter?
10    A. This would have been chapter 86 or 84.
11    Q. And that would not have involved voter
12 impersonation, correct?
13    A. No, it would not have involved voter
14 impersonation.
15    Q. There is a second indictment that's discussed
16 here on May 27, Beeville resident, Melva Kay Ponce, do
17 you see that?
18    A. Yes, sir, I do.
19    Q. And generally, can you tell me, does this
20 allegation involve voter impersonation?
21    A. Yes, sir, it does.
22    Q. And looking at Exhibit 584, can you explain to me
23 what the facts are?
24    A. Melva Kay Ponce utilized her mother's mail-in
25 ballot to cast a vote in the 2004 general election.

## 108

1     Q. So that's a by mail violation?
2     A. It's a by mail voter impersonation, yes, sir.
3     Q. Would that have been covered under the provisions
4 of SB 14?  Would it have been prevented if SB 14 was in
5 place?
6     A. No, sir.
7        (Exhibit No. 586 was marked.)
8 BY MR. GEAR:
9     Q. Just so I'm clear, both Akers and Ponce dealt
10 with by mail ballot fraud?
11    A. Yes, sir.
12    Q. I'm showing you what's been marked as
13 Exhibit 586.  And take your time and take a look at
14 that.  Generally, just so we can move along, you
15 indicated that Mr. Akers plead to the charge?
16    A. Yes, sir.
17    Q. Do you know what he plead to?
18    A. Plead guilty to one count of possession of
19 official ballot or carrier envelope of another.
20    Q. And the Exhibit I just handed you, the press
21 release from Greg Abbott indicates what he plead to?
22    A. Yes, sir.
23    Q. Okay.  And again, just so I'm clear on the
24 record, this is another press release from the attorney
25 general's office?

## 109

1     A. Yes, sir.
2     Q. And the date of the press release is
3  November 7th, 2005?
4     A. Yes, sir.
5     Q. All right.
6        (Exhibit No. 587 was marked.)
7  BY MR. GEAR:
8     Q. All right. So I'm showing you what's been marked
9  as Exhibit 587. Take your time and then identify what
10  it is for me, please.
11     A. Okay, sir.
12     Q. Can you identify that for me, please?
13     A. This appears to be a press release regarding
14  indictments against four Nueces County voters.
15     Q. And the date of the press release?
16     A. Would be December 19, 2005.
17     Q. Okay. And it indicates who was indicted within
18  the press release?
19     A. Yes, sir, it does.
20     Q. And can you tell me who was indicted?
21     A. Elida Garza Flores, Isabel Rios Gonzales,
22  Josefina Marinas Suarez and Virginia Ramos Garza.
23     Q. And so either looking at your spread sheet or at
24  Exhibit 587, can you tell me what the facts of that
25  indictment were?

## 110

1     A. Okay. This case was a 2005 school district
2  election. And it would have been referred to our office
3  by the Secretary of State's office. And it involved
4  mail-in ballot fraud. And when I mean mail-in ballot
5  fraud, it involves the unlawful handling of the mail-in
6  ballots and also unlawful assistance in assisting the
7  voter in the preparation of those ballots or the
8  application to obtain those ballots.
9     Q. So if I'm correct, this would not have been
10  chapter 64, which deals with voter impersonation,
11  correct?
12     A. It potentially could have been.
13     Q. Turning your attention to Exhibit 587, do you see
14  where it says the indictments apply to violations of
15  chapter 86?
16     A. Yes.
17     Q. Any reason to dispute that?
18     A. No, sir.
19     Q. Okay. And turning to your spread sheet, do you
20  see those individuals indicated on your spread sheet?
21     A. Yes, sir, I do.
22     Q. And can you tell me, ultimately, what the
23  determination was on these cases, were they resolved?
24     A. Yes, they were resolved. Virginia Ramos Garza
25  accepted a one-year pretrial diversion, which involved

## 111

1  12 months of community supervision. Elida Garza Flores
2  also accepted a one-year pre-trial diversion in which
3  she received 12 months of community supervision.
4  Isabel Lisa Rios Gonzalez pleaded no contest to two
5  counts of possession of an official ballot or carrier
6  envelop of another, and received one-year deferred
7  adjudication.
8     Q. All right. And so I want to ask you, there's a
9  couple of things that you said that I didn't completely
10  understand. A class C or class E misdemeanor, what does
11  that actually mean?
12     A. We have three claims of misdemeanor offenses in
13  the State of Texas. We have a class C misdemeanor, a
14  class B misdemeanor and a class A misdemeanor. A class
15  C is punishable by fine only. And I believe the fine is
16  $500 or less. A class B is punishable by up to six
17  months in a county correctional facility and a fine, I
18  think $2,000 or less. And then a class A misdemeanor is
19  punishable by up to one year in a county correctional
20  facility and a fine of $4,000 or less.
21     Q. So class C and class E, they non-criminal
22  offenses?
23     A. We don't have a class E. Class B, as in Brava.
24     Q. Okay. Class B, is that a non-criminal offense?
25     A. No, sir, that's a criminal offense.

## 112

1     Q. So focusing on class C then, you previously
2  testified that if there was a determination that it was
3  a class C offense, it would be referred back to the
4  referring agency?
5     A. Yes, sir.
6     Q. So would that then, be a non-criminal offense or
7  is it just -- you tell me.
8     A. It's a criminal offense. However, it's only
9  punish able by fine only.
10     Q. Okay. Would that be considered an ordinance
11  under Texas law?
12     A. Ordinances passed by city councils or county
13  commissioner's courts are also potential class C's only.
14  They don't involve jail time.
15     Q. And those would also be referred back if they
16  came to your office?
17     A. We wouldn't investigate municipal or county
18  ordinances.
19     Q. Okay. But local election officials could refer
20  various allegations to you regarding election code
21  violations; isn't that correct?
22     A. Local officials could refer election cases to us.
23     Q. Okay. Do they ever refer allegations that would
24  fall under the class C or ordinance type violations?
25     A. Yes, they do.

## 113

1   Q. Okay. And those would not be investigated by
2   your office?
3   A. Not now, no.
4   Q. Okay. When you say, "not now," let me understand
5   that. Was there ever a time when you actually
6   investigated class C or ordinance-type violations?
7   A. When -- in some of these referrals that come into
8   our office, they include a whole host of allegations.
9   Q. Okay. Including class Cs?
10  A. Including class Cs. And so if we were already
11  there investigating other offenses, we would address the
12  class C, but we would not initiate a case just off of a
13  class C.
14  Q. Okay. That's understandable. All right. And so
15  turning back to, I believe it's Exhibit 587, with the
16  four indictments, that was indictments for chapter 86,
17  and that's by mail ballot or fraud; is that correct?
18  A. That's correct.
19  Q. And that would not have included voter
20  impersonation?
21  A. It potentially could have.
22  Q. But again, the press release indicates that the
23  violations apply to chapter 86?
24  A. The press release does say that they were
25  indicted for mail-in ballot, yes.

## 114

1   Q. And so when you keep -- you testified several
2   times that it potentially could have. What do you mean
3   by that?
4   A. I mean that one of the schemes of conduct that we
5   have seen in mail-in ballot fraud, and examples by
6   Melva Kay Ponce, is that she impersonated her mother.
7   And some cases, some of the mail-in ballot case that we
8   examined, campaign workers will obtain a blank ballot
9   from the voter and then cast those ballots as if they
10  were the voter.
11  Q. And again, that's through the by mail ballot
12  system?
13  A. That is correct.
14  Q. And that would not have, as I understand your
15  testimony, been covered by -- if SB 14 was implemented?
16          MR. SWEETEN: Objection; calls for
17  speculation.
18  A. That is also correct.
19  Q. (By Mr. Gear) And your answer was?
20  A. No, it would not.
21  Q. Okay. And I'm sorry if I got off track. Can you
22  tell me, did you testify to what the conviction was, if
23  any?
24  A. I got the -- I got the first two down. The final
25  two Isabel Lisa Rice Gonzales pled no contest. And was,

## 115

1   on two counts of possession of an official ballot or
2   carrier envelope of another, received one year
3   adjudication, a $500 fine and 12 months community
4   supervision. Josefina Suarez also pled guilty to one
5   count of illegally possession of an official ballot or
6   carrier envelope of another, received one year
7   adjudication, a $500 fine and was sentenced to 12 months
8   community supervision.
9   Q. What does deferred -- retrial diversion mean?
10  A. Pretrial diversion is an agreement between the
11  defense attorney and the prosecuting attorney to some
12  sort of alternative punishment without any finding of
13  guilt.
14  Q. So in the case of Ms. Garza, Ms. Flores,
15  Ms. Gonzales, there was no finding of guilt?
16  A. With Garza and Flores, they both accepted a
17  pretrial diversion so there was no court finding.
18  Q. And then for Ms. Gonzales?
19  A. She plead no contest.
20  Q. Which is not an admission of guilt, correct?
21  A. Correct.
22  Q. And for Ms. Suarez, she pled guilty?
23  A. That's correct.
24          (Exhibit No. 588 was marked.)
25  BY MR. GEAR:

## 116

1   Q. Showing you what's been marked as 588. Take your
2   time and then identify that document for me, please.
3   A. Okay, sir. This document appears to be a press
4   release that was issued in Friday -- on Friday
5   January 13, 2006 by the office of the attorney general.
6   Q. Okay. And do you see the individual who was
7   indicted in this press release?
8   A. Yes, sir, I do.
9   Q. You say the name for the record?
10  A. There were actually two persons indicted in this
11  case. That would be Anita Baeza and Trinidad
12  Villalobos.
13  Q. Okay. So starting with Ms. Baeza, indicates that
14  she's a 68-year old mother of the sheriff's officer
15  candidate Jeffery Baeza. Can you tell me what the
16  allegation is for her?
17  A. This move involved mail-in ballot fraud.
18  Q. And I just say for the record, you refer to your
19  spread sheet?
20  A. Correct.
21  Q. So again, this is mail-in ballot fraud?
22  A. Yes, sir. In the 2006 primary election. No.
23  I'm sorry. Incorrect. The 2004 primary election.
24  Q. And there was another individual that you
25  indicated, Villalobos?

## 117

1   A.  Yes, sir.  Trinidad Villalobos.
2   Q.  And can you tell me what the allegation for that
3   was?
4   A.  Also mail-in ballot fraud.
5   Q.  From the same election?
6   A.  Referring to my spread sheet, it was the 2004
7   primary election yes, sir.
8   Q.  So both were the 2004 primary election.  Can you
9   tell me generally what the allegations of this
10  indictment were?
11  A.  This again, goes to persons who were assisting in
12  the application for mail-in ballots during the early
13  voting in that election.  And then also, once early
14  voting started assisted in either the completion of the
15  ballot or the handling of the ballot.
16  Q.  And if I'm correct, these would have been under
17  chapter 86, dealing with mail-in ballot fraud?
18  A.  Yes, sir 86006.
19  Q.  And do you know what the outcome of these
20  indictments were?
21  A.  Trinidad Villalobos was found guilty by a jury on
22  four counts of possession of mail-in ballot or carrier
23  of another.  She received ten days in jail.  And she was
24  sentenced to six months of probation.  And then Anita
25  Baeza accepted six months of pretrial diversion.

## 118

1   Q.  And again, neither of those dealt with voter
2   impersonation.  Or let me put it a different way so it's
3   easier for you to understand, perhaps.  Both of those
4   dealt with chapter 86 of the election codes?
5   A.  Yes, sir, that's what they were charged with.
6   Q.  And neither of them pled to a charge of voter
7   impersonation?
8   A.  That's correct, sir.
9   Q.  Okay.  It also says at the bottom of, I believe
10  Exhibit 588, that in December, four individuals were
11  indicted for illegally possessing and transporting
12  election ballots following the 2005 ISD election in, is
13  it Nueces County?
14  A.  Yes, sir, that's correct.
15  Q.  And that's what we've previously referred to in
16  your testimony?
17  A.  Yes, sir, the 2005 Robstown independent school
18  district election.  On the chart, it's listed as the
19  2005 school district election.
20  Q.  Okay.  And it also says, the paragraph underneath
21  that attorney general obtained a guilty plea from Bee
22  County woman accused of voter fraud.  And the Bee County
23  woman this is referring to would be Melva Ponce, is that
24  accurate?
25  A.  Yes, sir.  Melva Kay Ponce.

## 119

1   Q.  Okay.  So far is, it fair to say that all of
2   these violations dealt with by mail ballot fraud?
3       MR. SWEETEN:  Objection; asked and answered
4   Objection; compound.  You can answer.
5   A.  These all involved mail-in ballot fraud, which
6   could potentially include voter impersonation.
7   Q.  You keep indicating that, but these were charged
8   under chapter 86, correct?
9       MR. SWEETEN:  Objection; argumentative.
10  BY MR. GEAR:
11  Q.  Well, were they charged under chapter 86?
12  A.  They were charged under chapter 86.  Yes, sir.
13  Q.  Chapter 86 does not include voter impersonation,
14  correct?
15  A.  Well Melva Kay Ponce was charged with voter
16  impersonation.
17  Q.  But it was through the by mail ballot system?
18  A.  That's correct.
19  Q.  And again, I believe you testified that that
20  would not have been prevented if SB 14 was in place?
21      MR. SWEETEN:  Objection; calls for
22  speculation.
23  BY MR. GEAR:
24  Q.  You can answer.
25  A.  I don't believe it would have.

## 120

1       (Exhibit No. 589 was marked.)
2   BY MR. GEAR:
3   Q.  Showing you what's been marked as Exhibit 589.
4   Take a second to look at this, please.
5   A.  Okay, sir.
6   Q.  Can you tell me what this?
7   A.  Sir, appears to be a press release issued by the
8   Texas Attorney General's office regarding a training
9   initiative our office was conducting.
10  Q.  And the date of the press release?
11  A.  Wednesday January 25, 2006.
12  Q.  And before we talk about this, I would like to
13  talk about your spread sheet.  From -- the SIU was
14  established in 2005, correct?
15  A.  Yes, sir.
16  Q.  And what month in 2005?
17  A.  I want to say June.
18  Q.  June of 2005.  So between June 2005 to
19  January 25th of 2006, how many referrals did the OAG's
20  office receive?
21  A.  I'm sorry.  Could you repeat that one more time?
22  Q.  Between June of 2005, the establishment of SIU,
23  to January of 2006, the date of this press release, how
24  many referrals were received by the OAG office?  And can
25  you tell that based on your spread sheet?

## 121

1   A. Yes, sir I could tell the referral that we
2   received from the SOS.
3   Q. Okay. And how many referrals were those?
4   A. To January 2006?
5   Q. Yes, sir.
6   A. Six, sir, in the Secretary of State's office.
7   Q. And I believe that you said -- do one of these
8   spread sheets show the other referrals?
9   A. Yes, sir, it does.
10  Q. And which portion of the spread sheet or which
11  Bates stamp number would that be?
12  A. My Bates stamp number is partially cut off.
13  Q. And I apologize for that.
14  But it would start on Page 6 with a title heading
15  selection code referrals of the office of the
16  attorney general -- August 2, 2002 to present.
17  Q. What's the Bates stamp number on the bottom?
18  A. I have, it starts with TX 0005682.
19  Q. And the top is election code referrals to the
20  office of the attorney general, prosecutions revolved,
21  or am I looking at the wrong one?
22  A. I believe you're looking at the wrong one. It
23  would be election code referrals to the office of the
24  attorney general, August 2, 2002 to the present, Page 6.
25  It was published 3/9/2012.

## 123

1   sources.
2   Q. Eight?
3   A. Eight.
4   Q. Okay. Turning your attention back to 589,
5   indicates that, "the Attorney General Greg Abbott
6   launches initiative training -- training initiative to
7   identify, prosecute, prevent voter fraud." Was that
8   initiative launched in 2005 or was it launched in 2006?
9   A. It was initiated in late 2005 and finalized in
10  the first part of 2006.
11  Q. Okay. And so the initiative -- what did the
12  initiative involve? And you can refer to 589 if you
13  would like to.
14  A. It involved developing, first of all, identifying
15  geographical regions in the State of Texas where the
16  office had previously investigated and prosecuted
17  allegations of election misconduct. It involved the
18  development of a law enforcement outreach training
19  program. And then it involved scheduling and conducting
20  training to law enforcement officers in Texas.
21  Q. Before we get into the various categories, were
22  there training materials produced or created as a result
23  of this initiative?
24  A. Yes, sir.
25  Q. And were those training materials specific to the

## 122

1   Q. All right. And so I believe your testimony was
2   there were six referrals from the Secretary of State's
3   office. Between that time period, how many from other
4   sources?
5   A. I wouldn't be able to determine this off the
6   spread sheet.
7   Q. How would you make that determination then?
8   A. I would have to go back and look at the call for
9   service.
10  Q. Okay. Does this give you a general ball park of
11  the number of referrals?
12  A. I would say yes, because there were only two
13  elections that occurred in -- based off this document in
14  2005.
15  Q. Okay. And so how many referrals are we talking
16  about then, in a general ball park basically?
17  A. It would be two.
18  Q. Two. So we're talking about a total of seven
19  referrals from the date of the establishment of the SIU
20  to the date of this press release, which is January 25,
21  2006. Is that fair to say?
22  A. I believe I said there were six referrals from
23  the Secretary of State's office.
24  Q. Okay.
25  A. And then there appears to be two from other

## 124

1   different agencies that you were focusing on or was
2   there just one general training -- source of training
3   material?
4   A. Just one source of training.
5   Q. Okay. And were these training materials turned
6   over or provided to the different agencies that the
7   training was conducted?
8   A. I believe a -- I believe a copy of the PowerPoint
9   presentation would have been provided as an instructor
10  note -- or class notes.
11  Q. Who created the PowerPoint presentation?
12  A. It was a combined effort of multiple
13  investigators.
14  Q. Including yourself?
15  A. Yes.
16  Q. Were you in charge of the ultimate message or the
17  material that was produced in the PowerPoint
18  presentation?
19  A. No, I was not in charge at the time.
20  Q. Now, this training initiative in Exhibit 589, it
21  indicates that it targeted 44 key counties that either
22  have a history of voter fraud or the population of which
23  exceeds 100,000. Do you see that?
24  A. Yes, sir.
25  Q. Can you tell me, as of this date, how many

Major Forrest Mitchell                          June 15, 2012

## 125

1  different counties have been provided training by the
2  attorney general's office?
3      A. As of today's date?
4      Q. As of today's date.
5      A. I couldn't -- I don't know.
6      Q. More than 44 counties?
7      A. I don't recall.
8      Q. Okay. And just to be fair, and I'm trying to
9  understand this initiative. You were the lead
10 investigator of the supervisor of the SIU, correct?
11     A. At the time I was the lieutenant and Greg Lucus
12 was the captain over the unit.
13     Q. Okay. Would you have been involved in any
14 aspects of the training?
15     A. Yes, I was involved in some of the training.
16     Q. And that would have been to go out into the field
17 and provide the training?
18     A. Yes, sir.
19     Q. All right. And how many investigators were
20 involved in providing training?
21     A. I don't recall.
22     Q. Do you have a general idea of the number of
23 investigators?
24     A. It would just be a guess. And it would be,
25 perhaps ten.

## 126

1      Q. Okay. And so when we're talking about 44
2  counties and populations of 100,000 or more, can you
3  tell me the different types of agencies that were
4  targeted?
5      A. We conducted a total of, I believe, approximately
6  80 presentations through out the state. And in those
7  presentations would have been police departments,
8  sheriff's departments, Texas highway patrol, local
9  district attorney investigators or county attorney
10 investigators or anybody who was a Texas peace officer.
11     Q. Would that have involved local DAs or local
12 county attorneys as well?
13     A. Yes, sir.
14     Q. What about election officials?
15     A. No, sir.
16     Q. So local election officials were not invited to
17 the training?
18     A. This was a TCLEOSE, which is our State law
19 enforcement regulatory agency. It was designed to be a
20 peace officer presentation for training on election code
21 offenses.
22     Q. Was there a training initiative established for
23 local election officials?
24     A. No, not that I'm aware of.
25     Q. Okay. And maybe I should be clearer on that.

## 127

1  Through the SIU or through the OAG's office, was there a
2  training established for local election officials?
3      A. No, sir.
4      Q. Do you see in the fourth paragraph again, where
5  it's talking about 44 key counties including 18 cities
6  where the attorney general has previously investigated
7  or prosecuted alleged election code violations, do you
8  see that paragraph?
9      A. Yes, sir.
10     Q. The 44 counties contain 78 percent of eligible
11 registered voters in Texas. Do you see that?
12     A. Yes, sir.
13     Q. Any reason to dispute that?
14     A. No, sir.
15     Q. Underneath it indicates that, "earlier this
16 month, two Reeves County women were indicted on charges
17 of illegally possessing an transporting election ballots
18 of several voters." Do you see that?
19     A. Yes, sir.
20     Q. Looking at your spread sheet, can you identify
21 who the two women were?
22     A. That would be Anita Baeza and Trinidad
23 Villalobos.
24     Q. And you testified to that already, correct?
25     A. Yes, sir.

## 128

1      Q. Okay. So is this training initiative still in
2  place?
3      A. No, sir.
4      Q. And I believe I asked you what the number of
5  counties that actually received training was, and I
6  can't recall your answer.
7      A. I don't recall.
8      Q. And so generally would it have been -- how long
9  did this training initiative last?
10     A. About a month.
11     Q. Were there any other versions of this training
12 initiative that were put in place after this particular
13 training initiative? We're talking about, I believe
14 between 2005 and 2006.
15     A. No, sir.
16     Q. And the answer is no, no other training?
17     A. No other training initiatives.
18     Q. Okay.
19        (Exhibit No. 590 was marked.)
20 BY MR. GEAR:
21     Q. Go ahead and take a look at Exhibit 590. When
22 you've had a chance we'll talk about it.
23     A. Okay, sir.
24     Q. Okay. The fourth paragraph, "and the fraud
25 continues since last summer. My office has been

## 129

1 involved in several voter fraud cases across the state."
2 Are there any -- from 2002 to 2006, March 1st 2006 the
3 date of this article, are there any additional voter
4 fraud prosecutions or convictions that you're aware of,
5 based on this spread sheet?
6     A.  I think there were three additional persons
7 charged with election misconduct.
8     Q.  And which three are you referring to?
9     A.  Willie Howard Ray, Jamillah Johnson and Melinda
10 Hunter.
11     Q.  And they're in -- is it Bowie County?
12     A.  Bowie County.
13     Q.  Bowie County.  Thank you.  So let's talk about
14 them real quick.  Can you tell me what the allegation
15 for Willie Ray, Jamillah Johnson and Melinda Hunter are?
16     A.  Yes, sir.  This case was referred by the
17 Secretary of State's office.
18     Q.  Okay.
19     A.  It involved the 2004 primary election.  And the
20 allegations were unlawfully obstructing a poll watcher,
21 unlawfully witnessing the application of more than one
22 application, unlawful assistance, security of ballots,
23 ballot boxes and envelopes.
24     Q.  And would this have been a charge under chapter
25 86 or chapter 64?

## 130

1     A.  These -- the allegations involved multiple
2 chapters of the Texas election code.
3     Q.  Okay.  And would any of these allegations have
4 involved a charge of voter impersonation?
5     A.  The mail-in ballot applications and the unlawful
6 assistance could lead to potential illegal voting
7 charges under 64.  However, only charges that were filed
8 were under chapter 86.
9     Q.  Okay.  So is it fair to say there were no charges
10 filed under chapter 64 for any of the individuals who
11 were indicted that you just identified?
12     A.  That is correct.
13     Q.  And ultimately, was there a conviction?
14     A.  Willie Ray pled to one count of possession of an
15 official ballot or carrier envelope of another, which is
16 a class B misdemeanor.  She received a fine.  I'm sorry.
17 I'm having a hard time reading it.
18     Q.  It's small print.
19     A.  And then Jamillah Johnson was -- received
20 six months deferred adjudication and a $200 fine.
21     Q.  And again, that's not a criminal conviction?
22     A.  No.  For the purpose it's not a final conviction.
23     Q.  Okay.
24     A.  And then Melinda Hunter received six months
25 pretrial diversion.

## 131

1     Q.  And again, these were by mail ballot violations?
2     A.  Yes, sir, 86006 is possession of a mail-in
3 ballot.
4     Q.  Turning your attention back to Exhibit 590, there
5 are a number of different discussions of indictments
6 here.  Reeves County, the mother of the 2004 primary
7 candidate I believe you already testified that, correct?
8     A.  Yes, sir.
9     Q.  Nueces County, the four women allegedly targeting
10 elderly voters during last year's local school board
11 election, I believe you testified to that?
12     A.  Yes, sir.
13     Q.  Hardeman County commissioner pled guilty to
14 illegally collecting mail-in ballots during the 2004
15 election.  And that would have been Johnny Wayne Akers,
16 correct, for Hardeman County?
17     A.  Yes, sir.
18         MR. SWEETEN:  Bruce, we're getting close to
19 1:15, so if you get to a logical stopping point.
20         MR. GEAR:  Did you want to go to 1:30?
21         MR. SWEETEN:  Well, we were going to try
22 to -- we've got to be somewhere at 1:30.  It's short,
23 but yeah.  Just, I mean, I don't want to stop you I'm
24 just letting you know.
25         MR. GEAR:  I'll finish this and then we can

## 132

1 take a break.
2         MR. SWEETEN:  Sure.  That's fine.
3 BY MR. GEAR:
4     Q.  There's another indication here about, "I know
5 local prosecutor's are dealing with voter fraud, too.
6 The week before Christmas."  And they talk about
7 Hidalgo.  Did I pronounce that correct?
8     A.  Yes, sir.  Hidalgo County.
9     Q.  "Hidalgo County district attorney's office
10 obtained indictments against nine people in connection
11 with the McAllen City election in May of 2005."  Would
12 that be included on your spread sheet?
13     A.  No, sir.  It's included on our spread sheet in
14 referrals.
15     Q.  Okay.
16     A.  But not in prosecutions.
17     Q.  So is this one that you would have worked in
18 conjunction with the local prosecutor.  How does that
19 work?
20     A.  Yes, sir.  The Secretary of State's office
21 referred it to us, as well as the Texas Ranger assigned
22 to that jurisdiction.  And then also the district
23 attorney.  So all three requested assistance.
24     Q.  Okay.  Can you tell me on the referrals where
25 these nine individuals would be identified?

## 133

1    A. I would only have listed it once.
2    Q. Okay.
3    A. And it would be listed on Page 1 of election code
4  referrals to the office of the attorney general,
5  August 2007 to present.  And it would be Page 1.  And it
6  would be Hidalgo 2005 municipal election with the SOS
7  date of 6/16/2005.  And the office was method of
8  returning marked ballot, unlawful assistance and
9  assisting voter.
10    Q. And that would have included the nine individuals
11  that the allegations pertained to?
12    A. Yes, sir.
13    Q. And this is -- the allegation at least is, method
14  of returning marked ballots, unlawful assistance,
15  assisting voter, illegal voting.  Can you tell me what
16  the result of these allegations were?
17    A. I believe nine defendants were charged with a
18  variety of those offenses.
19    Q. Okay.
20    A. By the grand jury.  They were indicted.  And the
21  district attorney prosecuted that case.
22    Q. Go ahead.
23    A. I believe each of the indictments were
24  subsequently dismissed by the local district attorney in
25  the interest of justice or for insufficient evidence.

## 134

1    Q. Okay.  So there were no convictions regarding
2  this matter?
3    A. I don't believe so.
4    Q. Okay.
5        MR. GEAR:  I think this is a good place to
6  stop.
7        MR. SWEETEN:  Okay.  Very good.
8        (Brief recess.)
9  BY MR. GEAR:
10    Q. Back on the record.  Back from lunch.  All right.
11  I think we ended with Exhibit 590, which takes us up to
12  March 1st of 2006.  So I just want to ask you some
13  general questions about your spread sheet.  From 2002 to
14  March 1st of 2006, how many referrals, total, were
15  received in the office of the Attorney General?
16    A. From 2002 to 2006?
17    Q. Yes, sir.
18    A. 18 SOS referrals.
19    Q. And what about other?
20    A. That's not going to be as good of a number
21  because I can only distinguish elections prior to 2006,
22  so on the others, it would be two elections.
23    Q. So 20 referrals between 2002 to 2006.  Is that a
24  fair estimate?
25    A. Yes, sir.

## 135

1    Q. Okay.  Out of those 20 referrals -- and that
2  would have included referrals from the Secretary of
3  State's office, as well as other sources as you've
4  testified here.  How many of those dealt with voter
5  impersonation?
6    A. The one that I can definitely say dealt with
7  voter impersonation would be Melva Kay Ponce, through
8  Bee County.
9    Q. And we've talked about that, correct?
10    A. Yes, sir.  On the other cases that involved
11  mail-in ballot fraud, there were no other persons
12  charged with voter impersonation.
13    Q. Okay.  Which leads me to my next question
14  between -- other than Ms. Ponce who, I understand your
15  testimony about.  Between 2002 and 2006, were there any
16  charges of voter impersonation?
17    A. No, sir.
18    Q. Were there any investigations of voter
19  impersonation?
20    A. When we examine allegations of mail-in ballot
21  fraud, we sometimes have allegations that the voter
22  didn't cast the ballot and that someone assisted
23  them with their mail-in ballot or took their blank
24  mail-in ballot.  So there are potential cases that were
25  there.

## 136

1    Q. And those, again, would have been under
2  chapter 86, not chapter 64 because they're dealing with
3  mail-in ballots?
4    A. If you had a suspect who assisted a voter with
5  the mail-in ballot application and also the completion
6  of the ballot, and marked the ballot contrary to the
7  voter's intent or marked the ballot as if they were
8  themselves the voter as in the case of Melva Kay Ponce,
9  that would be under 64.
10    Q. Okay.  And again, the question I have for you is,
11  that would have fallen under the by mail ballot system,
12  however?
13    A. Yes.  You can commit illegal voting by -- you can
14  commit illegal voting by -- in the early voting mail-in
15  ballot portion, early voting polling place or actually
16  on election day itself.
17    Q. Okay.  And so from 2002 to 2006 dealing with
18  early voting at the polling place, were there any
19  charges, referrals or allegations of voter
20  impersonation?
21    A. No, sir.
22    Q. Were there any prosecutions of voter
23  impersonation, either early voting, by mail ballot or at
24  the polling place between 2002 and 2006?
25    A. By our office or the State of Texas as a whole?

## 137

1   Q.  Start with your office.
2   A.  No, sir.
3   Q.  Are you aware of any in the State of Texas as a
4   whole?
5   A.  No, sir.  Our data only represents what was
6   referred to the Attorney General's office.
7   Q.  Okay.  And as I understand your testimony, the
8   referrals come from a variety of sources?
9   A.  That's correct.
10  Q.  So going forward from 2006 to the end of 2011,
11  can you tell me how many referrals you received in your
12  office between 2006 to 2011?
13  A.  If you give me just a moment.
14  Q.  Sure.  I know it's going to take a little time.
15  Just for the record, I would indicate that the witness
16  is referring to his spread sheet.
17  A.  Did you say the end date was 2011?
18  Q.  Yes, sir.
19  A.  100 from the Secretary of State's office.
20  Q.  And other?
21  A.  Okay.  Since 2006, we each received approximately
22  160 allegations of misconduct in elections in that time
23  frame.
24  Q.  Total?
25  A.  168 from other sources outside of the SOS.

## 138

1   MR. ROSENBERG:  168?
2   A.  168.
3   Q.  So total would be, if I'm counting correctly, 268
4   referrals between 2006 to 2011.  Is that yes?
5   A.  Of elections from that time frame -- in that time
6   frame, yes, sir.
7   Q.  And I assume you -- counting on your spread sheet
8   you counted to the end of 2011?
9   A.  I counted to 2010, 2009, 2008, 2007 elections.
10  Q.  And you counted 2011 elections, correct?
11  A.  The -- on the other category in the other sources
12  outside of the SOS, we didn't have any in 2011.
13  Q.  Okay.  Did you have any in 2011 for SOS?
14  A.  Yes, sir.  But I didn't count those.
15  Q.  You did not count those.  Go ahead and count
16  those as well?
17  A.  Eight SOS referrals in 2011.
18  Q.  So what does that take our total to, 268 plus
19  eight?
20  A.  268 plus eight.
21  Q.  Uh-huh.
22  A.  276.
23  Q.  276.  And that would represent all of the
24  referrals from any source to the OAG's office from 2006
25  to the end of 2011?

## 139

1   A.  Yes, sir, I believe so.
2   Q.  Did I state that right, because I'm just trying
3   to make sure I'm clear on it?
4   A.  There are some, if I may clarify?
5   Q.  Please.
6   A.  There are some elections, which I'm unable the
7   determine exactly what election actually it involved.
8   There were complaints about unspecified elections.  And
9   I did not include those.
10  Q.  Okay.  And where in the spread sheet are you
11  referring to?
12  A.  If you would look at Page 11 of the election code
13  referrals office of the Attorney General, 2002 to the
14  present.
15  Q.  Okay.
16  A.  Undetermined in Nueces County, undetermined in
17  Duval County.
18  Q.  I see what you're referring to.  So there are two
19  referrals that are undetermined?
20  A.  Well, on other pages there are as well, sir.
21  Q.  Why don't you go ahead and add those in as well.
22  As far as referrals are concerned.  I see one on
23  Page 10.
24  A.  Looks like it would be, maybe five.
25  Q.  Five?

## 140

1   A.  Yes, sir.
2   Q.  So adding those five to the 276, what is your
3   total?
4   A.  It would be 281.
5   Q.  So the 281 referrals, as I understand it,
6   represent all of the referrals from any source from 2006
7   to 2011, including undetermined election dates?
8   A.  That were received by the Texas Attorney
9   General's office, yes, sir.
10  Q.  Okay.  Out of those 281, can you tell me how in
11  were actually investigated?
12  A.  I can tell you that when I reviewed the number of
13  investigations that we conducted in the period from 2004
14  to present, the number is 186.
15  Q.  The present, including 2012?
16  A.  Correct, sir.
17  Q.  Okay.  So let's go with that for a minute.  You
18  said from 2002 or 2004 to the present?
19  A.  2004 to the present.
20  Q.  Okay.  So from 2004 to the present, kind of
21  throws off our other estimate of referrals, but there
22  have been 186 that have been investigated?
23  A.  Yes, sir.
24  Q.  How many of those have resulted in -- of the 186
25  resulted in charges?

## 141

1   A. We referred 62 cases for prosecution.
2   Q. Out of the 186 from 2004 to the present, how many
3   of those referrals dealt with voter impersonation?
4   A. I have to go and count them on the spread sheet.
5   Q. Please do.
6       MR. SWEETEN:  Can you read the question back
7   while he's doing that?
8       (Requested question was read.)
9   BY MR. GEAR:
10  Q. I should be clear, how many of those were
11  allegations of voter impersonation?
12      MR. SWEETEN:  Same thing.  Do you understand
13  what he wants?
14  A. Of the prosecutions?
15  Q. (By Mr. Gear)  Of the -- of the 186 that were
16  received as -- I'm sorry.  I'm confused myself now.
17      MR. SWEETEN:  Investigations.
18  BY MR. GEAR:
19  Q. Yeah.  Of the 186 investigations, how many of
20  those were allegations of voter impersonation?
21  A. On the spread sheet that I maintain, voter
22  impersonation is included in the allegation of illegal
23  voting.  I would have to go through and count those as
24  well.
25  Q. Help me understand when you're talking about

## 142

1   "illegal voting," that's under chapter 64?
2   A. Yes, sir.
3   Q. And chapter 64 has a multitude of different
4   potential violations.
5   A. Yes, sir.
6   Q. And is illegal voting a general term or is it a
7   specific allegation.
8   A. It is a -- it is an offense title that includes
9   four different elements of -- four different ways to
10  commit that offense title.
11  Q. Okay.  Is there any way to distinguish between
12  allegations of illegal voting versus allegations of
13  voter impersonation?
14      MR. SWEETEN:  On the spread sheet, Bruce?
15      MR. GEAR:  Well, I'm asking him in general.
16  BY MR. GEAR:
17  Q. I'm just trying to understand how this is
18  inputted.
19  A. It only is inputted if that clearly is
20  articulated in the referral source.  In many cases, the
21  Secretary of State's office just refers a case to us and
22  says here is an allegation of -- a violation of 64012,
23  illegal voting.  And some other referrals they break it
24  down exactly how the offense is committed, either
25  through voter impersonation, voting twice, being an

## 143

1   ineligible voter.  In other cases, especially those that
2   are referred to the DA or other persons, they don't
3   break that down in the referral document.  So this is
4   created off that referral document.
5   Q. Okay.  So trying to move forward from the
6   referral, because we're talking about 2004 to the
7   present, correct?
8   A. Yes, sir.
9   Q. At some point is there a charging decision from
10  the OAG's office?
11  A. Yes, sir.
12  Q. How many of the -- this might be one step before
13  that.  But how many of the 186 referrals were
14  investigated as voter impersonation?  And let me narrow
15  that down even farther.  Were investigated as voter
16  impersonation at the polling place.  Can you identify
17  that?
18  A. I can identify that the defendants who have been
19  charged for that are Jack Carol Crowder out of Harris
20  County.  Reyna Almanza out of Hidalgo County.  Lorenzo
21  Antonio Almanza out of Hidalgo County.  And I believe
22  Mary Comparin out of Bexar County.
23  Q. So as I understand your testimony, there are four
24  individuals that have been charged with voter
25  impersonation between -- are you limiting this testimony

## 144

1   to 2004 to the present or are you going from 2002 to the
2   present?
3   A. I'm going to from 2004 to the present.
4   Q. Okay.  And so since we're going down this road,
5   were there any charged with voter impersonation at the
6   polling place between 2002 to the present?  And I
7   understand there are four that you already identified.
8   So I'm trying to get the total number of individuals
9   that were charged with voter impersonation at the
10  polling place between 2002 to the present.
11  A. Of the cases that were referred to our office and
12  the Attorney General's office, yes.  I believe there are
13  four.
14  Q. Okay.
15  A. Total.
16  Q. And those are the four you just identified?
17  A. Yes, sir.
18  Q. Would you say that the majority of the referrals
19  that come to your office are based on the by mail ballot
20  system?
21  A. I wouldn't say majority, no.
22  Q. What percentage would you say?
23  A. I know that illegal voting represents -- I'm
24  sorry.  I did the numbers.  I remember that 133 of the
25  Secretary of State's referrals, approximately 60 dealt

Major Forrest Mitchell                                June 15, 2012

## 145

1  with illegal voting of any type.
2  Q.  That's out of the 186 referrals?
3  A.  Well, the 133 would be part of the 186.
4  Q.  Okay.  Let's see if we can clarify this.
5  A.  Sorry.
6  Q.  We're getting into the numbers now.  So you said
7  133 and 186 would be part -- 133 would be part of 186.
8  What time period are we talking about?
9  A.  Of the spread sheet, would be 2002 to present.
10 Q.  And so the total number of referrals between 2002
11 to the present that were received by the OAG's office
12 would have been what number?
13 A.  The total number of SOS referrals in that time
14 frame was 133.
15 Q.  Okay.  And that's where the 133 came from.  And
16 then the total number of other referrals?
17 A.  I believe that number was 2 --
18 Q.  You gave me a number earlier of 276?
19 A.  Yeah.  That would be pretty close.
20     MR. SWEETEN:  I'm sorry.  What is 276?
21     MR. ROSENBERG:  Can we clear this up or
22 we'll go crazy.
23     MR. GEAR:  Yeah, I know.  Right.  I know.
24     MR. ROSENBERG:  Do you mind if I just -- to
25 get the numbers here's --

## 146

1     MR. SWEETEN:  I don't mind.
2     MR. GEAR:  Go ahead.  That's fine.
3     CLARIFYING EXAMINATION.
4  BY MR. ROSENBERG:
5  Q.  The 133 include -- from the Secretary of State,
6  includes 100 from 2006 to 2011; am I correct?  Just from
7  the Secretary of State.
8  A.  I believe the question earlier was 2006 to
9  present or to 2011?
10    MR. GEAR:  Yes.
11 A.  And I think that number I gave was, I believe
12 100.
13 Q.  (By Mr. Rosenberg)  Right.  The 133 is from 2002
14 to the present just from the Secretary of State?
15 A.  I believe that's correct, sir.
16 Q.  There were an additional 178 referrals that
17 weren't from the Secretary of State from 2002 forward,
18 which were based on two between 2002 and 2006?
19 A.  In 2005 there were two referrals from another
20 source.
21 Q.  168 between 2006 and 2011.  Non-referrals -- let
22 me say, not from the Secretary of State, not referrals
23 from the Secretary of State.
24 A.  As I can determine.
25 Q.  Eight from the 2011 election?

## 147

1  A.  Those would be SOS referrals.
2  Q.  Those were within the SOS.  Okay.  And five that
3  were undetermined?
4  A.  Yes, sir, I believe so.
5  Q.  So the total referrals from 2002 to 2000 -- to
6  date are 301?
7  A.  The number that I have in my head is, I think
8  around 320.
9  Q.  Okay.  So we're missing some.  That's the best I
10 can do.  I turn it back.
11    MR. SWEETEN:  Ezra, you were supposed to
12 clear this up.
13    BY MR. ROSENBERG:  I tried.  I tried.
14    FURTHER EXAMINATION
15 BY MR. GEAR:
16 Q.  So 320 is the number that is in your head, would
17 represent all referrals from any source that were
18 received from the OAG's office.  Is that accurate?
19 A.  One more time.  I'm sorry.
20 Q.  The 320 number that you said you had in your head
21 would be reflective of all of the referrals from any
22 source that were received by the OAG's office regarding
23 election code violations?
24 A.  Yes, sir.
25 Q.  And that would have been from 2002 to the

## 148

1  present, 2012?
2  A.  Yes, sir.
3  Q.  And so let's start from there since we've got
4  that number down.  So we've got 320 total referrals.  Of
5  those 320, how many were investigated?
6  A.  That's where the number -- I have to clarify.  I
7  have 186 investigations from 2004 to present.  And the
8  reason for that is the report system that we used.  I'm
9  able to query our report system that only goes back to
10 2004.
11 Q.  So then based on your testimony, is it fair to
12 say that you do not know the number of investigations
13 between 2002 up to 2004?  Let me ask that a different
14 way.  Are there files maintained somewhere that would
15 tell us what happened between 2002 and 2004 regarding
16 referrals?
17 A.  I believe that the records retention for election
18 code offense, I believe is like five years.  And so I
19 only can give you a number of the number of
20 investigations that we conducted based on our report
21 writing system that goes from 2004 to present.
22 Q.  So again, not to belabor the point, I'm just
23 trying to make sure I understand your testimony.  If I
24 was to ask you or anyone within your office to go back
25 and look at either electronic files or paper files for

## 149

1   investigations between 2002 to 2004, you would not be
2   able to do that?
3         A.  I don't know.
4         Q.  Is it fair to say that in preparation for this
5   deposition you didn't look at any files, either
6   electronic or paper, between 2002 up to 2004?
7         A.  I was able to query all of our election cases
8   which was through our system -- which showed me cases
9   from 2004 to present.
10        Q.  So is that a yes or no?  I'm sorry.
11        A.  I did not look at any files -- investigative case
12  files from 2002 to present -- or to 2004.
13        Q.  So we're still working with the 320 number, which
14  would be reflective of 2004 to the present, correct?
15        A.  No.  Actually that number would be -- that time
16  frame -- the 320 encompasses --
17        Q.  2002?
18        A.  2002 to the present.
19        Q.  Now, I'm sorry.  I talked over you.  That was
20  2002 to the present?
21        A.  Yes, sir.
22        Q.  I think we're getting there.  All right.  So of
23  the 320 referrals from all sources to the OAG's office
24  from 2002 to the present, how many of those were
25  investigated?

## 150

1         A.  I believe 186.
2         Q.  Okay.  Of those 186 referrals that were
3   investigated from 2002 to the present, how many of those
4   dealt with voter impersonation at the polling place?
5         A.  I can clearly identify four.
6         Q.  And you've done that already on the record?
7         A.  Yes, sir.
8         Q.  Other than those four, are you aware of any
9   others?
10             MR. SWEETEN:  And you're asking allegations,
11  just so I'm clear.
12             MR. GEAR:  No.  I'm asking about
13  investigations.
14             MR. SWEETEN:  Investigations.  Okay.
15        A.  There are more.  But those four are the ones that
16  were charged.  I do not know the number off the top of
17  my head for the other ones that weren't charged.
18        Q.  (By Mr. Gear)  And as we've -- as you've
19  testified before, that a referral can come into your
20  office and not result in a charge, correct?
21        A.  That's correct.
22        Q.  And that they can come in your office and not be
23  supported by, either the facts of the law, would that be
24  accurate?
25        A.  That's correct.

## 151

1         Q.  Which would be a reason not to charge?
2         A.  That's correct.
3         Q.  Okay.  So -- and now you've used the term "those
4   are the four, "and you're talking about Mr. Crowder,
5   Mary Comparin and can you remind me of the other two
6   names?
7         A.  Reyna Almanza and Lorenzo Antonio Almanza.  I
8   think his name was junior.
9         Q.  Okay.  Let's first start with Mr. Crowder.  Can
10  you tell me when that investigation occurred?  For the
11  record, the witness is referring to his spread sheet.
12  And I just direct your attention to Page 3 of the Texas
13  code of referrals to the office of Attorney General
14  prosecutions resolved, Bates stamped TX 00056820.  I
15  believe it's the third.
16        A.  Right.  This case was referred to our office by
17  the Secretary of State's office.
18        Q.  And when was it referred?
19        A.  It would have been -- the SOS document date was
20  1/14/09.  I mean, the date of the referral from the
21  Secretary of State's office was January 14, 2009.
22        Q.  2099.  What election --
23        A.  I'm sorry.
24        Q.  Go ahead.
25        A.  It involved the 2008 and 2000 -- primary and

## 152

1   general elections.
2         Q.  From the spread sheet referring to Page 3, I see
3   it indicates the primary election.  Where do you pick up
4   the general election?
5         A.  Because that's the actual election that he was
6   charged for illegally voting in and impersonating in.
7         Q.  In the general election?
8         A.  The actual referral indicates there were deceased
9   voters voting both the general and primary elections.
10        Q.  And is that indicated in the spread sheet?
11        A.  It's indicated -- yes, sir.  In the referral
12  spread sheet.
13        Q.  And which page is that?
14        A.  That would be Page 3 of the referral sheet,
15  spread sheet.
16        Q.  Can you tell me which --
17        A.  The -- eight from the bottom.  And it says,
18  "Harris 2008, primary and general elections, 1/14/09,
19  deceased voters voting."
20        Q.  And how do you know that this deals with
21  Mr. Crowder?
22        A.  Because that -- I just know that that's the
23  referral that we got which we initiated the
24  investigation at which Jack Carol Crowder was
25  subsequently charged.

## 153

1    Q.  Okay.  And so can you tell me what the facts are
2    for that case?
3       A.  A group of citizens had obtained voter
4    registration records and then compared that to the
5    actual voting records in those two elections.  And they
6    had come up with a list of names that they suspected
7    were potential dead persons voting.  They then presented
8    that information to the Secretary of State's office who
9    evaluated and then sent it to us for investigation.
10      Q.  And the group of citizens that you're referring
11   to?
12      A.  I'm sorry.  I don't know their name.
13      Q.  Was it an actual group that made this referral or
14   was it -- or are you just referring to that, generally a
15   group of citizens?
16      A.  I believe the SOS referral itself actually says
17   the name of the group.
18      Q.  Is that indicated anywhere in your spread sheet?
19      A.  No, sir.
20      Q.  Do you know if that name would have been the King
21   Street Patriots?
22      A.  No, I don't believe that was it.
23      Q.  But as you sit here today, you don't know the
24   name of the group?
25          MR. SWEETEN:  Objection' asked and answered.

## 154

1       A.  No, sir, I do not know the name of the group.
2       Q.  (By Mr. Gear)  So they conducted their own, I
3    guess informal investigation, and referred it on to the
4    Secretary of State's office.  Can you tell me what the
5    facts are of the case?
6       A.  Yes, I can.  Jack Carol Crowder -- Jack Carol
7    Crowder's father died preceding the election and his
8    son, Jack Carol Crowder also, used his voter
9    registration card to vote in that election.  The
10   investigation revealed that at no time did Jack
11   Crowder attempt to register to vote, either through the
12   signing up for his Texas driver's license or by actually
13   completing a voter registration card.  And he was
14   interviewed and advised that he didn't complete a voter
15   registration card.  He thought that he had asked to be
16   registered on his Texas driver's license.
17      Q.  So let me flesh out the facts now.  Jack Carol
18   Crowder, the individual who voted, has the same last
19   name as his father who was deceased?
20      A.  That is correct.
21      Q.  And the same first name as well?
22      A.  That's correct.
23      Q.  Is there any difference in the Jack Carol
24   Crowder, Jr., Jack Carol Crowder the third --
25      A.  I think Jack Carol Crowder the actual suspect is

## 155

1    the third.
2       Q.  Okay.  And do you know if the father has -- what
3    is the suffix on his last name?
4       A.  I don't remember.
5       Q.  Okay.  And you said that he presented some form
6    of identification when he voted?
7       A.  No, sir.  He presented his deceased father's
8    voter registration certificate.
9       Q.  And is that indicated anywhere here on your
10   spread sheet?
11      A.  No, sir.
12      Q.  And how would I know -- how would I determine
13   exactly what happened on the day of that election?  Are
14   there documents, reports that are available that would
15   clarify that?
16      A.  Yes, sir.  The combination form that was used at
17   the polling place indicates the kind of documentation
18   that the voter used to sign up at the polling place.  It
19   generally indicates if they presented a voter
20   registration certificate or some other form of ID.  I
21   believe the charging document itself, the indictment
22   that Jack Carol Crowder -- it actually mentions that he
23   used his father's voter registration certificate to cast
24   a ballot in that election as well.
25      Q.  Did you actually conduct this investigation?

## 156

1       A.  No, but I assisted in it.
2       Q.  What was the basis of the group believing or
3    attempting to determine that Mr. Crowder may have been
4    using a deceased voter certificate, in this case his
5    father's?
6       A.  I don't know what the group -- or why they did
7    what they did.
8       Q.  And he was ultimately indicted?
9       A.  Yes, sir.
10      Q.  What was he indicted for?
11      A.  The Harris County district attorney's office
12   indicted him for illegal voting, for impersonating his
13   deceased father.
14      Q.  Was there a resolution to the case?
15      A.  Yes, sir, there was.
16      Q.  And what was the resolution?
17      A.  He pled guilty to one count of fraudulent use of
18   identifying information and received one-year deferred
19   adjudication and a $200 fine.
20      Q.  Fraudulent use of -- did you say of information?
21      A.  Fraudulent use of identifying information.
22      Q.  What chapter would that have been under?
23      A.  That's actually in our Texas penal code.
24      Q.  And can you explain that for those of us who
25   don't know?

Major Forrest Mitchell                                    June 15, 2012

## 157

1   A. Yes, sir.  If a person possesses identifying
2   information of another and uses it with intent to harm
3   or defraud, they can be charged under the penal code as
4   well.  And identifying information under Texas law would
5   be a unique identifying number to that person, such as a
6   Texas driver's license, voter identification number, a
7   Texas voter ID, a social security number or a date of
8   birth.
9   Q. So as I understand it, there was no conviction
10  under chapter 64, which as I understand it, identifies
11  voter impersonation?
12  A. No, sir.  He pled guilty to possession and use of
13  identifying information.
14  Q. And again, would that have been under chapter 64?
15  A. No, sir.  That's a penal code offense.
16  Q. This may be a silly question, but I'm just trying
17  to understand the range of this.  What would be the
18  basis of pleading under the penal code versus pleading
19  under the election code?
20  A. It would be speculation on my part.  I don't know
21  why Harris County made the decision to reduce the
22  offense.  But illegal voting is a third degree felony
23  and -- which is punishable by up to two to 10 years in
24  the State penitentiary.  And a person who has no
25  criminal history whatsoever, might be charged for a

## 158

1   lesser offense for reduced punishment based on the fact
2   that they had no prior criminal history?
3   Q. Okay.  So it was the result of a plea agreement,
4   essentially?
5   A. I believe so, yes, sir.
6   Q. Do you know what the punishment or the penalty
7   was for his violation?
8   A. He pled to one year deferred adjudication and a
9   $200 fine.  So with that one year deferred adjudication
10  he probably had to report to a community supervision
11  department for the period of a year.
12  Q. So the deferred adjudication means there was no
13  actual conviction?
14  A. At the successful completion of a deferred
15  adjudication there's no final conviction; that's
16  correct.
17  Q. Did he successfully complete his period of
18  deferred adjudication?
19  A. I'm sorry.  I don't know that, standing here
20  today.  I don't know.
21  Q. If he didn't successfully complete it, what would
22  have happened?
23  A. If he didn't successfully complete it, he would
24  have been adjudicated and he could be forced to serve
25  the entire year in the county jail.

## 159

1   Q. Are you aware of whether or not Mr. Crowder ended
2   up serving any time in jail?
3   A. I'm not aware.
4   Q. So the end result in this is, if I understand
5   your testimony, if he successfully completed the
6   deferred adjudication, then he would not have been
7   convicted of a crime?
8   A. That's correct.
9   Q. You also said Mary Comparin.  Can you tell me,
10  based on your spread sheet, when that referral came into
11  the office?
12  A. This referral is going to be found in the other
13  category, as it was referred by law enforcement.  And so
14  I don't have a date in the spread sheet that says the
15  actual date of the referral.
16  Q. What page are you referring to, if any?
17  A. If you'll just give me a moment I'll look for it.
18  Q. Sure.
19  A. I believe I'm referring to Page 9 of the election
20  code referrals of the office of Attorney General, 2002
21  to present.  That says, "Bexar multiple primary and
22  general elections, other illegal voting."
23  Q. And again, how do you know that this particular
24  referral deals with Mary Comparin?
25  A. Because the DPS trooper who discovered this case

## 160

1   referred it directly to me.
2   Q. Which county did this come out of?
3   A. Bexar County.
4   Q. And again, we don't know which election?
5   A. It was multiple elections.
6   Q. Do you know the year of these elections?
7   A. If I could explain the facts, I probably could.
8   Q. Go ahead, please.
9   A. Mary Comparin was discovered by the Texas
10  Department of public safety, as through the Texas
11  driver's license image system had developed multiple
12  identities in her own name.  And the DPS trooper who
13  discovered this also discovered that in the -- in those
14  identities, she was voting in multiple elections.  Every
15  election that basically took place she would vote two to
16  three times.
17  Q. You're saying, "every election that took place."
18  I'm trying to understand the time frame in which you're
19  talking about.  Do you know the elections she allegedly
20  voted in?  And I understand the spread sheet to say,
21  "multiple primary and general elections."  But do you
22  know the actual elections that she allegedly voted in?
23  A. I know what we charged her for.  And I believe it
24  was the -- based off the spread sheet, she was charged
25  for voting in the 2008 general election.

161

1    Q.  You said, "2008 general"?
2    A.  Yes.
3    Q.  And you refer to your spread sheet.  Do you see
4    Ms. Comparin's name on here anywhere?
5    A.  Yes, sir.  It's on Page 1 of charges pending
6    resolution.
7    Q.  Would this charge still be pending at this point?
8    A.  Yes, sir, it is.
9    Q.  And she was charged with illegal voting?
10   A.  Yes, sir, in that election.
11   Q.  And is this set for trial?  Can you tell me where
12   it is in the process?
13       A.  I think she's currently been found by the court
14   as -- I don't know exactly the term.  But she's --
15       Q.  Give it a shot.
16       A.  Mentally incompetent.
17       Q.  That would be a legal term.  Do you know if this
18   case -- if there's any intention to proceed to trial in
19   this case?
20       A.  I think that we have to -- the State has to find
21   that she is competent through a court before it can
22   proceed to trial.  I think they have regular settings to
23   determine that.
24       Q.  And have you gone through that process?
25       A.  I personally haven't.  But I believe that the

162

1    prosecutor assigned has.
2    Q.  What was the end result of that?
3    A.  I think she's been found incompetent.
4        MR. SWEETEN:  Bruce, I'm going to, at this
5    point, I'm going to designate any discussion of an
6    active case, Ms. Comparin's case as under the protective
7    order, just this section related to questioning on her.
8    BY MR. GEAR:
9    Q.  Let's move forward to the next -- there's two
10   left, correct?
11   A.  Yes, sir, I believe so.
12   Q.  And did you say Almanza?
13   A.  Almanza.
14   Q.  Almanza.  Can you tell me when that referral came
15   into your office?
16   A.  I believe it was in 2009.
17   Q.  Can you tell me what page you're referring to on
18   your spread sheet?
19   A.  It would be Page 10 of the election code
20   referrals of the office of the Attorney General, 2002 to
21   the present.  And it would be the first entry, Hidalgo
22   2009 school district election, voter -- illegal voting.
23   Q.  Is this case still pending?
24   A.  There are actually two cases.  One of the cases
25   is pending.

163

1    Q.  Okay.  Well, let's break that out.  You said
2    there's two cases.  Did both of them deal with the 2009
3    school district election?
4    A.  Yes, sir, they did.
5    Q.  And they both deal with Mr. Almanza?
6    A.  Lorenzo Antonio Almanza, Jr.
7    Q.  Junior, okay.
8    A.  And his mother, Reyna Almanza.
9    Q.  And what are the facts for that case or those
10   cases, I guess properly stated?
11       A.  Lorenzo Almanza and his mother went into the
12   Progresso school district to vote in that election.
13   Lorenzo Almanza had already voted days prior to that
14   election and used his brother's voter registration
15   certificate to cast a second ballot in that election.
16   His brother was an ineligible voter because he was
17   incarcerated in San Antonio for a felony offense at the
18   time.
19       Upon presenting the card to the elections
20   official, a poll watcher who was present recognized the
21   name of the person who was presenting themselves to vote
22   with the card and said that's not that person.  The
23   election judge actually contacted the county elections
24   department to determine what to do because he wasn't
25   familiar what to do in such a circumstance.  And the

164

1    elections department told the election judge at the
2    polling place, since he's presented a lawful voting
3    registration certificate he must be allowed to vote.
4        The poll watcher was emphatic that he wasn't the
5    person and Reyna Almanza, the mother, interjected
6    herself and vouched for his identity as being Lorenzo
7    Antonio -- or Orlando Almanza, his brother.
8        Q.  So Reyna Almanza, the mother, has not been
9    charged with voter impersonation?
10       A.  No.  She was charged as a party to and illegal
11   voting impersonation.
12       Q.  So as far as -- as for as Mr. Almanza, that's
13   still an allegation at this point, correct?
14       A.  Yes, sir.  He was indicted and he is currently
15   awaiting trial.
16       Q.  Do you know the trial date?
17       A.  No, sir.  He was subsequently rearrested for a
18   federal violation.  And so I think he's in the custody
19   of the US government at this time.
20       Q.  Is there a scheduled trial date that you're aware
21   of?
22       A.  No, not that I'm aware of.
23       Q.  When you say, "he's in the custody of the US
24   government," is he in state, out of state?
25       A.  I believe he is, the last check I heard, he was

---

165

1  in the South Texas federal detention facility.
2           MR. SWEETEN:  Again, because this is an open
3  case, I'm going to designate this portion of the
4  testimony, the specifics about it as eyes only,
5  protective order.
6  BY MR. GEAR:
7       Q.  At this point I think we went through all four.
8  But let me just if back to the mother.  And her first
9  name, again, was?
10      A.  Reyna Almanza.
11      Q.  Okay.  So she was charged as a party to, but did
12  not actually, based on the allegations, cast a vote in
13  someone else's name.  Is that accurate?
14      A.  Yes.  She did not cast a ballot in that election.
15      Q.  She didn't vote at all in that election?
16      A.  I don't know at this time, sir.
17      Q.  Did she attempt to vote at all during that
18  election?
19      A.  I'm not sure she's a US citizen.
20      Q.  I don't know if that answers the question.  Are
21  you aware of whether or not she attempted to vote?
22      A.  I didn't look.  I don't know.
23      Q.  So in summary, I believe you said the total from
24  2002 to the present is 320 referrals, correct?
25      A.  Yes, sir, I believe that's correct.

---

166

1       Q.  And out of those 320 referrals, there have been
2  four charges of voter impersonation at the polls, if I
3  understand your testimony correctly?
4       A.  Yes, sir.  I believe there have been four charges
5  at the polling place.
6       Q.  And actually, one of those charges was a party
7  to, and that person did not, in fact, attempt to cast a
8  ballot as you know, as you sit here?
9       A.  I don't know if she did or not.
10      Q.  Out of the four charges, how many convictions
11  have there been for voter impersonation at the poles?
12          MR. SWEETEN:  Does that include pleas or are
13  you talking about convictions only by jury?
14          MR. GEAR:  Let's make it a general question
15  including pleas.
16  BY MR. GEAR:
17      Q.  How many of the four charges have actually
18  resulted in a conviction, including a plea of voter
19  impersonation at the polling place?
20      A.  The only person that comes to mind is Reyna
21  Almanza as voter impersonation.
22      Q.  Has that gone to trial?
23      A.  Oh, yes, sir.
24      Q.  What was the result of that trial?  I'm sorry.  I
25  might have glazed over that one?

---

167

1       A.  She was convicted by a jury in Brooks County on
2  November 16, 2011 and sentenced to two years in prison
3  which was suspended for five years of probation.  And as
4  a condition of the punishment, she was ordered to serve
5  90 days in jail, and as a condition of the probation
6  just pay $313 in court costs.
7       Q.  Which page of the spread sheet are you referring
8  to?
9       A.  I'm referring to the election code referrals
10  office of the Attorney General's prosecution resolve.
11  And I'm referring to Page 4, Reyna Almanza is the third
12  from the bottom.
13      Q.  I apologize.  Can you tell me the facts of this
14  case?
15      A.  That is the mother who interjected herself on
16  behalf of her son who was committing the voter
17  impersonation.
18      Q.  And she was charged as party to?
19      A.  Yes, sir.  And if I may clarify one thing.
20      Q.  Please.
21      A.  I left off Delores McMillian.  She, too, was
22  charged with voter impersonation or attempted voter
23  impersonation.
24      Q.  And she appears on Page 4 of your spread sheet
25  for --

---

168

1       A.  Yes, sir.
2       Q.  Prosecutions resolved?
3       A.  Yes, sir.
4       Q.  Can you tell me, just so we're clear, Delores
5  McMillian, was the election that the referral came from
6  is the 2010 primary election?
7       A.  In Dallas County.  Correct, sir.
8       Q.  In Dallas County.  Actually, Dallas
9  County/Rockwall as I see it here?
10      A.  The two counties, under Texas State law, when you
11  prosecute an election code offense, you can take it to
12  an adjoining county.
13      Q.  Okay.  And so can you tell me exactly what the
14  charges were for Delores McMillian?
15      A.  She was charged for attempted voter imperson --
16  she was charged for attempted illegal voting, voter
17  impersonation.
18      Q.  All right.  And can you tell me what the facts of
19  this case are?
20      A.  Delores McMillian and her mother, who is now
21  deceased, are both elections officials working at a
22  polling place in Dallas County during that election.
23  Both Delores and her mother used other voter's
24  information to cast ballots on behalf of those -- on
25  behalf of these other people.

## 169

1    Q.  Are we talking about at the polls or by mail?

2    A.  At the polls.

3    Q.  Okay.  I'm not clear on the facts.  You say,

4  "they used other people's information to cast ballots at

5  the poles."  Can you clarify that for me?

6    A.  Yes.  Their voter -- their voter registration

7  numbers.

8    Q.  And how did they -- how did they do this?

9    A.  I don't know off the top of my head.

10    Q.  Is there a file that would clarify that?

11    A.  Yes, sir.  There's an investigative file that

12  would be able to clarify that.

13    Q.  And was there a plea in this case?

14    A.  Yes, sir, I believe so.

15    Q.  And what was the plea?

16    A.  She pled guilty to one count of attempted illegal

17  voting and served -- was sentenced to one year probation

18  and paid $227 in court costs.

19    Q.  So you said they used other people's voter

20  registration -- their registration information.  Am I

21  saying that correctly?

22    A.  Yes, sir, I believe so.

23    Q.  How many people are we talking about that were

24  involved in this?

25    A.  I believe Delores used one person's identity.

## 170

1  And I do not remember how many her deceased mother used.

2  She died during the course of the investigation.

3    Q.  So that allegation was never proven?

4    A.  She was never charged for it.

5    Q.  Do we know the name of the voter that Delores

6  allegedly used?

7    A.  I don't know the name today.

8    Q.  Do you know how she obtained the voter

9  registration information or the voter's information?

10    A.  I'm sorry.  I don't know right now.

11    Q.  And when you say, "attempted illegal voting," do

12  you know if she actually cast a ballot?

13    A.  It was actually stopped by a fellow elections

14  worker.

15    Q.  And can you tell me the facts behind that?

16    A.  No, sir, I can't.  Other than to say that I

17  believe the other elections worker discovered that these

18  names appeared on the list prior to the opening of the

19  polling place.

20    Q.  When you say, "the list," are you talking about

21  the voter registration polls?

22    A.  No, sir.  The combination form at each polling

23  place.  And in Texas when a voter presents themselves to

24  vote, there is a combination form which election

25  officials complete and then the voter has to sign.  And

## 171

1  you either have to provide the certificate or some other

2  form of identification for that purpose.  So I'm

3  referring to the combination form.

4    Q.  So in the case where you have an election

5  official using -- impersonating another voter, is that

6  something that would be prevented by -- if SB 14 was

7  implemented?

8      MR. SWEETEN:  Objection; calls for

9  speculation.  You can answer.

10  BY MR. GEAR:

11    Q.  You can answer.

12    A.  I don't know.

13    Q.  But when you've got the election official who is

14  in charge of attempting to identify and prevent voter

15  impersonation, actually engaging in the voter

16  impersonation, who, if anyone, is left to prevent that

17  from happening?

18      MR. SWEETEN:  Same objection.

19    A.  I don't really know.

20    Q.  (By Mr. Gear)  Delores pled guilty to illegal

21  voting.  Do you know what chapter she entered a plea

22  under?

23    A.  64012.

24    Q.  So was the ultimate conviction voter

25  impersonation?

## 172

1    A.  It's attempted illegal voting, voter

2  impersonation.  I'm sorry.  If I could clarify.  The

3  judgments -- the judgments sometimes say the entire

4  title of the offense or sometimes just give the title.

5  In other words, illegal voting chapter 64012.  Didn't

6  break it down to Section 1, an ineligible voter,

7  Section 2, voting twice in an election, Section 3,

8  marking a ballot contrary.  So I believe the judgment

9  says attempted illegal voting.

10    Q.  Are there any of the four that you've actually

11  identified here today that actually have a judgment that

12  indicates voter impersonation?

13    A.  I would have to looking back at the judgments and

14  sentence.

15    Q.  Of the five.  I'm sorry.  Of the five you added

16  additional?

17    A.  I'm sorry, sir.  I would have to go back and look

18  at the judgments and sentences.

19    Q.  So as you sit here today, you don't know?

20    A.  Yes, sir.

21    Q.  Why don't we take a quick break if you don't

22  mind?

23      MR. SWEETEN:  In the break, can we get a

24  copy of this?  So I can look at it, too.

25      MR. GEAR:  Sure.

## 173

1      (Brief recess.)
2   BY MR. GEAR:
3     Q.  Back on the record.  Does the OAG's office have
4  primary jurisdiction or direct jurisdiction over voter
5  impersonation cases?
6     A.  I believe it has, going back to what I kind of
7  testified earlier, it depends on the type of election
8  that's conducted.  A single jurisdiction versus a
9  multi-jurisdiction case.  I think the attorney general's
10  office, under the Texas election code, can advise a
11  district attorney that they would be conducting the
12  prosecution.  I think that the attorney general's
13  office, under the chapter 273, can direct a DA or county
14  attorney to assist in the prosecution of the case as
15  well.
16     Q.  So as I understand your testimony, out of all of
17  the referrals that have been received by the OAG's
18  office, there have been five that were in some form
19  voter impersonation?
20     A.  Yes, sir.
21     Q.  At the poles; is that correct?
22     A.  Yes, sir.
23     Q.  Are you aware of any investigations of voter
24  impersonation that did not -- that were not referred to
25  the OAG's office?

## 174

1     A.  Yeah.  I'm only aware of cases that were referred
2  to our office.
3     Q.  And again, when we're talking about referrals,
4  we're talking about from multiple sources?
5     A.  Yes, sir.
6     Q.  Including police departments, correct?
7     A.  Yes, sir.
8     Q.  Local election officials?
9     A.  Yes, sir.
10     Q.  Local DA's and prosecutor's?
11     A.  Yes, sir.
12     Q.  Are you aware of any convictions of voter
13  impersonation other than the five cases that we've --
14  you've talked about here today, on the record?
15     A.  Yeah.  I don't really think there is a way to
16  know because I don't think -- you know, DA's offices
17  across the state don't report their -- don't report
18  their prosecutions to our office.  So I don't know any
19  other cases in Texas.
20     Q.  Well, let me explore that for a second.  At some
21  point there was an initiative that reached out to at
22  least 44 different counties or populations over 100,000
23  or more, correct?
24     A.  Yes, sir.
25     Q.  And did you -- "you," meaning your office.  Did

## 175

1  you create a referral system with the 44 different
2  counties?  Did you set up a way to communicate with them
3  regarding voter fraud in the State of Texas?
4     A.  If my memory serves me correctly, we took a look
5  at the referrals that our office had and then looked at
6  them geographically and divided the state based upon the
7  council of government divisions.  Because our hope was
8  to utilize the council of governments to help facilitate
9  the training.
10     Q.  And so just so I'm clear, on the record, "the
11  council of governments," what is that?
12     A.  Council of government is -- I don't know if it's
13  an actual political subdivision of the State.  But it is
14  a -- it is a group of counties and municipalities that
15  work together through a council of governments to share
16  resources.
17     Q.  And when you talked -- or when you discussed the
18  initiative, was there any specific training given to the
19  council of governments?
20     A.  No.  When I mentioned the council of governments,
21  we were hoping to -- council of governments provide a
22  lot of law enforcement training throughout the state.
23  And many of them actually have their own police
24  academies.
25     Q.  Okay.

## 176

1     A.  Which are State subsidized.  So we were hoping to
2  utilize their academies to help facilitate the training.
3     Q.  And did you?
4     A.  Yes, sir.
5     Q.  So as you sit here today, other than the five
6  that you've testified about, the five voter
7  impersonation cases that you've testified about, you're
8  unaware of any others?
9     A.  Yes, sir.  I don't have any knowledge of any
10  cases that the local DA's have prosecuted.
11     Q.  Have you attempted to determine if there's been
12  any prosecutions by local DA's regarding voter
13  impersonation claims?
14     A.  No, sir.
15     Q.  Have you attempted, and "you," being your office,
16  have you attempted to set up a system by which the local
17  DA's and prosecutors report to your office regarding
18  voter claims in general?
19     A.  No, sir, not that I'm aware of.  I would say that
20  it's statutorily required that if a DA's office is going
21  to do an investigation, that they notice the Secretary
22  of State's office if it involves a case.
23     Q.  Okay.  And so when the Secretary of State's
24  office is noticed, that may, in fact, result in a
25  referral to your office?

---

## 177

1   A. No, it wouldn't.

2   Q. Can you tell me what the process is?

3   A. If a local DA advises the Secretary of State's

4   office that they're going to investigate and prosecute a

5   case, it wouldn't generate a referral. Because we limit

6   to those cases that -- the SOS, I believe, would refer a

7   case to us if the local jurisdiction wasn't going to

8   handle it.

9   Q. Would -- I understand that it may not necessarily

10  generate a referral. Would it generate communication

11  between the Secretary of State's office and your office

12  regarding that potential prosecution?

13  A. No, sir, I don't believe so.

14      (Exhibit No. 591-592 was marked.)

15  BY MR. GEAR:

16  Q. I'm showing you what's been marked as

17  Exhibit 591. Take a look at it and then once you've had

18  a chance to review it, we can talk about it.

19  A. Do you want me to read the whole thing.

20  Q. No. And actually, why don't I ask you the

21  question. Have you seen this report before?

22  A. No, sir.

23  Q. Do you know what this is?

24  A. It's titled the House Committee on elections

25  Texas House of representative interim report. A report

---

## 179

1   A. I believe he would have been the Deputy Attorney

2   General for the office of the attorney general from 2010

3   to 2007, is my best guess.

4   Q. Were you aware that he provided testimony in 2008

5   before the House Committee on elections?

6   A. I wasn't aware that he provided testimony to the

7   House Committee.

8   Q. Were you aware that he provided testimony

9   regarding prosecution rates of voter fraud in the State

10  of Texas?

11  A. I know that he provided testimony to the Senate

12  Committee in 2009.

13  Q. Okay. Not so much asking you about the -- have

14  you seen this document. I really want to focus on the

15  substance of his testimony and ask you a few questions

16  about that. On the -- in the second paragraph,

17  prosecution rates and fraud in Texas, do you see where

18  it says, "that what the committee found is most election

19  fraud happened in Texas occurs with the absentee or

20  mail-in ballot system." Do you agree with that

21  statement?

22  A. I would -- actually, I don't know that I can

23  totally agree with that statement.

24  Q. Why not?

25  A. Because that's just the offenses that we have

---

## 178

1   to the Texas House of -- to the House of

2   Representatives, 81st Legislature.

3   Q. And I direct your attention to Page 37, where it

4   says prosecution rates and fraud in Texas.

5      MR. SWEETEN: Counsel, is this excerpted.

6   This isn't the full thing; is that right.

7      MR. GEAR: I do not believe it's the full

8   thing.

9      MR. SWEETEN: So we've got an excerpted.

10  Okay. Page 37, now. Is that what you said.

11     MR. GEAR: Yes.

12  BY MR. GEAR:

13  Q. Who is Eric Nichols?

14  A. Eric Nichols used to be the deputy for the office

15  of the Attorney General.

16  Q. Have you ever had any communications with Eric

17  Nichols regarding voter fraud?

18  A. Oh, yes, sir. He would have been my supervisor.

19  He supervised all criminal justice divisions within the

20  office of the attorney general.

21  Q. And he supervised prosecutions of voter fraud

22  claims?

23  A. Yes, sir.

24  Q. And when would he have been your supervisor, if

25  you can give me the dates?

---

## 180

1   detected and prosecuted.

2   Q. So specifically dealing with referrals to the

3   OAG's office, would you agree that the majority of the

4   referrals deal with the by mail ballot system? And I

5   understand that there could be a variety of violations

6   within that system.

7   A. To me, a majority means more than 50 percent.

8   And I don't know that the main-in ballot fraud

9   represents 50 percent or more of our election code

10  referrals. I do believe that it is a significant

11  portion of the referrals.

12  Q. Well and you -- you maintain the spread sheets?

13  A. Yes, sir.

14  Q. You update it whenever a referral comes in, and I

15  believe you testified to monthly?

16  A. Yes, sir.

17  Q. If you looked at your spread sheet, could you

18  tell me what percentage of the cases involved deal with

19  the by mail ballot system?

20  A. Yeah. I could go through and do a quick analysis

21  or an analysis. I don't know how quick.

22  Q. Well, in looking at your spread sheet, could you

23  give me a general number, percentage?

24  A. I would say it's probably close to 50 percent.

25  It's not a majority, but it's close.

Major Forrest Mitchell                          June 15, 2012

---

181

1    Q.  Okay.  And so the other 50 percent, what would
2  you say that...
3    A.  That comprises illegal voting as a whole.  And
4  then other types of poll place violations.  And then
5  election misconduct by actual elections officials,
6  campaign finance violations, those kinds of things.
7    Q.  So the charge of voter impersonation at the
8  polling place, what percentage would you say that makes
9  up of the 320 referrals that you've received in the
10  OAG's office?
11    A.  A small portion.
12    Q.  Five to be exact?
13    A.  Five.
14    Q.  Do you see the very next paragraph, "another
15  highly controversial topic brought up during the hearing
16  was the debate of whether or not illegal aliens or
17  illegal non-citizens were voting?"  And again, that's
18  Page 37.
19    A.  Yes, sir.
20    Q.  Were you aware of this controversy?
21    A.  Yes, sir.
22    Q.  Were you involved in any communications regarding
23  the controversy that illegal aliens -- illegal
24  non-citizens were voting?
25    A.  Could you repeat that one more time?

---

182

1    Q.  Were you involved in any communications regarding
2  the controversy as to whether or not illegal aliens or
3  legal non-citizens were voting?
4    MR. SWEETEN:  Objection; foundation.
5  Objection; scope.  Go ahead.  You can answer.
6    A.  I guess you would have to ask me communications
7  with who.
8    Q.  (By Mr. Gear)  Well, and that's why I
9  intentionally stated it broadly.  To find out if you
10  were first involved in any communications regarding this
11  topic.  And then if it will help, I will narrow that
12  down.
13    A.  Our investigations have revealed non-citizens and
14  illegal aliens casting ballots in elections.
15    Q.  Okay.  And so based on your referrals, can you
16  tell me, out of the 320, how many dealt with
17  non-citizens voting or illegal non-citizens voting?
18    A.  I do know that -- I do know that in the Dallas
19  2010 election that was referred to our office from the
20  Secretary of State, there was a non-citizen who voted in
21  that election.  I do know that in the Debra Briseno
22  case, which is a prosecution, that there were
23  non-citizens who voted in that election.  I am also
24  aware that in the Hidalgo County elections that there
25  were non-citizens who voted in those elections as well.

---

183

1    Q.  And Hidalgo County, what time period are we
2  talking about?
3    A.  I want to say that was the 2008 time frame.
4    Q.  Let's start with Hidalgo County 2008.  Is that
5  reflected in your spread sheet?
6    A.  I believe that would be on Page 3 of the election
7  code referrals office of Attorney General 2002 to
8  present.  And I believe it would be Hidalgo County
9  2008 municipal election, unlawfully rejecting voters,
10  illegal voting and unlawfully accepting voters.
11    Q.  What are the facts of that case?
12    A.  That was the City of Progresso municipal
13  election.  And our office assisted a portion of the
14  investigation that was conducted by the local district
15  attorney's office.
16    Q.  What did the facts show?
17    A.  I believe there was a Mexican national who voted
18  in that election.
19    Q.  And who was that, based on your spread sheet?
20    A.  It's not one of our prosecutions.  We just
21  assisted the investigation.  It's not reflected in
22  our spread sheet.
23    Q.  And what was the end result of -- first of all,
24  was that referred to your office?
25    A.  It was referred to our office.  However, the

---

184

1  district attorney's office was prosecuting it already.
2    Q.  Did you work in conjunction with the district
3  attorney's office on that investigation?
4    A.  Yes, sir.  We helped out on the mail-in ballot
5  portion of that case because many of the mail-in ballots
6  were outside Hidalgo County.  We assisted them in
7  interviewing voters and checking addresses in other
8  parts of Texas.
9    Q.  So again, and I'm sorry.  I'm trying to
10  understand what the facts are of this case.  So did this
11  case deal with a mail-in ballot system, if you know?
12    A.  That I don't know.  The ADA, I believe, told me
13  that a non-citizen had voted in the election.  I don't
14  think she clarified whether it was in person voting or
15  mail-in ballot fraud.
16    Q.  And that was the allegation.  Was there a
17  conviction in this case?
18    A.  I down know.
19    Q.  Were these cases dismissed?
20    A.  I don't know.
21    Q.  So as you sit here today, you don't know if -- do
22  you know if those went into prosecution?
23    A.  Yes, sir.  I believe that -- I don't know for
24  sure.
25    Q.  And as you sit here today, you don't know the

185

1    extent of the facts involving those cases, correct?
2    A.  No, sir.  I only know a portion of the case.
3         Q.  And they would not be reflected in your spread
4    sheet?
5    A.  No, sir.
6         Q.  All right.  Let's see.  The other case that you
7    mentioned was Dallas County in 2010?
8    A.  Yes, sir.
9         Q.  Was that referred to the OAG's office?
10   A.  Yes, sir it was.
11        Q.  And can you show me on the spread sheet where
12   that is?
13        A.  That would be on Page 4 of the election code
14   referrals of the office of the Attorney General 2002 to
15   the present.  It would be, I believe was sixth case
16   down.  And it says, "Dallas 2010 primary elections.
17   Unlawfully obstructing watcher.  Illegal voting,
18   unlawful assistance, failure to witness application,
19   unlawfully witnessing more than one application.
20   Providing false information on application, possession
21   of mail-in ballots.  Unlawful assistance in bribery."
22   And the referral date was 4/20/2010.
23        Q.  So I see it here.  I don't see any names
24   indicated on Page 4, as you're testifying to.  Would it
25   be in any other portion of your spread sheet?

186

1         A.  No, sir.  She was not prosecuted.
2         Q.  So the allegation was not substantiated?
3         A.  No, sir.  She is a non-citizen.  However, we
4    didn't think that she had the mens rea.  Because someone
5    led her to believe that as a resident she could vote in
6    an election.
7         Q.  So tell me what the facts are.  What did you
8    find?  Did you investigate the case?
9         A.  I didn't personally.  But one of my investigators
10   did.
11        Q.  And who was the investigator?
12        A.  Sergeant Jennifer Bloodworth.
13        Q.  And can you tell me what the facts of the
14   investigation found?
15        A.  Specific to that non-citizen or generally as a
16   whole?  Because it's a substantial case.
17        Q.  Let's talk about the substantial case.  And we're
18   talking about, just so this is clear, we're talking
19   about Dallas County, the 2010 primary election, correct?
20        A.  Yes, sir.
21        Q.  And there was one individual that was ultimately
22   investigated?
23        A.  No, sir.  There were multiple individuals that
24   were investigated.  And those -- many of those
25   individuals are indicated in the prosecution's and

187

1    charges pending spread sheet.
2         Q.  Okay.  So you seem to have in mind one
3    individual?
4         A.  Yes, sir.
5         Q.  And you mentioned mens rea, which is, did not
6    have the intent, essentially?
7         A.  Correct.
8         Q.  Okay.  Can you tell me what the facts -- the
9    overall facts are of the case that you're talking about?
10        A.  Yes, sir.  She was approached by someone who was
11   canvassing her neighborhood.  And she wasn't certain
12   about when the time frame was, but that person assisted
13   her in the completion of a mail-in ballot application --
14   I'm sorry.  Correction.  Of a voter registration
15   certificate.
16        Q.  Okay.
17        A.  And on that voter registration certificate,
18   indicated that she had checked she was US citizen when
19   indeed she was not.  So therefore, the elections office
20   processed her voter registration application and she was
21   issued a voter registration certificate.  And so she had
22   voted in an election.
23        Q.  And when you say that "she did not have the men
24   rea," can you tell me what you mean in the context of
25   the facts?

188

1         A.  Yes, sir.  The actual person who helped her
2    register was a deputy voter registrar who was sworn by
3    the county to help her -- to help voters fill out their
4    registration cards.
5         Q.  Okay.
6         A.  And the deputy voter registrar checked that she
7    was a US citizen and told her that she could vote.  And
8    so she believed she actually could vote in an election.
9         Q.  Do you know the name of the deputy registrar?
10        A.  No, sir, I do not.
11        Q.  And now, you seem to suggest that there were
12   other individuals involved in this?
13        A.  Yes, sir.  This case was one of the largest cases
14   that we have investigated over the years.  It had
15   multiple allegations.  And we charged multiple
16   defendants, Delores McMillian was part of this referral.
17        Q.  Okay.  And you've testified to Ms. McMillian?
18        A.  Correct.  Another defendant in the spread sheet
19   who was identified during that investigation was Sylvia
20   Medrano, whose case is currently pending?
21        Q.  And that would be on page -- the first page of
22   the exhibit?
23        A.  Yes, sir.
24        Q.  And Sylvia Medrano was charged with what?
25        A.  Seven counts of illegal voting, ineligible voter.

189

1    Q. And would this be by absentee ballot?
2    A. I don't know for sure.
3    Q. Well, tell me what you know about the facts for
4  Sylvia Medrano.
5    A. This case involves a very contentious justice of
6  the peace election in the Dallas County area.  I think
7  the election was decided by a little more than 100
8  votes.  And a long serving justice of the peace was --
9  lost the election to a challenger.  The investigation
10  revealed that many people who were family members and
11  friends of the challenger had just changed their voter
12  registration to addresses within the precinct for the
13  purposes of registering to vote in just that election
14  and to cast ballots.
15    Q. But as you sit here today, you don't know if it
16  was ballots by mail or ballots cast in person?
17    A. I don't know specifically which voters cast in
18  person.  I do remember that a number of the family
19  members went together to the polling place on the same
20  day and voted in that precinct.
21    Q. And again, looking at the spread sheet, the
22  charges are unlawfully obstructing a watcher, what does
23  that mean?
24    A. A poll watcher is allowed to witness the
25  activity.  And I think each candidate who's running for

190

1  office in Texas can designate a poll watcher.  And it is
2  a criminal offense in the State of Texas for an
3  elections official to obstruct the poll watcher from
4  generally observing what kind of conduct is occur.
5    Q. Sylvia Mendrano was an election official?
6    A. No, sir, I don't believe so.
7    Q. Was she a candidate?
8    A. I don't believe she was a candidate in that
9  election.
10    Q. But she's charged with unlawfully obstructing a
11  watcher?
12    A. No, sir.  I think you're looking at the
13  allegation portion and not the actual charge.
14    Q. Sure.  But as I understood your testimony,
15  unlawfully obstructing a watcher is generally a charge
16  or allegation that's levied against an election
17  official?
18    A. Yes, sir.  If I would clarify.
19    Q. Please.
20    A. When -- the design of the spread sheet is that we
21  take all of the allegations that are contained in the
22  referral for that specific election.  So the spread
23  sheet shows all of the allegations that were lodged in
24  that case or in that referral.
25    Q. Against the individual?

191

1    A. Against -- in that election.  And then what we do
2  is we actually show that the actual charge -- I guess
3  maybe I'm not making myself clear.
4    Q. Well, if I understood you correctly, you're
5  telling me that there may be multiple defendants -- and
6  we'll stay with Sylvia Medrano for a second.  There may
7  be multiple defendants in the allegations.  Are all of
8  the potential charges against all of the defendants?
9    A. No, sir.
10    Q. Okay.  Then I didn't understand you.
11    A. If I can kind of explain the mechanics of how I
12  do it.  You know, I do have three books in the Excel
13  spread sheet.  And as somebody is charged, I cut and
14  paste all of the allegations contained in the referral
15  into the charging book so that it shows the county and
16  all of the allegations that were in that election.  And
17  then the election itself and then the cause number of a
18  charging instrument.  And then the actual charge.
19    Q. So ultimately she was charged with four counts of
20  illegal voting.  Sorry.  Looking at the wrong one.  She
21  was charged with seven counts of illegal voting?
22    A. Yes, sir.
23    Q. And you're not -- as you testify today, you're
24  not saying that she voted seven times in a polling
25  place?

192

1    A. I don't know how many times that she voted in a
2  polling place.
3    Q. Is it fair to say that this charge is addressing
4  the issue of by mail ballots?
5    A. I don't know if it was a poll place violation, in
6  person voting or mail-in ballots.
7    Q. You don't know.
8    A. Not off the top of my head, no, sir?
9    A. I believe you also said Ms. Briseno?
10    A. Yes, sir.
11    Q. Can you tell me what the facts of that were?
12    A. This case was referred to our office by the
13  district attorney of, I believe it was Lavaca County.
14    Q. Port Lavaca?
15    A. Port Lavaca.  And he requested investigative
16  assistance from our office in determining allegations of
17  illegal voting and misconduct in the election.  It was a
18  very heated contested election.  And I think three
19  candidates emerged with a very close margin in that
20  election.  I think there were about 19 votes that
21  separated the three candidates.  And I think Debra
22  Briseno was the winning candidate.
23    Q. Can you tell me what the facts of the case are?
24    A. Debra Briseno signed up as a deputy voter
25  registrar.  So she assisted in the voter registration of

## 193

1  citizens in the county.  She additionally registered
2  non-citizens to vote during that election and informed
3  them that they could indeed vote in that election
4  despite the fact that they were not citizens in the US.
5      Q.  And Ms. Briseno was the only one charged in that
6  case?
7      A.  That's correct.
8      Q.  And was there a determination as to why not to
9  charge the non-citizens who had registered?
10     A.  Again, you have a person who is sworn as a deputy
11 voter registrar by the elections department who the
12 voters -- the non-citizens perceived to be as a
13 representative of the government.  At the time, she was
14 actually a city council person for the City of Port
15 Lavaca.  So these voters believed that what they were
16 telling -- what she was telling them, that they could
17 vote in the election, they took at face value.
18     Q.  And again, in this case there would have been no
19 mens rea?
20     A.  I believe that is why they were not charged in
21 this case.
22     Q.  Okay and so I believe we've gone through the
23 cases where non-citizens were alleged to have voted,
24 Dallas 2010, Ms. Briseno and Hidalgo County.  Were there
25 any others that you're aware of on these spread sheets?

## 194

1      A.  I remember a case in Culberson County where
2  allegations were made, but they were unsubstantiated.
3      Q.  Did that result in an investigation?
4      A.  Yes it did.
5      Q.  Did it result in any charges?
6      A.  No, sir, it did not.
7      Q.  So other than the -- three distinct cases,
8  Dallas County, Ms. Briseno and Hidalgo, are you aware of
9  any others?
10     A.  No, sir.  Not that resulted in criminal charges.
11     Q.  So out of the 320 referrals that came into your
12 office, are you aware of any others that alleged
13 non-citizens voting?
14     A.  Not of the cases that were referred to our
15 office.
16     Q.  Referring back to the 2008 report, page -- Page
17 37, paragraph 3, after prosecution rates and fraud in
18 Texas, it says, "through talking with our county
19 election officials and other experts the committee found
20 the chance of a legal alien -- of an illegal alien
21 actually voting are very slim."  Based on your
22 experience as an investigator who's been in the OAG's
23 office for -- since prior to 2005 and been with the SIU
24 the entire time of its creation, would you agree with
25 this statement?

## 195

1          MR. SWEETEN:  Can you read the question
2  back?
3  BY MR. GEAR:
4      Q.  And I can try to pose it again.  It was kind of a
5  long, run-on question.  Would you agree that based on
6  your experience in the -- as an investigator and
7  supervisor in the SIU, would you agree that the chance
8  of an illegal alien actually voting in an election in
9  the State of Texas, are very slim?
10         MR. SWEETEN:  Objection; calls for
11 speculation.  You can answer.
12     A.  I don't believe it's very slim.  It all depends
13 on the motivation to do so.  Through my investigations
14 over the years that I have worked with the Texas
15 Attorney General's office, it has come to our attention
16 that in some elections officials have told us, people
17 working in the voter registration departments, that
18 non-citizens have gotten voter identification cards to
19 try to develop -- to try to validate -- to validate
20 themselves inside Texas or the United States.  That it
21 is one of the precursor documents that they can obtain
22 to try to obtain other things like a Texas driver's
23 license, so they can remain here illegally.
24     So it really depends on the motivation.  If the
25 motivation to obtain a voter registration certificate is

## 196

1  simply to try to get documents, then I would say it is
2  not very likely.  But our investigations have also
3  revealed in certain areas of the state, that voters are
4  paid to vote.  And they might be persuaded to vote in an
5  election.
6      Q.  (By Mr. Gear)  Okay.  And so let me break that
7  down a little bit, because my question was voting.  Is
8  the chance slim?  So I understand your testimony that
9  there may be other motivations for them to obtain a
10 voter registration card.  But in your experience in the
11 SIU and based on the referrals that you've seen, is the
12 occurrence of an illegal alien or illegal non-citizen,
13 is that type of referral rare to your office?
14     A.  When I look at the 320 referrals that we have,
15 the allegations of a non-citizens voting in an election,
16 the number is small.
17     Q.  And "small," meaning three distinct cases that
18 you've identified here on the record?
19     A.  Yes, sir.  I can think of three to come to mind.
20     (Exhibit No. 593 was marked.)
21 BY MR. GEAR:
22     Q.  Let me know when you've had a chance to review
23 the document.
24     A.  Yes, sir.
25     Q.  Can you tell me what this is?

197

1     A.  This appears to be an article out of the Dallas
2  Morning News.  It's dated May 18, 2008, and it's titled
3  Abbott GOP Pressing For Required Photo ID.
4     Q.  Do you see the paragraph that indicates,
5  "Republicans say that the mere possibility of illegal
6  voting merits changes.  Particularly with the rising
7  illegal immigration population and that the photo ID
8  requirement is not onerous."  Do you see that?
9     A.  I'm sorry.  Okay.  Yes, sir, I see that.
10     Q.  As a supervisor in the SIU, were you aware of any
11  debate regarding the rise of -- rising illegal immigrant
12  population in reference to photo ID?
13     A.  You mean globally as a --
14     Q.  State of Texas.
15     A.  As a citizen of the State of Texas or...
16     Q.  Yes.  Well, no.  As your -- as the supervisor in
17  the SIU, were you aware of this debate?
18          MR. SWEETEN:  Assumes facts not in evidence.
19  Objection.
20     A.  I'm aware of the debate as a whole of this issue.
21  But not in the special investigations unit.
22     Q.  (By Mr. Gear)  Were you involved in any
23  communications either the Attorney General or the
24  Secretary of State's office that -- where the topic of
25  rising illegal immigrant population was the topic of

198

1  discussion?
2     A.  No, sir.
3     Q.  During the consideration of the referrals or
4  investigations, were you ever asked to give special
5  attention or focus on illegal aliens or non-citizens
6  voting?
7     A.  No, sir.  I was never asked to give any special
8  consideration to that.  At some point in time, I had
9  been asked, "Hey, are there any cases on your spread
10  sheet?"  And in those circumstances I identified the
11  ones on the spread sheet, as I have done today.
12     Q.  Who made this request?
13     A.  I don't remember.
14     Q.  Well, let's see if we can flesh this out.  When
15  were you asked to identify these types of cases on your
16  spread sheet?
17     A.  I don't remember.
18     Q.  Was it during the 2011 legislative session?
19     A.  I couldn't say for certain.
20     Q.  Was it by a legislator?
21     A.  Oh, no, sir.
22     Q.  Was it by someone in the Secretary of State's
23  office?
24     A.  I don't believe so, no.
25     Q.  Do you recall which office the request came from?

199

1     A.  I would believe it came from -- internally within
2  the law enforcement division.
3     Q.  Internally from which division?
4     A.  Well, the special -- I would say that it came
5  from either my division chief or my, at the time, who
6  would have been Major Boatright or the Deputy Attorney
7  General for criminal justice Eric Nichols.
8     Q.  Do you know what the reason for that request was?
9     A.  No, sir.
10     Q.  And did you respond to that request?
11     A.  I would presume so, yes.
12          (Exhibit No. 593 was marked.)
13  BY MR. GEAR:
14     Q.  I'm showing you what's been marked as Exhibit 593
15  and give you a chance to look at that.  Have you had a
16  chance to review the document?
17     A.  I'm almost done.  Sorry.
18     Q.  Take your time.
19     A.  Okay, sir.
20     Q.  Can you tell me what this is?
21     A.  This document appears to be a clipping of the
22  Dallas Morning News, dated May 18, 2008.  And it is
23  titled AG Fails to Uncover Major Voting Fraud.
24     Q.  Have you seen this newspaper article before?
25     A.  Not to my memory.

200

1     Q.  Focusing on the article itself, by May 18, 2008
2  it indicates that, "Mr. Abbott has prosecuted 26 cases."
3  Would that be accurate based on your spread sheet?
4     A.  I think about that time that would be pretty
5  close.
6     Q.  Okay.  Is it also accurate to say that in 18 of
7  the 26 cases the voters were eligible voters with -- the
8  votes were properly cast and no vote was changed, 18 of
9  the 26?
10     A.  I do know that no vote was changed, but I don't
11  know that it was properly cast.
12     Q.  It also goes on to say, "but people who collected
13  the ballots for mail-in were prosecuted."  Would that be
14  fair to say?
15     A.  Yes, sir.  If I could clarify.
16     Q.  Please.
17     A.  If someone assists in the completion of a mail-in
18  ballot, someone assists the voter, fails to sign as
19  assisting the voter and -- or possesses the ballot, they
20  would be prosecuted for the position of the ballot or
21  carrier of envelope of another.  Many of these cases
22  also involve unlawful assistance.  And if a voter was
23  unlawfully assisted in the completion of a mail-in
24  ballot or any other type of ballot, under State law that
25  ballot would be stricken.

## 201

1    Q. Okay. And it says, in 593, that "the State law
2    makes it a crime to carrier someone else's 'filled out
3    ballot to the ballot box." Is that fair?
4    A. It is a crime unless they identify themselves on
5    the carrier envelope.
6    Q. Unless the carrier puts his or her own name on
7    the -- and address on the envelope?
8    A. Yes, sir. I believe there are also defenses to
9    prosecution to that.
10   Q. In the middle column of Exhibit 593, I think it's
11   the third paragraph in the bottom, "when an attorney
12   general makes certain cases a priority, you can dispatch
13   investigators, assign teams of State lawyers and direct
14   millions of dollars from federal grants and the agency
15   budget, such assistance helps bolster action in counties
16   especially where local prosecutor's lack the resources."
17   Is that a fair statement? And let me -- why don't you
18   strike that. Is it accurate that when an attorney
19   general, in this case Attorney General Abbott, makes
20   voter fraud a priority, he can do the types of things
21   described here?
22        MR. SWEETEN: Assumes facts not in evidence.
23   Calls for speculation. Objection.
24   BY MR. GEAR:
25   Q. Well, let me see if I can come at that a little

## 202

1    bit differently then. Is it accurate to say that
2    Attorney Abbott dispatched investigators throughout the
3    state to root out and prosecute voter fraud cases?
4    A. No, I wouldn't say that's an accurate statement.
5    Q. What would you say is an accurate statement?
6    A. I would say that our office receives referrals
7    from third parties, such as the Secretary of State or
8    the DA's offices or local law enforcement, asking us to
9    help them in the investigation of election code
10   violations. And that we have a group of investigators
11   who perform their duty in that regard.
12   Q. Does he have an authority to assign teams of
13   State lawyers?
14        MR. SWEETEN: Objection; calls for
15   speculation. You can answer.
16   A. I don't think the Attorney General would direct
17   the assignment of prosecutor's to cases. I think that
18   we have a number of prosecutor's within our office who
19   handle a wide variety of cases, some which include
20   election cases.
21   Q. (By Mr. Gear) Is it accurate in this article
22   that there was a $1.4 million federal crime fighting
23   grant?
24   A. As I think I previously discussed in my
25   testimony, I think the criminal investigations division,

## 203

1    just the criminal investigations division, got a $1.4
2    million grant. And of that grant, a portion of
3    investigators were hired and the special investigations
4    unit, the money laundering unit, the cyber crimes unit
5    and the fugitive apprehension unit.
6    Q. Previously you testified to a case regarding
7    Hidalgo County. If you look at paragraph 3, second
8    paragraph I believe, from the top, it says, "in another
9    case, three Hidalgo County women were indicted on
10   charges. They illegal assisted elderly voters and
11   mishandled the mail-in ballots in 2005, McAllen mayor's
12   race." Was that the Hidalgo case that you were
13   referencing that was handled by a different agency?
14   A. No. This is actually a different case.
15   Q. It is a different case?
16   A. Yes, sir. And I think in that case there were --
17        MR. SWEETEN: Just answer his question.
18   A. I'm sorry.
19   Q. (By Mr. Gear) And the answer was this is a
20   different case?
21   A. This is a different case.
22   Q. And in this case in 2005, the judge dismissed the
23   allegations. Is that accurate?
24   A. Yes, sir, I believe so.
25   Q. And is this particular case referenced in your

## 204

1    spread sheet?
2    A. Yes, sir. It's referenced in the referrals.
3    Q. I think I'm almost done. Let me kind of go
4    through my notes here?
5    A. Yes, sir.
6    Q. Are you aware of any testimony during the 2011
7    legislative session where SB 14 was discussed where your
8    spread sheet was the topic of discussion?
9    A. I believe I was present when Deputy Director
10   David Maxwell testified, but I don't recall which
11   session -- which House.
12   Q. And he testified in 2011?
13   A. Yes, sir, I believe so.
14        (Exhibit No. 594 was marked.)
15   BY MR. GEAR:
16   Q. I'm going to show you what's been marked as
17   Exhibit 594 and give you a chance to look at that. You
18   indicated that David Maxwell provided testimony. And
19   the question is, is that what you were referring to?
20   A. Yes, sir, this is.
21   Q. Do you see any reference to a spread sheet in his
22   testimony, more specifically, to your spread sheet?
23   A. I don't see anything that says my spread sheet.
24   Q. Okay. Does anything he testified to in 2011
25   change any of the answers that you gave here today?

Major Forrest Mitchell                                    June 15, 2012

## 205

1  A. No, sir, I don't believe so.
2      MR. SWEETEN: I'm going to object to the
3  question as compound. But he's answered it.
4      (Exhibit No. 595 was marked.)
5  BY MR. GEAR:
6  Q. Did you still want the take some time to review
7  that?
8  A. I don't believe Mr. Maxwell's testimony will
9  change my testimony.
10  Q. Okay. Take some time to review that exhibit and
11  then we can talk about it.
12  A. This one right here, sir?
13  Q. Yes. And specifically, just so we can move this
14  forward a little bit, I think it's Page 7, do you see
15  your name indicated?
16  A. Yes, sir, I do.
17  Q. Have you seen this document before?
18  A. No, sir.
19  Q. And for the record, this is the plaintiffs
20  supplemental initial disclosures pursuant to federal
21  rules of civil procedure 26 A. Were you involved in any
22  aspect of preparing this particular document?
23  A. No, sir.
24  Q. All right. And I ask you, did you see your name
25  indicated in it under, I believe No. 12, it indicates

## 206

1  Captain Forrest Mitchell. That's actually Major
2  Mitchell at this point, correct?
3  A. Yes, sir.
4  Q. All right. And it says, "Captain Mitchell is a
5  member of the special investigations unit of the law
6  enforcement division of the office of the Texas Attorney
7  General," which is accurate, correct?
8  A. Yes, sir.
9  Q. "Captain Mitchell or Major Mitchell, has
10  knowledge regarding election fraud in the State of
11  Texas." Other than the testimony that you provided
12  today, is there any additional knowledge that may be
13  relevant to voter fraud in the State of Texas?
14      MR. SWEETEN: Counsel, I'm going to the
15  object to the question as vague. We've provided a
16  description of his areas of testimony. Obviously you've
17  had the opportunity to, now for six hours, to question
18  him on that. We intend to ask him questions, and in
19  relation to the substance of the matters here. So I
20  think the question is -- I think it's unfair.
21      MR. GEAR: I withdraw the question.
22  BY MR. GEAR:
23  Q. Other than what you've testified to here today,
24  are you aware of any other cases of voter impersonation
25  in the State of Texas?

## 207

1  A. No. I'm only aware of the ones that were
2  referred to our office.
3  Q. Other than what you testified to here today, are
4  you aware of any other cases where the allegation was
5  illegal aliens or illegal non-citizens voting?
6  A. No, sir.
7  Q. Other than what you testified to here today, are
8  you aware of any other investigations regarding voter
9  impersonation?
10  A. Could you repeat that one more time?
11  Q. Other than what you testified to here today, are
12  you aware of any other investigations involving voter
13  impersonation in the State of Texas?
14  A. I am aware of one.
15  Q. And what would that be?
16  A. I read an article about a case that's ongoing now
17  in Tarrant County where the -- a son used his father's
18  voter registration card to cast a ballot in an election.
19  But I just read that in the open source newspaper.
20  Q. So you gained that knowledge from the newspaper?
21  A. Uh-huh.
22  Q. Has any allegation been referred to the OAG's
23  office?
24  A. No, sir. That's being conducted by the Tarrant
25  County district attorney's office.

## 208

1  Q. Has there been any communication with the Tarrant
2  County district attorney's office regarding that
3  allegation?
4  A. No, I haven't talked to them at all.
5  Q. Do you know the name of the alleged?
6  A. No, sir, I'm sorry.
7  Q. Perpetrator, for lack of a better word?
8  A. No, sir, I'm sorry.
9  Q. Do you know the election that it allegedly
10  occurred?
11  A. I want to say it was this primary election.
12  Q. 2012?
13  A. Uh-huh.
14  Q. And that occurred on?
15  A. I think it would be May 29th.
16  Q. May 29 primary election. And other than what you
17  read from the newspaper, are you aware of any other
18  facts pertaining to that?
19  A. No, sir.
20  Q. Can you investigate alleged voter fraud without a
21  referral?
22  A. The Texas election code does say that if we had
23  reason to believe that a violation occurred, that the
24  attorney general's office could investigate.
25  Q. Have you ever investigated a voter fraud case

Major Forrest Mitchell                                    June 15, 2012

## 209

1  without an official referral?

2  A.  No, sir.  We generally -- we request a referral

3  before we initiate an investigation.

4  Q.  Have you requested a referral for the case which

5  you just referenced?

6  A.  No, sir.

7  Q.  Other than what you testified today, are you

8  aware of any prosecutions for voter impersonation in the

9  State of Texas?

10  A.  I believe the DA has indicted that case in

11  Tarrant County, the one I said regarded voter

12  impersonation.

13  Q.  Is the OAG's office involved in that case in any

14  aspect?

15  A.  No, sir.

16  Q.  I believe you testified that you have not

17  requested a referral?

18  A.  No, sir.

19  Q.  Why not request a referral for that particular

20  case?

21  A.  Because we have plenty of work to do on our own.

22  Q.  Fair answer.  I think I am done.

23  MR. GEAR:  And I will pass the questioning

24  to Ezra.

25  MR. ROSENBERG:  Thanks.

## 210

1  EXAMINATION

2  BY MR. ROSENBERG:

3  Q.  And I will be very short, Major.  Thanks for your

4  time today.

5  A.  Yes, sir.

6  Q.  Just a couple of questions.  You testified that

7  statutorily required for the district attorneys to

8  notice the Secretary of State when they are charging

9  someone with election fraud.  Is that what the

10  requirement is?

11  A.  I believe the statutory language says if they are

12  going to initiate an investigation of prosecution.

13  Q.  And I think you also testified then, that the

14  Secretary of State maintains a list of those instances

15  when it has been notified?

16  A.  I don't remember that.

17  Q.  Have you ever seen a list that's maintained by

18  the Secretary of State of investigations that were

19  initiated by the district attorney?

20  A.  No, I've never seen such a list.

21  Q.  Do you know if any such list has been produced in

22  this litigation?

23  A.  No, sir, I do not.

24  Q.  Other than the spread sheet that you maintained,

25  have you ever created any reports related to voter

## 211

1  fraud?

2  A.  As I previously testified, sir, preceding the --

3  preceding the creation of the spread sheet, I was

4  required to produce a WordPerfect document that talked

5  about the types of cases that we would referred and the

6  referral sources and the allegations contained.

7  Q.  And has that document been produced in this

8  litigation?

9  A.  I provided it to counsel.

10  Q.  Other than that WordPerfect document, have you

11  ever created any other report related to voter fraud?

12  A.  No, sir.

13  Q.  Have you ever done any specific analysis of in

14  person voter fraud, other than the spread sheet and the

15  WordPerfect document?

16  A.  One time in, I want to say 2006, I looked at the

17  incidents of mail-in -- not mail-in ballot fraud, but

18  the proportion of mail-in ballots received by a county.

19  Q.  And what was your purpose in doing that?

20  A.  I wanted to see what the typical average is in

21  the State of Texas for an elections office to receive --

22  for the number of registered voters to the number of

23  mail-in ballots cast.

24  Q.  Did you draw any conclusions in that report?

25  A.  If memory serves me correctly, I think it was,

## 212

1  the average county might receive two to three percent of

2  their registered voters for mail-in applications.

3  Q.  Did you break down that percentage by any

4  demographics?

5  A.  No.

6  Q.  Other than that report and the spread sheet and

7  the WordPerfect document, have you done any specific

8  analysis of in person voter fraud?

9  A.  No, sir.

10  Q.  Have you ever been asked to do any specific

11  analysis of in person voter fraud?

12  A.  No, sir.

13  Q.  To your knowledge, has anyone in your office ever

14  been asked to do any specific analysis of in person

15  voter fraud?

16  A.  No, sir.

17  Q.  To your knowledge, has anyone in your office ever

18  been asked to do an analysis of how various forms of

19  voter identification would affect the level of voter

20  fraud?

21  A.  No, sir.

22  Q.  I would like to talk, very briefly about the four

23  instances of voters who tried to impersonate -- who are

24  alleged to have tried to impersonate others.  And by

25  that -- I said four.  You can correct me if I'm wrong.

## 213

1  As I understand it, it is only four instances of persons
2  trying to impersonate others.  The fifth person was
3  charged with trying to help one of these four people
4  impersonate someone else.  Is that correct?
5      A.  That's correct.
6      Q.  So it is four instances where a person tried to
7  impersonate someone else.  One of those instances was
8  McMillian.  And as I understand that, that was an
9  election official; is that correct, McMillian?
10     A.  Yes, sir.  Delores McMillian was an elections
11  worker in Dallas County.
12     Q.  And somehow, prior to the polls opening, she had
13  somehow signed herself up as someone else?
14     A.  Yes, sir, that's my understanding.
15     Q.  So that wasn't a situation where
16  Delores McMillian walked into the polling place and
17  pretended, to the election official, that she was
18  someone else; is that correct?  She was basically
19  cooking the books because she was the election official
20  herself, right?
21     A.  My understanding is that she marked that voter on
22  the ballot before the polls were even opened.
23     Q.  Without having to interact with any other
24  election official, right?
25     A.  I believe that she was interacting with her

## 214

1  mother who was doing the same thing.
2      Q.  So it's not a situation where she presented an
3  identification to someone and said I'm someone else.
4  She just manufactured this along with her mother because
5  she was the election official, correct?
6      A.  That's my understanding, yes, sir.
7      Q.  Now, you also talk about a Mary Comparin.  And
8  did you say that that was a situation where
9  Ms. Comparin, and I know this is -- I've only,
10  Mr. Sweeten, because it's a company situation.  But
11  she's alleged to have gotten, I think you used the term
12  "various images of driver's licenses, et cetera?"
13     A.  It's my understanding that Mary Comparin had
14  obtained three or four Texas driver's licenses in
15  different names.
16     Q.  With her photo on them?
17     A.  Yes, sir.
18     Q.  So if she were to produce those driver's licenses
19  at the polling place, the photo would match her face,
20  correct?
21     A.  Yes, sir.
22     Q.  So SB 14 would not really help that situation; is
23  that correct?
24          MR. SWEETEN:  Objection; calls for legal
25  conclusions, speculation.  But you can answer.

## 215

1      A.  It depends on whether she used her voter
2  registration certificate to come to the polling place to
3  cast her ballot, or whether she used her Texas driver's
4  license.  That suspect had obtained four different voter
5  registrations that were mailed to her residence.
6      Q.  (By Mr. Rosenberg)  Right.  But for terms of the
7  photo ID that she had, there was three different photos
8  of her, but under three different names; is that
9  correct?
10     A.  Yes.  She had three different IDs in different
11  names.
12     Q.  Are you aware of anyone more knowledgeable than
13  yourself in the SUI or the OAG who has knowledge of
14  voter fraud?
15     A.  No, sir.
16     Q.  I didn't think so.
17          MR. ROSENBERG:  And I think I don't have any
18  further questions.
19          MR. SWEETEN:  I'm probably going to have a
20  short redirect.  So I'm going to speak with counsel
21  about it so let's take about a 5-minute break.
22          (Brief recess.)
23          EXAMINATION
24  BY MR. SWEETEN:
25     Q.  Major Mitchell, you have been asked a number of

## 216

1  questions today about voter fraud.  And I want to ask
2  you a few questions based upon your experience as an
3  investigator.  What types of cases do you work on in
4  addition to voter fraud?
5          MR. GEAR:  I just object; asked and
6  answered.  But go ahead.
7      A.  Currently, I don't do any investigations myself.
8  I'm just a supervisor investigator at this point in
9  time.  But historically, I have worked capital murder
10  investigations, public integrity investigations, money
11  laundering investigations, fraud investigations.
12  Citizen investigation, administrative investigations.
13  And a wide variety of criminal offense.
14     Q.  (By Mr. Sweeten)  How long have you worked
15  specifically on the issue of investigating voter fraud
16  as part of the many things you do?
17     A.  I would say since 2005.
18     Q.  Now, with respect to the issue of in person voter
19  fraud, can you tell us how difficult is in person voter
20  fraud to defect as a general matter?
21     A.  It is incredibly difficult to detect.
22     Q.  Why is that?
23     A.  Because the only way that -- it's my experience
24  that the only way that you would detect in person voter
25  fraud is if someone inside the polling place personally

## 217

1 knows the person who's presenting the fraudulent voter
2 registration certificate.  And additionally, there is an
3 absence of a positive identification in that regard, in
4 that it's difficult, many times when we get these cases
5 referred to us, that they are coming months after the
6 fact.  And many cases, it could be there's already
7 another election that has taken place.
8      And when I interview witnesses or any one of my
9 investigators interview witnesses it's very difficult
10 for voters to identify a potential suspect, if there was
11 one, through conventional photo line-ups or that regard.
12 So it is very hard to detect unless someone in the
13 actual polling place knows that person personally.
14      Q.  Okay.  How difficult is in person voting fraud to
15 detect as compared to other types of crimes, such as
16 white-color crime that you investigate?
17           MR. ROSENBERG:  I'm going to object to form.
18           MR. GEAR:  I would object; calls for
19 speculation.
20 BY MR. SWEETEN:
21      Q.  Just based upon your experience as an officer,
22 can you compare as far as detecting in person voter
23 fraud, how it compares to other types of crimes that you
24 investigate?
25           MR. SWEETEN:  I will also object to

## 218

1 relevance.
2           MR. ROSENBERG:  And compound.  Go ahead.
3      A.  I believe that in person voter fraud is very
4 difficult to detect in comparison to other cases because
5 in other cases I have, in many cases, forensic evidence
6 that I can rely upon to detect a potential suspect that
7 do not exist in person voter fraud.
8      Q.  (By Mr. Sweeten)  Okay.  Now, when we talked --
9 we talked about, I think to a large degree, about the
10 sources of referrals that the office of attorney general
11 received.  You talked about referrals from the Secretary
12 of State from local election officials and from local
13 law enforcements.  Let me ask you, when the district
14 attorney's office is prosecuting an election fraud case,
15 do you -- are you aware of that?  Are you made aware of
16 that?
17      A.  Not necessarily.
18      Q.  Okay.  And in the three most popular counties in
19 the State of Texas would Harris County.  When the Harris
20 County DA prosecutes a voter fraud case, is that
21 something you're made aware of?
22      A.  No, sir.
23      Q.  Do you have any access to statistics about how
24 often voter fraud is prosecuted by that agency?
25      A.  No, sir.

## 219

1      Q.  What about the Harris County attorney, same set
2 of questions.  Are you given the -- do you have access
3 to data regarding how much in person voter fraud they
4 prosecute in a given year?
5      A.  No, sir.
6      Q.  Are you necessarily made aware of any in person
7 voter fraud case that's occurring by the Harris County
8 attorney?
9      A.  No, sir.
10      Q.  What about Bexar County?  What about the Bexar
11 County district attorney.  Are you made aware
12 specifically of instances of in person voter fraud or
13 prosecutions?
14           MR. GEAR:  Are you saying bare or bared.
15           MR. SWEETEN:  Its' B-E-X-A-R, Bexar.  It's
16 San Antonio.
17      A.  No, sir.
18      Q.  (By Mr. Sweeten)  Okay.  With -- if the -- if a
19 county attorney prosecutes a case of voter fraud, are
20 you made aware of that?
21      A.  No, sir.
22      Q.  How about Dallas County, same question, are you
23 made aware when the Dallas County district attorney is
24 prosecuting a case of in person voter fraud?
25      A.  No, sir.

## 220

1      Q.  Do you have access to statistics related to that?
2      A.  No, sir.
3      Q.  What about if a county attorney is prosecuting a
4 case, do you have access to that information?
5      A.  No, sir.
6      Q.  Data regarding that?
7      A.  No, sir.
8      Q.  What about as to any other county in the State of
9 Texas, do you get automatically -- are you given data
10 regarding those prosecutions?
11      A.  No, sir.
12      Q.  Now, we've talked about other prosecutorial
13 entities within the State of Texas that prosecute.  Are
14 there other law enforcement agencies that prosecute in
15 person voter fraud?
16      A.  I believe there could be more.
17      Q.  Okay.  Does the federal -- does federal law
18 enforcement refer or do they investigate allegations of
19 voter fraud?
20      A.  I believe the FBI and the Department of Justice
21 could investigate allegations of in person voter fraud
22 if it was a national election.
23      Q.  From 2002 through 2011, did any federal law
24 enforcement agency refer any cases to your office?
25      A.  Would you repeat that one more time?

Major Forrest Mitchell                                      June 15, 2012

---

221

1    Q. From 2002 through 2011, did any federal law
2 enforcement agency refer any voter fraud cases to your
3 office?
4    A. No, sir, not voter fraud.
5    Q. Does your spread sheet include any cases
6 investigated by federal law enforcement officials?
7    A. No, sir.
8    Q. Does your spread sheet include any entries
9 related to district attorneys or county attorneys that
10 have prosecuted voter fraud?
11    A. Only the ones that we cooperated with or assisted
12 them on the investigation.
13    Q. Okay. If you wanted to find out what federal law
14 enforcement agencies have prosecuted voter fraud in this
15 State, who would you ask?
16    A. I would think I would have to ask the four
17 different US districts department of justice.
18    Q. Does -- let me ask you the question. Does the
19 fact that the office of the attorney general, and you
20 testified earlier that the office of the attorney
21 general received approximately 320 referrals from 2002
22 to the present for alleged election code violations. Do
23 you recall that testimony?
24    A. Yes, sir, I do.
25    Q. Does the fact that your list contains 320

---

222

1 entries, does that mean that since 2002 there have been 320
2 voter fraud cases in Texas?
3    MR. ROSENBERG: Objection; leading.
4 BY MR. SWEETEN:
5    Q. Does it mean that?
6    MR. GEAR: Same objection.
7    MR. ROSENBERG: Same objections.
8 BY MR. SWEETEN:
9    Q. You can answer.
10    A. I do not believe that the 320 referrals listed on
11 my spread sheets are representative of the actual
12 misconduct that's occurring in the State of Texas. I
13 believe that there's many that go undetected.
14    Q. And so is it your belief that in addition to the
15 320 referrals, what is your belief as to whether there
16 are additional cases of voter fraud that go undetected?
17    A. I believe that there are cases of voter fraud
18 that go undetected and unreported.
19    Q. Okay. Let me ask you, does the fact that the
20 office of the attorney general receive more referrals
21 related to mail-in voting fraud, meaning that it is any
22 less serious of -- actually that it's less serious a
23 crime than mail-in ballot fraud?
24    MR. ROSENBERG: Objection; leading.
25    MR. GEAR: Objection; leading.

---

223

1    A. I'm sorry. Could you restate the question?
2    Q. (By Mr. Sweeten) Yeah. Does the fact that the
3 office of the attorney general received 3 -- I think you
4 testified, received more mail-in ballot fraud
5 allegations and referrals than in person mail-in
6 referrals, does that make it a less serious crime under
7 the Texas statutes of the penal code?
8    MR. ROSENBERG: Same objection; leading.
9    MR. GEAR: Also same objection.
10    A. No, sir.
11    Q. (By Mr. Sweeten) In your experience as a law
12 enforcement officer, does increasing the severity of
13 criminal penalties act as a deterrent to those intends
14 to commit a criminal act?
15    A. Yes, sir I believe so.
16    Q. Does Senate Bill 14 increase criminal penalties
17 for attempts?
18    A. Yes, sir I believe it does.
19    Q. And what about for actual voter fraud?
20    A. I think it increases the penalty.
21    Q. Between mail-in voter fraud and in person voting
22 fraud, which of those two crimes is, as an investigator
23 more difficult to investigate?
24    MR. GEAR: Objection; vague. Objection;
25 calls for speculation.

---

224

1 BY MR. SWEETEN:
2    Q. You can answer.
3    A. It has been my experience that the most difficult
4 case to investigate would be in person voter fraud.
5    Q. I'm going to read a statement to you and I'm
6 going to ask you if you agree with this. "The well
7 publicized fact that voter registration lists
8 fraudulent, deceased or otherwise invalid names
9 undermines the public confidence in the electoral
10 process that is the life blood of Democratic
11 institutions." As your experience as an investigator,
12 would you agree with this statement?
13    MR. ROSENBERG: Objection; leading.
14    MR. GEAR: Same objection.
15 BY MR. SWEETEN:
16    Q. Would you agree with this statement?
17    A. I absolutely believe so.
18    Q. "Particularly given that in person voter fraud is
19 difficult to detect without rigorous ID requirements and
20 that as a practical matter, it is important for the
21 State to deter and not just detect and punish voter
22 fraud." Do you agree that, the first part of that, that
23 in person voter fraud is difficult to detect without
24 rigorous ID requirements?
25    MR. ROSENBERG: Objection; extraordinarily

## 225

1    leading.
2              MR. GEAR:  Objection; leading.
3         A.  I believe that in person voter fraud is difficult
4    to detect absent a photo ID requirement.
5         Q.  (By Mr. Sweeten)  Is that statement consistent or
6    inconsistent with your experience?
7              MR. ROSENBERG:  Same objection.
8              MR. GEAR:  Same objection.
9         A.  I believe that that statement is consistent with
10   my experience.
11             MR. ROSENBERG:  Why don't we take a couple
12   of minutes and we'll probably have a little redirect or
13   recross.
14             MR. GEAR:  We will have a redirect.
15             (Brief recess.)
16             FURTHER EXAMINATION
17   BY MR. GEAR:
18        Q.  You were asked a question by your counsel
19   regarding whether or not SB 14, the penalties in SB 14,
20   would act as a deterrent to voter fraud.  Do you recall
21   those questions?
22        A.  Yes, sir, I do.
23        Q.  Do you believe that the current laws as they are
24   in the State of Texas act as a deterrent to voter fraud?
25        A.  I believe they act as somewhat of a deterrent.

## 226

1         Q.  Do you believe that the current laws are
2    sufficient to act as a deterrent to voter fraud?
3         A.  It is my opinion that I believe that they're
4    insufficient in the penalty to deter voter fraud.
5         Q.  And what are the current penalties as they are
6    for voter fraud in the State of Texas?
7         A.  Currently an attempt is -- an attempt to commit
8    voter fraud or voter impersonation as characterized
9    would be a class A misdemeanor, which is punishable by
10   only up to a year in jail and a fine of $4,000.
11        Q.  And an actual act of voting -- voter
12   impersonation?
13        A.  I believe it's only, and I believe right now it's
14   only a third degree penalty.  Only two to three years in
15   the State of Texas and up to a $10,000 fine.
16        Q.  You're saying only two to 10 years.  Would you
17   consider that a significant amount of time for the act
18   of voter impersonation?
19        A.  And this is my opinion.  We have a statute in the
20   State of Texas which says that if you tamper with an
21   electronic voting device, in other words an electronic
22   E-machine, that is a first degree felony which is punish
23   able by up to five to 99.  I think tampering with an
24   electronic voting machine or illegal voting, in my mind
25   are not dissimilar.  So I think it should be more

## 227

1    severe.
2         Q.  So are you suggesting that a voter who commits
3    voter impersonation at the polls should be subject to up
4    to 99 years in prison?
5         A.  I think that's a very serious offense and that
6    elections in Texas are decided, in some cases, in small
7    rural jurisdictions by a handful of votes and just one
8    vote can swing an election.
9         Q.  Under the current law, non-citizens if they
10   voted, there's an enhancer penalty, correct?
11        A.  I can't remember all the laws.  I don't recall
12   that specific one right now.
13        Q.  Are the penalties specific to non-citizens
14   voting?
15        A.  I would think it would be just under 64012, which
16   would be illegal voting.
17        Q.  If a non-citizen represents that they're a
18   citizen when they register to vote, is there an
19   additional penalty to that?
20        A.  Yes, sir.  There is another statute.  It's an offense for providing
21   false information on the voter registration application.
22        Q.  That would be perjury, correct?
23        A.  Under the Texas election code it could be
24   prosecuted either way.  As perjury or the false
25   statement on the voter registration application.

## 228

1         Q.  And that would be an additional penalty to the
2    other penalties you've discussed?
3         A.  Yes, sir.
4         Q.  And a voter, a non-citizen, who votes at a
5    polling place would also be subject to deportation if
6    they were discovered?
7         A.  It's my understanding that the only way someone
8    would be deported at this time is if they were convicted
9    of a felony criminal offense.
10        Q.  And what are you basing that on?
11        A.  Articles I've read in the newspaper.
12        Q.  So as the supervisor for the SIU, are you aware
13   of what the penalties are for an illegal alien or
14   non-citizen voting?  And that would be an illegal
15   non-citizen voting.
16        A.  Federally or State?
17        Q.  State.
18        A.  I would think it would be -- I don't know exactly
19   what the penalties are.  I believe illegal voting is a
20   third degree felony.
21        Q.  And you mentioned federal.  There are additional
22   federal penalties for illegal aliens voting.  Would that
23   be correct?
24        A.  I don't know, sir.
25        Q.  You were asked a question about whether or not

229

1  you knew if there were additional allegations or
2  investigations of voter fraud in Harris County, Dallas
3  County, Bexar County.  Do you recall that testimony?
4      A.  Yes, sir, I do.
5      Q.  In fact, you received, you being the office of
6  the attorney general, has received referrals from all of
7  those counties, Harris County, Dallas and Bexar County;
8  isn't that correct?
9      A.  I do not think we have received any referrals
10  from the district attorney's office in Dallas County.
11  We have received allegations -- we have received
12  referrals from the Secretary of State referencing Dallas
13  elections.
14      Q.  And the initiative that you engaged in to train
15  various, I believe you said peace officers, that
16  included Harris, Dallas and Bexar County?
17      A.  I don't recall the exact specific locations that
18  we trained.  I do know that we enlisted the support of
19  the councils of government in geographical areas.  I
20  don't remember if Dallas or Houston were specific
21  locations that we trained.  I do know that we trained
22  all over Texas.
23      Q.  Specifically cities that had 100,000 or more?
24      A.  No, we trained in locations that were actually
25  even smaller than that.  The training that I personally

230

1  conducted was in deep East Texas, Smith County and Bowie
2  County.
3      Q.  Now, you've relied on your spread sheet for
4  various aspects of voter fraud in the State of Texas;
5  isn't that correct?
6      A.  Yes, sir, I have.
7      Q.  In fact, you relied on that to determine the
8  geographical areas of the violations were occurring in.
9  I believe that was your testimony?
10      A.  Yes, sir.
11      Q.  And so as you sit here today, you're aware of 320
12  referrals that came to the office of the Attorney
13  General, correct?
14      A.  Yes, sir.
15      Q.  And I believe I asked you during the initial part
16  of your testimony whether or not you were aware of any
17  other allegations of voter impersonation or
18  investigations of voter impersonation in the State of
19  Texas and I believe your answer was no; is that correct?
20          MR. SWEETEN:  I think that misstates the
21  testimony.
22  BY MR. GEAR:
23      Q.  Well, are you aware of any other investigations
24  of voter impersonation in the State of Texas, other than
25  the ones that have been investigated by the attorney

231

1  general's office?
2      A.  I believe I mentioned the fact that I was aware
3  of one that occurred in Tarrant County as well.
4      Q.  Other than Tarrant County?
5      A.  No, sir.
6      Q.  So your opinion that there are many and they are
7  undirected is just that, an opinion; is that correct?
8      A.  Yes, sir it is an opinion based upon
9  investigation that we've conducted and witnesses we've
10  interviewed and allegations that we've reviewed.
11      Q.  And based on investigations that you have
12  conducted, you would have pursued those if the facts and
13  the law warranted a charge of voter impersonation.  Is
14  that fair to say?
15          MR. SWEETEN:  Objection; compound.
16      A.  There are many reasons why we may not pursue
17  allegations or prosecute somebody for voter
18  impersonation.  We have the proof of -- we have the
19  burden of proof of beyond the reasonable doubt.
20      Q.  (By Mr. Gear)  Correct, because it's a criminal
21  offense.
22      A.  And there are cases where we may not have felt
23  that we had proof beyond the reasonable doubt to
24  prosecute somebody.
25      Q.  Are there cases that you believed you had proof

232

1  beyond a reasonable doubt that you determined not to
2  prosecute?
3      A.  No.  I don't believe that we had proof beyond a
4  reasonable doubt that we chose not to prosecute.
5      Q.  And as you sit here today, are you aware of
6  any -- are you aware of any cases that have not been
7  prosecuted for voter impersonation that should have
8  been?
9      A.  No, sir.
10      Q.  You were asked a question about the federal law
11  enforcement having the ability to prosecute voter
12  impersonation and investigating and prosecute voter
13  impersonation in the State of Texas.  Do you recall that
14  question?
15      A.  Yes, sir.
16      Q.  Are you aware of any investigations conducted by
17  federal law enforcement between 2002 and 2012 that
18  involved voter impersonation?
19      A.  Yes, sir, I'm aware that in the Dallas 2010
20  investigation that the FBI was also involved.
21      Q.  And you've testified to that particular case in
22  2010, correct?
23      A.  Yes, sir.
24      Q.  In any event, would you agree that if there was
25  federal investigation in the State of Texas that they

233

1    would communicate with the State of Texas Attorney
2    General before conducting an investigation in your
3    jurisdiction?
4              MR. SWEETEN:  Objection; it calls for
5    speculation.
6    BY MR. GEAR:
7        Q.  Well, I mean, based on your experience as a
8    supervisor, a police officer, the supervisor of the SIU,
9    are you aware of any cases where the federal government
10   has investigated without first informing you of the
11   investigation?
12       A.  No, I'm not aware of any.  I would hope that the
13   FBI would communicate with us.  But I know that that's
14   not always the case.
15       Q.  Regarding your opinion that there are cases that
16   have gone undetected, which investigations, if any, are
17   you referring to and which witnesses are you referring
18   to that lead you to this opinion?
19             MR. SWEETEN:  Objection; compound.
20   BY MR. GEAR:
21       Q.  Well, let's start with investigations.  Are you
22   aware of any investigations that lead you to the opinion
23   that there are cases that have gone undetected?
24       A.  I believe that there was a case in Progresso
25   which is Hidalgo County.

234

1        Q.  Does that appear on your spread sheet?
2        A.  Yes.
3        Q.  And can you show me where it appears on your
4    spread sheet?
5        A.  I believe it appears on Page 3 of election code
6    referrals, office of the attorney general, August 2002
7    to present.  It is approximately.
8        Q.  What was the date of the alleged election?
9        A.  It was the 2008 municipal election.
10       Q.  What are the facts of that case?
11       A.  This is a case that was referred to our office,
12   but also the local district attorney, I believe, got the
13   referral as well.
14       Q.  Okay.  And what are the facts of the case?
15       A.  We had witnesses who informed us that some
16   suspects were outside of the polling place and that they
17   were handing out voter registration cards to vote, to go
18   cast votes in that election.
19       Q.  Those were the allegations?
20       A.  Those were the allegations.
21       Q.  Did your office handle the investigation?
22       A.  We investigated that, yes.
23       Q.  What was the outcome of that investigation?
24       A.  No criminal charges were filed.
25       Q.  And what was the reason no criminal charges were

235

1    filed?
2        A.  The witness who gave us that information had
3    inconsistent statements between interviews.
4        Q.  Are there any other cases that you're basing your
5    opinion on, the opinion that there are cases that go
6    undetected?
7        A.  Well, if I could go back to the Harris County
8    case from the 2008 primary election, which I previously
9    testified to.
10       Q.  Can you tell me which case that is, who was
11   involved in that?
12       A.  That would be Jack Carol Crowder.
13       Q.  Okay.  Mr. Crowder who was ultimately convicted?
14       A.  Yes, sir.
15       Q.  Based on a plea?
16       A.  Yes, sir.  The group that did the analysis
17   comparing Harris County voters to deceased voters had --
18   and I don't remember the exact number, but I want the
19   say it was hundreds, if not thousands of voters who they
20   believed were deceased and who actually voted.
21       Q.  Did you investigate that?
22       A.  We could only -- we only have the resources to
23   investigate a small portion of that allegation.
24       Q.  Other than Mr. Crowder, are there any other open
25   investigations on your spread sheet?  Were there any

236

1    other investigations based on what the group presented
2    on your spread sheet?
3        A.  No.  I mean.
4        Q.  So you're saying hundreds if not thousands of
5    possible dead people that have voted, wouldn't that be
6    something that your office would investigate?
7        A.  I only have a limited number of investigators and
8    the ability to investigate all of the names on that list
9    was not feasible.
10       Q.  And isn't it a fact that there are people who
11   have passed away that are still on a voter registration
12   role and that's not -- that's because the roles have not
13   been updated to remove them?
14       A.  One of the difficulties in the State of Texas is
15   that there are multiple jurisdictions that have voter --
16   each county has their own voter registration department.
17   It could be based as an election office or it could be
18   based in a county clerk's office to handle the voter
19   registration.  So there's 254 different ways.  Not all
20   of them share the same systems.  And it's my experience
21   as an investigator, that many of the counties, the way
22   they purge their roles of deceased voters is by looking
23   at obituaries.  And in some cases they obtain the social
24   security death index, which could take months to do if
25   that's what they're relying on.  So there could be a

---

### 237

1  number of voters who are deceased.
2      Q. So ultimately, the answer to my question is yes?
3      A. Yes, sir.
4      Q. And the fact that there is a person who is
5  deceased on the voter registration role does not mean
6  that there is an incident of voter fraud, does not
7  necessarily mean that there's any type of fraud going
8  on?
9      A. Well, there's the opportunity for fraud.
10     Q. You said that you based your opinion that there
11  are undetected cases on speaking with witnesses, can you
12  name the witnesses who you're referring to?
13     A. No, I don't know their names today.
14     Q. And they would have been in connection with the
15  group that you've been speaking about?
16     A. No. I was mentioning witnesses down in the
17  Progresso case.
18     Q. And you've testified about that case, correct?
19     A. Yes, sir.
20     MR. GEAR: I don't think I have any further
21  questions. I am going to leave the deposition open.
22     MR. SWEETEN: I have a few follow-ups.
23     MR. ROSENBERG: If you're going to go I'll
24  go after you.
25     MR. SWEETEN: Okay. That's fine.

---

### 238

1      MR. ROSENBERG: You go first.
2      BY MR. ROSENBERG: It's your turn and then I
3  get it back. Go ahead.
4      FURTHER EXAMINATION.
5  BY MR. ROSENBERG:
6      Q. Major, just because a crime may be difficult to
7  detect doesn't mean the crime has necessarily been
8  committed, does it.
9      A. I'm sorry. Would you repeat that one more time?
10     Q. Sure. Just because a crime may be difficult to
11  detect doesn't mean that it's being committed, does it?
12     A. That's correct.
13     Q. Okay. And also you testified in response to
14  questions from Mr. Sweeten about the fact that he didn't
15  have access to the data from other counties, correct?
16     A. That's correct.
17     Q. But you have no basis upon which to quantify any
18  additional instances of in person voter impersonation,
19  other than those which you testified today, correct?
20     A. I have no other means to identify additional
21  cases.
22     Q. And you would also agree, wouldn't you, that if a
23  crime, in fact, even if it were difficult to detect
24  became more prevalent, the more prevalent it became the
25  more easy it would be to detect it. Isn't that a fact?

---

### 239

1      MR. SWEETEN: Objection; calls for
2  speculation.
3      A. I don't believe just because it's prevalent that
4  it's easier to detect.
5      Q. (By Mr. Rosenberg) The more prevalent it
6  becomes, isn't this what happens in your police work,
7  that more people know about things, more people talk
8  about things. More people may know the person who walks
9  into a polling place, isn't that likely to happen if it
10  were very much more prevalent and than it is according
11  to your statistics?
12     MR. SWEETEN: Objection; assumes facts not
13  in evidence. Objection; calls for speculation. You can
14  answer.
15     A. I believe that even if it's more prevalent in a
16  jurisdiction like Harris County or Dallas County or
17  Bexar County that it would still be very difficult to
18  defect because the key to detecting voter impersonation
19  fraud is that someone in the polling place must be able
20  to identify the person whose name appears in the voter
21  registration certificate as the system is currently
22  designed.
23     Q. (By Mr. Rosenberg) And the more prevalent in
24  person voter fraud was, the more likely it would be that
25  someone would be identifying someone; isn't that

---

### 240

1  correct?
2      MR. SWEETEN: Same objection.
3  BY MR. ROSENBERG:
4      Q. Common sense tells you that.
5      A. I don't believe so because there is a limited
6  number of people inside the polling place. It's limited
7  to the number of election officials working there and
8  limited to pole watchers who are there.
9      Q. That's correct, but the more people there are the
10  more likely there are going to be connections. Isn't
11  that just a matter of common sense?
12     MR. SWEETEN: Same objection. And asked and
13  answered, by the way.
14     A. You're talking about polling places which process
15  thousands of people a day for elections. And absent
16  some sort of ID requirement, it would -- the likelihood
17  that they themselves know the voters representing
18  themselves is very slim. In fact, some elections
19  officials I don't think even necessarily work or live in
20  the precincts where they're assigned.
21     Q. (By Mr. Rosenberg) But the more it happens, the
22  more likely it is people would recognize people, isn't
23  that correct?
24     MR. SWEETEN: Asked and answered.
25  Objection.