Richard Parsons                                                    June 14, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS,              )
         Plaintiff,          )
                             )
V.                           )
                             )
ERIC H. HOLDER, JR.,         )
in his official capacity     )
as Attorney General of       )
the United States,           )
         Defendant.          )
                             )
ERIC KENNIE, et al.,         )
Defendant-intervenors,       )
                             )
TEXAS STATE CONFERENCE       )  CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al.,   )  (RMC-DST-RLW)
Defendant-intervenors,       )  Three-Judge Court
                             )
TEXAS LEAGUE OF YOUNG        )
VOTERS EDUCATION FUND, et al.,)
Defendant-Intervenors,       )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al.,              )
Defendant-intervenors,       )
                             )
VICTORIA RODRIGUEZ, et al.,  )
Defendant-intervenors.       )
```

ORAL DEPOSITION OF
RICHARD PARSONS
JUNE 14, 2012

ORAL DEPOSITION OF RICHARD PARSONS, produced as a
witness at the instance of the Defendant-Intervenors, and duly
sworn, was taken in the above-styled and numbered cause on the
14th day June, 2012, from 2:06 p.m. to 5:23 p.m., before Amy C.
Kofron, CSR in and for the State of Texas, reported by machine
shorthand, at the offices of Dechert, 300 West 6th Street,
Austin, Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached hereto.

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Reynolds Brissenden
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548

FOR THE DEFENDANT:
Ms. Elizabeth Westfall
Ms. Michelle McLeod
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
NWB Room 7203
Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS
STATE CONFERENCE OF NAACP BRANCHES AND
MEXICAN AMERICAN LEGAL CAUCUS:
Mr. Ian Vandewalker, via phone
Ms. Myrna Perez, via phone
THE BRENNAN CENTER FOR JUSTICE
AT NYU LAW SCHOOL
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205

Also Present:
Ms. Lindsey Stencel
Mr. Nick Riley, via phone

## 3

INDEX

Appearances. . . . . . . . .                    2
RICHARD PARSONS
    Examination by Mr. Vandewalker. . .         4
    Examination by Ms. Westfall. ..            77
Signature and Changes. . . .                   96
Reporter's Certificate. . .                    98

EXHIBITS
NO.  DESCRIPTION                             PAGE
1   Request for Proposal                       10
2   Account Tracking                           16
3   Burson-Marsteller Invoice                  17
4   Burson-Marsteller Invoice                  20
5   Burson-Marsteller Invoice                  21
6   Account Tracking                           22
7   Burson-Marsteller documents                46
8   Affidavit of Keith Ingram                  58
9   Excerpts of Deposition of Keith Ingram     59
560 Secretary of State article                 81

## 4

RICHARD PARSONS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. VANDEWALKER:

Q.  Good afternoon, Mr. Parsons.  My name is Ian
Vandewalker.  I represent the defendant-intervenors in this
matter, the Texas State Conference of NAACP and Mexican American
Legislative Caucus.

    Thank you for coming to appear for this deposition
today.  And I also thank you for your patience in advance.  With
the phone setup, I wasn't able to make it there for the
deposition.  I apologize for that, but hopefully we won't have
any communications problems on the phone.  Can you hear me all
right?

A.  Yes, I can.

Q.  Okay.  Thank you.  Could you just state and spell your
full name for the record.

A.  Richard Daniel Parsons, R-i-c-h-a-r-d, Daniel,
D-a-n-i-e-l, Parsons, P-a-r-s-o-n-s.

Q.  Thank you.  And are you represented by counsel today?

A.  Yes.

Q.  And who is your attorney?

A.  Reynolds -- what was your last name?

    MR. BRISSENDEN:  Brissenden.

A.  Reynolds Brissenden.

Richard Parsons                                                    June 14, 2012

## 5

1   Q.  And who is your current employer?
2   A.  State of Texas.
3   Q.  Have you ever been deposed before?
4   A.  No.
5   Q.  Okay.  I am going to go through some sort of ground
6   rules, basic instructions to help things go smoothly.  You
7   are under oath and are required to answer all questions
8   truthfully and to the best of your knowledge; do you understand
9   that?
10   A.  Yes.
11   Q.  If you don't fully hear a question, please ask me to
12   repeat it.  Will you do that?
13   A.  Yes.
14   Q.  And if you don't understand a question, please tell me
15   so.  Will you do that?
16   A.  Yes.
17   Q.  Thank you.  And also, especially because there's some
18   unnaturalness to the conversation because I'm on the phone,
19   please wait for me to complete my question before you start your
20   answer.  Will you do that?
21   A.  Yes.
22   Q.  And also please answer all questions verbally so that
23   the court reporter can get it down rather than with gestures.
24   Will you do that?
25   A.  Yes.

## 6

1   Q.  Are you taking any medication today that would prevent
2   you from giving true and accurate answers to my questions?
3   A.  No.
4   Q.  Is there any other circumstance you're aware of that
5   would prevent you from giving true and accurate answers to my
6   questions today?
7   A.  No.
8   Q.  Did you do anything to prepare for today's deposition?
9   A.  Yes.
10   Q.  What did you do?
11   A.  Looked back at some of the documents that I provided
12   as a result of this notice of deposition and got some updated
13   information from my contact at the vendor for the voter
14   education program.
15   Q.  And what's the name of that vendor?
16   A.  Burson-Marsteller.
17   Q.  Thank you.  Did you talk to anybody else in
18   preparation for today's deposition?
19   A.  I spoke with the attorneys from the Attorney General's
20   office.
21   Q.  Okay.  And do you know which attorney it was?
22   A.  Yes.
23   Q.  And who were they?
24   A.  Reynolds, Brooke.  What's her last name?  Paup?
25   Brooke Paup and Jay Dyer.

## 7

1   Q.  Okay.  You currently work for the Texas Secretary of
2   State's office?
3   A.  Yes.
4   Q.  And how long have you worked for the Secretary of
5   State's office?
6   A.  Since mid September of 2011.  I don't know the exact
7   date that I began employment there.
8   Q.  That's fine.  Thank you.
9   A.  Excuse me.  Since mid, late September.  I don't
10   remember the exact date.
11   Q.  Okay.  What is your official title at the Secretary of
12   State's office?
13   A.  Director of Communications.
14   Q.  And is that the position that you've held since
15   September of 2011?
16   A.  Yes.
17   Q.  What did you do for a living prior to working for the
18   Secretary of State's office?
19   A.  Prior to joining the Secretary of State's office I
20   worked for a private communications agency in Austin.
21   Q.  And as Director of Communications for the Secretary of
22   State's office, what are your official duties?
23   A.  Media relations, speech preparation, press release
24   writing, anything that generally has to do with external
25   communications and some internal communications.

## 8

1   Q.  Do you typically oversee the Secretary of State's
2   voter education initiatives?
3   A.  I do -- I oversee the current one.
4   Q.  Right.  Okay.  Thank you.  And you oversee the
5   Secretary of State's efforts to train poll workers?
6   A.  I'm sorry.  Could you repeat that.
7   Q.  Do you oversee the Secretary of State's efforts to
8   train poll workers?
9   A.  No.
10   Q.  Okay.  Does the Secretary of State's office have any
11   plans to carry out, as a general matter, any statewide voter
12   education initiatives in 2012?
13   A.  Yes.
14   Q.  Does the Secretary of State's office -- could you,
15   just as a general matter, tell me what is the purpose of the
16   voter education initiative in 2012?
17   MR. BRISSENDEN:  Objection, vague.
18   MR. VANDEWALKER:  You can answer, if you
19   understand the question.
20   A.  To provide resources and information for voters and
21   voting age population to understand the voter registration
22   process, the election process and how to participate in that
23   process.
24   Q.  Is the Make Your Mark on Texas voter education plan
25   the voter education initiative for the Secretary of State for

## 9

1  this year?
2      A.  Yes.
3      Q.  Are there any other statewide voter education
4  initiatives planned for 2012?
5      A.  Not formally in the, I guess, scope of the Make Your
6  Mark on Texas program.  But we are constantly answering
7  questions and providing whatever resources we can to anyone who
8  needs them.
9      Q.  And just to clarify, you mean questions from voters?
10      A.  Voters, media, interest groups.
11      Q.  Did the Secretary of State hire a vendor to design the
12  Make Your Mark on Texas plan?
13      A.  Yes.
14      Q.  And is that Burson-Marsteller that you mentioned
15  earlier, is that the vendor in question?
16      A.  Yes.
17      Q.  How did the Secretary of State's office select
18  Burson-Marsteller to design the voter education plan?
19      A.  An RFP was let under whatever rules and regulations
20  are required by state procurement process.  Several companies
21  responded, submitted proposals.  Those proposals were scored by
22  an internal team.  Then the three highest scoring companies were
23  invited in for oral presentations.  Then following the oral
24  presentations the team discussed the presentations and voted on
25  the vendor to select.

## 10

1      MR. VANDEWALKER:  Okay.  And if I could ask
2  Ms. Stelcen to find the exhibit that's titled Request For
3  Proposal No. 12111.
4      MS. STELCEN:  I'm going to hand it to the court
5  reporter to mark as Parsons Exhibit 1.
6      MR. VANDEWALKER:  Thank you.
7      (Exhibit No. 1 marked.)
8      MS. STELCEN:  Okay.
9      Q.  Okay.  Mr. Parsons, is this the RFP that you were
10  referring to just now?
11      A.  It looks like it.
12      Q.  If you want to take a second to read through it to
13  make sure that you have identified it, that's okay.
14      A.  Yes.  This looks like it, yeah.  Yes.
15      Q.  To your knowledge, did the Secretary of State issue
16  any other RFPs other than No. 12111 to solicit proposals for
17  voter education plans related to S.B. 14?
18      A.  Not since this one.
19      Q.  Do you know if there were any before this one?
20      A.  Can you clarify that.
21      Q.  Is it your understanding that S.B. 14 requires the
22  Secretary of State to educate voters about photo ID requirements
23  for voting?
24      A.  Yes.
25      Q.  And is it your understanding that request -- RFP

## 11

1  No. 12111 in part responds to that by asking for a vendor to
2  help with educating voters about photo ID requirements?
3      A.  Yes.
4      Q.  And are you aware of any other RFPs, other than
5  No. 12111, that would respond to the requirements to voters
6  about photo ID requirements?
7      A.  No.
8      Q.  Who drafted RFP No. 12111?
9      A.  I don't know.
10      Q.  Do you know when it was drafted?
11      A.  Generally, last year.
12      Q.  And do you know when last year?
13      A.  Not specifically.
14      Q.  Do you know when it was issued?
15      A.  I don't know the date, but the general time frame.
16      Q.  And when was it issued?
17      A.  I believe it was issued in October 2011.
18      Q.  And how many voter education plan proposals did the
19  Secretary of State's office receive in response to this RFP?
20      A.  As I recall, it was fewer than ten.
21      Q.  Were you a part of the process to select the vendor
22  from those proposals?
23      A.  Yes.
24      Q.  Do you -- did any of those proposals specifically
25  include plans designed to target African American communities?

## 12

1      A.  Pardon me?
2      Q.  Did any of those proposals specifically include plans
3  designed to target African American communities?
4      A.  I don't remember the specifics of the plans that we
5  received.
6      Q.  Do you remember if any of them included plans
7  specifically designed to -- strike that.
8          Were there rating or selection criteria used to
9  differentiate the proposals from each other?
10      A.  Yes.
11      Q.  And what were those criteria?
12      A.  There were several.  I don't recall them section by
13  section.
14      Q.  Do you remember any of them?
15      A.  No.
16      Q.  Do you recall if those criteria involve treating as a
17  positive whether the plan targeted African American voters?
18      A.  I don't recall.
19      Q.  Do you recall whether those criteria treated as a
20  positive including plans to target Latino voters?
21      A.  I don't recall.
22      Q.  Who else was on the team that selected the vendor for
23  this RFP?
24      A.  Jordy Keith, who at the time was Deputy Communications
25  Director; John Sepehri, who at the time was general counsel for

Richard Parsons                                                June 14, 2012

## 13

1    the Secretary of State's office; and Louri O'Leary, who was and
2    is currently administration in the Elections division; and
3    Leticia Salazar.
4        Q.   Thank you.  And when was the decision made to select
5    Burson-Marsteller?
6        A.   I believe it was made in December.
7        Q.   And why did your office select Burson-Marsteller as
8    the vendor?
9        A.   I can only speak to why they scored -- or why I
10   personally felt they were the best company.
11       Q.   Okay.  Why did you think they were the best company?
12       A.   I thought their creative was good.  I thought they
13   presented the most flexibility with regard to implementing --
14   developing and implementing an education program, whether it was
15   focused on -- whether Senate Bill 14 got precleared or whether
16   it didn't.  And they had done this -- they had experience with
17   similar voter education programs in Texas and at least a couple
18   of other states that I don't recall what those states were.
19       Q.   And how did they show the flexibility that you
20   mentioned?
21       A.   Their campaign -- in my estimation, their campaign
22   could easily be implemented to educate voters generally and
23   specifically on any new photo identification requirements in --
24   as required by Senate Bill 14.  And if -- at the time if Senate
25   Bill 14 did not get precleared could be shifted to a general

## 14

1    voter education program very easily.
2        Q.   And how would they do that shifting?  What would the
3    -- how did their proposal prove to you that they could do that
4    kind of shifting?
5        A.   Their concepts could be used in either informing on
6    the regulation or requirements of Senate Bill 14 or they could
7    be used in a general voter education engagement message.
8        Q.   Did any legislators encourage anyone in the Secretary
9    of State's office to select Burson-Marsteller?
10       A.   No, none that I'm aware of.
11       Q.   Did anyone from the governor's office encourage your
12   office to select Burson-Marsteller?
13       A.   No, none that I'm aware of.
14       Q.   Did anyone in the Lt. Governor's office encourage your
15   office to select Burson-Marsteller?
16       A.   No, none that I'm aware of.
17       Q.   To your knowledge, does Burson-Marsteller have any
18   experience targeting non-white or non-Anglo communities of
19   voters?
20            MR. BRISSENDEN:  Objection, vague.
21       A.   Yeah.  Can you be more specific or re-ask.
22       Q.   To your knowledge, has Burson-Marsteller engaged in
23   public education campaigns that are targeted to non-white or
24   non-Anglo communities in the past?
25       A.   As I recall, there was discussion of that with them,

## 15

1    but I don't recall the specifics of the discussion.
2        Q.   Do you recall any of the context of that discussion?
3    Did they mention what client that kind of work might have been
4    done for?
5        A.   I don't recall the specifics.
6        Q.   Do you recall them communicating that they had
7    extensive experience in that area?
8        A.   No, I don't recall that.
9        Q.   How much money does the Secretary of State's office
10   plan to spend on the Make Your Mark on Texas plan?
11       A.   As the RFP lays out, proposers should assume a total
12   budget of no more than $3 million.
13       Q.   Do you know if that, in fact, is the budget for the
14   Make Your Mark on Texas plan?
15       A.   I would direct you again to the language in the RFP,
16   that the proposer should assume a budget of no more than
17   $3 million.
18       Q.   So that says what the parameters of the RFP is.  What
19   I'm trying to ask is what is the Secretary of State's actual
20   budgeting decision about the Make Your Mark on Texas plan?  Do
21   you know if $3 million is, in fact, what's budgeted for the Make
22   Your Mark on Texas plan?
23       A.   I know that it's consistent with what's in the RFP.
24            MR. VANDEWALKER:  Okay.  If I could again have
25   Ms. Stelcen's help to introduce Exhibit Bates No. Texas 298674.

## 16

1    Document has at the top Secretary of State/State of Texas then a
2    code and Account Tracking through March 31st 2012.
3            MS. STELCEN:  I'm going to have the court
4    reporter mark this as Parsons Exhibit 2.
5            (Exhibit No. 2 marked)
6            MS. STELCEN:  And it's been placed in front of
7    Mr. Parsons.
8            MR. VANDEWALKER:  Thank you.
9        Q.   Mr. Parsons, are you familiar with this document?
10       A.   Yep.  Yes.  Sorry.
11       Q.   Thank you.  And what is it?
12       A.   It's a statement of account tracking.
13       Q.   So if I could direct your attention to the small box
14   on the top left.  It says there "Budget" and then next to the
15   budget entry it says 3 million.  Do you know what that refers
16   to?
17       A.   The budget for the Make Your Mark program.
18       Q.   Okay.  And -- so I'm -- just to get the lingo down so
19   we can refer to this later, would you call this an account
20   tracking document?
21       A.   That's what it says it is at the top.
22       Q.   Okay.  And is it your understanding that this document
23   shows a total amount expended as of a certain date?
24       A.   That's correct.
25       Q.   And what is that date?

---

## 17

1    A.  March 31st, 2012.
2    Q.  Okay.  And how much has been expended as of March
3    31st, 2012?
4    A.  According to this document, just under $1.2 million.
5    Q.  Okay.  And that leaves just obviously, according to
6    math and the document, about $1.8 million out of the $3 million;
7    is that correct?
8    A.  Yes.
9         MR. VANDEWALKER:  Okay.  Thank you.  If we could
10   turn to another exhibit.  It begins with Bates Stamp Texas
11   298635.
12        MS. STELCEN:  Okay.  I'm going to have the court
13   reporter mark it as Parsons Exhibit 3.
14        MR. VANDEWALKER:  Thank you.
15        (Exhibit No. 3 marked)
16        MS. STELCEN:  And Exhibit 3 has been placed in
17   front of the witness.
18   Q.  So Mr. Parsons, are you familiar with this document?
19   A.  Yes.
20   Q.  And could you tell me what it is?
21   A.  It's an invoice from Burson-Marsteller.
22   Q.  And what date is the invoice?
23   A.  February 15th.
24   Q.  And what is the total due on the invoice?
25   A.  $40,065.

---

## 18

1    Q.  Is that amount reflected in the account tracking
2    document that we've discussed just now?
3    A.  I don't know.
4    Q.  If you were going to find out, what would you do?
5    A.  I would call Burson and ask them.
6    Q.  What would you ask them?
7    A.  The question you just asked, I guess.
8    Q.  Okay.  I understand the account tracking document to
9    be a document internal to the Secretary of State's office,
10   keeping track of expenditures.  So I'm not sure how
11   Burson-Marsteller would know what is or is not included in that
12   document.
13        MR. BRISSENDEN:  Objection, argumentative.
14        MR. VANDEWALKER:  You can answer.
15        MR. BRISSENDEN:  There's no question pending.
16        MR. VANDEWALKER:  There is a question pending.  I
17   would ask the court reporter to read it back, please.
18        (Requested portion read by reporter)
19        MR. VANDEWALKER:  I apologize.  You're right.
20   There is not a question pending.
21   Q.  How would Burson-Marsteller know what is or is not
22   included in the account tracking document which is an internal
23   document of the Secretary of State?
24        MR. BRISSENDEN:  Objection, speculation.
25        If you know, you may answer.

---

## 19

1    A.  Well, it would appear that the invoice is reflected in
2    the tracking document, now that I've had a chance to look at it.
3    Q.  Okay.  And how do you know the invoice is reflected in
4    the tracking document?
5    A.  I didn't say I knew.  I said it would appear.
6    Q.  What makes it appear the invoice is reflected in
7    the tracking document?
8    A.  The total amount on the front of the invoice is in the
9    column under January 12th.
10   Q.  And why would an invoice dated February 15th appear
11   under a column marked January 12th?
12   A.  I don't know.
13   Q.  Is this, the account tracking document, the kind of
14   thing that you see in your day-to-day duties at the Secretary of
15   State's office?
16   A.  Not day to day.
17   Q.  Do you ever see something like this at the Secretary
18   of State's office?
19   A.  Yes.
20   Q.  Do you know how the account tracking document was
21   generated?
22   A.  It was generated by Burson-Marsteller.
23   Q.  Do you know how this document came to be produced to
24   the attorneys for the State of Texas and ultimately to us?
25   A.  I believe I turned it over in response to the Notice

---

## 20

1    of Deposition.
2    Q.  Okay.  And can you say -- where did it ultimately come
3    from?  Where did you get it before that?
4    A.  Burson-Marsteller.
5         MR. VANDEWALKER:  Okay.  If I could move on to
6    another exhibit.  This one begins at Bates Stamp 298642.
7         MS. STELCEN:  Okay.  I'm going to have the court
8    reporter mark this as Parsons Exhibit 4.
9         (Exhibit No. 4 marked)
10        MS. STELCEN:  And the exhibit has been placed in
11   front of Mr. Parsons.
12        MR. VANDEWALKER:  Thank you.
13   Q.  Mr. Parsons, are you familiar with this document?
14   A.  Yes.
15   Q.  And what is it?
16   A.  An invoice from Burson-Marsteller.
17   Q.  And what's the date on the invoice?
18   A.  March 16th.
19   Q.  And what is the total amount due?
20   A.  $895,268.94.
21   Q.  Thank you.  And is this -- is that total amount due
22   reflected in the account tracking document?
23   A.  Yes.
24   Q.  And what leads you to say -- how do you know that it
25   is?  I'm sorry.

Richard Parsons

## 29

1    A.  It means creating media opportunities to promote the
2  message, whether it's Senate Bill 14 or some other initiative.
3  It means answering media questions as they come into our office.
4    Q.  And how much is budgeted for media engagement?
5    A.  It's our day-to-day -- it's part of my day-to-day
6  duties.
7       Excuse me.  I have a question.  Are you asking within
8  the Make Your Mark on Texas program or outside of the Make Your
9  Mark on Texas program?  You didn't clarify.
10    Q.  Sure.  I am trying to understand -- you mentioned that
11  several things would be done outside of the Make Your Mark on
12  Texas plan to inform voters about the photo ID requirement, and
13  I want to understand what those things are.
14    A.  Okay.  Yeah.
15    Q.  So I think we're on the same page.  The first thing
16  you mentioned was media engagement.  And the next thing you
17  mentioned was op eds.  What activity specifically does that
18  involve?
19    A.  Writing opinion pieces to place in newspapers and
20  publications around the state with information explaining
21  whatever we need to explain to voters.
22    Q.  And what media outlets will those op eds appear in?
23    A.  Whichever ones we ask to run it and who choose to run
24  it.
25    Q.  And how much is budgeted for this activity of writing

## 30

1  op eds?
2    A.  Part of my day-to-day activities.
3    Q.  Will you personally be writing these op eds?
4    A.  I have written some in the past.
5    Q.  Do you plan to write op eds about the photo ID
6  requirement under S.B. 14 if it's precleared?
7    A.  It's certainly possible.
8    Q.  Okay.  The third thing you mentioned was online
9  communications.  What does that mean?
10    A.  We have a -- we have two web sites that we maintain
11  that are resources for voters for all Texans, which we can put
12  information up that's important to voters.
13    Q.  And so I understand, we're talking about activities
14  outside of the Make Your Mark on Texas plan.  So you're saying
15  that there are things that you put up on the Secretary of
16  State's web site that are outside of that plan; is that correct?
17    A.  That's correct.
18    Q.  And what kinds of things will be on your web site
19  having to do with photo ID requirements that are not part of
20  Make Your Mark on Texas?
21    A.  That would be speculative.
22    Q.  Do you have a plan to use web site content other than
23  Make Your Mark on Texas to inform voters about photo ID
24  requirements?
25    A.  Not a specific plan.

## 31

1    Q.  And have you consulted with anyone in the Elections
2  division about these efforts to inform voters that are outside
3  of the Make Your Mark on Texas plan?
4    A.  Not sure I understand your question.
5    Q.  So we're talking about the things that your office
6  might do that are separate from the Make Your Mark on Texas plan
7  to educate voters about photo ID requirements.  Have you
8  coordinated with the Elections division on those activities?
9    A.  Not at this time.
10    Q.  Do you plan to?
11    A.  If it were appropriate.
12    Q.  Does the Secretary of State's office have a plan to
13  continue educating voters about the photo ID requirement under
14  S.B. 14 if it's precleared after the November 2012 election?
15    A.  Say that again, please.
16    Q.  I think that was a confusing question.  I apologize
17  and I will try to reformulate it.
18       We've talked about the Secretary of State's efforts --
19  plan to educate voters about the photo ID requirement under
20  S.B. 14 if it's precleared in 2012.  What I want to know is will
21  there be any efforts to educate voters about those requirements
22  after 2012?
23    A.  I'm sorry.  You broke up.  What was the very last part
24  of your question?  You broke up.
25    Q.  I'm sorry.  I want to know about efforts to educate

## 32

1  voters about photo ID requirements after November 2012.
2    A.  Our current focus is in preparation for the November
3  6, 2012 election.
4    Q.  So there is not currently a plan to engage in voter
5  education after November 2012?
6    A.  As I said, our current focus is on voter education
7  prior to the November 6, 2012 general election.
8    Q.  Does the Make Your Mark on Texas plan include any
9  voter education after November 2012?
10    A.  I believe the contract runs through January of 2013,
11  but I'm not certain of that.
12    Q.  Okay.  We've talked about the Secretary of State's
13  plan to notify voters that they will need photo ID in order to
14  vote if S.B. 14 is precleared.  What else will voters be
15  informed of related to S.B. 14's photo ID requirements?
16    A.  Say that again, please.
17    Q.  Sure.  What else, other than the fact that they will
18  need photo ID to vote if S.B. 14 is precleared, will voters be
19  informed of related to S.B. 14's photo ID requirements?
20    A.  We would want to let voters know what forms of ID
21  would be acceptable.  We would certainly want to let voters know
22  that the Department of Public Safety is -- would be in a
23  position to issue free election identification cards and how to
24  obtain one of those election identification cards.
25    Q.  And how will the Secretary of State inform voters

Richard Parsons                                                    June 14, 2012

## 33

1  about how to get the election identification certificates?
2      A.  It could be -- we haven't held our planning meetings
3  yet for the fall campaign, but those strategies could include
4  paid advertising through online broadcasts or print, media
5  engagement and online messages on our web sites and social media
6  sites.
7      Q.  And what will the content of those messages be?
8      A.  Again, we haven't held our planning strategy session
9  for the fall campaign yet, but they would generally be what I
10  just discussed.
11      Q.  When do you think planning sessions will be?
12      A.  Within the next few weeks.
13      Q.  Will those -- if S.B. 14 is precleared and -- will the
14  efforts to inform voters about where to get photo ID be designed
15  to target minority communities?
16          MR. BRISSENDEN:  Objection, vague.
17      A.  Can you be more specific.
18      Q.  Will there be any effort to target voter education
19  efforts regarding how to get acceptable forms of ID under
20  S.B. 14 to minority communities?
21      A.  Yes.
22      Q.  And what will those efforts be?
23      A.  They would include -- they would possibly include one
24  or all of the strategies that we plan to employ, including
25  online broadcasts, possibly print paid advertising, proactive

## 34

1  media engagement and online social media, mobile and online
2  social media.
3      Q.  And how would each of those media be targeted to
4  minority communities?
5      A.  Can you be a little more specific.
6      Q.  Well, let's take an example.  I'm sorry.  I don't
7  think I remember the entire list.  Did you mention television
8  advertising?
9      A.  Yes, sir.
10      Q.  So how would you ensure, if you created a television
11  ad, that it reached minority communities?
12      A.  All our ads are in Spanish and English.  And the
13  vendor who places the advertising uses data that is commonly and
14  widely used to target specific audiences, to reach specific
15  audiences.
16      Q.  Have you seen that data?
17      A.  I have seen some of it, but it's been months since
18  I've seen it, but I have seen some of it.
19      Q.  And could you just say, how does that targeting
20  happen?  I mean, what does that mean in practice for -- again,
21  take the example of a television ad?
22      A.  I'm sorry.  What's your question?
23      Q.  Well, you said the vendor uses data.  What I want to
24  know is how does data translate into a practical effort to
25  target a minority community?

## 35

1      A.  As I understand it, there are some TV shows, some TV
2  stations, some cable channels that have high viewership among
3  certain populations, and you can target ads to play on those
4  programs, those channels or those stations to run during periods
5  of high viewership among whatever targeted population you wish.
6      Q.  So it's your understanding that Burson-Marsteller is
7  able -- has information about what shows, what channels
8  minorities are more likely to watch; is that correct?
9      A.  That's correct.
10      Q.  Have you seen that information?
11      A.  I've seen some of it.
12      Q.  And which shows are minorities more likely to watch?
13      A.  I don't have that in front of me.
14      Q.  Is that part of the documents that you reviewed and
15  provided to your attorneys to produce to us?
16      A.  I don't have those documents.
17      Q.  Did you ever have those documents?
18      A.  I've seen documents that have that, but I've never had
19  them in my possession, that I recall.
20      Q.  How did you see them?
21      A.  In a meeting.
22      Q.  In a meeting with whom?
23      A.  With Burson staff.  Maybe with TKO Advertising staff.
24  I don't remember who exactly was there.
25      Q.  But you didn't get a copy of any information about how

## 36

1  advertising would be targeted to minority communities?
2      A.  I don't have a copy.
3      Q.  Is that correct?
4      A.  That's correct.  I don't have a copy.  It may have
5  been a Power Point.  I don't recall.
6      Q.  The information that you saw, was it specific to the
7  question of how someone who doesn't have an acceptable form of
8  ID under S.B. 14 would go about acquiring that?
9          MR. BRISSENDEN:  Objection, vague.
10      A.  Can you repeat that, please.
11      Q.  The information that you saw about targeting minority
12  communities, was it specifically directed at an effort to inform
13  voters who don't have an acceptable form of ID under S.B. 14 how
14  to get one?
15          MR. BRISSENDEN:  Same objection.
16      A.  Can you be more specific.
17      Q.  Was the information that you saw about targeting
18  minority communities specific to any content that would be in
19  the advertisement?
20      A.  As I recall, it was specific to -- it wasn't specific
21  to content.  It was more on how to best reach specific
22  populations.
23      Q.  Do you recall when this meeting where you saw this
24  data was?
25      A.  As I recall, it was in one of our conference rooms.

Richard Parsons                                          June 14, 2012

## 37

1    Q.   And do you know what date?
2    A.   No.
3    Q.   Do you remember what month?
4    A.   It was -- I'd be speculating.  I can't remember.
5    Q.   Was it after Burson-Marsteller was hired?
6    A.   Yes.
7    Q.   Have any specific web sites designed to inform voters
8 about photo ID requirements under S.B. 14 been designed yet?
9    A.   Say that again, please.
10    Q.   Have any web sites designed to inform voters about
11 photo ID requirements under S.B. 14 been designed yet?
12      MR. BRISSENDEN:  For clarification, are you
13 referring to web sites designed by the Secretary of State's
14 office or from somebody else?
15      MR. VANDEWALKER:  I'm referring to any web sites.
16 That would include both the Secretary of State's office and
17 anybody else.
18    A.   No web site has been designed specifically for the
19 purposes of educating on SB-14.  We have in place a voter
20 resources web site called VoteTexas.gov and that would be used
21 as a resource to educate voters if Senate Bill 14 is precleared.
22    Q.   And so how will it be used if S.B. 14 is precleared?
23    A.   We will put the information on there necessary for
24 voters relevant to any requirements within Senate Bill 14.
25    Q.   Has that content been drafted yet?

## 38

1    A.   No.
2    Q.   Do you know when it will be?
3    A.   No.  We're not permitted to implement Senate Bill 14.
4 Drafting content would be implementing Senate Bill 14.
5    Q.   Do you know how long it will take to draft that
6 content?
7    A.   Virtually no time.
8    Q.   Will you consult with the Elections division on that
9 content before it is posted?
10    A.   I would expect so.
11    Q.   Will you consult with lawyers for the Secretary of
12 State's office before that content is posted?
13    A.   I would expect so.
14    Q.   And do you know how long that will take?
15    A.   Virtually no time.
16    Q.   Do you have any plans to insure that that content is
17 understandable to the average voter?
18    A.   Say it again, please.
19    Q.   Do you have any plans to insure that that content --
20 the content that will inform voters about the photo ID
21 requirement under S.B. 14 is understandable to the average
22 voter?
23      MR. BRISSENDEN:  Objection, vague.
24    A.   Can you be more specific, please.
25    Q.   Do you have any plans to test whether the language

## 39

1 about photo ID requirements under S.B. 14 would be effective at
2 informing voters about those requirements?
3    A.   Not at this time.
4    Q.   Do you contemplate conducting such testing in the
5 future?
6    A.   Not at this time.
7    Q.   Will the content informing voters about photo ID
8 requirements under S.B. 14 also be available in Spanish?
9    A.   Of course.
10    Q.   Do you have any plans to test whether the Spanish
11 language will be effective to inform Spanish speaking voters
12 about photo ID requirements under S.B. 14?
13      MR. BRISSENDEN:  Objection, vague.
14    Q.   Can you re-ask that.
15    Q.   Do you have any plans to test whether the Spanish
16 language to inform voters about photo ID requirements under
17 S.B. 14 will be effective in communicating with Spanish speaking
18 voters?
19      MR. BRISSENDEN:  Same objection.
20    A.   Can you be more specific.
21    Q.   Do you have any plans to test how effective your web
22 content will be at reaching voters who speak only Spanish?
23    A.   Not at this time.  But all of our Spanish language
24 content goes through approval by Spanish speakers.  It's not
25 auto generated by some software program.  It's approved by

## 40

1 Spanish speakers to insure that it's understandable.
2    Q.   Are the Spanish speakers that you just mentioned
3 people who work in the Elections division?
4    A.   Yes, I believe so.
5    Q.   So would you say that they're people who have a
6 greater understanding than the average person about voting
7 issues?
8      MR. BRISSENDEN:  Objection, vague, calls for
9 speculation.
10    A.   Can you ask that again, please.
11    Q.   I'm just trying to understand.  The people you have
12 reviewing Spanish language content are not lay people?  They're
13 employees who work on elections every day?
14    A.   Yes, I believe that's correct.
15    Q.   Do you know what percentage of Latinos have internet
16 access?
17    A.   I believe in some of the research the Burson -- well,
18 that would be speculation.  I don't know.
19    Q.   Do you know if it's greater or less than the
20 percentage of Anglos who have internet access?
21    A.   I don't.
22    Q.   Do you know what percentage of African Americans have
23 internet access?
24    A.   I don't.
25    Q.   Do you know if the percentage of African Americans who

## 41

1  have internet access is greater or less than the percentage of
2  whites who have internet access?
3      A.  I don't.
4      Q.  Do you know what percentage of low-income Texans have
5  internet access?
6      A.  I don't.
7      Q.  What's the basis for thinking that the internet will
8  be an effective way to reach African American communities about
9  the photo ID requirements of S.B. 14?
10     MR. BRISSENDEN:  Objection, vague.
11     A.  Can you ask that again, please.
12     Q.  What is the Secretary of State's office's basis for
13 thinking that internet web sites will be an effective way to
14 reach African American communities to inform them about photo ID
15 requirements?
16     A.  Because of information provided by Burson-Marsteller,
17 both statistically and anecdotally, growth among all
18 populations, including Hispanics and African Americans regarding
19 internet use is growing rapidly, very rapidly.
20     Q.  It's growing rapidly compared to what?
21     A.  Compared to what it was in the past.
22     Q.  Do you know if the internet use relative to white,
23 Anglo people -- I'm sorry.  Strike that.
24     Do you know if it's -- despite growing rapidly, if
25 it's more or less than white internet usage?

## 42

1      MR. BRISSENDEN:  Objection, vague.
2      A.  Can you restate your question, please.
3      Q.  So you said that internet usage among both African
4  Americans and Latinos is growing rapidly.  Do you know if it is
5  greater or less than white internet usage?
6      A.  Anecdotally, my understanding is it's less, but I
7  don't know that for a fact.
8      Q.  Did the data that you said Burson-Marsteller provided
9  you offer any information about disparities among different
10 racial and ethnic groups with respect to internet access?
11     A.  I don't recall.  Anecdotally, I recall that their
12 information showed that Hispanics were the fastest -- among the
13 fastest, if not the fastest growing population for internet use.
14     Q.  Does the education plan -- does the plan to educate
15 voters about the photo ID requirements under S.B. 14 depend on
16 mailers or direct mailings?
17     A.  There were no direct mailings in the first phase, and
18 we have not finalized our strategy for the second phase.  So I
19 can't say that it will or will not be used.
20     Q.  Could you just tell me what the date range for the
21 second phase is.
22     A.  Be more specific, please.
23     Q.  Okay.  I don't know what the second phase means.
24     A.  Sorry.  Second phase means after the primary.
25     Q.  I see.  Thank you.

## 43

1      A.  Targeting the general election.
2      Q.  I see.  And has the primary happened yet?
3      A.  Yes.
4      Q.  So we're in the second phase; is that correct?
5      A.  That's correct.
6      Q.  Okay.  But the strategy has not been decided yet
7  regarding whether or not mailers will be used; is that correct?
8      A.  That's correct.
9      Q.  Do you know when the strategy will be finalized?
10     MR. BRISSENDEN:  Objection, vague.
11     Q.  Can you be more specific, please.
12     Q.  Well, the strategy isn't final yet, right?
13     A.  Correct.
14     Q.  Do you know when it will become final?
15     MR. BRISSENDEN:  Same objection.  Are you
16 referring to the direct mailings or overall?
17     Q.  I'm sorry.  I'm referring to overall, the entire
18 strategy.
19     A.  I don't have a specific date.  We'll be meeting in the
20 next few weeks.  We'll have a -- any strategy is subject to
21 change or amendment at any time based on any number of factors.
22 But we would -- right now our working plan is to begin ramping
23 up our voter education effort for November 6th in August, early
24 August.
25     Q.  And in order to implement strategy by early August,

## 44

1  when will you need to make decisions about what those strategies
2  will be?
3      A.  Next few weeks, month or so.
4      Q.  Do you know how long it would take to design mailers
5  before they would be ready to send out?
6      A.  We could have a mailer designed in ten minutes.
7      Q.  Does that include a mailer that would be designed to
8  inform voters about the photo ID requirement under S.B. 14?
9      A.  Certainly.
10     Q.  Would you need to consult with the Elections division
11 about such mail?
12     A.  I think that would be wise to consult with them.
13     Q.  Would you need to consult with other lawyers in the
14 Secretary of State's office about a mailer?
15     A.  I think it would be prudent to.
16     Q.  And could all of that consultation happen in ten
17 minutes?
18     A.  Yes.
19     Q.  And what about translation into Spanish?  Could that
20 happen in ten minutes?
21     A.  Yes.
22     Q.  And how would you direct such mailers?  Where would
23 you get your list of addresses from?
24     A.  I'm not sure I follow you.
25     Q.  Well, if you were going to send out a mailing, you

Richard Parsons                                                      June 14, 2012

## 45

1   would need addresses to send it to; is that correct?
2       A.   Yes.
3       Q.   And where would you get a list of addresses?
4       A.   Who do you contemplate sending these mailers to?
5       Q.   That what I'm asking you.
6       A.   You asked about sending mailers.  I don't know who
7   you're going to send out mailers to.  I mean, we can do it.
8   You're asking if we can.  Yes, we can.  We can do it quickly.
9   But I don't know who you want us to send them to.
10      Q.   I'm trying to understand what the Secretary of State's
11  plan is to inform voters about photo ID requirements under
12  S.B. 14 and whether that might include mailers.  If it did, who
13  would you send mailers to?
14      A.   That would be -- under the scenario under which you're
15  describing, I guess that would be registered voters.
16      Q.   Does the Secretary of State receive any discounts or
17  exemptions on postage that would allow it to avoid paying the
18  full postage costs for mailings?
19      A.   I don't know.
20      Q.   Do you know who would know?
21      A.   I don't.
22      Q.   Okay.  Does the plan to educate voters about photo ID
23  requirements under S.B. 14 make use of newspaper ads?
24      A.   That's a possible strategy.
25      Q.   But am I correct in understanding it's not one that

## 46

1   you're currently planning to do?
2       A.   It's not in the current plan, no.
3            MR. VANDEWALKER:  I apologize.  I should have
4   said earlier breaks should be, it's my firm belief, at the
5   control of the witness.  And I didn't say that, and I haven't
6   offered you a break so far.  So I'm going to take this
7   opportunity to take a five- to ten-minute break.
8            THE WITNESS:  I'd appreciate that.
9            (Recess from  3:37 p.m. to 3:48 p.m.)
10      Q.   I would like to take a look at the color exhibit,
11  please.
12           (Exhibit No. 7 marked)
13           MS. STENCEL:  And the court reporter has marked
14  this as Parsons Exhibit No. 7.  And Mr. Parsons has the exhibit.
15           MR. VANDEWALKER:  Thank you.
16           MR. BRISSENDEN:  And Ian, just for the record, so
17  the record is clear, Exhibit 7 in color is the document I
18  believe that you had asked Ms. Salazar about that was not in
19  color.  And we have, between the two depositions, gotten a copy
20  in color for you.
21           MR. VANDEWALKER:  Yes, that's right.  And I very
22  much appreciate the quick turnaround on that from the State of
23  Texas.  Thank you.
24      Q.   Mr. Parsons, have you seen this document before?
25      A.   Yes.

## 47

1       Q.   And what is it?
2       A.   It's survey research on voter attitudes and some
3   message ad concepts.
4       Q.   And is this document what you base your beliefs that
5   Burson-Marsteller will target minority communities on?
6            MR. BRISSENDEN:  Objection, vague.
7       Q.   Can you be more specific, please.
8       Q.   So you said earlier that you think that
9   Burson-Marsteller had data about how to target minority
10  communities in a public education plan.  I'm wondering if this
11  document is your evidence that that's true?
12           MR. BRISSENDEN:  Same objection.
13      A.   Could you again restate your question, please.
14           MR. VANDEWALKER:  I'll ask the court reporter to
15  read it back, please.
16           (Requested portion was read by the reporter)
17           MR. BRISSENDEN:  Same objection.  Also, to the
18  extent it mischaracterizes the witness' prior testimony, I also
19  object.
20      A.   Can you restate again, please.
21      Q.   I'll try a different question.  Do you believe
22  Burson-Marsteller has the ability to target minority communities
23  in a public education plan?
24      A.   Yes.
25      Q.   Why do you think that's true?

## 48

1       A.   Because of their experience on past campaigns and
2   their demonstrated knowledge of public relations in advertising
3   engagement and data that they have communicated to me.
4       Q.   Okay.  What other past campaigns are you referring to?
5       A.   As I said, they've done -- in previous years they
6   conducted a similar voter education campaign for the Secretary
7   of State's office, before I was part of the Secretary of State's
8   office.  And they've done other voter -- similar voter education
9   or voter outreach campaigns in other states, but I do not recall
10  which states those are.
11      Q.   And what about those campaigns involve targeting
12  minority communities?
13      A.   It's my understanding that that was part of the --
14  that that was part of those campaigns.
15      Q.   Have you seen documents relating to those campaigns?
16      A.   I have seen some -- I don't know if they're briefs or
17  synopsis of past campaigns, but I've seen some of that.  Not as
18  it specifically relates to minority outreach.  Just campaigns in
19  general.
20      Q.   You also mentioned data that Burson-Marsteller has
21  related to targeting minority communities.  What data is that?
22           MR. BRISSENDEN:  Objection, asked and
23  answered.
24      A.   Can you restate that, please.
25           MR. VANDEWALKER:  I'll ask the court reporter to

Richard Parsons                                                          June 14, 2012

## 53

1    Q.   If you could turn to Page 19 of this exhibit, the
2    slide entitled Web Sites and media are most used source of voter
3    information.
4    A.   Okay.  I'm there.  Sorry.  I'm there.
5    Q.   Thank you.  If I could just direct you to the second
6    group of columns there that says Media.  What does media mean,
7    as it's used here?
8          MR. BRISSENDEN:  Objection, calls for
9    speculation.
10   A.   I can tell you what it means to me.
11   Q.   Okay.  What does it mean to you?
12   A.   Traditional sources such as newspapers, periodicals,
13   television, radio, and I guess their online equivalents as well.
14   Q.   Okay.  And in looking to the fourth column labeled
15   Advertising, what does advertising mean, as used here?
16   A.   As I understand it, it would be ads placed in
17   different forms of media:  Online, broadcast, print.
18   Q.   Okay.  Thank you.  And if we could look at the first
19   group of columns here that's labeled Web Sites.  The far left
20   column -- I don't know what color to call this.  I'll call it
21   orange -- says that all Texas voters, as I understand it.  And
22   what percentage of Texas voters have answered the question, when
23   seeking out information or news about voting in your community
24   that they find the information on web sites?
25   A.   67 percent.

## 54

1    Q.   And so then is it your understanding that over 30
2    percent of Texas voters don't use web sites to seek out
3    information they need about voting?
4          MR. BRISSENDEN:  Objection, vague.  Calls for
5    speculation.
6    A.   It's my understanding that 67 percent do.
7    Q.   And in that group of columns, the far right column,
8    which seems to be black, is Hispanic voters.  What percentage of
9    Hispanic voters use web sites?
10   A.   53 percent.
11   Q.   And do you see on this chart any representation of
12   what percentages of African Americans use different sources for
13   information they need about voting?
14   A.   No.
15   Q.   And just look towards the middle of the column --
16   group of columns marked Social Networking Sites, what percentage
17   of Hispanics, according to this, use social networking sites?
18   A.   13 percent.
19   Q.   And what percentage of 18- to 24-year-olds use social
20   networking sites?
21   A.   24 percent.
22   Q.   And do you know what the racial composition of the 18-
23   to 24-year-old group in this survey is?
24   A.   I do not.
25   Q.   Do you know if it has -- do you have any reason to

## 55

1    believe that the 24 percent doesn't include all racial
2    identities combined in that age range?
3    Q.   Can you say that again, please.
4    Q.   Do you have any reason to believe that, as reflected
5    in this chart, the 18- to 24-year-old group doesn't include all
6    races?
7          MR. BRISSENDEN:  Objection, calls for
8    speculation.
9          To the extent you know, you may answer.
10   A.   Can you restate that.  I'm not clear on what you're
11   asking.
12         MR. VANDEWALKER:  Withdrawn.
13   Q.   Do you see any information on the group of columns
14   related to social networking sites about what percentage of
15   African Americans use that as a source of information they need?
16   A.   No.
17   Q.   Any information about African Americans anywhere on
18   this page?
19   A.   No.
20   Q.   Turning to now Page 21.  It's a slide titled Voters
21   find the process fair and accessible.
22   A.   Yes, I'm there.
23   Q.   Thank you.  Okay.  So the question here that was asked
24   of respondents was, "Do you believe that the voting process is
25   fair and accessible to all Texans?"  And if I could direct your

## 56

1    attention under the big circle, the first column, "Texas
2    Voters," what is the most commonly given reason that Texans --
3    that some people said they do not believe the voting process is
4    fair and accessible to all Texans?
5          MR. BRISSENDEN:  Objection, vague.
6    Q.   Can you say that again, please.
7    Q.   So the bottom of this page describes the people who
8    said no, they don't believe the voting process is fair and
9    accessible to all Texans and the reason they gave.  The column
10   all the way to the left gives a list of reasons.  Could you tell
11   me which of those reasons is the most commonly given, has the
12   highest percentage of respondents?
13         MR. BRISSENDEN:  Objection, vague, to the extent
14   it mischaracterizes the information.
15   Q.   Do you understand the question?
16   A.   Not really.
17   Q.   Okay.  The lower half of the box on this page says, in
18   a smaller box, "If no, why do you believe that the voting
19   process is not fair and accessible to all Texans?"  Do you see
20   that?
21   A.   Yes.
22   Q.   And then underneath it is a series of columns broken
23   down.  The far left column is labeled "Texas Voters".  Do you
24   see that?
25   A.   Yes.

Richard Parsons                                               June 14, 2012

## 61

1    A.  How far into the next page?

2    Q.  I would say please read until Line 7 in the next page.

3    A.  Okay.  "If I could just direct you to Paragraph 7.
You say that, 'In order to have a basic education program the
Secretary of State's office would need a final decision by
August 15th,'  and then you contrast that with a complete
education program which would need a decision by no later than
July 6th.  I wonder if you could tell me: What's the difference
between a basic program and a complete program?"

10    Answer:  "I cannot.  That would be a Rich Parsons
11  question."

12    Question:  "Could you turn to the next page and tell
13  me: Did you sign this affidavit?"

14    Answer:  "I did."

15    Question:  "And so when you signed this affidavit did
16  you understand what Paragraph 7 meant?"

17    Answer:  "I understand that it's what Rich told me."

18    Q.  Thank you.  So could you explain to me why Keith
19  Ingram said that you told him to say that there's a difference
20  between a complete education program and a basic program?

21    MR. BRISSENDEN:  To the extent that requires
22  speculation on the part of Keith's mental thought processes,
23  I'll object.  You may answer.

24    A.  I don't know that I told him to say anything.  That's
25  your speculation.  To the extent --

## 62

1    Q.  Do you recall having -- I'm sorry.

2    A.  To the extent there might have been any conversation,
3  I can tell you what, to me, differentiates a complete versus a
4  basic education program.

5    Q.  Do you recall talking to Keith Ingram about different
6  kinds of education plans and the timing of the preclearance of
7  S.B. 14?

8    A.  I have a recollection of conversations, but I don't
9  have a recollection of exactly what was said.

10    Q.  Do you recall Keith Ingram telling -- discussing with
11  you an affidavit that he was going to sign?

12    A.  Yes.

13    Q.  And do you recall talking about, with respect to that
14  affidavit, what education plan the Secretary of State would be
15  able to put out?

16    A.  Vaguely.  Like I said, I don't remember the -- I don't
17  remember what was said, the words exchanged.

18    Q.  So as you sit here today, do you understand what Keith
19  Ingram meant when he said -- when he made a distinction between
20  a basic education program and a complete program?

21    A.  If it's based on a conversation we had, then I know
22  what my differentiation would be, but I don't know -- I guess,
23  reading this, if he says it's based on a conversation we had, I
24  know what I would differentiate it as.

25    Q.  Okay.  What do you think the difference is?

## 63

1    A.  To me -- I speak only for me -- the difference would
2  be education campaign essentially run out of my office, by me,
3  using press releases, earned media, op eds potentially, and
4  community visits as best that we could do it with the limited
5  resources that I have.

6    Q.  I'm sorry.  Is what you just described -- which one of
7  the options is what you just described?

8    A.  The basic.

9    Q.  Okay.  And what would a complete education plan look
10  like?

11    A.  Paid advertising, coordinated community events,
12  coordinated community outreach, more coordinated community
13  visits, targeted advertising, I guess, within the overall
14  advertising, things like that.  A more formally planned
15  campaign.

16    Q.  Okay.  With that understanding in mind and seeing that
17  in Keith Ingram's affidavit he said that a complete program
18  would not be possible unless there were a final decision before
19  no later than July 6th, do you agree that the complete education
20  program that you just described is not possible if there's no
21  final decision on preclearance before July 6th?

22    A.  Based -- having done the primary voter education
23  campaign from the experience there, I can see that we can move
24  very quickly on a coordinated campaign.

25    Q.  I'm sorry.  I'm not sure I understand.  Is your answer

## 64

1  that it is possible to have what you described as a complete
2  program, even if the decision comes after July 6th?

3    A.  Yes.

4    Q.  So if I understand you correctly, you're saying that
5  what Keith Ingram said in Paragraph 7 is false?

6    A.  No, that's not correct.

7    Q.  What do you understand Keith Ingram to have said in
8  his affidavit about whether a complete program is possible?

9    MR. BRISSENDEN:  Objection, asked and answered
10  calls for speculation.

11    To the extent you can answer the question, you
12  may.

13    A.  "In order to have a basic education program in place
14  to have a successful November 2012 election season, the
15  Secretary of State's office would need to have a final decision
16  by August 15, 2012; however, to have a complete program that
17  would mirror what our Texas voters, counties and local entities
18  have become accustomed to, we would need to have a final
19  decision no later than July 6."

20    That's what I understand him to say.

21    Q.  Do you think that statement is true or false?

22    MR. BRISSENDEN:  Objection, calls for speculation
23  as to what Mr. Ingram meant when he said it or stated it in his
24  affidavit.  The question is conclusory.

25    To the extent you have information or are able to

## 65

1    answer, you may.
2        A.  He signed the affidavit.  It's sworn and subscribed on
3    March 22nd.  And what I'm saying is, based on my experience in
4    April and May with the first phase of our campaign and having
5    seen how quickly we can move on all aspects of that campaign,
6    now I can say confidently that we could move quickly on Phase 2.
7    This affidavit was given before the bulk of the primary phase
8    was run.  And now with experience running that, I'm much better
9    informed on how to run Phase 2.
10       Q.  The voter education effort in the primary, did that
11   involve educating voters about photo ID requirements under
12   S.B. 14?
13       A.  No.  Well, we're not permitted to educate voters on
14   the photo identification requirements in Senate Bill 14 because
15   it has not been precleared by the Department of Justice.
16   Therefore, anything we would do to educate on Senate Bill 14
17   would be implementation of a law we're not permitted to
18   implement, and we don't want to violate the law.
19       Q.  So your experience with the primary is different from
20   what would be contemplated after preclearance, in that it had
21   nothing to do with photo ID requirements?
22       A.  We did educate voters that no photo ID was necessary
23   in the primary election.  That was a core message of every
24   community engagement, media engagement stop we did.  So we did
25   educate that no photo ID would be required.

## 66

1        Q.  So it didn't include -- it didn't need to include any
2    information about how to go and get photo ID because that wasn't
3    a component of the law at that time?
4        A.  We weren't -- we did not want to be in violation of
5    the law, so we did not educate voters on the requirements within
6    Senate Bill 14.
7        Q.  So the education that would be required after S.B. 14
8    was precleared would necessarily be different from the kind of
9    education you were doing for the primary?
10       A.  Not substantially.
11       Q.  What do you mean by substantially?
12       A.  I anticipate the difference would be now you would be
13   required to provide photo ID when you vote, educate voters on
14   what is permissible and educate voters on how to obtain an
15   election identification card if they did not have ID that was
16   permissible under Senate Bill 14.  That's not substantially
17   different.
18       Q.  And after the Secretary of State's office has spent
19   over a million dollars to educate voters pursuant to a plan that
20   doesn't include information about -- the information that
21   they're required to bring photo ID, you now think that it will
22   be not substantially different to educate voters with a plan
23   that will have to include the opposite message?
24       A.  Can you be more clear on your question, please.
25       Q.  So the Secretary of State's office has already spent

## 67

1    over a million dollars, as we talked about earlier, on its voter
2    education plan, a plan that you just said included telling
3    people they don't have to bring photo ID to the polls.  Now
4    we're talking about, after preclearance, a plan that will have
5    to tell people the exact opposite of that.  How can that not be
6    substantially different?
7            MR. BRISSENDEN:  Objection, argumentative.
8        A.  It's telling people you do and telling them what it is
9    and how to get it if they don't have it.
10       Q.  Which are all different messages than the primary
11   voter education campaign.
12       A.  And I've just communicated those messages to you,
13   simply and understandably.
14       Q.  Is what you just said going to be the sum and
15   substance of the content of the voter education plan concerning
16   photo ID requirements under S.B. 14?
17       A.  No.
18       Q.  So do you acknowledge that you did not just
19   communicate everything to me that a voter would need to know
20   under S.B. 14?
21           MR. BRISSENDEN:  Objection, vague and
22   argumentative.
23       A.  I communicated a summarization.
24       Q.  Okay.  If we could look back at Paragraph 7 in Keith
25   Ingram's affidavit.  The first part of that sentence before the

## 68

1    semicolon says, "In order to have a basic education program in
2    place to have a successful 2012 election season, the Secretary
3    of State's office would need to have a final decision by August
4    15th."
5            If there is not a final decision on preclearance until
6    August 31st, does that mean that not even a basic education
7    program will be possible?
8            MR. BRISSENDEN:  Objection to the extent that
9    calls for speculation.
10           To the extent you have knowledge and are able to
11   answer the question, you may do so.
12       A.  We will execute a successful education program
13   regardless of when a decision is made.
14       Q.  How do you define success?
15       A.  We will identify the appropriate message or messages
16   and then we will communicate that through the strategies that
17   we've discussed here today to as many, if not all, registered
18   voters in Texas.
19       Q.  And how will you know if you've achieved that goal?
20           MR. BRISSENDEN:  Same objection.
21           To the extent you have knowledge and you're able
22   to answer, you may do so.
23       A.  In a literal sense, there's no way to know that you've
24   reached every single voter.  In a practical and literal sense
25   there's no way to know you've reached every single voter.

Richard Parsons                                              June 14, 2012

## 73

1       MS. STELCEN:  You're referring to Exhibit 2, Ian.
2       MR. VANDEWALKER:  I apologize.  Exhibit 2.
3   You're right.
4       THE WITNESS:  So where are we?
5   Q.  My question is does Exhibit 2 show spending up to
6   March 31st and not after?
7   A.  Yes.
8   Q.  And is there a similar document that shows spending
9   after March 31st?
10  A.  It's likely, but I didn't have it, so I didn't have
11  anything to turn over.
12  Q.  How many -- strike that.
13      Turning back to Keith Ingram's affidavit.  In
14  Paragraph 7, he says in order to have a basic education program
15  the Secretary of State's office would need a final decision by
16  August 15th.  If a final decision isn't reached until August
17  31st, will the education program have less of an impact?
18  A.  No.
19  Q.  Why not?
20  A.  Because a generally held belief in public relations
21  and advertising is that if you promote or advertise too early,
22  by the time it's important, it will be forgotten.  If you wait
23  too late, it won't have the impact.  That gives -- did you say
24  -- what date did you say?
25  Q.  August 15th versus August 31st.

## 74

1   A.  That would leave two months.  That would leave two
2   full months for the program.
3   Q.  Was that belief -- generally held belief in
4   communication also generally held in March, when Keith Ingram
5   submitted this affidavit?
6       MR. BRISSENDEN:  Objection, vague.
7   A.  I would think so.
8   Q.  Do you know why Keith Ingram said that it would be
9   impossible to have a basic education program in place if there
10  weren't a decision by August 15th?
11      MR. BRISSENDEN:  Objection, calls for
12  speculation.  I believe we've covered this.  Asked and answered.
13  A.  Can you ask that again.
14  Q.  Do you know why Keith Ingram said it would be
15  impossible to have a basic education program in place unless
16  there was a decision by August 15th?
17      MR. BRISSENDEN:  Same objection.
18  Mischaracterizes the statement.  I don't believe he says it's
19  impossible.
20  A.  If he says it was a Rich Parsons' question, then if
21  it's up to me, I would say prior -- not prior to -- that
22  affidavit, again, was signed in mid March or so.  And having had
23  the experience of conducting the primary phase, I have a much
24  better understanding of -- and -- much better understanding of
25  what pieces we would have in place and how best to conduct the

## 75

1   program.  I have not conducted a voter education program prior
2   to this.  So it's much -- that experience is invaluable in
3   preparing for Phase 2.
4   Q.  So if, as you said earlier, August 31st would not have
5   -- a decision by August 31st would not cause the plan to have
6   less of an impact than August 15th.  Was that also true if the
7   decision were delayed another two weeks, to September 15th?
8   A.  I would simply say that regardless of when there is a
9   decision, we will conduct a successful campaign.
10  Q.  If there was a decision on November 5th, would you
11  conduct a successful campaign?
12  A.  To the best of our abilities, yes.
13  Q.  What does success mean in that context?
14  A.  That would be speculative.
15  Q.  You used the word successful campaign.  I want to
16  understand what you meant by successful campaign that would be
17  conducted in less than one day.
18      MR. BRISSENDEN:  Objection, vague, argumentative.
19  A.  In one day, it may be a successful campaign could be a
20  press release.  We would do everything in our ability to
21  communicate that to the voters, everything in our ability.
22  Q.  So do you define success by how many voters you reach
23  with your message?
24      MR. BRISSENDEN:  Objection, asked and answered.
25  I believe we've covered this.

## 76

1   A.  Can you ask that again.
2   Q.  Do you define success according to how many voters you
3   reach with your message?
4   A.  That is one way to calculate success.
5   Q.  How many voters would a press release on November 5th
6   reach?
7   A.  I don't know.
8   Q.  But it would be successful; is that correct?
9       MR. BRISSENDEN:  Objection, vague and
10  argumentative.
11      You don't have to answer.
12  Q.  Do you understand the question?
13      MR. BRISSENDEN:  I've instructed him not to
14  answer.  It's argumentative and I believe at this point you're
15  badgering the witness.
16      MR. VANDERWALKER:  I'm just trying to understand
17  what it means that it's possible to have a successful campaign
18  that starts on November 5th for an election that happens
19  November 6th.  I want to understand what success means.
20      MR. BRISSENDEN:  We've been here all afternoon,
21  and he has been answering your questions.  We've already gone
22  over what is a successful campaign.  He's provided you with
23  testimony about how they would measure that in terms of
24  impressions.  I believe he's answered the question.  At this
25  point I think your questioning is argumentative.

DAN PATRICK                                                            May 30, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS,                    )
                                   )
          Plaintiff,               )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
          Defendant,               )
                                   )
ERIC KENNIE, et al,                )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS STATE CONFERENCE OF          )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )  (RMC-DST-RLW)
                                   )  Three-Judge Court
     Defendant-Intervenors,        )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
                                   )
     Defendant-Intervenors,        )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
     Defendant-Intervenors.        )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
SENATOR DAN PATRICK
MAY 30, 2012
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## 2

1    ORAL DEPOSITION OF SENATOR DAN PATRICK, produced as

2  a witness at the instance of the Defendant, was duly

3  sworn, was taken in the above-styled and numbered cause

4  on the MAY 30, 2012, from 11:39 a.m. to 7:23 p.m.,

5  before Chris Carpenter, CSR, in and for the State of

6  Texas, reported by machine shorthand, at the offices of

7  DECHERT, LLP, 300 W. 6th Street, Suite 2010, Austin,

8  Texas 78701, pursuant to the Federal Rules of Civil

9  Procedure and the provisions stated on the record or

10  attached hereto.

## 3

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFF, STATE OF TEXAS:
 3        Patrick K. Sweeten
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 4        P.O. Box 12548
          Austin, TX 78711-2548
 5
          209 West 14th Street
 6        8th Floor
          Austin, TX 78701
 7        (512) 936-1307
          patrick.sweeten@texasattorneygeneral.gov
 8
 9   FOR THE DEFENDANT, HOLDER, ET AL:
10        Spencer Fisher
          Bruce Gear
11        Michelle McLeod
          U.S. DEPARTMENT OF JUSTICE
12        950 Pennsylvania Avenue, NW
          NWB - Room 7202
13        Washington, DC  20530
          (202) 305-7766
14        spencer.fisher@usdoj.gov
          bruce.gear@usdoj.gov
15
16   FOR THE KENNIE INTERVENORS:
17        Chad W. Dunn
          BRAZIL & DUNN, LLP
18        4201 Cypress Creek Parkway
          Suite 530
19        Houston, TX  77068
          (281) 580-6310
20        chad@brazilanddunn.com
21   FOR THE DEFENDANT INTERVENORS NAACP AND MALC:
22        Amy L. Rudd
          DECHERT, LLP
23        300 W. 6th Street, Suite 2010
          Austin, Texas 78701
24        (512) 394-3000
          amy.rudd@dechert.com
25
```

## 4

```
 1                    INDEX
 2   Appearances,........................3
 3   SENATOR DAN PATRICK
 4        Examination by Mr. Spencer.................5
 5        Examination by Mr. Dunn..................197
          Further Examination by Mr. Spencer.......213
 6   Signature and Changes........................300
 7   Reporter's Certificate.......................302
 8                    EXHIBITS
 9   NO. DESCRIPTION                     PAGE MARKED
10   160  Amended Notice of Deposition        19
11   161  Transcript Excerpt, March 11, 2009   93
12   162  Transcript Excerpt, March 11, 2009  111
13   163  Texas Legislature Online History, SB 362   121
14   164  Senator Patrick Letter to Constituents,   123
          Fall 2010
15
16   165  LexisNexis Name Search              155
17   166  Texas Senate Staff Services Excerpt Senate  186
          Bill 14, Jan. 26, 2011
18   167  Texas Senate Staff Services Excerpt Senate  194
          Bill 14, Jan. 26, 2011
19
20   170  Senate Rules Adopted by 82nd Legislature,   223
          Jan. 19, 2011
21   171  Capitol View, 82nd Legislative Session,     234
          Jan. 26, 2011
22
23   173  Senator Patrick Letter to Constituents,    262
          80th Legislature
24   174  Houston Chronicle Article, May 19, 2011    264
25   175  Texas Observer Article, June 15, 2007      271
```

## 5

1   176   American Stateman Article, May 18, 2007    275
2   177   Senator Patrick Letter, Fall of 2008        286

## 7

1   Q.   Good morning, Senator.
2   A.   Good morning.
3   Q.   If you could state your name and spell your
4   name for the record.
5   A.   Dan Patrick, P-a-t-r-i-c-k.
6   Q.   We'll just first start off with some ground
7   rules for today.  Please testify truthfully, accurately,
8   and completely when answering my questions.
9       The court reporter, Mr. Carpenter here,
10  will prepare a transcript of everything that's said
11  today.  You must respond to my questions verbally, so no
12  head shaking, and that's for the purposes of the
13  transcript.  Is that clear?
14  A.   Yes.
15  Q.   Okay.  Please wait for me to finish my
16  questions before you answer, and I will do the same for
17  you, and that way, it will be easier to read the
18  transcript.  Is that okay?
19  A.   Yes.
20  Q.   And I'll try to ask you clear questions at all
21  times.  If you don't understand a question, please let
22  me know.  Okay?
23  A.   Yes.
24  Q.   If you wish to stop and take a break, please
25  tell me, and I will try to accommodate you.  It just

## 6

1       THE REPORTER:  The time on the record is
2   11:39.  Could everybody here make announcements and your
3   affiliations?
4       MR. SWEETEN:  Patrick Sweeten from the
5   Texas Attorney General's Office on behalf of the State
6   of Texas and on behalf the witness, Senator Patrick.
7       MR. FISHER:  Spencer Fisher representing
8   the Attorney General of the United States.
9       MR. GEAR:  Bruce Gear representing the
10  Attorney General of the United States.
11      MS. McLEOD:  Michelle McLeod representing
12  the Attorney General of the United States.
13      MR. DUNN:  Chad Dunn representing the
14  Defendant Kennie Intervenors.
15      MS. RUDD:  Amy Rudd representing the
16  Defendant Intervenors NAACP and MALC.
17      MR. McKENZIE:  John McKenzie from the
18  Texas Attorney General's Office representing the State
19  of Texas and the witness.
20          DAN PATRICK,
21  having been first duly sworn to testify the truth, the
22  whole truth, and nothing but the truth, testified as
23  follows:
24          EXAMINATION
25  BY MR. FISHER:

## 8

1   depends on where we are in the questioning, but as soon
2   as we get to the next stopping point, I will do so.  Is
3   that okay?
4   A.   Yes.
5   Q.   So just remember that you're under oath, and
6   you may be subject to the penalty of perjury for giving
7   false or misleading testimony today, just like at a
8   trial.  Is that clear?
9   A.   Yes.
10  Q.   Do you understand all of the ground rules and
11  instructions?
12  A.   Yes.
13  Q.   Do you have any questions about any of them?
14  A.   No.
15  Q.   Are you on any medication today that would
16  affect your ability to testify?
17  A.   No.
18  Q.   Is there any reason why you cannot testify
19  truthfully and accurately today?
20  A.   No.
21  Q.   So I might use the terms "voter ID" and "photo
22  ID" interchangeably during this deposition.  I want you
23  to interpret the term broadly to mean a requirement that
24  a voter present a form of identification, whether it has
25  a photo on it or otherwise, when voting in person before

DAN PATRICK                                              May 30, 2012

## 25

1   staff members are erased on some type of regular basis
2   but I'm not certain.
3       Q.   Is there any requirement, as a member of the
4   Texas Legislature, that you hang on to certain e-mails?
5       A.   I don't use -- no, there is none, not to my
6   knowledge.  I mean, not to my knowledge.  If there's a
7   policy, I'm not aware of it.
8       Q.   What about correspondence?
9       A.   Can you repeat the question?
10      Q.   What about correspondence?
11      A.   No.  What about correspondence?
12      Q.   How are records in your office maintained with
13  regard to correspondence?
14      A.   It depends on the type of correspondence.
15      Q.   Constituent correspondence.
16      A.   There is a system that does, to my knowledge,
17  maintain the correspondence we get from constituents.
18      Q.   Is that system a part of the Texas Legislature,
19  or is it a part of your office?
20      A.   I believe it's a part of the Legislature.
21      Q.   What about your responses to that constituent
22  correspondence?
23      A.   I'm not involved directly in that, but I
24  believe we keep that record.  I'm not certain, but I
25  believe we do.

## 26

1       Q.   And is there some kind of policy that's at play
2   in keeping that?
3       A.   Not for my office specifically, but I'm not
4   sure of this legislative computer system.  In that -- in
5   that respect, I don't know how long they are kept or
6   what is kept.
7       Q.   Have you told your staff to keep certain
8   correspondence, for instance, constituent
9   correspondence?
10      A.   Not that I recall.
11      Q.   So no instructions to your staff to hang on to
12  constituent correspondence?
13      A.   Not from me specifically.
14      Q.   And no instructions from you to retain your
15  responses to constituent correspondence?
16      A.   Repeat that again.
17      Q.   Are there any instructions from you to your
18  staff to retain your responses to constituent
19  correspondence?
20      A.   I'm sure on occasion I may have said, "Let's be
21  sure we keep that," but I don't have a specific
22  policy.  I'm going to back to the issue that there may
23  be -- and I'm not even certain of this -- there may be a
24  state system that keeps everything, but I'm not certain.
25      Q.   But you're not aware of that?

## 27

1       A.   I'm just not certain.  I'm aware there might
2   be, but I'm not certain if there is.
3       Q.   What about speeches, the speeches you give,
4   drafts of speeches, are those maintained in your office?
5       A.   I seldom write speeches.
6       Q.   Who writes speeches?
7       A.   I write, probably, all of my speeches.  98
8   percent of them.
9       Q.   What about reports, reports on legislation,
10  pending legislation, are those maintained in your
11  office?
12      A.   I would assume that some are for some
13  legislation, but I couldn't be certain of how much is
14  maintained.
15      Q.   So is it fair to say that you don't know what
16  records are maintained in your office and what records
17  are not maintained in your office?
18      A.   That would be fair to say.
19      Q.   Is there any off-site location where some
20  records in your office are stored?
21      A.   Off site being away from the Capitol?
22      Q.   Outside of your office.
23      A.   State records?
24      Q.   Yes.
25      A.   I'm not aware of any.

## 28

1       Q.   So the records that your office does maintain
2   are located in your office at the Texas Legislature at
3   the Capitol?
4       A.   The -- yes, with the exception that I may have
5   some files that, that I keep that, that I might take
6   home, and may be legislation that I take home to read.
7   It could be a booklet that I take home to read.  With
8   that exception, I'm not aware of any other.
9       Q.   So going back to Exhibit 160, did you look at
10  any of the files that might be at your home that were
11  responsive to any of the document requests in the
12  amended notice?
13      A.   Yeah, I did.
14      Q.   What's your educational background?
15      A.   I have a bachelor's degree in English.
16      Q.   From where?
17      A.   The University of Maryland in Baltimore County.
18      Q.   And how long have you served in the Senate?
19      A.   I have served four and a half -- five and a
20  half years.
21      Q.   And you were first elected in what year?
22      A.   I was elected in November of 2006.
23      Q.   What geographic areas are within your Senate
24  district?  Well, first of all -- strike that.
25           What senate district do you represent?

DAN PATRICK                                           May 30, 2012

## 29

1      A.   Seven.
2      Q.   And what geographic areas are within your
3    district?
4      A.   That is West Harris County.
5      Q.   Do you know, roughly, the total population of
6    West Harris County?
7      A.   My Senate District, before redistricting, was
8    the largest in the state, 1,015,000 constituents.
9      Q.   Are you aware of the racial demographics of the
10   district that you serve, District 7?
11     A.   I have a general knowledge.
12     Q.   What's that general knowledge?
13     A.   I believe that the African American and Latino
14   population is approximately 39 percent of the district.
15     Q.   And that would be the Latino and African
16   American population combined is 39 percent of the
17   district; is that correct?
18     A.   Let me correct that.  I don't know that that's
19   the population or the registered voters.  I remember
20   seeing a number of black and Hispanic, 39, but I don't
21   know if that's population or registered voters.
22     Q.   Do you serve on any committees in the Texas
23   Senate?
24     A.   Yes.
25     Q.   Which ones?

## 30

1      A.   Finance, Sunset, Education, Redistricting,
2    Criminal Justice, Health and Human Services,
3    Intergovernmental Relations, Subcommittee on School
4    Charters, School Vouchers, Flooding and -- the
5    Subcommittee on Flooding and Drainage.  I think that's
6    it.
7      Q.   Can you describe the Sunset Committee for me?
8      A.   The Sunset Committee, which I am brand new to
9    and haven't attended my first hearing, is -- reviews the
10   agencies in our government on a 12-year cycle.
11     Q.   Have you sponsored any election related or
12   voter-related bills?
13     A.   In a specific committee or in general?
14     Q.   In general.
15     A.   I'd have to check my record.
16     Q.   Have you co-sponsored any election related or
17   voter-related bills?
18     A.   I was a co-author, I believe, on the photo
19   voter ID bill.
20     Q.   And by photo voter ID bill, you mean?
21     A.   I mean --
22     Q.   Which one?
23     A.   I believe on the one that passed in 2011.  I'm
24   not sure about 2009.  I may have been.  I don't recall.
25   Or maybe that was 2007.  I don't recall.

## 31

1      Q.   So the one that passed in 2011, is that SB 14?
2    Senate Bill 14?
3      A.   If that's what the record indicates.
4      Q.   So you don't remember right now if you were the
5    co-author of Senate Bill 14?
6      A.   I believe I was.  But I have cast 13,000 votes
7    in three sessions, so you'd have to show me -- I don't
8    want to testify to something and not be absolutely
9    correct.  I believe I was, but if you show me the
10   document, I'd be happy to say yes.
11     Q.   Is there a difference between casting a vote
12   and co-authoring a bill?
13     A.   Yes.
14     Q.   And what's the difference?
15     A.   You may cast a vote and not be a sponsor or a
16   co-author, an author of the bill.  Usually, if you are a
17   sponsor, co-author, author of a bill, you're going to
18   cast a vote for it.
19     Q.   How many bills have you authored or
20   co-authored?
21     A.   I'd have to check the record, but a significant
22   number of bills.
23     Q.   Anywhere near 13,000?
24     A.   No.
25     Q.   How many bills have you sponsored or

## 32

1    co-sponsored?
2      A.   I'd have to check the record.
3      Q.   Anywhere near 13,000?
4      A.   No.
5      Q.   And so you don't remember if in 2011 you
6    co-sponsored or co-authored Senate Bill 14; is that
7    correct?
8      A.   No.  What I think my testimony was, and is:  I
9    believe I did co-sponsor.  But the point I'm trying to
10   make is that we -- I cast a lot of votes.  We probably
11   passed 1500 bills.  So if you're asking me the specific
12   number, I don't want to testify to a number if I'm not
13   sure.  If you're asking me did I co-sponsor the photo
14   voter ID or co-author, actually, I believe I co-authored
15   it.  If you want to show me Senate Bill 14, that's what
16   I'm not sure.  I don't know the number.
17     Q.   We'll get to that.
18     A.   Okay.
19     Q.   But I just want to make it clear that you don't
20   know for sure, sitting right now without taking a look
21   at anything, if you did co-author or co-sponsor Senate
22   Bill 14?
23     A.   No.  I believe I co-authored the photo voter
24   ID.
25     Q.   You believe?

DAN PATRICK                                                    May 30, 2012

## 45

1  telephone.
2      Q.  Are you employed in a capacity other than as a
3  Texas State Senator?
4      A.  Yes.
5      Q.  And what is that?
6      A.  I'm owner/operator of a radio station.  Patrick
7  Broadcasting would be the name of one.  Dallas
8  Broadcasting would be the name of two.
9      Q.  So as the owner/operator, is it fair to say
10 that you are the employer?
11     A.  Yes.
12     Q.  And what are your responsibilities as the owner
13 and operator of Patrick Broadcasting and --
14     A.  I'm responsible for the day to day -- I have
15 employees who work day-to-day, obviously, who carry out
16 various functions.  But as the owner/operator, I'm
17 responsible for making a profit.
18     Q.  How long have you been an owner/operator of
19 Patrick Broadcasting?
20     A.  I have to check the record for the exact date,
21 but I believe two years.
22     Q.  And before that?
23     A.  Before that, I was owner/operator of Houston
24 Broadcasting.
25     Q.  And for how long?

## 46

1      A.  I'd have to check the record, but approximately
2  ten years.
3      Q.  When you last renewed your driver's license,
4  where did you go to have that done?
5      A.  Hmm.  That's an interesting question.  I don't
6  remember.
7      Q.  Have you renewed your driver's license in the
8  past five years?
9      A.  I've renewed it, but I couldn't tell you
10 exactly when.
11     Q.  You don't know how you renewed your driver's
12 license?
13     A.  I -- I just recently, because I moved, renewed
14 it online.  I do recall that.  I was thinking in person,
15 as you phrased the question.
16     Q.  Do you have a copy of your birth certificate?
17     A.  I believe I do.  I'm not certain, but I believe
18 I do.
19     Q.  If you didn't have a copy of your birth
20 certificate, do you know where you would go to get one?
21     A.  I couldn't tell you exactly today, but I could
22 ascertain that information.
23     Q.  Is it fair to say you don't know where you
24 would go to get a copy of your birth certificate as you
25 sit here today?

## 47

1      A.  I would go to the record department of the City
2  of Baltimore, but I couldn't give the exact address or
3  phone number.
4      Q.  Do you have any idea how much it would cost to
5  get a replacement of your birth certificate?
6      A.  I do not.
7      Q.  Do you have any idea how long it would take?
8      A.  I do not.
9      Q.  When is the last time that you voted?
10     A.  A couple of weeks ago.
11     Q.  And how did you vote?
12     A.  In person.
13     Q.  How far is the polling place from your home?
14     A.  Well, it's early voting, so there's a polling
15 place very close to my home.  But in early voting, you
16 can vote anywhere.  The place I voted was closer to my
17 office than my home.  So maybe 15 miles.  But I could
18 have voted within two miles.
19     Q.  Do you usually vote in person?
20     A.  Yes.
21     Q.  Do you prefer to vote in person?
22     A.  Yes.
23     Q.  Do you have any experience related to election
24 law?
25     A.  Not specifically.

## 48

1      Q.  Do you have any experience related to election
2  administration?
3      A.  Not specifically.
4      Q.  Have you ever volunteered as a poll worker?
5      A.  I don't recall.  I don't believe so.
6      Q.  Have you ever monitored the polls as a member
7  of a political party?
8      A.  I have not monitored the polls.
9      Q.  Have you ever witnessed any problems in a
10 polling place?
11     A.  Not to my knowledge.
12     Q.  Ever witness anyone trying to impersonate
13 another voter?
14     A.  No.
15     Q.  Are you familiar with Section 5 of the Voting
16 Rights Act?
17     A.  Not specifically.
18     Q.  "Not specifically" means you've never heard of
19 Section 5 of the Voting Rights Act before?
20     A.  I've heard of Section 5, but I couldn't tell
21 you specifically, unless I read it, exactly what it
22 says.
23     Q.  So I'm not asking exactly what it says.
24     A.  Okay.
25     Q.  What I asked is:  Are you familiar with

DAN PATRICK                                                    May 30, 2012

---

**49**

1   Section 5 of the Voting Rights Act?
2          MR. SWEETEN:  Objection, argumentative.
3   Go ahead and answer.
4       A.  Yeah.  Again, I would have to have my memory
5   refreshed on it.
6       Q.  (By Mr. Fisher) Do you know what the Voting
7   Rights Act is?
8       A.  You would have to show me a document so that I
9   can look at it.
10      Q.  So sitting here today, you have no knowledge of
11  the Voting Rights Act; is that right?
12      A.  I cannot tell you specifically what's in the
13  Act.
14      Q.  Do you know the general purpose of the Voting
15  Rights Act?
16      A.  I would have to look at the history on that.
17      Q.  So sitting here today, you have no knowledge of
18  the general purpose of the Voting Rights Act?
19      A.  My knowledge of the Voting Rights Act is that
20  it is implemented for a certain number of states because
21  of what the federal government deemed important at a
22  certain point in time.
23      Q.  What's your understanding of what the federal
24  government deemed important?
25      A.  I couldn't tell you specifically what the

---

**50**

1   government was thinking at a certain point in time and
2   why they deemed it important.  But obviously, the Voting
3   Rights Act was implemented for a specific reason by the
4   federal government at a specific time.
5       Q.  And you're not aware of that reason?
6       A.  I couldn't tell you what the government's
7   specific reason.  My general knowledge would tell me
8   that the federal government was concerned about voting
9   irregularities at a certain point in time.
10      Q.  What do you mean by voting irregularities?
11      A.  You asked me the question of what I believed
12  that to be, and that was my answer.
13      Q.  That was your answer, but my next question is:
14  What do you believe the meaning of voting
15  irregularities, as you used the term, meant?
16      A.  My impression is that it -- that the federal
17  government, at some point, believed that some people
18  were not allowed to vote at a certain point in history.
19      Q.  And at what point did the federal government
20  believe this?
21      A.  That, I don't know.
22      Q.  Has the federal government stopped believing
23  this?
24      A.  I can't tell you what the federal government
25  believes or doesn't believe.

---

**51**

1       Q.  Yes, but you've testified today that the
2   federal government had a belief about voting
3   irregularities, and so I'm asking:  At what point did
4   that belief end, if at all?
5          MR. SWEETEN:  Objection, vague.
6       Q.  (BY MR. FISHER) You can answer.
7       A.  I don't know.
8       Q.  Does Texas have a history of what you term
9   voting irregularities?
10      A.  Not that I'm aware of.
11      Q.  Is Texas covered by Section 5?
12      A.  Yes.
13      Q.  How does the legislature ensure that election
14  laws comply with Section 5?
15         MR. SWEETEN:  I'm going to, at this point
16  go ahead and instruct Senator Patrick, who has asserted
17  his legislative privilege today, about the contours of
18  legislative privilege.
19         In answering your questions today, do not
20  reveal thoughts, mental impressions, opinions, or
21  motivations about legislation or in furtherance of
22  legislative process, including Senate Bill 14.
23         Also, do not reveal today communications
24  that you've had with legislators, legislative staff,
25  state agencies, the Texas Legislative Council, or

---

**52**

1   constituents.
2          If you can answer that question without
3   revealing that information, you can do so.
4          Also, just so you understand, my
5   instruction does not -- and you are free to include
6   matters of public record, including committee hearings,
7   Floor proceedings, in providing answers.
8          THE WITNESS:  Okay.
9       A.  What was the question?
10         MR. SWEETEN:  Would you mind reading back
11  the question?
12         (The requested portion was read back by
13  the court reporter.)
14      A.  I don't know.
15      Q.  (By Mr. Fisher) Has Texas ever denied the right
16  to vote to any of its citizens, to your knowledge?
17      A.  No.
18      Q.  Do you seek legal advice before voting on
19  election-related legislation?
20      Q.  Repeat that question.
21      Q.  Do you seek legal advice before voting on
22  election-elated legislation?
23         MR. SWEETEN:  You can answer whether or
24  not you seek legal advice.  Don't answer the substance
25  of any communications regarding that.

DAN PATRICK                                    May 30, 2012

---

## 53

1   A.  I'm just thinking -- I'm just trying to answer
2   honestly if I have or not.  Just say that one more time
3   for me, Spencer.
4   Q.  (By Mr. Fisher) Do you seek legal advice before
5   voting on election-related legislation?
6   A.  Do I seek legal advice before voting on
7   legislation?  Not to my knowledge.
8   Q.  Does your staff seek legal advice before you
9   make a vote on election-related legislation and provide
10  you advice?
11  A.  I can't speak to what my staff may or may not
12  do.
13  Q.  Do you receive any legal advice on election-
14  related legislation to ensure compliance with Section 5
15  before you vote on election-related legislation?
16  A.  Not to my knowledge.
17  Q.  Did you receive any legal advice from the Texas
18  Legislative Council on those matters?
19  A.  Not that I recall.
20  Q.  Did you receive any legal advice on Senate Bill
21  14 to ensure its compliance with Section 5?
22  A.  Not that I recall.
23  Q.  Do you receive bill analysis before making
24  votes on election-related legislation?
25  A.  Yes.

## 54

1   Q.  Did you receive bill analysis before making a
2   vote on Senate Bill 14?
3   A.  I can't specifically recall that situation, but
4   I would assume I did.
5   Q.  Did this bill analysis concern compliance with
6   Section 5?
7   A.  I don't remember.
8   Q.  Have you received any communications regarding
9   Senate Bill 14 in 2012?
10  A.  Well, obviously, I received communications from
11  your office to look into the bill.
12  Q.  Have you received any communications from your
13  staff regarding Senate Bill 14 in 2012?
14  A.  Yes.
15  Q.  When was that?
16  A.  I don't recall specifically.
17  Q.  From who?
18  A.  I believe Logan Spence.
19  Q.  Did Logan Spence provide a bill analysis of
20  Senate Bill 14 in 2012?
21  A.  Not that I recall.  What I'm referring is, he
22  communicated to me on this bill, based on the request
23  from your office, to search our documents.  That's the
24  -- you asked a broad question, have I talked to my staff
25  about this bill, and that's what I recall.  I don't

## 55

1   recall anything beyond that.
2   Q.  So when would that have occurred then?
3   A.  I'm not sure of the exact date.  Whenever your
4   office made the first request.  I'm not sure when that
5   was.
6   Q.  What's Texas's current system for determining
7   how to verify the identity of a voter?
8   A.  Would you repeat that?
9   Q.  What is the Texas's current system for
10  determining how to verify the identity of a voter?
11  A.  I would have to look at the specific law.
12  Q.  So as we sit here today, you do not know Texas
13  state law regarding the verification of the identity of
14  a voter; is that correct?
15  A.  If you ask me specifically do I know the state
16  law word for word, sentence by sentence, I do not.
17  Q.  I'm not asking you if you know specifically
18  word by word, sentence by sentence.  Do you know the
19  current system for determining how to verify the
20  identity of a voter in Texas?
21        MR. SWEETEN:  Objection, asked and
22  answered.
23  A.  I do not know specifically line for line,
24  sentence by sentence, what that law is.
25  Q.  (By Mr. Fisher) Do you know generally Texas's

## 56

1   current system for determining how to identify a voter?
2   A.  Yes.
3   Q.  Okay.  What is it?
4   A.  They verify your address.
5   Q.  How do they do that?
6   A.  By some form of identification.
7   Q.  What type of identification?
8   A.  Something that would have your address.
9   Q.  Anything else?
10  A.  If someone doesn't have verification of the
11  address, they are still able to vote.
12  Q.  How do they do that?
13  A.  Simply vote.
14  Q.  So your testimony here today is that under
15  current state law, a voter has to verify their address
16  with something that has their address, but if they don't
17  have that, then they still vote.  Is that correct?
18  A.  No.  My testimony is, I don't state law
19  specifically.  You asked me the question generally.  I
20  answered the question in general.
21  Q.  So you don't know the requirements of Texas
22  State law concerning how to verify the identity of a
23  voter?
24  A.  I have already answered that question.
25  Q.  Do you believe that the system that Texas uses

## 57

1   to verify the identity of a voter prevents voter fraud?
2          MR. SWEETEN:  I'm going to interpose an
3   objection with respect to legislative privilege.
4          First of all, don't reveal thoughts,
5   mental impressions or opinions, or motivations about
6   legislation, including Senate Bill 14, and don't reveal
7   communications with legislators, legislative staff,
8   state agencies, the Texas Leg Council or constituents in
9   answering this question.  To the extent you can answer
10  the question based upon matters of the public record,
11  you can do so.
12         A.  I assert legislative privilege on that, I
13  believe.
14      Q.  (By Mr. Fisher) What is voter ID fraud?
15         MR. SWEETEN:  You can answer.
16      A.  Voter fraud would be someone who is not
17  eligible to vote or impersonating another person.
18  Voting multiple times.
19      Q.  (By Mr. Fisher) Do you believe this happens in
20  Texas?
21      A.  I assert legislative intent on what I believe.
22         MR. SWEETEN:  You can answer as to right
23  now, as you're sitting here, do you believe voter fraud
24  occurs in Texas.  But in answering the question, don't
25  reveal your thoughts or mental impressions about

## 58

1   legislation.  So you can answer as you are sitting here.
2       A.  Do I believe it occurs?  Yes.
3       Q.  (By Mr. Fisher) What do you believe occurs?
4          MR. SWEETEN:  The same instruction.  To
5   the extent you can answer without revealing your mental
6   impressions, thoughts, opinions, motivations about
7   legislation, or in furtherance of the legislative
8   process, you can answer.
9          THE WITNESS:  Can you repeat the question,
10  please?
11         MR. FISHER:  I'll strike the last
12  question.
13      Q.  (By Mr. Fisher) Just summarizing, you said
14  voter fraud is someone impersonating someone else or
15  voting multiple times.  Is there anything else?
16      A.  Or if they're not eligible to vote.
17      Q.  If not eligible to vote.
18      A.  If they're not a registered voter.
19      Q.  And do you know of any specific instances of
20  any of these types of voter fraud that you've
21  identified:  Someone impersonating someone else, someone
22  voting multiple times, or someone voting who is not
23  eligible to vote happening in Texas?
24      A.  I don't have a -- I don't have specific
25  knowledge.

## 59

1       Q.  Do you have any general knowledge about that?
2          MR. SWEETEN:  Senator Patrick, with
3   respect to the matter of legislative privilege, don't
4   reveal in your answer your thoughts, your mental
5   impressions, your motivations about legislation.  To the
6   extent you can answer the question without doing so,
7   with respect to referring to the matters of the public
8   record, you can.
9       A.  Say that again.
10      Q.  (By Mr. Fisher) Do you have any general
11  knowledge about someone impersonating another voter
12  someone voting multiple times, or someone who is not
13  eligible to vote, voting in Texas?
14         MR. SWEETEN:  The same instruction.
15      A.  That would be legislative privilege on what I
16  believe is the -- on general knowledge.
17      Q.  (By Mr. Fisher) Have you heard of any
18  allegations of someone doing any of those types of
19  things?
20         MR. SWEETEN:  Again, you can answer to the
21  extent that you're not revealing your thoughts, mental
22  impressions, opinions, or motivations about legislation,
23  or communications that you had with legislators or staff
24  members, any other.
25      A.  Repeat the question.

## 60

1          MR. FISHER:  Can you repeat the question?
2          (The requested portion read back by the
3   court reporter.)
4       A.  I assert my general -- I mean, my legislative
5   privilege.
6       Q.  (By Mr. Fisher) So you assert your legislative
7   privilege over whether you've heard allegations about
8   someone impersonating another voter, someone voting
9   multiple times, or someone voting who is not eligible to
10  vote; is that correct?
11      A.  Yes.
12      Q.  Are you aware of any complaints regarding
13  someone impersonating another voter, someone voting
14  multiple times, or someone who is not eligible to vote,
15  voting in Texas, to your office?
16         MR. SWEETEN:  The same objection.  The
17  same instruction.
18      A.  I assert my legislative privilege.
19      Q.  (By Mr. Fisher) Are you aware of any
20  convictions in the state of Texas for any of those three
21  types of activities?
22         MR. SWEETEN:  The same instruction.  If
23  you can answer based upon the public record --
24      A.  Yeah, I believe -- I believe there is -- I
25  believe there is public record that I have read that

## 61

1 there have been convictions.
2   Q.  (By Mr. Fisher) Are you aware of any of the
3 specifics of those convictions?
4   A.  I am not.
5   Q.  Do you believe that Texas's current system has
6 prevented voter fraud, as you have defined it here today
7 in your testimony?
8   MR. SWEETEN:  I'm going to again instruct
9 you:  With respect to the legislative privilege, do not
10 reveal thoughts, mental impressions, opinions,
11 motivation about legislation or in furtherance of the
12 legislative process, nor conversations with legislators,
13 the Leg staff, state agencies, Texas Leg Council, or
14 constituents.  You can answer the question to the extent
15 you are not revealing that information.
16   A.  Yeah.  I assert the privilege legislative
17 privilege on that.
18   Q.  (By Mr. Fisher) So you assert legislative
19 privilege over whether Texas's current system for
20 identifying a voter has prevented voter fraud, as you
21 have defined it today in your testimony; is that
22 correct?
23   A.  Yes.
24   Q.  When did you first hear about any support for
25 enacting a voter identification requirement in Texas?

## 62

1   MR. SWEETEN:  Same instruction.
2   A.  Yeah.  I assert legislative privilege.
3   MR. SWEETEN:  You can refer to matters of
4 the public record or matters that are not part of that.
5   A.  I don't recall anything on the public record,
6 so I just don't recall whenever I first read something
7 or saw something on that.
8   Q.  (By Mr. Fisher) Do you remember hearing
9 anything in the public about enacting voter -- photo
10 voter identification in Texas?
11   MR. SWEETEN:  You can answer.
12   A.  Yeah.  I'm sure I have.
13   Q.  (By Mr. Fisher) And what were the circumstances
14 of that?
15   A.  I don't recall.
16   MR. FISHER:  We're at a good stopping
17 point.  Let's take ten minutes.  I've got one o'clock.
18   (Recess from 1:00 p.m. to 1:16 p.m.)
19   Q.  (By Mr. Fisher) Okay.  Senator Patrick, do you
20 recall voter ID legislation in 2009 in the Senate?
21   MR. SWEETEN:  You may answer that
22 question.
23   A.  Yeah, you know, I recall it but, you know,
24 vaguely.  I do recall it.
25   Q.  (By Mr. Fisher) I'm going to hand you what's

## 63

1 been marked previously as Exhibit 29.  Okay.  Does this
2 document look familiar to you?
3   A.  Yeah.  I mean, it's -- it's legislation that
4 I've seen before, yeah.
5   Q.  Okay.  So this is a nine page document with a
6 notation, SB Number 362 in the upper right-hand corner.
7   A.  Okay.
8   Q.  Does this -- is this the bill concerning voter
9 ID that was introduced in 2009 in the Senate?
10   A.  It appears to be.
11   Q.  When did you first hear about SB 362?
12   A.  Boy, I don't remember.
13   Q.  Were you involved in the development of SB 362?
14   A.  I don't think so.
15   Q.  Were you the co-sponsor of SB 362?
16   A.  I'd have to check the record.  I would assume I
17 was but I'd have to check the record.
18   Q.  Were you a co-author of SB 362?
19   A.  It would have -- if I was one of the two, it
20 would be an author.  Because if it's a Senate bill that
21 originates, you're an author; if it's a House bill that
22 originates, you're a sponsor.  You can't be both.  So if
23 I was one, I would have been a co-author.  I'd have to
24 check the record.
25   Q.  Were you involved in developing the language in

## 64

1 SB 362?
2   A.  I don't believe I was.  I don't recall.
3   Q.  So you don't believe you participated in the
4 development of any of the language in SB 362?
5   A.  It's possible I could have, so I can't say with
6 certainty that I did not, but I don't believe I was
7 involved in it.
8   Q.  When SB 362 was being considered by the Senate
9 did you have any communications with other legislators
10 about it?
11   MR. SWEETEN:  You can answer as to whether
12 or not you had communications.  Don't reveal the
13 substance of those however.
14   A.  I -- I'm sure I did.  I mean, I'm sure there
15 were --
16   Q.  (By Mr. Fisher) Do you remember any of those
17 conversations?
18   A.  I don't.
19   Q.  Did you have communications with any of the
20 staff of other legislators during the time that SB 362
21 was being considered by the Senate?
22   MR. SWEETEN:  Same instruction.
23   A.  I don't think so.  Could have, but I don't
24 think so.
25   Q.  (By Mr. Fisher) Did you have communications

## 65

1  with officials or legislators from any other states
2  about SB 362 when the Texas Senate was considering the
3  bill?
4      A.  I don't think so.
5      Q.  You don't think so, meaning you did or you
6  didn't?
7      A.  I don't believe I did.  With certainty could I
8  say I didn't, but I don't believe.  I don't remember
9  anything specific.
10      Q.  Any communications with anyone in Georgia?
11      A.  I don't recall that.
12      Q.  Any communications with anyone in Indiana?
13      A.  I feel certain the answer is no.
14      Q.  Any communications with interest groups?
15      A.  Do you want to define that?  Or is that just a
16  broad spectrum of -- there are all kind of groups.
17      Q.  To the extent you can answer, answer the
18  questions, please.
19          MR. SWEETEN:  And you can answer the
20  question so the extent you understand it.
21          THE WITNESS:  Yeah.
22          MR. SWEETEN:  But don't reveal the
23  substance of communication.  He's simply asking were
24  there communications.
25          THE WITNESS:  Yeah.

## 66

1          MR. SWEETEN:  You can answer that.
2      A.  It's -- it's possible I could have talked to a
3  group, but I don't -- I don't recall anything
4  specifically.  But like I say, with certainty, that I
5  didn't ever have a conversation with someone.
6      Q.  (By Mr. Fisher) Did you have any communications
7  with groups representing minority voters?
8      A.  Again, I can't recall specifically any
9  communication with any group.  Could have happened but I
10  don't recall it.
11      Q.  Do you remember SB 362?
12      A.  Not -- not specifically.  You know, I mean, not
13  clearly.
14      Q.  So the matters that SB 362 addresses, meaning
15  voter ID are not that important to you; is that
16  correct?
17          MR. SWEETEN:  Objection,
18  argumentative.  Also you're asking him to reveal
19  thoughts, mental impressions, opinions, motivations
20  about legislation.  As to whether or not it's important
21  to him is a -- is a question that would clearly impact
22  that.  So I'm not going to -- I'm going you instruct him
23  not to answer the question based on legislative
24  privilege.
25      A.  Yeah, I assert legislative privilege.

## 67

1      Q.  (By Mr. Fisher) Are you asserting legislative
2  privilege on the advice of your counsel with regard to
3  that last question?
4          THE WITNESS:  I can?
5          MR. SWEETEN:  Yeah.
6      A.  I assert legislative privilege on the -- on the
7  question that you asked.
8      Q.  (By Mr. Fisher) Is voter ID an issue you that
9  consider important?
10          MR. SWEETEN:  Same objection.  Same
11  instruction.
12              Don't answer the question.  Legislative
13  privilege.
14      A.  I assert legislative privilege.
15      Q.  So you assert legislative privilege over
16  whether you consider voter ID to be an important issue?
17          MR. SWEETEN:  Your question asks that he
18  reveal his thoughts, mental impressions, opinions,
19  motivation about legislation regarding SB 362 or in
20  furtherance of the legislative process.  As such, it
21  is -- it is --he's asking for matters that are clearly
22  afforded privilege under the legislative privilege.
23      Q.  (By Mr. Fisher) Senator, you're asserting
24  legislative privilege over that question?
25      A.  Yes.

## 68

1      Q.  Is that on the advice of your counsel?
2      A.  Yes.  And I believe that's appropriate for me
3  to do.
4      Q.  SB 362 aside, is voter ID an important issue
5  for you as a Texas State Senator?
6          MR. SWEETEN:  Okay.  As you are sitting
7  here today, you can answer just that question as you're
8  sitting here today; but don't reveal matters of
9  privilege
10      A.  Okay.  Repeat the question.  Sorry, I don't
11  mean to -- but just -- I want to be sure I get this
12  right.
13          MR. FISHER:  Can you repeat the question,
14  please.  Thank you.
15      (The requested portion was read by the court
16  reporter.)
17      A.  Yes.
18      Q.  (By Mr. Fisher) SB 362 was considered in 2009;
19  is that correct?
20      A.  Yes.
21      Q.  And the subject matter of SB 362 was voter ID;
22  is that correct?
23      A.  Yes.
24      Q.  And as you sit here today, you testified that
25  voter ID is an important issue to you; is that correct?

## 69

1    A.  Yes.
2    Q.  But you've also stated, as you sit here today,
3  that you can't recall any the specifics about SB 362; is
4  that correct?
5    A.  Consider -- considering that was about 3,000
6  bills ago, yes, I can't recall the specifics of it.
7    Q.  As you sit here today, how many issues do you
8  consider to be important to you as a Texas State
9  Senator?
10         MR. SWEETEN:  Objection, vague.
11         You can answer.
12    Q.  Do you want to define that?
13    Q.  (By Mr. Fisher) Is it less than 3,000?
14    A.  Yes.
15    Q.  Roughly, how many?
16    A.  There are dozens of issues that are important
17  to me.
18    Q.  Do you take a particular interest in the bills
19  that address issues that are important to you?
20    A.  It depends on the level, you know.  What is the
21  -- when you say take an interest, obviously you take an
22  interest.  You try to take an interest in
23  everything.  But there's -- there's only so much time
24  you can spend on any one issue.  There are limitations,
25  so...

## 70

1    Q.  So you said you try to take an interest in
2  everything.  Do you take an interest in things that are
3  your legislative priorities more so than other things?
4    A.  I -- take an interest in legislative
5  priorities, first, that -- that I write.  I didn't write
6  this bill.
7    Q.  You testified earlier you were not sure if you
8  authored this bill.  Is that still your testimony now?
9    A.  I think, you have to check the record.  I think
10  you asked if I co-authored.  I definitely didn't author
11  the bill.  I think your question was did I co-sponsor or
12  co-author and I clarified difference.  I'd have to check
13  the record.  I believe I co-authored it but I'd have to
14  check the record.  But I didn't author it.  I didn't
15  write it.
16    Q.  Did you support SB 362?
17    A.  Yes.
18    Q.  Did you vote for SB 362?
19         MR. SWEETEN:  You can answer.
20    A.  Yes.
21    Q.  (By Mr. Fisher) Did you have communications
22  with anyone about the forms of ID that were included in
23  SB 362?
24         MR. SWEETEN:  You can answer the question
25  as phrased.  Don't reveal the substance of the

## 71

1  communication, just the general subject matter.  Go
2  ahead.
3    A.  Yeah, I don't -- I don't recall, specifically,
4  going back three years ago.
5    Q.  (By Mr. Fisher) But it is your testimony that
6  voter identification is a priority issue for you as a
7  Texas State Senator as you sit here today; is that
8  correct?
9    A.  Yes.
10    Q.  And you don't remember if you had
11  communications with anyone about the forms of
12  identification included in the voter identification bill
13  in 2009; is that correct?
14         MR. SWEETEN:  Objection asked and
15  answered.  Objection, argumentative.
16         Go ahead.  You can answer.
17    A.  Yeah, I honestly can't recall the specific
18  conversations.  That's three years ago, about one of
19  hundreds of thousands of bills that we look at.
20    Q.  (By Mr. Fisher) Did you analyze or direct
21  anyone to analyze which registered voters did not
22  possess one of the required forms of identification
23  identified in SB 362?
24         MR. SWEETEN:  Do not answer the question.
25  He's asking matters that are protected by the

## 72

1  legislative privilege.
2    A.  I assert legislative privilege.
3    Q.  (By Mr. Fisher) Are you asserting legislative
4  privilege on the advice of your counsel with regard to
5  that question?
6    A.  Yes.
7    Q.  Did you read any research or analysis of voter
8  ID to assist you in your determination about whether to
9  support SB 362 or not?
10         MR. SWEETEN:  Okay.  Do not reveal
11  thoughts, mental impressions, opinions or motivations
12  about legislation or in furtherance of legislative
13  process.  His question clearly would, and I instruct you
14  not to the answer based on legislative privilege.
15    A.  I assert legislative privilege.
16    Q.  (By Mr. Fisher) Did you make a decision whether
17  to support or not support SB 362 at some point?
18    A.  Did I make a decision?  Yes.
19    Q.  Prior to making that decision, what did you
20  think was important to guide your determination --
21         MR. SWEETEN:  Do not answer --
22    Q.  (By Mr. Fisher) -- about whether to support or
23  not support SB 362?
24         MR. SWEETEN:  Objection, legislative
25  privilege.

## 73

1    Instruct you not to answer.
2    A.   Yeah, I assert legislative privilege.
3    Q.   (By Mr. Fisher) Did you conduct or instruct
4    anyone to conduct an analysis of the impact of SB 362 or
5    minority voters?
6        MR. SWEETEN:  Objection, calls for matters
7    subject to legislative privilege.
8        Instruct not to answer.
9    A.   I assert legislative privilege.
10   Q.   (By Mr. Fisher) Are you asserting legislative
11   privilege on the advice of your counsel with regard to
12   that question?
13   A.   Correct.
14   Q.   We discussed Section 5 of the Voting Rights Act
15   earlier.  If SB 362 had passed, would it have been
16   subject to the requirements of Section 5 of the Voting
17   Rights Act?
18   A.   I can't answer that specifically.
19   Q.   So you don't know if a bill like SB 362
20   concerning voter ID would be covered by Section 5 of the
21   Voting Rights Act; is that correct?
22       MR. SWEETEN:  Objection, vague.
23       Go ahead.  You can answer that question.
24   A.   Yeah, I assert legislative privilege on what I
25   thought at the time.

## 74

1    Q.   (By Mr. Fisher) Do bills concerning voter ID
2    identification remain subject to the requirements of
3    Section 5 of the Voting Rights Act today?
4        MR. SWEETEN:  Can you read that back.  I
5    missed first part.
6    A.   Yeah, I missed that too a little bit.
7        (The requested portion was read by the
8    court reporter.)
9        MR. SWEETEN:  Objection, asked and
10   answered.
11       I'm going to let you answer the question.
12   A.   Yeah, I'm a little unclear on that question if
13   you want to maybe rephrase it, take another shot at it.
14   I'm not sure I really understand that question.
15   Q.   (By Mr. Fisher) Are voter ID bills covered by
16   Section 5?
17   A.   Are voter IDs?  I could not give the legal
18   answer on that.
19   Q.   Can you give me a non-legal answer on that?
20   A.   I would assert privilege on what I think about
21   that issue.
22   Q.   So you're asserting legislative privilege over
23   whether voter identification bills are covered by
24   Section 5 of the Voting Rights Act, is that correct, as
25   you sit here today?

## 75

1        MR. SWEETEN:  Well, hold on a minute.  As
2    you're sitting here today, you can answer his question
3    as to whether or not voter ID bills are covered by that
4    as far as you know, but don't reveal matters of your
5    thought process as you were working on these -- this
6    legislation.
7    A.   I mean, I believe -- I believe they are.
8    Q.   (By Mr. Fisher) So if SB 362 had been passed,
9    would it have been subject to the requirements of
10   Section 5?
11       MR. SWEETEN:  I think that's been asked
12   and answered, but go ahead.
13   A.   I mean, I believe that it would have been.
14   Q.   (By Mr. Fisher) All right.  So we'll turn your
15   attention to the Exhibit SB 362 which you have in front of
16   you.
17   A.   Okay.
18   Q.   It's a nine -- as I mentioned, nine-page
19   document with notation SB 362 in the upper right-hand
20   corner.  And I'd like to turn your attention to, if
21   you'll look at the bottom, there are page numbers, Page
22   3 of the exhibit.
23   A.   All right.
24   Q.   And that's Section 6, Section 63.001.
25       MR. SWEETEN:  Spencer, right here.  Are

## 76

1    you talking about Section 6?
2        MR. FISHER:  Correct.
3    A.   Page 3, Section 6, I have it.
4    Q.   (By Mr. Fisher) So please take a look at that.
5        MR. SWEETEN:  Caution the witness to
6    review the document.
7    A.   Okay.  I read it.
8    Q.   (By Mr. Fisher) What forms of identification
9    would have been allowed under SB 362?
10   A.   I do not recall.
11   Q.   Considering the document that's in front of you
12   identifying what forms of identification are permitted
13   under SB 362, does that change your answer?
14   A.   Can you show me where that is?
15   Q.   Section 6 -- 63.001 B, "On
16   offering to vote, a voter must present to an election
17   officer at the polling place either:  1, One form of
18   identification listed in Section 63.0101 A; or 2, two
19   different forms of identification listed in Section
20   63.001 B."
21   A.   I -- I don't see the list.  What am I missing?
22   Q.   Well, Senator, it seems that the forms of
23   identification are incorporated by reference by this
24   section.  Does that seem correct to you?
25       MR. SWEETEN:  You can answer based on the

## 77

1   text of the bill that's in front of you.
2        A.   You're -- I don't see the forms listed in here
3   unless I'm looking at something different.
4        Q.   (By Mr. Fisher) Senator, when bills lay out
5   lists of things required, do they often incorporate --
6   are they incorporated by reference in other parts of the
7   bill?
8        A.   Yes.
9        Q.   Okay.  In the piece of the bill that you're
10  looking at here, does it seem to reference other
11  sections of the bill that do lay out the forms of
12  identification that are allowed?
13            MR. SWEETEN:  Read it carefully.
14       A.   Yes, listed in 63.0101.
15       Q.   (By Mr. Fisher) Okay.  So turning to Page 5.
16       A.   Okay.
17       Q.   63.0101 A.
18       A.   Okay.
19       Q.   The following documentation is an acceptable
20  form of photo identification under this chapter.  Would
21  you please read --
22       A.   Sure.
23       Q.   -- the sections after that.
24       A.   Sure.
25       Q.   And that would be 1, 2, 3, 4 --

## 78

1        A.   Okay.  I'm sorry, I was confused --
2        Q.   -- 5 and 6.
3        A.   -- on there.  Okay.
4        Q.   So what forms of identification would have been
5   allowed under SB 362?
6        A.   As I'm reading the legislation:  A driver's
7   license or a public identification card issued by the
8   Department of Public Safety, a certificate that contains
9   the person's photograph of citizenship, a concealed-
10  carry license, a person's photograph on a valid ID by an
11  agency or institution of the federal government, agency
12  institution or political subdivision of the state, also
13  a voter registration certificate or an official mail
14  address to the person, the birth certificate,
15  citizenship, court records on adoption, identification
16  card issued by a person of government entity, a
17  temporary driving permit, a pilot's license, a library
18  card, a hunting and fishing license.  I'm reading this
19  quickly but it would appear.
20       Q.   Okay.  And if we can reference the section I
21  showed you first, I think you'll see that one form of
22  identification under Section A is permitted, or two
23  forms of identification under Section B are permitted;
24  is that correct?
25       A.   Correct.

## 79

1        Q.   While SB 362 was being considered by the
2   Senate, did you consider proposing any additional forms
3   of identification, either to Section A or Section B,
4   photo or non-photo, identification?
5             MR. SWEETEN:  Objection, based on
6   legislative.
7             I would ask -- it would require you to
8   reveal thoughts, mental impressions, opinions,
9   motivations about legislation or in furtherance of the
10  legislative process of which that's legislative
11  privilege.  You can refer to matters of the public
12  record to answer.
13       A.   The public record that I offered, you can ask
14  me if I can answer, but I don't recall.
15       Q.   (By Mr. Fisher) What was the purpose of SB 362?
16            MR. SWEETEN:  You can answer as to the
17  general purpose, and in that regard I'm going to pull
18  out the Court Order.
19            The Court has ordered that the privilege
20  does not protect testimony with respect to the general
21  purpose or the purpose of a legislature as a whole in
22  enacting Senate Bill 14 as opposed to the subjective
23  intent.
24            So you can testify as to, to the extent
25  you know, as to the general purpose of the enactment of

## 80

1   the legislation.
2        A.   The purpose of the legislation was to protect
3   the integrity of the ballot box.
4        Q.   (By Mr. Fisher) And what does it mean to
5   protect the integrity of the ballot box?
6        A.   That people who vote are who they say they are,
7   and are registered, legal voters.
8        Q.   In 2009, was there people -- was there a
9   particular problem with people voting who were not who
10  they said they were or not legally registered voters?
11            MR. SWEETEN:  To the extent this question
12  asks you to reveal your thoughts, your mental
13  impressions, your opinions, motivation about legislation
14  or in furtherance of the legislative process or
15  communications that we've outlined previously, don't
16  reveal that information.
17       A.   I would assert legislative privilege.
18       Q.   (By Mr. Fisher) Are you asserting legislative
19  privilege over that question on the advice of your
20  counsel?
21       A.   Yes.  Yes, I am.
22       Q.   Are you aware of any public debate about
23  whether, in 2009, there was a particular problem with
24  voters voting who were not who they said they were, or
25  voters voting who were not legally eligible to vote?

DAN PATRICK                                                May 30, 2012

## 81

1      MR. SWEETEN:  You can answer the question
2   as phrased.
3      A.  Yeah, there was debate on the Senate Floor.
4   So, yes.
5      Q.  (By Mr. Fisher) How does the language of SB 362
6   prevent voters voting who are not who they say they are
7   or not eligible, legally eligible to vote?
8         MR. SWEETEN:  Objection.  The question
9   calls for you reveal matters subject to the legislative
10  privilege and require you to reveal your thoughts,
11  mental impressions, opinions and motivation about
12  legislation; therefore, I instruct you not to answer the
13  question.
14     A.  I assert legislative privilege.
15     Q.  (By Mr. Fisher) As you're looking at the
16  language -- as you're sitting here today looking at the
17  language of this bill sitting before you --
18     A.  Uh-huh.
19     Q.  -- how does the language of this bill remedy
20  the two problems you've just identified, that being,
21  voters voting who are not who they say they are, and
22  voters voting who are not legally eligible to vote?
23        MR. SWEETEN:  I think you're asking him to
24  reveal his thoughts, mental impressions, opinions about
25  legislation; therefore, I think that's a matter of

## 82

1   legislative privilege.
2      A.  I assert legislative privilege.
3      Q.  (By Mr. Fisher) Are you asserting legislative
4   privilege on the advice of your counsel in response to
5   that question?
6      A.  I'm asserting it on what I believe are my
7   rights.
8      Q.  Has your counsel advised you not to answer that
9   question based on legislative privilege?
10        MR. SWEETEN:  The record reflects what my
11  advice was, so.
12     A.  Yeah, I didn't hear him say that in that
13  particular question.  I didn't hear him advise me not to
14  answer that question.
15     Q.  (By Mr. Fisher) Is there any evidence in 2009
16  that the particular problems you've identified existed?
17        MR. SWEETEN:  To the extent that question
18  would require you to reveal your thoughts, your mental
19  impressions, opinions or motivation about legislation,
20  that matter would be legislatively privileged;
21  therefore, I object based upon that, and instruct you
22  not to answer on that basis.  In the event that you --
23  there are matters that you can testify that do not
24  invade the privilege, you can do so, on matters of
25  public record.

## 83

1      A.  I'm not aware of anything on the public record
2   and I would assert legislative on anything that's not.
3      Q.  (By Mr. Fisher) Did anyone contact your office
4   to alert you of evidence of any of the problems that
5   you've identified that would have been remedied by SB
6   362?
7         MR. SWEETEN:  I'm going to object.  I
8   think that if you're asking whether or not he had
9   communications, I'm going freely allow him to answer
10  that question.  But what you have -- the way you've
11  prefaced that question, I think you're asking a
12  specific -- more than a general subject matter
13  description of the conversation, so I would object to
14  that question.
15        However, Spencer, I will work with you.
16  If you want to ask, you know, questions of, you know,
17  that where it's not as loaded with the subject matter,
18  you're free to ask Senator Patrick.
19     Q.  (By Mr. Fisher) Did anyone communicate with
20  your office -- first of all, are you asserting
21  legislative privilege in response to my last question?
22     A.  Yes.
23     Q.  Is that on the advice of your counsel?
24     A.  Yes.
25     Q.  Did anyone contact your office, communicate

## 84

1   with your office, regarding the issues concerning
2   protecting the integrity of the ballot box?
3         MR. SWEETEN:  I'll -- I'll let you answer
4   the question.  Just yes or no.
5      A.  Yeah.  I'm sure they did.  I don't know the
6   specifics, but...
7      Q.  (By Mr. Fisher) Do you know who contacted you?
8      A.  No.
9      Q.  Do you know when?
10     A.  No.
11     Q.  How would SB 362 have been more effective in
12  presenting -- preventing in-person voter fraud than the
13  current practice?
14        MR. SWEETEN:  Is that the end of the
15  question?
16        I'm going to instruct you, as legislative
17  privilege that will require you to reveal your thoughts,
18  your mental impressions, your opinions or motivations
19  about legislation; therefore, instruct you not to
20  answer.
21     A.  I assert legislative privilege on the advice of
22  my attorney.
23     Q.  (By Mr. Fisher) So as you sit here today
24  looking at the language of SB 362 which is sitting in
25  front of you, can you tell me how this language would be

85

1  more effective in preventing voter impersonation than
2  what is currently in practice in Texas?
3          MR. SWEETEN:  Same objection.  That calls
4  for you to reveal your mental impressions, opinions,
5  motivations about legislation.  It's a matter of
6  legislative privilege.
7      A.  I will assert legislative on advice of my
8  attorney.
9      Q.  (By Mr. Fisher) Who were the main proponents of
10  SB 362?
11          MR. SWEETEN:  You can -- you can answer
12  that question.
13      A.  Yeah, I believe Senator Fraser was the author.
14      Q.  (By Mr. Fisher) Did you speak to Senator Fraser
15  about the bill?
16      A.  I would assert legislative on that.
17      Q.  Did you have a communication with Senator
18  Fraser about SB 362 at any time?
19          MR. SWEETEN:  Hold -- hold on.  You can
20  answer whether a communication occurred, the means of
21  communication, the date.  You can answer that, just
22  don't reveal the substance of the communication.
23      A.  Yeah.  The only thing I recall, specifically,
24  would have been a conversation.  You know, we talked
25  about it.  I don't -- I don't recall anything beyond

86

1  that.  Could have happened, but I don't recall that.
2      Q.  (By Mr. Fisher) So you're not certain if you
3  had a conversation with Senator Fraser; is that correct?
4      A.  I'm certain I had a conversation with Senator
5  Fraser on the bill at some point.  I do not recall any
6  other communication.
7      Q.  Was there anyone else present during that
8  conversation?
9      A.  That, I -- I couldn't tell you.  It been three
10  and a half years ago.  I don't recall if someone was
11  standing there in the room or not.
12      Q.  Was SB 362 a priority for others in the Texas
13  government, aside from Senator Fraser?
14          MR. SWEETEN:  You can -- you can refer to
15  matters of the public record in answering this
16  question.  Don't reveal specific communications you've
17  had with any legislators, staff, or other groups.
18      A.  Yeah.  I think it would be fair to say on the
19  -- you know, on the public record, you know, various
20  officials have stated their -- their support of this
21  legislation.
22      Q.  (By Mr. Fisher) Various officials like you?
23      A.  I think the -- I think the Governor has been on
24  public record in support of it.
25      Q.  Did you have any communications with the

87

1  Governor about SB 362?
2      A.  Not that I recall.
3      Q.  Did you have any communications with
4  legislators who opposed SB 362?
5          MR. SWEETEN:  You can answer as phrased.
6      A.  Yeah, you know, I don't recall anything
7  specific about it but I'm sure, you know, there was a
8  conversation on the Floor at some point or...
9      Q.  (By Mr. Fisher) So you did have communications
10  with legislators who opposed SB 362 --
11      A.  I couldn't tell you specifics --
12      Q.  Let me -- let me finish my question before you
13  answer.
14          You did have communications with
15  legislators who opposed SB 362; is that correct?
16      A.  I do not recall a specific conversation, but
17  I'm sure a conversation probably took place.
18      Q.  Who were the main opponents to SB 362?
19      A.  Every Democrat in the Texas Senate.
20      Q.  Are you aware of why they opposed SB 362?
21          MR. SWEETEN:  You can answer the
22  question.  You can refer to matters of the public
23  record.  Don't reveal communications you've had with any
24  individual senators, legislative staff, State agencies,
25  Texas Legislative Council, constituents.

88

1      A.  Yeah, I would assert legislative privilege on
2  those conversations.  And I'm not aware of specifically
3  anything anyone said publicly.  I'm sure they have
4  spoken out against it, but I don't -- I don't know of
5  anything specifically.
6      Q.  (By Mr. Fisher) So just to summarize:  You're
7  not aware of why those who opposed, and as you mentioned
8  every Democrat in the Senate opposed SB 362, and you're
9  not aware of why they opposed it; is that correct?
10          MR. SWEETEN:  Objection to the extent that
11  it would it call for him to reveal communications with
12  legislators on legislative staff.
13          Once again, you can refer to matters on
14  the public record in answering that question.
15      A.  Yeah, I assert legislative privilege on the
16  personal conversation and I just don't recall specifics
17  about --
18      Q.  (By Mr. Fisher) Are you aware of any public
19  debate regarding that issue?
20          MR. SWEETEN:  You can answer.
21      A.  Yeah, I'm aware of public debate on the issue
22  but not specifics of it.
23      Q.  (By Mr. Fisher) Do you know how the minority
24  members of the Senate felt about SB 362?
25          MR. SWEETEN:  Don't reveal any

DAN PATRICK                                          May 30, 2012

## 89

1  communications you've had with legislators or
2  legislative staff in answering this question.  You can
3  reveal further matters of the public record in doing so.
4      A.  Yeah, on the record, based on their objection
5  on the Senate Floor, they were not supportive of the
6  bill.
7      Q.  (By Mr. Fisher) So you've stated that every
8  Democrat in the Texas Senate was opposed to SB 362.
9  You've stated that the minority members of the Texas
10 Senate were opposed to SB 362.  Why do you think there
11 was such strong opposition to SB 362?
12      MR. SWEETEN:  Don't reveal communications
13 you've had with those individuals.  You can further
14 answer to the public record.
15          Also, the question calls for speculation.
16      A.  Yeah, I -- yeah, I'm not going to speculate.
17      Q.  (By Mr. Fisher) Speculation's fine.  That's
18 what we're here for.
19      MR. SWEETEN:  No, we're not here for
20 speculation.
21      A.  I'm not going to speculate on why they would be
22 opposed to it.  I mean, I -- and I -- and I would assert
23 legislative privilege on any conversations we've had
24 about it.
25      Q.  (By Mr. Fisher) Do you place any significance

## 90

1  on the unified opposition of all the minority members in
2  the Senate to SB 362?
3      A.  Can you read that question back?  I don't know
4  that I heard the whole thing.
5      Q.  Do you place any significance on the unified
6  opposition of all minority members in the Senate to SB
7  362?
8      MR. SWEETEN:  Yeah, that would require you
9  to reveal your thoughts, mental impressions, opinions or
10 motivations about legislation, specifically here 362;
11 therefore, it calls for matters of -- also it could
12 reveal -- require you to reveal communication.  So I'm
13 going to instruct you not to answer on the basis of
14 legislative privilege.
15      A.  On the advice of counsel, I assert legislative
16 privilege.
17      Q.  (By Mr. Fisher) What was your role during the
18 Floor consideration of SB 362?
19      MR. SWEETEN:  Are you talking about his
20 public role?
21      MR. FISHER:  Yes.
22      MR. SWEETEN:  He can testify about his
23 public role.
24      A.  As best recall, it's been some time, I
25 believe we had 26 hours of testimony.  I believe my

## 91

1  public role -- and the record would reflect my public
2  role.  I believe it was limited to asking a question
3  potentially of a witness.  But I -- the record would
4  reflect whatever my public role was.  It was not
5  significant.
6      Q.  (By Mr. Fisher) During the Floor consideration
7  of SB 362, do you remember anyone raising concerns about
8  its impact on minority voters?
9      MR. SWEETEN:  You can answer.  It's about
10 the Floor consideration, public.
11      A.  Yes, I -- I don't recall the specifics, but I
12 think in general that would -- would have been the
13 objection.
14      Q.  (By Mr. Fisher) Do you remember -- what would
15 have been the objection?
16      A.  What you just said, that the objection on the
17 record on the Senate Floor was the concern by the
18 Democrats who opposed the bill, that it would impact
19 certain voters.  I don't remember the specifics but.
20      Q.  Minority voters; is that correct?
21      A.  Yeah, I -- I would -- the record would reflect
22 that, but I think that would probably be an accurate
23 statement that that's what the record would reflect --
24 would reflect.
25      Q.  What was your response to those concerns?

## 92

1      MR. SWEETEN:  If you're talking about his
2  public response on the Floor, he can answer that.  As
3  far as his response with respect to the legislation, he
4  -- that would be privileged, so.
5      A.  You'd have to check the record, but I -- again,
6  I think out of the 26 hours on the record, I -- I don't
7  think I participated more than maybe 10 minutes.  And I
8  think that was an answer to your question.  I stand to
9  be corrected if the record -- if the record reflects my
10 memory differently.  But I didn't have a role of any
11 significance whatsoever in the debate on the Floor.
12      Q.  (By Mr. Fisher) Did you have a reaction to
13 those concerns?
14      MR. SWEETEN:  Yeah, don't reveal your
15 thoughts, your mental impressions, your opinions or
16 motivations about legislation.
17      THE WITNESS:  Yeah.
18      MR. SWEETEN:  That's legislatively
19 privileged.
20      A.  Yeah, I would assert legislative privilege on
21 that.
22      Q.  (By Mr. Fisher) If you have unified opposition
23 of minority members of the Senate and Democratic members
24 of the Senate with regard to a bill, does that give you
25 any pause with regard to your support of that bill?

DAN PATRICK                                                    May 30, 2012

## 93

1    MR. SWEETEN:  Yeah, I think you're asking
2  him to reveal his mental impressions, his thoughts, his
3  opinions, or motivation about legislation and I think
4  that's subject to the legislative privilege.
5           Instruct you not to answer.
6    A.  Yeah, I assert legislative on the advice of
7  counsel.
8    Q.  (By Mr. Fisher) I'm going to hand you what will
9  be marked Exhibit 161.
10          (Exhibit 161 marked for identification.)
11   Q.  (By Mr. Fisher) So it's a three -- three-page
12  document titled "Transcript of Proceedings before the
13  Senate of the State of Texas, 81st Legislature,
14  Committee of the Whole."  And that's the first
15  page.  And this is an excerpted document, so you have
16  Pages 646 through 653.  The date on it is March 11,
17  2009; is that correct?
18   A.  Yes.
19   Q.  Do you recognize this document?
20   A.  I haven't seen this before but I recognize
21  documents similar to this transcript.
22   Q.  Do you remember the hearing that this document
23  memorialized?
24   A.  I do.
25   Q.  Okay.  If I could direct your attention to the

## 94

1  second page of the document, on Page 648, and you'll see
2  your name there.  And if you could read your response
3  contained there, please.
4    A.  Okay, let me read it.  I'm going to read it
5  from the top so I can see what led into this.
6    Q.  Oh, please.
7    A.  (Reading) How far do you want me to read?
8    Q.  Just page -- I just wanted to read after your
9  name on 648.  To extent you need more context, that's
10  fine.
11   A.  Yeah, I do.  I wanted to see what the context
12  was.  Okay.
13   Q.  Are you ready, Senator?
14   A.  No.  I'm just now reading my -- if you'd give
15  me a moment.  Okay, I haven't read it all, but I'm ready
16  to -- if you want to ask me something.
17   Q.  Do you remember making the statement, "Let me
18  -- excuse me, I didn't ask that question.  The question
19  was our last witness clearly indicated proof that people
20  voted on behalf of dead people.  So don't sit there and
21  say there's been no evidence."
22   A.  I didn't remember it until I read it here.  But
23  I think this accurately reflects my earlier testimony
24  that of 26 hours I was not much of a participant.  This
25  probably lasted about two minutes, so.  I didn't recall

## 95

1  it specifically but do I recall this -- I do recall this
2  witness.
3    Q.  Well, let me be clear, this isn't the entire
4  transcript of the hearing.  This is a portion of it --
5    A.  Right.
6    Q.  -- so this might not reflect all of your
7  participation in the hearing.  Understood?
8    A.  Yes.  I believe it does, but the record would
9  reflect that.
10   Q.  Did you have any additional evidence outside of
11  the context of this hearing that people voted on behalf
12  of dead people?
13          MR. SWEETEN:  Yeah, that would require him
14  to reveal his thoughts, mental impressions, opinions or
15  motivations about the legislation.  So a matter of
16  legislative privilege.
17   A.  Yeah, I -- I assert legislative privilege on
18  that.
19   Q.  (By Mr. Fisher) Okay, you're asserting
20  legislative privilege on the advice of your counsel with
21  regard to that question?
22          MR. SWEETEN:  You can refer to matters on
23  the public record, but don't reveal privileged matters.
24   A.  Yeah.
25   Q.  Had you done any studies or analysis of this

## 96

1  matter of people voting on behalf of dead people?
2          MR. SWEETEN:  Same objection.
3          Don't reveal your thoughts, mental
4  impressions, opinions or motivations about legislation
5  or communications that were outlined previously.  Those
6  are matters subjective to legislative privilege.
7    A.  Not that I recall.
8    Q.  (By Mr. Fisher) So your answer is not that you
9  recall --
10   A.  Yeah, I --
11   Q.  -- as far as studies and analysis of the
12  matter; is that correct?
13          MR. SWEETEN:  Well, my instruction is
14  don't reveal matters that are subject to the legislative
15  privilege.  You're thoughts, mental impressions,
16  opinions or motivations about legislation.  Okay?
17          THE WITNESS:  Yeah.
18   A.  Yeah, I do not recall doing a study on that
19  issue.
20   Q.  (By Mr. Fisher) Outside of the context of the
21  witness that you have mentioned here, in your testimony,
22  do you recall anything else in the public record of this
23  hearing supporting the fact that people voted on behalf
24  of dead people?
25          MR. SWEETEN:  He can answer because --

DAN PATRICK                                                          May 30, 2012

## 97

1    A.   Yeah, I don't -- I don't recall even who the
2   witness was before this that we were talking about, but
3   that's what I recall.  I mean, I'm looking at the
4   record.
5    Q.   (By Mr. Fisher) What you recall is this -- is
6   this one witness you referred to here; is that correct?
7    A.   Correct.
8    Q.   Do you recall anything beyond this one witness
9   that you referred to here?
10        MR. SWEETEN:  On the public record?
11        MR. FISHER:  Correct.
12        MR. SWEETEN:  Okay.  You can answer.
13    A.   Yeah, I don't.
14    Q.   (By Mr. Fisher) You do not?
15    A.   Nuh-uh.
16    Q.   Had you ever heard of any investigations for
17   this type of activity, that is, people voting on behalf
18   of dead people?
19        MR. SWEETEN:  Okay.  If the question would
20   ask you to reveal any communications you've had with
21   senators, legislative staff or other members, don't
22   reveal that.  Also don't reveal thoughts, mental
23   impressions, opinions or motivations about legislation
24   in answering the question.  You can refer to matters of
25   the public record.

## 98

1    A.   Yeah.  Your question was?  I'm sorry, I hate to
2   make you repeat it, but...
3    Q.   (By Mr. Fisher) Had you heard of any
4   investigations for this type of activity, that is,
5   people voting on behalf of dead people?
6        MR. SWEETEN:  Same instruction.
7    A.   Not that I recall.
8    Q.   (By Mr. Fisher) So you had not heard of any
9   public information regarding investigations into people
10   voting on behalf of dead people?
11    A.   Not that I recall.
12    Q.   Convictions for that type of activity?
13        MR. SWEETEN:  Object --
14    Q.   (By Mr. Fisher) And convictions are public
15   knowledge.
16        MR. SWEETEN:  Objection to the question.
17        Again, you can refer to matters of the
18   public record but don't reveal your thoughts, your
19   mental impressions about legislation or communications
20   you've had.  Those are subject to the privilege.
21    Q.   (By Mr. Fisher) Just to clarify, Senator, I
22   asked about convictions.  So a conviction would be
23   something that's part of the public record.
24        MR. SWEETEN:  Well, but you're asking him
25   did he consider convictions.  And that reveals his

## 99

1   mental impressions and opinions.  So, again, he can
2   testify as to what was on the public record, what was
3   stated.
4        But don't reveal your mental impressions
5   or thought process with respect to that.
6        THE WITNESS:  Right.
7    A.   And I did not hear you say "consider," so.
8    Q.   (By Mr. Fisher) That's because I didn't.
9        Senator, have you heard of any convictions
10   of this type of activity of people voting on behalf of
11   dead people?
12        MR. SWEETEN:  You can refer to matters of
13   the public record.
14    A.   Yeah, earlier I testified that I believed there
15   was something on the public record about conviction, but
16   I can't -- I think I also testified that I didn't know
17   exactly what that public record was.  So, I can't recall
18   specifically the issue that you just asked me about.
19    Q.   (By Mr. Fisher) So if we turn to Page -- and
20   this is the same exhibit that's been marked as 161.  If
21   we turn to Page 651, Senator, which is the third page of
22   this document.
23    A.   Yes, I see it, uh-huh.
24    Q.   And you'll see your name on Page 651 and I'd
25   like to read what's after your name there and then to

## 100

1   the extent that you need to read any more to provide you
2   context, then please -- please do that as well.
3    A.   (Reading)  Yes.  Okay, I've read it.
4    Q.   Okay.  So to the extent that your statement
5   "Oh, I can -- oh, I can assure you I meet with hundreds,
6   thousands, I talk with them, I know my district, I'm
7   very well connected to the people in my district.  And
8   the seniors of my district, who are members of the AARP
9   support this bill.  Thank you."
10        Did you speak to hundreds or
11   thousands of constituents about SB 362?
12        MR. SWEETEN:  If -- I think you're
13   misstating the -- the record.  So misstates the facts
14   and assumes facts not in evidence in the question.
15        You can reveal whether or not you had
16   communications with individuals.  Don't reveal the
17   substance of those if they're constituents.
18        THE WITNESS:  Right.
19    A.   Your question, do -- have I met with hundreds
20   or thousands?
21    Q.   (By Mr. Fisher) Let's start with thousands.
22   Did you meet with thousands of constituents in which the
23   issue of SB 362 came up?
24    A.   I think that would be a fairly accurate
25   statement because I'm involved in -- in a number of

DAN PATRICK                                        May 30, 2012

---

## 101

1   events.  I can't tell you when and where but, I mean,
2   events where large numbers of people show up and I
3   represent a district of a million people.  And I do lots
4   of speeches and talk to people.  And lots of times
5   there's two hundred in a group, and you do two of those
6   a week.  So I think that's an accurate statement that,
7   over time, I've met with hundreds of thousands --
8   hundreds -- not of thousands -- hundreds or thousands of
9   people over a period of time.  I think that's close to
10  accurate.
11       Q.  So if you could explain this statement further,
12  are you saying that these thousands that you've met with
13  express support for SB 362?
14       MR. SWEETEN:  You can reveal whether or
15  not you've had communications with constituents.  I'm
16  going to let you do that.  But to the extent he's asking
17  you to reveal your mental impressions, your thoughts, or
18  opinions about legislation, you know, don't do that or
19  -- or the specifics of communications that you've had
20  with individuals.  So do you understand the instruction?
21       THE WITNESS:  Yes.
22       MR. SWEETEN:  Okay.
23       THE WITNESS:  I hope so.
24       A.  I think I can answer this clearly.  That this
25  issue is strongly supported by the people that I

---

## 102

1   represent in Senate District 7, when I have met with
2   them.
3       Q.  And by "issue," you mean?
4       A.  Photo voter ID.
5       Q.  (By Mr. Fisher)  Photo voter ID, you said was an
6   issue that's strongly supported by the members of your
7   district in District 7.  Is that specific to SB 362 or
8   is that as a general matter?
9       MR. SWEETEN:  The question asks you
10  matters that are subject to the legislative privilege.
11  Because what he's asking you is to characterize whether
12  there's support for a specific bill.  You can testify as
13  to whether you had communications.  I've allowed that to
14  go on.  But I don't want you to testify as to general
15  support or your legislative thought process as you're
16  working a bill.  So you can answer to the extent you're
17  not, you know, discussing support.  You can talk about
18  whether you've had conversations with individuals.
19       That's how I believe that's subject to the
20  legislative privilege.
21       A.  I assert legislative on the specific bill in
22  terms of -- of what people have said.
23       Q.  (By Mr. Fisher)  But, Senator, right now we're
24  talking about a public statement with regard to SB 362;
25  is that correct?

---

## 103

1       A.  A public statement?  You're talking about this?
2       Q.  I'm talking about Exhibit 161 --
3       A.  Correct.
4       Q.  -- and your statement that I directed you to on
5   Page 651; is that right?
6       A.  Correct.
7       Q.  Okay.  And in this statement you say, "I meet
8   with hundreds, thousands, I talk with them, I know my
9   district, I'm very well connected to the people in my
10  district.  And the seniors of my district, who are
11  members of the AARP, support this bill.  Thank you." Is
12  that correct?  Did I read the language correctly?
13       A.  You're correct.
14       Q.  Did you speak with thousands of constituents
15  about SB 362?
16       MR. SWEETEN:  Objection, asked and
17  answered.
18       You can answer.
19       A.  Yeah, I did not speak to thousands,
20  specifically, on this bill.  I have spoken to hundreds
21  or thousands of my constituents over time.
22       Q.  And those hundreds and thousands support SB
23  362; is that correct?
24       A.  At the time when this bill was the legislation
25  to address the issue of photo voter ID, there was

---

## 104

1   support for that issue.  People don't know what a bill
2   number is.  People don't know specific legislation.  But
3   they support the issue.
4       Q.  Did you conduct a survey of the members in your
5   district on this matter?
6       MR. SWEETEN:  Objection.  I think that
7   calls for him to reveal his mental impressions,
8   opinions, motivation about legislation or in furtherance
9   of the legislative process.  And I think this matter is
10  legislative.
11       He can, again, let him discuss whether or
12  not he's had conversations, that's fine.
13       A.  Yeah.  There may or may not be a public
14  statement or question or poll.  I don't recall
15  specifically if I have done that or not.  Could be.  I
16  just -- I don't -- I don't know.  From time to time we
17  poll people, it's public record, but I can't tell you
18  what year and what question.
19       Q.  (By Mr. Fisher)  Do you have the records
20  regarding the communications you had with hundreds,
21  thousands of people in your district who support or
22  supported SB 362?
23       MR. SWEETEN:  You can answer as to whether
24  or not you have records.
25       A.  Yeah.  If we asked that question in a poll, we

DAN PATRICK                                          May 30, 2012

---

### 105

1    would have a record of that.
2        Q.  (By Mr. Fisher) Did you speak to any seniors
3    who did not support this bill?
4            MR. SWEETEN:  You can answer.
5        A.  Not that I recall.
6        Q.  (By Mr. Fisher) So you've spoken to hundreds
7    and thousands of people in your district and not one has
8    expressed a dissenting voice regarding this bill?
9            MR. SWEETEN:  Objection, the question is
10   not limited to time, scope.
11       A.  Yeah.
12       Q.  (By Mr. Fisher) When SB 362 was being
13   considered -- let me rephrase.
14       A.  And let me be clear when I say that I speak to
15   hundreds or thousands, that is not a personal one-on-one
16   conversation, that's a group presentation.  It may be
17   personal conversations but it's primarily speeches and
18   going to meetings and where you don't specifically talk
19   to every person.  So I do not recall.  I do not recall.
20   It could have happened.  I don't recall a person ever
21   coming to me and not being supportive of that.
22       Q.  When you meet with large groups of people,
23   meaning hundreds or thousand of people, how do you know
24   that they support what it is that you're discussing?
25       A.  They usually tell me, applaud, say they don't

### 106

1    support it.  I mean, it's like any other communication
2    in life when you speak to group, they usually indicate
3    their preference.
4        Q.  Is it fair to say in a large group setting like
5    that, you would be unsure if there was someone who
6    didn't support the bill sitting in the meeting?
7        A.  That's -- that would always be possible.
8        Q.  So is it fair to say that your statement on
9    Page 651 is either a mischaracterization or a -- it's a
10   -- is a mischaracterization of the facts?
11       A.  No, because I don't recall anyone that ever
12   being -- not supportive of it.  I don't recall that.
13       Q.  But you said that the support that you
14   described here is based upon meetings with large groups
15   of individuals; is that correct?
16       A.  Yes.
17       Q.  And the support that you've described here is
18   not based upon one-on-one meetings with hundreds and
19   thousands of your constituents; is that correct?
20           MR. SWEETEN:  That mischaracterizes his
21   testimony.
22           But go ahead.  You can answer it.
23           THE WITNESS:  How did it mischaracterize
24   my testimony?
25           MR. SWEETEN:  Well, you -- you go ahead

### 107

1    and answer to the extent.
2            MR. FISHER:  Yeah.
3            MR. SWEETEN:  That's just my objection to
4    the question.  I think it mischaracterizes what -- the
5    testimony.
6            But you go ahead and answer to the extent
7    you can answer.
8        A.  I meet with small/large groups of people that
9    total up hundreds or thousands.  During that period of
10   time, I do not recall.  It could have been, but I don't
11   recall any significant or any objection to this
12   legislation, I just don't recall it.
13       Q.  (By Mr. Fisher) But if you're meeting a large
14   group of people, how would that -- how would such an
15   objection be lodged?
16       A.  Someone would say they object.
17       Q.  Has that ever happened before?
18       A.  As I said, I don't recall anyone ever raising
19   their hand or coming up to me afterwards and saying,
20   "Senator, I don't support this bill."  I just don't
21   recall.
22       Q.  Has that happened in the context of other
23   bills?
24       A.  Oh, yes.  Yes.
25       Q.  So in this bill, you never did encounter

### 108

1    opposition during a large group meeting, but in other
2    contexts, you have; is that correct?
3        A.  Yes.
4        Q.  Did you speak specifically to any racial
5    minorities in your district with regard to SB 362?
6            MR. SWEETEN:  You can answer as to whether
7    you spoke with.
8        A.  Did I speak to the issue of racial minorities
9    or to racial minorities?
10       Q.  (By Mr. Fisher) Did you speak to racial
11   minorities in your district with regard to the issue of
12   SB 362?
13       A.  People are invited to our meeting, I don't -- I
14   don't look at the audience to see the makeup of the
15   audience, so I would assume, yes, and that's the best
16   way I can answer that question.
17       Q.  Is it fair to say, then, that you didn't
18   specifically seek out racial minorities to speak to
19   about the issue of the SB 362?
20           MR. SWEETEN:  You're asking about his
21   thought processes and his mental impressions and
22   opinions, motivations about legislation or in
23   furtherance of legislative processes to whether he
24   sought out someone.  So I think that that implicates
25   matters of legislative privilege.

DAN PATRICK                                    May 30, 2012

## 109

1   Q.   (By Mr. Fisher) Senator?
2   A.   I'm just -- I'm trying to think how to answer
3   your question.
4        MR. SWEETEN:  Yeah, I'm -- I'm going to
5   object to --
6   A.   Yeah, I -- I think I would assert privilege --
7        MR. SWEETEN:  -- and I instruct you not to
8   answer.
9   Q.   (By Mr. Fisher) Are you asserting on the basis
10  of advice from your counsel?
11  A.   Yes.
12       MR. SWEETEN:  And just to be clear:  He
13  will answer whether or not he's had specific -- and I
14  think he has had specific discussions with my minority
15  voters.  He can testify about whether communications
16  occurred, means, date.
17  Q.   (By Mr. Fisher) Did any of the seniors you
18  identified in your statement tell you they might not
19  have the kinds of identification required by SB 362?
20       MR. SWEETEN:  I'm sorry.  Can you -- can
21  you read the question back, please?
22       (Requested portion was read back by the
23  court reporter.)
24       MR. SWEETEN:  Yeah, I think you're asking
25  about specific conversations he had with constituents.

## 110

1   I think that is covered by the legislative privilege.
2        I instruct you not to answer to the
3   specifics.
4        If you want to ask about the general
5   subject matter which is something the Court has allowed,
6   I'll allow him to do that.
7   A.   I'll assert legislative privilege on the advice
8   of counsel.
9   Q.   (By Mr. Fisher) Did you have any general
10  conversations with seniors regarding the types of
11  identification required by SB 362?
12       MR. SWEETEN:  You can answer as phrased.
13  A.   I don't recall that I went down the list of
14  specific identification under the bill.  That I don't
15  recall.
16  Q.   (By Mr. Fisher) Would it surprise you if
17  seniors in your district did not have the identification
18  required by SB 362?
19       MR. SWEETEN:  You're now asking his -- to
20  reveal his thoughts, his mental impressions, his
21  opinions, motivation about legislation and the
22  legislative process.
23       Therefore, I'm going instruct you that
24  that is a matter covered by legislative privilege.
25  A.   Then I would assert legislative privilege.

## 111

1   Q.   (By Mr. Fisher) Did you have any meetings with
2   minority groups concerning SB 362?
3        MR. SWEETEN:  You can answer as phrased.
4   A.   I do not recall having any specific meetings on
5   Senate Bill 362 with any group.
6   Q.   (By Mr. Fisher) I'm going to hand you the next
7   exhibit which will be 162.
8        (Exhibit 162 marked for identification.)
9   Q.   (By Mr. Fisher) So this is a similar three-page
10  document, similar to the last one you looked at, titled
11  "Transcript of Proceedings before the State -- Senate of
12  the State of Texas, 81st Legislature, Committee of the
13  Whole Senate," and this is excerpted Pages 694 through
14  701.
15  A.   Okay.
16  Q.   So do you remember the portion of the hearing
17  that this -- that this document memorializes?
18  A.   This, I don't remember but I'll have to...
19  Q.   Okay.  I'll direct your attention to Page 697,
20  please.
21  A.   All right.
22  Q.   And you'll see that you have a response there,
23  where you start out by saying, "Thank you,
24  Mr. Chairman."
25  A.   Yes, I see that.

## 112

1   Q.   You see that?
2   A.   Uh-huh.
3   Q.   Okay.  Would you take a look at that for me.
4   A.   Yeah.  Let me read that.  (Reading.)  Yes, I
5   have read it.
6   Q.   (By Mr. Fisher) So at the time you were
7   considering SB 362, did you have any specific examples
8   of someone actually doing what you've described on Page
9   697?
10       MR. SWEETEN:  Okay.  Don't reveal your
11  thoughts, mental impressions, opinions or motivation
12  about legislation or the legislative process.  Don't
13  reveal communications you've had with legislators,
14  legislative staff, TLC, state agencies or constituents
15  in answering the question.  You can refer to matters of
16  the public record.
17  A.   Yeah, I don't -- I don't recall.
18  Q.   (By Mr. Fisher) Are you asserting legislative
19  privilege over that question, or you don't recall an
20  answer?  You don't recall an answer to the question?
21  A.   I don't -- I don't recall.  I mean, I'm
22  answering the question.  I -- I just don't recall.
23  Q.   So you don't recall any support for your
24  statement on Page 697; is that correct?
25       MR. SWEETEN:  Objection.

DAN PATRICK                                                        May 30, 2012

## 113

1    It calls for you to reveal matters subject
2    to the legislative privilege.  I instruct you only to
3    answer with respect to the matters of the public record.
4    A.   So I'll assert legislative privilege.  I
5    answered your question.
6    Q.   (By Mr. Fisher) Are you aware of any cases like
7    this ever happening in Texas, based on public
8    information?
9    MR. SWEETEN:  Same objection.
10    You can refer to matters of the public
11    record though.
12    A.   Yeah, I'll assert legislative privilege on
13    that.
14    Q.   (By Mr. Fisher) So you'll assert legislative
15    privilege over whether you're aware of any public
16    information that supports your statement on Page 697 of
17    this transcript; is that correct?
18    MR. SWEETEN:  Again, you know, with
19    respect to the legislative privilege, don't reveal
20    thoughts, mental impressions, your motivation about
21    legislation or the legislative process.  You can answer
22    with respect to matters that are on the public record.
23    A.   Yeah, I think you said public record the second
24    time.  I'm not so sure you said it in the question the
25    first time.  So if you want to just clarify.

## 114

1    MR. FISHER:  Can you read it back, please.
2    (The requested portion was read by the
3    court reporter.)
4    A.   Okay, I -- I did not recall you saying public
5    statement in your first question.  If you're asking me
6    do I recall anything that's a public statement, I don't
7    recall a public statement.
8    Q.   (By Mr. Fisher) Are you aware of any public
9    information that supports your statement on page 697?
10    MR. SWEETEN:  Same objection as to
11    legislative privilege.
12    Don't reveal matters subject to the
13    legislative privilege.  You can reveal matters that are
14    -- are within the public record.
15    A.   Yeah.  I don't recall -- I don't recall
16    anything on the public record.
17    Q.   (By Mr. Fisher) Are you aware of any
18    convictions for the type of activity that you described
19    on Page 697 of this transcript?
20    MR. SWEETEN:  Same instruction.
21    A.   Yeah, and I've answered this question before
22    that I'm aware, in general, that there's been a public
23    statement about convictions but I'm -- I'm not aware
24    specifically of what those convictions were for.
25    Q.   (By Mr. Fisher) So you mentioned in this

## 115

1    statement you say -- actually, let's move on.
2    Let's move on to Page 698.  If you could
3    take a look at your statement on Page 698.
4    A.   All right.
5    Q.   So your statement, "The last part of the
6    question, if you had registrations in the same precinct,
7    you could go back over a period of multiple days if you
8    are willing to take that risk and vote.  So a person
9    could vote more than once.  I mean, it's not an extreme
10    thought that someone could register under several
11    different names."
12    You mentioned taking a risk.  What would
13    that risk be?
14    MR. SWEETEN:  Wait a minute.  You're
15    asking -- are you reading still?  You mentioned taking a
16    risk, or is that a question?
17    MR. FISHER:  It's a quote from the
18    document.
19    MR. SWEETEN:  Okay.  He -- he can testify
20    about matters on the public record.  He's not going to
21    reveal, based upon the legislative privilege, his
22    thoughts or his mental impressions about this
23    legislation or his opinions about it or his motivation
24    about the legislation.  That's subject to the
25    legislative privilege.

## 116

1    I instruct you not to reveal that
2    information.  You can refer to matters of the public
3    record.
4    A.   I assert public privilege -- I mean,
5    legislative privilege.
6    Q.   (By Mr. Fisher) Legislative privilege over
7    that?
8    A.   Yeah.
9    Q.   So, on the public record, you say, "willing to
10    take that risk and vote."  And you assert legislative
11    privilege over what that risk is; is that correct?
12    MR. SWEETEN:  That's correct because he's
13    -- you're asking him more than what's on the public
14    record, to reveal his thoughts and mental impressions
15    about legislation.  So he can -- he'll answer as to
16    whether something occurred on the public record.  He can
17    refer to the public record.  But he's not going to
18    reveal his mental impressions or thoughts that came up
19    through the legislative process.  And you're asking him
20    to do that.
21    And I instruct not to answer based on
22    legislative privilege.
23    A.   At request of counsel, legislative -- I assert
24    legislative privilege.
25    Q.   (By Mr. Fisher) What does taking a risk mean to

## 117

1   you, Senator?
2          MR. SWEETEN:  Same objection as to -- in
3   the context of this statement or if you're asking him to
4   explain this statement.  That is my instruction, that
5   it's legislative privilege.
6          If you want to ask as a general matter, as
7   he's sitting here, not involved with this legislation,
8   what is taking a risk to him, I'll allow him to answer
9   that question.
10     A.   Taking a risk would be doing something illegal.
11     Q.   (By Mr. Fisher) Is there a criminal penalty for
12  the type of activity you describe on Page 698?
13     A.   I'm not aware if it's criminal or civil or what
14  the penalty is, but there is penalty to the best of my
15  knowledge, under the law.  I'd have to look at the law
16  of voting illegally.
17     Q.   So under the law as it currently stands, there
18  is a criminal or civil penalty for the type of activity
19  you've described on Page 697 and 698 of this transcript;
20  is that correct?
21     A.   I believe that to be true, but I'd have to look
22  at the law.
23     Q.   Did you receive any complaints concerning this
24  type of activity, the type of activity you've described
25  on Page 697 or 698?

## 118

1          MR. SWEETEN:  Don't reveal your
2   legislative --
3          THE WITNESS:  Yeah.
4          MR. SWEETEN:  -- processes or specific
5   subject matters of conversation.  You can -- you can
6   testify as to whether a communication occurred.
7      A.   Yeah, I -- I don't -- may have but I don't
8   recall.  I just don't recall.
9      Q.   (By Mr. Fisher) Anything from election
10  officials, local election officials in your district?
11         MR. SWEETEN:  You can reveal
12  communications.
13     A.   May have but I don't -- I don't recall.
14     Q.   (By Mr. Fisher) Anything from constituents in
15  your district?
16     A.   May have, but I don't recall.  I just don't
17  recall, but I may have.
18     Q.   You've mentioned some knowledge in the public
19  record about voter fraud in the State of Texas.  Are you
20  aware of any incidence of in-person voter fraud in the
21  state of Texas in the last twenty years based upon the
22  public record?
23         MR. SWEETEN:  You can answer as phrased.
24     A.   My -- my answer remains the same to that.  I
25  believe -- I believe that I have read in the news -- in

## 119

1   the news that there have been convictions of people who
2   have committed voter fraud, whether it's in the last
3   twenty years or not I cannot tell you the last date, but
4   I believe there have been convictions.
5      Q.   (By Mr. Fisher) But you're not aware --
6      A.   Yeah, I can't tell you, specifically, but I
7   believe I've read that, I believe.
8      Q.   Are you aware of any incidents of mail-in
9   ballot fraud that have occurred in the state of Texas in
10  the last twenty years?
11         MR. SWEETEN:  Don't reveal thoughts,
12  impressions, motivations about legislation or
13  communications you've had with any of the groups you've
14  outlined previously in answering this question.  You can
15  refer to matters the public record.
16     A.   Again, I want to go back the public record.  I
17  believe I've read that there have been convictions, but
18  I could not tell you what they're specifically for.
19     Q.   (By Mr. Fisher) And by "read," you mean reading
20  something in the newspaper or elsewhere?  What -- what
21  documents are you describing?
22     A.   I just -- I can't recall exactly but seems to
23  me I've read somewhere.
24     Q.   Any testimony in the public debate that you're
25  aware of?  Testimony in the Senate?

## 120

1      A.   I don't recall if that's -- that's where I
2   heard it or read it.  I just don't recall.
3          I'm going to get some ice and keep
4   talking.
5          MR. SWEETEN:  Go ahead.
6      Q.   (By Mr. Fisher) Senator, what was your role in
7   trying to get SB 362 passed?
8          MR. SWEETEN:  Yeah, I think the question
9   asks to him the reveal mental impressions, opinions,
10  motivations about legislation in furtherance of the
11  legislative process, as well as communications that he's
12  had with legislators or legislative staff and any other
13  groups and individuals.
14         You can refer to matters of the public
15  record.
16     A.   You know, my public record is that I voted in
17  favor of it.
18     Q.   (By Mr. Fisher) Did you have any role, once SB
19  362 was referred to the House, in ensuring it's passage?
20         MR. SWEETEN:  Same objection.  Calls for
21  matters of legislative privilege.
22         You can testify about matters of the
23  public record.
24     A.   Yeah.  I don't think there's any public record
25  of that.

DAN PATRICK                                          May 30, 2012

## 125

1    Q.  If you need to make a specific amendment to
2   your statements about reviewing and editing newsletters,
3   please let me know in the context of another newsletter.
4    A.  Okay.
5    Q.  So I direct your attention to the second page
6   of this document, and it says --
7    A.  Yes.
8    Q.  -- "Key Policy Initiatives for the 2011
9   Session."
10   A.  Yes.
11   Q.  And you'll notice that one of these is voter
12  ID.  If you could read that paragraph there, please?
13   A.  (Witness reading.)  Okay.  I've read it.
14   Q.  Okay.  And what does that paragraph describe?
15   A.  It describes the fact that Senate bill in 2009
16  which I'm -- I guess was Senate Bill 362, did not pass
17  in the House, as we looked earlier on the record when we
18  looked at the House record.
19        And then in 2011, we must take up the
20  fight for increased election integrity.  What it says
21  here.  And that this issue is supported by over 70
22  percent of Texans.  And that I will, you know, fight
23  just as hard to protect the integrity of our electoral
24  process in 2011.
25   Q.  Okay.  You're basically reading --

## 126

1    A.  Yes.
2    Q.  -- the document?
3    A.  Yes.
4    Q.  Is it fair to say that taking up the fight for
5   increased election integrity was a priority of yours in
6   the 2011 session?
7    A.  It was a priority for the people, and so
8   therefore, it was a priority of mine.
9    Q.  But so we have four items listed under "Key
10  Policy Initiatives for the 2011 Session."  We have
11  immigration, voter ID, sonogram and school finance
12  reform.  So is it fair to say that these four were the
13  key issues for you for the 2011 session?
14   A.  Yes.
15   Q.  You mention that you fought hard to pass the
16  voter identification bill out of the Senate, and as you
17  just stated, you are referring to SB 362 there in
18  2009.  And that ultimately it died in the House.  Was
19  that a disappointment for you?
20       MR. SWEETEN:  I think you're asking him to
21  reveal his mental impressions, opinions, motivation
22  about legislation.  He can answer as to what his -- with
23  respect to the statement in the public statement that
24  was made, but in answering questions, don't reveal your
25  thoughts about the legislation or legislative process.

## 127

1    A.  Yeah.  I would assert legislative privilege.
2   It reads clearly.
3    Q.  (By Mr. Fisher)  What did you want the folks
4   that you were circulating this newsletter to, to take
5   away from your discussion of voter ID in this paragraph?
6    A.  That this bill is important.
7    Q.  What bill, Senator?
8    A.  That the voter ID bill is important to them,
9   it's important to me, and I will try to pass it.
10   Q.  And by voter ID bill, are you referring to SB
11  362, Senator?
12   A.  Well, in the future, it would be a different --
13  it could take a different form.  It could be a Senate
14  bill.  It could be a House bill.  But that a bill that
15  would address the issue of photo ID would be an
16  important bill.
17   Q.  Senator Patrick, were you involved in the
18  development of SB 14 in the 2011 session?
19   A.  I was not.
20   Q.  You were not involved in the development of SB
21  14; is that correct?
22   A.  Correct.  Not -- let me -- not in any
23  substantial way whatsoever.
24   Q.  Were you the author of SB 14?
25   A.  I'd have to check the record if I was a -- I'd

## 128

1   have to check the record.  We have several
2   classifications, as I mentioned earlier, author, joint
3   author, coauthor, sponsor, cosponsor, so I'd have to
4   check the record.  I was either, I believe, either a
5   joint author or a coauthor.
6    Q.  Would it surprise you if you were the author of
7   SB 14?
8    A.  Yes.  That would surprise me.
9    Q.  Would it surprise you if you were a cosponsor
10  of SB 14?
11   A.  Yes.  Because I don't think that would be the
12  accurate description.
13   Q.  What does an author of a bill in the Senate do?
14   A.  The author of a bill is generally recognized as
15  the -- is the primary person behind the legislation who
16  writes the legislation, who -- who shepherds the
17  legislation through the process, who files -- the author
18  is usually the person who files the bill.
19       Some bills have one author.  Some bills
20  have -- it's usually joint authors.  I'd have to check
21  the rules.  I don't think you can have two authors on a
22  bill.  I think there's one author and joint authors.
23  That's why I would be surprised because it's Troy
24  Fraser's bill.  But I may have been a joint author or
25  coauthor.

DAN PATRICK                                                    May 30, 2012

---

### 129

1    Q.   So your testimony is that you might have been a
2  joint author or a coauthor of SB 14; is that correct?
3    A.   I believe I was one of the two, but I'd have to
4  check the record.
5    Q.   Didn't you just say that it would surprise you
6  if you were an author of SB 14; is that correct?
7    A.   I interpreted your question directly as the
8  author.  You didn't ask me if it would surprise me if I
9  was a joint author or coauthor, but you asked me if I
10 would be surprised if I was an author.  And I would be
11 surprised if I were just an author.
12    Q.   I'm going to hand you what's been marked
13 previously as Exhibit 8.  And I'm going to hand that to
14 you now.
15    A.   Sure.
16    Q.   If you could take a look at the designations
17 here.  So in the upper left-hand corner, we have "Texas
18 Legislature Online History, Bill SB 14, Legislative
19 Session 82-R."  And Senator, if you would look at
20 author, is your name listed there as an author of SB 14?
21    A.   It is.  I think this is incorrect.  I could be
22 wrong.  There may have been a special exception for this
23 that I don't recall allowing everyone to be an
24 author.  But normally, you would have an author and
25 everyone else would be a coauthor.  But I could be

---

### 130

1  wrong.  If the record reflects that everyone was listed
2  as an author, I did not recall that.
3    Q.   Senator, do you recall something special
4  happening with SB 14 whereby more than one senator was
5  allowed to be an author?
6    A.   I don't recall that.  If I did, I would have
7  testified to that.  So, even now that I see this, it
8  doesn't refresh my memory.
9    Q.   So you're listed as author of SB 14 in this
10 exhibit; is that correct?
11    A.   Yes.  Uh-huh.
12    Q.   Do you remember being involved in the drafting
13 of the bill's language to any extent?
14    A.   I was not involved in the -- to the best of my
15 knowledge, I was not involved in the drafting of the
16 legislation.
17    Q.   So is it fair to say that the designation of
18 you as an author of SB 14 is misleading?
19        MR. SWEETEN:  On this sheet?
20    A.   Yeah.  Yeah.  This -- this sheet shows as an
21 author, and it may have been.  I just don't recall that
22 they made a special provision to allow everyone to be
23 author.  But when I think of an author of the bill, it's
24 the person who writes it and files it.  The original
25 person is what I think of the author.  And so that would

---

### 131

1  have been Senator Fraser.  But if there was a special
2  accommodation made so that everyone could be author
3  then that may have been made.  I just didn't remember
4  that.
5    Q.   (By Mr. Fisher)  Did you seek a special
6  accommodation with regard to SB 14's authorship?
7        MR. SWEETEN:  You can testify about
8  matters of the public records, or if there's a matter.
9    A.   Yeah.  I would assert legislative privilege on
10 that.  By I stand on my testimony, I just don't recall.
11 This is somewhat surprising that everyone is listed as
12 an author to me.
13    Q.   (By Mr. Fisher)  So do you see SB 14, as you're
14 looking at it now, with regard to the legislative
15 history as being different from other bills with regard
16 to the authorship?
17    A.   If everyone was listed as an author, that is --
18 that is different from the norm.
19    Q.   Can you look at the cosponsor designation, and
20 is your name listed there?
21    A.   No, because sponsors would be House members.
22    Q.   I'm sorry, Senator, I said the cosponsor.
23    A.   Yes.  And I said no, because they're all House
24 members, so I'm not listed there.
25        For the record, which could be helpful, if

---

### 132

1  a bill originates in a chamber, you're the author or
2  coauthor.  And then when you pick it up on the other
3  side, you're the sponsor.  So if it had originated in
4  the House, the House would be the author, so we would be
5  the sponsors.
6        So it originated in the Senate, it's a
7  Senate bill, so that's why we were authors or coauthors
8  or joint authors.
9    Q.   So your testimony today is that you played no
10 role in the development of the language contained in SB
11 14; is that correct?
12        MR. SWEETEN:  Wait.  Hold on a minute.  I
13 think you asked him did he draft, and I let him testify
14 as to whether he had the physical act of drafting the
15 bill.  Now you're asking him about the role, and I think
16 now you're asking about what role he had in the process
17 which could implicate communications with legislators,
18 staff, state agencies, Leg Council, constituents, and
19 reveal his mental impressions, motivations or opinions
20 about legislation.  So to the extent that's
21 legislatively privileged, don't answer that question.
22 But to the extent that you can answer based on matters
23 of the public record, you can do so.
24    A.   Yeah.  I played no significant role in drafting
25 or crafting the bill, to the best of my knowledge.

DAN PATRICK                                                May 30, 2012

---

133

1      Q.   (By Mr. Fisher)  Were you aware that the State
2   of Texas has identified you as someone who could testify
3   to the development of SB 14?
4      A.   I was not aware of that.
5      Q.   Did you have any communications about SB 14
6   with other legislators who had authored past photo ID
7   bills?
8           MR. SWEETEN:  You can answer if there was
9   a communication.
10     A.   Yeah.  I don't -- I don't recall that.
11     Q.   (By Mr. Fisher)  What about that, any
12  communication with other legislators' staff who had
13  authored past photo ID bills?
14     A.   Yeah.  I don't recall that.  I have very little
15  interaction of staff of other senators.
16     Q.   Did you at one point decide to support SB 14?
17     A.   Yes.
18     Q.   And prior to that, did you consider past photo
19  ID bills in the Texas legislature?
20          MR. SWEETEN:  I think the question asks
21  him to reveal his mental impressions, his mental
22  process, motivations about legislation.  I think that
23  would be legislatively privileged.
24     A.   Assert legislative privilege.
25     Q.   (By Mr. Fisher)  Is that on the advice of your

---

134

1   counsel, Senator?
2      A.   Yes, it is.
3      Q.   Did you have any communications with officials
4   or legislators from other states about SB 14?
5           MR. SWEETEN:  You can answer as to whether
6   you had communication.
7      A.   Not -- not to my knowledge.  I don't recall
8   that.
9      Q.   (By Mr. Fisher)  Did you have communications
10  concerning SB 14 with any interest groups?
11     A.   Not that I recall.
12     Q.   Did you have communications regarding SB 14
13  with any groups representing minority voters?
14     A.   Not that I recall.
15     Q.   Did you have communications about SB 14 with
16  any officials in the executive branch?
17     A.   I don't -- I don't recall.  It's possible, but
18  I don't recall anything specific.
19     Q.   Did you have communications with any local
20  election officials about SB 14?
21     A.   Local being Austin or local being Houston?
22     Q.   Did you have any communications with local
23  election officials in your district about SB 14?
24     A.   I don't think so.
25     Q.   Did you have communications with any local

---

135

1   election officials in Austin about SB 14?
2      A.   I don't think so.
3      Q.   So you've testified that you didn't have any
4   communications with other legislators who had authored
5   past photo ID bills, other -- their staff, other
6   legislators from other states, interest groups, minority
7   groups, groups representing minority voters, officials
8   in the executive branch or any local election officials
9   about SB 14; is that right?
10          MR. SWEETEN:  Objection, asked and
11  answered, but go ahead.
12     A.   To the best of my recollection, I -- that is an
13  accurate statement.
14     Q.   (By Mr. Fisher)  So what did you consider
15  before deciding whether to support or not support SB 14?
16          MR. SWEETEN:  Don't answer that.  That's a
17  matter that's subject to the legislative
18  privilege.  You're asking him to reveal your mental
19  impressions, opinions, motivations about legislation and
20  communications.
21     A.   Advice of the counsel, I assert legislative
22  privilege.
23     Q.   (By Mr. Fisher)  In drafting SB 14, did you or
24  your staff review any reports or studies?
25          MR. SWEETEN:  Objection.  That asks for

---

136

1   your mental impressions, opinions, motivations about
2   legislation and the legislative process.  So I'm going
3   to instruct you not to answer based on legislative
4   privilege.
5      A.   Yes, on advice of counsel, I assert legislative
6   privilege.
7      Q.   (By Mr. Fisher)  When was SB 14 signed into
8   law?
9      A.   I'd have to look at the record.  I don't know.
10     Q.   Please feel free to take a look at the exhibit,
11  Exhibit 8 that I just handed you.
12     A.   Okay.  (Witness reading.)  Okay.  There you go.
13  5/27/2011.
14     Q.   And did you vote for SB 14?
15     A.   Yes, I did.
16     Q.   To your knowledge, has the Secretary of State
17  enforced SB 14 after being passed into law?
18     A.   I do not believe it has been implemented.
19     Q.   Have any county election officials enforced SB
20  14?
21     A.   Not to my knowledge.
22     Q.   Are you aware of any problems or fraud, based
23  upon the public record, based on the fact that SB 14 has
24  not become law?
25     A.   We just had our election yesterday so I'm not

DAN PATRICK                                          May 30, 2012

---

**137**

1   aware of anything.

2        Q.   Do you recall what forms of identification are

3   permitted by SB 14?

4        A.   I'd have to -- I'd have to look.

5        Q.   I'm going to hand you what's previously been

6   marked as Exhibit 5.  It's a 17-page document with a

7   notation of SB 14 in the upper right-hand corner.

8        A.   Okay.

9        Q.   And Senator, do you recognize this document?

10  Just take a look at the front page here.  You can also

11  look at the last page that will tell you what version of

12  the bill this is.

13       A.   Yes.

14       Q.   Do you recognize this document, Senator?

15       A.   I -- it appears to be the SB 14.  Yes.

16       Q.   And is this the copy of the legislation that

17  you were listed as an author of?

18       A.   I haven't read every page of this, but I'm

19  assuming that it is.

20       Q.   So if you turn to what is Page 9 of the

21  document, and that's Section 14, Section 63.0101.

22       A.   Yes.  Okay.

23       Q.   And what does this section set out, Senator?

24       A.   Sets out the type of identification that would

25  be an acceptable form.

---

**138**

1        Q.   And what types are those, Senator?

2        A.   Driver's license, election identification

3   certificate or personal identification card issued to

4   the person by the Department of Public Safety that has

5   not expired nor 160 days.  And the United States

6   military ID or that has not expired prior to 60

7   days.  Citizenship certificate that contains a person's

8   photograph like a passport.  License to carry

9   concealed.  And that's what I see.

10       Q.   Did you have any communications with anyone

11  about the forms of identification included in this

12  section?

13       A.   Yes.

14       Q.   And when did you have those conversations?

15       A.   Sometime during the discussion of the bill.

16       Q.   And who are these communications with?

17       A.   The one I'm thinking of is, if my memory is

18  correct, I could be wrong, was Senator Hinojosa.

19       Q.   And was this the discussion in person, via

20  phone, via e-mail?  What was the form?

21       A.   I think it was in person.

22       Q.   Was there anyone else present during this

23  discussion?

24       A.   I don't recall.

25       Q.   And the substance of your conversation with

---

**139**

1   Senator Hinojosa regarding the forms of ID allowable by

2   Section 14?

3        MR. SWEETEN:  Can you read that question

4   back?

5        (Requested portion read back by the court

6   reporter.)

7        MR. SWEETEN:  Objection.  That calls for

8   matters subject to legislative privilege.  Don't reveal

9   the substance of any communications you had with Senator

10  Hinojosa.

11       A.   Advice of counsel, assert legislative

12  privilege.

13       Q.   (By Mr. Fisher)  Senator, how much does it cost

14  to obtain a U.S. passport?  Are you aware of that?

15       A.   I'm not.

16       Q.   Are you aware of the percentage of Texans that

17  have a passport?

18       A.   I'm not.

19       Q.   Are you aware of the Democrat -- demographic

20  makeup of Texans that have a passport?

21       A.   I'm not.

22       Q.   Senator, how often do military IDs expire?

23       A.   I don't know.

24       Q.   Do they expire more or less often than driver's

25  licenses?

---

**140**

1        A.   I don't know.

2        Q.   Where do members of the military have their IDs

3   made?

4        A.   I don't know.

5        Q.   Do members of the military often have Texas

6   driver's licenses?

7        A.   I don't know.

8        Q.   Are you aware of any information on this such

9   as studies or analysis?

10       MR. SWEETEN:  Yeah.  Don't reveal any

11  communications you had or thoughts, mental impressions,

12  opinions, motivations about legislation.  Those are

13  subject to the legislative privilege.

14       A.   Yeah.  I don't recall.

15       Q.   (By Mr. Fisher)  Do you know the number of

16  Texas registered voters that have a military ID?

17       MR. SWEETEN:  Same objection.  With

18  respect to your thoughts, mental impressions, opinions,

19  motivations about legislation, or in furtherance of the

20  legislative process, don't reveal those.  Those are

21  subject to the legislative privilege.  Also, don't

22  reveal communications you had with state agencies, Texas

23  Leg Council, legislators, legislative staff, or

24  constituents.  In answering this question, you can refer

25  to matters of the public record.

## 141

1    A.   Yeah.  I don't know.

2    Q.   (By Mr. Fisher)  Did you conduct any analysis

3    as to how many registered voters possessed the required

4    forms of ID required by Section 14 of SB 14?

5         MR. SWEETEN:  Same objection, calls for

6    matters of legislative privilege.  Don't answer except

7    for the extent you can refer to the matters of the

8    public record.

9    A.   Yeah.  I would assert legislative privilege on

10   advice of counsel.

11   Q.   (By Mr. Fisher)  Did you analyze or direct

12   anyone to analyze which registered voters did not

13   possess the required forms of ID required in SB 14?

14        MR. SWEETEN:  Same instruction.  Same

15   instruction.

16   A.   Yeah.  I would assert legislative privilege at

17   the advice of counsel.

18   Q.   (By Mr. Fisher)  Did you read any public

19   information that assisted you in evaluating the forms of

20   identification required by SB 14?

21        MR. SWEETEN:  I'm going to object to the

22   question.  I think it calls for him to reveal his

23   thoughts, his mental impressions, process, opinions,

24   motivation about legislation.  And I think to the extent

25   that I think that's legislative privilege, but if you

## 142

1    can answer to the extent that you can refer to matters

2    that aren't subject to the privilege.

3    A.   Yeah.  I'm sure I've read something in the

4    public domain somewhere about the issue.  I couldn't

5    tell you specifically what it was.

6    Q.   (By Mr. Fisher)  What you read in the public

7    domain, did it mention the impact of SB 14 and the

8    requirements of identification on minority voters?

9    A.   I don't recall.

10   Q.   Did you or your staff conduct any analysis to

11   determine if minority voters could be disproportionately

12   less likely to possess the forms of ID required in SB

13   14?

14        MR. SWEETEN:  Objection.  Legislative

15   privilege.  Don't answer the question.

16   A.   Yeah.  I would assert legislative privilege.

17   Q.   (By Mr. Fisher)  And is that on the advice of

18   your counsel, Senator?

19   A.   Yes, it is.

20   Q.   Under SB 14, in SB 14, you're listed as the

21   author; is that correct, Senator?

22   A.   It is based on the document you presented to

23   me.

24   Q.   Under SB 14, who would be verifying the

25   identity of a voter?

## 143

1         MR. SWEETEN:  You can refer to the

2    specific Texas Senate Bill 14 in answering the

3    question.  Don't reveal your thoughts, mental

4    impressions about the legislation itself.

5    A.   Yeah.  I'd have to read -- I'd have to read the

6    bill, specifically, what it says.

7    Q.   (By Mr. Fisher)  Please do, Senator.  There's

8    not -- it's not very long.

9    A.   You want me to read the whole bill?  It will

10   take us a while.  It is 16 pages.  If you have a

11   specific point you want to refer to, I'm happy to review

12   it.

13   Q.   Senator, I just want to know who would be

14   verifying the identity of a voter under SB 14?

15   A.   At the time of voting or a final arbiter of a

16   decision if it were in dispute?

17   Q.   At the time of voting, Senator.

18   A.   Okay.  Let me look and see if I can find the

19   wording.  Without being able to speed read 16 pages, we

20   do have designated people in polling places where there

21   are likely to be judges, who -- people sign in to vote.

22   So it would be the people at the polling place who would

23   verify.

24   Q.   Senator, do you think it's important --

25   A.   Let me just finish that.  Whoever those workers

## 144

1    might be.

2    Q.   Do you think it's important -- an important

3    part of the process, as far as the identification

4    required by SB 14, when that identification is actually

5    verified?

6         MR. SWEETEN:  I think that calls for his

7    thoughts, mental impressions or opinions about

8    legislation.  I'm going to instruct him not to answer.

9    A.   Yeah.  I would assert legislative privilege on

10   my own on that one.

11   Q.   (By Mr. Fisher)  So if we turn to Section 9,

12   and then flip it over a page to Section C.

13   A.   Which is what page actually?

14   Q.   It ended up being Page 5.

15   A.   Okay.

16   Q.   On the presentation of the documentation

17   required under Subsection B, would you read that

18   paragraph there, please?

19   A.   On the presentation -- okay.  I've read that.

20        MR. SWEETEN:  Do you want him to read it

21   out loud, Spencer?

22        MR. FISHER:  Sure.

23   A.   On presentation -- you want me to read it?

24   Q.   (By Mr. Fisher)  Absolutely.

25   A.   "On presentation of the documentation required

DAN PATRICK                                          May 30, 2012

## 145

1  under Subsection B, an election officer shall determine
2  whether the voter's name on the documentation is on the
3  list of registered voters for the precinct.  If in
4  making a determination under this subsection, the
5  election officer determines under standards adopted by
6  the Secretary of State that the voter's name on
7  documentation is substantially similar to but does not
8  match exactly with the name on the list, the voter shall
9  be accepted for voting under Subsection D if the voter
10  submits an affidavit stating that the voter is the
11  person on the list of registered voters."
12      Q.   And you can go ahead and read D.
13      A.   "If as determined under Subsection C, the
14  voter's name is on the precinct list of registered
15  voters and the voter's identity can be verified from
16  documentation presented under Subsection B, the voter
17  shall be accepted for voting."  Continue?
18      Q.   That's enough, Senator.
19      A.   All right.
20      Q.   Do you feel that this issue is central to
21  whether SB 14 would be a successful bill?
22          MR. SWEETEN:  I'm going to object.  I
23  think that calls for his mental impressions and thoughts
24  about the bill, and I think that's a matter subject to
25  the legislative privilege.  I instruct you not to answer

## 146

1  the question.
2      A.   Yeah.  I assert legislative privilege on advice
3  of counsel.
4      Q.   (By Mr. Fisher)  So, Senator, let me get your
5  thinking on something here.  If a person shows up to a
6  polling place with a driver's license and the name does
7  not match the registration role, what happens?
8          MR. SWEETEN:  You're saying under the
9  Texas Senate Bill 14 as currently written?
10          MR. FISHER:  The bill we're looking at.
11      A.   Say that again.  If a person --
12      Q.   (By Mr. Fisher)  As I said, let me get your
13  thinking on something here.  If a person shows up to a
14  polling place with a driver's license where the name
15  does not match the name on the registration roll, what
16  happens?
17      A.   I would have to refer back to the bill and see
18  what the law says.
19      Q.   Okay.  Let's go back.
20      A.   All right.  Where do we want to go back to,
21  Page 5?
22      Q.   I think that's where you'll find the answer.
23      A.   And your question, could you read back the
24  question for me?
25          (Requested portion read back by the court

## 147

1  reporter.)
2      A.   I'm rereading.  Well, it says here that if it
3  doesn't match but they have a name that's similar, and
4  they submit an affidavit, the voter would be accepted
5  for voting.
6      Q.   (By Mr. Fisher)  So based upon this, Senator,
7  how far off do the names have to be, or how similar do
8  the names have to be?
9          MR. SWEETEN:  You're asking him based on
10  the text of the bill?
11      Q.   (By Mr. Fisher)  Based on the text of the
12  bill.
13      A.   The bill does not address that.
14      Q.   Was there any thinking about this issue when
15  this legislation was considered?
16          MR. SWEETEN:  Objection.  Don't reveal
17  your thoughts, mental impressions or opinions about the
18  bill that was subject to the legislative privilege.  I
19  instruct you not to answer that question, unless to the
20  extent it was expressed in the matter of public record.
21      A.   Yeah.  I assert legislative privilege on the
22  advice of counsel.
23      Q.   (By Mr. Fisher)  Senator, do you know if the
24  name on your driver's license matches the name on your
25  voter registration card?

## 148

1      A.   Do I know for certain that it does?  I'm not
2  sure if it includes first, middle and last.  So I do not
3  know for certain that it would be very similar.
4      Q.   Could the names on your driver's license and
5  your voter registration card be substantially different?
6      A.   Be substantially different?  Not that I'm aware
7  of.
8      Q.   Is it possible that the last name on your
9  driver's license and the last name on your voter
10  registration card are different?
11      A.   Anything is possible, but I'm not aware.
12      Q.   Why would that be possible in your case,
13  Senator?
14          MR. SWEETEN:  Objection, calls for
15  speculation.  Go ahead.  You can answer.
16      A.   When you say "it's possible," anything is
17  possible.
18      Q.   (By Mr. Fisher)  Well, Senator, have you
19  changed your name in the past 15 years?
20      A.   Yes.
21      Q.   So it's possible, then, in the act of changing
22  your name, that the name on your driver's license and
23  the name on your voter registration card are no longer
24  the same, correct?
25      A.   No longer the same that it was before I changed

## 149

1  it?
2      Q.  No.  No longer the same as in they have the
3  same name on both documents.
4      A.  Today?
5      Q.  Yes, today, Senator.
6      A.  I don't know.  I mean, I'd have to verify that.
7      Q.  So you would have to do research with regard to
8  your own voter registration and your own driver's
9  license to determine if you're eligible to vote under SB
10 14; is that correct?
11     A.  I would not call it research.  I'd have to look
12 at my driver's license and look at my voter ID card.
13     Q.  As we sit here today, Senator, do you know if
14 you're eligible to vote under SB 14?
15     A.  I believe I'm eligible to vote.
16     Q.  Are you certain that you're eligible to vote
17 under SB 14, Senator?
18     A.  I believe I'm eligible to vote.
19     Q.  Would you be surprised if you were not eligible
20 to vote under SB 14, Senator?
21     A.  I would be surprised.
22     Q.  Given the fact that you've changed your name in
23 the past 15 years, is it at least possible that you're
24 not eligible to vote under SB 14?
25     A.  Anything is possible.

## 150

1      Q.  For someone that doesn't change their name, is
2  it possible that they're not eligible to vote under SB
3  14?
4      A.  Anything, when you say "is possible," anything
5  is possible.
6      Q.  If someone has a voter registration card and a
7  driver's license issued to them under the same name, and
8  they do not change their name, are they eligible to vote
9  under SB 14?
10     A.  I'm sorry.  Say that again.
11         (Requested portion read back by the court
12 reporter.)
13         MR. SWEETEN:  Under the Texas Senate Bill
14 14, right?  Is that the question?
15     Q.  (By Mr. Fisher)  The question is the question.
16 If you need clarification, Senator, please ask.
17     A.  If a person has a driver's license and the same
18 name is on the driver's license as is on the voter
19 registration card, and they have a photo ID, yes, they'd
20 be able to vote.
21     Q.  But if a person changes their name, and for any
22 reason, meaning marriage, or the fact that they changed
23 their name, is it possible that that voter would no
24 longer be able to vote under the terms of SB 14?
25     A.  I -- I couldn't address a specific, and again,

## 151

1  you're using the word "possible."
2      Q.  I'm not asking you to address a specific,
3  Senator.  I'm giving you a general, and I can't make it
4  any more general than that.
5      A.  Okay.
6      Q.  The question about eligibility to vote under SB
7  14, and we can make it more specific with regard to your
8  own circumstance, but generally, if someone changes
9  their name, is it possible that they're no longer able
10 to vote under the terms of SB 14 because their license
11 no longer matches their voter registration card, the
12 names on those two documents?
13     A.  I -- I believe that the law, and I would check
14 the record to be certain, that when you change your
15 name, you have to change your license within 30 days.
16     Q.  But that doesn't change your voter registration
17 card; is that correct, Senator?
18     A.  You can make a change on that as well.
19     Q.  But for a voter who has not made that change,
20 Senator, would their license and their voter
21 registration card then have different names on them?
22     A.  I'd have to know the specific situation, the
23 time line, what happened.  You're asking me about a
24 hypothetical, could something happen, is it possible?
25 Hypotheticals are -- hypotheticals are tough to answer

## 152

1  and possibles are always possible.
2      Q.  Well, hypotheticals, I think this is a very
3  specific hypothetical, Senator, and we can make it more
4  specific if you want about your own situation.
5      A.  Yeah.
6      Q.  Have you changed your name, Senator?  I'll
7  repeat the question.
8      A.  Yes.
9         MR. SWEETEN:  Objection, asked and
10 answered.
11     A.  Yeah.
12     Q.  (By Mr. Fisher)  Are you certain that your
13 voter registration name and the name on your driver's
14 license are the same name that you would be eligible to
15 vote under SB 14?
16        MR. SWEETEN:  Objection, asked and
17 answered.
18     A.  Yeah.  Asked and answered.
19     Q.  (By Mr. Fisher)  That's not an answer, Senator.
20     A.  You asked -- I think you included the word
21 "substantially" before.  Would there be a substantial
22 difference between my --
23     Q.  It doesn't matter what I asked before,
24 Senator.  This is the question on the table, and we can
25 read it back if you want.

## 153

1          MR. SWEETEN:  Objection, asked and
2  answered.  Object, argumentative.  But you can answer to
3  the extent you can answer.
4       A.  Sure.  You can ask again.
5          MR. FISHER:  Can you read it back?
6          (Requested portion read back by the court
7  reporter.)
8       A.  I believe they're the same, but --
9       Q.  (By Mr. Fisher)  The question is not whether
10  you believe, Senator.  The question is, are you
11  certain?
12          MR. SWEETEN:  Objection, asked and
13  answered.  Objection, argumentative.
14       A.  I've answered.  I believe they're the same.
15       Q.  (By Mr. Fisher)  That's not an answer to my
16  question, Senator.  The question is:  Are you certain
17  that they are the same?
18          MR. SWEETEN:  Same --
19       Q.  (By Mr. Fisher)  Sitting here today.
20          MR. SWEETEN:  -- objection.  Same
21  objection.
22          MR. FISHER:  I'm not getting an answer to
23  my question, Counsel.
24          MR. SWEETEN:  I think he's answered the
25  question.  He's trying to do so.

## 154

1       A.  I believe they're the same.
2       Q.  (By Mr. Fisher)  Senator, you're either certain
3  or you're not certain.  Are you certain that they're the
4  same and that you would be eligible to vote under SB 14?
5          MR. SWEETEN:  Objection, argumentative.
6  Objection, asked and answered.
7       A.  I'm just trying to -- I'm trying to -- you
8  know, just remember looking at both.  I believe they're
9  the same.  You know.
10       Q.  Would it surprise you if they were different,
11  Senator?
12       A.  If they were different at all?
13       Q.  Would it surprise you that the last name on
14  your voter registration was different than the last name
15  on your license?
16       A.  That would surprise me.
17          MR. FISHER:  Take a break here.
18          THE WITNESS:  Okay.
19          (Recess from 3:43 to 3:54 p.m.)
20       Q.  (By Mr. Fisher)  So Senator, referring back to
21  the question that I asked previously about your
22  knowledge of the name that appears on your voter
23  registration and your driver's license.  And you said
24  that you believe that they're the same; is that correct?
25       A.  I did.

## 155

1       Q.  If I can hand you, at this time, Exhibit 165.
2          (Exhibit 165 marked for identification.)
3       Q.  (By Mr. Fisher)  And so Exhibit 165 is a
4  LexisNexis search, and if you would turn to the second
5  page.
6       A.  Uh-huh.
7       Q.  You'll see the Texas voter registration
8  information.
9       A.  Okay.
10       Q.  And I believe this search is of you; is that
11  correct, Senator?
12       A.  Yes.
13       Q.  And on the second page, can you tell me what it
14  says underneath Registrant Information Name, and this is
15  under Texas Voter Registration.
16          MR. SWEETEN:  Can you tell me what you are
17  looking at, Counsel?
18          MR. FISHER:  The second page.
19          MR. SWEETEN:  Uh-huh.
20          MR. FISHER:  Which is Voter Registration,
21  so that would be the first item on the second page.
22          MR. SWEETEN:  Okay.
23       Q.  (By Mr. Fisher)  And we see Number 1 is Texas
24  Voter Registration, Registrant Information, and what
25  does it say next to Name, Senator?

## 156

1       A.  Goeb, Danny.
2       Q.  Okay.  And how that is spelled?  Could you
3  spell that for me?
4       A.  This is not accurate, but this -- my
5  registration is correct.  My registration matches my
6  driver's license today.  This is from --
7       Q.  Senator, did you check that during the break,
8  or how do you know that information?  Because in your
9  testimony previously, you said you were not certain or
10  you believed.
11       A.  Well, yeah, I wasn't certain, so I made sure I
12  was correct.  And the reason I said I believed is
13  because I just voted and I just looked at my
14  registration card two weeks ago.  And my registration
15  card matches my driver's license, Patrick, Dan Goeb.
16       Q.  And did you change your Texas voter
17  registration sometime after you changed your name,
18  Senator?
19       A.  You know, I must have.  I must have because
20  it's correct.
21       Q.  And how did you go about doing that, Senator?
22       A.  I don't recall.  I changed my name in 2004, so
23  it was eight years ago, and I don't recall the procedure
24  that I did that.
25       Q.  But you did have to go and -- you did -- strike

DAN PATRICK                                          May 30, 2012

## 157

1   that.  You did go and change your name with regard to
2   your Texas voter registration; is that correct?
3       A.  Yes, apparently.  I mean, apparently I did,
4   because it's correct.
5       Q.  And you're not aware of what you did to do
6   that, correct?
7       A.  You know, I don't recall if back in 2004, if it
8   was online or in person, you know.  I don't recall.  But
9   it happens all the time, because people get married all
10  the time and change their names.
11      Q.  So it's your testimony that you changed the
12  name on your voter registration in 2004; is that
13  correct?
14      A.  I don't know when I changed it, but it
15  accurately -- it's accurate today, and to my knowledge,
16  it's been accurate.
17      Q.  Did you change it at some point in the last two
18  weeks?
19      A.  No.  I moved in December of 2011, and when you
20  move, you have, I think, 30 days under the law, I stand
21  to be corrected, to change your driver's license to
22  reflect your new address, which I did.  I have a new
23  driver's license.  And then you go online and apply for
24  a new voter registration card to reflect your new
25  address so you can vote in the right precinct.  And

## 158

1   because of redistricting, those voter registration cards
2   were not sent out until that issue was resolved.
3       Q.  Senator, do all the members of your district
4   have access to the Internet?
5       A.  I -- I don't know.
6       Q.  Was the passage of SB 14 a priority for you.
7   Senator?
8       A.  It was a priority for me as stated in the
9   public record, yeah.
10      Q.  And what was the purpose of SB 14?
11          MR. SWEETEN:  You can testify as to the
12  understanding of the purpose of SB.
13      A.  To ensure the integrity of the ballot box.
14      Q.  (By Mr. Fisher) And in your opinion, would the
15  integrity of the ballot box be ensured by presenting a
16  photo ID before receiving a ballot?
17          MR. SWEETEN:  He's testified to the
18  purpose, and now I think you're asking specifics about
19  the bill and him to reveal his thoughts, mental
20  impressions or opinions.  I've let him answer as to the
21  purpose of the bill.  I think to the extent you're
22  going to ask specific his mental impressions about the
23  bill, that I think that that would be a subject of
24  legislative privilege.  But to the extent you can answer
25  without evading privilege, you can do so.

## 159

1       A.  The purpose of the bill is to ensure the
2   integrity of the voting process, of the ballot box.
3       Q.  (By Mr. Fisher) Well, Senator, we just spent,
4   you know, a few minutes talking about a situation where
5   someone who changes their name as you did, could have a
6   voter registration card that's different from the name
7   on their driver's license, and does that, for some
8   reason, impact the integrity of the ballot box?
9           MR. SWEETEN:  Don't reveal your thoughts,
10  mental impressions, opinions, motivations about the
11  legislation.  That is protected by the legislative
12  privilege.
13      A.  Yeah.  I think I would assert legislative
14  privilege on that.
15      Q.  (By Mr. Fisher) Are you asserting legislative
16  privilege in the answer to that question on the advice
17  of your counsel?
18      A.  Yes.
19      Q.  Was the passage of SB 14 a priority for anyone
20  outside of Texas government?
21      A.  I can't get into the minds of what is a
22  priority or not a priority of people.
23          MR. SWEETEN:  Objection, speculation.
24      Q.  (By Mr. Fisher) Were there any interest groups,
25  that you're aware of, that were interested in the

## 160

1   passage of SB 14?
2       A.  I think on the public record, although I can't
3   name a specific place that I read or heard, I think it's
4   -- there has been public statements of people who
5   support.
6       Q.  Do you remember those people?
7       A.  I can't remember specifics, but, you know,
8   obviously, I've read it, heard it, and seen it, am aware
9   of it.
10      Q.  Was the passage of SB 14 a priority for any
11  minority groups in Texas?
12          MR. SWEETEN:  Objection, calls for
13  speculation.
14      A.  You know, I don't know.
15      Q.  (By Mr. Fisher) Did you have any communications
16  with groups that supported the passage of SB 14?
17          MR. SWEETEN:  You can answer as phrased.
18      A.  Can you repeat that?
19      Q.  (By Mr. Fisher) Sure.  Did you have any
20  communications with groups that advocated for the
21  passage of SB 14?
22      A.  In a broad sense, if I'm speaking to groups and
23  they're in support of the bill, then, yes.  I, you know,
24  I spoke to groups, and that would be a form of
25  communication.

DAN PATRICK                                                    May 30, 2012

---

**161**

1      Q.   So the communications you're talking about
2   would be speeches you gave to large groups of people; is
3   that correct?
4      A.   Or it could be -- you know, it could be
5   sometimes you speak to a group of 25 people.  But, yes.
6   And if there were any other communications, I don't
7   recall anything specific.
8      Q.   Do you have any names of anyone that was
9   present during these communications?
10      A.   Outside of what I submitted to you that you
11   requested, or your office requested about correspondence
12   and those people would have names on there, because I
13   did submit some, I can't recall, you know, specifically
14   who all those were from.
15      Q.   So you've talked about the purpose of SB 14.
16   Was any part of the purpose of SB 14 to decrease the
17   number of Hispanics voters?
18           MR. SWEETEN:  You can answer as to the
19   purpose of the bill.
20      A.   The specific purpose of the bill was to protect
21   the integrity of the ballot box.
22      Q.   (By Mr. Fisher) Was any part of the purpose of
23   SB 14 to decrease the number of any other group of
24   minority voters from voting?
25      A.   The purpose of the bill was to protect the

---

**162**

1   integrity of the ballot box.
2      Q.   Was any part of the purpose of SB 14 to
3   discriminate in any way against any group of minority
4   voters?
5      A.   The purpose of the bill was to protect the
6   integrity of the ballot box.
7      Q.   Was any part of the purpose of SB 14 for
8   partisan purposes?
9      A.   The purpose of the bill was to protect the
10   integrity of the ballot box.
11      Q.   Did the purpose of photo identification in
12   Texas remain the same between SB 362 and SB 14?
13      A.   I would have to go back and do a bill
14   comparison.  From what we read in the record today, and
15   I'd have to go back and do a bill comparison, it looks
16   like 11 was somewhat different than SB 362.
17      Q.   Bill -- SB 362 and SB 14 --
18      A.   I mean 14.  Did I say 11?  I'm sorry.
19      Q.   SB 362 and SB 14 may be different, but the
20   question is:  Were the purposes of the bills the same?
21   Were the purposes of SB 362 and SB 14 the same?
22      A.   Yes.
23      Q.   Senator, could you describe all public
24   communications from your office about the purposes of
25   SB 14?

---

**163**

1      A.   Can I describe all -- all public information?
2      Q.   Communications from your office about the
3   purpose of SB 14.
4      A.   Boy, that's a hard question, because I don't
5   know all the public information disseminated.  But the
6   purpose would be to protect the integrity of the ballot
7   box.  To the best of my knowledge that -- you know
8   that's what we...
9      Q.   Any meetings with constituents at which you
10   were present where the purpose of SB 14 was discussed?
11      A.   I don't -- could have been, but I don't think
12   so, because Senate 14, you know, I didn't see it until
13   we were in session, and once I get in session, I don't
14   have that much interaction with the constituents because
15   I'm in Austin.  So could someone have come to my office
16   and talked and about it?  Possibly, but I don't recall.
17      Q.   Any meetings with the Lieutenant Governor?
18      A.   I don't -- maybe in a general meeting, yes, I'm
19   sure, but I don't remember a specific meeting.
20      Q.   Any meetings with the Governor?
21      A.   I don't recall any meetings with the Governor
22   on this bill.
23      Q.   Any conversations with other senators who
24   opposed SB 14 regarding the purpose of SB 14, that you
25   have previously identified?

---

**164**

1           MR. SWEETEN:  You can answer about any
2   conversations.  Don't reveal the substance.
3      A.   Okay.  I'm sure there were discussions.  I
4   referred to one earlier today, specifically with Senator
5   Hinojosa, that I believe I had.  But I don't -- beyond
6   that, outside of generic conversations with other
7   senators who were opposed to the bill, I don't have any.
8      Q.   (By Mr. Fisher) And who were the main opponents
9   to SB 14?
10      A.   There weren't any main opponents.  They were
11   just all the Democrats in the Senate who were opposed,
12   not one more than the other.
13      Q.   And what's your understanding of why they were
14   opposed to SB 14?
15           MR. SWEETEN:  In answering this question,
16   don't reveal specific communications with legislators or
17   legislative staff.
18      A.   Yeah, I can't speculate on that one.
19      Q.   (By Mr. Fisher) Any knowledge of public
20   statements by what you termed as all the Democrats --
21      A.   Right.
22      Q.   -- with regard to why they opposed to SB 14?
23           MR. SWEETEN:  You can answer as phrased.
24      A.   Yeah, I don't -- I don't recall.  I mean, maybe
25   I read something, but I don't recall anything

DAN PATRICK                                                    May 30, 2012

---

165

1  specifically.
2      Q.   (By Mr. Fisher) Why was SB 14 a better way to
3  accomplish the purpose that you've identified than
4  current practice in Texas?
5          MR. SWEETEN:  Don't reveal your thoughts,
6  mental impressions, opinions, motivations about
7  legislation, in furtherance of the legislative process,
8  nor in the communications we've outlined previously.
9  Those would be matters subject to the legislative
10 privilege.  I instruct you not to answer to the extent
11 your answer would reveal those.
12     A.   Yeah.  I'll assert legislative privilege.
13     Q.   (By Mr. Fisher) And is that on the advice of
14 your counsel?
15     A.   That's just on my own.
16     Q.   You supported, and you've testified earlier
17 that you supported SB 362; is that correct?
18     A.   Yes.
19     Q.   Okay.  So if you would take a look at SB 362,
20 which I think you already have as an exhibit, it's --
21     A.   162?
22     Q.   It's previously marked.
23     A.   162, I think.  You said Senate Bill 362?
24     Q.   Correct.
25     A.   I think it's Exhibit 162 is one that I have,

---

166

1  and another one is 161.
2      Q.   Those are both transcripts, Senator.
3      A.   Okay.  Sorry.
4      Q.   I wanted you to look at the actual bill, and I
5  believe it's right there.  Underneath.  And it's 29
6  previously marked, and then you'll have Exhibit 5, which
7  is SB 14.
8      A.   Okay.  I've got two 362s, so I assume they're
9  the same.
10     Q.   So Senator, we have Exhibit 5, which is SB 14,
11 previously marked, and we have Exhibit 29, which is
12 SB 362, and that's also been previously marked, and
13 we've taken a look at these.  We've looked at the photo
14 identification requirements of both bills; is that
15 correct?
16     A.   Yes.
17     Q.   And if you would turn to those now.  And I can
18 help you get there if you need me to.
19     A.   I think I remember on the first one.  Okay.
20 That starts on Page 6, I believe, on Exhibit 29, and on
21 page --
22     Q.   Actually, Senator, it starts on Page 5 of 29.
23     A.   Okay.
24     Q.   And Page 9 of Exhibit 5.
25     A.   All right.

---

167

1      Q.   And if you would take a look at these two
2  sections, please, and its Section 14 of Exhibit 5 and
3  Section 10 of Exhibit 29.
4      A.   All right.
5      Q.   And they both start out, I believe, with the
6  same language.  "The following documentation is an
7  acceptable form of photo identification under this
8  chapter."  And if you would take a look at those forms
9  of identification that are allowed, please.
10     A.   Okay.
11     Q.   Do you notice any differences between the forms
12 of identification that are allowed by each bill?
13         MR. SWEETEN:  You can answer based on the
14 text of the bill.
15     A.   Yes.  I'll have to go through it step by step.
16     Q.   (By Mr. Fisher) With regard to Item Number 1,
17 what differences do you note between the two bills with
18 regard to Item Number 1?
19     A.   In the bill, Senate Bill 14, the language says,
20 "Has not expired no earlier than 60 days before date of
21 presentation."  362 said "two years."
22     Q.   And you supported Senate Bill 362; is that
23 correct, Senator?
24         MR. SWEETEN:  You can testify about
25 matters of the public record.

---

168

1      A.   Yeah, I did.
2      Q.   (By Mr. Fisher) And was Senate Bill 362, with
3  regard to the expiration of a driver's license, an
4  inferior way to carry out the purpose which you've
5  identified as ensuring the integrity of the ballot box?
6      A.   I would assert legislative privilege.
7          MR. SWEETEN:  Objection, legislative
8  privilege.
9      Q.   (By Mr. Fisher) We can move on to -- Senator,
10 on Exhibit 29, why don't you go ahead and read Number 6,
11 and I'll read it.  "A valid identification card that
12 contains the person's photograph and is issued by an
13 agency or institution of the federal government or an
14 agency, institution, or political subdivision of this
15 state."  And let me ask you if you see any similar
16 language in SB 14?
17     A.   Is it just on Page 10 only, or is there more?
18     Q.   Regarding the acceptable forms of
19 identification --
20     A.   Right.  Right.
21     Q.   -- under SB 14, I think you're looking at Page
22 9 and 10 of Exhibit 5, Senator.
23     A.   I don't -- I don't see that.
24     Q.   So what changed between 2009 and 2011 that made
25 these forms of identification acceptable under SB 362,

DAN PATRICK                                                May 30, 2012

## 169

1  but not acceptable under SB 14?
2          MR. SWEETEN:  Objection, legislative
3  privilege.
4      A.  Yeah.  I would assert legislative privilege.
5      Q.  (By Mr. Fisher) And how would allowing these
6  forms of ID prevent the goal of ensuring the integrity
7  of the ballot box from being met?
8          MR. SWEETEN:  Same objection.
9      A.  I'll assert legislative privilege.
10     Q.  (By Mr. Fisher) And is that on the advice of
11 your counsel, Senator?
12     A.  Yes.
13     Q.   Senator, if I could have you take a look at
14 Exhibit 5, SB 14.  Do you see any provision for nonphoto
15 identification as was permitted under SB 362, which
16 we've discussed previously?
17     A.   Yeah, let me look.  I'm just reading it
18 carefully.  I'd have to, maybe, take a few more minutes
19 and read it, but it would appear that if you didn't have
20 a photo ID, you can cast a provisional ballot, but I'd
21 have to go back and do an analysis.
22     Q.   Is it fair to say that the provisions regarding
23 nonphoto identification that were included in 362
24 meaning -- and we did the cross-referencing where we
25 showed that two forms of identification under Section B

## 170

1  of 362, is it fair to say that that information is not
2  present in SB 14?
3      A.   Based on this document and the legislation,
4  yes.
5      Q.   And what changed between 2009 and 2011 that
6  made two forms of nonphoto ID acceptable as an option in
7  2009, but not in 2011?
8          MR. SWEETEN:  Objection, legislative
9  privilege.
10     A.   Yeah, I would assert legislative privilege on
11 advice of counsel.
12     Q.   (By Mr. Fisher) But you supported SB 362 based
13 upon your previous testimony in 2009, correct?
14         MR. SWEETEN:  Objection, asked and
15 answered, but you can answer.
16     A.  Yes.
17     Q.   (By Mr. Fisher) And at that time, did you feel
18 that SB 362 accomplished its purpose?
19     A.  I would assert legislative privilege.
20         MR. SWEETEN:  Yeah.  Objection,
21 legislative privilege.
22     A.  On advice of counsel.
23     Q.  (By Mr. Fisher) Senator, SB 14 provides for
24 what's called an election identification certificate.
25 Do you know what that is?

## 171

1      A.  I'd have to go back and read what that is.  I
2  don't --
3      Q.  Well, Senator, you were listed as an author of
4  this bill.  I understand that that might have been a
5  special circumstance in this case, but you don't know
6  what an election identification certificate is; is that
7  correct?
8          MR. SWEETEN:  Objection, argumentative.
9      A.  I would have to go back and read exactly what
10 it is.
11     Q.  (By Mr. Fisher) And you voted to support this
12 bill; is that correct?
13     A.  Yes, I did.
14     Q.   Senator, are you familiar with the Indiana
15 identification requirements?
16     A.  Vaguely.
17     Q.   Are you aware of any public records regarding
18 what changed between SB 362 and SB 14 concerning the
19 allowable forms of identification?
20         MR. SWEETEN:  You're asking about matters
21 of the public records?
22     A.  Yeah.  I don't recall being aware of anything.
23     Q.  (By Mr. Fisher) And you said you are vaguely
24 familiar with the Indiana identification rights; is that
25 correct?

## 172

1      A.  You know, in fact, I'm going to correct the
2  record.  I'm not even sure I'm aware of the Indiana
3  law.  I may have read something on it, but in the back
4  of my memory somewhere, but I don't recall anything
5  specific.
6      Q.   Did you conduct any analysis of photo
7  identification laws in other states prior to authoring
8  or supporting SB 14?
9          MR. SWEETEN:  Objection, legislative
10 privilege.
11     A.   Yeah, assert legislative privilege on advice of
12 counsel.
13     Q.  (By Mr. Fisher) Are you aware of the photo
14 identification requirements required in Georgia?
15         MR. SWEETEN:  You can answer as to whether
16 you're aware as you're sitting here.
17     A.  Yeah.  Again, I may have read something
18 somewhere, but nothing specifically.
19     Q.  (By Mr. Fisher) Did you ever do a side-by-side
20 comparison of the bills at work in Georgia or Indiana
21 and the proposed legislation of SB 14 in Texas?
22         MR. SWEETEN:  Objection, legislative
23 privilege.
24     A.  I assert the legislative privilege on advice of
25 counsel.

DAN PATRICK                                                    May 30, 2012

---

### 173

1    Q.  (By Mr. Fisher) Where did you read any
2    communications about -- you just mentioned you read
3    something about the Indiana law.  Where did you read
4    that?
5    A.  I was just trying to answer the question
6    honestly, that I probably read something or something
7    vaguely, but I don't have any specifics of where I read
8    it or where it was or who wrote it.  I just don't
9    recall.
10   Q.  Do you consider legislation in other states
11   prior to authoring or supporting legislation that's
12   being proposed in Texas?
13       MR. SWEETEN:  Objection, calls for matters
14   of legislative privilege.
15   A.  Yeah.  I'll assert legislative privilege on
16   advice of counsel.
17   Q.  (By Mr. Fisher) In your work as a senator, a
18   Texas State Senator, do you think that it's important
19   that the laws that you pass have proved successful in
20   other states?
21       MR. SWEETEN:  In answering the question,
22   don't reveal your thoughts and mental impressions about
23   any specific piece of legislation, including 362 or
24   Senate Bill 14 or others discussed.  You can answer as a
25   general matter that question as you're sitting here, but

---

### 174

1    don't reveal matters of privilege as to a specific bill.
2    A.  Yeah.  In general, I'm curious, but -- but I'm
3    interested, but it doesn't -- it doesn't necessarily
4    guide me to support or not to support legislation.
5    Q.  (By Mr. Fisher) So as a senator, as a Texas
6    State Senator, whether legislation has been successful
7    in other states does not guide your decision about
8    whether to support it in Texas; is that correct?
9        MR. SWEETEN:  Objection, asked and
10   answered.  Also, objection to the extent it seeks
11   matters or reveals his mental impressions, thought
12   process, and the legislative process as to any bills.
13   But to the extent it does not do so, you can answer as
14   you're sitting here.
15   A.  Yeah.  I would assert legislative privilege on
16   my thought process on making those decisions.
17   Q.  (By Mr. Fisher) Okay.  Senator, I'm going to
18   hand you what's been marked previously as Exhibit 47.
19   A.  Okay.
20   Q.  So Exhibit 47, it's titled Senate Journal, 82nd
21   Legislature, Regular Session, and it's dated January
22   26th, 2011.  Is that correct, Senator?
23   A.  Yes, sir.
24   Q.  So I'm going to turn your attention to what on
25   the document -- if you look at the upper right-hand

---

### 175

1    corner, you'll see pages numbers?
2    A.  Okay.
3    Q.  And obviously, those page numbers don't
4    correspond to the number of pages.
5    A.  Right.
6    Q.  But if you would take a look at Page 138, and
7    you'll see, towards the bottom of Page 138, you'll see
8    Floor Amendment 15.
9    A.  Uh-huh.
10       MR. SWEETEN:  What?  Did you say 138?
11       MR. FISHER:  Correct.
12       MR. SWEETEN:  Okay.
13   Q.  (By Mr. Fisher) 138.  Floor Amendment 15.
14   A.  Right.
15   Q.  And if you would take a look at that.
16   A.  Floor Amendment Number 15?
17   Q.  Correct.
18   A.  Okay.
19   Q.  And let me know after you've had a chance.
20   A.  Okay.  I'm reading it.  Okay.  I'm ready to
21   take your questions.
22   Q.  Floor Amendment 15 describes an amendment
23   offered by Senator Davis; is that correct?
24   A.  Yes, sir.  Yes.  Uh-huh.
25   Q.  And could you describe that amendment for me?

---

### 176

1    A.  I'll read what it says here.  "A driver's
2    license or personal identification card issued to the
3    person by the Department of Public Safety that has not
4    --" and then I don't know if she crossed it through or
5    it was crossed through.  It's a little confusing to read
6    these after the fact who did what crossing out.
7    " -- expired or has expired after the day
8    of the most recent general election."  And then it looks
9    like cross out after "United States military," and then
10   a cross out "birth certificate or other documents."  To
11   be very honest with you, it's a little confusing who did
12   the crossing out here, but I'm not so sure what this
13   amendment was trying to accomplish in reading it today.
14   Q.  Well, how did you vote on the amendment at the
15   time, Senator?
16   A.  I voted against.  I voted that we -- voted to
17   table.  I have to see here.  I voted -- this can be
18   confusing also.  I voted, "Yes, to table."
19   Q.  To table the amendment; is that correct?
20   A.  Yes.  Correct.
21   Q.  And what does it mean to table an amendment,
22   Senator?
23   A.  That means to not allow it to come to the floor
24   for a vote.
25   Q.  And if you look at Section 1 of this amendment

DAN PATRICK                                                                    May 30, 2012

## 177

1  offered by Senator Davis.
2      A.   Right.
3      Q.   And I understand your contention that it is
4  somewhat confusing.  But if we look at the last line
5  there, and I guess the "That has not expired," where it
6  has "expired" after date of the most recent general
7  election, is that different than what SB 14 ended up
8  looking like, based on what we've looked at here today?
9      A.   I don't know.  I mean...
10     Q.   Well, you can took a look, Senator, at SB 14,
11  and I think you'll find that it's -- there is some
12  mention in there of 60 days as an expiration?
13     A.   Oh, yes.  Okay.  I recall that.  Yes.
14     Q.   Actually, does this amendment, Senator, look
15  like more like 362, a bill which you also supported?
16     A.   No, it doesn't look similar to that, because
17  Senate Bill 362, I think, if I go back from memory, said
18  something about two years, so this would be not be
19  similar to --
20     Q.   How often are general elections held in Texas?
21     A.   Every two years.
22     Q.   And what does the language here say about the
23  expiration dates of the identification?
24     A.   "The most recent general election."
25     Q.   Is it fair to say that this is similar to

## 178

1  SB 362, as far as the expiration date, if general
2  elections are held every two years?
3      A.   I'd have to go back and do an exact
4  comparison.  They're similar in time.
5      Q.   So what was the purpose of your vote to table
6  an amendment that reflects something that you supported
7  in 362?
8          MR. SWEETEN:  Objection.  Don't reveal --
9  don't answer the question.  It calls for matters subject
10  to the legislative privilege.
11     A.   Yeah.  I assert legislative privilege.
12     Q.   (By Mr. Fisher) And how would this amendment
13  have interfered with the goals in enacting SB 14?
14         MR. SWEETEN:  Same objection, legislative
15  privilege.  Don't answer the question.
16     A.   Right.  I assert legislative privilege on the
17  advice of counsel.
18     Q.   (By Mr. Fisher) Sitting here today, do you have
19  any concerns about not including this amendment in
20  SB 14?
21         MR. SWEETEN:  Same objection, legislative
22  privilege.
23     A.   Yeah.  I assert legislative privilege on advice
24  of counsel.
25     Q.   (By Mr. Fisher) All right.  Senator, if we

## 179

1  could turn to Page 130, and that would be in the upper
2  left-hand corner of this page, 130.
3      A.   Okay.
4      Q.   And this one is pretty much all contained on
5  the same page here.  It starts with, "Senator Ellis
6  offered the following amendments of the bill," and I'm
7  referencing Floor Amendment 30.
8      A.   All right.
9      Q.   And you can go ahead and take a look at that,
10  and let me know after you've had a chance to take a look
11  at that, Senator.
12     A.   I've read it, or glanced through it.
13     Q.   So is it fair to say that Senator Ellis
14  introduced an amendment that would have required the
15  Secretary of State to conduct a study, and that that
16  study would have included information about the number
17  of eligible voters who are prevented from voting or had
18  to vote provisionally because of a lack of an ID, and an
19  analysis of this group by race, as well as an analysis
20  of the impact on racial and ethnic minorities?
21     A.   I believe that is a fair representation of his
22  amendment.
23     Q.   And how did you vote on this amendment,
24  Senator?
25     A.   I voted to table the amendment.

## 180

1      Q.   And what was the purpose of your vote to table
2  this amendment?
3          MR. SWEETEN:  Don't answer the question.
4  It calls for matters subject to the legislative
5  privilege.
6      A.   I assert legislative privilege on advice of
7  counsel.
8      Q.   (By Mr. Fisher) And how would this --
9  conducting this study have interfered with your stated
10  goals in enacting SB 14?
11         MR. SWEETEN:  Same objection.  It calls
12  for matters of legislative privilege.
13     A.   I assert legislative privilege.
14     Q.   (By Mr. Fisher) And is that on the advice of
15  your counsel?
16     A.   Yes, it is.
17     Q.   Do you have any concerns about not conducting
18  such a study, Senator, as you sit here today?
19         MR. SWEETEN:  Same objection.  It calls
20  for matters of legislative privilege, that is, thoughts
21  and mental impressions about the bill.
22     A.   Yeah.  Legislative -- assert legislative intent
23  on advice the counsel.
24     Q.   (By Mr. Fisher) Were you concerned that such a
25  study would show that minorities are disproportionately

## 181

1   impacted by SB 14?
2           MR. SWEETEN:  Same objection.  It calls
3   for matters of legislative privilege.
4           A.   Assert legislative privilege on the advice of
5   counsel.
6           Q.   (By Mr. Fisher) Senator, do you remember the
7   Floor consideration of SB 14 at all?
8           MR. SWEETEN:  You can answer at phrased.
9           A.   Yeah, not much of it.
10          Q.   (By Mr. Fisher) And was your role during the
11  Floor consideration of SB 14?
12          A.   My role in SB 14, my primary role was, I
13  believe, offering an amendment to the bill.  There may
14  have been -- you know, if I look at the record, I may
15  recall something else.  Once again, we spend a lot of
16  time on the Floor, so I don't remember every bill, every
17  instance.  But do I remember -- I believe I remember
18  that correctly.
19          Q.   Do you remember any concerns raised about
20  SB 14's impact on minority voters?
21          MR. SWEETEN:  You're asking about on the
22  Floor?
23          MR. FISHER:  Correct.
24          MR. SWEETEN:  You can answer as phrased.
25          A.   Yeah, in general, you know, those are

## 182

1   objections by members who opposed the bill.
2           Q.   (By Mr. Fisher) And who were those members?
3           A.   Our -- I don't know that every Democrat said
4   it, but various Democrats.
5           Q.   And what were those concerns?
6           A.   I don't recall specifically.
7           Q.   Were they concerns about the impact of SB 14 on
8   minority voters?  Is that fair to say as a general
9   matter?
10          A.   That's probably fair to say on a general
11  matter.
12          Q.   Was part of your role -- and you are listed as
13  an author of SB 14, and we have discussed how that --
14          A.   Right.
15          Q.   -- how that might not have been, you know,
16  completely applicable in this case.  But was part of
17  your role to answer any questions about the bill?
18          A.   No.
19          Q.   And you did say that you offered
20  amendments during the Floor debate of SB 14; is that
21  correct?
22          A.   I think I offered an amendment.
23          Q.   Okay.  If we can turn to Page 123, and you'll
24  see Floor Amendment 18.
25          A.   All right.

## 183

1           Q.   And this bill says, "Senator Hinojosa offered
2   the following amendment to the bill," but your name is
3   listed at the bottom as well.
4           A.   Yes.  Yes.
5           Q.   And so was this amendment offered by you and
6   Senator Hinojosa?
7           A.   It was.
8           Q.   And what was the purpose of this amendment?
9           MR. SWEETEN:  Don't discuss matters
10  subject to the legislative privilege, including your
11  mental impressions about legislation.
12          A.   Right.  This --
13          MR. SWEETEN:  You can reveal matters of
14  the public record, but do not discuss your mental
15  impressions or thoughts or opinions.
16          A.   Yeah.  On the -- there's -- I'm sure there's a
17  public record of the reasons that Senator Hinojosa
18  gave.  I don't know if I spoke on this or not.
19  Sometimes out of time and just senatorial respect, he
20  was the author of the amendment, and I was the co-author
21  of the amendment, so he may have been the only one to
22  speak on the bill.  And whatever he said would have been
23  the record.  I don't know if I spoke on the bill or not.
24  I don't remember.
25          Q.   Well, just looking at it, I mean, what was the,

## 184

1   on its face, the purpose of this amendment?
2           A.   The amendment says that if you have a license
3   to carry a concealed handgun, that that would be a form
4   of photo ID that you could use to vote.
5           Q.   Okay.  And so then it's fair to say that this
6   was an addition to the forms of photo identification
7   that were previously allowable under SB 14?
8           A.   Yes.  It was -- I thought, yeah, it was a form
9   of a change.
10          Q.   So it was an addition.  It expanded the
11  universe of photo identification that was acceptable
12  under SB 14; is that fair?
13          A.   Yes, sir.
14          Q.   And do you know the racial composition of
15  license to carry a concealed handgun license holders?
16          MR. SWEETEN:  In answering the question,
17  don't reveal conversations you've had with state
18  agencies, other legislators, legislative staff, state
19  departments, you know, within the state of Texas, or
20  your mental impressions or thoughts about the bill.
21          A.   Yeah.  I don't have the numbers on that.
22          Q.   (By Mr. Fisher) Are you aware of whether any
23  staff or legislator investigated the racial composition
24  of folks that carried a concealed handgun license?
25          MR. SWEETEN:  Same objection.  It calls

DAN PATRICK                                              May 30, 2012

## 185

1   for matters subject to the legislative privilege.

2   A.  Yeah, I'm not aware if that happened.

3   Q.  (By Mr. Fisher) There was -- did you have any

4   communications with anyone concerning the composition of

5   concealed handgun license holders, as far as racial

6   composition?

7       MR. SWEETEN:  You can answer if you had a

8   conversation.  You can identify one way or the other if

9   you did or didn't.

10  A.  Yeah.  I don't -- I don't recall that

11  conversation.  I don't recall a conversation on that.  I

12  think earlier I testified -- you asked me if I had a

13  conversation about this bill, and I said without talking

14  about the conversation, I referred to Senator Hinojosa.

15  He's a Democrat.  I'm a Republican.  We both have a

16  concealed carry license, so -- but I don't recall any --

17  you know, anything beyond that.

18  Q.  (By Mr. Fisher) Before supporting this

19  amendment, were you aware of the number of concealed

20  handgun license holders in Texas

21      MR. SWEETEN:  Objection, calls for matters

22  subject to the legislative privilege, including his

23  mental thoughts and impressions about legislation or

24  communications that he with the designated individuals

25  we have discussed today.

## 186

1   A.  Yeah.  I would assert legislative privilege.

2   Q.  (By Mr. Fisher) And is that one the advice of

3   your counsel, Senator?

4   A.  Yes.

5   Q.  Okay.

6       MR. FISHER:  Well, I'd would like to offer

7   at this time Exhibit 166.

8       (Exhibit 166 marked for identification.)

9   Q.  (By Mr. Fisher) So Exhibit 166, we have the

10  Texas Senate Staff Services, 82nd Legislative Session,

11  Excerpts Senate Bill 14, January 26th 2011; is that

12  correct?

13  A.  Yes, sir.

14  Q.  And if you'd take a look at the third page of

15  this document, and it is, at the top, Page 7, but it's

16  the third page of this excerpt.

17  A.  Yes.

18  Q.  And so it is hard to tell from the transcript

19  here, but either you or Senator Hinojosa answers with a

20  number of licensed -- concealed handgun license

21  holders.  So we have Senator Ellis who says, "You don't

22  know, do you?"  Senator Hinojosa says, "About four."

23  Senator Ellis says, "Senator Patrick," and then we see

24  "450 --" "inaudible overlapping conversation, inaudible

25  background conversation --" "About 415,000."  "Inaudible

## 187

1   background conversation."  "Yeah, about 400,000

2   roughly."  And then Senator Hinojosa.  "About 415,000."

3       So, after the word, "Senator Patrick," do

4   you remember, was that you offering the number of

5   concealed handgun license holders?

6       A.  To try to answer your question as accurately as

7   I can, if you go back to the previous page, I spoke

8   briefly, and I think earlier testimony I suggested -- I

9   didn't remember until I read it -- that usually you --

10  professional courtesy to the author of the amendment.

11  And so I simply stood up on the Floor and thanked

12  Senator Hinojosa, and then I said, "Thank you, Senator.

13  Appreciate it, thank you," which would indicate I turned

14  off my microphone and sat down.  And then Senator Ellis

15  was recognized by the Chair.  So I would not have been

16  on mic, because we press a button to speak, and once you

17  conclude your conversation, you turn your button off and

18  sit down.  So, there would have been no reason for me to

19  still be standing with my mic on the Floor, so I don't

20  believe that was me.

21  Q.  Well, Senator Patrick, I mean, that seems

22  exactly what happened here.  I mean, we have Senator

23  Ellis talking, then we have some inaudible background

24  conversation, and someone offering a number of 415,000.

25  A.  Right.

## 188

1   Q.  And from your reading of this transcript, do

2   you believe that wasn't you that you offered that

3   number?

4       A.  I couldn't be certain, to use an earlier word.

5   I don't think that was me.  I think Senator Ellis is

6   probably look at me sitting down and just saying --

7   because, Senator Hinojosa would have been standing the

8   whole time.  And once you finish, you sit down.  You

9   don't stand behind your desk, so I don't think that was

10  me.

11  Q.  If it wasn't you, Senator Patrick, who was it?

12  A.  It could have been Senator Hinojosa.  I mean, I

13  just don't know.  I just don't know.  It looks like he

14  -- it looks like he started to answer the question, and

15  then it looked he finished answering the question.

16  Q.  Do you think it was important to know the

17  number of holders of a concealed handgun license before

18  offering this amendment?

19      MR. SWEETEN:  Objection, it calls for

20  matters of legislative privilege.

21  A.  Yeah.  I would assert legislative privilege.

22  Q.  (By Mr. Fisher) Well, it's being asked for in

23  the public record by Senator Ellis.  Do you think

24  Senator Ellis thought it important to know this number?

25  He does ask for the number.

DAN PATRICK                                                    May 30, 2012

---

### 189

1     MR. SWEETEN:  Objection, calls for
2  speculation.
3     A.  Yeah, I can't speculate on that.
4     Q.  (By Mr. Fisher)  Just based on what's in front
5  of you, Senator, does it look like Senator Ellis asked a
6  question about the number license to carry holders?
7     MR. SWEETEN:  You can answer that question
8  as phrased.
9     A.  Yes.  Yes, it did.
10    Q.  (BY MR. FISHER)  And you said earlier you didn't
11  know the number of registered voters that did not
12  possess one of the required forms of ID identified in
13  SB 14, or did you assert privilege to the answer to that
14  question?
15    MR. SWEETEN:  Objection.  That calls for
16  matters subject to the legislative privilege, the
17  thoughts, mental impressions, opinions about legislation
18  or analysis.
19    A.  Yeah, I believe we asserted privilege.  You'd
20  have to go back, but I believe we asserted legislative
21  privilege.
22    Q.  (By Mr. Fisher)  So in response to a question
23  about the number of registered voters that did not
24  possess one of the required forms of ID identified in
25  SB 14, you asserted legislative privilege, but we did

---

### 190

1  discuss the fact that you voted to table an amendment
2  that would have required a study by the Secretary of
3  State regarding the number of racial and ethnic
4  minorities without ID; is that correct?
5     MR. SWEETEN:  You can testify about
6  what --
7     A.  Yeah.  The public record would indicate that.
8  You are correct.
9     Q.  (BY MR. FISHER)  And do you find any
10  inconsistency, as you sit here today, with the fact that
11  a study was not -- you voted to table an amendment that
12  would have required a study regarding the number of
13  racial and ethnic minorities without ID, yet offered an
14  amendment to increase the number of voters who could
15  show ID with a license to carry a concealed handgun
16  license?
17    MR. SWEETEN:  Senator Patrick, don't
18  reveal your thoughts, mental impressions, or opinions
19  about legislation or the legislative process in
20  answering this question, nor conversations that we've
21  discussed.
22    A.  Yeah.  I would assert my legislative privilege
23  on that.
24    Q.  (By Mr. Fisher)  And that's on the advice of
25  your counsel?

---

### 191

1     A.  Yeah.
2     Q.  And so, Senator, we do have Senator Ellis
3  clearly asking a question about the number of
4  individuals that would have been covered by your
5  amendment; is that correct?
6     A.  Yes.
7     Q.  And yet you voted to table an amendment that
8  would have potentially revealed numbers of voters that
9  did not have other forms of ID encompassed within SB 14;
10  is that correct?
11    MR. SWEETEN:  Objection, compound.
12  Objection, asked and answered.
13    A.  Yes.  I mean -- sorry.
14    MR. SWEETEN:  You can answer it.  I think
15  you've answered it.
16    A.  Yeah.  I think I've answered it.  I'm sorry.
17    Q.  (By Mr. Fisher)  I'm sorry, Senator.  What was
18  the answer?
19    A.  I got distracted.  I'm sorry.  I turned my
20  phone off.  Sorry.
21    MR. SWEETEN:  Yeah.  I mean, we can do it
22  again, but I think the record -- he said, and I think
23  we're done.  But whatever you want to do.
24    MR. FISHER:  Can we reread the question,
25  please.

---

### 192

1     (The requested portion was read back by
2  the court reporter.)
3     A.  Yes.  Yeah, I voted against -- I voted to table
4  the amendment.
5     Q.  (BY MR. FISHER)  Senator, how did the exception
6  for individuals with disabilities come to be included in
7  SB 14?
8     MR. SWEETEN:  Don't reveal matters that
9  are your thought processes, mental impressions about the
10  bill.  That is a matter of legislative privilege.
11    A.  Yeah.  I assert legislative privilege on the
12  advice of counsel.
13    Q.  (By Mr. Fisher)  Did you offer an amendment that
14  included an exception for individuals with disabilities
15  under SB 14?
16    MR. SWEETEN:  You can testify.  That's a
17  matter of public record.
18    A.  Yes.
19    Q.  (By Mr. Fisher)  Okay.  If you would turn to
20  page 133 of Exhibit 47, which is the big Senate Journal
21  with all the amendments that we were recently looking
22  at.
23    A.  Okay.  Page 147?
24    Q.  Page 133.
25    A.  All right.

DAN PATRICK                                    May 30, 2012

---

## 193

1    Q.   And it starts with, "Senator Patrick offered
2  the following amendment to the bill."  If you could take
3  a look at that, please.
4    A.   Okay.  "Senator Patrick."  Okay.  I'm good.
5    Q.   And was this an exception for individuals with
6  disabilities under SB 14?  Is that a fair
7  characterization of this amendment?
8    A.   It was an amendment for the exception with
9  certain people with disabilities.  Not all, but some.
10   Q.   And what were the circumstances under which
11 this exception was written into SB 14?
12        MR. SWEETEN:  I'm going to object.  I
13 think it calls for his mental impression, thoughts,
14 opinions, motivation regarding legislation and reveals
15 matters subject to legislative privilege.
16   Q.   (By Mr. Fisher) Senator?
17   A.   Yeah.  I would certainly assert privilege.
18   Q.   On the advice of your counsel?  Yes?
19   A.   Yes, sir.
20   Q.   What was the purpose of this amendment,
21 Senator?
22   A.   It -- what it says here in the record, that an
23 applicant who wishes to receive an exemption on the
24 basis of a disability for the requirements of Section
25 63.001 must include a certificate from a physician that

## 194

1  has a disability as defined by Section 21.002 of the
2  Labor Code, and --
3    Q.   Senator, are you reading from the bill right
4  now?
5    A.   Yes, I am.
6    Q.   And what's the general purpose of this
7  amendment, Senator, an amendment you offered?
8    A.   Yeah.  The purpose of the amendment is what it
9  says here in the Journal, it includes and states what
10 the purpose is.
11   Q.   So I give you Exhibit 167.
12        (Exhibit 167 marked for identification.)
13   Q.   (By Mr. Fisher) Exhibit 167 is a similar
14 transcript that reads, "Texas Senate Staff Services,
15 82nd Legislative Session."
16   A.   Okay.
17   Q.   "Senate Bill 14, January 26, 2011."  Is that a
18 fair characterization, Senator?
19   A.   Yes, sir.
20   Q.   So if you take a look at the second page of
21 this document, you'll see your name, and this is after
22 the president has said the Chair recognizes Senator
23 Patrick to explain Floor Amendment 35.  If you would
24 take a look at that paragraph after your name, Senator,
25 please.

## 195

1    A.   Yes, I have.
2    Q.   Does this change your recollection about the
3  purpose of the amendment you offered concerning
4  individuals with disabilities?
5    A.   Well, it doesn't change my view.  I was just
6  trying to answer your question accurately last time,
7  that the amendment spells out, it says what it says, and
8  I -- you know, I haven't read this or seen before today,
9  so I don't remember exactly what I said, you know, over
10 a year ago.
11   Q.   Do you remember that this hearing took place,
12 Senator?
13   A.   Oh, yes.  I mean, yeah, these are my words,
14 but, I mean, I don't remember specifically until
15 reading here what I said.
16   Q.   Senator, if you look about halfway down, maybe
17 just a little more than halfway, you'll a sentence that
18 starts, "They can, of course, vote by mail, as they do
19 now, by checking off the box, but many members of our
20 community of the disabled will actually want to go vote,
21 but it could be a burden to receive, to go get that
22 photo if they don't have one."  Do you see that
23 sentence?
24   A.   Yes, sir.
25   Q.   So why would it be a burden for an individual

## 196

1  described herein to get a photo ID?
2        MR. SWEETEN:  Don't reveal matters of
3  legislative privilege.  You can answer based upon the
4  public record.
5    A.   Yeah.  That -- you know, the public record
6  speaks for itself.
7    Q.   (By Mr. Fisher) Senator, how could it be a
8  burden for anyone to get a photo ID, as you have
9  indicated here in this public statement, that it could
10 be a burden to receive, to go and get that photo ID if
11 they don't have one?
12        MR. SWEETEN:  You can testify about
13 matters of the public record, but don't reveal matters
14 that are subject to the legislative privilege, including
15 your thoughts, mental impressions, opinions about
16 pending legislation, including Senate Bill 14.
17   A.   Okay.  Yeah.  I assert legislative privilege
18 because it does apply to my thinking behind that.  So on
19 advice of counsel, legislative privilege.
20   Q.   (By Mr. Fisher) Senator, you're not going to
21 answer questions about a public statement you made on
22 the record regarding an amendment you to Senate Bill 14;
23 is that correct?
24        MR. SWEETEN:  Let's be clear.  He is
25 answering questions about what's on the record, and I

197

1  will allow him to continue to do so, but he's not going
2  to reveal his thoughts, mental impressions, opinions,
3  motivations about legislation.  That's subject to the
4  privilege.
5      A.   I assert legislative privilege on advice of
6  counsel.
7      Q.   (By Mr. Fisher) As a general matter, how could
8  it be a burden for someone who is disabled to go and get
9  a photo ID from a DPS location in Texas?
10         MR. SWEETEN:  Same objection.  Same
11  instruction.
12     A.   I assert legislative privilege on advice of
13  counsel.
14     Q.   (By Mr. Fisher) As we sit here today, this
15  amendment aside and SB 14 aside, how could it be a
16  burden for someone who is disabled to get a photo ID?
17         MR. SWEETEN:  Same -- oh, wait.  You're
18  asking him, as we're sitting here today and not in the
19  context of legislation?
20         MR. FISHER:  Correct.
21         MR. SWEETEN:  Okay.  You can answer to the
22  extent you would not be revealing matters of legislative
23  privilege in doing so.
24         THE WITNESS:  I'd like to ask my -- I'd
25  like to ask counsel a question, if I may.

198

1         MR. FISHER:  We can go off the record.
2         (Recess from 4:50 p.m. to 4:59 p.m.)
3         (Pending question read back by court
4  reporter.)
5         MR. SWEETEN:  I'm going to object to the
6  extent the question is calling for matters subject to
7  the legislative privilege.  It could include his
8  opinions, mental impressions about any legislation.  So
9  I would instruct him not to answer on that basis,
10 because I think you're asking him to reveal his thought
11 processes about Senate Bill 14.
12     A.   So I would assert legislative privilege on my
13 thought process.
14     Q.   (By Mr. Fisher)  You're asserting based on the
15 advice of your counsel, Senator?
16     A.   Yes, sir.
17     Q.   At this time, I will turn it over to the
18 defendant intervener who'll ask you questions.
19         MR. SWEETEN:  Are you passing the witness,
20 Spencer?
21         MR. DUNN:  No, he's not, and I hope you
22 can accommodate me.  But he's just going to let me do
23 about 20 minutes and then we'll be done, and then he'll
24 continue, because I have to leave early today.
25         MR. SWEETEN:  Chad, we'll accommodate

199

1  you.  It's not a big deal.
2         MR. DUNN:  Okay
3            EXAMINATION
4  BY MR. DUNN:
5      Q.   Senator, my name is Chad Dunn.  I represent
6  Defendant Intervenors, a group of individuals that are
7  called the Kennie Intervenors.  But all of the
8  intervenors in this case have agreed that one lawyer
9  will get together at least at most depositions and do
10 the questions for intervenors, so I sort of represent
11 all of them, I suppose, in the next few minutes just in
12 asking you questions.
13     A.   Okay.
14     Q.   I do want you to understand upfront that the
15 questions I'm going to ask only relate to the public
16 record.  And I'll try to demonstrate that in each
17 question.  But in none of my questions do I want you to
18 get into any legislatively privileged materials, okay?
19 I just want to talk about what's in the public record
20 and what you recall, all right?
21         But first just a little bit about your
22 office and your election and district.  Your district, I
23 believe, you said was West, Northwest Harris County; is
24 that right?
25     A.   West Harris County, not Northwest.

200

1      Q.   And for our judges who may not know, that's the
2  Houston -- that's the county that Houston's in; is that
3  right?
4      A.   Correct.
5      Q.   All right.  How would you describe the racial
6  makeup of that district?
7      A.   I think I've testified to that earlier.  I was
8  not sure if that, if my answer was based on registered
9  voters or the population of the district, because I
10 don't recall.  But I believe I've seen a document or
11 something in writing that 39 percent of Senate District
12 7, again, I don't know if that's people or registered
13 voters, are Black and Hispanic.
14     Q.   Do you -- are there areas or pockets of your
15 district that have a higher degree of Latino or African-
16 American population?
17     A.   Yeah, not to my knowledge.
18     Q.   Is it fair to say that your district is a
19 predominantly Anglo district, at least in terms of those
20 that control the outcome of the election?
21     A.   You know, I don't know that I would
22 characterize that.  I don't look -- I don't look at the
23 racial makeup of people who vote for me or vote against
24 me.
25     Q.   Do you see a number of Latinos and African-

DAN PATRICK                                                                    May 30, 2012

## 201

1   Americans at political events you go to?
2       A.   I see a greater number of Latinos than I see
3   African-Americans.  And I believe, again, looking back
4   at the documentation, that there are more -- of that 39
5   percent, more than half are Latino; can't be certain of
6   that, but that seems to be.  It's not a large African-
7   American population in the district.
8       Q.   Do you have some what you would consider to be
9   key or large, whether it's donors or supporters or
10  activists on your behalf who are Latino or African-
11  American?
12      A.   You know, with the Latino population, you don't
13  always know someone is Latino, you know.  Not
14  necessarily by name, not necessarily by appearance.  So
15  I really don't have the answer to that question.
16      Q.   Well, could you name for us, for example, a
17  donor of yours that's African-American or Latino?
18      A.   The Latinos I really couldn't because I -- you
19  know, I just don't know.  There may be some people who
20  are Latino that I'm not aware of and some people who I
21  thought may be Latino who are not.  I just don't know.
22           African-Americans, because the population
23  is relatively small in the district, I'm trying to
24  think.  There are some, but I just can't remember
25  their -- I can't remember their name.

## 202

1       Q.   Would you describe your district as largely
2   suburban?
3       A.   Yeah.  I -- I believe under the new
4   redistricting, I'd have to verify the new number.  But
5   previously, it was about 20 percent Houston and 80
6   percent unincorporated Harris County.  So mostly
7   suburban.
8       Q.   Senator, before you got into the Senate, you
9   worked in radio, and you've testified that.  I'm not
10  going to try and cover that again.  You were and have
11  been for quite some time a radio host; is that correct?
12      A.   Correct.
13      Q.   And would it be fair to describe that your
14  activities of a radio host were in support of
15  conservative, politically conservative positions?
16      A.   Correct.
17      Q.   In fact, I think you've described yourself
18  publicly as, you know, one of the more conservative
19  members of the legislature; is that fair?
20      A.   Correct.
21      Q.   And you haven't been shy about talking about
22  the support you have for conservative and very
23  conservative initiatives; is that true?
24      A.   Correct.
25      Q.   Is it true that in Texas, anyway, in your

## 203

1   experience dealing with minorities in your district,
2   that minority citizens are supportive or not supportive
3   of conservative policies?
4       A.   Would you repeat that?
5       Q.   Sure.  In your experience in your district with
6   the minority population you've described earlier that
7   you've interacted with and represent, is it your
8   experience that that minority population supports
9   conservative causes that you often support?
10      A.   I think many do, and that would be indicative
11  of the fact that in a general election, I receive close
12  to 70 percent of the vote.
13      Q.   And so have you ever done any sort of figuring
14  or analysis to figure out in the 30 percent, roughly,
15  that don't support you, how much of them are made up of
16  Latino or African-American citizens?
17      A.   I don't know.
18      Q.   That could be all minority citizens.  It could
19  be all Anglo or a mix.  You don't -- you're not really
20  sure.
21      A.   It wouldn't be all of any one group.  It would
22  be a mixture of all groups.
23      Q.   All right.  When you prepare your election
24  campaign -- and let's see, you ran for Senate in 2008?
25      A.   2000 -- began my campaign 2005 for the 2006

## 204

1   primary general election.
2       Q.   You had quite a contested Republican primary as
3   I recall; is that true?
4       A.   I think there were 3 other candidates.
5       Q.   And at least two of the other candidates were
6   elected officials.
7       A.   They were House members.
8       Q.   State House members?
9       A.   Chairmen.
10      Q.   And who represented that area?
11      A.   Well, a Senate district is --
12      Q.   Part of the areas.
13      A.   Yeah.  They represented smaller pieces of the
14  area.
15      Q.   Sure.  One of the things that allowed you to
16  have success, and I'm not down-playing any of the
17  reasons that you had success, but one of the reasons was
18  your exposure on the radio; would you agree?
19      A.   I would agree that -- actually, I would
20  disagree, because I'd be, again, the campaign, and most
21  people said I may listen to you on the radio, but why
22  should I vote for you?
23      Q.   Okay.
24      A.   So I had to convince people that I was the
25  right guy.  Obviously, I had name ID, but my opponents

DAN PATRICK                                          May 30, 2012

## 205

1    outspent me and also had name ID.

2    Q.   In that election, one of the ways you were able

3    to defeat the other elected officials who were running

4    against you was to emphasize how conservative you vote

5    and the conservative policies you support; is that true?

6    A.   Correct.

7    Q.   Since you joined the Senate, you have led a

8    number of initiatives that to make the Senate more

9    conservative.

10    A.   Correct.

11    Q.   In fact, one of the more recent examples, I

12    believe, is you have requested that in the event the

13    Lieutenant Governor is elected to Senate, the United

14    States Senate, and resigns, you want just the Republican

15    caucus to vote for the replacement Lieutenant Governor;

16    is that true?

17    A.   Or at least the majority.

18    Q.   I beg your pardon?

19    A.   Or the majority of the Republican caucus.

20    Q.   I see.  But in other words, you want

21    Republicans to decide who the Lieutenant Governor would

22    be to the exclusion of the Democrats?

23    A.   Not to the exclusion but to the majority.

24    There are currently 19 Republicans and 12 Democrats.

25    And my public statements have been that at least a

## 206

1    majority.  In fact, I recently said it would be good if

2    there were 11 or 12 Republicans and 3 or 4 Democrats.

3    That would be a nice -- you know, could be more

4    Republicans, but it would be nice to have a mix, but it

5    should be a majority in my view.

6    Q.   Well, one of the proposals you've thrown out is

7    the Republicans should caucus alone, agree on a

8    Lieutenant Governor candidate, and then have the vote in

9    the chamber with the rest of the senators.  Was that not

10    your proposal?

11    A.   I -- I think my proposal, my most recent

12    conversations on the record have been that I would like

13    to see the Republicans select a candidate.  And if -- in

14    fact, I remember specifically saying it, because it was

15    a televised interview, but you know, if it's 12

16    Republicans and 3 Democrats or 4 Democrats, and that

17    would be a positive thing.

18    Q.   Now, in the Texas Senate, the only members who

19    are of Latino or African-American descent are Democrats;

20    is that true?

21    A.   In the Texas Senate?

22    Q.   Yes, sir.

23    A.   I just want to be sure.  There are no African-

24    American Republican senators.  I'm trying to -- do we

25    have any Latino senators?  I don't believe so.

## 207

1    Q.   All right.  When you -- when the Senate

2    considers measures, it typically has to have 21-votes in

3    order to take one out of order; is that right?

4    A.   Correct.

5    Q.   And there's been a lot of testimony about

6    this.  I'm not going to try to cover it here with you,

7    but would it be okay if I called out the 21-vote rule?

8    A.   Yes.

9    Q.   All right.  With respect to the 21-vote rule,

10    how many times in your service, and if you remember from

11    before your service, has that rule been overruled or

12    sort of stepped around on a piece of legislation?

13    A.   I -- I don't know how many times previous to me

14    joining the Senate, but during special session, which we

15    had one last session, the 21-vote rule absolutely is

16    not in play on any bill.  So it happens on certain

17    pieces of legislation in the regular session at times,

18    and then in special sessions, we don't invoke it.

19    And I -- and I believe from history, stand

20    to be corrected, that the precedent was set when

21    Democrats controlled the Senate, and there was a special

22    session, that they did not invoke the 21 rule on special

23    session.  And both Democrats and Republicans have

24    majorities or -- or Lieutenant Governors have -- have

25    put the 21-vote rule aside at various times.

## 208

1    Q.   This -- this most recent special session that

2    you discussed, that -- the priority during that session

3    was a congressional redistricting; was it not, the

4    special session?

5    A.   No, it was not.

6    Q.   The most recent special session?

7    A.   No, it was not a priority.  It was part of it,

8    but was not the priority.

9    Q.   Other than this Senate Bill 14 and whatever

10    came up in that special session, can you recall any

11    other examples when the 21-vote rule was adjusted or

12    altered?

13    A.   I'm sorry.  Would you repeat that question?

14    Q.   Sure.  Other than Senate Bill 14 and this

15    special session you just mentioned, during your service

16    do you know of any particular bill or measure that was

17    decided without the 21-vote rule?

18    A.   I don't recall.  There might have been one or

19    two, but I don't, I don't think so, but I don't recall.

20    Q.   You would agree that it's rare?

21    A.   Yes.

22    Q.   All right.  I think I've got about eight

23    minutes.  I promise to stay within it.

24    Now, have you responded to any complaints

25    by constituents that concern photo ID or voter fraud?

DAN PATRICK                                             May 30, 2012

## 209

1   MR. SWEETEN:  You can testify as to
2   whether or not you've responded to those.
3   A.  I personal -- are you talking about in writing
4   or verbally or --
5   Q.  (By Mr. Dunn)  Sure.  Have you called a
6   constituent, sent an e-mail or sent a letter that spoke
7   about voter fraud or photo ID?
8   A.  Addressing a complaint?
9   Q.  Yes, sir.
10  A.  To the best of my knowledge, I have not
11  personally.  Doesn't mean I didn't, but to the best of
12  my knowledge.  And my staff may have because, you know,
13  we get -- we get people who contact us, and my staff
14  will directly deal, you know, handle that.  So is it
15  possible my staff responded in some way reflecting my
16  position, simply saying the Senator supports this bill?
17  That, I couldn't testify to.  But I don't believe I have
18  personally -- could have happened, but I don't -- I
19  don't believe so.
20  Q.  Now, Senator, there's some issues that you have
21  to deal with constituent responses all the time about.
22  I'm sure you get contact maybe about ObamaCare, for
23  example.
24  A.  Sure.
25  Q.  You hear a great deal about them from your

## 210

1   constituents.  Is that true, there are a few issues that
2   you hear about and have to deal with all the time?
3   A.  Sure.  I don't normally respond directly unless
4   it's a unique situation.
5   Q.  Uh-huh.
6   A.  Because there's just not time in the day.
7   Q.  I understand.
8   A.  But the staff will get those issues and
9   respond.
10  Q.  In the course of your campaigns, have you done
11  anything to target the minority community in your
12  district to get their support?
13  A.  Yes.
14  Q.  What are those things?
15  A.  There is a -- there's a gentleman named Bill
16  Calhoun, I may have that name wrong, but I think that's
17  the correct name.  I just got to -- I just got a note
18  from him the other day, as a matter of fact, who
19  represents African-Americans, and so, you know, we have
20  met on a couple of occasions.  Been supportive of his
21  organization for outreach.  It's an outreach group for
22  African-Americans.  I, early on, when I was first
23  elected, I sat down with a group of Hispanic leaders.  A
24  gentleman named Reggie Gonzalez was a leader of an
25  outreach program for Latinos.  And both of those were --

## 211

1   tend to be conservative Latino groups and conservative
2   African-Americans.
3   But I also within the last six or eight
4   months, in the past, I've attended an all-Spanish-
5   speaking or primarily Spanish-speaking chamber of
6   commerce that I was invited to because I thought it was
7   important to go.  And I met with -- and my wife and I
8   stayed the full evening.  Had a great time.  Made some
9   good contacts with people.
10  And then I attended the Hispanic -- I
11  think it's called the Hispanic Chamber of Houston.  They
12  have a legislative awareness or appreciative --
13  legislative appreciation day.  And it's primarily
14  Democrat legislators who attend, but I attended.  And I
15  met the president, and I invited the president to come
16  and visit with me.  And within the last six months, the
17  president of the chamber and another person, I forget,
18  came to my Senate office and met with me.  And this is a
19  primarily Democrat-supported group.  And we -- we had a
20  long discussion on how we could work together to -- for
21  the betterment of Texas for Latinos, Anglos, African-
22  Americans, so I really work hard at that, because I
23  think it's really important.
24  Q.  Have you carried any legislation at the request
25  of Latino or African-American communities?

## 212

1   A.  To my knowledge, I've never been asked.  And
2   maybe that will manifest itself in the next session
3   after kind of beginning these -- these conversations.
4   But I don't think I've ever been asked, and I don't
5   think I've ever done that.
6   Q.  In the campaigns that you have run and that
7   you've assisted other friends of yours in the running of
8   their campaigns, did you become aware that an outcome of
9   an election was questioned because of potential voter
10  fraud?
11  A.  That I've run?
12  Q.  Yeah.
13  A.  Not that I've run, and -- and I can't speak to
14  the others.  Don't know.
15  Q.  Now, you -- you were asked a few questions
16  about Section 5 of the Voting Rights Act, and so I think
17  Section 5 means that certain government states, before
18  they can implement an election change, have to give
19  preclearance either from a court or Department of
20  Justice.  Does sound about --
21  A.  Yes.
22  Q.  -- the way you understand it?
23  A.  Sounds about the way I understand it.
24  Q.  So I assume that you've handled and worked on a
25  number of election-related measures since you've been in

## 213

1    the Senate?
2        A.  Some.
3        Q.  Okay.  When you work on a -- whether it's
4    voting on it or offering one, supporting one in
5    committee, do you give consideration as to how it would
6    get approved in the Section 5 process?
7            MR. SWEETEN:  Don't reveal your thoughts,
8    mental impressions, motivations, opinions about
9    legislation, or in furtherance of the legislative
10   process.  I think that calls for matters subject to
11   legislative privilege.
12       A.  Yeah.  I would assert legislative privilege on
13   that question.
14       Q.  (By Mr. Dunn)  Have you ever participated in
15   communicating with the Department of Justice in
16   furtherance of obtaining preclearance on a piece of
17   legislation?
18           MR. SWEETEN:  You can answer the question.
19       A.  Yeah.  I don't think we have.  I haven't
20   directly, to my -- except dealing with this issue here.
21       Q.  (By Mr. Dunn)  Do you have a person on staff
22   that you consider to be your point person for Section 5
23   that sort of analyzes those issues for you?
24       A.  Not really.
25       Q.  Do you -- are you familiar with racial -- this

## 214

1    is my last area of inquiry.  Are you familiar with
2    racially polarized voting?  Do you understand that term?
3        A.  No.
4        Q.  So without using that term, is it your belief
5    and experience representing a Senate district in Texas
6    that, in general, Anglos vote for Republicans , and in
7    general, Latinos and African-Americans vote for
8    Democrats?
9        A.  Excuse me.  In general, I think the public data
10   would show that a large percentage of African-Americans
11   vote for Democrats.  I don't know that it is as
12   predominant from the Latino community.  But again, the
13   public data would indicate more Latinos vote Democrats
14   than Republicans, but I don't think it's -- I'm not --
15   it's not predominant.
16       Q.  Do you think there's something different about
17   the minority population in your district in terms of how
18   it performs for political parties compared to other
19   parts of the state?
20       A.  I don't know that.
21       Q.  That's not something that you've worked on in
22   teams of preparing your campaign and getting out your
23   message for reelection?
24       A.  You know, I -- not specifically.  The issues
25   that I -- that I focus on are issues that are -- are

## 215

1    positive for the entire community.  I don't look at an
2    issue to just benefit one group or another group.  If
3    it's a tax issue.  If it's a transportation issue.  My
4    passion is education.  Education impacts -- in fact, our
5    public schools have a large segment of the minority
6    population.  So I might argue that a lot of what I
7    actually focus my time on is I believe positively
8    impacts minority community.
9            MR. DUNN:  All right.  Senator, I thank
10   you for the time.  I thank the Department of Justice for
11   letting me go out of order.
12           THE WITNESS:  All right.  I will tell
13   Logan hello.
14           MR. DUNN:  All right.  I hope you do.
15           FURTHER EXAMINATION
16   BY MR. FISHER:
17       Q.  All right.  So, Senator, turning back, I know
18   we just touched on this.  If you could clarify the
19   21-vote rule.  Could you just give me a quick definition
20   of the 21-vote rule?
21       A.  Yeah.  It's not a law.  It's just a rule that
22   the Senate -- senators, 31 senators vote on.  And it has
23   been a long-held tradition, that it takes 21-votes to
24   bring a bill to the floor.  It only requires 16 votes to
25   pass.  It takes a two-thirds majority to bring a bill to

## 216

1    the floor.
2        Q.  Have you also heard this is referred to as the
3    two-thirds rule, the same --
4        A.  Yes.
5        Q.  -- essential thing you just described?
6        A.  Yes.
7        Q.  I'm going to hand you what's going to be marked
8    as Exhibit 168.
9            (Exhibit 168 marked for identification.)
10       Q.  (By Mr. Fisher)  Exhibit 168 says "Senate
11   Journal, 81st Legislature, Regular Session, Austin,
12   Texas."  And then we've got "Second Day, Wednesday,
13   January 14, 2009"; is that correct?
14       A.  Yes, sir.
15       Q.  If we could turn to what would be page, in the
16   upper right-hand corner, designated as 23 of this
17   exhibit, but it's page 3 of the actual excerpt.
18       A.  Yes.
19       Q.  If you would take a look at the middle there,
20   you'll see "Special Orders Rule 5.11," and then we've
21   got A, B, C and D.  Do you see that, Senator?
22       A.  Yes.
23       Q.  And do you recognize this?
24       A.  It's 2009.  Yes.  I mean, I recognize it.
25       Q.  Okay.  What is it?

DAN PATRICK                                                    May 30, 2012

## 217

1    A.  It's a resolution -- when you say what is it?
2    It's just a resolution.  A little distracting with the
3    drummer out there.  Forgive me for all of us, not just
4    me, I'm sure.  A bill of resolution.
5    Q.  We are in Austin.
6    A.  Yeah, the Music Capital.  (Witness reading.)
7    Okay.  I've read it.  It's a special -- it's a special
8    order.
9    Q.  Would this rule have been in operation during
10   consideration of SB-362, which we've previously
11   discussed, which was brought to the floor in 2009?
12   A.  I can't exactly recall, but it may have.  It
13   may well have been.
14   Q.  And so if you look at Section D, and I'll go
15   ahead and read that.  "Notwithstanding Subsection A, a
16   bill or resolution relating to voter identification
17   requirements reported favorably from the Committee of
18   the Whole Senate may be set aside as a special order for
19   a time at least 24 hours after the motion is adopted by
20   a majority of the members of the Senate."  And so can
21   you tell me how this provision operated?
22   A.  I have to through this.
23   Q.  And if you need to, go ahead and reference
24   5.11A, which says "Any bill, resolution or other measure
25   made on any day be made a special order for a future

## 218

1    time of the session by an affirmative vote of two-thirds
2    of the members present."  Is that I guess what we would
3    term the proverbial two-thirds or 21-vote rule Section
4    A?
5    A.  I have to go back and kind of wrap my arms
6    around this.  When we're in session for six months, you
7    know, I've got the rules down pat, backwards and
8    forwards.  When I'm away for 12 months, I have to go
9    back and remember, revisit.
10   Q.  Well, Senator, let me ask you, is the
11   two-thirds rule and getting rid of the two-thirds rule,
12   has that been something that you have advocated for in
13   the past?
14   A.  I've advocated for reducing it from two-thirds
15   to 60 percent.
16   Q.  And that would be a three-fifths rule,
17   essentially, is that what you propose?
18   A.  It would take it from 21 to 19, true.
19   Q.  But Senator, has this been a priority for you
20   in the past, issues with regard to what we've termed the
21   two-thirds rule or 21-vote rule here today?
22        MR. SWEETEN:  You testified about matters
23   that you've publicly expressed.
24   A.  Publicly, yeah, it's a priority for me.
25   Q.  (By Mr. Fisher)  So Section D, what does that

## 219

1    do to the two-thirds Rule or the 21-vote rule, Section D
2    of Rule 5.11 that we're looking at here?
3    A.  And I would want to go back and make sure I'm
4    saying this correctly, because again, I don't have the
5    rule, Senate rule book in front of me, but I believe
6    what this does, this sets aside that 21-vote rule.
7    Q.  And it sets it aside specifically for a bill or
8    resolution relating to voter identification
9    requirements; is that correct?
10   A.  Correct.
11   Q.  And is it true that you pushed through this
12   rule's change along with Senator Williams in 2009?
13   A.  Senator Williams, I think, was the lead on it.
14   I don't recall my involvement in it or not.  If you have
15   a record that would reflect that, I'm happy to look at
16   that.
17   Q.  We'll mark Exhibit 169.  Exhibit 169 will be
18   Houston Chronicle article dated January 18, 2009.
19        (Exhibit 169 marked for identification.)
20   Q.  (By Mr. Fisher)  And I'll direct your attention
21   to the end of the first paragraph here where it says
22   "Republican Senators led by Tommy," and we do a cut-off
23   here, and I apologize for that," of the Woodlands and
24   Dan Patrick of Houston pushed through rules to suspend a
25   normal two-thirds margin needed to bring legislation to

## 220

1    the Senate Floor.  The only issue to which the change
2    would apply is voter ID."  And then if we move on, you'll
3    see more information about that.  Does this seem like a
4    fair characterization of what happened here?
5    A.  You know, I don't know if it's a fair
6    characterization, because the media doesn't always get
7    it right.  And I don't remember -- it didn't take two
8    people to push it through.  It just took one, and Tommy
9    took the lead on it.  But if there's something on the
10   record that I had a role in that, then that will, you
11   know, help me remember better.  But I just -- I don't
12   have any problem with it.  I'm just saying I don't
13   remember taking an active role in that.
14   Q.  Is pushing aside the two-thirds rule, as a
15   general matter, something that you support?  And you
16   have testified previously that you're in favor --
17   A.  Yeah.  I --
18   Q.  -- if there would be a 60 percent or three-
19   fifths rule?
20   A.  Yeah.  Yeah.  It is.
21   Q.  And in this case, you supported something a
22   little different than that in that it's not -- it's not
23   a change of the two-thirds rule.  It's essentially a
24   carve-out from the two-thirds rule for voter
25   identification requirements; is that correct?

## 221

1      A.   Yes, sir.
2      Q.   And what was the purpose of specifying a carve-
3   out for voter identification requirements of the
4   two-thirds rule?
5           MR. SWEETEN:  Don't reveal your thoughts,
6   mental impressions or opinions or motivation about
7   legislation --
8      A.   Okay.  Yeah.  I would --
9           MR. SWEETEN:  -- in answering.
10     A.   I would assert legislative privilege.
11     Q.   (By Mr. Fisher)  You'll assert legislative
12  privilege over on the advice of your counsel over the
13  purpose of Rule 5.11D on page 23 of the exhibit we just
14  marked; is that correct?
15          MR. SWEETEN:  Let's be clear.  The
16  question was not what is the purpose of 5.11.  The
17  purpose was why as to that specific legislation.  So if
18  you want to ask him the general purpose of Senate
19  Resolution 14 -- actually, I'm sorry.  Strike that.
20  Rule 5.111, I'll let him answer as to the purpose of the
21  bill.
22     Q.   (By Mr. Fisher)  I'll rephrase.  What was the
23  purpose of Rule 5.11D, carving out voter identification
24  requirements from the two-thirds or 21 rule that we've
25  talked about?

## 222

1      A.   To set aside the 21-vote rule to take up voter
2   ID.
3      Q.   So prior to 2009, when Rule 5.11 included this
4   carve-out under Subsection D, had there ever been an
5   area of legislation carved out from the two-thirds rule
6   before, to your knowledge?
7      A.   To my knowledge, we -- and you're saying prior
8   to 2009, so I --
9      Q.   Prior to 2009.
10     A.   I can't remember.  I think we had a special
11  session after -- I could be wrong, but it's been set
12  aside for special session.  Was it set aside?  I was
13  only there for one session before this, so I don't
14  recall in '07 if we did it or not.  We might have.  I
15  just don't remember.
16     Q.   And you've referenced this previously in your
17  testimony about the two-thirds or 21-vote rule being
18  abrogated for special sessions.
19     A.   Yeah.
20     Q.   Is that with regard to specific categories of
21  the legislation?
22     A.   Yes, because of a special session, we can only
23  take up what is on the emergency call.  So we can't take
24  up any legislation.  So the Governor puts certain items
25  on the emergency call.  So, in essence, when you set

## 223

1   aside the 21-vote rule in special session, it does apply
2   to specific legislation.
3      Q.   During a regular session, are you aware of any
4   carve-outs similar to what we see in Rule 5.11D
5   regarding voter identification requirements?
6      A.   I'm not -- could have happened, but I'm not
7   aware.
8      Q.   And the two-thirds rule is a rule that you have
9   written about or expressed an interest in; is that
10  correct?
11     A.   Yes, sir.
12     Q.   And so you're someone who would be
13  knowledgeable about the two-thirds rule and whether it's
14  been set aside in the past; is that correct?
15     A.   Yes.  Uh-huh.
16     Q.   And in fact, you are in favor of setting aside
17  the two-thirds rule as you've testified here today; is
18  that right?
19     A.   Yes.
20     Q.   Okay.  Would we'll have Exhibit 170 --
21     A.   Well, let me rephrase that.  I'm in favor of
22  reducing it to 60 percent.
23          (Exhibit 170 marked for identification.)
24     Q.   (By Mr. Fisher)  Senator, I'm going to hand you
25  Exhibit 170.  And Exhibit 170 says "Senate Rules Adopted

## 224

1   by 82nd Legislature, January 19, 2011.  Senate
2   Resolution Number 36."
3           And so if we turn to the second page of
4   this document, which has 24 in the lower left-hand
5   corner, again, you'll see Rule 5.11.  You'll see A, B, C
6   and D.  Can you compare that to the other exhibit I gave
7   you and tell me if those are the same.
8      A.   Which?
9      Q.   Previous exhibit which was Exhibit 168.
10     A.   Compare those two.  And what do you want me to
11  compare?
12     Q.   Rule 5.11 under the terms "Special Orders" in
13  both exhibits, does that look the seam, A, B, C and D?
14  Particularly Sections A and D.
15     A.   (Witness reading.)  I'm just reading it.  They
16  look -- they do.  Unless I'm missing something you see
17  that I'm not, but they look similar.
18     Q.   No.  I believe they are the same, Senator.  Was
19  the carve-out in Section D, was that reauthorized, to
20  your knowledge, in 2011?  Is that what we're seeing
21  here, a reauthorization?
22     A.   I believe it was, but I would have to have the
23  record reflect that.
24     Q.   Would SB-362 have passed the Senate if Rule
25  5.11D had not been in place?

DAN PATRICK                                            May 30, 2012

## 225

1         MR. SWEETEN:  Objection.  I think you're
2    calling for his mental impressions, opinions,
3    motivations --
4         MR. FISHER:  We can count the votes.  This
5    is a matter of math.
6    A.   Okay.
7    Q.   (By Mr. Fisher)  Would SB-362 have passed the
8    Senate if the two-thirds rule had not been suspended.
9    Meaning, did you have more than two-thirds of the vote
10   to pass SB-362?
11        MR. SWEETEN:  As phrased, I'm fine with
12   the question, if you're asking about the votes that were
13   cast on 362.
14   A.   You're also asking me to speculate because
15   votes do change.  Probable -- it probably would not have
16   passed, because I don't know that votes would have
17   changed, but -- but you can believe me, votes change.
18   Q.   Would a bill like SB-14 ordinarily be brought
19   only to the floor with a vote of two-thirds of the
20   Senate?  Meaning, in the absence of Rule 5.11D that I
21   just handed you, which is part of the Senate rules
22   exhibit from 2011?
23        MR. SWEETEN:  You're asking about as the
24   Senate as a general matter?
25        MR. FISHER:  As a general matter.

## 226

1         MR. SWEETEN:  As a procedural
2    question.  Yeah, you can answer.
3    A.   As a general matter, unless you have 21-votes
4    on any bill, it does not come to the floor.
5    Q.   So the answer is "yes," Senator; is that
6    correct?
7    A.   I think the answer to your question is "yes,"
8    if the question is, would it -- was it a negative
9    question, would it not have come to the floor?
10   Q.   No.  Senator, would a bill like SB-214
11   ordinarily be brought to the floor only with a vote of
12   two-thirds of the Senate, in the absence of Rule 5.11D,
13   which is the carve-out for a specific category of voter
14   identification?
15   A.   Maybe it's late in the day.  I'm getting
16   tired.  But you confused me, because I would think the
17   answer would be "no," but you said the answer would be
18   "yes."  So maybe you better read that question to me
19   again so I get it right.
20   Q.   Does it normally -- I'll rephrase.
21   A.   Okay.  Sorry.
22   Q.   A bill like SB-14.
23   A.   Right.
24   Q.   We're talking about a regular session of the
25   Senate so we're excluding special sessions.

## 227

1    A.   Okay.
2    Q.   Would it normally take a vote of two-thirds --
3    A.   Oh, okay.
4    Q.   -- of senators present to bring that to the
5    floor?
6    A.   I understand.
7         MR. SWEETEN:  And you can answer as a
8    general matter --
9    A.   Yes.
10        MR. SWEETEN:  -- about general Senate
11   procedure.
12   A.   Yes.  Okay.  I understand.
13   Q.   (By Mr. Fisher)  Okay.  So your answer is
14   "yes."  So Rule 5.11D carved out based on the subject
15   matter of the legislation SB-14 from that usual
16   requirement; is that correct?
17   A.   Yes.
18   Q.   Why is the support, and I know you don't
19   necessarily support the rule, but why is the support of
20   two-thirds of senators required for most bills?
21        MR. SWEETEN:  Currently, now, as a matter
22   of Senate procedure, you can answer.
23   A.   Why is it?  Did you say why is it?
24   Q.   (By Mr. Fisher)  Yes, Senator, why is the
25   support of two-thirds of senators required for most

## 228

1    bills?
2    A.   I actually think that was -- I assert
3    legislative privilege asking me the "why," because --
4         MR. SWEETEN:  Yeah.  I think if -- he's
5    asking you about your mental impressions or opinions or
6    motivations about legislation, or in particular, the why
7    of the bill.  I do think that that potentially
8    implicates legislative privilege.  So I think that's my
9    instruction.
10   A.   Yeah.  The way to rephrase it, but the way you
11   ask it, I would assert it.
12   Q.   (By Mr. Fisher)  So, Senator, are you asserting
13   legislative privilege on the advice of your counsel in
14   response to the last question that I asked?
15   A.   Yes.
16   Q.   As a general matter of procedure in the Texas
17   State Senate, why is there a requirement that two-thirds
18   of the senators present vote to bring a bill to the
19   floor?
20   A.   I'll try to answer this without asserting
21   legislative privilege.  The why is because that's what
22   the senators vote on.  That's the rule.
23   Q.   Is there a history behind it, Senator?  This is
24   an issue that I know you care about.
25   A.   Yeah.  Sure.

DAN PATRICK                                              May 30, 2012

---

229

1   Q.  It's an issue that you have written about.
2   A.  Yes.  There is a history.  There is a history.
3   Q.  What's the history, Senator?
4   A.  The history, which I've spoken about on the
5   record, on the Senate floor, I believe, is -- was when
6   Texas was primarily a one-party state when it was all
7   Democrats.  And you just couldn't have any member
8   bringing a bill to the floor who wanted to bring a bill
9   to the floor.  You had to have some kind of order.
10          And so at some point in the past, I
11  believe it was under Governor Shivers in 1951 where this
12  really became an issue, I'm just remembering, been a
13  couple of years since I've talked about this
14  specifically.  The Democrats started invoking the rule,
15  because they had to have a way to bring a bill to the
16  floor.  That's the best of my memory.
17          Of course, I wasn't there then.  But
18  history would indicate it was meant for really a
19  one-party system as a way to funnel bills to the floor
20  so you didn't have chaos of all the legislation.
21          And then as, you know, 30 or 40 years
22  later when we became more of a bipartisan state, you
23  know, as late as the '90s, I think we only had three
24  Republicans in the Senate, or in the late '80s.  As
25  Republicans grew, it really was -- it was an issue that

---

230

1   the Democrats controlled always.  And then as
2   Republicans grew, it became -- it did become an issue of
3   kind of a bipartisan issue over the last several years.
4   And so that's kind of the history of it.
5   And I -- I don't believe it works for a -- for a -- I
6   believe it worked well maybe for the Democrats for a
7   one-party system, but it's difficult for two parties to
8   -- because two-thirds is a very high threshold.
9   Q.  Is it fair that it requires a general consensus
10  on legislation so you've mentioned one party, but now
11  that the legislature is more evenly split, does it
12  require some kind of consensus on legislation before
13  it's brought to the floor?
14  A.  It does require consensus, but two-thirds is a
15  very high threshold consensus.  And our founding fathers
16  spoke about that as well.
17  Q.  And what did you mean, you mentioned a minute
18  ago, "bipartisan issue," and so what did you mean when
19  describing it as a bipartisan issue?  Do you mean it
20  affects both parties?  Is that what you mean?
21  A.  I'm not sure how I -- how I said that.  How did
22  I say that?  I don't want to make you go back there.
23  I'm not sure how I said that.
24  Q.  Did you -- do you mean that as -- you were
25  describing how the Texas legislature of the Senate has

---

231

1   become more bipartisan, meaning there's been more
2   Republicans --
3   A.  Yeah.  There are more Republicans .  And if you
4   look at -- and if you look at all of the votes that are
5   cast on the Senate floor, the vast majority have passed
6   with 28, 29 votes, and there's bipartisanship, both
7   parties, on many bills.
8   Q.  Was that the case with SB-14?
9   A.  Was not the case with SB-14.
10  Q.  So what was the purpose of adopting Rule 5.11D
11  in 2011?
12          MR. SWEETEN:  He's asked and answered that
13  question.  Objection, asked and answered.
14  Q.  (By Mr. Fisher)  You can still answer, Senator.
15  A.  Purpose was to pass a bill that would ensure
16  the integrity of the ballot box.
17  Q.  So Rule 5.11D, based upon your testimony, was
18  in place to ensure the passage of SB-14; is that
19  correct?
20          MR. SWEETEN:  Objection, asked and
21  answered.  You can answer again.
22  A.  Yeah.  The purpose of the exception to 5.11 was
23  to pass a bill that would ensure the integrity of the
24  ballot box.
25  Q.  And the bill would not have passed without

---

232

1   5.11D, I mean, that's the logical consequence of your
2   answer, correct?
3          MR. SWEETEN:  Objection, calls for
4   speculation.  Go ahead.
5   A.  Yeah.  Yeah.  I -- you know, as I said, it is
6   speculation.  I think it is fair to say that you're
7   correct, it may not have passed.  Doesn't mean it
8   wouldn't have passed, but you're -- I think that's a
9   fair --
10  Q.  Can you think of any other consensus
11  legislation in a similarly situated legislation that has
12  received the same kind of carve-out as we see in Rule
13  5.11D in Texas?
14          MR. SWEETEN:  Objection, asked and
15  answered.
16  Q.  (By Mr. Fisher)  You can still answer, Senator.
17  A.  Yeah.  I think I've -- I think I've answered
18  that question.
19  Q.  Is the answer "no"?  Is that what your
20  testimony has been?
21  A.  I think my testimony has been in special
22  session, we do it, and those bills in special session
23  are --
24  Q.  We're not talking about a special session.
25          MR. SWEETEN:  No, no, no.  Let him finish

DAN PATRICK                                                    May 30, 2012

---

233

1    his answer.  He can finish his answer.
2        A.   Again, the special session, those rules are
3    important, too, so it has that.
4        Q.   In regular session, Senator, are you aware of
5    any other bills that have been given the same treatment
6    as SB-14 and Rule 5.D11D?
7             MR. SWEETEN:  Same objection.  Asked and
8    answered multiple times.
9        A.   Yeah.  Yeah.  I've answered it.
10       Q.   (By Mr. Fisher)  And your answer is "no"; is
11   that correct, Senator?
12       A.   I said I didn't -- I think my answer was I
13   don't recall any specific.  Might have been.  I don't
14   recall.
15       Q.   Did you have any communications with anyone
16   about the suspension of the two-thirds rule in 5.11D?
17            MR. SWEETEN:  You can reveal whether or
18   not you had a conversation.  Do not reveal the substance
19   of the conversation.
20       A.   Sure.  Yeah.  Yes, I had a conversation.
21       Q.   And who were those conversations with?
22       A.   Would have been with senators from both
23   parties.
24       Q.   And when did those conversations occur?
25       A.   I couldn't tell you exactly, but it would have

---

234

1    been prior to this -- to this special order, because it
2    was a topic of discussion.
3        Q.   Do you remember the other senators involved
4    that you had discussions with?
5        A.   I can't tell you specifically.  I -- I don't
6    know if I talked to Senator Williams about it or
7    not.  Probably did.  Beyond that, I really can't
8    speak.  Everyone was talking about it so I think pretty
9    much.
10       Q.   Okay.  Senator, I'm going to hand you what's
11   been marked as Exhibit 171.
12            (Exhibit 171 marked for identification.)
13       A.   Okay.
14       Q.   (By Mr. Fisher)  And this is titled "Capitol
15   View, 82nd Legislative Session, Senator Dan Patrick,
16   Your Voice From Senate District 7, January 26, 2011."
17       A.   All right.
18       Q.   And if you remember, we had a discussion
19   earlier, and I asked you a series of questions about a
20   newsletter, and so those were whether you recognized the
21   document, the purpose of the document was created for.
22       A.   Right.
23       Q.   Would any of your answers change with regard to
24   this as opposed to a newsletter?  Do you have more or
25   less involvement in the creation of this advice than the

---

235

1    newsletter?
2        A.   I have -- I don't write this as much, but I
3    do -- I do look at it before it's sent out.
4        Q.   And what's the purpose of this document,
5    "Capital View, 82nd Legislative Session"?
6        A.   To disseminate information to the district on
7    what's going on.
8        Q.   And is this sent out to all of your
9    constituents; is that correct?
10       A.   No, this is different.  What we had before was
11   a newsletter that is distributed to all registered
12   voters that the state actually pays for the postage.
13   We're allowed to do that once a year.  This is a
14   campaign e-blast.  It's not an actual -- the other is an
15   actual letter.  This is a campaign e-blast that we send
16   out to whoever sends us their e-mail.  So if we have
17   their e-mail, we send it out.
18       Q.   Okay.  Thank you, Senator, for explaining the
19   difference.  If you look at -- and this is entitled
20   "2/3rds Rule Change."
21       A.   Yes.
22       Q.   "2/3rds Rule Challenge" -- I'm sorry -- "Gains
23   Ground Once More."
24       A.   Right.
25       Q.   You look about halfway down.  "Four years ago

---

236

1    stood alone," and this is I'm assuming you?
2        A.   Yeah.
3        Q.   "This year, Senator John Carona stood with me
4    on the Senate floor in opposition to the two-thirds
5    rule.  Several other senators also placed objections in
6    the Senate Journal.  We did set aside the two-thirds
7    rule on voter ID.  That's a big victory, but I want
8    total change."  Do you see that there?
9        A.   Yes.
10       Q.   And did you review that before it was sent out
11   to your constituents?
12       A.   I don't remember specifically if I did, but I
13   feel sure I did.
14       Q.   And what did you mean to convey by this
15   statement?
16       A.   Just to let the people who received this
17   e-blast know what had happened concerning the two-thirds
18   rule in general and specifically on voter ID.
19       Q.   And so why do you oppose the two-thirds rule if
20   you -- that's asked and answered.  Fair enough.
21            In your statement, you note that you stood
22   alone in opposition to the two-thirds rule; is that
23   correct?
24       A.   Correct.
25       Q.   So then does that mean as a logical consequence

DAN PATRICK                                                    May 30, 2012

---

237

1   that other senators disagree with you on this point?
2           MR. SWEETEN:  Don't reveal specific
3   communications that you had with senators.
4       A.  Well, standing alone -- standing alone would
5   indicate that, at that time in 2007, I was alone.
6       Q.  (By Mr. Fisher)  And obviously, since the
7   Senate actually has a majority of Republicans, many
8   Republicans do not support your view of the two-thirds
9   rule as well; is that correct?
10          MR. SWEETEN:  Are you asking now?  And
11  also, don't reveal communications you've had.
12      Q.  (By Mr. Fisher)  We can ask as far as 2007 and
13  then now, if there's been any change.  But in 2007,
14  since you do say you stood alone, there must have been
15  other folks from your party that didn't agree with your
16  position in the two-thirds rule; is that correct?
17          MR. SWEETEN:  You can answer the question
18  based upon matters of the public record.  Don't reveal
19  specific communications you had with senators or Senate
20  staff.
21      A.  I'm trying to think how to answer this
22  accurately and not -- I'm not alone any more in my view.
23      Q.  (By Mr. Fisher)  Okay.  But in 2007, you said
24  you stood alone, and this was something that you
25  proposed.  You've described your reasons for opposing

---

238

1   the two-thirds rule, which I almost asked you about
2   again, but I realized you've answered that question.
3       A.  Right.
4       Q.  So my question is, since you did stand alone,
5   there were obviously many other senators that disagreed
6   with you; is that s fair characterization?
7       A.  There -- yeah, not all senators disagreed.
8   Just because you don't stand up and speak out doesn't
9   mean you don't agree.  Sometimes you are alone.  But it
10  would be fair to say in 2007, the majority did not
11  agree, did not agree with me.
12      Q.  And in 2009, we see that many senators joined
13  with you in setting aside the two-thirds rule with
14  regard to SB-362; is that correct?
15      A.  Correct.
16      Q.  And in 2011, we see that many senators joined
17  with you in setting aside the two-thirds rule with
18  regard to SB-14; is that correct?
19      A.  Correct.
20      Q.  Have you ever brought up making a change to the
21  two-thirds rule?  And I know you support it.  Have you
22  brought up legislation to make a change to the
23  two-thirds rule as a hole?
24      A.  It wouldn't actually be legislation, because
25  it's just a rule that we vote on as a Committee of the

---

239

1   Whole.  So --
2       Q.  Have you brought up such a change to the
3   Committee of the Whole?
4       A.  Yes, I have.
5       Q.  And what happened when you brought that up?
6       A.  It was --
7           MR. SWEETEN:  You can testify about
8   matters of public record.
9       A.  Well, this Committee of the Whole, not a public
10  record.
11          MR. SWEETEN:  Okay.
12      A.  It's private caucus.
13          MR. SWEETEN:  Okay, well --
14      A.  It's a caucus --
15          MR. SWEETEN:  You can testify about
16  matters of public record, public statements, and, but
17  don't reveal matters that are subject to privilege,
18  which would include communications with senators.
19      A.  I have to assert -- in the definition of how
20  that's, you know, since it's not public record, I'd have
21  to assert.
22      Q.  (By Mr. Fisher)  Are you asserting legislative
23  privilege on the advice of your counsel, Senator?
24      A.  Yes.
25      Q.  I'm going to hand you what will be marked as

---

240

1   Exhibit 172, and this is an article from the San Antonio
2   Express News dated January 20th, 2011.
3           (Exhibit 172 marked for identification.)
4       Q.  (By Mr. Fisher)  Is that a correct
5   characterization of this article, Senator?
6       A.  Yes.
7       Q.  And if you read what is the second paragraph
8   and the third paragraph, we see "The Senate voted 18-11
9   largely along party lines, to keep in place the rules
10  that required a two-thirds super majority vote for a
11  bill to reach the floor for debate.  State Senator Dan
12  Patrick, Republican from Houston, tried as he has in
13  previous sessions to dump the longstanding Senate
14  tradition saying the two-thirds rule requiring approval
15  from at least 21 of the 31 senators gives the minority
16  party excessive power of the majority"; is that correct?
17      A.  Yes.
18      Q.  And so you've acknowledged that you don't have
19  the votes to make a broad-sweeping change to the
20  two-thirds rule; is that correct?
21      A.  Correct.
22      Q.  But other senators did join with you in 2009 to
23  make a change to the two-thirds rule with regard to
24  SB-362; is that correct?
25      A.  They joined with Senator Williams and myself,

DAN PATRICK                                                    May 30, 2012

| 241 | 243 |
|---|---|

**241**

1   yes.

2        Q.   And senators joined with you to make a change

3   to the two-thirds rule with regard to SB-14 in 2011; is

4   that correct?

5        A.   And Senator Williams, correct.

6        Q.   Yet some of these same senators, it would seem,

7   by a logical conclusion have not joined with you to make

8   a broad change to the two-thirds rule with regard to

9   legislation, all legislation being brought before the

10  Texas State Senate; is that correct?

11       A.   I believe that's correct.

12           (Recess from 5:50 to 6:02 p.m.)

13       Q.   (By Mr. Fisher) All right.  So if we could

14  return back to the record.

15           Senator, you mentioned -- you did mention

16  the founding fathers and you mentioned with regard to

17  wanting to make a move to a three-fifths rule instead of

18  two-thirds rule, and I just wanted to get your thinking

19  on that issue.

20           Why a three-fifths rule instead of a

21  two-thirds rule?

22           MR. SWEETEN:  You can reveal matters of

23  the public record, public speeches you have given on the

24  issue.

25       A.   Yeah.  The public speech I gave on the Floor,

**242**

1   paraphrasing, was that the founding fathers considered,

2   when writing the Constitution, should Congress be a

3   simple majority or a two-thirds.  And Madison and

4   Washington and others suggested that it should be a

5   simple majority, for a variety of reasons.  And so

6   Congress does -- you know, people forget about it, but

7   Congress passes bills on a simple majority.  In the

8   Senate, they pass bills on a simple majority, which have

9   the 60 vote, which is 60 percent cloture vote.  So, in

10  the Senate, in the Texas Senate, I thought 19 of 31,

11  which is close to 60 percent -- you can round it off

12  higher or lower -- would mirror the U.S. Senate vote.

13  That's the number I pegged.

14           And I've been very clear, in that

15  discussion on the Floor, that it's regardless of

16  Democrats or Republicans have the majority of members.

17       Q.   And how many members are Republicans in the

18  Senate at this point in time?

19       A.   It's 19-11.  19 Republicans.

20       Q.   Okay.  And so you would, at this point, that

21  would constitute enough senators that are Republicans so

22  that legislation could be brought to the Floor by

23  Republicans only; is that correct?

24       A.   Right.  It's just a happenstance of numbers

25  today, because that will change over time.

**243**

1        Q.   But as we mentioned, I mean, at this point in

2   time, you don't have the support to make such a change;

3   is that right?

4            MR. SWEETEN:  Objection.  Don't reveal

5   communications you've had with legislators or staff

6   members.

7        A.   Yeah.

8        Q.   (By Mr. Fisher) So if we could return back to

9   the previous exhibit, but we have talked about, you

10  know, your statements that at this time, you don't have

11  the support to make a change to the two-thirds rule; is

12  that correct?

13       A.   I think the public record would reflect that.

14       Q.   So if I could get you to return to a previous

15  exhibit, and this was the Senate Journal, 81st

16  Legislature, Regular Session, 2009.

17       A.   Okay.

18       Q.   And the exhibit number --

19       A.   168?  Is that it?

20           MR. SWEETEN:  I think it's 47.  Is it this

21  it, 47?

22           MR. FISHER:  2009.

23       A.   Yes.  January 14th, 2009.

24       Q.   (By Mr. Fisher) Correct.

25           MR. SWEETEN:  You guys are ahead of me.

**244**

1   Hold on now.

2        Q.   (By Mr. Fisher) So in previously referencing

3   this document, we talked about Page 23, and we talked

4   about Rule 5.11 A, B, C, and D?

5        A.   Yes.

6        Q.   Were there amendments offered -- at the time

7   that this language was placed in the Senate Journal,

8   were there amendments offered contemporaneously?

9        A.   I don't remember.

10       Q.   Okay.  Well, if we turn to Floor Amendment

11  Number 1, which is on Page 25 of the document in upper

12  right-hand corner.

13       A.   Okay.

14       Q.   And take a look at that Floor Amendment

15  Number 1 for me, please.

16       A.   Yes, I see.

17       Q.   And does that look like an amendment to the

18  language that was on Page 23, Rule 5.11 A, B, C, and

19  D.?  Does that look like an amendment to that language?

20       A.   Yes.

21       Q.   Okay.  And did Senator Ellis introduce this

22  amendment?

23       A.   Yes.

24       Q.   And how does it look like this amendment would

25  have worked, based on the language in 1 and 2 under

DAN PATRICK                                          May 30, 2012

---

245

1    "Amend SR 14 as followed"?
2        A.   It would have taken voter identification
3    requirements out, and in its place put "Protecting
4    families through insurance rate regulation and
5    foreclosure prevention."
6        Q.   And what was your vote on this amendment?
7        A.   It was a vote to table, and I voted to table.
8        Q.   And we've established earlier that you do not
9    support the two-thirds rule.  We've just discussed you
10   support a three-fifths rule that's more in line with the
11   operation of the U.S. Senate; is that correct?
12       A.   Yes.
13       Q.   Yet you voted to table this amendment, which
14   would have expanded the universe of legislation that was
15   not subject to the two-thirds rule; is that correct?
16       A.   It would not -- that's not correct.  This is --
17   if you read this closely, this would not have expanded.
18   This would have replaced voter ID.
19       Q.   Well, Senator, it would have replaced the
20   language of voter ID identification requirements, but
21   that aside, it would have expanded the amount of
22   legislation not subject to the two-thirds rule, correct?
23   It might be a different subject matter, but would it
24   have expanded the type of legislation not subject to the
25   two-thirds rule?

---

246

1            MR. SWEETEN:  You can answer based on the
2    text.
3        A.   Yeah.  Based on the text, I just -- I just read
4    it differently.  Expanding it would have been -- in
5    Senator Ellis's amendment, it would have been adding
6    another bill.
7        Q.   (By Mr. Fisher) Okay.  Well, let's move to
8    Floor Amendment Number 2.  Can you look at that
9    amendment for me?
10       A.   Sure.  Okay.
11       Q.   And that was offered by Senator Uresti; is that
12   correct?
13       A.   Yes.  Yes.
14       Q.   And can you read -- can you read the language
15   after Number 1?
16       A.   Do you want me to read after Number 1 or
17   Number 2?  You were talking about Uresti.  Did you mean
18   Number 2?
19       Q.   It's Floor Amendment Number 2, and then we have
20   a Number 1 --
21       A.   Oh, Number 1, I see.
22       Q.   -- on Page 2.
23       A.   Got you.
24       Q.   "Amend Modification 1 after voter
25   identification requirements by inserting the following:

---

247

1    We're increasing veterans' benefits."
2            And then we have Number 2 on Page 2,
3    "Amend Modification 2 after voter identification
4    requirements by inserting the following:  We're
5    increasing veterans' benefits."
6            Now, Senator, I know you've done a lot of
7    work in the area of supporting veterans; is that
8    correct?
9        A.   Yes.
10       Q.   Would this have expanded the sphere of
11   legislation not subject to the two-thirds rule to
12   include legislation regarding increasing veterans'
13   benefits?
14           MR. SWEETEN:  You can answer based on the
15   text of the document.
16       A.   Yes.
17       Q.   (By Mr. Fisher) And unlike the previous
18   amendment where you said that you had some concerns that
19   it would not have expanded the amount of legislation not
20   subject to the two-thirds rule, would this have expanded
21   the amount of legislation not subject to the two-thirds
22   rule?
23       A.   Yes.
24       Q.   And is that because it has the word "or" in it?
25       A.   Yes.

---

248

1        Q.   And how did you vote on this amendment,
2    Senator?
3        A.   I voted to table.
4        Q.   So your testimony is that you voted to table an
5    amendment that would have increased the amount of
6    legislation not subject to the two-thirds rule; is that
7    correct?
8        A.   Yes.
9        Q.   And it would have allowed for the consideration
10   of bills addressing veterans' benefits to not be subject
11   to the two-thirds rule; is that right?
12       A.   Yes.
13       Q.   Is voter ID legislation more or less important,
14   in your view, than increasing veterans' benefits?
15           MR. SWEETEN:  Don't answer the question to
16   the extent it asks you to reveal your thoughts and
17   mental impressions about legislation or communications.
18       A.   Yeah.  I assert legislative --
19           MR. SWEETEN:  -- privilege.
20       A.   -- privilege -- it's been a long day -- on the
21   advice of counsel.
22       Q.   (By Mr. Fisher) Are you asserting legislative
23   privilege on the advice of your counsel?
24       A.   Yes, I am.
25       Q.   Do you think increasing veterans' benefits is

DAN PATRICK                                                                    May 30, 2012

---

### 249

1  an important goal of legislation?

2        MR. SWEETEN:  The same objection.  It

3  calls for matters subject to legislative privilege.

4      A.  I assert legislative privilege on the advice of

5  counsel.

6      Q.  (By Mr. Fisher) Have you done work in support

7  of veterans and veterans' groups in your capacity as a

8  Texas State Senator?

9      A.  Yes.

10        MR. SWEETEN:  Yeah.  You can answer that

11  to the extent you're not revealing legislation or

12  matters related to your opinions or thoughts on

13  legislation.  To the extent that your question is not

14  calling for matters subject to legislative privilege, he

15  can answer the question.  I think he did, so...

16      Q.  (By Mr. Fisher) Senator, what kind of work have

17  you done on behalf of veterans?

18        MR. SWEETEN:  Same instruction.

19      A.  I passed a bill this past session that became a

20  constitutional amendment that would allow the wives of

21  deceased veterans or 100 percent disabled, to maintain

22  their property tax exemption, the property tax exemption

23  they have when they were alive.

24       I have passed a bill last session, I

25  believe it was last session, that would allow a veteran

---

### 250

1  to fly a American, Texas, or military flag in their

2  backyard, and that homeowners' associations could not

3  restrict their right to do so.

4       I have co-sponsored or co-authored,

5  depending on where the bill originated, a series of

6  bills dealing with veterans on other issues.

7      Q.  Well, thank you for your testimony on that,

8  Senator, and let me just say, as a member of the

9  military, I do appreciate that work.

10      A.  Thank you for your service.

11      Q.  But I have to ask you here and just based upon

12  your testimony, when given the opportunity to vote for

13  something as a non -- as someone who doesn't support the

14  two-thirds rule as a general matter --

15      A.  Right.

16      Q.  -- and when asked to vote for a bill, an

17  amendment that would allow for the consideration of

18  bills which increased veterans' benefits to not be bound

19  by the two-thirds rule and you voted to table that

20  amendment, I have to ask for the purpose of your vote in

21  that situation.

22        MR. SWEETEN:  I'm going to object.  You're

23  asking for matters subject to the legislative privilege,

24  his thoughts, opinions about legislation, specific

25  legislative, and I would instruct you not to answer

---

### 251

1  based upon legislative privilege.

2      A.  I assert legislative privilege on advice of

3  counsel.

4      Q.  (BY MR. FISHER) Are you aware that there were

5  other senators that were upset by the procedural change

6  prior to SB 14 being passed?  And by procedural change,

7  I mean what we've looked at in Rule 5.11D.

8        MR. SWEETEN:  Don't reveal matters subject

9  to the legislative privilege, including communications

10  with senators or senators' staffs.  But to the extent

11  you can refer to matters of the public record, you can

12  do so.

13      A.  Yeah.  I think there was public record where

14  certain members were not happy.

15      Q.  (By Mr. Fisher) And I'll hand you what's been

16  previously marked as Exhibit 45, and it's a declaration

17  of Carlos Uresti.  And who is Carlos Uresti, Senator?

18      A.  He's a State Senator.

19      Q.  Okay.  So it's a four-page document entitled

20  Declaration of Carlos Uresti.  And on the last page,

21  you'll see it's dated April 9, 2012.  And if you could

22  turn Page 10 on the second page, and then Page 11 on the

23  third page, and go ahead and read those paragraphs for

24  me.

25      A.  Okay.  Where do you want me to begin?

---

### 252

1      Q.  Number 10, which is on the second page, and

2  Number 11 -- move on to Number 11 on the third page, and

3  just read those two paragraphs.

4      A.  "In 2011, the Senate majority exempted SB 14

5  outright from requiring support of two-thirds of the

6  Senate. In other words, the requirement that at least

7  21 senators agree on SB 14 before it could be called up

8  for debate on the Senate Floor was waived.  Requiring

9  --" Number 11. "Requiring two-thirds of the Senate to

10  support a bill is basic, foundational rule of the

11  senate, which was highly unusual to waive, especially

12  when the waiver was only applied to one bill.  Of the

13  thousands of bills awaiting debate on the Senate Floor,

14  the two-thirds rule was only waived for SB 14 and was

15  applied to all other pending Senate bills."

16      Q.  Do you have a different view than Senator

17  Uresti concerning whether this was highly unusual

18  activity?

19        MR. SWEETEN:  Caution the witness, don't

20  reveal matters subject to the legislative privilege,

21  including your mental impressions, thoughts or

22  discussions with other senators, but to the extent you

23  can answer this question without doing so, you can, or

24  based upon matters of the public record.

25      A.  Just -- I'm thinking of your question

## 253

1    here.  You asked me do I have a different -- I believe
2    -- I believe what he has written is -- is -- it's
3    opinionated, but -- but it's factual.
4         Q.  (By Mr. Fisher)  Okay.  So it was highly unusual
5    for SB 14 to be considered without two-thirds vote of
6    the Senate before being considered on the Senate Floor?
7         A.  Well, you know, I'm going to correct the
8    record, because it's really more of opinion, and I don't
9    want to speculate on opinion.  So I would assert my
10   legislative privilege on this, because you're asking me
11   to give an opinion, and I'm not going to get involved in
12   that.
13              MR. SWEETEN:  And his mental -- yeah.
14        Q.  (By Mr. Fisher)  Do you agree that the
15   two-thirds rule is a basic foundational rule of the
16   Senate?
17              MR. SWEETEN:  Don't get into your thoughts
18   or opinions about legislative --
19        A.  Yeah.  I have to waive -- I have to waive --
20              MR. SWEETEN:  You can discuss matters of
21   public record, speeches on issues.
22        A.  On public record, I think we've gone over this
23   a lot.  I don't see it as a foundational...
24        Q.  (By Mr. Fisher)  It is fair to say that this
25   wasn't the usual procedure, correct?

## 254

1         A.  It is fair to say that.
2         Q.  Was SB 362 considered by any Senate committees?
3         A.  I don't -- you know, I just don't recall SB 62,
4    if it was or if it was not.
5         Q.  Was SB 14 considered by any Senate committees?
6         A.  By the Committee of the Whole.
7         Q.  And is the unusual for a bill to be considered
8    only by the Committee of the Whole and not by another
9    committee.  As you mentioned, you know, way back in the
10   beginning of your testimony, all the committees you
11   serve on.
12        A.  Yeah.
13        Q.  Is it unusual for a bill to not be considered
14   by one of those committees before being considered by
15   the Committee of the Whole?
16        A.  That would be accurate.
17        Q.  Do you recall any other bill being filed in the
18   Committee of the Whole without going to a separate
19   committee first?
20        A.  I can't recall one.  There may have been one,
21   but I don't recall one.  I think there may have been a
22   circumstance, but I can't -- it doesn't come to mind
23   right now, outside of the special session.
24        Q.  What does it mean for a bill have an emergency
25   designation?

## 255

1         A.  A bill that has an emergency designation
2    indicates that the Governor considers it a priority.
3         Q.  And how did SB 14 come to receive emergency
4    designation?
5              MR. SWEETEN:  Objection, calls for
6    speculation.  You can testify as to matters of public
7    record.
8         A.  Yeah.  You know, I assert senatorial privilege
9    on that, on the advice of counsel.
10        Q.  (By Mr. Fisher)  If we could turn back to --
11             MR. SWEETEN:  Let me, for the record,
12   objection, legislative privilege.
13        Q.  (By Mr. Fisher)  Let's turn back to Exhibit
14   Capitol View, 82nd Legislation Session, and that was
15   your document that went out to constituents.
16        A.  Okay.  All right.  170-something, I believe
17   this is it.
18        Q.  And that's 171?  Exhibit 171?
19        A.  Right.
20        Q.  And if you notice, on the last page of the
21   first -- I'm sorry -- the last line of the first page
22   and leading over into the second page, we have, "An
23   emergency bill is simply a bill that be acted upon
24   within the first 60 days of the session.  Bills are not
25   normally allowed to be voted on the Floor until the end

## 256

1    of filing."  And you're referencing here, it's under the
2    subheading of Sonogram Senate Bill 16, which you
3    referenced earlier is a bill that you supported.  So how
4    did you go about getting emergency designation for the
5    sonogram bill?
6              MR. SWEETEN:  Don't reveal matters subject
7    to legislative privilege, including communications or
8    your thought process or mental impressions regarding
9    legislation in answering the question.  You can discuss
10   matters of the public record.
11        A.  Yeah.  I would assert legislative privilege on
12   that.
13        Q.  (By Mr. Fisher)  Can you tell me how emergency
14   bills are attained?
15             MR. SWEETEN:  If that's a matter of public
16   record, you can answer that question.
17        A.  Yeah.  I don't think that that's a matter of
18   public record.
19        Q.  (By Mr. Fisher)  Well, Senator, we've got a
20   newsletter here of -- you know, with -- I guess a little
21   different than a newsletter, but a communication to your
22   constituents, essentially trumpeting your success in
23   getting emergency designation for a bill that you
24   supported.  And so my question is:  How did you get to
25   receive that emergency designation?  You have informed

DAN PATRICK                                         May 30, 2012

## 257

1  your constituents that you got it for this bill,
2  correct?
3          MR. SWEETEN:  Okay.  But what you're
4  asking him is to reveal conversations he may have had,
5  his thoughts, mental impressions about legislation.  To
6  the extent that he would have to do that, that is a
7  matter subject to the legislative privilege.  To the
8  extent you don't have to reveal those, you can answer
9  the question.
10         A.  Yeah.  I would have -- you know, the -- I think
11 the fact is, I was able to get legislative designation.
12 But beyond that -- or designation.  Beyond that would be
13 an area where I think I would have to assert legislative
14 privilege.
15         Q.  (By Mr. Fisher) Did you have communications
16 with the Governor's Office about this?
17         MR. SWEETEN:  You're -- I want to make
18 sure I'm clear on the question, because I'm going to let
19 him allow -- I'm going to allow him to discuss
20 communications and whether communications occurred.  But
21 are you asking in the context of the sonogram bill?
22         Q.  (By Mr. Fisher) In the context of the sonogram
23 bill, did you have communications with the Governor's
24 Office concerning the emergency designation?
25         MR. SWEETEN:  You can answer whether you

## 258

1  had conversations.
2          A.  Yes, I did.
3          Q.  (By Mr. Fisher) And what kind; written, verbal?
4          A.  I believe it was limited to verbal.
5          Q.  And who initiated these conversations?
6          A.  I believe I did.
7          Q.  And returning to SB 14, why did SB 14 need to
8  be considered in the first 60 days of the Legislature?
9          A.  That would be speculation.
10         MR. SWEETEN:  Yeah, that calls for his
11 mental impressions, thoughts, opinions about legislation
12 and thus, it would be subject to the legislative
13 privilege.
14         A.  Yeah, I assert legislative privilege.
15         Q.  (By Mr. Fisher) After giving emergency
16 designation, does a bill automatically get considered in
17 60 days?
18         MR. SWEETEN:  You can answer the effect of
19 emergency legislation.
20         A.  It doesn't automatically get considered.  It's
21 eligible to be considered.
22         Q.  (By Mr. Fisher) Is this something that happens
23 regularly?
24         A.  That's a broad definition of the word
25 "regularly."  It is -- and again, you have to check the

## 259

1  historical records.  I don't have those front of me.
2  But it seems to me that every session, or nearly every
3  session, there are bills that are designated as
4  emergency legislation.  It's not an uncommon occurrence
5  to begin a session with an emergency legislation.
6          Q.  Is it unusual for the Senate to pass
7  legislation in the first two weeks of a session?
8          A.  It is unusual in the context of the total
9  bills, but it's not unusual in the context of emergency
10 bills.
11         Q.  And were you pleased with the fact that your
12 sonogram bill was designated as emergency legislation?
13         MR. SWEETEN:  Don't reveal your mental
14 impressions, thoughts about legislation in answering the
15 question.
16         A.  Yeah.  I would assert legislative privilege.
17         Q.  (By Mr. Fisher) But you did want to inform your
18 constituents about that fact, correct?
19         A.  Yes.
20         Q.  You wanted to let them know that it was -- that
21 the sonogram bill was being considered on an emergency
22 basis; is that correct?
23         A.  Yes.
24         Q.  And so it was something noteworthy you wanted
25 your constituents to know about; is that right?

## 260

1          A.  Yes.
2          Q.  So he we could take a look at what was
3  previously marked as Exhibit 45, again, the declaration
4  of Senator Uresti.
5          A.  Okay.
6          Q.  And I'll have you look at 6 and 7 of that
7  declaration now.
8          A.  Okay.  I'm looking at it.
9          Q.  Just let me know when you're done reading
10 Paragraph 6 and 7, please.
11         A.  Okay.  Let me walk right through it.
12         (Reading documents.) I have read it.
13         Q.  So these paragraphs are describing what
14 occurred prior to a vote on HB 218; is that correct?
15         A.  Yes, sir.
16         Q.  Do you remember what HB 218 was?
17         A.  I didn't until I read -- read it here.
18         Q.  And what was HB 218?
19         A.  HB, standing for House Bill 218 was the photo
20 identification bill in 2007.
21         Q.  And do you dispute any of the facts in
22 Paragraph 6 or 7 concerning the attempt to pass HB 218
23 in Senator Uresti's absence?
24         MR. SWEETEN:  Okay.  Hold on a minute.  In
25 answering the question, don't reveal conversations that

261

1  you've had with other legislators, legislative staff, or
2  matters subject to the legislative privilege.
3      A.  The answer is, I have no knowledge of the facts
4  as he has laid those out here.
5      Q.  (By Mr. Fisher) Did you take a position on
6  HB 218?  Did you support HB 218?
7      A.  Yes.
8      Q.  Were you surprised that HB 218 did not pass the
9  Senate?
10     A.  I would --
11         MR. SWEETEN:  Hold on a minute.  You're
12 asking for his thoughts and mental impressions about a
13 bill.  I think that calls for matters subject to the
14 legislative privilege.  You can ask him if he voted for
15 it and about public matters related to it.
16     Q.  (By Mr. Fisher) Was HB 218 a good bill in your
17 opinion and did you support it?
18         MR. SWEETEN:  Don't answer as to your
19 opinions about pending legislation or mental
20 impressions.  It's subject to the legislative privilege.
21     A.  I assert legislative privilege on that aspect
22 the question.  I did vote for it.
23         MR. SWEETEN:  And objection, compound.
24     Q.  (By Mr. Fisher) Was there a vote taken on
25 HB 218, Senator?

263

1  mental impressions about legislation.  Okay?  So you can
2  answer as to the words here.
3      Q.  Do you want to rephrase that or --
4      Q.  (By Mr. Fisher) When I asked whether you were
5  disappointed that HB 218 did not pass the Senate, you
6  asserted legislative privilege.  I am now asking a
7  public document, where, underneath the title,
8  Disappointments of the 80th Legislature, there is a
9  reference to HB 218.  And I'm asking whether you were
10 disappointed that HB 218 did not pass the Senate based
11 upon this public record.
12         MR. SWEETEN:  You can refer to matters on
13 the public record, including this.
14     A.  Yeah.  My newsletter would -- says what it
15 says.  The inability to pass HB 218 is listed under
16 Disappointments of the 80th Legislature.
17     Q.  (By Mr. Fisher) Do you remember the vote on
18 HB 218, Senator?
19     A.  Do you mean the vote total or how it went down?
20     Q.  The vote that took place on the Senate Floor.
21     A.  For clarification, do you mean what the number
22 was or how it went down?
23     Q.  Do you remember the circumstances of the vote
24 on HB 218 on the Senate Floor, Senator?
25     A.  Vaguely, but do I remember.  I do remember it.

262

1      A.  Yes.
2          (Exhibit 173 marked for identification.)
3      Q.  Let me hand you what's been marked Exhibit 173.
4  And this is a similar newsletter describing
5  accomplishments of the 80th Session of the Texas
6  Legislature.
7      A.  Yes.
8      Q.  And I'll direct your attention to
9  "Disappointments of the 80th Legislature."
10     A.  Yes.
11     Q.  And we have Electoral Integrity, under which
12 there's some discussion of HB 218, and this is on the
13 third page.
14     A.  Yes.
15     Q.  So does this, you know, change your opinion
16 about whether you were disappointed that HB 218 did not
17 pass the Senate?  This public statement, I might add.
18         MR. SWEETEN:  Okay.  Well, let me first
19 say that I'm going to object to the question and the
20 preface of it.  I think it misstates his testimony about
21 disappointment.  I think we assert a privilege as to his
22 personal feelings with respect to that.
23         He can answer questions about a public
24 statement made, but in answering those questions about a
25 public statement made, don't reveal your thoughts and

264

1  I do remember it.
2      Q.  I'm going to hand you what I'll mark as
3  Exhibit 174.
4          (Exhibit 174 marked for identification.)
5      Q.  (By Mr. Fisher) This is a Houston Chronicle
6  article from May 19th, 2011.  And I'll direct your
7  attention to the second page, at the end of the second
8  page of the document, which -- there's a sentence that
9  starts, "On the first day."
10     A.  Oh, I'm sorry.  On the second page?
11     Q.  Correct.
12         MR. SWEETEN:  Yeah.  It's right down here.
13     A.  Okay.
14     Q.  (By Mr. Fisher) And so we have, "On the first
15 of the session, Senator Dan Patrick, Republican,
16 Houston, tried to kill the rule arguing that it stifles
17 debate.  This once again underscores why the two-thirds
18 rule has outlived its time, Patrick said Friday.  'This
19 should never have come to this.  Our concern is for
20 Mario's recovery.  No one wants to be put in a position
21 that makes it seem like we're taking advantage of
22 someone's health to pass a bill.'"  And then underneath
23 Bad Timing, there's another reference to you there where
24 it says, "Patrick said Dewhurst is now in the position
25 of looking unsympathetic to Gallegos's situation for

DAN PATRICK                                                    May 30, 2012

---

265

1  failing to pass a bill Republicans strongly support."
2  Do you remember these statements?
3       A.  I don't remember them, but I'm reading them, so
4  they were made a long time ago.
5       Q.  Do you have any disagreement with the substance
6  of these statements that are attributed to you?
7       A.  No.
8       Q.  And what did you mean by taking advantage of
9  someone's health to pass a bill?
10      MR. SWEETEN:  You can answer to the extent
11  that this is a matter of public record.  Don't reveal
12  thoughts, opinions, mental impressions about
13  legislation, though.  But you can answer.
14      A.  Yes.  I think the statement, as I read it, and
15  I haven't seen it for a long time, accurately reflects
16  the situation.
17      Q.  (By Mr. Fisher) And what was the situation,
18  Senator?
19      A.  That because of the 21 vote rule, the -- and in
20  2007, we had 20 Republicans, not 19.  So if one Democrat
21  was missing, then, if memory serves me right, we would
22  be able to pass it.  There's a sliding scale of the 21
23  vote rule.  You don't need 21 if less than 31 senators
24  are there.  But I forget where the break point is.
25      So, the point is that if Mario wasn't

---

266

1  there, we, apparently, this is from memory, would have
2  had enough votes to pass the bill.  And so my statement
3  reflects that, you know, no one -- you know, I say here,
4  no one wants to be put in a position that it looks like
5  you're taking advantage of someone's health because if
6  Mario, who was recovering from kidney -- I think he had
7  a kidney replacement -- was recovering, and if he is not
8  there, that's what the statement says.
9       Q.  And why would that have made someone look
10  unsympathetic?
11      MR. SWEETEN:  Don't reveal specific mental
12  impressions you have about legislation.  You can discuss
13  matters of the public record or public statements
14  regarding this without revealing those.
15      A.  Yeah.  I mean, the statement speaks for
16  itself.  You know, everyone knew that Mario was ill, and
17  I think the statement speaks for itself, that it says
18  what it says.  It's pretty clear to me.
19      Q.  (By Mr. Fisher) And based upon Exhibit 45,
20  which is the declaration of Senator Uresti, was he also
21  sick at the time that HB 218 was brought to the Floor of
22  the Senate?
23      A.  I didn't know that at the time.  You know, I
24  discovered that after the fact.  There --
25      MR. SWEETEN:  Yeah, just answer his

---

267

1  question, which is did --
2       A.  Yeah, I didn't know it.  Yeah, I didn't know at
3  the time.
4       Q.  (By Mr. Fisher) Do you remember the
5  circumstances of HB 218 being brought to the Floor of
6  the Senate for a vote?
7       MR. SWEETEN:  Don't reveal communications
8  you've had with legislators, legislators' staff or your
9  mental impressions, but you can answer to the extent --
10      THE WITNESS:  Yeah.  I mean, I'll
11  remember.  Sorry, I didn't mean to speak over you.
12      Q.  (By Mr. Fisher) And what is Senator Uresti's
13  race, to your knowledge?
14      A.  Latino.
15      Q.  And what is Senator Gallegos's race, to your
16  knowledge?
17      A.  Latino.
18      Q.  And you're aware of the areas of Texas that
19  they represent?
20      A.  Yes.
21      Q.  Did you have any concerns about holding the a
22  vote on photo ID when a Hispanic member of the Senate
23  was sick and not on the Senate Floor?
24      MR. SWEETEN:  Did he mention concerns?  Is
25  that what you said.

---

268

1       MR. FISHER:  Yes.  Did he have any
2  concerns.
3       MR. SWEETEN:  Yeah.  I think you're asking
4  for his mental impression, and I think would be subject
5  to the legislative privilege.  It's about legislation
6  and his concerns and thought process.
7       A.  Yeah.  I would assert legislative privilege on
8  advice of counsel.
9       Q.  (By Mr. Fisher) Do you remember there being a
10  calendar change to bring HB 218 to the Floor?
11      A.  I don't remember that.  I just read that in
12  Senator Uresti's exhibit.  But I don't remember that.
13      Q.  Did you have any concerns about holding a vote
14  on HB 28, given the constituencies that the Senators
15  represent?
16      MR. SWEETEN:  That calls for his mental
17  impressions and is subject to the legislative privilege.
18      A.  And I assert legislative privilege on advice of
19  counsel.
20      Q.  (By Mr. Fisher) And so was there a vote
21  eventually taken on HB 218 in the Senate?
22      MR. SWEETEN:  You can answer.
23      A.  Yes.
24      Q.  (By Mr. Fisher) And how many votes were taken?
25      A.  I believe there were two votes.

DAN PATRICK                                              May 30, 2012

## 269

1   Q.   And when HB 218 first went to the Senate Floor
2  for a vote, were any senators absent?
3   A.   Yes.
4   Q.   And who was that?
5   A.   Senator Uresti, and I believe Senator Hegar.
6   Q.   And do you remember Lieutenant Governor
7  Dewhurst issuing a letter concerning this situation
8  after the votes were taken on HB 218?
9   A.   I don't remember that.
10   Q.   I'll hand you what's previously been marked as
11  Exhibit 3.  And this is titled Texas Weekly, the Week in
12  the Rearview Mirror, and this describes -- I'll let you
13  take a look at it, Senator, but it describes a letter
14  from Lieutenant Governor Dewhurst.
15       MR. SWEETEN:  I caution the witness to
16  review the document.
17   A.   Yeah, I am.  Yeah.  Let me read this.
18       (Reading document.) Is this whole thing a
19  letter?  I'm not -- here's Dewhurst.
20   Q.   (By Mr. Fisher) I think if you take a look,
21  Senator, you'll notice that a letter -- a draft of the
22  letter is included here, as well as a second letter that
23  was issued by Lieutenant Governor Dewhurst soon after
24  the issuance of the first letter, I believe the next
25  day.  And if you'll take a look at the second page of

## 270

1  the document, you'll see that the paragraph that starts,
2  "The Lieutenant Governor disavowed his earlier statement
3  about the voter ID bill issued while the Senate was
4  caucusing on that subject on whether 11 senators should
5  be allowed to block a vote on it.  He says he didn't
6  authorize the earlier statement.  Here is his new
7  version with the cover letter."  And so everything
8  previous to that paragraph is the old letter and
9  everything that it is describing, you know, an
10  issue with that previous letter.
11       Do you remember these letters from Senator
12  -- from Lieutenant Governor Dewhurst creating any issues
13  in the Senate with other senators?
14       MR. SWEETEN:  Don't reveal communications
15  with senators or senate staff.
16   A.   Yeah, I invoke the legislative privilege on
17  advice of counsel.
18   Q.   (By Mr. Fisher) Do you remember your reaction
19  to these letters by Lieutenant Governor Dewhurst around
20  the time of the passage of HB 218?
21       MR. SWEETEN:  Object, based on legislative
22  privilege.  You're asking him to reveal his thoughts,
23  mental impressions about matters affecting legislation.
24   A.   I invoke the legislative privilege.
25   Q.   (By Mr. Fisher) Do you remember any public

## 271

1  debate about these issues in the Senate, the votes that
2  were taken on HB 218?
3       MR. SWEETEN:  You can answer as phrased.
4   A.   Yes.
5   Q.   (By Mr. Fisher) And do you remember what that
6  public debate concerned?
7   A.   I don't remember the specifics.
8   Q.   So I'll introduce Exhibit 175.  This is a Texas
9  Observer article from June 15th, 2007.
10       (Exhibit 175 marked for identification.)
11   Q.   (By Mr. Fisher) And I'll direct your attention
12  to the third page.  And if you look before the
13  subheading says, "Controlling Craddick's Crashes," and
14  there's two paragraphs before.
15   A.   Let me get to the right page.  Hold on.
16   Q.   Uh-huh.
17   A.   Okay.
18   Q.   And so we have, "The next day, Dewhurst's
19  office released an angry letter calling Senate Democrats
20  unAmerican and Senator Whitmire tried to make himself a
21  victim.  Dewhurst then insisted he hadn't authorized the
22  letter and that a staffer had written it.  The Senate
23  took a day off so they could caucus privately.  Members
24  sent three delegates to Dewhurst's office for an airing
25  of grievances."  Do you remember that private caucus

## 272

1  happening?
2   A.   I don't know.
3   Q.   "For the next week or so, the Lieutenant
4  Governor avoided the dais in the Senate chamber.  In a
5  meeting with reporters after the session, Dewhurst
6  claimed victory for everything positive that came out of
7  it, but with a pained look on his face, he carefully
8  explained that he'd just rather not get into the voter
9  ID debacle.  Freshman Republican Senator Dan Patrick, a
10  conservative Houston radio talk show host --" "radio
11  host, who also might challenge Dewhurst for the
12  Governorship in 2010, was less reserved."  Quote, "'If
13  you're going to run a play, you better make you sure you
14  run it right,' he told the Observer. 'We're the ones in
15  charge.  We have no excuses.'"
16       So this article discuss the two Dewhurst
17  letters --
18   A.   Uh-huh.
19   Q.   -- that we had talked about in the context of
20  Exhibit 3; is that right?
21   A.   Yes.
22   Q.   And it discusses the votes that were taken on
23  HB 218, correct?
24   A.   I still haven't read this entire thing, so, if
25  that's what it discusses, that would be accurate.

DAN PATRICK                                          May 30, 2012

---

273

1   Q.  And what did you mean by, "If you're going to
2   run a play, you better make sure you run it right"?
3        MR. SWEETEN:  You can answer to the extent
4   that you're not revealing matters subject to the
5   legislative privilege, including the communications we
6   discussed or your mental impressions or thoughts about a
7   bill.
8   A.  Yeah.  The truth is, I had forgotten all about
9   these things until you brought them to my attention.  I
10  had forgotten about the letters.  I hadn't even thought
11  about it for almost six years.  So, you know, again, I
12  says if you're going to run a play, you better make sure
13  you run it right.
14  Q.  Are you reading from the exhibit, Senator?
15  A.  Yes, sir.
16  Q.  Do you have any further explanation of what you
17  meant by this quote?
18       MR. SWEETEN:  The same instruction.
19  A.  Yeah, I would assert legislative privilege.  I
20  think it speaks for itself, but I would assert
21  legislative privilege on advice the counsel.
22  Q.  (By Mr. Fisher) So you'll assert legislative
23  privilege over a public statement you made to a
24  newspaper regarding Lieutenant Governor Dewhurst's
25  issuance of letters about the votes on HB 218; is that

---

274

1   correct?
2        MR. SWEETEN:  I want to make sure the
3   record is clear.  What my instruction is, that to the
4   extent that your providing an answer to this question
5   would require you to reveal thoughts, mental impressions
6   about a bill, don't do so.
7        THE WITNESS:  Okay.
8        MR. SWEETEN:  You can answer about matters
9   of the public record or public speeches, but don't
10  reveal those thoughts or mental impressions about a
11  bill.  Just so that's clear, that instruction, and so
12  your application of that instruction is clear.
13  A.  So if you're asking me what I did mean by that?
14  Q.  (By Mr. Fisher) That's the question, Senator.
15  A.  As it applies to that bill or --
16  Q.  As it applies to the votes that were taken on
17  HB 218, which were the subject of Lieutenant Governor
18  Dewhurst's letter.
19  A.  Okay.  I'm trying to answer your question for
20  you without violating my legislative privilege.
21       The fact that we didn't pass the bill
22  means we didn't pass the bill.  And, you know, I don't
23  remember that exact quote five and a half years later,
24  but that's what I was talking about.
25  Q.  What play was trying to be run, Senator?

---

275

1        MR. SWEETEN:  Don't reveal matters subject
2   to the legislative privilege.
3   A.  Yeah.
4        MR. SWEETEN:  Including conversations or
5   thoughts or mental impressions.
6   A.  Yeah.  I mean, I would assert legislative
7   privilege on that.
8   Q.  (By Mr. Fisher) Well, was it a Hail Mary?  Was
9   it an end around the rules?  What kind of play are we
10  talking about here?
11       MR. SWEETEN:  The same objection.  Same
12  instruction.
13  A.  Yeah.  I would invoke legislative privilege on
14  advice of counsel.
15  Q.  (By Mr. Fisher) Let me introduce Exhibit 176,
16  and this is an article from the -- I believe it's the
17  Austin American-Statesman, and this is May 18th, 2007.
18       (Exhibit 176 marked for identification.)
19  Q.  (By Mr. Fisher) And you'll have to look -- and
20  I know it's small writing.  I apologize for that.
21       About two-thirds of the way down the page,
22  we have a paragraph that begins, "Some Republicans."
23  And it says, "Some Republicans, particularly Senator Dan
24  Patrick, Republican of Houston, said the gentlemen's
25  agreements and the Lieutenant Governor uses to promote

---

276

1   harmony hurt Republicans on core issues such as voter ID
2   identification. 'I believe there is a consensus among
3   some senators that we either ought to follow the rules
4   all the time or ignore them all the time,' Patrick said.
5   Patrick, one the few senators who agreed to analyze the
6   past couple days said Dewhurst has opened himself to
7   leadership questions because he has discussed running
8   for Governor. 'I think he reacted the way he did,
9   because he was challenged on what I think is a
10  definitive issue,' Patrick said. 'He was challenged,
11  and he blinked by allowing the second vote.  The
12  Democrats won this round.'"
13       So what did you mean by, "I believe there
14  is a consensus among some senators that we either ough
15  to follow the rules all the time or ignore them all the
16  time"?
17       MR. SWEETEN:  You can answer with respect
18  to matters of the public record, public statements
19  made.  Do not reveal thoughts, mental impressions about
20  legislation or communications that you've had regarding
21  this issue.
22  A.  Yeah.  I would invoke the legislative privilege
23  on this, when your question -- the statement speaks for
24  itself.
25  Q.  (By Mr. Fisher) Is that on the advice of

DAN PATRICK                                              May 30, 2012

## 277

1    counsel, Senator --
2        A.  Yes.
3        Q.  -- you're invoking legislative privilege?
4        A.  Yes.
5            MR. SWEETEN:  And let me clarify, whenever
6    I said communications, I mean the communications that
7    I've outlined as the day has progressed, which are
8    constituents, representatives, legislative staff, state
9    agencies, and the Legislative Council.  I'm trying to
10   make sure my instruction was clear.
11           MR. FISHER:  But just to be clear, the
12   communication we're talking about here is a quote from
13   Senator Patrick that appears in the news article.
14           MR. SWEETEN:  And he can testify about the
15   quote, but not to the extent that it reveals his
16   thoughts, mental impressions about legislation.  So I'm
17   going to let him answer that, except to the extent that
18   it reveals those.
19       Q.  (By Mr. Fisher) Well, let me rephrase.
20   Senator, were the rules not being followed when HB 218
21   was passed?
22           MR. SWEETEN:  Same instruction.
23       A.  Yes, the rules were being followed.
24       Q.  (By Mr. Fisher) So what did you mean by,
25   "Either we ought to follow the rules all the time or

## 278

1    ignore them all of the time"?
2            MR. SWEETEN:  The same instruction.
3        A.  Yeah.  I'll assert legislative privilege.
4        Q.  (By Mr. Fisher) So you assert legislative
5    privilege to describe what it is that you mean by a
6    public statement; is that correct?
7        A.  No.  I think the public statement speaks for
8    itself.
9        Q.  And you won't go any further to explain what it
10   is you meant by that language that appears in the
11   newspaper article; is that correct, Senator?
12       A.  First of all, I don't remember.  Again, I'm
13   going back -- you're going back almost six years ago and
14   asking me to remember, and, you know, I haven't seen
15   this statement in a long time, and, you know, in the
16   context of the time, I'm not sure.
17       Q.  Senator, at the time that HB 218 was brought to
18   a vote -- and I think that based upon all that we have
19   talked about, the testimony that we have talked about
20   today, there was a -- would you agree that it was an
21   unusual situation?
22           MR. SWEETEN:  Objection to the question as
23   vague.  I'm sorry, what --
24           MR. FISHER:  I'll rephrase.
25       Q.  (By Mr. Fisher) Was it a newsworthy event?

## 279

1    We've seen many articles talking about what happened
2    during the passage of 218, the two votes that were
3    taken, the letters by Lieutenant Governor Dewhurst.  I
4    know this was six years ago, but is this a usual event?
5    Does this happen every legislative session?
6        A.  No.
7        Q.  Do you think the rules of the Texas State
8    Senate should be ignored?  Are you -- are you one that
9    believes they ought to be followed or ignored all the
10   time?
11           MR. SWEETEN:  Objection.  I think you're
12   asking for his mental impressions about specific
13   legislation, and I think those are subject to the
14   legislative privilege.  His own personal beliefs about
15   legislation are privileged.
16       A.  Yeah, I would assert legislative privilege on
17   the advice of counsel.
18       Q.  (By Mr. Fisher) Do you think the Senates rules
19   should be followed?
20       A.  Which Senate rule?
21       Q.  Do you think that the rules regarding when a
22   bill can be brought to the Floor of the Senate should be
23   followed?
24       A.  I think the rules that are in place at a given
25   time should be followed.

## 280

1        Q.  Well, let me get your thinking on something,
2    Senator.  If a Senator is out sick or a Senator is
3    unable to come to the Floor of the Senate to take a
4    vote, should the Senate take a vote on the bill in that
5    instance?
6            MR. SWEETEN:  Are you asking in the
7    context of this specific instance, or are you asking as
8    a general matter?
9            MR. FISHER:  I'm asking to get the
10   Senator's thinking on whether a vote should be taken on
11   a bill when a senator, for whatever reason, is not
12   present on the Senate Floor.
13           MR. SWEETEN:  Objection to the question as
14   vague.  And, I mean, to the extent you're discussing
15   this Senate Bill 218, I think that would be a matter
16   subject to the legislative privilege.  To the extent you
17   can reveal your answer without violating legislative
18   privilege, you can do so.
19       A.  Okay.  I can answer without revealing.
20           And the facts are that this is a common
21   occurrence, which usually occurs later in session.  The
22   members of the Senate are older.  They have student --
23   they have children graduating from high school or
24   college or grandchildren or weddings, and there have
25   been a number of senators who have missed those events

DAN PATRICK                                    May 30, 2012

## 281

1  to be on the Senate Floor because votes can be taken if
2  they're not there.  The Senate cannot operate, and get
3  the job done in the amount of time we have, if every
4  time a senator is missing, for whatever reason, that,
5  stop everything, we can't vote today on this.
6        Q.  (By Mr. Fisher) Well, Senator, I know you pride
7  yourself on voting on every bill.  Has a vote ever been
8  taken in your absence on the Senate Floor?
9            MR. SWEETEN:  You can answer as a factual
10 matter.
11       A.  Yeah.  I don't think I've ever missed -- I
12 think I've missed eight votes out of 13,000, and never
13 -- never a priority piece of legislation or -- those
14 votes may have been on -- I'm not sure how many votes
15 I've missed, but I don't miss a day.
16       Q.  (By Mr. Fisher) Are you aware of votes being
17 taken while senators -- and you mentioned in your
18 testimony senators being away for weddings and other
19 things that happen.  Are you aware of votes being taken
20 when senators are actually in the Capitol and just not
21 in the Senate chamber?
22       A.  I have no knowledge of that.  No, I really
23 don't know?
24       Q.  So you're not aware that that's ever happened
25 before?

## 282

1            MR. SWEETEN:  Objection, asked and
2  answered.
3        A.  Yeah, I just don't -- I just don't know.
4        Q.  (By Mr. Fisher) You don't know, or are you
5  aware of it ever happening before?
6            MR. SWEETEN:  Objection, asked and
7  answered.
8        A.  I've answered your question.
9        Q.  (By Mr. Fisher) Did it happen in the context of
10 HB 218, based upon the declaration of Senator Uresti?
11           MR. SWEETEN:  Objection.  I think he's
12 already testified about this issue.  And so I think
13 you're plowing the same ground you plowed.  I think he's
14 already testified about -- you had him read the specific
15 paragraphs that he claimed, and now you're asking it
16 again.  I think this is becoming -- I mean, you're
17 asking the same questions over and over.
18           I'm going to let you answer it this time,
19 but, I mean, to the extent you're not revealing any
20 matters of privilege, including conversations with any
21 senators, you can answer to the extent you know.
22       A.  Do you mind just repeating that?  I'm sorry.
23           MR. SWEETEN:  We can have him read it.
24           MR. FISHER:  Can you read the last
25 question, please?

## 283

1            MR. SWEETEN:  Before my objections.
2            (The requested portion was read back by
3  the court reporter.)
4        A.  Which I said I had no knowledge, and then you
5  asked --
6        Q.  (By Mr. Fisher) I asked:  Did it happen in the
7  context of HB 218?
8        A.  I believe my earlier testimony this afternoon
9  was that I believe Senator Uresti and Senator Hegar were
10 not on the Floor.  I'm not certain of that, but I
11 believe that.
12       Q.  Are you aware of Senator Whitmire not being on
13 the Floor during the vote on HB 218?
14       A.  I was not aware at the time, but was made aware
15 after the fact.
16       Q.  Is it unusual for a senator to be checked in,
17 meaning -- and you described senators being away for
18 weddings and just not present, given the large amount of
19 bills that are considered by the Senate; is that
20 correct?  Is that your testimony?
21       A.  Yeah.  It's not frequent, but there are people
22 who are away at various times for various personal
23 reasons.
24       Q.  Is it unusual for a senator to be checked in to
25 the Senate Floor, meaning they are present, but just not

## 284

1  physically in the chamber for votes to be taking place?
2        A.  That actually happens on a -- I don't know,
3  frequent may be a broad use of the word.  But it does
4  happen, particularly at the end of session, because we
5  could be meeting with a constituent in our office.  We
6  are often over at the House chamber, you know, trying to
7  get a bill passed.  You know, we're doing lots of
8  things.  So legislation does move and bills do pass with
9  less than all the senators.  In fact, there are times
10 when less than half the senators are on the Floor when
11 legislation is moving.  So that happens.
12       Q.  But you pride yourself on this not happening to
13 you; is that right, Senator?
14       A.  I do.
15           MR. FISHER:  We can either continue or we
16 can take a quick break?
17           (Recess from 6:57 to 7:02 p.m.)
18       Q.  (By Mr. Fisher) Senator Patrick, is illegal
19 immigration one of the main policy issues you focus on
20 in the Senate?
21       A.  Yes.
22       Q.  And you said it's one of the main concerns of
23 the citizens of your district, District 7; is that
24 correct?
25       A.  Yes.

DAN PATRICK                                          May 30, 2012

---

### 285

1      Q.   And you've introduced bills on this issue in
2    areas concerning sanctuary cities and other areas; is
3    that right?
4      A.   Yes.
5      Q.   And one of these issues was an amendment
6    requiring anyone getting a Texas driver's license to
7    prove they are in the country legally; is that correct?
8      A.   I don't remember it as of today, but if that's
9    the record, then... I have a lot of legislation, so, you
10   know, if that's what you have, then that would be
11   correct.
12     Q.   And was part of the purpose the SB 14 to
13   prevent noncitizens from voting?
14         MR. SWEETEN:   Objection, asked and
15   answered.  He's already provided his answer on the
16   purpose.  You asked him a tremendous number of questions
17   on that issue.
18     Q.   (By Mr. Fisher) You can answer, Senator.
19         MR. SWEETEN:   You can answer the question.
20     A.   Well, the purpose is to protect the integrity
21   of the ballot box.
22     Q.   (By Mr. Fisher) And does protecting the
23   integrity of the ballot box include protecting the
24   ballot box from votes by noncitizens?
25     A.   If you are protecting the integrity of ballot

---

### 286

1    box, then only people who are legally eligible to vote
2    would be able to vote.
3      Q.   So I'm going to give you another exhibit.
4         (Exhibit 177 marked for identification.)
5      Q.   (By Mr. Fisher) And it's 177.  This is Texas
6    Senator Dan Patrick, Fall of 2008.  And this is one of
7    the, you said, newsletters that is paid for, I guess, by
8    the Legislature that you're able to send out to your
9    constituents; is that right?
10     A.   I believe so.
11     Q.   And this differs from the previous exhibit, the
12   Capitol View, which was the e-mail blast?
13     A.   Correct.
14     Q.   But this is something you said earlier that you
15   do review the contents of before it goes out; is that
16   right?
17     A.   Correct.
18     Q.   And so underneath the heading, Texas Lags
19   Behind the World in Voting Integrity on Page 3?
20     A.   Yes, sir.
21     Q.   We have, "Today all that is needed to vote is a
22   voter registration card.  Unfortunately, photo
23   identification is not required to receive a registration
24   card.  After reviewing voter registrations in Texas for
25   2007, the State Auditor identified 49,049 registered

---

### 287

1    voters who may be ineligible to vote.  Of this number,
2    23,114 were possible felons, and 23,576 may be deceased
3         Since 1992, Harris County Tax Assessor-
4    Collector, and Voter Registrar Paul Bettencourt has
5    cancelled 3,742 registered voters for noncitizenship."
6         So with regard to the cancellation of
7    registered voters for noncitizenship, how would the
8    requirements of SB 14 prevent those types of citizens
9    from voting?
10        MR. SWEETEN:   Objection.  You're asking
11   for his mental thoughts and impressions about pending
12   legislation.  As such, that would be legislatively
13   privileged. He can answer questions about what's --
14   about this specific public statement, but to the extent
15   that you would ask him to reveal those mental
16   impressions or opinions or thoughts or communications,
17   that would be a matter of legislative privilege.
18        So you can answer to the extent you can do
19   so without revealing matters of privilege.
20     A.   I would assert legislative privilege.
21     Q.   (By Mr. Fisher) And is that on the advice of
22   your attorney?
23     A.   Yeah.
24     Q.   So you've said that the purpose of SB 14, just
25   to reiterate, was to protect the integrity of the ballot

---

### 288

1    box.  We have here, under Voter Integrity, a concern
2    about a cancellation by the voter registrar of Harris
3    County of the registered voters for noncitizenship.
4         So is it fair to say that this was part of
5    the ambit of voter integrity, noncitizenship?
6         MR. SWEETEN:   I'm going to object to the
7    question as calling for matters subject to the
8    legislative privilege.  You're asking him to reveal
9    thoughts, mental impressions, opinions or motivations
10   about legislation or in furtherance of the legislative
11   process.  To do so invades the legislative privilege.
12   So I'm going to instruct you not to answer to the extent
13   that you would have to so reveal those opinions and
14   thoughts.  You can answer as to the specific public
15   statement, but don't reveal your thoughts about
16   legislation.
17     A.   Yeah.  I assert legislative privilege on the
18   advice of counsel.
19     Q.   (By Mr. Fisher) Would noncitizens voting impact
20   vote integrity?  Based upon your statement here, the
21   fact that it's contained under a heading called "Texas
22   Lags Behind the World in Voter Integrity" is the fact
23   that noncitizens were cancelled as registered voters, is
24   that something that impacts voter integrity?
25        MR. SWEETEN:   The same objection as to

DAN PATRICK                                          May 30, 2012

## 289

1  legislative privilege.  Also objection, vague.
2        A.  I assert legislative privilege based on the
3  advice of counsel.
4        Q.  (By Mr. Fisher) Can a noncitizen receive a
5  driver's license in Texas at this time?
6        MR. SWEETEN:  You can answer as a factual
7  matter.
8        A.  I'd have to go back and look at the law.  There
9  may have been some changes to that.
10       Q.  (By Mr. Fisher) Well, did you ever propose an
11 amendment that required anyone getting a Texas driver's
12 license to prove they're in the country legally?
13       MR. SWEETEN:  You can testify as to
14 matters of public record.
15       A.  Yeah.  If that is the public record, then I
16 did.  Again, I know it may seem obvious to you, but
17 hundreds and hundreds and hundreds of bills and
18 amendments, I cannot remember every specific thing.  So
19 when you show it to me, if you have it, it helps refresh
20 my memory.
21       Q.  (By Mr. Fisher) But illegal immigration is one
22 of main areas of focus in your work as a Texas State
23 Senator; is that correct?
24       A.  Yes.
25       Q.  And we mentioned, it's one of the main concerns

## 290

1  of your citizens, so it's an area that you propose
2  legislation in and actively work in; is that right?
3        A.  Yes.
4        Q.  Let's turn to Exhibit 5, and that's SB 14.
5        A.  Okay.
6        Q.  So again, looking at the text of the bill,
7  Section 14, which we discussed previously.
8        A.  I'm not there yet.
9        Q.  And I'll let you take a look at Page 9 again,
10 which we've discussed, and this is Documentation of
11 Proof of Identification.
12       A.  Okay.
13       Q.  In any of those Documentation of Proof of
14 Identification, can you tell me how it is that a
15 noncitizen would be prevented from voting?
16       MR. SWEETEN:  You can answer as to the
17 text of the bill.
18       A.  You asked me how a -- can you read that back
19 for me, please?
20       (Requested portion read back by the court
21 reporter.)
22       MR. SWEETEN:  Don't reveal matters of
23 legislative privilege, including your mental thoughts,
24 impressions, investigation regarding legislation.  But
25 you can testify as to the text of the bill and specific

## 291

1  provisions.
2        A.  Well, I can only refer back to what the bill
3  says.
4        Q.  (By Mr. Fisher) Well, Senator, you're a
5  resident of Texas; is that correct?
6        A.  Yes, I am.
7        Q.  Have you ever served in the military?
8        A.  I have not.
9        Q.  Do you know if you have to be a citizen to get
10 a military identification card?
11       A.  I don't know.
12       Q.  Do you know if you have to be a citizen to get
13 a license to carry a concealed handgun in Texas?
14       A.  You know, I'd have to go back and look at the
15 law.  I believe you do, but I'd have to look at the law.
16       Q.  And we discussed the fact that you're not sure
17 about a Texas driver's license, whether you need to be a
18 citizen to get a Texas driver's license; is that right?
19       A.  Yeah.  I'm not sure of the status of that at
20 this moment in time.
21       Q.  But it's possible you could be a noncitizen and
22 get a Texas driver's license; is that right?
23       A.  Legally or illegally?
24       Q.  Legally.
25       A.  Yeah.  I'm not -- again, I'm just not advised

## 292

1  on that.  I'd have to look at the law.
2        Q.  Is it legally possible for someone to have a
3  military identification card and not be a citizen?
4        A.  I don't know how to answer that.  I don't know.
5        Q.  Do we have noncitizens serving in the United
6  States's military?
7        A.  I believe we do, but I'd have to have that
8  verified by it federal government.
9        Q.  Do you know if any of your constituents are
10 members of military that are noncitizens?
11       A.  I don't know.
12       Q.  And veterans' issues is one of the issues you
13 pay attention to; is that correct?
14       A.  Yes.
15       Q.  Are you aware of any legislators making
16 statements about illegal immigrants voting in Texas?
17       MR. SWEETEN:  Don't reveal communications
18 you've had with legislators or legislative staff.  You
19 can reveal matters of the public record.
20       A.  Yeah.  I'm not specifically aware.  I don't
21 recall anything as we sit here.
22       Q.  (By Mr. Fisher) Have you ever heard of a Texas
23 State legislators who voted in favor of SB 14 say that
24 would it prevent illegal immigrants from voting?
25       MR. SWEETEN:  The same instruction.

DAN PATRICK                                                   May 30, 2012

---

293

1    A.  Yeah, I just don't recall.
2    Q.  (By Mr. Fisher) Have you ever heard of a Texas
3    legislator who voted in favor of SB 14 say it would
4    prevent a legitimately registered voter from voting in
5    Texas?
6         MR. SWEETEN:  The same instruction.
7    A.  Yeah, I don't recall.
8    Q.  (By Mr. Fisher) Have you ever heard of a Texas
9    legislator who voted in favor of SB 14 say it would
10   prevent racial or ethnic minorities from voting in
11   Texas?
12        MR. SWEETEN:  The same objection.  Same
13   instruction.  Go ahead.
14   A.  Yeah.  We're talking about on the public
15   record?  That's what I thought all this was prefaced
16   by.  That's what I thought the first question was.
17        MR. SWEETEN:  Okay.  And what I'm -- my
18   instruction is, just don't reveal communications you've
19   had with legislators or legislative staff in answering
20   these questions.  You can refer to matters of the public
21   record.
22   A.  Yeah.  On the public record, not that I recall.
23   Q.  (By Mr. Fisher) Well, do you know of any -- did
24   you have any private conversations with any Texas State
25   legislators who said that SB 14 would prevent racial or

---

294

1    ethnic minorities from voting in Texas, either those who
2    have favored or opposed the bill?
3         MR. SWEETEN:  You're asking about the
4    substance of the communication that he had.  If you
5    could just not load, front end load the question with
6    the subject matter and ask about more of a general
7    subject matter, which is what the court has said that he
8    can answer, I'll allow him to answer it.  But as
9    phrased, I think you're --
10   Q.  (By Mr. Fisher) Did you have conversations with
11   other senators about SB 14?
12        MR. SWEETEN:  You can answer.
13   A.  Yes.
14   Q.  (By Mr. Fisher) Did any of those conversations
15   address whether SB 14 would prevent a legitimately
16   registered voter from voting in Texas?
17   A.  I don't recall.
18   Q.  Were any of those statements concerning an
19   issue about illegal immigrants voting in Texas
20   elections?
21   A.  I don't recall.
22   Q.  Are you aware of any allegations in the public
23   record that SB 14 attempted to play on people's fears of
24   illegal immigrants voting in Texas elections?
25   A.  Public statements?  Yeah, I'm not aware.

---

295

1    Q.  Have you had conversations with anyone
2    concerning the identity of a noncitizen who voted in a
3    Texas election?
4         MR. SWEETEN:  You can answer if you had
5    conversations.
6    A.  If I've conversations about a --
7    Q.  (By Mr. Fisher) A noncitizen voting in Texas
8    elections.
9    A.  I'm trying to think.  Excuse me.  I'm tired.
10   I'm trying to focus on the question and get it right.
11   It's possible someone has brought it up to me, but
12   specifically, I can't remember anything at this moment.
13   But it's possible.
14   Q.  Have you heard a registered voter state that he
15   or she is not going to vote because they are concerned
16   their vote will be diluted by illegitimate votes?
17   A.  Again, I can't remember anything specifically
18   if someone has said that.  It's possible.
19   Q.  So it's possible that someone has said that to
20   you, but nothing comes to mind at this moment?
21   A.  Nothing comes to mind specifically.
22   Q.  Do you believe that SB 14 has put a burden on
23   voting beyond what already existed?
24        MR. SWEETEN:  Don't answer if your
25   thoughts, mental impressions, opinions, and motivations

---

296

1    about legislation, including Senate Bill 14.
2    A.  I assert legislative privilege on advice of
3    counsel.
4    Q.  (By Mr. Fisher) Does it require a voter to do
5    more than they were required to do under Texas law as it
6    was before SB 14 was passed?
7         MR. SWEETEN:  I think the question asks
8    for him to reveal thoughts, mental impressions,
9    opinions, and motivations about legislation.  You're
10   asking him to compare and contrast and reveal those
11   thoughts in that question.
12   A.  Yeah.  I would assert legislative privilege.
13        MR. SWEETEN:  You can rely on the specific
14   text of the bill, if you want to -- I mean...
15   Q.  (By Mr. Fisher) Well, looking -- you do have
16   Exhibit 5 open before you, Senator, so just looking at
17   the bill, does it place additional requirements upon
18   voting beyond which were there previous to SB 14?  Does
19   it add things?
20   A.  Yes.
21   Q.  Were you concerned that these additional things
22   might disproportionally impact minority voters?
23        MR. SWEETEN:  Don't answer the question.
24   It asks for matters of legislative privilege, including
25   your thoughts, mental impressions, opinions and

DAN PATRICK                                                    May 30, 2012

---

297

1   motivation about legislation.

2       A.   I assert legislative privilege.

3       Q.   (By Mr. Fisher) And is that based upon the

4   advice of your counsel?

5       A.   Yes.

6       Q.   Did you ever have discussions about whether

7   SB 14 might disproportionally impact minority voters

8   with anyone?

9       A.   Nothing specific that I recall.

10      Q.   When you supported SB 14 -- and we talked about

11  your listing as an author -- did you believe you had an

12  obligation, pursuant to Section 5 of the Voting Rights

13  Act, to determine whether it might have an impact on

14  minority voters?

15           MR. SWEETEN:   Objection, calls for matters

16  subject to the legislative privilege, including your

17  thoughts, mental impressions, opinions and motivations

18  about legislation.   Instruct you not to answer the

19  question.

20      A.   I assert legislative privilege based on my

21  attorneys advice.

22      Q.   (By Mr. Fisher) So as you sit here today, do

23  you believe that SB 14 might disproportionally impact

24  minority voters?

25           MR. SWEETEN:   The same objection.   You're

---

298

1   asking him to reveal his thoughts, mental impressions,

2   opinions, motivation about legislation, or in

3   furtherance of the legislative process, including SB 14.

4       A.   I assert legislative privilege based on the

5   advice of counsel.

6       Q.   (By Mr. Fisher) At any time since the passage

7   of SB 14, have you come to believe it was passed with a

8   discriminatory purpose?

9            MR. SWEETEN:   Do not reveal your thoughts,

10  mental impressions, opinions, and motivations about

11  legislation.   So to the extent that the question asks

12  you to reveal those thoughts, don't answer it.   But if

13  it does not, then you can provide that answer.

14      A.   Excuse me.   I assert legislative privilege on

15  the advice of counsel.

16      Q.   (By Mr. Fisher) And at any time since the

17  passage of SB 14, have you come to believe that it will

18  have a retrogressive effect on minority voters?

19           MR. SWEETEN:   The same objection and

20  instruction.   You can answer to the extent you're not

21  revealing thoughts, mental impressions, opinions and

22  motivation about the legislation, including specifically

23  Senate Bill 14.

24      A.   I assert legislative privilege on the advice of

25  counsel.

---

299

1            MR. FISHER:   So we'll take a quick break

2   here, very quick, and we'll return back on the record.

3            MR. SWEETEN:   Okay.   Do you mind if we

4   just stay here?

5            MR. FISHER:   No, not at all.

6       Q.   (By Mr. Fisher) All right, Senator.   We're

7   back.

8       A.   Okay.

9       Q.   During the public debate on SB 14, do you

10  remember anyone from the Secretary of State's Office

11  testifying?

12      A.   I don't remember.   I think they might have, but

13  I don't recall.

14      Q.   Do you recall at any time anyone identifying

15  how many voters might not have the required ID required

16  by SB 14 to vote?

17      A.   I don't recall that.

18           MR. FISHER:   So at this time, we'll

19  conclude.   We'll keep the deposition open as we have in

20  the past.

21           MR. SWEETEN:   Based on the --

22           MR. FISHER:   Based on the pending ruling

23  of the court.

24           MR. SWEETEN:   Pending rulings of privilege

25  and scope.   Okay.

---

300

1            MR. FISHER:   Yeah.

2            MR. SWEETEN:   I have no questions.   I will

3   reserve questions to Senator Patrick at the time of

4   trial.

5            THE WITNESS:   Okay.

6            (Signature reserved.)

7            (Deposition concluded at 7:23 p.m.)



**1**

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
          Plaintiff,               )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
          Defendant,               )
                                   )
ERIC KENNIE, et al,                )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
     Defendant-Intervenors,        )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
     Defendant-Intervenors,        )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
     Defendant-Intervenors,        )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
     Defendant-Intervenors.        )

*************************************************
                 ORAL DEPOSITION OF
               REPRESENTATIVE AARON PENA
                   JUNE 1, 2012
*************************************************
```

**2**

```
 1       ORAL DEPOSITION OF REPRESENTATIVE AARON PENA,
 2   produced as a witness at the instance of the Defendant,
 3   was duly sworn, was taken in the above-styled and
 4   numbered cause on the JUNE 1, 2012, from 9:45 a.m. to
 5   4:06 p.m., before Chris Carpenter, CSR, in and for the
 6   State of Texas, reported by machine shorthand, at the
 7   offices of DECHERT, LLP, 300 W. 6th Street, Suite 2010,
 8   Austin, Texas 78701, pursuant to the Federal Rules of
 9   Civil Procedure and the provisions stated on the record
10   or attached hereto.
```

**3**

```
 1
 2
 3              A P P E A R A N C E S
 4   FOR THE PLAINTIFF, STATE OF TEXAS:
         John M. Hughes
 5       BARTLIT BECK HERMAN PALENCHAR & SCOTT, LLP
         1899 Wynkoop Street
 6       Suite 800
         Denver, CO 80202
 7       (303) 592-3113
         john.hughes@bartlit-beck.com
 8       Brooke Paup
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 9
10       P.O. Box 12548
         Austin, TX 78711-2548
11       209 West 14th Street
         8th Floor
12       Austin, TX 78701
         (512) 936-1307
13       patrick.sweeten@texasattorneygeneral.gov
14   FOR THE DEFENDANT, HOLDER, ET AL:
15       Daniel Freeman
         Risa Berkower
16       U.S. DEPARTMENT OF JUSTICE
         950 Pennsylvania Avenue, NW
17       NWB - Room 7202
         Washington, DC 20530
18       (202) 305-7766
         daniel.freeman@usdoj.gov
19
     FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
20   NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
     CAUCUS:
21
         Ezra D. Rosenberg
22       DECHERT, LLP
         Suite 500
23       902 Carnegie Center
         Princeton, NJ 08540-6531
24       (609) 955-3200
         ezra.rosenberg@dechert.com
25
```

**4**

```
 1   FOR THE MEXICAN AMERICAN LEGISLATIVE CAUCUS:
 2       Jose Garza
         LAW OFFICE OF JOSE GARZA
 3       7414 Robin Rest Drive
         San Antonio, TX 787209
 4       (210) 392-2856
         garzpalm@aol.com
 5
```

## 5

INDEX

Appearances....................................3

REPRESENTATIVE AARON PENA
    Examination by Mr. Freeman................6
    Examination by Mr. Garza................222

Signature and Changes..........................226

Reporter's Certificate.........................228

EXHIBITS

NO. DESCRIPTION                        PAGE MARKED

370  Amended Notice of Deposition           16

371  Sweeten Letter, May 9, 2012            106

372  The Monitor, 2-1-2011                  154

373  Texas Monthly Monitor, 5/23/2012       155

374  Article:  Beer and Wine Wholesalers Behind  159
     Legislators Pushing Controversial Voter ID
     Laws

375  Voter ID Act                           160

376  Fort Worth Telegram, May 7, 2009       169

377  Article:  Texas Voter ID Law's Unlikely  192
     Supporter

378  A Capitol Blog                         213

379  KXAN Aaron Pena                        215

## 6

1       THE REPORTER:  Time on the record 9:45.
2   Could everybody here make announcements and your
3   affiliations.
4       MR. FREEMAN:  Sure.  My name is Dan
5   Freeman on behalf of the Attorney General.
6       MS. BERKOWER:  Risa Berkower for the
7   Attorney General.
8       MR. GARZA:  Jose Garza for the Mexican
9   American Legislative Caucus.
10       MS. PAUP:  Brooke Paup for the State.
11       MR. HUGHES:  John Hughes for the State of
12   Texas.
13       MR. FREEMAN:  And this is the deposition
14   of Representative Aaron Pena in matter of Texas v.
15   Holder, U.S. District Court for the District of
16   Columbia, Docket Number 1:12-CV-128.
17       REPRESENTATIVE AARON PENA,
18   having been first duly sworn to testify the truth, the
19   whole truth, and nothing but the truth, testified as
20   follows:
21                    EXAMINATION
22   BY MR. FREEMAN:
23       Q.   We have introduced ourselves.  I want to say
24   congratulations on being in the New York Times this
25   morning, Representative.

## 7

1       A.  I was?
2       Q.   We saw that, yeah, on the website at least.
3   There was an article about Hispanic Republicans related
4   to the Senate.
5       A.  Well, I've got to read it.  Thank you.
6       Q.   So you've been deposed before.  In fact, we
7   spoke together last fall, correct?
8       A.  Yes, sir.
9       Q.   And I'll set up the ground rules again very
10   quickly, just so you're refreshed.  Okay?
11       A.  Yes.
12       Q.   So the purpose of this deposition is to obtain
13   your full knowledge with regard to voter ID, so I'll
14   need your full and complete answers.  Is that okay?
15       A.  Yes.
16       Q.   I may not always be clear.  If you don't
17   understand, please ask me to just restate the question.
18   Is that okay?
19       A.  Yes.
20       Q.   If you need a break, let me know.  We'll finish
21   the question, and then proceed to have a break.  Is that
22   okay?
23       A.  Yes.
24       Q.   If you need to get up for water or coffee
25   between questions, that's fine.  But if you can wait

## 8

1   until we have finished up with the question we're going
2   through, that's great.  There's water and coffee to your
3   right.
4       If you want to talk your attorney, again,
5   that's also fine.  But if there's a question pending or
6   if you're in the middle of an answer, I'll ask you to
7   finish that question up first.  Is that okay?
8       A.  Yes.
9       Q.   At various points, your attorney may object to
10   a question I ask.  Many of these objections can be
11   resolved by the court at a later time.  Therefore,
12   unless your attorney specifically directs you not to
13   answer, I'll ask you to please respond to my question
14   fully.  Is that okay?
15       A.  Yes.
16       Q.   Sometimes your attorney may instruct you not to
17   rely on certain information when answering a question.
18   If you follow that instruction, please answer
19   accordingly by preceding your answer by saying, "Based
20   on that instruction."  And if you follow that
21   instruction and cannot, as a result, answer at all,
22   please tell me, "I cannot answer based on any attorney's
23   instruction."  That way, we'll sort of understand the
24   basis for your answer or nonanswer.  Is that okay?
25       A.  I will try to remember what you have suggested.

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

---

## 33

1  committee that oversees the Department of Public Safety.
2       Q.  Okay.
3       A.  And I was in his office one day looking at
4  videos.  He was kind of a fun guy to be around, and he
5  said, "Check out my driver's license.  It's got a really
6  cool number," like, as an example, 007.  And I said,
7  "Wow, how did you do that?"  He says, "Well, I'm the
8  chairman of the committee."  And I said, "Could I have
9  one like that?"  And he said, "Sure.  What number do you
10 want?"  And I said, "Well, how about my birthday?"  He
11 said, "Okay, I'll call over there and see if we can get
12 you one with your birthday on it."  And so my driver's
13 license number is like my month and my year of birth.
14      Q.  Did you -- did you go to a specific office, or
15 was it done for you?
16      A.  It was done for me.
17      Q.  So how did they get your picture?
18      A.  I don't know.
19      Q.  Do you know the -- when was the last time that
20 you went to a driver's license office to renew your
21 driver's license?
22      A.  I don't remember.
23      Q.  Do you know where the closest driver's license
24 office is to your home in Edinburg?
25      A.  Sure.

## 34

1       Q.  Where is it?
2       A.  Well, when I used to go, it was on the
3  northeast side of town.  There is also one in McAllen
4  that is in the center part of McAllen.
5       Q.  So about how far is the northeast end of town
6  from where you live?
7       A.  Four miles.
8       Q.  Okay.  Do you know what the hours of operation
9  of that office in Edinburg are?
10      A.  I assume they're regular business hours.
11      Q.  And if you were to go, how would you get there?
12      A.  I could walk, but I would probably drive.
13      Q.  It's four miles.  It's a pretty healthy walk,
14 right?
15      A.  Yeah.  I used to be walker until I tore my
16 ACL. I used to like walking.
17      Q.  Sorry about that.
18      A.  I walked here.
19      Q.  And during business hours, when you could go to
20 the driver's license office, you're usually at work,
21 right?
22      A.  I'm an attorney, and so my hours are flexible.
23      Q.  Okay.
24      A.  But I'm always an attorney.  I don't know how
25 to say that.  You understand.  You're an attorney.

## 35

1       Q.  My BlackBerry is right in front of me.
2       A.  Right.
3       Q.  So you don't remember the last time you went to
4  that office, though, correct?
5       A.  To the driver's license?
6       Q.  Uh-huh?
7       A.  I went recently, because my daughter needed her
8  driver's license.
9       Q.  Oh, okay.  And what time of day did you go with
10 your daughter?
11      A.  Late in the afternoon.
12      Q.  Okay.  Do you know how long you waited in line?
13      A.  Hmm.  20 minutes, 15 minutes.
14      Q.  And that was in Edinburg?
15      A.  That was in McAllen.
16      Q.  Sorry.  McAllen.  And so you drove to McAllen,
17 correct?
18      A.  Yes.
19      Q.  Okay.  Do you know what documents you brought
20 with you to help your daughter renew her driver's
21 license or to get her driver's license?
22      A.  No, I don't recall.
23      Q.  Do you know what documents she needed to have?
24      A.  I don't recall.
25      Q.  Do you know if there are some driver's license

## 36

1  offices that have been closed because of a lack of
2  funding?
3       A.  I would have to assume or make a guess.  So
4  I'll just say I don't know.
5       Q.  Okay.  Do you know if any drivers' licenses
6  offices now have reduced hours because of a lack of
7  funding?
8       A.  I do not know that.
9       Q.  Do you know if there are drivers' licenses
10 offices in every county in Texas?
11      A.  I can't give you a specific -- I can't give you
12 a clear answer, so I just will say I don't know.
13      Q.  Okay.  Can we try the unclear answer?
14      A.  You want me to guess?
15      Q.  Well, if it's a guess, don't guess.
16          MR. HUGHES:  Don't guess.
17      Q.  (By Mr. Freeman) Don't guess.  But if you had
18 some kind of partial answer.
19      A.  I mean, I could -- I could make assumptions.
20          MR. HUGHES:  Let's not guess.
21      Q.  (By Mr. Freeman) No.  That's not what we're
22 here for.  I just need to find out what do you know.
23      Q.  Okay.
24      Q.  So that's fine.
25          Are you aware of whether there's a

REPRESENTATIVE AARON PENA                                      JUNE 01, 2012

---

### 37

1  particular driver's license office in Austin that is
2  used by legislators and staff?
3       A.  No.
4       Q.  Okay.
5       A.  No.  I've never -- really?  No.
6       Q.  Okay.  Now, you've previously said, in an
7  interview with Governing magazine, that it's not an
8  inconvenience to get an ID; is that correct?
9       A.  Is that what I said?  Let me just say, because
10  I don't -- I don't want to -- that -- that is a correct
11  general statement, okay?  But I will say that it is a
12  very minor hurdle.
13       Q.  Okay.  Do you know if there are longer delays
14  in some offices, in larger cities than McAllen, than the
15  delay you had with your daughter?
16       A.  I don't know.  The only experience I had was
17  when I was in college, and I went in to get a driver's
18  license in Austin, and it was basically the same as it
19  is in McAllen.
20       Q.  Okay.  Do you have a copy of your birth
21  certificate?
22       A.  Not with me, but I have one at home.
23       Q.  Yeah.  You don't carry it around.
24           Do you know where you'd get a copy if you
25  lost yours?

### 38

1       A.  I'd either go to my city hall or I'd come to
2  Austin, and I'd get it from the department -- it's a
3  building that's off of Guadalupe, and it's the north
4  side of downtown.
5       Q.  Do you know how much it would cost to get a
6  copy?
7       A.  No.  I could take a guess.
8       Q.  If you don't know, you don't know.
9           Do you know how long it would take to get
10  a copy?
11       A.  Again, I'd take a guess.  I'm sure it varies.
12  I don't know.
13       Q.  How would you go about finding the answers to
14  those questions if you needed to know them?
15       A.  Well, okay.  Like I said, you know, I could
16  make assumptions.  I could go to my downtown, you know,
17  city, and I could stand in line and I'd ask.
18       Q.  Okay.
19       A.  And my guess is, they'd either say we have it
20  or we don't have it or to come, or they'd say, "Here it
21  is."
22       Q.  Okay.
23       A.  You know.  Here in Austin, I've done it before,
24  because I've to get passports, and it's not that long.
25       Q.  Okay.  Any idea, not that long, matter of

### 39

1  weeks?  Matter of days?
2       A.  I have a visual of myself standing in line and
3  asking for the documents.  When I was physically
4  present, it wasn't that long.
5       Q.  Oh, okay.
6       A.  When I was physically present.  Now, I don't
7  know if I called in, you know.  But when I was
8  physically present, it wasn't that long.
9       Q.  Okay.  How much does gas go for Hidalgo County
10  these days?
11       A.  It fluctuates.  Recently, it's gone down.  I
12  can make a guesstimate.  3.60.
13       Q.  Okay.  Approximately 3.60?
14       A.  Yeah.
15       Q.  Okay.  When was the last time you voted?
16       A.  I vote in every election.  It's a habit I've
17  started since college.  I make it a ritual.  I'm very
18  proud of the fact that I don't miss elections.
19       Q.  Did you vote yesterday?  Tuesday.  And I
20  apologize.
21       A.  I voted the first day of early voting.
22       Q.  Okay.  But did you vote in person?
23       A.  Yes.
24       Q.  Sorry about the confusion about the dates.
25       A.  That's okay.  I said, "Oh, my God, I missed

### 40

1  one."
2       Q.  How far is the early voting location from your
3  home?
4       A.  It's in my downtown.  All right.  Let me -- let
5  me -- give me a moment.
6       Q.  Sure.
7       A.  Of it's in my downtown.
8       Q.  So about how many miles is that from your
9  house?
10       A.  Five, six.
11       Q.  Okay.  And do you know where your precinct is
12  if you would have voted on election day?
13       A.  Yes.  14.
14       Q.  And do you know how close that is to your
15  house?
16       A.  Just a couple of blocks away.
17       Q.  Okay.  So closer than your driver's license
18  office?
19       A.  Yes.  About halfway.  About a third.
20       Q.  What ID are you carrying today?
21       A.  I have a driver's license.  I have a concealed
22  handgun license.  Yes, that's what I have with me.
23       Q.  I'll make sure to keep my questions very
24  friendly.
25       A.  (Laughing).

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

**41**

1    Q.   And which of those IDs have photo IDs?
2    A.   This is Texas, okay?  It's just Texas, don't be
3    intimidated.  Go ahead.  I'm sorry.
4    Q.   Which of those IDs have photos?
5    A.   Both of them.
6    Q.   Okay.  And do either of them establish
7    citizenship?
8    A.   Hmm.  I will say to get your Texas driver's
9    license, you have to go through a process that -- that I
10   believe proves citizenship.
11   Q.   Can a long-term permanent resident get a Texas
12   driver's license?
13   A.   I can't answer the question.
14   Q.   And do you know if a green card holder who
15   lives in Texas and is waiting the amount of time that
16   they need to get citizenship, can they get a Texas
17   driver's license?
18   A.   I can take a guess, but I don't have a clear
19   answer, so...
20   Q.   So you're not certain if a Texas driver's
21   license establishes citizenship; is that correct?
22   A.   I will just say more likely than not that it
23   does establish citizenship, but there may be an
24   exception that I'm unaware of.
25   Q.   Is there any marker on your driver's license

---

**42**

1    that says that you're a citizen?
2    A.   Not on my driver's license.
3    Q.   Okay.  And have you ever seen a Texas driver's
4    license that indicates that someone is a noncitizen?
5    A.   I have heard that there is something like
6    that.  Somebody told me that.  But I don't know with
7    certainty.
8    Q.   Okay.  But your license to carry does not
9    indicate citizenship either; is that correct?
10   A.   No, but --
11   Q.   You can check, if you'd like.
12   A.   Yeah.  I don't think so.  I don't look at it
13   that much.  No, I don't see it.
14   Q.   Okay.  And can I just ask:  If someone is a
15   refugee from another country and lives in Texas now and
16   they're, you know, under asylum status, they wouldn't be
17   able to have driver's license from that other country;
18   is that correct?
19   A.   I can't answer with certainty.
20   Q.   But there's no -- but they'd still be able to
21   get a driver's license and drive?
22   A.   You mean, if they have formal asylum?
23   Q.   Yes.
24   A.   I can't answer with certainty, but it sounds
25   reasonable.  I'm guessing.  I don't know.

---

**43**

1    Q.   Okay.  If you don't know, you don't know.
2         And do you have a passport?
3    A.   Yes.
4    Q.   Do you have any form of military ID?
5    A.   Yes.
6    Q.   And a passport does establish citizenship,
7    correct?
8    A.   Yes.
9    Q.   Does military ID?
10   A.   I've never -- I don't recall anybody asking me
11   that question.
12   Q.   When did you serve in the military?
13   A.   I'm a member of the Texas State Guard, which is
14   a state militia.
15   Q.   What other types of ID are produced by the
16   state of Texas; are you aware?
17   A.   I've heard that there is an ID you can get that
18   simply identifies who you are.
19   Q.   So a nondriver ID?
20   A.   Right.
21   Q.   Anything else?
22   A.   Hmm.  Not that I'm aware of.
23   Q.   Do you have a legislator ID?
24   A.   Yes.
25   Q.   Does it have your picture on it?

---

**44**

1    A.   Yes.
2    Q.   So does that establish who you are?
3    A.   These are informal internal documents used by
4    the Capitol for security purposes.  I think there is one
5    of them that's issued by the State of Texas, DPS.  But
6    quite frankly, I think they're internal documents used
7    for management of personnel.
8    Q.   But if you were to show that to someone, it
9    would have your name and your photo, correct?
10   A.   Yes.
11   Q.   And so it would -- it would establish you are
12   Aaron Pena, correct?
13   A.   No, I assume they could be -- well, the
14   security levels are probably not as high.  Because I
15   simply go into an office and ask for my photo to be
16   taken.  I mean, they have to confirm who I am, but they
17   don't -- there's not a whole lot of security protocols,
18   I'm sure.  I can't answer with certainty.
19   Q.   Do you have that legislator ID on you now?
20   A.   I can check.  I probably don't, because it's
21   not a -- you know, the wallet gets real thick and it's
22   not an essential.  Okay.  Let me say that this is a
23   security magnetic card that allows access.  It's one of
24   the many IDs that they give us, okay?
25   Q.   And it has your photo on it?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 45

1    A.  Yes, it does.
2    Q.  And your name?
3    A.  Yes, it does.
4    Q.  And an expiration date?
5    A.  No.  Well, I guess by saying 82nd Legislative
6    Session, that's somewhat of an expiration.
7    Q.  So as of January 2011, it will no longer be
8    valid?
9    A.  I mean, my terms goes -- yes, that's correct.
10   Q.  Okay.  So that establishes your identity,
11   doesn't it?
12   A.  It doesn't have the security protocols that --
13   that I'm sure the State of Texas requires.  I know that
14   we have -- we follow some of the ID requirements out of
15   the federal government.  So I'm not sure what those are.
16   Q.  Does your license to carry have more security
17   features on it?
18   A.  Yes.
19   Q.  And what are those features?
20   A.  Well, if you look at it, you have to turn it
21   sideways, but you can see a -- and I don't know the
22   term.  It's kind of a ink that is apparent when you turn
23   it sideways.  And then the same with the star there.  Do
24   you see that?  It's hard to put in words.  But it is a
25   security, and then it has magnetic strip as well

## 46

1    containing information.
2    Q.  Are those all the security features?
3    A.  I'm not aware of what additional security
4    features are in it.
5    Q.  Does the State of Texas produce any other
6    employee --
7    A.  Oh, I'm sorry.  There's also an embossed number
8    here.
9    Q.  Okay.  Does the State of Texas produce any
10   other employee IDs?  For example, employees of the
11   office the Attorney General or the --
12   A.  Sure.  I'm sure there's internal management
13   cards that they issue.
14   Q.  Do Texas public universities produce student
15   IDs?
16   A.  I had one when I was at school.
17   Q.  Did it have a photo?
18   A.  I can't recall, but I would assume.
19   Q.  Do those documents establish an individual's
20   identity?
21   A.  Yes.  The levels of security, though, are very
22   weak.  I mean, they could be forged.
23   Q.  Is it your position that a driver's license
24   cannot be forged?
25   A.  No.  I assume everything could be forged.

## 47

1    Q.  And --
2    A.  But it's harder, you know?
3    Q.  And are there -- you mentioned the particular
4    security features of a Texas concealed handgun license.
5    Are there similar features on a Texas driver license?
6    A.  Yes.
7    Q.  And is there any equipment that's needed to
8    utilize any of those security features, like a black
9    light or a barcode reader?
10   A.  Yes.  I would assume yes, because I've noted
11   that when I go to the airport, they look at it with a
12   light and they turn it.  So I assume there's some
13   security feature they're looking for.
14   Q.  Do they have those blacks lights and barcode
15   readers at polling places?
16   A.  Hmm.  I don't think so.  They could have a
17   light, but I don't think they have the training or have
18   knowledge of the security features.
19   Q.  And so for purposes the polling place, those
20   security features aren't really going to be helpful,
21   will they?
22   A.  I don't understand your question.
23   Q.  For a poll worker who doesn't have the black
24   light, who doesn't have the scanning machine, and you
25   said doesn't have the training, the difference between

## 48

1    your legislator ID and a Texas driver license, it's not
2    really going to make a difference, will it?
3    A.  Sure.  I mean, you can feel more comfortable
4    that the Texas driver's license is who you are than a
5    university ID.
6    Q.  And what's your basis for that?
7    A.  Oh, well, you know, I am aware that we follow
8    certain protocols that the federal government -- I
9    forget what it's called.  I forget what the law is.  But
10   there are certain protocols that the government is
11   imposing on the states.
12   Q.  Uh-huh.
13   A.  Whatever that law is, I'm aware of it, because
14   we've had to deal with it in the Homeland Security
15   Committee.
16   Q.  Is that the Real ID Act?
17   A.  That's very good.  Very good.
18   Q.  I'm just trying to help.
19   A.  And then I am aware of these new features that
20   have been added to the drivers' licenses.  They were not
21   there before.  These are hard to duplicate.  I assume
22   anything could be duplicated, but it makes it very
23   hard.  The magnetic strip, I'm not sure what's contained
24   on it, but I know that it's used.
25   Q.  Is it -- have you ever seen a Texas citizen --

REPRESENTATIVE AARON PENA                                JUNE 01, 2012

---

## 49

1  or not a Texas citizenship certificate -- excuse me -- a
2  citizenship certificate used as a form of ID with a
3  photo?
4      A.  You mean a United States citizenship?
5      Q.  Uh-huh.
6      A.  No, I've never seen one.  Where can you get one
7  of those?
8      Q.  And do you know if those citizenship
9  certificates have similar security features to what
10  you've described?
11     A.  I've never seen one.  I don't know.
12     Q.  Okay.
13     A.  You've caused me to want to have one.
14     Q.  I think it may be for new citizens.
15     A.  Oh, okay.
16     Q.  But I'm not sure.
17          What's the drinking age in Texas?
18     A.  21.
19     Q.  And are you aware of whether anyone under the
20  age of 21 has ever created a counterfeit driver license
21  in Texas?
22     A.  In the old days, I'd say yes.  Nowadays,
23  people -- with the security features, it's very hard to
24  make a credible one.
25     Q.  And what's your basis for saying that it's hard

## 50

1  to create a credible one?
2      A.  Well, I've heard them talk about these security
3  features on the driver's license and how they make it
4  more difficult for people to create them.
5      Q.  But do you think that -- do you think that no
6  one is creating fake Texas IDs to get alcohol anymore?
7      A.  I don't have any personal knowledge.  I just
8  remember as a kid, you know, people would try to create
9  them.  But we didn't have a whole lot of safety features
10  at the ID.
11     Q.  Did it work?
12     A.  Oh, I didn't do it.  I just had friends who
13  said they did it.
14     Q.  Are you aware of how many convictions for the
15  use of fake IDs have been obtained in the state of Texas
16  in the last 20 years?
17     A.  No, I'm not.
18     Q.  Are you aware of how many fake IDs have been
19  seized at bars and clubs, et cetera?
20     A.  No, I'm not.
21     Q.  Do you know how many investigated incidents
22  there have been related to the use of fake IDs in Texas
23  in the last 20 years?
24     A.  No.
25     Q.  Do you have if SB 14 provides any financing for

## 51

1  polling places to have those black lights that we
2  discussed to test the validity of the Texas driver's
3  license?
4      A.  You know, I don't remember that being
5  discussed.
6      Q.  Where do you get information about elections?
7  What sources do you use?
8      A.  I am a consumer, a heavy consumer of all
9  information on the Internet, in the newspapers.  I
10  listen to -- I'm a news junkie.  When I'm in the
11  Capitol, there's all kinds of information we're
12  bombarded with.
13     Q.  Any particular newspapers or websites that you
14  focus on?
15     A.  The New York Times.  Well, look.  Okay.
16  Everything.
17     Q.  Okay.
18     A.  In this country and in other countries, even
19  when the language is difficult for me to read.
20     Q.  For Texas news, what are your top two?
21     A.  Hmm.  Dallas Morning News, and either the Texas
22  Tribune or Harvey Kronberg's Quorum Report, which is an
23  aggregation of news.
24     Q.  Do you read the McAllen Monitor?
25     A.  Oh, yeah, religiously.  Listen, I read nearly

## 52

1  every paper that I can get my hands on.
2      Q.  Okay.  Do you watch any TV news?
3      A.  Yes.
4      Q.  What channels do you watch?
5      A.  MSNBC, Fox News, CNN, Univision, Telemundo.  If
6  there is a news outlet and it's available to me, I watch
7  it.
8      Q.  Okay.  Giving your remote a workout.
9          Do you listen to any talk radio?
10     A.  Yes, I do.
11     Q.  What do you listen to?
12     A.  Well, if something is pinpointed on the
13  Internet as something to listen to, I will listen to it.
14     Q.  Okay.
15     A.  Of political interest.
16     Q.  Uh-huh.
17     A.  I listen to the Houston Talk Radio, 92 FM.  I
18  listen to KTRH out of Houston.  I listen to the 710 talk
19  radio in McAllen.  I listen to KTRH, 1200 in
20  San Antonio.  590 in San Antonio.  550 -- no, not 550.
21  I listen to Internet radio.
22     Q.  Okay.
23     A.  If it is on the air, and it has to do with
24  politics or culturally-interesting subjects, I will
25  listen to it.

## 61

1    A.  Okay.  What I'm given each day.
2    Q.  Uh-huh.
3    A.  The legislative analysis, all the stuff that
4  people give us from the outside, outside of government
5  interest groups, what not that they want us to read,
6  it's usually put in a folder and I carry it to the
7  floor.  And then on the floor after the day is up, that
8  material is usually not important for any other day.  So
9  I'll either put it under my desk where it will sit until
10  it ages to a point to where, you know -- I could have
11  access to it, but it ages to the point where I just need
12  to throw it away.  Or I'll hand it to my staff and say
13  "Here, figure out what you're going to do with this
14  stuff," and it probably is trashed.  Because unless it's
15  a long-running issue, I just see no reason to keep all
16  that paper piling up.  We have a blue trash can in the
17  corner, everything is put in the recycle, and so I don't
18  know the answer with certainty.
19    Q.  Okay.  You said your chiefs of staff.  Who is
20  that besides Mari Deleon?
21    A.  Mari is the one from here.  Although my former
22  chief of staff from here moved to the Valley, and so he
23  maintains the title for the Valley.  He's a more senior
24  member than Mari Deleon.  So --
25    Q.  Okay.

## 62

1    A.  -- he occasionally exerts his authority by
2  saying "Let's do things this way."
3    Q.  And that's Orlando?
4    A.  Orlando.
5    Q.  Okay.  And so you don't -- you're not aware of
6  any retention policy related to documents for your
7  office?
8    A.  I don't like to see a lot of paper in my
9  office.  I don't like to see file cabinets.  There's
10  just no purpose for it.  Information -- we're bombarded
11  with information, and if you don't get rid of it, it's
12  going to just consume you.  So we get rid of it.  And I
13  don't want paper sitting around.  If I need information
14  or I need to have the information one more time, people
15  are glad to give it to me.  So --
16    Q.  Okay.  Now, you had said you do maintain files
17  on some long-running issues.  What are some of those
18  issues?
19    A.  We would keep clippings from the Valley,
20  clippings where -- where we appeared.
21    Q.  Uh-huh.
22    A.  When I was in early in my career, I would keep
23  a folder on subjects, you know, I thought I could read
24  everything.  But now, it's just -- I know where to get
25  my information.  There are all kinds of channels like

## 63

1  caucuses that where we gather information, and it is you
2  read it and you get rid of it.
3    Q.  With regard to those policy issues that earlier
4  in your career you kept things around, what were those
5  issues?  Do you remember?
6    A.  I think the medical school in Harlingen, the
7  drug treatment center that we tried to achieve.  Some of
8  the airport -- the Edinburg airport issues.
9    Q.  Okay.  So was voter ID one of those issues?
10    A.  No.  I came into the session knowing how I was
11  going to vote.  Absent some oppressive, overly
12  oppressive requirements, you know, I knew how I was
13  going to vote.
14    Q.  Do you maintain files on your X or Y drive
15  concerning particular legislation?
16    A.  Not that I'm aware of.
17    Q.  How did you know how you were going to vote on
18  voter ID coming into the session?
19        MR. HUGHES:  I'm going to instruct on
20  legislative privilege, and not to reveal thoughts,
21  mental impressions, opinions about legislation,
22  including voter ID, and don't reveal communications that
23  you've had with legislators, legislative staff, any
24  state agency, legislative council or constituents
25  concerning the same.

## 64

1        MR. FREEMAN:  Mr. Hughes, with regard to
2  constituents, I think it's pretty clear from the court's
3  order concerning the Lieutenant Governor, that
4  constituent communications are not privileged, and the
5  responses to those communications are public.  Can we
6  agree on that?
7        MR. HUGHES:  One moment.
8        MR. FREEMAN:  The May 28th order, if
9  that's helpful.
10        MR. HUGHES:  What part of the order are
11  you talking about?
12        MR. FREEMAN:  It's the very end of the
13  order.
14        MR. HUGHES:  Yeah.  I'll revise my
15  instruction.  Again, don't offer testimony concerning
16  your thoughts, mental impressions, opinions about
17  legislation, including Senate Bill 14, and don't reveal
18  communications you've had with legislators, legislative
19  staff or any state agency concerning the same.
20    A.  Okay.  And you said that I would not be -- that
21  outside that privilege was communications with --
22    Q.  Constituents?
23    A.  Constituents.
24    Q.  We have some further disagreements with your
25  counsel, but I just thought that was one that was

REPRESENTATIVE AARON PENA                              JUNE 01, 2012

---

## 65

1   relatively --
2          MR. HUGHES:  For the record, I think the
3   communications with constituents is already part of the
4   legislative transcript regarding Representative Pena's
5   testimony on the floor so it's out there either way.
6          MR. FREEMAN:  Sure.  Sure.
7   Q.  (By Mr. Freeman)  I just wanted you to explain
8   the statement --
9      A.  I don't have any specific communications that I
10  can identify.
11     Q.  Okay.
12     A.  But I can tell you that the communications that
13  I got from constituents were generally -- there's too
14  much corruption here where we live.  There was too much
15  electoral corruption, especially in the Delta community,
16  which is a poor farming community where my family is
17  from.  It's adjacent to my home base which is Edinburg.
18  And in the La Joya-Sullivan City area and in the
19  outskirts of Edinburg, that electoral corruption had
20  gotten really bad and had reached -- there was a certain
21  amount that we all kind of know exists, and we kind
22  of -- like a fly that you just want it to go away but it
23  doesn't go away.  But it had reached the point where
24  even the organizations that were -- that had encouraged
25  that sort of behavior were stepping forward and saying

---

## 66

1   "It's gotten too far.  We've got to put a stop to it."
2          Specifically, I remember the BEE Club, the
3   Better Edcouch-Elsa community organization, and the TACO
4   Club.  The Delta area community organization had come to
5   me wanting to stop the corruption, the voter
6   corruption.  And then -- okay.  That was a constituent
7   -- those were constituent communications.
8          Then also from many of the same people,
9   there was a sense of that voter ID is a good thing.  The
10  only time I had somebody say it was a bad thing were
11  from activists, activists from the Democratic ranks.  I
12  heard it in speeches and what not.
13     Q.  And when they said voter ID is a good thing,
14  did they explain what they meant by that?
15     A.  They wanted -- they wanted somebody to do
16  something.  They just wanted -- it was getting worse and
17  worse, and they wanted somebody to do something.
18     Q.  But doesn't Texas already have some kind of law
19  that requires some form of identification prior to
20  voting in person that requires you to establish your
21  identity?
22     A.  Okay.  Ask your question again.
23     Q.  Doesn't Texas already have a law that requires
24  you to establish your identity when you vote in person?
25     A.  And that law is?

---

## 67

1      Q.  Well, I'm asking.
2      A.  Well, you know, I sometimes I'd have my card,
3   my voter card, and I hand it to them.  But I live in
4   such a small town, everybody knows who I am, so they
5   just say, "Oh, Mr. Pena, come on in."  But I usually
6   give them the card so they can stamp it.  But I -- I'm
7   the sort of the person that hands an ID every time I
8   vote.
9      Q.  But they -- you have to under Texas law show
10  that voter registration card or some alternative form of
11  ID in order to vote in person, correct?
12     A.  Okay.  I'll accept what you say.
13     Q.  But you don't need to show ID similarly to vote
14  by mail, right?
15     A.  I don't think so.
16     Q.  And so when people were saying that they wanted
17  you to deal with corruption and to deal with that fly
18  that you mentioned before, were they talking about --
19     A.  It was greater than a fly.  The fly was the
20  standard operating procedure, but it had reached
21  proportions that they just said it's got to stop.  It's
22  getting out of hand.
23     Q.  A swarm of flies?
24     A.  Okay.
25     Q.  Were they talking about in-person voting, or

---

## 68

1   were they talking about mail-in ballots?
2      A.  They were talking about all forms of voter
3   fraud.  That's my sense.
4      Q.  Were they talking about voter impersonation?
5      A.  Yeah.  I would assume that's part of it.  But
6   you're asking me to assume what other people were
7   telling me, but it was general statements like "This has
8   got to stop.  This is bad.  Things are getting out of
9   hand."
10     Q.  Did anyone ever specifically say this voter
11  impersonation has got to stop?  People are coming in and
12  --
13     A.  Nobody talks like that.  We don't use those
14  words.
15     Q.  Did they ever say "It's got to stop.  People
16  are coming in and showing a registration card saying
17  they're someone else and voting for someone else"?
18     A.  I've heard that from the McAllen community but
19  not from the Delta community.
20     Q.  Is there ever any -- so you came into this
21  session knowing that you were going to vote specifically
22  in favor of voter ID unless they were overly oppressive
23  requirements.  That was your testimony earlier, right?
24     A.  Yes.
25     Q.  And so did anyone -- did you make any promises

## 73

1  figure out what the proper protocol is from hence
2  forward.
3      Q.  Okay.  And so you are unable to answer with
4  regard to any promises that were made by you or to you
5  because of the legislative privilege, is that your
6  testimony?
7          MR. HUGHES:  Same instruction.
8      A.  Am I able to answer?  Okay.  I'm going to
9  answer.
10         MR. HUGHES:  Can you repeat the question?
11         MR. FREEMAN:  I was just asking if he's
12 unable to answer concerning any promises that were made
13 by him or to him concerning legislative -- or concerning
14 voter ID because of his privilege assertion.
15         MR. HUGHES:  Same instruction.
16     A.  I'm physically able to answer but because of
17 the instruction, I'm going to follow the advice of
18 counsel.
19     Q.  (By Mr. Freeman)  Now, you had said before that
20 you were going to support voter ID unless there were any
21 overly oppressive requirements.
22     A.  Yes.
23     Q.  What did you mean by that?
24     A.  Well, I can -- I can -- I was waiting to see
25 what somebody was going to suggest, but requiring

## 74

1  multiple IDs, you know, that's an example, something
2  that I thought was overly oppressive.
3      Q.  Anything else?
4      A.  Well, you know, people are creative, and they
5  would have come up with something, but I wasn't going to
6  -- I wasn't going to allow something overly oppressive
7  to keep people from voting.  This in my opinion is not
8  overly oppressive.
9      Q.  Okay.  Do you believe that compliance with the
10 Texas constitution is an important consideration in the
11 law-making process?
12         MR. HUGHES:  And again, this is going to
13 get old.  But I want to instruct you with respect to
14 legislative privilege, not to reveal thoughts, mental
15 impressions or opinions about legislation, including
16 Senate Bill 14.  And to the extent this question calls
17 for testimony concerning your mental impressions,
18 opinions about Senate Bill 14, I instruct you not to
19 answer, to that extent only.
20     A.  Look, like any lawyer, the law should be
21 followed, unless you're attempting to make a challenge,
22 to extend the law, to change the law.  The law should
23 always be followed.
24     Q.  (By Mr. Freeman)  What steps do you take to
25 ensure that a bill you're working on or voting on

## 75

1  complies with the Texas constitution?
2          MR. HUGHES:  I'm going to offer the same
3  instruction on legislative privilege, not to answer to
4  the extent that calls for revealing communications with
5  other legislators, legislative staff, any state agency,
6  including the Texas Legislative Council, or to the
7  extent it calls for you to reveal your thoughts, mental
8  impressions or opinions about legislation.
9      A.  I can use my own training as a lawyer.
10     Q.  (By Mr. Freeman)  Anything else?
11     A.  The adversarial process will ferret things out.
12     Q.  So is it your understanding that sometimes
13 things make it out of the legislature that don't comply
14 with the Texas constitution, but people fight it out in
15 litigation, and that's part of the process?
16         MR. HUGHES:  Same instruction.
17     A.  No.  That's not what I meant when I said that.
18     Q.  Okay.
19     A.  What I meant was --
20     Q.  Please clarify.
21     A.  There's a -- there are multiple positions taken
22 on a bill, and the adversarial system will cause the
23 opposing side to raise the issue.
24     Q.  Okay.
25     A.  And but there are other controls involving

## 76

1  lawyers and what not that are -- that are present.
2      Q.  I guess I'm more curious what's your process?
3  You said you rely on your own training as a lawyer.
4  Anything else?
5          MR. HUGHES:  Same instruction.  Don't
6  answer to the extent it calls you to reveal
7  communications with other legislators, legislative
8  staff, or any state agency, including the Texas
9  Legislative Council.
10     A.  Yeah.  I think I answered it with the previous
11 question.
12     Q.  (By Mr. Freeman)  Okay.  Do you believe
13 compliance with federal law is an important
14 consideration in the law-making process?
15     A.  Yeah.  I'll give the same answer I gave to the
16 state law.  We should always try to follow the law.  And
17 absent an attempt to extend it or challenge it, that's
18 what you ought to do.
19     Q.  And do you believe compliance with the federal
20 Voting Rights Act is an important consideration in the
21 law-making process?
22         MR. HUGHES:  I'm going to continue to give
23 the same instruction to you, which is not to answer to
24 the extent that answer calls for you to reveal your
25 thoughts, mental impressions, opinions about

## 77

1    legislation, including voter ID.
2        A.   The same answers I gave before apply to this
3    one.
4        Q.   And was part of the purpose of SB 14 to
5    challenge the federal Voting Rights Act as you described
6    it previously?
7            MR. HUGHES:  Again, I'm going to instruct
8    you not to answer to the extent the answer calls for you
9    to reveal your thoughts, mental impressions, opinions
10   about legislation, including Senate Bill 14, and don't
11   reveal communications that you've had with legislators,
12   legislative staff, any state agency, including the Texas
13   Legislative Council.
14           MR. FREEMAN:  Mr. Hughes, two things:
15   First, I thought that I was under the impression that
16   you were going to try to limit speaking objections.
17           MR. HUGHES:  These aren't speaking
18   objections.  These are asserting my legislative
19   privilege objection.
20           MR. FREEMAN:  It's a lengthy objection,
21   and we're trying to move this along for everyone's
22   benefit.
23           Secondly, I think it's pretty clear under
24   the Jewish War Veterans' decision that information
25   relating to the overall purpose of a legislative act,

## 78

1    rather than the individual motivations of the
2    legislators, is not covered by the privilege.  And I
3    believe that when this issue was raised during the first
4    week of depositions, that the State of Texas conceded
5    that point and allowed us to pursue questioning
6    concerning the purpose of the bill.
7            MR. HUGHES:  You can ask about the
8    publicly stated purposes of the bill.  You can't ask
9    about the mental impressions, deliberations, back-room
10   discussions that may or may not have occurred.  That's
11   all covered by the privilege.
12           MR. FREEMAN:  I'm not asking about
13   individual motivation, but I am going to ask about
14   nonpublic purposes, which the purpose of the bill and
15   are covered by -- that are not covered by the
16   legislative privilege, regardless of whether someone got
17   up on the floor and said it.
18           And I believe the State of Texas has
19   already agreed, and I hope we do not have to -- I mean
20   we got on the call or we got on the -- we sent out a
21   letter, I believe, with the state to the court and
22   resolved this issue.  And if we have to take a break to
23   pull that up that letter, I'm happy to do so.
24           Let's go off the record for a second and
25   we'll get that and see if we can resolve this, because I

## 79

1    don't want to be fighting this out all day.
2            (Recess taken from 11:33 a.m.to
3    11:38 a.m.)
4            MR. FREEMAN:  Would you read back the last
5    question?
6            (Requested portion read back by the court
7    reporter.)
8            MR. HUGHES:  I will -- my objection to
9    that is that you -- that you -- based on legislative
10   privilege, is that you may testify pursuant to the
11   court's order about the general purpose or the purpose
12   of the legislature as a whole in enacting Senate Bill
13   14, as opposed to the subjective intent of any
14   particular legislator.  But you may not answer or reveal
15   communications that you had with the legislators,
16   legislative staff, members of any state agency, and so
17   forth.
18       A.   The purpose of the bill was to respond to the
19   desires of the community, which is reflected in what I
20   was told as I described to you.  And the public polls
21   have shown overwhelming support, not only in the Anglo
22   community but the minority community, the Hispanic
23   community.  Those polls were done by the University of
24   Texas and the Texas Tribune and have been done by
25   others.  As to -- as to the intent from other

## 80

1    legislators, I can't speak for them.  But that was my
2    intent.
3        Q.   (By Mr. Freeman)  Okay.  But in terms of the
4    purpose, not -- not the primary purpose, but whether a
5    purpose of the bill was to challenge the federal Voting
6    Rights Act, as you've described earlier that compliance
7    may or may not be an important purpose if you're trying
8    to push back against the law, was a purpose of the bill
9    to do that?
10           MR. HUGHES:  And again, the -- I'm
11   instructing you based on legislative privilege not to
12   answer other than an answer concerning the general
13   purpose of Senate Bill 14 and not the subjective or
14   individualized purpose of any legislator.
15       A.   The two purposes that I answered were the
16   purpose that I had.
17           MR. FREEMAN:  Mr. Hughes, I'll ask if the
18   question is not objectionable, that you not give that --
19   give that instruction as you are interfering with the
20   examination by doing so.  Thank you.
21       Q.   (By Mr. Freeman)  What committees do you
22   currently sit on?
23       A.   Okay.  Including subcommittees?
24       Q.   Just committees?
25       A.   Okay.  Homeland Security.  It may be called by

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

81

1  a different name, but that's essentially what we call
2  it.  The Technology Committee, which I chair.  There are
3  a couple of select committees.  Oh, okay.  One of them
4  has to do with -- that the voter ID went through, and I
5  think that was called the Committee on -- I forget the
6  name.
7      Q.   Was it Voter Identification and Voter Fraud?
8      A.   Very good.
9      Q.   Were you on any other select committees?
10     A.   Yes.  But I can't recall their names.
11     Q.   Okay.  What is a select committee?
12     A.   A select committee is one that where a
13  committee is created.  It's not a standing committee.
14  It's created for a specific purpose.  And the committee
15  is hand-picked.  Well, they're all -- I guess they're
16  all hand-picked for a specific purpose.
17     Q.   Okay.  Are you aware of who picked the name,
18  "Select Committee on Voter Identification and Voter
19  Fraud?"
20     A.   No.
21     Q.   Are you aware of whether there have been any
22  other select committees relating to voting or elections
23  in the current or past legislatures in which you served?
24     A.   I served on the Elections Committee.
25     Q.   But were there any other select committees

---

82

1  distinct from elections?
2      A.   There may have been.  I don't recall.
3      Q.   Okay.  Are you aware of any other select
4  committees that relate directly to a standing committee
5  in the way that Select Committee on Voter Identification
6  and Voter Fraud relates directly to elections?
7      A.   I was on the Emergency Management select
8  committee.  And that related to -- even though that was
9  covered by the homeland -- was the Homeland Security
10  Committee in existence?  Okay.  Yes, vaguely.  Okay?  I
11  was on a select committee that had to do with the
12  subject area of another committee.
13     Q.   Okay.
14     A.   Border Affairs and Homeland Security, and we
15  handled emergency preparedness and homeland security.
16     Q.   Okay.
17     A.   And I was the chair of that committee.
18     Q.   Okay.  Was the Select Committee on Voter
19  Identification and Voter Fraud a fast-track committee?
20     A.   I can't answer that.  I don't know.
21     Q.   This exhibit has previously been marked as U.S.
22  Exhibit 12.  And do you see at the bottom of the page
23  where key -- after key facts on committees -- well,
24  first, have you seen this document before?
25     A.   Never, not that I can recall.

---

83

1      Q.   What is this document?
2      A.   It appears to be a document, a press release,
3  announcing House committee assignments.
4      Q.   Okay.  And do you see on the second to the last
5  page where next to Select Committee on Voter
6  Identification and Voter Fraud, it italics says
7  "fast-track"?
8      A.   I do see that.
9      Q.   Do you have any idea what that means?
10     A.   I didn't put it there so I don't know.
11     Q.   Have you ever seen any other committee
12  designated as a fast-track committee?
13     A.   No.  And I've never -- other than this
14  document, I've never seen this committee referred to as
15  a fast-track committee.
16     Q.   Okay.  How many bills did the Select Committee
17  on Voter Identification and Voter Fraud consider?
18     A.   You know, I know I had a bunch of bills in the
19  committee.  Hold on a second.  They did go to
20  elections.  I think they was scattered all over the
21  place.  Yes.  They went to elections.  No.  The answer
22  is no, I can't give you a specific answer.
23     Q.   Let's see if I can refresh your recollection.
24  This document is --
25     A.   Oh, you know what?  Forgive me.  Forgive

---

84

1  me.  State it again, please, the question.
2      Q.   Do you know how many bills the Select Committee
3  on Voter Identification and Voter Fraud considered?
4      A.   To answer your specific question, no, I don't,
5  but I recalled something else.  But go ahead and ask
6  your next question.
7      Q.   Well, let's just see if I can refresh your
8  recollection.  This document has already been marked as
9  Exhibit 13.  First off, what did you recall in response
10  to my question?
11     A.   I can recall that the committee chair for his
12  own -- got frustrated, but I think it gets into the
13  legislative privilege.
14     Q.   Okay.
15     A.   And -- okay.
16     Q.   Having now looked at this document, first, have
17  you seen this document before?
18     A.   Yes.  Something -- if not, something similar.
19     Q.   Okay.  So you're able to recognize what this
20  document is?
21     A.   Yeah.
22     Q.   What is this document?
23     A.   It's -- this document contains information that
24  -- in a format that describes, that we regularly see,
25  that describes, you know, what the bill is, who the

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

85

1    authors are, who the sponsors are, and the caption,
2    which is a small blurb, describing the bill.
3        Q.   But this document also names the number of
4    bills that were considered by the Voter Identification
5    and Voter Fraud Committee, correct?
6        A.   Oh, I don't know if that's what that document
7    refers to.  If you tell me that's what it refers to, I
8    have nothing to contradict what you're saying.
9        Q.   Well, do you see at the top of the committee --
10   or at the top of the document it says, "Texas
11   Legislature Bills by Committee."  And so if you're happy
12   to accept my representation, I can say that it is the
13   Texas Legislature's website's report on --
14       A.   The number of bills.
15       Q.   -- the number of bills by committee.
16           So having looked at this document, can you
17   now let me know how many bills that select committee
18   that you were on considered?
19       A.   Well, you say it's one, that this represents
20   one, and I'll accept what you say, because I have
21   nothing --
22       Q.   Do you recall any other documents that -- or
23   excuse me, any other bills that you addressed
24   specifically in the context of that committee?
25       A.   Not that I can recall.

---

86

1        Q.   Okay.  Can you think of any other examples of a
2    select committee that heard only one bill?
3        A.   I can't think of one.
4        Q.   Did you ask to be on the Select Committee on
5    Voter Identification and Voter Fraud?
6        A.   No.  I was placed there.
7        Q.   Did you have any conversations as a general
8    matter concerning committee assignments prior to the
9    assignments being made in the 82nd Legislature?
10           MR. HUGHES:  I want to instruct you on
11   legislative privilege not to reveal communications or
12   thought -- communications relating to voter ID
13   legislation or your thoughts or mental impressions
14   relating to voter ID.  And I think the question about
15   committee assignments may invite testimony on that.  And
16   so with that limitation in mind, you can answer the
17   question.
18       A.   I had one communication.
19       Q.   (By Mr. Freeman)  Okay.
20       A.   And but it involved another legislator, so I'm
21   not going to get into it.
22           MR. HUGHES:  So, Mr. Hughes, this is what
23   the court has described as a privileged log type of
24   question.  I believe that I phrased the subject matter
25   pretty broadly.  I was trying to avoid any kind of

---

87

1    objection on this matter about committee assignments as
2    a general matter.
3           And therefore, within that general
4    subject matter, I believe that we are entitled to
5    discuss with the witness whether communications
6    occurred, when they occurred, where they occurred, and
7    with whom they occurred.  I will not go beyond that,
8    unless I'm making a record.  But I will understand that
9    you -- there's a legitimate dispute beyond that point.
10   But before that point, I do not believe there's a
11   legitimate dispute.
12           MR. HUGHES:  I think you're accurately
13   interpreting the court's guidance to us.
14           MR. FREEMAN:  Okay.
15           MR. HUGHES:  So if you asked your
16   questions that way.
17           MR. FREEMAN:  Well, I believe that my
18   question was asked that way.
19           MR. HUGHES:  Why don't you try again?
20           MR. FREEMAN:  Can we have it read back?
21   Sorry.
22           (Requested portion read back by the court
23   reporter.)
24           MR. HUGHES:  So now you can ask your next
25   question, because I think you've already got Step 1, the

---

88

1    court's guidance.
2        Q.   (By Mr. Freeman)  Who was that other
3    legislator?
4        A.   Speaker Strauss.
5        Q.   And when did that occur?
6        A.   I think a day or two prior to the announcement.
7        Q.   And was anyone else present?
8        A.   No.
9        Q.   And where did it occur?
10       A.   It occurred -- well, he was somewhere, and I
11   was on the receiving end of a phone call.
12       Q.   Okay.  Did you discuss your assignments with
13   anyone after they were made?
14       A.   Other legislators.
15       Q.   Any other members of the Select Committee on
16   Voter Identification and Voter Fraud?
17       A.   No.  Well, you know, I mean, I may have bumped
18   into them and said, "Hey, I'm on the committee with
19   you."
20       Q.   Okay.
21       A.   But I'm taking a guess.
22       Q.   Okay.  Fair enough.
23           Now, you previously testified that you
24   were previously on the Elections Committee; is that
25   correct?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

## 89

1    A.   Yes.
2    Q.   What sessions were you on the Elections
3  Committee?
4    A.   I think the session before this last one so
5  probably the 81st.
6    Q.   Anything besides that?
7    A.   I don't recall.  It all blends.
8    Q.   And you were vice chairman of the Elections
9  Committee; is that correct?
10   A.   Yes.
11   Q.   What is the scope of the Elections Committee's
12 authority?
13   A.   We looked at elections-related bills.
14   Q.   So any bill related to the Texas elections
15 code?
16   A.   Yeah.  But of course, the bill had to be
17 referred to that committee.  Okay.  Because just because
18 it's within the purview of one doesn't mean it won't go
19 to another.
20   Q.   And who makes those referrals?
21   A.   The speaker's office is what I understand.
22   Q.   And what was your authority as the vice
23 chairman of the Elections Committee?
24   A.   My job was to substitute -- to be the
25 substitute for the chairman when he was not present.

---

## 90

1    Q.   Is it typical for the vice chairman to be of
2  the opposing party to the chairman?
3    A.   That is a recent custom, yes.
4    Q.   Is there any, as a matter of custom, and this
5  doesn't even need to be restricted to the Elections
6  Committee, but typically, do the chairman and vice
7  chairman organize the members of their party to some
8  extent within the committee?
9    A.   No.  That's not been my experience.
10   Q.   Okay.
11        MR. HUGHES:  It's like herding cats.
12   A.   Yeah.  Everybody is their own dictator.  They
13 all decide on their own.
14   Q.   (By Mr. Freeman)  Magic of the legislative
15 process.
16        Were you aware at the time of committee
17 assignments that the Select Committee on Voter
18 Identification and Voter Fraud would address only
19 in-person voter impersonation and not mail-in fraud
20 issues?
21   A.   I wasn't aware of what bills were going to be
22 referred.
23   Q.   Okay.  I guess I have another sort of
24 technical Texas Legislature question for you.  Some
25 bills have multiple sponsors, correct?

---

## 91

1    A.   Yes.
2    Q.   What does it mean to be a second or third
3  sponsor of a bill?
4    A.   That means you're -- you are lending your
5  support.  There's a lot of symbolism involved.  You're
6  lending your support and -- and other legislators will
7  look upon that as some guidance, at times, depending on
8  the legislator.  Sometimes they're given to people
9  because they asked for them early or they're best
10 friends with the author.  Sometimes it means nothing
11 more than they got there first and the author said okay.
12   Q.   Is there typically a speaking role on the floor
13 in debate associated with a second or third spot?
14   A.   When it comes to larger bills like the budget,
15 yes, it's customary that when it comes to a very large
16 bill, that they will break up discussions.  But no,
17 there's not necessarily a speaking role.
18   Q.   I'd like to talk to you about your district,
19 District 40.  Do you know how big your district is in
20 square miles?
21   A.   It's fairly large.
22   Q.   The Delta area, that's the area to the north of
23 Edinburg, correct?
24   A.   To the east of Edinburg.
25   Q.   East of Edinburg.  Okay.  But there's a whole

---

## 92

1  swath of northern Hidalgo County that's in your
2  district, right?
3    A.   Yeah.  That's what we call the "ranch country."
4    Q.   Okay.
5    A.   They're historic ranches, land-granted land
6  from the King of Spain to families that are still
7  there.  They're very proud of that.  So that's what we
8  call the "ranch land" or the -- yes.
9    Q.   The ranch land is big, right?
10   A.   It is big.
11   Q.   Okay.  How would you describe your district in
12 terms of its population?
13   A.   I would assume that it meets the parameters of
14 what the population ought to be --
15   Q.   Do you know --
16   A.   -- for a district.
17   Q.   Do you know approximately how big, how many
18 people are in a Texas House District?
19   A.   No.
20   Q.   Okay.
21   A.   No.  I could take a guess, but I don't know.
22   Q.   And how would you describe in it terms of its
23 demographics?
24   A.   Okay.  Let's start on the west side.  There's
25 an area called La Joya and Sullivan City.  Culturally

REPRESENTATIVE AARON PENA                    JUNE 01, 2012

---

### 97

1    A.  Yes.  We've talked about this before in a prior
2  deposition.
3    Q.  We have.
4    A.  It used to be when I was a young boy, the Anglo
5  community was the more affluent.
6    Q.  Uh-huh.
7    A.  But in the '70s, and after the World War II
8  generation, the Hispanics had a chance to go college,
9  and that generation, my parent's generation got an
10  education.  And with NAFTA, and then some of the banks
11  are no longer -- they're owned by local folks, mainly
12  Hispanics.  When the banks started giving out access to
13  capital, many of the business people and Mexicans,
14  Mexicans, at least the ones who come over, are quite
15  affluent.  At least -- I'm talking about they're
16  affluent people from Monterey and other areas began to
17  move in, in addition to the large poor population.
18    Q.  Okay.
19    A.  And -- I don't know.  Did I answer -- what was
20  your question?
21    Q.  I guess my question was, and I can be a little
22  bit more specific --
23    A.  Okay.  But I want to get back to it.  I now
24  remember.
25    Q.  Okay.

---

### 98

1    A.  Today, the very affluent tend to be Mexican or
2  Mexican-American.  Anglos run in two streams.  They're
3  either the working class, oil field workers, truck
4  drivers, or farmers, descendants of farmers.  But many
5  of those folks on the lower end of the spectrum, a lot
6  of them have intermarried, so they're -- you know,
7  they're this new kind of folk.  They're like the rest of
8  us -- mutts.  They're mixed.  They're all -- you know
9  what I mean?  They're all mixed.
10    Q.  Yep.
11    A.  But then you have recent -- recent Anglos who
12  come in but they're working class folks.  Then you have
13  this very wealthy elite, but it's a small group of
14  people.
15    Q.  Okay.
16    A.  You will have the university community with
17  their professors and what not, and they're like regular
18  folks.  But I would say the most affluent in our
19  community are Mexicans or Mexican-Americans.
20    Q.  Okay.
21    A.  Mainly Mexicans.
22    Q.  So you previously said that a lot of your
23  district is working class.  Would you say that many of
24  the adults work for hourly wages?
25    A.  Yes.

---

### 99

1    Q.  Most adults?
2    A.  Yes.
3    Q.  Would you say that there's any difference
4  between the Anglo and Hispanic communities about who
5  works hourly versus working, as you said, all the time
6  but as more of a salary issue?
7    A.  Those differences were stark prior to the '70s.
8    Q.  Okay.
9    A.  Okay.  Thanks to good lawyers like this
10  gentleman over here (indicating Mr. Garza) and some of
11  the civil rights changes and things have changed.
12  Hispanics became empowered and are now the leaders of
13  the community.  And we are moving slowly, some of us,
14  into a post -- I want to believe a post-racial era.
15        I'm sorry.  I lost your question.
16    Q.  No.  I was just asking if you thought that
17  there was a difference in terms of between Anglo and
18  Hispanic communities --
19    A.  Yeah.
20    Q.  -- where the folks are more likely to work
21  hourly wage type of jobs?
22    A.  The Anglo community is smaller today in
23  comparison to the -- prior to the '70s.  Many of the
24  children of the Anglo families have moved on to
25  San Antonio --

---

### 100

1    Q.  Okay.
2    A.  -- and Dallas and other places.  Because they
3  wanted to marry.  And they -- prior to the '70s, it was
4  -- it was -- there was social limitations on marrying
5  other Hispanics.  Today, I don't think those -- those
6  limitations are generally not there.  And amongst the
7  poor, amongst the working class, they're not there.  I
8  mean, Anglo work poor will marry Hispanic poor
9  because -- but in the old days, prior to the '70s, I'd
10  say those limitations were there.
11    Q.  Okay.  By the way, let the record reflect that
12  when Representative Pena said that there was a good
13  lawyer over there, he was pointing at Mr. Jose Garza.
14    A.  Jose Garcia has been involved in many of those
15  civil rights cases and --
16    Q.  Does it -- do a lot of the Hispanic families in
17  your district not own cars?
18    A.  Most people own cars.
19    Q.  Are there some who don't?
20    A.  Yeah, like me.
21    Q.  Is there public transportation in your
22  district?
23    A.  Yes.  Not in the Delta area, not in La Joya-
24  Sullivan.  And you know what, probably not in the
25  Edinburg either.  But there is in McAllen.

REPRESENTATIVE AARON PENA                     JUNE 01, 2012

## 101

1    Q.   Okay.  How many precincts are there in your
2  district?
3    A.   I can't answer that.
4    Q.   Do you know how many polling places there are?
5    A.   No.  I can't answer that.
6    Q.   More than ten?
7    A.   That's a good guess.
8    Q.   Do you know how many driver's license offices
9  there are in your district?
10    A.   I'm aware of one.
11    Q.   Would you agree that for most voters, a polling
12  place is closer than a driver's license office?
13    A.   Yes.
14    Q.   How long does it usually take a voter to cast
15  their ballot in person?
16    A.   Depending on the election and who the
17  candidates are, whether or not it's a presidential cycle
18  or a gubernatorial cycle, I'll just take an average from
19  my personal experience, 15 minutes.
20    Q.   You described your constituents as being
21  working class, some of them as living on public
22  assistance.
23    A.   Most of them.
24    Q.   And would you say that a lot of your
25  constituents need all the wages that they make?

## 102

1    A.   I think we all do.
2    Q.   Would you agree that having to take a few hours
3  off from work would be a burden for those people?
4    A.   You mean to go vote?
5    Q.   For any purpose?
6    A.   Would be a burden, is that what you said?
7    Q.   Yeah.
8    A.   It would be an inconvenience, but it's not
9  significant.  Look, voting in itself is an
10  inconvenience, but it's a duty that we, I think we
11  should have.
12    Q.   For some of your constituents, would an
13  unexpected $22 expense be a burden?
14    A.   For me that would be a burden.
15    Q.   Okay.  Is there high voter turnout in your
16  district?
17    A.   You know, this last election cycle, we had one
18  of the highest turnouts when it comes to early voting.
19    Q.   Okay.
20    A.   But I will say that Hispanics, in general, do
21  not vote on the level of the general population,
22  whatever that means.  And that's a nationwide phenomena.
23    Q.   So I'd like to talk to you about forms of
24  photographic identification in Texas.  We talked about
25  this a little bit with the card you had in your wallet,

## 103

1  but just a couple of additional questions about
2  that.  Do you know how many registered voters in Texas
3  lack a driver's license, state ID card or a license to
4  carry a concealed weapon?
5    A.   You know, I've seen the numbers reported in the
6  newspaper, and I've seen the argument made by, I guess,
7  yourselves that have been reported in the paper, but I
8  don't recall the number.
9    Q.   Did you ever try to find out what that number
10  was at any point, you actively try?
11    A.   You mean, do I go around in my district and
12  say -- and do a sample survey and say how many people
13  have a license or don't?
14    Q.   That is not what I meant.
15    A.   Okay.
16    Q.   I'm wondering if you ever, you know, asked
17  with -- concerning voter ID, whether you ever tried to
18  find out from DPS --
19    A.   Those arguments --
20      MR. HUGHES:  Hold on.  I'm going to
21  instruct him with respect to legislative privilege, to
22  not reveal the substance of any communication that you
23  had concerning SB 14 or other legislation with any
24  legislators, legislative staff, or with any state
25  agency.

## 104

1      And Mr. Freeman is entitled to ask certain
2  foundational questions, but by fine-tuning the subject
3  matter like you're doing, you're getting into the
4  legislative privilege, so you need to kind of get more
5  general.  So let's try again.
6      MR. FREEMAN:  Okay.  I'll actually just
7  withdraw the question and take a step back.
8    Q.   (By Mr. Freeman)  You said you did at some
9  point see some information or arguments made.  Do you
10  know when you saw about the number of people who lack
11  IDs, do you remember when that was?
12    A.   I've seen it in the paper.  I don't recall
13  when.  I think arguments were made on the floor.
14    Q.   Okay.  Did you ever see any specific numbers?
15    A.   You know -- I can recall seeing it.
16    Q.   Okay.
17    A.   But I don't recall the number.
18    Q.   Was that before May of 2011?
19    A.   I don't know.
20    Q.   Okay.  Do you have any understanding of whether
21  some groups are more likely than others to lack those
22  types of ID?
23    A.   I assume that -- I'm making an assumption,
24  based on observation, that this has to do with
25  educational levels and economic levels.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

## 105

1    Q.   I would describe that as inductive logic rather
2    than an assumption.
3        If -- and so you'd say that poor people
4    are more likely to not have these types of ID, correct?
5    A.   They're less likely than affluent people.
6    Q.   Yes.  Are poverty rates in Texas similar across
7    racial groups?
8    A.   No.  As I've described, prior to the '60s and
9    after the civil rights movement, Hispanics were largely
10   poor and undereducated.  And it's only been a generation
11   or two that we've been able to emerge.  You know,
12   emerge.
13   Q.   Okay.  But as of right now, isn't it the case
14   that Hispanics are much more likely to be poor than
15   Anglos in the state of Texas?
16   A.   I would -- you know, where I live.  Okay.  Your
17   question, let me answer your question.
18   Q.   Thank you.
19   A.   I would say yes.
20   Q.   Are you aware that Texas recently informed the
21   Attorney General that it was the state's belief that
22   there are 795,955 registered voters in the state of
23   Texas who lack a Texas driver's license, identification
24   card or a license to carry?
25   A.   I'm aware that you all -- that you all --

## 106

1    people from your position have made that assertion.
2    I've seen it in the paper.
3    Q.   Are you aware of whether the state has agreed
4    with that assertion?
5    A.   Oh, I don't know.  If you tell me it has, then
6    great.
7        MR. FREEMAN:  Well, let's -- if we can
8    have this marked as U.S. 371?
9        (Exhibit U.S. 371 marked for
10   identification.)
11   Q.   (By Mr. Freeman)  If you can just take a look
12   at that for a moment.
13   A.   Why don't you tell me what it says.
14       MR. HUGHES:  I want you to take the time
15   to look at it --
16       THE WITNESS:  Oh, okay.
17       MR. HUGHES:  -- see if you have questions
18   about it.
19       THE WITNESS:  Oh, okay.
20   Q.   (By Mr. Freeman)  Okay.  Are you aware that
21   Texas, that the State of Texas provided data to the
22   Attorney General stating that less than 70 percent of
23   the Spanish surnamed registered voters in Hidalgo County
24   have those types of necessary ID?
25   A.   Less than 70 percent?

## 107

1    Q.   Less than 70 percent.
2    A.   Is it -- that is information that the Justice
3    Department --
4    Q.   It's numbers that were given to the Justice
5    Department by the State of Texas.
6    A.   Okay.  No.  I was not aware of that.
7    Q.   Do you know where a voter can obtain an
8    election identification certificate?  First off, are you
9    familiar with the term "election identification
10   certificate"?
11   A.   I've heard that referenced.  Yes.
12   Q.   Is that the type of identification that is made
13   available to voters under SB 14?
14   A.   That's the --
15   Q.   The new type --
16   A.   -- free ID, yes, as it's described commonly.
17   Q.   Do you know where a voter can get that?
18   A.   I assume at the DPS office.  I don't know.
19   Q.   Does SB 14 require employers to provided paid
20   leave to go obtain an ID?
21   A.   I don't think that's in there.
22   Q.   If an individual had to travel from the ranch
23   country, the northern part of your district, to a DPS
24   office in Edinburg, that would take -- that would take a
25   good amount of time, right?

## 108

1    A.   20 minutes, 30 minutes, maybe, the furthest
2    reaches of the county.
3    Q.   Okay.  And you said earlier that at a minimum
4    it would take 15 minutes to go through a transaction at
5    the driver's license office, right?
6    A.   Yes.  Yes.
7    Q.   And then you got to drive back?
8    A.   Yes.
9    Q.   So that's an hour off from work at least,
10   right?
11   A.   Yes.
12   Q.   And so that's going to cost a voter, if they
13   have to go get that ID, that's going to cost them money,
14   right?
15   A.   Yeah.
16   Q.   In gas, wages?
17   A.   Yes.
18   Q.   And given that we talked about how the poorer
19   people are more likely not to have ID, would you guess
20   that those are going to be some of the same people who
21   don't have cars?
22   A.   Nearly everybody has a car.  Okay?  But I can
23   say that there are some people without cars, because as
24   I said, I don't have a car.  My wife and daughter have a
25   car.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 109

```
 1        Q.   Do you think that the loss of wages and the
 2   cost of gas to drive back and forth has -- may deter
 3   some voters from going to get an ID if they don't have
 4   one?
 5        A.   Okay.  May deter?  Okay.  You want me to answer
 6   your specific question and not anything else, right?
 7   That could deter somebody.
 8        Q.   What if -- what if the time at the office were
 9   more like two hours or three hours, would that -- would
10   that probably deter some people?
11        A.   You mean the office times?
12        Q.   Yeah.
13        A.   Yeah.  That could deter somebody.
14        Q.   Do you think that a -- if it cost $22 to get a
15   document that you needed to get that election
16   identification certificate, would that $22 cost deter
17   some people from voting?
18        A.   Okay.  I'm making an assumption based on human
19   behavior.  Okay?  But I assume it could be somebody
20   that's deterred.
21        Q.   You said that some people had described the
22   election identification certificate as a free ID.  But
23   if you need to pay money to get a document that you need
24   to get that free ID, is the ID really free?
25        A.   Okay.  You're making an argument.  I don't know
```

## 110

```
 1   what to say.  I don't know what to say to you.
 2        Q.   I'm asking a question.
 3        A.   It is a fair description, generally speaking,
 4   to say "free ID."  Okay.  But the point you're making is
 5   also a fair description based on your perspective.
 6        Q.   For an individual who does not have a copy of
 7   their birth certificate, if it costs them $22 to get a
 8   copy of their birth certificate, and if they need that
 9   birth certificate to get the election identification
10   certificate, for that individual is the election
11   identification certificate free?
12        A.   You make a good point, but the ID is still
13   free.
14        Q.   Is it effectively free?  Is there a cost to
15   that individual that they must --
16        A.   Well, everything --
17        Q.   -- incur to get that ID?
18        A.   Everything in life has a cost.  You know.  The
19   point you make is a good argument, but the ID is still
20   free.  And I don't know what else to say.
21        Q.   Is it possible to get that ID without spending
22   any money for an individual who doesn't have a copy of
23   their birth certificate or any of the other documents
24   that they need, if they have to pay for the birth
25   certificate?
```

## 111

```
 1        A.   I don't know how to answer your question.
 2        Q.   Will it cost money to that person, the process
 3   that they go through to get the certificate?
 4        A.   Look, if you need to get a certificate, that
 5   will cost you money.
 6        Q.   Okay.
 7        A.   Okay?
 8             MR. FREEMAN:  You know, lunch is ready,
 9   and I'm at a good spot to take a break.  I know we want
10   to take a short lunch.
11             MR. HUGHES:  Let's go off the record.
12             MR. FREEMAN:  Off the record.
13             (Recess from 12:21 to 12:59 p.m.)
14             MR. FREEMAN:  And we are back from lunch.
15        Q.   (By Mr. Freeman)  Representative Pena, you
16   first ran in 2002; is that correct?
17        A.   Yes.  It could have been 2001, but...
18        Q.   But the election was 2002?
19        A.   Yes.
20        Q.   And was election integrity an issue at all in
21   that campaign?
22        A.   Yeah.  I mean, I've always been a good
23   government guy.  That was not my primary focus at the
24   time.
25        Q.   What position did you take with regard to
```

## 112

```
 1   election integrity in 2002?
 2        A.   I don't understand.  It was not a movement for
 3   this bill that I can recall.
 4        Q.   Okay.  Did you -- did you say anything about
 5   cleaning up elections in your 2002 campaign?
 6        A.   You know what, I didn't experience what I -- it
 7   was my first election cycle, and that's when I got hit
 8   with what is required to get elected in my -- where I
 9   live.  And that was my first --
10        Q.   Okay.
11        A.   -- full-blown experience of the uniqueness of
12   my area.
13        Q.   We'll talk about that uniqueness in a moment.
14             How about 2004; was it an issue at all?
15        A.   As we move forward, I began to speak out more.
16   I don't remember when.  But as we moved forward, oh,
17   yeah, I spoke out.
18        Q.   Okay.
19        A.   I mean, I think even a, I think, YouTube video
20   out there somewhere where I'm speaking out.
21        Q.   And what aspects of elections did you speak you
22   about?
23        A.   Corruption.
24        Q.   What type of corruption?
25        A.   We had a fire bombing of a political camp.  It
```

## 113

1   was a Molotov cocktail, and I spoke out against that.
2       Q.   At the campaign office?
3       A.   Yeah.
4       Q.   Anything else?
5       A.   The use of politiqueras, on the abuse of the
6   use of them.  Look, they perform a valuable function in
7   terms of getting people out to vote who otherwise -- you
8   know, constitutionally and from a good government
9   perspective, it's important to get people out to vote.
10  It's when they cross the line, that's it's offensive.
11      Q.   Okay.  We'll talk about politiqueras a little
12  bit more later.
13      A.   Okay.
14      Q.   I just want to focus for a moment on positions
15  that you took in your campaigns with regard to
16  corruption and election integrity.
17           So other than the fire bombing incident
18  and the abuse of politiqueras, was there anything else?
19      A.   Paying the voters, paying voters to vote.
20      Q.   Okay.
21      A.   Using government vans, school district vans to
22  haul voters to the polls.  The emptying of day care --
23  adult dare care centers, and paying off the manager of
24  the center; things of that nature.
25      Q.   Anything else specific that you can remember

## 114

1   talking about in your campaigns?
2       A.   Initially -- okay.  I know I'm only supposed to
3   answer the question, but initially, because of
4   recommendations from my staff, I was not as vociferous
5   as I should have been.  But I grew stronger in my
6   opposition, as things progressed, because it was bad.
7   Mail-in ballots.  I did speak about that a lot.  People
8   walk in with ballots in their hands and say, "Hey, you
9   want to buy these from me?"  And I'd said, "This can't
10  be legal."
11      Q.   Did you ever report any of those incidents to
12  the District Attorney or the Attorney General's Office
13  or anything like that?
14      A.   To answer your question, no, but there are
15  reasons for it.
16      Q.   Were those individuals -- and I won't ask you
17  to name names, because it's not particularly relevant,
18  but were those individuals politically involved in
19  Hildago County?
20      A.   In order to get elected in Hidalgo County,
21  everybody looks the other way or is a participant.
22      Q.   Okay.
23      A.   I'm talking about elected officials.
24      Q.   Yeah.  Did you ever campaign on mentioning
25  issues of in-person voter impersonation as one of those

## 115

1   election integrity problems?
2       A.   We talked about it, but it was not the dominant
3   form of voter fraud.
4       Q.   Do you know when you talked about it in your
5   campaign?
6       A.   No, I don't remember that.
7       Q.   Do you remember, was it a speech?  Was it a
8   mailer?
9       A.   These are not -- the audience is not
10  necessarily that receptive --
11      Q.   Okay.
12      A.   -- to that speech.  But it became so offensive,
13  that I just said, "What the hell am I here for?  I'm
14  going to speak up on this."
15      Q.   Did you -- did you ever talk about voter ID as
16  a solution during your campaigns?
17      A.   At some point, I'm sure I did.
18      Q.   Prior to 2010?
19      A.   Okay.  Not this last cycle.
20      Q.   Uh-huh.
21      A.   But the cycle before that, voter ID was
22  significant, if I recall correctly.  I did speak about
23  it then.
24      Q.   Did you had opposed voter ID in 2009, hadn't
25  you?

## 116

1       A.   Okay.  Now, you're getting into the days -- the
2   dates are confused in my mind.
3       Q.   Okay.
4       A.   I think I commented on it in my blog that it
5   was -- I didn't think it was appropriate.
6       Q.   And then did you -- did you ever take a
7   position, in your 2010 campaign, that it was
8   appropriate?
9       A.   2010?
10      Q.   The last time you ran.
11      A.   No.  No.  It wasn't until -- I remember sitting
12  with my chief of staff and saying, "I'm going to support
13  this."
14      Q.   Do you remember when that was?
15      A.   No.
16      Q.   Was it just in this last session?
17      A.   I don't remember.  It was prior to the last
18  session.
19      Q.   So I would like to talk to you about some of
20  these Hidalgo County election issues that you have been
21  mentioning.
22      A.   Okay.  Yes.
23      Q.   Sure.  What were you about to say?
24      A.   It's not just Hidalgo County.  Okay?  But since
25  that's where I live, that's what I focus on.

REPRESENTATIVE AARON PENA                                          JUNE 01, 2012

## 117

1    Q.  Okay.  Would you say that these issues are
2  endemic to South Texas?
3    A.  Yes.
4    Q.  Okay.
5    A.  But -- yes.  Okay.  To answer your question,
6  yes.
7    Q.  Okay.
8    A.  But they are in other areas as well.
9    Q.  So let's focus on Hidalgo County, just because
10  your knowledge of Hidalgo County is best --
11    A.  Yes.
12    Q.  -- than other counties, correct?
13    A.  Yes.
14    Q.  So let's focus on Hidalgo County.
15          How would you describe political
16  campaigning in Hidalgo County?
17    A.  It's in transition, but the traditional method
18  of campaigning is, as -- I didn't notice it at the time
19  when I ran, but this is what I've come to learn -- is
20  you go to the political bosses in the county.  And by
21  that I mean, well, political bosses, I think you
22  understand what I mean by that.
23          And at the time when I first started,
24  there were multiple political bosses.  Now, they have
25  consolidated to some degree.  But you go over there, you

## 118

1  kiss their ring and you ask for their blessing.  They
2  usually want money.  It's either said or inferred, okay?
3          Now, I'm not speaking of personal
4  knowledge, because nobody asked me, nobody directly
5  asked me for money.  They want to hire their ladies,
6  hire their ladies, which means hire their crew of
7  politiqueras.  Once you get the blessings of certain
8  people, then other sub bosses fall in line.  Then you
9  look to the dominant families of the community.  You
10  know, hopefully you mimic the -- your population as a
11  whole in terms of their issues.  Hopefully you come from
12  a family that's respected.  And you got out and meet
13  people.  In the Delta area, we have competing clubs.  We
14  now have three, where we used to have two during my
15  period, the TACO and the BEE Club.  And you go and you
16  pitch yourself to them.  And they typically want money
17  in exchange.  Well, it is implied that the money is in
18  exchange for an endorsement.  And then they have their
19  ladies that go out and gather people together.
20          It's not something I did, but it is well
21  known that you -- there are certain people you can go
22  to, to buy elderly day care centers.  By "buy" I mean
23  you hire the leader who leads the ladies to go in to
24  vote.  And they strongly suggest, in the past, now they
25  just do it there with them with assisted voting -- but

## 119

1  in the past, it was, they would say, "This is who you're
2  voting for."  Now, to my advantage is, no one remembered
3  what they told them to do, and they remembered me,
4  because I have a -- my father was a prominent figure
5  from the Delta area, so we always kind of won out that
6  way.  Today, though, assisted voting is the crime, the
7  voter fraud of choice.
8    Q.  Okay.
9    A.  They go in and say, "Hey, we want to assist
10  you.  You need to ask for us to assist you."  And they
11  will say yes because they want to continue their
12  employment or their family's employment with some of
13  the local government jobs, usually a school district.
14  And if you refuse, well, you're deemed not to be
15  loyal.  You're too independent for them.
16          And so you have some areas, like in the
17  Delta area, like in Hidalgo, like in the Mid Valley, and
18  this phenomena is growing, where assisted voting is now
19  the -- the voter fraud of choice.
20          Now, mail-in ballots, it used to be really
21  strongly abused, but after Steve Wolens passed a bill
22  restricting -- or increasing punishments for it -- Steve
23  Wolens is a member from Dallas.
24    Q.  Uh-huh.
25    A.  That strongly diminished things, so -- and

## 120

1  then, for those independent voters in Edinburg or
2  McAllen or somewhere, you would make a pitch.
3    Q.  Okay.
4    A.  You know, "Hey, let me tell you why I'm the
5  best guy, because I didn't get arrested for drug
6  dealing," you know?  My first opponent was arrested for
7  selling drugs, and he was a convicted felon in Mexico.
8  But since he wasn't arrested here, the argument was that
9  he was not a convicted felon in the States.  I just
10  wanted to beat him.  I didn't care about that issue.
11  And, you know, you hope that the independent voter, the
12  election day voter -- it was traditionally an election
13  day voter which is the independent voter -- would carry
14  you.  That was my support.
15    Q.  Uh-huh.  So the voter assistance and the issues
16  with regard to mail-in ballots, is that what you
17  previously referred to in the media as voter harvesting?
18    A.  I used the term "voter harvesting" because
19  Steve Wolens used that specific language when he
20  presented the bill.
21    Q.  Okay.
22    A.  He never used that word in the Valley, we said
23  "politiqueras."
24    Q.  Okay.
25    A.  And as I said, being a politiqueras is not a

## 121

1   bad thing in itself.  All it means is, is if you're a
2   political person, a female political person, or a
3   political person, is when they cross the line, and then
4   it becomes inappropriate.
5          Q.   So politiqueras, they're mostly women?   There
6   are a few politiqueros?
7          A.   Yeah, they're mostly women.
8          Q.   Okay.  Have you ever hired any politiqueras?
9          A.   In my first cycle, yes, I did.
10          Q.   Okay.  And what was the role for politiqueras
11   in your election?
12          A.   Well, forgive me.  In my first cycle, I hired
13   somebody who hired them, okay?
14          Q.   Yeah.  What was the role of the politiqueras?
15          A.   As I understood it, their job was to go and
16   advocate in the community.
17          Q.   Okay.
18          A.   And particularly to some of the poorer elements
19   in the community.  And I was unaware of the adult day
20   care centers and I was unaware of a lot of the other
21   stuff I have now described to you.
22          Q.   And current law doesn't address all of these
23   issues that you have described with regard to
24   politiqueras, correct?
25          A.   Yeah, as I said, it's not -- it's like being a

## 122

1   lawyer.  There's nothing wrong with being a lawyer.
2   It's when you cross the line that it's inappropriate.
3   There's nothing wrong being a politiquera; it's when you
4   cross the line that it's inappropriate.
5          So is there anything in the law?  I'm sure
6   there -- there is something the law about intimidating
7   voters.  There is something in the law about other
8   things like that.  But what I have found is, nobody
9   advocates for cleaning it up, because everybody depends
10   on it, where I'm from.
11          Q.   Okay.
12          A.   Now, Steven Wolens encountered it because
13   what -- what happens in the border has been moved to
14   Dallas, and Steve Wolens had it apply to him, so he
15   spoke up.
16          Q.   Okay.
17          A.   So when I spoke up, I was generally met with
18   resistance from the elected politicians who said, "What
19   are you doing?  We've got a good thing going here.  Why
20   are you doing this?"
21          Q.   And you've advocated for changes in laws that
22   would rein in some of these practices, correct?
23          A.   Yes, sir.
24          Q.   So you -- based on that, you believe that
25   current law doesn't address all of these practices that

## 123

1   you think are improper, correct?
2          A.   Yeah.  Current law needs to be refined to
3   address specific circumstances.  But it's a delicate
4   balance, because there are a lot of constitutional
5   questions involved.  Somebody has got to care, because
6   I'm not sure -- I'm not sure we've reached that point of
7   viability where people are concerned about the question.
8          Q.   Okay.
9          A.   On the specific questions I have raised.
10          Q.   Were there any in-person voter impersonation
11   issues that came up in any of your campaigns, where a
12   voter came up and said --
13          A.   In-person impersonation?
14          Q.   Uh-huh.
15          A.   One of my staff members told me that his father
16   had voted against me, and I said, "Why?"  He said,
17   "Well, he's been dead for five years."  So somebody
18   impersonated him.
19          Q.   How did you know the vote was against you?
20          A.   That's what he told.
21          Q.   Okay.  So you couldn't have known whether the
22   vote was for or against you, correct?
23          A.   That's what he told me.
24          Q.   But you'll agree with me that we have ballot
25   secrecy laws in the United States, right?

## 124

1          A.   Well, okay.  Look, I've never checked the
2   point, okay?
3          Q.   Yeah.
4          A.   He just said it to me.  But this fellow who
5   worked for me is from the area and knows the inner
6   workings of the area.  So if that's what he said, I had
7   no reason to doubt what he said.  It's not a -- it's
8   within the realm of possibility, okay?
9          Q.   Sure.  But you don't have -- you don't real
10   proof that it happened other than him saying it,
11   correct?
12          A.   No, I just -- I just trust what he said.  He
13   has no reason to say it to me.
14          Q.   And did he say that that was in person, or did
15   he say that someone had voted in person as his father?
16          A.   All he said was, "Hey, my dad voted against
17   you."  And I said, "How did he do that?"  He said,
18   "Mr. Pena, my dad has been dead for five years."  And I
19   said, "Really?  Who told you that?"  And he says -- I
20   don't remember what he said after that, but he somehow
21   knew.
22          Q.   Okay.  But he didn't say, "My dad voted
23   in-person against you"?
24          A.   No, he didn't.
25          Q.   Okay.  Any other in-person issues?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

## 125

1    A.   Well, like I said, everything I tell you is
2    going to -- what I'm going to tell you next is that
3    somewhat hearsay, because I only hear what people tell
4    me, okay?
5    Q.   Sure.
6    A.   They'd say at the -- at the polling -- at the
7    elections office, that individuals would know who did
8    not vote or whose ballot has not been cast, and they
9    somehow would get those votes or ballots to somebody
10   else to cast in those persons' names.
11   Q.   Uh-huh.
12   A.   We were always concerned that that was going to
13   be applied to us.
14   Q.   Uh-huh.
15   A.   You know, because I had the machine working
16   against me for two or three of the cycles.  And so we
17   were always concerned that we'd win the independent vote
18   but we'd lose through these manipulations.  So we
19   watched, to the extent we could watched.  But these are
20   well established practices that I had no way of knowing
21   or infiltrating.  I was simply told.
22   Q.   Okay.  And so with regard to knowing who hadn't
23   voted yet, using those votes, is that being done by the
24   person running the polling place?
25   A.   Well, look, if you operate the machine, the

## 126

1    political machine --
2    Q.   Uh-huh.
3    A.   -- or machines?
4    Q.   Uh-huh.
5    A.   You want to make sure that you have people in
6    there.
7    Q.   Yeah.
8    A.   The people in office are part of the political
9    process, and they are part of the machine many times, so
10   they have people in there, so that they won't get
11   screwed from the other side who's got people in there.
12   You know what I mean?
13   Q.   No, I understand what you mean completely.
14        If the people in the precinct, though, are
15   part of the fraud, a voter --
16   A.   No.  This is the election office.
17   Q.   In the election office.
18   A.   This is the way it was described to me.
19   Q.   Okay.  Not in the precinct?
20   A.   I don't know.  The time I told you about where
21   people were -- they looked for people who hadn't voted,
22   and they then they passed out ballots --
23   Q.   Yep?
24   A.   -- was in the elections office.
25   Q.   Okay.  So passing out ballots, that's going to

## 127

1    be mail in, right?
2    A.   Yeah.
3    Q.   Okay.  So voter ID won't do anything about
4    that, right?
5    A.   Right.
6    Q.   Okay.  And am I correct that there were
7    indictments in McAllen in 2006 related to the 2005
8    mayoral election?
9    A.   Yeah.  That's one of these fellows who -- yes.
10   Q.   What are the alleged crimes?
11   A.   Well, he was taped, and I think he was willing
12   to sell votes.  He was a well known -- well, he was a
13   son of a politiquera.
14   Q.   Okay.
15   A.   And he was -- he was a politiquero in training,
16   okay?
17   Q.   Okay.  Got it.
18   A.   And he went to, I think, Olthal Brand, Jr. and
19   said, "Hey, I've got all these ballots.  Would you like
20   to buy them?"
21   Q.   Okay.  But those were for mail-in ballots?
22   A.   Yeah, that's got to be what it is.
23   Q.   So, again, this isn't an issue that had
24   to do with voter ID, right?
25   A.   No.

## 128

1    Q.   And there weren't actually convictions in the
2    end; is that right?
3    A.   You rarely have convictions.  But to answer
4    your question, no.
5    Q.   Okay.
6    A.   But just as a commentary, you're not going to
7    have convictions.
8    Q.   Are there any other indictments in Hildago
9    County that you remember in recent time about like
10   election crimes like this?
11   A.   Like this?
12   Q.   Uh-huh.
13   A.   They occur on occasion, but they always go
14   away.
15   Q.   Are you aware of any other incidents of proven
16   in-person voter impersonation that have occurred in your
17   district?
18   A.   Proven you mean like a conviction?
19   Q.   A conviction or established fact in some other
20   way, an admission.
21   A.   No.
22   Q.   Anything else in Hidalgo County?
23   A.   None that I can recall.
24   Q.   Anything else in the state of Texas?
25   A.   Yeah.  Recently in Fort Worth, there was

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

---

129

1   something.
2        Q.   Was that a conviction or just an allegation?
3        A.   Oh, okay.  I think he was convicted, was he
4   not?
5        Q.   In Fort Worth?
6        A.   This was like a judge -- forgive me.  I read it
7   in the paper.
8        Q.   It was just recent, though, right?
9        A.   It was just recent.
10       Q.   Anything other than that incident?
11       A.   Yeah.  There have been others.  You mean voter
12   fraud crimes?
13       Q.   In-person voter impersonation.
14       A.   Oh, in-person?
15       Q.   Uh-huh.
16       A.   No, I'm sorry, I don't recall that.
17       Q.   Okay.  You know, I think we discussed briefly
18   before, but what is Texas's current system, before SB 14
19   is implemented, if it is implemented, for determining a
20   voter's identity when they show up at the polling place
21   to vote?
22       A.   What is the procedure?
23       Q.   Yeah.
24       A.   Well, normally, you have your voter card.
25       Q.   Okay.

---

130

1        A.   And I assume there's a presumption that that's
2   you who signed.
3        Q.   Okay.
4        A.   You have an ID, which is what I think most
5   people do.
6        Q.   Okay.
7        A.   And you sign.
8        Q.   And so under the system that exists now, what
9   would someone have to do to commit in-person voter
10   impersonation?
11       A.   You want me to give you an example --
12       Q.   Sure.
13       A.   -- of what they would do?
14       Q.   Yeah.
15       A.   This is what I would do:  If I was in the
16   Valley, I'd find a polling place that is rarely used
17   probably one out in a small little colonia that nobody
18   goes to, and I'd make sure that the campaign workers
19   were my campaign workers.  And then I'd figure out the
20   people who had not voted, especially on the last day.
21   And I'd say, "These people haven't voted.  Come on in
22   and vote," and they would simply come in and vote.
23       Q.   But wouldn't they have to show a registration
24   card?
25       A.   Not if you're the person.  Not if you're the

---

131

1   person there controlling things.
2        Q.   Okay.  Okay.  But if you're the person there
3   controlling things, and if SB 14 were in place, that
4   wouldn't make a difference, either, correct, because you
5   would just tell them, who cares about the driver's
6   license, just let them vote?
7        A.   Okay.  So, your question again?
8        Q.   So you were saying under the current law, if
9   you wanted to commit in-person voter impersonation, you
10   would just go to a polling place where you controlled
11   the poll workers?
12       A.   Right.
13       Q.   And then they wouldn't have to show the voter
14   registration card?
15       A.   Right.
16       Q.   But if SB 14 were in place and a voter ID
17   requirement were in place with a photo voter ID, you
18   would just tell the poll workers who were yours to
19   control, "Don't make them show a photo ID," just like
20   you wouldn't have them show a voter registration card,
21   right?
22       A.   That's what I would do.
23       Q.   Okay.  So SB 14 wouldn't solve that, would it?
24       A.   I don't know.
25       Q.   Well, how would it solve it?

---

132

1        A.   Well, let me just say this, that once the
2   message is communicated back home that the government is
3   getting involved in taking care of the corruption, just
4   like when the W bill passed --
5        Q.   Uh-huh.
6        A.   -- there was a chilling effect on the
7   corruption.  I think that if you pass a bill like this,
8   it sends a message of confidence, and it will have a
9   chilling effect on the corruption.  It may not solve it
10   all.
11       Q.   Okay.
12       A.   I doubt that you will eliminate the sins of
13   man, but you'll at least, you know, have -- there will
14   be a sense that somebody is paying attention.
15       Q.   So is it your opinion that the current voter
16   identification system does not create a sense that
17   someone is paying attention?
18       A.   I think we are striving -- okay.  I think the
19   general public is frustrated.
20       Q.   Okay.
21       A.   And they're frustrated with government in
22   general.  They're frustrated with our institutions.
23   They're frustrated with a lot of things, and they want
24   to have a solution, and this is one they've latched on
25   to, for whatever reason.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 133

1  Q.  Okay.
2  A.  And so by voting for the bill, if this is what
3  they want -- and even if it's a piece of symbolism, it
4  has value.  Now, I would say it goes beyond symbolism,
5  because it does have value.  So I do think it's
6  important that we stand up.
7  Q.  Do you feel that some of that symbolic value is
8  lost if the law at issue disenfranchises some people?
9  A.  Let me tell you.  That's the question for the
10  court, okay?  And as I've said to you, make your case.
11  And the question really is:  Is this impediment, this
12  minor impediment, what I consider a minor impediment, is
13  it significant enough that it's illegal?  And that's the
14  question you're going to raise.
15       But what we were told is that the law that
16  we passed was very similar to, I think, an Indiana law,
17  which had already ruled constitutional.  Now, they did
18  not have preclearance requirements.  And so we sought to
19  take the course of least resistance, which was to have a
20  law that was basically like the one that was found to be
21  constitutional.  And this is what people want.  If you
22  look at the polls, this is what people want.
23       Now, knowing all the type of voter fraud
24  that I encounter back home, I realize, and I have
25  publicly stated, that this was simply a good start.  But

## 135

1  prior to when you voted on the bill, how many people
2  didn't have this necessary ID, would you have wanted to
3  know then?  Would that have mattered?
4  A.  The arguments were made, and it's always
5  important to have information available to you, as much
6  as you can provide.  But I still think the overwhelming
7  benefit, where I live, at least, is important, because
8  at the moment, you can literally buy an election.  And
9  what it does is, it produces officials who are part of a
10  corrupt process, and they reflect that process.
11       And so you will have -- there are many
12  people serving in office who ought to be in jail today
13  where I live.  But there's very little accountability
14  except through the federal system, and they can't be
15  watching us all of the time.  This corruption is a tax
16  on the very poor people I represent.
17  Q.  But isn't taking away the rights of the very
18  poorest people who don't have the ID also a tax on them?
19  A.  Well, I don't think -- you know, in order to
20  get those of us -- those of us, those in my community
21  who are on government assistance, they have to have ID
22  in order to get that assistance.  I just don't see it.
23  If they need the identification, they need to -- they
24  need to get it if they don't already have it.
25       Now, in future legislative sessions, can

## 134

1  the injection of confidence that somebody is actually
2  doing something matters.  Now, all that I say to you
3  is:  Make your case and let the court decide.
4  Q.  My question for you is, as a legislator --
5  A.  Uh-huh.
6  Q.  -- doesn't that possibility concern you when you decide what
7  disenfranchisement concern you when you decide what
8  symbol to use?
9  A.  Okay.  Look.  When I go to an airport, I used
10  to love it, when I'd go to Southwest Airlines here in
11  Austin, I could be there 30 seconds of when they closed
12  the gate, and they'd let me in, and we'd take off.  And
13  it was wonderful.  You know, now, they don't let me do
14  that.  Now I've got to go through screening and all
15  that, and now I have to have an ID, and, you know, a
16  pat-downs or whatever.  It's an inconvenience, but it is
17  a minor inconvenience for the value that's achieved.
18       Now, like I said, if you can prove that
19  this is a substantial inconvenience and people are not
20  voting in large numbers, make your case.  But I think
21  that this is something that people want and that is not
22  -- is not burdensome in comparison to our daily lives
23  where we have to use an ID card for everything else.
24  Q.  If the Department of Elections had known prior
25  to your -- if the Department of Elections had known,

## 136

1  the -- can the identification -- identifications
2  expand?  Can they have other locations available that
3  are more proximate?  Those are questions of policy or
4  law, and they'll have to be made in the future.  I still
5  think the value of having this passed has more value, at
6  least to where I live, than any detriment.
7  Q.  Even it it's a purely symbolic value?
8  A.  It has value even if it is symbolic.
9  Q.  And would you say that flying is a fundamental
10  right?  The ability to get on an airplane?
11  A.  Hmm.  Is that fundamental right?
12  Q.  (Nods head yes.)
13  A.  No, I don't think it's a fundamental right.
14  Q.  Is voting a fundamental right?
15  A.  Yeah, I would say it is.
16  Q.  And so would you say that balancing voting
17  against symbolism is a trickier proposition than
18  balancing flying against symbolism?
19  A.  That's the argument you're going to have to
20  make.
21  Q.  I'm asking you a question.
22  A.  Oh.
23  Q.  Would you agree?
24  A.  Taking all things into consideration, I still
25  think the law has more value than it does harm.

## 137

1         MR. FREEMAN:  I'm going to object that
2    that's not responsive and ask you to answer my
3    question.
4         A.   Ask it again.
5         Q.   Do you think that it is more -- do you think
6    that it is a more difficult proposition to balance
7    voting against symbolism than to balance flying against
8    symbolism and a more dangerous proposition?
9         A.   Is it more difficult?
10        Q.   Is it -- is it the same thing?
11        A.   Oh.
12        Q.   Is it equivalent?
13        A.   Well, okay.  Yeah, it depends on your
14   perspective.  If you want to say that one is a right and
15   the other is not a right, I guess those are different
16   things.
17        Q.   Are you aware of how many convictions in total
18   have been obtained by the Attorney General of Texas for
19   in-person voter impersonation in the last 20 years?
20        A.   No.  I would assume -- well, okay.  It's not my
21   job to assume.  No.
22        Q.   Okay.  Are you aware of whether Attorney
23   General Abbott has dedicated substantial resources to
24   investigate in-person voter impersonation?
25        A.   I know that he cares deeply about the issue,

## 138

1    because I have spoken -- you know, many of my
2    constituents.  Just the other day, just last week, I
3    turned in 88 or 81 complaints to his office on voter
4    fraud, and I know his office takes an interest in the
5    question.
6         Q.   Would you agree that mail-in ballots are a
7    greater source of fraud or election abuses than
8    in-person voter impersonation?
9         MR. HUGHES:  Asked and answered.
10        Q.   (By Mr. Freeman) You can answer.
11        A.   Yeah.  There are other abuses that are greater.
12        Q.   In fact, isn't the case that you told the
13   McAllen Monitor that there is, in fact, voter
14   corruption, but most of it appears in mail-in, in mail
15   ballot voting, and some people think voter ID is going
16   to solve these things, but it doesn't deal with the
17   problem?
18        A.   Right.
19        Q.   Are you aware of any incidents of noncitizen
20   voting that have occurred in your district?
21        A.   That is not -- okay.  In my experience and what
22   I've perceived, that is not a large problem.  Now, that
23   doesn't mean it doesn't exist, okay?  Where I live, many
24   people don't even know if they're Americans or not.
25        My wife -- I always a pick on her and joke

## 139

1    with her.  We didn't know if she was an American or not,
2    because half of her brothers are Mexicans, and her
3    parents told her that she was an American.  And so I
4    said, "Well, how do you know you're an American?  How do
5    you prove you're an American?"  Well, she was born
6    through midwife, so we had to get documentation, and it
7    was contested by the federal government.
8         On the border, these are real things.  So
9    I can see somebody voting who thinks they're an
10   American, but, in fact, they're not.  I mean, inside
11   themselves, they think like an American, but they
12   legally are not American.  So it's possible.  But you
13   don't see mass floods of people coming across the bridge
14   to vote.  Now, is it possible?  Yeah.  Now, I've heard,
15   in the Delta area, that some of the people may have to
16   go in and cast votes are noncitizens.  But I will tell
17   you, that is not a significant part of voter fraud.
18        Q.   Okay.
19        A.   These are Americans committing voter fraud.
20        Q.   Are you aware of any investigations of the
21   issue in your area?
22        A.   No.  You're not going to find that occurring.
23   One, the federal level has more important things to deal
24   with, the cartels and smuggling and murder and
25   kidnapping.  And on the state level, I think you'll find

## 140

1    this across the board, that the DAs are not going to get
2    involved.  They think it's too hard to prosecute or it's
3    inconvenient for them, politically speaking.
4         Q.   Are you aware of any public statements made by
5    advocates of photographic voter ID laws that photo voter
6    ID will deter illegal immigrants from voting?
7         A.   Yeah, I've had people say that to me, and I've
8    responded in public saying that we have a hard enough
9    time getting Americans to vote, let alone Mexicans.
10        That -- you know, look, people will speak
11   their fears or speak their -- but the reality on the
12   ground, because I live there and I live in probably one
13   of the areas with the highest level of this voter fraud,
14   we don't have Mexicans coming over.  If they do, it's a
15   mistake that was made.  They were corralled in an old
16   folks' home, they were brought in, "Are you an
17   American?"  "Yeah, I'm an American.  Look here.  I live
18   here.  I live here.  I'm an American."  In fact, they
19   never got their citizenship papers, and they're 90 years
20   old and they don't know any better.  That's what
21   happens.
22        Q.   Yeah.  Is it necessary to swear under oath that
23   you're a U.S. citizen to register to vote?
24        A.   Huh.  I've never looked at the documentation,
25   but I don't know if it's there or not.  It is there?

## 141

```
 1    Q.  Do you recall on a voter registration card --
 2    A.  No.
 3    Q.  -- if there's a box you have to check?
 4    A.  No.  No.  I'm curious.  Does it say that?
 5    Q.  It's my role not to testify.
 6    A.  (Laughing.)
 7    Q.  Can I ask you:  What ethnic or language
 8  minority group makes up the majority of noncitizens in
 9  Texas?
10    A.  Oh, that's Mexican American.  I'm sorry.
11  Mexicans, Mexican American.
12    Q.  Okay.  Why would people who advocated in favor
13  of this law in public, like David Temple, who is an
14  election judge from, I don't recall exactly where,
15  connect voter ID to undocumented immigrants, or as
16  they're going to say, illegal aliens from voting?
17        MR. HUGHES:  Objection.  That calls for
18  speculation and the reading of somebody else's mind and
19  is a totally improper question.
20    Q.  (By Mr. Freeman) To the best of your
21  understanding of the political process, what role would
22  it have for an individual to advocate publicly in favor
23  of the bill based on connections to stopping illegal
24  aliens from voting?
25        MR. HUGHES:  The same objection.  You can
```

## 142

```
 1  answer.  This is not a privilege objection.
 2    A.  You know, politics is polemic.  Sometimes it's
 3  easy to throw out language that helps -- that brings
 4  people together by having a world view that's similar,
 5  and you espouse that, so you're a member of the club
 6  because you espouse the same world view that other
 7  people have, because they have fears that there are
 8  changes occurring in Texas.  And the reality is, as I've
 9  stated before, we don't have a lot of Mexican nationals
10  coming over intentionally to vote.
11    Q.  (By Mr. Freeman) But was one of the purposes of
12  SB 14 to prevent illegal aliens from voting?
13        MR. HUGHES:  Again, I want to give my
14  legislative privilege instruction not to reveal your
15  mental impressions, opinions about the legislation.  And
16  as to purpose, you can testify about the general
17  purpose, but not about the individual intents of
18  specific legislators.
19    A.  My intent was, because of the people who wanted
20  it and because it was presented to me, and I have to
21  answer the question, because I believe it injects
22  confidence in the people.  I see it as the first step,
23  not as a step to solve the whole lot.  It's a first
24  step.
25    Q.  (By Mr. Freeman) And beyond your individual
```

## 143

```
 1  intent, but in the intent of the legislature as a whole,
 2  the purpose of the bill, given this advocacy, do you
 3  believe that any part, the purpose of the bill was to
 4  prevent illegal aliens from voting?
 5        MR. HUGHES:  Keep if mind my prior
 6  instruction to you, please.
 7    A.  I have never -- I never heard, except through
 8  the testimony of one witness who came before us
 9  representing some advocacy group, I never heard that
10  stated amongst legislators.  We simply wanted to pass
11  the bill.  It's a long standing question, or it was.
12        MR. FREEMAN:  Mr. Hughes, I'll ask if, if
13  I ask a general purpose question, that you not interrupt
14  my examination of the witness with an instruction that
15  goes beyond a general purpose question and restricts the
16  witness from answering my question immediately.
17        MR. HUGHES:  I'm going to keep making my
18  objections.
19        MR. FREEMAN:  And I'm going to keep making
20  my record that your objections are entirely unwarranted.
21        THE WITNESS:  We must be at the good part.
22    Q.  (By Mr. Freeman) This document has been
23  previously marked as Exhibit 7.
24        Mr. Pena, have you seen this website
25  before?
```

## 144

```
 1    A.  Have I seen her website?
 2    Q.  Uh-huh.
 3    A.  Not that I recall.
 4    Q.  And who is -- who is "her"?
 5    A.  Patricia Harless is a member, and I think in
 6  relation to this question before us, she's the author of
 7  the bill.
 8    Q.  Is she the author of the bill or the sponsor of
 9  the bill?
10    A.  I'm sorry.  Sponsor of the bill.
11    Q.  Thank you.  Just helping you out.
12    A.  I forgot that it came out of the Senate.
13    Q.  And do you see where, on her list of important
14  issues, she lists require Texas photo ID to vote?
15    A.  Yes, I see that.
16    Q.  And do you see what category it's under?
17    A.  Immigration reform.
18    Q.  What is the connection between photographic ID
19  and immigration reform?
20    A.  I assume -- well, I'm just having to assume
21  here, but I believe that many people make the false
22  impression that there's a connection that we have
23  illegal aliens voting, and it's not been my experience.
24    Q.  Okay.  But in terms of the general purpose of
25  the legislature, do you believe that -- do you continue
```

---

145

1  to believe that not part of the purpose of SB 14 is to
2  prevent illegal aliens from voting?
3              MR. HUGHES:  Keeping in mind my prior
4  caution.
5       A.  I assume, and you know -- well, I don't know.
6  Yeah, I'm guessing.  Nobody communicated that to me
7  except for that one witness that we had testify, who I
8  corrected on the record.  I said, "It's not the case.
9  We don't have -- we don't have Mexicans coming across
10 the border for that purpose.  They come over to work."
11      Q.  And are you aware of whether staff of the
12 Lieutenant Governor have continued to state, during
13 depositions in this case, that the purpose of the bill
14 was to prevent noncitizens from voting?
15      A.  No, I'm not aware of that.
16      Q.  If they had stated that, and I'll represent to
17 you as a member of the court that they have, would that
18 change your answer?
19      A.  You mean, if what you say is true --
20      Q.  Yeah.
21      A.  -- did he say it?
22      Q.  I can represent to you, as a member of the
23 court, that staff of the Lieutenant Governor and
24 multiple staff members of the Lieutenant Governor stated
25 during their depositions in this case, that the purpose

---

146

1  of SB 14 is to prevent noncitizens from voting.
2       A.  Okay.  If you say so.  Okay.
3       Q.  Does the change your --
4       Q.  Now, I will say that it does prevent
5  noncitizens from voting, okay?
6       Q.  How does it prevent noncitizens from voting?
7       A.  Well, in order to get an ID, you've got --
8  you've got to show that you're from this country.
9       Q.  And you are certain that in order to have a
10 Texas driver's license -- if you're a green card holder,
11 waiting for citizenship --
12      A.  If you're here legally, you can get a driver's
13 license.
14      Q.  Okay.  So if someone is legal, if someone is
15 documented?
16      A.  Right.  But illegal immigrants are not -- or
17 illegal aliens are not going to get it.
18      Q.  Sure.  But noncitizens can have drivers'
19 licenses, correct?
20      A.  Oh, okay.  Yes, they can.
21      Q.  So SB 14 won't prevent them from voting, right?
22      A.  No, not those citizens, but -- I'm sorry, not
23 those people.
24      Q.  Yes.
25      A.  But it does have the purpose of keeping people

---

147

1  in this country legally from voting.  I mean, not to say
2  that that's a large problem.  But in my experience, it
3  does have that purpose -- effect, I should say.
4       Q.  Are there any other problems that you can think
5  of with the current system of establishing voters'
6  identities at the polls?
7              MR. HUGHES:  Objection, vague.
8       A.  I don't understand.  Say it again.
9       Q.  (By Mr. Freeman) So we have discussed the
10 current system of establishing the voters' identity at
11 that polls.  You have to show your election, your
12 registration certificate, or if you don't have that, you
13 have to show an ID.  We talked about that before, right?
14      A.  Right?
15      Q.  Are there any other problems, other than what
16 we've discussed previously?
17      A.  Not that I can think of.
18      Q.  Okay.  Now, we previously talked about the lack
19 of reported incidents of voter impersonation, reported
20 incidents of voter impersonation in Hildago County; that
21 the fraud or irregularities or problems that they're
22 having are not about impersonation, right?
23      A.  Well, what I will say is that I know of
24 none.  That doesn't mean that they don't happen.
25      Q.  Okay.  Just like you don't know about a bunch

---

148

1  of illegal aliens coming over from Mexico and voting?
2       A.  Right.  It's not been something that I've
3  observed or I hear a lot of talk of, because I'll be
4  quite honest, if that was to occur, the other camp would
5  say, "Well, we need to do the same thing."  And I don't
6  hear that, other than what I described, okay?  There was
7  discussion, as I mentioned that, some illegal aliens
8  from the Delta area were taking those slots where people
9  hadn't voted.  But I can't confirm that, because I have
10 no personal knowledge.  But people have said that to me.
11      Q.  But so isn't the fear about in-person
12 impersonation is just as unreasonable as the fear about
13 undocumented immigrants voting?
14      A.  I will say that it's reasonable, because a
15 large of number of people have it.  Do you understand
16 what I mean by that?  Now, there are a lot of Texans who
17 believe that, and -- but they don't have the primary
18 experience.  They don't have the experience I have being
19 proximate to the border to realize that's not a big
20 problem.  But this is -- fears are real, and if people
21 want to address their fears through legislation, that's
22 perfectly legitimate.
23      Q.  But is it legitimate to balance people's fears,
24 that are not based on reality, against people's rights
25 that are?

---

153

1    invoke it because there, apparently, is a larger
2    principle here, and that is, that by my failing to
3    invoke it it could be waived, so I invoke the privilege.
4         Q.   (By Mr. Freeman) I mean, you've spoken about
5    these issues in public, right?
6         A.   If you could remind me.
7         Q.   You have spoken about voter ID in public,
8    right?
9         A.   I have.
10        Q.   So, you know, that didn't waive your privilege,
11   right?
12        A.   What's the question?
13        Q.   So I'm trying to --
14             MR. FREEMAN:  You know what, why don't we
15   go off the record for half a second?
16             (Discussion off the record from 1:51
17   1:53 p.m.)
18             MR. FREEMAN:  Back on the record.
19        Q.   (By Mr. Freeman) Representative Pena, are you
20   familiar with any studies that have concluded that voter
21   turnout among minority communities goes down in the
22   presence of a voter ID law?
23        A.   Am I presently aware?
24        Q.   Uh-huh.
25        A.   No.  I mean, I've heard -- in reading articles,

---

154

1    people may state that, but I don't recall specifically.
2    I don't recall -- I have a vague notion that the
3    argument's been made.
4         Q.   Okay.  Would it be fair to say that there's
5    evidence on both sides?
6         A.   Yeah.  There's always evidence on both sides.
7         Q.   Representative Pena, do you recall telling the
8    McAllen Monitor that although you weren't opposed to
9    SB 14, you did not think it would address voter fraud?
10        A.   I don't recall.  Let me just say that that
11   sounds like something I'd say, but I don't recall if
12   that specific language is correct.
13             MR. FREEMAN:  This can be marked U.S. 372.
14             (Exhibit 372 marked for identification.)
15        A.   Can you tell me which paragraph?
16        Q.   (By Mr. Freeman) It's in the last paragraph.
17        A.   The last paragraph?
18        Q.   The last paragraph of the first page.
19        A.   Hmm.  No.  You know, I've always told you the
20   way I see it, and I think what I've said is, it's a good
21   first step.  That appears to be the -- Mr. Janes's
22   language.  My position is always the same, that it --
23   you know, in person -- in-person voter fraud, voter
24   impersonation is not the most dominant form of voter
25   fraud.  But to answer your question, this is what he

---

155

1    says.
2         Q.   Okay.
3              MR. FREEMAN:  If we could have this marked
4    as U.S. 373.
5              (Exhibit 373 marked for identification.)
6         Q.   (By Mr. Freeman) And this is a direct quote
7    from you.  It's --
8         A.   Steve miller.
9         Q.   It's "He told Texas Monthly," beginning one,
10   two, three, four, five -- the sixth paragraph.
11             MR. HUGHES:  Is there a question?
12        Q.   (By Mr. Freeman) Do you recall telling Texas
13   Monthly, "If it makes us feel good to pass voter ID,
14   okay, but it's not the solution to the voter fraud
15   that's out there"?
16        A.   Yeah, I said that, and that's consistent with
17   what I have said before, that is not the dominant form
18   of voter fraud.
19        Q.   Okay.  And so was the most common statement
20   that you heard concerning this bill that its purpose was
21   to combat voter fraud?
22             MR. HUGHES:  Again, I want to remind you
23   of the legislative privilege issues here.
24        Q.   (By Mr. Freeman) In a public forum.
25        A.   Okay.  In that you said it that way.  Yeah,

---

156

1    that's it.
2         Q.   But if it isn't going to really solve the voter
3    ID fraud that's out there, there must be some other
4    purpose, right?
5         A.   I can't say.  I just say, you know, look, we
6    all got to start somewhere.  And I presented many other
7    bills that addressed many of other problems, and some of
8    them were passed.  Some of them were passed by my
9    colleagues.  So, we addressed the questions that were in
10   front of us.  This one, for some reason, has taken a
11   high profile position.
12        Q.   Was the purpose of SB 14, in any part, to
13   decrease the number of Hispanic voters who could
14   effectively cast a ballot?
15        A.   That was not my intention.
16        Q.   I am not asking about your intention, which I
17   believe is privileged.
18             MR. HUGHES:  Yes, I'll remind you of the
19   same.
20        A.   Yeah.  I have to say, I saw no evidence of
21   that, okay?
22        Q.   (By Mr. Freeman) Was the purpose of SB 14, in
23   any part, to discriminate in any way against any group
24   of minority voters?
25             MR. HUGHES:  The same privilege reminder.

## 157

1    A.   You know, saw no -- I heard no language that
2    would cause me to infer that.  I saw no action that
3    caused me to infer that.
4    Q.   (By Mr. Freeman) Do you believe in limited
5    government?
6    A.   Hmm.  You're asking me a deep, philosophical
7    question there.  Government has its purpose oh, okay?
8    And let us start from the beginning.  To defend the
9    country in times of war, and I guess for that same
10   purpose, to develop an interstate transportation system.
11   Q.   We don't need to go that deep.
12   A.   Okay.
13   Q.   Do you believe in government -- do you believe
14   that is good policy --
15   A.   Oh, I see.
16   Q.   -- to have a government that passes legislation
17   that doesn't solve an actual problem?
18   A.   Oh, I know where you're going with this
19   question.  What I believe is, in answering the questions
20   that are presented to me, okay, and so this question was
21   presented to me, and I had to provide a -- I had to make
22   a decision, and I made my decision.
23        MR. FREEMAN:  I'm going to object to that
24   as nonresponsive.  But we'll move on.
25   Q.   (By Mr. Freeman) Are you familiar with the

## 158

1    Federal Help America Vote Act?
2    A.   Yeah.  HAVA.
3    Q.   Yeah.  Are you familiar with the voter
4    identification requirements for first-time voters under
5    HAVA who have registered to vote via a mail-in voter
6    registration form?
7    A.   Remind me, because I don't recall them.
8    Q.   Do you recall what ID are sufficient under
9    HAVA?
10   A.   No, I don't recall.
11   Q.   Do you recall whether a photo ID is necessary?
12   A.   I don't recall.
13   Q.   Are you a member of the American Legislative
14   Exchange Council?
15   A.   Hmm.  I don't know if I am.  I have been in the
16   past.
17   Q.   Okay.  And in the past, what was your
18   participation in the American Legislative Exchange
19   Council?
20   A.   Hmm.  I attended their convention.  Conference,
21   I believe, is the phrase used today.  I received
22   occasional e-mails.  I don't know if they're the ones
23   who put out a magazine, but they certainly put out
24   information.
25   Q.   Did you ever sit on a task force related to

## 159

1    election laws?
2    A.   I don't recall.  I think it's been mentioned
3    before by somebody, but I don't recall.
4    Q.   Let's refresh your recollection.
5        MR. FREEMAN:  If we can mark this as U.S.
6    374.
7        (Exhibit 374 marked for identification.)
8    Q.   (By Mr. Freeman) Do you see on Page 4, where it
9    says, "Two of them, Representatives Aaron Pena and Larry
10   W. Taylor, sat on the ALEC task force that approved
11   Voter ID model legislation"?
12   A.   Oh, yes.
13   Q.   Do you believe that to be the case?
14   A.   I saw this article, and I was called by a
15   reporter.  I don't know if it's the same one.  Do I
16   believe?  I assume he says I am, that I am.
17   Q.   Do you remember sitting on that task force?
18   A.   No.
19   Q.   Do you remember approving a model voter ID
20   bill?
21   A.   No.
22   Q.   Do you remember the contours of the model ID
23   bill that was released by ALEC?
24   A.   No.
25        MR. FREEMAN:  I'll have this marked as

## 160

1    U.S. 375.
2        (Exhibit 375 marked for identification.)
3    Q.   (By Mr. Freeman) Under this bill -- does this
4    look at all familiar to you?
5    A.   No.
6    Q.   Under this model bill, what are the forms of
7    proofs of identity that are acceptable?
8    A.   Okay.  Under Exhibit 375, Section 1.A1, it
9    shows the name of the person to whom the document was
10   issued.  2, shows a photograph of the person to whom the
11   document was issued.  3, contains an expiration date and
12   is not expired.  4, is issued by the United States or
13   the State of Arkansas.
14   Q.   So this is an Arkansas modeled bill, but --
15   A.   Okay.
16   Q.   -- it's by the United States or the state; is
17   that correct?
18   A.   Yes.
19   Q.   And do you see under Section 2 C, small 2, is
20   there an exception for indigent voters who may not have
21   an ID?
22   A.   Yes.
23   Q.   Are you familiar at all with the Indiana model
24   legislation that you discussed before?
25   A.   No, not specifically.

## 161

1    Q.   Are you familiar with the forms of ID that are
2    permissible under the Indiana model legislation?
3    A.   No.
4    Q.   But you said before that part of the reason
5    that you thought that the Texas bill was legal was that
6    of it was modeled after Indiana, right?
7    A.   Yes.
8    Q.   But you didn't know if they were actually the
9    same, did you?
10   A.   I was -- I was told that they were similar.
11   Q.   Okay.  This has previously been marked as U.S.
12   Exhibit 60.  (Handed to witness.)  And this is just one
13   page of Exhibit 60, but it's relevant page.
14        If you could take a quick look at this.
15   A.   (Viewing documents.)  Okay.
16   Q.   Isn't it the case that Indiana allows the use
17   of any state or federal ID with a named photo and
18   expiration date that is unexpired or expired after the
19   last general election --
20   A.   That's what it appears to say.
21   Q.   And so that's pretty much the same as the ALEC
22   model legislation, right?
23        MR. HUGHES:  Are you making a
24   representation that Exhibit --
25        MR. FREEMAN:  I'm asking if --

## 162

1        MR. HUGHES:  -- 375 is the ALEC model?
2        MR. FREEMAN:  I am.
3        MR. HUGHES:  Because I don't think he ever
4    testified to that.
5    Q.   (By Mr. Freeman) Well, it's relatively similar.
6    A.   I don't see the -- yeah, relatively similar,
7    yeah.
8    Q.   What are the differences?
9    A.   That indigent language I don't see here.
10   Q.   I'm just asking about the form of ID there.
11   A.   Oh.
12   Q.   I can represent to you that there's more of the
13   Indiana bill.
14   A.   Oh, okay.  Yeah, that seems similar.
15   Q.   Okay.  And does the Indiana law establish an
16   individual's identity with those documents?
17   A.   Yes.
18   Q.   Okay.  Are you familiar with the forms of ID
19   that were permissible under the Georgia photo ID law?
20   A.   No.
21        MR. FREEMAN:  This has previously been
22   marked as Exhibit 6.  U.S. Exhibit 6.
23        MR. HUGHES:  This is 6?
24   A.   No, I'm not familiar, and I've not that seen
25   this before.

## 163

1    Q.   (By Mr. Freeman) Can you take a quick look at
2    the forms of ID that are acceptable under Section
3    21-2-417 of Georgia code for acceptable voter ID in
4    Georgia?
5    A.   Okay.
6    Q.   Does it allow the use of an employee ID?
7    A.   Yes.
8    Q.   Does it allow the use of a tribal ID?
9    A.   Yes.
10   Q.   Does the Georgia law establish voters'
11   identities?  Identities?
12        MR. HUGHES:  Based on?
13   Q.   (By Mr. Freeman) Based on the use of these
14   documents?
15   A.   Yes.
16   Q.   Are you aware of a photographic voter
17   identification bill that was introduced in the 81st
18   Texas Legislature in 2009?
19   A.   Yes.
20   Q.   Was a single bill subject to serious
21   consideration?
22   A.   Yes.
23   Q.   Who introduced that bill?
24   A.   I don't recall.
25   Q.   Do you recall why they said they introduced it?

## 164

1    A.   No.
2    Q.   What was your involvement with that bill?
3    A.   I voted or didn't vote.
4    Q.   Did it pass through the Elections Committee?
5    A.   I don't recall, but I assume so.
6    Q.   Do you recall whether you voted against it in
7    the Elections Committee?
8    A.   I probably voted against it.
9    Q.   Do you recall the basic provisions of that
10   bill?
11   A.   No.
12   Q.   And this has previously been marked as U.S.
13   Exhibit 29.  (Handing to witness.)
14   A.   Okay.
15   Q.   Have you seen this before?
16   A.   I can assume that I did.
17   Q.   And what forms of identification are allowable
18   under the bill under Section 6 of the bill, if that gets
19   you to the right place?  Section 6 and Section 11.
20   A.   Where?  I'm sorry.  It says 6301 -- okay.
21   Amended -- okay.  63.1001A.  Do I got to go there?
22   Q.   You do.
23   A.   Driver's license.  Personal ID card issued by
24   the Department of Public Safety that has not expired or
25   expired no earlier than two years before date of the

## 165

1    presentation.  A United States military ID.  A United
2    States citizen's certificate.  Passport.  Concealed
3    handgun license.  A valid ID that contains a person's
4    photograph issued by an agency, institution -- the
5    voter's -- a voter registration certificate.
6        Q.  And just to be clear, after that -- that first
7    set, one of those is acceptable, in the second set, you
8    need two, correct, under Section 6B-2 back on Page 3?
9        A.  If you say so.  Okay.
10       Q.  Maybe I'll lead a little bit, and this might
11   get easier.
12       A.  Okay.
13       Q.  Isn't it the case that under SB 362, which is
14   Exhibit 29, and the bill that was introduced and
15   considered in 2009, that a voter could offer either,
16   one, driver's license, personal identification card,
17   military identification card, citizenship certificate
18   with a photographic, a passport, license to carry, or
19   any other state or federal ID with a photograph; or two
20   of either a voter registration certificate, current
21   utility bill, bank statement, government check,
22   paycheck, other government document that shows the name
23   and address of the voter, any official mail from the
24   government, a certified birth certificate, United States
25   citizenship papers without a photograph, a marriage

## 166

1    license, a divorce decree, adoption records, name change
2    or sex change records, public benefits cards, veterans
3    benefits cards, Medicaid cards, Medicare cards,
4    temporary driving permits, pilot's licenses, library
5    cards, or hunting and fishing licenses?
6        A.  Yes.
7        Q.  How would this bill have solved any problem
8    related to in-person voter fraud in comparison to
9    current law?
10       A.  How would it solve it?
11       Q.  Yes.
12       A.  I don't understand.  You mean --
13       Q.  What would SB --
14       A.  -- would it more effective?  Less effective?  Is
15   that what you mean?
16       Q.  Yes.  What would SB 362 have done, in
17   comparison to current law, to fix voter fraud?
18       A.  I think we had this discussion before.
19       Q.  Well, this is a different bill from SB 14.
20   This allows you to use different types of documents.
21       A.  Yeah.  Yes.
22       Q.  And you don't think -- am I correct that you
23   don't think that it would solve any other real types of
24   fraud that happen in your district?
25       A.  It may stop a few instances that I'm aware of,

## 167

1    but like I said, most of the voter fraud is in other
2    channels of doing this sort of voter fraud.  It's not --
3    in-person impersonation is not as significant in my
4    experience.
5        Q.  Okay.  Did you participate in the chubbing of
6    SB 362?
7        A.  I don't remember.
8        Q.  What is chubbing, for Mr. Hughes's benefit?
9        A.  Chubbing is a phrase that is used in Texas for
10   wasting time at the microphone to delay, for a variety
11   of purposes, for the sole purpose of delay.
12       Q.  And was chubbing what caused SB 362 to not pass
13   the Texas House?
14       A.  Yeah.
15       Q.  Do you recall whether or not you stood at the
16   microphone and participated in the chubbing?
17       A.  It's not likely that I did.
18       Q.  Okay.  To be honest, I have no idea.  I was
19   just asking.
20       A.  No, I'm not the sort that chubs.
21           MR. HUGHES:  If we're at a breaking point.
22           MR. FREEMAN:  Want to take a break?
23           MR. HUGHES:  Yeah.
24           MR. FREEMAN:  Okay.  Let's take a break.
25           (Recess from 2:16 p.m. to 2:29 p.m.)

## 168

1            MR. FREEMAN:  Back on the record.
2        Q.  (By Mr. Freeman) Okay.  Back on the record
3    after a break.
4            During the committee debate on SB 362, the
5    exhibit in front of you there, Exhibit 29, do you recall
6    telling the McAllen Monitor that you found little to no
7    evidence of voter impersonation and complaining about a
8    lack of opportunity to cross-examine witnesses?
9        A.  I do remember something to that effect.  The
10   lack of cross-examination had to do with a group of
11   witnesses that came up from the Valley.
12       Q.  Uh-huh.
13       A.  Uh-huh.  And if I remember right, somebody was
14   going to say something, and said, "Well, I surely would
15   like examine them," but they were pulled away.
16       Q.  Did they submit affidavits instead?
17       A.  I don't recall.
18       Q.  Okay.
19       A.  They might have.
20       Q.  Do you recall telling the Fort Worth Star
21   Telegram that voter ID was bad for Texas, plain and
22   simple?
23       A.  Did I say that?
24       Q.  Do you recall saying that?
25       A.  If you say I said it, then, yes, okay.

REPRESENTATIVE AARON PENA                        JUNE 01, 2012

---

**169**

1    Q.  Well, let's see if we can refresh your
2    recollection.
3           MR. FREEMAN:  If we can mark this as U.S.
4    376.
5           (Exhibit 376 marked for identification.)
6    Q.  (By Mr. Freeman) This is on Page 2 in the
7    middle of the page.
8    A.  I don't see it.  Oh, Page 2?
9    Q.  Yes.
10   A.  You did say that.
11   Q.  I did.
12   A.  If that's what it says I said.
13   Q.  Did you believe in 2009 that voter ID was bad
14   for Texas, plain and simple?
15   A.  I don't remember.  I'm sorry.
16   Q.  You have no recollection why you opposed a
17   major bill in the Elections Committee of which you were
18   the vice chairman?
19          MR. HUGHES:  And I'll remind you of your
20   legislative privilege concerning, and the question has
21   been asked and answered.
22   A.  I am not sure the Elections Committee was a
23   major committee.  No, I don't recall.
24   Q.  (By Mr. Freeman) Okay.
25   A.  But I know Dave Montgomery.  If he says I said

---

**170**

1    that, then I may have said that.
2    Q.  It's as good as you can get from Dave
3    Montgomery?
4    A.  He's a good guy.  He's not a somebody who makes
5    stuff up.
6    Q.  I'm sure he is.
7    Q.  Huh?
8    Q.  I'm sure he is.  No sarcasm.  That's not going
9    to come across on the record.  I'm saying that honestly,
10   Mr. Montgomery.
11          Did SB 14 resolve any problems you may
12   have had with -- you may have publicly commented on with
13   regard to SB 362?
14   A.  Not that I recall.
15   Q.  Do you recall the basic provisions of SB 362?
16   A.  Other than what you described to me.  You need
17   have a photo ID to vote.
18   Q.  Do you recall the forms of identification that
19   are allowable under SB 14?
20   A.  If I remember right, a passport and driver's
21   license, hunting, concealed carry, the so-called free
22   voter identification card.  Did I miss one?
23   Q.  Military ID?
24   A.  Military ID.
25   Q.  And a U.S. citizenship certificate with a

---

**171**

1    photo?
2    A.  Oh, yeah.  You introduced that to me today.
3    Q.  It's in the bill, though, correct?
4    A.  Okay.
5    Q.  All right.  Would you like to have a copy of
6    the bill in front of you?
7    A.  No.
8    Q.  Okay.  Now, we previously discussed the list of
9    ID that can be used under the -- what I represented to
10   you was the ALEC model legislation.  Is this a narrower
11   list than the ALEC model legislation?
12   A.  Yes.
13   Q.  Is it a narrower list than Indiana?
14   A.  Yes.
15   Q.  Is it a narrower list than Georgia?
16   A.  Yes.
17   Q.  Didn't you earlier testify that each of those
18   bills would establish identity?
19   A.  That's what the bill said, each of those bills.
20   Q.  Okay.  Is it your belief --
21   A.  The legislative language said these are
22   identification, and then listed them.  So that's what
23   the bill said.
24   Q.  Okay.  Is it your belief that the IDs in the
25   Georgia bill are sufficient to establish a voter's

---

**172**

1    identity?
2    A.  Okay.  That's the policy question that Texas
3    was given and was made through the various processes we
4    go through.
5    Q.  Is it your belief that the IDs in the Georgia
6    bill establish a person's identity when they show up to
7    vote?
8    A.  Okay.  I will say that I have reservations
9    about employee identifications, employee or agencies of
10   the government, as we described, I would like there to
11   be some security in the identification.  So if your
12   question is asking me:  Are those sufficient
13   identifications, that's a policy question Texas was
14   confronted with.  I personally don't find that internal
15   office IDs, college IDs are sufficient.  I like there to
16   be some safeguards.
17   Q.  And your basis for saying that they're not
18   sufficient?
19   A.  Is a judgment that I make.
20   Q.  And as the security features?
21   A.  Yeah.  Yes.  I'm sorry.  I said "Yeah."  I read
22   -- okay.  Yes.
23   Q.  But you said previously that -- sorry, strike
24   that.
25          Is Indiana as racially diverse as Texas?

## 173

1    A.  You know, I don't know.  All I know about
2  Indiana is Abraham Lincoln's history there.
3    Q.  That's Illinois, I believe.
4    A.  No, he started Indiana, and then he moved
5  across.  But I don't know much more.  I mean, I've to be
6  Illinois, I'm sorry.  I know it's humorous, but Texas
7  has three major ethnic groups.  Three major -- well,
8  okay.  Hispanic is not a -- is an ethic group, not a
9  racial group.  We have whites.  We have African
10  Americans, and we have Hispanics.  Those are the major
11  groups here.  Now, I don't know if it's more diverse or
12  not --
13    Q.  You don't know?
14    A.  -- to answer your question.  I don't know.
15    Q.  Are you familiar with the Supreme Court's
16  decision of Crawford v. Marion County Board of
17  Elections?
18    A.  Refresh my memory.  I don't --
19    Q.  The Supreme Court decision concerning voter ID?
20    A.  No.
21    Q.  Is it possible that the factual circumstances
22  in Texas, with regard to race and poverty, access to IDs,
23  et cetera?
24    A.  I'm sure there are factual distinctions that

## 174

1  could be raised.
2    Q.  Okay.  Do you recall telling the McAllen
3  Monitor that the Attorney General's decision to deny
4  preclearance of SB 14 was blatantly political?
5    A.  What?  I'm sorry.  Which Attorney General?
6    Q.  The Attorney General of the United States.
7    A.  Oh, yes.
8    Q.  The defendant in this case.
9    A.  Okay.  Yes.  I do recall that.  I'm sorry.
10  It's because Attorney General Abbott and I have a very
11  close relationship, and I know him quite well, and I
12  know his wife, and it's just not like me to talk that
13  way about him.  But as to Mr. Holder, yeah, that was
14  political.  He -- he is -- okay.  To answer the
15  question, yes, I remember.
16    Q.  What was the basis for that statement?
17    A.  He has made this issue a seemingly campaign
18  issue, where he goes around the country, and he seems to
19  be whipping up support for him.  That's perfectly good
20  and fine.  As an American citizen, he can do it.  But
21  that being so close to the election, when the swing
22  states involved are places like Colorado and some of the
23  western states, where there's a high Hispanic
24  percentage, seems to me to be blatantly political.
25    Q.  Is Eric Holder an elected official?

## 175

1    A.  No.
2    Q.  And hasn't he signed off on objections to voter
3  ID bills in only Texas and South Carolina?
4    A.  I don't know that.
5    Q.  Would you describe Texas as being a state that
6  is in contention in the 2012 election?
7    A.  No, but it has a heavy Hispanic population.
8  Okay.  Look, you're asking -- okay.  I still maintain
9  that it was it was a political -- a blatantly political
10  decision.
11    Q.  And I'm just curious --
12    A.  I don't know why he came to Austin to give that
13  speech.  He seems to be making a point of it.  The
14  administration seems to be making a point of this, and I
15  think it's to create a wedge issue between Hispanics and
16  the conservative movement.
17    Q.  Did you ever have any conversations concerning
18  aspects of SB 14 that were different from SB 362?
19       MR. HUGHES:  And I want to, again, caution
20  you on the legislative privilege, and ask if we could
21  get the question rephrased to remove the obvious concern
22  here that you're asking about potential conversations
23  that are subject to the legislative privilege.
24    Q.  (By Mr. Freeman) Did you ever have any
25  conversations concerning the substance of SB 14 prior --

## 176

1  specifically that bill, what would be in that bill?  Is
2  that sufficiently broad?
3    A.  "I don't recall" is the answer.
4    Q.  You solved all our problems.  Thank you.
5  What was the purpose of omitting student
6  IDs from SB 14?
7    A.  I don't know what --
8       MR. HUGHES:  And again, I'll give you the
9  legislative privilege caution that you can talk about
10  the purpose of the bill as a whole, but not individual
11  legislative intent.  On that basis, you can answer.
12    A.  All right.  I've stated -- I don't know what
13  other people were thinking, okay, and I am not the one
14  who omitted it.  But I find that there are not enough
15  security, levels of security in student identification
16  cards.
17    Q.  (By Mr. Freeman) How about tribal ID?
18    A.  What about it?
19    Q.  What was the purpose the omitting tribal ID?
20    A.  I don't know.
21       MR. HUGHES:  The same instruction.
22    A.  I don't know.  It was in my -- it wasn't my
23  choice to remove or not put that in there.
24    Q.  (By Mr. Freeman) What does the term
25  "legislative emergency" mean within the Texas

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

177

1      Legislature?
2           A.   Oh, is this -- is this the Governor's call for
3      a legislative emergency?  Is that what you're talking
4      about?
5           Q.   Uh-huh.
6           A.   It doesn't mean what it says, okay?  It is a
7      misnomer, in that what it means is that this a priority
8      to him rather than an emergency, okay?  So people always
9      -- newspapers love to make a point of the fact that this
10     language doesn't match with the purpose that it's
11     there.  It is not an emergency; it's simply a priority
12     to the Governor.
13          Q.   Are there any constraints on what the Governor
14     may declare to be a quote, unquote emergency?
15          A.   I guess political constraints.
16          Q.   But not substantive, not legal constraints?
17          A.   Not that I'm aware of.
18          Q.   Okay.  Was photographic voter identification
19     declared to be a legislative emergency?
20          A.   Yeah, I assume that that language, legislative
21     emergency, must be the Constitution or somewhere,
22     because it keeps being raised.  Yes, it was -- it was
23     declared an emergency.
24          Q.   Just to take a quick step back, you said that
25     there are political constraints.  What did you mean by

---

178

1      that?
2           A.   Well, like I said, every time that there is --
3      well, first of all, internally within his -- within his
4      support, he shouldn't raise something that he doesn't
5      have political support for, like abolishing the death
6      penalty is a good example, or legalizing cocaine.
7      That's a -- you know, he's got his own constraints.
8                The other thing would be having to put up
9      with what the press does every time that he declares
10     something a legislative emergency.  The press will say,
11     you know, he'll declare -- let's use an example -- that
12     this is Bugs Bunny's hundredth birthday, and we're going
13     to do -- we're going to have a -- he's got to put up
14     with people picking on him for saying that.  Those are
15     the only sort of limitations.  He's otherwise free to do
16     as he pleases.
17          Q.   Are there any particular individuals within the
18     Governor's Office of which you're aware who are
19     responsible for setting out the declarations of
20     legislative emergencies?
21          A.   No, not that I'm aware of.  I can take guesses,
22     but I'm not going to do that.
23          Q.   Were you a part of any conversations concerning
24     what would be declared a legislative emergency in 2011?
25               MR. HUGHES:  I'm going to instruct --

---

179

1      them.  Let me make my objections, but we can move on.
2                MR. FREEMAN:  You're going to obstruct --
3      instruct?  Sorry, that was a Freudian slip there.
4                Let me try and make it a little broader,
5      then, and avoid the instruction.
6           Q.   (By Mr. Freeman) Are you aware of any
7      conversations concerning legislative emergencies that
8      occurred in early 2011?
9                MR. HUGHES:  And again, I'm going to
10     caution you on legislative privilege not to reveal
11     legislatively-privileged conversations between
12     legislators or between legislators and legislative staff
13     or between legislators and members of the Governor's
14     Office.
15          A.   I'm not.
16          Q.   (By Mr. Freeman) Are you aware of any documents
17     relating to the subject of legislative emergencies that
18     were circulated at the beginning of 2011 or any e-mail?
19               MR. HUGHES:  The same precaution.
20          A.   After the fact is publicly made --
21          Q.   (By Mr. Freeman) Yeah.
22          A.   -- we typically get a form on the Floor, and it
23     says the Governor is hereby proclaimed whatever.
24          Q.   Okay.  That's all?
25          A.   Sometimes they read it into the record on the

---

180

1      Floor.  I don't recall if the caucus put anything out.
2           Q.   Anything else?
3           A.   No, not that I can recall.
4           Q.   Is there any election set to occur in Texas
5      during the session or early in the session?
6           A.   Forgive me.  I don't remember.
7           Q.   Of which you're aware?
8           A.   Yeah, maybe you could help refresh my memory.
9      I don't remember one.
10          Q.   Okay.  Do you have any other understanding of
11     why voter ID would be a legislative emergency?
12          A.   Because the public wanted it.
13          Q.   Are you aware of any conversation concerning
14     SB 14 that occurred before it was submitted for
15     consideration in the Senate?
16               MR. HUGHES:  And again, I'm going to
17     instruct you that if you can just answer it yes or no,
18     then we're not going to get into the legislative
19     privilege problem.
20          A.   No, I'm not aware of anything.
21          Q.   (By Mr. Freeman) What constituents did you
22     speak with concerning SB 14?
23          A.   My staff.
24          Q.   Any lobbyists?
25          A.   No.  Lobbyists usually don't care about stuff

## 181

```
 1    like that.
 2        Q.   Any interest groups?
 3        A.   Not me personally.  Interest groups may have
 4    called in to the office.
 5        Q.   Anyone stop by your office to talk about the
 6    bill?
 7        A.   Not that I recall.
 8        Q.   Did Catherine Engelbrecht ever stop by your
 9    office?
10        A.   I don't know who that is.
11        Q.   Did Paul Bettencourt ever stop by your office?
12        A.   You know, I've heard that name Paul
13    Bettencourt.  Is he a Valley person?
14        Q.   I'll represent to you that he is not, that he's
15    from Harris County.
16        A.   Okay.  Forgive me.  I recognize the name, but I
17    don't know who they are and I can't put a face to it.
18        Q.   Okay.  So he didn't stop by your office?
19        A.   Oh, I don't know.
20        Q.   Did you speak directly with any experts
21    concerning SB 14?
22        A.   In committee.
23        Q.   Did you speak directly with any representatives
24    of minority groups?
25        A.   My staff.  Oh, forgive me.  You mean organized.
```

## 182

```
 1        Q.   I mean organized minority groups, yeah.
 2        A.   In committee.
 3        Q.   No one came by your office?
 4        A.   They may have.  They would speak to my staff,
 5    I'm sure.
 6        Q.   Did you speak with anyone at any public events?
 7        A.   Not that I recall.
 8        Q.   Do you recall whether any minority groups
 9    advocated for particular changes in the bill?
10        A.   Look, I'm aware of MALDEF's position, and
11    they're always involved in the subject area.  And I'm
12    aware of like the ACLU.  They're always involved in the
13    question.  I got lost from the question.  What was it?
14        Q.   Are you aware of any minority groups who
15    particularly advocated for any particular changes to
16    SB 14?
17        A.   You know, most of it was, "We just don't like
18    it."  Okay?  But I don't recall changes.
19        Q.   So they were just urging you to vote against
20    it?
21        A.   No.  The groups that I mentioned, MALDEF,
22    LULAC.
23        Q.   GI Forum?
24        A.   GI Forum.  Well, okay.  GI Forum, I don't talk
25    with.
```

## 183

```
 1        Q.   Okay.
 2        A.   Not that I have a -- actually, I was a member
 3    of the GI Forum.  Don't have any objection to them.  But
 4    they're not as organized as you may think, okay?
 5    They're out there, but they're not -- they don't have a
 6    legislative person.  They have individuals who come by
 7    and see you.  LULAC is a very diverse group, in that
 8    each -- they each have individual districts or chapters,
 9    and they all speak differently.  You know, the State is
10    the only who speaks with a coherent position.
11            So, I'll have LULAC members back home, and
12    they'll have -- they'll say whatever they personally
13    feel, but then the State will come down with a
14    position.  MALC, they tend to have a progressive
15    position on things.  I give consideration to MALDEF
16    probably more than other groups.
17        Q.   Did any suggestions made by MALDEF or any of
18    these other groups find their way into the final bill as
19    passed?
20        A.   I don't recall.  Like I said, what I do recall
21    is that some of these organized groups took positions
22    against the bill.
23        Q.   Did DPS or SOS ever provide you with an
24    analysis what voters possessed the identification
25    required by SB 14?
```

## 184

```
 1            MR. HUGHES:  And I'm going to caution you
 2    on legislative privilege not to reveal any nonpublic
 3    communications that you had with legislators,
 4    legislative staff, or DPS or SOS.
 5        A.   Not that I recall.
 6        Q.   (By Mr. Freeman) Do you recall when SB 14 was
 7    filed in the Senate?
 8        A.   No.  Go ahead.  I'm going to grab some water.
 9            MR. FREEMAN:  Let's take a break a two-
10    minute break.  Off the record.
11            (Recess from 2:53 to 3:02 p.m.)
12        Q.   (By Mr. Freeman) Are you aware of any
13    conversations that occurred concerning who would sponsor
14    SB 14 in the House?  Yes or no?
15        A.   Yes.
16        Q.   When did those conversations occur?
17        A.   Before it came out.
18        Q.   Who was present?
19        A.   I don't know.  I don't remember that.
20        Q.   Were you a part of those conversations?
21        A.   I heard.  Heard.
22        Q.   So you're aware of the conversation?
23        A.   I'm aware of the conversation.  I wasn't
24    there.  In other words, they hit my ears through a third
25    person.
```

## 185

1    Q.   When did you sign onto SB 14 as a sponsor?
2    A.   After it was filed.  Sometime shortly
3    thereafter.
4    Q.   What was your role as the third-named sponsor?
5    A.   I think my role was that I was -- I was giving
6    my blessing to the legislation.  That's the way I saw
7    it.  In other words, that I was satisfied that it ought
8    to be passed.
9    Q.   Are you aware of when the Select Committee on
10   Voter ID Identification and Voter Fraud began
11   considering SB 14?
12   A.   No.
13   Q.   If it was a legislative emergency, was it early
14   in the session?
15   A.   We all knew, all the way up until the session
16   before, that it was coming up.
17   Q.   Okay.
18   A.   That's the reason before the session started, I
19   was able to say, "This session, I'm supporting that
20   bill."
21   Q.   What's the emergency calendar?
22   A.   That designation allows you to be put up at the
23   front of the line rather than waiting in line like
24   everybody else does.
25   Q.   And is that controlled by the Calendar

## 186

1    Committee?
2    A.   Oh, I'm sorry.  No, I think that -- well, I
3    don't know where that comes from, but the understanding
4    is that it always goes first.
5    Q.   Okay.
6    A.   There must be some rule or maybe Calendars
7    Committee decides that.
8    Q.   Are you aware of any changes that were
9    introduced to SB 14 in Conference Committee that had not
10   been in the version of the bill that passed either
11   House?
12   A.   Yes.
13   Q.   What changes occurred?
14   A.   If I remember, they took out the senior citizen
15   exemption, if I remember correctly.  You can confirm
16   that with me.
17   Q.   Can you name any other instance when changes
18   like that were made?
19   A.   No, I can't.  What do you mean by that?  You
20   mean in other bills?
21   Q.   Other bills where a change was made in
22   conference that hadn't been in either the Senate or
23   House version?
24   A.   Oh, no, that happens.  Look, Conference
25   Committee, that's the reason everybody wants to be on

## 187

1    the Conference Committee, because it's a free -- you
2    have a free ride to try to get in or get out whatever it
3    is you want.
4    Q.   Regardless of whether it had been in or out in
5    either bill; it's not just resolving the differences?
6    A.   Right.  Right.  In other words, it's -- if
7    you're not paying attention, your whole bill could be
8    stripped and totally reversed in Conference Committee.
9    Q.   Okay.  To your knowledge has the Secretary of
10   State or any local election official enforced SB 14 at
11   all?
12   A.   No.
13   Q.   Are you aware of any reports of confusion about
14   whether the bill is in effect?
15   A.   I saw on the Internet somebody say that they
16   were speaking at a black church to tell people that it
17   was not enforced.  This was out of Houston or somewhere.
18   Just in my various readings, I scanned it, I saw it, and
19   that was it.
20   Q.   Anything else?
21   A.   Not that I can recall.
22   Q.   And we touched on this a little already, but
23   who are the main opponents of SB 14?
24   A.   Democrats.
25   Q.   Anyone in particular?

## 188

1    A.   Progressives, organized groups that are part of
2    the Democratic coalition.
3    Q.   Any particular legislators?
4    A.   That are against it?
5    Q.   Uh-huh.
6    A.   Rafael Anchia is somebody I served with who has
7    been a vocal opponent of it.
8    Q.   Anyone else?
9    A.   I guess Trey Fischer Martinez.  He's always got
10   an objection to everything that Republicans present.
11        MR. GARZA:  Now, now, now.
12   A.   That's just a little fun, okay?
13   Q.   (By Mr. Freeman) We're going to run to Trey,
14   and we're going to tell on you.
15   A.   He'll just say, you know, something derogatory
16   towards me.  That's okay. (Laughing)
17   Q.   We're all friends here.
18        Anyhow, did any of your constituents
19   express opposition to the bill?
20   A.   Hmm.  Activist Democrats on the Internet.
21   Q.   Anyone who lived in your district?
22   A.   Not that I recall.
23   Q.   Were there any election officials who told you
24   that it wasn't necessary?
25   A.   My colleagues from the Valley, the Democratic

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

### 189

1  colleagues from the Valley.
2        Q.   Did the county judge of Hidalgo County express
3  opposition?
4        A.   I would assume he'd be opposed to it.  He's a
5  Democratic loyalist.
6        Q.   Why was he opposed to it?
7             MR. HUGHES:  It calls for speculation.
8        Q.   (By Mr. Freeman) If you're aware?
9        A.   It's his natural orientation, philosophical
10  orientation.
11       Q.   Was there substance to the opposition of which
12  you were aware?
13       A.   Substance?  All the arguments you've made today
14  would be echoed and embraced by some of the Democratic
15  activists from back home, including the county judge.
16       Q.   Representative Pena, I've only asked questions.
17       A.   The inferences that are made within your
18  questions, then.
19            No, back home -- okay.  I better shut up,
20  because I'm just going to chatter on, and y'all have to
21  get on.
22       Q.   You have interesting things to say, and we have
23  seven hours to talk.
24       A.   No.  No.  Keep going.
25            MR. HUGHES:  Just answer the questions.

---

### 190

1        A.   Keep going.
2        Q.   (By Mr. Freeman) Are the concerns that other --
3  the Hispanic-elected officials who you named, your two
4  colleagues who you named who are also both Hispanic, are
5  the reasons for their opposition that they expressed
6  similar to the concerns that you once held about the
7  bill?
8             MR. HUGHES:  And I'm going to remind you
9  about the legislative privilege and not to disclose, you
10  know, off-the-record communications between you and
11  other legislators or legislative staff or your own
12  impression, mental impressions, thoughts, or opinions
13  about the legislation.
14       A.   I don't know.
15       Q.   (By Mr. Freeman) Did you make any public
16  statements about other legislators' opposition or other
17  groups' oppositions other than what we've discussed
18  today?
19       A.   I don't understand the question.
20       Q.   Did you ever -- so, for example, you made
21  public statements in favor of the bill.  You made a
22  public statement that you believe the Attorney General
23  of the United States's opposition is political.  Are
24  there any other public statements that you've made
25  concerning the arguments against SB 14?

---

### 191

1        A.   Not that I recall.
2        Q.   Have you ever made any public statements about
3  on the subject of whether SB 14 might disproportionately
4  impact Hispanic voters?
5             MR. HUGHES:  Can you ask that one again?
6        Q.   (By Mr. Freeman) Have your made any public
7  statements about on the subject of whether SB 14 might
8  disproportionately impact Hispanic voters?
9        A.   Not that I recall.
10       Q.   Do you recall telling Governing Magazine,
11  quote, "This is not racial at all.  It's the mark of
12  desperation when they constantly bring up these things"?
13       A.   Did I say that?
14       Q.   Do you recall saying that?
15       A.   No, I don't recall.
16       Q.   I don't want to put words in your mouth, but
17  I'm happy to put it in front of you.
18       A.   I trust you.  If you say that I said that.
19            THE WITNESS:  Can I say something off the
20  record?  Do we have permission from you to say something
21  off the record?
22            MR. FREEMAN:  There is a question
23  pending.
24            MR. HUGHES:  Let's --
25            THE WITNESS:  Okay.  I don't need to say

---

### 192

1  it.  It was just a commentary.  I shouldn't say it.
2            MR. FREEMAN:  If we can mark this 377.
3            (Exhibit 377 marked for identification.)
4            MR. HUGHES:  Do you have a question in
5  particular?
6            MR. FREEMAN:  There is a question pending
7  of whether he recalls saying to Governing Magazine --
8        Q.   (By Mr. Freeman) Whether you recall saying,
9  "This is not racial at all.  It's the mark of
10  desperation when they just constantly bring up these
11  things"?
12       A.   Can you tell me where that is?
13       Q.   I'm sorry.
14            MR. HUGHES:  It's at the very bottom.  The
15  very end of the second page.
16       A.   Oh, okay.  (Viewing document.) I don't recall,
17  okay?  I'm quite serious.  I don't recall, but if he
18  wrote it down, I suspect that it's more true than not.
19       Q.   (By Mr. Freeman) Okay.
20       A.   This is a publication I trust.
21       Q.   Okay.  But you testified earlier that you
22  didn't look at whether this facially-neutral law would
23  have a discriminatory impact, did you?
24       A.   Well, I considered that.
25       Q.   But you didn't look to see whether it was more

### 193

1  likely or less likely that Hispanic voters would lack
2  the necessary ID, did you?
3      A.   No, I considered that.
4      Q.   Did you look at the statistics about who had
5  the ID?
6      A.   Somebody presented those, but I don't -- I
7  don't recall specifically.
8      Q.   Now, you used to -- you used to litigate
9  employment --
10     A.   Yes.
11     Q.   -- issues, right?
12     A.   Yes.
13     Q.   And you're familiar with the idea that
14  sometimes a facially-neutral policy can have a
15  discriminatory effect, correct?
16     A.   I'm aware of that.
17     Q.   But you think that in this case, this facially-
18  neutral policy, regardless of whether Hispanics had --
19  were less likely to have ID, that it was desperation to
20  bring up whether it would have a discriminatory effect?
21     A.   I'm aware that the Supreme Court of the United
22  States looked at a similar law and found it to be
23  constitutional.
24     Q.   Are you aware of whether the Supreme Court of
25  the United States considered at all whether Indiana's

### 194

1  law would have a disparate impact?
2      A.   I can only assume that the argument was made.
3  I mean, if you assume that lawyers of that caliber that
4  get cases to that point make every argument they can to
5  win, I assume it was made.
6      Q.   So you're not aware?
7      A.   I'm not aware.  But I can assume, okay, that
8  good lawyers would have made that argument.  If it goes
9  to the Supreme Court of the United States, I would
10  assume they made the argument.
11     Q.   And if you were to learn that they did not, if
12  you were to learn that that was just a due process case
13  that didn't address disparate impact on minority groups,
14  would that make you think differently about whether
15  SB 14 was problematic in terms of its racial impact?
16     A.   You know, it's not relevant because we're
17  talking about now.  I've already voted.
18     Q.   But in terms of whether it's a mark of
19  desperation to bring up a racial impact, in terms of
20  that --
21     A.   Well, I think what I was referring to here,
22  assuming that I said it, was that almost every time we
23  bring up a bill that the progressives do not like, they
24  raise the racial argument and it waters down the
25  occasions when it really needs to be raised, and it gets

### 195

1  frustrating.  Everything is racial.  It's just
2  desperation, and it's very frustrating to have
3  everything be racial.  Why wasn't I invited to this
4  meeting?  Oh, it must be racial.  Why did he get a
5  parking spot?  It must be racial.  And you get tired of
6  it get it after a point.  And quite -- well, I'm not
7  going to just get on a soapbox.  But it's just
8  frustrating that everything is racial, when we have --
9  leaders of our community have to get past that element
10  of human behavior, where we see each other as
11  different.  It is frustrating.  And so I can only assume
12  that I'm speaking out of frustration.  I'm sick and
13  tired of hearing that everything is racial.
14     Q.   At any point, did you have any conversations
15  about a Floor debate for SB 14?
16         MR. HUGHES:  Again, I'm going to instruct
17  on legislative privilege not to reveal off-the-record
18  conversations with other legislators, legislative staff,
19  or members of any government agency.
20     A.   Outside of the legislative privilege, I don't
21  recall any.
22     Q.   (By Mr. Freeman) No, I'm just asking yes or no
23  if you recall them.  And in terms of not disclosing the
24  content, you can tell me yes or no.
25         MR. HUGHES:  You can answer that.

### 196

1      A.   Yes, I do recall.
2      Q.   (By Mr. Freeman) Who did you have those
3  conversations with?
4      A.   Aliseda.
5      Q.   Anyone else?
6      A.   Not that I recall.
7      Q.   When did that conversation occur?
8      A.   Right before he got up to speak, I said, "I'll
9  ask you questions."
10     Q.   You didn't need to tell me that --
11     A.   I'm sorry, okay.
12     Q.   -- but I don't think that you ruined your
13  counsel's case.
14     A.   Okay.
15     Q.   Okay.  I am going to put in front of you what
16  has previously marked as Exhibit 9, which is the House
17  Journal from the day of the debate.  And we're just
18  going to have a whirlwind tour of a couple of the
19  amendments.
20         Whirlwind, Mr. Hughes.
21         MR. HUGHES:  Whirlwinds.
22     Q.   (By Mr. Freeman) And if you could turn to
23  Page 969.
24     A.   Okay.
25     Q.   And Amendment 15.

## 197

1    A.   Yes.
2    Q.   And this amendment would have prohibited fees
3  for the underlying documents necessary to receive any
4  form of proof of identification under SB 14, correct?
5    A.   I'm sorry.  State it again.
6    Q.   This amendment would have prohibited fees for
7  the underlying documents necessary for an ID needed to
8  vote under SB 14, correct?
9    A.   Okay.  Yes.
10    Q.   What was the purpose of this amendment?
11    A.   I don't know.  I mean, what was the purpose
12  behind Mr. Martinez filing the amendment?
13    Q.   What was the purpose of the amendment?  Had the
14  amendment been a separate piece of legislation, what was
15  the purpose of the amendment?
16        MR. HUGHES:  I'll object that it calls for
17  speculation and remind you of the legislative privilege
18  instruction.
19        MR. FREEMAN:  Mr. Hughes, I believe that
20  this is the same functionally as asking the purpose of a
21  piece of legislation.
22    A.   I can -- all I can do is read, and then make an
23  assumption, okay, that the language has a purpose.
24    Q.   (By Mr. Freeman) And you voted to table this
25  amendment, correct?  You can see on page 970?

## 198

1    A.   Okay.  I assume.  If Mr. Trey Fischer Martinez
2  gets up, it's more than likely I'm going to move to
3  table.
4    Q.   And as we discussed above, do you believe that
5  a cost for a document necessary to get an ID is a part
6  of the cost of getting the document?
7        MR. HUGHES:  Asked and answered.  But you
8  can still answer it again.
9    A.   The free ID is free.
10    Q.   (By Mr. Freeman) If you'd turn to Amendment 23
11  on Page 979.  Is it the case that Amendment 23 would
12  have added a student identification card issued by a
13  public or private high school or institution of higher
14  education that contains a photograph?
15    A.   That's what it looks like it says.
16    Q.   But you voted to table this amendment, correct?
17    A.   Right.  I have previously stated to you that I
18  don't think there are enough security protocols in a
19  high school ID.
20    Q.   Are you aware of the security protocols in a
21  military ID?
22    A.   No, but I trust that they are significant.
23    Q.   Does a military ID include a military
24  employment ID for outside contractors, are you aware?
25    A.   No, I don't know.

## 199

1    Q.   But you didn't vote against any aspect of the
2  bill on the basis that it included military IDs, right,
3  despite your lack of awareness of the security features
4  of a military ID?
5    A.   I served in the military forces, and I know
6  they are very careful in the presentation of their ID,
7  in preparation of it.  I can only assume that the United
8  States Army or Marines or other branches must have more
9  heightened security levels.
10    Q.   What about the Veterans Administration?
11    A.   I don't know.
12    Q.   Okay.  You can turn to Amendment 34 on Page
13  987.
14        MR. HUGHES:  987?
15        MR. FREEMAN:  987.
16    Q.   (By Mr. Freeman) Amendment 34 would have
17  rendered the act unenforceable if it didn't comply with
18  Section 5, Section 203, or Section 4(f)(4) of the Voting
19  Rights Act, correct?
20    A.   That's what it says.
21    Q.   When you voted to table this amendment, what
22  was your understanding of the purpose of the amendment
23  or what is current understanding of the purpose the
24  amendment, if that --
25    A.   Well, it speaks for what it wants to do.  But

## 200

1  let me explain that when a bill has been hashed out by
2  the majority and has been debated within that majority
3  coalition --
4    Q.   Uh-huh.
5    A.   -- one of the strategies to defeat a bill is to
6  load it up with amendments.  And what the author
7  typically says, or what we understand is, stay with the
8  bill, we've worked hard on it this far, let's just get
9  it through.  And so you can have perfectly good
10  amendments that sound perfectly well and reasonable, but
11  because we've already hashed out the bill, and we've
12  already negotiated it, you simply want to get it
13  through.
14    Q.   Aren't most of the Representatives in the
15  minority communities in Texas not a part of that
16  majority coalition?
17    A.   No, they're represented there.  I mean, it has
18  a color of skin that you want.
19    Q.   Aren't most Representatives who are preferred
20  candidates of minority voters not a part of the majority
21  coalition?
22    A.   I don't like that term, "preferred
23  candidates."  I was the preferred candidate for my
24  district, and then I switched parties, and all of a
25  sudden I was unpreferred.  That doesn't make sense.

REPRESENTATIVE AARON PENA                        JUNE 01, 2012

## 201

```
1    Sometimes y'all get lost in the legalese and common
2    sense goes out the door.
3       Q.  Well, let's -- let's -- outside of your unique
4    circumstances, with regard to the candidates who were
5    voted -- who were voted for by minority voters, aren't
6    most of those legislators outside of the majority
7    coalition?
8       A.  I think that those people tried try their best
9    to represent those people.  I think that the minority
10   voters -- that these other people try their best to
11   represent people.  Now, maybe their experiences are a
12   little different, but nothing is perfect.  Everybody
13   tries to do their best.
14      Q.  Okay.  I will repeat my question, because I
15   believe you haven't answered it.
16          Aren't most the Representatives who are
17   elected by voters who are minorities not in the majority
18   coalition?
19      A.  Understanding what you intend to say and your
20   meaning behind those words, I think you're right.
21      Q.  Isn't the opportunity for those --
22      A.  But I don't agree that that -- with the
23   judgment that I think you're making.
24      Q.  My question is intended only to rest on
25   empirical facts, and as long as we are sharing the same
```

## 202

```
1    understanding of the meaning of those facts in terms of
2    voting patterns, not in term of theories of
3    representation, is that something we can agree on?
4       A.  Okay.
5       Q.  Okay.  Isn't the amendment process the
6    opportunity that those Representatives outside of the
7    majority coalition -- isn't that their opportunity to
8    effect and shape a bill?
9       A.  That's what it should be.  Unfortunately, it's
10   become a weapon used by the minority, not minorities,
11   but the minority coalition, to delay and chub and try to
12   derail the process.  It's a legitimate strategy.  Kind
13   like at the end of a football game when people try to
14   run out the clock, it is an acceptable strategy.
15          But so is it acceptable for the majority
16   to say, "We're not taking any amendments.  This is what
17   we want.  We already have the votes."  And this is such
18   a long-held discussion on a question, everybody had
19   their mind made up.  So, when things come up like, you
20   know, let's salute George Washington and something
21   really good, you know, everybody can agree to, we're
22   going to turn it down, because it's just an attempt to
23   delay the process.
24      Q.  Okay.  Then let's just through a couple more
25   amendments very quickly.
```

## 203

```
1           If you look to Page 1009 to 1010,
2    Amendment 50.  And Amendment 50 would have reimbursed
3    poor individuals for the costs necessary to travel to
4    get an ID, right?
5       A.  Yeah.  That's what it says.
6       Q.  And what's your understanding of the purpose of
7    this amendment?
8       A.  I can only assume.  Richard filed this as a --
9    well, because it sounds good, but it makes the
10   legislation unworkable or burdensome.
11      Q.  Burdensome on whom?
12      A.  In its implementation.
13      Q.  On whom?
14      A.  On the state.
15      Q.  Is it better to place the burden on the state
16   than on the poor voter?
17      A.  Under these circumstances, no.  And that's why
18   I probably moved to table it or I moved --
19      Q.  You voted to table it.
20      A.  Voted to table.
21      Q.  Correct?  Yes?
22      A.  Yes.
23      Q.  Okay.  Isn't it true that the majority of --
24   pardon me.  Isn't it true that members of racial or
25   language minority groups in Texas are far more likely to
```

## 204

```
1    live below the federal poverty line than Anglos?
2       A.  Yeah.  I've said that.  That's likely true,
3    because of the history that we've gone through.
4       Q.  And a lot of people in your district are poor,
5    as we've discussed, right?
6       A.  Yes, they are.
7       Q.  And so didn't voting to table this amendment
8    choose to place the burden that this amendment
9    recognizes on those poor people in your district rather
10   than on the state?
11      A.  What I know is that the Supreme Court of the
12   United States has interpreted this law, in some
13   variation of the one presented in Texas, to be not
14   overly burdensome.
15      Q.  My question was your understanding of whether
16   it was placing that burden on poor voters rather than on
17   the state, not the Supreme Court's --
18      A.  I don't think it's one or the other.  I think
19   there's a balancing test, and we, the policy deciders,
20   made a choice, and I was comfortable in that choice.
21   Because previously, the United States Supreme Court has
22   said that some version of this bill was acceptable and
23   not overly burdensome.
24      Q.  Can you turn to 1015, Amendment 54.  Take a
25   look at that real quick.  And this amendment would have
```

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 205

```
1    -- are you ready?
2        A.  Yes, I'm ready.
3        Q.  And this amendment would have required the
4    Secretary of State to determine who was prevented from
5    voting and who filed provisional ballots that were not
6    counted according to racial group, right?
7        A.  Yes, that's what it looks likes it says.
8        Q.  And you voted to table that amendment, correct?
9        A.  Yes.
10       Q.  Is there something going on behind my head?
11       A.  There's like two military helicopters flying
12   over.  It's not a common sight.  It's common in
13   San Antonio, but not here.
14           (Pausing for helicopter noise.)
15           They're looking for you.  Either that or
16   Eric Holder is landing.
17           (Laughter)
18       Q.  I don't know how Eric Holder travels.
19       A.  That was a joke, for the record.
20       Q.  I know, yes.
21       A.  Okay.
22       Q.  Oh, I'm sure the record knows too.
23           Anyhow, let's just take a step back.
24           Amendment 54, isn't it the case that it
25   would have required the Secretary of State to determine
```

## 206

```
1    who was prevented from voting and who filed provisional
2    ballots that were not counted according to demographics?
3        A.  Yes, that's right.
4        Q.  And you voted to table that, correct?
5        A.  Yeah.  Again, as I said, the question had been
6    decided, amendments were -- are usually filed of this
7    nature when the minority coalition knows that it's going
8    to lose, to embarrass the majority by offering something
9    that's apple pie and sounds good, but has not been part
10   of the previously-negotiated bill.  So yeah, I voted
11   against it.
12       Q.  Would it concern you if Hispanic voters were
13   disproportionately showing up at polling places and
14   turned away because they didn't have the -- not turned
15   away, but voted a provisional ballot that didn't count
16   because Hispanic voters didn't have the ID?
17       A.  Would it concern me?
18       Q.  Uh-huh.
19       A.  It would be something that I'd want to know.
20       Q.  Well, if it was something that you wanted to know,
21   why did you vote against the amendment that precisely
22   would have given you that information?
23       A.  I told you.  It's because we had previously
24   negotiated the bill.  This -- Representative Alvarado
25   knew full well this bill, this amendment was not going
```

## 207

```
1    to be accepted.  As with the many previous other
2    amendments, it was an attempt to make political -- to
3    create a political advantage for the newspapers or I
4    guess in this litigation.  So he probably wasn't
5    thinking of this litigation, but any opportunity to
6    embarrass the majority.
7            MR. FREEMAN:  Can we go off the record for
8    a minute?
9            MR. HUGHES:  Yes.
10           (Recess from 3:35 a.m. to 3:41 p.m..)
11           MR. FREEMAN:  We are back on the record.
12       Q.  (By Mr. Freeman) Very quickly, I can guess what
13   your response is going to be, but if I can very quickly
14   just go through it.  Can you look at Amendment 55 on
15   page 1016.  Can you take a look real quickly?
16       A.  Yes.
17       Q.  Amendment 55 would have required the Secretary
18   State to determine whether the majority of voters
19   casting provisional ballots did so because they lacked
20   photo ID were minority, and if that were the case, to
21   allow them to use voter registration certificates,
22   correct?
23       A.  Yes.
24       Q.  What was the purpose this amendment?
25           MR. HUGHES:  Again, I would just caution
```

## 208

```
1    you on the legislative privilege.  Under the court's
2    order, you can talk about the general purpose, but not
3    individual --
4        A.  I assume the purpose was what it says.
5        Q.  (By Mr. Freeman) And you voted to table this,
6    correct?
7        A.  Yes, for the same reasons I've described
8    before.
9        Q.  Okay.  And Amendment 58 on Page 1021.  This
10   would have -- I'll let you take a look real quickly
11   first.
12       A.  Go ahead.
13       Q.  This would have required a study by county and
14   ethnicity of access to the necessary photo ID, along
15   with an analysis of the potential impact on voter
16   turnout, right?
17       A.  Okay.
18       Q.  What was the purpose of the amendment?
19           MR. HUGHES:  The same caution.
20       A.  The same thing; whatever it says, that's what
21   the purpose was.  But I voted to table, I'm sure, for
22   the same reason, that many of these amendments were put
23   up simply to delay the process, to add to a bill that
24   had been hashed out, where the votes were already known
25   and we had a long-standing argument going on for years,
```

REPRESENTATIVE AARON PENA                                   JUNE 01, 2012

---

### 209

1   and we finally wanted to get it over with.
2      Q.   Okay.  Do freshman frequently provide the
3   closing remarks after a debate on a major bill?
4      A.   They can.
5      Q.   Are there any other instances that you're aware
6   of, where a freshman delivered closing remarks on a
7   major bill?
8      A   I did.
9      Q.   When was that?
10     A.   On the budget.
11     Q.   In 2001 or 2003?
12     A.   Yeah.  Are you aware of it?
13     Q.   I'm asking.  I don't know.
14     A.   That was like my main speech, so I remember it.
15     Q.   Okay.  Are you aware of any conversations
16  concerning who would deliver the closing remarks
17  considering SB 14?
18          MR. HUGHES:  The same legislative
19  privilege instruction.
20     Q.   (By Mr. Freeman) Yes or no.
21          MR. HUGHES:  Yeah, you can answer yes or
22  no.
23     A.   No.  No.  I don't know.
24     Q.   (By Mr. Freeman) Okay.  And did you move to
25  have Representative Aliseda's closing remarks printed in

---

### 210

1   record?
2      A.   Is that what the record says?
3      Q.   You can look at --
4      A.   Yes.  Yes, I did.
5      Q.   -- on Page 1031.
6      A.   Yes, I did.
7      Q.   Okay.
8      A.   Representative -- yes, I did.
9      Q.   Did you agree with Representative Aliseda's
10  remarks?
11     A.   Very good.  He captured the spirit of what many
12  of us feel.  Look, we are Hispanic and very proud to be
13  of that culture.  I'm from the area.  My ancestors go
14  back to the founding soldiers who came to colonize the
15  area.  And Aliseda is the same way.  We simply have a
16  difference of opinion that's not racial in nature.  We
17  want to clean up voter fraud.  We see a lot of it where
18  we live.  It's unfair that politicians are enriched and
19  when poor people are having to pay that tax.  I
20  sincerely feel that way, and he sincerely feels that
21  way.
22          Representative Aliseda is a person born in
23  Mexico.  The common refrain is, "Well, you're not
24  Mexican enough.  You're not really a Mexican."  That's
25  what Mexican Americans say to each other, as do other

---

### 211

1   ethnic groups.  Well, he's from Mexico, for God's sakes,
2   and he became an American citizen.  And so that attack
3   couldn't be made to him.  The fact that he was a
4   prosecutor and prosecuted these very similar cases was
5   important.  And so his remarks embodied the conservative
6   perspective, and certainly the conservative Hispanic
7   perspective.  And so I was -- I assumed I was moved to
8   put it in record so that it could be remembered.
9      Q.   And you just mentioned that Representative
10  Aliseda prosecuted voter fraud cases.  Are you aware of
11  whether he ever prosecuted a case related to in-person
12  voter impersonation?
13     A.   No, I don't know.
14     Q.   Okay.  Are you aware that when Representative
15  Larry Gonzales was deposed in this case just yesterday,
16  he was not carrying a photographic voter ID -- or a
17  photographic ID?
18     A.   He wasn't?  He didn't?
19     Q.   No.
20     A.   No, that doesn't surprise me.  Look, the only
21  reason I have my wallet is because I've got to go to the
22  airport.  Otherwise, I don't like to carry anything.
23  It's too burdensome.  Too burdensome and too fat, and
24  I'm fat enough as it is.
25     Q.   Do you still believe ID is necessary to do

---

### 212

1   everything in our society?
2      A.   Increasingly, it's becoming that way.  And
3   increasingly, it is -- I think the general public has
4   come to accept these inconveniences.
5          Like coming in this office, for example, I
6   cannot ever imagine a law firm, you have to get
7   permission to enter the door.  But increasingly, our
8   society has these limitations or security measures that
9   are set up.  I love the way that we used to travel, just
10  jumping on the plane.  But we live in a different world
11  and people are demanding more security.  Increasingly,
12  there are ways to corrupt the system, and people want
13  solutions.  And so yes.  Yes to your question.
14     Q.   If Representative Aliseda prosecuted only
15  issues that did not relate to voter impersonation and if
16  the issues in your district did not relate to voter
17  impersonation, but related more to voter assistance,
18  mail-in vote harvesting and the like, won't this bill
19  just give them a false sense of confidence, the voters,
20  that the problem has been fixed?
21     A.   No, they'll know it's not been fixed, because
22  it's growing where I'm at.  Look, we had -- like I said,
23  I had 88 complaints, 88 or 81, come into my office the
24  other day.  We had elections that were essentially
25  bought by assisted voting.  You have complaints that

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 213

1    were filed recently from the City of Hidalgo.  It's
2    running rampant where I live.  And I come from a
3    Hispanic community, and those people want honest
4    elections.  And that's why I sincerely come here and
5    have advocated for that position.  And voter ID was a
6    starting point, okay?  It's not the final solution, as
7    I've stated many times.
8         Q.   And that's actually a delightful segue.
9              Did you introduce any other bills, in the
10   82nd Legislature, regarding election administration?
11        A.   Yes.
12        Q.   Do you know how many?
13        A.   I can guess around 30.
14        Q.   Around 30?  Wow.
15        A.   Is it more?
16        Q.   Not quite.
17             MR. FREEMAN:  This is the last major
18   subject, Mr. Hughes.  You don't need to stretch like
19   that.
20        A.   I will take your -- whatever you tell me it is,
21   that's what it is.
22        Q.   (By Mr. Freeman) Well, let's just real quickly
23   mark this is as U.S. Exhibit 378.  It's a couple of your
24   blog posts.
25             (Exhibit 378 marked for identification.)

## 214

1         A.   I'll tell you what.  Let me just say:  This is
2    why getting on the Internet and saying things is not --
3    because you're going to be cross-examined about them.
4    But go ahead.
5         Q.   (By Mr. Freeman) There is nothing negative
6    about what you posted here.
7         A.   No, I agree.  These are probably a list of
8    bills that I filed.
9         Q.   Indeed they are.  Well, let me ask you:  Did
10   you make these blog posts?
11        A.   Yeah.  I remember -- I remember putting a thing
12   like this up, yes.  I can't imagine that you -- that
13   it's fraudulently made.  I assume it's true.
14        Q.   Is this your blog?
15        A.   Yes, it is.
16        Q.   Okay.  Are there 19 bills listed here that
17   you --
18        A.   I trust your representation.
19        Q.   Do you recall saying during an interview with
20   KXAN that the Speaker had made issues concerning mail-in
21   ballot fraud a priority when he created the Select
22   Committee on Voter Identification and Voter Fraud?
23        A.   I don't recall.  KXAN is not a radio station
24   I'm regularly -- I'm on.  So I don't recall.  If you
25   have that transcript, I'd love to read it.

## 215

1         Q.   I do.
2         A.   Wow.  How in the world do you find all this
3    stuff?
4              MR. FREEMAN:  Can I have this marked as
5    U.S. 379.
6              (Exhibit 379 marked for identification.)
7         A.   And even I know, this must be television.  Not
8    radio, okay?  Did you get that?  It is television.
9    Yeah, so that's the reason I don't recall.  But do I
10   recall television.
11        Q.   (By Mr. Freeman) Okay.  And do you see on Page
12   3, the last paragraph?
13        A.   3.
14        Q.   Do you recall saying, "The Speaker of the House
15   has made this a priority when he created the Voter Fraud
16   Committee and the Voter ID Voter Fraud Committee"?
17        A.   Okay.  I see that.
18        Q.   And do you see in context that you were
19   referring to the mail-in segment, as you say in the
20   second paragraph on that same page?
21        A.   I think I was jumping around.  I was talking
22   about voter assistance.  So I cannot say if that's what
23   -- that's not the limited context.
24        Q.   Okay.  But you were saying that fraud and the
25   issues that you were raising was priority, and the

## 216

1    Speaker made it a priority when he created the Select
2    Committee on voter impersonation and voter fraud?
3         A.   Yeah.  That was my opinion, yes.
4         Q.   But the 19 bills that you sponsored, none of
5    them were referred to the Select Committee; is that
6    correct?
7         A.   You know, I remember they didn't all go to the
8    same committee.  I think it's more than 19.  But that's
9    the Speaker's prerogative.
10        Q.   I apologizes if I missed some.
11        A.   Yeah, you missed some.  But let me just say
12   that that's the Speaker's prerogative.  I mean, he
13   doesn't have to say yes to everything I ask for.  And
14   sometimes he has reason to send them somewhere else, and
15   somebody, either he or a chief of staff or a legislator
16   or a director made that decision, and so be it.
17        Q.   And so in fact, the only bill that the voter
18   impersonation and voter fraud committee addressed didn't
19   address real world voter fraud, right?
20        A.   Well, there are other reasons that there was
21   only one bill, and I touched on those briefly, but I
22   don't think I want to get into it.
23        Q.   Okay.  And you're not going to get into it on
24   the basis of legislative privilege, just so the record
25   is clear?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 217

1      A.  Yes.  It had to do --
2          MR. HUGHES:  Again, caution you on the
3      legislative privilege.
4      A.  Oh, okay.  Look, as to my communications with
5      other people that would explain the reasons why the
6      committee didn't go forward with the legislation is a
7      communication with other legislators and protected by
8      the privilege.
9      Q.  (By Mr. Freeman) Now, if we could jump back to
10     that article from Governing Magazine.
11     A.  Okay.  I've got it.
12     Q.  And can you remind me what exhibit number that
13     is, if that's on your copy?
14     A.  377.
15     Q.  377.  Thank you.
16         Do you see where you said here that many
17     people who complained about the lack of voter confidence
18     were unwilling to attach their names to bills that
19     address real corruption?
20     A.  Yeah.
21     Q.  Why did you make that statement?
22     A.  Where I live, everybody knows that it goes on,
23     but no legislator is likely to stand up for it because
24     he's going against the beast that gets him elected.
25     Being a member of the opposing party makes it easy for

## 218

1      me to do that, but I did it anyway as a Democrat.  But
2      I'm freer to do it because the machine -- well, they
3      were already coming after me, and so was the system, the
4      politiqueras and everybody else, they wanted to
5      eliminate me for speaking against their system.
6      Q.  But what about the people who aren't from South
7      Texas but who are concerned about voter confidence, the
8      main people speaking in favor of this bill, why, with
9      regard to those people would complained about the lack
10     of voter confidence, as you said in this article, why
11     did you say in this article that those people were
12     unwilling to attach their names to bills that address
13     real corruption?
14     A.  Did I say specifically say other people?
15     Q.  You said -- you said, "Many people who complain
16     about the lack of voter confidence."
17     A.  Yes.
18     Q.  Were you referring only to people in South
19     Texas when you made that statement?
20     A.  Oh, I don't remember what I was referring
21     to.  A long time ago.
22     Q.  Isn't it the case that about the 19 bills
23     listed on the -- on your website in that post, that 18
24     of them died in committee?
25     A.  If you say so, but...

## 219

1      Q.  Or excuse me.  Died in committee or died in
2      committee in either the House or the Senate?
3      A.  I did attach some of them as amendments to
4      other bills.  But, yes.  That's true.
5      Q.  Would you agree that prioritizing photographic
6      voter ID ignored real practical concerns about election
7      integrity?
8      A.  Many people don't have the experience that I
9      have down there, okay?  They don't live with the day to
10     day.  It's not a -- you know, Dallas is beginning to
11     experience it, and Laredo is beginning to experience
12     it.  It's like a cancer that's growing.  And I'm not
13     sure they understand the priorities.
14         During the debate, many times I would say,
15     "Hey, look, this is -- there's other kinds of voter
16     fraud, and we need to deal with it."  And people, I
17     could tell, they were -- there was a novelty.  Novelty
18     is not right.  It was a surprise to them.
19         So I think these are well-meaning people;
20     they just don't have the daily experience like I do, or
21     other people along the border do, where we have a well-
22     honed system of corruption going back to the boss era at
23     the turn of the last century.
24     Q.  Now, you told Governing Magazine that the
25     strength of SB 14 was it's a symbol that the legislature

## 220

1      was beginning to address corruption, correct?
2      A.  Yes.
3      Q.  But in the last legislature, it was pretty much
4      the end as well, right?
5      A.  Well, it's the end because I'm not there, but
6      others will the carry -- look, we've had a redistricting
7      battle and I was one of the victims of that, and
8      hopefully, somebody else will carry the banner.  And I
9      hope that other Hispanics have the courage to speak up
10     for their own communities, that it doesn't have to be
11     imposed on them without their involvement.
12         MR. FREEMAN:  All right.  If we can just
13     take a couple of minutes, I think I'm just about done.
14         MR. HUGHES:  Off the record.
15         MR. FREEMAN:  Let's go off the record.
16         (Recess from 3:59 p.m. to 4:00 p.m.)
17         MR. FREEMAN:  Okay.  Back on the record.
18     Q.  (By Mr. Freeman) Are you aware that you were
19     designated as a person with knowledge and a likely
20     witness by the State of Texas in this case?
21         MR. HUGHES:  I'm not sure I agree with
22     that characterization.  I think the first part is right.
23         MR. FREEMAN:  I'll withdraw my question
24     and rephrase it.
25     Q.  (By Mr. Freeman) Are you aware that you were

## 221

1  designated by the State of Texas as a person with
2  knowledge of the issues and claims in this case?
3       A.  You mean a designation that I could potentially
4  be a witness?
5       Q.  Yes?
6       A.  I was informed about that in either this case
7  or in the last case.
8       Q.  If you were you called to testify in D.C., what
9  would your anticipated testimony be?
10      A.  I would answer the questions that I was given,
11 just as I've answered them to you.  I think you have a
12 gist of what I feel, and we have a slight difference of
13 opinion, but I think we want to achieve the same goal.
14 You want fair elections and I want fair elections.  We
15 just disagree on how to get there.
16      Q.  Okay.  Are there any answers that you wish to
17 change from today?
18      A.  I can't recall any.
19      Q.  Is there any information that you didn't recall
20 previously that you recall now?
21      A.  No, I can't recall any.
22           MR. FREEMAN:  So I'm just going to state
23 for the record that this deposition is left open pending
24 any decisions concerning privilege over testimony and
25 documents.  And with that, I pass the witness to

## 222

1  Mr. Garza.
2           MR. GARZA:  I just have a few questions.
3           EXAMINATION
4  BY MR. GARZA:
5       Q.  You were -- in earlier testimony from
6  Mr. Freeman, you were talking about the lack of public
7  transportation in the region that you represent.  Do you
8  recall that?
9       A.  Yes.
10      Q.  Now, Hidalgo County is part of a bigger,
11 generally referred to area as the Rio Grande Valley; is
12 that correct?
13      A.  Yes.
14      Q.  And that encompass a number of counties along
15 the border, is that correct?
16      A.  Yes.
17      Q.  Cameron County, Starr County on the east and
18 west of Hidalgo?
19      A.  Yes.
20      Q.  Any other counties?
21      A.  Willacy County.
22      Q.  Willacy County.  And in that general area,
23 would you agree with me that there is a lack of public
24 transportation?
25      A.  By urban standards, yes.  Urban standards of

## 223

1  Texas.
2       Q.  Uh-huh.  And you specifically mentioned, you
3  know, the La Joya-Sullivan City area and the Delta area
4  on the east?
5       A.  Yes.
6       Q.  And generally, those are areas that are away
7  from McAllen, which is the most urban of the --
8       A.  That's correct.
9       Q.  Okay.  And in McAllen is where you have some
10 viable public transportation?
11      A.  Yes.
12      Q.  Okay.  But not in the other parts of the
13 county, correct?
14      A.  I'm not aware of any, okay?  There may be a
15 system that, since I don't live there, I'm not aware of
16 it.  It would surprise me, because the market is not
17 there.  There's not a market for regular transportation.
18      Q.  All right.  And Cameron County and Willacy
19 County and Starr County have similar socioeconomic
20 characteristics as Hidalgo County; that is, there are a
21 lot of poor people?
22      A.  Yes.
23      Q.  And there are a lot of brown people?
24      A.  Yes.  So you would find public transportation
25 probably in the Brownsville-Harlingen region, but in the

## 224

1  surrounding regions, you would not have the -- I'm not
2  aware of any public transportation.  There may be some
3  informal transportation that I simply don't know about.
4       Q.  Right.
5       A.  But that's generally correct.
6       Q.  And would you also agree with me in the Rio
7  Grande Valley area that we've talked about, there is a
8  higher incidence of drivers without liability
9  insurance --
10      A.  Yes.
11      Q.  -- than in other parts of the state?
12      A.  Yes.
13      Q.  And would you agree with me that that is, in
14 large part, due to economic reasons?
15      A.  Yes.
16      Q.  People can't afford to buy automobile
17 insurance?
18      A.  Absolutely.
19      Q.  And without automobile insurance, you are not
20 eligible to secure a driver's licenses in Texas; isn't
21 that correct?
22      A.  Hmm.  I know you can't get your license
23 plates.  I'm not sure.  If you say so.
24      Q.  Okay.
25      A.  It's been a while since I've got my license.

## 225

1      Q.   Do you know, as an attorney and dealing with
2   the legal problems of people in the Valley -- and when I
3   say the Valley, I'm talking about the Rio Grande Valley
4   -- that there is a problem with motorists involved with
5   automobile accidents, who don't have insurance, having
6   their licenses suspended?
7      A.   Yes.
8      Q.   Okay.
9      A.   And because we're one of the more poorer
10  regions, I would assume that we have high incidences of
11  people without insurance.
12     Q.   Okay.
13     A.   Higher percentages of that.
14          MR. GARZA:  I don't have any other
15  questions.
16          MR. HUGHES:  Nor do I.
17          THE WITNESS:  God bless you all.
18          MR. HUGHES:  Thank you so much.
19          (Signature reserved.)
20          (Deposition concluded at 4:06 p.m.)
21
22
23
24
25

## 226

1   CHANGES AND SIGNATURE
2   RE: TEXAS VS. HOLDER, ET AL
3   PAGE  LINE  CHANGE       REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20     I, REPRESENTATIVE AARON PENA, have read the
21  foregoing deposition and hereby affix my signature that
22  same is true and correct, except as noted above.
23
24          _____
25          REPRESENTATIVE AARON PENA

## 227

1   THE STATE OF _____)
2   COUNTY OF_____)
3
4       Before me,_____, on this day
5   personally appeared REPRESENTATIVE AARON PENA, known to
6   me (or proved to me under oath or
7   through_____ (description of identity
8   card or other document) to be the person whose name is
9   subscribed to the foregoing instrument and acknowledged
10  to me that they executed the same for the purposes and
11  consideration therein expressed.
12      Given under my hand and seal of office
13  this_____day of _____, 2012.
14
15
16          _____
            NOTARY PUBLIC IN AND FOR
17          THE STATE OF _____
18
19
20
21
22
23
24
25

## 228

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2   STATE OF TEXAS,          )
3          Plaintiff,        )
4   VS.                      )
5   ERIC H. HOLDER, JR. in his   )
    official capacity as Attorney )
6   General of the United States, )
7          Defendant,        )
8   ERIC KENNIE, et al,      )
9          Defendant-Intervenors,   )
10  TEXAS STATE CONFERENCE OF    )  CASE NO. 1:12-CV-00128
11  NAACP BRANCHES,          )  (RMC-DST-RLW)
                            )  Three-Judge Court
12         Defendant-Intervenors,   )
13  TEXAS LEAGUE OF YOUNG VOTERS )
    EDUCATION FUND, et al,   )
14         Defendant-Intervenors,   )
15  TEXAS LEGISLATIVE BLACK  )
    CAUCUS, et al,           )
16         Defendant-Intervenors,   )
17  VICTORIA RODRIGUEZ, et al.. )
18         Defendant-Intervenors.   )
19          REPORTER'S CERTIFICATION
20          DEPOSITION OF REPRESENTATIVE AARON PENA
21              JUNE 1, 2012
22      I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25      That the witness, REPRESENTATIVE AARON PENA, was



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                     )
                                    )
            Plaintiff,              )
                                    )
VS.                                 )
                                    )
ERIC H. HOLDER, JR. in his          )
official capacity as Attorney       )
General of the United States,       )
                                    )
            Defendant,              )
                                    )
ERIC KENNIE, et al,                 )
                                    )
      Defendant-Intervenors,        )
                                    )
TEXAS STATE CONFERENCE OF           )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                     )   (RMC-DST-RLW)
                                    )   Three-Judge Court
      Defendant-Intervenors,        )
                                    )
TEXAS LEAGUE OF YOUNG VOTERS        )
EDUCATION FUND, et al,              )
                                    )
      Defendant-Intervenors,        )
                                    )
TEXAS LEGISLATIVE BLACK             )
CAUCUS, et al.,                     )
                                    )
      Defendant-Intervenors,        )
                                    )
VICTORIA RODRIGUEZ, et al.,         )
                                    )
      Defendant-Intervenors.        )

*********************************************
         ORAL DEPOSITION OF
      REPRESENTATIVE AARON PENA
            JUNE 1, 2012
*********************************************

**2**

1      ORAL DEPOSITION OF REPRESENTATIVE AARON PENA,
2  produced as a witness at the instance of the Defendant,
3  was duly sworn, was taken in the above-styled and
4  numbered cause on the JUNE 1, 2012, from 9:45 a.m. to
5  4:06 p.m., before Chris Carpenter, CSR, in and for the
6  State of Texas, reported by machine shorthand, at the
7  offices of DECHERT, LLP, 300 W. 6th Street, Suite 2010,
8  Austin, Texas 78701, pursuant to the Federal Rules of
9  Civil Procedure and the provisions stated on the record
10 or attached hereto.

**3**

1
2                    A P P E A R A N C E S
3  FOR THE PLAINTIFF, STATE OF TEXAS:
4      John M. Hughes
       BARTLIT BECK HERMAN PALENCHAR & SCOTT, LLP
5      1899 Wynkoop Street
       Suite 800
6      Denver, CO 80202
       (303) 592-3113
7      john.hughes@bartlit-beck.com
8      Brooke Paup
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
9      P.O. Box 12548
       Austin, TX 78711-2548
10
11     209 West 14th Street
       8th Floor
       Austin, TX 78701
12     (512) 936-1307
       patrick.sweeten@texasattorneygeneral.gov
13
14 FOR THE DEFENDANT, HOLDER, ET AL:
15     Daniel Freeman
       Risa Berkower
16     U.S. DEPARTMENT OF JUSTICE
       950 Pennsylvania Avenue, NW
17     NWB - Room 7202
       Washington, DC 20530
18     (202) 305-7766
       daniel.freeman@usdoj.gov
19
   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
20 NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
   CAUCUS:
21
       Ezra D. Rosenberg
22     DECHERT, LLP
       Suite 500
23     902 Carnegie Center
       Princeton, NJ 08540-6531
24     (609) 955-3200
       ezra.rosenberg@dechert.com
25

**4**

1  FOR THE MEXICAN AMERICAN LEGISLATIVE CAUCUS:
2      Jose Garza
       LAW OFFICE OF JOSE GARZA
3      7414 Robin Rest Drive
       San Antonio, TX 787209
4      (210) 392-2856
       garzpalm@aol.com
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 5

INDEX

Appearances........................................3

REPRESENTATIVE AARON PENA
    Examination by Mr. Freeman.................6
    Examination by Mr. Garza.................222

Signature and Changes..........................226

Reporter's Certificate.........................228

EXHIBITS

NO. DESCRIPTION                         PAGE MARKED

370  Amended Notice of Deposition            16

371  Sweeten Letter, May 9, 2012            106

372  The Monitor, 2-1-2011                  154

373  Texas Monthly Monitor, 5/23/2012       155

374  Article: Beer and Wine Wholesalers Behind  159
     Legislators Pushing Controversial Voter ID
     Laws

375  Voter ID Act                          160

376  Fort Worth Telegram, May 7, 2009      169

377  Article: Texas Voter ID Law's Unlikely  192
     Supporter
378  A Capitol Blog                        213
379  KXAN Aaron Pena                       215

## 7

1    A.  I was?
2    Q.  We saw that, yeah, on the website at least.
3  There was an article about Hispanic Republicans related
4  to the Senate.
5    A.  Well, I've got to read it.  Thank you.
6    Q.  So you've been deposed before.  In fact, we
7  spoke together last fall, correct?
8    A.  Yes, sir.
9    Q.  And I'll set up the ground rules again very
10  quickly, just so you're refreshed.  Okay?
11    A.  Yes.
12    Q.  So the purpose of this deposition is to obtain
13  your full knowledge with regard to voter ID, so I'll
14  need your full and complete answers.  Is that okay?
15    A.  Yes.
16    Q.  I may not always be clear.  If you don't
17  understand, please ask me to just restate the question.
18  Is that okay?
19    A.  Yes.
20    Q.  If you need a break, let me know.  We'll finish
21  the question, and then proceed to have a break.  Is that
22  okay?
23    A.  Yes.
24    Q.  If you need to get up for water or coffee
25  between questions, that's fine.  But if you can wait

## 6

1        THE REPORTER:  Time on the record 9:45.
2  Could everybody here make announcements and your
3  affiliations.
4        MR. FREEMAN:  Sure.  My name is Dan
5  Freeman on behalf of the Attorney General.
6        MS. BERKOWER:  Risa Berkower for the
7  Attorney General.
8        MR. GARZA:  Jose Garza for the Mexican
9  American Legislative Caucus.
10        MS. PAUP:  Brooke Paup for the State.
11        MR. HUGHES:  John Hughes for the State of
12  Texas.
13        MR. FREEMAN:  And this is the deposition
14  of Representative Aaron Pena in matter of Texas v.
15  Holder, U.S. District Court for the District of
16  Columbia, Docket Number 1:12-CV-128.
17        REPRESENTATIVE AARON PENA,
18  having been first duly sworn to testify the truth, the
19  whole truth, and nothing but the truth, testified as
20  follows:
21        EXAMINATION
22  BY MR. FREEMAN:
23    Q.  We have introduced ourselves.  I want to say
24  congratulations on being in the New York Times this
25  morning, Representative.

## 8

1  until we have finished up with the question we're going
2  through, that's great.  There's water and coffee to your
3  right.
4        If you want to talk your attorney, again,
5  that's also fine.  But if there's a question pending or
6  if you're in the middle of an answer, I'll ask you to
7  finish that question up first.  Is that okay?
8    A.  Yes.
9    Q.  At various points, your attorney may object to
10  a question I ask.  Many of these objections can be
11  resolved by the court at a later time.  Therefore,
12  unless your attorney specifically directs you not to
13  answer, I'll ask you to please respond to my question
14  fully.  Is that okay?
15    A.  Yes.
16    Q.  Sometimes your attorney may instruct you not to
17  rely on certain information when answering a question.
18  If you follow that instruction, please answer
19  accordingly by preceding your answer by saying, "Based
20  on that instruction."  And if you follow that
21  instruction and cannot, as a result, answer at all,
22  please tell me, "I cannot answer based on any attorney's
23  instruction."  That way, we'll sort of understand the
24  basis for your answer or nonanswer.  Is that okay?
25    A.  I will try to remember what you have suggested.

## 33

1  committee that oversees the Department of Public Safety.
2    Q.  Okay.
3    A.  And I was in his office one day looking at
4  videos.  He was kind of a fun guy to be around, and he
5  said, "Check out my driver's license.  It's got a really
6  cool number," like, as an example, 007.  And I said,
7  "Wow, how did you do that?"  He says, "Well, I'm the
8  chairman of the committee."  And I said, "Could I have
9  one like that?"  And he said, "Sure.  What number do you
10  want?"  And I said, "Well, how about my birthday?"  He
11  said, "Okay, I'll call over there and see if we can get
12  you one with your birthday on it."  And so my driver's
13  license number is like my month and my year of birth.
14    Q.  Did you -- did you go to a specific office, or
15  was it done for you?
16    A.  It was done for me.
17    Q.  So how did they get your picture?
18    A.  I don't know.
19    Q.  Do you know the -- when was the last time that
20  you went to a driver's license office to renew your
21  driver's license?
22    A.  I don't remember.
23    Q.  Do you know where the closest driver's license
24  office is to your home in Edinburg?
25    A.  Sure.

## 34

1    Q.  Where is it?
2    A.  Well, when I used to go, it was on the
3  northeast side of town.  There is also one in McAllen
4  that is in the center part of McAllen.
5    Q.  So about how far is the northeast end of town
6  from where you live?
7    A.  Four miles.
8    Q.  Okay.  Do you know what the hours of operation
9  of that office in Edinburg are?
10    A.  I assume they're regular business hours.
11    Q.  And if you were to go, how would you get there?
12    A.  I could walk, but I would probably drive.
13    Q.  It's four miles.  It's a pretty healthy walk,
14  right?
15    A.  Yeah.  I used to be walker until I tore my
16  ACL.  I used to like walking.
17    Q.  Sorry about that.
18    A.  I walked here.
19    Q.  And during business hours, when you could go to
20  the driver's license office, you're usually at work,
21  right?
22    A.  I'm an attorney, and so my hours are flexible.
23    Q.  Okay.
24    A.  But I'm always an attorney.  I don't know how
25  to say that.  You understand.  You're an attorney.

## 35

1    Q.  My BlackBerry is right in front of me.
2    A.  Right.
3    Q.  So you don't remember the last time you went to
4  that office, though, correct?
5    A.  To the driver's license?
6    Q.  Uh-huh?
7    A.  I went recently, because my daughter needed her
8  driver's license.
9    Q.  Oh, okay.  And what time of day did you go with
10  your daughter?
11    A.  Late in the afternoon.
12    Q.  Okay.  Do you know how long you waited in line?
13    A.  Hmm.  20 minutes, 15 minutes.
14    Q.  And that was in Edinburg?
15    A.  That was in McAllen.
16    Q.  Sorry.  McAllen.  And so you drove to McAllen,
17  correct?
18    A.  Yes.
19    Q.  Okay.  Do you know what documents you brought
20  with you to help your daughter renew her driver's
21  license or to get her driver's license?
22    A.  No, I don't recall.
23    Q.  Do you know what documents she needed to have?
24    A.  I don't recall.
25    Q.  Do you know if there are some driver's license

## 36

1  offices that have been closed because of a lack of
2  funding?
3    A.  I would have to assume or make a guess.  So
4  I'll just say I don't know.
5    Q.  Okay.  Do you know if any drivers' licenses
6  offices now have reduced hours because of a lack of
7  funding?
8    A.  I do not know that.
9    Q.  Do you know if there are drivers' licenses
10  offices in every county in Texas?
11    A.  I can't give you a specific -- I can't give you
12  a clear answer, so I just will say I don't know.
13    Q.  Okay.  Can we try the unclear answer?
14    A.  You want me to guess?
15    Q.  Well, if it's a guess, don't guess.
16          MR. HUGHES:  Don't guess.
17    Q.  (By Mr. Freeman) Don't guess.  But if you had
18  some kind of partial answer.
19    A.  I mean, I could -- I could make assumptions.
20          MR. HUGHES:  Let's not guess.
21    Q.  (By Mr. Freeman) No.  That's not what we're
22  here for.  I just need to find out what do you know.
23    A.  Okay.
24    Q.  So that's fine.
25          Are you aware of whether there's a

## 37

1  particular driver's license office in Austin that is
2  used by legislators and staff?
3      A.  No.
4      Q.  Okay.
5      A.  No.  I've never -- really?  No.
6      Q.  Okay.  Now, you've previously said, in an
7  interview with Governing magazine, that it's not an
8  inconvenience to get an ID; is that correct?
9      A.  Is that what I said?  Let me just say, because
10  I don't -- I don't want to -- that -- that is a correct
11  general statement, okay?  But I will say that it is a
12  very minor hurdle.
13      Q.  Okay.  Do you know if there are longer delays
14  in some offices, in larger cities than McAllen, than the
15  delay you had with your daughter?
16      A.  I don't know.  The only experience I had was
17  when I was in college, and I went in to get a driver's
18  license in Austin, and it was basically the same as it
19  is in McAllen.
20      Q.  Okay.  Do you have a copy of your birth
21  certificate?
22      A.  Not with me, but I have one at home.
23      Q.  Yeah.  You don't carry it around.
24          Do you know where you'd get a copy if you
25  lost yours?

## 38

1      A.  I'd either go to my city hall or I'd come to
2  Austin, and I'd get it from the department -- it's a
3  building that's off of Guadalupe, and it's the north
4  side of downtown.
5      Q.  Do you know how much it would cost to get a
6  copy?
7      A.  No.  I could take a guess.
8      Q.  If you don't know, you don't know.
9          Do you know how long it would take to get
10  a copy?
11      A.  Again, I'd take a guess.  I'm sure it varies.
12  I don't know.
13      Q.  How would you go about finding the answers to
14  those questions if you needed to know them?
15      A.  Well, okay.  Like I said, you know, I could
16  make assumptions.  I could go to my downtown, you know,
17  city, and I could stand in line and I'd ask.
18      Q.  Okay.
19      A.  And my guess is, they'd either say we have it
20  or we don't have it or to come, or they'd say, "Here it
21  is."
22      Q.  Okay.
23      A.  You know.  Here in Austin, I've done it before,
24  because I've to get passports, and it's not that long.
25      Q.  Okay.  Any idea, not that long, matter of

## 39

1  weeks?  Matter of days?
2      A.  I have a visual of myself standing in line and
3  asking for the documents.  When I was physically
4  present, it wasn't that long.
5      Q.  Oh, okay.
6      A.  When I was physically present.  Now, I don't
7  know if I called in, you know.  But when I was
8  physically present, it wasn't that long.
9      Q.  Okay.  How much does gas go for Hidalgo County
10  these days?
11      A.  It fluctuates.  Recently, it's gone down.  I
12  can make a guesstimate.  3.60.
13      Q.  Okay.  Approximately 3.60?
14      A.  Yeah.
15      Q.  Okay.  When was the last time you voted?
16      A.  I vote in every election.  It's a habit I've
17  started since college.  I make it a ritual.  I'm very
18  proud of the fact that I don't miss elections.
19      Q.  Did you vote yesterday?  Tuesday.  And I
20  apologize.
21      A.  I voted the first day of early voting.
22      Q.  Okay.  But did you vote in person?
23      A.  Yes.
24      Q.  Sorry about the confusion about the dates.
25      A.  That's okay.  I said, "Oh, my God, I missed

## 40

1  one."
2      Q.  How far is the early voting location from your
3  home?
4      A.  It's in my downtown.  All right.  Let me -- let
5  me -- give me a moment.
6      Q.  Sure.
7      A.  Of it's in my downtown.
8      Q.  So about how many miles is that from your
9  house?
10      A.  Five, six.
11      Q.  Okay.  And do you know where your precinct is
12  if you would have voted on election day?
13      A.  Yes.  14.
14      Q.  And do you know how close that is to your
15  house?
16      A.  Just a couple of blocks away.
17      Q.  Okay.  So closer than your driver's license
18  office?
19      A.  Yes.  About halfway.  About a third.
20      Q.  What ID are you carrying today?
21      A.  I have a driver's license.  I have a concealed
22  handgun license.  Yes, that's what I have with me.
23      Q.  I'll make sure to keep my questions very
24  friendly.
25      A.  (Laughing).

REPRESENTATIVE AARON PENA                                   JUNE 01, 2012

## 41

1   Q.   And which of those IDs have photo IDs?
2   A.   This is Texas, okay?  It's just Texas, don't be
3   intimidated.  Go ahead.  I'm sorry.
4   Q.   Which of those IDs have photos?
5   A.   Both of them.
6   Q.   Okay.  And do either of them establish
7   citizenship?
8   A.   Hmm.  I will say to get your Texas driver's
9   license, you have to go through a process that -- that I
10  believe proves citizenship.
11  Q.   Can a long-term permanent resident get a Texas
12  driver's license?
13  A.   I can't answer the question.
14  Q.   And do you know if a green card holder who
15  lives in Texas and is waiting the amount of time that
16  they need to get citizenship, can they get a Texas
17  driver's license?
18  A.   I can take a guess, but I don't have a clear
19  answer, so...
20  Q.   So you're not certain if a Texas driver's
21  license establishes citizenship; is that correct?
22  A.   I will just say more likely than not that it
23  does establish citizenship, but there may be an
24  exception that I'm unaware of.
25  Q.   Is there any marker on your driver's license

## 42

1   that says that you're a citizen?
2   A.   Not on my driver's license.
3   Q.   Okay.  And have you ever seen a Texas driver's
4   license that indicates that someone is a noncitizen?
5   A.   I have heard that there is something like
6   that.  Somebody told me that.  But I don't know with
7   certainty.
8   Q.   Okay.  But your license to carry does not
9   indicate citizenship either; is that correct?
10  A.   No, but --
11  Q.   You can check, if you'd like.
12  A.   Yeah.  I don't think so.  I don't look at it
13  that much.  No, I don't see it.
14  Q.   Okay.  And can I just ask:  If someone is a
15  refugee from another country and lives in Texas now and
16  they're, you know, under asylum status, they wouldn't be
17  able to have driver's license from that other country;
18  is that correct?
19  A.   I can't answer with certainty.
20  Q.   But there's no -- but they'd still be able to
21  get a driver's license and drive?
22  A.   You mean, if they have formal asylum?
23  Q.   Yes.
24  A.   I can't answer with certainty, but it sounds
25  reasonable.  I'm guessing.  I don't know.

## 43

1   Q.   Okay.  If you don't know, you don't know.
2        And do you have a passport?
3   A.   Yes.
4   Q.   Do you have any form of military ID?
5   A.   Yes.
6   Q.   And a passport does establish citizenship,
7   correct?
8   A.   Yes.
9   Q.   Does military ID?
10  A.   I've never -- I don't recall anybody asking me
11  that question.
12  Q.   When did you serve in the military?
13  A.   I'm a member of the Texas State Guard, which is
14  a state militia.
15  Q.   What other types of ID are produced by the
16  state of Texas; are you aware?
17  A.   I've heard that there is an ID you can get that
18  simply identifies who you are.
19  Q.   So a nondriver ID?
20  A.   Right.
21  Q.   Anything else?
22  A.   Hmm.  Not that I'm aware of.
23  Q.   Do you have a legislator ID?
24  A.   Yes.
25  Q.   Does it have your picture on it?

## 44

1   A.   Yes.
2   Q.   So does that establish who you are?
3   A.   These are informal internal documents used by
4   the Capitol for security purposes.  I think there is one
5   of them that's issued by the State of Texas, DPS.  But
6   quite frankly, I think they're internal documents used
7   for management of personnel.
8   Q.   But if you were to show that to someone, it
9   would have your name and your photo, correct?
10  A.   Yes.
11  Q.   And so it would -- it would establish you are
12  Aaron Pena, correct?
13  A.   No, I assume they could be -- well, the
14  security levels are probably not as high.  Because I
15  simply go into an office and ask for my photo to be
16  taken.  I mean, they have to confirm who I am, but they
17  don't -- there's not a whole lot of security protocols,
18  I'm sure.  I can't answer with certainty.
19  Q.   Do you have that legislator ID on you now?
20  A.   I can check.  I probably don't, because it's
21  not a -- you know, the wallet gets real thick and it's
22  not an essential.  Okay.  Let me say that this is a
23  security magnetic card that allows access.  It's one of
24  the many IDs that they give us, okay?
25  Q.   And it has your photo on it?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

## 45

1     A.   Yes, it does.
2     Q.   And your name?
3     A.   Yes, it does.
4     Q.   And an expiration date?
5     A.   No.  Well, I guess by saying 82nd Legislative
6  Session, that's somewhat of an expiration.
7     Q.   So as of January 2011, it will no longer be
8  valid?
9     A.   I mean, my terms goes -- yes, that's correct.
10    Q.   Okay.  So that establishes your identity,
11 doesn't it?
12    A.   It doesn't have the security protocols that --
13 that I'm sure the State of Texas requires.  I know that
14 we have -- we follow some of the ID requirements out of
15 the federal government.  So I'm not sure what those are.
16    Q.   Does your license to carry have more security
17 features on it?
18    A.   Yes.
19    Q.   And what are those features?
20    A.   Well, if you look at it, you have to turn it
21 sideways, but you can see a -- and I don't know the
22 term.  It's kind of a ink that is apparent when you turn
23 it sideways.  And then the same with the star there.  Do
24 you see that?  It's hard to put in words.  But it is a
25 security, and then it has magnetic strip as well

## 46

1  containing information.
2     Q.   Are those all the security features?
3     A.   I'm not aware of what additional security
4  features are in it.
5     Q.   Does the State of Texas produce any other
6  employee --
7     A.   Oh, I'm sorry.  There's also an embossed number
8  here.
9     Q.   Okay.  Does the State of Texas produce any
10 other employee IDs?  For example, employees of the
11 office the Attorney General or the --
12    A.   Sure.  I'm sure there's internal management
13 cards that they issue.
14    Q.   Do Texas public universities produce student
15 IDs?
16    A.   I had one when I was at school.
17    Q.   Did it have a photo?
18    A.   I can't recall, but I would assume.
19    Q.   Do those documents establish an individual's
20 identity?
21    A.   Yes.  The levels of security, though, are very
22 weak.  I mean, they could be forged.
23    Q.   Is it your position that a driver's license
24 cannot be forged?
25    A.   No.  I assume everything could be forged.

## 47

1     Q.   And --
2     A.   But it's harder, you know?
3     Q.   And are there -- you mentioned the particular
4  security features of a Texas concealed handgun license.
5  Are there similar features on a Texas driver license?
6     A.   Yes.
7     Q.   And is there any equipment that's needed to
8  utilize any of those security features, like a black
9  light or a barcode reader?
10    A.   Yes.  I would assume yes, because I've noted
11 that when I go to the airport, they look at it with a
12 light and they turn it.  So I assume there's some
13 security feature they're looking for.
14    Q.   Do they have those blacks lights and barcode
15 readers at polling places?
16    A.   Hmm.  I don't think so.  They could have a
17 light, but I don't think they have the training or have
18 knowledge of the security features.
19    Q.   And so for purposes the polling place, those
20 security features aren't really going to be helpful,
21 will they?
22    A.   I don't understand your question.
23    Q.   For a poll worker who doesn't have the black
24 light, who doesn't have the scanning machine, and you
25 said doesn't have the training, the difference between

## 48

1  your legislator ID and a Texas driver license, it's not
2  really going to make a difference, will it?
3     A.   Sure.  I mean, you can feel more comfortable
4  that the Texas driver's license is who you are than a
5  university ID.
6     Q.   And what's your basis for that?
7     A.   Oh, well, you know, I am aware that we follow
8  certain protocols that the federal government -- I
9  forget what it's called.  I forget what the law is.  But
10 there are certain protocols that the government is
11 imposing on the states.
12    Q.   Uh-huh.
13    A.   Whatever that law is, I'm aware of it, because
14 we've had to deal with it in the Homeland Security
15 Committee.
16    Q.   Is that the Real ID Act?
17    A.   That's very good.  Very good.
18    Q.   I'm just trying to help.
19    A.   And then I am aware of these new features that
20 have been added to the drivers' licenses.  They were not
21 there before.  These are hard to duplicate.  I assume
22 anything could be duplicated, but it makes it very
23 hard.  The magnetic strip, I'm not sure what's contained
24 on it, but I know that it's used.
25    Q.   Is it -- have you ever seen a Texas citizen --

REPRESENTATIVE AARON PENA                              JUNE 01, 2012

## 49

1   or not a Texas citizenship certificate -- excuse me -- a
2   citizenship certificate used as a form of ID with a
3   photo?
4       A.   You mean a United States citizenship?
5       Q.   Uh-huh.
6       A.   No, I've never seen one.  Where can you get one
7   of those?
8       Q.   And do you know if those citizenship
9   certificates have similar security features to what
10  you've described?
11      A.   I've never seen one.  I don't know.
12      Q.   Okay.
13      A.   You've caused me to want to have one.
14      Q.   I think it may be for new citizens.
15      A.   Oh, okay.
16      Q.   But I'm not sure.
17           What's the drinking age in Texas?
18      A.   21.
19      Q.   And are you aware of whether anyone under the
20  age of 21 has ever created a counterfeit driver license
21  in Texas?
22      A.   In the old days, I'd say yes.  Nowadays,
23  people -- with the security features, it's very hard to
24  make a credible one.
25      Q.   And what's your basis for saying that it's hard

## 50

1   to create a credible one?
2       A.   Well, I've heard them talk about these security
3   features on the driver's license and how they make it
4   more difficult for people to create them.
5       Q.   But do you think that -- do you think that no
6   one is creating fake Texas IDs to get alcohol anymore?
7       A.   I don't have any personal knowledge.  I just
8   remember as a kid, you know, people would try to create
9   them.  But we didn't have a whole lot of safety features
10  at the ID.
11      Q.   Did it work?
12      A.   Oh, I didn't do it.  I just had friends who
13  said they did it.
14      Q.   Are you aware of how many convictions for the
15  use of fake IDs have been obtained in the state of Texas
16  in the last 20 years?
17      A.   No, I'm not.
18      Q.   Are you aware of how many fake IDs have been
19  seized at bars and clubs, et cetera?
20      A.   No, I'm not.
21      Q.   Do you know how many investigated incidents
22  there have been related to the use of fake IDs in Texas
23  in the last 20 years?
24      A.   No.
25      Q.   Do you have if SB 14 provides any financing for

## 51

1   polling places to have those black lights that we
2   discussed to test the validity of the Texas driver's
3   license?
4       A.   You know, I don't remember that being
5   discussed.
6       Q.   Where do you get information about elections?
7   What sources do you use?
8       A.   I am a consumer, a heavy consumer of all
9   information on the Internet, in the newspapers.  I
10  listen to -- I'm a news junkie.  When I'm in the
11  Capitol, there's all kinds of information we're
12  bombarded with.
13      Q.   Any particular newspapers or websites that you
14  focus on?
15      A.   The New York Times.  Well, look.  Okay.
16  Everything.
17      Q.   Okay.
18      A.   In this country and in other countries, even
19  when the language is difficult for me to read.
20      Q.   For Texas news, what are your top two?
21      A.   Hmm.  Dallas Morning News, and either the Texas
22  Tribune or Harvey Kronberg's Quorum Report, which is an
23  aggregation of news.
24      Q.   Do you read the McAllen Monitor?
25      A.   Oh, yeah, religiously.  Listen, I read nearly

## 52

1   every paper that I can get my hands on.
2       Q.   Okay.  Do you watch any TV news?
3       A.   Yes.
4       Q.   What channels do you watch?
5       A.   MSNBC, Fox News, CNN, Univision, Telemundo.  If
6   there is a news outlet and it's available to me, I watch
7   it.
8       Q.   Okay.  Giving your remote a workout.
9            Do you listen to any talk radio?
10      A.   Yes, I do.
11      Q.   What do you listen to?
12      A.   Well, if something is pinpointed on the
13  Internet as something to listen to, I will listen to it.
14      Q.   Okay.
15      A.   Of political interest.
16      Q.   Uh-huh.
17      A.   I listen to the Houston Talk Radio, 92 FM.  I
18  listen to KTRH out of Houston.  I listen to the 710 talk
19  radio in McAllen.  I listen to KTRH, 1200 in
20  San Antonio.  590 in San Antonio.  550 -- no, not 550.
21  I listen to Internet radio.
22      Q.   Okay.
23      A.   If it is on the air, and it has to do with
24  politics or culturally-interesting subjects, I will
25  listen to it.

## 61

1   A.  Okay.  What I'm given each day.

2   Q.  Uh-huh.

3   A.  The legislative analysis, all the stuff that

4   people give us from the outside, outside of government,

5   interest groups, what not that they want us to read,

6   it's usually put in a folder and I carry it to the

7   floor.  And then on the floor after the day is up, that

8   material is usually not important for any other day.  So

9   I'll either put it under my desk where it will sit until

10  it ages to a point to where, you know -- I could have

11  access to it, but it ages to the point where I just need

12  to throw it away.  Or I'll hand it to my staff and say

13  "Here, figure out what you're going to do with this

14  stuff," and it probably is trashed.  Because unless it's

15  a long-running issue, I just see no reason to keep all

16  that paper piling up.  We have a blue trash can in the

17  corner, everything is put in the recycle, and so I don't

18  know the answer with certainty.

19  Q.  Okay.  You said your chiefs of staff.  Who is

20  that besides Mari Deleon?

21  A.  Mari is the one from here.  Although my former

22  chief of staff from here moved to the Valley, and so he

23  maintains the title for the Valley.  He's a more senior

24  member than Mari Deleon.  So --

25  Q.  Okay.

## 62

1   A.  -- he occasionally exerts his authority by

2   saying "Let's do things this way."

3   Q.  And that's Orlando?

4   A.  Orlando.

5   Q.  Okay.  And so you don't -- you're not aware of

6   any retention policy related to documents for your

7   office?

8   A.  I don't like to see a lot of paper in my

9   office.  I don't like to see file cabinets.  There's

10  just no purpose for it.  Information -- we're bombarded

11  with information, and if you don't get rid of it, it's

12  going to just consume you.  So we get rid of it.  And I

13  don't want paper sitting around.  If I need information

14  or I need to have the information one more time, people

15  are glad to give it to me.  So --

16  Q.  Okay.  Now, you had said you do maintain files

17  on some long-running issues.  What are some of those

18  issues?

19  A.  We would keep clippings from the Valley,

20  clippings where -- where we appeared.

21  Q.  Uh-huh.

22  A.  When I was in early in my career, I would keep

23  a folder on subjects, you know, I thought I could read

24  everything.  But now, it's just -- I know where to get

25  my information.  There are all kinds of channels like

## 63

1   caucuses that where we gather information, and it is you

2   read it and you get rid of it.

3   Q.  With regard to those policy issues that earlier

4   in your career you kept things around, what were those

5   issues?  Do you remember?

6   A.  I think the medical school in Harlingen, the

7   drug treatment center that we tried to achieve.  Some of

8   the airport -- the Edinburg airport issues.

9   Q.  Okay.  So was voter ID one of those issues?

10  A.  No.  I came into the session knowing how I was

11  going to vote.  Absent some oppressive, overly

12  oppressive requirements, you know, I knew how I was

13  going to vote.

14  Q.  Do you maintain files on your X or Y drive

15  concerning particular legislation?

16  A.  Not that I'm aware of.

17  Q.  How did you know how you were going to vote on

18  voter ID coming into the session?

19      MR. HUGHES:  I'm going to instruct on

20  legislative privilege, and not to reveal thoughts,

21  mental impressions, opinions about legislation,

22  including voter ID, and don't reveal communications that

23  you've had with legislators, legislative staff, any

24  state agency, legislative council or constituents

25  concerning the same.

## 64

1       MR. FREEMAN:  Mr. Hughes, with regard to

2   constituents, I think it's pretty clear from the court's

3   order concerning the Lieutenant Governor, that

4   constituent communications are not privileged, and the

5   responses to those communications are public.  Can we

6   agree on that?

7       MR. HUGHES:  One moment.

8       MR. FREEMAN:  The May 28th order, if

9   that's helpful.

10      MR. HUGHES:  What part of the order are

11  you talking about?

12      MR. FREEMAN:  It's the very end of the

13  order.

14      MR. HUGHES:  Yeah.  I'll revise my

15  instruction.  Again, don't offer testimony concerning

16  your thoughts, mental impressions, opinions about

17  legislation, including Senate Bill 14, and don't reveal

18  communications you've had with legislators, legislative

19  staff or any state agency concerning the same.

20  A.  Okay.  And you said that I would not be -- that

21  outside that privilege was communications with --

22  Q.  Constituents?

23  A.  Constituents.

24  Q.  We have some further disagreements with your

25  counsel, but I just thought that was one that was

65

```
 1    relatively --
 2         MR. HUGHES:  For the record, I think the
 3    communications with constituents is already part of the
 4    legislative transcript regarding Representative Pena's
 5    testimony on the floor so it's out there either way.
 6         MR. FREEMAN:  Sure.  Sure.
 7    Q.   (By Mr. Freeman)  I just wanted you to explain
 8    the statement --
 9    A.   I don't have any specific communications that I
10    can identify.
11    Q.   Okay.
12    A.   But I can tell you that the communications that
13    I got from constituents were generally -- there's too
14    much corruption here where we live.  There was too much
15    electoral corruption, especially in the Delta community,
16    which is a poor farming community where my family is
17    from.  It's adjacent to my home base which is Edinburg.
18    And in the La Joya-Sullivan City area and in the
19    outskirts of Edinburg, that electoral corruption had
20    gotten really bad and had reached -- there was a certain
21    amount that we all kind of know exists, and we kind
22    of -- like a fly that you just want it to go away but it
23    doesn't go away.  But it had reached the point where
24    even the organizations that were -- that had encouraged
25    that sort of behavior were stepping forward and saying
```

66

```
 1    "It's gotten too far.  We've got to put a stop to it."
 2         Specifically, I remember the BEE Club, the
 3    Better Edcouch-Elsa community organization, and the TACO
 4    Club.  The Delta area community organization had come to
 5    me wanting to stop the corruption, the voter
 6    corruption.  And then -- okay.  That was a constituent
 7    -- those were constituent communications.
 8         Then also from many of the same people,
 9    there was a sense of that voter ID is a good thing.  The
10    only time I had somebody say it was a bad thing were
11    from activists, activists from the Democratic ranks.  I
12    heard it in speeches and what not.
13    Q.   And when they said voter ID is a good thing,
14    did they explain what they meant by that?
15    A.   They wanted -- they wanted somebody to do
16    something.  They just wanted -- it was getting worse and
17    worse, and they wanted somebody to do something.
18    Q.   But doesn't Texas already have some kind of law
19    that requires some form of identification prior to
20    voting in person that requires you to establish your
21    identity?
22    A.   Okay.  Ask your question again.
23    Q.   Doesn't Texas already have a law that requires
24    you to establish your identity when you vote in person?
25    A.   And that law is?
```

67

```
 1    Q.   Well, I'm asking.
 2    A.   Well, you know, I sometimes I'd have my card,
 3    my voter card, and I hand it to them.  But I live in
 4    such a small town, everybody knows who I am, so they
 5    just say, "Oh, Mr. Pena, come on in."  But I usually
 6    give them the card so they can stamp it.  But I -- I'm
 7    the sort of the person that hands an ID every time I
 8    vote.
 9    Q.   But they -- you have to under Texas law show
10    that voter registration card or some alternative form of
11    ID in order to vote in person, correct?
12    A.   Okay.  I'll accept what you say.
13    Q.   But you don't need to show ID similarly to vote
14    by mail, right?
15    A.   I don't think so.
16    Q.   And so when people were saying that they wanted
17    you to deal with corruption and to deal with that fly
18    that you mentioned before, were they talking about --
19    A.   It was greater than a fly.  The fly was the
20    standard operating procedure, but it had reached
21    proportions that they just said it's got to stop.  It's
22    getting out of hand.
23    Q.   A swarm of flies?
24    A.   Okay.
25    Q.   Were they talking about in-person voting, or
```

68

```
 1    were they talking about mail-in ballots?
 2    A.   They were talking about all forms of voter
 3    fraud.  That's my sense.
 4    Q.   Were they talking about voter impersonation?
 5    A.   Yeah.  I would assume that's part of it.  But
 6    you're asking me to assume what other people were
 7    telling me, but it was general statements like "This has
 8    got to stop.  This is bad.  Things are getting out of
 9    hand."
10    Q.   Did anyone ever specifically say this voter
11    impersonation has got to stop?  People are coming in and
12    --
13    A.   Nobody talks like that.  We don't use those
14    words.
15    Q.   Did they ever say "It's got to stop.  People
16    are coming in and showing a registration card saying
17    they're someone else and voting for someone else"?
18    A.   I've heard that from the McAllen community but
19    not from the Delta community.
20    Q.   Is there ever any -- so you came into this
21    session knowing that you were going to vote specifically
22    in favor of voter ID unless they were overly oppressive
23    requirements.  That was your testimony earlier, right?
24    A.   Yes.
25    Q.   And so did anyone -- did you make any promises
```

## 73

1  figure out what the proper protocol is from hence
2  forward.
3      Q.  Okay.  And so you are unable to answer with
4  regard to any promises that were made by you or to you
5  because of the legislative privilege, is that your
6  testimony?
7          MR. HUGHES:  Same instruction.
8      A.  Am I able to answer?  Okay.  I'm going to
9  answer.
10         MR. HUGHES:  Can you repeat the question?
11         MR. FREEMAN:  I was just asking if he's
12  unable to answer concerning any promises that were made
13  by him or to him concerning legislative -- or concerning
14  voter ID because of his privilege assertion.
15         MR. HUGHES:  Same instruction.
16     A.  I'm physically able to answer but because of
17  the instruction, I'm going to follow the advice of
18  counsel.
19     Q.  (By Mr. Freeman)  Now, you had said before that
20  you were going to support voter ID unless there were any
21  overly oppressive requirements.
22     A.  Yes.
23     Q.  What did you mean by that?
24     A.  Well, I can -- I can -- I was waiting to see
25  what somebody was going to suggest, but requiring

## 74

1  multiple IDs, you know, that's an example, something
2  that I thought was overly oppressive.
3      Q.  Anything else?
4      A.  Well, you know, people are creative, and they
5  would have come up with something, but I wasn't going to
6  -- I wasn't going to allow something overly oppressive
7  to keep people from voting.  This in my opinion is not
8  overly oppressive.
9      Q.  Okay.  Do you believe that compliance with the
10  Texas constitution is an important consideration in the
11  law-making process?
12         MR. HUGHES:  And again, this is going to
13  get old.  But I want to instruct you with respect to
14  legislative privilege, not to reveal thoughts, mental
15  impressions or opinions about legislation, including
16  Senate Bill 14.  And to the extent this question calls
17  for testimony concerning your mental impressions,
18  opinions about Senate Bill 14, I instruct you not to
19  answer, to that extent only.
20     A.  Look, like any lawyer, the law should be
21  followed, unless you're attempting to make a challenge,
22  to extend the law, to change the law.  The law should
23  always be followed.
24     Q.  (By Mr. Freeman)  What steps do you take to
25  ensure that a bill you're working on or voting on

## 75

1  complies with the Texas constitution?
2          MR. HUGHES:  I'm going to offer the same
3  instruction on legislative privilege, not to answer to
4  the extent that calls for revealing communications with
5  other legislators, legislative staff, any state agency,
6  including the Texas Legislative Council, or to the
7  extent it calls for you to reveal your thoughts, mental
8  impressions or opinions about legislation.
9      A.  I can use my own training as a lawyer.
10     Q.  (By Mr. Freeman)  Anything else?
11     A.  The adversarial process will ferret things out.
12     Q.  So is it your understanding that sometimes
13  things make it out of the legislature that don't comply
14  with the Texas constitution, but people fight it out in
15  litigation, and that's part of the process?
16         MR. HUGHES:  Same instruction.
17     A.  No.  That's not what I meant when I said that.
18     Q.  Okay.
19     A.  What I meant was --
20     Q.  Please clarify.
21     A.  There's a -- there are multiple positions taken
22  on a bill, and the adversarial system will cause the
23  opposing side to raise the issue.
24     Q.  Okay.
25     A.  And but there are other controls involving

## 76

1  lawyers and what not that are -- that are present.
2      Q.  I guess I'm more curious what's your process?
3  You said you rely on your own training as a lawyer.
4  Anything else?
5          MR. HUGHES:  Same instruction.  Don't
6  answer to the extent it calls for you to reveal
7  communications with other legislators, legislative
8  staff, or any state agency, including the Texas
9  Legislative Council.
10     A.  Yeah.  I think I answered it with the previous
11  question.
12     Q.  (By Mr. Freeman)  Okay.  Do you believe
13  compliance with federal law is an important
14  consideration in the law-making process?
15     A.  Yeah.  I'll give the same answer I gave to the
16  state law.  We should always try to follow the law.  And
17  absent an attempt to extend it or challenge it, that's
18  what you ought to do.
19     Q.  And do you believe compliance with the federal
20  Voting Rights Act is an important consideration in the
21  law-making process?
22         MR. HUGHES:  I'm going to continue to give
23  the same instruction to you, which is not to answer to
24  the extent that answer calls for you to reveal your
25  thoughts, mental impressions, opinions about

## 77

1  legislation, including voter ID.
2      A.   The same answers I gave before apply to this
3  one.
4      Q.   And was part of the purpose of SB 14 to
5  challenge the federal Voting Rights Act as you described
6  it previously?
7           MR. HUGHES:  Again, I'm going to instruct
8  you not to answer to the extent the answer calls for you
9  to reveal your thoughts, mental impressions, opinions
10  about legislation, including Senate Bill 14, and don't
11  reveal communications that you've had with legislators,
12  legislative staff, any state agency, including the Texas
13  Legislative Council.
14           MR. FREEMAN:  Mr. Hughes, two things:
15  First, I thought that I was under the impression that
16  you were going to try to limit speaking objections.
17           MR. HUGHES:  These aren't speaking
18  objections.  These are asserting my legislative
19  privilege objection.
20           MR. FREEMAN:  It's a lengthy objection,
21  and we're trying to move this along for everyone's
22  benefit.
23           Secondly, I think it's pretty clear under
24  the Jewish War Veterans' decision that information
25  relating to the overall purpose of a legislative act,

## 78

1  rather than the individual motivations of the
2  legislators, is not covered by the privilege.  And I
3  believe that when this issue was raised during the first
4  week of depositions, that the State of Texas conceded
5  that point and allowed us to pursue questioning
6  concerning the purpose of the bill.
7           MR. HUGHES:  You can ask about the
8  publicly stated purposes of the bill.  You can't ask
9  about the mental impressions, deliberations, back-room
10  discussions that may or may not have occurred.  That's
11  all covered by the privilege.
12           MR. FREEMAN:  I'm not asking about
13  individual motivation, but I am going to ask about
14  nonpublic purposes, which the purpose of the bill and
15  are covered by -- that are not covered by the
16  legislative privilege, regardless of whether someone got
17  up on the floor and said it.
18           And I believe the State of Texas has
19  already agreed, and I hope we do not have to -- I mean
20  we got on the call or we got on the -- we sent out a
21  letter, I believe, with the state to the court and
22  resolved this issue.  And if we have to take a break to
23  pull that up that letter, I'm happy to do so.
24           Let's go off the record for a second and
25  we'll get that and see if we can resolve this, because I

## 79

1  don't want to be fighting this out all day.
2           (Recess taken from 11:33 a.m.to
3  11:38 a.m.)
4           MR. FREEMAN:  Would you read back the last
5  question?
6           (Requested portion read back by the court
7  reporter.)
8           MR. HUGHES:  I will -- my objection to
9  that is that you -- that you -- based on legislative
10  privilege, is that you may testify pursuant to the
11  court's order about the general purpose or the purpose
12  of the legislature as a whole in enacting Senate Bill
13  14, as opposed to the subjective intent of any
14  particular legislator.  But you may not answer or reveal
15  communications that you had with the legislators,
16  legislative staff, members of any state agency, and so
17  forth.
18      A.   The purpose of the bill was to respond to the
19  desires of the community, which is reflected in what I
20  was told as I described to you.  And the public polls
21  have shown overwhelming support, not only in the Anglo
22  community but the minority community, the Hispanic
23  community.  Those polls were done by the University of
24  Texas and the Texas Tribune and have been done by
25  others.  As to -- as to the intent from other

## 80

1  legislators, I can't speak for them.  But that was my
2  intent.
3      Q.   (By Mr. Freeman)  Okay.  But in terms of the
4  purpose, not -- not the primary purpose, but whether a
5  purpose of the bill was to challenge the federal Voting
6  Rights Act, as you've described earlier that compliance
7  may or may not be an important purpose if you're trying
8  to push back against the law, was a purpose of the bill
9  to do that?
10           MR. HUGHES:  And again, the -- I'm
11  instructing you based on legislative privilege not to
12  answer other than an answer concerning the general
13  purpose of Senate Bill 14 and not the subjective or
14  individualized purpose of any legislator.
15      A.   The two purposes that I answered were the
16  purpose that I had.
17           MR. FREEMAN:  Mr. Hughes, I'll ask if the
18  question is not objectionable, will you not give that --
19  give that instruction as you are interfering with the
20  examination by doing so.  Thank you.
21      Q.   (By Mr. Freeman)  What committees do you
22  currently sit on?
23      A.   Okay.  Including subcommittees?
24      Q.   Just committees?
25      A.   Okay.  Homeland Security.  It may be called by

## 81

1    a different name, but that's essentially what we call
2    it.  The Technology Committee, which I chair.  There are
3    a couple of select committees.  Oh, okay.  One of them
4    has to do with -- that the voter ID went through, and I
5    think that was called the Committee on -- I forget the
6    name.
7        Q.   Was it Voter Identification and Voter Fraud?
8        A.   Very good.
9        Q.   Were you on any other select committees?
10       A.   Yes.  But I can't recall their names.
11       Q.   Okay.  What is a select committee?
12       A.   A select committee is one that where a
13   committee is created.  It's not a standing committee.
14   It's created for a specific purpose.  And the committee
15   is hand-picked.  Well, they're all -- I guess they're
16   all hand-picked for a specific purpose.
17       Q.   Okay.  Are you aware of who picked the name,
18   "Select Committee on Voter Identification and Voter
19   Fraud?"
20       A.   No.
21       Q.   Are you aware of whether there have been any
22   other select committees relating to voting or elections
23   in the current or past legislatures in which you served?
24       A.   I served on the Elections Committee.
25       Q.   But were there any other select committees

## 82

1    distinct from elections?
2        A.   There may have been.  I don't recall.
3        Q.   Okay.  Are you aware of any other select
4    committees that relate directly to a standing committee
5    in the way that Select Committee on Voter Identification
6    and Voter Fraud relates directly to elections?
7        A.   I was on the Emergency Management select
8    committee.  And that related to -- even though that was
9    covered by the homeland -- was the Homeland Security
10   Committee in existence?  Okay.  Yes, vaguely.  Okay?  I
11   was on a select committee that had to do with the
12   subject area of another committee.
13       Q.   Okay.
14       A.   Border Affairs and Homeland Security, and we
15   handled emergency preparedness and homeland security.
16       Q.   Okay.
17       A.   And I was the chair of that committee.
18       Q.   Okay.  Was the Select Committee on Voter
19   Identification and Voter Fraud a fast-track committee?
20       A.   I can't answer that.  I don't know.
21       Q.   This exhibit has previously been marked as U.S.
22   Exhibit 12.  And do you see at the bottom of the page
23   where key -- after key facts on committees -- well,
24   first, have you seen this document before?
25       A.   Never, not that I can recall.

## 83

1        Q.   What is this document?
2        A.   It appears to be a document, a press release,
3    announcing House committee assignments.
4        Q.   Okay.  And do you see on the second to the last
5    page where next to Select Committee on Voter
6    Identification and Voter Fraud, it italics says
7    "fast-track"?
8        A.   I do see that.
9        Q.   Do you have any idea what that means?
10       A.   I didn't put it there so I don't know.
11       Q.   Have you ever seen any other committee
12   designated as a fast-track committee?
13       A.   No.  And I've never -- other than this
14   document, I've never seen this committee referred to as
15   a fast-track committee.
16       Q.   Okay.  How many bills did the Select Committee
17   on Voter Identification and Voter Fraud consider?
18       A.   You know, I know I had a bunch of bills in the
19   committee.  Hold on a second.  They did go to
20   elections.  I think they was scattered all over the
21   place.  Yes.  They went to elections.  No.  The answer
22   is no, I can't give you a specific answer.
23       Q.   Let's see if I can refresh your recollection.
24   This document is --
25       A.   Oh, you know what?  Forgive me.  Forgive

## 84

1    me.  State it again, please, the question.
2        Q.   Do you know how many bills the Select Committee
3    on Voter Identification and Voter Fraud considered?
4        A.   To answer your specific question, no, I don't,
5    but I recalled something else.  But go ahead and ask
6    your next question.
7        Q.   Well, let's just see if I can refresh your
8    recollection.  This document has already been marked as
9    Exhibit 13.  First off, what did you recall in response
10   to my question?
11       A.   I can recall that the committee chair for his
12   own -- got frustrated, but I think it gets into the
13   legislative privilege.
14       Q.   Okay.
15       A.   And -- okay.
16       Q.   Having now looked at this document, first, have
17   you seen this document before?
18       A.   Yes.  Something -- if not, something similar.
19       Q.   Okay.  So you're able to recognize what this
20   document is?
21       A.   Yeah.
22       Q.   What is this document?
23       A.   It's -- this document contains information that
24   -- in a format that describes, that we regularly see,
25   that describes, you know, what the bill is, who the

85

1    authors are, who the sponsors are, and the caption,
2    which is a small blurb, describing the bill.
3          Q.   But this document also names the number of
4    bills that were considered by the Voter Identification
5    and Voter Fraud Committee, correct?
6          A.   Oh, I don't know if that's what that document
7    refers to.  If you tell me that's what it refers to, I
8    have nothing to contradict what you're saying.
9          Q.   Well, do you see at the top of the committee --
10   or at the top of the document it says, "Texas
11   Legislature Bills by Committee."  And so if you're happy
12   to accept my representation, I can say that it is the
13   Texas Legislature's website's report on --
14         A.   The number of bills.
15         Q.   -- the number of bills by committee.
16              So having looked at this document, can you
17   now let me know how many bills that select committee
18   that you were on considered?
19         A.   Well, you say it's one, that this represents
20   one, and I'll accept what you say, because I have
21   nothing --
22         Q.   Do you recall any other documents that -- or
23   excuse me, any other bills that you addressed
24   specifically in the context of that committee?
25         A.   Not that I can recall.

86

1          Q.   Okay.  Can you think of any other examples of a
2    select committee that heard only one bill?
3          A.   I can't think of one.
4          Q.   Did you ask to be on the Select Committee on
5    Voter Identification and Voter Fraud?
6          A.   No.  I was placed there.
7          Q.   Did you have any conversations as a general
8    matter concerning committee assignments prior to the
9    assignments being made in the 82nd Legislature?
10              MR. HUGHES:  I want to instruct you on
11   legislative privilege not to reveal communications or
12   thought -- communications relating to voter ID
13   legislation or your thoughts or mental impressions
14   relating to voter ID.  And I think the question about
15   committee assignments may invite testimony on that.  And
16   so with that limitation in mind, you can answer the
17   question.
18         A.   I had one communication.
19         Q.   (By Mr. Freeman)  Okay.
20         A.   And but it involved another legislator, so I'm
21   not going to get into it.
22              MR. HUGHES:  So, Mr. Hughes, this is what
23   the court has described as a privileged log type of
24   question.  I believe that I phrased the subject matter
25   pretty broadly.  I was trying to avoid any kind of

87

1    objection on this matter about committee assignments as
2    a general matter.
3              And therefore, within that general
4    subject matter, I believe that we are entitled to
5    discuss with the witness whether communications
6    occurred, when they occurred, where they occurred, and
7    with whom they occurred.  I will not go beyond that,
8    unless I'm making a record.  But I will understand that
9    you -- there's a legitimate dispute beyond that point.
10   But before that point, I do not believe there's a
11   legitimate dispute.
12              MR. HUGHES:  I think you're accurately
13   interpreting the court's guidance to us.
14              MR. FREEMAN:  Okay.
15              MR. HUGHES:  So if you asked your
16   questions that way.
17              MR. FREEMAN:  Well, I believe that my
18   question was asked that way.
19              MR. HUGHES:  Why don't you try again?
20              MR. FREEMAN:  Can we have it read back?
21   Sorry.
22              (Requested portion read back by the court
23   reporter.)
24              MR. HUGHES:  So now you can ask your next
25   question, because I think you've already got Step 1, the

88

1    court's guidance.
2          Q.   (By Mr. Freeman)  Who was that other
3    legislator?
4          A.   Speaker Strauss.
5          Q.   And when did that occur?
6          A.   I think a day or two prior to the announcement.
7          Q.   And was anyone else present?
8          A.   No.
9          Q.   And where did it occur?
10         A.   It occurred -- well, he somewhere, and I
11   was on the receiving end of a phone call.
12         Q.   Okay.  Did you discuss your assignments with
13   anyone after they were made?
14         A.   Other legislators.
15         Q.   Any other members of the Select Committee on
16   Voter Identification and Voter Fraud?
17         A.   No.  Well, you know, I mean, I may have bumped
18   into them and said, "Hey, I'm on the committee with
19   you."
20         Q.   Okay.
21         A.   But I'm taking a guess.
22         Q.   Okay.  Fair enough.
23              Now, you previously testified that you
24   were previously on the Elections Committee; is that
25   correct?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

89

1     A.   Yes.
2     Q.   What sessions were you on the Elections
3   Committee?
4     A.   I think the session before this last one so
5   probably the 81st.
6     Q.   Anything besides that?
7     A.   I don't recall.  It all blends.
8     Q.   And you were vice chairman of the Elections
9   Committee; is that correct?
10     A.   Yes.
11     Q.   What is the scope of the Elections Committee's
12   authority?
13     A.   We looked at elections-related bills.
14     Q.   So any bill related to the Texas elections
15   code?
16     A.   Yeah.  But of course, the bill had to be
17   referred to that committee.  Okay.  Because just because
18   it's within the purview of one doesn't mean it won't go
19   to another.
20     Q.   And who makes those referrals?
21     A.   The speaker's office is what I understand.
22     Q.   And what was your authority as the vice
23   chairman of the Elections Committee?
24     A.   My job was to substitute -- to be the
25   substitute for the chairman when he was not present.

---

90

1     Q.   Is it typical for the vice chairman to be of
2   the opposing party to the chairman?
3     A.   That is a recent custom, yes.
4     Q.   Is there any, as a matter of custom, and this
5   doesn't even need to be restricted to the Elections
6   Committee, but typically, do the chairman and vice
7   chairman organize the members of their party to some
8   extent within the committee?
9     A.   No.  That's not been my experience.
10     Q.   Okay.
11          MR. HUGHES:  It's like herding cats.
12     A.   Yeah.  Everybody is their own dictator.  They
13   all decide on their own.
14     Q.   (By Mr. Freeman)  Magic of the legislative
15   process.
16          Were you aware at the time of committee
17   assignments that the Select Committee on Voter
18   Identification and Voter Fraud would address only
19   in-person voter impersonation and not mail-in fraud
20   issues?
21     A.   I wasn't aware of what bills were going to be
22   referred.
23     Q.   Okay.  I guess I have another sort of
24   technical Texas Legislature question for you.  Some
25   bills have multiple sponsors, correct?

---

91

1     A.   Yes.
2     Q.   What does it mean to be a second or third
3   sponsor of a bill?
4     A.   That means you're -- you are lending your
5   support.  There's a lot of symbolism involved.  You're
6   lending your support and -- and other legislators will
7   look upon that as some guidance, at times, depending on
8   the legislator.  Sometimes they're given to people
9   because they asked for them early or they're best
10   friends with the author.  Sometimes it means nothing
11   more than they got there first and the author said okay.
12     Q.   Is there typically a speaking role on the floor
13   in debate associated with a second or third spot?
14     A.   When it comes to larger bills like the budget,
15   yes, it's customary that when it comes to a very large
16   bill, that they will break up discussions.  But no,
17   there's not necessarily a speaking role.
18     Q.   I'd like to talk to you about your district,
19   District 40.  Do you know how big your district is in
20   square miles?
21     A.   It's fairly large.
22     Q.   The Delta area, that's the area to the north of
23   Edinburg, correct?
24     A.   To the east of Edinburg.
25     Q.   East of Edinburg.  Okay.  But there's a whole

---

92

1   swath of northern Hidalgo County that's in your
2   district, right?
3     A.   Yeah.  That's what we call the "ranch country."
4     Q.   Okay.
5     A.   They're historic ranches, land-granted land
6   from the King of Spain to families that are still
7   there.  They're very proud of that.  So that's what we
8   call the "ranch land" or the -- yes.
9     Q.   The ranch land is big, right?
10     A.   It is big.
11     Q.   Okay.  How would you describe your district in
12   terms of its population?
13     A.   I would assume that it meets the parameters of
14   what the population ought to be --
15     Q.   Do you know --
16     A.   -- for a district.
17     Q.   Do you know approximately how big, how many
18   people are in a Texas House District?
19     A.   No.
20     Q.   Okay.
21     A.   No.  I could take a guess, but I don't know.
22     Q.   And how would you describe in it terms of its
23   demographics?
24     A.   Okay.  Let's start on the west side.  There's
25   an area called La Joya and Sullivan City.  Culturally

## 97

1    A.   Yes.  We've talked about this before in a prior
2  deposition.
3    Q.   We have.
4    A.   It used to be when I was a young boy, the Anglo
5  community was the more affluent.
6    Q.   Uh-huh.
7    A.   But in the '70s, and after the World War II
8  generation, the Hispanics had a chance to go college,
9  and that generation, my parent's generation got an
10  education.  And with NAFTA, and then some of the banks
11  are no longer -- they're owned by local folks, mainly
12  Hispanics.  When the banks started giving out access to
13  capital, many of the business people and Mexicans,
14  Mexicans, at least the ones who come over, are quite
15  affluent.  At least -- I'm talking about they're
16  affluent people from Monterey and other areas began to
17  move in, in addition to the large poor population.
18    Q.   Okay.
19    A.   And -- I don't know.  Did I answer -- what was
20  your question?
21    Q.   I guess my question was, and I can be a little
22  bit more specific --
23    A.   Okay.  But I want to get back to it.  I now
24  remember.
25    Q.   Okay.

## 98

1    A.   Today, the very affluent tend to be Mexican or
2  Mexican-American.  Anglos run in two streams.  They're
3  either the working class, oil field workers, truck
4  drivers, or farmers, descendants of farmers.  But many
5  of those folks on the lower end of the spectrum, a lot
6  of them have intermarried, so they're -- you know,
7  they're this new kind of folk.  They're like the rest of
8  us -- mutts.  They're mixed.  They're all -- you know
9  what I mean?  They're all mixed.
10    Q.   Yep.
11    A.   But then you have recent -- recent Anglos who
12  come in but they're working class folks.  Then you have
13  this very wealthy elite, but it's a small group of
14  people.
15    Q.   Okay.
16    A.   You will have the university community with
17  their professors and what not, and they're like regular
18  folks.  But I would say the most affluent in our
19  community are Mexicans or Mexican-Americans.
20    Q.   Okay.
21    A.   Mainly Mexicans.
22    Q.   So you previously said that a lot of your
23  district is working class.  Would you say that many of
24  the adults work for hourly wages?
25    A.   Yes.

## 99

1    Q.   Most adults?
2    A.   Yes.
3    Q.   Would you say that there's any difference
4  between the Anglo and Hispanic communities about who
5  works hourly versus working, as you said, all the time
6  but as more of a salary issue?
7    A.   Those differences were stark prior to the '70s.
8    Q.   Okay.
9    A.   Okay.  Thanks to good lawyers like this
10  gentleman over here (indicating Mr. Garza) and some of
11  the civil rights changes and things have changed.
12  Hispanics became empowered and are now the leaders of
13  the community.  And we are moving slowly, some of us,
14  into a post -- I want to believe a post-racial era.
15        I'm sorry.  I lost your question.
16    Q.   No.  I was just asking if you thought that
17  there was a difference in terms of between Anglo and
18  Hispanic communities --
19    A.   Yeah.
20    Q.   -- where the folks are more likely to work
21  hourly wage type of jobs?
22    A.   The Anglo community is smaller today in
23  comparison to the -- prior to the '70s.  Many of the
24  children of the Anglo families have moved on to
25  San Antonio --

## 100

1    Q.   Okay.
2    A.   -- and Dallas and other places.  Because they
3  wanted to marry.  And they -- prior to the '70s, it was
4  -- it was -- there was social limitations on marrying
5  other Hispanics.  Today, I don't think those -- those
6  limitations are generally not there.  And amongst the
7  poor, amongst the working class, they're not there.  I
8  mean, Anglo work poor will marry Hispanic poor
9  because -- but in the old days, prior to the '70s, I'd
10  say those limitations were there.
11    Q.   Okay.  By the way, let the record reflect that
12  when Representative Pena said that there was a good
13  lawyer over there, he was pointing at Mr. Jose Garza.
14    A.   Jose Garcia has been involved in many of those
15  civil rights cases and --
16    Q.   Does it -- do a lot of the Hispanic families in
17  your district not own cars?
18    A.   Most people own cars.
19    Q.   Are there some who don't?
20    A.   Yeah, like me.
21    Q.   Is there public transportation in your
22  district?
23    A.   Yes.  Not in the Delta area, not in La Joya-
24  Sullivan.  And you know what, probably not in the
25  Edinburg either.  But there is in McAllen.

REPRESENTATIVE AARON PENA                           JUNE 01, 2012

## 101

1    Q.   Okay.  How many precincts are there in your
2  district?
3    A.   I can't answer that.
4    Q.   Do you know how many polling places there are?
5    A.   No.  I can't answer that.
6    Q.   More than ten?
7    A.   That's a good guess.
8    Q.   Do you know how many driver's license offices
9  there are in your district?
10   A.   I'm aware of one.
11   Q.   Would you agree that for most voters, a polling
12  place is closer than a driver's license office?
13   A.   Yes.
14   Q.   How long does it usually take a voter to cast
15  their ballot in person?
16   A.   Depending on the election and who the
17  candidates are, whether or not it's a presidential cycle
18  or a gubernatorial cycle, I'll just take an average from
19  my personal experience, 15 minutes.
20   Q.   You described your constituents as being
21  working class, some of them as living on public
22  assistance.
23   A.   Most of them.
24   Q.   And would you say that a lot of your
25  constituents need all the wages that they make?

## 102

1    A.   I think we all do.
2    Q.   Would you agree that having to take a few hours
3  off from work would be a burden for those people?
4    A.   You mean to go vote?
5    Q.   For any purpose?
6    A.   Would be a burden, is that what you said?
7    Q.   Yeah.
8    A.   It would be an inconvenience, but it's not
9  significant.  Look, voting in itself is an
10  inconvenience, but it's a duty that we, I think we
11  should have.
12   Q.   For some of your constituents, would an
13  unexpected $22 expense be a burden?
14   A.   For me that would be a burden.
15   Q.   Okay.  Is there high voter turnout in your
16  district?
17   A.   You know, this last election cycle, we had one
18  of the highest turnouts when it comes to early voting.
19   Q.   Okay.
20   A.   But I will say that Hispanics, in general, do
21  not vote on the level of the general population,
22  whatever that means.  And that's a nationwide phenomena.
23   Q.   So I'd like to talk to you about forms of
24  photographic identification in Texas.  We talked about
25  this a little bit with the card you had in your wallet,

## 103

1  but just a couple of additional questions about
2  that.  Do you know how many registered voters in Texas
3  lack a driver's license, state ID card or a license to
4  carry a concealed weapon?
5    A.   You know, I've seen the numbers reported in the
6  newspaper, and I've seen the argument made by, I guess,
7  yourselves that have been reported in the paper, but I
8  don't recall the number.
9    Q.   Did you ever try to find out what that number
10  was at any point, you actively try?
11   A.   You mean, do I go around in my district and
12  say -- and do a sample survey and say how many people
13  have a license or don't?
14   Q.   That is not what I meant.
15   A.   Okay.
16   Q.   I'm wondering if you ever, you know, asked
17  with -- concerning voter ID, whether you ever tried to
18  find out from DPS --
19   A.   Those arguments --
20        MR. HUGHES:  Hold on.  I'm going to
21  instruct him with respect to legislative privilege, to
22  not reveal the substance of any communication that you
23  had concerning SB 14 or other legislation with any
24  legislators, legislative staff, or with any state
25  agency.

## 104

1        And Mr. Freeman is entitled to ask certain
2  foundational questions, but by fine-tuning the subject
3  matter like you're doing, you're getting into the
4  legislative privilege, so you need to kind of get more
5  general.  So let's try again.
6        MR. FREEMAN:  Okay.  I'll actually just
7  withdraw the question and take a step back.
8    Q.   (By Mr. Freeman)  You said you did at some
9  point see some information or arguments made.  Do you
10  know when you saw about the number of people who lack
11  IDs, do you remember when that was?
12   A.   I've seen it in the paper.  I don't recall
13  when.  I think arguments were made on the floor.
14   Q.   Okay.  Did you ever see any specific numbers?
15   A.   You know -- I can recall seeing it.
16   Q.   Okay.
17   A.   But I don't recall the number.
18   Q.   Was that before May of 2011?
19   A.   I don't know.
20   Q.   Okay.  Do you have any understanding of whether
21  some groups are more likely than others to lack those
22  types of ID?
23   A.   I assume that -- I'm making an assumption,
24  based on observation, that this has to do with
25  educational levels and economic levels.

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

## 105

1    Q.  I would describe that as inductive logic rather
2  than an assumption.
3        If -- and so you'd say that poor people
4  are more likely to not have these types of ID, correct?
5    A.  They're less likely than affluent people.
6    Q.  Yes.  Are poverty rates in Texas similar across
7  racial groups?
8    A.  No.  As I've described, prior to the '60s and
9  after the civil rights movement, Hispanics were largely
10 poor and undereducated.  And it's only been a generation
11 or two that we've been able to emerge.  You know,
12 emerge.
13   Q.  Okay.  But as of right now, isn't it the case
14 that Hispanics are much more likely to be poor than
15 Anglos in the state of Texas?
16   A.  I would -- you know, where I live.  Okay.  Your
17 question, let me answer your question.
18   Q.  Thank you.
19   A.  I would say yes.
20   Q.  Are you aware that Texas recently informed the
21 Attorney General that it was the state's belief that
22 there are 795,955 registered voters in the state of
23 Texas who lack a Texas driver's license, identification
24 card or a license to carry?
25   A.  I'm aware that you all -- that you all --

## 106

1  people from your position have made that assertion.
2  I've seen it in the paper.
3    Q.  Are you aware of whether the state has agreed
4  with that assertion?
5    A.  Oh, I don't know.  If you tell me it has, then
6  great.
7        MR. FREEMAN:  Well, let's -- if we can
8  have this marked as U.S. 371?
9        (Exhibit U.S. 371 marked for
10 identification.)
11   Q.  (By Mr. Freeman)  If you can just take a look
12 at that for a moment.
13   A.  Why don't you tell me what it says.
14       MR. HUGHES:  I want you to take the time
15 to look at it --
16       THE WITNESS:  Oh, okay.
17       MR. HUGHES:  -- see if you have questions
18 about it.
19       THE WITNESS:  Oh, okay.
20   Q.  (By Mr. Freeman)  Okay.  Are you aware that
21 Texas, that the State of Texas provided data to the
22 Attorney General stating that less than 70 percent of
23 the Spanish surnamed registered voters in Hidalgo County
24 have those types of necessary ID?
25   A.  Less than 70 percent?

## 107

1    Q.  Less than 70 percent.
2    A.  Is it -- that is information that the Justice
3  Department --
4    Q.  It's numbers that were given to the Justice
5  Department by the State of Texas.
6    A.  Okay.  No.  I was not aware of that.
7    Q.  Do you know where a voter can obtain an
8  election identification certificate?  First off, are you
9  familiar with the term "election identification
10 certificate"?
11   A.  I've heard that referenced.  Yes.
12   Q.  Is that the type of identification that is made
13 available to voters under SB 14?
14   A.  That's the --
15   Q.  The new type --
16   A.  -- free ID, yes, as it's described commonly.
17   Q.  Do you know where a voter can get that?
18   A.  I assume at the DPS office.  I don't know.
19   Q.  Does SB 14 require employers to provided paid
20 leave to go obtain an ID?
21   A.  I don't think that's in there.
22   Q.  If an individual had to travel from the ranch
23 country, the northern part of your district, to a DPS
24 office in Edinburg, that would take -- that would take a
25 good amount of time, right?

## 108

1    A.  20 minutes, 30 minutes, maybe, the furthest
2  reaches of the county.
3    Q.  Okay.  And you said earlier that at a minimum
4  it would take 15 minutes to go through a transaction at
5  the driver's license office, right?
6    A.  Yes.  Yes.
7    Q.  And then you got to drive back?
8    A.  Yes.
9    Q.  So that's an hour off from work at least,
10 right?
11   A.  Yes.
12   Q.  And so that's going to cost a voter, if they
13 have to go get that ID, that's going to cost them money,
14 right?
15   A.  Yeah.
16   Q.  In gas, wages?
17   A.  Yes.
18   Q.  And given that we talked about how the poorer
19 people are more likely not to have ID, would you guess
20 that those are going to be some of the same people who
21 don't have cars?
22   A.  Nearly everybody has a car.  Okay?  But I can
23 say that there are some people without cars, because as
24 I said, I don't have a car.  My wife and daughter have a
25 car.

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

---

**109**

1    Q.  Do you think that the loss of wages and the
2  cost of gas to drive back and forth has -- may deter
3  some voters from going to get an ID if they don't have
4  one?
5    A.  Okay.  May deter?  Okay.  You want me to answer
6  your specific question and not anything else, right?
7  That could deter somebody.
8    Q.  What if -- what if the time at the office were
9  more like two hours or three hours, would that -- would
10  that probably deter some people?
11    A.  You mean the office times?
12    Q.  Yeah.
13    A.  Yeah.  That could deter somebody.
14    Q.  Do you think that a -- if it cost $22 to get a
15  document that you needed to get that election
16  identification certificate, would that $22 cost deter
17  some people from voting?
18    A.  Okay.  I'm making an assumption based on human
19  behavior.  Okay?  But I assume it could be somebody
20  that's deterred.
21    Q.  You said that some people had described the
22  election identification certificate as a free ID.  But
23  if you need to pay money to get a document that you need
24  to get that free ID, is the ID really free?
25    A.  Okay.  You're making an argument.  I don't know

---

**110**

1  what to say.  I don't know what to say to you.
2    Q.  I'm asking a question.
3    A.  It is a fair description, generally speaking,
4  to say "free ID."  Okay.  But the point you're making is
5  also a fair description based on your perspective.
6    Q.  For an individual who does not have a copy of
7  their birth certificate, if it costs them $22 to get a
8  copy of their birth certificate, and if they need that
9  birth certificate to get the election identification
10  certificate, for that individual is the election
11  identification certificate free?
12    A.  You make a good point, but the ID is still
13  free.
14    Q.  Is it effectively free?  Is there a cost to
15  that individual that they must --
16    A.  Well, everything --
17    Q.  -- incur to get that ID?
18    A.  Everything in life has a cost.  You know.  The
19  point you make is a good argument, but the ID is still
20  free.  And I don't know what else to say.
21    Q.  Is it possible to get that ID without spending
22  any money for an individual who doesn't have a copy of
23  their birth certificate or any of the other documents
24  that they need, if they have to pay for the birth
25  certificate?

---

**111**

1    A.  I don't know how to answer your question.
2    Q.  Will it cost money to that person, the process
3  that they go through to get the certificate?
4    A.  Look, if you need to get a certificate, that
5  will cost you money.
6    Q.  Okay.
7    A.  Okay?
8        MR. FREEMAN:  You know, lunch is ready,
9  and I'm at a good spot to take a break.  I know we want
10  to take a short lunch.
11        MR. HUGHES:  Let's go off the record.
12        MR. FREEMAN:  Off the record.
13        (Recess from 12:21 to 12:59 p.m.)
14        MR. FREEMAN:  And we are back from lunch.
15    Q.  (By Mr. Freeman)  Representative Pena, you
16  first ran in 2002; is that correct?
17    A.  Yes.  It could have been 2001, but...
18    Q.  But the election was 2002?
19    A.  Yes.
20    Q.  And was election integrity an issue at all in
21  that campaign?
22    A.  Yeah.  I mean, I've always been a good
23  government guy.  That was not my primary focus at the
24  time.
25    Q.  What position did you take with regard to

---

**112**

1  election integrity in 2002?
2    A.  I don't understand.  It was not a movement for
3  this bill that I can recall.
4    Q.  Okay.  Did you -- did you say anything about
5  cleaning up elections in your 2002 campaign?
6    A.  You know what, I didn't experience what I -- it
7  was my first election cycle, and that's when I got hit
8  with what is required to get elected in my -- where I
9  live.  And that was my first --
10    Q.  Okay.
11    A.  -- full-blown experience of the uniqueness of
12  my area.
13    Q.  We'll talk about that uniqueness in a moment.
14        How about 2004; was it an issue at all?
15    A.  As we move forward, I began to speak out more.
16  I don't remember when.  But as we moved forward, oh,
17  yeah, I spoke out.
18    Q.  Okay.
19    A.  I mean, I think even a, I think, YouTube video
20  out there somewhere where I'm speaking out.
21    Q.  And what aspects of elections did you speak you
22  about?
23    A.  Corruption.
24    Q.  What type of corruption?
25    A.  We had a fire bombing of a political camp.  It

REPRESENTATIVE AARON PENA                                                JUNE 01, 2012

## 113

1  was a Molotov cocktail, and I spoke out against that.
2  Q.  At the campaign office?
3  A.  Yeah.
4  Q.  Anything else?
5  A.  The use of politiqueras, on the abuse of the
6  use of them.  Look, they perform a valuable function in
7  terms of getting people out to vote who otherwise -- you
8  know, constitutionally and from a good government
9  perspective, it's important to get people out to vote.
10  It's when they cross the line, that's it's offensive.
11  Q.  Okay.  We'll talk about politiqueras a little
12  bit more later.
13  A.  Okay.
14  Q.  I just want to focus for a moment on positions
15  that you took in your campaigns with regard to
16  corruption and election integrity.
17      So other than the fire bombing incident
18  and the abuse of politiqueras, was there anything else?
19  A.  Paying the voters, paying voters to vote.
20  Q.  Okay.
21  A.  Using government vans, school district vans to
22  haul voters to the polls.  The emptying of day care --
23  adult dare care centers, and paying off the manager of
24  the center; things of that nature.
25  Q.  Anything else specific that you can remember

## 114

1  talking about in your campaigns?
2  A.  Initially -- okay.  I know I'm only supposed to
3  answer the question, but initially, because of
4  recommendations from my staff, I was not as vociferous
5  as I should have been.  But I grew stronger in my
6  opposition, as things progressed, because it was bad.
7  Mail-in ballots.  I did speak about that a lot.  People
8  walk in with ballots in their hands and say, "Hey, you
9  want to buy these from me?"  And I'd said, "This can't
10  be legal."
11  Q.  Did you ever report any of those incidents to
12  the District Attorney or the Attorney General's Office
13  or anything like that?
14  A.  To answer your question, no, but there are
15  reasons for it.
16  Q.  Were those individuals -- and I won't ask you
17  to name names, because it's not particularly relevant,
18  but were those individuals politically involved in
19  Hildago County?
20  A.  In order to get elected in Hidalgo County,
21  everybody looks the other way or is a participant.
22  **Q.  Okay.**
23  **A.  I'm talking about elected officials.**
24  **Q.  Yeah.  Did you ever campaign on mentioning**
25  **issues of in-person voter impersonation as one of those**

## 115

1  **election integrity problems?**
2  **A.  We talked about it, but it was not the dominant**
3  **form of voter fraud.**
4  Q.  Do you know when you talked about it in your
5  campaign?
6  A.  No, I don't remember that.
7  Q.  Do you remember, was it a speech?  Was it a
8  mailer?
9  A.  These are not -- the audience is not
10  necessarily that receptive --
11  Q.  Okay.
12  A.  -- to that speech.  But it became so offensive,
13  that I just said, "What the hell am I here for?  I'm
14  going to speak up on this."
15  Q.  Did you -- did you ever talk about voter ID as
16  a solution during your campaigns?
17  A.  At some point, I'm sure I did.
18  Q.  Prior to 2010?
19  A.  Okay.  Not this last cycle.
20  Q.  Uh-huh.
21  A.  But the cycle before that, voter ID was
22  significant, if I recall correctly.  I did speak about
23  it then.
24  Q.  Did you had opposed voter ID in 2009, hadn't
25  you?

## 116

1  A.  Okay.  Now, you're getting into the days -- the
2  dates are confused in my mind.
3  Q.  Okay.
4  A.  I think I commented on it in my blog that it
5  was -- I didn't think it was appropriate.
6  Q.  And then did you -- did you ever take a
7  position, in your 2010 campaign, that it was
8  appropriate?
9  A.  2010?
10  Q.  The last time you ran.
11  A.  No.  No.  It wasn't until -- I remember sitting
12  with my chief of staff and saying, "I'm going to support
13  this."
14  Q.  Do you remember when that was?
15  A.  No.
16  Q.  Was it just in this last session?
17  A.  I don't remember.  It was prior to the last
18  session.
19  Q.  So I would like to talk to you about some of
20  these Hidalgo County election issues that you have been
21  mentioning.
22  A.  Okay.  Yes.
23  Q.  Sure.  What were you about to say?
24  A.  It's not just Hidalgo County.  Okay?  But since
25  that's where I live, that's what I focus on.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 117

1    Q.  Okay.  Would you say that these issues are
2  endemic to South Texas?
3    A.  Yes.
4    Q.  Okay.
5    A.  But -- yes.  Okay.  To answer your question,
6  yes.
7    Q.  Okay.
8    A.  But they are in other areas as well.
9    Q.  So let's focus on Hidalgo County, just because
10  your knowledge of Hidalgo County is best --
11    A.  Yes.
12    Q.  -- than other counties, correct?
13    A.  Yes.
14    Q.  So let's focus on Hidalgo County.
15       How would you describe political
16  campaigning in Hidalgo County?
17    A.  It's in transition, but the traditional method
18  of campaigning is, as -- I didn't notice it at the time
19  when I ran, but this is what I've come to learn -- is
20  you go to the political bosses in the county.  And by
21  that I mean, well, political bosses, I think you
22  understand what I mean by that.
23       And at the time when I first started,
24  there were multiple political bosses.  Now, they have
25  consolidated to some degree.  But you go over there, you

## 118

1  kiss their ring and you ask for their blessing.  They
2  usually want money.  It's either said or inferred, okay?
3       Now, I'm not speaking of personal
4  knowledge, because nobody asked me, nobody directly
5  asked me for money.  They want to hire their ladies,
6  hire their ladies, which means hire their crew of
7  politiqueras.  Once you get the blessings of certain
8  people, then other sub bosses fall in line.  Then you
9  look to the dominant families of the community.  You
10  know, hopefully you mimic the -- your population as a
11  whole in terms of their issues.  Hopefully you come from
12  a family that's respected.  And you got out and meet
13  people.  In the Delta area, we have competing clubs.  We
14  now have three, where we used to have two during my
15  period, the TACO and the BEE Club.  And you go and you
16  pitch yourself to them.  And they typically want money
17  in exchange.  Well, it is implied that the money is in
18  exchange for an endorsement.  And then they have their
19  ladies that go out and gather people together.
20       It's not something I did, but it is well
21  known that you -- there are certain people you can go
22  to, to buy elderly day care centers.  By "buy" I mean
23  you hire the leader who leads the ladies to go in to
24  vote.  And they strongly suggest, in the past, now they
25  just do it there with them with assisted voting -- but

## 119

1  in the past, it was, they would say, "This is who you're
2  voting for."  Now, to my advantage is, no one remembered
3  what they told them to do, and they remembered me,
4  because I have a -- my father was a prominent figure
5  from the Delta area, so we always kind of won out that
6  way.  Today, though, assisted voting is the crime, the
7  voter fraud of choice.
8    Q.  Okay.
9    A.  They go in and say, "Hey, we want to assist
10  you.  You need to ask for us to assist you."  And they
11  will say yes because they want to continue their
12  employment or their family's employment with some of
13  the local government jobs, usually a school district.
14  And if you refuse, well, you're deemed not to be
15  loyal.  You're too independent for them.
16       And so you have some areas, like in the
17  Delta area, like in Hidalgo, like in the Mid Valley, and
18  this phenomena is growing, where assisted voting is now
19  the -- the voter fraud of choice.
20       Now, mail-in ballots, it used to be really
21  strongly abused, but after Steve Wolens passed a bill
22  restricting -- or increasing punishments for it -- Steve
23  Wolens is a member from Dallas.
24    Q.  Uh-huh.
25    A.  That strongly diminished things, so -- and

## 120

1  then, for those independent voters in Edinburg or
2  McAllen or somewhere, you would make a pitch.
3    Q.  Okay.
4    A.  You know, "Hey, let me tell you why I'm the
5  best guy, because I didn't get arrested for drug
6  dealing," you know?  My first opponent was arrested for
7  selling drugs, and he was a convicted felon in Mexico.
8  But since he wasn't arrested here, the argument was that
9  he was not a convicted felon in the States.  I just
10  wanted to beat him.  I didn't care about that issue.
11  And, you know, you hope that the independent voter, the
12  election day voter -- it was traditionally an election
13  day voter which is the independent voter -- would carry
14  you.  That was my support.
15    Q.  Uh-huh.  So the voter assistance and the issues
16  with regard to mail-in ballots, is that what you
17  previously referred to in the media as voter harvesting?
18    A.  I used the term "voter harvesting" because
19  Steve Wolens used that specific language when he
20  presented the bill.
21    Q.  Okay.
22    A.  He never used that word in the Valley, we said
23  "politiqueras."
24    Q.  Okay.
25    A.  And as I said, being a politiqueras is not a

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

## 121

1    bad thing in itself.  All it means is, is if you're a
2    political person, a female political person, or a
3    political person, is when they cross the line, and then
4    it becomes inappropriate.
5         Q.   So politiqueras, they're mostly women?   There
6    are a few politiqueros?
7         A.   Yeah, they're mostly women.
8         Q.   Okay.  Have you ever hired any politiqueras?
9         A.   In my first cycle, yes, I did.
10        Q.   Okay.  And what was the role for politiqueras
11   in your election?
12        A.   Well, forgive me.  In my first cycle, I hired
13   somebody who hired them, okay?
14        Q.   Yeah.  What was the role of the politiqueras?
15        A.   As I understood it, their job was to go and
16   advocate in the community.
17        Q.   Okay.
18        A.   And particularly to some of the poorer elements
19   in the community.  And I was unaware of the adult day
20   care centers and I was unaware of a lot of the other
21   stuff I have now described to you.
22        Q.   And current law doesn't address all of these
23   issues that you have described with regard to
24   politiqueras, correct?
25        A.   Yeah, as I said, it's not -- it's like being a

---

## 122

1    lawyer.  There's nothing wrong with being a lawyer.
2    It's when you cross the line that it's inappropriate.
3    There's nothing wrong being a politiquera; it's when you
4    cross the line that it's inappropriate.
5         So is there anything in the law?  I'm sure
6    there -- there is something the law about intimidating
7    voters.  There is something in the law about other
8    things like that.  But what I have found is, nobody
9    advocates for cleaning it up, because everybody depends
10   on it, where I'm from.
11        Q.   Okay.
12        A.   Now, Steven Wolens encountered it because
13   what -- what happens in the border has been moved to
14   Dallas, and Steve Wolens had it apply to him, so he
15   spoke up.
16        Q.   Okay.
17        A.   So when I spoke up, I was generally met with
18   resistance from the elected politicians who said, "What
19   are you doing?  We've got a good thing going here.  Why
20   are you doing this?"
21        Q.   And you've advocated for changes in laws that
22   would rein in some of these practices, correct?
23        A.   Yes, sir.
24        Q.   So you -- based on that, you believe that
25   current law doesn't address all of these practices that

---

## 123

1    you think are improper, correct?
2         A.   Yeah.  Current law needs to be refined to
3    address specific circumstances.  But it's a delicate
4    balance, because there are a lot of constitutional
5    questions involved.  Somebody has got to care, because
6    I'm not sure -- I'm not sure we've reached that point of
7    viability where people are concerned about the question.
8         Q.   Okay.
9         A.   On the specific questions I have raised.
10        Q.   Were there any in-person voter impersonation
11   issues that came up in any of your campaigns, where a
12   voter came up and said --
13        A.   In-person impersonation?
14        Q.   Uh-huh.
15        A.   One of my staff members told me that his father
16   had voted against me, and I said, "Why?"  He said,
17   "Well, he's been dead for five years."  So somebody
18   impersonated him.
19        Q.   How did you know the vote was against you?
20        A.   That's what he told.
21        Q.   Okay.  So you couldn't have known whether the
22   vote was for or against you, correct?
23        A.   That's what he told me.
24        Q.   But you'll agree with me that we have ballot
25   secrecy laws in the United States, right?

---

## 124

1         A.   Well, okay.  Look, I've never checked the
2    point, okay?
3         Q.   Yeah.
4         A.   He just said it to me.  But this fellow who
5    worked for me is from the area and knows the inner
6    workings of the area.  So if that's what he said, I had
7    no reason to doubt what he said.  It's not a -- it's
8    within the realm of possibility, okay?
9         Q.   Sure.  But you don't have -- you don't real
10   proof that it happened other than him saying it,
11   correct?
12        A.   No, I just -- I just trust what he said.  He
13   has no reason to say it to me.
14        Q.   And did he say that that was in person, or did
15   he say that someone had voted in person as his father?
16        A.   All he said was, "Hey, my dad voted against
17   you."  And I said, "How did he do that?"  He said,
18   "Mr. Pena, my dad has been dead for five years."  And I
19   said, "Really?  Who told you that?"  And he says -- I
20   don't remember what he said after that, but he somehow
21   knew.
22        Q.   Okay.  But he didn't say, "My dad voted
23   in-person against you"?
24        A.   No, he didn't.
25        Q.   Okay.  Any other in-person issues?

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

125

1    A.  Well, like I said, everything I tell you is
2    going to -- what I'm going to tell you next is that
3    somewhat hearsay, because I only hear what people tell
4    me, okay?
5    Q.  Sure.
6    A.  They'd say at the -- at the polling -- at the
7    elections office, that individuals would know who did
8    not vote or whose ballot has not been cast, and they
9    somehow would get those votes or ballots to somebody
10   else to cast in those persons' names.
11   Q.  Uh-huh.
12   A.  We were always concerned that that was going to
13   be applied to us.
14   Q.  Uh-huh.
15   A.  You know, because I had the machine working
16   against me for two or three of the cycles.  And so we
17   were always concerned that we'd win the independent vote
18   but we'd lose through these manipulations.  So we
19   watched, to the extent we could watched.  But these are
20   well established practices that I had no way of knowing
21   or infiltrating.  I was simply told.
22   Q.  Okay.  And so with regard to knowing who hadn't
23   voted yet, using those votes, is that being done by the
24   person running the polling place?
25   A.  Well, look, if you operate the machine, the

---

126

1    political machine --
2    Q.  Uh-huh.
3    A.  -- or machines?
4    Q.  Uh-huh.
5    A.  You want to make sure that you have people in
6    there.
7    Q.  Yeah.
8    A.  The people in office are part of the political
9    process, and are part of the machine many times, so
10   they have people in there, so that they won't get
11   screwed from the other side who's got people in there.
12   You know what I mean?
13   Q.  No, I understand what you mean completely.
14      If the people in the precinct, though, are
15   part of the fraud, a voter --
16   A.  No.  This is the election office.
17   Q.  In the election office.
18   A.  This is the way it was described to me.
19   Q.  Okay.  Not in the precinct?
20   A.  I don't know.  The time I told you about where
21   people were -- they looked for people who hadn't voted,
22   and they then they passed out ballots --
23   Q.  Yep?
24   A.  -- was in the elections office.
25   Q.  Okay.  So passing out ballots, that's going to

---

127

1    be mail in, right?
2    A.  Yeah.
3    Q.  Okay.  So voter ID won't do anything about
4    that, right?
5    A.  Right.
6    Q.  Okay.  And am I correct that there were
7    indictments in McAllen in 2006 related to the 2005
8    mayoral election?
9    A.  Yeah.  That's one of these fellows who -- yes.
10   Q.  What are the alleged crimes?
11   A.  Well, he was taped, and I think he was willing
12   to sell votes.  He was a well known -- well, he was a
13   son of a politiquera.
14   Q.  Okay.
15   A.  And he was -- he was a politiquero in training,
16   okay?
17   Q.  Okay.  Got it.
18   A.  And he went to, I think, Olthal Brand, Jr. and
19   said, "Hey, I've got all these ballots.  Would you like
20   to buy them?"
21   Q.  Okay.  But those were for mail-in ballots?
22   A.  Yeah, that's got to be what it is.
23   Q.  So, again, this isn't an issue that had
24   to do with voter ID, right?
25   A.  No.

---

128

1    Q.  And there weren't actually convictions in the
2    end; is that right?
3    A.  You rarely have convictions.  But to answer
4    your question, no.
5    Q.  Okay.
6    A.  But just as a commentary, you're not going to
7    have convictions.
8    Q.  Are there any other indictments in Hildago
9    County that you remember in recent time about like
10   election crimes like this?
11   A.  Like this?
12   Q.  Uh-huh.
13   A.  They occur on occasion, but they always go
14   away.
15   Q.  Are you aware of any other incidents of proven
16   in-person voter impersonation that have occurred in your
17   district?
18   A.  Proven you mean like a conviction?
19   Q.  A conviction or established fact in some other
20   way, an admission.
21   A.  No.
22   Q.  Anything else in Hidalgo County?
23   A.  None that I can recall.
24   Q.  Anything else in the state of Texas?
25   A.  Yeah.  Recently in Fort Worth, there was

REPRESENTATIVE AARON PENA                                  JUNE 01, 2012

---

129

1    something.
2    Q.   Was that a conviction or just an allegation?
3    A.   Oh, okay.  I think he was convicted, was he
4    not?
5    Q.   In Fort Worth?
6    A.   This was like a judge -- forgive me.  I read it
7    in the paper.
8    Q.   It was just recent, though, right?
9    A.   It was just recent.
10   Q.   Anything other than that incident?
11   A.   Yeah.  There have been others.  You mean voter
12   fraud crimes?
13   Q.   In-person voter impersonation.
14   A.   Oh, in-person?
15   Q.   Uh-huh.
16   A.   No, I'm sorry, I don't recall that.
17   Q.   Okay.  You know, I think we discussed briefly
18   before, but what is Texas's current system, before SB 14
19   is implemented, if it is implemented, for determining a
20   voter's identity when they show up at the polling place
21   to vote?
22   A.   What is the procedure?
23   Q.   Yeah.
24   A.   Well, normally, you have your voter card.
25   Q.   Okay.

---

130

1    A.   And I assume there's a presumption that that's
2    you who signed.
3    Q.   Okay.
4    A.   You have an ID, which is what I think most
5    people do.
6    Q.   Okay.
7    A.   And you sign.
8    Q.   And so under the system that exists now, what
9    would someone have to do to commit in-person voter
10   impersonation?
11   A.   You want me to give you an example --
12   Q.   Sure.
13   A.   -- of what they would do?
14   Q.   Yeah.
15   A.   This is what I would do:  If I was in the
16   Valley, I'd find a polling place that is rarely used
17   probably one out in a small little colonia that nobody
18   goes to, and I'd make sure that the campaign workers
19   were my campaign workers.  And then I'd figure out the
20   people who had not voted, especially on the last day.
21   And I'd say, "These people haven't voted.  Come on in
22   and vote," and they would simply come in and vote.
23   Q.   But wouldn't they have to show a registration
24   card?
25   A.   Not if you're the person.  Not if you're the

---

131

1    person there controlling things.
2    Q.   Okay.  Okay.  But if you're the person there
3    controlling things, and if SB 14 were in place, that
4    wouldn't make a difference, either, correct, because you
5    would just tell them, who cares about the driver's
6    license, just let them vote?
7    A.   Okay.  So, your question again?
8    Q.   So you were saying under the current law, if
9    you wanted to commit in-person voter impersonation, you
10   would just go to a polling place where you controlled
11   the poll workers?
12   A.   Right.
13   Q.   And then they wouldn't have to show the voter
14   registration card?
15   A.   Right.
16   Q.   But if SB 14 were in place and a voter ID
17   requirement were in place with a photo voter ID, you
18   would just tell the poll workers who were yours to
19   control, "Don't make them show a photo ID," just like
20   you wouldn't have them show a voter registration card,
21   right?
22   A.   That's what I would do.
23   Q.   Okay.  So SB 14 wouldn't solve that, would it?
24   A.   I don't know.
25   Q.   Well, how would it solve it?

---

132

1    A.   Well, let me just say this, that once the
2    message is communicated back home that the government is
3    getting involved in taking care of the corruption, just
4    like when the W bill passed --
5    Q.   Uh-huh.
6    A.   -- there was a chilling effect on the
7    corruption.  I think that if you pass a bill like this,
8    it sends a message of confidence, and it will have a
9    chilling effect on the corruption.  It may not solve it
10   all.
11   Q.   Okay.
12   A.   I doubt that you will eliminate the sins of
13   man, but you'll at least, you know, have -- there will
14   be a sense that somebody is paying attention.
15   Q.   So is it your opinion that the current voter
16   identification system does not create a sense that
17   someone is paying attention?
18   A.   I think we are striving -- okay.  I think the
19   general public is frustrated.
20   Q.   Okay.
21   A.   And they're frustrated with government in
22   general.  They're frustrated with our institutions.
23   They're frustrated with a lot of things, and they want
24   to have a solution, and this is one they've latched on
25   to, for whatever reason.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

### 133

1     Q.  Okay.
2     A.  And so by voting for the bill, if this is what
3  they want -- and even if it's a piece of symbolism, it
4  has value.  Now, I would say it goes beyond symbolism,
5  because it does have value.  So I do think it's
6  important that we stand up.
7     Q.  Do you feel that some of that symbolic value is
8  lost if the law at issue disenfranchises some people?
9     A.  Let me tell you.  That's the question for the
10 court, okay?  And as I've said to you, make your case.
11 And the question really is:  Is this impediment, this
12 minor impediment, what I consider a minor impediment, is
13 it significant enough that it's illegal?  And that's the
14 question you're going to raise.
15        But what we were told is that the law that
16 we passed was very similar to, I think, an Indiana law,
17 which had already ruled constitutional.  Now, they did
18 not have preclearance requirements.  And so we sought to
19 take the course of least resistance, which was to have a
20 law that was basically like the one that was found to be
21 constitutional.  And this is what people want.  If you
22 look at the polls, this is what people want.
23        Now, knowing all the type of voter fraud
24 that I encounter back home, I realize, and I have
25 publicly stated, that this was simply a good start.  But

---

### 134

1  the injection of confidence that somebody is actually
2  doing something matters.  Now, all that I say to you
3  is:  Make your case and let the court decide.
4     Q.  My question for you is, as a legislator --
5     A.  Uh-huh.
6     Q.  -- doesn't that possibility of
7  disenfranchisement concern you when you decide what
8  symbol to use?
9     A.  Okay.  Look.  When I go to an airport, I used
10 to love it, when I'd go to Southwest Airlines here in
11 Austin, I could be there 30 seconds of when they closed
12 the gate, and they'd let me in, and we'd take off.  And
13 it was wonderful.  You know, now, they don't let me do
14 that.  Now I've got to go through screening and all
15 that, and now I have to have an ID, and, you know, a
16 pat-downs or whatever.  It's an inconvenience, but it is
17 a minor inconvenience for the value that's achieved.
18        Now, like I said, if you can prove that
19 this is a substantial inconvenience and people are not
20 voting in large numbers, make your case.  But I think
21 that this is something that people want and that is not
22 -- is not burdensome in comparison to our daily lives
23 where we have to use an ID card for everything else.
24     Q.  If the Department of Elections had known prior
25 to your -- if the Department of Elections had known,

---

### 135

1  prior to when you voted on the bill, how many people
2  didn't have this necessary ID, would you have wanted to
3  know then?  Would that have mattered?
4     A.  The arguments were made, and it's always
5  important to have information available to you, as much
6  as you can provide.  But I still think the overwhelming
7  benefit, where I live, at least, is important, because
8  at the moment, you can literally buy an election.  And
9  what it does is, it produces officials who are part of a
10 corrupt process, and they reflect that process.
11        And so you will have -- there are many
12 people serving in office who ought to be in jail today
13 where I live.  But there's very little accountability
14 except through the federal system, and they can't be
15 watching us all of the time.  This corruption is a tax
16 on the very poor people I represent.
17     Q.  But isn't taking away the rights of the very
18 poorest people who don't have the ID also a tax on them?
19     A.  Well, I don't think -- you know, in order to
20 get those of us -- those of us, those in my community
21 who are on government assistance, they have to have ID
22 in order to get that assistance.  I just don't see it.
23 If they need the identification, they need to -- they
24 need to get it if they don't already have it.
25        Now, in future legislative sessions, can

---

### 136

1  the -- can the identification -- identifications
2  expand?  Can they have other locations available that
3  are more proximate?  Those are questions of policy or
4  law, and they'll have to be made in the future.  I still
5  think the value of having this passed has more value, at
6  least to where I live, than any detriment.
7     Q.  Even it it's a purely symbolic value?
8     A.  It has value even if it is symbolic.
9     Q.  And would you say that flying is a fundamental
10 right?  The ability to get on an airplane?
11    A.  Hmm.  Is that fundamental right?
12    Q.  (Nods head yes.)
13    A.  No, I don't think it's a fundamental right.
14    Q.  Is voting a fundamental right?
15    A.  Yeah, I would say it is.
16    Q.  And so would you say that balancing voting
17 against symbolism is a trickier proposition than
18 balancing flying against symbolism?
19    A.  That's the argument you're going to have to
20 make.
21    Q.  I'm asking you a question.
22    A.  Oh.
23    Q.  Would you agree?
24    A.  Taking all things into consideration, I still
25 think the law has more value than it does harm.

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

---

## 137

1        MR. FREEMAN:  I'm going to object that
2   that's not responsive and ask you to answer my
3   question.
4        A.  Ask it again.
5        Q.  Do you think that it is more -- do you think
6   that it is a more difficult proposition to balance
7   voting against symbolism than to balance flying against
8   symbolism and a more dangerous proposition?
9        A.  Is it more difficult?
10       Q.  Is it -- is it the same thing?
11       A.  Oh.
12       Q.  Is it equivalent?
13       A.  Well, okay.  Yeah, it depends on your
14  perspective.  If you want to say that one is a right and
15  the other is not a right, I guess those are different
16  things.
17       Q.  Are you aware of how many convictions in total
18  have been obtained by the Attorney General of Texas for
19  in-person voter impersonation in the last 20 years?
20       A.  No.  I would assume -- well, okay.  It's not my
21  job to assume.  No.
22       Q.  Okay.  Are you aware of whether Attorney
23  General Abbott has dedicated substantial resources to
24  investigate in-person voter impersonation?
25       A.  I know that he cares deeply about the issue,

---

## 138

1   because I have spoken -- you know, many of my
2   constituents.  Just the other day, just last week, I
3   turned in 88 or 81 complaints to his office on voter
4   fraud, and I know his office takes an interest in the
5   question.
6        Q.  Would you agree that mail-in ballots are a
7   greater source of fraud or election abuses than
8   in-person voter impersonation?
9        MR. HUGHES:  Asked and answered.
10       Q.  (By Mr. Freeman) You can answer.
11       A.  Yeah.  There are other abuses that are greater.
12       Q.  In fact, isn't the case that you told the
13  McAllen Monitor that there is, in fact, voter
14  corruption, but most of it appears in mail-in, in mail
15  ballot voting, and some people think voter ID is going
16  to solve these things, but it doesn't deal with the
17  problem?
18       A.  Right.
19       Q.  Are you aware of any incidents of noncitizen
20  voting that have occurred in your district?
21       A.  That is not -- okay.  In my experience and what
22  I've perceived, that is not a large problem.  Now, that
23  doesn't mean it doesn't exist, okay?  Where I live, many
24  people don't even know if they're Americans or not.
25       My wife -- I always a pick on her and joke

---

## 139

1   with her.  We didn't know if she was an American or not,
2   because half of her brothers are Mexicans, and her
3   parents told her that she was an American.  And so I
4   said, "Well, how do you know you're an American?  How do
5   you prove you're an American?"  Well, she was born
6   through midwife, so we had to get documentation, and it
7   was contested by the federal government.
8        On the border, these are real things.  So
9   I can see somebody voting who thinks they're an
10  American, but, in fact, they're not.  I mean, inside
11  themselves, they think like an American, but they
12  legally are not American.  So it's possible.  But you
13  don't see mass floods of people coming across the bridge
14  to vote.  Now, is it possible?  Yeah.  Now, I've heard,
15  in the Delta area, that some of the people may have to
16  go in and cast votes are noncitizens.  But I will tell
17  you, that is not a significant part of voter fraud.
18       Q.  Okay.
19       A.  These are Americans committing voter fraud.
20       Q.  Are you aware of any investigations of the
21  issue in your area?
22       A.  No.  You're not going to find that occurring.
23  One, the federal level has more important things to deal
24  with, the cartels and smuggling and murder and
25  kidnapping.  And on the state level, I think you'll find

---

## 140

1   this across the board, that the DAs are not going to get
2   involved.  They think it's too hard to prosecute or it's
3   inconvenient for them, politically speaking.
4        Q.  Are you aware of any public statements made by
5   advocates of photographic voter ID laws that photo voter
6   ID will deter illegal immigrants from voting?
7        A.  Yeah, I've had people say that to me, and I've
8   responded in public saying that we have a hard enough
9   time getting Americans to vote, let alone Mexicans.
10       That -- you know, look, people will speak
11  their fears or speak their -- but the reality on the
12  ground, because I live there and I live in probably one
13  of the areas with the highest level of this voter fraud,
14  we don't have Mexicans coming over.  If they do, it's a
15  mistake that was made.  They were corralled in an old
16  folks' home, they were brought in, "Are you an
17  American?" "Yeah, I'm an American.  Look here.  I live
18  here.  I live here.  I'm an American."  In fact, they
19  never got their citizenship papers, and they're 90 years
20  old and they don't know any better.  That's what
21  happens.
22       Q.  Yeah.  Is it necessary to swear under oath that
23  you're a U.S. citizen to register to vote?
24       A.  Huh.  I've never looked at the documentation,
25  but I don't know if it's there or not.  It is there?

REPRESENTATIVE AARON PENA                     JUNE 01, 2012

## 141

1   Q.  Do you recall on a voter registration card --
2   A.  No.
3   Q.  -- if there's a box you have to check?
4   A.  No.  No.  I'm curious.  Does it say that?
5   Q.  It's my role not to testify.
6   A.  (Laughing.)
7   Q.  Can I ask you:  What ethnic or language
8   minority group makes up the majority of noncitizens in
9   Texas?
10   A.  Oh, that's Mexican American.  I'm sorry.
11   Mexicans, Mexican American.
12   Q.  Okay.  Why would people who advocated in favor
13   of this law in public, like David Temple, who is an
14   election judge from, I don't recall exactly where,
15   connect voter ID to undocumented immigrants, or as
16   they're going to say, illegal aliens from voting?
17       MR. HUGHES:  Objection.  That calls for
18   speculation and the reading of somebody else's mind and
19   is a totally improper question.
20   Q.  (By Mr. Freeman) To the best of your
21   understanding of the political process, what role would
22   it have for an individual to advocate publicly in favor
23   of the bill based on connections to stopping illegal
24   aliens from voting?
25       MR. HUGHES:  The same objection.  You can

## 142

1   answer.  This is not a privilege objection.
2   A.  You know, politics is polemic.  Sometimes it's
3   easy to throw out language that helps -- that brings
4   people together by having a world view that's similar,
5   and you espouse that, so you're a member of the club
6   because you espouse the same world view that other
7   people have, because they have fears that there are
8   changes occurring in Texas.  And the reality is, as I've
9   stated before, we don't have a lot of Mexican nationals
10   coming over intentionally to vote.
11   Q.  (By Mr. Freeman) But was one of the purposes of
12   SB 14 to prevent illegal aliens from voting?
13       MR. HUGHES:  Again, I want to give my
14   legislative privilege instruction not to reveal your
15   mental impressions, opinions about the legislation.  And
16   as to purpose, you can testify about the general
17   purpose, but not about the individual intents of
18   specific legislators.
19   A.  My intent was, because of the people who wanted
20   it and because it was presented to me, and I have to
21   answer the question, because I believe it injects
22   confidence in the people.  I see it as the first step,
23   not as a step to solve the whole lot.  It's a first
24   step.
25   Q.  (By Mr. Freeman) And beyond your individual

## 143

1   intent, but in the intent of the legislature as a whole,
2   the purpose of the bill, given this advocacy, do you
3   believe that any part, the purpose of the bill was to
4   prevent illegal aliens from voting?
5       MR. HUGHES:  Keep if mind my prior
6   instruction to you, please.
7   A.  I have never -- I never heard, except through
8   the testimony of one witness who came before us
9   representing some advocacy group, I never heard that
10   stated amongst legislators.  We simply wanted to pass
11   the bill.  It's a long standing question, or it was.
12       MR. FREEMAN:  Mr. Hughes, I'll ask if, if
13   I ask a general purpose question, that you not interrupt
14   my examination of the witness with an instruction that
15   goes beyond a general purpose question and restricts the
16   witness from answering my question immediately.
17       MR. HUGHES:  I'm going to keep making my
18   objections.
19       MR. FREEMAN:  And I'm going to keep making
20   my record that your objections are entirely unwarranted.
21       THE WITNESS:  We must be at the good part.
22   Q.  (By Mr. Freeman) This document has been
23   previously marked as Exhibit 7.
24       Mr. Pena, have you seen this website
25   before?

## 144

1   A.  Have I seen her website?
2   Q.  Uh-huh.
3   A.  Not that I recall.
4   Q.  And who is -- who is "her"?
5   A.  Patricia Harless is a member, and I think in
6   relation to this question before us, she's the author of
7   the bill.
8   Q.  Is she the author of the bill or the sponsor of
9   the bill?
10   A.  I'm sorry.  Sponsor of the bill.
11   Q.  Thank you.  Just helping you out.
12   A.  I forgot that it came out of the Senate.
13   Q.  And do you see where, on her list of important
14   issues, she lists require Texas photo ID to vote?
15   A.  Yes, I see that.
16   Q.  And do you see what category it's under?
17   A.  Immigration reform.
18   Q.  What is the connection between photographic ID
19   and immigration reform?
20   A.  I assume -- well, I'm just having to assume
21   here, but I believe that many people make the false
22   impression that there's a connection that we have
23   illegal aliens voting, and it's not been my experience.
24   Q.  Okay.  But in terms of the general purpose of
25   the legislature, do you believe that -- do you continue

---

**145**

1  to believe that not part of the purpose of SB 14 is to
2  prevent illegal aliens from voting?
3          MR. HUGHES:  Keeping in mind my prior
4  caution.
5      A.  I assume, and you know -- well, I don't know.
6  Yeah, I'm guessing.  Nobody communicated that to me
7  except for that one witness that we had testify, who I
8  corrected on the record.  I said, "It's not the case.
9  We don't have -- we don't have Mexicans coming across
10  the border for that purpose.  They come over to work."
11      Q.  And are you aware of whether staff of the
12  Lieutenant Governor have continued to state, during
13  depositions in this case, that the purpose of the bill
14  was to prevent noncitizens from voting?
15      A.  No, I'm not aware of that.
16      Q.  If they had stated that, and I'll represent to
17  you as a member of the court that they have, would that
18  change your answer?
19      A.  You mean, if what you say is true --
20      Q.  Yeah.
21      A.  -- did he say it?
22      Q.  I can represent to you, as a member of the
23  court, that staff of the Lieutenant Governor and
24  multiple staff members of the Lieutenant Governor stated
25  during their depositions in this case, that the purpose

---

**146**

1  of SB 14 is to prevent noncitizens from voting.
2      A.  Okay.  If you say so.  Okay.
3      Q.  Does the change your --
4      A.  Now, I will say that it does prevent
5  noncitizens from voting, okay?
6      Q.  How does it prevent noncitizens from voting?
7      A.  Well, in order to get an ID, you've got --
8  you've got to show that you're from this country.
9      Q.  And you are certain that a noncitizen can have a
10  Texas driver's license -- if you're a green card holder,
11  waiting for citizenship --
12      A.  If you're here legally, you can get a driver's
13  license.
14      Q.  Okay.  So if someone is legal, if someone is
15  documented?
16      A.  Right.  But illegal immigrants are not -- or
17  illegal aliens are not going to get it.
18      Q.  Sure.  But noncitizens can have drivers'
19  licenses, correct?
20      A.  Oh, okay.  Yes, they can.
21      Q.  So SB 14 won't prevent them from voting, right?
22      A.  No, not those citizens, but -- I'm sorry, not
23  those people.
24      Q.  Yes.
25      A.  But it does have the purpose of keeping people

---

**147**

1  in this country legally from voting.  I mean, not to say
2  that that's a large problem.  But in my experience, it
3  does have that purpose -- effect, I should say.
4      Q.  Are there any other problems that you can think
5  of with the current system of establishing voters'
6  identities at the polls?
7          MR. HUGHES:  Objection, vague.
8      A.  I don't understand.  Say it again.
9      Q.  (By Mr. Freeman) So we have discussed the
10  current system of establishing the voters' identity at
11  that polls.  You have to show your election, your
12  registration certificate, or if you don't have that, you
13  have to show an ID.  We talked about that before, right?
14      A.  Right?
15      Q.  Are there any other problems, other than what
16  we've discussed previously?
17      A.  Not that I can think of.
18      Q.  Okay.  Now, we previously talked about the lack
19  of reported incidents of voter impersonation, reported
20  incidents of voter impersonation in Hildago County; that
21  the fraud or irregularities or problems that they're
22  having are not about impersonation, right?
23      A.  Well, what I will say is that I know of
24  none.  That doesn't mean that they don't happen.
25      Q.  Okay.  Just like you don't know about a bunch

---

**148**

1  of illegal aliens coming over from Mexico and voting?
2      A.  Right.  It's not been something that I've
3  observed or I hear a lot of talk of, because I'll be
4  quite honest, if that was to occur, the other camp would
5  say, "Well, we need to do the same thing."  And I don't
6  hear that, other than what I described, okay?  There was
7  discussion, as I mentioned that, some illegal aliens
8  from the Delta area were taking those slots where people
9  hadn't voted.  But I can't confirm that, because I have
10  no personal knowledge.  But people have said that to me.
11      Q.  But so isn't the fear about in-person
12  impersonation is just as unreasonable as the fear about
13  undocumented immigrants voting?
14      A.  I will say that it's reasonable, because a
15  large of number of people have it.  Do you understand
16  what I mean by that?  Now, there are a lot of Texans who
17  believe that, and -- but they don't have the primary
18  experience.  They don't have the experience I have being
19  proximate to the border to realize that's not a big
20  problem.  But this is -- fears are real, and if people
21  want to address their fears through legislation, that's
22  perfectly legitimate.
23      Q.  But is it legitimate to balance people's fears,
24  that are not based on reality, against people's rights
25  that are?

## 153

1  invoke it because there, apparently, is a larger
2  principle here, and that is, that by my failing to
3  invoke it it could be waived, so I invoke the privilege.
4       Q.   (By Mr. Freeman) I mean, you've spoken about
5  these issues in public, right?
6       A.   If you could remind me.
7       Q.   You have spoken about voter ID in public,
8  right?
9       A.   I have.
10      Q.   So, you know, that didn't waive your privilege,
11 right?
12      A.   What's the question?
13      Q.   So I'm trying to --
14           MR. FREEMAN:  You know what, why don't we
15 go off the record for half a second?
16           (Discussion off the record from 1:51
17 1:53 p.m.)
18           MR. FREEMAN:  Back on the record.
19      Q.   (By Mr. Freeman) Representative Pena, are you
20 familiar with any studies that have concluded that voter
21 turnout among minority communities goes down in the
22 presence of a voter ID law?
23      A.   Am I presently aware?
24      Q.   Uh-huh.
25      A.   No.  I mean, I've heard -- in reading articles,

## 154

1  people may state that, but I don't recall specifically.
2  I don't recall -- I have a vague notion that the
3  argument's been made.
4       Q.   Okay.  Would it be fair to say that there's
5  evidence on both sides?
6       A.   Yeah.  There's always evidence on both sides.
7       Q.   Representative Pena, do you recall telling the
8  McAllen Monitor that although you weren't opposed to
9  SB 14, you did not think it would address voter fraud?
10      A.   I don't recall.  Let me just say that that
11 sounds like something I'd say, but I don't recall if
12 that specific language is correct.
13           MR. FREEMAN:  This can be marked U.S. 372.
14           (Exhibit 372 marked for identification.)
15      A.   Can you tell me which paragraph?
16      Q.   (By Mr. Freeman) It's in the last paragraph.
17      A.   The last paragraph?
18      Q.   The last paragraph of the first page.
19      A.   Hmm.  No.  You know, I've always told you the
20 way I see it, and I think what I've said is, it's a good
21 first step.  That appears to be the -- Mr. Janes's
22 language.  My position is always the same, that it --
23 you know, in person -- in-person voter fraud, voter
24 impersonation is not the most dominant form of voter
25 fraud.  But to answer your question, this is what he

## 155

1  says.
2       Q.   Okay.
3            MR. FREEMAN:  If we could have this marked
4  as U.S. 373.
5            (Exhibit 373 marked for identification.)
6       Q.   (By Mr. Freeman) And this is a direct quote
7  from you.  It's --
8       A.   Steve miller.
9       Q.   It's "He told Texas Monthly," beginning one,
10 two, three, four, five -- the sixth paragraph.
11           MR. HUGHES:  Is there a question?
12      Q.   (By Mr. Freeman) Do you recall telling Texas
13 Monthly, "If it makes us feel good to pass voter ID,
14 okay, but it's not the solution to the voter fraud
15 that's out there"?
16      A.   Yeah, I said that, and that's consistent with
17 what I have said before, that is not the dominant form
18 of voter fraud.
19      Q.   Okay.  And so was the most common statement
20 that you heard concerning this bill that its purpose was
21 to combat voter fraud?
22           MR. HUGHES:  Again, I want to remind you
23 of the legislative privilege issues here.
24      Q.   (By Mr. Freeman) In a public forum.
25      A.   Okay.  In that you said it that way.  Yeah,

## 156

1  that's it.
2       Q.   But if it isn't going to really solve the voter
3  ID fraud that's out there, there must be some other
4  purpose, right?
5       A.   I can't say.  I just say, you know, look, we
6  all got to start somewhere.  And I presented many other
7  bills that addressed many of other problems, and some of
8  them were passed.  Some of them were passed by my
9  colleagues.  So, we addressed the questions that were in
10 front of us.  This one, for some reason, has taken a
11 high profile position.
12      Q.   Was the purpose of SB 14, in any part, to
13 decrease the number of Hispanic voters who could
14 effectively cast a ballot?
15      A.   That was not my intention.
16      Q.   I am not asking about your intention, which I
17 believe is privileged.
18           MR. HUGHES:  Yes, I'll remind you of the
19 same.
20      A.   Yeah.  I have to say, I saw no evidence of
21 that, okay?
22      Q.   (By Mr. Freeman) Was the purpose of SB 14, in
23 any part, to discriminate in any way against any group
24 of minority voters?
25           MR. HUGHES:  The same privilege reminder.

## 157

1    A.   You know, saw no -- I heard no language that
2    would cause me to infer that.  I saw no action that
3    caused me to infer that.
4    Q.   (By Mr. Freeman) Do you believe in limited
5    government?
6    A.   Hmm.  You're asking me a deep, philosophical
7    question there.  Government has its purpose oh, okay?
8    And let us start from the beginning.  To defend the
9    country in times of war, and I guess for that same
10   purpose, to develop an interstate transportation system.
11   Q.   We don't need to go that deep.
12   A.   Okay.
13   Q.   Do you believe in government -- do you believe
14   that is good policy --
15   A.   Oh, I see.
16   Q.   -- to have a government that passes legislation
17   that doesn't solve an actual problem?
18   A.   Oh, I know where you're going with this
19   question.  What I believe is, in answering the questions
20   that are presented to me, okay, and so this question was
21   presented to me, and I had to provide a -- I had to make
22   a decision, and I made my decision.
23        MR. FREEMAN:  I'm going to object to that
24   as nonresponsive.  But we'll move on.
25   Q.   (By Mr. Freeman) Are you familiar with the

## 158

1    Federal Help America Vote Act?
2    A.   Yeah.  HAVA.
3    Q.   Yeah.  Are you familiar with the voter
4    identification requirements for first-time voters under
5    HAVA who have registered to vote via a mail-in voter
6    registration form?
7    A.   Remind me, because I don't recall them.
8    Q.   Do you recall what ID are sufficient under
9    HAVA?
10   A.   No, I don't recall.
11   Q.   Do you recall whether a photo ID is necessary?
12   A.   I don't recall.
13   Q.   Are you a member of the American Legislative
14   Exchange Council?
15   A.   Hmm.  I don't know if I am.  I have been in the
16   past.
17   Q.   Okay.  And in the past, what was your
18   participation in the American Legislative Exchange
19   Council?
20   A.   Hmm.  I attended their convention.  Conference,
21   I believe, is the phrase used today.  I received
22   occasional e-mails.  I don't know if they're the ones
23   who put out a magazine, but they certainly put out
24   information.
25   Q.   Did you ever sit on a task force related to

## 159

1    election laws?
2    A.   I don't recall.  I think it's been mentioned
3    before by somebody, but I don't recall.
4    Q.   Let's refresh your recollection.
5         MR. FREEMAN:  If we can mark this as U.S.
6    374.
7         (Exhibit 374 marked for identification.)
8    Q.   (By Mr. Freeman) Do you see on Page 4, where it
9    says, "Two of them, Representatives Aaron Pena and Larry
10   W. Taylor, sat on the ALEC task force that approved
11   Voter ID model legislation"?
12   A.   Oh, yes.
13   Q.   Do you believe that to be the case?
14   A.   I saw this article, and I was called by a
15   reporter.  I don't know if it's the same one.  Do I
16   believe?  I assume he says I am, that I am.
17   Q.   Do you remember sitting on that task force?
18   A.   No.
19   Q.   Do you remember approving a model voter ID
20   bill?
21   A.   No.
22   Q.   Do you remember the contours of the model ID
23   bill that was released by ALEC?
24   A.   No.
25        MR. FREEMAN:  I'll have this marked as

## 160

1    U.S. 375.
2         (Exhibit 375 marked for identification.)
3    Q.   (By Mr. Freeman) Under this bill -- does this
4    look at all familiar to you?
5    A.   No.
6    Q.   Under this model bill, what are the forms of
7    proofs of identity that are acceptable?
8    A.   Okay.  Under Exhibit 375, Section 1.A1, it
9    shows the name of the person to whom the document was
10   issued.  2, shows a photograph of the person to whom the
11   document was issued.  3, contains an expiration date and
12   is not expired.  4, is issued by the United States or
13   the State of Arkansas.
14   Q.   So this is an Arkansas modeled bill, but --
15   A.   Okay.
16   Q.   -- it's by the United States or the state; is
17   that correct?
18   A.   Yes.
19   Q.   And do you see under Section 2 C, small 2, is
20   there an exception for indigent voters who may not have
21   an ID?
22   A.   Yes.
23   Q.   Are you familiar at all with the Indiana model
24   legislation that you discussed before?
25   A.   No, not specifically.

## 161

1   Q.   Are you familiar with the forms of ID that are
2   permissible under the Indiana model legislation?
3   A.   No.
4   Q.   But you said before that part of the reason
5   that you thought that the Texas bill was legal was that
6   of it was modeled after Indiana, right?
7   A.   Yes.
8   Q.   But you didn't know if they were actually the
9   same, did you?
10  A.   I was -- I was told that they were similar.
11  Q.   Okay.  This has previously been marked as U.S.
12  Exhibit 60.  (Handed to witness.)  And this is just one
13  page of Exhibit 60, but it's relevant page.
14      If you could take a quick look at this.
15  A.   (Viewing documents.)  Okay.
16  Q.   Isn't it the case that Indiana allows the use
17  of any state or federal ID with a named photo and
18  expiration date that is unexpired or expired after the
19  last general election --
20  A.   That's what it appears to say.
21  Q.   And so that's pretty much the same as the ALEC
22  model legislation, right?
23      MR. HUGHES:  Are you making a
24  representation that Exhibit --
25      MR. FREEMAN:  I'm asking if --

## 162

1       MR. HUGHES:  -- 375 is the ALEC model?
2       MR. FREEMAN:  I am.
3       MR. HUGHES:  Because I don't think he ever
4   testified to that.
5   Q.   (By Mr. Freeman) Well, it's relatively similar.
6   A.   I don't see the -- yeah, relatively similar,
7   yeah.
8   Q.   What are the differences?
9   A.   That indigent language I don't see here.
10  Q.   I'm just asking about the form of ID there.
11  A.   Oh.
12  Q.   I can represent to you that there's more of the
13  Indiana bill.
14  A.   Oh, okay.  Yeah, that seems similar.
15  Q.   Okay.  And does the Indiana law establish an
16  individual's identity with those documents?
17  A.   Yes.
18  Q.   Okay.  Are you familiar with the forms of ID
19  that were permissible under the Georgia photo ID law?
20  A.   No.
21      MR. FREEMAN:  This has previously been
22  marked as Exhibit 6.  U.S. Exhibit 6.
23      MR. HUGHES:  This is 6?
24  A.   No, I'm not familiar, and I've not that seen
25  this before.

## 163

1   Q.   (By Mr. Freeman) Can you take a quick look at
2   the forms of ID that are acceptable under Section
3   21-2-417 of Georgia code for acceptable voter ID in
4   Georgia?
5   A.   Okay.
6   Q.   Does it allow the use of an employee ID?
7   A.   Yes.
8   Q.   Does it allow the use of a tribal ID?
9   A.   Yes.
10  Q.   Does the Georgia law establish voters'
11  identities?  Identities?
12      MR. HUGHES:  Based on?
13  Q.   (By Mr. Freeman) Based on the use of these
14  documents?
15  A.   Yes.
16  Q.   Are you aware of a photographic voter
17  identification bill that was introduced in the 81st
18  Texas Legislature in 2009?
19  A.   Yes.
20  Q.   Was a single bill subject to serious
21  consideration?
22  A.   Yes.
23  Q.   Who introduced that bill?
24  A.   I don't recall.
25  Q.   Do you recall why they said they introduced it?

## 164

1   A.   No.
2   Q.   What was your involvement with that bill?
3   A.   I voted or didn't vote.
4   Q.   Did it pass through the Elections Committee?
5   A.   I don't recall, but I assume so.
6   Q.   Do you recall whether you voted against it in
7   the Elections Committee?
8   A.   I probably voted against it.
9   Q.   Do you recall the basic provisions of that
10  bill?
11  A.   No.
12  Q.   And this has previously been marked as U.S.
13  Exhibit 29.  (Handing to witness.)
14  A.   Okay.
15  Q.   Have you seen this before?
16  A.   I can assume that I did.
17  Q.   And what forms of identification are allowable
18  under the bill under Section 6 of the bill, if that gets
19  you to the right place?  Section 6 and Section 11.
20  A.   Where?  I'm sorry.  It says 6301 -- okay.
21  Amended -- okay.  63.1001A.  Do I got to go there?
22  Q.   You do.
23  A.   Driver's license.  Personal ID card issued by
24  the Department of Public Safety that has not expired or
25  expired no earlier than two years before date of the

## 165

1  presentation.  A United States military ID.  A United
2  States citizen's certificate.  Passport.  Concealed
3  handgun license.  A valid ID that contains a person's
4  photograph issued by an agency, institution -- the
5  voter's -- a voter registration certificate.
6      Q.   And just to be clear, after that -- that first
7  set, one of those is acceptable, in the second set, you
8  need two, correct, under Section 6B-2 back on Page 3?
9      A.   If you say so.  Okay.
10      Q.   Maybe I'll lead a little bit, and this might
11  get easier.
12      A.   Okay.
13      Q.   Isn't it the case that under SB 362, which is
14  Exhibit 29, and the bill that was introduced and
15  considered in 2009, that a voter could offer either,
16  one, driver's license, personal identification card,
17  military identification card, citizenship certificate
18  with a photographic, a passport, license to carry, or
19  any other state or federal ID with a photograph; or two
20  of either a voter registration certificate, current
21  utility bill, bank statement, government check,
22  paycheck, other government document that shows the name
23  and address of the voter, any official mail from the
24  government, a certified birth certificate, United States
25  citizenship papers without a photograph, a marriage

## 166

1  license, a divorce decree, adoption records, name change
2  or sex change records, public benefits cards, veterans
3  benefits cards, Medicaid cards, Medicare cards,
4  temporary driving permits, pilot's licenses, library
5  cards, or hunting and fishing licenses?
6      A.   Yes.
7      Q.   How would this bill have solved any problem
8  related to in-person voter fraud in comparison to
9  current law?
10      A.   How would it solve it?
11      Q.   Yes.
12      A.   I don't understand.  You mean --
13      Q.   What would SB --
14      A.   -- would it more effective?  Less effective?  Is
15  that what you mean?
16      Q.   Yes.  What would SB 362 have done, in
17  comparison to current law, to fix voter fraud?
18      A.   I think we had this discussion before.
19      Q.   Well, this is a different bill from SB 14.
20  This allows you to use different types of documents.
21      A.   Yeah.  Yes.
22      Q.   And you don't think -- am I correct that you
23  don't think that it would solve any other real types of
24  fraud that happen in your district?
25      A.   It may stop a few instances that I'm aware of,

## 167

1  but like I said, most of the voter fraud is in other
2  channels of doing this sort of voter fraud.  It's not --
3  in-person impersonation is not as significant in my
4  experience.
5      Q.   Okay.  Did you participate in the chubbing of
6  SB 362?
7      A.   I don't remember.
8      Q.   What is chubbing, for Mr. Hughes's benefit?
9      A.   Chubbing is a phrase that is used in Texas for
10  wasting time at the microphone to delay, for a variety
11  of purposes, for the sole purpose of delay.
12      Q.   And was chubbing what caused SB 362 to not pass
13  the Texas House?
14      A.   Yeah.
15      Q.   Do you recall whether or not you stood at the
16  microphone and participated in the chubbing?
17      A.   It's not likely that I did.
18      Q.   Okay.  To be honest, I have no idea.  I was
19  just asking.
20      A.   No, I'm not the sort that chubs.
21           MR. HUGHES:  If we're at a breaking point.
22           MR. FREEMAN:  Want to take a break?
23           MR. HUGHES:  Yeah.
24           MR. FREEMAN:  Okay.  Let's take a break.
25           (Recess from 2:16 p.m. to 2:29 p.m.)

## 168

1           MR. FREEMAN:  Back on the record.
2      Q.   (By Mr. Freeman) Okay.  Back on the record
3  after a break.
4           During the committee debate on SB 362, the
5  exhibit in front of you there, Exhibit 29, do you recall
6  telling the McAllen Monitor that you found little to no
7  evidence of voter impersonation and complaining about a
8  lack of opportunity to cross-examine witnesses?
9      A.   I do remember something to that effect.  The
10  lack of cross-examination had to do with a group of
11  witnesses that came up from the Valley.
12      Q.   Uh-huh.
13      A.   Uh-huh.  And if I remember right, somebody was
14  going to say something, and said, "Well, I surely would
15  like examine them," but they were pulled away.
16      Q.   Did they submit affidavits instead?
17      A.   I don't recall.
18      Q.   Okay.
19      A.   They might have.
20      Q.   Do you recall telling the Fort Worth Star
21  Telegram that voter ID was bad for Texas, plain and
22  simple?
23      A.   Did I say that?
24      Q.   Do you recall saying that?
25      A.   If you say I said it, then, yes, okay.

## 169

1    Q.   Well, let's see if we can refresh your
2    recollection.
3             MR. FREEMAN:  If we can mark this as U.S.
4    376.
5             (Exhibit 376 marked for identification.)
6    Q.   (By Mr. Freeman) This is on Page 2 in the
7    middle of the page.
8    A.   I don't see it.  Oh, Page 2?
9    Q.   Yes.
10   A.   You did say that.
11   Q.   I did.
12   A.   If that's what it says I said.
13   Q.   Did you believe in 2009 that voter ID was bad
14   for Texas, plain and simple?
15   A.   I don't remember.  I'm sorry.
16   Q.   You have no recollection why you opposed a
17   major bill in the Elections Committee of which you were
18   the vice chairman?
19            MR. HUGHES:  And I'll remind you of your
20   legislative privilege concerning, and the question has
21   been asked and answered.
22   A.   I am not sure the Elections Committee was a
23   major committee.  No, I don't recall.
24   Q.   (By Mr. Freeman) Okay.
25   A.   But I know Dave Montgomery.  If he says I said

## 170

1    that, then I may have said that.
2    Q.   It's as good as you can get from Dave
3    Montgomery?
4    A.   He's a good guy.  He's not a somebody who makes
5    stuff up.
6    Q.   I'm sure he is.
7    Q.   Huh?
8    Q.   I'm sure he is.  No sarcasm.  That's not going
9    to come across on the record.  I'm saying that honestly,
10   Mr. Montgomery.
11            Did SB 14 resolve any problems you may
12   have had with -- you may have publicly commented on with
13   regard to SB 362?
14   A.   Not that I recall.
15   Q.   Do you recall the basic provisions of SB 362?
16   A.   Other than what you described to me.  You need
17   have a photo ID to vote.
18   Q.   Do you recall the forms of identification that
19   are allowable under SB 14?
20   A.   If I remember right, a passport and driver's
21   license, hunting, concealed carry, the so-called free
22   voter identification card.  Did I miss one?
23   Q.   Military ID?
24   A.   Military ID.
25   Q.   And a U.S. citizenship certificate with a

## 171

1    photo?
2    A.   Oh, yeah.  You introduced that to me today.
3    Q.   It's in the bill, though, correct?
4    A.   Okay.
5    Q.   All right.  Would you like to have a copy of
6    the bill in front of you?
7    A.   No.
8    Q.   Okay.  Now, we previously discussed the list of
9    ID that can be used under the -- what I represented to
10   you was the ALEC model legislation.  Is this a narrower
11   list than the ALEC model legislation?
12   A.   Yes.
13   Q.   Is it a narrower list than Indiana?
14   A.   Yes.
15   Q.   Is it a narrower list than Georgia?
16   A.   Yes.
17   Q.   Didn't you earlier testify that each of those
18   bills would establish identity?
19   A.   That's what the bill said, each of those bills.
20   Q.   Okay.  Is it your belief --
21   A.   The legislative language said these are
22   identification, and then listed them.  So that's what
23   the bill said.
24   Q.   Okay.  Is it your belief that the IDs in the
25   Georgia bill are sufficient to establish a voter's

## 172

1    identity?
2    A.   Okay.  That's the policy question that Texas
3    was given and was made through the various processes we
4    go through.
5    Q.   Is it your belief that the IDs in the Georgia
6    bill establish a person's identity when they show up to
7    vote?
8    A.   Okay.  I will say that I have reservations
9    about employee identifications, employee or agencies of
10   the government, as we described, I would like there to
11   be some security in the identification.  So if your
12   question is asking me:  Are those sufficient
13   identifications, that's a policy question Texas was
14   confronted with.  I personally don't find that internal
15   office IDs, college IDs are sufficient.  I like there to
16   be some safeguards.
17   Q.   And your basis for saying that they're not
18   sufficient?
19   A.   Is a judgment that I make.
20   Q.   And as the security features?
21   A.   Yeah.  Yes.  I'm sorry.  I said "Yeah." I read
22   -- okay.  Yes.
23   Q.   But you said previously that -- sorry, strike
24   that.
25            Is Indiana as racially diverse as Texas?

## 173

1    A.  You know, I don't know.  All I know about
2  Indiana is Abraham Lincoln's history there.
3    Q.  That's Illinois, I believe.
4    A.  No, he started Indiana, and then he moved
5  across.  But I don't know much more.  I mean, I've to be
6  Illinois.  I'm sorry.  I know it's humorous, but Texas
7  has three major ethnic groups.  Three major -- well,
8  okay.  Hispanic is not a -- is an ethic group, not a
9  racial group.  We have whites.  We have African
10  Americans, and we have Hispanics.  Those are the major
11  groups here.  Now, I don't know if it's more diverse or
12  not --
13    Q.  You don't know?
14    A.  -- to answer you question.  I don't know.
15    Q.  Are you familiar with the Supreme Court's
16  decision of Crawford v. Marion County Board of
17  Elections?
18    A.  Refresh my memory.  I don't --
19    Q.  The Supreme Court decision concerning voter ID?
20    A.  No.
21    Q.  Is it possible that the factual circumstances
22  in Texas, with regard to race and poverty, access to IDs,
23  et cetera?
24
25    A.  I'm sure there are factual distinctions that

## 174

1  could be raised.
2    Q.  Okay.  Do you recall telling the McAllen
3  Monitor that the Attorney General's decision to deny
4  preclearance of SB 14 was blatantly political?
5    A.  What?  I'm sorry.  Which Attorney General?
6    Q.  The Attorney General of the United States.
7    A.  Oh, yes.
8    Q.  The defendant in this case.
9    A.  Okay.  Yes.  I do recall that.  I'm sorry.
10  It's because Attorney General Abbott and I have a very
11  close relationship, and I know him quite well, and I
12  know his wife, and it's just not like me to talk that
13  way about him.  But as to Mr. Holder, yeah, that was
14  political.  He -- he is -- okay.  To answer the
15  question, yes, I remember.
16    Q.  What was the basis for that statement?
17    A.  He has made this issue a seemingly campaign
18  issue, where he goes around the country, and he seems to
19  be whipping up support for him.  That's perfectly good
20  and fine.  As an American citizen, he can do it.  But
21  that being so close to the election, when the swing
22  states involved are places like Colorado and some of the
23  western states, where there's a high Hispanic
24  percentage, seems to me to be blatantly political.
25    Q.  Is Eric Holder an elected official?

## 175

1    A.  No.
2    Q.  And hasn't he signed off on objections to voter
3  ID bills in only Texas and South Carolina?
4    A.  I don't know that.
5    Q.  Would you describe Texas as being a state that
6  is in contention in the 2012 election?
7    A.  No, but it has a heavy Hispanic population.
8  Okay.  Look, you're asking -- okay.  I still maintain
9  that it was it was a political -- a blatantly political
10  decision.
11    Q.  And I'm just curious --
12    A.  I don't know why he came to Austin to give that
13  speech.  He seems to be making a point of it.  The
14  administration seems to be making a point of this, and I
15  think it's to create a wedge issue between Hispanics and
16  the conservative movement.
17    Q.  Did you ever have any conversations concerning
18  aspects of SB 14 that were different from SB 362?
19      MR. HUGHES:  And I want to, again, caution
20  you on the legislative privilege, and ask if we could
21  get the question rephrased to remove the obvious concern
22  here that you're asking about potential conversations
23  that are subject to the legislative privilege.
24    Q.  (By Mr. Freeman) Did you ever have any
25  conversations concerning the substance of SB 14 prior --

## 176

1  specifically that bill, what would be in that bill?  Is
2  that sufficiently broad?
3    A.  "I don't recall" is the answer.
4    Q.  You solved all our problems.  Thank you.
5      What was the purpose of omitting student
6  IDs from SB 14?
7    A.  I don't know what --
8      MR. HUGHES:  And again, I'll give you the
9  legislative privilege caution that you can talk about
10  the purpose of the bill as a whole, but not individual
11  legislative intent.  On that basis, you can answer.
12    A.  All right.  I've stated -- I don't know what
13  other people were thinking, okay, and I am not the one
14  who omitted it.  But I find that there are not enough
15  security, levels of security in student identification
16  cards.
17    Q.  (By Mr. Freeman) How about tribal ID?
18    A.  What about it?
19    Q.  What was the purpose the omitting tribal ID?
20    A.  I don't know.
21      MR. HUGHES:  The same instruction.
22    A.  I don't know.  It was in my -- it wasn't my
23  choice to remove or not put that in there.
24    Q.  (By Mr. Freeman) What does the term
25  "legislative emergency" mean within the Texas

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

177

1    Legislature?
2        A.   Oh, is this -- is this the Governor's call for
3    a legislative emergency?  Is that what you're talking
4    about?
5        Q.   Uh-huh.
6        A.   It doesn't mean what it says, okay?  It is a
7    misnomer, in that what it means is that this a priority
8    to him rather than an emergency, okay?  So people always
9    -- newspapers love to make a point of the fact that this
10   language doesn't match with the purpose that it's
11   there.  It is not an emergency; it's simply a priority
12   to the Governor.
13       Q.   Are there any constraints on what the Governor
14   may declare to be a quote, unquote emergency?
15       A.   I guess political constraints.
16       Q.   But not substantive, not legal constraints?
17       A.   Not that I'm aware of.
18       Q.   Okay.  Was photographic voter identification
19   declared to be a legislative emergency?
20       A.   Yeah, I assume that that language, legislative
21   emergency, must be the Constitution or somewhere,
22   because it keeps being raised.  Yes, it was -- it was
23   declared an emergency.
24       Q.   Just to take a quick step back, you said that
25   there are political constraints.  What did you mean by

---

178

1    that?
2        A.   Well, like I said, every time that there is --
3    well, first of all, internally within his -- within his
4    support, he shouldn't raise something that he doesn't
5    have political support for, like abolishing the death
6    penalty is a good example, or legalizing cocaine.
7    That's a -- you know, he's got his own constraints.
8             The other thing would be having to put up
9    with what the press does every time that he declares
10   something a legislative emergency.  The press will say,
11   you know, he'll declare -- let's use an example -- that
12   this is Bugs Bunny's hundredth birthday, and we're going
13   to do -- we're going to have a -- he's got to put up
14   with people picking on him for saying that.  Those are
15   the only sort of limitations.  He's otherwise free to do
16   as he pleases.
17       Q.   Are there any particular individuals within the
18   Governor's Office of which you're aware who are
19   responsible for setting out the declarations of
20   legislative emergencies?
21       A.   No, not that I'm aware of.  I can take guesses,
22   but I'm not going to do that.
23       Q.   Were you a part of any conversations concerning
24   what would be declared a legislative emergency in 2011?
25            MR. HUGHES:  I'm going to instruct --

---

179

1    them.  Let me make my objections, but we can move on.
2            MR. FREEMAN:  You're going to obstruct --
3    instruct?  Sorry, that was a Freudian slip there.
4            Let me try and make it a little broader,
5    then, and avoid the instruction.
6        Q.   (By Mr. Freeman) Are you aware of any
7    conversations concerning legislative emergencies that
8    occurred in early 2011?
9            MR. HUGHES:  And again, I'm going to
10   caution you on legislative privilege not to reveal
11   legislatively-privileged conversations between
12   legislators or between legislators and legislative staff
13   or between legislators and members of the Governor's
14   Office.
15       A.   I'm not.
16       Q.   (By Mr. Freeman) Are you aware of any documents
17   relating to the subject of legislative emergencies that
18   were circulated at the beginning of 2011 or any e-mail?
19           MR. HUGHES:  The same precaution.
20       A.   After the fact is publicly made --
21       Q.   (By Mr. Freeman) Yeah.
22       A.   -- we typically get a form on the Floor, and it
23   says the Governor is hereby proclaimed whatever.
24       Q.   Okay.  That's all?
25       A.   Sometimes they read it into the record on the

---

180

1    Floor.  I don't recall if the caucus put anything out.
2        Q.   Anything else?
3        A.   No, not that I can recall.
4        Q.   Is there any election set to occur in Texas
5    during the session or early in the session?
6        A.   Forgive me.  I don't remember.
7        Q.   Of which you're aware?
8        A.   Yeah, maybe you could help refresh my memory.
9    I don't remember one.
10       Q.   Okay.  Do you have any other understanding of
11   why voter ID would be a legislative emergency?
12       A.   Because the public wanted it.
13       Q.   Are you aware of any conversation concerning
14   SB 14 that occurred before it was submitted for
15   consideration in the Senate?
16           MR. HUGHES:  And again, I'm going to
17   instruct you that if you can just answer it yes or no,
18   then we're not going to get into the legislative
19   privilege problem.
20       A.   No, I'm not aware of anything.
21       Q.   (By Mr. Freeman) What constituents did you
22   speak with concerning SB 14?
23       A.   My staff.
24       Q.   Any lobbyists?
25       A.   No.  Lobbyists usually don't care about stuff

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

181

1    like that.
2         Q.   Any interest groups?
3         A.   Not me personally.  Interest groups may have
4    called in to the office.
5         Q.   Anyone stop by your office to talk about the
6    bill?
7         A.   Not that I recall.
8         Q.   Did Catherine Engelbrecht ever stop by your
9    office?
10        A.   I don't know who that is.
11        Q.   Did Paul Bettencourt ever stop by your office?
12        A.   You know, I've heard that name Paul
13   Bettencourt.  Is he a Valley person?
14        Q.   I'll represent to you that he is not, that he's
15   from Harris County.
16        A.   Okay.  Forgive me.  I recognize the name, but I
17   don't know who they are and I can't put a face to it.
18        Q.   Okay.  So he didn't stop by your office?
19        A.   Oh, I don't know.
20        Q.   Did you speak directly with any experts
21   concerning SB 14?
22        A.   In committee.
23        Q.   Did you speak directly with any representatives
24   of minority groups?
25        A.   My staff.  Oh, forgive me.  You mean organized.

---

182

1         Q.   I mean organized minority groups, yeah.
2         A.   In committee.
3         Q.   No one came by your office?
4         A.   They may have.  They would speak to my staff,
5    I'm sure.
6         Q.   Did you speak with anyone at any public events?
7         A.   Not that I recall.
8         Q.   Do you recall whether any minority groups
9    advocated for particular changes in the bill?
10        A.   Look, I'm aware of MALDEF's position, and
11   they're always involved in the subject area.  And I'm
12   aware of like the ACLU.  They're always involved in the
13   question.  I got lost from the question.  What was it?
14        Q.   Are you aware of any minority groups who
15   particularly advocated for any particular changes to
16   SB 14?
17        A.   You know, most of it was, "We just don't like
18   it."  Okay?  But I don't recall changes.
19        Q.   So they were just urging you to vote against
20   it?
21        A.   No.  The groups that I mentioned, MALDEF,
22   LULAC.
23        Q.   GI Forum?
24        A.   GI Forum.  Well, okay.  GI Forum, I don't talk
25   with.

---

183

1         Q.   Okay.
2         A.   Not that I have a -- actually, I was a member
3    of the GI Forum.  Don't have any objection to them.  But
4    they're not as organized as you may think, okay?
5    They're out there, but they're not -- they don't have a
6    legislative person.  They have individuals who come by
7    and see you.  LULAC is a very diverse group, in that
8    each -- they each have individual districts or chapters,
9    and they all speak differently.  You know, the State is
10   the only who speaks with a coherent position.
11            So, I'll have LULAC members back home, and
12   they'll have -- they'll say whatever they personally
13   feel, but then the State will come down with a
14   position.  MALC, they tend to have a progressive
15   position on things.  I give consideration to MALDEF
16   probably more than other groups.
17        Q.   Did any suggestions made by MALDEF or any of
18   these other groups find their way into the final bill as
19   passed?
20        A.   I don't recall.  Like I said, what I do recall
21   is that some of these organized groups took positions
22   against the bill.
23        Q.   Did DPS or SOS ever provide you with an
24   analysis what voters possessed the identification
25   required by SB 14?

---

184

1            MR. HUGHES:  And I'm going to caution you
2    on legislative privilege not to reveal any nonpublic
3    communications that you had with legislators,
4    legislative staff, or DPS or SOS.
5         A.   Not that I recall.
6         Q.   (By Mr. Freeman) Do you recall when SB 14 was
7    filed in the Senate?
8         A.   No.  Go ahead.  I'm going to grab some water.
9            MR. FREEMAN:  Let's take a break a two-
10   minute break.  Off the record.
11            (Recess from 2:53 to 3:02 p.m.)
12        Q.   (By Mr. Freeman) Are you aware of any
13   conversations that occurred concerning who would sponsor
14   SB 14 in the House?  Yes or no?
15        A.   Yes.
16        Q.   When did those conversations occur?
17        A.   Before it came out.
18        Q.   Who was present?
19        A.   I don't know.  I don't remember that.
20        Q.   Were you a part of those conversations?
21        A.   I heard.  Heard.
22        Q.   So you're aware of the conversation?
23        A.   I'm aware of the conversation.  I wasn't
24   there.  In other words, they hit my ears through a third
25   person.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

---

185

1    Q.   When did you sign onto SB 14 as a sponsor?
2    A.   After it was filed.  Sometime shortly
3    thereafter.
4    Q.   What was your role as the third-named sponsor?
5    A.   I think my role was that I was -- I was giving
6    my blessing to the legislation.  That's the way I saw
7    it.  In other words, that I was satisfied that it ought
8    to be passed.
9    Q.   Are you aware of when the Select Committee on
10   Voter ID Identification and Voter Fraud began
11   considering SB 14?
12   A.   No.
13   Q.   If it was a legislative emergency, was it early
14   in the session?
15   A.   We all knew, all the way up until the session
16   before, that it was coming up.
17   Q.   Okay.
18   A.   That's the reason before the session started, I
19   was able to say, "This session, I'm supporting that
20   bill."
21   Q.   What's the emergency calendar?
22   A.   That designation allows you to be put up at the
23   front of the line rather than waiting in line like
24   everybody else does.
25   Q.   And is that controlled by the Calendar

---

186

1    Committee?
2    A.   Oh, I'm sorry.  No, I think that -- well, I
3    don't know where that comes from, but the understanding
4    is that it always goes first.
5    Q.   Okay.
6    A.   There must be some rule or maybe Calendars
7    Committee decides that.
8    Q.   Are you aware of any changes that were
9    introduced to SB 14 in Conference Committee that had not
10   been in the version of the bill that passed either
11   House?
12   A.   Yes.
13   Q.   What changes occurred?
14   A.   If I remember, they took out the senior citizen
15   exemption, if I remember correctly.  You can confirm
16   that with me.
17   Q.   Can you name any other instance when changes
18   like that were made?
19   A.   No, I can't.  What do you mean by that?  You
20   mean in other bills?
21   Q.   Other bills where a change was made in
22   conference that hadn't been in either the Senate or
23   House version?
24   A.   Oh, no, that happens.  Look, Conference
25   Committee, that's the reason everybody wants to be on

---

187

1    the Conference Committee, because it's a free -- you
2    have a free ride to try to get in or get out whatever it
3    is you want.
4    Q.   Regardless of whether it had been in or out in
5    either bill; it's not just resolving the differences?
6    A.   Right.  Right.  In other words, it's -- if
7    you're not paying attention, your whole bill could be
8    stripped and totally reversed in Conference Committee.
9    Q.   Okay.  To your knowledge has the Secretary of
10   State or any local election official enforced SB 14 at
11   all?
12   A.   No.
13   Q.   Are you aware of any reports of confusion about
14   whether the bill is in effect?
15   A.   I saw on the Internet somebody say that they
16   were speaking at a black church to tell people that it
17   was not enforced.  This was out of Houston or somewhere.
18   Just in my various readings, I scanned it, I saw it, and
19   that was it.
20   Q.   Anything else?
21   A.   Not that I can recall.
22   Q.   And we touched on this a little already, but
23   who are the main opponents of SB 14?
24   A.   Democrats.
25   Q.   Anyone in particular?

---

188

1    A.   Progressives, organized groups that are part of
2    the Democratic coalition.
3    Q.   Any particular legislators?
4    A.   That are against it?
5    Q.   Uh-huh.
6    A.   Rafael Anchia is somebody I served with who has
7    been a vocal opponent of it.
8    Q.   Anyone else?
9    A.   I guess Trey Fischer Martinez.  He's always got
10   an objection to everything that Republicans present.
11        MR. GARZA:  Now, now, now.
12   A.   That's just a little fun, okay?
13   Q.   (By Mr. Freeman) We're going to run to Trey,
14   and we're going to tell on you.
15   A.   He'll just say, you know, something derogatory
16   towards me.  That's okay. (Laughing)
17   Q.   We're all friends here.
18        Anyhow, did any of your constituents
19   express opposition to the bill?
20   A.   Hmm.  Activist Democrats on the Internet.
21   Q.   Anyone who lived in your district?
22   A.   Not that I recall.
23   Q.   Were there any election officials who told you
24   that it wasn't necessary?
25   A.   My colleagues from the Valley, the Democratic

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

## 189

1  colleagues from the Valley.
2      Q.  Did the county judge of Hidalgo County express
3  opposition?
4      A.  I would assume he'd be opposed to it.  He's a
5  Democratic loyalist.
6      Q.  Why was he opposed to it?
7          MR. HUGHES:  It calls for speculation.
8      Q.  (By Mr. Freeman) If you're aware?
9      A.  It's his natural orientation, philosophical
10 orientation.
11     Q.  Was there substance to the opposition of which
12 you were aware?
13     A.  Substance?  All the arguments you've made today
14 would be echoed and embraced by some of the Democratic
15 activists from back home, including the county judge.
16     Q.  Representative Pena, I've only asked questions.
17     A.  The inferences that are made within your
18 questions, then.
19          No, back home -- okay.  I better shut up,
20 because I'm just going to chatter on, and y'all have to
21 get on.
22     Q.  You have interesting things to say, and we have
23 seven hours to talk.
24     A.  No.  No.  Keep going.
25          MR. HUGHES:  Just answer the questions.

## 190

1      A.  Keep going.
2      Q.  (By Mr. Freeman) Are the concerns that other --
3  the Hispanic-elected officials who you named, your two
4  colleagues who you named who are also both Hispanic, are
5  the reasons for their opposition that they expressed
6  similar to the concerns that you once held about the
7  bill?
8          MR. HUGHES:  And I'm going to remind you
9  about the legislative privilege and not to disclose, you
10 know, off-the-record communications between you and
11 other legislators or legislative staff or your own
12 impression, mental impressions, thoughts, or opinions
13 about the legislation.
14     A.  I don't know.
15     Q.  (By Mr. Freeman) Did you make any public
16 statements about other legislators' opposition or other
17 groups' oppositions other than what we've discussed
18 today?
19     A.  I don't understand the question.
20     Q.  Did you ever -- so, for example, you made
21 public statements in favor of the bill.  You made a
22 public statement that you believe the Attorney General
23 of the United States's opposition is political.  Are
24 there any other public statements that you've made
25 concerning the arguments against SB 14?

## 191

1      A.  Not that I recall.
2      Q.  Have you ever made any public statements about
3  on the subject of whether SB 14 might disproportionately
4  impact Hispanic voters?
5          MR. HUGHES:  Can you ask that one again?
6      Q.  (By Mr. Freeman) Have your made any public
7  statements about on the subject of whether SB 14 might
8  disproportionately impact Hispanic voters?
9      A.  Not that I recall.
10     Q.  Do you recall telling Governing Magazine,
11 quote, "This is not racial at all.  It's the mark of
12 desperation when they constantly bring up these things"?
13     A.  Did I say that?
14     Q.  Do you recall saying that?
15     A.  No, I don't recall.
16     Q.  I don't want to put words in your mouth, but
17 I'm happy to put it in front of you.
18     A.  I trust you.  If you say that I said that.
19          THE WITNESS:  Can I say something off the
20 record?  Do we have permission from you to say something
21 off the record?
22          MR. FREEMAN:  There is a question
23 pending.
24          MR. HUGHES:  Let's --
25          THE WITNESS:  Okay.  I don't need to say

## 192

1  it.  It was just a commentary.  I shouldn't say it.
2          MR. FREEMAN:  If we can mark this 377.
3          (Exhibit 377 marked for identification.)
4          MR. HUGHES:  Do you have a question in
5  particular?
6          MR. FREEMAN:  There is a question pending
7  of whether he recalls saying to Governing Magazine --
8      Q.  (By Mr. Freeman) Whether you recall saying,
9  "This is not racial at all.  It's the mark of
10 desperation when they just constantly bring up these
11 things"?
12     A.  Can you tell me where that is?
13     Q.  I'm sorry.
14          MR. HUGHES:  It's at the very bottom.  The
15 very end of the second page.
16     A.  Oh, okay.  (Viewing document.) I don't recall,
17 okay?  I'm quite serious.  I don't recall, but if he
18 wrote it down, I suspect that it's more true than not.
19     Q.  (By Mr. Freeman) Okay.
20     A.  This is a publication I trust.
21     Q.  Okay.  But you testified earlier that you
22 didn't look at whether this facially-neutral law would
23 have a discriminatory impact, did you?
24     A.  Well, I considered that.
25     Q.  But you didn't look to see whether it was more

193

1  likely or less likely that Hispanic voters would lack
2  the necessary ID, did you?
3       A.  No, I considered that.
4       Q.  Did you look at the statistics about who had
5  the ID?
6       A.  Somebody presented those, but I don't -- I
7  don't recall specifically.
8       Q.  Now, you used to -- you used to litigate
9  employment --
10      A.  Yes.
11      Q.  -- issues, right?
12      A.  Yes.
13      Q.  And you're familiar with the idea that
14  sometimes a facially-neutral policy can have a
15  discriminatory effect, correct?
16      A.  I'm aware of that.
17      Q.  But you think that in this case, this facially-
18  neutral policy, regardless of whether Hispanics had --
19  were less likely to have ID, that it was desperation to
20  bring up whether it would have a discriminatory effect?
21      A.  I'm aware that the Supreme Court of the United
22  States looked at a similar law and found it to be
23  constitutional.
24      Q.  Are you aware of whether the Supreme Court of
25  the United States considered at all whether Indiana's

194

1  law would have a disparate impact?
2       A.  I can only assume that the argument was made.
3  I mean, if you assume that lawyers of that caliber that
4  get cases to that point make every argument they can to
5  win, I assume it was made.
6       Q.  So you're not aware?
7       A.  I'm not aware.  But I can assume, okay, that
8  good lawyers would have made that argument.  If it goes
9  to the Supreme Court of the United States, I would
10 assume they made the argument.
11      Q.  And if you were to learn that they did not, if
12 you were to learn that that was just a due process case
13 that didn't address disparate impact on minority groups,
14 would that make you think differently about whether
15 SB 14 was problematic in terms of its racial impact?
16      A.  You know, it's not relevant because we're
17 talking about now.  I've already voted.
18      Q.  But in terms of whether it's a mark of
19 desperation to bring up a racial impact, in terms of
20 that --
21      A.  Well, I think what I was referring to here,
22 assuming that I said it, was that almost every time we
23 bring up a bill that the progressives do not like, they
24 raise the racial argument and it waters down the
25 occasions when it really needs to be raised, and it gets

195

1  frustrating.  Everything is racial.  It's just
2  desperation, and it's very frustrating to have
3  everything be racial.  Why wasn't I invited to this
4  meeting?  Oh, it must be racial.  Why did he get a
5  parking spot?  It must be racial.  And you get tired of
6  it get it after a point.  And quite -- well, I'm not
7  going to just get on a soapbox.  But it's just
8  frustrating that everything is racial, when we have --
9  leaders of our community have to get past that element
10 of human behavior, where we see each other as
11 different.  It is frustrating.  And so I can only assume
12 that I'm speaking out of frustration.  I'm sick and
13 tired of hearing that everything is racial.
14      Q.  At any point, did you have any conversations
15 about a Floor debate for SB 14?
16           MR. HUGHES:  Again, I'm going to instruct
17 on legislative privilege not to reveal off-the-record
18 conversations with other legislators, legislative staff,
19 or members of any government agency.
20      A.  Outside of the legislative privilege, I don't
21 recall any.
22      Q.  (By Mr. Freeman) No, I'm just asking yes or no
23 if you recall them.  And in terms of not disclosing the
24 content, you can tell me yes or no.
25           MR. HUGHES:  You can answer that.

196

1       A.  Yes, I do recall.
2       Q.  (By Mr. Freeman) Who did you have those
3  conversations with?
4       A.  Aliseda.
5       Q.  Anyone else?
6       A.  Not that I recall.
7       Q.  When did that conversation occur?
8       A.  Right before he got up to speak, I said, "I'll
9  ask you questions."
10      Q.  You didn't need to tell me that --
11      A.  I'm sorry, okay.
12      Q.  -- but I don't think that you ruined your
13 counsel's case.
14      A.  Okay.
15      Q.  Okay.  I am going to put in front of you what
16 has previously marked as Exhibit 9, which is the House
17 Journal from the day of the debate.  And we're just
18 going to have a whirlwind tour of a couple of the
19 amendments.
20           Whirlwind, Mr. Hughes.
21           MR. HUGHES:  Whirlwinds.
22      Q.  (By Mr. Freeman) And if you could turn to
23 Page 969.
24      A.  Okay.
25      Q.  And Amendment 15.

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

## 197

1    A.  Yes.
2    Q.  And this amendment would have prohibited fees
3  for the underlying documents necessary to receive any
4  form of proof of identification under SB 14, correct?
5    A.  I'm sorry.  State it again.
6    Q.  This amendment would have prohibited fees for
7  the underlying documents necessary for an ID needed to
8  vote under SB 14, correct?
9    A.  Okay.  Yes.
10    Q.  What was the purpose of this amendment?
11    A.  I don't know.  I mean, what was the purpose
12  behind Mr. Martinez filing the amendment?
13    Q.  What was the purpose of the amendment?  Had the
14  amendment been a separate piece of legislation, what was
15  the purpose of the amendment?
16         MR. HUGHES:  I'll object that it calls for
17  speculation and remind you of the legislative privilege
18  instruction.
19         MR. FREEMAN:  Mr. Hughes, I believe that
20  this is the same functionally as asking the purpose of a
21  piece of legislation.
22    A.  I can -- all I can do is read, and then make an
23  assumption, okay, that the language has a purpose.
24    Q.  (By Mr. Freeman) And you voted to table this
25  amendment, correct?  You can see on page 970?

## 198

1    A.  Okay.  I assume.  If Mr. Trey Fischer Martinez
2  gets up, it's more than likely I'm going to move to
3  table.
4    Q.  And as we discussed above, do you believe that
5  a cost for a document necessary to get an ID is a part
6  of the cost of getting the document?
7         MR. HUGHES:  Asked and answered.  But you
8  can still answer it again.
9    A.  The free ID is free.
10    Q.  (By Mr. Freeman) If you'd turn to Amendment 23
11  on Page 979.  Is it the case that Amendment 23 would
12  have added a student identification card issued by a
13  public or private high school or institution of higher
14  education that contains a photograph?
15    A.  That's what it looks like it says.
16    Q.  But you voted to table this amendment, correct?
17    A.  Right.  I have previously stated to you that I
18  don't think there are enough security protocols in a
19  high school ID.
20    Q.  Are you aware of the security protocols in a
21  military ID?
22    A.  No, but I trust that they are significant.
23    Q.  Does a military ID include a military
24  employment ID for outside contractors, are you aware?
25    A.  No, I don't know.

## 199

1    Q.  But you didn't vote against any aspect of the
2  bill on the basis that it included military IDs, right,
3  despite your lack of awareness of the security features
4  of a military ID?
5    A.  I served in the military forces, and I know
6  they are very careful in the presentation of their ID,
7  in preparation of it.  I can only assume that the United
8  States Army or Marines or other branches must have more
9  heightened security levels.
10    Q.  What about the Veterans Administration?
11    A.  I don't know.
12    Q.  Okay.  You can turn to Amendment 34 on Page
13  987.
14         MR. HUGHES:  987?
15         MR. FREEMAN:  987.
16    Q.  (By Mr. Freeman) Amendment 34 would have
17  rendered the act unenforceable if it didn't comply with
18  Section 5, Section 203, or Section 4(f)(4) of the Voting
19  Rights Act, correct?
20    A.  That's what it says.
21    Q.  When you voted to table this amendment, what
22  was your understanding of the purpose of the amendment
23  or what is current understanding of the purpose the
24  amendment, if that --
25    A.  Well, it speaks for what it wants to do.  But

## 200

1  let me explain that when a bill has been hashed out by
2  the majority and has been debated within that majority
3  coalition --
4    Q.  Uh-huh.
5    A.  -- one of the strategies to defeat a bill is to
6  load it up with amendments.  And what the author
7  typically says, or what we understand is, stay with the
8  bill, we've worked hard on it this far, let's just get
9  it through.  And so you can have perfectly good
10  amendments that sound perfectly well and reasonable, but
11  because we've already hashed out the bill, and we've
12  already negotiated it, you simply want to get it
13  through.
14    Q.  Aren't most of the Representatives in the
15  minority communities in Texas not a part of that
16  majority coalition?
17    A.  No, they're represented there.  I mean, it has
18  a color of skin that you want.
19    Q.  Aren't most Representatives who are preferred
20  candidates of minority voters not a part of the majority
21  coalition?
22    A.  I don't like that term, "preferred
23  candidates."  I was the preferred candidate for my
24  district, and then I switched parties, and all of a
25  sudden I was unpreferred.  That doesn't make sense.

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 201

1    Sometimes y'all get lost in the legalese and common
2    sense goes out the door.
3        Q.  Well, let's -- let's -- outside of your unique
4    circumstances, with regard to the candidates who were
5    voted -- who were voted for by minority voters, aren't
6    most of those legislators outside of the majority
7    coalition?
8        A.  I think that those people tried try their best
9    to represent those people.  I think that the minority
10   voters -- that these other people try their best to
11   represent them.  Now, maybe their experiences are a
12   little different, but nothing is perfect.  Everybody
13   tries to do their best.
14       Q.  Okay.  I will repeat my question, because I
15   believe you haven't answered it.
16           Aren't most the Representatives who are
17   elected by voters who are minorities not in the majority
18   coalition?
19       A.  Understanding what you intend to say and your
20   meaning behind those words, I think you're right.
21       Q.  Isn't the opportunity for those --
22       A.  But I don't agree that that -- with the
23   judgment that I think you're making.
24       Q.  My question is intended only to rest on
25   empirical facts, and as long as we are sharing the same

## 202

1    understanding of the meaning of those facts in terms of
2    voting patterns, not in term of theories of
3    representation, is that something we can agree on?
4        A.  Okay.
5        Q.  Okay.  Isn't the amendment process the
6    opportunity that those Representatives outside of the
7    majority coalition -- isn't that their opportunity to
8    effect and shape a bill?
9        A.  That's what it should be.  Unfortunately, it's
10   become a weapon used by the minority, not minorities,
11   but the minority coalition, to delay and chub and try to
12   derail the process.  It's a legitimate strategy.  Kind
13   like at the end of a football game when people try to
14   run out the clock, it is an acceptable strategy.
15           But so is it acceptable for the majority
16   to say, "We're not taking any amendments.  This is what
17   we want.  We already have the votes."  And this is such
18   a long-held discussion on a question, everybody had
19   their mind made up.  So, when things come up like, you
20   know, let's salute George Washington and something
21   really good, you know, everybody can agree to, we're
22   going to turn it down, because it's just an attempt to
23   delay the process.
24       Q.  Okay.  Then let's just through a couple more
25   amendments very quickly.

## 203

1           If you look to Page 1009 to 1010,
2    Amendment 50.  And Amendment 50 would have reimbursed
3    poor individuals for the costs necessary to travel to
4    get an ID, right?
5        A.  Yeah.  That's what it says.
6        Q.  And what's your understanding of the purpose of
7    this amendment?
8        A.  I can only assume.  Richard filed this as a --
9    well, because it sounds good, but it makes the
10   legislation unworkable or burdensome.
11       Q.  Burdensome on whom?
12       A.  In its implementation.
13       Q.  On whom?
14       A.  On the state.
15       Q.  Is it better to place the burden on the state
16   than on the poor voter?
17       A.  Under these circumstances, no.  And that's why
18   I probably moved to table it or I moved --
19       Q.  You voted to table it.
20       A.  Voted to table.
21       Q.  Correct?  Yes?
22       A.  Yes.
23       Q.  Okay.  Isn't it true that the majority of --
24   pardon me.  Isn't it true that members of racial or
25   language minority groups in Texas are far more likely to

## 204

1    live below the federal poverty line than Anglos?
2        A.  Yeah.  I've said that.  That's likely true,
3    because of the history that we've gone through.
4        Q.  And a lot of people in your district are poor,
5    as we've discussed, right?
6        A.  Yes, they are.
7        Q.  And so didn't voting to table this amendment
8    choose to place the burden that this amendment
9    recognizes on those poor people in your district rather
10   than on the state?
11       A.  What I know is that the Supreme Court of the
12   United States has interpreted this law, in some
13   variation of the one presented in Texas, to be not
14   overly burdensome.
15       Q.  My question was your understanding of whether
16   it was placing that burden on poor voters rather than on
17   the state, not the Supreme Court's --
18       A.  I don't think it's one or the other.  I think
19   there's a balancing test, and we, the policy deciders,
20   made a choice, and I was comfortable in that choice.
21   Because previously, the United States Supreme Court has
22   said that some version of this bill was acceptable and
23   not overly burdensome.
24       Q.  Can you turn to 1015, Amendment 54.  Take a
25   look at that real quick.  And this amendment would have

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

---

205

1    -- are you ready?
2        A.   Yes, I'm ready.
3        Q.   And this amendment would have required the
4    Secretary of State to determine who was prevented from
5    voting and who filed provisional ballots that were not
6    counted according to racial group, right?
7        A.   Yes, that's what it looks likes it says.
8        Q.   And you voted to table that amendment, correct?
9        A.   Yes.
10       Q.   Is there something going on behind my head?
11   There's like two military helicopters flying
12   over.  It's not a common sight.  It's common in
13   San Antonio, but not here.
14            (Pausing for helicopter noise.)
15            They're looking for you.  Either that or
16   Eric Holder is landing.
17            (Laughter)
18       Q.   I don't know how Eric Holder travels.
19       A.   That was a joke, for the record.
20       Q.   I know, yes.
21       A.   Okay.
22       Q.   Oh, I'm sure the record knows too.
23            Anyhow, let's just take a step back.
24            Amendment 54, isn't it the case that it
25   would have required the Secretary of State to determine

---

206

1    who was prevented from voting and who filed provisional
2    ballots that were not counted according to demographics?
3        A.   Yes, that's right.
4        Q.   And you voted to table that, correct?
5        A.   Yeah.  Again, as I said, the question had been
6    decided, amendments were -- are usually filed of this
7    nature when the minority coalition knows that it's going
8    to lose, to embarrass the majority by offering something
9    that's apple pie and sounds good, but has not been part
10   of the previously-negotiated bill.  So yeah, I voted
11   against it.
12       Q.   Would it concern you if Hispanic voters were
13   disproportionately showing up at polling places and
14   turned away because they didn't have the -- not turned
15   away, but voted a provisional ballot that didn't count
16   because Hispanic voters didn't have the ID?
17       A.   Would it concern me?
18       Q.   Uh-huh.
19       A.   It would be something that I'd want to know.
20       Q.   Well, if it was something that you wanted to know,
21   why did you vote against the amendment that precisely
22   would have given you that information?
23       A.   I told you.  It's because we had previously
24   negotiated the bill.  This -- Representative Alvarado
25   knew full well this bill, this amendment was not going

---

207

1    to be accepted.  As with the many previous other
2    amendments, it was an attempt to make political -- to
3    create a political advantage for the newspapers or I
4    guess in this litigation.  So he probably wasn't
5    thinking of this litigation, but any opportunity to
6    embarrass the majority.
7            MR. FREEMAN:  Can we go off the record for
8    a minute?
9            MR. HUGHES:  Yes.
10           (Recess from 3:35 a.m. to 3:41 p.m..)
11           MR. FREEMAN:  We are back on the record.
12       Q.   (By Mr. Freeman) Very quickly, I can guess what
13   your response is going to be, but if I can very quickly
14   just go through it.  Can you look at Amendment 55 on
15   page 1016.  Can you take a look real quickly?
16       A.   Yes.
17       Q.   Amendment 55 would have required the Secretary
18   State to determine whether the majority of voters
19   casting provisional ballots did so because they lacked
20   photo ID were minority, and if that were the case, to
21   allow them to use voter registration certificates,
22   correct?
23       A.   Yes.
24       Q.   What was the purpose this amendment?
25           MR. HUGHES:  Again, I would just caution

---

208

1    you on the legislative privilege.  Under the court's
2    order, you can talk about the general purpose, but not
3    individual --
4        A.   I assume the purpose was what it says.
5        Q.   (By Mr. Freeman) And you voted to table this,
6    correct?
7        A.   Yes, for the same reasons I've described
8    before.
9        Q.   Okay.  And Amendment 58 on Page 1021.  This
10   would have -- I'll let you take a look real quickly
11   first.
12       A.   Go ahead.
13       Q.   This would have required a study by county and
14   ethnicity of access to the necessary photo ID, along
15   with an analysis of the potential impact on voter
16   turnout, right?
17       A.   Okay.
18       Q.   What was the purpose of the amendment?
19           MR. HUGHES:  The same caution.
20       A.   The same thing; whatever it says, that's what
21   the purpose was.  But I voted to table, I'm sure, for
22   the same reason, that many of these amendments were pu
23   up simply to delay the process, to add to a bill that
24   had been hashed out, where the votes were already known
25   and we had a long-standing argument going on for years,

## 209

1  and we finally wanted to get it over with.
2      Q.   Okay.  Do freshman frequently provide the
3  closing remarks after a debate on a major bill?
4      A.   They can.
5      Q.   Are there any other instances that you're aware
6  of, where a freshman delivered closing remarks on a
7  major bill?
8      A   I did.
9      Q.   When was that?
10     A.   On the budget.
11     Q.   In 2001 or 2003?
12     A.   Yeah.  Are you aware of it?
13     Q.   I'm asking.  I don't know.
14     A.   That was like my main speech, so I remember it.
15     Q.   Okay.  Are you aware of any conversations
16  concerning who would deliver the closing remarks
17  considering SB 14?
18         MR. HUGHES:  The same legislative
19  privilege instruction.
20     Q.  (By Mr. Freeman) Yes or no.
21         MR. HUGHES:  Yeah, you can answer yes or
22  no.
23     A.   No.  No.  I don't know.
24     Q.  (By Mr. Freeman) Okay.  And did you move to
25  have Representative Aliseda's closing remarks printed in

## 210

1  record?
2      A.   Is that what the record says?
3      Q.   You can look at --
4      A.   Yes.  Yes, I did.
5      Q.   -- on Page 1031.
6      A.   Yes, I did.
7      Q.   Okay.
8      A.   Representative -- yes, I did.
9      Q.   Did you agree with Representative Aliseda's
10  remarks?
11     A.   Very good.  He captured the spirit of what many
12  of us feel.  Look, we are Hispanic and very proud to be
13  of that culture.  I'm from the area.  My ancestors go
14  back to the founding soldiers who came to colonize the
15  area.  And Aliseda is the same way.  We simply have a
16  difference of opinion that's not racial in nature.  We
17  want to clean up voter fraud.  We see a lot of it where
18  we live.  It's unfair that politicians are enriched and
19  when poor people are having to pay that tax.  I
20  sincerely feel that way, and he sincerely feels that
21  way.
22         Representative Aliseda is a person born in
23  Mexico.  The common refrain is, "Well, you're not
24  Mexican enough.  You're not really a Mexican."  That's
25  what Mexican Americans say to each other, as do other

## 211

1  ethnic groups.  Well, he's from Mexico, for God's sakes,
2  and he became an American citizen.  And so that attack
3  couldn't be made to him.  The fact that he was a
4  prosecutor and prosecuted these very similar cases was
5  important.  And so his remarks embodied the conservative
6  perspective, and certainly the conservative Hispanic
7  perspective.  And so I was -- I assumed I was moved to
8  put it in record so that it could be remembered.
9      Q.   And you just mentioned that Representative
10  Aliseda prosecuted voter fraud cases.  Are you aware of
11  whether he ever prosecuted a case related to in-person
12  voter impersonation?
13     A.   No, I don't know.
14     Q.   Okay.  Are you aware that when Representative
15  Larry Gonzales was deposed in this case just yesterday,
16  he was not carrying a photographic voter ID -- or a
17  photographic ID?
18     A.   He wasn't?  He didn't?
19     Q.   No.
20     A.   No, that doesn't surprise me.  Look, the only
21  reason I have my wallet is because I've got to go to the
22  airport.  Otherwise, I don't like to carry anything.
23  It's too burdensome.  Too burdensome and too fat, and
24  I'm fat enough as it is.
25     Q.   Do you still believe ID is necessary to do

## 212

1  everything in our society?
2      A.   Increasingly, it's becoming that way.  And
3  increasingly, it is -- I think the general public has
4  come to accept these inconveniences.
5         Like coming in this office, for example, I
6  cannot ever imagine a law firm, you have to get
7  permission to enter the door.  But increasingly, our
8  society has these limitations or security measures that
9  are set up.  I love the way that we used to travel, just
10  jumping on the plane.  But we live in a different world
11  and people are demanding more security.  Increasingly,
12  there are ways to corrupt the system, and people want
13  solutions.  And so yes.  Yes to your question.
14     Q.   If Representative Aliseda prosecuted only
15  issues that did not relate to voter impersonation and if
16  the issues in your district did not relate to voter
17  impersonation, but related more to voter assistance,
18  mail-in vote harvesting and the like, won't this bill
19  just give them a false sense of confidence, the voters,
20  that the problem has been fixed?
21     A.   No, they'll know it's not been fixed, because
22  it's growing where I'm at.  Look, we had -- like I said,
23  I had 88 complaints, 88 or 81, come into my office the
24  other day.  We had elections that were essentially
25  bought by assisted voting.  You have complaints that

REPRESENTATIVE AARON PENA                                    JUNE 01, 2012

## 213

1  were filed recently from the City of Hidalgo.  It's
2  running rampant where I live.  And I come from a
3  Hispanic community, and those people want honest
4  elections.  And that's why I sincerely come here and
5  have advocated for that position.  And voter ID was a
6  starting point, okay?  It's not the final solution, as
7  I've stated many times.
8        Q.   And that's actually a delightful segue.
9             Did you introduce any other bills, in the
10  82nd Legislature, regarding election administration?
11       A.   Yes.
12       Q.   Do you know how many?
13       A.   I can guess around 30.
14       Q.   Around 30?  Wow.
15       A.   Is it more?
16       Q.   Not quite.
17            MR. FREEMAN:  This is the last major
18  subject, Mr. Hughes.  You don't need to stretch like
19  that.
20       A.   I will take your -- whatever you tell me it is,
21  that's what it is.
22       Q.   (By Mr. Freeman) Well, let's just real quickly
23  mark this is as U.S. Exhibit 378.  It's a couple of your
24  blog posts.
25            (Exhibit 378 marked for identification.)

## 214

1        A.   I'll tell you what.  Let me just say:  This is
2  why getting on the Internet and saying things is not --
3  because you're going to be cross-examined about them.
4  But go ahead.
5        Q.   (By Mr. Freeman) There is nothing negative
6  about what you posted here.
7        A.   No, I agree.  These are probably a list of
8  bills that I filed.
9        Q.   Indeed they are.  Well, let me ask you:  Did
10  you make these blog posts?
11       A.   Yeah.  I remember -- I remember putting a thing
12  like this up, yes.  I can't imagine that you -- that
13  it's fraudulently made.  I assume it's true.
14       Q.   Is this your blog?
15       A.   Yes, it is.
16       Q.   Okay.  Are there 19 bills listed here that
17  you --
18       A.   I trust your representation.
19       Q.   Do you recall saying during an interview with
20  KXAN that the Speaker had made issues concerning mail-in
21  ballot fraud a priority when he created the Select
22  Committee on Voter Identification and Voter Fraud?
23       A.   I don't recall.  KXAN is not a radio station
24  I'm regularly -- I'm on.  So I don't recall.  If you
25  have that transcript, I'd love to read it.

## 215

1        Q.   I do.
2        A.   Wow.  How in the world do you find all this
3  stuff?
4             MR. FREEMAN:  Can I have this marked as
5  U.S. 379.
6             (Exhibit 379 marked for identification.)
7        A.   And even I know, this must be television.  Not
8  radio, okay?  Did you get that?  It is television.
9  Yeah, so that's the reason I don't recall.  But do I
10  recall television.
11       Q.   (By Mr. Freeman) Okay.  And do you see on Page
12  3, the last paragraph?
13       A.   3.
14       Q.   Do you recall saying, "The Speaker of the House
15  has made this a priority when he created the Voter Fraud
16  Committee and the Voter ID Voter Fraud Committee"?
17       A.   Okay.  I see that.
18       Q.   And do you see in context that you were
19  referring to the mail-in segment, as you say in the
20  second paragraph on that same page?
21       A.   I think I was jumping around.  I was talking
22  about voter assistance.  So I cannot say if that's what
23  -- that's not the limited context.
24       Q.   Okay.  But you were saying that fraud and the
25  issues that you were raising was priority, and the

## 216

1  Speaker made it a priority when he created the Select
2  Committee on voter impersonation and voter fraud?
3        A.   Yeah.  That was my opinion, yes.
4        Q.   But the 19 bills that you sponsored, none of
5  them were referred to the Select Committee; is that
6  correct?
7        A.   You know, I remember they didn't all go to the
8  same committee.  I think it's more than 19.  But that's
9  the Speaker's prerogative.
10       Q.   I apologizes if I missed some.
11       A.   Yeah, you missed some.  But let me just say
12  that that's the Speaker's prerogative.  I mean, he
13  doesn't have to say yes to everything I ask for.  And
14  sometimes he has reason to send them somewhere else, and
15  somebody, either he or a chief of staff or a legislator
16  or a director made that decision, and so be it.
17       Q.   And so in fact, the only bill that the voter
18  impersonation and voter fraud committee addressed didn't
19  address real world voter fraud, right?
20       A.   Well, there are other reasons that there was
21  only one bill, and I touched on those briefly, but I
22  don't think I want to get into it.
23       Q.   Okay.  And you're not going to get into it on
24  the basis of legislative privilege, just so the record
25  is clear?

REPRESENTATIVE AARON PENA                          JUNE 01, 2012

## 217

1      A.   Yes.  It had to do --
2           MR. HUGHES:  Again, caution you on the
3      legislative privilege.
4      A.   Oh, okay.  Look, as to my communications with
5      other people that would explain the reasons why the
6      committee didn't go forward with the legislation is a
7      communication with other legislators and protected by
8      the privilege.
9      Q.   (By Mr. Freeman) Now, if we could jump back to
10     that article from Governing Magazine.
11     A.   Okay.  I've got it.
12     Q.   And can you remind me what exhibit number that
13     is, if that's on your copy?
14     A.   377.
15     Q.   377.  Thank you.
16          Do you see where you said here that many
17     people who complained about the lack of voter confidence
18     were unwilling to attach their names to bills that
19     address real corruption?
20     A.   Yeah.
21     Q.   Why did you make that statement?
22     A.   Where I live, everybody knows that it goes on,
23     but no legislator is likely to stand up for it because
24     he's going against the beast that gets him elected.
25     Being a member of the opposing party makes it easy for

## 218

1      me to do that, but I did it anyway as a Democrat.  But
2      I'm freer to do it because the machine -- well, they
3      were already coming after me, and so was the system, the
4      politiqueras and everybody else, they wanted to
5      eliminate me for speaking against their system.
6      Q.   But what about the people who aren't from South
7      Texas but who are concerned about voter confidence, the
8      main people speaking in favor of this bill, why, with
9      regard to those people would complained about the lack
10     of voter confidence, as you said in this article, why
11     did you say in this article that those people were
12     unwilling to attach their names to bills that address
13     real corruption?
14     A.   Did I say specifically say other people?
15     Q.   You said -- you said, "Many people who complain
16     about the lack of voter confidence."
17     A.   Yes.
18     Q.   Were you referring only to people in South
19     Texas when you made that statement?
20     A.   Oh, I don't remember what I was referring
21     to.  A long time ago.
22     Q.   Isn't it the case that about the 19 bills
23     listed on the -- on your website in that post, that 18
24     of them died in committee?
25     A.   If you say so, but...

## 219

1      Q.   Or excuse me.  Died in committee or died in
2      committee in either the House or the Senate?
3      A.   I did attach some of them as amendments to
4      other bills.  But, yes.  That's true.
5      Q.   Would you agree that prioritizing photographic
6      voter ID ignored real practical concerns about election
7      integrity?
8      A.   Many people don't have the experience that I
9      have down there, okay?  They don't live with the day to
10     day.  It's not a -- you know, Dallas is beginning to
11     experience it, and Laredo is beginning to experience
12     it.  It's like a cancer that's growing.  And I'm not
13     sure they understand the priorities.
14          During the debate, many times I would say,
15     "Hey, look, this is -- there's other kinds of voter
16     fraud, and we need to deal with it."  And people, I
17     could tell, they were -- there was a novelty.  Novelty
18     is not right.  It was a surprise to them.
19          So I think these are well-meaning people;
20     they just don't have the daily experience like I do, or
21     other people along the border do, where we have a well-
22     honed system of corruption going back to the boss era at
23     the turn of the last century.
24     Q.   Now, you told Governing Magazine that the
25     strength of SB 14 was it's a symbol that the legislature

## 220

1      was beginning to address corruption, correct?
2      A.   Yes.
3      Q.   But in the last legislature, it was pretty much
4      the end as well, right?
5      A.   Well, it's the end because I'm not there, but
6      others will the carry -- look, we've had a redistricting
7      battle and I was one of the victims of that, and
8      hopefully, somebody else will carry the banner.  And I
9      hope that other Hispanics have the courage to speak up
10     for their own communities, that it doesn't have to be
11     imposed on them without their involvement.
12          MR. FREEMAN:  All right.  If we can just
13     take a couple of minutes, I think I'm just about done.
14          MR. HUGHES:  Off the record.
15          MR. FREEMAN:  Let's go off the record.
16          (Recess from 3:59 p.m. to 4:00 p.m.)
17          MR. FREEMAN:  Okay.  Back on the record.
18     Q.   (By Mr. Freeman) Are you aware that you were
19     designated as a person with knowledge and a likely
20     witness by the State of Texas in this case?
21          MR. HUGHES:  I'm not sure I agree with
22     that characterization.  I think the first part is right.
23          MR. FREEMAN:  I'll withdraw my question
24     and rephrase it.
25     Q.   (By Mr. Freeman) Are you aware that you were

## 221

1 designated by the State of Texas as a person with
2 knowledge of the issues and claims in this case?
3     A.   You mean a designation that I could potentially
4 be a witness?
5     Q.   Yes?
6     A.   I was informed about that in either this case
7 or in the last case.
8     Q.   If you were you called to testify in D.C., what
9 would your anticipated testimony be?
10    A.   I would answer the questions that I was given,
11 just as I've answered them to you.  I think you have a
12 gist of what I feel, and we have a slight difference of
13 opinion, but I think we want to achieve the same goal.
14 You want fair elections and I want fair elections.  We
15 just disagree on how to get there.
16    Q.   Okay.  Are there any answers that you wish to
17 change from today?
18    A.   I can't recall any.
19    Q.   Is there any information that you didn't recall
20 previously that you recall now?
21    A.   No, I can't recall any.
22         MR. FREEMAN:  So I'm just going to state
23 for the record that this deposition is left open pending
24 any decisions concerning privilege over testimony and
25 documents.  And with that, I pass the witness to

## 222

1 Mr. Garza.
2         MR. GARZA:  I just have a few questions.
3         EXAMINATION
4 BY MR. GARZA:
5     Q.   You were -- in earlier testimony from
6 Mr. Freeman, you were talking about the lack of public
7 transportation in the region that you represent.  Do you
8 recall that?
9     A.   Yes.
10    Q.   Now, Hidalgo County is part of a bigger,
11 generally referred to area as the Rio Grande Valley; is
12 that correct?
13    A.   Yes.
14    Q.   And that encompass a number of counties along
15 the border, is that correct?
16    A.   Yes.
17    Q.   Cameron County, Starr County on the east and
18 west of Hidalgo?
19    A.   Yes.
20    Q.   Any other counties?
21    A.   Willacy County.
22    Q.   Willacy County.  And in that general area,
23 would you agree with me that there is a lack of public
24 transportation?
25    A.   By urban standards, yes.  Urban standards of

## 223

1 Texas.
2     Q.   Uh-huh.  And you specifically mentioned, you
3 know, the La Joya-Sullivan City area and the Delta area
4 on the east?
5     A.   Yes.
6     Q.   And generally, those are areas that are away
7 from McAllen, which is the most urban of the --
8     A.   That's correct.
9     Q.   Okay.  And in McAllen is where you have some
10 viable public transportation?
11    A.   Yes.
12    Q.   Okay.  But not in the other parts of the
13 county, correct?
14    A.   I'm not aware of any, okay?  There may be a
15 system that, since I don't live there, I'm not aware of
16 it.  It would surprise me, because the market is not
17 there.  There's not a market for regular transportation.
18    Q.   All right.  And Cameron County and Willacy
19 County and Starr County have similar socioeconomic
20 characteristics as Hidalgo County; that is, there are a
21 lot of poor people?
22    A.   Yes.
23    Q.   And there are a lot of brown people?
24    A.   Yes.  So you would find public transportation
25 probably in the Brownsville-Harlingen region, but in the

## 224

1 surrounding regions, you would not have the -- I'm not
2 aware of any public transportation.  There may be some
3 informal transportation that I simply don't know about.
4     Q.   Right.
5     A.   But that's generally correct.
6     Q.   And would you also agree with me in the Rio
7 Grande Valley area that we've talked about, there is a
8 higher incidence of drivers without liability
9 insurance --
10    A.   Yes.
11    Q.   -- than in other parts of the state?
12    A.   Yes.
13    Q.   And would you agree with me that that is, in
14 large part, due to economic reasons?
15    A.   Yes.
16    Q.   People can't afford to buy automobile
17 insurance?
18    A.   Absolutely.
19    Q.   And without automobile insurance, you are not
20 eligible to secure a driver's licenses in Texas; isn't
21 that correct?
22    A.   Hmm.  I know you can't get your license
23 plates.  I'm not sure.  If you say so.
24    Q.   Okay.
25    A.   It's been a while since I've got my license.

## 225

1    Q.   Do you know, as an attorney and dealing with
2    the legal problems of people in the Valley -- and when I
3    say the Valley, I'm talking about the Rio Grande Valley
4    -- that there is a problem with motorists involved with
5    automobile accidents, who don't have insurance, having
6    their licenses suspended?
7    A.   Yes.
8    Q.   Okay.
9    A.   And because we're one of the more poorer
10   regions, I would assume that we have high incidences of
11   people without insurance.
12   Q.   Okay.
13   A.   Higher percentages of that.
14        MR. GARZA:  I don't have any other
15   questions.
16        MR. HUGHES:  Nor do I.
17        THE WITNESS:  God bless you all.
18        MR. HUGHES:  Thank you so much.
19        (Signature reserved.)
20        (Deposition concluded at 4:06 p.m.)
21
22
23
24
25

## 227

1    THE STATE OF _____)
2    COUNTY OF_____)
3
4         Before me,_____, on this day
5    personally appeared REPRESENTATIVE AARON PENA, known to
6    me (or proved to me under oath or
7    through_____ (description of identity
8    card or other document) to be the person whose name is
9    subscribed to the foregoing instrument and acknowledged
10   to me that they executed the same for the purposes and
11   consideration therein expressed.
12        Given under my hand and seal of office
13   this_____day of _____, 2012.
14
15
16        _____
          NOTARY PUBLIC IN AND FOR
17        THE STATE OF _____
18
19
20
21
22
23
24
25

## 226

1    CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3    PAGE LINE CHANGE      REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   I, REPRESENTATIVE AARON PENA, have read the
21   foregoing deposition and hereby affix my signature that
22   same is true and correct, except as noted above.
23
24        _____
25        REPRESENTATIVE AARON PENA

## 228

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2    STATE OF TEXAS,          )
3         Plaintiff,          )
4    VS.                      )
5    ERIC H. HOLDER, JR. in his   )
     official capacity as Attorney )
6    General of the United States,  )
7         Defendant,          )
8    ERIC KENNIE, et al,      )
9         Defendant-Intervenors,   )
10   TEXAS STATE CONFERENCE OF    )  CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,          )  (RMC-DST-RLW)
                              )  Three-Judge Court
12        Defendant-Intervenors,  )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al,   )
14        Defendant-Intervenors,  )
15   TEXAS LEGISLATIVE BLACK   )
     CAUCUS, et al,           )
16        Defendant-Intervenors,  )
17   VICTORIA RODRIGUEZ, et al.,  )
18        Defendant-Intervenors.  )
19        REPORTER'S CERTIFICATION
          DEPOSITION OF REPRESENTATIVE AARON PENA
20             JUNE 1, 2012
21        I, Chris Carpenter, Certified Shorthand Reporter in
22   and for the State of Texas, hereby certify to the
23   following:
24        That the witness, REPRESENTATIVE AARON PENA, was
25

ANITA PRIVETT                                                June 7, 2012

## 1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )

        Plaintiff,                 )

VS.                                )

ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )

        Defendant,                 )

ERIC KENNIE, et al,                )

        Defendant-Intervenors,     )

TEXAS STATE CONFERENCE OF          )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )  (RMC-DST-RLW)
                                   )  Three-Judge Court
        Defendant-Intervenors,     )

TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )

        Defendant-Intervenors,     )

TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )

        Defendant-Intervenors,     )

VICTORIA RODRIGUEZ, et al.,        )

        Defendant-Intervenors.     )
****************************************
               ORAL DEPOSITION OF
      THE LEAGUE OF WOMEN VOTERS OS TEXAS
                  ANITA PRIVETT
                  JUNE 7, 2012
****************************************
```

## 2

1    ORAL DEPOSITION OF ANITA PRIVETT, produced as a
2  witness at the instance of the Defendant, was duly
3  sworn, was taken in the above-styled and numbered cause
4  on the JUNE 7, 2012, from 9:38 a.m. to 12:51 p.m.,
5  before Chris Carpenter, CSR, in and for the State of
6  Texas, reported by machine shorthand, at the offices of
7  The Attorney General of the State of Texas, 209 West
8  14th Street, First Floor Conference Room, Austin, Texas
9  78701, pursuant to the Federal Rules of Civil Procedure
10  and the provisions stated on the record or attached
11  hereto.

## 3

```
 1
 2
 3                  A P P E A R A N C E S
 4  FOR THE PLAINTIFF, STATE OF TEXAS:
 5      John McKenzie
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 6      P.O. Box 12548
        Austin, TX 78711-2548
 7
        209 West 14th Street
 8      8th Floor
        Austin, TX 78701
 9      (512) 936-1307
        john.mckenzie@texasattorneygeneral.gov
10
11  FOR THE DEFENDANT, HOLDER, ET AL:
12      Bruce Gear
        Angela Miller
13      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
14      NWB - Room 7202
        Washington, DC  20530
15      (202) 305-7766
        bruce.gear@usdoj.gov
16      angela.miller5@usdoj.gov
17  FOR THE DEFENDANT-INTERVENOR THE LEAGUE OF WOMEN VOTERS
    OS TEXAS AND THE DEPONENT:
18
        Rebecca L. Robertson
19      AMERICAN CIVIL LIBERTIES UNION OF TEXAS
        P.O. Box 8306
20      Houston, TX 77288
        (713) 942-8146 x 116
21      rrobertson@aclutx.org
22
23
24
25
```

## 4

```
 1                      INDEX
 2  Appearances.......................................3
 3  ANITA PRIVETT
 4      Examination by Mr. McKenzie................5
 5  Signature and Changes..........................119
 6  Reporter's Certificate.........................121
 7              EXHIBITS
 8  NO. DESCRIPTION                    PAGE MARKED
 9   1   Deposition Notice                14
10   2   Mission Statement                38
11   3   August 18, 2011 letter to Justice     88
             Department
12
13   4   August 25, 2011 e-mail           104
14
     5   Responses to Interrogatories     114
15
16
17
18
19
20
21
22
23
24
25
```

## 5

1    MR. McKENZIE:  All right.  Good morning.
2  My name is John McKenzie.  I work for the Texas Attorney
3  General, and I am representing the State of Texas in
4  this matter.
5            If counsel will go ahead and introduce
6  yourselves.
7            MS. ROBERTSON:  Rebecca Robertson of the
8  ACLU of Texas, and I am here on behalf of the League of
9  Women Voters of Texas and the Department.
10           MR. GEAR:  Bruce Gear.  I am with the
11  Department of Justice representing Eric Holder, the
12  Attorney General.
13           MR. MILLER:  I'm Angela Miller, also here
14  with the U.S. Department Of Justice, representing the
15  Attorney General, Eric Holder.
16           ANITA PRIVETT,
17  having been first duly sworn to testify the truth, the
18  whole truth, and nothing but the truth, testified as
19  follows:
20           EXAMINATION
21  BY MR. McKENZIE:
22     Q.  All right.  And would you please state your
23  full name for the record.
24     A.  My name is Anita Spikes Privett.
25     Q.  And could you spell Privett for us, please?

## 6

1     A.  P-r-i-v-e-t-t.
2     Q.  And have you ever been deposed before?
3     A.  No.
4     Q.  And are you suffering from any illnesses today
5  that will affect your ability to provide accurate
6  answers to my questions?
7     A.  Runny nose.
8     Q.  Okay.  I think we'll be okay on that one.
9            Are you taking any medications that will
10  affect your ability to provide accurate answers to my
11  questions?
12     A.  No.
13     Q.  And are you aware of anything else that might
14  prevent you from accurately answering my questions?
15     A.  No.
16     Q.  All right.  Since you've never been deposed
17  before, I'm going to go through a couple of ground
18  rules.  Please answer audibly so the court reporter can
19  hear.  And no nodding or shaking of the head.  Do you
20  understand?
21     A.  Yes.
22     Q.  If you don't understand my questions, please
23  tell me, and I will attempt to rephrase.  Do you
24  understand?
25     A.  Yes.

## 7

1     Q.  Okay.  Please wait until I finish my question
2  to answer.  If we talk at the same time, the court
3  reporter can't capture all of our dialogue, and the
4  transcript will get jumbled.  So if you don't mind
5  waiting until I finish my question to answer.  Do you
6  understand?
7     A.  Yes.
8     Q.  Okay.  Your lawyer may object to a question.
9  Even if she objects, you must answer my question unless
10  she instructs you not to answer.  Do you understand?
11     A.  Yes.
12     Q.  Okay.  Are you represented by counsel today?
13     A.  She represents me.
14     Q.  Okay.  And who is your counsel?
15     A.  Rebecca Robertson.
16     Q.  And when did that representation begin?
17     A.  Within the last six weeks.
18           For you personally.
19     Q.  Okay.  And do you understand that you have been
20  designated to provide testimony on behalf of the Texas
21  League of Women Voters today?
22     A.  I do.
23     Q.  Okay.  And do you understand that your
24  testimony today is the testimony of the Texas League of
25  Young -- of Women Voters, I should say?

## 8

1     A.  Yes.
2     Q.  Okay.  Unless I indicate otherwise, when I use
3  the term "you" in this deposition, I mean the
4  organization, not you personally, and I will clarify if
5  I mean you personally.  Do you understand?
6     A.  Yes.
7     Q.  Okay.  We're going to go over some preparation
8  for the deposition.  What did you do to get ready for
9  your deposition?
10     A.  I reviewed all of the documents that -- that
11  the League has produced associated with voter ID in the
12  last about six years.
13     Q.  Okay.
14     A.  And I met with counsel.  I talked to some board
15  members.
16     Q.  Okay.
17     A.  And I also talked to one of the national staff
18  who provides guidance to states with regard to election
19  law.
20     Q.  Okay.  And other than reviewing documents,
21  meeting with counsel, meeting with board members, and
22  what was the last thing you said?
23     A.  I talked to one of the national staff members.
24     Q.  And other than those four things, is there
25  anything else you did to prepare for the deposition?

ANITA PRIVETT                                                    June 7, 2012

## 25

1      MS. ROBERTSON:  You can ask for
2  clarification if you need it.
3      A.  Do you mean how do we recruit?
4      Q.  (By Mr. McKenzie) No.  I mean -- it says that
5  one of the factors is resources.  I understand your
6  testimony to say that one of the factors is resources,
7  and that means whether or not you have somebody who can
8  work on the item.  And I guess I'm trying to understand
9  how do you decide whether someone can work on an item?
10  Is it that they have the aptitude to work on it or the
11  time to work on it?  What does it mean that they can
12  work on it?
13      A.  I would add passion to work on it.
14      Q.  Okay.
15      A.  Generally, those are -- those are the things,
16  yes.
17      Q.  So passion, time, and expertise, one could say?
18      A.  Yes.
19      Q.  Okay.  And so the factors, as I understand them
20  so far, are resources, likelihood of passage, and
21  whether or not the League has a preexisting position on
22  the issue.  Are there any other factors you can think of
23  that would be relevant to the League's designation of an
24  item as an urgent matter for Lobby Days?
25      A.  I don't think of any at the moment.

## 26

1      Q.  Okay.  On all of the factors other than
2  likelihood of passage, where did voter ID rate?
3      MS. ROBERTSON:  Objection, compound.
4      Q.  (By Mr. McKenzie) You may answer.
5      A.  Say it again.
6      Q.  Sure.  For all the factors, other than
7  likelihood of passage, and by that I mean resources
8  available -- your counsel is correct; there is a
9  compound question.
10      When it comes to resources to address
11  voter ID, how did that rate prior to the session?
12      A.  It was recognized that we would likely need
13  resources for that, and we would have an issue chair --
14  that's the designation for the person who leads the
15  effort -- and we would have an issue chair for that.
16      Q.  Uh-huh.  So it had already been predetermined
17  that voter ID would require resources in the form of a
18  designated person to, I guess, address that issue?
19      A.  I would say yes, except I would change it from
20  voter ID to election law.
21      Q.  Okay.
22      A.  Because we look at election law voter rights as
23  a broad topic.
24      Q.  Okay.
25      A.  And voter ID just falls within that.

## 27

1      Q.  So was election law an urgent item on the --
2  for the Lobby Days?
3      A.  It was not one of the items that had been
4  identified prior to the session as a priority.
5      Q.  Okay.
6      A.  By the time of Lobby Day in early March, it was
7  recognized -- well, in the first place, voter ID was
8  already passed pretty much by then, I believe.
9      Q.  So there wasn't anybody before session that had
10  been identified by the League of Women Voters who had
11  the passion, time, and expertise to deal with voter ID;
12  is that correct?
13      A.  There was somebody who was identified as an
14  issue chair for election law.
15      Q.  Okay.
16      A.  As Advocacy Vice President, I had a team of
17  about close to 30 people, many of whom were issue chairs
18  for particular topics that over the years we had a
19  position on and that we expected to follow legislation
20  on.
21      Q.  Okay.
22      A.  And election law was one of those.
23      Q.  But not voter ID specifically; is that correct?
24      A.  No.
25      Q.  Okay.  And as to the preexisting position, I

## 28

1  think that you've already answered, and let me know if
2  I'm mischaracterizing your testimony, that there wasn't
3  a preexisting position on voter ID per se, but there may
4  have been policies that broadly related to voter ID; is
5  that fair?
6      A.  Well, again, time is the important issue.
7  Since voter ID began to come up before the legislature,
8  the first time it came up, we -- we identified it as
9  being something we would like to defeat.
10      Q.  Okay.
11      A.  And that's been a number of years.  So we have
12  known ever since we initially identified it.  I mean, we
13  relook at things pretty regularly, but ever since we
14  identified it as something that did not meet our overall
15  goals for election law, it was on our list of things to
16  defeat.
17      Q.  And so what made you believe that there wasn't
18  a high likelihood of passage of voter ID?
19      MS. ROBERTSON:  Objection,
20  mischaracterizes prior testimony.
21      Q.  (By Mr. McKenzie) You may answer.
22      A.  I don't think I said that.  I believed that --
23  that it would likely come up.
24      Q.  Uh-huh.
25      A.  But I didn't know that it would.

## 29

1  Q.  Uh-huh.
2  A.  And I don't think I'm answering this right.
3  There was something -- something you said that caused me
4  to chase a rabbit, but ask the question again.
5  Q.  Sure.  And maybe I'll rephrase it slightly.
6  Well, I'll start with another question.
7        Isn't it true that prior to session, you
8  don't know if anything is actually going to pass; is
9  that right?
10  A.  Right.
11  Q.  Okay.  So based on that, how do you decide
12  which bills are going to be urgent?  Because you
13  mentioned before likelihood of passage is one of the
14  factors.  So I guess I'm just asking:  How do you
15  measure that?  How do you measure likelihood of passage?
16  A.  Perhaps I should have said, in how -- you
17  didn't really ask me how we set the priorities, so I'm
18  confused about how to answer this.  Can you try again?
19  I'm sorry.
20        MS. ROBERTSON:  Can you read back the
21  question?
22        (Requested portion was read back by the
23  court reporter.)
24  A.  Okay.  First of all, we don't, before the
25  session, identify specific bills.

## 30

1  Q.  (By Mr. McKenzie) Uh-huh.
2  A.  We identify areas where we're concerned about
3  potential legislation.
4  Q.  Okay.
5  A.  Either we want the legislation to pass or we
6  don't, but we're concerned about what's going to
7  happen.  Budget, for instance.
8  Q.  Okay.
9  A.  And so we identify some certain priority areas
10  to provide extra work on.
11  Q.  Uh-huh.
12  A.  Election law always becomes one of those, so we
13  don't necessarily label it as that.
14  Q.  Ahead of time?
15  A.  Yes.
16  Q.  Do you always label the budget as --
17  A.  No.
18  Q.  -- a priority?  Okay.  What were the priorities
19  prior to the legislative session?
20        MS. ROBERTSON:  Objection, vague.  Can you
21  specify the -- which legislative session?
22        MR. McKENZIE:  Sure.
23  Q.  (By Mr. McKenzie) The 82nd Legislative Session
24  2011.
25  A.  Let me see if I can even remember.  Budget.

## 31

1  Transparency.  We were concerned about what was
2  happening in terms of transparency of information.  And
3  I'm afraid I'm having a brain freeze on what the other
4  two were that were actually for.
5  Q.  Budget, transparency, and there are two more,
6  you say?
7  A.  Yeah.
8  Q.  Okay.  If you remember those two more, just let
9  me know.
10  A.  Okay.
11  Q.  So we kind of went off my outline a little bit
12  there.  But we spoke with -- we spoke about seminars,
13  that there weren't actually seminars per se, there were
14  Lobby Days.  Anything else like a seminar that -- or
15  like a Lobby Day?
16  A.  Again, are you talking about the whole period
17  of our efforts to defeat voter ID?
18  Q.  Yeah.  We'll start -- we'll start with the
19  whole efforts, and then --
20  A.  Okay.
21  Q.  -- we'll drill down.
22  A.  In the previous legislative session -- I don't
23  know about the one before that, but the previous
24  legislative session there was a January briefing of
25  staff, legislative staff, that the Texas Election Reform

## 32

1  Group did.
2  Q.  Uh-huh.
3  A.  I participated in -- in helping with some of
4  the development of the materials, just talking about
5  it.  That's all.  But I was not there.
6  Q.  Okay.
7  A.  But -- but our name was on it.
8  Q.  Is there anything other than that?
9  A.  In my role, I would talk about voter ID along
10  with the other issues in the legislative session when I
11  met with groups.  I met with the local League of Women
12  Voters; I talked to them.  I know I talked to a
13  statewide business women's group.  Those are the ones
14  that I remember at the moment.
15  Q.  Okay.  And did you offer any speakers on voter
16  ID?
17  A.  No.
18  Q.  And did you, as an organization, offer any
19  testimony?
20  A.  Yes.
21  Q.  And did you offer testimony in the 82nd
22  Legislative Session, 2011?
23  A.  Yes, I did.
24  Q.  And the same question for the 2009 Legislative
25  Session.

ANITA PRIVETT                                                June 7, 2012

---

## 33

1   A.  Yes.
2   Q.  And how about 2007?
3   A.  Yes.
4   Q.  And I mean you as an organization, not --
5   A.  Yes.
6   Q.  Because I know we're -- we're hitting, kind of,
7   the cusp of when you started.
8   A.  I actually gave the last two -- two sessions
9   worth myself, but yes, we did time before too.
10  Q.  And what about 2005?
11  A.  I don't really have any information about 2005.
12  Q.  Okay.  And did you prepare any studies about
13  voter ID?
14  A.  During that period, we didn't.  We certainly
15  read other people's studies, but we did not do any
16  studies.  The only election law-related study we did was
17  about how to increase voter turnout.
18  Q.  Okay.  And that study on voter turnout didn't
19  deal with voter ID; is that correct?
20  A.  Correct.
21  Q.  Okay.  Any academic papers or anything to that
22  effect that the --
23  A.  No.
24  Q.  -- League issued?  Okay.
25          MS. ROBERTSON:  Let him finish his

---

## 34

1   question.
2   A.  I'm sorry.
3   Q.  (By Mr. McKenzie) No, that's fine.  It's for
4   our court reporter.  I'm okay with it, but he won't be.
5          MS. ROBERTSON:  The record won't be
6   pretty.
7   Q.  (By Mr. McKenzie) Now, for Topic 7.  That was
8   all on Topic 6.  Topic 7, have you been designated to
9   testify on Topic 7?
10  A.  I'm sorry.  I didn't understand what you said.
11  Q.  I spoke a little quickly.
12          Have you been designated to testify on
13  Topic 7?
14  A.  Yes.
15  Q.  Are you prepared to testify about Topic 7?
16  A.  Yes.
17  Q.  Okay.  And what did you do to prepare to
18  testify about Topic 7?
19  A.  The same thing I did for the other items.
20  Q.  All right.  Topic 8, have you been designated
21  to testify on Topic 8?
22  A.  Yes.
23  Q.  Are you prepared to testify about Topic 8?
24  A.  Yes.
25  Q.  And what did you do to prepare to testify about

---

## 35

1   Topic 8?
2   A.  The same thing I did for the other items.
3   Q.  The same question for the Topic 9:  Have you
4   been designated to testify on Topic 9?
5   A.  Yes.
6   Q.  Are you prepared to testify about Topic 9?
7   A.  Yes.
8   Q.  What did you do you to prepare to testify about
9   Topic 9?
10  A.  The same thing I did for the other items.
11  Q.  Okay.  And for Topic 10, have you been
12  designated to testify about Topic 10?
13  A.  Yes.
14  Q.  Are you prepared to testify about Topic 10?
15  A.  Yes.
16  Q.  And what did you do to prepare to testify about
17  Topic 10?
18  A.  The same thing I did the other items.
19  Q.  And Topic 11, have you been designated to
20  testify on Topic 11?
21  A.  Yes.
22  Q.  Are you prepared to testify about Topic 11?
23  A.  Yes.
24  Q.  And what did you do to prepare to testify about
25  Topic 11?

---

## 36

1   A.  The same thing I did on the other items.
2   Q.  Okay.  What are the requirements for membership
3   in the League of Women Voters of Texas?
4   A.  There really are no specific requirements.  We
5   have male members as well as female members.
6   Q.  Okay.
7   A.  Generally, people are adults, but we don't
8   check your ID.
9   Q.  Okay.  So how does one become a member?
10  A.  One says one wants to join and offers up the
11  membership fee.
12  Q.  Okay.  And do they fill out an application or
13  anything of that sort?
14  A.  They fill out a little form that gives us
15  contact information and indicates what areas that they
16  might be interested in.
17  Q.  And what is the membership fee?
18  A.  $80.
19  Q.  $80?
20  A.  A year.
21  Q.  $80 per year.  Okay.  So it's $80, and it's
22  good for a year; is that correct?
23  A.  I said that, and as soon as I said it, it might
24  be $60, with a family membership is 80.  I believe
25  that's the case.  I'm sorry.

ANITA PRIVETT                                                    June 7, 2012

---

## 37

1    Q.  Okay.  $60 a year for an individual?
2    A.  Yes.
3    Q.  And $80 per year for a family.  And are there
4  any limitations on how big the family can be?
5    A.  Not that I am aware of, but it basically is
6  generally a spouse or a significant other.
7    Q.  Okay.  Is membership in a language, ethnic, or
8  racial minority group a requirement for membership in
9  the League of Women Voters of Texas?
10    A.  No.
11    Q.  Okay.  Do you know the demographics of the
12  membership for the League of Women Voters of Texas?
13    A.  No.
14        MS. ROBERTSON:  Objection, vague, but go
15  ahead.
16    Q.  (By Mr. McKenzie) So you don't know, for
17  instance, the percentage of members who belong to any
18  racial minority group; is that correct?
19    A.  No, I do not.
20    Q.  And the same thing for the language minority
21  group; is that correct?
22    A.  I do not.
23    Q.  Okay.  How many members does your organization
24  have?
25    A.  We have close to 2,000.

---

## 38

1    Q.  Okay.  And when you say you have 2,000 members,
2  that's 2,000 people who have paid the membership fee and
3  provided the personal information you described earlier
4  in your testimony; is that right?
5    A.  Yes.  Yes.
6    Q.  Okay.  What is the purpose of the League of
7  Women Voters of Texas?
8    A.  Our purpose is to study issues related to
9  government and to educate the public on those issues.
10    Q.  Okay.  I'm going to show you what will be
11  marked as Exhibit 2.
12        (Exhibit 2 marked for identification.)
13    Q.  (By Mr. McKenzie) Okay.  Have you seen the
14  exhibit that has been marked as Exhibit 2?
15    A.  Yes.
16    Q.  And do you recognize this exhibit?
17    A.  Yes.
18    Q.  And can you identify what it is?
19    A.  It's our mission statement.
20    Q.  And it's not very long, so would you mind
21  reading it for the record?
22    A.  "The League of Women Voters, a nonpartisan
23  political organization, encourages informed and active
24  participation in government and influences public policy
25  through education and advocacy."

---

## 39

1    Q.  Okay.  And do you think the purpose described
2  on Exhibit 2 is materially different from the exhibit
3  you offered -- I mean, from the testimony you offered as
4  to what the purpose of the League is?
5    A.  No, I do not.
6    Q.  Okay.  And does this purpose state anything
7  about race, language, or ethnic minorities?
8    A.  No.
9    Q.  Okay.  How do your efforts to oppose Senate
10  Bill 14 advance the purpose stated in Exhibit 2?
11    A.  We are seeking to encourage policy in
12  government that allow full participation of all
13  citizens.
14    Q.  Okay.  And how does opposing Senate Bill 14
15  advance those purposes?
16    A.  We believe that Senate Bill 14 is a step
17  backwards in terms of allowing the full participation of
18  all of our citizens.
19    Q.  Okay.  How is it a step backwards?
20    A.  It puts what amounts to a poll tax in place for
21  some voters.  It will confuse voters.  It's confusing
22  election officials across the state.  It will not
23  improve government.
24    Q.  Okay.  So let me just go back to the first
25  statement, that it is effectively a poll tax.  How is it

---

## 40

1  effectively a poll tax?
2    A.  Persons who do not have a picture ID and who do
3  not have any documents that DPS will accept in order to
4  give them a free election certificate will have to pay
5  for, perhaps, a birth certificate.  They may have been
6  born in some -- you know, New York or someplace else.
7  They'll have to figure out how to -- how to find out
8  what it's going to cost them to get their birth
9  certificate from New York, what it's going to cost, what
10  address they send the information to, to get it; all of
11  that kind stuff amounts to time, which, for a low-income
12  individual, can be a major problem.
13        Or perhaps they live in South Texas, 75
14  miles from a DPS office, and they don't have a car, and
15  there's no public transportation.  Those are problems
16  that a low-income person will face in getting a
17  "free" -- I'm putting quotes around free -- ID.
18    Q.  Okay.  So let me sort of unpack the comparison
19  to a poll tax, based on what you just said.
20        Now, is it your understanding that poll
21  taxes were universally applied to all voters as a quid
22  pro quo, that you pay money in order to vote?  Is that
23  your understanding of the poll tax?
24    A.  Additionally, it was my understanding that it
25  negatively affected poor people.

ANITA PRIVETT                                              June 7, 2012

---

**41**

1    Q.  Yes.  But I mean, I'm just talking about what a
2    poll tax is, not its effects, that what it -- what it
3    actually is, that you have to pay money to cast a
4    ballot.  Is that what your understanding of the poll tax
5    is, in terms of the mechanics of how a poll tax works?
6    A.  It's hard for me to see the poll tax in
7    anything except a discriminatory light.
8    Q.  Right.  And I understand the, sort of,
9    impermissible purpose that a lot of these barriers had
10   back when they were enacted.  But I'm just asking in
11   terms of how a poll tax worked, when -- it is my
12   understanding, and if your understanding is different,
13   please let me know -- that it's, you pay money as an
14   exchange to cast a ballot.  Is that your understanding
15   of what a poll tax is?
16   A.  I frankly don't remember whether you were able
17   to pay it once a year or for -- for each ballot.  I
18   think it was a once-a-year thing, but I'm not sure.  So
19   that -- that's what I would quibble with the -- the
20   statement that you made.
21   Q.  Okay.  And does SB 14 require that --
22       MS. ROBERTSON:  Objection, vague.  Go
23   ahead.
24   Q.  (By Mr. McKenzie) Well, I'll clarify.
25       Does SB 14 require you to pay a tax once a

---

**42**

1    year to vote?
2    A.  The cost is implied.
3    Q.  I'm going to ask you to just focus on the -- on
4    the question with a yes or no, and you can elaborate
5    after the yes or no, if you want, to give more full
6    testimony.  But does SB 14 require voters to pay a tax
7    once a year in order to vote?
8    A.  No.
9    Q.  Okay.
10   A.  However, the cost is implied.
11   Q.  Okay.  And does SB 14 require people to pay
12   money in exchange to cast a ballot?
13   A.  No.
14   Q.  Okay.  And going back to your statement, the
15   cost is implied.  Once -- if you -- if you have a birth
16   certificate, is there any cost other than time --
17       MR. McKENZIE:  Object --
18   Q.  -- to get --
19       MS. ROBERTSON:  Go ahead and finish.
20   Q.  (By Mr. McKenzie) -- to get a free ID?
21       MS. ROBERTSON:  Objection, calls for
22   speculation.  Okay, now.
23   A.  There is still the issue of gas to get to DPS,
24   possibly taking off time to go at a time that the DPS
25   office would be open.  Some places in Texas, there are

---

**43**

1    limited days, and -- and certainly some of the offices
2    don't have after hours.
3    Q.  (By Mr. McKenzie) Okay.  So there are -- there
4    are various, I guess you could call them --
5    A.  Barriers.
6    Q.  Yeah, I wouldn't use that word.
7        There are certain tasks you must fulfill
8    in order to get a free ID; is that correct?
9    A.  Yes.
10   Q.  And some of those tasks cost money, right?
11   A.  Yes.
12   Q.  But if you have a -- or time; is that correct?
13   A.  Yes.
14   Q.  But if you have a birth certificate, the cost
15   of obtaining a birth certificate is not one of the costs
16   of getting a free ID; is that correct?
17   A.  Yes.
18   Q.  Okay.  And are birth -- do birth certificates
19   have any other function other than obtaining a free ID,
20   election ID?
21   A.  Yes.
22   Q.  Okay.  And so once somebody has a birth
23   certificate, they can use it for those other functions,
24   for those functions other than obtaining a free ID, if
25   they wanted to; is that correct?

---

**44**

1    A.  Yes.
2    Q.  Okay.  And once you have the birth certificate,
3    you would have that -- and you didn't lose it, you would
4    have it to renew your voter free ID, to the extent you
5    needed to; is that correct?
6        MS. ROBERTSON:  Objection, calls for
7    speculation.  You can go ahead.
8    A.  I would suggest that most likely you would.
9    However, there are a lot of reasons why people don't
10   have birth certificates.  Hurricanes.  Domestic abuse,
11   women frequently lose their documents in those cases.
12   Q.  (By Mr. McKenzie) Right.  But I'm saying, if we
13   set to one side the hypothetical situations where they
14   might lose their birth certificate or it might be taken
15   from them or it might be destroyed, if they have -- if
16   they've gotten it once and they keep it and none of
17   those things happen, they can renew free ID to the
18   extent they need to; is that correct?
19       MS. ROBERTSON:  Objection, calls for
20   speculation.
21   Q.  (By Mr. McKenzie) You may answer.
22   A.  As far as I know.
23   Q.  Okay.  So does it take time to vote?
24   A.  Yes.
25   Q.  Does it take gas to get to the polling station

ANITA PRIVETT                                              June 7, 2012

## 45

1  to vote?
2      A.  Not necessarily, and with our system of
3  precincts, many people walk.
4      Q.  Okay.  But assuming you don't live within
5  walking distance of your precinct, does it require gas?
6      A.  Some people catch a ride with neighbors.  There
7  are groups in communities that offer rides to people to
8  the polls.
9      Q.  Understood.  But other than those cases where
10  they get a ride or take public transportation or walk,
11  are there costs -- does it cost gas money if they drive
12  themselves to the poll?
13      A.  Yes.  However, they may combine that trip to
14  the grocery store and other locations so that it's not
15  an additional cost.
16      Q.  Okay.  Could somebody combine a trip to the DPS
17  to the grocery store -- with a grocery store trip?
18      A.  Possibly.
19      Q.  Are there -- is there any reason to believe
20  that they are any more likely to combine a trip to the
21  precinct with a trip to the grocery store than a trip to
22  the DPS with a trip to the grocery store?
23      A.  Yes.
24          MS. ROBERTSON:  Objection, calls for
25  speculation.  Go ahead.

## 46

1      A.  Yes.  Grocery stores are likely to be closer
2  than DPS offices.
3      Q.  (By Mr. McKenzie) But it's true that there may
4  be some DPS offices that are closer to grocery stores
5  than precincts; is that correct?
6      A.  Yes.
7      Q.  Okay.  So could people catch a ride with
8  friends to go to the DPS?
9          MS. ROBERTSON:  Objection, calls for
10  speculation.
11      A.  It seems unlikely, but possibly.
12      Q.  (By Mr. McKenzie) So other than walking, what
13  costs associated with going to the polls are more likely
14  to be -- well, it's going to come out too convoluted.
15  I'll strike that.
16          How are the costs of going to the polls,
17  in terms of transportation costs, any greater than the
18  costs of going to a DPS station?
19      A.  I think you said that backwards.  Say it again.
20      Q.  I did.  How are the costs going to a DPS
21  station any greater than the cost of going to the polls?
22          MS. ROBERTSON:  Objection, calls for
23  speculation.
24      A.  In most cases, in the state of Texas, the DPS
25  is a lot further away than the polls.

## 47

1      Q.  (By Mr. McKenzie) And what's the basis of that
2  contention?
3      A.  I have seen a map of where the DPS offices are.
4      Q.  And could you identify what a "lot closer"
5  means?
6      A.  We heard testimony, I believe, during the last
7  legislative session, that some of them were as much as
8  75 miles away.
9      Q.  And do you know how many people would be
10  affected by that?
11      A.  No.
12      Q.  Okay.
13          MS. ROBERTSON:  Are we at a good stopping
14  point?
15          MR. McKENZIE:  Sure.
16          MS. ROBERTSON:  We've been going an hour
17          MR. McKENZIE:  Sure.  Yeah.  That's fine.
18  That's fine.  We can take a break.
19          MS. ROBERTSON:  Great.  Thank you.
20          (Recess from 10:35 a.m. to 10:53 a.m.)
21      Q.  (By Mr. McKenzie)  Okay.  We were just talking
22  about the transportation costs associated with going to
23  the DPS as opposed to going to vote.  Would you agree
24  with me that, unless you walk, there are transportation
25  costs to do both; is that correct?

## 48

1      A.—Yes.
2      Q.  Okay.  And we already established, though, but
3  I just want to make sure that it's clear on the record,
4  it also takes time to vote; is that correct?
5      A.  Yes.
6      Q.  Okay.  Now, do you believe that Senate Bill 14
7  will reduce the voter turnout?
8      A.  Yes, I do.
9      Q.  And what is the basis of your belief?
10      A.  It will create additional confusion amongst
11  voters.
12      Q.  Uh-huh.
13      A.  Students, who are not known to plan ahead, will
14  not have recognized that their college ID will not get
15  them in at the polls.  Other people like that.
16      Q.  Does confusion inevitably lead to lower voter
17  turnout?
18      A.  Yes.
19      Q.  And what is the basis of that belief?
20      A.  Our offices around the state get calls from
21  voters that are confused.  They tell us that they, you
22  know, are trying to clarify things, and if there's any
23  open issues, they often say, "Well, I just won't vote."
24      Q.  When you say "open issues," you mean confusion?
25      A.  I mean anything that they're still uneasy

ANITA PRIVETT                                           June 7, 2012

---

49

1    about.
2         Q.  But I guess my question is:  Does being uneasy
3    about something the same as confusion?
4         A.  Close.
5         Q.  But not exactly the same?
6         A.  Let me give you an example.
7         Q.  Okay.
8         A.  Okay.  I'm a woman.  I'm a Latino woman.  My
9    driver's license name does not exactly match my voter
10   registration or my driver's license document.  There is
11   a potential that I will be turned away at the polls over
12   that.
13        Q.  Uh-huh.
14        A.  As the League of Women Voters person at the
15   office, I can't tell them for sure that they won't be.
16        Q.  Okay.  So there are hypothetical situations --
17   because we don't have any data, it's not been
18   implemented -- but there are hypothetical situations
19   where some people might not vote because of voter
20   ID.  Is it the case that some people might choose to
21   vote because of voter ID?
22        A.  Not to my knowledge.
23        Q.  Do you believe that if people believed that
24   voter ID increases ballot integrity and that increases
25   their confidence in the system, that this increased

---

50

1    confidence in the system could at the margins persuade
2    some voters to vote who wouldn't vote before?
3             MS. ROBERTSON:  Objection, calls for
4    speculation.
5         A.  I do not believe that.
6         Q.  (By Mr. McKenzie)  You may not subjectively
7    believe it, but I'm asking is it possible?
8             MS. ROBERTSON:  Same objection.
9         A.  It could be possible.
10        Q.  (By Mr. McKenzie)  Okay.  What does your
11   organization do?
12        A.  We study issues and prepare materials about
13   those issues.  We have regular meetings where we discuss
14   various topics.  We have issue forums where we bring in
15   experts.  We have candidate forums, where we ask
16   candidates to discuss their positions.  We publish a
17   voter's guide, which is a nonpartisan guide to issues.
18            We identify a few issues and ask the
19   candidates to reply.  Their answers are accepted
20   verbatim, except we do have a word limit, and if they
21   send us something that's got too many words, we just
22   chop it off.  So that we don't influence what's said
23   there.  And then we publish those in communities around
24   the state.
25        Q.  Is there anything else you guys do?

---

51

1         A.  We -- sometimes we go into high schools to do
2    voter registration.  We show up at other places,
3    including immigration events, to register voters.  We
4    talk to our legislators about issues.  We write letters
5    to our legislators, both -- some of them officially as
6    league members and some of them as individual members.
7         Q.  Okay.
8         A.  That's what comes to mind at the moment.
9         Q.  Okay.  And will your organization be able to
10   perform these activities if Senate Bill 14 is
11   precleared?
12        A.  Yes.
13        Q.  Okay.  Will your organization have to expend
14   additional resources performing these activities if
15   Senate Bill 14 is precleared?
16        A.  We will want to.
17        Q.  But will you have to?
18        A.  Nobody compels us.  Okay.  We're a voluntary
19   organization.
20        Q.  Do you believe that any of the registered
21   voters that you will try to get to the polls on election
22   day will choose not to go because they lack photo
23   identification, even though SB 14 allows them to cast
24   provisional ballots and obtain a photo ID later?
25            MS. ROBERTSON:  Objection, calls for

---

52

1    speculation and assumes facts not in evidence.
2         A.  Ask me again.
3         Q.  (By Mr. McKenzie)  Sure.
4             MR. McKENZIE:  Would you mind reading back
5    the question for me?
6             (Record read back by the reporter.)
7             MS. ROBERTSON:  Same objection.
8         A.  Yes.  I think some of them will choose not to
9    go.  The additional burden of going to the election
10   office and getting the ID and doing all that within six
11   days will be a problem.
12        Q.  (By Mr. McKenzie)  And that is the basis of
13   your belief that you think some people will find that
14   barrier or that extra effort too much?
15        A.  Yes.
16        Q.  Okay.  Does the League of Women Voters have a
17   chapter in Georgia?
18        A.  Yes.
19        Q.  Do you know whether persons who work with the
20   Georgia chapter have been hindered in their work by the
21   photo ID now in effect in that state?
22            MS. ROBERTSON:  Objection, calls for
23   speculation.  It's also outside the scope of what she's
24   been designated to testify about.
25            MR. McKENZIE:  I'm sorry.  I didn't mean

ANITA PRIVETT                                          June 7, 2012

---

## 53

```
1    to exceed the scope.
2            MS. ROBERTSON:  You can answer if you
3    know.
4       A.  I don't have personal knowledge.
5       Q.  (By Mr. McKenzie)  Okay.  You may have answered
6    this, but -- and I apologize if you have, but is the
7    Texas League of Women Voters nonpartisan?
8       A.  Yes, it is.
9       Q.  Okay.  Does the League of Women Voters ever
10   help Anglo middle-class voters to register?
11      A.  Yes.
12      Q.  Without identifying specific members, do any of
13   the members of the League of Women Voters of Texas lack
14   photo ID that would be required by SB 14?
15      A.  I have no knowledge of that.
16      Q.  Okay.  And so -- you may feel free to object on
17   this question, but can you identify any members of the
18   League of Women Voters of Texas who do not have one of
19   the types of photo ID required by SB 14?
20      A.  I cannot.
21      Q.  Okay.  Does the League of Women Voters of Texas
22   represent anyone else in this litigation besides its
23   members?
24      A.  We believe we represent the citizens of Texas.
25   We have for over 90 years sought to improve government
```

## 54

```
1    in Texas and election law, and to encourage citizens to
2    vote and work to improve our laws, and we believe we
3    represent everybody.
4       Q.  Do you mean -- the term "represent" can mean
5    different things.  I'm talking about specifically in
6    this litigation.  Do you represent anyone in this
7    litigation other than the members of your organization?
8            MS. ROBERTSON:  Objection, asked and
9    answered.
10      Q.  (By Mr. McKenzie)  You may answer.
11      A.  I believe that we represent the citizens of
12   Texas.
13      Q.  And does your organization have authority from
14   all the citizens of Texas to represent them in
15   litigation?
16      A.  No.
17      Q.  Okay.  How would preclearance of SB 14 harm the
18   League of Women Voters of Texas?
19      A.  It is a barrier to our efforts to increase
20   turnout in Texas.  We have the worst turnout of any
21   state.  In 2010, Texas was worse than any other state in
22   the general election in terms of turnout.
23      Q.  Uh-huh.
24      A.  And we have a big push on for increasing
25   turnout.
```

## 55

```
1       Q.  How is voter ID a barrier to raising turnout?
2       A.  We -- from the Secretary of State's Office, we
3    think there's at least 600,000 registered voters who may
4    lack ID, and the expectation that all of those people
5    would get ID and be able to vote in a November election
6    is ludicrous.
7       Q.  Are you familiar with the experience of other
8    states who have promoted voter ID?
9       A.  I am -- I have heard testimony from partisans
10   who characterized the experience as great and
11   wonderful.  I did not believe it.
12      Q.  Okay.  But I'm just asking a question about the
13   scope of your personal knowledge.  Are you familiar with
14   it, other than that testimony?
15      A.  I obviously read a lot about what's going on in
16   other states and the concerns.
17          What was the question again?
18      Q.  Are you familiar with the experience of other
19   states who have implemented voter ID laws?
20      A.  In general.
21      Q.  And do you know what the effect on turnout has
22   been in those states?
23          MS. ROBERTSON:  Objection, vague.
24      A.  I heard testimony that turnout was better in
25   the Obama election.
```

## 56

```
1       Q.  (By Mr. McKenzie)  Uh-huh.
2       A.  Which since that was the largest turnout ever,
3    that testimony didn't mean much to me.  That turnout got
4    bigger that year because it quite naturally would have.
5       Q.  And where was it bigger, do you recall?
6       A.  I think it was bigger in Georgia, but I'm not
7    sure.
8       Q.  And this is -- just so it's clear for the
9    record, this is turnout after implementation of voter ID
10   law; is that correct?
11      A.  I can't be sure.
12      Q.  Okay.  So you -- if you can't be sure, then you
13   don't necessarily know the experience of other states
14   who've implemented voter ID as it pertains to turnout;
15   is that correct?
16      A.  That's correct.
17      Q.  Okay.  So is -- is it your belief as to the
18   disparity between -- or potential disparity between
19   registered voters and those who hold IDs acceptable
20   under SB 14, is it your testimony that that disparity is
21   the main reason why you believe turnout would not rise
22   after implementation of SB 14?
23          MS. ROBERTSON:  Objection,
24   mischaracterizes prior testimony.
25          You can answer.
```

ANITA PRIVETT                                                    June 7, 2012

---

**65**

1  to another topic, back to the idea of having to pay,
2  potentially, a fee for a birth certificate if you don't
3  already own one and -- or not own, I should say, but
4  already in possession of one.
5      And my question is:  Do you know how much
6  it costs to get a birth certificate?
7      A.  In Texas, I believe it's $23.
8      Q.  Okay.
9      A.  Now, recognize that what you might be looking
10  for is your citizenship documents.  If you don't have
11  citizenship documents that have your picture on them,
12  that might cost as much as $200.
13      Q.  Okay.  Do you know if all naturalized citizens
14  must obtain at one point or another citizenship
15  documents with photos on them?
16      A.  I don't believe they do.  I don't know that,
17  but the law specifically says what's acceptable is
18  something with a photo on it.  So I have assumed that
19  there are some that do not.
20      I tried to clarify that issue with
21  Secretary of State's Office, and it was during a time
22  when the chief elections person had left and they had a
23  new person and it just -- I never was able to clarify.
24      Q.  Okay.  But going back --
25      A.  Because I wanted to know exactly what documents

---

**66**

1  would be accepted.
2      Q.  Okay.
3      A.  Never got an answer to that.  Like the number,
4  no.  Most government documents have a number.
5      Q.  Going back to the birth certificate.  You
6  testified that you think it's $23; is that correct, in
7  Texas?
8      A.  In Texas.
9      Q.  Okay.
10      A.  But every state has a different -- has the
11  right to charge whatever they want to charge.
12      Q.  Okay.  And if a voter gets -- if a voter who
13  lacks a birth certificate obtains a certificate and pays
14  a fee for the certificate, and then the cost of that
15  certificate is amortized over the life of the voter's
16  eligible voting life, is it your contention that cost is
17  significant?
18      MS. ROBERTSON:  Objection, calls for
19  speculation.
20      A.  When the -- when the person who wishes to vote
21  needs that document today, the cost is not amortized
22  over time.  It's today.
23      Q.  (By Mr. McKenzie)  Right.  I understand.  But
24  I'm just saying under the -- and I understand my
25  question is a hypothetical.  But under the conditions of

---

**67**

1  my hypothetical, if somebody obtains a birth
2  certificate, pays the fee, and then the fee they pay is
3  amortized over the life, the voting life of that voter,
4  is it your contention that cost is significant?
5      MS. ROBERTSON:  Objection, calls for
6  speculation.
7      A.  I don't know how to answer your question.  I
8  reject the -- I reject the question as being irrelevant.
9      Q.  (By Mr. McKenzie)  Well, unfortunately, you
10  still got to answer it.  Unless you don't understand it,
11  in which case I can try to clarify it.
12      A.  I believe I understand the question.
13      Q.  Uh-huh.
14      A.  And yes, I believe it is still significant.
15      Q.  Why do you believe that?
16      A.  When you have a young mother who has
17  babysitting cost and food costs and is barely getting by
18  and is having to make choices between food and gas and
19  other things, to that person, any money that they have
20  to expend for something that is not actually required is
21  a big expense.
22      Q.  Right.  But we established earlier there's some
23  transportation costs unless you walk, even as a time
24  cost, to get to the poll; is that right?
25      MS. ROBERTSON:  Objection, asked and

---

**68**

1  answered.
2      Q.  (By Mr. McKenzie)  You may answer.
3      A.  Yes.
4      Q.  And so for the hypothetical voter, you just
5  mentioned the one who's struggling, that voter would
6  have to pay those costs to vote in time or money to get
7  to the polls; is that correct?
8      A.  Yes.
9      Q.  So is that expense significant?
10      A.  Yes.
11      Q.  Now we're going to move on to a new topic.
12      Are you aware that Texas law prohibits
13  non-U.S. citizens from voting?
14      A.  Yes.
15      Q.  Okay.  And are you aware that Texas law does
16  not require persons to present proof of citizenship when
17  they register to vote?
18      A.  Yes.
19      Q.  Okay.  Are you aware that Texas issues special
20  driver's licenses to noncitizens that poll workers can
21  identify as belonging to an ineligible voter?
22      A.  Yes.
23      Q.  Okay.  If a noncitizen registers to vote, how
24  do you propose Texas should go about preventing that
25  noncitizen from voting?

ANITA PRIVETT                                         June 7, 2012

## 69

1      MS. ROBERTSON:  Objection, calls for
2  speculation, and is beyond the scope of what she's been
3  designated to testify about in the 30(b)(6) notice.
4      Q.  (By Mr. McKenzie)  To the extent you have
5  knowledge.  The 30(b)(6) just lists out what you're
6  expected to have knowledge about.  So to the extent that
7  you have knowledge about other ways Texas can go about
8  preventing that noncitizen from voting, I'd ask you to
9  answer.
10      MS. ROBERTSON:  Calls for speculation.  I
11  mean, I have the same objections.  If you know, you may
12  answer.
13      A.  First of all, I don't believe that noncitizens
14  actually try to vote except in exceptionally rare
15  occasions.  They try to avoid government offices or any
16  place that they might be caught doing anything that
17  might get them to be deported.  I don't believe the
18  noncitizens are trying to vote.
19      There are a few occasions when somebody
20  misunderstands and thinks -- I remember one particular
21  case, they thought they were trying to be a good
22  American by voting.  They didn't realize they had no
23  right.
24      What can Texas do to stop?  Texas has
25  already taken steps to make it more difficult to get

## 70

1  documents if you do not have -- if you're not a
2  citizen.  We could require all citizens to carry
3  papers.  There was a federal law to that effect, which
4  Texas has refused to implement.
5      Q.  (By Mr. McKenzie)  Right.  But this is -- this
6  is -- this question is directed specifically to a
7  noncitizen who registers to vote.  So they're on the
8  voter rolls, and once they're on the voter rolls, and
9  they have a voter registration card, how do you propose
10  Texas go about preventing that noncitizen from voting?
11      MS. ROBERTSON:  Objection, calls for
12  speculation.  It's also beyond the scope of the
13  30(b)(6), so it's not something that she can testify
14  about on behalf of the League.  If you have personal
15  knowledge, you can answer.
16      A.  No personal knowledge.
17      Q.  (By Mr. McKenzie)  So you don't know, then, how
18  Texas could prevent that noncitizen from voting?
19      A.  No.
20      Q.  Okay.  Do you believe that the number of
21  incidents of voter impersonation in Texas is zero?
22      A.  I believe it's close to zero.
23      Q.  But do you believe it is zero?
24      A.  No.
25      Q.  Okay.  Why do you believe it's close to zero?

## 71

1  What's the basis of that belief?
2      A.  There have been efforts on the part of the
3  Attorney General to identify cases like that, and very
4  few that have been found.  There -- I've heard hours and
5  hours of testimony, and people will get up and say, "I
6  saw this red-headed woman twice," but when you say to
7  them, "Who did you report it to?  Did they follow up?
8  Well, were you able to make" -- "bring charges against
9  that person?"  It's always no.  "No, I didn't tell
10  anybody," or whatever.
11      Q.  So based on the example you just provided, is
12  it possible that voter impersonation goes unreported?
13      A.  Certainly, it is possible.
14      Q.  Okay.  And is it possible that voter
15  impersonation goes undetected?
16      MS. ROBERTSON:  Objection, calls for
17  speculation.
18      A.  It's possible.
19      Q.  (By Mr. McKenzie)  So if you were doing an
20  investigation to identify voter fraud or voter
21  impersonation, and it -- in some cases it goes
22  unreported, and in some cases it goes undetected, would
23  that investigation uncover anything?
24      MS. ROBERTSON:  Objection, calls for
25  speculation.

## 72

1      A.  I don't know.
2      Q.  (By Mr. McKenzie)  Would it uncover the
3  undetected and unreported cases?
4      MS. ROBERTSON:  Calls for speculation.
5      A.  I wouldn't think so.
6      Q.  (By Mr. McKenzie)  Okay.  Do you believe that
7  Texas should be required to tolerate voter fraud if it
8  occurs in only small amounts?
9      A.  I believe that one has to balance the issue of
10  absolute zero no fraud against disenfranchising
11  significant numbers of registered voters.
12      Q.  So is that -- if the result of that balance is
13  that some voters will not be able to vote but voter
14  fraud will become less likely, is that a tradeoff --
15  does Texas have to accept a tradeoff that it maximized
16  potential voters and not reduced voter fraud?
17      MS. ROBERTSON:  Objection, compound, calls
18  for speculation.
19      A.  Can you uncompound it?
20      MR. McKENZIE:  Read back the question for
21  me, and I'll try to uncompound it, to the extent I
22  believe --
23      MS. ROBERTSON:  We have a new verb.
24      (Requested portion read back by the court
25  reporter.)

ANITA PRIVETT                                                    June 7, 2012

## 73

1   Q.  (By Mr. McKenzie) I'll take the second part of
2   that question.
3       Does Texas have to maximize the tradeoff
4   so that -- does it have to accept the tradeoff that it
5   maximize the potential number of people who can vote at
6   the expense of not addressing potential voter fraud?
7       MS. ROBERTSON:  Objection, calls for
8   speculation.
9   A.  I think you have to look at the number of fraud
10  cases where voter ID would have addressed it.
11  Q.  Uh-huh.
12  A.  Now there are fraud cases out there where voter
13  ID will not address it.
14  Q.  Uh-huh.
15  A.  But if voter ID would actually address the
16  fraud, you have to match that with the number of people
17  who will be adversely affected by SB 14.  You have to
18  look at both of those.  And my judgment is that the
19  number of -- what evidence I have of the number of
20  actual fraud cases that would be affected by this law,
21  or would be stopped by this law, that the impact is much
22  greater on Texas and Texans on those people who will be
23  unable to vote or will have difficulties in voting.
24  Q.  All right.  And I guess my question is:  Does
25  Texas have to accept that judgment and build its law or

## 74

1   policy on that basis?
2       MS. ROBERTSON:  Objection, asked and
3   answered.
4   A.  Do I have to answer it again?
5   Q.  (By Mr. McKenzie) Yes.  I mean, she can
6   object, but yes.
7   A.  I believe Texas should.
8   Q.  Okay.  Do you believe there's any quantity of
9   in-person voter fraud, either impersonation or voting by
10  noncitizens, that could justify Senate Bill 14?
11      MS. ROBERTSON:  Objection, calls for
12  speculation.
13  A.  Not in its current form.  I think there could
14  be a voter ID bill that could be written that would be
15  justified, if there was a huge amount of fraud that
16  would be addressed by that law, but we would be having
17  student IDs accepted and, you know, a lot more freedom
18  in what's an acceptable ID.
19  Q.  (By Mr. McKenzie)  So but would it have to be a
20  huge amount of fraud is what I believe your testimony
21  is; is that correct?
22  A.  A significant amount of fraud.
23  Q.  Okay.
24  A.  Don't get me wrong, the League is against
25  fraud.  We would like to stop it.

## 75

1   Q.  Uh-huh.  How many cases would you say is the
2   balance?
3       MS. ROBERTSON:  Objection, calls for
4   speculation.
5   A.  If there were as many as 500 in a single
6   election, I would think we needed to seriously look at
7   it.
8   Q.  (By Mr. McKenzie)  Okay.
9   A.  I mean, that's a statewide election.
10  Q.  A statewide election, okay.
11  A.  That is my personal opinion.  That is not the
12  League's opinion.  We have not taken a position on that
13  Q.  Okay.
14      MR. MCKENZIE:  It's 11:36.
15      MS. ROBERTSON:  I was going to ask you
16  take a break at 11:45, but if this is a good stopping
17  point, we could take it now.
18      MR. MCKENZIE:  Yeah, it's a good time.
19      (Recess from 11:37 to 11:45)
20  Q.  (By Mr. McKenzie) Why did you decide to
21  intervene in this lawsuit?
22  A.  The League determined to intervene because we
23  feel very strongly that it does not -- that it's
24  discriminatory, that particularly Latino and Latin
25  American and Asian voters and poor people and older

## 76

1   people and students will have more difficulty voting,
2   and we think that's wrong.
3   Q.  Who are the groups that will have difficulty
4   voting?
5   A.  Elderly, students, Latinos, African American,
6   and Asians.
7   Q.  Okay.  Do you believe the United States
8   Department of Justice will not adequately represent the
9   interests of those who oppose SB 14?
10      MS. ROBERTSON:  Objection, calls for legal
11  conclusion, and is also the subject of an objection that
12  we made to the 30(b)(6) notice in advance of the
13  deposition.
14  Q.  (By Mr. McKenzie) And subject to those
15  objections, you may answer the question.
16  A.  We're not making comment on the Justice
17  Department's ability.  What I would say, that we have
18  League of Women Voters groups in 27 communities around
19  Texas, and they are feet on the ground.  Many of our
20  members are actually election workers.  They talk
21  regularly to our election workers.  They know what's
22  happening.  They receive calls and e-mails from people
23  around Texas about -- about their concerns and questions
24  about voting.
25      Texas is a very large state.  We have huge

## 77

1  areas that are rural.  We have members that can
2  adequately represent those people.  We also have three
3  of the biggest cities out of the top ten in the
4  country.  So we're just such a big, varied state, and
5  the League has boots on the ground in those areas.  We
6  feel like we know Texas.
7       Q.  Do you think that the League could apprise the
8  Department of Justice of that information without
9  intervening?
10      MS. ROBERTSON:  Objection, calls for
11 speculation.
12      A.  We have written them three letters about our
13 concerns, but we believe actually intervening is a
14 better means of objecting to this law.
15      Q.  (By Mr. McKenzie) Is it because you have boots
16 on the ground?
17      A.  Yes.
18      Q.  Okay.  And it's your belief that communicating
19 whatever institutional knowledge you may gather through
20 the boots on the ground to DOJ would not be an adequate
21 substitute for your participation in the lawsuit; is
22 that correct?
23      MS. ROBERTSON:  Objection, calls for a
24 legal conclusion.
25      A.  I believe that the League's personal

## 78

1  involvement in the suit can be helpful in making the
2  case.
3       Q.  (By Mr. McKenzie) And it's the same boots on
4  the ground -- the same boots-on-the-ground reasoning?
5       A.  Yes.
6       Q.  And why is the personal involvement better?
7       A.  I just believe that being personally involved
8  in the conversation with the attorneys that are going to
9  represent us and they're being personally involved in
10 the suit opens up the possibility of getting additional
11 information into the record.
12      Q.  Okay.  But if that information were
13 communicated to the Department of Justice, they could
14 also get it into the record; is that correct?
15      MS. ROBERTSON:  Objection, calls for
16 speculation.
17      A.  More voices saying even the same thing is
18 better.
19      Q.  (By Mr. McKenzie) Okay.  Has the United States
20 Department of Justice done anything in this litigation
21 to indicate that your interests are not adequately
22 represented by the Attorney General of the United
23 States?
24      MS. ROBERTSON:  Objection, calls for a
25 legal conclusion.  The same objection as to the fact

## 79

1  that the court has already ruled that the League can
2  intervene.
3       Q.  (By Mr. McKenzie) And it's the same -- it's the
4  same drill; she can object, and after those objections,
5  you can answer unless instructed not to by your counsel.
6       A.  I am not aware of anything.
7       Q.  Okay.  Do you intend to seek attorneys' fees
8  from the State of Texas if the courts deny preclearance
9  to Senate Bill 14?
10      A.  No.
11      Q.  Okay.
12      A.  That -- that doesn't say that the ACLU might
13 not, but the League would not.
14      Q.  Okay.  Is the League paying anything for
15 representation in this case?
16      A.  No.
17      Q.  Okay.  Did the -- I'm assuming the answer will
18 be no, but I just want it to be clear for the record.
19 Does the prospect of attorneys' fees in any way
20 influence your decision to intervene in the lawsuit?
21      A.  Had there been fees, it would have been
22 difficult for us to intervene.
23      Q.  I mean, collecting fees at the end of
24 litigation.
25      A.  Oh.

## 80

1       Q.  If the court order denies preclearance and
2  orders Texas to pay fees?
3       A.  Oh, absolutely it had nothing whatsoever to do
4  the League's decision.
5       Q.  Okay.  By intervening in this lawsuit, do you
6  hope to deter other states in Section 5 jurisdiction
7  from enacting photo ID requirements similar to SB 14?
8       MS. ROBERTSON:  Objection, calls for
9  speculation.  Also, she is representing the League of
10 Women Voters of Texas and can't really testify as to
11 other states.
12      Q.  (By Mr. McKenzie) Subject to those objections,
13 you may answer.
14      A.  That was not a consideration.
15      Q.  Okay.  The League of Women Voters of Texas
16 intervened with other parties; is that correct?
17      A.  Yes.
18      Q.  And those parties include the Texas Legislative
19 Black Caucus and Justice Seekers as well as individual
20 intervenors; is that right?
21      A.  Yes.
22      Q.  Okay.  Did -- and I'm just going to use
23 shorthand so I don't have to say Texas League of Women
24 Voters and Texas Legislative Black Caucus all the time.
25 So I'm going to refer to Texas Legislative Black Caucus

ANITA PRIVETT                                         June 7, 2012

## 89

1  of Karen?
2    A.  Yes.
3    Q.  Okay.  I wanted to ask you about the last
4  sentence in the first paragraph.  Would you mind reading
5  that sentence for me?
6    A.  "We fear the implementation of this law, as
7  scheduled, may perpetuate existing disparities in voter
8  participation between Anglos and minorities in Texas."
9    Q.  Okay.  And it says "perpetrate," right?
10   A.  Perpetrate.
11   Q.  Do you think it meant perpetrate or perpetuate?
12       MS. ROBERTSON:  Objection, calls for
13  speculation.
14   A.  Yeah, it's speculation.  You saw that I read it
15  the other way, so I think she may have meant that, the
16  other word, because she goes on down here to give the
17  statistics.
18   Q.  (By Mr. McKenzie) And Karen Nicholson signed
19  this on behalf of --
20   A.  The League of Women Voters of Texas.
21   Q.  Right.  That's correct, right?
22   A.  Yes.
23   Q.  Okay.  And you're the corporate representative
24  for this deposition for the League, right?
25   A.  Yes.  I've been designated as the person to

## 90

1  answer these questions, as the most knowledgeable person
2  to answer these questions.
3    Q.  Right.  And so the only reason why I'm trying
4  to establish that is to -- it's for the record.
5    A.  Sure.
6    Q.  For speculation objections, basically, so that
7  I can say this is an official letter from the League of
8  Women Voters, right?  And that's -- and that's who
9  you're testifying on behalf of, right?
10   A.  Yes.
11   Q.  Okay.  So when it says "perpetrate" here, you
12  read that to mean to perpetrate or perpetuate on behalf
13  of the organization?
14   A.  I would need a dictionary to be sure.  Linda is
15  an academic.
16   Q.  Okay.
17   A.  Okay?  And she's usually right, but I would
18  have used the other word.  That's all I can say.
19   Q.  Okay.  But the question I want to ask about
20  this is:  This letter indicates there's already
21  disparate voting participation by different racial,
22  ethnic, and language minority groups in Texas; is that
23  right?
24   A.  Yes.
25   Q.  And is that consistent with the League's

## 91

1  understanding?
2    A.  Yes.
3    Q.  Okay.  And there's currently no photo voter ID
4  requirement in Texas; is that right?
5    A.  That's correct.  There is a requirement that
6  there be some sort of ID, but not a photo ID.
7    Q.  Okay.  And so if voting participation rates for
8  members of different racial, ethnic, and language
9  minority groups in Texas will continue at existing
10  levels, at existing disparities, instead of get worse
11  after implementation of SB 14x, how will SB 14 cause a
12  disparate impact?
13       MS. ROBERTSON:  Objection, calls for a
14  legal conclusion.
15   A.  I believe that it will get worse because these
16  minority groups are, I believe, three times as likely to
17  be below the poverty line, and the Brennan Center
18  study -- my tongue won't say that -- in 2006 indicated
19  that persons that had incomes lower than $25,000 were
20  twice as likely not to have these types of documents,
21  so, so it just makes things worse.
22   Q.  (By Mr. McKenzie) But the letter says it will
23  perpetrate -- perpetrate existing disparities, or
24  perpetuate.  We can't really pin down what's going on
25  with that word and with the verb.  But it's either

## 92

1  perpetuate or perpetrate.  But the existing disparities
2  is clear, correct?
3    A.  Existing disparities will get worse is the
4  point of this letter.  That part I'm very sure of.
5    Q.  But it doesn't say that, does it?
6       MS. ROBERTSON:  Objection.
7    Q.  (By Mr. McKenzie) In this sentence.  Now, it
8  may say it somewhere else, if you can find it in there.
9    A.  Like I say, I need a dictionary to be sure what
10  that actually means.
11   Q.  Well, also, if you -- I don't want to cut you
12  short, so if you want to say something in relation to
13  that question, you are welcome to.  Okay.
14       It also says at the bottom here of the
15  third paragraph, the last sentence, "The added
16  requirements of SB 14 make it more difficult to raise
17  voter registration and turnout of underrepresented
18  groups to the levels of groups with the highest voter
19  participation rates."
20       So it's -- the letter speaks in terms of
21  making it more difficult to raise voter registration and
22  turnout rates; is that correct?
23   A.  That's one of the points made here.  We
24  figured, in 2010, that if we just raise Texas turnout to
25  what it was across the country, there would be one

ANITA PRIVETT                                                    June 7, 2012

---

### 93

1 million more voters.  That's how bad it was in Texas.
2             And so our emphasis has been trying to
3 raise voter participation.  But this letter is saying
4 that this law is going to make it even more difficult
5 for us to have any impact on turnout, because it's going
6 to be -- because minorities primarily are going to be
7 less likely to vote than they already are.
8      Q.  But -- well, at least as far as the two
9 sentences I've pointed out, the letter doesn't say it's
10 going to reduce voter turnout; is that correct?
11             MS. ROBERTSON:  Objection,
12 mischaracterizes her testimony and the letter speaks for
13 itself.
14      A.  This might be a good example of why our
15 intervening is better than letters to DOJ.
16      Q.  (By Mr. McKenzie) But I'm just speaking
17 confined to this particular letter that you sent to the
18 DOJ.  It doesn't speak anything -- you can review it
19 more if you want.  But at least as to those two
20 sentences, it doesn't speak about reducing turnout or
21 reducing voter registration; is that correct?
22             MS. ROBERTSON:  Objection,
23 mischaracterizes the exhibit.
24      A.  And I wouldn't agree with that statement.
25      Q.  (By Mr. McKenzie) And why wouldn't you agree?

---

### 94

1      A.  Because I don't think that's what it says.  I
2 think it's -- I think it's talking -- I know the intent,
3 and I believe the words themselves, if you read the
4 whole thing, indicate that what we're trying to say is
5 that the bill itself will reduce voter turnout.
6      Q.  So is it your testimony that the letter is
7 completely silent on the issue of whether or not SB 14
8 will reduce voter turnout?
9      A.  No.
10             MS. ROBERTSON:  Objection,
11 mischaracterizes her testimony.
12      A.  No, that's not my testimony.
13      Q.  (By Mr. McKenzie) What is your testimony about
14 this letter?
15             MS. ROBERTSON:  Objection, asked and
16 answered.
17      Q.  (By Mr. McKenzie) Have you had a chance to read
18 the whole letter?
19      A.  Yeah, but it's very dense. (Laughing).
20      Q.  Are you able to find anything that talks about
21 reducing voter turnout or voter registration?
22      A.  Not specifically.
23      Q.  Okay.  That's fine.  We can go on to the next
24 exhibit.
25      A.  Probably one of the other letters would cover

---

### 95

1 it, and this one didn't.
2      Q.  And I honestly -- I was going to ask questions,
3 but I cut out those letters for time purposes.
4             How does the cost associated with getting
5 a free ID differ materially from the usual cost of
6 voting?
7             MS. ROBERTSON:  Objection, asked and
8 answered.
9      A.  It is an additional burden on time and expense,
10 and it is something new to learn about, to find out that
11 you've got to do it, in a timely manner, and to get it
12 done.
13      Q.  (By Mr. McKenzie) But how do those things
14 differ from what you usually have to do to vote?
15             MS. ROBERTSON:  Objection, vague and asked
16 and answered.
17      A.  What you usually have to do to vote is receive
18 your voter registration card in the mail, go to the
19 polls and vote.  And with this, you've got to understand
20 the new law, you've got to figure out whether you've got
21 the documents, you've got to -- if you don't have the
22 documents, you've got to go to the DPS office and
23 potentially supply documents you may or may not already
24 have.
25      Q.  (By Mr. McKenzie) But in order to vote, you

---

### 96

1 have to present documents; is that correct?
2      A.  Absolutely.  We have a perfectly good
3 requirement for identification when you vote as it
4 existed before SB 14.
5      Q.  And it -- it requires some knowledge of where
6 your precinct is to; vote, is that correct?
7      A.  Your voter registration card tells you what
8 your precinct is.
9      Q.  But you have to receive your voter registration
10 card and actually read it and maintain it and take it to
11 the polls; is that correct?
12      A.  Yes.  Or you can look it up on the web to find
13 out you're supposed to vote.
14      Q.  And you have to know the day of the election;
15 is that correct?
16      A.  Yes.
17      Q.  Okay.  So you have to know some basic
18 information about the election in order to vote; is that
19 correct?
20      A.  Right.
21      Q.  And you need to know some basic information
22 about SB 14 in order to get a free ID; is that correct?
23      A.  You would have to know something about SB 14 to
24 know that there was an issue over the way we've been
25 voting in Texas for years and years and years.  So you

ANITA PRIVETT                                                      June 7, 2012

## 97

1  would have to recognize that things have changed, and
2  then look into whether you had the required documents,
3  and if you didn't, go to the trouble of getting them.
4       Q.   Is acquiring that knowledge different in
5  character than acquiring the regular knowledge you need
6  to vote?
7            MS. ROBERTSON:  Objection, vague, calls
8  for speculation.
9       A.   I would see it as different in that it is new
10  information that people don't -- aren't looking for,
11  because they've been voting.  Many people have been
12  voting in the same precinct for 50 years.
13      Q.   (By Mr. McKenzie) Uh-huh.
14      A.   Some less than that.  But they often -- they
15  just do it as a routine kind of thing.  They don't look
16  to see if anything has changed, because generally,
17  nothing has changed that affects them.
18      Q.   But other than being new, is the information
19  you need to comply with SB 14 different in character
20  than the information you need to vote in the first
21  place?
22           MS. ROBERTSON:  Objection, calls for
23  speculation, vague.
24      A.   It's more complex.
25      Q.   (By Mr. McKenzie) How so?

## 98

1       A.   Because there's a very limited number of IDs
2  that are acceptable.
3       Q.   So how does the limited number of IDs make it
4  more complex?
5       A.   Well, you have to figure out whether you've got
6  one of those, and we anticipate that quite a number of
7  people will not.  For instance, students.  Students
8  would expect that whatever ID they already have would
9  work.  It's a photo ID.  Your bus driver would think "I
10  have a photo ID from the City of Austin."  There are all
11  kinds of photo IDs out there that even in previous laws
12  that have been discussed in Texas, some of them have
13  been acceptable; government IDs have been and student
14  IDs.  But none of those are going to be acceptable.  So,
15  really understanding what is acceptable and what's not
16  is more complex.
17      Q.   It's more complex than knowing what you need to
18  know vote now?
19      A.   Yes.
20      Q.   Do voters who are voting now need to know that
21  they need to present a voter registration card?
22      A.   They need to know that they need that or -- or
23  a driver's license.  There are a few other things -- if
24  they don't have one of those two things, there are a few
25  other things that are acceptable.  But the voter

## 99

1  registration card comes in the mail, I think it's every
2  two years, and if you don't move, it's going to come in
3  the mail.
4       Q.   Uh-huh.
5       A.   And it's all you need.
6       Q.   But you'd have to know to carry it with you to
7  the poll; is that correct?
8            MS. ROBERTSON:  Objection, that
9  mischaracterizes the law.
10      Q.   (By Mr. McKenzie) Carry it, or other acceptable
11  forms of ID.
12      A.   Right.  And a lot of people have a driver's
13  license in which they carry all the time, and so if they
14  get to the polls without the voter registration card,
15  they whip that out, and under this law, that will be
16  acceptable.
17      Q.   Yes.
18      A.   But a lot of people, particularly elderly
19  people, as you quit driving, you don't need a driver's
20  license anymore, so you're not going to pay for one, you
21  may find that you need an official voter -- not voter --
22  a photo ID that's not a driver's license that you pay
23  for from DPS, and some elderly people get those.  But in
24  general, once you stop driving, you don't have a
25  driver's license and that.  And always before, that

## 100

1  piece of paper that you got in the mail that said it was
2  a voter registration card was all you needed.  If you're
3  an elderly person, there's a real good chance you'll
4  show at the polls with just that.
5       Q.   But I'm trying to get to the issue of
6  complexity.  And it sounds like one potential feature of
7  complexity is that it's a new requirement right; is that
8  correct?
9       A.   Yes.
10      Q.   Okay.  And that would deal with the
11  hypothetical you presented of an elderly voter who is
12  used to going to the polls with their voter ID card,
13  with his or her voter ID card, and then they don't know
14  about SB 14, and they show up with just their voter ID
15  card or voter registration card, and they wouldn't be
16  allowed to vote; is that correct?
17      A.   That's correct.
18      Q.   So other that that hypothetical and the newness
19  of the law, how is knowing the acceptable IDs under SB
20  14 more complex than knowing the acceptable IDs that are
21  acceptable now?
22           MS. ROBERTSON:  Objection, asked and
23  answered, and calls for speculation.
24      A.   It's not intuitive, is one thing, in terms of
25  the number of documents that are acceptable.  I mean, if

ANITA PRIVETT                                                    June 7, 2012

---

## 101

1    any -- if you asked somebody on the street what
2    documents do you think they would accept, they would --
3    people would say a government ID before they would say a
4    gun carry permit.
5         Q.   (By Mr. McKenzie) But a gun carry permit is a
6    form -- is a government ID; is that correct?
7         A.   It is, but --
8         Q.   And so is a state driver's license.
9         MS. ROBERTSON:  You guys are talking over
10   each other, so what's the question?  What's the
11   question?
12        Q.   (By Mr. McKenzie) A concealed handgun license
13   is a government ID, right?
14        A.   Yes, it is.
15        Q.   Okay.
16        A.   But people would think that any government ID
17   would be acceptable, including the bus driver's ID from
18   the City of Austin.
19        Q.   What is the basis of that belief?
20        A.   It's a government ID.  People --
21        Q.   But why do you think people would expect that
22   their --
23        A.   I'm sorry -- there's a --
24        MS. ROBERTSON:  There's a gnat.
25        THE WITNESS:  There's a gnat that seems to

---

## 102

1    want to get into my mouth or nose.
2         Q.   (By Mr. McKenzie) What -- okay.  Sorry.  Pardon
3    the interruption of the gnat.
4         What makes you believe that voters would
5    expect any government ID to be acceptable?
6         A.   Well, a government -- first of all, they
7    would think of a photo ID, and some people would think
8    that their employment ID might be acceptable, because it
9    was a photo ID, said who you were and gave your address
10   maybe.  So I think some people would think that that
11   would be okay.  But next to that, I think they would
12   think that a government ID, as a photo ID officially
13   given out by the government, as opposed to this narrow
14   list of specific government IDs.
15        Q.   Do you know anybody who has that belief about
16   SB 14?
17        A.   I have certainly talked to people who were
18   shocked by the actual list.
19        Q.   That doesn't precisely answer the question.
20        Do you know anybody who believes, based on
21   SB 14, that they can use any government ID if that law
22   is implemented?
23        A.   Can I name specific person?  No.
24        Q.   Okay.  We're just going to go real quick.
25        Do you think SB 14 was enacted with a

---

## 103

1    discriminatory purpose?
2         A.   The League has not taken a position on that.
3         Q.   I think in your pleading, you may not have read
4    the pleading, because your lawyers may have handled
5    that, which is natural, but --
6         A.   I read --
7         MS. ROBERTSON:  Let him finish the
8    question.
9         Q.   (By Mr. McKenzie) But I think in your pleading,
10   you have denied Texas's allegation that SB 14 was not
11   enacted with a discriminatory purpose.  So under
12   Section 5, we have to prove the negative, that the law
13   was not enacted with a discriminatory purpose, and I
14   want to ask why you denied that allegation.
15        MS. ROBERTSON:  Objection, calls for a
16   legal conclusion.
17        A.   To my knowledge, the League has not taken a
18   position on whether there was a discriminatory
19   purpose.  I have an opinion, but the League has not
20   taken a position.  I did read the pleadings.  I missed
21   that, if you think it says something different than I
22   thought.
23        Q.   (By Mr. McKenzie) It doesn't expressly say that
24   it was enacted with a discriminatory purpose.  It denies
25   Texas's allegation that it was enacted without a

---

## 104

1    discriminatory purpose.  So I was curious if the League
2    had any facts that would support that allegation -- or
3    that denial?
4         A.   We have not taken a position on that.
5         Q.   So is that a no, that the League doesn't have
6    any facts?
7         A.   We don't have any facts we wish to present.
8         Q.   But do you have any facts?
9         A.   I have personal opinions.
10        Q.   Yeah, I'm talking about the League, not your
11   personal opinions.
12        A.   I know.  And so, no, we don't have any facts
13   then.
14        Q.   Okay.  I'd like to introduce Exhibit 4, I
15   think.  Is that correct?  Okay.  Exhibit 4.
16        (Privett Exhibit 4 marked for
17   identification.)
18        Q.   (By Mr. McKenzie) And have you seen this
19   document before?
20        A.   Yes.
21        Q.   And can you identify what that document is?
22        A.   Linda Krefting got this request from DOJ for
23   information, and she is making sure that the president
24   and I and Julie is also in -- kind of in the chain of
25   command to deal with this.  And the Julie Oliver is a

ANITA PRIVETT                                                      June 7, 2012

---

## 105

1   staff person.  So she's just making sure we all know
2   what's going on.
3       Q.   And so the record is clear, this is an e-mail,
4   right?
5       A.   Yes,
6       Q.   And the sender of the e-mail is who again?
7       A.   Linda Krefting.
8       Q.   And who are the recipients?
9       A.   Karen Nicholson was the president at the time
10  of this note.  I was Advocacy Vice President at the time
11  of the note.  Julie Lowenberg is coordinator for the
12  section that election law comes under.
13      Q.   Uh-huh.
14      A.   We have so many issues that we have some
15  coordinators, and she was the coordinator for that, and
16  Julie Oliver is a staff member.
17      Q.   Okay.  And so these are all people who are in
18  some sort of leadership or official position with the
19  Texas League of Women Voters?  Is that fair?
20      A.   That's right.
21           MS. ROBERTSON:  Objection, compound.
22      Q.   (By Mr. McKenzie) Okay.
23      A.   Sorry.
24      Q.   No, it's fine.  You were fine to answer that
25  question.

---

## 106

1            It would be enough to say that they are
2   all somehow officially associated with the Texas League
3   of Women Voters; is that correct?
4       A.   Yes.
5       Q.   Okay.  And I want to direct your attention to
6   the fifth paragraph.
7       A.   Yes.
8       Q.   And if you wouldn't mind reading it for me.
9   It's really short.
10      A.   "She asked if we had any evidence of
11  discriminatory intent in the legislation.  I said not
12  really.  I indicated our concern was discrimary effects.
13  Certainly, that's the argument we were making."
14      Q.   And Linda is the president of the Texas League
15  of Women Voters; is that correct?
16      A.   She is today.  At the time of this letter, she
17  was the issue chair --
18      Q.   Okay.
19      A.   -- for election law.
20      Q.   And does that paragraph state the position of
21  the Texas League of Women Voters?
22      A.   Yes.
23      Q.   Okay.  And then I'm on the final piece of my
24  outline.  Are we on time?
25           MS. ROBERTSON:  It's 12:34.

---

## 107

1            MR. McKENZIE:  Okay.  I'm assuming we'll
2   just have to power through, right?
3            MS. ROBERTSON:  How much longer?
4            MR. McKENZIE:  30 minutes maybe.
5            MS. ROBERTSON:  Do you need to take a
6   break and stretch your legs?
7            THE WITNESS:  I think I'm okay.
8            MR. McKENZIE:  Okay.
9       Q.   (By Mr. McKenzie) Okay.  Do you contend that
10  SB 14 will have the effect of denying or abridging
11  African American Texans' his right to vote?
12      A.   Say that again, please.
13      Q.   The problem is that Texas ends in -- and the
14  plural ends in an S.
15           So do you contend that SB 14 will have the
16  effect of denying or abridging African American Texans'
17  right to vote?
18           MS. ROBERTSON:  Objection, calls for a
19  legal conclusion.  You can answer.
20      A.   Yes.
21      Q.   (By Mr. McKenzie) And what is the basis for
22  that contention?
23      A.   Not all African Americans have the documents
24  that are required under SB 14, and African Americans in
25  Texas are more likely to be below the poverty line, and

---

## 108

1   there's an even increased number of expectations that
2   African Americans below the poverty line will not have
3   those documents, making it more -- having a bigger
4   affect on minorities than on Anglos.
5       Q.   And do you know how many African American
6   Texans lack a photo ID acceptable under SB 14?
7       A.   No, we don't know exactly how many don't have
8   any of these documents.  We can speculate based on
9   things we do know.  The Secretary of State's Office has
10  offered a number of about 600,000 that didn't provide
11  information that indicated they had a document.  And
12  there have been studies, the Brennan Center has done a
13  number of studies about this sort thing, and that
14  information is on our website and in the material that
15  we provided you, and I'm not real good at remembering
16  numbers.
17      Q.   Sure.  Okay.  And can you identify any African
18  American Texans who lack the photo IDs required by
19  SB 14?
20      A.   No.
21      Q.   Okay.  Has the League conducted any studies on
22  the effect of SB 14 on African American voters?
23      A.   No.
24      Q.   Okay.  And have you conducted any surveys on
25  that effect on African American voters?

## 109

1    A.  No.
2    Q.  Okay.  Do you contend that SB 14 will have the
3  effect of denying or abridging Latino Texans' right to
4  vote?
5         MS. ROBERTSON:  Objection, calls for a
6  legal conclusion.
7    A.  Yes.
8    Q.  (By Mr. McKenzie) And what is the basis for
9  that contention?
10   A.  The same as the basis was for African
11  Americans.
12   Q.  Okay.  And do you know how many Latino Texans
13  lack the IDs that are required under SB 14?
14   A.  No, I do not.
15   Q.  Can you identify any Latino voters who don't
16  have these IDs?
17   A.  No.
18   Q.  Okay.  And do you contend that Asian American
19  voters will be adversely affected by SB 14 at a higher
20  rate than other racial, ethnic, or language minority
21  groups?
22         MS. ROBERTSON:  Objection, calls for a
23  legal conclusion.
24   A.  The studies I have seen indicate that Asian
25  Americans would be affected.  I am not sure whether it

## 110

1  would be more highly affected than Blacks and Latinos.
2  There's some statistics in one of those documents that
3  we sent to DOJ that addresses that.  I don't remember
4  the numbers.
5    Q.  (By Mr. McKenzie) Okay.  So you don't know the
6  number, then, of voters --
7    A.  No.
8    Q.  -- registered Asian voters in Texas who lack
9  the photo IDs required under SB 14; is that right?
10   A.  No.
11   Q.  Okay.  And do you know any Asian American
12  voters in Texas who lack the required photo IDs under
13  SB 14?
14   A.  No.
15   Q.  And I may have asked this.  I apologize, but I
16  haven't been checking off my outline properly.  But what
17  is basis of your belief that African Americans will be
18  adversely affected?
19   A.  It's this issue of statistics that show us that
20  there are more minorities, including African Americans,
21  that live below the poverty line and that persons below
22  the poverty line are less likely to have the required
23  documents that we're talking about for SB 14.
24   Q.  And are those the same studies and surveys you
25  have cited in response to the question about -- the

## 111

1  questions about African American voters and Latino
2  voters?
3    A.  Yes.
4    Q.  Okay.  And have you produced all those studies
5  to us?
6    A.  They are publicly available.  We have talked
7  about them in the -- in the documents to DOJ.
8    Q.  Okay.  Are you familiar with the polls
9  regarding support for voter ID legislation?
10   A.  Yes, I am.
11   Q.  And are you aware of polls showing that the
12  majority of Texans support a photographic ID requirement
13  to vote regardless of political affiliation?
14   A.  Yes, I am.
15   Q.  And are you aware of polls showing that the
16  majority of Texans support a photographic ID requirement
17  to vote regardless of race?
18   A.  Yes.
19   Q.  Okay.  Are you aware of polls showing that the
20  majority of Texans support a photographic ID requirement
21  to vote regardless of language minority status?
22   A.  I don't remember a poll that specifically
23  addressed the language minority issue.
24   Q.  Okay.
25   A.  That was probably true of the previous

## 112

1  question, too.  I don't remember a poll that
2  particularly addressed minorities at all in the poll.
3  It may have done, but I don't recall that.
4    Q.  Okay.  That's good to know.
5         And this is a threshold, but you don't
6  ever have to speculate.  If you don't know the answer,
7  you can just say "I don't know."  When I offer a
8  hypothetical question, as long as I produce sufficient
9  facts to answer it, then I'd ask that you answer it.
10  But as far as questions where I ask about a past fact or
11  an existing fact and you just don't know the answer, you
12  can just say, "I don't know."
13        Do you believe that elderly voters are
14  more likely than the average voter to lack a form of
15  identification required by SB 14?
16   A.  Yes.
17   Q.  Do you believe that indigent voters are more
18  likely than the average voter to lack a form of
19  identification required by SB 14?
20   A.  Yes.
21   Q.  Do you believe that disabled voters are more
22  likely than the average voter to lack a form of ID
23  required by SB 14?
24   A.  Yes.
25   Q.  Do you believe that rural voters are more